# EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

THE CHARITABLE DONOR
ADVISED FUND, L.P., and CLO
HOLDCO, LTD.,

     *Plaintiffs*,

v.

U.S. BANK NATIONAL
ASSOCIATION, MOODY'S
INVESTORS SERVICE, INC., ACIS
CAPITAL MANAGEMENT, L.P., AND
BRIGADE CAPITAL MANAGEMENT,
LP, AND JOSHUA N. TERRY

     *Defendants*.

CASE NO.: <u>1:20-cv-1036</u>

**PLAINTIFFS' ORIGINAL COMPLAINT
AND JURY DEMAND**

TO THE HONORABLE COURT:

Plaintiffs The Charitable Donor Advised Fund, L.P., a charitable partnership whose charitable non-profit beneficiaries include the Dallas Foundation, the Greater Kansas City Community Foundation, the Santa Barbara Foundation and the North Texas Community Foundation, and CLO HoldCo, Ltd. (collectively, "Plaintiffs" or "The Charitable DAF"), by and through their attorneys of record, file this Original Complaint against Defendants U.S. Bank National Association ("U.S. Bank"), Moody's Investors Service, Inc. ("Moody's"), ACIS Capital Management, L.P. ("ACM" or "Acis"), and Brigade Capital Management, LP ("Brigade"), and Joshua N. Terry ("Terry"), and in support thereof, respectfully states and alleges as follows:

<u>**NATURE OF LAWSUIT**</u>

The Charitable DAF files this lawsuit to enforce and protect its rights as an investor in certain collateralized loan obligations, or CLOs, that for at least ten months have been, and

continue to be, grossly and willfully mismanaged by their investment advisers: ACM, an entity owned and managed by Mr. Terry, and Brigade, whose CLO business is managed by Jared Worman.[1] Together, ACM and Brigade as Portfolio Manager, have severely mismanaged the Acis CLOs to the tune of several millions of dollars in actual losses, several million dollars in expected losses and exorbitant incurred expenses far in excess of anything seen elsewhere in the $600 billion CLO market. U.S. Bank, which serves as Trustee of the Acis CLOs, has impermissibly enabled this gross mismanagement, and in the process has severely violated The Charitable DAF's rights. The Charitable DAF is both the Holder of Secured Notes issued under certain ACIS Indentures, and an indirect Holder of equity interests under those same Indentures. In this capacity, The Charitable DAF possesses beneficial interests in the portfolio of collateral underlying the Acis CLOs and which the Portfolio Manager, enabled by U.S. Bank and Moody's, has willfully and self-servingly mismanaged and failed to protect.

Each of the Portfolio Manager's and U.S. Bank's wrongful and negligent conduct has severely compromised the value of The Charitable DAF's Secured Notes, decimated the credit profile of the Acis CLOs in their entirety, and caused The Charitable DAF to incur other extensive direct damages. This clear mismanagement has resulted in unprecedented losses not explained by market conditions, the extent of which is crystal clear: the equity tranches in the Acis CLOs at issue have lost material value (all fair market value at specified dates):

---

[1] Such CLOs, are referred to herein as the "Acis CLOs", of which ACM is the portfolio manager and to which Brigade provides sub-servicing and shared services. Together, ACM and Brigade are referred to herein as the "Portfolio Manager."

| Acis CLO | August 1, 2018 | February 20, 2019 | October 31, 2019 |
|----------|----------------|-------------------|------------------|
| Acis CLO 2014-5 | $36m | $18.1m | $11.2m |
| Acis CLO 2015-6 | $38.3m | $19m | $12m |
| Total | $74.3m | $37.1m | $23.2m |

To protect its rights, The Charitable DAF seeks four things through this lawsuit.

**First**, it seeks to recover the losses it sustained in connection with U.S. Bank's negligence and breach of its extra-contractual duties to The Charitable DAF, including the duties to perform all basic, non-discretionary, ministerial tasks with due care, and to avoid conflicts of interest.

**Second**, it seeks judicial intervention to protect its interests before U.S. Bank commits or facilitates any further wrongful conduct. The Charitable DAF cannot allow U.S. Bank to continue to shirk its duties as Indenture Trustee.

**Third**, it seeks to recover the losses it sustained from the willful misconduct of the Portfolio Manager and its sub-adviser, whose gross negligence has decimated the value of The Charitable DAF's investment, and whose rampant conflicts of interest have destroyed the value of The Charitable DAF's investment. The Portfolio Manager's conduct has caused The Charitable DAF to sustain direct damages.

**Fourth**, it seeks to protect the value of its investment by requiring Moody's, as a ratings provider to the Acis CLOs, to accurately, and in accordance with market precedent and practice, communicate to the market the truth about the Portfolio's Managers' and Indenture Trustee's willful violation of the requirements of the Indentures and the PMA that Moody's has been on notice of since at least August 2019. The market deserves the truth about the extensive conflicts

of interests, skewed incentives and complete lack of accountability exhibited by each of Acis, Brigade and the Indenture Trustee.

## PARTIES

1.      Plaintiff The Charitable Donor Advised Fund, L.P. is a limited partnership, with its principal place of business at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.  The Charitable DAF is both a Secured Noteholder and an indirect holder of equity interests under the Acis CLOs discussed in this Complaint.

2.      Plaintiff CLO HoldCo, Ltd. ("CLO HoldCo"), a Cayman Islands exempted company, possesses assets of Plaintiff The Charitable Donor Advised Fund, L.P. CLO HoldCo's principal place of business is 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.  CLO HoldCo is both a Secured Noteholder and an indirect holder of equity interests under the Acis CLOs discussed in this Complaint.

3.      Defendant U.S. Bank National Association (the "Indenture Trustee" or "Trustee") is a national banking association that is Trustee of the ACIS Indentures, as defined further herein. Pursuant to the ACIS Indentures, Defendant U.S. Bank may be served at its corporate office located at 190 South LaSalle Street, 8th Floor, Chicago, IL 60603.

4.      Defendant Moody's Investors Service, Inc., is a Delaware corporation registered to do business in New York State. Moody's may be served through its registered agent CT Corporation System, located at 28 Liberty Street, New York, New York 10005. Moody's is a nationally recognized statistical rating organization ("NRSRO").

5.     Defendant ACIS Capital Management, L.P. ("ACM") is a Delaware limited partnership.  ACM may be served through its registered agent Capitol Services, Inc., located at 1675 S. State Street Suite B, Dover, Delaware 19901.

