# EXHIBIT L



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 7, 2021**

United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Adversary Proceeding No. |
| Plaintiff, | § | |
| | § | |
| vs. | § | Case No. 20-03190-sgj11 |
| | § | |
| JAMES D. DONDERO, | § | |
| Defendant. | § | |
| | § | |
| | § | |

---

### MEMORANDUM OPINION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION TO HOLD JAMES DONDERO IN CIVIL CONTEMPT OF COURT FOR ALLEGED VIOLATION OF TRO[2]

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] This Order addresses the Motion filed at DE # 48 in above-referenced Adversary Proceeding.

*You know, this is -- I hate to say it, but I feel like I've been in the role of a divorce judge today. We have very much a corporate divorce that has been in the works . . . and I'm a judge having to enter interim orders keeping one spouse away from the other, keeping one spouse out of the house, keeping one spouse away from the kids. It's not pleasant at all.*

Transcript from 1/8/21 Hearing at 194:1-9. [DE # 80, Exh. 36].

## I.    Introduction.

The above quote aptly describes the above-referenced 20-month-old corporate bankruptcy case:  it has, at times, become very much like a nasty divorce—in which one spouse (here, the company) is very much at odds with the other spouse (here, the company's former CEO).  It is contentious, protracted, and unpleasant.

For a while, things were a bit like a situation where one spouse has filed for divorce, but both spouses remain living under the same roof for a while—rather than physically separating—for the perceived best interests of the family. This co-habitation eventually became untenable.

Next, things developed similarly to a situation in which one spouse wants to keep the family vacation home, boat, or mutual funds (*i.e.*, the husband), but the other spouse (*i.e.,* the one who happens to have custody and control over them) thinks the assets need to be liquidated to pay off the family's expenses or debt.

Also, this corporate divorce, sadly, is similar to a situation in which one spouse criticizes the other's new partner who has moved into the family home and also bears animus towards the spouse's lawyers. He thinks they are, collectively, mismanaging everything and taking actions towards him out of pure spite.

It's also similar to a situation in which one spouse is endeavoring to have members of the other spouse's household assist or cooperate with him in various ways, in his efforts to get what he perceives to be his fair share in the divorce.

And, finally, it is similar to a situation in which one spouse finally decides to seek a TRO against the other—for fear (legitimate or not) that the ex-spouse is about to burn the house down.

There is a bit of irony in all of this because the spouse (*i.e.*, former CEO) who is the alleged antagonist is the one who signed the divorce (*i.e.*, bankruptcy) petition to start the proceedings.

Divorce metaphors aside, this Order relates to a request by Chapter 11 Debtor Highland Capital Management, L.P. (the "Debtor" or "Highland"), made shortly before its Chapter 11 plan was confirmed,[3] that its co-founder, former President, former Chief Executive Officer ("CEO"), and indirect beneficial equity owner—Mr. James Dondero ("Mr. Dondero")—be held in civil contempt of court for allegedly violating a temporary restraining order ("TRO") of this court.[4] The TRO that Mr. Dondero is alleged to have violated arose in the above-referenced adversary proceeding ("Adversary Proceeding") that the Debtor filed December 7, 2020. A brief summary of the circumstances leading up to the Adversary Proceeding and the TRO is set forth below.

---

[3] As of the date of issuance of this Order, the Debtor's confirmed plan has not yet gone effective.

[4] In addition to being the former CEO, Mr. Dondero represents that he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy. This court has stated on various occasions that this assertion is ostensibly true, but somewhat tenuous. Mr. Dondero filed five proofs of claim in the Debtor's bankruptcy case. Two of those proofs of claim were withdrawn with prejudice on November 23, 2020 [DE # 1460 in main bankruptcy case]. The other three are unliquidated, contingent claims, each of which stated that Mr. Dondero would "update his claim in the next ninety days." Ninety days has long-since passed since those proofs of claim were filed and Mr. Dondero has not updated those claims to this court's knowledge. With regard to Mr. Dondero's assertion that he is an "indirect equity security holder," the details have been represented to the court many times to be as follows (undisputed): Mr. Dondero holds no direct equity interest in the Debtor. Mr. Dondero instead owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner. Strand, however, holds only 0.25% of the total limited partnership interests in the Debtor through its ownership of Class A limited partnership interests. The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests. The Class A interests are also junior to all other claims filed against the Debtor. Finally, Mr. Dondero's recovery on his indirect equity interest is junior to any claims against Strand itself. Consequently, before Mr. Dondero can recover on his indirect equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be paid.

## II.     Background: The Chapter 11 Case.

On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Highland is a registered investment advisor that is in the business of buying, selling, and managing assets on behalf of its managed investment vehicles. It manages billions of dollars of assets—to be clear, the assets are spread out in numerous, separate fund vehicles. While the Debtor has continued to operate and manage its business as a debtor-in-possession, the role of Mr. Dondero *vis-à-vis* the Debtor was significantly limited early in the bankruptcy case and ultimately terminated. The Debtor's current CEO is an individual selected by the creditors named James P. Seery.

Specifically, early in the case, the Official Unsecured Creditors Committee ("UCC") and the U.S. Trustee ("UST") desired to have a Chapter 11 Trustee appointed—absent some major change in corporate governance[5]—due to conflicts of interest and the alleged self-serving, improper acts of Mr. Dondero and possibly other officers (for example, allegedly engaging, for years, in fraudulent schemes to put Highland's assets out of the reach of creditors). Under this pressure, the Debtor negotiated a term sheet and settlement with the UCC (the "January 2020 Corporate Governance Settlement"), which was executed by Mr. Dondero and approved by a court order on January 9, 2020 (the "January 2020 Corporate Governance Order").[6] The settlement and term sheet contemplated a complete overhaul of the corporate governance structure of the Debtor. Mr. Dondero resigned from his role as an officer and director of the Debtor and of its general partner. Three new independent directors (the "Independent Board") were appointed to govern the Debtor's general partner Strand Advisors, Inc.—which, in turn, managed the Debtor. All of the new

---

[5] The UST was steadfast in wanting a Trustee.

[6] *See* DE ## 281 & 339 in main bankruptcy case. *See also* Dondero Exh. 8 (DE # 106 in the Adversary Proceeding).

Independent Board members were selected by the UCC and are very experienced within either the industry in which the Debtor operates, restructuring, or both (Retired Bankruptcy Judge Russell Nelms, John Dubel, and James P. Seery). As noted above, one of the Independent Board members, James P. Seery ("Mr. Seery"), was ultimately appointed as the Debtor's new CEO and CRO.[7] As for Mr. Dondero, while not originally contemplated as part of the January 2020 Corporate Governance Settlement, the Debtor proposed at the hearing on the January 2020 Corporate Governance Settlement that Mr. Dondero remain on as an unpaid employee of the Debtor and also continue to serve as and retain the title of a portfolio manager for certain separate ***non-Debtor*** investment vehicles/entities whose funds are managed by the Debtor.[8] The court approved this arrangement when the UCC ultimately did not oppose it. Mr. Dondero's authority with the Debtor was subject to oversight by the Independent Board.[9] Mr. Seery was given authority to oversee the day-to-day management of the Debtor, including the purchase and sale of assets held by the Debtor and its subsidiaries, as well as the purchase and sale of assets that the Debtor manages for various separate non-Debtor investment vehicles/entities. Significant to the court and the UCC was a provision in the order, at paragraph 9, stating that "Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor."

To be sure, this was a complex arrangement. Apparently, there were well-meaning professionals in the case that thought that having the founder and "face" behind the Highland brand

---

[7] "CRO" means Chief Restructuring Officer. *See* DE # 854 in main bankruptcy case, entered July 16, 2020.

[8] Although not discussed at the time, the court has become aware that Mr. Dondero has been a paid employee of the Non-Debtor Highland-Related Entities known as NexPoint and/or NexBank postpetition. *See* 1/8/21 Hearing Transcript, Debtor Exh. 36 (DE # 80) at 107:20-23.

[9] "Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors . . . [and] will be subject at all times to the supervision, direction and authority of the Independent Directors. In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero agrees to resign immediately upon such determination." *See* Debtor's Exh. 2, at Exh. 1 thereto, at 3 of 62 (DE # 80).

still involved with the business might be value-enhancing for the Debtor and its creditors (even though Mr. Dondero was perceived as not being the type of fiduciary needed to steer the ship through bankruptcy). For sake of clarity, it should be understood that there are at least hundreds of entities—the lawyers have sometimes said 2,000 entities—within the Highland byzantine organizational structure (sometimes referred to as the "Highland complex"), most of which are ***not*** subsidiaries of the Debtor, nor otherwise owned by Highland. And only Highland itself is in bankruptcy. However, these entities are very much intertwined with Highland—in that they have shared services agreements, sub-advisory agreements, payroll reimbursement agreements, or perhaps, in some cases, less formal arrangements with Highland. Through these agreements Highland (***through its own employees***) has historically provided resources such as fund managers, legal and accounting services, IT support, office space, and other overhead. Many of these non-Debtor entities appear to be under the *de facto* control of Mr. Dondero—as he is the president and portfolio manager for many or most of them—although Mr. Dondero and certain of these entities stress that these entities have board members with independent decision-making power and are not the mere "puppets" of Mr. Dondero (for ease of reference, these numerous entities will be referred to as the "Non-Debtor Dondero-Related Entities"). This court has never been provided a complete organizational chart that shows ownership and affiliations of all 2,000 Non-Debtor Dondero-Related Entities (such a chart would, no doubt, be the size of a football field), but the court has, on occasion, been shown information about some of them and is aware that a great many of them were formed in non-U.S. jurisdictions, such as the Cayman Islands.

Eventually, the Debtor's new Independent Board and management concluded that it was untenable for Mr. Dondero to continue to be employed by the Debtor in any capacity. Various events occurred that led to the termination of his employment with the Debtor. For one thing, Mr.

Dondero prominently opposed certain actions taken by the Debtor through its CEO and Independent Board including: (a) objecting to a significant settlement that the Debtor had reached in court-ordered mediation[10] with creditors Acis Capital Management and Josh and Jennifer Terry (the "Acis Settlement")—which settlement helped pave the way toward a consensual Chapter 11 plan, and (b) pursuing, through one of his family trusts (the Dugaboy Investment Trust), a proof of claim alleging that the Debtor (including Mr. Seery) had mismanaged one of the Debtor's subsidiaries, Highland Multi Strategy Credit Fund, L.P. ("MSCF"), with respect to the sale of certain of its assets during the bankruptcy case (in May of 2020).[11] The Debtor's Independent Board and management considered these two actions to create a conflict of interest—if Mr. Dondero was going to litigate significant issues against the Debtor in court, that was his right, but he could not continue to work for the Debtor (among other things, having access to its computers and office space) while litigating these issues with the Debtor in court.

But the termination of his employment was not the end of the friction between the Debtor and Mr. Dondero. In fact, a week after his termination, litigation posturing and disputes began erupting between Mr. Dondero and certain Non-Debtor Dondero-Related Entities, on the one hand, and the Debtor on the other (as further described below).

III. **The Impetus for the Adversary Proceeding**.

The Adversary Proceeding centers significantly around two Non-Debtor Dondero-Related Entities known as NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors")—both of which, like

---

[10] The court appointed Retired Bankruptcy Judge Allan Gropper, S.D.N.Y., and Attorney Sylvia Mayer, Houston, Texas (both with the American Arbitration Association), to be co-mediators over multiple disputes in the Bankruptcy Case, including the Acis dispute. The co-mediators, among other things, attempted to mediate disputes/issues with Mr. Dondero.

[11] *See, e.g.,* Proof of Claim No. 177 and DE # 1154 in main bankruptcy case.

Highland, are registered investment advisors. Mr. Dondero is President of NexPoint and has an ownership interest in it.[12] Mr. Dondero is President of HCMFA and has an ownership interest in it as well.[13]

        <u>A. Alleged Interference with the Debtor's Management of the Highland CLOs.</u>

        The Advisors separately manage three funds ("NexPoint/HCMFA Funds"). The Advisors and these NexPoint/HCMFA Funds own, among other things, equity interests in certain pooled ***collateralized loan obligation*** ("CLO") vehicles that are managed by the Debtor (hereinafter the "Highland CLOs"). A key fact here to remember is that the CLO vehicles are managed by the Debtor (pursuant to contracts and neither the Advisors nor the NexPoint/HCMFA Funds are parties to such contracts).

