# EXHIBIT A



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 31, 2019**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **CASE NO. 18-30264-SGJ-11** |
| | § | **(Chapter 11)** |
| Debtor. | § | |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT GP, L.L.C.,** | § | **CASE NO. 18-30265-SGJ-11** |
| | § | **(Chapter 11)** |
| | § | |
| Debtor. | § | |

## BENCH RULING AND MEMORANDUM OF LAW IN SUPPORT OF:
## (A) FINAL APPROVAL OF DISCLOSURE STATEMENT; AND (B)
## CONFIRMATION OF CHAPTER 11 TRUSTEE'S THIRD AMENDED JOINT PLAN

Before this court is a request by the Chapter 11 Trustee (herein so called) for final

approval of the adequacy of a disclosure statement and for confirmation of his Third Amended

Joint Plan of Reorganization,[1] as amended, modified or supplemented (the "Plan"), for the two above-referenced debtors: (1) Acis Capital Management, L.P. (the "Debtor-Acis"), a Delaware limited partnership, and (2) Acis Capital Management GP, LLC, a Delaware limited liability company (the general partner of the Debtor-Acis; collectively, the "Debtors"). The two chapter 11 cases have been administratively consolidated.[2]

The hearing on these matters transpired over multiple days in December 2018, and the court considered the testimony of more than a dozen witnesses, more than 700 exhibits, and hundreds of pages of legal briefing. Based on the foregoing, the court *overrules all objections* and will confirm the Plan, including all proposed modifications to it. The Chapter 11 Trustee has demonstrated, by a preponderance of the evidence, that the Plan, as modified, satisfies the applicable provisions of the Bankruptcy Code including but not limited to Sections 1122, 1123, 1127, and 1129 of the Bankruptcy Code.[3] The court also approves on a final basis the adequacy of the accompanying disclosure statement to the Plan, determining that it meets the requirements set forth in Section 1125 of the Bankruptcy Code. Notice and solicitation with respect to the

---

[1] Exhs. 508 & 509; *see also* DE ## 660, 661, 693, 702, & 769. References to "DE # __" from time to time in this ruling relate to the docket number at which a pleading or other item appears in the docket maintained in these administratively consolidated Bankruptcy Cases, in Case # 18-30264.

[2] Note that the Debtor-Acis is, essentially, the debtor that is the operating company. As a general partner, Acis Capital Management GP, LLC is legally obligated on all of the operating company's debt. *See* 6 Del. C. § 17-403(b) ("Except as provided in this chapter, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law in effect on July 11, 1999 (6 Del. C. § 1501 et seq.) to persons other than the partnership and the other partners."); *see also* 6 Del. C. § 15-306(a) ("(a) Except as otherwise provided in subsections (b) and (c) of this section, all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law"). The Plan jointly addresses both of the Debtors' debts.

[3] *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.),* 994 F.2d 1160, 1165 (5th Cir. 1993); *In re Sears Methodist Ret. Sys.,* No. 14-32821-11, 2015 Bankr. LEXIS 709, at *8 (Bankr. N.D. Tex. Mar. 5, 2015); *In re Couture Hotel Corp.,* 536 B.R. 712, 732 (Bankr. N.D. Tex. 2015); *In re Mirant Corp.,* No. 03-46590, 2007 Bankr. LEXIS 4951, at *19-20 (Bankr. N.D. Tex. Apr. 27, 2007).

Plan is determined to have complied with the applicable Bankruptcy Rules and due process.  The

court provides reasoning for its ruling below.  The court directs the Chapter 11 Trustee to submit

to the court for signing the proposed Findings of Fact and Conclusions of Law and Order that

were filed at DE # 814.  This Bench Ruling supplements those Findings of Fact and Conclusions

of Law and Order and, where appropriate, should be considered additional findings and

conclusions as contemplated by Fed. R. Bankr. Proc. 7052.

## I.   Background.[4]

The above-referenced bankruptcy cases (the "Bankruptcy Cases") have been pending

since January 30, 2018 and have been astonishingly contentious.  The Chapter 11 Trustee has

been in place since on or about May 14, 2018.  The Plan (which is the fourth one proposed by the

Chapter 11 Trustee) has been objected to by three related entities: (a) Highland Capital

Management, L.P. ("Highland"), (b) Highland CLO Funding Ltd. ("HCLOF Guernsey"), and (c)

Neutra, Ltd. ("Neutra Cayman").  The Chapter 11 Trustee loosely refers to these three objectors

(the "Objectors") as "the Highlands" because they are not only related to each other (*i.e.,* they

are all, directly or indirectly, part of the Highland 2,000-member corporate organizational

structure), but they also have been in "lockstep" with one another in objecting to virtually every

position taken by the Chapter 11 Trustee during the Bankruptcy Cases.[5]  These Objectors'

parties-in-interest status will be explained below.

---

[4] For a complete set of background facts, the court incorporates herein by reference its Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Petitions, entered April 13, 2018.  DE # 118.  Exh. 243.

[5] It is also undisputed that, prior to the appointment of the Chapter 11 Trustee, *the Debtors* and Highland were affiliated and had a close relationship.  Exhs. 17, 18, 22-27, 251, 619 & 649.

In simplest terms, the Debtor-Acis, which was formed in the year 2011, is primarily a
CLO portfolio manager. [6]  It manages hundreds of millions of dollars' worth of CLOs (which is
an acronym for "collateralized loan obligations").  Specifically, it provides fund management
services to various special purpose entities that hold CLOs.  The Debtor-Acis was providing
management services for five such special purpose entities (the "Acis CLOs") as of the time that
it and its general partner were put into the involuntary Bankruptcy Cases.  The parties have
informally referred to the special purpose entities themselves as the "CLO Issuers" or "CLO Co-
Issuers" but, to be clear, these special purpose entities (hereinafter, the "CLO SPEs") are
structured as follows:  (a) on the asset side of their balance sheets, the entities own pieces of
senior debt owed by large corporations and, therefore, earn revenue from the variable interest
payments made by those corporations on such senior debt; and (b) on the liability side of their
balance sheets, the entities have obligations in the form of notes (*i.e.,* tranches of fixed interest
rate notes) on which the CLO SPEs themselves are obligated—the holders of which notes are
mostly institutions and pension funds (these tranches of notes are usually rated anywhere from
Triple A to Single B, depending upon things such as their interest rate and perceived risk).  The
CLO SPEs make a profit, based on the spread or "delta" between: (a) the variable rates of
interest paid on the assets that the CLO SPEs own (*i.e.,* the basket of senior notes); and (b) the
fixed rates of interest that the CLO SPEs must pay on their own tranches of debt.  At the bottom
of the CLO SPEs' capital structure is their equity (sometimes referred to as "subordinated notes,"
but these "notes" are genuinely equity).  As portfolio manager, the Debtor-Acis manages the
CLO SPEs' pools of assets (by buying and selling senior loans to hold in the CLO SPEs'

---

[6] The Debtor-Acis has managed other funds, from time to time, besides CLOs.

4

portfolios) and communicates with investors in the CLO SPEs.  The CLO SPEs' tranches of notes are traded on the Over-the-Counter market.

To be perfectly clear, none of the CLO SPEs themselves are in bankruptcy.  This has never been threatened or a concern.  Only the Debtor-Acis which *manages* the CLO business is in bankruptcy.  For the most part, the CLO SPEs have continued somewhat "business as usual" during the Chapter 11 Bankruptcy Cases (*i.e.,* they have continued to receive interest payments on their baskets of loans; the usual interest payments on their tranches of debt have been paid;[7] and baskets of loans have been bought and sold from time to time).  The CLO SPEs have retained their own separate counsel during the Chapter 11 cases, have appeared from time-to-time on matters, and are not currently objecting to the Plan.  There is also an indenture trustee (U.S. Bank National Association) for the CLO SPEs' debt, that has seemingly faithfully carried on its role during the Chapter 11 Bankruptcy Cases without many objections to the bankruptcy process—only making occasional statements aimed at ensuring that the indentures for the CLOs are not interfered with or disrespected.  The indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases and is not currently objecting to the Plan.

Historically, the Debtor-Acis has had four main sets of contracts that were at the heart of its business and allowed it to function.  The Chapter 11 Trustee has from time-to-time credibly

---

[7] The evidence reflected that there have been a couple of occasions recently when there were insufficient funds to make distributions to the equity.  *E.g.,* Transcript 12/11/18 (PM) [DE # 790], at p. 15 (line 2) through p. 16 (line 18).  But it appears to this court that these missed distributions were due to actions of Highland—as later explained herein—in improperly, surreptitiously attempting to liquidate the Acis CLOs, from the time period after the Chapter 11 Trustee was appointed, until the bankruptcy court issued an injunction to temporarily halt Highland's actions.  *E.g.,* Transcript 12/11/18 (AM) [DE # 789], p. 67 (line 14) through p. 68 (line 6).

testified that these agreements essentially created an "eco-system" that allowed the Acis CLOs to be effectively and efficiently managed by the Debtor-Acis.

### 1. The PMAs with the CLO SPEs.[8]

First, the Debtor-Acis has various portfolio management agreements (the "PMAs") **with the CLO SPEs**, pursuant to which the Debtor-Acis earns management fees. The PMAs have been the primary "assets" (loosely speaking) of the Debtor-Acis (to be more precise, the PMAs are executory contracts pursuant to section 365 of the Bankruptcy Code). They are what generate revenue for the Debtor-Acis.

### 2. The Sub-Advisory Agreement with Highland.[9]

Second, the Debtor-Acis had a Sub-Advisory Agreement (herein so called) with an insider, **Highland** (*i.e.,* one of the Objectors). Highland's "insider" status will be further explained below. Pursuant to this agreement, the Debtor-Acis essentially sub-contracted for the use of Highland front-office personnel/advisors to perform management services for the Debtor-Acis (*i.e.,* so that the Debtor-Acis could fulfill its obligations to the CLO SPEs under the PMAs). The Debtor-Acis paid handsome fees to Highland pursuant to this agreement. This, too, was an executory contract pursuant to section 365 of the Bankruptcy Code. As explained below, this agreement was rejected (with bankruptcy court approval)[10] by the Chapter 11 Trustee during the Bankruptcy Cases, when the Chapter 11 Trustee credibly represented that he had not only found resources to provide these services at a much lower cost to the estate, but he also had begun to

---

[8] Exhs. 6-10.

[9] Exh. 17.

[10] *See* 11 U.S.C. § 365(a).

believe that Highland was engaging in stealth efforts to liquidate the Acis CLOs, to the detriment of the Debtor-Acis's creditors.[11]

### 3. The Shared Services Agreement with Highland.[12]

Third, the Debtor-Acis also had a Shared Services Agreement (herein so called) with Highland, pursuant to which the Debtor-Acis essentially sub-contracted for the use of Highland's back-office services (again, so that the Debtor-Acis could fulfill its obligations to the CLO SPEs under the PMAs). To be clear, the Debtor-Acis had no employees of its own—only a couple of officers and members. The Debtor-Acis paid handsome fees to Highland for the personnel and back-office services that Highland provided to the Debtor-Acis. This, too, was an executory contract pursuant to section 365 of the Bankruptcy Code. As explained below, this agreement was also rejected by the Chapter 11 Trustee during the Bankruptcy Cases (with bankruptcy court approval) for the same reasons that the Sub-Advisory Agreement with Highland was rejected.

