# EXHIBIT I

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **NEXPOINT STRATEGIC OPPORTUNITIES FUND,** | § § § | |
| *Plaintiff,* | § § | |
| **v.** | § § | **Cause No. 1:21-cv-04384-GHW** |
| **ACIS CAPITAL MANAGEMENT, L.P., U.S. BANK, N.A., JOSHUA N. TERRY, BRIGADE CAPITAL MANAGEMENT, L.P.,** | § § § § § | |
| *Defendants.* | § § | |

---

## PLAINTIFF'S SECOND AMENDED COMPLAINT

---

## I.

## INTRODUCTION

Plaintiff NexPoint Strategic Opportunities Fund ("NexPoint" or "Plaintiff") respectfully files this action to recover damages caused by the gross malfeasance of Defendants U.S. Bank National Association ("U.S. Bank"), as a trustee, and Acis Capital Management, L.P. ("Acis" or "Acis"), Brigade Capital Management, LP ("Brigade"), and Joshua N. Terry ("Terry"), as registered investment advisors ("RIAs", together with U.S. Bank, "Defendants" and each a "Defendant"). The Defendants are jointly and severally liable for mismanaging certain collateralized loan obligations that NexPoint invested in.

The acts and omissions which have recently come to light reveal breaches of fiduciary duty, a pattern of violations of the Investment Advisers Act of 1940 and the Trust Indenture Act of

1939, and conversion, among others, which have caused and/or likely will continue to cause Plaintiff damages.

At all relevant times, the Defendants managed and advised ACIS CLO-2014-2, Ltd., ("ACIS 2"), ACIS CLO-2014-3, Ltd., ("ACIS 3"), ACIS CLO-2014-4 Ltd. ("ACIS 4"), ACIS CLO-2014-5 Ltd. ("ACIS 5"), and ACIS CLO-2014-6, Ltd. ("ACIS 6") (any two or more, the "CLOs"). In a classic "let's rob Peter to pay Paul" scheme, the RIAs have—and the Trustee has allowed the RIAs to do so:

- Knowingly charged the CLOs exorbitant amounts of "expenses" without accountability or justification;

- Knowingly caused the CLOs to purchase loans that failed to meet credit quality tests and average life tests, and caused the entire portfolio to fail the applicable collateral quality tests;

- Knowingly cause the CLOs to sell valuable assets cheaply; and

- Knowingly breach industry standards for best execution when buying and selling.

To put it simply, since February 16, 2019, forward, through the combined effect of the above malfeasance, Defendants have wiped out more than $50 million in value from the CLOs and have hamstrung NexPoint from recouping its investments in the CLOs.

The impact on NexPoint is substantial. It owns approximately $7.5 million of the equity of ACIS 6. Defendants have caused the net asset value of the ACIS 6 equity to be worth a mere 30 cents on the dollar. Defendants have thus caused Plaintiff to suffer over millions in losses.

These are not just ephemeral numbers. Plaintiff represents the interests of thousands of investors who rely on the promised security of these types of investments to provide cash flow and to fund things like retirements and college tuitions. Plaintiff invested in the CLOs because, if managed in the way provided for in the indentures and portfolio management agreements ("PMAs"), they are secure and relatively safe, diversified investments.

The economic purpose is obliterated where, as here, the RIAs manage the CLOs for their own ends, extending the life of the existing portfolio so as to maximize fees and prohibiting the noteholders from making redemptions. Meanwhile, the trustee, U.S. Bank, looks the other way (whether intentionally or negligently) while the value of the CLOs is decimated. The Defendants are legally obligated fiduciaries who have to look out for the best interests of the advised funds, *i.e.*, the CLOs and their investors.

## II.

## THE PARTIES

1.      Plaintiff NexPoint Strategic Opportunities Fund ("NexPoint"), a Delaware statutory trust, is a closed-end retail fund managed by NexPoint Advisors, L.P. Its principal place of business is in Dallas, Texas. Interests in NexPoint trade on the New York Stock Exchange (NYSE: NexPoint).

2.      Joshua N. Terry is an individual resident of Texas located at 3509 Princeton Avenue, Dallas, Texas, 75205, who may be personally served wherever he may be found. Terry is the owner and President of Acis.

3.      Defendant Acis Capital Management, L.P. ("Acis") is a Delaware limited partnership. Acis may be served through its registered agent Capitol Services, Inc., located at 1675 S. State Street, Suite B, Dover, Delaware 19901, or wherever it may be found. Acis is a registered investment advisor.

4.      Defendant Brigade Capital Management, LP is a Delaware limited partnership that is registered to do business in New York, with its principal place of business in the state of New York. Brigade may be served through Donald E. Morgan III, 399 Park Avenue, 16th Floor, New York, New York, 10022, or wherever it may be found. Brigade is a registered investment

advisor.

5.      Defendant U.S. Bank, N.A. ("U.S. Bank", the "Indenture Trustee" or "Trustee") is a national banking association that is Trustee of the Acis Indenture, as defined further herein. Defendant U.S. Bank may be served at its corporate office located at 190 South LaSalle Street, 8th Floor, Chicago, IL 60603, or wherever it may be found.

**III.**

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because one or more claims "arises under" federal law—namely, the Investment Advisers Act of 1940 and the Indenture Trust Act of 1939 (as amended). This Court also has original jurisdiction over all claims alleging violations of the Advisers Act or its regulations or commission rules, and venue is proper herein for same under 15 U.S.C. § 80b-14. All such other claims are properly before this Court under its supplemental jurisdiction supplied by 28 U.S.C. § 1367.

7.      Personal jurisdiction and venue over Acis and U.S. Bank are proper because the governing documents—the indentures and portfolio management agreements—to which they are bound required them to agree to submit to the jurisdiction of New York and to waive any objection to New York as a forum and venue. Both Defendants are authorized to and do regularly conduct business in the state of New York and are accused of torts directed at the state of New York, at least in part. Furthermore, the acts and/or omissions giving rise to the causes of action herein occurred in whole or in part in this District and affect property situated in this District.

8.      Jurisdiction and venue over Brigade are proper in this district because Brigade is registered to do business in New York, and the transactions and occurrences that are the subject of NexPoint's claims against Brigade, including certain advice, communications, and trading

activity with brokers or dealers, took place in whole or in part in this District.

9.      Jurisdiction and venue over Terry are proper in this District because Terry is bound by the indenture clauses cited above, and he committed torts that are the subject of NexPoint's claims against him that occurred within or were directed to New York, including through certain trading activity with brokers or dealers within New York or to New York.

## IV.

## FACTUAL BACKGROUND

### A. A BRIEF PRIMER ON CLOS

10.      Collateralized loan obligations ("CLOs") are a specific type of structured financial transaction. CLOs are usually comprised of a mixture of publicly available, floating rate, senior-secured debt instruments issued by corporations (collectively, the "CLO Assets").

11.      These loans are pooled together and then funneled into a trust entity known as a special purpose vehicle ("SPV"). The pooled loans within an SPV constitute the assets of a CLO.

12.      To fund the purchases of these loans, SPVs raise equity funds from one or more equity investors, and then they raise additional cash in the form of debt, usually from the public markets by issuing notes to third party investors (collectively, the "CLO Notes").

