# EXHIBIT O

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
|  | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | Friday, June 25, 2021 |
|  | ) | 9:30 a.m. Docket |
| Debtor. | ) |  |
|  | ) | EXCERPT:  MOTION FOR |
|  | ) | MODIFICATION OF ORDER |
|  | ) | AUTHORIZING RETENTION OF JAMES |
|  | ) | P. SEERY, JR. DUE TO LACK OF |
|  | ) | SUBJECT MATTER JURISDICTION |
|  | ) | (2248) |
| _____ | ) |  |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:              Jeffrey Nathan Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                              13th Floor
                             Los Angeles, CA  90067-4003
                             (310) 277-6910

For the Debtor:              John A. Morris
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

For CLO Holdco, Ltd. and     Jonathan E. Bridges
The Charitable DAF Fund,     Mazin Ahmad Sbaiti
LP:                          SBAITI & COMPANY, PLLC
                             JP Morgan Chase Tower
                             2200 Ross Avenue, Suite 4900 W
                             Dallas, TX  75201
                             (214) 432-2899

For Get Good Trust and       Douglas S. Draper
Dugaboy Investment Trust:    HELLER, DRAPER & HORN, LLC
                             650 Poydras Street, Suite 2500
                             New Orleans, LA  70130
                             (504) 299-3300

```
 1   APPEARANCES, cont'd.:

 2   For the Official Committee    Matthew A. Clemente
     of Unsecured Creditors:       SIDLEY AUSTIN, LLP
 3                                  One South Dearborn Street
                                    Chicago, IL  60603
 4                                  (312) 853-7539

 5   Recorded by:                  Michael F. Edmond, Sr.
                                    UNITED STATES BANKRUPTCY COURT
 6                                  1100 Commerce Street, 12th Floor
                                    Dallas, TX  75242
 7                                  (214) 753-2062

 8   Transcribed by:               Kathy Rehling
                                    311 Paradise Cove
 9                                  Shady Shores, TX  76208
                                    (972) 786-3063
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
              Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.
```

1         <u>DALLAS, TEXAS - JUNE 25, 2021 - 9:36 A.M.</u>

2      (Transcript excerpt begins at 11:33 a.m.)

3         THE CLERK:  All rise.

4         THE COURT:  All right.  Please be seated.  We are

5  back on the record, and our last motion this morning is the

6  Motion to Reconsider filed by CLO Holdco and the DAF.  Do we

7  have Mr. Bridges and Mr. Sbaiti back with us now?

8         MR. BRIDGES:  Yes, Your Honor.  I have changed seats

9  because of audio problems we're having here, but we're both

10  here.

11         THE COURT:  Okay.  Well, I think we heard an

12  agreement that you all have agreed that you're going to have

13  an hour and a half each, and I presume that means everything:

14  opening statements, arguments, evidence.  So, we'll start the

15  clock.  Nate, it's 11:35.  So, Mr. Bridges, your opening

16  statement?

17   OPENING STATEMENT ON BEHALF OF CLO HOLDCO AND THE CHARITABLE

18                     DAF, LP

19         MR. BRIDGES:  Thank you, Your Honor.  We're here on a

20  motion to modify an order that we'd submit has already been

21  modified by the plan confirmation order, although that order

22  has not yet become effective.

23     The modification there was to add the phrase "to the

24  extent legally permissible" to the Court's assertion of

25  jurisdiction in what is essentially the same gatekeeper

4

```
 1   provision that's at issue here.  We submit that change is an
 2   admission or at least a strong indication that the unmodified
 3   order, at least as applied in some instances, contains
 4   legally-impermissible provisions.  The entire argument today
 5   from our side is about what's not legally permissible in that
 6   order.
 7        And that starts with our concerns regarding the
 8   application of 28 U.S.C. § 959(a).  As Your Honor knows well,
 9   959(a) is a provision of law that the Fifth Circuit and
10   Collier on Bankruptcy call an exception to the Barton
11   doctrine.  I know from the last time we were here that the
12   Court is already aware of what 959(a) says.  It's the second
13   sentence, I understand, which the Court pointed to in our
14   previous hearing that creates general equity powers or
15   authorizes the Court to use its general equity powers to
16   exercise some jurisdiction, some control over actions that
17   fall within the first sentence of 959(a).  But that second
18   sentence also prohibits explicitly the Court's using general
19   equity powers to deprive a litigant of his right to trial by
20   jury.
21        Here, we're not under Barton, the statutory exception to
22   Barton applies, because Mr. Seery is a manager of hundreds of
23   millions of third-party investor property.  Instead, we're
24   here under the Court's general equity powers, as authorized by
25   959(a).  And those equity powers cannot deprive the right to
```

1  trial by jury.

2      But the order does deprive trials by jury, first by

3  asserting sole jurisdiction here, where jury trials are

4  unavailable, and secondly, by abolishing any trial rights for

5  claims that do not involve gross negligence or intentional

6  misconduct.

7      Movants' third cause of action in the District Court case

8  is for ordinary negligence.  It comes with a Seventh Amendment

9  jury right.  But it's barred by the order because the order

10  only allows colorable claims involving gross negligence or

11  intentional conduct, not ordinary negligence.

12      Movants' second cause of action in the District Court case

13  is for breach of contract.  That comes with a Seventh

14  Amendment jury right, but it's barred by the order because the

15  order only allows colorable claims of gross negligence or

16  intentional misconduct, not negligent or faultless breaches of

17  contractual obligations.

18      Movants' first cause of action in the District Court case,

19  breach of Advisers Act fiduciary duties, comes with a jury

20  right.  It's also barred by the order because the order only

21  allows colorable claims involving gross negligence or

22  intentional misconduct.

23      You see there what I mean.  Congress couldn't have been

24  clearer.  Courts cannot deprive litigants of their day in

25  court before a jury of their peers by invoking general equity

1    powers.  Those powers don't trump the constitutional right to

2    a jury trial.

3         Yet this Court's order purports to do precisely that, not

4    only for the Movants, but also for future potential litigants

5    who may have claims that have not even accrued yet.  If those

6    claims are for ordinary negligence or breach of contract or

7    breach of fiduciary duties and don't rise to the level of

8    gross negligence or intentional misconduct, this order says

9    that those claims are barred, and it would deprive them of

10   their day in court.

11        The Court's general equity powers are simply not broad

12   enough to uphold such an order.

13        This issue is even more problematic when the causes of

14   action at issue fall within the mandatory withdrawal of the

15   reference provisions of 28 U.S.C. § 157(d).  As this Court

16   knows, it lacks jurisdiction over proceedings that require

17   consideration of non-bankruptcy federal law regulating

18   interstate commerce.  Some such claims -- Movants' Advisers

19   Act claim, for instance -- do not involve culpability rising

20   to the level of gross negligence or intentional misconduct,

21   but the order purports to bar them nonetheless, despite this

22   Court's lacking jurisdiction over the subject matter of those

23   claims.

24        Even if there is gross negligence or intentional

25   misconduct, the order states that this Court will have sole

1  jurisdiction over such claims.  And that can't be right if

2  withdrawal of the reference is mandatory.

3      Opposing counsel will tell you that 157(d) is inapplicable

4  here because they think our claims in the District Court won't

5  require substantial consideration of the Advisers Act or any

6  other federal laws regulating interstate commerce.  But their

7  cases don't come anywhere close to making that showing, as the

8  briefing demonstrates.

9      And in any case, that argument is beside the point.  This

10  order is contrary to 157(d) because it asserts jurisdiction

11  over claims that 157(d) does not apply -- I'm sorry, does

12  apply to.  And that's true regardless of whether Movants'

13  claims are among those.

14      The idea that there's no substantial consideration of

15  federal law, however, in the District Court case is undermined

16  by Mr. Seery's testimony in support of his appointment in

17  which he confirmed that the Advisers Act applies to him and

18  that he has fiduciary duties under that Act to the investors

19  of the funds he manages.

20      Your Honor, importantly, the Advisers Act isn't the

21  typical federal statute with loads of case law under it.  It's

22  actually an underdeveloped, less-relied-upon statute, and most

23  -- most of the law under that Act is promulgated by regulation

24  and supervised by the SEC.  As a registered investment

25  advisor, Mr. Seery is bound by that Act, which he admits, he

1  agrees to.  But to flesh out what his duties are requires a

2  close exam of more than three dozen regulations under 17

3  C.F.R. Part 275.

4      The obligations include robust duties of transparency and

5  disclosure, as well as duties against self-dealing and the

6  necessity of obtaining informed consent, none of which are

7  waivable, these duties.

8      The proceedings here in this Court reflect an effort to

9  have those unwaivable duties waived.  The allegations in the

10  District Court are essentially insider trading allegations

11  that the Debtor and Mr. Seery knew or should have known

12  information that they had a duty under the Advisers Act to

13  disclose to their advisees.  Both under the Act and

14  contractually, they had those duties.  And, instead, they did

15  not disclose and consummated a transaction that benefited

16  themselves nonetheless.

17      In considering those claims, the presiding court will have

18  to consider and apply the Advisers Act and the many

19  regulations promulgated under it, in addition to other federal

20  laws regulating interstate commerce.  For that reason,

21  withdrawal of the reference on the District Court action is

22  mandatory.  That's the two major -- that's two major problems

23  out of four with the order that we're here on today.

24      First, it deprives litigants of their right to trial, to a

25  jury trial, when Section 959(a) says that can't be done.  And,

1   two, the order asserts jurisdiction -- sole jurisdiction, even

2   -- over proceedings in which withdrawal of the reference is

3   mandatory under 157(d).

4        The fourth major problem is what the Court called

5   specificity at the previous hearing.  The Fifth Circuit's

6   *Applewood Chair* case holds that the rule from *Shoaf* does not

7   apply without a "specific discharge or release," and that that

8   release has to be enumerated and approved by the Bankruptcy

9   Court.  Thus, the order here can't exculpate Mr. Seery of

10  liability for ordinary negligence and the like in a blanket

11  fashion.  The claims being released must be identified.

12       That's what happened in *Shoaf*.  Shoaf's guaranty

13  obligation was explicitly released.  That's also what happened

14  in *Espinosa*.  Espinosa's plan listed his student loan as his

15  only specific indebtedness.  But it's not what happened here.

16  And it couldn't happen here, because the ordinary negligence

17  and similar claims being discharged by the order had not yet

18  accrued and thus were not even in existence at the time the

19  order issued.

20       Instead, what we have here is a nonconsensual, nondebtor

21  injunction or release that's precisely what the Fifth Circuit

22  refused to enforce in the *Pacific Lumber* case.

23       So, lack of specificity is the third major problem with

24  the order.  And that brings us to the fourth problem, which is

25  the *Barton* doctrine.  *Barton* is the only possible basis for

1    this Court to assert exclusive or sole jurisdiction over

2    anything.  Outside of *Barton*, it's plain black letter law that

3    the District Court's jurisdiction is equal to and includes

4    anything that this Court's derivative jurisdiction would also

5    reach.

6        But the exception to the *Barton* doctrine in 959(a) plainly

7    applies here, leaving no basis for exclusivity with regards to

8    jurisdiction and the District Court.  That's because Mr. Seery

9    is carrying on the business of a debtor and managing the

10   property of others, rather than merely administering the

11   bankruptcy estate.  The exclusive jurisdiction function of the

12   *Barton* doctrine has no applicability because 959(a) creates

13   that exception here.

14       Under its general equity powers, yes, 959(a) still

15   authorizes this Court to exercise some control over actions

16   against Mr. Seery, but short of depriving litigants of their

17   day in court.  And nothing in 959(a), that exception to

18   *Barton*, says that the Court can nonetheless exercise

19   exclusivity in that jurisdiction.  Those general equity powers

20   do not create exclusive or sole jurisdiction.  They do not

21   deprive the District Court of its Congressionally-granted

22   original jurisdiction.

23       Moreover, Mr. Seery is not an appointed trustee entitled

24   to the protections of the *Barton* doctrine in any case.  His

25   appointment was a corporate decision that the Court was asked

 1   not to interfere with.  The Court was asked to defer under the

 2   business judgment rule to the Debtor's appointment of Mr.

 3   Seery.  And the Court did so.

 4       As we asserted last time, no authority that we can find

 5   combines these two unrelated doctrines, the *Barton* doctrine

 6   and the business judgment rule.  And they don't go together.

 7   None of the testimony or the briefing or argument, in the July

 8   order, in the January order that preceded it, none of that

 9   indicated that Mr. Seery would be a trustee or the functional

10   equivalent of a trustee.  The word "trustee" does not appear

11   in any of those briefs or transcripts.

12       Opposing -- and because of that, the District Court suit

13   is not about -- well, not because of that.  The District Court

14   suit simply is not about any trustee-like role that Mr. Seery

15   may have played anyway.  Opposing counsel will try to convince

16   you otherwise, will tell you that the District Court case is a

17   collateral attack on the settlement, but it's not.  Wearing

18   his estate administrator hat, Mr. Seery can settle claims in

19   this court.  Wearing his advisor hat, he has to fulfill his

20   Advisers Act duties and properly advise his clients.

21       He doesn't have to wear both hats, and it seems highly

22   unusual that he would choose to fill both of those roles

23   simultaneously.  But he has chosen both roles.  And the

24   District Court case is a hundred percent about his role as an

25   advisor.  Did he comply with the Act?  Did he do the things

Case 19-3405, Document 115-2, 06/30/2021, 3115000, Page13 of 122
Case 1:11-cv-10952-DJC Document 15 Filed 06/30/21 Page 13 of 122

12

1   that his advisor role obligated him to do as a manager of that

2   property?

3       The District Court suit really is only being used to

4   illustrate the issues that we're raising here.  It's

5   important, it's timely to address those issues now because of

6   the District Court action, but that's an illustration of the

7   problems with the order.  It is not exclusively that that

8   action is what we're attempting to address.  Rather, the order

9   exculpating Mr. Seery from ordinary negligence liability and

10  similar liability is problematic, is contrary to the law.  On

11  top of that, the Court is asserting jurisdiction over gross

12  negligence and intentional misconduct claims.  To the extent

13  that 157(d) applies, it is problematic and contrary to law as

14  well.

15          THE COURT:  Okay.  We're occasionally getting some

16  breakup of your sound.  So please -- I don't know what you can

17  do to adjust, but it was just now, and intermittently we get a

18  little bit of garbly.  So if you could just say your last

19  sentence one more time, and we'll see if it improves.

20          MR. BRIDGES:  Your Honor, I'm not sure I can say this

21  last sentence again.

22          THE COURT:  Okay.

23          MR. BRIDGES:  I was -- I was mentioning that the

24  District Court case is an illustration of our argument.  Our

25  argument is not merely that the District Court case should be

1  exempted or excepted from the order.  Our argument is that the

2  order is legally infirm and that the District Court case and

3  the claims there illustrate some of those infirmities, but

4  that the infirmities go beyond just what's at issue in the

5  District Court case.

6       In sum, there are four problems with the order that render

7  parts of it legally infirm.  It deprives the right of a jury

8  trial -- in fact, of any trial -- in contravention of 959(a)

9  for some causes of action.

10      It asserts jurisdiction -- two, it asserts jurisdiction

11 over claims that are subject to the mandatory withdrawal of

12 the reference provision (garbled) 157(d).

13      And three, it lacks the specificity required to discharge

14 future claims under *Applewood*.

15      Finally, Your Honor, number four, the order relies on the

16 *Barton* doctrine, which doesn't apply and which 959(a) creates

17 an exception to.

18      Movants respectfully submit the order should be modified

19 for those reasons.

20           MR. SBAITI:  Tell him Mark Patrick is here, for the

21 record.

22           THE COURT:  All right.  I have a couple of follow-up

23 questions for you.  I want to drill down on the issue of your

24 client not having appealed the July 2020 order.  Or the

25 HarbourVest settlement order, for that matter.  Tell me as

1    directly as possible why you don't view that as a big problem.

2    Because it's high on my list of possible problems here.

3          MR. BRIDGES:  I understand, Your Honor.  The

4    *Applewood Chair* case is our -- our defense to that argument,

5    that without providing specifics as to the claims being

6    discharged in the July order, that *Shoaf* cannot apply to

7    create a res judicata effect from the failure to appeal that

8    order.

9          THE COURT:  But is that really what we're talking

10    about, a discharge of certain claims?  We're talking about a

11    protocol that the Court established which wasn't appealed.

12          MR. BRIDGES:  Your Honor, your order does many

13    things.  We're talking about a few of them in one paragraph of

14    the order.  And in that order -- in that paragraph, yes, it

15    creates a protocol for determining the colorability of some

16    claims, claims that rise to the level of gross negligence or

17    intentional misconduct.  It does not create a protocol for

18    claims that fall below that threshold, claims for ordinary

19    negligence, as an example.

20          THE COURT:  Okay.

21          MR. BRIDGES:  For breach of contract that's not

22    intentional, is not grossly negligent, it's just a breach of

23    contract.  It can even be faultless.  There's still liability.

24    There's still a jury right under the Seventh Amendment for

25    faultless breach of contract.

1     The protocols in the order do not address such claims

2  other than to bar them.  To discharge them.  And thus, yes,

3  it's a release, it's a discharge of those claims.  It can be

4  viewed as a permanent injunction against bringing such claims.

5  It's what's -- it's what's not allowed by the *Applewood Chair*

6  case and by *Pacific Lumber*.

7          THE COURT:  All right.  So you're arguing that was --

8  the wording of the order was not specific enough to apprise

9  affected parties of what they were releasing, they're

10 releasing claims based on ordinary negligence against Mr.

11 Seery?  That's not specific enough?

12         MR. BRIDGES:  Correct.  Future unproved claims, the

13 factual basis for which has not happened yet.  Those cannot be

14 and were not disclosed with any specificity in this order.

15    If we compare it to *Shoaf* and to *Espinosa*, in *Shoaf* what

16 we had was a guaranty, Shoaf's guaranty on a transaction that

17 was listed in the actual release, describing what the

18 transaction was that was being -- that the guaranty was being

19 released for.

20    In *Espinosa*, what we had was a student loan --

21         THE COURT:  Right.

22         MR. BRIDGES:  -- that was listed in the plan

23 specifically, as the only specific indebtedness.

24    Here, we don't have any of that specificity.  What we have

25 is a notice to the entire world, Your Honor, that for an

1   unlimited period of time any claim for ordinary negligence,

2   for ordinary breach of contract or fiduciary duty against Mr.

3   Seery is barred if it relates to his CEO role.  And his CEO

4   role means as a manager of property, exactly precisely what

5   959(a) is talking about.

6        Those jury rights (garbled) claims cannot be released,

7   discharged, expunged, done away with, in an order that isn't

8   explicit.

9        On top of that, even in an explicit order, 959(a) tells

10  the Court it cannot deprive a litigant of its jury trial

11  right.

12              THE COURT:  Well, as anyone knows who's been around a

13  while in this case, my brain sometimes goes down an unexpected

14  trail, and maybe this one is one of those situations.  Are

15  there contracts that your clients would rely on in potential

16  litigation?

