**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

U.S. BANK NATIONAL ASSOCIATION, in
its capacity as Trustee, JOSHUA N. TERRY,
and ACIS CAPITAL MANAGEMENT, L.P.,

        *Plaintiffs*,

    v.

THE CHARITABLE DONOR ADVISED
FUND, L.P., CLO HOLDCO LTD., and
NEXPOINT DIVERSIFIED REAL ESTATE
TRUST,

        *Defendants*.

Case No. 1:21-cv-11059-GHW

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DAF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Jonathan E. Pickhardt
  Blair A. Adams
  Misha Boutilier
  51 Madison Avenue, 22nd Floor
  New York, New York 10010
  (212) 849-7000
  *Attorneys for Plaintiffs Joshua N. Terry and Acis*
  *Capital Management, L.P.*

SEWARD & KISSEL LLP
  Mark D. Kotwick
  Thomas Ross Hooper
  Julie J. Hong
  One Battery Park Plaza
  New York, New York 10004
  (202) 574-1200
  *Attorneys for Plaintiff U.S. Bank National*
  *Association, in its capacity as Trustee*

T<span>ABLE OF</span> C<span>ONTENTS</span>

**Page**

PRELIMINARY STATEMENT ................................................. 1

FACTUAL BACKGROUND ................................................... 2

LEGAL STANDARD .......................................................... 9

ARGUMENT ................................................................. 10

I.     THE DAF DEFENDANTS' THREATS TO SUE PLAINTIFFS CREATED A
CONTROVERSY AND MADE PLAINTIFFS THE REAL PARTIES IN
INTEREST .................................................................. 11

     A.     The DAF Defendants' Litigation Threats Satisfy The Case-Or-Controversy
Requirement ........................................................ 11

     B.     Declaratory Judgment Will Redress Plaintiffs' Injury ........................ 19

     C.     Plaintiffs Are Real Parties In Interest ................................ 21

II.    THE MOTION SHOULD BE DENIED EVEN UNDER THE DAF
DEFENDANTS' NOTEHOLDER-INJURY THEORY ................................... 22

III.   DECLARATORY RELIEF IS APPROPRIATE ................................. 23

CONCLUSION .............................................................. 24

### TABLE OF AUTHORITIES

**Page**

*Alta Wind I Owner Lessor C v. United States,*
   150 Fed. Cl. 152 (Fed. Cl. 2020) ........................................................ 17, 18

*Am. Mar. Transp., Inc. v. United States,*
   18 Cl. Ct. 283 (1989) ................................................................................. 18

*Baur v. Veneman,*
   352 F.3d 625 (2d Cir. 2003)................................................................. 13, 16

*Bennett v. Spear,*
   520 U.S. 154 (1997)...................................................................................... 22

*Carlin Equities Corp. v. Offman,*
   2007 WL 2388909 (S.D.N.Y. Aug. 21, 2007)........................... 11, 12, 14

*Carter v. HealthPort Techs., LLC,*
   822 F.3d 47 (2d Cir. 2016)............................................................. 9, 10, 16

*Caul v. Petco Animal Supplies, Inc.,*
   2021 WL 6805889 (E.D.N.Y. Dec. 22, 2021) ...................................... 22

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013)...................................................................................... 14

*Classic Liquor Importers, Ltd. v. Spirits Int'l B.V.,*
   151 F. Supp. 3d 451 (S.D.N.Y. 2015)............................................... 14, 15

*Dean v. Town of Hempstead,*
   527 F. Supp. 3d 347 (E.D.N.Y. 2021) .................................................. 20

*Harty v. W. Point Realty, Inc.,*
   28 F.4th 435 (2d Cir. 2022) ...................................................................... 10

*House of Eur. Funding I Ltd. v. Wells Fargo Bank,*
   2015 WL 5190432 (S.D.N.Y. Sept. 4, 2015)........................................ 23

*Humm v. Lombard World Trade, Inc.,*
   916 F. Supp. 291 (S.D.N.Y. 1996) ......................................................... 21

*In re Chateaugay Corp.,*
   201 B.R. 48 (Bankr. S.D.N.Y. 1996)...................................................... 11

*Kawa v. United States,*
   77 Fed. Cl. 294 (2007) ............................................................................... 18

*Kidder, Peabody & Co. v. Maxus Energy Corp.,*
   925 F.2d 556 (2d Cir. 1991)....................................................... 11, 14, 19

*Koons v. XL Insur. Am., Inc.,*
   620 F. App'x 110 (3d Cir. 2015) ............................................................ 18

TABLE OF AUTHORITIES

**Page**

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992).................................................................................................... 22

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007)............................................................................................... 11, 14

*Mhany Mgmt., Inc. v. Cty. of Nassau*,
  819 F.3d 581 (2d Cir. 2016)...................................................................................... 20

*Micron Tech., Inc. v. Mosaid Techs., Inc.*,
  518 F.3d 897 (Fed. Cir. 2008).................................................................................. 15

*Museum of Mod. Art v. Schoeps*,
  549 F. Supp. 2d 543 (S.D.N.Y. 2008)................................................................. 19, 24

*Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*,
  710 F.3d 71 (2d Cir. 2013)........................................................................................ 11

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Continental Ill. Corp.*,
  110 F.R.D. 615 (N.D. Ill. 1986)............................................................................... 18

*Nike, Inc. v. Already, LLC*,
  663 F.3d 89 (2d Cir. 2011), *aff'd*, 568 U.S. 85 (2013) ............................................ 12

*Park B. Smith, Inc. v. CHF Indus. Inc.*,
  811 F. Supp. 2d 766 (S.D.N.Y. 2011)...................................................................... 21

*Rodriguez v. Central Parking Sys. of N.Y., Inc.*,
  17 Misc.3d 108 (1st Dep't 2007) ............................................................................. 15

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013)........................................................................................ 22

*Sasson v. Hachette Filipacci Presse*,
  2016 WL 1599492 (S.D.N.Y. Apr. 20, 2016).......................................................... 15

*Sketchworks Indus. Strength Comedy, Inc. v. Jacobs*,
  2021 WL 1226955 (S.D.N.Y. Mar. 31, 2021) .................................................. 11, 13

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016).................................................................................................. 12

*St. Pierre v. Dyer*,
  208 F.3d 394 (2d Cir. 2000)................................................................................ 22, 23

*Stoncor Grp., Inc. v. Peerless Ins. Co.*,
  2021 WL 2215558 (S.D.N.Y. June 2, 2021) .................................................... 21, 23

*Tamam v. Fransabank Sal*,
  677 F. Supp. 2d 720 (S.D.N.Y. 2010)...................................................................... 10

*Sprint Commc'ns Co., L.P. v. APCC Services, Inc.*,
  554 U.S. 269 (2008)......................................................................................... 17, 18, 21

*Twentieth Century Fox Film v. Marvel Enters.*,
  220 F. Supp. 2d 289 (S.D.N.Y. 2002)........................................................................ 5

## TABLE OF AUTHORITIES

**Page**

*U.S. Bank Nat'l Ass'n. v. Triaxx Asset Mgmt. LLC,*
    2021 WL 4993895 (S.D.N.Y. Oct. 26, 2021) ............................................................. 11, 12, 19

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State,*
    *Inc.,*
    454 U.S. 464 (1982) ............................................................................................................... 12

*Women for Am. First v. de Blasio,*
    520 F. Supp. 3d 532 (S.D.N.Y. 2021) ............................................................................. 20, 23

*WR Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP,*
    549 F.3d 100 (2d Cir. 2008) ................................................................................................... 17

*Young Women's Christian Ass'n of U. S., Nat'l Bd. v. HMC Ent., Inc.,*
    1992 WL 279361 (S.D.N.Y. Sept. 25, 1992) ................................................................. 11, 12

## Rules

Fed. R. Civ. P. 17 ........................................................................................................................ 21

28 U.S.C. § 2201 .................................................................................................... 1, 11, 15, 24

## Treatises

12 *Moore's Federal Practice - Civil*, § 57.22 (2022) ........................................................ 11, 12

15 *Moore's Federal Practice - Civil*, § 101.40 (2022) ............................................................ 22

Plaintiffs U.S. Bank, National Association, in its capacity as trustee ("U.S. Bank" or the "Trustee"), Joshua N. Terry ("Mr. Terry"), and Acis Capital Management, L.P. ("ACM," and, collectively with the Trustee and Mr. Terry, "Plaintiffs"), submit this memorandum in opposition to the Defendants The Charitable Donor Advised Fund, L.P.'s ("DAF"), and CLO HoldCo, Ltd.'s ("CLO HoldCo," and, collectively with DAF, the "DAF Defendants"), motion to dismiss the Amended Complaint (Dkt. 41-1, the "Motion" or "Mot.").

