UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. BANK, NATIONAL ASSOCIATION, in its capacity as Trustee, JOSHUA N. TERRY, AND ACIS CAPITAL MANAGEMENT, L.P.,<br><br>                Plaintiffs,<br><br>  -against-<br><br>THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO LTD., AND NEXPOINT DIVERSIFIED REAL ESTATE TRUST,<br><br>                Defendants. | Case No. 1:21-cv-11059 (GHW) |

## AMENDED ANSWER OF DEFENDANT/COUNTER-PLAINTIFF NEXPOINT DIVERSIFIED REAL ESTATE TRUST TO AMENDED COMPLAINT

Defendant/Counter-Plaintiff NexPoint Diversified Real Estate Trust ("NexPoint") submits its Amended Answer to the Amended Complaint filed by Plaintiff U.S. Bank, N.A. ("U.S. Bank"), Plaintiff/Counter-Defendant Joshua N. Terry ("Terry"), and Plaintiff/Counter-Defendant Acis Capital Management, L.P. ("Acis") (together with U.S. Bank and Terry, "Plaintiffs") in Case No. 1:21-cv-11059, alleging as follows:

## NATURE OF THE ACTION

1.      NexPoint admits that Plaintiffs are seeking a declaratory judgment in this action. NexPoint denies the remaining allegations in paragraph 1.

2.      NexPoint denies the allegations in paragraph 2.

3.      NexPoint admits that it initiated a lawsuit with Case No. 1:21-cv-04384-GHW (S.D.N.Y.). NexPoint also admits that the complaint in that lawsuit pleaded, among other things, claims under the Advisers Act against Acis and Terry and under the Trust Indenture Act against U.S. Bank. NexPoint denies the remaining allegations in paragraph 3.

4.      NexPoint is without sufficient knowledge to admit or deny the allegations in paragraph 4.

5.      NexPoint denies the allegations in paragraph 5.

6.      NexPoint denies the allegations in paragraph 6.

7.      NexPoint denies the allegations in paragraph 7.

8.      NexPoint admits the allegations in paragraph 8.

## THE PARTIES

9.      NexPoint admits the allegations in paragraph 9.

10.     NexPoint admits the allegations in paragraph 10.

11.     NexPoint is without sufficient knowledge to admit or deny the allegations in paragraph 11.

12.     NexPoint admits the allegations in paragraph 12.

13.     NexPoint admits the allegations in paragraph 13.

14.     NexPoint admits the allegations in paragraph 14.

15.     NexPoint denies that Acis manages the ACIS CLOs to the extent that the allegation implies that Acis is the exclusive manager. NexPoint admits the remaining allegations in paragraph 15.

16.     NexPoint denies the allegations in paragraph 16 to the extent that Brigade's role as a sub-advisor to Acis implies that Brigade does not bear the same liability that Acis does as a registered investment advisor.

17.     NexPoint is without sufficient knowledge to admit or deny the allegations in paragraph 17.

18.     NexPoint admits the allegations in paragraph 18 to the extent that the percentages are approximations.

19.     NexPoint admits that James Dondero is an individual resident of Texas. NexPoint denies the remaining allegations in paragraph 19.

## JURISDICTION AND VENUE

20.     NexPoint admits that U.S. Bank is a national banking association. NexPoint also admits that the ACIS CLOs are Cayman Islands-exempted limited liability companies. NexPoint also admits that U.S. Bank is the trustee to the ACIS CLOs. NexPoint denies the remaining allegations in paragraph 20.

21.     NexPoint denies the allegations in paragraph 21.

22.     NexPoint admits the allegations in paragraph 22.

23.     NexPoint admits the allegations in paragraph 23.

24.     NexPoint admits the allegations in paragraph 24.

## STATEMENT OF FACTS

25.     NexPoint denies that Acis manages the ACIS CLOs to the extent that the allegation implies that Acis is the exclusive manager. NexPoint admits the remaining allegations in paragraph 25.

26.     NexPoint denies that Acis manages the ACIS CLOs to the extent that the allegation implies that Acis is the exclusive manager. NexPoint admits the remaining allegations in paragraph 26.

27.     NexPoint admits that U.S. Bank is "the Trustee under each of the ACIS Indentures." NexPoint denies the remaining allegations in paragraph 27.

28.     NexPoint admits that an arbitrator held Acis and its general partner, Acis Capital Management GP, LLC, liable to Terry for $8 million in damages. NexPoint denies the remaining allegations in paragraph 28.

29.     NexPoint is without sufficient knowledge to admit or deny the allegations in paragraph 29.

30.     NexPoint states that the allegations in paragraph 30 are based on Exhibit A to the Amended Complaint, which speaks for itself.

31.     NexPoint denies the allegations in paragraph 31.

32.     NexPoint is without sufficient knowledge to admit or deny the allegations in paragraph 32.

33.     NexPoint denies the allegations in footnote 2 of paragraph 33. NexPoint admits the remaining allegations in paragraph 33.

34.     NexPoint states that the document discussed in paragraph 34 speaks for itself and denies the Amended Complaint's characterization of that document.

35.     NexPoint states that the document discussed in paragraph 35 speaks for itself and denies the Amended Complaint's characterization of that document.

36.     NexPoint states that the document discussed in paragraph 36 speaks for itself and denies the Amended Complaint's characterization of that document.

37.     NexPoint states that the document discussed in paragraph 37 speaks for itself and denies the Amended Complaint's characterization of that document.

38.     NexPoint states that the document discussed in paragraph 38 speaks for itself and denies the Amended Complaint's characterization of that document.

39.     NexPoint admits that DAF filed a lawsuit on February 6, 2020, in the Southern District of New York. NexPoint is without sufficient knowledge to admit or deny the remaining allegations in paragraph 39.

40.     NexPoint states that the document discussed in paragraph 40 speaks for itself and denies the Amended Complaint's characterization of that document.

41.     NexPoint admits that DAF and CLO HoldCo. filed a notice of voluntarily dismissal of the lawsuit discussed in paragraph 41 on February 25, 2020. NexPoint also admits that the court ordered that dismissal the following day. NexPoint denies the remaining allegations in paragraph 41.

42.     NexPoint denies the allegations in paragraph 42.

43.     NexPoint denies the allegations in paragraph 43.

44.     NexPoint admits that it commenced a lawsuit against Acis, U.S. Bank, Terry, and Brigade in the Southern District of New York on May 14, 2021, bearing the case number 1:21-cv-04384-GHW. NexPoint also admits that the lawsuit discussed in paragraph 44 involved, among other causes of action, claims under the Advisers Act against Acis and Terry, as well as claims under the Trust Indenture Act against U.S. Bank. NexPoint also admits that it is an investor in ACIS-6, and the claims NexPoint brought in the lawsuit discussed in paragraph 44 in part concerned Acis's management of ACIS-6 and another Acis-managed CLO. NexPoint denies the remaining allegations in paragraph 42.

45.     NexPoint denies the allegations in paragraph 45.

46.     NexPoint denies the allegations in paragraph 46.

47.     NexPoint denies the allegations in the final sentence of paragraph 47. NexPoint is without sufficient knowledge to admit or deny the remaining allegations in paragraph 47.

48.     NexPoint admits that "Highland acquired a 51% controlling stake in HCLOF" in January 2021. NexPoint is without sufficient knowledge to admit or deny the remaining allegations in paragraph 48.

49.     NexPoint is without sufficient knowledge to admit or deny the allegations in paragraph 49.

50.     NexPoint is without sufficient knowledge to admit or deny the allegations in paragraph 50.

51.     NexPoint admits that the ACIS CLOs liquidated their assets and redeemed their secured notes in June 2021, leaving only the subordinated notes outstanding. NexPoint denies the remaining allegations in paragraph 51.

52.     NexPoint is without sufficient knowledge to admit or deny the factual allegations in paragraph 52 and denies any legal conclusions therein.

## STATEMENT OF RELATEDNESS TO THE NEXPOINT LAWSUIT

53.     NexPoint denies that "Local Civil Rule 13(a)(1)" has any bearing on this action because such a rule does not exist. NexPoint admits that under Rule 13(a)(1) of this District's Rules for the Division of Business Among District Judges, "[t]his Action and the NexPoint Lawsuit are related cases . . . because (a) this Action and the NexPoint Lawsuit concern the same or substantially similar parties, property, transactions or events; (b) there is substantial factual overlap between this Action and the NexPoint Lawsuit; and (c) there would be a substantial duplication of effort and expense for the Court and the parties if this Action and the NexPoint Lawsuit were not treated as related."

54.     NexPoint denies that NexPoint, DAF, and CLO HoldCo. are related parties. NexPoint admits the remaining allegations in paragraph 54.

55.     NexPoint admits that "[b]ecause this Action and the NexPoint Lawsuit concern the same facts, transactions, events, and property, and similar parties, there would be a substantial duplication of effort and expense if this Action and the NexPoint Lawsuit were not treated as related." NexPoint also admits that "[t]reating the cases as related would streamline litigation of identical and/or similar issues and avoid duplication of effort and expense by the parties and the Court." NexPoint denies the remaining allegations in paragraph 55.

## CAUSES OF ACTION

56.     NexPoint incorporates paragraphs 1–55 as if fully set forth herein.

57.     NexPoint denies the allegations in paragraph 57.

58.     NexPoint denies the allegations in paragraph 58.

59.     NexPoint admits the allegations in paragraph 59.

60.     NexPoint denies the allegations in paragraph 60.

61.     NexPoint denies the allegations in paragraph 61.

62.     NexPoint denies the allegations in paragraph 62.

63.     NexPoint denies the allegations in paragraph 63.

64.     NexPoint denies the allegations in paragraph 64.

65.     NexPoint admits the allegations in paragraph 65.

66.     NexPoint denies the allegations in paragraph 66.

67.     NexPoint incorporates paragraphs 1–66 as if fully set forth herein.

68.     NexPoint admits that Acis and HCLOF are parties to the "HCLOF Settlement Agreement." NexPoint denies the remaining allegations in paragraph 68.

69.     NexPoint denies the allegations in paragraph 69.

70.     NexPoint admits the allegations in paragraph 70.

71.     NexPoint denies the allegations in paragraph 71.

72.     NexPoint denies the allegations in paragraph 72.

73.     NexPoint admits the allegations in paragraph 73.

74.     NexPoint denies the allegations in paragraph 74.

## AFFIRMATIVE DEFENSES

### AFFIRMATIVE DEFENSE NUMBER ONE
### (Failure to State a Claim)

Plaintiffs fail to state facts sufficient to state a claim upon which relief can be granted in their Amended Complaint.

### AFFIRMATIVE DEFENSE NUMBER TWO
### (Estoppel)

Plaintiffs' claims are barred by the doctrine of estoppel. The legal issues present in this action were decided in the previous action, 1:21-cv-04384-GHW (S.D.N.Y.), and Plaintiffs are thereby estopped from raising those issues here.

### AFFIRMATIVE DEFENSE NUMBER THREE
### (Res Judicata)

Plaintiffs' claims are barred by res judicata. There was a previous action involving an adjudication on the merits; that previous action involved Plaintiffs or those in privity with them; and the claims asserted in this action were or could have been raised in the previous action.

