**EXECUTION VERSION**

---

**ACIS CLO 2015-6 LTD.**
Issuer,


**ACIS CLO 2015-6 LLC**
Co-Issuer,


AND


**U.S. BANK NATIONAL ASSOCIATION**
as Trustee



**INDENTURE**



Dated as of April 16, 2015

**COLLATERALIZED LOAN OBLIGATIONS**

---

# TABLE OF CONTENTS

**Page**

ARTICLE 1        DEFINITIONS...............................................................................2

Section 1.1.        Definitions......................................................................2

Section 1.2.        Assumptions as to Pledged Obligations...........................61

ARTICLE 2        THE NOTES ...............................................................................64

Section 2.1.        Forms Generally...........................................................64

Section 2.2.        Forms of Notes.............................................................64

Section 2.3.        Authorized Amount; Stated Maturity; Denominations.....................65

Section 2.4.        Additional Notes..........................................................66

Section 2.5.        Execution, Authentication, Delivery and Dating.............................67

Section 2.6.        Registration, Registration of Transfer and Exchange.....................68

Section 2.7.        Mutilated, Defaced, Destroyed, Lost or Stolen Note.......................80

Section 2.8.        Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved.............................81

Section 2.9.        Persons Deemed Owners.............................................84

Section 2.10.       Surrender of Notes; Cancellation................................84

Section 2.11.       Certificated Notes........................................................85

Section 2.12.       Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations................................85

Section 2.13.       Issuer Purchase of Secured Notes...............................88

Section 2.14.       No Gross Up.................................................................89

ARTICLE 3        CONDITIONS PRECEDENT.......................................................89

Section 3.1.        Conditions to Issuance of Notes on Closing Date............................89

Section 3.2.        Conditions to Issuance of Additional Notes....................................92

Section 3.3.        Custodianship; Delivery of Collateral Obligations and Eligible Investments.................................95

ARTICLE 4        SATISFACTION AND DISCHARGE..........................................95

Section 4.1.        Satisfaction and Discharge of Indenture.........................95

Section 4.2.        Application of Trust Money...........................................97

Section 4.3.        Repayment of Monies Held by Paying Agent.................97

ARTICLE 5        REMEDIES....................................................................................97

Section 5.1.        Events of Default..........................................................98

# TABLE OF CONTENTS
(continued)

**Page**

Section 5.2.      Acceleration of Maturity; Rescission and Annulment....................... 99

Section 5.3.      Collection of Indebtedness and Suits for Enforcement by Trustee............................................................................................ 100

Section 5.4.      Remedies............................................................................................ 102

Section 5.5.      Optional Preservation of Assets........................................................ 105

Section 5.6.      Trustee May Enforce Claims Without Possession of Notes ............ 107

Section 5.7.      Application of Money Collected....................................................... 107

Section 5.8.      Limitation on Suits............................................................................ 107

Section 5.9.      Unconditional Rights of Holders to Receive Principal and Interest.............................................................................................. 108

Section 5.10.     Restoration of Rights and Remedies................................................. 108

Section 5.11.     Rights and Remedies Cumulative..................................................... 108

Section 5.12.     Delay or Omission Not Waiver......................................................... 108

Section 5.13.     Control by Majority of Controlling Class........................................ 109

Section 5.14.     Waiver of Past Defaults .................................................................... 109

Section 5.15.     Undertaking for Costs ....................................................................... 110

Section 5.16.     Waiver of Stay or Extension Laws ................................................... 110

Section 5.17.     Sale of Assets .................................................................................... 110

Section 5.18.     Action on the Notes .......................................................................... 111

ARTICLE 6       THE TRUSTEE ........................................................................................ 112

Section 6.1.      Certain Duties and Responsibilities of the Trustee.......................... 112

Section 6.2.      Representations and Warranties of the Bank ................................... 113

Section 6.3.      Certain Rights of the Trustee ........................................................... 114

Section 6.4.      Trustee Not Responsible for Recitals or Issuance of Notes............. 117

Section 6.5.      Trustee May Hold Notes .................................................................. 117

Section 6.6.      Money Held in Trust by the Trustee ................................................ 117

Section 6.7.      Trustee Compensation and Reimbursement ..................................... 117

Section 6.8.      Corporate Trustee Required; Eligibility............................................ 118

Section 6.9.      Resignation and Removal of the Trustee; Appointment of Successor Trustee............................................................................... 119

Section 6.10.     Acceptance of Appointment by Successor Trustee ......................... 120

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 6.11. | Merger, Conversion, Consolidation or Succession to Business of the Trustee | 120 |
| Section 6.12. | Co-Trustees | 121 |
| Section 6.13. | Withholding by the Trustee | 122 |
| Section 6.14. | Authenticating Agents | 122 |
| Section 6.15. | Notice of Default by the Trustee | 123 |
| Section 6.16. | Certain Duties of the Trustee Related to Delayed Payment of Proceeds | 123 |
| Section 6.17. | Trustee Representative for the Holders of the Secured Notes Only; Agent for each Hedge Counterparty and the Holders of the Subordinated Notes | 124 |
| ARTICLE 7 | COVENANTS | 124 |
| Section 7.1. | Payment of Principal and Interest | 124 |
| Section 7.2. | Maintenance of Office or Agency | 124 |
| Section 7.3. | Money for Note Payments to be Held in Trust | 125 |
| Section 7.4. | Existence of Co-Issuers | 127 |
| Section 7.5. | Protection of Assets | 128 |
| Section 7.6. | Opinions as to Assets | 129 |
| Section 7.7. | Performance of Obligations | 130 |
| Section 7.8. | Negative Covenants | 130 |
| Section 7.9. | Statement as to Compliance | 132 |
| Section 7.10. | Co-Issuers May Consolidate, etc., Only on Certain Terms | 132 |
| Section 7.11. | Successor Substituted | 134 |
| Section 7.12. | No Other Business | 134 |
| Section 7.13. | Maintenance of Listing | 135 |
| Section 7.14. | Annual Rating Review | 135 |
| Section 7.15. | Reporting | 135 |
| Section 7.16. | Calculation Agent | 135 |
| Section 7.17. | Certain Tax Matters | 136 |
| Section 7.18. | Ramp-up Period; Purchase of Additional Collateral Obligations | 140 |
| Section 7.19. | Representations Relating to Security Interests in the Assets | 142 |

# TABLE OF CONTENTS
(continued)

**Page**

Section 7.20.     Objection to Bankruptcy Proceeding ................................................ 144

ARTICLE 8          SUPPLEMENTAL INDENTURES ........................................................ 144

Section 8.1.      Supplemental Indentures Without Consent of Holders of
                  Offered Securities ................................................................................. 144

Section 8.2.      Supplemental Indentures With Consent of Holders of Offered
                  Securities ............................................................................................... 148

Section 8.3.      Execution of Supplemental Indentures ............................................ 151

Section 8.4.      Effect of Supplemental Indentures .................................................... 151

Section 8.5.      Reference in Notes to Supplemental Indentures ............................. 151

ARTICLE 9          REDEMPTION OF NOTES .................................................................. 152

Section 9.1.      Mandatory Redemption ...................................................................... 152

Section 9.2.      Optional Redemption and Refinancing ............................................. 152

Section 9.3.      Redemption Procedures ...................................................................... 154

Section 9.4.      Notes Payable on Redemption Date ................................................... 156

Section 9.5.      Special Redemption .............................................................................. 157

Section 9.6.      Clean-up Call Redemption .................................................................. 157

ARTICLE 10        ACCOUNTS, ACCOUNTINGS AND RELEASES ................................. 160

Section 10.1.     Collection of Money ............................................................................. 160

Section 10.2.     Collection Account ............................................................................... 160

Section 10.3.     Payment Account; Custodial Account; Ramp-up Account;
                  Expense Reserve Account; Interest Reserve Account ..................... 162

Section 10.4.     The Revolver Funding Account .......................................................... 164

Section 10.5.     Hedge Accounts ................................................................................... 165

Section 10.6.     Reinvestment of Funds in Accounts; Reports by Trustee ............... 166

Section 10.7.     Accountings ......................................................................................... 167

Section 10.8.     Release of Securities ............................................................................ 177

Section 10.9.     Reports by Independent Accountants ............................................... 178

Section 10.10.    Reports to the Rating Agency and Additional Recipients; Rule
                  17g-5 Procedures ................................................................................. 180

Section 10.11.    Procedures Relating to the Establishment of Accounts
                  Controlled by the Trustee .................................................................. 181

# TABLE OF CONTENTS
(continued)

**Page**

ARTICLE 11     APPLICATION OF MONIES ................................................................ 181

Section 11.1.     Disbursements of Monies from Payment Account ........................ 181

ARTICLE 12     SALE OF COLLATERAL OBLIGATIONS; PURCHASE OF
ADDITIONAL COLLATERAL OBLIGATIONS.................................... 189

Section 12.1.     Sales of Collateral Obligations ...................................... 189

Section 12.2.     Purchase of Additional Collateral Obligations ............................... 191

Section 12.3.     Conditions Applicable to All Sale and Purchase Transactions........ 194

Section 12.4.     Trading Plans ........................................................................... 194

Section 12.5.     Maturity Amendments ................................................................ 195

ARTICLE 13     NOTEHOLDERS' RELATIONS ..................................................... 195

Section 13.1.     Subordination; Non-Petition ........................................................ 195

Section 13.2.     Standard of Conduct .................................................................. 196

Section 13.3.     Information Regarding Holders ................................................... 196

ARTICLE 14     MISCELLANEOUS ....................................................................... 196

Section 14.1.     Form of Documents Delivered to Trustee ................................... 196

Section 14.2.     Acts of Holders ......................................................................... 197

Section 14.3.     Notices, etc., to the Trustee, the Co-Issuers, the Collateral
Administrator, the Portfolio Manager, the Initial Purchaser, the
Hedge Counterparty, the Paying Agent, the Administrator and
the Rating Agency.......................................................................... 198

Section 14.4.     Notices to Holders; Waiver.......................................................... 201

Section 14.5.     Effect of Headings and Table of Contents ...................................... 202

Section 14.6.     Successors and Assigns............................................................... 202

Section 14.7.     Separability ................................................................................ 202

Section 14.8.     Benefits of Indenture.................................................................. 202

Section 14.9.     Governing Law .......................................................................... 202

Section 14.10.    Submission to Jurisdiction and Waiver of Jury Trial...................... 202

Section 14.11.    Counterparts .............................................................................. 203

Section 14.12.    Acts of Issuer ............................................................................ 203

Section 14.13.    Confidential Information ............................................................. 203

Section 14.14.    Liability of Co-Issuers ................................................................ 205

## TABLE OF CONTENTS
(continued)

**Page**

ARTICLE 15     ASSIGNMENT OF CERTAIN AGREEMENTS ....................................... 205

    Section 15.1.     Assignment of Portfolio Management Agreement .......................... 205

    Section 15.2.     Assignment of Hedge Agreement .................................................... 206

<u>SCHEDULES</u>

Schedule 1      --      Moody's Industry Classification Group List
Schedule 2      --      S&P Industry Classifications
Schedule 3      --      S&P Recovery Rate Tables
Schedule 4      --      Diversity Score Calculation
Schedule 5      --      Moody's Rating Definitions
Schedule 6      --      Certificate of Issuer Regarding Accountants' Reports and Certificates
Schedule 7      -       Additional Report Recipients

<u>EXHIBITS</u>

Exhibit A      --      Forms of Notes
Exhibit A1      --      Form of Global Secured Note
Exhibit A2      --      Form of Global Subordinated Note
Exhibit A3      --      Form of Certificated Subordinated Note
Exhibit A4      --      Form of Certificated Secured Note
Exhibit B      --      Forms of Transfer and Exchange Certificates
Exhibit B1      --      Form of Transferor Certificate for Transfer to Regulation S Global Secured Note
Exhibit B2      --      Form of Transferor Certificate for Transfer to Rule 144A Global Secured Note
Exhibit B3      --      Form of Transferee Certificate for Transfer of Certificated Secured Note
Exhibit B4      --      Form of ERISA Certificate
Exhibit B5      --      Form of Transferor Certificate for Transfer to Regulation S Global Subordinated Note
Exhibit B6      --      Form of Transferor Certificate for Transfer to Rule 144A Global Subordinated Note
Exhibit B7      --      Form of Transferee Certificate for Transfer of Certificated Subordinated Note
Exhibit C      --      Forms of Dechert LLP Opinions
Exhibit D      --      Form of Dechert LLP Opinion
Exhibit E      --      Form of Seward & Kissel LLP Opinion
Exhibit F      --      Form of Maples and Calder Opinion
Exhibit G      --      Calculation of LIBOR
Exhibit H      --      Form of Securities Account Control Agreement
Exhibit I      --      Form of Note Owner Certificate

INDENTURE, dated as of April 16, 2015, among ACIS CLO 2015-6 Ltd., an exempted company incorporated in the Cayman Islands with limited liability (the "Issuer"), ACIS CLO 2015-6 LLC, a limited-liability company organized under the laws of the State of Delaware (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), and U.S. Bank National Association, a national banking association, as trustee (herein, together with its permitted successors in the trusts hereunder, the "Trustee").

## PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Notes issuable and governed by this Indenture and to secure the Secured Notes and other obligations secured under this Indenture.  Except as otherwise provided herein, all covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Secured Parties and the Trustee.  The Co-Issuers are entering into this Indenture and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with the agreement's terms have been done.

## GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit and security of the Holders of the Secured Notes, the Trustee, each Hedge Counterparty, the Collateral Administrator and the Portfolio Manager (collectively, the "Secured Parties"), all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, (a) the Collateral Obligations which the Issuer causes to be delivered to the Trustee (directly or through an intermediary or bailee) herewith and all payments thereon or with respect thereto, and all Collateral Obligations which are purchased, or otherwise acquired, by the Issuer in the future pursuant to the terms hereof and all payments thereon or with respect thereto, (b) the Issuer's interest in each of the Accounts, each Hedge Account (to the extent permitted by the applicable Hedge Agreement), any Eligible Investments purchased with funds on deposit therein, and all income from the investment of funds therein, (c) the Issuer's rights under the Portfolio Management Agreement as set forth in Article 15 hereof, the Hedge Agreements (*provided* that there is no such Grant to the Trustee on behalf of any Hedge Counterparty in respect of its related Hedge Agreement), the Collateral Administration Agreement, the Purchase Agreement and any subscription agreements related to the purchase of the Notes, (d) all Cash or Money delivered to the Trustee (or its bailee), (e) all accounts, chattel paper, deposit accounts, financial assets, general intangibles, instruments, investment property, letter-of-credit rights and other supporting obligations relating to the foregoing, (f) any other property otherwise delivered to the Trustee by or on behalf of the Issuer (whether or not constituting Collateral Obligations or Eligible Investments (including, without limitation, Equity Securities)), (g) the Issuer's rights in all assets owned by any ETB Subsidiary and the Issuer's rights under any agreement with any ETB Subsidiary and (h) all proceeds with respect to the foregoing; *provided* that such Grants shall not include the $250 transaction fee paid to the Issuer in consideration of the issuance of the Secured Notes and Subordinated Notes, the funds attributable to the issue and allotment of the Issuer's ordinary shares and the Co-Issuer's membership interests or the bank account in the

Cayman Islands in which such funds are deposited (or any interest thereon) (or any funds deposited or credited thereto) (the assets referred to in (a) through (h) are collectively referred to as the "Assets").  Such Grants are made to secure, in accordance with the priorities set forth in the Priority of Payments, the Secured Notes equally and ratably without prejudice, priority or distinction between any Secured Note and any other Secured Note by reason of difference in time of issuance, documentation governing the incurrence or otherwise, except as expressly provided in this Indenture, and to secure, in accordance with the priorities set forth in the Priority of Payments of this Indenture, (i) the payment of all amounts due on the Secured Notes in accordance with their terms, (ii) the payment of all other sums payable under this Indenture and other related transaction documents and (iii) compliance with the provisions of this Indenture, all as provided in this Indenture.  The foregoing Grant shall, for the purpose of determining the property subject to the lien of this Indenture, be deemed to include any securities and any investments granted to the Trustee by or on behalf of the Issuer, whether or not such securities or investments satisfy the criteria set forth in the definitions of "Collateral Obligation" or "Eligible Investments," as the case may be.

The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof.

ARTICLE 1

DEFINITIONS

Section 1.1.   Definitions.  Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and to the masculine, feminine and neuter genders of such terms.  The word "including" shall mean "including without limitation."  All references in this Indenture to designated "Articles," "Sections," "Subsections" and other subdivisions are to the designated articles, sections, subsections and other subdivisions of this Indenture.  The words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular article, section, subsection or other subdivision.

"17g-5 Site":  The meaning specified in Section 10.10(f) (Reports to the Rating Agency and Additional Recipients; Rule 17g-5 Procedures).

"25% Limitation":  The meaning specified in Section 2.6(c) (Registration, Registration of Transfer and Exchange).

"Acceleration Event":  The meaning specified in Section 11.1(a)(iii) (Disbursements of Monies from Payment Account).

"Acceleration Priority of Payments":  The meaning specified in Section 11.1(a)(iii) (Disbursement of Monies from Payment Account).

"Accountants' Report":  A certificate of the firm or firms appointed by the Issuer pursuant to Section 10.9(a) (Reports by Independent Accountants).

"Accounts":  (i) the Payment Account; (ii) the Collection Account; (iii) the Ramp-up Account; (iv) the Revolver Funding Account; (v) the Expense Reserve Account; (vi) the Custodial Account; (vii) the Interest Reserve Account and (viii) each Hedge Account.

"Accredited Investor":  An accredited investor as defined in Regulation D under the Securities Act.

"Act" and "Act of Holders":  The meanings specified in Section 14.2 (Acts of Holders).

"Additional Notes Closing Date":  The closing date for the issuance of any Additional Subordinated Notes pursuant to Section 2.4 (Additional Notes) as set forth in an indenture supplemental to this Indenture pursuant to Section 8.2(b) (Supplemental Indentures With Consent of Holders of Offered Securities).

"Additional Subordinated Notes":  Any Subordinated Notes issued pursuant to Section 2.4 (Additional Notes).

"Adjusted Collateral Principal Amount":  As of any date of determination:

(a)     the Aggregate Principal Balance of the Collateral Obligations (other than (i) Defaulted Obligations, (ii) Deferring Obligations and (iii) Discount Obligations) *plus* any Principal Financed Accrued Interest; *plus*

(b)     without duplication, the amounts on deposit in the Accounts, excluding the Revolver Funding Account, (including Eligible Investments in such Accounts) representing Principal Proceeds; *plus*

(c)     the S&P Collateral Value of each Deferring Obligation; *plus*

(d)     the lesser of (x) the Market Value of each Defaulted Obligation and (y) the S&P Recovery Amount for each Defaulted Obligation; *provided* that Defaulted Obligations that have constituted Defaulted Obligations for a period of at least 3 years shall be deemed to have a value of 0; *plus*

(e)     the original purchase price (expressed as a percentage of par) *multiplied by* the current Principal Balance, excluding accrued interest, expressed as a dollar amount, of all Discount Obligations; *minus*

(f)     the Excess CCC/Caa Adjustment Amount;

*provided* that, with respect to any Collateral Obligation that would be subject to more than one of clauses (c) through (f) of this definition of "Adjusted Collateral Principal Amount," such Collateral Obligation shall, for the purposes of this definition, be treated as belonging to the category of Collateral Obligations which results in the lowest Adjusted Collateral Principal Amount on any date of determination; *provided further* that the Aggregate Principal Balance of any Deferring Obligation shall not include any deferred or capitalized interest for purposes of calculating the Adjusted Collateral Principal Amount.  For the purposes of clause (a) above,

Current Pay Obligations representing up to 2.5% of the Collateral Principal Amount shall be included in the calculation of the Aggregate Principal Balance of the Collateral Obligations.

"Administration Agreement":  An agreement between the Administrator and the Issuer relating to the various administrative functions the Administrator will perform on behalf of the Issuer, including communications with shareholders and the general public, and the provision of certain clerical, administrative and other corporate services in the Cayman Islands, as amended from time to time.

"Administrative Expense Cap":  An amount equal on any Payment Date (when taken together with any Administrative Expenses paid during the period since the preceding Payment Date or, in the case of the first Payment Date, the Closing Date (excluding Administrative Expenses paid by amounts in the Expense Reserve Account)) equal to the sum of (a) 0.02% *per annum* (prorated for the related Interest Accrual Period on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount, on the Determination Date relating to the immediately preceding Payment Date and (b) $250,000 *per annum* (prorated for the related Interest Accrual Period on the basis of a 360-day year consisting of twelve 30-day months); *provided* that, if the amount of Administrative Expenses paid under the Administrative Expense Cap (including any excess applied in accordance with this proviso) on the three immediately preceding Payment Dates or during the related Collection Periods is less than the stated Administrative Expense Cap (without regard to any excess applied in accordance with this proviso) in the aggregate for such three preceding Payment Dates, the excess may be applied to the Administrative Expense Cap with respect to the then-current Payment Date; *provided further* that, in respect of the first three Payment Dates from the Closing Date, such excess amount shall be calculated based on the Payment Dates preceding such Payment Date; *provided further* that the Administrative Expense Cap shall not apply to the Petition Expense Amount or Petition Expenses (except as set forth in the Priority of Payments).

"Administrative Expenses":  Fees, expenses (including indemnities) and other amounts due or accrued with respect to any Payment Date and payable in the following order by the Issuer, the Co-Issuer or any ETB Subsidiary:  first *pro rata* to the Trustee pursuant to Section 6.7 (Trustee Compensation and Reimbursement) and the Bank in each of its capacities hereunder and the Collateral Administrator for its fees and expenses under the Collateral Administration Agreement and then *pro rata* to (i) the Independent accountants, agents (other than the Portfolio Manager) and counsel of the Issuer and any ETB Subsidiary for fees and expenses and any taxes or government fees of the Issuer, the Co-Issuer or any ETB Subsidiary; (ii) the Rating Agency for fees and expenses (including surveillance fees) in connection with any rating of the Secured Notes or any Collateral Obligations; (iii) any Person in respect of Petition Expenses; (iv) the Portfolio Manager under this Indenture and the Portfolio Management Agreement, including, without limitation, reasonable expenses of the Portfolio Manager (including fees for its accountants, agents and counsel) incurred in connection with the purchase or sale of any Collateral Obligations (including amounts owed to any Independent Review Party (as defined in the Portfolio Management Agreement)), any other expenses incurred in connection with the Collateral Obligations and amounts payable pursuant to Sections 9(c) and 11 of the Portfolio Management Agreement but excluding the Management Fees; (v) the Administrator pursuant to the Administration Agreement and the Registered Office Agreement; and (vi) any other Person in respect of any other fees or expenses permitted under this Indenture and the documents

delivered pursuant to or in connection with this Indenture (including the payment of facility rating fees and all legal and other fees and expenses incurred in connection with the purchase or sale of any Collateral Obligations and any other expenses incurred in connection with the Collateral Obligations) and the Offered Securities, including but not limited to, amounts owed to the Co-Issuer pursuant to <u>Section 7.1</u> (Payment of Principal and Interest), any amounts due in respect of the listing of the Offered Securities on any stock exchange or trading system, any costs associated with producing Certificated Notes, any fees, taxes and expenses incurred in connection with complying with FATCA or the establishment and maintenance of any ETB Subsidiary (other than those amounts paid under clause (i)); *provided* that amounts due in respect of actions taken on or before the Closing Date (or, at the Portfolio Manager's discretion, expenses incurred in connection with the acquisition of the initial portfolio of Collateral Obligations prior to the fourth Payment Date) shall not be payable as Administrative Expenses but shall be payable only from the Expense Reserve Account pursuant to <u>Section 10.3(d)</u> (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"<u>Administrator</u>":  MaplesFS Limited and any successor thereto.

"<u>Affected</u>":  Any Class of Notes which becomes subject to a tax as a result of a Tax Event.

"<u>Affiliate</u>" or "<u>Affiliated</u>":  With respect to a Person, (i) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (ii) any other Person who is a director, Officer or employee (a) of such Person, (b) of any subsidiary or parent company of such Person or (c) of any Person described in clause (i) above.  For the purposes of this definition, control of a Person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Persons or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.  For purposes of this definition, the management of an account by one Person for the benefit of any other Person shall not constitute "control" of such other Person and no entity shall be deemed an Affiliate of the Issuer or the Co-Issuer solely because the Administrator or its Affiliates serve as administrator or share trustee for such entity.

"<u>Agent Members</u>":   Members of, or participants in, DTC, Euroclear or Clearstream.

"<u>Aggregate Outstanding Amount</u>":  With respect to any of the Notes as of any date, the aggregate unpaid principal amount of such Notes Outstanding (including any Deferred Interest previously added to the principal amount of any Class of Deferrable Notes that remains unpaid) on such date. Payments received on the Subordinated Notes shall not reduce the Aggregate Outstanding Amount of the Subordinated Notes prior to the Stated Maturity.

"<u>Aggregate Principal Balance</u>":  When used with respect to all or a portion of the Collateral Obligations or the Pledged Obligations, the sum of the Principal Balances of all or of such portion of the Collateral Obligations or Pledged Obligations, respectively.

"<u>Aggregate Weighted Average Life</u>": With respect to all Collateral Obligations as of any date of determination is a date equal to the actual number of years (*rounded* to the nearest one hundredth thereof) following such date obtained by (i) *summing* the products obtained by *multiplying* the Weighted Average Life at such time of each Collateral Obligation *by* the Principal Balance at such time of such Collateral Obligation and (ii) *dividing* such sum *by* the Aggregate Principal Balance at such time of all Collateral Obligations.

"<u>AML and Sanctions Laws</u>": The meaning specified in <u>Section 2.6(m)</u> (Registration, Registration of Transfer and Exchange).

"<u>Applicable Issuer</u>" or "<u>Applicable Issuers</u>": With respect to the Co-Issued Notes of any Class, the Issuer or each of the Co-Issuers, as specified in <u>Section 2.3</u> (Authorized Amount; Stated Maturity; Denominations) and with respect to the Class E Notes and the Subordinated Notes, the Issuer only.

"<u>Asset-Backed Commercial Paper</u>": Commercial paper or other short-term obligations of a program that primarily issues externally rated commercial paper backed by assets or exposures held in a bankruptcy-remote, special purpose entity.

"<u>Assets</u>": The meaning assigned in the Granting Clauses hereof.

"<u>Assigned Moody's Rating</u>": With respect to any Collateral Obligation, the rating determined pursuant to <u>Schedule 5</u> hereto.

"<u>Assumed Reinvestment Rate</u>": For each Interest Accrual Period, LIBOR (as determined on the most recent Interest Determination Date) *minus* 0.50% *per annum*; *provided* that, if the calculation above results in an interest rate of less than zero, the Assumed Reinvestment Rate will be deemed to be zero for purposes of such calculation.

"<u>Authenticating Agent</u>": With respect to the Notes or a Class of the Notes, the Person designated by the Trustee to authenticate such Notes on behalf of the Trustee pursuant to <u>Section 6.14</u> (Authenticating Agents) hereof.

"<u>Authorized Officer</u>": With respect to the Issuer or the Co-Issuer, any Officer or any other Person who is authorized to act for the Issuer or the Co-Issuer, as applicable, in matters relating to, and binding upon, the Issuer or the Co-Issuer. With respect to the Portfolio Manager, any Officer, employee, partner, member or agent of the Portfolio Manager or any other Person who is authorized to act for the Portfolio Manager in matters relating to, and binding upon, the Portfolio Manager with respect to the subject matter of the request, certificate or order in question. With respect to the Collateral Administrator, any Officer, employee or agent of the Collateral Administrator who is authorized to act for the Collateral Administrator in matters relating to, and binding upon, the Collateral Administrator with respect to the subject matter of the request or certificate in question. With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Bank Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any person to act (which certification shall include the email address of each Authorized Officer), and such certification may be considered as in full force and effect until receipt from such other party of written notice to the contrary.

"<u>Balance</u>":  On any date, with respect to Cash or Eligible Investments in any account, the aggregate (i) current balance of Cash, demand deposits, time deposits, certificates of deposit and federal funds; (ii) principal amount of interest-bearing corporate and government securities, money market accounts and repurchase obligations; and (iii) purchase price (but not greater than the face amount) of non-interest-bearing government and corporate securities and commercial paper.

"<u>Bank</u>":  U.S. Bank National Association, a national banking association, in its individual capacity and not as Trustee, Collateral Administrator or any successor thereto.

"<u>Bank Officer</u>":  When used with respect to the Trustee, any officer within the Corporate Office (or any successor group of the Trustee) including any vice president, assistant vice president or officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred at the Corporate Office because of his knowledge of and familiarity with the particular subject and in each case having direct responsibility for the administration of this Indenture.

"<u>Bankruptcy Law</u>":  The federal Bankruptcy Code, Title 11 of the United States Code, as amended from time to time, the Companies Winding Up Rules and Part V of the Companies Law (2013 Revision) of the Cayman Islands, as amended from time to time.

"<u>Bankruptcy Subordination Agreement</u>":  The meaning specified in <u>Section 5.4(d)(iii)</u> (Remedies).

"<u>Benefit Plan Investor</u>":  Means (a) an employee benefit plan (as defined in Section 3(3) of Title I of ERISA) that is subject to the fiduciary responsibility provisions of Title I of ERISA, (b) a plan as defined in Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code, (c) any entity whose underlying assets include "plan assets" (within the meaning of the Plan Asset Regulations issued by the United States Department of Labor at 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of the Employee Retirement Income Security Act of 1974, for purposes of ERISA or Section 4975 of the Code) by reason of such employee benefit plan's or plan's investment in the entity and (d) a "benefit plan investor" as such term is otherwise defined in any regulations promulgated by the U.S. Department of Labor or under Section 3(42) of ERISA.

"<u>Board of Directors</u>":  With respect to the Issuer, the directors of the Issuer duly appointed by the shareholders of the Issuer or the board of directors of the Issuer, and with respect to the Co-Issuer, the manager of the Co-Issuer duly appointed by the member of the Co-Issuer.

"<u>Board Resolution</u>":  With respect to the Issuer, a resolution of the Board of Directors of the Issuer and, with respect to the Co-Issuer, a resolution of the Board of Directors of the Co-Issuer.

"<u>Bridge Loan</u>":  Any loan or other obligation that (x) is incurred in connection with a merger, acquisition, consolidation, or sale of all or substantially all of the assets of a Person or similar transaction and (y) by its terms, is required to be repaid within one year of the

incurrence thereof with proceeds from additional borrowings or other refinancings (it being understood that any such loan or debt security that has a nominal maturity date of one year or less from the incurrence thereof but has a term-out or other provision whereby (automatically or at the sole option of the obligor thereof) the maturity of the indebtedness thereunder may be extended to a later date is not a Bridge Loan).

"Business Day":  Any day other than (i) a Saturday or a Sunday or (ii) a day on which commercial banks are authorized or required by applicable law, regulation or executive order to close in New York, New York or in the city in which the Corporate Office of the Trustee is located or, for any final payment of principal, in the relevant place of presentation.

"Caa Collateral Obligation":  A Collateral Obligation (other than a Defaulted Obligation or a Deferring Obligation) with a Moody's Rating of "Caa1" or lower.

"Calculation Agent":  The meaning specified in Section 7.16 (Calculation Agent).

"Cash":  Such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

"Cayman IGA":  The intergovernmental agreement between the Cayman Islands and the United States signed on November 29, 2013, as the same may be amended from time to time.

"CCC Collateral Obligation":  A Collateral Obligation (other than a Defaulted Obligation or a Deferring Obligation) with an S&P Rating of "CCC+" or lower.

"CCC/Caa Excess":  The greater of: (i) the excess, if any, by which the Aggregate Principal Balance of Caa Collateral Obligations exceeds 7.5% of the Collateral Principal Amount and (ii) the excess, if any, by which the Aggregate Principal Balance of CCC Collateral Obligations exceeds 7.5% of the Collateral Principal Amount; *provided* that, in determining which of the CCC Collateral Obligations and the Caa Collateral Obligations shall be included in the CCC/Caa Excess, the CCC Collateral Obligations and the Caa Collateral Obligations with the lowest Market Value (expressed as a percentage of par) shall be deemed to constitute such CCC/Caa Excess; *provided further* that, if the greater of clause (i) or (ii) above does not result in the larger Excess CCC/Caa Adjustment Amount, then the lesser of clause (i) or (ii) shall be applicable for purposes of this definition.

"Certificate of Authentication":  The meaning specified in Section 2.1 (Forms Generally).

"Certificated Class E Note":  The meaning specified in Section 2.2(b)(ii) (Forms of Notes).

"Certificated Note":  The meaning specified in Section 2.11(b) (Certificated Notes).

"Certificated Secured Notes":  The meaning specified in Section 2.11(b) (Certificated Notes).

"Certificated Security":   The meaning specified in Section 8-102(a)(4) of the UCC.

"Certificated Subordinated Note":   The meaning specified in Section 2.2(b) (Forms of Notes) and Section 2.11(b) (Certificated Notes).

"CFTC":  The Commodity Futures Trading Commission.

"CFR":  With respect to any Collateral Obligation, the rating determined pursuant to Schedule 5 hereto.

"Class":   In the case of (1) the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes, all of the Secured Notes having the same Note Interest Rate, Stated Maturity and designation; it being agreed and understood that, notwithstanding any of the foregoing, any Pari Passu Classes shall be treated as a single Class, except as otherwise provided for in Section 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities) (or as the context otherwise may require), and (2) the Subordinated Notes, all of the Subordinated Notes.

"Class A Notes":  Collectively, the Class A-1 Notes and the Class A-2 Notes.

"Class A-1 Notes":  The Class A-1 Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class A-2 Notes":   The Class A-2 Senior Secured Fixed Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class A/B Coverage Tests":   The Overcollateralization Ratio Test and the Interest Coverage Test applied respectively to the Class A Notes and the Class B Notes, collectively.

"Class B Notes":  Collectively, the Class B-1 Notes and the Class B-2 Notes.

"Class B-1 Notes":   The Class B-1 Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class B-2 Notes":   The Class B-2 Senior Secured Fixed Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class Break-even Default Rate":   With respect to the most senior Class of Secured Notes outstanding then rated by S&P, the maximum percentage of defaults, at any time, that the Current Portfolio or the Proposed Portfolio, as applicable, can sustain, determined through application of the applicable S&P CDO Monitor chosen by the Portfolio Manager in accordance with the definition of "S&P CDO Monitor" that is applicable to the portfolio of

Collateral Obligations, which, after giving effect to S&P's assumptions on recoveries, defaults and timing and to the Priority of Payments, will result in sufficient funds remaining for the payment of such Class of Notes in full.  The S&P CDO Monitor is available at www.structuredfinanceinterface.com and S&P may provide the Portfolio Manager with any input files in connection therewith, in each case, pursuant to the definition of "S&P CDO Monitor" and based upon the Weighted Average Floating Spread and the Weighted Average S&P Recovery Rate to be associated with such S&P CDO Monitor as selected by the Portfolio Manager from Section 2 of Schedule 3 or any other Weighted Average Floating Spread and Weighted Average S&P Recovery Rate selected by the Portfolio Manager from time to time.

"Class C Coverage Tests":  The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied with respect to the Class C Notes.

"Class C Notes":  The Class C Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class D Coverage Tests":  The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied with respect to the Class D Notes.

"Class D Notes":  The Class D Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class Default Differential":  With respect to the most senior Class of Secured Notes outstanding then rated by S&P at any time, the rate calculated by subtracting the Class Scenario Default Rate at such time for such Class of Secured Notes from the Class Break-even Default Rate for such Class of Secured Notes at such time.

"Class E Coverage Tests":  The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied with respect to the Class E Notes.

"Class E Notes":  The Class E Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class Scenario Default Rate":  With respect to the most senior Class of Secured Notes outstanding then rated by S&P, at any time, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with S&P's Initial Rating of such Class of Secured Notes, determined by application by the Portfolio Manager and the Collateral Administrator of the S&P CDO Monitor at such time.

"Clean-up Call Redemption":  A redemption of the Notes in accordance with Section 9.6 (Clean-up Call Redemption).

"Clean-up Call Redemption Date":  The meaning specified in Section 9.6 (Clean-up Call Redemption).

"Clean-up Call Redemption Price":  A purchase price in Cash at least equal to the sum of (a) the Aggregate Outstanding Amount of the Secured Notes, *plus* (b) all unpaid interest on the Secured Notes accrued to the date of such redemption (including any interest accrued on Deferred Interest), *plus* (c) the aggregate of all other amounts owing by the Issuer on the date of such redemption that are payable in accordance with the Priority of Payments prior to distributions in respect of the Subordinated Notes, including any amounts payable in respect of any Hedge Agreement and all expenses incurred in connection with effecting the Clean-up Call Redemption; *provided* that, in connection with any Clean-Up Call Redemption of the Notes, Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Clean-up Call Redemption Price that would otherwise be payable to the Holders of such Class of Secured Notes.

"Clearing Agency":  An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"Clearing Corporation":  As the context may require, any or all of (i) Clearstream, (ii) DTC, (iii) Euroclear and (iv) any entity included within the meaning of "clearing corporation" under Section 8-102(a)(5) of the UCC.

"Clearing Corporation Security":  Securities which are in the custody of or maintained on the books of a Clearing Corporation or a nominee subject to the control of a Clearing Corporation and, if they are Certificated Securities in registered form, properly endorsed to or registered in the name of the Clearing Corporation or such nominee.

"Clearstream":  Clearstream Banking, *société anonyme*, a corporation organized under the laws of the Grand Duchy of Luxembourg.

"Closing Date":  April 16, 2015.

"Code":  The U.S. Internal Revenue Code of 1986, as amended.

"Co-Issued Notes":  The Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes.

"Co-Issuer":  The Person named as such on the first page of this Indenture until a successor Person shall have become the Co-Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Co-Issuer" shall mean such successor Person.

"Co-Issuers":  The Issuer and the Co-Issuer.

"Collateral Administration Agreement":  An agreement dated as of the Closing Date among the Issuer, the Portfolio Manager and the Collateral Administrator, as amended from time to time.

"Collateral Administrator":  U.S. Bank National Association, in its capacity as such under the Collateral Administration Agreement, and any successor thereto.

"Collateral Interest Amount":   As of any date of determination, without duplication, the sum of (i) the aggregate amount of Interest Proceeds in the Interest Collection Subaccount that have been received or that are expected to be received (other than Interest Proceeds expected to be received from Defaulted Obligations and Deferring Obligations, but including Interest Proceeds actually received from Defaulted Obligations and Deferring Obligations) during the Collection Period (and, if such Collection Period does not end on a Business Day, the next succeeding Business Day) in which such date of determination occurs and (ii) in the case of the Hedge Agreements, any net payments expected to be received by the Issuer on or before the immediately following Payment Date (other than any payments that would be classified as Principal Proceeds).

"Collateral Obligation":  A debt obligation (including, but not limited to, interests in bank loans acquired by way of a sale or assignment, and high-yield debt securities) or Participation Interest that as of the date of acquisition by the Issuer:

(i)     is U.S. Dollar denominated and is neither convertible by the issuer thereof into, nor payable in, any other currency;

(ii)    is not a Defaulted Obligation or a Credit Risk Obligation;

(iii)   is not a lease;

(iv)    if it is a Deferrable Obligation, is not currently deferring the payment of any accrued and unpaid interest that otherwise would have been due and continues to remain unpaid;

(v)     provides for a fixed amount of principal payable in Cash on scheduled payment dates and/or at maturity and does not by its terms provide for earlier amortization or prepayment at a price of less than par;

(vi)    does not constitute Margin Stock;

(vii)   is not a Margin Loan;

(viii)  has payments that do not subject the Issuer to withholding tax unless (i) the related obligor is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after tax basis (for the avoidance of doubt, this clause shall not apply to commitment fees, letter of credit fees or similar fees) or (ii) such withholding is imposed under FATCA or on commitment fees, letter of credit fees or other similar fees;

(ix)    has a Moody's Rating and an S&P Rating and does not have an S&P Rating that is below "CCC-" or a Moody's Default Probability Rating that is below "Caa3";

(x)     is not a debt obligation whose repayment is subject to substantial non-credit related risk as determined by the Portfolio Manager;

(xi)    except for Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations, is not an obligation pursuant to which any future advances or payments, other than Excepted Advances, to the borrower or the obligor thereof may be required to be made by the Issuer;

(xii)    does not have an "f," "r," "p," "pi," "q," "t" or "sf" subscript assigned by S&P or an "sf" subscript assigned by any nationally recognized statistical rating agency;

(xiii)    is not a Related Obligation;

(xiv)    is not subject to an Offer other than (a) an offer of publicly traded registered securities with equal or greater face value and similar terms issued in exchange for securities issued under Rule 144A or a loan or security that would otherwise qualify for purchase under the Investment Criteria or (b) a Permitted Offer;

(xv)    is not a Structured Finance Obligation;

(xvi)    is not a Synthetic Security;

(xvii)    will not consist of a debt obligation of a single obligor where the total potential indebtedness of such obligor under all of its loan agreements, indentures and other underlying instruments is less than $250,000,000;

(xviii)    will not require the Issuer, the Co-Issuer or the pool of collateral to be registered as an investment company under the Investment Company Act;

(xix)    is neither (A) an Equity Security nor (B) by its terms convertible into or exchangeable for an Equity Security;

(xx)    is not a Bridge Loan;

(xxi)    is not a Zero Coupon Obligation;

(xxii)    is not a Step-up Obligation or a Step-down Obligation;

(xxiii)    is not an Interest Only Security;

(xxiv)    it does not mature after the earliest Stated Maturity of the Notes;

(xxv)    it is not a bond or Pre-funded Letter of Credit;

(xxvi)    if the obligation is payable 184 days or more from the date of its original issuance, is issued in "registered form" for purposes of Section 163(f) of the Code;

(xxvii)    is purchased at a price at least equal to 65% of its principal balance; and

(xxviii) is not a Real Estate Loan.

"Collateral Principal Amount":  As of any date of determination, the sum of (a) the Aggregate Principal Balance of the Collateral Obligations (other than Defaulted Obligations) and (b) without duplication, the amounts on deposit in the Accounts, excluding the Revolver Funding Account, (including Eligible Investments in such Accounts) representing Principal Proceeds.

"Collateral Quality Test":  A test satisfied if, as of any date of determination at, or subsequent to, the end of the Ramp-up Period (or, with respect to the test set forth in clause (iii) below, at, or subsequent to any date of determination on or after the Effective Date and which occurs during the Reinvestment Period), in the aggregate, the Collateral Obligations owned (or, for purposes of *pro forma* calculations in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer satisfy each of the tests set forth below (or, if a test is not satisfied on such date of determination, the degree of compliance with such test is maintained or improved after giving effect to any purchase or sale effected on such date of determination), calculated in each case as required by Section 1.2 (Assumptions as to Pledged Obligations) herein:

> (i)     the Minimum Weighted Average Coupon Test;
>
> (ii)    the Minimum Floating Spread Test;
>
> (iii)   the S&P CDO Monitor Test;
>
> (iv)    the Minimum Weighted Average S&P Recovery Rate Test; and
>
> (v)     the Weighted Average Life Test.

"Collection Account":  The non-interest bearing segregated trust account established pursuant to Section 10.2 (Collection Account), which includes the Principal Collection Subaccount and the Interest Collection Subaccount.

"Collection Period":  With respect to any Payment Date, the period commencing immediately following the prior Collection Period (or on the Closing Date, in the case of the Collection Period relating to the first Payment Date) and ending on the 8th Business Day prior to such Payment Date or, in the case of (x) the final Collection Period preceding the latest Stated Maturity of any Class of Notes, (y) the final Collection Period preceding an Optional Redemption or Clean-up Call Redemption or (z) the final Collection Period preceding final payment on the Notes following the liquidation of the Assets following an Event of Default, ending on the day preceding such Stated Maturity, Redemption Date or final payment, respectively.

"Concentration Limitations":  Limitations satisfied, if as of any date of determination at or subsequent to, the end of the Ramp-up Period, in the aggregate, the Collateral Obligations owned (or, for purposes of *pro forma* calculations in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer comply with all of the

requirements set forth below, calculated in each case as required by <u>Section 1.2</u> (Assumptions as to Pledged Obligations) herein:

(i)     all of the Collateral Obligations must be issued by Non-Emerging Market Obligors and the country of organization of such Obligor must either (x) be the United States or (y) have a country ceiling for foreign currency bonds rating of at least "AA" by S&P;

(ii)     no more than the percentage listed below of the Collateral Principal Amount may be issued by obligors Domiciled in the country or countries set forth opposite such percentage:

| % Limit | Country or Countries |
|---|---|
| 20% | All countries (in the aggregate) other than the United States; |
| 15% | All countries other than the United States or Canada; |
| 15% | Canada; |
| 10% | United Kingdom; |
| 10% | Any Tax Jurisdiction; |
| 10% | All Group I Countries in the aggregate; |
| 10% | All Group II Countries in the aggregate; |
| 7.5% | All Group III Countries in the aggregate; |
| 10% | Any individual country other than the United States, United Kingdom or Canada; |

(iii)     the sum of the aggregate unfunded commitments under Delayed Drawdown Collateral Obligations that are available to be funded and the Aggregate Principal Balance of Revolving Collateral Obligations may not be more than 15% of the Collateral Principal Amount;

(iv)     not less than 90% of the Collateral Principal Amount may consist of Senior Secured Loans, Cash and Eligible Investments representing Principal Proceeds;

(v)     not less than 95% of the Collateral Principal Amount may consist of floating rate Collateral Obligations, Cash and Eligible Investments representing Principal Proceeds;

(vi)     not more than 20% of the Collateral Principal Amount may consist of Participation Interests;

(vii)     not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations that are Second Lien Loans;

(viii)   not more than 5% of the Collateral Principal Amount may consist of DIP Collateral Obligations and not more than 2% of the Collateral Principal Amount may consist of DIP Collateral Obligations issued by a single obligor;

(ix)   not more than 2% of the Collateral Principal Amount may consist of obligations issued by a single obligor, except that up to 2.5% of the Collateral Principal Amount may consist of obligations issued by each of up to five other obligors;

(x)   (a) not more than 7.5% of the Collateral Principal Amount may consist of Collateral Obligations with a Moody's Rating of "Caa1" or below and (b) not more than 7.5% of the Collateral Principal Amount may consist of Collateral Obligations with an S&P Rating of "CCC+" or below;

(xi)   the Third Party Credit Exposure may not exceed 20% of the Collateral Principal Amount and the Third Party Credit Exposure with counterparties with a rating below "AA" by S&P may not exceed 5% of the Collateral Principal Amount; *provided* that no Third Party Credit Exposure is permitted with counterparties that do not have a long-term debt rating of at least "A" by S&P and a short-term debt rating of at least "A 1" by S&P (or a long-term debt rating of at least "A+" by S&P);

(xii)   not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations with an S&P Rating derived from a Moody's Rating as set forth in clause (iii)(a) of the definition of the term "S&P Rating" ;

(xiii)   not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations that are issued by obligors that belong to any single S&P Industry Classification, except that up to two other S&P Industry Classifications may each represent up to 12% of the Collateral Principal Amount and up to one other S&P Industry Classification may represent up to 15% of the Collateral Principal Amount;

(xiv)   not more than 60% of the Collateral Principal Amount may consist of Cov-Lite Loans;

(xv)   not more than 7.5% of the Collateral Principal Amount may consist of Collateral Obligations that are Non-Quarterly Assets; *provided* that not more than 3% of the Collateral Principal Amount may consist of Collateral Obligations that pay interest less frequently than semi-annually;

(xvi)   not more than 3% of the Collateral Principal Amount may consist of Deferrable Obligations, including Partial Deferrable Obligations; *provided* that no such Deferrable Obligations are Deferring Obligations; and

(xvii)   not more than 2.5% of the Collateral Principal Amount may consist of Current Pay Obligations.

"<u>Confidential Information</u>":  The meaning specified in <u>Section 14.13(b)</u> (Confidential Information).

"<u>Consenting Holder of the Subordinated Notes</u>": With respect to any Payment Date, a Holder of Subordinated Notes that has consented by delivering an irrevocable written notice to the Paying Agent to a distribution of Equity Securities in lieu of payment of Interest Proceeds on such Payment Date.

"<u>Controlling Class</u>":  The Class A Notes (voting as a single class), so long as any Class A Notes are Outstanding; then the Class B Notes (voting as a single class), if there are no Class A Notes Outstanding; then the Class C Notes, if there are no Class A Notes or Class B Notes Outstanding; then the Class D Notes, if there are no Class A Notes, Class B Notes or Class C Notes Outstanding; then the Class E Notes, if there are no Class A Notes, Class B Notes, Class C Notes or Class D Notes Outstanding; and then the Subordinated Notes, if there are no Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes Outstanding.

"<u>Controlling Person</u>":  The meaning specified in <u>Section 2.6(c)</u> (Registration, Registration of Transfer and Exchange).

"<u>Corporate Office</u>":  With respect to the Trustee, (x) for Note transfer purposes and presentment of the Notes, the corporate office of the Trustee located at 111 Filmore Avenue East, St. Paul, MN 55107-1402, Attn: Bond Holder Service – ACIS CLO 2015-6 and (y) for all other purposes, the corporate office of the Trustee located at 190 South LaSalle Street, 8th Floor, Chicago, IL 60603, Attn: Corporate Trust Services – ACIS CLO 2015-6, e-mail: ACIS.CLO.2015.06@usbank.com; and at or such other address as the Trustee may designate from time to time by notice to the Holders, the Portfolio Manager, any Hedge Counterparty and the Issuer or the principal corporate office of any successor Trustee.

"<u>Coverage Tests</u>":  The Class A/B Coverage Tests, the Class C Coverage Tests, the Class D Coverage Tests and the Class E Coverage Tests.

"<u>Cov-Lite Loan</u>":  A loan that (i) does not contain any financial covenants or (ii) requires the borrower to comply with one or more financial covenants only upon the occurrence of certain actions of the borrower including, but not limited to, a debt issuance, dividend payment, share purchase, merger, acquisition or divestiture (such covenant, an "<u>Incurrence Covenant</u>"), but contains no covenants requiring the borrower to comply with one or more financial covenants during each reporting period, whether or not it has taken any specified action (such covenant, a "<u>Maintenance Covenant</u>"); *provided* that, for all purposes other than the determination of the S&P Recovery Rate for such loan, a loan described in clause (i) or (ii) above which either contains a cross default provision to, or is pari passu with, another loan of the underlying obligor that requires the underlying obligor to comply with both an Incurrence Covenant and a Maintenance Covenant will be deemed not to be a Cov-Lite Loan.

"<u>Credit Improved Criteria</u>":  The criteria that will be met with respect to any Collateral Obligation (i) if such Collateral Obligation is a loan, the Loan Pricing Change since the date of purchase by the Issuer has been a percentage point increase of 0.25% or more, (ii) if such Collateral Obligation is a loan, the spread over the applicable reference rate for such

Collateral Obligation has been decreased in accordance with the Underlying Instruments with respect to such Collateral Obligation since the date of acquisition by (a) 0.25% or more (in the case of a loan with a spread (prior to such decrease) less than or equal to 2.00%), (b) 0.375% or more (in the case of a loan with a spread (prior to such decrease) greater than 2.00% but less than or equal to 4.00%) or (c) 0.50% or more (in the case of a loan with a spread (prior to such decrease) greater than 4.00%) due, in each case, to an improvement in the related borrower's financial ratios or financial results or (iii) if it has a projected cash flow interest coverage ratio (earnings before interest and taxes *divided by* cash interest expense as estimated by the Portfolio Manager) of the underlying borrower or other obligor of such Collateral Obligation that is expected to be more than 1.15 times the current year's projected cash flow interest coverage ratio.

"Credit Improved Obligation":  Any Collateral Obligation which, in the Portfolio Manager's reasonable commercial judgment, has significantly improved in credit quality after it was acquired by the Issuer, which improvement may (but need not) be evidenced by one of the following:  (a) such Collateral Obligation satisfies at least one of the Credit Improved Criteria, (b) such Collateral Obligation has been upgraded at least one rating sub-category by either Rating Agency or has been placed and remains on credit watch with positive implication by any Rating Agency, (c) the issuer of such Collateral Obligation has raised equity capital or other capital subordinated to the Collateral Obligation or (d) the issuer of such Collateral Obligation has, in the Portfolio Manager's reasonable commercial judgment, shown improved results or possesses less credit risk, in each case since such Collateral Obligation was acquired by the Issuer; *provided* that, during a Restricted Trading Period, a Collateral Obligation will qualify as a Credit Improved Obligation only if (i) such Collateral Obligation has been upgraded by any Rating Agency at least one rating sub-category or has been placed and remains on a credit watch with positive implication by any Rating Agency since it was acquired by the Issuer, (ii) at least one of the Credit Improved Criteria are satisfied with respect to such Collateral Obligation or (iii) a Majority of the Controlling Class vote to treat such Collateral Obligation as a Credit Improved Obligation.

"Credit Risk Criteria":  The criteria that will be met with respect to any Collateral Obligation (i) if such Collateral Obligation is a loan, the Loan Pricing Change since the date of purchase by the Issuer has been a percentage point decrease of 0.25% or more, (ii) if such Collateral Obligation is a loan, the spread over the applicable reference rate for such Collateral Obligation has been increased in accordance with the Underlying Instruments with respect to such Collateral Obligation since the date of acquisition by (a) 0.25% or more (in the case of a loan with a spread (prior to such increase) less than or equal to 2.00%), (b) 0.375% or more (in the case of a loan with a spread (prior to such increase) greater than 2.00% but less than or equal to 4.00%) or (c) 0.50% or more (in the case of a loan with a spread (prior to such increase) greater than 4.00%) due, in each case, to a deterioration in the related borrower's financial ratios or financial results or (iii) if it has a projected cash flow interest coverage ratio (earnings before interest and taxes *divided by* cash interest expense as estimated by the Portfolio Manager) of the underlying borrower or other obligor of such Collateral Obligation of less than 1.00 or that is expected to be less than 0.85 times the current year's projected cash flow interest coverage ratio.

"Credit Risk Obligation":  Any Collateral Obligation that, in the Portfolio Manager's reasonable commercial judgment, has a significant risk of declining in credit quality

or price unrelated to general market conditions; *provided* that, during a Restricted Trading Period, a Collateral Obligation will qualify as a Credit Risk Obligation only if (i) such Collateral Obligation has been downgraded by any Rating Agency at least one rating sub-category or has been placed and remains on a credit watch with negative implication by any Rating Agency since it was acquired by the Issuer, (ii) at least one of the Credit Risk Criteria are satisfied with respect to such Collateral Obligation or (iii) a Majority of the Controlling Class vote to treat such Collateral Obligation as a Credit Risk Obligation.

"Current Pay Obligation":  Any Collateral Obligation (other than a DIP Collateral Obligation) that would otherwise be treated as a Defaulted Obligation but as to which no payments are due and payable that are unpaid (disregarding any forbearance or grace period in excess of 90 days with respect to any payment that is unpaid but would be due and payable but for such forbearance or grace period) and with respect to which the Portfolio Manager has certified to the Trustee (with a copy to the Collateral Administrator) in writing that it believes, in its reasonable business judgment, that (i) the issuer or obligor of such Collateral Obligation will continue to make scheduled payments of interest (and/or fees, as applicable, in the case of a Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation) thereon and will pay the principal thereof by maturity or as otherwise contractually due, (ii) if the issuer or obligor is subject to a bankruptcy proceeding, it has been the subject of an order of a bankruptcy court that authorizes payments on such Collateral Obligation and all interest (and/or fees, as applicable, in the case of a Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation) and principal payments and any other amounts due thereunder have been paid in cash when due, and (iii) the Market Value of such Collateral Obligation is at least 80% of the par value thereof; *provided* that the Aggregate Principal Balance of all Collateral Obligations which constitute "Current Pay Obligations" may not exceed 2.5% of the Collateral Principal Amount; *provided further,* that in determining which of the Collateral Obligations will be included in the preceding proviso as Current Pay Obligations, the Collateral Obligations with the highest Market Value expressed as a percentage will be deemed to constitute Current Pay Obligations. If the Market Value of a Collateral Obligation is determined pursuant to clause (E) of the definition of Market Value, such Collateral Obligation cannot be a Current Pay Obligation.

"Current Portfolio":   At any time, the then current portfolio of Collateral Obligations and Eligible Investments representing Principal Proceeds (determined in accordance with Section 1.2 (Assumptions as to Pledged Obligations) to the extent applicable), then held by the Issuer.

"Custodial Account":   The non-interest bearing segregated trust account established in the name of the Trustee pursuant to Section 10.3(b) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"Custodian":   The meaning specified in the first sentence of Section 3.3(a) (Custodianship; Delivery of Collateral Obligations and Eligible Investments) with respect to items of collateral referred to therein, and each entity with which an Account is maintained, as the context may require, each of which shall be a Securities Intermediary.

"Default":   Any Event of Default or any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"Defaulted Obligation":  Any Collateral Obligation included in the Assets shall constitute a "Defaulted Obligation" if:

(a)     a default as to the payment of principal and/or interest has occurred and is continuing with respect to such Collateral Obligation (without regard to any grace period applicable thereto, or waiver thereof, after the passage (in the case of a default that in the Portfolio Manager's judgment, as certified to the Trustee in writing, is not due to credit-related causes) of a three Business Day grace period);

(b)     a default known to a Responsible Officer of the Portfolio Manager as to the payment of principal and/or interest has occurred and is continuing on another debt obligation of the same issuer which is senior or *pari passu* in right of payment to such Collateral Obligation (without regard to any grace period applicable thereto, or waiver or forbearance thereof, after the passage (in the case of a default in the Portfolio Manager's judgment that is not due to credit-related causes) of five Business Days or seven calendar days, whichever is greater, but in no case beyond the passage of any grace period applicable thereto; *provided* that both the Collateral Obligation and such other debt obligation are full recourse obligations);

(c)     the issuer or others have instituted proceedings to have the issuer adjudicated as bankrupt or insolvent or placed into receivership and such proceedings have not been stayed or dismissed or such issuer has filed for protection under Chapter 11 of the United States Bankruptcy Code;

(d)     (x) such Collateral Obligation has an S&P Rating of "CC" or lower or "SD" or had such rating before such rating was withdrawn or (y) the obligor of such Collateral Obligation has a Moody's probability default rating (as published by Moody's) of "D" or "LD" or had such rating before such rating was withdrawn;

(e)     the Portfolio Manager has in its reasonable commercial judgment otherwise declared such Collateral Obligation to be a "Defaulted Obligation";

(f)     such Collateral Obligation is a Participation Interest and (1) the related Selling Institution fails in any material respect in the performance of any of its payment obligations in accordance with the terms of such Participation Interest and such failure continues for seven Business Days or (2) the Selling Institution has an S&P Rating of "CC" or lower or "SD" or a Moody's probability of default rating of "D" or "LD" or had either such rating before such rating was withdrawn;

(g)     such Collateral Obligation is *pari passu* or subordinate in right of payment as to the payment of principal and/or interest to another debt obligation of the same issuer that would constitute a Defaulted Obligation under clause (d) above were such other debt obligation owned by the Issuer; *provided* that both the debt obligation and such other debt obligation are full recourse obligations of the applicable issuer;

(h)     such obligation is a Deferring Obligation; or

(i)      such obligation is included in the excess, if any, of any Collateral Obligations that would qualify as Current Pay Obligations but for the provisos to the definition thereof;

*provided* that a Collateral Obligation will not constitute a Defaulted Obligation pursuant to clauses (b) or (c) above if such Collateral Obligation is a DIP Collateral Obligation.

"Deferrable Cash-Pay Interest":  As to any Partial Deferrable Obligation, the portion of interest required to be paid in cash (and not permitted to be added to the balance of such Partial Deferrable Obligation or otherwise deferred and accrued) thereon pursuant to the terms of the related underlying instruments.

"Deferrable Notes":  The Notes specified as such in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Deferrable Obligation":  A Collateral Obligation which by its terms permits the deferral of payment of any accrued or unpaid interest.

"Deferred Interest":  With respect to any specified Class of Deferrable Notes, the meaning specified in Section 2.8(a) (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved).

"Deferring Obligation":  A Deferrable Obligation that is deferring the payment of interest due thereon and has been so deferring the payment of interest due thereon (i) with respect to Collateral Obligations that have a Moody's Rating of at least "Baa3," for the shorter of two consecutive accrual periods or one year and (ii) with respect to Collateral Obligations that have a Moody's Rating of "Ba1" or below, for the shorter of one accrual period or six consecutive months, which deferred capitalized interest has not, as of the date of determination, been paid in Cash.

"Delayed Drawdown Collateral Obligation":  A Collateral Obligation that (a) requires the Issuer to make one or more future advances to the borrower under the Underlying Instruments relating thereto, (b) specifies a maximum amount that can be borrowed on one or more borrowing dates and (c) does not permit the re-borrowing of any amount previously repaid by the borrower thereunder; but any such Collateral Obligation will be a Delayed Drawdown Collateral Obligation only until all commitments by the Issuer to make advances to the borrower expire or are terminated or reduced to zero.

"Deliver" or "Delivered" or "Delivery":  The taking of the following steps:

(i)      in the case of each Certificated Security (other than a Clearing Corporation Security), Instrument or Participation Interest in which the underlying loan or Participation Interest is represented by an Instrument,

(a)      causing the delivery of such Certificated Security or Instrument to the Custodian registered in the name of the Custodian or its affiliated nominee or endorsed to the Custodian or in blank,

(b)    causing the Custodian to continuously indicate on its books and records that such Certificated Security or Instrument is credited to the applicable Account, and

(c)    causing the Custodian to maintain continuous possession of such Certificated Security or Instrument;

(ii)    in the case of each Uncertificated Security (other than a Clearing Corporation Security),

(a)    causing such Uncertificated Security to be continuously registered on the books of the issuer thereof to the Custodian, and

(b)    causing the Custodian to continuously indicate on its books and records that such Uncertificated Security is credited to the applicable Account;

(iii)    in the case of each Clearing Corporation Security,

(a)    causing the relevant Clearing Corporation to credit such Clearing Corporation Security to the securities account of the Custodian or a nominee, and

(b)    causing the Custodian to continuously indicate on its books and records that such Clearing Corporation Security is credited to the applicable Account;

(iv)    in the case of each security issued or guaranteed by the United States of America or agency or instrumentality thereof and that is maintained in book-entry records of a Federal Reserve Bank ("FRB") (each such security, a "Government Security"),

(a)    causing the creation of a Security Entitlement to such Government Security by the credit of such Government Security to the securities account of the Custodian at such FRB, and

(b)    causing the Custodian to continuously indicate on its books and records that such Government Security is credited to the applicable Account;

(v)    in the case of each Security Entitlement not governed by clauses (i) through (iv) above,

(a)    causing a Securities Intermediary (x) to indicate on its books and records that the underlying Financial Asset has been credited to the Custodian's securities account, (y) to receive a Financial Asset from a Securities Intermediary or to acquire the underlying Financial Asset for a Securities Intermediary, and in either case, accepting it for credit to the

Custodian's securities account or (z) to become obligated under other law, regulation or rule to credit the underlying Financial Asset to a Security Intermediary's securities account,

(b)      causing such Securities Intermediary to make entries on its books and records continuously identifying such Security Entitlement as belonging to the Custodian and continuously indicating on its books and records that such Security Entitlement is credited to the Custodian's securities account, and

(c)      causing the Custodian to continuously indicate on its books and records that such Security Entitlement (or all rights and property of the Custodian representing such Security Entitlement) is credited to the applicable Account;

(vi)      in the case of Cash or Money,

(a)      causing the delivery of such Cash or Money to the Custodian,

(b)      causing the Custodian to treat such Cash or Money as a Financial Asset maintained by such Custodian for credit to the applicable Account in accordance with the provisions of Article 8 of the UCC, and

(c)      causing the Custodian to continuously indicate on its books and records that such Cash or Money is credited to the applicable Account; and

(vii)      in the case of each general intangible (including any loan or Participation Interest in which neither the Participation Interest nor the loan is represented by an Instrument) or any other Asset the security interest in respect of which may be perfected under the UCC by filing a Financing Statement,

(a)      causing the filing of a Financing Statement in the office of the Recorder of Deeds of the District of Columbia, Washington, DC, and

(b)      causing the registration of the security interests granted under this Indenture in the Register of Mortgages and Charges of the Issuer at the Issuer's registered office in the Cayman Islands.

In addition, the Issuer will obtain any and all consents required by the underlying instruments relating to any such general intangibles for the transfer of ownership and/or pledge hereunder (except to the extent that the requirement for such consent is rendered ineffective under Section 9-406 of the UCC).

"Designated Principal Proceeds":  Principal Proceeds in an aggregate amount not greater than $2,820,000, designated, from time to time after the Effective Date and on or prior to the Designated Principal Proceeds Cut-off Date, by the Portfolio Manager to be treated as

Interest Proceeds (but only if the Effective Date Overcollateralization Test would be satisfied after each such designation).

"<u>Designated Principal Proceeds Cut-off Date</u>":  October 8, 2015.

"<u>Determination Date</u>":  With respect to each Payment Date, the last day of the related Collection Period.

"<u>DIP Collateral Obligation</u>":  A loan paying interest on a current basis made to a debtor-in-possession pursuant to Section 364 of the U.S. Bankruptcy Code having the priority allowed by either Section 364(c) or 364(d) of the U.S. Bankruptcy Code and secured by senior liens.

"<u>Discount Obligation</u>":  Any Collateral Obligation that was purchased (as determined without averaging prices of purchases on different dates and treating each portion of a Collateral Obligation purchased on different dates as a separate Collateral Obligation) for less than (a) 85.0% of its Principal Balance, if such Collateral Obligation has a Moody's Rating lower than "B3," or (b) 80.0% of its Principal Balance, if such Collateral Obligation has a Moody's Rating of "B3" or higher; *provided* that, solely for the purposes of the Effective Date Overcollateralization Test, until the date that is one year following the Closing Date, any Collateral Obligation that is classified as "Oil and Gas" by S&P will be considered a Discount Obligation if such Collateral Obligation was purchased for less than 85% of its Principal Balance, irrespective of its Moody's Rating; *provided further* that;

(i)     such Collateral Obligation will cease to be a Discount Obligation at such time as the Market Value (expressed as a percentage of the par amount of such Collateral Obligation) determined for such Collateral Obligation on each day during any period of 30 consecutive days since the acquisition by the Issuer of such Collateral Obligation, equals or exceeds 90% of the Principal Balance of such Collateral Obligation;

(ii)     any Collateral Obligation that would otherwise be considered a Discount Obligation, but that is purchased in accordance with the Eligibility Criteria with the proceeds of sale of a Collateral Obligation that was not a Discount Obligation at the time of its purchase, so long as such purchased Collateral Obligation:

(A)     is purchased or committed to be purchased within 20 Business Days of such sale,

(B)     is purchased at a purchase price (expressed as a percentage of the par amount of such Collateral Obligation) equal to or greater than the sale price of the sold Collateral Obligation,

(C)     is purchased at a purchase price (expressed as a percentage of the par amount of such Collateral Obligation) not less than 65%; and

(D)      has a Moody's Default Probability Rating equal to or greater than the Moody's Default Probability Rating of the sold Collateral Obligation.

Any Collateral Obligations described in clauses (A) through (D) above will not be considered to be Discount Obligations.

(iii)      clause (ii) above in this proviso shall not apply to any such Collateral Obligation at any time on or after the acquisition by the Issuer of such Collateral Obligation if, as determined at the time of such acquisition, such application would result in:

(A)      more than 5% of the Collateral Principal Amount consisting of Collateral Obligations to which such clause (ii) has been applied; or

(B)      the Aggregate Principal Balance of all Collateral Obligations to which such clause (ii) has been applied since the Closing Date being more than 10% of the Target Initial Par Amount.

"Distribution Report": The meaning specified in Section 10.7(b) (Accountings).

"Diversity Score":   A single number that indicates collateral concentration in terms of both issuer and industry concentration, calculated as set forth in Schedule 4 hereto.

"Dollar" or "$":  A dollar or other equivalent unit in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

"Domicile":  With respect to any issuer of, or obligor with respect to, a Collateral Obligation, its country of organization.

"DTC":   The Depository Trust Company, its nominees, and their respective successors.

"Due Date":  Each date on which any payment is due on a Pledged Obligation in accordance with its terms.

"Exchanged Equity Security":  Any Equity Security received by the Issuer in exchange for a Defaulted Obligation and held by an ETB Subsidiary.

"Effective Date":  The date on which each of the Effective Date Conditions are met.

"Effective Date Conditions":  Means conditions that will be satisfied if the S&P Effective Date Rating Condition has been satisfied after the end of the Ramp-up Period.

"Effective Date Overcollateralization Test":  A test that is satisfied if, on any date of determination, the ratio of (x) the Adjusted Collateral Principal Amount *divided by* (y) the

Aggregate Outstanding Amount of all Secured Notes is equal to or greater than the Target Initial Par Ratio.

"Effective Date Report":  A report, compiled by the Collateral Administrator and provided to the Rating Agency, determined as of the end of the Ramp-up Period, containing (A) the information required in a Monthly Report and (B) a calculation with respect to whether the Target Initial Par Condition is satisfied.

"Eligible Investment Required Ratings":  Are (a) if such obligation or security (i) has both a long-term and a short-term credit rating from Moody's, such ratings are "Aa3" or higher (not on credit watch for possible downgrade) and "P-1" (not on credit watch for possible downgrade), respectively, (ii) has only a long-term credit rating from Moody's, such rating is at least equal to or higher than the current Moody's sovereign ratings of the U.S. government, and (iii) has only a short-term credit rating from Moody's, such rating is "P-1" (not on credit watch for possible downgrade), and (b) a long-term credit rating of "A" or higher and a short-term credit rating of at least "A-1" (or, in the absence of a short-term credit rating, "A+" or higher) from S&P; *provided* that, if held by the Issuer for more that 60 days, such obligation or security has a long-term credit rating of at least "AA-" from S&P.

"Eligible Investments":  (A) Cash and (B) any United States dollar denominated investment that, at the time it is Delivered to the Trustee (directly or through an intermediary or bailee), is one or more of the following obligations or securities:

(i)      direct obligations of, and obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States of America or any agency or instrumentality of the United States of America the obligations of which are expressly backed by the full faith and credit of the United States of America and such obligations meet the criteria set forth in clause (b) of the definition of Eligible Investment Required Ratings;

(ii)      demand and time deposits in, certificates of deposit of, trust accounts with, bankers' acceptances issued by, or federal funds sold by any depository institution or trust company incorporated under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state banking authorities, so long as the commercial paper and/or the debt obligations of such depository institution or trust company at the time of such investment or contractual commitment providing for such investment have the Eligible Investment Required Ratings;

(iii)      commercial paper or other short-term obligations (other than Asset-Backed Commercial Paper) with the Eligible Investment Required Ratings and that either bear interest or are sold at a discount from the face amount thereof and have a maturity of not more than 183 days from their date of issuance and such maturity is not extendable; and

(iv)     shares of non-U.S. registered money market funds which funds have, at all times, credit ratings of "Aaa-mf" by Moody's and "AAAm" or "AAAm-G" by S&P, respectively;

*provided* that Eligible Investments purchased with funds in the Collection Account shall be held until maturity except as otherwise specifically provided herein and shall include only such obligations or securities, other than those referred to in clause (iv) above, as mature (or are putable at par to the issuer thereof) no later than the Business Day prior to the next Payment Date; and *provided* that none of the foregoing obligations or securities shall constitute Eligible Investments if (a) such obligation or security has an "f," "r," "p," "pi," "q," "t" or "sf" subscript assigned by S&P, (b) all, or substantially all, of the remaining amounts payable thereunder consist of interest and not principal payments, (c) such obligation or security is subject to withholding tax unless (i) the issuer of the security is required to make "gross-up" payments for the full amount of such foreign withholding tax or (ii) such withholding is imposed pursuant to FATCA, (d) such obligation or security is secured by real property, (e) such obligation or security is purchased at a price greater than 100% of the principal or face amount thereof, (f) in the Portfolio Manager's judgment, such obligation or security is subject to material non-credit related risks or (g) such obligation is a Structured Finance Obligation or Synthetic Security; *provided further* that each Eligible Investment, other than those referred to in clause (vii) above, must mature on the earlier of (A) 60 days following its acquisition or (B) the Business Day prior to the next Payment Date (subject to the limited exception set forth in the first proviso of this paragraph above).  Eligible Investments may include, without limitation, those investments for which the Trustee or an Affiliate of the Trustee provides services and receives compensation. For the avoidance of doubt, the Issuer shall not acquire any Eligible Investments that are not "cash equivalents" as defined in and subject to the Volcker Rule.

"Entitlement Order":  The meaning specified in Section 8-102(a)(8) of the UCC.

"Equity Security":  Any security or debt obligation that at the time of acquisition, conversion or exchange does not satisfy one or more of the requirements of the definition of "Collateral Obligation" and is not an Eligible Investment.

"ERISA":  The United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Limited Notes":  The Notes specified as such in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"ETB Subsidiary":  The meaning specified in Section 7.4(b) (Existence of Co-Issuers).

"Euroclear":  Euroclear Clearance System.

"Event of Default":  The meaning specified in Section 5.1 (Events of Default).

"Excepted Advances":  Customary advances made to protect or preserve rights against the borrower of or obligor under a Collateral Obligation or to indemnify an agent or representative for lenders pursuant to the Underlying Instrument.

"Excess CCC/Caa Adjustment Amount":  As of any date of determination, an amount equal to the excess, if any, of (i) the Aggregate Principal Balance of all Collateral Obligations included in the CCC/Caa Excess, over (ii) the sum of the Market Values of all Collateral Obligations included in the CCC/Caa Excess.

"Excess Weighted Average Coupon":  As of any date of determination, an amount equal to: (a) the excess, if any, of the Weighted Average Coupon over the Minimum Weighted Average Coupon *multiplied by* (b) an amount equal to (i) the Aggregate Principal Balance of all fixed rate Collateral Obligations *divided by* (ii) the Aggregate Principal Balance of all floating rate Collateral Obligations.

"Excess Weighted Average Floating Spread":  As of any date of determination, an amount equal to: (a) the excess, if any, of the Weighted Average Floating Spread over the Minimum Floating Spread; *multiplied by* (b) an amount equal to the Aggregate Principal Balance of all floating rate Collateral Obligations as of such date of determination; *divided by* (c) the Aggregate Principal Balance of all fixed rate Collateral Obligations.

"Exchange Act":  The United States Securities Exchange Act of 1934, as amended.

"Expense Reserve Account":  The non-interest bearing segregated trust account established pursuant to Section 10.3(d) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"FATCA":  Sections 1471 through 1474 of the Code and the Treasury regulations (and any notices, guidance or official pronouncements) promulgated thereunder, any agreement entered into with respect thereto, any intergovernmental agreement in respect thereof (including the Cayman IGA), and any law, rule or regulation implementing such an intergovernmental agreement, including any regulations, rules and guidance notes or other approach or practices adopted in respect thereof.

"FATCA Compliance":  Compliance with FATCA, as necessary so that no tax will be imposed or withheld thereunder in respect of payments to or for the benefit of, and no penalty will be imposed upon, the Issuer.

"Federal Reserve Board":  The Board of Governors of the Federal Reserve System.

"Fee Basis Amount":  As of any date of determination, the sum of (a) the Collateral Principal Amount (including all Collateral Obligations held by an ETB Subsidiary) and (b) the Aggregate Principal Amount of all Defaulted Obligations.

"Filing Holder": The meaning specified in Section 5.4(d)(iii) (Remedies).

"Financial Asset":  The meaning specified in Section 8-102(a)(9) of the UCC.

"Financing Statements":  The meaning specified in Section 9-102(a)(39) of the UCC.

"First-Lien Last-Out Loan":  Any assignment of or Participation Interest in a Loan that: (a) may by its terms become subordinate in right of payment to any other obligation of the obligor of the Loan solely upon the occurrence of a default or event of default by the obligor of the Loan and (b) is secured by a valid perfected first priority security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan.

"Fixed Rate Notes":  The Class A-2 Notes and the Class B-2 Notes.

"Floating Rate Notes": All of the Secured Notes, collectively, other than the Class A-2 Notes and the Class B-2 Notes.

"GAAP":  The meaning specified in Section 6.3(j) (Certain Rights of the Trustee).

"Global Notes":  Any Regulation S Global Notes or Rule 144A Global Notes.

"Global Subordinated Notes":  Any Regulation S Global Subordinated Notes or Rule 144A Global Subordinated Notes.

"Grant":   To grant, bargain, sell, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of setoff against, deposit, set over and confirm.  A Grant of the Pledged Obligations, or of any other instrument, shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including, the immediate continuing right to claim for, collect, receive and receipt for principal and interest payments in respect of the Pledged Obligations, and all other Monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Group I Country": The Netherlands, Australia, New Zealand and the United Kingdom (or such other countries as may be notified by Moody's to the Portfolio Manager from time to time).

"Group II Country": Germany, Sweden and Switzerland (or such other countries as may be notified by Moody's to the Portfolio Manager from time to time).

"Group III Country": Austria, Belgium, Denmark, Finland, France, Iceland, Liechtenstein, Luxembourg and Norway (or such other countries as may be notified by Moody's to the Portfolio Manager from time to time).

"Hedge Account":  Any trust account established pursuant to Section 10.5 (Hedge Accounts).

"Hedge Agreements":  Any interest rate swap, cap or similar agreement between the Issuer and any Hedge Counterparty, as amended from time to time, and any replacement agreement entered into pursuant to Section 15.2 (Assignment of Hedge Agreement).

"Hedge Counterparty":   Any one or more institutions entering into or guaranteeing a Hedge Agreement with the Issuer.

"Holder":   With respect to any Note, the Person whose name appears on the Register as the registered holder of such Note.

"Holder FATCA Information":   Information and documentation requested by the Issuer (or an authorized agent acting on behalf of the Issuer) to be provided by the holder of a Note to the Issuer (or an authorized agent acting on behalf of the Issuer) that may be required to enable the Issuer to comply with FATCA.

"Incentive Management Fee":   A fee payable to the Portfolio Manager in arrears on each Payment Date (prorated for the related Interest Accrual Period) pursuant to Section 9 of the Portfolio Management Agreement and Section 11.1 (Disbursements of Monies from Payment Account) in amount equal to (1) 15% of the remaining Interest Proceeds, if any, available for payment pursuant to Section 11.1(a)(i)(X) (Disbursements of Monies from Payment Account), (2) 15% of the remaining Principal Proceeds, if any, available for payment pursuant to Section 11.1(a)(ii)(J) (Disbursements of Monies from Payment Account) and (3) 15% of the remaining amounts, if any, available for payment pursuant to Section 11.1(a)(iii)(P) (Disbursements of Monies from Payment Account).

"Incentive Management Fee Threshold":   The threshold that will be satisfied on any Payment Date if the Subordinated Notes that are issued on the Closing Date have received an annualized internal rate of return (computed using the "XIRR" function in Microsoft® Excel or an equivalent function in another software package) of at least 10% on the original purchase price of the Subordinated Notes as of the current Payment Date (after giving effect to all payments made or to be made on such Payment Date).   The annualized rate of return will be calculated based on the distributions made on the Subordinated Notes issued on the Closing Date, and without taking into account distributions made on any Additional Subordinated Notes issued after the Closing Date.

"Indenture":   This instrument as originally executed and, if from time to time supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended.

"Independent":   As to any Person, any other Person (including, in the case of an accountant or lawyer, a firm of accountants or lawyers, and any member thereof, or an investment bank and any member thereof) who (i) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person and (ii) is not connected with such Person as an Officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions. "Independent" when used with respect to any accountant may include an accountant who audits the books of such Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Professional Conduct of the American Institute of Certified Public Accountants.

"Index Maturity":  With respect to any Class of Secured Notes, the period indicated with respect to such Class in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Information":  S&P's "Credit Estimate Information Requirements" dated April 2011 and any other available information S&P reasonably requests in order to produce a credit estimate for a particular asset.

"Information Agent":  The Collateral Administrator.

"Initial Purchaser":  Jefferies LLC, in its capacity as initial purchaser under the Purchase Agreement.

"Initial Rating":  With respect to any Class of Secured Notes, the rating or ratings, if any, indicated in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Institutional Accredited Investor": An Accredited Investor under Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

"Instrument":  The meaning specified in Section 9-102(a)(47) of the UCC.

"Interest Accrual Period":  The period from and including the Closing Date to but excluding the first Payment Date, and each succeeding period from and including each Payment Date to but excluding the following Payment Date until the principal of the Secured Notes is paid or made available for payment.  For purposes of determining any Interest Accrual Period, in the case of the Fixed Rate Notes, each Payment Date will be assumed to be the 1st day of the relevant month (irrespective of whether such day is a Business Day).

"Interest Collection Subaccount":  The meaning specified in Section 10.2(a) (Collection Account).

"Interest Coverage Ratio":  With respect to any designated Class or Classes of Secured Notes, as of any date of determination, an amount, expressed as a percentage, equal to:

(a)    (i) the Collateral Interest Amount as of such date of determination *minus* (ii) amounts payable (or expected as of the date of determination to be payable) on the following Payment Date as set forth in clauses (A) through (C) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account); *divided by*

(b)    (i) amounts payable (or expected as of the date of determination to be payable) on the following Payment Date as set forth in clause (D) and, with respect to the Deferrable Notes, clause (G) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account) *plus* (ii) interest due and payable on the Secured Notes of such Class or Classes, each Priority Class of Secured Notes and each Pari Passu Class of Secured Notes (excluding any Deferred Interest but including any interest on Deferred Interest with respect to any such Classes) on such Payment Date.

"<u>Interest Coverage Test</u>":  A test that is satisfied with respect to any specified Class or Classes of Secured Notes if, as of any date of determination at, or subsequent to, the Determination Date with respect to the second Payment Date, the Interest Coverage Ratio for such Class or Classes is at least equal to the applicable Required Coverage Ratio for such Class or Classes.

"<u>Interest Determination Date</u>":  For each Interest Accrual Period, the second London Banking Day preceding the first day of such Interest Accrual Period.

"<u>Interest Only Security</u>":  Any obligation or security that does not provide in the related Underlying Instruments for the payment or repayment of a stated principal amount in one or more installments on or prior to its stated maturity.

"<u>Interest Proceeds</u>":  With respect to any Collection Period or Determination Date (without duplication and excluding with respect to (x) any Payment Date, amounts used to purchase or pay accrued interest in connection with the purchase of Collateral Obligations or Repurchased Notes, respectively, and (y) any date on which a Refinancing of some, but not all, of the Classes of Secured Notes occurs, Partial Refinancing Interest Proceeds), the sum of: (i) all payments of interest received by the Issuer during the related Collection Period on the Collateral Obligations and Eligible Investments, including the accrued interest received in connection with a sale thereof during the related Collection Period, less (x) any such amount that represents Principal Financed Accrued Interest and (y) an amount designated by the Portfolio Manager in writing up to the amount of unpaid interest on the Collateral Obligations that accrued prior to the Closing Date and is owing to the Issuer and remains unpaid as of the Closing Date; (ii) all principal and interest payments on Eligible Investments purchased with Interest Proceeds; (iii) all amendment and waiver fees, late payment fees and other fees, except for any fee in connection with the reduction of the par of the related Collateral Obligation; (iv) any amounts deposited in the Interest Collection Subaccount of the Collection Account from the Expense Reserve Account pursuant to <u>Section 10.3(d)</u> (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account); (v) commitment fees and other similar fees actually received by the Issuer during such Collection Period in respect of Revolving Collateral Obligations and Delayed Drawdown Collateral Obligations; (vi) any payment received with respect to any Hedge Agreement other than an upfront payment received upon entering into such Hedge Agreement or a payment received as a result of the termination of such Hedge Agreement (for this purpose, any such payment received or to be received on a Payment Date will be deemed received in respect of the preceding Collection Period and included in the calculation of Interest Proceeds received in such Collection Period); (vii) any funds transferred from the Ramp-up Account to the Interest Collection Subaccount of the Collection Account designated as Interest Proceeds by the Portfolio Manager to the Trustee in writing pursuant to <u>Section 10.3(c)</u> (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account); (viii) Designated Principal Proceeds and (ix) any amount deposited in the Interest Collection Subaccount of the Collection Account from the Interest Reserve Account pursuant to <u>Section 10.3(f)</u> (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account);

*provided* that any amounts received in respect of any Defaulted Obligation or any Exchanged Equity Security will constitute (i) Principal Proceeds (and not Interest Proceeds) until the

aggregate of all collections in respect of such Defaulted Obligation or Exchanged Equity Security, as applicable, since such Defaulted Obligation (or in the case of an Exchanged Equity Security, the related Underlying Exchanged Defaulted Obligation) became a Defaulted Obligation equals the outstanding Principal Balance of such Defaulted Obligation (or, in the case of an Exchanged Equity Security, the related Underlying Exchanged Defaulted Obligation) when it became a Defaulted Obligation, and then (ii) Interest Proceeds thereafter; *provided further* that any amounts received in respect of any Deferring Obligation will constitute Principal Proceeds (and not Interest Proceeds) until the aggregate of all collections in respect of such Deferring Obligation since it became a Deferring Obligation equals the outstanding Principal Balance of such Collateral Obligation (including any deferred or capitalized interest) when it became a Deferring Obligation, and thereafter any amounts received shall constitute Interest Proceeds.

With respect to any Payment Date, an amount equal to the Interest Proceeds due to the Consenting Holders of the Subordinated Notes that are paid in the form of Equity Securities in lieu of Cash pursuant to Section 11.1(a)(i) (Application of Moneys) will be treated for all purposes by the Issuer and the Trustee as Principal Proceeds.

"Interest Reinvestment Test": A test that will be satisfied on any Determination Date during the Reinvestment Period if the Adjusted Collateral Principal Amount *divided by* the Aggregate Outstanding Amount of the Secured Notes equals or exceeds 105.8%.

"Interest Reserve Account": The non-interest bearing segregated trust account established pursuant to Section 10.3(f) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"Investment Company Act": The Investment Company Act of 1940, as amended from time to time.

"Investment Criteria": The criteria specified in Section 12.2(a) (Purchase of Additional Collateral Obligations).

"Investment Criteria Adjusted Balance": With respect to each Collateral Obligation, the Principal Balance of such Collateral Obligation; *provided* that for all purposes the Investment Criteria Adjusted Balance of any:

(i)      Deferring Obligation will be the S&P Collateral Value of such Deferring Obligation;

(ii)     Discount Obligation will be the original purchase price (expressed as a percentage of par) *multiplied by* the current Principal Balance, excluding accrued interest, expressed as a dollar amount;

(iii)    CCC Collateral Obligations and Caa Collateral Obligations included in the CCC/Caa Excess will be the Market Value of such Collateral Obligation; and

(iv)     Defaulted Obligation will be the S&P Collateral Value for such Defaulted Obligations; *provided* that any such Defaulted Obligation that has

constituted a Defaulted Obligation for a period of at least 3 years shall be deemed to have an Investment Criteria Adjusted Balance of zero;

*provided further* that, if any Collateral Obligation would be subject to more than one of clauses (i) through (iv) of this definition of "Investment Criteria Adjusted Balance," such Collateral Obligation shall, for the purposes of this definition, be treated as belonging to the clause that results in the lowest Investment Criteria Adjusted Balance.

"Irish Listing Agent":  The meaning specified in Section 7.2 (Maintenance of Office or Agency).

"IRS":  The U.S. Internal Revenue Service.

"Issuer":  The Person named as such on the first page of this Indenture until a successor Person shall have become the Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Issuer" shall mean such successor Person.

"Issuer Order" and "Issuer Request":  A written order or request dated (which may be (i) provided via email or other electronic communication acceptable to the Trustee or (ii) a standing order or request, respectively), in the name of the Issuer or the Co-Issuer by an Authorized Officer of the Issuer or the Co-Issuer, as applicable, or by the Portfolio Manager by an Authorized Officer thereof, on behalf of the Issuer.  An order provided in an email or other electronic communication by an Authorized Officer of the Issuer or by an Authorized Officer of the Portfolio Manager on behalf of the Issuer shall constitute an Issuer Order, except in each case that the Trustee requests otherwise in writing.

"Junior Class":  With respect to a particular Class of Notes, each Class of Notes that is subordinated to such Class, as indicated in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Knowledgeable Employee":  The meaning set forth in Rule 3c-5 promulgated under the Investment Company Act.

"LIBOR":  The meaning set forth in Exhibit G hereto.

"LIBOR Floor Obligation":  As of any date of determination, a floating rate Collateral Obligation (a) the interest in respect of which is paid based on a London interbank offered rate and (b) that provides that such London interbank offered rate is (in effect) calculated as the greater of (i) a specified "floor" rate *per annum* and (ii) the London interbank offered rate for the applicable interest period for such Collateral Obligation.

"Loan Pricing Change":  With respect to a loan, the change in price of such loan (expressed as a percentage of par) relative to the S&P/LSTA U.S. Leveraged Loan 100 Index or any other nationally recognized index as calculated by the Portfolio Manager in its reasonable commercial judgment.

"London Banking Day":  A day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London, England.

"Make-Whole Amount":  With respect to a redemption or repayment of principal of a Note of a Make-Whole Class in connection with an Optional Redemption or Refinancing on a Redemption Date before the Make-Whole Date, (i) 100% of the Aggregate Outstanding Amount of such Note multiplied by (ii) the product of (A) the interest rate indicated with respect to the applicable Make-Whole Class in Section 2.3 (Authorized Amount; Stated Maturity; Denominations) and (B) the number of days in the period from and including such Redemption Date to but excluding the Make-Whole Date, divided by 360.

"Make-Whole Class": Each of the Class A-1 Notes, the Class A-2 Notes, the Class B-1 Notes, the Class B-2 Notes and the Class C Notes.

"Make-Whole Date":  The Payment Date in May, 2017.

"Majority":  With respect to any Class of Notes, the Holders of more than 50% of the Aggregate Outstanding Amount of the Notes of such Class.

"Management Fees": The Senior Management Fee, the Subordinated Management Fee and the Incentive Management Fee.

"Margin Loan":  An extension of credit that is "purpose credit" within the meaning of Regulation U issued by the Federal Reserve Board.

"Margin Stock":  "Margin Stock" as defined under Regulation U issued by the Federal Reserve Board, including any debt security which is by its terms convertible into "Margin Stock."

"Market Value":  As of any date of determination for any Collateral Obligation and as determined by the Portfolio Manager in the following manner: (A) the average bid price value determined by an Independent pricing service; (B) if the price described in clause (A) is not available, the average of the bid side prices determined by three Independent broker-dealers active in the trading of such Collateral Obligation; (C) if a price or bid described in clause (A) or (B) is not available, the lowest of the bid side prices determined by two Independent broker-dealers active in the trading of such Collateral Obligation; (D) if a price or bid described in clause (A), (B) or (C) is not available and the Portfolio Manager is a Registered Investment Adviser, the bid side price determined by one Independent broker-dealer active in the trading of such Collateral Obligation; or (E) if a price or bid described in clause (A), (B), (C) or (D) is not available, then the lower of (a) the bid side price of such Collateral Obligation determined by the Portfolio Manager in a manner consistent with reasonable and customary market practice and (b) the greater of (i) 70% of the par value of such Collateral Obligation and (ii) the S&P Recovery Rate; *provided* that (x) if the Market Value of any Collateral Obligation is determined pursuant to clause (E) above, the Portfolio Manager will use commercially reasonable efforts to obtain the Market Value of such Collateral Obligation in accordance with subclauses (A) through (D) above and (y) if the Portfolio Manager is not a Registered Investment Adviser, the Market Value of any Collateral Obligation that cannot be obtained in accordance with subclauses (A) through (D) above within 30 days of the date on which its Market Value was determined pursuant to clause (E) above shall be deemed to be zero until determined in accordance with subclauses (A) through (D) above; *provided further* that any bid side price determined by the Portfolio Manager

pursuant to clause (E)(a) above shall be used by the Portfolio Manager as the market value of such Collateral Obligation in all other portfolios it manages.

"Material Change":  With respect to a Collateral Obligation whose S&P Rating is determined pursuant to clauses (iii)(b) or (iii)(c) of the definition of such term, the occurrence of any event, which event, in the reasonable judgment of the Portfolio Manager, constitutes a material adverse change with respect to such Collateral Obligation, including, but not limited to: (i) nonpayment of interest or principal; (ii) the rescheduling of any interest or principal in any part of the capital structure; (iii) any breach of covenants; (iv) the likelihood (more than 50%) of a breach of covenant(s) occurring in the next six months; (v) material underperformance (more than 20% off base case) either at the operating profit or cash flow level; (vi) any restructuring of debt (including proposed debt); (vii) the occurrence of significant transactions (sale or acquisitions of assets); or (viii) changes in payment terms (such as addition of payment-in-kind terms, changes in maturity dates and changes in coupon rates).

"Maturity":  With respect to any Note, the date on which the unpaid principal of such Note becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration, call for redemption or otherwise.

"Maturity Amendment":  With respect to any Collateral Obligation, any waiver, modification, amendment or variance that would extend the stated maturity date of such Collateral Obligation.  For the avoidance of doubt, a waiver, modification, amendment or variance that would extend the stated maturity date of the credit facility of which a Collateral Obligation is part, but would not extend the stated maturity date of the Collateral Obligation held by the Issuer, does not constitute a Maturity Amendment.

"Measurement Date":  Means (i) any day on which a sale, a purchase or a default of a Collateral Obligation occurs, (ii) any Determination Date, (iii) the date as of which the information in any Monthly Report is calculated, (iv) with five Business Days prior notice, any Business Day requested by the Rating Agency and (v) the last day of the Ramp-up Period.

"Memorandum and Articles":  The Issuer's Memorandum and Articles of Association, as they may be amended, revised or restated from time to time.

"Merging Entity":  As defined in Section 7.10 (Co-Issuers May Consolidate, etc., Only on Certain Terms).

"Minimum Floating Spread":  As of any date of determination, the number specified as the "Minimum Floating Spread" in the Minimum Floating Spread/Minimum Weighted Average Coupon Pairing selected by the Portfolio Manager and applicable at such time.

"Minimum Floating Spread/Minimum Weighted Average Coupon Pairing": The Minimum Floating Spread and Minimum Weighted Average Coupon pairing chosen by the Portfolio Manager from time to time pursuant to Section 7.18(f) (Ramp-up Period; Purchase of Additional Collateral Obligations) from a row in Section 2 of Schedule 3 (or the pairing derived from the linear interpolation of two adjacent rows) from the S&P Asset Quality Matrix.

"Minimum Floating Spread Test":   A test that is satisfied on any date of determination if (a) the sum of (i) the Weighted Average Floating Spread and (ii) the Excess Weighted Average Coupon equals or exceeds (b) the Minimum Floating Spread.

"Minimum Weighted Average Coupon":   As of any date of determination, the number specified as the "Minimum Weighted Average Coupon" in the Minimum Floating Spread/Minimum Weighted Average Coupon Pairing selected by the Portfolio Manager and applicable at such time.

"Minimum Weighted Average Coupon Test":   A test that is satisfied on any date of determination if the Weighted Average Coupon *plus* the Excess Weighted Average Floating Spread equals or exceeds the Minimum Weighted Average Coupon.

"Minimum Weighted Average S&P Recovery Rate Test":   The test that will be satisfied on any date of determination if the Weighted Average S&P Recovery Rate for the most senior Class of Secured Notes outstanding then rated by S&P equals or exceeds the Weighted Average S&P Recovery Rate as selected by the Portfolio Manager pursuant to the definition of "S&P CDO Monitor".

"Money":  The meaning specified in Section 1-201(24) of the UCC.

"Monthly Report":  The meaning specified in Section 10.7(a) (Accountings).

"Monthly Report Determination Date":  The meaning specified in Section 10.7(a) (Accountings).

"Moody's":  Moody's Investors Service, Inc., and its successors in interest.

"Moody's Default Probability Rating":  With respect to any Collateral Obligation, the rating determined pursuant to Schedule 5 hereto.

"Moody's Derived Rating":  With respect to any Collateral Obligation whose Moody's Rating or Moody's Default Probability Rating cannot otherwise be determined pursuant to the definitions thereof, the rating determined for such Collateral Obligation as set forth in Schedule 5 hereto.

"Moody's Industry Classification":   The industry classifications set forth in Schedule 1 hereto, as such industry classifications shall be updated at the option of the Portfolio Manager (with notice to the Collateral Administrator) if Moody's publishes revised industry classifications.

"Moody's Rating":    With respect to any Collateral Obligation, the rating determined pursuant to Schedule 5 hereto.

"Moody's Rating Factor":  For each Collateral Obligation, the "Moody's Rating Factor" is the number set forth in the table below opposite the Moody's Default Probability Rating of such Collateral Obligation.

| Moody's Default Probability Rating | Moody's Rating Factor | Moody's Default Probability Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1,350 |
| Aa2 | 20 | Ba3 | 1,766 |
| Aa3 | 40 | B1 | 2,220 |
| A1 | 70 | B2 | 2,720 |
| A2 | 120 | B3 | 3,490 |
| A3 | 180 | Caa1 | 4,770 |
| Baa1 | 260 | Caa2 | 6,500 |
| Baa2 | 360 | Caa3 | 8,070 |
| Baa3 | 610 | Ca or lower | 10,000 |

"Moody's Recovery Rate":  With respect to any Collateral Obligation, as of any date of determination, the recovery rate determined in accordance with the following, in the following order of priority:

(a)      if the Collateral Obligation has been specifically assigned a recovery rate by Moody's (for example, in connection with the assignment by Moody's of an estimated rating), such recovery rate; or

(b)      if the preceding clause does not apply to the Collateral Obligation, except with respect to DIP Collateral Obligations, the rate determined pursuant to the table below based on the number of rating subcategories difference between the Collateral Obligation's Moody's Rating and its Moody's Default Probability Rating (for purposes of clarification, if the Moody's Rating is higher than the Moody's Default Probability Rating, the rating subcategories difference will be positive and if it is lower, negative):

| Number of Moody's Ratings Subcategories Difference Between the Moody's Rating and the Moody's Default Probability Rating | Senior Secured Loans | Second Lien Loans* | Other Collateral Obligations |
|---|---|---|---|
| +2 or more | 60.0% | 55.0% | 45.0% |
| +1 | 50.0% | 45.0% | 35.0% |
| 0 | 45.0% | 35.0% | 30.0% |
| 1 | 40.0% | 25.0% | 25.0% |
| 2 | 30.0% | 15.0% | 15.0% |
| 3 or less | 20.0% | 5.0% | 5.0% |

\*      If such Collateral Obligation does not have both a CFR and an Assigned Moody's Rating, such Collateral Obligation's Moody's Recovery Rate will be determined under the "Other Collateral Obligations" column.

or

(c)      if the Collateral Obligation is a DIP Collateral Obligation (other than a DIP Collateral Obligation which has been specifically assigned a recovery rate by Moody's), 50%.

"Non-Call Period":  The period from the Closing Date to but excluding the Payment Date in November 2016.

"Non-Emerging Market Obligor":  An Obligor that is Domiciled either in (x) the United States or (y) any country that has a country ceiling for foreign currency bonds of at least "Aa2" by Moody's and a foreign currency issuer credit rating of at least "AA" by S&P.

"Non-Permitted ERISA Holder":  As defined in Section 2.12(e) (Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations).

"Non-Permitted Holder":  As defined in Section 2.12(b) (Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations).

"Non-Permitted Tax Holder":  As defined in Section 2.12(c) (Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations).

"Non-Quarterly Assets":  Collateral Obligations (other than Deferrable Obligations) that pay interest less frequently than quarterly, but no less frequently than annually.

"Note Interest Amount":  With respect to any specified Class of Secured Notes and any Payment Date, the amount of interest for the next Interest Accrual Period payable in respect of each U.S. $100,000 principal amount of such Class of Secured Notes.

"Note Interest Rate":  With respect to any specified Class of Secured Notes, the per annum interest rate payable on the Secured Notes of such Class with respect to each Interest Accrual Period, which rate (A) for each Class of the Floating Rate Notes, shall be equal to LIBOR for such Interest Accrual Period plus the spread specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations) with respect to such Notes and (B) for the Fixed Rate Notes, shall be equal to the "Interest Rate" specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations) with respect to such Notes.

"Note Payment Sequence":  The application, in accordance with the Priority of Payments, of Interest Proceeds or Principal Proceeds, as applicable, in the following order:

(i)      to the payment of principal of the Class A-1 Notes and the Class A-2 Notes, pro rata, based on their respective Aggregate Outstanding Amounts, until the Class A-1 Notes and the Class A-2 Notes have been paid in full;

(ii)      to the payment of principal of the Class B-1 Notes and the Class B-2 Notes, pro rata, based on their respective Aggregate Outstanding Amounts, until the Class B-1 Notes and the Class B-2 Notes have been paid in full;

(iii)      to the payment of accrued and unpaid interest and any Deferred Interest on the Class C Notes until such amounts have been paid in full;

(iv)    to the payment of principal of the Class C Notes until the Class C Notes have been paid in full;

(v)    to the payment of accrued and unpaid interest and any Deferred Interest on the Class D Notes until such amounts have been paid in full;

(vi)    to the payment of principal of the Class D Notes until the Class D Notes have been paid in full;

(vii)    to the payment of accrued and unpaid interest and any Deferred Interest on the Class E Notes until such amounts have been paid in full; and

(viii)    to the payment of principal of the Class E Notes until the Class E Notes have been paid in full.

"Notes":  Collectively, the Secured Notes and the Subordinated Notes authorized by, and authenticated and delivered under, this Indenture (as specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations)) or any supplemental indenture (and including any Additional Subordinated Notes issued hereunder pursuant to Section 2.4 (Additional Notes)).

"Obligor":  The obligor or guarantor under a loan, as the case may be.

"Offer":  As defined in Section 10.8(c) (Release of Securities).

"Offered Securities":  The Notes.

"Offering":  The offering of the Offered Securities pursuant to the Offering Circular.

"Offering Circular":  The offering circular, dated April 14, 2015 relating to the Offered Securities, including the supplements thereto.

"Officer":  With respect to the Issuer, the Co-Issuer and any corporation, any director, the Chairman of the Board of Directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer of such entity or any Person authorized by such entity; with respect to any partnership, any general partner thereof or any Person authorized by such entity; with respect to a limited liability company, any member thereof or any Person authorized by such entity; and with respect to the Trustee, any Bank Officer.

"offshore transaction":  The meaning specified in Regulation S.

"Opinion of Counsel":  A written opinion addressed to the Trustee and the Rating Agency, in form and substance reasonably satisfactory to the Trustee and the Rating Agency, of a nationally recognized law firm (or, in the case of an opinion relating to the laws of the Cayman Islands, an attorney at law admitted to practice before the highest court of the Cayman Islands), which attorney may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer or the Co-Issuer, as the case may be, and which firm or attorney, as the case may be, shall

be reasonably satisfactory to the Trustee.  Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory, which opinions of other counsel shall accompany such Opinion of Counsel and shall either be addressed to the Trustee and the Rating Agency or shall state that the Trustee and the Rating Agency shall be entitled to rely thereon.

"Optional Redemption":  A redemption of the Notes in accordance with Section 9.2 (Optional Redemption and Refinancing).

"Outstanding":  With respect to the Notes of any specified Class, as of any date of determination, all of the Notes or all of the Notes of such Class, as the case may be, theretofore authenticated and delivered under this Indenture, except:

> (i)     Notes theretofore canceled by the Registrar or delivered to the Registrar for cancellation in accordance with Section 2.10 (Cancellation);

> (ii)    Notes or portions thereof for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes pursuant to Section 4.1(a)(ii) (Satisfaction and Discharge of Indenture); *provided* that, if such Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

> (iii)   Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a Protected Purchaser; and

> (iv)    Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note);

*provided* that, in determining whether the Holders of the requisite Aggregate Outstanding Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder, (I)  Notes owned by the Issuer, the Co-Issuer or any other obligor upon the Notes shall be disregarded and deemed not to be Outstanding and (only in the case of a vote to remove or replace the Portfolio Manager and not, for the avoidance of doubt, in the case of a vote to propose or approve a successor Portfolio Manager), Notes owned or controlled by the Portfolio Manager, any Affiliate of the Portfolio Manager or any accounts or funds managed on a discretionary basis by the Portfolio Manager or its Affiliates, shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded and (II) Notes so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to

act with respect to such Notes and that the pledgee is not the Issuer, the Co-Issuer, any other obligor upon the Notes, the Portfolio Manager or any Affiliate of the Portfolio Manager.

"Overcollateralization Ratio":  With respect to any specified Class or Classes of Secured Notes as of any Measurement Date, an amount, expressed as a percentage, equal to:  (i) the Adjusted Collateral Principal Amount *divided by* (ii) the Aggregate Outstanding Amount of the Secured Notes of such Class or Classes, each Priority Class of Secured Notes and each Pari Passu Class of Secured Notes (including all applicable Deferred Interest), in each case, if applicable.

"Overcollateralization Ratio Test":  A test that is satisfied with respect to any Class or Classes of Secured Notes as of any date of determination at, or subsequent to, the Effective Date, if (i) the Overcollateralization Ratio for such Class or Classes is at least equal to the applicable Required Coverage Ratio for such Class or Classes or (ii) such Class or Classes of Secured Notes are no longer Outstanding.

"Pari Passu Class":  With respect to each Class of Notes, each Class of Notes that ranks *pari passu* with such Class, as indicated in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Partial Deferrable Obligation":  Any Collateral Obligation with respect to which under the related Underlying Instruments (i) a portion of the interest due thereon is required to be paid in Cash on each payment date therefor and is not permitted to be deferred or capitalized (which portion will at least be equal to (A) in the case of floating rate assets, LIBOR and (B) in the case of fixed rate assets, 4.00%) and (ii) the issuer thereof or obligor thereon may defer or capitalize the remaining portion of the interest due thereon.  Any component of a Partial Deferrable Obligation that is paid "in kind" shall not be included for purposes of calculations related to the Minimum Floating Spread Test, the Weighted Average Coupon or the Weighted Average Floating Spread.

"Partial Refinancing Interest Proceeds":  In connection with a Refinancing of one or more (but not all) of the Secured Notes, Interest Proceeds in an amount equal to the lesser of (a) the amount of accrued interest on the Classes being refinanced (after giving effect to payments under the Priority of Interest Proceeds if the Redemption Date would have been a Payment Date without regard to the Refinancing) and (b) the amount the Portfolio Manager reasonably determines would have been available for distribution under the Priority of Payments for the payment of accrued interest on the Classes being refinanced on the next subsequent Payment Date as if such Notes had not been refinanced.

"Participation Interest":  A participation interest in a loan that at the time of acquisition, satisfies each of the following criteria: (i) such loan would constitute a Collateral Obligation were it acquired directly, (ii) the seller of the participation is a lender on the loan, (iii) the aggregate participation in the loan granted by such Selling Institution to any one or more participants does not exceed the principal amount or commitment with respect to which the Selling Institution is a lender under such loan, (iv) such participation does not grant, in the aggregate, to the participant in such participation a greater interest than the seller holds in the loan or commitment that is the subject of the participation, (v) the entire purchase price for such

participation is paid in full (without the benefit of financing from the Selling Institution or its affiliates) at the time of its acquisition (or, in the case of a participation in a Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, at the time of the funding of such loan), (vi) the participation provides the participant all of the economic benefit and risk of the whole or part of the loan or commitment that is the subject of the loan participation, (vii) is represented by a contractual obligation of a Selling Institution that has at the time of acquisition (a) a long-term debt rating of at least "A" by S&P and a short-term debt rating of at least "A-1" by S&P or (b) a long-term-debt rating of at least "A+" by S&P and (viii) such participation is documented under a Loan Syndications and Trading Association, Loan Market Association or similar agreement standard for loan participation transactions among institutional market participants. Such Selling Institution must directly hold or own the relevant portion of the loan underlying such participation interest, and the Issuer may not acquire a participation interest in a participation. For the avoidance of doubt, a Participation Interest shall not include a sub-participation interest in any loan.

"Paying Agent":  Any Person authorized by the Issuer to pay the principal of or interest on any Notes on behalf of the Issuer as specified in Section 7.2 (Maintenance of Office or Agency).

"Payment Account":  The non-interest bearing segregated trust account established pursuant to Section 10.3(a) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"Payment Date":  The 1st day of February,May,August and November of each year, commencing in August 2015 (or, if such day is not a Business Day, then the next succeeding Business Day).

"PBGC":  The United States Pension Benefit Guaranty Corporation.

"Permitted Offer":  An offer (i) pursuant to the terms of which the offeror offers to acquire a debt obligation (including a Collateral Obligation) in exchange for consideration consisting solely of Cash, other Eligible Investments and/or other Collateral Obligations in an amount equal to or greater than the full face amount of such debt obligation *plus* any accrued and unpaid interest and (ii) as to which the Portfolio Manager has determined in its judgment that the offeror has sufficient access to financing to consummate the offer.

"Person":  An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"Petition Expense Amount":  An aggregate sum (until the Notes are paid in full or until this Indenture is otherwise terminated, in which case it will equal zero) of $500,000.

"Petition Expenses":  The costs and expenses (including, without limitation, fees and expenses of counsel to the Issuer) incurred by the Issuer in connection with its obligations described in Section 7.20 (Objection to Bankruptcy Proceeding); *provided* that such amounts will be payable in accordance with the Priority of Payments as Administrative Expenses, applied

first as Petition Expense Amount in the order set forth in the definition of Administrative Expenses, and then subject to the Administrative Expense Cap as set forth in the Priority of Payments.  Such Petition Expenses may only be paid to the extent such payment would not directly result in the failure to pay any principal or interest due on the Class A Notes or the Class B Notes or, if there are no Class A Notes or Class B Notes Outstanding, the Controlling Class.

"Pledged Obligations":  As of any date of determination, the Collateral Obligations, the Eligible Investments and any Equity Security which forms part of the Assets that have been Granted to the Trustee.

"Portfolio Management Agreement":  The Portfolio Management Agreement, dated as of the Closing Date, between the Issuer and the Portfolio Manager relating to the Notes and the Assets, as amended from time to time, in accordance with the terms hereof and thereof.

"Portfolio Manager":  Acis Capital Management, L.P., a Delaware limited partnership, until a successor Person shall have become the Portfolio Manager pursuant to the provisions of the Portfolio Management Agreement, and thereafter "Portfolio Manager" shall mean such successor Person.

"Post-Reinvestment Period Investment Criteria":  With respect to any proposed investment in substitute Collateral Obligations after the Reinvestment Period, the applicable criteria specified in Section 12.2(b).

"Pre-funded Letter of Credit":  Any letter of credit facility that requires a lender party thereto to pre-fund in full its obligations thereunder.

"Principal Balance":  Subject to Section 1.2 (Assumptions as to Pledged Obligations), with respect to (a) any Pledged Obligation other than a Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, as of any date of determination, the outstanding principal amount of such Pledged Obligation (excluding any capitalized interest) and (b) any Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, as of any date of determination, the outstanding principal amount of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, *plus* (except as expressly set forth in this Indenture) any undrawn commitments that have not been irrevocably reduced with respect to such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation; *provided* that, for all purposes the Principal Balance of any Equity Security or Interest Only Security shall be deemed to be zero.

"Principal Collection Subaccount":  The meaning specified in Section 10.2(a) (Collection Account).

"Principal Financed Accrued Interest":  With respect to any Collateral Obligation purchased during and after the Ramp-up Period, an amount equal to the amount of Principal Proceeds, if any, applied towards the purchase of accrued interest on such Collateral Obligation.

"Principal Proceeds":  With respect to any Collection Period or Determination Date, all amounts received by the Issuer during the related Collection Period that do not

constitute Interest Proceeds and any amounts that have been designated as Principal Proceeds hereunder.

"Priority Class":  With respect to any specified Class of Notes, each Class of Notes that ranks senior to such Class, as indicated in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Priority Hedge Termination Event":  The occurrence of (i) the Issuer's failure to make required payments or deliveries pursuant to a Hedge Agreement, (ii) certain events of bankruptcy, dissolution or insolvency with respect to the Issuer, (iii) the merger of the Issuer with or into another entity where such surviving entity fails to assume all obligations of the Issuer, (iv) the liquidation of the Assets due to an Event of Default under this Indenture, (v) a change in law after the Closing Date which makes it unlawful for the Issuer to perform its obligations under a Hedge Agreement, (vi) any termination described in Section 15.2(b) (Assignment of Hedge Agreement) hereof or (vii) an "Additional Termination Event" (as defined in such Hedge Agreement) with respect to the Issuer.

"Priority of Payments":  The meaning specified in Section 11.1(a) (Disbursements of Monies from Payment Account).

"Proceeding":  Any suit in equity, action at law or other judicial or administrative proceeding.

"Proposed Portfolio":  The portfolio of Collateral Obligations and Eligible Investments representing Principal Proceeds resulting from the proposed purchase, sale, maturity or other disposition of a Collateral Obligation or a proposed reinvestment in an additional Collateral Obligation, as the case may be.

"Protected Purchaser":  As defined in Section 8-303 of the UCC.

"Purchase Agreement":  The agreement dated as of April 16, 2015 by and among the Co-Issuers and the Initial Purchaser relating to the Offering of the Notes.

"QIB/QP":  Any Person that, at the time of its acquisition, purported acquisition or proposed acquisition of Notes is both a Qualified Institutional Buyer and a Qualified Purchaser.

"Qualified Institutional Buyer":  The meaning specified in Rule 144A under the Securities Act.

"Qualified Purchaser":  The meaning specified in Section 2(a)(51) of the Investment Company Act and Rule 2a51-2 under the Investment Company Act.

"Ramp-up Account":  The non-interest bearing segregated trust account established pursuant to Section 10.3(c) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"Ramp-up Period":   The period commencing on the Closing Date and ending upon the earlier to occur of (a) June 22, 2015 and (b) the date selected by the Portfolio Manager and upon which the Issuer has satisfied the Target Initial Par Condition.

"Rating":  The Moody's Rating and/or S&P Rating, as applicable.

"Rating Agency": (i) With respect to the Notes, S&P, for so long as any Class of Notes is rated by S&P, and (ii) with respect to Assets generally, Moody's or S&P, and if at any time Moody's or S&P ceases to provide rating services with respect to debt obligations, any other nationally recognized investment rating agency selected by the Issuer (or the Portfolio Manager on behalf of the Issuer).  In the event that at any time either S&P or Moody's ceases to be a Rating Agency, references to rating categories of S&P or Moody's, as applicable, in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and S&P or Moody's, as applicable, published ratings for the type of obligation in respect of which such alternative rating agency is used.

"Record Date":   As to any Payment Date, (x) the 15th day (whether or not a Business Day) in the case of Certificated Notes and (y) one day (whether or not a Business Day) in the case of Global Notes, in each case, prior to such Payment Date.

"Redemption Date":   The Business Day specified for the redemption of Notes pursuant to Sections 9.2 (Optional Redemption), 9.3 (Redemption Procedures), 9.4 (Notes Payable on Redemption Date) or 9.6 (Clean-up Call Redemption).

"Redemption Price":   When used with respect to (i) any Class of Secured Notes, an amount equal to (a) 100% of the Aggregate Outstanding Amount of the Secured Notes to be redeemed *plus* (b) accrued and unpaid interest thereon (including, if applicable, interest on any accrued and unpaid Deferred Interest with respect to such Deferrable Notes) to the Redemption Date *plus* (c) with respect to the Notes of any Make-Whole Class only, if any such Notes are redeemed on or before the Make-Whole Date, the Make-Whole Amount with respect to such Notes; and (ii) any Subordinated Note, its proportional share of the amount of the proceeds of the Assets (including proceeds created when the lien of this Indenture is released) remaining after giving effect to the redemption of the Secured Notes and payment in full of all expenses of the Co-Issuers; *provided* that the Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes to be redeemed may elect to receive less than 100% of the Redemption Price that would otherwise be payable to the Holders of such Class of Secured Notes.

"Real Estate Loan": A loan which (a) a majority of the proceeds of which are used to finance (or refinance) the acquisition or development of real estate or to finance (or refinance) real estate construction or (b) is secured primarily by a mortgage, deed of trust or similar lien on real estate (or ownership interests therein) and the improvements thereon financed with such loan proceeds; *provided* that, notwithstanding the foregoing clauses (a) and (b), a loan secured by collateral consisting materially of an operating business in at least one other industry shall not be considered a "Real Estate Loan".

"Reference Banks":  The meaning specified in Exhibit G hereto.

"Refinancing":  The meaning specified in Section 9.2 (Optional Redemption and Refinancing).

"Refinancing Proceeds":  The meaning specified in Section 9.2 (Optional Redemption and Refinancing).

"Register" and "Registrar":  The respective meanings specified in Section 2.6(a) (Registration, Registration of Transfer and Exchange).

"Registered Investment Adviser":  An investment adviser registered under the Investment Advisers Act of 1940, as amended.

"Registered Office Agreement":  An agreement between the Administrator and the Issuer for the provision of registered office services to the Issuer, as amended from time to time.

"Regulation S":  Regulation S, as amended, under the Securities Act.

"Regulation S Global Note":  The meaning specified in Section 2.2(b)(i) (Forms of Notes).

"Regulation S Global Secured Note":  A Secured Note issued in the form of a Regulation S Global Note.

"Regulation S Global Subordinated Note":  A Subordinated Note issued in the form of a Regulation S Global Note.

"Reinvestment Period":  The period from and including the Closing Date to and including the earliest of (i) May 1, 2019 (or, if such date is not a Business Day, the next succeeding Business Day) or (ii) the date of the acceleration of the Maturity of any Class of Secured Notes pursuant to Section 5.2 (Acceleration of Maturity; Rescission and Annulment).

"Related Obligation":  An obligation issued by the Portfolio Manager, any of its Affiliates that are investment funds or any other Person that is an investment fund whose investments are primarily managed by the Portfolio Manager or any such Affiliate.

"Required Coverage Ratio":  With respect to a specified Class or Classes of Secured Notes and the related Interest Coverage Test or Overcollateralization Ratio Test as the case may be, as of any date of determination (with respect to the Interest Coverage Test, on and after the Determination Date with respect to the second Payment Date), the applicable percentage indicated below opposite such specified Class:

| Class | Overcollateralization Ratio Test | Interest Coverage Ratio Test |
|---|---|---|
| A/B | 119.4% | 120.0% |
| C | 112.6% | 115.0% |
| D | 108.5% | 110.0% |
| E | 104.8% | 105.0% |

"<u>Responsible Officer</u>":  Any officer, authorized person or employee of the Portfolio Manager set forth on the list provided by the Portfolio Manager to the Issuer and the Trustee, which list shall include any portfolio manager having day-to-day responsibility for the performance of the Portfolio Manager under the Portfolio Management Agreement, as such list may be amended from time to time.

"<u>Restricted Trading Period</u>":  Each day during any period in which either (i) the S&P rating of the Class A Notes is one or more sub-categories below its Initial Rating or (ii) the S&P rating of the Class A Notes then Outstanding has been withdrawn and not reinstated; *provided* that such period will not be a Restricted Trading Period upon the direction of a Majority of the Controlling Class (so long as the S&P rating of the Class A Notes has not been further downgraded, withdrawn or put on watch since the receipt of such direction).

"<u>Revolver Funding Account</u>":  The non-interest bearing segregated trust account established pursuant to <u>Section 10.4</u> (The Revolver Funding Account).

"<u>Revolving Collateral Obligation</u>":  Any Collateral Obligation (other than a Delayed Drawdown Collateral Obligation) that is a loan (including, without limitation, revolving loans, including funded and unfunded portions of revolving credit lines and letter of credit facilities, unfunded commitments under specific facilities and other similar loans and investments) that by its terms may require one or more future advances to be made to the borrower by the Issuer; *provided* that any such Collateral Obligation will be a Revolving Collateral Obligation only until all commitments to make advances to the borrower expire or are terminated or irrevocably reduced to zero.

"<u>Rule 144A</u>":  Rule 144A, as amended, under the Securities Act.

"<u>Rule 144A Global Note</u>":  The meaning specified in <u>Section 2.2(b)(ii)</u> (Forms of Notes).

"<u>Rule 144A Global Secured Note</u>":  A Secured Note issued in the form of a Rule 144A Global Note.

"<u>Rule 144A Global Subordinated Note</u>":  A Subordinated Note issued in the form of a Rule 144A Global Note.

"<u>Rule 144A Information</u>":  The meaning specified in <u>Section 7.15</u> (Reporting).

"<u>S&P</u>":  Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor or successors thereto.

"<u>S&P Asset Quality Matrix</u>":  For purposes of determining compliance with the Minimum Floating Spread Test and the Minimum Weighted Average Coupon Test as set forth in <u>Section 7.18(f)</u> (Ramp-up Period; Purchase of Additional Collateral Obligations), the combination (as selected by the Portfolio Manager with notice to the Collateral Administrator) of a certain of the Minimum Floating Spread/Minimum Weighted Average Coupon Pairing and another case of the S&P Recovery Rate (that can be selected separately with respect to each

Class of Secured Notes) from Section 2 of <u>Schedule 3</u> (or the linear interpolation between two cases, as applicable).

"<u>S&P CDO Monitor</u>":  Each dynamic, analytical computer model developed by S&P and available at www.structuredfinanceinterface.com, used to calculate the default frequency in terms of the amount of debt assumed to default as a percentage of the original principal amount of the Collateral Obligations consistent with a specified benchmark rating level based upon certain assumptions (including the applicable Weighted Average S&P Recovery Rate) and S&P's proprietary corporate default studies, as may be amended by S&P from time to time.  Each S&P CDO Monitor shall be chosen by the Portfolio Manager and associated with either (x) a Weighted Average S&P Recovery Rate and a Minimum Floating Spread/Minimum Weighted Average Coupon Pairing from Section 2 of <u>Schedule 3</u> or (y) a Weighted Average S&P Recovery Rate, a Minimum Floating Spread and an Minimum Weighted Average Coupon confirmed by S&P; *provided* that as of any date of determination the Weighted Average S&P Recovery Rate for the most senior Class of Secured Notes outstanding then rated by S&P equals or exceeds the Weighted Average S&P Recovery Rate for such Class chosen by the Portfolio Manager, the Weighted Average Floating Spread equals or exceeds the Minimum Floating Spread chosen by the Portfolio Manager, and the Weighted Average Coupon equals or exceeds the Minimum Weighted Average Coupon chosen by the Portfolio Manager.

"<u>S&P CDO Monitor Test</u>":  A test that will be satisfied on any date of determination on or after the Effective Date if, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, each Class Default Differential of the Proposed Portfolio is positive with respect to the most senior Class of Secured Notes outstanding then rated by S&P.  The S&P CDO Monitor Test will be considered to be improved if the Class Default Differential of the Proposed Portfolio with respect to the most senior Class of Secured Notes outstanding then rated by S&P is greater than the corresponding Class Default Differential of the Current Portfolio.

"<u>S&P Collateral Value</u>":  With respect to any Defaulted Obligation or Deferring Obligation, the lesser of (i) the S&P Recovery Amount of such Defaulted Obligation or Deferring Obligation as of the relevant Measurement Date and (ii) the Market Value of such Defaulted Obligation or Deferring Obligation as of the relevant Measurement Date.

"<u>S&P Effective Date Rating Condition</u>": A condition that is satisfied if, after the end of the Ramp-up Period, S&P has confirmed in writing to the Issuer (which confirmation may be in the form of an email to the Issuer or the Portfolio Manager or a press release), the Trustee and/or the Portfolio Manager its Initial Rating of each Class of Secured Notes; *provided* that the S&P Effective Date Rating Condition will be deemed to be satisfied if S&P makes a public announcement or informs the Issuer, the Portfolio Manager or the Trustee in writing (including by means of email notification or a press release) that (i) it believes satisfaction of the S&P Effective Date Rating Condition is not required or (ii) its practice is not to give such confirmation.

"<u>S&P Excel Default Model Input File</u>":  An electronic spreadsheet file in Microsoft Excel format to be provided to S&P by the Portfolio Manager or by the Collateral Administrator at the direction of the Portfolio Manager, which file shall include the balance of

Cash and Eligible Investments in each Account and the following information (to the extent such information is available and is not confidential, unless the terms of such Collateral Obligation allow disclosure of such confidential information to S&P) with respect to each Collateral Obligation:  (a) the name and country of domicile of the issuer thereof and the particular issue held by the Issuer, (b) the CUSIP, LoanX ID and/or other applicable identification number associated with such Collateral Obligation, (c) the par value of such Collateral Obligation, (d) the type of issue (including, by way of example, whether such Collateral Obligation is a bond, loan, a Cov-Lite Loan or a First-Lien Last-Out Loan), using such abbreviations as may be selected by the Collateral Administrator, (e) a description of the index or other applicable benchmark upon which the interest payable on such Collateral Obligation is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR) and, in the case of a LIBOR Floor Obligation, the specified "floor" rate *per annum*, (f) the coupon (in the case of a Collateral Obligation which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Obligation which bears interest at a floating rate), (g) the S&P Industry Classification Group for such Collateral Obligation, (h) the stated maturity date of such Collateral Obligation, (i) the S&P Rating of such Collateral Obligation or the issuer thereof, as applicable, (j) the priority category of such Collateral Obligation used to determine the S&P Recovery Rate, if available, (k) the balance in Cash and Eligible Investments for each Account of the Issuer, (l) such other information as the Portfolio Manager may determine to include in such file and (m) the settlement date (or, if not yet settled, the anticipated settlement date and purchase price).

"S&P Industry Classification":  The S&P Industry Classifications set forth in Schedule 3 hereto, and such industry classifications shall be updated at the option of the Portfolio Manager if S&P publishes revised industry classifications.

"S&P Rating":  With respect to any Collateral Obligation, as of any date of determination, will be determined in accordance with the following methodology:

(i)      (a) if there is an issuer credit rating of the issuer of such Collateral Obligation by S&P as published by S&P, or the guarantor which unconditionally and irrevocably guarantees such Collateral Obligation pursuant to a form of guaranty approved by S&P for use in connection with this transaction, then the S&P Rating shall be such rating (regardless of whether there is a published rating by S&P on the Collateral Obligations of such issuer held by the Issuer, *provided* that private ratings (that is, ratings provided at the request of the obligor) may be used for purposes of this definition if the related obligor has consented to the disclosure thereof and a copy of such consent has been provided to S&P) or (b) if there is no issuer credit rating of the issuer by S&P but (1) there is a senior secured rating on any obligation or security of the issuer, then the S&P Rating of such Collateral Obligation shall be one sub-category below such rating; (2) if clause (1) above does not apply, but there is a senior unsecured rating on any obligation or security of the issuer, the S&P Rating of such Collateral Obligation shall equal such rating; and (3) if neither clause (1) nor clause (2) above applies, but there is a subordinated rating on any obligation or security of the issuer, then the S&P Rating of such Collateral Obligation shall be one sub-category above such rating if such rating is higher than "BB+," and shall be two sub-categories above such rating if such rating is "BB+" or lower;

(ii)     with respect to any Collateral Obligation that is a DIP Collateral Obligation, the S&P Rating thereof shall be the credit rating assigned to such issue by S&P;

(iii)     if there is not a rating by S&P on the issuer or on an obligation of the issuer, then the S&P Rating may be determined pursuant to clauses (a) through (c) below:

(a)     if an obligation of the issuer is not a DIP Collateral Obligation and is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Rating set forth above except that the S&P Rating of such obligation will be (1) one sub-category below the S&P equivalent of the Moody's Rating if such Moody's Rating is "Baa3" or higher and (2) two sub-categories below the S&P equivalent of the Moody's Rating if such Moody's Rating is "Ba1" or lower;

(b)     the S&P Rating may be based on a credit estimate provided by S&P, and in connection therewith, the Issuer, the Portfolio Manager on behalf of the Issuer or the issuer of such Collateral Obligation shall, prior to or within 30 days after the acquisition of such Collateral Obligation, apply (and concurrently submit all available Information in respect of such application) to S&P for a credit estimate which shall be its S&P Rating; *provided* that, if such Information is submitted within such 30-day period, then, pending receipt from S&P of such estimate, such Collateral Obligation shall have an S&P Rating as determined by the Portfolio Manager in its sole discretion if the Portfolio Manager certifies to the Trustee and the Collateral Administrator that it believes that such S&P Rating determined by the Portfolio Manager is commercially reasonable and that the credit estimate provided by S&P will be at least equal to such S&P Rating determined by the Portfolio Manager; *provided further* that, if such Information is not submitted within such 30-day period, then, pending receipt from S&P of such estimate, the Collateral Obligation shall have (1) the S&P Rating as determined by the Portfolio Manager for a period of up to 90 days after the acquisition of such Collateral Obligation and (2) an S&P Rating of "CCC-" following such 90-day period; unless, during such 90-day period, the Portfolio Manager has requested the extension of such period and S&P, in its sole discretion, has granted such request; *provided further* that, if such 90-day period (or other extended period) elapses pending S&P's decision with respect to such application, the S&P Rating of such Collateral Obligation shall be "CCC-"; *provided further* that, if the Collateral Obligation has had a public rating by S&P that S&P has withdrawn or suspended within six months prior to the date of such application for a credit estimate in respect of such Collateral Obligation, the S&P Rating in respect thereof shall be "CCC-" pending receipt from S&P of such estimate, and S&P may elect not to provide such estimate until a period of six months have elapsed after the withdrawal or

suspension of the public rating; *provided further* that the S&P Rating may not be determined pursuant to this clause (b) if the Collateral Obligation is a DIP Collateral Obligation; *provided further* that such credit estimate shall expire 12 months after the acquisition of such Collateral Obligation, following which such Collateral Obligation shall have an S&P Rating of "CCC-" unless, during such 12-month period, the Issuer applies for renewal thereof in accordance with Section 7.14(b), in which case such credit estimate shall continue to be the S&P Rating of such Collateral Obligation until S&P has confirmed or revised such credit estimate, upon which such confirmed or revised credit estimate shall be the S&P Rating of such Collateral Obligation; *provided further* that such confirmed or revised credit estimate shall expire on the next succeeding 12-month anniversary of the date of the acquisition of such Collateral Obligation and (when renewed annually in accordance with Section 7.14(b)) on each 12-month anniversary thereafter; or

(c)     with respect to a Collateral Obligation that is not a Defaulted Obligation, the S&P Rating of such Collateral Obligation will at the election of the Issuer (at the direction of the Portfolio Manager) be "CCC-" provided (i) neither the issuer of such Collateral Obligation nor any of its Affiliates are subject to any bankruptcy or reorganization proceedings and (ii) the issuer has not defaulted on any payment obligation in respect of any debt security or other obligation of the issuer at any time within the two year period ending on such date of determination, all such debt securities and other obligations of the issuer that are *pari passu* with or senior to the Collateral Obligation are current and the Portfolio Manager reasonably expects them to remain current; or

(iv)     with respect to a DIP Collateral Obligation that has no issue rating by S&P or a Current Pay Obligation that is rated "D" or "SD" by S&P, the S&P Rating of such DIP Collateral Obligation or Current Pay Obligation, as applicable, will be, at the election of the Issuer (at the direction of the Portfolio Manager), "CCC-" or the S&P Rating determined pursuant to clause (iii)(b) above;

*provided* that, for purposes of the determination of the S&P Rating, (x) if the applicable rating assigned by S&P to an obligor or its obligations is on "credit watch positive" by S&P, such rating will be treated as being one sub-category above such assigned rating and (y) if the applicable rating assigned by S&P to an obligor or its obligations is on "credit watch negative" by S&P, such rating will be treated as being one sub-category below such assigned rating.

The Portfolio Manager shall use commercially reasonable efforts to provide to S&P all available Information for any Collateral Obligation with an S&P Rating determined pursuant to clause (iii)(c) of this definition, prior to or within thirty (30) days after the acquisition of such Collateral Obligation.

"<u>S&P Rating Condition</u>":  With respect to any action taken or to be taken by or on behalf of the Issuer, a condition that is satisfied if S&P has confirmed in writing to the Issuer (which confirmation may be in the form of a press release), the Trustee and/or the Portfolio Manager that no immediate withdrawal or reduction with respect to its then-current rating by S&P of any Class of Secured Notes will occur as a result of such action; *provided* that the S&P Rating Condition will be deemed to be satisfied if (x) no Class of Secured Notes Outstanding is rated by S&P or (y) if S&P makes a public announcement or informs the Issuer, the Portfolio Manager or the Trustee that (i) it believes satisfaction of the S&P Rating Condition is not required with respect to the applicable action or (ii) its practice is not to give such confirmations.

"<u>S&P Recovery Amount</u>":  With respect to any Collateral Obligation, an amount equal to: (a) the applicable S&P Recovery Rate *multiplied by* (b) the Principal Balance of such Collateral Obligation.

"<u>S&P Recovery Rate</u>":  with respect to a Collateral Obligation, the recovery rate set forth in Section 1 of <u>Schedule 3</u> using the initial rating of the most senior Class of Secured Notes outstanding at the time of determination.

"<u>S&P Recovery Rating</u>":  With respect to a Collateral Obligation for which an S&P Recovery Rate is being determined, the "Recovery Rating" assigned by S&P to such Collateral Obligation based upon the tables set forth in <u>Schedule 3.</u>

"<u>S&P Selling Institution Percentage</u>":  With respect to any Participation Interest proposed to be entered into by the Issuer, criteria that will be met if immediately after giving effect to such acquisition, (x) the percentage of the Collateral Principal Amount that consists in the aggregate of Participation Interests with Selling Institutions that have the same or a lower S&P credit rating does not exceed the "Aggregate Selling Institution Percentage" set forth below for such S&P credit rating and (y) the percentage of the Collateral Principal Amount that consists in the aggregate of Participation Interests with any single Selling Institution that have the same or a lower S&P credit rating does not exceed the "Individual Selling Institution Percentage" set forth below for such S&P credit rating:

| Long-term Senior Unsecured Debt Rating of Selling Institution S&P | Individual Selling Institution Percentage | Aggregate Selling Institution Percentage |
|---|---|---|
| AAA | 20% | 20% |
| AA+ | 10% | 10% |
| AA | 10% | 10% |
| AA- | 10% | 10% |
| A+ | 5% | 5% |
| A | 5% | 5% |
| Below A | 0% | 0% |

*provided* that a Selling Institution having an S&P credit rating of "A" must also have a short-term S&P rating of "A-1" otherwise its Individual Selling Institution Percentage and Aggregate Selling Institution Percentage shall be 0%.

"Sale":  The meaning specified in Section 5.17(a) (Sale of Assets).

"Sale Proceeds":  All proceeds (excluding accrued interest, if any) received with respect to Assets as a result of sales of such Assets less any reasonable expenses incurred by the Portfolio Manager or the Trustee (other than amounts payable as Administrative Expenses) in connection with such sales.  Sale Proceeds will include Principal Financed Accrued Interest received in respect of such a sale.

"Scheduled Distribution":  With respect to any Pledged Obligation, for each Due Date, the scheduled payment of principal and/or interest due on such Due Date with respect to such Pledged Obligation, determined in accordance with the assumptions specified in Section 1.2 (Assumptions as to Pledged Obligations) hereof.

"Second Lien Loan":  Any assignment of or Participation Interest in or other interest in a loan (x) that is required to be secured by a valid and perfected second priority pledge of collateral (which pledge may be subject to customary permitted liens, such as, but not limited to, tax liens) and which has a senior (or, solely with respect to any related first lien indebtedness, subordinated) pre-petition priority (including *pari passu* with other obligations of the obligor) in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, (y) with respect to which the Portfolio Manager determines in good faith that the value of the collateral securing the loan on or about the time of acquisition by the Issuer together with other attributes of the issuer of such loan (including, without limitation, its general financial condition, ability to generate cash flow available for debt service, refinancing ability and other demands for that cash flow) is adequate to repay the principal balance of the loan in accordance with its terms and to repay the principal balance of all other loans of equal or greater seniority secured by a security interest in the same collateral and (z) that is not secured solely or primarily by common stock or other equity interests; *provided* that the limitation set forth in this clause (z) shall not apply with respect to a loan made to a parent entity that is secured solely or primarily by the stock of one or more of the subsidiaries of such parent entity to the extent that the granting by any such subsidiary of a lien on its own property would violate law or regulations applicable to such subsidiary (whether the obligation secured is such loan or any other similar type of indebtedness owing to third parties); and *provided further* that, for a loan to which, due to the operation of the foregoing proviso, the limitation set forth in this clause (z) does not apply, the S&P Recovery Rate will be assigned by S&P on a case by case basis if there is no assigned S&P Recovery Rating.

"Secured Notes":  The Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes.

"Secured Parties":  The meaning specified in the Granting Clauses.

"Securities Account Control Agreement":  An agreement in substantially the form of Exhibit H hereto.

"Securities Act":  The United States Securities Act of 1933, as amended.

"Securities Intermediary":  As defined in Section 8-102(a)(14) of the UCC.

"Security Entitlement":  The meaning specified in Section 8-102(a)(17) of the UCC.

"Selling Institution":  The entity obligated to make payments to the Issuer under the terms of a Participation Interest and, as to which the S&P Selling Institution Percentage is met.

"Senior Management Fee":  A fee payable to the Portfolio Manager in arrears on each Payment Date (prorated for the related Interest Accrual Period) pursuant to Section 9 of the Portfolio Management Agreement and Section 11.1 (Disbursements of Monies from Payment Account) in an amount equal to 0.15% *per annum* (calculated on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount at the beginning of the Collection Period relating to such Payment Date.

"Senior Notes":  The Class A Notes and the Class B Notes.

"Senior Secured Loan":  An assignment of or Participation Interest in or other interest in a loan (w) that is required to be secured by a valid and perfected, first priority pledge of collateral (which pledge may be subject to customary permitted liens, such as, but not limited to, tax liens) and which has a senior pre-petition priority (including *pari passu* with other obligations of the obligor) in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, (x) solely for purposes of calculating the Weighted Average S&P Recovery Rate, such loan cannot, by its terms, be subordinated to another obligation of the Obligor and the value of the collateral securing such loan, as determined by the Portfolio Manager in good faith, on or about the time of acquisition by the Issuer together with other attributes of the Obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service, refinancing ability and other demands for that cash flow) is adequate to repay the Principal Balance of the loan in accordance with its terms and to repay the Principal Balance of all other loans of equal seniority secured by a security interest in the same collateral; (y) that is not secured solely or primarily by common stock or other equity interests; *provided* that the limitation set forth in this clause (y) shall not apply with respect to a loan made to a parent entity that is secured solely or primarily by the stock of one or more of the subsidiaries of such parent entity to the extent that the granting by any such subsidiary of a lien on its own property would violate law or regulations applicable to such subsidiary (whether the obligation secured is such loan or any other similar type of indebtedness owing to third parties); and *provided further* that, for a loan to which, due to the operation of the foregoing proviso, the limitation set forth in this clause (y) does not apply, the S&P Recovery Rate will be assigned by S&P on a case by case basis if there is no assigned S&P Recovery Rating and (z) is not a First-Lien Last-Out Loan.

"Similar Law":  Any federal, state, local, non-U.S. or other laws or regulations that are substantially similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code.

"Special Redemption":  As defined in Section 9.5 (Special Redemption).

"Special Redemption Amount":  As defined in Section 9.5 (Special Redemption).

"Special Redemption Date":  As defined in Section 9.5 (Special Redemption).

"Standby Investment":  The US Bank National Association Money Market Deposit Account.

"Stated Maturity":  With respect to any security, the maturity date specified in such security or applicable Underlying Instrument; and with respect to the Notes of any Class, the date specified as such in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Step-down Obligation":  An obligation or security which by the terms of the related Underlying Instruments provides for a decrease in the *per annum* interest rate on such obligation or security (other than by reason of any change in the applicable index or benchmark rate used to determine such interest rate) or in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; *provided* that an obligation or security providing for payment of a constant rate of interest at all times after the date of acquisition by the Issuer shall not constitute a Step-down Obligation.

"Step-up Obligation":  An obligation or security which by the terms of the related Underlying Instruments provides for an increase in the *per annum* interest rate on such obligation or security, or in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; *provided* that an obligation or security providing for payment of a constant rate of interest at all times after the date of acquisition by the Issuer shall not constitute a Step-up Obligation.

"Structured Finance Obligation":  A non-recourse or limited-recourse debt obligation issued by a special purpose vehicle and secured solely by the assets thereof that is a mortgage backed security, an asset-backed security, a collateralized bond obligation, a collateralized loan obligation, a repackaging of a bond (or a pool of bonds) of any of the foregoing or any similar securitization of an asset or a pool of assets (or any combination thereof).

"Subordinated Management Fee":  A fee payable to the Portfolio Manager in arrears on each Payment Date (prorated for the related Interest Accrual Period) pursuant to Section 9 of the Portfolio Management Agreement and Section 11.1 (Disbursements of Monies from Payment Account) of this Indenture in an amount equal to 0.25% *per annum* (calculated on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount at the beginning of the Collection Period relating to such Payment Date.  The Subordinated Management Fee is payable on each Payment Date only to the extent that sufficient Interest Proceeds or Principal Proceeds are available, and, to the extent any such Subordinated Management Fee is not paid on any Payment Date for any reason, such payment will be deferred and will accrue interest at LIBOR (as determined for the applicable Interest Accrual Period with respect to the Secured Notes), compounded quarterly (calculated on the basis of a 360-day year consisting of twelve 30-day months).

"Subordinated Notes":  The subordinated notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Subsequent Delivery Date":  A date fixed by the Portfolio Manager on behalf of the Issuer for the delivery of a Collateral Obligation to be pledged to the Trustee after the Closing Date.

"Successor Entity":  As defined in Section 7.10 (Co-Issuers May Consolidate, etc., Only on Certain Terms).

"Synthetic Security":  A security or swap transaction other than a Participation Interest or a Pre-funded Letter of Credit that has payments associated with either payments of interest and/or principal on a reference obligation or the credit performance of a reference obligation or payments on, or the return of, an equity interest.

"Target Balance":  An amount equal to (a) the Target Initial Par Amount, *minus* (b) the amount of any principal payments made on the Notes of any Class, *plus* (c) the aggregate amount of Principal Proceeds that result from any additional issuance of Subordinated Notes.

"Target Initial Par Amount":  With respect to the Collateral Obligations purchased by the Issuer or subject to binding agreements to purchase at the end of the Ramp-up Period, $564,000,000 in Aggregate Principal Balance of such Collateral Obligations.

"Target Initial Par Condition":  A condition satisfied as of the end of the Ramp-up Period if the Issuer has purchased, or entered into binding commitments to purchase, Collateral Obligations, including Collateral Obligations acquired by the Issuer on or prior to the Closing Date, the Aggregate Principal Balance of which equals or exceeds the Target Initial Par Amount (not including the reduction in the Aggregate Principal Balance of any Collateral Obligation after the Closing Date as a result of prepayments, maturities or redemptions, unless such amounts have been reinvested in Collateral Obligations; *provided* that, for purposes of this calculation, the Principal Balance of any Defaulted Obligation shall be its S&P Collateral Value).

"Target Initial Par Ratio":  108.78%.

"Tax":  Any present or future tax, levy, impost, duty, charge, assessment, deduction, withholding or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority other than a stamp, registration, documentation or similar tax.

"Tax Event":  Any (1) new, or change to (a) a U.S. or non-U.S. tax statute, treaty, regulation, rule, ruling, practice, procedure or judicial decision or interpretation which results in any portion of any payment due from any issuer or obligor under any Collateral Obligation becoming properly subject to the imposition of U.S. or non-U.S. tax, which in the case of withholding tax is not compensated for by a "gross-up" provision under the terms of the Collateral Obligation (other than withholding imposed on commitment fees, letter of credit fees or other similar fees) or (b) a Cayman Islands law that results in Holders becoming properly subject to the imposition of Cayman Islands withholding tax unless the Issuer has changed its

governing jurisdiction to a jurisdiction that does not impose withholding tax on Holders of the Secured Notes within 90 days of becoming aware of such change in law and (2) tax arising under or as a result of FATCA as a result of or with respect to any payment due from any issuer or obligor under any Collateral Obligation, which is not compensated for by a "gross-up" provision under the terms of the Collateral Obligation, but only, in each case, (1) or (2), if such tax or taxes amount, in the aggregate, to at least $1,000,000, during any 12 month period.

"Tax Jurisdiction":   The Bahamas, Bermuda, the British Virgin Islands, the Cayman Islands, Luxembourg or the Channel Islands, Ireland or the Netherlands Antilles and any other tax advantaged jurisdiction as may be notified by S&P to the Portfolio Manager from time to time; provided that, in the case of each such tax jurisdiction, in the Portfolio Manager's good faith business judgment, a majority of the assets, revenues or operations supporting the related Collateral Obligation are directly or through subsidiaries located in the United States of America.

"Third Party Credit Exposure":  As of any date of determination, the sum (without duplication) of the Principal Balance (or such lesser amount as may be determined by S&P) of each Collateral Obligation that consists of a Participation Interest.

"Trading Plan":  The meaning specified in Section 12.4 (Trading Plans).

"Trading Plan Period":  The meaning specified in Section 12.4 (Trading Plans).

"Transaction Party": Each of the Issuer, the Co-Issuer, the Initial Purchaser, the Collateral Administrator, the Trustee, the Registrar, the Share Trustee, the Administrator and the Portfolio Manager.

"Transfer Agent":  The Person or Persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

"Trustee":  As defined in the first sentence of this Indenture.

"UCC":  The Uniform Commercial Code as in effect in the State of New York or, if different, the state of the United States that governs the perfection of the relevant security interest as amended from time to time.

"Uncertificated Security":  The meaning specified in Section 8-102(a)(18) of the UCC.

"Underlying Exchanged Defaulted Obligation": Any Defaulted Obligation that was exchanged by the Issuer for an Equity Security.

"Underlying Instrument":  The indenture or other agreement pursuant to which a Pledged Obligation has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such Pledged Obligation or of which the holders of such Pledged Obligation are the beneficiaries.

"Unregistered Securities":  The meaning specified in Section 5.17(c) (Sale of Assets).

"Unscheduled Principal Payments":  Any principal payments received with respect to a Collateral Obligation as a result of optional redemptions, exchange offers, tender offers, consents or other payments or prepayments made at the option of the issuer thereof.

"U.S. Tax Person":  A "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. person":  The meaning specified in Regulation S.

"USD" and "$":  The legal currency of the United States of America.

"Volcker Rule":  Section 13 of the U.S. Bank Holding Company Act of 1956, as amended, and the applicable rules and regulations thereof.

"Volcker Rule Prohibited Asset":  Any Asset which the Portfolio Manager determines would cause the Issuer to be unable to qualify as a "loan securitization" under the Volcker Rule. No Asset shall be a Volcker Rule Prohibited Asset unless a Majority of the Controlling Class consents in writing to such designation.

"Weighted Average Adjusted Moody's Rating Factor":  The number (rounded up to the nearest whole number) equal to: (i) the sum of the products of (a) the Principal Balance of each Collateral Obligation (excluding Equity Securities) multiplied by (b) the Moody's Rating Factor of such Collateral Obligation, divided by (ii) the Aggregate Principal Balance of all such Collateral Obligations; provided that, for purposes of determining the Moody's Rating Factor (including, for the avoidance of doubt, any related Moody's Rating, Moody's  Default Probability Rating or Moody's Derived Rating) of any Collateral Obligation in respect of which the applicable rating is (a) on positive watch by Moody's, such rating will be treated as having been upgraded by one rating subcategory, (b) on negative watch by Moody's, such rating will be treated as having been downgraded by two rating subcategories, and (c) on negative outlook by Moody's, such rating will be treated as having been downgraded by one rating subcategory.

"Weighted Average Coupon":  As of any date of determination, the number, expressed as a percentage (rounded up to the nearest 0.01%), equal to: (i) the aggregate sum, in respect of each fixed rate Collateral Obligation (excluding Deferring Obligations), of an amount equal to the product of (a) the interest coupon (excluding any non-Cash interest portion) of such Collateral Obligation *multiplied by* (b) the Principal Balance of such Collateral Obligation (with respect to any Deferrable Obligation, including for this purpose any capitalized interest with respect to which current cash interest is being paid but excluding any portion of the Principal Balance or capitalized interest with respect to which current cash interest is not being paid), *divided by* (ii) the Aggregate Principal Balance of all such fixed rate Collateral Obligations.

"Weighted Average Floating Spread":  As of any date of determination, the number, expressed as a percentage (rounded up to the nearest 0.01%), obtained by calculating the sum of: (i) in the case of each floating rate Collateral Obligation (excluding Deferring Obligations, Revolving Collateral Obligations and Delayed Drawdown Collateral Obligations),

the aggregate interest (excluding any non-Cash interest portion) on such Collateral Obligation over LIBOR *multiplied by* the outstanding Principal Balance of such Collateral Obligation as of such date (with respect to any Deferrable Obligation, including for this purpose any capitalized interest with respect to which current cash interest is being paid but excluding any portion of the Principal Balance or capitalized interest with respect to which current cash interest is not being paid) and (ii) in the case of each Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, (a) the commitment fee for such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation *multiplied by* the undrawn commitments of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation and (b) the aggregate interest on such Collateral Obligation over LIBOR *multiplied by* the outstanding principal amount of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation (*provided* that letter of credit fees shall be excluded for all purposes), and *dividing* such sum *by* the Aggregate Principal Balance of all such floating rate Collateral Obligations as of such date of determination. For purposes of the foregoing, (1) in the case of each floating rate Collateral Obligation that bears interest at a spread over an index other than a London interbank offered rate based index, the interest over LIBOR for such Collateral Obligation shall be equal to the excess of the sum of such spread and such index over LIBOR calculated for the Secured Notes for the immediately preceding Interest Determination Date (which spread or excess may be expressed as a negative number), (2) LIBOR with respect to any floating rate Collateral Obligation that bears interest based on a spread over LIBOR shall be calculated in the same manner as it is calculated for payments on such Collateral Obligation, (3) with respect to any LIBOR Floor Obligation, the interest over LIBOR for such Collateral Obligation shall be equal to the sum of (a) the applicable spread over LIBOR and (b) the excess, if any, of the specified "floor" rate relating to such Collateral Obligation over LIBOR calculated for the Secured Notes for the immediately preceding Interest Determination Date and (4) the interest over the applicable index in respect of a floating rate Step-up Obligation shall be deemed to be its current interest spread over such index and the interest over the applicable index in respect of a floating rate Step-down Obligation shall be deemed to be the lowest possible interest spread over such index under the Underlying Instruments relating to such Step-down Obligation.

"Weighted Average Life":  With respect to each Collateral Obligation as of any date of determination is an amount equal to (i) the sum of the products obtained by *multiplying* (A) the actual number of years (*rounded* to the nearest one hundredth thereof) from such date of determination to the respective dates of each successive scheduled distribution of principal of such Collateral Obligation and (B) the related amounts of the principal of such scheduled distribution; *divided by* (ii) the sum of the aggregate amount of all such scheduled distributions of principal of such Collateral Obligation.

"Weighted Average Life Test":  A test that is satisfied if the Aggregate Weighted Average Life on such date of determination is not later than April 17, 2023.

"Weighted Average Moody's Recovery Rate":  As of any date of determination, the number, expressed as a percentage, obtained by summing the product of the Moody's Recovery Rate on such date of determination of each Collateral Obligation and the Principal Balance of such Collateral Obligation, dividing such sum by the Aggregate Principal Balance of all such Collateral Obligations and rounding up to the first decimal place.

"Weighted Average S&P Recovery Rate":  As of any date of determination, the number, expressed as a percentage and determined for the most senior Class of Secured Notes outstanding then rated by S&P, obtained by *summing* the products obtained by *multiplying* the Principal Balance as of such time of each Collateral Obligation by its corresponding recovery rate as determined in accordance with Section 1 of Schedule 3 hereto, *dividing* such sum *by* the Aggregate Principal Balance of all Collateral Obligations, and *rounding* to the nearest tenth of a percent.

"Zero Coupon Security":  Any Collateral Obligation that at the time of purchase does not by its terms provide for the payment of cash interest; *provided* that, if after such purchase, such Collateral Obligation provides for the payment of cash interest it shall cease to be a Zero Coupon Security.

Section 1.2.   Assumptions as to Pledged Obligations.   In connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Pledged Obligation, or any payments on any other assets included in the Assets, with respect to the sale of and reinvestment in Collateral Obligations, and with respect to the income that can be earned on Scheduled Distributions on such Pledged Obligations and on any other amounts that may be received for deposit in the Collection Account, the provisions set forth in this Section 1.2 (Assumptions as to Pledged Obligations) shall be applied.   The provisions of this Section 1.2 shall be applicable to any determination or calculation, whether or not reference is specifically made to Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision.

(a)     All calculations with respect to Scheduled Distributions on the Pledged Obligations securing the Notes shall be made on the basis of information as to the terms of each such Pledged Obligation and upon report of payments, if any, received on such Pledged Obligation that are furnished by or on behalf of the issuer of such Pledged Obligation and, to the extent they are not manifestly in error, such information or report may be conclusively relied upon in making such calculations.

(b)     For purposes of calculating the Coverage Tests and the Interest Reinvestment Test, except as otherwise specified in the Coverage Tests or the Interest Reinvestment Test, as applicable, such calculations will not include scheduled interest and principal payments on Defaulted Obligations or payments (including under any Hedge Agreement) as to which the Portfolio Manager or the Issuer has actual knowledge that such payments will not be made unless or until such payments are actually made.

(c)     For each Collection Period and as of any date of determination, the Scheduled Distribution on any Pledged Obligation (other than a Defaulted Obligation, which, except as otherwise provided herein, shall be assumed to have a Scheduled Distribution of zero) shall be the sum of (i) the total amount of payments and collections to be received during such Collection Period in respect of such Pledged Obligation (including the proceeds of the sale of such Pledged Obligation received and, in the case of sales which have not yet settled, to be received during the Collection Period and not reinvested in additional Collateral Obligations or Eligible Investments or retained in the Collection Account for subsequent reinvestment pursuant to Section 12.2 (Purchase of

Additional Collateral Obligations)) that, if paid as scheduled, will be available in the Collection Account at the end of the Collection Period and (ii) any such amounts received in prior Collection Periods that were not disbursed on a previous Payment Date.

(d)     Each Scheduled Distribution receivable with respect to a Pledged Obligation shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the Collection Account to earn interest at the Assumed Reinvestment Rate.  All such funds shall be assumed to continue to earn interest until the date on which they are required to be available in the Collection Account for application, in accordance with the terms hereof, to payments of principal of or interest on the Notes or other amounts payable pursuant to this Indenture.  For purposes of the applicable determinations required by Section 10.7(b)(iii) (Accountings), Article 12 and the definition of "Interest Coverage Ratio," the expected interest on Secured Notes and floating rate Collateral Obligations will be calculated using the then-current interest rates applicable thereto.

(e)     References in Section 11.1(a) (Disbursements of Monies from Payment Account) to calculations made on a "*pro forma* basis" shall mean such calculations after giving effect to all payments, in accordance with the Priority of Payments described herein, that precede (in priority of payment) or include the clause in which such calculation is made.

(f)     For purposes of determining whether the Effective Date Overcollateralization Test has been satisfied, all calculations shall be made on a "*pro forma* basis" giving effect to any purchases and sales, and, for purposes of determining whether any Coverage Test or the Interest Reinvestment Test has been satisfied on any Determination Date for purposes of the Priority of Payments, all calculations shall be made on a "*pro forma*" basis after giving effect to any payments made through the applicable clause of the Priority of Payments.

(g)     For purposes of calculating all Concentration Limitations, in both the numerator and the denominator of any component of the Concentration Limitations, Defaulted Obligations will be treated as having a Principal Balance equal to zero.

(h)     If one or more Collateral Obligations included in the Assets would be deemed Current Pay Obligations but for the applicable percentage limitation in the definition thereof, the Portfolio Manager shall determine which such Collateral Obligations have the lowest Market Value expressed as a percentage and such Collateral Obligations with the lowest Market Value expressed as a percentage will be deemed Defaulted Obligations.  Each such Defaulted Obligation will be treated as a Defaulted Obligation for all purposes until such time as the Aggregate Principal Balance of Current Pay Obligations would not exceed, on a *pro forma* basis including such Defaulted Obligation, the applicable percentage of the Collateral Principal Amount.

(i)     Except as otherwise provided herein, Defaulted Obligations will not be included in the calculation of the Collateral Quality Test.  Solely, for purposes of determining whether a Collateral Obligation satisfies the S&P CDO Monitor Test with

respect to a purchase, additional Collateral Obligations purchased with Sale Proceeds of a Credit Risk Obligation, a Defaulted Obligation or an Equity Security shall not be included in the calculation of the S&P CDO Monitor Test.

(j)     For purposes of calculating the Collateral Quality Test, DIP Collateral Obligations will be treated as having an S&P Recovery Rate equal to the recovery rate for Senior Secured Loans set forth in the definition of "Weighted Average S&P Recovery Rate."

(k)     For purposes of calculating the sale proceeds of a Collateral Obligation in purchase and sale transactions, sales proceeds will include any Principal Financed Accrued Interest received in respect of such sale.

(l)     For purposes of calculating clauses (iv) and (v) of the Concentration Limitations, without duplication, the amounts on deposit in the Collection Account and the Ramp-up Account (including Eligible Investments therein) representing Principal Proceeds shall each be deemed to be a floating rate Collateral Obligation that is a Senior Secured Loan.

(m)     Notwithstanding any other provision of this Indenture to the contrary, all monetary calculations under this Indenture shall be in U.S. Dollars.

(n)     If the Issuer (or the Portfolio Manager on behalf of the Issuer) is notified by the administrative agent or other withholding agent or otherwise for the syndicate of lenders in respect of any Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation or other letter of credit that amounts associated therewith are subject to withholding tax imposed by any jurisdiction, the applicable Collateral Quality Test, the Coverage Tests and the Interest Reinvestment Test shall be calculated thereafter net of the full amount of such withholding tax unless the related obligor is required to make "gross-up" payments to the Issuer that cover the full amount of any such withholding tax on an after-tax basis pursuant to the underlying instruments with respect thereto.

(o)     For all purposes (including calculation of the Coverage Tests, the Interest Reinvestment Test and the calculation required pursuant to the Event of Default specified in clause (g) of the definition of such term), the Principal Balance of a Revolving Collateral Obligation or a Delayed Drawdown Collateral Obligation will include all unfunded commitments that have not been irrevocably reduced or withdrawn.

(p)     For purposes of calculating compliance with any tests, ratios, or calculations under this Indenture, the trade date (and not the settlement date) with respect to any acquisition or disposition of a Collateral Obligation or Eligible Investment shall be used to determine whether and when such acquisition or disposition has occurred.

(q)     For reporting purposes and for purposes of calculating the Coverage Tests, the Investment Criteria and the requirements of <u>Section 12.2(b)</u> (Purchase of Additional Collateral Obligations), assets held by any ETB Subsidiary shall be treated as Equity

Securities owned by the Issuer (and the equity interest in such ETB Subsidiary shall not be included in such calculation).

(r)     For purposes of calculating the Weighted Average Coupon and Weighted Average Floating Spread, only the interest payable in cash, including Deferrable Cash-Pay Interest with respect to a Partial Deferrable Obligation, shall be included in such calculation.

(s)     In determining the amount of any principal payment required to satisfy any Coverage Test after the Reinvestment Period, for purposes of the priorities set forth under Section 11.1(a)(i) (Disbursements of Monies from Payment Account), the Aggregate Outstanding Amount of the Secured Notes shall give effect to the application of Principal Proceeds to be used on the applicable Payment Date to repay principal of the Secured Notes, and the application of Interest Proceeds on such Payment Date pursuant to all prior clauses in the priorities set forth under Section 11.1(a)(i) (Disbursements of Monies from Payment Account).

ARTICLE 2

THE NOTES

Section 2.1.    Forms Generally.   The Notes and the Trustee's or Authenticating Agent's certificate of authentication thereon (the "Certificate of Authentication") shall be in substantially the forms required by this Article, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may be consistent herewith, determined by the Authorized Officers of the Applicable Issuers executing such Notes as evidenced by their execution of such Notes.  Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note.

Section 2.2.    Forms of Notes.   (a) The forms of the Notes, including the forms of Certificated Secured Notes, Certificated Subordinated Notes, Regulation S Global Notes and Rule 144A Global Notes, shall be as set forth in the applicable part of Exhibit A hereto.

(b)     Regulation S Global Notes and Rule 144A Global Notes.  (i) The Secured Notes of each Class and the Subordinated Notes sold to persons who are not U.S. persons in offshore transactions in reliance on Regulation S shall each be issued initially in the form of one permanent global note per Class in definitive, fully registered form without interest coupons substantially in the applicable form of Exhibit A1 or Exhibit A2 hereto (each, a "Regulation S Global Note") and shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, DTC for the respective accounts of Euroclear and Clearstream, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided.

(ii)     The Secured Notes of each Class and Subordinated Notes sold to persons that are QIB/QPs shall each be issued initially in the form of one permanent global note per Class in definitive, fully registered form without interest coupons substantially in the applicable form of <u>Exhibit A1</u> or <u>Exhibit A2</u> hereto (each, a "<u>Rule 144A Global Note</u>"), which shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, DTC, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided.  The Class E Notes sold to Institutional Accredited Investors shall be issued in the form of definitive, fully registered notes without coupons substantially in the form of <u>Exhibit A4</u> (each, a "<u>Certificated Class E Note</u>") which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided.  The Subordinated Notes (other than the Global Subordinated Notes) shall be issued in the form of definitive, fully registered notes without coupons substantially in the form of <u>Exhibit A3</u> (each, a "<u>Certificated Subordinated Note</u>") which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided.

(iii)     The Aggregate Outstanding Amount of the Regulation S Global Notes and the Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or DTC or its nominee, as the case may be, as hereinafter provided.

(c)     <u>Book Entry Provisions</u>.  This <u>Section 2.2(c)</u> (Forms of Notes) shall apply only to Global Notes deposited with or on behalf of DTC.

The provisions of the "Operating Procedures of the Euroclear System" of Euroclear and the "Terms and Conditions Governing Use of Participants" of Clearstream, respectively, will be applicable to the Global Notes insofar as interests in such Global Notes are held by the Agent Members of Euroclear or Clearstream, as the case may be.

Agent Members shall have no rights under this Indenture with respect to any Global Notes held on their behalf by the Trustee, as custodian for DTC and DTC may be treated by the Co-Issuers, the Trustee, and any agent of the Co-Issuers or the Trustee as the absolute owner of such Note for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

(d)     <u>Certificated Securities</u>.  Except as provided in <u>Section 2.11</u> (Certificated Notes) hereof, owners of beneficial interests in Global Notes will not be entitled to receive physical delivery of Certificated Notes.

Section 2.3.     <u>Authorized Amount; Stated Maturity; Denominations</u>.  The Aggregate Outstanding Amount of the Secured Notes and the Subordinated Notes that may be authenticated

and delivered under this Indenture is limited to $578,350,000 Aggregate Outstanding Amount of Notes, except for Deferred Interest with respect to the Deferrable Notes, Additional Subordinated Notes issued pursuant to <u>Section 2.4</u> (Additional Notes) and Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to <u>Section 2.6</u> (Registration, Registration of Transfer and Exchange), <u>2.7</u> (Mutilated, Defaced, Destroyed, Lost or Stolen Note) or <u>8.5</u> (Reference in Notes to Supplemental Indentures) and Notes issued pursuant to supplemental indentures in accordance with <u>Article 8</u>.

Such Notes shall be divided into the Classes, having the designations, original principal amounts and other characteristics as follows:

<u>Offered Securities</u>

| Class Designation | A-1 | A-2 | B-1 | B-2 | C | D | E | Subordinated Notes[3] |
|---|---|---|---|---|---|---|---|---|
| Issuer(s) | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Issuer | Issuer |
| Original Principal Amount | $300,000,000 | $47,000,000 | $75,000,000 | $14,000,000 | $31,500,000 | $25,000,000 | $26,000,000 | $59,850,000 |
| Stated Maturity[1] | May 1, 2027 | May 1, 2027 | May 1, 2027 | May 1, 2027 | May 1, 2027 | May 1, 2027 | May 1, 2027 | May 1, 2027 |
| Floating Rate Debt | Yes | No | Yes | No | Yes | Yes | Yes | No |
| Index[2] | LIBOR | N/A | LIBOR | N/A | LIBOR | LIBOR | LIBOR | N/A |
| Index Maturity | 3 month | N/A | 3 month | N/A | 3 month | 3 month | 3 month | N/A |
| Spread or Interest Rate | LIBOR + 1.59% | 3.367% | LIBOR + 2.48% | 4.425% | LIBOR + 3.37% | LIBOR + 3.77% | LIBOR + 5.49% | N/A |
| Expected S&P Initial Rating | "AAA (sf)" | "AAA (sf)" | "AA (sf)" | "AA(sf)" | "A (sf)" | "BBB (sf)" | "BB (sf)" | N/A |
| Priority Classes | None | None | A | A, | A, B | A, B, C | A, B, C, D | A, B, C, D, E |
| Pari Passu Classes | A-2 | A-1 | B-2 | B-1 | None | None | None | None |
| Junior Classes | B, C, D, E, Subordinated | B, C, D, E, Subordinated | C, D, E, Subordinated | C, D, E, Subordinated | D, E, Subordinated | E, Subordinated | Subordinated | None |
| Deferrable Notes | No | No | No | No | Yes | Yes | Yes | N/A |
| ERISA Limited Notes | No | No | No | No | No | No | Yes | Yes |

(1)   If such date is not a Business Day, the next succeeding Business Day.
(2)   For the definition of LIBOR, see <u>Exhibit G</u>.
(3)   The Subordinated Notes do not bear interest at a stated rate but will receive distributions on each Payment Date in accordance with the Priority of Payments.

The Notes shall be issuable in minimum denominations of $100,000 and integral multiples of $1 in excess thereof.  Notes shall only be transferred or resold in compliance with the terms of the representation letter delivered by the initial purchaser of such Notes.

Section 2.4.   <u>Additional Notes</u>.  (a) At any time, the Issuer may, with the consent of the Portfolio Manager, issue Additional Subordinated Notes; *provided* that the following conditions are met as certified to the Trustee by the Issuer:

(i)   such issuance is made (x) with the consent of the Holders of at least 66-⅔% of the Aggregate Outstanding Amount of the Subordinated Notes and (y) with the consent of the Portfolio Manager;

(ii)   such issuance may not exceed 100% of the original outstanding amount of the Subordinated Notes;

(iii)    the terms of the Subordinated Notes issued must be identical to the respective terms of previously issued Subordinated Notes;

(iv)    an opinion of tax counsel of nationally recognized standing in the United States experienced in such matters shall be delivered to the Trustee to the effect that (1) such issuance will not result in the Issuer becoming subject to U.S. federal income taxation with respect to its net income, (2) such issuance would not cause the holders or beneficial owners of Secured Notes previously issued to be deemed to have sold or exchanged such Notes under Section 1001 of the Code and (3) such issuance would not adversely affect the tax characterization of any Outstanding Notes that was characterized as debt at the time of issuance; *provided* that such opinions described in clauses (2) and (3) shall not be required with respect to any Class if 100% of the Holders of such Class have consented to a waiver of such requirement; and

(v)    after giving effect to the issuance of Additional Subordinated Notes, each Overcollateralization Ratio Test for each Class of Notes is satisfied.

(b)    The Additional Subordinated Notes will rank *pari passu* in all respects with the initial Subordinated Notes.

(c)    Any Additional Subordinated Notes issued pursuant to this Section 2.4 (Additional Notes) will, to the extent reasonably practicable, be offered first to Holders of the Subordinated Notes, in such amounts as are necessary to preserve their *pro rata* holdings of Subordinated Notes.

(d)    Any Additional Subordinated Notes may be offered at prices that differ from the applicable initial offering price.

(e)    The net proceeds of any Additional Subordinated Notes may be designated as Interest Proceeds or Principal Proceeds by the Portfolio Manager.

(f)    For the avoidance of doubt, the Issuer shall not issue additional Secured Notes (other than in connection with a Refinancing).

Section 2.5.    Execution, Authentication, Delivery and Dating.    The Notes shall be executed on behalf of each of the Applicable Issuers by one of their respective Authorized Officers.  The signature of such Authorized Officer on the Notes may be manual or facsimile.

Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of the Issuer or the Co-Issuer, as applicable, shall bind the Issuer and the Co-Issuer, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of issuance of such Notes.

At any time and from time to time after the execution and delivery of this Indenture, the Issuer and the Co-Issuer may deliver Notes executed by the Applicable Issuers to the Trustee or the Authenticating Agent for authentication and the Trustee or the Authenticating

Agent, upon Issuer Order (which Issuer Order shall, in connection with a transfer of Notes hereunder, be deemed to have been provided upon the delivery of an executed Note to the Trustee), shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

Each Note authenticated and delivered by the Trustee or the Authenticating Agent upon Issuer Order (which Issuer Order shall, in connection with a transfer of Notes hereunder, be deemed to have been provided upon the delivery of an executed Note to the Trustee) on the Closing Date shall be dated as of the Closing Date.  All other Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations reflecting the original Aggregate Outstanding Amount of the Notes so transferred, exchanged or replaced, but shall represent only the current Outstanding principal amount of the Notes so transferred, exchanged or replaced.  In the event that any Note is divided into more than one Note in accordance with this Article 2, the original principal amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor and shall be deemed to be the original aggregate principal amount of such subsequently issued Notes.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a Certificate of Authentication, substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual signature of one of their authorized signatories, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

Section 2.6.    Registration, Registration of Transfer and Exchange.  (a) The Issuer shall cause to be kept a register (the "Register") at the office of the Trustee in which, subject to such reasonable regulations as it may prescribe, the Issuer shall provide for the registration of Notes and the registration of transfers of Notes.  The Trustee is hereby initially appointed "Registrar" for the purpose of registering Notes and transfers of such Notes with respect to the Register maintained in the United States as herein provided.  Upon any resignation or removal of the Registrar, the Issuer shall promptly appoint a successor or, in the absence of such appointment, assume the duties of Registrar.

If a Person other than the Trustee is appointed by the Issuer as Registrar, the Issuer will give the Trustee prompt written notice of the appointment of a Registrar and of the location, and any change in the location, of the Register, and the Trustee shall have the right to inspect the Register at all reasonable times and to obtain copies thereof and the Trustee shall have the right to rely upon a certificate executed on behalf of the Registrar by an Officer thereof as to the names and addresses of the Holders of the Notes and the principal or face amounts and numbers of such Notes.  Upon request at any time the Registrar shall provide to the Issuer, the Portfolio Manager, the Initial Purchaser or any Holder of Notes a current list of Holders as reflected in the Register.

Subject to this Section 2.6 (Registration, Registration of Transfer and Exchange), upon surrender for registration of transfer of any Notes at the office or agency of the Co-Issuers to be maintained as provided in Section 7.2 (Maintenance of Office or Agency), the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denomination and of a like aggregate principal or face amount.

At the option of the Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like aggregate principal or face amount, upon surrender of the Notes to be exchanged at such office or agency.  Whenever any Note is surrendered for exchange, the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, the Notes that the Holder making the exchange is entitled to receive.

All Notes issued and authenticated upon any registration of transfer or exchange of Notes shall be the valid obligations of the Issuer and, solely in the case of the Co-Issued Notes, the Co-Issuer, evidencing the same debt (to the extent they evidence debt), and entitled to the same benefits under this Indenture as the Notes surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Registrar duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge shall be made to a Holder for any registration of transfer or exchange of Notes, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.  The Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in Securities Transfer Agents Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Exchange Act.

(b)     No Note may be sold or transferred (including, without limitation, by pledge or hypothecation) unless such sale or transfer is exempt from the registration requirements of the Securities Act, is exempt from the registration requirements under applicable state securities laws and will not cause either of the Co-Issuers to become subject to the requirement that it register as an investment company under the Investment Company Act.

(c)     (i)     No transfer of any Class E Notes to any Benefit Plan Investors will be effective, and no transfer of any Subordinated Notes will be effective if it would result in 25% or more of the value of Subordinated Notes being held by Benefit Plan Investors (the "25% Limitation"), and the Trustee will not recognize any such transfers.   For purposes of the 25% Limitation calculations and all other calculations required by this subsection, any ERISA Limited Notes held by a Person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Co-

Issuers or that provides investment advice for a fee (direct or indirect) with respect to such assets (or any "affiliate" of such a Person (as defined in 29 C.F.R. Section 2510.3-101(f)(3)) (a "Controlling Person"), the Trustee, the Portfolio Manager, the Initial Purchaser and their respective affiliates shall be disregarded and not treated as being Outstanding.  In addition, if any Holder of ERISA Limited Notes (a) informs the Trustee that as a result of a proposed transfer of any such ERISA Limited Note or of interests in, or securities issued by, such Holder, all or a specified portion of the ERISA Limited Notes owned by such Holder would be deemed to be held by a Benefit Plan Investor and (b) requests the Trustee to determine and notify such Holder whether the 25% Limitation would be exceeded after giving effect to such transfer, then the Trustee shall make such determination, subject to the last sentence of this clause (i), and notify such Holder accordingly.  Each Holder of ERISA Limited Notes shall be required to covenant that it will inform the Trustee of any such transfer, will not permit any such transfer that would cause the 25% Limitation to be exceeded to become effective, and will notify the Trustee of the effectiveness of any transfer that is not prohibited by this paragraph.  After it is notified of the effectiveness of any transfer pursuant to the foregoing sentence, the Trustee shall regard the ERISA Limited Notes held by such Holder (or specified portion thereof) as being held by a Benefit Plan Investor in future calculations of the 25% Limitation made pursuant to this Indenture unless subsequently notified by such Holder that such Notes (or specified portion thereof) would no longer be deemed to be held by Benefit Plan Investors.  The Trustee shall be entitled to rely exclusively upon the information set forth in the face of the transfer certificates received pursuant to the terms of this Section 2.6 (Registration, Registration of Transfer and Exchange) and only Notes that a Bank Officer of the Trustee actually knows to be so held shall be so disregarded.

(d)     The Trustee shall not be responsible for ascertaining whether any transfer complies with, or for otherwise monitoring or determining compliance with, the requirements or terms of the Securities Act, applicable state securities laws, ERISA, the Code or the Investment Company Act; except that if a certificate is specifically required by the terms of this Section 2.6 (Registration, Registration of Transfer and Exchange) to be provided to the Trustee by a prospective transferor or transferee, the Trustee shall be under a duty to receive and examine the same to determine whether it conforms substantially on its face to the applicable requirements of this Section 2.6 (Registration, Registration of Transfer and Exchange).

(e)     For so long as any of the Notes are Outstanding, the Issuer shall not issue or permit the transfer of any shares of the Issuer to U.S. persons and the Co-Issuer shall not issue or permit the transfer of any membership interests of the Co-Issuer to U.S. persons.

(f)     So long as a Global Note remains Outstanding and is held by or on behalf of DTC, transfers of such Global Note, in whole or in part, shall only be made in accordance with Section 2.2(b) (Forms of Notes) and this Section 2.6(f) (Registration, Registration of Transfer and Exchange).  Subject to clauses (i), (ii) and (iii) of this Section 2.6(f) (Registration, Registration of Transfer and Exchange), transfers of a Global Note shall be limited to transfers of such Global Note in whole, but not in part, to nominees of DTC or to a successor DTC or such successor's nominee.

(i)      <u>Rule 144A Global Secured Note to Regulation S Global Secured Note</u>.  If a holder of a beneficial interest in a Rule 144A Global Secured Note deposited with DTC wishes at any time to exchange its interest in such Rule 144A Global Note for an interest in the corresponding Regulation S Global Secured Note, or to transfer its interest in such Rule 144A Global Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Regulation S Global Secured Note, such holder, provided such holder or, in the case of a transfer, the transferee is not a U.S. person and is acquiring such interest in an offshore transaction, may, subject to the immediately succeeding sentence and the rules and procedures of DTC, exchange or transfer, or cause the exchange or transfer of, such interest for an equivalent beneficial interest in the corresponding Regulation S Global Secured Note.  Upon receipt by the Trustee or Registrar of (A) instructions given in accordance with DTC's procedures from an Agent Member directing the Trustee or Registrar to credit or cause to be credited a beneficial interest in the corresponding Regulation S Global Secured Note, but not less than the minimum denomination applicable to such holder's Notes, in an amount equal to the beneficial interest in the Rule 144A Global Secured Note to be exchanged or transferred, (B) a written order given in accordance with DTC's procedures containing information regarding the participant account of DTC and the Euroclear or Clearstream account to be credited with such increase and (C) a certificate in the form of <u>Exhibit B1</u> attached hereto given by the holder of such beneficial interest stating that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Global Notes, including that the holder or the transferee, as applicable, is not a U.S. person, and in an offshore transaction pursuant to and in accordance with Regulation S, then the Trustee or Registrar shall instruct DTC to reduce the principal amount of the Rule 144A Global Secured Note and to increase the principal amount of the Regulation S Global Secured Note by the Aggregate Outstanding Amount of the beneficial interest in the Rule 144A Global Secured Note to be exchanged or transferred, and to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the corresponding Regulation S Global Secured Note equal to the reduction in the principal amount of the Rule 144A Global Note.

(ii)      <u>Regulation S Global Secured Note to Rule 144A Global Secured Note</u>.  If a holder of a beneficial interest in a Regulation S Global Secured Note deposited with DTC wishes at any time to exchange its interest in such Regulation S Global Secured Note for an interest in the corresponding Rule 144A Global Secured Note or to transfer its interest in such Regulation S Global Secured Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Rule 144A Global Secured Note, such holder may, subject to the immediately succeeding sentence and the rules and procedures of Euroclear, Clearstream and/or DTC, as the case may be, exchange or transfer, or cause the exchange or transfer of, such interest for an equivalent beneficial interest in the corresponding Rule 144A Global Secured Note.  Upon receipt by the Trustee or Registrar of (A) instructions from Euroclear, Clearstream and/or DTC, as the case may be, directing the Trustee or Registrar to cause to be credited a beneficial

interest in the corresponding Rule 144A Global Secured Note in an amount equal to the beneficial interest in such Regulation S Global Secured Note, but not less than the minimum denomination applicable to such holder's Notes to be exchanged or transferred, such instructions to contain information regarding the participant account with DTC to be credited with such increase and (B) a certificate in the form of Exhibit B2 attached hereto given by the holder of such beneficial interest and stating, among other things, that, in the case of a transfer, the Person transferring such interest in such Regulation S Global Secured Note reasonably believes that the Person acquiring such interest in a Rule 144A Global Secured Note is a Qualified Institutional Buyer, is obtaining such beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction, and is also a Qualified Purchaser, then the Trustee or Registrar will instruct DTC to reduce, or cause to be reduced, the Regulation S Global Secured Note by the Aggregate Outstanding Amount of the beneficial interest in the Regulation S Global Secured Note to be transferred or exchanged and the Trustee or Registrar shall instruct DTC, concurrently with such reduction, to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the corresponding Rule 144A Global Secured Note equal to the reduction in the principal amount of the Regulation S Global Secured Note.

(iii)    Regulation S Global Subordinated Note or Rule 144A Global Subordinated Note to Certificated Subordinated Note.  If a holder of a beneficial interest in a Regulation S Global Subordinated Note or a Rule 144A Global Subordinated Note deposited with DTC wishes at any time to transfer its interest in such Regulation S Global Subordinated Note or Rule 144A Global Subordinated Note to a Person who wishes to take delivery thereof in the form of a Certificated Subordinated Note, such holder may, subject to the immediately succeeding sentence and the rules and procedures of Euroclear, Clearstream and/or DTC, as the case may be, transfer, or cause the transfer of, such interest for a Certificated Subordinated Note.   Upon receipt by the Registrar of (A) certificates substantially in the form of Exhibits B4 and B7 attached hereto executed by the transferee and (B) appropriate instructions from DTC, if required, the Registrar will approve the instructions at DTC to reduce, or cause to be reduced, the Regulation S Global Subordinated Note or Rule 144A Global Subordinated Note, as applicable, by the Aggregate Outstanding Amount of the beneficial interest in the Regulation S Global Subordinated Note or Rule 144A Global Subordinated Note, as applicable, to be transferred, record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and upon execution by the Issuer and authentication and delivery by the Trustee, one or more corresponding Certificated Subordinated Notes, registered in the names specified in the instructions in clause (B) above, in principal amounts designated by the transferee (the aggregate of such principal amounts being equal to the Aggregate Outstanding Amount of the interest in such Regulation S Global Subordinated Notes or Rule 144A Global Subordinated

Notes, as applicable, transferred by the transferor), and in authorized denominations.

(iv)    Other Exchanges.  In the event that a Global Note is exchanged for Notes in definitive registered form without interest coupons pursuant to Section 2.11 (Certificated Notes) hereof, such Notes may be exchanged for one another only in accordance with such procedures as are substantially consistent with the provisions above (including certification requirements intended to insure that such transfers are made only to Holders who are Qualified Purchasers and comply with Rule 144A or are to persons who are not U.S. persons who are non-U.S. residents (as determined for purposes of the Investment Company Act), and otherwise comply with Regulation S under the Securities Act, as the case may be), and as may be from time to time adopted by the Co-Issuers and the Trustee.

(g)    So long as a Certificated Note remains Outstanding, transfers of a Certificated Note, in whole or in part, shall only be made in accordance with this Section 2.6(g) (Registration, Registration of Transfer and Exchange).

(i)    Transfer and Exchange of Certificated Secured Note to Certificated Secured Note.  If a Holder of a Certificated Secured Note wishes at any time to transfer such Certificated Secured Note to a Person who wishes to take delivery thereof in the form of one or more Certificated Secured Notes of the same Class, such Holder may transfer or cause the transfer of such Note as provided below. Upon receipt by the Trustee or the Registrar of (A) such Holder's Certificated Secured Note properly endorsed for assignment to the transferee and (B) a certificate in the form of Exhibit B3 attached hereto given by the transferee of such Certificated Secured Note, then the Registrar shall cancel such Certificated Secured Note in accordance with Section 2.10 (Cancellation), record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and upon execution by the Applicable Issuers authenticate and deliver one or more Certificated Secured Notes bearing the same designation as the Certificated Secured Notes endorsed for transfer, registered in the names specified in the assignment described in clause (A) above, in principal or face amounts designated by the transferee (the aggregate of such principal or face amounts being equal to the Aggregate Outstanding Amount of the Certificated Secured Notes surrendered by the transferor), and in authorized denominations.  Certificated Secured Notes may be exchanged in the manner set forth in Section 2.6(g)(iv) (Registration, Registration of Transfer and Exchange).

(ii)    Transfer and Exchange of Certificated Subordinated Note to Certificated Subordinated Note.  Upon receipt by the Registrar of (A) a Holder's Certificated Subordinated Note properly endorsed for assignment to the transferee and (B) certificates substantially in the form of Exhibits B4 and B7 attached hereto (which may be in the form of a subscription agreement containing substantially the representations in Exhibits B4 and B7) given by the transferee of such Certificated Subordinated Note, then the Registrar shall cancel such Certificated Subordinated Note in accordance with Section 2.10 (Cancellation),

record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and upon execution by the Issuer authenticate and deliver one or more Certificated Subordinated Notes bearing the same designation as the Certificated Subordinated Note endorsed for transfer, registered in the names specified in the assignment described in clause (A) above, in principal amounts designated by the transferee (the aggregate of such principal amounts being equal to the aggregate principal amount of the Certificated Subordinated Note surrendered by the transferor), and in authorized denominations.  Certificated Subordinated Notes may be exchanged in the manner set forth in Section 2.6(g)(iv) (Registration, Registration of Transfer and Exchange).

(iii)    Transfer of Certificated Subordinated Note to Regulation S Global Subordinated Note or Rule 144A Global Subordinated Note.  If a holder of a Certificated Subordinated Note wishes at any time to transfer such Certificated Subordinated Note to a Person who wishes to take delivery thereof in the form of a beneficial interest in a Regulation S Global Subordinated Note or a Rule 144A Global Subordinated Note, such holder may, subject to the rules and procedures of Euroclear, Clearstream and/or DTC, as the case may be, exchange or transfer, or cause the exchange or transfer of, such Certificated Subordinated Note for a beneficial interest in a Regulation S Global Subordinated Note or a Rule 144A Global Subordinated Note, as applicable.  Upon receipt by the Registrar of (A) a holder's Certificated Subordinated Note properly endorsed for assignment to the transferee, (B) a certificate substantially in the form of Exhibit B5 or B6, as applicable, attached hereto executed by the transferor, (C) instructions given in accordance with Euroclear, Clearstream or DTC's procedures, as the case may be, from an Agent Member to instruct DTC to cause to be credited a beneficial interest in the Regulation S Global Subordinated Note or Rule 144A Global Subordinated Note, as applicable, in an amount equal to the Certificated Subordinated Note to be transferred or exchanged and (D) a written order given in accordance with DTC's procedures containing information regarding the participant's account at DTC and/or Euroclear or Clearstream to be credited with such increase, the Registrar shall cancel such Certificated Subordinated Note in accordance with Section 2.10 (Cancellation), record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and approve the instructions at DTC, concurrently with such cancellation, to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the Regulation S Global Subordinated Note or Rule 144A Global Subordinated Note, as applicable, equal to the principal amount of the Certificated Subordinated Note transferred or exchanged.

(iv)    Exchange of Certificated Notes.  If a Holder of one or more Certificated Notes wishes at any time to exchange such Certificated Notes for one or more Certificated Notes of the same Class of different principal amounts, such holder may exchange or cause the exchange of such Certificated Note for Certificated Notes bearing the same designation as the Certificated Notes

endorsed for exchange.  Upon receipt by the Applicable Issuers and the Trustee or the Registrar of (x) such Holder's Certificated Notes properly endorsed for such exchange and (y) written instructions from such Holder designating the number and principal or face amounts of the Certificated Notes to be issued (the aggregate of such principal or face amounts being equal to the aggregate principal or face amount of the Certificated Notes surrendered for exchange), then the Registrar shall cancel such Certificated Notes in accordance with <u>Section 2.10</u> (Cancellation), record the exchange in the Register in accordance with <u>Section 2.6(a)</u> (Registration, Registration of Transfer and Exchange) and upon execution by the Applicable Issuers authenticate and deliver one or more Certificated Notes bearing the same designation as the Certificated Notes endorsed for exchange, registered in the same names as the Certificated Notes surrendered by such Holder, in different principal or face amounts designated by such Holder, and in authorized denominations.

(v)     <u>Transfer of Certificated Secured Notes to Regulation S Global Secured Note or Rule 144A Global Secured Note</u>.  If a Holder of a Certificated Secured Note wishes at any time to transfer such Certificated Secured Note to a Person who wishes to take delivery thereof in the form of a beneficial interest in a Regulation S Global Secured Note or Rule 144A Global Secured Note, such Holder may, subject to the rules and procedures of DTC, exchange or transfer, or cause the exchange or transfer of, such Certificated Secured Note for a beneficial interest in a Regulation S Global Secured Note or Rule 144A Global Secured Note, as applicable.  Upon receipt by the Registrar of (A) a Holder's Certificated Secured Note properly endorsed for assignment to the transferee, (B) a certificate substantially in the form of <u>Exhibit B1</u> or <u>B2</u>, as applicable, attached hereto executed by the transferor, (C) instructions given in accordance with Euroclear, Clearstream or DTC's procedures, as the case may be, from an Agent Member to instruct DTC to cause to be credited a beneficial interest in the Regulation S Global Secured Note or Rule 144A Global Secured Note, as applicable, in an amount equal to the Certificated Secured Note to be transferred or exchanged and (D) a written order given in accordance with DTC's procedures containing information regarding the participant's account at DTC and/or Euroclear or Clearstream, as applicable, to be credited with such increase, the Registrar shall cancel such Certificated Secured Note in accordance with <u>Section 2.10</u> (Cancellation), record the transfer in the Register in accordance with <u>Section 2.6(a)</u> (Registration, Registration of Transfer and Exchange) and approve the instructions at DTC, concurrently with such cancellation, to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the Regulation S Global Secured Note or Rule 144A Global Secured Note, as applicable, equal to the principal amount of the Certificated Secured Note transferred or exchanged.

(h)     If Notes are issued upon the transfer, exchange or replacement of Notes bearing the applicable legends set forth in the applicable part of <u>Exhibit A</u> hereto, and if a request is made to remove such applicable legend on such Notes, the Notes so issued shall bear such applicable legend, or such applicable legend shall not be removed, as the

case may be, unless there is delivered to the Trustee and the Applicable Issuers such satisfactory evidence, which may include an Opinion of Counsel acceptable to them, as may be reasonably required by the Applicable Issuers (and which shall by its terms permit reliance by the Trustee), to the effect that neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of the Securities Act, the Investment Company Act, ERISA or the Code.  Upon provision of such satisfactory evidence, the Trustee or its Authenticating Agent, at the written direction of the Applicable Issuers shall, after due execution by the Applicable Issuers authenticate and deliver Notes that do not bear such applicable legend.

(i)     Each Person who becomes a beneficial owner of Notes of a Class represented by an interest in a Global Note will be deemed to have represented and agreed as follows:

(i)     In connection with the purchase of such Notes: (A) none of the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator, the Initial Purchaser or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for such beneficial owner; (B) such beneficial owner is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator or the Initial Purchaser or any of their respective Affiliates other than any statements in the final offering circular for such Notes, and such beneficial owner has read and understands such final offering circular; (C) such beneficial owner has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to this Indenture) based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator or the Initial Purchaser or any of their respective affiliates; (D) such beneficial owner is either (1) both (x) a Qualified Institutional Buyer that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A that holds the assets of such a plan, if investment decisions with respect to the plan are made by beneficiaries of the plan and (y) a Qualified Purchaser or (2) not a U.S. person as defined in Regulation S and is acquiring the Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from registration provided by Regulation S; (E) such beneficial owner is acquiring its interest in such Notes for its own account; (F) such beneficial owner was not formed for the purpose of investing in such Notes; (G) such beneficial owner understands that the Issuer may receive a list of participants holding interests in the Notes from one or more book-entry depositories; (H) such beneficial owner will hold and transfer at least the minimum denomination of such Notes; and (I) such beneficial owner will

provide notice of the relevant transfer restrictions to subsequent transferees; *provided* that, in the case of clauses (A), (B) and (C) above, the Portfolio Manager or an Affiliate of the Portfolio Manager may have acted as financial and investment advisor to certain accounts for the benefit of certain beneficial owners of Notes managed by the Portfolio Manager or such Affiliate of the Portfolio Manager and in that capacity has provided, and in the future may provide, advice to such beneficial owners of Notes; *provided further* that no such representations under subclauses (A) through (C) are made with respect to the Initial Purchaser by any Affiliate of the Initial Purchaser or any discretionary account for which the Initial Purchaser or its Affiliates act as investment advisor.

(ii)      (a)  In the case of the Secured Notes other than the Class E Notes, on each day from the date on which such beneficial owner acquires its interest in a Co-Issued Note through and including the date on which such beneficial owner disposes of its interest in such Secured Notes that either (x) it is neither a Benefit Plan Investor nor a governmental, church, non-U.S. or other plan which is subject to Similar Law or (y) its acquisition, holding and disposition of a Co-Issued Note, as applicable, will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of Similar Law) and (b) in the case of Class E Notes, on each day from the date on which such beneficial owner acquires its interest in such Class E Note through and including the date on which such beneficial owner disposes of its interest in such Class E Note, that (1) it is not a Benefit Plan Investor and (2) if it is a governmental, church, non-U.S. or other plan that is subject to Similar Law, its acquisition, holding and disposition of such Class E Note will not constitute or result in a non-exempt violation of Similar Law.  Any purported transfer of a Secured Note, or any interest therein to a purchaser or transferee that does not comply with the requirements specified in the applicable documents will be of no force and effect and shall be null and void *ab initio*.

Each purchaser of Global Subordinated Notes from the Issuer in the initial offering will be required to represent and warrant, with certificates substantially in the form of Exhibit B4 hereto, with respect to each day it holds such Global Subordinated Note or any beneficial interest therein, (1) whether or not the purchaser or transferee is a Benefit Plan Investor, (2) whether or not the purchaser or transferee is a Controlling Person and (3) (a) if it is a Benefit Plan Investor, its acquisition, holding and disposition of such Global Subordinated Notes will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or (b) if it is a governmental, church, non-U.S. or other plan which is subject to Similar Law, its acquisition, holding and disposition of Global Subordinated Notes will not constitute or result in a non-exempt violation of Similar Law.  Each purchaser from the Issuer in the initial offering of a Global Subordinated Note that fails to provide the certification described in the prior sentence will be deemed to have represented and warranted, with respect to each day it holds such Global Subordinated Note or any beneficial interest therein, that (1) such purchaser is not a Benefit Plan Investor or

Controlling Person and (2) if the purchaser is a governmental, church, non-U.S. or other plan that is subject to Similar Law, its acquisition, holding and disposition of Global Subordinated Notes will not constitute or result in a non-exempt violation of Similar Law.   Such purchaser or transferee, as applicable, acknowledges that no Global Subordinated Notes may be acquired by any purchaser or transferee, as applicable, that is a Benefit Plan Investor or Controlling Person if it would cause 25% or more of the value of the Subordinated Notes to be held by Benefit Plan Investors.   Each purchaser or transferee of Global Subordinated Notes other than from the Issuer in the initial offering will be deemed to have represented and warranted, with respect to each day it holds such Global Subordinated Note or any beneficial interest therein, that (1) such purchaser or transferee is not a Benefit Plan Investor or Controlling Person and (2) if the purchaser or transferee is a governmental, church, non-U.S. or other plan that is subject to Similar Law, its acquisition, holding and disposition of Global Subordinated Notes will not constitute or result in a non-exempt violation of Similar Law.   No Global Subordinated Notes may be acquired other than from the Issuer in the initial offering by Benefit Plan Investors or Controlling Persons.   Any purported transfer of the Global Subordinated Notes, or any interest therein, to a purchaser or transferee that does not comply with the requirements of this paragraph will be of no force and effect, shall be null and void *ab initio* and the Issuer will have the right to direct the purchaser to transfer the Subordinated Notes, or any interest therein, as applicable, to a person who meets the foregoing criteria.

(iii)     Such beneficial owner understands that such Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, such Notes have not been and will not be registered under the Securities Act, and, if in the future such beneficial owner decides to offer, resell, pledge or otherwise transfer such Notes, such Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of this Indenture and the legend on such Notes.   Such beneficial owner acknowledges that no representation has been made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Notes.   Such beneficial owner understands that neither of the Co-Issuers has been registered under the Investment Company Act, and that the Co-Issuers are exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act.

(iv)     It is aware that, except as otherwise provided in this Indenture, the Notes being sold to it, if any, in reliance on Regulation S will be represented by one or more Regulation S Global Notes, and that beneficial interests therein may be held only through DTC for the respective accounts of Euroclear or Clearstream.

(v)     The holder will provide notice to each Person to whom it proposes to transfer any interest in the Notes of the transfer restrictions and representations

set forth in this <u>Section 2.6</u> (Registration, Registration of Transfer and Exchange), including the Exhibits referenced herein.

(vi)     It is not a member of the public in the Cayman Islands.

(vii)    It agrees to be subject to the Bankruptcy Subordination Agreement.

(j)     Each Person who becomes an owner of a Certificated Note will be required to make the representations and agreements set forth in <u>Exhibit B3</u>, <u>Exhibit B4</u> and/or <u>Exhibit B7</u>, as applicable.

(k)     Any purported transfer of a Note not in accordance with this <u>Section 2.6</u> (Registration, Registration of Transfer and Exchange) shall be null and void and shall not be given effect for any purpose whatsoever.

(l)     To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon written notice to the Trustee, impose additional transfer restrictions on the Subordinated Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 and other similar laws or regulations, including, without limitation, requiring each transferee of a Subordinated Note to make representations to the Issuer in connection with such compliance.

(m)     Each purchaser of the Notes (or any interest therein) will be deemed to have represented that it is not a person with whom dealings are restricted or prohibited under any law relating to economic sanctions or anti-money laundering of the United States, the European Union, Switzerland, or any other applicable jurisdiction ("<u>AML and Sanctions Laws</u>"), and such purchaser's purchase of the Notes will not result in the violation of any AML and Sanctions Law by any Transaction Party, whether as a result of the identity of the purchaser or its beneficial owners, their source of funds, or otherwise.

(n)     Any holder may assign its voting rights to one or more assignees pursuant to agreements entered into between such holder and the assignees.  Holders shall not assign voting rights to a person that has no right to cashflows from the applicable Notes (directly or indirectly) or retain voting rights when such holders have no remaining right to cashflow from the applicable Notes (directly or indirectly).

(o)     Each purchaser will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year (or, if longer, the applicable preference period then in effect) *plus* one day after the payment in full of all Notes.  Each purchaser understands that the foregoing restrictions are a material inducement for each holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Trustee to enter into this Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of this Indenture and that any holder or beneficial owner of a Note, the Trustee, the Portfolio Manager or either

of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

Section 2.7.   Mutilated, Defaced, Destroyed, Lost or Stolen Note.  If (a) any mutilated or defaced Note is surrendered to a Transfer Agent, or if there shall be delivered to the Applicable Issuers, the Trustee and the relevant Transfer Agent evidence to their reasonable satisfaction of the destruction, loss or theft of any Note and (b) there is delivered to the Applicable Issuers, the Trustee and such Transfer Agent such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Applicable Issuers, the Trustee or such Transfer Agent that such Note has been acquired by a Protected Purchaser, the Applicable Issuers shall execute and, upon Issuer Order (which Issuer Order shall be deemed to have been provided upon the delivery of an executed Note to the Trustee), the Trustee shall authenticate and deliver, in lieu of any such mutilated, defaced, destroyed, lost or stolen Note, a new Note, of like tenor (including the same date of issuance) and equal principal or face amount, registered in the same manner, dated the date of its authentication, bearing interest from the date to which interest has been paid on the mutilated, defaced, destroyed, lost or stolen Note and bearing a number not contemporaneously outstanding.

If, after delivery of such new Note, a Protected Purchaser of the predecessor Note presents for payment, transfer or exchange such predecessor Note, the Applicable Issuers, the Transfer Agent and the Trustee shall be entitled to recover such new Note from the Person to whom it was delivered or any Person taking therefrom, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Applicable Issuers, the Trustee and the Transfer Agent in connection therewith.

In case any such mutilated, defaced, destroyed, lost or stolen Note has become due and payable, the Applicable Issuers in their discretion may, instead of issuing a new Note pay such Note without requiring surrender thereof except that any mutilated or defaced Note shall be surrendered.

Upon the issuance of any new Note under this Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note), the Applicable Issuers may require the payment by the Holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Note issued pursuant to this Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note) in lieu of any mutilated, defaced, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Applicable Issuers and such new Note shall be entitled, subject to the second paragraph of this Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note), to all the benefits of this Indenture equally and proportionately with any and all other Notes of the same Class duly issued hereunder.

The provisions of this Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note) are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

Section 2.8.    Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved.   (a) Each Class of Secured Notes shall accrue interest during each Interest Accrual Period at the applicable Note Interest Rate and such interest will be payable in arrears on each Payment Date on the Aggregate Outstanding Amount thereof on the first day of the related Interest Accrual Period (after giving effect to payments of principal thereof on such date), except as otherwise set forth below.  Payment of interest on each Class of Secured Notes (and payments of Interest Proceeds to the Holders of the Subordinated Notes) will be subordinated to the payments of interest on the related Priority Classes.  So long as any Priority Classes are Outstanding with respect to any Class of Deferrable Notes, any payment of interest due on such Class of Deferrable Notes which is not available to be paid ("Deferred Interest" with respect thereto) in accordance with the Priority of Payments on any Payment Date shall not be considered "due and payable" for the purposes of Section 5.1(a) (Events of Default) (and the failure to pay such interest shall not be an Event of Default) until the earliest of the Payment Date (i) on which such interest is available to be paid in accordance with the Priority of Payments, (ii) which is a Redemption Date with respect to such Class of Deferrable Notes and (iii) which is the Stated Maturity of such Class of Deferrable Notes.  Deferred Interest on any Class of Deferrable Notes shall be added to the principal balance of such Class of Deferrable Notes and payable on the first Payment Date on which funds are available to be used for such purpose in accordance with the Priority of Payments, but in any event no later than the earlier of the Payment Date (i) which is the Redemption Date with respect to such Class of Deferrable Notes and (ii) which is the Stated Maturity of such Class of Deferrable Notes.  Interest will cease to accrue on each Secured Note, or in the case of a partial repayment, on such part, from the date of repayment or the respective Stated Maturity, unless payment of principal is improperly withheld or unless default is otherwise made with respect to such payments of principal.  To the extent lawful and enforceable, (x) interest on Deferred Interest with respect to any Class of Deferrable Notes shall accrue at the Note Interest Rate for such Class until paid as provided herein and (y) interest on the interest on the Class A Notes or the Class B Notes or, if no Class A Notes or Class B Notes are Outstanding, any Class C Note or, if no Class C Notes are Outstanding, any Class D Note or, if no Class D Notes are Outstanding, any Class E Notes that is not paid when due shall accrue at the Note Interest Rate for such Class until paid as provided herein.

(b)     The principal of each Secured Note of each Class matures at par and is due and payable on the Payment Date which is the Stated Maturity for such Class of Secured Notes, unless the unpaid principal of such Secured Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.  Notwithstanding the foregoing, the payment of principal of each Class of Secured Notes (and payments of Principal Proceeds to the Holders of the Subordinated Notes) may only occur (other than amounts constituting Deferred Interest thereon which will be payable from Interest Proceeds pursuant to Section 11.1(a)(i) (Disbursements of Monies from Payment Account)) after principal on each Class of Notes that constitutes a Priority Class with respect to such Class has been paid in full and is subordinated to the payment on each Payment Date of the principal and interest due and payable on such Priority

Class(es), and other amounts in accordance with the Priority of Payments, and any payment of principal of any Class of Secured Notes which is not paid, in accordance with the Priority of Payments, on any Payment Date (other than the Payment Date which is the Stated Maturity of such Class or any Redemption Date), shall not be considered "due and payable" for purposes of Section 5.1(a) (Events of Default) until the Payment Date on which such principal may be paid in accordance with the Priority of Payments or all of the Priority Classes with respect to such Class have been paid in full.

(c)      Principal payments on the Notes will be made in accordance with the Priority of Payments and Section 9.1 (Mandatory Redemption) hereof.

(d)      As a condition to the payment of principal of and interest on any Secured Note or any payment on any Subordinated Note, without the imposition of withholding tax, the Paying Agent may require certification acceptable to it to enable the Issuer, the Co-Issuer, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to deduct or withhold from payments in respect of such Note under any present or future law or regulation of the United States and any other applicable jurisdiction, or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

(e)      Payments in respect of interest on and principal of any Secured Note and any payment with respect to any Subordinated Note shall be made by the Trustee in United States dollars to DTC or its designee with respect to a Global Note and to the Holder or its nominee with respect to a Certificated Note, by wire transfer, as directed by the Holder, in immediately available funds to a United States dollar account, as the case may be, maintained by DTC or its nominee with respect to a Global Note, and to the Holder or its designee with respect to a Certificated Note; *provided* that, in the case of a Certificated Note, the Holder thereof shall have provided written wiring instructions to the Trustee on or before the related Record Date; and *provided further* that, if appropriate instructions for any such wire transfer are not received by the related Record Date, then such payment shall be made by check drawn on a U.S. bank mailed to the address of the Holder specified in the Register.  Upon final payment due on the Maturity of a Note, the Holder thereof shall present and surrender such Note at the Corporate Office of the Trustee or at the office of any Paying Agent on or prior to such Maturity; *provided* that, if the Trustee and the Applicable Issuers shall have been furnished such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such certificate, then, in the absence of notice to the Applicable Issuers or the Trustee that the applicable Note has been acquired by a Protected Purchaser, such final payment shall be made without presentation or surrender.  None of the Co-Issuers, the Trustee, the Portfolio Manager, the Collateral Administrator nor any Paying Agent will have any responsibility or liability for any aspects of the records maintained by DTC, Euroclear, Clearstream or any of the Agent Members relating to or for payments made thereby on account of beneficial interests in a Global Note.  In the case where any final payment of principal and interest is to be made on any Secured Note (other than on the Stated Maturity thereof) or any final payment is to be made on any Subordinated Note (other than on the Stated Maturity thereof), the Trustee, in the name

and at the expense of the Applicable Issuers shall, not more than 30 nor less than 10 days prior to the date on which such payment is to be made, mail (by first class mail, postage prepaid) to the Persons entitled thereto at their addresses appearing on the Register a notice which shall specify the date on which such payment will be made, the amount of such payment per $100,000 original principal amount of Secured Notes, original principal amount of Subordinated Notes and the place where such Notes may be presented and surrendered for such payment.

(f)     Payments of principal to Holders of the Secured Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Debt of such Class registered in the name of each such Holder on the applicable Record Date bears to the Aggregate Outstanding Amount of all Notes of such Class on such Record Date. Payments to the Holders of the Subordinated Notes from Interest Proceeds and Principal Proceeds shall be made in the proportion that the Aggregate Outstanding Amount of the Subordinated Notes registered in the name of each such Holder on the applicable Record Date bears to the Aggregate Outstanding Amount of all Subordinated Notes on such Record Date.

(g)     Interest accrued with respect to the Floating Rate Notes shall be calculated on the basis of the actual number of days elapsed in the applicable Interest Accrual Period *divided by* 360.  Interest accrued with respect to the Fixed Rate Notes shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

(h)     All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.

(i)     Notwithstanding any other provision of this Indenture, the obligations of the Applicable Issuers under the Notes and this Indenture are limited recourse obligations of the Applicable Issuers payable solely from the Assets and following realization of the Assets, and application of the proceeds thereof in accordance with this Indenture, all obligations of and any claims against the Co-Issuers hereunder or in connection herewith after such realization shall be extinguished and shall not thereafter revive.  No recourse shall be had against any Officer, director, partner, employee, shareholder, member, manager or incorporator of either the Co-Issuers, the Portfolio Manager or their respective successors or assigns for any amounts payable under the Notes or (except as otherwise provided herein or in the Portfolio Management Agreement) this Indenture.  It is understood that the foregoing provisions of this paragraph (i) shall not (i) prevent recourse to the Assets for the sums due or to become due under any security, instrument or agreement which is part of the Assets or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until such Assets have been realized.  It is further understood that the foregoing provisions of this paragraph (i) shall not limit the right of any Person to name the Issuer or the Co-Issuer as a party defendant in any Proceeding or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency

judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.  The Subordinated Notes are not secured hereunder.

(j)     Subject to the foregoing provisions of this Section 2.8 (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved), each Note delivered and upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights of unpaid interest and principal (or other applicable amount) that were carried by such other Note.

Section 2.9.    Persons Deemed Owners.  The Issuer, the Co-Issuer, the Trustee and any agent of the Co-Issuers or the Trustee may treat as the owner of such Note the Person in whose name any Note is registered on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Issuer, the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuers or the Trustee shall be affected by notice to the contrary.

Section 2.10.    Surrender of Notes; Cancellation.  (a) Any Holder may tender any Notes or beneficial interests in Notes owned by such Holder for cancellation by the Trustee without receiving any payment (any such surrendered Notes or beneficial interests in Notes, "Surrendered Notes").  For the avoidance of doubt, Notes surrendered by the Issuer after purchase pursuant to Section 2.13 shall not constitute "Surrendered Notes."  The Issuer shall provide notice to the Co-Issuer, the Trustee and the Rating Agency of any Surrendered Notes tendered to it and the Trustee shall provide notice to the Applicable Issuers of any Surrendered Note tendered to it.  Any such Surrendered Notes shall be submitted to the Trustee for cancellation; *provided* that, for purposes of calculation of the Overcollateralization Ratio and any calculation required by Section 5.1(g), any Surrendered Notes will be deemed to remain outstanding until all Notes of the applicable Class and each Class that is senior in right of principal payment thereto in the Note Payment Sequence have been retired or redeemed, having an Aggregate Outstanding Amount equal to the Aggregate Outstanding Amount as of the date of surrender, reduced proportionately with, and to the extent of, any payments of principal on Notes of the same Class thereafter.

(b)     All Surrendered Notes and Notes that are surrendered for payment, registration of transfer, exchange or redemption, surrendered by the Issuer following purchase pursuant to Section 2.13, or deemed lost or stolen shall be promptly cancelled by the Trustee and may not be reissued or resold; *provided* that, in the event an anticipated Optional Redemption or Partial Redemption by Refinancing does not occur, Notes that are delivered in connection with such anticipated Optional Redemption or Partial Redemption by Refinancing shall be returned by the Trustee to the Person surrendering the same.  Any such Notes shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee.  No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.10, except as expressly permitted hereunder.  All canceled Notes held by the Trustee shall be destroyed by the Trustee in accordance with its standard policy, unless the Co-Issuers shall direct by an Issuer Order received prior to destruction that they be returned to it.

Section 2.11.  Certificated Notes.  (a) A Global Note deposited with DTC pursuant to Section 2.2 (Forms of Notes) shall be transferred in the form of a Certificated Note to the beneficial owners thereof only if such transfer complies with Section 2.6 (Registration, Registration of Transfer and Exchange) and either (i) DTC notifies the Co-Issuers that it is unwilling or unable to continue as depository for such Global Note or (ii) if at any time DTC ceases to be a Clearing Agency registered under the Exchange Act and, in each case, a successor depository is not appointed by the Co-Issuers within 90 days after such notice.  In addition, the owner of a beneficial interest in a Global Note will be entitled to receive a Certificated Note in exchange for such interest if an Event of Default has occurred and is continuing.

(b)    Any Global Note that is transferable in the form of a Certificated Note to the beneficial owners thereof pursuant to this Section 2.11 (Certificated Notes) shall be surrendered by DTC to the Trustee's office located in the Borough of Manhattan, the City of New York to be so transferred, in whole or from time to time in part, without charge, and the Applicable Issuers shall execute and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Note, an equal aggregate principal amount of definitive physical certificates (pursuant to the instructions of DTC) substantially in the form of Exhibit A3 or Exhibit A4 (each such Secured Note (including a Certificated Class E Note) issued in definitive form, a "Certificated Secured Note" and, each such Subordinated Note issued in definitive form, a "Certificated Subordinated Note" and, collectively, the "Certificated Notes") in authorized denominations.  Any Certificated Note delivered in exchange for an interest in a Global Note shall, except as otherwise provided by Section 2.6(h) (Registration, Registration of Transfer and Exchange), bear the legends set forth in the applicable Exhibit A and shall be subject to the transfer restrictions referred to in such legends.

(c)    Subject to the provisions of paragraph (b) of this Section 2.11 (Certificated Notes), the Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

(d)    In the event of the occurrence of either of the events specified in subclauses (i) and (ii) of subsection (a) of this Section 2.11 (Certificated Notes), the Co-Issuers will promptly make available to the Trustee a reasonable supply of Certificated Notes in definitive, fully registered form without interest coupons.

(e)    In the event that Certificated Notes are not so issued by the Issuer to such beneficial owners of interests in Global Notes as required by Section 2.11(a) (Certificated Notes), the Issuer expressly acknowledges that the beneficial owners shall be entitled to pursue any remedy that the Holders of a Global Note would be entitled to pursue in accordance with Article 5 of this Indenture (but only to the extent of such beneficial owner's interest in the Global Note) as if Certificated Notes had been issued.

Section 2.12.  Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations.  (a) Notwithstanding anything to the contrary elsewhere in this Indenture, (x) any transfer of a beneficial interest in any Secured Note (other than the Class E

Notes) to a U.S. person that is not a QIB/QP and that is not made pursuant to an applicable exemption under the Securities Act and the Investment Company Act, (y) any transfer of a beneficial interest in any Class E Note to a U.S. person that is not (i) a Qualified Institutional Buyer or an Institutional Accredited Investor and (ii) a Qualified Purchaser and that is not made pursuant to an applicable exemption under the Securities Act and the Investment Company Act and (z) any transfer of a beneficial interest in any Subordinated Note to a U.S. person that is not (i) a Qualified Institutional Buyer or an Accredited Investor and (ii) a Qualified Purchaser, a Knowledgeable Employee with respect to the Issuer or a corporation, partnership, limited liability company or other entity (other than a trust) each shareholder, partner, member or other equity owner of which is either a Knowledgeable Employee with respect to the Issuer or a Qualified Purchaser and that is not made pursuant to an applicable exemption under the Securities Act and the Investment Company Act shall be null and void and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee shall have notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(b)     If any U.S. person that is not a Qualified Institutional Buyer (other than Institutional Accredited Investors purchasing Class E Notes or Accredited Investors purchasing Subordinated Notes) and a Qualified Purchaser (or, in the case of the Subordinated Notes, a Knowledgeable Employee with respect to the Issuer or an entity exclusively owned by Knowledgeable Employees with respect to the Issuer and/or Qualified Purchasers) shall become the beneficial owner of an interest in any Note (any such person a "Non-Permitted Holder") the Issuer may (in its sole discretion), promptly after discovery that such person is a Non-Permitted Holder by the Issuer, the Co-Issuer or the Trustee (and notice by the Trustee or the Co-Issuer to the Issuer, if either of them makes the discovery), send notice to such Non-Permitted Holder demanding that such Non-Permitted Holder transfer its interest in the Notes held by such person to a Person that is not a Non-Permitted Holder within 30 days of the date of such notice. If such Non-Permitted Holder fails to so transfer such Notes, the Issuer shall (1) have the right to compel such Holder to sell its interest in the Notes, (2) assign such Notes a separate CUSIP number or numbers and (3) have the right, without further notice to the Non-Permitted Holder to sell such Notes or interest in such Notes to a purchaser selected by the Issuer that is not a Non-Permitted Holder on such terms as the Issuer may choose. The Issuer, or the Portfolio Manager acting on behalf of the Issuer, may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the Notes, and selling such Notes to the highest such bidder. However, the Issuer or the Portfolio Manager acting on behalf of the Issuer may select a purchaser by any other means determined by it in its sole discretion. The Holder of each Note, the Non-Permitted Holder and each other Person in the chain of title from the Holder to the Non-Permitted Holder by its acceptance of an interest in the Notes, agrees to cooperate with the Issuer and the Trustee to effect such transfers. The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to the Non-Permitted Holder. The terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to any Person having an interest in the Notes sold as a result of any such sale or the exercise of such discretion.

(c)      If a Holder fails for any reason to comply with its obligation to provide Holder FATCA Information or otherwise becomes a Holder or beneficial owner (a) that the Issuer reasonably determines that such Holder or holder's direct or indirect acquisition, holding or transfer of an interest in such Note would cause the Issuer to be unable to achieve FATCA Compliance or (b) that is or that the Issuer is required to treat as a "nonparticipating FFI" or a "recalcitrant account holder" of the Issuer, in each case as defined in FATCA (a "Non-Permitted Tax Holder"), the Issuer will have the right, in addition to withholding on "passthru payments" (as defined in the Code), to (x) compel such Holder to sell its interest in such Note and (y) sell such interest on such Holder's behalf in accordance with the procedures described in the preceding paragraph. Moreover, each Holder will agree to indemnify the Issuer, the Trustee and other holders for all damages, costs and expenses that result from the failure of such Holder to comply with its obligation to provide Holder FATCA Information. This indemnification will continue even after the applicable Holder ceases to have an ownership interest in the Notes.

(d)      Notwithstanding anything to the contrary elsewhere in this Indenture, any transfer of a beneficial interest in any ERISA Limited Note to a Person who has made or is deemed to have made an ERISA-related representation required by Section 2.6 (Registration, Registration of Transfer and Exchange) that is subsequently shown to be false or misleading shall be null and void and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee shall have notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(e)      If any Person shall become the beneficial owner of an interest in a Note who has made or is deemed to have made an ERISA-related representation required by Section 2.6 (Registration, Registration of Transfer and Exchange) that is subsequently shown to be false or misleading or whose beneficial ownership otherwise causes a violation of the 25% Limitation (any such person a "Non-Permitted ERISA Holder"), the Issuer shall, promptly after discovery by the Issuer that such person is a Non-Permitted ERISA Holder (or upon notice by the Trustee to the Issuer if it makes the discovery), send notice to such Non-Permitted ERISA Holder demanding that such Non-Permitted ERISA Holder transfer all or any portion of the ERISA Limited Notes held by such Person to a Person that is not a Non-Permitted ERISA Holder within 10 days of the date of such notice.  If such Non-Permitted ERISA Holder fails to so transfer its ERISA Limited Notes the Issuer shall have the right, without further notice to the Non-Permitted ERISA Holder, to sell such ERISA Limited Notes or interest in such ERISA Limited Notes to a purchaser selected by the Issuer that is not a Non-Permitted ERISA Holder on such terms as the Issuer may choose.  The Issuer may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the ERISA Limited Notes and selling such ERISA Limited Notes to the highest such bidder.  However, the Issuer may select a purchaser by any other means determined by it in its sole discretion.  The Holder of each ERISA Limited Note, the Non-Permitted ERISA Holder and each other Person in the chain of title from the Holder to the Non-Permitted ERISA Holder, by its acceptance of an interest in the ERISA Limited Notes agrees to cooperate with the Issuer and the Trustee to effect such transfers.  The proceeds of such sale, net of any commissions, expenses and taxes due in

connection with such sale shall be remitted to the Non-Permitted ERISA Holder.  The terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to any Person having an interest in the ERISA Limited Notes sold as a result of any such sale or the exercise of such discretion.

Section 2.13.    Issuer Purchase of Secured Notes.

(a)    Notwithstanding anything to the contrary in this Indenture, the Portfolio Manager, on behalf of the Issuer, may conduct purchases of the Secured Notes, in whole or in part, in accordance with, and subject to, the terms and conditions set forth in Section 2.13(b) below, by disbursing amounts in the Principal Collection Subaccount or the Interest Collection Subaccount for purchases of Secured Notes in accordance with the provisions described in this Section 2.13.  The Trustee shall cancel in accordance with Section 2.10 any such purchased Secured Notes surrendered to it for cancellation or, in the case of any Global Notes, the Trustee shall decrease the Aggregate Outstanding Amount of such Global Notes in its records by the original principal amount of the purchased Secured Notes, and instruct DTC or its nominee, as the case may be, to conform its records.

(b)    No purchases of the Secured Notes by, or on behalf of, the Issuer may occur without the consent of a Majority of the Subordinated Notes and unless each of the following conditions are satisfied:

(i)    such purchases of Secured Notes shall occur in the following sequential order of priority: first, the Class A Notes until the Class A Notes are retired in full; second, the Class B Notes, until the Class B Notes are retired in full; third, the Class C Notes until the Class C Notes are retired in full; fourth, the Class D Notes, until the Class D Notes are retired in full; and fifth, the Class E Notes, until the Class E Notes are retired in full;

(ii)    (1) each such purchase of Secured Notes of any Class shall be made pursuant to an offer made to all Holders of the Secured Notes of such Class, by notice to such Holders, which notice shall specify the purchase price (as a percentage of par) at which such purchase will be effected, the maximum amount of Principal Proceeds that will be used to effect such purchase and the length of the period during which such offer will be open for acceptance, (2) each such Holder shall have the right, but not the obligation, to accept such offer in accordance with its terms and (3) if the Aggregate Outstanding Amount of Notes of the relevant Class held by Holders who accept such offer exceeds the amount of Principal Proceeds specified in such offer, a portion of the Secured Notes of each accepting holder shall be purchased *pro rata* based on the respective principal amount held by each such holder;

(iii)    each such purchase shall be effected only at prices discounted from par;

(iv)    each such purchase of Secured Notes shall occur during the Reinvestment Period and shall be effected with Principal Proceeds to pay the purchase price of such Secured Notes and either Principal Proceeds or Interest Proceeds to purchase the accrued interest on such Secured Notes;

(v)    no Event of Default shall have occurred and be continuing;

(vi)    with respect to each such purchase, notice shall have been provided to the Rating Agency by the Issuer;

(vii)    any Secured Notes to be purchased shall be surrendered to the Trustee for cancellation in accordance with Section 2.10;

(viii)    each Coverage Test will be satisfied immediately prior to each such purchase and will be maintained or improved immediately after giving effect to each such purchase;

(ix)    each such purchase will otherwise be conducted in accordance with applicable law;

(x)    no such purchase shall occur during a Restricted Trading Period; and

(xi)    the Trustee has received an Officer's certificate of the Portfolio Manager to the effect that the conditions in Section 2.13(b)(i) through (x) have been satisfied.

Section 2.14.   No Gross Up.   The Issuer shall not be obligated to pay any additional amounts to the Holders or beneficial owners of the Notes as a result of any withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges imposed on payments in respect of the Notes.

ARTICLE 3

CONDITIONS PRECEDENT

Section 3.1.   Conditions to Issuance of Notes on Closing Date.   (a) The Notes to be issued on the Closing Date may be executed by the Applicable Issuers and delivered to the Trustee for authentication upon Issuer Order and thereupon the same shall be authenticated and delivered by the Trustee upon Issuer Order and upon receipt by the Trustee of the following:

(i)    Officers' Certificates of the Co-Issuers Regarding Corporate Matters.   An Officer's certificate of each of the Co-Issuers (A) evidencing the authorization by Board Resolution of the execution and delivery of this Indenture, and, in the case of the Issuer, the Portfolio Management Agreement, the Securities Account Control Agreement, the Purchase Agreement, the Collateral Administration Agreement, any Hedge Agreements and related transaction documents and in each case the execution, authentication and delivery of the

Notes applied for by it and specifying the Stated Maturity, principal amount and Note Interest Rate of each Class of Secured Notes to be authenticated and delivered, the Stated Maturity and principal amount of Subordinated Notes to be authenticated and delivered and (B) certifying that (1) the attached copy of the Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon.

(ii)     Governmental Approvals.  From each of the Co-Issuers either (A) a certificate of the Applicable Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of such Applicable Issuer that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes applied for by it or (B) an Opinion of Counsel of the Applicable Issuer that no such authorization, approval or consent of any governmental body is required for the valid issuance of such Notes except as have been given.

(iii)     U.S. Counsel Opinions.  Opinions of Dechert LLP, special U.S. counsel to the Co-Issuers, Dechert LLP, counsel to the Portfolio Manager, and Seward & Kissel LLP, counsel to the Trustee, dated the Closing Date, substantially in the form of Exhibit C, Exhibit D, and Exhibit E attached hereto.

(iv)     Cayman Counsel Opinion.  An opinion of Maples and Calder, Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of Exhibit F attached hereto.

(v)     Officers' Certificates of Co-Issuers Regarding Indenture.  An Officer's certificate of each of the Co-Issuers stating that the Applicable Issuer is not in default under this Indenture and that the issuance of the Offered Securities applied for by it will not result in a default or a breach of any of the terms, conditions or provisions of, or constitute a default under, its organizational documents, any indenture or other agreement or instrument to which it is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which it is a party or by which it may be bound or to which it may be subject; that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Offered Securities applied for by it have been complied with; and that all expenses due or accrued with respect to the Offering or relating to actions taken on or in connection with the Closing Date have been paid or reserves therefor have been made.  The Officer's certificate of the Issuer shall also state that all of its representations and warranties contained herein are true and correct as of the Closing Date.

(vi)     Hedge Agreements.  Executed copies of any Hedge Agreement entered into by the Issuer.

(vii)    Portfolio Management Agreement and Collateral Administration Agreement.  An executed counterpart of the Portfolio Management Agreement and the Collateral Administration Agreement.

(viii)   Grant of Collateral Obligations.   The Grant pursuant to the Granting Clause of this Indenture of all of the Issuer's right, title and interest in and to the Collateral Obligations pledged to the Trustee for inclusion in the Assets on the Closing Date securing the Notes and Delivery of such Collateral Obligations (including any promissory note and all other Underlying Instruments related thereto to the extent received by the Issuer) as contemplated by Section 3.3 (Custodianship; Delivery of Collateral Obligations and Eligible Investments).

(ix)    Certificate of the Issuer Regarding Assets.   A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, in the case of each Collateral Obligation pledged to the Trustee for inclusion in the Assets, on the Closing Date and immediately prior to the Delivery thereof on the Closing Date:

(A)    the Issuer is the owner of such Collateral Obligation free and clear of any liens, claims or encumbrances of any nature whatsoever except for (i) those which are being released on the Closing Date and (ii) those Granted pursuant to this Indenture;

(B)    the Issuer has acquired its ownership in such Collateral Obligation in good faith without notice of any adverse claim, except as described in paragraph (A) above;

(C)    the Issuer has not assigned, pledged or otherwise encumbered any interest in such Collateral Obligation (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(D)    the Issuer has full right to Grant a security interest in and assign and pledge such Collateral Obligation to the Trustee;

(E)    each Collateral Obligation included in the Assets satisfies the requirements of the definition of "Collateral Obligation" and of Section 3.1(a)(viii) (Conditions to Issuance of Notes on Closing Date); and

(F)    upon Grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral Obligations and other Assets, except as permitted by this Indenture.

(x)    Rating Letters. An Officer's certificate of the Issuer to the effect that attached thereto is a true and correct copy of a letter signed by the Rating Agency and confirming that each Class of Secured Notes has been assigned the

applicable Initial Rating and that such ratings are in full force and effect on the Closing Date.

(xi)   <u>Accounts</u>.  A certificate evidencing the establishment of each of the Accounts.

(xii)   <u>Issuer Order for Deposit of Funds into Accounts</u>.  (a) An Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of $564,373,534.26 from the proceeds of the issuance of the Notes into the Ramp-up Account for use pursuant to Section 7.18 (Ramp-up Period; Purchase of Additional Collateral Obligations) and 10.3(c) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account), (b) an Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of $988,534.26 from the proceeds of the issuance of the Notes into the Expense Reserve Account for use pursuant to Section 10.3(d) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account) and (c) an Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of $1,500,000 from the proceeds of the issuance of the Notes into the Interest Reserve Account for use pursuant to Section 10.3(f) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

(xiii)   <u>Irish Listing</u>.  An Officer's certificate of the Issuer to the effect that application has been made to the Irish Stock Exchange to admit the Notes to the Official List and to trade on the Global Exchange Market.

(xiv)   <u>Other Documents</u>.  Such other documents as the Trustee may reasonably require; *provided* that nothing in this clause (xiv) shall imply or impose a duty on the part of the Trustee to require any other documents.

Section 3.2.   <u>Conditions to Issuance of Additional Notes</u>.  Additional Subordinated Notes to be issued on an Additional Notes Closing Date pursuant to <u>Section 2.4</u> (Additional Notes) may be executed by the Applicable Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered to the Issuer by the Trustee upon Issuer Order and upon receipt by the Trustee of the following:

(i)   <u>Officers' Certificates of the Co-Issuers Regarding Corporate Matters</u>.  An Officer's certificate of each of the Co-Issuers (1) evidencing the authorization by Board Resolution of the execution and delivery of a supplemental indenture pursuant to <u>Section 8.2(b)</u> (Supplemental Indentures With Consent of Holders of Offered Securities) and the execution, authentication and delivery of the Additional Subordinated Notes applied for by it specifying the Stated Maturity and principal amount of the Subordinated Notes to be authenticated and delivered and (2) certifying that (a) the attached copy of such Board Resolution is a true and complete copy thereof, (b) such resolutions have

not been rescinded and are in full force and effect on and as of the Additional Notes Closing Date and (c) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon.

(ii)     Governmental Approvals.  From each of the Co-Issuers either (A) a certificate of the Applicable Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of such Applicable Issuer that no other authorization, approval or consent of any governmental body is required for the valid issuance of such Additional Subordinated Notes or (B) an Opinion of Counsel of the Applicable Issuer that no such authorization, approval or consent of any governmental body is required for the valid issuance of such Additional Subordinated Notes except as have been given.

(iii)     U.S. Counsel Opinions.  Opinions of Dechert LLP, special U.S. counsel to the Co-Issuers, or other counsel acceptable to the Trustee, dated the Additional Notes Closing Date, substantially in the form of Exhibit C attached hereto, each with additions or deletions reflecting the additional issuance.

(iv)     Cayman Counsel Opinion.  An opinion of Maples and Calder, Cayman Islands counsel to the Issuer, or other counsel acceptable to the Trustee, dated the Additional Notes Closing Date, substantially in the form of Exhibit F attached hereto.

(v)     Officers' Certificates of Co-Issuers Regarding Indenture.  An Officer's certificate of each Co-Issuer stating that the Applicable Issuer is not in default under this Indenture and that the issuance of the Additional Subordinated Notes applied for by it will not result in a default or a breach of any of the terms, conditions or provisions of, or constitute a default under, its organizational documents, any indenture or other agreement or instrument to which it is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which it is a party or by which it may be bound or to which it may be subject; that all conditions precedent provided in this Indenture and the supplemental indenture pursuant to Section 8.2(b) (Supplemental Indentures With Consent of Holders of Offered Securities) relating to the authentication and delivery of the Additional Subordinated Notes applied for have been complied with; and that all expenses due or accrued with respect to the Offering of the Additional Subordinated Notes or relating to actions taken on or in connection with the Additional Notes Closing Date have been paid or reserved. The Officer's certificate of the Issuer shall also state that all of its representations and warranties contained herein are true and correct as of the Additional Notes Closing Date.

(vi)     Grant of Collateral Obligations.  The Grant pursuant to the Granting clause of this Indenture of all of the Issuer's right, title and interest in and to the additional Collateral Obligations pledged to the Trustee for inclusion in

the Assets on the Additional Notes Closing Date, and Delivery of such additional Collateral Obligations (including any promissory note and all other Underlying Instruments related thereto to the extent received by the Issuer) as contemplated by <u>Section 3.3</u> (Custodianship; Delivery of Collateral Obligations and Eligible Investments).

(vii)   <u>Certificate of the Issuer Regarding Assets</u>.   A certificate of an Authorized Officer of the Issuer, dated as of the Additional Notes Closing Date, to the effect that, in the case of each Collateral Obligation pledged to the Trustee for inclusion in the Assets on the Additional Notes Closing Date and immediately prior to the Delivery thereof on the Additional Notes Closing Date:

(A)   the Issuer is the owner of such Collateral Obligation free and clear of any liens, claims or encumbrances of any nature whatsoever except for (i) those which are being released on the Additional Notes Closing Date or (ii) those Granted pursuant to this Indenture;

(B)   the Issuer has acquired its ownership in such Collateral Obligation in good faith without notice of any adverse claim, except as described in paragraph (A) above;

(C)   the Issuer has not assigned, pledged or otherwise encumbered any interest in such Collateral Obligation (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(D)   the Issuer has full right to Grant a security interest in and assign and pledge such Collateral Obligation to the Trustee;

(E)   the Collateral Obligations included in the Assets satisfy the requirements of the definition of "Collateral Obligations" and of <u>Section 3.2(vi)</u> (Conditions to Issuance of Additional Notes) and, if the Additional Notes Closing Date is subsequent to the Ramp-up Period, each component of the Concentration Limitations and the Collateral Quality Test; and

(F)   upon Grant by the Issuer, the Trustee has a first priority perfected security interest in such Collateral Obligations and other Assets, except as permitted by this Indenture.

(viii)   <u>Rating Letters</u>.   An Officer's certificate of the Issuer to the effect that attached thereto is a true and correct copy of a letter signed by the Rating Agency and confirming that the Rating Agency's rating of the Secured Notes has not been lowered from the Initial Ratings and will not be lowered as a result of the issuance of the Additional Subordinated Notes.

(ix)   <u>Irish Listing</u>.   If the Additional Subordinated Notes are of a Class of Notes listed on the Global Exchange Market of the Irish Stock Exchange, an Officer's certificate of the Issuer to the effect that attached thereto is a true and

correct copy of written confirmation from the Irish Stock Exchange that such Additional Subordinated Notes have been admitted to listing on the Irish Stock Exchange.

(x)     Other Documents.  Such other documents as the Trustee may reasonably require; *provided* that nothing in this clause (xi) shall imply or impose a duty on the Trustee to so require any other documents.

Section 3.3.    Custodianship; Delivery of Collateral Obligations and Eligible Investments.  (a) The Issuer shall deliver or cause to be delivered to a custodian appointed by the Issuer, which shall be a Securities Intermediary (the "Custodian"), all Assets in accordance with the definition of "Deliver."  Initially, the Custodian shall be U.S. Bank National Association. Any successor custodian shall be a state or national bank or trust company that is not an Affiliate of the Issuer or the Co-Issuer and has capital and surplus of at least U.S.$200,000,000 and is a Securities Intermediary and shall be subject to the requirements of Section 10.1 (Collection of Money).  Subject to the limited right to relocate Pledged Obligations as provided in Section 7.5(b) (Protection of Assets), the Trustee or the Custodian, as applicable, shall hold (i) all Collateral Obligations, Eligible Investments, Cash and other investments purchased in accordance with this Indenture and (ii) any other property of the Issuer otherwise Delivered to the Trustee or the Custodian, as applicable, by or on behalf of the Issuer, in the relevant Account, established and maintained pursuant to Article 10; as to which in each case the Trustee shall have entered into an Agreement with the Custodian substantially in the form of Exhibit H providing, *inter alia*, that the establishment and maintenance of such Account will be governed by a law of a jurisdiction satisfactory to the Issuer and the Trustee.

(b)     Each time that the Portfolio Manager on behalf of the Issuer directs or causes the acquisition of any Collateral Obligation, Eligible Investment, or other investments, the Portfolio Manager (on behalf of the Issuer) shall, if the Collateral Obligation, Eligible Investment, or other investment is required to be, but has not already been, transferred to the relevant Account, cause the Collateral Obligation, Eligible Investment, or other investment to be Delivered to the Custodian to be held in the Custodial Account (or in the case of any such investment that is not a Collateral Obligation, in the Account in which the funds used to purchase the investment are held in accordance with Article 10) for the benefit of the Trustee in accordance with this Indenture.  The security interest of the Trustee in the funds or other property used in connection with such acquisition shall, immediately and without further action on the part of the Trustee, be released.  The security interest of the Trustee shall nevertheless come into existence and continue in the Collateral Obligation, Eligible Investment, or other investment so acquired, including all interests of the Issuer in to any contracts related to and proceeds of the Collateral Obligations, Eligible Investments, or other investments.

ARTICLE 4

SATISFACTION AND DISCHARGE

Section 4.1.    Satisfaction and Discharge of Indenture.  This Indenture shall be discharged and shall cease to be of further effect except as to (i) rights of registration of transfer

and exchange, (ii) substitution of mutilated, defaced, destroyed, lost or stolen Notes, (iii) rights of Holders to receive payments of principal thereof and interest thereon, (iv) the rights and immunities of the Trustee hereunder and those obligations of the Trustee set forth in Section 4.2 (Application of Trust Money), (v) the rights, obligations and immunities of the Portfolio Manager hereunder and under the Portfolio Management Agreement, the rights, obligations and immunities of the Collateral Administrator under the Collateral Administration Agreement and (vi) the rights of Holders of Notes as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them (and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture) when:

     (a)    either:

         (i)    all Notes theretofore authenticated and delivered to Holders (other than (A) Notes which have been mutilated, defaced, destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note) and (B) Notes for whose payment Money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 7.3 (Money for Note Payments to be Held in Trust)), have been delivered to the Trustee for cancellation; or

         (ii)    all Notes not theretofore delivered to the Trustee for cancellation (A) have become due and payable, (B) will become due and payable at their Stated Maturity within one year or (C) are to be called for redemption pursuant to Article 9 under an arrangement satisfactory to the Trustee for the giving of notice of redemption by the Applicable Issuers pursuant to Section 9.3 (Redemption Procedures), Section 9.6 (Clean-up Call Redemption) and the Issuer has irrevocably deposited or caused to be deposited with the Trustee, in trust for such purpose, Cash or non-callable direct obligations of the United States of America; *provided* that the obligations are entitled to the full faith and credit of the United States of America or are debt obligations which are rated "Aaa" by Moody's and "AAA" by S&P, in an amount sufficient, as verified by a firm of Independent certified public accountants which are nationally recognized, to pay and discharge the entire indebtedness on such Notes not theretofore delivered to the Trustee for cancellation, for principal and interest to the date of such deposit (in the case of Notes which have become due and payable), or to the respective Stated Maturity or the respective Redemption Date, as the case may be, and shall have Granted to the Trustee a valid perfected security interest in such Eligible Investment that is of first priority or free of any adverse claim, as applicable, and shall have furnished an Opinion of Counsel with respect thereto; *provided* that this subsection (ii) shall not apply if an election to act in accordance with the provisions of Section 5.5(a) (Optional Preservation of Assets) shall have been made and not rescinded;

     (b)    the Issuer has paid or caused to be paid all other sums then due and payable hereunder (including any amounts then due and payable pursuant to the Hedge Agreements, the Collateral Administration Agreement and the Portfolio Management

Agreement without regard to the Administrative Expense Cap) by the Issuer and no other amounts are scheduled to be due and payable by the Issuer; and

(c)     the Co-Issuers have delivered to the Trustee Officers' certificates and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with;

*provided* that, in the case of clause (a)(ii) above, the Issuer has delivered to the Trustee an Opinion of Counsel of Independent U.S. tax counsel of nationally recognized standing in the United States experienced in such matters to the effect that the Holders of Secured Notes would recognize no income gain or loss for U.S. federal income tax purposes as a result of such deposit and satisfaction and discharge of this Indenture; *provided further* that, upon the final distribution of all proceeds of any liquidation of the Collateral Obligations, the Equity Securities and the Eligible Investments effected pursuant to Article 5, the requirements of clauses (a) and (b) above shall be deemed satisfied for the purposes of discharging this Indenture.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee, the Portfolio Manager and, if applicable, the Holders, as the case may be, under Sections 2.8 (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved), 4.2 (Application of Trust Money), 5.4(d) (Remedies), 5.9 (Unconditional Rights of Holders to Receive Principal and Interest), 5.18 (Action on the Notes), 6.6 (Money Held in Trust), 6.7(c) (Trustee Compensation and Reimbursement), 7.1 (Payment of Principal and Interest), 7.3 (Money for Note Payments to be Held in Trust), 13.1 (Subordination; Non-Petition), 14.13 (Confidential Information) and 14.14 (Liability of Co-Issuers) hereof shall survive.

Section 4.2.   Application of Trust Money.   All Monies deposited with the Trustee pursuant to Section 4.1 (Satisfaction and Discharge of Indenture) shall be held in trust and applied by it in accordance with the provisions of the Notes and this Indenture, including, without limitation, the Priority of Payments, to the payment of principal and interest (or other amounts with respect to the Subordinated Notes), either directly or through any Paying Agent, as the Trustee may determine; and such Money shall be held in a segregated account identified as being held in trust for the benefit of the Secured Parties.

Section 4.3.   Repayment of Monies Held by Paying Agent.   In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all Monies then held by any Paying Agent other than the Trustee under the provisions of this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.3 (Money for Note Payments to be Held in Trust) hereof and in accordance with the Priority of Payments and thereupon such Paying Agent shall be released from all further liability with respect to such Monies.

ARTICLE 5

REMEDIES

Section 5.1.   <u>Events of Default</u>.  "<u>Event of Default</u>," wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)      a default in the payment, when due and payable, of (i) any interest on any Class A Note or Class B Note or, if there are no Class A Notes or Class B Notes Outstanding, any Class C Note or, if there are no Senior Notes or Class C Notes Outstanding, any Class D Note or, if there are no Co-Issued Notes Outstanding, any Class E Note, and the continuation of any such default for five Business Days or (ii) any principal, interest, or Deferred Interest on, or any Redemption Price in respect of, any Secured Note at its Stated Maturity or any Redemption Date; *provided* that, in each case, if such failure resulted solely from an administrative error or omission by the Trustee, the continuation of any such default for an additional five Business Days;

(b)      unless legally required or permitted to withhold such amounts, the failure by the Issuer on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments (other than as provided in clause (a) above), which failure is incapable of remedy or, if capable of remedy, is not remedied within 30 days after notice of such failure has been given to the Issuer by the Trustee or to the Issuer, the Trustee and the Portfolio Manager by a Majority of the Controlling Class (or, if such failure can only be remedied on a Payment Date, is not remedied by the later of the 30 day period specified above and the next Payment Date);

(c)      either of the Co-Issuers or the Assets becomes an investment company required to be registered under the Investment Company Act;

(d)      except as otherwise provided in this <u>Section 5.1</u> (Events of Default), a default, in a material respect, in the performance, or breach, in a material respect, of any other material covenant or other agreement of the Issuer or the Co-Issuer in this Indenture (it being understood, without limiting the generality of the foregoing, that any failure to meet any Concentration Limitation, Collateral Quality Test, Interest Reinvestment Test, or Coverage Test is not an Event of Default), or the failure of any material representation or warranty of the Issuer or the Co-Issuer made in this Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith to be correct in all material respects when the same shall have been made, and the continuation of such default, breach or failure for a period of 30 days after notice to the Applicable Issuers and the Portfolio Manager by registered or certified mail or overnight courier, by the Trustee, or to the Applicable Issuers, the Portfolio Manager and the Trustee by a Majority of the Controlling Class, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder; *provided* that, if the Issuer or the Co-Issuer, as applicable (as notified to the Trustee by the Portfolio Manager in writing) has commenced curing such default, breach or failure during the 30 day period specified above, such default, breach or failure shall not constitute an Event of Default under this clause (d) unless it continues for a period of 45 days (rather than, and

not in addition to, such 30 day period specified above) after notice to the Applicable Issuers and the Portfolio Manager by registered or certified mail or overnight courier;

(e)     the entry of a decree or order by a court having competent jurisdiction adjudging the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Issuer or the Co-Issuer under the Bankruptcy Law or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, respectively, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days;

(f)     the institution by the shareholders or members, as applicable, of the Issuer or the Co-Issuer of Proceedings to have the Issuer or Co-Issuer, as the case may be, adjudicated as bankrupt or insolvent, or the consent by the shareholders or members, as applicable, of the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency Proceedings against the Issuer or Co-Issuer, or the filing by the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Law or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, respectively, or the making by the Issuer or the Co-Issuer of an assignment for the benefit of creditors, or the taking of any action by the Issuer or the Co-Issuer in furtherance of any such action; or

(g)     on any Measurement Date prior to payment in full of the Class A Notes, failure of the percentage equivalent of a fraction, (i) the numerator of which is equal to (1) the Collateral Principal Amount *plus* (2) the aggregate Market Value of all Defaulted Obligations on such date and (ii) the denominator of which is equal to the Aggregate Outstanding Amount of the Class A Notes, to equal or exceed 102.5%.

Upon obtaining knowledge of the occurrence of an Event of Default (in the case of the Trustee, subject to <u>Section 6.1(d)</u> (Certain Duties and Responsibilities of the Trustee) hereof), each of (i) the Co-Issuers, (ii) the Trustee and (iii) the Portfolio Manager shall notify each other of such Event of Default.  Upon the occurrence of an Event of Default actually known to a Bank Officer of the Trustee, the Trustee shall promptly notify each Hedge Counterparty, the Holders (as their names appear on the Register), each Paying Agent, DTC, the Rating Agency and the Irish Stock Exchange (for so long as any Class of Notes is listed on the Global Exchange Market of the Irish Stock Exchange and so long as the guidelines of such exchange so require) of such Event of Default in writing (unless such Event of Default has been waived as provided in <u>Section 5.14</u> (Waiver of Past Defaults)).

Section 5.2.     <u>Acceleration of Maturity; Rescission and Annulment</u>.  (a) If an Event of Default occurs and is continuing (other than an Event of Default specified in <u>Section 5.1(e)</u> or <u>(f)</u> (Events of Default)), the Trustee may, and shall, upon the written direction of a Majority of the Controlling Class, by notice to the Co-Issuers and the Rating Agency, declare the principal of all the Secured Notes to be immediately due and payable, and upon any such declaration such

principal, together with all accrued and unpaid interest thereon, and other amounts payable hereunder, shall become immediately due and payable.  If an Event of Default specified in Section 5.1(e) or (f) (Events of Default) occurs, all unpaid principal, together with all accrued and unpaid interest thereon, of all the Secured Notes, and other amounts payable hereunder, shall automatically become due and payable without any declaration or other act on the part of the Trustee or any Holder.

(b)  At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the Money due has been obtained by the Trustee as hereinafter provided in this Article 5, the Holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Controlling Class by written notice to the Issuer and the Trustee, may rescind and annul such declaration and its consequences if:

(i)  The Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A)  all unpaid installments of interest and principal then due on the Secured Notes (other than as a result of such acceleration);

(B)  to the extent that the payment of such interest is lawful, interest upon any Deferred Interest at the applicable Note Interest Rates; and

(C)  all unpaid taxes and Administrative Expenses of the Co-Issuers and other sums paid or advanced by the Trustee hereunder and any other amounts then payable by the Co-Issuers hereunder prior to such Administrative Expenses; and

(ii)  The Trustee has determined (based upon the information available to it) that all Events of Default, other than the nonpayment of the interest on or principal of the Secured Notes that have become due solely by such acceleration, have (A) been cured, and a Majority of the Controlling Class by written notice to the Trustee has agreed with such determination (which agreement shall not be unreasonably withheld) or (B) been waived as provided in Section 5.14 (Waiver of Past Defaults).

No such rescission shall affect any subsequent Default or impair any right consequent thereon.

Section 5.3.  Collection of Indebtedness and Suits for Enforcement by Trustee.  The Applicable Issuers covenant that if a Default shall occur in respect of the payment of any principal of or interest when due and payable on any Secured Notes, the Applicable Issuers will, upon demand of the Trustee, pay to the Trustee, for the benefit of the Holder of such Secured Note, the whole amount, if any, then due and payable on such Secured Note for principal and interest with interest upon the overdue principal and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest, at the applicable Note Interest Rate, and, in addition thereto, such further amount as shall be sufficient to cover the costs and

expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel.

If the Issuer or the Co-Issuer fails to pay such amounts forthwith upon such demand, the Trustee, in its own name and as agent for the Secured Parties, may, and shall upon written direction of a Majority of the Controlling Class, institute a Proceeding for the collection of the sums so due and unpaid, prosecute such Proceeding to judgment or final decree, and enforce the same against the Applicable Issuers or any other obligor upon the Secured Notes and collect the Monies adjudged or decreed to be payable in the manner provided by law out of the Assets.

If an Event of Default occurs and is continuing, the Trustee may in its discretion, and shall upon written direction of a Majority of the Controlling Class (and, if the action of the Applicable Issuers pursuant to such written direction would have a material adverse effect on any Hedge Counterparty as determined by the Applicable Issuers, with the consent of such Hedge Counterparty), proceed to protect and enforce its rights and the rights of Holders of the Secured Notes by such appropriate Proceedings as the Trustee shall deem most effectual (if no such direction is received by the Trustee) or as the Trustee may be directed by a Majority of the Controlling Class, to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.

In case there shall be pending Proceedings relative to the Issuer or the Co-Issuer or any other obligor upon the Secured Notes under the Bankruptcy Law or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Secured Notes, or the creditors or property of the Issuer, the Co-Issuer or such other obligor, the Trustee, regardless of whether the principal of any Secured Notes shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of this Section 5.3 (Collection of Indebtedness and Suits for Enforcement by Trustee), shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(a)     to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Secured Notes upon direction by a Majority of the Controlling Class, and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee, except as a result of negligence or willful misconduct) and of the Holders of the Secured Notes allowed in any Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Secured Notes or to the creditors or property of the Issuer, the Co-Issuer or such other obligor;

(b)     unless prohibited by applicable law and regulations, to vote on behalf of the Holders of the Secured Notes, upon the direction of a Majority of the Controlling Class, in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or person performing similar functions in comparable Proceedings; and

(c)     to collect and receive any Monies or other property payable to or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Holders and of the Trustee on their behalf; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Holders of the Secured Notes to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Holders of the Secured Notes, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or willful misconduct.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Holder of the Secured Notes, any plan of reorganization, arrangement, adjustment or composition affecting the Secured Notes or any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder of the Secured Notes in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person.

In any Proceedings brought by the Trustee on behalf of the Holders of the Secured Notes (and any such Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party), the Trustee shall be held to represent all the Holders of the Secured Notes.

Notwithstanding anything in this Section 5.3 (Collection of Indebtedness and Suits for Enforcement by Trustee) to the contrary, neither the Trustee nor any Holder may sell or liquidate the Assets or institute Proceedings in furtherance thereof pursuant to this Section 5.3 (Collection of Indebtedness and Suits for Enforcement by Trustee) except according to the provisions specified in Section 5.5(a) (Optional Preservation of Assets).

Section 5.4.   Remedies.   (a) If an Event of Default shall have occurred and be continuing, and the Secured Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, the Co-Issuers agree that the Trustee may, and shall, upon written direction of a Majority of the Controlling Class, to the extent permitted by applicable law, exercise one or more of the following rights, privileges and remedies:

(i)     institute Proceedings for the collection of all amounts then payable on the Secured Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Assets any Monies adjudged due;

(ii)      sell or cause the sale of all or a portion of the Assets or rights or interests therein, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17 (Sale of Assets) hereof;

(iii)     institute Proceedings from time to time for the complete or partial foreclosure of this Indenture for the benefit of all Secured Parties with respect to the Assets;

(iv)     exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Trustee and the Holders of the Secured Notes hereunder; and

(v)      exercise any other rights and remedies that may be available at law or in equity;

*provided* that, the Trustee may not sell or liquidate the Assets or institute Proceedings in furtherance thereof pursuant to this Section 5.4 (Remedies) except according to the provisions specified in Section 5.5(a) (Optional Preservation of Assets).

The Trustee may, but need not, obtain (at the expense of the Co-Issuers) and rely upon an opinion of an Independent investment banking firm of national reputation with demonstrated capabilities in structuring and distributing securities similar to the Secured Notes, which may be the Initial Purchaser, as to the feasibility of any action proposed to be taken in accordance with this Section 5.4 (Remedies) and as to the sufficiency of the proceeds and other amounts receivable with respect to the Assets to make the required payments of principal of and interest on the Secured Notes, which opinion shall be conclusive evidence as to such feasibility or sufficiency.

(b)      If an Event of Default as described in Section 5.1(d) (Events of Default) hereof shall have occurred and be continuing the Trustee may, and at the direction of the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class shall, institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under such Section, and enforce any equitable decree or order arising from such Proceeding.

(c)      Upon any sale, whether made under the power of sale hereby given or by virtue of judicial Proceedings, any Holder of Secured Notes may bid for and purchase the Assets or any part thereof and, upon compliance with the terms of sale, may hold, retain, possess or dispose of such property in its or their own absolute right without accountability; and any purchaser at any such sale may, in paying the purchase Money, deliver to the Trustee for cancellation any of the Class A Notes in lieu of Cash equal to the amount which shall, upon distribution of the net proceeds of such sale, be payable on the Class A Notes so delivered by such Holder (taking into account the Priority of Payments and Article 13).  Said Notes, in case the amounts payable thereon shall be less

than the amount due thereon, shall be returned to the Holders thereof after proper notation has been made thereon to show partial payment.

Upon any sale, whether made under the power of sale hereby given or by virtue of judicial Proceedings, the receipt of the Trustee, or of the Officer making a sale under judicial Proceedings, shall be a sufficient discharge to the purchaser or purchasers at any sale for its or their purchase Money, and such purchaser or purchasers shall not be obliged to see to the application thereof.

Any such sale, whether under any power of sale hereby given or by virtue of judicial Proceedings, shall bind the Co-Issuers, the Trustee and the Holders of the Secured Notes, shall operate to divest all right, title and interest whatsoever, either at law or in equity, of each of them in and to the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against any and all Persons claiming through or under them.

(d)     (i)     Notwithstanding any other provision of this Indenture, none of the Trustee, any beneficial owner or Holder of Notes, any other Secured Party or any third-party beneficiary may, prior to the date which is one year (or if longer, any applicable preference period) *plus* one day after the payment in full of all Notes, institute against, or join any other Person in instituting against, the Issuer, the Co-Issuer or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or State bankruptcy or similar laws.  Nothing in this <u>Section 5.4</u> (Remedies) shall preclude, or be deemed to stop, the Trustee (i) from taking any action prior to the expiration of the aforementioned period in (A) any case or Proceeding voluntarily filed or commenced by the Issuer, the Co-Issuer or any ETB Subsidiary or (B) any involuntary insolvency Proceeding filed or commenced by a Person other than the Trustee or (ii) from commencing against the Issuer, the Co-Issuer or any ETB Subsidiary or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceeding.

(ii)     So long as any Notes remain Outstanding and for a year (or, if longer, the applicable preference period then in effect) *plus* one day thereafter, the Issuer, the Co-Issuer or any ETB Subsidiary, as applicable, shall, subject to the availability of funds under the Priority of Payments, timely file an answer and any other appropriate pleading objecting to (i) the institution of any proceeding to have the Issuer, the Co-Issuer or such ETB Subsidiary, as the case may be, adjudicated as bankrupt or insolvent or (ii) the filing of any petition seeking relief, reorganization, arrangement, adjustment or composition of or in respect of the Issuer, the Co-Issuer or such ETB Subsidiary, as the case may be, under the Bankruptcy Law or any other applicable law.  The reasonable fees, costs, charges and expenses incurred by the Issuer (including reasonable attorneys' fees and expenses) in connection with taking any such action shall be paid as Administrative Expenses.  Any person who acquires a beneficial interest in the Securities shall be deemed to have accepted and agreed to the restrictions in clauses (d)(i) and (d)(ii) of this <u>Section 5.4</u> (Remedies).

(iii)     In the event one or more Holders or beneficial owners of Notes (collectively, the "Filing Holder") cause the filing of a petition in bankruptcy against the Issuer in violation of the prohibition described above, each such Filing Holder will be deemed to acknowledge and agree that any claim that it and/or any of its Affiliates have against the Issuer or with respect to any Assets (including any proceeds thereof) shall, notwithstanding anything to the contrary in the Priority of Payments, be jointly fully subordinate in right of payment to the claims of each Holder and beneficial owner of any Note that is not a Filing Holder or an Affiliate thereof, with such subordination being effective until each Note held by each such non-Filing Holder is paid in full in accordance with the Priority of Payments (after giving effect to such subordination).  The terms described in the immediately preceding sentence are referred to herein as the "Bankruptcy Subordination Agreement."  The Bankruptcy Subordination Agreement will constitute a "subordination agreement" within the meaning of Section 510(a) of the U.S. Bankruptcy Code (Title 11 of the United States Code, as amended from time to time (or any successor statute)).

(iv)     The parties hereto agree that the restrictions described in clauses (i) through (iii) of this Section 5.4(d) (Remedies) are a material inducement for each Holder and beneficial owner of the Securities to acquire such Securities and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into this Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of this Indenture.  Any Holder or beneficial owner of a Security, any ETB Subsidiary or either of the Co-Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, U.S. federal or state bankruptcy law or similar laws.

Section 5.5.     Optional Preservation of Assets.     (a) Notwithstanding anything to the contrary herein, if an Event of Default shall have occurred and be continuing, the Trustee shall retain the Assets securing the Secured Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Assets and the Notes in accordance with the Priority of Payments and the provisions of Article 10 and Article 12 unless:

(i)     the Trustee, in consultation with the Portfolio Manager (so long as no "cause" (as defined in the Portfolio Management Agreement) for the termination of the Portfolio Manager has occurred under the Portfolio Management Agreement) determines that the anticipated proceeds of a sale or liquidation of the Assets (after deducting the reasonable expenses of such sale or liquidation) would be sufficient to discharge in full the amounts then due (or, in the case of interest, accrued) and unpaid on the Secured Notes for principal and interest (including Deferred Interest), and all amounts payable prior to payment of principal on such Secured Notes (including amounts payable to any Hedge Counterparty upon liquidation of the Assets and all Administrative Expenses) and a Majority of the Controlling Class agrees with such determination;

(ii)     if an Event of Default described in Section 5.1(a), (d) or (g) has occurred and is continuing, a Majority of the Controlling Class (without consent of any other Class of Notes including, for the avoidance of doubt, any such consent as may otherwise be required pursuant to clause (iii) below) direct, subject to the provisions of this Indenture and in compliance with applicable law, such sale and liquidation; *provided* that, this clause (ii) shall not apply in the case of an Event of Default described in Section 5.1(a) that arises solely from an acceleration of the Secured Notes due to an Event of Default in Section 5.1(b), (c), (e) or (f);

(iii)     if an Event of Default described in Section 5.1(b), (c), (e) or (f) has occurred and is continuing, the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of each Class of Secured Notes (voting separately by Class) direct, subject to the provisions of this Indenture and in compliance with applicable law, such sale and liquidation of the Assets; or

(iv)     if an Event of Default described in Section 5.1(a), (b), (c), (d), (e) or (f) has occurred and is continuing and all of the Secured Notes have been repaid in full, the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes direct, subject to the provisions of this Indenture and in compliance with applicable law, such sale and liquidation.

The Trustee shall give written notice of the retention of the Assets to the Issuer with a copy to the Co-Issuer and the Portfolio Manager.  So long as such Event of Default is continuing, any such retention pursuant to this Section 5.5(a) (Optional Preservation of Assets) may be rescinded at any time when the conditions specified in clause (i), (ii), (iii), (iv) or (v) exist.

(b)     Nothing contained in Section 5.5(a) (Optional Preservation of Assets) shall be construed to require the Trustee to sell the Assets securing the Secured Notes if the conditions set forth in any of clauses (i) through (iv) of Section 5.5(a) (Optional Preservation of Assets) are not satisfied.  Nothing contained in Section 5.5(a) (Optional Preservation of Assets) shall be construed to require the Trustee to preserve the Assets securing the Notes if prohibited by applicable law.

(c)     In determining whether the condition specified in Section 5.5(a)(i) (Optional Preservation of Assets) exists, the Trustee shall obtain bid prices with respect to each security contained in the Assets from two nationally recognized dealers (as specified by the Portfolio Manager in writing) at the time making a market in such securities and shall compute the anticipated proceeds of sale or liquidation on the basis of the lower of such bid prices for each such security.  For the purposes of making the determinations required pursuant to Section 5.5(a)(i) (Optional Preservation of Assets), the Trustee shall apply the standards set forth in Section 6.3(c)(i) or (ii) (Certain Rights of the Trustee).  In addition, for the purposes of determining issues relating to the execution of a sale or liquidation of the Assets and the execution of a sale or other liquidation thereof in connection with a determination whether the condition specified in Section 5.5(a)(i) (Optional Preservation of Assets) exists, the Trustee may retain (at the Co-

Issuers' expense) and rely on an opinion of an Independent investment banking firm of national reputation.

The Trustee shall deliver to the Holders, the Issuer and the Portfolio Manager a report stating the results of any determination required pursuant to Section 5.5(a)(i) (Optional Preservation of Assets) no later than 10 days after such determination is made. The Trustee shall make the determinations required by Section 5.5(a)(i) (Optional Preservation of Assets) at the request of a Majority of the Controlling Class at any time after the occurrence of an Event of Default during which the Trustee retains the Assets pursuant to Section 5.5(a)(i) (Optional Preservation of Assets); *provided* that any such request made more frequently than once in any 90 day period shall be at the expense of such requesting party or parties.

Section 5.6.    Trustee May Enforce Claims Without Possession of Notes.  All rights of action and claims under this Indenture or under any of the Secured Notes may be prosecuted and enforced by the Trustee without the possession of any of the Secured Notes or the production thereof in any trial or other Proceeding relating thereto, and any such action or Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in Section 5.7 (Application of Money Collected) hereof.

Section 5.7.    Application of Money Collected.  Any Money collected by the Trustee with respect to the Notes pursuant to this Article 5 and any Money that may then be held or thereafter received by the Trustee with respect to the Notes hereunder shall be applied in accordance with the provisions of Section 11.1 (Disbursements of Monies from Payment Account), at the date or dates fixed by the Trustee.

Section 5.8.    Limitation on Suits.  No Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)    such Holder has previously given to the Trustee written notice of an Event of Default;

(b)    the Holders of not less than 25% of the then Aggregate Outstanding Amount of the Notes of the Controlling Class shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder and such Holder or Holders have offered to the Trustee indemnity reasonably satisfactory to it against the costs, expenses and liabilities to be incurred in compliance with such request;

(c)    the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(d)    no direction inconsistent with such written request has been given to the Trustee during such 30 day period by a Majority of the Controlling Class; it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes of the same Class or to

obtain or to seek to obtain priority or preference over any other Holders of the Notes of the same Class or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class subject to and in accordance with the Priority of Payments.

In the event the Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee shall act at the direction of the group of Holders representing a greater percentage of the Controlling Class.  If both groups represent the same percentage, the Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture.  Notwithstanding anything to the contrary contained herein, Holders and beneficial owners of Notes may enforce the obligations of other Holders and beneficial owners described in Section 13.1(d) (Subordination; Non-Petition).

Section 5.9.    Unconditional Rights of Holders to Receive Principal and Interest. Subject to Section 2.8(i) (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved), but notwithstanding any other provision in this Indenture, the Holders of any Secured Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Secured Note as such principal and interest become due and payable in accordance with the Priority of Payments and Section 13.1 (Subordination; Non-Petition), and, subject to the provisions of Section 5.8 (Limitation on Suits), to institute proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.  Holders of Secured Notes ranking junior to Notes still Outstanding shall have no right to institute proceedings for the enforcement of any such payment until such time as no Secured Note ranking senior to such Secured Note remains Outstanding, which right shall be subject to the provisions of Section 5.8 (Limitation on Suits), and shall not be impaired without the consent of any such Holder.

Section 5.10.    Restoration of Rights and Remedies.  If the Trustee or any Holder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or such Holder, then and in every such case the Co-Issuers, the Trustee or Holder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Secured Parties shall continue as though no such Proceeding had been instituted.

Section 5.11.    Rights and Remedies Cumulative.  No right or remedy herein conferred upon or reserved to the Trustee or any Secured Party is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.12.    Delay or Omission Not Waiver.  No delay or omission of the Trustee or any Holder of Secured Notes to exercise any right or remedy accruing upon any Event of Default

shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein or of a subsequent Event of Default.  Every right and remedy given by this Article 5 or by law to the Trustee or to the Holders of Secured Notes may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders of the Secured Notes, as the case may be.

Section 5.13.  Control by Majority of Controlling Class.  Notwithstanding any other provision of this Indenture, a Majority of the Controlling Class shall have the right following the occurrence, and during the continuance of, an Event of Default to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee; *provided* that:

(a)  such direction shall not conflict with any rule of law or with any express provision of this Indenture;

(b)  the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; *provided* that, subject to Section 6.1 (Certain Duties and Responsibilities of the Trustee), the Trustee need not take any action that it determines might involve it in liability (unless the Trustee has received the indemnity as set forth in (c) below);

(c)  the Trustee shall have been provided with indemnity reasonably satisfactory to it; and

(d)  notwithstanding the foregoing, any direction to the Trustee to undertake a Sale of the Assets shall be by the Holders of Notes secured thereby representing the requisite percentage of the Aggregate Outstanding Amount of Notes specified in Section 5.4 (Remedies) and/or 5.5 (Optional Preservation of Assets).

Section 5.14.  Waiver of Past Defaults.  Prior to the time a judgment or decree for payment of the Money due has been obtained by the Trustee, as provided in this Article 5, the Holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Controlling Class may on behalf of the Holders of all the Notes waive any past Default and its consequences, except a Default:

(a)  in the payment of the principal of any Secured Note (which may be waived with the consent of each Holder of such Secured Note);

(b)  in the payment of interest on the Notes of the Controlling Class (which may be waived with the consent of the Holders of 100% of the Controlling Class);

(c)  in respect of a covenant or provision hereof that under Section 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities) cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note adversely affected thereby (which may be waived with the consent of each such Holder); or

(d)    in respect of a representation contained in <u>Section 7.19</u> (Representations and Warranties Relating to Security Interests in the Assets) (which may be waived by the Holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Controlling Class if the S&P Rating Condition is satisfied).

In the case of any such waiver, the Co-Issuers, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto. The Trustee shall promptly give written notice of any such waiver to S&P, the Portfolio Manager and each Holder.

Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

Section 5.15.   <u>Undertaking for Costs</u>.   All parties to this Indenture agree, and each Holder of any Note by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as the Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this <u>Section 5.15</u> (Undertaking for Costs) shall not apply to any suit instituted by the Trustee, to any suit instituted by any Holder, or group of Holders, holding in the aggregate more than 10% in Aggregate Outstanding Amount of the Controlling Class, or to any suit instituted by any Holder for the enforcement of the payment of the principal of or interest on any Note on or after the applicable Stated Maturity (or, in the case of redemption, on or after the applicable Redemption Date). Such waiver shall not affect the rights of any Hedge Counterparty, which rights shall be governed by its respective Hedge Agreements.

Section 5.16.   <u>Waiver of Stay or Extension Laws</u>.   The Co-Issuers covenant (to the extent that they may lawfully do so) that they will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any valuation, appraisement, redemption or marshalling law or rights, in each case wherever enacted, now or at any time hereafter in force, which may affect the covenants, the performance of or any remedies under this Indenture; and the Co-Issuers (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law or rights, and covenant that they will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted or rights created.

Section 5.17.   <u>Sale of Assets</u>.   (a) The power to effect any sale (a "<u>Sale</u>") of any portion of the Assets pursuant to <u>Sections 5.4</u> (Remedies) and <u>5.5</u> (Optional Preservation of Assets) shall not be exhausted by any one or more Sales as to any portion of such Assets remaining unsold, but shall continue unimpaired until the entire Assets shall have been sold or all amounts secured

by the Assets shall have been paid.  The Trustee may upon notice to the Holders and the Portfolio Manager, and shall, upon direction of a Majority of the Controlling Class, from time to time postpone any Sale by public announcement made at the time and place of such Sale.  The Trustee hereby expressly waives its rights to any amount fixed by law as compensation for any Sale; *provided* that the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it in connection with such Sale from the proceeds thereof notwithstanding the provisions of Section 6.7 (Trustee Compensation and Reimbursement) hereof.

(b)     The Trustee and the Portfolio Manager (and/or any of its Affiliates) may bid for and acquire any portion of the Assets in connection with a public Sale thereof, and the Trustee may pay all or part of the purchase price by crediting against amounts owing on the Secured Notes or other amounts secured by the Assets, all or part of the net proceeds of such Sale after deducting the reasonable costs, charges and expenses incurred by the Trustee in connection with such Sale notwithstanding the provisions of Section 6.7 (Trustee Compensation and Reimbursement) hereof.  The Holder(s) of Subordinated Notes may bid for and acquire any portion of the Assets in connection with a public or private Sale thereof.  The Secured Notes need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Notes.  The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)     If any portion of the Assets consists of securities issued without registration under the Securities Act ("Unregistered Securities"), the Trustee may seek an Opinion of Counsel.

(d)     The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Assets in connection with a Sale thereof.  In addition, the Trustee is hereby irrevocably appointed the agent and attorney in fact of the Issuer to transfer and convey its interest in any portion of the Assets in connection with a Sale thereof, and to take all action necessary to effect such Sale.  No purchaser or transferee at such a sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent or see to the application of any Monies.

Section 5.18.   Action on the Notes.  The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Trustee or the Holders shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Assets or upon any of the assets of the Issuer or the Co-Issuer.

ARTICLE 6

THE TRUSTEE

Section 6.1.   Certain Duties and Responsibilities of the Trustee.  (a) Except during the continuance of an Event of Default:

(i)       the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)      in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; *provided* that, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not, on their face, they substantially conform to the requirements of this Indenture and shall promptly in the case of an Officer's certificate furnished by the Portfolio Manager, notify the Portfolio Manager if such certificate or opinion does not conform.

(b)      In case an Event of Default known to the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from a Majority of the Controlling Class, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c)      No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)       this subsection shall not be construed to limit the effect of subsection (a) of this Section 6.1 (Certain Duties and Responsibilities of the Trustee);

(ii)      the Trustee shall not be liable for any error of judgment made in good faith by a Bank Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)     the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer or the Co-Issuer or the Portfolio Manager in accordance with this Indenture and/or a Majority (or such other percentage as may be required by the terms hereof) of the Controlling Class (or other Class if required or permitted by the terms hereof) relating to the time, method and place of conducting any Proceeding

for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

(iv)     no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers contemplated hereunder, if it shall have reasonable grounds for believing that repayment of such funds or indemnity reasonably satisfactory to it against such risk or liability is not reasonably assured to it unless such risk or liability relates to incidental costs in connection with the performance of its ordinary services, under this Indenture; and

(v)     in no event shall the Trustee be liable for special, punitive, indirect or consequential loss or damage (including lost profits) even if the Trustee has been advised of the likelihood of such damages and regardless of such action.

(d)     For all purposes under this Indenture, the Trustee shall not be deemed to have notice or knowledge of any Event of Default described in Sections 5.1(c), (d), (e) or (f) (Events of Default) unless a Bank Officer assigned to and working in the Corporate Office has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default or Default is received by a Bank Officer at the Corporate Office, and such notice references the Notes generally, the Issuer, the Co-Issuer, the Assets or this Indenture.  For purposes of determining the Trustee's responsibility and liability hereunder, whenever reference is made in this Indenture to such an Event of Default or a Default, such reference shall be construed to refer only to such an Event of Default or Default of which the Trustee is deemed to have notice as described in this Section 6.1 (Certain Duties and Responsibilities of the Trustee).

(e)     Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct of or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 6.1 (Certain Duties and Responsibilities of the Trustee) and Section 6.3 (Certain Rights of the Trustee).

Section 6.2.     Representations and Warranties of the Bank.  The Bank hereby represents and warrants as follows:

(a)     Organization.  The Bank has been duly organized and is validly existing as a national banking association under the laws of the United States and has the power to conduct its business and affairs as a trustee.

(b)     Authorization; Binding Obligations.  The Bank has the corporate power and authority to perform the duties and obligations of trustee under this Indenture.  The Bank has taken all necessary corporate action to authorize the execution, delivery and performance of this Indenture, and all of the documents required to be executed by the Bank pursuant hereto.  Upon execution and delivery by the Bank, this Indenture will constitute the legal, valid and binding obligation of the Bank enforceable in accordance

with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the rights and remedies of creditors generally.

(c)     Eligibility.   The Bank is eligible under Section 6.8 (Corporate Trustee Required; Eligibility) hereof to serve as Trustee hereunder.

(d)     No Conflict.   Neither the execution, delivery and performance of this Indenture, nor the consummation of the transactions contemplated by this Indenture, (i) is prohibited by, or requires the Bank to obtain any consent, authorization, approval or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon the Bank or any of its properties or assets or (ii) will violate any provision of, result in any default or acceleration of any obligations under, result in the creation or imposition of any lien pursuant to, or require any consent under, any material agreement to which the Bank is a party.

Section 6.3.   Certain Rights of the Trustee.  Except as otherwise provided in Section 6.1 (Certain Duties and Responsibilities of the Trustee):

(a)     the Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report (including, without limitation, an Accountants Report), notice, request, direction, consent, order, note or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)     any request or direction of the Issuer or the Co-Issuer mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order, as the case may be;

(c)     whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, request and rely upon an Officer's certificate or (ii) be required to determine the value of any Assets or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants, investment bankers or other persons qualified to provide the information required to make such determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d)     as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e)     the Trustee shall be under no obligation to exercise or to honor any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders pursuant to this Indenture, unless such Holders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and

liabilities which might reasonably be incurred by it in compliance with such request or direction;

(f)      the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report (including any Accountants' Report), notice, request, direction, consent, order, note or other paper or document, but the Trustee, in its discretion, may, and upon the written direction of a Majority of the Controlling Class shall, make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and the Trustee shall be entitled, on reasonable prior notice to the Co-Issuers and the Portfolio Manager, to examine the books and records relating to the Notes and the Assets, personally or by agent or attorney, during the Co-Issuers' or the Portfolio Manager's normal business hours; *provided* that the Trustee shall, and shall cause its agents to, hold in confidence all such information, except (i) to the extent disclosure may be required by law or by any regulatory or administrative authority and (ii) to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(g)      the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, nominees, custodians or attorneys; *provided* that the Trustee shall not be responsible for any misconduct or negligence on the part of any non-Affiliated agent or non-Affiliated attorney appointed with due care by it hereunder;

(h)      the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably believes to be authorized or within its rights or powers hereunder;

(i)      nothing herein shall be construed to impose an obligation on the part of the Trustee to recalculate, evaluate or verify any report, certificate or information received from the Issuer or Portfolio Manager (unless and except to the extent otherwise expressly set forth herein);

(j)      to the extent any defined term hereunder, or any calculation required to be made or determined by the Trustee hereunder, is dependent upon or defined by reference to generally accepted accounting principles (as in effect in the United States) ("GAAP"), the Trustee shall be entitled to request and receive (and rely upon) instruction from the Issuer or the accountants identified in the Accountants' Report (and in the absence of its receipt of timely instruction therefrom, shall be entitled to obtain from an Independent accountant at the expense of the Issuer) as to the application of GAAP in such connection, in any instance;

(k)      to the extent permitted by applicable law, the Trustee shall not be required to give any bond or surety in respect of the execution of this Indenture or otherwise;

(l)      the Trustee shall not be deemed to have notice or knowledge of any matter unless a Bank Officer has actual knowledge thereof or unless written notice thereof is

received by a Bank Officer at the Corporate Office and such notice references the Notes generally, the Issuer or this Indenture.  Whenever reference is made in this Indenture to a Default or an Event of Default such reference shall, insofar as determining any liability on the part of the Trustee is concerned, be construed to refer only to a Default or an Event of Default of which the Trustee is deemed to have knowledge in accordance with this paragraph;

(m)    the permissive right of the Trustee to take or refrain from taking any actions enumerated in this Indenture shall not be construed as a duty;

(n)    the Trustee shall not be responsible for delays or failures in performance resulting from acts or circumstances beyond its control (such circumstances include but are not limited to acts of God, strikes, lockouts, riots, acts of war, loss or malfunctions of utilities, computer (hardware or software) or communications services);

(o)    the Trustee shall have no liability for the acts or omissions of the Portfolio Manager, the Collateral Administrator, the Issuer or the Co-Issuer, any Paying Agent (other than the Trustee) or any Authenticating Agent (other than the Trustee) appointed under or pursuant to this Indenture;

(p)    the Trustee or its Affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's economic self-interest for (i) serving as investment adviser, administrator, shareholder, servicing agent, custodian or sub-custodian with respect to certain of the Eligible Investments, (ii) using Affiliates to effect transactions in certain Eligible Investments and (iii) effecting transactions in certain Eligible Investments;

(q)    the Trustee is not responsible or liable for the preparation, filing, continuation or correctness of financing statements or the validity or perfection of any lien or security interest;

(r)    in making or disposing of any investment permitted by this Indenture, the Trustee is authorized to deal with itself (in its individual capacity) or with any one or more of its Affiliates, whether it or such Affiliate is acting as a subagent of the Trustee or for any third person or dealing as principal for its own account.  If otherwise qualified, obligations of the Bank or any of its Affiliates shall qualify as Eligible Investments hereunder;

(s)    in order to comply with laws, rules, regulations and executive orders in effect from time to time applicable to banking institutions, including those relating to the funding of terrorist activities and money laundering, the Trustee is required to obtain, verify and record certain information relating to individuals and entities which maintain a business relationship with the Trustee.  Accordingly, each of the parties agrees to provide to the Trustee upon its request from time to time such party's complete name, address, tax identification number and such other identifying information together with copies of such party's constituting documentation, securities disclosure documentation and such other identifying documentation as may be available for such party; and

(t)     to the extent that the Bank is acting as Registrar, Calculation Agent, Paying Agent, Collateral Administrator, Authenticating Agent, Securities Intermediary, or Custodian, the rights, privileges and indemnities set forth in this Article 6 shall also apply to the Bank acting in each such capacity and shall be in addition to any other right, privilege and indemnities the Bank may have in such capacity.

Section 6.4.    <u>Trustee Not Responsible for Recitals or Issuance of Notes</u>.  The recitals contained herein and in the Debt, other than the Certificate of Authentication thereon, shall be taken as the statements of the Applicable Issuers; and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations hereunder), the Assets or the Notes.  The Trustee shall not be accountable for the use or application by the Co-Issuers of the Notes or the proceeds thereof or any Money paid to the Co-Issuers pursuant to the provisions hereof.

Section 6.5.    <u>Trustee May Hold Notes</u>.  The Trustee, any Paying Agent, Registrar or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Co-Issuers or any of their Affiliates with the same rights it would have if it were not Trustee, Paying Agent, Registrar or such other agent.

Section 6.6.    <u>Money Held in Trust by the Trustee</u>.  Money held by the Trustee hereunder shall be held in trust to the extent required herein.  The Trustee shall be under no liability for interest on any Money received or invested by it hereunder.

Section 6.7.    <u>Trustee Compensation and Reimbursement</u>.  (a) The Issuer agrees:

(i)     to pay the Trustee on each Payment Date reasonable compensation for all services rendered by it hereunder as set forth in the fee letter dated February 13, 2015 (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(ii)     to reimburse the Trustee in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including, without limitation, securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to any term of this Indenture, except any such expense, disbursement or advance as may be attributable to its negligence or willful misconduct) but with respect to securities transaction charges, only to the extent any such charges have not been waived during a Collection Period due to the Trustee's receipt of a payment from a financial institution with respect to certain Eligible Investments, as specified by the Portfolio Manager; and

(iii)     to indemnify the Trustee and its Officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense incurred without negligence or willful misconduct on their part, arising out of or

in connection with the acceptance or administration of this trust, including the costs and expenses of defending themselves (including reasonable attorney's fees and costs) against any claim or liability in connection with the exercise or performance of any of their powers or duties hereunder and under any other transaction document.

(b)     The Trustee shall receive amounts pursuant to this <u>Section 6.7</u> (Trustee Compensation and Reimbursement) as provided in <u>Sections 11.1(a)(i)</u>, <u>(ii)</u> and <u>(iii)</u> (Disbursements of Monies from Payment Account) but only to the extent that funds are available for the payment thereof.  Subject to <u>Section 6.9</u> (Resignation and Removal of the Trustee; Appointment of Successor), the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee shall not have received amounts due it hereunder.  No direction by the Holders or the Controlling Class shall affect the right of the Trustee to collect amounts owed to it under this Indenture.  If on any date when a fee shall be payable to the Trustee pursuant to this Indenture insufficient funds are available for the payment thereof, any portion of a fee not so paid shall be deferred and payable on such later date on which a fee shall be payable and sufficient funds are available therefor.

(c)     The Trustee hereby agrees not to cause the filing of a petition in bankruptcy for the non-payment to the Trustee of any amounts provided by this <u>Section 6.7</u> (Trustee Compensation and Reimbursement) until at least one year, or if longer the applicable preference period then in effect, *plus* one day after the payment in full of all Notes issued under this Indenture.

(d)     When the Trustee incurs expenses after the occurrence of a Default or an Event of Default under <u>Sections 5.1(e)</u> or <u>(f)</u> (Events of Default) the expenses are intended to constitute expenses of administration under the Bankruptcy Code or any other applicable federal or state bankruptcy, insolvency or similar law; *provided* that, without limiting the Trustee's rights under the Bankruptcy Code or any other applicable federal or state bankruptcy, insolvency or similar law, such expenses shall be subject to and payable only to the extent allowed under the Priority of Payments.

Section 6.8.     <u>Corporate Trustee Required; Eligibility</u>.  There shall at all times be a Trustee hereunder which shall be an Independent organization or entity organized and doing business under the laws of the United States of America or of any state thereof, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $200,000,000, subject to supervision or examination by federal or state authority, having a rating of at least "Baa1" by Moody's and at least "BBB+" by S&P and having an office within the United States.  If such organization or entity publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this <u>Section 6.8</u> (Corporate Trustee Required; Eligibility), the combined capital and surplus of such organization or entity shall be deemed to be its combined capital and surplus as set forth in its most recent published report of condition.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this <u>Section 6.8</u> (Corporate Trustee Required; Eligibility), it shall resign immediately in the manner and with the effect hereinafter specified in this <u>Article 6</u>.

Section 6.9.    <u>Resignation and Removal of the Trustee; Appointment of Successor Trustee</u>.  (a) No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this <u>Article 6</u> shall become effective until the acceptance of appointment by the successor Trustee under <u>Section 6.10</u> (Acceptance of Appointment by Successor Trustee).

(b)    The Trustee may resign at any time by giving not less than 30 days written notice thereof to the Co-Issuers, the Portfolio Manager, the Holders of the Notes and the Rating Agency.  Upon receiving such notice of resignation, the Co-Issuers shall promptly appoint a successor trustee or trustees satisfying the requirements of <u>Section 6.8</u> (Corporate Trustee Required; Eligibility) by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the Trustee so resigning and one copy to the successor Trustee or Trustees, together with a copy to each Holder and the Portfolio Manager; *provided* that such successor Trustee shall be appointed only upon the written consent of a Majority of the Controlling Class and the Portfolio Manager (such consent, in the case of the Portfolio Manager, not to be unreasonably withheld).  If no successor Trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee or any Holder, on behalf of himself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee satisfying the requirements of <u>Section 6.8</u> (Corporate Trustee Required; Eligibility).

(c)    The Trustee may be removed at any time by written consent of the Portfolio Manager and Act of a Majority of the Controlling Class or, at any time when an Event of Default shall have occurred and be continuing by an Act of a Majority of the Controlling Class, delivered to the Trustee and to the Co-Issuers.

(d)    If at any time:

(i)    the Trustee shall cease to be eligible under <u>Section 6.8</u> (Corporate Trustee Required; Eligibility) and shall fail to resign after written request therefor by the Co-Issuers or a Majority of the Controlling Class; or

(ii)    the Trustee shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation;

then, in any such case (subject to <u>Section 6.9(a)</u> (Resignation and Removal of the Trustee; Appointment of Successor)), (A) the Co-Issuers, by Issuer Order, may remove the Trustee or (B) subject to <u>Section 5.15</u> (Undertaking for Costs), any Holder may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)     If the Trustee shall be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any reason (other than resignation), the Co-Issuers, by Issuer Order, shall promptly appoint a successor Trustee.  If the Co-Issuers shall fail to appoint a successor Trustee within 30 days after such removal or incapability or the occurrence of such vacancy, a successor Trustee may be appointed by a Majority of the Controlling Class by written instrument delivered to the Issuer and the retiring Trustee.  The successor Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Trustee and supersede any successor Trustee proposed by the Co-Issuers.  If no successor Trustee shall have been so appointed by the Co-Issuers or a Majority of the Controlling Class and shall have accepted appointment in the manner hereinafter provided, subject to Section 5.15 (Undertaking for Costs), the Trustee or any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)     The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first class mail, postage prepaid, to the Portfolio Manager, to the Rating Agency and to the Holders of the Notes as their names and addresses appear in the Register.  Each notice shall include the name of the successor Trustee and the address of its Corporate Office.  If the Co-Issuers fail to mail such notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Co-Issuers.

Section 6.10.  Acceptance of Appointment by Successor Trustee.  Every successor Trustee appointed hereunder shall meet the requirements of Section 6.8 (Corporate Trustee Required; Eligibility) and shall execute, acknowledge and deliver to the Co-Issuers and the retiring Trustee an instrument accepting such appointment.  Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Co-Issuers or a Majority of any Class of Secured Notes or the successor Trustee, such retiring Trustee shall, upon payment of its charges then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and Money held by such retiring Trustee hereunder.  Upon request of any such successor Trustee, the Co-Issuers shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

Section 6.11.  Merger, Conversion, Consolidation or Succession to Business of the Trustee.  Any organization or entity into which the Trustee may be merged or converted or with which it may be consolidated, or any organization or entity resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any organization or entity succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, provided such organization or entity shall be otherwise qualified and eligible under this Article 6, without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case any of the Notes has been authenticated, but not delivered, by the Trustee then in office, any successor by merger,

conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

Section 6.12.  Co-Trustees.  At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Assets may at the time be located, the Co-Issuers and the Trustee shall have power to appoint one or more Persons to act as co-trustee (subject to the written approval of the Rating Agency), jointly with the Trustee, of all or any part of the Assets, with the power to file proofs of claims and take such other actions pursuant to Section 5.6 (Trustee May Enforce Claims Without Possession of Notes) herein and to make such claims and enforce such rights of action on behalf of the Holders, as such Holders themselves may have the right to do, subject to the other provisions of this Section 6.12 (Co-Trustees).

The Co-Issuers shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-trustee.  If the Co-Issuers do not join in such appointment within 15 days after the receipt by them of a request to do so, the Trustee shall have the power to make such appointment.

Should any written instrument from the Co-Issuers be required by any co-trustee so appointed, more fully confirming to such co-trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Co-Issuers.  The Co-Issuers agree to pay (but only from and to the extent of the Assets), to the extent funds are available therefor under Section 11.1(a)(i)(B) (Disbursements of Monies from Payment Account), for any reasonable fees and expenses in connection with such appointment.

Every co-trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms:

(a)     the Notes shall be authenticated and delivered and all rights, powers, duties and obligations hereunder in respect of the custody of securities, Cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely by the Trustee;

(b)     the rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and such co-trustee jointly as shall be provided in the instrument appointing such co-trustee;

(c)     the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this Section 6.12 (Co-Trustees), and in case an Event of Default has occurred and is continuing, the Trustee shall have the power to accept the resignation of, or remove, any such co-trustee without the concurrence of the Co-Issuers.  A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.12 (Co-Trustees);

(d)      no co-trustee hereunder shall be personally liable by reason of any act or omission of the Trustee hereunder;

(e)      the Trustee shall not be liable by reason of any act or omission of a co-trustee; and

(f)      any Act of Holders delivered to the Trustee shall be deemed to have been delivered to each co-trustee.

Section 6.13.  <u>Withholding by the Trustee</u>.  If any withholding tax is imposed on the Issuer's payment (or allocations of income) under the Notes to any Holder, such tax shall reduce the amount otherwise distributable to such Holder.  The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to any Holder sufficient funds for the payment of any tax that is legally owed by the Issuer (but such authorization shall not prevent the Trustee from contesting any such tax in appropriate proceedings and withholding payment of such tax, if permitted by law, pending the outcome of such proceedings) or may be withheld because of a failure by a Holder to provide any information required under FATCA or take any other actions that the Issuer, the Portfolio Manager, the Trustee or their respective agents deem necessary to comply with FATCA and to timely remit such amounts to the appropriate taxing authority.  The amount of any withholding tax imposed with respect to any Holder shall be treated as cash distributed to such Holder at the time it is withheld by the Trustee and remitted to the appropriate taxing authority.  If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold such amounts in accordance with this <u>Section 6.13</u> (Withholding).  If any Holder wishes to apply for a refund of any such withholding tax, the Trustee shall reasonably cooperate with such Holder in making such claim so long as such Holder agrees to reimburse the Trustee for any out-of-pocket expenses incurred.  Nothing herein shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuer or in respect of the Notes.

Section 6.14.  <u>Authenticating Agents</u>.  Upon the request of the Co-Issuers, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Subordinated Notes in connection with issuance, transfers and exchanges under <u>Sections 2.4</u> (Additional Notes), <u>2.5</u> (Execution, Authentication, Delivery and Dating), <u>2.6</u> (Registration, Registration of Transfer and Exchange), <u>2.7</u> (Mutilated, Defaced, Destroyed, Lost or Stolen Note) and <u>8.5</u> (Reference in Notes to Supplemental Indentures), as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by such Sections to authenticate such Notes.  For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this <u>Section 6.14</u> (Authenticating Agents) shall be deemed to be the authentication of Notes by the Trustee.

Any corporation into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any corporation succeeding to the corporate trust business of any Authenticating Agent, shall be the

successor of such Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Authenticating Agent or such successor corporation.

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer.  The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Co-Issuers.  Upon receiving such notice of resignation or upon such a termination, the Trustee shall promptly appoint a successor Authenticating Agent and shall give written notice of such appointment to the Co-Issuers.

The Co-Issuers (or the Trustee if the Trustee shall have appointed the Authenticating Agent) agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating thereto, and the Trustee if it shall have paid such amounts shall be entitled to be reimbursed for such payments.  The provisions of <u>Sections 2.9</u> (Persons Deemed Owners), <u>6.4</u> (Not Responsible for Recitals or Issuance of Notes) and <u>6.5</u> (Trustee May Hold Notes) shall be applicable to any Authenticating Agent.

Section 6.15.   <u>Notice of Default by the Trustee</u>.  Promptly (and in no event later than five Business Days) after the occurrence of any Default actually known to a Bank Officer of the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to <u>Section 5.2</u> (Acceleration of Maturity; Rescission and Annulment), the Trustee shall provide to the Portfolio Manager, the Rating Agency, and all Holders, as their names and addresses appear on the Register, and the Irish Stock Exchange, for so long as any Class of Notes is listed on the Irish Stock Exchange and so long as the guidelines of such exchange so require, notice of all Defaults hereunder known to the Trustee, unless such Default shall have been cured or waived.

Section 6.16.   <u>Certain Duties of the Trustee Related to Delayed Payment of Proceeds</u>.  In the event that in any month the Trustee shall not have received a payment with respect to any Pledged Obligation on its Due Date, (a) the Trustee shall promptly notify the Issuer and the Portfolio Manager in writing or electronically and (b) unless within three Business Days (or the end of the applicable grace period for such payment, if longer) after such notice such payment shall have been received by the Trustee, or the Issuer, in its absolute discretion (but only to the extent permitted by <u>Section 10.2(a)</u> (Collection Account)), shall have made provision for such payment satisfactory to the Trustee in accordance with <u>Section 10.2(a)</u> (Collection Account), the Trustee shall request the issuer of such Pledged Obligation, the Trustee under the related Underlying Instrument or paying agent designated by either of them, as the case may be, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request.  In the event that such payment is not made within such time period, the Trustee, subject to the provisions of clause (iv) of <u>Section 6.1(c)</u> (Certain Duties and Responsibilities of the Trustee), shall take such action as the Portfolio Manager shall direct in writing.  Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture.  In the event that the Issuer or the Portfolio Manager requests a release of a Pledged Obligation and/or delivers an additional Collateral Obligation in connection with any such action under the Portfolio Management Agreement, such release and/or

substitution shall be subject to <u>Section 10.6</u> (Reinvestment of Funds in Accounts; Reports by Trustee) and <u>Article 12</u> of this Indenture, as the case may be.

Section 6.17.   <u>Trustee Representative for the Holders of the Secured Notes Only; Agent for each Hedge Counterparty and the Holders of the Subordinated Notes</u>.  With respect to the security interest created hereunder, the delivery of any item of Pledged Obligation to the Trustee is to the Trustee as representative of the Holders of the Secured Notes and agent for each Hedge Counterparty and the Holders of the Subordinated Notes, in furtherance of the foregoing, the possession by the Trustee of any item of Pledged Obligation, the endorsement to or registration in the name of the Trustee of any item of Pledged Obligation (including, without limitation, as entitlement holder of the Custodial Account) are all undertaken by the Trustee in its capacity as representative of the Holders of the Secured Notes and agent for each Hedge Counterparty and the Holders of the Subordinated Notes.

ARTICLE 7

<u>COVENANTS</u>

Section 7.1.   <u>Payment of Principal and Interest</u>.  The Applicable Issuers will duly and punctually pay the principal of and interest on the Secured Notes, in accordance with the terms of such Notes and this Indenture pursuant to the Priority of Payments.  The Issuer will, to the extent legally permitted and to the extent funds are available pursuant to the Priority of Payments, duly and punctually pay all required distributions on the Subordinated Notes, in accordance with the Subordinated Notes and this Indenture.

The Issuer shall, subject to the Priority of Payments, reimburse the Co-Issuer for any amounts paid by the Co-Issuer pursuant to the terms of the Notes or this Indenture.  The Co-Issuer shall not reimburse the Issuer for any amounts paid by the Issuer pursuant to the terms of the Notes or this Indenture.

Amounts properly withheld under the Code or other applicable law by any Person from a payment to any Holder shall be considered as having been paid by the Applicable Issuers to such Holder for all purposes of this Indenture.

Section 7.2.   <u>Maintenance of Office or Agency</u>.  The Co-Issuers hereby appoint the Trustee as a Paying Agent for payments on the Notes.  Notes may be surrendered for registration of transfer or exchange at the Corporate Office of the Trustee or its agent designated for purposes of surrender, transfer or exchange.  As of the Closing Date, the Trustee designates the Corporate Office for such purpose, as the place where Notes may be surrendered for transfer and exchange. The Co-Issuers hereby appoint Corporation Service Company, as agent upon whom process or demands may be served in any action arising out of or based on this Indenture or the transactions contemplated hereby.

The Co-Issuers may at any time and from time to time vary or terminate the appointment of any such agent or appoint any additional agents for any or all of such purposes; *provided* that the Co-Issuers will maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands to or upon the Co-Issuers in respect of such

Notes and this Indenture may be served and, subject to any laws or regulations applicable thereto, an office or agency outside of the United States where Notes may be presented and surrendered for payment; and *provided further* that no paying agent shall be appointed in a jurisdiction which subjects payments on the Notes to withholding tax solely by reason of the location of the paying agent in such jurisdiction.  The Co-Issuers hereby appoint, for so long as any Class of Notes is listed on the Irish Stock Exchange, Maples and Calder (the "Irish Listing Agent") as listing agent in Ireland with respect to the Notes.  In the event that the Irish Listing Agent is replaced at any time during such period, notice of the appointment of any replacement will be published via the Irish Stock Exchange as promptly as practicable after such appointment.  The Co-Issuers shall at all times maintain a duplicate copy of the Register at the Corporate Office of the Trustee.  The Co-Issuers shall give prompt written notice to the Trustee, the Rating Agency and the Holders of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

If at any time the Co-Issuers shall fail to maintain any such required office or agency in the Borough of Manhattan, The City of New York, or outside the United States, or shall fail to furnish the Trustee with the address thereof, presentations and surrenders may be made (subject to the limitations described in the preceding paragraph) at and notices and demands may be served on the Co-Issuers, and Notes may be presented and surrendered for payment to the appropriate Paying Agent at its main office, and the Co-Issuers hereby appoint the same as their agent to receive such respective presentations, surrenders, notices and demands.

Section 7.3.    Money for Note Payments to be Held in Trust.  All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Applicable Issuers by the Trustee or a Paying Agent with respect to payments on the Notes.

When the Applicable Issuers shall have a Paying Agent that is not also the Registrar, they shall furnish, or cause the Registrar to furnish, no later than the fifth calendar day after each Record Date a list, if necessary, in such form as such Paying Agent may reasonably request, of the names and addresses of the Holders and of the certificate numbers of individual Notes held by each such Holder.

Whenever the Applicable Issuers shall have a Paying Agent other than the Trustee, they shall, on or before the Business Day next preceding each Payment Date or Redemption Date, as the case may be, direct the Trustee to deposit on such Payment Date with such Paying Agent, if necessary, an aggregate sum sufficient to pay the amounts then becoming due (to the extent funds are then available for such purpose in the Payment Account), such sum to be held in trust for the benefit of the Persons entitled thereto and (unless such Paying Agent is the Trustee) the Co-Issuers shall promptly notify the Trustee of its action or failure so to act. Any Monies deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Notes with respect to which such deposit was made shall be paid over by such Paying Agent to the Trustee for application in accordance with Article 10.

The initial Paying Agent shall be as set forth in Section 7.2 (Maintenance of Office or Agency).  Any additional or successor Paying Agents shall be appointed by Issuer

Order with written notice thereof to the Trustee; *provided* that, so long as the Notes of any Class is rated by a Rating Agency, with respect to any additional or successor Paying Agent, either (i) such Paying Agent an Independent organization or entity organized and doing business under the laws of the United States of America or of any state thereof, having a combined capital and surplus of at least $200,000,000, subject to supervision or examination by federal or state authority, having a rating of at least "Baa1" by Moody's and at least "BBB+" by S&P and having an office within the United States or (ii) the S&P Rating Condition is satisfied.  In the event that such successor Paying Agent ceases to have the required ratings specified above, the Co-Issuers shall promptly remove such Paying Agent and appoint a successor Paying Agent. The Co-Issuers shall not appoint any Paying Agent that is not, at the time of such appointment, a depository institution or trust company subject to supervision and examination by federal and/or state and/or national banking authorities.  The Co-Issuers shall cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee (and if the Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this <u>Section 7.3</u> (Money for Note Payments to be Held in Trust), that such Paying Agent will:

(a)     allocate all sums received for payment to the Holders of Notes for which it acts as Paying Agent on each Payment Date and any Redemption Date among such Holders in the proportion specified in the applicable report to the extent permitted by applicable law;

(b)     hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(c)     immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards set forth above required to be met by a Paying Agent at the time of its appointment;

(d)     immediately give the Trustee notice of any default by the Issuer or the Co-Issuer (or any other obligor upon the Notes) in the making of any payment required to be made; and

(e)     during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

The Co-Issuers may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-Issuers or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Co-Issuers or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such Money.

Except as otherwise required by applicable law, any Money deposited with the Trustee or any Paying Agent in trust for any payment on any Note and remaining unclaimed for two years after such amount has become due and payable shall be paid to the Applicable Issuers on Issuer Order; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Applicable Issuers for payment of such amounts and all liability of the Trustee or such Paying Agent with respect to such trust Money (but only to the extent of the amounts so paid to the Applicable Issuers) shall thereupon cease.  The Trustee or such Paying Agent, before being required to make any such release of payment, may, but shall not be required to, adopt and employ, at the expense of the Applicable Issuers any reasonable means of notification of such release of payment, including, but not limited to, mailing notice of such release to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in Monies due and payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each such Holder.

Section 7.4.   <u>Existence of Co-Issuers</u>.  (a) The Issuer and the Co-Issuer shall, to the maximum extent permitted by applicable law, maintain in full force and effect their existence and rights as companies incorporated or organized under the laws of the Cayman Islands and the State of Delaware, respectively, and shall obtain and preserve their qualification to do business as foreign corporations in each jurisdiction in which such qualifications are or shall be necessary to protect the validity and enforceability of this Indenture, the Notes or any of the Assets; *provided* that the Issuer shall be entitled to change its jurisdiction of incorporation from the Cayman Islands to any other jurisdiction reasonably selected by the Issuer so long as (i) the Issuer has received a legal opinion to the effect that such change is not disadvantageous in any material respect to the Holders, (ii) written notice of such change shall have been given by the Issuer to the Trustee (which shall provide notice to the Holders), the Portfolio Manager and the Rating Agency and (iii) on or prior to the 15th Business Day following receipt of such notice the Trustee shall not have received written notice from a Majority of the Controlling Class objecting to such change; and *provided further* that the Issuer shall be entitled to take any action required by this Indenture within the United States notwithstanding any provision of this Indenture requiring the Issuer to take such action outside of the United States so long as prior to taking any such action the Issuer receives a legal opinion from nationally recognized legal counsel to the effect that it is not necessary to take such action outside of the United States or any political subdivision thereof in order to prevent the Issuer from becoming subject to U.S. federal, state or local income taxes on a net income basis or any material other taxes to which the Issuer would not otherwise be subject.

(b)      The Issuer and the Co-Issuer shall (i) ensure that all corporate or other formalities regarding their respective existences (including, if required, holding regular board of directors' and shareholders' or members', or other similar, meetings) are followed, (ii) maintain their books and records separate from any other Person, (iii) maintain their accounts separate from those of any other Person, (iv) not commingle any of their assets with those of another Person, (v) maintain an arm's length relationship with their Affiliates, (vi) each maintain separate financial statements from those of any other Person, (vii) pay their liabilities out of their respective funds, (viii) each hold themselves out as a separate entity and (ix) take affirmative steps to correct any misunderstanding regarding their separate identity.  Neither the Issuer nor the Co-Issuer shall take any action, or conduct its affairs in a manner, that is likely to result in its

separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding.  Without limiting the foregoing, (i) the Issuer shall not have any subsidiaries (other than the Co-Issuer and any subsidiary that (x) meets the then-current general criteria of the Rating Agency for bankruptcy remote entities and (y) is formed for the sole purpose of holding any asset that could cause the Issuer to be engaged or deemed to be engaged in a trade or business in the United States as a result of a workout or prior to (or, to the extent necessary, following) the receipt or acquisition of a Defaulted Obligation in connection with a workout of a Collateral Obligation (an "ETB Subsidiary")); (ii) the Co-Issuer shall not have any subsidiaries; and (iii) except to the extent contemplated in the Administration Agreement or the declaration of trust by MaplesFS Limited, the Issuer and the Co-Issuer shall not (A) have any employees (other than their respective directors), (B) except as contemplated by the Portfolio Management Agreement, the Memorandum and Articles or the Administration Agreement, engage in any transaction with any shareholder that would constitute a conflict of interest or (C) pay dividends other than in accordance with the terms of this Indenture and the Memorandum and Articles.

(c)     The Issuer shall ensure that any ETB Subsidiary (i) is wholly owned by the Issuer, (ii) will not sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of its assets, except in compliance with the Issuer's rights and obligations under this Indenture and with such subsidiary's constituent documents, (iii) will not have any subsidiaries, (iv) will comply with the restrictions set forth in Section 7.8(a)(ix) and (x) (Negative Covenants), (v) will not incur or guarantee any indebtedness except indebtedness with respect to which the Issuer is the sole creditor and will not hold itself out as being liable of the debts of any other Person, (vi) will include in its constituent documents a limitation on its business such that it may only engage in the acquisition of Equity Securities and the disposition of Equity Securities and the proceeds thereof to the Issuer (and activities ancillary thereto), (vii) will have at least one director that is Independent from the Portfolio Manager, (viii) will distribute (including by way of interest payment) 100% of the proceeds of the assets acquired by it (net of applicable taxes and expenses payable by such subsidiary) to the Issuer, (ix) will be treated as a corporation for U.S. federal income tax purposes and (x) will not acquire any real property or any ownership interest in real property.  The Issuer shall provide prior notice to the Rating Agency of the formation of any ETB Subsidiary and of the transfer of any Equity Security to an ETB Subsidiary.

Section 7.5.   Protection of Assets.  (a) The Portfolio Manager on behalf of the Issuer will cause the taking of such action within the Portfolio Manager's control as is reasonably necessary in order to maintain the perfection and priority of the security interest of the Trustee in the Assets.  The Issuer shall from time to time execute and deliver all such supplements and amendments hereto and all such Financing Statements, continuation statements, instruments of further assurance and other instruments, and shall take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Holders of the Secured Notes hereunder and to:

(i)      Grant more effectively all or any portion of the Assets;

(ii)     maintain, preserve and perfect any Grant made or to be made by this Indenture including, without limitation, the first priority nature of the lien or carry out more effectively the purposes hereof;

(iii)    perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulations);

(iv)     enforce any of the Pledged Obligations or other instruments or property included in the Assets;

(v)      preserve and defend title to the Assets and the rights therein of the Trustee and the Holders of the Secured Notes against the claims of all Persons and parties; or

(vi)     pay or cause to be paid any and all taxes levied or assessed upon all or any part of the Assets.

The Issuer hereby designates the Trustee as its agent and attorney in fact to prepare, execute and file any Financing Statement, continuation statement and all other instruments, and take all other actions, required pursuant to this Section 7.5 (Protection of Assets); *provided* that such designation shall not impose upon the Trustee any obligations under this Section 7.5 (Protection of Assets).  The Issuer further authorizes the Trustee to file without the Issuer's signature a Financing Statement that names the Issuer as debtor and the Bank as secured party and that describes "all assets in which the debtor now or hereafter has rights" as the Assets in which the Trustee has a Grant.

(b)      The Trustee shall not, except in accordance with Section 10.6 (Reinvestment of Funds in Accounts; Reports by Trustee) and Section 10.8 (Release of Securities) permit the removal of any portion of the Assets or transfer any such Assets from the Account to which it is credited, or cause or permit any change in the Delivery made pursuant to Section 3.3 (Custodianship; Delivery of Collateral Obligations and Eligible Investments) with respect to any Assets, if, after giving effect thereto, the jurisdiction governing the perfection of the Trustee's security interest in such Assets is different from the jurisdiction governing the perfection at the time of delivery of the most recent Opinion of Counsel pursuant to Section 7.6 (Opinions as to Assets) (or, if no Opinion of Counsel has yet been delivered pursuant to Section 7.6 (Opinions as to Assets), the Opinion of Counsel delivered at the Closing Date pursuant to Section 3.1 (a)(iii)) (Conditions to Issuance of Notes on Closing Date) unless the Trustee shall have received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property and the priority thereof will continue to be maintained after giving effect to such action or actions.

Section 7.6.    Opinions as to Assets.  On or before the 5th anniversary of the Closing Date and every 5th anniversary thereafter, the Issuer shall furnish to the Trustee, the Rating

Agency, an Opinion of Counsel relating to the security interest granted by the Issuer to the Trustee, which opinion may be substantially in the form of Exhibit C attached hereto.

Section 7.7.    Performance of Obligations.  (a) The Co-Issuers, each as to itself, shall not take any action, and will use their best efforts not to permit any action to be taken by others, that would release any Person from any of such Person's covenants or obligations under any instrument included in the Assets, except in the case of enforcement action taken with respect to any Defaulted Obligation in accordance with the provisions hereof and actions by the Portfolio Manager under the Portfolio Management Agreement and in conformity with this Indenture or as otherwise required hereby.

(b)    The Applicable Issuers may, with the prior written consent of a Majority of each Class of Secured Notes (except in the case of the Portfolio Management Agreement and the Collateral Administration Agreement, in which case no consent shall be required), contract with other Persons, including the Portfolio Manager, the Trustee and the Collateral Administrator for the performance of actions and obligations to be performed by the Applicable Issuers hereunder and under the Portfolio Management Agreement by such Persons.  Notwithstanding any such arrangement, the Applicable Issuers shall remain primarily liable with respect thereto.  In the event of such contract, the performance of such actions and obligations by such Persons shall be deemed to be performance of such actions and obligations by the Applicable Issuers; and the Applicable Issuers will punctually perform, and use their best efforts to cause the Portfolio Manager, the Trustee, the Collateral Administrator and such other Person to perform, all of their obligations and agreements contained in the Portfolio Management Agreement, this Indenture, the Collateral Administration Agreement or any such other agreement.

Section 7.8.    Negative Covenants.  (a) The Issuer will not and, with respect to clauses (ii), (iii), (iv), (vi), (vii), (viii), (ix) and (x) the Co-Issuer will not, in each case from and after the Closing Date:

(i)    sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Assets, except as expressly permitted by this Indenture and the Portfolio Management Agreement;

(ii)    claim any credit on, make any deduction from, or dispute the enforceability of payment of the principal or interest payable (or any other amount) in respect of the Notes (other than amounts withheld in accordance with the Code or in order to comply with FATCA or any applicable laws (including all rules, regulations and guidance notes) of the Cayman Islands or other applicable jurisdiction) or assert any claim against any present or future Holder of Notes, by reason of the payment of any taxes levied or assessed upon any part of the Assets;

(iii)    (A) incur or assume or guarantee any indebtedness, other than the Notes and this Indenture and the transactions contemplated hereby (including, without limitation, as a result of a Refinancing) or (B)(1) issue any additional

class of securities (except as provided in <u>Section 2.4</u> (Additional Notes) and <u>Article 8</u> (Supplemental Indentures)) or (2) issue any additional shares, member interests or limited liability company interests, as the case may be;

(iv)    (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be permitted hereby or by the Portfolio Management Agreement, (B) except as permitted by this Indenture, permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Assets or any part thereof, any interest therein or the proceeds thereof or (C) except as permitted by this Indenture, take any action that would permit the lien of this Indenture not to constitute a valid first priority security interest in the Assets;

(v)    amend the Portfolio Management Agreement except pursuant to the terms thereof and <u>Article 15</u>;

(vi)    dissolve or liquidate in whole or in part, except as permitted hereunder or required by applicable law;

(vii)    pay any distributions other than in accordance with the Priority of Payments;

(viii)    permit the formation of any subsidiaries (other than the Co-Issuer and any ETB Subsidiary);

(ix)    conduct business under any name other than its own;

(x)    have any employees (other than directors to the extent they are employees); and

(xi)    sell, transfer, exchange or otherwise dispose of Assets, or enter into an agreement or commitment to do so or enter into or engage in any business with respect to any part of the Assets, except as expressly permitted by this Indenture or the Portfolio Management Agreement.

(b)    The Co-Issuer will not invest any of its assets in "securities" as such term is defined in the Investment Company Act, and will keep all of its assets in Cash.

(c)    Notwithstanding anything to the contrary contained herein, the Issuer shall not, and shall use its best efforts to ensure that the Portfolio Manager acting on the Issuer's behalf does not, acquire any asset, conduct any activity or take any action if the acquisition or ownership of such asset, the conduct of such activity or the taking of such action, as the case may be, would cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax

purposes or otherwise to be subject to U.S. federal income tax on a net basis or income tax on a net income basis in any other jurisdiction.

(d)     The Issuer, Co-Issuer and any ETB Subsidiary shall not be party to any agreements that provide for a future financial obligation on the part of the Issuer (including Hedge Agreements) without including customary "non-petition" and "limited recourse" provisions therein (and shall not amend or eliminate such provisions in any agreement to which it is party) without satisfaction of the S&P Rating Condition, except for (i) any agreements related to the purchase and sale of any Collateral Obligations or Eligible Investments which contain customary (as determined by the Portfolio Manager) purchase or sale terms or which are documented using customary (as determined by the Portfolio Manager) loan trading documentation and (ii) any agreements entered with respect to FATCA.

Section 7.9.   Statement as to Compliance.  (i) On or before April 16 in each calendar year commencing in 2016, (ii) immediately if there has been a Default under this Indenture and (iii) prior to the issuance of any Additional Subordinated Notes pursuant to Section 2.4 (Additional Notes), the Issuer shall deliver to the Trustee (to be forwarded by the Trustee to each Holder making a written request therefor), the Portfolio Manager and the Rating Agency an Officer's certificate of the Issuer that, having made reasonable inquiries of the Portfolio Manager, and to the best of the knowledge, information and belief of the Issuer, there did not exist, as at a date not more than five days prior to the date of the certificate, nor had there existed at any time prior thereto since the date of the last certificate (if any), any Default hereunder or, if such Default did then exist or had existed, specifying the same and the nature and status thereof, including actions undertaken to remedy the same, and that the Issuer has complied with all of its obligations under this Indenture or, if such is not the case, specifying those obligations with which it has not complied.

Section 7.10.   Co-Issuers May Consolidate, etc., Only on Certain Terms.  Neither the Issuer nor the Co-Issuer (the "Merging Entity") shall consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person, unless permitted by Cayman Islands law (in the case of the Issuer) or United States and Delaware law (in the case of the Co-Issuer) and unless:

(a)     the Merging Entity shall be the surviving corporation, or the Person (if other than the Merging Entity) formed by such consolidation or into which the Merging Entity is merged or to which all or substantially all of the assets of the Merging Entity are transferred (the "Successor Entity") (A) if the Merging Entity is the Issuer, shall be a company organized and existing under the laws of the Cayman Islands or any other similar jurisdiction (e.g., having no entity-level tax) and (B) in any case shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee and each Holder, the due and punctual payment of the principal of and interest on all Secured Notes issued by the Merging Entity and the performance and observance of every covenant of this Indenture on its part to be performed or observed, all as provided herein;

(b)     the Rating Agency shall have been notified in writing of such consolidation or merger and the S&P Rating Condition is satisfied with respect to the consummation of such transaction;

(c)     if the Merging Entity is not the surviving corporation, the Successor Entity shall have agreed with the Trustee (i) to observe the same legal requirements for the recognition of such formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Merging Entity with respect to its Affiliates and (ii) not to consolidate or merge with or into any other Person or transfer or convey the Assets or all or substantially all of its assets to any other Person except in accordance with the provisions of this Section 7.10 (Co-Issuers May Consolidate, etc., Only on Certain Terms);

(d)     if the Merging Entity is not the surviving corporation, the Successor Entity shall have delivered to the Trustee and the Rating Agency an Officer's certificate and an Opinion of Counsel each stating that such Person shall be duly organized, validly existing and in good standing in the jurisdiction in which such Person is organized; that such Person has sufficient power and authority to assume the obligations set forth in subsection (a) above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; that such Person has duly authorized the execution, delivery and performance of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is a valid, legal and binding obligation of such Person, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law); if the Merging Entity is the Issuer, that, immediately following the event which causes such Successor Entity to become the successor to the Issuer, (i) such Successor Entity has title, free and clear of any lien, security interest or charge, other than the lien and security interest of this Indenture, to the Assets securing all of the Secured Notes and (ii) the Trustee continues to have a valid perfected first priority security interest in the Assets securing all of the Secured Notes; and in each case as to such other matters as the Trustee or any Holder may reasonably require;

(e)     immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(f)     the Merging Entity shall have notified the Rating Agency of such consolidation, merger, transfer or conveyance and shall have delivered to the Trustee and each Holder an Officer's certificate and an Opinion of Counsel each stating that such consolidation, merger, transfer or conveyance and such supplemental indenture comply with this Article 7 and that all conditions precedent in this Article 7 relating to such transaction have been complied with and that no adverse tax consequences will result therefrom to the Holders of the Notes (as compared to the tax consequences of not effecting the transaction);

(g)      the Merging Entity shall have delivered to the Trustee an Opinion of Counsel stating that after giving effect to such transaction, neither of the Co-Issuers (or, if applicable, the Successor Entity) will be required to register as an investment company under the Investment Company Act;

(h)      after giving effect to such transaction, the outstanding stock (other than the Subordinated Notes) of the Merging Entity (or, if applicable, the Successor Entity) will not be beneficially owned within the meaning of the Investment Company Act by any U.S. person; and

(i)      immediately after giving effect to such transaction, the surviving entity shall not be subject to U.S. federal, state or local income tax on a net income basis.

Section 7.11.  <u>Successor Substituted</u>.  Upon any consolidation or merger, or transfer or conveyance of all or substantially all of the assets of the Issuer or the Co-Issuer, in accordance with <u>Section 7.10</u> (Co-Issuers May Consolidate, etc., Only on Certain Terms) hereof in which the Merging Entity is not the surviving corporation, the Successor Entity shall succeed to, and be substituted for, and may exercise every right and power of, the Merging Entity under this Indenture with the same effect as if such Person had been named as the Issuer or the Co-Issuer, as the case may be, herein.   In the event of any such consolidation, merger, transfer or conveyance, the Person named as the "Issuer" or the "Co-Issuer" in the first paragraph of this Indenture or any successor which shall theretofore have become such in the manner prescribed in this <u>Article 7</u> may be dissolved, wound up and liquidated at any time thereafter, and such Person thereafter shall be released from its liabilities as obligor and maker on all the Notes and from its obligations under this Indenture.

Section 7.12.  <u>No Other Business</u>.  From and after the Closing Date, the Issuer shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture and acquiring, owning, holding, selling, lending, exchanging, redeeming, pledging, contracting for the management of and otherwise dealing with Collateral Obligations and the other Assets in connection therewith (including, without limitation, establishing and maintaining any ETB Subsidiary) and entering into Hedge Agreements, the Collateral Administration Agreement, the Securities Account Control Agreement, the Portfolio Management Agreement, the Administration Agreement and the Registered Office Agreement and other agreements specifically contemplated by this Indenture and shall not engage in any activity that would cause the Issuer to be subject to U.S. federal or state income tax on a net income basis, and the Co-Issuer shall not engage in any business or activity other than issuing and selling the Notes to be issued by it pursuant to this Indenture and, with respect to the Issuer and the Co-Issuer, such other activities which are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith or ancillary thereto.  The Issuer and the Co-Issuer may amend, or permit the amendment of, their Memorandum and Articles and Certificate of Incorporation or By-laws, respectively, only if such amendment would satisfy the S&P Rating Condition; *provided* that, without satisfying the S&P Rating Condition, the Issuer and Co-Issuer shall each change their names at the direction of the Portfolio Manager only if prior notice of such change is provided to each Hedge Counterparty and the Rating Agency. Notwithstanding anything to the contrary in this <u>Section 7.12</u> (No Other Business), the Issuer may take all actions necessary or advisable to comply with FATCA.

Section 7.13.  <u>Maintenance of Listing</u>.  To the extent such listing is not obtained on the Closing Date, the Issuer shall continue to use all reasonable efforts to obtain the listing of the Notes on the Irish Stock Exchange.  Following such listing, so long as any Class of Notes remain Outstanding, the Co-Issuers shall use all reasonable efforts to maintain the listing of such Notes on the Global Exchange Market of the Irish Stock Exchange.

Section 7.14.  <u>Annual Rating Review</u>.  (a) So long as any of the Secured Notes of any Class remain Outstanding, on or before April 16 in each year commencing in 2016, the Applicable Issuers shall obtain and pay for an annual review of the rating of each such Class of Secured Notes from the Rating Agency, as applicable.  The Applicable Issuers shall promptly notify the Trustee and the Portfolio Manager in writing (and the Trustee shall promptly provide the Holders with a copy of such notice) if at any time the rating of any such Class of Secured Notes have been, or is known will be, changed or withdrawn.

(b)     With respect to any Collateral Obligation receiving a credit estimate from Moody's, the Issuer shall obtain and pay for an annual review of each such Collateral Obligation.  With respect to any Collateral Obligation which has a S&P Rating derived as set forth in clause (iii)(b) of the part of the definition of the term "S&P Rating," the Issuer shall obtain and pay for an annual review of each such Collateral Obligation.

Section 7.15.  <u>Reporting</u>.  At any time when the Co-Issuers are not subject to Section 13 or 15(d) of the Exchange Act and are not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder or beneficial owner of a Note, the Co-Issuers shall promptly furnish or cause to be furnished "Rule 144A Information" to such Holder or beneficial owner, to a prospective purchaser of such Note designated by such Holder, or to the Trustee for delivery to such Holder or beneficial owner or a prospective purchaser designated by such Holder or beneficial owner, as the case may be, in order to permit compliance by such Holder or beneficial owner of such Note with Rule 144A under the Securities Act in connection with the resale of such Note by such Holder or beneficial owner of such Note, respectively.  "<u>Rule 144A Information</u>" shall be such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto).

Section 7.16.  <u>Calculation Agent</u>.  (a) The Issuer hereby agrees that for so long as any Secured Notes remain Outstanding there will at all times be an agent appointed (which does not control or is not controlled or under common control with the Issuer or its Affiliates or the Portfolio Manager or its Affiliates) to calculate LIBOR in respect of each Interest Accrual Period in accordance with the terms of Exhibit G hereto (the "<u>Calculation Agent</u>").  The Issuer initially appoints the Collateral Administrator as Calculation Agent.  The Calculation Agent may be removed by the Issuer or the Portfolio Manager, on behalf of the Issuer, at any time.  If the Calculation Agent is unable or unwilling to act as such or is removed by the Issuer or the Portfolio Manager, on behalf of the Issuer, the Issuer or the Portfolio Manager, on behalf of the Issuer, will promptly appoint a replacement Calculation Agent which does not control or is not controlled by or under common control with the Issuer or its Affiliates or the Portfolio Manager or its Affiliates.  For so long as any Class of Notes is listed on the Irish Stock Exchange and the guidelines of such exchange so require, notice of the appointment of any replacement Calculation Agent shall be published via the Irish Stock Exchange as promptly as practicable

after such appointment.  The Calculation Agent may not resign its duties without a successor having been duly appointed.

(b)     The Calculation Agent shall be required to agree that, as soon as possible after 11:00 a.m. London time on each Interest Determination Date, but in no event later than 11:00 a.m. London time on the London Banking Day immediately following each Interest Determination Date, the Calculation Agent will calculate the Note Interest Rate for each Class of Floating Rate Notes for the next Interest Accrual Period and the Note Interest Amount for each Class of Secured Notes (in each case, rounded to the nearest cent, with half a cent being rounded upward) for the next Interest Accrual Period, on the related Payment Date.  At such time the Calculation Agent will communicate such rates and amounts to the Co-Issuers, the Trustee, each Paying Agent Euroclear, Clearstream and the Portfolio Manager.  The Calculation Agent will also specify to the Co-Issuers the quotations upon which the Interest Rate for each Class of Floating Rate Notes are based, and in any event the Calculation Agent shall notify the Co-Issuers before 5:00 p.m. (London time) on every Interest Determination Date that either:  (i) it has determined or is in the process of determining the Note Interest Rate and Note Interest Amount for each Class of Secured Notes or (ii) it has not determined and is not in the process of determining any such Note Interest Rate or Note Interest Amount together with its reasons therefor.  The Calculation Agent's determination of the foregoing rates and amounts for any Interest Accrual Period will (in the absence of manifest error) be final and binding upon all parties.

Section 7.17.   Certain Tax Matters.

(a)     The Issuer shall treat each purchase of Collateral Obligations as a "purchase" for tax accounting and reporting purposes.

(b)     The Co-Issuers shall prepare and file, and the Issuer shall cause each ETB Subsidiary to prepare and file, or in each case shall hire accountants and the accountants shall cause to be prepared and filed (and, where applicable, delivered to the Issuer or Holders) for each taxable year of the Issuer, the Co-Issuer and the ETB Subsidiary, the federal, state and local income tax returns and reports as required under the Code, or any tax returns or information tax returns required by any governmental authority that the Issuer, the Co-Issuer or the ETB Subsidiary are required to file (and, where applicable, deliver), and shall provide to each Holder any information (at such Holder's expense) that such Holder reasonably requests in order for such Holder to (i) comply with its federal, state, or local tax and information returns and reporting obligations, (ii) make and maintain a "qualified electing fund" ("QEF") election (as defined in the Code) with respect to the Issuer, (iii) file a protective statement preserving such Holder's ability to make a retroactive QEF election with respect to the Issuer (such information to be provided at such Holder's expense), or (iv) comply with filing requirements that arise as a result of the Issuer being classified as a "controlled foreign corporation" for U.S. federal income tax purposes or any ETB Subsidiary being classified as either a "controlled foreign corporation" or a "passive foreign investment company", for U.S. federal income tax purposes; *provided* that the Issuer shall not file, or cause to be filed, any income or franchise tax return in the United States or any state of the United States

taking a position that it is engaged in a trade or business within the United States unless it shall have obtained an opinion or written advice from Dechert LLP or an opinion of other nationally recognized U.S. tax counsel experienced in such matters prior to such filing that, under the laws of such jurisdiction, the Issuer or the Co-Issuer (as applicable) is required to file such income or franchise tax return.  The Trustee may provide to the Accountants information necessary to prepare filings under this Section 7.17(b) (Certain Tax Matters).

(c)     If required to prevent the withholding and imposition of United States income tax on payments made to the Issuer, the Issuer shall deliver or cause to be delivered a U.S. Internal Revenue Service Form W-8BEN-E or applicable successor form certifying as to the non-U.S. Tax Person status of the Issuer to each issuer or obligor of or counterparty with respect to an Asset at the time such Asset is purchased or entered into by the Issuer and thereafter prior to the obsolescence or expiration of such form.

(d)     Upon the Trustee's receipt of a written request of a Holder of a Note or written request in the form of Exhibit I of a Person certifying that it is an owner of a beneficial interest in a Note for the information described in U.S. Treasury Regulations Section 1.1275-3(b)(1)(i) that is applicable to such Note, the Issuer shall cause its Independent accountants to provide promptly to the Trustee and such requesting Holder or owner of a beneficial interest in such a Note all of such information.

(e)     Notwithstanding any contrary agreement or understanding, the Portfolio Manager, the Co-Issuers, the Trustee, the Collateral Administrator and the Holders and beneficial owners of the Notes (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Indenture and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such tax treatment and tax structure.  The foregoing provision shall apply from the beginning of discussions between the parties.  For this purpose, the tax treatment of a transaction is the purported or claimed U.S. tax treatment of the transaction under applicable U.S. federal, state or local law, and the tax structure of a transaction is any fact that may be relevant to understanding the purported or claimed U.S. tax treatment of the transaction under applicable U.S. federal, state or local law.

(f)     If the Issuer is aware that it has purchased an interest in a "reportable transaction" within the meaning of Section 6011 of the Code, and a Holder of a Subordinated Note (or any other Note that is required to be treated as equity for U.S. federal income tax purposes) requests in writing information about any such transactions in which the Issuer is an investor, the Issuer shall provide, or cause its Independent accountants to provide, such information it has reasonably available that is required to be obtained by such Holder under the Code as soon as practicable after such request.

(g)     Each holder of the Secured Notes (and any interest therein) will be deemed to have represented and agreed to treat the Secured Notes as indebtedness for U.S. federal, state and local income and franchise tax purposes, provided that this shall

not prevent such holder from making a "protective qualified electing fund" election with respect to any Class E Note.

(h)      Each holder of the Subordinated Notes (and any interest therein) will be deemed to have represented and agreed to treat the Subordinated Notes as equity for U.S. federal, state and local income and franchise tax purposes.

(i)      Each holder of a Note understands that the failure to provide the Issuer and the Trustee (and any of their agents) with the properly completed and signed tax certifications (generally, in the case of U.S. federal income tax, an IRS Form W-9 (or applicable successor form) in the case of a person that is a U.S. Tax Person or the appropriate IRS Form W-8 (or applicable successor form) in the case of a person that is not a U.S. Tax Person) may result in withholding from payments in respect of such Note, including U.S. federal withholding or back-up withholding.

(j)      Each holder of the Notes (and any interest therein) will (i) provide the Issuer, the Portfolio Manager, the Trustee and their respective agents with the Holder FATCA Information and will take any other actions that the Issuer, the Portfolio Manager, the Trustee or their respective agents deem necessary or helpful to achieve FATCA Compliance and (ii) update any such information provided in clause (i) promptly upon learning that any such information previously provided has become obsolete or incorrect or is otherwise required. In the event the holder fails to provide the Holder FATCA Information, take such actions, update such information or otherwise becomes a Non-Permitted Tax Holder, (a) the Issuer or an agent acting on its behalf is authorized to withhold amounts otherwise distributable to the holder and (b) the Issuer or an agent acting on its behalf will have the right to compel the holder to sell its Notes or, if such holder does not sell its Notes within 10 Business Days after notice from the Issuer, to sell such Notes in the same manner as if such holder were a Non-Permitted Holder, and to remit the net proceeds of such sale (taking into account any taxes incurred in connection with such sale) to the holder as payment in full for such Notes.  Each holder of Notes agrees to indemnify the Issuer, the Trustee and other beneficial owners of Notes for all damages, costs and expenses that result from its failure to comply with its obligation to provide the Holder FATCA Information. This indemnification will continue even after the person ceases to have an ownership interest in the Notes. Each such holder agrees, or by acquiring a Note or an interest in a Note will be deemed to agree, that (i) the Issuer, the Portfolio Manager or the Trustee may provide such information and any other information regarding its investment in the Notes to the IRS, the Cayman Islands Tax Information Authority or other relevant governmental authority and (ii) the Trustee or the Registrar may provide certain information to the Issuer, the Portfolio Manager or any agent thereof pursuant to <u>Section 7.17(o)</u> (Certain Tax Matters).

(k)      Each holder of the Notes (and any interest therein) that is not a U.S. Tax Person will make, or by acquiring a Note or an interest in a Note will be deemed to make, a representation to the effect that (i) either (a) it is not a bank (or an entity affiliated with a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of Section 881(c)(3)(A) of the Code), (b) it is a person that is eligible for benefits under an income tax treaty with the United States that

eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States, or (c) it has provided an IRS Form W-8ECI representing that all payments received or to be received by it on the Notes are effectively connected with the conduct of a trade or business in the United States, and (ii) it is not purchasing a Note or an interest in a Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan within the meaning of Treasury Regulation Section 1.881-3.

(l)        Each holder of a Note (and any interest therein) will indemnify the Issuer, the Trustee, their respective agents and each of the holders of the Note from any and all damages, cost and expenses (including any amount of taxes, fees, interest, additions to tax, or penalties) resulting from the failure by such holder to comply with FATCA or its obligations under the Note. The indemnification will continue with respect to any period during which the holder held a Note (and any interest therein), notwithstanding the holder ceasing to be a holder of the Note.

(m)        By its acceptance of a Note, each Holder and each beneficial owner of a Note shall be deemed to acknowledge and agree that upon written request, the Trustee and the Registrar shall provide to the Issuer, the Portfolio Manager or any agent thereof any specified information regarding the Holders of the Notes and payments on the Notes that is reasonably available to the Trustee or the Registrar, as the case may be, and (as determined by the Issuer) may be necessary for compliance with FATCA.

(n)        The Issuer (or an agent acting on its behalf) will take such reasonable actions, including hiring agents or advisors, consistent with law and its obligations under this Indenture, as are necessary to comply with FATCA, including appointing any agent or representative to perform due diligence, withholding or reporting obligations of the Issuer pursuant to FATCA, and any other action that the Issuer would be permitted to take under this Indenture in furtherance of complying with FATCA. The Issuer shall provide any certification or documentation (including the applicable IRS Form W-8 or any successor form) to any payor (as defined in FATCA) from time to time as provided by law to minimize U.S. withholding tax or backup withholding tax.

(o)        Upon reasonable written request and at the expense of the Issuer, the Trustee and the Registrar shall provide to the Issuer, the Portfolio Manager, the Initial Purchaser or any agent thereof any information specified by such parties regarding the Holders of the Notes and payments on the Notes that is reasonably available to the Trustee or the Registrar, as the case may be, by reason of its acting in such capacity and as may be determined by the Issuer or the Portfolio Manager is necessary for compliance with FATCA, subject in all cases to confidentiality provisions.  Neither the Trustee nor the Registrar will have any liability for any disclosure under this Section 7.17(o) (Certain Tax Matters).

(p)        The Issuer has not elected and will not elect to be treated other than as a corporation for U.S. federal, state or local income or franchise tax purposes and shall make any election necessary to avoid classification as a partnership or disregarded entity for U.S. federal, state or local tax purposes.

(q)      The Co-Issuer has not elected and will not elect to be treated as other than a disregarded entity for U.S. federal, state or local tax purposes.

Section 7.18.  <u>Ramp-up Period; Purchase of Additional Collateral Obligations</u>.  (a) The Issuer shall use its commercially reasonable efforts to satisfy the Target Initial Par Condition.

(b)      During the Ramp-up Period, the Issuer shall use the following funds to purchase additional Collateral Obligations in the following order:  (i) to pay for the principal portion of any Collateral Obligation, first, any amounts on deposit in the Ramp-up Account and second, any Principal Proceeds on deposit in the Collection Account and (ii) to pay for accrued interest on any such Collateral Obligation, first, any amounts on deposit in the Ramp-up Account and second, any Principal Proceeds on deposit in the Collection Account.  In addition, the Issuer shall use its commercially reasonable efforts to acquire such Collateral Obligations that will satisfy, as of the end of the Ramp-up Period, the Concentration Limitations, the Collateral Quality Test and each of the Overcollateralization Ratio Tests.

(c)      Within 30 days after the end of the Ramp-up Period: (i) the Issuer shall cause the Collateral Administrator to compile and provide to the Rating Agency an Effective Date Report and, to S&P, the S&P Excel Default Model Input File, (ii) the Issuer shall provide to the Collateral Administrator (upon its execution of an acknowledgement letter satisfactory to such accountants) an Accountants' Report (A) setting forth the issuer, principal balance, coupon/spread, Stated Maturity, Moody's Default Probability Rating, Moody's Rating, S&P Rating and country of Domicile with respect to each Collateral Obligation as of the end of the Ramp-up Period and the information provided by the Issuer with respect to every other asset included in the Assets, by reference to such sources as shall be specified therein, (B) calculating as of the end of the Ramp-up Period (1) the Overcollateralization Ratio Tests, (2) the Concentration Limitations, (3) the Collateral Quality Test (excluding the S&P CDO Monitor Test), (4) the Effective Date Overcollateralization Test and (5) the Target Initial Par Condition; and (C) specifying the procedures undertaken by them to review data and computations relating to the Accountants' Report and (iii) the Issuer shall request that S&P (such request shall be made to CDOEffectiveDatePortfolios@sandp.com) confirm that the S&P Effective Date Rating Condition is satisfied.

(d)      If, after the end of the Ramp-up Period, the Effective Date Conditions have not been met, the Issuer may, in accordance with <u>Section 10.2(f)</u> (Collection Account), instruct the Trustee to (x) prior to the first Determination Date, transfer amounts from the Interest Collection Subaccount to the Principal Collection Subaccount in an amount sufficient to satisfy the Effective Date Conditions (*provided* that the amount of such transfer would not result in the failure to pay interest due on any Senior Notes in accordance with the Priority of Payments) or (y) take such other action, including but not limited to a Special Redemption, sufficient to satisfy the Effective Date Conditions.

(e)      The failure of the Issuer to satisfy the requirements of this <u>Section 7.18</u> (Ramp-up Period; Purchase of Additional Collateral Obligations) will not constitute an Event of Default unless such failure constitutes an Event of Default under <u>Section 5.1(d)</u>

(Events of Default) hereof and the Issuer, or the Portfolio Manager acting on behalf of the Issuer, has acted in bad faith.  Of the proceeds of the issuance of the Notes which are not applied to pay for the purchase of Collateral Obligations purchased by the Issuer on or before the Closing Date the amount specified in Section 3.1(a)(xii) (Conditions to Issuance of Notes on Closing Date) shall be deposited in the Ramp-up Account on the Closing Date.  At the direction of the Issuer (or the Portfolio Manager on behalf of the Issuer), the Trustee shall apply amounts held in the Ramp-up Account to purchase additional Collateral Obligations.  If at the end of the Ramp-up Period, any amounts on deposit in the Ramp-up Account have not been applied to purchase Collateral Obligations, such amounts shall be applied as described in Section 10.3(c) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

(f)     On or prior to the Effective Date, the Portfolio Manager shall (with notice to the Trustee and the Collateral Administrator): (i) determine and select from the S&P Asset Quality Matrix in Section 2 of Schedule 3 a Minimum Floating Spread/Minimum Weighted Average Coupon Pairing that shall be applied, on and after the Effective Date, for purposes of determining compliance with the Minimum Weighted Average Coupon Test and the Minimum Floating Spread Test; and (ii) determine the applicable S&P CDO Monitor that shall apply on and after the Effective Date for purposes of determining compliance with the S&P CDO Monitor Test.  With respect to the S&P CDO Monitor chosen for the Effective Date, the Portfolio Manager may provide S&P (via email to CDOEffectiveDatePortfolios@standardandpoors.com) with up to 10,000 different combinations of (i) recovery rates for each liability rating of Secured Notes and (ii) spread/coupon pairs with which to calculate the applicable S&P CDO Monitor.  Thereafter, from time to time, provided that the Portfolio Manager shall have provided at least two Business Days' written notice to the Trustee, the Collateral Administrator and S&P (via email to CDO_surveillance@standardandpoors.com), the Portfolio Manager may select a different "case combination" of the S&P Asset Quality Matrix, a different Minimum Floating Spread/Minimum Weighted Average Coupon Pairing or a different S&P CDO Monitor to be applied to the Collateral Obligations for such purposes; *provided* that: (A) if any of the component tests of the Collateral Quality Test shall be satisfied at such time, then all of such component tests that were satisfied shall be satisfied after giving effect to such selection and (B) if any of the component tests of the Collateral Quality Test shall not be satisfied at such time, then the level of compliance with each of such component tests shall be maintained or improved after giving effect to such selection.  If the Portfolio Manager does not notify the Trustee and the Collateral Administrator that it will alter the "case combination" of the S&P Asset Quality Matrix, the Minimum Floating Spread/Minimum Weighted Average Coupon Pairing or the S&P CDO Monitor, in each case chosen on the Effective Date in the manner set forth above, the "case combination" of the S&P Asset Quality Matrix, the Minimum Floating Spread/Minimum Weighted Average Coupon Pairing or the S&P CDO Monitor (as the case may be) chosen on the Effective Date shall continue to apply.  Notwithstanding the foregoing, the Portfolio Manager may elect at any time after the Effective Date, in lieu of selecting a "case combination" of the S&P Asset Quality Matrix, to interpolate between two cases, as applicable, on a straight line basis and round the results to two decimal points

Section 7.19.   Representations Relating to Security Interests in the Assets.  (a) The Issuer hereby represents and warrants that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and be deemed to be repeated on each date on which an Asset is Granted to the Trustee hereunder), with respect to the Assets:

(i)      The Issuer owns such Asset free and clear of any lien, claim or encumbrance of any person, other than such as are created under, or permitted by, this Indenture.

(ii)     Other than the security interest Granted to the Trustee pursuant to this Indenture, except as permitted by this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Assets.  The Issuer has not authorized the filing of and is not aware of any Financing Statements against the Issuer that include a description of collateral covering the Assets other than any Financing Statement relating to the security interest granted to the Trustee hereunder or that has been terminated; the Issuer is not aware of any judgment, PBGC liens or tax lien filings against the Issuer.

(iii)    All Assets constitute Cash, accounts (as defined in Section 9-102(a)(2) of the UCC), Instruments, general intangibles (as defined in Section 9-102(a)(42) of the UCC), uncertificated securities (as defined in Section 8-102(a)(18) of the UCC), Certificated Securities or security entitlements to financial assets resulting from the crediting of financial assets to a "securities account" (as defined in Section 8-501(a) of the UCC).

(iv)     All Accounts constitute "securities accounts" under Section 8-501(a) of the UCC.

(v)      This Indenture creates a valid and continuing security interest (as defined in Section 1-201(37) of the UCC) in such Assets in favor of the Trustee, for the benefit and security of the Secured Parties, which security interest is prior to all other liens, claims and encumbrances (except as permitted otherwise in this Indenture), and is enforceable as such against creditors of and purchasers from the Issuer.

(b)      The Issuer hereby represents and warrants that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and be deemed to be repeated on each date on which an Asset is Granted to the Trustee hereunder), with respect to Assets that constitute Instruments:

(i)      Either (x) the Issuer has caused or shall have caused, within ten days of the Closing Date, the filing of all appropriate Financing Statements in the proper office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Instruments granted to the Trustee, for the benefit and security of the Secured Parties, hereunder or (y)(A) all original executed copies of each promissory note or mortgage note that constitutes or evidences the Instruments have been delivered to the Trustee or the Issuer has

received written acknowledgement from a custodian that such custodian is holding the mortgage notes or promissory notes that constitute evidence of the Instruments solely on behalf of the Trustee and for the benefit of the Secured Parties and (B) none of the Instruments that constitute or evidence the Assets has any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Trustee, for the benefit of the Secured Parties.

(ii)     The Issuer has received all consents and approvals required by the terms of the Assets to the pledge hereunder to the Trustee of its interest and rights in the Assets.

(c)     The Issuer hereby represents and warrants that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and be deemed to be repeated on each date on which an Asset is Granted to the Trustee hereunder), with respect to the Assets that constitute Security Entitlements:

(i)     All of such Assets have been and will have been credited to one of the Accounts which are securities accounts within the meaning of Section 8-501(a) of the UCC.  The Custodian for each Account has agreed to treat all assets credited to such Accounts as "financial assets" within the meaning of Section 8-102(a)(9) the UCC.

(ii)     The Issuer has received all consents and approvals required by the terms of the Assets to the pledge hereunder to the Trustee of its interest and rights in the Assets.

(iii)     Either (x) the Issuer has caused or shall have caused, within ten days of the Closing Date, the filing of all appropriate Financing Statements in the proper office in the appropriate jurisdictions under applicable law in order to perfect the security interest granted to the Trustee, for the benefit and security of the Secured Parties, hereunder or (y)(A) the Issuer has delivered to the Trustee a fully executed Securities Account Control Agreement pursuant to which the Custodian has agreed to comply with all instructions originated by the Trustee relating to the Accounts without further consent by the Issuer or (B) the Issuer has taken all steps necessary to cause the Custodian to identify in its records the Trustee as the person having a security entitlement against the Custodian in each of the Accounts.

(iv)     The Accounts are not in the name of any person other than the Issuer or the Trustee.  The Issuer has not consented to the Custodian to comply with the entitlement order of any person other than the Trustee (and the Issuer prior to a notice of exclusive control being provided by the Trustee).

(d)     The Issuer hereby represents and warrants that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and be

deemed to be repeated on each date on which an Asset is Granted to the Trustee hereunder), with respect to Assets that constitute general intangibles:

(i)     The Issuer has caused or shall have caused, within ten days of the Closing Date, the filing of all appropriate Financing Statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Assets granted to the Trustee, for the benefit and security of the Secured Parties, hereunder.

(ii)    The Issuer has received, or shall receive, all consents and approvals required by the terms of the Assets to the pledge hereunder to the Trustee of its interest and rights in the Assets.

(e)     The Co-Issuers agree to notify the Rating Agency promptly if they become aware of the breach of any of the representations and warranties contained in this Section 7.19 (Representations Relating to Security Interests in the Assets).

Section 7.20.   <u>Objection to Bankruptcy Proceeding</u>.   So long as any of the Notes are Outstanding, the Issuer shall promptly object to the institution of any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other similar proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar law against it and take all necessary or advisable steps to cause the dismissal of any such proceeding; *provided* that such obligation shall be subject to the availability of funds therefor.

ARTICLE 8

SUPPLEMENTAL INDENTURES

Section 8.1.   <u>Supplemental Indentures Without Consent of Holders of Offered Securities</u>.   Without the consent of the Holders of any Offered Securities, but with the written consent of the Portfolio Manager, the Co-Issuers, when authorized by Board Resolutions, at any time and from time to time subject to the requirement provided below in this Section 8.1 (Supplemental Indentures Without Consent of Holders of Offered Securities) with respect to the ratings of any Class of Secured Notes, may enter into one or more indentures supplemental hereto for any of the following purposes:

(i)     to evidence the succession of another Person to the Issuer or the Co-Issuer and the assumption by any such successor Person of the covenants of the Issuer or the Co-Issuer herein and in the Notes;

(ii)    to add to the covenants of the Co-Issuers or the Trustee for the benefit of the Secured Parties or to surrender any right or power herein conferred upon the Co-Issuers;

(iii)   to convey, transfer, assign, mortgage or pledge any property to or with the Trustee or to add to the conditions, limitations or restrictions on the authorized amount, authentication and delivery of the Notes;

(iv)     to evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one Trustee, pursuant to the requirements of Sections 6.9 (Resignation and Removal; Appointment of Successor), 6.10 (Acceptance of Appointment by Successor) and 6.12 (Co-Trustees) hereof;

(v)     to correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey and confirm unto the Trustee any property subject or required to be subjected to the lien of this Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulations, whether pursuant to Section 7.5 (Protection of Assets) or otherwise) or to subject to the lien of this Indenture any additional property;

(vi)     to modify the restrictions on and procedures for resales and other transfers of Notes to reflect any changes in applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder;

(vii)     at the direction of the Portfolio Manager, to change the name of the Issuer and the Co-Issuer, so long as prior notice of such change is provided to each Hedge Counterparty and the Rating Agency;

(viii)     to make such changes as shall be necessary or advisable in order for a Class of Notes to be listed on an exchange, including the Irish Stock Exchange;

(ix)     subject to the approval of a Majority of the Controlling Class (if such issuance of Additional Subordinated Notes occurs on or after the Effective Date) and the Portfolio Manager, to make such changes as shall be necessary to permit the Issuer to issue Additional Subordinated Notes, *provided* that any such new classes of notes shall be subordinate in payment of principal and interest to all existing Classes of Secured Notes and *pari passu* in all respects with all existing Subordinated Notes; *provided further* that no amendment to this Indenture that does not relate directly to the issuance of the Additional Subordinated Notes or the terms of such Additional Subordinated Notes may be effected under this clause (ix), but may be effected simultaneously under another clause of this Section 8.1 (Supplemental Indentures Without Consent of Holders of Offered Securities) or under Section 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities), to the extent such other provision is available;

(x)     with the consent of a Majority of the Controlling Class, to conform the provisions of this Indenture to the Offering Circular or to correct any inconsistency or cure any ambiguity, omission or errors in this Indenture;

(xi)     with the consent of a Majority of the Controlling Class, to accommodate, modify or amend existing and/or replacement Hedge Agreements;

(xii)    to (x) take any action advisable to prevent the Co-Issuers, any ETB Subsidiary or the Holders from becoming subject to withholding or other taxes, fees or assessments, including by achieving FATCA Compliance, or to prevent the Co-Issuers from being treated as engaged in a U.S. trade or business or otherwise being subject to U.S. federal, state or local income tax on a net income basis or (y) take any action to allow the Co-Issuers to comply with FATCA (including providing for remedies against, or imposing penalties upon, any Holder who fails to deliver the Holder FATCA Information or is a non-compliant FFI);

(xiii)   with the consent of a Majority of the Controlling Class, to evidence any waiver by the Rating Agency as to any  of its requirements or conditions, as applicable, set forth herein;

(xiv)   with the consent of the Portfolio Manager and a Majority of the Controlling Class, to modify the definitions of "Credit Improved Obligation," "Credit Risk Obligation," "Defaulted Obligation" or "Equity Security" or the restrictions on the sales of Collateral Obligations set forth in Section 12.1 (Sales of Collateral Obligations) in a manner not material and adverse to Holders of any Class of Notes, subject to the notice and objection provisions set forth in the second succeeding paragraph;

(xv)    to make changes necessary to issue replacement securities or undertake loans in connection with a Refinancing; *provided* that no amendment to this Indenture that does not relate directly to the issuance of the replacement securities or loans or the terms of such replacement securities or loans may be effected under this clause (xv), but may be effected simultaneously under another clause of this Section 8.1 (Supplemental Indentures Without Consent of Holders of Offered Securities) or under Section 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities), to the extent such other provision is available.

(xvi)   to modify any provision to facilitate an exchange of one obligation for another obligation of the same Obligor that has substantially identical terms except transfer restrictions, including to effect any serial designation relating to the exchange;

(xvii)  to modify or implement procedures necessary to comply with Rule 17g-5;

(xviii) to make such changes as shall be necessary or advisable in order for the Certificated Class E Notes to be held electronically through DTC or other clearing agencies in a manner similar to, and subject to the same procedures as, the Rule 144A Global Notes;

(xix)   to facilitate the issuance of combination notes with components consisting of existing Classes of Notes;

(xx)    with the consent of a Majority of the Controlling Class, to make any modification or amendment determined by the Issuer or the Portfolio Manager (in consultation with legal counsel of national reputation experienced in such matters) as necessary or advisable (A) for any Class of Secured Notes to not be considered an "ownership interest" as defined for purposes of the Volcker Rule or (B) (1) to enable the Issuer to rely upon the exemption from registration as an investment company provided by Rule 3a-7 under the Investment Company Act or another exemption or exclusion from registration as an investment company under the Investment Company Act (other than Section 3(c)(1) or Section 3(c)(7) thereof) or (2) for the Issuer to not otherwise be considered a "covered fund" as defined for purposes of the Volcker Rule, in each case so long as any such modification or amendment would not have a material adverse effect on any Class of Notes, as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of the counsel delivering the opinion);

(xxi)   with the consent of a Majority of the Controlling Class, to conform to ratings criteria and other guidelines (including any alternative methodology published by the Rating Agency) relating to collateral debt obligations in general published by the Rating Agency; or

(xxii)  with the consent of a Majority of the Controlling Class, to modify any of the requirements of this Indenture with respect to the Issuer's ability to enter into Hedge Agreements.

The Trustee shall join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise, except to the extent required by law.

In the case of any supplemental indenture entered into pursuant to Section 8.1(xiv) (Supplemental Indentures Without Consent of Holders of Offered Securities), if a Majority of the Notes of any other Class provide written notice to the Issuer and the Trustee that such Holders will be materially and adversely affected by any such proposed supplemental indenture (which notice shall (i) set forth the basis on which such Holder or Holders are materially and adversely affected thereby and (ii) provide evidence of such Holder's identity, including a guarantee by a member of a signature guarantee program of its signature with respect to such notice), the Co-Issuers and the Trustee shall not enter into such supplemental indenture (it being understood that any Holder that does not object to such proposed supplemental indenture in writing within 15 Business Days of delivery of such proposed supplemental indenture will be deemed to have consented to such proposed supplemental indenture).   In addition, for so long as any Class of Notes is listed on the Global Exchange Market of the Irish

Stock Exchange and the guidelines of such exchange shall so require, the Issuer shall notify the Irish Stock Exchange of any material modification of this Indenture.

Section 8.2.  Supplemental Indentures With Consent of Holders of Offered Securities. (a) With the consent of (i) a Majority of each Class of Notes (voting separately by Class) materially and adversely affected thereby and (ii) without limiting clause (i) above, a Majority of the Controlling Class (*provided* that if such supplemental indenture would modify the Weighted Average Life Test or extend the Reinvestment Period, the Class A-1 Notes and the Class A-2 Notes shall be treated as separate Classes and shall vote separately), the Trustee and the Co-Issuers may enter into a supplemental indenture to add any provisions to, or change in any manner or eliminate any of the provisions of, this Indenture or modify in any manner the rights of the Holders of the Secured Notes or the Holders of the Subordinated Notes, as applicable; *provided* that, notwithstanding anything in this Indenture to the contrary, no such supplemental indenture shall, without the consent of each Holder of any Class materially and adversely affected thereby:

> (i)      change the Stated Maturity of the principal of any Class of Notes or the due date of any installment of interest on any Secured Note, reduce the principal amount thereof or the rate of interest thereon or the Redemption Price with respect to any Offered Security, or change the earliest date on which Notes of any Class may be redeemed, change the provisions of this Indenture relating to the application of proceeds of any Assets to the payment of principal of or interest on Secured Notes or distributions on the Subordinated Notes or change any place where, or the coin or currency in which, Subordinated Notes or Secured Notes or the principal thereof or interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof (or, in the case of redemption, on or after the applicable Redemption Date); *provided* that, the consent of the Controlling Class shall not be required with respect to a supplemental indenture that reduces the principal amount of, or rate of interest on, a Class of Notes or changes the earliest date on which a Class of Notes may be redeemed (unless such reduction or change is with respect to the Notes of the Controlling Class);

> (ii)      reduce the percentage of the Aggregate Outstanding Amount of Holders of each Class whose consent is required for the authorization of any such supplemental indenture or for any waiver of compliance with certain provisions of this Indenture or certain defaults hereunder or rescission or annulment of the consequences thereof provided for in this Indenture;

> (iii)      impair or adversely affect the Assets;

> (iv)      permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Assets or terminate such lien on any property at any time subject hereto or deprive the Holder of any Secured Note of the security afforded by the lien of this Indenture;

(v)      reduce the percentage of the Aggregate Outstanding Amount of Holders of Secured Notes of each Class whose consent is required to request the Trustee to preserve the Assets or rescind the Trustee's election to preserve the Assets pursuant to Section 5.5 (Optional Preservation of Assets) or to sell or liquidate the Assets pursuant to Section 5.4 (Remedies) or 5.5 (Optional Preservation of Assets);

(vi)     modify any of the provisions of this Article 8 (Supplemental Indentures), except to increase the percentage of Outstanding Secured Notes or Subordinated Notes the consent of the Holders of which is required for any such action or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Secured Note or Subordinated Note Outstanding and affected thereby;

(vii)    modify the definition of the terms "Outstanding," "Controlling Class," "Collateral Obligation," "Eligible Investments," "Participation Interest," or "Majority" or modify the Priority of Payments set forth in Section 11.1(a) (Disbursements of Monies from Payment Account) or the Note Payment Sequence;

(viii)   modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of any payment of the Redemption Price, interest or principal on any Secured Note, or any amount available for distribution to the Subordinated Notes or to affect the rights of the Holders of Secured Notes to the benefit of any provisions for the redemption of such Secured Notes contained herein; *provided* that, the consent of the Controlling Class shall not be required with respect to a supplemental indenture that modifies the Non-Call Period with respect to a Class of Notes (unless such modification is with respect to the Notes of the Controlling Class); or

(ix)     modify any of the provisions of this Indenture with respect to the Weighted Average Life Test or to extend the Reinvestment Period.

(b)      Subject to Section 8.1 (Supplemental Indentures Without Consent of Holders of Offered Securities), with the consent of the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes delivered to the Trustee, the Co-Issuers and the Portfolio Manager, the Trustee and the Co-Issuers may enter into one or more indentures supplemental hereto to accommodate the issuance of Additional Subordinated Notes pursuant to Section 2.4 (Additional Notes).

(c)      Not later than 20 Business Days prior to the execution of any proposed supplemental indenture pursuant to Sections 8.1 (Supplemental Indentures Without Consent of Holders of Offered Securities) and 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities), the Trustee, at the expense of the Co-Issuers, shall deliver to the Holders (and, upon receipt of a written request therefor in the form of Exhibit I certifying that it is a holder of a beneficial interest in a Note, any beneficial owner of a Note) and the Rating Agency (with respect to the Rating Agency, only for so

long as any Outstanding Secured Notes are rated by the Rating Agency), a copy of such supplemental indenture. Unless otherwise notified in writing by a Majority of any Class of Notes that such Class would be materially and adversely affected by a supplemental indenture, the Trustee may conclusively rely upon an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates (including certificates delivered by the Portfolio Manager) and/or documents) as to whether the interests of any Holder of Notes would be materially and adversely affected by any supplemental indenture or other modification or amendment of this Indenture. Except as set forth in the previous sentence, such determination shall be conclusive and binding on all present and future Holders. The Trustee shall not be liable for any such determination made in good faith and in reliance in good faith upon an Opinion of Counsel delivered to the Trustee as described in Section 8.3 (Execution of Supplemental Indentures) hereof. If such a determination cannot be made with respect to a Class or Classes of Notes, such Class or Classes of Notes will be treated as if they would be materially and adversely affected by such change.

(d)     It shall not be necessary for any Act of Holders under this Section 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities) to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act or consent shall approve the substance thereof.

(e)     The Issuer shall not enter into any supplemental indenture which materially adversely affects any rights of any Hedge Counterparty under this Indenture without the prior written consent of such Hedge Counterparty.

(f)     Promptly after the execution by the Co-Issuers and the Trustee of any supplemental indenture pursuant to Sections 8.1 (Supplemental Indentures Without Consent of Holders of Offered Securities) and 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities), the Trustee at the expense of the Co-Issuers, shall deliver to the Holders (and, upon receipt of a written request therefor in the form of Exhibit I certifying that it is a holder of a beneficial interest in a Note, any beneficial owner of a Note), the Portfolio Manager and the Rating Agency a copy thereof. Any failure of the Trustee to deliver a copy of any supplemental indenture as provided herein, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

(g)     Any supplemental indenture that amends or modifies the definitions of Concentration Limitations, Collateral Quality Tests, Collateral Obligations, Eligible Investments, Participation Interest or Investment Criteria shall be deemed to materially and adversely affect the rights and interests of the Holders of each Class of Notes for the purposes of this Article 8.

(h)     Notwithstanding anything to the contrary above, with respect to any supplemental indenture that requires the consent of a Majority of the Subordinated Notes, after the Reinvestment Period, if the Aggregate Principal Balance of all Collateral Obligations is less than or equal to 50% of the Target Initial Par Amount, the Holders of the Subordinated Notes shall be deemed to have consented to any proposed supplemental

indenture if a Majority of the Subordinated Notes has not objected to such proposed supplemental indenture in writing within 30 days of notice of such proposed supplemental indenture.

Section 8.3.    Execution of Supplemental Indentures.    In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article 8 or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to Sections 6.1 (Certain Duties and Responsibilities of the Trustee), 6.3 (Certain Rights of Trustee) and Section 8.2(c) (Supplemental Indentures With Consent of Holders of Offered Securities) hereof) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent thereto have been satisfied.  The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.  The Portfolio Manager will be bound to follow any amendment or supplement to this Indenture of which it has received written notice from the time it has received a copy of such amendment from the Issuer or the Trustee; *provided* that, with respect to any amendment or supplement to this Indenture which would (i) increase the duties or liabilities of, or adversely change the economic consequences to the Portfolio Manager, (ii) modify the restrictions on the purchases or sales of Collateral Obligations described under Article 12 or the Investment Criteria, (iii) expand or restrict the Portfolio Manager's discretion or (iv) modify the restrictions on and procedures for resales and other transfers of Subordinated Notes, except as set forth in Section 8.1(vi) (Supplemental Indentures Without Consent of Holders of Offered Securities) above, the Portfolio Manager shall not be bound thereby unless the Portfolio Manager shall have consented thereto in writing, such consent not to be unreasonably withheld or delayed.  The Issuer shall promptly provide the Portfolio Manager with notice of any proposed supplemental indenture that would have the effect of modifying the restrictions on and procedures for resales and other transfers of Subordinated Notes (whether as set forth in Section 8.1(vi) (Supplemental Indentures Without Consent of Holders of Offered Securities) above or otherwise).  For so long as any Class of Notes is listed on the Irish Stock Exchange, the Issuer shall notify the Irish Stock Exchange of any material modification to this Indenture.

Section 8.4.    Effect of Supplemental Indentures.    Upon the execution of any supplemental indenture under this Article 8, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered hereunder shall be bound thereby.

Section 8.5.    Reference in Notes to Supplemental Indentures.    Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article 8 may, and if required by the Issuer shall, bear a notice in form approved by the Trustee as to any matter provided for in such supplemental indenture.  If the Applicable Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Co-Issuers to any such supplemental indenture, may be prepared and executed by the Applicable Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

ARTICLE 9

REDEMPTION OF NOTES

Section 9.1.    Mandatory Redemption.    If a Coverage Test is not met on any Determination Date occurring subsequent to the Ramp-up Period (or, in the case of each Interest Coverage Test, at or subsequent to the Determination Date with respect to the second Payment Date), the Issuer shall apply available amounts in the Payment Account on the related Payment Date to make payments in accordance with the Note Payment Sequence to the extent necessary to achieve compliance with such Coverage Test, as applicable.

Section 9.2.    Optional Redemption and Refinancing.    The Secured Notes shall be redeemable by the Applicable Issuers, in whole, on any Business Day (x) after the end of the Non-Call Period and (y) during the Non-Call Period, only if a Tax Event has occurred.  No Optional Redemption shall occur unless the Issuer has received written direction from Holders of at least (i) when no Tax Event has occurred or is ongoing, 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes or (ii) when a Tax Event has occurred and is ongoing, 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes or of the Aggregate Outstanding Amount of any Class of Secured Notes Affected by such Tax Event (*provided* that if the Tax Event that has occurred is with respect to any tax arising under or as a result of FATCA, then Holders that have not provided the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information (to the extent that the failure to provide the Holder FATCA Information was a cause of the tax arising under FATCA) shall not be considered in determining whether the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the applicable Class of Notes have directed a redemption of Secured Notes) provided to the Issuer, the Trustee and the Portfolio Manager not later than 30 days prior to the Business Day on which such redemption shall occur.

Upon receipt or delivery of a notice of redemption of the Secured Notes, the Portfolio Manager in its sole discretion will (except in the case of a Refinancing) direct the sale of all or part of the Collateral Obligations and other Assets in order that the proceeds from such sale and all other funds available for such purpose in the Collection Account and the Payment Account will be at least sufficient to pay the Redemption Price on all of the Secured Notes and to pay any applicable Management Fees, all Administrative Expenses (without limitation thereof by the Administrative Expense Cap) and other fees and expenses payable under the Priority of Payments (including, without limitation, any amounts due to the Hedge Counterparties), *provided* that, in the event that the Redemption Date is not a Payment Date, any applicable Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments shall be calculated as of such Redemption Date. On the Redemption Date, proceeds available for an Optional Redemption will be applied to redeem the Secured Notes and pay other amounts and expenses in accordance with the Priority of Payments. If, in the sole discretion of the Portfolio Manager, such proceeds of sale and all other funds available for such purpose in the Collection Account and the Payment Account would not be sufficient to redeem all Secured Notes and to pay such applicable Management Fees, Administrative Expenses and other fees and expenses, the Secured Notes may not be redeemed.  The Portfolio Manager, in its discretion, may effect the sale of all or any part of the Collateral Obligations or other Assets through the sale of one or more participations in such Assets.

The Subordinated Notes may be redeemed, in whole but not in part, on any Business Day on or after the redemption or repayment of the Secured Notes, at the written direction of Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes.

Any Class or Classes of Secured Notes may be redeemed in whole, but not in part, on any Business Day after the Non-Call Period from Refinancing Proceeds at the written direction of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes (with the consent of the Portfolio Manager) delivered to the Issuer and the Portfolio Manager (with a copy to the Trustee and the Rating Agency).  The Co-Issuers shall redeem such Class or Classes of Secured Notes on the applicable Redemption Date following receipt of such direction by obtaining a loan or an issuance of replacement securities, the terms of which loan or issuance will be negotiated by the Portfolio Manager on behalf of the Issuer, from one or more financial institutions or purchasers (a refinancing provided pursuant to such loan or issuance, a "Refinancing").  Any replacement notes issued pursuant to a Refinancing of any Class of Secured Notes will, to the extent reasonably practicable, be offered first to the Holders of such Class subject to the Refinancing, in such amounts as are necessary to preserve such Holders' *pro rata* holdings in the related Class of Secured Notes being refinanced as determined immediately prior to the Refinancing.

The Issuer shall not obtain a Refinancing of less than all Classes of Secured Notes unless the Portfolio Manager determines and certifies to the Trustee and the Issuer that:  (i) in the case of a Refinancing of Floating Rate Notes, the spread over LIBOR of any obligations providing the Refinancing Proceeds will not be greater than the spread over LIBOR of the Secured Notes subject to such Refinancing; (ii) in the case of a Refinancing of Fixed Rate Notes, either (A) the stated interest rate of the obligations providing the Refinancing will not be greater than the stated interest rate of the Secured Notes subject to such Refinancing or (B) if the obligations providing the Refinancing Proceeds are Floating Rate Notes, the spread over LIBOR of the obligations providing the Refinancing will not be greater than the spread over LIBOR on the corresponding Pari Passu Class of the Secured Notes subject to such Refinancing; (iii) the proceeds from the Refinancing (the "Refinancing Proceeds") (together with Partial Refinancing Interest Proceeds available to pay the accrued interest portion of the applicable Redemption Price) will be at least sufficient to pay the Redemption Price of the Class or Classes of Secured Notes subject to Refinancing; (iv) the aggregate principal amount of any obligations providing the Refinancing is equal to the Aggregate Outstanding Amount of the Secured Notes being redeemed with the proceeds of such obligations; (v) the stated maturity of the obligations providing the Refinancing is no earlier than the Stated Maturity of the Secured Notes being refinanced; (vi) the Refinancing Proceeds will be used (to the extent necessary) to redeem the applicable Secured Notes; (vii) the agreements relating to the Refinancing contain limited-recourse and non-petition provisions equivalent to those applicable to the Secured Notes being redeemed, as set forth herein; (viii) the obligations providing the Refinancing are not senior in priority of payment, and do not have greater voting rights than, the Class of Secured Notes being redeemed; and (ix) the expenses in connection with the Refinancing have been paid or will be adequately provided for from (1) the proceeds of the Refinancing (except for expenses owed to persons that agree to be paid solely as Administrative Expenses payable in accordance with the Priority of Payments) and/or (2) the application of Section 11.1(a)(i)(T) (Disbursements of Monies from Payment Account).

In addition to the foregoing restrictions, no replacement Class of Secured Notes shall be issued in connection with a Refinancing of less than all Classes of Secured Notes unless the Issuer has reasonably determined, after consulting nationally recognized U.S. tax counsel experienced in such matters that the issuance of such Notes would not affect the U.S. federal income tax treatment of the Secured Notes then Outstanding (including any resulting deemed exchange under Section 1001 of the Code) that are not subject to the Refinancing.

In the case of a Refinancing upon a redemption of all Classes of Secured Notes, the Issuer shall not obtain such Refinancing unless (i) the Refinancing Proceeds and all other available funds will be at least sufficient to redeem simultaneously the Secured Notes, in whole but not in part, and to pay the other amounts included in the aggregate Redemption Price and all accrued and unpaid applicable Management Fees, Administrative Expenses (regardless of the Administrative Expense Cap), including the reasonable fees, costs, charges and expenses incurred by the Trustee and the Collateral Administrator (including reasonable attorneys' fees and expenses) in connection with such Refinancing, *provided* that, in the event that the Redemption Date is not a Payment Date, any applicable Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments shall be calculated as of such Redemption Date, (ii) the Refinancing Proceeds and other available funds are used (to the extent necessary) to make such redemption and (iii) the agreements relating to the Refinancing contain limited recourse and non-petition provisions equivalent to those applicable to the Secured Notes being redeemed, as set forth herein.

Refinancing Proceeds shall not constitute Interest Proceeds or Principal Proceeds but will be applied directly on the related Redemption Date pursuant to this Indenture to redeem the Secured Notes being refinanced without regard to the Priority of Payments; *provided* that to the extent that any Refinancing Proceeds are not applied to redeem the Secured Notes being refinanced or to pay expenses in connection with the Refinancing, such Refinancing Proceeds shall be treated as Principal Proceeds.

The Holders of the Notes shall not have any cause of action against any of the Co-Issuers, the Portfolio Manager or the Trustee for any failure to obtain a Refinancing. In the event that a Refinancing is obtained meeting the requirements specified above as certified by the Portfolio Manager, the Issuer and the Trustee shall amend this Indenture to the extent necessary to reflect the terms of the Refinancing and no further consent for such amendments shall be required from the Holders of Notes other than the consent of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes directing or consenting to the redemption.

In the event of any redemption pursuant to this Section 9.2 (Optional Redemption and Refinancing), the Issuer shall, at least 20 days prior to the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee in writing of such Redemption Date, the applicable Record Date, the principal amount of Notes to be redeemed on such Redemption Date and the applicable Redemption Price(s).

Section 9.3.    Redemption Procedures.  (a) In the event of any redemption pursuant to Section 9.2 (Optional Redemption and Refinancing), the written direction of the Holders of the Subordinated Notes set forth therein shall be provided to the Trustee, the Issuer and the Portfolio Manager not later than 30 days prior to the Business Day on which such redemption is to be

made (which date shall be designated in such notice) and a notice of redemption shall be given by first class mail, postage prepaid, mailed not later than 10 Business Days prior to the applicable Redemption Date, to each applicable Holder of Notes, at such Holder's address in the Register and the Rating Agency.  In addition, for so long as any Class of Notes is listed on the Global Exchange Market of the Irish Stock Exchange and so long as the guidelines of such exchange so require, notice of redemption pursuant to Section 9.2 (Optional Redemption and Refinancing) shall also be given to the Holders by publication via the Irish Stock Exchange.

(b)     All notices of redemption delivered pursuant to Section 9.3(a) (Redemption Procedures) shall state:

(i)     the applicable Redemption Date;

(ii)     the Redemption Price of the Notes to be redeemed;

(iii)     that all of the Secured Notes are to be redeemed in full, in the case of an Optional Redemption, or listing the applicable Class of Notes that are to be redeemed, in the case of a Refinancing, and that interest on the Secured Notes shall cease to accrue on the Business Day specified in the notice;

(iv)     the place or places where Notes are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Co-Issuers to be maintained as provided in Section 7.2 (Maintenance of Office or Agency); and

(v)     whether the Subordinated Notes are to be redeemed in full on such Redemption Date and, if so, the place or places where the Subordinated Notes are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Co-Issuers to be maintained as provided in Section 7.2 (Maintenance of Office or Agency).

The Co-Issuers shall have the option to withdraw any such notice of redemption up to the Business Day immediately prior to the scheduled Redemption Date by written notice to the Trustee (who shall notify DTC or any other Clearing Corporation, as applicable) and the Portfolio Manager.  If the Co-Issuers so withdraw any notice of redemption or is otherwise unable to complete any redemption of the Notes, the Sale Proceeds received from the sale of any Collateral Obligations and other Assets sold pursuant to Section 9.2 (Optional Redemption and Refinancing) may, during the Reinvestment Period at the Portfolio Manager's discretion, be reinvested in accordance with the Investment Criteria.

Notice of redemption shall be given by the Co-Issuers (so long as the Co-Issuers have received notice thereof) or, upon an Issuer Order, by the Trustee in the name and at the expense of the Co-Issuers.  Failure to give notice of redemption, or any defect therein, to any Holder of any Notes selected for redemption shall not impair or affect the validity of the redemption of any other Notes.

(c)     In the event of any redemption pursuant to Section 9.2 (Optional Redemption and Refinancing), no Notes may be optionally redeemed (other than in connection with a Refinancing) unless (i) at least 10 Business Days before the scheduled

Redemption Date the Portfolio Manager shall have furnished to the Trustee evidence, in form satisfactory to the Trustee, that the Portfolio Manager on behalf of the Issuer has entered into a binding agreement or agreements with a financial or other institution or institutions to sell to such institution, not later than the second Business Day preceding the scheduled Redemption Date in immediately available funds, all or part of the Collateral Obligations and/or the Hedge Agreements at a purchase price at least equal to an amount sufficient, together with the Eligible Investments maturing, redeemable (or putable to the issuer thereof at par) on or prior to the scheduled Redemption Date and any payments to be received in respect of the Hedge Agreements, to pay any applicable Management Fees, all Administrative Expenses and other fees and expenses payable in accordance with the Priority of Payments (without limitation thereof by the Administrative Expense Cap) prior to the payment of the principal of the Notes to be redeemed and redeem all of the Secured Notes on the scheduled Redemption Date at the applicable Redemption Price, *provided* that, in the event that the Redemption Date is not a Payment Date, any applicable Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments shall be calculated as of such Redemption Date or (ii) prior to selling any Collateral Obligations and/or Eligible Investments, the Portfolio Manager shall certify to the Trustee that, in its judgment, the aggregate sum of (A) expected proceeds from Hedge Agreements and the sale of Eligible Investments and (B) the aggregate Market Value of all Collateral Obligations and other Assets shall exceed the sum of (x) the aggregate Redemption Prices of the Outstanding Secured Notes and (y) any applicable Management Fees, all Administrative Expenses and other fees and expenses payable under the Priority of Payments (without limitation thereof by the Administrative Expense Cap) prior to the redemption of the Notes, *provided* that, in the event that the Redemption Date is not a Payment Date, any applicable Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments shall be calculated as of such Redemption Date.   Any certification delivered pursuant to Section 9.3(c)(ii) (Redemption Procedures) shall include (1) the approximate prices of, and expected proceeds from, the sale of any Collateral Obligations, Eligible Investments and/or Hedge Agreements and (2) all calculations required by this Section 9.3(c) (Redemption Procedures).  The Issuer shall deposit, or cause to be deposited, the funds required for an Optional Redemption in the Payment Account on or prior to the Redemption Date.

Section 9.4.    Notes Payable on Redemption Date.  (a) Notice of redemption pursuant to Section 9.3 (Redemption Procedures) having been given as aforesaid, the Notes to be redeemed shall, on the Redemption Date, subject to (i) Section 9.3(c) (Redemption Procedures) and (ii) the Co-Issuers' right to withdraw any notice of redemption pursuant to Section 9.3(b) (Redemption Procedures), become due and payable at the Redemption Price therein specified, and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest) all such Secured Notes shall cease to bear interest on the Redemption Date.  Upon final payment on a Note to be so redeemed, each Holder shall present and surrender its Note at the place specified in the notice of redemption on or prior to such Redemption Date; *provided* that if there is delivered to the Co-Issuers and the Trustee such security or indemnity as may be required by any of them to save such party harmless and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Co-Issuers or the Trustee that the applicable Note has been acquired by a Protected Purchaser, such final payment shall be made

without presentation or surrender.  Payments of interest on Secured Notes so to be redeemed whose Stated Maturity is on or prior to the Redemption Date shall be payable to the Holders of such Secured Note, or one or more predecessor Notes, registered as such at the close of business on the relevant Record Date according to the terms and provisions of Section 2.8(e) (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved).

(b)      If any Secured Note called for redemption shall not be paid upon surrender thereof for redemption, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Note Interest Rate for each successive Interest Accrual Period the Secured Note remains Outstanding; *provided* that the reason for such non-payment is not the fault of such Holder.

Section 9.5.    Special Redemption.  The Secured Notes shall be subject to redemption in part on any Payment Date (A) during the Reinvestment Period, if the Portfolio Manager at its discretion notifies the Trustee that it has been unable, for a period of 20 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager in its sole discretion and would meet the Investment Criteria in sufficient amounts to permit the investment or reinvestment of all or a portion of the funds then in the Collection Account that are to be invested in additional Collateral Obligations or (B) after the Ramp-up Period, if the Portfolio Manager notifies the Trustee that a redemption is required pursuant to Section 7.18(d) (Ramp-up Period; Purchase of Additional Collateral Obligations) (in each case, a "Special Redemption").  On the first Payment Date following the Collection Period in which such notice is given (and, in the case of clause (B) above, any subsequent Payment Date) (a "Special Redemption Date"), the amount in the Principal Collection Subaccount representing Principal Proceeds which (1) the Portfolio Manager has determined cannot be reinvested in additional Collateral Obligations or (2) must be applied to redeem the Secured Notes in accordance with Section 7.18(d) (Ramp-up Period; Purchase of Additional Collateral Obligations) (such amount, a "Special Redemption Amount"), as the case may be, will be available to be applied in accordance with the Priority of Payments under Section 11.1(a)(ii) (Disbursements of Monies from Payment Account).  Notice of payments pursuant to this Section 9.5 (Special Redemption) shall be given by the Trustee mailed not less than three Business Days prior to the applicable Special Redemption Date to each Holder of Secured Notes affected thereby at such Holder's address in the Register and to the Rating Agency.  Failure to give any such notice, or any defect therein, to any Holder selected for redemption shall not impair or affect the validity of the redemption or any other Notes.  In addition, for so long as any Class of Notes is listed on the Global Exchange Market of the Irish Stock Exchange and so long as the guidelines of such exchange so require, notice of Special Redemption shall also be given by publication via the Irish Stock Exchange.  The Issuer shall deposit, or cause to be deposited, the funds required for a Special Redemption in the Payment Account on or prior to the Special Redemption Date.

Section 9.6.    Clean-up Call Redemption.  (a) The Notes are redeemable at the option of the Applicable Issuer(s) acting at the direction of the Portfolio Manager (which direction shall (x) be given so as to be received by the Issuer and the Trustee (who shall promptly provide notice thereof to the Holders of the Subordinated Notes) not later than 30 days prior to the proposed Clean-up Call Redemption Date and (y) include the Clean-up Call Redemption Date and the Clean-up Call Redemption Price of the Notes to be redeemed), in whole but not in part (a

"Clean-up Call Redemption"), at the applicable Redemption Price, on any Business Day selected by the Portfolio Manager (such Business Day, the "Clean-up Call Redemption Date") which occurs on or after the Payment Date on which the Aggregate Principal Balance of the Collateral Obligations and Eligible Investments representing Principal Proceeds is less than or equal to 20% of the Target Initial Par Amount, unless a Majority of the Subordinated Notes directs to prevent such redemption in a writing delivered to the Issuer, the Trustee and the Portfolio Manager at least 20 days prior to the Clean-up Call Redemption Date.  In such event a notice of redemption shall be given by first class mail, postage prepaid, mailed not later than six Business Days prior to the applicable Clean-up Call Redemption Date, to each Holder of Notes, at such Holder's address in the Register and to the Rating Agency.  Any such Clean-up Call Redemption may only be effectuated on a Payment Date and only from (a) the disposition proceeds of the Assets and (b) all other funds in the Accounts on the Payment Date relating to such redemption. A Clean-up Call Redemption may not occur unless the proceeds from the liquidation of the Assets and all other funds in the Accounts on the Payment Date relating to such redemption results in an amount at least equal to the Clean-up Call Redemption Price.

(b)     All notices of redemption delivered pursuant to Section 9.6(a) (Clean-up Call Redemption) shall state:

(i)     the Clean-up Call Redemption Date;

(ii)     the Clean-up Call Redemption Price of the Notes to be redeemed; and

(iii)     that all of the Notes are to be redeemed in full and that interest on the Secured Notes shall cease to accrue on the Payment Date specified in the notice.

Notice of redemption shall be given by the Co-Issuers or, upon an Issuer Order, by the Trustee in the name and at the expense of the Co-Issuers.  Failure to give notice of redemption, or any defect therein, to any Holder shall not impair or affect the validity of the redemption of any other Notes.  In addition, for so long as any Class of Notes is listed on the Global Exchange Market of the Irish Stock Exchange and so long as the guidelines of such exchange so require, notice of Clean-up Call Redemption shall also be given by publication via the Irish Stock Exchange.

(c)     Any Clean-up Call Redemption is subject to (i) the purchase of the Assets by any Person(s) from the Issuer, on or prior to the fourth Business Day immediately preceding the Clean-up Call Redemption Date, for a purchase price in Cash at least equal to the Clean-up Call Redemption Price (less the amount of funds in the Accounts that are available to pay the Clean-up Call Redemption Price) and (ii) the receipt by the Trustee from the Portfolio Manager, prior to such purchase, of a certification from the Portfolio Manager that the sum so received satisfies the requirements of clause (i).  Upon receipt by the Trustee of the certification referred to in the preceding sentence, the Trustee (pursuant to written direction from the Portfolio Manager on behalf of the Issuer) and the Portfolio Manager, acting on behalf of the Issuer, shall take all commercially reasonable actions necessary to sell, assign and transfer the Assets to such Person(s) (which may be

the Portfolio Manager or any of its Affiliates) upon payment in immediately available funds of the purchase price for such Assets. The Issuer shall deposit, or cause to be deposited, the funds required for a Clean-up Call Redemption in the Payment Account on or prior to the Clean-up Call Redemption Date. The Trustee shall deposit such payment into the Collection Account.

(d)     Any notice of Clean-up Call Redemption may be withdrawn by the Issuer (or the Portfolio Manager on its behalf) up to the fourth Business Day prior to the scheduled Clean-up Call Redemption Date by written notice to the Trustee, the Rating Agency and (if applicable) the Portfolio Manager only if amounts equal to the Clean-up Call Redemption Price (including funds in the Accounts available to pay the Clean-up Call Redemption Price) are not received in full in immediately available funds by the fourth Business Day immediately preceding the Clean-up Call Redemption Date. Notice of any such withdrawal of a notice of Clean-up Call Redemption shall be given by the Trustee at the expense of the Issuer to each Holder of Notes at such Holder's address in the Note Register by overnight courier guaranteeing next day delivery not later than the second Business Day prior to the scheduled Clean-up Call Redemption Date. The Trustee shall also arrange for notice of such withdrawal to be delivered to the Irish Stock Exchange so long as any Class of Notes is listed thereon and so long as the guidelines of such exchange so require.

(e)     On the Clean-up Call Redemption Date, the Clean-up Call Redemption Price shall be distributed pursuant to the Priority of Payments.

(f)     Notice of redemption pursuant to Section 9.6 (Clean-up Call Redemption) having been given as aforesaid, the Notes to be redeemed shall, on the Clean-up Call Redemption Date, subject to Section 9.6(c) (Clean-up Call Redemption) and the Co-Issuers' right to withdraw any notice of redemption pursuant to Section 9.6(d) (Clean-up Call Redemption), become due and payable at the Clean-up Call Redemption Price therein specified, and from and after the Clean-up Call Redemption Date (unless the Issuer shall default in the payment of the Clean-up Call Redemption Price and accrued interest) all the Secured Notes shall cease to bear interest on the Clean-up Call Redemption Date. Upon final payment on a Note to be so redeemed, the Holder shall present and surrender such Notes at the place specified in the notice of redemption on or prior to such Clean-up Call Redemption Date; *provided* that if there is delivered to the Co-Issuers and the Trustee such security or indemnity as may be required by any of them to save such party harmless and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Co-Issuers or the Trustee that the applicable Note has been acquired by a Protected Purchaser, such final payment shall be made without presentation or surrender.

If any Secured Note called for redemption pursuant to Section 9.6 (Clean-up Call Redemption) shall not be paid upon surrender thereof for redemption, the principal thereof shall, until paid, bear interest from the Clean-up Call Redemption Date at the applicable Note Interest Rate for each successive Interest Accrual Period the Secured Note remains Outstanding; *provided* that the reason for such non-payment is not the fault of the Holder of such Secured Note.

ARTICLE 10

ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 10.1.  Collection of Money.  Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all Money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Obligations, in accordance with the terms and conditions of such Pledged Obligations.  The Trustee shall segregate and hold all such Money and property received by it in trust for the Holders of the Notes and shall apply it as provided in this Indenture.

Each Account shall be established and maintained with (a) a federal or state-chartered depository institution with (x) a long-term debt rating of at least "A" by S&P and a short-term debt rating of at least "A-1" by S&P or a long-term debt rating of at least "A+" by S&P and if such institution's long-term debt rating falls below "A" by S&P or its short-term rating falls below "A-1" by S&P (or its long-term rating falls below "A+" by S&P), the assets held in such Account shall be transferred within 60 calendar days to another institution that has a long-term debt rating of at least "A" by S&P and a short-term debt rating of at least "A-1" by S&P (or a long-term debt rating of at least "A+" by S&P) and (y) a long-term senior unsecured debt rating of at least "A2" or a short-term credit rating of "P-1" by Moody's or (b) in segregated non-interest bearing trust accounts with the corporate trust department of a federal or state-chartered deposit institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulation Section 9.10(b), which depository institution (x) has a long term senior unsecured debt rating of at least "Baa3" by Moody's and (y) to the extent any related trust account is holding cash, satisfies the ratings requirements specified in clause (a).  If, in the case of either clause (a) or (b) above, such institution's long-term debt rating or short-term credit rating by Moody's falls below any such required rating, the assets held in the related Accounts shall be transferred within 30 calendar days to another institution that satisfies such rating requirements. The Trustee shall have the right to open subaccounts of any such Account as it deems necessary or appropriate for convenience of administration.

Section 10.2.  Collection Account.  (a) In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2015-6 Ltd., subject to the lien of the Trustee," which shall be designated as the Collection Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement.  In addition, the Trustee shall maintain two segregated subaccounts within the Collection Account, one of which will be designated the "Interest Collection Subaccount," and one of which will be designated the "Principal Collection Subaccount."  The Trustee shall from time to time deposit into the Interest Collection Subaccount, in addition to the deposits required pursuant to Section 10.6(a) (Reinvestment of Funds in Accounts; Reports by Trustee), immediately upon receipt thereof (except for income earned on amounts deposited in the Ramp-up Account and, to the extent provided in Section 10.4(a) (the Revolver Funding Account), the subaccount of the Revolver Funding Account relating to Permitted Currencies) (i) any funds received by the Issuer after the Closing Date and deemed by the Portfolio Manager to be Interest Proceeds and (ii) all Interest Proceeds (unless simultaneously reinvested in additional Collateral

Obligations in accordance with Article 12) received by the Trustee.  The Trustee shall deposit immediately upon receipt thereof all other amounts remitted to the Collection Account into the Principal Collection Subaccount, including in addition to the deposits required pursuant to Section 10.6(a) (Reinvestment of Funds in Accounts; Reports by Trustee), (i) any funds received by the Issuer after the Closing Date and deemed by the Portfolio Manager to be Principal Proceeds, (ii) all Principal Proceeds (unless simultaneously reinvested in additional Collateral Obligations in accordance with Article 12 or in Eligible Investments) received by the Trustee, and (iii) all other funds received by the Trustee.  All Monies deposited from time to time in the Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Assets and shall be applied to the purposes herein provided.  Subject to Section 10.2(d) (Collection Account), amounts in the Collection Account shall be reinvested pursuant to Section 10.6(a) (Reinvestment of Funds in Accounts; Reports by Trustee).

(b)     The Trustee, within one Business Day after receipt of any distribution or other proceeds in respect of the Assets which are not Cash, shall so notify or cause to notify the Issuer and the Issuer shall, use its commercially reasonable efforts to, within five Business Days of receipt of such notice from the Trustee (or as soon as practicable thereafter), sell such distribution or other proceeds for Cash in an arm's length transaction to a Person which is not the Portfolio Manager or an Affiliate of the Issuer or the Portfolio Manager and deposit the proceeds thereof in the Collection Account; *provided* that the Issuer (i) need not sell such distributions or other proceeds if it delivers an Issuer Order or an Officer's certificate to the Trustee certifying that such distributions or other proceeds constitute Collateral Obligations or Eligible Investments or (ii) may otherwise retain such distribution or other proceeds for up to two years from the date of receipt thereof if it delivers an Officer's certificate to the Trustee certifying that (x) it will sell such distribution within such two-year period and (y) retaining such distribution is not otherwise prohibited by this Indenture.

(c)     At any time when reinvestment is permitted pursuant to Article 12, the Portfolio Manager on behalf of the Issuer may direct the Trustee to, and upon receipt of such direction the Trustee shall, (x) withdraw funds on deposit in the Principal Collection Subaccount representing Principal Proceeds (together with accrued interest received with regard to any Collateral Obligation and Interest Proceeds but only to the extent used to pay for accrued interest on an additional Collateral Obligation) and reinvest (or invest, in the case of funds referred to in Section 7.18 (Ramp-up Period; Purchase of Additional Collateral Obligations)) such funds in additional Collateral Obligations or (y) withdraw funds in the Interest Collection Subaccount to exercise a warrant held in the Assets, in each case in accordance with the requirements of Article 12 and such direction; *provided* that, in the case of clause (y) above (i) funds on deposit in the Principal Collection Subaccount may be used to exercise warrants in Assets if the Effective Date Overcollateralization Test is satisfied as of the date such warrant is exercised and (ii) proceeds from the sale of securities obtained upon the exercise of such warrant may be treated as Interest Proceeds (up to the amount of Interest Proceeds used to exercise such warrant) or Principal Proceeds at the election of the Portfolio Manager.  At any time, the Portfolio Manager on behalf of the Issuer may direct the Trustee to, and upon receipt of such direction the Trustee shall, withdraw funds on deposit in the Principal Collection Subaccount representing Principal Proceeds and transfer such funds to the Revolver

Funding Account, to be used in accordance with Section 10.4 (The Revolver Funding Account).

(d)     The Portfolio Manager on behalf of the Issuer may direct the Trustee to, and upon receipt of such direction the Trustee shall, pay from amounts on deposit in the Collection Account on any Business Day during any Interest Accrual Period (i) from Interest Proceeds only, any amount required to exercise a warrant held in the Assets or right to acquire securities in accordance with the requirements of Article 12 and such Issuer Order; *provided* that, (x) Principal Proceeds may be used to exercise warrants in Assets if the Effective Date Overcollateralization Test is satisfied as of the date such warrant is exercised and (y) proceeds from the sale of securities obtained upon the exercise of such warrant may be treated as Interest Proceeds (up to the amount of Interest Proceeds used to exercise such warrant) or Principal Proceeds at the election of the Portfolio Manager and (ii) from Interest Proceeds only, any Administrative Expenses; *provided* that the aggregate Administrative Expenses paid pursuant to this Section 10.2(d) (Collection Account) during any Collection Period shall not exceed the Administrative Expense Cap for the related Payment Date.

(e)     The Trustee shall transfer to the Payment Account as applicable, from the Collection Account, for application pursuant to Section 11.1(a) (Disbursements of Monies from Payment Account), on or not later than the Business Day preceding each Payment Date, the amount set forth to be so transferred in the Distribution Report for such Payment Date.

(f)     The Portfolio Manager on behalf of the Issuer may direct the Trustee to, and upon receipt of such direction the Trustee shall, transfer from amounts on deposit in the Interest Collection Subaccount on any Business Day during any Interest Accrual Period to the Principal Collection Subaccount, amounts necessary for application pursuant to Section 7.18(d) (Ramp-up Period; Purchase of Additional Collateral Obligations) if, as of the end of the Ramp-up Period, any of the Effective Date Conditions have not been met.

Section 10.3.   Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account.

(a)     Payment Account.  In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2015-6 Ltd., subject to the lien of the Trustee," which shall be designated as the Payment Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement.  Except as provided in Section 11.1(a) (Disbursements of Monies from Payment Account), the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay amounts due and payable on the Notes in accordance with their terms and the provisions of this Indenture and, upon Issuer Order, to pay Administrative Expenses and other amounts specified herein, each in accordance with the Priority of Payments.  The Co-Issuers shall

not have any legal, equitable or beneficial interest in the Payment Account other than in accordance with the Priority of Payments.

(b)     Custodial Account.  In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2015-6 Ltd., subject to the lien of the Trustee," which shall be designated as the Custodial Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement.  The only permitted withdrawals from the Custodial Account shall be in accordance with the provisions of this Indenture.  The Trustee agrees to give the Co-Issuers immediate notice if (to the Trustee's actual knowledge) the Custodial Account or any assets or securities on deposit therein, or otherwise to the credit of the Custodial Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.

(c)     Ramp-up Account.  The Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2015-6 Ltd., subject to the lien of the Trustee," which shall be designated as the Ramp-up Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement.  The Issuer shall direct the Trustee to deposit the amount specified in Section 3.1(a)(xii) (Conditions to Issuance of Notes on Closing Date) in the Ramp-up Account.  In connection with any purchase of an additional Collateral Obligation, the Trustee will apply amounts held in the Ramp-up Account as provided by Section 7.18(b) (Ramp-up Period; Purchase of Additional Collateral Obligations).  Upon the occurrence of an Event of Default, the Trustee shall deposit any amounts remaining on deposit in the Ramp-Up Account (excluding any proceeds that shall be required and used to settle binding commitments entered into prior to such date) into the Principal Collection Subaccount for application as Principal Proceeds.  After the Effective Date, but on or prior to the Designated Principal Proceeds Cut-off Date, and after taking into account amounts to be transferred, up to $2,820,000 in Designated Principal Proceeds may be designated, from time to time, by the Portfolio Manager to be treated as Interest Proceeds (but only if the Effective Date Overcollateralization Test would be satisfied after each such designation).  Such Designated Principal Proceeds will be withdrawn from the Ramp-up Account and deposited into the Interest Collection Subaccount.  On the first Business Day to occur after the end of the Ramp-Up Period (so long as the Target Initial Par Condition has been satisfied), the Trustee shall deposit any amounts remaining on deposit in the Ramp-Up Account (excluding any proceeds that will be required and used to settle binding commitments entered into prior to such date), as directed by the Portfolio Manager, into the Principal Collection Subaccount for application as Principal Proceeds.  Amounts in the Ramp-up Account may be invested at the direction of the Portfolio Manager in Eligible Investments in accordance with Section 10.6(a) (Reinvestment of Funds in Accounts; Reports by Trustee); *provided* that any income earned on amounts deposited in the Ramp-up Account will be deposited in the Ramp-up Account as it is paid.

(d)     Expense Reserve Account.  In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, on or prior to the Closing Date,

establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2015-6 Ltd., subject to the lien of the Trustee," which shall be designated as the Expense Reserve Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement.  On any Business Day from the Closing Date to and including the Determination Date relating to the fourth Payment Date, the Trustee shall apply funds from the Expense Reserve Account, as directed by the Portfolio Manager, to pay expenses of the Co-Issuers incurred in connection with the establishment of the Co-Issuers, the structuring and consummation of the Offering, the issuance of the Offered Securities or the acquisition of the initial portfolio of Collateral Obligations prior to the fourth Payment Date or to the Collection Account as Principal Proceeds.  By the Determination Date relating to the fourth Payment Date following the Closing Date, all funds in the Expense Reserve Account (after deducting any expenses paid on such Determination Date) will be deposited in the Collection Account as Interest Proceeds and/or Principal Proceeds (in the respective amounts directed by the Portfolio Manager in its discretion) and the Expense Reserve Account will be closed.  Amounts in the Expense Reserve Account may be invested at the direction of the Portfolio Manager in Eligible Investments in accordance with Section 10.6(a) (Reinvestment of Funds in Accounts; Reports by Trustee).  For the avoidance of doubt, interest earned on amounts in the Expense Reserve Account shall be deposited into the Interest Collection Subaccount and treated as Interest Proceeds.

(e)   Interest Reserve Account.   In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2015-6 Ltd., subject to the lien of the Trustee," which shall be designated as the Interest Reserve Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement.  The Issuer shall direct the Trustee to deposit the amount specified in Section 3.1(a)(xii) (Conditions to Issuance of Notes on Closing Date) in the Interest Reserve Account. On any Business Day from the Closing Date to and including the Determination Date relating to the fourth Payment Date, the Trustee shall transfer funds from the Interest Reserve Account, as directed by the Portfolio Manager, to the Collection Account as Interest Proceeds and/or Principal Proceeds (in the respective amounts directed by the Portfolio Manager in its discretion).   By the Determination Date relating to the fourth Payment Date following the Closing Date, all funds in the Interest Reserve Account (after deducting any transfer made on such Determination Date) will be deposited in the Collection Account as Interest Proceeds and/or Principal Proceeds (in the respective amounts directed by the Portfolio Manager in its discretion) and the Interest Reserve Account will be closed.  Amounts in the Interest Reserve Account may be invested at the direction of the Portfolio Manager in Eligible Investments in accordance with Section 10.6(a) (Reinvestment of Funds in Accounts; Reports by Trustee).  For the avoidance of doubt, interest earned on amounts in the Interest Reserve Account shall be deposited into the Interest Collection Subaccount and treated as Interest Proceeds.

Section 10.4.   The Revolver Funding Account.

(a)   <u>Revolver Funding Account</u>.   Upon the purchase of any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, funds may be withdrawn first from the Ramp-up Account and then from the Collection Account, and deposited by the Trustee in a single, segregated non-interest bearing trust account maintained by the Issuer with the Custodian (the "<u>Revolver Funding Account</u>") subject to the lien of the Trustee.  Upon initial purchase, funds deposited in the Revolver Funding Account in respect of any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation will be treated as part of the purchase price therefor.  Amounts in each subaccount of the Revolver Funding Account shall be invested in overnight funds that are Eligible Investments at the direction of the Portfolio Manager in accordance <u>Section 10.6(a)</u> (Reinvestment of Funds in Accounts; Reports by Trustee).   For the avoidance of doubt, interest earned on amounts in the Revolver Funding Account shall be deposited into the Interest Collection Subaccount and treated as Interest Proceeds.

With respect to any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, upon the purchase of any such Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, funds shall be deposited in the Revolver Funding Account such that the sum of the amount of funds on deposit in such account shall be equal to or greater than the sum of the unfunded funding obligations under all such Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations then included in the Assets. If the Issuer receives proceeds with respect to any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation that have any remaining unfunded obligations, the Issuer shall deposit all such proceeds into the Revolver Funding Account in an amount up to such unfunded obligations.

Any funds in the Revolver Funding Account (other than earnings from Eligible Investments therein) shall be available solely to cover any drawdowns on the Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations; *provided* that any excess of (A) the amounts on deposit in the Revolver Funding Account over (B) the sum of the unfunded funding obligations under all Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations that are included in the Assets may be transferred by the Trustee (at the direction of the Portfolio Manager) from time to time as Principal Proceeds to the Principal Collection Subaccount.

Upon (a) the sale or maturity of a Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation or (b) the occurrence of an event of default with respect to any such Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation or any other event or circumstance which results in the irrevocable reduction of the undrawn commitments under such Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, any excess of (A) the amounts on deposit in the Revolver Funding Account over (B) the sum of the unfunded amounts of all Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations that are included in the Assets shall be transferred (at the direction of the Portfolio Manager) by the Trustee as Principal Proceeds to the Principal Collection Subaccount.

Section 10.5.   <u>Hedge Accounts</u>.   If and to the extent that any Hedge Agreement requires the related Hedge Counterparty to secure its obligations thereunder, the Issuer shall, on or prior to the date such Hedge Agreement is entered into, establish a segregated, non-interest bearing trust account which shall be designated as a Hedge Account (each, a "<u>Hedge Account</u>").   The

Trustee (as directed by the Portfolio Manager on behalf of the Issuer) shall deposit into each Hedge Account all amounts or collateral which are required to secure the obligations of the Hedge Counterparty in accordance with the terms of the related Hedge Agreement.  Amounts or collateral in the Hedge Account shall be released to the Issuer or the related Hedge Counterparty only in accordance with this <u>Section 10.5(c)</u> (Hedge Accounts), the applicable Hedge Agreement and applicable law.

As directed by the Portfolio Manager in writing, in accordance with the applicable Hedge Agreement, amounts on deposit in a Hedge Account may be invested in Eligible Investments.  Income received on amounts or collateral on deposit in each Hedge Account shall be applied, as directed by the Portfolio Manager, to the payment of any periodic amounts owed by the Hedge Counterparty to the Issuer on the date any such amounts are due.  After application of any such amounts, any income then contained in such Hedge Account shall be withdrawn from such account and paid to the related Hedge Counterparty in accordance with the applicable Hedge Agreement as directed by the Portfolio Manager on behalf of the Issuer.

Upon the occurrence of any "event of default" or "termination event" (each as defined in the applicable Hedge Agreement) under the related Hedge Agreement, amounts contained in the related Hedge Account shall, as directed by the Portfolio Manager in writing, be withdrawn by the Trustee and applied toward the payment of any amounts payable by the related Hedge Counterparty to the Issuer in accordance with the terms of such Hedge Agreement.  Any excess amounts held in a Hedge Account after payment of all amounts owing from the related Hedge Counterparty to the Issuer shall be withdrawn from such Hedge Account and paid to the related Hedge Counterparty in accordance with the applicable Hedge Agreement, as directed by the Portfolio Manager on behalf of the Issuer.

Section 10.6.  <u>Reinvestment of Funds in Accounts; Reports by Trustee</u>.  (a) By Issuer Order (which may be in the form of standing instructions), the Issuer (or the Portfolio Manager on behalf of the Issuer) shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds on deposit in the Accounts (other than the Custodial Account and the Payment Account) and the Hedge Account as so directed in Eligible Investments having Stated Maturities no later than the Business Day preceding the next Payment Date (or such shorter maturities expressly provided herein).  If prior to the occurrence of an Event of Default, the Issuer shall not have given any such investment directions, the Trustee shall seek instructions from the Portfolio Manager within three Business Days after transfer of any funds to such accounts.  If the Trustee does not thereafter receive written instructions from the Portfolio Manager within five Business Days after transfer of such funds to such accounts, it shall invest and reinvest the funds held in such accounts, as fully as practicable, in the Standby Investment maturing no later than the Business Day immediately preceding the next Payment Date (or such shorter maturities expressly provided herein).  If after the occurrence of an Event of Default, the Issuer shall not have given such investment directions to the Trustee for three consecutive days, the Trustee shall invest and reinvest such Monies as fully as practicable in the Standby Investment.  Except to the extent expressly provided otherwise herein, all interest and other income from such investments shall be deposited in the Interest Collection Subaccount, any gain realized from such investments shall be credited to the Principal Collection Subaccount upon receipt, and any loss resulting from such investments shall be charged to the Principal Collection Subaccount.  The Trustee shall not in any way be held liable by reason of any

insufficiency of such accounts which results from any loss relating to any such investment, except with respect to investments in obligations of the Bank or any Affiliate thereof (if the Bank is then the Trustee).

(b)     The Trustee agrees to give the Issuer immediate notice if any Account or any funds on deposit in any Account, or otherwise to the credit of an Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.  All Accounts shall remain at all times with the Trustee or a financial institution having a long-term debt rating of at least equal to "Baa1" by Moody's and having combined capital and surplus of at least $200,000,000 and shall be subject to the requirements of Section 10.1 (Collection of Money).

(c)     The Trustee shall supply, in a timely fashion, to the Co-Issuers, the Rating Agency and the Portfolio Manager any information regularly maintained by the Trustee that the Co-Issuers, the Rating Agency or the Portfolio Manager may from time to time request with respect to the Pledged Obligations, the Accounts and the other Assets and provide any other requested information reasonably available to the Trustee by reason of its acting as Trustee hereunder and required to be provided by Section 10.7 (Accountings) or to permit the Portfolio Manager to perform its obligations under the Portfolio Management Agreement.  The Trustee shall promptly forward to the Portfolio Manager copies of notices and other writings received by it from the issuer of any Collateral Obligation or from any Clearing Agency with respect to any Collateral Obligation which notices or writings advise the holders of such security of any rights that the holders might have with respect thereto (including, without limitation, requests to vote with respect to amendments or waivers and notices of prepayments and redemptions) as well as all periodic financial reports received from such issuer and Clearing Agencies with respect to such issuer.

Section 10.7.   Accountings.

(a)     Monthly.  Not later than the 1st day of each month (or, if such day is not a Business Day on the next succeeding Business Day) beginning with June 2015, the Issuer shall compile and provide (or cause to be compiled and provided) (including, at the election of the Issuer, via appropriate electronic means acceptable to the recipient) to the Rating Agency, the Trustee, the Portfolio Manager and Intex Solutions, Inc. and the Initial Purchaser (upon receipt of written request therefor) a monthly report (each a "Monthly Report").  The Monthly Report shall contain the following information with respect to the Collateral Obligations and Eligible Investments included in the Assets, determined as of the close of business on the 21st day of the prior calendar month (such 21st day, the "Monthly Report Determination Date" related to the current calendar month) (for which purpose only, assets of any ETB Subsidiary in which the Issuer has a first priority perfected security interest shall be included as if such assets were owned by the Issuer); provided that any Monthly Report delivered with respect to a Monthly Report Determination Date occurring prior to the Effective Date shall contain only the information described in clauses (iii), (iv)(A), (iv)(C), (iv)(D) and (viii) below:

(i)  Aggregate Principal Balance of Collateral Obligations and Eligible Investments representing Principal Proceeds.

(ii)  Adjusted Collateral Principal Amount of Collateral Obligations.

(iii)  Collateral Principal Amount of Collateral Obligations.

(iv)  A list of Collateral Obligations, including, with respect to each such Collateral Obligation, the following detailed information:

  (A)  The obligor thereon (including the issuer ticker, if any);

  (B)  The CUSIP or security identifier thereof;

  (C)  The Principal Balance thereof (other than any accrued interest that was purchased with Principal Proceeds (but excluding any capitalized interest));

  (D)  The percentage of the aggregate Collateral Principal Amount represented by such Collateral Obligation;

  (E)  The related interest rate or spread (in the case of a LIBOR Floor Obligation, indicating the spread both with and without giving effect to modifications relating to LIBOR Floor Obligations and the specified "floor" rate *per annum* for such LIBOR Floor Obligation);

  (F)  The stated maturity thereof;

  (G)  The related Moody's Industry Classification;

  (H)  The related S&P Industry Classification;

  (I)  The Moody's Rating, unless such rating is based on a credit estimate unpublished by Moody's (and, in the event of a downgrade or withdrawal of the applicable Moody's Rating, the prior rating and the date such Moody's Rating was changed);

  (J)  The Moody's Default Probability Rating;

  (K)  The S&P Rating, unless such rating is based on a credit estimate unpublished by S&P;

  (L)  The country of Domicile;

  (M)  An indication as to whether each such Collateral Obligation is (1) a Defaulted Obligation, (2) a Delayed Drawdown Collateral Obligation (including an indication of the principal amount of unfunded funding obligations thereunder), (3) a Revolving Collateral Obligation (including an indication of the principal amount of unfunded funding

obligations thereunder), (4) a Senior Secured Loan, (5) a floating rate Collateral Obligation, (6) a Participation Interest (indicating the related Selling Institution and its ratings by the Rating Agency), (7) a Deferrable Obligation, (8) a Zero Coupon Security, (9) a Current Pay Obligation, (10) a DIP Collateral Obligation, (11) convertible into or exchangeable for equity securities, (12) a Discount Obligation (including its purchase price), (13) a Cov-Lite Loan, (14) a Bridge Loan, (15) a Non-Quarterly Asset, (16) a First-Lien Last-Out Loan, (17) a Partial Deferrable Obligation or (18) a Second Lien Loan;

(N)     The Moody's Recovery Rate;

(O)     The S&P Recovery Rate; and

(P)     The Weighted Average Adjusted Moody's Rating Factor.

(v)     If the Monthly Report Determination Date occurs on or after the Effective Date, for each of the limitations and tests specified in the definitions of Concentration Limitations and Collateral Quality Test, (1) the result, (2) the related minimum or maximum test level and any calculation of such amount (calculated with and without the, the Excess Weighted Average Coupon, the Excess Weighted Average Floating Spread and the modifications to the Weighted Average Floating Spread calculation relating to LIBOR Floor Obligations (which calculation, with respect to the Minimum Floating Spread Test, will consist of the test level and the calculation of (x) the Weighted Average Floating Spread without giving effect to modifications relating to LIBOR Floor Obligations, (y) the Weighted Average Floating Spread giving effect to modifications relating to LIBOR Floor Obligations and (z) the calculated amount of the modifications relating to LIBOR Floor Obligations), as applicable) and (3) a determination as to whether such result satisfies the related test.

(vi)     The calculation of each of the following:

(A)     Each Interest Coverage Ratio (and setting forth each related Required Coverage Ratio); and

(B)     Each Overcollateralization Ratio (and setting forth each related Required Coverage Ratio and the Overcollateralization Ratio required to pass the Interest Reinvestment Test).

(vii)     For each Account, a schedule showing the beginning balance, each credit or debit specifying the nature, source and amount, and the ending balance.

(viii)     A schedule showing for each of the following the beginning balance, the amount of Interest Proceeds received from the date of determination of the immediately preceding Monthly Report, and the ending balance for the current Measurement Date:

(A)     Interest Proceeds from Collateral Obligations; and

(B)     Interest Proceeds from Eligible Investments.

(ix)     Purchases, prepayments, and sales:

(A)     The identity, Principal Balance (other than any accrued interest that was purchased with Principal Proceeds (but excluding any capitalized interest)), Principal Proceeds and Interest Proceeds received, and date for (X) each Collateral Obligation that was released for sale or disposition pursuant to Section 12.1 (Sales of Collateral Obligations) since the Monthly Report Determination Date related to the prior calendar month and (Y) for each prepayment or redemption of a Collateral Obligation, and in the case of (X), whether such Collateral Obligation was a Credit Risk Obligation or a Credit Improved Obligation, whether the sale of such Collateral Obligation was a discretionary sale; and

(B)     The identity, Principal Balance (other than any accrued interest that was purchased with Principal Proceeds (but excluding any capitalized interest)), and Principal Proceeds and Interest Proceeds expended to acquire each Collateral Obligation acquired pursuant to Section 12.2 (Purchase of Additional Collateral Obligations) since the Monthly Report Determination Date related to the prior calendar month.

(x)     The identity of each Defaulted Obligation, the S&P Collateral Value and Market Value of each such Defaulted Obligation and date of default thereof.

(xi)     The identity of each Collateral Obligation with an S&P Rating of "CCC+" or below and/or a Moody's Rating of "Caa1" or below and the Market Value of each such Collateral Obligation included in the Excess CCC/Caa Adjustment Amount.

(xii)     The identity of each Deferring Obligation, the S&P Collateral Value and Market Value of each Deferring Obligation, and the date on which interest was last paid in full in cash thereon.

(xiii)     For any Collateral Obligation, whether the rating of such Collateral Obligation has been upgraded, downgraded or put on credit watch by any Rating Agency since the date of the immediately preceding Monthly Report and such old and new rating or the implication of such credit watch.

(xiv)     Whether the Issuer has been notified that the Class Break-even Default Rate has been modified.

(xv)     The results of the S&P CDO Monitor Test, including the Class Default Differential and the characteristics of the current portfolio.

(xvi)   The identity of each Current Pay Obligation, the Market Value of each such Current Pay Obligation, the percentage of the Collateral Principal Amount comprised of Current Pay Obligations, the portfolio limitation for Current Pay Obligations expressed as a percentage of the Collateral Principal Amount and whether such limitation is satisfied.

(xvii)   For each Hedge Agreement, a schedule showing (x) the notional balance thereof and (y) any amounts due to or from the Hedge Counterparty for such Hedge Agreement.

(xviii)  Such other information as the Trustee, any Hedge Counterparty, the Rating Agency or the Portfolio Manager may reasonably request.

(xix)   With respect to each Trading Plan commenced or completed since the date of determination of the immediately preceding Monthly Report or Distribution Report, as applicable, the obligor, rating, maturity, trade date and settlement status of each Collateral Obligation sold (or to be sold) and purchased (or to be purchased) pursuant thereto (which details shall be reported on a dedicated page of the Monthly Report).

(xx)   The identity of each ETB Subsidiary and the identity of each Equity Security, if any, held by each such ETB Subsidiary and the amount of Cash, if any, held by each such ETB Subsidiary.

(xxi)   A list of the Eligible Investments, including, with respect to each such Eligible Investment, the obligor thereon, the stated maturity thereof and the S&P Rating thereof (unless such rating is based on a credit estimate unpublished by S&P).

(xxii)  The Weighted Average Floating Spread as of such date of determination.

(xxiii) Following the end of the Reinvestment Period, a schedule of all Collateral Obligations that the Issuer has purchased on a trade date basis but with respect to which the settlement date has not yet occurred.

(xxiv)  The Diversity Score.

Upon receipt of each Monthly Report, the Portfolio Manager shall (a) notify the Issuer (who shall notify S&P) if such Monthly Report indicates that the S&P CDO Monitor Test has not been satisfied as of the relevant Measurement Date and (b) compare the information contained in such Monthly Report to the information contained in its records with respect to the Assets and shall, within three Business Days after receipt of such Monthly Report, notify the Issuer, the Collateral Administrator, the Rating Agency and the Trustee if the information contained in the Monthly Report does not conform to the information maintained by the Trustee with respect to the Assets.  In the event that any discrepancy exists, the Trustee and the Issuer, or the Portfolio Manager on behalf of the Issuer, shall attempt to resolve the discrepancy.  If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days cause the

Independent accountants appointed by the Issuer pursuant to Section 10.9 (Reports by Independent Accountants) to review such Monthly Report and the Trustee's records to determine the cause of such discrepancy.  If such review reveals an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be utilized in making all calculations pursuant to this Indenture and notice of any error in the Monthly Report shall be sent as soon as practicable by the Issuer to all recipients of such report.  In addition, the Portfolio Manager or the Collateral Administrator at the direction of the Portfolio Manager shall deliver to S&P the S&P Excel Default Model Input File with each Monthly Report.

(b)     Payment Date Accounting.  The Issuer shall prepare or cause to be prepared a report (each a "Distribution Report"), determined as of the close of business on each Determination Date preceding a Payment Date, and shall deliver such Distribution Report (including, at the election of the Issuer, via appropriate electronic means acceptable to the recipient) to the Trustee, the Portfolio Manager, Intex Solutions, Inc. and the Rating Agency not later than the Business Day preceding the related Payment Date.  The Distribution Report shall contain the following information:

(i)     (a) the Aggregate Outstanding Amount of the Secured Notes of each Class at the beginning of the Interest Accrual Period and such amount as a percentage of the original Aggregate Outstanding Amount of the Secured Notes of such Class, the amount of principal payments to be made on the Secured Notes of each Class on the next Payment Date, the amount of any Deferred Interest on each Class of Deferrable Notes, and the Aggregate Outstanding Amount of the Secured Notes of each Class after giving effect to the principal payments, if any, on the next Payment Date and such amount as a percentage of the original Aggregate Outstanding Amount of the Secured Notes of such Class and (b) the Aggregate Outstanding Amount of the Subordinated Notes at the beginning of the Interest Accrual Period and such amount as a percentage of the original Aggregate Outstanding Amount of the Subordinated Notes, the amount of payments to be made on the Subordinated Notes in respect of Subordinated Note Redemption Price on the next Payment Date, and the Aggregate Outstanding Amount of the Subordinated Notes after giving effect to such payments, if any, on the next Payment Date and such amount as a percentage of the original Aggregate Outstanding Amount of the Subordinated Notes;

(ii)     the Note Interest Rate and accrued interest for each applicable Class of Secured Notes for such Payment Date;

(iii)     the amounts payable pursuant to each clause of Section 11.1(a)(i) (Disbursements of Monies from Payment Account), each clause of Section 11.1(a)(ii) (Disbursements of Monies from Payment Account) and, if applicable, each clause of Section 11.1(a)(iii) (Disbursements of Monies from Payment Account) on the related Payment Date;

(iv)     with respect to the first and second Determination Dates, the amount of Principal Proceeds designated as Designated Principal Proceeds to be treated as Interest Proceeds;

(v)     for the Collection Account:

(A)     the Balance on deposit in the Collection Account at the end of the related Collection Period (or, with respect to the Interest Collection Subaccount, the next Business Day);

(B)     the amounts payable from the Collection Account to the Payment Account, in order to make payments pursuant to Section 11.1(a)(i) (Disbursements of Monies from Payment Account), Section 11.1(a)(ii) (Disbursements of Monies from Payment Account) and, if applicable, Section 11.1(a)(iii) (Disbursements of Monies from Payment Account) on the next Payment Date (net of amounts which the Portfolio Manager intends to re-invest in additional Collateral Obligations pursuant to Article 12); and

(C)     the Balance remaining in the Collection Account immediately after all payments and deposits to be made on such Payment Date; and

(vi)     such other information as the Trustee, any Hedge Counterparty or the Portfolio Manager may reasonably request.

Each Distribution Report shall constitute instructions to the Trustee to withdraw funds from the Payment Account and pay or transfer such amounts set forth in such Distribution Report in the manner specified and in accordance with the priorities established in Section 11.1 (Disbursements of Monies from Payment Account).

(c)     Interest Rate Notice.  The Trustee shall post to its website, no later than the sixth day after each Payment Date, a notice setting forth the Note Interest Rate for the Secured Notes for the Interest Accrual Period preceding the next Payment Date.

(d)     [RESERVED]

(e)     Failure to Provide Accounting.  If the Trustee shall not have received any accounting provided for in this Section 10.7 (Accountings) on the first Business Day after the date on which such accounting is due to the Trustee, the Trustee shall use all reasonable efforts to cause such accounting to be made by the applicable Payment Date. To the extent the Trustee is required to provide any information or reports pursuant to this Section 10.7 (Accountings) as a result of the failure of the Issuer to provide such information or reports, the Trustee shall be entitled to retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for such Independent certified public accountant shall be reimbursed pursuant to Section 6.7 (Trustee Compensation and Reimbursement).

(f)     <u>Required Content of Certain Reports</u>.   Each Monthly Report and each Distribution Report sent to any Holder or beneficial owner of an interest in a Note shall contain, or be accompanied by, the following notices:

The Notes may be held or beneficially owned, as applicable, only by Persons that (a)(i) are not U.S. persons and are purchasing their beneficial interest in an offshore transaction or (ii) are either (A) Qualified Purchasers (as defined for purposes of Section 3(c)(7) of the Investment Company Act) ("<u>Qualified Purchasers</u>") or (B) (in the case of the Subordinated Notes only) Knowledgeable Employees (as defined in Rule 3c-5 under the Investment Company Act) ("<u>Knowledgeable Employees</u>") with respect to the Issuer or corporations, partnerships, limited liability companies or other entities (other than trusts) each shareholder, partner, member or other equity owner of which is either (x) a Knowledgeable Employee with respect to the Issuer or (y) a Qualified Purchaser that in the case of (A) and (B) are either (1) "institutional" accredited investors ("<u>Accredited Investors</u>") (in the case of the Class E Notes and the Subordinated Notes only) meeting the requirements of Rule 501(a)(1), (2), (3) or (7) under the Securities Act, who, in the case of Subordinated Notes only, if "individual" Accredited Investors, are also Knowledgeable Employees with respect to the Issuer or (2) qualified institutional buyers ("<u>Qualified Institutional Buyers</u>") within the meaning of Rule 144A under the Securities Act and (b) can make the representations set forth in <u>Section 2.6</u> (Registration, Registration of Transfer and Exchange) of this Indenture or the appropriate Exhibit to this Indenture.   Beneficial ownership interests in the Rule 144A Global Notes may be transferred only to a Person that is both a Qualified Institutional Buyer and a Qualified Purchaser and that can make the representations referred to in clause (b) of the preceding sentence.   The Issuer has the right to compel any beneficial owner of an interest in Rule 144A Global Notes that does not meet the qualifications set forth in such clauses to sell its interest in such Notes, or may sell such interest on behalf of such owner, pursuant to <u>Section 2.12</u> (Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations) of this Indenture.

Each Holder or beneficial owner receiving this report agrees to keep all non-public information herein confidential and not to use such information for any purpose other than its evaluation of its investment in the Offered Securities, *provided* that any Holder or beneficial owner may provide such information on a confidential basis to any prospective purchaser of such Holder or beneficial owner's Offered Securities that is permitted by the terms of this Indenture to acquire such Holder or beneficial owner's Offered Securities and that agrees to keep such information confidential in accordance with the terms of this Indenture.

In addition, the Trustee shall deliver the foregoing notice under the name of the Issuer to DTC for forwarding to its participants on at least an annual basis with the heading "Important Reminder Notice."

(g)     <u>Initial Purchaser Information</u>. The Issuer and the Initial Purchaser, or any successor to the Initial Purchaser, may post the information contained in a Monthly Report or Distribution Report to a password-protected internet site accessible only to the Holders of the Notes and to the Portfolio Manager.

(h)     <u>Availability of Reports</u>.  The Trustee will make the Monthly Report and the Distribution Report available via its internet website initially located at

www.usbank.com/cdo on a password protected basis. The Trustee shall separately post the information required under Section 10.7(a)(xix) (Accountings) to its internet website promptly upon knowledge of the Issuer entering into a Trading Plan. Parties that are unable to use the above distribution option are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such. The Trustee shall have the right to change the way such statements are distributed in order to make such distribution more convenient and/or more accessible to the above parties and the Trustee shall provide timely and adequate notification to all above parties regarding any such changes. As a condition to access to the Trustee's internet website, the Trustee may require registration and the acceptance of a disclaimer. The Trustee will not be liable for the dissemination of information in accordance with this Indenture. The Trustee shall be entitled to rely on but shall not be responsible for the content or accuracy of any information provided in the information set forth in the Monthly Report and the Distribution Report and may affix thereto any disclaimer it deems appropriate in its reasonable discretion. Each Holder that has previously provided evidence that it is the holder of a Note may at any time be requested by the Trustee or the Portfolio Manager to reconfirm that it continues to be the holder of a Note. If such evidence has not been provided by a Holder to the reasonable satisfaction of the Portfolio Manager within 45 days of any such request, such Holder will have no further right to obtain either the Monthly Report, the Distribution Report or the associated commentary. The Trustee shall provide the Rating Agency, the Portfolio Manager, each Holder (and, upon receipt of a written request therefor in the form of Exhibit I certifying that it is a holder of a beneficial interest in a Note, to any beneficial owner of a Note) and Intex Solutions, Inc. access to its internet website.

    (i)    <u>Required Actions</u>.

        (i)    <u>DTC Actions</u>. The Issuer will direct DTC to take the following steps in connection with the Global Notes:

            (A)    The Issuer will direct DTC to include the marker "3c7" in the DTC 20-character security descriptor and the 48-character additional descriptor for the Rule 144A Global Notes in order to indicate that sales are limited to Qualified Purchasers.

            (B)    The Issuer will direct DTC to cause each physical deliver order ticket that is delivered by DTC to purchasers to contain the 20-character security descriptor. The Issuer will direct DTC to cause each deliver order ticket that is delivered by DTC to purchasers in electronic form to contain a "3c7" indicator and a related user manual for participants. Such user manual will contain a description of the relevant restrictions imposed by Section 3(c)(7).

            (C)    On or prior to the Closing Date, the Issuer will instruct DTC to send a Section 3(c)(7) Notice to all DTC participants in connection with the offering of the Rule 144A Global Notes.

(D)     In addition to the obligations of the Registrar set forth in Section 2.5 (Execution, Authentication, Delivery and Dating), the Issuer will from time to time (upon the request of the Trustee) make a request to DTC to deliver to the Issuer a list of all DTC participants holding an interest in the Rule 144A Global Notes.

(E)     The Issuer will cause each CUSIP number obtained for a Global Note to have a fixed field containing "3c7" and "144A" indicators, as applicable, attached to such CUSIP number.

(ii)     Bloomberg Screens, Etc.  The Issuer will from time to time request all third-party vendors to include on screens maintained by such vendors appropriate legends regarding Rule 144A and Section 3(c)(7) under the Investment Company Act restrictions on the Global Notes.  Without limiting the foregoing, the Issuer will cause the Initial Purchaser to request (prior to the Closing Date) that each third-party vendor include the following legends on each screen containing information about the Notes:

(A)     Bloomberg.

(w)     "Iss'd Under 144A/3c7," to be stated in the "Note Box" on the bottom of the "Security Display" page describing the Global Notes;

(x)     a flashing red indicator stating "See Other Available Information" located on the "Security Display" page;

(y)     a link to an "Additional Security Information" page on such indicator stating that the Rule 144A Global Notes are being offered in reliance on the exception from registration under Rule 144A of the Securities Act of 1933 to persons that are both (i) "Qualified Institutional Buyers" as defined in Rule 144A under the Securities Act and (ii) "Qualified Purchasers" as defined under Section 2(a)(51) of the Investment Company Act of 1940, as amended; and

(z)     a statement on the "Disclaimer" page for the Global Notes that the Notes will not be and have not been registered under the Securities Act of 1933, as amended, that the Issuer has not been registered under the Investment Company Act of 1940, as amended, and that the Rule 144A Global Notes may only be offered or sold in accordance with Section 3(c)(7) of the Investment Company Act of 1940, as amended.

(B)     Reuters.

(x)     a "144A – 3c7" notation included in the security name field at the top of the Reuters Instrument Code screen;

(y)    a <144A3c7Disclaimer> indicator appearing on the right side of the Reuters Instrument Code screen; and

(z)    a link from such <144A3c7Disclaimer> indicator to a disclaimer screen containing the following language:  "These Notes may be sold or transferred only to Persons who are both (i) Qualified Institutional Buyers, as defined in Rule 144A under the Securities Act and (ii) Qualified Purchasers, as defined under Section 3(c)(7) under the U.S. Investment Company Act of 1940."

(j)    <u>Trading Plans</u>.  Following notice or knowledge of such failure, the Issuer shall provide notice of any failed Trading Plan to Moody's and S&P.

Section 10.8.  <u>Release of Securities</u>.  (a) The Issuer may, by Issuer Order or a trade confirmation or a written direction from an Authorized Officer of the Portfolio Manager, delivered to the Trustee at least two Business Days prior to the settlement date for any sale of a security certifying that the sale of such security is being made in accordance with <u>Section 12.1</u> (Sales of Collateral Obligations) hereof and such sale complies with all applicable requirements of <u>Section 12.1</u> (Sales of Collateral Obligations), (which certification shall be deemed to have been made upon the delivery of such Issuer Order or other direction) direct the Trustee to release or cause to be released such security from the lien of this Indenture and, upon receipt of such Issuer Order or other direction, the Trustee shall deliver any such security, if in physical form, duly endorsed to the broker or purchaser designated in such Issuer Order or other direction or, if such security is a Clearing Corporation Security, cause an appropriate transfer thereof to be made, in each case against receipt of the sales price therefor as specified by the Portfolio Manager in such Issuer Order or other direction; *provided* that the Trustee may deliver any such security in physical form for examination in accordance with street delivery custom.  The Trustee shall, upon receipt of an Issuer Order or a written direction from an Authorized Officer of the Portfolio Manager, release from the lien of this Indenture any Collateral Obligation or other Asset being transferred to an ETB Subsidiary and deliver such Asset to be held by the ETB Subsidiary in exchange for the pledge of the equity interest in such ETB Subsidiary.  Such Issuer Order or direction shall be executed by an Authorized Officer of the Portfolio Manager, request release of a Collateral Obligation or other Asset, certify that such release is permitted under this Indenture and request that the Trustee execute the agreements, releases or other documents releasing such Asset as presented to it by the Portfolio Manager.

(b)    Subject to <u>Article 12</u> hereof, the Trustee shall upon written direction from an Authorized Officer of the Portfolio Manager (i) deliver any Pledged Obligation, and release or cause to be released such security from the lien of this Indenture, which is set for any mandatory call or redemption or payment in full to the appropriate paying agent on or before the date set for such call, redemption or payment, in each case against receipt of the call or redemption price or payment in full thereof and (ii) provide notice thereof to the Portfolio Manager.

(c)    Upon receiving actual notice of any Offer (as defined below) or any request for a waiver, consent, amendment or other modification with respect to any Collateral Obligation, the Trustee on behalf of the Issuer shall notify the Portfolio

Manager of any Collateral Obligation that is subject to a tender offer, voluntary redemption, exchange offer, conversion or other similar action (an "Offer") or such request.  Unless the Notes have been accelerated following an Event of Default, the Portfolio Manager may direct (x) the Trustee to accept or participate in or decline or refuse to participate in such Offer and, in the case of acceptance or participation, to release from the lien of this Indenture such Collateral Obligation in accordance with the terms of the Offer against receipt of payment therefor or (y) the Issuer or the Trustee to agree to or otherwise act with respect to such consent, waiver, amendment or modification.

(d)     As provided in Section 10.2(a) (Collection Account), the Trustee shall deposit any proceeds received by it from the disposition of a Pledged Obligation in the applicable subaccount of the Collection Account, unless simultaneously applied to the purchase of additional Collateral Obligations or Eligible Investments as permitted under and in accordance with the requirements of this Article 10 and Article 12.

(e)     The Trustee shall, upon receipt of an Issuer Order at such time as there are no Secured Notes Outstanding and all obligations of the Co-Issuers hereunder in favor of the Holders of the Secured Notes and the Trustee have been satisfied, release any remaining Assets from the lien of this Indenture.

(f)     Any security, Collateral Obligation or amounts that are released pursuant to Section 10.8(a), (b) or (c) (Release of Securities) shall be released from the lien of this Indenture.

Section 10.9.   Reports by Independent Accountants.  (a) At the Closing Date, the Issuer shall appoint one or more firms of Independent certified public accountants of recognized international reputation for purposes of reviewing and delivering the reports or certificates of such accountants required by this Indenture, which may be the firm of Independent certified public accountants that performs accounting services for the Issuer or the Portfolio Manager. The Issuer may remove any firm of Independent certified public accountants at any time without the consent of any Holder of Notes.  Upon any resignation by such firm or removal of such firm by the Issuer, the Issuer (or the Portfolio Manager on behalf of the Issuer) shall promptly appoint by Issuer Order delivered to the Trustee and the Rating Agency a successor thereto that shall also be a firm of Independent certified public accountants of recognized international reputation, which may be a firm of Independent certified public accountants that performs accounting services for the Issuer or the Portfolio Manager.  If the Issuer shall fail to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after such resignation, the Issuer shall promptly notify the Trustee of such failure in writing.  If the Issuer shall not have appointed a successor within ten days thereafter, the Portfolio Manager shall promptly appoint a successor firm of Independent certified public accountants of recognized international reputation.  The fees of such Independent certified public accountants and its successor shall be payable by the Issuer. The Trustee shall not have any responsibility to the Issuer or the Secured Parties hereunder to make any inquiry or investigation as to, and shall have no obligation in respect of, the terms of any engagement of Independent certified public accountants by the Issuer (or the Portfolio Manager on behalf of the Issuer); *provided* that the Trustee shall be authorized, and the Issuer hereby directs the Trustee, to execute any

acknowledgment or other agreement with the Independent certified public accountants required for the Trustee to receive any of the reports or instructions provided for herein, which acknowledgment or agreement may include, among other things, (i) acknowledgements with respect to the sufficiency of the agreed upon procedures to be performed by the Independent certified public accountants by the Issuer, (ii) releases of claims (on behalf of itself and the Holders) and other acknowledgments of limitations of liability in favor of the Independent certified public accountants, or (iii) restrictions or prohibitions on the disclosure of information or documents provided to it by such firm of Independent certified public accountants (including to the Holders). It is understood and agreed that the Trustee will deliver such acknowledgement or other agreement in conclusive reliance on the foregoing direction of the Issuer, and the Trustee shall make no inquiry or investigation as to, and shall have no obligation in respect of, the sufficiency, validity or correctness of such procedures. Notwithstanding the foregoing, in no event shall the Trustee be required to execute any agreement in respect of the Independent certified public accountants that the Trustee determines adversely affects it in its individual capacity.

(b)     Upon the written request of the Trustee, or any Holder or beneficial owner, the Issuer will use commercially reasonable efforts to cause the firm of Independent certified public accountants appointed pursuant to <u>Section 10.9(a)</u> (Reports by Independent Accountants) to provide such Holder or beneficial owner with all of the information required to be provided by the Issuer pursuant to <u>Section 7.17(b)</u>, <u>(d)</u> or <u>(f)</u> (Certain Tax Matters) or assist the Issuer in the preparation thereof.

(c)     Notwithstanding any provision of this Indenture to the contrary, each Person that does not sign and deliver to the Issuer's firm of Independent certified public accountants a written confirmation in the form provided by such firm of Independent certified public accountants indicating the procedures employed by such firm of Independent certified public accountants in connection with each report specified in <u>Section 12.1(e)</u> (Sale of Collateral Obligations) and the Accountants' Reports specified in <u>7.18(c)</u> (Ramp-up Period; Purchase of Additional Collateral Obligations) are acceptable for its purposes and that it has taken responsibility for the sufficiency of such procedures will not be entitled to receive any such report or Accountants' Report and shall receive, to the extent it is otherwise entitled to receive any such report or Accountants' Report pursuant to this Indenture, a certificate of the Issuer in the form of <u>Schedule 6</u> hereto in lieu thereof.  In the event such firm requires the Trustee to agree to the procedures performed by such firm, the Issuer shall direct the Trustee in writing to so agree; it being understood and agreed that the Trustee will deliver such letter of agreement in conclusive reliance upon the direction of the Issuer, and the Trustee makes no independent inquiry or investigation as to, and shall have no obligation or liability in respect of, the sufficiency, validity or correctness of such procedures.

(d)     The Trustee and the Collateral Administrator shall have no responsibility to the Issuer or the Secured Parties hereunder to make any inquiry or investigation as to, and shall have no obligation in respect of, the terms of any engagement of Independent accountants by the Issuer (or the Portfolio Manager on behalf of the Issuer); *provided* that the Trustee and the Collateral Administrator shall be authorized, upon receipt of an Issuer Order directing the same, to execute any acknowledgment or other agreement with the

Independent accountants required for the Trustee and the Collateral Administrator to receive any of the reports or instructions provided for herein, which acknowledgment or agreement may include, among other things, (i) acknowledgements with respect to the sufficiency of the agreed upon procedures to be performed by the Independent accountants by the Issuer, (ii) releases of claims (on behalf of itself and the Holders) and other acknowledgments of limitations of liability in favor of the Independent accountants and (iii) restrictions or prohibitions on the disclosure of information or documents provided to it by such firm of Independent accountants (including to the Holders). It is understood and agreed that the Trustee and the Collateral Administrator will deliver such acknowledgement or other agreement in conclusive reliance on the foregoing direction of the Issuer, and the Trustee shall make no inquiry or investigation as to, and shall have no obligation in respect of, the sufficiency, validity or correctness of such procedures. Notwithstanding the foregoing, in no event shall the Trustee or the Collateral Administrator be required to execute any agreement in respect of the Independent accountants that the Trustee or the Collateral Administrator determines adversely affects it in its individual capacity.

Section 10.10. Reports to the Rating Agency and Additional Recipients; Rule 17g-5 Procedures. (a) In addition to the information and reports specifically required to be provided to the Rating Agency pursuant to the terms of this Indenture, the Issuer shall provide the Rating Agency with all information or reports delivered to the Trustee hereunder, and such additional information as the Rating Agency may from time to time reasonably request (including notification to the Rating Agency of any modification of any loan document relating to a DIP Collateral Obligation or any release of collateral thereunder not permitted by such loan documentation and of any amendment or the occurrence of a Material Change with respect to any Collateral Obligation that is the subject of a rating estimate by the Rating Agency).

(b) The Trustee (without assuming any obligations to any such person, including for its failure to do so) shall make available to the persons identified on Schedule 7 (if any) (including by access to its password protected website) duplicate copies of all reports, notices and statements that the Trustee is required to deliver to any Holder, at the address specified in Schedule 7.

(c) The Trustee shall, upon the written request of the Portfolio Manager, provide the Portfolio Manager with a list of all registered Holders of Notes. In addition, if so requested by the Portfolio Manager in writing, the Trustee shall request that DTC request the identity of its participants.

(d) The Issuer shall submit, or shall cause the Portfolio Manager to submit on its behalf, at least every twelve months (from the date of the last such credit estimate), a request to S&P to perform a credit estimate on each Collateral Obligation with a credit estimate, together with the information reasonably required by S&P to perform such credit estimate.

(e) If the Trustee or the Issuer receives confirmation of the S&P Rating Condition in connection with this Indenture or the transactions contemplated hereby, such

Person shall promptly forward such confirmation to the other such Person and to the Portfolio Manager.

(f)     (i)     The Trustee shall notify the Portfolio Manager of the internet address of the website to which the Trustee posts Monthly Reports, Distribution Reports and any other reports relating to this Indenture, the Notes or the transactions contemplated hereby and thereby from time to time.  The Information Agent shall maintain a password-protected website required pursuant to Rule 17g-5 (the "17g-5 Site") in accordance with the Collateral Administration Agreement.

(ii)    If the Trustee responds to requests for information by or otherwise communicates with the Rating Agency in relation to this Indenture, the Trustee agrees to (x) notify the Portfolio Manager of such communication within a reasonable time and (y) use commercially reasonable efforts to assist the Portfolio Manager in complying with Rule 17g-5 (including, but not limited to, providing copies of such communications and/or information provided to the Rating Agency).  The Trustee may, but shall not be obligated to engage in, or respond to, any oral communications from the Rating Agency.

Section 10.11. Procedures Relating to the Establishment of Accounts Controlled by the Trustee.  Notwithstanding anything else contained herein, the Trustee agrees that with respect to each of the Accounts and any Hedge Account, it will cause each Securities Intermediary establishing such accounts to enter into a securities account control agreement and, if the Securities Intermediary is the Bank, in connection with the Accounts, cause the Bank to comply with the provisions of the Securities Account Control Agreement.

ARTICLE 11

APPLICATION OF MONIES

Section 11.1.  Disbursements of Monies from Payment Account.  (a) Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section 11.1 (Disbursements of Monies from Payment Account), on each Payment Date, the Trustee shall disburse amounts transferred from the Collection Account to the Payment Account pursuant to Section 10.2 (Collection Account) in accordance with the following priorities (the "Priority of Payments"); provided that, unless an Acceleration Event has occurred and is continuing, (x) amounts transferred from the Interest Collection Subaccount shall be applied solely in accordance with Section 11.1(a)(i) (Disbursements of Monies from Payment Account); and (y) amounts transferred from the Principal Collection Subaccount shall be applied solely in accordance with Section 11.1(a)(ii) (Disbursements of Monies from Payment Account).

(i)     On each Payment Date (other than Payment Dates on which the Acceleration Priority of Payments is applicable) and on each Redemption Date (to the extent such Redemption Date is not a Payment Date), Interest Proceeds on deposit in the Collection Account, to the extent received on or before the related Determination Date (or if such Determination Date is not a Business Day, the next succeeding Business Day) and that are transferred into the Payment Account, and,

in the case of any Hedge Agreements, payments received on or before such Payment Date, shall be applied in the following order of priority:

(A)    to the payment of taxes, governmental fees and registered office fees owing by the Issuer or the Co-Issuer, if any;

(B)    to the payment of the accrued and unpaid Administrative Expenses up to the Administrative Expense Cap in the order set forth in the definition of Administrative Expenses; *provided* that the Petition Expense Amount may be applied pursuant to this clause (B) to the payment of Petition Expenses at the time that such Petition Expenses are incurred without regard to the Administrative Expense Cap and, if (but only after) the Petition Expense Amount is applied to the payment of Petition Expenses in full, Petition Expenses shall be paid together with other Administrative Expenses subject to the Administrative Expense Cap above; *provided further* that the Petition Expenses paid pursuant to this clause (B) shall be paid in the order set forth in the definition of Administrative Expenses;

(C)    to the payment of the Senior Management Fee to the Portfolio Manager;

(D)    to the payment, *pro rata*, of any amounts due to any Hedge Counterparty under any Hedge Agreement other than amounts due as a result of the termination (or partial termination) of such Hedge Agreement;

(E)    to the payment of accrued and unpaid interest on the Class A-1 Notes and the Class A-2 Notes, *pro rata*, allocated in proportion to the respective amounts of accrued and unpaid interest;

(F)    the payment of accrued and unpaid interest on the Class B-1 Notes and the Class B-2 Notes, *pro rata*, allocated in proportion to the respective amounts of accrued and unpaid interest;

(G)    to the payment, *pro rata*, of any amounts due to any Hedge Counterparty under any Hedge Agreement pursuant to an early termination (or partial termination) of any Hedge Agreement as a result of a Priority Hedge Termination Event;

(H)    if either of the Class A/B Coverage Tests (other than the Interest Coverage Test, in the case of the first Payment Date after the Closing Date) is not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both Class A/B Coverage Tests to be met;

(I)    to the payment of accrued and unpaid interest on the Class C Notes;

(J)     to the payment of any Deferred Interest on the Class C Notes (and interest accrued thereon);

(K)     if either of the Class C Coverage Tests (other than the Interest Coverage Test, in the case of the first Payment Date after the Closing Date) is not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both Class C Coverage Tests to be met;

(L)     to the payment of accrued and unpaid interest on the Class D Notes;

(M)     to the payment of any Deferred Interest on the Class D Notes (and interest accrued thereon);

(N)     if either of the Class D Coverage Tests (other than the Interest Coverage Test, in the case of the first Payment Date after the Closing Date) is not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence, to the extent necessary to cause both Class D Coverage Tests to be met;

(O)     to the payment of accrued and unpaid interest on the Class E Notes;

(P)     to the payment of any Deferred Interest on the Class E Notes (and interest accrued thereon);

(Q)     if either Class E Coverage Test (other than the Interest Coverage Test, in the case of the first Payment Date after the Closing Date) is not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both Class E Coverage Tests to be met;

(R)     if the Effective Date Conditions have not been satisfied on or prior to such Payment Date, at the election of the Portfolio Manager to (x) the payment of principal of the Secured Notes in accordance with the Note Payment Sequence or (y) purchase Collateral Obligations, in each case, in the amount necessary so that the Rating Agency will be able to confirm its Initial Rating on the Secured Notes (including by means of a deemed confirmation as set forth in the definition of S&P Rating Condition) or the Secured Notes are paid in full, as applicable;

(S)     during the Reinvestment Period only, if the Interest Reinvestment Test is not satisfied on the related Determination Date, an amount equal to the lesser of (i) 50% of the Interest Proceeds remaining as of such Payment Date and (ii) an amount which would cause the Interest Reinvestment Test to be satisfied, at the discretion of the Portfolio Manager either (1) to the Collection Account as Principal Proceeds to

purchase additional Collateral Obligations or (2) to the payment of principal of the Secured Notes in accordance with the Note Payment Sequence;

(T)    (1) first, to the payment of any accrued and unpaid Subordinated Management Fee to the Portfolio Manager, together with accrued interest thereon, (2) second, to the payment of any Administrative Expenses not paid in full pursuant to clause (B) above due to the limitation contained therein and (3) third, to the payment of any expenses incurred in connection with a Refinancing;

(U)    to the payment of any amounts due to any Hedge Counterparty under any Hedge Agreement pursuant to an early termination (or partial termination) of any Hedge Agreement not otherwise paid pursuant to clause (G) above;

(V)    unless each of the Effective Date Conditions has been satisfied, all remaining Interest Proceeds to the Interest Collection Subaccount as Interest Proceeds for distribution on the next subsequent Payment Date;

(W)    to the Holders of the Subordinated Notes in an amount necessary (taking into account all payments made to the Holders of the Subordinated Notes on prior Payment Dates) to cause the Incentive Management Fee Threshold to be satisfied; and

(X)    any remaining Interest Proceeds shall be paid as follows: (i) 15% of such remaining Interest Proceeds to the Portfolio Manager as the Incentive Management Fee and (ii) 85% of such remaining Interest Proceeds to the Holders of the Subordinated Notes;

*provided* that, in lieu of the payment of Interest Proceeds referred to under clause (X)(ii) above, in whole or in part on any Payment Date, the Portfolio Manager, on behalf of the Issuer, shall have the right to direct the Trustee to distribute any Equity Securities *pro rata* to the Consenting Holders of the Subordinated Notes with respect to such Payment Date to the extent that the Market Value of such Equity Securities (determined by the Portfolio Manager as of the relevant Determination Date) is equal to or lower than the aggregate amount of Interest Proceeds that would otherwise be due and payable on such Payment Date to such Consenting Holders of the Subordinated Notes. Interest Proceeds in an amount equal to or greater than the Market Value of such Equity Securities (determined by the Portfolio Manager as of the relevant Determination Date) distributed to the Consenting Holders of the Subordinated Notes with respect to any such Payment Date shall be treated for all purposes by the Issuer and the Trustee as Principal Proceeds available for distribution in accordance with the Priority of Payments on the relevant Payment Date. In connection therewith, the amount of Interest Proceeds available on the relevant Payment Date shall be reduced and the amount of Principal Proceeds available on the relevant Payment Date shall be increased in corresponding amounts.

(ii)    On each Payment Date (other than Payment Dates on which the Acceleration Priority of Payments is applicable) and on each Redemption Date (to the extent such Redemption Date is not a Payment Date), Principal Proceeds on deposit in the Collection Account that are received on or before the related Determination Date and that are transferred to the Payment Account shall be applied, except for any Principal Proceeds that will be used to settle binding commitments (entered into prior to the Determination Date) for the purchase of Collateral Obligations, in the following order of priority:

(A)    to pay the amounts referred to in clauses (A) through (H) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account) (in the priority stated therein), but (a) only to the extent not paid in full thereunder and (b) subject to the Administrative Expense Cap; *provided* that, if the Senior Notes have been repaid in full, to pay the amounts referred to in Section 11.1(a)(i) (Disbursements of Monies from Payment Account) above, through and including full payment of accrued and unpaid interest on the Controlling Class;

(B)    to pay as contemplated in Section 11.1(a)(i) (Disbursements of Monies from Payment Account) (1) the amounts referred to in clauses (I) and (J); *provided* that payments under clauses (I) and (J) shall be made only to the extent the Class C Notes are the Controlling Class on such Payment Date; (2) then, the amounts referred to in clause (K); (3) then, the amounts referred to in clauses (L) and (M); *provided* that payments under clauses (L) and (M) shall be made only to the extent the Class D Notes are the Controlling Class on such Payment Date; (4) then, the amounts referred to in clause (N); (5) then, the amounts referred to in clauses (O) and (P); *provided* that payments under clauses (O) and (P) shall be made only to the extent the Class E Notes are the Controlling Class on such Payment Date; and (6) then, the amounts referred to in clause (Q); but, in each case, (a) only to the extent not paid in full thereunder and (b) subject to any applicable caps or other limitations expressly described therein;

(C)    to make payments in accordance with the Note Payment Sequence in the amount of the Special Redemption Amount, if any;

(D)    on any Redemption Date (other than a Redemption Date relating to a Refinancing), (1) first, to pay the Redemption Price of the Secured Notes in accordance with the Note Payment Sequence and (2) second, to the payments under clauses (T) and (U) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account) (in the same order of priority specified thereunder, but only to the extent not paid in full thereunder and without regard to any cap thereunder);

(E)    (1) during the Reinvestment Period, at the discretion of the Portfolio Manager, to the Collection Account as Principal Proceeds to

invest in Eligible Investments and/or additional Collateral Obligations or (2) at the sole discretion of the Portfolio Manager, after the Reinvestment Period, so long as no Event of Default has occurred and is continuing, Principal Proceeds received with respect to Credit Risk Obligations and Unscheduled Principal Payments to the Collection Account as Principal Proceeds to invest in Eligible Investments and/or to the purchase of additional Collateral Obligations in accordance with the Post-Reinvestment Period Investment Criteria;

(F)    after the Reinvestment Period, to make payments in accordance with the Note Payment Sequence;

(G)    after the Reinvestment Period, to (1) first, the payment of accrued but unpaid Subordinated Management Fees, together with accrued interest thereon, and (2) second, Administrative Expenses as referred to in Section 11.1(a)(i)(T)(2) (Disbursements of Monies from Payment Account) in the priority stated therein, but only to the extent not paid in full thereunder;

(H)    after the Reinvestment Period, to the payment, *pro rata* of any amount due to any Hedge Counterparty as referred to in Section 11.1(a)(i)(U) (Disbursements of Monies from Payment Account), but only to the extent not paid in full thereunder;

(I)    to the Holders of the Subordinated Notes in an amount necessary (taking into account all payments made to the Holders of Subordinated Notes on prior Payment Dates and all payments made under Section 11.1(a)(i)(W) (Disbursements of Monies from Payment Account) on such Payment Date) to cause the Incentive Management Fee Threshold to be satisfied; and

(J)    any remaining Principal Proceeds shall be paid as follows: (i) 15% of such remaining Principal Proceeds to the Portfolio Manager as the Incentive Management Fee and (ii) 85% of such remaining Principal Proceeds to the Holders of the Subordinated Notes.

(iii)    Notwithstanding the provisions of Section 11.1(a)(i) and 11.1(a)(ii) (Disbursements of Monies from Payment Account), if declaration of acceleration of the maturity of the Secured Notes has occurred following an Event of Default and such acceleration has not been rescinded or annulled (an "Acceleration Event"), on each date or dates fixed by the Trustee, all proceeds in respect of the Assets will be applied in the following order of priority (the "Acceleration Priority of Payments"):

(A)    to pay all amounts under clauses (A) through (D) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account) above (only if the Trustee has begun liquidating Assets in accordance with Section 5.5

(Optional Preservation of Assets), such payments to be made without regard to the Administrative Expense Cap);

(B)     to the payment, *pro rata*, of any amounts due to any Hedge Counterparty or under any Hedge Agreement pursuant to an early termination (or partial termination) of any Hedge Agreement as a result of a Priority Hedge Termination Event;

(C)     to the payment of accrued and unpaid interest on the Class A-1 Notes and the Class A-2 Notes, *pro rata*, allocated in proportion to the respective amounts of accrued and unpaid interest until such amounts have been paid in full;

(D)     to the payment of principal of the Class A-1 Notes and the Class A-2 Notes, *pro rata*, based on their respective Aggregate Outstanding Amounts, until such amounts have been paid in full;

(E)     to the payment of accrued and unpaid interest on the Class B-1 Notes and the Class B-2 Notes, *pro rata*, allocated in proportion to the respective amounts of accrued and unpaid interest until such amounts have been paid in full;

(F)     to the payment of principal of the Class B-1 Notes and the Class B-2 Notes, *pro rata*, based on their respective Aggregate Outstanding Amounts, until such amounts have been paid in full;

(G)     to the payment of accrued and unpaid interest and any Deferred Interest on the Class C Notes until such amounts have been paid in full;

(H)     to the payment of principal of the Class C Notes until such amount has been paid in full;

(I)     to the payment of accrued and unpaid interest and any Deferred Interest on the Class D Notes until such amounts have been paid in full;

(J)     to the payment of principal of the Class D Notes until such amount has been paid in full;

(K)     to the payment of accrued and unpaid interest and any Deferred Interest on the Class E Notes until such amounts have been paid in full;

(L)     to the payment of principal of the Class E Notes until such amount has been paid in full;

(M)     (1) first, to the payment of any accrued and unpaid Subordinated Management Fee to the Portfolio Manager, together with accrued interest thereon and (2) second, to the payment of any Administrative Expenses not paid in full pursuant to clause (A) above due to the limitation contained therein (in the priority stated therein);

(N)     to the payment of any amounts due to any Hedge Counterparty under any Hedge Agreement pursuant to an early termination (or partial termination) of such Hedge Agreement not otherwise paid in full pursuant to clause (B) above;

(O)     to the Holders of the Subordinated Notes in an amount necessary (taking into account all payments made to the Holders of the Subordinated Notes on prior Payment Dates) to cause the Incentive Management Fee Threshold to be satisfied; and

(P)     any remaining proceeds shall be paid as follows: (i) 15% of such remaining amounts to the Portfolio Manager as the Incentive Management Fee and (ii) 85% of such remaining amounts to the Holders of the Subordinated Notes.

On the Stated Maturity of the Notes, the Trustee shall pay the net proceeds from the liquidation of the Assets and all available Cash, after the payment of all fees, expenses, including the Trustee's fees and other Administrative Expenses, and interest and principal on the Secured Notes, to the Holders of the Subordinated Notes in final payment of such Subordinated Notes.

(b)     If on any Payment Date the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by the Distribution Report, the Trustee shall make the disbursements called for in the order and according to the priority set forth under Section 11.1(a) (Disbursements of Monies from Payment Account) above, subject to Section 13.1 (Subordination; Non-Petition), to the extent funds are available therefor.

(c)     In connection with the application of funds to pay Administrative Expenses of the Issuer or the Co-Issuer, as the case may be, in accordance with Section 11.1(a)(i) (Disbursements of Monies from Payment Account), Section 11.1(a)(ii) (Disbursements of Monies from Payment Account) and Section 11.1(a)(iii) (Disbursements of Monies from Payment Account), the Trustee shall remit such funds, to the extent available, as directed and designated in an Issuer Order (which may be in the form of standing instructions) delivered to the Trustee no later than the Business Day prior to each Payment Date and which Issuer Order shall be deemed to have been provided in respect of Administrative Expenses identified in the Distribution Report.

(d)     In the event that the Hedge Counterparty defaults in the payment of its obligations to the Issuer under any Hedge Agreement on the date on which any payment is due thereunder, the Trustee at the direction of the Portfolio Manager shall make a

demand on such Hedge Counterparty, or any guarantor, if applicable, demanding payment by 12:30 p.m., New York time, on such date.  The Trustee shall give notice to the Holders of Notes, the Portfolio Manager and the Rating Agency if such Hedge Counterparty continues to fail to perform its obligations for two Business Days following a demand made by the Trustee on such Hedge Counterparty, and shall take such action with respect to such continuing failure as may be directed to be taken pursuant to Section 5.13 (Control by Majority of Controlling Class).

ARTICLE 12

SALE OF COLLATERAL OBLIGATIONS;
PURCHASE OF ADDITIONAL COLLATERAL OBLIGATIONS

Section 12.1.  Sales of Collateral Obligations.  Subject to the satisfaction of the conditions specified in Section 12.3 (Conditions Applicable to All Sale and Purchase Transactions) and *provided* that no Event of Default has occurred and is continuing (except for sales pursuant to Sections 12.1(a), (b), (c), (d), (e), (g) and (h) (Sales of Collateral Obligations)), the Portfolio Manager on behalf of the Issuer may in writing direct the Trustee to sell and the Trustee (on behalf of the Issuer) shall sell in the manner directed by the Portfolio Manager any Collateral Obligation or Equity Security if such sale meets the requirements of any one of paragraphs (a) through (h) of this Section 12.1 (Sales of Collateral Obligations).  For purposes of this Section 12.1 (Sales of Collateral Obligations), the Sale Proceeds of a Collateral Obligation sold by the Issuer shall include any Principal Financed Accrued Interest received in respect of such sale.

(a)      Credit Risk Obligations.  The Portfolio Manager may direct the Trustee to sell any Credit Risk Obligation at any time during or after the Reinvestment Period without restriction.

(b)      Credit Improved Obligations.  The Portfolio Manager may direct the Trustee to sell any Credit Improved Obligation at any time during or after the Reinvestment Period if either:

(i)      during the Reinvestment Period, the Portfolio Manager reasonably believes prior to such sale that it will be able to enter into binding commitments to reinvest all or a portion of the proceeds of such sale, in compliance with the Investment Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Investment Criteria Adjusted Balance of the sold Credit Improved Obligation within 30 Business Days of such sale; or

(ii)      at any time, either (1) the Sale Proceeds from such sale are at least equal to the Investment Criteria Adjusted Balance of the sold Credit Improved Obligation or (2) after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations (excluding the Collateral Obligation being sold but including, without duplication, the anticipated cash proceeds of such sale) *plus*, without duplication, the amounts on deposit in the Accounts (including Eligible

Investments therein) representing Principal Proceeds, will be greater than (or equal to) the Target Balance.

(c)    Defaulted Obligations.  The Portfolio Manager may direct the Trustee to sell any Defaulted Obligation at any time during or after the Reinvestment Period without restriction.

(d)    Equity Securities.  The Portfolio Manager may direct the Trustee to sell any Equity Security or any asset held by any ETB Subsidiary at any time during or after the Reinvestment Period without restriction, and shall use its commercially reasonable efforts to effect the sale of any Equity Security within 45 days of receipt if such Equity Security constitutes Margin Stock, unless such sale is prohibited by applicable law, in which case such Equity Security shall be sold as soon as such sale is permitted by applicable law.

(e)    Optional Redemption; Clean-up Call Redemption.  After the Issuer has notified the Trustee of an Optional Redemption of the Notes in accordance with Section 9.2 (Optional Redemption and Refinancing) or a Clean-up Call Redemption in accordance with Section 9.6 (Clean-up Call Redemption), the Portfolio Manager shall (except in connection with a Refinancing) direct the Trustee to sell (which sale may be through participation) all or a portion of the Collateral Obligations if (i) the applicable requirements of Article 9 (including the certification requirements of Section 9.3(c)(ii) (Redemption Procedures)) are satisfied.

(f)    Discretionary Sales.  The Portfolio Manager may direct the Trustee to sell any Collateral Obligation at any time if (a) during or after the Reinvestment Period, and after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations sold pursuant to this Section 12.1(f) (Sales of Collateral Obligations) during any 12 calendar month period (excluding any Volcker Rule Prohibited Assets) is not greater than 25% of the Collateral Principal Amount as of the beginning of such 12 calendar month period; and (b) either:

(i)    during the Reinvestment Period, the Portfolio Manager reasonably believes prior to such sale that it will be able to enter into binding commitments to reinvest all or a portion of the proceeds of such sale, in compliance with the Investment Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Investment Criteria Adjusted Balance of the sold Collateral Obligation within 30 Business Days of such sale; or

(ii)    at any time, either (1) the Sale Proceeds from such sale are at least equal to the Investment Criteria Adjusted Balance of the sold Collateral Obligation or (2) the Effective Date Overcollateralization Test will be satisfied after giving effect to such sale.

(g)    Mandatory Sales.  The Portfolio Manager shall use its commercially reasonable efforts to effect the sale (regardless of price) of any Collateral Obligation that (i) no longer meets the criteria described in clause (viii) of the definition of "Collateral

Obligation," within 18 months of the failure of such Collateral Obligation to meet any such criteria and (ii) no longer meets the criteria described in clause (vi) or (vii) of the definition of "Collateral Obligation," within 45 days of the failure of such Collateral Obligation to meet either such criteria.  Notwithstanding anything in this Article 12 to the contrary, so long as any Secured Notes are Outstanding, the Portfolio Manager shall use its commercially reasonable efforts to effect the sale of all remaining Collateral Obligations, Eligible Investments and Equity Securities (including Equity Securities held by any ETB Subsidiary) upon the Stated Maturity of such Notes.

(h)     Volcker Rule Prohibited Assets.  The Portfolio Manager, on behalf of the Issuer, shall be required to take commercially reasonable efforts to sell any Volcker Rule Prohibited Asset, which efforts may take into account the perceived reasonableness of the market conditions then existing for the sale of such Volcker Rule Prohibited Asset.

Section 12.2.   Purchase of Additional Collateral Obligations.   On any date during the Reinvestment Period, the Portfolio Manager on behalf of the Issuer may direct the Trustee to invest Principal Proceeds and accrued interest received with respect to any Collateral Obligation to the extent used to pay for accrued interest on additional Collateral Obligations in additional Collateral Obligations, and the Trustee shall invest such proceeds, if each of the conditions specified in this Section 12.2 (Purchase of Additional Collateral Obligations) and Section 12.3 (Conditions Applicable to All Sale and Purchase Transactions) are met; *provided* that, for the avoidance of doubt, with respect to any Collateral Obligations for which the trade date has occurred during the Reinvestment Period and for which Principal Proceeds are available (including for this purpose, cash on deposit in the Collection Account as well as any Principal Proceeds that will be received by the Issuer from the sale of Collateral Obligations for which the trade date has already occurred but the settlement date has not yet occurred) but which settle after the end of the Reinvestment Period, the purchase of such Collateral Obligations shall be treated as a purchase made during the Reinvestment Period for purposes of this Section 12.2 (Purchase of Additional Collateral Obligations).

(a)     Investment Criteria.  No Collateral Obligation may be purchased unless each of the following conditions are satisfied as of the date the Portfolio Manager commits on behalf of the Issuer to make such purchase, in each case (subject to the provisions of Section 12.4 (Trading Plans)) after giving effect to such purchase and all other sales or purchases previously or simultaneously committed to; *provided* that the conditions set forth in clauses (iii) through (iv) below need only be satisfied with respect to purchases of Collateral Obligations occurring after the end of the Ramp-up Period:

(i)     such obligation is a Collateral Obligation;

(ii)     each Coverage Test will be satisfied, or if not satisfied such Coverage Test will be maintained or improved;

(iii)     (A) in the case of an additional Collateral Obligation purchased with the Sale Proceeds of a Credit Risk Obligation or a Defaulted Obligation, either (1) the Aggregate Principal Balance of all additional Collateral Obligations purchased with the proceeds from such sale will at least equal the Sale Proceeds

from such sale, (2) the Aggregate Principal Balance of the Collateral Obligations when such Credit Risk Obligation or Defaulted Obligation was sold will be maintained or increased following the purchase of such additional Collateral Obligation or (3) after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations (excluding the Collateral Obligation being sold but including, without duplication, the anticipated cash proceeds of such sale) *plus*, without duplication, the amounts on deposit in the Accounts (including Eligible Investments therein) representing Principal Proceeds, will be greater than (or equal to) the Target Balance and (B) in the case of any other purchase of additional Collateral Obligations, either (1) the Aggregate Principal Balance of the Collateral Obligations when such Collateral Obligations were sold will be maintained or increased after giving effect to the purchase of such additional Collateral Obligations or (2) after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations (excluding the Collateral Obligation being sold but including, without duplication, the anticipated cash proceeds of such sale) *plus*, without duplication, the amounts on deposit in the Accounts (including Eligible Investments therein) representing Principal Proceeds, will be greater than (or equal to) the Target Balance; and

(iv)     either (A) each requirement or test, as the case may be, of the Concentration Limitations and the Collateral Quality Test will be satisfied or (B) if any such requirement or test was not satisfied immediately prior to such reinvestment, such requirement or test will be maintained or improved after giving effect to the reinvestment.

(b)     <u>Reinvesting After the Reinvestment Period</u>.     After the Reinvestment Period, Sale Proceeds received with respect to Credit Risk Obligations and Unscheduled Principal Payments may be reinvested in accordance with the requirements of this Indenture.     After the Reinvestment Period, provided that no Event of Default has occurred and is continuing, the Portfolio Manager may, but will not be required to, invest Principal Proceeds that were received with respect to Unscheduled Principal Payments and Credit Risk Obligations in additional Collateral Obligations within the longer of (i) 30 Business Days of the Issuer's receipt thereof and (ii) the last day of the related Collection Period; provided, that the Portfolio Manager may not reinvest such Principal Proceeds unless the Portfolio Manager reasonably believes that after giving effect to any such reinvestment (A) each test of the Collateral Quality Test (excluding the S&P CDO Monitor Test) will be satisfied or, if not satisfied, will be maintained or improved as compared to such failing test level prior to the sale of the related Credit Risk Obligation or the receipt of the Unscheduled Principal Payment (provided that, on and after the date that is one year following the end of the Reinvestment Period the Weighted Average Life Test must be satisfied), (B) the Coverage Tests will be satisfied or, if not satisfied, will be maintained or improved as compared to such failing test level prior to the sale of the related Credit Risk Obligation or the receipt of the Unscheduled Principal Payment, (C) each requirement of the Concentration Limitations (other than the requirements set forth in clause (x) of the definition thereof) will be satisfied or, if any such requirement was not satisfied immediately prior to such reinvestment, the level of compliance with such requirement will be maintained or improved after giving effect to the reinvestment, (D)

clause (x) of the Concentration Limitations will be satisfied, (E) the Restricted Trading Period is not in effect, (F) the additional Collateral Obligations purchased will have (1) the same or higher S&P Ratings and (2) the same or earlier maturity, as such Credit Risk Obligations or prepaid Collateral Obligations, (G) the Aggregate Principal Balance of all additional Collateral Obligations purchased with the proceeds from the sale of such Credit Risk Obligations will at least equal the related Sale Proceeds, and (H) solely with respect to the reinvestment of Unscheduled Principal Payments, the Aggregate Principal Balance of the Collateral Obligations will be maintained or increased (by comparison to the Aggregate Principal Balance of the Collateral Obligations immediately prior to such payment). The Post-Reinvestment Period Investment Criteria may not be amended without the written consent of a Majority of each Class of Notes, voting separately.

(c)     <u>Post-Reinvestment Period Settlement</u>.  Not later than the Business Day immediately following the end of the Reinvestment Period, the Portfolio Manager shall deliver to the Trustee a schedule of Collateral Obligations that the Issuer has purchased on a trade date basis but with respect to which the settlement date has not yet occurred and shall certify to the Trustee that sufficient Principal Proceeds are available (including for this purpose, cash on deposit in the Collection Account as well as any Principal Proceeds that will be received by the Issuer from the sale of Collateral Obligations for which the trade date has already occurred but the settlement date has not yet occurred) to effect the settlement of such Collateral Obligations.

(d)     <u>Certification by Portfolio Manager</u>.   Not later than the Subsequent Delivery Date for any Collateral Obligation purchased after the end of the Ramp-up Period, the Portfolio Manager shall deliver to the Trustee an Officer's certificate of the Portfolio Manager certifying that such purchase complies with this <u>Section 12.2</u> (Purchase of Additional Collateral Obligations) and <u>Section 12.3</u> (Conditions Applicable to All Sale and Purchase Transactions).

(e)     <u>Purchase Following Sale of Credit Improved Obligations and Discretionary Sales</u>.  Following the sale of any Credit Improved Obligation pursuant to <u>Section 12.1(b)(i)</u> (Sales of Collateral Obligations) or any discretionary sale of a Collateral Obligation pursuant to <u>Section 12.1(f)(i)(B)</u> (Sales of Collateral Obligations), the Portfolio Manager shall use its reasonable efforts to purchase additional Collateral Obligations pursuant to this <u>Section 12.2</u> (Purchase of Additional Collateral Obligations) within 30 Business Days after such sale.

(f)     <u>Investment in Eligible Investments</u>.  Cash on deposit in any Account or Hedge Account may be invested at any time in Eligible Investments in accordance with <u>Article 10</u> (or, in the case of Hedge Accounts, collateral required to secure the obligations of the applicable Hedge Counterparty).

(g)     <u>Equity Securities</u>.  Equity Securities may not be purchased by the Issuer, but the Issuer (or an Issuer Subsidiary) may receive an Equity Security in connection with an insolvency, bankruptcy, reorganization, debt restructuring or workout which will be considered "received in lieu of debts previously contracted with respect to the Collateral Obligation" under the Volcker Rule.

Section 12.3.  <u>Conditions Applicable to All Sale and Purchase Transactions</u>.  (a) Any transaction effected under this <u>Article 12</u> or in connection with the acquisition of additional Collateral Obligations during the Ramp-up Period shall be conducted on an arm's length basis and, if effected with a Person Affiliated with the Portfolio Manager, shall be effected in accordance with the requirements of Section 6 of the Portfolio Management Agreement on terms no less favorable to the Issuer than would be the case if such Person were not so Affiliated, *provided* that the Trustee shall have no responsibility to oversee compliance with this clause (a) by the other parties.

(b)    Upon any acquisition of a Collateral Obligation pursuant to this <u>Article 12</u>, all of the Issuer's right, title and interest to the Pledged Obligation or Pledged Obligations shall be Granted to the Trustee pursuant to this Indenture, such Pledged Obligations shall be Delivered to the Trustee, and, if applicable, the Issuer shall receive the Pledged Obligation for which the Pledged Obligation was substituted.  The Trustee shall also receive, not later than the Subsequent Delivery Date, an Officer's certificate of the Issuer containing the statements set forth in <u>Section 3.1(a)(ix)</u> (Conditions to Issuance of Notes on Closing Date).

(c)    In the event that the Portfolio Manager has determined that the Issuer's ownership of any specific Asset would constitute ownership of a Volcker Rule Prohibited Asset, then the Portfolio Manager, on behalf of the Issuer, will be required to take commercially reasonable efforts to sell such Asset in accordance with <u>Section 12.1(h)</u> (Sales of Collateral Obligations) and will not purchase or otherwise accept receipt of any additional Asset of the type identified in such determination.

Section 12.4.  <u>Trading Plans</u>.   For purposes of calculating compliance with the Investment Criteria, the Portfolio Manager may elect to execute one or more Trading Plans (with notice to the Collateral Administrator, which notice shall include the identity of all sales and purchases forming part of such Trading Plan); *provided* that, if a previous Trading Plan failed to comply with the Investment Criteria, the Portfolio Manager may not execute any further Trading Plans until the S&P Rating Condition is satisfied (and, following the satisfaction of the S&P Rating Condition, any number of additional Trading Plans may be executed subject to the other limitations in this <u>Section 12.4</u> (Trading Plans)).  "<u>Trading Plan</u>" means, with respect to any proposed investment, a plan under which compliance with the Investment Criteria will be evaluated after giving effect to all sales and purchases proposed to be entered into within ten Business Days following the date of determination of such compliance (such period, the "<u>Trading Plan Period</u>"); *provided* that (i) the execution of a Trading Plan will not result in the averaging of the purchase price of a Collateral Obligation or Collateral Obligations purchased at separate times for purposes of any calculation made in connection with the Investment Criteria; (ii) no Trading Plan may be executed over a time period that includes a Determination Date; (iii) no Trading Plan may relate to the purchase of Collateral Obligations having an Aggregate Principal Balance in excess of 5.0% of the Collateral Principal Amount; (iv) only one Trading Plan may be outstanding at any time; (v) so long as the Investment Criteria are satisfied upon the expiry of the applicable Trading Plan Period, the failure of all of the terms and assumptions specified in such Trading Plan to be satisfied shall not be deemed to constitute a failure of such Trading Plan, (vi) the difference between the Collateral Obligation with the highest Weighted Average Life and the Collateral Obligation with the lowest Weighted Average Life, in each case,

purchased in connection with a Trading Plan may not be greater than two years and (vii) a Trading Plan may only be executed during the Reinvestment Period.

Section 12.5.  <u>Maturity Amendments</u>.  The Issuer shall not, at any time during or after the Reinvestment Period, execute, enter into, agree to or vote in favor of any Maturity Amendment if (x) either (A) the Weighted Average Life Test will not be satisfied immediately after giving effect to such Maturity Amendment or (B) during the Reinvestment Period only, if the Weighted Average Life Test was not satisfied immediately prior to giving effect to such Maturity Amendment, the level of compliance with the Weighted Average Life Test will not be maintained or improved after giving effect to such Maturity Amendment or (y) such Maturity Amendment would cause such Collateral Obligation to mature after the earliest Stated Maturity of the Notes.

ARTICLE 13

<u>NOTEHOLDERS' RELATIONS</u>

Section 13.1.  <u>Subordination; Non-Petition</u>.  (a) Anything in this Indenture or the Notes to the contrary notwithstanding, the Holders of each Class of Notes that constitute a Junior Class agree for the benefit of the Holders of the Notes of each Priority Class with respect to such Junior Class that such Junior Class shall be subordinate and junior to the Notes of each such Priority Class to the extent and in the manner set forth in this Indenture.

(b)     In the event that, notwithstanding the provisions of this Indenture, any Holder of Notes of any Junior Class shall have received any payment or distribution in respect of such Notes contrary to the provisions of this Indenture, then, unless and until each Priority Class with respect thereto shall have been paid in full in Cash or, to the extent a Majority of such Priority Class consents, other than in Cash in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the applicable Priority Class(es) in accordance with this Indenture; *provided* that if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Assets and subject in all respects to the provisions of this Indenture, including this <u>Section 13.1</u> (Subordination; Non-Petition).

(c)     Each Holder of Notes of any Junior Class agrees with all Holders of the applicable Priority Classes that such Holder of Junior Class Notes shall not demand, accept, or receive any payment or distribution in respect of such Notes in violation of the provisions of this Indenture including, without limitation, this <u>Section 13.1</u> (Subordination; Non-Petition); *provided* that after a Priority Class has been paid in full, the Holders of the related Junior Class or Classes shall be fully subrogated to the rights of the Holders of such Priority Class.  Nothing in this <u>Section 13.1</u> (Subordination; Non-Petition) shall affect the obligation of the Issuer to pay Holders of any Junior Class of Notes.

(d)     The Holders of each Class of Notes agree, for the benefit of all Holders of each Class of Notes, not to cause the filing of a petition in bankruptcy against the Issuer, the Co-Issuer or any ETB Subsidiary until the payment in full of the Notes and not before one year, or if longer, the applicable preference period then in effect, and a day has elapsed since such payment.   The restrictions set forth in this <u>Section 13.1(d)</u> (Subordination; Non-Petition) are a material inducement for each holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into this Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of this Indenture.  Any Holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

Section 13.2.   <u>Standard of Conduct</u>.  In exercising any of its or their voting rights, rights to direct and consent or any other rights as a Holder under this Indenture, a Holder or Holders shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any Holder, the Issuer, or any other Person, except for any liability to which such Holder may be subject to the extent the same results from such Holder's taking or directing an action, or failing to take or direct an action, in bad faith or in violation of the express terms of this Indenture.

Section 13.3.   <u>Information Regarding Holders</u>.   By its acceptance of a Note, each Holder and each beneficial owner of a Note shall be deemed to acknowledge and agree that upon written request, the Trustee shall: (i) provide to the Issuer and the Portfolio Manager upon reasonable request all reasonably available information in the possession of the Trustee and specifically requested by the Issuer or the Portfolio Manager in connection with regulatory matters, including any information that is necessary or advisable (as determined by the Issuer) in order for the Issuer or the Portfolio Manager (or its parent or Affiliates) to comply with regulatory requirements, including, for the avoidance of doubt, FATCA; (ii) provide to the Issuer and the Portfolio Manager upon request a list of Holders (including beneficial owners who have provided the Trustee with a beneficial holder certificate for any purpose); and (iii) obtain and provide to the Issuer and the Portfolio Manager upon request a list of Agent Members holding positions in the Notes at the cost of the Issuer as an Administrative Expense to the extent funds are available to pay such expense.

ARTICLE 14

MISCELLANEOUS

Section 14.1.   <u>Form of Documents Delivered to Trustee</u>.  In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may

certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Officer of the Issuer, the Co-Issuer or the Portfolio Manager may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Officer knows, or should know that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate of an Officer of the Issuer, Co-Issuer or the Portfolio Manager or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, the Issuer, the Co-Issuer, the Portfolio Manager or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer, the Co-Issuer, the Portfolio Manager or such other Person, unless such Officer of the Issuer, Co-Issuer or the Portfolio Manager or such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous. Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer of the Portfolio Manager, the Issuer or the Co-Issuer, stating that the information with respect to such matters is in the possession of the Portfolio Manager, the Issuer or the Co-Issuer, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture it is *provided* that the absence of the occurrence and continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of either Co-Issuer, then notwithstanding that the satisfaction of such condition is a condition precedent to such Co-Issuer's right to make such request or direction, the Trustee shall be protected in acting in accordance with such request or direction if it does not have knowledge of the occurrence and continuation of such Default or Event of Default as provided in <u>Section 6.1(d)</u> (Certain Duties and Responsibilities of Trustee).

Section 14.2. <u>Acts of Holders</u>. (a) Any request, demand, authorization, instruction, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in writing or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Co-Issuers, if made in the manner provided in this <u>Section 14.2</u> (Acts of Holders).

(b)     The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c)     The principal amount or face amount, as the case may be, and registered numbers of Notes held by any Person, and the date of his holding the same, shall be proved by the Register.

(d)     Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of such Note and of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Co-Issuers in reliance thereon, whether or not notation of such action is made upon such Note.

Section 14.3.   <u>Notices, etc., to the Trustee, the Co-Issuers, the Collateral Administrator, the Portfolio Manager, the Initial Purchaser, the Hedge Counterparty, the Paying Agent, the Administrator and the Rating Agency</u>.   (a) Any request, demand, authorization, instruction, direction, order, notice, consent, waiver or Act of Holders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:

(i)     the Trustee shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery, by electronic mail, or by facsimile in legible form, to the Trustee addressed to it at its applicable Corporate Office, or at any other address previously furnished in writing to the other parties hereto by the Trustee; *provided* that any demand, authorization, direction, instruction, order, notice, consent, waiver or other document sent to U.S. Bank National Association (in any capacity hereunder) will be deemed effective only upon receipt thereof by U.S. Bank National Association;

(ii)     the Co-Issuers shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Issuer addressed to it at c/o MaplesFS Limited, P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands, telephone number +1 (345) 945-7099, facsimile number +1 (345) 945-7100, or to the Co-Issuer addressed to it at c/o Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711, Attention: Donald J. Puglisi, facsimile no. (302) 738-7210 or at any other address previously furnished in writing to the other parties hereto by the Issuer or the Co-Issuer, as the case may be, with a copy to the Portfolio Manager at its address below;

(iii)     the Portfolio Manager shall be sufficient for every purpose hereunder if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Portfolio Manager addressed to it at Acis Capital Management, L.P., 300 Crescent Court,

Dallas, TX 75201, Attention: Josh Terry, facsimile no.: 972-628-4155, email: jterry@hcmlp.com, or at any other address previously furnished in writing to the parties hereto;

(iv)     the Initial Purchaser shall be sufficient for every purpose hereunder if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Initial Purchaser addressed to it at Jefferies LLC, 520 Madison Avenue, New York, New York, 10022, Attention: Global CDO Trading, or at any other address previously furnished in writing to the parties hereto;

(v)     the Collateral Administrator shall be sufficient for every purpose hereunder if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Collateral Administrator at U.S. Bank National Association, 190 S. LaSalle Street, 8th Floor, Chicago, IL 60603, Attention: Global Corporate Trust – ACIS CLO 2015-6 Ltd., email: ACIS.CLO.2015.06@usbank.com, or at any other address previously furnished in writing to the parties hereto;

(vi)     the Rating Agency shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service to the Rating Agency addressed to it at Standard & Poor's, 55 Water Street, 41st Floor, New York, New York 10041-0003 or by facsimile in legible form to facsimile no. (212) 438 2655, Attention:   Asset-Backed-CBO/CLO Surveillance or by electronic copy to CDO_Surveillance@sandp.com; *provided* that (x) in respect of any request to S&P for a confirmation of its Initial Ratings of the Secured Notes pursuant to <u>Section 7.18(c)</u> (Ramp-up Period; Purchase of Additional Collateral Obligations), such request must be submitted by email to CDOEffectiveDatePortfolios@sandp.com, (y) in respect of any application for a ratings estimate by S&P in respect of a Collateral Obligation, Information must be submitted to creditestimates@sandp.com and (z) in respect of any requests for CDO monitor cases (after the Effective Date) such request must be submitted by email to CDOMonitor@standardandpoors.com;

(vii)     the Irish Stock Exchange shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by facsimile in legible form, to the Irish Stock Exchange at 28 Anglesea Street, Dublin 2, Ireland (or, if to be released through the Irish Stock Exchange website, by submission in Microsoft Word Format via www.isedirect.ie) or at any other address furnished in writing to the Trustee, the Portfolio Manager and the Issuer by the Irish Stock Exchange;

(viii)     the Irish Listing Agent shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service

guaranteeing next day delivery or by facsimile in legible form, to the Irish Listing Agent addressed to it at Maples and Calder, 75 St. Stephen's Green, Dublin 2, Ireland or by email to dublindebtlistings@maplesandcalder.com or at any other address previously furnished in writing to the other parties hereto by the Irish Listing Agent; and

(ix)     the Administrator shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by facsimile in legible form, to the Administrator addressed to it at c/o MaplesFS Limited, P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands, Attention:  ACIS CLO 2015-6 Ltd.

(b)     In the event that any provision in this Indenture calls for any notice or document to be delivered simultaneously to the Trustee and any other person or entity, the Trustee's receipt of such notice or document shall entitle the Trustee to assume that such notice or document was delivered to such other person or entity unless otherwise expressly specified herein.

(c)     Notwithstanding any provision of this Section 14.3 (Notices, etc., to the Trustee, the Co-Issuers, the Collateral Administrator, the Portfolio Manager, the Initial Purchaser, the Hedge Counterparty, the Paying Agent, the Administrator and the Rating Agency) to the contrary, any request, demand, authorization, direction, order, notice, consent, waiver or Act of Holders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with any party specified in Section 14.3(a) (Notices, etc., to the Trustee, the Co-Issuers, the Collateral Administrator, the Portfolio Manager, the Initial Purchaser, the Hedge Counterparty, the Paying Agent, the Administrator and the Rating Agency) above shall be sufficient for every purpose hereunder if made, given or furnished by electronic mail to an e-mail address specified in Section 14.3(a) (Notices, etc., to the Trustee, the Co-Issuers, the Collateral Administrator, the Portfolio Manager, the Initial Purchaser, the Hedge Counterparty, the Paying Agent, the Administrator and the Rating Agency) or provided to the notifying party in accordance therewith.

(d)     The Bank (in each of its capacities) agrees to accept and act upon instructions or directions pursuant to this Indenture or any document executed in connection herewith sent by unsecured email, facsimile transmission or other similar unsecured electronic methods, *provided* that the Bank shall have received an incumbency certificate listing such person as a person designated to provide such instructions or directions, which incumbency certificate may be amended whenever a person is added or deleted from the listing.  If such person elects to give the Bank email or facsimile instructions (or instructions by a similar electronic method) and the Bank in its discretion elects to act upon such instructions, the Bank's reasonable understanding of such instructions shall be deemed controlling.  The Bank shall not be liable for any losses, costs or expenses arising directly or indirectly from the Bank's reliance upon and compliance with such instructions notwithstanding such instructions conflicting with or being inconsistent with a subsequent written instruction.  Any person providing such

instructions or directions agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Bank, including without limitation the risk of the Bank acting on unauthorized instructions, and the risk of interception and misuse by third parties and acknowledges and agrees that there may be more secure methods of transmitting such instructions than the method(s) selected by it and agrees that the security procedures (if any) to be followed in connection with its transmission of such instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances.

Section 14.4.  <u>Notices to Holders; Waiver</u>.  Except as otherwise expressly provided herein, where this Indenture provides for notice to Holders of any event,

(a)     such notice shall be sufficiently given to Holders if in writing and mailed, first class postage prepaid, to each Holder affected by such event, at the address of such Holder as it appears in the Register not earlier than the earliest date and not later than the latest date, prescribed for the giving of such notice; and

(b)     such notice shall be in the English language.

Such notices will be deemed to have been given on the date of such mailing.

Notwithstanding clause (a) above, a Holder may give the Trustee a written notice in a form acceptable to the Trustee that it is requesting that notices to it be given by facsimile transmissions and stating the facsimile number for such transmission.  Thereafter, the Trustee shall give notices to such Holder by facsimile transmission; *provided* that, if such notice also requests that notices be given by mail, then such notice shall also be given by mail in accordance with clause (a) above.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.  In case by reason of the suspension of regular mail service as a result of a strike, work stoppage or similar activity or by reason of any other cause it shall be impracticable to give such notice by mail of any event to Holders when such notice is required to be given pursuant to any provision of this Indenture, then such notification to Holders as shall be made with the approval of the Trustee shall constitute a sufficient notification to such Holders for every purpose hereunder.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Holders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

So long as any Class of Notes is listed on the Irish Stock Exchange and the guidelines of such exchange so require, all notices to Holders of such Notes will be published via the Irish Stock Exchange.

Section 14.5.  Effect of Headings and Table of Contents.  The Article and Section headings herein (including those used in cross-references herein) and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 14.6.  Successors and Assigns.  All covenants and agreements in this Indenture by the Co-Issuers shall bind their respective successors and assigns, whether so expressed or not.

Section 14.7.  Separability.  Except to the extent prohibited by applicable law, in case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 14.8.  Benefits of Indenture.  Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Portfolio Manager, the Holders of the Notes and (to the extent provided herein) the Collateral Administrator and the Administrator (solely in its capacity as such) and the other Secured Parties any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 14.9.  Governing Law.  THIS INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

Section 14.10. Submission to Jurisdiction and Waiver of Jury Trial.  (a) EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE NOTES OR THIS INDENTURE, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.

(b)     EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS INDENTURE SHALL AFFECT ANY RIGHT THAT THE TRUSTEE OR ANY HOLDER OF NOTES MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS INDENTURE AGAINST THE CO-ISSUERS OR THEIR PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR

HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE IN ANY COURT REFERRED TO IN THE PREVIOUS PARAGRAPH.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     EACH PARTY (OTHER THAN THE CO-ISSUERS) TO THIS INDENTURE IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES HEREIN.   EACH OF THE CO-ISSUERS IRREVOCABLY APPOINTS CORPORATION SERVICE COMPANY, AS ITS AUTHORIZED AGENT ON WHICH ANY AND ALL LEGAL PROCESS MAY BE SERVED IN ANY SUCH ACTION OR PROCEEDING.   NOTHING IN THIS INDENTURE WILL AFFECT THE RIGHT OF ANY PARTY TO THIS INDENTURE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(e)     EACH PARTY TO THIS INDENTURE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING.

Section 14.11. Counterparts.   This instrument may be executed in any number of counterparts (including by facsimile or pdf), each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 14.12. Acts of Issuer.   Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or performed by the Issuer shall be effective if given or performed by the Issuer or by the Portfolio Manager on the Issuer's behalf.

Section 14.13. Confidential Information.   (a) The Trustee and each Holder of Notes will maintain the confidentiality of all Confidential Information in accordance with procedures adopted by the Trustee or such Holder in good faith to protect Confidential Information of third parties delivered to such Person; *provided* that such Person may deliver or disclose Confidential Information to:   (i) such Person's directors, trustees, officers, employees, agents, auditors, attorneys and affiliates who agree to hold confidential the Confidential Information substantially in accordance with the terms of this Section 14.13 (Confidential Information) and to the extent such disclosure is reasonably required for the administration of this Indenture, the matters contemplated hereby or the investment represented by the Notes; (ii) such Person's financial advisors and other professional advisors who agree to hold confidential the Confidential Information substantially in accordance with the terms of this Section 14.13 (Confidential Information) and to the extent such disclosure is reasonably required for the administration of this Indenture, the matters contemplated hereby or the investment represented by the Notes; (iii) any other Holder; (iv) any Person of the type that would be, to such Person's knowledge, permitted to acquire Notes in accordance with the requirements of Section 2.6 (Registration, Registration of Transfer and Exchange) hereof to which such Person sells or offers to sell any such Note or any part thereof (if such Person has agreed in writing prior to its receipt of such

Confidential Information to be bound by the provisions of this Section 14.13 (Confidential Information)); (v) any other Person from which such former Person offers to purchase any security of the Co-Issuers (if such other Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this Section 14.13 (Confidential Information)); (vi) any Federal or state or other regulatory, governmental or judicial authority having jurisdiction over such Person; (vii) the National Association of Insurance Commissioners or any similar organization, or any nationally recognized rating agency that requires access to information about the investment portfolio of such Person, reinsurers and liquidity and credit providers that agree to hold confidential the Confidential Information substantially in accordance with this Section 14.13 (Confidential Information); (viii) Moody's (so long as any Class A Notes are rated by Moody's) or S&P; (ix) any other Person with the consent of the Co-Issuers and the Portfolio Manager; or (x) any other Person to which such delivery or disclosure may be necessary or appropriate (A) to effect compliance with any law, rule, regulation or order applicable to such Person, (B) in response to any subpoena or other legal process upon prior notice to the Co-Issuers (unless prohibited by applicable law, rule, order or decree or other requirement having the force of law), (C) in connection with any litigation to which such Person is a party upon prior notice to the Co-Issuers (unless prohibited by applicable law, rule, order or decree or other requirement having the force of law) or (D) if an Event of Default has occurred and is continuing, to the extent such Person may reasonably determine such delivery and disclosure to be necessary or appropriate in the enforcement or for the protection of the rights and remedies under the Notes or this Indenture; and *provided further* that delivery to Holders by the Trustee of any report of information required by the terms of this Indenture to be provided to Holders shall not be a violation of this Section 14.13 (Confidential Information). Each Holder of Notes and each person who delivers a note owner certificate in substantially the form of Exhibit I hereto to the Trustee agrees, except as set forth in clauses (vi), (vii) and (x) above, that it shall use the Confidential Information for the sole purpose of making an investment in the Notes or administering its investment in the Notes; and that the Trustee shall neither be required nor authorized to disclose to Holders any Confidential Information in violation of this Section 14.13 (Confidential Information).  In the event of any required disclosure of the Confidential Information by such Holder, such Holder agrees to use reasonable efforts to protect the confidentiality of the Confidential Information.  Each Holder of a Note, by its acceptance of such Note will be deemed to have agreed to be bound by and to be entitled to the benefits of this Section 14.13 (Confidential Information).  Notwithstanding the foregoing, the Holders and beneficial owners of the Offered Securities (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Indenture and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such tax treatment and U.S. federal income tax structure.

> (b)    For the purposes of this Section 14.13 (Confidential Information), "Confidential Information" means information delivered to the Trustee or any Holder of Notes or on behalf of the Co-Issuers in connection with and relating to the transactions contemplated by or otherwise pursuant to this Indenture; *provided* that such term does not include information that:  (i) was publicly known or otherwise known to the Trustee or such Holder prior to the time of such disclosure; (ii) subsequently becomes publicly known through no act or omission by the Trustee, any Holder or any person acting on behalf of the Trustee or any Holder; (iii) otherwise is known or becomes known to the

Trustee or any Holder other than (x) through disclosure by the Co-Issuers or (y) to the knowledge of the Trustee or a Holder, as the case may be, in each case after reasonable inquiry, as a result of the breach of a fiduciary duty to the Co-Issuers or a contractual duty to the Co-Issuers; or (iv) is allowed to be treated as non-confidential by consent of the Co-Issuers.

Section 14.14. <u>Liability of Co-Issuers</u>.   Notwithstanding any other terms of this Indenture, the Notes or any other agreement entered into between, *inter alia*, the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other of the Co-Issuers under this Indenture, the Notes, any such agreement or otherwise and, without prejudice to the generality of the foregoing, neither of the Co-Issuers shall be entitled to take any action to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any such agreement or otherwise against the other of the Co-Issuers.  In particular, neither of the Co-Issuers nor any ETB Subsidiary shall be entitled to petition or take any other steps for the winding up or bankruptcy of the Issuer, the Co-Issuer or any ETB Subsidiary, as applicable, or shall have any claim in respect to any assets of the Issuer, the Co-Issuer or any ETB Subsidiary, as applicable.

ARTICLE 15

ASSIGNMENT OF CERTAIN AGREEMENTS

Section 15.1.  <u>Assignment of Portfolio Management Agreement</u>.  (a) The Issuer hereby acknowledges that its Grant pursuant to the first Granting Clause hereof includes all of the Issuer's estate, right, title and interest in, to and under the Portfolio Management Agreement, including (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Portfolio Manager thereunder, including the commencement, conduct and consummation of proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; *provided* that notwithstanding anything herein to the contrary, the Trustee shall not have the authority to exercise any of the rights set forth in (i) through (iv) above or that may otherwise arise as a result of the Grant until the occurrence of an Event of Default hereunder and such authority shall terminate at such time, if any, as such Event of Default is cured or waived.

(b)     The assignment made hereby is executed as collateral security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Portfolio Management Agreement, nor shall any of the obligations contained in the Portfolio Management Agreement be imposed on the Trustee.

(c)     Upon the retirement of the Notes, the payment of all amounts required to be paid pursuant to the Priority of Payments and the release of the Assets from the lien of this Indenture, this assignment and all rights herein assigned to the Trustee for the benefit of the Holders shall cease and terminate and all the estate, right, title and interest of the Trustee in, to and under the Portfolio Management Agreement shall revert to the Issuer

and no further instrument or act shall be necessary to evidence such termination and reversion.

(d)     The Issuer represents that the Issuer has not executed any other assignment of the Portfolio Management Agreement.

(e)     The Issuer agrees that this assignment is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith.  The Issuer will, from time to time upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may reasonably specify.

Section 15.2.  Assignment of Hedge Agreement.  (a) After the Closing Date, the Issuer may enter into Hedge Agreements from time to time.  Each Hedge Agreement shall be required to (x) satisfy the S&P Rating Condition, (y) contain appropriate limited recourse and non-petition provisions equivalent to those contained in this Indenture with respect to the Notes and (z) provide that any amounts payable to the related Hedge Counterparties thereunder will be subject to the Priority of Payments (including, without limitation, the Acceleration Priority of Payments).  The Issuer shall not enter into a Hedge Agreement unless (i) it receives the consent of a Majority of the Controlling Class to such Hedge Agreement, (ii) such Hedge Agreement is an interest rate or foreign exchange derivative and the terms of such derivative relate to the Collateral Obligations and the Notes and reduce the interest rate or foreign exchange risks related to the Collateral Obligations and the Notes and (iii)(x) it reasonably determines that such Hedge Agreement would not cause the Issuer or the Portfolio Manager to be required to register with the CFTC or that the Issuer and the Portfolio Manager would be eligible for an exemption to the requirement to register with the CFTC as a "commodity pool operator" (under the Commodity Exchange Act) or (y) with the consent of a Majority of the Subordinated Notes, the Portfolio Manager will register as a "commodity pool operator" (under the Commodity Exchange Act) and comply with the requirements of the CFTC.  The Issuer shall assign any such Hedge Agreement to the Trustee pursuant to this Indenture.  The Trustee shall, on behalf of the Issuer and in accordance with the Distribution Report, pay amounts due to the Hedge Counterparty under any Hedge Agreements on any Payment Date in accordance with Section 11.1 (Disbursements of Monies from Payment Account).  The Issuer shall not enter into any Hedge Agreement unless such Hedge Agreement provides that any costs attributable to entering into a replacement Hedge Agreement which exceed the sum of the proceeds of the liquidation of any such Hedge Agreement shall be borne solely by the Hedge Counterparty; provided that such liquidation is not the result of a Priority Hedge Termination Event.

(b)     The Trustee shall agree to any reduction in the notional amount of any Hedge Agreement proposed by the related Hedge Counterparty and agreed to by the Portfolio Manager, or any termination, replacement and/or other modification of a Hedge Agreement or any additional Hedge Agreement proposed by the Portfolio Manager; provided that the S&P Rating Condition has been satisfied.

(c)     If at any time a Hedge Agreement becomes subject to early termination due to the occurrence of an event of default or a termination event, the Issuer (or the Portfolio Manager on its behalf) and the Trustee (following an Event of Default) shall

notify the Rating Agency and take such actions (following the expiration of any applicable grace period) to enforce the rights of the Issuer and the Trustee under such Hedge Agreement as may be permitted by the terms of such Hedge Agreement and consistent with the terms hereof, and may apply the proceeds of any such actions (including, without limitation, the proceeds of the liquidation of any collateral pledged by the Hedge Counterparty thereunder) to enter into a replacement Hedge Agreement on such terms as satisfy the S&P Rating Condition (unless such early termination is due to an additional termination event caused by an Optional Redemption).   No Hedge Agreement entered into by the Issuer may include an additional termination event resulting from an Optional Redemption unless such additional termination event is not effective until the notice of such Optional Redemption given by the Co-Issuers has become irrevocable.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Indenture as of the date first written above.

ACIS CLO 2015-6 LTD.,
as Issuer

By:_____

    Name:  **Wendy Ebanks**
    Title:   **Director**

ACIS CLO 2015-6 LLC,
as Co-Issuer

By:_____

    Name:
    Title:

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____

    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have executed and delivered this indenture as of the date first written above.

ACIS CLO 2015-6 LTD.,
as Issuer

By:_____

    Name:

    Title:

ACIS CLO 2015-6 LLC,
as Co-Issuer

By:_____

    Name:   Donald J. Puglisi

    Title:   Independent Manager

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____

    Name:

    Title:

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Indenture as of the date first written above.

ACIS CLO 2015-6 LTD.,
as Issuer

By:_____

   Name:
   Title:

ACIS CLO 2015-6 LLC,
as Co-Issuer

By:_____

   Name:
   Title:

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____

   Name:    Elaine P. Mah
   Title:    Senior Vice President

<u>SCHEDULE 1</u>

<u>MOODY'S INDUSTRY CLASSIFICATION GROUP LIST</u>

| | |
|---|---|
| CORP - Aerospace & Defense | 1 |
| CORP - Automotive | 2 |
| CORP - Banking, Finance, Insurance & Real Estate | 3 |
| CORP - Beverage, Food & Tobacco | 4 |
| CORP - Capital Equipment | 5 |
| CORP - Chemicals, Plastics, & Rubber | 6 |
| CORP - Construction & Building | 7 |
| CORP - Consumer goods:  Durable | 8 |
| CORP - Consumer goods:  Non-durable | 9 |
| CORP - Containers, Packaging & Glass | 10 |
| CORP - Energy:  Electricity | 11 |
| CORP - Energy:  Oil & Gas | 12 |
| CORP - Environmental Industries | 13 |
| CORP - Forest Products & Paper | 14 |
| CORP - Healthcare & Pharmaceuticals | 15 |
| CORP - High Tech Industries | 16 |
| CORP - Hotel, Gaming & Leisure | 17 |
| CORP - Media:  Advertising, Printing & Publishing | 18 |
| CORP - Media:  Broadcasting & Subscription | 19 |
| CORP - Media:  Diversified & Production | 20 |
| CORP - Metals & Mining | 21 |
| CORP - Retail | 22 |
| CORP - Services:  Business | 23 |
| CORP - Services:  Consumer | 24 |
| CORP - Sovereign & Public Finance | 25 |
| CORP - Telecommunications | 26 |
| CORP - Transportation:  Cargo | 27 |
| CORP - Transportation:  Consumer | 28 |
| CORP - Utilities:  Electric | 29 |
| CORP - Utilities:  Oil & Gas | 30 |
| CORP - Utilities:  Water | 31 |
| CORP – Wholesale | 32 |

<u>SCHEDULE 2</u>

<u>S&P INDUSTRY CLASSIFICATIONS</u>

1.  Aerospace & defense
2.  Air transport
3.  Automotive
4.  Beverage & tobacco
5.  Radio & television
7.  Building & development
8.  Business equipment & services
9.  Cable & satellite television
10. Chemical & plastics
11. Clothing/textiles
12. Conglomerates
13. Containers & glass products
14. Cosmetics/toiletries
15. Drugs
16. Ecological services & equipment
17. Electronics/electrical
18. Equipment leasing
19. Farming/agriculture
20. Financial intermediaries
21. Food/drug retailers
22. Food products
23. Food service
24. Forest products
25. Health care
26. Home furnishings
27. Lodging & casinos
28. Industrial equipment
30. Leisure goods/activities/movies
31. Nonferrous metals/minerals
32. Oil & gas
33. Publishing
34. Rail industries
35. Retailers (except food & drug)
36. Steel
37. Surface transport
38. Telecommunications

39. Utilities
40. Mortgage REITs
41. Equity REITs and REOCs
42. Reserved corporate
43. Life insurance
44. Health insurance
45. Property & casualty insurance
46. Diversified insurance
47. Reserved corporate
48. Reserved corporate
49. Reserved corporate

Sch. 2-1

SCHEDULE 3

S&P RECOVERY RATE TABLES

**Section 1.**

(a)   (i)   If a Collateral Obligation has an S&P Recovery Rating, the S&P Recovery Rate for such Collateral Obligation shall be determined as follows (taking into account, for any Collateral Obligation with an S&P Recovery Rating of '2' through '5', the recovery range indicated in the S&P published report therefore):

| S&P Recovery Rating of a Collateral Obligation | Recovery Range from S&P published reports* | Initial Liability Rating | | | | | |
|---|---|---|---|---|---|---|---|
| | | "AAA" | "AA" | "A" | "BBB" | "BB" | "B" and below |
| 1+ | N/A | 75% | 85% | 88% | 90% | 92% | 95% |
| 1 | N/A | 65% | 75% | 80% | 85% | 90% | 95% |
| 2 | 80-90 | 60% | 70% | 75% | 81% | 86% | 90% |
| 2 | 70-80 | 50% | 60% | 66% | 73% | 79% | 80% |
| 3 | 60-70 | 40% | 50% | 56% | 63% | 67% | 70% |
| 3 | 50-60 | 30% | 40% | 46% | 53% | 59% | 60% |
| 4 | 40-50 | 27% | 35% | 42% | 46% | 48% | 50% |
| 4 | 30-40 | 20% | 26% | 33% | 39% | 40% | 40% |
| 5 | 20-30 | 15% | 20% | 24% | 26% | 28% | 30% |
| 5 | 10-20 | 5% | 10% | 15% | 20% | 20% | 20% |
| 6 | N/A | 2% | 4% | 6% | 8% | 10% | 10% |

\*   If a recovery range is not available from S&P's published reports for a given loan with an S&P Recovery Rating of '2' through '5', the lower range for the applicable recovery rating will be assumed.

(ii)   If (x) a Collateral Obligation does not have an S&P Recovery Rating and such Collateral Obligation is a senior unsecured loan or second lien loan and (y) the issuer of such Collateral Obligation has issued another debt instrument that is outstanding and senior to such Collateral Obligation that is a Senior Secured Loan or senior secured note (a "**Senior Secured Debt Instrument**") that has an S&P Recovery Rating, the S&P Recovery Rate for such Collateral Obligation shall be determined as follows:

For Collateral Obligations Domiciled in Group A

Sch. 3-1

| S&P Recovery Rating of a Collateral Obligation | Initial Liability Rating | | | | | |
|---|---|---|---|---|---|---|
| | "AAA" | "AA" | "A" | "BBB" | "BB" | "B" and below |
| 1+ | 18% | 20% | 23% | 26% | 29% | 31% |
| 1 | 18% | 20% | 23% | 26% | 29% | 31% |
| 2 | 18% | 20% | 23% | 26% | 29% | 31% |
| 3 | 12% | 15% | 18% | 21% | 22% | 23% |
| 4 | 5% | 8% | 11% | 13% | 14% | 15% |
| 5 | 2% | 4% | 6% | 8% | 9% | 10% |
| 6 | - % | - % | - % | - % | - % | - % |

For Collateral Obligations Domiciled in Group B

| S&P Recovery Rating of a Collateral Obligation | Initial Liability Rating | | | | | |
|---|---|---|---|---|---|---|
| | "AAA" | "AA" | "A" | "BBB" | "BB" | "B" and below |
| 1+ | 16% | 18% | 21% | 24% | 27% | 29% |
| 1 | 16% | 18% | 21% | 24% | 27% | 29% |
| 2 | 16% | 18% | 21% | 24% | 27% | 29% |
| 3 | 10% | 13% | 15% | 18% | 19% | 20% |
| 4 | 5% | 5% | 5% | 5% | 5% | 5% |
| 5 | 2% | 2% | 2% | 2% | 2% | 2% |
| 6 | - % | - % | - % | - % | - % | - % |

For Collateral Obligations Domiciled in Group C

| S&P Recovery Rating of a Collateral Obligation | Initial Liability Rating | | | | | |
|---|---|---|---|---|---|---|
| | "AAA" | "AA" | "A" | "BBB" | "BB" | "B" and below |
| 1+ | 13% | 16% | 18% | 21% | 23% | 25% |
| 1 | 13% | 16% | 18% | 21% | 23% | 25% |
| 2 | 13% | 16% | 18% | 21% | 23% | 25% |
| 3 | 8% | 11% | 13% | 15% | 16% | 17% |
| 4 | 5% | 5% | 5% | 5% | 5% | 5% |
| 5 | 2% | 2% | 2% | 2% | 2% | 2% |

Sch. 3-2

| S&P Recovery Rating of a Collateral Obligation | Initial Liability Rating | | | | | |
|---|---|---|---|---|---|---|
| 6 | - % | - % | - % | - % | - % | - % |

(iii)   If (x) a Collateral Obligation does not have an S&P Recovery Rating and such Collateral Obligation is a subordinated loan and (y) the issuer of such Collateral Obligation has issued another debt instrument that is outstanding and senior to such Collateral Obligation that is a Senior Secured Debt Instrument that has an S&P Recovery Rating, the S&P Recovery Rate for such Collateral Obligation shall be determined as follows:

For Collateral Obligations Domiciled in Groups A, B and C

| S&P Recovery Rating of a Collateral Obligation | Initial Liability Rating | | | | | |
|---|---|---|---|---|---|---|
| | "AAA" | "AA" | "A" | "BBB" | "BB" | "B" and below |
| 1+ | 8% | 8% | 8% | 8% | 8% | 8% |
| 1 | 8% | 8% | 8% | 8% | 8% | 8% |
| 2 | 8% | 8% | 8% | 8% | 8% | 8% |
| 3 | 5% | 5% | 5% | 5% | 5% | 5% |
| 4 | 2% | 2% | 2% | 2% | 2% | 2% |
| 5 | - % | - % | - % | - % | - % | - % |
| 6 | - % | - % | - % | - % | - % | - % |

(b)   If a recovery rate cannot be determined using clause (a) and the Collateral Obligation is secured solely or primarily by common stock, other equity interests and goodwill, and the issuer of such Collateral Obligation has issued another debt instrument that is a senior unsecured loan, then the S&P Recovery Rate for such Collateral Obligation will be equal to the S&P Recovery Rate for such senior unsecured loan (or such other S&P Recovery Rate as S&P may provide, at the request of the Portfolio Manager, on a case-by-case basis).

(c)   If a recovery rate cannot be determined using clause (a) or clause (b) and the Collateral Obligation is secured solely or primarily by common stock, other equity interests and goodwill, then the recovery rate shall be determined using the table following clause (d) as if such Collateral Obligation were an Unsecured Loan.

(d)   If a recovery rate cannot be determined using clause (a), clause (b) or clause (c), the recovery rate shall be determined using the following table:

Recovery rates for obligors Domiciled in Group A, B, C or D:

Sch. 3-3

| Priority Category | Initial Liability Rating | | | | | |
|---|---|---|---|---|---|---|
| | "AAA" | "AA" | "A" | "BBB" | "BB" | "B" and "CCC" |
| **Senior Secured Loans** | | | | | | |
| Group A | 50% | 55% | 59% | 63% | 75% | 79% |
| Group B | 45% | 49% | 53% | 58% | 70% | 74% |
| Group C | 39% | 42% | 46% | 49% | 60% | 63% |
| Group D | 17% | 19% | 27% | 29% | 31% | 34% |
| **Senior Secured Loans (Cov-Lite Loans)[1]** | | | | | | |
| Group A | 41% | 46% | 49% | 53% | 63% | 67% |
| Group B | 37% | 41% | 44% | 49% | 59% | 62% |
| Group C | 32% | 35% | 39% | 41% | 50% | 53% |
| Group D | 17% | 19% | 27% | 29% | 31% | 34% |
| **Unsecured loans and Second Lien Loans[2]** | | | | | | |
| Group A | 18% | 20% | 23% | 26% | 29% | 31% |
| Group B | 16% | 18% | 21% | 24% | 27% | 29% |
| Group C | 13% | 16% | 18% | 21% | 23% | 25% |
| Group D | 10% | 12% | 14% | 16% | 18% | 20% |
| **Subordinated loans** | | | | | | |
| Group A | 8% | 8% | 8% | 8% | 8% | 8% |
| Group B | 10% | 10% | 10% | 10% | 10% | 10% |
| Group C | 9% | 9% | 9% | 9% | 9% | 9% |
| Group D | 5% | 5% | 5% | 5% | 5% | 5% |

*Group A:  Australia, Denmark, Finland, Hong Kong, Ireland, The Netherlands, New Zealand, Norway, Singapore, Sweden, U.K.*

*Group B:  Austria, Belgium, Canada, Germany, Israel, Japan, Luxembourg, Portugal, South Africa, Switzerland, U.S.*

*Group C:  Brazil, France, Greece, Italy, Mexico, South Korea, Spain, Taiwan, Turkey, United Arab Emirates.*

*Group D: Kazakhstan, Russia, Ukraine, others*

**Section 2.      S&P CDO Monitor**

---

[1]      Solely for purposes of the determinations pursuant hereto, the definition of "Cov-Lite Loan" shall be read to exclude the proviso thereto.

[2]      Second Lien Loans with an Aggregate Principal Balance in excess of 15% of the Collateral Principal Amount shall use the "Subordinated loans" Priority Category for the purpose of determining their S&P Recovery Rate.  Additionally, First Lien Last Out Loans shall be treated as Second Liens Loans for the purpose of determining their S&P Recovery Rate.

Sch. 3-4

| Liability Rating Weighted Average S&P Recovery Rate: | "AAA" | "AA" | "A" | "BBB" | "BB" |
|---|---|---|---|---|---|
| 1 | 37.000% | 46.500% | 52.000% | 58.000% | 62.500% |
| 2 | 37.125% | 46.625% | 52.125% | 58.125% | 62.625% |
| 3 | 37.250% | 46.750% | 52.250% | 58.250% | 62.750% |
| 4 | 37.375% | 46.875% | 52.375% | 58.375% | 62.875% |
| 5 | 37.500% | 47.000% | 52.500% | 58.500% | 63.000% |
| 6 | 37.625% | 47.125% | 52.625% | 58.625% | 63.125% |
| 7 | 37.750% | 47.250% | 52.750% | 58.750% | 63.250% |
| 8 | 37.875% | 47.375% | 52.875% | 58.875% | 63.375% |
| 9 | 38.000% | 47.500% | 53.000% | 59.000% | 63.500% |
| 10 | 38.125% | 47.625% | 53.125% | 59.125% | 63.625% |
| 11 | 38.250% | 47.750% | 53.250% | 59.250% | 63.750% |
| 12 | 38.375% | 47.875% | 53.375% | 59.375% | 63.875% |
| 13 | 38.500% | 48.000% | 53.500% | 59.500% | 64.000% |
| 14 | 38.625% | 48.125% | 53.625% | 59.625% | 64.125% |
| 15 | 38.750% | 48.250% | 53.750% | 59.750% | 64.250% |
| 16 | 38.875% | 48.375% | 53.875% | 59.875% | 64.375% |
| 17 | 39.000% | 48.500% | 54.000% | 60.000% | 64.500% |
| 18 | 39.125% | 48.625% | 54.125% | 60.125% | 64.625% |
| 19 | 39.250% | 48.750% | 54.250% | 60.250% | 64.750% |
| 20 | 39.375% | 48.875% | 54.375% | 60.375% | 64.875% |
| 21 | 39.500% | 49.000% | 54.500% | 60.500% | 65.000% |
| 22 | 39.625% | 49.125% | 54.625% | 60.625% | 65.125% |
| 23 | 39.750% | 49.250% | 54.750% | 60.750% | 65.250% |
| 24 | 39.875% | 49.375% | 54.875% | 60.875% | 65.375% |
| 25 | 40.000% | 49.500% | 55.000% | 61.000% | 65.500% |
| 26 | 40.125% | 49.625% | 55.125% | 61.125% | 65.625% |
| 27 | 40.250% | 49.750% | 55.250% | 61.250% | 65.750% |
| 28 | 40.375% | 49.875% | 55.375% | 61.375% | 65.875% |
| 29 | 40.500% | 50.000% | 55.500% | 61.500% | 66.000% |
| 30 | 40.625% | 50.125% | 55.625% | 61.625% | 66.125% |
| 31 | 40.750% | 50.250% | 55.750% | 61.750% | 66.250% |
| 32 | 40.875% | 50.375% | 55.875% | 61.875% | 66.375% |
| 33 | 41.000% | 50.500% | 56.000% | 62.000% | 66.500% |
| 34 | 41.125% | 50.625% | 56.125% | 62.125% | 66.625% |
| 35 | 41.250% | 50.750% | 56.250% | 62.250% | 66.750% |
| 36 | 41.375% | 50.875% | 56.375% | 62.375% | 66.875% |
| 37 | 41.500% | 51.000% | 56.500% | 62.500% | 67.000% |
| 38 | 41.625% | 51.125% | 56.625% | 62.625% | 67.125% |
| 39 | 41.750% | 51.250% | 56.750% | 62.750% | 67.250% |
| 40 | 41.875% | 51.375% | 56.875% | 62.875% | 67.375% |
| 41 | 42.000% | 51.500% | 57.000% | 63.000% | 67.500% |
| 42 | 42.125% | 51.625% | 57.125% | 63.125% | 67.625% |
| 43 | 42.250% | 51.750% | 57.250% | 63.250% | 67.750% |
| 44 | 42.375% | 51.875% | 57.375% | 63.375% | 67.875% |
| 45 | 42.500% | 52.000% | 57.500% | 63.500% | 68.000% |
| 46 | 42.625% | 52.125% | 57.625% | 63.625% | 68.125% |
| 47 | 42.750% | 52.250% | 57.750% | 63.750% | 68.250% |
| 48 | 42.875% | 52.375% | 57.875% | 63.875% | 68.375% |
| 49 | 43.000% | 52.500% | 58.000% | 64.000% | 68.500% |

Sch. 3-5

| Liability Rating | "AAA" | "AA" | "A" | "BBB" | "BB" |
|---|---|---|---|---|---|
| 50 | 43.125% | 52.625% | 58.125% | 64.125% | 68.625% |
| 51 | 43.250% | 52.750% | 58.250% | 64.250% | 68.750% |
| 52 | 43.375% | 52.875% | 58.375% | 64.375% | 68.875% |
| 53 | 43.500% | 53.000% | 58.500% | 64.500% | 69.000% |
| 54 | 43.625% | 53.125% | 58.625% | 64.625% | 69.125% |
| 55 | 43.750% | 53.250% | 58.750% | 64.750% | 69.250% |
| 56 | 43.875% | 53.375% | 58.875% | 64.875% | 69.375% |
| 57 | 44.000% | 53.500% | 59.000% | 65.000% | 69.500% |
| 58 | 44.125% | 53.625% | 59.125% | 65.125% | 69.625% |
| 59 | 44.250% | 53.750% | 59.250% | 65.250% | 69.750% |
| 60 | 44.375% | 53.875% | 59.375% | 65.375% | 69.875% |
| 61 | 44.500% | 54.000% | 59.500% | 65.500% | 70.000% |
| 62 | 44.625% | 54.125% | 59.625% | 65.625% | 70.125% |
| 63 | 44.750% | 54.250% | 59.750% | 65.750% | 70.250% |
| 64 | 44.875% | 54.375% | 59.875% | 65.875% | 70.375% |
| 65 | 45.000% | 54.500% | 60.000% | 66.000% | 70.500% |
| 66 | 45.125% | 54.625% | 60.125% | 66.125% | 70.625% |
| 67 | 45.250% | 54.750% | 60.250% | 66.250% | 70.750% |
| 68 | 45.375% | 54.875% | 60.375% | 66.375% | 70.875% |
| 69 | 45.500% | 55.000% | 60.500% | 66.500% | 71.000% |
| 70 | 45.625% | 55.125% | 60.625% | 66.625% | 71.125% |
| 71 | 45.750% | 55.250% | 60.750% | 66.750% | 71.250% |
| 72 | 45.875% | 55.375% | 60.875% | 66.875% | 71.375% |
| 73 | 46.000% | 55.500% | 61.000% | 67.000% | 71.500% |
| 74 | 46.125% | 55.625% | 61.125% | 67.125% | 71.625% |
| 75 | 46.250% | 55.750% | 61.250% | 67.250% | 71.750% |
| 76 | 46.375% | 55.875% | 61.375% | 67.375% | 71.875% |
| 77 | 46.500% | 56.000% | 61.500% | 67.500% | 72.000% |
| 78 | 46.625% | 56.125% | 61.625% | 67.625% | 72.125% |
| 79 | 46.750% | 56.250% | 61.750% | 67.750% | 72.250% |
| 80 | 46.875% | 56.375% | 61.875% | 67.875% | 72.375% |
| 81 | 47.000% | 56.500% | 62.000% | 68.000% | 72.500% |
| 82 | 47.125% | 56.625% | 62.125% | 68.125% | 72.625% |
| 83 | 47.250% | 56.750% | 62.250% | 68.250% | 72.750% |
| 84 | 47.375% | 56.875% | 62.375% | 68.375% | 72.875% |
| 85 | 47.500% | 57.000% | 62.500% | 68.500% | 73.000% |
| 86 | 47.625% | 57.125% | 62.625% | 68.625% | 73.125% |
| 87 | 47.750% | 57.250% | 62.750% | 68.750% | 73.250% |
| 88 | 47.875% | 57.375% | 62.875% | 68.875% | 73.375% |
| 89 | 48.000% | 57.500% | 63.000% | 69.000% | 73.500% |
| 90 | 48.125% | 57.625% | 63.125% | 69.125% | 73.625% |
| 91 | 48.250% | 57.750% | 63.250% | 69.250% | 73.750% |
| 92 | 48.375% | 57.875% | 63.375% | 69.375% | 73.875% |
| 93 | 48.500% | 58.000% | 63.500% | 69.500% | 74.000% |
| 94 | 48.625% | 58.125% | 63.625% | 69.625% | 74.125% |
| 95 | 48.750% | 58.250% | 63.750% | 69.750% | 74.250% |
| 96 | 48.875% | 58.375% | 63.875% | 69.875% | 74.375% |
| 97 | 49.000% | 58.500% | 64.000% | 70.000% | 74.500% |
| 98 | 49.125% | 58.625% | 64.125% | 70.125% | 74.625% |
| 99 | 49.250% | 58.750% | 64.250% | 70.250% | 74.750% |
| 100 | 49.375% | 58.875% | 64.375% | 70.375% | 74.875% |
| 101 | 49.500% | 59.000% | 64.500% | 70.500% | 75.000% |

Sch. 3-6

| **Liability Rating** | **"AAA"** | **"AA"** | **"A"** | **"BBB"** | **"BB"** |
|---|---|---|---|---|---|
| 102 | 49.625% | 59.125% | 64.625% | 70.625% | 75.125% |
| 103 | 49.750% | 59.250% | 64.750% | 70.750% | 75.250% |
| 104 | 49.875% | 59.375% | 64.875% | 70.875% | 75.375% |
| 105 | 50.000% | 59.500% | 65.000% | 71.000% | 75.500% |
| 106 | 50.125% | 59.625% | 65.125% | 71.125% | 75.625% |
| 107 | 50.250% | 59.750% | 65.250% | 71.250% | 75.750% |
| 108 | 50.375% | 59.875% | 65.375% | 71.375% | 75.875% |
| 109 | 50.500% | 60.000% | 65.500% | 71.500% | 76.000% |
| 110 | 50.625% | 60.125% | 65.625% | 71.625% | 76.125% |
| 111 | 50.750% | 60.250% | 65.750% | 71.750% | 76.250% |
| 112 | 50.875% | 60.375% | 65.875% | 71.875% | 76.375% |
| 113 | 51.000% | 60.500% | 66.000% | 72.000% | 76.500% |
| 114 | 51.125% | 60.625% | 66.125% | 72.125% | 76.625% |
| 115 | 51.250% | 60.750% | 66.250% | 72.250% | 76.750% |
| 116 | 51.375% | 60.875% | 66.375% | 72.375% | 76.875% |
| 117 | 51.500% | 61.000% | 66.500% | 72.500% | 77.000% |
| 118 | 51.625% | 61.125% | 66.625% | 72.625% | 77.125% |
| 119 | 51.750% | 61.250% | 66.750% | 72.750% | 77.250% |
| 120 | 51.875% | 61.375% | 66.875% | 72.875% | 77.375% |
| 121 | 52.000% | 61.500% | 67.000% | 73.000% | 77.500% |

**Minimum Floating Spread/Minimum Weighted Average Coupon Pairing**

| Case | Minimum Floating Spread | Minimum Weighted Average Coupon |
|---|---|---|
| 1. | 2.80% | 4.40% |
| 2. | 2.90% | 4.50% |
| 3. | 3.00% | 4.60% |
| 4. | 3.10% | 4.70% |
| 5. | 3.20% | 4.80% |
| 6. | 3.30% | 4.90% |
| 7. | 3.40% | 5.00% |
| 8. | 3.50% | 5.10% |
| 9. | 3.60% | 5.20% |
| 10. | 3.70% | 5.30% |
| 11. | 3.80% | 5.40% |
| 12. | 3.90% | 5.50% |
| 13. | 4.00% | 5.60% |
| 14. | 4.10% | 5.70% |
| 15. | 4.20% | 5.80% |
| 16. | 4.30% | 5.90% |
| 17. | 4.40% | 6.00% |
| 18. | 4.50% | 6.10% |
| 19. | 4.60% | 6.20% |
| 20. | 4.70% | 6.30% |
| 21. | 4.80% | 6.40% |
| 22. | 4.90% | 6.50% |
| 23. | 5.00% | 6.60% |
| 24. | 5.10% | 6.70% |
| 25. | 5.20% | 6.80% |

Sch. 3-7

Unless the Portfolio Manager otherwise notifies S&P in writing on or prior to the Effective Date, as of the Effective Date the Portfolio Manager will elect the following Weighted Average S&P Recovery Rates:

| Liability Rating | "AAA" | "AA" | "A" | "BBB" | "BB" |
|---|---|---|---|---|---|
| Weighted Average S&P Recovery Rate | 48.00% | 57.50% | 63.00% | 69.00% | 73.50% |

20718186.19.BUSINESS

SCHEDULE 4

DIVERSITY SCORE CALCULATION

The Diversity Score is calculated as follows:

(a)     An "Issuer Par Amount" is calculated for each issuer of a Collateral Obligation, and is equal to the Aggregate Principal Balance of all the Collateral Obligations issued by that issuer and all affiliates.

(b)     An "Average Par Amount" is calculated by summing the Issuer Par Amounts for all issuers, and dividing by the number of issuers.

(c)     An "Equivalent Unit Score" is calculated for each issuer, and is equal to the lesser of (x) one and (y) the Issuer Par Amount for such issuer divided by the Average Par Amount.

(d)     An "Aggregate Industry Equivalent Unit Score" is then calculated for each of the Moody's industry classification groups, shown on Schedule 2, and is equal to the sum of the Equivalent Unit Scores for each issuer in such industry classification group.

(e)     An "Industry Diversity Score" is then established for each Moody's industry classification group, shown on Schedule 2, by reference to the following table for the related Aggregate Industry Equivalent Unit Score, provided, that if any Aggregate Industry Equivalent Unit Score falls between any two such scores, the applicable Industry Diversity Score will be the lower of the two Industry Diversity Scores:

| Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score |
|---|---|---|---|---|---|---|---|
| 0.0000 | 0.0000 | 5.0500 | 2.7000 | 10.1500 | 4.0200 | 15.2500 | 4.5300 |
| 0.0500 | 0.1000 | 5.1500 | 2.7333 | 10.2500 | 4.0300 | 15.3500 | 4.5400 |
| 0.1500 | 0.2000 | 5.2500 | 2.7667 | 10.3500 | 4.0400 | 15.4500 | 4.5500 |
| 0.2500 | 0.3000 | 5.3500 | 2.8000 | 10.4500 | 4.0500 | 15.5500 | 4.5600 |
| 0.3500 | 0.4000 | 5.4500 | 2.8333 | 10.5500 | 4.0600 | 15.6500 | 4.5700 |
| 0.4500 | 0.5000 | 5.5500 | 2.8667 | 10.6500 | 4.0700 | 15.7500 | 4.5800 |
| 0.5500 | 0.6000 | 5.6500 | 2.9000 | 10.7500 | 4.0800 | 15.8500 | 4.5900 |
| 0.6500 | 0.7000 | 5.7500 | 2.9333 | 10.8500 | 4.0900 | 15.9500 | 4.6000 |
| 0.7500 | 0.8000 | 5.8500 | 2.9667 | 10.9500 | 4.1000 | 16.0500 | 4.6100 |
| 0.8500 | 0.9000 | 5.9500 | 3.0000 | 11.0500 | 4.1100 | 16.1500 | 4.6200 |
| 0.9500 | 1.0000 | 6.0500 | 3.0250 | 11.1500 | 4.1200 | 16.2500 | 4.6300 |
| 1.0500 | 1.0500 | 6.1500 | 3.0500 | 11.2500 | 4.1300 | 16.3500 | 4.6400 |
| 1.1500 | 1.1000 | 6.2500 | 3.0750 | 11.3500 | 4.1400 | 16.4500 | 4.6500 |
| 1.2500 | 1.1500 | 6.3500 | 3.1000 | 11.4500 | 4.1500 | 16.5500 | 4.6600 |
| 1.3500 | 1.2000 | 6.4500 | 3.1250 | 11.5500 | 4.1600 | 16.6500 | 4.6700 |
| 1.4500 | 1.2500 | 6.5500 | 3.1500 | 11.6500 | 4.1700 | 16.7500 | 4.6800 |
| 1.5500 | 1.3000 | 6.6500 | 3.1750 | 11.7500 | 4.1800 | 16.8500 | 4.6900 |
| 1.6500 | 1.3500 | 6.7500 | 3.2000 | 11.8500 | 4.1900 | 16.9500 | 4.7000 |
| 1.7500 | 1.4000 | 6.8500 | 3.2250 | 11.9500 | 4.2000 | 17.0500 | 4.7100 |

Sch. 4-1

| Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score |
|---|---|---|---|---|---|---|---|
| 1.8500 | 1.4500 | 6.9500 | 3.2500 | 12.0500 | 4.2100 | 17.1500 | 4.7200 |
| 1.9500 | 1.5000 | 7.0500 | 3.2750 | 12.1500 | 4.2200 | 17.2500 | 4.7300 |
| 2.0500 | 1.5500 | 7.1500 | 3.3000 | 12.2500 | 4.2300 | 17.3500 | 4.7400 |
| 2.1500 | 1.6000 | 7.2500 | 3.3250 | 12.3500 | 4.2400 | 17.4500 | 4.7500 |
| 2.2500 | 1.6500 | 7.3500 | 3.3500 | 12.4500 | 4.2500 | 17.5500 | 4.7600 |
| 2.3500 | 1.7000 | 7.4500 | 3.3750 | 12.5500 | 4.2600 | 17.6500 | 4.7700 |
| 2.4500 | 1.7500 | 7.5500 | 3.4000 | 12.6500 | 4.2700 | 17.7500 | 4.7800 |
| 2.5500 | 1.8000 | 7.6500 | 3.4250 | 12.7500 | 4.2800 | 17.8500 | 4.7900 |
| 2.6500 | 1.8500 | 7.7500 | 3.4500 | 12.8500 | 4.2900 | 17.9500 | 4.8000 |
| 2.7500 | 1.9000 | 7.8500 | 3.4750 | 12.9500 | 4.3000 | 18.0500 | 4.8100 |
| 2.8500 | 1.9500 | 7.9500 | 3.5000 | 13.0500 | 4.3100 | 18.1500 | 4.8200 |
| 2.9500 | 2.0000 | 8.0500 | 3.5250 | 13.1500 | 4.3200 | 18.2500 | 4.8300 |
| 3.0500 | 2.0333 | 8.1500 | 3.5500 | 13.2500 | 4.3300 | 18.3500 | 4.8400 |
| 3.1500 | 2.0667 | 8.2500 | 3.5750 | 13.3500 | 4.3400 | 18.4500 | 4.8500 |
| 3.2500 | 2.1000 | 8.3500 | 3.6000 | 13.4500 | 4.3500 | 18.5500 | 4.8600 |
| 3.3500 | 2.1333 | 8.4500 | 3.6250 | 13.5500 | 4.3600 | 18.6500 | 4.8700 |
| 3.4500 | 2.1667 | 8.5500 | 3.6500 | 13.6500 | 4.3700 | 18.7500 | 4.8800 |
| 3.5500 | 2.2000 | 8.6500 | 3.6750 | 13.7500 | 4.3800 | 18.8500 | 4.8900 |
| 3.6500 | 2.2333 | 8.7500 | 3.7000 | 13.8500 | 4.3900 | 18.9500 | 4.9000 |
| 3.7500 | 2.2667 | 8.8500 | 3.7250 | 13.9500 | 4.4000 | 19.0500 | 4.9100 |
| 3.8500 | 2.3000 | 8.9500 | 3.7500 | 14.0500 | 4.4100 | 19.1500 | 4.9200 |
| 3.9500 | 2.3333 | 9.0500 | 3.7750 | 14.1500 | 4.4200 | 19.2500 | 4.9300 |
| 4.0500 | 2.3667 | 9.1500 | 3.8000 | 14.2500 | 4.4300 | 19.3500 | 4.9400 |
| 4.1500 | 2.4000 | 9.2500 | 3.8250 | 14.3500 | 4.4400 | 19.4500 | 4.9500 |
| 4.2500 | 2.4333 | 9.3500 | 3.8500 | 14.4500 | 4.4500 | 19.5500 | 4.9600 |
| 4.3500 | 2.4667 | 9.4500 | 3.8750 | 14.5500 | 4.4600 | 19.6500 | 4.9700 |
| 4.4500 | 2.5000 | 9.5500 | 3.9000 | 14.6500 | 4.4700 | 19.7500 | 4.9800 |
| 4.5500 | 2.5333 | 9.6500 | 3.9250 | 14.7500 | 4.4800 | 19.8500 | 4.9900 |
| 4.6500 | 2.5667 | 9.7500 | 3.9500 | 14.8500 | 4.4900 | 19.9500 | 5.0000 |
| 4.7500 | 2.6000 | 9.8500 | 3.9750 | 14.9500 | 4.5000 | | |
| 4.8500 | 2.6333 | 9.9500 | 4.0000 | 15.0500 | 4.5100 | | |
| 4.9500 | 2.6667 | 10.0500 | 4.0100 | 15.1500 | 4.5200 | | |

(f)    The Diversity Score is then calculated by summing each of the Industry Diversity Scores for each Moody's industry classification group shown on <u>Schedule 2</u>.

(g)    For purposes of calculating the Diversity Score, affiliated issuers in the same Industry are deemed to be a single issuer except as otherwise agreed to by Moody's.

Sch. 4-2

SCHEDULE 5

MOODY'S RATING DEFINITIONS

ASSIGNED MOODY'S RATING

The monitored publicly-available rating or the estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised; *provided* that, if such rating estimate has been issued or provided by Moody's for a period (x) longer than 13 months but not beyond 15 months, for purposes of the Moody's Default Probability Rating and Moody's Rating, as applicable, the "Assigned Moody's Rating" will be one subcategory lower than such rating estimate and (y) beyond 15 months, for purposes of the Moody's Default Probability Rating and Moody's Rating, as applicable, the "Assigned Moody's Rating" will be deemed to be "Caa3".

CFR

With respect to an obligor of a Collateral Obligation, if such obligor has a corporate family rating by Moody's, then such corporate family rating; *provided* that, if such obligor does not have a corporate family rating by Moody's but any entity in the obligor's corporate family does have a corporate family rating, then the CFR is such corporate family rating.

MOODY'S DEFAULT PROBABILITY RATING

(i)     With respect to a Collateral Obligation, if the obligor of such Collateral Obligation has a CFR, then such CFR;

(ii)    With respect to a Collateral Obligation if not determined pursuant to clause (i) above, if the obligor of such Collateral Obligation has one or more senior unsecured obligations with an Assigned Moody's Rating, then the Assigned Moody's Rating on any such obligation as selected by the Portfolio Manager in its sole discretion;

(iii)   With respect to a Collateral Obligation if not determined pursuant to clauses (i) or (ii) above, if the obligor of such Collateral Obligation has one or more senior secured obligations with an Assigned Moody's Rating, then the Moody's rating that is one subcategory lower than the Assigned Moody's Rating on any such senior secured obligation as selected by the Portfolio Manager in its sole discretion;

(iv)    With respect to a Collateral Obligation if not determined pursuant to clauses (i), (ii) or (iii) above, if a rating estimate has been assigned to such Collateral Obligation by Moody's upon the request of the Issuer, the Portfolio Manager or an Affiliate of the Portfolio Manager, then the Moody's Default Probability Rating is such rating estimate as long as such rating estimate or a renewal for such rating estimate has been issued or provided by Moody's in each case within the 15 month period preceding the date on which the Moody's Default Probability Rating is being determined; *provided* that, if such rating estimate has been issued or provided by Moody's for a period (x) longer than 13 months but not beyond 15 months, the Moody's Default Probability Rating will be one

Sch. 5-1

subcategory lower than such rating estimate and (y) beyond 15 months, the Moody's Default Probability Rating will be deemed to be "Caa3";

(v)     With respect to any DIP Collateral Obligation, the Moody's Default Probability Rating of such Collateral Obligation shall be the rating which is one subcategory below the Assigned Moody's Rating of such DIP Collateral Obligation;

(vi)    With respect to a Collateral Obligation if not determined pursuant to any of clauses (i) through (v) above and at the election of the Portfolio Manager, the Moody's Derived Rating; and

(vii)   With respect to a Collateral Obligation if not determined pursuant to any of clauses (i) through (vi) above, the Collateral Obligation will be deemed to have a Moody's Default Probability Rating of "Caa3."

With respect to any rating estimate assigned by Moody's to a Collateral Obligation hereunder, the Issuer (or the Portfolio Manager on the Issuer's behalf) shall be required to send to Moody's the related obligor's updated financial information upon its receipt thereof from, or on behalf of, such obligor and shall use commercially reasonable efforts to obtain and provide to Moody's such information (x) upon any significant change in the financial condition of such obligor (as determined by the Portfolio Manager in its commercially reasonably business judgment), and (y) upon any material modification that would result in substantial changes to the terms of any loan document relating to such Collateral Obligation or any release of collateral thereunder not permitted thereby.

## MOODY'S RATING

(i)     With respect to a Collateral Obligation that is a Senior Secured Loan:

(a)     if such Collateral Obligation has an Assigned Moody's Rating, such Assigned Moody's Rating;

(b)     if such Collateral Obligation does not have an Assigned Moody's Rating but the obligor of such Collateral Obligation has a CFR, then the Moody's rating that is one subcategory higher than such CFR;

(c)     if neither clause (a) nor (b) above apply, if such Collateral Obligation does not have an Assigned Moody's Rating but the obligor of such Collateral Obligation has one or more senior unsecured obligations with an Assigned Moody's Rating, then the Moody's rating that is two subcategories higher than the Assigned Moody's Rating on any such obligation as selected by the Portfolio Manager in its sole discretion;

(d)     if none of clauses (a) through (c) above apply, at the election of the Portfolio Manager, the Moody's Derived Rating; and

(e)     if none of clauses (a) through (d) above apply, the Collateral Obligation will be deemed to have a Moody's Rating of "Caa3"; and

Sch. 5-2

(ii)    With respect to a Collateral Obligation other than a Senior Secured Loan:

    (a)    if such Collateral Obligation has an Assigned Moody's Rating, such Assigned Moody's Rating;

    (b)    if such Collateral Obligation does not have an Assigned Moody's Rating but the obligor of such Collateral Obligation has one or more senior unsecured obligations with an Assigned Moody's Rating, then the Assigned Moody's Rating on any such obligation as selected by the Portfolio Manager in its sole discretion;

    (c)    if neither clause (a) nor clause (b) above apply, if such Collateral Obligation does not have an Assigned Moody's Rating but the obligor of such Collateral Obligation has a CFR, then the Moody's rating that is one subcategory lower than such CFR;

    (d)    if none of clauses (a), (b) or (c) above apply, if such Collateral Obligation does not have an Assigned Moody's Rating but the obligor of such Collateral Obligation has one or more subordinated debt obligations with an Assigned Moody's Rating, then the Moody's rating that is one subcategory higher than the Assigned Moody's Rating on any such obligation as selected by the Portfolio Manager in its sole discretion;

    (e)    if none of clauses (a) through (d) above apply, at the election of the Portfolio Manager, the Moody's Derived Rating; and

    (f)    if none of clauses (a) through (e) above apply, the Collateral Obligation will be deemed to have a Moody's Rating of "Caa3."

## MOODY'S DERIVED RATING

With respect to a Collateral Obligation whose Moody's Rating or Moody's Default Probability Rating is determined as the Moody's Derived Rating, the rating as determined in the manner set forth below:

(i)    By using one of the methods provided below:

    (a)    if such Collateral Obligation is rated by S&P, then the Moody's Rating and Moody's Default Probability Rating (as applicable) of such Collateral Obligation will be determined, at the election of the Portfolio Manager, in accordance with the methodology set forth in the following table below:

| Type of Collateral Obligation | S&P Rating (Public and Monitored) | Collateral Obligation Rated by S&P | Number of Subcategories Relative to Moody's Equivalent of S&P Rating |
|---|---|---|---|
| Not Structured Finance Obligation | ≥ "BBB-" | Not a Loan or Participation Interest in Loan | −1 |

| Not Structured Finance Obligation | ≤ "BB+" | Not a Loan or Participation Interest in Loan | −2 |
|---|---|---|---|
| Not Structured Finance Obligation | | Loan or Participation Interest in Loan | −2 |

(b)    if such Collateral Obligation is not rated by S&P but another security or obligation of the obligor has a public and monitored rating by S&P (a "parallel security"), then the rating of such parallel security will at the election of the Portfolio Manager be determined in accordance with the table set forth in subclause (i)(a) above, and the Moody's Derived Rating for purposes of the definitions of Moody's Rating and Moody's Default Probability Rating (as applicable) of such Collateral Obligation will be determined in accordance with the methodology set forth in the following table (for such purposes treating the parallel security as if it were rated by Moody's at the rating determined pursuant to this subclause (i)(b));

| Obligation Category of Rated Obligation | Rating of Rated Obligation | Number of Subcategories Relative to Rated Obligation Rating |
|---|---|---|
| Senior secured obligation | greater than or equal to B2 | −1 |
| Senior secured obligation | less than B2 | −2 |
| Subordinated obligation | greater than or equal to B3 | +1 |
| Subordinated obligation | less than B3 | 0 |

or;

(c)    if such Collateral Obligation is a DIP Collateral Obligation, no Moody's Derived Rating may be determined based on a rating by S&P or any other rating agency;

*provided* that the Aggregate Principal Balance of the Collateral Obligations that may have a Moody's Rating derived from an S&P Rating as set forth in sub-clauses (a) or (b) of this clause (i) may not exceed 10% of the Collateral Principal Amount.

(ii)    If not determined pursuant to clause (i) above and such Collateral Obligation is not rated by Moody's or S&P and no other security or obligation of the issuer of such Collateral Obligation is rated by Moody's or S&P, and if Moody's has been requested by the Issuer, the Portfolio Manager or the issuer of such Collateral Obligation to assign a rating or rating estimate with respect to such Collateral Obligation but such rating or rating estimate has not been received, pending

Sch. 5-4

receipt of such estimate, the Moody's Derived Rating of such Collateral Obligation for purposes of the definitions of Moody's Rating or Moody's Default Probability Rating shall be (x) "B3" if the Portfolio Manager certifies to the Trustee and the Collateral Administrator that the Portfolio Manager believes that such estimate shall be at least "B3" and if the Aggregate Principal Balance of Collateral Obligations determined pursuant to this clause (ii)(x) and clause (i) above does not exceed 10% of the Collateral Principal Amount or (y) otherwise, "Caa1."

Sch. 5-5

<u>SCHEDULE 6</u>

CERTIFICATE OF ISSUER REGARDING ACCOUNTANTS' REPORTS AND
<u>CERTIFICATES</u>
Section 10.9(c)

       Pursuant to <u>Section 10.9(c)</u> of the Indenture, dated as of April 16, 2015 among ACIS CLO 2015-6 Ltd., as Issuer, ACIS CLO 2015-6 LLC, as Co-Issuer and U.S. Bank National Association, as Trustee, the undersigned, ACIS CLO 2015-6 Ltd. does hereby certify that it has received a statement from a firm of Independent certified public accountants indicating that:

    1.    Such firm has reviewed each Distribution Report received since the last review and applicable information from the Trustee, including a complete and accurate electronic data file, a copy of the applicable Distribution Report and any assumptions needed to complete their procedures.

    2.    The calculations (other than the S&P CDO Monitor Test) within the Distribution Reports dated [   ], [   ], [   ] and [   ] have been performed in accordance with the applicable provisions of the Indenture, except as noted in Exhibit A to this certificate.

    3.    The Aggregate Principal Balance of the Pledged Obligations and the Aggregate Principal Balance of the Collateral Obligations securing the Secured Notes as of [   ], [   ], [   ] and [   ] were as follows:

<u>Aggregate Principal Balance of the Pledged Obligations</u>

[   ]$ XXX,XXX,XXX
[   ]$ XXX,XXX,XXX
[   ]$ XXX,XXX,XXX
[   ]$ XXX,XXX,XXX

<u>Aggregate Principal Balance of the Collateral Obligations</u>

[   ]$ XXX,XXX,XXX
[   ]$ XXX,XXX,XXX
[   ]$ XXX,XXX,XXX
[   ]$ XXX,XXX,XXX

       The information and/or procedures not contained in the engagement letter between the Issuer and the firm of Independent certified public accountants are set forth in <u>Exhibit B</u> to this certificate and provided to the firm of Independent certified public accountants by the Portfolio Manager.

20718186.19.BUSINESS

Dated:  [    ]

ACIS CLO 2015-6 LTD.

By:  _____
     Name:
     Title:  Authorized Person

<u>EXHIBIT A</u>

ACIS CLO 2015-6 LTD.
DISTRIBUTION REPORT EXCEPTIONS

| **Description** | **Report Date** | **Dist Rpt Value** | **Accountant Value** | **Notes** |
| --- | --- | --- | --- | --- |

Sch. 6-3

<u>EXHIBIT B</u>

ACIS CLO 2015-6 LTD.
PORTFOLIO MANAGER INFORMATION/PROCEDURES

| <u>**Description**</u> | <u>**Report Date**</u> | <u>**Notes**</u> |
| --- | --- | --- |

Sch. 6-4

<u>CERTIFICATE OF ACIS CLO 2015-6 LTD.</u>
Section  [7.18(c)][12.1(e)]

Pursuant to <u>Section</u> [<u>7.18(c)</u>][<u>12.1(e)</u>] of the Indenture, dated as of April 16, 2015 among ACIS CLO 2015-6 Ltd., as Issuer, ACIS CLO 2015-6 LLC, as Co-Issuer and U.S. Bank National Association, as Trustee, the undersigned, ACIS CLO 2015-6 Ltd., does hereby certify that it has received an [report] from a firm of Independent certified public accountants:

[Applicable to <u>Section 7.18(c)</u> certificates]

[        (A) confirming the issuer, principal balance, coupon/spread, Stated Maturity, Moody's Default Probability Rating, Moody's Rating, S&P Rating and country of Domicile with respect to each Collateral Obligation as of the end of the Ramp-up Period and the information provided by the Issuer with respect to every other asset included in the Assets, by reference to such sources as shall be specified therein, except as specified in <u>Exhibit A</u> hereto; ]

[        (B) confirming that as of the end of the Ramp-up Period (1) the Overcollateralization Ratio Tests were met, (2) the Collateral Obligations complied with all of the requirements of the Concentration Limitations, (3) the Collateral Quality Test (excluding the S&P CDO Monitor Test) was met, (4) the Effective Date Overcollateralization Test is satisfied and (5) the Target Initial Par Condition is satisfied, except as specified in <u>Exhibit A</u> hereto; and ]

[        (C) specifying the procedures undertaken by them to review data and computations relating to above referenced Accountants' Report]

[Applicable to <u>Section 12.1(e)</u> certificates]

[confirmed the calculations contained in the certificate furnished by the Portfolio Manager pursuant to <u>Section 9.3(c)</u>, except as otherwise specified in <u>Exhibit A</u> hereto]

[Applicable to all certificates]

The information and/or procedures not contained in the engagement letter between the Issuer and the firm of Independent certified public accountants are set forth in <u>Exhibit B</u> to this certificate and provided to the firm of Independent certified public accountants by the Portfolio Manager.

Dated: [      ], [    ]

ACIS CLO 2015-6 LTD.

By: _____
     Name:
     Title:  Authorized Person

Sch. 6-5

<u>EXHIBIT A</u>

ACIS CLO 2015-6 LTD.
<u>ACCOUNTANTS' CERTIFICATE EXCEPTIONS</u>

| **Description** | **Issuer Value** | **Accountant Value** | **Notes** |
|---|---|---|---|

Sch. 6-6

<u>EXHIBIT B</u>

ACIS CLO 2015-6 LTD.
<u>PORTFOLIO MANAGER INFORMATION/PROCEDURES</u>

| **Description** | **Report Date** | **Notes** |
| --- | --- | --- |

Sch. 6-7

<u>SCHEDULE 7</u>

<u>ADDITIONAL REPORT RECIPIENTS</u>

Sch. 7-1

<u>EXHIBIT A</u>

<u>FORMS OF NOTES</u>

Ex. A-1

<u>EXHIBIT A1</u>

<u>FORM OF GLOBAL NOTE</u>

[RULE 144A][REGULATION S] GLOBAL SECURED NOTE
representing
CLASS [A-1][A-2][B-1][B-2][C][D][E] [SENIOR] [SECURED]
[DEFERRABLE] [FLOATING] [FIXED] RATE NOTES DUE 2027

[THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>SECURITIES ACT</u>"), OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(D) OR (A)(1)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN, THAT IS A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT) OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS NOTE IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH REGULATION, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.  THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN THIS NOTE THAT IS A U.S. PERSON AND IS NOT A QUALIFIED PURCHASER AND A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTES, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.][3]

[THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "<u>SECURITIES ACT</u>") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) (X) TO A "<u>QUALIFIED INSTITUTIONAL BUYER</u>" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25

---

[3] Applicable only to the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes.

MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(D) OR (A)(1)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (Y) TO AN "INSTITUTIONAL" ACCREDITED INVESTOR (AN ENTITY DEFINED IN RULE 501(A)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT) AND, IN THE CASE OF (X) AND (Y), THAT IS A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT) OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS NOTE IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH REGULATION, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.  THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN THIS NOTE THAT IS A U.S. PERSON AND DOES NOT COMPLY WITH THE FOREGOING RESTRICTIONS TO SELL ITS INTEREST IN THE NOTES, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.][4]

[BY ITS ACQUISITION OF CO-ISSUED NOTES (THE "ERISA DEBT SECURITIES"), EACH PURCHASER AND SUBSEQUENT TRANSFEREE WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED OR REQUIRED TO REPRESENT AND WARRANT, AS APPLICABLE, AT THE TIME OF ITS ACQUISITION AND THROUGHOUT THE PERIOD IT HOLDS SUCH ERISA DEBT SECURITY, THAT EITHER (X) IT IS NOT AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), THAT IS SUBJECT TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF TITLE I OF ERISA, A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, ANY ENTITY WHOSE UNDERLYING ASSETS ARE DEEMED TO INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY OR A "BENEFIT PLAN INVESTOR" AS SUCH TERM IS OTHERWISE DEFINED IN ANY REGULATIONS PROMULGATED BY THE U.S. DEPARTMENT OF LABOR OR UNDER SECTION 3(42) OF ERISA, OR A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY FEDERAL, STATE, LOCAL OR NON-U.S. LAW THAT IS SUBSTANTIALLY SIMILAR TO THE PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE OR (Y) ITS ACQUISITION, HOLDING AND DISPOSITION OF THE ERISA DEBT SECURITY WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE (OR, IN THE CASE OF A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN, A NON-EXEMPT VIOLATION OF ANY SUBSTANTIALLY SIMILAR LAW).  ANY PURPORTED TRANSFER OF AN ERISA DEBT SECURITY, OR ANY INTEREST THEREIN, TO A

---

[4] Applicable only to the Class E Notes.

PURCHASER OR TRANSFEREE THAT DOES NOT COMPLY WITH THE REQUIREMENTS SPECIFIED IN THE INDENTURE, THIS NOTE, THE OFFERING CIRCULAR AND ANY APPLICABLE TRANSFER CERTIFICATION, AS APPLICABLE, WILL BE OF NO FORCE AND EFFECT AND SHALL BE NULL AND VOID *AB INITIO*.][5]

[EACH PURCHASER AND EACH SUBSEQUENT TRANSFEREE OF THIS NOTE WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED, OR REQUIRED TO REPRESENT AND WARRANT, AS APPLICABLE, AT THE TIME OF ITS ACQUISITION AND THROUGHOUT THE PERIOD THAT IT HOLDS SUCH NOTE OR ANY INTEREST HEREIN, THAT (1) IT IS NOT AN "EMPLOYEE BENEFIT PLAN" (AS DEFINED IN SECTION 3(3) OF TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA")) THAT IS SUBJECT TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF TITLE I OF ERISA, A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, ANY ENTITY WHOSE UNDERLYING ASSETS ARE DEEMED TO INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY OR A "BENEFIT PLAN INVESTOR" AS SUCH TERM IS OTHERWISE DEFINED IN ANY REGULATIONS PROMULGATED BY THE U.S. DEPARTMENT OF LABOR OR UNDER SECTION 3(42) OF ERISA (COLLECTIVELY, "BENEFIT PLAN INVESTORS") AND (2) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO ANY FEDERAL, STATE, LOCAL OR NON-U.S. LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE, ITS ACQUISITION, HOLDING AND DISPOSITION OF THIS NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION UNDER ANY SUCH SUBSTANTIALLY SIMILAR LAW.  ANY PURPORTED TRANSFER OF THIS NOTE, OR ANY INTEREST THEREIN TO A PURCHASER OR TRANSFEREE THAT DOES NOT COMPLY WITH THE REQUIREMENTS SPECIFIED IN THE INDENTURE, THIS NOTE, THE OFFERING CIRCULAR AND ANY APPLICABLE TRANSFER CERTIFICATION, AS APPLICABLE, WILL BE OF NO FORCE AND EFFECT AND SHALL BE NULL AND VOID *AB INITIO*.][6]

ANY TRANSFER, PLEDGE OR OTHER USE OF THIS NOTE FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN, UNLESS THE NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC"), NEW YORK, NEW YORK, TO THE CO-ISSUERS OR THEIR AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR OF SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO.).

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF

---

[5] Applicable only to the Co-Issued Notes.
[6] Applicable only to the Class E Notes.

OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.  ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER AND BENEFICIAL OWNER OF THIS NOTE WILL NOT INSTITUTE AGAINST, OR JOIN ANY OTHER PERSON IN INSTITUTING AGAINST, EITHER OF THE ISSUERS OR ANY ETB SUBSIDIARY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY, MORATORIUM OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS UNDER CAYMAN ISLANDS LAW, UNITED STATES FEDERAL OR STATE BANKRUPTCY LAW OR SIMILAR LAWS UNTIL THE DATE WHICH IS ONE YEAR (OR, IF LONGER, THE APPLICABLE PREFERENCE PERIOD THEN IN EFFECT) *PLUS* ONE DAY AFTER THE PAYMENT IN FULL OF ALL NOTES. EACH HOLDER AND BENEFICIAL OWNER OF THIS NOTE UNDERSTANDS THAT THE FOREGOING RESTRICTIONS ARE A MATERIAL INDUCEMENT FOR EACH OTHER HOLDER AND BENEFICIAL OWNER OF THE NOTES TO ACQUIRE SUCH NOTES AND FOR THE ISSUER, THE CO-ISSUER AND THE PORTFOLIO MANAGER TO ENTER INTO THE INDENTURE (IN THE CASE OF THE ISSUER AND THE CO-ISSUER) AND THE OTHER APPLICABLE TRANSACTION DOCUMENTS AND ARE AN ESSENTIAL TERM OF THE INDENTURE AND THAT ANY HOLDER OR BENEFICIAL OWNER OF A NOTE, THE PORTFOLIO MANAGER OR EITHER OF THE ISSUERS MAY SEEK AND OBTAIN SPECIFIC PERFORMANCE OF SUCH RESTRICTIONS (INCLUDING INJUNCTIVE RELIEF), INCLUDING, WITHOUT LIMITATION, IN ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY, MORATORIUM OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS UNDER CAYMAN ISLANDS LAW, UNITED STATES FEDERAL OR STATE BANKRUPTCY LAW OR SIMILAR LAWS.  EACH HOLDER AND BENEFICIAL OWNER OF THIS NOTE AGREES THAT IT IS SUBJECT TO THE BANKRUPTCY SUBORDINATION AGREEMENT.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE SECURED NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE

Ex. A1-5

MEANING OF SECTION 7701(a)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE PORTFOLIO MANAGER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER OR PORTFOLIO MANAGER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE AND THE TREASURY REGULATIONS (AND ANY NOTICES, GUIDANCE OR OFFICIAL PRONOUNCEMENTS) PROMULGATED THEREUNDER, ANY AGREEMENT ENTERED INTO WITH RESPECT THERETO, ANY INTERGOVERNMENTAL AGREEMENT IN RESPECT THEREOF (INCLUDING THE CAYMAN INTERGOVERNMENTAL AGREEMENT) AND ANY LAW, RULE OR REGULATION IMPLEMENTING SUCH AN INTERGOVERNMENTAL AGREEMENT, INCLUDING ANY REGULATIONS, RULES AND GUIDANCE NOTES OR OTHER APPROACH OR PRACTICES ADOPTED IN RESPECT THEREOF ("FATCA") AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE PORTFOLIO MANAGER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER OR AN AGENT ACTING ON ITS BEHALF IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AND (B) THE ISSUER OR AN AGENT ACTING ON ITS BEHALF WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELL ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER OR AN AGENT ACTING ON ITS BEHALF, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT (I) THE ISSUER, THE PORTFOLIO MANAGER OR THE TRUSTEE MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY AND (II) THE TRUSTEE OR THE REGISTRAR MAY PROVIDE CERTAIN INFORMATION TO THE ISSUER, THE PORTFOLIO MANAGER OR ANY AGENT THEREOF PURSUANT TO THE INDENTURE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN

Ex. A1-6

THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(c)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN WITHIN THE MEANING OF TREASURY REGULATION SECTION 1.881-3.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE, THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT OR INTERGOVERNMENTAL AGREEMENT THEREUNDER OR IN RESPECT THEREOF, INCLUDING THE CAYMAN IGA) AND ANY OTHER LAW, RULE OR REGULATION IMPLEMENTING SUCH AGREEMENTS OR INTERGOVERNMENTAL AGREEMENTS, INCLUDING, ANY REGULATIONS, RULES AND GUIDANCE NOTES OR OTHER APPROACH OR PRACTICES ADOPTED IN RESPECT THEREOF, SIMILAR TO THE FOREGOING OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

[THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR U.S. FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY OF THIS NOTE MAY BE OBTAINED BY WRITING TO THE ISSUER.][7]

---

[7]    Insert for the Class C Notes, Class D Notes and Class E Notes.

Ex. A1-7

ACIS CLO 2015-6 LTD.
ACIS CLO 2015-6 LLC

[RULE 144A GLOBAL SECURED NOTE][REGULATION S GLOBAL SECURED NOTE]
representing
Class [A-1][A-2][B-1][B-2][C][D][E] [SENIOR] SECURED
[DEFERRABLE] [FLOATING] [FIXED] RATE NOTES DUE 2027

Up to U.S.$[__]

[R][S]-1
CUSIP No. [__]
[ISIN [__]]

ACIS CLO 2015-6 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer")[, and ACIS CLO 2015-6 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers")], for value received, hereby promise[s] to pay to [CEDE & CO.] [_____], or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum [as indicated on Schedule A] [of _____] on the Payment Date in May 2027 (the "Stated Maturity") except as provided below and in the Indenture.  The obligations of the [Co-Issuers][Issuer] under this Note and the Indenture are limited recourse obligations of the [Co-Issuers][Issuer] payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Holders shall be extinguished and shall not thereafter revive.

The [Co-Issuers promise] [Issuer promises] to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing in August 2015 (or if such day is not a Business Day, the next succeeding Business Day), at the rate equal to [LIBOR *plus*]$^8$ [•]% *per annum* on the unpaid principal amount hereof until the principal hereof is paid or duly provided for.  [Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period *divided by* 360.]$^8$ [Interest shall be computed on the basis of a 360-day year consisting of twelve 30-day months.]$^9$ The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest.

Interest will cease to accrue on each Class [A-1][A-2][B-1][B-2][C][D][E] Note, or in the case of a partial repayment, on such part, from the date of repayment or Stated Maturity unless payment of principal is improperly withheld or unless a default is otherwise made with

---

$^8$ Include for Floating Rate Notes.
$^9$ Include for Fixed Rate Notes.

Ex. A1-8

respect to such payments.  The principal of this Class [A-1][A-2][B-1][B-2][C][D][E] Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.  The principal of each Class [A-1][A-2][B-1][B-2][C][D][E] Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

[Any interest on the Class [C][D][E] Notes that is not paid when due by operation of the Priority of Payments will be deferred.  Any interest so deferred will be added to the principal balance of the Class [C][D][E] Notes, and thereafter, interest will accrue on the aggregate outstanding principal amount of the Class [C][D][E] Notes, as so increased.][10]

Unless the Certificate of Authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class [A-1][A-2][B-1][B-2][C][D][E] [Senior] Secured [Deferrable] [Floating] [Fixed] Rate Notes due 2027 (the "Class [A-1][A-2][B-1][B-2][C][D][E] Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an Indenture dated as of April 16, 2015 (the "Indenture") among the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

Transfers of this [Rule 144A Global Secured Note][Regulation S Global Secured Note] shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of DTC or to a successor of DTC or such successor's nominee.

Interests in this [Rule 144A Global Secured Note][Regulation S Global Secured Note] will be transferable in accordance with DTC's rules and procedures in use at such time, as set forth in the Indenture.

In the event Coverage Tests (other than the Interest Reinvestment Test) are not satisfied on any Determination Date occurring subsequent to the Ramp-up Period or the Interest Reinvestment Test is not satisfied on any Determination Date during the Reinvestment Period, or an Optional Redemption, a Refinancing, a Special Redemption or a Clean-Up Call Redemption occurs as set forth in the Indenture, this Note may be redeemed in whole or in part (as applicable) in the manner and with the effect provided in the Indenture.

---

[10]Applicable only to the Class C Notes, the Class D Notes and the Class E Notes.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class [A-1][A-2][B-1][B-2][C][D][E] Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Interests in this [Rule 144A Global Secured Note][Regulation S Global Secured Note] may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding [Regulation S Global Secured Note][Rule 144A Global Secured Note] subject to the restrictions as set forth in the Indenture.  This [Rule 144A Global Secured Note][Regulation S Global Secured Note] is subject to mandatory exchange for Certificated Secured Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this [Rule 144A Global Secured Note] [Regulation S Global Secured Note], this [Rule 144A Global Secured Note][Regulation S Global Secured Note] shall be endorsed on Schedule A hereto to reflect the reduction of or increase in the principal amount evidenced hereby.

The Class [A-1][A-2][B-1][B-2][C][D][E] Notes will be issued in minimum denominations of $100,000 and integral multiples of $1 in excess thereof.

Title to Notes shall pass by registration in the Note Register kept by the Trustee, acting through its Corporate Office.

No service charge shall be made for registration of transfer or exchange of this Note, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the [Co-Issuers have][Issuer has] caused this Note to be duly executed.

Dated as of _____.

ACIS CLO 2015-6 LTD.

By:_____
   Name:
   Title:

[ACIS CLO 2015-6 LLC

By:_____
   Name:
   Title:]

CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

Dated: _____

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
Authorized Signatory

Ex. A1-12

SCHEDULE A

SCHEDULE OF EXCHANGES OR REDEMPTIONS

The following exchanges, redemptions of or increase in the whole or a part of the Notes represented by this [Rule 144A Global Secured Note][Regulation S Global Secured Note] have been made:

| Date exchange/redemption/increase made | Original principal amount of this Global Note | Part of principal amount of this Global Note exchanged/redeemed/increased | Remaining principal amount of this Global Note following such exchange/redemption/increase | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
| [__] | $[  ] | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Ex. A1-13

EXHIBIT A2

FORM OF [REGULATION S] [RULE 144A] GLOBAL SUBORDINATED NOTE

[REGULATION S] [RULE 144A] GLOBAL SUBORDINATED NOTE
representing

SUBORDINATED NOTES DUE 2027

THIS SUBORDINATED NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) (1) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT), (2) TO A "KNOWLEDGEABLE EMPLOYEE" (AS DEFINED IN RULE 3c-5 UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED) WITH RESPECT TO THE ISSUER OR (3) TO AN ENTITY EXCLUSIVELY OWNED BY KNOWLEDGEABLE EMPLOYEES WITH RESPECT TO THE ISSUER AND/OR QUALIFIED PURCHASERS AND, IN THE CASE OF (1), (2) AND (3), THAT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE OR (Y) AN ACCREDITED INVESTOR (AS DEFINED IN RULE 501(A) UNDER THE SECURITIES ACT) WHO, IF NOT AN "INSTITUTIONAL" ACCREDITED INVESTOR (AN ENTITY DEFINED IN RULE 501(A)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT), IS A KNOWLEDGEABLE EMPLOYEE WITH RESPECT TO THE ISSUER OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS SUBORDINATED NOTE IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH REGULATION, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.  THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN THIS SUBORDINATED NOTE THAT IS A U.S. PERSON AND DOES NOT COMPLY WITH THE FOREGOING RESTRICTIONS TO SELL ITS INTEREST IN THE SUBORDINATED NOTES, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER OF THIS SUBORDINATED NOTE FROM THE ISSUER IN THE INITIAL OFFERING WILL BE REQUIRED TO REPRESENT AND WARRANT, WITH RESPECT TO EACH DAY IT HOLDS THE SUBORDINATED NOTE OR ANY BENEFICIAL INTEREST THEREIN, IN THE FORM SPECIFIED IN THE INDENTURE, THIS NOTE, THE OFFERING CIRCULAR AND ANY APPLICABLE TRANSFER CERTIFICATION, AS APPLICABLE, (UNLESS OTHERWISE AGREED TO BY THE ISSUER) (1) WHETHER OR NOT IT IS (A) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY

Ex. A2-1

ACT OF 1974, AS AMENDED ("ERISA"), THAT IS SUBJECT TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF TITLE I OF ERISA, A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY OR A "BENEFIT PLAN INVESTOR" AS SUCH TERM IS OTHERWISE DEFINED IN ANY REGULATIONS PROMULGATED BY THE U.S. DEPARTMENT OF LABOR OR UNDER SECTION 3(42) OF ERISA (COLLECTIVELY, "BENEFIT PLAN INVESTORS") OR (B) A PERSON (OTHER THAN A BENEFIT PLAN INVESTOR) WHO HAS DISCRETIONARY AUTHORITY OR CONTROL WITH RESPECT TO THE ASSETS OF THE ISSUER OR ANY PERSON WHO PROVIDES INVESTMENT ADVICE FOR A FEE (DIRECT OR INDIRECT) WITH RESPECT TO SUCH ASSETS, OR ANY AFFILIATE OF SUCH A PERSON (A "CONTROLLING PERSON") AND (2) (A) IF IT IS A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF A SUBORDINATED NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE OR (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY FEDERAL, STATE, LOCAL OR NON-U.S. LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE ("SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF A SUBORDINATED NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF SIMILAR LAW.  EACH PURCHASER FROM THE ISSUER IN THE INITIAL OFFERING OF A SUBORDINATED NOTE THAT FAILS TO PROVIDE THE CERTIFICATION DESCRIBED IN THE PRIOR SENTENCE WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED, OR REQUIRED TO REPRESENT AND WARRANT, AS APPLICABLE, WITH RESPECT TO EACH DAY IT HOLDS SUCH SUBORDINATED NOTE OR ANY BENEFICIAL INTEREST THEREIN, THAT (1) SUCH PURCHASER IS NOT A BENEFIT PLAN INVESTOR OR CONTROLLING PERSON AND (2) IF THE PURCHASER IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO SIMILAR LAW, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUBORDINATED NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF SIMILAR LAW.   NO TRANSFER OR PURCHASE OF THIS SUBORDINATED NOTE WILL BE EFFECTIVE IF IT WOULD CAUSE 25% OR MORE OF THE VALUE OF THE SUBORDINATED NOTES TO BE HELD BY BENEFIT PLAN INVESTORS. EACH PURCHASER OR TRANSFEREE OF THIS SUBORDINATED NOTE OTHER THAN FROM THE ISSUER IN THE INITIAL OFFERING WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED WITH RESPECT TO EACH DAY IT HOLDS SUCH SUBORDINATED NOTE OR ANY BENEFICIAL INTEREST HEREIN THAT (1) SUCH PURCHASER OR TRANSFEREE IS NOT A BENEFIT PLAN INVESTOR OR CONTROLLING PERSON AND (2) IF SUCH PURCHASER OR TRANSFEREE IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO SIMILAR LAW, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH SUBORDINATED NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF SIMILAR LAW. NO SUBORDINATED NOTES MAY BE ACQUIRED FROM PERSONS OTHER THAN THE ISSUER OR OTHER THAN IN THE INITIAL

Ex. A2-2

OFFERING BY BENEFIT PLAN INVESTORS OR CONTROLLING PERSONS.   EACH PURCHASER AND TRANSFEREE FURTHER UNDERSTANDS AND AGREES THAT ANY PURPORTED TRANSFER OF THE SUBORDINATED NOTES, OR ANY INTEREST THEREIN, TO A PURCHASER OR TRANSFEREE THAT DOES NOT COMPLY WITH THE REQUIREMENTS AS SPECIFIED IN THE INDENTURE, THIS NOTE, THE OFFERING CIRCULAR AND ANY APPLICABLE TRANSFER CERTIFICATION, AS APPLICABLE, WILL BE OF NO FORCE AND EFFECT, SHALL BE NULL AND VOID *AB INITIO* AND THE ISSUER WILL HAVE THE RIGHT TO DIRECT THE PURCHASER TO TRANSFER THE SUBORDINATED NOTES, OR ANY INTEREST THEREIN, AS APPLICABLE, TO A PERSON WHO MEETS THE FOREGOING CRITERIA.

ANY TRANSFER, PLEDGE OR OTHER USE OF THIS NOTE FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN, UNLESS THE NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC"), NEW YORK, NEW YORK, TO THE CO-ISSUERS OR THEIR AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR OF SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO.)

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

DISTRIBUTIONS OF PRINCIPAL PROCEEDS AND INTEREST PROCEEDS TO THE HOLDER OF THE SUBORDINATED NOTES REPRESENTED HEREBY ARE SUBORDINATE TO THE PAYMENT ON EACH PAYMENT DATE OF PRINCIPAL OF AND INTEREST ON THE SECURED NOTES OF THE ISSUER AND THE PAYMENT OF CERTAIN OTHER AMOUNTS, TO THE EXTENT AND AS DESCRIBED IN THE INDENTURE GOVERNING SUCH SECURED NOTES.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE SUBORDINATED NOTES AS EQUITY FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING

Ex. A2-3

OF SECTION 7701(a)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE PORTFOLIO MANAGER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER OR PORTFOLIO MANAGER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE AND THE TREASURY REGULATIONS (AND ANY NOTICES, GUIDANCE OR OFFICIAL PRONOUNCEMENTS) PROMULGATED THEREUNDER, ANY AGREEMENT ENTERED INTO WITH RESPECT THERETO, ANY INTERGOVERNMENTAL AGREEMENT IN RESPECT THEREOF (INCLUDING THE CAYMAN INTERGOVERNMENTAL AGREEMENT) AND ANY LAW, RULE OR REGULATION IMPLEMENTING SUCH AN INTERGOVERNMENTAL AGREEMENT, INCLUDING ANY REGULATIONS, RULES AND GUIDANCE NOTES OR OTHER APPROACH OR PRACTICES ADOPTED IN RESPECT THEREOF ("FATCA") AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE PORTFOLIO MANAGER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER OR AN AGENT ACTING ON ITS BEHALF IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AND (B) THE ISSUER OR AN AGENT ACTING ON ITS BEHALF WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELL ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER OR AN AGENT ACTING ON ITS BEHALF, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT (I) THE ISSUER, THE PORTFOLIO MANAGER OR THE TRUSTEE MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY AND (II) THE TRUSTEE OR THE REGISTRAR MAY PROVIDE CERTAIN INFORMATION TO THE ISSUER, THE PORTFOLIO MANAGER OR ANY AGENT THEREOF PURSUANT TO THE INDENTURE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE

Ex. A2-4

ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(c)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN WITHIN THE MEANING OF TREASURY REGULATION SECTION 1.881-3.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE, THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT OR INTERGOVERNMENTAL AGREEMENT THEREUNDER OR IN RESPECT THEREOF, INCLUDING THE CAYMAN IGA) AND ANY OTHER LAW, RULE OR REGULATION IMPLEMENTING SUCH AGREEMENTS OR INTERGOVERNMENTAL AGREEMENTS, INCLUDING, ANY REGULATIONS, RULES AND GUIDANCE NOTES OR OTHER APPROACH OR PRACTICES ADOPTED IN RESPECT THEREOF, SIMILAR TO THE FOREGOING OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

EACH HOLDER AND BENEFICIAL OWNER OF THIS NOTE WILL NOT INSTITUTE AGAINST, OR JOIN ANY OTHER PERSON IN INSTITUTING AGAINST, EITHER OF THE ISSUERS OR ANY ETB SUBSIDIARY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY, MORATORIUM OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS UNDER CAYMAN ISLANDS LAW, UNITED STATES FEDERAL OR STATE BANKRUPTCY LAW OR SIMILAR LAWS UNTIL THE DATE WHICH IS ONE YEAR (OR, IF LONGER, THE APPLICABLE PREFERENCE PERIOD THEN IN EFFECT) *PLUS* ONE DAY AFTER THE PAYMENT IN FULL OF ALL NOTES. EACH HOLDER AND BENEFICIAL OWNER OF THIS NOTE UNDERSTANDS THAT THE FOREGOING RESTRICTIONS ARE A MATERIAL INDUCEMENT FOR EACH OTHER HOLDER AND BENEFICIAL OWNER OF THE NOTES TO ACQUIRE SUCH NOTES AND FOR THE ISSUER, THE CO-ISSUER AND THE PORTFOLIO MANAGER TO ENTER INTO THE INDENTURE (IN THE CASE OF THE ISSUER AND THE CO-ISSUER) AND THE OTHER APPLICABLE TRANSACTION DOCUMENTS AND ARE AN ESSENTIAL TERM OF THE INDENTURE AND THAT ANY HOLDER OR BENEFICIAL OWNER OF A NOTE, THE PORTFOLIO MANAGER OR EITHER OF THE ISSUERS MAY SEEK AND OBTAIN SPECIFIC PERFORMANCE OF SUCH RESTRICTIONS (INCLUDING INJUNCTIVE RELIEF),

Ex. A2-5

INCLUDING, WITHOUT LIMITATION, IN ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY, MORATORIUM OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS UNDER CAYMAN ISLANDS LAW, UNITED STATES FEDERAL OR STATE BANKRUPTCY LAW OR SIMILAR LAWS.  EACH HOLDER AND BENEFICIAL OWNER OF THIS NOTE AGREES THAT IT IS SUBJECT TO THE BANKRUPTCY SUBORDINATION AGREEMENT.

<u>ACIS CLO 2015-6 LTD.</u>

[REGULATION S] [RULE 144A] GLOBAL SUBORDINATED NOTE
representing
SUBORDINATED NOTES DUE 2027

S-l
CUSIP No. [__]                                                    Up to US.$[__]
ISIN:  [__]
Common Code:  [__]

   ACIS CLO 2015-6 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "<u>Issuer</u>"), for value received, hereby promises to pay to CEDE & CO., or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum as indicated on <u>Schedule A</u> on the Payment Date in May 2027 (the "<u>Stated Maturity</u>") except as provided below and in the Indenture.

   The obligations of the Issuer under this Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Holders shall be extinguished and shall not thereafter revive.  The Subordinated Notes represent unsecured, subordinated obligations of the Issuer and are not entitled to security under the Indenture.

   The principal of each Subordinated Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

   Payments of Interest Proceeds and Principal Proceeds to the Holders of the Subordinated Notes are subordinated to payments in respect of other classes of Notes as set forth in the Indenture and failure to pay such amounts will not constitute an Event of Default under the Indenture.

   Unless the Certificate of Authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

   This Note is one of a duly authorized issue of Subordinated Notes due 2027 (the "<u>Subordinated Notes</u>" and, together with the other classes of Notes issued under the Indenture, the "<u>Notes</u>") issued and to be issued under an Indenture dated as of April 16, 2015 (the "<u>Indenture</u>") among the Issuer, ACIS CLO 2015-6 LLC and U.S. Bank National Association, as trustee (the "<u>Trustee</u>", which term includes any successor trustee as permitted under the Indenture).  Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of

the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

The Subordinated Notes may be redeemed, in whole but not in part, on any Business Day on or after the redemption or repayment of the Secured Notes, at the written direction of Holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes.  In addition, this Note is redeemable at the option of the Issuer acting at the direction of the Portfolio Manager, in whole but not in part, on or after the Payment Date on which the Aggregate Principal Balance of the Collateral Obligations and Eligible Investments has been reduced to 20% or less of the Target Initial Par Amount, unless a Majority of the Subordinated Notes directs to prevent such redemption in a writing delivered to the Issuer, the Trustee and the Portfolio Manager at least 30 days prior to the next succeeding Payment Date.

Transfers of this [Rule 144A][Regulation S] Global Subordinated Note shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of the DTC or to a successor of the DTC or such successor's nominee.

Interests in this [Rule 144A][Regulation S] Global Subordinated Note will be transferable in accordance with the DTC's rules and procedures in use at such time, and to transferees acquiring Certificated Subordinated Notes or to a transferee taking an interest in a [Rule 144A][Regulation S] Global Subordinated Note, subject to and in accordance with the restrictions set forth in the Indenture.

The Issuer, the Trustee, and any agent of the Issuer or the Trustee may treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of Interest Proceeds and Principal Proceeds on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Issuer nor the Trustee nor any agent of the Issuer or the Trustee shall be affected by notice to the contrary.

Interests in this [Rule 144A][Regulation S] Global Subordinated Note may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding [Regulation S Global][Rule 144A Global][Certificated] Subordinated Note, subject to the restrictions as set forth in the Indenture.  This [Rule 144A][Regulation S] Global Subordinated Note is subject to mandatory exchange for Certificated Subordinated Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this [Rule 144A][Regulation S] Global Subordinated Note, this [Rule 144A][Regulation S] Global Subordinated Note shall be endorsed on <u>Schedule A</u> hereto to reflect the reduction of or increase in the principal amount evidenced hereby.

The Subordinated Notes will be issued in minimum denominations of $100,000 and integral multiples of $1 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Trustee, acting through its Corporate Office.

No service charge shall be made for registration of transfer or exchange of this Note, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Ex. A2-9

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed.

Dated as of _____.

ACIS CLO 2015-6 LTD.

By:_____
    Name:
    Title:

Ex. A2-10

<u>CERTIFICATE OF AUTHENTICATION</u>

This is one of the Notes referred to in the within-mentioned Indenture.

Dated: _____

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
Authorized Signatory

Ex. A2-11

<u>SCHEDULE A</u>

<u>SCHEDULE OF EXCHANGES OR REDEMPTIONS</u>

The following exchanges, redemptions of or increase in the whole or a part of the Notes represented by this [Rule 144A][Regulation S] Global Subordinated Note have been made:

| Date exchange/redemption/increase made | Original principal amount of this [Rule 144A][Regulation S] Global Subordinated Note | Part of principal amount of this [Rule 144A][Regulation S] Global Subordinated Note exchanged/redeemed /increased | Remaining principal amount of this [Rule 144A][Regulation S] Global Subordinated Note following such exchange/redemption/increase | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
| [__] | $[__] | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Ex. A2-12

<u>EXHIBIT A3</u>

<u>FORM OF CERTIFICATED SUBORDINATED NOTE</u>

CERTIFICATED SUBORDINATED NOTE
representing,

SUBORDINATED NOTES DUE 2027

THIS SUBORDINATED NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "<u>SECURITIES ACT</u>") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) (1) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT), (2) TO A "KNOWLEDGEABLE EMPLOYEE" (AS DEFINED IN RULE 3c-5 UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED) WITH RESPECT TO THE ISSUER OR (3) TO AN ENTITY EXCLUSIVELY OWNED BY KNOWLEDGEABLE EMPLOYEES WITH RESPECT TO THE ISSUER AND/OR QUALIFIED PURCHASERS AND, IN THE CASE OF (1), (2) AND (3), THAT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE OR (Y) AN ACCREDITED INVESTOR (AS DEFINED IN RULE 501(A) UNDER THE SECURITIES ACT) WHO, IF NOT AN "INSTITUTIONAL" ACCREDITED INVESTOR (AN ENTITY DEFINED IN RULE 501(A)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT), IS A KNOWLEDGEABLE EMPLOYEE WITH RESPECT TO THE ISSUER OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS SUBORDINATED NOTE IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH REGULATION, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.  THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN THIS SUBORDINATED NOTE THAT IS A U.S. PERSON AND DOES NOT COMPLY WITH THE FOREGOING RESTRICTIONS TO SELL ITS INTEREST IN THE SUBORDINATED NOTES, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER OF A CERTIFICATED SUBORDINATED NOTE AND EACH SUBSEQUENT TRANSFEREE WILL BE REQUIRED TO REPRESENT AND WARRANT, IN THE FORM SPECIFIED IN THE INDENTURE, THIS NOTE, THE OFFERING CIRCULAR AND ANY APPLICABLE TRANSFER CERTIFICATION, AS APPLICABLE, WITH RESPECT TO EACH DAY IT HOLDS SUCH CERTIFICATED SUBORDINATED NOTE OR ANY BENEFICIAL INTEREST HEREIN, (1) WHETHER OR NOT IT IS (A) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED

Ex. A3-1

("ERISA"), THAT IS SUBJECT TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF TITLE I OF ERISA, A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY OR A "BENEFIT PLAN INVESTOR" AS SUCH TERM IS OTHERWISE DEFINED IN ANY REGULATIONS PROMULGATED BY THE U.S. DEPARTMENT OF LABOR OR UNDER SECTION 3(42) OF ERISA (COLLECTIVELY, "BENEFIT PLAN INVESTORS") OR (B) A PERSON (OTHER THAN A BENEFIT PLAN INVESTOR) WHO HAS DISCRETIONARY AUTHORITY OR CONTROL WITH RESPECT TO THE ASSETS OF THE ISSUER OR ANY PERSON WHO PROVIDES INVESTMENT ADVICE FOR A FEE (DIRECT OR INDIRECT) WITH RESPECT TO SUCH ASSETS, OR ANY AFFILIATE OF SUCH A PERSON (A "CONTROLLING PERSON") AND (2) (A) IF IT IS A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF A CERTIFICATED SUBORDINATED NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE OR (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY FEDERAL, STATE, LOCAL OR NON-U.S. LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE, ITS ACQUISITION, HOLDING AND DISPOSITION OF A CERTIFICATED SUBORDINATED NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION UNDER ANY SUCH SUBSTANTIALLY SIMILAR LAW.  NO PURCHASE OR TRANSFER OF A CERTIFICATED SUBORDINATED NOTE WILL BE EFFECTIVE IF IT WOULD CAUSE 25% OR MORE OF THE VALUE OF THE SUBORDINATED NOTES TO BE HELD BY BENEFIT PLAN INVESTORS.  EACH PURCHASER AND TRANSFEREE FURTHER UNDERSTANDS AND AGREES THAT ANY PURPORTED TRANSFER OF THE CERTIFICATED SUBORDINATED NOTES, OR ANY INTEREST THEREIN, TO A PURCHASER OR TRANSFEREE THAT DOES NOT COMPLY WITH THE REQUIREMENTS AS SPECIFIED IN THE INDENTURE, THIS NOTE, THE OFFERING CIRCULAR AND ANY APPLICABLE TRANSFER CERTIFICATION, AS APPLICABLE, WILL BE OF NO FORCE AND EFFECT, SHALL BE NULL AND VOID *AB INITIO*, AND THE ISSUER WILL HAVE THE RIGHT TO DIRECT THE PURCHASER TO TRANSFER THE CERTIFICATED SUBORDINATED NOTES, OR ANY INTEREST THEREIN, AS APPLICABLE, TO A PERSON WHO MEETS THE FOREGOING CRITERIA.

DISTRIBUTIONS OF PRINCIPAL PROCEEDS AND INTEREST PROCEEDS TO THE HOLDER OF THE SUBORDINATED NOTES REPRESENTED HEREBY ARE SUBORDINATE TO THE PAYMENT ON EACH PAYMENT DATE OF PRINCIPAL OF AND INTEREST ON THE SECURED NOTES OF THE ISSUER AND THE PAYMENT OF CERTAIN OTHER AMOUNTS, TO THE EXTENT AND AS DESCRIBED IN THE INDENTURE GOVERNING SUCH SECURED NOTES.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE SUBORDINATED NOTES AS EQUITY FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES.

Ex. A3-2

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE PORTFOLIO MANAGER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER OR PORTFOLIO MANAGER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE AND THE TREASURY REGULATIONS (AND ANY NOTICES, GUIDANCE OR OFFICIAL PRONOUNCEMENTS) PROMULGATED THEREUNDER, ANY AGREEMENT ENTERED INTO WITH RESPECT THERETO, ANY INTERGOVERNMENTAL AGREEMENT IN RESPECT THEREOF (INCLUDING THE CAYMAN INTERGOVERNMENTAL AGREEMENT) AND ANY LAW, RULE OR REGULATION IMPLEMENTING SUCH AN INTERGOVERNMENTAL AGREEMENT, INCLUDING ANY REGULATIONS, RULES AND GUIDANCE NOTES OR OTHER APPROACH OR PRACTICES ADOPTED IN RESPECT THEREOF ("FATCA") AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE PORTFOLIO MANAGER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER OR AN AGENT ACTING ON ITS BEHALF IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AND (B) THE ISSUER OR AN AGENT ACTING ON ITS BEHALF WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELL ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER OR AN AGENT ACTING ON ITS BEHALF, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT (I) THE ISSUER, THE PORTFOLIO MANAGER OR THE TRUSTEE MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY AND (II) THE TRUSTEE OR THE REGISTRAR MAY

PROVIDE CERTAIN INFORMATION TO THE ISSUER, THE PORTFOLIO MANAGER OR ANY AGENT THEREOF PURSUANT TO THE INDENTURE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(c)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN WITHIN THE MEANING OF TREASURY REGULATION SECTION 1.881-3.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE, THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT OR INTERGOVERNMENTAL AGREEMENT THEREUNDER OR IN RESPECT THEREOF, INCLUDING THE CAYMAN IGA) AND ANY OTHER LAW, RULE OR REGULATION IMPLEMENTING SUCH AGREEMENTS OR INTERGOVERNMENTAL AGREEMENTS, INCLUDING, ANY REGULATIONS, RULES AND GUIDANCE NOTES OR OTHER APPROACH OR PRACTICES ADOPTED IN RESPECT THEREOF, SIMILAR TO THE FOREGOING OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

EACH HOLDER AND BENEFICIAL OWNER OF THIS NOTE WILL NOT INSTITUTE AGAINST, OR JOIN ANY OTHER PERSON IN INSTITUTING AGAINST, EITHER OF THE ISSUERS OR ANY ETB SUBSIDIARY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY, MORATORIUM OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS UNDER CAYMAN ISLANDS LAW, UNITED STATES FEDERAL OR STATE BANKRUPTCY LAW OR SIMILAR LAWS UNTIL THE DATE WHICH IS ONE YEAR (OR, IF LONGER, THE APPLICABLE PREFERENCE PERIOD THEN IN EFFECT) *PLUS* ONE DAY AFTER THE PAYMENT IN FULL OF ALL NOTES. EACH HOLDER AND BENEFICIAL OWNER OF

THIS NOTE UNDERSTANDS THAT THE FOREGOING RESTRICTIONS ARE A MATERIAL INDUCEMENT FOR EACH OTHER HOLDER AND BENEFICIAL OWNER OF THE NOTES TO ACQUIRE SUCH NOTES AND FOR THE ISSUER, THE CO-ISSUER AND THE PORTFOLIO MANAGER TO ENTER INTO THE INDENTURE (IN THE CASE OF THE ISSUER AND THE CO-ISSUER) AND THE OTHER APPLICABLE TRANSACTION DOCUMENTS AND ARE AN ESSENTIAL TERM OF THE INDENTURE AND THAT ANY HOLDER OR BENEFICIAL OWNER OF A NOTE, THE PORTFOLIO MANAGER OR EITHER OF THE ISSUERS MAY SEEK AND OBTAIN SPECIFIC PERFORMANCE OF SUCH RESTRICTIONS (INCLUDING INJUNCTIVE RELIEF), INCLUDING, WITHOUT LIMITATION, IN ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY, MORATORIUM OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS UNDER CAYMAN ISLANDS LAW, UNITED STATES FEDERAL OR STATE BANKRUPTCY LAW OR SIMILAR LAWS.  EACH HOLDER AND BENEFICIAL OWNER OF THIS NOTE AGREES THAT IT IS SUBJECT TO THE BANKRUPTCY SUBORDINATION AGREEMENT.

<u>ACIS CLO 2015-6 LTD.</u>

CERTIFICATED SUBORDINATED NOTE
representing

SUBORDINATED NOTES DUE 2027

C-[__]
CUSIP No. [__]                                                          U.S.$[__]

        ACIS CLO 2015-6 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "<u>Issuer</u>"), for value received, hereby promises to pay to [_____], or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$ [_____]) on the Payment Date in May 2027 (the "<u>Stated Maturity</u>") except as provided below and in the Indenture.

        The obligations of the Issuer under this Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Holders shall be extinguished and shall not thereafter revive. The Subordinated Notes represent unsecured, subordinated obligations of the Issuer and are not entitled to security under the Indenture.

        The principal of each Subordinated Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

        Payments of Interest Proceeds and Principal Proceeds to the Holders of the Subordinated Notes are subordinated to payments in respect of other classes of Notes as set forth in the Indenture and failure to pay such amounts will not constitute an Event of Default under the Indenture.

        Unless the Certificate of Authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

        This Note is one of a duly authorized issue of Subordinated Notes due 2027 (the "<u>Subordinated Notes</u>" and, together with the other classes of Notes issued under the Indenture, the "<u>Notes</u>") issued and to be issued under an Indenture dated as of April 16, 2015 (the "<u>Indenture</u>") among the Issuer, ACIS CLO 2015-6 LLC and U.S. Bank National Association, as trustee (the "<u>Trustee</u>", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Ex. A3-6

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

The Subordinated Notes may be redeemed, in whole but not in part, on any Business Day on or after the redemption or repayment of the Secured Notes, at the written direction of Holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes.  In addition, this Note is redeemable at the option of the Issuer acting at the direction of the Portfolio Manager, in whole but not in part, on or after the Payment Date on which the Aggregate Principal Balance of the Collateral Obligations and Eligible Investments has been reduced to 20% or less of the Target Initial Par Amount, unless a Majority of the Subordinated Notes directs to prevent such redemption in a writing delivered to the Issuer, the Trustee and the Portfolio Manager at least 30 days prior to the next succeeding Payment Date.

The Issuer, the Trustee, and any agent of the Issuer or the Trustee may treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of Principal Proceeds and Interest Proceeds on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Issuer nor the Trustee nor any agent of the Issuer or the Trustee shall be affected by notice to the contrary

Interests in this Certificated Subordinated Note may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding [Rule 144A][Regulation S] Global Subordinated Note, subject to the restrictions as set forth in the Indenture.

The Subordinated Notes will be issued in minimum denominations of $100,000 and integral multiples of $1 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Trustee, acting through its Corporate Office.

No service charge shall be made for registration of transfer or exchange of this Note, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK.

Ex. A3-7

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed. Dated as of _____.

ACIS CLO 2015-6 LTD.

By:_____

    Name:

    Title:

Ex. A3-8

<u>CERTIFICATE OF AUTHENTICATION</u>

This is one of the Notes referred to in the within-mentioned Indenture.

Dated: _____

U.S. BANK NATIONAL ASSOCIATION, as Trustee


By:_____
    Authorized Signatory

Ex. A3-9

<u>ASSIGNMENT FORM</u>

For value received _____

does hereby sell, assign, and transfer to

_____

_____

Please insert social security or
other identifying number of assignee

Please print or type name
and address, including zip code,
of assignee:

_____

_____

_____

_____

the within Note and docs hereby irrevocably constitute and appoint
_____ Attorney to transfer the Note on the books of the Trustee with
full power of substitution in the premises.

Date: _____          Your Signature* 

_____

(Sign exactly as your name appears
in the security)

* NOTE:  The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note in every particular without alteration, enlargement or any change whatsoever.  *Such signature must be guaranteed by an "eligible guarantor institution" "meeting the requirements of the Note Registrar, which requirements include membership or participation in Securities Transfer Agents Medallion Program ("<u>STAMP</u>") or such other "signature guarantee program" as may be determined by the Note Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.*

Ex. A3-10

EXHIBIT A4

FORM OF CERTIFICATED SECURED NOTE

CERTIFICATED SECURED NOTE
representing
CLASS [A-1][A-2][B-1][B-2][C][D][E] [SENIOR] SECURED
[DEFERRABLE] [FLOATING] [FIXED] RATE NOTES DUE 2027

[THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(D) OR (A)(1)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN, THAT IS A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT) OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS NOTE IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH REGULATION, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.  THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN THIS NOTE THAT IS A U.S. PERSON AND IS NOT A QUALIFIED PURCHASER AND A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTES, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.][11]

[THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) (X) TO A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF

---

[11] Applicable only to the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes.

Ex. A4-1

THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(D) OR (A)(1)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (Y) TO AN "INSTITUTIONAL" ACCREDITED INVESTOR (AN ENTITY DEFINED IN RULE 501(A)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT) AND, IN THE CASE OF (X) AND (Y), THAT IS A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT) OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS NOTE IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH REGULATION, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.   THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN THIS NOTE THAT IS A U.S. PERSON AND DOES NOT COMPLY WITH THE FOREGOING RESTRICTIONS TO SELL ITS INTEREST IN THE NOTES, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.][12]

[BY ITS ACQUISITION OF CO-ISSUED NOTES (THE "ERISA DEBT SECURITIES"), EACH PURCHASER AND SUBSEQUENT TRANSFEREE WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED OR REQUIRED TO REPRESENT AND WARRANT, AS APPLICABLE, AT THE TIME OF ITS ACQUISITION AND THROUGHOUT THE PERIOD IT HOLDS SUCH ERISA DEBT SECURITY, THAT EITHER (X) IT IS NOT AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), THAT IS SUBJECT TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF TITLE I OF ERISA, A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, ANY ENTITY WHOSE UNDERLYING ASSETS ARE DEEMED TO INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY OR A "BENEFIT PLAN INVESTOR" AS SUCH TERM IS OTHERWISE DEFINED IN ANY REGULATIONS PROMULGATED BY THE U.S. DEPARTMENT OF LABOR OR UNDER SECTION 3(42) OF ERISA, OR A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY FEDERAL, STATE, LOCAL OR NON-U.S. LAW THAT IS SUBSTANTIALLY SIMILAR TO THE PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE OR (Y) ITS ACQUISITION, HOLDING AND DISPOSITION OF THE ERISA DEBT SECURITY WILL NOT CONSTITUTE OR RESULT IN A NON EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE (OR, IN THE CASE OF A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN, A NON EXEMPT VIOLATION OF ANY SUBSTANTIALLY SIMILAR LAW).  ANY PURPORTED TRANSFER OF AN ERISA DEBT SECURITY, OR ANY INTEREST THEREIN, TO A PURCHASER   OR   TRANSFEREE   THAT   DOES   NOT   COMPLY   WITH   THE

---

[12] Applicable only to the Class E Notes.

Ex. A4-2

REQUIREMENTS SPECIFIED IN THE INDENTURE, THIS NOTE, THE OFFERING CIRCULAR AND ANY APPLICABLE TRANSFER CERTIFICATION, AS APPLICABLE, WILL BE OF NO FORCE AND EFFECT AND SHALL BE NULL AND VOID *AB INITIO*.][13]

[EACH PURCHASER AND EACH SUBSEQUENT TRANSFEREE OF THIS NOTE WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED, OR REQUIRED TO REPRESENT AND WARRANT, AS APPLICABLE, AT THE TIME OF ITS ACQUISITION AND THROUGHOUT THE PERIOD THAT IT HOLDS SUCH NOTE OR ANY INTEREST HEREIN, THAT (1) IT IS NOT AN "EMPLOYEE BENEFIT PLAN" (AS DEFINED IN SECTION 3(3) OF TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA")) THAT IS SUBJECT TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF TITLE I OF ERISA, A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, ANY ENTITY WHOSE UNDERLYING ASSETS ARE DEEMED TO INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY OR A "BENEFIT PLAN INVESTOR" AS SUCH TERM IS OTHERWISE DEFINED IN ANY REGULATIONS PROMULGATED BY THE U.S. DEPARTMENT OF LABOR OR UNDER SECTION 3(42) OF ERISA (COLLECTIVELY, "BENEFIT PLAN INVESTORS") AND (2) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO ANY FEDERAL, STATE, LOCAL OR NON-U.S. LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE, ITS ACQUISITION, HOLDING AND DISPOSITION OF THIS NOTE WILL NOT CONSTITUTE OR RESULT IN A NON EXEMPT VIOLATION UNDER ANY SUCH SUBSTANTIALLY SIMILAR LAW.  ANY PURPORTED TRANSFER OF THIS NOTE, OR ANY INTEREST THEREIN TO A PURCHASER OR TRANSFEREE THAT DOES NOT COMPLY WITH THE REQUIREMENTS SPECIFIED IN THE INDENTURE, THIS NOTE, THE OFFERING CIRCULAR AND ANY APPLICABLE TRANSFER CERTIFICATION, AS APPLICABLE, WILL BE OF NO FORCE AND EFFECT AND SHALL BE NULL AND VOID *AB INITIO*.][14]

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN.  ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.  ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER AND BENEFICIAL OWNER OF THIS NOTE WILL NOT INSTITUTE AGAINST, OR JOIN ANY OTHER PERSON IN INSTITUTING AGAINST, EITHER OF THE ISSUERS OR ANY ETB SUBSIDIARY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY, MORATORIUM OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS UNDER CAYMAN ISLANDS LAW, UNITED STATES FEDERAL OR STATE BANKRUPTCY LAW OR SIMILAR LAWS UNTIL THE DATE WHICH IS ONE YEAR (OR, IF LONGER, THE APPLICABLE PREFERENCE PERIOD THEN IN EFFECT) *PLUS* ONE DAY AFTER THE PAYMENT IN FULL OF ALL NOTES.

---

[13]  Applicable only to the Co-Issued Notes.
[14]  Applicable only to the Class E Notes.

EACH HOLDER AND BENEFICIAL OWNER OF THIS NOTE UNDERSTANDS THAT THE FOREGOING RESTRICTIONS ARE A MATERIAL INDUCEMENT FOR EACH OTHER HOLDER AND BENEFICIAL OWNER OF THE NOTES TO ACQUIRE SUCH NOTES AND FOR THE ISSUER, THE CO-ISSUER AND THE PORTFOLIO MANAGER TO ENTER INTO THE INDENTURE (IN THE CASE OF THE ISSUER AND THE CO-ISSUER) AND THE OTHER APPLICABLE TRANSACTION DOCUMENTS AND ARE AN ESSENTIAL TERM OF THE INDENTURE AND THAT ANY HOLDER OR BENEFICIAL OWNER OF A NOTE, THE PORTFOLIO MANAGER OR EITHER OF THE ISSUERS MAY SEEK AND OBTAIN SPECIFIC PERFORMANCE OF SUCH RESTRICTIONS (INCLUDING INJUNCTIVE RELIEF), INCLUDING, WITHOUT LIMITATION, IN ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY, MORATORIUM OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS UNDER CAYMAN ISLANDS LAW, UNITED STATES FEDERAL OR STATE BANKRUPTCY LAW OR SIMILAR LAWS.  EACH HOLDER AND BENEFICIAL OWNER OF THIS NOTE AGREES THAT IT IS SUBJECT TO THE BANKRUPTCY SUBORDINATION AGREEMENT.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE SECURED NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE PORTFOLIO MANAGER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER OR PORTFOLIO MANAGER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE AND THE TREASURY REGULATIONS (AND ANY NOTICES, GUIDANCE OR OFFICIAL PRONOUNCEMENTS) PROMULGATED THEREUNDER, ANY AGREEMENT ENTERED INTO WITH RESPECT THERETO, ANY INTERGOVERNMENTAL AGREEMENT IN RESPECT THEREOF (INCLUDING THE CAYMAN INTERGOVERNMENTAL AGREEMENT) AND ANY LAW, RULE OR REGULATION IMPLEMENTING SUCH AN INTERGOVERNMENTAL AGREEMENT, INCLUDING ANY REGULATIONS, RULES AND GUIDANCE NOTES OR OTHER APPROACH OR PRACTICES ADOPTED IN RESPECT THEREOF ("FATCA")

AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE PORTFOLIO MANAGER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER OR AN AGENT ACTING ON ITS BEHALF IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AND (B) THE ISSUER OR AN AGENT ACTING ON ITS BEHALF WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELL ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER OR AN AGENT ACTING ON ITS BEHALF, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT (I) THE ISSUER, THE PORTFOLIO MANAGER OR THE TRUSTEE MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY AND (II) THE TRUSTEE OR THE REGISTRAR MAY PROVIDE CERTAIN INFORMATION TO THE ISSUER, THE PORTFOLIO MANAGER OR ANY AGENT THEREOF PURSUANT TO THE INDENTURE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(c)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN WITHIN THE MEANING OF TREASURY REGULATION SECTION 1.881-3.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE, THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES

Ex. A4-5

(INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT OR INTERGOVERNMENTAL AGREEMENT THEREUNDER OR IN RESPECT THEREOF, INCLUDING THE CAYMAN IGA) AND ANY OTHER LAW, RULE OR REGULATION IMPLEMENTING SUCH AGREEMENTS OR INTERGOVERNMENTAL AGREEMENTS, INCLUDING, ANY REGULATIONS, RULES AND GUIDANCE NOTES OR OTHER APPROACH OR PRACTICES ADOPTED IN RESPECT THEREOF, SIMILAR TO THE FOREGOING OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

[THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR U.S. FEDERAL INCOME TAX PURPOSES.  THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY OF THIS NOTE MAY BE OBTAINED BY WRITING TO THE ISSUER.][15]

---

[15] Insert for the Class C Notes, Class D Notes and Class E Notes.

Ex. A4-6

ACIS CLO 2015-6 LTD.
ACIS CLO 2015-6 LLC

CERTIFICATED SECURED NOTE
representing
CLASS [A-1][A-2][B-1][B-2][C][D][E] [SENIOR] SECURED
[DEFERRABLE] [FLOATING] [FIXED] RATE NOTES DUE 2027

U.S.$[__]

C-[__]
CUSIP No. [__]
ISIN[__]

ACIS CLO 2015-6 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer")[, and ACIS CLO 2015-6 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers")], for value received, hereby promises) to pay to [_____] or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$[____]) on the Payment Date in May 2027 (the "Stated Maturity") except as provided below and in the Indenture.  The obligations of the Co-Issuers][Issuer] under this Note and the Indenture are limited recourse obligations of the [Co-Issuers] [Issuer] payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Holders shall be extinguished and shall not thereafter revive.

The [Co-Issuers promise] [Issuer promises] to pay interest, if any, 1st day of February, May, August and November of each year, commencing in August 2015 (or if such day is not a Business Day, the next succeeding Business Day), at the rate equal to [LIBOR plus][16] [•]% per annum on the unpaid principal amount hereof until the principal hereof is paid or duly provided for.  [Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360.][16] [Interest shall be computed on the basis of a 360-day year consisting of twelve 30-day months.][17]  The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest.

Interest will cease to accrue on each Class [A-1][A-2][B-1][B-2][C][D][E] Note, or in the case of a partial repayment, on such part, from the date of repayment or Stated Maturity unless payment of principal is improperly withheld or unless a default is otherwise made with respect to such payments.  The principal of this Class [A-1][A-2][B-1][B-2][C][D][E] Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.  The principal of each Class [A-1][A-2][B-1][B-2][C][D][E] Note shall be payable no later than the Stated Maturity unless the unpaid principal

---

[16] Include for Floating Rate Notes.
[17] Include for Fixed Rate Notes.

Ex. A4-7

of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

[Any interest on the Class [C][D][E] Notes that is not paid when due by operation of the Priority of Payments will be deferred.  Any interest so deferred will be added to the principal balance of the Class [C][D][E] Notes, and thereafter, interest will accrue on the aggregate outstanding principal amount of the Class [C][D][E] Notes, as so increased.][18]

Unless the Certificate of Authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class [A-1][A-2][B-1][B-2][C][D][E] [Senior] Secured [Deferrable] [Floating] [Fixed] Rate Notes due 2027 (the "Class [A-1][A-2][B-1][B-2][C][D][E] Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an Indenture dated as of April 16, 2015 (the "Indenture") among the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

In the event Coverage Tests (other than the Interest Reinvestment Test) are not satisfied on any Determination Date occurring subsequent to the Ramp-up Period or the Interest Reinvestment Test is not satisfied on any Determination Date during the Reinvestment Period, or an Optional Redemption, a Refinancing, a Special Redemption or a Clean-Up Call Redemption occurs as set forth in the Indenture, this Note may be redeemed in whole or in part (as applicable) in the manner and with the effect provided in the Indenture.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class [A-1][A-2][B-1][B-2][C][D][E] Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

---

[18] Applicable only to the Class C Notes, the Class D Notes and the Class E Notes.

Ex. A4-8

The Class [A-1][A-2][B-1][B-2][C][D][E] Notes will be issued in minimum denominations of $100,000 and integral multiples of $1 in excess thereof.

Title to Notes shall pass by registration in the Note Register kept by the Trustee, acting through its Corporate Office.

No service charge shall be made for registration of transfer or exchange of this Note, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the [Co-Issuers have][Issuer has] caused this Note to be duly executed.

Dated as of _____.

ACIS CLO 2015-6 LTD.

By:_____
    Name:
    Title:

[ACIS CLO 2015-6 LLC

By:_____
    Name:
    Title:]

Ex. A4-10

<u>CERTIFICATE OF AUTHENTICATION</u>

This is one of the Notes referred to in the within-mentioned Indenture.

Dated: _____

U.S. BANK NATIONAL ASSOCIATION,
    as Trustee


By:_____
    Authorized Signatory

Ex. A4-11

<u>ASSIGNMENT FORM</u>

For value received _____

does hereby sell, assign, and transfer to

_____

_____

Please insert social security or
other identifying number of assignee

Please print or type name
and address, including zip code,
of assignee:

_____

_____

_____

_____

the within Note and docs hereby irrevocably constitute and appoint
_____ Attorney to transfer the Note on the books of the Trustee with
full power of substitution in the premises.

Date: _____        Your Signature*

_____

(Sign exactly as your name appears
in the security)

* NOTE:  The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note in every particular without alteration, enlargement or any change whatsoever.  *Such signature must be guaranteed by an "eligible guarantor institution" "meeting the requirements of the Note Registrar, which requirements include membership or participation in Securities Transfer Agents Medallion Program ("<u>STAMP</u>") or such other "signature guarantee program" as may be determined by the Note Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.*

Ex. A4-12

EXHIBIT B

FORMS OF TRANSFER AND EXCHANGE CERTIFICATES

Ex. B-1

<u>EXHIBIT B1</u>

## FORM OF TRANSFEROR CERTIFICATE FOR TRANSFER TO<br><u>REGULATION S GLOBAL SECURED NOTE</u>

U.S. Bank National Association
111 Filmore Avenue East
St. Paul, MN 55107-1402
Attn:  Bond Holder Service – ACIS CLO 2015-6

   Re: ACIS CLO 2015-6 LTD. and ACIS CLO 2015-6 LLC
     <u>Class [A-1][A-2][B-1][B-2][C][D][E] Notes due 2027 (the "Notes")</u>

   Reference is hereby made to the Indenture dated as of April 16, 2015 (the "<u>Indenture</u>") among ACIS CLO 2015-6 Ltd., as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer (and together with the Issuer, the "<u>Co-Issuers</u>") and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

   This letter relates to U.S. $[_____] aggregate principal amount of Notes which are held in the form of a Rule 144A Global Secured Note with the Depository in the name of [____] (the "<u>Transferor</u>") to effect the transfer of the Notes in exchange for an equivalent beneficial interest in a Regulation S Global Note.

   In connection with such transfer, and in respect of such Notes, the Transferor does hereby certify that such Notes are being transferred to [_____] (the "<u>Transferee</u>") in accordance with the transfer restrictions set forth in the Indenture and the Offering Circular dated April 14, 2015, including the supplements thereto, relating to such Notes and that:

   (a) the offer of the Notes was not made to a person in the United States:

   (b) at the time the buy order was originated, the Transferee was outside the United States or the Transferor and any person acting on its behalf reasonably believed that the Transferee was outside the United States;

   (c) no directed selling efforts have been made in contravention of the requirements of Rule 903 or 904 of Regulation S, as applicable;

   (d) the transaction is not part of a plan or scheme to evade the registration requirements of the United States Securities Act of 1933, as amended (the "<u>Securities Act</u>"):

   (e) the Transferee is not a U.S. person:

   (f) solely with respect to the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes, either that (1) the Transferee is not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of

Ex. B1-1

1974, as amended ("ERISA"), that is subject to the fiduciary responsibility provisions of Part 4, Subtitle B of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975 of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity, or a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to Section 406 of ERISA or Section 4975 of the Code ("Similar Law") or (2) its acquisition, holding and disposition of the Notes will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of Similar Law; and

(g)    solely with respect to the Class E Notes, (1) the Transferee is not a Benefit Plan Investor and (2) if it is a governmental, church, non-U.S. or other plan that is subject to Similar Law, its acquisition, holding and disposition of such Class E Note will not constitute or result in a non-exempt violation of Similar Law.

The Transferor understands that the Co-Issuers, the Trustee and their counsel will rely upon the accuracy and truth of the foregoing representations, and the Transferor hereby consents to such reliance.

Ex. B1-2

(NAME OF TRANSFEROR)

By:_____

    Name:

    Title:

Dated:  _____, _____

cc:  ACIS CLO 2015-6 Ltd. and ACIS CLO 2015-6 LLC

Ex. B1-3

<u>EXHIBIT B2</u>

FORM OF TRANSFEROR CERTIFICATE FOR TRANSFER TO
<u>RULE 144A GLOBAL SECURED NOTE</u>

U.S. Bank National Association
111 Filmore Avenue East
St. Paul, MN  55107-1402
Attn:  Bond Holder Service – ACIS CLO 2015-6

> Re:  ACIS CLO 2015-6 LTD. and ACIS CLO 2015-6 LLC
> <u>Class [A-1][A-2][B-1][B-2][C][D][E] Notes due 2027 (the "Notes")</u>

Reference is hereby made to the Indenture dated as of April 16, 2015 (the "<u>Indenture</u>") among ACIS CLO 2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC, as Co-Issuer (and together with the Issuer, the "<u>Co-Issuers</u>") and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

This letter relates to U.S. $[_____] aggregate principal amount of Notes which are held in the form of a Regulation S Global Note in the name of [__] (the "<u>Transferor</u>") to effect the transfer of the Notes in exchange for an equivalent beneficial interest in a Rule 144A Global Secured Note.

In connection with such transfer, and in respect of such Notes, the Transferor does hereby certify that such Notes are being transferred to [_____] (the "<u>Transferee</u>") in accordance with (i) the transfer restrictions set forth in the Indenture and the Offering Circular dated April 14, 2015, including the supplements thereto, relating to such Notes and (ii) Rule 144A under the United States Securities Act of 1933, as amended, and it reasonably believes that (a) the Transferee is purchasing the Notes for its own account or an account with respect to which the Transferee exercises sole investment discretion, (b) the Transferee and any such account is a QIB/QP or, solely with respect to the Class E Notes, a (1) Qualified Purchaser and (2) either (x) a Qualified Institutional Buyer or (y) an Institutional Accredited Investor, in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction, (c) solely with respect to the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes, either that (1) the Transferee is not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), that is subject to the fiduciary responsibility provisions of Part 4, Subtitle B of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), that is subject to Section 4975 of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity, or a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to Section 406 of ERISA or Section 4975 of the Code ("<u>Similar Law</u>") or (2) its acquisition, holding and disposition of the Notes will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the

Ex. B2-1

Code or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of Similar Law and (d) solely with respect to the Class E Notes, (1) the Transferee is not a Benefit Plan Investor and (2) if it is a governmental, church, non-U.S. or other plan that is subject to Similar Law, its acquisition, holding and disposition of such Class E Notes will not constitute or result in a non-exempt violation of Similar Law.

The Transferor understands that the Co-Issuers, the Trustee and their counsel will rely upon the accuracy and truth of the foregoing representations, and the Transferor hereby consents to such reliance.

Ex. B2-2

(NAME OF TRANSFEROR)

By:_____
    Name:
    Title:


Dated: _____, _____

cc:  ACIS CLO 2015-6 Ltd. and ACIS CLO 2015-6 LLC

Ex. B2-3

FORM OF TRANSFEREE CERTIFICATE FOR TRANSFER OF CERTIFICATED
SECURED NOTES

U.S. Bank National Association
111 Filmore Avenue East
St. Paul, MN  55107-1402
Attn:  Bond Holder Service – ACIS CLO 2015-6

> Re:    ACIS CLO 2015-6 Ltd.
>         Class E Notes

Reference is hereby made to the Indenture, dated as of April 16, 2015, among ACIS CLO 2015-6 Ltd., as issuer, ACIS CLO 2015-6 LLC, as Co-Issuer, and U.S. Bank National Association, as Trustee (the "Indenture") Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

This letter relates to U.S. $[_____] aggregate principal amount of Class [E] Notes, which are held in the form of one or more Certificated Notes  (the "Certificated Class E Notes") in the name of _____ (the "Transferor") to effect the transfer of the Certificated Class E Notes to _____ (the "Transferee").

In connection with such request, and in respect of such Notes, the Transferee does hereby certify that the Certificated Secured Notes are being transferred (i) in accordance with the transfer restrictions set forth in the Indenture and (ii) pursuant to an exemption from registration under the United States Securities Act of 1933, as amended (the "Securities Act") and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

In addition, the Transferee hereby represents, warrants and covenants for the benefit of the Issuer and its counsel that we are:

(a)     (PLEASE CHECK ONLY ONE)

_____     a "qualified institutional buyer" as defined in Rule 144A under the Securities Act of 1933, as amended (the "Securities Act") who is also a Qualified Purchaser or an entity owned exclusively by Qualified Purchasers;

_____     an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act who is also a Qualified Purchaser or an entity owned exclusively by Qualified Purchasers; or

_____     a person that is not a "U.S. person" as defined in Regulation S under the Securities Act, and are acquiring the Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from Securities Act registration provided by Regulation S; and

(b)      acquiring the Certificated Secured Notes for our own account (and not for the account of any other Person) in a minimum denomination of $100,000 and in integral multiples of $1 in excess thereof or (y) in such other minimum denominations as the Issuer may agree on a case-by-case basis.

The Transferee further represents and warrants as follows:

1.      It understands that the Certificated Secured Notes have not been and will not be registered under the Securities Act, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Certificated Secured Notes, such Certificated Secured Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of the Indenture and the legends on such Certificated Secured Notes, including the requirement for written certifications.  In particular, it understands that the Certificated Secured Notes may be transferred only to a person that is either (1) both (a) either (x) a qualified institutional buyer (as defined under Rule 144A under the Securities Act) that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A under the Securities Act or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A under the Securities Act that holds the assets of such a plan, if investment decisions with respect to the plan are made by beneficiaries of the plan or (y) an "institutional" accredited investor (an entity defined in rule 501(a)(1), (2), (3) or (7) under the Securities Act) and (b) a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act or (2) not a "U.S. person" as defined in Regulation S and is acquiring the Certificated Secured Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from registration provided by Regulation S.  It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Certificated Secured Notes.

2.      In connection with its purchase of the Certificated Secured Notes:  (i) none of the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator, the Initial Purchaser or any of their respective affiliates is acting as a fiduciary or financial or investment advisor for such beneficial owner; (ii) such beneficial owner is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator or the Initial Purchaser or any of their respective affiliates other than any statements in the final offering circular for such Certificated Secured Notes, and such beneficial owner has read and understands such final offering circular; (iii) such beneficial owner has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary and has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the Indenture) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator or the Initial Purchaser or any of their respective affiliates; (iv) such beneficial owner is acquiring its interest in such Certificated Secured Notes for its own account; (v) such beneficial owner was not formed for the purpose of investing in such Certificated Secured Notes; (vi) such beneficial owner understands that the Issuer may receive a list of participants holding interests in the Certificated Secured Notes from one or more book-entry depositories; (vii) such beneficial

20718186.19.BUSINESS

owner will hold and transfer at least the minimum denomination of such Certificated Secured Notes and (viii) such beneficial owner will provide notice of the relevant transfer restrictions to subsequent transferees; provided that in the case of clauses (i), (ii) and (iii) above, the Portfolio Manager or an affiliate of the Portfolio Manager may have acted as financial and investment advisor to certain accounts for the benefit of certain beneficial owners of Notes managed by the Portfolio Manager or such affiliate of the Portfolio Manager and in that capacity has provided, and in the future may provide, advice to such beneficial owners of Notes; provided further that no such representations under subclauses (i) through (iii) are made with respect to the Initial Purchaser by any Affiliate of the Initial Purchaser or any discretionary account for which the Initial Purchaser or its Affiliates act as investment advisor.

3.      (i) It is either (1) both (a) either (x) a qualified institutional buyer (as defined under Rule 144A under the Securities Act) that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A under the Securities Act or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A under the Securities Act that holds the assets of such a plan, if investment decisions with respect to the plan are made by beneficiaries of the plan or (y) an "institutional" accredited investor (an entity defined in rule 501(a)(1), (2), (3) or (7) under the Securities Act) and (b) a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act or (2) not a "U.S. person" as defined in Regulation S and is acquiring the Certificated Secured Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from registration provided by Regulation S thereunder; (ii) it is acquiring the Certificated Secured Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (iii) it is not a (A) partnership, (B) common trust fund, or (C) special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants may designate the particular investments to be made; (iv) it agrees that it shall not hold any Certificated Secured Notes for the benefit of any other person, that it shall at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and that it shall not sell participation interests in the Certificated Secured Notes or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the distributions on the Certificated Secured Notes; and (v) it will hold and transfer at least the minimum denomination of the Certificated Secured Notes and provide notice of the relevant transfer restrictions to subsequent transferees.

4.      It acknowledges and agrees that on each day from the date on which it acquires its interest in such Class E Notes through and including the date on which it disposes of its interest in such Class E Notes, that (1) it is not a Benefit Plan Investor and (2) if it is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to Section 406 of ERISA or Section 4975 of the Code ("Similar Law"), its acquisition, holding and disposition of such Class E Notes will not constitute or result in a non-exempt violation of Similar Law.  It agrees and acknowledges that none of Issuer or the Trustee will recognize any transfer of the Class E Notes if such transfer may result in 25% or more of the value of any of the Class E Notes being held by Benefit Plan Investors.

5.     It agrees to treat the Secured Notes as indebtedness for U.S. federal, state and local income and franchise tax purposes, provided that this shall not prevent it from making a "protective qualified electing fund" election with respect to any Class E Note.

6.     It understands that the failure to provide the Issuer and the Trustee (and any of their agents) with the properly completed and signed tax certifications (generally, in the case of U.S. federal income tax, an Internal Revenue Service Form W-9 (or applicable successor form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or the appropriate Internal Revenue Service Form W-8 (or applicable successor form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code) may result in withholding from payments in respect of such Note, including U.S. federal withholding or back-up withholding.

7.     It will (i) provide the Issuer, the Portfolio Manager, the Trustee and their respective agents with the Holder FATCA Information and will take any other actions that the Issuer, the Portfolio Manager, the Trustee or their respective agents deem necessary or helpful to achieve FATCA Compliance and (ii) update any such information provided in clause (i) promptly upon learning that any such information previously provided has become obsolete or incorrect or is otherwise required. In the event it fails to provide the Holder FATCA Information, take such actions, update such information or otherwise becomes a Non-Permitted Tax Holder, (a) the Issuer or an agent acting on its behalf is authorized to withhold amounts otherwise distributable to it and (b) the Issuer or an agent acting on its behalf will have the right to compel it to sell its Notes or, if it does not sell its Notes within 10 Business Days after notice from the Issuer, to sell such Notes in the same manner as if it were a Non-Permitted Holder, and to remit the net proceeds of such sale (taking into account any taxes incurred in connection with such sale) to it as payment in full for such Notes. It agrees to indemnify the Issuer, the Trustee and other beneficial owners of Notes for all damages, costs and expenses that result from its failure to comply with its obligation to provide the Holder FATCA Information. This indemnification will continue even after the person ceases to have an ownership interest in the Notes. It agrees, or by acquiring this Note or an interest in this Note will be deemed to agree, that (i) the Issuer, the Portfolio Manager or the Trustee may provide such information and any other information regarding its investment in the Notes to the IRS or other relevant governmental authority and (ii) the Trustee or the Registrar may provide certain information to the Issuer, the Portfolio Manager or any agent thereof pursuant to the Indenture.

8.     If it is not a "United States person" within the meaning of Section 7701(a)(30) of the Code, it represents that (i) either (a) it is not a bank (or an entity affiliated with a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of Section 881(c)(3)(A) of the Code), (b) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States, or (c) it has provided an Internal Revenue Service Form W-8ECI representing that all payments received or to be received by it on the Notes are effectively connected with the conduct of a trade or business in the United States, and (ii) it is not purchasing this Note or an interest in this Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan within the meaning of treasury regulation section 1.881-3.

Ex. B3-4

9.      It will indemnify the Issuer, the Trustee, their respective agents and each of the holders of the Note from any and all damages, cost and expenses (including any amount of taxes, fees, interest, additions to tax, or penalties) resulting from the failure by such holder to comply with Sections 1471 through 1474 of the Code (or any agreement or intergovernmental agreement thereunder or in respect thereof, including the Cayman IGA) and any other law, rule or regulation implementing such agreements or intergovernmental agreements, including, any regulations, rules and guidance notes or other approach or practices adopted in respect thereof, similar to the foregoing or its obligations under this Note. The indemnification will continue with respect to any period during which the holder held a Note (and any interest therein), notwithstanding the holder ceasing to be a holder of the Note.

10.     It has read the summary of the provisions related to no petitions for bankruptcy in "*Description of the Offered Securities—The Indenture—No Petitions for Bankruptcy*" in the Offering Circular.  It agrees not to institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year (or, if longer, the applicable preference period then in effect) *plus* one day after the payment in full of all Notes. It understands that the foregoing restrictions are a material inducement for each holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.  It agrees that it is subject to the Bankruptcy Subordination Agreement.

11.     To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon notice to the Trustee, impose additional transfer restrictions on the Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA Patriot Act") and other similar laws or regulations, including, without limitation, requiring each transferee of a Note to make representations to the Issuer in connection with such compliance.

The Transferee agrees to provide promptly such information and execute and deliver such documents as may be necessary to comply with any and all laws and regulations (including the USA Patriot Act) to which the Issuer may be subject.  The Transferee understands and agrees that, in order to ensure compliance under applicable anti-money laundering laws and regulations, the Issuer may require a detailed verification of the identity of the Transferee.  The Issuer reserves the right to request such information as is necessary to verify the identity of a Transferee.  In the event of delay or failure by the Transferee to produce any information required for verification purposes, the Issuer may refuse to issue the Notes to the Transferee until proper information has been provided.

Ex. B3-5

The Transferee covenants and agrees that it shall provide the Issuer with such information as the Issuer determines to be necessary or appropriate to (a) verify compliance with the anti-money laundering regulations of any applicable jurisdiction or (b) respond to requests for information concerning the identity of the Transferee from any governmental authority, self-regulatory organization or financial institution in connection with the Issuer's anti-money laundering compliance procedures.

12.     It is not a person with whom dealings are restricted or prohibited under any law relating to economic sanctions or anti-money laundering of the United States, the European Union, Switzerland, or any other applicable jurisdiction ("AML and Sanctions Laws"), and its purchase of the Notes will not result in the violation of any AML and Sanctions Law by any Transaction Party, whether as a result of the identity of the purchaser or its beneficial owners, their source of funds, or otherwise.

13.     It is not a member of the public in the Cayman Islands.

14.     It understands that the Certificated Class E Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, such Certificated Class E Notes have not been and will not be registered under the Securities Act, and, if in the future it decides to offer, resell, pledge or otherwise transfer such Certificated Class E Notes, such Certificated Class E Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of the Indenture and the legend on such Certificated Class E Notes.  It acknowledges that no representation has been made as to the availability of any exemption under the Securities Act or any state securities laws for resale of such Certificated Class E Notes.  It understands that neither of the Co-Issuers has been registered under the Investment Company Act, and that the Co-Issuers are exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act.

15.     It is aware that, except as otherwise provided in the Indenture, any Secured Notes or Subordinated Notes being sold to it in reliance on Regulation S will be represented by one or more Regulation S Global Notes and that in each case beneficial interests therein may be held only through DTC for the respective accounts of Euroclear or Clearstream.

16.     It understands that the Issuer, the Trustee, the Initial Purchaser and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

17.     It agrees to provide notice to each person to whom it proposes to transfer any interest in the Certificated Class E Notes of the transfer restrictions and representations set forth in the Indenture. It understands that any purported transfer of a [Certificated Class E Note, or any interest therein, to a purchaser or transferee that does not comply with the requirements specified in the Indenture, the Certificated Class E Note, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void *ab initio*.

Name of Purchaser:

Dated:

By:_____

    Name:
    Title:

Amount of Notes:  $_____

Taxpayer identification number:

| Address for notices: | Wire transfer information for payments: |
|---|---|
| | Bank: |
| | Address: |
| | Bank ABA#: |
| | Account #: |
| Telephone: | FAO: |
| Facsimile: | Attention: |
| Attention: | |

Denominations of certificates (if more than one):  Registered name:

cc:  ACIS CLO 2015-6 Ltd. and ACIS CLO 2015-6 LLC

Ex. B3-7

<u>EXHIBIT B4</u>

FORM OF ERISA CERTIFICATE

The purpose of this ERISA Certificate (this "<u>Certificate</u>") is, among other things, to (i) endeavor to ensure that less than 25% of the value of the Subordinated Notes issued by ACIS CLO 2015-6 Ltd. (the "<u>Issuer</u>") is held by (a) an "employee benefit plan" (as defined in Section 3(3) of the United States Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>") that is subject to the fiduciary responsibility provisions of Part 4, Subtitle B of Title I of ERISA, (b) a "plan" as defined in Section 4975(e)(1) of the United States Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), that is subject to Section 4975 of the Code, (c) any entity whose underlying assets include "plan assets" by reason of any such employee benefit plan's or plan's investment in the entity or (d) a "benefit plan investor" as defined in U.S. Department of Labor regulations or under Section 3(42) of ERISA (collectively, "<u>Benefit Plan Investors</u>") so that the Issuer will not be subject to the U.S. federal pension laws contained in ERISA and Section 4975 of the Code, (ii) obtain from you certain representations and agreements and (iii) provide you with certain related information with respect to your acquisition, holding or disposition of the Subordinated Notes.  By signing this Certificate, you agree to be bound by its terms.

Please be aware that the information contained in this Certificate is not intended to constitute advice and the examples given below are not intended to be, and are not, comprehensive.  You should contact your own counsel if you have any questions in completing this Certificate.  Capitalized terms not defined in this Certificate shall have the meanings ascribed to them in the final offering circular of the Issuer or the Indenture.

Please review the information in this Certificate and check the box(es) that are applicable to you.

If a box is not checked, you are agreeing that the applicable Section does not, and will not, apply to you.

1.     <u>Employee Benefit Plans Subject to ERISA or the Code</u>.  We, or the entity on whose behalf we are acting, are an "employee benefit plan" within the meaning Section 3(3) of ERISA that is subject to the fiduciary responsibility provisions of Title I of ERISA or a "plan" within the meaning of Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code.

<u>Examples</u>:   (i) tax qualified retirement plans such as pension, profit sharing and section 401 (k) plans, (ii) welfare benefit plans such as accident, life and medical plans, (iii) individual retirement accounts or "IRAs" and "Keogh" plans and (iv) certain tax-qualified educational and savings trusts.

2.     <u>Entity Holding Plan Assets by Reason of Plan Asset Regulations</u>. We, or the entity on whose behalf we are acting, are an entity or fund whose underlying assets include "plan assets" by reason of the investment in such entity by an employee benefit plan or plan described in <u>Section 1</u> above.

Ex. B4-1

Examples:   (i) a hedge fund or other private investment vehicle where 25% or more of the value of any class of its equity is held by Benefit Plan Investors. (ii) an insurance company separate account and (iii) a bank collective trust fund.

ERISA and the regulations promulgated thereunder are technical.   Accordingly, if you have any question regarding whether you may be an entity described in this Section 2, you should consult with your counsel.

If you check Box 2, please also complete Box A.

A.      The maximum percentage of the entity's or fund's assets that we anticipate will constitute "plan assets" for purposes of conducting the 25% test under the Plan Asset Regulations is:  ____%.

IF YOU CHECKED BOX 2 BUT DO NOT INCLUDE ANY PERCENTAGE IN THE BLANK SPACE, YOU WILL BE COUNTED AS IF YOU FILLED IN 100% IN THE BLANK SPACE.

3.      Insurance Company General Account.  We, or the entity on whose behalf we are acting, are an insurance company purchasing the Subordinated Notes with funds from our or their general account (i.e., the insurance company's corporate investment portfolio), the assets of which, in whole or in part, constitute "plan assets" for purposes of the U.S. Department of Labor's regulations set forth at 29 C.F.R. Section 2510.3-101, as effectively modified by Section 3(42) of ERISA (the "Plan Asset Regulations").

If you check Box 3, please also check either Box A or Box B.

A.      We are not able to determine an exact percentage of the general account that constitutes "plan assets" but the maximum percentage of the general account that constitutes (or will constitute) "plan assets" for purposes of, the Plan Asset Regulations is less than 25%.

B.      The maximum percentage of the insurance company general account that will constitute "plan assets" for purposes of conducting the 25% test under the Plan Asset Regulations is:  ____%.  IF YOU CHECK THIS BOX B BUT DO NOT INCLUDE ANY PERCENTAGE IN THE BLANK SPACE, YOU WILL BE COUNTED AS IF YOU FILLED IN 100% IN THE BLANK SPACE.

4.      None of Sections (1) Through (3) Above Apply.  We, or the entity on whose behalf we are acting, are a person that does not fall into any of the categories described in Sections (1) through (3) above.

5.      No Prohibited Transaction.  If we checked any of the boxes in Sections (1) through (3) above, we represent, warrant and agree that our acquisition, holding and disposition of the Subordinated Notes do not and will not constitute or give rise to a non-exempt prohibited

Ex. B4-2

transaction under Section 406 of ERISA or Section 4975 of the Code.

6.     <u>No Violation of Similar Law</u>.  If we are a governmental, church, non-U.S. or other plan subject to any federal, state, local or non-U.S. law substantially similar to Section 406 of ERISA or Section 4975 of the Code ("<u>Similar Law</u>"), we represent, warrant and agree that our acquisition, holding and disposition of the Subordinated Notes do not and will not constitute or give rise to a non-exempt violation of Similar Law.

7.     <u>Controlling Person</u>.  We are, or we are acting on behalf of any of: (i) the Trustee, (ii) the Portfolio Manager, (iii) the Initial Purchaser, (iv) any person that has discretionary authority or control with respect to the assets of the Issuer, (v) any person who provides investment advice for a fee (direct or indirect) with respect to such assets or (vi) any "affiliate" of any of the above persons.  "<u>Affiliate</u>" shall have the meaning set forth in the Plan Asset Regulations.  Any of the persons described in the first sentence of this <u>Section (7)</u> is referred to in this Certificate as a "<u>Controlling Person</u>."

<u>Note</u>:  We understand that, for purposes of determining whether Benefit Plan Investors hold less than 25% of the value of the Subordinated Notes, the value of any Subordinated Notes held by Controlling Persons (other than Benefit Plan Investors) are required to be disregarded.

8.     <u>Compelled Disposition</u>.  We acknowledge and agree that:

(i)     if any representation that we made hereunder is subsequently shown to be false or misleading or our beneficial ownership otherwise causes Benefit Plan Investors to own 25% or more of the value of any class of equity in the Issuer, the Issuer shall, promptly after such discovery (or upon notice from the Trustee if a responsible officer of the Trustee makes the discovery (who, in each case, agrees to notify the Issuer of such discovery, if any)), send notice to us demanding that we transfer our interest to a person that is not a Non-Permitted ERISA Holder within 10 days of the date of such notice;

(ii)     if we fail to transfer our Subordinated Notes, the Issuer shall have the right, without further notice to us, to sell our Subordinated Notes or our interest in the Subordinated Notes, to a purchaser selected by the Issuer that is not a Non-Permitted ERISA Holder on such terms as the Issuer may choose;

(iii)     the Issuer may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the Subordinated Notes and selling such securities to the highest such bidder.  However, the Issuer may select a purchaser by any other means determined by it in its sole discretion;

(iv)     by our acceptance of an interest in the Subordinated Notes, we agree to cooperate with the Issuer to effect such transfers;

(v)     the proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to us; and

Ex. B4-3

(vi)    the terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to us, as a result of any such sale or the exercise of such discretion.

9.     <u>Required Notification</u>.  We hereby agree that we (a) will inform the Trustee of any proposed transfer by us of all or a specified portion of the Subordinated Notes owned by us to a transferee who would be deemed to be a Benefit Plan Investor or a Controlling Person or of any proposed change in our status under ERISA which would result in all or a portion of the Subordinated Notes owned by us and not previously so characterized being deemed to be held by a Benefit Plan Investor or a Controlling Person and (b) will not permit any such transfer or change of status that would cause Benefit Plan Investors to own 25% or more of the value of any class of equity in the Issuer to be exceeded to become effective.  We hereby agree and acknowledge that after the Trustee effects any permitted transfer of Subordinated Notes owned by us to a Benefit Plan Investor or a Controlling Person or receives notice of any such permitted change of status, the Trustee shall include such Subordinated Notes in future calculations of this 25% limitation made pursuant hereto unless subsequently notified that such Subordinated Notes (or such portion), as applicable, would no longer be deemed to be held by Benefit Plan Investors or Controlling Persons.

10.    <u>Continuing Representation; Reliance</u>.   We acknowledge and agree that the representations contained in this Certificate shall be deemed made on each day from the date we make such representations through and including the date on which we dispose of our interests in the Subordinated Notes.   We understand and agree that the information supplied in this Certificate will be used and relied upon by the Issuer, the trustee to determine that Benefit Plan Investors own or hold less than 25% of the value of the Subordinated Notes upon any subsequent transfer of the Subordinated Notes in accordance with the indenture.

11.    <u>Further Acknowledgement</u>.   We acknowledge and agree that (i) all of the assurances contained in this Certificate are for the benefit of the Issuer, the Trustee, the Initial Purchaser and the Portfolio Manager as third-party beneficiaries hereof, (ii) copies of this Certificate and any information contained herein may be provided to the Issuer, the Trustee, the Initial Purchaser, the Portfolio Manager, affiliates of any of the foregoing parties and to each of the foregoing parties' respective counsel for purposes of making the determinations described above and (iii) any acquisition or transfer of the Subordinated Notes by us that is not in accordance with the provisions of this Certificate shall be null and void from the beginning, and of no legal effect.

13.    <u>Future Transfer Requirements</u>.

<u>Transferee Letter and its Delivery</u>.  We acknowledge and agree that we may not transfer any Subordinated Notes to any person unless the Trustee has received a certificate substantially in the form of this Certificate.  Any attempt to transfer in violation of this section will be null and void from the beginning, and of no legal effect.

<u>Note</u>:  Unless you are notified otherwise, the name and address of the Trustee is as follows:

Ex. B4-4

U.S. Bank National Association
111 Filmore Avenue East
St. Paul, MN  55107-1402
Attn:  Bond Holder Service – ACIS CLO 2015-6
Email: ACIS.CLO.2015.06@usbank.com

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Certificate.

_____ [Insert Purchaser's Name]
By:
Name:
Title:

Dated:

This Certificate relates to $_____ of Subordinated Notes.

<u>EXHIBIT B5</u>

FORM OF TRANSFEROR CERTIFICATE FOR TRANSFER TO
<u>REGULATION S GLOBAL SUBORDINATED NOTE</u>

U.S. Bank National Association
111 Filmore Avenue East
St. Paul, MN  55107-1402
Attn:  Bond Holder Service – ACIS CLO 2015-6

Re:    ACIS CLO 2015-6 LTD.
       Subordinated Notes

Reference is hereby made to the Indenture dated as of April 16, 2015 (the "<u>Indenture</u>") among ACIS CLO 2015-6 Ltd., as Issuer, ACIS CLO 2015-6 LLC, as Co-Issuer (and together with the Issuer, the "<u>Co-Issuers</u>") and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

This letter relates to U.S. $[_____] aggregate principal amount of Subordinated Notes which are held in the form of a Certificated Subordinated Note by [__] (the "<u>Transferor</u>") to effect the transfer of the Subordinated Notes in exchange for an equivalent beneficial interest in a [Regulation S][Rule 144A] Global Subordinated Note.

In connection with such transfer, and in respect of such Subordinated Notes, the Transferor does hereby certify that such Subordinated Notes are being transferred to _____ (the "<u>Transferee</u>") in accordance with the transfer restrictions set forth in the Indenture and the Offering Circular dated April 14, 2015, including the supplements thereto, relating to such Subordinated Notes and that:

(a)    the offer of the Subordinated Notes was not made to a person in the United States;

(b)    at the time the buy order was originated, the Transferee was outside the United States or the Transferor and any person acting on its behalf reasonably believed that the Transferee was outside the United States;

(c)    no directed selling efforts have been made in contravention of the requirements of Rule 903 or 904 of Regulation S, as applicable;

(d)    the transaction is not part of a plan or scheme to evade the registration requirements of the United States Securities Act of 1933, as amended (the "Securities Act");

(e)    the Transferee is not a U.S. person;

(f)    the Transferee is not a Benefit Plan Investor or Controlling Person; and

(g)      if the Transferee is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to Section 406 of ERISA or Section 4975 of the Code ("Similar Law"), its acquisition, holding and disposition of such Subordinated Notes will not constitute or result in a non-exempt violation of Similar Law.

The Transferor understands that the Issuer, the Trustee and their counsel will rely upon the accuracy and truth of the foregoing representations, and the Transferor hereby consents to such reliance.

(NAME OF TRANSFEROR)


By:_____
        Name:
        Title:


Dated:  _____, _____

cc:  ACIS CLO 2015-6 Ltd.

Ex. B5-2

<u>EXHIBIT B6</u>

FORM OF TRANSFEROR CERTIFICATE FOR TRANSFER TO<br><u>RULE 144A GLOBAL SUBORDINATED NOTE</u>

U.S. Bank National Association
111 Filmore Avenue East
St. Paul, MN  55107-1402
Attn:  Bond Holder Service – ACIS CLO 2015-6

   Re: ACIS CLO 2015-6 LTD.
     Subordinated Notes

   Reference is hereby made to the Indenture dated as of April 16, 2015 (the "<u>Indenture</u>") among ACIS CLO 2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC, as Co-Issuer (and together with the Issuer, the "<u>Co-Issuers</u>") and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

   This letter relates to U.S. $[_____] aggregate principal amount of Subordinated Notes which are held in the form of a Regulation S Global Subordinated Note in the name of [__] (the "<u>Transferor</u>") to effect the transfer of the Subordinated Notes in exchange for an equivalent beneficial interest in a Rule 144A Global Subordinated Note.

   In connection with such transfer, and in respect of such Subordinated Notes, the Transferor does hereby certify that such Subordinated Notes are being transferred to [_____] (the "<u>Transferee</u>") in accordance with (i) the transfer restrictions set forth in the Indenture and the Offering Circular dated April 14, 2015, including the supplements thereto, relating to such Subordinated Notes and (ii) Rule 144A under the United States Securities Act of 1933, as amended, and it reasonably believes that (a) the Transferee is purchasing the Subordinated Notes for its own account or an account with respect to which the Transferee exercises sole investment discretion, (b) the Transferee and any such account is a QIB/QP and (c) (1) the Transferee is not a Benefit Plan Investor or Controlling Person and (2) if the Transferee is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to Section 406 of ERISA or Section 4975 of the Code ("<u>Similar Law</u>"), its acquisition, holding and disposition of such Subordinated Notes will not constitute or result in a non-exempt violation of Similar Law.

   The Transferor understands that the Issuer, the Trustee and their counsel will rely upon the accuracy and truth of the foregoing representations, and the Transferor hereby consents to such reliance.

Ex. B6-1

(NAME OF TRANSFEROR)

By:_____
    Name:
    Title:

Dated:  _____, _____

cc:  ACIS CLO 2015-6 Ltd.

Ex. B6-2

<u>EXHIBIT B7</u>

FORM OF TRANSFEREE CERTIFICATE FOR TRANSFER OF CERTIFICATED
<u>SUBORDINATED NOTE</u>

U.S. Bank National Association
111 Filmore Avenue East
St. Paul, MN  55107-1402
Attn:  Bond Holder Service – ACIS CLO 2015-6

       Re:      ACIS CLO 2015-6 Ltd.
                Subordinated Notes

        Reference is hereby made to the Indenture, dated as of April 16, 2015, among the Issuer, ACIS CLO 2015-6 LLC, as co-issuer of the Co-Issued Notes, and U.S. Bank National Association, as Trustee (the "<u>Indenture</u>").  Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

        This letter relates to ____ Aggregate Outstanding Amount of Certificated Subordinated Notes (the "<u>Certificated Subordinated Notes</u>"), which are held in the form of one or more certificated Subordinated Notes in the name of _____ (the "<u>Transferor</u>") to effect the transfer of the Certificated Subordinated Notes to _____ (the "<u>Transferee</u>").

        In connection with such request, and in respect of such Certificated Subordinated Notes, the Transferee does hereby certify that the Certificated Subordinated Notes are being transferred (i) in accordance with the transfer restrictions set forth in the Indenture and (ii) pursuant to an exemption from registration under the United States Securities Act of 1933, as amended (the "<u>Securities Act</u>") and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

        In addition, the Transferee hereby represents, warrants and covenants for the benefit of the Issuer and its counsel that we are:

        (a)      (PLEASE CHECK ONLY ONE (UNLESS (c) IS CHECKED))

_____     a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act of 1940, as amended (the "Investment Company Act");

_____     a "knowledgeable employee", as defined in Rule 3c-5 promulgated under the Investment Company Act, with respect to the Issuer; or

_____     an entity owned exclusively by "knowledgeable employees" (as defined in the Investment Company Act) with respect to the Issuer and/or qualified purchasers (as defined in the Investment Company Act); and

20718186.19.BUSINESS



(b)        (PLEASE CHECK ONLY ONE (UNLESS (c) IS CHECKED))

_____        a "qualified institutional buyer" as defined in Rule 144A under the Securities  Act of 1933, as amended (the "Securities Act");

_____        an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act; or

_____        an individual "accredited investor" as defined in Rule 501(a)(5) or (6) under the Securities Act who, is also a "knowledgeable employee" (as defined in the Investment Company Act) with respect to the Issuer;  or

(c)        (PLEASE CHECK, IF APPLICABLE)

_____        a person that is not a "U.S. person" as defined in Regulation S under the Securities Act, and are acquiring the Certificated Subordinated Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from Securities Act registration provided by Regulation S; and

(d)        acquiring the Certificated Subordinated Notes for our own account (and not for the account of any other Person) in a minimum denomination of $100,000 and in integral multiples of $1 in excess thereof.

The Transferee further represents and warrants as follows:

1.        It understands that the Certificated Subordinated Notes have not been and will not be registered under the Securities Act, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Certificated Subordinated Notes, such Certificated Subordinated Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of the Indenture and the legends on such Certificated Subordinated Notes, including the requirement for written certifications.   In particular, it understands that the Certificated Subordinated Notes may be transferred only to a person that is either (a) a "qualified purchaser" (as defined in the Investment Company Act of 1940, as amended (the "Investment Company Act")), (b) a "Knowledgeable Employee," as defined in Rule 3c-5 promulgated under the Investment Company Act, with respect to the Issuer or (c) a corporation, partnership, limited liability company or other entity (other than a trust) each shareholder, partner, member or other equity owner of which is either a Knowledgeable Employee with respect to the Issuer or a Qualified Purchaser; and in the case of (a), (b) and (c) above that is either (i) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act who purchases such Certificated Subordinated Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder (or, in the case of the initial investors in the Subordinated Notes, another exemption from the registration requirements of the Securities Act) or (ii) an "accredited investor" as defined in Rule 501(a) under the Securities Act who, if not an "institutional accredited investor" (an entity defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) is also a "Knowledgeable Employee" with respect to the Issuer or (d) a person that is not a "U.S. person" as defined in Regulation S under the Securities Act, and is acquiring the Certificated Subordinated Notes in an offshore transaction (as defined in Regulation S thereunder) in reliance on the exemption from registration provided by Regulation S thereunder.

Ex. B7-2

It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Certificated Subordinated Notes.

2.      In connection with its purchase of the Certificated Subordinated Notes:  (i) none of the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator, the Initial Purchaser or any of their respective affiliates is acting as a fiduciary or financial or investment advisor for such beneficial owner; (ii) such beneficial owner is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator or the Initial Purchaser or any of their respective affiliates other than any statements in the final offering circular for such Subordinated Notes, and such beneficial owner has read and understands such final offering circular; (iii) such beneficial owner has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary and has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the Indenture) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator or the Initial Purchaser or any of their respective affiliates; (iv) such beneficial owner is acquiring its interest in such Subordinated Notes for its own account; (v) such beneficial owner was not formed for the purpose of investing in such Subordinated Notes; (vi) such beneficial owner understands that the Issuer may receive a list of participants holding interests in the Subordinated Notes from one or more book-entry depositories; (vii) such beneficial owner will hold and transfer at least the minimum denomination of such Subordinated Notes and (viii) such beneficial owner will provide notice of the relevant transfer restrictions to subsequent transferees; provided that in the case of clauses (i), (ii) and (iii) above, the Portfolio Manager or an affiliate of the Portfolio Manager may have acted as financial and investment advisor to certain accounts for the benefit of certain beneficial owners of Notes managed by the Portfolio Manager or such affiliate of the Portfolio Manager and in that capacity has provided, and in the future may provide, advice to such beneficial owners of Notes; provided further that no such representations under subclauses (i) through (iii) are made with respect to the Initial Purchaser by any Affiliate of the Initial Purchaser or any discretionary account for which the Initial Purchaser or its Affiliates act as investment advisor.

3.      (i) It is either (A) a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act, (B) a "Knowledgeable Employee" with respect to the Issuer for purposes of Rule 3c-5 of the Investment Company Act or (C) a corporation, partnership, limited liability company or other entity (other than a trust) each shareholder, partner, member or other equity owner of which is either a Knowledgeable Employee with respect to the Issuer or a Qualified Purchaser and in the case of (A), (B) and (C) above that is either (x) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act who purchases such Certificated Subordinated Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder (or, in the case of the initial investors in the Subordinated Notes, another exemption from the registration requirements of the Securities Act) or (y) an "accredited investor" as defined in Rule 501(a) under the Securities Act who, if not an "institutional accredited investor" (an entity defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) is also a "Knowledgeable Employee" with respect to the Issuer or (D) not a "U.S. person" as defined in Regulation S under the Securities Act and is acquiring the

Ex. B7-3

Certificated Subordinated Notes in an offshore transaction (as defined in Regulation S thereunder) in reliance on the exemption from registration provided by Regulation S thereunder; (ii) it is acquiring the Certificated Subordinated Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (iii) it is not a (A) partnership, (B) common trust fund, or (C) special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants may designate the particular investments to be made; (iv) it agrees that it shall not hold any Certificated Subordinated Notes for the benefit of any other person, that it shall at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and that it shall not sell participation interests in the Certificated Subordinated Notes or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the distributions on the Certificated Subordinated Notes; (v) it is acquiring its interest in the Certificated Subordinated Notes for its own account; and (vi) it will hold and transfer at least the minimum denomination of the Certificated Subordinated Notes and provide notice of the relevant transfer restrictions to subsequent transferees.

4.      It acknowledges and agrees that all of the assurances given by it in the attached Subordinated Note ERISA Certificate are correct and are for the benefit of the Issuer, the Trustee, the Initial Purchaser and the Portfolio Manager.  If it fails to provide the assurances to be given by it in the attached Subordinated Note ERISA Certificate, it will be deemed to have represented and warranted, with respect to each day it holds such Certificated Subordinated Note or any beneficial interest therein, that (1) such purchaser is not a Benefit Plan Investor or Controlling Person and (2) if the purchaser is a governmental, church, non-U.S. or other plan that is subject to Similar Law, its acquisition, holding and disposition of Subordinated Notes will not constitute or result in a non exempt violation of Similar Law.  It agrees and acknowledges that none of Issuer or the Trustee will recognize any transfer of the Subordinated Notes if such transfer may result in 25% or more of the value of the Subordinated Notes being held by Benefit Plan Investors.

5.      It agrees to treat the Subordinated Notes as equity for U.S. federal, state and local income and franchise tax purposes.

6.      It understands that the failure to provide the Issuer and the Trustee (and any of their agents) with the properly completed and signed tax certifications (generally, in the case of U.S. federal income tax, an Internal Revenue Service Form W-9 (or applicable successor form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or the appropriate Internal Revenue Service Form W-8 (or applicable successor form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code) may result in withholding from payments in respect of such Note, including U.S. federal withholding or back-up withholding.

7.      It will (i) provide the Issuer, the Portfolio Manager, the Trustee and their respective agents with the Holder FATCA Information and will take any other actions that the Issuer, the Portfolio Manager, the Trustee or their respective agents deem necessary or helpful to achieve FATCA Compliance and (ii) update any such information provided in clause (i) promptly upon learning that any such information previously provided has become obsolete or incorrect or is otherwise required. In the event it fails to provide the Holder FATCA Information,

Ex. B7-4

take such actions, update such information or otherwise becomes a Non-Permitted Tax Holder, (a) the Issuer or an agent acting on its behalf is authorized to withhold amounts otherwise distributable to it and (b) the Issuer or an agent acting on its behalf will have the right to compel it to sell its Notes or, if it does not sell its Notes within 10 Business Days after notice from the Issuer, to sell such Notes in the same manner as if it were a Non-Permitted Holder, and to remit the net proceeds of such sale (taking into account any taxes incurred in connection with such sale) to it as payment in full for such Notes. It agrees to indemnify the Issuer, the Trustee and other beneficial owners of Notes for all damages, costs and expenses that result from its failure to comply with its obligation to provide the Holder FATCA Information. This indemnification will continue even after the person ceases to have an ownership interest in the Notes. It agrees, or by acquiring this Note or an interest in this Note will be deemed to agree, that (i) the Issuer, the Portfolio Manager or the Trustee may provide such information and any other information regarding its investment in the Notes to the IRS or other relevant governmental authority and (ii) the Trustee or the Registrar may provide certain information to the Issuer, the Portfolio Manager or any agent thereof pursuant to the Indenture.

8.      If it is not a "United States person" within the meaning of Section 7701(a)(30) of the Code, it represents that (i) either (a) it is not a bank (or an entity affiliated with a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of Section 881(c)(3)(A) of the Code), (b) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States, or (c) it has provided an Internal Revenue Service Form W-8ECI representing that all payments received or to be received by it on the Notes are effectively connected with the conduct of a trade or business in the United States, and (ii) it is not purchasing this Note or an interest in this Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan within the meaning of Treasury Regulation section 1.881-3.

9.      It will indemnify the Issuer, the Trustee, their respective agents and each of the holders of the Note from any and all damages, cost and expenses (including any amount of taxes, fees, interest, additions to tax, or penalties) resulting from the failure by such holder to comply with Sections 1471 through 1474 of the Code (or any agreement or intergovernmental agreement thereunder or in respect thereof, including the Cayman IGA) and any other law, rule or regulation implementing such agreements or intergovernmental agreements, including, any regulations, rules and guidance notes or other approach or practices adopted in respect thereof, similar to the foregoing or its obligations under this Note. The indemnification will continue with respect to any period during which the holder held a Note (and any interest therein), notwithstanding the holder ceasing to be a holder of the Note.

10.     It has read the summary of the provisions related to no petitions for bankruptcy in "*Description of the Offered Securities—The Indenture—No Petitions for Bankruptcy*" in the Offering Circular.   It agrees not to institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year (or, if longer, the applicable preference period then in effect) *plus* one day after the payment in full of all Notes. It understands that the foregoing restrictions are a material

inducement for each holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws. It agrees that it is subject to the Bankruptcy Subordination Agreement.

11.     To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon notice to the Trustee, impose additional transfer restrictions on the Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA Patriot Act") and other similar laws or regulations, including, without limitation, requiring each transferee of a Note to make representations to the Issuer in connection with such compliance.

The Transferee agrees to provide promptly such information and execute and deliver such documents as may be necessary to comply with any and all laws and regulations (including the USA Patriot Act) to which the Issuer may be subject.  The Transferee understands and agrees that, in order to ensure compliance under applicable anti-money laundering laws and regulations, the Issuer may require a detailed verification of the identity of the Transferee.  The Issuer reserves the right to request such information as is necessary to verify the identity of a Transferee.  In the event of delay or failure by the Transferee to produce any information required for verification purposes, the Issuer may refuse to issue the Notes to the Transferee until proper information has been provided.

The Transferee covenants and agrees that it shall provide the Issuer with such information as the Issuer determines to be necessary or appropriate to (a) verify compliance with the anti-money laundering regulations of any applicable jurisdiction or (b) respond to requests for information concerning the identity of the Transferee from any governmental authority, self-regulatory organization or financial institution in connection with the Issuer's anti-money laundering compliance procedures.

12.     It is not a person with whom dealings are restricted or prohibited under any law relating to economic sanctions or anti-money laundering of the United States, the European Union, Switzerland, or any other applicable jurisdiction ("AML and Sanctions Laws"), and its purchase of the Notes will not result in the violation of any AML and Sanctions Law by any Transaction Party, whether as a result of the identity of the purchaser or its beneficial owners, their source of funds, or otherwise.

13.     It is not a member of the public in the Cayman Islands.

14.     It understands that the Certificated Subordinated Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, such Certificated Subordinated Notes have not been and will not be registered

under the Securities Act, and, if in the future it decides to offer, resell, pledge or otherwise transfer such Certificated Subordinated Notes, such Certificated Subordinated Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of the Indenture and the legend on such Certificated Subordinated Notes.  It acknowledges that no representation has been made as to the availability of any exemption under the Securities Act or any state securities laws for resale of such Certificated Subordinated Notes.  It understands that neither of the Co-Issuers has been registered under the Investment Company Act, and that the Co-Issuers are exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act.

15.    It is aware that, except as otherwise provided in the Indenture, any Secured Notes or Subordinated Notes being sold to it in reliance on Regulation S will be represented by one or more Regulation S Global Notes and that in each case beneficial interests therein may be held only through DTC for the respective accounts of Euroclear or Clearstream.

16.    It understands that the Issuer, the Trustee, the Initial Purchaser and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

It agrees to provide notice to each person to whom it proposes to transfer any interest in the Certificated Subordinated Notes of the transfer restrictions and representations set forth in the Indenture. It understands that any purported transfer of a Certificated Subordinated Note, or any interest therein, to a purchaser or transferee that does not comply with the requirements specified in the Indenture, the Certificated Subordinated Note, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void *ab initio*.

Name of Purchaser:

Dated:

By:_____

    Name:

    Title:

Amount of Subordinated Notes:  $_____

Taxpayer identification number:

Address for notices:                                    Wire transfer information for payments:

                                                                  Bank:

                                                                  Address:

Ex. B7-7

Bank ABA#:

Account #:

Telephone:                          FAO:

Facsimile:                          Attention:

Attention:

Denominations of certificates (if more than one):
Registered name:

cc:     ACIS CLO 2015-6 Ltd.
        c/o MaplesFS Limited
        P.O. Box 1093, Boundary Hall, Cricket Square
        Grand Cayman, KY1-1102, Cayman Islands
        Attention: The Directors

Ex. B7-8

EXHIBIT C

FORMS OF DECHERT LLP OPINIONS

<u>EXHIBIT D</u>

<u>FORM OF DECHERT LLP OPINION</u>

Ex. D-1

<u>EXHIBIT E</u>

<u>FORM OF SEWARD & KISSEL LLP OPINION</u>

Ex. E-1

<u>EXHIBIT F</u>

<u>FORM OF MAPLES AND CALDER OPINION</u>

<u>EXHIBIT G</u>

<u>CALCULATION OF LIBOR</u>

"<u>LIBOR</u>" for any Interest Accrual Period will equal (a) the rate appearing on the Reuters Screen for deposits with a term of three months (*provided* that with respect to the first Interest Accrual Period, LIBOR will equal the rate representing the linear interpolation of the rates appearing on the Reuters Screen for deposits with a term of 3 months and 6 months as calculated on the relevant Interest Determination Date) or (b) if such rate is unavailable at the time LIBOR is to be determined, LIBOR shall be determined on the basis of the rates at which deposits in U.S. Dollars are offered by four major banks in the London market selected by the Calculation Agent (the "<u>Reference Banks</u>") at approximately 11:00 a.m., London time, on the Interest Determination Date to prime banks in the London interbank market for a period approximately equal to such period and an amount approximately equal to the aggregate outstanding principal amount of the Secured Notes.  The Calculation Agent will request the principal London office of each Reference Bank to provide a quotation of its rate.  If at least two such quotations are provided, LIBOR shall be the arithmetic mean of such quotations (rounded upward to the next higher 1/100).  If fewer than two quotations are provided as requested, LIBOR with respect to such Interest Accrual Period will be the arithmetic mean of the rates quoted by three major banks in New York, New York selected by the Calculation Agent at approximately 11:00 a.m., New York time, on such Interest Determination Date for loans in U.S. Dollars to leading European banks for a term approximately equal to such Interest Accrual Period and an amount approximately equal to the aggregate outstanding principal amount of the Secured Notes.  If the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures described above, LIBOR will be LIBOR as determined on the previous Interest Determination Date.

"<u>Reuters Screen</u>" means Reuters Page LIBOR01 (or such other page that may replace that page on such service for the purpose of displaying comparable rates) as reported by Bloomberg Financial Markets Commodities News (or a successor) as of 11:00 a.m., London time, on the Interest Determination Date.

20718186.19.BUSINESS

<u>EXHIBIT H</u>

<u>FORM OF SECURITIES ACCOUNT CONTROL AGREEMENT</u>

<u>EXHIBIT I</u>

<u>FORM OF NOTE OWNER CERTIFICATE</u>

U.S. Bank National Association,
as Trustee
111 Filmore Avenue East
St. Paul, MN 55107-1402
Attn:  Bond Holder Service – ACIS CLO 2015-6

ACIS CLO 2015-6 Ltd.
c/o MaplesFS Limited
P.O. Box 1093, Boundary Hall, Cricket Square
Grand Cayman, KY1-1102, Cayman Islands
Attention: The Directors

ACIS CLO 2015-6 LLC
c/o Puglisi & Associates
850 Library Avenue, Ste. 204
Newark, DE  19711

ACIS Capital Management, L.P.
300 Crescent Court
Dallas, Texas  75201

    Re: Reports Prepared Pursuant to the Indenture, dated as of April 16, 2015, among ACIS CLO 2015-6 Ltd., ACIS CLO 2015-6 LLC and U.S. Bank National Association, as Trustee (the "<u>Indenture</u>").

Ladies and Gentlemen:

    The undersigned hereby certifies that it is the beneficial owner of U.S.$_____ in principal amount of the [Class A-1 Senior Secured Floating Rate Note due 2027] [Class A-2 Senior Secured Fixed Rate Note due 2027] [Class B Senior Secured Floating Rate Note due 2027] [Class C Secured Deferrable Floating Rate Note due 2027] [Class D Secured Deferrable Floating Rate Note due 2027] [of ACIS CLO 2015-6 Ltd. and ACIS CLO 2015-6 LLC] [Class E Secured Deferrable Floating Rate Note due 2027] [Subordinated Notes due 2027] [of ACIS CLO 2015-6 Ltd.], and hereby requests the Trustee to provide to it (or its designated nominee set forth below) at the following address the [information specified in <u>Section 7.17(b)</u> of the Indenture] [and/or the] [information specified in <u>Section 7.17(d)</u> of the Indenture] [and/or the] [information specified in <u>Section 7.17(f)</u> of the Indenture] [and/or the] [access to the Trustees website specified in <u>Section 10.7(g)</u> of the Indenture].

    Please return the form via email to the Trustee at 190 South LaSalle Street, 8th Floor, Chicago, IL 60603, Attn: Corporate Trust Services – ACIS CLO 2015-6, Email: ACIS.CLO.2015.06@usbank.com.

Ex. I-1

20718186.19.BUSINESS

Address:_____

_____

_____

IN WITNESS WHEREOF, the undersigned has caused this certificate to be duly executed this _____ day of _____, _____.

[NAME OF BENEFICIAL OWNER]

By: _____
Authorized Signatory

Ex. I-2