UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

U.S. BANK, NATIONAL ASSOCIATION, in its
capacity as Trustee, JOSHUA N. TERRY, AND
ACIS CAPITAL MANAGEMENT, L.P.,

     Plaintiffs,

 -against-

THE CHARITABLE DONOR ADVISED FUND,
L.P., CLO HOLDCO LTD., AND NEXPOINT
DIVERSIFIED REAL ESTATE TRUST,

     Defendants.

Case No. 1:21-cv-11059 (GHW)

**NEXPOINT DIVERSIFIED REAL ESTATE TRUST'S RESPONSE TO
PLAINTIFFS' MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS
AND FOR JUDGMENT ON THE PLEADINGS**

Dated:  June 14, 2023

**SBAITI & COMPANY PLLC**

*Mazin A. Sbaiti*
Mazin A. Sbaiti
New York Bar No. 4339057
mas@sbaitilaw.com
Griffin S. Rubin
Texas Bar No. 24121809
gsr@sbaitilaw.com
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: 214.432.2899
F: 214.853.4367

**COUNSEL FOR DEFENDANT NEXPOINT
DIVERSIFIED REAL ESTATE TRUST**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES......................................................................................... iii

I.      INTRODUCTION & SUMMARY ....................................................................1

II.     BACKGROUND ..............................................................................................3

III.    RULE 12(f) STATEMENT AND MOTION TO STRIKE EXHIBITS ...........7

        A.      The Information a Court May Consider on a Motion to
                Dismiss Under Rule 12(b)(6) or 12(c) Is Limited .................................7

        B.      The Court Should Exclude Certain Exhibits from Consideration
                of the Motion to Dismiss NexPoint's Counterclaims ...........................8

        C.      If the Court Chooses to Consider the Exhibits, NexPoint Requests
                that the Court Convert the Motion to Dismiss to a Motion for
                Summary Judgment and Provide NexPoint with Adequate Time to
                Conduct Discovery Before Responding....................................................9

IV.     LEGAL STANDARDS ...................................................................................10

        A.      12(b)(6) Standard ..................................................................................10

        B.      12(c) Standard ......................................................................................11

V.      ARGUMENTS & AUTHORITIES ................................................................11

        A.      12(b)(6) Motion ....................................................................................11

                1,.     NexPoint Has Set Forth a Prima Facie Case of Tortious
                        Interference ..............................................................................12

                        a.      A Valid Contract with a Third Party Has Been
                                Alleged ..........................................................................12

                        b.      Counter-Defendants Knew of the Notes .....................12

                        c.      Counter-Defendants' Intentional, Unjustified,
                                Wrongful Acts Directly Caused the Breach................13

                        d.      Damages........................................................................15

2. There is No Legal Basis to Dismiss the Claims for Breach of Fiduciary Duty ...................................................................16

    a. Counter-Defendants Owe Direct Fiduciary Duties ....................16

        i. The Trust Theory.............................................................16

        ii.. The Nature of the Relationship Otherwise Gives Rise to Direct Fiduciary Duties Under Common Law and Under Cayman Islands Law .............................................................................20

        iii. Direct and Unwaivable Fiduciary Duties Lie Under the IAA, Which Are Actionable Under New York Law .............................................................23

    b. Even if the Duties Only Existed with Respect to the Fund, NexPoint Has Derivative Standing Under New York and Cayman Islands Law ....................................................27

        i. Derivative Standing Exists Under New York Law .........27

        ii. Derivative Standing Exists Under Cayman Islands Law ..............................................................................29

3. Counter-Defendants' Ancillary Arguments Have No Merit....................30

    a. NexPoint's Tort Claims Are Not Duplicative .............................30

    b. NexPoint's Unjust Enrichment Claim is Properly Pleaded ........................................................................31

    c. The Economic Loss Rule is Inapplicable....................................32

4. If Necessary, Repleading Should be Permitted.......................................32

B. Response to 12(c) Motion ........................................................................34

    1. The Motion is Premature ........................................................................34

    2. The Motion is Facially Defense...............................................................35

    3. The Motion Confuses Allegations for Admissions .................................36

        4.      The Court Likely Lacks Jurisdiction to Issue the
                Requested Judgment ............................................................................38

VI.    CONCLUSION ....................................................................................................39

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ..................................................................................10

*Anonymous v. CVS Corp.*,
  728 N.Y.S.2d 333 (N.Y. Sup. Ct. 2001) ................................................................20

*Apple Recs., Inc. v. Capitol Recs., Inc.*,
529 N.Y.S.2d 279 (N.Y. App. Div. 1988).................................................................24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................10

*Ash v. Jacobson*,
  No. 1:16-cv-9548, 2020 U.S. Dist. LEXIS 96493
  (S.D.N.Y. June 1, 2020) ........................................................................................11

*Babaev v. Grossman*,
  312 F. Supp. 2d 407 (E.D.N.Y. 2004) ...................................................................37

*Barrett v. Freifeld*,
  883 N.Y.S.2d 305 (N.Y. App. Div. 2009)...............................................................16

*Bass v. Hoagland*,
  172 F.2d 205 (5th Cir. 1949) .................................................................................36

*Beal v. Mo. Pac. R.R. Corp.*,
  312 U.S. 45 (1941) .................................................................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................10

*Belmont v. MB Inv. Partners, Inc.*,
  708 F.3d 470 (3d Cir. 2013) ..................................................................................25

*Brass v. Am. Film Techs. Inc.*,
  987 F.2d 142 (2d Cir. 1993) ..................................................................................24

*Brown v. De Fillipis*,
  717 F. Supp. 172 (S.D.N.Y. 1989) ........................................................................39

*Bullmore v. Banc of Am. Sec. LLC*,
  485 F. Supp. 2d 464 (S.D.N.Y. 2007) ...................................................................30

*Catskill Dev., L.L.C. v. Park Place Ent. Corp.*,
   547 F.3d 115 (2d Cir. 2008) ...................................................................................12

*CFIP Master Fund, Ltd. v. Citibank, Nat'l Ass'n*,
   738 F. Supp. 2d 450 (S.D.N.Y. 2010) .................................................................27

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ...................................................................................8

*Ciccone v. Hersh*,
   530 F. Supp. 2d 574 (S.D.N.Y. 2008) .................................................................24

*Coleson v. Janssen Pharm., Inc.*,
   251 F. Supp. 3d 716 (S.D.N.Y. 2017) .................................................................24

*Commerzbank AG v. U.S. Bank Nat'l Ass'n*,
   277 F. Supp. 3d 483 (S.D.N.Y. 2017) .................................................................32

*Cortec Indus., Inc. v. Sum Holding L.P.*,
   949 F.2d 42 (2d Cir. 1991) ...................................................................................32

*Dall. Cowboys Football Club v. NFL Tr.*,
   No. 95-cv-9426, 1996 U.S. Dist. LEXIS 15501
   (S.D.N.Y. Oct. 18, 1996).......................................................................................26

*Davis v. McCready*,
   283 F. Supp. 3d 108 (S.D.N.Y. 2017) .................................................................33

*Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp.*,
   933 F.3d 751 (D.C. Cir. 2019) .............................................................................38

*Doe v. Columbia Univ.*,
   No. 1:20-cv-06770, 2022 U.S. Dist. LEXIS 176629
   (S.D.N.Y. Sept. 28, 2022) ............................................................................. 10-11

*Dorking Genetics v. United States*,
   76 F.3d 1261 (2d Cir. 1996) .................................................................................30

*Douglass v. Beakley*,
   900 F. Supp. 2d 736 (N.D. Tex. 2012) ................................................................24

*Ellington Credit Fund, LTD. v. Select Portfolio Servicing, Inc.*,
   837 F. Supp. 2d 162 (S.D.N.Y. 2011)..................................................................26

*Elliott Int'l L.P. v. Vitro, S.A.B. de C.V.*, 9
  45 N.Y.S.2d 1 (N.Y. App. Div. 2012)................................................28

*Feldman v. CSX Transp., Inc.*,
  821 N.Y.S.2d 85 (N.Y. App. Div. 2006)..............................................24

*Foman v. Davis*,
  371 U.S. 178 (1962)......................................................................33

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................10

*Gabilly v. City of New York*,
  No. 19-CV-11884, 2021 U.S. Dist. LEXIS 154925
  (S.D.N.Y. Aug. 17, 2021)...............................................................35

*Goel v. Bunge, Ltd.*,
  820 F.3d 554 (2d Cir. 2016) .............................................................8

*Goldenson v. Steffens*,
  No. 2:10-cv-00440, 2014 U.S. Dist. LEXIS 201258
  (D. Me. Mar. 7, 2014) ..................................................................25

*Goldstein v. SEC*,
  451 F.3d 873 (D.C. Cir. 2006)......................................................25, 26

*Greenspun v. Lindley*,
  330 N.E.2d 79 (N.Y. 1975) .............................................................28

*Grgurev v. Licul*,
  229 F. Supp. 3d 267 (S.D.N.Y. 2017) ................................................31

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
  406 N.E.2d 445 (N.Y. 1980) ...........................................................15

*Gucci Am., Inc. v. Frontline Processing Corp.*,
  721 F. Supp. 2d 228 (S.D.N.Y. 2010) ................................................13

*Holland v. City of New York*,
  197 F. Supp. 3d 529 (S.D.N.Y. 2016) ................................................37

*Hydro Invs., Inc. v. Trafalgar Power Inc.*,
  227 F.3d 8 (2d Cir. 2000) ..............................................................32

*In re China Cast Educ. Corp. Sec. Litig.*,
  809 F.3d 471 (9th Cir. 2015)...........................................................23

*In re Dolcater*,
106 F.2d 30 (2d Cir. 1939) ............................................................................................27

*In re Est. of Rubin*,
540 N.Y.S.2d 944 (N.Y. Sur. Ct. 1989) ........................................................................19

*In re United Elec., Radio & Mach. Workers of Am.*,
111 F. Supp. 858 (S.D.N.Y. 1953) ................................................................................38

*Int'l Mins. & Res., Inc. v. Pappas*,
761 F. Supp. 1068 (S.D.N.Y. 1991) ..............................................................................15

*King Cnty. v. IKB Deutsche Industriebank AG*,
863 F. Supp. 2d 288 (S.D.N.Y. 2012) ...........................................................................32

*Klebanow v. N.Y. Produce Exch.*,
344 F.2d 294 (2d Cir. 1965) ..........................................................................................26

*Knowles-Carter v. Feyonce, Inc.*,
No. 16-cv-2532, 2017 U.S. Dist. LEXIS 233031
(S.D.N.Y. Sept. 23, 2017) .........................................................................................35-36

*Kopec v. Coughlin*,
922 F.2d 152 (2d Cir. 1991) .............................................................................................9

*Kramer v. Time Warner, Inc.*,
937 F.2d 767 (2d Cir. 1991) ........................................................................................ 8-9

*Kraus USA, Inc. v. Magarik*,
No. 17-cv-6541, 2018 U.S. Dist. LEXIS 168164
(S.D.N.Y. Sept. 28, 2018) .............................................................................................35

*Krys v. Paul, Weiss, Rifkind, Wharton & Garrison, LLP*,
539 B.R. 643 (S.D.N.Y. 2015) ......................................................................................28

*Lazar v. Robinson Knife Mfg. Co.*,
692 N.Y.S.2d 539 (N.Y. App. Div. 1999)......................................................................31

*Lively v. WAFRA Inv. Advisory Grp., Inc.*,
6 F.4th 293 (2d Cir. 2021) ................................................................................. 7, 8, 36-37

*Lovatio v. Petróleos de Venez., S.A.*,
No. 1:19-cv-4799, 2020 U.S. Dist. LEXIS 181114
(S.D.N.Y. Sept. 30, 2020) ..............................................................................................12

*Merck & Co. v. Mediplan Health Consulting*,
   425 F. Supp. 2d 402 (S.D.N.Y. 2006) ............................................................37

*Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*,
   No. 03-cv-5539, 2004 U.S. Dist. LEXIS 11761
   (S.D.N.Y. June 25, 2014) ............................................................21

*NBT Bancorp v. Fleet/Norstar Fin. Grp.*,
   664 N.E.2d 492 (N.Y. 1996) ............................................................12

*Oddo Asset Mgmt. v. Barclays Bank PLC*,
   973 N.E.2d 735 (N.Y. 2012) ............................................................22-23