6.     Defendant Brigade Capital Management, LP is a Delaware limited partnership that is registered to do business in New York.  Brigade may be served through  Donald E. Morgan III, 399 Park Avenue, 16th  Floor, New York, New York, 10022. Brigade is a registered investment advisor.

7.     Joshua N. Terry ("Mr. Terry") is an individual resident of Texas located at 3509 Princeton Avenue, Dallas, Texas 75205 who may be personally served wherever he may be found. Mr. Terry is the owner and President of ACM.

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between a citizen of a State and a citizens of a foreign state.

9.     Jurisdiction and venue over Moody's are proper in this District because Moody's is registered to do business in New York, and the transactions and occurrences that are the subject of The Charitable DAF's claims against Moody's took place in New York, New York.

10.     Jurisdiction and venue over ACM are proper in this District because ACM is registered to do business in New York, and the transactions and occurrences that are the subject of The Charitable DAF's claims against ACM, including certain trading activity with brokers or dealers,  took place in New York, New York.

11.     Jurisdiction and venue over Brigade are proper in this District because Brigade is registered to do business in New York, and the transactions and occurrences that are the subject of

The Charitable DAF's claims against Brigade, including certain trading activity with brokers or dealers, took place in New York, New York.

12.　　Jurisdiction and venue over U.S. Bank are proper in this District because, pursuant to Section 14.10 of the ACIS Indentures, as defined further herein, each party to such indentures, including U.S. Bank:

> [H]ereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of . . . the United States District Court of the Southern District of New York . . . in any action or proceeding arising out of or relating to the notes or th[ese] indenture[s] . . .

13.　　Venue is also proper because U.S. Bank waived any objection to venue in this District under the ACIS Indentures, as defined further herein. Section 14.10 specifically provides that:

> Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to th[ese] indenture[s] in any court referred to in the previous paragraph. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

14.　　New York law governs the claims in this lawsuit.

## STATEMENT OF FACTS

**A. The Charitable DAF is a Secured Noteholder under a set of collateralized loan obligations to which U.S. Bank serves as Trustee, and ACM and Brigade serve as Portfolio Managers.**

15.　　Between 2014 and 2015, The Charitable DAF became a Secured Noteholder and beneficiary under three CLOs and associated indentures: (i) the Indenture dated November 18, 2014 among ACIS CLO 2014-5 LTD., as Issuer, ACIS CLO 2014-5 LLC, as Co-Issuer, and U.S. Bank as Trustee ("Indenture 5"); and (ii) the Indenture dated April 16, 2015 among ACIS CLO

2015-6 LTD., as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and U.S. Bank as Trustee ("Indenture 6" together with Indenture 5, the "ACIS Indentures").[2]

16.     U.S. Bank agreed to serve as the Trustee for these ACIS Indentures, and ACM as the Portfolio Manager.

17.     The ACIS Indentures impose a number of obligations on U.S. Bank in connection with its role as Trustee, and a separate set of agreements, the Portfolio Management Agreements ("PMAs"), impose obligations on ACM in connection with its role as Portfolio Manager. ACM, as a result of it having no employees or wherewithal to manage the Acis CLOs itself, retained Brigade to assist it in providing these portfolio management services, with Mr. Terry.

18.     Mr. Terry is President of ACM, an entity which he also owns.

> **i.     The ACIS Indentures require that each of U.S. Bank, ACM and Brigade ensure that new investments satisfy certain criteria, and that U.S. Bank not accept any plan that would affect the rights of Secured Noteholders.**

19.     *First,* the ACIS Indentures provide that U.S. Bank shall hold in trust, for the "benefit and security" of the Noteholders, all "Collateral Obligations" that secure the Co-Issuers' financial obligations to the Noteholders.  In connection therewith, the ACIS Indentures also provide that, for future purchases and sales of collateral obligations, the Portfolio Manager and the Trustee shall only consummate these transactions where certain investment criteria are satisfied. One such criterion is that, for all purchases, either (A) each requirement or test, as the case may be, of the Concentration Limitations and the Collateral Quality Test will be satisfied, or (B) if any such requirement or test was not satisfied immediately prior to such reinvestment, such requirement or test will be maintained or improved after giving effect to the reinvestment.  *See, e.g.*, Indenture 5 § 12.2(a)(iv).  The ACIS Indentures define "Collateral Quality Test" as:

---

[2] The CLOs subject of the Acis Indentures are referred to herein as the Acis CLOs.

A test satisfied if, as of any date of determination . . . in the aggregate, the Collateral Obligations owned (or, for purposes of *pro forma* calculations in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer satisfy . . . the Maximum Moody's Rating Factor Test . . . [and the] Weighted Average Life Test.

*Id.* at 14.

20.     These tests are defined, in turn, as follows:

"Maximum Moody's Rating Factor Test": The test that will be satisfied on any date of determination if the Weighted Average Adjusted Moody's Rating Factor[3] of the Collateral Obligations is less than or equal to the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Moody's Asset Quality Matrix, based upon the applicable "row/column combination" chosen by the Portfolio Manager with notice to the Collateral Administrator . . . plus the Rating Factor Adjustment Amount.

"Weighted Average Life Test": A test that is satisfied if the Aggregate Weighted Average Life[4] on such date of determination is not later than November 18, 2022.

*See, e.g.*, Indenture 5 at 37-38, 64.

---

[3] "Weighted Average Adjusted Moody's Rating Factor" means "[a]s of any date of determination, a number equal to the Weighted Average Moody's Rating Factor determined in the following manner: for purposes of this definition, the last paragraph of the definition of "Moody's Default Probability Rating," the second to last paragraph of the definition of "Moody's Rating" and the last paragraph of the definition of "Moody's Derived Rating" will be disregarded, and instead each applicable rating on credit watch by Moody's that is on (a) positive watch will be treated as having been upgraded by one rating subcategory, (b) negative watch will be treated as having been downgraded by two rating subcategories and (c) negative outlook will be treated as having been downgraded by one rating subcategory. *See, e.g.*, Indenture 5 at 64-65.