        Generally speaking, the term/acronym "CLO" is loosely used in the investment world to refer to a special purpose entity ("CLO SPE"), in which a manager (here, Highland) purchases a basket of loans to be held in the CLO SPE. The loans in the basket would typically be obligations of large well-known public companies and, collectively, provide a variable rate of interest. The CLO manager typically has discretion to buy and sell different loans to go into the pool of assets, with certain restrictions. There are, meanwhile, tranches of investors who invest funds into the CLO SPE, pursuant to an indenture (with an independent, third-party indenture trustee in place) so that the CLO SPE can purchase the loans, and those investors receive fixed interest from the CLO SPE (with the CLO SPE earning income on the "spread" between: (a) the variable interest being earned on the pool of loans in the CLO SPE's portfolio and (b) the amount of fixed interest the CLO SPE must pay out to its tranches of investors). This description, again, is a bit of a generalization. In

---

[12] 1/8/21 Hearing Transcript, Debtor's Exh. 36 at 35:9-25 (DE # 80).

[13] 1/8/21 Hearing Transcript, Debtor's Exh. 36 at 36:10-14 (DE # 80).

the case of the Highland CLOs (there are approximately 16 of them), many of them are quite old and do not have the typical diverse portfolio of loans that CLOs commonly have. Many of the CLOs are structured as closed-end investment funds and, in fact, own equity in post-reorganization companies (that are publicly traded and quite liquid) and some even own real estate.[14] In any event, as mentioned, the Debtor serves as portfolio manager on the numerous Highland CLOs (there more than a dozen), pursuant to **separate portfolio management agreements** that Highland has with the CLO SPEs. There are about $1 billion of assets in these CLO SPEs that Highland manages.[15] And, to be clear, the Advisors and NexPoint/HCMFA Funds own **equity** (*i.e.,* the bottom tranche) in most if not all of these Highland CLOs.

The Debtor has alleged in this Adversary Proceeding that the Advisors, acting under the direction of their President Mr. Dondero, have interfered multiple times with Mr. Seery's attempts to sell various assets in the CLO SPEs, by, among other things, exerting pressure on certain of the Debtor's employees to halt trades that were ordered by Mr. Seery. To be clear, the Advisors have no contractual right to do that—they are not party to the portfolio management agreements that Highland has with the CLO SPEs. The Advisors simply purport to speak for various investors (*i.e.,* the investors in the NexPoint/HCMFA Funds) who have invested in (*i.e.,* own the equity) in the Highland CLOs. However, it appears that the majority of these investors are yet **other Non-Debtor Dondero-Related Entities**, including but not limited to the entities known as Charitable DAF HoldCo, Ltd. and CLO Holdco, Ltd.[16] In any event, various examples of communications that

---

[14] *See* 1/26/21 Hearing Transcript, Debtor's Exh. 37 at 155:9-18 (DE # 80).

[15] *See id.* at 202: 3-7.

[16] *See* Debtor's Exh. 2, Exh. 7 thereto (DE # 80). There may be some "mom and pop" or unrelated institutional investors in certain of these Highland CLOs (indirectly through the NexPoint/HCMFA Funds), *see* 1/26/21 Hearing Transcript, Debtor Exh. 37 (DE # 80), at 201:14-22, but **none** have ever come forward during the Highland bankruptcy. Moreover, the Debtor aptly notes that there is nothing preventing unhappy investors from simply selling their investments in the Highland CLOs if they are not happy with management decisions of the portfolio manager.

allegedly constituted interference were described in the Adversary Proceeding.[17] The court notes, anecdotally, that Mr. Dondero was continuing, well after his October 9, 2020 termination with the Debtor, to use an email address showing he was an employee of Highland in many of the communications introduced into evidence.[18]

B. Alleged Threats When Debtor Attempted to Collect Demand Notes from Mr. Dondero.

Additionally, the Adversary Proceeding describes that there are certain demand notes on which Mr. Dondero, personally, and certain Non-Debtor Dondero-Related Entities owe significant money to the Debtor. The Debtor made demand upon Mr. Dondero for payment on these demand notes on December 3, 2020, demanding payment by December 11, 2020, so that the Debtor could have these funds to use in its Chapter 11 plan that was set for confirmation in January 2021. Mr. Dondero is alleged to have sent a threatening text to Mr. Seery, just a few hours after the demand letters were sent to him.

After describing Mr. Dondero's alleged conduct, the complaint in the Adversary Proceeding sought injunctive relief preventing Mr. Dondero from interfering with the Debtor's operations, management of assets, and pursuit of a plan of reorganization, to the detriment of the Debtor, its estate, and its creditors, relying on 11 U.S.C. § 105 and Fed. R. Bankr. Pro. 7065. The Debtor has argued that Mr. Dondero's actions have jeopardized the Debtor's ability to effectively wind down its business in the Chapter 11 proceedings—to the detriment of its creditors.

---

[17] Debtor's Exh. 3, DE # 80 (10/16/20 letter from counsel for Advisors expressing "concerns" about the Debtor's management of the Highland CLOs and a desire that management be transitioned over to the Advisors); Debtor's Exh. 4, DE # 80 (11/24/20 letter from counsel for the Advisors further expressing "concerns" about the Debtor's management of Highland CLOs, especially the selling of assets therein); Debtor's Exh. 5, DE # 80 (11/24/20-11/27/20 emails of Mr. Dondero instructing Highland employee Hunter Covitz not to trade SKY equity as he had been instructed by James Seery); Debtor's Exh. 14, DE # 80 (12/24/20 letter of Debtor's counsel to counsel for the Advisors addressing some of their clients' actions).

[18] *See, e.g.,* Debtor's Exh. 5 (DE # 80).

IV.     **Motion for TRO [DE # 6].**

Almost immediately after filing the Adversary Proceeding, the Debtor sought entry of a TRO enjoining Mr. Dondero from: (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Independent Board member *unless* Mr. Dondero's counsel and counsel for the Debtor were included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents; (c) communicating with any of the Debtor's employees, except as it specifically related to shared services currently provided by the Debtor to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct"). It was supported by a Memorandum of Law[19] and a Declaration of Mr. Seery.[20]

The court held a hearing on December 10, 2020 on the Motion for TRO.

A. The Evidence at the TRO Hearing.

At the hearing on the Motion for TRO, the Debtor relied upon the Declaration of Mr. Seery and all exhibits that had been attached thereto (which the court admitted with no objection).[21] The court also heard a small amount of additional live testimony from Mr. Seery.  Mr. Dondero's

---

[19] *See* DE # 6.

[20] *See* DE # 4 (with 29 exhibits attached, 177 pages in total length).

[21] *Id.*

counsel appeared and made some statements but did not file a responsive pleading or put on any evidence.

Mr. Seery credibly testified that, pursuant to the January 2020 Corporate Governance Settlement, Mr. Dondero surrendered control of the Debtor to the Independent Board. After that January 2020 Corporate Governance Settlement, Mr. Dondero's responsibilities with the Debtor were to be, in all cases, as determined by the Independent Board and subject at all times to the supervision, direction and authority of the Independent Board. In the event the Independent Board was to determine for any reason that the Debtor should no longer retain Mr. Dondero as an employee, Mr. Dondero agreed to resign immediately upon such determination.[22] By resolution passed on January 9, 2020, the Independent Board authorized Mr. Seery to work with the Debtor's traders and approve trades of certain of the Debtor's and funds' assets.[23] However, up until mid-March 2020, Mr. Dondero controlled certain of the Debtor's managed funds and accounts (as he still maintained the title of portfolio manager). Mr. Seery credibly testified that "[w]e took them away after they lost considerable amounts of money, about ninety million bucks. Real money. So we took over control of those accounts since then, and we've been managing to sell them down to create cash where we think the market opportunity is correct."[24]

Later, however, during the summer of 2020, the Independent Board determined that it was in the best interests of the Debtor's estate to formally appoint Mr. Seery as the Debtor's CEO and CRO (*i.e.,* not just an Independent Board member with trading authority). The bankruptcy court approved Mr. Seery's appointment as CEO and CRO on July 16, 2020.[25] Mr. Seery's appointment

---

[22] Debtor's Exh. 1, at pp. 2-3 (DE # 80).

[23] Debtor's Exh. 3, at p. 2 (DE # 80).

[24] 12/10/20 Transcript from TRO Hearing, at p. 51:21-25 (DE # 19).

[25] DE # 854 in main bankruptcy case.

as CEO and CRO formalized his role and his authority to oversee the day-to-day management of the Debtor, including the purchase and sale of assets held by the Debtor and its managed investment vehicles, funds, and subsidiaries. Mr. Seery credibly represented that he has routinely carried out such responsibilities during the case.

On August 12, 2020, the Debtor filed its Plan of Reorganization with the court[26] (as subsequently amended, the "Plan"). The Plan provided for, among other things, the gradual monetization of the Debtor's assets for the benefit of the Debtor's creditors. Also in August 2020, the Debtor entered into court-ordered mediation with certain of its creditors which resulted in, among other things, the Acis Settlement (mentioned earlier). After the Acis Settlement was publicly announced, Mr. Dondero voiced his displeasure with not just the terms of the Acis Settlement, but that a settlement had been reached at all. On October 5, 2020, Mr. Dondero objected to the Debtor's motion seeking approval of the Acis Settlement, which the Debtor believed created an actual conflict with the Independent Board and the Debtor.[27] Additionally, one of Mr. Dondero's family trusts also filed a proof of claim alleging the Debtor and Mr. Seery were mismanaging the assets of a subsidiary of the Debtor.[28] Concluding that this situation was untenable, Mr. Dondero was asked to resign from the Debtor, and he did on October 9, 2020.[29]

Subsequent to Mr. Dondero's termination from the Debtor, he began engaging in activities that the Debtor perceived to be interference with its business judgment and management of the Highland CLOs. Approximately one week after Mr. Dondero resigned, the Advisors began writing letters to Mr. Seery requesting, among other things, that "no [Highland] CLO assets be sold without

---

[26] DE # 944 in main bankruptcy case.

[27] DE # 1121 in main bankruptcy case; Debtor's Exh. 2 (Mr. Seery's Decl.) at ¶ 11; DE # 80.

[28] *Id.* at ¶ 12.

[29] Debtor's Exhs. 4-5 (DE # 80).

prior notice and consent from the Advisors."[30] Not only is the Advisors' consent for Highland CLO assets sales not contractually required, but the Debtor's Chapter 11 plan (then on file, now confirmed) contemplates the gradual wind down of Highland's business over time so that it will have funds to pay its creditors. In fact, Mr. Seery credibly testified that the business model of Highland in recent years (under the direction of Mr. Dondero—and with its web and layers of entities) has not allowed Highland itself to operate at a profit.[31] Thus, interference with assets sales in the Highland CLOs seemed equivalent to interference with, not just the Debtor's efforts to manage the business in ways that allowed it to pay its expenses, but also interference with the Debtor's Chapter 11 plan.

In the November 24-27, 2020 time period (again, just a few weeks after Mr. Dondero's termination from the Debtor), Mr. Dondero sent various emails to both Debtor and Advisor employees (*e.g.,* Matt Pearson, Hunter Covitz, Joe Sowin, and Tom Surgent) telling them he had instructed the Debtor not to engage in trades of Highland CLO assets and that they should not engage in certain trades of Highland CLO assets that Mr. Seery had instructed them to make.[32] A review of this correspondence makes apparent the underlying conflicts of interest present— Highland was attempting to gradually wind down its business and monetize its managed assets for the benefit of its creditors (and this court believes—all the while—balancing its fiduciary duties to investors in such funds) and, meanwhile, Mr. Dondero (wearing his hat as a portfolio manager for, and indirect equity owner in, certain of the Non-Debtor Dondero-Related Entities—*i.e.,* the

---

[30] Debtor's Exh. 6, p.2 (DE # 80); *see also* Debtor's Exh. 7 (DE # 80).

[31] Apparently, the Debtor even ***offered to assign Highland's CLO management agreements to Mr. Dondero's affiliate, NexPoint (in early December 2020)***, but Mr. Dondero thought the proposed terms were untenable. *See* DE # 50, John Morris Decl., Exh. Z thereto (January 5, 2021 Deposition Transcript of Mr. Dondero, at 101:11-25).