### 4. The Equity PMA.[13]

Fourth, until a few weeks before the Bankruptcy Cases were filed, the Debtor-Acis also had yet another portfolio management agreement (distinct from its PMAs with the CLO SPEs) whereby the Debtor-Acis provided services not just to the CLO SPEs themselves, but separately to the equity holder in the CLO SPEs. This portfolio management agreement with the equity holder in the CLO SPEs is sometimes referred to by the parties as the "ALF PMA," but it would probably be easier to refer to it as the "Equity PMA" (for ease of reference, the court will refer to

---

[11] *See* Transcript 12/11/18 (AM) [DE # 789], at p. 48 (line 15) through p. 49 (line 16); p. 50 (line 12) through p. 52 (line 7).

[12] Exh. 18.

[13] Exh. 11.

7

it as the "Equity/ALF PMA").[14]  The Debtor-Acis did not earn a specific fee pursuant to the

Equity/ALF PMA, but the Chapter 11 Trustee and certain of his witnesses credibly testified that

the Debtor-Acis considered the agreement valuable and very important, because it essentially

gave the Debtor-Acis the ability to control the whole Acis CLO eco-system—in other words,

gave the Debtor-Acis the ability to make substantial decisions on behalf of the CLO SPEs'

*equity*—distinct from making decisions for the CLO SPEs themselves pursuant to the PMAs.

The more credible evidence before the court suggests that the Equity/ALF PMA delegated to the

portfolio manager (*i.e.,* the Debtor-Acis) the right to control the terms of any liquidation of

collateral in an optional redemption under the terms of the CLO indentures.[15]  In any event,

shortly before the Bankruptcy Cases were filed, agents of Highland and/or others controlling the

Debtor-Acis (including but not limited to Mr. James Dondero—the chief executive officer of

both the Debtor-Acis and of Highland):  (a) caused the Debtor-Acis to terminate this Equity/ALF

PMA (notably, the counter-party to this agreement, the equity owner, would have only been able

to terminate it "for cause"[16]); and (b) then caused the equity owner to enter into a new Equity

PMA with a newly formed offshore entity called Highland HCF Advisor, Ltd. ("Highland

HCF").[17]  Mr. Dondero, in addition to being the chief executive of Highland and the Debtor-

Acis, also became the president of the newly formed Highland HCF.[18]  The Equity/ALF PMA

---

[14] There were actually different iterations of the Equity/ALF PMA including one dated August 10, 2015, and another dated December 22, 2016.

[15] Transcript 12/18/18 [DE # 804], at pp. 77-78.  *See also* Exh. 11 at §§ 5 and 6.

[16] The Equity/ALF PMA provided that the Debtor-Acis could only be removed as portfolio manager "for cause" at § 14(a)-(e).  Exh. 11.  On the contrary, the Debtor-Acis could terminate the Equity/ALF PMA without cause upon at least ninety (90) days' notice, pursuant to § 13(a)-(c).  Exh. 11.

[17] Exh. 23 (testimony of Scott Ellington), p. 175 (lines 6-25); *see also* Transcript 12/11/18 (AM) [DE # 789], at p. 54 (line 11) through p. 55 (line 5).

[18] *Id.* at p. 266 (lines 1-4).

would have been an executory contract of the Debtor-Acis, pursuant to section 365 of the Bankruptcy Code, if it had not been terminated shortly before the Bankruptcy Cases. The court has heard credible testimony that leads it to conclude that the Equity/ALF PMA would have been assumed by the Debtor-Acis, pursuant to section 365 of the Bankruptcy Code, if not terminated by agents of Highland on the eve of bankruptcy. The court has heard credible testimony that it is important for a portfolio manager to have not only the PMAs with the CLO SPEs themselves, but also with the equity owners of the CLO SPEs.

## II.    A Few More Basics About CLOs.

In the world of CLOs (like other public debt instruments) there are occasionally redemptions, refinancings, and resets. A redemption is essentially when the equity in the CLO, before maturity, calls for the liquidation of the collateral in the CLO and the repayment of the tranches of notes, so that the CLO comes to an end. A refinancing is when a lower interest rate can be accomplished in the market place on the tranches of debt of the CLO, but the maturity date and other terms remain in place (similar to a refinancing on a home mortgage). This can happen typically after a two-year non-call period. A reset is when the maturity date, the reinvestment period, or other changes in the terms of a CLO (beyond simply interest rate) are accomplished.[19]

It should be noted that the top tranche of notes in the CLO SPEs (AAA-rated) is considered the "controlling" class, and a majority of holders in this class can terminate the CLO manager (*i.e.,* the Debtor-Acis LP) for cause on 45 days' notice, but these folks have apparently been content to ignore the Bankruptcy Cases and the fighting between the Debtor-Acis and

---

[19] *See generally* Transcript 2/9/2018 [DE # 26], at p. 74-75.

Highland (as further described below)—no doubt because they are earning their fixed income stream without a hitch. And the bottom tranche of "notes" in the CLO SPEs (the equity) has voting rights and is a capital provider and, in certain ways, controls the CLO SPEs, by virtue of having the ability to make a redemption call after a certain "no-call" period—which would force a liquidation of the basket of loans in the CLO, with the proceeds paying down the tranches of notes, starting at the top with the Triple A's. But, by virtue of the Equity/ALF PMA, the Debtor-Acis was really acting for the equity. It seems substantially likely to the court that this is why Highland and its agents caused the Debtor-Acis to terminate the Equity/ALF PMA (which, as mentioned above, was an agreement that the equity could have only terminated "for cause"—and it appears there would have been no "cause").

## III.    The Non-Insider Creditors.

The Debtor-Acis does not have many creditors. The non-insider creditors are, for the most part, Joshua Terry ("Mr. Terry") and a few vendors (most of which are law firms).

Mr. Terry commenced the Bankruptcy Cases with the filing of involuntary bankruptcy petitions. Mr. Terry was the human being who formerly, quite successfully served as the portfolio manager for the Debtor-Acis for many years. Mr. Terry was terminated under contentious circumstances on June 9, 2016, after getting into disagreements with Mr. Dondero. Mr. Terry was technically an employee of Highland itself (like all employees are, in the Highland family of companies—no matter which subsidiary or affiliate they work for). After his employment termination, Highland sued Mr. Terry in September 2016. Mr. Terry asserted claims back against Highland and both of the above-referenced Debtors. The litigation was referred to arbitration, and, after a ten-day arbitration trial in September 2017 before "JAMS," Mr. Terry obtained an Arbitration Award (herein so called), on October 20, 2017, jointly and

severally, against both of the Debtors in the amount of $7,949,749.15, plus post-award interest at the legal rate. A Final Judgment (the "Terry Judgment") confirming the Arbitration Award was entered on December 18, 2017, in the same amount as that contained in the Arbitration Award—$7,949,749.15.

Mr. Terry commenced the Bankruptcy Cases when he became concerned that the Debtor-Acis was being rendered insolvent and unable to pay creditors including himself, due to actions undertaken by Highland and its agents immediately after entry of the Arbitration Award (*e.g.*, transfers of assets, contracts, and business away from the Debtor-Acis).

The Debtor-Acis also is obligated on large administrative expense claims, since: (a) a Chapter 11 Trustee was appointed very early—due to what the bankruptcy court perceived to be massive conflicts of interest with regard to the Debtors' management; and (b) the Objectors have opposed virtually every action taken by the Chapter 11 Trustee during the Bankruptcy Cases, resulting in many long hearings.

## IV.     The Objectors (all of which are "Insiders").

*There are no non-insider creditors objecting to the Plan*.  Mr. Terry supports the Plan. The CLO SPEs and Indenture Trustee do not oppose the Plan.  None of the vendors oppose the Plan.  The U.S. Trustee is not opposing the Plan.  As a technical matter, two impaired classes of creditors voted to accept the Plan.[20]  *So who are the Objectors to the Plan (which Plan will be further described below) and what is their party-in-interest status here?*

As earlier mentioned, the Objectors are: (a) Highland, (b) HCLOF Guernsey, and (c) Neutra Cayman.  As noted earlier, the Chapter 11 Trustee frequently refers to them collectively as "The Highlands"—but the Objectors do not like this conflation.  At one time Highland and

---

[20] Classes 2 and 3.  *See* Exh. 613.

HCLOF Guernsey had the same lawyers.  They do not anymore.  However, they frequently file joint pleadings and take the same positions.  Highland and Neutra Cayman do still have the same lawyers.

    1.  <u>Highland.</u>

    Highland is a Dallas, Texas-based company that is a Registered Investment Advisor. Highland was founded in 1993 by Mr. Dondero, originally with a 75% ownership interest, and Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest.  As mentioned earlier, Mr. Dondero is the chief executive of Highland.  Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles including CLOs, private equity funds, and mutual funds.  Highland provides employees to entities in the organizational structure, such as it did with the Debtor-Acis, through the mechanism of shared services agreements and sub-advisory agreements (as mentioned above).  ***Notably, Highland's chief executive, Mr. Dondero, served as the President of the Debtor-Acis at all relevant times prepetition.***[21]  Highland claims to be a large creditor of the Debtor-Acis for services provided to the Debtor-Acis under the Shared Services Agreement and the Sub-Advisory Agreement.  The Chapter 11 Trustee disputes these claims and has asserted numerous claims back against Highland in an adversary proceeding (the "Highland Entities Adversary Proceeding").

    In any event, Highland is a ***disputed insider creditor***.  It is an "insider," as contemplated by Bankruptcy Code section 101(31)(C), because it, beyond any shadow of a doubt, controlled the Debtor-Acis until these Bankruptcy Cases developed to the point of having a Chapter 11

---

[21] One witness, Hunter Covitz, referred to the Debtor-Acis as the "structured credit arm of Highland." Transcript 12/13/18 (AM) [DE # 793], at p. 57.

Trustee take charge of the Debtor-Acis. Highland does not seem to dispute that it is an insider.[22] But, for the avoidance of doubt, Highland should be considered an insider of the Debtor-Acis for at least the following reasons: (a) the same human being (Mr. Dondero) was president of the Debtor-Acis and was the chief executive of Highland; (b) Highland's General Counsel, Scott Ellington, testified that Mr. Dondero controlled them both;[23] and (c) Highland provided the Debtor-Acis with employees and management services pursuant to the Sub-Advisory Agreement and Shared Services Agreement.[24]

Additionally, the court believes that the Chapter 11 Trustee made a convincing argument in connection with Plan confirmation (and his justification for the separate classification of Highland's claim in the Plan from other general unsecured creditors) that Highland should also be regarded as a "competitor" of the Debtor-Acis at this juncture, since they are both in the fund management business and Highland's control over the Debtor-Acis has now been divested. Highland's competitor status, in addition to its insider status, warrants additional scrutiny of its

---

[22] Under section 101(31) of the Bankruptcy Code, an insider includes certain enumerated parties, such as an officer of the debtor, affiliate, *etc.* Further, the list of enumerated "insiders" is not exclusive or exhaustive. *See Wilson v. Huffman (In re Missionary Baptist Foundation of Am., Inc.),* 712 F.2d 206, 210 (5th Cir. 1983). Recently, the United States Supreme Court stated: "Courts have additionally recognized as insiders some persons not on that [101(31)] list—commonly known as 'nonstatutory insiders.' The conferral of that status often turns on whether the person's transactions with the debtor (or another of its insiders) were at arm's length." *U.S. Bank N.A. v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 963 (2018). The Fifth Circuit has noted that "cases which have considered whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the parties and (2) whether the transaction . . . [was] conducted at arm's length." *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992).