13.      It is standard for this debt to be arranged in tranches—the most senior debt is paid back first but bears the lowest expected yield (*i.e.*, smallest interest rate), whereas the most junior debt is paid back next-to-last but bears the highest expected yield (*i.e.*, largest interest rate). Characterized differently, the greater the seniority of the debt, the less risk the investor carries.

14.      After all debt, regardless of seniority, is paid out and all defaults have been taken on, the equity holders are paid. The character of incoming funds cascading down the tranches to pay the debt in descending seniority order, and then the equity holders last, is frequently referred

to as the "payment waterfall." This general structure is depicted below.



15.     The CLO assets are the source of cash flow that pay a CLO's expenses, followed by the principal and interest payments due on the CLO notes—which go to the CLO's noteholders. Any cash remaining at the end of each quarter was typically paid to the equity holders.

16.     In other words, equity holders take on the most risk of any investor in a CLO. The value of their equity increases as incoming cash flows from the CLO Assets pay the operating expenses and interest on the CLO Notes, and pay down the debt tranches.

17.     As the debt tranches are paid down, as long as cash flows from the asset base continue at a level that is higher than the cost of servicing the debt and the expenses, the equity will realize more and more of the benefits.

18.     Other than the investors themselves, the key parties to the success or failure of a CLO are (1) the portfolio manager, (2) the advisor, and (3) the indenture trustee.

19.     Each of these parties is bound together by a contract known as an "indenture." Indentures are governed by federal law—namely, the Trust Indenture Act of 1939, and the Trust Indenture Reform Act of 1990, as well as their enacting regulations.

20.     The portfolio manager's role is two-fold: The first is to identify and purchase the CLO Assets, doing so in a manner that creates the cash flow necessary to satisfy a CLO's debt-service requirements (*i.e.*, the payout, diversification, credit-quality, and average-life requirements) while not exposing the CLO to non-market risks. The second is to monitor the CLO Assets to ensure that over time, the individual CLO Assets continue to meet various collateral-quality, which are designed to ensure a CLO can meet its debt-service requirements all the while producing income for equity holders. This latter task usually requires the portfolio manager to monitor each CLO asset to ensure that the CLO has a mix of assets in different industries or markets, with differing maturity dates within acceptable risk profiles, and within a variety of credit ratings. This aspect of the portfolio manager's job normally includes selling assets that are deteriorating and buying assets that are superior to assets in the portfolio— otherwise, investing too much of the portfolio in any one of these categories overexposes a CLO to risk and may well lead to losses.

21.     The portfolio manager is typically subject to a separate agreement called the portfolio management agreement ("PMA").

22.     The portfolio manager also often serves as the primary investment advisor and may also outsource or delegate certain functions to a sub-advisor.

23.     Advisors are required to be "Registered Investment Advisors" under federal law,

which imposes a robust non-waivable fiduciary duty on them discussed in greater detail below. One such duty is to maintain the best interest of the investors and to make investment decision that are suitable to the investors' assumption of risk.

24.     An indenture trustee is a role required by federal law to safeguard the interests of both the noteholders and equity holders, serving as a vigilant eye that guarantees a portfolio manager's compliance with the indenture, as well as with good and sound collateral management practices.

25.     The law imposes a fiduciary duty and a "prudent person" standard on indenture trustees, which governs their performance of their duties under the indenture.

26.     These obligations and responsibilities are vital to an indenture trustee's role as to a CLO—indenture trustees are the risk-managing, counterbalance to the portfolio manager.

27.     As compensation for the role with a CLO, portfolio managers receive a percentage of the "assets under management" ("AUM"), which is determined by the face value, also known as par value, of the CLO Assets.

28.     Because of this compensation structure, if left unchecked, portfolio managers can maximize their take-home pay by purchasing debt instruments with the highest par value, irrespective of the quality of these assets.

29.     Because lower-credit-quality debt instruments are cheaper than those of higher quality, portfolio managers can acquire a greater number of these lower-quality loans, and pool them in the SPV to manipulate the CLO's fee structure to their own benefit.

30.     Doing so allows portfolio managers to achieve the largest par value in the aggregate as possible and, thereby charge the largest fees for themselves.

31.     Pursuing this investing strategy would allow portfolio managers to earn

significantly more in fees over a longer period of time, even though doing so exposes a CLO (and, thereby, the noteholders and equity holders) to significantly more risk on account of the longer maturities and lower credit ratings of these lower-quality debt instruments.

32.     This is where indenture trustees play their part—they prevent portfolio managers from engaging in such behavior by monitoring changes in the CLO assets and in the portfolio's credit quality and maturity.

33.     Indenture trustees have various tools to monitor and protect the security and soundness of CLO assets, two of which are the weighted average rating factor ("WARF") and the weighted average life ("WAL").

34.     The WARF demonstrates the credit quality of a CLO's entire portfolio. WARF is calculated by taking the credit rating of each debt instrument in the CLO, determining the percentage of the CLO portfolio that each instrument constitutes, and aggregating those to a factor of the portfolio's notional balance. The better the WARF, the lower the risk to a CLO's investors.

35.     The WAL demonstrates average maturity of the debt instruments in the CLO, *i.e.*, the riskiness of the entire portfolio with respect to the time until the principal is repaid. Calculating the WAL yields the average number of years for which each dollar of unpaid principal on an investment remains outstanding. This metric is important because, in general, investors want to be paid back sooner rather than later. Longer payouts typically mean greater exposure to risk because of unforeseen circumstances, *e.g.*, inflation, default risk, etc. Therefore, the shorter the maturity dates, the better the WAL—and, accordingly, the lower the risk to a CLO's investors.

36.     Together, the WARF and the WAL are effective gauges to evaluate whether CLO

Assets are becoming too risky. Thus, indenture trustees have several tools to monitor and rein in portfolio managers in order to protect a CLO's noteholders and equity holders.

## B. NexPoint Invests in the ACIS CLOs

37.     In this case, Acis was the portfolio manager. Mr. Terry is the president, owner, and primary advisor of Acis. Brigade is the sub-advisor to Terry and Acis.

38.     Between 2014 and 2016, NexPoint became a holder under the indenture dated April 16, 2015, among Acis CLO 2015-6 Ltd. and Acis CLO 2015-6 LLC (together "ACIS-6"). The value of the equity was approximately $7,500,000.

39.     NexPoint invested in the indenture for ACIS-6 (the "Acis Indenture") as part of its mission and as a secure and safe investment on behalf of its investors.

40.     U.S. Bank agreed to serve as the trustee for the Acis Indenture. Acis came onboard as the portfolio manager, and Highland Capital Management L.P. ("Highland") served as the sub-advisor.

41.     The Acis Indenture imposed several obligations on Acis as the portfolio manager and U.S. Bank as the trustee.

42.     Additionally, the PMAs for the Acis CLOs impose obligations on Acis as the portfolio manager, generally requiring Acis to "supervise and direct the investment and reinvestment of the Assets" and to "monitor the Assets."

43.     These PMAs also impose liability on U.S. Bank as a third-party beneficiary in its role as indenture trustee.

44.     When Terry took over Acis in August 2018, Acis continued to serve as portfolio manager to the Acis CLOs, but Terry became the advisor.

45.     As a result of having neither the labor force nor the wherewithal to manage the Acis CLOs on its own, Acis retained Brigade to assist the company and Terry to provide these portfolio management services as a sub-advisor.