17              MR. BRIDGES:  Yes, Your Honor.

18              THE COURT:  What are those contracts?

19              MR. BRIDGES:  It is a management contract.  I don't

20  think I can give you the specifics at this moment, but I

21  probably can before we're done here today.  A management

22  contract in which the Debtor provides advisory and management

23  services to the DAF --

24              THE COURT:  Well, you know, the shared services

25  agreements that we heard so much about in this case?  A shared

```
1    service agreement?  I can't remember, you know, which entities
2    have them and which do not at times.  So, --
3              MR. BRIDGES:  The shared services agreement is one of
4    those contracts, Your Honor.
5              THE COURT:  Okay.
6              MR. BRIDGES:  It's not the only one.
7              THE COURT:  And what are the others?
8              MR. BRIDGES:  There's -- the other is the investment
9    advisory agreement.
10             THE COURT:  Those two?
11             MR. BRIDGES:  (no response)
12             THE COURT:  Those are the only two?
13             MR. BRIDGES:  There may be one other, Your Honor.
14   I'm not sure.
15             THE COURT:  Are they in evidence?
16             MR. BRIDGES:  I can find out shortly.
17             THE COURT:  Are they in evidence?  We haven't talked
18   about evidence yet, but are they going to be in evidence,
19   potentially?
20             MR. BRIDGES:  They are referenced in the District
21   Court case, the complaint, which is in evidence.
22             THE COURT:  I'm asking, are --
23             MR. BRIDGES:  But those contracts I don't believe are
24   listed as exhibits here in this motion, no.
25             THE COURT:  They are not?  Okay.
```

1     Well, what my brain is thinking about here is, of the

2  umpteen agreements I've seen -- more than umpteen -- of the

3  many, many agreements I've seen over time in this case, so

4  often there's a waiver of jury trial rights, as I recall, as

5  well as an arbitration clause.  I just was curious, hmm, you

6  know, you talked a lot about your clients' jury trial rights:

7  do we know that these agreements have not waived those?

8     MR. BRIDGES:  Your Honor, I think I can answer that

9  by the end of our hearing.  I don't have an answer off the top

10  of my head.  What I can tell you is a jury right has been

11  demanded in the federal court complaint, which is in evidence,

12  and that opposing counsel has brought no evidence indicating

13  that they have the defense of our having waived the right to a

14  jury trial here.

15     THE COURT:  Okay.  Well, I just --

16     MR. BRIDGES:  Or arbitra...

17     THE COURT:  -- would think that you would know that.

18  Does anyone know that on the Debtor's side off the top of your

19  head?

20     MR. POMERANTZ:  I do not, Your Honor.

21     THE COURT:  Uh-huh.

22     MR. POMERANTZ:  And to Mr. Bridges' last point, we

23  have filed a motion to dismiss.  We have not answered the

24  complaint.  So any time to object to their jury trial right

25  would be in the context of the answer.  So the implication

1    that we have not raised the issue and therefore it doesn't

2    exist is just not a correct implication and connection he's

3    trying to draw.

4              THE COURT:  Okay.  All right.

5         Well, let me also ask you about this.  I'm obsessing a

6    little over the *Barton* doctrine and your insistence that it

7    does not provide authority or an analogy here.

8         Well, for one thing, is there anything in the Fifth

9    Circuit case *Sherman v. Ondova* that you think either helps you

10   or hurts you on that point?  I'm intimately familiar with it,

11   although I haven't read it in a while, because it was my

12   opinion that the Fifth Circuit affirmed.  And I spent a lot of

13   time thinking about that.  It was a trustee, a traditional --

14   well, no, a Chapter 11 trustee and his counsel.  But anything

15   from that case that you think is worthy of pointing out here?

16             MR. BRIDGES:  No, Your Honor.  I'm not -- nothing

17   comes to mind.  That case is not fresh on my mind.

18        What I would tell you is that *Barton* doctrine and the

19   business judgment rule are incompatible, and the appointment

20   of a trustee never involves application of the business

21   judgment rule or deference to the Debtor or another party in

22   terms of making that appointment.

23        The *Barton* doctrine, as it applies to trustees, is viewed

24   as an extension, to some extent, of judicial immunity to the

25   trustee, who is chosen by, selected by the Court and assigned

1    by the Court to carry out certain functions.  That --

2              THE COURT:  Well, let me --

3              MR. BRIDGES:  -- quasi-immunity --

4              THE COURT:  -- stop you there.  You say it's an

5    extension of immunity.  But isn't it, by nature, really a

6    gatekeeping provision?  It's a gatekeeping provision, right?

7    Before you even get to immunity, maybe, in a lawsuit, it's a

8    gatekeeping function that the Supreme Court has blessed, you

9    know, obviously in the context of a receiver, but appellate

10   courts have blessed it in the bankruptcy context.  The

11   Bankruptcy Court can be the gatekeeper on whether the trustee

12   or someone I think in a similar position can get sued or not.

13        And then we had that Fifth Circuit case after *Ondova*.  It

14   begins with a V, *Villegas* or something like that.  Didn't

15   that, I don't know, further ratify, if you will, the whole

16   *Barton* doctrine by saying, oh, just because they're noncore

17   claims, state law or non-bankruptcy law claims, doesn't mean,

18   after *Stern*, the Bankruptcy Court still cannot serve the

19   gatekeeper function.

20        Tell me what you disagree.  That's my kind of combined

21   reading of all of that.

22             MR. BRIDGES:  Your Honor, I have to parse it out.

23   There's a lot to unpack there.  If I can make sure to get in

24   the follow-ups, I can start with saying it's okay for the

25   Court in many instances to act as a gatekeeper.

1          THE COURT:  Okay.

2          MR. BRIDGES:  Both under *Barton* -- under *Barton*, or

3     when the *Barton* exception in 959(a) applies, under the Court's

4     general equitable powers, that gatekeeping functions are not

5     across-the-board prohibited, --

6          THE COURT:  Okay.

7          MR. BRIDGES:  -- and we aren't trying to argue that

8     they're prohibited across the board.

9          THE COURT:  Okay.

10         MR. BRIDGES:  Now, to try to dig into that a little

11    deeper, the order does two things:  gatekeeping as to some

12    claims, and, frankly, discharging or barring other claims.

13    Those are two separate functions.

14         The first one, the gatekeeping, may be, in some

15    circumstances, which we'll come to, many circumstances, may be

16    allowable, may be even mandatory under *Barton*, not even

17    requiring an order from this Court, for the gatekeeping of

18    *Barton* to apply.  But nonetheless, allowable in many instances

19    under the Court's general equity powers under 959(a).  That

20    part is right about gatekeeping.

21         It does not create jurisdiction in this Court where 157(d)

22    deprives this Court of jurisdiction.  Just because it's

23    related to bankruptcy isn't enough to say that the Court

24    therefore has jurisdiction if, one, if mandatory withdrawal of

25    the reference is required.

1      Furthermore, Your Honor, that gatekeeping function, under
2  the equity powers authorized by 959(a), will not allow a court
3  to discharge or -- or deprive, is the word I'm looking for --
4  deprive a litigant of their right to a trial -- a specific
5  kind of trial, a jury trial -- but a trial.  And by crafting
6  an order that says certain kinds of claims that do (garbled)
7  jury rights are barred, rather than just providing a
8  gatekeeper provision, flat-out bars them, that doesn't -- that
9  doesn't comply with 959.
10         THE COURT:  Okay.
11         MR. BRIDGES:  Your Honor, if I could add one last
12  thing.
13         THE COURT:  Go ahead.
14         MR. BRIDGES:  The Supreme Court's *Stern* case points
15  out that -- that it's -- well, actually, it's the *Villegas*
16  case from the Fifth Circuit --
17         THE COURT:  The one I mentioned.
18         MR. BRIDGES:  -- points out that *Stern* -- *Stern* --
19  yes, you did.  *Stern* did not create an exception to the *Barton*
20  doctrine.  And that gives -- that endorses a *Barton* court's
21  ability to perform gatekeeping, even over claims that *Stern*
22  says there would not be jurisdiction over.
23      Contrast that with 959(a), which *Collier on Bankruptcy* and
24  the Fifth Circuit have held is an exception to the *Barton*
25  doctrine.  Because of that exception, *Barton* no longer

1  applies, and what you're using in invoking a gatekeeper order

2  is the Court's inherent equitable powers, its general powers

3  in equity.  And those equity powers are cabined.  They're

4  broad, but they're cabined by 959(a)'s prohibition of doing

5  away with a litigant's right to a trial, a jury trial.

6      Now, I also -- counsel is telling me I should note for the

7  record that Mr. Mark Patrick is here as a representative of

8  our clients.  But Your Honor, I'll -- I will quit now unless

9  you have further questions for me.

10         THE COURT:  All right.  I do not at this time.  Mr.

11  Morris or Mr. Pomerantz, who's going to make the argument?

12         MR. POMERANTZ:  It's me, Your Honor.

13         OPENING STATEMENT ON BEHALF OF THE DEBTOR

14         MR. POMERANTZ:  And I'll start with the jury trial

15  right.  In the last few minutes, we have been able to

16  determine that the Second Amended and Restated Investment

17  Advisory Agreement between the DAF and the Debtor has a broad

18  jury trial waiver under 14(f).  And in addition, as I will

19  include in my discussion, there is no private right of action

20  under the Investment Advisers Act.

21      I think those two points are fatal to Movants' argument,

22  and probably I can get away with not even responding to the

23  others.  But since I prepared a lengthy presentation to

24  address the issues that were raised today, and also the half

25  hour that Mr. Bridges spent with Your Honor on June 8th in

1    which was his first opening statement on the motion for

2    reconsideration, I'll now proceed.

3           THE COURT:  All right.

4           MR. POMERANTZ:  The arguments that the Movants made

5    in the original motion essentially boil down to one legal

6    proposition, that the Court did not have jurisdiction to enter

7    the July 16th order because those orders impermissibly

8    stripped the District Court from jurisdiction, in violation of

9    (inaudible) Supreme Court precedent and 28 U.S.C. Section

10   157(d).

11        As with all things Dondero, the arguments continue to

12   morph, and you heard argument at the contempt hearing on June

13   8th and further argument today that now the prospective

14   exculpation for negligence in the order is also unenforceable

15   and should be modified.

16        Movants continue to try to distance themselves from the

17   January 9th order and argue that it is not relevant because

18   they seek to pursue claims against Mr. Seery as CEO and not as

19   an independent director.  Movants ignore, however, that the

20   January 9th order not only protects Mr. Seery in his role as

21   the independent director, but also as an agent of the board.

22   I will walk the Court through my arguments on that issue in a

23   few moments.

24        Of course, the Movants had no explanation, Your Honor, for

25   the question of why it took them until May of 2021, 10 months

1   after the entry of the July 16th order that appointed Mr.

2   Seery as CEO and CRO, and 16 months after the Court appointed

3   the independent board, with Mr. Dondero's blessing and

4   consent, as a substitute for what would have surely been the

5   imminent appointment of a Chapter 11 trustee.

6      Movants try to distance themselves from the prior orders

7   by essentially arguing that the DAF is a newcomer to the

8   Chapter 11 and is not under Mr. Dondero's control but is

9   rather managed separately and independently by Mr. Patrick,

10  who recently replaced Mr. Scott.

11      The Movants admit, as they must, that the DAF is the

12  parent and the sole shareholder of CLO Holdco and conducts its

13  business through CLO Holdco, and both entities conduct their

14  business through one individual.  It was Grant Scott then;

15  it's Mark Patrick now.  So even if Mr. Dondero does not

16  control the DAF and CLO Holdco, which issue was the subject of

17  lengthy testimony in connection with the DAF hearing, both the

18  DAF and the CLO Holdco are bound by the Debtor's res judicata

19  argument, which I will discuss shortly.

20      In any event, I really doubt the Court is convinced that

21  the DAF operates truly independently of Mr. Dondero any more

22  than the Court has been convinced that the Advisors, the

23  Funds, Dugaboy and Get Good, all operate independently from

24  Mr. Dondero.  The only explanation for the delay is that Mr.

25  Dondero has been and continues to be unhappy with the Court's

1    rulings and has now hired a new set of lawyers in a desperate

2    attempt to evade this Court's jurisdiction.  Having failed in

3    their attempt to recuse Your Honor from the case, this is

4    essentially their last hope.

5        And these new lawyers, Your Honor, have not only filed

6    this DAF lawsuit in the District Court which is the subject of

7    the contempt motion and today's motion, but they also filed

8    another lawsuit in the District Court on behalf of an entity

9    called PCMG, another Dondero entity, challenging yet another

10   of Mr. Seery's postpetition decisions.

11       And there's no doubt that this is only the beginning.  Mr.

12   Dondero recently told Your Honor at a hearing that there were

13   many more sets of lawyers waiting in the wings.  And as the

14   Court remarked at the hearing on the Trusts' motion to compel

15   compliance with Rule 2015.3, the Trusts were trying through

16   that motion to obtain information about the Debtor's control

17   entities so that they could file more lawsuits against the

18   Debtor, a concern that Mr. Draper unconvincingly denied.

19       I would like to focus the Court preliminarily on exactly

20   what the January 9th and July 16th orders do, because Movants

21   try to confuse things by casting the entire order with a broad

22   brush of their jurisdictional overreach arguments, and they

23   misinterpret Supreme Court and Fifth Circuit precedent.

24       I would like to put up on the screen the language of

25   Paragraph 10 of the January 9th order and Paragraph 35

1  (garbled) of the July 16th.

2       Your Honor is very familiar with these orders, I'm sure,

3  having dealt with them in connection with confirmation and in

4  prior proceedings.  But to recap, the orders essentially do

5  three things.

6       First, they require the parties to first come to the

7  Bankruptcy Court before commencing or pursuing a claim against

8  certain parties.

9       Second, they provided the Court with the sole jurisdiction

10 to make a finding of whether the party has asserted a

11 colorable claim of negligence -- of willful misconduct or

12 gross negligence.

13      And lastly, the orders provided the Court with exclusive

14 jurisdiction over any claims that the Court determined were

15 colorable.

16      The protected parties under the January 9th order are the

17 independent directors, their agents and advisors, which, as I

18 mentioned earlier, includes Mr. Seery -- who, at least as of

19 March 2020, was acting as the agent on the board's behalf as

20 the CEO -- for any actions taken under their direction.

21      The protected parties under the July 16th order are Mr.

22 Seery, as the CEO and CRO, and his agents and advisors.

23      Movants spend a lot of time in their moving papers and

24 reply arguing that the Court may not assert exclusive

25 jurisdiction over any claims that pass through the gate.  They

1  also spend a lot of time arguing that the Bankruptcy Court

2  does not even have jurisdiction at all to assert -- to

3  adjudicate claims against Mr. Seery because such claims are

4  subject to mandatory withdrawal under Section 157(d).

5       The Debtor doesn't agree, and has briefed why mandatory

6  withdrawal of the reference is inapplicable.  The Debtor has

7  also filed in the District Court a motion to enforce the

8  reference in effect in this district which refers cases in

9  this district arising under, arising in, or related to Chapter

10  11 to the Bankruptcy Court.

11       The motion to enforce the reference, Your Honor, which

12  extensively briefs this issue, is contained in Exhibit 3 of

13  the Debtor's exhibits.

14       We were somewhat surprised that the complaint filed in the

15  District Court wasn't automatically referred to this Court

16  under the standing order in effect in this district, given the

17  related bankruptcy case, the Court's prior approval of the

18  HarbourVest settlement, and the appeal in the District Court

19  of the HarbourVest settlement.

20       When we dug a little further, we found out that Movants

21  filed a civil case cover sheet accompanying the complaint in

22  the District Court.  They neglected in that initial filing to

23  point out that there was any related case to the lawsuit they

24  filed.

25       Mr. Bridges fell on his sword at the contempt hearing on

1    June 8th and took complete responsibility for the oversight.

2    I commend him for not trying to argue that the bankruptcy

3    case, the HarbourVest settlement, and the District Court

4    appeal are not related cases that would require disclosure, an

5    argument that surely would have been unsupportable.

6        But as I said at the contempt hearing, I find it curious

7    that such an important issue was overlooked, an issue which

8    would have likely changed the entire trajectory of the

9    proceedings and landed the DAF lawsuit in this Court rather

10   than the District Court.

11       And this Tuesday, Your Honor, Movants filed a revised

12   civil cover sheet with the District Court.  Although they

13   referenced the bankruptcy case as a related case, they didn't

14   bother to mention the appeal already pending in the District

15   Court regarding the HarbourVest settlement -- surely, a

16   related case.

17       Your Honor also asked Mr. Bridges at the June 8th hearing

18   whether it was an oversight or intentional that he didn't

19   mention 28 U.S.C. Section 1334 as a basis for jurisdiction in

20   his complaint.  Mr. Bridges had no answer for Your Honor then,

21   and has given no answer now.  His only comment at the hearing

22   last time was that it must have been Ms. Sbaiti that wrote it

23   because he had no recollection of it.

24       So, Your Honor, it's no surprise that Movants conveniently

25   found themselves in the District Court, which was their

1  ultimate strategy from the get go.

2      In any event, Your Honor, we have briefed the withdrawal

3  of the reference issue.  A response by the Movants is due --

4  CLO Holdco and DAF is due on June 29th.  And we hope the

5  District Court will decide soon thereafter whether to enforce

6  the reference.

7      While I'm happy to argue why Movants' mandatory withdrawal

8  of the reference argument is [not] persuasive, I don't think

9  it's necessary, but I do, again, want to highlight that there

10  is no private right of action under the Investment Advisers

11  Act.

12      Your Honor, it's not really relevant to today's hearing,

13  since we have argued in opposition to the motion before Your

14  Honor that resolving the issue of the Bankruptcy Court's

15  jurisdiction to adjudicate claims contained in the complaint

16  as they relate to Mr. Seery is premature at this point.  The

17  January 9th and July 16th orders first require the Court to

18  determine whether a claim is colorable.  It's not until this

19  Court determines if a claim is colorable that the decision on

20  where the lawsuit should be tried is relevant.

21      Having said that, Your Honor, we read the Movants' reply

22  brief very carefully and noticed in Footnote 6 that the

23  Movants state that modifying the exclusive grant of

24  jurisdiction to adjudicate any claims that pass through the

25  gate to include the language "to the extent permissible by

1    law," in the same way the Debtor modified the plan, would

2    resolve the motion.  So let's look at the provision as it

3    exists in the plans.

4        Ms. Canty, if you can put up the next demonstrative,

5    please.

6        This provision provides that the Bankruptcy Court will

7    have sole and exclusive jurisdiction to determine whether a

8    claim or cause of action is colorable, and, only to the extent

9    legally permissible and provided in Article XI, shall have

10   jurisdiction to determine -- to adjudicate the underlying

11   colorable claim or cause of action.

12       The Movants request in their reply brief in Footnote 6

13   that the July 16th order be given the plan treatment.  That

14   treatment:  sole authority to determine colorability and

15   jurisdiction, and, to the extent legally permissible, to

16   adjudicate underlying claim, only if jurisdiction existed.

17       After reviewing the reply brief and prior to the June 8th

18   hearing, we decided that we would agree to modify both the

19   January 9th and the July 16th orders to provide that the

20   Bankruptcy Court would only have jurisdiction to adjudicate

21   claims that pass through the colorability gate to the extent

22   permissible by law.

23       Prior to the June 8th hearing, Mr. Morris and I had a

24   conversation with Mr. Bridges.  We conferred about a potential

25   resolution and a proposed modification.  Mr. Bridges indicated

1  they were interested in exploring a resolution and wanted to

2  --

3          MR. BRIDGES:  Objection, Your Honor.

4          THE COURT:  There's an objection?

5          MR. BRIDGES:  Objection, Your Honor.  There's a Rule

6  408 settlement discussion.  He's welcome to talk about the

7  results, but he shouldn't be talking about what was -- what

8  was proposed by opposing counsel in a settlement conversation.