## PRELIMINARY STATEMENT

This case represents a paradigmatic use of the Declaratory Judgment Act. The DAF Defendants have repeatedly threatened Plaintiffs with litigation. Rather than wait for the DAF Defendants to act on those threats, Plaintiffs have sought a declaration that the DAF Defendants' claims are without merit. The DAF Defendants' explicit litigation threats are sufficient to satisfy the case-or-controversy requirement for Article III standing.

The DAF Defendants' only response is that their threats have been neutralized by the passage of time. But the DAF Defendants have done nothing to disclaim the claims they asserted against Plaintiffs in a series of complaints filed in 2019 and 2020, and then again threatened in a demand letter in May 2020. To the contrary, the DAF Defendants' actions—and the actions of James Dondero, who functionally controls the DAF Defendants—have only highlighted that the DAF Defendants' threats remain real and present. In May 2021, Mr. Dondero caused another entity under his control, NexPoint Diversified Real Estate Trust ("NexPoint"), to bring a near-carbon copy of the 2019 and 2020 lawsuits previously filed by the DAF Defendants. When Plaintiffs wrote the DAF Defendants shortly after the filing of this action to request that the DAF Defendants disclaim their threats, the DAF Defendants refused to do so. And the DAF Defendants have even speculated in their filings before this Court that they may bring claims against Plaintiffs

even if the Court enters a declaratory judgment in Plaintiffs' favor.  The passage of time is of limited relevance in the face of these facts.

The DAF Defendants' argument that Plaintiffs lack standing to seek declaratory relief on behalf of the Subordinated Noteholders attacks a strawman.  Plaintiffs' well-pled allegations are clear that they have pursued this case to vindicate their own rights, not those of others.  The DAF Defendants previously sued Plaintiffs, not the Subordinated Noteholders.  The suggestion that Plaintiffs lack standing to seek declaratory relief in response to that threat has no basis in the case law or in common sense.  That Plaintiffs have sought indemnification to cover the cost of their defense does not make the threat against them any less real, or the need for declaratory relief any less urgent, and the caselaw that the DAF Defendants' contend to be to the contrary is completely inapposite.

Because the DAF Defendants' repeated litigation threats satisfy the case-and-controversy requirement and establish Plaintiffs as real parties in interest to bring the claims for declaratory relief sought in the Amended Complaint, the DAF Defendants' Motion should be denied.

## FACTUAL BACKGROUND

Plaintiffs brought this action to address the DAF Defendants' continuing threat of litigation related to the DAF Defendants' indirect investments in ACIS CLO 2014-4 Ltd. ("Acis 4"), ACIS CLO 2014-5 Ltd. ("Acis 5"), and ACIS CLO 2015-6 Ltd. ("Acis 6" and, collectively with Acis 4 and Acis 5, the "Acis CLOs").  Dkt. 15 ("Complaint" or "AC") ¶ 1.

The Acis CLOs are investment funds organized in the Cayman Islands with independent Cayman Islands-based directors.  AC ¶¶ 15, 25.  The Acis CLOs raised money in 2014 and 2015 by issuing notes to investors in private offerings.  U.S. Bank serves as the Acis CLOs' Trustee.  *Id.* ¶¶ 9, 27.  One investor, Highland CLO Funding, Ltd. ("HCLOF"), purchased and continues to hold all of the junior-most subordinated notes (the "Subordinated Notes") issued by Acis 4 and

Acis 5, and 87% of the Subordinated Notes issued by Acis 6.  *Id.* ¶ 17.  DAF, through CLO HoldCo,

holds a 49% ownership stake in HCLOF.  *Id.* ¶ 31.  Neither DAF nor CLO HoldCo is a direct

investor in any of the Acis CLOs.  Another investor, NexPoint, purchased and continues to hold

substantially all of the remaining 13% of Subordinated Notes issued by Acis 6.[1]  *Id.* ¶¶ 17, 44, 51.

The Acis CLOs repaid all of their outstanding notes except for the Subordinated Notes in mid-

2021.  *Id.* ¶ 51.

ACM acts as portfolio manager and investment advisor for the Acis CLOs.  AC ¶¶ 11, 26.

Brigade Capital Management, L.P., is ACM's sub-advisor.  *Id.* ¶ 16.  Mr. Dondero was the original

majority owner of ACM.  *Id.* ¶ 28.  In January 2019, a federal bankruptcy court in Texas transferred

ownership of ACM to Mr. Terry in satisfaction of an unpaid judgment that Mr. Terry held against

ACM.  *Id.* ¶¶ 28-31.

Since that time, Mr. Dondero has carried out a litigation campaign against Mr. Terry and

ACM, with the DAF Defendants acting as one of Mr. Dondero's fronts for that campaign.[2]  On

October 24, 2019, Mr. Dondero caused DAF to sue the Trustee in this District for alleged

mismanagement of the Acis CLOs by ACM.  AC ¶ 32; Dkt. 15-6 (*The Charitable Donor Advised*

*Fund, L.P. v. U.S. Bank Nat'l Ass'n, et al.*, 1:19-cv-9857-NRB, Dkt. 1 (S.D.N.Y.) (the "2019

---

[1]  Before November 8, 2021, NexPoint's name was NexPoint Strategic Opportunities Fund.  *See* Dkt. 34.

[2]  Mr. Terry and ACM are not the only target of Mr. Dondero's litigious tactics.  Mr. Dondero has also directed a barrage of litigation against another investment adviser that he previously controlled, Highland Capital Management, L.P., and its current CEO, James P. Seery.  *See* AC ¶¶ 18, 51 n.5.  Mr. Dondero's tactics led Judge Stacey G.C. Jernigan, who presides over Highland Capital Management, L.P.'s bankruptcy, to observe that "we seem to have vexatious litigation behavior with regard to Mr. Dondero and his many controlled entities."  Dkt. 15-15 at 109:20-22 (Tr. Ruling, *In re Highland Cap. Mgmt., L.P.*, Case No. 19-34054-sgj11, Dkt. 2500 (Bankr. N.D. Tex.)).  And Judge Jernigan has twice held Mr. Dondero in contempt for this behavior.  Dkt. 15-2 at 26-27, 30 (*In Re Highland Cap. Mgmt., L.P.*, Case No. 19-34054-sgj11, Dkt. 2660 (Bankr. N.D. Tex.)); Dkt. 15-14 at 44-46, 54 (*In Re Highland Cap. Mgmt., L.P. v. Dondero*, Case No. 20-3190-sgj, Dkt. 190 (Bankr. N.D. Tex.)).