### AFFIRMATIVE DEFENSE NUMBER FOUR
### (Waiver)

Plaintiffs' claims are barred by the doctrine of waiver. Their claims have been or should have been brought in the previous action, 1:21-cv-04384-GHW (S.D.N.Y.), and as such, the claims pleaded in the Amended Complaint are waived.

**AFFIRMATIVE DEFENSE NUMBER FIVE**
**(Not the Real Parties in Interest)**

Plaintiffs do not have standing to bring this declaratory-judgment action because they are not the real parties in interest.

**AFFIRMATIVE DEFENSE NUMBER FIVE**
**(Reservation of Rights)**

NexPoint expressly reserves the right to amend this Answer and assert any rights or defenses, including counterclaims as appropriate, it may have, which discovery or other evidence may reveal to be appropriate.

## JURY DEMAND

Pursuant to the Seventh Amendment of the United States Constitution and Rule 38 of the Federal Rules of Civil Procedure, NexPoint hereby demands a trial by jury on all issues so triable.

## COUNTERCLAIMS

Defendant/Counter-Plaintiff NexPoint Diversified Real Estate Trust ("NexPoint") respectfully files these compulsory counterclaims seeking disgorgement and to recover damages caused by the gross malfeasance of Plaintiff/Counter-Defendant Acis Capital Management, L.P. ("Acis"), Plaintiff/Counter-Defendant Joshua N. Terry ("Terry), and Additional Counterclaim Defendant Brigade Capital Management, LP ("Brigade"), (collectively with Acis and Terry, the "Counter-Defendants").[1]

Counter-Defendants are liable for (i) breaches of fiduciary duty with respect to the management of an investment trust in which NexPoint invested; (ii) tortious interference with NexPoint's rights under its Notes and conversion of funds that NexPoint would have otherwise

---

[1] This action is solely predicated on claims that accrued after February 15, 2019, which is the effective date of the Bankruptcy Court order exculpating Counter-Defendants from liability as of that date and enjoining any lawsuit or action seeking to recover for liability accruing on or prior to that date. Nothing in this action is intended to violate said injunction or order.

received; and (iii) breaches of the Portfolio Management Agreement. The acts and omissions which have come to light reveal a pattern of conduct transgressing fiduciary duties which have caused NexPoint damages.

## SUMMARY OF THE ACTION

1.    Acis CLO 2015-6 Ltd. and Acis CLO 2015-6 LLC (together, the "Issuers") acquired a series of assets, namely interests in collateralized loan obligations. Via a trust indenture agreement, the Issuers granted all rights, title, and interest in the assets to a trustee, U.S. Bank, N.A., and vested all management power over the securities in Acis, thus creating a trust for the purpose of paying off the secured noteholders and paying all residual cash flows to the equity holders (hereinafter, this arrangement is referred to as "ACIS-6").

2.    ACIS-6 is managed by Acis as the portfolio manager and Terry as the primary advisor. Brigade is a sub-advisor. All three are registered investment advisors and agreed to abide by the Portfolio Management Agreement (the "PMA").

3.    In a classic "rob Peter to pay Paul" scheme, Counter-Defendants:

- Knowingly charged ACIS-6 exorbitant amounts of "expenses" without accountability or justification;

- Knowingly caused ACIS-6 to purchase loans that failed to meet credit-quality tests and average-life tests, causing the entire portfolio to fail the applicable collateral-quality tests;

- Knowingly caused ACIS-6 to sell valuable assets cheaply; and

- Knowingly breached industry standards (*e.g.*, best execution) when buying and selling assets of managed funds.

4.    To put it simply, since February 16, 2019, Counter-Defendants have wiped out millions in value from ACIS-6 through the combined effect of their malfeasance and deprived NexPoint of the full benefit of its investment bargain.

5.     The impact on NexPoint is substantial. It is entitled to millions of dollars from ACIS-6. Counter-Defendants have caused the net asset value of ACIS-6 to nosedive. Counter-Defendants have thus caused NexPoint to suffer millions in losses.

6.     These are not just ephemeral numbers. NexPoint represents the interests of thousands of investors who rely on the promised security of these types of investments to provide cash flow and to fund things like retirements and college tuitions.

7.     NexPoint invested in ACIS-6 because the portfolio was supposed to contain relatively safe, diversified investments and, if managed properly, secure returns.

8.     The economic purpose of investing in portfolio trusts, like the one at issue, is obliterated where the portfolio manager and assorted advisors manage the portfolio for their own ends, extend the life of the existing portfolio to maximize fees earned, and prohibit the investors from realizing gains to which they are entitled. Unfortunately, that is *exactly* what Counter-Defendants did here. Counter-Defendants are legally obligated fiduciaries who must look out for the best interests of the advised funds, *i.e.*, ACIS-6 and its beneficiaries.

## THE PARTIES

9.     Defendant/Counter-Plaintiff NexPoint Diversified Real Estate Trust is a Delaware statutory trust and a publicly traded real estate investment trust. At the time of the events herein, it was denoted "NexPoint Strategic Opportunities Fund," a Delaware closed-end trust. Its principal place of business is Dallas, Texas. Interests in NexPoint are owned by people nationwide and traded on the New York Stock Exchange (NYSE: NXDT).

10.     Plaintiff/Counter-Defendant Acis Capital Management, L.P. is a Delaware limited partnership.  Acis is a registered investment advisor. It may be served via its counsel of record appearing in this lawsuit.

11.     Plaintiff/Counter-Defendant Joshua N. Terry is an individual citizen of Texas. Terry is the owner and President of Acis. Terry is a registered investment advisor. Terry may be served via his counsel of record appearing in this action.

12.     Potential Additional Counterclaim-Defendant Brigade Capital Management, LP is a Delaware limited partnership registered to do business in and with its principal place of business in the state of New York. Brigade will only be added to this case if the Court grants leave to add Brigade as a party. Brigade is being added under Rule 13(h) of the Federal Rules of Civil Procedure and, if leave to serve Brigade is granted, it may be served through Donald E. Morgan, III, 399 Park Avenue, 16th Floor, New York, New York, 10022, or wherever it may be found. Brigade is a registered investment advisor.

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over each Counter-Defendant pursuant to N.Y. C.P.L.R. 301 and/or 302.

14.      Personal jurisdiction and venue are proper as to Acis because the governing documents—the Indenture and the PMA, to which Acis is bound—require Acis to submit to the jurisdiction of New York and to waive any objection to New York as a forum or venue. Acis is authorized to and regularly conducts business in the state of New York and, here, is accused of torts directed within and at the state of New York. Furthermore, the acts and/or omissions giving rise to the causes of action herein occurred in whole or in part in this county and affected property situated in this county.

15.     Personal jurisdiction and venue are proper as to Terry because he is bound by the governing documents mentioned *supra*, and he committed torts that are the subject of NexPoint's claims against him that occurred within or were directed to New York, including certain trading

activity with brokers or dealers within New York or to New York.

16.     Personal jurisdiction and venue are proper as to Brigade because it is registered to do business in New York, and the transactions and occurrences that are the subject of NexPoint's claims against Brigade, including certain advice, communications, and trading activity with brokers or dealers, took place in whole or in part in this county.

17.     Further, by filing their Complaint in this action, Acis and Terry have consented to the Court's jurisdiction and have waived all challenges and objections to personal jurisdiction and venue. *See Adam v. Saenger*, 303 U.S. 59, 67–68 (1938).

## FACTUAL BACKGROUND

### A.  A BRIEF (AND CONTEXTUAL) PRIMER ON THE TRANSACTION

18.     Unlike a standard bond indenture trust—where unsecured bonds are issued and the indenture trustee has no "trust res" to manage or look after—the type of indenture trust at issue here creates a trust that contains a res to hold and manage, which may consist of many different forms of assets. The res of ACIS-6 contained various loan obligations and is, as such, is commonly referred to as a "Collateralized Loan Obligation" or a "CLO".[2]

19.     CLOs are a form of structured financial transaction. CLOs are usually comprised of a mixture of publicly available, floating rate, senior-secured debt instruments issued by corporations.

20.     To raise the money necessary to acquire the assets constituting a CLO, an issuer may pool CLOs together and funnel them into a special purpose vehicle. From there, the special purpose vehicle brings in the necessary funds by (1) raising equity funds from equity investors, and (2) obtaining additional financing in the form of debt, normally from the public markets, by

---

[2] A CLO does not have to be a trust, it can be organized as a corporation, a partnership, an limited liability company, or any other form of unincorporated associations.

issuing notes to third-party investors.

21.     This debt is typically arranged in tranches based on their makeup—the most senior debt being paid back first but bearing the lowest expected yield (*i.e.*, the lowest interest rate), whereas the most junior debt is paid back next-to-last but bears the highest expected yield (*i.e.*, largest interest rate). In other words, the more senior the debt, the less relative risk the investor carries.

22.     After all debt, regardless of seniority, is paid out and all defaults are taken on, the equity holders are paid. The character of incoming funds cascading down these tranches to pay the debt in descending seniority order, and then the equity holders last, is frequently referred to as a "payment waterfall."

23.     This general structure is depicted this way:



24.     The assets within a CLO are the source of cash flow that pay a CLO's expenses, followed by the principal and interest payments due on those assets—which go to the CLO's noteholders.

25.     Any cash remaining at the end of each quarter (after debt service and paying the

fees and expenses of the trustee and portfolio manager) is typically paid to the junior-most noteholders Thus, they are tantamount to the equity holders, who take on the most risk of any investor in a CLO.

26.     The value of an investor's equity increases as incoming cash flows from a CLO's assets pay the operating expenses and interest on the issued notes, and then pay down the principal on the debt tranches.

27.     As the principal of the debt tranches is paid down, the equity will realize more and more of the benefits—so long as cash flows from the assets continue in an amount that is greater than the cost of servicing the debt and the expenses.

28.     Other than the investors themselves, the key parties to the success or failure of a CLO in this arrangement are (1) the portfolio manager, (2) the advisor, and (3) the indenture trustee.

29.     Each of these parties is bound by contracts known as indentures and portfolio management agreements.

30.     A trustee's role is often limited to holding legal title to the assets, while the portfolio manager is responsible for managing the assets of the CLO.

31.     A portfolio manager's role is two-fold: (1) identify and purchase the assets within a CLO, doing so in a manner that creates the cash flow necessary to satisfy a CLO's debt-service requirements (*e.g.*, the payout, diversification, credit-quality, and average-life requirements) while not exposing the CLO to non-market risks; and (2) to monitor the assets within a CLO to ensure that, over time, those assets individually continue to meet various collateral-quality tests, which are designed to ensure a CLO can meet its debt-service requirements—all the while producing income for equity holders. This latter task usually requires the portfolio manager to

monitor each and every asset in the CLO to ensure that the CLO has a mix of assets in different industries or markets, with differing maturity dates within acceptable risk profiles, and within a variety of credit ratings. This aspect of the portfolio manager's job normally includes selling assets that are deteriorating and buying assets that are superior to those already in a CLO's portfolio; otherwise, investing too much of the portfolio in any one of these categories overexposes a CLO to risk and may well lead to losses.

32.     The portfolio manager also often serves as the primary investment advisor and may also outsource or delegate certain functions to one or more sub-advisors.