*Orentreich v. Prudential Ins. Co. of Am.*,
   713 N.Y.S.2d 330 (N.Y. App. Div. 2000) ............................................................17

*Palin v. N.Y. Times Co.*,
   940 F.3d 804 (2d Cir. 2019) ............................................................9

*Pangburn v. Culbertson*,
   200 F.3d 65 (2d Cir. 1999) ............................................................33-34

*Pavelic & LeFlore v. Marvel Ent. Grp.*,
   493 U.S. 120 (1989) ............................................................35

*Penato v. George*,
   383 N.Y.S.2d 900 (N.Y. App. Div. 1976) ............................................................20

*Perez v. Wells Fargo N.A.*,
   774 F.3d 1329 (11th Cir. 2014) ............................................................34-35

*Republic of Haiti v. Duvalier*,
   626 N.Y.S.2d 472 (N.Y. App. Div. 1995) ............................................................31

*Rhode Island v. Massachusetts*,
   37 U.S. (12 Pet.) 657 (1838) ............................................................38-39

*Robare Grp., Ltd. v. SEC*,
   922 F.3d 468 (D.C. Cir. 2019) ............................................................30

*Rose v. Different Twist Pretzel, Inc.*,
   999 N.Y.S.2d 438 (N.Y. App. Div. 2014) ............................................................12

*Sampaio v. Atl.-Heydt, LLC*,
   294 F. Supp. 2d 466 (S.D.N.Y. 2003) ............................................................24

*Schafer v. Direct Energy Servs., LLC*,
   845 F. App'x 81 (2d Cir. 2021) ...................................................................8

*Schlick v. Penn-Dixie Cement Corp.*,
   507 F.2d 374 (2d Cir. 1974) ............................................................33, 37

*Schneider v. Lazard Freres & Co.*,
   206552 N.Y.S.2d 571 (N.Y. App. Div. 1990) .......................................22

*Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*,
   972 F.3d 915 (7th Cir. 2020) ................................................................35

*SEC v. ABS Manager, LLC*,
   No. 13-cv-319, 2014 U.S. Dist. LEXIS 80542
   (S.D. Cal. June 11, 2014) ......................................................................30

*SEC v. Cap. Gains Rsch. Bureau, Inc.*,
   375 U.S. 180 (1961) .........................................................................23, 25

*SEC v. Markusen*,
   143 F. Supp. 3d 877 (D. Minn. 2015) .............................................. 24-25

*SEC v. Roberts*,
   No. 8:21-cv-01615, 2022 U.S. Dist. LEXIS 25502
   (C.D. Cal. Jan. 25, 2022) ................................................................. 23-24

*Singleton Mgmt. v. Compere*,
   673 N.Y.S.2d 381 (N.Y. App. Div. 1998) .......................................15, 16

*SLS Brands, LLC v. Authentic Brands Grp., LLC*,
   No. 19-CV-8115, 2021 U.S. Dist. LEXIS 21438
   (S.D.N.Y. Feb. 4, 2021) ..........................................................................1

*Sprague v. Salisbury Bank & Tr. Co.*,
   969 F.3d 95 (2d Cir. 2020) ...................................................................33

*State ex rel. Udall v. Colonial Penn Ins. Co.*,
   812 P.2d 777 (N.M. 1991) ....................................................................25

*State Farm Fire & Cas. Co. v. Spradling Home Inspections, LLC*,
   No. 4:10-CV-01887, 2011 U.S. Dist. LEXIS 103292
   (E.D. Mo. Sept. 13, 2011) .....................................................................35

*Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*,
   964 F. Supp. 783 (S.D.N.Y. 1997) ..................................................16, 25

*The Limited, Inc. v. McCrory Corp.*,
    683 F. Supp. 387 (S.D.N.Y. 1988) ..................................................................37

*Transamerica Mortg.  Advisors, Inc. (TAMA) v. Lewis*,
    444 U.S. 11 (1979) ..........................................................................................26

*True Believers Ink 2, Corp. v. Russell Brands, LLC*,
    No. 4:18-CV-00432, 2019 U.S. Dist. LEXIS 144949
    (E.D. Tex. Aug. 27, 2019) ........................................................................ 37-38

*Trundle & Co. Pension Plan v. Emanuel*,
    No. 18-cv-7290, 2019 U.S. Dist. LEXIS 167065
    (S.D.N.Y. Sept. 26, 2019) ........................................................................ 33-34

*United Food & Com. Workers, Local 1995 v. Kroger Co.*,
    51 F.4th 197 (6th Cir. 2022).....................................................................11, 36

*U.S. Bank N.A. v. Xxx*,
    No. 650630/2021, 2021 N.Y. Misc. LEXIS 3747
    (N.Y. Sup. Ct. June 28, 2021) .........................................................................19

*Wade Park Land Holdings, LLC v. Kalikow*,
    No. 21-cv-1657, 2022 U.S. Dist. LEXIS 118899
    (S.D.N.Y. July 6, 2022)...................................................................................32

*Wolfson v Glass*,
    754 N.Y.S.2d 82 (N.Y. App. Div. 2003)........................................................24

## Grand Cayman Cases

*Tianrui (Int'l) Holding Co. Ltd. v. China Shanshui Cement Grp. Ltd.*,
    Grand Court of the Cayman Is., Apr. 6, 2020 ..................................................29

## Statutes, Rules and Regulations

15 C.F.R. § 275.206(2)......................................................................... *passim*

17 C.F.R. § 275.206(4)-8 ..................................................................... *passim*

15 U.S.C. § 80b-6(4)................................................................................26

FED. R CIV. P. 8(d)(2)–(3)..........................................................................30

FED. R. CIV. P. 11(b)(3) ............................................................................37

FED. R. CIV. P. 12(b)(6) ............................................................................. *passim*

FED. R. CIV. P. 12(c) .................................................................................. *passim*

FED. R. CIV. P. 12(d).......................................................................................... 9-10

FED. R. CIV. P. 12(f) ...............................................................................................7

FED. R. CIV. P. 44.1 .............................................................................................29

FED. R. CIV. P. 56 ..................................................................................................9

## <u>Other Authorities</u>

5C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE
 (3d ed. 2021) ...................................................................................................11

J. R. Kemper, *Construction and Operation of Will or Trust Provision Appointing Advisors to Trustee of Executor*, 56 A.L.R.3d 1249 ....................................................................19

N.Y. Jur. 2d Trusts.............................................................................................20

Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles, 72 Fed. Reg. 44,756 (Aug. 9, 2007) (codified at 17 C.F.R. pt. 275)..........................................................26

RESTATEMENT (SECOND) OF TRUSTS (AM. L. INST. 1959)...........................................19

# I.

## INTRODUCTION & SUMMARY

Plaintiff/Counter-Defendant Acis Capital Management, L.P. ("ACM") and its control person, Plaintiff/Counter-Defendant Joshua N. Terry ("Terry") (collectively with ACM, "Counter-Defendants"[1]), move to dismiss Defendant/Counter-Plaintiff NexPoint Diversified Real Estate Trust ("NexPoint")'s Counterclaims (the "Counterclaims"), and Counter-Defendants and Plaintiff U.S. Bank, N.A. ("U.S. Bank") (collectively with Counter-Defendants, "Plaintiffs") move for judgment on their pleadings under Rule 12(c) (collectively, the "Motions"). They do not attempt to argue that the allegations fail to meet the elements of the causes of action. Rather, they argue that NexPoint lacks standing to seek redress. When coupled with arguments made against NexPoint's rights under the Investment Advisers Act of 1940 (the "IAA"), their argument boils down to this: Even if 100% of what NexPoint has alleged is true, and therefore grave malfeasance has occurred, NexPoint has *no* remedy. Not only that, but they intend to consecrate this lack of remedy in a premature and ill-conceived Rule 12(c) motion for declaratory relief.

The fact of the matter is that NexPoint is a holder of a subordinated note—a contract with either the Acis-6 Issuer or the Acis-6 trust. That note entitles NexPoint to a percentage of the moneys left over after all senior-debt obligations, expenses, and other fees are paid. This contractual right was interfered with by Counter-Defendants in their ploy to self-deal. Counter-Defendants contend that they owe no duties to NexPoint because all of NexPoint's rights are held in its notes, contracts that they are not parties to. Given that it is those rights that NexPoint

---

[1] Brigade Capital Management, LP ("Brigade") is also a counter-defendant to NexPoint's claims in this action. For purposes of this response, Brigade is not included in Counter-Defendants because Brigade has filed its own motion to dismiss, *see* Dkt. Nos. 119–20, and NexPoint's response to Brigade's motion is forthcoming.

pleads Counter-Defendants have interfered with, NexPoint has pleaded a direct tortious-interference-with-contract claim even if all other claims fail, and NexPoint undeniably has standing to bring such a claim.

NexPoint also pleads breaches of fiduciary duties. Counter-Defendants attack nothing but the non-existence of a duty owed to NexPoint. The laws of New York and the Cayman Islands recognize that an investment advisor who exercises control over an investment fund for the benefit of investors owes direct fiduciary duties to those investors, which are actionable in a direct claim. Although not formally denominated as such, ACM is a co-trustee of the Acis-6 CLO and owes direct fiduciary duties to beneficiaries. Even if Acis-6 is not a trust, fiduciary duties remain, and NexPoint has standing to bring suit against Counter-Defendants. Derivative standing likewise exists under New York and Cayman Islands law as the caselaw shows, and as Cayman Islands legal expert Bhavesh Patel explains below, NexPoint either is equity (or is functionally equivalent to equity) and has pleaded claims under the exceptions to *Foss v. Harbottle*.[2]

Counter-Defendants fail to specifically attack any other claim except to say that those claims: are duplicative (which is not a basis to dismiss alternative pleadings), violate the economic-loss rule (based on a complete misapprehension of the rule and its misapplication at the pleading stage), and are insufficient (even though they satisfy Rule 8). Most importantly, nothing in the Motions addresses the control-person and aiding-and-abetting liability allegations against Terry (the latter also applying to Brigade).

Finally, Plaintiffs' Rule 12(c) motion is both premature and pointless. That motion begs the Court to resolve fact questions when the pleadings are not closed; fails to address the affirmative defenses raised in NexPoint's operative answer; and requests relief far beyond any

---

[2] *See, e.g.*, Patel Decl. at ¶ 49.

actual case or controversy. Perhaps most acutely, the declaration sought is not specified but appears to ask this Court to declare a lack of standing for any claim—including claims that otherwise survive 12(b)(6). In short, Plaintiffs' Rule 12(c) motion is nonsensical.

## II.

## <u>BACKGROUND</u>

NexPoint mainly relies on and incorporates its pleadings in the Counterclaims and the incorporated documents, which is more extensive that what could be summarized here. NexPoint is an investor in a pooled investment vehicle managed and advised by Counter-Defendants, the Acis-6 Collateralized Loan Obligation Fund (the "<u>Acis-6</u>" CLO or trust). The terms of the Acis-6 transaction are governed by an indenture—an agreement governed by New York law (the "<u>Indenture</u>")[3] and the accompanying Offering Circular.[4] The Indenture posits that the "Issuer," Acis CLO 2015-6 Ltd., a Cayman Islands company, would issue various notes for money with a Co-Issuer, Acis CLO 2015-6 LLC (a Delaware limited liability company). It would then assign the money—all but $250 of it—and any and all securities or other assets purchased with the funds (collectively, the "<u>Assets</u>") to two trustees: U.S. Bank to hold legal title, and ACM as Portfolio Manager to control the fund and manage the Assets "for the benefit of" the noteholders.[5] The Issuer has no duty to pay NexPoint's (or anyone else's) notes—in fact, the Issuers have no assets to speak of and if they had to satisfy the notes they would be insolvent.[6] And although its note is denoted "unsecured," NexPoint may not look to the Issuer to satisfy any part of its note and must look

---

[3] Sbaiti Declaration, Ex. 1 ("<u>Indenture</u>"); Dkt. No. 78, ¶ 46 ("<u>Counterclaim</u>").

[4] Indenture, i-172. *See also* Sbaiti Declaration, Ex. 2 ("<u>Offering Circular</u>"). The key terms of the Indenture are summarized in the Offering Circular and the Offering Circular's statements about them are incorporated into the Indenture.

[5] Ex 1, Indenture p. 1; Ex. 2 Offering Circular pp. 97-99.