"Weighted Average Moody's Rating Factor" means "[t]he number (rounded up to the nearest whole number) equal to: (i) the sum of the products of (a) the Principal Balance of each Collateral Obligation (excluding Equity Securities) multiplied by (b) the Moody's Rating Factor of such Collateral Obligation, divided by (ii) the Aggregate Principal Balance of all such Collateral Obligations." *Id.*

[4] "Aggregate Weighted Average Life" means "[w]ith respect to all Collateral Obligations as of any date of determination is a date equal to (a) the number of years following such date obtained by (i) *summing* the products obtained by *multiplying* the Weighted Average Life at such time of each Collateral Obligation *by* the Principal Balance at such time of such Collateral Obligation and (ii) *dividing* such sum *by* the Aggregate Principal Balance at such tie of all Collateral Obligations *plus* (B) such date of determination. *Id.* at 6.

---

21.     These provisions seek to maintain the integrity and performance of the portfolio of collateral securing the Co-Issuers' obligations by requiring certain parties, including the Portfolio Managers and the Trustee, to ensure that any purchase or sale of such collateral complies with detailed, industry-recognized, and bargained-for tests – the exact investor protections that The Charitable DAF relied on when it invested in the Acis CLOs.

22.     ***Second***, the ACIS Indentures provide that, in performing its duties as Trustee, U.S. Bank may not "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, any plan of reorganization, arrangement, adjustment or composition affecting the Secured Notes or any Holder thereof".  Similar to the provisions concerning collateral quality, these provisions also seek to ensure that the Trustee does not prejudice the rights of any secured Noteholder under the ACIS Indentures, such as The Charitable DAF.

23.     Finally, in addition to requiring that U.S. Bank observe certain safeguards, the ACIS Indentures also grant U.S. Bank the broad power to "execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, nominees, custodians, or attorneys."

24.     The foregoing contractual provisions provide context for U.S. Bank's role as Trustee, and of the Trustee's relationship with the Portfolio Manager. As Trustee, U.S. Bank is obligated to perform a number of extra-contractual duties for Noteholders, such as The Charitable DAF, including the duties to perform all basic non-discretionary, ministerial tasks with due care, and to avoid conflicts of interest. U.S. Bank's failure to satisfy the extra-contractual duties that it owes to The Charitable DAF is the focus of The Charitable DAF's claims against U.S. Bank in this lawsuit, discussed in further detail below.

**B.** *ACM supervises and directs the investment and reinvestment of the ACIS Indentures' assets, in addition to providing other services delegated to ACM as portfolio manager.*

25. At the same time that the issuers executed the ACIS Indentures with U.S. Bank, they also executed portfolio management agreements with ACM, which at the time was sub-advised by Highland Capital Management, LP. Specifically, ACIS CLO 2014-5 LTD., as issuer, executed a portfolio management agreement for Indenture 5 with ACM, as portfolio manager, on November 18, 2014 ("PMA 5"); and ACIS CLO 2015-6 LTD., as issuer, executed a portfolio management agreement for Indenture 6 with ACM, as portfolio manager, on April 16, 2015 ("PMA 6" together with PMA 5, the "PMAs").

26. Notably, in connection with the 2018 bankruptcy of ACM and its emergence in February 2019, the management of the Acis CLOs was transferred to Messrs. Terry and Worman, through their respective firms ACM and Brigade. Such bankruptcy case is described in further detail below.

27. In general, the PMAs provide that, subject to the terms of the ACIS Indentures, ACM is obligated to "supervise and direct the investment and reinvestment of the Assets" and to "monitor the Assets". Furthermore, in so doing, ACM must "comply with all [applicable] terms and conditions of the [ACIS Indentures]" and "perform its obligations . . . in good faith and with reasonable care". The applicable "terms and conditions of" the ACIS Indentures include an obligation to ensure compliance with the collateral quality tests described above.

28. The PMAs hold ACM liable for its acts or omissions, including acting in bad faith, willful misconduct, gross negligence, or reckless disregard in the performance of its obligations under the ACIS Indentures.

29.     As Portfolio Manager, ACM, through Mr. Terry and sub-advisor Brigade, were aware that in that capacity, they performed services for the Acis CLOs for a particular purpose.

30.     Likewise, the Portfolio Manager had further awareness that Secured Noteholders and Holders of indirect equity interests under the Acis CLOs, like The Charitable DAF, relied on ACM and Brigade to perform services in furtherance of their particular purpose of managing the portfolio of the Acis CLOs.

31.     The Portfolio Manager understood that Noteholders and equity interest Holders under the Acis CLOs, including The Charitable DAF, relied on the Portfolio Manager to perform services in furtherance of their particular purpose of managing the portfolio of the Acis CLOs.

32.     Despite extra-contractual duties that the Portfolio Manager owes to The Charitable DAF as Secured Noteholders and Holders of indirect equity interests under the Acis CLOs, and in furtherance of clear and impermissible conflicts of interest, from February 20, 2019 to the present, the Portfolio Manager has caused the ACIS Indentures to incur astronomically unprecedented expenses well outside historical expense patterns in the Acis CLOs and very clearly outside market and industry norms, as discussed in more detail below.

*i.*     ***Brigade is the Sub-Advisor and Shared Services Provider to ACM, and acts as ACM's agent.***

33.     As part of a jointly administered bankruptcy proceeding under case number 18-30264-SGJ-11 (the "Bankruptcy Proceeding"), in which Mr. Terry became 100% owner of ACM (as well as its President and owner of its general partner),[5] the United States Bankruptcy Court for the Northern District of Texas, formally approved ACM's appointment of Brigade as Sub-Advisor

---

[5] The two case numbers in the consolidated Bankruptcy Proceeding include case numbers 18-30264-SGJ-11 and 18-30265-SGJ-11.

and Shared Services Provider to ACM in connection with ACM's management of the ACIS CLOs. Brigade has provided these critical services at all pertinent times (to wit, from February 16, 2019 to the date of filing of this Complaint).

34.     Of note, although Mr. Terry effectively approves all trading activity for the ACIS CLOs, Mr. Terry and ACM have no executive level employees aside from Mr. Terry, upon information and belief, nor wherewithal to themselves effectively manage the investment vehicles. As President and owner of ACM, Mr. Terry exercises complete domination over ACM. With no chain of command besides himself, as ACM, Mr. Terry only answers to himself.

35.     Upon information and belief, other than Mr. Terry's experience in the CLO industry, about which Mr. Terry gave extensive testimony in the Bankruptcy Proceeding in connection with seeking approval of a plan of reorganization and upon which Secured Noteholders in the Acis CLOs have relied, aside from Mr. Terry, ACM has no other executive level employees or other capability to itself provide sufficient portfolio management services to the Acis CLOs.