[32] Debtor's Exh. 8 (DE # 80).

14

Advisors and the NexPoint/HCMFA Funds) did not want assets sold as part of a wind down. Mr. Dondero, it appears to this court, was putting his own and the Non-Debtor Dondero-Related Entities' interests (as investors in the Highland CLOs) ahead of Highland's creditors and the Highland CLOs, as a whole. But, Highland had duties to its creditors and to the Highland CLOs *as a whole*, and not to the Advisors or their funds (as investors in or equity owners in the Highland CLOs). Mr. Seery further credibly explained the situation, and the harm the interference caused the bankruptcy estate, as follows: "We intend to continue to manage the CLOs, we intend to assume those contracts [*i.e.,* the portfolio management agreements for the Highland CLOs], we intend to manage them post-confirmation, after exit from bankruptcy. And causing confusion among the employees, preventing the Debtor from consummating trades in the ordinary course, deferring those transactions, we thought put the estate at significant risk, in addition to the cost."[33] The Highland CLOs generate fee income for the Debtor. Not all of them have liquid assets that are able to pay quarterly fees. Some owe deferred fees to Highland.[34]

The Debtor thereafter sent communications instructing the Advisors and Mr. Dondero to cease and desist their interference, indicating that Mr. Dondero's actions interfered with the management of the Debtor's bankruptcy estate and the property of such estate, in violation of the Bankruptcy Code and the January 9, 2020 Order.[35]

Meanwhile, around this same time period, the Debtor sent demand letters[36] to Mr. Dondero and certain Non-Debtor Dondero-Related Entities, each of whom are obligated to the Debtor on various demand notes, pursuant to which approximately $30 million is collectively owed to the

---

[33] Debtor's Exh. 37 at 166:6-13 (DE # 80).

[34] *Id.* 166-167.

[35] Debtor's Exhs. 9 & 10 (DE # 80).

[36] Debtor's Exhs. 24-27 (DE # 80).

Debtor.[37]  Collection on these notes was part of the Debtor's liquidity plan, to help pay creditors under its Chapter 11 plan. Mr. Seery credibly testified that Mr. Dondero's response was a text message that stated: "Be careful what you do, last warning."[38]

The next day, Debtor's counsel sent Mr. Dondero's counsel correspondence demanding that he "cease and desist from (a) communicating directly with any Board member without counsel for the Debtor, (b) making any further threats against HCMLP or any of its directors, officers, employees, professionals, or agents, or (c) communicating with any of HCMLP's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero." The letter put Mr. Dondero on notice that the above-referenced Adversary Proceeding and Motion for TRO would be filed.

### B.  Entry of the TRO.

After hearing the evidence at the TRO Hearing, the court determined that the Debtor had met its burden of proving the need for a TRO.  The court issued the TRO[39] which temporarily enjoined Mr. Dondero from "(a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents; (c) communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the

---

[37] Debtor's Exhs. 11-23 (DE # 80).

[38] Debtor's Exh. 28 (DE # 80).

[39] *See* DE # 10; *see also* Debtor's Exh. 11 (DE # 80).

Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the 'Prohibited Conduct')." Mr. Dondero was further temporarily enjoined "from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct."

### V. The Contempt Motion Now Before the Court.

Less than a month after entry of the TRO, on January 7, 2021, Highland filed *Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* (the "Contempt Motion"),[40] which was supported by a Memorandum of Law[41] and a Declaration of John Morris with Exhs. G, K, L, M, N, P, Q, R, S, U, W, X, Y, Z attached.[42] Highland alleges Mr. Dondero violated the TRO as follows: (a) he willfully ignored it by not reading the TRO, the underlying pleadings, and allegations that supported it, nor did he listen to the hearing at which it was entered or make any meaningful effort to understand the scope of it; (b) he threw in the garbage his Highland-furnished cell phone, in what the Debtor believes was an attempt to evade discovery; (c) he trespassed on the Debtor's property after the Debtor had evicted him because the Debtor believed he was interfering with the Debtor's business; (d) he interfered with the Debtor's trading of Highland CLO assets; (e) he pushed and encouraged the Advisors and NexPoint/HCMFA Funds to make further demands and threats against the Debtor regarding the trading of Highland CLO assets; (f) he communicated with the Debtor's inhouse

---

[40] DE # 48.

[41] DE # 49.

[42] DE # 50.

counsel, Scott Ellington and Isaac Leventon, before they were terminated from Highland, to coordinate legal his own strategy against the Debtor; and (g) he interfered with the Debtor's obligation to produce certain documents that were requested by the UCC and that were in the Debtor's possession, custody and control.

The court held an evidentiary hearing on the Contempt Motion on March 22, 2021 (with closing arguments March 24, 2021). The court considered dozens of exhibits[43] and testimony from two witnesses (Mr. Dondero and the Debtor's current CEO, James Seery). The Debtor asserted that there were seventeen different violations of the TRO. To be clear, this Contempt Motion ***deals solely with whether Mr. Dondero violated the TRO after its entry on December 10, 2020 at 1:31 pm CST, up through the time of the filing of the Contempt Motion on January 7, 2021***.[44] In fact, the court has subsequently entered a Preliminary Injunction[45] and Agreed Injunction[46] resolving this Adversary Proceeding but reserved jurisdiction to rule on the earlier-filed Contempt Motion.

> A. <u>The Evidence Regarding Whether Mr. Dondero Willfully Ignored the TRO by Not Reading It or the Underlying Pleadings and Allegations that Supported It; by Not Attending the Hearing Thereon; and by Not Making Any Meaningful Effort to Understand the Scope of the TRO.</u>

The Debtor argues that Mr. Dondero's willful ignorance of both the TRO, and the underlying evidence presented in connection with the TRO, is in and of itself contemptible.

---

[43] The court admitted Debtor's Exhibits #1, #2, #7, #8, #9, #10, #11, #12, #13, #14, #15, #17, #18, #19, #20, #21, #22, #24, #25, #26, #27, #28, #33, #35, #36, #37, #38, #39, #47 through #57 (found at DE ## 80, 101, & 128), and Mr. Dondero's Exhibits #1 through #20 (found at DE # 106).

[44] The Debtor initially sought an expedited hearing on the Contempt Motion for January 8, 2021—the same day that the Debtor's request for a preliminary injunction was set for hearing. The court denied the request for an expedited hearing on the Contempt Motion—believing this was not enough notice to Mr. Dondero. So, there was a hearing on a request for a preliminary injunction only on January 8, 2021 (which was granted ultimately). To be clear, Mr. Dondero and his counsel had approximately 75 days to prepare for the hearing on this matter.

[45] DE # 59.

[46] DE # 182.

The evidence on this point is that Mr. Dondero testified multiple times in connection with this Adversary Proceeding[47] that he had not: (a) reviewed the Declaration of James P. Seery, Jr., the Debtor's Chief Executive Officer, in support of the TRO Motion; (b) attempted to learn of the allegations made against him; (c) thought about the fact that the Debtor was seeking a restraining order against him; (d) listened to the hearing where the court admitted evidence and heard argument on the Debtor's motion; (e) read the transcript of the hearing at which the court granted the Debtor's motion for the TRO; (f) read the TRO after it was entered; or (g) made any meaningful effort to understand the scope of the TRO.[48]

But on later examination by his counsel at the Hearing on the Contempt Motion itself, Mr. Dondero testified as follows:

Q Did you have an opportunity to ask your counsel questions about the TRO?

A Yes.

Q And did you rely on your counsel to explain to you what the TRO meant?

A Yes.

Q And in the weeks that followed the entry of the TRO, did you continue to seek advice from your counsel regarding what you could and could not do under the TRO?

A Yes.

Q And why did you do that?

A Again, to stay compliant, not -- to stay compliant any specific tripwires or any trickery that might have been in the agreement.[49]

---

[47] The court will refer frequently herein to three Transcripts and hereinafter use the following defined terms for ease of reference: (a) the January 5, 2021 Transcript from Mr. Dondero's deposition in connection with this matter, found as an attachment to the John Morris Declaration, DE # 50, at Exh. Z ("1/5/21 Transcript"); (b) the January 8, 2021 Transcript from the hearing on the Motion for Preliminary Injunction, which was admitted as Debtor's Exh. 36 at the Hearing on the Contempt Motion ("1/8/21 Transcript"); and (c) the March 22, 2021 Transcript from the Hearing on the Contempt Motion, which is found at DE # 138 ("3/22/21 Transcript").

[48] *See* 1/5/21 Transcript at 12:17-15:14; 1/8/21 Transcript at 23:10-12 and 101:13-14; 3/22/21 Transcript at 30:20-22; 35:6-16. *See also* 1/5/21 Transcript at 84:8-16; 3/22/21 Transcript at 35:20-36:1.

[49] 3/22/21 Transcript at 130:6-19.

Mr. Dondero went on to testify: "Yeah, I -- again, I take seriously anything that comes from the Court, and I did adjust my behavior, but the overall theme, that somehow I was doing something to hurt the creditor or hurt the Debtor or hurt investors I viewed as incongruent with any of my behavior. So I didn't think it was going to require much adjustment."[50]

The court concludes that Mr. Dondero's testimony was very inconsistent on when and how carefully he read the TRO. Whether this amounted to contempt of the TRO will be addressed in the Conclusions of Law section below.

> B. The Evidence Regarding Whether Mr. Dondero Disposed of His Highland-Furnished Cell Phone to Evade Discovery.

### *First, the Highland Cell Phone Policy.*

The evidence is undisputed that Highland had a cell phone policy for all of its employees dated March 27, 2012 that still remained in place at all relevant times during this bankruptcy case.[51] Employees could, among other things, have their cell phone expenses reimbursed by Highland. Mr. Dondero participated in this program. To be clear, Highland actually purchased and paid for Mr. Dondero's cell phone (in contrast, some employees used their own cell phones and obtained expense reimbursement). The policy stated as follows:

> Your obligations under this policy shall terminate upon the termination of your employment, ***provided that you will remain obligated to furnish historical call records covering the period through the date of your termination***, as requested following the termination of your employment. Employees participating in this policy should have no expectation of privacy regarding e-mail, voice mail, ***text messages***, graphics, and other electronic data composed, sent, and/or received on their cell phones. Notwithstanding the foregoing, Highland agrees not to review any call records on an employee's bill other than those associated with the phone number of employee. Further, regardless of whether employees choose to participate in this policy, ***all e-mail, voice mail, text messages, graphics, and other***

---

[50] 3/22/21 Transcript at 129:6-11; *see more generally, id.* at 130-136.

[51] Debtor's Exh. 54 (DE # 101).

*electronic data composed, sent, and/or received related to company business remain the property of Highland.*"[52]

Mr. Dondero certified in January 2020 and again on October 7, 2020, that he had read the Employee Handbook.[53] Mr. Dondero testified that he reviewed it and the company's Compliance Manual once a year in connection with required compliance training.[54]

It is undisputed that as of the day that the TRO was entered (December 10, 2020), Mr. Dondero had a cell phone that was bought and paid for by the Debtor.[55] Mr. Dondero testified that he would sometimes use it for business texts.[56]

From this evidence, the court finds that the cell phone that Mr. Dondero used for the majority of the Chapter 11 case (and as of the date of the TRO, December 10, 2020) was property of the bankruptcy estate, as was the data thereon related to company business.

### *Mr. Dondero's Cell Phone Goes Missing Immediately After Entry of the December 10, 2020 TRO. Coincidence or Not?*

Soon after the entry of the December 10, 2020 TRO, on December 23, 2020, Debtor's counsel sent Mr. Dondero's counsel a letter informing him that Highland would:

> terminate Mr. Dondero's cell phone plan and those cell phone plans associated with parties providing personal services to Mr. Dondero (collectively, the 'Cell Phones'). [Highland] demands that Mr. Dondero immediately turn over the Cell Phones to [Highland] by delivering them to [Mr. Dondero's counsel]; we can make arrangements to recover the phones from [Mr. Dondero's counsel] at a later date. The Cell Phones and the accounts are property of [Highland]. [Highland] further demands that Mr. Dondero refrain from deleting or "wiping" any information or messages on the Cell Phone. [Highland], as the owner of the account

---

[52] *Id.* (emphasis added). *See also* Debtor's Exh. 55, at 12-13 (DE # 101).

[53] Debtor's Exhs. 56 & 57 (DE # 101).