[23] *E.g.,* Exh. 23, at pp. 160 (line 15) through 161 (line 4); p. 196 (lines 14-19); p. 219 (lines 1-21).

[24] *See* 11 U.S.C. §§ 101(2)(D); (31)(C)(5). The court notes that, although Highland has, from time to time, alleged that Mr. Terry is a "non-statutory insider" of the Trustee, it has never put on any credible evidence to support this contention.

motivations in objecting to the Plan. More importantly, it provides a sound legal and business justification for separately classifying its claim in the Plan.

### 2. HCLOF Guernsey.

The second Objector, HCLOF Guernsey, is an entity formed in the island nation of Guernsey. It has two allegedly independent Directors from Guernsey who have provided testimony in connection with confirmation of the Plan. It was enormously clear to the court (as will be elaborated upon below) that the two Directors of HCLOF Guernsey are—stated in the kindest way possible—mere "figureheads" for HCLOF Guernsey and they defer to Highland *entirely* to tell them what to do, what to say, and when. In any event, HCLOF Guernsey is the owner of the equity in the CLO SPEs (as earlier mentioned, this equity is sometimes referred to as the "subordinated notes" in the CLO SPEs). According to HCLOF Guernsey's 2017 Annual Report and Audited Financials, all of its subordinated notes issued by the Acis CLOs are physically held at and are pledged to HCLOF Guernsey's lender, NexBank, which happens to be a Dallas bank that is an affiliate of Highland.[25] HCLOF Guernsey was created in the year 2015 and was formerly known as "ALF."[26] Its name was changed on October 30, 2017 (ten days after Mr. Terry's Arbitration Award was entered), to allegedly distance itself from the Debtor-Acis. The equity owner HCLOF Guernsey, in turn, has three equity owners: (i) a 49% equity owner that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that was seeded with contributions from *Highland*, is managed/advised by *Highland*, and whose *independent trustee is a long-time friend of Highland's chief executive officer, Mr. Dondero*; (ii) 2% is owned by *Highland employees*; and (iii) a 49% equity owner that is a third-party institutional investor based in

---

[25] Exh. 647.

[26] "ALF" is short-hand for Acis Loan Funding, Ltd.

Boston, Massachusetts that only recently invested in HCLOF Guernsey (*i.e.,* in November 2017, just after the Terry Arbitration Award was issued), and desires to remain passive and anonymous (hereinafter, the "Passive Investor").[27] Notably, the Debtor-Acis itself owned a small percentage of HCLOF Guernsey, in addition to providing management services to it, until October 24, 2017 (four days after the Terry Arbitration Award was issued).

The court has allowed HCLOF Guernsey to vigorously participate in the confirmation hearing (and other hearings during the Bankruptcy Cases), although its party-in-interest status has been questionable. So how is HCLOF Guernsey a party-in-interest? The answer is a bit of a stretch—but the court has decided it is impacted by the Plan, so it should have the right to object. Its party-in-interest status has evolved during the Bankruptcy Cases.

First, early on in these Bankruptcy Cases, HCLOF Guernsey (together with Highland) sued the Chapter 11 Trustee in the above-mentioned "Highland Entities Adversary Proceeding"—mostly, if not entirely, seeking injunctive relief. At that point, the Chapter 11 Trustee treated HCLOF Guernsey as a disputed creditor,[28] since it was seeking equitable relief that could arguably be monetized.[29] However, HCLOF Guernsey subsequently withdrew its requests for relief in that Highland Entities Adversary Proceeding. But then, the Chapter 11 Trustee subsequently filed claims ***against*** HCLOF Guernsey in the Highland Entities Adversary Proceeding (along with his claims against Highland and a couple of other Highland entities) asserting avoidance actions and other causes of action against HCLOF Guernsey (among other

---

[27] The testimony was that the Passive Investor committed to a $150 million investment ($75 million immediately and $75 million callable over the next several years).

[28] In fact, on August 15, 2018, the Chapter 11 Trustee filed a proof of claim on behalf of HCLOF Guernsey. HCLOF Guernsey has since objected to the proof of claim.

[29] *See* 11 U.S.C. §§ 101(5)(B) & 101(10).

things, the Chapter 11 Trustee alleged that HCLOF Guernsey schemed with Highland to

terminate the Equity/ALF PMA, in a step toward systematically dismantling the Debtor-Acis of

its value). Thus, HCLOF Guernsey may ultimately owe money to this estate. But most

importantly, HCLOF Guernsey should be deemed a party-in-interest because of a proposed

temporary injunction in the Plan that essentially would enjoin (for a finite, defined period)

HCLOF Guernsey from exercising certain of its rights with regard to its equity in the CLO SPEs,

pending resolution of the Highland Entities Adversary Proceeding. This temporary injunction in

the Plan, directed towards HCLOF Guernsey and affiliates, will be further described below.

    3.   Neutra Cayman.

Neutra Cayman is a Cayman island exempted company that is the equity owner ***of the***

***Debtor-Acis itself*** (in contrast to HCLOF Guernsey, which only owns equity in the CLO SPEs).

Neutra Cayman only acquired its equity interest in the Debtor-Acis the day after the Terry

Judgment was entered (on December 18, 2017), and for no consideration, from the Dugaboy

Investment Trust (a family trust on which Mr. Dondero's sister is named trustee, that previously

owned 74.9% of the Debtor-Acis) and from Mr. Akada (who previously owned 25% of the

Debtor-Acis).[30] The court concludes that Neutra Cayman has standing to object to the Plan,

---

[30] The court is repeatedly referring to the Debtor-Acis but, to be clear, there are two consolidated Debtors: Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP/LLC"). *See* note 2, *supra*. When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC, with a .1% interest) and it had three limited partners: (a) the Dugaboy Investment Trust (a Dondero family trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the trustee at all relevant times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest. When Acis GP/LLC was formed (*i.e.,* the .1% owner of Acis LP), its sole member was the Dugaboy Investment Trust. After Mr. Terry was terminated by Highland, his 25% limited partnership interest in Acis LP was forfeited and divided among the two remaining limited partners: Mr. Akada (increasing his interest by 10% up to 25%), and the Dugaboy Investment Trust (increasing its interest by 15% up to 74.9%). But, most importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.,* on December 18, 2017), both Mr. Akada and the Dugaboy Investment Trust conveyed their entire limited partnership interests in Acis LP—25% and 74.9%, respectively—to Neutra Cayman. The Dugaboy Investment Trust also conveyed its 100% membership interest in Acis GP/LLC to Neutra Cayman.

since it is an equity owner of the Debtors (albeit only having acquired its equity about a month

before the bankruptcy). As with HCLOF Guernsey, the court also concludes that Neutra-

Cayman is absolutely, beyond any reasonable doubt, controlled by Highland, as explained

further below.

## V.     The Plan.

The Plan is fairly simple, considering the complexity of the business and the

relationships, and the contentiousness of the Bankruptcy Cases. Again, there aren't many

creditors.

The Plan proposes[31] that the Debtor-Acis, as a "Reorganized Debtor," will continue with

the business operations of the Debtors after the Effective Date[32] of the Plan. Specifically, the

Debtor-Acis will assume, pursuant to section 365 of the Bankruptcy Code, its CLO PMAs and

continue to serve as the portfolio manager to the CLO SPEs (and as to any resets of the CLOs

therein). The Reorganized Debtor will continue to earn fees and will pay claims from post-

Effective Date income as provided in the Plan. The Reorganized Acis will actively pursue

additional fund management contracts. Again, there is no objection by the CLO SPEs to the

Plan, and the indenture trustee on the tranches of CLO notes has no objection.

Mr. Terry (again, the former human manager of the Debtor-Acis and also the largest

creditor) shall receive 100% of the equity interests in the Reorganized Debtor, in exchange for a

negotiated $1 million reduction in his partially secured claim.[33] The remainder of his claim will

---

[31] This is merely a high-level summary of the Plan. The Plan terms, as modified, shall in all ways govern, not this summary.

[32] The "Effective Date" is defined, essentially, as the first business day which is fourteen (14) days after entry of an order confirming the Plan, if the confirmation order is not stayed.

[33] Mr. Terry has asserted partial secured status as to his claim in the proofs of claim he has filed in these cases. The Chapter 11 Trustee credibly testified that there was no other logical party to take the equity of

be treated as an unsecured claim. Each unsecured creditor will receive on the Plan Effective Date an unsecured cash flow note in the full amount of its claim, which notes will mature three years after the Effective Date of the Plan, with equal quarterly payments of principal and interest, at 5% interest per annum. These cash flow notes are expected to yield payment in full (actually 102%) to the unsecured creditors.[34]

As for the sub-advisory and shared services agreements with Highland, as noted earlier, the Chapter 11 Trustee, with bankruptcy court approval, has already (as of August 2018) rejected these during the Bankruptcy Cases, pursuant to section 365 of the Bankruptcy Code. The Chapter 11 Trustee caused the Debtor-Acis to subsequently contract, with bankruptcy court approval, with a different entity, Brigade Capital Management, L.P. ("Brigade"), to provide the sub-advisory and shared services going forward, for a minimum two-year term (unless the Reorganized Debtor and Brigade otherwise agree), at a much cheaper cost than Highland.[35] Thus, Brigade will provide sub-servicing and sub-advisory services to the Reorganized Debtor.

---

the Reorganized Debtor, at this juncture, and that he had negotiated this reduction to Mr. Terry's secured claim, and he thought it was justified by the circumstances of this case. While the Objectors have argued that the secured status of Mr. Terry's claim may be subject to challenge under section 547(b) of the Bankruptcy Code, section 547(b) is discretionary (e.g., a "trustee may avoid any transfer" that might be avoidable as a preference). The Chapter 11 Trustee credibly emphasized that this was negotiated treatment of an asserted secured claim, and he had no "exclusivity" on proposing a plan if someone else had wanted to propose something different. Transcript 12/11/18 (AM) [DE # 789], at p. 70 (line 3) through p. 71 (line 2).

[34] Insider claims—namely Highland—are separately classified from general unsecured claims under the Plan. To the extent such claims are ultimately allowed (after any allowed defenses and offsets), and to the extent such claims are not equitably subordinated by Bankruptcy Court adjudication, these claims will receive the same treatment as other general unsecured claims (cash flow notes). To the extent any of these claims are ultimately allowed but equitably subordinated, they will receive subordinated promissory notes, accruing interest at 5% per annum, that will not be payable until all non-subordinated claims have been paid in full (they will have maturity dates to occur on the earlier of: (i) the date that is two years after the date all Unsecured Cash Flow Notes have been paid in full, or (ii) five years after the Effective Date). The expected recovery under the Plan for the insider claims is from 65% to 100%.

[35] An entity named Cortland Capital Markets Services LLC ("Cortland") is actually providing some of the back-office shared services agreement type functions.

As for the Equity/ALF PMA, it is not an agreement with the Debtor-Acis anymore to either be assumed or rejected, pursuant to section 365. However, in the Highland Entities Adversary Proceeding, the Chapter 11 Trustee seeks to avoid the termination of the Equity/ALF PMA. Pursuant to the Plan, the Reorganized Debtor will be vested with certain Assets of the Debtors, including Estate Claims and Estate Defenses, to be administered and liquidated by the Reorganized Debtor.