46.     As RIAs, Acis, Terry, and Brigade are subject to the Investment Advisors Act of 1940 (the "Advisors Act").

47.     As part of the Acis bankruptcy proceeding (the "Acis Bankruptcy"),[1] in which Terry became 100% owner of Acis (as well as its president and owner of its general partner), the United States Bankruptcy Court for the Northern District of Texas formally approved Acis's appointment of Brigade as sub-advisor and shared-services provider to Acis in connection with Acis's management of the Acis CLOs. At all pertinent times through the present, Brigade has provided these services.

48.     As a sub-advisor, Brigade is the agent of Acis and, therefore, of the Acis CLOs. Upon information and belief, Terry needed help managing the Acis CLOs, so he retained to provide advisory services, as well as back-and middle-office functions, including, but not limited to, accounting, payments, operations, technology, and finance, among other things, in connection with Acis's obligations under the PMAs.

49.     Terry additionally employed Brigade to assist in the negotiation and execution of all documents necessary to acquire or dispose of assets under the PMAs. He further delegated to Brigade certain tasks related to the Acis CLOs, including, but not limited to, identifying potential assets (and their buyers and sellers) and modeling ratings, default, and price scenarios as needed. In providing these critical portfolio management services for the Acis CLOs, Brigade works

---

[1] The two case numbers in the consolidated Bankruptcy Proceeding include Case Nos. 18-30264-SGJ-11 and 18-30265-SGJ-11.

directly with and for Terry. Terry testified in the Acis bankruptcy proceedings that he intended for this arrangement.

50.     Critically, although Terry effectively approves all trading activity for the Acis CLOs, Terry and Acis have no executive level employees aside from Terry, and, upon information and belief, they do not possess the ability to manage the CLO Assets effectively. As president and sole owner of Acis, Terry exercises complete dominion over the company and its activities. Absent a chain of command or support system, Terry answers to nothing other than his greed and self-interest.

51.     Given the far-reaching extent of Brigade's involvement in managing the CLOs' portfolios, Brigade's conduct—and by extension Acis's conduct through Terry's direction and control—severely and adversely impacted the portfolios of the Acis CLOs in which NexPoint is a noteholder and equity holder.

52.     Acis paid Brigade as though Brigade were another portfolio manager or advisor for its portfolio management services. As of February 20, 2019, Brigade had charged Acis fifteen basis points on the Acis CLOs' assets, a fee which Brigade represented to have been negotiated in good faith with Acis.

53.     Prior to the Acis Bankruptcy, Highland managed the Acis CLOs, serving as a sub-advisor to Acis. One of the original investment vehicles, Acis CLO-7, continued to be managed by Highland after the RIA Defendants took over control of the other Acis CLOs.

54.     Since August 2, 2018, the RIA Defendants have managed the Acis CLOs subject to the indentures and PMAs, which require them to "comply with all [applicable] terms and conditions of the [Acis Indenture]" and "perform [their] obligations . . . in good faith and with

reasonable care." The Acis Indenture's applicable "terms and conditions" obligate the RIA Defendants to ensure compliance with collateral quality tests described above. [2]

55.     As such, U.S. Bank, as the trustee of the Acis Indenture, must ensure that every purchase and sale made involving the Acis CLOs maintains or improves any failing collateral quality test.

56.     Moreover, Section 8 of the PMAs prohibits the portfolio manager—here, Terry, Acis, and Brigade—from "taking any action that would intentionally or with reckless disregard . . . which would knowingly and willfully adversely affect the interest of the Holders in the Assets in any material respect,"[3] unless approved in writing by, among others, a majority of both the controlling class and the subordinate noteholders.

57.     The PMAs hold Acis liable for its acts or omissions, including, but not limited to, acting in bad faith, willful misconduct, gross negligence, or reckless disregard in the performance of its obligations under the Acis Indenture.

58.     Notably, Section 11(a)(i) of the PMAs expressly holds Acis liable for any decrease in the value of the Acis CLOs as a result of bad faith, willful misconduct, gross negligence, or reckless disregard in the performance of its obligations.

59.     As portfolio manager, advisor, and sub-advisor, respectively, Acis, Terry, and Brigade were aware that they performed services for the Acis CLOs for a particular purpose.

---

[2] *See e.g.*, Indenture 4 at p. 15 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 6 at p. 14 (*see* definition of "Collateral Quality Test"), p. 35 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12.

[3] *See* Portfolio Management Agreement between Acis CLO 2015-6 and Acis Capital Management, L.P. Section 8, page 15.

---

60.     The RIA Defendants also understood, and were fully aware, that investors in the Acis CLOs, like NexPoint, relied on them to perform services in furtherance of their collective duty to manage the portfolios of the Acis CLOs diligently.

61.     Despite the extra-contractual duties the RIA Defendants owe to NexPoint (and in furtherance of clear and impermissible conflicts of interest), from February 15, 2019[4] to the present, the RIA Defendants caused the Acis CLOs including Acis 6 to incur astronomic, unprecedented expenses, which were well outside the Acis CLOs' historical expense patterns— and, as discussed in more detail below, very clearly outside market and industry norms.

62.     Further, U.S. Bank failed to uphold its duty as trustee to the Acis Indenture to ensure that every purchase and sale under the indenture maintained or improved any failing collateral quality test. U.S. Bank further failed in its fiduciary capacity by allowing transactions to be effectuated that do not maintain or improve the Acis Indenture's failing WAL metric.

63.     Moreover, Defendants attempted to offset transactions that the Acis Indenture prohibited by making same-day, bulk purchases of loans with non-failing WALs but that were overpriced or bad investments based on, among other factors, the loans' coupon return rates being lower than the expense to acquire them.

64.     Finally, to add insult to injury, the BK Order, through Plan D, imposes several provisions that directly affect the Acis CLOs' investors. Among other restrictions, Plan D inhibits the ability of the noteholders and equity holders to make optional redemptions, which prohibits the beneficial trading (and free flow of the investors' capital) that would protect the pecuniary interests of the Acis CLOs' investors. Put differently, the capital of both the noteholders and

---

[4] Effective February 15, 2019, the Bankruptcy Court issued an order (the "BK Order") that (1) released any claims against Acis or Terry that accrued prior to the effective date and (2) enjoined any lawsuit from being filed against Acis or Terry to recover on any claims that accrued prior to the effective date.

equity holders have effectively been held hostage, allowing Acis to covet this capital belonging to the CLOs' investors.

**C. HOW DID THE RIA DEFENDANTS DECIMATE THE ACIS CLOS' VALUE AND INTEGRITY?**

65.     Before Terry took the reins of Acis, the Acis CLOs, under Highland's management, had produced consistent distributions to equity holders over time.

66.     Since Terry assumed control of Acis, this is no longer the case. Payouts to Acis CLOs' equity holders have been far and few between, and these equity holders, by means of the BK Order, have been prevented from making redemptions to recoup the remaining value of their initial investments.

67.     Under Terry's management, Acis replaced shorter-term debt with longer term loans, extending the WAL of the CLOs' portfolios.

68.     This course of conduct extended the average life of the CLO Assets and allowed prepayments to be avoided, which resulted in, among other things: (1) increased risk, (2) decreased residual principal value, and (3) longer, artificially induced periods for interest accrual.

69.     Predictably, and as explained in greater detail below, Terry's tactics have decimated the value of the assets constituting the Acis CLOs. In the meanwhile, the revenue and profit to Acis and Terry have increased significantly due to artificially inflated fees, the exorbitant yet unexplained expenses foisted on the Acis CLOs, and the extended life of the CLOs.