9          THE COURT:  Okay.  I overrule.

10         MR. POMERANTZ:  Your Honor, this was not --

11         THE COURT:  I don't think this is a 408 issue.

12 Continue.

13         MR. BRIDGES:  Thank you.

14         MR. POMERANTZ:  The stipulation and order which we

15 provided to counsel is attached to my declaration, which is

16 found at Document 2418, and it was filed in connection with a

17 Notice of Revised Proposed Orders that we filed at Docket

18 2417.  And I would like to put up on the screen the relevant

19 paragraphs of the order that we provided to the Movants.

20     So, you see, we agreed to modify each of the orders at the

21 end to do what the plan says.  The Court would only have

22 jurisdiction for claims passing through the gate if the Court

23 had jurisdiction and it was legally permissible.

24     Movants' counsel, however, responded with a mark-up that

25 went beyond -- went beyond what Movants proposed in Footnote 6

1    and sought to fundamentally change the January 9th and July

2    16th orders in ways that were not acceptable to the Debtor and

3    not even contemplated by the original motion.

4         Ms. Canty, can you put up on the screen the relevant

5    paragraphs of the response we received?

6         Specifically, Your Honor, you see at the first part they

7    wanted to provide that the only -- the order only applied to

8    claims involving injury to the Debtor, presumably as opposed

9    to alleged injuries to affiliated funds or third parties.

10   They also provided that the Court's ability to make the

11   initial colorability determination was also qualified by "to

12   the extent permissible by law" in the way that the Court --

13   that the Debtor agreed to modify the ultimate adjudication

14   jurisdiction provision.

15        Your Honor, Movants haven't even talked about this back

16   and forth.  They haven't talked about their about-face.  And

17   I'll leave it for Your Honor to read their Footnote 6 that

18   said it would resolve their motion, the back and forth, our

19   proposal, and now Mr. Bridges' modified, morphed arguments

20   that now point out other issues.

21        In any event, Your Honor, we made the change, and we think

22   it should resolve the motion, or at least it resolves part of

23   the motion.  There can't be any argument that the Court is

24   trying to exert exclusive jurisdiction on claims that pass

25   through the gate.

1    What apparently remains from the arguments raised by the

2    Movants is the argument that the Court does not even have

3    jurisdiction to act as a gatekeeper in the first place because

4    it doesn't have jurisdiction of the underlying lawsuit.  And

5    on June 8th and today, they've added a new argument, that the

6    orders impermissibly exculpate Mr. Seery and others, violate

7    their jury trial rights, and are contrary to the Fifth Circuit

8    precedent.

9    Movants claims that the orders are a jurisdictional

10   overreach, a violation of constitutional proportions, a

11   violation of due process, and inconsistent with several U.S.

12   Supreme Court cases.  But, of course, they cite no cases whose

13   facts are even remotely similar to this one.  Instead, they

14   are content to rely on general statements regarding bankruptcy

15   jurisdiction, how it is derived from district court

16   jurisdiction and is constitutionally limited, legal

17   propositions which are not terribly controversial or even

18   applicable to these facts.

19   There are several arguments -- I mean, there are several

20   reasons, Your Honor, why Movants' arguments fail.  Initially,

21   Movants have not cited any authority, any statute, or any rule

22   which would allow this Court to revisit the January 9th and

23   July 16th orders.  As I will discuss in a moment, Your Honor,

24   *Republic v. Shoaf*, a case the Court is very familiar in and

25   relied on in connection with plan confirmation, bars a

 1  collateral attack on these orders under the doctrine of res

 2  judicata.

 3      Similarly, as the Court remarked on June 8th, the Supreme

 4  Court's *Espinosa* decision, which rejected an attack based upon

 5  Federal Rule of Civil Procedure 60(b)(4) to a prior order that

 6  may have been unlawful, prohibits the Court from now

 7  reconsidering the January 9th and July 16th orders.

 8      But even if Your Honor rules that res judicata does not

 9  apply, there are two independent reasons why the orders were

10  not an unlawful extension of the Court's jurisdiction.  The

11  first is because the Court had jurisdiction to enter both of

12  those orders as the ability to determine the colorability of

13  claims is within the jurisdiction of the Court.  The second is

14  because the orders are justified by the *Barton* doctrine.

15      Lastly, Your Honor, Movants' argument that the Court may

16  not act as a gatekeeper to determine the colorability of a

17  claim for which it may not have jurisdiction is incorrect, and

18  as Your Honor has mentioned and as Mr. Bridges unconvincingly

19  tried to distinguish, the Fifth Circuit *Villegas v. Schmidt*

20  case is a case on point and resolves that issue.

21      Turning to res judicata, Your Honor, it prevents the Court

22  from revisiting these governance orders.  CLO Holdco had

23  formal notice of the Seery CEO motion and the opportunity to

24  respond.  It failed to do so.  It is clearly bound.

25      As reflected on Debtor's Exhibit 4, CLO Holdco is a

1   wholly-owned subsidiary of the DAF.  The DAF is its sole

2   shareholder.  There is no dispute about that.  Importantly, at

3   the time of both the January and July orders, Grant Scott was

4   the only human being authorized to act on behalf of CLO Holdco

5   and the DAF.  The DAF did not respond to the Seery CEO motion,

6   either.

7        And why is that important, Your Honor?  It's because

8   Movants argue in their reply that the DAF cannot be bound by

9   res judicata because they did not receive notice of the July

10  16th order.  However, Your Honor, that is not the law.  Res

11  judicata binds parties to the dispute and their privies, and

12  the DAF is bound to the prior orders even though it did not

13  receive notice.

14       There are several cases, Your Honor, that stand for this

15  unremarkable proposition.  First I would point Your Honor to

16  the Fifth Circuit's opinion of *Astron Industrial Associates v.*

17  *Chrysler*, found at 405 F.2d 958, a Fifth Circuit case from

18  1968.  In that case, Your Honor, the Fifth Circuit held that

19  the appellant was barred by the doctrine of res judicata from

20  bringing a claim because its parent, which was its sole

21  shareholder, would have been bound by res judicata.

22       *Astron* is consistent with the 1978 Fifth Circuit case of

23  *Pollard v. Cockrell*, 578 F.2d 1002 (1978).  And the Northern

24  District of Texas in 2000 case of *Bank One v. Capital*

25  *Associates*, 2000 U.S. Dist. LEXIS 11652, found that a parent

1    and a sole shareholder of an entity couldn't assert res

2    judicata as a defense when those claims could have been

3    brought against its wholly-owned subsidiary.

4         And lastly, Your Honor, the 2011 Southern District of

5    Texas case, *West v. WRH Energy Partners*, 2011 LEXIS 5183, held

6    that res judicata applied with respect to a partnership's

7    general partner because the general partner was in privity

8    with the partnership.

9         These cases are spot on and make sense.  DAF is CLO

10   Holdco's parent.  Grant Scott was the only live person to

11   represent these entities in any capacity at the relevant

12   times.  Accordingly, just as CLO Holdco is bound, DAF is

13   bound.

14        Allowing DAF to assert a claim when its wholly-owned and

15   controlled subsidiary is barred would allow entities to

16   transfer claims amongst their related entities in order to

17   relitigate them and they would never be finality.  And, of

18   course, Jim Dondero, as we know, consented to the January 9th

19   order, which provided Mr. Seery protection in a variety of

20   capacities.

21        And as Your Honor has pointed out, and as Mr. Bridges

22   didn't have an answer for, neither CLO Holdco nor the DAF or

23   any other party appealed any of the governance orders.  And

24   nobody challenged the validity of these orders at the

25   confirmation hearing, where the terms of these orders were

1    front and center.

2        And importantly, Your Honor, the orders are clear and

3    unambiguous.  They require a Bankruptcy Court [sic] to seek

4    Bankruptcy Court approval before they commence or pursue an

5    action against the independent board, the CEO, CRO, or their

6    agents.  And they clearly and unambiguously set the standard

7    of care for actions prospectively:  gross negligence or

8    willful misconduct.

9        The Bankruptcy Court had jurisdiction to enter the

10   governance orders, which, as expressly indicated in the

11   orders, were core proceedings dealing with the administration

12   of the estate.  No one challenged this finding of core

13   jurisdiction.  And as I will discuss later, the failure to

14   challenge core jurisdiction is waived under applicable Supreme

15   Court and Fifth Circuit precedent.

16       Your Honor, the Court [sic] does not argue that Movants

17   have waived their right to seek adjudication of a lawsuit that

18   passes through the colorability gate by an Article III Court.

19   The issue is not before the Court, but the changes to the

20   order that the Debtor agreed to make clearly -- clearly will

21   provide Mr. Bridges' clients the ability to make that

22   determination.

23       The Debtor is, however, arguing that the Movants have

24   waived their right to contest the core jurisdiction of the

25   Bankruptcy Court to make the determination that the claims are

1   colorable in the first place, and to challenge the exculpation

2   provisions provided to the beneficiaries of those orders.

3       Accordingly, Your Honor, the elements of res judicata are

4   satisfied.  Both proceedings involve the same parties.  The

5   prior judgment was entered by a court of competent

6   jurisdiction.  The prior order was a final judgment on its

7   merits.  And they involved the same causes of action.

8       Importantly, the members of the independent board,

9   including Jim Seery, relied on the protections contained in

10  the January 9th and July 16th orders and would not have

11  accepted these appointments if the protections weren't

12  included.  And how do we know this?  Because each of them,

13  both Mr. Seery and Mr. Dubel, both testified at the

14  confirmation hearing on this very topic.

15      And I would like to put up on the screen an excerpt from

16  Mr. Seery's testimony at confirmation, which is testimony

17  included in the February 2nd, 2021 transcript, which is

18  Exhibit 2 of the Debtor's exhibits.

19          THE COURT:  Okay.

20          MR. POMERANTZ:  And I would like to just read this,

21  Your Honor.

22      "Q   Okay.   You mentioned that there were certain

23      provisions of the January 9th order that were important

24      to you and the other independent directors.  Do I have

25      that right?"

1       MR. POMERANTZ:  A little bit later on, Mr. Seery

2 testifies:

3     "A   And then ultimately there'll be another provision

4     in the agreement here, I don't see it off the top of my

5     head, but a gatekeeper provision.  And that provision"

6     --

7     "Q   Hold on one second, Mr. Seery."

8       MR. POMERANTZ:  Please scroll.

9     "Q   So, Paragraph 4 and 5, were those -- were those --

10     were those provisions put in there at the insistence of

11     the prospective independent directors?

12     "A   Yes.

13     "Q   Okay.  Can we go to Paragraph 10, please?  There

14     you go."

15   Mr. Morris:  Is this the other provision that you were

16 referring to?

17     "A   This  is  --  it's  become  to  be  known  as  the

18     gatekeeper  provision,  but  it's  a  provision  that  I

19     actually  got  from  other  cases  --  again,  another  very

20     litigious  case  --  that  I  thought  it  was  appropriate  to

21     bring  it  into  this  case.  And  the  concept  here  is  that

22     when  you  are  dealing  with  parties  that  seem  to  be

23     willing  to  engage  in  decade-long  litigation  and

24     multiple  forums,  not  only  domestically  but  even

25     throughout  the  world,  it  seemed  important  and  prudent

1    to me and a requirement that I set out that somebody

2    would have to come to this Court, the Court with

3    jurisdiction over these matters, and determine whether

4    there was a colorable claim. And that colorable claim

5    would have to show gross negligence and willful

6    misconduct -- i.e., something that would not otherwise

7    be indemnifiable" --

8       MR. POMERANTZ: Hold on one second.

9    "A   So, basically, it set an exculpation standard for

10    negligence. It exculpates the directors from

11    negligence, and if somebody wants to bring a cause

12    against the directors, they have to come to this Court

13    first to get a finding that there's a colorable claim

14    for gross negligence or willful misconduct."

15    "Q   Would you have accepted the engagement as an

16    independent director without the Paragraphs 4, 5, and

17    10 that we just looked at?

18    "A   No, these were very specific requests. The

19    language here has been smithed, to be sure, but I

20    provided the original language for Paragraph 10 and

21    insisted on the guaranty provisions above to ensure

22    that the indemnity would have some support.

23    "Q   And ultimately did the Committee and the Debtor

24    agree to provide all the protections afforded by

25    Paragraphs 4, 5, and 10?

1    "A   Yes."

2         MR. POMERANTZ:  So, Your Honor, these -- this

3    testimony also applied to as well as the CEO.

4         The testimony was echoed by Mr. Dubel, another member of

5    the board.  And I'm not going to put his testimony on the

6    screen, but it can be found at Pages 272 to 281 of Exhibit 2,

7    which is the February 2nd transcript.

8         Movants argue, however, that res judicata doesn't apply

9    because the Court didn't have jurisdiction to enter these

10   orders.  And they argue that the order stripped the District

11   Court of this jurisdiction.  As I previously described, the

12   Debtor is prepared to modify the governance orders to provide

13   that the Court shall retain jurisdiction to -- on claims that

14   pass through the gate only to the extent legally permissible.

15   The modification does not appear to be good enough for the

16   Movants.  They continue to argue that the Bankruptcy Court

17   can't even act as the exclusive gatekeeper to determine

18   whether such actions are colorable as a prerequisite for

19   commencing or pursuing an action.

20        The problem Movants run into is the Fifth Circuit's

21   opinion of *Republic v. Shoaf* and various Supreme Court

22   decisions, including *Espinosa*.

23        In *Shoaf*, the Fifth Circuit held that a party cannot

24   subsequently challenge a confirmed plan that clearly and

25   unambiguously released a third party, even if the Bankruptcy

1   Court lacked jurisdiction to approve the release in the first

2   place.  Movants' proper recourse was to appeal the governance

3   orders, not to seek to collaterally attack them.

4       In *Shoaf*, the Fifth Circuit held that the confirmed plan

5   was res judicata with respect to a suit by the creditor

6   against the guarantor.  And in so ruling, the Fifth Circuit

7   says that the prong of res judicata standard that requires an

8   order, prior order to be made by a court of competent

9   jurisdiction is satisfied regardless of whether the issue was

10  actually litigated.  This is because whenever a court enters

11  an order, it does so by implicitly making a finding of its

12  jurisdiction, a determination that can't be attacked.  And in

13  fact, in the January 9th and the July 16th orders, it wasn't

14  implicit, the Court's jurisdiction; it was set out that the

15  Court had core jurisdiction.

16      Movants try to brush *Shoaf* aside, arguing that is the only

17  case the Debtor cites to support res judicata argument and is

18  a narrow opinion that has been questioned and distinguished.

19  That's just not correct, Your Honor.  Movants ignore that we

20  have cited two United States Supreme Court cases, *Stoll v.*

21  *Gottleib* and *Chicot County Drainage District*, upon which the

22  Fifth Circuit based its *Shoaf* decision.  In each case, the

23  U.S. Supreme Court gave res judicata effect to a Bankruptcy

24  Court order that made a ruling party -- that a ruling party

25  later claimed was beyond the Court's jurisdiction to do so.

1    In *Stoll*, it was a release of guaranty without jurisdiction,

2    like *Shoaf*.  In *Chicot*, it was an extinguishment of a bond

3    claim without jurisdiction.

4         Similarly, Your Honor, the U.S. Supreme Court held in

5    *Espinosa* that a party was not entitled to reconsideration of a

6    Bankruptcy Court order under Federal Rule of Civil Procedure

7    60(b)(4) discharging a student loan without making the

8    required statutory finding of undue hardship in an adversary

9    proceeding.  And the Supreme Court reasoned in that opinion as

10   follows:  A judgment is not void, for example, simply because

11   it may have been erroneous.  Similarly, a motion under

12   60(b)(4) is not a substitute for a timely appeal.  Instead,

13   60(b)(4) applies only in the rare instance where a judgment is

14   premised either on a certain type of jurisdictional error or a

15   violation of due process that deprives a party of notice or

16   the opportunity to be heard.

17        Federal courts considering Rule 60(b)(4) motions that

18   assert a judgment is void because of a jurisdictional defect

19   generally have reserved it only for the exceptional case in

20   which the court that rendered the judgment lacked even an

21   arguable basis for jurisdiction.  This case is not the

22   exceptional -- exceptional circumstance that was referred to

23   by *Espinosa*.

24        In addition, we argue in our brief, and I'll get to in a

25   few moments, that both of the orders are justified under the

1    *Barton* doctrine.

2        Actually, before I go to that, Your Honor, I think Movants

3    are really trying to distinguish *Espinosa* by arguing that the

4    Court's order exculpating Mr. Seery for negligence liability

5    did not provide people, mom-and-pop investors, with the due

6    process informing them that they would not be able to assert

7    duty claims based upon mere negligence.  I think that's the

8    core of Mr. Bridges' argument, that, hey, you entered an

9    order, you gave this exculpation, it was inappropriate, and it

10    couldn't be done.

11        There are several problems with Movants' argument.  First,

12    Movants mischaracterize both the facts and the law in

13    connection with the Debtor's relationship with its investors.

14    The Debtor is the registered investment advisor for HCLOF as

15    well as approximately 15 to 18 CLOs.  The only investor in

16    HCLOF other than the Debtor is CLO Holdco.  The investors in

17    the CLOs are the retail funds advised by the Dondero advisors

18    and the other -- and other institutional investors.

19    Accordingly, the thousands of investors, the mom-and-pop

20    investors whose due process rights have allegedly been

21    trampled by the January 9th and July 16th orders, are not

22    investors in any funds managed by the Debtor.

23        And, of course, I have mentioned, as I've mentioned

24    before, no non -- non-Dondero investor, be it a mom-and-pop

25    investor, another institutional investor, anyone unrelated to

 1    Mr. Dondero, has ever appeared in this Court to challenge the

 2    Debtor's activities.

 3        But more fundamentally, Your Honor, the Debtor does not

 4    owe fiduciary duties to investors in any of the funds that the

 5    Debtor advises.  The fiduciary duty that the Debtor owes is to

 6    the funds themselves, not the investors in the funds.

 7        And while Movants point to Mr. Seery's prior testimony to

 8    support the argument that the Debtor owes a duty to investors,

 9    Mr. Seery was not testifying as a lawyer and his testimony

10    just cannot change the law.

11        As to each of the funds that the Debtor manages, HCLOF and

12    the CLOs, they were each provided with actual notice of the

13    January 16th -- the July 16th order and didn't object.  And as

14    Your Honor will recall, the Trustees for the CLOs, the party

15    that could potentially have claims for breach of fiduciary

16    duty, they participated in the January 9th hearing.  They came

17    to the Court and were concerned about the protocols that the

18    Debtor was agreeing to with the Committee.  We revised them.

19    The Trustees didn't object.  They didn't object then; they

20    didn't object now.  And, in fact, they consented to the

21    assumption of the contracts between the Debtor and the CLOs.

22        So the argument that the orders, by having this

23    exculpation for future conduct, violated due process rights of

24    anyone and is the type -- essentially, the type of order that

25    *Espinosa* would have contemplated could be attacked, is --

1  relies on faulty legal and factual premises.  No duty to

2  investors.  No private right of action.  And both -- and all

3  the funds received due process.