Lawsuit")).  Mr. Dondero subsequently added ACM and Mr. Terry as defendants in January 2020, AC ¶ 35, only to purportedly voluntarily dismiss the 2019 Lawsuit without prejudice for lack of service on all of the defendants on February 5, 2020, *id.* ¶ 38.  Then, the day after this Court entered the dismissal in the 2019 Lawsuit, both DAF Defendants sued Plaintiffs again for the same alleged mismanagement.  *Id.* ¶ 39; Dkt. 15-7 (*The Charitable Donor Advised Fund, L.P. v. U.S. Bank Nat'l Ass'n*, 1:20-cv-1036-LGS, Dkt. 1 (S.D.N.Y) (the "2020 Lawsuit")).  As with the 2019 Lawsuit, the DAF Defendants voluntarily dismissed the 2020 Lawsuit before serving all of the named defendants.  AC ¶ 41.[3]

The 2019 Lawsuit and the 2020 Lawsuit made materially identical allegations against Mr. Terry and ACM.  The DAF Defendants alleged that Mr. Terry and ACM mismanaged all three Acis CLOs by effecting transactions that did not satisfy applicable tests, permitting the Weighted Average Moody's Rating Factor ("WARF") to increase, and permitting the Acis CLOs to incur unjustified fees, and that the Trustee breached its duties of due care and to avoid conflicts of interest by not interfering with ACM's management of the Acis CLOs.  *Id.* ¶¶ 36, 40.  The 2019 Lawsuit and 2020 Lawsuit each threatened Plaintiffs with tens of millions of dollars in liability.  *See* Dkt. 15-6 at 2, 31-32 (claiming "several millions of dollars in actual losses, several million dollars in expected losses" and identifying approximately $50 million in lost value); Dkt. 15-7 at 2-3, 31-32 (same).  Those claims create a real threat of litigation to Plaintiffs because there is nothing to prevent the DAF Defendants from bringing those claims again at any time.

In both the 2019 Lawsuit and the 2020 Lawsuit, the DAF Defendants relied on CLO HoldCo's indirect investment through HCLOF in the Subordinated Notes for standing and sought

---

[3]  The DAF Defendants served the Trustee with the complaints in both the 2019 Lawsuit and 2020 Lawsuit prior to the purported voluntary dismissal of each.  AC ¶¶ 38, 41.

damages allegedly suffered on that indirect investment. AC ¶¶ 37, 40, 60; Dkt. 15-6 ¶¶ 87, 96, 106, 111-12; Dkt. 15-7 ¶¶ 84, 88, 97, 112, 123. In order to proceed with such claims, the DAF Defendants need to establish double derivative standing based on alleged harm to the Acis CLOs that indirectly impacted them by injuring the Subordinated Notes owned by HCLOF. AC ¶¶ 37, 40, 60. But Guernsey law prohibits them from asserting first-level derivative standing on behalf of HCLOF, and Cayman Islands law prevents them from asserting second-level derivative standing on behalf of the Acis CLOs. *Id.* ¶¶ 62-63.

On May 8, 2020, shortly after voluntarily dismissing the 2020 Lawsuit, the DAF Defendants again threatened Plaintiffs with litigation in a seven-page, single-spaced letter (Dkt. 15-8, the "May 2020 Letter"). AC ¶ 42. The May 2020 Letter repeated the allegations from the 2019 Lawsuit and 2020 Lawsuit and demanded that the Trustee "fulfill its duties" or face "litigation" if it failed to do so. *Id.* ¶ 43 (quoting Dkt. 15-8 at 7).

In a letter addressed to the Texas Bankruptcy Court on September 23, 2020, Mr. Dondero's counsel reiterated the allegation that "Mr. Terry's … mismanagement of Acis" caused large losses to the Subordinated Notes indirectly held by the DAF Defendants. Dkt. 15-3 (No. 18-30264-sgj11, Dkt. 1191 at 1 (Bankr. N.D. Tex. Sept. 29, 2020)).[4] In the same letter, Mr. Dondero's counsel asked the Texas Bankruptcy Court to "keep an open mind" on whether it "has exercisable jurisdiction over suits based on [ACM's] post-confirmation, ordinary course of business activities," *id.*—a question only relevant because the DAF Defendants' threat of litigation persisted.

---

[4]  This letter is attached to, and incorporated by reference in, the Amended Complaint as Exhibit C.  *See* Dkt. 15-3.  The Court also may properly take judicial notice of this letter because it was filed with the Bankruptcy Court. *See Twentieth Century Fox Film v. Marvel Enters.*, 220 F. Supp. 2d 289, 293 n.4 (S.D.N.Y. 2002).

On April 28, 2021, Mr. Terry and ACM reached a settlement agreement with HCLOF (Dkt.

15-12, the "HCLOF Settlement Agreement") related to its ownership of Subordinated Notes in the

Acis CLOs.  As part of the HCLOF Settlement Agreement, HCLOF agreed to release:

> any and all claims . . . that [] HCLOF . . . has or thereafter may have, of whatsoever
> nature and kind, whether known or unknown, whether then existing or thereafter
> arising, whether arising at law or in equity, exiting on or before [April 28, 2021,]
> against Acis GP, Acis LP [ACM], and [Mr.] Terry, in any capacity, Brigade Capital
> Management, LP, U.S. Bank National Association, . . . [and] the Acis CLOs (with
> respect to any claims for breach of any duties or obligations owed by Acis to the
> Acis CLOs . . . including but not limited to any fees and expenses paid by the Acis
> CLOs to Acis)."

Dkt. 15-12 § 10; AC ¶¶ 48-50.   In other words, HCLOF, as the owner of the Acis CLOs'

Subordinated Notes, released the claims that the DAF Defendants had asserted in the 2019 and

2020 Lawsuits based on their indirect interest (through HCLOF) in the Subordinated Notes.  Mr.

Terry and ACM entered into a separate settlement agreement (the "Highland Settlement

Agreement") with HCLOF's majority owner, Highland Capital Management, L.P. ("Highland"),

in which Highland, on behalf of itself and its "subsidiaries" and "affiliates," expressly released the

Trustee and Brigade from "any and all claims . . . with respect to the [2019 and 2020] Lawsuits."

*Id.* ¶ 50 (quoting Dkt. 15-13 §§ 1(b), (c)).  The Highland Settlement Agreement was filed in the

Texas Bankruptcy Court, putting the DAF Defendants on notice that their claims could be barred

and providing an opportunity for them to object. Dkt. 15-13.  Indeed, Mr. Dondero did object to

the Highland Settlement Agreement, but the Court approved the settlement and overruled Mr.

Dondero's objection in its entirety.  *Id.* at 3.

On May 14, 2021, another Dondero-controlled entity, NexPoint, filed a lawsuit against

Plaintiffs making the same allegations that the DAF Defendants advanced in their 2019 Lawsuit,

2020 Lawsuit, and May 2020 Letter.[5]  AC ¶ 44; Dkt. 15-9 (*NexPoint Diversified Real Estate Trust v. Acis Capital Mgmt., L.P.*, Case No. 1:21-cv-04384-GHW, Dkt. 42 (S.D.N.Y.) (the "<u>NexPoint Lawsuit</u>")).  The NexPoint Lawsuit was a near-carbon copy of the 2019 and 2020 Lawsuits and further reinforced the ongoing and substantial threat of litigation faced by Plaintiffs based on the DAF Defendants' threats.  NexPoint repeated the same factual allegations of mismanagement made in the DAF Defendants' prior lawsuits—that ACM had effected transactions involving Acis CLO assets that did not satisfy applicable tests, permitted the WARF to increase, and permitted the Acis CLOs to incur unjustified and exorbitant fees, as well as that U.S. Bank had breached its duties of due care and to avoid conflicts of interest by not interfering with ACM's management of the Acis CLOs.  AC ¶¶ 36, 40, 45.  Indeed, the NexPoint Lawsuit challenged three of the same loan purchases as the 2019 and 2020 Lawsuits.  AC ¶¶ 45, 54.[6]  And NexPoint appears to have copied and pasted certain charts (or at least their underlying data) from the DAF Defendants' 2020 Lawsuit into their own complaint—close coordination inadvertently confirmed through a drafting mistake, whereby NexPoint left in the total expenses for four Acis CLOs (Acis 3, 4, 5, and 6) even though the NexPoint Lawsuit only concerned two of those CLOs (Acis 3 and 6).  *Compare* Dkt. 15-7 ¶ 74, *with* Boutilier Decl., Ex. A ¶ 83; *see also* Appendix A.