33.     Advisors of these sorts of asset pools must register as investment advisors under federal law, which imposes robust un-waivable fiduciary duties (discussed in greater detail *infra*). One such duty is to maintain the best interest of the investors and to make investment decision that are suitable to the investors' assumption of risk.

34.     Advisors are also subject to fiduciary duties imposed by state law. Registered investment advisors act for the benefit of the equity holders.

35.     As compensation, portfolio managers receive a percentage of the assets under management (the "AUM"), which is determined by the face value, or par value, of the assets in a CLO.

36.     If this compensation structure is left unchecked, portfolio managers can maximize their own pay by purchasing debt instruments with the highest par value, irrespective of the quality of these assets.

37.     Because lower-quality debt instruments are cheaper than those of higher quality, portfolio managers can acquire a greater number of these lower-quality loans and pool them in the special purpose vehicle to manipulate a CLO's fee structure for their own benefit.

38.     Doing so allows portfolio managers to achieve the largest possible par value in the aggregate—thereby "earning" the largest fees for themselves.

39.     Pursuing this strategy allows portfolio managers to earn significantly more in fees over a longer period, even though doing so exposes a CLO (and, thereby, the noteholders and equity holders) to significantly more risk due to the longer maturities and lower credit ratings of these inferior debt instruments.

40.     This is where indenture trustees come in—the governing documents charge them to safeguard the beneficiaries, doing so by monitoring changes in the assets within a CLO, as well as in the portfolio's credit quality and maturity.

41.     Indentures provide much needed structure to support oversight efforts, typically including standards, generally called collateral-quality tests, by which portfolio managers and indenture trustees are to govern the asset pools. Of immediate note, two such tests are the weighted average rating factor ("WARF") and the weighted average life ("WAL").

42.     The WARF demonstrates the credit quality of a CLO's entire portfolio. WARF is calculated by taking the credit rating of each debt instrument in a CLO, determining the percentage of the CLO portfolio that each instrument constitutes, and aggregating those to a factor of the portfolio's notional balance. The better the WARF, the lower the risk to a CLO's investors.

43.     The WAL demonstrates average maturity of the debt instruments in a CLO, *i.e.*, the riskiness of the entire portfolio with respect to the time until the principal is repaid. Calculating the WAL yields the average number of years for which each dollar of unpaid principal on an investment remains outstanding. This metric is important because, in general, investors want to be paid back sooner rather than later. Longer payouts typically mean greater

exposure to risk due to unforeseen circumstances, *e.g.*, inflation, default risk, etc. Therefore, the shorter the maturity dates, the better the WAL—and, accordingly, the lower the risk to a CLO's investors.

44.     Together, the WARF and the WAL are effective gauges to evaluate whether assets within a CLO are becoming too risky. Thus, those managing an indenture trust have several benchmarks designed to protect a CLO's noteholders and equity holders.

**B.   NexPoint Invests in the ACIS CLOs, and ACIS-6 Is Created**

45.     In or around 2014, the Issuers issued certain debt instruments to secured noteholders and equity securities (unsecured notes with residuary interests) to raise capital, and, with that cash, purchased a variety of CLOs (collectively, the "Assets").

46.     NexPoint became a holder of the subordinated notes, *i.e.*, the equity securities pursuant to the issuance. At that time, the face value of the equity was approximately $7.5 million. NexPoint invested as part of its mission and as a secure and safe investment on behalf of its investors.

47.     Via a trust indenture dated April 16, 2015 (the "Indenture"), the Issuers granted all ownership, title, and interest not only in the Assets, but also in the Indenture (attached as Exhibit 1), the PMA (attached as Exhibit 2), and other instruments, to the trustee. The Assets were granted to secure the liens of the secured noteholders.

48.     Specifically, the Indenture states that:

> The Issuer hereby Grants to the Trustee . . . **all of its right, title and interest** in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, (a) the Collateral Obligations which the Issuer causes to be delivered to the Trustee (directly or through an intermediary or bailee) herewith and all payments thereon or with respect thereto, and all Collateral Obligations which are purchased, or otherwise acquired, by the Issuer in the future pursuant to the terms hereof and all payments thereon or with respect thereto, (b) the

Issuer's interest in each of the Accounts, …any Eligible Investments purchased with funds on deposit therein, and all income from the investment of funds therein, (c) the Issuer's rights under the Portfolio Management Agreement as set forth in Article 15 hereof, the Hedge Agreements . . . the Collateral Administration Agreement, the Purchase Agreement **and any subscription agreements related to the purchase of the Notes**, (d) all Cash or Money delivered to the Trustee (or its bailee), (e) all accounts, chattel paper, deposit accounts, financial assets, general intangibles, instruments, investment property, letter-of-credit rights and other supporting obligations relating to the foregoing, (f) any other property otherwise delivered to the Trustee by or on behalf of the Issuer (whether or not constituting Collateral Obligations or Eligible Investments (including, without limitation, Equity Securities)), (g) the Issuer's rights in all assets owned by any ETB Subsidiary and the Issuer's rights under any agreement with any ETB Subsidiary and (h) all proceeds with respect to the foregoing; *provided* that such Grants shall not include the $250 transaction fee paid to the Issuer in consideration of the issuance of the Secured Notes and Subordinated Notes, the funds attributable to the issue and allotment of the Issuer's ordinary shares and the Co-Issuer's membership interests or the bank account in the Cayman Islands in which such funds are deposited (or any interest thereon) (or any funds deposited or credited thereto) (the assets referred to in (a) through (h) are collectively referred to as the "Assets"). Such Grants are made to secure, in accordance with the priorities set forth in the Priority of Payments, the Secured Notes equally and ratably without prejudice, priority or distinction between any Secured Note and any other Secured Note by reason of difference in time of issuance, documentation governing the incurrence or otherwise, except as expressly provided in this Indenture, and to secure, in accordance with the priorities set forth in the Priority of Payments of this Indenture, (i) the payment of all amounts due on the Secured Notes in accordance with their terms, (ii) the payment of all other sums payable under this Indenture and other related transaction documents and (iii) compliance with the provisions of this Indenture, all as provided in this Indenture. The foregoing Grant shall, for the purpose of determining the property subject to the lien of this Indenture, be deemed to include any securities and any investments granted to the Trustee by or on behalf of the Issuer, whether or not such securities or investments satisfy the criteria set forth in the definitions of "Collateral Obligation" or "Eligible Investments," as the case may be.

***THE TRUSTEE ACKNOWLEDGES SUCH GRANTS, ACCEPTS THE TRUSTS HEREUNDER IN ACCORDANCE WITH THE PROVISIONS HEREOF***.

Ex. 1, Indenture, pp. 1–2 (emphases added).

49.     Since closing on the Indenture, the Issuers have had no title or interest in the assets, have no independent obligation to pay NexPoint or any other Subordinated Noteholder— that obligation now rests with the Trustee who only has to pay NexPoint out of the income from the Assets and, when liquidated, NexPoint is entitled to a pro-rata share of the liquidation amount, after deducting the prescribed fees and expenses.

50.     U.S. Bank, N.A. agreed to serve as the trustee (the "Trustee"). Acis originally came on board as the portfolio manager, and Highland Capital Management L.P. ("Highland") served as the sub-advisor.

51.     NexPoint was not a signatory to the Indenture. However, by virtue of the Indenture granting all rights, title, and interest in the underlying assets and governing agreements to the Trustee and the powers therein to Acis, ACIS-6 was born. And due to its ownership of the equity securities, NexPoint became a beneficiary of ACIS-6.

52.     NexPoint's rights are solely related to the assets assigned to ACIS-6. According to the Notes, NexPoint may not seek recourse from the Issuers, the officers or directors of the Issuers, or the Trustee. Once all senior debt is paid off, the subordinated notes become entitled to all net proceeds (after expenses and fees). Today, all senior debt has been paid off. There is no interest to which the subordinated notes are senior or junior at this stage.

53.     The subordinated notes expressly incorporate by reference certain duties that are explained in the Indenture and provide that there is no recourse against the Issuers. It provides in relevant part that:

> The obligations of the Issuer under this Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Assets in accordance with the Indenture[.].

Ex. 1, Indenture, Subordinated Note, A2-7.

> Reference is hereby made to the Indenture and all indentures supplemental
> thereto for a statement of the respective rights, limitations of rights, duties
> and immunities thereunder of the Issuer, the Trustee and the Holders of the
> Notes and the terms upon which the Notes are, and are to be, authenticated
> and delivered.

*Id.* at A2-8.

54.     The subordinated notes are essentially equity:

> EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN)
> WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO
> TREAT THE SUBORDINATED NOTES AS EQUITY FOR U.S.
> FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX
> PURPOSES.

*Id.* at A2-3.

55.     The PMA also assigned away the Issuers' rights and obligations as to the original

securities.  Now, instead of the contract being between Counter-Defendants and the Issuers, it is

between Counter-Defendants and the Trustee (as counterparty).

56.     The PMA imposed several obligations on Acis as the portfolio manager, requiring

Acis to "supervise and direct the investment and reinvestment of the Assets" and to "monitor the

Assets."

57.     When Terry took over Acis in August 2018, Acis continued to serve as portfolio

manager to ACIS-6, but Terry became the advisor.

58.     As a result of having neither the labor force nor the wherewithal to manage the

Assets on its own, Acis retained Brigade to assist the company and Terry to provide the portfolio-

management services as a sub-advisor.

59.     As registered investment advisors, Acis, Terry, and Brigade are subject to the Investment Advisers Act of 1940 (the "IAA").

60.     As part of the Acis bankruptcy proceeding (the "Acis Bankruptcy")[3] in which Terry became 100% owner of Acis (as well as its president and owner of its general partner), the United States Bankruptcy Court for the Northern District of Texas formally approved Acis's appointment of Brigade as sub-advisor and shared-services provider to Acis in connection with Acis's management of the Assets.

61.     At all pertinent times through the present, Brigade has provided these services.

62.     As a sub-advisor, Brigade is the agent of Acis and, therefore, of ACIS-6. Upon information and belief, Terry needed help managing the Assets, so he retained Brigade to provide advisory services, as well as back-and middle-office functions, including, but not limited to, accounting, payments, operations, technology, and finance, among other things, in connection with Acis's obligations under the PMA.

63.     Upon information and belief, Terry employed Brigade to assist in the negotiation and execution of all documents necessary to acquire or dispose of assets under the PMA. He further delegated to Brigade certain tasks related to the Assets, including, but not limited to, identifying potential assets (and their buyers and sellers) and modeling ratings, default, and price scenarios as needed.

64.     In providing these critical portfolio-management services for ACIS-6, Brigade worked directly with and for Terry. Terry testified in the Acis bankruptcy proceedings that he intended for this arrangement to manifest.

---

[3] The two case numbers in the consolidated bankruptcy proceeding are: Case Nos. 18-30264-SGJ-11 and 18-30265-SGJ-11.

65.     Critically, although Terry effectively approves all trading activity as to ACIS-6's portfolio, Terry and Acis have no executive-level employees aside from Terry, and, upon information and belief, they do not possess the ability to manage the Assets effectively. As president and sole owner of Acis, Terry exercises complete dominion over the company and its activities. Absent a chain of command or support system, Terry answers to nothing and no one other than his self-interest and greed.