[6] Ex 2, Offering Circular at 107 ("The Issuer will not have any material assets other than the Collateral Obligations and certain other eligible assets. The Collateral Obligations and such other eligible assets will be pledged to the Trustee as security for the Issuer's obligations under the Secured Notes and the Indenture. . . . The Issuer has, and will have, no assets other than the sum of US$250. . . .").

solely to the Assets entrusted to U.S. Bank and ACM.[7] This much is undisputed.

At all relevant times, all senior notes had been paid off, and NexPoint essentially held 12.5% of the Acis-6 trust's equity in the form of subordinated Notes (the "Notes"),[8] meaning NexPoint was entitled to 12.5% of all residual and net proceeds after all senior debt obligations were satisfied, along with all fees and expenses having been paid.[9] The Notes incorporate by reference the Indenture's rights for subordinated noteholders.[10]

Under the Portfolio Management Agreement (the "PMA"), the Indenture, and the Offering Circular, Counter-Defendants earn percentages of various calculated assets under management ("AUM") as fees.[11] Terry is the only member or employee of ACM and thus serves as the primary investment advisor.[12] At all relevant times, ACM outsourced a majority of the advisory functions to the sub-advisor, Brigade, which earned fifteen basis points of the Acis-6 AUM's par value as a fee.[13] ACM, Terry, and Brigade are all registered investment advisors subject to the IAA.[14]

---

[7] Ex. 1, Indenture, § 2.8(i) (subordinated noteholder's obligations are "payable solely from the Assets").

[8] Counterclaim, ¶¶ 69–72.

[9] Counterclaim, ¶ 46 (stating that Appellant owns $7,500,000 in notional equity, which in the Indenture is the subordinated class); Indenture at p. 66 (total notional amount of subordinated class was $59,850,000). $7,500,000 ÷ $59,850,000 = 12.5% (approximate).

[10] See Ex. 1, Indenture, Form of Subordinated Note (Indenture Ex. A-2, pp. A2-1 through A2-10; id. at A2-7 ("Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee and the Holders of the Notes[.]"). The standards that impact the right to payment under the Notes include things such as the fact that the Indenture cannot be wound up until all payments due to note holders in accordance with the terms and conditions in the Indenture, have been made. See also Indenture § 7.1 ("The Issuer will, … pursuant to the Priority of Payments, duly and punctually pay all required distributions on the Subordinated Notes, in accordance with the Subordinated Notes and this Indenture."); Indenture § 11.1 (outlining priority of payments to subordinated noteholders); Indenture § 12.2(a)(iii), (iv) (setting forth investment criteria that needs to be followed when purchasing new Assets including compliance with Coverage Tests and Collateral Quality Tests); § 12(b) and § 12.3 (stating that purchases and sales of Assets will satisfy—or if not satisfied, maintain or improve collateral quality under—Collateral Quality Tests). See also § 12.3(a) (incorporating PMA standards).

[11] Ex. 1, Indenture, p. 1 ("The Co-Issuers are entering into this Indenture and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged."); id. at pp. 1–2 (bearing the Granting Clauses, which state, in relevant part, "The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof").

[12] Ex. 2, Offering Circular, pp. 13, 15-16.

[13] Id., p. 2; Counterclaim, ¶¶ 59–69.

[14] Counterclaim, ¶¶ 11, 59-69.

Given how the fees are calculated, the governing documents contain several safeguards to prevent the advisors or managers of Acis-6 from self-dealing or managing the assets in a way that would be financially detrimental to the investors/beneficiaries—called collateral-quality tests and coverage tests.[15] There are additional tests in the Indenture and the Offering Circular as well for those purposes.[16] Failure to abide by these tests violates the Indenture and, by extension, the Notes and the PMA.[17]

NexPoint alleges that Counter-Defendants engaged in acts that, taken on their own or altogether, amounted to a self-dealing, deceptive, and manipulative scheme which injured NexPoint.

*__First__*, Counter-Defendants engaged in a scheme to maximize their fees by inflating the value of AUM. AUM is calculated by simply adding up the face value, *i.e.*, par value, of the securities owned by the fund—irrespective of what they are worth on the market or how much was paid for them.[18] Counter-Defendants' fees are a percentage of notional assets under management, that is, cumulative par value irrespective of asset quality.[19] NexPoint alleges that Counter-Defendants entered into agreements for trades through which they purchased lesser quality assets (which would have been less expensive) that failed the various collateral-quality tests under the Indenture and the PMA—all to inflate the AUM.[20] NexPoint alleges that ACM,

---

[15] Counterclaim, ¶ 59.

[16] Counterclaim, ¶¶ 340–44.

[17] Ex. 2, Offering Circular, p. 17 ("Collateral Quality Test" and "Concentration Limitations"); Ex. 1, Indenture, pp. 35–36 (definition of "Market Value"); p. 14 (definition of "Collateral Quality Test"); pp. 61–64, 140–41, 189–95 (Indenture §§ 1.2, 7.18, 12, rules governing purchase and sales of securities).

[18] Ex. 2, Offering Circular, pp. 9–11 (Application of Principal Proceeds).

[19] Counterclaim, ¶ 35; Ex. 2, Offering Circular, pp. 13, 100 (defining management fee as percentage of Fee Basis Amount), and p. 28 (definition of "Fee Basis Amount").

[20] Counterclaim, ¶¶ 78–86, 12–30, 174(a)-(l) –76; Ex. 2, Offering Circular, p. 17 ("Collateral Quality Tests" and "Concentration Limitations"); Ex. 1, Indenture, pp. 35-36 ("Market Value"), p. 14 (definition of "Collateral Quality Test"); *id.,* pp. 61–64, 140–41, 189-195 (Indenture §§ 1.2, 7.18, 12, (Portfolio Manager's authority over purchase and sales of securities)).

Terry, and Brigade also held on to certain securities when they should have been sold.[21] Put differently, the same amount of money could purchase lower-quality securities in greater volume, thus inflating the aggregate par value and, by extension, the AUM—which concomitantly (and not coincidentally) increased the fees earned by Counter-Defendants.

      ***Second***, Counter-Defendants also created a mix of assets whose maturities were further out than the Indenture would have allowed, thus extending the life of Acis-6 in violation of the Indenture's provisions that required improvement or maintenance of the weighted average life of the assets.[22] Thus, not only could Counter-Defendants collect higher fees in violation of the IAA, but they could also do so for a longer period.

      ***Third***, NexPoint alleges that Counter-Defendants repeatedly violated the best-execution rule in the way they purchased and sold securities. Specifically, they timed trades poorly given the market; they purchased when they should have remained in cash; and they bundled same-day purchases, bulk bought securities, and did not seek best pricing.[23]

      ***Fourth***, NexPoint alleges that Counter-Defendants inflated expenses and charged expenses outside of what was authorized and more than what had historically been charged with no explanation for the increase. NexPoint specifically alleges how, upon taking over Acis-6 CLO, Counter-Defendants caused it to incur expenses that were orders of magnitude higher than what had been incurred in the past, and what would appear to have been authorized by the Indenture or the PMA.[24]

---

[21] Counterclaim, ¶¶ 125–36, 14–88.
[22] Counterclaim, pp. 8–12, ¶¶ 78–124.
[23] Counterclaim, ¶¶ 76–77, 78–84, 131–39, 144–88; Ex. 2, Offering Circular, p. 17 (describing standard for meeting Collateral Quality Tests).
[24] Counterclaim, ¶¶ 78–124; 144–88.

The transactions undergirding the fees and the expenses, coupled with the lack of disclosure, were improper, and all improper fees and expenses should be reimbursed in full. Furthermore, Counter-Defendants should have to pay damages for the amounts NexPoint could or should have earned had the assets been managed properly by Counter-Defendants and/or had the cash simply been returned to investors for reinvestment.[25]

NexPoint maintains that each of these constituted tortious interference with its rights in the Notes, otherwise violated fiduciary duties and other obligations, and were the components of a scheme to convert or misappropriate moneys that Counter-Defendants were not entitled to keep under the law and under the various agreements. NexPoint has brought its claims both directly and derivatively.[26]

## III.

## RULE 12(f) STATEMENT AND MOTION TO STRIKE EXHIBITS

In support of their motion, Counter-Defendants filed three declarations (Dkt. Nos. 108–09, 111), which collectively contain seventy-one exhibits that encompass thousands of pages. The Declaration of Blair Adams (Dkt. 108, the "Adams Declaration") alone is over 1,500 pages and contains nineteen (19) exhibits. The Adams Declaration contains many exhibits that are not appropriately considered and thus should be excluded from the Court's deliberation.

### A.   THE INFORMATION A COURT MAY CONSIDER ON A MOTION TO DISMISS UNDER RULE 12(b)(6) OR 12(c) IS LIMITED

In deciding a motion to dismiss for failure to state a claim or for judgment on the pleadings, a court should not consider any extrinsic evidence or make factual determinations. *See Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301–02 (2d Cir. 2021). A court may consider

---

[25] Counterclaim, ¶¶ 73–139; 169–76, 177–90.
[26] Counterclaim, ¶¶ 241–42.

anything "qualify[ing] as part of the non-movant's pleading," which includes the non-movant's pleading itself; documents attached to the pleading; documents incorporated by reference in the pleading; documents integral to the pleading; and matters of which the Court may take judicial notice. *Id*. at 306. "[A] document is 'integral to the complaint' only if the plaintiff himself 'relied on the terms and effect of the document." *Id.* at 305 (original alterations omitted) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). However, "'merely mentioning a document in the complaint will not satisfy' to deem a document integral to the complaint." *Schafer v. Direct Energy Servs., LLC*, 845 F. App'x 81, 83 (2d Cir. 2021) (brackets omitted) (quoting *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016)).

**B.    THE COURT SHOULD EXCLUDE CERTAIN EXHIBITS FROM CONSIDERATION OF THE MOTION TO DISMISS NEXPOINT'S COUNTERCLAIMS**

NexPoint objects to consideration of several documents. NexPoint first objects to the inclusion of the Agreement between HCLOF, ACM, and U.S. Bank National Association, dated February 28, 2023 (Exhibit 3 to the Adams Declaration). This document is not incorporated by reference in NexPoint's counterclaims, it was not integral to the drafting of NexPoint's counterclaims, and it is not a matter of which the Court may take judicial notice. Thus, this document should be excluded from consideration on Counter-Defendants' motion to dismiss. *See Lively*, 6 F.4th at 302 n.2

NexPoint also objects to Exhibits 2, 5, 8, 9–12, 13, 17, 18, and 19 from the Adams Declaration. These documents are not being offered for anything other than the truth of the matter asserted in those documents. While "courts routinely take judicial notice of documents filed in other courts . . . to establish the fact of such litigation and related filings," such documents cannot be considered if offered "for the truth of the matter asserted in the other litigation." *Kramer v. Time*

*Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). Therefore, the Court must exclude them from consideration at this stage of the proceedings. *See id.*[27]

Third, NexPoint objects to Exhibits 8, 15, and 16. These are not incorporated into NexPoint's counterclaims, and Counter-Defendants have not even cited them in their own brief. While it is unclear why Counter-Defendants filed these documents in support of the Motions, the Court should not consider them at all because they are irrelevant.

Finally, Counter-Defendants include the entirety of two transcripts as exhibits (Exhibits 1 and 5). But Counter-Defendants cite these two documents only in regard to a claim of another Defendant in this action. Because Counter-Defendants have provided no notice on whether or how these transcripts support their motion to dismiss NexPoint's counterclaims, these documents should be excluded from consideration as to NexPoint.

### C. IF THE COURT CHOOSES TO CONSIDER THE EXHIBITS, NEXPOINT REQUESTS THAT THE COURT CONVERT THE MOTION TO A MOTION FOR SUMMARY JUDGMENT AND PROVIDE NEXPOINT WITH ADEQUATE TIME TO CONDUCT DISCOVERY BEFORE RESPONDING

When a court is presented with documents that are not proper for consideration on a motion to dismiss, it has "only two options: (1) 'the court may exclude the additional material and decide the motion on the complaint alone' or (2) 'it may convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material.'" *Palin v. N.Y. Times Co.*, 940 F.3d 804, 810–11 (2d Cir. 2019) (quoting *Kopec v. Coughlin*, 922 F.2d 152, 154 (2d Cir. 1991)); *see also* FED. R. CIV. P. 12(d) ("All parties must be given a reasonable

---

[27] It is clear that a predominant reason for attaching several of these documents is to jaundice the Court's view of some of the individuals appearing before it and to attempt to distract the Court from the instant legal and factual issues. For instance, the Motions are the third time that Counter-Defendants have plopped a sanctions order in front of the Court—one that is on appeal—in the hopes that the Court will be so blindingly swayed by the order as to not seriously consider the arguments being made. Needless to say, this is unprofessional and unbecoming of members of the legal profession.

opportunity to present all the material that is pertinent to the motion" "under Rule 12(b)(6) or 12(c)" if the motion is "treated as one for summary judgment under Rule 56."). NexPoint submits it needs "a reasonable opportunity to present all the material that is pertinent to the motion." Therefore, NexPoint respectfully requests that if the Court chooses to consider these "matters presented outside the pleadings" that it provide NexPoint the opportunity to address the issues once discovery is complete and present all the pertinent material before the Court decides the motion. *See* FED. R. CIV. P. 12(d).