36.     Succinctly, Mr. Terry needed help managing the Acis CLOs, and he retained Brigade to provide, among other services, back-and middle-office functions, including, but not limited to, accounting, payments, operations, technology, and finance, in connection with ACM's obligations under the PMAs. He also employed Brigade to provide assistance relating to the negotiation and execution of any documents necessary to acquire or dispose of an asset under the PMAs.

37.     As an agent of ACM and subject at all times to Mr. Terry's approval, Mr. Worman's team at Brigade has purchased well over $300 million in loans for the Acis CLOs, in addition to engaging in other conduct directly related to the portfolio management of the Acis CLOs.

38.     In addition to executing the purchase of loans, as an agent of ACM and Mr. Terry, Mr. Worman's team at Brigade has provided several services to ACM in connection with the portfolio management of the Acis CLOs, including the provision of sub-advisory and shared services.

39.     During the Bankruptcy Proceedings, in connection with confirmation of Acis' plan of reorganization, Mr. Worman gave extensive testimony describing Brigade's expertise and competencies, including compliance support for the Acis CLOs, in addition to other tasks, such as day-to-day portfolio management, including but not limited to identifying trades due, executing on those trades.

40.     Further, Mr. Terry has delegated certain tasks related to the Acis CLOs to Brigade, including, but not limited to research services as needed, and modeling of ratings, default, and price scenarios as needed. In providing these critical portfolio management services for the ACIS CLOs, Brigade works directly with Terry, and is under Terry's direction and control. Mr. Terry testified in the Acis Bankruptcy proceedings that this was the intention.

41.     Given Brigade's extensive level of involvement of the portfolio management of the CLOs, under Mr. Worman's direction, Brigade's and Worman's conduct, and by extension ACM's through Mr. Terry's direction and control, severely and adversely impacts the collateral portfolios in which The Charitable DAF owns as a Secured Noteholder and as the indirect Holder of equity interests under the Acis CLOs.

42.     As of February 20, 2019 (and also prior to ACM's emergence from bankruptcy), Brigade has charged ACM fifteen basis points on total ACIS CLO assets under management for these portfolio management services, a fee which Brigade has represented it negotiated in good faith with ACM.

43.     As discussed in more detail below, none of Mr. Terry, ACM, Mr. Worman nor Brigade has complied with the duties set forth in the PMAs, and the loans it acquired and the expenses incurred have left the Acis CLOs credit profile severely deteriorated and without sufficient interest income to make distributions to its equity holders.

**C.  U.S. Bank must satisfy extra-contractual obligations owed to The Charitable DAF.**

44.     U.S. Bank must satisfy certain extra-contractual obligations in connection with its role as Trustee, and the broad powers associated therewith.  These pre-default extra-contractual obligations include the duty to perform all basic, non-discretionary, ministerial tasks with due care, and to avoid conflicts of interest.

45.     For example, U.S. Bank was required to perform all basic, non-discretionary, ministerial tasks with due care, including, but not limited to, the following extra-contractual tasks: reserving Noteholder rights impacted by active litigation, such as bankruptcy proceedings; exercising due care in connection with the payment of expenses; collecting and distributing the interest and dividends due on the portfolio securities; and  providing Noteholders with periodic reports concerning the interest received, amounts distributed and securities in the portfolio.

46.     Notably, no provisions of the ACIS Indentures "shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct".

**D.  U.S. Bank fails to reserve or otherwise protect The Charitable DAF's rights in connection with bankruptcy proceedings.**

47.     The Charitable DAF's rights as a Secured Noteholder under the ACIS Indentures have been compromised by certain proceedings and judicial rulings in the Bankruptcy Proceeding consolidated Chapter 11 bankruptcy proceeding, and related adversary proceeding.

48.     On July 29, 2018, the Chapter 11 Trustee in the Bankruptcy Proceeding filed a First Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management, GP, LLC (the "First Amended Plan").

49.     The First Amended Plan provided for certain amendments to the ACIS Indentures that would be effected through a certain Plan B and Plan C. These proposals concerned, among other things, re-writing the ACIS Indentures to protect Acis' management fee stream for several years.

50.     In full recognition that the First Amended Plan encroached on the rights of Noteholders under the Acis CLOs like The Charitable DAF, the Trustee filed a Reservation of Rights and Limited Objections to the First Amended Plan in the Bankruptcy Proceeding. The Trustee took prompt measures to protect noteholder rights, filing these pleadings only fifteen days after the filing of the First Amended Plan.

51.     Among other infringements on the rights of Noteholders under the ACIS Indentures, the Trustee explained that: "In other words, both Plan B and Plan C purport to ignore the express terms of the Indenture and the rights of the Noteholders with respect to amending the Indenture."[6]

52.     On January 31, 2019, a Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC was entered in the Bankruptcy Proceeding ("Plan D").

53.     Like Plan B and C, Plan D also substantially impacted the rights of Noteholders under the ACIS Indentures, including The Charitable DAF.

---

[6] *See* Bankruptcy Proceeding, case number 18-30264-SGJ-11 at Dkt. Nos. 500, 501, and 500; *see id.* at Dkt. No. 505.

54.     In addition to other restrictions, Plan D impedes the ability of noteholders under the ACIS Indentures to make optional redemptions, which restriction has decimated the value of such investments across the capital stack of each CLO covered by the ACIS Indentures.

55.     Moreover, Plan D conflicts with the express terms of the ACIS Indentures. Specifically, the ACIS Indentures do not permit U.S. Bank to "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, **any plan** of reorganization, arrangement, adjustment or composition **affecting the Secured Notes or any Holder thereof**". (emphases added).

56.     Tellingly, in its Reservation of Rights filed in 2018, U.S. Bank acknowledged that the specific plans "adversely affect[ed] the rights of Noteholders."[7]  The same holds true for Plan D.

57.     Notwithstanding its ability to do so, U.S. Bank did not reserve any Noteholders' rights, or otherwise object to the entry of Plan D.

58.     Instead, as noted by the court's ruling approving confirmation of Plan D on January 31, 2019, "[t]he indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases **and is not currently objecting to the Plan**."[8] (emphasis added).