[54] 3/22/21 Transcript at 37:1-23; 42:1-25. *See also* Debtor's Exh. 55 (Employee Handbook); Debtor's Exhs. 56 & 57 (Compliance Certificates) (DE # 80).

[55] 3/22/21 Transcript at 51:17-21

[56] *Id.* at 51:22-25.

and the Cell Phones, intends to recover all information related to the Cell Phones and the accounts and reserves the right to use the business-related information.[57]

On December 29, 2020, Mr. Dondero's counsel sent a letter replying to the December 23, 2020 letter, stating that Mr. Dondero had recently acquired a new phone and they were not sure where Mr. Dondero's old Highland-provided phone was at the moment.[58] Mr. Dondero was copied on that letter. Nothing was ever mentioned in that letter about the disposal or wiping of the old cell phone. And yet, in discovery that soon unfolded, as well as the hearing on the Contempt Motion, Mr. Dondero testified that his old company cell phone had been wiped of data and disposed.

When Mr. Dondero was asked specifically about what happened to the cell phone he had that was "bought and paid for by the debtor," he testified that it "was disposed of as part of getting a replacement phone in anticipation of potentially a transition."[59] He testified that there was a historical practice at Highland of destroying old phones when he obtained a new one.[60] He testified that "[a]s far as I know, it was disposed of in the garbage, but I don't know if it was recycled or whatever."[61] He said he did not know specifically who threw it away.[62] When asked if he was aware that the UCC had asked for his phone messages, he testified no and that no one had ever told him.[63] He further testified that maybe an employee named Jason Rothstein (an employee in Highland's technology group) was involved with getting him a new phone and disposing of his old phone, but he was equivocal.[64] Mr. Dondero was insistent that disposing of old phones was always

---

[57] Debtor's Exh. 12, at pp. 2-3 (DE # 80).

[58] Debtor's Exh. 22 (DE # 80).

[59] 1/5/21 Transcript at 72:5-7.

[60] Id. at 72:9-13.

[61] Id. at 72:18-20.

[62] Id. at 73: 4-18.

[63] Id. at 74:19-25.

[64] Id. at 75:7-11.

the protocol at Highland and, also, employees routinely kept their old phone numbers (as he had done after leaving Highland and getting a new phone).[65] He further testified that he thought that he and all senior executives had to "move their phones in the next 30 days or next 25 days, based on Seery's termination notice."[66] ("Seery's termination notice" presumably was a reference to Highland sending a letter on November 30, 2020 that Highland was terminating the shared services agreements among Highland and the Advisors effective January 30, 2021.[67] Of course, Mr. Dondero had been terminated as a Highland employee back on October 9, 2020).

An exhibit was shown to Mr. Dondero[68] during a January 5, 2021 deposition which was a text from Jason Rothstein (the aforementioned Debtor employee in the technology group) to Mr. Dondero dated December 10, 2020 at 6:25 pm. The TRO had been entered earlier that same day at 1:31 pm (after a 9:30 am hearing). Jason Rothstein's text stated, "I left your old phone in the top drawer of Tara's [Mr. Dondero's assistant's] desk" to which Mr. Dondero replied "[o]k."[69]

When questioned about this text and asked whether Mr. Dondero had told Jason Rothstein to do anything with the phone, he replied, "I don't—all I know is the phone's been disposed of. That's all I know."[70] He then specifically testified that he did not tell either Jason Rothstein or his assistant Tara to throw the phone in the garbage.[71] When later asked if he disposed of the phone "somewhere around December 10, 2020" he replied "I—I don't know. Probably."[72] Later at the

---

[65] *Id.* at 76:8-77:2.

[66] *Id.* at 79:25-80:4.

[67] Dondero's Exhs. 4 & 5 (DE # 106).

[68] Debtor's Exh. 8 (DE # 80).

[69] While this timing seems very coincidental, Mr. Dondero testified that he had ordered his new cell phone a couple of weeks before December 10, 2020. 3/22/21 Transcript at 147:17-148:7.

[70] 1/5/21 Transcript at 80:18-81:8.

[71] *Id.* at 81:9-15.

[72] *Id.* at 85:15-17.

hearing on the Contempt Motion on March 22, 2021, Mr. Dondero answered more ambiguously as to what happened to the cell phone: "I don't know what happened to the phone. I don't know what Jason did or did not do."[73] Nobody called Jason Rothstein to testify at the hearing on the Contempt Motion. In any event, Mr. Dondero was insistent that he did nothing wrong—stating that he turned the cell phone over to the "tech group" for the Debtor (Jason Rothstein) as he was supposed to do and that he wiped it in accordance with company protocol.[74] Mr. Dondero further testified:

Q Do you have any personal knowledge about what happened to your phone after Jason Rothstein texted you that he left it in Tara's desk?

A No.

Q Did you ever look to see if it was in Tara's desk?

A No.

Q Did you -- you -- you didn't take the phone out of Tara's desk?

A No.

Q So did you ever see the phone again after you turned it over to Jason Rothstein?

A No.

Q Do you know where the phone is today?

A But, again, I don't know why this is relevant. They can get the text messages from the phone company if they think it's that big of a deal.[75]

Q When you previously testified that the phone was disposed of, what did you mean?

---

[73] 3/22/21 Transcript at 57:3-4.

[74] *Id.* at 58:1-16.

[75] The court did not have any expert evidence of this, but the court believes without much doubt that this is incorrect. While this may have been true long ago (in the days before iPhones and WiFi communications), Mr. Dondero testified that he had an iPhone. Whether he uses the iPhone "Messages" text app or some other messaging app such as "WhatsApp" or "Signal," his phone company (which he testified was AT&T) would not have his text messages since text messages are sent through these apps—not the AT&T phone service.

A I mean, that's -- that's the last step. That's what always happens to the old phones. But to say it was tossed in the garbage, I have no idea. I have no idea what happened to it after it went back to Tara's desk.

Q So do you have any personal knowledge that your phone was actually disposed of?

A I don't know.[76]

*Is the Missing Phone Any Big Deal?*

Mr. Dondero is rather adamant that this is all much ado about nothing. Is the missing cell phone a big deal? The answer is "maybe or maybe not." It depends on what was on it and whether the data on it was responsive to numerous discovery requests in this bankruptcy case. And in any event, the phone and any data on it related to Highland was "property of the estate," pursuant to section 541 of the Bankruptcy Code.

With regard to discovery requests, there have actually been many discovery requests in the bankruptcy case for which *any relevant data on Mr. Dondero's phone would have been responsive*, starting from almost the very beginning, when the UCC sought, among other things, electronically stored information ("ESI") from the Debtor and key custodians including Mr. Dondero.

For example, back on November 10, 2019 (when the bankruptcy case was still pending in Delaware), the UCC served its first document request *while Mr. Dondero was still CEO and during which time all original management and inhouse counsel were still intact*.[77] This first UCC document request, in seeking communications about numerous topics, defined "Communications" as including *electronic communications such as texts*. And the "Instructions" therein to the Debtor

---

[76] 3/22/21 Transcript at 150:5-151:4.

[77] Debtor's Exh. 15 (DE # 80).

provided at paragraph 4 that: "You are requested to produce not only those documents in Your physical possession, but also those documents within Your custody and control, including, without limitation, documents in the possession of Your agents, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf."[78] To be clear, this was approximately two months before the January 2020 Corporate Governance Settlement was reached, with the subsequent installment of the Independent Board. Mr. Dondero was still in control of the Debtor when this document request would have been served. The UCC served a second document request on February 3, 2020 (with the same definitions and instructions);[79] a third document request on February 24, 2020 (same definitions and instructions),[80] and a fourth document request on July 8, 2020 (same definition and instructions).[81]

At the same time as the UCC's fourth request for document production (on July 8, 2020), the UCC also filed a motion to compel.[82] This motion to compel brought to the court's attention for the first time that problems were brewing with the UCC's efforts to obtain documents that might be relevant to estate causes of action, and in particular, the UCC motion to compel sought assistance from the court in the UCC's efforts to obtain ESI from various custodians of documents of the Debtor.

The UCC's motion to compel reminded the court that the January 2020 Corporate Governance Settlement explicitly granted the UCC standing to pursue bankruptcy estate claims, defined as "any and all estate claims and causes of actions against Mr. Dondero, Mr. Okada, other

---

[78] *Id.*

[79] Debtor's Exh. 30 (DE # 80).

[80] Debtor's Exh. 31 (DE # 80).

[81] Debtor's Exh. 32 (DE # 80).

[82] Debtor's Exh. 33 (DE # 80).

insiders of the Debtor, and each of the Related Entities, including promissory notes held by any of the foregoing."[83]  The parties also agreed in the January 2020 Corporate Governance Settlement that the UCC would receive any privileged documents or communications that relate to the "Estate Claims" so that the UCC could bring those claims.  In short, the UCC, pursuant to the January 2020 Corporate Governance Settlement, stands in Debtors' shoes with respect to the "Estate Claims." In fact, the January 2020 Corporate Governance Settlement set forth a "Document Production Protocol," which stated that ESI was included within the documents being sought and stated that "*Debtor acknowledges that they should take reasonable and proportional steps to preserve discoverable information in the party's possession, custody or control. This includes notifying employees possessing relevant information of their obligation to preserve such data*."[84] Thus, whether Mr. Dondero and inhouse counsel paid attention or not, they were on notice very early in this case that they had a duty to preserve ESI.

The UCC motion to compel (again, filed July 8, 2020) further stated that for approximately eight months, the UCC had attempted to work cooperatively with the Debtor to obtain documents and communications needed to investigate those claims, and, despite the UCC's efforts, the Debtor had not yet provided the UCC with the ESI it had requested. In particular, the UCC alleged that it had spent a considerable amount of time attempting to obtain "*production of emails, chats, texts, or other ESI or communications from the Debtor.*"  In summary, the UCC, in July 2020 (some five months before Mr. Dondero's cell phone was disposed) moved to compel production of documents and communications of nine custodians pursuant to a protocol proposed by the UCC and these nine custodians were Patrick Boyce, Jim Dondero, Scott Ellington, David Klos, Isaac

---

[83] *Id.* at 4.

[84] Debtor's Exh. 2, Exh. 1.C. thereto (DE # 80).

Leventon, Mark Okada, Trey Parker, Tom Surgent, and Frank Waterhouse. The UCC specifically stated that for "avoidance of doubt," it was requesting "all ESI for the nine custodians, including without limitation, email, chat, text, Bloomberg messaging, or any other ESI attributable to the custodians."[85]

Notably, Mr. Dondero filed a responsive pleading to this UCC motion to compel—which would be some indication that he knew about it.[86] In his response, he argued that he did not want Josh Terry (Acis's manager, with whom he had been in long-running litigation) to get any documents that might be produced pursuant to the UCC motion to compel.

Finally, the Debtor also sought document production from Mr. Dondero including ESI in a formal document request it sent to him dated December 23, 2020.[87] More pointedly, on December 23, 2020, Debtor's counsel sent Mr. Dondero's counsel the letter mentioned above, in which the Debtor specifically asked that Mr. Dondero turn over his Highland-purchased cell phone.[88]

With regard to awareness about discovery requests, Mr. Dondero testified at his deposition on January 5, 2021 that he was aware of a document request sent to his lawyers for documents of his and that he delegated to his lawyers and his assistant, Tara Loiben, the task of responding by saying, "she has full access to my email, and I gave her my phone for the better part of a couple of days in the office."[89] He also testified that he understood that the Debtor's document requests called for the production of all text messages that were responsive to the requests.[90] When asked if he

---

[85] *Id.*

[86] Debtor's Exh. 40 (DE # 101).

[87] Debtor's Exh. 7 (DE # 80).

[88] Debtor's Exh. 12 (DE # 80).

[89] *See* 1/5/21 Transcript at 67:20-69:9. *See also* Debtor's Exh. 9 (DE # 80).

[90] *Id.* at 70:1-6.

understood the document request was for the time period of December 10, 2020 to the end of the month, he replied "I didn't need the details of this. I didn't get into it. I didn't do the document production that I believe was completed and responsive. I delegated it."[91]

Mr. Dondero's testimony about awareness as to discovery requests has been inconsistent. Mr. Dondero testified at the hearing on the Contempt Motion that no one ever asked him to preserve his text messages.[92]

The court concludes that Mr. Dondero exercised control over property of the estate (*i.e.,* his Highland-provided cell phone and the company-related data thereon) and potentially spoliated evidence thereon that was responsive to multiple, pending discovery requests. Whether this amounted to contempt of the TRO will be addressed in the Conclusions of Law section below.