    1.   The Highland Entities Adversary Proceeding (Adv. Proc. No. 18-03212).

Suffice it to say that the Highland Entities Adversary Proceeding is a somewhat significant part of the Plan; it is what justifies the temporary injunction that is a critical part of the Plan. With regard to the Highland Entities Adversary Proceeding, the Defendants in it (there are five of them) are: (i) Highland; (ii) HCLOF Guernsey; (iii) Highland HCF (*i.e.,* the Cayman Island entity that was recently formed to essentially replace the Debtor-Acis under the Equity/ALF PMA); (iv) Highland CLO Management, Ltd. ("Highland Management") (an entity registered in the Cayman Islands on October 27, 2017—seven days after Mr. Terry's Arbitration Award); and (v) Highland CLO Holdings, Ltd. (yet another entity incorporated in the Cayman Island on October 27, 2017). The Highland Entities Adversary Proceeding is essentially a multi-faceted fraudulent transfer action. The statutory predicates for the relief sought are sections 502, 542, 544, 547, 548, and 550 of the Bankruptcy Code and Texas Business & Commerce Code § 24.001 et seq. ("TUFTA").

Distilled to its essence, the Highland Entities Adversary Proceeding argues that Highland, along with its related Co-Defendants, ***orchestrated a systematic transfer of value away from the Debtor-Acis to other Highland entities*** (all of those transferee-entities are offshore entities—whereas the Debtor-Acis is a Delaware entity), beginning almost immediately after Mr. Terry

was terminated in June 2016, and continuing on during Mr. Terry's litigation/arbitration with the Debtor-Acis, and then rapidly unfolding after the Arbitration Award. This was allegedly done to denude the Debtor-Acis of value and make the Debtors "judgment proof." This was allegedly also done to ensure that the Debtor-Acis's very valuable business as portfolio manager would be taken over by other Highland entities and remain under Highland's and Mr. Dondero's control.[36]

The evidence is rather startling on this point. Among other things, pursuant to amendments made to the Debtor-Acis's Sub-Advisory Agreement and Shared Services Agreements with Highland, starting soon after Mr. Terry was terminated, the fees owed by the Debtor-Acis to Highland under these agreements shot up to an enormously higher level. Then, in April 2017, a new CLO was issued (or actually a former Acis CLO was reset) and a new Highland-affiliated Cayman Island entity was ultimately put in place to manage it instead of the Debtor-Acis (even though the Debtor-Acis managed all other CLOs in the Highland corporate empire). Numerous other transactions were undertaken through the Fall of 2017, removing assets and agreements away from the Debtor-Acis. For example, a multi-million dollar note receivable owed to the Debtor-Acis by Highland was transferred out of the Debtor-Acis,[37] and

---

[36] Exh. 627.

[37] On November 3, 2017, the Debtor-Acis, Highland, and Highland Management (a newly created, offshore Highland affiliate) entered into that certain Agreement for Assignment and Transfer of Promissory Note (the "Note Assignment and Transfer Agreement"). Exh. 225. The Note Assignment and Transfer Agreement, among other things, transferred a $9.5 million principal amount promissory note executed by Highland and payable to the Debtor-Acis (the "Note"), Exh. 218, from the Debtor-Acis to Highland Management (the "Note Transfer"). The Assignment and Transfer Agreement memorializing this transaction is signed by Mr. Dondero for the Debtor-Acis. The document recites that (i) Highland is no longer willing to continue providing support services to the Debtor-Acis, (ii) the Debtor-Acis, therefore, can no longer fulfill its duties as a collateral manager, and (iii) Highland Management agrees to step into the collateral manager role if the Debtor-Acis will assign the Note to it. Notably, Highland Management was registered in the Cayman Islands on October 27, 2017, roughly a week before the Note Transfer. Thus, Highland Management had no portfolio or collateral management experience whatsoever when it entered the Assignment and Transfer Agreement. To the contrary, it appears Highland Management was an entity that was created specifically to hold the Note and eventually take possession of the CLO PMAs in an international forum that would be difficult for Mr. Terry to reach. The Debtor-

shares in HCLOF Guernsey held by the Debtor-Acis were sold back to HCLOF Guernsey (four days after the Arbitration Award). And then the Equity/ALF PMA was terminated so that the Debtor-Acis would no longer have management-control over HCLOF Guernsey as its portfolio manager—arguably putting Highland in a position to liquidate the Acis CLOs and put the Debtor-Acis out of business. Specifically, on October 27, 2017, just seven days after Mr. Terry's Arbitration Award, the Debtor-Acis ostensibly terminated its own portfolio management rights under the Equity/ALF PMA[38] and transferred its authority and its valuable portfolio management rights—for no value—to Highland HCF, an affiliate of Highland. It appears that the only alleged consideration for these transfers, to the extent there was any, was the satisfaction of purported debts owed to other Highland entities or their representatives.

---

Acis appears to have received no or insufficient consideration for the Note Transfer. The primary consideration for the Note Transfer was an alleged payable due from the Debtor-Acis to Highland in the approximate amount of $7.5 million for participation fees, which was transferred to Highland Management shortly before the Note Assignment and Transfer Agreement was entered. The validity of the alleged "participation fees" is unknown. The remainder of the consideration for the Note Transfer is a promise to pay certain expenses of the Debtor-Acis, which has apparently never occurred. In any event, it appears highly likely that the Note Transfer took away the Note as an asset from which Mr. Terry could collect his judgment.

[38] As mentioned earlier, the Equity/ALF PMA provided that the Debtor-Acis could only be removed as portfolio manager by the equity owner (now known as HCLOF Guernsey) *"for cause"* at § 14(a)-(e). Exh. 11. Meanwhile, the Debtor-Acis could terminate the Equity/ALF PMA without cause upon at least ninety (90) days' notice, pursuant to § 13(a)-(c). Exh. 11. It would appear that these terms were wholly ignored by the persons orchestrating the Equity/ALF PMA termination. It appears that the Debtor-Acis was simply manipulated to consent and agree to its removal and replacement as portfolio manager of HCLOF Guernsey. This transfer of the Debtor-Acis's portfolio management rights to the offshore entity Highland HCF was accomplished by way of a new portfolio management agreement entered into by the equity owner (now known as HCLOF Guernsey) and Highland HCF on October 27, 2017, which empowered Highland HCF with the same broad authority to direct the management of HCLOF Guernsey as was previously held by the Debtor-Acis LP under the Equity/ALF PMA. *See* Exh. 19, October 27, 2017 PMA §§ 1 & 5(a)-(q). This agreement appears to have been further solidified in a second portfolio management agreement dated November 15, 2017. Exh. 215. The Debtor-Acis received no consideration for this transfer.

The Highland Defendants argue that the Equity/ALF PMA (its termination being arguably the most significant transfer referenced in the Highland Entities Adversary Proceeding) did not have value. But the evidence convinces the court that it absolutely did. A witness, Mr. Zachary Alpern, credibly testified that the portfolio manager (under the Equity/ALF PMA) made decisions regarding the underlying financial instruments including seeking an optional redemption and negotiating a reset. Mr. Alpern also credibly testified about the importance, in the CLO industry, of the portfolio manager having control of a CLO's equity to ensure an "evergreen fee stream."[39] Additionally, Mr. Terry also credibly testified that the portfolio manager (not the CLO equity interest holder) has the right to control the terms of the liquidation of collateral in an optional redemption under the terms of the indentures.[40] The Chapter 11 Trustee also credibly testified that the Equity/ALF PMA allowed the Debtor-Acis to have control of an optional redemption.[41] Finally, a witness, Mr. Klein, credibly testified about the value of the Equity/ALF PMA and the negative impact of its transfer on the Debtor-Acis LP. [42]

To be clear, Highland and HCLOF Guernsey have argued in opposition to the Chapter 11 Trustee's position that it is HCLOF Guernsey—the actual equity holder of the CLO SPEs—that had/has the absolute power and authority to control the CLO SPEs' destinies and it is ludicrous to suggest otherwise. However, not only does the Equity/ALF PMA appear to this court to have delegated the relevant power and authority *to the Debtor-Acis*, but Highland's own expert on this

---

[39] Exh. 404, Transcript 8/23/18 (AM) at pp. 65-67, 81-93 and Transcript 8/23/18 (PM) at pp. 34-35, 38-40, 46, and 49.

[40] Transcript 12/18/18 [DE # 804], at pp. 77-78. *See also* Exh. 405, Transcript 8/27/18 (AM) at pp. 63-75.

[41] Exh. 405, Transcript 8/27/18 (AM) at p. 53.

[42] Exh. 405, Transcript 8/27/18 (PM) at pp. 143-144, 147-159 and 205-207.

topic, Mr. Castro, testified that the "actual humans" who would make the decision for HCLOF
Guernsey as to whether to request an optional redemption of the Acis CLOs were not the
HCLOF Guernsey directors but, rather, Highland executives Mr. Dondero, Mr. Okada, and
Highland employee Mr. Covitz (acting for Highland HCF).[43]  Moreover, Mr. Alpern credibly
testified that, before the Terry Arbitration Award, the Debtor-Acis, as the portfolio manager
under the Equity/ALF PMA, rather than the HCLOF Guernsey's directors, issued the notices of
optional redemption for HCLOF Guernsey.[44]

    The court concludes that the Chapter 11 Trustee has demonstrated a likelihood of
success on the merits with regard to his claims set forth in the Highland Entities Adversary
Proceeding.  Therefore, the Temporary Injunction that is part of the Plan is supportable (as
further explained below).  Of course, the nature and extent of the rights ultimately recovered by
the Debtor-Acis will either be determined in the Highland Entities Adversary Proceeding or, as
HCLOF Guernsey's own Guernsey expert conceded, in a binding arbitration in Dallas, Texas
under the terms of the Equity/ALF PMA.[45]

    2.    The Plan Injunction.

    The most controversial aspect of the Plan—the aspect of it that seems to be the primary
focus of the Objectors—is a ***portion*** of an injunction in the Plan (the "Temporary Injunction").
The Temporary Injunction would ***temporarily*** enjoin the following parties ***from effectuating an
optional redemption or liquidating the Acis CLOs*** and related actions: (i) Highland; (ii) HCLOF

---

[43] Exh. 406, Transcript 8/28/18 (PM) at pp. 61-63.

[44] Exh. 404, Transcript 8/23/18 (AM) at pp. 85-89 and Exhs. 323-325 (Notices of Optional Redemption
signed by the Debtor-Acis as portfolio manager of HCLOF).

[45] Transcript 12/13/18 (PM) [DE #794], at pp. 116, 118-19, 122, 124 (Corfield); *see also*, p. 140
(McGuffin).