70.     The value of the Acis CLOs' assets is understood through an assessment of net asset value ("NAV") of the CLOs' equity.

71.     Because any equity is junior to all debt, healthy equity signifies healthy debt. Unhealthy equity (or, worse yet, equity that has been wiped out) signifies potential default at least as to the junior debt tranches.

72. The Acis CLOs' NAV over time (counting the distributions made to equity) can be seen via the following graphic illustration:



73. The NAV of the ACIS-6 equity has been reduced to approximately thirty cents on the dollar as of April 1, 2021.

74. This data make it no small wonder that national CLO rankings place each Terry-managed CLO at the bottom of every list in terms of performance.

75. Yet, despite beginning with similar profiles and investment goals as the other Acis CLOs, ACIS-7, which remains under Highland's management, has done remarkably well, returning almost one hundred cents on the dollar.

76. Thus far, Plaintiff have discerned three primary ways that the RIA Defendants have eradicated the value of the Acis CLOs.

1. **Failure to Buy Loans that Satisfy the WAL Threshold**

77.    Considering the life cycle of a CLO, the Acis CLOs are currently outside the reinvestment period. As such, these CLOs are stuck with the collateral they have at this moment.

78.    Normally this may be fine, but such is not the case here. The issue here is that, prior to the close of the reinvestment period, Defendants caused the Acis CLOs to buy and hold collateral that failed the risk parameters delineated in the Acis Indenture and the PMAs.

79.    For instance, some loans have maturity dates further out than what is appropriate, others simply lacked the creditworthiness on their own to qualify under the applicable parameters. Defendants' purchase of these loans violated the PMAs, the course of performance, and good industry practices.

80.    Equally important, Defendants' purchase of these loans did not maintain or improve the credit quality of the Acis CLOs' portfolios, which violates the terms of the Acis Indenture and the PMAs.

81.    The purchase of these loans caused the Acis CLOs to suffer substantial losses.

82.    An analysis of these individual trades and purchases, made with U.S. Bank's approval, further underscores U.S. Bank's failure as trustee to adhere to the respective indenture's collateral quality requirements.

83.    For example, Acis-6 is required to provide monthly reports, which disclose, among other things, where the CLO remains in compliance with the WAL thresholds required by the indenture.[5]

84.    The WAL threshold for Acis-6 is 4.66.

---

[5] *See* Article 10 Section 10.7 of Indenture.

85.     On August 21, 2018, Acis-6 registered a failing WAL of 4.78. According to the indenture's terms, failing the WAL threshold means that the fund cannot purchase any additional collateral unless said purchase improves the WAL of the CLO's portfolio.[6]

86.     Further, the portfolio manager is required to use commercially reasonable efforts to effect the sale of any collateral obligation that no longer meets the applicable criteria, including collateral causing the portfolio to fail the WAL threshold.[7]

87.     From a practical perspective, this means that (1) the portfolio manager needed to sell all collateral obligations that caused the CLO's portfolio to violate the WAL threshold, and (2) the portfolio manager could only purchase collateral that would effectuate a more favorable WAL.

88.     Despite these requirements, the RIA Defendants made multiple purchasers that did not improve the WAL, thereby violating the terms of the relevant indenture.

89.     Defendants may well argue that even though these acquisitions did not meet the WAL threshold, they bundled these purchases with loans that did satisfy the WAL threshold.

90.     According to their contention, Defendants purport to have met the requisite WAL threshold by packaging all of these loans together to average out to a satisfactory WAL under the indenture's terms.

91.     But Defendants' argument is illusory. Defendants bought loans with maturity dates that are more than two years apart, which the Acis Indenture do not allow. Once the less risk-laden notes are paid off more quickly due to their shorter durations, the Acis CLOs' portfolios become disproportionately weighted with longer-term notes, no longer offset by the healthier notes.

---

[6] *See* Article 12 Section 12.2 of Indenture.

[7] *See* Article 12 Section 12.1(g) of the Indenture.

92.     The result of this course of conduct taken by Defendants initially projects an (albeit false) impression that a portfolio's WAL threshold is under control, while, in reality, this is simply a mirage, soon to be vanquished by a predictably rapid ascension in the WAL due to the less risky debt being paid off.

93.     Pairing these loans of diverging quality circumvents the maintain/improve language engrained in the Acis Indenture's WAL thresholds.

94.     Defendants' actions saddle investors with long-dated collateral, escalating duration risk, and increasing debt levels in the CLOs' portfolios, which is particularly problematic because these CLOs should be decreasing in maturity time and deleveraging through the amortization of shorter-term loans.

**2. Buying Bad Investments**

95.     Upon information and belief, Defendants intentionally and purposefully purchased substandard assets.

96.     For instance, Defendants bought nineteen loans on a single day, likely in a scheme to circumvent the requisite WAL thresholds.

97.     These loans remain in the Acis CLOs' portfolios and, due to a continuing and apparently uncurable default, are currently valued at approximately twenty cents on the dollar— amounting to a roughly $1.5 million loss in value to the Acis CLOs.

98.     Defendants should have foreseen, and indeed foresaw, this risk because of the low credit ratings.

99.     Had Defendants abided by the requirements of the Acis Indenture and PMAs, not to mention prudent investing standards, these losses incurred by the Acis CLOs could have been avoided.

100.    There was no pro-investor justification for how Defendants managed this investment.

### 3. Failure to Seek Best Execution Prices

101.    A third problem with certain of Defendants' loan purchases is that they were often executed on the same day at a time when the market was flying high. Single-day purchases tend to make assets more expensive to buy.

102.    These same-day purchases violated Defendants' duties of best execution.

103.    Additionally, many of the purchased assets were some of the cheapest on the market, and were still overpriced nevertheless.

104.    At the time Defendants executed these purchases, loans were scarce, making the market conditions much more suitable for sellers than buyers.

105.    The prudent course would been to remain in cash or identify investment opportunities that were more secure and of shorter duration. Defendants did not do so.

106.    Moreover, Defendants caused the Acis CLOs to sell certain collateral prematurely and on the cheap.

107.    As a result of Defendants' tactics and actions, the mix of assets constituting the Acis CLOs' assets is well short of the required WARF, and the maturity of the assets in the portfolios of these CLOs has pushed well past the required WAL.

108.    Both the Acis Indenture and the PMAs require Acis to seek best execution for all Acis assets.[8]

### D. The Indenture Trustee Is Nowhere to Be Found

109.    All things considered, where was the adult in the room?

---

[8] PMA Section 4(a); Indentures Section 12.2.

110.    The Acis Indenture provides that U.S. Bank shall hold in trust, for the "benefit and security" of the investors, all "Collateral Obligations" that secure the financial obligations to the investors.

111.    Relatedly, the Acis Indenture also provides that, for future purchases and sales of collateral obligations, the portfolio manager and the trustee shall only consummate transactions that satisfy certain investment criteria.

112.    One such criterion for all purchases is that either (A) each requirement or test, as the case may be, of the Concentration Limitations and the Collateral Quality Test will be satisfied, or (B) if any such requirement or test was not satisfied immediately prior to such reinvestment, such requirement or test will be maintained or improved after giving effect to the reinvestment. *See, e.g.*, Indenture 5 § 12.2(a)(iv).