4      In addition, Your Honor, as we argue in our brief and I'll

5  get to in a few moments, both of the orders are justified

6  under the *Barton* doctrine, as Mr. Seery is entitled to

7  protection based upon how courts around the country have

8  interpreted the *Barton* doctrine.  As such, Mr. Seery is

9  performing his role both as an agent of the independent board

10 under the January 9th order, as a CEO under the July 16th

11 order, as a quasi-judicial officer.  And as Your Honor

12 examined in the *Ondova* opinion which you mentioned, trustees

13 are entitled to qualified immunity for damage to third parties

14 resulting from simple negligence, provided that the trustee is

15 operating within the scope of his duties and is not acting in

16 an *ultra vires* manner.

17     So, exculpating the independent directors, their agents,

18 and the CEO in the January 9th and July 16th orders was a

19 recognition by this Court that they would be entitled to

20 qualified immunity, much in the same way trustees are.

21     No doubt that Movants contend that this was error and that

22 the Court overreached.  However, the remedy for that overreach

23 was an appeal, not a reconsideration 16 months later.  The

24 Court's orders based upon the determination that in this

25 highly contentious case that these court officers needed to be

1  protected from negligence suits is not the exceptional case

2  where the Court lacked any arguable basis for jurisdiction.

3  Accordingly, this Court must follow *Espinosa*, *Shoaf*, *Stoll*,

4  and *Chicot* and reject the attack on the prior court orders.

5      The only case Movants cite to challenge the Supreme

6  Court's decision -- to challenge the Supreme Court precedent I

7  mentioned and the Fifth Circuit's *Shoaf* decision is the

8  *Applewood* case. *Applewood* is totally consistent with *Shoaf*.

9  *Applewood* also involved a plan that purported to release a

10  guaranty claim that the guarantor argued was res judicata in

11  subsequent litigation regarding the guaranty. The Fifth

12  Circuit held in that case that the plan was not res judicata.

13  It made that ruling because the plan did not contain clear and

14  unambiguous language releasing the guaranty. In that way, the

15  Fifth Circuit distinguished *Shoaf*.

16      *Applewood* and *Shoaf* are consistent. A Bankruptcy Court

17  order will be given res judicata effect, even if the Court

18  didn't have jurisdiction to enter it, if the order was clear

19  and unambiguous. In *Shoaf*, the release was. In *Applewood*, it

20  wasn't.

21      Movants argued on June 8th and argue now that the

22  *Applewood* case really argues -- really deals with prospective

23  exculpation of claims. I went back and read Mr. Bridges'

24  comments carefully of June 8th. He said *Applewood*,

25  exculpation. Well, that's just not correct. *Applewood* is all

about requiring specificity of a (garbled) to give it res judicata effect. Claims that existed at that time, were they described clearly and unambiguously? Yes? *Shoaf* applies. No? *Applewood* does -- applies.

So how should the Court apply these principles here? The Court approved a procedure for certain claims in the governance orders. The procedure: come to Bankruptcy Court before pursuing a claim against the independent directors and Seery or their agents so that the Court can make a colorability determination. Clear and unambiguous. The governance orders each provide that the Bankruptcy Court had jurisdiction to enter the orders, and the orders were not appealed.

Movants attempt to confuse the Court and argue *Applewood* is on point because the January 9th and July 16th orders do not clearly identify specific claims that Movants now have that are being released. And because they're not specific, then basically it's an ambiguous release and *Applewood* applies.

The problem with the Movants' argument is that neither the January 9th or July 16th orders released claims that existed at that time. If they did, and if there wasn't an adequate description, I might agree with Mr. Bridges that *Applewood* applied. But there were no claims. It was prospective. It was a standard of care. The Court clearly and unambiguously

1 said what the standard of care would be going forward.

2 Clearly, under *Shoaf* and Supreme Court precedent, they are

3 entitled to res judicata because it's a clear and unambiguous

4 provision. *Applewood* just simply doesn't apply.

5     Mr. Phillips at the last hearing made an impassioned plea

6 to the Court for a narrow interpretation of the exculpation

7 provisions in the January 9th and July 16th orders, and he

8 argued that the Court could not possibly have intended for the

9 exculpation for negligence to apply on a go forward basis.  He

10 thus argued to the Court that the Court should construe the

11 exculpation narrowly and only apply it to potential claims of

12 harm caused to the Debtor, as opposed to harm caused to third

13 parties, which he said included thousands of innocent

14 investors.

15     Of course, Mr. Phillips made those arguments unburdened by

16 the actual facts and the prior proceedings which led to the

17 entry of these orders, because, as he was the first to admit,

18 he only became involved in the case a month ago.

19     As the Court recalls, and as reinforced by Mr. Seery's and

20 Mr. Dubel's testimony I just mentioned, the exculpation

21 provisions were included precisely to prevent Mr. Dondero,

22 through any one of the entities he's owned and controlled, the

23 Movants being two of those, from asserting baseless claims

24 against the beneficiaries of those orders, exactly the

25 situation Mr. Seery now finds himself in.

1   And, again, it bears emphasizing:  throughout this case,

2   not one of the purported public investors Mr. Phillips

3   lamented would be prevented from holding Mr. Seery responsible

4   for his conduct has ever appeared in this case to object about

5   anything.  And none of the directors of the funds, the funds

6   where the Debtor acts as an investment adviser, have ever

7   stepped foot in this court, either.

8   Even if the Court declines to apply res judicata, Your

9   Honor, to prevent challenges to the governance orders, the

10  Court has the jurisdiction, had the jurisdiction to include

11  the gatekeeping provisions in those orders.  The Bankruptcy

12  Court derives its jurisdiction from 28 U.S.C. Section 157, and

13  bankruptcy jurisdiction is divided into two parts:  core

14  matters, which are those arising in or arising under Title 11,

15  and noncore matters, those matters which are related to a

16  Chapter 11 case.

17  Bankruptcy Courts may enter final orders in core

18  proceedings, and with the consent of parties, noncore

19  proceedings.  If a party does not consent to a final judgment

20  in the noncore matters or waives its right to consent, then

21  the Bankruptcy Court -- or does not waive its right to

22  consent, then the Bankruptcy Court issues a report and

23  recommendation to the District Court.

24  The seminal Fifth Circuit case on bankruptcy court

25  jurisdiction is the 1987 case of *Wood v. Wood*, 825 F.2d 90.

1    There, the Fifth Circuit held that the Bankruptcy Court has

2    related to jurisdiction over matters if the outcome of that

3    proceeding could conceivably have any effect on the estate

4    being administered in the bankruptcy.

5         More recently, the Fifth Circuit, in the 2005 case, in

6    *Stonebridge Tech's*, elaborated on when a matter has a

7    conceivable effect on the estate such as to confer Bankruptcy

8    Court jurisdiction.  There, the Fifth Circuit held that an

9    action is related to bankruptcy if the outcome could alter the

10   debtor's rights, liabilities, options, or freedom of action,

11   either positively or negatively, and which in any way impacts

12   upon the handling and the administration of the bankruptcy

13   estate.  It is against this backdrop, Your Honor, that the

14   Court should evaluate its jurisdiction to have entered the

15   orders.

16        So, again, what did the orders do?  They established

17   governance over the Chapter 11 debtor with new independent

18   directors being approved.  They established the procedures and

19   protocols of how transactions were going to be presented to

20   and approved by the Committee.  They vested in the Committee

21   certain related-party claims, and they provided for the

22   procedures parties would have to follow to assert any claims

23   against the independent directors and the CRO and the agents

24   and advisors.

25        Your Honor, it's hard to imagine that there is a more core

1  order than the entry of these orders.  At the time the orders

2  were entered, the Court was well aware of the potential for

3  acrimony from Mr. Dondero and his related entities, and

4  included the gatekeeper provisions to prevent the Debtor's

5  estate from being embroiled in frivolous litigation against

6  the board and the CEO.

7      Such protections were clearly within the Court's

8  jurisdiction, both to protect the administration of the estate

9  but also under applicable Fifth Circuit law dealing with

10 vexatious litigants, as set forth in the *Baum* and *Carroll*

11 cases that the Court cited in its confirmation order.

12     Not that it was hard to predict, but the last several

13 months have reinforced how important the gatekeeping

14 provisions in the order are and how important similar

15 provisions in the plan are.

16     The Court heard extensive testimony at the confirmation

17 hearing regarding the havoc continued litigation by Mr.

18 Dondero and his related entities would cause, which

19 predictions have unfortunately been borne out by the

20 unprecedented blizzard of litigation involving Mr. Dondero and

21 his related entities that has consumed the Court over the last

22 several months and caused the estate to incur millions of

23 dollars in fees that could have been used to pay its

24 creditors.

25     And these attacks are continuing.  As I mentioned before,

1    in addition to the DAF lawsuit, Sbaiti & Co. filed an action

2    against the Debtor on behalf of PCMG, another related entity,

3    alleging postpetition mismanagement of the Select Fund.

4         And to complete the hat trick, they are the lawyers

5    seeking to sue Acis in the Southern District of New York for

6    allegedly post-confirmation matters.

7         The Court knew then and certainly knows now that the

8    potential for sizable indemnification claims could consume the

9    estate.  The Court used that as the potential basis for

10   determining that the orders were within its jurisdiction, just

11   as it used that potential to justify the exculpation

12   provisions in the plan as being consistent with *Pacific*

13   *Lumber*.

14        Movants also ignore the cases -- and we cited in our

15   opposition -- where courts in this district, including Judge

16   Lynn in *Pilgrim's Pride* in 2010 and Judge Houser in the *CHC*

17   *Group* in 2016, approved gatekeeper provisions that provided

18   the Bankruptcy Court with exclusive jurisdiction to adjudicate

19   claims against postpetition fiduciaries.

20        Movants also ignore cases outside this district, including

21   *General Motors* and *Madoff*, which we cited in our brief as

22   examples of cases where Bankruptcy Courts have been used as

23   gatekeepers to determine if claims are colorable or being

24   asserted against the correct entity.

25        And there's another reason, Your Honor, why Movants may

1    now not contest the Court's jurisdiction to have entered those

2    orders.  Each of those orders, as I said before, include a

3    finding that the Court had core jurisdiction to enter the

4    orders.  No party contested that finding or refused to consent

5    to the core jurisdiction.

6         Under well-established Supreme Court precedent, parties

7    can waive their right to challenge the Bankruptcy Court's

8    jurisdiction, core jurisdiction, by failing to object.  In

9    *Wellness v. Sharif* in 2015, the Supreme Court expressly held

10   that Article III was not violated if parties knowingly and

11   voluntarily consented to adjudication of *Stern v. Marshall*-

12   type alter ego claims, and that the consent need not be

13   express, so long as it was knowing and voluntary.

14        And *Wellness* confirmed the pre-*Stern* opinion of the Fifth

15   Circuit in the 1995 *McFarland* case, which held that a person

16   who fails to object to the Bankruptcy Court's assumption of

17   core jurisdiction is deemed to have consented to the entry of

18   a final order by the Bankruptcy Court.

19        Your Honor, I'd now like to turn to the *Barton* doctrine.

20   The Court also has jurisdiction to have entered the orders

21   based upon the *Barton* doctrine.  The *Barton* doctrine dates

22   back to an old United States Supreme Court case and provides

23   as a general rule that, before a suit may be brought against a

24   trustee, consent from the appointing court must be obtained.

25        Movants essentially make two arguments why the *Barton*

doctrine doesn't apply.

First, Movants, without citing any authority, argue that it does not apply to Mr. Seery because he is not a trustee or receiver and was not appointed by the Court. Although the doctrine was originally applied to receivers, it has been extended over time to cover various court-appointed fiduciaries and their agents in bankruptcy cases, including debtors in possession, officers and directors of the debtor, and the general partner of the debtor. And although Mr. Bridges says he couldn't find one case that applied the *Barton* doctrine to a court-retained professional, I will now talk about several such cases.

In *Helmer v. Pogue*, a 2012 case cited in our brief, the District Court for the Northern District of Alabama extensively analyzed the *Barton* doctrine jurisprudence from the Eleventh Circuit and beyond and concluded that it applied to debtors in possession. The *Helmer* Court relied in part on a prior 2000 decision of the Eleventh Circuit in *Carter v. Rodgers*, which held that the doctrine applies to both court-appointed and court-approved officers of the debtor, which is consistent with the law in other circuits.

And subsequently, the Eleventh Circuit again considered -- and in that case, the distinction of a court-appointed as a court-retained professional was -- was not persuasive to the Court, and the Court held that a court-retained professional

can still have *Barton* protection, notwithstanding that he

wasn't appointed, the argument that Mr. Bridges tries to make.

And subsequently, --

THE COURT:  I wonder, was that -- was that Judge

Clifton Jessup, by chance?  Or maybe Bennett?

MR. POMERANTZ:  Your Honor, this was -- this was the

Eleventh Circuit *Carter v. Rodgers*, so I think Judge Jessup

was --

THE COURT:  Oh, I thought you were still talking

about the Alabama case.  No?

MR. POMERANTZ:  Yeah, the Alabama -- well, the

Alabama case referred to the Eleventh Circuit case, *Carter v.*

*Rodgers*, --

THE COURT:  Okay.

MR. POMERANTZ:  -- and the appointment and -- or

retention issue was discussed in the *Carter v. Rodgers* case.

THE COURT:  Okay.

MR. POMERANTZ:  And subsequently, the Eleventh

Circuit again considered the contours of the *Barton* doctrine

in *CDC Corp.*, a 2015 case, 2015 U.S. App. LEXIS 9718.  In that

case, which Your Honor referenced in your *Ondova* opinion,

which I will discuss in a few moments, the Eleventh Circuit

held that a debtor's general counsel who had been approved by

the Court, who was appointed by a chief restructuring officer

who was also approved by the Court, was covered by the *Barton*

1  doctrine for acts taken in furtherance of the administration

2  of the estate and the liquidation of the assets.

3  And the Eleventh Circuit last year, in *Tufts v. Hay*, 977

4  F.3d 204, reaffirmed that court-approved counsel who function

5  as the equivalent of court-appointed officers are entitled to

6  protection under *Barton*.  While the Court in that case

7  ultimately ruled that counsel could be sued without first

8  going to the Bankruptcy Court, it did so because it determined

9  that the suit between two sets of lawyers would not have any

10  effect on the administration of the estate.

11  So, Your Honor, not only is there authority, there is

12  overwhelming authority that Mr. Seery is entitled to the

13  protections.

14  In *Gordon v. Nick*, a District -- a case from 1998 from the

15  Fourth Circuit, the Court that the *Barton* doctrine applied to

16  a lawsuit against a general partner who was responsible for

17  administering the bankruptcy estate.

18  And as I mentioned, Your Honor, and as Your Honor

19  mentioned, Your Honor had reason to look at the *Barton*

20  doctrine in length and in depth in the 2017 *Ondova* opinion.

21  And in the course of the opinion, Your Honor discussed one of

22  the policy rationales for the doctrine, which you took from

23  the Seventh Circuit's *Linton* opinion, and you said as follows:

24  "Finally, another policy concern underlying the doctrine is a

25  concern for the overall integrity of the bankruptcy process

1    and the threat of trustees being distracted from or

2    intimidated from doing their jobs.  For example, losers in the

3    bankruptcy process might turn to other courts to try to become

4    winners there by alleging the trustee did a negligent job."

5        Here, the independent board was approved by the Court as

6    an alternative to the appointment of a Chapter 11 trustee.

7    And it and its agent, including Mr. Seery as the CEO, even

8    before the July 16th order, were provided protections in the

9    form of the gatekeeper order and exculpation.

10       I'm sure the Court has a good recollection of the January

11   9th hearing -- we've talked about it a lot in the proceedings

12   before Your Honor -- where the Debtor and the Committee

13   presented the governance resolution to Your Honor.  And as

14   Your Honor will recall, the appointment of the board was a

15   hotly-contested issue among the Debtor and the Committee and

16   was heavily negotiated.  And the appointment of the

17   independent board was even contested by the United States

18   Trustee at a hearing on January 20th, 2020.

19       I refer the Court to the transcripts of the hearings on

20   January 9th and January 20th of 2020, which clearly

21   demonstrate that appointing this board and giving it the

22   rights and protections and its agents the rights and

23   protections was not your typical corporate governance issue,

24   but it was essentially the Court's alternative to appointing a

25   trustee.  And recognizing that the members of the independent

1    board were essentially officers of the Court, the Court

2    approved the gatekeeper provision, requiring parties first to

3    come and seek the Court's permission before suing them, in

4    order to prevent them from being harassed by frivolous

5    litigation.

6        And the independent board was given the responsibility in

7    the January 9th order to retain a CEO it deemed appropriate,

8    and it did so by retaining Mr. Seery.

9        Recognizing the *Barton* doctrine as it applies to Mr. Seery

10    is consistent with a legion of cases throughout the United

11    States, and Movants' argument that Mr. Seery is not court-

12    appointed is just wrong.

13        Second, Your Honor, Movants cite without any authority,

14    argue that even if the *Barton* doctrine applied there is an

15    exception which would allow it to pursue a claim against Mr.

16    Seery without leave of the Court.

17        The Debtor agrees the 28 U.S.C. § 959 is an exception to

18    the *Barton* doctrine.  Section 959(a) provides that trustees,

19    receivers, or managers of any property, including debtors in

20    possession, may be sued without leave of the court appointing

21    them with respect to any of their acts or transactions in

22    carrying on business connected with such property.

23        As the Court also pointed out at the June 8th hearing, and

24    Mr. Bridges alluded to in his argument, the last sentence of

25    959(a) provides that such actions -- clearly referring to

1    actions that may be pursued without leave of the appointing

2    court -- shall be subject to the general equity power of such

3    court, so far as the same may be necessary to the ends of

4    justice.

5         And Mr. Bridges made a plea, saying you can't take away my

6    jury trial right there.  You just cannot do that.  Well, I

7    have two answers to that, Your Honor.  One, they relinquished

8    their jury trial right.  We've established that.  Okay?

9         The second is allowing Your Honor to act as a gatekeeper

10   has nothing to do with their jury trial right.  Allowing Your

11   Honor to act as a gatekeeper allows you to determine whether

12   the action could go forward, and it'll either go forward in

13   Your Honor's court or some other court.

14        And the argument that the exculpation was essentially a

15   violation of 959 is just -- is just -- it just is twisting

16   what happened.  You have an exculpation provision.  We already

17   went through the authority the Court had to give an

18   exculpation.  With respect to these litigants who are before

19   Your Honor -- we're not talking about anyone else who's coming

20   in to try to get relief from the order; we're talking about

21   these litigants -- we've already established that they were

22   here, they're bound by res judicata.  So their 959 argument

23   goes away.

24        And as the Court -- and separate and apart from that, the

25   issue at issue in the District Court litigation is -- is not

1  even subject to 959.

2      Mr. Bridges says, well, of course it is because it deals

3  with the administration of the estate.  I'd like to refer to

4  what the Court said -- this Court said in its *Ondova* opinion:

5  The exception generally applies to situations in which the

6  trustee is operating a business and some stranger to the

7  bankruptcy process might be harmed, such as a negligence claim

8  in a slip-and-fall case, and is inapplicable to suits based

9  upon actions taken to further the administering or liquidating

10 the bankruptcy estate.