Finally, on December 28, 2021, Plaintiffs contacted the DAF Defendants to request that they disclaim their threatened claims identified in the 2019 and 2020 Lawsuits and the May 2020 Letter.  Dkt. 15-10; *see* AC ¶ 47.  Plaintiffs offered to "negotiate a form of release" to spare both

---

[5]   The DAF Defendants have not contested that Dondero exercises functional control over NexPoint as its founder, owner, and portfolio manager.  AC ¶ 31; Dkt. 15-2 at 20 n.68.

[6]   The NexPoint Lawsuit challenged three of the same specific purchases as the 2019 and 2020 Lawsuits—the Chief Power, KCA Deutag UK Finance PL, and Envision Healthcare purchases. *Compare* Dkt. 15-6 ¶ 63 & Dkt. 15-7 ¶ 64, *with* Ex. A to the Declaration of Misha Boutilier ("<u>Boutilier Decl.</u>") (original complaint in the NexPoint Lawsuit) ¶¶ 99, 101, 104.

parties "unnecessary litigation expense." Dkt. 15-10 at 1-2. The DAF Defendants refused. Dkt. 15-11 at 2; AC ¶ 47. At no time since the 2019 Lawsuit, the 2020 Lawsuit, and the May 2020 Letter have the DAF Defendants done anything to walk back their litigation threats. Indeed, to the contrary, the DAF Defendants in their opening brief assert that they might bring the threatened claims even if the declaratory judgment sought in this case is obtained. Mot. at 13 ("there is nothing barring DAF/CLOH from later establishing standing to sue").

The DAF Defendants, in their brief and in Mark Patrick's supporting declaration, attempt to distance themselves from the NexPoint Lawsuit (Mot. at 4-6) by asserting that DAF has "no right of control" over NexPoint or Mr. Dondero. Mot. at 4; *see also* Decl. of Mark Patrick (Dkt. 41-2, the "Patrick Decl.") ¶ 6 (the DAF Defendants do not "own[] or control[] NexPoint"). That denial offers no response to Plaintiffs' central allegation: Mr. Dondero functionally controls **both** NexPoint **and** the DAF Defendants, AC ¶¶ 1, 19, 31, and as a result, Mr. Dondero's decision to bring the DAF Defendants' threatened claims through NexPoint reaffirms the DAF Defendants' threat to bring those claims as well, *id.* ¶ 46.

Separately, the DAF Defendants make a factual assertion that Mr. Patrick, the Managing Member of the DAF's corporate parent, "continuously had exclusive control to make . . . the decision of whether to cause DAF [or CLO HoldCo] to file suit" "[s]ince at least March 24, 2021." Patrick Decl. ¶ 5. This factual assertion similarly offers no response to Plaintiffs' allegation that, notwithstanding Mr. Patrick's purported formal control of the DAF Defendants, Mr. Dondero functionally controls both the DAF Defendants and NexPoint. AC ¶¶ 1, 19, 31. As the Court observed at the June 9, 2022 hearing on Plaintiffs' request for jurisdictional discovery, Mr. Patrick's declaration is "careful[ly] word[ed]" so as not to conflict with the factual findings of the Texas Bankruptcy Court in a decision holding the DAF Defendants in contempt for filing a lawsuit

in April 2021 in violation of an anti-suit-injunction.  Boutilier Decl., Ex. B (Tr. of June 9, 2022

Hearing at 15:13).  There, after hearing testimony from Mr. Dondero and Mr. Patrick, the Texas

Bankruptcy Court rejected Mr. Patrick's claims of exclusive control, instead finding:

> The totality of the evidence was clear that ***Mr. Dondero sparked this fire*** (i.e., the
> idea of bringing the District Court Action to essentially re-visit the HarbourVest
> Settlement and to find a way to challenge Mr. Seery's and the Debtor's conduct),
> and ***Mr. Patrick and Sbaiti & Company, PLLC, were happy to take the idea and
> run with it***.  The court believes the evidence was clear and convincing that Mr.
> Dondero encouraged Mr. Patrick to do something wrong, and ***Mr. Patrick basically
> abdicated responsibility to Mr. Dondero with regard to dealing with Sbaiti and
> executing the litigation strategy***.

Dkt. 15-2 at 21 (emphasis added); *id.* at 30 (holding the DAF Defendants, Sbaiti & Company,

PLLC, Mr. Patrick, and Mr. Dondero in civil contempt of court).  Plaintiffs have incorporated

those factual findings into their Complaint to support their allegations of functional control.

AC ¶ 31 n.1.  Ultimately, the Court need not rely on Plaintiffs' well-pled allegations concerning

Mr. Dondero's functional control, because the DAF Defendants' two prior lawsuits, subsequent

threatening demand letter, and refusal to disclaim the threats they have repeatedly made, satisfy

the case-or-controversy requirement regardless of who is responsible for the filing of the NexPoint

Lawsuit.  Nonetheless, in the event the Court does conclude that it is necessary to address Mr.

Dondero's functional control, Mr. Patrick's declaration does not contradict the Complaint's

allegations, or the Texas Bankruptcy Court's findings, of functional control.

## LEGAL STANDARD

A Rule 12(b)(1) motion must be denied if the plaintiff "establish[es] the[] elements of

Article III standing."  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (quotation

omitted) (second alteration in original).  A plaintiff meets that burden by "alleg[ing] facts that

affirmatively and plausibly suggest that [the plaintiff] has standing . . . if the evidence proffered

by the defendant . . . does not contradict the [complaint's] plausible allegations."[7]  *Id.* at 56-57;
*see also Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022) (similar).

<u>**ARGUMENT**</u>

The Complaint alleges that Plaintiffs brought this action to free themselves from the DAF
Defendants' repeated threats of litigation that risk imposing millions of dollars in liability on
Plaintiffs.   The DAF Defendants' motion ignores these well-pled allegations.   The DAF
Defendants assert that Plaintiffs are suing solely to redress injury to the holders of Subordinated
Notes (the "Subordinated Noteholders") and argue that Plaintiffs thus lack standing and are not
the real parties in interest to bring such claims.  Mot. at 6-7.  The DAF Defendants are wrong on
both counts.  Plaintiffs are suing to stop the DAF Defendants from "hanging the perpetual threat
of further litigation . . . over Plaintiffs' heads."  AC ¶ 7.  Plaintiffs have standing to seek declaratory
judgment to remove these threats, and Plaintiffs are the proper parties to obtain declaratory
judgment that the threatened claims against them are meritless.   While the Court need decide
nothing more to deny the DAF Defendants' motion to dismiss, their motion fails even if the DAF
Defendants' theory that the action is brought solely to protect the Subordinated Noteholders were
correct.  The delay in payments to the Subordinated Noteholders is a cognizable injury, that injury
is traceable to the DAF Defendants' actions and redressable by judicial declaration, and Plaintiffs
are proper parties to that declaratory relief.

---

[7]   Moreover, "[d]ocuments attached to the complaint are considered part of the pleadings when
deciding a motion to dismiss."  *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 729 n.2 (S.D.N.Y.
2010).