66.     Given the far-reaching extent of Brigade's involvement in managing the portfolio of ACIS-6, Brigade's conduct—and, by extension, Acis's conduct through Terry's direction and control—severely and adversely impacted ACIS-6, in which NexPoint is a noteholder and equity holder.

67.     Acis paid Brigade for its portfolio-management services as though Brigade were another portfolio manager or advisor. As of February 20, 2019, Brigade had charged Acis fifteen basis points on the Assets, a fee which Brigade represented to have been negotiated in good faith with Acis.

68.     Prior to the Acis Bankruptcy, Highland managed various Acis indenture trusts, serving as a sub-advisor to Acis. One of the original investment vehicles, ACIS-7, continued to be managed by Highland after Counter-Defendants took over control of the other Acis indenture trusts.

69.     Since August 2, 2018, Counter-Defendants have managed ACIS-6 subject to the Indenture and the PMA, which require them to "comply with all [applicable] terms and conditions of the [Indenture]" and "perform [their] obligations . . . in good faith and with reasonable care."

The Indenture's applicable "terms and conditions" obligate Counter-Defendants to ensure compliance with the collateral-quality tests described above. [4]

70.     Moreover, § 8 of the PMA prohibits the portfolio manager—here, Acis, Terry, and Brigade—from "taking any action that would intentionally, or with reckless disregard . . . adversely affect the interest of the Holders in the Assets in any material respect,"[5] unless approved in writing by, among others, a majority of both the controlling class and the subordinate noteholders.

71.     The PMA holds Acis liable for its acts or omissions, including, but not limited to, acting in bad faith, willful misconduct, gross negligence, or reckless disregard in the performance of its obligations under the Acis Indenture.

72.     Notably, § 11(a)(i) of the PMA holds Acis liable for any decrease in the value of ACIS-6's portfolio as a result of bad faith, willful misconduct, gross negligence, or reckless disregard in the performance of its obligations.

73.     As portfolio manager, advisor, and sub-advisor, respectively, Acis, Terry, and Brigade were aware that they performed services for ACIS-6 for a particular purpose.

74.     Counter-Defendants also understood, and were fully aware, that investors in the Assets, like NexPoint, directly relied on them to perform services in furtherance of their collective duty to manage the portfolio of ACIS-6 diligently.

75.     Despite the extra-contractual duties Counter-Defendants owed to NexPoint (and

---

[4] *See, e.g.*, Ex. 1, Indenture at p. 14 (*see* definition of "Collateral Quality Test"), p. 35 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12.

[5] *See* Ex. 2, PMA, p. 15.

in furtherance of clear and impermissible conflicts of interest), from February 15, 2019,[6] to the present, Counter-Defendants caused ACIS-6 to incur astronomic, unprecedented expenses, which were well outside the historical expense patterns—and, as discussed *infra*, clearly outside market and industry norms.

76.     As well, Acis failed to uphold its duty to ensure that every purchase and sale made thereunder maintained or improved any failing collateral-quality test. Acis further failed in its fiduciary capacity when it permitted transactions that did not maintain or improve ACIS-6's failing WAL metric.

77.     Moreover, Counter-Defendants attempted to offset transactions that the Indenture prohibited by making same-day, bulk purchases of loans with non-failing WALs, but that were overpriced or bad investments based on, among other factors, the loans' coupon return rates being lower than the expense to acquire them.

**C.   HOW DID COUNTER-DEFENDANTS DECIMATE THE VALUE AND INTEGRITY OF ACIS-6'S PORTFOLIO?**

78.     Before Terry took the reins of Acis, the Acis CLOs, under Highland's management, had produced consistent distributions to equity holders over time.

79.     Since Counter-Defendants assumed control of ACIS-6, this is no longer the case. Payouts to the equity holders have been far and few between.

80.     Under Counter-Defendants' management, Acis replaced shorter-term debt with longer-term loans, extending the WAL of ACIS-6's portfolio assets.

81.     This course of conduct extended the average life of the Assets and allowed

---

[6] Effective February 15, 2019, the Bankruptcy Court issued an order (the "BK Order") that (1) released any claims against Acis or Terry that accrued prior to the effective date, and (2) enjoined any lawsuit from being filed against Acis or Terry to recover on any claims that accrued prior to the effective date.

prepayments to be avoided, which resulted in, among other things: (1) increased risk, (2) decreased residual principal value, and (3) longer, artificially induced periods for interest accrual.

82.    Predictably, and as explained *infra*, Counter-Defendants' tactics have decimated the value of the Assets. Meanwhile, the revenue and profit to Acis, Terry, and Brigade have increased significantly due to artificially inflated fees, the exorbitant yet unexplained expenses foisted on the Assets, and the extended life of the Assets.

83.    The value of the assets in ACIS-6's portfolio is best understood through an

84.    assessment of the net asset value (the "NAV") of its equity. Because equity is junior to all debt, healthy equity signifies healthy debt. Unhealthy equity (or, worse yet, equity that has been wiped out) signifies potential default at least as to the less senior debt tranches. The NAV of the Acis CLOs over time (counting the distributions made to equity) can be seen via the following graphic illustration:



85.    The NAV of ACIS-6's equity has been reduced to approximately thirty cents on the dollar.

86.     This data makes it no small wonder that national CLO rankings place each Terry-managed indenture trust at the bottom of every list in terms of performance.

87.     Yet, despite beginning with similar profiles and investment goals as the other Acis CLOs, ACIS-7, which remains under Highland's management, has done remarkably well, returning almost one hundred cents on the dollar.

88.     Thus far, NexPoint has discerned three primary ways that Counter-Defendants have eradicated the value of ACIS-6's portfolio.

### 1.   **Mis-Accruing and Mis-Allocating Expenses**

89.     Prior to Terry and Brigade advising the ACIS-6 portfolio, the Acis CLOs generally paid out millions of distributions to the equity holders, and expenses were remarkably low (as a percentage of those distributions).

90.     The expenses incurred since February 15, 2019, have been nothing short of impressive. Counter-Defendants literally inverted the distributions-to-expenses ratio that had been in place for years prior.

91.     Upon information and belief, the following graphic depicts that inexplicable inversion:

| Expenses Paid before Highland was removed | | | | | |
|---|---|---|---|---|---|
| Date | A3 | A4 | A5 | A6 | Total |
| 11/1/2017 | 53,366 | 74,533 | 75,099 | 97,077 | 300,075 |
| 2/1/2018 | 45,996 | 79,541 | 97,729 | 149,641 | 372,907 |
| 5/1/2018 | 32,194 | 15,635 | 11,723 | - | 59,552 |
| 8/1/2018 | - | 27,653 | 39,900 | 33,217 | 100,771 |
| **Total** | **131,557** | **197,363** | **224,450** | **279,935** | **833,305** |

| Equity Distirbutions Paid before Highland was removed | | | | | |
|---|---|---|---|---|---|
| Date | A3 | A4 | A5 | A6 | Total |
| 11/1/2017 | 1,068,208 | 1,434,935 | 1,220,175 | 1,499,862 | 5,223,179 |
| 2/1/2018 | 471,645 | 898,027 | 640,095 | 870,666 | 2,880,433 |
| 5/1/2018 | 229,888 | 1,231,081 | 1,096,471 | 1,313,207 | 3,870,646 |
| 8/1/2018 | - | - | 166,472 | 651,402 | 817,874 |
| **Total** | **1,769,741** | **3,564,043** | **3,123,213** | **4,335,136** | **12,792,132** |

92.     The ratio was approximately $13 million in equity distributions to shareholders versus less than $900,000 in expenses, or roughly 14-to-1 distributions to expenses.

93.     Since Counter-Defendants began managing ACIS-6, the distributions to expenses has plummeted to what it is now: an anemic 0.25-to-1 ratio.

94.     Because of the way the Acis CLOs have been managed, the expenses were distributed proportionately among themselves, thereby impacting ACIS-6 *pro rata*.

95.     Assuming that remains true, and given the amount of revenue that Acis has purportedly earned, roughly $12 million, Acis has taken well over $24 million in revenue through its manipulation of the Assets and accompanying expenses as of NexPoint's latest estimate.

96.     ACIS-6 has never incurred such profoundly high expenses and fees. This includes roughly $2.3 million in extra profits to Acis, as well as substantial legal fees incurred by Acis itself (not by the Assets, and not for the benefit of ACIS-6's beneficiaries).

97.     Acis periodically reported its expenses, yet wholly lacked candor, as evidenced by the use of misleading descriptions and failure to come clean about what all the expenses actually were for.

98.     For it to all come at the expense of the investors in ACIS-6, *i.e.*, the beneficiaries, is gob smacking.

99.     That the expenses were incurred by Counter-Defendants—who are registered investment advisors—only *after* securing bankruptcy protections for themselves against redemptions gives rise to a strong inference that they are not properly allocated as expenses.

100.    That Acis has represented these expenses as having been charged on behalf of or for the benefit of ACIS-6, and then unilaterally collecting those expenses under the same pretense, gives rise to a strong inference that Counter-Defendants knowingly misrepresented the nature and proper allocation of these expenses.

101.    That Counter-Defendants have complete control over this information and have not disclosed it, all the while misrepresenting the nature of the fees and expenses, is a bad-faith manipulation of their duties and rights under the Indenture and the PMA.

**2.     Failure to Buy Loans that Satisfy the Collateral Quality Requirements.**

102.    Considering the life cycle of a CLO, the Assets are currently outside the reinvestment period. As such, ACIS-6 is stuck with the assets it has at this moment.

103.    Normally this may be fine, but not so here. The issue is that, prior to the close of the reinvestment period, Counter-Defendants caused ACIS-6 to buy and hold collateral that failed the risk parameters delineated in the Indenture and the PMA.

104.    Relatedly, the Notes (via incorporation from the Indenture) also provide that, for future purchases and sales of collateral obligations, Counter-Defendants shall only consummate transactions that satisfy certain investment criteria.

105.     One such criterion for all purchases is that either (A) each requirement or test, as the case may be, of the Concentration Limitations and the Collateral Quality Test will be satisfied, or (B) if any such requirement or test was not satisfied immediately prior to such reinvestment, such requirement or test will be maintained or improved after giving effect to the reinvestment. *See, e.g.*, Indenture § 12.2(a)(iv).

106.     The defines "Collateral Quality Test" as:

> A test satisfied if, as of any date of determination . . . in the aggregate, the Collateral Obligations owned (or, for purposes of *pro forma* calculations in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer satisfy . . . the Maximum Moody's Rating Factor Test . . . [and the] Weighted Average Life Test.

107.     These tests are defined, in turn, as follows:

> "<u>Maximum Moody's Rating Factor Test</u>": The test that will be satisfied on any date of determination if the Weighted Average Adjusted Moody's Rating Factor[7] of the Collateral Obligations is less than or equal to the lesser of (i) the sum of (A) the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Moody's Asset Quality Matrix, based upon the applicable "row/column combination" chosen by the Portfolio Manager with notice to the Collateral Administrator . . . plus the Excess Recovery Adjustment Amount.