## IV.

## LEGAL STANDARDS

### A.     12(b)(6) STANDARD

"Motions to dismiss are generally viewed with disfavor." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 178 (S.D.N.Y. 2010). To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* "The choice between two plausible inferences that may be drawn from factual allegations is *not* a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Twombly*, 550 U.S. at 556. "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Doe v. Columbia Univ.*, No. 1:20-cv-06770, 2022

U.S. Dist. LEXIS 176629, at *65 (S.D.N.Y. Sept. 28, 2022) (cleaned up) (Woods, J.) (quoting *Twombly*, 550 U.S. at 556).

**B.**    **12(c) STANDARD**

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). "The legal standard for a Rule 12(c) motion is the same as for a motion under Rule 12(b)(6)," *Ash v. Jacobson*, No. 1:16-cv-9548, 2020 U.S. Dist. LEXIS 96493, at *5 (S.D.N.Y. June 1, 2020) (Woods, J.)—"that is, with one caveat. When the plaintiff, as opposed to the defendant, moves for judgment on the pleadings," courts "ask 'whether the plaintiff's [complaint], stripped of those allegations which are denied by the defendant's answer, would leave the [complaint] stating a cause of action against the defendant.'" *United Food & Com. Workers, Local 1995 v. Kroger Co.*, 51 F.4th 197, 202 (6th Cir. 2022) (citation omitted); *see Beal v. Mo. Pac. R.R. Corp.*, 312 U.S. 45, 51 (1941). "[J]udgment on the pleadings only has utility when *all* material allegations of fact are admitted or not controverted in the pleadings and *only* questions of law remain to be decided by the district court." 5C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1367 (3d ed. 2021) (emphasis added).

**V.**

**ARGUMENTS & AUTHORITIES**[28]

**A.**    **12(b)(6) MOTION**

**1.**    **NexPoint Has Set Forth a Prima Facie Case of Tortious Interference**

In New York, the basic elements of tortious interference with contract are (i) the existence of a valid contract with a third party, (ii) defendant's knowledge of that contract, (iii) defendant's

---

[28] To the extent that the arguments Defendants/Counter-Plaintiffs The Charitable Donor Advised Fund, L.P. and CLO HoldCo Ltd. ultimately offer in response to the Motions overlap with those made herein or address attacks aimed at NexPoint, NexPoint joins those arguments.

intentional and unjustified act caused a breach of that contract, and (iv) damages caused by the breach. *Rose v. Different Twist Pretzel, Inc.*, 999 N.Y.S.2d 438, 440 (N.Y. App. Div. 2014). The third element can be met when the defendant employed "dishonest, unfair, or improper means." *Catskill Dev.*, *L.L.C. v. Park Place Ent. Corp.*, 547 F.3d 115, 132 (2d Cir. 2008). Thus, a plaintiff may recover even though "the defendant was engaged in lawful behavior." *NBT Bancorp v. Fleet/Norstar Fin. Grp.*, 664 N.E.2d 492, 496 (N.Y. 1996).

Here, the elements of tortious interference have been properly pleaded.

### a.   *A Valid Contract with a Third Party Has Been Alleged*

NexPoint has a valid contract—the Notes. *Lovatio v. Petróleos De Venez., S.A.*, No. 1:19-cv-4799, 2020 U.S. Dist. LEXIS 181114, at *10–12 (S.D.N.Y. Sept. 30, 2020) (recognizing that notes issued pursuant to an indenture are both securities and contracts). No one contests the validity of the Notes. Whether that contract is still deemed to be with the Issuer or is now with the Acis-6 trust, that contract is *not* with any of ACM, Terry, or Brigade (all of whom would be third parties to the Notes). Therefore, element one is satisfied.

### b.   *Counter-Defendants Knew of the Notes*

It is indisputable that the Notes are explicitly referenced in the Indenture and the PMA.[29] The PMA incorporates and adopts the obligations of the Issuer to the subordinated noteholders that are in the Indenture.[30] Therefore, as Counter-Defendants are charged with having knowledge of

---

[29] *See, e.g.,* Ex. 1, Indenture p. 57, § 2.2, § 7.1 and § 11.1 (payment duties to note holders), Form of Notes Ex. A2-7, *et seq.*; PMA p. 10, and § 3(a) ("Subject to and in accordance with the terms of the Indenture and this Agreement, the Portfolio Manager agrees to supervise and direct the investment and reinvestment of the Assets, and shall perform on behalf of the Issuer the duties that have been specifically delegated to the Portfolio Manager in this Agreement and in the Indenture…");

[30] *See* Sbaiti Declaration, Ex. 3 ("Portfolio Management Agreement" or "PMA") at pp. 5–9 (§ 3, Duties of Portfolio Manager to comply with investment criteria and Collateral Quality Tests and other terms of Indenture); § 8 (prohibiting ACM, Terry or Brigade from "taking any action that would intentionally, or with reckless disregard . . . adversely affect the interest of the Holders [of notes] in the Assets in any material respect").

their own agreements, they cannot seriously contest this element, nor do they appear to try. No one contests that ACM, Terry, or Brigade was unaware of the Notes—nor do they rest the Motions on such an idea.

### c.      Counter-Defendants' Intentional, Unjustified, Wrongful Acts Directly Caused the Breach

The terms of the Notes incorporate by reference the rights for subordinated noteholders as outlined in the Indenture—including their rights to application of the investment criteria and to the good-faith compliance with the various elements thereof.[31] Here, NexPoint pleads that Counter-Defendants' intentional and wrongful acts were self-interested and caused Acis-6 (whether referring to the Issuer or the Acis-6 Trust) to breach the terms of the Indenture, which in turn caused NexPoint to lose money in the form of both the misappropriated fees and expenses and the lost appreciation in the investments themselves.[32]

In its Counterclaims, NexPoint pleads, and the governing documents show, that ACM, Terry, and Brigade had control over the entire scheme and stood to gain from it.[33] This is sufficient to infer that the interference was intentional. *See SLS Brands, LLC v. Authentic Brands Grp., LLC*, No. 19-CV-8115, 2021 U.S. Dist. LEXIS 21438, at *10 (S.D.N.Y. Feb. 4, 2021) (because the defendant was in particular control of facts establishing intent, allegations that the defendant controlled transaction and stood to gain from breaches was enough to infer intent to tortiously interfere with plaintiff's contract); *Gucci Am., Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228, 253 (S.D.N.Y. 2010) (allegations that the defendant exercised control over decisions that lead to violations was enough to infer intent). Intentional interference does not require that NexPoint

---

[31] *See, e.g.*, Ex. 1, Indenture, Form of Subordinated Note (Indenture Ex. A-2, pp. A2-1 through A2-10; *id.* at A2-7); Indenture § 7.1; Indenture § 12.2(a)(iii) and (iv); § 12(b) and § 12.3.

[32] Counterclaim, ¶¶ 220–32.

[33] *See, e.g.*, Counterclaim, ¶¶ 59–69, 73, 79–81, 101, 168.

was the target of the interference, only that the acts constituting the interference were willful and not merely negligent. *See id.*

Counter-Defendants' core argument is that they cannot be liable for tortiously interfering with NexPoint's Notes if their actions complied with another contract, such as the PMA, because then their acts would be "justified." The Counterclaims—incorporating the Notes, the Indenture, the PMA, and the other transaction documents—specifically show how the wrongful acts alleged are in fact not permitted by the Indenture or the PMA. Indeed, the Offering Circular and the PMA specifically state that ACM, Terry, and Brigade will abide by the Indenture's provisions.[34] Therefore, by pleading violations of the Indenture's material investment terms, NexPoint has pleaded violations of the PMA, which nullifies the "justification" argument Counter-Defendants advance.

Moreover, nowhere does NexPoint admit in the Counterclaims that ACM complied with the PMA or that the PMA allowed them to do what they did. Nowhere do the Counterclaims plead that Counter-Defendants had a contractual right to self-deal, artificially inflate the AUM, or charge inflated fees. Nowhere do the Counterclaims plead that Terry's or Brigade's agreements entitled them to cause Acis-6 to buy securities that violated the investment criteria, collateral-quality or coverage tests. Nowhere do the Counterclaims plead that Counter-Defendants had a right to take more expenses than what was permitted in the Indenture or the PMA. And nowhere do the Counterclaims plead that the Indenture, PMA, or any other document entitled any Counter-

---

[34] *See, e.g.* Ex. 3, PMA § 3 ("Subject to and in accordance with the terms of the Indenture and this Agreement, the Portfolio Manager agrees to supervise and direct the investment and reinvestment of the Assets, and shall perform on behalf of the Issuer the duties that have been specifically delegated to the Portfolio Manager in this Agreement and in the Indenture" and "The Portfolio Manager shall comply with all the terms and conditions of the Indenture affecting the duties and functions that have been delegated to it thereunder"); *see also id.* at § 15(a) (finding breach of PMA and Indenture where "the Portfolio Manager willfully violates, or takes any action that it knows breaches, any material provision of this Agreement or the Indenture applicable to it in bad faith").

Defendant to breach the duty of best execution.  In fact, NexPoint pleads just the opposite: it asserts that those violations occurred. Therefore, it is untrue that NexPoint has not pleaded a violation of the PMA. Such violations have been pleaded with robust specificity.[35]

      **d.**    ***Damages***

In an action for tortious interference with contract, plaintiffs may recover "the full pecuniary loss of the benefits" that would have flowed from the interfered-with contract. *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 452 (N.Y. 1980); *see Int'l Mins. & Res., Inc. v. Pappas*, 761 F. Supp. 1068, 1079 (S.D.N.Y. 1991). In other words, the moneys recoverable in a tortious-interference-with-contract claim include not only compensatory damages, but also consequential damages. *See Guard-Life*, 406 N.E.2d at 452 & n.6 ("In an action against the third party for tortious interference, . . . the elements of damages, including consequential damages, would be those recognized under the more liberal rules applicable to tort actions"); *see also Pappas*, 761 F. Supp. at 1079 (same).

Here, NexPoint has pleaded injury and damage arising from the tortious interference in the form of both moneys taken in derogation of its legitimate contractual expectation and the losses it suffered due to violations of the various investment criteria and coverage collateral-quality tests (*i.e.*, amounts it would have earned had those tests been followed) and/or amounts it would have

---

[35] To the extent that Counter-Defendants' position ultimately rests on the premise that because NexPoint has pleaded a derivative action for breach of the PMA in the past, but elected not to do so here, it has "abandoned" the claim and with it, any allegations of such a breach. Neither is true. While accurate that NexPoint did not plead breach of the PMA in this action, the reasons have nothing to do with "abandoning" the claim. And the fact that it has not brought that specific claim is irrelevant to the tortious-interference claim—Counter-Defendants cite no case (and NexPoint has found none) holding that to bring a tortious-interference claim, one must also assert a claim for breach of the underlying agreement in the same lawsuit. That is incorrect as a matter of law. *See Singleton Mgmt. v. Compere*, 673 N.Y.S.2d 381, 384 (N.Y. App. Div. 1998) ("[T]he cause of action against S.W.V., in the action that was settled, was for [third party]'s breach of contract, while the cause of action asserted here against [the] defendant . . . is for [the defendant]'s tortious interference with that contract. That these are not the same or identical causes of action, but, rather, wholly separate and distinct legal wrongs, giving rise to different causes of action, has long been settled.") (citation omitted).

reaped had Counter-Defendants not engaged in self-dealing (*i.e.*, had they managed it properly or had they simply returned cash rather than engaging in the self-dealing scheme). This is sufficient.