59.     U.S. Bank's election to take no action regarding the entry of Plan D amplified the exposure of The Charitable DAF and the overall risk that it faces during the pendency of the Plan D injunction. Though U.S. Bank has a duty to avoid conflicts of interest, its election to take no action regarding the entry of Plan D underscores the Trustee's self-serving conduct.

---

[7] *See e.g.,* Bankruptcy Proceeding at Dkt. No. 505 ¶ 3; *see also,* Bankruptcy Proceeding at Dkt. Nos. 499-505
[8] *See e.g.,* Bankruptcy Proceeding, case number 18-30264-SGJ-11 at Dkt. No. 827 p. 5.

60.    U.S. Bank is not excused from failing to protect The Charitable DAF's rights affected by Plan D or by the Bankruptcy Proceeding generally.

**E.   Mr. Terry and ACM, as Portfolio Manager, with the assistance of Mr. Worman's team at Brigade and enabled by U.S. Bank, willfully orchestrate an extensive series of collateral trades that fail to satisfy the collateral quality tests and instead deteriorate the ACIS CLOs' credit profile to the detriment of The Charitable DAF and all investors.**

61.    As set forth above, U.S. Bank and the Portfolio Manager must ensure that every purchase made under the ACIS Indentures satisfies the collateral quality tests, including the Weighted Average Life Test ("WAL test") and the Minimum Weighted Average Moody's Recovery Rate Test ("WAM test"), or maintains or improves any failing collateral quality tests. They failed to satisfy these obligations in at least two ways.

62.    *First*, U.S. Bank and the Portfolio Manager effectuated or facilitated certain transactions that did not satisfy the WAL test or maintain or improve such failing WAL test. Specifically, they made multiple same-day trades and consolidated the weighted average maturity date for these trades.  In so doing, they created the false appearance of a maintained or improved WAL test.  Absent this consolidation, the same-day purchases could not have maintained or improved the failing WAL tests on individual bases.

63.    The value destruction of this forced "bunched trading" is clear when one compares the prices at trade date against the prices from the previous day.  For example:

| CLO | Trade | Issuer | Commitment | Date | Trade Px | Day Before | Close Mid Price | 2 Day Before | Close Mid Price | Change | P&L |
|-----|-------|--------|-----------|------|----------|-----------|----------------|--------------|----------------|--------|-----|
| CLO 6 | Purchase | Diebold Inc - Diebold DD T/L A | 1,578,541.42 | 3/26/2019 | 99.00 | 3/25/2019 | 95.50 | 3/22/2019 | 95.5 | -3.50 | (55,248.95) |
| CLO 5 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 6 | Purchase | Team Health Holdings Inc - Team Health Holdings T/L | 1,279,236.64 | 3/26/2019 | 88.50 | 3/25/2019 | 86.13 | 3/22/2019 | 86.9375 | -2.38 | (30,381.87) |

64.     What is more, this artificial trading philosophy, disguised as "responsible management," has resulted in myriad poorly conceived and timed buys, which positions have plummeted, destroying value for the investors.  For example:

| Issuer | Buy/Sell | 1st Purchase Date | Last Purchase Date | LoanX ID | Sum of 1/14/20 P&L | Cost | 11/8/2019 Mark |
|---|---|---|---|---|---|---|---|
| Chief Power | Buy | 3/13/2019 | 3/26/2019 | LX142450 | (2,966,283.06) | 95.41 | 51.50 |
| Peak 10 | Buy | 9/27/2018 | 3/19/2019 | LX167187 | (1,198,856.69) | 95.58 | 85.63 |
| KCA Deutag UK Finance PL | Buy | 4/22/2019 | 5/23/2019 | LX172320 | (1,723,142.31) | 84.89 | 65.58 |
| Envision Healthcare | Buy | 4/3/2018 | 6/18/2019 | LX175867 | (1,103,425.06) | 94.14 | 886.26 |

65.     Mr. Terry and ACM, with the assistance of Mr. Worman's team at Brigade, enabled by U.S. Bank as indenture trustee, have continued this blatant trading misconduct. As recently as November 15, 2019, the Portfolio Manager and U.S. Bank effectuated multiple improper same day trades which fail to meet the applicable collateral quality standards, in further reckless disregard of the portfolio management obligations that bind the Portfolio Manager and U.S. Bank, discussed herein.

66.     The transaction history of the ACIS Indentures makes clear that each of Mr. Terry, ACM, Mr. Worman's team at Brigade and U.S. Bank appreciate the import of trading on specific days.  In connection with one such indenture, these defendants authorized the purchase of a term loan in Capital Automotive 1st Lien with a maturity date of March 25, 2024.  But, to maintain or improve the WAL test for this indenture, they should have required the CLOs to purchase assets with a maturity date of April 4, 2023 or earlier. They committed or facilitated similar misconduct across the ACIS Indentures.

67. **Second**, the Weighted Average Moody's Rating Factor ("WARF") a factor on which the WAM test turns, has steadily increased this year for each portfolio of the ACIS Indentures.

68. Since the entry of Plan D, under ACM's and Brigade's "management" of the ACIS Indentures, U.S. Bank has impermissibly enabled the collective WARF of the portfolios to become one of the dirtiest pools in the market in a matter of months. Specifically, as of October 2019 and through December 20,219, the WARF of each such indenture has dramatically worsened, as follows:

CLO 5:  2673 ⟶ 3004 ⟶ 3200
CLO 6:  2627 ⟶ 2917 ⟶ 3074

69. Against the backdrop of malfeasance, it is important to note that the Acis CLO portfolios and its investors including The Charitable DAF, had original risk/ratings expectations based on an average life that would shrink materially as modeled now that the reinvestment period of the Acis CLOs ended.

70. Moreover, and in contrast to Mr. Terry's and ACM's management, prepayments would lower the risk of the Acis CLO notes, including those held by The Charitable DAF, by paying off senior lower-cost debt (for example, at the AAA tranche of the respective CLO). The benefit would be realized at the junior tranches and the equity as holders would receive less-levered, lower interest payments but those investors' residual principal value would have more certainty. By keeping the average life extended and avoiding prepayments: (1) risk increases, (2) residual principal value falls, and (3) interest to equity holders theoretically continues for an artificially longer period.