The Evidence Regarding Whether Mr. Dondero Trespassed.

In the December 23, 2020 letter that Debtor's counsel sent to Mr. Dondero's counsel mentioned earlier (that demanded turn over of Mr. Dondero's cell phone), it also stated that Highland:

> has concluded that Mr. Dondero's presence at the [Highland] office suite and his access to all telephonic and information services provided by [Highland] are too disruptive to [Highland's] continued management of its bankruptcy case to continue. As a consequence, Mr. Dondero's access to the offices located at 200/300 Crescent Court, Suite 700, Dallas, Texas 75201 (the "Office"), will be revoked effective Wednesday, December 30, 2020 (the "Termination Date"). As of the Termination Date, Mr. Dondero's key card will be de-activated and building staff will be informed that Mr. Dondero will no longer have access to the Office.[93]

---

[91] *Id.* at 70:17-20.

[92] 3/22/21 Transcript at 152:1-11.

[93] Debtor's Exh. 12 (DE # 80).

The letter went on to warn that: "Any attempt by Mr. Dondero to enter the Office, regardless of whether he is entering on his own or as a guest, will be viewed as an act of trespass. Similarly, any attempts by Mr. Dondero to access his @highlandcapital.com email account or any other service previously provided to Mr. Dondero by [Highland] will be viewed as an act of trespass, theft, and/or an attempted breach of [Highland's] security protocols."[94]

Mr. Dondero testified that he was aware of this and he nevertheless went into the office on January 5, 2021, to give a deposition regarding this Adversary Proceeding:

> I went through my phone, the January 5th deposition that has somehow become important, even though there were no Highland employees in the office other than the receptionist, is memorialized by a calendar invite on my phone -- which will also be in the Highland system -- where it was an invite a week earlier from Sarah Goldsmith, who was one of the Highland employees supporting the legal team that was largely supporting Jim Seery, sent me a calendar invite to the conference room at Highland for the deposition on the 5th. It's right front and center in my calendar. It'll be on the Highland Outlook program. And Sarah Smith -- I mean, Sarah Goldsmith works directly for Jim Seery.[95]

The court concludes that Mr. Dondero was trespassing against the Debtor's wishes and instructions at the Highland offices on January 5, 2020. Whether this amounted to contempt of the TRO will be addressed in the Conclusions of Law section below.

### The Evidence Regarding Whether Mr. Dondero Interfered with Trading of Highland CLO Assets.

It is undisputed that Mr. Dondero resigned (at the Debtor's request) completely from Highland on October 9, 2020. About a week later, on October 16, 2020, a law firm representing the Advisors and the NexPoint/HCMFA Funds sent its first of several letters complaining about the Debtor's supposed rush to sell assets in the Highland CLOs at so-called fire sale prices and

---

[94] *Id.* at 3.

[95] 3/22/21 Transcript at 179:7-18.

expressing a desire that the Debtor not sell the Highland CLO assets without prior notice and consent of the Advisors. The second in this series of letters was sent in November 2020. Mr. Dondero testified that he supported these letters being sent.[96]

What was this about? The Debtor sought during certain times in November and December 2020 to cause the Highland CLOs to sell certain publicly-traded equity securities, including "AVYA" and "SKY' (stock tickers). Mr. Dondero disagreed that these securities should be sold. At issue here, in particular, are the Debtor's attempted sales in late December 2020—after entry of the TRO. Mr. Dondero testified at a deposition on January 5, 2021, that he gave instructions to a Debtor employee, Hunter Covitz, not to sell "SKY" equity after Mr. Covitz had been instructed by Mr. Seery to sell it.[97] He also testified that he communicated with an employee named Matt Pearson, an equity trader, informing him that certain Non-Debtor Highland Related Entities ("HFAM" and "DAF")—who were investors in the NexPoint/HCMFA Funds—had "instructed Highland in writing not to sell any CLO underlying assets. There is potential liability. Don't do it again."[98] Matt Pearson, in response, canceled scheduled sales of SKY as well as AVYA.[99] Mr. Dondero also communicated with an employee of one of the Advisors named Joe Sowin regarding stoppage of trades of CLO assets. Mr. Dondero explained: "My intent was to prevent trades that weren't in the best interests of investors, that investors—the beneficial holders had articulated they didn't want sold while these funds were in transition, and that the–there was no business purpose to benefit the debtor to sell these assets."[100] To be clear, the so-called investors/beneficial holders were Non-

---

[96] 1/26/21 Transcript at 61:4-18.

[97] 1/5/21 Transcript at 41:22-43:11.

[98] *Id.* at 43:15-44:08.

[99] *Id.*

[100] *Id.* at 50:8-14; *see also, id.* at 89:8-25.

31

Debtor Highland Related Entities under the control of Mr. Dondero. And the Debtor, indeed, *did* have a business purpose—despite Mr. Dondero's belief that Mr. "Seery had no business purpose and he was doing it to tweak myself and everybody else."[101]  For one thing, the Debtor is owed fees from managing these Highland CLOs and it cannot just defer them indefinitely—Highland needed liquidity to fund its Chapter 11 plan. Moreover, Mr. Seery credibly testified that he had consulted with many advisors on the Highland and Advisors team, and he concluded it was a good time to sell the AYVA and SKY securities. In any event, Mr. Dondero also communicated with Debtor employee Thomas Surgent, the Chief Compliance Officer, to inform him that he thought Mr. Seery was engaging in improper trades of Highland CLO assets and told Mr. Surgent he might face personal liability over this.[102]  Finally, Mr. Dondero communicated with a text to Mr. Seery that stated: "Be careful what you do, last warning."[103] As a result of this conduct, the Debtor notified Mr. Dondero's counsel that they were essentially evicting Mr. Dondero from access to the Highland offices effective December 31, 2020 and terminating his Highland email account.[104]

Mr. Dondero stated that he communicated as he did regarding the Highland CLO asset sales because he thought Mr. Seery was acting improperly with the trades he was attempting to execute.[105] Mr. Dondero testified at the hearing on the Contempt Motion that he may have interfered with trades the week of Thanksgiving, but he did not after entry of the TRO. The evidence does not seem to support this testimony.[106]

---

[101] *Id.* at 55:5-6.

[102] *Id.* at 60:23-61-25.

[103] *Id.* at 62:25.

[104] *See* Debtor's Exh. 12 (DE # 80).

[105] 1/5/21 Transcript at 63:1-64:20.

[106] 3/22/21 Transcript at 80-81.

Mr. Dondero testified that he only talked to Jason Post about trades in late December and that Jason Post was not a Debtor employee but rather an employee of NexPoint.[107]

What was at the bottom of this? Mr. Dondero said he "viewed it as a violation of the Advisers Act and the spirit of the Advisers Act, when the beneficial holders have told you they're going to change managers and don't want their account liquidated."[108] Mr. Post inconsistently testified at one hearing that he believed the trades violated Advisors' policies and procedures because they were not initiated through an electronic system called the OMS (Order Management System).[109]  It appears to this court that Mr. Dondero wanted these funds to be kept intact and not have any assets liquidated until he could get a new company up and running (or maybe one of his existing companies) to hopefully take over Highland's role of managing these Highland CLOs.

In any event, the Debtor pointed out, in response to Mr. Dondero's "defense" of his interference—that he was looking out for investors—that Mr. Dondero himself, during January-October 2020, while still an employee of Highland, traded a significantly larger amount of the AVYA stock that was held in the Highland CLOs, sometimes at a lower price than Mr. Seery did or attempted.[110] Mr. Seery, in fact, credibly testified that the original impetus to sell AVYA came from Mr. Hunter Covitz, one of the Highland CLO portfolio managers, who had been looking at this security and noticed it had started moving up after performing extremely poorly post its own Chapter 11.  Mr. Covitz, during the summer of 2020, believed Highland should "start lightening up" on the AVYA holdings, and Mr. Seery also had the following additional personnel look into it: Kunal Sachdev (Highland analyst); Joe Sowin (head trader at HCFMA) and Matthew Gray (another

---

[107] *Id.* at 162.

[108] 3/22/21 Transcript at 168:22-25.

[109] 1/26/21 Transcript at 223:11-16.

[110] *Id.* at 106:9-20, 159-161.

senior analyst). They determined (Mr. Sachdev, in particular) that AVYA had reached its peak and even though it could continue to go up, they just did not think the value was there and thought it should be sold. A similar analytical process was undertaken with the SKY equity holdings.[111]

One might wonder, if Mr. Dondero and the Advisors and the NexPoint/HCMFA Funds believed that Mr. Seery and the Debtor were mismanaging the Highland CLOs, why not offer to take them over during Highland's case (or as part of Highland' Chapter 11 plan)? Mr. Seery credibly testified that:

> Q Has the Debtor made any attempt to transfer the CLO management agreements to the Defendants or to others?
>
> A Well, our original construct of our plan was to do that. We've since determined, when we tried to do that, we got virtually no response from the Dondero interests. The structure of the original thought of the plan was if we didn't get a grand bargain we would effectively transition a significant part of the business to Dondero entities, they would assume employee responsibilities and the operations, and then assure that the third-party funds were not impacted.
>
> As I think I testified on the -- I can't recall if it was the deposition or my prior testimony in court -- Mr. Dondero, true to his word, told me that would be very difficult, he would not agree, and he has made that very difficult.
>
> So we examined it. We've determined that we're going to maintain the CLOs and assume them. But we originally tried to contemplate a way to assign those management agreements.[112]

What's really going on here? These Highland CLOs are one of the ways that the Debtor earns revenue. Specifically, the CLO SPEs must pay fees to the Debtor. Highland's management of the CLO SPEs generates about $4.5-$5 million of fees for it per year.[113] That sometimes requires liquidation of assets in the CLO SPEs to pay the fees, since not all of the assets in the CLO SPEs

---

[111] *Id.* at 156-157.

[112] *Id.* at 163:5-22.

[113] *Id.* at 187:5-12.

are cash-generative.[114] To be more specific, these are very old CLOs that are no longer in a reinvestment period. The manager (Highland) can no longer sell assets and reinvest cash in new assets. Thus, the manager must either hold them or sell them. But the assets are for the most part not loans anymore—they are equity (such as MGM stock) and real estate. Many of the assets, as stated, do not regularly generate cash, so the only way Highland can generate cash to pay management fees is to sell assets (presumably at prudent times). When there is interference with liquidation of assets in the CLO SPEs, it interferes with Highland's revenue stream. Yes, it also reduces the assets in the CLO SPEs ultimately available for the equity tranche. ***But there would appear to be nothing in any contract (or any law presented to the court) that precludes Highland from liquidating assets in the CLO SPEs, from time to time, to pay its fees or otherwise as it deems fit—and the evidence was not at all convincing that there was any sort of bad decision making ongoing in that regard.*** Most importantly, it was Highland's decision to make when and how to liquidate assets. It is easy to see a conflict of interest here. To the extent assets in a Highland CLO are not cash-generative, they will not have liquid funds to pay Highland, as portfolio manager, its management fees. That's not optimal for Highland to indefinitely defer/accrue management fees. But it *would* be optimal for Mr. Dondero and the Advisors as equity holders—they would rather see assets kept in the Highland CLOs longer to hopefully grow their investment. And it also might be optimal for Mr. Dondero and the Advisors for Highland to decide they do not want to manage these Highland CLOs anymore (because of inconsistent ability to pay management fees) and perhaps agree to assign their management agreements over to the Advisors so Mr. Dondero could once again have ultimate, total control over the Highland CLOs. Conspicuously absent on this issue are the indenture trustees and other ultimate equity holders of the Highland CLOs. Only

---

[114] *Id.* at 189:12-18.

Non-Debtor Dondero-Related equity holders have complained. The indenture trustees for the Highland CLOs even agreed to Highland continuing to be the portfolio manager on these CLOs post-confirmation.

The court concludes that Mr. Dondero interfered with the Debtor's trading of Highland CLO assets after entry of the TRO. Whether this amounted to contempt of the TRO will be addressed in the Conclusions of Law section below.

> The Evidence Regarding Mr. Dondero's Communications with Debtor Employees—in Particular, with Inhouse Counsel—to Coordinate His Own Legal Strategy Against the Debtor.