Guernsey; (iii) CLO Holdco, Ltd. (the donor advised fund, seeded with Highland contributions and managed by Highland that owns 49% of HCLOF Guernsey); (iv) Neutra Cayman; (v) Highland HCF (the Cayman Island entity created shortly before the Bankruptcy Cases to replace the Debtor-Acis under the Equity/ALF PMA); (vi) Highland Management (the Highland-created entity that entered into a portfolio management agreement with a new Acis-CLO that was established in 2017); and (vii) any affiliates of Highland and their respective employees, agents, representatives, transferees, assigns, and successors.[46] This Temporary Injunction is proposed to only last until the earlier of when: (a) the creditors of the Debtors are paid in full; (b) resolution of the Highland Entities Adversary Proceeding; (c) a material breach in the Plan; or (d) the bankruptcy court terminates the Temporary Injunction upon request of a party-in-interest. ***Fully consensual resets of the Acis CLOs are permissible if HCLOF Guernsey, as the equity owner in the CLO SPEs, chooses to agree to resets***. The basis for the Temporary Injunction is as follows: The Chapter 11 Trustee has asserted numerous claims in the Highland Entities Adversary Proceeding against Highland, HCLOF Guernsey, and affiliates, including claims to recover the Debtor-Acis's rights under the Equity/ALF PMA.[47] The Temporary Plan Injunction essentially provides for the continuation, after the Effective Date, of injunctive relief that the bankruptcy court previously granted in its Preliminary Injunction Order (the "Preliminary Injunction") [DE # 21 in Adversary No. 18-03212-sgj] entered on July 10, 2018 in the Highland Entities Adversary Proceeding. The Preliminary Injunction was originally set to expire by its

---

[46] There is another portion of this Plan injunction that is more of a general plan injunction (*i.e.,* very typical) that would prohibit actions against the Debtors, Reorganized Debtor and the Estate Assets, based on acts occurring before the Effective Date, which would be permanent and would not expire upon the occurrence of any event that causes the Temporary Plan Injunction to expire.

[47] *See* Exh. 627, Trustee's Counterclaims and Claim Objection.

own terms upon confirmation of the Plan but would be extended pursuant to an order confirming the Plan, through the Effective Date of the Plan.

As the Fifth Circuit has stated, the four elements to justify a preliminary injunction are (a) substantial likelihood of success on the merits; (b) substantial threat that the plaintiff will suffer irreparable injury; (c) the threatened injury outweighs any harm the injunction might cause the defendant; and (d) the injunction is in the public interest.[48] Each element is present in these cases.

*Immediate and Irreparable Harm.* The court finds and concludes that the Temporary Injunction is legally permissible, necessary, and appropriate to avoid immediate and irreparable harm to the Reorganized Debtor (*i.e.,* evisceration of the Acis CLOs, by parties with unclean hands, that would have no authority to effectuate a liquidation of the CLOs, absent the prepetition wrongful termination of the Equity/ALF PMA). Mr. Scott, a director of HCLOF Guernsey, testified that, absent the Temporary Plan Injunction, HCLOF Guernsey would call for an optional redemption of the Acis CLOs.[49] The testimony of Ms. Bestwick, the other director of HCLOF Guernsey, also implied that, when the injunction expires, HCLOF Guernsey would redeem the Acis CLOs so that they could once again be managed by Highland.[50] The Chapter 11 Trustee credibly testified that if the Acis CLOs are liquidated, there is nothing for the Debtor-Acis to manage.[51] The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction

---

[48] *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Women's Med. Ctr. of N.W. Houston v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001); *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998).

[49] Exh. 721, Mr. Scott Depo. at pp. 204.

[50] Exh. 719, Bestwick Depo. at p. 112.

[51] Exh. 405, Transcript 8/27/18 (AM) at p. 40.

is very important because it protects the revenues under the Acis PMAs, which is a source of potential recovery to creditors under the Plan.[52]  Mr. Terry credibly testified that the Temporary Plan Injunction is a critical component of the Plan and that the Debtor-Acis would have no going concern value without it.  In fact, without the Plan Injunction, Mr. Terry will be precluded from reorganizing the business and paying creditors.[53]

 The Objectors have argued that the Chapter 11 Trustee cannot suffer irreparable harm because he has an adequate remedy at law.  This argument misses the mark.  The destruction of the Debtors' ongoing business, which has the potential to repay creditors under the Plan in two years, constitutes irreparable harm.  The fact that the estate possesses a number of avoidance claims for damages against Highland and its affiliates, and could potentially obtain damages on such claims, does not render the destruction of the Debtor-Acis's ongoing business any less harmful.  Indeed, according to the Fifth Circuit:

> [T]he mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.' For example, some courts have found that a remedy at law is inadequate if legal redress may be obtained only by pursuing a multiplicity of actions.[54]

 *Likelihood of Success on the Merits.*  The Chapter 11 Trustee has also demonstrated a likelihood of succeeding on the merits in the Highland Entities Adversary Proceeding.

---

[52] Transcript 12/11/18 (AM) [DE # 789], at pp. 71-72.

[53] Transcript 12/12/18 (AM) [DE # 791], at pp. 40-41, 54-55.

[54] *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (citing *Lee v. Bickell*, 292 U.S. 415, 421 (1934) ("we are not in doubt, the multiplicity of actions necessary for redress at law [is] sufficient . . . to uphold the remedy by injunction.")).

The record contains substantial evidence of both intentional and constructive fraudulent transfers with regard to the Equity/ALF PMA and other assets.[55] The numerous prepetition transfers that occurred around the time of and after the Terry Arbitration Award appear more likely than not to have been made to deprive the Debtor-Acis of value and with actual intent to hinder, delay or defraud the Debtors' creditors. Highland's only purported business justifications for the prepetition transfers were that the Passive Investor demanded it and that the Debtor-Acis's brand was toxic in the market place.[56] However, these business justifications were not supported (and, in fact, were contradicted) by the evidence.

Indeed, while representatives of Highland and its affiliates said that the Passive Investor's demands were the reason for the termination (*i.e.,* essentially a "transfer") of the Equity/ALF PMA, the Passive Investor's representative testified that this was untrue and that these alleged demands were never made by the Passive Investor.[57] In fact, the Passive Investor was just that— a passive, minority investor in HCLOF Guernsey with no ability to influence or control any of

---

[55] *E.g.,* Exh. 22, Transcript 2/6/18 at pp. 82-109, 130, 202-244, and the exhibits discussed therein; Exh. 201, Transcript 3/21/18 at pp. 110-133 & 186-191; Exh. 24, Transcript 3/22/18 at pp. 71-75 & pp. 204-205; Transcript 12/11/18 [DE # 789], at pp. 52-56; *see also* Transcript 8/27/18 (AM) [DE # 552], at p. 52; Transcript 12/12/18 (PM) [DE # 792], at pp. 92-98;

[56] Highland General Counsel Scott Ellington testified that the Passive Investor said it had no interest in doing business with the Debtor-Acis because the Debtor-Acis brand was purportedly toxic and, consequently, nothing associated with the Debtor-Acis could be managed or marketed as a CLO. Exh. 23, Transcript 2/7/18 at pp. 55-58. Mr. Ellington further testified that the Passive Investor demanded that the Equity/ALF PMA be transferred. Exh. 23, Transcript 2/7/18 at pp. 203-204. Mr. Ellington also testified that, because the Passive Investor would be putting in additional capital in connection with any reset CLOs, it had the ability to "start calling the shots" and dictate the terms of any reset transactions. Exh. 23, Transcript 2/7/18 at p. 226. Additionally, Highland executive Mark Okada testified that a reset transaction could not be performed by the Debtor-Acis because the market would not accept the Debtor-Acis as a portfolio manager and the Debtor-Acis was no longer risk-retention compliant. Exh. 25, Transcript 3/23/18 at p. 53. Additionally, Mr. Dondero testified that the "Boston investor" deal was contingent on getting away from the Debtor-Acis and getting a new collateral manager. Exh. 25, Transcript 3/23/18 at pp. 143-144.

[57] *See* Exh. 720 and excerpts read in to the trial record on 12/11/18 (PM) at pp. 149-157.

the actual investment decisions.[58] The only other business justification Highland and HCLOF

Guernsey have suggested for the prepetition transfers was that the Debtor-Acis "was a shell" and

not capable of being risk retention compliant.[59] However, Highland portfolio manager Hunter

Covitz testified that in October 2017, prior to the Terry Arbitration Award, there was a structure

in place that would comply with risk retention.[60] Mr. Covitz could not convincingly distinguish

why the "shell" status of the Debtor-Acis was distinguishable from the "shell" status of other

Highland-related entities that were the recipients of various fraudulent transfers.[61] Mr. Covitz

also subsequently admitted that the Passive Investor did not request that the Debtor-Acis end its

involvement with HCLOF Guernsey through the Equity/ALF PMA fraudulent transfer or request

that ALF change its name to HCLOF [Guernsey].[62] Mr. Covitz's testimony contradicted the

testimony provided by Scott Ellington, General Counsel[63] and Mr. Dondero.[64] And, at bottom, if

the Debtor-Acis was a thinly capitalized "shell," it appears to be only because Highland

systematically made it that way after the Terry Arbitration Award.

The evidence established overwhelmingly that there is a substantial likelihood that the

transfers were part of an intentional scheme to keep assets away from Mr. Terry as a creditor.

Highland put on an expert, Mr. Greenspan, who testified that he did not consider whether the

---

[58] Exh. 720, Depo. of Passive Investor representative at pp. 32-33.

[59] Transcript 12/13/18 (AM) [DE # 793], at pp. 55-58.

[60] Transcript 12/13/18 (AM) [DE # 793], at pp. 77-78.

[61] Transcript 12/13/18 (AM) [DE # 793], at p. 78; Transcript 12/18/18 [DE # 804], at pp. 59-63.

[62] Transcript 12/13/18 (AM) [DE # 793], at p. 103.

[63] *See* Exh. 23, Transcript 2/7/18 at pp. 177-178.

[64] *See* Ex. 25, Transcript 3/23/28 at pp. 143-44.

Equity/ALF PMA transfer was an "actual" fraudulent transfer, but only considered whether the transfer was "constructively" fraudulent.[65] While Highland has taken the position that termination of the Equity/ALF PMA was not a transfer, Mr. Greenspan testified that the termination of a contract can constitute a transfer and acknowledged that the definition of a transfer in the Bankruptcy Code does not include a value component.[66]

*Balance of Harms.* The Chapter 11 Trustee has also shown the balance of harms weighs in his and the estates' favor in granting the Plan's Temporary Injunction. The Chapter 11 Trustee is entitled to the Temporary Injunction pending resolution of the claims asserted in the Highland Entities Adversary Proceeding. The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction is important to the Plan, because it allows the cash flow from the CLO management to be collected by the Reorganized Debtor, and that is the source of revenue available at this time to pay creditors.[67] Mr. Terry also credibly testified that the Temporary Plan Injunction is a critical component of the Plan necessary to preserve the Debtors' going concern value and allow the Reorganized Debtor to generate new business and repay creditors.[68] Conversely, in this court's view, there is no real harm to Highland or the Co-Defendants because they can ask for a reset under the Plan.[69] Mr. Scott, a director of HCLOF Guernsey, testified that

---

[65] Transcript 12/12/18 (PM) [DE # 792], at pp. 116-117 and 161.

[66] Transcript 12/12/18 (PM) [DE # 792], at pp. 92-98. Section 548(a)(1)(A) of the Bankruptcy Code only requires that a transfer be made with actual intent to hinder, delay or defraud creditors. In the context of an intentionally fraudulent transfer claim, questions of value are immaterial. 11 U.S.C. § 548(a)(1)(A). The definition of "transfer" under the Texas Uniform Fraudulent Transfer Act ("TUFTA") also does not include a value component. Tex. Bus. & Comm. Code Ann. § 24.002(12) (West, Westlaw through 2017).

[67] Transcript 12/11/18 (AM) [DE # 789], at pp. 71-72.

[68] Transcript 12/12/18 (AM) [DE # 791], at pp. 40-41, 54-55.

[69] Transcript 12/11/18 (AM) [DE # 792], at p. 92.