113.    The Acis Indenture defines "Collateral Quality Test" as:

> A test satisfied if, as of any date of determination . . . in the aggregate, the Collateral Obligations owned (or, for purposes of *pro forma* calculations in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer satisfy . . . the Maximum Moody's Rating Factor Test . . . [and the] Weighted Average Life Test.

114.    These tests are defined, in turn, as follows:

> "Maximum Moody's Rating Factor Test": The test that will be satisfied on any date of determination if the Weighted Average Adjusted Moody's Rating Factor[9] of the Collateral Obligations is less than or equal to the

---

[9] "Weighted Average Adjusted Moody's Rating Factor" means "[a]s of any date of determination, a number equal to the Weighted Average Moody's Rating Factor determined in the following manner: for purposes of this definition, the last paragraph of the definition of "Moody's Default Probability Rating," the second to last paragraph of the definition of "Moody's Rating" and the last paragraph of the definition of "Moody's Derived Rating" will be disregarded, and instead each applicable rating on credit watch by Moody's that is on (a) positive watch will be treated as having been upgraded by one rating subcategory, (b) negative watch will be treated as having been downgraded by two rating subcategories and (c) negative outlook will be treated as having been downgraded by one rating subcategory. *See, e.g.*, Indenture 5 at 64-65.

"Weighted Average Moody's Rating Factor" means "[t]he number (rounded up to the nearest whole number) equal to: (i) the sum of the products of (a) the Principal Balance of each Collateral Obligation

lesser of (i) the sum of (A)the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Moody's Asset Quality Matrix, based upon the applicable "row/column combination" chosen by the Portfolio Manager with notice to the Collateral Administrator . . . plus the Excess Recovery Adjustment Amount.

"Weighted Average Life Test": A test that is satisfied if the Aggregate Weighted Average Life[10] on such date of determination is not later than November 18, 2022.

*See, e.g.*, Indenture 6 at 37-38, 64.

115.     These provisions of the Acis Indenture seek to maintain the integrity and continued performance of Acis CLOs' assets by requiring certain parties, including the portfolio manager and the trustee, to ensure that the collateral complies with the detailed, industry-recognized, bargained-for tests—the exact safeguards on which investors, like NexPoint, relied when investing in the Acis CLOs.

116.     The Acis Indenture also provides that, in the performance of its duties as trustee, U.S. Bank may not "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, any plan of reorganization, arrangement, adjustment, or composition affecting the Secured Notes or any Holder thereof."[11]

---

(excluding Equity Securities) multiplied by (b) the Moody's Rating Factor of such Collateral Obligation, divided by (ii) the Aggregate Principal Balance of all such Collateral Obligations." *Id.*

[10] "Aggregate Weighted Average Life" means "[w]ith respect to all Collateral Obligations as of any date of determination is a date equal to (A) the actual number of years (…) following such date obtained by (i) *summing* the products obtained by *multiplying* the Weighted Average Life at such time of each Collateral Obligation *by* the Principal Balance at such time of such Collateral Obligation and (ii) *dividing* such sum *by* the Aggregate Principal Balance at such time of all Collateral Obligations *plus* (B) such date of determination. *Id.* at 6.

[11] *See* Acis Indenture Section 5.3.

117.     Similar to those terms concerning collateral quality, these provisions aim to ensure that the indenture trustee does not prejudice the right of any investor under the Acis Indenture, such as NexPoint.

118.     In addition to the protections by which U.S. Bank must abide as trustee of the Acis CLOs, the Acis Indenture also endow U.S. Bank with the broad authority to "execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, nominees, custodians, or attorneys."

119.     As previously set forth, the portfolio manager and the trustee must ensure that the mix of assets in Acis funds satisfies the collateral quality tests, including the WAL threshold and the Minimum Weighted Average Moody's Recovery Rate Test ("WAM Test"), or maintains or improves any failing collateral quality tests.

120.     Defendants failed to satisfy these obligations.

121.     For one thing, the assets in the Acis funds either failed the WAL threshold. Subsequent transaction have failed to maintain or improve a failing WAL threshold. For example, on several occasions during the relevant, actionable timeframe, Defendants have made multiple same-day purchases and consolidated the weighted average maturity date for these trades.

122.     Doing so created the false appearance that a CLO portfolio's WAL threshold had been maintained or improved upon. Absent this consolidation, the same-day purchases could not have maintained or improved the failing WAL thresholds on individual bases.

123.     Furthermore, in its role as indenture trustee, U.S. Bank bears an obligation to seek best execution on trades reasonably available to the Acis CLOs. U.S. Bank greenlit many same-day trades, thereby ignoring its binding obligation under the Acis Indenture to ensure the

maintenance or improvement of the collateral quality test as to each and every trade made in respect to the Acis CLOs.

124.     Additionally, U.S. Bank has allowed, and continues to allow, the RIA Defendants to circumvent the collateral quality requirements by allowing consolidation of the weighted average maturity date of these same-day trades.

125.     Permitting this course of conduct conjures the appearance of a maintained or improved WAL threshold—this too is an illusion.

126.     Absent this consolidation, these U.S. Bank-approved, same-day purchases could not maintain or improve the WAL threshold.

127.     U.S. Bank has failed to perform its duties as indenture trustee by allowing Acis CLOs to act as market *takers* and allowing them to hold longer-term collateral that does not comport with the requirements of the Acis Indenture.

128.     In short, as the indenture trustee, U.S. Bank should not have allowed these bad loans to have been acquired by the RIA Defendants in the first place, much less on the same day or bundled with other loans, and certainly should not have allowed Acis to continue to reap the rewards of its wrongdoing.

129.     And it should not have allowed the quality loans within the Acis CLOs to be sold prematurely, especially since these loans were dumped in such a short period of time.

130.     U.S. Bank failed to exercise any care in connection with the payment of expenses; collection and distribution of the interest and dividends due on the portfolio securities; and provision of periodic reports to Acis CLOs' investors concerning the interest received, amounts distributed, and securities retained in the CLOs' portfolios.

131.    Significantly, the Acis Indenture provides that none of its terms "shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct."

## V.

## CAUSES OF ACTION

### COUNT ONE
### Violations of the Advisors Act
### Against the RIA Defendants

132.    Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

133.    As registered investment advisors, the RIA Defendants are subject to the Advisers Act, 15 U.S.C. § 80b-1 *et seq.*

134.    The Advisers Act establishes an unwaivable fiduciary duty for investment advisers.[12]

135.    The RIA Defendants' fiduciary duties are broad and apply to the entire advisory relationship. The core of the fiduciary duty is to always act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party. *See SEC v. Gruss*, 245 F. Supp. 3d 527, 591 (S.D.N.Y. 2017).

---

[12] *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979) ("[Section] 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers." (citation omitted)); *SEC v. DiBella*, 587 F.3d 553, 568 (2d Cir. 2009) ("The 'legislative history of the Advisers Act leaves no doubt that Congress intended to impose enforceable fiduciary obligations' on investment advisors." (citation and brackets omitted)). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing Proxy Voting by Investment Advisers*, Investment Advisers Act Release No. IA-2106 (Jan. 31, 2003)).

136.   The essence of these fiduciary duties is manifested in the duties of loyalty and utmost care. These duties also signify that the RIA Defendants must follow the terms of any agreements and regulations that apply to the investment vehicles.