11     And your *Ondova* opinion is consistent with the Third and

12 Eleventh Circuit opinions Your Honor cited in your opinion, as

13 well as numerous other --

14     (Interruption.)

15     MR. POMERANTZ:  -- from the -- from around the

16 country, including cases from the First, Second, Sixth,

17 Seventh, and Ninth Circuits.  And I'm not going to give all

18 the cites to those cases, but it's not a -- it's not a

19 remarkable proposition that Your Honor relied on in *Ondova*.

20     In addition, several of these cases, including the

21 Eleventh Circuit's *Carter* opinion, have been cited with

22 approval by the Fifth Circuit in *National Business Association

23 v. Lightfoot*, a 2008 unpublished opinion for this very point.

24 The *Barton* exception of 959 does not apply to actions taken in

25 the administration of the case and the liquidation of assets

1    in the estate.

2         Suffice it to say that it's clear that the Section 959

3    exception to *Barton* has no applicability in this case.

4    Movants, hardly strangers to the bankruptcy case, want to sue

5    Mr. Seery for acts taken relating to a settlement of very

6    complex and significant claims against the estate.  They want

7    to sue a court-appointed fiduciary for doing his job,

8    resolving claims against the estate and his management of the

9    bankruptcy estate.  And they want to do this outside of the

10   Bankruptcy Court.

11        Settlement of the HarbourVest claim, which is where this

12   claim arises under -- whether it's a collateral attack now or

13   not, and we say it is, is for another issue -- but it clearly

14   arises in the context of settlement of the HarbourVest claim,

15   is the quintessential act to further the administration and

16   liquidation of the bankruptcy estate, and certainly doesn't

17   fall within the 959 exception.

18        Movants seem to be arguing that 959(a) makes a distinction

19   between claims against Mr. Seery that damaged the Debtor and

20   claims against Mr. Seery that damaged third parties.  However,

21   the Movants make up that distinction, and it's not in the

22   statute, it's not in the case law.  The focus is not on who

23   the conduct damages, but it's rather on whether the conduct

24   was taken in connection with the administration or the

25   liquidation of the estate.

1    And even if the Debtor is wrong, Your Honor, which it's

2    not, the savings clause allows the Court to determine whether

3    leave to be -- sue will be granted.  Given that these claims

4    are asserted by Dondero-related entities, if not controlled

5    entities, no serious argument exists that the equities do not

6    permit this Court to determine if leave to sue is appropriate.

7    Accordingly, Movants' argument that the orders create this

8    tension with 959 is simply an over-dramatization.  And in any

9    event, Your Honor, there's a basis independent of *Barton* that

10   supports the jurisdiction to enter the orders, as I mentioned.

11   But even if the orders only relied on *Barton*, there is an

12   easy fix to Movants' concerns:  let them come to court and

13   argue that the type of suit they are bringing allegedly falls

14   within the exception of 959.

15   Your Honor, Movants argue that the Bankruptcy Court may

16   not act as a gatekeeper if it would not have jurisdiction to

17   deal with the underlying action.  They essentially argue that

18   an Article I judge may not pass on the colorability of a

19   claim, that it should be decided by an Article III judge.

20   This is the same argument, Your Honor, that Your Honor

21   rejected in connection with plan confirmation and which I

22   touched on earlier.

23   And the reason why Your Honor rejected it is because

24   there's no law to support it.  In fact, there is Fifth Circuit

25   law that holds to the contrary.  And we talked about a little

1  bit the Fifth Circuit case decided is *Villegas v. Schmidt* in

2  2015.  And *Villegas* is a simple case.  Schmidt was appointed

3  trustee over a debtor and liquidated its estate and the

4  Bankruptcy Court approved his final fees.  Four years later,

5  Villegas and the prior debtor sued Schmidt in District Court,

6  the district in which the Bankruptcy Court was pending,

7  arguing that he was negligent in the performance of his

8  duties.  The District Court dismissed the case because

9  Villegas failed to obtain Bankruptcy Court approval to bring

10  the suit under the *Barton* doctrine.

11       On appeal, Villegas argued *Barton* didn't apply for two

12  reasons.  First, that *Stern v. Marshall* created an exception

13  to the *Barton* doctrine for claims that the Bankruptcy Court

14  would not have the jurisdiction to adjudicate.  And second,

15  that *Barton* did not apply if the suit is brought in the

16  District Court, which exercises supervisory authority over the

17  Bankruptcy Court that appointed the trustee.  Pretty much the

18  argument that was made by Movants at the contempt hearing.

19       The Fifth Circuit rejected both arguments.  It held that

20  the existence of a *Stern* claim does not impact the Bankruptcy

21  Court's authority because *Stern* did not overrule *Barton* and

22  the Supreme Court had cautioned circuit courts against

23  interpreting later cases as impliedly overruling prior cases.

24       More importantly, the Fifth Circuit pointed to a post-

25  *Stern* 2014 case, *Executive Benefits v. Arkison*, 573 U.S. 25

1   (2014), which held that *Stern* does not decide how a Bankruptcy

2   Court or District Courts should proceed when a *Stern* creditor

3   is identified, as support for the argument that *Barton* is

4   still good law, even dealing with a *Stern* claim.

5        Second, the Fifth Circuit, joining every circuit to have

6   addressed the issue, ruled that the District Court and the

7   Bankruptcy Court are distinct from one another and the

8   Bankruptcy Court has the exclusive authority to determine the

9   colorability of *Barton* claims and that the supervisory

10  District Court does not.

11       Movants didn't address *Villegas* in their reply.  Briefly

12  tried to distinguish it, unconvincingly, today.  The bottom

13  line is *Villegas* is directly applicable.  Your Honor cited it

14  in the *Ondova* opinion for precisely the proposition that

15  *Barton* applies whether or not the Court has authority to

16  adjudicate the claim.

17       Accordingly, Your Honor, it was within the Court's

18  jurisdiction to require a party to seek approval of Your Honor

19  on the colorability of a claim before an action may be

20  commenced or pursued against the protected parties, even if

21  Your Honor wouldn't have authority to adjudicate the claim at

22  the end of the day.

23       In fact, some courts have even addressed the proper

24  procedure for doing so, requiring the putative plaintiff to

25  not only seek leave of Bankruptcy Court but also to provide a

1    draft complaint and a basis for the Court to determine if the

2    claim is colorable.

3        Movants have done neither, and they should not be

4    permitted to modify the final orders of the Court as a

5    workaround.

6        Your Honor, that concludes my presentation.  I'm happy to

7    answer any questions Your Honor may have.

8            THE COURT:  All right.  Not at this time.  All right.

9    I'm going to figure out, do we need a break or not, depending

10   on what Mr. Bridges tells me.  I assume we're just doing this

11   on argument today.  I think that's what I heard.  No witnesses

12   or exhibits.

13           MR. BRIDGES:  That is correct, Your Honor.

14           THE COURT:  Okay.  Mr. Bridges, how long do you

15   expect your rebuttal to take so I can figure out does the

16   Court need a break?

17           MR. BRIDGES:  Fifteen minutes plus whatever it takes

18   to submit agreed-to exhibits.

19           THE COURT:  Okay.  Let's take a five-minute bathroom

20   break.  We'll come back.  It's -- what time is it?  It's 1:11

21   Central time.  We'll come back in five minutes.

22           THE CLERK:  All rise.

23       (A recess ensued from 1:11 p.m. until 1:17 p.m.)

24           THE CLERK:  All rise.

25           THE COURT:  All right.  Please be seated.  We're

1    going back on the record in the Highland matters.

2         Mr. Bridges, time for your rebuttal.  I want to ask you a

3    question right off the bat.  Mr. Pomerantz pointed out

4    something that was on my list that I forgot to ask you when

5    you made your initial presentation.  What is the authority

6    you're relying on?  You did not cite a statute or a rule *per*

7    *se*, but I guess we can probably all agree that Bankruptcy Rule

8    9024 and Federal Rule 60 is the authority that would govern

9    your motion, correct?

10        MR. BRIDGES:  I don't agree, Your Honor.  I don't

11   believe this is a final order that we're contesting here.  And

12   I think that's demonstrated by the Court's final confirmation

13   -- plan -- plan confirmation order that seeks to modify this

14   order or will modify this order upon being -- being effective.

15   So I don't think so.

16        In the alternative, if we are challenging a final order,

17   then I think you're right as to the rules that would be

18   controlling.

19        THE COURT:  All right.  Well, let me back up.  Why

20   exactly do you say this would be an interlocutory order as

21   opposed to a final order?

22        MR. BRIDGES:  Because of its nature, Your Honor.

23   While the appointment in the order or the approval of the

24   appointment in the order might, as a separate component of the

25   order, have -- have finality, the provisions -- the provisions

1  in it relating to gatekeeping and exculpation are, we think,

2  by their very nature, quite obviously interlocutory and not

3  permanent.  They don't seem to indicate an intention by any of

4  the parties that, 30 years from now, if Mr. Seery is still CEO

5  at Highland, long after the bankruptcy case has ended, that

6  nonetheless parties would be prohibited from bringing claims,

7  strangers to this action would be prohibited from bringing

8  claims related to his CEO role.

9      I think the nature of it demonstrates that, the

10  modifications to it, and even the inclusion of it in the final

11  plan confirmation, as well as -- can't read that.

12         THE COURT:  Can you give me some authority?  Because

13  as we know, there's a lot of authority out there in the

14  bankruptcy universe on what discrete orders are interlocutory

15  in nature that a bankruptcy judge might routinely enter and

16  which ones are final.  You know, it would just probably, if I

17  flipped open *Collier's*, I could -- you know, it would be mind-

18  numbing.

19      So what authority can you rely on?  I mean, is there any

20  authority that says an employment order is not a final order?

21  That would be shocking to me if you have cases to that effect,

22  but, I mean, of course, sometimes we do interim on short

23  notice and then final.  But this would be shocking to me if

24  there is case authority to support the argument this is not a

25  final order.  But I learn something new every day, so maybe I

1   would be shocked and there is.

2           MR. BRIDGES: Your Honor, I'd point you to *In re*

3 *Smyth*, 207 F.3d 758, and *In re Royal Manor*, 525 B.K. 338

4 [sic], for the proposition that retaining a bankruptcy

5 professional is an interlocutory order.

6           THE COURT: Okay. Stop for a moment. The *Smyth*

7 case. Which court is that?

8           MR. BRIDGES: Fifth Circuit.

9           THE COURT: Okay. So tell me the facts. I'm

10 surprised I don't know about this case. But, again, I don't

11 know every case. So, it held that an employment order is an

12 interlocutory order?

13           MR. BRIDGES: Appointing counsel. A professional in

14 the bankruptcy context, Your Honor.

15           THE COURT: Counsel for a debtor-in-possession? An

16 order approving counsel was an interlocutory order?

17           MR. BRIDGES: Yes, or the Trustee's counsel.

18           THE COURT: Or the Trustee's counsel? Okay. What

19 were the circumstances? Was this on an expedited basis and

20 there wasn't a follow-up final order, or what?

21           MR. BRIDGES: Your Honor, I don't have -- I don't

22 have that at the tip of my memory. I'm sorry.

23           THE COURT: Okay. And the other one, 525 B.R. 338,

24 what court was that?

25           MR. BRIDGES: It's a Bankruptcy Court within the

1    Sixth Circuit.  I'm not certain which district.

2            THE COURT:  All right.  Well, maybe one of you two

3    over there can look them up and give me the context, because

4    that is surprising authority.  Or other lawyers on the WebEx

5    maybe can do some quickie research.

6      Okay.  We'll come back to that.  But assuming that this

7    was a final order, which I have just been presuming it was,

8    Rule 60 is the authority you're going under?  9024 and Rule

9    60, correct?

10           MR. BRIDGES:  Your Honor, we have not invoked those

11   rules.  Alternatively, I think you're right that they would

12   control if we are wrong about the interlocutory nature of the

13   order.

14           THE COURT:  Well, you have to be going under certain

15   -- some kind of authority when you file a motion.  So I'm --

16           MR. BRIDGES:  As an alternative --

17           THE COURT:  I'm approaching this exactly, I assure

18   you, as the District Court or a Court of Appeals would.  You

19   know, you start out, what is the legal authority that is being

20   invoked here?

21           MR. BRIDGES:  Well, --

22           THE COURT:  So I just assume Rule 60.  I can't, you

23   know, come up with anything else that would be the authority.

24           MR. BRIDGES:  Yes, Your Honor.  You also have

25   inherent power to modify orders that are in violation of the

1    law.  And we pointed you to --

2            THE COURT:  Now, is that right?  Is that really

3    right?  Why do we have Rule 60 if I can just willy-nilly, oh,

4    I feel like I got that wrong two years ago?  I can't do that,

5    can I?  Rule 60 is the template for when a court can do that.

6    Parties are entitled to rely on orders of courts.  And that's

7    why we have Rule 60, right?  So, --

8            MR. BRIDGES:  Your Honor, I think -- I think that

9    we're miscommunicating.  I'm trying not to rely on Rule 60 in

10   the first instance because in the first instance we view this

11   as not a final order.  So, in the first instance, --

12           THE COURT:  I got that.  And I've got my law clerks

13   looking up your cases to see if they convince me.  But I'm

14   asking you to go to layer two.  Assuming I don't agree with

15   you these are final orders, what is your authority for the

16   relief you're seeking?

17           MR. BRIDGES:  Yes, Your Honor.  Rule 60 would apply

18   in the alternative.

19           THE COURT:  All right.

20           MR. BRIDGES:  That's correct.

21           THE COURT:  So, which provision?  Which provision of

22   Rule 60?  (b) what?

23           MR. BRIDGES:  Your Honor, I'm not prepared to concede

24   any of them.  I don't have the rule in front of me.

25           THE COURT:  You're not prepared to concede what?

1          MR. BRIDGES:  Any of the provisions of Rule 60.  Just

2  (b)(1), (b)(2), especially, but I'm -- I'm -- Rule 60 is our

3  basis, as is the particulars (b)(1), (2), (6) --

4     (Garbled audio.)

5          THE COURT:  Okay.  You're breaking up.  Can you

6  restate?

7          MR. BRIDGES:  (b)(1), (2), and (6), as -- as well as

8  any other provision, Your Honor, of Rule 60.

9          THE COURT:  Okay.  Well, so (1), mistake,

10  inadvertence, surprise, excusable neglect.  Which one of

11  those?

12          MR. BRIDGES:  All of the above, Your Honor.

13          THE COURT:  Surprise?  Who's surprised?

14          MR. BRIDGES:  Your Honor, I think every potential

15  litigant who discovers that your order purports to bar

16  prospective unaccrued claims at the time the order issued

17  would be surprised.

18    Frankly, I think Mr. Seery would be surprised, given his

19  testimony that he owes fiduciary duty -- duties that he must

20  abide by and that he appears to have, as I continue to

21  represent to clients, to advisees, and to the SEC, that those

22  duties are owing.

23          THE COURT:  Okay.  I'm giving you one more chance

24  here to make clear on the record what provision of Rule 60(b)

25  are you relying on, okay?  I need to know.  It's not in your

1  pleading.

2          MR. BRIDGES:  Your Honor, --

3          THE COURT:  So tell me specifically.  I can only --

4          MR. BRIDGES:  -- (b)(1) --

5          THE COURT:  -- come up with a result here if I know

6  exactly what's being presented.

7          MR. BRIDGES:  Your Honor, (b)(1), (b)(2), and (b)(6)

8  --

9          THE COURT:  Which, okay, there are multiple parts to

10  (1).  You're saying somebody's surprised by the ruling.  I

11  don't know who.  Really, all that matters is your client, the

12  Movants.  You're saying, even though they participated, --

13          MR. BRIDGES:  Yes, Your Honor.

14          THE COURT:  -- got notice, they're somehow surprised?

15  Why are they surprised?

16          MR. BRIDGES:  Yes, Your Honor.

17          THE COURT:  Do you have evidence of their surprise?

18          MR. BRIDGES:  Your Honor, our brief shows the

19  intentions of all involved were not the interpretation of that

20  order being advanced at this -- at this point in time.  And

21  so, yes, I believe that is evidence.  The transcripts of the

22  hearings I believe evidence that as well, that the

23  understanding of everyone involved was not that future --

24  unspecified future claims that had not accrued yet would be

25  released under (b)(1).  Yes, Your Honor.

1      THE COURT:  Okay.

2      MR. BRIDGES:  Under (b)(2), --

3      THE COURT:  I don't have any evidence of that.  All I

4  have is the clear wording of the order.  Okay.  Let me just --

5  just let me go through this.

6      Assuming Rule 60 (1) through (6) are what you're arguing

7  here, what about Rule 60(c):  a motion under Rule 60(b) must

8  be made within a reasonable time?  We're now 11 months --

9      MR. BRIDGES:  Your Honor, --

10      THE COURT:  We're now 11 months past the July 2020

11  order.  What is your authority for this being a reasonable

12  time?

13      MR. BRIDGES:  Yes, Your Honor.  If I may back up one

14  step before answering your question.  Under (b)(2), we're

15  relying on newly-discovered evidence that was discovered in

16  late March and caused both the filing of this motion and the

17  filing of the District Court action.

18      Under (b)(4), we believe that the order is --

19      THE COURT:  Let me stop.  Let me stop.  What is my

20  evidence that you're putting in the record that's newly

21  discovered?

22      MR. BRIDGES:  The evidence is detailed in the

23  complaint that is in the record.  You know, --

24      THE COURT:  That's not evidence.

25      MR. BRIDGES:  -- honestly, Your Honor, --

1           THE COURT:  That is not evidence.  Okay?  A lawyer-

2  drafted complaint in another court is not evidence.  Okay?

3           MR. BRIDGES:  Your Honor, I think, to be technical,

4  that there is not a record yet, that we have evidence yet to

5  be admitted on our exhibit list.  I believe in this

6  circumstance -- I understand that, in general, allegations in

7  a pleading are not evidence.  In this instance, when we're

8  talking about whether or not new facts led to the filing of a

9  lawsuit, I do believe that the allegations in the lawsuit are

10  evidence of those new facts.

11           THE COURT:  All right.  Go on.

12           MR. BRIDGES:  Under (b)(4), we believe the order is,

13  in part, void.  It is void because of the jurisdictional and

14  other defects noted in our argument.

15    And also, under (b)(6) (garbled) ground for relief that

16  we're appealing to the equitable powers of this Court to

17  correct errors and manifest injustice towards not just the

18  litigants here but to correct the order of the Court to make

19  it comply with -- with the law, with the statutes promulgated

20  by Congress and to respect the jurisdiction of the District

21  Court.

22           THE COURT:  All right.  Do you agree with Mr.

23  Pomerantz that the case law standard for Rule 60(b)(4) is

24  exceptional circumstances?  It's only applied so that a

25  judgment is voided in exceptional circumstances.  Do you

1     disagree with that case authority?

2               MR. BRIDGES:  I would -- I would agree, in part, that

3     unusual circumstances is not the ordinary case.  I'm not

4     entirely sure what you mean by exceptional, but I think we're

5     on the same page.

6               THE COURT:  Okay.  It's not what I mean.  That's just

7     the case law standard.  And I'm asking, do you agree with Mr.

8     Pomerantz that that is the standard set forth in case law when

9     applying 60(b)(4)?  There have to be some sort of exceptional

10    circumstances where there's just basically no chance the Court

11    had authority to do what it did.