# I.    THE DAF DEFENDANTS' THREATS TO SUE PLAINTIFFS CREATED A CONTROVERSY AND MADE PLAINTIFFS THE REAL PARTIES IN INTEREST

## A.    The DAF Defendants' Litigation Threats Satisfy The Case-Or-Controversy Requirement

The DAF Defendants' repeated and credible threats of litigation satisfy the case-or-controversy requirement and create exactly the type of controversy that the Declaratory Judgment Act, 28 U.S.C. § 2201, exists to redress.  An Article III case or controversy exists when the plaintiff shows that: (1) it has suffered an injury in fact, (2) traceable to the defendant's actions, and (3) that the court can redress.  *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 79 (2d Cir. 2013), *as amended* (Mar. 21, 2013).  Where, as here, plaintiffs seek declaratory judgment, the case or controversy requirement is satisfied if (1) there is a "definite and concrete" dispute between "parties having adverse legal interests," and (2) that dispute "admi[ts] of specific relief through a decree of a conclusive character."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007).  It is governing law in this Circuit that "[a] declaratory judgment action . . . [i]s properly commenced in light of [a] real threat of litigation."  *See Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir. 1991); *see also U.S. Bank Nat'l Ass'n. v. Triaxx Asset Mgmt. LLC*, 2021 WL 4993895, at *7 (S.D.N.Y. Oct. 26, 2021) (finding it "well-settled" in this District that a "non-speculative threat of litigation" establishes a case or controversy); 12 Moore's Federal Practice - Civil § 57.22 (2022) ("a reasonable apprehension of being sued satisfies the actual controversy requirement").[8]

---

[8]    *See also Sketchworks Indus. Strength Comedy, Inc. v. Jacobs*, 2021 WL 1226955, at *3 (S.D.N.Y. Mar. 31, 2021) ("threat of future litigation remains relevant in determining whether an actual controversy exists"); *Carlin Equities Corp. v. Offman*, 2007 WL 2388909, at *2-3 (S.D.N.Y. Aug. 21, 2007) ("real threat of litigation" established controversy); *In re Chateaugay Corp.*, 201 B.R. 48, 67 (Bankr. S.D.N.Y. 1996) ("Actual threats of litigation . . . constitute a real and immediate controversy"), *aff'd in part*, 213 B.R. 633 (S.D.N.Y. 1997); *Young Women's Christian Ass'n of U. S., Nat'l Bd. v. HMC Ent., Inc.*, 1992 WL 279361, at *3 (S.D.N.Y. Sept. 25, 1992)

The DAF Defendants' conduct here has created a real threat of litigation. The DAF Defendants have not just threatened litigation; they actually filed two lawsuits against Plaintiffs. Both lawsuits were voluntarily withdrawn with a reservation of rights to refile. AC ¶¶ 32-41. And the DAF Defendants made clear in their May 2020 Letter, after withdrawing the 2020 Lawsuit, that they intended to maintain their threatened claims and bring those claims unless the Trustee acquiesced to their demands. *See id.* ¶¶ 42-43. The DAF Defendants' lawsuits alone are enough to satisfy the case-or-controversy standard because their voluntarily dismissals do not remove Plaintiffs' reasonable fear that the DAF Defendants might reassert those claims. *See Carlin Equities*, 2007 WL 2388909, at *3 (voluntary dismissal of lawsuit did not eliminate controversy because plaintiffs feared that defendant "would reassert . . . claims in another [] action").

"Simply holding litigation in abeyance," as the DAF Defendants have done, "does not eliminate the case or controversy" created by "the threat of future litigation." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 96 (2d Cir. 2011), *aff'd*, 568 U.S. 85 (2013). Even had the DAF Defendants not filed the 2019 and 2020 Lawsuits, they expressly threatened litigation in the May 2020 Letter— more than enough to satisfy the "real threat" requirement, which does not even require a "direct threat to sue" like the DAF Defendants made here. *See Young Women's Christian Ass'n*, 1992 WL 279361, at *3.

The DAF Defendants' refusal to disclaim their threatened claims in response to Plaintiffs December 2021 letter, *see* AC ¶ 47; Dkts. 15-10, 15-11, further confirms that Plaintiffs' fears of

---

(similar). This jurisprudence is consistent with Article III because "standing to bring a declaratory judgment claim may be premised on threatened rather than actual injury." *U.S. Bank Nat'l Ass'n.*, 2021 WL 4993895, at *7 (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016); *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982)).

future litigation brought by the DAF Defendants are reasonable. *See Baur v. Veneman*, 352 F.3d 625, 637 n.11 (2d Cir. 2003) ("post-filing events may confirm that a plaintiff's fear of future harm is reasonable"); *Sketchworks*, 2021 WL 1226955, at *3 (finding controversy because defendants refused plaintiffs' requests to "provide[] assurances . . . that they would refrain from litigating"). Likewise, the NexPoint Lawsuit, virtually copied and pasted from the DAF Defendants' prior complaints, is further confirmation of the litigation threats orchestrated by Mr. Dondero.  AC ¶¶ 44-46.

The DAF Defendants' effort to overcome this clear record of litigation threats cannot be squared with governing law, their own actions, or the well-pled allegations of the Complaint.

*First*, the DAF Defendants' assertion that Plaintiffs only sued "to remedy injuries to the Holders of Subordinated Notes," not also to free themselves from threatened litigation (Mot. at 6), cannot be squared with the Complaint.  The Complaint clearly states that Plaintiffs are suing to stop the DAF Defendants from "threatening to bring meritless litigation against Plaintiffs" in addition to whatever benefits might flow to Subordinated Noteholders from judgment.  AC ¶ 1; *see also id.* ¶ 2 (seeking relief from Mr. Dondero's "harass[ment] [of] Plaintiffs through threatening letters and legal actions"), ¶ 7 (seeking relief from the DAF Defendants' "hanging [of] the perpetual threat of further litigation . . . over Plaintiffs' heads"), ¶ 31 (seeking relief from Dondero's "vendetta" against Plaintiffs); ¶ 38 (seeking relief from "hold[ing] the sword of litigation above Plaintiffs' heads"); ¶ 46 (Plaintiffs sued to prevent "further litigation . . . against ACM and Mr. Terry . . . [and] U.S. Bank"); ¶ 52 (seeking relief from "threatened claims . . . hung over Plaintiffs' heads").  The DAF Defendants' attempt to graft some ulterior purpose onto Plaintiffs' Complaint, or to suggest that Plaintiffs' Complaint lacks the allegations noted above, is meritless.  The fact that a judgment in Plaintiffs' favor may *also* benefit the Subordinated

Noteholders is beside the point to whether Plaintiffs have standing to redress injuries in their own right.

*Second*, the DAF Defendants' reliance on the "certainly impending" language in *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (Mot. at 10-11), is misplaced.  In *Clapper*, the Supreme Court considered a constitutional challenge to a statute authorizing surveillance of foreign nationals brought by U.S. persons who feared that the government would target their communications with foreign nationals.  The Supreme Court found this fear was "highly speculative" because the government had never threatened to target foreign nationals' communications with plaintiffs, who lacked "actual knowledge of the Government's [] targeting practices" and could only guess about how government officials might exercise their discretion. *Clapper*, 568 U.S. at 410-12.

Unlike in *Clapper*, where plaintiffs attempted to imply the threat of harm from surrounding circumstances because the declaratory judgment defendant had never expressly threatened plaintiffs, the DAF Defendants made real and explicit threats of litigation against Plaintiffs.  Those real threats are sufficient to establish a case or controversy with "sufficient immediacy and reality to warrant . . . a declaratory judgment" and establish Article III standing.  *See Medimmune*, 549 U.S. at 127; *Kidder*, 925 F.2d at 562 ("real threat of litigation" created case or controversy); *Carlin Equities*, 2007 WL 2388909, at *2-3 ("threat[] to sue" created case or controversy); *Classic Liquor Importers, Ltd. v. Spirits Int'l B.V.*, 151 F. Supp. 3d 451, 457 (S.D.N.Y. 2015) ("threat of future litigation" created case or controversy).  In cases like *Clapper*, in which an explicit threat is absent, courts look to whether the unthreatened harm is nonetheless so "certainly impending" as to render it non-speculative and justiciable.  By contrast, here, as in *Kidder* and numerous subsequent Southern District cases, the explicit threat to sue renders the potential injury (a lawsuit against

Plaintiffs claiming millions of dollars in damages) non-speculative and sufficiently immediate as the Declaratory Judgment Act and Article III require.  Having refused to disclaim their threatened claims (AC ¶ 47) and having asserted in briefing that they may bring their threatened claims after "later acquiring standing" regardless of how this Court rules (Mot. at 12-13), the DAF Defendants cannot now suggest they did not "mean" to follow through on their threats, *see Classic Liquor Importers, Ltd.*, 151 F. Supp. 3d at 457 (rejecting argument that defendant "did not really mean" to threaten litigation), or that they were "just kidding," *Lee v. Makhnevich*, 2013 WL 1234829, at *4 (S.D.N.Y. Mar. 27, 2013) (similar).