---

[7] "Weighted Average Adjusted Moody's Rating Factor" means "[a]s of any date of determination, a number equal to the Weighted Average Moody's Rating Factor determined in the following manner: for purposes of this definition, the last paragraph of the definition of "Moody's Default Probability Rating," the second to last paragraph of the definition of "Moody's Rating" and the last paragraph of the definition of "Moody's Derived Rating" will be disregarded, and instead each applicable rating on credit watch by Moody's that is on (a) positive watch will be treated as having been upgraded by one rating subcategory, (b) negative watch will be treated as having been downgraded by two rating subcategories and (c) negative outlook will be treated as having been downgraded by one rating subcategory. *See, e.g.*, Indenture, pp. 64–65.

"Weighted Average Moody's Rating Factor" means "[t]he number (rounded up to the nearest whole number) equal to: (i) the sum of the products of (a) the Principal Balance of each Collateral Obligation (excluding Equity Securities) multiplied by (b) the Moody's Rating Factor of such Collateral Obligation, divided by (ii) the Aggregate Principal Balance of all such Collateral Obligations." *Id*.

> "Weighted Average Life Test": A test that is satisfied if the Aggregate Weighted Average Life[8] on such date of determination is not later than November 18, 2022.

*See, e.g.*, Ex. 1, Indenture at pp. 37–38.

108.     These provisions of the Indenture seek to maintain the integrity and continued performance of the Assets by requiring certain parties, including the portfolio manager and the Trustee, to ensure that the collateral complies with the detailed, industry-recognized, bargained-for tests—the exact safeguards on which investors relied when investing in the Assets.

109.     Similar to those terms concerning collateral quality, these provisions aim to ensure the rights of any investor under the Indenture, such as NexPoint, are not diluted.

110.     Moreover, some loans have maturity dates further out than what is appropriate; others simply lacked the creditworthiness on their own to qualify under the governing parameters. Counter-Defendants' purchase of these loans violated the PMA, the course of performance, and good industry practices.

111.     Equally important, Counter-Defendants' purchase of these loans did not maintain or improve the credit quality of the ACIS-6 portfolio, which violates the terms of the Indenture and the PMA.

112.     The purchase of these loans caused ACIS-6 to suffer substantial losses.

113.     An analysis of these individual trades and purchases further underscores Acis's failure to adhere to the Indenture's collateral-quality requirements.

114.     For example, ACIS-6 is required to provide monthly reports which disclose, among

---

[8] "Aggregate Weighted Average Life" means "[w]ith respect to all Collateral Obligations as of any date of determination is a date equal to (A) the actual number of years (…) following such date obtained by (i) *summing* the products obtained by *multiplying* the Weighted Average Life at such time of each Collateral Obligation *by* the Principal Balance at such time of such Collateral Obligation and (ii) *dividing* such sum *by* the Aggregate Principal Balance at such time of all Collateral Obligations *plus* (B) such date of determination. Indenture, p. 6.

other things, whether the Assets remain in compliance with the requisite WAL thresholds.[9]

115.    The WAL threshold for the portfolio of ACIS-6 is 4.66.

116.    On August 21, 2018, the Assets registered a failing WAL of 4.78. According to the Indenture, failing the WAL threshold means that Counter-Defendants could not make any further transactions unless a given purchase improved the WAL of ACIS-6's portfolio.

117.    Further, the portfolio manager must use commercially reasonable efforts to effect the sale of any collateral obligation that no longer meets the applicable criteria, including assets causing the portfolio to fail the WAL threshold.

118.    From a practical perspective, this means that (1) the portfolio manager needed to sell all collateral obligations that caused the Assets to violate the WAL threshold, and (2) the portfolio manager could only execute transactions that would effectuate a more favorable WAL.

119.    Despite these requirements, Counter-Defendants made multiple purchases that did not improve the WAL, thereby violating the terms of the Indenture.

120.    Counter-Defendants may well argue that even though these acquisitions did not meet the WAL threshold, they bundled these purchases with loans that did satisfy the WAL threshold.

121.    According to such a contention, Counter-Defendants purport to have met the requisite WAL threshold by packaging these loans together to average out to a satisfactory WAL under the Indenture's terms. But their argument is illusory. Counter-Defendants bought loans with maturity dates that are more than two years apart, which the Indenture does not allow. Once the less risky notes are paid off more quickly due to their shorter durations, ACIS-6's portfolio becomes disproportionately weighted with longer-term notes, no longer offset by the healthier notes.

---

[9] *See* Ex. 1, Indenture, § 10.7.

122.    The result of Counter-Defendants' course of conduct initially projects an impression (albeit, a false one) that a portfolio's WAL threshold is under control, while, in reality, it is a mirage, soon to be vanquished by a predictably rapid ascension in WAL due to the less risky debt being paid off.

123.    Pairing these loans of diverging quality circumvents the maintain/improve language engrained in the Indenture's WAL threshold.

124.    Counter-Defendants' actions saddle investors with long-dated collateral, escalating duration risk, and increasing ACIS-6's debt levels, which is particularly problematic because the Assets should be decreasing in maturity time and deleveraging through the amortization of shorter-term loans.

### 3.   Buying Bad Investments

125.    Upon information and belief, Counter-Defendants intentionally and purposefully purchased substandard assets.

126.    For instance, Counter-Defendants bought nineteen loans on a single day, likely in a scheme to circumvent the requisite WAL threshold.

127.    These loans remain in ACIS-6's portfolio and, due to a continuing and (apparently) uncurable default, are currently valued at approximately twenty cents on the dollar.

128.    Counter-Defendants should have foreseen, and indeed foresaw, this risk given the low credit ratings.

129.    Had Counter-Defendants abided by the requirements of the Indenture and the PMA (not to mention prudent investing standards), these losses incurred by ACIS-6 could have been avoided.

130.    There was no pro-investor justification for how Counter-Defendants managed this investment.

### 4.   **Failure to Provide Best Execution**

131.   Counter-Defendants' loan purchases were often executed on the same day at a time when the market was flying high. Single-day purchases tend to make assets more expensive to buy.

132.   These same-day purchases violated Counter-Defendants' duties of best execution.

133.   Counter-Defendants' purchases also appear to have been consolidated together to create the false appearance that a portfolio's WAL threshold had been maintained or improved upon. Absent this consolidation, the same-day purchases could not have maintained or improved the failing WAL thresholds on individual bases.

134.   Additionally, many of the purchased assets were some of the cheapest on the market—and yet were still overpriced.

135.   At the time Counter-Defendants executed these purchases, loans were scarce, making the market conditions much more suitable for sellers than buyers.

136.   The prudent course would have been to remain in cash or identify investment opportunities that were more secure and of shorter duration. Counter-Defendants did not do so.

137.   Moreover, Counter-Defendants caused ACIS-6 to sell certain collateral prematurely and at a severe discount.

138.   As a result of Counter-Defendants' tactics and actions, the mix of assets in the ACIS-6 portfolio is well short of the required WARF, and the maturity of the assets in the portfolio has pushed well past the required WAL.

139.   Both the Indenture and the PMA require Acis to seek best execution.[10]

---

[10] *See* Ex. 1, Indenture, § 12.2; PMA, § 4(a).

## CAUSES OF ACTION

### COUNT ONE
**Breach of Fiduciary Duty**
**Against All Counter-Defendants**

140.    NexPoint incorporates all factual averments in this pleading as if fully set forth herein.

141.    Fiduciary duties are unique in nature and of the utmost importance. These duties involve "something stricter than the morals of the market place"—the "standard of behavior" is "[n]ot honesty alone, but the punctilio of an honor the most sensitive." *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, J.).

142.    Counter-Defendants did not come close to upholding this standard.

143.    NexPoint first explains the three sources of fiduciary duties applicable to some or all of Counter-Defendants, subsequently turning to general allegations of breach, causation, and damages.

**A.  THERE ARE THREE INDEPENDENT BASES FOR FIDUCIARY DUTY**

**1.  Counter-Defendants Owe Fiduciary Duties Under the IAA that Are Actionable Under New York Law**

144.    As registered investment advisors, each Counter-Defendant is subject to the IAA.

145.    The IAA establishes an unwaivable fiduciary duty for investment advisors.[11]

---

[11] *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979) ("[Section] 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers." (citation omitted)); *SEC v. DiBella*, 587 F.3d 553, 568 (2d Cir. 2009) ("The 'legislative history of the [IAA] leaves no doubt that Congress intended to impose enforceable fiduciary obligations' on investment advisors." (citation and brackets omitted)). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (citing *Proxy Voting by Investment Advisers*, Investment Advisers Act Release No. IA-2106 (Jan. 31, 2003)).

146.    Counter-Defendants' fiduciary duties are broad and apply to the entire advisory relationship. The core of the fiduciary duty is to always act in the best interest of their investors— the advisor must put the ends of the client before its own ends or the ends of a third party. *See SEC v. Gruss*, 245 F. Supp. 3d 527, 591 (S.D.N.Y. 2017).

147.    The essence of these fiduciary duties is manifested in the duties of loyalty, transparency, and utmost care.

148.    These duties also signify that Counter-Defendants must follow the terms of any agreements and regulations that apply to the investment vehicles.

149.    The fiduciary duties Counter-Defendants owed to NexPoint are predicated on trust and confidence. Section 204A of the IAA requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent registered investment advisors from violating disclosure rules. 15 U.S.C. § 80b-4a; *see also* 17 C.F.R. § 275.206(4)-7(a).

150.    Therefore, registered investment advisors must disclose all aspects relevant to potential conflicts of interest and report their own malfeasance to investors.

151.    Specifically, for all conflicts of interest, registered investment advisors must (1) disclose those conflicts to the clients verbally, in writing, on Form ADV,[12] and (2) obtain the client's written consent before proceeding with any transaction that could be deemed double dealing.[13]

---

[12] General Instruction 3 to Part 2 of Form ADV (stating that an adviser's disclosure obligation "requires that [the adviser] provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest [the adviser has] and the business practices in which [the adviser] engage[s], and can give informed consent to such conflicts or practices or reject them").

[13] Investment Advisers Act Release 3060, *supra*; General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your *clients* of all material facts relating to the advisory relationship. As a fiduciary, you also must seek to avoid conflicts of interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and

152.     Where registered investment advisors trade on their own behalf or place their interests above those of the advisee or investors, the IAA holds such registered investment advisors liable to the advisee and its investors for breaching their fiduciary duty.

153.     Section 206 of the IAA prohibits registered investment advisors from employing "any device, scheme, or artifice to defraud any client or prospective client," "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client," or to "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(1)–(2), (4).

154.     Section 206 of the IAA focuses on the use of the unlawful means—its provisions do not require that the activity be in the offer or sale of any security, or in connection with a purchase or sale with the advisee. They do not require evidence of reliance or materiality.

### 2.     Acis Owes Fiduciary Duties as Co-Trustee of ACIS-6

155.     ACIS-6 is a valid trust under New York law. *See Brown v. Spohr*, 73 N.E. 14, 16–17 (N.Y. 1904).

156.     The Indenture designates the equity holders as the beneficiaries of ACIS-6. In doing so, the Issuers granted all *equitable* title in the Assets to the noteholders, among them, NexPoint.

157.     The Issuers granted legal title in the Assets to two entities: first, to Acis to manage the Assets, and second, to the Trustee as custodian and certain ministerial obligations.