Finally, Counter-Defendants' reliance on a baseless application of the economic loss rule is a non-starter because Counter-Defendants cite no applicable authority. And in any event, tortious interference seeks to enforce a duty separate from a contractual one and seeks a different remedy from a different party. *Singleton Mgmt.*, 673 N.Y.S.2d at 384. The economic loss rule is irrelevant here.

### 2.     There Is No Legal Basis to Dismiss the Claims for Breach of Fiduciary Duty

NexPoint also brings a common law breach-of-fiduciary-duty claim. The elements of a claim for breach of fiduciary duty are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom. *Barrett v. Freifeld*, 883 N.Y.S.2d 305, 308 (N.Y. App. Div. 2009). "Common law breach of fiduciary duty is properly pleaded where, as here, [Counter-Defendants] are alleged to have put their interests or the interests of another before the interests of the [business they manage]." *Strougo ex rel. Braz. Fund v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 799 (S.D.N.Y. 1997), *rev'd in part on other grounds sub nom.*, *Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002). Counter-Defendants' core arguments are that (1) no fiduciary duty runs directly from any of them to NexPoint, and (2) that NexPoint lacks derivative standing under Cayman Islands law. Both arguments are wrong for various reasons.

#### a.   *Counter-Defendants Owe Direct Fiduciary Duties*

##### i.   The Trust Theory

"An express trust may be created orally or in writing; no particular form of words is necessary, and it may arise by implication from the settlor's conduct" if "[a]ll of the essential elements of a trust" are present: (i) a designated beneficiary, (ii) a designated trustee, (iii) a clearly

identifiable res, and (iv) delivery of the res by the settlor to the trustee with the intent of vesting legal title in the trustee. *Orentreich v. Prudential Ins. Co. of Am.*, 713 N.Y.S.2d 330, 331–32 (N.Y. App. Div. 2000). Although not articulated the same way, these elements track the elements of finding a trust under Cayman Islands law.[36]

Here, the Indenture itself answers these questions: there is a designated beneficiary (the Noteholders) and clearly identifiable *res* in the form of the assets and collateral that were assigned by the Issuer to U.S. Bank and that now comprise the Acis-6 assets.

The Indenture plainly states that the Issuer and Co-Issuer "execute and deliver this Indenture to provide for the Notes issuable and governed by this Indenture and to secure the Secured Notes and other obligations secured under this Indenture."[37] It also provides that the Issuer "grants" for the benefit of the Noteholders "all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising" all assets and property save for a *de minimis* amount of cash (altogether, the "Assets").[38] The Indenture then provides that

> Such Grants are made to secure, in accordance with the priorities set forth in the Priority of Payments, . . . (ii) the payment of all sums payable under this Indenture and other related transaction documents and (iii) compliance with the provisions of this Indenture, all as provided in this Indenture.[39]

The Indenture's granting clause concludes that "[t]he Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof."[40]

The Indenture also expressly states that all rights, title, or interest in the PMA is being assigned away—meaning, ACM's duties are no longer owed to the Issuer, but to the Trustee (and

---

[36] *See* Patel Decl. at ¶ 11 (identifying the delivery of property to one person for the benefit of another combined with the "Three Certainties")

[37] Ex. 1, Indenture, p. 1.

[38] Ex. 1, Indenture, pp. 1–2.

[39] Ex. 1, Indenture, p. 2.

[40] Ex. 1, Indenture, p. 2 (capitalization in original; emphasis added).

because of the Trustee's limited purview), ACM, as the Portfolio Manager, stepped into the shoes of the Issuer and the Trustee and controls the fund.[41] This divorce between the Issuer and the Acis-6 CLO is further evidenced by the fact that the Noteholders (like NexPoint) have no recourse against the Issuer and must look solely to the trust *res* for satisfaction of any and all obligations under the Notes.[42] Indeed, the Indenture further provides that the Indenture cannot be wound up until satisfaction of the "the rights of Holders of *Notes as beneficiaries hereof with respect to the property deposited with the Trustee* and payable to all of them" in accordance with the Indenture.[43]

The Indenture assigns the Issuer's rights under the PMA to U.S. Bank. While a trustee normally holds legal title *and* manages and controls the trust *res*, under the Indenture, the trustee role is divided between U.S. Bank (who holds legal title to the Assets but otherwise has no other non-ministerial role other than when ACM declares itself in default of the Indenture),[44] and ACM

---

[41] Ex. 1, Indenture,  p. 1, and at Art. 15 § 15.1 (terms of assignment of PMA). *See also* Indenture § 14.12 ("Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or performed by the Issuer shall be effective if given or performed by the Issuer or by the Portfolio Manager on the Issuer's behalf."). *See also* Ex. 2, Offering Circular, p. 100 ("Pursuant to the terms of the Portfolio Management Agreement, and in accordance with the requirements set forth in the Indenture, the Portfolio Manager will select the portfolio of Collateral Obligations and will instruct the Trustee with respect to any acquisition, disposition or sale of a Collateral Obligation, Eligible Investment or other Asset.").

[42] Ex. 1, Indenture, § 2.8(i) ("Notwithstanding any other provision of this Indenture, the obligations of the Applicable Issuers under the Notes and this Indenture are limited recourse obligations of the Applicable Issuers payable solely from the Assets").

[43] Ex. 1, Indenture § 4.1 (emphasis added)

[44] *See, e.g.,* Ex. 1,  Indenture, § 5.6 and Article 6; *see also* § 6.1(a) ("the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee") and § 6.3(f) ("the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note or other paper or document[.]") and § 6.3(i) ("nothing herein shall be construed to impose an obligation on the part of the Trustee to recalculate, evaluate or verify any report, certificate or information received from the Issuer or Portfolio Manager (unless and except to the extent otherwise expressly set forth herein)"), § 6.3(o) ("the Trustee shall have no liability for the acts or omissions of the Portfolio Manager, the Collateral Administrator, the Issuer or the Co-Issuer, any Paying Agent (other than the Trustee) or any Authenticating Agent (other than the Trustee) appointed under or pursuant to this Indenture");

(who manages and controls the trust *res* in accordance with the Indenture and PMA).[45] Cayman Islands law likewise would find that the Indenture creates a trust.[46]

Therefore, given the above, NexPoint submits that the Indenture created a trust. Notably, when U.S. Bank sought to declare its rights and obligations under a similar indenture, it did so using Article 77 of New York's Civil Practice Law and Rules, a provision strictly reserved for construing rights in trust instruments.[47]

NexPoint further submits that under New York law, ACM would owe direct fiduciary duties as a co-trustee. New York courts have repeatedly found such a direct fiduciary duty to beneficiaries of a trust such as this one where the investment advisor exercised the sort of power vested in ACM by the Indenture. *See In re Est. of Rubin*, 540 N.Y.S.2d 944, 947 (N.Y. Sur. Ct. 1989) ("Insofar as the status of an advisor is concerned, the courts have generally considered him a fiduciary, somewhat in the nature of a cotrustee. Another term employed is that of a quasi-trustee or special trustee.") (citations omitted) (citing RESTATEMENT (SECOND) OF TRUSTS § 185 (AM. L. INST. 1959)), *aff'd*, 570 N.Y.S.2d 996 (N.Y. App. Div. 1991); *see also* RESTATEMENT (SECOND) OF TRUSTS § 185 cmts. c, e ("A power given to some third person, who is expert in the making of investments, to control the trustee in disposing of or acquiring trust investments, would ordinarily be a power for the benefit of the beneficiaries of the trust generally" and because such power "is for the benefit of someone other than the holder of the power, the holder of the power is subject to a fiduciary duty in the exercise of the power."); J. R. Kemper, *Construction and Operation of Will or Trust Provision Appointing Advisors to Trustee of Executor*, 56 A.L.R.3d 1249, § 10

---

[45] *See* Ex. 1, Indenture, p. 44 ("Portfolio Manager" and "Portfolio Management Agreement"). *See also* Indenture, §§ 1.2(b) (duty of Portfolio Manager as to the Assets), and § 3.3(b) (duty of Portfolio Manager regarding purchasing collateral).

[46] *See* Patel Decl. at ¶¶ 12–15.

[47] *U.S. Bank N.A. v. Xxx*, No. 650630/2021, 2021 N.Y. Misc. LEXIS 3747, at *17 (N.Y. Sup. Ct. June 28, 2021).

("Consonant with the status of a nonbeneficiary advisor as a quasi-trustee, or assistant to a trustee, it has generally been held or recognized that such an advisor stands in a fiduciary relationship to the beneficiaries of a[] . . . trust."); 106 N.Y. Jur.2d Trusts § 348 ("the relationship between a trustee and advisor is that of a co-trustee, with the advisor having the controlling power").

Cayman Islands law is in accord with this view, looking to investment advisors as being "shadow trustees" who also owe direct fiduciary duties and can be sued directly for breach of trust.[48] Therefore, because there is a direct fiduciary duty owed by ACM essentially as a trustee, NexPoint has a direct claim for breach of fiduciary duty, as well as a claim for aiding and abetting (addressed below) against Terry and Brigade.

  ii. <u>The Nature of the Relationship Otherwise Gives Rise to Direct Fiduciary Duties Under Common Law and Under Cayman Islands Law</u>

"[I]t is well settled in New York that a fiduciary duty arises, even in a commercial transaction, where one party reposed trust and confidence in another who exercises discretionary functions for the party's benefit or possesses superior expertise on which the party relied." *Anonymous v. CVS Corp.*, 728 N.Y.S.2d 333, 337 (N.Y. Sup. Ct. 2001). The duty "embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another." *Penato v. George*, 383 N.Y.S.2d 900, 904–05 (N.Y. App. Div. 1976).

The transaction documents state that 100% of the Assets will be for investment purposes benefiting the Noteholders.[49] The Offering Circular specifically and explicitly extolls ACM as the

---

[48] *See* Patel Decl. at ¶¶ 16–26.
[49] *See, e.g.*, Ex. 1, Indenture, pp. 1–2 (Preliminary Statement and Granting Clauses); Offering Circular ("The Issuer's investment portfolio consists primarily of debt obligations (including, but not limited to, interests in bank loans acquired by way of a sale or assignment, Participation Interests and high-yield debt securities, in each case, generally rated below investment grade). The portfolio will be managed by Acis Capital Management, L.P."); Ex. 2, Offering Circular at 107 ("The Issuer will not have any material assets other than the Collateral Obligations and certain other eligible assets. The Collateral Obligations and such other eligible assets will be pledged to the Trustee as security for the Issuer's obligations under the Secured Notes and the Indenture. . . . The Issuer has, and will have, no assets other than the sum of US$250. . . .").

investment advisor[50]—meaning, investors specifically chose this investment vehicle because of who the investment manager is.[51] The Offering Circular also specifically states that the Issuer has no role other than as an empty vessel.[52]

New York courts have repeatedly found *direct* fiduciary duties where investment advisors gave advice directly for the benefit of investors. For instance, in *Metropolitan West*, the plaintiff, a junior noteholder, sued the indenture trustee and investment manager for breach of fiduciary duty, among other things. *Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*, No. 03-cv-5539, 2004 U.S. Dist. LEXIS 11761, at *2 (S.D.N.Y. June 24, 2004). The investment manager moved to dismiss the fiduciary-duty claim on the premise that "it was in privity with the Issuers, not the noteholders, and thus owed no duty to any individual noteholder." *Id*. at *30. The court disagreed and found that "even in the absence of a contract with plaintiff, it did owe a duty to the noteholders by virtue of its relationship with the Issuers." *Id*. at *30–31. Specifically, the court found that the investment manager was an agent of the issuer and had expressly recognized in its offering documents that it could be liable to the bondholders for their losses in some cases. *See id.* Here, ACM also specifically expected that it would be liable directly to the Noteholders for any act or omission that "adversely affect[] the interests" of the Noteholders in the Assets,[53] and against acts of self-dealing and represented that fact to the Noteholders.[54]

---

[50] Ex. 2, Offering Circular, p. 47 ("The performance of the Issuer's portfolio depends heavily on the skills of the Portfolio Manager in analyzing, selecting and managing the Collateral Obligations").

[51] *See* Ex. 2, Offering Circular, pp. 97–99 ("The Portfolio Manager (among other accounts that it manages) is responsible for purchasing and selling the Collateral Obligations and performing certain other advisory and administrative tasks for and on behalf of the Issuer in each case subject to the provisions of the Portfolio Management Agreement and any applicable provisions of the Indenture.") and 100 (noting Portfolio Management agreement gives all power to select investments to Portfolio Manager, ACM).