71.     Mr. Terry's and ACM's management thus kills the equity's residual principal recoveries while impairing and extending the duration of the debt. It is clear that the ACIS CLOs' original model and duration and risk expectation was that it would be half of what it is today but for the mismanagement by Mr. Terry and ACM, with the help of Mr. Worman's team at Brigade and enabled by U.S. Bank. And this mismanagement can be shown through the clear diminution in value at the equity tranches of the ACIS CLOs over 2019, which valuation takes into account the "health" of the overall portfolio in each such deal (in which The Charitable DAF is indirectly an investor through a different investment vehicle) (all of the below are third-party valuations on a mark-to-market methodology):

| Valuation at | Acis 5 | Acis 6 |
|---|---|---|
| 1/31/2019 | 34.25 | 36.50 |
| 4/30/2019 | 31.75 | 35.00 |
| 7/31/2019 | 29.50 | 29.92 |
| 10/31/2019 | 21.25 | 23.17 |

**F.   U.S. Bank and the Portfolio Manager's conduct has damaged The Charitable DAF substantially.**

72.     The conduct described above has resulted in myriad damage to The Charitable DAF, including, but not limited to, the following.

73.     The collective failure by each of Mr. Terry and ACM, with the assistance of Mr. Worman's team at Brigade, as well as U.S. Bank as Indenture Trustee, to ensure that transactions under the ACIS Indentures comply with the collateral quality tests set forth therein constitute violations of the Defendants' extra-contractual obligations to The Charitable DAF, negligence,

and/or willful misconduct. By committing or facilitating extensive portfolio mismanagement, the Defendants have further violated their obligations to The Charitable DAF. These violations have compromised, among other things, the credit profile of the ACIS Indentures, and the value of The Charitable DAF's secured notes thereunder.

74.     Under its watch, since ACM has emerged from bankruptcy, Mr. Terry and ACM have caused the Acis CLOs to incur exorbitant and unprecedented administrative expenses. Indeed, as a result of the payment of uncharacteristically high expenses, equity holders under ACIS Indentures have received **zero** cash flows, an almost unprecedented situation that severely weakens the overall credit quality of the CLOs, which condition inures to the detriment of all the Secured Noteholders, including The Charitable DAF.  The Charitable DAF has summarized these expenses in the following table:

| *Expenses Paid in 2019* | | | |
|---|---|---|---|
| Date | A5 | A6 | Total |
| 5/1/19 | 27,135 | 56,452 | 176,587 |
| 8/1/19 | 609,974 | 1,046,612 | 3,128,642 |
| 11/1/19 | 437,613 | 1,074,214 | 3,171,885 |
| Total | $ 1,074,722 | $2,177,278 | $ 6,477,114 |

75.     On or about November 4, 2019, certain Noteholders under the ACIS Indentures sent a letter to each of Mr. Terry, ACM and U.S. Bank regarding this misconduct. Among other things, Noteholders under the ACIS Indentures requested that each of ACM and U.S. Bank comply with a simple books and records request to provide a written statement setting forth in reasonable detail the Administrative Expenses and other costs and expenses identified in each of the Distribution Reports prepared and delivered pursuant to the Indentures for Payment Dates occurring through November 2019.  Highland CLO Funding, Ltd. ("HCLOF"), a Holder of

Subordinated Notes under certain of the ACIS Indentures and in which The Charitable DAF is a 49% investor, submitted a substantially similar books and records request to U.S. Bank on November 6, 2019. To date, neither of U.S. Bank nor the Portfolio Manager have provided any kind of accounting for these exorbitant fees or any other books and records response. The sheer magnitude of fees require a necessary inference that expenses unrelated to the Acis CLOs are being improperly reimbursed. This is a clear and actionable conflict of interest. Mr. Terry, one and the same as ACM, abused the privilege of doing business as ACM to perpetuate these wrongs.

76.     The request for an accounting described above, was made by similarly situated Noteholders to The Charitable DAF who also own Secured Notes under the Acis Indentures and/or are Holders of equity. As such, the Portfolio Manager, having received the request for an account, had an understanding that Noteholders like The Charitable DAF relied on the Portfolio Manager to perform particular services.

77.     Mr. Terry and ACM, Mr. Worman's team at Brigade, and U.S. Bank as Indenture Trustee owed a duty to The Charitable DAF to avoid conflicts of interest. They shirked these duties by, among other things, facilitating trades that did not comply with the collateral test in order to artificially maximize certain management fees. They shirked these duties by incurring unprecedented expenses that were close to twenty times the historical expense rate.

78.     Likewise, despite U.S. Bank's duty to avoid conflicts of interest, in failing to object or otherwise reserve **any** Noteholder rights impacted by Plan D, U.S. Bank further demonstrated its inability to prioritize or protect the rights of Noteholder The Charitable DAF.

### G. Moody's knowingly or recklessly published false ratings of the ACIS Indentures.

79.     Moody's is a nationally recognized statistical rating organization, or an NRSRO. As an NRSRO, Moody's "evaluate[s] a debt offering based on public, and sometimes nonpublic,

information regarding the assets of an issuer and assign[s] the debt offering a rating to convey information to a potential creditor/investor about the creditworthiness of the issuer's debt." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 164 (S.D.N.Y. 2009). This rating is important to issuers and investors because, among other things, a "[debt offering]'s success depends on the credit quality of the [underlying] assets," and "[i]f stable [assets] comprise the [debt offering], then []investors are much less likely to suffer a loss." *Id.* at 165; *see also In re Fitch, Inc.*, 330 F.3d 104, 106 (2d Cir. 2003) ("[Moody's] endorsement of a given security has regulatory significance, as many regulated institutional investors are limited in what types of securities they may invest based on the securities' NRSRO ratings.")

80.     Between June and November 2014, Moody's gave Indenture 5 a AAA rating. This is a top rating, and the "same as those usually assigned by the Rating Agencies to bonds backed by the full faith and credit of the United States Government, such as Treasury Bills." *Abu Dhabi Commercial Bank*, 651 F. Supp. 2d at 165. The rating is "commonly understood in the marketplace to [indicate an investment is] stable, secure, and safe." *Id.*

81.     Still, depending upon the circumstances, an NRSRO like Moody's can downgrade a particular rating to reflect new information. To that end, on August 6, 2019, certain ACIS Noteholders provided Moody's with written notice of U.S. Bank's misconduct, including its practice of bunched trading under the ACIS Indentures by effectuating multiple same day transactions that did not satisfy the WAL test or maintain or improve such failing WAL test.

82.     The same Noteholders provided Moody's with a supplemental notice of U.S. Bank's trading misconduct on September 13, 2019.