It is apparent from the evidence (numerous emails) that Mr. Dondero communicated with Highland inhouse general counsel Scott Ellington (who was terminated from Highland in January 2021) about all kinds of things post-TRO *other* than shared services, including Mr. Dondero's own personal litigation strategies.[115] As a reminder, Section 2(c) of the TRO stated that Mr. Dondero was enjoined, "from communicating with any of the Debtor's employees, except as it specifically relates to ***shared services provided to affiliates*** owned or controlled by Mr. Dondero" (emphasis added).

Mr. Dondero asserts that after entry of the TRO, he never spoke with any Debtor employees, including Mr. Ellington, regarding anything other than shared services, a "pot plan," and to Mr. Ellington in connection with his role as settlement counsel. In other words, Mr. Dondero's defense is that, yes, he conversed with Scott Ellington regarding things other than shared services provided to affiliates—such as Mr. Dondero's desire to propose a "pot plan" in the case and maybe a few other subjects—but this was permissible because Mr. Ellington was understood by all to be in some

---

[115] *See, e.g.,* Debtor's Exhs. 17, 18, 21 (DE # 80); Debtor's Exhs. 48, 49, 50, 52, 53 (DE # 101). *See also* 3/22/21 Transcript at 122:1-124:7; 124:15-125:12.

sort of role of "settlement counsel" in the case: "Scott Ellington, as my settlement counsel, or as the go-between with Seery and with the creditors, was an important piece of trying to get something done."[116] But this is simply not accurate. This court never would have approved that role for Mr. Ellington. Moreover, Mr. Seery, the current Highland CEO, credibly testified as follows:

> Q Did you task Mr. Ellington with the role of a go-between between the board and Mr. Dondero?
>
> A No. This -- this settlement counsel is something I'd never heard until Dondero raised it and made it up. It -- it's wholly fictitious.
>
> Now, what Ellington did do is he was on a number of calls with me and Dondero, and he had a communication line with Dondero. This was through the first half of the case and into -- into the summer. But as it started to become more adversarial, particularly around the mediation, he wasn't invited. So, for example, Mr. Ellington was not invited to -- to participate in the mediation. He asked. I said no.
>
> The -- in addition, this idea that he was drafting the pot plan, well, not to my knowledge or understanding, because I drafted it for Dondero and his lawyers because you guys [Pachulski] couldn't.[117]

Mr. Seery further credibly testified as follows:

> Q So you're denying Mr. Dondero's testimony to the contrary?
>
> A Yes.
>
> Q Did Mr. Dondero send messages to you through Mr. Ellington?
>
> A No. Mr. Ellington often came back and gave me messages. They were often critical of Mr. Dondero. I didn't always believe them, because I figured Mr. Ellington had an ulterior motive. But he took a number of, you know, shots at Mr. Dondero and he came back and gave his color of what he thought was going on in Mr. Dondero's mind.[118]

---

[116] 3/22/21 Transcript at 135:3-5.

[117] *Id.* at 257:6-21.

[118] *Id.* at 258:2-12.

In addition to this testimony, the documentary evidence reflects that just two days after the TRO was entered, Mr. Dondero was communicating with Scott Ellington seeking advice regarding an appropriate witness to support his interests at an upcoming hearing.[119]  And just six days after entry of the TRO, Mr. Dondero was emailing Mr. Ellington telling him "I'm going to need you to provide leadership here" and Ellington replies "[o]n it."[120]  Additionally, there are emails reflecting that inhouse lawyers Scott Ellington and Isaac Leventon were receiving and responding to information requests from Mr. Dondero[121] and were being copied on draft joint defense agreement prepared by the Dugaboy and Get Good Trusts' counsel.[122]  And Mr. Dondero emailed with Scott Ellington on December 24, 2020 regarding his unhappiness and intention to object to a settlement between HarbourVest and Debtor.[123]

> The Evidence Regarding Interference with Debtor's Duty to Produce Documents to the UCC.

On December 16, 2020, at 5:18 pm Mr. Dondero sent Melissa Schroth, a Highland employee (executive accountant), a text stating: "No dugaboy details without subpoena."[124]  This was a reference to document requests from the UCC in which they were seeking documents that were on the Highland server concerning Mr. Dondero's family trust, the Dugaboy Trust.

---

[119] Debtor's Exh. 17 (DE # 80) (Scott Ellington email to Mr. Dondero and his counsel on 12/12/20 at 11:55 pm suggesting JP Sevilla for a witness for some unknown hearing). *See also* Debtor's Exh. 26 (DE # 80).

[120] *See* Debtor's Exh. 18 (DE # 80).

[121] *See* Debtor's Exh. 20 (DE # 80).

[122] *See* Debtor's Exh. 24 (DE # 80).

[123] Debtor's Exh. 21 (DE # 80).

[124] *See* Debtor Exh. 19 (DE # 80).

## VI.    Conclusions of Law

A. <u>Jurisdiction and Authority</u>.

Bankruptcy subject matter jurisdiction exists in this matter, pursuant to 28 U.S.C. § 1334(b). This bankruptcy court has authority to exercise such subject matter jurisdiction, pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This is a core matter pursuant to 28 U.S.C. § 157(b) in which this court may issue a final order. Section 105 of the Bankruptcy Code and the cases construing it are the substantive legal authority.

The Contempt Motion seeks for this court to hold Mr. Dondero in civil contempt of court for violating an order of this court (the TRO). It is well established that bankruptcy courts have civil (as opposed to criminal) contempt powers. "The power to impose sanctions for contempt of an order is an inherent and well-settled power of all federal courts—including bankruptcy courts."[125] A bankruptcy court's power to sanction those who "flout [its] authority is both necessary and integral" to the court's performance of its duties.[126] Indeed, without such power, the court would be a "mere board[ ] of arbitration, whose judgments and decrees would be only advisory."[127]

---

[125] *In re SkyPort Global Comm's, Inc.,* No. 08-36737-H4-11, 2013 WL 4046397, at *1 (Bankr. S.D.Tex. Aug. 7, 2013), *aff'd.,* 661 Fed. Appx. 835 (5th Cir. 2016); *see also In re Bradley*, 588 F.3d 254, 255 (5th Cir. 2009) (noting that "civil contempt remains a creature of inherent power[,]" to "prevent insults, oppression, and experimentation with disobedience of the law[,]" and it is "widely recognized" that contempt power extends to bankruptcy) (quoting 11 U.S.C. § 105(a), which states, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); *Placid Refining Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.),* 108 F.3d 609, 613 (5th Cir.1997) ("[W]e assent with the majority of the circuits … and find that a bankruptcy court's power to conduct civil contempt proceedings and issue orders in accordance with the outcome of those proceedings lies in 11 U.S.C. § 105."); *Citizens Bank & Trust Co. v. Case (In re Case),* 937 F.2d 1014, 1023 (5th Cir. 1991) (held that bankruptcy courts, as Article I as opposed to Article III courts, have the inherent power to sanction and police their dockets with respect to misconduct).

[126] *SkyPort Global,* 2013 WL 4046397, at *1.

[127] *Id.* (internal quotations omitted); *see also Bradley,* 588 F.3d at 266 (noting that contempt orders are both necessary and appropriate where a party violates an order for injunctive relief, noting such orders "are important to the management of bankruptcy cases, but have little effect if parties can irremediably defy them before they formally go into effect.").

Contempt is characterized as either civil or criminal depending upon its "primary purpose."[128] If the purpose of the sanction is to punish the contemnor and vindicate the authority of the court, the order is viewed as criminal. If the purpose of the sanction is to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation, the order is considered purely civil.[129] It is clear that Highland's intent is to both seek compensation for the expenses incurred by Highland, due to Mr. Dondero's alleged violations of the TRO, and to coerce compliance going forward.[130]

B.  Type of Civil Contempt: Alleged Violation of a Court Order.

There are different types of civil contempt, but the most common type is violation of a court order (such as is alleged here). "A party commits contempt when [they] violate[] a definite and specific order of the court requiring [them] to perform or refrain from performing a particular act or acts with knowledge of the court's order."[131] Thus, the party seeking an order of contempt in a civil contempt proceeding need only establish, by clear and convincing evidence:[132] "(1) that a

---

[128] *Bradley*, 588 F.3d at 263.

[129] *Id.* (internal citations omitted).

[130] Highland seeks the following relief in the Contempt Motion: an order (i) finding and holding Mr. Dondero in contempt for violating the TRO; (ii) directing Mr. Dondero to produce to the Debtor and the UCC within three days all financial statements and records of Dugaboy and Get Good for the last five years; (iii) directing Mr. Dondero to pay the Debtor's estate an amount of money equal to two times the Debtor's actual expenses incurred in bringing this Motion and addressing Mr. Dondero's conduct that lead to the imposition of the TRO and this Motion (e.g., responding to the K&L Gates Clients' frivolous motion and related demands and threats and taking Mr. Dondero's deposition), payable within three (3) calendar days of presentment of an itemized list of expenses, (iv) imposing a penalty of three (3) times the Debtor's actual expenses incurred in connection with any future violation of any order of this Court, and (iv) granting the Debtor such other and further relief as the court deems just and proper under the circumstances.

[131] *Travelhost*, 68 F.3d at 961.

[132] *United States v. Puente*, 558 F. App'x 338, 341 (5th Cir. 2013) (per curiam) (internal citation omitted) ("[C]ivil contempt orders must satisfy the clear and convincing evidence standard, while criminal contempt orders must be established beyond a reasonable doubt.").

court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order."[133]

### C. Specificity of the Order.

"To support a contempt finding in the context of a TRO, the order must delineate 'definite and specific' mandates that the defendants violated."[134] The court need not, however, "anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated."[135]

### D. Possible Sanctions.

To be clear, if the court ultimately determines that Mr. Dondero is in contempt of court, for not having complied with the TRO, the court can order what is necessary to: (1) compel or coerce obedience of the order; and (2) to compensate the Debtor/estate for losses resulting from Mr. Dondero's non-compliance with a court order.[136] The court must determine that the Debtor/movant showed by clear and convincing evidence that: (1) the TRO was in effect; (2) the TRO required certain conduct by Mr. Dondero; and (3) that Mr. Dondero failed to comply with the TRO.[137] "[T]he factors to be considered in imposing civil contempt sanctions are: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in

---

[133] *F.D.I.C. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995); *see also Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir.1992) (same); *Travelhost*, 68 F.3d at 961 (same).

[134] *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000) (citing Fed. R. Civ. P. 65).

[135] *Id.*

[136] *In re Gervin*, 337 B.R. 854, 858 (W.D. Tex. 2005) (citing *United States v. United Mine Workers*, 330 U.S. 258 (1947)).

[137] *In re LATCL&F, Inc.*, 2001 WL 984912. *3 (N.D. Tex. 2001) (citing to *Petroleos Mexicanos v. Crawford Enterprises, Inc.*, 826 F.2d 392, 400 (5th Cir. 1987)).

disregarding the court's order."[138] "Compensatory civil contempt reimburses the injured party for the losses and expenses incurred because of [their] adversary's noncompliance."[139] Ultimately, courts have "broad discretion in the assessment of damages in a civil contempt proceeding."[140]

### E. Knowledge of the Order.

"An alleged contemnor must have had knowledge of the order on which civil contempt is to be based.  The level of knowledge required, however, is not high. And intent or good faith is irrelevant."[141] To be clear, "intent is not an element in civil contempt matters.  Instead, the basic rule is that all orders and judgments of courts must be complied with promptly."[142]

### F. Willfulness of Actions.

For civil contempt of a court order to be found, "[t]he contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order."[143] For a stay violation, the complaining party need not show that the contemnor intended to violate the stay. Rather, the complaining party must show that the contemnor intentionally committed the acts which violate the stay. Nevertheless, in determining whether damages should be awarded under the court's

---

[138] *Lamar Financial Corp. v. Adams,* 918 F.2d 564, 567 (5th Cir. 1990) (citing *United States v. United Mine Workers,* 330 U.S. 258 (1947)).