HCLOF Guernsey can sell its interest in the subordinated notes in the market.[70]  The Chapter 11

Trustee credibly testified that the Temporary Plan Injunction would not impair the value of the

subordinated notes because a rational investor would not want to liquidate the Acis CLOs, but

rather would acquire them to do a reset under the Plan.[71]  Mr. Terry credibly testified that even if

the Acis CLOs are not reset, it still does not make sense to redeem the Acis CLOs.[72]

    *Public Interest.*  Finally, issuance of the Plan Injunction is consistent with public policy.

Public policy favors the equitable collecting of a debtor's assets, maximizing the value of those

assets, and distributing the proceeds in an orderly fashion in accordance with the priorities and

safeguards set forth in the Bankruptcy Code, rather than in an uncontrolled, piecemeal, and

potentially wasteful way.  Public policy also supports successful reorganizations.[73]  The public

interest is furthered by confirming a plan that saves the Debtor-Acis's business operations and

allows it to pay its creditors under a successful plan of reorganization.  The public interest is also

furthered by maintaining the status quo through the Temporary Plan Injunction so that the

avoidance action relating to the Equity ALF PMA can be determined on its merits.  The public

interest is not furthered by allowing potential wrongdoers to complete the last step in what

appears likely to have been a scheme to strip the Debtor-Acis of its assets, steal its business, and

leave it unable to pay creditors.  The public interest is not furthered by leaving the Debtors

---

[70] Exh. 721, Mr. Scott Depo. at p. 28.

[71] Transcript 12/11/18 (PM) [DE # 790], at pp. 23-24.

[72] Transcript 12/12/18 (AM) [DE #791], at p. 82.

[73] *Tex. Comptroller of Pub. Accounts v. Transtexas Gas Corp. (In re Transtexas Gas Corp.)*, 303 F.3d 571, 580 (5th Cir. 2002).

without sufficient resources to pursue and effectively litigate potentially valuable causes of action.

In sum, the court finds and concludes that the proposed Plan injunction (including the Temporary Injunction) is legally permissible and justified under all the circumstances.  It is narrowly tailored to address the specific harm to which it is directed and comports with governing case and statutory authority and applicable rules of bankruptcy and civil procedure.  The Plan Injunction is consistent with Fifth Circuit precedent.[74]  Such an injunction would not violate section 524(e) of the Bankruptcy Code.  That subsection provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."[75]  The Plan Injunction would not affect the liability of any entity, or the liability of any property.  The injunction would only temporarily prohibit Highland and its Co-Defendants from exercising one form of economic recourse, thereby preserving the status quo while the Chapter 11 Trustee and/or Reorganized Debtor has a fair opportunity to prosecute the

---

[74] The Fifth Circuit, in an unpublished opinion, has recognized the propriety of an injunction to preserve the status quo in cases where equitable relief is sought.  *See Animale Group v. Sunny's Perfume, Inc.,* 256 F. App'x 707, 709 (5th Cir. 2007) ("Because Defendants seek equitable relief, the district court was authorized to preserve the status quo by entering a limited asset freeze.").  The Chapter 11 Trustee's claims in the Highland Entities Adversary Proceeding to avoid fraudulent transfers seek equitable relief.  *See United States ex rel. Rahmen v. Oncology Assocs., P.C.,* 198 F.3d 489, 498 (4th Cir. 1999) ("The complaint's request to void transfers as fraudulent—a form of rescission—is also an equitable remedy."); *Dong v. Miller,* No. 16-CV-5836 (NGG) (JO), 2018 U.S. Dist. LEXIS 48506, at *30-31 (E.D.N.Y. Mar. 23, 2018) ("The setting-aside of a fraudulent conveyance is a form of equitable relief.").  *See also Iantosca v. Step Plan Servs.,* 604 F.3d 24, 33 (1st Cir. 2010) (affirming preliminary injunction where creditors had a "colorable claim that appellants' own supposed interest under the settlement rests upon a fraudulent conveyance"); *Seidel v. Warner (In re Atlas Fin. Mortg., Inc.),* Adv. No. 13-03222, 2014 Bankr. LEXIS 140 at *10 (Bankr. N.D. Tex. Jan. 14, 2014) (granting preliminary injunction where complaint sought avoidance of fraudulent transfers under the Bankruptcy Code and the Texas Uniform Fraudulent Conveyance Act); *Paradigm Biodevices, Inc. v. Centinel Spine, Inc.,* No. 11 Civ. 3489 (JMF), 2013 U.S. Dist. LEXIS 66858, at *7 (S.D.N.Y. May 9, 2013) (authority to grant preliminary injunction existed because plaintiff alleged not only a legal claim for money damages, but also an equitable claim to avoid fraudulently transferred assets).

[75] 11 U.S.C. § 524(e).

31

Highland Entities Adversary Proceeding.[76]  Likewise, the proposed injunction does not

contravene any other provision of the Bankruptcy Code or the Bankruptcy Rules.[77]  Finally, the

Chapter 11 Trustee's avoidance claim relating to the Equity/ALF PMA transfer under TUFTA

also provides a statutory basis for injunctive relief.[78]

### 3.  Feasibility of the Plan—Specific Findings and Conclusions Regarding Mr. Terry and Brigade.

The Objectors have challenged the feasibility of the Plan.[79]  The court finds and

concludes that the preponderance of the evidence supported the feasibility of the Plan.  Among

other things, the Chapter 11 Trustee credibly testified that Mr. Terry has an excellent track

record as a portfolio manager, and that there is no reason why Mr. Terry will not be able to

obtain new business—that is, new portfolios to manage which will provide additional revenue

streams for the Reorganized Debtor.[80]  The evidence was credible and compelling that Mr. Terry

---

[76] *See In re Seatco, Inc.*, 259 B.R. 279, 283-84 (Bankr. N.D. Tex. 2001) (approving temporary injunction of suit against nondebtor on guaranty of debt treated in plan).

[77] *Compare Omni Mfg. v. Smith (In re Smith)*, 21 F.3d 660, 666-67 (5th Cir. 1994) (disapproving injunction extending time to file proof of claim beyond limits set in Bankruptcy Rules 3003(c)(3) and 9006(b)(1)); *Chiasson v. Bingler (In re Oxford Mgmt.)*, 4 F.3d 1329, 1334 (5th Cir. 1993) (disapproving injunction ordering payment that altered distribution scheme set forth in § 726(b)); *Unites States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) (disapproving injunction ordering spousal support payments contrary to § 523(a)(5)).

[78] Tex. Bus. & Comm. Code Ann. § 24.008 (West, Westlaw through 2017) (providing a creditor may obtain "an injunction against further disposition by the debtor or the transferee, or both, of the asset transferred or of other property . . . [or] any other relief the circumstances may require.").  TUFTA's injunction provision is construed broadly and courts have found that "[a] claim for fraudulent transfer under Texas law contemplates the issuance of a preliminary injunction." *Sargeant v. Al Saleh*, 512 S.W.3d 399, 413 (Tex. App.—Corpus Christi 2016, no pet.); *accord, Janvey v Alguire*, 647 F.3d 585, 602-03 (5th Cir. 2011).

[79] 11 U.S.C. § 1129(a)(11).

[80] Transcript 12/11/18 (AM) [DE # 789], at p. 90 (lines 5-12).  Moreover, to the extent there are any gaps, recoveries from the Highland Entities Adversary Proceeding might eventually be available for ongoing operations and payment of creditors.

will be capable of fulfilling the equity owner position in the Reorganized Debtor (stepping in to essentially run the Reorganized Debtor) and will be able to ensure the feasibility of the Plan. He is well qualified to reorganize the Debtor-Acis. Mr. Terry testified that his role with the Reorganized Debtor will be similar to the role he very successfully performed for the Debtor-Acis.[81] The Debtor-Acis received numerous awards during Mr. Terry's service as the portfolio manager of the Acis CLOs.[82] The arbitration panel that issued the Arbitration Award found that Mr. Terry was terminated for essentially doing the right thing for investors.[83] Mr. Terry credibly testified that numerous market participants have expressed an interest in working with the Reorganized Debtor if the Plan is confirmed.[84]

Moreover, the court finds and concludes that Brigade (who stepped in as sub-advisor in place of Highland during the Bankruptcy Cases and is a registered investment advisor) is qualified to serve as a sub-advisor to the Reorganized Acis. Mr. Jared Worman, a portfolio manager for Brigade,[85] credibly testified that Brigade, founded in the year 2007, currently has $20 billion of total assets under management, $5 billion of which consists of six U.S. CLOs, two U.S. CDOs, and three European CLOs.[86] Mr. Worman credibly testified that Brigade has issued 17 CLOs and has reset or refinanced several of them.[87] Mr. Worman and Mr. Terry credibly

---

[81] Transcript 12/11/18 (PM) [DE # 790], at pp. 172-73.

[82] Transcript 12/11/18 (PM) [DE # 790], at pp. 162-163 and Exh. 752.

[83] Transcript 12/11/18 (PM) [DE # 790], at pp. 161-62.

[84] Transcript 12/12/18 (AM) [DE # 791], at pp. 16-18.

[85] Mr. Worman has an undergraduate degree from Emory University and an MBA from Wharton.

[86] Transcript 12/11/18 (PM) [DE # 790], at p. 84.

[87] Transcript 12/11/18 (PM) [DE # 790], at p. 86.

testified that Brigade is willing to serve as sub-advisor to the Reorganized Acis for fifteen basis points.[88] Highland attempted to show with evidence and argument that Brigade had made some failed trades since stepping in as sub-advisor to the Acis CLOs and that this perhaps made them unfit to serve in this role. But Mr. Terry credibly testified that the fact that a few failed trades were made by Brigade does not make them unfit to serve as sub-advisor to Reorganized Acis, and that trades out of compliance with the applicable CLO tests occasionally happen, and Brigade has handled them appropriately.[89] In fact, the evidence suggested that at least ten failed trades occurred while Highland was acting as sub-advisor to the Debtor-Acis.[90]

Highland's suggestions that Brigade is not up to the task to manage the Reorganized Debtor are specious. Likewise, HCLOF Guernsey's insistence that it will not be getting the benefit of its bargain if the Acis CLOs are not managed by Highland personnel going forward appears to be a manufactured position aimed at thwarting Mr. Terry at all costs. Not only is there no credible evidence of Brigade mismanagement but, to the contrary, it appears that Highland (prior to the Debtor-Acis's rejection of the Sub-Advisory Agreement and Shared Services Agreement), intentionally liquidated assets of the CLO SPEs and built up cash without reasonable justification. Specifically, Mr. Terry credibly testified that there were $85 million in purchases in the Acis CLOs in the hours leading up to the entry of the orders for relief, but virtually no purchases of loans in the CLOs afterwards—only sales.[91] And Mr. Worman further

---

[88] Transcript 12/11/18 (PM) [DE # 790], at p. 89; Transcript 12/12/18 (AM) [DE # 791], at p. 62.

[89] Transcript 12/11/18 (PM) [DE # 790], at pp. 182-83; Transcript 12/18/18 [DE # 804], at pp. 72-73.

[90] *See* Exhs. 727, 728; Transcript 12/11/18 (PM) [DE # 790], at pp. 71-74, 182-83.