137.   The fiduciary duties the RIA Defendants owed to Plaintiff are predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent RIAs from violating disclosure rules. 15 U.S.C. § 80b-4a; *see* 17 C.F.R. § 275.206(4)-7(a). As a result, RIAs must disclose all aspects relevant to potential conflicts of interest and report their own malfeasance to investors.

138.   Specifically, for all conflicts of interest, RIAs must (1) disclose those conflicts to the clients verbally, in writing, on Form ADV,[13] and (2) obtain the client's written consent.[14]

139.   Where RIAs trade on their own behalf or place their interests above those of the advisee or investors, the Advisers Act holds such RIAs liable to the advisee and its investors for breaching their fiduciary duty.

---

[13] General Instruction 3 to Part 2 of Form ADV (stating that an adviser's disclosure obligation "requires that [the adviser] provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest [the adviser has] and the business practices in which [the adviser] engage[s], and can give informed consent to such conflicts or practices or reject them")

[14] Investment Advisers Act Release 3060, *supra*; General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your *clients* of all material facts relating to the advisory relationship. As a fiduciary, you also must seek to avoid conflicts of interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your *clients* that could affect the advisory relationship. This obligation requires that you provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest you have and the business practices in which you engage, and can give informed consent to such conflicts or practices or reject them."). *See also Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 472 (D.C. Cir. 2019) ("[R]egardless of what Form ADV requires, [investment advisers have] a fiduciary duty to fully and fairly reveal conflicts of interest to their clients.").

---

140.    The Advisers Act's provisions and regulations require full transparency and accountability to an advisers' investors and clients—a showing of reliance or materiality is not required.

141.    Section 206 of the Advisers Act prohibits RIAs from using any instrumentality of interstate commerce, directly or indirectly, as a means or in support of "any device, scheme, or artifice to defraud any client or prospective client," "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client," or to "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(1)–(2), (4).

142.    Section 206 of the Advisers Act focuses on the use of the unlawful means—its provisions do not require that the activity be in the offer or sale of any security, or in connection with a purchase or sale with the advisee. They do not require evidence of reliance or materiality.

143.    The RIA Defendants utilized the interstate wires and mails, including, but not limited to, utilizing telephones and email communications and trading on national exchanges, to effectuate one or more of the transactions referred to in this Complaint, all while engaged in a scheme to manipulate their fees from the inflated par value of the assets in the Acis CLOs.

144.    There is no plausible pro-investor basis for such actions.

145.    The RIA Defendants utilized interstate wires and mails as part of their business and transactions to effectuate the inflated expenses, passing them on to the Acis-6 account, withdrawing and manipulating the funds required to pay said expenses and fees, and executing the purchases and sales of collateral—all which have decimated the value of Acis-6.

146.    There is no plausible pro-investor basis for such actions.

147. The RIA Defendants have engaged in a practice or course of business consisting of passing off expenses, without disclosure or accountability, that were incurred by Acis—the portfolio manager—as though they were the expenses of the CLOs—the *advisees.* By doing so, the RIA Defendants affirmatively misrepresented the character and nature of those expenses and subsequently assessed their managed entities their pro rata share.

148. There is no plausible pro-investor basis for such actions.

149. The RIA Defendants have engaged in transactions as part of a course of business to manipulate, which operates as a fraud on or deception of the Acis CLOs' investors. The acts and omissions of the RIA Defendants include employing a scheme or artifice to charge millions in expenses that it incurred to the advised funds and trading in securities as a naked means of maximizing the notional value of the CLO Assets—which directly translated into higher fees. By doing so, the RIA Defendants have engaged in transactions that operate as a deceit or fraud upon those to whom they owe a fiduciary duty, such as NexPoint.

150. There is no plausible pro-investor basis for such actions.

151. The RIA Defendants have engaged in transactions such as selling qualified assets prematurely without being able to replace them, all to the detriment of the investors, including Plaintiff. The bona fide purpose of these acts and omissions, which doubtfully exists, has been concealed and not disclosed. However, the obvious reason for these acts and omissions is to increase the amount of fees the RIA Defendants can continue to collect, as well as the duration over which those fees may be collected.

152. There is no plausible pro-investor basis for such actions.

153. The RIA Defendants have engaged in a deceptive and manipulative course of conduct by purchasing bundled loans or loans on the same day as a means of making them appear

creditworthy and possessing proper maturity dates and have misrepresented whether such transactions were compliant with the Acis Indenture and with the RIAs' fiduciary duties to the Plaintiff and to the Indenture Trustee. The obvious reason for doing so is to conceal their wrongful conduct.

154.    The RIA Defendants have engaged in a deceptive, manipulative course of conduct and continue to do so in violation of the Advisers Act and its regulations and rules.

155.    Upon information and belief, RIA Defendants have misled or otherwise compromised U.S. Bank's ability or willingness to police their malfeasance by submitting misleading reports or documentation to the Indenture Trustee—or have otherwise manipulated U.S. Bank by submitting false reports or justifications, then those actions will be added as a basis for damages under this Count.

156.    The Advisers Act declares any contract void that is made in violation of the Advisers Act, or the performance of which involves the violation of, or the continuance of any relationship or practice in violation of the Advisers Act, or any rule, regulation, or order issued thereunder.

157.    Thus, the agreements between Acis and any third party in any transaction in violation of the Advisers Act is accordingly void, and the RIA Defendants' rights under the indentures and PMAs are void due to the violations of the Advisers Act thereof.

158.    Plaintiff seeks all legal and equitable relief to which Plaintiff is justly entitled including but limited to restitution and disgorgement of all funds and moneys paid in violation of the Advisers Act after the effective date of the ACIS bankruptcy final plan order.

## COUNT TWO
### Breach of Fiduciary Duty
### Against the RIA Defendants

159.    Plaintiff incorporates all foregoing factual averments and the factual and legal averments in Count One as if set fully set forth herein.

160.    As registered investment advisors, the RIA Defendants are subject to the Advisers Act.

161.    The Advisers Act establishes an unwaivable fiduciary duty for investment advisers.[15]

162.    The RIA Defendants' fiduciary duties are broad and apply to the entire advisory relationship.

163.    The essence of these fiduciary duties is manifested in the duties of loyalty and utmost care.

164.    The core of the fiduciary duty is to always act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.[16]

165.    These duties also signify that the RIA Defendants must follow the terms of any agreements and regulations that apply to the investment vehicles.

---

[15] *Transam. Morg. Advisors (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979) (finding that "the [Advisers] Act's legislative history leaves no doubt that Congress intended to impose enforceable fiduciary obligations").

[16] *SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008) ("[15 U.S.C. § 80b-6] imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund and its investors.").

166.    The fiduciary duty that the RIA Defendants owed to investors like Plaintiff is predicated on trust and confidence and to not commit corporate waste.[17]

167.    The Advisers Act's provisions and regulations require full transparency and accountability to an advisers' investors and clients—a showing of reliance or materiality is not required.

168.    These duties are extra-contractual and cannot be waived.

169.    The RIA Defendants have breached their fiduciary duties of transparency by failing to fulsomely justify and document their investor-related activities.

170.    Failing to do so is a breach of the duty of loyalty because it is plainly a means to conceal the true extent of the malfeasance and damage done.