12              MR. BRIDGES:  Out of the ordinary would be the phrase

13    I would use, Your Honor.

14              THE COURT:  Okay.  So I guess then I'll go from

15    there.  Is it your argument that gatekeeping provisions in the

16    bankruptcy world are out of the ordinary?

17              MR. BRIDGES:  The exculpation of Mr. Seery for

18    liability falling short of gross negligence or intentional

19    wrongdoing in connection with his continuing to conduct the

20    business of the Debtor as an investment advisor subject to the

21    Advisers Act, yes, I would say that is out of the ordinary,

22    that it is extraordinary, that it is --

23              THE COURT:  Okay.  What is your authority or evidence

24    on that?  Because this Court approves exculpation provisions

25    regularly in connection with employment orders, and pretty

Case 19-3405, Document 115, 06/30/2021, 3130521, Page79 of 122
Case 1:14-cv-01050-VM Document 115 Filed 06/30/21 Page 78 of 122

78

1   much every judge I know does.  In fact, I'm wondering why this

2   isn't just a term of compensation.  You know, he's going to do

3   x, y, z in the case.  His compensation is going to be a, b, c,

4   d, e.  And by the way, we're going to set a standard of

5   liability for his performance as CEO or investment banker,

6   financial advisor, whatever, so that no one can sue him

7   regarding his performance of his job duties unless it rises to

8   the level of gross negligence, willful misconduct.

9        It's a term of employment that, from my vantage point,

10  seems to be employed all the time.  So it would be anything

11  but exceptional circumstances.  Do you have authority or

12  evidence --

13            MR. BRIDGES:  Your Honor, frankly, --

14            THE COURT:  -- to the contrary?

15            MR. BRIDGES:  Your Honor, frankly, I'm astonished at

16  your view of that situation, that it would merely be a term of

17  his employment, that vitiates the entire fiduciary duty

18  standard created by the Advisers Act that tells him, with

19  hundreds of millions of dollars of assets under management for

20  people he's advising as a registered investment advisor,

21  people he's advising who believe that he has a fiduciary duty

22  to them and that it's enforceable, that the SEC, who monitors,

23  believes he has an enforceable fiduciary duty to those people,

24  and that he's testified that he has fiduciary duties to those

25  people, and that Your Honor is saying no, just as a regular

1    term of employment we have undone the Advisers Act's

2    imposition of an unwaivable fiduciary duty.

3         Your Honor, the order is void to the extent that it

4    attempts to do so.

5         This is not an ordinary employment agreement, Your Honor.

6    This is an attempt to exculpate someone from the key thing

7    that our entire investment system depends upon, regulation by

8    the SEC and the requirement in investment advisors to act as

9    fiduciaries when they manage the money of another.

10        It would be the equivalent of telling lawyers who are

11   appointed in a bankruptcy proceeding that they don't have any

12   duties to their client, or at least not fiduciary duties.

13   That the lawyers merely owe a duty not to be grossly negligent

14   to their clients.  That's not an ordinary term of employment,

15   Your Honor.

16             THE COURT:  All right.  So I guess we're back to my

17   question, was this brought within a reasonable time under Rule

18   60(c)?

19             MR. BRIDGES:  It was brought very quickly after the

20   new evidence was discovered at the end of March, Your Honor,

21   yes.

22             THE COURT:  Okay.  Well, I guess I'll just ask you

23   one more question before you continue on with your rebuttal

24   argument.  I mean, again, I want your best argument of why

25   *Villegas* doesn't absolutely permit the gatekeeping provisions

1   that you're challenging.  And many cases were cited by Mr.

2   Pomerantz in his brief where courts have extended the *Barton*

3   doctrine to persons other than trustees.  And so what is your

4   best rebuttal to that?

5            MR. BRIDGES:  Your Honor, we've already given it.

6   I'm afraid --

7            THE COURT:  Okay.  If you don't want to say more, --

8            MR. BRIDGES:  -- what I have is not --

9            THE COURT:  -- I'm not going to make you say more.

10           MR. BRIDGES:  I --

11           THE COURT:  I'm just telling you what's on my brain.

12           MR. BRIDGES:  I do.  I want to -- I am apologizing in

13   advance for repeating, but yes, *Villegas*, *Villegas*, however

14   that case is pronounced, says that *Stern* is not an exception

15   to the *Barton* doctrine.

16           THE COURT:  Uh-huh.

17           MR. BRIDGES:  959(a) is an exception to the *Barton*

18   doctrine.  You are not operating under the *Barton* doctrine

19   here.  Even counsel's brief, the Debtor's brief, doesn't say

20   *Barton* applies.  It says it's consistent with *Barton*.

21      Your Honor, in our previous hearing, you directed me to

22   the second sentence of 959(a) because you believe it's what

23   empowers you to do the gatekeeping.  It limits the gatekeeping

24   that you can do by protecting jury rights, the right to trial,

25   says you cannot discharge, undo, deprive a litigant of their

1   right to a trial, a jury trial.

2              THE COURT:  Well, you mentioned it again, jury trial

3   rights.  Do you have any argument --

4              MR. BRIDGES:  Yes, Your Honor.

5              THE COURT:  -- of why that hasn't flown out the

6   window?

7              MR. BRIDGES:  Yes, Your Honor.  I am told that

8   Section 14(f) that counsel for the Debtor referred to is not a

9   waiver of jury rights at all.  It is an arbitration agreement.

10  Your Honor is probably familiar how arbitration agreements

11  work, is that they need not be elected.  They need not be

12  invoked by the parties.  When they are, they create a

13  situation where arbitration may be required.  But a waiver of

14  a jury right outside of arbitration is not part of this

15  arbitration clause, or of any.  The issue is not briefed or in

16  evidence before the Court.  We're relying on representations

17  of counsel as to what that provision contains.  That Mr. Seery

18  wasn't even a party to that agreement, the advisory agreement,

19  with the Charitable DAF.  The arbitration agreement is subject

20  to defenses that are not at issue here before the Court.  That

21  Movants' rights, their contractual rights to invoke the

22  arbitration clause, also appear to be terminated by the

23  orders' assertion of sole jurisdiction in this matter.

24      Your Honor, yes, our jury rights survive Section 14(f) in

25  the advisory agreement with the DAF for all of those potential

 1 | reasons.

 2 |     On top of that, it doesn't go to all of our causes of

 3 | action.  It goes to the contract cause of action.  And to the

 4 | extent they can argue that the other claims are subject to

 5 | arbitration, that also is a defense and -- defensible and

 6 | complex issue requiring the application of the Federal

 7 | Arbitration Act, requiring consideration of the Federal

 8 | Arbitration Act, which this Court doesn't have jurisdiction to

 9 | do under 157(d).

10 |        THE COURT:  What?  Repeat that.

11 |        MR. BRIDGES:  Yes.  This Court does not have

12 | jurisdiction to determine whether or not arbitration --

13 | arbitration is enforceable due to the mandatory withdrawal of

14 | the reference provisions of 157(d).

15 |        THE COURT:  That's just not consistent with Fifth

16 | Circuit authority.  *National Gypsum*.  What are some of these

17 | other arbitration cases?  I've written an article on it.  I

18 | can't remember them.  That's just not right.  Bankruptcy

19 | courts look at arbitration clauses all the time.  Motions to

20 | compel arbitration.

21 |        MR. BRIDGES:  Your Honor, under 157(d), in the

22 | circumstances of this case, if the Court is going to take into

23 | consideration an arbitration clause under the Federal

24 | Arbitration Act, when that clause is not in evidence and is

25 | not before the Court, then Movants respectfully move to

1    withdraw the reference of your consideration of that issue and

2    of any proceeding and ask that you would issue only a report

3    and recommendation rather than an order on that issue.

4              THE COURT:  Okay.  I regret that we even got off on

5    this trail.  I'm sorry.  So just proceed with your rebuttal

6    argument as you had envisioned it, Mr. Bridges.

7              MR. BRIDGES:  Thank you, Your Honor.

8         Debtor's counsel says there's no private right of action

9    under the Advisers Act.  That is both inaccurate and

10   misleading.  The Advisory Act creates, imposes fiduciary

11   duties that state law provides the cause of action for.  It is

12   a state law breach of fiduciary duty claim regarding --

13   regarding fiduciary duties imposed as a matter of law by the

14   Investment Advisers Act that is Count One in the District

15   Court action.

16        Furthermore, that Act does create a private right of

17   action for rescission.  That would be rescission of the

18   advisory agreement with the Charitable DAF, not rescission of

19   the HarbourVest settlement.

20        Second, Your Honor, the notion that this Court has related

21   to jurisdiction is irrelevant and beside the point.  I would

22   like to note for the record that the District Court civil

23   cover sheet that omitted to state that this was a related

24   action has been corrected, has been amended, and that that has

25   taken place.

 1      Counsel for the Debtor also appears to agree with us that

 2   the order ought to be modified for having asserted exclusive

 3   jurisdiction over colorable claims to the extent it's not

 4   legally permissible to do.  And in trying to invoke the

 5   discussions between us as to how the orders might be fixed,

 6   what counsel does is tries to cabin the legally-permissible

 7   caveat to just the second half of the paragraph at issue.  It

 8   is both -- both portions, the gatekeeping and the subsequent

 9   hearing of the claims, that should be limited to the extent it

10   would be impermissible legally for this Court to make those

11   decisions.

12      On top of that, Your Honor, merely stating "to the extent

13   legally permissible" would result in a considerable amount of

14   ambiguity in the order that would lead it, I fear, to be

15   unenforceable as a matter of law.

16      Next, Your Honor, when Debtor's counsel talks about the

17   authority in this case, it feels like we're ships passing in

18   the night.  He says that we're wrong in asserting that no case

19   we can find involves both the *Barton* doctrine and the

20   application of the business judgment rule where the Court is

21   asked to defer, and he mentions cases that apply the *Barton*

22   doctrine to an approval rather than an appointment.  The Court

23   is asked to --

24      (Garbled audio.)

25          THE COURT:  I lost you for a moment.  Could you

1    repeat the last 30 seconds?

2            MR. BRIDGES:  Thank you, Your Honor.  Yes.  He points

3    -- opposing counsel points us to case law where the *Barton*

4    doctrine has been applied despite the Bankruptcy Court having

5    merely approved rather than appointed the trustee or the, I'm

6    sorry, the professional.  But in doing so, he doesn't

7    reference any case that has done so in the context of business

8    judgment rule deference.  It's like we're ships passing in the

9    night.

10       What we're saying isn't that a mere approval can never

11   rise to the level of the *Barton* doctrine.  What we're saying

12   is that, in combination with the business judgment rule

13   deference, the two cannot go together.  There's no authority

14   for saying that they do.

15       We -- I further feel like we're ships passing in the night

16   when he talks about *Shoaf*.  Counsel says that in *Shoaf* there

17   was a confirmed final plan and it specifically identified the

18   released guaranty.  And yeah, that distinguishes it from this

19   case, just as it distinguished -- just as the *Applewood Chair*

20   case distinguished it when there's not that specific

21   identification.  And here, we don't even have a final plan

22   confirmation at the time these orders are being issued.

23   Without that express -- express notion of what the claims are

24   being discharged, *Shoaf* doesn't apply.

25       There, there was a guaranty to a party on a specific

1   indebtedness that was listed, identified with specificity, and

2   disappeared as a result of the judgment, as a result of the

3   judgment in the underlying case.  Here, we're talking about

4   any potential claim that might arise in the future.  As of the

5   July order's issuance, it didn't apply on its -- either it

6   didn't apply to future claims that had not yet accrued or else

7   in violation of *Applewood Chair*, it was releasing claims

8   without identifying them.

9       Who does Seery owe a fiduciary duty to?  Is it, as

10  Debtor's counsel says, only to the funds and not to the

11  investors, or does he also owe those duties to the investors

12  as well?  Your Honor, that is going to be a hotly-contested

13  issue in this litigation, and it involves -- it requires

14  consideration of the Advisers Act and the multitude of

15  accompanying regulations.  To just state that his fiduciary

16  duties are limited in a way that couldn't affect anyone that

17  is -- whose claims are precluded by the July order is both

18  wrong on the law and is invoking something that will be a

19  hotly-contested issue that falls under 157(d), where, again,

20  this Court doesn't have the jurisdiction to decide that, other

21  than in a report and recommendation.

22      The order is legally infirm because it's issued without

23  jurisdiction for doing that as well.

24      Finally, Your Honor, I think (garbled) wrong direction

25  with a statement that suggests that Mr. Seery is an agent of

1    the independent directors under the January order.  He is, in

2    fact, not an independent agent -- not an agent of any of the

3    independent directors, but, at most, of the company that is

4    controlled by the board, not -- not of individual directors

5    who could confer on him -- who could confer on him any

6    immunity that they have obtained from the January order just

7    by having appointed him.

8        The proposed order from the other side failed to address

9    either the ambiguity in the order or its attempt to exculpate

10   Mr. Seery from the liability, including liability for which

11   there is a jury trial right, and it is not a fix to the

12   problem for that reason.

13       In order to make the order enforceable and to fix its

14   infirmities, the Court would have to do significantly more.

15   It would have to both apply the caveat from the final

16   confirmation plan order, rope that caveat to the first part of

17   the relevant paragraph, as well as the second part, and it

18   would have to provide directive clarity to be enforceable

19   rather than too vague.

20       Your Honor, I think that's all I have.

21           THE COURT:  Okay.  Just FYI, my law clerk pulled the

22   *Smyth* case from 21 years ago from the Fifth Circuit.  And

23   while it more prominently deals with the issue of whether

24   trustees -- in this case, it was a Chapter 11 trustee -- could

25   be subjected to personal liability for damages to the

1    bankruptcy estate --

2        (Echoing.)

3            THE COURT:  Someone, put your phone on mute.  I don't

4    know who that is.

5        It dealt with, you know, the standard of liability, that

6    the trustee could not be sued for matters not to the level of

7    gross negligence.

8        But it does say, in the very last paragraph, to my shock

9    and amazement, that -- it's just one sentence in a 10-page

10   opinion -- orders appointing counsel -- and it was talking

11   about the trustee's lawyer he hired to handle appeals to the

12   Fifth Circuit -- orders appointing counsel under the

13   Bankruptcy Code are interlocutory and are not generally

14   considered final and appealable.  And it cites one case from

15   1993, the Middle District of Florida.  Live and learn.  There

16   is one sentence in that opinion that says that.  But I don't

17   know that it's hugely impactful here, but I did not know about

18   that opinion and I'm rather surprised.

19       All right.  You were going to walk me through evidence,

20   you said?

21           MR. BRIDGES:  Well, do I -- Your Honor, do you want

22   to do that first before I submit --

23           THE COURT:  Yes, please.

24           MR. BRIDGES:  -- my rebuttal argument?

25           THE COURT:  Please.

1           MR. BRIDGES:  Okay.

2           THE COURT:  Uh-huh.

3           MR. BRIDGES:  Your Honor, we would submit and offer

4   Exhibits 1 through 44, with the exception of those that have

5   been withdrawn, that are 2, 13 --

6           THE COURT:  Okay.  Slow down.  Slow down.  I need to

7   get to the docket entry number we're talking about.  Are we

8   talking -- are your -- the Debtor's exhibits are at 2412.  But

9   Nate, I misplaced my notes.  Where are Charitable DAF and

10  Holdco's?

11          THE CLERK:  I have 2411.

12          THE COURT:  2411?  Is that it?

13          MR. BRIDGES:  2420, Your Honor.

14          THE COURT:  2420?  Okay.  Give me a minute.  (Pause.)

15  2420?

16          MR. BRIDGES:  Yes, Your Honor.

17          THE COURT:  Okay, I'm there.  And it's which

18  exhibits?

19          MR. BRIDGES:  It's Exhibits 1 through 44, Your

20  Honor, with four exceptions.  We have agreed to withdraw

21  Exhibit 2, 13, 14, and 29.

22          THE COURT:  All right.

23          MR. BRIDGES:  Also, Your Honor, we'd like to submit

24  Debtor's Exhibit 1, which is under Exhibit 49 on our list,

25  would be anything offered by the other side.  But we'd like

1  to make sure that Debtor's Exhibit 1 gets in the record as

2  well.

3  THE COURT:  Let me back up.  When I pull up the

4  docket entry you just told me, I have Exhibits 44, 45, and 46

5  only.  Am I misreading this?

6  MR. BRIDGES:  I have a chart showing Exhibits 1

7  through 49 titled Docket 2420 filed 6/7/21.

8  THE COURT:  Okay.  The docket entry number you told

9  me, 2420, it only has three exhibits:  44, 45, and 46.  So,

10  first off, I understand -- are you offering 45 and 46 or not?

11  MR. BRIDGES:  No, Your Honor.

12  THE COURT:  Okay.  So you said you were offering 1

13  through 44 minus certain ones.  44 is here.

14  MR. BRIDGES:  Yes.

15  THE COURT:  But I've got to go back to a different

16  docket number.

17  THE CLERK:  It's actually 2411.

18  THE COURT:  It's at 2411.  That has all the others?

19  THE CLERK:  Yes.

20  THE COURT:  Okay.

21  So, Mr. Pomerantz, do you have any objection to Exhibits

22  1 through 44, which he's excepted out 2, 13, 14, and 29, and

23  then he's added Debtor's Exhibit 1?  Any objection?

24  MR. POMERANTZ:  I don't believe so.  I just would

25  confirm with John Morris, who has been focused on the

 1  exhibits, just to confirm.

 2          THE COURT:  Mr. Morris?

 3          MR. MORRIS:  No objection, Your Honor.  It's fine.

 4          THE COURT:  Okay.  They're admitted.

 5      (Movants' Exhibits 1, 3 through 12, 15 through 28, and 30

 6  through 44 are received into evidence.  Debtor's Exhibit 1 is

 7  received into evidence.)

 8          THE COURT:  So, any --

 9          MR. BRIDGES:  Thank you, Your Honor.

10          THE COURT:  Anything you wanted to call to my

11  attention about these?

12          MR. BRIDGES:  Your Honor, the things that we

13  mentioned in the argument, for sure, but especially that the

14  word "trustee" is not used in the January hearing's

15  transcript, nor is it under discussion in that transcript

16  that it would be a trustee-like role being played by the

17  Strand directors, as well as the transcript of the July

18  hearing on the order at issue here, Your Honor, where you are

19  asked to defer both in that transcript and in the motion, the

20  motion that was at issue in that hearing, you are asked to

21  defer to the business judgment of the company.

22      And finally, Your Honor, I'd ask you to look at the

23  allegations in the District Court complaint.

24          THE COURT:  All right.

25      Mr. Pomerantz or Morris, let's see what exhibits you're

1    wanting the Court to consider.  Your exhibits, it looks like,

2    are at Docket Entry 2412.

3              MR. MORRIS:  As subsequently amended at 2423.

4              THE COURT:  Oh.  All right.  So which ones are you

5    offering?

6              MR. MORRIS:  We're offering all of the exhibits on

7    2423, which is 1 through 17.

8         (Echoing.)

9              THE COURT:  Whoops.  We got some distortion there.

10   Say again?

11             MR. MORRIS:  Yeah.  All of the exhibits that are on

12   2423, which are Exhibits 1 through 17.  But I want to make

13   sure that, as I did earlier, that that has the exhibits that

14   we're relying on.  Does that --

15        (Pause.)