*Third*, the DAF Defendants' suggestion that their threats to "proceed to litigation" in the May 2020 Letter (AC ¶ 43) somehow grew stale by the time Plaintiffs initiated this lawsuit (Mot. at 11) has no support in the case law.  *See, e.g.*, *Sasson v. Hachette Filipacci Presse*, 2016 WL 1599492, at *2 (S.D.N.Y. Apr. 20, 2016) (finding controversy where plaintiffs sought declaratory judgment five months following last threat to sue); *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 900-01 (Fed. Cir. 2008) (finding case or controversy where declaratory judgment suit was not filed until four years after the defendant sent the last warning letter).  Since that time, the DAF Defendants have done nothing to disclaim their threats, or otherwise relieve Plaintiffs from the threats they chose to impose.  Moreover, the statute of limitations for many of the DAF Defendants' purported claims is six years, leaving plenty of time for them to follow-through on their threats.[9]  And, given the opportunity to stand down in December 2021, the DAF Defendants

---

[9]    The DAF Defendants' negligence claim against ACM and Mr. Terry is subject to a six-year statute of limitations because it alleges "failure to exercise due care in the performance of a contract."  *See Rodriguez v. Central Parking Sys. of N.Y., Inc.*, 17 Misc.3d 108, 109 (1st Dep't 2007); Dkt. 15-7 at 3 & ¶¶ 106-110, 122-27 (negligence claims based on alleged "violation of the requirements of the Indentures and the PMA").

refused to do so, confirming that their threats continue to pose a substantial risk to Plaintiffs.  *See Baur*, 352 F.3d at 637 n.11 ("post-filing events" relevant to whether future litigation likely).

The DAF Defendants' two prior lawsuits, subsequent threatening demand letter, and refusal to disclaim the threats they have repeatedly made are sufficient to establish a case or controversy.  But even if any further actions were required, Plaintiffs have alleged that the filing of the NexPoint Lawsuit in May 2021 reaffirmed the DAF Defendants' threats because Mr. Dondero functionally controls both NexPoint and, as the Texas Bankruptcy Court found, the DAF Defendants.  AC ¶¶ 31 n.1, 44-46; Dkt. 15-2 at 21.  The Complaint's allegations concerning Mr. Dondero's functional control of the DAF Defendants, including the Complaint's adoption of the Texas Bankruptcy Court's findings (*see* AC ¶ 31 n.1), must be credited because Mr. Patrick's declaration "does not contradict" them.  *See Carter*, 822 F.3d at 57.  As the Court observed, Mr. Patrick's declaration is instead "careful[ly] word[ed]" to avoid such a contradiction.  Boutilier Decl., Ex. B at 15:13; *see supra*, at 8.

Nor is it correct that Plaintiffs sat on their rights by waiting until December 2021 to file their declaratory judgment claims.  After receiving the May 2020 Letter, Plaintiffs negotiated with the direct owner of the Subordinated Notes, HCLOF, to reach a settlement and release of the DAF Defendants' threatened claims.  AC ¶¶ 48-50.  That settlement was completed in April 2021, Dkt. 15-12, and Plaintiffs were hopeful that the HCLOF Settlement Agreement and the related Highland Settlement Agreement could lead to global peace on the DAF Defendants' threatened claims.  Mr. Dondero instead caused NexPoint to file claims virtually identical to the DAF Defendants' claims the very next month, in May 2021.  The DAF Defendants thereafter refused Plaintiffs' request to disclaim their threats to bring derivatively the claims that HCLOF has already released directly

16

earlier that year.  AC ¶¶ 44-47.  With this context, the timing of Plaintiffs' declaratory judgment action makes perfect sense.

*Fourth*, the DAF Defendants' assertion that Plaintiffs lack injury due to their indemnification rights against the Acis CLOs (Mot. at 11-12) is meritless and inconsistent with relevant authority.  It has long been settled law that third-party agreements to transfer the risks and rewards of legal claims do not impact legal standing.  Thus, in *Sprint Commc'ns Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269 (2008), the Supreme Court held that assignees of claims have Article III standing to pursue them despite having agreed to remit all proceeds from the claims back to their assignors.  *Id.* at 287 ("What does it matter what the [assignees] do with the money afterward?  The injuries would be redressed whether the aggregators remit the litigation proceeds to the [assignors], donate them to charity, or use them to build new corporate headquarters."); *accord WR Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008) ("The Court [in *Sprint*] explicitly rejected the argument that assignees lacked standing because they planned to remit the litigation proceeds to the assignors.").

Courts applying the reasoning from *Sprint* to cases like this where a party is indemnified against the losses for which it seeks a legal remedy have consistently concluded that the third-party indemnification agreement has no impact on standing.  For example, in *Alta Wind I Owner Lessor C v. United States*, 150 Fed. Cl. 152 (Fed. Cl. 2020), the court rejected a standing challenge brought against a wind-farm owner who sought to recover against the U.S. government for underpayment of stimulus funds despite having already been indemnified by the third-party leasing those wind farms for the full amount of the underpayment.  *Id.* at 155.  After a lengthy analysis of *Sprint* and related cases, the court concluded:

> Here, as owners of the [wind farms], plaintiffs are the parties who suffered the initial alleged injury of underpayment, and, as owners and applicants, plaintiffs are

> entitled to receive the [stimulus] check from the Government . . . The alleged
> underpayment under [the stimulus statute], the injury in this case, continues to exist
> even if another party contractually bore the risk of the injury occurring and has a
> contractual claim on any proceeds recovered from the litigation.  An analysis of
> standing focuses on the legal injury itself, rather than outside agreements between
> plaintiff and third parties.

*Id.* at 169 (internal quotations omitted); *see also Kawa v. United States*, 77 Fed. Cl. 294, 299 (2007)

(plaintiff injured by government underpayment had standing even though "he was protected from

liability under [] escrow agreement" with third party); *Am. Mar. Transp., Inc. v. United States*, 18

Cl. Ct. 283, 291 (1989) (similar).  These cases recognize standing because "it was plaintiffs—

rather than a third party—who suffered the initial legal injury," *Alta Wind I Owner Lessor C*, 150

Fed. Cl. at 169, which "guarantee[s] [the] 'concrete adverseness'" that Article III requires

regardless of whether a third party later indemnifies plaintiff, *id.* (quoting *Sprint Commc'ns Co.*,

554 U.S. at 288-89).  The same result follows here because the DAF Defendants threatened to sue

Plaintiffs, not the Acis CLOs or the Subordinated Noteholders.

The DAF Defendants' inapposite out-of-circuit cases address the existence of an injury in

coverage disputes between an insurer and an insured where the insured has already received

coverage from a third-party.  *See Koons v. XL Insur. Am., Inc.*, 620 F. App'x 110, 113 (3d Cir.

2015) (insured who obtained liability coverage from non-party insurer and assigned all claims and

rights to recovery to that non-party insurer lacks standing to pursue declaration of coverage against

party insurer); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Continental Ill. Corp.*, 110 F.R.D.

615, 618 (N.D. Ill. 1986) (insurer cannot seek non-coverage declaration against officers and

directors who were fully indemnified by company for costs of lawsuits that had been previously

dismissed).  The existence of separate liability coverage from a third-party rendered the threat of

a coverage dispute with the insurer at some point in the future either speculative or nonexistent.