---

your clients that could affect the advisory relationship. This obligation requires that you provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest you have and the business practices in which you engage, and can give informed consent to such conflicts or practices or reject them."). *See also Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 472 (D.C. Cir. 2019) ("[R]egardless of what Form ADV requires, [investment advisers have] a fiduciary duty to fully and fairly reveal conflicts of interest to their clients.").

158.    The Indenture designates U.S. Bank, N.A. as the "Trustee" of ACIS-6. The Indenture states that the Trustee is granted "all title and interest" in specific assets of the Issuer and Co-Issuer, and that the Trustee "accepts these trusts , leaving the Issuers essentially as empty shells and nominal players only. The Issuers identified the specific Assets as the property constituting ACIS-6's res and that would pass to the Trustee. And upon execution of the Indenture, not only did all legal title and interest to the trust res actually passed to the Trustee of ACIS-6 from the Issuers, custody passed as well .

159.    Acis, the portfolio manager, was designated as the manager of all aspects of the investment—typically, a trustee role.

160.    Therefore, in executing the Indenture, the Issuers, as trust settlors, formed ACIS-6, a trust created under New York law.

161.    Under New York law, a person acting as an investment manager for property for the benefit of another, and who is vested with the discretion and power to decide what investment to make, owes fiduciary duties directly to the beneficiaries of the propert . *See Matter of Wallens*, 877 N.E.2d 960, 962 (N.Y. 2007); *Mercury Bay Boating Club, Inc. v. San Diego Yacht Club*, 557 N.E.2d 87, 95 (N.Y. 1990); *see also* 106 N.Y. Jur. 2d Trusts § 348 ("Since the relationship between a trustee and advisor is that of a cotrustee, with the advisor having the controlling power, the trustee is justified in complying with the directives of the advisor and will not, generally, be held liable for any losses[.]") (citing *In re Est. of Rubin*, 540 N.Y.S.2d 944 (N.Y. Sur. Ct. 1989)); J. R. Kemper, *Construction and Operation of Will or Trust Provision Appointing Advisors to Trustee of Executor*, 56 A.L.R.3d 1249, § 10 ("Consonant with the status of a nonbeneficiary advisor as a quasi-trustee, or assistant to a trustee, it has generally been held or recognized that such an advisor stands in a fiduciary relationship to the beneficiaries of a[] . . . trust.").

162.    The division of authority between Acis and the Trustee as to ACIS-6 is nothing

unordinary. "[T]he terms of [a] trust may provide that certain powers shall be exercised by one

trustee and other powers by another." *Crocker-Citizens Nat'l Bank v. Younger*, 481 P.2d 222,

228 (Cal. 1971) (citing 2 A.W. SCOTT, THE LAW OF TRUSTS § 185 (3d ed. 1967)). Here, the

Trustee functions as a standard trustee per the trust-formation documents, and Acis functions as

a trustee as to its assigned roles in the Indenture and PMA, which makes Acis a  trustee with

fiduciary duties to the beneficiaries of ACIS-6. *See Rubin*, 540 N.Y.S.2d at 947.

163.    As such, Acis "must act with the same diligence, loyalty, and prudence" that a

trustee otherwise would. *See* Kemper, *supra*, 56 A.L.R.3d 1249, § 10; *see also Rubin*, 540

N.Y.S.2d at 947 ("Insofar as the status of an advisor is concerned, the courts have generally

considered him a fiduciary, somewhat in the nature of a . . . special trustee.").

164.    As Acis's control person, Terry also bore the fiduciary duties that inured to Acis

as co-trustee of ACIS-6 or is liable for aiding and abetting a breach of fiduciary duty.

165.    Brigade knew of such duties and directly participated in identifying the trades,

had a direct pecuniary interest in inflating its own fees, and is thus liable directly or for aiding

and abetting a breach of fiduciary duty.

### 3.  Under New York Law, Acis Owes Fiduciary Duties to ACIS-6 Even If Not a Trust

166.    Under New York law, investment advisors owe fiduciary duties to their clients

and "may be subject to tort liability for failure to exercise reasonable care, irrespective of their

contractual duties," since in "these instances, it is policy, not the parties' contract, that gives rise

to a duty of care." *Sommer v Fed. Signal Corp.*, 593 N.E.2d 1365, 1369 (N.Y. 1992); *see also*

*Bullmore v Ernst & Young Cayman Islands*, 846 N.Y.S.2d 145, 148 (N.Y. App. Div., 1st Dep't.,

2007) (professional investment adviser had fiduciary duty in connection with investment advice tendered, notwithstanding whether a direct contractual duty exists).

167.    New York further recognizes that an investor has a direct action for an injury resulting from a wrongful inflation of the value of assets as a means to inflating the manager's fees or to avoid negative reactions from investors. *See Bullmore v. Banc of Am. Sec. LLC*, 485 F. Supp. 2d 464, 471 (S.D.N.Y. 2007); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 409 (S.D.N.Y. 2005) ("the principal wrong here appears to have been a valuation fraud that injured plaintiffs, not the Funds") (citing *Coronado Dev. Corp. v. Millikin*, 175 Misc. 1, 5, 22 N.Y.S.2d 670, 674 (Sup. Ct. 1940) (injury "resulting from the dissemination of false information as to corporate assets or business or management, as distinguished from a wrongful withholding or taking or dissipation of corporate property or interference with its business, necessarily constitutes a direct injury to individual stockholders and is a wrong to them rather than to the corporation and may be redressed by suit by individual stockholders suing in their own right")).

168.    Here, Acis owed fiduciary duties under New York law directly to the investors and to the ACIS-6 CLO. Acis is thus liable for breach of these duties, and Terry as control person is likewise liable directly or as an aider and abettor, as is Brigade.

## B.  BREACH, CAUSATION, AND DAMAGES

169.    Counter-Defendants violated their fiduciary duties by breaching the terms of the Indenture, by self-dealing, and by converting property of the investors for themselves.

170.    Because of the life cycle of a CLO, the Assets are currently outside the period of reinvestment. Therefore, ACIS-6 is stuck with the assets it has.

171.    The problem is that, prior to the close of the reinvestment period, Counter-Defendants caused ACIS-6 to buy and hold collateral that would not have qualified for the risk parameters delineated in the PMA and the Indenture.

172.    Certain loans have maturity dates further out than what is necessary or appropriate. Certain loans simply lacked the creditworthiness on their own to qualify. The purchase of these loans violated the PMA, as well as the course of performance and good industry practices.

173.    Equally important, the purchase of these loans violated the requirements in the Indenture and the PMA that any trading should maintain or improve the credit quality of the portfolio.

174.    This has caused the ACIS-6 portfolio to suffer substantial losses. Several examples are shown here.

    a.    <u>Chief Power.</u> Throughout the relevant time period, Counter-Defendants held the Chief Power loan, which bore a very dismal Caa1/B- rating when Counter-Defendants initially purchased it. Critically, the loan had a December 2020 maturity date. The loan's lack of creditworthiness is evidenced not only by its low credit rating, but also by the fact that it was not refinanced when it could have been in 2018–2019. The loan was then downgraded to Caa2/CCC in the fall of 2019. It was only then that Counter-Defendants went on to sell this loan at 51 cents on the dollar within a year, locking in $4.7 million of realized losses to the Acis CLOs. The manager had purchased this loan with a December 2020 (1+ year) maturity date on the same day Counter-Defendants bought multiple loans with 2025 (6+ year) and 2024 (5+ year) maturities. This is important because the 2025 and 2024 loans <u>do not</u> maintain or improve failing WAL tests in existence at the time of purchase. However, the addition of Chief Power was

plainly to generate the appearance of a *blended* WAL that did maintain or improve the failing WAL test. This type of chicanery is not allowed by, nor is it in the spirit of, the Indenture, and ended up directly causing almost $5 million in losses to the Acis CLOs. There was no pro-investor justification for how Counter-Defendants managed this investment.

b. <u>Glass Mountain Pipeline.</u> Counter-Defendants purchased $2 million of this loan on a single day (April 30, 2019). It had B3/B ratings at the time of purchase, indicating heightened credit risk, and also had a December 2024 maturity date, which was 5.5+ years from the purchase date. The WAL test for ACIS-6 that bought this loan was failing at this time, meaning a loan purchased needed to maintain or improve the failing WAL, which stood at four years or shorter. This was a purchase that, in addition to heightening credit risk and increasing the average maturity date of ACIS-6's portfolio, also violated the Indenture's credit-quality requirements. Similar to other situations, Counter-Defendants bought nineteen loans on a single day, likely in a scheme to circumvent the WAL test restrictions. Counter-Defendants should have known and foreseen this risk because of the low credit ratings. Had Counter-Defendants abided by the Indenture and the PMA, as well as prudent investing standards, these losses to ACIS-6 would have been avoided. There was no pro-investor justification for how Counter-Defendants managed this investment.

c. <u>KCA Deutag.</u> Counter-Defendants purchased this loan with a Caa1/CCC+ rating at the time of its purchase in April through May 2019. There was no justification to purchase loans with a Caa/CCC rating, as the implied credit quality is far too risky for a levered CLO structure. The purchase price averaged 85 cents on the dollar (*i.e.*, of the face

value of the loan), which also implies significant credit risk. Counter-Defendants ended up selling this loan six months later on November 18, 2019, at 65 cents on the dollar, locking in $1.8 million in losses. The low credit rating and the fact that the loan had a long maturity date would have warned Counter-Defendants that the loan lacked the requisite credit quality and would not maintain or improve the credit quality of the portfolio; in fact, it would have certainly dragged the credit quality down. There was no pro-investor justification for how Counter-Defendants managed this investment.

d.  <u>Libbey Glass.</u> This loan was being held by Acis for no apparent reason. Its B2/B credit was weak, which is why it had not already been refinanced or extended during a very strong 2018–2019 market. Inexplicably, Counter-Defendants held on to the loan, which was downgraded to B3 in November 2019 and again to Caa2/CCC in March 2020. The issuer corporation filed for bankruptcy, and the loan was restructured into reorganized equity, wiping out essentially all the value from the lenders. Counter-Defendants' decision to hold the loan throughout the entire downward process locked in $12.7 million of tangible losses to the Acis CLOs. There was no pro-investor justification for how Counter-Defendants managed this investment.

e.  <u>Carestream Health.</u> This loan had B3/B- ratings. The credit was very weak, which was reflected in the ratings, and is why it had not already been refinanced or extended during a very strong 2018–2019 market. Following an S&P downgrade from B- to CCC+ in February 2020 (and also remaining Creditwatch Negative), Counter-Defendants sold this loan across all portfolios on the same day (March 3, 2020) at 75 cents on the dollar, locking in $4.8 million of realized losses to the Acis CLOs.

f.  <u>Envision Healthcare.</u>  This loan had B2/B+ ratings at the time of purchase in April 2019 because the loan had been issued with a maturity date of October 2025.  The WAL of this loan was 6.5 years. The WAL Tests for the CLOs that bought this were failing at this time, meaning a loan purchased needed to main or improve the failing WAL Tests, which were all standing at less than 4.0 years or shorter. This was a purchase that clearly violated the CLOs' indentures. The loan would go on to be downgraded to its current Caa2/CCC ratings. The loan is currently still held in the Acis CLO portfolios at a $1.5 million loss thus far.