[52] Ex. 2, Offering Circular, p. 107.

[53] Ex. 3, PMA § 8. Also, the PMA § 11(a)(i) holds ACM liable for any decrease in the value of ACIS-6's portfolio as a result of bad faith, willful misconduct, gross negligence, or reckless disregard in the performance of its obligations.

[54] *See, e.g.,* Ex. 2, Offering Circular, p. 100 ("Neither the Portfolio Manager nor any of its directors, managers, [etc.] will be liable to . . . the holders of the Notes, . . . for any claim, loss, liability, damage, judgments, assessments, settlement, cost, or other expense (including attorneys' fees and expenses and court costs) arising

That decision rested on a similarly situated suit, where the plaintiff-shareholders in a fund brought fiduciary-duty claims against the investment advisor hired by a special committee of the board of directors. *See Schneider v. Lazard Freres & Co.*, 552 N.Y.S.2d 571, 572 (N.Y. App. Div. 1990). There, the First Department held that:

> No claim is made by the shareholders that any of them actually relied on any advice the bankers gave the special committee concerning either the conduct of the auction or the relative values of the competing bids. Nor is there any allegation that any such advice was passed on, or intended to be passed on, to any of the shareholders for the purpose of influencing them to take any particular action in connection with the auction. On the contrary, underlying the complaint is the notion that it was the expectation of all concerned that the shareholders were not to do anything other than passively follow the recommendation of the special committee, which was set up specifically to protect their interests in the auction . . . . Viewing the relationship between the shareholders and the special committee thus, that is, as one of principal and agent, we do not see how it can be said that a duty of care owed by the bankers to the special committee was not intended for the benefit of the shareholders.

*Id*. at 574. Here too, the entire purpose of the Acis-6 fund and ACM's entire existence in the transaction is to manage the assets for the benefit of the Noteholders. Indeed, the Offering Circular makes clear to all would-be investors that the entire premise of the investment is to have ACM manage the portfolio and that no one else will have any ability to contravene ACM.[55]

Counter-Defendants' own case, *Oddo Asset Management v. Barclays Bank PLC*, supports the position that New York recognizes a fiduciary duty directly owed to NexPoint. There, the Court of Appeals held that the investment advisors did in fact owe fiduciary duties to the "holders of

---

out of any investment, or for any other act taken . . . or omission arising out of or in connection with the performance by the Portfolio Manager, . . . under the Portfolio Management Agreement or the terms of the Indenture applicable to the Portfolio Manager, incurred as a result of actions taken or recommended or for any omissions of the Portfolio Manager, or for any decrease in the value of the Collateral Obligations, **except that the Portfolio Manager will be liable (i) by reason of acts or omissions constituting bad faith, willful misconduct, gross negligence or reckless disregard in the performance of its obligations under the Portfolio Management Agreement or the terms of the Indenture applicable to the Portfolio Manager[.]**") (ellipses and bolding added).

[55] Ex. 2, Offering Circular, p. 100.

equity," denoted the "capital noteholders." *Oddo Asset Mgmt. v. Barclays Bank PLC*, 973 N.E.2d 735, 741 (N.Y. 2012). Despite the phrase "noteholders," the Court of Appeals recognized that capital noteholders were equity because—unlike the senior debt who received a fixed rate of return and principal at maturity—the capital noteholders "absorbed the first losses" and their return was a "share in the profits." *Id.* Here, NexPoint's return as a subordinated noteholder is also the first to suffer defaults, and its return is limited to the "profits."[56] Thus, it is no surprise that NexPoint's interest—because it is held by a U.S. person—is explicitly considered "equity" in the Indenture.[57]

Therefore, there is ample basis in the common law to find that fiduciary duties can exist directly between an investment advisor and investors in a passive pooled fund. Indeed, the Supreme Court recognized that § 206 of the IAA *codified* common law fiduciary duties. *See SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 194 (1963). And § 206(4) not being limited to the direct clients of advisors confirms the conclusion that a direct action for breach of fiduciary duty lies at common law—and always has.

Accordingly, this Court should deny the Motions.

    iii.   <u>Direct and Unwaivable Fiduciary Duties Lie Under the IAA, Which Are Actionable Under New York Law</u>

The Counterclaims set forth with particularity the deceptive acts, including a dozen specific transactions.[58] Counter-Defendants do not appear to contest that violations of § 206 were pleaded,[59] but simply argue that such violations are not actionable via state fiduciary-duty claims.

---

[56] *See, e.g.,* Ex. 2, Offering Circular, 31 ("Distributions to holders of the Subordinated Notes will be made solely from distributions on the Assets after all other payments have been made pursuant to the Priority of Payments described herein."); *see also* Ex. 1, Indenture, § 7.1 and § 11.1.

[57] Ex. 1, Indenture, § 7.16(h) ("Each holder of the Subordinated Notes (and any interest therein) will be deemed to have represented and agreed to treat the Subordinated Notes as equity for U.S. federal, state and local income and franchise tax purposes.").

[58] *See, e.g.*, Counterclaim, ¶¶ 70–139, 144–88; *id.*, ¶ 174(a)-(l) (setting forth transactions).

[59] While Terry is liable as principal and under the doctrine of imputation, *In re China Cast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475–76 (9th Cir. 2015) (holding that principals are generally responsible for violations of federal

While it is true, no court has expressly held that violations of § 206 are actionable under New York law, no court has rejected the notion either, requiring this Court to make an "Erie guess." *See Coleson v. Janssen Pharm., Inc.*, 251 F. Supp. 3d 716, 719–20 (S.D.N.Y. 2017).

Under New York law, fiduciary relationships exist "where it can be readily seen that one party reasonably trusted another." *Brass v. Am. Film Techs. Inc.*, 987 F.2d 142, 151 (2d Cir. 1993). Therefore, "the existence of fiduciary relationships under New York law cannot be determined by recourse to rigid formulas." *Ciccone v. Hersh*, 530 F. Supp. 2d 574, 577 (S.D.N.Y. 2008); *Apple Recs., Inc. v. Capitol Recs., Inc.*, 529 N.Y.S.2d 279, 283 (N.Y. App. Div. 1988). Under New York law, "a statute or regulation may provide the Court with the relevant standard of care." *Sampaio v. Atl.-Heydt, LLC*, 294 F. Supp. 2d 466, 469–70 (S.D.N.Y. 2003); *Feldman v. CSX Transp., Inc.*, 821 N.Y.S.2d 85, 89–90 (N.Y. App. Div. 2006) (holding that violation of Federal Railroad Administration regulations could give rise to state tort claims). "[T]he determination as to whether a statute imposes a statutory standard of care turns on 'whether the underlying policy of the legislation is the protection of a certain class of individuals and whether judicial recognition of a statutory standard will further that policy of protection." *Wolfson v. Glass*, 754 N.Y.S.2d 82, 83 (N.Y. App. Div. 2003) (finding that federal Americans with Disabilities Act established a standard of care under New York law despite providing no private cause of action).

Here, there can be no doubt that § 206(4) views NexPoint as within the class of persons that the statute was designed to protect. Other jurisdictions have recognized that state fiduciary-duty actions are vehicles for vindicated breaches of § 206's fiduciary duties. *See Douglass v.*

---

securities laws where agents committed within the scope of their authority), if Terry contends that he cannot be directly liable, NexPoint respectfully contends that Terry would be liable for aiding and abetting at the very least. *See also SEC v. Roberts*, No. 8:21-cv-01615, 2022 U.S. Dist. LEXIS 25502, at *16 (C.D. Cal. Jan. 25, 2022) (holding that a defendant could be held civilly liable for aiding and abetting where they were in control of agents' conduct and therefore would have knowledge of same). Counter-Defendants failed to address the aiding and abetting claim in total.

*Beakley*, 900 F. Supp. 2d 736, 751–52 & n.16 (N.D. Tex. 2012) (holding that the IAA provided the bases for a formal fiduciary relationship actionable under Texas law); *SEC v. Markusen*, 143 F. Supp. 3d 877, 891 (D. Minn. 2015); *Goldenson v. Steffens*, No. 2:10-cv-00440, 2014 U.S. Dist. LEXIS 201258, at *137 (D. Me. Mar. 7, 2014) (citing Rule 206(4)-8 and holding that "[e]ven assuming the IAA provides no private right of action, this does not mean that it does not create a standard of care from which a duty arises . . . ."); *State ex rel. Udall v. Colonial Penn Ins. Co.*, 812 P.2d 777, 785 (N.M. 1991) (applying the standard in *Capital Gains* and ruling that a state-law claim for breach of fiduciary duty against an investment advisor could proceed); *see also Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 502–06 (3d Cir. 2013) (holding that state fiduciary-duty claims are a recognized vehicle for enforcing violations of the IAA and citing cases). The Southern District of New York likewise held that federally imposed fiduciary duties under the Investment Company Act of 1940 were actionable in state-law actions for breach of fiduciary duty. *See Strougo*, 964 F. Supp. at 799.

Here, Counter-Defendants concede that § 206 of the IAA imposes fiduciary duties on investment advisors. Dkt. No. 107 at pdf 40. But they completely misconstrue the scope of those duties. For one thing, they rely exclusively on *Goldstein v. S.E.C.*, 451 F.3d 873, 881 (D.C. Cir. 2006) for the proposition that § 206 only applies when the advisor is in privity with the plaintiff. Not so. Granted, that case invalidated an SEC rule similar to Rule 206(4)-8 (17 C.F.R. § 275.206(4)-8) passed under 15 U.S.C. § 206(2), which the D.C. Circuit noted only related to "clients" of investment advisors. 451 F.3d at 881. The court thus logically rejected a rule that expanded § 206(2) to include the investors in the advised funds since those investors were not the "clients." *Id.* The D.C. Circuit did note, however, that § 206(4) did not use the word "clients" and was thus not so limited. *See id.* at n.6 ("[Section 206] also applies, however, to persons other than

clients. *See* 15 U.S.C. § 80b-6(4).”). Section 206(4) lack of al imitation to “clients” was the SEC’s basis for passing Rule 206(4)-8 after *Goldstein*.[60]

Counter-Defendants misconstrue the SEC’s statement that Rule 206(4)-8 created no *new* fiduciary duties as a statement that Rule 206(4)-8 reflects no fiduciary duty at all. The opposite is plainly true. For one thing, Counter-Defendants cannot, and do not, dispute that § 206 in general codified common law fiduciary duties. *See Cap. Gains*, 375 U.S. at 194; *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979) (citing *Capital Gains*).  As a rule promulgated under § 206, Rule 206(4)-8 merely “defines” the scope of the fiduciary duties already represented and declared under § 206. *See* 15 U.S.C. § 80b-6(4) (“The Commission shall, for the purposes of this paragraph (4) by rules and regulations **define**, . . . such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.”) (emphasis added). Therefore, the SEC’s statement that it is imposing no new fiduciary duties merely meant that Rule 206(4)-8 defined the scope of fiduciary duties that already existed, it was not a statement that § 206 (or the rules passes pursuant to it) reflects no fiduciary duty at all.

Interestingly, as already discussed, the cases cited in the previous section mirror the scope of the duty discussed here: an advisor with control over a fund owes duties to the investors in the fund. Accordingly, the IAA duties under § 206(4) are not inventions of federal law or regulation— they are recognition of existing common law duties and principals. Accordingly, NexPoint respectfully submits that it has standing to bring a direct claim for breach of fiduciary duty.

---

[60] *See Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles*, 72 Fed. Reg. 44,756, 44,757 (Aug. 9, 2007) (codified at 17 C.F.R. pt. 275) (noting that proposed rule is in reaction to *Goldstein* and that *Goldstein* only addressed § 206(2), but not § 206(4)).