83.     Nevertheless, and since that time, Moody's has continued to publish false ratings of those assets.  Indeed, Moody's has continued to rate Indenture 5 as an AAA investment, notwithstanding its notice of the facts set forth in more detail above.

84.     This, in turn, has allowed U.S. Bank and the Portfolio Manager to continue disregarding their obligations under the ACIS Indentures, further compromising the value of the assets securing the Co-Issuers' obligations thereunder.  Moody's wrongful conduct has therefore diminished the equity that The Charitable DAF owns indirectly pursuant to the ACIS Indentures.

## COUNT I: BREACH OF THE DUTY TO PERFORM ALL BASIC, NON-DISCRETIONARY, MINISTERIAL TASKS WITH DUE CARE (AGAINST U.S. BANK)

85.     The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

86.     U.S. Bank has an extra-contractual duty to perform all basic, non-discretionary, ministerial tasks under the ACIS Indentures with due care. This duty subjects each of the foregoing to tort liability.

87.     U.S. Bank breached this duty in at least two ways.

88.     First, U.S. Bank breached this duty by permitting the ACIS Indentures to incur exorbitant expenses, which have diminished the equity that The Charitable DAF owns indirectly pursuant to the ACIS Indentures.

89.     Second, U.S. Bank breached its duty by negligently failing to act, and by accepting the entry of "Plan D" in the Bankruptcy Proceeding, which directly affects the secured Noteholders. Among other things, Plan D adversely impacts the rights of The Charitable DAF by imposing an injunction that prohibits beneficial trading activity, and impeding the ability of Noteholders to make optional redemptions.

90.     U.S. Bank's omission to act was not in good faith. In 2018, U.S. Bank filed multiple pleadings in the Bankruptcy Proceeding, including, but not limited to, a Reservation of Rights, and Limited Objections to the entry of the predecessor plans to Plan D. U.S. Bank failed to take any action whatsoever in regard to Plan D.

91.     These breaches were the proximate cause of damages to Charitable DAF.

92.     Based on investigation to date, such damages include, but are not limited to, The Charitable DAF's inability to make certain trades or redemptions, which restriction has decreased the value of The Charitable DAF's investment across the capital stack of each contract. They also include the diminished value of the collateral securing the issuer and co-issuer's financial obligations to The Charitable DAF. U.S. Bank's failure to reserve or otherwise protect The Charitable DAF's rights impacted by the Bankruptcy Proceeding has caused it to suffer damages.

## COUNT II: BREACH OF THE DUTY TO AVOID CONFLICTS OF INTEREST (AGAINST U.S. BANK)

93.     The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

94.     U.S. Bank has an extra-contractual duty to avoid conflicts of interest. This duty subjects each of such parties to tort liability.

95.     U.S. Bank is prohibited from advancing its own interests at the expense of its investor, The Charitable DAF.

96.     U.S. Bank breached this duty by, among other things, facilitating extensive portfolio mismanagement and failing to ensure compliance with the collateral quality tests in order to artificially maximize management fees. Such facilitation of noncompliant trades gives rise to an inference of bad faith.

97. U.S. Bank also breached this duty by allowing the ACIS Indentures to incur exorbitant fees which have diminished the equity that The Charitable DAF owns indirectly pursuant to the ACIS Indentures.

98. U.S. Bank's breaches were the proximate cause of damages to The Charitable DAF.

99. Based on investigation to date, such damages include, but are not limited to, the diminished value of the collateral securing the issuer and co-issuer's financial obligations to Charitable DAF.

100. U.S. Bank's breaches, set forth herein, have damaged The Charitable DAF in not less than $5,000,000.00.

## COUNT III: DEFAMATION (AGAINST MOODY'S)

101. The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

102. On August 6, 2019, certain Acis Noteholders provided Moody's with credible information regarding U.S. Bank's wrongful trading conduct and portfolio mismanagement, as described in more detail above. Since that date, Moody's has had actual or constructive notice of U.S. Bank's wrongful trading conduct.

103. Notwithstanding such notice, Moody's has continued to publish a false rating of AAA for Indenture 5 to investors.

104. Moody's published these ratings with knowledge of their falsity or with reckless disregard thereto.

105. In so doing, Moody's has caused The Charitable DAF to suffer special damages. Specifically, by continuing to provide an AAA rating for Indenture 5, Moody's has enabled U.S. Bank and the Portfolio Manager to compromise the value of the assets securing the co-issuer's

obligations under the ACIS Indentures.  Since August 2019, when Moody's first learned of U.S. Bank's misconduct, these assets have continued to decrease in value.

## COUNT IV: NEGLIGENCE (AGAINST ACM)

106.    The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

107.    ACM owed independent extra-contractual duties The Charitable DAF, including, but not limited to, the duty to preserve the equity interests that The Charitable DAF indirectly owns, and a duty to refrain from self-dealing. Among other things, ACM assumed obligations that affected The Charitable DAF's rights, and The Charitable DAF detrimentally relied on ACM's continued performance of such obligations.  Upon information and belief, ACM understood that The Charitable DAF relied on it to perform the foregoing duties.

108.    As set forth in more detail above, ACM breached its duty to The Charitable DAF by mismanaging the portfolio of the ACIS Indentures, and by failing to ensure that new trades complied with the collateral quality tests.

109.    The Charitable DAF has suffered direct damages as a proximate result of ACM's breach.

110.    Such damages include, but are not limited to, the diminished value of the collateral securing the issuer and co-issuer's financial obligations to The Charitable DAF.

## COUNT V: NEGLIGENCE (AGAINST BRIGADE)

111.    The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

112.    Brigade owed independent extra-contractual duties to The Charitable DAF, including, but not limited to the duty to preserve the equity interests that The Charitable DAF

indirectly owns. As ACM's agent, Brigade assumed obligations that affected The Charitable DAF's rights, and The Charitable DAF detrimentally relied on Brigade's continued performance of such obligations. Upon information and belief, Brigade understood that The Charitable DAF relied on it to perform the foregoing duties.

113. As set forth in more detail above, Brigade breached this duty by mismanaging the portfolio of the ACIS Indentures, and by failing to ensure that new trades complied with the collateral quality tests.

114. The Charitable DAF has suffered direct damages as a proximate result of Brigade's breach.

115. Such damages include, but are not limited to, the diminished value of the collateral securing the issuer and co-issuer's financial obligations to The Charitable DAF.