[139] *Norman Bridge Drug Co. v. Banner,* 529 F.2d 822, 827 (5th Cir.1976); *see also Travelhost,* 68 F.3d at 961 (noting that "[b]ecause the contempt order in the present case is intended to compensate [plaintiff] for lost profits and attorneys' fees resulting from the contemptuous conduct, it is clearly compensatory in nature."); *In re Terrebonne Fuel & Lube, Inc.,* 108 F.3d at 613 (affirming court's decision to impose sanctions for violating injunction and awarding plaintiff costs and fees incurred in connection with prosecuting defendant's conduct); *F.D.I.C.,* 43 F.3d 168 (affirming court's imposition of sanctions requiring defendant to pay movant attorneys' fees).

[140] *Am. Airlines,* 228 F.3d at 585; *see also F.D.I.C.,* 43 F.3d 168 (reviewing lower court's contempt order for "abuse of discretion" under the "clearly erroneous standard."); *In re Terrebonne Fuel & Lube, Inc.,* 108 F.3d at 613 ("The bankruptcy court's decision to impose sanctions is discretionary[]").

[141] *Kellogg v. Chester,* 71 B.R. at 38.

[142] *In re Unclaimed Freight of Monroe, Inc.,* 244 B.R. 358, 366 (Bankr. W.D. La. 1999).  *See also In re Norris*, 192 B.R. 863, 873 (Bankr. W.D. La. 1995) ("Intent is not an element of civil contempt.")

[143] *Id.* (citing *N.L.R.B. v. Trailways, Inc.*, 729 F.2d 1013, 1017 (5th Cir.1984)).

contempt powers, the court considers whether the contemnor's conduct constitutes a willful violation of the stay.[144]

G. Applying the Evidence to the Literal Terms of the TRO.

The court concludes that there is clear and convincing evidence that Mr. Dondero violated the specific wording of the TRO in certain ways and, thus, is in contempt of the court as follows.

1. **The TRO states in Section 2(c) that Mr. Dondero is enjoined, "from communicating with any of the Debtor's employees, except as it specifically relates to shared services provided to affiliates owned or controlled by Mr. Dondero."**

There are several examples of violations of this provision. And many of the communications appeared to be adverse to the Debtor's interests.

First, notably, Mr. Dondero actually admitted that he had conversations with some Debtor employees, including Scott Ellington, after December 10, 2020, regarding things other than "shared services," including a "pot plan" and, more generally, in connection with Mr. Ellington's role as "settlement counsel": "Scott Ellington, as my settlement counsel, or as the go-between with Seery and with the creditors, was an important piece of trying to get something done."[145] As indicated earlier, this court never would have approved that role for Mr. Ellington, and Mr. Seery credibly testified that this was never approved by him or the Independent Board. There was no exception for this in the TRO. As for Mr. Dondero's desire to pursue a pot plan, again, there's nothing in the TRO that allowed Mr. Dondero to speak with any of the Debtor's employees about the pot plan. It is clear that he knew that because on December 16, 2020, just six days after the TRO was entered, Mr. Dondero filed a motion seeking to modify the TRO to allow Mr. Dondero to speak directly with the Independent Board about a pot plan. He later withdrew that motion.[146]

---

[144] *In re All Trac Transport, Inc.*, 306 B.R. 859, 875 (Bankr. N.D. Tex. 2004) (internal citations omitted).

[145] 3/22/21 Transcript at 135:3-5.

[146] *See* DE # 24.

Additionally, as noted earlier in this Opinion, it appears that Mr. Dondero communicated with inhouse lawyer Scott Ellington about all kinds of other things such as: (a) reporting to him about his intention to object to the settlement by the Debtor of the HarbourVest claim;[147] (b) reporting to him about his desire to collaborate with UBS and its counsel to give them "evidence of Seery ineptitude" and they would "run with it";[148] (c) forwarding email conversations to Scott Ellington that Mr. Dondero was having with his counsel (and thereby eviscerating attorney-client privilege as to those emails) about various disputes involving certain Non-Debtor Dondero-Related Entities and regarding the Debtor's desire to seek discovery from Mr. Dondero;[149] (d) reviewing a joint defense agreement that the lawyer for his family trusts (Dugaboy and Get Good) had drafted;[150] and (e) "showing leadership"—whatever that meant—but likely meaning coordinating of all the many lawyers involved for Mr. Dondero's interests.[151]

Finally, Mr. Dondero communicated with Highland employee (executive accountant) Melissa Schroth about resisting production of Dugaboy documents that were on the Highland server without a subpoena[152] and Jason Rothstein about his phone.[153]

In summary, Mr. Dondero violated Section 2(c) of the TRO numerous times.[154] His intent does not matter. He knew about the TRO. Thus, he was in contempt for these numerous violations.

---

[147] Debtor's Exh. 21 (DE # 80).

[148] Debtor's Exh. 50 (DE # 101).

[149] Debtor's Exh. 52 & 53 (DE # 101).

[150] *See* Debtor's Exh. 24 (DE # 80).

[151] Debtor's Exh. 18 (DE # 80). *See also* 3/22/21 Transcript at 122:1-124:7; 124:15-125:12.

[152] *See* Debtor Exh. 19 (DE # 80) (on December 16, 2020, at 5:18 pm: "No dugaboy details without subpoena.").

[153] Debtor's Exh. 8 (DE # 80); 1/5/21 Transcript at 80-55; 3/22/21 Transcript at 57-58.

[154] The court notes that there was also clear and convincing evidence to suggest various conversations occurred between Mr. Dondero and his assistant Tara Loiben after December 10, 2020. However, it is not clear from the record if Tara Loiben was a Highland employee or an employee of one of the Non-Debtor Dondero-Related Entities. Moreover, there was evidence to suggest Mr. Dondero communicated with Mr. Ellington on December 11-12, 2020 regarding who should be a witness for Mr. Dondero at an upcoming hearing. However, the evidence of this was not

> 2. *The TRO states at Section 3(a) that Mr. Dondero is "enjoined from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct" (and the "Prohibited Conduct" includes "interfering with or otherwise impeding" the Debtor's "decisions concerning disposition of assets controlled by the Debtor").*

The court concludes that there is clear and convincing evidence that Mr. Dondero violated this provision.

Things had grown very awkward at Highland, to say the least, by October 2020 when Mr. Dondero was terminated. It is clear from the evidence that Mr. Dondero did not like the way the bankruptcy case was playing out (his pot plan was not getting the attention or reception he hoped for from the UCC and the Debtor) and he did not like certain trading decisions that Mr. Seery was making. Conflicts of interest between the Debtor and Mr. Dondero (and the Non-Debtor Dondero-Controlled Entities) were seeming more and more problematic. It was against this backdrop that the TRO was entered. It was also against this backdrop that Mr. Dondero and his Non-Debtor Dondero-Related Entities began hiring armies of lawyers. In the midst of all of this, Mr. Dondero gave instructions to a Debtor employee, Hunter Covitz, not to sell "SKY" equity after Mr. Covitz had been instructed by Mr. Seery to sell it.[155] He also communicated with an employee named Matt Pearson, an equity trader, informing him that certain Non-Debtor Highland Related Entities ("HFAM" and "DAF")—who were investors in the NexPoint/HCMFA Funds—had "instructed Highland in writing not to sell any CLO underlying assets. There is potential liability. Don't do it again."[156]  Matt Pearson, in response, canceled scheduled sales of SKY, as well as AVYA. Mr.

---

clear and convincing that Mr. Dondero spoke directly with Mr. Ellington (as opposed to being copied on conversations among Mr. Ellington and Mr. Dondero's counsel). *See* Debtor's Exhs. 17 (DE # 80), 48 & 49 (DE # 101).

[155] 1/5/21 Transcript at 41:22–43:11.

[156] *Id.* at 43:15–44:08.

Dondero also communicated with an employee of one of the Advisors named Joe Sowin regarding stoppage of trades of CLO assets.[157]  Mr. Dondero also communicated with Debtor employee Thomas Surgent, the Chief Compliance Officer, to inform him that he thought Mr. Seery was engaging in improper trades of Highland CLO assets and told Mr. Surgent he might face personal liability over this.[158]  Finally, Mr. Dondero communicated with a text to Mr. Seery that stated: "Be careful what you do, last warning."[159]

Mr. Dondero's "defense" of his interference—that he was looking out for investors—is neither relevant nor entirely credible.  As earlier indicated, intent does not matter with civil contempt.  Moreover, the evidence was credible that Mr. Dondero himself, postpetition, while still an employee of Highland, traded a significantly larger amount of the AVYA stock that was held in the Highland CLOs, sometimes at a lower price than Mr. Seery did or attempted.[160]

In summary, Mr. Dondero violated Section 3 of the TRO.  His intent does not matter.  He knew about the TRO.  Thus, he was in contempt of court for interfering with or otherwise impairing the Debtor's business, including its decisions concerning disposition of assets controlled by the Debtor.

3. ***The TRO states in Section 2(e) that Mr. Dondero shall not violate section 362(a) of the Bankruptcy Code.***

The Debtor has argued that Mr. Dondero's actions with regard to the disappearing cell phone provided to him by the Debtor amounted to a violation of the automatic stay, section 362(a)(3) (as an exercise of control over property of the estate—*i.e.,* the phone and its data thereon) and, thus, a

---

[157] *Id.* at 50:8-14; *see also id.* at 89:8-25.

[158] *Id.* at 60:23-61-25.

[159] *Id.* at 62:25.

[160] *Id.* at 106:9-20, 159-161.

violation of this provision of the TRO. While the court is more than a little troubled by the mysterious disappearance of the cell phone—just hours after entry of the TRO and after a year of numerous ESI requests by the UCC during the case—the court cannot conclude that the disappearance was a clear and convincing violation of the TRO. There may or may not be a later evaluation of whether a spoliation of evidence has occurred, but for now, this is simply a matter of whether the TRO was violated.

As earlier stated, "To support a contempt finding in the context of a TRO, the order must delineate 'definite and specific' mandates that the defendants violated."[161] While the court need not, however, "anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated,"[162] the court concludes that the TRO simply was not specific enough with regard to the phone. The TRO did not specifically state "turn over your cell phone." A letter on December 23, 2020 from Debtor's counsel to Mr. Dondero's counsel later made such a demand,[163] but this was not the same as there being a mandate in the four corners of the TRO. Additionally, the Highland Employee Handbook made it clear that the phone and its data were the Debtor's.[164] But this, too, is not the same as the TRO's literal terms.

Mr. Dondero should not consider this to be a victory. ***The court reiterates that it is highly concerned about possible spoliation of evidence that may or not be presented in a contested matter later.***[165] At the same time, no one else should consider "spoliation" to be a foregone

---

[161] *Am. Airlines, Inc. v. Allied Pilots Ass'n,* 228 F.3d 574, 578 (5th Cir. 2000) (citing Fed. R. Civ. P. 65).

[162] *Id.*

[163] Debtor's Exh. 12 (DE # 80).

[164] Debtor's Exhs. 54 & 55 (DE # 101).

[165] *See* Fed. R. Civ. Proc. 37(e) (dealing with failure to preserve electronically stored information); *Hawkins v. Gresham,* No. 3:13-CV-00312-P, 2015 WL 11122118, at *3 (N.D. Tex. Jan. 16, 2015) (dealing with the question of whether a defendant's sale of his phone containing relevant text messages after being notified of a lawsuit was a breach of his duty to preserve evidence); *Paisley Park Enterprises, Inc. v. Boxill,* 330 F.R.D. 226, 230-237 (D. Minn. 2019) (dealing with whether two defendants' loss of relevant text messages resulting from their phones' auto-delete function

conclusion here. The court never heard testimony from Jason Rothstein or Tara Loiben (who seem

to have been involved with the disappearing phone). The court never heard evidence as to whether

the inhouse lawyers (*e.g.,* Scott Ellington, Isaac Leventon) properly addressed with Highland

employees, such as Mr. Dondero, as they should have, the preservation notice and document

requests served on the Debtor by the UCC.[166] The court also cannot be sure at this time whether

there was even relevant and retrievable information on the phone. The court has many lingering

questions, but it cannot find contempt of the TRO based on the TRO's lack of specificity where the

cell phone was concerned.