[91] Transcript 12/12/18 (AM) [DE # 791], at pp. 18-19, 28-31; Transcript 12/18/18 [DE # 804], at pp. 87-89; *see also,* Terry Demonstrative.

credibly testified that Highland, while acting as sub-advisor, allowed approximately $380 million in cash to build up in the Acis CLOs. Meanwhile, Brigade has subsequently reduced that cash balance by $280 million to approximately $100 million.[92] Mr. Worman also credibly testified that Brigade has purchased approximately $300 million in loans for the Acis CLOs.[93] The Chapter 11 Trustee and Mr. Terry both credibly testified that the build-up of cash in the Acis CLOs while Highland was sub-advisor, rather than the loans acquired by Brigade, left the Acis CLOs without sufficient interest income to make a distribution to the equity holders.[94] Certain contradictory testimony of Hunter Covitz was not convincing that: (a) there were very few conforming loans available to be purchased for the Acis CLOs in the approximately four months that elapsed between the entry of the Order for Relief and the time when Highland was terminated as sub-advisor;[95] and (b) it made more sense to accumulate cash to pay down the AAA notes rather than invest in new loans.[96] The court found more convincing the testimony of Mr. Terry: (a) that there was $310 billion of performing loans rated above CCC in the S&P loan index in May of 2018 available for purchase in CLO-6 that would have satisfied the weighted average life test;[97] (b) that Highland purchased loans for CLO-7 that would have satisfied the weighted average life constraints in the Debtor-Acis's CLO-4, CLO-5, and CLO-6;[98] and (c)

---

[92] Transcript 12/11/18 (PM) [DE # 790], at p. 100.

[93] Transcript 12/11/18 (PM) [DE # 790], at pp. 70, 94.

[94] Transcript 12/11/18 (AM) [DE # 789], at pp. 67-69; Transcript 12/11/18 (PM) [DE # 790], at pp. 70-71; Transcript 12/12/18 (AM) [DE # 791] at pp. 34-37.

[95] Transcript 12/13/18 (AM) [DE # 793], at pp. 12-13.

[96] Transcript 12/13/18 (AM) [DE # 793], at pp. 13-16.

[97] Transcript 12/18/18 [DE # 804], at p. 87.

[98] Transcript 12/18/18 [DE # 804], at pp. 87-88.

that, although there was no change in market conditions, Highland essentially stopped buying collateral for the Acis CLOs[99] after the entry of the Orders for Relief.[100]

    4.   Resets—Non-impairment of Anyone's Rights.

The Plan only contemplates *consensual* resets of the Acis CLOs—in other words, only if HCLOF Guernsey requests resets.[101] Messrs. Worman and Terry both credibly testified that they believed the Reorganized Acis and Brigade could perform a consensual reset of the Acis CLOs.[102] Mr. Terry credibly testified that other asset managers have been able to issue or reset CLOs after a bankruptcy proceeding.[103] Mr. Terry also credibly testified that he wants to come to a resolution with HCLOF Guernsey and consensually reset the Acis CLOs.[104]

HCLOF Guernsey has taken the position that it and its new Passive Investor (new as of mid-November 2017—just before the Bankruptcy Cases) only want to be involved with CLOs that are managed by Highland or Highland affiliates. Is the Plan impairing their rights—to the extent the Plan (and any subsequent re-sets) brings in Brigade as the sub-advisor to the Reorganized Debtor (whereas Highland was in that sub-advisor role before)? It appears no. The

---

[99] Transcript 12/18/18 [DE # 804], at pp. 88-89.

[100] Highland has also argued that the Plan is not feasible because the administrative expense claims are extremely high (to which the Chapter 11 Trustee responds, it is of Highland's making, since Highland has objected to literally every action proposed by the Chapter 11 Trustee). The court does not believe there is a legitimate feasibility problem here. Not only has the court not ruled yet on final professional fee applications, but the Chapter 11 Trustee represented that certain professionals have agreed to defer their fees (beyond payment in full on the Effective Date) as necessary.

[101] *See* Plan § 6.08.

[102] Transcript 12/11/18 (PM) [DE # 790], at pp. 86-90, 176-178; Transcript 12/12/18 (AM) [DE # 793], at pp. 16-18.

[103] Transcript 12/11/18 (PM) [DE # 790], at pp. 179-180.

[104] Transcript 12/18/18 [DE # 804], at p. 74.

36

Offering Memorandum between HCLOF Guernsey and the Passive Investor, dated November

15, 2017, pursuant to which the Passive Investor agreed to invest in HCLOF Guernsey, provided

that there may be a change in circumstances following the date of the Offering Memorandum

and that any forward-looking statements in the Offering Memorandum involved risks and

uncertainties "because they relate to events and depend on circumstances that may or may not

occur in the future."[105]  Heather Bestwick, one of the HCLOF Guernsey directors, testified that

the Offering Memorandum does not require HCLOF Guernsey to invest only in Highland-

managed funds[106] and instead expressly provides that HCLOF Guernsey will invest in "CLOs

managed by other asset managers."[107]  Another witness, Mr. McGuffin, testified that the HCLOF

Guernsey directors' fiduciary duties require them to act independently and objectively in the best

interests of HCLOF Guernsey, and also require them to consider a change in circumstances.[108]

HCLOF Guernsey's counsel, HCLOF Guernsey's director, and the Passive Investor have all

testified that they would consider doing a reset with the Reorganized Acis in the event the Plan is

confirmed.[109]

     Mr. Terry credibly testified that a reset of the Acis CLOs can occur after the expiration of

the reinvestment periods of the Acis CLOs.[110]  The Plan is feasible regardless of whether a reset

of the Acis CLOs is requested by HCLOF Guernsey.  Messrs. Phelan and Terry both credibly

---

[105] *See* Exh. 90, HCLOF Guernsey Offering Memorandum, at pp. 4-5.

[106] *See* Exh. 719, Bestwick Depo., at pp. 109, 118-121.

[107] *See* Exh. 90, HCLOF Offering Memorandum, at p. 12.

[108] Transcript 12/13/18 (PM) [DE # 794], at pp. 142-145.

[109] *See* Exh. 602, p. 12 of 70 (statement by HCLOF Guernsey's Counsel); Exh. 719 at pp. 166-167 (Heather Bestwick); Exh. 720, p. 72.

[110] Transcript 12/18/18 [DE # 804], at pp. 82-83.

testified that the Reorganized Debtor will have cash flow from multiple potential sources—
including the revenues from the CLO PMAs with the Acis CLOs, potential new business
developed by the Reorganized Acis, and the outcome of any potential litigation claims.[111]

## VI. General Credibility Assessments.

In ruling in a contested matter such as confirmation, and weighing the preponderance of
the evidence, the credibility of witnesses and contradictions in their testimony naturally can be
significant. Here, there were some noteworthy problems and contradictions with some of the
testimony provided by the Objectors' witnesses. They are summarized below.

### 1. Scott Ellington: A Seemingly Manufactured Narrative to Justify Prior Actions.

Scott Ellington testified on February 7, 2018 at the trial on the involuntary petitions, and
the court was asked to consider his testimony again in connection with confirmation (he did not
attend the confirmation hearing). He is the General Counsel, Chief Legal Officer, and a Partner
at Highland. Mr. Ellington testified that the Debtor-Acis's name is "toxic" in the market place
and that, due to the litigation with Mr. Terry and allegations in that litigation, "nothing can be
associated with the Acis brand and be managed as a CLO or marketed as a CLO."[112] Mr.
Ellington elaborated that it had been determined in late 2016 or 2017 that re-sets or re-financings
of the Acis CLOs were a prudent thing to pursue (in fact, there was indeed a trend of
refinancings and resets for this vintage of CLOs in the market place) and, in connection with
that, the Debtor-Acis's contracts and assets needed to be diverted to different, newly created
entities because: (a) the "Acis" name was toxic and underwriters and investors were not going to

---

[111] Transcript 12/11/18 (AM) [DE # 789], at pp. 72, 88-90; Transcript 12/12/18 (AM) [DE # 791], at p. 53.

[112] Exh. 23, p. 55 (line 17) through p. 56 (line 7); p. 98 (lines 8-12).

be interested in re-financings or resets for CLOs managed by the Debtor-Acis;[113] and (b) the new Passive Investor wanted the Debtor-Acis out of the picture.[114] Mr. Ellington further elaborated: "The equity, you know, calls the tune, so to speak, in terms of the CLO . . ..”[115] In summary, an overarching theme of Mr. Ellington's testimony was that the Debtor-Acis was tainted or toxic in the marketplace and the Passive Investor wanted the Debtor-Acis out of the picture—thus, this was the motivation for the prepetition transactions orchestrated by Highland prior to the Bankruptcy Cases. The problems with the Scott Ellington testimony were at least two-fold. First, there is no credible evidence that the Debtor-Acis is/was toxic in the market place. In fact, in April 2017 (well after the litigation with Mr. Terry commenced), the Debtor-Acis issued a new CLO (CLO-7). And in market publications as recently as August 21, 2017, Highland was touting the *Acis* structure stating "our vehicle will allow us to issue between six and 12 CLOs over the next few years.”[116] Second, the Passive Investor denies demanding that the Debtor-Acis be removed as the CLO manager. Term sheets as recent as August 21, 2017 contemplated the Debtor-Acis as the continuing portfolio manager of CLOs, with apparently no protestations by the Passive Investor.[117]

---

[113] *E.g., Id.* at p. 177 (line 21) though p. 178 (line 12); p. 184 (lines 13-17) (“The underwriters in this case, Mizuho, Goldman, et al., the equity, they said we want every possible relation to anything that could be legacy Acis or Acis-related affiliates to be severed”).

[114] *Id.* at p. 202 (lines 11-13) (“we have third-party investors that said we don't want to be involved in this brand; and their equity is one of the reasons that new CLOs can be launched”); p. 203 (lines 7-8) (“It was call the deal and terminate the CMAs or transfer the CMAs”); p. 223 (lines 8-12) (“Because if the involuntary remains, and I'm just – I'm just being frank – we've already been told by equity holders, including the separate account, BBK, that you may have seen on some of the exhibits, they're pulling everything.”).

[115] *Id.* at p. 74 (lines 3-6).

[116] Exh. 801, pp. 3 & 5.

[117] Exh. 802, p.1.

2.  Michael Pugatch: The Passive Investor Made Into a Scapegoat.

The reality is that Highland, indeed, started working on the concept of doing resets of

some of the older vintage Acis CLOs in at least early 2017 (and perhaps late 2016). Highland, in

fact, completed a reset of one Acis CLO in April 2017 (with the Debtor-Acis still in place as the

portfolio manager for that reset in April 2017). As part of that process of implementing resets

for the Acis CLOs, Highland worked on bringing in a new investor or investors to have a share

of the equity tranche of the Acis CLOs. Highland finally obtained the commitment of the

Passive Investor in November 2017, after starting initial discussions with them in the second

quarter of 2017.[118] A representative for the Passive Investor referred to itself as "passive" in a

deposition.[119] Concepts and documentation for the Passive Investor's investment in the Acis

CLOs were discussed for a while during 2017. As recently as August 2017, the negotiations

with the Passive Investor appeared to contemplate the Debtor-Acis still as the portfolio manager

for the CLOs.[120] Then the arbitration trial with Mr. Terry began in September 2017 and the

Terry Arbitration Award was issued on October 20, 2017. Suddenly, it appears that the

dismantling of the Debtor-Acis began with all deliberate speed. The court believes, based on the

totality of the evidence, that it was Highland who did not want the Debtor-Acis as CLO manager

going forward, so that Highland could keep reaping the benefits of the reset CLOs. Specifically,

when deposed on the topic, a representative for the Passive Investor, Mr. Pugatch, denied the

accuracy of Mr. Ellington's testimony, stating that the Passive Investor "viewed Acis and

Highland as interchangeable from the perspective of the—you know, the actual investment

---

[118] *See* Exh. 720, Pugatch Deposition Transcript dated November 27, 2018, p. 18, lines 14-20.