171.    The RIA Defendants have breached their fiduciary duties by committing corporate waste in two primary forms: (1) by incurring unnecessary expenses or improperly imposing expenses on the Acis CLOs without justification, and (2) by collecting fees based upon a knowingly inflated notional asset value.

172.    The RIA Defendants should have known that the market was heating up and should not have sold the assets in such a short time span because doing so violated rules of best execution. These rules exist to avoid *precisely* what happened here.

173.    The RIA Defendants have breached their fiduciary duties by recklessly and knowingly purchasing certain assets after that were below the requisite creditworthiness and allowing the WARF and the WAL to expose Plaintiff to inexcusable risk.

174.    As Plaintiff set forth in greater detail above, Acis breached its duty to investors by

---

[17] *See Cap. Gains Rsch.*, 375 U.S. at 191–92 (stating that the Advisers Act was meant to "eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser — consciously or unconsciously — to render advise which was not disinterested").

mismanaging the portfolio of Acis-6, failing to ensure that new trades complied with the collateral quality tests required by the Acis Indenture.

175.   Key to these requirements are the duties to preserve the equity interests NexPoint holds and to refrain from self-dealing.

176.   Among other things, the RIA Defendants assumed obligations that affected NexPoint's rights, and NexPoint detrimentally relied on Acis's continued performance of such obligations.

177.   However, the RIA Defendants plainly concocted a scheme to enrich themselves at the expense of NexPoint, which is an independent breach of fiduciary duty.

178.   The fiduciary duty is actionable under applicable state law.

179.   The RIA Defendants have further aided and abetted the breaches by U.S. Bank, as described in Count Three (the acts of which are incorporated by reference herein).

180.   The RIA Defendants are thus liable for damages, punitive damages, and all other relief to which Plaintiff is justly entitled.

181.   To the extent the RIA Defendants must be served via derivative action, Plaintiff alleges that any demand would have been futile because ACIS's control-person, Mr. Terry, would not have sued himself, the subadviser, or any other person with whom he is plainly aligned.

**COUNT THREE**
**Breach of Contract**
**Against Acis**

182.   Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

183.   Section 11(a)(i) of the PMAs expressly holds Acis liable for any decrease in the value of the CLOs that was accomplished by bad faith, willful misconduct, gross negligence, or reckless disregard in the performance of its obligations.

184.     The PMAs further give Acis the discretion to allocate and manage the CLOs' assets and to incur expenses on behalf of the CLOs for services that benefit the CLOs.

185.     The Acis Indenture further requires that Acis manage the CLO Assets in a manner that maintains or improves the credit quality of the CLOs' portfolios, subject to the collateral quality tests defined above.

186.     By contract, New York law governs the PMAs and Acis Indenture; under New York law, every contract contains an implied duty of good faith and fair dealing. *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002).

187.     Acis has breached these agreements and caused the CLOs to incur expenses that, upon information and belief, go considerably beyond what is contractually permissible for the Acis CLOs.

188.     Acis has breached these agreements and manipulated the CLOs' assets in a way that prolongs the CLOs and maximizes fees owed to Acis—all at the expense of NexPoint and other investors in the Acis CLOs.

189.     These breaches of contract have caused damage to the CLOs and, thereby, to NexPoint.

190.     NexPoint alleges and avers that it may bring this breach of contract claim directly to the extent it and Acis are parties to the indentures, and to the extent that the indentures incorporate the PMAs and the duties therein.

191.     If NexPoint is required to bring this claim derivatively, it hereby does so and avers that any pre-suit demand would have been futile because asking Acis-6 to bring suit when it is controlled by the Defendants would have been futile. Plaintiff alleges that any demand would have been futile because ACIS's control-person, Mr. Terry, would not have sued himself, the subadviser

and the Indenture Trustee, or any other person with whom he is plainly aligned.

192.    NexPoint thus seeks damages, attorneys' fees, restitution, disgorgement, and any and all other remedies to which it is justly entitled.

### COUNT FOUR
### Breach of Trust Indenture Act
### Against US Bank

193.    Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

194.    U.S. Bank's role as trustee is governed in part by the Trust Indenture Act of 1939, as amended by the Trust Indenture Reform Act of 1990.

195.    The Trust Indenture Act of 1939 (the "Act"), codified at 15 U.S.C. §§ 77aaa *et seq.*, is designed to protect bond investors. *In re Bd. of Dirs. of Telecom Arg., S.A.*, 528 F.3d 162, 172 (2d Cir. 2008).

196.    As amended, the Act codifies an indenture trustee's fiduciary duty to the bondholders and holders of investors in debt securities. It also requires the provision of periodic reports to the Indenture Trustee.

197.    Prior to a default, an indenture trustee's primary duty is to follow the indenture. The trustee must report any default that it recognizes.

198.    U.S. Bank failed to ensure that the RIA Defendants managed the CLO Assets in a manner that maintained or improved the credit quality of the CLOs' portfolios. Instead, it appears that US Bank assisted—or capitulated with the foregoing acts.

199.    U.S. Bank has neither reported nor taken action against the RIA Defendants despite the obvious defaults they committed by them as detailed herein.

200.    U.S. Bank has thus violated the Act in numerous ways and can and should be held liable for the losses suffered by NexPoint to the extent those losses accrued after the effective date

of the ACIS bankruptcy final order.

201.     U.S. Bank's breaches, set forth herein, have accordingly damaged Plaintiff in an amount of $8,000,000 or more.

## COUNT FIVE
### Breach of Fiduciary Duty
### Against U.S. Bank

202.     Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

203.     U.S. Bank has an extra-contractual duty to perform all basic, non-discretionary, ministerial tasks under the Acis Indenture with due care.

204.     This duty subjects U.S. Bank to tort liability.

205.     U.S. Bank breached this duty by permitting the Acis CLOs to incur exorbitant expenses, which have diminished the equity that NexPoint indirectly owns under the Acis Indenture.

206.     U.S. Bank has an extra-contractual duty to avoid conflicts of interest.

207.     This duty subjects U.S. Bank to tort liability.

208.     U.S. Bank is prohibited from advancing its own interests at the expense of the Acis CLOs' investors, such as NexPoint.

209.     U.S. Bank breached this duty by, among other things, facilitating extensive portfolio mismanagement and failing to ensure compliance with the collateral quality tests outlined in the Acis Indenture in order to artificially maximize management fees.

210.     Such facilitation of noncompliant trades gives rise to an inference of bad faith.

211.     U.S. Bank also breached this duty by allowing the Acis Indenture to incur exorbitant fees which have diminished the equity that Plaintiff indirectly owns under the Acis Indenture.

212.     U.S. Bank's breaches were the proximate cause of damages to NexPoint.

213.     Based on investigation to date, such damages include, but are not limited to, the diminished value of the collateral securing the financial obligations owed to Plaintiff.

214.     U.S. Bank's conduct was knowing and willful, and done in disregard of known and established safeguards, implemented, and created in the industry in order to avoid well-known, foreseeable risks.

215.     Defendants' acts and omissions were taken in reckless disregard of these known risks.

216.     U.S. Bank's breaches, set forth herein, have accordingly damaged Plaintiff in an amount of $8,000,000 or more.

217.     U.S Bank is thus liable for damages, punitive damages, attorneys' fees, and costs, as well as restitution and disgorgement.