16             THE COURT:  Okay.  Let me make sure I know what's

17   going on here.  You're double-checking your exhibits, Mr.

18   Morris?

19             MR. MORRIS:  Yes, Your Honor.

20             THE COURT:  Okay.

21        (Pause.)

22             MR. MORRIS:  Your Honor, we start with Docket No.

23   2419, --

24             THE COURT:  Okay.

25             MR. MORRIS:  -- which was the amended exhibit list.

1  And that actually had Exhibits 1 through 17.  And then that

2  was amended at Docket 2423.  So, the exhibits on both of

3  those lists.

4         THE COURT:  Well, they're one and the same, it looks

5  like, right?

6         MR. MORRIS:  Yes.

7         THE COURT:  Okay.  So you're offering those?

8         MR. MORRIS:  I think -- yeah.

9         THE COURT:  Any objection?

10         MR. BRIDGES:  No objection.

11         THE COURT:  All right.  They're admitted.

12     (Debtor's Exhibits 1 through 17 are received into

13  evidence.)

14         MR. POMERANTZ:  Your Honor, if I may take a few

15  moments to respond to Mr. Bridges' reply?

16         THE COURT:  All right.  Is he still within his hour

17  and a half?

18         THE CLERK:  At an hour and one minute.

19         THE COURT:  Okay.  All right.  You have a little

20  time left, so go ahead.

21         MR. POMERANTZ:  Thank you, Your Honor.

22     So look, I -- it sort of was really not fair to us.  Mr.

23  Bridges was really making things up on the fly.  He was

24  changing the theories of his case and responding to Your

25  Honor.  But I'm going to do my best to respond to the

1    arguments made, many of which I sort of anticipated.

2         I'll first start with the issue that Your Honor raised,

3    which was whether this is under Rule 60 or not.  Mr. Bridges

4    identified a couple of cases, said that the order was

5    interlocutory, said that somehow the orders have anything to

6    do with a plan confirmation order.  They do not.  Your Honor

7    didn't hear that argument at the plan confirmation.  The

8    January 9th and July 16th orders are old and cold.  There's

9    an exculpation provision in the plan.  There's a gatekeeper

10   in the plan.  The provisions do not overlap entirely.  The

11   gatekeeper applies prospectively.  The exculpation provision

12   includes additional parties.

13        So the arguments that basically the plan had anything to

14   do -- and the fact that the plan is not a final order -- has

15   anything to do with the January 9th and July 16th orders is

16   just wrong.  It's just wrong.

17        More fundamentally, Your Honor, as Your Honor pointed

18   out, the *Smyth* case is a professional employment order.  And

19   ironically, if you abide by the *Smyth* case, that order is

20   never appealable because it's interlocutory.

21        But more fundamentally, Your Honor, that's dealing with

22   327 professionals.  And again, there's not much analysis in

23   the *Smyth* case, but we're not dealing with a 327

24   professional.  We're dealing with orders that were approved

25   under 363.

1    So the premise of the argument that Rule 60(b) -- 60

2    doesn't apply and they have other arguments just doesn't make

3    any sense.

4    Okay.  So now that gets us to Rule 60.  And Your Honor,

5    Your Honor hit the nail on the head.  They haven't presented

6    any evidence.  Allegations in a complaint aren't evidence.

7    They can't stand up there and say surprise evidence.  They

8    had the opportunity -- and this hearing's been continued a

9    few weeks -- they had the opportunity to bring it up, and

10   it's -- they had the opportunity to claim that there was

11   surprise, but they just didn't.  Okay?

12   So to go on to the Rule 60 arguments.  Surprise.

13   Surprise and reasonable delay are really -- go hand in hand

14   with Mr. Bridges' argument.  He says, well, we didn't find

15   out that -- months after the order was entered that he

16   violated a duty to us, so we are surprised by that, and it's

17   a reasonable time.  Well, Your Honor, the order provided for

18   an exculpation.  CLO Holdco and DAF knew that it applied to

19   an exculpation.  They were bound.  They knew based upon that

20   order that they would not be able to bring claims for normal

21   negligence.  There is no surprise.

22   If you take Mr. Bridges' argument to its conclusion, he

23   could wait until the end of the statute of limitations after

24   an order and have come in four years from now and say, Your

25   Honor, we just found out facts so we should go back four

1    years before.  That, Your Honor, that's not how the surprise

2    works.  That's not how the reasonable time works.

3        Mr. Bridges did not contest that they're bound by res

4    judicata.  He did not contest that the exculpation itself was

5    clear and unambiguous.  Of course he argued Your Honor

6    couldn't enter an order saying there was exculpation, again,

7    with no authority.  And he seemed surprised, as I suspect he

8    should, since he's not a bankruptcy lawyer, that retention

9    orders, whether it's investment bankers, financial advisors,

10   include exculpations all the time.  So there's no grounds

11   under surprise.

12       There's no grounds -- the motions are late under 60(c).

13       And they're not void.  I went through a painstaking

14   analysis, Your Honor, and I described in detail what the

15   *Espinosa* case held, and the exceptional circumstances which

16   Mr. Bridges tried to get away from as much as he could.

17   Maybe he can try to get away from language in a district

18   Court opinion, in a Bankruptcy Court opinion, in a Circuit

19   Court opinion.  You can't get away from language in a Supreme

20   Court opinion.  The Supreme Court opinion said exceptional

21   circumstances, where there was arguably no basis for

22   jurisdiction for what the Court did.  They have not even come

23   close to convincing Your Honor that there was absolutely no

24   basis.

25       Now, they disagree.  We granted, we think it's a good-

1    faith disagreement, but they haven't come close to

2    establishing the *Espinosa* standard, so their motion under 60

3    does not -- it fails.

4         And I don't think -- look, these are good lawyers.  Mr.

5    Bridges and Mr. Sbaiti are good lawyers.  They didn't just

6    inadvertently not mention Rule 60.  They never mentioned it

7    because they knew they had no claim under Rule 60.

8         Your Honor, Mr. Bridges has made comments about the

9    fiduciary duty of Mr. Seery, about what the Investor's Act

10   provides.  He's just wrong on the law.  Now, Your Honor

11   doesn't have to decide that.  Whichever court adjudicates the

12   DAF lawsuit will have to decide it.  But there is no private

13   cause of action for damages.  There are no fiduciary duties to

14   the investors.

15        And what Mr. Bridges doesn't even mention, in that the

16   investment agreement that's so prominent in his complaint,

17   they waived claims other than willful misconduct and gross

18   negligence against Highland.  They waived those claims.  So

19   for Mr. Bridges to come in here and argue that there's some

20   surprise, when he hasn't even bothered to look at the document

21   that's underlying the contractual relationship between the DAF

22   and the Debtor, is -- you know, I'll just say it's

23   inadvertence.

24        Your Honor, Mr. Bridges tried to argue that Mr. Seery is

25   not a beneficiary of the January 9th order.  He's not an

1    agent.  Well, again, Your Honor, Mr. Bridges wasn't there.

2    Your Honor and we were.  On January 9th, an independent board

3    was picked, and at the time Mr. Dondero ceased to become the

4    CEO.  So you have three gentlemen coming in -- Mr. Seery, Mr.

5    Dubel, and Mr. Nelms -- coming in to run Highland, in a very

6    chaotic time.  They had to act through their agents.  There

7    was no expectation that this board was going to actually run

8    the day-to-day operations of the Debtor.  Of course not.  They

9    needed someone to run.  And they picked Mr. Seery.  And the

10   argument that well, he's an agent of the company, he's not an

11   agent of the board, that just doesn't make sense.  The

12   independent board had to act.  The directors had to act.  And

13   the directors, how do they deal with that?  They acted through

14   Mr. Seery.  So he is most certainly governed by the January

15   9th order.

16       Your Honor, I want to talk about the jury trial right.

17   Mr. Bridges said that Paragraph 14 is an arbitration clause

18   and not a jury trial waiver.  Now, again, I will forgive Mr.

19   Bridges because I assume he didn't read the provision, okay,

20   and he -- somebody told him that, and that person just got it

21   wrong.  But what I would like to do is read for Your Honor

22   Paragraph 14(f).  It doesn't have to do with arbitration.

23   It's a waiver of jury trial.  14(f), Jurisdiction Venue,

24   Waiver of Jury Trial.  The parties hereby agree that any

25   action, claim, litigation, or proceeding of any kind

1  whatsoever against any other party in any way arising from or

2  relating to this agreement and all contemplated transactions,

3  including claims sounding in contract, equity, tort, fraud,

4  statute defined as a dispute shall be submitted exclusively to

5  the U.S. District Court for the Northern District of Texas, or

6  if such court does not have subject matter jurisdiction, the

7  courts of the State of Texas, City of Dallas County, and any

8  appellate court thereof, defined as the enforcement court.

9  Each party ethically and unconditionally submits to the

10 exclusive personal and subject matter jurisdiction of the

11 enforcement court for any dispute and agrees to bring any

12 dispute only in the enforcement court.  Each party further

13 agrees it shall not commence any dispute in any forum,

14 including administrative, arbitration, or litigation, other

15 than the enforcement court.  Each party agrees that a final

16 judgment in any such action, litigation, or proceeding is

17 conclusive and may be enforced through other jurisdictions by

18 suit on the judgment or in any manner provided by law.

19     And then the kick, Your Honor, all caps, as jury trial

20 waiver always are:  Each party irrevocably and unconditionally

21 waives to the fullest extent permitted by law any right it may

22 have to a trial by jury in any legal action, proceeding, cause

23 of action, or counterclaim arising out of or relating to this

24 agreement, including any exhibits, schedules, and appendices

25 attached to this agreement or the transactions contemplated

1    hereby.  Each party certifies and acknowledges that no

2    representative of the owner of the other party has represented

3    expressly or otherwise that the other party won't seek to

4    enforce the foregoing waiver in the event of a legal action.

5    It has considered the implications of this waiver, it makes

6    this waiver knowingly and voluntarily, and it has been induced

7    to enter into this agreement by, among other things, the

8    mutual waivers and certifications in this section.

9       Your Honor, I will forgive Mr. Bridges.  I assume he just

10    did not read that.  But to represent to the Court that that

11    language does not contain a jury trial waiver is -- is just

12    wrong.

13       THE COURT:  All right.  I'm going to stop right

14    there.  And you were reading from the Second Amended and

15    Restated Shared Services Agreement between Highland --

16       MR. POMERANTZ:  Not shared services.  I'm reading

17    from the Second Amended and Restated Investment Advisory

18    Agreement --

19       THE COURT:  Investment --

20       MR. POMERANTZ:  -- between the Charitable DAF, the

21    Charitable DAF GP, and Highland Capital Management.  The

22    agreement whereby the Debtor was the investment advisor to the

23    Charitable DAF Fund and the Charitable DAF GP.

24       THE COURT:  All right.  Well, Mr. Bridges, I'm going

25    to bounce quickly back to you.  This is your chance to defend

1    your honor.

2            MR. BRIDGES:  Yeah, we're -- we're looking at a

3    different agreement, where -- where literally the words that

4    were read to you are not in the agreement in front of us and

5    it is news to me.  So, Your Honor, this is a problem --

6            THE COURT:  What is the agreement you're looking at?

7            MR. BRIDGES:  It is the Amended -- I assume that

8    means First Amended -- Restated Advisory Agreement.

9            MR. POMERANTZ:  Your Honor, we are happy to file this

10   agreement with the Court so the Court has the benefit of it in

11   connection with Your Honor's ruling.

12           THE COURT:  Okay.  I would like you to do that.  Uh-

13   huh.

14           MR. BRIDGES:  I'd like -- I'd like to request -- I'll

15   withdraw that.

16           THE COURT:  Okay.  Go on, Mr. Pomerantz.

17           MR. POMERANTZ:  Mr. Bridges, if you could put us on

18   mute.  If you could put us on mute, Mr. Bridges, so I don't

19   hear your feedback.  Thank you.

20       Mr. Bridges also complains about the language "to the

21   extent permissible by law."  As Your Honor knows and as has

22   been my practice over 30 years, that language is probably in

23   every plan where there's a retention of jurisdiction:  to the

24   extent permissible by law.  And Mr. Bridges says that this

25   will create ambiguity in the order that couldn't be enforced.

1    There's no basis for that.  Our including the language "to the

2    extent permissible by law" in the orders, as we are prepared

3    to do, is consistent with the plan confirmation order where we

4    addressed that issue.  And we addressed that issue because we

5    didn't want to put Your Honor in a position where thereby Your

6    Honor may have an action before Your Honor that passes the

7    colorability gate that Your Honor may not be able to assert

8    jurisdiction.  And since jurisdiction can't be waived in that

9    regard, we will agree to amend that.

10       There's nothing ambiguous about that, and there's no

11   reason, though, that clause has to modify the Court's ability

12   to act as a gatekeeper, because, as we've argued *ad nauseam*,

13   gatekeeper provisions where the Court has that ability is not

14   only part of general bankruptcy jurisprudence but also part of

15   the Bankruptcy Code.

16       Counsel says that *Barton* doesn't apply because the

17   business judgment of Your Honor was used in retaining Mr.

18   Seery as opposed to in some other capacity.  There's no basis

19   for that, Your Honor.  A court-appointed -- a court-approved

20   CEO, CRO, professional, they are all entitled to protection

21   under the *Barton* act.  And the argument -- and again, this is

22   separate and apart from whether he's entitled to protection

23   under the January 9th order. But the argument that because it

24   was the business judgment -- again, business judgment in doing

25   something that Your Honor expressly contemplated under the

1    January 9th corporate governance order -- there's just no law

2    to support that.  And I guess he's trying to get around the

3    plethora of cases that deal with the situation where *Barton*

4    has been extended.

5         Your Honor, Mr. Bridges, again, in arguing that we're

6    ships passing in the night on *Shoaf* and *Applewood* and

7    *Espinosa*, no, we're not ships passing in the night.  We have a

8    difference in agreement on what these cases stand for.  These

9    cases stand for the proposition that a clear and unambiguous

10   provision, plain and simple, if it's clear and unambiguous, it

11   will be given res judicata effect.  The release in *Shoaf*,

12   clear and unambiguous.  The release in *Applewood*, not.  The

13   issue here is the exculpation language.  That was clear and

14   unambiguous.  It applied prospectively.  The argument makes no

15   sense that we didn't identify -- we didn't identify claims

16   that might arise in the future, so therefore an exculpation

17   clause doesn't apply?  That doesn't make any sense.

18        Your Honor clearly exculpated parties.  Mr. Dondero knew

19   it.  CLO Holdco knew it.  The DAF knew it.  So the issue Your

20   Honor has to decide is whether that exculpation was a clear

21   and unambiguous provision such that it should be entitled to

22   res judicata effect.  And we submit that the answer is

23   unequivocally yes.

24        That's all I have, Your Honor.

25             THE COURT:  All right.  Well, --

1          MR. MORRIS:  Your Honor?  I apologize.

2          THE COURT:  Okay.

3          MR. MORRIS:  This is John Morris.

4          THE COURT:  Yes?

5          MR. MORRIS:  I just want to, with respect to the

6    exhibits, I know there was no objection, but I had cited to

7    Docket Nos. 2419 and 2423.  The original exhibit list is at

8    Docket No. 2412.  So it's the three of those lists together.

9    2412, as amended by 2419, as amended by 2423.  Thank you very

10   much.

11         THE COURT:  All right.  Thank you.  All right.

12         MR. BRIDGES:  Your Honor, I still have no objection

13   to that, but may I have the last word on my motion?

14         THE COURT:  Is there time left?

15         THE CLERK:  Yes.

16         THE COURT:  Okay.  Go ahead.

17         MR. BRIDGES:  I just need a minute, Your Honor.  They

18   agreed to change the order.  They proposed it to us.  They

19   proposed it in a proposed order to you.  They can't also say

20   that it cannot be changed.

21         Secondly, Your Honor, in *Milic v. McCarthy*, 469 F.Supp.3d

22   580, the Eastern District of Virginia points out that the

23   Fourth Circuit treats appointment of estate professionals as

24   interlocutory orders as well.

25         That's all.  Thank you, Your Honor.

```
 1              THE COURT:  All right.  Here's what we're going to
 2    do.  We've been going a very long time.  I'm going to take a
 3    break to look through these exhibits, see if there's anything
 4    in there that I haven't looked at before and that might affect
 5    the decision here.  So we will come back at 3:00 o'clock
 6    Central Time -- it's 2:22 right now -- and I will give you my
 7    bench ruling on this.  All right.
 8         So, Mike, they can all stay on the line, right?
 9         Okay.  You can stay on, and we'll be back at 3:00 o'clock.
10              THE CLERK:  All rise.
11         (A recess ensued from 2:22 p.m. to 3:04 p.m.)
12              THE CLERK:  All rise.
13              THE COURT:  All right.  Please be seated.  All right.
14    Everyone presented and accounted for.  We're going back on the
15    record.
16              MR. POMERANTZ:  Your Honor, before you start, this is
17    Jeff Pomerantz.  We had sent to your clerk, and hopefully it
18    got to you, a copy of the Second Amended and Restated
19    Investment Advisory Agreement.  We also copied Mr. Sbaiti with
20    it as well.  And we would also like to move that into
21    evidence, just so that it's part of the Court's record.
22              THE COURT:  All right.
23              MR. BRIDGES:  We would object to that, Your Honor.
24    We haven't had an opportunity to even verify its authenticity
25    yet.
```

 1          THE COURT:  All right.  Well, I'll tell you what.

 2     I'm going to address this in my ruling.  So it's not going to

 3     be part of the record for this decision, and yet -- well, I'll

 4     get to it.

 5          All right.  So we're back on the record in Case Number 19-

 6     34054, Highland Capital.  The Court has deliberated, after

 7     hearing a lot of argument and allowing in a lot of documentary

 8     evidence, and the Court concludes that the motion of CLO

 9     Holdco, Ltd. and The Charitable DAF to modify the retention

10     order of James Seery, which was entered almost a year ago, on

11     July 16th, 2020, should be denied.

12          This is the Court's oral bench ruling, but the Court

13     reserves discretion to supplement or amend in a more fulsome

14     written order what I'm going to announce right now, pursuant

15     to Rule 7052.

16          First, what is the Movants' authority to request the

17     modification of a bankruptcy court order that has been in

18     place for so many months, which was issued after reasonable

19     notice to the Movants, and after a hearing, which was not

20     objected to by the Movants, or appealed, when the Movants were

21     represented by sophisticated counsel, I might add, and which

22     order was relied upon by parties in this case, most notably

23     Mr. Seery and the Debtor, and in fact was entered after

24     significant negotiations involving a sophisticated court-

25     appointed Unsecured Creditors' Committee with sophisticated

1    professionals and sophisticated members, and after negotiation

2    with an independent board of directors, court-appointed, one

3    of whose members is a retired bankruptcy judge?  What is the

4    Movants' authority?

5        Movants fumbled a little on that question, in that the

6    exact authority wasn't set forth in the motion.  But Movants'

7    primary argument is that Movants think the Seery retention

8    order was an interlocutory order and that the Court simply has

9    the inherent authority to modify it as an interlocutory order.

10       The Court disagrees with this analysis.  I do not think

11   the Fifth Circuit's *Smyth* case dictates that the Seery

12   retention order is still interlocutory.  The Seery retention

13   order was an order entered pursuant to Section 363 of the

14   Bankruptcy Code, not a Section 327 professionals to a debtor-

15   in-possession, professionals to a trustee employment order

16   such as the one involved in the *Smyth* case.