*Koons*, 620 F. App'x at 113 (threat or coverage dispute eliminated because declaratory judgment

plaintiff assigned away all claims and rights to recovery to third-party insurer); *Nat'l Union*, 110 F.R.D. at 618 (threat of coverage dispute speculative because it was contingent on further litigation being filed against insured directors that falls outside scope of coverage provided by the company they serve).  Neither of the DAF Defendants' cases stand for the novel theory that the existence of insurance coverage (or, here, indemnification) renders an explicit threat of litigation insufficiently concrete to satisfy the case-or-controversy requirement.  Nor would that theory make practical sense, as Plaintiffs remain the parties who would be primarily liable in the DAF Defendants' threatened lawsuit.

Further, full indemnification is not guaranteed here.  The Plaintiffs have attempted to reserve prudently against anticipated costs, but the full cost of litigation cannot be predicted with certainty.[10]

### B.    Declaratory Judgment Will Redress Plaintiffs' Injury

Declaratory judgment will redress the threatened injury traceable to the DAF Defendants' actions by "reliev[ing] [Plaintiffs] from the Damoclean threat of impending litigation."  *Museum of Mod. Art v. Schoeps*, 549 F. Supp. 2d 543, 548 (S.D.N.Y. 2008) (quotations omitted); *see also, e.g.*, *Kidder*, 925 F.2d at 563 (declaratory judgment would redress threatened litigation by "dispel[ling] all uncertainty regarding the liability of [plaintiff] for [the threatened] claims"); *U.S. Bank Nat'l Ass'n*, 2021 WL 4993895, at *8 (declaratory judgment "would redress . . . threatened injuries" by "bar[ring] potential future suits").  The DAF Defendants' contrary suggestion that

---

[10]    Moreover, while Plaintiffs are confident that the retention of liquidation proceeds is proper under the Acis CLOs Indentures, HCLOF has indicated that it may challenge the retention, which challenge, if successful, could leave Plaintiffs without any source of indemnification.  Dkt. 36 at 2; *see also* NexPoint Lawsuit, Case No. 1:21-cv-04384-GHW, Dkt. 44 at 10-11.

they might "later acquire standing," to bring their threatened claims (Mot. 12-13) is factually dubious and legally irrelevant.

Factually, the DAF Defendants have no way of obtaining standing for their threatened claims in the future. HCLOF owns all of the Subordinated Notes in Acis 4 and Acis 5. Other than NexPoint, which has already sued, HCLOF holds substantially all of the Subordinated Notes in Acis 6. AC ¶ 17. And HCLOF has agreed that any future sale of the Subordinated Notes will be subject to the terms of the HCLOF Settlement Agreement, include its release, barring the claims threatened by the DAF Defendants that are at issue here. Dkt. 15-12 § 2(ii). If that were not enough, the HCLOF Settlement Agreement also prohibits HCLOF from selling the Subordinated Notes to the DAF Defendants or "any other entities owned or controlled by James Dondero." *Id.* § 2(iii). Thus, the DAF Defendants have no real avenue to acquire future standing for their claims, and a declaration on their present lack of standing will be dispositive of the question.

Even if the DAF Defendants' far-fetched, hypothetical were a real possibility—and it is not—that would not negate the "likel[ihood] . . . that the injury will be redressed by a favorable decision." *See Women for Am. First v. de Blasio*, 520 F. Supp. 3d 532, 541 (S.D.N.Y. 2021); *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016) (rejecting argument that injury not redressable because it "requires [] improper speculation"). Plaintiffs need not also show that declaratory judgment might redress every conceivable future injury in a hypothetical world that has no possibility of materializing. *Dean v. Town of Hempstead*, 527 F. Supp. 3d 347, 406 (E.D.N.Y. 2021) ("The redressability prong does not demand that court-ordered relief completely redress all injury."). Declaratory relief would redress the injuries the DAF Defendants threatened in the 2019 and 2020 Lawsuits and the May 2020 Letter, which is all Plaintiffs seek and all the

law requires.  AC ¶¶ 65, 73; *see Sprint Commc'ns Co.*, 554 U.S. at 287 (redressability "focuses . . . on whether the injury that a plaintiff alleges is likely to be redressed through the litigation").

## C.      Plaintiffs Are Real Parties In Interest

In addition to creating a controversy, the DAF Defendants' threats to sue Plaintiffs made Plaintiffs the real parties in interest.  Federal Rule of Civil Procedure 17 is satisfied when the plaintiff "possesses the right to enforce the claim and [] has a significant interest in the litigation." *Park B. Smith, Inc. v. CHF Indus. Inc.*, 811 F. Supp. 2d 766, 774 (S.D.N.Y. 2011).  Plaintiffs meet the test because they have the statutory right to seek a declaratory judgment to be free from threatened litigation, and they have a significant interest in the litigation because it will free them from millions of dollars in potential liability.  *See Humm v. Lombard World Trade, Inc.*, 916 F. Supp. 291, 298 (S.D.N.Y. 1996) (investors were "real parties in interest" because they "face[d] [] liability").  As with traceability, the DAF Defendants only challenge whether Plaintiffs are the real parties in interest to prevent "injuries to . . . the Holders of Subordinated Notes" (Mot. at 14) and do not contest that Plaintiffs are the real parties to protect themselves from threatened litigation. The DAF Defendants cannot, because whether the Acis CLOs may cover Plaintiffs' costs of defending against the threatened claims is irrelevant to whether Plaintiffs are the real parties in interest.  *See Stoncor Grp., Inc. v. Peerless Ins. Co.*, 2021 WL 2215558, at *6 (S.D.N.Y. June 2, 2021) (insured was real party in interest in indemnification contract claim against insurer even though another insurer had indemnified plaintiff's litigation costs).  Because the DAF Defendants' threats to sue Plaintiffs for millions of dollars created a controversy for which Plaintiffs are the real parties in interest, the Motion should be denied.  The Court need not also consider whether a controversy exists and whether Plaintiffs are the real parties in interest under the DAF Defendants' (incorrect) theory that Plaintiffs are only suing to redress injury to the Subordinated Noteholders.

## II.     THE MOTION SHOULD BE DENIED EVEN UNDER THE DAF DEFENDANTS' NOTEHOLDER-INJURY THEORY

While the Court need not reach whether a controversy exists or Plaintiffs are the real parties in interest under the DAF Defendants' erroneous theory that Plaintiffs are suing solely to prevent injury to the Subordinated Noteholders, the Motion should be denied even under that theory because the DAF Defendants have still created a controversy and Plaintiffs remain the real parties in interest.

*First*, the DAF Defendants' threats to sue Plaintiffs injured the Subordinated Noteholders by delaying payments to them.  *See* 15 Moore's Federal Practice - Civil § 101.40 (2022) (the "loss of the use of money for a period of time" constitutes injury); *see also Caul v. Petco Animal Supplies, Inc.*, 2021 WL 6805889, at *2 (E.D.N.Y. Dec. 22, 2021) ("temporary deprivation of money to which a plaintiff has a right is a sufficient injury to establish standing").  And that injury is traceable to the DAF Defendants because their threats caused it.  *See* AC ¶ 51; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (injury that is "causal[ly] connect[ed]" to the defendant's action is traceable).[11]

*Second*, declaratory judgment will redress the injury to the Subordinated Noteholders by freeing reserved funds for distribution, *see* AC ¶¶ 7-8, 52, and the DAF Defendants' conclusory speculation that distributions may continue to be withheld because Plaintiffs have not also sued