g.  <u>Doncasters.</u> This loan bore a B3/B- rating which means it was unlikely to be paid off or refinanced. While Counter-Defendants continued to hold the loan (which they should never have bought), Caa1/CCC- and the manager sold the loan around July 1, 2020, at an average price of 80.51, locking in $1.2 million of realized losses to the Acis CLOs in less than a year.

h.  <u>Lumileds (Bright Bidco).</u> This loan is being held in violation of the CLOs' indentures. As of February 16, 2019, the loan had just recently been issued, carried B1/B ratings, and has a June 2024 maturity date, which was nearly six years from when it was bought in September 2018. The WAL Tests for the CLOs that bought this were failing at this time, meaning it failed to maintain or improve the failing WAL Tests, which were all standing at four years or shorter. In September 2019, the loan was downgraded to B3/CCC+, and in November 2019, the loan's ratings were downgraded again to Caa1/CCC+. The manager has not sold any of this loan to date. Today, the loan trades at 76-77, which is currently $2.2 million in losses to the Acis CLOs.

i. <u>McGraw-Hill.</u> This loan had B2/B rating and was downgraded by Moody's to B3 in May 2019 and then again to Caa2 in August 2020. S&P downgraded the rating to B- in May 2020 and to CCC+ in September 2020. This was a loan with a very weak credit profile, but seemingly one that the manager believed in, as this was one of the largest positions put on by the manager. However, after purchasing over $36 million across four CLOs between August 2018 and December 2019, the manager decided to sell all of it on a single day--September 30, 2020—at a price of $82.75, foregoing any chance of a par recovery. This loan was then fully paid off at 100 cents on the dollar <u>roughly three months </u>later in January 2021. The sell at $82.75 cost the four CLOs a total of $5.9 million compared to the full paydown the CLOs would have received in January 2021 had the loans not been sold;

j. <u>GIP III Stetson.</u> The GIP Stetson loan bore low credit ratings of Ba3/B+ and, more critically, was a loan that carried a 6+ year maturity (July 2025) that made purchasing it a violation of the indentures. The WAL Test of this loan did not maintain or improve the failing WAL Tests. By purchasing this loan—in addition to all the others herein— the manager was engaging in a scheme or artifice to deceive by manipulating the metrics of the indenture in bad faith. The manager was buying risky loans that never should have been included in the collateral pool. The loan was subsequently downgraded to B1/B-, and the manager sold this loan at 66 cents on the dollar between May 2020 and August 2020, locking in $1.5 million in damages. It is also curious as to why the manager would then sell this loan down 34 points; not long after the loan was sold, the trading levels moved up materially and is now trading at 96 cents on the dollar.

k. <u>Boardriders.</u>   Purchased in March 2019, the loan had B3/B- ratings at the time of purchase, indicating heightened credit risk, and it also had an April 2024 maturity date, which was 5+ years from when it was purchased. The WAL Tests for the CLOs that bought this were failing at this time, meaning a loan purchased needed to maintain or improve the failing WAL Tests, which were all standing at 4.0 years or shorter. This was a purchase that, in addition to heightened credit risk, also violated the CLOs' indentures. The loan is currently still held in the portfolios, has been downgraded to B3/CCC, and trades in the low-mid 90s--several points lower than where it was purchased--and reflects a loss of $442,193;

l. <u>Premiere Brands (Nine West)</u>. This loan had B3/B- ratings at the time of purchase, including a Caa1 tranche rating on the loan, indicating heightened credit risk, and also had a March 2024 maturity date, which almost five years from when it was bought in April 2019. The WAL Tests for ACIS-6, the CLO that bought this, was failing at this time, meaning a loan purchased needed to maintain or improve the failing WAL Tests, stood at 4.15 years. This was a purchase that, in addition to heightened credit risk, also violated the CLOs' indentures. Similar to other situations, the manager bought sixteen items on a single day, which is a violation of the indenture and of best execution conventions. The loan has subsequently been downgraded to Caa2/CCC, is currently still held in the portfolios and is quoted in the mid-high 60s, which is more than a $600,000 unrealized loss.

This chart summarizes an estimate of the losses:

| Issuer | Commitment Bought | Loss on Investment |
|---|---|---|
| **Libbey Glass** | 12,750,000 | (12,660,000) |

| | | |
|---|---|---|
| **Chief Power** | 10,894,048 | (4,724,826) |
| **Lumileds Holding** | 9,732,632 | (2,181,083) |
| **KCA Deutag UK Finance PL** | 8,992,443 | (1,781,329) |
| **Glass Mountain Pipeline** | 1,994,949 | (1,548,280) |
| **Envision Healthcare** | 13,994,987 | (1,470,094) |
| **Doncasters** | 9,730,000 | (1,190,979) |
| **Premiere Brands** | 2,000,000 | (635,000) |
| **Boardriders** | 6,569,202 | (448,763) |
| **Total** | **$76,658,262** | **($26,640,333)** |

175.    These purchases were also problematic because they were often executed on the same day (purchasing in a single day tends to make an asset more expensive to buy) and were executed at a time when the market was flying high.  This violated the Counter-Defendants' best-execution duties.[14]

176.    Additionally, many of the purchased "bad" assets were some of the cheapest assets on the market—and yet were still overpriced. The market at the time was a seller's market—loans were scarce.

177.    The most prudent course would have been to remain in cash or find far more secure short-term investments.

178.    Counter-Defendants have furthermore caused ACIS-6 to sell certain collateral cheaply and prematurely. In other words, Counter-Defendants took over advising and managing ACIS-6 with several credit-worthy assets, or they themselves (luckily) bought several creditworthy assets.

179.    The problem is that Counter-Defendants then sold those assets, inexplicably, at a

---

[14] *See* PMA, § 4(a); Indenture, § 12.2.

time when the assets could not be replaced by any of equal or improved quality—and Counter-Defendants knew as much.

180.    Given that Counter-Defendants had no intention of redeeming the Assets (that is, allowing investors to take their money out) or resetting them (raising new debt and opening a new investment period), the investors in the Assets would have been best served had these "good" assets simply been allowed to mature.

181.    These losses are illustrated here:

| Issuer | Commitment Sold | Lost Value |
|---|---|---|
| McGraw-Hill Global Education | $34,288,241 | ($5,914,722) |
| Carestream Health | $20,644,508 | ($4,799,848) |
| Advantage Sales & Marketing 1L | $27,038,364 | ($3,622,316) |
| Advantage Sales & Marketing 2L | $10,688,828 | (  2,820,378) |
| Mohegan Tribal Gaming | $12,153,419 | (  1,830,609) |
| GIP III STETSON I | $5,169,653 | (  1,518,878) |
| Advantage Sales & Marketing 1L | $6,510,157 | (    890,963) |
| Party City | $8,826,376 | (    822,638) |
| **Total** | **$125,319,547** | **($22,220,350)** |

182.    There is no plausible pro-investor basis for such actions.

183.    One is left to wonder who the purchasers of these assets were, and whether they were entities or persons related to Terry, or in which he had a hidden or surreptitious or beneficial interest.

184.    These assets were sold well after the start of COVID—in late 2020. And so they were sold *after* they had hit their "COVID lows"—but the market had already shown it was roaring back in the last quarter of 2020.

185.    The above assets were also sold on or about the same day—again, a breach of best-execution practices.

186.    Because of these knowingly errant purchases and sales, the Assets fall well below the acceptable, reasonable WARF, and pushed maturity of the portfolio out past any acceptable, reasonable WAL.

187.    As shown, Counter-Defendants sold qualified assets early without justification and without being able to replace them with the same or better-quality assets. Instead, they bought cheaper assets—and more of them—doing so using bundling, same-day purchasing, and other deceptive means to mask the low quality and true life of the loans, all in violation of their best-execution duties and the collateral-quality tests in the Indenture.

188.    The purpose of these transactions is obvious: purchasing more bad assets on the cheap to inflate the notional value of the AUM, thus inflating the fees Counter-Defendants could charge, and extending their tenure for this mountain of money. This scheme operated as an artifice to deceive and defraud the investors like NexPoint.

189.    As if that were not enough, Counter-Defendants engaged in a practice or course of business consisting of passing off expenses, without disclosure or accountability, that were incurred by Acis—as though they were the expenses of ACIS-6—to the *advisees.* By doing so, Counter-Defendants affirmatively misrepresented the character and nature of those expenses and subsequently assessed the managed entities their pro rata share.

190.    The fiduciary duty that Counter-Defendants owed to investors like NexPoint is predicated on trust and confidence, and not committing corporate waste.[15]

---

[15] *See Cap. Gains Rsch. Bureau*, 375 U.S. at 191–92 (stating that the IAA was meant to "eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser — consciously or unconsciously — to render advise which was not disinterested").

191.    Counter-Defendants have breached their fiduciary duties by committing corporate waste in two primary forms: (1) by incurring unnecessary expenses or improperly imposing expenses on ACIS-6 without justification, and (2) by collecting fees based upon a knowingly inflated notional asset value.

192.    Counter-Defendants have breached their fiduciary duties of transparency by failing to fulsomely justify and document their investor-related activities. Failing to do so is a breach of the duty of loyalty because it is plainly a means to conceal the true extent of the malfeasance and damage done.

193.    All contracts made in violation of the IAA are void, and the IAA also voids all contracts, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of the IAA, or any rule, regulation, or order issued thereunder.

194.    Therefore, there are no contractual defenses or justifications for the violations of the IAA's duties.

195.    The agreements between Acis and any third party in any transaction in violation of the IAA are also void, and Counter-Defendants' rights under the Indenture and the PMA are void due to their violations of the IAA.

196.    Counter-Defendants have further aided and abetted the breaches by their co-Counter-Defendants and/or conspired with their co-Counter-Defendants, making them liable as principals for breaches of fiduciary duty.

197.    Counter-Defendants are thus liable for damages, punitive damages, and all other relief to which NexPoint is justly entitled. NexPoint seeks all legal and equitable relief to which it is entitled, including, but not limited to, restitution and disgorgement of all funds and moneys paid in violation of the IAA after the effective date of the Bankruptcy Order.

198.    In particular, Terry and Brigade are also liable, or liable in the alternative, for aiding and abetting a breach of fiduciary duty owed by Acis, based on the facts above.

## COUNT TWO
### Negligence/Gross Negligence
### Against All Counter-Defendants

199.    NexPoint incorporates all factual averments in this pleading as if fully set forth herein.

200.    To the extent Counter-Defendants would be liable for any of the foregoing causes of action prior to their lack of sufficient intent or willful actions, NexPoint pleads in the alternative that such acts or omissions were negligent.

201.    Counter-Defendants owed NexPoint a duty of care in managing ACIS-6 and in discharging their duties under the IAA, the Indenture, and the PMA.

202.    Counter-Defendants' acts and omissions in violation of the duties outlined herein have resulted in substantial losses to NexPoint, totaling at least $8 million.

203.    Counter-Defendants' conduct was knowing and willful and done in disregard of known and established safeguards implemented and created in the industry to avoid well-known, foreseeable risks.