### b. Even if the Duties Only Existed with Respect to the Fund, NexPoint Has Derivative Standing Under New York and Cayman Islands Law

#### i. Derivative Standing Exists Under New York Law

Counter-Defendants concede that they owe duties to the fund; they challenge NexPoint's derivative standing right. Because Acis-6 is a New York law-governed vehicle created by the Indenture, beneficiaries like NexPoint have the right to bring what is, in effect, a derivative action to recoup injuries. *See Klebanow v. N.Y. Produce Exch.*, 344 F.2d 294, 297 (2d Cir. 1965); *Ellington Credit Fund, LTD. v. Select Portfolio Servicing, Inc.,* 837 F. Supp. 2d 162, 188 (S.D.N.Y. 2011) ("Derivative suits may also be brought by the beneficiaries of a trust in New York"); *Dall. Cowboys Football Club v. NFL Tr.*, No. 95-cv-9426, 1996 U.S. Dist. LEXIS 15501, at *7 (S.D.N.Y. Oct. 18, 1996) (noting the right of trust beneficiaries to bring derivative actions, citing *In re Dolcater*, 106 F.2d 30, 31 (2d Cir. 1939)); *see also CFIP Master Fund, Ltd. v. Citibank, Nat'l Ass'n*, 738 F. Supp. 2d 450, 477 (S.D.N.Y. 2010) ("[B]eneficiaries may bring a suit on behalf of the trust, analogous to stockholders' derivative suits on behalf of a corporation.").

Rather than challenging NexPoint's derivative pleading under New York law, Counter-Defendants inexplicably argue that the procedure of such pleading is governed by Cayman Islands law. But they never explain how this lawsuit implicates the internal affairs of the *Issuer* in any way. Indeed, they speak out of both sides of their mouths by first insisting that this action involves the internal affairs of the Issuer, but then contending that NexPoint is not a shareholder and is not suing for any obligation imposed under Cayman Islands' corporate-governance laws—going so far as to hire a Cayman Islands expert to explain why. Indeed, NexPoint is not even technically a creditor of the issuers—the Indenture, the Notes, and Cayman Islands law do not provide any recourse for NexPoint against the Cayman Island issuers

for default or payment on the Notes. NexPoint must look "solely" to the Assets held and governed by ACM, Terry, U.S. Bank, and Brigade.

The Notes, the Indenture, and the PMA all contain choice-of-law provisions electing New York law.[61] That the Indenture selects New York is dispositive. *See Greenspun v. Lindley*, 330 N.E.2d 79, 80 (N.Y. 1975) (rejecting internal affairs doctrine to apply the law of issuer, New York, where the trust declaration expressly selected Massachusetts law). Counter-Defendants cite no case holding that this Court may ignore the Indenture's choice of law provision—indeed, New York courts have rejected the very argument Counter-Defendants ask this Court to adopt. *See, e.g., Elliott Int'l L.P. v. Vitro, S.A.B. de C.V.*, 945 N.Y.S.2d 1, 2 (N.Y. App. Div. 2012) (holding that courts will enforce choice of law and forum close in indenture even where foreign law might otherwise apply). And the fact that the PMA specifically states that it will be governed by New York Law "without regard to conflicts of law"[62] vitiates Counter-Defendants' argument that Cayman Islands law applies under the internal affairs doctrine because the internal affairs doctrine *is* a New York choice-of-law doctrine. *See Krys v. Paul, Weiss, Rifkind, Wharton & Garrison, LLP*, 539 B.R. 643, 650 n.3 (S.D.N.Y. 2015) (characterizing the internal affairs doctrine as "a feature of state . . . choice of law norms").

Because there is no argument that, outside of federal law, New York law does not govern the substantive and derivative standing rights of NexPoint, the question of Cayman Islands law is irrelevant. Because the Motions never address why NexPoint lacks standing under New York law, their position on that issue is waived for immediate purposes.

---

[61] Ex. 1, Indenture, § 14.9; PMA § 24.

[62] Ex. 3, PMA, § 24 ("This agreement shall be governed by and construed in accordance with the law of the state of New York (without giving effect to the conflicts of laws provisions thereof)").

ii.   <u>Derivative Standing Exists Under Cayman Islands Law</u>

NexPoint has derivative standing under Cayman Islands law. The Declaration of Bhavesh Patel, an expert on Cayman Islands law, explains why NexPoint has derivative standing under Cayman Islands law and is adopted here.[63]

As Counter-Defendants concede, Cayman Islands law allows derivative actions for interests, such as NexPoint's here, when an injury inures to that person under a specific right granted under statute. *See Tianrui (Int'l) Holding Co. Ltd. v. China Shanshui Cement Grp. Ltd.*, Grand Court of the Cayman Is., Apr. 6., 2020, at ¶¶ 100, 105 (Sbaiti Dec., Ex. 5).[64] Counter-Defendants contend that Cayman Islands law would exclude NexPoint from bringing such an action because it is merely a creditor and not equity. But NexPoint has alleged it is equity.[65] Moreover, as revealed by the decision dismissing U.S. Bank, the Portfolio Manager (ACM, as dominated by Terry) had control over whether U.S. Bank, the Trustee, could bring a cause of action because the Indenture and the PMA consigned the authority to declare an "Event of Default" to the Portfolio Manager and the Trustee is allowed to rely on the Portfolio Manager's judgment.[66] This has been exacerbated by the fact that Counter-Defendants colluded with the majority of the Controlling Class (Highland CLO Funding, Ltd.) to obliterate the chance of a direct action under the Indenture.

Therefore, even if derivative standing may be required under Cayman Islands law, it has been properly pleaded.[67]

---

[63] *See* Patel Decl. at ¶¶ 36–48; *see also* FED. R. CIV. P. 44.1.

[64] *See also* Patel Decl. at ¶¶ 39–40 (regarding personal rights exception).

[65] *See* Counterclaim ¶¶ 56-67; Patel Decl. at ¶¶ 27–35.

[66] Ex. 1, Indenture, § 5.1, § 6.1(c)(iii), (d),(e); Ex. 3, PMA § 3(i).

[67] Patel Decl. at ¶¶ 36 to 48.

### 3.   Counter-Defendants' Ancillary Arguments Have No Merit[68]

#### a.   *NexPoint's Tort Claims Are Not Duplicative*

Plaintiffs also argue that NexPoint's claims for breach of fiduciary duty, negligence, and conversion "must be dismissed as duplicative" since the sole basis for these causes of action stem from contractual obligations. To start, the claims are primarily pleaded in the alternative—a practice permitted under the Federal Rules of Civil Procedure. *See* FED. R CIV. P. 8(d)(2)–(3).

The argument is also flat-wrong. A plaintiff may maintain both a contract and a tort claim that arise out of the same wrongful conduct when an independent duty is present. *See Bullmore v. Banc of Am. Sec. LLC*, 485 F. Supp. 2d 464, 469–70 (S.D.N.Y. 2007). "Negligent performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract. The two claims may be submitted as alternatives to the jury[.]" *Dorking Genetics v. United States*, 76 F.3d 1261, 1269 (2d Cir. 1996) (applying New York law) (citations omitted).

Here, independent duties arise from the IAA as well as New York law. Rule 206(4)-8 imposes direct duties on Counter-Defendants, which can be violated through negligent conduct. *Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 472 (D.C. Cir. 2019) (holding that violations of § 206(2) only require showing of negligence); *SEC v. ABS Manager, LLC*, No. 13-cv-319, 2014 U.S. Dist. LEXIS 80542, at *45 (S.D. Cal. June 11, 2014) (adopting SEC's position and granting summary judgment as to violations of Rule 206(4)-8 because "section 206(4) and Rule 275.206(4)-8 . . . prohibit the same conduct as sections 206(1) and 206(2) but in connection with 'pooled investment vehicles'"). To call NexPoint's claims duplicative is to ignore the duties' dual nature. The laws governing pleading are not so constrained.

---

[68] Nowhere in their 12(b)(6) motion do Counter-Defendants address the aiding-and-abetting claim NexPoint pleaded. NexPoint notes that when any of the first five counts pleaded in the Counterclaims survive 12(b)(6) scrutiny, so too will the aiding-and-abetting claim survive.

As well, the basis of NexPoint's conversion claim does not duplicate any contract claim.[69] "Under New York law, 'a conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession.'" *Grgurev v. Licul*, 229 F. Supp. 3d 267, 285 (S.D.N.Y. 2017) (Woods, J.) (brackets and citation omitted). To recover converted funds, the money must be "specifically identifiable" and "subject to an obligation to be returned or to be otherwise treated in a particular manner." *Republic of Haiti v. Duvalier*, 626 N.Y.S.2d 472, 475 (N.Y. App. Div. 1995). Here, NexPoint seeks funds rightfully belonging to it but were wrongfully and improperly paid to ACM, Terry, or Brigade. The duty not to convert another's property does not depend on a contractual promise. Because Counter-Defendants never possessed this money pursuant to a contractual arrangement with NexPoint, the claims pleaded by NexPoint for conversion are therefore not duplicative.

### b. *NexPoint's Unjust Enrichment Claim Is Properly Pleaded*

Plaintiffs' challenge to NexPoint's unjust enrichment claim should also be denied. The Complaint asserts claims that may entitle NexPoint to rescission. *See, e.g.*, *Lazar v. Robinson Knife Mfg. Co.*, 692 N.Y.S.2d 539, 541 (N.Y. App. Div. 1999) ("[I]f plaintiffs establish that a breach of fiduciary duty occurred, then the actions of defendants are unlawful and plaintiffs may be entitled to equitable relief."). In such circumstances—with relevant contracts rescinded—disgorgement or restitution may be necessary avenues to a remedy. *Id.* This is particularly the case when, as here, NexPoint is not a party to the Indenture or the PMA; in other words, NexPoint could not plead to recover the funds Plaintiffs improperly withheld under a contract theory, so unjust enrichment is an appropriate claim to bring for this purpose.

---

[69] Counterclaim, ¶¶ 207–13, 216.

At this stage of the case, alternative pleading is allowed, and NexPoint is not required to elect a remedy. This Court should not dismiss NexPoint's unjust enrichment claim on this basis.

### c. *The Economic Loss Rule Is Inapplicable*

Plaintiffs similarly contend that the economic loss rule applies to NexPoint's negligence and conversion claims. This is nonsense. "The economic loss rule . . . does not apply in 'cases involving liability for the violation of a professional duty.'" *Commerzbank AG v. United States Bank Nat'l Ass'n*, 277 F. Supp. 3d 483, 496 (S.D.N.Y. 2017) (quoting *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 18 (2d Cir. 2000)). Further, "the New York Court of Appeals [has] cautioned that the 'economic loss rule' has no application outside of the product-liability context." *King Cnty. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 302 (S.D.N.Y. 2012). None of the cases cited by Counter-Defendants comes remotely close to applying the economic loss rule to the claims to which they purport it applies. This argument is thus a nullity.

### 4. If Necessary, Repleading Should Be Permitted

If the Court grants some or all of Counter-Defendants' 12(b)(6) motion, NexPoint respectfully requests that the Court permit an opportunity to replead, as is the "usual practice" in this circuit. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see Wade Park Land Holdings, LLC v. Kalikow*, No. 21-cv-1657, 2022 U.S. Dist. LEXIS 118899, at *11 (S.D.N.Y. July 6, 2022) ("[T]his Circuit favors an opportunity to replead after dismissal under Rule 12(b)(6).").

Counter-Defendants premise their argument on two points, both of which misunderstand the law. They first argue that "NexPoint has not corrected these deficiencies even though this is the third lawsuit in which it has advanced them." Dkt. No. 107 at pdf 54 n.19. Counter-Defendants are attempting to prevent repleading by implying that the sufficiency of NexPoint's pleadings have

already been ruled on; they have not been. "'Repeated failure to cure deficiencies *by amendments previously allowed*' is a valid reason to deny leave to amend." *Sprague v. Salisbury Bank & Tr. Co.*, 969 F.3d 95, 101 (2d Cir. 2020) (emphasis added) (brackets omitted) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). NexPoint has never been afforded an opportunity to replead following a 12(b)(6) ruling, much less a dismissal. As such, Counter-Defendants misconstrue the applicable legal principle here. *See Davis v. McCready*, 283 F. Supp. 3d 108, 125 (S.D.N.Y. 2017) (Woods, J.) (dismissing only after plaintiff "had two opportunities to cure deficiencies raised in his previous pleadings" which were ruled on by the Court).

Counter-Defendants also argue for denial of opportunity to replead because "there is no indication" that NexPoint possesses facts that could cure any purported pleading deficiencies. Dkt. No. 107 at pdf 54-55. Putting aside that NexPoint believes it has advanced sufficient facts to state a claim (and no judicial authority has held to the contrary), Counter-Defendants' point is self-defeating. NexPoint pleaded the Counterclaims without all the relevant facts, as Rule 11 entitles it to, because most of the evidence pertinent to NexPoint's claims is within the knowledge or possession of Counter-Defendants. *See Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir. 1974). The parties are heavily engaged in discovery practice, and it is illogical for Counter-Defendants to argue that NexPoint should not be able to replead because it lacks relevant facts when those facts are in *Counter-Defendants'* exclusive knowledge or possession and (presumably) will come out in discovery.