### COUNT VI: CONVERSION (AGAINST MR. TERRY AND ACM)

116. The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

117. The ACIS CLOs are obligated to pay specific and identifiable Administrative Expenses and other costs and expenses. The payment of these expenses is pulled from a reserve of specific and identifiable equity which includes funds belonging to The Charitable DAF as an indirect holder of equity interests under the Acis CLOs.

118. As a Secured Noteholder and indirect holder of equity interests under the Acis CLOs under the Acis CLOs, The Charitable DAF had ownership, possession or control over the property used to pay the Acis CLOs' Administrative Expenses and costs before the property's conversion.

119.     In allowing the payment of uncharacteristically high expenses upwards near twenty times their historical amount—Mr. Terry, upon information and belief, wrongfully and improperly reimbursed ACM, and potentially himself, using The Charitable DAF's property designated for the payment of the Acis CLOs' Administrative Expenses and costs.

120.     Upon information and belief, Mr. Terry and ACM exercised a wrongful and unauthorized dominion over The Charitable DAF's property designated for the payment of the Acis CLOs' Administrative Expenses and costs, to the alteration of its condition or to the exclusion of The Charitable DAF's rights.

121.     An action for the conversion of using The Charitable DAF's property designated for the payment of the Acis CLOs' Administrative Expenses and costs lies based on this conduct. The property at issue is a specific, identifiable fund that has an obligation to be returned or otherwise treated in a particular manner.

## COUNT VII: NEGLIGENCE (AGAINST MR. TERRY)

122.     The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

123.     Mr. Terry owed independent extra-contractual duties The Charitable DAF, including, but not limited to the duty to preserve the equity interests that The Charitable DAF indirectly owns, and a duty to refrain from self-dealing.  As ACM's owner and upon information and belief, ACM's sole executive level employee, Mr. Terry assumed obligations that affected The Charitable DAF's rights, and The Charitable DAF detrimentally relied on Mr. Terry's continued performance of such obligations. Upon information and belief, Mr. Terry as owner and President of ACM, understood that The Charitable DAF relied on it to perform the foregoing duties.

124.    As set forth in more detail above, Mr. Terry breached this duty by mismanaging the portfolio of the ACIS Indentures, and by failing to ensure that new trades complied with the collateral quality tests.

125.    Mr. Terry also breached the duties that he owes to The Charitable DAF by incurring unprecedented expenses of the Acis CLOs up to twenty times their historical expense rate.

126.    The Charitable DAF has suffered direct damages as a proximate result of Mr. Terry's breach.  For example, Mr. Terry's conduct related to the expenses of the Acis CLOs has caused damaged The Charitable DAF's equity residual principal recoveries, and impaired and extended the duration of The Charitable DAF's debt.

127.    In addition, Mr. Terry's conduct cause The Charitable DAF to sustain damages which include, but are not limited to, the diminished value of the collateral securing the issuer and co-issuer's financial obligations to The Charitable DAF.

## REQUEST TO PIERCE ACIS CAPITAL MANAGEMENT'S CORPORATE VEIL

128.    The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

129.    Mr. Terry has exercised complete domination over ACM.

130.    As described herein, Mr. Terry used such domination to commit a fraud or wrongs that injured the Charitable DAF. Mr. Terry abused the privilege of doing business as ACM to amass unprecedented expenses of the Acis CLOs up to twenty times the historical expense rate, among other wrongs.

131.    These expenses, coupled with ACM's refusal to provide the accounting requested by certain Noteholders under the ACIS Indentures, creates an inference of impropriety. Further,

the foregoing conduct raises an inference that expenses under the Acis CLOs are being improperly reimbursed.

132.    The circumstances described herein warrant the disregard of ACM's corporate form, in particular, because Courts in this District will disregard the corporate form when necessary to prevent fraud or to achieve equity.

133.    The Charitable DAF respectfully requests that the Court pierce the corporate veil of ACM such that ACM and Mr. Terry and jointly and severally liable for the wrongful conduct described herein.

## CONDITIONS PRECEDENT

134.    Pursuant to Federal Rule of Civil Procedure 9(c), Charitable DAF hereby pleads that all conditions precedent have occurred or been performed.  Although the ACIS Indentures contain "no-action" clauses that require certain noteholders to make written request to U.S. Bank to institute any judicial proceedings in its own name, the Second Circuit has held that noncompliance with a no-action provision is excused in a suit against the indenture trustee.  *See Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992) ("The district court held that the 'no action' clause applied only to the debenture holder suits against [the issuer], not the Indenture Trustees . . . This construction of [the limitation on suits provision] obviously is correct, as it would be absurd to require the debenture holders to ask the Trustee to sue itself.").

## DEMAND FOR ATTORNEYS' FEES

135.    Pursuant to Section 5.15 of the ACIS Indentures, Charitable DAF hereby makes a demand for the attorneys' fees and court costs it has sustained in bringing this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs The Charitable Donor Advised Fund, L.P. and CLO HoldCo, Ltd., respectfully requests that judgment be entered in its favor and against Defendants U.S. Bank, Moody's, ACM, and Brigade as follows:

A.      An award of damages sustained as a result of U.S. Bank National Association's activities in not less than $5,000,000.00;

B.      An award of damages sustained as a result of Moody's conduct in an amount to be determined at trial;

C.      An award of damages sustained as a result of ACM's conduct in an amount to be determined at trial;

D.      An award of damages sustained as a result of Brigade's conduct in an amount to be determined at trial;

E.      An award of reasonable attorneys' fees and court costs;

F.      An award of pre-judgment and post-judgment interest on all sums awarded; and

G.      For such other and further relief as the Court may deem just, equitable and appropriate.

DATED: February 6, 2020

Respectfully submitted,

*/s/ Michael K. Hurst*

Michael K. Hurst (*pro hac admission pending*)
Texas State Bar No. 10316310
mhurst@lynnllp.com
V. Chisara Ezie-Boncoeur
New York Bar No. 5333224
cezie-boncoeur@lynnllp.com
John R. Christian (*pro hac admission pending*)
Texas State Bar No. 24109727
jchristian@lynnllp.com
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
214-981-3800 – Telephone
214-981-3839 – Facsimile

**ATTORNEYS FOR THE CHARITABLE DONOR ADVISED FUND, L.P. AND CLO HOLDCO, LTD.**