### 4. *Other Allegations of TRO Violations.*

The Debtor has cited various other instances of Mr. Dondero's behavior that it believes were

violative of the TRO. For example: (a) Mr. Dondero's alleged willful ignorance of it by not reading

it or underlying pleadings associated with it; (b) trespassing on the Debtor's property after the

Debtor had evicted him; and (c) allegedly interfering with the Debtor's obligation to produce certain

documents that were requested by the UCC and that were in the Debtor's possession, custody, and

---

constituted spoliation of evidence when the defendants had explicitly discussed the possibility of litigation before the deletion and were principals of the company being sued); *First Fin. Sec., Inc. v. Freedom Equity Grp., LLC,* No. 15-CV-1893-HRL, 2016 WL 5870218, at *3-4 (N.D. Cal. Oct. 7, 2016) (dealing with whether Defendants' intentional deletion of text messages after they had discussed the likelihood of litigation was spoliation of evidence under Rule 37(e); also, whether sanctions were warranted when it was unclear whether the information contained in the deleted text messages would have been critical to plaintiff's claims); *Living Color Enterprises, Inc. v. New Era Aquaculture, Ltd.,* No. 14-CV-62216, 2016 WL 1105297, at *1-2, 4-7 (S.D. Fla. Mar. 22, 2016) (dealing with whether the deletion of text messages from Defendant's cell phone as a result of the phone's auto-delete feature after he reasonably anticipated litigation was spoliation of evidence that prejudiced the Plaintiff; also, whether Defendant's failure to disable the auto-delete feature that resulted in the deletion of text messages was evidence of his intent to deprive Plaintiff of relevant evidence.); *Clear-View Tech., Inc. v. Rasnick,* No. 5:13-CV-02744-BLF, 2015 WL 2251005, at *2, 7-11 (N.D. Cal. May 13, 2015) (whether Defendants spoliated text message evidence by purposefully deleting emails and discarding cell phones after receiving messages threatening a lawsuit from Plaintiff and discussing the possibility of litigation); *Kan-Di-Ki, LLC v. Suer,* No. CV 7937-VCP, 2015 WL 4503210, at *30 (Del. Ch. July 22, 2015) (whether Plaintiff's deletion of relevant emails and loss of his cell phone constituted spoliation and whether sanctions were warranted).

[166] Debtor's Exhs. 29-33 (DE # 80).

control. While the allegations are problematic, the court does not conclude these actions constituted civil contempt of the TRO.[167]

With regard to Mr. Dondero's alleged "willful ignorance" of the TRO, it is technically not a violation of any term of the TRO. The most important thing here is that Mr. Dondero cannot claim lack of knowledge of the TRO's contents. As mentioned earlier, "[a]n alleged contemnor must have had knowledge of the order on which civil contempt is to be based. The level of knowledge required, however, is not high."[168] When Mr. Dondero testified that he had not read the TRO (or the underlying pleadings supporting it), maybe he was trying to imply lack of knowledge of its terms as some sort of defense? Or maybe he really did not care to read the TRO and was relying entirely upon his counsel to tell him all of its terms. Whatever the explanation, it really does not matter much. The court determines that Mr. Dondero had the necessary knowledge of the TRO, for purposes of holding him accountable for compliance with it, but—even if he was somewhat cavalier in not actually reading the TRO line-for-line—this alone is not a violation of the TRO's terms.

With regard to Mr. Dondero's trespassing on the Debtor's property after the Debtor had evicted him, the problem here is that the "eviction" of Mr. Dondero occurred pursuant to the letter that Debtor's counsel sent to Mr. Dondero's counsel on December 23, 2010—not pursuant to the actual terms of the TRO.[169] The TRO itself did not specifically enjoin Mr. Dondero from going to

---

[167] The court should add that it does not conclude that letters sent by counsel for the Advisors and the NexPoint/HCMFA Funds, seeking to stop the sale of Highland CLO assets, and a motion that they filed to address Highland CLO management issues, constituted contempt of court by Mr. Dondero. *See* Debtor's Exh. 25 (DE # 80). While Mr. Dondero, as the President and portfolio manager of these Non-Debtor Dondero-Related entities, was/is no doubt in control of them, and while it is a very close call as to whether—through these lawyers' actions—Mr. Dondero was causing "(a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf," to interfere with the disposition of assets controlled by the Debtor, the court ultimately believes that hiring lawyers to file motions (and those lawyers taking steps leading up to the filing of the motions, such as sending letters previewing that they may take legal actions), should not be viewed as having crossed the line into contemptuous behavior. Again, this was a close call.

[168] *Kellogg v. Chester,* 71 B.R. at 38.

[169] Debtor's Exh. 12 (DE # 80).

the Highland offices. The later preliminary injunction entered on January 8, 2021 for the first time contained such an injunction.[170] Thus, even though Mr. Dondero showed up in the Debtor's offices on January 5, 2021 to sit for the Debtor's virtual deposition of him, the court does not conclude that this violated a term of the TRO.

With regard to Mr. Dondero's allegedly interfering with the Debtor's obligation to produce certain documents that were requested by the UCC and that were in the Debtor's possession, custody, and control, the court understands this to be a reference to Mr. Dondero texting Highland employee Melissa Schroth and instructing her not to turn over documents concerning the Dugaboy Trust (that were on Highland's server) without a subpoena.[171] The court has already addressed this as a TRO violation, ***since it was a communication with a Highland employee regarding matters other than "shared services."*** For the avoidance of doubt, there was no shared services agreement between the Dugaboy Trust and Highland. This clearly was a TRO violation.

**V. Damages.**

The Contempt Motion requests that the court (i) find and hold Mr. Dondero in contempt for violating the TRO; (ii) direct Mr. Dondero to produce to the Debtor and the UCC, within three days all financial statements and records of Dugaboy and Get Good for the last five years; (iii) direct Mr. Dondero to pay the Debtor's estate an amount of money equal to two times the Debtor's actual expenses incurred in bringing this Motion, payable within three calendar days of presentment of an itemized list of expenses; (iv) impose a penalty of three times the Debtor's actual expenses incurred in connection with any future violation of any order of this Court, and (v) grant the Debtor such other and further relief as the court deems just and proper under the circumstances.

---

[170] DE # 59 at ¶ 5.

[171] Debtor's Exh. 19 (DE # 101).

As indicated earlier, the court can order what is necessary to: (1) compel or coerce obedience of an order; and (2) to compensate the Debtor/estate for losses resulting from Mr. Dondero's non-compliance with a court order. Here, the court believes compensatory damages are more appropriate than a remedy to compel or coerce future compliance. Compensatory damages are supposed to reimburse the injured party for the losses and expenses incurred because of their adversary's noncompliance. Courts have broad discretion but may consider such factors as: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in disregarding the court's order.

As far as the harm from noncompliance, the Debtor presented invoices of the fees incurred by its counsel relating to the TRO and Contempt Motion. The Debtor did not attempt to quantify any potential economic harm to the Debtor from Mr. Dondero's prohibited conversations with Debtor employees and attempted interference with trading. Should this matter? Once again, is this much ado about nothing? In answering this question, context matters. Recall that the Corporate Governance Settlement between the Debtor and UCC from January 2020 was ***all about removing Mr. Dondero from control of the Debtor but avoiding the drastic remedy of a Chapter 11 Trustee***. It was heavily negotiated and extremely detailed in its terms. Ultimately, Mr. Dondero was kept around at the company in a non-control capacity, but eventually conflicts between the Debtor and him (and between the Debtor and the Non-Debtor Dondero-Related Entities) became intolerable. Mr. Dondero was, therefore, terminated. But almost immediately, he essentially began instructing Debtor employees to ignore their boss (Mr. Seery) and do as Mr. Dondero said instead. All of this was occurring at a critical time when the Debtor had filed a Chapter 11 plan, was still negotiating it with creditors, and was set for a confirmation hearing—and, meanwhile, Mr. Dondero was trying

to gain support for his own pot plan that would involve him regaining control of the company and/or transitioning the Debtor's managed funds over to his control. His interference—even if not ultimately resulting in quantifiable harm to the Debtor's balance sheet or cash flow—posed a risk to the Debtor's plan of reorganization that, ultimately ended up being supported by hundreds of millions of dollars-worth of creditors (in fact, all creditors except the Non-Debtor Dondero-Related Entities). The reality is that the Debtor's counsel acted quickly in bringing the Contempt Motion before much damage could be done. The fact that they acted swiftly—before the Debtor had incurred any quantifiable damage other than significant attorneys' fees—should not preclude the Debtor from alleging harm and receiving reimbursement of its attorneys' fees and expenses incurred relating to the TRO and Contempt Motion.

As far as the attorneys' fees incurred relating to the TRO and Contempt Motion, the Debtor presented invoices of the fees incurred by its primary bankruptcy counsel, Pachulski Stang, during December 2020 and January 2021, pertaining to "Bankruptcy Litigation"—much of which it represented related to its attorney time devoted to the Contempt Motion. The Debtor admitted that there were some other litigation matters mixed in these invoices.[172] Total December fees were $526,686. The court has reviewed the December invoice and conservatively estimates that **$170,919** of the fees reflected in the December invoice related to the TRO and Contempt Motion (other fees appeared to relate to other litigation matters such as the HarbourVest settlement, Pat Daugherty issues, UBS, demand note litigation, and Dugaboy claims). Total January fees were $698,770. The court has reviewed this invoice and conservatively estimates that **$195,002** of the fees reflected in the January 2021 invoice related to the TRO and Contempt Motion (again, other

---

[172] Debtor's Exhs. 38 & 39 (DE # 128).

fees appeared to relate to other litigation matters such as UBS and other litigation). These two sums total **$365,921**.

However, the hearing on this matter (as a result of continuances sought by Mr. Dondero) did not occur until March 22 & 24, 2021. The court was presented with no invoices for February or March. The court estimates that the hearing on this matter (March 22 & 24, 2021) required 10 hours of in-court time. The primary attorney handling this matter for the Debtor (Mr. Morris) charged at $1,245 per hour and his paralegal (Ms. Canty) charged $425 per hour. The court will assume that they each spent 10 hours during the day or two before the hearing preparing for it. This would amount to an additional **$33,400** of fees, bringing the total now to **$399,321**. The court stresses that it used conservative math when scrutinizing the invoices. Moreover, this represents fees only. The court assumes that the various depositions and transcripts required as a result of this litigation resulted in many thousands of dollars of additional expenses. Also, Pachulski had local counsel (Hayward & Associates) whose invoices were not submitted. Additionally, the UCC had counsel monitoring all of this (Sidley & Austin)—whose fees and expenses are reimbursed by the bankruptcy estate—and their fees and expenses have not been included. In summary, the $399,321 number is extremely conservative, and it does not include likely significant add-ons (expenses; local counsel; and UCC counsel). The court determines that it is reasonable to round the $399,321 number up approximately $50,000, to **$450,000** because of these extra items. In considering the probable effectiveness of the sanction, the financial resources of Mr. Dondero and the burden the sanctions may impose, and the willfulness of Mr. Dondero in disregarding the court's TRO, the court believes—based on information it has learned at numerous hearings about Mr. Dondero's compensation and the size of the companies he has been running for almost 30 years—he has substantial resources, and this $450,000 compensatory sanction will not place much of a burden on

him at all. The court believes that there was willfulness with regard to many of Mr. Dondero's actions. The court has no idea about the probability of these sanctions being effective. Time will tell.

The Debtor has asked for the court to impose a penalty of three times the Debtor's actual expenses incurred in connection with any future violation of any order of this Court. The court declines to do this. However, the court will add on a sanction of $100,000 for each level of rehearing, appeal, or petition for *certiorari* that Mr. Dondero may choose to take with regard to this Order, to the extent any such motions for rehearing, appeals, or petitions for *certiorari* are not successful.

Accordingly, it is hereby ORDERED that:

(i)     Mr. Dondero is in civil contempt of court in having violated the court's December 10, 2020 TRO—the court having found by clear and convincing evidence that: (1) the TRO was in effect and Mr. Dondero knew about it; (2) the TRO required certain conduct by Mr. Dondero; and (3) Mr. Dondero failed to comply with the TRO;

(ii)    In order to compensate the Debtor's estate for loss and expense resulting from Mr. Dondero's non-compliance with the TRO, Mr. Dondero is directed to pay the Debtor (on the 15th day after entry of this order) an amount of money equal to **$450,000;**

(iii)   The court will add on a sanction of **$100,000** for each level of rehearing, appeal, or petition for *certioriari* that Mr. Dondero may choose to take with regard to this Order, to the extent that any such motions for rehearing, appeals, or petitions for *certiorari* are pursued by him and are not successful;

(iv)    Other sanctions are denied at this time; and

(v)     The court reserves jurisdiction to interpret and enforce this Order.

### End of Memorandum Opinion and Order ###