[119] *Id.* at p. 22 (lines 2-3) ("we're you know, 49 percent sort of passive minority investor").

[120] Exh. 802, p. 1.

opportunity."[121]  When asked, "Are you aware that Scott Ellington, general counsel for HCM, testified that [the Passive Investor] said with absolute certainty that they had no interest in doing business with Acis because the Acis brand was purportedly toxic and, consequently, nothing associated with Acis could be managed or marketed as a CLO?" Mr. Pugatch testified that he had read that testimony and that the statement was not true.[122]  He further stated that "the ultimate sort of name change did not come from [the Passive Investor]."[123]  In fact, when further asked whether the Passive Investor knew why Acis CLO Funding Limited changed its name to Highland CLO Funding Limited (*i.e.,* HCLOF Guernsey), Mr. Pugatch testified, "We were told that it was a change in the brand or the name, as requested by Highland."[124]  And when asked "Did [the Passive Investor] request that the name be changed?" he answered "No."[125]  When asked whether the Passive Investor considered "Acis toxic in the industry?" Mr. Pugatch answered:  "No. What I would say is, when the suggested name change did occur, there were commercial reasons given to us as to why that would be beneficial in terms of the ongoing management of those CLOs and the intended investment thesis around the investment that we had made, which seemed to make commercial sense."[126]  When Mr. Pugatch was asked, "Those reasons were given by Highland, correct?" he replied "Correct" and confirmed that they were not demanded by the Passive Investor.[127]  Mr. Pugatch was emphatic that the Passive Investor was

---

[121] *Id.* at p. 30 (lines 19-20).

[122] *Id.* at p. 31 (lines 6-19).

[123] *Id.* (lines 24-25).

[124] *Id.* at p. 27 (lines 24-25).

[125] *Id.* at p. 28 (lines 1-3).

[126] *Id.* at p. 32 (lines 1-8).

[127] *Id.* at p. 32 (lines 9-12).

just that—a passive investor—that did not have the ability to "start calling the shots" and dictate the terms of any reset transactions.[128] When asked if the Passive Investor was concerned about the Terry Arbitration Award, Mr. Pugatch replied: "The award itself, no. I think the only thing we were concerned about or focused on was that vis-à-vis our equity investment in Highland CLO Funding Limited and, in turn, the equity that that vehicle held in the various CLOs was appropriately, you know, ring-fenced or not exposed to any potential damages or economic loss in value as a result of that arbitration award."[129]

The Passive Investor further testified that Brigade has "a fine reputation in the market" but that it had no interaction with them historically.[130] The Passive Investor also testified that it was concerned about the cash buildups that had happened recently due to actions while Highland had still been the sub-advisor on the Acis CLOs.[131]

### 3. The Seemingly Rehearsed Testimony of the Two HCLOF Guernsey Witnesses.

The court was presented with video depositions of HCLOF Guernsey's two non-executive directors (*i.e.,* its only directors): Mr. William Scott[132] and Ms. Heather Bestwick.[133] It was very apparent to the court that HCLOF Guernsey is controlled by Highland in every way. Putting things in the kindest way possible, Mr. Scott and Ms. Bestwick appear to be nominal figureheads who are paid to act like they are in charge, while they are not. They are both

---

[128] *Id.* at p. 32 (lines 16-17); pp. 33-35.

[129] *Id.* at p. 43 (lines 3-9); p. 89.

[130] *Id.* at p. 68 (lines 11-13).

[131] *Id.* at p. 82, lines 9-24.

[132] *See* Exh. 721.

[133] *See* Exh. 719.

basically professional directors-for-hire, for companies that choose to form/organize in the nation of Guernsey.

Ms. Bestwick testified that she is a nonexecutive director for six companies in Guernsey (none of the others are in the CLO business).[134] She testified that she earned £35,000 per year to serve as a director of HCLOF Guernsey.[135] She testified that she was selected by Highland[136] and that Highland also made the decision to hire HCLOF Guernsey's law firm in the Bankruptcy Cases.[137] Ms. Bestwick, when questioned as to why the Equity/ALF PMA it had with the Debtor-Acis was terminated shortly after the Terry Arbitration Award was issued, testified that she was told it was "a condition precedent to the new Passive Investor" coming in and that she was told this by Highland.[138] She also testified that she had never talked to the Passive Investor (who, of course, is a 49% owner of HCLOF Guernsey)[139] or Grant Scott (the trustee of the charitable organization that owns 49% of HCLOF Guernsey).[140] She reiterated that she only talks to Highland employees. She also was under the impression that terminating the Equity/ALF PMA would improve marketability of the CLOs going forward but that it was the same people and "business as usual for us."[141] She testified that she learned of the Terry

---

[134] *Id.* at pp. 7-8; p. 21 (line 5) through p. 22 (line 20); p. 26 (lines 10-12).

[135] *Id.* at p. 43 (lines 18-19).

[136] *Id.* at p. 42 (lines 17-25).

[137] *Id.* at p. 53 (lines 7-20).

[138] *Id.* at p. 16 (line 13) through p. 17 (line 23); p. 58 (line 21) through p. 60 (line 17).

[139] *Id.* at p. 188 (lines 12-15).

[140] *Id.* at p. 188 (line 19) through p. 189 (line 9).

[141] *Id.* at p. 189 (lines 12-15); p. 200 (line 22).

Arbitration Award in mid-April 2018 (some six months after the fact)[142] and "[y]ou'd have to ask Highland"[143] why it did not inform her sooner. Her testimony was clear that she defers to Highland on everything, stating that as directors they were "heavily reliant on our service providers, and that means Highland."[144] With regard to a lawsuit that HCLOF Guernsey filed against Mr. Terry in Guernsey during the Bankruptcy Cases, she testified that it was neither her nor the other director, William Scott's, idea.

Mr. Scott, the other HCLOF Guernsey director, is a "professional director" for 10-15 Guernsey companies[145]—all of which are "paying assignments."[146] He became rather incensed when testifying, at the suggestion that he and Ms. Bestwick were not in control of HCLOF Guernsey, stating that board minutes and other documents would show that they took a great level of interest in running the company.[147] He testified that he earned £40,000 per year to serve as a director of HCLOF Guernsey and that, due to the extra work of the Bankruptcy Cases, he also was charging another £350 per hour, after the first 35 hours[148] (the court notes, anecdotally, that it required participation in court hearings by a director of HCLOF Guernsey each time that HCLOF Guernsey took a position in court). Mr. Scott confirmed that he was not aware of the litigation with Mr. Terry nor the Acis Bankruptcy Cases until April 2018.[149] He also testified

---

[142] *Id.* at p. 61 (lines 3-19); p. 130 (line 14) through p. 136 (line 2).

[143] *Id.* at p. 137 (line 21).

[144] *Id.* at p. 152 (lines 18-19).

[145] *See* Exh. 721 at p 8 (line 9) through p. 9 (line 5); p. 79 (lines 20-25).

[146] *Id.* at p. 80 (lines 3-5).

[147] *Id.* at p. 13 (lines 1-12); p. 22 (line 23) through p. 23 (line 12).

[148] *Id.* at p. 80 (lines 6-18).

[149] *Id.* at p. 132 (line 20) through p. 135 (line 10).

44

that Highland had proposed the legal counsel HCLOF Guernsey used in the Bankruptcy Cases and that he had never disagreed with Highland's advice.[150] He confirmed that all investment decisions were made by Highland and that he and Ms. Bestwick's role was to "police" service providers.[151] Like Ms. Bestwick, Mr. Scott testified that they were told that the Passive Investor had made it a condition precedent to their investment in HCLOF Guernsey that "Acis depart."[152] But he had not talked to the Passive Investor.[153] As if all this deference to Highland were not enough, HCLOF Guernsey's lender is NexBank (an affiliate of Highland—which is based in Dallas, not Guernsey) and HCLOF Guernsey has given its actual equity notes to NexBank as security for its loans from NexBank.[154] Also, interestingly, when asked about the adversary proceeding that HCLOF Guernsey filed against the Chapter 11 Trustee a few months ago in the Bankruptcy Cases (*i.e.,* the Highland Entities Adversary Proceeding—it was originally commenced by Highland and HCLOF Guernsey as Plaintiffs), Mr. Scott testified that "we haven't sued the trustee, he has sued us" but later acknowledged his mistake when corrected by counsel.

This court is not naïve—it realizes that so-called "fiduciary services firms" are apparently a typical thing in the world of off-shore jurisdictions that are large financial centers.[155] Maybe

---

[150] *See generally id.* at pp. 277-280.

[151] *Id.* at p. 106 (lines 1-7).

[152] *Id.* at p. 254 (line 20) through p. 260.

[153] *Id.* at p. 155 (lines 2-25).

[154] *See* Exh. 719 at p. 213 (line 2-22); Exh. 721 at p. 129 (line 10) through p. 130 (line 13).

[155] During the testimony of both Ms. Bestwick and Mr. Scott, the court was reminded of an old TV commercial in which an actor states, "I am not a doctor, but I play one on TV." The court could not help but conclude that these were not real directors but were playing them (when legally necessary).

the system works, for the most part and in many business contexts. But not when trying to convince a bankruptcy court of the bona fides of transactions that look like attempts to denude another party of value and/or to thwart creditors. And not when accusations are made that you are the alter ego of the party (Highland) who orchestrated the company's creation. The evidence was overwhelming that: (a) the HCLOF Guernsey Directors do whatever they are told to do by Highland; (b) they do not talk to anyone else but Highland; (c) they have never challenged Highland; (d) they let Highland pick and consult with their lawyers; and (e) they were not made aware by Highland of the Terry Arbitration Award, the Terry Judgment, the involuntary bankruptcy petitions, or pleadings that lawyers filed in the Bankruptcy Cases on HCLOF Guernsey's behalf.

In summary, the testimony of these two HCLOF Guernsey Directors was of little or no value in convincing the court that the Objector, HCLOF Guernsey, has valid concerns of its own (separate from Highland's) with regard to the bona fides of the Plan.

## VII.    Conclusion.

This Bench Ruling and Memorandum Opinion is intended to address some of the most pertinent facts and issues raised in connection with confirmation of the Plan. Among other things, the court believed it was necessary to stress, in a separate ruling: (a) *the unique status of the Objectors* (they are "insiders" as defined in the Bankruptcy Code whose prepetition actions suggest unclean hands—this seems highly relevant to consider, when there are no non-insider creditors or other relevant parties objecting to the Plan); (b) *the appropriateness and legality of the proposed Plan Injunction* that would temporarily prevent nonconsensual redemptions/liquidations  (it is in all ways justified given the allegations in the Highland Entities Adversary Proceeding and under the traditional four-prong test for preliminary injunctions); and

(c) *the feasibility of the Plan* (Mr. Terry and Brigade are well qualified to perform their contemplated roles).

The court will separately sign the Findings of Fact, Conclusions of Law and Order Confirming Plan submitted by the Chapter 11 Trustee to address all other relevant issues.

#### **#### End of Bench Ruling and Memorandum Opinion ####**