218.     If NexPoint is required to bring this claim derivatively, it hereby does so and avers that any pre-suit demand would have been futile because asking Acis-6 to bring suit when it is controlled by the Defendants would have been futile. Plaintiff alleges that any demand would have been futile because ACIS's control-person, Mr. Terry, would not have sued himself, the subadviser and the Indenture Trustee, or any other person with whom he is plainly aligned.

## COUNT SIX
### Negligence
### Against All Defendants

219.     Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

220.     To the extent any Defendant would be liable for any of the foregoing causes of action prior to their lack of sufficient intent or willful actions, Plaintiff pleads in the alternative that such Defendant's acts or omissions were negligent.

221.    Defendants owed NexPoint a duty of care in managing the investments of the CLOs and in discharging their duties under the Advisers Act, the Acis Indenture, and the PMAs.

222.    Defendants' acts and omissions in violation of the duties outlined herein have resulted in substantial losses to the NexPoint, totaling $8,000,000 or more.

223.    Defendants' conduct was knowing and willful, and done in disregard of known and established safeguards, implemented, and created in the industry in order to avoid well-known, foreseeable risks.

224.    Defendants' acts and omissions were taken in reckless disregard of these known risks.

225.    Defendants are thus liable for negligence and gross negligence.

226.    If NexPoint is required to bring this claim derivatively, it hereby does so and avers that any pre-suit demand would have been futile because asking Acis-6 to bring suit when it is controlled by the Defendants would have been futile. Plaintiff alleges that any demand would have been futile because ACIS's control-person, Mr. Terry, would not have sued himself, the subadviser and the Indenture Trustee, or any other person with whom he is plainly aligned.

227.    Plaintiff is thus entitled to damages, punitive damages, attorneys' fees, and costs as the law provides and to which it is justly entitled.

## COUNT SEVEN
### Conversion
### Against Acis and Terry

228.    Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

229.    The Acis CLOs are obligated to pay specific and identifiable administrative expenses in addition to other costs and expenses. The payment of these expenses is pulled from a reserve of specific and identifiable equity, which includes funds belonging to NexPoint (to the extent it is an equity holder under the Acis CLOs).

230.     As both a noteholder and equity holder, NexPoint had ownership, and therefore a right, to the property used to pay the Acis CLOs' administrative expenses and costs before the property's conversion.

231.     In allowing the payment of inexplicably high expenses (near twenty times their historical amount), Terry, upon information and belief, wrongfully and improperly reimbursed Acis, and potentially himself, using Plaintiff's property designated for the payment of the Acis CLOs' administrative expenses and costs.

232.     Upon information and belief, Terry wrongfully and improperly reimbursed Acis and potentially himself, by using Plaintiff's property designated for the payment of the Acis CLOs' administrative expenses and costs, and by allowing the payment of uncharacteristically high expenses upwards near 20 times their historical amount.

233.     Upon information and belief, Terry and Acis exercised a wrongful and unauthorized dominion over NexPoint's property designated for the payment of the Acis CLOs' administrative expenses and costs, to the alteration of its condition or to the exclusion of Plaintiff's rights.

234.     An action for the conversion of using Plaintiff's property designated for the payment of the Acis CLOs' administrative expenses and costs is based on this conduct. The property at issue is a specific, identifiable fund that has an obligation to be returned or otherwise treated in a particular manner.

235.     If NexPoint is required to bring this claim derivatively, it hereby does so and avers that any pre-suit demand would have been futile because asking Acis-6 to bring suit when it is controlled by the Defendants would have been futile. Plaintiff alleges that any demand would have been futile because ACIS's control-person, Mr. Terry, would not have sued himself, the subadviser

and the Indenture Trustee, or any other person with whom he is plainly aligned.

## REQUEST TO PIERCE ACIS CAPITAL MANAGEMENT'S CORPORATE VEIL

236.    Plaintiff hereby alleges and incorporates the preceding allegations as if fully set forth herein.

237.    Terry has exercised complete domination over Acis.

238.    As described herein, Terry used such control to commit fraud or wrongdoing that injured NexPoint. Terry abused his role within Acis to amass unprecedented expenses of the Acis CLOs, which, among other wrongs, amounted to twenty times the historical expense rate.

239.    These expenses and Acis's refusal to provide the accounting requested by certain noteholders under the Acis Indenture loudly imply impropriety. Further, the foregoing conduct raises an inference that expenses incurred under the Acis CLOs have been and are being improperly reimbursed.

240.    The circumstances described herein warrant the disregard of Acis's corporate form, particularly so because courts in this District will disregard the corporate form when necessary to prevent fraud or to achieve equity. *See, e.g.*, *Lakah v. UBS AG*, No. 07-CV-2799, 2017 U.S. Dist. LEXIS 229131, at *255–59 (S.D.N.Y. 2017).

241.    Plaintiff respectfully requests that the Court pierce the corporate veil of Acis as to render Acis and Terry jointly and severally liable for the wrongful conduct described herein, to the extent that such conduct would otherwise be attributable to Acis alone.

## CONDITIONS PRECEDENT

242.    Pursuant to Federal Rule of Civil Procedure 9(c), Plaintiff hereby pleads that all conditions precedent have occurred or been performed.

243. Although the Acis Indenture contains a "no-action" clause that requires certain noteholders to make a request to U.S. Bank in writing to institute any judicial proceeding in its own name, noncompliance with a no-action provision is excused in a suit against the indenture trustee. *See Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir. 1992) ("The district court held that the 'no action' clause applied only to the debenture holder suits against [the issuer], not the Indenture Trustees . . . . This construction of [the limitation on suits provision] obviously is correct, as it would be absurd to require the debenture holders to ask the Trustee to sue itself.").

244. To the extent any claim herein is more properly characterized as a derivative claim, Plaintiff submits that any condition precedent to such claim has been satisfied, and that any pre-suit demand would have been futile because Defendants control ACIS-6, and the Trustee who is empowered to bring suit failed to do so despite numerous written requests.

## DEMAND FOR ATTORNEYS' FEES

245. Pursuant to Section 5.15 of the Acis Indenture, Plaintiff hereby makes a demand for the attorneys' fees and court costs it has sustained in bringing this action.

## PRAYER FOR RELIEF

246. All requested relief is hereby expressly intended to be predicated solely on the alleged acts and omission accruing after the effective date of the final Bankruptcy Order in the Acis Bankruptcy.

247. Plaintiff respectfully requests that judgment be entered in its favor and against Defendants U.S. Bank, Acis, Terry, and Brigade as follows:

    A.    Damages in an amount to be determined at trial;

    B.    Punitive damages in an amount to be determined at trial;

    C.    Disgorgement of wrongfully paid fees and expenses and restitution thereof in an amount to be determined at trial;

D.      Disgorgement of any and all ill-gotten gains in an amount to be determined at trial;

E.      Attorneys' fees and costs;

F.      Constructive trust;

G.      All other legal and equitable relief to which Plaintiff is justly entitled.


Dated:  November 23, 2021                          Respectfully submitted,

                                                   **SBAITI & COMPANY PLLC**

                                                   */s/  Mazin A. Sbaiti*
                                                   **Mazin A. Sbaiti**
                                                   NY Bar No. 4339057
                                                   J.P. Morgan Chase Tower
                                                   2200 Ross Avenue – Suite 4900W
                                                   Dallas, TX  75201
                                                   T:  (214) 432-2899
                                                   F:  (214) 853-4367
                                                   E:  mas@sbaitilaw.com


                                                   ***Counsel for Plaintiff***