17       But even if the Seery retention order is interlocutory --

18   the Court feels strongly that it's not, but even if it is --

19   the Court believes it would be an abuse of this Court's

20   inherent discretion or authority to modify that order almost a

21   year after the fact and under the circumstances of this case.

22       Now, assuming Rule 60(b) applies to the Movants' request,

23   the Court determines that the Movants have not made their

24   motion anywhere close to within a reasonable time, as Rule

25   60(c) requires, nor do I think the Movants have demonstrated

1  any exceptional circumstances to declare the order or any of

2  its provisions void.  The Movants have put on no evidence that

3  constitutes surprise or constitutes newly-disputed evidence.

4  So why are there no exceptional circumstances here such that

5  the Court might find, you know, a void order or void

6  provisions of an order?

7      First, this Court concludes that there's no credible

8  argument that the Court overreached its jurisdiction with the

9  gatekeeping provisions in the order.  Gatekeeping provisions

10  are not only very common in the bankruptcy world -- in

11  retention orders and in plan confirmation orders, for example

12  -- but they are wholly consistent with the *Barton* case, the

13  U.S. Supreme Court's *Barton's* case, and its progeny that has

14  become known collectively as the *Barton* doctrine.  Gatekeeping

15  provisions are wholly consistent with 28 U.S.C. Section

16  959(a)'s complete language.

17      The Fifth Circuit has blessed gatekeeping provisions in

18  all sorts of contexts.  It has blessed them in the situation

19  of when *Stern* claims are involved in the *Villegas* case.  It

20  even blessed Bankruptcy Courts' gatekeeping functions a long

21  time ago, in 1988, in a case that I don't think anyone

22  mentioned in the briefing, but as I've said, my brain

23  sometimes goes down trails, and I'm thinking of the *Louisiana*

24  *World Exposition* case in 1988, when the Fifth Circuit blessed

25  there a procedure where an unsecured creditors' committee can

1   bring causes of action against persons, such as officers and

2   directors or other third parties, if they first come to the

3   Bankruptcy Court and show a colorable claim.  They have to

4   come to the Bankruptcy Court, show they have a colorable claim

5   and they're the ones that should be able to pursue them.  Not

6   exactly on point, but it's just one of many cases that one

7   could cite that certainly approve gatekeeper functions of

8   various sorts of Bankruptcy Courts.

9        It doesn't matter which court might ultimately adjudicate

10   the claims; the Bankruptcy Court can be the gatekeeper.

11        And the Court agrees with the many cases cited from

12   outside this circuit, such as the case in Alabama, in the

13   Eleventh Circuit, and there was another circuit-level case, at

14   least one other, that have held that the *Barton* doctrine

15   should be extended to other types of case fiduciaries, such as

16   debtor-in-possession management, among others.

17        Finally, as I pointed out in my confirmation ruling in

18   this case, gatekeeping provisions are commonplace for all

19   types of courts, not just Bankruptcy Courts, when vexatious

20   litigants are involved.  I have commented before that we seem

21   to have vexatious litigation behavior with regard to Mr.

22   Dondero and his many controlled entities.

23        Now, as far as the Movants' argument that there was not

24   just improper gatekeeping provisions but actually an improper

25   discharge in the Seery retention order of negligence claims or

1    other claims that don't rise to the level of gross negligence

2    or willful misconduct, again, I reiterate there's nothing

3    exceptional in the bankruptcy world about exculpation

4    provisions like this.  They absolutely are a term of

5    employment very often.  Just like compensation, they're

6    frequently requested, negotiated, and approved.  They are

7    normal in the corporate governance world, generally.  They are

8    normal in corporate contracts between sophisticated parties.

9    And most importantly of all, even if this Court overreached

10   with the exculpation provisions in the Seery retention order,

11   even if it did, res judicata bars the attack of these

12   provisions at this late stage, under cases such as *Shoaf,*

13   *Republic Supply v. Shoaf* from the Fifth Circuit, the *Espinosa*

14   case from the U.S. Supreme Court, and even *Applewood*, since

15   the Court finds the language in this order was clear,

16   specific, and unambiguous with regard to the gatekeeping

17   provisions and the exculpation provisions.

18       Last, and this is the part where I said I'm going to get

19   to this agreement that has been submitted, the Second Amended

20   and Restated Investment Advisor Agreement or whatever the

21   title is.  I am more than a little disturbed that so much of

22   the theme of the Movants' pleadings and arguments, and I think

23   even representations to the District Court, have been they

24   have these sacred jury trial rights, these inviolate jury

25   trial rights, and an Article I Court like this Court should

1  have no business through a gatekeeping provision impinging on

2  the possible pursuit of an action where there's a jury trial

3  right.

4      I was surprised initially when I thought about this.  I

5  thought, wow, I've seen so many agreements over the months.  I

6  can't say every one of them waived the jury trial right, but I

7  just remembered seeing that a lot, and seeing arbitration

8  provisions, and so that's why I asked.  It just was lingering

9  in my brain.  So I'm going to look at what is submitted.  I'm

10  not relying on that as part of my ruling.  As you just heard,

11  I had a multi-part ruling, and whether there's a jury trial

12  right or not is irrelevant to how I'm choosing to rule on this

13  motion.  But I do want to see the agreement, and then I want

14  Movants within 10 days to respond with a post-hearing trial

15  brief either saying you agree that this is the controlling

16  document or you don't agree and explain the oversight, okay?

17  Because it feels like a gross omission here to have such a

18  strong theme in your argument -- we have a jury trial right,

19  we have a jury trial right, by God, the gatekeeping

20  provisions, among other things, impinge on our sacred pursuit

21  of our jury trial right -- and then maybe it was very

22  conspicuous in the controlling agreement that you'd waived

23  that, the Movants had waived that.

24      So, anyway, I'm requiring some post-hearing briefing, if

25  you will, on whether omissions, misrepresentations were made

1   to the Court.

2       Anyway, so I reserve the right to supplement or amend this

3   ruling with a more fulsome written order.  I am asking Mr.

4   Pomerantz to upload a form of order that is consistent with

5   this ruling, and --

6       MR. POMERANTZ:  Your Honor, we will do so.  I do have

7   one thing to bring to the Court's attention, unrelated to the

8   motion, before Your Honor leaves the bench.

9       THE COURT:  All right.  So just a couple of follow-up

10  things.  Have you -- I'm not clear I heard what you said about

11  this agreement.  Did you email it to my courtroom deputy or

12  did you file it on the docket?

13      MR. POMERANTZ:  We emailed it to your courtroom

14  deputy.  We're happy to file it on the docket.  And we also

15  provided a copy to Mr. Sbaiti.

16      I would note for the Court that it's signed both by The

17  Charitable DAFs by Grant Scott, just for what it's worth.

18      THE COURT:  Okay.  All right.  Well, I'm trying to

19  think what I want -- I do want you to file it on the docket,

20  and I'm trying to think of what you label it.  Just call it

21  Post-Hearing Submission or something and link it to the motion

22  that we adjudicated here today.  And then, again, you've got

23  10 days, Mr. Bridges, to say whatever you want to say about

24  that agreement.

25      I guess the last thing I wanted to say is we sure devoted

1   a lot of time to this motion today.  We have -- this is a

2   recurring pattern, I guess you can say.  We have a lot of

3   things that we devote a lot of time to in this case that I get

4   surprised, but it is what it is.  You file a motion.  I'm

5   going to give it all the attention Movants and Respondents

6   think it warrants.  I'm going to develop a full record,

7   because, you know, there's a recurring pattern of appeals

8   right now, 11 or 12 appeals, I think, not to mention motions

9   to withdraw the reference.  If we're going to have higher

10  courts involved in the administration of this case, I'm going

11  to make a very thorough record so nobody is confused about

12  what we did, what I considered, what my reasoning was.

13      So I kind of think it's unfortunate for us to have to

14  spend case resources and so much time and fees on things like

15  this, but I'm going to make sure a Court of Appeals is not

16  ever confused about what happened and what we did.  So that's

17  just the way it's going to be.  And I feel like we have no

18  choice, given, again, the pattern of appeals.

19      All right.  So, with that, Mr. Pomerantz, you had one

20  other case matter, you said?

21          MR. POMERANTZ:  Yes.  But before I get to that, Your

22  Honor, I assume that, in response to the Movants' submission

23  on the agreement, that we would have right at four or seven

24  days to respond if we deem it's appropriate?

25          THE COURT:  I think that's reasonable.  That's

1   reasonable.

2           MR. POMERANTZ:  Okay.  Thank you, Your Honor.

3           THE COURT:  So let me think of how I want to do this.

4   I'll just do a short scheduling order of sorts that just, it

5   says in one or two paragraphs, at the hearing on this motion,

6   the Court raised questions about the jury trial rights and the

7   Debtor has now submitted the controlling agreements, I'm

8   giving the Movants 10 days to respond to whether this is

9   indeed a controlling agreement, and why, if it is, the Movants

10  have heretofore taken the position they have jury trial

11  rights.  And then I will give you seven days thereafter to

12  reply, and then the Court will set a further status conference

13  if it determines it's necessary.  Okay?

14       So, Nate, we'll do a short little order to that effect.

15  Okay?

16          MR. POMERANTZ:  Thank you, Your Honor.

17       I -- again, before I raise the other issue, I want to pick

18  up on a comment Your Honor just made towards the end.  I know

19  the Court has been frustrated with the time and effort we've

20  been spending.  The Debtor and the creditors have been

21  extremely frustrated, because in addition to the time and

22  effort everyone's spending, we're spending millions of

23  dollars, millions of dollars on litigation that --

24          THE COURT:  It's one of the reasons you needed an

25  exit loan, right?

1          MR. POMERANTZ:  Right.  No, exactly.  That's

2     frivolous, that we think is made in bad faith.

3          And Your Honor, and everyone else who's hearing this on

4     behalf of Mr. Dondero, should understand we're looking into

5     what appropriate authority Your Honor would have to shift some

6     of the costs.  Your Honor did that in the contempt motion.

7     Your Honor can surely do that in connection with the notes

8     litigation.  But all this other stuff that is requiring us to

9     spend hundreds and hundreds of hours and spend millions of

10    dollars, we are clearly looking into whether it would be

11    appropriate and what authority there is.  I just wanted to let

12    Your Honor know that.

13         And in connection with that, the last point, Your Honor, I

14    can't actually even believe I'm saying this, but there was

15    another lawsuit filed -- we just found out in the break -- on

16    Wednesday night by the Sbaiti firm on behalf of Dugaboy in the

17    District Court.

18         Now, to make matters worse, Your Honor, the litigation

19    relates to alleged improper management by the Debtor of Multi-

20    Strat.  If Your Honor will recall, at many times I've told

21    this Court what Dugaboy's claims they filed in this case.

22    Dugaboy has a claim that is filed in this case for

23    mismanagement postpetition of Multi-Strat.  Now the Sbaiti

24    firm, in addition to representing CLO Holdco, in addition to

25    representing the DAF, and whatever the Plaintiffs' lawyers are

1  in that other District Court, PCMG, and in connection with the

2  Acis matter, they've decided they haven't had enough.  They've

3  now filed another motion that -- you know, why they filed it

4  in District Court and there's a proof of claim on the same

5  issues, I don't know.  But I thought Your Honor should know.

6  I'm not asking Your Honor to do anything about it.  But we

7  will act aggressively, strongly, and promptly.

8      Thank you, Your Honor.

9        THE COURT:  All right.  Well, you've reminded me of

10  what came out earlier today about the entity -- I left my

11  notepad in my chambers -- PMC or PMG or something.

12    Mr. Bridges, we're not going to have a hearing right now

13  on me doing anything, but what are you thinking?  What are you

14  doing?

15        MR. BRIDGES:  Your Honor, I'm not trying to duck your

16  question.  I literally have no involvement with any other

17  claim, and we would have to ask Mr. Sbaiti to answer your

18  questions.

19        THE COURT:  All right.  Is he there?

20        MR. BRIDGES:  He is.

21        THE COURT:  I'll listen.

22        MR. BRIDGES:  I'll switch seats and give him this

23  chair.

24        MR. SBAITI:  Sorry, Your Honor.  We had two computers

25  going and weren't able to use the sound on one, so we ended up

1  turning that off.

2      Your Honor, I'm not sure what the question is about when

3  you say what are we thinking.  We have a client that's asked

4  us to file something, and when we're advised by bankruptcy

5  counsel that it's not prohibited for us to do so, and don't

6  know why we're precluded from doing so, and when the time

7  comes I'm sure we'll be able to explain to Your Honor --

8  someone will be able to explain to Your Honor why what we're

9  doing, despite Mr. Pomerantz's exacerbation, or excuse me,

10  exasperation, why that wasn't improper.  It's our belief that

11  it wasn't improper or a violation of the Court's rule.

12          THE COURT:  Just give me a quick shorthand *Readers'*

13  *Digest* of why you don't think it's improper.

14          MR. SBAITI:  Sure.  My understanding is, Your Honor,

15  there's not a rule that says we can't file it against the

16  Debtor for postpetition actions.  So that, that's as -- that's

17  as much as I understand.  And I'm going to -- I'm not trying

18  to duck it, either.  And if I'm wrong about that and someone

19  wants to correct me on our side offline and if we have to

20  explain to the Court why that's so or what rule has been

21  violated, I'm sure we'll be able to put together something for

22  that.  But that's what I've been advised.

23          THE COURT:  Have you done thorough --

24          MR. POMERANTZ:  Your Honor, I think what --

25          MR. SBAITI:  (garbled), Your Honor.

1        THE COURT:  Have you done thorough research yourself?

2  Your Rule 11 signature is on the line, not some bankruptcy

3  counsel you talked to.  Have you done the research yourself?

4        MR. SBAITI:  Well, Your Honor, I've relied on the

5  research and advice of people who are experts, and I believe

6  my Rule 11 obligations also allow me to do that, so yes.

7        MR. POMERANTZ:  Your Honor, I think we're entitled to

8  know if it's Mr. Draper's firm who has been representing

9  Dugaboy.  He's the bankruptcy counsel.  I don't think it's an

10  attorney-client privilege issue.  If Mr. Sbaiti is going to be

11  here and sort of say, hey, bankruptcy counsel said it was

12  okay, I think we would like to know and I'm sure Your Honor

13  would like to know who is that bankruptcy counsel.

14        THE COURT:  Yes.  Fair enough.  Mr. Sbaiti?

15        MR. SBAITI:  Your Honor, in consultation with Mr.

16  Draper and with consultation with other counsel that we've

17  spoken to, that has been our understanding.

18        THE COURT:  Who's the other counsel?

19        MR. SBAITI:  Well, we've talked to Mr. Rukavina about

20  some of these things for the PCMG and the Acis case.  We've

21  talked to the people who, when they tell us you can't do this

22  because they're bankruptcy counsel for our client, then we

23  don't do something.  So, and I'm not trying to throw anybody

24  under the bus, but my understanding of what goes on in

25  Bankruptcy Court is incredibly limited, so, you know, and if

1   it's a mistake then I'll own it, if I have a mistaken

2   understanding, but I also wasn't anticipating having to make a

3   presentation about this right here right now, so --

4          THE COURT:  Well, you're filing lawsuits that involve

5   this bankruptcy case during the hearing, so --

6          MR. SBAITI:  Oh, we didn't file it during the

7   hearing, Your Honor.  It was filed last night, I believe.

8          THE COURT:  Okay.  Well, I assume that you're going

9   to go back and hit the books, hit the computer, and be

10   prepared to defend your actions, because your bankruptcy

11   experts, they may think they know a lot, but the judge is not

12   very happy about what she's hearing.

13          MR. POMERANTZ:  Your Honor, if I may ask when Your

14   Honor intends to issue the contempt ruling in connection with

15   the June 8th hearing?  I strongly believe -- and, obviously,

16   this has nothing to do with the contempt hearing; this

17   happened after -- but I strongly believe that sending a

18   message that Your Honor is inclined to hold counsel in

19   contempt, which obviously is one of the violators we said

20   should be held in contempt, it may be important to do that

21   sooner rather than later so that people know that Your Honor

22   is serious.

23          THE COURT:  All right.  Well, I understand and

24   respect that request.  And let me tell you all, I had a seven-

25   day -- okay.  You all were here on that motion June 8th.  I

```
1    had a seven-day, all-day, every-day, 9:00 to 5:00, 45-minute

2    lunch break, in-person hearing with a dozen or so live

3    witnesses that I just finished Tuesday at 5:00 o'clock.  So

4    you all were here on the 8th, and then -- what day was that --

5    what was -- Tuesday, I finished.  Tuesday was the 22nd.  So I

6    started on the 14th, okay?  So you all were here on the 8th

7    and I had a live jury trial -- I mean, not jury trial, a live

8    bench trial -- live human beings in the courtroom, beginning

9    June 14th.  So you're here the 8th.  June 14th through 22nd, I

10   did my trial.  And here we are on the 25th.  And guess what, I

11   have another live human-being bench trial next week, Monday

12   through Friday.

13       So we've been working in other things like this in between

14   those two.  So I'm telling you that not to whine, I'm just

15   telling you that, that's the only reason I didn't get out a

16   quick ruling on this, okay?

17           MR. POMERANTZ:  And Your Honor, I was not at all

18   making that comment to imply anything about the Court.

19           THE COURT:  Well, --

20           MR. POMERANTZ:  The time and effort that you have

21   given to this case is extraordinary, --

22           THE COURT:  Okay.

23           MR. POMERANTZ:  -- so please don't misunderstand my

24   comment.

25           THE COURT:  Okay.  And I didn't mean to express
```

```
 1   annoyance or anything like that.  I guess what I'm trying to

 2   do is I don't want anyone to mistake the delay in ruling on

 3   the contempt motion to mean I'm just not that -- you know, I'm

 4   not prioritizing it, other things are more serious to me or

 5   important to me, or I'm going to take two months to get to it.

 6   It's literally been I've been in trial almost all day long

 7   every day since you were here.  But trust me, I'm about as

 8   upset as upset can be about what I heard on June 8th, and I'm

 9   going to get to that ruling, and I know what I'm going to do.

10   And, well, like I said, it's just a matter of figuring out

11   dollars and whom, okay?  There's going to be contempt.  I just

12   haven't put it on paper because I've been in court all day and

13   I haven't come up with a dollar figure.  Okay?

14       So I hope -- I don't know if that matters very much, but

15   it should.

16       All right.  We stand adjourned.

17       (Proceedings concluded at 3:35 p.m.)

18                           --oOo--

19

20                         CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    /s/ Kathy Rehling                        06/29/2021

24   _____     _____
     Kathy Rehling, CETD-444                      Date
25   Certified Electronic Court Transcriber
```

INDEX
*Excerpt*
*11:33 a.m. to 3:35 p.m.*

PROCEEDINGS                                              3

OPENING STATEMENTS

- By Mr. Bridges                                         3
- By Mr. Pomerantz                                      23

WITNESSES

-none-

EXHIBITS

Movants' Exhibits 1, 3 through 12, 15 through    Received 91
28, and 30 through 44

Debtor's Exhibit 1                               Received 91
Debtor's Exhibits 1 through 17                   Received 93

RULINGS                                               106

END OF PROCEEDINGS                                    121

INDEX                                                 122