---

[11]    That Plaintiffs exercised prudent judgment in creating the reserves so the Acis CLOs could satisfy their indemnification obligations does not make the injury "[s]elf-inflicted" (Mot. at 10) or somehow break the chain of causation.  *See St. Pierre v. Dyer*, 208 F.3d 394, 402 (2d Cir. 2000) (injury that was the "direct result of defendants' misfeasance" was not "so completely due to plaintiff's own fault as to break the causal chain"); *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013) (holding that defendants were "'wrong[]' to 'equate[] injury 'fairly traceable' to the defendant[s] with injury as to which the defendant[s'] actions are the very last step in the chain of causation'" because "Article III requires no more than *de facto* causality") (quoting *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)).

themselves or the Acis CLOs (Mot. at 12) is meritless.  *See Women for Am. First*, 520 F. Supp. 3d at 541.[12]

*Third and critically*, Plaintiffs are the real parties in interest even under the DAF Defendants' noteholder injury theory because Plaintiffs "ha[ve] the power to enforce the right in question"—the right to seek declaratory judgment to be free from threatened litigation that is delaying distributions.  *See House of Eur. Funding I Ltd. v. Wells Fargo Bank*, 2015 WL 5190432, at *5 (S.D.N.Y. Sept. 4, 2015).  Plaintiffs are therefore authorized to seek declaratory judgment in respect of those rights regardless of whether they will "benefit from the right's vindication." *See id.*; *Stoncor Grp.*, 2021 WL 2215558, at *6 (party with "the power to enforce its right under the contract . . . is a real party in interest, even though it may not ultimately be entitled to financially benefit").  While no further authority is required, the Trustee is also the real party in interest under the Acis CLOs Indentures[13] because they authorize the Trustee to enforce the Indentures without possession of the notes.  *See* Indentures § 5.6 ("All rights of action and claims under this Indenture . . . may be prosecuted and enforced by the Trustee . . . and any such action or Proceeding by the Trustee shall be brought in its own name as a trustee of an express trust . . .").  The DAF Defendants' threats arise from the Acis CLOs Indentures.  *See* Dkt. 15-6 at 3 (alleging "violation of . . . the Indentures"); Dkt. 15-7 at 3 (same); Dkt. 15-8 at 6 (similar).

## III.   DECLARATORY RELIEF IS APPROPRIATE

Finally, the DAF Defendants' suggestion that the Court should exercise discretion to dismiss Plaintiffs' request for declaratory relief (Mot. at 15) merely rehashes the DAF Defendants' baseless claim that their repeated threats of litigation are somehow abstract and hypothetical, rather

---

[12]   The DAF Defendants' argument that they might "later acquir[e] standing" (Mot. at 12-13) fails for the reasons set forth in Section I.B., *supra*.

[13]   The Acis CLOs Indentures are docketed as Dkts. 41-6, 41-7, and 41-8.

than real and concrete. There is nothing "remote, attenuated, and hypothetical" (*id.*) about the claims that the DAF Defendants have asserted in two separate lawsuits and a subsequent demand letter. The Declaratory Judgment Act exists to provide relief from uncertainty in precisely these circumstances by "temper[ing]" the DAF Defendants' ability "to refuse to initiate a lawsuit while hanging the threat of one over" Plaintiffs. *See Museum of Mod. Art*, 549 F. Supp. 2d at 547. Having refused to withdraw their claims at the very start of this action, AC ¶ 47, it is far too late for the DAF Defendants to claim that they were "just kidding," *see Lee*, 2013 WL 1234829, at *4. Plaintiffs should not be "required to await [the DAF Defendants'] initiation of an action to settle this actual controversy" that has threatened Plaintiffs with injury, disrupted the operation of the Acis CLOs, and delayed distributions to investors. *Id.*

## CONCLUSION

For the reasons stated above, the Motion should be denied.

Dated: New York, New York
June 17, 2022

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Jonathan E. Pickhardt*
Jonathan E. Pickhardt
Blair A. Adams
Misha Boutilier
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiffs Joshua N. Terry and Acis Capital Management, L.P.*

SEWARD & KISSEL LLP

By: */s/ Mark D. Kotwick*
Mark D. Kotwick
Thomas Ross Hooper
Julie J. Hong
One Battery Park Plaza
New York, New York 10004
(202) 574-1200

*Attorneys for Plaintiff U.S. Bank National Association, in its capacity as Trustee*

**APPENDIX A**

**Alleged Purchases and Expenses at Issue in Both the 2019 Lawsuit
and 2020 Lawsuit, and the NexPoint Lawsuit**

| Alleged Transaction or Expense Payment | 2019 Lawsuit[14] | 2020 Lawsuit[15] | NexPoint Lawsuit[16] |
|---|---|---|---|
| Chief Power Purchase | Chief Power Buy 3/13/2019 – 3/26/2019 (¶ 63) | Chief Power Buy 3/13/2019 – 3/26/2019 (¶ 64) | Chief Power loan purchased in 2019 with a December 2020 Maturity date (¶ 99) |
| KCA Deutag Purchase | KCA Deutag UK Finance PL Buy 4/22/2019 – 5/23/2019 (¶ 63) | KCA Deutag UK Finance PL Buy 4/22/2019 – 5/23/2019 (¶ 64) | KCA Deutag purchased April through May 2019 (¶ 101) |
| Envision Healthcare Purchase | Envision Healthcare Buy 4/3/2018 – 6/18/2019 (¶ 63) | Envision Healthcare Buy 4/3/2018 – 6/18/2019 (¶ 64) | Envision Healthcare purchased April 2019 (¶ 104) |
| 11/15/19 Same Day Trades | 11/15/2019 "multiple improper same day trades which fail to meet the applicable collateral quality standards" (¶ 64) | 11/15/2019 "multiple improper same day trades which fail to meet the applicable collateral quality standards" (¶ 65) | "Another problem with these purchases is that they were often executed on the same day" (¶ 112) |
| 5/1/19 Acis 5 Expense Payment | Acis 5 Expenses Paid 5/1/19 – $27,135 (¶ 73) | Acis 5 Expenses Paid 5/1/19 – $27,135 (¶ 74) | Acis 5 Expenses Paid 5/1/19 – $27,135 (¶ 83) |
| 8/1/19 Acis 5 Expense Payment | Acis 5 Expenses Paid 8/1/19 – $609,974 (¶ 73) | Acis 5 Expenses Paid 8/1/19 – $609,974 (¶ 74) | Acis 5 Expenses Paid 8/1/19 – $609,974 (¶ 83) |
| 11/1/19 Acis 5 Expense Payment | Acis 5 Expenses Paid 11/1/19 – $437,613 (¶ 73) | Acis 5 Expenses Paid 11/1/19 – $437,613 (¶ 74) | Acis 5 Expenses Paid 11/1/19 – $437,613 (¶ 83) |
| 5/1/19 Acis 6 Expense Payment | Acis 6 Expenses Paid 5/1/19 – $56,452 (¶ 73) | Acis 6 Expenses Paid 5/1/19 – $56,452 (¶ 74) | Acis 6 Expenses Paid 5/1/19 – $56, 452 (¶ 83) |
| 8/1/19 Acis 6 Expense Payment | Acis 6 Expenses Paid 8/1/19 – $1,046,612 (¶ 73) | Acis 6 Expenses Paid 8/1/19 – $1,046,612 (¶ 74) | Acis 6 Expenses Paid 8/1/19 – $1,046,612 (¶ 83) |

---

[14]   All citations in this column are to Dkt. 15-6.

[15]   All citations in this column are to Dkt. 15-7.

[16]   All citations in this column are to Boutilier Decl., Ex. A.

| Alleged Transaction or Expense Payment | 2019 Lawsuit[14] | 2020 Lawsuit[15] | NexPoint Lawsuit[16] |
|---|---|---|---|
| 11/1/19 Acis 6 Expense Payment | Acis 6 Expenses Paid 11/1/19 – $1,074,214 (¶ 73) | Acis 6 Expenses Paid 11/1/19 – $1,074,214 (¶ 74) | Acis 6 Expenses Paid 11/1/19 – $1,074,214 (¶ 83) |