204.    Counter-Defendants' acts and omissions were taken in reckless disregard of these known risks.

205.    Counter-Defendants are fiduciaries and are thus liable for negligence and gross negligence.

206.    NexPoint is thus entitled to damages, punitive damages, attorneys' fees, disgorgement, and costs as the law provides and to which it is justly entitled.

**COUNT THREE**
**Conversion**
**Against All Counter-Defendants**

207.   NexPoint incorporates all factual averments in this pleading as if fully set forth herein.

208.   NexPoint holds a subordinated note with that it purchased for $7.5 million.

209.   The note is a contract, but it is not directly with Acis, Terry, or Brigade.

210.   Under the note, NexPoint is entitled to an amount from the Assets, that is residual after compliance with the investment criteria has been met, and specific and identifiable administrative expenses in addition to other costs and expenses have been deducted. The payment of these expenses is pulled from a reserve of specific and identifiable equity, which includes funds belonging to NexPoint (to the extent it is an equity holder in ACIS-6).

211.   NexPoint has an identifiable property interest in specific moneys and/or assets held by the Trustee on behalf of ACIS-6.

212.   In allowing the payment of inexplicably high expenses (near twenty times their historical amount), Terry, upon information and belief, wrongfully and improperly reimbursed Acis, and potentially himself and Brigade, using NexPoint's property designated for the payment of ACIS-6's administrative expenses and costs.

213.   Upon information and belief, Terry wrongfully and improperly reimbursed Acis and potentially himself by using NexPoint's property designated for the payment of the Acis CLOs' administrative expenses and costs, and by allowing the payment of uncharacteristically high expenses upwards near 20 times their historical amount.

214.   Upon information and belief, Terry, Acis and Brigade each exercised a wrongful and unauthorized dominion over NexPoint's property designated for the payment of fees and

ACIS-6's administrative expenses and costs to the alteration of its condition or to the exclusion of NexPoint's rights.

215.    The property at issue is a specific, identifiable fund that has an obligation to be returned or otherwise treated in a particular manner.

216.    Additionally, Defendants caused distributable funds to be withheld pending litigation, which is not privileged or authorized.

217.    One or more Counter-Defendants are liable for conversion and/or for aiding and abetting conversion.

## COUNT FOUR
### Unjust Enrichment/Assumpsit/Money Had and Received
### Against All Counter-Defendants

218.    NexPoint incorporates all factual averments as if fully set forth herein.

219.    NexPoint pleads in the alternative that the foregoing actions and omissions are wrongful, and that NexPoint is entitled to disgorge the ill-gotten gains from Counter-Defendants under the theory of unjust enrichment, assumpsit or money had and received.

## COUNT FIVE
### Tortious Interference with Contract
### Against All Counter-Defendants

220.    NexPoint incorporates all factual averments in this pleading as if fully set forth herein.

221.    NexPoint pleads this claim in addition to or in the alternative to the foregoing actions.

222.    NexPoint is a holder of a subordinated note with face value of $7.5 million.

223.    The subordinated note incorporates certain duties and obligations of the Indenture and is a contract with ACIS-6. The rights of the noteholders to payment(s) (here, NexPoint) are

incorporated by reference from the Indenture.

224.    Thus, the note is a contract, but it is not directly with Acis, Terry, or Brigade.

225.    Acis, Terry, and Brigade were well aware of the note's terms since they were appended to the Indenture, which is incorporated into the PMA and by which each Defendant agreed to live.

226.    Under the note, NexPoint is entitled to an amount from the Assets that is residual after compliance with the investment criteria has been met, and specific and identifiable administrative expenses in addition to other costs and expenses have been deducted. The payment of these expenses is pulled from a reserve of specific and identifiable equity, which includes funds belonging to NexPoint (to the extent it is an equity holder in ACIS-6).

227.    NexPoint thus had a property interest in identifying amounts in the ACIS-6 (even if it is not held to be a trust) to its share of the moneys used to pay the fees and administrative expenses and costs.

228.    Counter-Defendants' actions were tortious, unlawful, wrongful, and/or illegal.

229.    Counter-Defendants' actions were purposeful and intentional.

230.    Counter-Defendants' actions caused ACIS-6 to breach the terms of the subordinated note with NexPoint by causing the portfolio to pay substantially less than what NexPoint is entitled to under its note. Acis, Terry, and/or Brigade's direct involvement in identifying the securities to be bought and sold in violation of the note's requirements, their direct involvement in executing the trades, and their direct involvement in inflating the amount of expenses and fees directly caused ACIS-6 to pay less to NexPoint than what it is obligated to pay under the note.

231.    Counter-Defendants' actions tortiously interfered with NexPoint's right(s) as a

minority holder to have the Controlling Class declare a default and/or bring suit.

232.    NexPoint thus seeks damages, attorneys' fees, restitution, disgorgement, and any and all other remedies to which it is justly entitled for tortious interference.

## COUNT SIX
### Aiding and Abetting
### Against Terry and Brigade

233.    NexPoint incorporates the foregoing factual averments as if fully set forth herein.

234.    To the extent that Terry and Brigade are found to not owe a duty to NexPoint under Counts 1, 2, 3, 4 and 5, NexPoint alternatively pleads that Terry and Brigade actively aided and abetted Acis's breaches of the duties Acis owed to NexPoint.

235.    NexPoint has sufficiently pleaded the underlying causes of action necessary to an aiding-and-abetting claim *supra*.

236.    NexPoint thus seeks damages, attorneys' fees, restitution, disgorgement, and any and all other remedies to which it is justly entitled.

## COUNT SEVEN
### Declaratory Judgment Action Under 28 U.S.C. § 2201 *et seq.*
### Against All Counter-Defendants

237.    NexPoint incorporates the foregoing factual averments as if fully set forth herein.

238.    NexPoint seeks a declaratory judgment to resolve questions concerning the respective rights, obligations, and duties of NexPoint and Counter-Defendants under the Indenture, the PMA, and New York law.

239.    The issuance of declaratory relief by this Court will terminate some or all of the existing controversy among the parties and will provide certainty to the parties with respect to their rights, obligations, and duties under the Indenture, the PMA, and New York law.

240.    NexPoint therefore requests declaratory relief under 28 U.S.C. §§ 2201–02 that:

- Counter-Defendants manipulated the assets in derogation of NexPoint's rights under the Notes in one or more ways as described herein;

- The Acis-6 fund and/or NexPoint has been damaged by Counter-Defendants' actions;

- NexPoint is owed fiduciary duties under New York or Federal law as an investor in Acis-6;

As a Noteholder suing for its rights under the Notes, NexPoint is not bound by the Indenture's No-Action clause for each of its claims.

## CONDITIONS PRECEDENT

241.    NexPoint hereby pleads that all conditions precedent to bringing suit or to finding liability have occurred, or been performed, or have been waived.

242.    To the extent Counter-Defendants must be sued via a derivative action as to any count, NexPoint respectfully pleads these claims in the alternative as a derivative action on the Notes.

243.    All conditions precedent to derivative standing have been met. The subordinated note, of which NexPoint is a holder, selects New York law as the governing choice of law.[16]

244.    Under New York law, subordinated notes are tantamount to equity. They are the residuary interest for all payments after all debt and expenses have been paid.

245.    On August 6, 2019, NexPoint sent a demand letter to U.S. Bank as Trustee via its then-identified counsel, Frost Brown Todd LLP, and to other persons, regarding the alleged malfeasance of the portfolio manager and advisors. *See* Exhibit 3 attached hereto. The Trustee failed to act given the ample amount of evidence demonstrating such malfeasance.

246.    While no further demand on the Trustee was necessary, NexPoint alleges that any

---

[16] *See* Ex. 1, Indenture, at  Exhibit A2-9 ("THE NOTES SHALL BE CONSRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK").

Case 1:21-cv-11059-GHW   Document 78   Filed 03/30/23   Page 57 of 59

further demand to the Trustee or to anyone else would have been futile due to, among other things, a conflict of interest with Counter-Defendants, who functioned as the trustees in managing the Assets. Acis would not have sued itself. Acis's control person, Terry, would not have sued himself, Brigade, or any other person with whom he is aligned, *e.g.*, Highland CLO Funding, Ltd. (with whom Acis settled in exchange for mutual releases).

247.     Moreover, the Trustee has been held in federal court to have breached no duty because neither the Portfolio Manager, Acis, nor the majority in interest, Highland CLO Funding, Ltd. ("HCLOF"), declared a default. The Trustee contends it had no duty to act because, under the Indenture, it only had a duty to act after there had been a declared "Event of Default" as set forth in  § 5.1(d) and § 5.3. Section 5.1(e) specifically states that no event of default shall be deemed an "Event of Default unless notice is given to the trustee of such default by the Portfolio Manager or by the "Controlling Class." Section 5.3 specifically states that the Controlling Class Notably, Highland is the majority in interest, controlling holder of HCLOF, and investment advisor of HCLOF. Highland therefore controlled the "Controlling Class." Upon information and belief, Highland entered into one or more settlement agreements to settle claims against it by Acis and Terry, to obtain releases for itself from them  in exchange for, in part, releases of Acis and Terry given by itself and by HCLOF. This collusive settlement is an additional reason why HCLOF has not joined in any suit and why any demand would be futile.

248.     Furthermore, to the extent that Counter-Defendants' actions caused the Controlling Class not to declare a default or to bring suit as a condition precedent to NexPoint's rights to recover, the prevention doctrine holds that Counter-Defendants have waived such a condition precedent.

249.     Accordingly, any demand on the Trustee, Acis, or the Controlling Class would

have been futile.

## DEMAND FOR ATTORNEYS' FEES

250.     NexPoint hereby makes a demand for the attorneys' fees and court costs it has

sustained in bringing this action as may be available under contract, statute, or other law or equity.

## JURY DEMAND

Pursuant to the Seventh Amendment of the United States Constitution and Rule 38 of the

Federal Rules of Civil Procedure, NexPoint hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

251.     All requested relief is hereby expressly intended to be predicated solely on the

alleged acts and omission accruing after the effective date of the Bankruptcy Order.

252.     NexPoint respectfully requests that judgment be entered in its favor and against

Counter-Defendants Acis, Terry, and Brigade as follows:

A.     Damages in an amount to be determined at trial;

B.     Punitive damages in an amount to be determined at trial;

C.     Disgorgement of wrongfully paid fees and expenses and restitution thereof in an amount to be determined at trial;

D.     Disgorgement of any and all ill-gotten gains in an amount to be determined at trial;

E.     Attorneys' fees and costs;

F.     Constructive trust, injunctive relief, and any other equitable relief necessary to prevent further injury;

G.     All other legal and equitable relief to which NexPoint is justly entitled.

Dated:  March 30, 2023                    Respectfully submitted,

**SBAITI & COMPANY PLLC**

/s/ *Mazin A. Sbaiti*
Mazin A. Sbaiti
New York Bar No. 4339057
mas@sbaitilaw.com
Griffin S. Rubin
Texas Bar No. 24121809 (admitted *pro hac vice*)
gsr@sbaitilaw.com
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: 214.432.2899
F: 214.853.4367

*COUNSEL FOR DEFENDANT/COUNTER-*
*PLAINTIFF NEXPOINT DIVERSIFIED REAL*
*ESTATE TRUST*