At day's end, this is a complex case implicating considerable evidence and intricate legal issues. Denial of the opportunity to replead is appropriate only "when it is 'beyond doubt that [NexPoint] can prove no set of facts in support of'" the Counterclaims. *Trundle & Co. Pension Plan v. Emanuel*, No. 18-cv-7290, 2019 U.S. Dist. LEXIS 167065, at *7 (S.D.N.Y. Sept. 26, 2019)

(quoting *Pangburn v. Culbertson*, 200 F.3d 65, 71 (2d Cir. 1999)). Because Counter-Defendants failed to make this showing, NexPoint respectfully requests that it be granted the opportunity to replead if the Court grants Counter-Defendants' 12(b)(6) motion.

## B.   RESPONSE TO 12(c) MOTION

Counter-Defendants' flawed arguments from their 12(b)(6) motion are even more problematic in relation to Plaintiffs' 2(c) motion. Just as Plaintiffs do in the Motion, *see, e.g.*, Dkt. No. 107 at pdf 51-52. NexPoint incorporates the arguments made in Section A *supra* as part of the response in opposition to the 12(c) portion of the Motion. And critically, though NexPoint is confident that the 12(c) motion fails for various reasons detailed below, because Plaintiffs' 12(c) motion seeks to declare that NexPoint has "no standing" to bring "any" claim and is thus in many ways the logical inverse of Counter-Defendants' 12(b)(6) motion, the entire 12(c) motion fails if the Court denies *any* part of Counter-Defendants' 12(b)(6) motion.[70]

This notwithstanding, numerous issues permeate Plaintiffs' 12(c) motion. To start, Plaintiff's 12(c) motion is premature because the pleadings are not closed. Plaintiffs' attempt to import Counter-Defendants' 12(b)(6) arguments into the 12(c) motion confuses the pleadings to be considered and the method of consideration. Plaintiffs misappropriate the concept of an admission to the point of legal error. And none of what Plaintiffs argue in their 12(c) motion in any way negates (or even affects) the affirmative defenses NexPoint pleaded.

### 1.   The Motion Is Premature

Parties "may move for judgment on the pleadings" only after "the pleadings are closed." FED. R. CIV. P. 12(c). Ordinarily, this occurs when a defendant files an answer to the plaintiff's complaint. But "where a counterclaim is filed, the pleadings are not closed until a response to the

---

[70] To the extent Plaintiffs (somehow) believe that their 12(c) motion covers a breach-of-contract claim that NexPoint has not even pleaded here, *see* Dkt. No. 107 at pdf 51-52, the arguments NexPoint offers in this section apply as well.

counterclaim is filed." *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1339 n.10 (11th Cir. 2014); *see State Farm Fire & Cas. Co. v. Spradling Home Inspections, LLC*, No. 4:10-CV-01887, 2011 U.S. Dist. LEXIS 103292, at *5 (E.D. Mo. Sept. 13, 2011) (collecting cases). Here, NexPoint counterclaimed, and none of the parties have answered those counterclaims. A Rule 12 motion is not a responsive pleading. *See* FED. R. CIV. P. 7(a). As such, Plaintiffs' "motion for judgment on the pleadings is premature" and should be denied per the plain text of Rule 12(c). *Kraus USA, Inc. v. Magarik*, No. 17-cv-6541, 2018 U.S. Dist. LEXIS 168164, at *30 (S.D.N.Y. Sept. 28, 2018); *see Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 123 (1989) (holding that courts must "give the Federal Rules of Civil Procedure their plain meaning").

### 2.     The Motion Is Facially Deficient

Plaintiffs' 12(c) motion lacks any mention of the affirmative defenses NexPoint pleaded in its Answer. *See* Dkt. No. 78 at pdf 8–9. It is black letter law that a 12(c) motion "should not be granted unless it appears beyond doubt that the nonmovant cannot prove facts sufficient to support its position, and that the plaintiff is entitled to relief." *Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 919 (7th Cir. 2020). This standard applies to affirmative defenses pleaded if the nonmovant is the defendant. *See, e.g.*, *Gabilly v. City of New York*, No. 19-CV-11884, 2021 U.S. Dist. LEXIS 154925, at *6 (S.D.N.Y. Aug. 17, 2021) (denying a 12(c) motion, in part, because the nonmovant raised affirmative defenses that the movant did not address).

This makes sense—Plaintiffs are asking the Court to enter to judgment in their favor despite what NexPoint has pleaded in its answer, including affirmative defenses. Plaintiffs have not demonstrated that any of NexPoint's affirmative defenses fail as a matter of law, and so judgment cannot be granted on the pleadings. *See id.* And because Plaintiffs did not make any argument regarding NexPoint's affirmative defenses in the opening Motion, any argument about these

defenses in the reply would be waived. *See Knowles-Carter v. Feyonce, Inc.*, No. 16-cv-2532, 2017 U.S. Dist. LEXIS 233031, at *37 (S.D.N.Y. Sept. 23, 2017) (restating the well-established rule that arguments raised for the first time on reply are waived).

### 3.    The Motion Confuses Allegations for Admissions

Next, Plaintiffs attempt to move for judgment on the pleadings on their own complaint by referencing almost anything besides their own complaint. In doing so, Plaintiffs have entirely missed the mark on the appropriate analytical framework.

Where, as here, Plaintiffs are the 12(c) movants, the Court is to "accept all factual allegations in the answer and draw all reasonable inferences in favor of [NexPoint]." *Lively*, 6 F.4th at 305. The dispositive question is whether Plaintiffs' complaint, "stripped of those allegations which are denied by [NexPoint]'s answer, would leave" Plaintiffs' complaint "stating a cause of action against" NexPoint. *United Food*, 51 F.4th at 202 (internal quotations marks and citation omitted); *accord Bass v. Hoagland*, 172 F.2d 205, 207 (5th Cir. 1949) ("[T]he fact allegations of the answer are to be taken as true, but those of the complaint are taken as true only where and to the extent that they do not conflict with those of the answer.").

In Exhibit 4, NexPoint struck all allegations in Plaintiffs' operative complaint, leaving only those that NexPoint admitted. Plainly, very little is left of the allegations in once NexPoint's answer is properly considered, and certainly not enough remains for the Court to grant the 12(c) motion. *See id.* Essentially all that stands is the procedural history of previous and ongoing litigation among Plaintiffs and NexPoint.[71] *See id.* These allegations are far from stating any cause of action against NexPoint, meaning the 12(c) motion fails. *See United Food*, 51 F.4th at 202.

---

[71] Throughout their argument, Plaintiffs almost exclusively cite to documents and filings of NexPoint instead of the only documents that count here: Plaintiffs' complaint and NexPoint's answer to that complaint. *See* Dkt. No. 107 at pdf 50–52. A plaintiff's 12(c) motion is properly analyzed with only the following: the complaint; the answer to that complaint; documents attached to the complaint as exhibits; documents incorporated by reference in the complaint;

Recognizing the paucity of their own allegations, Plaintiffs also seek to secure judgment on *their Amended Complaint* by using "the facts admitted by [NexPoint]" in NexPoint's counterclaims and other filings (some not even in this case). *See* Dkt. No. 107 at pdf 51 n.16. This attempted stratagem is too clever by half. For starters, any allegations NexPoint offers in its counterclaims have not been admitted by the Plaintiffs, but they would have to have been to be considered in this 12(c) motion. Otherwise, they are merely *allegations*, different from stipulated admissions or answers to requests for admission. Any allegations in the counterclaims are "controvertible, not conclusive, admissions." *The Limited, Inc. v. McCrory Corp.*, 683 F. Supp. 387, 395 n.5 (S.D.N.Y. 1988). They may be changed and altered in litigation, particularly as new information becomes available in discovery, *see Babaev v. Grossman*, 312 F. Supp. 2d 407, 409 (E.D.N.Y. 2004), which is particularly the case when, as here, most matters are "peculiarly within the opposing part[ies'] knowledge," *Schlick*, 507 F.2d at 379. *See* FED. R. CIV. P. 11(b)(3) (making clear that "factual contenti" in "a pleading, written motion, or other paper" may be made if there "will likely" be "evidentiary support after a reasonable opportunity for further investigation or discovery").

What is more, Plaintiffs also seek to treat statements in extrinsic evidence—*i.e.*, those made by NexPoint in motions and letters—as judicial admissions, as well as statements made in pleadings from other cases. *See, e.g.*, Dkt. No. 107 at pdf 51. Those statements from NexPoint's motions and letters, while made and offered in good faith, are in no way considered judicial admissions properly considered in this posture. *See Holland v. City of New York*, 197 F. Supp. 3d 529, 539 n.9 (S.D.N.Y. 2016); *see also True Believers Ink 2, Corp. v. Russell Brands, LLC*, No. 4:18-CV-00432, 2019 U.S. Dist. LEXIS 144949, at *8 (E.D. Tex. Aug. 27, 2019) ("[W]here a

---

and matters subject to judicial notice. *See Lively*, 6 F.4th at 301; *Merck & Co. v. Mediplan Health Consulting*, 425 F. Supp. 2d 402, 410 (S.D.N.Y. 2006) (Chin, J.).

party's pleadings are inconsistent—*e.g.*, pled in the alternative—any 'admission' cannot be unequivocal.").

It is clear that Plaintiffs have incorporated by reference the alleged deficiencies from Counter-Defendants' 12(b)(6) motion into the 12(c) motion. And Plaintiffs' errors are only compounded by the unusual posture they place themselves by moving for judgment on their complaint instead for summary judgment. Plaintiffs fall far short of satisfying their "heavy burden of justification" on their 12(c) motion, *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp.*, 933 F.3d 751, 760 (D.C. Cir. 2019), and the 12(c) motion must therefore be denied.

### 4.    The Court Likely Lacks Jurisdiction to Issue the Requested Judgment

Plaintiffs' premature 12(c) motion is further confounded by the sheer breadth of the relief they seek. Their operative complaint seeks a declaration that there are no set of facts that could give NexPoint standing to sue Plaintiffs.

It would be one thing for them to ask for a declaration of lack of standing for the claims NexPoint has brought—but the declaratory judgment action either will be *mooted* if the Court were to dismiss all claims under 12(b)(6) or Rule 56 or entirely *defeated* if the Court were to deny those motions. Seeking a declaration for claims that have not only never been brought, but that may never be brought and may not have even accrued, beggars the Court's exercise of jurisdiction. Anything broader than the current case and controversy yanks the Court into the arena of advisory opinions, which federal courts have no power to issue. *See In re United Elec., Radio & Mach. Workers of Am.*, 111 F. Supp. 858, 864 (S.D.N.Y. 1953); *see also Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 714 (1838) ("Jurisdiction is the power to hear and determine the subject

matter in controversy between parties to a suit, to adjudicate or exercise any judicial power over them[.]").

In sum, NexPoint respectfully requests that the Court deny Plaintiffs' 12(c) motion because Plaintiffs simply lack the proper legal and factual bases that when properly considered come anywhere near enough for judgment on the pleadings.[72]

## VI

## <u>CONCLUSION</u>

For these reasons, this Court should deny the Rule 12(b)(6) motion (or permit repleading), and, in either event, deny the Rule 12(c) motion.

Dated: June 14, 2023                          Respectfully submitted,

**SBAITI & COMPANY PLLC**

<u>*Mazin A. Sbaiti*</u>
Mazin A. Sbaiti
New York Bar No. 4339057
mas@sbaitilaw.com
Griffin S. Rubin  (Admitted *pro hac vice*)
Texas Bar No. 24121809
gsr@sbaitilaw.com
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: 214.432.2899
F: 214.853.4367

**COUNSEL FOR DEFENDANT NEXPOINT DIVERSIFIED REAL ESTATE TRUST**

---

[72] To the extent the Court is inclined to consider the material Plaintiffs have offered that is outside the proper scope of a 12(c) motion, § III *supra*, NexPoint respectfully requests that the Court invoke Rule 12(d) and permit NexPoint a reasonable opportunity to complete discovery and respond to Plaintiffs' converted Rule 56 motion, *see Brown v. De Fillipis*, 717 F. Supp. 172, 178 (S.D.N.Y. 1989).

39