**IMPORTANT NOTICE**

Attached please find an electronic copy of the offering circular dated April 14, 2015 (the "**Offering Circular**"), relating to the offering of the Co-Issued Notes of ACIS CLO 2015-6 Ltd. and ACIS CLO 2015-6 LLC, and the Issuer Notes of ACIS CLO 2015-6 Ltd. (as such terms are defined in the Offering Circular).

The Offering Circular is highly confidential and does not constitute an offer to any person other than the recipient nor to the public generally to subscribe for or otherwise acquire any of the securities described herein.

THIS OFFERING IS AVAILABLE ONLY TO INVESTORS THAT ARE EITHER (I) CERTAIN NON-U.S. PERSONS OUTSIDE THE UNITED STATES IN RELIANCE ON REGULATION S UNDER THE SECURITIES ACT OR (II) (A) (i) "QUALIFIED INSTITUTIONAL BUYERS" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) OR (ii) (x) SOLELY IN THE CASE OF THE CLASS E NOTES, INSTITUTIONAL ACCREDITED INVESTORS (THE ENTITIES DESCRIBED IN RULE 501(A)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT) OR (y) SOLELY IN THE CASE OF THE SUBORDINATED NOTES, ACCREDITED INVESTORS (AS DEFINED IN RULE 501(A) UNDER THE SECURITIES ACT) WHO, IF NOT INSTITUTIONAL ACCREDITED INVESTORS ARE ALSO "KNOWLEDGEABLE EMPLOYEES" (UNDER RULE 3C-5 OF THE INVESTMENT COMPANY ACT) WITH RESPECT TO THE ISSUER, AND (B) (i) QUALIFIED PURCHASERS (AS DEFINED IN SECTION 2(A)(51) OF THE INVESTMENT COMPANY ACT OF 1940) OR (ii) SOLELY IN THE CASE OF THE SUBORDINATED NOTES, (x) KNOWLEDGEABLE EMPLOYEES WITH RESPECT TO THE ISSUER OR (y) CORPORATIONS, PARTNERSHIPS, LIMITED LIABILITY COMPANIES OR OTHER ENTITIES (OTHER THAN TRUSTS) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS EITHER A KNOWLEDGEABLE EMPLOYEE WITH RESPECT TO THE ISSUER OR A QUALIFIED PURCHASER.

Distribution of the Offering Circular to any persons other than the person receiving this electronic transmission from the Initial Purchaser or an affiliate thereof or any persons retained to advise the person receiving this electronic transmission from the Initial Purchaser or an affiliate thereof with respect thereto is unauthorized. Any photocopying, disclosure or alterations of the contents of the Offering Circular, and any forwarding of a copy of the Offering Circular or any portion thereof by electronic mail or any other means to any person other than the person receiving this electronic transmission from the Initial Purchaser or an affiliate thereof is prohibited. By accepting delivery of this Offering Circular, the recipient agrees to the foregoing.

**EXHIBIT**

**2**

# ACIS CLO 2015-6 LTD.
## ACIS CLO 2015-6 LLC

U.S.$300,000,000 Class A-1 Senior Secured Floating Rate Notes due 2027
U.S.$47,000,000 Class A-2 Senior Secured Fixed Rate Notes due 2027
U.S.$75,000,000 Class B-1 Senior Secured Floating Rate Notes due 2027
U.S.$14,000,000 Class B-2 Senior Secured Fixed Rate Notes due 2027
U.S.$31,500,000 Class C Secured Deferrable Floating Rate Notes due 2027
U.S.$25,000,000 Class D Secured Deferrable Floating Rate Notes due 2027
U.S.$26,000,000 Class E Secured Deferrable Floating Rate Notes due 2027
U.S.$59,850,000 Subordinated Notes due 2027

The Issuer's investment portfolio consists primarily of debt obligations (including, but not limited to, interests in bank loans acquired by way of a sale or assignment, Participation Interests and high-yield debt securities, in each case, generally rated below investment grade). The portfolio will be managed by Acis Capital Management, L.P.

ACIS CLO 2015-6 Ltd. (the "**Issuer**") and ACIS CLO 2015-6 LLC (the "**Co-Issuer**" and, together with the Issuer, the "**Co-Issuers**") will issue U.S.$300,000,000 Class A-1 Senior Secured Floating Rate Notes due 2027 (the "**Class A-1 Notes**"), U.S.$47,000,000 Class A-2 Senior Secured Fixed Rate Notes due 2027 (the "**Class A-2 Notes**" and together with the Class A-1 Notes, the "**Class A Notes**"), U.S.$75,000,000 Class B-1 Senior Secured Floating Rate Notes due 2027 (the "**Class B-1 Notes**"), U.S.$14,000,000 Class B-2 Senior Secured Fixed Rate Notes due 2027 (the "**Class B-2 Notes**" and together with the Class B-1 Notes, the "**Class B Notes**") (the **Class B Notes** together with the Class A Notes, the "**Senior Notes**"), U.S.$31,500,000 Class C Secured Deferrable Floating Rate Notes due 2027 (the "**Class C Notes**") and U.S.$25,000,000 Class D Secured Deferrable Floating Rate Notes due 2027 (the "**Class D Notes**" and, together with the Class C Notes and the Senior Notes, the "**Co-Issued Notes**"). The Issuer will also issue U.S.$26,000,000 Class E Secured Deferrable Floating Rate Notes due 2027 (the "**Class E Notes**" and, the Class E Notes together with the Co-Issued Notes, the "**Secured Notes**" and, the Class E Notes, together with the Class C Notes and the Class D Notes, the "**Deferrable Notes**") and U.S.$59,850,000 Subordinated Notes due 2027 (the "**Subordinated Notes**" and, together with the Class E Notes, the "**Issuer Notes**"). The Secured Notes and the Subordinated Notes are referred to collectively as the "**Offered Securities**" or the "**Notes**". The Notes will be issued on or about April 16, 2015 (the "**Closing Date**") pursuant to an Indenture, dated as of the Closing Date (the "**Indenture**"), among the Co-Issuers and U.S. Bank National Association, as trustee (in such capacity, the "**Trustee**").

The Co-Issued Notes and Issuer Notes will be limited recourse debt obligations of the Issuer and the Co-Issued Notes will be non-recourse debt obligations of the Co-Issuer. The Notes do not represent interests in, or obligations of, and are not insured or guaranteed by the Initial Purchaser, the Trustee, the Portfolio Manager, the Collateral Administrator, the Administrator (each, as defined herein), or any of their respective affiliates, officers or directors or any other person or entity (other than the Co-Issuers or the Issuer, as applicable). Payments on the Notes will be made in accordance with the Priority of Payments (described herein). The Issuer may optionally redeem each Class of Notes under certain conditions described herein. For a more detailed description of the Notes, see "*Description of the Offered Securities*" herein.

Application has been made to the Irish Stock Exchange for listing particulars in respect of the Notes to be approved. This Offering Circular does not constitute listing particulars for the purposes of such application. Application has been made to the Irish Stock Exchange for the Notes to be admitted to the Official List and trading on its Global Exchange Market. There can be no assurance that such listing will be maintained. No application will be made to list the Notes on any other stock exchange.

It is a condition of the issuance of the Notes on the Closing Date that (i) the Class A-1 Notes be rated "AAA(sf)" by Standard & Poor's Financial Services LLC business ("**S&P**") (ii) the Class A-2 Notes be rated "AAA(sf)" by S&P (iii) the Class B-1 Notes be rated at least "AA(sf)" by S&P; (iv) the Class B-2 Notes be rated at least "AA(sf)" by S&P; (v) the Class C Notes be rated at least "A(sf)" by S&P; (vi) the Class D Notes be rated at least "BBB(sf)" by S&P and (vii) the Class E Notes be rated at least "BB(sf)" by S&P. The Subordinated Notes will not be rated.

––––––––––––––––––
**Investing in the Notes involves risks. See "*Risk Factors*" beginning on page 23.**
––––––––––––––––––

The Offered Securities have not been registered under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"). The Offered Securities are being offered only (I) to non-U.S. persons outside the United States in reliance on Regulation S and (II) to, or for the account or benefit of, persons that are (A) (i) Qualified Institutional Buyers or (ii) (x) solely in the case of the Class E Notes, Institutional Accredited Investors or (y) solely in the case of the Subordinated Notes, Accredited Investors who, if not Institutional Accredited Investors, are also Knowledgeable Employees with respect to the Issuer and (B) (i) Qualified Purchasers or (ii) solely in the case of the Subordinated Notes, Knowledgeable Employees with respect to the Issuer or certain entities owned exclusively by Knowledgeable Employees with respect to the Issuer or Qualified Purchasers. For a description of certain restrictions on transfer, see "*Transfer Restrictions*" herein. The Co-Issuers or the Issuer, as applicable, expect to deliver the Offered Securities to purchasers on the Closing Date. The Notes (other than the Subordinated Notes sold by the Issuer to the Portfolio Manager, its affiliates or accounts advised or sub-advised by the Portfolio Manager or its affiliates) are being offered by and through Jefferies LLC ("**Jefferies**"), as the initial purchaser of such Notes (referred to herein in such capacity as the "**Initial Purchaser**"), subject to prior sale when, as and if issued. The Subordinated Notes sold by the Issuer to the Portfolio Manager, its affiliates or accounts advised or sub-advised by the Portfolio Manager or its affiliates will not be purchased by the Initial Purchaser.

# Jefferies

*April 14, 2015*

**TABLE OF CONTENTS**

SUMMARY OF TERMS ....................................... 1

RISK FACTORS ............................................. 23

General Economic Risks ........................................ 23
Risks Relating to the Offered Securities ............. 28
Risks Relating to the Portfolio Manager ............. 46
Risks Relating to the Collateral
    Obligations ............................................. 47
Risks Relating to Certain Conflicts of
    Interest ................................................... 55

DESCRIPTION OF THE OFFERED
    SECURITIES ...................................... 62

The Indenture and the Secured Notes ................. 62
Status and Security ............................................. 62
Interest ............................................................... 62
Principal ............................................................. 64
Optional Redemption and Refinancing ............... 64
Mandatory Redemption....................................... 66
Special Redemption ............................................ 66
Clean-up Call Redemption .................................. 67
Issuer Purchases of Secured Notes...................... 68
Surrender and Cancellation of Notes ................... 69
Entitlement to Payments ..................................... 69
Priority of Payments ........................................... 70
The Indenture ..................................................... 70
Form, Denomination and Registration of
    the Offered Securities ..................................... 78
The Subordinated Notes...................................... 81
No Gross-up ....................................................... 82

RATINGS OF THE SECURED NOTES ............... 83

The Secured Notes .............................................. 83

SECURITY FOR THE SECURED NOTES .......... 84

Collateral Obligations ........................................ 84
The Concentration Limitations ........................... 85
The Collateral Quality Test................................. 85
The Coverage Tests............................................. 87
The Interest Reinvestment Test........................... 88
Sales of Collateral Obligations;
    Additional Collateral Obligations and
    Investment Criteria .......................................... 88
The Collection Account and Payment
    Account............................................................ 91
The Ramp-up Account......................................... 92
The Custodial Account ........................................ 92
The Revolver Funding Account ........................... 92
The Hedge Accounts ........................................... 93
The Expense Reserve Account............................. 94
Interest Reserve Account .................................... 94
Hedge Agreements.............................................. 94

USE OF PROCEEDS ......................................... 96

General ............................................................... 96
Ramp-up Period .................................................. 96

THE PORTFOLIO MANAGER ........................... 97

Personnel of the Portfolio Manager .................... 97

THE PORTFOLIO MANAGEMENT
    AGREEMENT ..................................... 100

General............................................................. 100
Compensation ................................................... 100
Limitation of Liability....................................... 102
Amendment....................................................... 103
Restrictions ...................................................... 103
Conflicts of Interest.......................................... 103
Resignation, Removal and Replacement
    of the Portfolio Manager............................... 104
Assignment....................................................... 106
Collateral Administration.................................. 106

THE CO-ISSUERS........................................... 107

The Issuer ........................................................ 107
Principal Activities of the Issuer....................... 107
Restrictions on the Offer of the Notes............... 108
The Co-Issuer ................................................... 108
Capitalization of the Issuer............................... 108
Business of the Co-Issuers ................................ 108
The Collateral Administrator ............................ 109
The Administrator ............................................. 109

CERTAIN TAX CONSIDERATIONS ................ 110

U.S. Federal Income Tax Treatment of the
    Issuer............................................................ 110
U.S. Federal Income Tax Treatment of the
    Notes............................................................ 111
U.S. Holders of the Secured Notes.................... 112
U.S. Holders of the Subordinated Notes ........... 114
Medicare Consideration .................................... 117
Tax-Exempt U.S. Holders of the Notes.............. 117
Non-U.S. Holders.............................................. 117
Backup Withholding and Information
    Reporting...................................................... 118
Cayman Islands Taxation.................................. 118

ERISA AND LEGAL INVESTMENT
    CONSIDERATIONS .......................... 120

The Secured Notes (Other than the
    Class E Notes) .............................................. 121
The Class E Notes and the Subordinated
    Notes............................................................ 121
Further considerations....................................... 122
Legal investment considerations ....................... 123

PLAN OF DISTRIBUTION............................... 125

TRANSFER RESTRICTIONS............................ 127

Global Notes .................................................... 127
Certificated Notes ............................................ 129
Additional Restrictions ..................................... 129
Legends ............................................................ 131

**TABLE OF CONTENTS**

Non-Permitted Holder/Non-Permitted Tax
  Holder/Non-Permitted ERISA Holder..........143
Cayman Islands Placement Provisions...............144

LISTING AND GENERAL
  INFORMATION.................................................145

LEGAL MATTERS ...............................................147

GLOSSARY OF DEFINED TERMS....................148

INDEX OF DEFINED TERMS ............................171

Annex A:   S&P Recovery Rate Tables

Annex B:   Sub-Advisory Agreement between
           Acis Capital Management, L.P. and
           Highland Capital Management,
           L.P.

Annex C:   Shared Services Agreement
           between Acis Capital Management,
           L.P. and Highland Capital
           Management, L.P.

**IMPORTANT INFORMATION REGARDING THIS OFFERING CIRCULAR AND THE OFFERED SECURITIES**

In making your investment decision, you should only rely on the information contained in this Offering Circular and in the transaction documents.  No person has been authorized to give you any information or to make any representation other than those contained in this Offering Circular and in the transaction documents.  If you receive any other information, you should not rely on it.

You should not assume that the information contained in this Offering Circular is accurate as of any date other than the date on the front cover of this Offering Circular.

The Offered Securities are being offered and sold only in places where offers and sales are permitted.

The Co-Issuers and the Initial Purchaser reserve the right, for any reason, to reject any offer to purchase in whole or in part, to allot to you less than the full amount of Offered Securities sought by you or to sell less than the stated initial principal amount of any Class of Notes.

The Offered Securities do not represent interests in or obligations of, and are not insured or guaranteed by, the Initial Purchaser, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective affiliates.

U.S. Bank National Association in each of its capacities, including but not limited to the Trustee, Paying Agent, Registrar and Collateral Administrator, has not participated in the preparation of this Offering Circular and assumes no responsibility for its contents.

The Offered Securities are subject to restrictions on resale and transfer as described under "*Description of the Offered Securities*," "*Plan of Distribution*" and "*Transfer Restrictions*."  By purchasing any Offered Securities, you will be deemed to have made certain acknowledgments, representations and agreements as described in "Transfer Restrictions".  You may be required to bear the financial risks of investing in the Offered Securities for an indefinite period of time.

Unless the context otherwise requires or as otherwise indicated herein, each reference to "Jefferies" in this Offering Circular means Jefferies LLC in its capacity as initial purchaser of the Offered Securities (other than the Subordinated Notes sold by the Issuer to the Portfolio Manager, its affiliates or accounts advised or sub-advised by the Portfolio Manager or its affiliates).

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, EFFECTIVE FROM THE DATE OF COMMENCEMENT OF DISCUSSIONS, RECIPIENTS, AND EACH EMPLOYEE, REPRESENTATIVE OR OTHER AGENT OF THE RECIPIENTS, MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE U.S. TAX TREATMENT AND TAX STRUCTURE OF THE OFFERING AND ALL MATERIALS OF ANY KIND, INCLUDING OPINIONS OR OTHER TAX ANALYSES, THAT ARE PROVIDED TO THE RECIPIENTS RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE.  THIS AUTHORIZATION TO DISCLOSE THE U.S. TAX TREATMENT AND TAX STRUCTURE DOES NOT PERMIT DISCLOSURE OF INFORMATION IDENTIFYING A CO-ISSUER, THE INITIAL PURCHASER, THE PORTFOLIO MANAGER OR ANY OTHER PARTY TO THE TRANSACTION, THIS OFFERING OR THE PRICING (EXCEPT TO THE EXTENT SUCH INFORMATION IS RELEVANT TO U.S. TAX STRUCTURE OR TAX TREATMENT) OF THIS OFFERING.

_____

**NOTICE TO NEW HAMPSHIRE RESIDENTS**

**NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED**

**UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING.  NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION.  IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.**

———————————————

None of the Issuer, the Co-Issuer or the pool of Assets has been registered under the Investment Company Act.  Each purchaser of a Certificated Subordinated Note and a Certificated Class E Note will represent and agree, and each purchaser of an interest in a Global Note will be deemed to have represented and agreed, that the purchaser is acquiring the Offered Securities for its own account or for one or more accounts as to each of which the purchaser exercises sole investment discretion and in an authorized denomination, in each case, for the purchaser and each such account.  Each U.S. person purchasing a Certificated Subordinated Note and a Certificated Class E Note will also represent and agree, and each purchaser of an interest in a Rule 144A Global Note will be deemed to have represented and agreed, among other things, that it and any account for which it is acquiring the Offered Securities is (i) a "qualified purchaser" (for purposes of Section 3(c)(7) of the Investment Company Act) or (ii) solely in the case of the Certificated Subordinated Notes, either (x) a "knowledgeable employee" (as defined in Rule 3c-5 under the Investment Company Act) with respect to the Issuer or (y) a corporation, partnership, limited liability company or other entity (other than a trust) each shareholder, partner, member or other equity owner of which is a qualified purchaser or a knowledgeable employee with respect to the Issuer.  See "*Transfer Restrictions*."

———————————————

This offering circular dated April 14, 2015 (this "**Offering Circular**") has been prepared by the Co-Issuers solely for use in connection with the offering (the "**Offering**") of the Offered Securities and the listing of the Secured Notes and the Subordinated Notes, all as described herein.  This Offering Circular is being provided only to prospective purchasers of the Offered Securities.  You should read this Offering Circular and the transaction documents before making a decision whether to purchase any Offered Securities.  Except as otherwise authorized above, you must not:

- use this Offering Circular for any other purpose;

- make copies of any part of this Offering Circular or give a copy of this Offering Circular or any portion thereof to any other person; or

- disclose any information in this Offering Circular to any other person.

The information contained in this Offering Circular has been provided by the Co-Issuers and other sources identified herein. The Co-Issuers accept responsibility for the information contained in this Offering Circular other than the Portfolio Manager Information.  The "**Portfolio Manager Information**" consists of the information contained under the headings "*Risk Factors—Risks Relating to the Portfolio Manager*" and the sub-headings thereunder, "*Risk Factors—Risks Relating to Certain Conflicts of Interest—The Issuer will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates*" and "*The Portfolio Manager.*" The Portfolio Manager accepts responsibility for the Portfolio Manager Information.  To the best of the knowledge and belief of the Co-Issuers (having taken reasonable care to ensure that such is the case), the information contained in this Offering Circular (other than the Portfolio Manager Information) is in accordance with the facts and does not omit anything likely to affect the import of such information.  To the best of the knowledge and belief of the Portfolio Manager (having taken reasonable care to ensure that such is the case), the Portfolio Manager Information is in accordance with the facts and does not omit anything likely to affect the import of such information.

The Initial Purchaser will have no liability for any information included in this Offering Circular or otherwise made available in connection with the offering of the Offered Securities, except for any liabilities expressly assumed by the Initial Purchaser in the definitive securities purchase agreement for the Offered Securities (other than the

Subordinated Notes sold by the Issuer to the Portfolio Manager, its affiliates or accounts advised or sub-advised by the Portfolio Manager or its affiliates) and related documentation for the offering of the Offered Securities.  Without limiting the foregoing, the Initial Purchaser does not make any representation or warranty, express or implied, as to the accuracy or completeness of any information included in this Offering Circular or any other information, written or oral, or any document made available in connection with the offering of the Offered Securities.

You are responsible for making your own examination of the Co-Issuers and the Portfolio Manager and your own assessment of the merits and risks of investing in the Offered Securities.  By purchasing any Offered Securities, you will be deemed to have acknowledged that:

- you have reviewed this Offering Circular;

- you have had an opportunity to request any additional information that you need from the Issuer and the Portfolio Manager; and

- neither the Initial Purchaser nor the Portfolio Manager is responsible for, or is making any representation to you concerning, (i) the future performance of the Issuer or (ii) the accuracy or completeness of this Offering Circular (except, in the case of the Portfolio Manager, with respect to the Portfolio Manager Information).

None of the Co-Issuers, the Initial Purchaser, the Portfolio Manager nor any other party to the transactions contemplated by this Offering Circular is providing you with any legal, business, tax or other advice in this Offering Circular.  You should consult with your own advisors as needed to assist you in making an investment decision and to advise you as to whether you are legally permitted to purchase the Offered Securities.

The Offered Securities are being offered in reliance on exemptions from the registration requirements of the Securities Act.  These exemptions apply to offers and sales of securities that do not involve a public offering.  The Offered Securities have not been approved or disapproved by the United States Securities and Exchange Commission or any state securities commission or other regulatory authority, and none of the foregoing authorities has confirmed the accuracy or determined the adequacy of this Offering Circular.  Any representation to the contrary is a criminal offense.

_____

You must comply with all laws that apply to you in any place where you buy, offer or sell any Offered Securities or possess this Offering Circular.  You must also obtain any consents or approvals that you need in order to purchase any Offered Securities.  None of the Co-Issuers, the Initial Purchaser, the Portfolio Manager nor any other party to the transactions contemplated by this Offering Circular is responsible for your compliance with these legal requirements.

You are hereby notified that a seller of the Offered Securities may rely on an exemption from the registration requirements of Section 5 of the Securities Act provided by Rule 144A or by Section 4(a)(2) of the Securities Act.  These exemptions apply to offers and sales of securities that do not involve a public offering.

_____

**IMPORTANT INFORMATION REGARDING OFFERS AND SALES OF THE OFFERED SECURITIES**

The Offered Securities offered hereby are subject to modification or revision and are offered on a "when, as and if issued" basis.  You understand that, when you are considering the purchase of Offered Securities, a binding contract of sale will not exist prior to the time that the relevant class of Offered Securities has been priced and Jefferies or the Issuer (as the case may be) has confirmed the allocation of such Offered Securities to be made to you; prior to that time any "indications of interest" expressed by you, and any "soft circles" generated by Jefferies or the Issuer, as applicable, will not create binding contractual obligations for you or Jefferies (or the Issuer, as applicable) and may be withdrawn at any time.

You may commit to purchase one or more classes of Offered Securities that have characteristics that may change after such commitment, and you are advised that all or a portion of the Offered Securities may not be issued with the characteristics described in this Offering Circular.  The obligation of Jefferies or the Co-Issuers to sell and/or Jefferies to place, as applicable, such Offered Securities to you is conditioned on the Offered Securities having the characteristics described in this Offering Circular.  If Jefferies or the Co-Issuers determine that condition is not satisfied in any material respect, you will be notified, and none of the Issuer, the Co-Issuer or Jefferies will have any obligation to you to deliver any portion of the Offered Securities that you have committed to purchase, and there will be no liability among the Issuer, the Co-Issuer, their affiliates, Jefferies and you as a consequence of the non-delivery.  Your payment for the Offered Securities will confirm your agreement to the terms and conditions described in this Offering Circular.

The information contained herein supersedes any previous such information delivered to you and may be superseded by information delivered to you prior to the time of contract of sale.

_____

No invitation may be made to the public in the Cayman Islands to subscribe for the Notes.

_____

THIS OFFERING CIRCULAR DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, (I) ANY SECURITIES OTHER THAN THE OFFERED SECURITIES OR (II) ANY OFFERED SECURITIES IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION.  THE DISTRIBUTION OF THIS OFFERING CIRCULAR AND THE OFFER OR SALE OF THE OFFERED SECURITIES MAY BE RESTRICTED BY LAW IN CERTAIN JURISDICTIONS.  PERSONS INTO WHOSE POSSESSION THIS OFFERING CIRCULAR OR ANY OF THE OFFERED SECURITIES COME ARE REQUIRED BY THE CO-ISSUERS AND THE INITIAL PURCHASER TO INFORM THEMSELVES ABOUT, AND OBSERVE, ANY SUCH RESTRICTIONS.

EACH PROSPECTIVE PURCHASER OF ANY OF THE OFFERED SECURITIES MUST COMPLY WITH ALL APPLICABLE LAWS AND REGULATIONS IN FORCE IN ANY JURISDICTION IN WHICH IT PURCHASES, OFFERS OR SELLS SUCH OFFERED SECURITIES OR POSSESSES OR DISTRIBUTES THIS OFFERING CIRCULAR AND MUST OBTAIN ANY CONSENT, APPROVAL OR PERMISSION REQUIRED BY IT FOR THE PURCHASE, OFFER OR SALE BY IT OF THE OFFERED SECURITIES UNDER THE LAWS AND REGULATIONS IN FORCE IN ANY JURISDICTION TO WHICH IT IS SUBJECT OR IN WHICH IT MAKES SUCH PURCHASES, OFFERS OR SALES, AND NONE OF THE CO-ISSUERS, THE INITIAL PURCHASER, THE PORTFOLIO MANAGER AND ANY OF THEIR RESPECTIVE AFFILIATES SHALL HAVE ANY RESPONSIBILITY THEREFOR.

_____

**NOTICE TO FLORIDA RESIDENTS**

THE OFFERED SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 517.061 OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT AND HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA.  ALL FLORIDA RESIDENTS WHO ARE NOT INSTITUTIONAL INVESTORS DESCRIBED IN SECTION 517.061(7) OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT HAVE THE RIGHT TO VOID THEIR PURCHASE OF THE OFFERED SECURITIES, WITHOUT PENALTY, WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION.

_____

**NOTICE TO GEORGIA RESIDENTS**

THE OFFERED SECURITIES HAVE NOT BEEN REGISTERED UNDER THE GEORGIA UNIFORM SECURITIES ACT OF 2008, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION

THAT IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.

––––––––––––––––––––––

**NOTICE TO RESIDENTS OF THE UNITED KINGDOM**

THE OFFERED SECURITIES MUST NOT BE OFFERED OR SOLD AND THE DISTRIBUTION OF THIS OFFERING CIRCULAR AND ANY OTHER DOCUMENT IN CONNECTION WITH THE OFFERING AND ISSUANCE OF THE OFFERED SECURITIES MUST NOT BE ISSUED OR PASSED ON TO PERSONS IN THE UNITED KINGDOM EXCEPT TO PERSONS WHO: (i) ARE OUTSIDE OF THE UNITED KINGDOM; OR (ii) WHO ARE IN THE UNITED KINGDOM AND (A) HAVE PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS; OR (B) ARE PERSONS FALLING WITHIN ARTICLE 49(2) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2005 OR ARE PERSONS TO WHOM THIS OFFERING CIRCULAR OR ANY OTHER SUCH DOCUMENT MAY OTHERWISE LAWFULLY BE ISSUED OR PASSED ON (ALL SUCH PERSONS TOGETHER BEING REFERRED TO AS "**RELEVANT PERSONS**"). ANY INVESTMENT OR INVESTMENT ACTIVITY TO WHICH THIS OFFERING CIRCULAR RELATES IS AVAILABLE ONLY TO RELEVANT PERSONS AND WILL BE ENGAGED IN ONLY WITH RELEVANT PERSONS. RELEVANT PERSONS SHOULD NOTE THAT ALL, OR MOST, OF THE PROTECTIONS OFFERED BY THE UNITED KINGDOM REGULATORY SYSTEM WILL NOT APPLY TO AN INVESTMENT IN THE OFFERED SECURITIES AND THAT COMPENSATION WILL NOT BE AVAILABLE UNDER THE UNITED KINGDOM FINANCIAL SERVICES COMPENSATION SCHEME.

––––––––––––––––––––––

**NOTICE TO RESIDENTS OF AUSTRALIA**

NO PROSPECTUS OR OTHER DISCLOSURE DOCUMENT (AS DEFINED IN THE CORPORATIONS ACT 2001 OF AUSTRALIA) IN RELATION TO THE OFFERED SECURITIES HAS BEEN LODGED WITH THE AUSTRALIAN SECURITIES AND INVESTMENTS COMMISSION ("**ASIC**"). THE INITIAL PURCHASER WILL REPRESENT AND AGREE THAT IT:

(A) HAS NOT OFFERED OR INVITED APPLICATIONS, AND WILL NOT OFFER OR INVITE APPLICATIONS, FOR THE ISSUE, SALE OR PURCHASE OF THE OFFERED SECURITIES IN AUSTRALIA (INCLUDING AN OFFER OR INVITATION WHICH IS RECEIVED BY A PERSON IN AUSTRALIA); AND

(B) HAS NOT DISTRIBUTED OR PUBLISHED, AND WILL NOT DISTRIBUTE OR PUBLISH, ANY DRAFT, PRELIMINARY OR DEFINITIVE OFFERING MEMORANDUM, ADVERTISEMENT OR OTHER OFFERING MATERIAL RELATING TO THE OFFERED SECURITIES IN AUSTRALIA;

UNLESS (1) THE AGGREGATE CONSIDERATION PAYABLE BY EACH OFFEREE OR INVITEE IS AT LEAST AUD500,000 (OR ITS EQUIVALENT IN OTHER CURRENCIES, BUT DISREGARDING MONIES LENT BY THE OFFEROR OR ITS ASSOCIATES) OR THE OFFER OR INVITATION OTHERWISE DOES NOT REQUIRE DISCLOSURE TO INVESTORS IN ACCORDANCE WITH PART 6D.2 OF THE CORPORATIONS ACT, (2) SUCH ACTION COMPLIES WITH ALL APPLICABLE LAWS, REGULATIONS AND DIRECTIVES, AND (3) DOES NOT REQUIRE ANY DOCUMENT TO BE LODGED WITH ASIC.

––––––––––––––––––––––

**NOTICE TO RESIDENTS OF FINLAND**

THE OFFERED SECURITIES MAY NOT BE OFFERED OR SOLD, AND THIS OFFERING CIRCULAR MAY NOT BE DISTRIBUTED, DIRECTLY OR INDIRECTLY, TO ANY RESIDENT OF THE REPUBLIC OF FINLAND OR IN THE REPUBLIC OF FINLAND, EXCEPT PURSUANT TO APPLICABLE FINNISH LAWS AND REGULATIONS. SPECIFICALLY, THE OFFERED SECURITIES MAY ONLY BE ACQUIRED FOR DENOMINATIONS OF NOT LESS THAN EURO 50,000, AND THE OFFERED SECURITIES MAY NOT BE OFFERED OR SOLD, AND THIS OFFERING CIRCULAR MAY NOT BE DISTRIBUTED, DIRECTLY OR

INDIRECTLY, TO THE PUBLIC IN THE REPUBLIC OF FINLAND AS DEFINED UNDER THE FINNISH SECURITIES MARKET ACT OF 1989.

_____

### NOTICE TO RESIDENTS OF TAIWAN AND THE PEOPLE'S REPUBLIC OF CHINA

THE OFFER OF THE OFFERED SECURITIES HAS NOT BEEN AND WILL NOT BE REGISTERED WITH THE SECURITIES AND FUTURES COMMISSION OF TAIWAN OR WITH THE RELEVANT REGULATORY AUTHORITIES IN THE PEOPLE'S REPUBLIC OF CHINA PURSUANT TO RELEVANT SECURITIES LAWS AND REGULATIONS AND MAY NOT BE OFFERED OR SOLD WITHIN TAIWAN OR THE PEOPLE'S REPUBLIC OF CHINA THROUGH A PUBLIC OFFERING OR IN CIRCUMSTANCES WHICH CONSTITUTE AN OFFER WITHIN THE MEANING OF THE SECURITIES AND EXCHANGE LAW OF TAIWAN OR WITHIN THE MEANING OF RELEVANT SECURITIES LAWS AND REGULATIONS IN THE PEOPLE'S REPUBLIC OF CHINA THAT REQUIRE A REGISTRATION OR APPROVAL OF THE SECURITIES AND FUTURES COMMISSION OF TAIWAN OR THE RELEVANT SECURITIES REGULATORY AUTHORITIES IN THE PEOPLE'S REPUBLIC OF CHINA.

_____

### NOTICE TO RESIDENTS OF THE EUROPEAN ECONOMIC AREA

IN RELATION TO EACH MEMBER STATE OF THE EUROPEAN ECONOMIC AREA THAT HAS IMPLEMENTED THE PROSPECTUS DIRECTIVE (EACH A "**RELEVANT MEMBER STATE**"), THE INITIAL PURCHASER HAS REPRESENTED AND AGREED THAT WITH EFFECT FROM AND INCLUDING THE DATE ON WHICH THE PROSPECTUS DIRECTIVE IS IMPLEMENTED IN THAT RELEVANT MEMBER STATE (THE "**RELEVANT IMPLEMENTATION DATE**") IT HAS NOT MADE AND WILL NOT MAKE AN OFFER OF OFFERED SECURITIES TO THE PUBLIC WHICH ARE THE SUBJECT OF THE OFFERING CONTEMPLATED BY THIS OFFERING CIRCULAR IN THAT RELEVANT MEMBER STATE OTHER THAN:

(A) TO ANY LEGAL ENTITY WHICH IS A "QUALIFIED INVESTOR" AS DEFINED IN THE PROSPECTUS DIRECTIVE;

(B) TO FEWER THAN 100 OR, IF THE RELEVANT MEMBER STATE HAS IMPLEMENTED THE RELEVANT PROVISIONS OF THE 2010 PD AMENDMENT DIRECTIVE, 150, NATURAL OR LEGAL PERSONS (OTHER THAN QUALIFIED INVESTORS AS DEFINED IN THE PROSPECTUS DIRECTIVE), AS PERMITTED UNDER THE PROSPECTUS DIRECTIVE, SUBJECT TO OBTAINING THE PRIOR CONSENT OF THE ISSUER; OR

(C) IN ANY OTHER CIRCUMSTANCES FALLING WITHIN ARTICLE 3(2) OF THE PROSPECTUS DIRECTIVE;

PROVIDED THAT NO SUCH OFFER OF OFFERED SECURITIES SHALL REQUIRE THE ISSUER OR THE INITIAL PURCHASER TO PUBLISH A PROSPECTUS PURSUANT TO ARTICLE 3 OF THE PROSPECTUS DIRECTIVE OR SUPPLEMENT A PROSPECTUS PURSUANT TO ARTICLE 16 OF THE PROSPECTUS DIRECTIVE.

FOR THE PURPOSES OF THIS PROVISION, (I) THE EXPRESSION "AN OFFER OF OFFERED SECURITIES TO THE PUBLIC" IN RELATION TO ANY SECURITIES IN ANY RELEVANT MEMBER STATE MEANS THE COMMUNICATION IN ANY FORM AND BY ANY MEANS OF SUFFICIENT INFORMATION ON THE TERMS OF THE OFFER AND THE SECURITIES TO BE OFFERED SO AS TO ENABLE AN INVESTOR TO DECIDE TO PURCHASE OR SUBSCRIBE THE SECURITIES, AS THE SAME MAY BE VARIED IN THAT MEMBER STATE BY ANY MEASURE IMPLEMENTING THE PROSPECTUS DIRECTIVE IN THAT MEMBER STATE; (II) THE EXPRESSION "**PROSPECTUS DIRECTIVE**" MEANS DIRECTIVE 2003/71/EC (AND AMENDMENTS THERETO, INCLUDING THE 2010 PD AMENDMENT DIRECTIVE TO THE EXTENT IMPLEMENTED IN THE RELEVANT MEMBER STATE) AND INCLUDES

ANY RELEVANT IMPLEMENTING MEASURE IN EACH RELEVANT MEMBER STATE; AND (III) THE EXPRESSION "2010 PD AMENDMENT DIRECTIVE" MEANS DIRECTIVE 2010/73/EU.

————————————

## STABILIZATION

In connection with the issue of the Secured Notes, Jefferies LLC (in such capacity, the "**Stabilizing Manager**") (or persons acting on behalf of the Stabilizing Manager) may over-allot Offered Securities or effect transactions with a view to supporting the market price of the Offered Securities at a level higher than that which might otherwise prevail. However, there is no assurance that the Stabilizing Manager (or persons acting on behalf of the Stabilizing Manager) will undertake stabilization action. Any stabilization action may begin on or after the date on which adequate public disclosure of the terms of the offer of the Offered Securities is made and, if begun, may be ended at any time, but it must end no later than the earlier of 30 days after the Closing Date and 60 days after the date of the allotment of the Offered Securities. Any stabilization action or over-allotment will be conducted by the Stabilizing Manager (or persons acting on behalf of the Stabilizing Manager) in accordance with all applicable laws and rules.

————————————

## FORWARD-LOOKING STATEMENTS

This Offering Circular contains forward-looking statements, which can be identified by words like "anticipate," "believe," "plan," "hope," "goal," "initiative," "expect," "future," "intend," "will," "could," and "should" and by similar expressions. Other information herein, including any estimated, targeted or assumed information, also may constitute or contain forward-looking statements. You should not place undue reliance on forward-looking statements. Actual results could differ materially from those referred to in forward-looking statements for many reasons, including the risks described in "*Risk Factors*." Forward-looking statements are necessarily speculative in nature, and some of or all the assumptions underlying any forward-looking statements may not materialize or may vary significantly from actual results. Variations between assumptions and results may be material.

Without limiting the generality of the foregoing, you should not regard the inclusion of forward-looking statements in this Offering Circular as a representation by the Co-Issuers, the Portfolio Manager, the Initial Purchaser, the Trustee, the Collateral Administrator or any of their respective affiliates or any other person of the results that will actually be achieved by the Issuer or the Offered Securities. None of the foregoing persons has any obligation to update or otherwise revise any forward-looking statements, including any revisions to reflect changes in any circumstances arising after the date of this Offering Circular relating to any assumptions or otherwise.

————————————

## CERTAIN DEFINITIONS AND RELATED MATTERS

Unless otherwise indicated, (i) references in this Offering Circular to "**U.S. Dollars**," "**Dollars**" and "U.S.\$" will be to United States dollars and references to "**Euros**" and "**€**" are to the currency established pursuant to the treaty founding the European Community; (ii) references to the term "**Holder**" or "**Noteholder**" will mean the person in whose name a security is registered; except where the context otherwise requires, "**holder**" or "**Holder**" will include the beneficial owner of such security; and (iii) references to "**U.S.**" and "**United States**" will be to the United States of America, its territories and its possessions.

————————————

## SUMMARIES OF DOCUMENTS

This Offering Circular summarizes certain provisions of the Offered Securities, the Indenture, the Portfolio Management Agreement and other transaction documents. The summaries do not purport to be complete and (whether or not so stated in this Offering Circular) are subject to, are qualified in their entirety by reference to, and incorporate by reference, the provisions of the actual documents (including definitions of terms). Copies of the above documents are available on request from the Trustee. However, no documents incorporated by reference are part of this Offering Circular for purposes of the admission of the Notes to trading on the Global Exchange Market

of the Irish Stock Exchange.  You should direct any requests to receive such documents to the Trustee at the following address:  U.S. Bank National Association, 190 S. LaSalle Street, 8th Floor, Chicago, IL  60603, Attention: Corporate Trust Services – ACIS CLO 2015-6 Ltd.

_____

### AVAILABLE INFORMATION

To permit compliance with Rule 144A in connection with the sale of the Offered Securities, the Issuer (and, solely in the case of the Secured Notes, the Co-Issuer) will be required to furnish upon request of a holder of a Note to such holder and a prospective purchaser designated by such holder the information required to be delivered under Rule 144A(d)(4) under the Securities Act if at the time of the request the Co-Issuers are neither (a) reporting companies under Section 13 or Section 15(d) of the Exchange Act nor (b) exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act.  Neither of the Co-Issuers expects to become such a reporting company or to become so exempt from reporting.  Such information may be obtained directly from the Issuer at the address set forth on the final page of this Offering Circular.

# SUMMARY OF TERMS

*The following summary does not purport to be complete and is qualified in its entirety by reference to the detailed information appearing elsewhere in this Offering Circular and related documents referred to herein.  An index of defined terms appears at the back of this Offering Circular.*

**Principal Terms of the Offered Securities**

| Designation | Class A-1 Notes | Class A-2 Notes | Class B-1 Notes | Class B-2 Notes | Class C Notes | Class D Notes | Class E Notes | Subordinated Notes |
|---|---|---|---|---|---|---|---|---|
| **Type** | Floating Rate | Fixed Rate | Floating Rate | Fixed Rate | Deferrable Floating Rate | Deferrable Floating Rate | Deferrable Floating Rate | |
| **Issuer(s)** | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Issuer | Issuer |
| **Initial Principal Amount (U.S.$)** | $300,000,000 | $47,000,000 | $75,000,000 | $14,000,000 | $31,500,000 | $25,000,000 | $26,000,000 | $59,850,000 |
| **Expected S&P Initial Rating** | "AAA(sf)" | "AAA(sf)" | "AA(sf)" | "AA(sf)" | "A(sf)" | "BBB(sf)" | "BB(sf)" | N/A |
| **Interest Rate**[1] | LIBOR + 1.59% | 3.367% | LIBOR + 2.48% | 4.425% | LIBOR + 3.37% | LIBOR + 3.77% | LIBOR + 5.49% | N/A[2] |
| **Stated Maturity**[3] | May 1, 2027 | May 1, 2027 | May 1, 2027 | May 1, 2027 | May 1, 2027 | May 1, 2027 | May 1, 2027 | May 1, 2027 |
| **Minimum Denominations (U.S.$) (Integral Multiples)** | $100,000 ($1) | $100,000 ($1) | $100,000 ($1) | $100,000 ($1) | $100,000 ($1) | $100,000 ($1) | $100,000 ($1) | $100,000 ($1) |
| **Priority Class(es)** | None | None | A | A | A, B | A, B, C | A, B, C, D | A, B, C, D, E |
| **Pari Passu Class(es)** | A-2 | A-1 | B-2 | B-1 | None | None | None | None |
| **Junior Class(es)** | B, C, D, E, Subordinated | B, C, D, E, Subordinated | C, D, E, Subordinated | C, D, E, Subordinated | D, E, Subordinated | E, Subordinated | Subordinated | None |
| **Deferrable Notes** | No | No | No | No | Yes | Yes | Yes | N/A |

1    For the definition of LIBOR, see "*Description of the Offered Securities*."

2    The Subordinated Notes do not bear interest at a stated rate but will receive distributions on each Payment Date in accordance with the priorities set forth under "*—Priority of Payments*."

3    If such date is not a Business Day, the next succeeding Business Day.

1

| | |
|---|---|
| **Issuer:** | ACIS CLO 2015-6 Ltd., an exempted company incorporated in the Cayman Islands with limited liability (the "**Issuer**"). |
| **Co-Issuer:** | ACIS CLO 2015-6 LLC, a Delaware limited liability company (the "**Co-Issuer**" and, together with the Issuer, the "**Co-Issuers**"). |
| **Portfolio Manager:** | Acis Capital Management, L.P. (the "**Portfolio Manager**"), an affiliate of Highland Capital Management, L.P. ("**Highland**"). |
| **Trustee:** | U.S. Bank National Association (the "**Trustee**"). |
| **Initial Purchaser:** | Jefferies LLC (the "**Initial Purchaser**"). |
| **Eligible Purchasers:** | The Offered Securities are being offered hereby (i) to non-U.S. persons in offshore transactions in reliance on Regulation S ("**Regulation S**") under the Securities Act and (ii) to persons that are either (A) "qualified purchasers" (for purposes of Section 3(c)(7) of the Investment Company Act of 1940, as amended (the "**Investment Company Act**"), and Rule 2a51-2 under the Investment Company Act) ("**Qualified Purchasers**"); (B) in the case of the Subordinated Notes only, "Knowledgeable Employees" (as defined in Rule 3c-5 under the Investment Company Act) ("**Knowledgeable Employees**") with respect to the Issuer or (C) in the case of the Subordinated Notes only, corporations, partnerships, limited liability companies or other entities (other than trusts) each shareholder, partner, member or other equity owner of which is either a Knowledgeable Employee with respect to the Issuer or a Qualified Purchaser and, in the case of (A), (B) and (C) are either (1) "qualified institutional buyers" ("**Qualified Institutional Buyers**") within the meaning of Rule 144A or (2) either (x) in the case of the Class E Notes, Accredited Investors meeting the requirements of Rule 501(a)(1), (2), (3) or (7) under the Securities Act ("**Institutional Accredited Investors**") or (y) in the case of the Subordinated Notes only, Accredited Investors meeting the requirements of Rule 501(a) under the Securities Act ("**Accredited Investors**") who, if not Institutional Accredited Investors, are Knowledgeable Employees with respect to the Issuer.  See "*Description of the Offered Securities—Form, Denomination and Registration of the Offered Securities*" *and* "*Transfer Restrictions*." |

**Payments on the Notes:**

| | |
|---|---|
| *Payment Dates* ........................... | The 1st day of February, May, August and November of each year, commencing in August 2015 (or, if such day is not a Business Day, then the next succeeding Business Day) (each, a "**Payment Date**"). |
| *Stated Note Interest* ................... | Interest on the Secured Notes is payable quarterly in arrears on each Payment Date in accordance with the Priority of Payments described herein. |
| *Deferral of Interest* .................... | So long as any more senior Class of Secured Notes is outstanding, to the extent interest is not paid on the Deferrable Notes on any Payment Date, such amounts will be deferred and added to the principal balance of the applicable Class of Secured Notes and will bear interest at the Interest Rate applicable to such Deferrable Notes, and the failure to pay such amounts prior to the maturity of such Notes will not be an Event of Default under the Indenture. See "*Description of the Offered Securities—Interest*." |

| | |
|---|---|
| *Distributions on Subordinated Notes* ......................................... | The Subordinated Notes will not bear a stated rate of interest but will be entitled to receive distributions on each Payment Date if and to the extent funds are available for such purpose.  Such payments will be made on the Subordinated Notes only pursuant to the Priority of Payments.  See "—*Priority of Payments*" below and "*Description of the Offered Securities—The Subordinated Notes—Distributions on the Subordinated Notes*." |

**Optional Redemption:**

| | |
|---|---|
| *Non-Call Period* .......................... | During the period from the Closing Date to but excluding the Payment Date in November 2016 (such period, the "**Non-Call Period**"), the Secured Notes and the Subordinated Notes are not subject to Optional Redemption, unless a Tax Event has occurred.  See "*Description of the Offered Securities—The Indenture and the Secured Notes—Optional Redemption and Refinancing*." |
| *Optional Redemption* ................. | The Secured Notes shall be redeemable by the Co-Issuers, in whole, on any Business Day (x) after the end of the Non-Call Period and (y) during the Non-Call Period, only if a Tax Event has occurred.  No Optional Redemption (as defined below) may occur unless the Issuer has received written direction of the holders of at least (i) when no Tax Event has occurred or is ongoing, 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes or (ii) when a Tax Event has occurred and is ongoing, 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes or of the Aggregate Outstanding Amount of any Class of Secured Notes Affected by such Tax Event (provided that if the Tax Event that has occurred is with respect to any tax arising under or as a result of FATCA, then holders that have not provided the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information (to the extent that the failure to provide the Holder FATCA Information was a cause of the tax arising under FATCA) shall not be considered in determining whether the holders of at least 66-2/3% of the Aggregate Outstanding Amount of the applicable Class of Notes have directed a redemption of Secured Notes), and the Subordinated Notes may be redeemed, in whole but not in part, on any Business Day on or after the redemption or repayment of the Secured Notes, at the written direction of the holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes (each of the foregoing, an "**Optional Redemption**").  In such event, the Portfolio Manager will (except in the case of a Refinancing) direct the sale of Assets in order to make payments as described under "*Description of the Offered Securities—Optional Redemption and Refinancing*." |
| | There are certain other restrictions on the ability of the Co-Issuers to effect an Optional Redemption.  See "*Description of the Offered Securities—Optional Redemption and Refinancing*." |
| *Refinancing* ................................ | Any Class or Classes of Secured Notes may be redeemed in whole, but not in part, on any Business Day after the Non-Call Period from Refinancing Proceeds at the written direction of at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes (with consent of the Portfolio Manager) delivered to the Issuer and the Portfolio Manager (with a copy to the Trustee and the Rating Agency).  The Co-Issuers will redeem such Class or Classes of Secured Notes on the applicable Redemption Date following receipt of such direction by obtaining a loan or an issuance of replacement securities, the terms of which loan or issuance will be negotiated by the Portfolio Manager on behalf of the Issuer, from one or more financial |

3

institutions or purchasers (a refinancing provided pursuant to such loan or issuance, a "**Refinancing**").   Any replacement notes issued pursuant to a Refinancing of any Class of Secured Notes will, to the extent reasonably practicable, be offered first to the Holders of such Class subject to the Refinancing, in such amounts as are necessary to preserve such Holders' *pro rata* holdings in the related Class of Secured Notes being refinanced as determined immediately prior to the Refinancing.

The Issuer will not obtain a Refinancing of less than all Classes of Secured Notes unless the Portfolio Manager determines and certifies to the Trustee and the Issuer that:  (i) in the case of a Refinancing of Floating Rate Notes, the spread over LIBOR of any obligations providing the Refinancing Proceeds will not be greater than the spread over LIBOR of the Secured Notes subject to such Refinancing;  (ii) in the case of a Refinancing of Fixed Rate Notes, either (A) the stated interest rate of the obligations providing the Refinancing will not be greater than the stated interest rate of the Secured Notes subject to such Refinancing or (B) if the obligations providing the Refinancing Proceeds are Floating Rate Notes, the spread over LIBOR of the obligations providing the Refinancing will not be greater than the spread over LIBOR on the corresponding Pari Passu Class of the Secured Notes subject to such Refinancing; (iii) the proceeds from the Refinancing (together with Partial Refinancing Interest Proceeds available to pay the accrued interest portion of the applicable Redemption Price) will be at least sufficient to pay the Redemption Price of the Class or Classes of Secured Notes subject to Refinancing; (iv) the aggregate principal amount of any obligations providing the Refinancing is equal to the Aggregate Outstanding Amount of the Secured Notes being redeemed with the proceeds of such obligations; (v) the stated maturity of the obligations providing the Refinancing is no earlier than the Stated Maturity of the Secured Notes being refinanced; (vi) the Refinancing Proceeds will be used (to the extent necessary) to redeem the applicable Secured Notes; (vii) the agreements relating to the Refinancing contain limited-recourse and non-petition provisions equivalent to those applicable to the Secured Notes being redeemed, as set forth in the Indenture; (viii) the obligations providing the Refinancing are not senior in priority of payment, and do not have greater voting rights than, the Class of Secured Notes being redeemed; and (ix) the expenses in connection with the Refinancing have been paid or will be adequately provided for from (1) the proceeds of the Refinancing (except for expenses owed to persons that agree to be paid solely as Administrative Expenses payable in accordance with the Priority of Payments) and/or (2) the application of clause (T) of "—*Application of Interest Proceeds*."

In addition to the foregoing restrictions, no replacement Class of Secured Notes will be issued in connection with a Refinancing of less than all Classes of Secured Notes unless the Issuer has reasonably determined, after consulting nationally recognized U.S. tax counsel experienced in such matters, that the issuance of such notes would not affect the U.S. federal income tax treatment of the Secured Notes then outstanding (including any resulting deemed exchange under Section 1001 of the Code) that are not subject to the Refinancing.

In the case of a Refinancing upon a redemption of all Classes of Secured Notes, the Issuer will not obtain such Refinancing unless (i) the Refinancing Proceeds and all other available funds will be at least sufficient to redeem simultaneously the Secured Notes, in whole but not in part, and to pay the other amounts included in the aggregate Redemption Price and all accrued and

unpaid applicable Management Fees, Administrative Expenses (regardless of the Administrative Expense Cap), including the reasonable fees, costs, charges and expenses incurred by the Trustee and the Collateral Administrator (including reasonable attorneys' fees and expenses) in connection with such Refinancing; *provided* that, in the event that the Redemption Date is not a Payment Date, any applicable Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments will be calculated as of such Redemption Date, (ii) the Refinancing Proceeds and other available funds are used (to the extent necessary) to make such redemption and (iii) the agreements relating to the Refinancing contain limited-recourse and non-petition provisions equivalent to those applicable to the Secured Notes being redeemed, as set forth in the Indenture.

Refinancing Proceeds will not constitute Interest Proceeds or Principal Proceeds but will be applied directly on the related Redemption Date pursuant to the Indenture to redeem the Secured Notes being refinanced without regard to the Priority of Payments; *provided* that, to the extent that any Refinancing Proceeds are not applied to redeem the Secured Notes being refinanced or to pay expenses in connection with the Refinancing, such Refinancing Proceeds will be treated as Principal Proceeds.

The holders of the Notes will not have any cause of action against any of the Co-Issuers, the Portfolio Manager or the Trustee for any failure to obtain a Refinancing.   In the event that a Refinancing is obtained meeting the requirements specified above as certified by the Portfolio Manager, the Issuer and the Trustee will amend the Indenture to the extent necessary to reflect the terms of the Refinancing and no further consent for such amendments shall be required from the holders of Notes, other than the consent of at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes directing or consenting to the redemption.

| | |
|---|---|
| *Redemption Prices* ..................... | The redemption price of each Class of Secured Notes (the "**Redemption Price**" for such Secured Notes) will be (a) 100% of the Aggregate Outstanding Amount of the Secured Notes to be redeemed *plus* (b) accrued and unpaid interest thereon (including, if applicable, interest on any accrued and unpaid Deferred Interest with respect to such Deferrable Notes) to the Redemption Date *plus* (c) with respect to the Notes of any Make-Whole Class only, if any such Notes are redeemed on or before the Make-Whole Date as described in "*—Make-Whole Amount*" below, the Make-Whole Amount (as defined below) with respect to such Notes; *provided* that the holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes to be redeemed may elect to receive less than 100% of the Redemption Price that would otherwise be payable to the holders of such Class of Secured Notes. |

The Redemption Price for each Subordinated Note will be its proportional share of the amount of proceeds of the Assets (including proceeds created when the lien of the Indenture is released) remaining after giving effect to the redemption of the Secured Notes and payment in full of all expenses of the Co-Issuers.

| | |
|---|---|
| *Make-Whole Amount*.................. | If on or before the Payment Date in May 2017 (the "**Make-Whole Date**") the Class A-1 Notes, the Class A-2 Notes, the Class B-1 Notes, the Class B-2 Notes or the Class C Notes (each such Class a "**Make Whole Class**") (i) are redeemed in connection with an Optional Redemption or (ii) are redeemed in connection with a Refinancing, then the holders of such Notes will be entitled to receive a Make-Whole Amount as part of the Redemption Price for such Notes. The "**Make-Whole Amount**" means, with respect to a redemption or repayment of principal of a Note of a Make-Whole Class in connection with an Optional Redemption or Refinancing on a Redemption Date before the Make-Whole Date, (i) 100% of the Aggregate Outstanding Amount of such Note multiplied by (ii) the product of (A) the interest rate indicated with respect to the applicable Make-Whole Class under "—*Principal Terms of the Offered Securities*" and (B) the number of days in the period from and including such Redemption Date to but excluding the Make-Whole Date, divided by 360. |

**Clean-up Call Redemption:**

The Notes are redeemable at the option of the Co-Issuers acting at the direction of the Portfolio Manager (a "**Clean-up Call Redemption**") on any Business Day, in whole but not in part, on or after the Payment Date on which the Aggregate Principal Balance of the Collateral Obligations and Eligible Investments representing Principal Proceeds has been reduced to 20% or less of the Target Initial Par Amount, unless a Majority of the Subordinated Notes directs to prevent such redemption in a writing delivered to the Issuer, the Trustee and the Portfolio Manager at least 20 days prior to the Clean-up Call Redemption Date.

See "*Description of the Offered Securities—Clean-up Call Redemption*."

**Surrender or Cancellation of Notes:**

All Notes that are redeemed or paid in full and/or surrendered for cancellation as described herein will forthwith be canceled and may not be reissued or resold. Any holder may tender any Notes or beneficial interests in Notes owned by such holder for cancellation by the Trustee without receiving any payment (any such surrendered Notes or beneficial interests in Notes, "**Surrendered Notes**"); *provided* that such Surrendered Notes will be deemed outstanding to the extent described under "*Description of the Offered Securities—Surrender and Cancellation of Notes*". Except as otherwise described under "*Description of the Offered Securities—Issuer Purchases of Secured Notes*" below, no Note (other than Surrendered Notes) may be surrendered (including any surrender in connection with abandonment) for any purpose other than for payment in full as provided herein, or for registration of transfer, exchange or redemption, or for replacement in connection with any Note mutilated, defaced or deemed lost or stolen.

**Priority of Payments:**

*Application of Interest Proceeds*

On each Payment Date (other than Payment Dates on which the Acceleration Priority of Payments is applicable) and on each Redemption Date (to the extent such Redemption Date is not a Payment Date), Interest Proceeds on deposit in the Collection Account that were received on or before the related Determination Date (or if such Determination Date is not a Business Day, the next succeeding Business Day) and that are transferred into the Payment Account, and, in the case of any Hedge Agreements, payments received on or before such Payment Date, will be applied in the following order of priority:

(A) to the payment of taxes, governmental fees and registered office fees owing by the Issuer or the Co-Issuer, if any;

(B) to the payment of the accrued and unpaid Administrative Expenses up to the Administrative Expense Cap in the order set forth in the definition of Administrative Expenses; *provided* that the Petition Expense Amount may be applied pursuant to this clause (B) to the payment of Petition Expenses at the time that such Petition Expenses are incurred without regard to the Administrative Expense Cap and, if (but only after) the Petition Expense Amount is applied to the payment of Petition Expenses in full, Petition Expenses shall be paid together with other Administrative Expenses subject to the Administrative Expense Cap above; *provided further* that the Petition Expenses paid pursuant to this clause (B) shall be paid in the order set forth in the definition of Administrative Expenses;

(C) to the payment of the Senior Management Fee to the Portfolio Manager;

(D) to the payment, *pro rata,* of any amounts due to any Hedge Counterparty under any Hedge Agreement other than amounts due as a result of the termination (or partial termination) of such Hedge Agreement;

(E) to the payment of accrued and unpaid interest on the Class A-1 Notes and the Class A-2 Notes, *pro rata*, allocated in proportion to the respective amounts of accrued and unpaid interest;

(F) to the payment of accrued and unpaid interest on the Class B-1 Notes and the Class B-2 Notes, *pro rata*, allocated in proportion to the respective amounts of accrued and unpaid interest;

(G) to the payment, *pro rata,* of any amounts due to any Hedge Counterparty under any Hedge Agreement pursuant to an early termination (or partial termination) of any Hedge Agreement as a result of a Priority Hedge Termination Event;

(H) if either of the Class A/B Coverage Tests (other than the Interest Coverage Test, in the case of the first Payment Date after the Closing Date) is not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both Class A/B Coverage Tests to be met;

(I) to the payment of accrued and unpaid interest on the Class C Notes;

(J) to the payment of any Deferred Interest on the Class C Notes (and interest accrued thereon);

(K) if either of the Class C Coverage Tests (other than the Interest Coverage Test, in the case of the first Payment Date after the Closing Date) is not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both Class C Coverage Tests to be met;

(L) to the payment of accrued and unpaid interest on the Class D Notes;

(M)   to the payment of any Deferred Interest on the Class D Notes (and interest accrued thereon);

(N)   if either of the Class D Coverage Tests (other than the Interest Coverage Test, in the case of the first Payment Date after the Closing Date) is not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence, to the extent necessary to cause both Class D Coverage Tests to be met;

(O)   to the payment of accrued and unpaid interest on the Class E Notes;

(P)   to the payment of any Deferred Interest on the Class E Notes (and interest accrued thereon);

(Q)   if either Class E Coverage Test (other than the Interest Coverage Test, in the case of the first Payment Date after the Closing Date) is not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both Class E Coverage Tests to be met;

(R)   if the Effective Date Conditions have not been satisfied on or prior to such Payment Date, at the election of the Portfolio Manager to (x) the payment of principal of the Secured Notes in accordance with the Note Payment Sequence or (y) purchase Collateral Obligations, in each case, in the amount necessary so that the Rating Agency will be able to confirm its initial rating on the Secured Notes (including by means of a deemed confirmation as set forth in the definition of S&P Rating Condition) or the Secured Notes are paid in full, as applicable;

(S)   during the Reinvestment Period only, if the Interest Reinvestment Test is not satisfied on the related Determination Date, an amount equal to the lesser of (i) 50% of the Interest Proceeds remaining as of such Payment Date and (ii) an amount which would cause the Interest Reinvestment Test to be satisfied, at the discretion of the Portfolio Manager either (1) to the Collection Account as Principal Proceeds to purchase additional Collateral Obligations or (2) to the payment of principal of the Secured Notes in accordance with the Note Payment Sequence;

(T)   (1) *first*, to the payment of any accrued and unpaid Subordinated Management Fee to the Portfolio Manager, together with accrued interest thereon, (2) *second*, to the payment of any Administrative Expenses not paid in full pursuant to clause (B) above due to the limitation contained therein and (3) *third,* to the payment of any expenses incurred in connection with a Refinancing;

(U)   to the payment of any amounts due to any Hedge Counterparty under any Hedge Agreement pursuant to an early termination (or partial termination) of any Hedge Agreement not otherwise paid pursuant to clause (G) above;

(V)   unless each of the Effective Date Conditions has been satisfied, all remaining Interest Proceeds to the Interest Collection Subaccount as Interest Proceeds for distribution on the next subsequent Payment Date;

(W)     to the Holders of the Subordinated Notes in an amount necessary (taking into account all payments made to the Holders of the Subordinated Notes on prior Payment Dates) to cause the Incentive Management Fee Threshold to be satisfied; and

(X)     any remaining Interest Proceeds shall be paid as follows: (i) 15% of such remaining Interest Proceeds to the Portfolio Manager as the Incentive Management Fee and (ii) 85% of such remaining Interest Proceeds to the Holders of the Subordinated Notes;

*provided*  that, in lieu of the payment of Interest Proceeds referred to under clause (X)(ii) above, in whole or in part on any Payment Date, the Portfolio Manager, on behalf of the Issuer, shall have the right to direct the Trustee to distribute any Equity Securities *pro rata* to the Consenting Holders of the Subordinated Notes with respect to such Payment Date to the extent that the Market Value of such Equity Securities (determined by the Portfolio Manager as of the relevant Determination Date) is equal to or lower than the aggregate amount of Interest Proceeds that would otherwise be due and payable on such Payment Date to such Consenting Holders of the Subordinated Notes. Interest Proceeds in an amount equal to or greater than the Market Value of such Equity Securities (determined by the Portfolio Manager as of the relevant Determination Date) distributed to the Consenting Holders of the Subordinated Notes with respect to any such Payment Date shall be treated for all purposes by the Issuer and the Trustee as Principal Proceeds available for distribution in accordance with the Priority of Payments on the relevant Payment Date. In connection therewith, the amount of Interest Proceeds available on the relevant Payment Date shall be reduced and the amount of Principal Proceeds available on the relevant Payment Date shall be increased in corresponding amounts.

*Application of Principal Proceeds*.....................................

On each Payment Date (other than Payment Dates on which the Acceleration Priority of Payments is applicable) and on each Redemption Date (to the extent such Redemption Date is not a Payment Date), Principal Proceeds on deposit in the Collection Account that were received on or before the related Determination Date, and that are transferred to the Payment Account, will be applied, except for any Principal Proceeds that will be used to settle binding commitments (entered into prior to the Determination Date) for the purchase of Collateral Obligations, in the following order of priority:

(A)     to pay the amounts referred to in clauses (A) through (H) of "— *Application of Interest Proceeds*" above (in the priority stated therein), but (a) only to the extent not paid in full thereunder and (b) subject to the Administrative Expense Cap; *provided* that, if the Senior Notes have been repaid in full, to pay the amounts referred to in "— *Application of Interest Proceeds*" above, through and including full payment of accrued and unpaid interest on the Controlling Class;

(B)     to pay, as contemplated under "—*Application of Interest Proceeds*" (1) the amounts referred to in clauses (I) and (J); *provided* that payments under clauses (I) and (J) shall be made only to the extent the Class C Notes are the Controlling Class on such Payment Date; (2) then, the amounts referred to in clause (K); (3) then, the amounts referred to in clauses (L) and (M); *provided* that payments under clauses (L) and (M) shall be made only to the extent the Class D Notes are the Controlling Class on such Payment Date; (4) then, the amounts referred to in clause

(N); (5) then, the amounts referred to in clauses (O) and (P); *provided that* payments under clauses (O) and (P) shall be made only to the extent the Class E Notes are the Controlling Class on such Payment Date; and (6) then, the amounts referred to in clause (Q); but, in each case, (a) only to the extent not paid in full thereunder and (b) subject to any applicable caps or other limitations expressly described therein;

(C)     to make payments in accordance with the Note Payment Sequence in the amount of the Special Redemption Amount, if any;

(D)     on any Redemption Date (other than a Redemption Date relating to a Refinancing), (1) *first*, to pay the Redemption Price of the Secured Notes in accordance with the Note Payment Sequence and (2) *second*, to the payments under clauses (T) and (U) of "—*Application of Interest Proceeds*" above (in the same order of priority specified thereunder, but only to the extent not paid in full thereunder and without regard to any cap thereunder;

(E)     (1) during the Reinvestment Period, at the discretion of the Portfolio Manager, to the Collection Account as Principal Proceeds to invest in Eligible Investments and/or additional Collateral Obligations or (2) at the sole discretion of the Portfolio Manager, after the Reinvestment Period, so long as no Event of Default has occurred and is continuing, Principal Proceeds received with respect to Credit Risk Obligations and Unscheduled Principal Payments to the Collection Account as Principal Proceeds to invest in Eligible Investments and/or to the purchase of additional Collateral Obligations in accordance with the Post-Reinvestment Period Investment Criteria;

(F)     after the Reinvestment Period, to make payments in accordance with the Note Payment Sequence;

(G)     after the Reinvestment Period, to (1) *first,* the payment of accrued but unpaid Subordinated Management Fees, together with accrued interest thereon, and (2) *second,* Administrative Expenses as referred to in clause (T)(2) of "—*Application of Interest Proceeds*" above (in the priority stated therein), but only to the extent not paid in full thereunder;

(H)     after the Reinvestment Period, to the payment, *pro rata,* of any amount due to any Hedge Counterparty as referred to in clause (U) of "—*Application of Interest Proceeds*" above, but only to the extent not paid in full thereunder;

(I)     to the Holders of the Subordinated Notes in an amount necessary (taking into account all payments made to the Holders of Subordinated Notes on prior Payment Dates and all payments made under clause (W) of "—*Application of Interest Proceeds*" above on such Payment Date) to cause the Incentive Management Fee Threshold to be satisfied; and

(J)     any remaining Principal Proceeds shall be paid as follows: (i) 15% of such remaining Principal Proceeds to the Portfolio Manager as the Incentive Management Fee and (ii) 85% of such remaining Principal Proceeds to the Holders of the Subordinated Notes.

10

In determining the amount of any principal payment required to satisfy any Coverage Test after the Reinvestment Period, for purposes of the priorities set forth under "—*Application of Interest Proceeds*" above, the Aggregate Outstanding Amount of the Secured Notes shall give effect to the application of Principal Proceeds to be used on the applicable Payment Date to repay principal of the Secured Notes, and the application of Interest Proceeds on such Payment Date pursuant to all prior clauses in the priorities set forth under "—*Application of Interest Proceeds*" above.

*Acceleration Priority of Payments*.....................................  Notwithstanding the provisions of "—*Application of Interest Proceeds*" and "—*Application of Principal Proceeds*," if declaration of acceleration of the maturity of the Secured Notes has occurred following an Event of Default and such acceleration has not been rescinded or annulled (an "**Acceleration Event**"), on each date or dates fixed by the Trustee, all proceeds in respect of the Assets will be applied in the following order of priority (the "**Acceleration Priority of Payments**"):

(A)     to pay all amounts under clauses (A) through (D) of "—*Application of Interest Proceeds*" above (only if the Trustee has begun liquidating Assets in accordance with the Indenture, such payments to be made without regard to the Administrative Expense Cap);

(B)     to the payment, *pro rata,* of any amounts due to any Hedge Counterparty or under any Hedge Agreement pursuant to an early termination (or partial termination) of any Hedge Agreement as a result of a Priority Hedge Termination Event;

(C)     to the payment of accrued and unpaid interest on the Class A-1 Notes and the Class A-2 Notes, *pro rata*, allocated in proportion to the respective amounts of accrued and unpaid interest until such amounts have been paid in full;

(D)     to the payment of principal of the Class A-1 Notes and the Class A-2 Notes, *pro rata*, based on their respective Aggregate Outstanding Amounts, until such amounts have been paid in full;

(E)     to the payment of accrued and unpaid interest on the Class B-1 Notes and the Class B-2 Notes, *pro rata*, allocated in proportion to the respective amounts of accrued and unpaid interest until such amounts have been paid in full;

(F)     to the payment of principal of the Class B-1 Notes and the Class B-2 Notes, *pro rata*, based on their respective Aggregate Outstanding Amounts, until such amounts have been paid in full;

(G)     to the payment of accrued and unpaid interest and any Deferred Interest on the Class C Notes until such amounts have been paid in full;

(H)     to the payment of principal of the Class C Notes until such amount has been paid in full;

(I)     to the payment of accrued and unpaid interest and any Deferred Interest on the Class D Notes until such amounts have been paid in full;

(J)    to the payment of principal of the Class D Notes until such amount has been paid in full;

(K)    to the payment of accrued and unpaid interest and any Deferred Interest on the Class E Notes until such amounts have been paid in full;

(L)    to the payment of principal of the Class E Notes until such amount has been paid in full;

(M)    (1) *first*, to the payment of any accrued and unpaid Subordinated Management Fee to the Portfolio Manager, together with accrued interest thereon, and (2) *second*, to the payment of any Administrative Expenses not paid in full pursuant to clause (A) above due to the limitation contained therein (in the priority stated therein);

(N)    to the payment of any amounts due to any Hedge Counterparty under any Hedge Agreement pursuant to an early termination (or partial termination) of such Hedge Agreement not otherwise paid in full pursuant to clause (B) above;

(O)    to the Holders of the Subordinated Notes in an amount necessary (taking into account all payments made to the Holders of the Subordinated Notes on prior Payment Dates) to cause the Incentive Management Fee Threshold to be satisfied; and

(P)    any remaining proceeds shall be paid as follows: (i) 15% of such remaining amounts to the Portfolio Manager as the Incentive Management Fee and (ii) 85% of such remaining amounts to the Holders of the Subordinated Notes.

*Note Payment Sequence*..............    The "**Note Payment Sequence**" shall be the application, in accordance with the Priority of Payments described above, of Interest Proceeds or Principal Proceeds, as applicable, in the following order:

(i)    to the payment of principal of the Class A-1 Notes and the Class A-2 Notes, *pro rata*, based on their respective Aggregate Outstanding Amounts, until the Class A-1 Notes and the Class A-2 Notes have been paid in full;

(ii)    to the payment of principal of the Class B-1 Notes and the Class B-2 Notes, *pro rata*, based on their respective Aggregate Outstanding Amounts, until the Class B-1 Notes and the Class B-2 Notes have been paid in full;

(iii)    to the payment of accrued and unpaid interest and any Deferred Interest on the Class C Notes until such amounts have been paid in full;

(iv)    to the payment of principal of the Class C Notes until the Class C Notes have been paid in full;

(v)    to the payment of accrued and unpaid interest and any Deferred Interest on the Class D Notes until such amounts have been paid in full;

(vi)    to the payment of principal of the Class D Notes until the Class D Notes

have been paid in full;

(vii) to the payment of accrued and unpaid interest and any Deferred Interest on the Class E Notes until such amounts have been paid in full; and

(viii) to the payment of principal of the Class E Notes until the Class E Notes have been paid in full.

**Portfolio Management Fees:**  The Management Fees consist of (i) the Senior Management Fee in the amount of 0.15% *per annum* of the Fee Basis Amount, (ii) the Subordinated Management Fee in the amount of 0.25% *per annum* of the Fee Basis Amount and (iii) an Incentive Management Fee equal to:  (1) 15% of the remaining Interest Proceeds, if any, available for payment pursuant to clause (X) of "—*Priority of Payments—Application of Interest Proceeds*," (2) 15% of the remaining Principal Proceeds, if any, available for payment pursuant to clause (J) of "—*Priority of Payments—Application of Principal Proceeds*" and (3) 15% of the remaining amounts, if any, available for payment pursuant to clause (P) of the "—*Priority of Payments—Acceleration Priority of Payments*," in each case, calculated and subject to the limitations described under "*The Portfolio Management Agreement*" and are payable as described under "—*Priority of Payments*."  The Subordinated Management Fee is payable on (x) each Payment Date pursuant to clause (T)(1) of "—*Application of Interest Proceeds*," (y) each Payment Date after the Reinvestment Period pursuant to clause (G)(1) of "—*Application of Principal Proceeds*" or earlier if paid in connection with an Optional Redemption pursuant to clause (D) of "—*Application of Principal Proceeds*" and (z) each Payment Date pursuant to clause (M)(1) of "—*Acceleration Priority of Payments*," in each case, only to the extent that sufficient Interest Proceeds or Principal Proceeds are available, and, to the extent any such Subordinated Management Fee is not paid on any Payment Date for any reason, such payment will be deferred and will accrue interest at LIBOR, compounded quarterly (calculated on the basis of a 360-day year consisting of twelve 30-day months).

**Security for the Secured Notes:**

*General* ......................................  The Secured Notes will be secured by the Assets, which include the various accounts pledged under the Indenture.  In purchasing and selling Collateral Obligations, the Issuer will generally be required to meet certain requirements imposed by the Concentration Limitations described under "—Concentration Limitations" and "Security for the Secured Notes—The Concentration Limitations," the Collateral Quality Test described under the "—Collateral Quality Test" and "Security for the Secured Notes—The Collateral Quality Test," the Coverage Tests described under "—Coverage Tests" and "Security for the Secured Notes—The Coverage Tests" and various other criteria described under "Security for the Secured Notes—Sales of Collateral Obligations; Additional Collateral Obligations and Investment Criteria." Substantially all of the Collateral Obligations will be rated below investment grade and accordingly will have greater credit and liquidity risk than investment grade corporate obligations.  See "Risk Factors—Risks Relating to the Collateral Obligations—Below Investment-Grade Assets."  The initial portfolio of Collateral Obligations will be purchased and/or refinanced through the application of the net proceeds of the sale of the Offered Securities.  See "Security for the Secured Notes—Collateral Obligations." During the Ramp-up Period (as defined below), pending investment in such Collateral Obligations, a portion of such net proceeds will be invested in

Eligible Investments.

*Collateral Obligations* ............... An obligation meeting the standards set forth below, whether pledged to the Trustee on the Closing Date, during the Ramp-up Period or thereafter, will constitute a "**Collateral Obligation**".

An obligation will be eligible for purchase by the Issuer and pledge to the Trustee as a Collateral Obligation if it is a debt obligation (including, but not limited to, interests in bank loans acquired by way of a sale or assignment, and high-yield debt securities) or Participation Interest that as of the date of acquisition by the Issuer (collectively, the "**Eligibility Criteria**"):

(i)     is U.S. Dollar denominated and is neither convertible by the issuer thereof into, nor payable in, any other currency;

(ii)    is not a Defaulted Obligation or a Credit Risk Obligation;

(iii)   is not a lease;

(iv)    if it is a Deferrable Obligation, is not currently deferring the payment of any accrued and unpaid interest that otherwise would have been due and continues to remain unpaid;

(v)     provides for a fixed amount of principal payable in cash on scheduled payment dates and/or at maturity and does not by its terms provide for earlier amortization or prepayment at a price of less than par;

(vi)    does not constitute Margin Stock;

(vii)   is not a Margin Loan;

(viii)  has payments that do not subject the Issuer to withholding tax unless (i) the related obligor is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after tax basis (for the avoidance of doubt, this clause shall not apply to commitment fees, letter of credit fees or similar fees) or (ii) such withholding is imposed under FATCA or on commitment fees, letter of credit fees or other similar fees;

(ix)    has a Moody's Rating and an S&P Rating and does not have an S&P Rating that is below "CCC-" or a Moody's Default Probability Rating that is below "Caa3";

(x)     is not a debt obligation whose repayment is subject to substantial non-credit related risk as determined by the Portfolio Manager;

(xi)    except for Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations, is not an obligation pursuant to which any future advances or payments, other than Excepted Advances, to the borrower or the obligor thereof may be required to be made by the Issuer;

(xii)   does not have an "f," "r," "p," "pi," "q," "t" or "sf" subscript assigned by S&P or an "sf" subscript assigned by any nationally recognized statistical rating agency;

14

(xiii) is not a Related Obligation;

(xiv) is not subject to an Offer other than (a) an offer of publicly traded registered securities with equal or greater face value and similar terms issued in exchange for securities issued under Rule 144A or a loan or security that would otherwise qualify for purchase under the Investment Criteria or (b) a Permitted Offer;

(xv) is not a Structured Finance Obligation;

(xvi) is not a Synthetic Security;

(xvii) will not consist of a debt obligation of a single obligor where the total potential indebtedness of such obligor under all of its loan agreements, indentures and other underlying instruments is less than $250,000,000;

(xviii)  will not require the Issuer, the Co-Issuer or the pool of collateral to be registered as an investment company under the Investment Company Act;

(xix) is neither (A) an Equity Security nor (B) by its terms convertible into or exchangeable for an Equity Security;

(xx) is not a Bridge Loan;

(xxi) is not a Zero Coupon Obligation;

(xxii) is not a Step-up Obligation or a Step-down Obligation;

(xxiii)  is not an Interest Only Security;

(xxiv)  it does not mature after the earliest Stated Maturity of the Notes;

(xxv) it is not a bond or Pre-funded Letter of Credit;

(xxvi)  if the obligation is payable 184 days or more from the date of its original issuance, is issued in "registered form" for purposes of Section 163(f) of the Code;

(xxvii)  is purchased at a price at least equal to 65% of its principal balance; and

(xxviii) is not a Real Estate Loan.

| | |
|---|---|
| *Hedge Agreements* ..................... | Subject to certain restrictions, the Issuer is permitted to enter into one or more interest rate Hedge Agreements, with any one or more institutions entering into or guaranteeing a Hedge Agreement with the Issuer (each, a "**Hedge Counterparty**"). See "*Security for the Secured Notes—Hedge Agreements.*" Each Hedge Agreement shall require satisfaction of the S&P Rating Condition. |
| **Portfolio Management:** | Management of the portfolio will be conducted by the Portfolio Manager pursuant to a portfolio management agreement to be entered into between the Issuer and the Portfolio Manager (the "**Portfolio Management Agreement**"). Under the Portfolio Management Agreement, and subject to the limitations of |

the Indenture, the Portfolio Manager will manage the selection, acquisition, reinvestment and disposition of the Assets, including exercising rights and remedies associated with the Assets, disposing of the Assets and certain related functions.

On the Closing Date, the Portfolio Manager, its affiliates or accounts advised or sub-advised by the Portfolio Manager or its affiliates or their respective advised accounts, are expected to purchase approximately U.S.$32,000,000 of the Class A-1 Notes, U.S.$2,000,000 of the Class D Notes, U.S.$5,500,000 of the Class E Notes and U.S.$51,850,000 of the Subordinated Notes and may purchase other Classes on the Closing Date or at any time in the future. None of the Portfolio Manager, any affiliate thereof or their respective advised or sub-advised accounts is required to continue to hold any such Notes.

**Use of Proceeds:**

The net cash proceeds of the offering of the Offered Securities will be applied by the Issuer to make deposits into certain accounts and to purchase Collateral Obligations on and after the Closing Date, all of which will be pledged under the Indenture by the Issuer to the Trustee.  See "*Use of Proceeds*."

*Designated Principal Proceeds*.....................................

Principal Proceeds in an aggregate amount not greater than $2,820,000 ("**Designated Principal Proceeds**") may be designated, from time to time after the Effective Date and on or prior to October 8, 2015 (the "**Designated Principal Proceeds Cut-off Date**") by the Portfolio Manager to be treated as Interest Proceeds (but only if the Effective Date Overcollateralization Test would be satisfied after each such designation).

**Purchase of Collateral Obligations; Ramp-up Period:**

The Issuer is expected to have entered into binding agreements to purchase, on or about the Closing Date, Collateral Obligations the Aggregate Principal Balance of which is at least 90% of the Target Initial Par Amount.  The Issuer will use its commercially reasonable efforts to have purchased or to have entered into binding agreements to purchase, by the earlier to occur of (a) June 22, 2015 and (b) the date selected by the Portfolio Manager and upon which the Issuer has purchased, or entered into binding commitments to purchase, Collateral Obligations, including Collateral Obligations acquired by the Issuer on or prior to the Closing Date, the Aggregate Principal Balance of which equals or exceeds the Target Initial Par Amount (not including the reduction in the Aggregate Principal Balance of any Collateral Obligation after the Closing Date as a result of prepayments, maturities or redemptions, unless such amounts have been reinvested in Collateral Obligations; *provided* that, for purposes of this calculation, the Principal Balance of any Defaulted Obligation shall be its S&P Collateral Value) (the "**Target Initial Par Condition**" and the period from the Closing Date to such date being the "**Ramp-up Period**").

If, after the end of the Ramp-up Period, the Effective Date Conditions have not been met, the Issuer may, in accordance with the Indenture, instruct the Trustee to (x) prior to the first Determination Date, transfer amounts from the Interest Collection Subaccount to the Principal Collection Subaccount in an amount sufficient to satisfy the Effective Date Conditions (*provided* that the amount of such transfer would not result in the failure to pay interest due on any Senior Notes in accordance with the Priority of Payments) or (y) take such other action, including but not limited to a Special Redemption, sufficient to satisfy the Effective Date Conditions.

It is expected, but there can be no assurance, that the Concentration Limitations, the Collateral Quality Test, the Target Initial Par Condition, the Effective Date Overcollateralization Test and each of the Overcollateralization Ratio Tests described herein will be satisfied not later than the end of the Ramp-up Period.

*Reinvestment Period* ................. The "**Reinvestment Period**" will be the period from and including the Closing Date to and including the earliest of (i) May 1, 2019 (or, if such date is not a Business Day, the next succeeding Business Day) or (ii) the date of the acceleration of the maturity of any Class of Secured Notes due to an Event of Default as described under "*Description of the Offered Securities—The Indenture and the Secured Notes—The Indenture.*"  See "*Security for the Secured Notes—Sales of Collateral Obligations; Additional Collateral Obligations and Investment Criteria.*"

**Collateral Quality Test:** The "**Collateral Quality Test**" will be satisfied if, as of any date of determination at, or subsequent to, the end of the Ramp-up Period (or, with respect to the test set forth in clause (iii) below, at, or subsequent to any date of determination on or after the Effective Date and which occurs during the Reinvestment Period), in the aggregate, the Collateral Obligations owned (or, for purposes of *pro forma* calculations in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer satisfy each of the tests set forth below (or, if a test is not satisfied on such date of determination, the degree of compliance with such test is maintained or improved after giving effect to any purchase or sale effected on such date of determination) (see "*Security for the Secured Notes—The Collateral Quality Test*"):

(i)   the Minimum Weighted Average Coupon Test;

(ii)   the Minimum Floating Spread Test;

(iii)   the S&P CDO Monitor Test;

(iv)   the Minimum Weighted Average S&P Recovery Rate Test; and

(v)   the Weighted Average Life Test.

**Concentration Limitations:** The "**Concentration Limitations**" will be satisfied if, as of any date of determination at or subsequent to the end of the Ramp-up Period, in the aggregate, the Collateral Obligations owned (or, for purposes of *pro forma* calculations in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer comply with all of the requirements set forth below:

*Non-Emerging Market Obligors* ..................................... (i)   all of the Collateral Obligations must be issued by Non-Emerging Market Obligors and the country of organization of such obligor must either (x) be the United States or (y) have a country ceiling for foreign currency bonds rating of at least "AA" by S&P;

*Domicile of Obligor* ................... (ii)   no more than the percentage listed below of the Collateral Principal Amount may be issued by obligors Domiciled in the country or countries set forth opposite such percentage:

| % Limit | Country or Countries |
|---------|----------------------|

| 20% | All countries (in the aggregate) other than the United States; |
| 15% | All countries other than the United States or Canada; |
| 15% | Canada; |
| 10% | United Kingdom; |
| 10% | Any Tax Jurisdiction; |
| 10% | All Group I Countries in the aggregate; |
| 10% | All Group II Countries in the aggregate; |
| 7.5% | All Group III Countries in the aggregate; |
| 10% | Any individual country other than the United States, United Kingdom or Canada; |

*Delayed Drawdown/Revolving Collateral Obligations* ............... (iii) the sum of the aggregate unfunded commitments under Delayed Drawdown Collateral Obligations that are available to be funded and the Aggregate Principal Balance of Revolving Collateral Obligations may not be more than 15% of the Collateral Principal Amount;

*Senior Secured Loans, Cash and Eligible Investments* ................... (iv) not less than 90% of the Collateral Principal Amount may consist of Senior Secured Loans, cash and Eligible Investments representing Principal Proceeds;

*Floating Rate Collateral Obligations, Cash and Eligible Investments* ................................ (v) not less than 95% of the Collateral Principal Amount may consist of floating rate Collateral Obligations, cash and Eligible Investments representing Principal Proceeds;

*Participation Interests* ............... (vi) not more than 20% of the Collateral Principal Amount may consist of Participation Interests;

*Second Lien Loans* ..................... (vii) not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations that are Second Lien Loans;

*DIP Collateral Obligations* ........ (viii) not more than 5% of the Collateral Principal Amount may consist of DIP Collateral Obligations and not more than 2% of the Collateral Principal Amount may consist of DIP Collateral Obligations issued by a single obligor;

*Single Obligor* ............................ (ix) not more than 2% of the Collateral Principal Amount may consist of obligations issued by a single obligor, except that up to 2.5% of the Collateral Principal Amount may consist of obligations issued by each of up to five other obligors;

*Rating of "Caa1"/"CCC+" and below* .......................................... (x) (a) not more than 7.5% of the Collateral Principal Amount may consist of Collateral Obligations with a Moody's Rating of "Caa1" or below and (b) not more than 7.5% of the Collateral Principal Amount may consist

of Collateral Obligations with an S&P Rating of "CCC+" or below;

| | | |
|---|---|---|
| *Third Party Credit Exposure* ...... | (xi) | the Third Party Credit Exposure may not exceed 20% of the Collateral Principal Amount and the Third Party Credit Exposure with counterparties with a rating below "AA" by S&P may not exceed 5% of the Collateral Principal Amount; *provided* that no Third Party Credit Exposure is permitted with counterparties that do not have a long-term debt rating of at least "A" by S&P and a short-term debt rating of at least "A-1" by S&P (or a long-term debt rating of at least "A+" by S&P); |
| *S&P Rating Derived from a Moody's Rating* .......................... | (xii) | not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations with an S&P Rating derived from a Moody's Rating as set forth in clause (iii)(a) of the definition of the term "S&P Rating;" |
| *S&P Industry Classification* ....... | (xiii) | not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations that are issued by obligors that belong to any single S&P industry classification, except that up to two other S&P industry classifications may each represent up to 12% of the Collateral Principal Amount and up to one other S&P industry classification may represent up to 15% of the Collateral Principal Amount; |
| *Cov-Lite Loans* ........................... | (xiv) | not more than 60% of the Collateral Principal Amount may consist of Cov-Lite Loans; |
| *Non-Quarterly Assets* ................. | (xv) | not more than 7.5% of the Collateral Principal Amount may consist of Collateral Obligations that are Non-Quarterly Assets; provided that not more than 3% of the Collateral Principal Amount may consist of Collateral Obligations that pay interest less frequently than semi-annually; |
| *Deferrable Obligations* .............. | (xvi) | not more than 3% of the Collateral Principal Amount may consist of Deferrable Obligations, including Partial Deferrable Obligations; provided that no such Deferrable Obligations are Deferring Obligations; and |
| *Current Pay Obligations* ............ | (xvii) | not more than 2.5% of the Collateral Principal Amount may consist of Current Pay Obligations. |

**Coverage Tests:**  The Coverage Tests will be used primarily to determine whether principal and interest may be paid on the Secured Notes and distributions may be made on the Subordinated Notes or whether funds which would otherwise be used to pay interest on the Secured Notes and to make distributions on the Subordinated Notes must instead be used to pay principal on one or more Classes of Secured Notes according to the priorities referred to in "*Summary of Terms—Priority of Payments*." The "**Coverage Tests**" will consist of the Overcollateralization Ratio Test and the Interest Coverage Test applied respectively to the Class A Notes and the Class B Notes, collectively (together, the "**Class A/B Coverage Tests**"), the Class C Notes (together, the "**Class C Coverage Tests**"), the Class D Notes (together, the "**Class D Coverage Tests**") and the Class E Notes (together, the "**Class E Coverage Tests**"). Measurement of the degree of compliance with each of (x) the Overcollateralization Ratio Tests will be required as of each Measurement Date beginning on the Determination Date which is at or subsequent to the

Effective Date and (y) the Interest Coverage Tests will be required as of each Measurement Date beginning on the Determination Date with respect to the second Payment Date.

The "**Overcollateralization Ratio Test**" and "**Interest Coverage Test**" applicable to the indicated Classes of Secured Notes will be satisfied as of any date of determination at or subsequent to the Effective Date (or, in the case of each Interest Coverage Test, at or subsequent to the Determination Date with respect to the second Payment Date) if the applicable Overcollateralization Ratio or Interest Coverage Ratio, as the case may be, is at least equal to the applicable ratio indicated below.  If the Coverage Tests are not satisfied on any Determination Date occurring at or subsequent to the Effective Date (or, in the case of each Interest Coverage Test, at or subsequent to the Measurement Date with respect to the second Payment Date), the Issuer will be required to apply available amounts in the Payment Account on the related Payment Date to make payments in accordance with the Note Payment Sequence to the extent necessary to achieve compliance with such Coverage Tests.

| Class | Required Overcollateralization Ratio |
|---|---|
| A/B | 119.4% |
| C | 112.6% |
| D | 108.5% |
| E | 104.8% |

| Class | Required Interest Coverage Ratio |
|---|---|
| A/B | 120.0% |
| C | 115.0% |
| D | 110.0% |
| E | 105.0% |

The "**Overcollateralization Ratio**" is, with respect to any specified Class or Classes of Secured Notes as of any Measurement Date, an amount, expressed as a percentage, equal to:

(a) the Adjusted Collateral Principal Amount;

*divided by*

(b) the Aggregate Outstanding Amount of the Secured Notes of such Class or Classes, each Priority Class of Secured Notes and each Pari Passu Class of Secured Notes (including all applicable Deferred Interest), in each case, if applicable.

The "**Interest Coverage Ratio**" for any designated Class or Classes of Secured Notes as of any date of determination is an amount, expressed as a percentage, equal to:

(a) (i) the Collateral Interest Amount as of such date of determination *minus* (ii) amounts payable (or expected as of the date of determination to be payable) on the following Payment Date as set forth in clauses (A) through (C) under "*Summary of Terms—Priority of Payments—Application of Interest*

20

*Proceeds*;"

*divided by*

(b) (i) amounts payable (or expected as of the date of determination to be payable) on the following Payment Date as set forth in clause (D) and, with respect to the Deferrable Notes, clause (G) under "*Summary of Terms— Priority of Payments—Application of Interest Proceeds*" *plus* (ii) interest due and payable on the Secured Notes of such Class or Classes, each Priority Class of Secured Notes and each Pari Passu Class of Secured Notes (excluding any Deferred Interest but including any interest on Deferred Interest with respect to any such Classes) on such Payment Date.

**Interest Reinvestment Test:** The Interest Reinvestment Test will be used primarily to determine whether distributions may be made on the Subordinated Notes using Interest Proceeds during the Reinvestment Period or whether Interest Proceeds which would otherwise be used to make distributions on the Subordinated Notes during the Reinvestment Period must instead be diverted and applied as Principal Proceeds as set forth under "*Summary of Terms—Priority of Payments*." The "**Interest Reinvestment Test**" is a test that will be satisfied on any Determination Date during the Reinvestment Period if the Adjusted Collateral Principal Amount *divided by* the Aggregate Outstanding Amount of the Secured Notes equals or exceeds 105.8%.

**Petition Expense Amount:** The "**Petition Expense Amount**" is an aggregate sum (until the Notes are paid in full or until the Indenture is otherwise terminated, in which case it will equal zero) of $500,000.

**Other Information:**

*Listing, Trading and Form of Notes* ........................................... Application has been made to the Irish Stock Exchange for the Notes to be admitted to the Official List and trading on its Global Exchange Market. No assurances can be given that, following the Closing Date, the listing of the Notes on the Irish Stock Exchange will be obtained or, if obtained, maintained for the entire period that the Notes are outstanding. There is currently no market for the Notes of any Class and there can be no assurance that such a market will develop. See "*Risk Factors—Risks Relating to the Offered Securities—Limited Liquidity and Restrictions on Transfers of Offered Securities*." The Secured Notes and Subordinated Notes sold to persons who are Qualified Purchasers and Qualified Institutional Buyers in reliance on Rule 144A under the Securities Act or (in the case of the initial sale by the Issuer) another exemption from the registration requirements of the Securities Act will be represented by global notes in fully registered form without interest coupons to be deposited with a custodian for and registered in the name of a nominee of The Depository Trust Company ("**DTC**"). The Secured Notes and Subordinated Notes sold to non-U.S. persons in offshore transactions in reliance on Regulation S under the Securities Act will be represented by global notes or certificates, as applicable, in fully registered form without interest coupons to be deposited with a custodian for and registered in the name of a nominee of DTC for the accounts of Euroclear or Clearstream. All other Class E Notes and Subordinated Notes will be issued in definitive, fully registered form without interest coupons.

*Governing Law*............................ The Offered Securities and the Indenture will be governed by, and construed in accordance with, the laws of the State of New York.

*Tax Matters* .................................. See "*Certain Tax Considerations.*"

*ERISA* ......................................... See "*ERISA and Legal Investment Considerations.*"

*Additional Issuance* .................... The Indenture will provide that, at any time, the Issuer may, with the consent of the Portfolio Manager, issue and sell additional Subordinated Notes, designate such issuance proceeds as either Interest Proceeds or Principal Proceeds and use the proceeds to purchase additional Collateral Obligations or as otherwise permitted under the Indenture; *provided* that the following conditions are met as certified to the Trustee by the Issuer: (a) such issuance is made (x) with the consent of the Holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes and (y) with the consent of the Portfolio Manager; (b) such issuance may not exceed 100% of the original outstanding amount of the Subordinated Notes; (c) the terms of the Subordinated Notes issued must be identical to the respective terms of previously issued Subordinated Notes; (d) an opinion of tax counsel of nationally recognized standing in the United States experienced in such matters shall be delivered to the Trustee to the effect that (i) such issuance will not result in the Issuer becoming subject to U.S. federal income tax on a net income basis, (ii) such issuance would not cause the holders or beneficial owners of Secured Notes previously issued to be deemed to have sold or exchanged such Notes under Section 1001 of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and (iii) such issuance would not adversely affect the tax characterization of any outstanding Notes that were characterized as debt at the time of issuance; *provided* that such opinions described in clauses (ii) and (iii) shall not be required with respect to any Class if 100% of the Holders thereof have consented to a waiver of such requirement; and (e) after giving effect to the issuance of additional Subordinated Notes, each Overcollateralization Ratio Test for each Class of Notes is satisfied. Such additional Notes may be offered at prices that differ from the applicable initial offering price, and will rank *pari passu* in all respects with the initial Subordinated Notes. For the avoidance of doubt, the Issuer shall not issue additional Secured Notes (other than in connection with a Refinancing).

# RISK FACTORS

*An investment in the Offered Securities involves certain risks. Prospective investors should carefully consider the following factors, in addition to the matters set forth elsewhere in this Offering Circular, prior to investing in the Offered Securities.*

## General Economic Risks

*General economic conditions may affect the ability of the Issuer to make payments on the Notes*

Beginning in mid-2007, there occurred an extreme downturn in the credit markets and other financial markets, which resulted in dramatic deterioration in the financial condition of many companies. However, there are some indications that credit markets and other financial markets are emerging from such downturn. Although corporate default rates have been decreasing and rating upgrades have recently been exceeding downgrades, it is difficult to predict how long and to what extent these conditions will continue to improve and which markets, products, businesses and assets will experience improvement (or to what degree any such improvement is dependent on monetary policies by central banks, particularly the Federal Reserve). The ability of the Issuer to make payments on the Notes may depend on the continued recovery of the economy, and there is no assurance that this recovery will continue. In addition, the business, financial condition or results of operations of the obligors on the Collateral Obligations, and in turn the market value and future performance of any Collateral Obligations acquired by the Issuer, may be adversely affected by a worsening of economic and business conditions. To the extent that economic and business conditions deteriorate, non-performing assets are likely to increase, and the value and collectability of the Assets is likely to decrease. A decrease in market value of the Collateral Obligations also would adversely affect the Sale Proceeds that could be obtained upon the sale of the Collateral Obligations and could ultimately affect the ability of the Issuer to pay in full or redeem the Secured Notes, as well as the ability of the Issuer to make any distributions in respect of the Subordinated Notes.

Many financial institutions including banks continue to suffer from capitalization issues. The bankruptcy or insolvency of a major financial institution may have an adverse effect on the Issuer and the Notes, particularly if such financial institution is a grantor of a participation in an asset or is a hedge counterparty to a swap or hedge involving the Issuer, or a counterparty to a buy or sell trade that has not settled with respect to an asset. The bankruptcy or insolvency of another financial institution may result in the disruption of payments to the Issuer. In addition, the bankruptcy or insolvency of one or more additional financial institutions may trigger additional crises in the global credit markets and the overall economy which could have a significant adverse effect on the Issuer, the Assets and the Notes.

*Additional information about Libor*

Regulators and law-enforcement agencies from a number of governments, including entities in the United States, Japan, Canada and the United Kingdom, have conducted and continue to conduct civil and criminal investigations into whether the banks that contribute to the British Bankers' Association (the "**BBA**") in connection with the calculation of daily Libor may have been under-reporting or otherwise manipulating or attempting to manipulate Libor. Several financial institutions have reached settlements with the CFTC, the U.S. Department of Justice Fraud Section and the United Kingdom Financial Conduct Authority (and its predecessor) in connection with investigations by such authorities into submissions made by such financial institutions to the bodies that set Libor and other interbank offered rates. In such settlements, such financial institutions admitted to submitting rates to the BBA that were lower than the actual rates at which such financial institutions could borrow funds from other banks. Actions by the BBA, regulators or law-enforcement agencies may affect Libor (and/or the determination thereof) in unknown ways, including, among other ways, by changing the methodology of setting Libor. Based on a review conducted by the Financial Conduct Authority of the United Kingdom (the "**FCA**"), legislation has been proposed which would alter the manner in which Libor is determined. If the determination of Libor is subject to additional regulatory oversight, it is possible that fewer banks will actively participate in the Libor submission process which could result in erratic swings in Libor. The review commissioned by the FCA also encouraged market participants to evaluate whether Libor was an appropriate benchmark for their transactions and whether adequate contingency provisions existed in contracts in the event that Libor was no longer available. The implementation of the proposed legislation to change the process for determining Libor or additional regulatory oversight over Libor could lead to

the reduction or elimination of Libor as a global benchmark going forward which could adversely affect the value of the Notes.  As noted above, if the interest rate on an increased proportion of the loans is based on a rate other than Libor, the Issuer could have interest rate mismatches which could lead to shortfalls in available proceeds to make payments on the Notes.  Any of such actions or other effects from such investigations could adversely affect the liquidity and value of the Notes.  For example, any uncertainty in the value of Libor or the development of a market view that Libor has been or is being manipulated by BBA member banks may adversely affect the liquidity of the Notes in the secondary market and their market value.  Additional investigations remain ongoing and there can be no assurance that there will not be additional admissions or findings of rate-setting manipulation or that future manipulation of Libor or other similar interbank offered rates will not occur.

On February 1, 2014, the ICE Benchmark Administration ("**ICE**") assumed the role of administering Libor from the BBA. While ICE has confirmed, in its January 17, 2014 press release, that it does not currently intend to make any change to the methodology of calculating Libor from that used by the BBA, no assurance can be given that ICE or any successor administrator of Libor will not make methodological changes that could change the level of Libor, which in turn may adversely affect the value of the floating rate Collateral Obligations.  ICE or any successor administrator of Libor may also alter, discontinue or suspend calculation or dissemination of Libor.  No administrator of Libor will have any obligation to any investor in respect of any floating rate Collateral Obligations. ICE or any successor administrator of Libor may take any actions in respect of Libor without regard to the interests of any investor in the Secured Notes, and any of these actions could have an adverse effect on the value of the Secured Notes.

*Changes in the legislative and regulatory environment may affect the ability of the Co-Issuers to make payments on the Offered Securities*

The Issuer and the Notes are subject to regulations and laws at the U.S. federal, state and local levels. These laws and regulations, as well as their interpretation, may change from time to time, and new laws, regulations and interpretations may also come into effect. Any such new or changed laws or regulations could have a material adverse effect on the Issuer. In particular, the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "**Dodd-Frank Act**"), which was signed into law on July 21, 2010, and imposes a new regulatory framework over the U.S. financial services industry and the consumer credit markets in general, and proposed regulations by the United States Securities and Exchange Commission (the "**SEC**") and other federal regulatory agencies, if enacted, would significantly alter the manner in which asset-backed securities, including securities similar to the Notes, are issued and structured and increase the reporting obligations of the issuers of such securities. Given the broad scope and sweeping nature of these changes and the fact that all final implementing rules and regulations have not yet been enacted, the potential impact of these actions on the Issuer, any of the Notes or any holders of the Notes is unknown, and no assurance can be made that the impact of such changes would not have a material adverse effect on the prospects of the Issuer or the value or marketability of the Notes.  In particular, if existing transactions are not exempted from certain of such new rules or regulations, the costs of compliance with such rules and regulations could have a material adverse effect on the Issuer and the holders of the Notes.  Among other things, if the Issuer was unable to comply with such rules and regulations (because of excessive cost, unavailability of information or otherwise), an Event of Default could result.  Liquidation of the Assets as a result of an Event of Default or otherwise could have a material adverse effect on the holders of Notes.

As part of the Dodd-Frank Act, the United States has adopted statutory provisions that prohibit a "banking entity"—which is broadly defined to include banks, banking holding companies and affiliates thereof, among others—from engaging in proprietary trading or holding ownership interests in certain private funds (the "**Volcker Rule**"), including "covered funds."  The definition of "covered fund" in the regulations adopted to implement the Volcker Rule includes (generally) any entity that would be an investment company under the 1940 Act but for the exemption provided under Sections 3(c)(1) or 3(c)(7) thereunder.  Because the Issuer will rely on Section 3(c)(7), it may be a "covered fund" within the meaning of the Volcker Rule regulations.  If the Issuer is a "covered fund," certain entities (including, without limitation, a "banking entity," which includes insured depository institutions, bank holding companies, foreign banking entities regulated by the Federal Reserve Board and their respective affiliates) may be limited or prohibited from, among other things, acting as a "sponsor" to, or having an "ownership interest" in, the Issuer.  The Volcker Rule became effective July 21, 2012. The relevant U.S. federal agencies adopted final regulations with respect to the Volcker Rule on December 10, 2013. Banking entities that are subject to the Volcker Rule have until July 21, 2015 to bring any existing activities and investments into compliance, though

the Federal Reserve announced on April 7, 2014 that it intends to grant two additional one-year extensions, which together would extend the conformance period until July 21, 2017.  Although not required by the implementing regulations adopted December 10, 2013, the order issued by the Federal Reserve extending the conformance period to July 21, 2017 requires that banking entities develop and implement a conformance plan to terminate prohibited activities and divest impermissible investments by the end of the conformance period.  Banks are expected to establish their compliance programs "as soon as practicable and in no case later than the end of the conformance period."  Although the Volcker Rule and the final implementing regulations contain an exemption applicable to loan securitizations, under such exemption only loans and certain related assets are permitted to be held by the relevant fund.  The Issuer intends to qualify for the "loan securitization" exclusion from the definition of "covered fund" provided for in the Volcker Rule and the final implementing regulations. Under the Indenture, the Issuer will not be permitted to own Collateral Obligations that are bonds, notes or letters of credit. Notwithstanding such requirement, no assurance can be made that the Issuer will qualify for such loan securitization exemption or for any other exemption that might be available under the Volcker Rule and its implementing regulations. In addition, no assurance can be made as to the effect of the Volcker Rule and the final implementing regulations on the ability of certain investors subject to the Volcker Rule to have an "ownership interest" in collateralized loan obligation securities, and as a result no assurance can be made that the Volcker Rule will not adversely affect the market value or liquidity of any or all of the Notes.  Banking entities and other investors should consult their own counsel as to the potential consequences of the Volcker Rule, including the possibility that their regulators may require them to divest their interest, before making an investment decision. Investors in the Notes are responsible for analyzing their own regulatory position and none of the Issuer, the Initial Purchaser, the Portfolio Manager, the Trustee nor any of their affiliates makes any representation to any prospective investor or purchaser of the Notes regarding the application of the Volcker Rule to the Issuer, or to such investor's investment in the Notes on the Closing Date or at any time in the future.

The Dodd-Frank Act requires that federal banking agencies amend their regulations to remove reference to or reliance on credit agency ratings, including but not limited to those found in the federal banking agencies' risk-based capital regulations.  New regulations have been proposed, some of which have been adopted as final rules while others remain pending.  As the regulations are adopted and become effective, investments in asset-backed securities like the Notes by institutions subject to the risk-based capital regulations may result in greater capital charges to financial institutions that own such securities, or otherwise adversely affect the treatment of such securities for regulatory capital purposes.

The Financial Accounting Standards Board has adopted changes to the accounting standards for structured products and continues to consider additional changes.  These changes, or any future changes, may affect the accounting for entities such as the Issuer, could under certain circumstances require an investor or its owner generally to consolidate the assets and liabilities of the Issuer in its consolidated financial statements and record third parties' investments in the Issuer as liabilities of that investor or owner or could otherwise adversely affect the manner in which the investor or its owner must report an investment in Notes for financial reporting purposes.

The Issuer is not entering into any Hedge Agreements on the Closing Date.  Nevertheless, economic and market conditions could change, and the Issuer or the Portfolio Manager could conclude that it would be in the interest of the Issuer to enter into Hedge Agreements from time to time after the Closing Date to, for example, hedge interest rate risk. There have been recent developments, however, that may increase the cost of, or prevent the Issuer from, entering into such Hedge Agreements.  Pursuant to the Dodd-Frank Act, the Commodity Futures Trading Commission ("**CFTC**") has promulgated a range of new regulatory requirements that may affect the pricing, terms and compliance costs associated with Hedge Agreements.  Such requirements include (i) the requirement that certain swaps be centrally cleared and in some cases traded on a designated contract market or swap execution facility, (ii) initial and variation margin requirements of any central clearing organization (with respect to cleared swaps) or initial or variation requirements as may otherwise be required with respect to uncleared swaps and (iii) swap reporting and recordkeeping obligations, and other matters. If the Issuer were to enter into a Hedge Agreement, such new requirements could significantly increase the cost of such Hedge Agreement, have unforeseen legal consequences on the Issuer or the Portfolio Manager or have other material adverse effects on the Issuer or the Noteholders.

In addition, the Dodd-Frank Act amended the Commodity Exchange Act to include "swaps" in the definition of "commodity interests" which, if traded by an entity, may cause that entity to fall within the definition of a

"commodity pool" under the Commodity Exchange Act and the Portfolio Manager to fall within the definition of a "commodity pool operator" ("**CPO**").  Based on recent CFTC interpretive guidance, the Issuer is not expected to be treated as a commodity pool.  In the event that such guidance changes or the Issuer engages in one or more activities that might cause it to be treated as a commodity pool or the Portfolio Manager to be treated as a CPO or "commodity trading adviser" ("**CTA**"), regulation of the Portfolio Manager (or another transaction party) as a CPO and/or a CTA could cause the Portfolio Manager to be subject to extensive registration and reporting requirements that would involve material costs to the Issuer.  The scope of such requirements and related compliance costs are uncertain but could adversely affect the amount of funds available to make payments on the Notes.  In addition, the operators of pooled investment vehicles that own Notes could also be subject to the jurisdiction of the CFTC and be required to register with the CFTC as CPOs if the Issuer is a commodity pool.  As a result of these developments, the Issuer may not enter into a Hedge Agreement unless (i) it receives the consent of a Majority of the Controlling Class to such Hedge Agreement, (ii) such Hedge Agreement is an interest rate or foreign exchange derivative and the terms of such derivative relate to the Collateral Obligations and the Notes and reduce the interest rate or foreign exchange risks related to the Collateral Obligations and the Notes and (iii)(x) it reasonably determines that such Hedge Agreement would not cause the Issuer or Portfolio Manager to be required to register with the CFTC or that the Issuer and Portfolio Manager would be eligible for an exemption to the requirement to register with the CFTC as a CPO or (y) with the consent of a Majority of the Subordinated Notes, the Portfolio Manager will register as a CPO and comply with the requirements of the CFTC.  See "*Security for the Secured Notes—Hedge Agreements*." Accordingly, there may be circumstances where it would otherwise be in the Issuer's interest to enter into a Hedge Agreement, but it will not be able to do so, which could reduce the amounts available to make payments on the Secured Notes and distributions in respect of the Subordinated Notes.

*United States retention requirements may affect future actions of the Issuer and negatively impact the leveraged loan market*

On October 21st and 22nd, 2014, six federal agencies (including the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Securities and Exchange Commission, the Department of Housing and Urban Development, and the Federal Housing Finance Agency) adopted joint final regulations requiring risk retention by sponsors, including with respect to CLOs ("**US Risk Retention Regulations**").  Except with respect to asset-backed securities transactions that satisfy certain exemptions, the US Risk Retention Regulations generally require sponsors of asset-backed securities to retain not less than 5% of the credit risk of the assets collateralizing asset-backed securities.  The US Risk Retention Regulations will become effective on December 24, 2016 with respect to asset-backed securities collateralized by assets other than residential mortgages (and December 24, 2015 for asset-backed securities collateralized by residential mortgages).  The US Risk Retention Regulations would not apply to the issuance and sale of the Notes on the Closing Date.  However, the US Risk Retention Regulations could potentially limit the ability of the Issuer to issue additional Notes or undertake any Refinancing, if such subsequent issuance or Refinancing occurs on or after the effective date of the US Risk Retention Regulations.  As a result, the US Risk Retention Regulations may adversely affect the Issuer (and the market value and liquidity of the Notes) if the Issuer is unable to undertake any such additional issuance or Refinancing.  Furthermore, no assurance can be given as to whether the US Risk Retention Regulations would have any future material adverse effect on the business, financial condition or prospects of the Collateral Manager.

No assurance can be made that the U.S. federal government, any U.S. regulatory body or non-U.S. government or regulatory body will not continue to take further legislative or regulatory action in response to the economic crisis or otherwise, and the effect of such actions, if any, cannot be known or predicted.

*Economic trends in credit markets may decline*

Negative economic trends nationally as well as in specific geographic areas of the United States could result in an increase in loan defaults and delinquencies. Though levels of defaults and delinquencies have decreased from peak levels, there is a material possibility that economic activity will be volatile or will slow, and some obligors may be significantly and negatively impacted by negative economic trends.  A continuing decreased ability of obligors to obtain refinancing (particularly as high levels of required refinancings approach) may result in an economic decline that could delay an economic recovery and cause a deterioration in loan performance generally and defaults of Collateral Obligations.  There is no way to determine whether such trends in the credit markets will continue, improve or worsen in the future.

*Illiquidity in the CDO, leveraged finance and fixed income markets may affect the holders of the Notes*

Events in the CDO (including CLO), leveraged finance and fixed income markets contributed to a severe liquidity crisis in global credit markets in recent years and as a result, leveraged loans have experienced substantial price fluctuations and reduced liquidity.  During periods of higher price volatility and reduced liquidity, the Issuer's ability to acquire or dispose of Collateral Obligations at a price and time that the Issuer deems advantageous may be severely impaired.  As a result, in periods of rising market prices, the Issuer may be unable to participate in price increases fully to the extent that it is unable to acquire desired positions quickly; and the Issuer's inability to dispose fully and promptly of positions in declining markets may exacerbate losses suffered by the Issuer when Collateral Obligations are sold.  Furthermore, significant additional risks for the Issuer and investors in the Notes exist.  Those risks include, among others, (i) the possibility that, after the Closing Date, the prices at which Collateral Obligations can be sold by the Issuer will have deteriorated from their effective purchase price, (ii) the possibility that opportunities for the Issuer to sell its assets in the secondary market, including Credit Risk Obligations, Credit Improved Obligations and Defaulted Obligations, may be impaired or restricted by the Indenture, and (iii) increased illiquidity of the Notes because of reduced secondary trading in collateralized loan obligation securities.  These additional risks may affect the returns on the Notes to investors or otherwise adversely affect holders of the Notes.

Regardless of current or future market conditions, certain Collateral Obligations purchased by the Issuer will have only a limited trading market (or none).  The Issuer's investment in illiquid debt obligations may restrict its ability to dispose of investments in a timely fashion and for a fair price, as well as its ability to take advantage of market opportunities.  Illiquid debt obligations may trade at a discount from comparable, more liquid investments.

In addition, lower liquidity levels than experienced in past years have adversely affected the primary market for a number of financial products, including leveraged loans. If these lower liquidity levels persist, the Issuer may experience reduced opportunities to purchase new issuances of Collateral Obligations.  In addition, the ability of private equity sponsors and leveraged loan arrangers to effectuate new leveraged buy-outs and the ability of the Issuer to purchase such assets may be partially or significantly limited.  There has been a very recent increase in primary leveraged loan market activity, but there can be no assurance that such increase will persist or that the primary leveraged loan market will not return to its previous levels or cease altogether for a period of time.  The impact of another liquidity crisis on the global credit markets could adversely affect the management flexibility of the Portfolio Manager in relation to the portfolio and, ultimately, the returns on the Notes to investors.

*Eurozone risk could adversely affect the value of the Assets*

The ongoing deterioration of the sovereign debt of several countries, in particular Greece, together with the risk of contagion to other, more stable, countries, particularly France and Germany, has exacerbated the global economic crisis. This situation has also raised a number of uncertainties regarding the stability and overall standing of the European Economic and Monetary Union and may result in changes to the composition of the Eurozone.

As a result of the credit crisis in Europe, in particular in Cyprus, Greece, Italy, Ireland, Portugal and Spain, the European Commission created the European Financial Stability Facility (the "**EFSF**") and the European Financial Stability Mechanism (the "**EFSM**") to provide funding to Eurozone countries in financial difficulties that seek such support. In March 2011, the European Council agreed on the need for Eurozone countries to establish a permanent stability mechanism, the European Stability Mechanism (the "**ESM**"), which will be activated by mutual agreement, to assume the role of the EFSF and the EFSM in providing external financial assistance to Eurozone countries after June 2013.

Despite these measures, concerns persist regarding the growing risk that other Eurozone countries could be subject to an increase in borrowing costs and could face an economic crisis similar to that of Cyprus, Greece, Italy, Ireland, Spain and Portugal, together with the risk that some countries could leave the Eurozone (either voluntarily or involuntarily), and that the impact of these events on Europe and the global financial system could be severe which could have a negative impact on the Assets.

Investors should carefully consider how changes to the Eurozone may affect their investment in the Notes.

**Risks Relating to the Offered Securities**

*Investor Suitability*

An investment in the Notes will not be appropriate for all investors.  Structured investment products, like the Notes, are complex instruments, and typically involve a high degree of risk and are intended for sale only to sophisticated investors who are capable of understanding and assuming the risks involved.  Any investor interested in purchasing Notes should conduct its own investigation and analysis of the product and consult its own professional advisers as to the risks involved in making such a purchase.  None of the Co-Issuers, the Initial Purchaser, the Portfolio Manager, the Collateral Administrator, the Trustee nor any of their respective affiliates is providing investment, accounting, tax or legal advice in respect of the Notes and will not have a fiduciary relationship with any investor or prospective investor in the Notes.  None of the Co-Issuers, the Initial Purchaser, the Portfolio Manager, the Collateral Administrator, the Trustee nor any of their respective affiliates makes any representation as to the proper characterization of the Notes for legal investment, financial institution regulatory, financial reporting or other purposes, as to the ability of the particular investors to purchase the Notes under applicable legal investment or other restrictions or as to the consequences of an investment in the Notes for such purposes or under such restrictions.

The Dodd-Frank Act requires that federal banking regulators amend their regulations such that capital charges imposed on banking institutions are determined to a lesser extent than previously on the ratings of their investments.  No such regulations have yet been adopted.  When such regulations are proposed or adopted, investments in asset-backed securities like the Notes by such institutions may result in greater capital charges to financial institutions that own such securities, or otherwise adversely affect the treatment of such securities for regulatory capital purposes.

Accordingly, all investors whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult with their own legal, accounting and other advisers in determining whether, and to what extent, the Notes will constitute legal investments for them or are subject to investment or other restrictions, unfavorable accounting treatment, capital charges or reserve requirements.

*Limited Liquidity and Restrictions on Transfers of Offered Securities*

Currently, no market exists for the Notes.  The Initial Purchaser is under no obligation to make a market for the Notes.  There can be no assurance that any secondary market for any of the Notes will develop, or if a secondary market does develop, that it will provide the holders of the Notes with liquidity of investment or will continue for the life of the Notes.  Consequently, a purchaser of Notes must be prepared to hold the Notes until their Stated Maturity.  In addition, the Notes are subject to certain transfer restrictions and can only be transferred to certain transferees as described herein under "*Transfer Restrictions.*"  As described therein, the Issuer may, in the future, impose additional restrictions to comply with changes in applicable law.  Such restrictions on the transfer of the Notes may further limit their liquidity.  The Notes will not be registered under the Securities Act or any state securities laws, and the Co-Issuers have no plans, and are under no obligation, to register the Notes under the Securities Act.  In the past several years, securities issued in securitization transactions (such as the Notes) have experienced significant market value fluctuations.  In addition, a variety of potential investors now consider such investments as inappropriate or are prohibited by regulatory restrictions or investments policies from purchasing such securities.

If the Notes are held by any holder in violation of transfer restrictions as described in the definition of Non-Permitted Holder or in the definition of Non-Permitted ERISA Holder, the Issuer has a right to cause the sale of such Notes by such holder.  See "*—Investors should consider certain ERISA considerations*" and "*Transfer Restrictions.*"

As described herein, the Issuer may, in the future, impose additional restrictions to comply with changes in applicable law.  Such restrictions on the transfer of the Notes may further limit their liquidity.  To the extent that any secondary market exists for the Notes in the future, the price (if any) at which the Notes may be sold could be at a discount, which in some cases may be substantial, from the principal or notional amount of the Notes and significant delays could occur in any actual sale of Notes.

While an application has been made to list the Notes on the Global Exchange Market of the Irish Stock Exchange, there can be no assurance that such listing will be obtained, or if obtained, that such listing will be continued.  If a listing on the Irish Stock Exchange is not obtained, or if obtained, is not continued, with respect to the Notes, application may be made to list the Notes on another stock exchange, although there is no assurance that any such listing will be obtained or if obtained, will be continued, particularly if the Issuer determines that such listing has become unduly burdensome or not feasible.  Listing on a stock exchange may not increase the liquidity of any Notes.

*Need to Seek Independent Advice; Lack of Hypothetical Performance Scenarios*

None of the Initial Purchaser, the Portfolio Manager or any affiliate of any of them is providing investment, accounting, tax or legal advice in respect of the Notes and will not have a fiduciary relationship with any investor or prospective investor in the Notes.

No assurances can be provided to an investor in the Notes regarding the composition or actual performance of the portfolio of Collateral Obligations that the Issuer will own at any time, or (without limiting the foregoing) that the composition or performance of such portfolio, at any time, will resemble or correspond (in any way) to the composition of any hypothetical portfolios or hypothetical performance scenarios previously shared with such investor in written materials provided to such investor, or discussed with such investor, by the Initial Purchaser, the Portfolio Manager, the Trustee, the Collateral Administrator or any other person, if any.  No financial hypothetical performance scenarios, modeling runs or return analyses are included in this Offering Circular. Any materials previously provided to an investor in connection with the Notes, including any projections, financial hypothetical performance scenarios, modeling runs or return analyses contained therein, are superseded in their entirety by this Offering Circular (whether or not the substance thereof is specifically addressed herein) and should not be relied upon by a prospective purchaser in considering its investment or for any other purpose.

The actual performance of the Notes will be affected by, among other things, (i) the amount and frequency of principal payments on the Collateral Obligations, which are dependent upon, among other things, the amount of sinking fund payments and any other payments received at or in advance of the scheduled maturity of Collateral Obligations (whether through sale, maturity, redemption, default or other liquidation or disposition) and (ii) the financial condition of the obligors of the Collateral Obligations and the characteristics thereof, including the existence and frequency of exercise of any optional or mandatory redemption or prepayment features (including applicable redemption prices or prepayment fees), the prevailing level of interest rates, the actual default rate and the actual level and timing of recoveries on, among other Collateral Obligations, any Defaulted Obligations, Credit Risk Obligations, Credit Improved Obligations and Current Pay Obligations, the frequency of tender or exchange offers for such Collateral Obligations, and the extent to which Collateral Obligations may be acquired in the circumstances set forth in the Indenture or otherwise and the reinvestment rates obtained in connection with the purchase of such Collateral Obligations or in connection with the reinvestment of proceeds in Eligible Investments.  It is expected that, with respect to a substantial portion of the Collateral Obligations, the obligor thereof will have the right or obligation to cause them to be mandatorily or optionally redeemed or otherwise repaid at various times and subject to various conditions.

*European risk retention rules may affect the liquidity of the Notes*

The EU has also taken a number of actions in response to the financial crisis.  European reforms related to the regulation of securitization markets include risk retention and due diligence requirements.  The number and type of entities that are subject to these requirements increased beginning in January 2014.  In addition to credit institutions organized in the European Economic Area ("**EEA**"), certain types of investment funds organized in the EEA will face punitive capital requirements with respect to investments in securitizations that fail to comply with certain requirements concerning retention by the originator, sponsor or original lender of the securitized assets of a portion of the securitization's credit risk.  Proposed legislation would impose similar requirements on other entities, including insurance and reinsurance undertakings, investment firms and UCITS.  The Issuer and the other parties to this transaction have not taken, and do not intend to take, any steps to comply with these risk retention requirements, which will likely limit the ability of these types of institutions to purchase the Notes.  This, in turn, may adversely affect the liquidity of the Notes in the secondary market and could adversely affect the ability to transfer Notes or the price received upon any sale of the Notes.

In addition, investment funds organized in the EEA and such funds organized outside the EEA that are "marketed" to EEA investors may be subject to regulation as "alternative investment funds" under the EU directive on alternative investment fund managers.  CLO issuers, including the Co-Issuers, are generally taking the position that they are not subject to these requirements because they qualify for an exemption for securitization special purpose entities.  If this exemption were to become unavailable, certain obligations (including reporting and audit obligations) would apply to the Portfolio Manager.  The expenses related to such obligations would be reimbursable by the Issuer and would be borne first by the Subordinated Notes.

EU Directive 2011/61/EU on Alternative Investment Fund Managers (the "**AIFMD**") was required to be transposed into local laws by Member States of the EEA as of July 22, 2013 and applies to "alternative investment funds" ("**AIFs**") domiciled within the EEA ("**EEA AIFs**") and outside the EEA ("**non-EEA AIFs**") that are "marketed" to EEA investors within the meaning of the AIFMD.  CLO issuers, including the Co-Issuers, are generally taking the position that they are not subject to the AIFMD because they qualify for the exemption for "securitization special purpose entities" provided for in the AIFMD.  It is possible, however, that one or more European regulatory authorities may determine that such exemption is not available to some or all CLOs, including the Co-Issuers.  If the Co-Issuers were treated as non-EEA AIFs, and if interests in them were marketed in the EEA within the meaning of the AIFMD then, subject to certain transitional provisions in some EEA Member States, certain transparency and other obligations (including reporting and audit obligations, the cost of which could be material) would apply to the Portfolio Manager under AIFMD.  The expenses related to such obligations would be reimbursable by the Issuer under the Portfolio Management Agreement and would be borne first by the Subordinated Notes.

*No Ongoing Responsibility of the Initial Purchaser for the Collateral Obligations or the Actions of the Portfolio Manager or the Co-Issuers*

The Initial Purchaser will have no obligation to monitor the performance of the Assets or the actions of the Portfolio Manager or the Issuer and will have no authority to advise the Portfolio Manager or the Issuer or to direct their actions, which will be solely the responsibility of the Portfolio Manager and/or the Issuer, as the case may be.  If the Initial Purchaser owns Notes, it will have no responsibility to consider the interests of any holders of Notes in actions it takes in such capacities.  While the Initial Purchaser may own Offered Securities at any time, it may sell at any time any Offered Securities it purchases.

*The Issuer may not be able to reinvest available funds in appropriate Collateral Obligations; impact of uninvested cash balances*

The amount of Collateral Obligations purchased on the Closing Date, the amount and timing of purchases of additional Collateral Obligations after the Closing Date and the subsequent reinvestment of Principal Proceeds will affect the cash flows available to makes payments on, and the return to the holders of, the Notes.  Leveraged loans and privately placed high yield bonds are not as easily (or as quickly) purchased or sold as publicly traded securities for a variety of reasons, including confidentiality requirements with respect to obligor information, the customized non-uniform nature of loan agreements and private syndication.  Reduced liquidity and relatively lower volumes of trading in certain of such Collateral Obligations, in addition to restrictions on investment represented by the Investment Criteria, could result in periods during which the Issuer is not able to fully invest its available cash in Collateral Obligations, and it is unlikely that the Issuer's available cash will be fully invested in Collateral Obligations at any time.  The longer the period before reinvestment of cash or cash-equivalents in Collateral Obligations and the larger the amount of uninvested cash or cash-equivalents, which may tend to be lower yielding obligations, the greater the adverse impact may be on aggregate interest collected and distributed by the Issuer, thereby resulting in lower yield than could have been obtained if the net proceeds associated with the offering of the notes and all Principal Proceeds were immediately and fully reinvested.  The associated reinvestment risk on the Collateral Obligations will be borne by the holders of the Notes, beginning with the Subordinated Notes.

If the Issuer issues additional notes after the Closing Date, the Issuer would likely have significant uninvested proceeds of the offering, pending investment in Collateral Obligations.  The extent to which cash balances remain uninvested will be subject to a variety of factors, including future market conditions, and is difficult to predict.  To the extent the Portfolio Manager (on behalf of the Issuer) maintains cash balances invested in short-term investments instead of higher yielding obligations, income received on the Collateral Obligations will be reduced, which may result in lower amounts available for distributions to the Notes.

Generally, Principal Proceeds (together with Interest Proceeds, but only to the extent used to pay for accrued interest on Collateral Obligations, and Sale Proceeds received on the Collateral Obligations) will be reinvested during the Reinvestment Period (and, to the limited extent described more fully herein, after the Reinvestment Period) in substitute Collateral Obligations or temporarily reinvested in the Eligible Investments pending reinvestment in substitute Collateral Obligations in accordance with the Priority of Payments. The earnings with respect to substitute Collateral Obligations will depend, among other factors, on reinvestment rates available in the marketplace at the time and on the availability of investments acceptable to the Portfolio Manager that satisfy the criteria under "*Security for the Secured Notes—Sales of Collateral Obligations; additional Collateral Obligations and Investment Criteria*." The need to satisfy the Investment Criteria and identify acceptable investments may require the purchase of substitute Collateral Obligations having lower yields than those initially acquired or require that Principal Proceeds be held temporarily in cash or Eligible Investments, which will reduce the yield earned by the Issuer. Further, issuers or obligors of Collateral Obligations may be more likely to exercise any rights they may have to redeem them when interest rates or spreads are declining. Any decrease in the yield on the Collateral Obligations will reduce the amounts available to make payments of principal and interest on the Secured Notes and to make distributions to the holders of the Subordinated Notes.

### Secured Notes are Limited Recourse Obligations

The Co-Issued Notes are limited recourse obligations of the Co-Issuers and the Class E Notes are limited recourse obligations of the Issuer; therefore, the Notes are payable solely from the Collateral Obligations and all other Assets pledged by the Issuer pursuant to the Indenture. None of the Trustee, the Collateral Administrator, the Portfolio Manager, the Initial Purchaser or any of their respective affiliates or the Co-Issuers' affiliates or any other person or entity will be obligated to make payments on the Notes. Consequently, holders of the Notes must rely solely on distributions on the Assets for payments on the Notes. If distributions on such Assets are insufficient to make payments on the Notes, no other assets (in particular, no assets of the Portfolio Manager, the holders of the Notes, the Initial Purchaser, the Trustee, the Collateral Administrator or any affiliates of any of the foregoing) will be available for payment of the deficiency and all obligations of the Co-Issuers and any claims against the Co-Issuers in respect of the Notes will be extinguished and will not revive.

### Subordinated Notes Are Unsecured Obligations

The Subordinated Notes will not be secured by any of the Assets, and will not generally be entitled to exercise remedies under the Indenture and, while the Secured Notes are outstanding, the Trustee will have no obligation to act on behalf of the holders of Subordinated Notes. Distributions to holders of the Subordinated Notes will be made solely from distributions on the Assets after all other payments have been made pursuant to the Priority of Payments described herein. There can be no assurance that the distributions on the Assets will be sufficient to make distributions to holders of the Subordinated Notes after making payments that rank senior to payments on the Subordinated Notes. The Issuer's ability to make distributions to the holders of the Subordinated Notes will be limited by the terms of the Indenture. If distributions on the Assets are insufficient to make distributions on the Subordinated Notes, no other assets will be available for any such distributions. Subordinated Notes will be entitled to receive distributions solely to the extent funds are legally available. None of the Trustee, the Collateral Administrator, the Portfolio Manager, the Initial Purchaser, any of their respective affiliates or the Co-Issuers' affiliates or any other person or entity will be obligated to make payments on the Subordinated Notes. See "*Description of the Offered Securities—The Subordinated Notes*."

### Limited Funds Available to the Issuer to Pay Its Operating Expenses

The funds available to the Issuer to pay certain fees and expenses of the Trustee, the Collateral Administrator and the Administrator and for payment of the Issuer's other accrued and unpaid Administrative Expenses are limited as described in "*Summary of Terms—Priority of Payments*." In the event that such funds are not sufficient to pay the expenses incurred by the Issuer, the ability of the Issuer to operate effectively may be impaired, and they may not be able to defend or prosecute legal proceedings that may be brought against them or that they might otherwise bring to protect the interests of the Issuer.

### Third Party Litigation

The Issuer's investment activities subject it to the normal risks of becoming involved in litigation by third parties. This risk would be somewhat greater if the Issuer were to exercise control or significant influence over a

company's direction.  The expense of defending against claims by third parties and paying any amounts pursuant to settlements or judgments would generally be borne by the Issuer and would reduce the Interest Proceeds available for distribution and the Issuer's net assets.

*Subordination of the Notes*

The Class B Notes are subordinated on each Payment Date to the Class A Notes; the Class C Notes are subordinated on each Payment Date to the Class A Notes and the Class B Notes; the Class D Notes are subordinated on each Payment Date to the Class A Notes, the Class B Notes and the Class C Notes; the Class E Notes are subordinated on each Payment Date to the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes and the Subordinated Notes are subordinated on each Payment Date to the Secured Notes and certain additional fees and expenses.  Interest Proceeds will be diverted, in accordance with the Priority of Payments, at the discretion of the Portfolio Manager (a) to purchase additional Collateral Obligations or (b) to pay principal on Secured Notes, in each case during the Reinvestment Period if the Interest Reinvestment Test is not satisfied as of the related Determination Date, to the extent necessary to satisfy such test as of the Determination Date.  No payments of interest or distributions from Interest Proceeds will be made on any Class of Notes on any Payment Date until interest on the Notes of each Class to which it is subordinated has been paid, and no payments of principal (other than Deferred Interest with respect to the Deferrable Notes, as applicable, to the extent set forth in the Priority of Payments) or distributions from Principal Proceeds will be made on any Class of Notes on any Payment Date until principal on the Notes of each Class to which it is subordinated has been paid in full.  Therefore, to the extent that any losses are suffered by any of the holders of any Notes, such losses will be borne in the first instance by holders of the Subordinated Notes, then by the holders of the Class E Notes, then by the holders of the Class D Notes, then by the holders of the Class C Notes, then by the holders of the Class B Notes, then by the holders of the Class A Notes.  Furthermore, payments on the Deferrable Notes are subject to diversion to pay more senior Classes of Notes pursuant to the Priority of Payments if certain Coverage Tests are not met, as described herein, and failure to make such payments on the Deferrable Notes will not be a default under the Indenture.  In addition, if an Event of Default occurs, the holders of the Controlling Class of Notes (which will be the most senior Class then outstanding) will be entitled to determine the remedies to be exercised under the Indenture.  See "*Description of the Offered Securities—The Indenture—Events of Default.*"  Remedies pursued by the holders of the Controlling Class could be adverse to the interests of the holders of the Notes that are subordinated to the Controlling Class, and the holders of the Controlling Class will have no obligation to consider any possible adverse effect on such other interests.

*The Controlling Class will control many rights under the Indenture and therefore, holders of subordinate Classes will have limited rights in connection with an Event of Default, acceleration or distributions thereunder*

Under the Indenture, many rights of the holders of the Notes will be controlled by a Majority of the Controlling Class.  Remedies pursued by the holders of the Controlling Class upon an Event of Default could be adverse to the interests of the holders of Notes subordinated to the Controlling Class.  After any acceleration and also on and after the Stated Maturity of the Notes, proceeds of any realization on the Assets will be allocated in accordance with the Acceleration Priority of Payments pursuant to which the Secured Notes and certain other amounts owing by the Co-Issuers will be paid in full before any allocation to the Subordinated Notes, and each Class of Notes (along with certain other amounts owing by the Co-Issuers) will be paid in order of seniority until it is paid in full before any allocation is made to any more junior  Class of Notes.  If an Event of Default has occurred and is continuing, the holders of the Subordinated Notes will not have any creditors' rights against the Issuer and will not have the right to determine the remedies to be exercised under the Indenture.  There is no guarantee that any funds will remain to make distributions to the holders of subordinated Classes of Notes following any liquidation of the Assets and the application of the proceeds from the Assets to pay senior Classes of Notes and the fees, expenses, and other liabilities payable by the Co-Issuers.

Furthermore, the Collateral Obligations may be sold and liquidated only if, among other things, (i) the Trustee determines (in the manner set forth in the Indenture), in consultation with the Portfolio Manager (so long as no "cause" (as defined in the Portfolio Management Agreement) for the termination of the Portfolio Manager has occurred under the Portfolio Management Agreement), that the anticipated proceeds of such sale or liquidation (after deducting the reasonable expenses of such sale or liquidation) would be sufficient to discharge in full the amounts then due and unpaid with respect to all the Secured Notes and all Administrative Expenses and the holders of at least a Majority of the Controlling Class agrees with such determination, (ii) if an Event of Default described under clause (a), (d) or (f) of the definition thereof has occurred, the holders of at least a Majority of the Controlling Class

(without consent of any other Class of Notes including, for the avoidance of doubt, any such consent as may otherwise be required pursuant to clause (iii) below) direct, subject to the provisions of the Indenture and in compliance with applicable law, such sale and liquidation; *provided* that this clause (ii) shall not apply in the case of an Event of Default described in clause (a) of the definition thereof that arises solely from an acceleration of the Secured Notes due to an Event of Default described in clause (b), (c) or (e) of the definition thereof, (iii) if an Event of Default described under clauses (b), (c) or (e) of the definition thereof has occurred, the holders of at least 66-2/3% of the Aggregate Outstanding Amount of each Class of Secured Notes (voting separately by Class) direct, subject to the provisions of the Indenture and in compliance with applicable law, such sale and liquidation or (iv) if an Event of Default described under clauses (a), (b), (c), (d) or (e) of the definition thereof has occurred and all of the Secured Notes have been repaid in full, the holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes, subject to the provisions of the Indenture and in compliance with applicable law, direct such sale and liquidation.

*Leveraged Nature of the Subordinated Notes*

The Subordinated Notes represent a highly leveraged investment in the Assets.  Therefore, the market value of the Subordinated Notes would be anticipated to be significantly affected by, among other things, changes in the market value of the Assets, changes in the distributions on the Assets, defaults and recoveries on the Assets, capital gains and losses on the Assets, prepayments on Assets and the availability, prices and interest rates of Assets and other risks associated with the Assets as described in "— *Risks Relating to the Collateral Obligations*" below. Accordingly, the Subordinated Notes may not be paid in full and may be subject to up to 100% loss.  Furthermore, the leveraged nature of each subordinated class of Offered Securities may magnify the adverse impact on each such Class of changes in the market value of the Assets, changes in the distributions on the Assets, defaults and recoveries on the Assets, capital gains and losses on the Assets, prepayments on Assets and availability, prices and interest rates of Assets.

*Insufficiency of Assets upon an Event of Default*

It is anticipated that the proceeds received by the Issuer on the Closing Date from the issuance of the Offered Securities, net of certain fees and expenses, will be less than the aggregate amount of Notes.  Consequently, it is anticipated that on the Closing Date the Assets would be insufficient to repay the Secured Notes and Subordinated Notes in the event of an Event of Default under the Indenture.

*Distributions Following an Acceleration Event*

If an Acceleration Event has occurred and is continuing, proceeds of the liquidation of the Assets and all available Interest Proceeds and Principal Proceeds will be allocated after paying accrued and unpaid senior fees and expenses in accordance with the Acceleration Priority of Payments, (1) to pay the accrued interest and the entire Aggregate Outstanding Amount of the Class A Notes prior to any allocation to pay interest or principal on the Class B Notes, Class C Notes, the Class D Notes and the Class E Notes or any distributions on the Subordinated Notes, (2) to pay the accrued interest and the entire Aggregate Outstanding Amount of the Class B Notes prior to any allocation to pay interest or principal on the Class C Notes, the Class D Notes and the Class E Notes or any distributions on the Subordinated Notes, (3) to pay the accrued interest and the entire Aggregate Outstanding Amount of the Class C Notes (including any Deferred Interest) prior to any allocation to pay interest or principal on the Class D Notes and the Class E Notes or any distributions on the Subordinated Notes, (4) to pay the accrued interest and the entire Aggregate Outstanding Amount of the Class D Notes (including any Deferred Interest) prior to any allocation to pay interest or principal on the Class E Notes or any distributions on the Subordinated Notes and (5) to pay the accrued interest and the entire Aggregate Outstanding Amount of the Class E Notes (including any Deferred Interest) prior to any allocation to distributions on the Subordinated Notes.  See "*Summary of Terms— Priority of Payments—Acceleration Priority of Payments*."

As a result of the foregoing, Interest Proceeds that would otherwise have been used to pay interest on (or, in the case of the Subordinated Notes, make distributions of Interest Proceeds to) Junior Classes will instead be used to pay principal of Priority Classes.  If the Secured Notes are accelerated and the Assets are not promptly liquidated, Classes of Notes may remain outstanding without the payment of any amounts for an unforeseeable amount of time. In general, the application of the Acceleration Priority of Payments will decrease the likelihood that Classes of Secured Notes will be repaid in full or that further distributions will be made in respect of the Subordinated Notes.

*Ratings Not Necessarily Indicative of Asset Quality*

The ratings assigned to the Secured Notes by the Rating Agency are not necessarily indicative of the quality of the Secured Notes.  Credit ratings only represent the Rating Agency's opinions of credit quality and are not a recommendation to buy, sell or hold assets.  They do not purport to assess market, regulatory or other risks that are relevant to the assessment of the quality of an asset.  Credit ratings may not accurately assess credit risk and may be reduced or withdrawn at any time.

In the past, rating agencies have rapidly reduced or withdrawn the ratings of many structured finance securities, including CDOs and CLOs, as a result of rapidly changing economic conditions, flaws in their rating methodologies and other factors.  The Rating Agency may modify its ratings criteria at any time and the ratings of the Secured Notes may be reduced or withdrawn as a consequence.  In addition, the ratings of the Secured Notes could be reduced or withdrawn at any time without a change in Rating Agency methodology as a result of changes in economic conditions, conditions in the loan markets or a variety of other factors.  A reduction in the ratings of the Secured Notes will have negative consequences to holders including, without limitation, decreased liquidity of the Secured Notes (including lower market values of the Secured Notes) and, for regulated entities, adverse effects on the value of the Secured Notes as a legal investment or the capital treatment of the Secured Notes.

The ratings assigned to Collateral Obligations by any rating agency are also subject to change at any time due to changes in rating agency methodology, changes in economic conditions, changes in the loan markets, changes in the creditworthiness of the underlying obligors and a variety of other factors.  If Collateral Obligations are downgraded, the Portfolio Manager may be forced to sell such Collateral Obligations in unfavorable circumstances and one or more Overcollateralization Ratio Tests may be caused to fail, resulting in amortization of one or more classes of Secured Notes.  Reduced credit ratings may also impair the ability of underlying obligors to obtain financing and may lead to an increase in defaults with respect to Collateral Obligations.  If a significant number of leveraged loans or high yield bonds are downgraded at or around the same time, the Portfolio Manager may also have difficulty obtaining new Collateral Obligations that it deems suitable investments for the Issuer.

*Future actions of any Rating Agency can adversely affect the market value or liquidity of the Notes*

The Rating Agency may change its published ratings criteria or methodologies for securities such as the Secured Notes at any time in the future.  Further, the Rating Agency may retroactively apply any such new standards to the ratings of the Secured Notes.  Any such action could result in a substantial lowering (or even withdrawal) of any rating assigned to any Secured Note, despite the fact that such Secured Note might still be performing fully to the specifications set forth for such Secured Note in this Offering Circular and the transaction documents.  The rating assigned to any Secured Note may also be lowered following the occurrence of an event or circumstance despite the fact that a Rating Agency previously provided confirmation that such occurrence would not result in the rating of such Secured Note being lowered.  Additionally, the Rating Agency may, at any time and without any change in its published ratings criteria or methodology, lower or withdraw any rating assigned by it to any class of Secured Notes.  If any rating initially assigned to any Secured Note is subsequently lowered or withdrawn for any reason, holders of the Notes may not be able to resell their Notes without a substantial discount.  Any reduction or withdrawal to the ratings on any class of Secured Notes may significantly reduce the liquidity thereof and may adversely affect the Issuer's ability to make certain changes to the composition of the Assets.

In addition to the ratings assigned to the Secured Notes, the Issuer will be utilizing ratings assigned by the Rating Agencies to obligors of individual Collateral Obligations.  Such ratings will primarily be publicly available ratings.  There can be no assurance that the Rating Agencies will continue to assign such ratings utilizing the same methods and standards utilized today despite the fact that such Collateral Obligation might still be performing fully to the specifications set forth in its underlying instrument.  Any change in such methods and standards could result in a significant rise in the number of CCC Collateral Obligations or Caa Collateral Obligations in the Assets, which could cause the Issuer to fail to satisfy the Overcollateralization Ratio Test on subsequent Determination Dates, which failure could lead to the early amortization of some or all of one or more Classes of the Secured Notes.  See "*Description of the Offered Securities—Mandatory Redemption*," "*Security for the Secured Notes—The Coverage Tests*," and "*Security for the Secured Notes—The Interest Reinvestment Test*."

The Rating Agency may revise or withdraw its ratings of the Secured Notes as a result of a failure by the responsible party to provide it with information requested by the Rating Agency or comply with any of its

obligations contained in the engagement letter with the Rating Agency, including the posting of information provided to the Rating Agency on a website that is accessible by rating agencies that were not hired in connection with the issuance of the Secured Notes as described under "—*Rating agencies may have certain conflicts of interest; and the Secured Notes may receive an unsolicited rating, which may have an adverse effect on the liquidity or the market price of the Secured Notes.*" Any such revision or withdrawal of a rating as a result of such a failure might adversely affect the value of the Notes and, for regulated entities, could affect the status of the Secured Notes as a legal investment or the capital treatment of the Secured Notes.

*The Rating Agency may refuse to give rating agency confirmations*

Historically, many actions by issuers of collateralized loan obligation vehicles (including but not limited to issuing additional securities and amending relevant agreements) have been conditioned on receipt of confirmation from the applicable rating agencies that such action would not cause the ratings on the applicable securities to be reduced or withdrawn. Recently, certain rating agencies have changed the manner and the circumstances under which they are willing to provide such confirmation and have indicated reluctance to provide confirmation in the future, regardless of the requirements of the applicable indenture and other transaction documents. In the circumstances where the transaction documents require that the S&P Rating Condition be satisfied or written confirmation from S&P be obtained before certain actions may be taken and if S&P is unwilling to provide the required confirmation, it may be impossible to effect such action, which could result in losses being realized by the Issuer and, indirectly, by holders of Notes.

*Under current S&P policy, the Notes could be subject to early amortization even if the Issuer's investment portfolio is performing well*

On any Payment Date after the Effective Date, if S&P has not yet confirmed its initial rating of the Secured Notes, the Secured Notes will be subject to redemption in part in an amount sufficient to cause S&P to provide written confirmation of its initial rating of the Secured Notes. Under current S&P policy, S&P reserves the right not to provide such rating confirmations upon request, regardless of the terms agreed to among transaction participants. There can be no assurance that S&P will not subsequently withdraw or downgrade its ratings on one or more Classes of Secured Notes, which could materially adversely affect the value of liquidity of the Notes. For example, even if the Issuer satisfies the requirements described under "*Use of Proceeds—Ramp-up Period,*" including the Target Initial Par Condition, the Concentration Limitations, the Collateral Quality Test, the Effective Date Overcollateralization Test and each Overcollateralization Ratio Test, S&P would not be obligated to provide confirmation of its initial ratings of the Secured Notes. As a result, under current S&P policy, the Secured Notes may be subject to a partial redemption even if the Issuer's investment portfolio is in compliance with the applicable tests under the Indenture.

*Rating agencies may have certain conflicts of interest; and the Secured Notes may receive an unsolicited rating, which may have an adverse effect on the liquidity or the market price of the Secured Notes*

The Rating Agency has been hired by the Issuer to provide its ratings on the Secured Notes. A rating agency may have a conflict of interest where, as is the case with the ratings of the Secured Notes (with the exception of unsolicited ratings), the issuer of a security pays the fee charged by the rating agency for its rating services.

To enable the Rating Agency to comply with Rule 17g-5 of the Exchange Act, the Issuer agreed with the Rating Agency to the effect that it will post on a password-protected internet website, at the same time such information is provided to the Rating Agency, all information (which shall not include any accountants' report) the Issuer provides to the Rating Agency for the purposes of determining the initial credit rating of the Secured Notes or undertaking credit rating surveillance of the Secured Notes. Pursuant to the Indenture, the Trustee will be obligated, from and after the Closing Date, to maintain this website on behalf of the Issuer. Nationally recognized statistical rating organizations ("**NRSROs**") providing the requisite certification will have access to all information posted on such website. As a result, an NRSRO other than the Rating Agency may issue ratings on the Secured Notes (the "**Unsolicited Ratings**"), which may be lower, and could be significantly lower, than the ratings assigned by the Rating Agency. The Unsolicited Ratings may be issued prior to, or after, the Closing Date and will not be reflected in the final Offering Circular for the Notes. Issuance of any Unsolicited Rating will not affect the issuance of the Secured Notes. Issuance of an Unsolicited Rating lower than the ratings assigned by the Rating Agency on the Secured Notes might adversely affect the value of the Notes and, for regulated entities, could affect the status of the

Secured Notes as a legal investment or the capital treatment of the Secured Notes.  Investors in the Secured Notes should monitor whether an unsolicited rating of the Secured Notes has been issued by a non-hired NRSRO and should consult with their legal counsel regarding the effect of the issuance of a rating by a non-hired NRSRO that is lower than the expected ratings set forth in this Offering Circular.

Although various provisions of the Indenture require that the Issuer provide reports regarding the Collateral Obligations that are derived in part from and in accordance with the then current criteria published by Moody's, the Notes will not be rated by Moody's in the absence of an Unsolicited Rating from Moody's.  Accordingly, no investor should draw any inference from the inclusion of such reporting obligations in the Indenture that Moody's has expressed any opinion as to the likelihood of payments or other distributions (timely, ultimate or otherwise) in respect of any of the Notes.

*Rule 17g-7 and the new requirements on NRSROs may, once effective, adversely affect the ability of the Issuer to obtain rating agency confirmations, the cost of obtaining such confirmations, or the market price or liquidity of the Notes*

Certain credit rating agency reforms adopted by the SEC on August 27, 2014 (the "**NRSRO Reform Regulations**") will, when effective, impose new requirements on NRSROs in connection with "rating actions," as defined in amended Rule 17g-7 under the Exchange Act ("**Rule 17g-7**").  "Rating actions" include publication of a preliminary or expected rating; an initial rating; an upgrade or downgrade of an existing rating; or certain affirmations or withdrawals of existing ratings.  The new requirements include the publication of a form with extensive information about the issuance and maintenance of the rating, including, among other requirements:

(i)  The version of the procedure or methodology used to determine the rating;

(ii)  The main assumptions and principles used in constructing the procedures and methodologies used to determine the credit rating, including qualitative methodologies and quantitative inputs, and, if the credit rating is for a structured finance product, assumptions about the correlation of defaults across the underlying assets;

(iii)  The potential limitations of the rating, including any risks that it excludes (such as liquidity or market risk);

(iv)  Information on the uncertainty of the rating, including (i) information on the reliability, accuracy, and quality of the data relied on in determining the credit rating and (ii) a statement as to limitations on such data;

(v)  If applicable, how the NRSRO used third-party due diligence services in taking the rating action;

(vi)  A description of how, and with what frequency, the NRSRO uses servicer or remittance reports to conduct surveillance of the rating;

(vii)  A description of the types of data that were relied to determine the rating;

(viii)  A statement containing an overall assessment of the quality of information available and considered to determine the rating in relation to the quality of information available to the NRSRO in determining ratings for similar obligors or securities;

(ix)  A description of conflicts of interest affecting the rating, including whether and by whom the NRSRO was paid in connection with its issuance of the rating;

(x)  If applicable, the determinations made in any look-back review conducted by the NRSRO if it determined that the original rating was influenced by conflicts of interest (where a rating analyst involved in the original rating later became employed by a transaction party);

(xi)  An explanation of the potential volatility of the rating and its sensitivity to assumptions made by the NRSRO, including a discussion of the most significant assumptions;

(xii)  Information on the content of the rating, including, if applicable, the historical performance of the rating and the expected probability of default and the expected loss in the event of default;

(xiii)  Information on the sensitivity of the rating to the assumptions made by the NRSRO; and

(xiv)  If the rating is assigned to an asset-backed security as defined in the Exchange Act, information on the representations, warranties and enforcement mechanisms available to investors and how they differ from representations, warranties and enforcement mechanisms in issuances of similar securities; provided such information need only be included if the rating action is a preliminary rating, an initial rating or the first rating action taken after a material change in such representations, warranties or enforcement mechanisms.

The form must also include a signed attestation by the person within the NRSRO responsible for the rating action affirming that the rating action was not influenced by business considerations, was based solely on the merits of the security and was an independent evaluation of the credit risk of the security.

Although these new Rule 17g-7 requirements are not yet effective, when they become effective (or are adopted by the Rating Agency, if earlier) they may adversely affect the ability of the Issuer to obtain rating agency confirmations, the cost of obtaining such confirmations, or the market price or liquidity of the Notes.

These new Rule 17g-7 requirements will become effective on June 15, 2015.

*S&P Settlements*

On January 21, 2015, the SEC entered into administrative settlement agreements with S&P with respect to, among other things, multiple allegations of making misleading public statements with respect to its ratings methodology and certain misleading publications concerning criteria and research, in each case relating to commercial mortgage-backed security transactions.  S&P neither admitted nor denied the charges in these settlements.  As a result of these settlement agreements, the SEC ordered S&P censured and enjoined S&P from violating the statutory provisions and rules related to the allegations described above.  Additionally, S&P agreed to pay civil penalties and other disgorgements exceeding $76 million.  Finally, S&P agreed to refrain from giving preliminary or final ratings for any new issue U.S. conduit commercial mortgage-backed security transaction until January 21, 2016.

On February 3, 2015, S&P entered into a settlement agreement with the United States Justice Department, 19 States and the District of Columbia, to settle lawsuits relating to S&P's alleged inflation of subprime mortgage bonds.  S&P did not admit to any wrongdoing in connection with such settlement.  Also on February 3, 2015, S&P entered into a settlement agreement with the California Public Employees Retirement System to resolve claims over three structured investment vehicles.  Under these settlement agreements, S&P agreed to pay an aggregate amount of about $1.5 billion.

No assurance can be given as to the affect these settlement agreements will have on S&P's business or operations, and, consequently, the relationship the Issuer or the Portfolio Manager will have with S&P.

*Mandatory Redemption of Secured Notes for Failure to Satisfy Coverage Tests*

If the Coverage Tests with respect to any applicable Class or Classes of Secured Notes are not met, Interest Proceeds that otherwise would have been paid or distributed to the holders of the Offered Securities of each Class that is subordinated to other Class(es) of Secured Notes and Principal Proceeds that would otherwise have been reinvested in Collateral Obligations will instead be used to redeem the Secured Notes of the most senior Class or Classes then outstanding to the extent necessary to satisfy the applicable Coverage Tests as described under "*Summary of Terms—Priority of Payments.*"  This could result in an elimination, deferral or reduction in the payments of Interest Proceeds to the holders of the Deferrable Notes and/or the Subordinated Notes, as the case may be.  It could result in an increase in the average weighted interest rate payable by the Issuer on the Secured Notes, which would adversely affect the Issuer.

*Mandatory Redemption of Secured Notes upon Failure to Satisfy Certain Conditions after the Ramp-up Period*

After the Ramp-up Period, a redemption of the Secured Notes may result from a failure to satisfy certain conditions set forth in the Indenture.  See "*Description of the Offered Securities—Special Redemption.*"  In the event of an early redemption, the holders of the Secured Notes will be repaid prior to the respective Stated Maturity of such Secured Notes.  Interest Proceeds or Principal Proceeds diverted for this purpose would not be available to make distributions in respect of the Subordinated Notes.  In addition, a special redemption of Secured Notes could incentivize the Portfolio Manager to liquidate positions more rapidly than would otherwise be desirable, which could adversely affect the realized value of the Collateral Obligations sold.

*Optional Redemption of Notes*

The holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes or, if a Tax Event has occurred, at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes or the Aggregate Outstanding Amount of any Class of Secured Notes Affected by such Tax Event may cause the Secured Notes and the Subordinated Notes to be redeemed (including in part by full class, in the case of a Refinancing) as described under "*Description of the Offered Securities—Optional Redemption and Refinancing*" after the expiration of the Non-Call Period.  In the event of an early redemption, the holders of the Secured Notes and the Subordinated Notes will be repaid prior to the respective Stated Maturity of such Notes.  There can be no assurance that, upon any such redemption, the Sale Proceeds realized and other available funds would permit any distribution on the Subordinated Notes after all required payments are made to the holders of the Secured Notes.  In addition, (except in the case of a Refinancing) an Optional Redemption of Notes could require the Portfolio Manager to liquidate positions more rapidly than would otherwise be desirable, which could adversely affect the realized value of the Collateral Obligations sold.

The Indenture provides that any Class of Secured Notes may be redeemed in whole, but not in part, on any Business Day after the Non-Call Period from Refinancing Proceeds subject to the satisfaction of certain requirements.  See "*Description of the Offered Securities—Optional Redemption and Refinancing*" and "*Description of the Offered Securities—The Subordinated Notes—Optional Redemption.*"  Accordingly, a more junior Class of Notes may be redeemed in whole from Refinancing Proceeds even if a more senior Class of Notes remains outstanding.  Holders of Notes that are refinanced (or otherwise optionally redeemed) may not be able to reinvest the proceeds of such redeemed Notes in assets with comparable interest rates or maturity.

*Clean-up Call Redemption of Notes*

At the direction of the Portfolio Manager in accordance with the Indenture and the Portfolio Management Agreement, the Notes will be subject to redemption, in whole but not in part, on any Business Day occurring on or after the Payment Date on which the Aggregate Principal Balance of the Collateral Obligations and Eligible Investments is reduced to 20% of the Target Initial Par Amount or less, unless a Majority of the Subordinated Notes directs to prevent such redemption in a writing delivered to the Issuer, the Trustee and the Portfolio Manager at least 20 days prior to the Clean-up Call Redemption Date.  Any such redemption of Subordinated Notes will be made from any remaining proceeds after the payment of all required amounts described in this Offering Circular.  The timing of a Clean-up Call Redemption could impact the return to the holders of the Subordinated Notes.

*Early Termination of the Reinvestment Period*

Although the Reinvestment Period is expected to terminate on May 1, 2019, the Reinvestment Period may terminate prior to such date if the maturity of any Class of Secured Notes is accelerated.  Such early termination of the Reinvestment Period may shorten the expected lives of the Notes.

*The Co-Issuers May Modify the Indenture by Supplemental Indentures, and Some Supplemental Indentures Do Not Require the Consent of Noteholders*

The Indenture provides that the Co-Issuers and the Trustee may enter into supplemental indentures to modify various provisions of the Indenture, in many cases without the consent of any noteholders.  For example, no noteholder consent is needed to supplement the Indenture to facilitate an additional issuance (other than the consent of the holders of the Subordinated Notes, the Portfolio Manager or the Controlling Class, as applicable), to issue replacement securities or undertake loans in a Refinancing or to facilitate compliance with U.S. tax laws (including

by imposing remedies or penalties upon a noteholder to ensure compliance with FATCA and the regulations promulgated thereunder (including any regulations enacted after the Closing Date)).  Any of these amendments to the Indenture may have a material adverse effect on a noteholder, including, with respect to an amendment with respect to FATCA, Noteholders who have delivered the applicable Holder FATCA Information.  See "*Description of the Offered Securities—The Indenture.*"

*Additional issuances of Subordinated Notes may the effect of preventing the failure of the Coverage Tests and the occurrence of an Event of Default*

At any time the Issuer, (x) with the consent of the Portfolio Manager, (y) with the consent of the holders of at least 66-2/3% of Aggregate Outstanding Amount of the Subordinated Notes and (z) (i) during the Reinvestment Period, with the consent of a Majority of the Controlling Class; *provided* that such consent will not be required if the Additional Issuance Threshold Test is satisfied, or (ii) after the Reinvestment Period, with the consent of a Majority of the Controlling Class, may issue and sell additional Subordinated Notes if the conditions for such additional issuance described under "*Summary of Terms—Other Information—Additional Issuance*" are met.  The use of such issuance proceeds as Principal Proceeds may have the effect of causing a Coverage Test that would otherwise be failing to be cured or modifying the timing of events that would otherwise give rise to an Event of Default and permit the Controlling Class to exercise remedies under the Indenture.

*Offered Securities are Subject to Interest Rate Risks*

The Aggregate Outstanding Amount of the Secured Notes may be different than the Aggregate Principal Balance of the Collateral Obligations and the Aggregate Outstanding Amount of Secured Notes bearing interest at a floating rate may be different than the Aggregate Principal Balance of the Collateral Obligations bearing interest at a floating rate.  In addition, any payments of principal of or interest on Collateral Obligations received during a Collection Period occurring during the Reinvestment Period and not reinvested in Collateral Obligations during such Collection Period will be reinvested in Eligible Investments.  There is no requirement that such Eligible Investments bear interest at a floating rate, and the interest rates available for such Eligible Investments are inherently uncertain.  The Class A-2 Notes and the Class B-2 Notes will bear interest at a fixed rate, although no more than 5% of the Collateral Obligations may be fixed rate Collateral Obligations.  As a result of such mismatches, changes in the level of LIBOR or any other applicable floating rate index could adversely affect the ability of the Issuer to make payments on the Notes.  To the extent described herein, the Issuer may enter into Hedge Agreements to reduce the effect of any such interest rate mismatch.  However, there can be no assurance that the Issuer will enter into such Hedge Agreements or that, if entered into, such Hedge Agreements will significantly reduce the effect of such interest rate mismatch. The Subordinated Notes will be subordinated to the payment of interest on the Secured Notes.  There can be no assurance that the Collateral Obligations and the Eligible Investments will in all circumstances generate sufficient Interest Proceeds to make timely payments of interest on the Secured Notes and to make distributions to the holders of the Subordinated Notes, nor that the Hedge Agreements will ensure any particular return on such Offered Securities.

*The Floating Rate Notes may be affected by Changes in LIBOR; Historical performance of LIBOR has been volatile*

LIBOR used to compute the Interest Rate on each class of the Floating Rate Notes.  Therefore the Interest Rate may fluctuate from one Interest Accrual Period to another in response to changes in LIBOR.  Over the past several years, LIBOR has experienced historically high volatility and significant fluctuations.  The Issuer believes that LIBOR will continue to fluctuate and makes no representation as to what LIBOR will be in the future.  Because the Floating Rate Notes initially will bear interest based upon three-month LIBOR (other than during the first Interest Accrual Period), there may be a basis mismatch between the Floating Rate Notes and the underlying Collateral Obligations with interest rates based on LIBOR for a different period of time or even three-month LIBOR for a different accrual period.  It is possible that LIBOR payable on the Floating Rate Notes may rise (or fall) during periods in which LIBOR with respect to the various Collateral Obligations is stable or falling (or rising but capped at a level lower than LIBOR for the Floating Rate Notes).  Some Collateral Obligations, however, may have LIBOR floor arrangements that may help mitigate this risk, but there is no requirement for any Collateral Obligation to have a LIBOR floor and there is no guaranty that any such LIBOR floor will fully mitigate the risk of falling LIBOR.  If LIBOR payable on the Floating Rate Notes rises during periods in which LIBOR with respect to the various Collateral Obligations is stable, is falling or is rising but is capped at a lower level, "excess spread" (i.e., the difference between the interest collected on the Collateral Obligations and the sum of the interest payable on the

Floating Rate Notes and certain transaction fees payable by the Issuer) that otherwise would be available as credit support may instead be used to pay interest on the Floating Rate Notes. There may also be a timing mismatch between the Floating Rate Notes and the underlying Collateral Obligations as the LIBOR on such Collateral Obligations may adjust more frequently or less frequently or on different dates than LIBOR on the Floating Rate Notes. Such a mismatch could result in the Issuer not collecting sufficient Interest Proceeds to make interest payments on the Secured Notes.

In recent years, LIBOR has experienced high volatility. The historical performance of LIBOR should not be taken as an indication of future performance during the term of the Secured Notes. Changes in the levels of LIBOR will affect the amount of interest payable on the Secured Notes, and the trading price of the Secured Notes, but it is impossible to predict whether such levels will rise or fall.

Syndicated commercial loans typically bear interest at a floating rate based on LIBOR. However, any of the developments described in "—*Additional information about Libor*" may decrease the confidence of commercial borrowers in LIBOR and lead such borrowers to look for alternative, non-LIBOR based types of financing, such as fixed rate loans or bonds or floating rate loans based on non-LIBOR indices. An increase in alternative types of financing at the expense of LIBOR-based syndicated commercial loans may make it more difficult for the Issuer to source Collateral Obligations prior to the Effective Date or reinvest proceeds in Collateral Obligations with comparable interest rates that satisfy the reinvestment criteria specified herein or may increase interest rate mismatches between the Notes and the Collateral Obligations.

*Certain Risks Relating to Hedge Agreements*

A Hedge Counterparty may terminate the applicable Hedge Agreements if any withholding tax is imposed on payments thereunder by such Hedge Counterparty, and any amounts that would be required to be paid by the Issuer to enter into replacement Hedge Agreements will reduce amounts available for payments to holders of Notes. A Hedge Counterparty may also terminate the applicable Hedge Agreements upon the occurrence of certain events of default or termination events thereunder with respect to the Issuer (expected to include, but not be limited to, bankruptcy, a change in law making the performance of the obligations under such Hedge Agreement unlawful, or the determination to sell or liquidate the Assets upon the occurrence of an Event of Default under the Indenture), and in the case of such early termination of any Hedge Agreement, the Issuer may be required to make a payment to the related Hedge Counterparty. Any amounts that would be required to be paid by the Issuer to enter into replacement Hedge Agreements will reduce amounts available for payments to holders of Notes. In either case, there can be no assurance that the remaining payments on the Assets would be sufficient to make payments of interest and principal on the Secured Notes and distributions with respect to the Subordinated Notes.

The Issuer may terminate a Hedge Agreement upon the occurrence of certain events of default or termination events thereunder with respect to the Hedge Counterparty (including, but not limited to, bankruptcy or the failure of the Hedge Counterparty to make payments to the Issuer under the applicable Hedge Agreement). In the event that the Issuer terminated a Hedge Agreement upon the occurrence of a bankruptcy of the applicable Hedge Counterparty, there can be no assurance that termination amounts due and payable to the Hedge Counterparty from the Issuer would be subordinated to payments made to the holders of the Notes as required under the Priority of Payments. Decisions in U.S. bankruptcy proceedings have held that subordination provisions similar to those set forth in the Priority of Payments are unenforceable with respect to a bankrupt hedge counterparty. In addition, upon the occurrence of a bankruptcy of a Hedge Counterparty, if the Issuer fails to terminate the applicable Hedge Agreement in a timely manner, such Hedge Agreement could be assumed by the bankruptcy estate of such Hedge Counterparty and the Issuer could be required to continue making payments to such Hedge Counterparty, even if such Hedge Counterparty failed to perform its obligations under the applicable Hedge Agreement prior to the assumption. In either case, amounts available for payments to holders of Notes would be reduced and may be materially reduced.

*Stated Maturity, Average Life and Prepayment Considerations*

The Stated Maturity of the Notes is May 1, 2027. The average life of each Class of Notes is expected to be shorter than the number of years until its Stated Maturity. Each such average life may vary due to various factors affecting the early retirement of Collateral Obligations, the timing and amount of sales of such Collateral Obligations, the ability of the Portfolio Manager to invest collections and proceeds in additional Collateral

Obligations, and the occurrence of any Mandatory Redemption, Optional Redemption or Special Redemption. Retirement of the Collateral Obligations prior to their respective final maturities will depend, among other things, on the financial condition of the issuers of the underlying Collateral Obligations and the respective characteristics of such Collateral Obligations, including the existence and frequency of exercise of any optional redemption, mandatory redemption or sinking fund features, the prevailing level of interest rates, the redemption prices, the actual default rates and the actual amount collected on any Defaulted Obligations and the frequency of tender or exchange offers for such Collateral Obligations. In particular, loans are generally prepayable at par, and a high proportion of loans could be prepaid. The ability of the Issuer to reinvest proceeds in securities with comparable interest rates that satisfy the reinvestment criteria specified herein may affect the timing and amount of payments received by the holders of Notes and the yield to maturity of the Notes. See "*Security for the Secured Notes—Sales of Collateral Obligations; Additional Collateral Obligations and Investment Criteria*."

*Changes in Tax Law; No Gross-up in Respect of Notes*

All payments made on the Notes will be made without any deduction or withholding for or on account of any tax unless such deduction or withholding is required by FATCA or any applicable law, as modified by the practice of any relevant governmental revenue authority then in effect. Although no withholding tax or deduction is currently imposed on the payments of interest or principal or other amounts on the Notes to holders that provide appropriate tax certifications, there can be no assurance that, as a result of a change in any applicable law, treaty, rule, regulation, or interpretation thereof (whether by official or informal means), or as a result of the application of FATCA, the payments on the Notes would not in the future become subject to withholding taxes or deductions. In the event that any withholding tax or deduction is imposed on payments on the Notes, the Issuer will not "gross up" payments to the holders of the Notes.

*Changes in Tax Law; Imposition of Tax on Issuer*

The Issuer is not currently subject to Cayman Islands tax. There can be no assurance, however, that the Issuer will not in the future be subject to tax by the Cayman Islands or some other jurisdiction as a result of a change in law. In the event that tax is imposed on the Issuer, the Issuer's ability to repay the Notes may be impaired.

*Changes in Tax Law; No Gross-Up in Respect of Collateral Obligations*

A Collateral Obligation will generally only be eligible for purchase by the Issuer if, at the time it is purchased, either the payments thereon are not subject to withholding tax (other than withholding imposed on account of FATCA or withholding on commitment fees, letter of credit fees and other similar fees) or the obligor thereof is required to "gross up" payments on account of such withholding taxes. There can be no assurance, however, that, as a result of any change in any applicable law, treaty, rule, regulation or interpretation thereof, the payments on the Collateral Obligations would not in the future become subject to withholding taxes. In that event, if the obligors of such Collateral Obligations were not then required to make "gross up" payments that cover the full amount of any such withholding taxes, the amounts available to make payments on the Notes would accordingly be reduced. There can be no assurance that remaining payments on the Collateral Obligations would be sufficient to make timely payments on each Class of Notes.

*Trade or Business within the United States*

The Issuer's profits will not be subject to U.S. federal income tax on a net income basis (including the branch profits tax), unless the Issuer is treated as engaged in the conduct of a trade or business within the United States. Upon the issuance of the Notes, Dechert LLP, special U.S. tax counsel to the Issuer and the Portfolio Manager, will deliver an opinion generally to the effect that, under current law, although no activity closely comparable to that contemplated by the Issuer has been the subject of any Treasury regulation, revenue ruling or judicial decision, the contemplated activities of the Issuer will not cause the Issuer to be engaged in a trade or business within the United States for U.S. federal income tax purposes and, accordingly, the Issuer will not be subject to U.S. federal income tax on a net income basis. The opinion of Dechert LLP will assume compliance with the Indenture (and certain other documents) and be based upon certain assumptions, covenants and representations regarding restrictions on the future conduct of the activities of the Issuer and the Portfolio Manager, including certain restrictions on the Portfolio Manager's activities attached as an exhibit to the Portfolio Management Agreement (the "**Trading Restrictions**"). The Issuer intends to conduct its business in accordance with the assumptions, representations and agreements upon which the opinion of Dechert LLP is based, and the Portfolio Manager has generally undertaken to comply with the

Trading Restrictions. In complying with such assumptions, representations, and agreements, however, the Issuer (or the Portfolio Manager acting on its behalf) is permitted to take certain actions that would otherwise be prohibited under the Trading Restrictions if it obtains written advice from Dechert LLP or an opinion of other tax counsel of nationally recognized standing in the United States experienced in such matters that the departure will not cause the Issuer to be treated as engaged in a trade or business within the United States for U.S. federal income tax purposes. The opinion of Dechert LLP will not address any such actions. In addition, the relevant law is subject to change and modification after the date that the foregoing opinion is rendered, but the Portfolio Manager is not obligated to monitor (and conform the Issuer's activities in order to comply with) changes in law. Accordingly, any such changes could adversely affect whether the Issuer is treated as engaged in a trade or business within the United States. Further, the Issuer may, for certain specified purposes, enter into supplemental indentures, some of which may be entered into without the consent of any holders, and no assurance can be given that such supplemental indentures will not affect whether the Issuer is treated as engaged in a trade or business within the United States. The opinion of Dechert LLP will be based on the documents as of the Closing Date, and accordingly, will not address any potential U.S. federal income tax consequences of any supplemental indenture. The opinion of Dechert LLP and any such other advice or opinion are not binding on the IRS or the courts, and no ruling will be sought from the IRS regarding this, or any other, aspect of the U.S. federal income tax treatment of the Issuer. Accordingly, in the absence of authority on point, the U.S. federal income tax treatment of the Issuer is not entirely free from doubt, and there can be no assurance that positions contrary to those stated in the opinion of Dechert LLP or any such other advice or opinions may not be asserted successfully by the IRS.

If it were determined that the Issuer was engaged in the conduct of a trade or business within the United States, and had income that is effectively connected with such trade or business, then the Issuer would be subject under the Code to the regular corporate income tax on such effectively connected income (possibly on a gross income basis) and possibly to the 30% branch profits tax as well. In addition, interest paid on the Notes to a Non-U.S. Holder (as defined in "*Certain Tax Considerations*") could in such circumstance be subject to a 30% U.S. withholding tax. The imposition of such taxes would materially affect the Issuer's financial ability to make payments with respect to the Notes.

The imposition of taxes may also result in a redemption of the Notes in the manner described under "*Description of the Offered Securities—Optional Redemption and Refinancing.*"

*The Issuer will be required to comply with certain reporting and informational requirements*

To avoid withholding under FATCA, the Issuer generally will be required to comply with the Cayman Islands law implementing the intergovernmental agreement between the United States and the Cayman Islands (the "**IGA**"). These laws generally require the Issuer to obtain certain information from holders or beneficial owners of Notes and to report this information to the Tax Information Authority of the Cayman Islands, which will share this information with the U.S. Internal Revenue Service ("**IRS**"). The required information includes the name, address, taxpayer identification number and certain other information regarding certain holders that are (or exhibit indicia that they are) U.S. Tax Persons, and in certain cases, information regarding U.S. Tax Persons that are owners of holders of the Notes. In certain circumstances, the Issuer's ability to avoid withholding under FATCA may be outside of the Issuer's control. For example, the Issuer may be treated as subject to withholding under FATCA if the holder(s) of more than 50% of the Subordinated Notes (or any other interests treated as equity for U.S. federal income tax purposes) is, or is affiliated with, a foreign financial institution that is not FATCA compliant.

Although not currently required under the IGA, the Issuer eventually may be required to withhold on payments to holders that are "nonparticipating foreign financial institutions", as defined in FATCA. Under a grandfathering rule, however, no withholding under FATCA is required on payments (including gross proceeds) made in respect of Notes that are properly treated as indebtedness of the Issuer for U.S. federal income tax purposes, unless those Notes are materially modified on or after six months after the date of publication of final regulations defining the term "foreign passthru payments." Notes treated as equity for U.S. federal income tax purposes, such as the Subordinated Notes, will not be grandfathered.

If an investor fails to provide the Issuer with any correct, complete and accurate information requested that may be required for the Issuer to comply with FATCA or otherwise fails to comply with FATCA, the Issuer is authorized to withhold amounts otherwise distributable to the investor, to compel the investor to sell its Notes and, if the

investor does not sell its Notes within 10 Business Days after notice from the Issuer, to sell the investor's Notes on behalf of the investor.  In addition, each investor must indemnify the Issuer, the Trustee and their respective agents from any and all damages, costs, taxes and expenses resulting from the investor's failure to provide the Issuer with appropriate tax forms and other documentation reasonably requested by the Issuer, including documentation necessary for the Issuer to comply with FATCA.

*The Issuer will be a passive foreign investment company and may be a controlled foreign corporation*

The Issuer will be a passive foreign investment company for U.S. federal income tax purposes, which means that a U.S. Holder (as defined in "*Certain Tax Considerations*") of Subordinated Notes may be subject to adverse tax consequences that may generally be avoided if it elects to treat the Issuer as a qualified electing fund and to recognize currently its pro rata share of the Issuer's ordinary earnings and net capital gain whether or not distributed to such U.S. Holder. In addition, depending on the overall ownership of the Subordinated Notes, a U.S. Holder of more than 10% of the Subordinated Notes may be treated as a U.S. shareholder in a controlled foreign corporation and required to recognize currently its proportionate share of the "subpart F income" of the Issuer whether or not distributed to such U.S. Holder. A U.S. Holder that makes a qualified electing fund election, or that is required to include subpart F income in the event that the Issuer is treated as a controlled foreign corporation, may recognize income in amounts significantly greater than the payments received from the Issuer. See "*Certain Tax Considerations—U.S. Holders of the Subordinated Notes*."

*Possible Treatment of the Class E Notes as Equity in the Issuer for U.S. Federal Income Tax Purposes*

The Class E Notes could be treated as representing equity in the Issuer for U.S. federal income tax purposes. If the Class E Notes are so treated, gain on the sale of a Class E Note could be treated as ordinary income and subject to additional tax in the nature of interest, and certain interest on the Class E Notes could be subject to the additional tax. U.S. Holders (as defined in "*Certain Tax Considerations*") may be able to avoid these adverse consequences by filing a "protective qualified electing fund" election with respect to their Class E Notes. See "*Certain Tax Considerations—U.S. Holders of the Secured Notes—Alternative Characterization of the Class E Notes.*" In addition, any Class of Note treated as equity for U.S. federal income tax purposes will not be treated as grandfathered from withholding under FATCA.

*Investors should consider certain ERISA considerations*

If the ownership of any class of equity interest of the Issuer, such as a class of Notes which is characterized as equity, by Benefit Plan Investors were to equal or exceed 25% of the total value of such class, as determined under the Plan Asset Regulations issued by the United States Department of Labor at 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") (such regulation as so modified, the "**Plan Asset Regulation**"), assets of the Issuer would be deemed to be "plan assets." (The Plan Asset Regulation provides that in applying such 25% limitation, Notes held by Controlling Persons must be disregarded.)  If for any reason the assets of the Issuer were deemed to be "plan assets," certain transactions that the Issuer might enter into, or may have entered into, in the ordinary course of its business might constitute non-exempt "prohibited transactions" under Section 406 of ERISA or Section 4975 of the Code and might have to be rescinded at significant cost to the Issuer. The Portfolio Manager, on behalf of the Issuer, may be prevented from engaging in certain investments or other transactions or fee arrangements because they might be deemed to cause non-exempt prohibited transactions. Moreover, if the underlying assets of the Issuer were deemed to be assets constituting plan assets, (i) the assets of the Issuer could be subject to ERISA's reporting and disclosure requirements, (ii) a fiduciary causing a Benefit Plan Investor to make an investment in the equity of the Issuer could be deemed to have delegated its responsibility to manage the assets of the Benefit Plan Investor, (iii) various providers of fiduciary or other services to the Issuer, and any other parties with authority or control with respect to the Issuer, could be deemed to be Plan fiduciaries or otherwise "parties in interest" as defined in Section 3(14) of ERISA (each a "**Party in Interest**") for purposes of ERISA or "disqualified persons" as defined in Section 4975(e)(2) of the Code by virtue of their provision of such services, and (iv) it is not clear that Section 404(b) of ERISA, which generally prohibits plan fiduciaries from maintaining the indicia of ownership of assets of plans subject to Title I of ERISA outside the jurisdiction of the district courts of the United States, would be satisfied in all instances.  The term "Benefit Plan Investor" is defined in 29 C.F.R. Section 2510.3-101 and Section 3(42) of ERISA as (a) any employee benefit plan (as defined in Section 3(3) of ERISA) that is subject to the fiduciary responsibility provisions of Title I of ERISA, (b) any plan to which Section 4975 of the Code applies and (c) any entity whose

underlying assets include plan assets by reason of such an employee benefit plan's or plan's investment in such entity.

An equity interest is defined under the Plan Asset Regulation as an interest other than an instrument which is treated as indebtedness under applicable local law and which has no substantial equity features. Although there is little guidance on how this definition applies, the Issuer believes that the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes will be treated as indebtedness without substantial equity features for purposes of the Plan Asset Regulation, although no assurance can be given in this regard. The Issuer believes that the Class E Notes and the Subordinated Notes will likely be treated as equity interests in the Issuer for purposes of the Plan Asset Regulation.

The Issuer intends, through the use of written or deemed representations, to restrict ownership of the Class E Notes and the Subordinated Notes by Benefit Plan Investors and/or Controlling Persons, as applicable, so that no assets of the Issuer will be deemed to be "plan assets" as such term is defined in the Plan Asset Regulation subject to Title I of ERISA or Section 4975 of the Code. However, there can be no assurance that ownership of the Class E Notes and the Subordinated Notes by Benefit Plan Investors will always remain below the 25% Limitation established under the Plan Asset Regulation.

See "*ERISA and Legal Investment Considerations*" herein for a more detailed discussion of certain ERISA and related considerations with respect to an investment in the Notes.

### *The Issuer is subject to U.S. anti-money laundering legislation*

The Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA PATRIOT Act**"), signed into law on and effective as of October 26, 2001, requires that financial institutions, a term that includes banks, broker-dealers and investment companies, establish and maintain compliance programs to guard against money laundering activities. The USA PATRIOT Act requires the Secretary of the United States Department of the Treasury (the "**Treasury**") to prescribe regulations in connection with anti-money laundering policies of financial institutions. The Financial Crimes Enforcement Network ("**FinCEN**"), an agency of the Treasury, has announced that it is likely that such regulations would require pooled investment vehicles such as the Co-Issuers to enact anti-money laundering policies. In addition, in December 2011, the Director of FinCEN announced that FinCEN is working on a regulatory proposal that would require investment advisors to establish anti-money laundering programs and report suspicious activity. It is possible that there could be promulgated legislation or regulations that would require the Co-Issuers, the Initial Purchaser or other service providers to the Co-Issuers, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to investors in the Notes. Such legislation and/or regulations could require the Co-Issuers to implement additional restrictions on the transfer of the Notes. The Co-Issuers reserve the right to request such information as is necessary to verify the identity of a Noteholder and the source of the payment of subscription monies, or as is necessary to comply with any customer identification programs required by FinCEN and/or the SEC. In the event of delay or failure by the applicant to produce any information required for verification purposes, an application for or transfer of Notes and the subscription monies relating thereto may be refused.

### *The Issuer is subject to Cayman Islands Anti-Money Laundering Legislation*

The Administrator is, and the Issuer may be, subject to the Cayman Islands Money Laundering Regulations (2013 Revision) ("**Regulations**"). The Regulations apply to anyone conducting "relevant financial business" in or from the Cayman Islands intending to form a business relationship or carry out a one-off transaction. The Regulations require a financial service provider to maintain certain anti-money laundering procedures including those for the purposes of verifying the identity and source of funds of an "applicant for business"; e.g. an investor. Except in certain circumstances, including where an entity is regulated by a recognised overseas regulatory authority and/or listed on a recognised stock exchange in an approved jurisdiction, the Administrator will likely be required to verify each investor's identity and the source of the payment used by such investor for purchasing the Notes in a manner similar to the obligations imposed under the laws of other major financial centers. In addition, if any person resident in the Cayman Islands knows or suspects, or has reasonable grounds for knowing or suspecting that another person is engaged in criminal conduct, or is involved with terrorism or terrorist property, and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade,

profession, business or employment, the person will be required to report such knowledge or suspicion to (i) the Financial Reporting Authority of the Cayman Islands ("**FRA**") , pursuant to the Proceeds of Crime Law (2014 Revision) of the Cayman Islands ("**PCL**"), if the disclosure relates to criminal conduct or money laundering, or (ii) a police officer of the rank of constable or higher, or the FRA, pursuant to the Terrorism Law (2011 Revision) of the Cayman Islands, if the disclosure relates to involvement with terrorism or terrorist financing and property.  If the Issuer were determined by the Cayman Islands authorities to be in violation of the PCL, the Terrorism Law or Regulations, the Issuer could be subject to substantial criminal penalties.  The Issuer may be subject to similar restrictions in other jurisdictions.  Such a violation could materially adversely affect the timing and amount of payments by the Issuer to the holders of the Notes.

*No Operating History*

Each of the Issuer and the Co-Issuer is a recently organized entity and has no prior operating history or track record.  Accordingly, neither the Issuer nor the Co-Issuer has a performance history for a prospective investor to consider in making its decision to invest in the Offered Securities.

*No Guarantees on Offered Securities*

None of the Co-Issuers, the Initial Purchaser, the Portfolio Manager, any Hedge Counterparty, the Collateral Administrator or the Trustee or any affiliate thereof makes any assurance, guarantee or representation whatsoever as to the expected or projected success, profitability, return, performance result, effect, consequence or benefit (including legal, regulatory, tax, financial, accounting or otherwise) to investors of ownership of the Offered Securities and no purchaser may rely on any such party for a determination of expected or projected success, profitability, return, performance result, effect, consequence or benefit (including legal, regulatory, tax, financial, accounting or otherwise) to such purchaser of ownership of the Offered Securities.  Each purchaser of any Class of Secured Notes, by its acceptance thereof, will be deemed, and each purchaser of the Subordinated Notes, by its acceptance thereof, will be required, to represent to the Issuer and the Initial Purchaser, among other things, that such purchaser has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors regarding investment in the Offered Securities as such purchaser has deemed necessary and that the investment by such purchaser is within its powers and authority, is permissible under applicable laws governing such purchase, has been duly authorized by it and complies with applicable securities laws and other laws.

*The Issuer Could Be Adversely Affected by Non-Compliance of Holders of Offered Securities with Investment Company Act Restrictions*

Neither the Issuer nor the Co-Issuer has registered with the SEC as an investment company pursuant to the Investment Company Act, in reliance on an exception under Section 3(c)(7) of the Investment Company Act for investment companies (a) whose outstanding securities are beneficially owned only by Qualified Purchasers and Knowledgeable Employees with respect to the Issuer and certain transferees thereof identified in Rules 3c-5 and 3c-6 under the Investment Company Act and (b) which do not make a public offering of their securities in the United States.

No opinion or no-action position has been requested of the SEC with respect to the status of the Co-Issuers as investment companies under the Investment Company Act.

If the SEC or a court of competent jurisdiction were to find that the Issuer or the Co-Issuer is required, but in violation of the Investment Company Act had failed, to register as an investment company, possible consequences would include, but not be limited to, the following:  (i) the SEC could apply to a district court to enjoin the violation; (ii) investors in the Issuer and the Co-Issuer could sue the Issuer and the Co-Issuer and recover any damages caused by the violation; and (iii) any contract to which the Issuer and/or the Co-Issuer is party that is made in violation of the Investment Company Act or whose performance involves such violation would be unenforceable by any party to the contract unless a court were to find that under the circumstances enforcement would produce a more equitable result than non-enforcement and would not be inconsistent with the purposes of the Investment Company Act. Should the Issuer or the Co-Issuer be subjected to any or all of the foregoing, the Issuer and the Co-Issuer would be materially and adversely affected.  In addition, such a finding would constitute an Event of Default under the Indenture.

*Book-Entry Holders Not Holders under the Indenture*

Holders of beneficial interests in any Notes held in global form will not be considered holders of such Notes under the Indenture.  After payment of any interest, principal or other amount to DTC, neither the Issuer nor the Co-Issuer will have any responsibility or liability for the payment of such amount by DTC or to any holder of a beneficial interest in a Note.  DTC or its nominee will be the sole holder for any Notes held in global form, and therefore each person owning a beneficial interest in a Note held in global form must rely on the procedures of DTC (and if such person is not a participant in DTC on the procedures of the participant through which such person holds such interest) with respect to the exercise of any rights of a holder of a Note under the Indenture.

## Risks Relating to the Portfolio Manager

*Past Performance Not Indicative of Future Results*

The past performance of the Portfolio Manager and its principals and affiliates in other portfolios or investment vehicles, including, without limitation, Hewett's Island CLO I-R, ACIS CLO 2013-1, ACIS CLO 2013-2, ACIS CLO 2014-3, ACIS CLO 2014-4 and ACIS CLO 2014-5 may not be indicative of the results that the Portfolio Manager may be able to achieve with the Collateral Obligations.  Similarly, the past performance of the Portfolio Manager and its principals and affiliates over a particular period may not necessarily be indicative of the results that may be expected in future periods.  Furthermore, the nature of, and risks associated with, the Issuer's investments may differ substantially from those investments and strategies undertaken historically by the Portfolio Manager and its principals and affiliates.  There can be no assurance that the Issuer's investments will perform as well as past investments of the Portfolio Manager or its principals and affiliates, that the Issuer will be able to avoid losses or that the Issuer will be able to make investments similar to the past investments of the Portfolio Manager and its principals and affiliates.  In addition, such past investments may have been made utilizing a leveraged capital structure, an asset mix and fee arrangements that are different from the anticipated capital structure, asset mix and fee arrangements of the Issuer.  Moreover, because the investment criteria that govern investments in the Issuer's portfolio do not govern the investments and investment strategies of the Portfolio Manager and its principals and affiliates generally, such investments conducted in accordance with such criteria, and the results they yield, are not directly comparable with, and may differ substantially from other investments undertaken by the Portfolio Manager and its principals and affiliates.

In addition, the Indenture places significant restrictions on the Portfolio Manager's ability to buy and sell Collateral Obligations, and the Portfolio Manager is required to comply with the restrictions contained in the Indenture.  As a result of these restrictions, during certain periods or in certain specified circumstances, the Portfolio Manager may be unable to buy or sell Collateral Obligations or to take other actions which it might consider to be in the best interest of the Issuer and the holders of Notes.

*The Portfolio Manager Relies on Highland to Perform Certain Services*

The Portfolio Manager currently relies on Highland, a Registered Investment Adviser under common control with the Portfolio Manager, pursuant to the Service Agreements, to provide investment research and operational support to the Portfolio Manager, including services in connection with credit research, due diligence of actual or potential investments, the execution of investment transactions approved by the Portfolio Manager, and certain loan services and administrative services. If Highland does not continue to provide such services to the Portfolio Manager, or there is a departure or inability of certain Highland personnel to provide such services to the Portfolio Manager, there can be no assurances that the Portfolio Manager would be able to find a substitute service provider with the same experience, or on the same terms as its Service Agreements with, Highland.  The inability of the Portfolio Manager to perform its duties under the Portfolio Management Agreement in accordance with the standard of care specified therein due to the termination of the Service Agreements could result in removal of the Portfolio Manager under the Portfolio Management Agreement. See "*The Portfolio Management Agreement*."

*Litigation Involving Acis and Highland.*

The Portfolio Manager relies on Highland pursuant to the Service Agreements for provision of certain portfolio management, loan and administrative services. See "—*The Portfolio Manager Relies on Highland to Perform Certain Services*" and "*The Portfolio Manager*." The Portfolio Manager and/or Highland may be, from time to time, subject to various legal proceedings and claims. Any such claims, whether with or without merit, could be time-

consuming and expensive to defend and could divert the Portfolio Manager and/or Highland's attention and resources.

*Dependence on Portfolio Manager*

The performance of the Issuer's portfolio depends heavily on the skills of the Portfolio Manager in analyzing, selecting and managing the Collateral Obligations. As a result, the Co-Issuers will be highly dependent on the financial and managerial experience of certain investment professionals associated with the Portfolio Manager, none of whom is under any contractual obligation to the Issuer to continue to be associated with the Portfolio Manager for the term of this transaction. The loss of one or more of these individuals could have a material adverse effect on the performance of the Co-Issuers. Furthermore, the Portfolio Manager has informed the Issuer that these investment professionals are also actively involved in other investment activities and will not be able to devote all of their time to the Issuer's business and affairs. In addition, individuals not currently associated with the Portfolio Manager may become associated with the Portfolio Manager and the performance of the Collateral Obligations may also depend on the financial and managerial experience of such individuals. Moreover, the Portfolio Management Agreement may be terminated under certain circumstances. See "*The Portfolio Management Agreement*" and "*The Portfolio Manager.*"

*The Subordinated Management Fee and the Incentive Management Fee may create an incentive for the Portfolio Manager to seek to maximize the yield on the Collateral Obligations*

On each Payment Date, the Portfolio Manager may be paid the Subordinated Management Fee and the Incentive Management Fee to the extent of funds available on such Payment Date as described in "*Summary of Terms—Priority of Payments*," and, in the case of the Incentive Management Fee, if the holders of the Subordinated Notes have realized the specified Incentive Management Fee Threshold as of such Payment Date. Therefore, payment of the Incentive Management Fee will be dependent to a large extent on the yield earned on the Collateral Obligations. This fee structure could create a further incentive for the Portfolio Manager to make more speculative investments in the Collateral Obligations than the Issuer would otherwise make in order to maximize the yield on the Collateral Obligations relative to investments of higher creditworthiness. Managing the portfolio with the objective of increasing yield, even though the Portfolio Manager is constrained by investment restrictions described in "Security for the Secured Notes," could result in an increase in defaults or volatility and could contribute to a decline in the aggregate market value of the Collateral Obligations.

*Portfolio Manager remains entitled to Incentive Management Fee following removal for cause and its termination, resignation or assignment*

As described under "*The Portfolio Management Agreement—Compensation*" the Portfolio Manager will remain entitled to receive a portion of the Incentive Management Fee which may be payable following its removal for cause or its termination, resignation or assignment. Accordingly, even if the Incentive Management Fee Threshold has not been met prior to the removal, termination, resignation or assignment by or of the Portfolio Manager but is subsequently achieved under the management of a successor Portfolio Manager, the exiting Portfolio Manager shall remain entitled to a portion of Incentive Management Fee payable in accordance with the Priority of Payments based on the allocations described under "*The Portfolio Management Agreement—Compensation*."

**Risks Relating to the Collateral Obligations**

*Below Investment-Grade Assets*

The Assets will consist primarily of non-investment grade loans or interests in non-investment grade loans, which are subject to liquidity, market value, credit, interest rate, reinvestment and certain other risks. It is anticipated that the Assets generally will be subject to greater risks than investment grade corporate obligations. These risks could be exacerbated to the extent that the portfolio is concentrated in one or more particular types of Collateral Obligations.

Prices of the Assets may be volatile, and will generally fluctuate due to a variety of factors that are inherently difficult to predict, including but not limited to changes in interest rates, prevailing credit spreads, general economic conditions, financial market conditions, domestic and international economic or political events, developments or trends in any particular industry, and the financial condition of the obligors of the Assets. The current uncertainty

affecting the United States economy and the economies of other countries in which issuers or obligors of Collateral Obligations are domiciled and the possibility of increased volatility in financial markets could adversely affect the value and performance of the Collateral Obligations.  Additionally, loans and interests in loans have significant liquidity and market value risks since they are not generally traded in organized exchange markets but are traded by banks and other institutional investors engaged in loan syndications.  Because loans are privately syndicated and loan agreements are privately negotiated and customized, loans are not purchased or sold as easily as publicly traded securities.  In addition, historically the trading volume in the loan market has been small relative to the debt securities market.

Leveraged loans have historically experienced greater default rates than has been the case for investment grade securities.  There can be no assurance as to the levels of defaults and/or recoveries that may be experienced on the Collateral Obligations, and an increase in default levels could adversely affect payments on the Notes.

A non-investment grade loan or debt obligation or an interest in a non-investment grade loan is generally considered speculative in nature and may become a Defaulted Obligation for a variety of reasons.  Upon any Collateral Obligation becoming a Defaulted Obligation, such Defaulted Obligation may become subject to either substantial workout negotiations or restructuring, which may entail, among other things, a substantial reduction in the interest rate, a substantial write-down of principal, and a substantial change in the terms, conditions and covenants with respect to such Defaulted Obligation.  In addition, such negotiations or restructuring may be quite extensive and protracted over time, and therefore may result in substantial uncertainty with respect to the ultimate recovery on such Defaulted Obligation.  The liquidity for Defaulted Obligations may be limited, and to the extent that Defaulted Obligations are sold, it is highly unlikely that the proceeds from such sale will be equal to the amount of unpaid principal and interest thereon.  Furthermore, there can be no assurance that the ultimate recovery on any Defaulted Obligation will be at least equal to either the minimum recovery rate assumed by S&P in rating the Secured Notes or any recovery rate used in connection with any analysis of the Notes that may have been prepared by Jefferies for or at the direction of holders of any Notes.

*The Issuer Will Enter Into Agreements to Acquire A Portion of the Initial Portfolio of Collateral Obligations On or About the Closing Date; Limited Disclosure about the Collateral Obligations*

It is expected that all of the Assets will be purchased for settlement on or after the Closing Date.  During the period from the pricing of the Notes to the Closing Date, the Portfolio Manager will enter into transactions in the secondary market to purchase Collateral Obligations the Aggregate Principal Balance of which is expected to equal at least 90% of the Target Initial Par Amount for settlement on or about the Closing Date (the "**Pre-Closing Acquisitions**") to facilitate the accumulation of the Issuer's initial portfolio.  Pre-Closing Acquisitions representing approximately 11.6% of the Target Initial Par Amount were committed to be purchased from a fund for which the Portfolio Manager acts as investment adviser.  Such Assets were purchased in accordance with the Portfolio Manager's policies and procedures with respect to cross-transactions as described under "*—Risks Relating to Certain Conflicts of Interest—The Issuer will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates*".  The Portfolio Manager expects to use the remaining net proceeds to purchase (and enter into agreements to purchase) additional Collateral Obligations during the Ramp-up Period, which is expected to end on or before June 22, 2015.

Trades to purchase Collateral Obligations in the Pre-Closing Acquisitions will be executed at the prevailing prices at the time of execution of such trades and in market conditions applicable at that time. At any point during the Ramp-up Period, the market conditions related to and the prices of the Collateral Obligations purchased in the Pre-Closing Acquisitions may differ.  Investors, especially those in the more subordinated Class of Notes, may be adversely impacted by higher prevailing prices, the quality of loans and other market conditions during the limited time period the trades for Pre-Closing Acquisitions will be entered into.

A substantial portion of the initial portfolio of Collateral Obligations to be acquired before the end of the Ramp-up Period has been identified by the Portfolio Manager but, for reasons of confidentiality, is not identified in this Offering Circular.  Investors that regard the identity of the portfolio in whole or in part necessary or desirable for their investment decision need to consider the availability of that information other than through this Offering Circular.

The Issuer and the Portfolio Manager will not be required to provide the holders of the Offered Securities or the Trustee with financial or other information (which may include material non-public information) it receives pursuant to the Collateral Obligations and related documents.  The Portfolio Manager also will not disclose to any of these parties the contents of any notice it receives pursuant to the Collateral Obligations or related documents.  In particular, the Portfolio Manager will not have any obligation to keep any of these parties informed as to matters arising in relation to any Collateral Obligations, except with respect to:  (i) the receipt or non-receipt, on an aggregate basis, of principal, interest, or other amounts of collections or recoveries; (ii) the cancellation of any Collateral Obligations; (iii) default amounts in respect of the Collateral Obligations; and (iv) certain other information required to be reported under the Portfolio Management Agreement and the Indenture.

The holders of the Offered Securities and the Trustee will not have any right to inspect any records relating to the Collateral Obligations, and the Portfolio Manager will not be obligated to disclose any further information or evidence regarding the existence or terms of, or the identity of any obligor on, any Collateral Obligations, unless specifically required by the Portfolio Management Agreement.  Furthermore, the Portfolio Manager and the Trustee may demand that any persons requesting that information execute confidentiality agreements before being provided with the information.

*Lender Liability and Equitable Subordination*

A number of judicial decisions have upheld judgments of borrowers against lending institutions on the basis of various evolving legal theories, collectively termed "lender liability."  Generally, lender liability is founded on the premise that a lender has violated a duty (whether implied or contractual) of good faith, commercial reasonableness and fair dealing, or a similar duty owed to the borrower or has assumed an excessive degree of control over the borrower resulting in the creation of a fiduciary duty owed to the borrower or its other creditors or shareholders.  Because of the nature of the Assets, the Issuer may be subject to allegations of lender liability.

In addition, under common law principles that in some cases form the basis for lender liability claims, if a lender or bondholder (a) intentionally takes an action that results in the undercapitalization of a borrower to the detriment of other creditors of such borrower, (b) engages in other inequitable conduct to the detriment of such other creditors, (c) engages in fraud with respect to, or makes misrepresentations to, such other creditors or (d) uses its influence as a stockholder to dominate or control a borrower to the detriment of other creditors of such borrower, a court may elect to subordinate the claim of the offending lender or bondholder to the claims of the disadvantaged creditor or creditors, a remedy called "equitable subordination."  Because of the nature of the Assets, the Assets may be subject to claims of equitable subordination.

Because affiliates of, or persons related to, the Portfolio Manager may hold equity or other interests in obligors of Collateral Obligations, the Issuer could be exposed to claims for equitable subordination or lender liability or both based on such equity or other holdings.

The preceding discussion is based upon principles of U.S. federal and state laws.  Insofar as Collateral Obligations that are obligations of non-U.S. obligors are concerned, the laws of certain foreign jurisdictions may impose liability upon lenders or bondholders under factual circumstances similar to those described above, with consequences that may or may not be analogous to those described above under U.S. federal and state laws.

*Loan Prepayments*

Loans are generally prepayable in whole or in part at any time at the option of the obligor thereof at par *plus* accrued unpaid interest thereon.  Prepayments on loans may be caused by a variety of factors (including market conditions favoring refinancing at a lower rate) which are often difficult to predict.  Consequently, there exists a risk that loans purchased at a price greater than par may experience a capital loss as a result of such a prepayment.  In addition, principal proceeds received upon such a prepayment are subject to reinvestment risk during the Reinvestment Period.  Any inability of the Issuer to reinvest payments or other proceeds in Assets with comparable interest rates that satisfy the Investment Criteria specified herein may adversely affect the timing and amount of payments received by the holders of Offered Securities and the yield to maturity of the Secured Notes and the distributions on the Subordinated Notes.  There is no assurance that the Issuer will be able to reinvest proceeds in assets with comparable interest rates that satisfy the Investment Criteria or (if it is able to make such reinvestments) as to the length of any delays before such investments are made.  If a high proportion of the Assets are prepaid in

each year and the Issuer is unable to reinvest in additional collateral at the projected prices and rates of interest, the expected returns to the Notes may be substantially diminished.

*Ability of the Issuer to Acquire Collateral Obligations that Satisfy the Investment Criteria Subject to Market Conditions*

A portion of the initial Collateral Obligations is expected to be purchased after the Closing Date as described herein.  The ability of the Issuer to acquire an initial portfolio of Collateral Obligations that satisfies the Investment Criteria at the projected prices, ratings, rates of interest and any other applicable characteristics will be subject to market conditions and availability of such Collateral Obligations.  Any inability of the Issuer to acquire Collateral Obligations that satisfy the Investment Criteria specified herein may adversely affect the timing and amount of payments received by the holders of Offered Securities and the yield to maturity of the Secured Notes and the distributions on the Subordinated Notes. In addition, the Secured Notes will be subject to redemption in part by the Co-Issuers or the Issuer, as applicable, on any Payment Date during the Reinvestment Period if the Portfolio Manager notifies the Trustee that it has been unable, for a period of at least 20 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager in its sole discretion and which would meet the criteria for reinvestment described under "*Security for the Secured Notes—Sales of Collateral Obligations; Additional Collateral Obligations and Investment Criteria*" in sufficient amounts to permit the investment or reinvestment of all or a portion of the funds then in the Collection Account that are to be invested in additional Collateral Obligations.  There is no assurance that the Issuer will be able to acquire Collateral Obligations that satisfy the Investment Criteria.  In the event that all or a portion of the Collateral Obligations cannot be acquired either at the projected prices, rates of interest or timing of acquisition thereof, the expected cash flows to the Subordinated Notes and amounts available for reinvestment in additional portfolio assets will be impaired.

*Additional Risks Involved in Investments in Loans*

The Issuer may acquire interests in loans either directly (by way of assignment from the selling institution) or indirectly (by purchasing a Participation Interest from the selling institution).  As described in more detail below, holders of Participation Interests are subject to additional risks not applicable to a holder of a direct interest in a loan.  In addition, if the Issuer acquires an interest in a Pre-funded Letter of Credit, the Issuer will be exposed to the credit risk of the applicable agent bank with respect to funded amounts deposited by the Issuer with such agent bank.

Participations by the Issuer in a selling institution's portion of a loan typically result in a contractual relationship only with such selling institution, not with the borrower.  In the case of a Participation Interest, the Issuer will generally have the right to receive payments of principal, interest and any fees to which it is entitled only from the institution selling the participation and only upon receipt by such selling institution of such payments from the borrower.  By holding a Participation Interest in a loan, the Issuer generally will have no right to enforce compliance by the borrower with the terms of the loan agreement, nor any rights of set off against the borrower, and the Issuer may not directly benefit from the collateral supporting the loan in which it has purchased the participation.  As a result, the Issuer will assume the credit risk of both the borrower and the institution selling the participation, which will remain the legal owner of record of the applicable loan.  In the event of the insolvency of the selling institution, the Issuer, by owning a Participation Interest, may be treated as a general unsecured creditor of the selling institution, and may not benefit from any set off between the selling institution and the borrower.  In addition, the Issuer may purchase a participation from a selling institution that does not itself retain any portion of the applicable loan and, therefore, may have limited interest in monitoring the terms of the loan agreement and the continuing creditworthiness of the borrower.  When the Issuer holds a Participation Interest in a loan it will not have the right to vote under the applicable loan agreement with respect to every matter that arises thereunder, and it is expected that each selling institution will reserve the right to administer the loan sold by it as it sees fit and to amend the documentation evidencing such loan in all respects.  Selling institutions voting in connection with such matters may have interests different from those of the Issuer and may fail to consider the interests of the Issuer in connection with their votes.

Certain of the loans or Participation Interests may be governed by the law of a jurisdiction other than a United States jurisdiction.  Risks of investing outside the United States may include:  (i) less publicly available information; (ii) varying levels of governmental regulation and supervision; and (iii) the difficulty of enforcing legal rights in a foreign jurisdiction and uncertainties as to the status, interpretation and application of laws.  Moreover, foreign companies may be subject to accounting, auditing and financial reporting standards, practices and requirements

different from those applicable to U.S. companies.  The economies of individual non-U.S. countries may also differ from the U.S. economy in such respects as growth of gross domestic product, rate of inflation, volatility of currency exchange rates, capital reinvestment, resource self-sufficiency and balance of payments position.  The Issuer is unable to provide any information with respect to the risks associated with purchasing a loan or a Participation Interest under an agreement governed by the laws of a jurisdiction other than a United States jurisdiction, including characterization under such laws of such Participation Interest or sub-Participation Interest in the event of the insolvency of the institution from whom the Issuer purchases such Participation Interest or sub-Participation Interest or the insolvency of the institution from whom the grantor of the sub-Participation Interest purchased its Participation Interest.

The purchaser of an assignment of an interest in a loan typically succeeds to all the rights and obligations of the assigning selling institution and becomes a lender under the loan agreement with respect to that loan.  As a purchaser of an assignment, the Issuer generally will have the same voting rights as other lenders under the applicable loan agreement, including the right to vote to waive enforcement of breaches of covenants or to enforce compliance by the borrower with the terms of the loan agreement, and the right to set off claims against the borrower and to have recourse to collateral supporting the loan.  Assignments are, however, arranged through private negotiations between assignees and assignors, and in certain cases the rights and obligations acquired by the purchaser of an assignment may differ from, and be more limited than, those held by the assigning selling institution.

Assignments and participations are sold strictly without recourse to the selling institutions, and the selling institutions will generally make no representations or warranties about the underlying loan, the borrowers, the documentation of the loans or any collateral securing the loans.  In addition, the Issuer will be bound by provisions of the underlying loan agreements, if any, that require the preservation of the confidentiality of information provided by the borrower.  Because of certain factors including confidentiality provisions, the unique and customized nature of the loan agreement, and the private syndication of the loan, loans are not purchased or sold as easily as are publicly traded securities.

*Limited control of administration and amendment of Collateral Obligations*

As a holder of an interest in a syndicated loan, the Issuer will have limited consent and control rights and such rights may not be effective in view of the expected proportion of such obligations held by the Issuer.  The Portfolio Manager will exercise or enforce, or refrain from exercising or enforcing, any or all of the Issuer's rights in connection with the Collateral Obligations or any related documents or will refuse amendments or waivers of the terms of any Collateral Obligation and related documents in accordance with its portfolio management practices and the standard of care specified in the Portfolio Management Agreement.  The Portfolio Manager's ability to change the terms of the Collateral Obligations will generally not otherwise be restricted by the Indenture.  The holders of Notes will not have any right to compel the Portfolio Manager to take or refrain from taking any actions other than in accordance with its portfolio management practices and the standard of care specified in the Portfolio Management Agreement.

The Portfolio Manager may, in accordance with its portfolio management standards and subject to the Transaction Documents, agree to extend or defer the maturity, or adjust the outstanding balance of any Collateral Obligation, or otherwise amend, modify or waive the terms of any related loan agreement, including the payment terms thereunder.  Any amendment, waiver or modification of a Collateral Obligation could postpone the expected maturity of the Notes and/or reduce the likelihood of timely and complete payment of interest on or principal of the Secured Notes or distributions on the Subordinated Notes.

*Voting restrictions on syndicated loans for minority holders*

The Issuer will generally purchase each Collateral Obligation in the form of an assignment of, or Participation Interest in, a note or other obligation issued under a loan facility to which more than one lender is a party.  These loan facilities are administered for the lenders by a lender or other agent acting as the lead administrator.  The terms and conditions of these loan facilities may be amended, modified or waived only by the agreement of the lenders.  Generally, any such agreement must include a majority or a super-majority (measured by outstanding loans or commitments) or, in certain circumstances, a unanimous vote of the lenders, and the Issuer may have a minority interest in such loan facilities.  Consequently, the terms and conditions of a Collateral Obligation issued or sold in

connection with a loan facility could be modified, amended or waived in a manner contrary to the preferences of the Issuer if the amendment, modification or waiver of such term or condition does not require the unanimous vote of the lenders and a sufficient number of the other lenders concur with such modification, amendment or waiver. There can be no assurance that any Collateral Obligations issued or sold in connection with any loan facility will maintain the terms and conditions to which the Issuer or a predecessor in interest to the Issuer originally agreed.

*Participation on Creditors' Committees*

The Issuer may participate on committees formed by creditors to negotiate the management of financially troubled companies that may or may not be in bankruptcy or the Issuer may seek to negotiate directly with the debtors with respect to restructuring issues. The participants on such a committee will attempt to achieve an outcome that is in their respective individual best interests and there can be no assurance that results that are the most favorable to the Issuer will be obtained in such proceedings. By participating on such committees, the Issuer may be deemed to have duties to other creditors represented by the committees, which might thereby expose the Issuer to liability to such other creditors who disagree with the Issuer's actions.

*Third party litigation; limited funds available*

The Issuer's investment activities may subject it to the risks of becoming involved in litigation by third parties. This risk may be greater where the Issuer exercises control or significant influence over a company's direction. See "*—Lender Liability and Equitable Subordination*." The expense of defending against claims against the Issuer by third parties and paying any amounts pursuant to settlements or judgments would be borne by the Issuer. The funds available to the Issuer to pay certain fees and expenses of the Trustee, the Collateral Administrator and the Administrator and for payment of the Issuer's other accrued and unpaid Administrative Expenses are limited as described in "*Description of the Offered Securities—Priority of Payments*." In the event that such funds are not sufficient to pay the expenses incurred by the Issuer, the ability of the Issuer to operate effectively may be impaired, and the Issuer may not be able to defend or prosecute legal proceedings that may be bought against it or that the Issuer might otherwise bring to protect its interests.

*Concentration risk*

The Issuer will invest in a portfolio of Collateral Obligations consisting of assignments of or Participation Interests in loans. Although no significant concentration with respect to any particular obligor, industry or country (other than the United States) is expected to exist at the Effective Date, the concentration of the portfolio in any one obligor would subject the Notes to a greater degree of risk with respect to defaults by such obligor, and the concentration of the portfolio in any one industry would subject the Notes to a greater degree of risk with respect to economic downturns relating to such industry. In purchasing and selling Assets, the Issuer will be required to satisfy certain tests to limit Collateral Obligation concentration in terms of both obligor and industry concentrations. Although the resulting diversification of Collateral Obligations may reduce the risk described above, the diversification requirements applicable to the Issuer may cause the Issuer to invest in obligors or industries that suffer more defaults than is the Issuer were not required to invest in a diversified portfolio See "Security for the Secured Notes." In addition, to the extent that below investment-grade obligations in an asset class generally underperform or experience increased levels of credit losses or market volatility, the Collateral Obligations will likely experience credit and trading losses even with industry and obligor diversification. There can be no assurance that the diversification guidelines of the Indenture will be effective in minimizing losses on any Class of Notes.

*International Investing*

A portion of the Assets may consist of Collateral Obligations that are obligations of non-U.S. obligors. Investing outside the United States may involve greater risks than investing in the United States. These risks include: (i) less publicly available information, (ii) varying levels of governmental regulation and supervision and (iii) the difficulty of enforcing legal rights in a non-U.S. jurisdiction and uncertainties as to the status, interpretation and application of laws. Moreover, non-U.S. obligors may not be subject to uniform accounting, auditing and financial reporting standards, practices and requirements comparable to those applicable to United States companies. Generally, there is less governmental supervision and regulation of exchanges, brokers, obligors and issuers in foreign countries than there is in the United States. For example, there may be no comparable provisions under certain foreign laws with respect to insider trading and similar investor protection afforded by securities laws that apply with respect to securities transactions consummated in the United States. Moreover, if the sovereign rating of

a country in which an obligor on a Collateral Obligation is located is downgraded, the ratings applicable to such Collateral Obligation may decline as well.

Foreign markets also have different clearance and settlement procedures, and in certain markets there have been times when settlements have failed to keep pace with the volume of securities transactions, making it difficult to conduct such transactions.  Delays in settlement could result in periods when assets of the Issuer are uninvested and no return is earned thereon.  The inability of the Issuer to make intended purchases of Collateral Obligations due to settlement problems or the risk of intermediary counterparty failures could cause the Issuer to miss investment opportunities.  The inability to dispose of a Collateral Obligation due to settlement problems could result either in losses to the Issuer due to subsequent declines in the value of such Collateral Obligation or, if the Issuer has entered into a contract to sell the security, could result in possible liability to the purchaser.  Transaction costs of buying and selling foreign securities, including brokerage, tax and custody costs, also are generally higher than those involved in domestic transactions.  Furthermore, foreign financial markets, while generally growing in volume, have, for the most part, substantially less volume than U.S. markets, and securities of many foreign companies are less liquid and their prices more volatile than securities of comparable domestic companies.

In many foreign countries, there is the possibility of expropriation, nationalization or confiscatory taxation, limitations on the convertibility of currency or the removal of securities, property or other assets of the Issuer, political, economic or social instability or adverse diplomatic developments, each of which could have an adverse effect on the Issuers investments in such foreign countries (which may make it more difficult to pay U.S. Dollar-denominated obligations).  The economies of individual non-U.S. countries may also differ favorably or unfavorably from the U.S. economy in such respects as the effect of the global recession, growth or contraction of gross domestic product, rate of inflation, volatility of currency exchange rates, depreciation, capital reinvestment, resource self-sufficiency and balance of payments position.

*Defaults; market and credit spread volatility*

To the extent that a default occurs with respect to any Collateral Obligation and the Issuer sells or otherwise disposes of the Collateral Obligation, it is likely that the proceeds will be less than its unpaid principal and interest or its purchase price.  This could have a material adverse effect on the payments on the Notes.  The Issuer also may incur additional expenses to the extent it is required to seek recovery after a default or participate in the restructuring of an obligation.  Even in the absence of a default with respect to any of the Collateral Obligations, the market value of the Collateral Obligation at any time will vary, and may vary substantially, from the price at which that Collateral Obligation was initially purchased and from the principal amount of such Collateral Obligation, due to market volatility, changes in relative credit quality, availability of financial information and remedies under the underlying instruments of such Collateral Obligation, general economic conditions, the level of interest rates, changes in exchange rates, the supply of below investment grade debt obligations and other factors that are difficult to predict.  In addition, the Indenture places significant restrictions on the Portfolio Manager's ability to buy and sell Collateral Obligations.

The market price of below investment grade debt obligations has and may from time to time in the future experience significant volatility.  In particular, this market has experienced severe price volatility and reduced liquidity.  No assurance can be given as to the levels of volatility in the below investment grade debt market in the future.  Such volatility may adversely impact the liquidity, market prices and other performance characteristics of the Collateral Obligations.

In addition to default frequency, recovery rate and market price volatility, leveraged loans may experience volatility in the spread that is paid on such leveraged loans.  Such spreads will vary based on a variety of factors, including, but not limited to, the level of supply and demand in the leveraged loan market, general economic conditions, levels of relative liquidity for leveraged loans, the actual and perceived level of credit risk in the leveraged loan market, regulatory changes, changes in credit ratings and the methodology used by credit rating agencies in assigning credit ratings, and such other factors that may affect pricing in the leveraged loan market.  Since leveraged loans may generally be prepaid at any time without penalty, the obligors of such leveraged loans would be expected to prepay or refinance such leveraged loans if alternative financing were available at a lower cost.  For example, if the credit ratings of an obligor were upgraded, the obligor were recapitalized or if credit spreads were declining for leveraged loans, such obligor would likely seek to refinance at a lower credit spread.  The

rates at which Collateral Obligations may prepay or refinance and the level of credit spreads for leveraged loans in the future are subject to numerous factors and are difficult to predict. Declining credit spreads in the leveraged loan market and increasing rates of prepayments and refinancings will likely result in a reduction of portfolio yield and interest collections on the Collateral Obligations, which would have adverse effect on the amount available for distributions on Notes, beginning with the Subordinated Notes as the most junior Class.

*Cov-Lite Loans*

A significant portion (up to 60% of the Collateral Principal Amount) of the Collateral Obligations owned by the Issuer at any given time may be comprised of Cov-Lite Loans. Cov-Lite Loan documents do not contain any, or only contain very limited, financial covenants obligating the underlying borrower to comply with certain financial ratios, such as debt-service-coverage ratios or leverage ratios. Such covenants are usually designed to enable lenders to monitor the financial condition of the borrower, to restrict the ability of the borrower to change significantly its operations, to restrict the ability of the borrower to enter into other significant transactions that could affect the borrower's ability to repay its debts, and to permit a lender to either default the borrower or restructure the Loan in order to maximize the lender's recovery on the Loan.

In recent years, the prevalence of Cov-Lite Loans in the United States leveraged loan market has increased significantly, driven by what some market participants and observers believe is an increased investor demand for leveraged loans and other leveraged-loan products as well as other factors. Therefore, many (or most) of the Collateral Obligations that will be available for purchase by the Issuer in the secondary loan market will be Cov-Lite Loans. It is very likely that, on the Closing Date and for as long as the Notes are outstanding, the Issuer will purchase a significant number of Cov-Lite Loans.

Historically, Cov-Lite Loans were offered by lenders only to borrowers considered to have strong credit profiles. However, in more recent months many market participants and observers have expressed the concern that Cov-Lite Loans are being made more frequently to borrowers with weaker credit profiles. As a result of the foregoing and the ability of the Issuer to purchase and own a significant number of Cov-Lite Loans, the Issuer (and, therefore, holders of the Notes) may be exposed to heightened credit and other risks related to the portfolio of loans that will be owned by the Issuer. Breaches of the financial covenants in loans that are not Cov-Lite Loans alert lenders to the fact (or the possibility) that a borrower is experiencing, or may experience, financial difficulty or that a borrower may become insolvent, each of which, if not averted, might reduce the lender's ability to recover amounts due to it under the loan or, ultimately, might decrease the amount of the lender's recovery. Some market participants or observers view breaches of these financial covenants as an "early-warning system" that enables a lender to put the borrower in default or to restructure the loan in a manner that might maximize or enhance the lender's ultimate recovery on the loan. Because Cov-Lite Loans do not contain financial covenants (or contain only limited financial covenants), a lender of a Cov-Lite Loan will not have the benefit of this early-warning mechanism, exposing it to more risk and potentially greater losses than it would have been exposed had the Loan been documented with financial covenants. Cov-Lite Loans also typically have increased price volatility and more limited liquidity than loans that include financial covenants.

It is also important for any potential holder of a Note to understand that, according to the Indenture, a loan that does not include any financial covenants will not be considered to be a Cov-Lite Loan (as that term is defined in the Indenture) if its documentation contains a cross default provision to, or is pari passu with, another loan of the underlying obligor that requires the underlying obligor to comply with both an Incurrence Covenant and a Maintenance Covenant. Therefore, many loans that do not include financial covenants in their own underlying documentation (and that would otherwise be considered to be Cov-Lite Loans but for such qualification in the definition of the term Cov-Lite Loan) will not be considered to be a Cov-Lite Loan under the Indenture. Therefore, such loans will not be taken into account when imposing the 60% concentration limit on Cov-Lite Loans that is described above.

Prospective investors in the Notes are advised to take these risks into consideration when deciding whether or not to purchase any of the Notes and should understand that the inclusion of Cov-Lite Loans in the portfolio of loans owned by the Issuer might have an adverse effect on the Issuer's ability to fully and promptly make payments on the Notes.

*Insolvency Considerations*

Various laws enacted for the protection of creditors may apply to the Collateral Obligations.  The information in this and the following paragraph is applicable with respect to U.S. issuers.  Insolvency considerations will differ with respect to non-U.S. Issuers.  If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an issuer of a Collateral Obligation, such as a trustee in bankruptcy, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting such Collateral Obligation and, after giving effect to such indebtedness, the issuer (i) was insolvent, (ii) was engaged in a business for which the remaining assets of such issuer constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could determine to invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, to subordinate such indebtedness to existing or future creditors of the issuer or to recover amounts previously paid by the issuer in satisfaction of such indebtedness.  The measure of insolvency for purposes of the foregoing will vary.  Generally, an issuer would be considered insolvent at a particular time if the sum of its debts were then greater than all of its property at a fair valuation or if the present fair salable value of its assets were then less than the amount that would be required to pay its probable liabilities on its existing debts as they became absolute and matured.  There can be no assurance as to what standard a court would apply in order to determine whether the issuer was "insolvent" after giving effect to the incurrence of the indebtedness constituting the Collateral Obligations or that, regardless of the method of valuation, a court would not determine that the issuer was "insolvent" upon giving effect to such incurrence.  In addition, in the event of the insolvency of an issuer of a Collateral Obligation, payments made on such Collateral Obligations could be subject to avoidance as a "preference" if made within a certain period of time (which may be as long as one year under Federal bankruptcy law or even longer under state laws) before insolvency.

In general, if payments on Collateral Obligations are avoidable, whether as fraudulent conveyances or preferences, such payments can be recaptured either from the initial recipient (such as the Issuer) or from subsequent transferees of such payments (such as the holders of the Offered Securities).  To the extent that any such payments are recaptured from the Issuer, the resulting loss will be borne by the holders of the Offered Securities in inverse order of seniority as described above under "*—Risk Relating to the Offered Securities—Subordination of the Notes*."  However, a court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any such payment from a holder of Offered Securities only to the extent that such court has jurisdiction over such holder or its assets.  Moreover, it is likely that avoidable payments could not be recaptured directly from a holder that has given value in exchange for its Offered Security, in good faith and without knowledge that the payments were avoidable.  Nevertheless, since there is no judicial precedent relating to a structured transaction such as the Offered Securities, there can be no assurance that a holder of Offered Securities will be able to avoid recapture on this or any other basis.

*Purchase of Equity Securities through One or More Subsidiaries*

Equity Securities may be held by an ETB Subsidiary.  The Issuer's ability to realize the economic benefits of its indirect ownership of these assets depends on the ability of the ETB Subsidiaries to make payments and other distributions to the Issuer.  In the event that any ETB Subsidiary is unable for any reason to make such payments or other distributions to the Issuer, the Issuer may not be able to realize the full economic benefits of the assets held by such ETB Subsidiary.  In addition, the Issuer will generally be responsible for the taxes and costs associated with ETB Subsidiaries.

**Risks Relating to Certain Conflicts of Interest**

*Certain Conflicts of Interest Involving the Rating Agency*

S&P may have a conflict of interest because the Issuer pays the fees charged by S&P for its ratings services.

*Various Potential and Actual Conflicts of Interest*

Various potential and actual conflicts of interest may arise from the overall investment activity of the Portfolio Manager, its clients and its affiliates and the Initial Purchaser, its clients and its affiliates.  Certain conflicts of interest may also arise from the activities of the Rating Agency in connection with the transaction.  The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

*The Issuer will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates*

The following briefly summarizes certain potential and actual conflicts of interest which may arise from the overall investment activity of the Portfolio Manager, its clients and its affiliates, but is not intended to be an exhaustive list of all such conflicts.  The scope of the activities of the Portfolio Manager, its affiliates, and the funds and clients managed or advised by the Portfolio Manager or any of its affiliates may give rise to conflicts of interest or other restrictions and/or limitations imposed on the Issuer in the future that cannot be foreseen or mitigated at this time.

As part of their regular business, the Portfolio Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees hold, purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective clients, on a principal or agency basis, with respect to loans, securities and other investments and financial instruments of all types.  The Portfolio Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees also provide investment advisory services, among other services, and engage in private equity, real estate and capital markets-oriented investment activities.  The Portfolio Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees will not be restricted in their performance of any such services or in the types of debt or equity investments which they may make.  The Portfolio Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees may have economic interests in or other relationships with obligors or issuers in whose obligations or securities or credit exposures the Issuer may invest.  In particular, such persons may make and/or hold an investment in an obligor's or issuer's securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's securities made and/or held by the Issuer or in which partners, security holders, members, officers, directors, agents, personnel or employees of such persons serve on boards of directors or otherwise have ongoing relationships.  Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Issuer and otherwise create conflicts of interest for the Issuer.  In such instances, the Portfolio Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Issuer's investments.  In connection with any such activities described above, the Portfolio Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable to be included as Collateral Obligations.  The Portfolio Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees will not be required to offer such securities or investments to the Issuer or provide notice of such activities to the Issuer.  In addition, in managing the Collateral Obligations, the Portfolio Manager may take into account its relationship or the relationships of its affiliates with obligors and their respective affiliates, which may create conflicts of interest.  Furthermore, in connection with actions taken in the ordinary course of business of the Portfolio Manager in accordance with its fiduciary duties to its other clients, the Portfolio Manager may take, or be required to take, actions which adversely affect the interests of the Issuer in the Assets.

The Portfolio Manager, its clients, its partners, its members, funds or other investment accounts managed by the Portfolio Manager or any of its affiliates, or their personnel, employees and their affiliates ("**Related Entities**") have invested and may continue to invest in debt obligations that would also be appropriate as Collateral Obligations.  Such investments may be different from those made on behalf of the Issuer.  Neither the Portfolio Manager nor any Related Entity has any duty, in making or maintaining such investments, to act in a way that is favorable to the Issuer or to offer any such opportunity to the Issuer.  The investment policies, fee arrangements and other circumstances applicable to such other parties may vary from those applicable to the Issuer.  The Portfolio Manager and/or any Related Entity may also provide advisory or other services for a customary fee to issuers or obligors whose debt obligations or other securities are Collateral Obligations, and neither the holders of Notes nor the Issuer shall have any right to such fees.  The Portfolio Manager and/or any Related Entity may also have ongoing relationships with, render services to or engage in transactions with other clients, including other issuers of collateralized loan obligations and collateralized debt obligations, who invest in assets of a similar nature to those of the Issuer, and with companies whose securities or loans are acquired by the Issuer as Collateral Obligations and may own equity or debt securities issued by obligors of Collateral Obligations.  In connection with the foregoing activities the Portfolio Manager and/or any Related Entity may from time to time come into possession of material nonpublic information that limits the ability of the Portfolio Manager to effect a transaction for the Issuer, and the

56

Issuer's investments may be constrained as a consequence of the Portfolio Manager's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Issuer.  In addition, officers or affiliates of the Portfolio Manager and/or Related Entities may possess information relating to obligors of Collateral Obligations that is not known to the individuals at the Portfolio Manager responsible for monitoring the Collateral Obligations and performing the other obligations under the Portfolio Management Agreement.

In addition, the Portfolio Manager and its affiliates may, from time to time, be presented with investment opportunities that fall within the investment objectives of the Issuer and other clients, funds or other investment accounts managed by the Portfolio Manager or its affiliates, and in such circumstances, the Portfolio Manager and its affiliates expect to allocate such opportunities among the Issuer and such other clients, funds or other investment accounts on a basis that the Portfolio Manager and its affiliates determine in good faith is appropriate taking into consideration such factors as the fiduciary duties owed to the Issuer and such other clients, funds or other investment accounts, the primary mandates of the Issuer and such other clients, funds or other investment accounts, the capital available to the Issuer and such other clients, funds or other investment accounts, any restrictions on investment, the sourcing of the transaction, the size of the transaction, the amount of potential follow-on investing that may be required for such investment and the other Collateral Obligations of the Issuer and such other clients, funds or other investment accounts, the relation of such opportunity to the investment strategy of the Issuer and such other clients, funds or other investment accounts, reasons of portfolio balance and any other consideration deemed relevant by the Portfolio Manager and its affiliates in good faith.  The Portfolio Manager will allocate investment opportunities across the entities for which such opportunities are appropriate, consistent with (1) its internal conflict of interest and allocation policies and (2) the requirements of the Advisers Act.  The Portfolio Manager will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy.  However, there is no assurance that such investment opportunities will be allocated to the Issuer fairly or equitably in the short-term or over time and there can be no assurance that the Issuer will be able to participate in all such investment opportunities that are suitable for it.

Although the professional staff of the Portfolio Manager will devote as much time to the Issuer as the Portfolio Manager deems appropriate to perform its duties in accordance with the Portfolio Management Agreement and in accordance with reasonable commercial standards, the staff may have conflicts in allocating its time and services among the Issuer and the Portfolio Manager's other accounts.  The Indenture places significant restrictions on the Portfolio Manager's ability to buy and sell Collateral Obligations.  Accordingly, during certain periods or in certain circumstances, the Portfolio Manager may be unable as a result of such restrictions to buy or sell securities or to take other actions that it might consider to be in the best interests of the Issuer and the holders of the Notes.

The directors, officers, personnel, employees and agents of the Portfolio Manager and its Related Entities may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Issuer or any Related Entity, or for any obligor or issuer in respect of the Collateral Obligations, Equity Securities or Eligible Investments or any affiliate thereof, to the extent permitted by their governing instruments, or by any resolutions duly adopted by the Issuer, its Related Entities or any obligor or issuer in respect of any of the Collateral Obligations, Eligible Investments or Equity Securities (or any affiliate thereof) pursuant to their respective governing instruments, and neither the Holders of the Notes nor the Issuer shall have the right to any such fees.

As further described below, the Portfolio Manager may effect client cross-transactions where the Portfolio Manager causes a transaction to be effected between the Issuer and another client advised by it or any of its Related Entities.  The Portfolio Manager may engage in a client cross-transaction involving the Issuer any time that the Portfolio Manager believes such transaction to be fair to the Issuer and such other client.  By purchasing the Notes of the Issuer, a Holder is deemed to have consented to such client cross-transactions between the Issuer and another client of the Portfolio Manager or one of its Related Entities.

As further described below, the Portfolio Manager may effect principal transactions where the Issuer acquires Asset from or sells Assets to Portfolio Manager and/or its affiliates, in each case in accordance with applicable law, which may include the Portfolio Manager obtaining the consent and approval of the Independent Review Party prior to engaging in any such principal transaction between the Issuer and the Portfolio Manager or its affiliates.  By

purchasing the Notes of the Issuer, a holder is deemed to have consented to such procedures relating to principal transactions between the Issuer and the Portfolio Manager or its Related Entities.

The Portfolio Manager may direct the Issuer to acquire or dispose of Collateral Obligations in cross trades between the Issuer and other clients of the Portfolio Manager or its affiliates in accordance with applicable legal and regulatory requirements.  In addition, the Issuer may invest in securities of obligors or issuers in which the Portfolio Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Issuer may enhance the profitability of the Portfolio Manager's own investments in such companies.  Moreover, the Issuer may invest in assets originated by the Portfolio Manager or its affiliates.  In each such case, the Portfolio Manager and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the Issuer and the other parties to such trade.  Under certain circumstances, the Portfolio Manager and its affiliates may determine that it is appropriate to avoid such conflicts by selling a Collateral Obligation at a fair value that has been calculated pursuant to the Portfolio Manager's valuation procedures to another client managed or advised by the Portfolio Manager or such affiliates.  In addition, the Portfolio Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Issuer and for the other party to the transaction, to the extent permitted under applicable law.  The Portfolio Manager may obtain the Issuer's written consent through the Independent Review Party as provided in the Portfolio Management Agreement if any such transaction requires the consent of the Issuer under Section 206(3) of the Advisers Act.  See "*The Portfolio Management Agreement*."  However, the Issuer will be barred from acquiring Related Obligations.

The Portfolio Manager and/or its Related Entities may participate in creditors or other committees with respect to the bankruptcy, restructuring or workout of obligors or issuers of Collateral Obligations.  In such circumstances, the Portfolio Manager may take positions on behalf of itself or Related Entities that are adverse to the interests of the Issuer in the Collateral Obligations.

The Portfolio Manager and/or its Related Entities may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of Collateral Obligations purchased by the Issuer.  Such transactions are on an arm's-length basis and may be subject to arm's-length fees.  There is no expectation for preferential access to transactions involving Collateral Obligations that are underwritten, originated, arranged or placed by the Portfolio Manager and/or its Related Entities and neither the holders of the Notes nor the Issuer shall have the right to any such fees.

There is no limitation or restriction on the Portfolio Manager or any of its Related Entities with regard to acting as investment adviser or collateral manager (or in a similar role) to other parties or persons.  This and other future activities of the Portfolio Manager and/or its Related Entities may give rise to additional conflicts of interest.  Such conflicts may related to obligations that the Portfolio Manager's investment committee, the Portfolio Manager or its affiliates have to other clients.

The members of the Portfolio Manager's investment committee serve or may serve as personnel, officers, directors or principals of entities that operate in the same or a related line of business as the Issuer, or of other clients managed by the Portfolio Manager or its affiliates.  In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Issuer or the holders of the Notes.  The Issuer may compete with other entities managed by the Portfolio Manager and its affiliates for capital and investment opportunities.

There are generally no ethical screens or information barriers among the Portfolio Manager and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions.  If the Portfolio Manager, any of its personnel or its affiliates were to receive material non-public information about a particular obligor, issuer or Collateral Obligation, or have an interest in causing the Issuer to acquire a particular Collateral Obligation, the Portfolio Manager may be prevented from causing the Issuer to purchase or sell such asset due to internal restrictions imposed on the Portfolio Manager.  Notwithstanding the maintenance of certain internal controls relating to the management of material non-public information, it is possible that such controls could fail and result in the Portfolio Manager, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information.  Inadvertent trading on material non-public information could have adverse effects on the Portfolio Manager's reputation, result in the imposition of regulatory or financial sanctions,

and as a consequence, negatively impact the Portfolio Manager's ability to perform its portfolio management services to the Issuer.  In addition, while the Portfolio Manager and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers.  In such event, the Portfolio Manager's ability to operate as an integrated platform could also be impaired, which would limit the Portfolio Manager's access to personnel of its affiliates and potentially impair its ability to manage the Issuer's investments.

It is expected that the Portfolio Manager, its affiliates or accounts advised or sub-advised by the Portfolio Manager or its affiliates will initially hold the Subordinated Notes.  There may be a variety of conflicts of interest that occur as a result.  The holder of the Subordinated Notes has certain rights to direct actions and consent rights.  One of those consent rights relates to the replacement of the Portfolio Manager following the termination, removal or resignation of the Portfolio Manager.  If the holder of the Subordinated Notes does not direct the Issuer to appoint a replacement Portfolio Manager, the existing Portfolio Manager will remain in place until (i) any of the Portfolio Manager, a Majority of the Controlling Class or a Majority of the Subordinated Notes shall petition a court of competent jurisdiction to appoint a replacement, (ii) a court makes such an appointment and (iii) such appointment becomes effective.  No assurance can be given that any such appointment will occur in a timely manner.

*Conflicts of Interest Involving the Initial Purchaser*

Various potential and actual conflicts of interest may arise as a result of the investment banking, asset management, financing and financial advisory services and products provided by Jefferies and/or its affiliates (each, a "**Jefferies Entity**") to the Issuer, the Trustee, the Portfolio Manager, the issuers of the Collateral Obligations and others, as well as in connection with the investment, trading and brokerage activities of the Jefferies Entities.  The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

Jefferies will act as the Initial Purchaser of the Notes (other than the Subordinated Notes sold by the Issuer to the Portfolio Manager, its affiliates or accounts advised or sub-advised by the Portfolio Manager or its affiliates) and will be paid fees and commissions for such services by the Issuer from the proceeds of the issuance of the Notes.  The Notes will be sold to investors on the Closing Date at varying prices.  One or more of the Jefferies Entities may from time to time hold Notes for investment, trading or other purposes.  None of the Jefferies Entities are required to own or hold any Notes and may sell any Notes held by them at any time.

Certain Eligible Investments may be issued, managed or underwritten by one or more of the Jefferies Entities.  One or more of the Jefferies Entities may provide investment banking, asset management, financing and financial advisory services and products to the Portfolio Manager, its affiliates, and funds managed by the Portfolio Manager and its affiliates, and purchase, hold and sell, both for their respective accounts or for the account of their respective clients, on a principal or agency basis, loans, securities, and other obligations and financial instruments of the Portfolio Manager, its affiliates, and funds managed by the Portfolio Manager and its affiliates.  As a result of such transactions or arrangements, one or more of the Jefferies Entities may have interests adverse to those of the Issuer and holders of the Notes.

One or more of the Jefferies Entities may:

(a)  have placed or underwritten, or acted as a financial arranger, structuring agent or advisor in connection with the original issuance of, or may act as a broker or dealer with respect to, participate or make a market in, certain of the Collateral Obligations;

(b)  act as trustee, paying agent and in other capacities in connection with certain of the Collateral Obligations or other classes of securities issued by an issuer of or obligor on a Collateral Obligation or an affiliate thereof;

(c)  be a counterparty to issuers or obligors of certain of the Collateral Obligations under swap or other derivative agreements;

(d)  lend to certain of the issuers or obligors of Collateral Obligations or their respective affiliates or receive guarantees from the issuers or obligors of those Collateral Obligations or their respective affiliates (which may

include investments in obligations or securities that are senior to, or have interests different from or adverse to, the Collateral Obligations);

(e)   provide other investment banking, asset management, financing or financial advisory services to the issuers or obligors of Collateral Obligations or their respective affiliates;

(f)   as principal or agent, have an equity interest, which may be a substantial equity interest, in certain issuers of the Collateral Obligations or their respective affiliates;

(g)   from time to time, act in two or more different capacities or roles (including as advisor, investor or creditor) in transactions or in relation to other services provided by any Jefferies Entity and may pay or receive fees, commissions or other benefits and allow or receive discounts or rebates in respect of each such capacity or role or as a result of any other matter referred to herein (which such Jefferies Entity shall be entitled to retain); or

(h)   have officers who serve as directors of any of the companies referred to in this Offering Circular or the issuers or obligors of Collateral Obligations.

When acting as a trustee, paying agent or in other service capacities with respect to a Collateral Obligation, the Jefferies Entities will be entitled to fees and expenses senior in priority to payments to the holders of such Collateral Obligation.  When acting as a trustee for other classes of securities issued by the issuer of or obligor on a Collateral Obligation or an affiliate thereof, the Jefferies Entities will owe fiduciary duties to the holders of such other classes of securities, which classes of securities may have differing interests from the holders of the class of securities of which the Collateral Obligation is a part, and may take actions that are adverse to the holders (including the Issuer) of the class of securities of which the Collateral Obligation is a part.  As a counterparty under swaps and other derivative agreements, the Jefferies Entities might take actions adverse to the interests of the Issuer, including, but not limited to, demanding collateralization of its exposure under such agreements (if provided for thereunder) or terminating such swaps or agreements in accordance with the terms thereof that might cause the issuer or obligor that is or is affiliated with the derivatives or swap counterparty to be in financial distress.  In making and administering loans and other obligations, the Jefferies Entities might take actions including, but not limited to, restructuring a loan, foreclosing on or exercising other remedies with respect to a loan, requiring additional collateral or other credit enhancement, charging significant fees and interest, placing the obligor in bankruptcy or demanding payment on a loan guarantee or under other credit enhancement.  The Issuer's purchase, holding and sale of Collateral Obligations may enhance the profitability or value of investments made by the Jefferies Entities in the obligors or issuers thereof.  As a result of all such transactions or arrangements between the Jefferies Entities and issuers or obligors of Collateral Obligations or their respective affiliates, the Jefferies Entities may have interests that are contrary to the interests of the Issuer and the holders of the Notes.

As part of their regular business, the Jefferies Entities may also provide a wide range of investment banking, asset management, investment advisory (including issuance of research), financing and financial advisory services and products to, and purchase, hold and sell, both for their respective accounts or for the account of their respective clients, on a principal or agency basis, a wide range of loans, securities, and other obligations and financial instruments and engage in private equity investment activities.  The Jefferies Entities will not be restricted in their performance of any such services or in the types of debt or equity investments, which they may make.  In conducting the foregoing activities, the Jefferies Entities will be acting for their own account or the account of their customers and will have no obligation to act in the interest of the Issuer.

The Jefferies Entities may, by virtue of the relationships described above or otherwise, at the date hereof or at any time hereafter, be in possession of information regarding certain of the issuers of Collateral Obligations and their respective affiliates, that is or may be material in the context of the Notes and that is or may not be known to the general public.  None of the Jefferies Entities has any obligation, and the offering of the Notes will not create any obligation on their part, to disclose to any purchaser of the Notes any such relationship or information, whether or not confidential.

Each Jefferies Entity operates rules, policies and procedures, including the deployment of permanent and ad hoc arrangements/information barriers within or between business groups or within or between single business areas within business groups, directed to ensuring that individual directors, officers and employees are not influenced by

any conflicting interest or duty and that confidential and/or price sensitive information held by such Jefferies Entity is not improperly disclosed or otherwise inappropriately made available to any other client(s).

From time to time the Portfolio Manager may sell Collateral Obligations through Jefferies.  Jefferies and its affiliates take no responsibility for, and have no obligation in respect of, either Co-Issuer.

# DESCRIPTION OF THE OFFERED SECURITIES

**The Indenture and the Secured Notes**

All of the Notes will be issued pursuant to the Indenture.  However, only the Secured Notes will be secured obligations of the Issuer. The following summary describes certain provisions of the Secured Notes and the Indenture and, to a limited extent, the Subordinated Notes.  The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Indenture.  Additional information regarding the Subordinated Notes appears under "*—The Subordinated Notes*."

**Status and Security**

The Co-Issued Notes will be limited recourse obligations of the Co-Issuers and the Class E Notes and the Subordinated Notes will be limited recourse obligations of the Issuer, in each case, secured as described below, and will rank in priority with respect to each other as described herein. Under the terms of the Indenture, the Issuer will grant to the Trustee a security interest in the Assets to secure the Issuer's obligations under the Indenture and the Secured Notes.  See "*Security for the Secured Notes*."

Payments of interest and principal on the Secured Notes will be made from the proceeds of the Assets, in accordance with the priorities described under "*Summary of Terms—Priority of Payments*" herein.  The aggregate amount that will be available from the Assets for payment on the Secured Notes and of certain expenses of the Co-Issuers on any Payment Date will be (i) the sum of Interest Proceeds and Principal Proceeds for the period (a "**Collection Period**") commencing immediately following the prior Collection Period (or on the Closing Date, in the case of the Collection Period relating to the first Payment Date) and ending on the 8th Business Day prior to such Payment Date or, in the case of (x) the final Collection Period preceding the latest Stated Maturity of any Class of Notes, (y) the final Collection Period preceding an Optional Redemption or Clean-up Call Redemption or (z) the final Collection Period preceding final payment on the Notes following the liquidation of the Assets following an Event of Default, ending on the day preceding such Stated Maturity, Redemption Date or final payment, respectively, *plus* (ii) any payments received on or before such Payment Date on any Hedge Agreement.  To the extent these amounts are insufficient to meet payments due in respect of the Secured Notes and expenses following liquidation of the Assets, the Co-Issuers will have no obligation to pay such deficiency.

**Interest**

The Secured Notes of each Class will bear stated interest from the Closing Date and such interest will be payable in arrears on each quarterly Payment Date on the Aggregate Outstanding Amount thereof on the first day of the related Interest Accrual Period (after giving effect to payments of principal thereof on such date).  The period from and including the Closing Date to but excluding the first Payment Date and each succeeding period from and including each Payment Date to but excluding the following Payment Date until the principal of the Secured Notes is paid or made available for payment, is an "**Interest Accrual Period**."  For purposes of determining any Interest Accrual Period, in the case of the Fixed Rate Notes, each Payment Date will be assumed to be the 1st day of the relevant month (irrespective of whether such day is a Business Day).

The *per annum* stated interest rate payable on the Secured Notes of each Class (the "**Interest Rate**" for such Class) with respect to each Interest Accrual Period will be the rate indicated under "*Summary of Terms—Principal Terms of the Offered Securities*."  As used herein, "**Class**" means, in the case of (1) the Class A Notes, Class B Notes, Class C Notes, Class D Notes and Class E Notes, all of the Secured Notes having the same Interest Rate, Stated Maturity and designation; it being agreed and understood that, notwithstanding any of the foregoing, any Pari Passu Classes shall be treated as a single Class, in each case, except as otherwise provided in the Indenture (or as the context otherwise may require) and (2) the Subordinated Notes, all of the Subordinated Notes.

So long as any more senior Class of Secured Notes is outstanding, to the extent that funds are not available on any Payment Date to pay the full amount of interest on any Class of Deferrable Notes, or if such interest is not paid in order to satisfy the Coverage Tests, such amounts ("**Deferred Interest**") will not be due and payable on such Payment Date, but will be deferred and added to the principal balance of such Classes and, thereafter, will bear interest at the Interest Rate for such Classes until paid, and the failure to pay such Deferred Interest on such Payment

Date will not be an Event of Default under the Indenture; *provided* that any such Deferred Interest must, in any case, be paid no later than the earlier of the Redemption Date or Stated Maturity of the relevant Class of the Secured Notes.  See "—*The Indenture—Events of Default.*"  Interest may be deferred on the Class C Notes as long as any Senior Notes are outstanding, on the Class D Notes as long as any Senior Notes or Class C Notes are outstanding and on the Class E Notes as long as any Co-Issued Notes are outstanding.

If any interest due and payable in respect of any Senior Notes (or, if there are no Senior Notes outstanding, any Class C Note or, if there are no Class C Notes outstanding, any Class D Note or, if there are no Class D Notes outstanding, any Class E Note) is not punctually paid or duly provided for on the applicable Payment Date and such default continues for five Business Days or is not paid at the applicable Stated Maturity, an Event of Default will occur.  To the extent lawful and enforceable, interest on such defaulted interest will accrue at a *per annum* rate equal to the Interest Rate applicable to such Notes from time to time in each case until paid.

Interest on the Floating Rate Notes will be calculated on the basis of the actual number of days elapsed in the applicable Interest Accrual Period *divided* by 360.  Interest accrued with respect to the Fixed Rate Notes will be calculated on the basis of a 360-day year consisting of twelve 30-day months.

The Issuer has initially appointed the Collateral Administrator as calculation agent (the "**Calculation Agent**") for purposes of determining LIBOR for each Interest Accrual Period.  The Calculation Agent will determine LIBOR for each Interest Accrual Period on the second London Banking Day preceding the first day of such Interest Accrual Period (each, an "**Interest Determination Date**").

"**LIBOR**" for any Interest Accrual Period will equal (a) the rate appearing on the Reuters Screen for deposits with a term of three months (*provided* that with respect to the first Interest Accrual Period, LIBOR will equal the rate representing the linear interpolation of the rates appearing on the Reuters Screen for deposits with a term of 3 months and 6 months as calculated on the relevant Interest Determination Date) or (b) if such rate is unavailable at the time LIBOR is to be determined, LIBOR shall be determined on the basis of the rates at which deposits in U.S. Dollars are offered by four major banks in the London market selected by the Calculation Agent (the "**Reference Banks**") at approximately 11:00 a.m., London time, on the Interest Determination Date to prime banks in the London interbank market for a period approximately equal to such period and an amount approximately equal to the Aggregate Outstanding Amount of the Secured Notes.  The Calculation Agent will request the principal London office of each Reference Bank to provide a quotation of its rate.  If at least two such quotations are provided, LIBOR shall be the arithmetic mean of such quotations (*rounded* upward to the next higher 1/100).  If fewer than two quotations are provided as requested, LIBOR with respect to such Interest Accrual Period will be the arithmetic mean of the rates quoted by three major banks in New York, New York selected by the Calculation Agent at approximately 11:00 a.m., New York time, on such Interest Determination Date for loans in U.S. Dollars to leading European banks for a term approximately equal to such Interest Accrual Period and an amount approximately equal to the Aggregate Outstanding Amount of the Secured Notes.  If the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures described above, LIBOR will be LIBOR as determined on the previous Interest Determination Date.

"**London Banking Day**" means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London, England.

"**Reuters Screen**" means the rates for deposits in dollars which appear on the Reuters Screen LIBOR 01 Page (or such other page that may replace that page on such service for the purpose of displaying comparable rates) on the Bloomberg Financial Markets Commodities News (or a successor) as of 11:00 a.m., London time, on the Interest Determination Date.

As soon as possible after 11:00 a.m. London time on each Interest Determination Date, but in no event later than 11:00 a.m. London time on the London Banking Day immediately following each Interest Determination Date, the Calculation Agent will calculate the Interest Rate for each Class of Secured Notes for the next Interest Accrual Period and the amount of interest payable in respect of each $100,000 principal amount of each Class of Secured Notes (the "**Note Interest Amount**" with respect thereto) (in each case, *rounded* to the nearest cent, with half a cent being *rounded* upward) on the related Payment Date to be given to the Co-Issuers, the Trustee, the Paying Agents (as defined herein), Euroclear, Clearstream and the Portfolio Manager.  The Calculation Agent will also specify to

the Co-Issuers the quotations upon which the Interest Rate for each Class of Floating Rate Notes are based, and in any event the Calculation Agent shall notify the Co-Issuers before 5:00 p.m. (London time) on every Interest Determination Date that either:  (i) it has determined or is in the process of determining the Interest Rate and Note Interest Amount for each Class of Secured Notes or (ii) it has not determined and is not in the process of determining any such Interest Rate or Note Interest Amount, together with its reasons therefor.  The Trustee shall post on a password protected website (the address for such website may be obtained from the Trustee), no later than the sixth day after each Payment Date, a notice setting forth the Interest Rate for the Secured Notes for the Interest Accrual Period preceding the next Payment Date.

The Issuer will agree that for so long as any Secured Notes remain outstanding there will at all times be a Calculation Agent which shall not control, be controlled by or be under common control with the Issuer or its affiliates or the Portfolio Manager or its affiliates.  The Calculation Agent may be removed by the Issuer or the Portfolio Manager, on behalf of the Issuer, at any time.  If the Calculation Agent is unable or unwilling to act as such or is removed by the Issuer or the Portfolio Manager, on behalf of the Issuer, the Issuer or the Portfolio Manager, on behalf of the Issuer, will be required to appoint promptly a replacement Calculation Agent which does not control and is not controlled by or under common control with the Issuer, the Portfolio Manager or their respective affiliates.  In addition, for so long as any Class of Notes is listed on the Global Exchange Market of the Irish Stock Exchange and the guidelines of such exchange so require, notice of the appointment of any replacement Calculation Agent will be published via the Irish Stock Exchange, as promptly as practicable after such appointment.

**Principal**

The Secured Notes of each Class will mature at par on the Payment Date in May 2027 (the "**Stated Maturity**" for each Class of Secured Notes), unless previously redeemed or repaid prior thereto as described herein.  During the Reinvestment Period, principal will not be payable on the Secured Notes except with respect to Deferred Interest, and in the limited circumstances described under "—*Optional Redemption and Refinancing*," "—*Mandatory Redemption*," "—*Special Redemption*," "—*Clean-up Call Redemption,*" *Summary of Terms—Priority of Payments—Application of Interest Proceeds*" and "*Summary of Terms—Priority of Payments—Application of Principal Proceeds*."  After the Reinvestment Period, on each Payment Date, Principal Proceeds will be payable on the Secured Notes in accordance with the priorities set forth under "*Summary of Terms—Priority of Payments—Application of Principal Proceeds*."  Notwithstanding the foregoing, upon the occurrence and continuation of an Acceleration Event, Interest Proceeds and Principal Proceeds will be applied in accordance with the Acceleration Priority of Payments described under "*Summary of Terms—Priority of Payments—Acceleration Priority of Payments*."

At any time during which the Coverage Tests are not met, principal payments on the Secured Notes will be made as described under "—*Mandatory Redemption*."

The average life of each class of Secured Notes is expected to be less than the number of years until the Stated Maturity, as applicable, of such Secured Notes.  See "*Risk Factors—Risks Relating to the Offered Securities—Stated Maturity, Average Life and Prepayment Considerations*."

Any payment of principal on a Class of Secured Notes will be remitted by the Trustee on a *pro rata* basis among the holders of such Class of Notes according to the respective Aggregate Outstanding Amounts thereof immediately prior to such payment.

**Optional Redemption and Refinancing**

*General—Redemption of Notes*.  The Secured Notes are redeemable by the Co-Issuers, in whole, on any Business Day (x) after the end of the Non-Call Period and (y) during the Non-Call Period, only if a Tax Event has occurred.  No Optional Redemption above may occur unless the Issuer has received written direction from holders of at least  (i) when no Tax Event has occurred or is ongoing, 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes or (ii) when a Tax Event has occurred and is ongoing, 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes or of the Aggregate Outstanding Amount of any Class of Secured Notes Affected by such Tax Event (provided that if the Tax Event that has occurred is with respect to any tax arising under or as a result of FATCA, then holders that have not provided the Issuer (or its authorized agent) with the Holder FATCA Information (to the extent that the failure to provide the Holder FATCA Information was a cause of the tax arising

under FATCA) shall not be considered in determining whether the holders of at least 66-2/3% of the Aggregate Outstanding Amount of the applicable Class of Notes have directed a redemption of Secured Notes) provided to the Issuer, the Trustee and the Portfolio Manager not later than 30 days prior to the Business Day on which such redemption shall occur.

Upon receipt or delivery of a notice of redemption of the Secured Notes, the Portfolio Manager in its sole discretion will (except in the case of a Refinancing) direct the sale of all or part of the Assets in an amount sufficient that the proceeds of sale therefrom and all other funds available for such purpose in the Collection Account and the Payment Account will be at least sufficient to pay the Redemption Price on all of the Secured Notes and to pay any applicable Management Fees, all Administrative Expenses (without limitation thereof by the Administrative Expense Cap) and other fees and expenses payable under "*Summary of Terms—Priority of Payments—Application of Interest Proceeds*" (including, without limitation, any amounts due to the Hedge Counterparties), as described herein; *provided* that, in the event that the Redemption Date is not a Payment Date, any applicable Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments shall be calculated as of such Redemption Date. On the Redemption Date, proceeds available for an Optional Redemption will be applied to redeem the Secured Notes and pay other amounts and expenses in accordance with the Priority of Payments. If, in the sole discretion of the Portfolio Manager, such proceeds of sale and all other funds available for such purpose in the Collection Account and the Payment Account would not be sufficient to redeem all Secured Notes and to pay such applicable Management Fees, Administrative Expenses and other fees and expenses, as described herein, the Secured Notes may not be redeemed. The Portfolio Manager, in its discretion, may effect the sale of all or any part of the Collateral Obligations or other Assets through the sale of one or more participations in such Assets.

The Subordinated Notes may be redeemed, in whole but not in part, on any Business Day on or after the redemption or repayment of the Secured Notes, at the written direction of holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes.

Any Class or Classes of Secured Notes may be redeemed in whole, but not in part, on any Business Day after the Non-Call Period from Refinancing Proceeds at the written direction of the holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes (with consent of the Portfolio Manager) delivered to the Issuer and the Portfolio Manager (with a copy to the Trustee and the Rating Agency). In the event that the Redemption Date is not a Payment Date, the Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments shall be calculated as of such Redemption Date. The Co-Issuers will redeem such Class or Classes of Secured Notes on the applicable Redemption Date following receipt of such direction by obtaining a loan or loans or by issuing replacement securities, the terms of which loan(s) or issuance will be negotiated by the Portfolio Manager on behalf of the Issuer, from one or more financial institutions or purchasers (a refinancing provided pursuant to such loan or issuance, a "**Refinancing**") and to the extent and subject to the restrictions described herein. Any replacement notes issued pursuant to a Refinancing of any Class of Secured Notes will, to the extent reasonably practicable, be offered first to the Holders of such Class subject to the Refinancing, in such amounts as are necessary to preserve such Holders' *pro rata* holdings in the related Class of Secured Notes being refinanced as determined immediately prior to the Refinancing. See "*Summary of Terms—Optional Redemption*" and "*Refinancing*."

*Redemption Procedures.* Notice of an Optional Redemption or a Refinancing will be given by the Trustee by first-class mail, postage prepaid, mailed not later than ten Business Days prior to the applicable Redemption Date, to each applicable holder of Notes at such holder's address in the register maintained by the registrar under the Indenture and the Rating Agency. In addition, for so long as any Class of Notes is listed on Global Exchange Market of the Irish Stock Exchange and so long as the guidelines of such exchange so require, notice of Optional Redemption to the holders of such Offered Securities shall also be given by publication via the Irish Stock Exchange. Secured Notes called for redemption must be surrendered at the office of any paying agent (each, a "**Paying Agent**") appointed under the Indenture in order to receive the Redemption Price.

The Co-Issuers will have the option to withdraw any such notice of redemption up to the Business Day immediately prior to the scheduled Redemption Date by written notice to the Trustee and the Portfolio Manager. If the Co-Issuers so withdraw any notice of redemption or are otherwise unable to complete redemption of the Secured Notes, the proceeds received from the sale of any Collateral Obligations and other Assets sold in contemplation of

such redemption may during the Reinvestment Period, at the Portfolio Manager's discretion, be reinvested in accordance with the Investment Criteria described herein.

No Secured Notes or Subordinated Notes may be optionally redeemed (other than in connection with a Refinancing) unless (i) at least ten Business Days before the scheduled Redemption Date the Portfolio Manager shall have furnished to the Trustee evidence, in form satisfactory to the Trustee, that the Portfolio Manager on behalf of the Issuer has entered into a binding agreement or agreements with a financial or other institution or institutions to sell to such institution, not later than the second Business Day preceding the scheduled Redemption Date in immediately available funds, all or part of the Collateral Obligations and/or any Hedge Agreements at a purchase price at least equal to an amount sufficient, together with the Eligible Investments maturing, redeemable (or putable to the issuer thereof at par) on or prior to the scheduled Redemption Date and any payments to be received in respect of any Hedge Agreements, to pay the Management Fees, all Administrative Expenses (without limitation thereof by the Administrative Expense Cap) and other fees and expenses payable in accordance with the Priority of Payments (without limitation thereof by the Administrative Expense Cap) prior to the payment of the principal of the Secured Notes to be redeemed and to redeem all of the Secured Notes on the scheduled Redemption Date at the applicable Redemption Price, each such amount to be determined in the manner described herein; *provided* that, in the event that the Redemption Date is not a Payment Date, any applicable Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments shall be calculated as of such Redemption Date, or (ii) prior to selling any Collateral Obligations and/or Eligible Investments, the Portfolio Manager shall certify to the Trustee that, in its judgment, the aggregate sum of (A) expected proceeds from Hedge Agreements and the sale of Eligible Investments, and (B) the aggregate Market Value of all Collateral Obligations and other Assets shall exceed the sum of (x) the aggregate Redemption Prices of the outstanding Secured Notes and (y) the Management Fees, all Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments (without limitation thereof by the Administrative Expense Cap) prior to the redemption of the Secured Notes, each such amount to be determined in the manner described herein; *provided* that, in the event that the Redemption Date is not a Payment Date, any applicable Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments shall be calculated as of such Redemption Date. Any certification delivered by the Portfolio Manager as described in clause (ii) above shall include (1) the approximate prices of, and expected proceeds from, the sale of any Collateral Obligations, Eligible Investments and/or Hedge Agreements and (2) all calculations required as described above. The Issuer shall deposit, or cause to be deposited, the funds required for an Optional Redemption in the Payment Account on or prior to the Redemption Date.

Notice of redemption shall be given by the Co-Issuers (so long as the Co-Issuers have received notice thereof) or, upon an issuer order, by the Trustee in the name and at the expense of the Co-Issuers. Failure to give notice of redemption, or any defect therein, to any holder of any Note selected for redemption shall not impair or affect the validity of the redemption of any other Notes.

## Mandatory Redemption

If a Coverage Test (as described under "*Security for the Secured Notes—The Coverage Tests*") is not met on any Determination Date occurring subsequent to the Ramp-up Period (or, in the case of each Interest Coverage Test, at or subsequent to the Determination Date with respect to the second Payment Date), the Issuer will be required to apply available amounts in the Payment Account on the related Payment Date to make payments in accordance with the Note Payment Sequence (a "**Mandatory Redemption**") to the extent necessary to achieve compliance with such Coverage Test, as described under "*Summary of Terms—Priority of Payments*," as applicable.

## Special Redemption

The Secured Notes will be subject to redemption in part by the Co-Issuers on any Payment Date (i) during the Reinvestment Period if the Portfolio Manager at its discretion notifies the Trustee that it has been unable, for a period of 20 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager in its sole discretion and which would meet the criteria for reinvestment described under "*Security for the Secured Notes—Sales of Collateral Obligations; Additional Collateral Obligations and Investment Criteria*" in sufficient amounts to permit the investment or reinvestment of all or a portion of the funds then in the Collection Account that are to be invested in additional Collateral Obligations or (ii) after the Ramp-up Period if the Portfolio Manager notifies the Trustee that a redemption is required pursuant to the Indenture (in either case, a

"**Special Redemption**").  On the first Payment Date following the Collection Period in which such notice is given (and, in the case of clause (ii) above, any subsequent Payment Date) (a "**Special Redemption Date**"), the amount in the Principal Collection Subaccount representing Principal Proceeds which (1) the Portfolio Manager has determined cannot be reinvested in additional Collateral Obligations or (2) must be applied to redeem the Secured Notes in accordance with the Indenture (such amount, the "**Special Redemption Amount**"), as the case may be, will be applied as described under "*Summary of Terms—Priority of Payments—Application of Principal Proceeds*."  Notice of Special Redemption will be given by the Trustee mailed not less than three Business Days prior to the applicable Special Redemption Date to each holder of Secured Notes affected thereby at such holder's address in the register maintained by the applicable registrar under the Indenture and to the Rating Agency.  Failure to give any such notice, or any defect therein, to any holder selected for redemption shall not impair or affect the validity of the redemption.  In addition, for so long as any Class of Notes is listed on the Global Exchange Market of the Irish Stock Exchange and so long as the guidelines of such exchange so require, notice of Special Redemption to the holders of such Offered Securities shall also be given by the Issuer or the Irish Listing Agent, in the name and at the expense of the Issuer, to holders by publication via the Irish Stock Exchange.  The Issuer shall, deposit, or cause to be deposited, the funds required for a Special Redemption in the Payment Account on or prior to the Special Redemption Date.

**Clean-up Call Redemption**

The Notes are redeemable at the option of the Co-Issuers acting at the direction of the Portfolio Manager (which direction shall (x) be given so as to be received by the Issuer and the Trustee (who shall promptly provide notice thereof to the holders of the Subordinated Notes) not later than 30 days prior to the proposed Clean-up Call Redemption Date and (y) include the Clean-up Call Redemption Date and the Clean-up Call Redemption Price of the Notes to be redeemed), in whole but not in part (a "**Clean-up Call Redemption**"), at the applicable Redemption Price, on any Business Day selected by the Portfolio Manager (such Business Day, the "**Clean-up Call Redemption Date**") which occurs on or after the Payment Date on which the Aggregate Principal Balance of the Collateral Obligations and Eligible Investments representing Principal Proceeds is less than or equal to 20% of the Target Initial Par Amount, unless a Majority of the Subordinated Notes directs to prevent such redemption in a writing delivered to the Issuer, the Trustee and the Portfolio Manager at least 20 days prior to the Clean-up Call Redemption Date.  In such event a notice of redemption shall be given by first class mail, postage prepaid, mailed not later than six Business Days prior to the applicable Clean-up Call Redemption Date, to each holder of Notes, at such holder's address in the note register and to the Rating Agency.  Any such Clean-up Call Redemption may only be effected on a Payment Date and only from (a) the disposition proceeds of the Assets and (b) all other funds in the Accounts on the Payment Date relating to such redemption.  A Clean-up Call Redemption may not occur unless the proceeds from the liquidation of the Assets and all other funds in the Accounts on the Payment Date relating to such redemption results in an amount at least equal to the Clean-up Call Redemption Price.  The "**Clean-up Call Redemption Price**" means a purchase price in cash at least equal to the sum of (a) the Aggregate Outstanding Amount of the Secured Notes, *plus* (b) all unpaid interest on the Secured Notes accrued to the date of such redemption (including any interest accrued on Deferred Interest), *plus* (c) the aggregate of all other amounts owing by the Issuer on the date of such redemption that are payable in accordance with the Priority of Payments prior to distributions in respect of the Subordinated Notes, including any amounts payable in respect of any Hedge Agreement and all expenses incurred in connection with effecting the Clean-up Call Redemption; *provided* that, in connection with any Clean-Up Call Redemption of the Notes, Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Clean-up Call Redemption Price that would otherwise be payable to the Holders of such Class of Secured Notes.

Notice of redemption shall be given by the Co-Issuers or, upon an Issuer order, by the Trustee in the name and at the expense of the Co-Issuers.  Failure to give notice of redemption, or any defect therein, to any holder shall not impair or affect the validity of the redemption of any other Notes.  In addition, for so long as any Class of Notes is listed on the Global Exchange Market of the Irish Stock Exchange and so long as the guidelines of such exchange so require, notice of Clean-up Call Redemption shall also be given by publication via the Irish Stock Exchange.

Any notice of Clean-up Call Redemption may be withdrawn by the Issuer (or the Portfolio Manager on its behalf) up to the fourth Business Day prior to the scheduled Clean-up Call Redemption Date by written notice to the Trustee, the Rating Agency and (if applicable) the Portfolio Manager only if amounts equal to the Clean-up Call Redemption Price (including funds in the accounts available to pay the Clean-up Call Redemption Price) are not

received in full in immediately available funds by the fourth Business Day immediately preceding the Clean-up Call Redemption Date.  Notice of any such withdrawal of a notice of Clean-up Call Redemption shall be given by the Trustee at the expense of the Issuer to each Holder of Notes at such Holder's address in the note register not later than the second Business Day prior to the scheduled Clean-up Call Redemption Date.  The Trustee shall also arrange for notice of such withdrawal to be delivered to the Irish Stock Exchange so long as any Notes are listed thereon and so long as the guidelines of such exchange so require.

On the Clean-up Call Redemption Date, the Clean-up Call Redemption Price shall be distributed pursuant to the Priority of Payments.

Subject to satisfaction of the foregoing conditions, the Notes to be redeemed shall, on the Clean-up Call Redemption Date, become due and payable at the Clean-up Call Redemption Price therein specified, and from and after the Clean-up Call Redemption Date (unless the Issuer shall default in the payment of the Clean-up Call Redemption Price and accrued interest) all the Secured Notes shall cease to bear interest on the Clean-up Call Redemption Date.  Upon final payment on a Note to be so redeemed, each holder shall present and surrender its Note at the place specified in the notice of redemption on or prior to such Clean-up Call Redemption Date.

If any Secured Note called for redemption pursuant to a Clean-up Call Redemption shall not be paid upon surrender thereof for redemption, the principal thereof shall, until paid, bear interest from the Clean-up Call Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period the Secured Note remains outstanding; *provided* that the reason for such non-payment is not the fault of the holder of such Secured Note.

## Issuer Purchases of Secured Notes

Notwithstanding the provisions of the Indenture described under "*Security for the Secured Notes—The Collection Account and Payment Account*," amounts in the Principal Collection Account or the Interest Collection Account may be disbursed by the Portfolio Manager, on behalf of the Issuer, for purchases of Secured Notes in accordance with the provisions described in this section.  The Trustee shall cancel as described below under "—*Surrender and Cancellation of Notes*" any such purchased Secured Notes surrendered to it for cancellation or, in the case of any Global Notes, the Trustee shall decrease the Aggregate Outstanding Amount of such Global Notes in its records by the full par amount of the purchased Secured Notes, and instruct DTC or its nominee, as the case may be, to conform its records.

No such purchases of the Secured Notes by or on behalf of the Issuer may occur without the consent of a Majority of the Subordinated Notes and unless each of the following conditions are satisfied:

(i)      such purchases of Secured Notes shall occur in the following sequential order of priority:  first, the Class A Notes, until the Class A Notes are retired in full; second, the Class B Notes until the Class B Notes are retired in full; third, the Class C Notes, until the Class C Notes are retired in full; fourth, the Class D Notes, until the Class D Notes are retired in full; and fifth, the Class E Notes, until the Class E Notes are retired in full;

(ii)     (1) each such purchase of Secured Notes of any Class shall be made pursuant to an offer made to all Holders of the Secured Notes of such Class, by notice to such Holders, which notice shall specify the purchase price (as a percentage of par) at which such purchase will be effected, the maximum amount of Principal Proceeds that will be used to effect such purchase and the length of the period during which such offer will be open for acceptance, (2) each such Holder shall have the right, but not the obligation, to accept such offer in accordance with its terms and (3) if the Aggregate Outstanding Amount of Secured Notes of the relevant Class held by Holders who accept such offer exceeds the amount of Principal Proceeds specified in such offer, a portion of the Secured Notes of each accepting holder shall be purchased *pro rata* based on the respective Aggregate Outstanding Amount held by each such holder;

(iii)    each such purchase shall be effected only at prices discounted from par;

(iv)      each such purchase of Secured Notes shall occur during the Reinvestment Period and shall be effected with Principal Proceeds to pay the purchase price of such Secured Notes and either Principal Proceeds or Interest Proceeds to purchase the accrued interest on such Secured Notes;

(v)      no Event of Default shall have occurred and be continuing;

(vi)      with respect to each such purchase, notice shall have been provided to the Rating Agency by the Issuer;

(vii)      any Secured Notes to be purchased shall be surrendered to the Trustee for cancellation as described under "*—Surrender and Cancellation of Notes*";

(viii)      each Coverage Test will be satisfied immediately prior to each such purchase and will be maintained or improved immediately after giving effect to each such purchase;

(ix)      each such purchase will otherwise be conducted in accordance with applicable law;

(x)      no such purchase shall occur during a Restricted Trading Period; and

(xi)      the Trustee has received an officer's certificate of the Portfolio Manager to the effect that the conditions in the foregoing clauses (i) through (x) have been satisfied.

### Surrender and Cancellation of Notes

Any holder may tender any Notes or beneficial interests in Notes owned by such holder for cancellation by the Trustee without receiving any payment.  Any such Surrendered Notes will be submitted to the Trustee for cancellation; *provided* that, for purposes of calculation of the Overcollateralization Ratio and any calculation required by clause (f) of the definition of "Event of Default," any Surrendered Notes will be deemed to remain outstanding until all Notes of the applicable Class and each Class that is senior in right of principal payment thereto in the Note Payment Sequence have been retired or redeemed, having an Aggregate Outstanding Amount equal to the Aggregate Outstanding Amount as of the date of surrender, reduced proportionately with, and to the extent of, any payments of principal on Notes of the same Class thereafter.

All Surrendered Notes and Notes that are redeemed or paid in full and surrendered for cancellation as described herein will forthwith be canceled and may not be reissued or resold.  Except as otherwise described under "*—Issuer Purchases of Secured Notes*" above, no Note (other than Surrendered Notes) may be surrendered (including any surrender in connection with any abandonment) for any purpose other than for payment in full as provided herein, or for registration of transfer, exchange or redemption, or for replacement in connection with any Note mutilated, defaced or deemed lost or stolen.

### Entitlement to Payments

Payments in respect of principal and interest on the Notes will be made to the person in whose name the Note is registered (x) fifteen days, in the case of certificated Notes, and (y) one day, in the case of the Global Notes, prior to the applicable Payment Date (the "**Record Date**").  Payments on certificated Notes will be made in U.S. Dollars by wire transfer, as directed by the holder of such Notes, in immediately available funds to such holder; *provided* that wiring instructions have been provided to the Trustee on or before the related Record Date and *provided further* that, if appropriate instructions for any such wire transfer are not received by the Record Date, then such payment shall be made by check drawn on a U.S. bank mailed to such holder at such holder's address specified in the applicable register maintained by the Trustee.  Final payments in respect of principal on the Notes will be made only against surrender of the Notes at the office of any Paying Agent appointed under the Indenture.

Payments in respect of the principal and interest of any Global Notes will be made to DTC or its nominee, as the registered owner thereof.  None of the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator nor any Paying Agent will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in Global Notes or for maintaining, supervising or

reviewing any records relating to the beneficial ownership interests.  The Co-Issuers expect that DTC or its nominee, upon receipt of any payment of principal or interest in respect of a Global Note representing a Class of Notes held by it or its nominee, will immediately credit participants' accounts (through which, in the case of Regulation S Global Notes, Euroclear and Clearstream hold their respective interests) with payments in amounts proportionate to their respective beneficial interests in the stated original principal amount of a Global Note for a Class of Notes, as shown on the records of DTC or its nominee.  The Co-Issuers also expect that payments by participants to owners of beneficial interests in a Global Note held through the participants will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for the customers.  The payments will be the responsibility of the participants.

*Prescription*.  Except as otherwise required by applicable law, claims by holders of Notes in respect of principal and interest must be made to the Trustee or any Paying Agent if made within two years of such principal or interest becoming due and payable.  Any funds deposited with the Trustee or any Paying Agent in trust for the payment of principal or interest remaining unclaimed for two years after such principal or interest has become due and payable shall be paid to the Issuer and, if applicable, the Co-Issuer, pursuant to the Indenture; and the holder of a Note shall thereafter, as an unsecured general creditor, look only to the Issuer and, if applicable, the Co-Issuer, for payment of such amounts and all liability of the Trustee or any Paying Agent with respect to such trust funds shall thereupon cease.

## Priority of Payments

On each Payment Date (other than Payment Dates on which the Acceleration Priority of Payments is applicable), Interest Proceeds will be applied in the order of priority described under "*Summary of Terms—Priority of Payments—Application of Interest Proceeds*."

On each Payment Date (other than Payment Dates on which the Acceleration Priority of Payments is applicable), Principal Proceeds will be applied in the order of priority described under "*Summary of Terms—Priority of Payments—Application of Principal Proceeds*."

On each Payment Date, if an Acceleration Event has occurred and is continuing, Interest Proceeds and Principal Proceeds will be applied in the order of priority described under "*Summary of Terms—Priority of Payments— Acceleration Priority of Payments*."

For so long as any Class of Notes is listed on the Global Exchange Market of the Irish Stock Exchange, the Trustee at the direction of the Issuer will render or cause to be rendered a report to the Irish Stock Exchange prior to the related Payment Date which will contain the Aggregate Outstanding Amount of the Offered Securities of each such Class at the beginning of the Interest Accrual Period and such amount as a percentage of the original Aggregate Outstanding Amount of the Secured Notes of such Class, the amount of principal payments to be made on the Secured Notes of such Class on the next Payment Date, the amount of any Deferred Interest on any such Class of Deferrable Notes, and the Aggregate Outstanding Amount of the Secured Notes of such Class after giving effect to the principal payments, if any, on the next Payment Date and such amount as a percentage of the original Aggregate Outstanding Amount of the Secured Notes of such Class.

## The Indenture

The following summary describes certain provisions of the Indenture among the Co-Issuers and the Trustee to be dated as of the Closing Date.  The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Indenture.

*Events of Default*.  An "**Event of Default**" is defined in the Indenture as:

(a)  a default in the payment, when due and payable, of (i) any interest on any Class A Note or Class B Note or, if there are no Class A Notes or Class B Notes outstanding, any Class C Note or, if there are no Senior Notes or Class C Notes outstanding, any Class D Note or, if there are no Co-Issued Notes outstanding, any Class E Note, and the continuation of any such default for five Business Days or (ii) any principal, interest, or Deferred Interest on, or any Redemption Price in respect of, any Secured Note at its Stated Maturity or any Redemption Date, *provided* that,

in each case, if such failure resulted solely from an administrative error or omission by the Trustee, the continuation of any such default for an additional five Business Days;

(b)  unless legally required or permitted to withhold such amounts, the failure by the Issuer on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments (other than as provided in clause (a) above), which failure is incapable of remedy or, if capable of remedy, is not remedied within 30 days after notice of such failure has been given to the Issuer by the Trustee or to the Issuer, the Trustee and the Portfolio Manager by a Majority of the Controlling Class (or, if such failure can only be remedied on a Payment Date, is not remedied by the later of the 30 day period specified above and the next Payment Date);

(c)  either of the Co-Issuers or the Assets becomes an investment company required to be registered under the Investment Company Act;

(d)  except as otherwise provided in the Indenture, a default, in a material respect, in the performance, or breach, in a material respect, of any other material covenant or other agreement of the Issuer or the Co-Issuer in the Indenture (it being understood, without limiting the generality of the foregoing, that any failure to meet any Concentration Limitation, Collateral Quality Test, Interest Reinvestment Test or Coverage Test is not an Event of Default), or the failure of any material representation or warranty of the Issuer or the Co-Issuer made in the Indenture or in any certificate or other writing delivered pursuant thereto or in connection therewith to be correct in all material respects when the same shall have been made, and the continuation of such default, breach or failure for a period of 30 days after notice to the Issuer or the Issuers, as applicable, and the Portfolio Manager by registered or certified mail or overnight courier, by the Trustee, or to the Co-Issuers, the Portfolio Manager and the Trustee by a Majority of the Controlling Class, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "**Notice of Default**" under the Indenture; *provided* that, if the Issuer or the Co-Issuer, as applicable (as notified to the Trustee by the Portfolio Manager in writing) has commenced curing such default, breach or failure during the 30 day period specified above, such default, breach or failure shall not constitute an Event of Default under this clause (d) unless it continues for a period of 45 days (rather than, and not in addition to, such 30 day period specified above) after notice to the Issuer and Co-Issuer, as applicable, and the Portfolio Manager by registered or certified mail or overnight courier;

(e)  certain events of bankruptcy, insolvency, receivership or reorganization of either of the Co-Issuers; or

(f)  on any Measurement Date prior to payment in full of the Class A Notes, failure of the percentage equivalent of a fraction, (i) the numerator of which is equal to (1) the Collateral Principal Amount *plus* (2) the aggregate Market Value of all Defaulted Obligations on such date and (ii) the denominator of which is equal to the Aggregate Outstanding Amount of the Class A Notes, to equal or exceed 102.5%.

If an Event of Default occurs and is continuing (other than an Event of Default referred to in clause (e) above), the Trustee may, and shall, upon the written direction of a Majority of the Controlling Class by notice to the Co-Issuers and the Rating Agency, declare the principal of and accrued interest on the Secured Notes to be immediately due and payable.  If an Event of Default described in clause (e) above occurs, such an acceleration will occur automatically. The "**Controlling Class**" will be the Class A Notes (voting as a single class), so long as any Class A Note is outstanding; then the Class B Notes (voting as a single class), if there are no Class A Notes outstanding; then the Class C Notes, if there are no Class A Notes or Class B Notes outstanding; then the Class D Notes, if there are no Class A Notes, Class B Notes or Class C Notes outstanding; then the Class E Notes, if there are no Class A Notes, Class B Notes, Class C Notes or Class D Notes outstanding and then the Subordinated Notes, if there are no Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes outstanding.

At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee provided in the Indenture, the holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Controlling Class by written notice to the Issuer and the Trustee, may rescind and annul such declaration and its consequences if: (i) the Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay: (a) all unpaid installments of interest and principal then due on the Secured Notes (other than as a result of such acceleration); (b) to the extent that the payment of such interest is lawful, interest upon any Deferred Interest at the applicable Interest Rates and (c) all unpaid taxes and Administrative Expenses of the Co-Issuers and other sums paid or advanced by the Trustee under the Indenture and any other

amounts then payable by the Co-Issuers under the Indenture prior to such Administrative Expenses and (ii) the Trustee has determined (based upon the information available to it) that all Events of Default, other than the nonpayment of the interest on or principal of the Secured Notes that have become due solely by such acceleration, have (a) been cured and a Majority of the Controlling Class by written notice to the Trustee have agreed with such determination (which agreement shall not be unreasonably withheld) or (b) been waived as provided in the Indenture. No such rescission shall affect any subsequent Event of Default or impair any right consequent thereon.

If an Event of Default has occurred and is continuing, the Trustee will retain the Assets intact and collect all payments in respect of the Assets unless (i) the Trustee, in consultation with the Portfolio Manager (so long as no "cause" (as defined in the Portfolio Management Agreement) for the termination of the Portfolio Manager has occurred under the Portfolio Management Agreement), determines that the anticipated proceeds of a sale or liquidation of the Assets (after deducting the reasonable expenses of such sale or liquidation) would be sufficient to discharge in full the amounts then due (or, in the case of interest, accrued) and unpaid on the Secured Notes for principal and interest (including Deferred Interest) and all amounts payable prior to payment of principal on such Secured Notes (including amounts payable to any Hedge Counterparty upon liquidation of the Assets and all Administrative Expenses) and a Majority of the Controlling Class agrees with such determination, (ii) if an Event of Default described in clause (a), (d) or (f) above has occurred and is continuing, a Majority of the Controlling Class (without consent of any other Class of Notes including, for the avoidance of doubt, any such consent as may otherwise be required pursuant to clause (iii) below ) direct, subject to the provisions of the Indenture and in compliance with applicable law, such sale and liquidation; provided that this clause (ii) shall not apply in the case of an Event of Default described in clause (a) above that arises solely from an acceleration of the Secured Notes due to an Event of Default described in clause (b), (c) or (e) above, (iii) if an Event of Default described in clause (b), (c) or (e) above has occurred and is continuing, the holders of at least 66-2/3% of the Aggregate Outstanding Amount of each Class of Secured Notes (voting separately by Class) direct, subject to the provisions of the Indenture and in compliance with applicable law, such sale and liquidation or (iv) if an Event of Default described in clause (a), (b), (c), (d) or (e) above has occurred and is continuing and all of the Secured Notes have been repaid in full, the holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes, subject to the provisions of the Indenture and in compliance with applicable law, direct such sale and liquidation.

A Majority of the Controlling Class will have the right following the occurrence, and during the continuance of, an Event of Default to cause the institution of and direct the time, method and place of conducting any proceeding for any remedy available to the Trustee; *provided* that (a) such direction shall not conflict with any rule of law or with any express provision of the Indenture, (b) the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; *provided* that, subject to the Indenture, the Trustee need not take any action that it determines might involve it in liability (unless the Trustee has received an indemnity as set forth in clause (c)), (c) the Trustee shall have been provided with indemnity reasonably satisfactory to it and (d) notwithstanding the foregoing, any direction to the Trustee to undertake a sale of Assets may be given only in accordance with the preceding paragraph and the applicable provisions of the Indenture.

Subject to the provisions of the Indenture relating to the duties of the Trustee, the Trustee will be under no obligation to exercise the rights or powers vested in it under the Indenture in respect of such Event of Default at the request or direction of the holders of any Notes unless such holders have offered to the Trustee security or indemnity reasonably satisfactory to it.  The holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Controlling Class may, in certain cases, waive any default with respect to all of the Notes, except a default (a) in the payment of the principal of any Secured Note (which may be waived, with the consent of each holder of such Note), (b) in the payment of interest on the Notes of the Controlling Class (which may be waived with the consent of the holders of 100% of the Controlling Class), (c) in respect of a provision of the Indenture that cannot be modified or amended without the waiver or consent of the holder of each such outstanding Note adversely affected thereby (which may be waived with the consent of each such holder) or (d) in respect of certain representations in the Indenture regarding security interests in the Assets (which may be waived by the holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Controlling Class if the S&P Rating Condition is satisfied).

No holder of a Note will have the right to institute any proceeding with respect to the Indenture unless (i) such holder previously has given to the Trustee written notice of an Event of Default, (ii) the holders of not less than 25% in Aggregate Outstanding Amount of the Controlling Class have made a written request upon the Trustee to institute such proceedings in its own name as Trustee and such holders have offered the Trustee indemnity reasonably

satisfactory to it, (iii) the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding and (iv) no direction inconsistent with such written request has been given to the Trustee during such 30-day period by a Majority of the Controlling Class. Notwithstanding anything above to the contrary, holders and beneficial owners of Notes may enforce the obligations of other holders and beneficial owners described in the second paragraph under "—*No Petitions for Bankruptcy*" below in the manner described therein.

In determining whether the holders of the requisite Aggregate Outstanding Amount have given any request, demand, authorization, direction, notice, consent or waiver under the Indenture, (a) Notes owned by the Issuer, the Co-Issuer or any other obligor upon the Notes shall be disregarded and deemed not to be outstanding and (only in the case of a vote to remove or replace the Portfolio Manager and not, for the avoidance of doubt, in the case of a vote to propose or approve a successor Portfolio Manager), Notes owned or controlled by the Portfolio Manager, any affiliate of the Portfolio Manager or any account or funds managed on a discretionary basis by the Portfolio Manager or its affiliates shall be disregarded and deemed not to be outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that an authorized officer of the Trustee actually knows to be so owned shall be so disregarded and (b) Notes so owned that have been pledged in good faith may be regarded as outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Issuer, the Co-Issuer, any other obligor upon the Notes, the Portfolio Manager or any affiliate of the Portfolio Manager.

*Notices*.  Notices to the holders of the Notes shall be given by first class mail, postage prepaid, to registered holders of Notes at each such holder's address appearing in the register maintained by the Trustee.  In addition, for so long as any Class of Notes is listed on the Global Exchange Market of the Irish Stock Exchange and so long as the guidelines of such exchange so require, notices to the holders of such Offered Securities shall also be given by publication via the Irish Stock Exchange.

*Supplemental Indentures*.  With the consent of (a) a Majority of each Class of Notes (voting separately by Class) materially and adversely affected thereby and (b) without limiting clause (a) above, a Majority of the Controlling Class (*provided* that if such supplemental indenture would modify the Weighted Average Life Test or extend the Reinvestment Period, the Class A-1 Notes and the Class A-2 Notes shall be treated as separate Classes and shall vote separately), the Trustee and the Co-Issuers may enter into a supplemental indenture to add any provisions to, or change in any manner or eliminate any of the provisions of, the Indenture or modify in any manner the rights of the holders of the Secured Notes or the holders of the Subordinated Notes, as applicable. Unless otherwise notified in writing by a Majority of any Class of Notes that such Class would be materially and adversely affected by a supplemental indenture, the Trustee may conclusively rely upon an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates (including certificates delivered by the Portfolio Manager) and/or documents) as to whether the interests of any holder of Securities would be materially and adversely affected by any supplemental indenture or other modification or amendment of the Indenture.  Except as set forth in the previous sentence, such determination shall be conclusive and binding on all present and future holders.  If such a determination cannot be made with respect to a Class or Classes of Notes, such Class or Classes of Notes will be treated as if they would be materially and adversely affected by such change.

Any supplemental indenture that amends or modifies the definitions of Concentration Limitations, Collateral Quality Tests, Collateral Obligations, Eligible Investments, Participation Interest or Investment Criteria shall be deemed to materially and adversely affect the rights and interests of the holders of each Class of Notes for the purposes of the previous paragraph.

However, without the consent of each holder of any Class of Notes materially and adversely affected thereby, no supplemental indenture may:

(i)   change the Stated Maturity of the principal of any Class of Notes or the due date of any installment of interest on any Secured Note, reduce the principal amount thereof or the rate of interest thereon or the Redemption Price with respect to any Offered Security, or change the earliest date on which Notes of any Class may be redeemed, change the provisions of the Indenture relating to the application of proceeds of any Assets to the payment of principal of or interest on Secured Notes or distributions on the Subordinated Notes or change any place

where, or the coin or currency in which, Subordinated Notes or Secured Notes or the principal thereof or interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof (or, in the case of redemption, on or after the applicable Redemption Date); *provided* that, the consent of the Controlling Class shall not be required with respect to a supplemental indenture that reduces the principal amount of, or the rate of interest on, a Class of Notes or changes the earliest date on which a Class of Notes may be redeemed (unless such reduction or change is with respect to the Notes of the Controlling Class);

(ii) reduce the percentage of the Aggregate Outstanding Amount of holders of Notes of each Class whose consent is required for the authorization of any such supplemental indenture or for any waiver of compliance with certain provisions of the Indenture or certain defaults thereunder or rescission or annulment the consequences thereof provided for in the Indenture;

(iii) impair or adversely affect the Assets;

(iv) permit the creation of any lien ranking prior to or on a parity with the lien of the Indenture with respect to any part of the Assets or terminate such lien on any property at any time subject thereto or deprive the holder of any Secured Note of the security afforded by the lien of the Indenture;

(v) reduce the percentage of the Aggregate Outstanding Amount of holders of Secured Notes of each Class whose consent is required to request the Trustee to preserve the Assets or rescind the Trustee's election to preserve the Assets or to sell or liquidate the Assets pursuant to the Indenture;

(vi) modify any of the provisions of the Indenture with respect to supplemental indentures, except to increase the percentage of outstanding Secured Notes or Subordinated Notes the consent of the holders of which is required for any such action or to provide that certain other provisions of the Indenture cannot be modified or waived without the consent of the holder of each Secured Note or Subordinated Note outstanding and affected thereby;

(vii) modify the definition of the terms "Outstanding," "Controlling Class," "Collateral Obligation," "Eligible Investments," "Participation Interest," or "Majority" or modify the Priority of Payments set forth in the Indenture or the Note Payment Sequence;

(viii)        modify any of the provisions of the Indenture in such a manner as to affect the calculation of the amount of any payment of the Redemption Price, interest or principal on any Secured Note, or any amount available for distribution to the Subordinated Notes or to affect the rights of the holders of Secured Notes to the benefit of any provisions for the redemption of such Secured Notes contained therein; *provided* that, the consent of the Controlling Class shall not be required with respect to a supplemental indenture that modifies the Non-Call Period with respect to a Class of Notes (unless such modification is with respect to the Notes of the Controlling Class); or

(ix) modify any of the provisions of the Indenture with respect to the Weighted Average Life Test or to extend the Reinvestment Period.

In addition, with the consent of the holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes delivered to the Trustee, the Co-Issuers and the Portfolio Manager, the Trustee and the Co-Issuers may enter into one or more supplemental indentures to accommodate the issuance of additional Subordinated Notes.

The Co-Issuers and the Trustee may also enter into supplemental indentures, without obtaining the consent of holders of the Offered Securities (except as expressly noted below), but with the written consent of the Portfolio Manager, at any time and from time to time, subject to certain requirements described in the Indenture:

(i) to evidence the succession of another person to the Issuer or the Co-Issuer and the assumption by any such successor person of the covenants of the Issuer or the Co-Issuer in the Indenture and in the Notes;

(ii) to add to the covenants of the Co-Issuers or the Trustee for the benefit of the Secured Parties or to surrender any right or power conferred upon the Co-Issuers by the Indenture;

74

(iii) to convey, transfer, assign, mortgage or pledge any property to or with the Trustee or to add to the conditions, limitations or restrictions on the authorized amount, authentication and delivery of the Notes;

(iv) to evidence and provide for the acceptance of appointment under the Indenture by a successor Trustee and to add to or change any of the provisions of the Indenture as shall be necessary to facilitate the administration of the trusts under the Indenture by more than one Trustee, pursuant to the requirements of the Indenture;

(v)  to correct or amplify the description of any property at any time subject to the lien of the Indenture, or to better assure, convey and confirm unto the Trustee any property subject or required to be subjected to the lien of the Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulations) or to subject to the lien of the Indenture any additional property;

(vi) to modify the restrictions on and procedures for resales and other transfers of Notes to reflect any changes in applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required by the Indenture;

(vii) at the direction of the Portfolio Manager, to change the name of the Issuer and the Co-Issuer, so long as prior notice of such change is provided to each Hedge Counterparty and the Rating Agency;

(viii)          to make such changes as shall be necessary or advisable in order for a Class of Notes to be listed on an exchange, including the Irish Stock Exchange;

(ix) subject to the approval of a Majority of the Controlling Class (if such issuance of additional Subordinated Notes occurs on or after the Effective Date) and the Portfolio Manager, to make such changes as shall be necessary to permit the Issuer to issue additional Subordinated Notes; *provided* that any such new classes of notes shall be subordinate in payment of principal and interest to all existing Classes of Secured Notes and *pari passu* in all respects with all existing Subordinated Notes; *provided further* that no amendment to the Indenture that does not relate directly to the issuance of the additional Subordinated Notes or the terms of such additional Subordinated Notes may be effected under this clause (ix), but may be effected simultaneously under another clause, as described under "—*Supplemental Indentures*," to the extent such other provision is available;

(x)  with the consent of a Majority of the Controlling Class, to conform the provisions of the Indenture to the final Offering Circular or to correct any inconsistency or cure any ambiguity, omission or errors in the Indenture;

(xi) with the consent of a Majority of the Controlling Class, to accommodate, modify or amend existing and/or replacement Hedge Agreements;

(xii) to (x) take any action advisable to prevent the Co-Issuers, any ETB Subsidiary or the Holders from becoming subject to withholding or other taxes, fees or assessments, including by achieving FATCA Compliance, or to prevent the Co-Issuers from being treated as engaged in a U.S. trade or business or otherwise being subject to U.S. federal, state or local income tax on a net income basis or (y) take any action to allow the Co-Issuers to comply with FATCA (including providing for remedies against, or imposing penalties upon, any holder who fails to deliver the Holder FATCA Information or is a non-compliant FFI);

(xiii)          with the consent of a Majority of the Controlling Class, to evidence any waiver by the Rating Agency as to any of its requirements or conditions, as applicable, set forth herein;

(xiv)          with the consent of the Portfolio Manager and a Majority of the Controlling Class, to modify the definitions of "Credit Improved Obligation," "Credit Risk Obligation," "Defaulted Obligation" or "Equity Security" or the restrictions on the sales of Collateral Obligations in a manner not material and adverse to holders of any Class of Notes, subject to the notice and objection provisions set forth in the second succeeding paragraph;

(xv) to make changes necessary to issue replacement securities or undertake loans in connection with a Refinancing; *provided* that no amendment to the Indenture that does not relate directly to the issuance of the

replacement securities or loans or the terms of such replacement securities or loans may be effected under this clause (xv), but may be effected simultaneously under another clause, as described under "—*Supplemental Indentures,*" to the extent such other provision is available;

(xvi)        to modify any provision to facilitate an exchange of one obligation for another obligation of the same Obligor that has substantially identical terms except transfer restrictions, including to effect any serial designation relating to the exchange;

(xvii)        to modify or implement procedures necessary to comply with Rule 17g-5;

(xviii)        to make such changes as shall be necessary or advisable in order for the Certificated Class E Notes to be held electronically through DTC or other clearing agencies in a manner similar to, and subject to the same procedures as, the Rule 144A Global Notes;

(xix)        to facilitate the issuance of combination notes with components consisting of existing Classes of Notes;

(xx) with the consent of a Majority of the Controlling Class, to make any modification or amendment determined by the Issuer or the Portfolio Manager (in consultation with legal counsel of national reputation experienced in such matters) as necessary or advisable (A) for any Class of Secured Notes to not be considered an "ownership interest" as defined for purposes of the Volcker Rule or (B) (1) to enable the Issuer to rely upon the exemption from registration as an investment company provided by Rule 3a-7 under the Investment Company Act or another exemption or exclusion from registration as an investment company under the Investment Company Act (other than Section 3(c)(1) or Section 3(c)(7) thereof) or (2) for the Issuer to not otherwise be considered a "covered fund" as defined for purposes of the Volcker Rule, in each case so long as any such modification or amendment would not have a material adverse effect on any Class of Notes, as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of the counsel delivering the opinion);

(xxi)        with the consent of a Majority of the Controlling Class, to conform to ratings criteria and other guidelines (including any alternative methodology published by the Rating Agency) relating to collateral debt obligations in general published by the Rating Agency; or

(xxii)        with the consent of a Majority of the Controlling Class, to modify any of the requirements of the Indenture with respect to the Issuer's ability to enter into Hedge Agreements.

Not later than 20 Business Days prior to the execution of any proposed supplemental indenture, the Trustee, at the expense of the Co-Issuers, shall deliver to the holders of the Notes and the Rating Agency, a copy of such supplemental indenture.

In the case of any supplemental indenture entered into pursuant to clause (xiv), if a Majority of the Notes of any other Class provide written notice to the Issuer and the Trustee that such holders will be materially and adversely affected by any such proposed supplemental indenture (which notice shall (i) set forth the basis on which such holder or holders are materially and adversely affected thereby and (ii) provide evidence of such holder's identity, including a guarantee by a member of a signature guarantee program of its signature with respect to such notice), the Co-Issuers and the Trustee shall not enter into such supplemental indenture (it being understood that any holder that does not object to such proposed supplemental indenture in writing within 15 Business Days of delivery of such proposed supplemental indenture will be deemed to have consented to such proposed supplemental indenture).  In addition, for so long as any Class of Notes is listed on the Global Exchange Market of the Irish Stock Exchange and the guidelines of such exchange shall so require, the Issuer will notify the Irish Stock Exchange of any material modification of the Indenture.

With respect to any supplemental indenture that requires the consent of a Majority of the Subordinated Notes, after the Reinvestment Period, if the Aggregate Principal Balance of all Collateral Obligations is less than or equal to 50% of the Target Initial Par Amount, the holders of the Subordinated Notes will be deemed to have consented to

such proposed supplemental indenture if a Majority of the Subordinated Notes has not objected to such proposed supplemental indenture in writing within 30 days of notice of such proposed supplemental indenture.

The Portfolio Manager will be bound to follow any amendment or supplement to the Indenture from the time it has received a copy of such amendment or supplement from the Issuer or the Trustee; *provided* that with respect to any amendment or supplement to the Indenture which would (i) increase the duties or liabilities of, or adversely change the economic consequences to the Portfolio Manager, (ii) modify the restrictions on the purchases or sales of Collateral Obligations or the Investment Criteria described under "*Security for the Secured Notes—Sales of Collateral Obligations; Additional Collateral Obligations and Investment Criteria,*" (iii) expand or restrict the Portfolio Manager's discretion or (iv) modify the restrictions on and procedures for resales and other transfers of Subordinated Notes, except as set forth in clause (vi) of the fifth preceding paragraph, the Portfolio Manager shall not be bound thereby unless the Portfolio Manager shall have consented thereto in writing, such consent to not be unreasonably withheld or delayed.

The Issuer may not enter into any supplemental indenture which materially adversely affects any rights of any Hedge Counterparty under the Indenture without the prior written consent of such Hedge Counterparty.

*Additional Issuance*.  At any time the Issuer, (x) with the consent of the Portfolio Manager and (y) with the consent of the holders of at least 66-2/3% of Aggregate Outstanding Amount of the Subordinated Notes, may issue and sell additional Subordinated Notes if the conditions for such additional issuance described under "*Summary of Terms—Other Information—Additional Issuance*" are met.  For the avoidance of doubt, the Issuer shall not issue additional Secured Notes (other than in connection with a Refinancing).

*Consolidation, Merger or Transfer of Assets*.  Except under the limited circumstances set forth in the Indenture, neither the Issuer nor the Co-Issuer may consolidate with, merge into, or transfer or convey all or substantially all of its assets to, any other corporation, partnership, trust or other person or entity.

*No Petitions for Bankruptcy*.  The Indenture will provide that the holders of the Notes may not seek to commence a bankruptcy proceeding against or cause the Issuer, Co-Issuer or any ETB Subsidiary to petition for bankruptcy before one year, or if longer, the applicable preference period then in effect, and one day has elapsed since the payment in full of the Notes.

In the event one or more Holders or beneficial owners of Offered Securities (collectively, the "**Filing Holder**") cause the filing of a petition in bankruptcy against the Issuer in violation of the prohibition described above, each such Filing Holder will be deemed to acknowledge and agree that any claim that it and/or any of its Affiliates have against the Issuer or with respect to any Assets (including any proceeds thereof) shall, notwithstanding anything to the contrary in the Priority of Payments, be jointly fully subordinate in right of payment to the claims of each Holder and beneficial owner of any Offered Security that is not a Filing Holder or an Affiliate thereof, with such subordination being effective until each Offered Security held by each such non-Filing Holder is paid in full in accordance with the Priority of Payments (after giving effect to such subordination). The terms described in the immediately preceding sentence are referred to herein as the "**Bankruptcy Subordination Agreement**." The Bankruptcy Subordination Agreement will constitute a "subordination agreement" within the meaning of Section 510(a) of the U.S. Bankruptcy Code (Title 11 of the United States Code, as amended from time to time (or any successor statute)).

The Indenture will provide that the foregoing restrictions are a material inducement for each holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture. Any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

The Indenture will require, so long as any of the Notes are outstanding, the Issuer to promptly object to the institution of any such proceeding against it and to take all necessary or advisable steps to cause the dismissal of any

such proceeding; *provided* that such obligation shall be subject to the availability of funds therefor. The costs and expenses (including, without limitation, fees and expenses of counsel to the Issuer) incurred by the Issuer in connection with its obligations described in the immediately preceding sentence ("**Petition Expenses**") will be payable in accordance with the Priority of Payments as Administrative Expenses, applied first as Petition Expense Amount in the order set forth in the definition of Administrative Expenses, and then subject to cap as set forth in the Priority of Payments.  Such Petition Expenses may only be paid to the extent such payment would not directly result in the failure to pay any principal or interest due on the Class A Notes or the Class B Notes or, if there are no Class A Notes or Class B Notes Outstanding, the Controlling Class.

*Satisfaction and Discharge of the Indenture*.  The Indenture will be discharged with respect to the Assets securing the Secured Notes upon (i) delivery to the Trustee for cancellation of all of the Notes, or, with certain exceptions (including the obligation to pay principal and interest of the Secured Notes), upon deposit with the Trustee of funds sufficient for the payment or redemption thereof and (ii) the payment by the Co-Issuers of all other amounts due under the Indenture; *provided* that, upon the final distribution of all proceeds of any liquidation of the Collateral Obligations, the Equity Securities and the Eligible Investments effected under the Indenture, the foregoing requirements shall be deemed satisfied for the purposes of discharging the Indenture.

*Trustee*.  U.S. Bank National Association will be the Trustee under the Indenture for the Notes.  The payment of the fees and expenses of the Trustee relating to the Notes is solely the obligation of the Co-Issuers and solely payable out of the Assets.  The Co-Issuers, the Portfolio Manager and their affiliates may maintain other banking relationships in the ordinary course of business with the Trustee or its affiliates.

The Indenture contains provisions for the indemnification of the Trustee by the Issuer, payable solely out of the Assets notwithstanding any other provision of the Indenture, for any loss, liability or expense incurred without negligence or willful misconduct on its part, arising out of or in connection with the acceptance or administration of the trust.  The Trustee may resign at any time by providing 30 days' notice.  The Trustee may be removed (i) at any time by written consent of the Portfolio Manager and by a Majority of the Controlling Class, (ii) at any time when an Event of Default shall have occurred and be continuing, by a Majority of the Controlling Class or (iii) by order of a court of competent jurisdiction as set forth in the Indenture.  No resignation or removal of the Trustee will become effective until the acceptance of the appointment of the successor Trustee.

*Tax Classification of the Issuer.*  The Issuer expects to be treated as a corporation for U.S. federal tax purposes and the Indenture will provide that the Issuer agrees not to elect to be treated otherwise.

**Form, Denomination and Registration of the Offered Securities**

The Secured Notes (other than the Class E Notes) will be sold only to (i) non-U.S. persons in offshore transactions in reliance on Regulation S under the Securities Act and (ii) persons that are Qualified Purchasers and are Qualified Institutional Buyers.  The Class E Notes will be sold only to (i) non-U.S. persons in offshore transactions in reliance on Regulation S under the Securities Act and (ii) persons that are (x) Qualified Purchasers and (y) either (i) Qualified Institutional Buyers or (ii) Institutional Accredited Investors.  Each Secured Note sold to a person that, at the time of the acquisition, purported acquisition or proposed acquisition of any such Secured Note is both a Qualified Institutional Buyer and a Qualified Purchaser, will be issued in the form of one or more permanent global notes in definitive, fully registered form without interest coupons (the "**Rule 144A Global Secured Notes**").  The Secured Notes sold to non-U.S. persons in offshore transactions in reliance on Regulation S will be issued in the form of one or more permanent global notes in definitive, fully registered form without interest coupons (the "**Regulation S Global Secured Notes**").  Each initial investor of Class E Notes in the form of Global Notes will be required to provide a purchaser representation letter in which it will be required to certify as to its status under ERISA.

Each Class E Note sold to a person that, at the time of the acquisition, purported acquisition or proposed acquisition of any such Class E Note is both an Institutional Accredited Investor and a Qualified Purchaser, will be issued in the form of one or more permanent global notes in definitive, fully registered form without interest coupons (the "**Certificated Class E Notes**"). Each initial investor and each subsequent transferee of a Certificated Class E Note will be required to provide a purchaser representation letter in which it will be required to certify, among other matters, as to its status under the Securities Act, the Investment Company Act and ERISA.

The Subordinated Notes are being initially offered, and may subsequently be transferred, only (a) to persons in the United States that are either (A) Qualified Purchasers, (B) Knowledgeable Employees with respect to the Issuer or (C) corporations, partnerships, limited liability companies or other entities (other than trusts) each shareholder, partner, member or other equity owner of which is either a Knowledgeable Employee with respect to the Issuer or a Qualified Purchaser, and in the case of (A), (B) and (C) are also either Qualified Institutional Buyers or Accredited Investors who, if not Institutional Accredited Investors, are Knowledgeable Employees with respect to the Issuer and (b) to certain non-U.S. persons in offshore transactions in reliance on Regulation S under the Securities Act.

The Subordinated Notes sold to persons that, at the time of the acquisition, purported acquisition or proposed acquisition of any such Subordinated Note are both Qualified Institutional Buyers and Qualified Purchasers, will be issued in the form of one or more permanent global notes in definitive, fully registered form without interest coupons (the "**Rule 144A Global Subordinated Notes**" and, together with the Rule 144A Global Secured Notes, the "**Rule 144A Global Notes**").  The Subordinated Notes sold to U.S. persons that are either (A) Qualified Purchasers, (B) Knowledgeable Employees with respect to the Issuer or corporations, partnerships, limited liability companies or (C) other entities (other than trusts) each shareholder, partner, member or other equity owner of which is either a Knowledgeable Employee with respect to the Issuer or a Qualified Purchaser, and in the case of (A), (B) and (C) are also Accredited Investors who, if not Institutional Accredited Investors, are Knowledgeable Employees with respect to the Issuer will be evidenced by notes in definitive, fully registered form without interest coupons ("**Certificated Subordinated Notes**" and, together with the Certificated Class E Notes, the "**Certificated Notes**"). Each initial investor and each subsequent transferee of a Certificated Subordinated Note will be required to provide a purchaser representation letter in which it will be required to certify, among other matters, as to its status under the Securities Act, the Investment Company Act and ERISA.

The Subordinated Notes sold to non-U.S. persons in offshore transactions in reliance on Regulation S will be issued in the form of one or more permanent global notes in definitive, fully registered form without interest coupons (the "**Regulation S Global Subordinated Notes**" and, together with the Rule 144A Global Subordinated Notes, the "**Global Subordinated Notes**" and, together with the Regulation S Global Secured Notes, the "**Regulation S Global Notes**").  The Rule 144A Global Notes and the Regulation S Global Notes are referred to herein collectively as the "**Global Notes**."   Each initial investor of Subordinated Notes in the form of Global Notes will be required to provide a purchaser representation letter in which it will be required to certify as to its status under ERISA.

As used above, "**U.S. person**" and "**offshore transaction**" shall have the meanings assigned to such terms in Regulation S under the Securities Act.

The Global Notes will be deposited with the Trustee as custodian for, and registered in the name of, a nominee of DTC and, in the case of the Regulation S Global Notes, for the respective accounts of Euroclear Clearance System ("**Euroclear**") and Clearstream Banking, société anonyme ("**Clearstream**").

A beneficial interest in a Regulation S Global Secured Note may be transferred to a person who takes delivery in the form of an interest in the corresponding Rule 144A Secured Global Note only upon receipt by the Trustee of a written certification from the transferor in the form required by the Indenture to the effect that such transfer is being made to a person whom the transferor reasonably believes is a Qualified Institutional Buyer and a Qualified Purchaser (a "**QIB/QP**") in a transaction meeting the requirements of Rule 144A under the Securities Act and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.  Beneficial interests in a Rule 144A Global Note or a Certificated Note may be transferred to a person who takes delivery in the form of an interest in the corresponding Regulation S Global Note only upon receipt by the Trustee of a written certification from the transferor in the form required by the Indenture to the effect that such transfer is being made in accordance with Regulation S under the Securities Act.  Any beneficial interest in one of the Global Notes that is transferred to a person who takes delivery in the form of an interest in another Global Note will, upon transfer, cease to be an interest in such Global Note and become an interest in such other Global Note, and accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in such other Global Notes for as long as it remains such an interest. A beneficial interest in a Certificated Class E Note may be transferred to a person who takes delivery in the form of an interest in a corresponding Certificated Class E Note only upon receipt by the Trustee of a written certification from the transferor in the form required by the Indenture to the effect that such transfer is being made either (x) to a person whom the transferor reasonably believes is a (i)

either a (A) Qualified Institutional Buyer or (B) an Institutional Accredited Investor and (ii) a Qualified Purchaser in a transaction under the Securities Act and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction or (y) in accordance with Regulation S under the Securities Act.

A Certificated Subordinated Note or Certificated Class E Note may be transferred only upon receipt by the Issuer and the Trustee of (A) the transferor's Note together with an interest transfer form in the form prescribed by the Indenture executed by the transferor and (B) (only in the case of a transfer to a person who takes delivery in the form of a Certificated Subordinated Note or Certificated Class E Note) certificates in the form required by the Indenture executed by the transferee. In addition, a beneficial interest in a Class E Note in the form of a Global Note or a Global Subordinated Note may be transferred to a transferee acquiring a Certificated Class E Note or a Certificated Subordinated Note, respectively, only upon receipt by the Issuer and the Trustee of certificates substantially in the form required by the Indenture executed by the transferee.

No service charge will be made for any registration of transfer or exchange of Notes, but the Trustee may require payment of a sum sufficient to cover any transfer, tax or other governmental charge payable in connection therewith. The Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

The registered owner of the relevant Global Note will be the only person entitled to receive payments in respect of the Offered Securities represented thereby, and the Co-Issuers will be discharged by payment to, or to the order of, the registered owner of such Global Note in respect of each amount so paid. No person other than the registered owner of the relevant Global Note will have any claim against the Co-Issuers in respect of any payment due on that Global Note. Account holders or participants in Euroclear and Clearstream shall have no rights under the Indenture with respect to Global Notes held on their behalf by the Trustee as custodian for DTC, and DTC may be treated by the Co-Issuers, the Trustee and any agent of the Co-Issuers or the Trustee as the holder of Global Notes for all purposes whatsoever.

Except in the limited circumstances described below, owners of beneficial interests in the Global Notes will not be entitled to have Notes registered in their names, will not receive or be entitled to receive definitive physical Notes and will not be considered "holders" of Notes under the Indenture or the Notes. If DTC notifies the Co-Issuers that it is unwilling or unable to continue as depositary for Global Notes of any Class or Classes or ceases to be a "clearing agency" registered under the Exchange Act and a successor depositary or custodian is not appointed by the Co-Issuers within 90 days after receiving such notice, the Issuer will issue or cause to be issued, Notes of such Class or Classes in the form of definitive physical certificates in fully restricted form in exchange for the applicable Global Notes to the beneficial owners of such Global Notes in the manner set forth in the Indenture. In addition, the owner of a beneficial interest in a Global Note will be entitled to receive a definitive physical Note in exchange for such interest (i) if an Event of Default has occurred and is continuing. In the event that definitive physical Notes are not so issued by the Issuer to such beneficial owners of interests in Global Notes, the Issuer expressly acknowledges that such beneficial owners shall be entitled to pursue any remedy that the holders of a Global Note would be entitled to pursue in accordance with the Indenture (but only to the extent of such beneficial owner's interest in the Global Note) as if definitive physical Notes had been issued. In the event that definitive physical Notes are issued in exchange for Global Notes as described above, the applicable Global Note will be surrendered to the Trustee by DTC and the Issuer or the Co-Issuers, as applicable, will execute and the Trustee will authenticate and deliver an equal Aggregate Outstanding Amount of definitive physical Notes.

In the event that the Irish Listing Agent is replaced at any time during such period, notice of the appointment of any replacement will be published via the Irish Stock Exchange.

Interests in Global Notes, Certificated Class E Notes and Certificated Subordinated Notes will be subject to certain restrictions on transfer set forth therein and in the Indenture and the Notes will bear the restrictive legend set forth under "*Transfer Restrictions*."

The Notes will be issued in minimum denominations of $100,000 and integral multiples of $1 in excess thereof.

**The Subordinated Notes**

The Subordinated Notes will be issued pursuant to the Indenture, but will not be secured obligations thereunder. The following summary, together with the preceding summary of certain principal terms of the Indenture, describes certain provisions of the Subordinated Notes, but does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Indenture.

*Status and Ranking*.  The Subordinated Notes will be fully subordinated to the Secured Notes and to the payment of all other amounts payable in accordance with the Priority of Payments.  The Subordinated Notes will not be secured by the Assets or any pledge of the Assets but, under the terms of the Indenture, the Trustee will remit to the holders of the Subordinated Notes amounts available pursuant to the Priority of Payments.  To the extent that following realization of the Assets, these amounts are insufficient to repay the principal amount of the Subordinated Notes or distributions thereon, no other funds will be available to make such payments.

*Distributions on the Subordinated Notes*.  The Stated Maturity of the Subordinated Notes will be on the Payment Date in May 2027.  To the extent funds are available for such purpose under the Indenture as described above, payments will be made to the holders of the Subordinated Notes on each Payment Date and in connection with any redemption of the Subordinated Notes.  Payments received on the Subordinated Notes shall not reduce the Aggregate Outstanding Amount of the Subordinated Notes prior to the Stated Maturity.

Payments on Subordinated Notes will be made to the person in whose name such Subordinated Note is registered on the applicable Record Date in the same manner as payments are made to the holders of the Secured Notes as described under "—*Entitlements to Payments*" and any unclaimed payments will be subject to the terms described under "—*Entitlements to Payments—Prescription*."

*Repayment*.  The Subordinated Notes will be fully redeemed on the Stated Maturity indicated in "*Summary of Terms—Principal Terms of the Offered Securities*" unless previously redeemed as described herein.  The average life of the Subordinated Notes is expected to be less than the number of years until their Stated Maturity.  See "*Risk Factors—Risks Relating to the Offered Securities— Stated Maturity, Average Life and Prepayment Considerations*."

*Optional Redemption*.  The Subordinated Notes will be redeemed by the Issuer, in whole but not in part, on or after the date on which all of the Secured Notes have been redeemed or repaid, from the proceeds of the Assets remaining after giving effect to redemption or repayment of the Secured Notes and payment in full of all expenses of the Co-Issuers, at the written direction of the holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes (which direction may be given in connection with a direction to redeem the Secured Notes or at any time after the Secured Notes have been redeemed or repaid in full).  The Redemption Price payable to each holder of the Subordinated Notes will be its proportionate share of the proceeds of the Assets remaining after the payments described above.

*Clean-up Call Redemption*.  The Subordinated Notes will be subject to Clean-up Call Redemption as described under "—*Clean-up Call Redemption*."  Any such redemption of Subordinated Notes will be made from any remaining proceeds after the payment of the required amounts described under "—*Clean-up Call Redemption*."

*Voting*.  Holders of the Subordinated Notes will have no voting rights except as set forth in the Indenture, the Portfolio Management Agreement or the other transaction documents, as described herein.  The holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes will be able to direct a redemption or repayment of the Secured Notes and/or the Subordinated Notes pursuant to the Indenture (including by Refinancing).  In addition, the holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes will, subject to the consent of other parties, be able to direct the issuance of additional Subordinated Notes, as described herein.  See "*Summary of Terms—Other Information—Additional Issuance*" above.  Any holder may assign its voting rights to one or more assignees pursuant to agreements entered into between such holder and the assignees.  Holders will be prohibited from assigning voting rights to a person that has no right to cashflows from the applicable Notes (directly or indirectly) or retaining voting rights when such holders have no remaining right to cashflow from the applicable Notes (directly or indirectly).

*Cancellation*.   All Subordinated Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall be promptly canceled by the Trustee and may not be reissued or resold. No Subordinated Note may be surrendered (including any surrender in connection with any abandonment) except for payment as provided herein, or for registration of transfer, exchange or redemption in accordance with an Optional Redemption or a Clean-up Call Redemption, or for replacement in connection with any Note deemed lost or stolen. Neither of the Co-Issuers may acquire or purchase any Notes (including any Notes surrendered or abandoned). The previous sentence shall not limit any Optional Redemption, Clean-up Call Redemption, Special Redemption or Mandatory Redemption pursuant to the terms of the Indenture.

**No Gross-up**

All payments with respect to the Notes will be made without any deduction or withholding for or on account of any tax unless the deduction or withholding is required by any applicable law (including FATCA), as modified by the practice of any relevant governmental revenue authority, then in effect. If any such deduction or withholding is required, no additional amounts will be payable in respect of that withholding or deduction.

# RATINGS OF THE SECURED NOTES

**The Secured Notes**

It is a condition of the issuance of the Offered Securities that the Secured Notes of each Class receive from S&P the minimum rating indicated under "*Summary of Terms—Principal Terms of the Offered Securities*." A security rating is not a recommendation to buy, sell or hold securities and is subject to withdrawal at any time. There is no assurance that a rating will remain for any given period of time or that a rating will not be lowered or withdrawn entirely by the assigning Rating Agency if in its judgment circumstances in the future so warrant.

The ratings of the Secured Notes address the likelihood of full and ultimate payment to holders of the Secured Notes of all distributions of stated interest (or, in the case of the ratings of the Class A Notes and the Class B Notes, as applicable, timely distribution of stated interest) and the ultimate payment in full of the principal amount of each such Class not later than its respective Stated Maturity. The ratings assigned to the Secured Notes of each Class by the Rating Agency are based upon its assessment of the probability that the Collateral Obligations will provide sufficient funds to pay the Secured Notes of such Class (based upon the Interest Rate and principal balance or face amount, as applicable, of such Class), based largely upon the Rating Agency's statistical analysis of historical default rates on debt securities with various ratings, the terms of the Indenture, the asset and interest coverage required for the Secured Notes (which is achieved through the subordination of the Subordinated Notes and certain Classes of Secured Notes as described herein), and the Concentration Limitations and the Collateral Quality Test, each of which must be satisfied, maintained or improved in order to reinvest in additional Collateral Obligations.

In addition to its respective quantitative tests, the ratings of the Rating Agency take into account qualitative features of a transaction, including the legal structure and the risks associated with such structure, the Rating Agency's view as to the quality of the participants in the transaction and other factors that it deems relevant.

Although various provisions of the Indenture require that the Issuer provide reports regarding the Collateral Obligations that are derived in part from and in accordance with the then current criteria published by Moody's, the Notes will not be rated by Moody's in the absence of an Unsolicited Rating from Moody's. Accordingly, no investor should draw any inference from the inclusion of such reporting obligations Indenture that Moody's has expressed any opinion as to the likelihood of payments or other distributions (timely, ultimate or otherwise) in respect of any of the Notes.

# SECURITY FOR THE SECURED NOTES

The "**Assets**" will consist of, and the Issuer will grant to the Trustee a perfected security interest for the benefit of the Secured Parties in:

(a)  the Collateral Obligations that the Issuer causes to be delivered to the Trustee (directly or through an intermediary or bailee) pursuant to the Indenture and all payments thereon or with respect thereto, and all Collateral Obligations which are purchased, or otherwise acquired by, the Issuer in the future pursuant to the terms of the Indenture and all payments thereon or with respect thereto;

(b)  the Issuer's interest in (i) the Payment Account, (ii) the Collection Account, (iii) the Ramp-up Account, (iv) the Revolver Funding Account, (v) each Hedge Account (to the extent permitted under the related Hedge Agreement), (vi) the Expense Reserve Account, (vii) the Custodial Account and (viii) the Interest Reserve Account, any Eligible Investments purchased with funds on deposit therein, and all income from the investment of funds therein;

(c)  the Issuer's rights under the Portfolio Management Agreement, the Hedge Agreements (*provided,* that there is no such grant to the Trustee on behalf of any Hedge Counterparty in respect of its related Hedge Agreement), the Collateral Administration Agreement, the Purchase Agreement and any subscription agreements related to the purchase of the Notes;

(d)  all cash or money delivered to the Trustee (or its bailee);

(e)  all accounts, chattel paper, deposit accounts, financial assets, general intangibles, instruments, investment property, letter-of-credit rights and other supporting obligations relating to the foregoing;

(f)  any other property otherwise delivered to the Trustee by or on behalf of the Issuer (whether or not constituting Collateral Obligations or Eligible Investments (including, without limitation, Equity Securities));

(g)  the Issuer's rights in all assets owned by any ETB Subsidiary and the Issuer's rights under any agreement with any ETB Subsidiary; and

(h)  all proceeds with respect to the foregoing; *provided* that such grants shall not include the $250 transaction fee paid to the Issuer in consideration of the issuance of the Notes, the funds attributable to the issue and allotment of the Issuer's ordinary shares and the Co-Issuer's membership interests or the bank account in the Cayman Islands in which such funds are deposited (or any interest thereon) (or any funds deposited or credited thereto).

In the event that the Portfolio Manager has determined that the Issuer's ownership of any specific Asset would constitute ownership of a Volcker Rule Prohibited Asset, then the Portfolio Manager, on behalf of the Issuer, will be required to take commercially reasonable efforts to sell such Asset in accordance with clause (h) of the first paragraph of "—*Sales of Collateral Obligations; Additional Collateral Obligations and Investment Criteria*" and will not purchase or otherwise accept receipt of any additional Asset of the type identified in such determination.

## Collateral Obligations

It is anticipated that the Issuer will have entered into binding agreements to purchase, on or about the Closing Date, at least 90% (by principal amount) of the initial portfolio.  It is expected (but there can be no assurance) that the Concentration Limitations, the Collateral Quality Test, the Target Initial Par Condition, the Effective Date Overcollateralization Test and each Overcollateralization Ratio Test will be satisfied not later than the end of the Ramp-up Period.

The composition of the Collateral Obligations will change over time as a result of (i) the acquisition of additional Collateral Obligations during the Ramp-up Period, (ii) scheduled and unscheduled principal payments on the Collateral Obligations and (iii) sales of Assets and reinvestment of Sale Proceeds and other Principal Proceeds

during the Reinvestment Period, subject to the limitations described under "—*Sales of Collateral Obligations; Additional Collateral Obligations and Investment Criteria*" below.

**The Concentration Limitations**

By the end of the Ramp-up Period, and in connection with any reinvestment in additional Collateral Obligations, the Collateral Obligations in the aggregate are expected to comply with all of the requirements of the Concentration Limitations set forth under "*Summary of Terms—Concentration Limitations.*"

Measurement of the degree of compliance with the Concentration Limitations will be required on (i) any day on which a sale, a purchase or a default of a Collateral Obligation occurs, (ii) any Determination Date, (iii) the date as of which the information in any monthly report prepared under the Indenture is calculated, (iv) with five Business Days prior notice, any Business Day requested by the Rating Agency and (v) the last day of the Ramp-up Period (each such date, a "**Measurement Date**").

**The Collateral Quality Test**

By the end of the Ramp-up Period, and in connection with any reinvestment in additional Collateral Obligations, the Collateral Obligations in the aggregate are expected to comply with all of the requirements of the Collateral Quality Test set forth under "*Summary of Terms—Collateral Quality Test.*"  Measurement of the degree of compliance with the Collateral Quality Test will be required on every Measurement Date.

*Minimum Weighted Average Coupon Test*

The "**Minimum Weighted Average Coupon Test**" will be satisfied on any date of determination if the Weighted Average Coupon *plus* the Excess Weighted Average Floating Spread equals or exceeds the Minimum Weighted Average Coupon.

The "**Minimum Weighted Average Coupon**" means, as of any date of determination, the number specified as the "Minimum Weighted Average Coupon" in the Minimum Floating Spread/Minimum Weighted Average Coupon Pairing selected by the Portfolio Manager and applicable at such time.

The "**Weighted Average Coupon**" means, as of any date of determination, the number, expressed as a percentage (*rounded* up to the nearest 0.01%), equal to:

(i)   the aggregate sum, in respect of each fixed rate Collateral Obligation (excluding Deferring Obligations), of an amount equal to the product of (a) the interest coupon (excluding any non-cash interest portion) of such Collateral Obligation *multiplied by* (b) the Principal Balance of such Collateral Obligation (with respect to any Deferrable Obligation, including for this purpose any capitalized interest with respect to which current cash interest is being paid but excluding any portion of the Principal Balance or capitalized interest with respect to which current cash interest is not being paid), *divided by*

(ii)   the Aggregate Principal Balance of all such fixed rate Collateral Obligations.

The "**Excess Weighted Average Floating Spread**" means, as of any date of determination, an amount equal to:

(i)   the excess, if any, of the Weighted Average Floating Spread over the Minimum Floating Spread, *multiplied by*

(ii)   an amount equal to the Aggregate Principal Balance of all floating rate Collateral Obligations as of such date of determination *divided by* (b) the Aggregate Principal Balance of all fixed rate Collateral Obligations.

*Minimum Floating Spread Test*

The "**Minimum Floating Spread Test**" will be satisfied on any date of determination if (a) the sum of (i) the Weighted Average Floating Spread and (ii) the Excess Weighted Average Coupon equals or exceeds (b) the Minimum Floating Spread.

The "**Minimum Floating Spread**" means, as of any date of determination, the number specified as the "Minimum Floating Spread" in the Minimum Floating Spread/Minimum Weighted Average Coupon Pairing selected by the Portfolio Manager and applicable at such time.

The "**Weighted Average Floating Spread**" means, as of any date of determination, the number, expressed as a percentage (*rounding* up to the nearest 0.01%), obtained by calculating the sum of:

(i)  in the case of each floating rate Collateral Obligation (excluding Deferring Obligations, Revolving Collateral Obligations and Delayed Drawdown Collateral Obligations), the aggregate interest (excluding any non-cash interest portion) on such Collateral Obligation over LIBOR *multiplied by* the outstanding Principal Balance of such Collateral Obligation as of such date (with respect to any Deferrable Obligation, including for this purpose any capitalized interest with respect to which current cash interest is being paid but excluding any portion of the Principal Balance or capitalized interest with respect to which current cash interest is not being paid), and

(ii)  in the case of each Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, (a) the commitment fee for such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation *multiplied by* the undrawn commitments of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation and (b) the aggregate interest on such Collateral Obligation over LIBOR *multiplied by* the outstanding principal amount of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation (*provided* that letter of credit fees shall be excluded for all purposes),

and *dividing such sum by* the Aggregate Principal Balance of all such floating rate Collateral Obligations as of such date of determination.

For purposes of the foregoing, (1) in the case of each floating rate Collateral Obligation that bears interest at a spread over an index other than a London interbank offered rate based index, the interest over LIBOR for such Collateral Obligation shall be equal to the excess of the sum of such spread and such index over LIBOR calculated for the Secured Notes for the immediately preceding Interest Determination Date (which spread or excess may be expressed as a negative number), (2) LIBOR with respect to any floating rate Collateral Obligation that bears interest based on a spread over LIBOR shall be calculated in the same manner as it is calculated for payments on such Collateral Obligation, (3) with respect to any LIBOR Floor Obligation, the interest over LIBOR for such Collateral Obligation shall be equal to the sum of (a) the applicable spread over LIBOR and (b) the excess, if any, of the specified "floor" rate relating to such Collateral Obligation over LIBOR calculated for the Secured Notes for the immediately preceding Interest Determination Date and (4) the interest over the applicable index in respect of a floating rate Step-up Obligation shall be deemed to be its current interest spread over such index and the interest over the applicable index in respect of a floating rate Step-down Obligation shall be deemed to be the lowest possible interest spread over such index under the underlying instruments relating to such Step-down Obligation.

The "**Excess Weighted Average Coupon**" means, as of any date of determination, an amount equal to:

(i)  the excess, if any, of the Weighted Average Coupon over the Minimum Weighted Average Coupon *multiplied by*

(ii)  an amount equal to (a) the Aggregate Principal Balance of all fixed rate Collateral Obligations *divided by* (b) the Aggregate Principal Balance of all floating rate Collateral Obligations.

"**LIBOR Floor Obligation**" means, as of any date of determination, a floating rate Collateral Obligation (a) the interest in respect of which is paid based on a London interbank offered rate and (b) that provides that such London interbank offered rate is (in effect) calculated as the greater of (i) a specified "floor" rate *per annum* and (ii) the London interbank offered rate for the applicable interest period for such Collateral Obligation.

The "**Minimum Floating Spread/Minimum Weighted Average Coupon Pairing**" means the Minimum Floating Spread and Minimum Weighted Average Coupon pairing chosen by the Portfolio Manager from time to time in accordance with the Indenture from a row in Section 2 of Annex A (or the pairing derived from the linear interpolation of two adjacent rows) from the S&P Asset Quality Matrix.

*S&P CDO Monitor Test*

The "**S&P CDO Monitor Test**" will be satisfied on any date of determination on or after the Effective Date if, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, each Class Default Differential of the Proposed Portfolio is positive with respect to the most senior Class of Secured Notes outstanding then rated by S&P. The S&P CDO Monitor Test will be considered to be improved if the Class Default Differential of the Proposed Portfolio with respect to the most senior Class of Secured Notes outstanding then rated by S&P is greater than the corresponding Class Default Differential of the Current Portfolio.

Compliance with the S&P CDO Monitor Test will be measured by the Portfolio Manager on each Measurement Date on or after the Effective Date and prior to the last day of the Reinvestment Period.

There can be no assurance that actual defaults of the Collateral Obligations will not exceed those assumed in the application of the S&P CDO Monitor or that recovery rates with respect thereto will not differ from those assumed in the S&P CDO Monitor. None of the Portfolio Manager, the Initial Purchaser, the Trustee, the Collateral Administrator or the Co-Issuers makes any representation as to the expected rate of defaults of the Collateral Obligations or the timing of defaults or as to the expected recovery rate or the timing of recoveries.

*Minimum Weighted Average S&P Recovery Rate Test*

The "**Minimum Weighted Average S&P Recovery Rate Test**" will be satisfied on any date of determination if the Weighted Average S&P Recovery Rate for the most senior Class of Secured Notes outstanding then rated by S&P equals or exceeds the Weighted Average S&P Recovery Rate as selected by the Portfolio Manager pursuant to the definition of "S&P CDO Monitor".

*Weighted Average Life Test*

The "**Weighted Average Life Test**" will be satisfied if the Aggregate Weighted Average Life on such date of determination is not later than April 17, 2023.

The "**Weighted Average Life**" with respect to each Collateral Obligation as of any date of determination is an amount equal to (i) the sum of the products obtained by *multiplying* (A) the actual number of years (*rounded* to the nearest one hundredth thereof) from such date of determination to the respective dates of each successive scheduled distribution of principal of such Collateral Obligation and (B) the related amounts of the principal of such scheduled distribution; *divided by* (ii) the sum of the aggregate amount of all such scheduled distributions of principal of such Collateral Obligation.

"**Aggregate Weighted Average Life**" with respect to all Collateral Obligations as of any date of determination is a date equal to the actual number of years (*rounded* to the nearest one hundredth thereof) following such date obtained by (i) *summing* the products obtained by *multiplying* the Weighted Average Life at such time of each Collateral Obligation *by* the Principal Balance at such time of such Collateral Obligation and (ii) *dividing* such sum *by* the Aggregate Principal Balance at such time of all Collateral Obligations.

**The Coverage Tests**

*Overcollateralization Ratio.* See "*Summary of Terms—Coverage Tests*" for a description of the calculation of the Overcollateralization Ratio used in connection with the Overcollateralization Ratio Tests and the Interest Reinvestment Test.

*Interest Coverage Ratio.* See "*Summary of Terms—Coverage Tests*" for a description of the calculation of the Interest Coverage Ratio.

In determining the amount of any principal payment required to satisfy any Coverage Test after the Reinvestment Period, for purposes of the priorities set forth under "*Summary of Terms—Priority of Payments—Application of Interest Proceeds,*" the Aggregate Outstanding Amount of the Notes shall give effect to the application of Principal Proceeds to be used on the applicable Payment Date to repay principal of the Secured Notes,

and the application of Interest Proceeds on such Payment Date pursuant to all prior clauses in the priorities set forth under "*Summary of Terms—Priority of Payments—Application of Interest Proceeds*."

**The Interest Reinvestment Test**

See "*Summary of Terms—Interest Reinvestment Test*" for a description of the Interest Reinvestment Test.

**Sales of Collateral Obligations; Additional Collateral Obligations and Investment Criteria**

Subject to other requirements set forth in the Indenture; and *provided,* that no Event of Default has occurred and is continuing (except for a sale pursuant to clauses (a), (b), (c), (d), (e), (g) and (h) below), the Portfolio Manager on behalf of the Issuer may in writing direct the Trustee to sell and the Trustee (on behalf of the Issuer) shall sell in the manner directed by the Portfolio Manager any Collateral Obligation or Equity Security if such sale meets any one of the following requirements:

(a)   The Portfolio Manager may direct the Trustee to sell any Credit Risk Obligation at any time during or after the Reinvestment Period without restriction;

(b)   The Portfolio Manager may direct the Trustee to sell any Credit Improved Obligation at any time during or after the Reinvestment Period if: either (i) during the Reinvestment Period, the Portfolio Manager reasonably believes prior to such sale that it will be able to enter into binding commitments to reinvest all or a portion of the proceeds of such sale, in compliance with the Investment Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Investment Criteria Adjusted Balance of the sold Credit Improved Obligation within 30 Business Days of such sale or (ii) at any time, either (1) the Sale Proceeds from such sale are at least equal to the Investment Criteria Adjusted Balance of the sold Credit Improved Obligation or (2) after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations (excluding the Collateral Obligation being sold but including, without duplication, the anticipated cash proceeds of such sale) *plus*, without duplication, the amounts on deposit in the Accounts (including Eligible Investments therein) representing Principal Proceeds, will be greater than (or equal to) the Target Balance;

(c)   The Portfolio Manager may direct the Trustee to sell any Defaulted Obligation at any time during or after the Reinvestment Period without restriction;

(d)   The Portfolio Manager may direct the Trustee to sell any Equity Security or any asset held by any ETB Subsidiary at any time during or after the Reinvestment Period without restriction, and shall use its commercially reasonable efforts to effect the sale of any Equity Security within 45 days of receipt if such Equity Security constitutes Margin Stock, unless such sale is prohibited by applicable law, in which case such Equity Security will be sold as soon as such sale is permitted by applicable law;

(e)   After the Issuer has notified the Trustee of an Optional Redemption of the Notes or a Clean-up Call Redemption and all requirements set forth in the Indenture are met, the Portfolio Manager shall (except in connection with a Refinancing) direct the Trustee to sell (which sale may be through participation) all or a portion of the Collateral Obligations;

(f)   The Portfolio Manager may direct the Trustee to sell any Collateral Obligation at any time if (a) during or after the Reinvestment Period, and after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations sold as described in this paragraph during any 12 calendar month period (excluding any Volcker Rule Prohibited Assets) is not greater than 25% of the Collateral Principal Amount as of the beginning of such 12 calendar month period; and (b) either:

(i)   during the Reinvestment Period, the Portfolio Manager reasonably believes prior to such sale that it will be able to enter into binding commitments to reinvest all or a portion of the proceeds of such sale, in compliance with the Investment Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Investment Criteria Adjusted Balance of the sold Collateral Obligation within 30 Business Days of such sale; or

(ii)  at any time, either (1) the Sale Proceeds from such sale are at least equal to the Investment Criteria Adjusted Balance of the sold Collateral Obligation or (2) the Effective Date Overcollateralization Test will be satisfied after giving effect to such sale;

(g)  The Portfolio Manager shall use its commercially reasonable efforts to effect the sale (regardless of price) of any Collateral Obligation that (i) no longer meets the criteria described in clause (viii) of the definition of "Collateral Obligation," within 18 months of the failure of such Collateral Obligation to meet any such criteria and (ii) no longer meets the criteria described in clause (vi) or (vii) of the definition of "Collateral Obligation" within 45 days of the failure of such Collateral Obligation to meet either such criteria.  Notwithstanding the other requirements set forth in the Indenture, so long as any Secured Notes are outstanding, the Portfolio Manager shall use its commercially reasonable efforts to effect the sale of all remaining Collateral Obligations, Eligible Investments and Equity Securities (including Equity Securities held by any ETB Subsidiary) upon the Stated Maturity of such Notes; or

(h)  The Portfolio Manager, on behalf of the Issuer, will be required to take commercially reasonable efforts to sell any Volcker Rule Prohibited Asset, which efforts may take into account the perceived reasonableness of the market conditions then existing for the sale of such Volcker Rule Prohibited Asset.

*Investment Criteria*.  On any date during the Reinvestment Period, pursuant to and subject to the other requirements of the Indenture the Portfolio Manager on behalf of the Issuer may, but will not be required to, direct the Trustee to invest Principal Proceeds (together with accrued interest received with respect to any Collateral Obligation to the extent used to pay for accrued interest on additional Collateral Obligations) in additional Collateral Obligations; *provided* that, for the avoidance of doubt, with respect to any Collateral Obligations for which the trade date has occurred during the Reinvestment Period and for which Principal Proceeds are available (including for this purpose, cash on deposit in the Collection Account as well as any Principal Proceeds that will be received by the Issuer from the sale of Collateral Obligations for which the trade date has already occurred but the settlement date has not yet occurred) but which settle after the end of the Reinvestment Period, the purchase of such Collateral Obligations shall be treated as a purchase made during the Reinvestment Period. Such proceeds may be used to acquire additional Collateral Obligations subject to the requirement that each of the following conditions are satisfied as of the date the Portfolio Manager commits on behalf of the Issuer to make such purchase, in each case (subject to any Trading Plan restrictions) after giving effect to such purchase and all other sales or purchases previously or simultaneously committed to; *provided* that the conditions set forth in clauses (c) through (d) below need only be satisfied with respect to purchases of Collateral Obligations occurring after the end of the Ramp-up Period (the "**Investment Criteria**"):

(a)  such obligation is a Collateral Obligation;

(b)  each Coverage Test will be satisfied, or if not satisfied such Coverage Test will be maintained or improved;

(c)  (A) in the case of an additional Collateral Obligation purchased with the proceeds from the sale of a Credit Risk Obligation or a Defaulted Obligation, either (1) the Aggregate Principal Balance of all additional Collateral Obligations purchased with the proceeds from such sale will at least equal the Sale Proceeds from such sale, (2) the Aggregate Principal Balance of the Collateral Obligations when such Credit Risk Obligation or Defaulted Obligation was sold will be maintained or increased following the purchase of such additional Collateral Obligation, or (3) after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations (excluding the Collateral Obligation being sold but including, without duplication, the anticipated cash proceeds of such sale) *plus*, without duplication, the amounts on deposit in the Accounts (including Eligible Investments therein) representing Principal Proceeds, will be greater than (or equal to) the Target Balance, and (B) in the case of any other purchase of additional Collateral Obligations, either (1) the Aggregate Principal Balance of the Collateral Obligations when such Collateral Obligations were sold will be maintained or increased after giving effect to the purchase of such additional Collateral Obligations, or (2) after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations (excluding the Collateral Obligation being sold but including, without duplication, the anticipated cash proceeds of such sale) *plus*, without duplication, the amounts on deposit in the Accounts (including Eligible Investments therein) representing Principal Proceeds, will be greater than (or equal to) the Target Balance; and

(d) either (A) each requirement or test, as the case may be, of the Concentration Limitations and the Collateral Quality Test will be satisfied or (B) if any such requirement or test was not satisfied immediately prior to such reinvestment, such requirement or test will be maintained or improved after giving effect to the reinvestment.

Following the sale of any Credit Improved Obligation or any discretionary sale of a Collateral Obligation, the Portfolio Manager shall use its reasonable efforts to purchase additional Collateral Obligations within 30 Business Days after such sale.

Equity Securities may not be purchased by the Issuer, but the Issuer (or an Issuer Subsidiary) may receive an Equity Security in connection with an insolvency, bankruptcy, reorganization, debt restructuring or workout which will be considered "received in lieu of debts previously contracted with respect to the Collateral Obligation" under the Volcker Rule.

*Trading Plans*. For purposes of calculating compliance with the Investment Criteria, the Portfolio Manager may elect to execute one or more Trading Plans (with notice to the Collateral Administrator, which notice shall include the identity of all sales and purchases forming part of such Trading Plan); *provided* that if a previous Trading Plan failed to comply with the Investment Criteria, the Portfolio Manager may not execute any further Trading Plans until the S&P Rating Condition is satisfied (and, following satisfaction of the S&P Rating Condition, any number of additional Trading Plans may be executed subject to the other limitations in this paragraph). "**Trading Plan**" means, with respect to any proposed investment, a plan under which compliance with the Investment Criteria will be evaluated after giving effect to all sales and purchases proposed to be entered into within ten Business Days following the date of determination of such compliance (such period, the "**Trading Plan Period**"); *provided* that (i) the execution of a Trading Plan will not result in the averaging of the purchase price of a Collateral Obligation or Collateral Obligations purchased at separate times for purposes of any calculation made in connection with the Investment Criteria; (ii) no Trading Plan may be executed over a time period that includes a Determination Date; (iii) no Trading Plan may relate to the purchase of Collateral Obligations having an Aggregate Principal Balance in excess of 5.0% of the Collateral Principal Amount; (iv) only one Trading Plan may be outstanding at any time; (v) so long as the Investment Criteria are satisfied upon the expiry of the applicable Trading Plan Period, the failure of all of the terms and assumptions specified in such Trading Plan to be satisfied shall not be deemed to constitute a failure of such Trading Plan; (vi) the difference between the Collateral Obligation with the highest Weighted Average Life and the Collateral Obligation with the lowest Weighted Average Life, in each case, purchased in connection with a Trading Plan may not be greater than two years and (vii) a Trading Plan may only be executed during the Reinvestment Period.

*Maturity Amendments*. The Issuer will not, at any time during or after the Reinvestment Period, execute, enter into, agree to or vote in favor of any Maturity Amendment if (x) either (A) the Weighted Average Life Test would not be satisfied immediately after giving effect to such Maturity Amendment or (B) during the Reinvestment Period only, if the Weighted Average Life Test was not satisfied immediately prior to giving effect to such Maturity Amendment, the level of compliance with the Weighted Average Life Test would not be maintained or improved after giving effect to such Maturity Amendment or (y) such Maturity Amendment would cause such Collateral Obligation to mature after the earliest Stated Maturity of the Notes.

*Investment after the Reinvestment Period*. After the Reinvestment Period, Sale Proceeds received with respect to Credit Risk Obligations and Unscheduled Principal Payments may be reinvested in accordance with the requirements of the Indenture. After the Reinvestment Period, provided that no Event of Default has occurred and is continuing, the Portfolio Manager may, but will not be required to, invest Principal Proceeds that were received with respect to Unscheduled Principal Payments and Credit Risk Obligations in additional Collateral Obligations within the longer of (i) 30 Business Days of the Issuer's receipt thereof and (ii) the last day of the related Collection Period; *provided*, that the Portfolio Manager may not reinvest such Principal Proceeds unless the Portfolio Manager reasonably believes that after giving effect to any such reinvestment (A) each test of the Collateral Quality Test (excluding the S&P CDO Monitor Test) will be satisfied or, if not satisfied, will be maintained or improved as compared to such failing test level prior to the sale of the related Credit Risk Obligation or the receipt of the Unscheduled Principal Payment (provided that, on and after the date that is one year following the end of the Reinvestment Period the Weighted Average Life Test must be satisfied), (B) the Coverage Tests will be satisfied or, if not satisfied, will be maintained or improved as compared to such failing test level prior to the sale of the related Credit Risk Obligation or the receipt of the Unscheduled Principal Payment, (C) each requirement of the

Concentration Limitations (other than the requirements set forth in clause (x) of the definition thereof) will be satisfied or, if any such requirement was not satisfied immediately prior to such reinvestment, the level of compliance with such requirement will be maintained or improved after giving effect to the reinvestment, (D) clause (x) of the Concentration Limitations will be satisfied, (E) the Restricted Trading Period is not in effect, (F) the additional Collateral Obligations purchased will have (1) the same or higher S&P Ratings and (2) the same or earlier maturity, as such Credit Risk Obligations or prepaid Collateral Obligations, (G) the Aggregate Principal Balance of all additional Collateral Obligations purchased with the proceeds from the sale of such Credit Risk Obligations will at least equal the related Sale Proceeds, and (H) solely with respect to the reinvestment of Unscheduled Principal Payments, the Aggregate Principal Balance of the Collateral Obligations will be maintained or increased (by comparison to the Aggregate Principal Balance of the Collateral Obligations immediately prior to such payment) (such conditions, the "***Post-Reinvestment Period Investment Criteria***").  The Post-Reinvestment Period Investment Criteria may not be amended without the written consent of a Majority of each Class of Notes, voting separately.

*Post-Reinvestment Period Settlement*.  Not later than the Business Day immediately following the end of the Reinvestment Period, the Portfolio Manager shall deliver to the Trustee a schedule of Collateral Obligations that the Issuer has purchased on a trade date basis but with respect to which the settlement date has not yet occurred and shall certify to the Trustee that sufficient Principal Proceeds are available (including for this purpose, cash on deposit in the Collection Account as well as any Principal Proceeds that will be received by the Issuer from the sale of Collateral Obligations for which the trade date has already occurred but the settlement date has not yet occurred) to effect the settlement of such Collateral Obligations.

**The Collection Account and Payment Account**

All distributions on the Collateral Obligations and any proceeds received from the disposition of any Collateral Obligations will be remitted to a single, non-interest bearing segregated trust account held in the name of the Issuer (the "**Collection Account**") and subject to the lien of the Trustee for the benefit of the Secured Parties, and will be available, together with reinvestment earnings thereon, for application to the payment of the amounts set forth under "*Summary of Terms—Priority of Payments*" and for the acquisition of additional Collateral Obligations under the circumstances and pursuant to the requirements described herein and in the Indenture.  Two segregated subaccounts will be recorded within the Collection Account, one of which will be designated the "Interest Collection Subaccount" (the "**Interest Collection Subaccount**") and one of which will be designated the "Principal Collection Subaccount" (the "**Principal Collection Subaccount**").  All Interest Proceeds received by the Trustee after the Closing Date (except for income earned on amounts deposited in the Ramp-up Account and certain subaccounts of the Revolver Funding Account) will be deposited in the Interest Collection Subaccount.  All other amounts remitted to the Collection Account will be deposited in the Principal Collection Subaccount.

The Portfolio Manager on behalf of the Issuer may direct the Trustee to pay from amounts on deposit in the Collection Account on any Business Day during any Interest Accrual Period (i) from Interest Proceeds only, any amount required to exercise a warrant held in the Assets or right to acquire securities held in the Assets in accordance with the requirements of "*Security for the Secured Notes—Sales of Collateral Obligations; Additional Collateral Obligations and Investment Criteria*"; *provided* that (x) Principal Proceeds may be used to exercise warrants in Assets if the Effective Date Overcollateralization Test is satisfied as of the date such warrant is exercised and (y) proceeds from the sale of the securities obtained upon the exercise of such warrant may be treated as Interest Proceeds (up to the amount of Interest Proceeds used to exercise such warrant) or Principal Proceeds at the election of the Portfolio Manager and (ii) from Interest Proceeds only, any Administrative Expenses; *provided* that the aggregate Administrative Expenses paid during any Collection Period shall not exceed the Administrative Expense Cap for the related Payment Date.  In addition, the Portfolio Manager on behalf of the Issuer may direct the Trustee to pay from the Principal Collection Subaccount amounts required to meet funding requirements with respect to Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations.

Amounts received in the Collection Account during a Collection Period may be invested at the direction of the Portfolio Manager in Eligible Investments with stated maturities no later than the Business Day prior to the Payment Date next succeeding the acquisition of such securities or instruments.  All proceeds from the Eligible Investments will be retained in the Collection Account unless used to purchase additional Collateral Obligations in accordance with the Investment Criteria, or used as otherwise permitted under the Indenture.  See "*—Sales of Collateral*

*Obligations; Additional Collateral Obligations and Investment Criteria*," and "*Summary of Terms—Priority of Payments*."

On the Business Day preceding each Payment Date, the Trustee will deposit into a segregated trust account held in the name of the Issuer (the "**Payment Account**") and subject to the lien of the Trustee for the benefit of the Secured Parties all funds in the Collection Account (other than amounts that the Issuer is entitled to reinvest in accordance with the Investment Criteria described herein, which may be retained in the Collection Account for subsequent reinvestment) required for payments to holders of the Secured Notes and distributions on the Subordinated Notes and payments of fees and expenses in accordance with the priorities described under "*Summary of Terms—Priority of Payments*."

### The Ramp-up Account

The net proceeds of the issuance of the Offered Securities remaining after payment of fees and expenses (including the deposit made into the Expense Reserve Account on the Closing Date) will be deposited on the Closing Date into a non-interest bearing segregated trust account held in the name of the Issuer (the "**Ramp-up Account**") and subject to the lien of the Trustee for the benefit of the Secured Parties. Of such net proceeds of the issuance of the Offered Securities which are not applied to pay for the purchase of Collateral Obligations purchased by the Issuer on or before the Closing Date, approximately $561,885,000 will be deposited in the Ramp-up Account on the Closing Date and, after the Effective Date, but on or prior to the Designated Principal Proceeds Cut-off Date, and after taking into account amounts to be transferred, an aggregate amount not greater than $2,820,000 in Principal Proceeds may be designated as Designated Principal Proceeds, from time to time, by the Portfolio Manager to be treated as Interest Proceeds (but only if the Effective Date Overcollateralization Test would be satisfied after each such designation). On behalf of the Issuer, the Portfolio Manager will direct the Trustee to, from time to time during the Ramp-up Period, purchase additional Collateral Obligations and invest in Eligible Investments any amounts not used to purchase such additional Collateral Obligations. In connection with any purchase of an additional Collateral Obligation, the Trustee will apply amounts held in the Ramp-up Account to pay for such Collateral Obligation. Upon the occurrence of an Event of Default, the Trustee shall deposit any amounts remaining on deposit in the Ramp-Up Account (excluding any proceeds that shall be required and used to settle binding commitments entered into prior to such date) into the Principal Collection Account for application as Principal Proceeds. On the first Business Day to occur after the end of the Ramp-Up Period (so long as the Target Initial Par Condition has been satisfied), the Trustee shall deposit any amounts remaining on deposit in the Ramp-Up Account (excluding any proceeds that will be required and used to settle binding commitments entered into prior to such date), as directed by the Portfolio Manager, into the Principal Collection Account for application as Principal Proceeds. Amounts in the Ramp-up Account may be invested at the direction of the Portfolio Manager in Eligible Investments in accordance the Indenture; *provided* that any income earned on amounts deposited in the Ramp-up Account will be deposited in the Ramp-up Account as it is paid.

### The Custodial Account

The Issuer will, on or prior to the Closing Date, establish a non-interest bearing segregated trust account in the name of the Issuer and subject to the lien of the Trustee for the benefit of the Secured Parties which will be designated as the "**Custodial Account**." The only permitted withdrawals from the Custodial Account shall be in accordance with the provisions of the Indenture. The Trustee agrees to give the Co-Issuers immediate notice if (to the Trustee's actual knowledge) the Custodial Account or any assets or securities on deposit therein, or otherwise to the credit of the Custodial Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Custodial Account other than in accordance with the Indenture and the Priority of Payments.

### The Revolver Funding Account

Upon the purchase of any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, funds may be withdrawn first from the Ramp-up Account and then from the Collection Account and deposited in a single, non-interest bearing segregated trust account established in the name of the Issuer (the "**Revolver Funding Account**") and subject to the lien of the Trustee for the benefit of the Secured Parties. Upon initial purchase, funds deposited in the Revolver Funding Account in respect of any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation will be treated as part of the purchase price therefor. Amounts in each subaccount

of the Revolver Funding Account shall be invested in overnight funds that are Eligible Investments in accordance with the Indenture.

With respect to any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, upon the purchase of any such Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, funds will be deposited in the Revolver Funding Account such that the sum of the amount of funds on deposit in such account shall be equal to or greater than the sum of the unfunded funding obligations under all such Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations then included in the Assets.  If the Issuer receives proceeds with respect to any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation that have any remaining unfunded obligations, the Issuer shall deposit all such proceeds into the Revolver Funding Account in an amount up to such unfunded obligations.

Any funds in the Revolver Funding Account will be available solely to cover any drawdowns on the Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations; *provided* that any excess of (A) the amounts on deposit in the Revolver Funding Account over (B) the sum of the unfunded funding obligations under all Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations that are included in the Assets may be transferred by the Trustee (at the direction of the Portfolio Manager) from time to time as Principal Proceeds to the Principal Collection Subaccount.

Upon (a) the sale or maturity of a Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation or (b) the occurrence of an event of default with respect to any such Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation or any other event or circumstance which results in the irrevocable reduction of the undrawn commitments under such Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, any excess of (A) the amounts on deposit in the Revolver Funding Account over (B) the sum of the unfunded amounts of all Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations that are included in the Assets will be transferred by the Trustee (at the direction of the Portfolio Manager) as Principal Proceeds to the Principal Collection Subaccount.

**The Hedge Accounts**

If and to the extent that any Hedge Agreement requires the Hedge Counterparty thereunder to secure its obligations to the Issuer with respect to such Hedge Agreement, the Issuer will be required to establish a segregated, non-interest bearing trust account (each such account, a "**Hedge Account**").  The Trustee (as directed by the Portfolio Manager on behalf of the Issuer) will be required to deposit into each Hedge Account all amounts or collateral which are required to secure the obligations of the Hedge Counterparty in accordance with the terms of the related Hedge Agreement.  Amounts or collateral in any Hedge Account will be released to the Issuer or the related Hedge Counterparty only in accordance with the Indenture, the applicable Hedge Agreement and applicable law.

As directed by the Portfolio Manager in writing and in accordance with the applicable Hedge Agreement, amounts on deposit in a Hedge Account may be invested in Eligible Investments.  Income received on amounts or collateral on deposit in each Hedge Account will be applied, as directed by the Portfolio Manager, to the payment of any periodic amounts owed by such Hedge Counterparty to the Issuer on the date any such amounts are due.  After application of any such amounts, any income then contained in such Hedge Account shall be withdrawn from such account and paid to the related Hedge Counterparty in accordance with the applicable Hedge Agreement as directed by the Portfolio Manager on behalf of the Issuer.

Upon the occurrence of any "event of default" or "termination event" (each as defined in the applicable Hedge Agreement) under the related Hedge Agreement, amounts contained in the related Hedge Account will, as directed by the Portfolio Manager in writing, be withdrawn by the Trustee and applied toward the payment of any amounts payable by the related Hedge Counterparty to the Issuer in accordance with the terms of such Hedge Agreement.  Any excess amounts held in a Hedge Account after payment of all amounts owing from the related Hedge Counterparty to the Issuer will be withdrawn from such Hedge Account and paid to the related Hedge Counterparty in accordance with the applicable Hedge Agreement, as directed by the Portfolio Manager on behalf of the Issuer.

**The Expense Reserve Account**

The Trustee will, on or prior to the Closing Date, establish a non-interest bearing segregated trust account held in the name of the Issuer which will be designated as the "**Expense Reserve Account**" and will be subject to the lien of the Trustee for the benefit of the Secured Parties. Approximately $988,534 will be deposited in the Expense Reserve Account as Interest Proceeds on the Closing Date for the payment of certain expenses of the Issuer incurred in connection with the issuance of the Offered Securities and the purchase of the initial portfolio of Collateral Obligations prior to the fourth Payment Date. On any Business Day from the Closing Date to and including the Determination Date relating to the fourth Payment Date, the Trustee will apply funds from the Expense Reserve Account, as directed by the Portfolio Manager, to pay expenses of the Co-Issuers incurred in connection with the establishment of the Co-Issuers, the structuring and consummation of the Offering, the issuance of the Offered Securities or the acquisition of the initial portfolio of Collateral Obligations prior to the fourth Payment Date or to the Collection Account as Principal Proceeds. By the Determination Date relating to the fourth Payment Date following the Closing Date, all funds in the Expense Reserve Account (after deducting any expenses paid on such Determination Date) will be deposited in the Collection Account as Interest Proceeds and/or Principal Proceeds (in the respective amounts directed by the Portfolio Manager in its discretion) and the Expense Reserve Account will be closed. Amounts in the Expense Reserve Account may be invested at the direction of the Portfolio Manager in Eligible Investments in accordance with the Indenture.

**Interest Reserve Account**

The Trustee will, on or prior to the Closing Date, establish a non-interest bearing segregated trust account held in the name of the Issuer which will be designated as the "**Interest Reserve Account**" and will be subject to the lien of the Trustee for the benefit of the Secured Parties. The Issuer will direct the Trustee to deposit approximately $1,500,000 in the Interest Reserve Account. On any Business Day from the Closing Date to and including the Determination Date relating to the fourth Payment Date, the Trustee will transfer funds from the Interest Reserve Account, as directed by the Portfolio Manager, to the Interest Collection Subaccount as Interest Proceeds and/or Principal Proceeds (in the respective amounts directed by the Portfolio Manager in its discretion). By the Determination Date relating to the fourth Payment Date following the Closing Date, all funds in the Interest Reserve Account (after deducting any transfer made on such Determination Date) will be deposited in the Collection Account as Interest Proceeds and/or Principal Proceeds (in the respective amounts directed by the Portfolio Manager in its discretion) and the Interest Reserve Account will be closed. Amounts in the Interest Reserve Account may be invested at the direction of the Portfolio Manager in Eligible Investments in accordance with the Indenture.

**Hedge Agreements**

The Issuer is permitted to enter into one or more interest rate swap, cap or similar agreements (each, a "**Hedge Agreement**"). Each Hedge Agreement will be documented as one or more confirmations under a master swap agreement in the form published by the International Swaps and Derivatives Association, Inc. Each Hedge Agreement will be governed by New York law (or, at the option of the Issuer, English law).

The Issuer will not enter into any Hedge Agreement on or prior to the Closing Date. Each Hedge Agreement shall be required to (x) satisfy the S&P Rating Condition, (y) contain appropriate limited recourse and non-petition provisions equivalent to those contained in the Indenture with respect to the Notes and (z) provide that any amounts payable to the related Hedge Counterparty thereunder will be subject to the Priority of Payments (including, without limitation, the Acceleration Priority of Payments).

The Issuer may not enter into a Hedge Agreement unless (i) it receives the consent of a Majority of the Controlling Class to such Hedge Agreement, (ii) such Hedge Agreement is an interest rate or foreign exchange derivative and the terms of such derivative relate to the Collateral Obligations and the Notes and reduce the interest rate or foreign exchange risks related to the Collateral Obligations and the Notes and (iii)(x) it reasonably determines that such Hedge Agreement would not cause the Issuer or Portfolio Manager to be required to register with the CFTC or that the Issuer and Portfolio Manager would be eligible for an exemption to the requirement to register with the CFTC as a CPO or (y) with the consent of a Majority of the Subordinated Notes, the Portfolio Manager will register as a CPO and comply with the requirements of the CFTC.

Under the terms of the Hedge Agreements, upon the failure of the related Hedge Counterparty to have the minimum debt or counterparty ratings specified in the related Hedge Agreement, such Hedge Counterparty (at its own expense) will be required, within the lesser of the minimum time periods specified in such Hedge Agreement, to take one or more of certain required actions, which are expected to include transferring all of its rights and obligations to a replacement Hedge Counterparty that has, or obtaining a guarantor that has, the minimum debt or counterparty rating specified in such Hedge Agreement and/or posting collateral to the Issuer in an amount specified in such Hedge Agreement, in each case as set forth in such Hedge Agreement.

The Indenture requires that if at any time any Hedge Agreement becomes subject to early termination due to the occurrence of an event of default or a termination event, the Issuer (or the Portfolio Manager on its behalf) and the Trustee (if an Event of Default has occurred) shall notify the Rating Agency and take such actions (following the expiration of any applicable grace period) to enforce the rights of the Issuer and the Trustee under such Hedge Agreement as may be permitted by the terms of such Hedge Agreement and consistent with the terms hereof, and may apply the proceeds of any such actions (including, without limitation, the proceeds of the liquidation of any collateral pledged by the Hedge Counterparty thereunder) to enter into a replacement Hedge Agreement on such terms as satisfy the S&P Rating Condition (unless such early termination is due to an additional termination event caused by an Optional Redemption).  No Hedge Agreement entered into by the Issuer may include an additional termination event resulting from an Optional Redemption unless such additional termination event is not effective until the notice of such Optional Redemption given by the Co-Issuers has become irrevocable.  Any costs attributable to entering into a replacement Hedge Agreement which exceed the sum of the proceeds of the liquidation of any such Hedge Agreement shall be borne solely by the Hedge Counterparty; *provided* that such liquidation is not the result of a Priority Hedge Termination Event.

The Trustee will agree to any reduction in the notional amount of any Hedge Agreement proposed by the related Hedge Counterparty and agreed to by the Portfolio Manager, or any termination, replacement and/or other modification of any such Hedge Agreement or any additional Hedge Agreement proposed by the Portfolio Manager; *provided* that the S&P Rating Condition shall have been satisfied.

# USE OF PROCEEDS

**General**

The net proceeds from the issuance of the Offered Securities, after any discounts and payment of applicable fees and expenses of the Initial Purchaser in connection with the structuring and placement of the Offered Securities are expected to be approximately $564,373,534.

The net proceeds from the issuance of the Offered Securities will be used to acquire Collateral Obligations on the Closing Date and to make deposits into the Ramp-up Account, the Expense Reserve Account and the Interest Reserve Account.

**Ramp-up Period**

The additional Collateral Obligations referred to in the preceding paragraph, together with the Collateral Obligations purchased on or before the Closing Date, must satisfy, as of the end of the Ramp-up Period, the Target Initial Par Condition, the Concentration Limitations, the Collateral Quality Test, the Effective Date Overcollateralization Test and each Overcollateralization Ratio Test.  If sufficient Collateral Obligations that satisfy the foregoing tests are purchased by the end of the Ramp-up Period, any excess funds reserved for that purpose will be available for investment in additional Collateral Obligations during the Reinvestment Period.

Principal Proceeds in an aggregate amount not greater than $2,820,000 may be designated as Designated Principal Proceeds, from time to time, by the Portfolio Manager to be treated as Interest Proceeds, after the Effective Date and on or prior to the Designated Principal Proceeds Cut-off Date (but only if the Effective Date Overcollateralization Test would be satisfied after each such designation).

If, after the end of the Ramp-up Period, the Effective Date Conditions have not been met, the Issuer may, in accordance with the Indenture, instruct the Trustee to (x) prior to the first Determination Date, transfer amounts from the Interest Collection Subaccount to the Principal Collection Subaccount in an amount sufficient to satisfy the Effective Date Conditions (*provided* that the amount of such transfer would not result in the failure to pay interest due on any Senior Notes in accordance with the Priority of Payments) or (y) take such other action, including but not limited to a Special Redemption, sufficient to satisfy the Effective Date Conditions.

# THE PORTFOLIO MANAGER

The information appearing in this section has been prepared by the Portfolio Manager and has not been independently verified by the Initial Purchaser. Accordingly, notwithstanding anything to the contrary herein, the Initial Purchaser does not assume any responsibility for the accuracy, completeness or applicability of such information.

General

Acis Capital Management, L.P. ("**Acis**"), a Delaware limited partnership, will act as Portfolio Manager on behalf of the Issuer pursuant to the Portfolio Management Agreement. The Portfolio Manager (among other accounts that it manages) is responsible for purchasing and selling the Collateral Obligations and performing certain other advisory and administrative tasks for and on behalf of the Issuer in each case subject to the provisions of the Portfolio Management Agreement and any applicable provisions of the Indenture. See "The Portfolio Management Agreement."

Acis, an affiliate of Highland, is an SEC Registered Investment Adviser and currently manages Hewett's Island CLO I-R, ACIS CLO 2013-1, ACIS CLO 2013-2, ACIS CLO 2014-3, ACIS CLO 2014-4 and ACIS CLO 2014-5. Acis is 100% owned by Highland senior management, and was established by James Dondero, Mark Okada and Josh Terry to focus on managing traditional CLOs that invest in liquid, broadly syndicated bank loans. The establishment of Acis aligns the incentives of Highland's structured credit investment professionals with the performance of the structured credit vehicles under management. Acis has a Sub-Advisory Agreement (the "**Sub-Advisory Agreement**") and a Shared Services Agreement (the "**Shared Services Agreement**", together with the Sub-Advisory Agreement, the "Service Agreements") in place with Highland, pursuant to which Highland provides credit research and operational support to Acis, including services in connection with determining the composition, nature and timing of changes to the Portfolio Manager's portfolio, the due diligence of actual or potential investments, the execution of investment transactions approved by the Portfolio Manager, and certain loan services and administrative services. The Sub-Advisory Agreement and the Shared Services Agreement (each with certain pricing information redacted) are attached hereto as <u>Annex B</u> and <u>Annex C</u>, respectively. Investors in Acis managed vehicles benefit from Highland's 20 years of experience, credit research platform and trading capabilities. All final credit decisions are made by the Acis individuals referenced above.

Additional information regarding Acis can be obtained from Part 2 of the Portfolio Manager's most recent Form ADV, which is incorporated by reference hereto. A copy of Part 2 of the Portfolio Manager's most recent Form ADV is available at www.adviserinfo.sec.gov.

Based in Dallas, Texas, Highland is an SEC Registered Investment Adviser founded in 1993 that specializes in senior secured bank loans, high yield bonds, structured products and equities. Highland issued its first CLO in 1996, and has since issued over $30 billion of CLOs and CDOs consisting of 39 separate vehicles. As of December 31, 2014, Highland and its affiliate advisers, managed or serviced approximately $20.3 billion in senior secured bank loans, high yield bonds, structured products and other assets for banks, insurance companies, pension plans, foundations and high net worth individuals. assets for banks, insurance companies, pension plans, foundations and high net worth individuals.

**Personnel of the Portfolio Manager**

Set forth below is information regarding certain persons who are currently employed by the Portfolio Manager or Highland. Such persons may not necessarily continue to be so employed during the entire term of the Portfolio Management Agreement.

**James Dondero, CFA, CMA**

*Co-Founder, President*

James Dondero is President of Acis Capital Management, L.P. and Co-Founder and President of Highland Capital Management, L.P. (an alternative asset manager specializing in high-yield fixed income investments). Mr.

Dondero has over 30 years of experience in the credit markets. Prior to founding Highland in 1993, Mr. Dondero served as Chief Investment Officer of Protective Life's GIC subsidiary and helped grow the business from concept to over $2 billion between 1989 and 1993. His portfolio management experience includes mortgage-backed securities, investment grade corporates, leveraged bank loans, high-yield bonds, emerging market debt, derivatives, preferred stocks and common stocks. From 1985 to 1989, he managed approximately $1 billion in fixed income funds for American Express. Prior to American Express, he completed the financial training program at JP Morgan. Mr. Dondero received a BS in Commerce (Accounting and Finance) from the University of Virginia. Mr. Dondero is a Certified Public Accountant, a Certified Managerial Accountant, and a Chartered Financial Analyst. He currently serves as Chairman for CCS Medical and NexBank and serves on the board of directors of American Banknote Corporation, Cornerstone Healthcare Group, and Metro-Goldwyn-Mayer.

**Mark Okada, CFA**

*Co-Founder, Chief Investment Officer*

Mr. Okada Co-Founder of Acis Capital Management, L.P. and is Chief Investment Officer of Highland Capital Management, L.P. and is responsible for overseeing Highland's investment activities for its various strategies. Mr. Okada is a pioneer in the development of the bank loan market and has over 30 years of credit experience. He is responsible for structuring one of the industry's first arbitrage CLOs and was actively involved in the development of Highland's bank loan separate account and mutual fund platforms. Mr. Okada received a BA in Economics and a BA in Psychology, cum laude, from the University of California, Los Angeles. He has earned the right to use the Chartered Financial Analyst designation. Mr. Okada is a Director of NexBank, Chairman of the Board of Directors of Common Grace Ministries, Inc., is on the Board of Directors for Education is Freedom, and also serves on the GrowSouth Fund advisory board.

**Josh Terry, CFA**

*Co-Founder, Portfolio Manager*

Mr. Terry is Co-Founder and Portfolio Manager of Acis Capital Management, L.P. and Head of Structured Products and Trading at Highland Capital Management, L.P. He is the Portfolio Manager responsible for all CLOs, separate accounts and hedge funds managed by Acis. Mr. Terry has led Highland's CLO team since March 2009, serves on Highland's investment committee and currently leads Highland's credit trading desk and structured products investment teams. Since joining Highland in July 2005, Mr. Terry has served in various roles, including Senior Portfolio Analyst on the Distressed & Special Situations team and trading loans, bonds, CDS and equities on Highland's trading desk. Prior to joining Highland, Mr. Terry worked as an investment banking analyst at Stephens Inc. Mr. Terry serves on the Board of Governors of Uplift Education and on the Dallas Regional Chamber's Education Advisory Council. He received a BBA in Finance and Economics, summa cum laude, from Baylor University. Mr. Terry has earned the right to use the Chartered Financial Analyst designation.

**Philip Braner, CPA**

*Managing Director, Structured Products*

Mr. Braner is a Managing Director of Structured Products at Highland Capital Management. Mr. Braner is responsible for structuring, marketing, and business development of Acis's and Highland's CLO platform, as well as Highland's emerging markets platform with a primary focus on Brazil. Prior to his current role, Mr. Braner acted as COO of the Structured Products Group and the COO of Highland Financial Partners, LP. Mr. Braner also headed the Deal Team within Highland's Structured Products Group, which was responsible for the origination of structured finance transactions and separate investment accounts. Since joining Highland, Mr. Braner has structured over 20 CLO/CDOs and separate accounts totaling over $20 billion, including US and Euro cash CLOs, CDO Squareds, middle market CLOs, and real estate CDOs. Prior to joining Highland in March 2004, Mr. Braner served as a Senior Accountant at KPMG in Dallas, Texas serving primarily the Telecommunications industry. He received both a Masters in Accountancy and a BBA from Baylor University. Mr. Braner is a licensed Certified Public Accountant.

**Hunter Covitz, CPA**

*Managing Director, Structured Products*

Mr. Covitz is a Managing Director of Structured Products at Highland Capital Management, L.P. He is responsible for coordinating day-to-day transactions in all Acis and Highland CLO structures, working closely with various groups throughout the firm to optimize CLO performance. He is also involved in structuring, analyzing, and marketing new CLOs and other structured products transactions. From 2005-2008, Mr. Covitz was instrumental in the structuring, warehousing, ramping, and ongoing operations of over 20 Highland-originated U.S. and European CLOs. Additionally, Mr. Covitz utilizes his extensive knowledge of CLOs to analyze CLO securities for Highland's $2.1 billion structured products portfolio. Prior to joining Highland in 2003, Mr. Covitz served as a tax consultant at Deloitte & Touche and KBA Group LLP, where he focused on high-net worth individuals and middle-market companies. He received both his MS and BBA in Accounting from the University of Oklahoma, where he played baseball, earning three letters. Mr. Covitz is a licensed Certified Public Accountant.

**Felicia Smith**

*Managing Director, Structured Products*

Ms. Smith is a Managing Director of Structured Products at Highland Capital Management, L.P. She is focused on capital raising activities for Acis's and Highland's CLO and credit platforms, hedge funds, and separate accounts. Prior to joining Highland in November 2014, Ms. Smith was the Vice President of Capital Markets for Santander Consumer USA (NYSE: SC), the largest capital markets issuer in the auto finance space. Prior to her role in capital markets, Ms. Smith held other leadership positions in Corporate & Business Development, as well as Pricing & Analytics at Santander, and in Global Currencies and Commodities at J.P. Morgan Securities. She is also on the Board of Trustees of Brother Bill's Helping Hand, a non-profit serving West Dallas. Ms. Smith received a Bachelor's degree in Economics from Baylor University.

# THE PORTFOLIO MANAGEMENT AGREEMENT

**General**

The Issuer and the Portfolio Manager will enter into the Portfolio Management Agreement pursuant to which the Portfolio Manager will perform certain administrative and advisory functions with respect to the Assets. Pursuant to the terms of the Portfolio Management Agreement, and in accordance with the requirements set forth in the Indenture, the Portfolio Manager will select the portfolio of Collateral Obligations and will instruct the Trustee with respect to any acquisition, disposition or sale of a Collateral Obligation, Eligible Investment or other Asset. The Portfolio Manager will, among other things, have the right, on behalf of the Issuer, to exercise or refrain from exercising any voting rights with respect to any Collateral Obligation and to exercise any other rights or remedies with respect thereto consistent with the terms of the Indenture.  None of the Initial Purchaser nor any affiliates thereof will select any of the Collateral Obligations.

Pursuant to the terms of the Portfolio Management Agreement, the Portfolio Manager will monitor the Collateral Obligations, the Eligible Investments and certain other assets and provide the Issuer with certain information received from the Collateral Administrator, as described below, with respect to the composition and characteristics of the Collateral Obligations, any disposition or tender of a Collateral Obligation, the reinvestment of the proceeds of any such disposition in Eligible Investments and with respect to the retention of the proceeds of any such disposition or the application thereof toward the purchase of an additional Collateral Obligation.

The Portfolio Manager may employ third parties (including affiliates) to render advice (including investment advice) and assistance; *provided* that the Portfolio Manager shall not be relieved of any of its duties under the Portfolio Management Agreement regardless of the performance of any services by third parties.

Notwithstanding the foregoing, the Portfolio Management Agreement, and any obligations or duties of the Portfolio Manager under the Portfolio Management Agreement, can be delegated by the Portfolio Manager, in whole or in part, to any entity that (i) is controlled by any of James Dondero, Mark Okada or Josh Terry and (ii) is one in which any of James Dondero, Mark Okada or Josh Terry is involved in the day to day management and operations (and in any such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), with the prior written consent of the Issuer and, notwithstanding any such consent, no delegation of obligations or duties by the Portfolio Manager (including, without limitation, to an entity described above) shall relieve the Portfolio Manager from any of its duties or any liability under the Portfolio Management Agreement.

**Compensation**

As compensation for the performance of its obligations as Portfolio Manager, the Portfolio Manager will be entitled to receive a fee, which will accrue quarterly in arrears on each Payment Date (prorated for the related Interest Accrual Period), in an amount equal to the sum of (i) 0.15% *per annum* (calculated on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount at the beginning of the Collection Period relating to such Payment Date (the "**Senior Management Fee**") and (ii) 0.25% *per annum* (calculated on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount at the beginning of the Collection Period relating to such Payment Date (the "**Subordinated Management Fee**").  In addition, if the Incentive Management Fee Threshold is satisfied, the Portfolio Manager will be entitled to receive an amount on each Payment Date or upon application of the Acceleration Priority of Payments, as applicable, equal to (1) 15% of the remaining Interest Proceeds, if any, available for payment pursuant to clause (X) of "*Summary of Terms—Priority of Payments—Application of Interest Proceeds*," (2) 15% of the remaining Principal Proceeds, if any, available for payment pursuant to clause (J) of "*Summary of Terms—Priority of Payments—Application of Principal Proceeds*" and (3) 15% of the remaining amounts, if any, available for payment pursuant to clause (P) of the "*Summary of Terms—Priority of Payments—Acceleration Priority of Payments*," (such amounts, the "**Incentive Management Fee**" and, together with the Senior Management Fee and the Subordinated Management Fee, the "**Management Fees**").  The Subordinated Management Fee is payable in arrears on (x) each Payment Date pursuant to clause (T)(1) of "*Summary of Terms—Priority of Payment—Application of Interest Proceeds*," (y) each Payment Date after the Reinvestment Period pursuant to clause (G)(1) of "*Summary of Terms—Priority of Payments—Application of Principal Proceeds*" or earlier if paid in connection with an Optional Redemption pursuant to clause (D) of "*Summary of Terms—Priority of Payments—Application of Principal Proceeds*" and (z) each Payment Date

pursuant to clause (M)(1) of "*Summary of Terms—Priority of Payments—Acceleration Priority of Payments*," in each case, only to the extent that sufficient Interest Proceeds or Principal Proceeds are available, and, to the extent any such Subordinated Management Fee is not paid on any Payment Date for any reason, such payment will be deferred and will accrue interest at LIBOR (as determined for the applicable Interest Accrual Period with respect to the Secured Notes), compounded quarterly (calculated on the basis of a 360-day year consisting of twelve 30-day months).

The Portfolio Manager may (but shall not be obligated to), at its election upon notice to the Issuer, the Trustee and the Collateral Administrator, reduce for a predetermined period of time the amount which is due to it as a Senior Management Fee, in which case the Subordinated Management Fee shall automatically be increased by the same amount (the "**Fee Election**").  Any Fee Election must be made on or before the Determination Date for the first Collection Period in respect of which the Fee Election will apply and shall not be revocable during the period of the Fee Election; *provided* that, in the event that the Portfolio Manager is removed, resigns or assigns its rights to any persons, as contemplated by the Portfolio Management Agreement, the Fee Election will not apply to such replacement Portfolio Manager.

The "**Incentive Management Fee Threshold**" means the threshold that will be satisfied on any Payment Date if the Subordinated Notes that are issued on the Closing Date have received an annualized internal rate of return (computed using the "XIRR" function in Microsoft® Excel or an equivalent function in another software package) of at least 10% on the original purchase price of the Subordinated Notes as of the current Payment Date (after giving effect to all payments made or to be made on such Payment Date). The annualized rate of return will be calculated based on the distributions made on the Subordinated Notes issued on the Closing Date and without taking into account distributions made on any additional Subordinated Notes issued after the Closing Date.

The "**Fee Basis Amount**" means, as of any date of determination, the sum of (a) the Collateral Principal Amount (including all Collateral Obligations held by an ETB Subsidiary) and (b) the Aggregate Principal Balance of all Defaulted Obligations.

Upon the effectiveness of any termination of the Portfolio Management Agreement or any removal or resignation of the Portfolio Manager thereunder, (a) all Management Fees accrued but not paid prior to the effective date of such termination, removal, resignation or assignment, as the case may be (the "**Exit Date**"), shall continue to be payable to the exiting Portfolio Manager on Payment Dates occurring after the Exit Date and (b) (1) in the case of removal for cause, the Incentive Management Fee, if any, will be due and payable on each Payment Date after such removal for cause to the former Portfolio Manager and the successor Portfolio Manager *pro rata* based on the duration of service as portfolio manager for the Issuer during the period from the Closing Date to (and including) such Payment Date and (2) in the case of termination, resignation or assignment, as the case may be, for any reason other than cause, the Incentive Management Fee that is due and payable will be payable to the former Portfolio Manager and the successor Portfolio Manager based upon the former Portfolio Manager's reasonable determination of each portfolio manager's proportional participation and engagement in providing services to the Issuer in connection with the management of the Issuer's portfolio and carrying out the duties and obligations set forth in the Portfolio Management Agreement.

The Portfolio Manager shall pay (without reimbursement by the Issuer) its general overhead expenses, including (i) all costs and expenses on account of salaries, wages, bonuses and other employee benefits of the Portfolio Manager and (ii) all occupational expenses, including rent, taxes and utilities, of the Portfolio Manager. The Issuer shall pay or reimburse the Portfolio Manager  (at closing in the case of clause (i) below) for its payment of any and all reasonable costs and expenses incurred on behalf of the Issuer, including, without limitation:  (i) the costs and expenses of the Portfolio Manager incurred in connection with the negotiation and preparation of the Portfolio Management Agreement and all other agreements and matters related to the issuance of the Notes; (ii) any transfer fees necessary to register any Collateral Obligation in accordance with the Indenture; (iii) any costs, fees and expenses in connection with the acquisition, management or disposition of Assets or otherwise in connection with the Notes or the Issuer (including (a) investment related travel, communications and related expenses, (b) loan processing fees, legal fees and expenses and other expenses of professionals retained by the Portfolio Manager on behalf of the Issuer and (c) amounts in connection with the termination, cancellation or abandonment of a potential acquisition or disposition of any Assets that is not consummated); (iv) any and all costs and expenses incurred in connection with the carrying or management of the Assets; (v) any and all costs and expenses incurred in connection

with the Notes and other indebtedness of the Issuer; (vi) any and all attorneys', accountants', rating agencies', consultants', brokers' and other professionals' fees and disbursements relating to Issuer matters (including in house attorneys' and accountants' services provided by or on behalf of the Portfolio Manager to the Issuer as may be reasonably allocated to the Issuer); (vii) any and all taxes and governmental charges that may be incurred or payable by the Issuer or any ETB Subsidiary; (viii) any and all insurance premiums or expenses incurred in connection with the activities of the Issuer by the Portfolio Manager; (ix) any and all costs, fees and expenses incurred in connection with the rating of the Notes or obtaining ratings or credit estimates on Collateral Obligations, and communications with rating agencies (including (a) any expenses related to compliance with Rule 17g-5 of the Exchange Act and (b) any fees, expenses or other amounts payable to rating agencies); (x) any and all costs, fees and expenses incurred in connection with the Portfolio Manager's communications with the holders (including charges related to annual meetings) and costs and expenses for services to the Issuer in respect of the Assets relating to asset pricing and rating services and specialty database software licensing and development fees; (xi) any and all costs and expenses incurred by the Portfolio Manager in connection with the establishment of any ETB Subsidiary (provided that such costs and expenses are directly attributable to the establishment of such ETB Subsidiary), and (xii) any and all expenses incurred to comply with any law or regulation related to the activities of the Issuer, any ETB Subsidiary and the Portfolio Manager.  Other than as stated above, the Issuer will bear, and will pay directly in accordance with the Indenture, all other costs and expenses incurred by it or on its behalf in connection with the organization, operation or liquidation of the Issuer.

## Limitation of Liability

The Portfolio Manager shall not be responsible for any action or inaction of the Co-Issuers or the Trustee in declining to follow any advice, recommendation or direction of the Portfolio Manager.  Neither the Portfolio Manager nor any of its directors, managers, officers, stockholders, members, partners, partnership committee members, personnel, employees, agents or affiliates will be liable to the Co-Issuers, the Trustee or the holders of the Notes, the Initial Purchaser or any other person for any act, omission, error of judgment, mistake of law, or for any claim, loss, liability, damage, judgments, assessments, settlement, cost, or other expense (including attorneys' fees and expenses and court costs) arising out of any investment, or for any other act taken by or recommended by or omission arising out of or in connection with the performance by the Portfolio Manager, its directors, managers, officers, stockholders, members, partners, partnership committee members, personnel, employees, agents or affiliates under the Portfolio Management Agreement or the terms of the Indenture applicable to the Portfolio Manager,  incurred as a result of actions taken or recommended or for any omissions of the Portfolio Manager, or for any decrease in the value of the Collateral Obligations, except that the Portfolio Manager will be liable (i) by reason of acts or omissions constituting bad faith, willful misconduct, gross negligence or reckless disregard in the performance of its obligations under the Portfolio Management Agreement or the terms of the Indenture applicable to the Portfolio Manager or (ii) with respect to the information concerning the Portfolio Manager included herein in the Portfolio Manager Information, as of the date of such information, to the extent that such information contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements herein, in light of the circumstances under with they were made, not misleading.  The Portfolio Manager shall not be liable for any consequential, punitive, exemplary or treble damages or lost profits under the Portfolio Management Agreement or under the Indenture.

Pursuant to the terms of the Portfolio Management Agreement, the Issuer will indemnify and hold harmless the Portfolio Manager, its directors, managers, officers, stockholders, members, partners, partnership committee members, agents, personnel and employees and its affiliates and their directors, managers, officers, stockholders, members, partners, partnership committee members, agents, personnel and employees (each, an "**Indemnified Party**") from and against any and all losses, claims, damages, judgments, assessments, costs or other liabilities (other than losses in the value of a Collateral Obligation or Eligible Investment incurred by the Portfolio Manager or any of its affiliates in connection with a transaction in which it elects to acquire a Collateral Obligation or an Eligible Investment from the Issuer as principal) (collectively, "**Liabilities**"), and will promptly reimburse each such Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) as such fees and expenses (collectively, the "**Expenses**") are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "**Actions**"), caused by, or arising out of or in connection with the Assets or business of the Issuer or any ETB Subsidiary or otherwise relating to the Indenture or the Portfolio Management Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; *provided* that the Portfolio Manager shall not be indemnified for

any Liabilities or Expenses (x) it incurs as a result of any acts or omissions constituting bad faith, willful misconduct, gross negligence or reckless disregard in the performance by the Portfolio Manager of its obligations under the Portfolio Management Agreement or the terms of the Indenture applicable to the Portfolio Manager, or (y) it incurs with respect to the information concerning the Portfolio Manager included in the Portfolio Manager Information that contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements herein, in light of the circumstances under with they were made, not misleading. The obligations of the Issuer to indemnify any Indemnified Party for any Losses are limited recourse obligations of the Issuer payable solely out of the Assets in accordance with the Priority of Payments. The Indemnified Parties are not required to consult with, or obtain the consent of, the Issuer with respect to any settlement, negotiation or other act of the Indemnified Parties in connection with any Action.

Pursuant to the terms of the Portfolio Management Agreement, the Portfolio Manager shall indemnify and hold harmless the Issuer from and against any and all expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) arising directly out of the Portfolio Manager Information, as of the date of such information, to the extent that such information contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading; *provided* that the Portfolio Manager shall not be liable for any special, indirect, consequential, punitive, exemplary or treble damages or lost profits.

## Amendment

The Portfolio Management Agreement may be amended to (i) reflect a change that is of an inconsequential nature, (ii) correct inconsistencies, typographical or other errors, defects or ambiguities; (iii) conform the Portfolio Management Agreement to this Offering Circular or the Indenture (as it may be amended from time to time as set forth above under "*Description of the Offered Securities—The Indenture—Supplemental Indentures*") or (iv) reflect a change that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation (including ERISA, the Code, the Investment Advisers Act and the Investment Company Act) of any U.S. federal or state agency or contained in any U.S. federal or state statute, in each case without the consent of the holders of any Notes and without satisfaction of the S&P Rating Condition. Any other amendment to the Portfolio Management Agreement (other than in respect of a modification or amendment of the type that may be made to the Indenture without Holder consent) shall be permitted only upon (i) the consent of Majority of the Subordinated Notes, (ii) the consent of a Majority of the Controlling Class and (iii) notice to the Rating Agency.

## Restrictions

The Indenture places significant restrictions on the Portfolio Manager's ability to buy and sell Assets, and the Portfolio Manager is required to comply with these restrictions contained in the Indenture. Accordingly, during certain periods or in certain specified circumstances, the Portfolio Manager may be unable to buy or sell securities or to take other actions which it might consider in the best interest of the Issuer and the holders of the Notes, as a result of the restrictions set forth in the Indenture.

## Conflicts of Interest

It is understood that the Portfolio Manager and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including persons which may have investment policies similar to those followed by the Portfolio Manager with respect to the Assets and which may own securities or obligations of the same class, or which are of the same type, as the Collateral Obligations or the Eligible Investments or other securities or obligations of the issuers or obligors of the Collateral Obligations or the Eligible Investments. The Portfolio Manager will be free, in its sole discretion, to make recommendations to others or effect transactions on behalf of itself or for others, which may be the same as or different from those effected with respect to the Assets. Nothing in the Indenture and the Portfolio Management Agreement shall prevent the Portfolio Manager or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer or obligor, as those directed by the Portfolio Manager to be purchased or sold on behalf of the Issuer. It is understood that, to the extent permitted by applicable law, the Portfolio Manager, is affiliates or Related Entities, or any of their directors, managers, officers,

stockholders, members, partners, partnership committee members, personnel, employees, agents or affiliates or any member of their families or a person or entity advised by the Portfolio Manager or any of its affiliates may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer or obligor, as those whose purchase or sale the Portfolio Manager may direct under the Portfolio Management Agreement. If, in light of market conditions and investment objectives, the Portfolio Manager determines that it would be advisable to purchase the same item of Collateral Obligation both for the Issuer, and either the proprietary account of the Portfolio Manager or any affiliate of the Portfolio Manager or another client of the Portfolio Manager, the Portfolio Manager will allocate such investment opportunities across such entities for which such opportunities are appropriate consistent with (i) its internal conflicts of interest and allocation policies and (ii) any applicable requirements of the Investment Advisers Act. In the Portfolio Management Agreement, the Issuer will agree that, in the course of managing the Collateral Obligations held by the Issuer, the Portfolio Manager may consider its relationships with other clients (including obligors and issuers) and its affiliates. The Portfolio Manager may decline to make a particular investment for the Issuer in view of such relationships. See "*Risk Factors—Risks Relating to Certain Conflicts of Interest—The Issuer will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates.*"

The Portfolio Manager may, subject to compliance with applicable laws and regulations and subject to the Portfolio Management Agreement and the Indenture, direct the Trustee to acquire a Collateral Obligation from, or sell a Collateral Obligation, Equity Security, Eligible Investment or asset held by any ETB Subsidiary to, the Portfolio Manager, any of its affiliates or any account or portfolio for which the Portfolio Manager or any of its affiliates serve as investment advisor for fair market value. The Portfolio Manager may obtain the Issuer's written consent through the Independent Review Party as provided herein if any such transaction requires the consent of the Issuer under Section 206(3) of the Investment Advisers Act (any such transaction, an "**Affiliate Transaction**"). At the written request of the Portfolio Manager, the Issuer shall establish a conflicts review board or appoint an independent third party to act on behalf of the Issuer (such board or party, an "**Independent Review Party**") with respect to Affiliate Transactions. Decisions of any Independent Review Party shall be binding on the Portfolio Manager, the Issuer and the holders of the Notes. Any Independent Review Party (i) shall either (A) be the Issuer's Board of Directors, (B) be an established financial institution or other financial company with experience in assessing the merits of transactions similar to the Affiliate Transactions or (C) be a review board comprised of one or more individuals selected by the Issuer (or at the request of the Issuer, selected by the Portfolio Manager), (ii) shall be required to assess the merits of the Affiliate Transaction and either grant or withhold consent to such transaction in its sole judgment and (iii) shall not be (A) affiliated with the Portfolio Manager (other than as a holder or as a passive investor in the Issuer or an affiliate of the Issuer) or (B) (other than the Issuer's Board of Directors) involved in the daily management and control of the Issuer. The Issuer (i) shall be responsible for any fees relating to the services provided by any Independent Review Party and shall reimburse members of any Independent Review Party for their out-of-pocket expenses and (ii) may indemnify members of such Independent Review Party to the maximum extent permitted by law, subject to terms and conditions satisfactory to the Portfolio Manager.

**Resignation, Removal and Replacement of the Portfolio Manager**

The Portfolio Manager may resign upon 90 days' (or such shorter notice as is acceptable to the Issuer) written notice to the Issuer; *provided* that the Portfolio Manager shall have the right to resign immediately upon the effectiveness of any material change in applicable law or regulations which renders the performance by the Portfolio Manager of its duties under the Portfolio Management Agreement or under the Indenture to be a violation of such law or regulation.

The Portfolio Manager may be removed for cause by a Majority of the Controlling Class upon 30 days' prior written notice to the Portfolio Manager. For purposes of determining whether the holders of the required percentage of relevant principal amount of the Notes have given notice of removal of the Portfolio Manager for cause, Notes owned or controlled by the Portfolio Manager or any affiliate thereof or an account or fund managed on a discretionary basis by the Portfolio Manager or its affiliates will be disregarded and deemed to be not outstanding. No such termination or removal will be effective until the date as of which a successor Portfolio Manager has agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to the Portfolio Management Agreement and as specified in the Indenture. For purposes of determining "cause" with respect to any such termination of the Portfolio Manager or removal of the Portfolio Manager, such term includes any one of the following events:

(1)  the Portfolio Manager willfully violates, or takes any action that it knows breaches, any material provision of the Portfolio Management Agreement or the Indenture applicable to it in bad faith (not including a willful and intentional breach that results from a good faith dispute regarding reasonable alternative courses of action or interpretation of instructions);

(2)  the Portfolio Manager breaches in any respect any provision of the Portfolio Management Agreement or any terms of the Indenture applicable to it (other than as covered by clause (1) and it being understood that failure to meet any Coverage Test, any Concentration Limitation, Interest Reinvestment Test or the Collateral Quality Test is not such a violation) (except for any such violations or breaches that have not had, or could not, either individually or in the aggregate, reasonably be expected to have, a material adverse effect on the Issuer) and fails to cure such breach within 30 days of a Responsible Officer receiving notice of such breach, unless, if such breach is remediable, the Portfolio Manager has taken action that the Portfolio Manager believes in good faith will remedy such breach, and such action does remedy such breach, within 60 days after a Responsible Officer receives notice thereof;

(3)  certain events of bankruptcy or insolvency with respect to the Portfolio Manager;

(4)  the occurrence of an Event of Default under the Indenture that consists of a default in the payment of principal or interest on the Secured Notes when due and payable and results primarily from any material breach by the Portfolio Manager of its duties under the Portfolio Management Agreement or under the Indenture, which breach or default is not cured within any applicable cure period;

(5)  the occurrence of an act by the Portfolio Manager that constitutes fraud or criminal activity in the performance of its obligations under the Portfolio Management Agreement (as determined pursuant to a final adjudication by a court of competent jurisdiction), or the Portfolio Manager being indicted for a criminal offense materially related to its business of providing asset management services;

(6)  any senior executive officer of the Portfolio Manager (in the performance of his or her investment management duties) is convicted for a criminal offense materially related to the business of the Portfolio Manager providing asset management services and continues to have responsibility for the performance by the Portfolio Manager under the Portfolio Management Agreement for a period of 10 days after such conviction; or

(7)  the inability of the Portfolio Manager to perform its duties under the Portfolio Management Agreement in accordance with the standard of care specified therein due to the termination of the Service Agreements, unless the Portfolio Manager believes in good faith that it will be able to either (i) secure reasonably equivalent substitute services to those that were performed for the Portfolio Manager under the Service Agreements or (ii) perform its duties under the Portfolio Management Agreement in accordance with the applicable standard of care without engaging a third-party service provider, in each case, within 30 days, and the Portfolio Manager is in fact able to secure such services or perform such duties within such 30-day period.

If any of the events specified in the definition of "cause" shall occur, the Portfolio Manager shall give prompt written notice thereof to the Issuer, the Rating Agency, each holder of Notes and the Trustee upon the Portfolio Manager's becoming aware of the occurrence of such event.  A Majority of the Controlling Class may waive any event described in (1), (2), (4) through (7) above as a basis for termination of the Portfolio Management Agreement and removal of the Portfolio Manager thereunder.

Any termination, removal or resignation of the Portfolio Manager while any Notes are outstanding will be effective only upon (a) the appointment by the Issuer, at the direction of a Majority of the Subordinated Notes, with the consent of a Majority of the Controlling Class, of a successor Portfolio Manager in accordance with the requirements set forth in the Portfolio Management Agreement which (i) has demonstrated an ability to professionally and competently perform duties reasonably comparable to those imposed upon the Portfolio Manager under the Portfolio Management Agreement, (ii) is legally qualified and has the capacity to act as successor to the Portfolio Manager under the Portfolio Management Agreement in the assumption of all of the responsibilities, duties and obligations of the Portfolio Manager under the Portfolio Management Agreement and under the terms of the Indenture applicable to the Portfolio Manager, (iii) satisfies the S&P Rating Condition, (iv) shall not cause the Issuer or the Co-Issuer or the pool of collateral to become required to register under the provisions of the Investment Company Act and (v) shall not result in the imposition of any entity level or withholding tax on the Issuer or the

payments to the holders of the Notes or cause any other material adverse tax consequences to the Issuer and (b) written acceptance of appointment by such successor manager. In the event that the successor manager has not been appointed or has not assumed the duties of the Portfolio Manager in writing within a 60 day period, any of the Portfolio Manager, a Majority of the Controlling Class or a Majority of the Subordinated Notes may petition a court of competent jurisdiction for the appointment of a successor Portfolio Manager, which appointment will not require the consent of, or be subject to the approval or disapproval of, the Issuer or any holder (so long as such court appointed successor meets the requirements set forth in the Portfolio Management Agreement and described above for successor portfolio managers).

**Assignment**

Except as provided below, the Portfolio Manager may not assign its rights or responsibilities under the Portfolio Management Agreement without the written consent of the Issuer, a Majority of the Subordinated Notes (provided that failure to object within 45 days of written notice of assignment will constitute consent) and a Majority of the Controlling Class and satisfaction of the S&P Rating Condition.

The Portfolio Manager may, (1) with the consent of a Majority of the Controlling Class and without satisfaction of the S&P Rating Condition or the consent of any other Class, assign any of its rights or obligations under the Portfolio Management Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to the Portfolio Management Agreement, (ii) has the legal right and capacity to act as Portfolio Manager under the Portfolio Management Agreement, and (iii) shall not cause the Issuer or the pool of collateral to become required to register under the provisions of the Investment Company Act, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity and, (A) at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Portfolio Manager under the Portfolio Management Agreement generally and the other entity is solely a continuation of the Portfolio Manager in another corporate or similar form and has substantially the same staff and (B) such action does not cause the Issuer to be subject to tax in any jurisdiction outside of its jurisdiction of incorporation; *provided* that the Portfolio Manager shall deliver prior notice to the Rating Agency of any assignment, delegation or combination made pursuant to this sentence.

Notwithstanding the foregoing to the extent that applicable law requires the consent of the Issuer to any "assignment" (as defined in the Investment Advisers Act) of the Portfolio Management Agreement to any person, in whole or in part, by the Portfolio Manager, such requirement may be satisfied with respect to the Issuer and all holders (i) by obtaining consent to such assignment on behalf of the Issuer from any of the following persons as determined by the Portfolio Manager: (A) one or more directors of the Issuer independent from the Portfolio Manager, (B) the Independent Review Party, or (C) an advisory committee established by the Portfolio Manager; or (ii) in any other manner that is permitted pursuant to then applicable law.

The Portfolio Management Agreement expressly provides that holders of the Notes are not third party beneficiaries of the Portfolio Management Agreement.

**Collateral Administration**

Pursuant to the terms of the Portfolio Management Agreement and the Indenture, the Portfolio Manager will (i) select the Collateral Obligations and Eligible Investments to be acquired by the Issuer and (ii) monitor the Collateral Obligations and provide the Issuer and the Trustee certain information with respect to the composition and characteristics of the Collateral Obligations, any disposition or tender of a Collateral Obligation, the reinvestment of the proceeds of any such disposition in Eligible Investments and with respect to the retention of the proceeds of any such disposition or the application thereof toward the purchase of an additional Collateral Obligation. Certain administrative duties of the Issuer will be performed for the Issuer, or the Portfolio Manager on behalf of the Issuer, with respect to the Collateral, including the performance of certain calculations by the Collateral Administrator under the agreement to be entered into among the Issuer, the Portfolio Manager and U.S. Bank National Association, as the collateral administrator (the "**Collateral Administration Agreement**").

# THE CO-ISSUERS

**The Issuer**

ACIS CLO 2015-6 Ltd. (the "**Issuer**") is an exempted company incorporated with limited liability under the laws of the Cayman Islands and is a special purpose entity established for the sole purpose of acquiring the Collateral Obligations, issuing the Notes and engaging in certain related transactions. The Issuer was incorporated on February 11, 2015 in the Cayman Islands with registered number 296533 and has an indefinite existence. The Issuer's registered office is at P.O. Box 1093, Queensgate House, Grand Cayman, KY1-1102, Cayman Islands, telephone number +1 (345) 945-7099 and the business address of each of the directors of the Issuer is at the offices of MaplesFS Limited. The directors of the Issuer are Cleveland Stewart and Wendy Ebanks. The directors of the Issuer serve as directors of and provide services to other special purpose entities that issue collateralized obligations and perform other duties for the Administrator. The Issuer does not publish any financial statements.

Subject to the contracting restrictions imposed upon the Issuer by the Indenture, the directors of the Issuer have the power to borrow on behalf of the Issuer. A director of the Issuer is not required to own any shares in the Issuer in order to qualify as a director.

A director of the Issuer (or his alternate director in his absence) is at liberty to vote in respect of any contract or transaction in which he is interested; *provided* that the nature of the interest of any director or alternate director in any such contract or transaction is disclosed by him or the alternate director appointed by him at or prior to its consideration and any vote on it.

As of the Closing Date, the authorized share capital of the Issuer will consist of 50,000 ordinary voting shares, U.S. $1.00 par value per share (the "**Shares**") of which, 250 have been issued and will be on the Closing Date, held by MaplesFS Limited (in such capacity, the "**Share Trustee**"), under the terms of a declaration of trust (the "**Declaration of Trust**") in favor of charitable purposes. The Issuer will not have any material assets other than the Collateral Obligations and certain other eligible assets. The Collateral Obligations and such other eligible assets will be pledged to the Trustee as security for the Issuer's obligations under the Secured Notes and the Indenture.

**Principal Activities of the Issuer**

The Issuer has no prior operating history or prior business and will not have any substantial assets or liabilities other than in connection with the Notes.

So long as any of the Notes remain outstanding, the Issuer shall not, without the consent of the Trustee, incur any other indebtedness for borrowed moneys or engage in any business (other than acquiring and holding assets in connection with the Notes), issuing the Notes and entering into related agreements and transactions as provided for in the transaction documents, or, *inter alia*, declare any dividends, have any subsidiaries, other than the Co-Issuer, or employees, purchase, own, lease, or otherwise acquire any real property (including office premises or like facilities), consolidate or merge with any other person or convey or transfer its properties or assets substantially as an entity to any person (otherwise than as contemplated in the transaction documents) or issue any shares.

The Issuer has, and will have, no assets other than the sum of US$250 representing the issued and paid-up share capital, such fees (as agreed) payable to it in connection with the issue of the Notes and the acquisition of assets in connection with the Notes, the bank account into which such paid-up share capital and fees are deposited, any interest earned thereon and the assets on which the Notes are secured. Except for fees generated in connection with the issue of the Notes any related profits and proceeds of any deposits and investments made from such fees or from amounts representing the Issuer's issued and paid-up share capital, the Issuer does not expect to accumulate any surpluses.

The Notes is the obligations of the Co-Issuers alone and not the Share Trustee.

**Restrictions on the Offer of the Notes**

No invitation whether directly or indirectly may be made to the public in the Cayman Islands to subscribe for the Notes unless the Issuer is listed on the Cayman Islands Stock Exchange.

**The Co-Issuer**

ACIS CLO 2015-6 LLC was formed under the Limited Liability Company Act of the State of Delaware for the sole purpose of co-issuing the Co-Issued Notes.  The Co-Issuer was formed on February 25, 2015 in the State of Delaware with registered number 5699532 and has an indefinite existence.  The Co-Issuer's registered office is at 850 Library Avenue, Newark, Delaware (New Castle County).  The telephone number of the Co-Issuer at such address is (302) 738-6680.  The Co-Issuer has no substantial assets and will not pledge any assets to secure the Notes.

The sole manager and officer of the Co-Issuer is Donald J. Puglisi.  The principal outside function of Donald J. Puglisi consists of being a finance professor emeritus at the University of Delaware and serving as a corporate director for a variety of entities.  Donald J. Puglisi may be contacted at the office of the Co-Issuer.  The Co-Issuer has no prior operating history.  Unless otherwise required pursuant to the Indenture, the Co-Issuer will not publish any financial statements.

The sole member of the Co-Issuer is the Issuer.  The membership interest of the Issuer is, or will be on the Closing Date, held by the Share Trustee, under the terms of the Declaration of Trust.  The Co-Issuer will be capitalized to the extent of its membership interests of U.S.$10.

The Offered Securities are not obligations of the Trustee, the Collateral Administrator, the Portfolio Manager, the Initial Purchaser or any of their respective affiliates, the Administrator, the Share Trustee or any directors or officers of the Co-Issuers.

**Capitalization of the Issuer**

The Issuer's initial proposed capitalization and indebtedness as of the Closing Date after giving effect to the issuance of the Offered Securities and the Shares (before deducting expenses of the offering) is set forth below:

|  | Amount |
|---|---|
| Class A-1 Notes | $300,000,000 |
| Class A-2 Notes | $47,000,000 |
| Class B-1 Notes | $75,000,000 |
| Class B-2 Notes | $14,000,000 |
| Class C Notes | $31,500,000 |
| Class D Notes | $25,000,000 |
| Class E Notes | $26,000,000 |
| Subordinated Notes | $59,850,000 |
| Total Debt | $578,350,000 |
| Shares | $250 |
| Retained Earnings | $0 |
| Total Equity | $250 |
| **Total Capitalization** | $578,350,250 |

_____

The Co-Issuer has no other liabilities other than the Co-Issued Notes.

**Business of the Co-Issuers**

The Issuer's Memorandum of Association describes the objects of the Issuer, which is unrestricted and therefore includes the business to be carried out by the Issuer in connection with the Offered Securities.  The Co-Issuer's certificate of incorporation describes the objects of the Co-Issuer, which include the business to be carried out by the Co-Issuer in connection with the Notes.  The Co-Issuers have not issued securities, other than ordinary or common

shares, prior to the date of this Offering Circular and have not listed any securities on any exchange.  The Co-Issuers will not undertake any business other than the issuance of the Co-Issued Notes and, in the case of the Issuer, the issuance of the Class E Notes and the Subordinated Notes and the management of the Assets and other related transactions.  Neither of the Co-Issuers will have any subsidiaries (except, in the case of the Issuer, the Co-Issuer and any subsidiary that (x) meets the then-current general criteria of the Rating Agency for bankruptcy remote entities and (y) is formed for the sole purpose of holding any asset that could cause the Issuer to be engaged or deemed to be engaged in a trade or business in the United States as a result of a workout or prior to (or, to the extent necessary, following) the receipt or acquisition of a Defaulted Obligation in connection with a workout of a Collateral Obligation) (each, an "**ETB Subsidiary**").  In general, subject to the credit quality and diversity of the Collateral Obligations and general market conditions and the need (in the judgment of the Portfolio Manager) to satisfy the Coverage Tests, the Concentration Limitations and the Collateral Quality Test or to obtain funds for the redemption or payment of the Offered Securities, the Issuer will own the Assets and will receive payments of interest and principal on the Collateral Obligations and Eligible Investments as the principal source of its income. The ability to purchase additional Collateral Obligations and sell Collateral Obligations prior to maturity is subject to significant restrictions under the Indenture.  See "*Security for the Secured Notes—Sales of Collateral Obligations; Additional Collateral Obligations and Investment Criteria*."

**The Collateral Administrator**

In addition, pursuant to the terms of the Collateral Administration Agreement, the Issuer will retain U.S. Bank National Association, in such capacity as collateral administrator (the "**Collateral Administrator**") to, among other things, perform certain administrative duties of the Issuer, or of the Portfolio Manager on behalf of the Issuer, with respect to the Assets, including the compilation of certain reports and the performance of certain calculations with respect to the Collateral Quality Test, the Interest Reinvestment Test and the Coverage Tests, subject, in each case, to the Collateral Administrator's receipt from the Portfolio Manager of information with respect to the Assets that is not contained in the collateral database maintained under the Collateral Administration Agreement.  The compensation paid by the Issuer for such services will be in addition to the fees paid to the Portfolio Manager and will be treated as an expense of the Issuer and will be subject to the Priority of Payments.

**The Administrator**

MaplesFS Limited will also act as the administrator of the Issuer (in such capacity, the "**Administrator**").  The office of the Administrator will serve as the general business office of the Issuer.  Through the office, and pursuant to the terms of an Administration Agreement to be entered into between the Issuer and the Administrator (the "**Administration Agreement**"), the Administrator will perform in the Cayman Islands or such other jurisdiction as may be agreed by the parties from time to time various management functions on behalf of the Issuer and the provision of certain clerical, administrative and other corporate services until termination of the Administration Agreement.  The Issuer and the Administrator have also entered into a registered office agreement, dated February 11, 2015 (the "**Registered Office Agreement**") for the provision of registered office facilities to the Issuer.  In consideration of the foregoing, the Administrator will receive various fees payable by the Issuer at rates agreed upon from time to time, *plus* expenses.

The Administrator will be subject to the overview of the Issuer's board of directors.  The Administration Agreement and the Registered Office Agreement may be terminated by either the Issuer or the Administrator giving the other three months written notice in which case a replacement Administrator will be appointed.

The Administrator's principal office is at PO Box 1093, Boundary Hall, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands.

# CERTAIN TAX CONSIDERATIONS

The following is a summary of certain material U.S. federal income tax consequences of the acquisition, ownership and disposition of Notes by a U.S. Holder or Non-U.S. Holder (each as defined below). This summary deals only with purchasers that acquire the Notes in the initial offering, that purchase the Secured Notes at their "issue price" (as defined below), and will hold the Notes as capital assets within the meaning of Section 1221 of the Code. The discussion does not cover all aspects of U.S. federal income taxation that may be relevant to, or the actual tax effect that any of the matters described herein will have on, the acquisition, ownership or disposition of Notes by particular investors, and does not address state, local, foreign or other tax laws. This summary also does not discuss all of the tax considerations that may be relevant to certain types of investors subject to special treatment under the U.S. federal income tax laws (such as financial institutions, insurance companies, investors liable for the alternative minimum tax, individual retirement accounts and other tax-deferred accounts, REITs, regulated investment companies, tax-exempt organizations, dealers in securities or currencies, investors that will hold the Notes as part of straddles, hedging transactions or conversion transactions for U.S. federal income tax purposes or investors whose functional currency is not the U.S. Dollar). This summary is based on the Code, its legislative history, existing and proposed regulations thereunder, and published rulings and court decisions, all as of the date hereof and all subject to change at any time, possibly with retroactive effect.

For purposes of this summary, the term "**U.S. Holder**" means a beneficial owner of Notes that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation created or organized under the laws of the United States or any State thereof (including the District of Columbia), (iii) an estate the income of which is subject to U.S. federal income tax regardless of its source or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust, or the trust has made a valid election to be treated as a domestic trust for U.S. federal income tax purposes. A "**Non-U.S. Holder**" is any beneficial owner of a Note that is not a U.S. Holder or person treated as a partnership for U.S. federal income tax purposes.

The U.S. federal income tax treatment of a partner in a partnership that holds Notes will depend on the status of the partner and the activities of the partnership. Prospective purchasers that are partnerships should consult their tax advisers concerning the U.S. federal income tax consequences to their partners of the acquisition, ownership and disposition of Notes by the partnership.

**THE SUMMARY OF U.S. FEDERAL INCOME TAX CONSEQUENCES SET OUT BELOW IS FOR GENERAL INFORMATIONAL PURPOSES ONLY. THIS SUMMARY AND THE OPINIONS DESCRIBED HEREIN WERE NOT WRITTEN TO BE USED TO AVOID PENALTIES THAT MAY BE IMPOSED UNDER THE CODE. PROSPECTIVE PURCHASERS SHOULD CONSULT THEIR TAX ADVISERS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF OWNING THE NOTES, INCLUDING THE APPLICABILITY AND EFFECT OF STATE, LOCAL, FOREIGN AND OTHER TAX LAWS AND POSSIBLE CHANGES IN TAX LAW.**

### U.S. Federal Income Tax Treatment of the Issuer

For U.S. federal income tax purposes, the Issuer, and not the Co-Issuer, will be treated as the issuer of the Notes. The Issuer's profits will not be subject to U.S. federal income tax on a net income basis (including the branch profits tax), unless the Issuer is treated as engaged in the conduct of a trade or business within the United States. Upon the issuance of the Notes, Dechert LLP, special U.S. tax counsel to the Issuer, will deliver an opinion generally to the effect that, under current law, although no activity closely comparable to that contemplated by the Issuer has been the subject of any Treasury regulation, revenue ruling or judicial decision, the contemplated activities of the Issuer will not cause the Issuer to be engaged in a trade or business within the United States for U.S. federal income tax purposes and, accordingly, the Issuer will not be subject to U.S. federal income tax on a net income basis. The opinion of Dechert LLP will assume compliance with the Indenture (and certain other documents) and be based upon certain assumptions, covenants and representations regarding restrictions on the future conduct of the activities of the Issuer and the Portfolio Manager, including the Trading Restrictions. The Issuer intends to conduct its business in accordance with the assumptions, representations and agreements upon which the opinion of Dechert LLP is based, and the Portfolio Manager has generally undertaken to comply with the Trading Restrictions.

In complying with such assumptions, representations, and agreements, however, the Issuer (or the Portfolio Manager acting on its behalf) is permitted to take certain actions that would otherwise be prohibited under the Trading Restrictions if it obtains written advice from Dechert LLP or an opinion of other tax counsel of nationally recognized standing in the United States experienced in such matters that the departure will not cause the Issuer to be treated as engaged in a trade or business within the United States for U.S. federal income tax purposes. The opinion of Dechert LLP will not address any such actions.  In addition, the relevant law is subject to change and modification after the date that the foregoing opinion is rendered but the Portfolio Manager is not obligated to monitor (and conform the Issuer's activities in order to comply with changes in law.  Accordingly, any such changes could adversely affect whether the Issuer is treated as engaged in a trade or business within the United States. Further, the Issuer may, for certain specified purposes, enter into supplemental indentures, some of which may be entered into without the consent of any holders, and no assurance can be given that such supplemental indentures will not affect whether the Issuer is treated as engaged in a trade or business within the United States. The opinion of Dechert LLP will be based on the documents as of the Closing Date, and accordingly, will not address any potential U.S. federal income tax consequences of any supplemental indenture. The opinion of Dechert LLP and any such other advice or opinions are not binding on the IRS or the courts, and no ruling will be sought from the IRS regarding this, or any other, aspect of the U.S. federal income tax treatment of the Issuer. Accordingly, in the absence of authority on point, the U.S. federal income tax treatment of the Issuer is not entirely free from doubt, and there can be no assurance that positions contrary to those stated in the opinion of Dechert LLP or any such other advice or opinions may not be asserted successfully by the IRS.

If the Issuer were determined to be engaged in a trade or business within the United States for U.S. federal income tax purposes, its income (computed possibly without any allowance for deductions) would be subject to U.S. federal income tax at the usual corporate rate, and possibly to a branch profits tax of 30% as well. The imposition of such taxes would materially affect the Issuer's financial ability to make payments on the Notes and might also result in a Tax Event. In addition, certain amounts paid on the Notes could be treated as from U.S. sources and become subject to U.S. withholding tax when paid to a Non-U.S. Holder. If withholding or deduction of any taxes from payments is required by law in any jurisdiction, the Issuer will be under no obligation to make any additional payments to any person in respect of such withholding or deduction. The remainder of this summary assumes that the Issuer will not be treated as engaged in a trade or business within the United States.

To reduce the risk that the Issuer will be engaged in a trade or business within the United States for U.S. federal income tax purposes, in certain circumstances set forth in the Indenture, certain assets that could cause the Issuer to be treated as engaged in a trade or business within the United States may be owned by one or more ETB Subsidiaries that will be treated as either U.S. or foreign corporations for U.S. federal income tax purposes.  Any foreign Tax Subsidiary may be treated as engaged in a trade or business within the United States for U.S. federal income tax purposes and its income (computed possibly without any allowance for deductions) could be subject to U.S. federal income tax at the usual corporate rate, and, in the case of a foreign ETB Subsidiary possibly to a branch profits tax of 30% as well. U.S. Holders of Subordinated Notes (or any other Class of Notes treated as equity for U.S. federal income tax purposes) will not be permitted to use losses recognized by the ETB Subsidiary to offset gains recognized by the Issuer and may be subject to the adverse PFIC or CFC rules with respect to the ETB Subsidiary described above under "—U.S. Holders of Subordinated Notes."

**U.S. Federal Income Tax Treatment of the Notes**

The Issuer has agreed and, by its acceptance of a Secured Note, each Holder will be deemed to have agreed, to treat the Secured Notes as indebtedness of the Issuer for U.S. federal income tax purposes, except as otherwise required by applicable law; provided, that this shall not limit a Holder from making a protective qualified fund election (described below under "—*U.S. Holders of the Subordinated Notes—Passive Foreign Investment Company*") or filing certain U.S. tax information returns required of only certain equity owners with respect to various reporting requirements under the Code (as described below under "—*Reporting Requirements*"). Upon the issuance of the Notes, Dechert LLP will deliver an opinion generally to the effect that, under current law and to the extent issued to persons otherwise unrelated to the Issuer, although there is no specific authority with respect to the characterization for U.S. federal income tax purposes of securities having the same terms as the Secured Notes, the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes will, and the Class E Notes should, be characterized as indebtedness for U.S. federal income tax purposes.  The determination of whether a Secured Note will be characterized as indebtedness for U.S. federal income tax purposes is based on the facts and circumstances

existing at the time the Secured Note is issued. The opinion of Dechert LLP will assume compliance with the Indenture (and certain other documents) and be based upon certain factual assumptions, covenants and representations. Prospective investors should be aware that opinions of counsel are not binding on the IRS, and there can be no assurance that the IRS will not seek to characterize any particular Class of Secured Notes as something other than indebtedness. In addition, the Issuer may, for certain specified purposes, enter into supplemental indentures, some of which may be entered into without the consent of any Holders and without requiring the Issuer to consider specifically if such supplemental indentures will affect the characterization of the Notes as indebtedness or equity for U.S. federal income tax purposes. The opinion of Dechert LLP will be based on the documents as of the Closing Date, and accordingly, will not address any potential U.S. federal income tax consequences of any supplemental indenture. Except as discussed below under "*U.S. Holders of the Secured Notes—Alternative Characterization of the Class E Notes*," the balance of this discussion assumes that the Secured Notes will be characterized as indebtedness of the Issuer for U.S. federal income tax purposes.

The Issuer intends to treat the Subordinated Notes as equity in the Issuer for U.S. federal income tax purposes, and each Holder by its purchase of a Subordinated Note agrees to treat the Subordinated Notes consistent with this treatment. If the Subordinated Notes were treated as indebtedness for U.S. federal income tax purposes, the timing and character of income, gain or loss recognized with respect to an investment in the Subordinated Notes would be materially different from that summarized below. The balance of this discussion assumes that the Subordinated Notes will be characterized as equity of the Issuer for U.S. federal income tax purposes.

**U.S. Holders of the Secured Notes**

*Payments of Interest*

Subject to the discussion on original issue discount ("**OID**") below, interest on a Secured Note will be taxable to a U.S. Holder as ordinary income at the time it is received or accrued, depending on the U.S. Holder's method of accounting for tax purposes. Stated interest on the Secured Notes and OID, if any, accrued with respect to the Secured Notes (as described below under "*—Original Issue Discount*") constitutes income from sources outside the United States.

*Original Issue Discount*

*General*. A U.S. Holder of a Secured Note issued with OID must include the OID in income on a constant yield-to-maturity basis whether or not it receives cash payments. The Class A Notes or the Class B Notes will have been issued with OID if their stated redemption price exceeds their issue price by an amount that is 0.25% or more of their stated redemption price multiplied by their weighted average maturity. In this case, the amount of a Note's OID is the excess of the Note's stated redemption price at maturity over its issue price. Generally, the issue price of a Secured Note will be the first price at which a substantial amount of Secured Notes included in the issue of which the Secured Note is a part are sold to persons other than bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers. The stated redemption price at maturity of a Secured Note is the total of all payments provided by the Secured Note that are not payments of "qualified stated interest." Subject to certain other requirements, a qualified stated interest payment includes any one of a series of stated interest payments on a Secured Note that are unconditionally payable at least annually. In general, a Class A Note or a Class B Note that is a Floating Rate Note will be converted into an "equivalent" fixed rate debt instrument for purposes of determining the amount of OID on the Note. Because stated interest payments on the Deferrable Notes may be deferred in certain events, they might not be treated as unconditionally payable at least annually, and therefore the Issuer does not intend to treat any stated interest on the Deferrable Notes as qualified stated interest.

U.S. Holders of Secured Notes must include OID in income calculated on a constant-yield method before the receipt of cash attributable to the income. The amount of OID includible in income by a U.S. Holder of a Secured Note is the sum of the daily portions of OID with respect to the Secured Note for each day during the taxable year or portion of the taxable year on which the U.S. Holder holds the Secured Note ("**accrued OID**"). The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID allocable to that accrual period. Accrual periods with respect to a Secured Note may be of any length selected by the U.S. Holder and may vary in length over the term of the Secured Note as long as (i) no accrual period is longer than one year; and (ii) each scheduled payment of interest or principal on the Secured Note occurs on either the final or first day of an accrual period. Assuming the Secured Notes are properly treated as debt for U.S. federal income tax purposes, the

Secured Notes are debt instruments described in Section 1272(a)(6) of the Code (debt instruments that may be accelerated by reason of the prepayment of other debt obligations securing such debt instruments). Special tax rules principally relating to the amount of OID allocable to an accrual period, market discount, and bond premium apply to debt instruments described in Section 1272(a)(6) of the Code. Accordingly, accruals of OID on the Secured Notes will be calculated using a prepayment assumption. Adjustments will be made to the amount of discount accruing in each taxable year in which the actual prepayment rate differs from the prepayment assumption Prospective investors should consult with their own tax advisors regarding the effects of Section 1272(a)(6) of the Code.

*Election to Treat All Interest as Original Issue Discount*. A U.S. Holder may elect to include in gross income all interest that accrues on a Secured Note using the constant-yield method described above under "—General", with certain modifications. For purposes of this election, interest includes interest, OID, market discount and de minimis market discount, as adjusted by any amortizable bond premium or acquisition premium. This election generally applies only to the Secured Note with respect to which it is made and may not be revoked without the consent of the IRS. U.S. Holders should consult their tax advisers concerning the propriety and consequences of this election.

*Make-Whole Payment on the Make-Whole Classes*

Upon certain redemption events, the Issuer may be required to pay additional amounts in excess of the accrued interest and stated principal amount of the Notes of the Make-Whole Classes. The Issuer believes (and this summary assumes) that the Notes of the Make-Whole Classes will not be treated as contingent payment debt instruments. The Issuer's determination that the Notes of the Make-Whole Classes are not contingent payment debt instruments is binding on U.S. Holders unless they disclose their contrary positions to the IRS in the manner required by applicable Treasury regulations. The determination that the Notes of the Make-Whole Classes are not contingent payment debt instruments is not binding on the IRS. If the IRS were successfully to challenge this determination and the Notes of a Make-Whole Class were treated as contingent payment debt instruments, U.S. Holders would be required, among other things, to accrue interest income at a rate higher than the stated interest rate on the Notes of such Make-Whole Class and to treat as ordinary income, rather than capital gain, any gain recognized on a sale, exchange or redemption of the Notes of such Make-Whole Class. U.S. Holders should consult their own tax advisors regarding the potential application to the Make-Whole Classes of the contingent payment debt instrument rules and the consequences thereof.

*Sale, Exchange or other Disposition of the Secured Notes*

In general, a U.S. Holder of a Secured Note will have a tax basis in that Secured Note equal to the cost of that Secured Note, increased by any OID and the amount, if any, of income attributable to de minimis OID included in the U.S. Holder's income with respect to the Secured Note and reduced by the amount of any payments that are not qualified stated interest payments. Upon a sale, exchange or other disposition (including a deemed exchange) of a Secured Note, a U.S. Holder will generally recognize gain or loss from U.S. sources equal to the difference between the amount realized on the sale, exchange or other disposition (less any accrued and unpaid interest, which would be taxable as such) and the U.S. Holder's tax basis in such Secured Note. Gain or loss recognized on the sale, exchange or disposition of a Secured Note will be capital gain or loss and will be long-term capital gain or loss if the U.S. Holder held the Secured Note for more than one year at the time of disposition. In certain circumstances, U.S. Holders that are individuals may be entitled to preferential treatment for net long-term capital gains; however, the ability of U.S. Holders to offset capital losses against ordinary income is limited.

*Alternative Characterization of the Class E Notes*

Holders should recognize that there is some uncertainty regarding the appropriate classification of the Class E Notes. It is possible that the IRS may contend that the Class E Notes should be characterized as equity interests in the Issuer. Such a recharacterization might result in material adverse U.S. federal income tax consequences to beneficial owners of those Notes. If the Class E Notes are characterized as equity for U.S. federal income tax purposes, the U.S. federal income tax consequences to such holders holding such recharacterized Notes would be as described under "—*U.S. Holders of the Subordinated Notes*," except that holders may be required to accrue any discount on such recharacterized Notes under principles similar to those for original issue discount, as described above. To avoid the application of the PFIC rules described below, each U.S. Holder of a Class E Note should consider making a qualified electing fund election provided in Section 1295 of the Code on a "protective" basis (although such a protective election may not be respected by the IRS because current regulations do not specifically

113

authorize such an election). See "—*U.S. Holders of the Subordinated Notes—Passive Foreign Investment Company.*"

**U.S. Holders of the Subordinated Notes**

*General*. Subject to the anti-deferral rules discussed below, any payment on the Subordinated Notes that is distributed to a U.S. Holder will be taxable to that U.S. Holder as a dividend to the extent of the current and accumulated earnings and profits (determined under U.S. federal income tax principles) of the Issuer. Such payments will not be eligible for the dividends received deduction generally allowable to corporations and will not be eligible for the preferential income tax rate on qualified dividend income. Distributions in excess of earnings and profits will be non-taxable to the extent of, and will be applied against and reduce, the U.S. Holder's adjusted tax basis in the Subordinated Notes. Distributions in excess of earnings and profits and adjusted tax basis will be taxable as gain from the sale or exchange of property, as described below.

*Passive Foreign Investment Company*.  The Issuer will be treated as a "passive foreign investment company" ("**PFIC**") for U.S. federal income tax purposes. In general, to avoid certain adverse tax rules described below that apply to deferred income from a PFIC, a U.S. Holder of Subordinated Notes may desire to make an election to treat the Issuer as a "qualified electing fund" ("**QEF**") with respect to such U.S. Holder. Generally, a QEF election should be made on or before the due date for filing a U.S. Holder's federal income tax return for the first taxable year in which it held Subordinated Notes. If a U.S. Holder makes a timely QEF election with respect to the Issuer, the electing U.S. Holder will be required in each taxable year to include in gross income (i) as ordinary income, such U.S. Holder's pro rata share of the Issuer's ordinary earnings and (ii) as long term capital gain, such U.S. Holder's pro rata share of the Issuer's net capital gain, whether or not distributed. A U.S. Holder's pro rata share of the Issuer's ordinary income and net capital gain is the amount which would have been distributed with respect to such U.S. Holder's Subordinated Notes if, on each day during the taxable year of the Issuer, the Issuer had distributed to each holder of Subordinated Notes a pro rata share of that day's ratable share of the Issuer's ordinary earnings and net capital gain for such year. In addition, any net losses of the Issuer will not be currently deductible by such U.S. Holder. Rather, any tax benefit from such losses will be available only when a U.S. Holder sells or disposes of its Subordinated Notes. In certain cases in which a QEF does not distribute all of its earnings in a taxable year, its U.S. Holders may also be permitted to elect to defer payment of some or all of the taxes on the QEF's undistributed income but will then be subject to an interest charge on the deferred amount.

Prospective purchasers of the Subordinated Notes should be aware that the Collateral Obligations may be purchased by the Issuer with substantial OID. In addition, under certain circumstances, Interest Proceeds may be used to pay principal of the Secured Notes or to purchase additional Collateral Obligations. As a result, the Issuer may have significant ordinary earnings from such instruments, but the receipt of cash attributable to such earnings may be deferred, perhaps for a substantial period of time. Furthermore, if the Issuer discharges its debt at a price less than its adjusted issue price (which may include a deemed discharge arising from a significant modification to the terms of the debt), it could recognize cancellation of debt income equal to that difference, although such income may be deferred if the Issuer is insolvent at the time of the discharge. Thus, absent an election to defer the payment of taxes, U.S. Holders that make a QEF election may owe tax on a significant amount of "phantom" income. If applicable, the rules pertaining to a "controlled foreign corporation," discussed below, generally override those pertaining to a PFIC with respect to which a QEF election is in effect.

The Issuer will provide to each Holder of Subordinated Notes (at such Holder's expense) requesting such information (i) all information that a U.S. Holder of such Subordinated Notes making a QEF election is required to obtain for U.S. federal income tax purposes (e.g., the U.S. Holder's pro rata share of ordinary income and net capital gain), and (ii) a "PFIC Annual Information Statement" as described in Treasury Regulation section 1.1295–1 (or in any successor IRS release or Treasury regulation), including all representations and statements required by such statement, and will take any other steps it reasonably can to facilitate such election. The Issuer will also provide, upon request, such information to a U.S. Holder of Class E Notes (at such Holder's expense) that has made a protective QEF election, as described above.

If a U.S. Holder of Subordinated Notes does not make a timely QEF election for the year in which it acquired its Subordinated Notes and the PFIC rules are otherwise applicable, it will be subject to a special tax at ordinary income tax rates on "excess distributions". An excess distribution is the amount by which distributions for a taxable

year exceed 125% of the average distribution in respect of the Subordinated Notes during the three preceding taxable years (or, if shorter, the U.S. Holder's holding period for the Subordinated Notes). Under the PFIC rules, (a) the excess distribution will be allocated rateably over the U.S. Holder's holding period, (b) the amount allocated to the current taxable year will be taxed as ordinary income, and (c) the amount allocated to each of the other taxable years will be subject to tax at the highest rate of tax in effect for the applicable class of taxpayer for that year and an interest charge for the deemed deferral benefit will be imposed with respect to the resulting tax attributable to each such other taxable year.

Where a QEF election is not timely made by a U.S. Holder of Subordinated Notes for the year in which it acquired its Subordinated Notes, but is made for a later year, the excess distribution rules can be avoided by making an election to recognize gain from a deemed sale of the Subordinated Notes at the time when the QEF election becomes effective. U.S. Holders should consult with their tax counsel regarding the U.S. federal income tax consequences of investing in a PFIC and the desirability of making the QEF election.

*Controlled Foreign Corporation*. Depending on the degree of ownership of the Subordinated Notes by U.S. Shareholders (as defined below), the Issuer may be considered a controlled foreign corporation ("**CFC**"). In general, a foreign corporation will be a CFC if more than 50% of the shares of the corporation, measured by combined voting power or value, are held, directly or indirectly, by U.S. Shareholders. A "**U.S. Shareholder**" for this purpose is any U.S. person who owns or is treated as owning (after applying certain attribution rules) 10% or more of the combined voting power of all classes of shares of a corporation. It is likely that the IRS would assert that the Subordinated Notes are voting securities and that U.S. Holders owning 10% or more of the Subordinated Notes are U.S. Shareholders. If this argument were successful and more than 50% of the Subordinated Notes were held by such U.S. Shareholders, the Issuer would be a CFC.

If the Issuer were a CFC for at least 30 consecutive days during the taxable year, subject to certain exceptions, a U.S. Shareholder of the Issuer at the end of a taxable year of the Issuer would be required to recognize ordinary income in an amount equal to that person's pro rata share of the "subpart F income" of the Issuer for the year, whether or not such income is distributed currently to the U.S. Shareholder. Among other items, and subject to certain exceptions, "subpart F income" includes interest, gains from the sale of securities and income from certain notional principal contracts (e.g., swaps and caps). The Issuer expects that, if the Issuer were a CFC, substantially all of its income would be subpart F income. If more than 70% of the Issuer's income is subpart F income, then 100% of its income will be so treated. The Issuer's income may include non-cash items, as described above under "—*Passive Foreign Investment Company*."

If the Issuer were a CFC, a U.S. Shareholder of the Issuer would be taxable on the subpart F income of the Issuer under the CFC regime and not under the PFIC rules previously described. As a result, to the extent subpart F income of the Issuer includes net capital gains, such gains would be treated as ordinary income of the U.S. Shareholder, notwithstanding the fact that generally the character of such gains otherwise would be preserved under the PFIC rules if a QEF election were made. Also, the PFIC rule permitting the deferral of tax on undistributed earnings would not apply.

A U.S. Holder of Subordinated Notes that is a U.S. Shareholder of the Issuer subject to the CFC rules for only a portion of the time in which it holds Subordinated Notes should consult its own tax advisers regarding the interaction of the PFIC and CFC rules.

*Distributions on Subordinated Notes*. The treatment of actual cash distributions on the Subordinated Notes, in very general terms, will vary depending on whether a U.S. Holder has made a timely QEF election as described above. See "—*Passive Foreign Investment Company*."  If a timely QEF election has been made, dividends (which are distributions up to the amount of current and accumulated earnings and profits of the Issuer) allocable to amounts previously taxed pursuant to the QEF election will not be taxable to U.S. Holders. Similarly, if the Issuer is a CFC of which the U.S. Holder is a U.S. Shareholder, dividends will be allocated first to amounts previously taxed pursuant to the CFC rules and to this extent will not be taxable to U.S. Holders. Dividends in excess of such previously taxed amounts will be taxable to U.S. Holders as ordinary income upon receipt. Except where a U.S. Holder has not made a timely QEF election and the U.S. Holder is not treated as a U.S. Shareholder in a CFC with respect to the Issuer, distributions in excess of any current and accumulated earnings and profits will be treated first as a nontaxable return of capital, to the extent of the U.S. Holder's tax basis in the Subordinated Notes, and then as

capital gain. The distributions on the Subordinated Notes do not qualify for the benefit of the reduced U.S. tax rate applicable to certain dividends received by individuals.

In the event that a U.S. Holder of Subordinated Notes does not make a timely QEF election, then except to the extent that distributions may be attributable to amounts previously taxed pursuant to the CFC rules, some or all of any distributions with respect to the Subordinated Notes may be considered excess distributions, taxable as previously described. See "—*Passive Foreign Investment Company*."

*Sale, Exchange or other Disposition of Subordinated Notes.* In general, a U.S. Holder of Subordinated Notes will recognize gain or loss (which will be capital gain or loss, except as discussed below) upon the sale or exchange of Subordinated Notes equal to the difference between the amount realized and such U.S. Holder's adjusted tax basis in the Subordinated Notes. The pledge of stock of a PFIC may in some circumstances be treated as a disposition of such stock. A U.S. Holder's tax basis in Subordinated Notes will generally equal the amount it paid for the Subordinated Notes, increased by amounts taxable to such U.S. Holder by virtue of a QEF election, or under the CFC rules, and decreased by actual distributions from the Issuer that are deemed to consist of such previously taxed amounts or represent a return of capital.

If a U.S. Holder does not make a timely QEF election as described above and if the U.S. Holder is not treated as a U.S. Shareholder in a CFC with respect to the Issuer, a U.S. Holder generally will not reduce its basis in its Subordinated Notes except to the extent that the Issuer makes a payment with respect to a Subordinated Note in excess of the Issuer's current and accumulated earnings and profits and that is not an "excess distribution" (as described above). In addition, any gain realized on the sale or exchange of Subordinated Notes by such U.S. Holder will be treated as an excess distribution and effectively taxed as ordinary income with an interest charge under the special tax rules described above. See "—*Passive Foreign Investment Company*."

If the Issuer were treated as a CFC and a U.S. Holder were treated as a U.S. Shareholder, then any gain realized by such U.S. Holder upon the disposition of Subordinated Notes, other than gain constituting an excess distribution under the PFIC rules, generally would be treated as ordinary income to the extent of the U.S. Holder's share of the current and accumulated earnings and profits of the Issuer. In this respect, earnings and profits would not include any amounts previously taxed pursuant to a QEF election or pursuant to the CFC rules.

*Reporting Requirements*

A U.S. Holder who purchases Subordinated Notes may be required to file Form 926 (or similar form) with the IRS. A U.S. Holder who fails to file any such required form could be required to pay a penalty equal to 10% of the gross amount paid for the Subordinated Notes (subject to a maximum penalty of $100,000, except in cases of intentional disregard).

In addition, a U.S. Holder that directly or indirectly owns at least 10% of the voting power or value of the Issuer's equity may need to comply with certain additional reporting requirements. In general, a U.S. Holder that is deemed to own the applicable percentage of the voting power or value of the Issuer's equity will be required to file a Form 5471 with the IRS and to supply certain information to the IRS, including with respect to the activities and assets of the Issuer and other holders of the Subordinated Notes. If a U.S. holder fails to comply with the reporting requirements, the U.S. Holder may be subject to a penalty, depending on the circumstances, equal to $10,000 for each failure to comply, subject to a maximum of $60,000.

Generally, a U.S. Holder of Subordinated Notes generally will be required to file an annual report with respect to each PFIC in which it owns an interest directly or, in certain cases, indirectly. The Issuer will use reasonable efforts to provide each holder of Subordinated Notes with the information necessary to comply with the holder's reporting obligations with respect to each such PFIC. U.S. Holders are urged to consult their own tax advisers regarding the PFIC reporting requirements.

Any person that is required to file a U.S. federal income tax return or U.S. federal information return and participates in a "reportable transaction" in a taxable year is required to disclose certain information on IRS Form 8886 (or its successor form) and to retain certain documents related to the transaction. Various penalties and adverse consequences can result from a failure to file. A person that is a U.S. Shareholder may be considered to participate

in any reportable transactions entered into by the Issuer. Although none are anticipated, the Issuer could participate in reportable transactions. If the Issuer participates in a reportable transaction, it will exercise reasonable efforts to make such information available.  In addition, due to the Issuer's status as a PFIC, U.S. Holders of Subordinated Notes may be required to file an IRS Form 8886 (or its successor form) if the U.S. Holder claims a loss deduction that exceeds a certain threshold.

Reporting requirements apply to the holding of certain foreign financial assets, including debt and equity of foreign entities, if the aggregate value of all of these assets exceeds $50,000. The Notes are expected to constitute foreign financial assets subject to these requirements unless the Notes are regularly traded on an established securities market and held in an account at a financial institution (in which case, the account may be reportable if maintained by a foreign financial institution). U.S. Holders should consult their tax advisors regarding the application of this legislation.

Certain U.S. Holders of Subordinated Notes may be required to report certain information on Financial Crimes Enforcement Network (FinCEN) Form 114 for any calendar year in which they hold such securities. Purchasers of Subordinated Notes are urged to consult their own tax advisers regarding their applicable reporting requirements.

**Medicare Consideration**

Distributions and gain on the Notes received by certain individuals, estates and trusts generally will be includible in "net investment income" for purposes of the Medicare contribution tax. Provided that the Issuer is not engaged in a trade or business of trading in securities or commodities, QEF or subpart F income inclusions in respect of the Subordinated Notes generally will not be includible in "net investment income" subject to the Medicare contribution tax until the time that a distribution is made on Subordinated Notes. Under the Treasury regulations, however, a U.S. Holder may elect to compute investment income from an interest in a QEF or CFC for purposes of the Medicare contribution tax in the same manner as inclusions, distributions and gain or loss are determined for ordinary income tax purposes. Under these regulations, once such an election is made, it will apply to all Subordinated Notes owned by the electing U.S. Holder, including Subordinated Notes that subsequently are acquired by the electing U.S. Holder, and cannot be revoked without the consent of the IRS. U.S. Holders making a QEF election or required to include income under the CFC inclusion rules should consult their own tax advisors with respect to the tax consequences to them of income inclusions and receipt of distributions with respect to the Subordinated Notes for purposes of the Medicare contribution tax.

**Tax-Exempt U.S. Holders of the Notes**

In general, a tax-exempt U.S. Holder of the Notes will not be subject to tax on unrelated business taxable income ("**UBTI**") with respect to the income from the Notes regardless of whether they are treated as equity or debt for U.S. federal income tax purposes, except to the extent that the Notes are considered debt-financed property (as defined in the Code) of that entity. A tax-exempt U.S. Holder that owns more than 50% of the Subordinated Notes and also owns other Classes of Notes should consider the possible application of the special UBTI rules for amounts received from controlled entities.

**Non-U.S. Holders**

Subject to the discussion of backup withholding below, interest (including OID, if any) and any proceeds of a sale or other disposition on the Notes are currently exempt from U.S. federal income tax, including withholding taxes, if paid to a Non-U.S. Holder unless the interest (or OID) is effectively connected with the conduct of a trade or business within the United States.

In addition, subject to the discussion of backup withholding below, a Non-U.S. Holder will not be subject to U.S. federal income tax on any gain realized on the sale or exchange of a Note; *provided* that such gain is not effectively connected with the conduct by the holder of a trade or business within the United States and, in the case of a Non-U.S. Holder who is an individual, the holder is not present in the United States for a total of 183 days or more during the taxable year in which the gain is realized and certain other conditions are met.

**Backup Withholding and Information Reporting**

Payments of principal, interest and accruals of OID on, and the proceeds of sale or other disposition of Notes by a U.S. paying agent or other U.S. intermediary will be reported to the IRS and to the U.S. Holder as may be required under applicable regulations. Backup withholding may apply to these payments, including payments of accrued OID, if the U.S. Holder fails to provide an accurate taxpayer identification number or certification of exempt status or fails to report all interest and dividends required to be shown on its U.S. federal income tax returns. Certain U.S. Holders are not subject to backup withholding. U.S. Holders that hold Certificated Class E Notes and Certificated Subordinated Notes should consult their tax advisors regarding applicable reporting requirements.

A Non-U.S. Holder that provides the applicable IRS Form W-8, together with all appropriate attachments, signed under penalties of perjury, identifying the Non-U.S. Holder and stating that the Non-U.S. Holder is not a United States person, will not be subject to backup withholding and generally will not be subject to IRS reporting requirements.

Any backup withholding from a payment will be allowed as a credit against a holder's U.S. federal income tax liability and may entitle such holder to a refund, provided the required information is furnished to the IRS.

**Cayman Islands Taxation**

The following is a discussion on certain Cayman Islands income tax consequences of an investment in the Notes. The discussion is a general summary of present law, which is subject to prospective and retroactive change. It is not intended as tax advice, does not consider any investor's particular circumstances, and does not consider tax consequences other than those arising under Cayman Islands law.

Under existing Cayman Islands laws:

(a)   Payments of interest and principal on the Notes will not be subject to taxation in the Cayman Islands and no withholding will be required on the payment of interest and principal to any holder of the Notes, nor will gains derived from the disposal of the Notes be subject to Cayman Islands income or corporation tax.  The Cayman Islands currently have no income, corporation or capital gains tax and no estate duty, inheritance tax or gift tax.

(b)   No stamp duty is payable in respect of the issue of the Notes.  An instrument of transfer in respect of a Note is stampable if executed in or brought into the Cayman Islands.

The Company has been incorporated under the laws of the Cayman Islands as an exempted company with limited liability and, as such, has applied for and obtained an undertaking from the Governor in Cabinet of the Cayman Islands in the following form:

"**The Tax Concessions Law**

**2011 Revision**

**Undertaking as to Tax Concessions**

In accordance with the provision of section 6 of The Tax Concessions Law (2011 Revision), the Governor in Cabinet undertakes with ACIS CLO 2015-6 Ltd. (the "**Company**").

1     That no law which is hereafter enacted in the Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Company or its operations; and

2     In addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable:

2.1  On or in respect of the shares, debentures or other obligations of the Company; or

2.2  by way of the withholding in whole or part, of any relevant payment as defined in Section 6(3) of the Tax Concessions Law (2011 Revision).

These concessions shall be for a period of twenty years from the 24th day of February 2015."

The Cayman Islands does not have an income tax treaty arrangement with the United States or any other country. However, the Cayman Islands has entered into a tax information exchange agreement with the United States.

# ERISA AND LEGAL INVESTMENT CONSIDERATIONS

The United States Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), imposes certain requirements on "employee benefit plans" (as defined in Section 3(3) of ERISA) which are subject to Part 4, Subtitle B of Title I of ERISA, including entities such as collective investment funds and separate accounts whose underlying assets are deemed to include the assets of such plans (collectively, "**ERISA Plans**") and on those persons who are fiduciaries with respect to ERISA Plans.  Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that an ERISA Plan's investments be made in accordance with ERISA and the documents governing the ERISA Plan.  The prudence of a particular investment must be determined by the responsible fiduciary of an ERISA Plan by taking into account the ERISA Plan's particular circumstances and all of the facts and circumstances of the investment including, but not limited to, the matters discussed above under "*Risk Factors*" and the fact that in the future there may be no market in which such fiduciary will be able to sell or otherwise dispose of the Offered Securities.

Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving the assets of an ERISA Plan (as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Code, such as individual retirement accounts (together with ERISA Plans, "**Plans**")) and certain persons (referred to as "parties in interest" or "disqualified persons") having certain relationships to such Plans, unless a statutory or administrative exemption is applicable to the transaction.  A party in interest or disqualified person who engages in a prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and Section 4975 of the Code.  In addition, the fiduciary of the Plan that is engaged in such a non-exempt prohibited transaction may be subject to penalties under ERISA and the Code.

The U.S. Department of Labor has promulgated regulations 29 C.F.R. Section 2510.3-101 (as effectively modified by Section 3(42) of ERISA, the "**Plan Asset Regulations**"), describing what constitutes the assets of a Plan with respect to the Plan's investment in an entity for purposes of certain provisions of ERISA and Section 4975 of the Code, including the fiduciary responsibility provisions of Title I of ERISA and Section 4975 of the Code.  Under the Plan Asset Regulations, if a Plan invests in an "equity interest" of an entity that is neither a "publicly offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets, unless it is established that the entity is an "operating company" or, as further discussed below, that equity participation in the entity by "benefit plan investors" is not "significant."

Prohibited transactions within the meaning of Section 406 of ERISA or Section 4975 of the Code may arise if Offered Securities are acquired with the assets of a Plan with respect to which the Co-Issuers, the Initial Purchaser, the Trustee, the Portfolio Manager, the Administrator, any seller of Collateral Obligations to the Issuer or any of their respective affiliates, is a party in interest or a disqualified person.  Certain exemptions from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code may be applicable, however, depending in part on the type of Plan fiduciary making the decision to acquire a Note and the circumstances under which such decision is made.  Included among these exemptions are Prohibited Transaction Class Exemption ("**PTCE**") 91-38 (relating to investments by bank collective investment funds), PTCE 84-14 (relating to transactions effected by a "qualified professional asset manager"), PTCE 90-1 (relating to investments by insurance company pooled separate accounts), PTCE 95-60 (relating to investments by insurance company general accounts), and PTCE 96-23 (relating to transactions effected by in-house asset managers), ("**Investor-Based Exemptions**").  There is also a statutory exemption that may be available under Section 408(b)(17) of ERISA and Section 4975(d)(20) of the Code to a party in interest that is a service provider to a Plan investing in the Offered Securities for adequate consideration, provided such service provider is not (i) the fiduciary with respect to the Plan's assets used to acquire the Offered Securities or an affiliate of such fiduciary or (ii) an affiliate of the employer sponsoring the Plan (the "**Service Provider Exemption**").  Adequate consideration is defined to include fair market value as determined in good faith by the Plan fiduciary pursuant to regulations to be promulgated by the Department of Labor.  There can be no assurance that any of these Investor-Based Exemptions or the Service Provider Exemption or any other

administrative or statutory exemption will be available with respect to any particular transaction involving the Offered Securities.

Governmental plans, certain church plans and non-U.S. plans, while not subject to the fiduciary responsibility provisions of ERISA or the provisions of Section 4975 of the Code, may nevertheless be subject to state, local, other federal laws or non-U.S. laws that are substantially similar to the foregoing provisions of ERISA and the Code. Fiduciaries of any such plans should consult with their counsel before acquiring any Offered Securities.

### The Secured Notes (Other than the Class E Notes)

The Plan Asset Regulations define an "equity interest" as any interest in an entity other than an instrument that is treated as indebtedness under applicable local law and which has no substantial equity features. As noted above in "*Certain Tax Considerations*," it is the opinion of tax counsel to the Issuer that the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes will be treated as indebtedness for U.S. federal income tax purposes. Although there is little guidance on the subject, at the time of their issuance, the Co-Issuers believe that the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes should be treated as indebtedness under applicable local law without substantial equity features for purposes of the Plan Asset Regulations. This determination is based in part upon (i) tax counsel's opinion that the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes will be treated as debt for U.S. federal income tax purposes and (ii) the traditional debt features of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes, including the reasonable expectation of purchasers of such Notes that they will be repaid when due, as well as the absence of conversion rights, warrants and other typical equity features. Based upon and subject to the foregoing and other considerations, and subject to the considerations described below, the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes may be purchased by a Plan. Nevertheless, without regard to whether the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes are considered equity interests, prohibited transactions within the meaning of Section 406 of ERISA or Section 4975 of the Code may arise if such Notes are acquired with the assets of a Plan with respect to which the Co-Issuers, the Initial Purchaser, the Trustee, the Portfolio Manager, the Administrator or in certain circumstances, any of their respective affiliates, is a party in interest or a disqualified person. The Investor-Based Exemptions or the Service Provider Exemption may be available to cover such prohibited transactions.

By its acquisition of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes, each purchaser and subsequent transferee thereof will be deemed to have represented and warranted, on each day from the date on which such purchaser or transferee, as applicable, acquires its interest in such Class A Note, Class B Note, Class C Note and Class D Note through and including the date on which such purchaser or transferee, as applicable, disposes of its interest in such Class A Note, Class B Note, Class C Note and Class D Note, either that (a) it is neither a Benefit Plan Investor nor a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code ("**Similar Law**") or (b) its acquisition, holding and disposition of a Class A Note, Class B Note, Class C Note or Class D Note will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of Similar Law).

### The Class E Notes and the Subordinated Notes

Equity participation in an issuer of notes by "benefit plan investors" is "significant" and will cause the assets of the issuer to be deemed the assets of an investing Plan (in the absence of another applicable Plan Asset Regulations exception) if 25 percent or more of the value of any class of equity interest in the issuer is held by "benefit plan investors" as calculated under the Plan Asset Regulations. The term "benefit plan investor" includes (a) an employee benefit plan (as defined in Section 3(3) of Title I of ERISA) that is subject to the fiduciary responsibility provisions of ERISA, (b) a plan as defined in Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code, (c) any entity whose underlying assets include "plan assets" (within the meaning of the Plan Asset Regulations for purposes of ERISA or Section 4975 of the Code) by reason of any such employee benefit plan's or plan's investment in the entity and (d) as such term is otherwise defined in any regulations promulgated by the U.S. Department of Labor or under Section 3(42) of ERISA (collectively "**Benefit Plan Investors**"). For purposes of making the 25% determination, the value of any equity interests held by a person (other than a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the Co-Issuers or any person who

provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person (a "**Controlling Person**"), the Trustee, the Portfolio Manager, the Initial Purchaser and their respective affiliates will be disregarded and not treated as being outstanding.  Under the Plan Asset Regulations, an "affiliate" of a person includes any person, directly or indirectly through one or more intermediaries, controlling, controlled by or under common control with the person, and "control" with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.  Although there is little guidance and there can be no assurance in this regard, the Issuer believes that the Class E Notes and the Subordinated Notes may likely be considered equity investments for the purposes of applying the fiduciary responsibility provisions of Title I of ERISA and Section 4975 of the Code.  Accordingly, purchasers and transferees of the Class E Notes and Subordinated Notes will make or be deemed to make representations and to agree to certain transfer restrictions regarding their status as Benefit Plan Investors and/or Controlling Persons, as described in more detail below.  The Subordinated Notes (i) held as principal by the Portfolio Manager, the Initial Purchaser, the Trustee, any of their respective affiliates, employees of the Portfolio Manager and any charitable foundation of any such employees (other than any of such interests held as a Benefit Plan Investor) or (ii) held by persons that have represented that they are Controlling Persons will be disregarded (to the extent that such a Controlling Person is not a Benefit Plan Investor) and will not be treated as outstanding for purposes of determining compliance with the 25% limitation with respect to the Subordinated Notes.

With respect to the Class E Notes acquired from the Issuer in the initial offering, a purchaser will be required to represent and warrant and, with respect to Class E Notes acquired other than from the Issuer in the initial offering, a purchaser and any subsequent transferee will be deemed to have represented and warranted, on each day from the date on which such purchaser or subsequent transferee, as applicable, acquires its interest in such Class E Note through and including the date on which such purchaser or subsequent transferee, as applicable, disposes of its interest in such Class E Note, that (1) such purchaser or subsequent transferee, as applicable, is not a Benefit Plan Investor and (2) if it is a governmental, church, non-U.S. or other plan that is subject to Similar Law, its acquisition, holding and disposition of such Class E Note will not constitute or result in a non-exempt violation of Similar Law.

With respect to the Certificated Subordinated Notes, a purchaser and any subsequent transferee and, with respect to Global Subordinated Notes acquired from the Issuer in the initial offering, a purchaser, will be required to represent and warrant, with respect to each day it holds such Subordinated Notes or any beneficial interest therein, (1) whether or not the purchaser or subsequent transferee, as applicable, is a Benefit Plan Investor, (2) whether or not the purchaser or subsequent transferee, as applicable, is a Controlling Person and (3) (a) if it is a Benefit Plan Investor, its acquisition, holding and disposition of such Subordinated Notes will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or (b) if it is a governmental, church, non-U.S. or other plan which is subject to Similar Law, its acquisition, holding and disposition of such Subordinated Notes will not constitute or result in a non-exempt violation under any such substantially similar law.  No Certificated Subordinated Notes (or Global Subordinated Notes purchased from the Issuer in the initial offering) may be acquired by Benefit Plan Investors or Controlling Persons if it would cause the 25% limitation described above to be exceeded.  Each purchaser and subsequent transferee, as applicable, of Global Subordinated Notes, in each case other than an acquisition from the Issuer in the initial offering, will be deemed to have represented and warranted, on each day from the date on which such purchaser or subsequent transferee, as applicable, acquires its interest in such Subordinated Notes through and including the date on which such purchaser or subsequent transferee, as applicable, disposes of its interest in such Subordinated Notes, that (1) such purchaser or subsequent transferee, as applicable, is not a Benefit Plan Investor or Controlling Person and (2) if it is a governmental, church, non-U.S. or other plan that is subject to Similar Law, its acquisition, holding and disposition of such Subordinated Notes will not constitute or result in a non-exempt violation of Similar Law.

**Further considerations**

There can be no assurance that, despite the transfer restrictions relating to acquisitions by Benefit Plan Investors and Controlling Persons and the procedures to be employed to attempt to prohibit ownership by Benefit Plan Investors of the Class E Notes and to limit ownership by Benefit Plan Investors of the Subordinated Notes to less than 25%, Benefit Plan Investors will not in actuality own 25% or more of the outstanding Class E Notes or Subordinated Notes.

If for any reason the assets of the Co-Issuers are deemed to be "plan assets" of a Plan because one or more Plans holds Class E Notes or holds Subordinated Notes in excess of the above 25% limitation, certain transactions that the Co-Issuers might enter into, or may have entered into, in the ordinary course of business might constitute non-exempt "prohibited transactions" under Section 406 of ERISA or Section 4975 of the Code and might have to be rescinded at significant cost to the Co-Issuers.  The Portfolio Manager might be considered an ERISA fiduciary, and as such may be prevented from engaging in certain investments (as not being deemed consistent with the ERISA prudent investment standards) or engaging in certain transactions or fee arrangements because they might be deemed to cause non-exempt prohibited transactions.  It also is not clear that Section 403(a) of ERISA, which, among other things, limits delegation of investment management responsibilities by fiduciaries of ERISA Plans, would be satisfied.  In addition, it is unclear whether Section 404(b) of ERISA, which generally provides that no fiduciary may maintain the indicia of ownership of any assets of a plan outside the jurisdiction of the district courts of the United States, would be satisfied or any of the exceptions to the requirement set forth in 29 C.F.R. Section 2550.404b-1 would be available.

Any Plan fiduciary or other person who proposes to use assets of any Plan to acquire any Offered Securities should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and Section 4975 of the Code to such an investment, and to confirm that such investment will not constitute or result in a non-exempt prohibited transaction or any other violation of an applicable requirement of ERISA.

The sale of any Offered Securities to a Plan, or to a person using assets of any Plan to effect its acquisition of any Offered Securities, is in no respect a representation by the Co-Issuers, the Initial Purchaser or the Portfolio Manager that such an investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that such an investment is appropriate for Plans generally or any particular Plan.

The disclosure set forth in "*The Portfolio Management Agreement*" is intended to satisfy the alternative reporting option of Schedule C of the U.S. Department of Labor's Form 5500, in addition to serving the other purposes for which the disclosure is provided.

**Legal investment considerations**

Investors whose investment activities are subject to regulation by federal, state or local law or governmental authorities should review the applicable laws and/or rules, policies and guidelines adopted from time to time by such authorities before purchasing any Subordinated Notes or any Class of Secured Notes.  No representation is made as to the proper characterization of the Offered Securities for legal investment or other purposes or as to the ability of particular investors to purchase any Subordinated Notes or any Class of Secured Notes under applicable law or other legal investment restrictions.  Accordingly, all investors whose investment activities are subject to such laws and/or regulations, regulatory capital requirements or review by regulatory authorities should consult their own legal advisors in determining whether and to what extent the Offered Securities constitute a legal investment or are subject to investment, capital or other restrictions.

None of the Issuer, the Co-Issuer, the Portfolio Manager, the Initial Purchaser, the Collateral Administrator or the Trustee make any representation as to the proper characterization of the Offered Securities for legal investment or other purposes, as to the ability of particular investors to purchase the Offered Securities for legal investment or other purposes or as to the ability of particular investors to purchase the Offered Securities under applicable investment restrictions.  All institutions the activities of which are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult their own legal advisors in determining whether and to what extent the Offered Securities are subject to investment, capital or other restrictions. Without limiting the generality of the foregoing, none of the Issuer, the Co-Issuer, the Portfolio Manager, the Initial Purchaser, the Collateral Administrator or the Trustee makes any representation as to the characterization of the Offered Securities as a U.S.-domestic or foreign (non-U.S.) investment under any state insurance code or related regulations, and they are not aware of any published precedent that addresses such characterization.  Although they are not making any such representation, the Co-Issuers understand that the New York State Insurance Department, in response to a request for guidance, has been considering the characterization (as U.S.-domestic or foreign (non-U.S.)) of certain collateralized debt obligation securities co-issued by a non-U.S. issuer and a U.S. co-issuer.  There can be no assurance as to the nature of any advice or other action that may result from such consideration.  The

uncertainties described above (and any unfavorable future determinations concerning legal investment or financial institution regulatory characteristics of the Offered Securities) may affect the liquidity of the Offered Securities.

# PLAN OF DISTRIBUTION

Subject to the terms and conditions contained in a purchase agreement (the "**Purchase Agreement**") to be entered into among the Co-Issuers and the Initial Purchaser, the Offered Securities (other than the Subordinated Notes sold by the Issuer to the Portfolio Manager, its affiliates or accounts advised or sub-advised by the Portfolio Manager or its affiliates) are being offered by and through the Initial Purchaser pursuant to the Purchase Agreement, subject to prior sale when, as and if issued.  The Initial Purchaser reserves the right to withdraw, cancel or modify such offer and to reject orders in whole or in part.  The Offered Securities (other than the Subordinated Notes sold by the Issuer to the Portfolio Manager, its affiliates or accounts advised or sub-advised by the Portfolio Manager or its affiliates) purchased by the Initial Purchaser will be resold to prospective purchasers from time to time in negotiated transactions at varying prices to be determined in each case at the time of sale.  It is expected that the Offered Securities will be delivered to investors on or about the Closing Date against payment therefor in immediately available funds.

Each prospective investor should note that its account representative at the Initial Purchaser will receive compensation in connection with the sale of an Offered Security (other than the Subordinated Notes sold by the Issuer to the Portfolio Manager, its affiliates or accounts advised or sub-advised by the Portfolio Manager or its affiliates) to such investor.  In addition, certain persons (including brokers, dealers, solicitors and agents) may introduce and act as continuing liaison with certain investors of the Issuer.  In such instances, the Initial Purchaser generally will pay a portion of the compensation it receives from the Issuer to the persons providing the introduction and liaison services.

In the Purchase Agreement, each of the Co-Issuers will agree to indemnify Jefferies against certain liabilities under the Securities Act, the Exchange Act or otherwise, insofar as such liabilities arise out of or are connected with the consummation of the transactions contemplated by the offering documents for the Offered Securities (including the preliminary Offering Circular for the Offered Securities and this Offering Circular) or the execution and delivery of, and the consummation of the transactions contemplated by, the transaction documents or to contribute to payments Jefferies may be required to make in respect thereof.  In addition, the Issuer will agree to reimburse Jefferies for certain of its expenses incurred in connection with the closing of the transactions contemplated hereby.

The offering of the Offered Securities has not been and will not be registered under the Securities Act and may not be offered or sold in non-offshore transactions except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act.

No action has been taken or is being contemplated by the Issuer and Co-Issuer that would permit a public offering of the Offered Securities or possession or distribution of this Offering Circular or any amendment thereof, or supplement thereto or any other offering material relating to the Offered Securities in any jurisdiction (other than Ireland) where, or in any other circumstances in which, action for those purposes is required.  No offers, sales or deliveries of any Offered Securities, or distribution of this Offering Circular or any other offering material relating to the Offered Securities, may be made in or from any jurisdiction except in circumstances that will result in compliance with any applicable laws and regulations and will not impose any obligations on the Issuer or Jefferies.  Because of the restrictions contained in the front of this Offering Circular, you are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of the Offered Securities.

In the Purchase Agreement, Jefferies will agree that it or one or more of its affiliates will sell or arrange for the sale (as applicable) of Offered Securities (other than the Subordinated Notes sold by the Issuer to the Portfolio Manager, its affiliates or accounts advised or sub-advised by the Portfolio Manager or its affiliates) only to or with, in each case, (a) purchasers it reasonably believes to be (i) Qualified Institutional Buyers (or, solely in the case of the Class E Notes, Institutional Accredited Investors) and (ii)  Qualified Purchasers and (b) non-U.S. persons in offshore transactions pursuant to Regulation S.  Until 40 days after completion of the distribution by the Issuer, an offer or sale of Offered Securities, in a non-offshore transaction by a dealer (whether or not participating in the offering) may violate the registration requirements of the Securities Act if the offer or sale is made otherwise than pursuant to Rule 144A or a transaction exempt from the registration requirements under the Securities Act.  Resales of the Offered Securities offered in reliance on Rule 144A or in another transaction exempt from the registration requirements under the Securities Act, as the case may be, are restricted as described under "Transfer Restrictions."

Beneficial interests in a Regulation S Global Note may not be held by a U.S. person at any time, and resales of the Offered Securities offered in offshore transactions to non-U.S. persons in reliance on Regulation S may be effected only in accordance with the transfer restrictions described herein.  As used in this paragraph, the terms "United States" and "U.S." have the meanings given to them by Regulation S.

The Offered Securities are offered when, as and if issued, subject to prior sale or withdrawal, cancellation or modification of the offer without notice and subject to approval of certain legal matters by counsel and certain other conditions.

The Offered Securities are a new issue of securities for which there is currently no market.  Jefferies is under no obligation to make a market in any Class of the Notes and any market making activity, if commenced, may be discontinued at any time.  There can be no assurance that a secondary market for any Class of the Notes will develop, or if one does develop, that it will continue.  Accordingly, no assurance can be given as to the liquidity of or trading market for the Offered Securities.

The Purchase Agreement provides that the obligations of the Initial Purchaser to purchase the Offered Securities (other than the Subordinated Notes sold by the Issuer to the Portfolio Manager, its affiliates or accounts advised or sub-advised by the Portfolio Manager or its affiliates) are subject to approval of legal matters by counsel, various representation and warranties of the Co-Issuers and other pre-conditions.

The Initial Purchaser and its affiliates may have had in the past and may in the future have business relationships and dealings with one or more obligors on the Collateral Obligations and their affiliates and may own equity or debt securities issued by such obligors or their affiliates.  The Initial Purchaser or its affiliates may have provided and may in the future provide investment banking services to an obligor on Collateral Obligations or its affiliates and may have received or may receive compensation for such services.  In addition, the Initial Purchaser and its affiliates may buy securities from and sell securities to an obligor on Collateral Obligations or its affiliates for its own account or for the accounts of its customers.

# TRANSFER RESTRICTIONS

Because of the following restrictions, purchasers are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of the Offered Securities.

The Offered Securities have not been registered under the Securities Act or any state securities or "Blue Sky" laws or the securities laws of any other jurisdiction and, accordingly, may not be reoffered, resold, pledged or otherwise transferred except in accordance with the restrictions described herein and set forth in the Indenture.

Without limiting the foregoing, by holding an Offered Security, each holder will acknowledge and agree, among other things, that such holder understands that neither of the Co-Issuers is registered as an investment company under the Investment Company Act, and that the Co-Issuers are exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act.  Section 3(c)(7) excepts from the provisions of the Investment Company Act those issuers who privately place their securities solely to persons who at the time of purchase are Qualified Purchasers or Knowledgeable Employees with respect to such issuer.  In general terms, Qualified Purchaser is defined to mean, among other things, any natural person who owns not less than $5,000,000 in investments; any person who in the aggregate owns and invests on a discretionary basis, not less than $25,000,000 in investments; and trusts as to which both the settlor and the decision-making trustee are Qualified Purchasers (but only if such trust was not formed for the specific purpose of making such investment).  In general terms, Knowledgeable Employees is defined to mean, among other things, executive officers, directors and certain investment professionals and employees of an issuer and its related investment manager.

## Global Notes

Each initial purchaser of Rule 144A Global Subordinated Notes or Regulations S Global Subordinated Notes will be required to represent and warrant, in the form specified in the applicable documents, and each initial purchaser and each transferee of Secured Notes represented by an interest in a Global Note and each transferee of Rule 144A Global Subordinated Notes or Regulation S Global Subordinated Notes will be deemed to have represented and agreed as follows (except as may be expressly agreed in writing between the Co-Issuers and any initial purchasers):

(i)  In connection with the purchase of such Offered Securities:  (A) none of the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator, the Initial Purchaser or any of their respective affiliates is acting as a fiduciary or financial or investment advisor for such beneficial owner; (B) such beneficial owner is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator or the Initial Purchaser or any of their respective affiliates other than any statements in the final offering circular for such Offered Securities, and such beneficial owner has read and understands such final offering circular; (C) such beneficial owner has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary and has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the Indenture) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator or the Initial Purchaser or any of their respective affiliates; (D) such beneficial owner is either (1) both (a) a qualified institutional buyer (as defined under Rule 144A under the Securities Act) that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A under the Securities Act or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A under the Securities Act that holds the assets of such a plan, if investment decisions with respect to the plan are made by beneficiaries of the plan and (b) a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act or (2) not a "U.S. person" as defined in Regulation S and is acquiring the Offered Securities in an offshore transaction (as defined in Regulation S) in reliance on the exemption from registration provided by Regulation S; (E) such beneficial owner is acquiring its interest in such Offered Securities for its own account; (F) such beneficial owner was not formed for the purpose of investing in such Offered Securities; (G) such beneficial owner understands that the Issuer may receive a list of participants holding interests in the Offered Securities from one or more book-entry depositories; (H) such beneficial owner will hold and transfer at least the minimum denomination

of such Offered Securities and (I) such beneficial owner will provide notice of the relevant transfer restrictions to subsequent transferees; *provided* that in the case of clauses (A), (B) and (C) above, the Portfolio Manager or an affiliate of the Portfolio Manager may have acted as financial and investment advisor to certain accounts for the benefit of certain beneficial owners of Notes managed by the Portfolio Manager or such affiliate of the Portfolio Manager and in that capacity has provided, and in the future may provide, advice to such beneficial owners of Notes; *provided further* that no such representations under subclauses (A) through (C) are made with respect to the Initial Purchaser by any Affiliate of the Initial Purchaser or any discretionary account for which the Initial Purchaser or its Affiliates act as investment advisor).

(ii)  In the case of the Secured Notes (other than Class E Notes), that on each day from the date on which such purchaser or transferee, as applicable, acquires its interest in a Co-Issued Note through and including the date on which such purchaser or transferee, as applicable, disposes of its interest in such Note, either that (A) it is neither a Benefit Plan Investor nor a governmental, church, non-U.S. or other plan which is subject to Similar Law or (B) its acquisition, holding and disposition of a Co-Issued Note, as applicable, will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of Similar Law).

(iii)  In the case of the Class E Notes, that on each day from the date on which such purchaser or transferee, as applicable, acquires its interest in such Class E Note through and including the date on which such purchaser or transferee, as applicable, disposes of its interest in such Class E Note, that (1) such purchaser or transferee, as applicable, is not a Benefit Plan Investor and (2) if it is a governmental, church, non-U.S. or other plan that is subject to Similar Law, its acquisition, holding and disposition of such Class E Note will not constitute or result in a non-exempt violation of Similar Law.

Each purchaser of Global Subordinated Notes from the Issuer in the initial offering will be required to represent and warrant, with a certificate or subscription agreement, with respect to each day it holds such Global Subordinated Note or any beneficial interest therein, (1) whether or not the purchaser is a Benefit Plan Investor, (2) whether or not the purchaser is a Controlling Person and (3) (a) if it is a Benefit Plan Investor, its acquisition, holding and disposition of such Subordinated Notes will not constitute or result in a non exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or (b) if it is a governmental, church, non-U.S. or other plan which is subject to Similar Law, its acquisition, holding and disposition of Global Subordinated Notes will not constitute or result in a non exempt violation of Similar Law.  Each purchaser from the Issuer in the initial offering of a Global Subordinated Note that fails to provide the certification described in the prior sentence will be deemed to have represented and warranted, with respect to each day it holds such Global Subordinated Note or any beneficial interest therein, that (1) such purchaser is not a Benefit Plan Investor or Controlling Person and (2) if the purchaser is a governmental, church, non-U.S. or other plan that is subject to Similar Law, its acquisition, holding and disposition of Global Subordinated Notes will not constitute or result in a non exempt violation of Similar Law. Such purchaser acknowledges that no Global Subordinated Notes may be acquired by any purchaser or transferee, as applicable, that is a Benefit Plan Investor or Controlling Person if it would cause 25% or more of the value of the Subordinated Notes to be held by Benefit Plan Investors.  Each purchaser or transferee of Global Subordinated Notes other than from the Issuer in the initial offering will be deemed to have represented and warranted, with respect to each day it holds such Global Subordinated Note or any beneficial interest therein, that (1) such purchaser or transferee is not a Benefit Plan Investor or Controlling Person and (2) if the purchaser or transferee is a governmental, church, non-U.S. or other plan that is subject to Similar Law, its acquisition, holding and disposition of Global Subordinated Notes will not constitute or result in a non exempt violation of Similar Law.  No Global Subordinated Notes may be acquired other than from the Issuer in the initial offering by Benefit Plan Investors or Controlling Persons.  Any purported transfer of the Global Subordinated Notes or any interest therein, to a purchaser or transferee that does not comply with the requirements of this paragraph will be of no force and effect, shall be null and void *ab initio* and the Issuer will have the right to direct the purchaser to transfer the Subordinated Notes, or any interest therein, as applicable, to a person who meets the foregoing criteria.

(iv)  Such beneficial owner understands that such Offered Securities are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, such Offered Securities have not been and will not be registered under the Securities Act, and, if in the future such beneficial owner decides to offer, resell, pledge or otherwise transfer such Offered Securities, such Offered Securities may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of the Indenture and the legend on such

Offered Securities.  Such beneficial owner acknowledges that no representation has been made as to the availability of any exemption under the Securities Act or any state securities laws for resale of such Offered Securities.  Such beneficial owner understands that neither of the Co-Issuers has been registered under the Investment Company Act, and that the Co-Issuers are exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act.

(v)  It is aware that, except as otherwise provided in the Indenture, any Secured Notes or Subordinated Notes being sold to it in reliance on Regulation S will be represented by one or more Regulation S Global Notes and that in each case beneficial interests therein may be held only through DTC for the respective accounts of Euroclear or Clearstream.

(vi)  It will provide notice to each person to whom it proposes to transfer any interest in the Notes of the transfer restrictions and representations set forth in the Indenture.

(vii)  Any purported transfer of a Secured Note, or any interest therein, to a purchaser or transferee that does not comply with the requirements specified in the Indenture, the Note, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void *ab initio*.

(viii)  It is not a member of the public in the Cayman Islands.

(ix)  It agrees to be subject to the Bankruptcy Subordination Agreement.

**Certificated Notes**

No purchase or transfer of a Certificated Note will be recorded or otherwise recognized unless the purchaser or transferee thereof has provided the Trustee with a subscription agreement or transfer certificate in the form required by the Indenture, in each case making substantially similar representations as the related Global Notes.

**Additional Restrictions**

No transfer of any Class E Notes to Benefit Plan Investors will be effective, and no transfer of any Subordinated Notes will be effective if it may result in 25% or more of the value of Subordinated Notes being held by Benefit Plan Investors (the "**25% Limitation**") and the Trustee will not recognize any such transfers.  For purposes of the 25% Limitation determination, the value of equity interests held by the Initial Purchaser, the Trustee, the Portfolio Manager and certain of their affiliates (other than those interests held by a Benefit Plan Investor) or a person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Co-Issuers or that provides investment advice for a fee (direct or indirect) with respect to such assets (or any affiliate of such a person) is disregarded.  See "*ERISA and Legal Investment Considerations.*"

To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon notice to the Trustee, impose additional transfer restrictions on the Subordinated Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 and other similar laws or regulations, including, without limitation, requiring each transferee of a Subordinated Note, as applicable, to make representations to the Issuer in connection with such compliance.

Each holder of the Notes (and any interest therein) will be deemed to have represented that it is not a person with whom dealings are restricted or prohibited under any law relating to economic sanctions or anti-money laundering of the United States, the European Union, Switzerland, or any other applicable jurisdiction ("**AML and Sanctions Laws**"), and such holder's purchase of the Notes will not result in the violation of any AML and Sanctions Law by any Transaction Party, whether as a result of the identity of the Transferee or its beneficial owners, their source of funds, or otherwise.

Each purchaser has read the summary of the provisions related to no petitions for bankruptcy in "*Description of the Offered Securities—The Indenture—No Petitions for Bankruptcy.*" Each purchaser will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy,

reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year (or, if longer, the applicable preference period then in effect) *plus* one day after the payment in full of all Notes. Each purchaser understands that the foregoing restrictions are a material inducement for each holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

Each holder of the Secured Notes (and any interest therein) will be deemed to have represented and agreed to treat the Secured Notes as indebtedness for U.S. federal, state and local income and franchise tax purposes, provided that this shall not prevent such holder from making a "protective qualified electing fund" election with respect to any Class E Note.

Each holder of the Subordinated Notes (and any interest therein) will be deemed to have represented and agreed to treat the Subordinated Notes as equity for U.S. federal, state and local income and franchise tax purposes.

Each holder of a Note understands that the failure to provide the Issuer and the Trustee (and any of their agents) with the properly completed and signed tax certifications (generally, in the case of U.S. federal income tax, an IRS Form W-9 (or applicable successor form) in the case of a person that is a U.S. Tax Person or the appropriate IRS Form W-8 (or applicable successor form) in the case of a person that is not a U.S. Tax Person) may result in withholding from payments in respect of such Note, including U.S. federal withholding or back-up withholding.

Each holder of the Notes (and any interest therein) will (i) provide the Issuer, the Portfolio Manager, the Trustee and their respective agents with the Holder FATCA Information and will take any other actions that the Issuer, the Portfolio Manager, the Trustee or their respective agents deem necessary or helpful to achieve FATCA Compliance and (ii) update any such information provided in clause (i) promptly upon learning that any such information previously provided has become obsolete or incorrect or is otherwise required. In the event the holder fails to provide the Holder FATCA Information, take such actions, update such information or otherwise becomes a Non-Permitted Tax Holder, (a) the Issuer or an agent acting on its behalf is authorized to withhold amounts otherwise distributable to the holder and (b) the Issuer or an agent acting on its behalf will have the right to compel the holder to sell its Notes or, if such holder does not sell its Notes within 10 Business Days after notice from the Issuer, to sell such Notes in the same manner as if such holder were a Non-Permitted Holder, and to remit the net proceeds of such sale (taking into account any taxes incurred in connection with such sale) to the holder as payment in full for such Notes. Each holder of Notes agrees to indemnify the Issuer, the Trustee and other beneficial owners of Notes for all damages, costs and expenses that result from its failure to comply with its obligation to provide the Holder FATCA Information. This indemnification will continue even after the person ceases to have an ownership interest in the Notes. Each such holder agrees, or by acquiring a Note or an interest in a Note will be deemed to agree, that (i) the Issuer, the Portfolio Manager or the Trustee may provide such information and any other information regarding its investment in the Notes to the IRS or other relevant governmental authority and (ii) the Trustee or the Registrar may provide certain information to the Issuer, the Portfolio Manager or any agent thereof pursuant to the Indenture.

Each holder of the Notes (and any interest therein) that is not a U.S. Tax Person will make, or by acquiring a Note or an interest in a Note will be deemed to make, a representation to the effect that (i) either (a) it is not a bank (or an entity affiliated with a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of Section 881(c)(3)(A) of the Code), (b) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States, or (c) it has provided an IRS Form W-8ECI representing that all payments received or to be received by it on the Notes are effectively connected with the conduct of a trade or business in the United States, and (ii) it is not purchasing a Note or an interest in a Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan within the meaning of Treasury Regulation section 1.881-3.

Each holder of a Note (and any interest therein) will indemnify the Issuer, the Trustee, their respective agents and each of the holders of the Note from any and all damages, cost and expenses (including any amount of taxes, fees, interest, additions to tax, or penalties) resulting from the failure by such holder to comply with Sections 1471 through 1474 of the Code (or any agreement or intergovernmental agreement thereunder or in respect thereof, including the Cayman IGA) and any other law, rule or regulation implementing such agreements or intergovernmental agreements, including, any regulations, rules and guidance notes or other approach or practices adopted in respect thereof, similar to the foregoing or its obligations under the Note. The indemnification will continue with respect to any period during which the holder held a Note (and any interest therein), notwithstanding the holder ceasing to be a holder of the Note.

**Legends**

The Secured Notes in the form of a Global Note and the Certificated Class E Notes will bear a legend substantially to the following effect unless the Issuer determines otherwise in compliance with applicable law:

[THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(D) OR (A)(1)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN, THAT IS A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT) OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS NOTE IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH REGULATION, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION. THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN THIS NOTE THAT IS A U.S. PERSON AND IS NOT A QUALIFIED PURCHASER AND A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTES, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.][1]

[THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) (X) TO A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(D) OR (A)(1)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(F) OF RULE 144A

---

[1] Applicable only to the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes.

THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (Y) TO AN "INSTITUTIONAL" ACCREDITED INVESTOR (AN ENTITY DEFINED IN RULE 501(A)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT) AND, IN THE CASE OF (X) AND (Y), THAT IS A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT) OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS NOTE IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH REGULATION, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.  THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN THIS NOTE THAT IS A U.S. PERSON AND DOES NOT COMPLY WITH THE FOREGOING RESTRICTIONS TO SELL ITS INTEREST IN THE NOTES, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.][2]

[BY ITS ACQUISITION OF CO-ISSUED NOTES (THE "ERISA DEBT SECURITIES"), EACH PURCHASER AND SUBSEQUENT TRANSFEREE WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED OR REQUIRED TO REPRESENT AND WARRANT, AS APPLICABLE, AT THE TIME OF ITS ACQUISITION AND THROUGHOUT THE PERIOD IT HOLDS SUCH ERISA DEBT SECURITY, THAT EITHER (X) IT IS NOT AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), THAT IS SUBJECT TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF TITLE I OF ERISA, A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, ANY ENTITY WHOSE UNDERLYING ASSETS ARE DEEMED TO INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY OR A "BENEFIT PLAN INVESTOR" AS SUCH TERM IS OTHERWISE DEFINED IN ANY REGULATIONS PROMULGATED BY THE U.S. DEPARTMENT OF LABOR OR UNDER SECTION 3(42) OF ERISA, OR A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY FEDERAL, STATE, LOCAL OR NON-U.S. LAW THAT IS SUBSTANTIALLY SIMILAR TO THE PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE OR (Y) ITS ACQUISITION, HOLDING AND DISPOSITION OF THE ERISA DEBT SECURITY WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE (OR, IN THE CASE OF A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN, A NON-EXEMPT VIOLATION OF ANY SUBSTANTIALLY SIMILAR LAW).  ANY PURPORTED TRANSFER OF AN ERISA DEBT SECURITY, OR ANY INTEREST THEREIN, TO A PURCHASER OR TRANSFEREE THAT DOES NOT COMPLY WITH THE REQUIREMENTS SPECIFIED IN THE INDENTURE, THIS NOTE, THE OFFERING CIRCULAR AND ANY APPLICABLE TRANSFER CERTIFICATION, AS APPLICABLE, WILL BE OF NO FORCE AND EFFECT AND SHALL BE NULL AND VOID *AB INITIO*.][3]

[EACH PURCHASER AND EACH SUBSEQUENT TRANSFEREE OF THIS NOTE WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED, OR REQUIRED TO REPRESENT AND WARRANT, AS APPLICABLE, AT THE TIME OF ITS ACQUISITION AND THROUGHOUT THE PERIOD THAT IT HOLDS SUCH NOTE OR ANY INTEREST HEREIN, THAT (1) IT IS NOT AN "EMPLOYEE BENEFIT PLAN" (AS DEFINED IN

---

[2] Applicable only to the Class E Notes.
[3] Applicable only to the Co-Issued Notes.

SECTION 3(3) OF TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA")) THAT IS SUBJECT TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF TITLE I OF ERISA, A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, ANY ENTITY WHOSE UNDERLYING ASSETS ARE DEEMED TO INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY OR A "BENEFIT PLAN INVESTOR" AS SUCH TERM IS OTHERWISE DEFINED IN ANY REGULATIONS PROMULGATED BY THE U.S. DEPARTMENT OF LABOR OR UNDER SECTION 3(42) OF ERISA (COLLECTIVELY, "BENEFIT PLAN INVESTORS") AND (2) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO ANY FEDERAL, STATE, LOCAL OR NON-U.S. LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE, ITS ACQUISITION, HOLDING AND DISPOSITION OF THIS NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION UNDER ANY SUCH SUBSTANTIALLY SIMILAR LAW.  ANY PURPORTED TRANSFER OF THIS NOTE, OR ANY INTEREST THEREIN TO A PURCHASER OR TRANSFEREE THAT DOES NOT COMPLY WITH THE REQUIREMENTS SPECIFIED IN THE INDENTURE, THIS NOTE, THE OFFERING CIRCULAR AND ANY APPLICABLE TRANSFER CERTIFICATION, AS APPLICABLE, WILL BE OF NO FORCE AND EFFECT AND SHALL BE NULL AND VOID *AB INITIO*.][4]

[ANY TRANSFER, PLEDGE OR OTHER USE OF THIS NOTE FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN, UNLESS THE NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC"), NEW YORK, NEW YORK, TO THE CO-ISSUERS OR THEIR AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR OF SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO.).

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.][5]

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN.  ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.  ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER AND BENEFICIAL OWNER OF THIS NOTE WILL NOT INSTITUTE AGAINST, OR JOIN ANY OTHER PERSON IN INSTITUTING AGAINST, EITHER OF THE ISSUERS OR ANY ETB SUBSIDIARY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY, MORATORIUM OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS UNDER CAYMAN ISLANDS LAW, UNITED STATES FEDERAL OR STATE BANKRUPTCY LAW OR SIMILAR LAWS UNTIL THE DATE WHICH IS ONE YEAR (OR, IF LONGER, THE APPLICABLE PREFERENCE PERIOD THEN IN EFFECT) *PLUS* ONE DAY AFTER THE PAYMENT IN FULL OF ALL NOTES. EACH HOLDER AND

---

[4] Applicable only to the Class E Notes.
[5] Applicable to Global Notes only.

BENEFICIAL OWNER OF THIS NOTE UNDERSTANDS THAT THE FOREGOING RESTRICTIONS ARE A MATERIAL INDUCEMENT FOR EACH OTHER HOLDER AND BENEFICIAL OWNER OF THE NOTES TO ACQUIRE SUCH NOTES AND FOR THE ISSUER, THE CO-ISSUER AND THE PORTFOLIO MANAGER TO ENTER INTO THE INDENTURE (IN THE CASE OF THE ISSUER AND THE CO-ISSUER) AND THE OTHER APPLICABLE TRANSACTION DOCUMENTS AND ARE AN ESSENTIAL TERM OF THE INDENTURE AND THAT ANY HOLDER OR BENEFICIAL OWNER OF A NOTE, THE PORTFOLIO MANAGER OR EITHER OF THE ISSUERS MAY SEEK AND OBTAIN SPECIFIC PERFORMANCE OF SUCH RESTRICTIONS (INCLUDING INJUNCTIVE RELIEF), INCLUDING, WITHOUT LIMITATION, IN ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY, MORATORIUM OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS UNDER CAYMAN ISLANDS LAW, UNITED STATES FEDERAL OR STATE BANKRUPTCY LAW OR SIMILAR LAWS.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE SECURED NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE PORTFOLIO MANAGER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER OR PORTFOLIO MANAGER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE AND THE TREASURY REGULATIONS (AND ANY NOTICES, GUIDANCE OR OFFICIAL PRONOUNCEMENTS) PROMULGATED THEREUNDER, ANY AGREEMENT ENTERED INTO WITH RESPECT THERETO, ANY INTERGOVERNMENTAL AGREEMENT IN RESPECT THEREOF (INCLUDING THE CAYMAN IGA) AND ANY LAW, RULE OR REGULATION IMPLEMENTING SUCH AN INTERGOVERNMENTAL AGREEMENT, INCLUDING ANY REGULATIONS, RULES AND GUIDANCE NOTES OR OTHER APPROACH OR PRACTICES ADOPTED IN RESPECT THEREOF ("FATCA") AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE PORTFOLIO MANAGER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER OR AN AGENT ACTING ON ITS BEHALF IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AND (B) THE ISSUER OR AN AGENT ACTING ON ITS BEHALF WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELL ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER OR AN AGENT ACTING ON ITS BEHALF, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH

HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER OF NOTES AGREES TO INDEMNIFY THE ISSUER, THE TRUSTEE AND OTHER BENEFICIAL OWNERS OF NOTES FOR ALL DAMAGES, COSTS AND EXPENSES THAT RESULT FROM ITS FAILURE TO COMPLY WITH ITS OBLIGATION TO PROVIDE THE HOLDER FATCA INFORMATION. THIS INDEMNIFICATION WILL CONTINUE EVEN AFTER THE PERSON CEASES TO HAVE AN OWNERSHIP INTEREST IN THE NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT (I) THE ISSUER, THE PORTFOLIO MANAGER OR THE TRUSTEE MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY AND (II) THE TRUSTEE OR THE REGISTRAR MAY PROVIDE CERTAIN INFORMATION TO THE ISSUER, THE PORTFOLIO MANAGER OR ANY AGENT THEREOF PURSUANT TO THE INDENTURE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(c)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN WITHIN THE MEANING OF TREASURY REGULATION SECTION 1.881-3.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE, THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT OR INTERGOVERNMENTAL AGREEMENT THEREUNDER OR IN RESPECT THEREOF, INCLUDING THE CAYMAN IGA) AND ANY OTHER LAW, RULE OR REGULATION IMPLEMENTING SUCH AGREEMENTS OR INTERGOVERNMENTAL AGREEMENTS, INCLUDING, ANY REGULATIONS, RULES AND GUIDANCE NOTES OR OTHER APPROACH OR PRACTICES ADOPTED IN RESPECT THEREOF, SIMILAR TO THE FOREGOING OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

[THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR U.S. FEDERAL INCOME TAX PURPOSES.  THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY OF THIS NOTE MAY BE OBTAINED BY WRITING TO THE ISSUER.][6]

The Global Subordinated Notes will bear a legend substantially to the following effect unless the Issuer determines otherwise in compliance with applicable law:

THIS SUBORDINATED NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) (1) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT), (2) TO A "KNOWLEDGEABLE EMPLOYEE" (AS DEFINED IN RULE 3c-5 UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED) WITH RESPECT TO THE ISSUER OR (3) TO AN ENTITY EXCLUSIVELY OWNED BY KNOWLEDGEABLE EMPLOYEES WITH RESPECT TO THE ISSUER AND/OR QUALIFIED PURCHASERS AND, IN THE CASE OF (1), (2) AND (3), THAT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE OR (Y) AN ACCREDITED INVESTOR (AS DEFINED IN RULE 501(A) UNDER THE SECURITIES ACT) WHO, IF NOT AN "INSTITUTIONAL" ACCREDITED INVESTOR (AN ENTITY DEFINED IN RULE 501(A)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT), IS A KNOWLEDGEABLE EMPLOYEE WITH RESPECT TO THE ISSUER OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS SUBORDINATED NOTE IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH REGULATION, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.  THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN THIS SUBORDINATED NOTE THAT IS A U.S. PERSON AND DOES NOT COMPLY WITH THE FOREGOING RESTRICTIONS TO SELL ITS INTEREST IN THE SUBORDINATED NOTES, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER OF THIS SUBORDINATED NOTE FROM THE ISSUER IN THE INITIAL OFFERING WILL BE REQUIRED TO REPRESENT AND WARRANT, WITH RESPECT TO EACH DAY IT HOLDS THE SUBORDINATED NOTE OR ANY BENEFICIAL INTEREST THEREIN, IN THE FORM SPECIFIED IN THE INDENTURE, THIS NOTE, THE OFFERING CIRCULAR AND ANY APPLICABLE TRANSFER CERTIFICATION, AS APPLICABLE, (UNLESS OTHERWISE AGREED TO BY THE ISSUER) (1) WHETHER OR NOT IT IS (A) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), THAT IS SUBJECT TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF TITLE I OF ERISA, A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY OR A "BENEFIT PLAN INVESTOR" AS SUCH TERM IS OTHERWISE DEFINED IN ANY REGULATIONS PROMULGATED BY THE U.S. DEPARTMENT OF LABOR OR

---

[6] Insert for the Class C Notes, Class D Notes and Class E Notes.

UNDER SECTION 3(42) OF ERISA (COLLECTIVELY, "BENEFIT PLAN INVESTORS") OR (B) A PERSON (OTHER THAN A BENEFIT PLAN INVESTOR) WHO HAS DISCRETIONARY AUTHORITY OR CONTROL WITH RESPECT TO THE ASSETS OF THE ISSUER OR ANY PERSON WHO PROVIDES INVESTMENT ADVICE FOR A FEE (DIRECT OR INDIRECT) WITH RESPECT TO SUCH ASSETS, OR ANY AFFILIATE OF SUCH A PERSON (A "CONTROLLING PERSON") AND (2) (A) IF IT IS A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF A SUBORDINATED NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE OR (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY FEDERAL, STATE, LOCAL OR NON-U.S. LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE ("SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF A SUBORDINATED NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF SIMILAR LAW. EACH PURCHASER FROM THE ISSUER IN THE INITIAL OFFERING OF A SUBORDINATED NOTE THAT FAILS TO PROVIDE THE CERTIFICATION DESCRIBED IN THE PRIOR SENTENCE WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED, OR REQUIRED TO REPRESENT AND WARRANT, AS APPLICABLE, WITH RESPECT TO EACH DAY IT HOLDS SUCH SUBORDINATED NOTE OR ANY BENEFICIAL INTEREST THEREIN, THAT (1) SUCH PURCHASER IS NOT A BENEFIT PLAN INVESTOR OR CONTROLLING PERSON AND (2) IF THE PURCHASER IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO SIMILAR LAW, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUBORDINATED NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF SIMILAR LAW. NO TRANSFER OR PURCHASE OF THIS SUBORDINATED NOTE WILL BE EFFECTIVE IF IT WOULD CAUSE 25% OR MORE OF THE VALUE OF THE SUBORDINATED NOTES TO BE HELD BY BENEFIT PLAN INVESTORS. EACH PURCHASER OR TRANSFEREE OF THIS SUBORDINATED NOTE OTHER THAN FROM THE ISSUER IN THE INITIAL OFFERING WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED WITH RESPECT TO EACH DAY IT HOLDS SUCH SUBORDINATED NOTE OR ANY BENEFICIAL INTEREST HEREIN THAT (1) SUCH PURCHASER OR TRANSFEREE IS NOT A BENEFIT PLAN INVESTOR OR CONTROLLING PERSON AND (2) IF SUCH PURCHASER OR TRANSFEREE IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO SIMILAR LAW, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH SUBORDINATED NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF SIMILAR LAW. NO SUBORDINATED NOTES MAY BE ACQUIRED FROM PERSONS OTHER THAN THE ISSUER OR OTHER THAN IN THE INITIAL OFFERING BY BENEFIT PLAN INVESTORS OR CONTROLLING PERSONS. EACH PURCHASER AND TRANSFEREE FURTHER UNDERSTANDS AND AGREES THAT ANY PURPORTED TRANSFER OF THE SUBORDINATED NOTES, OR ANY INTEREST THEREIN, TO A PURCHASER OR TRANSFEREE THAT DOES NOT COMPLY WITH THE REQUIREMENTS AS SPECIFIED IN THE INDENTURE, THIS NOTE, THE OFFERING CIRCULAR AND ANY APPLICABLE TRANSFER CERTIFICATION, AS APPLICABLE, WILL BE OF NO FORCE AND EFFECT, SHALL BE NULL AND VOID *AB INITIO* AND THE ISSUER WILL HAVE THE RIGHT TO DIRECT THE PURCHASER TO TRANSFER THE SUBORDINATED NOTES, OR ANY INTEREST THEREIN, AS APPLICABLE, TO A PERSON WHO MEETS THE FOREGOING CRITERIA.

ANY TRANSFER, PLEDGE OR OTHER USE OF THIS NOTE FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN, UNLESS THE NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC"), NEW YORK, NEW YORK, TO THE CO-ISSUERS OR THEIR AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR OF SUCH OTHER ENTITY

AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO.)

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

DISTRIBUTIONS OF PRINCIPAL PROCEEDS AND INTEREST PROCEEDS TO THE HOLDER OF THE SUBORDINATED NOTES REPRESENTED HEREBY ARE SUBORDINATE TO THE PAYMENT ON EACH PAYMENT DATE OF PRINCIPAL OF AND INTEREST ON THE SECURED NOTES OF THE ISSUER AND THE PAYMENT OF CERTAIN OTHER AMOUNTS, TO THE EXTENT AND AS DESCRIBED IN THE INDENTURE GOVERNING SUCH SECURED NOTES.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE SUBORDINATED NOTES AS EQUITY FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE PORTFOLIO MANAGER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER OR PORTFOLIO MANAGER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE AND THE TREASURY REGULATIONS (AND ANY NOTICES, GUIDANCE OR OFFICIAL PRONOUNCEMENTS) PROMULGATED THEREUNDER, ANY AGREEMENT ENTERED INTO WITH RESPECT THERETO, ANY INTERGOVERNMENTAL AGREEMENT IN RESPECT THEREOF (INCLUDING THE CAYMAN IGA) AND ANY LAW, RULE OR REGULATION IMPLEMENTING SUCH AN INTERGOVERNMENTAL AGREEMENT, INCLUDING ANY REGULATIONS, RULES AND GUIDANCE NOTES OR OTHER APPROACH OR PRACTICES ADOPTED IN RESPECT THEREOF ("FATCA") AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE PORTFOLIO MANAGER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER OR AN AGENT ACTING ON ITS BEHALF IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AND (B) THE ISSUER OR AN AGENT ACTING ON ITS BEHALF WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELL ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER OR AN AGENT ACTING ON ITS BEHALF, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH

HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER OF NOTES AGREES TO INDEMNIFY THE ISSUER, THE TRUSTEE AND OTHER BENEFICIAL OWNERS OF NOTES FOR ALL DAMAGES, COSTS AND EXPENSES THAT RESULT FROM ITS FAILURE TO COMPLY WITH ITS OBLIGATION TO PROVIDE THE HOLDER FATCA INFORMATION. THIS INDEMNIFICATION WILL CONTINUE EVEN AFTER THE PERSON CEASES TO HAVE AN OWNERSHIP INTEREST IN THE NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT (I) THE ISSUER, THE PORTFOLIO MANAGER OR THE TRUSTEE MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY AND (II) THE TRUSTEE OR THE REGISTRAR MAY PROVIDE CERTAIN INFORMATION TO THE ISSUER, THE PORTFOLIO MANAGER OR ANY AGENT THEREOF PURSUANT TO THE INDENTURE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(c)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN WITHIN THE MEANING OF TREASURY REGULATION SECTION 1.881-3.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE, THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT OR INTERGOVERNMENTAL AGREEMENT THEREUNDER OR IN RESPECT THEREOF, INCLUDING THE CAYMAN IGA) AND ANY OTHER LAW, RULE OR REGULATION IMPLEMENTING SUCH AGREEMENTS OR INTERGOVERNMENTAL AGREEMENTS, INCLUDING, ANY REGULATIONS, RULES AND GUIDANCE NOTES OR OTHER APPROACH OR PRACTICES ADOPTED IN RESPECT THEREOF, SIMILAR TO THE FOREGOING OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

EACH HOLDER AND BENEFICIAL OWNER OF THIS NOTE WILL NOT INSTITUTE AGAINST, OR JOIN ANY OTHER PERSON IN INSTITUTING AGAINST, EITHER OF THE ISSUERS OR ANY ETB SUBSIDIARY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY, MORATORIUM OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS UNDER CAYMAN ISLANDS LAW, UNITED STATES FEDERAL

OR STATE BANKRUPTCY LAW OR SIMILAR LAWS UNTIL THE DATE WHICH IS ONE YEAR (OR, IF LONGER, THE APPLICABLE PREFERENCE PERIOD THEN IN EFFECT) *PLUS* ONE DAY AFTER THE PAYMENT IN FULL OF ALL NOTES. EACH HOLDER AND BENEFICIAL OWNER OF THIS NOTE UNDERSTANDS THAT THE FOREGOING RESTRICTIONS ARE A MATERIAL INDUCEMENT FOR EACH OTHER HOLDER AND BENEFICIAL OWNER OF THE NOTES TO ACQUIRE SUCH NOTES AND FOR THE ISSUER, THE CO-ISSUER AND THE PORTFOLIO MANAGER TO ENTER INTO THE INDENTURE (IN THE CASE OF THE ISSUER AND THE CO-ISSUER) AND THE OTHER APPLICABLE TRANSACTION DOCUMENTS AND ARE AN ESSENTIAL TERM OF THE INDENTURE AND THAT ANY HOLDER OR BENEFICIAL OWNER OF A NOTE, THE PORTFOLIO MANAGER OR EITHER OF THE ISSUERS MAY SEEK AND OBTAIN SPECIFIC PERFORMANCE OF SUCH RESTRICTIONS (INCLUDING INJUNCTIVE RELIEF), INCLUDING, WITHOUT LIMITATION, IN ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY, MORATORIUM OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS UNDER CAYMAN ISLANDS LAW, UNITED STATES FEDERAL OR STATE BANKRUPTCY LAW OR SIMILAR LAWS.

The Certificated Subordinated Notes will bear a legend substantially to the following effect unless the Issuer determines otherwise in compliance with applicable law:

THIS SUBORDINATED NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) (1) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT), (2) TO A "KNOWLEDGEABLE EMPLOYEE" (AS DEFINED IN RULE 3c-5 UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED) WITH RESPECT TO THE ISSUER OR (3) TO AN ENTITY EXCLUSIVELY OWNED BY KNOWLEDGEABLE EMPLOYEES WITH RESPECT TO THE ISSUER AND/OR QUALIFIED PURCHASERS AND, IN THE CASE OF (1), (2) AND (3), THAT IS EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE OR (Y) AN ACCREDITED INVESTOR (AS DEFINED IN RULE 501(A) UNDER THE SECURITIES ACT) WHO, IF NOT AN "INSTITUTIONAL" ACCREDITED INVESTOR (AN ENTITY DEFINED IN RULE 501(A)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT), IS A KNOWLEDGEABLE EMPLOYEE WITH RESPECT TO THE ISSUER OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS SUBORDINATED NOTE IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH REGULATION, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION. THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN THIS SUBORDINATED NOTE THAT IS A U.S. PERSON AND DOES NOT COMPLY WITH THE FOREGOING RESTRICTIONS TO SELL ITS INTEREST IN THE SUBORDINATED NOTES, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER OF A CERTIFICATED SUBORDINATED NOTE AND EACH SUBSEQUENT TRANSFEREE WILL BE REQUIRED TO REPRESENT AND WARRANT, IN THE FORM SPECIFIED IN THE INDENTURE, THIS NOTE, THE OFFERING CIRCULAR AND ANY APPLICABLE TRANSFER CERTIFICATION, AS APPLICABLE, WITH RESPECT TO EACH DAY IT HOLDS SUCH CERTIFICATED SUBORDINATED NOTE OR ANY BENEFICIAL INTEREST HEREIN, (1) WHETHER OR NOT IT IS (A) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT

INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), THAT IS SUBJECT TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF TITLE I OF ERISA, A "PLAN" AS DEFINED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY OR A "BENEFIT PLAN INVESTOR" AS SUCH TERM IS OTHERWISE DEFINED IN ANY REGULATIONS PROMULGATED BY THE U.S. DEPARTMENT OF LABOR OR UNDER SECTION 3(42) OF ERISA (COLLECTIVELY, "BENEFIT PLAN INVESTORS") OR (B) A PERSON (OTHER THAN A BENEFIT PLAN INVESTOR) WHO HAS DISCRETIONARY AUTHORITY OR CONTROL WITH RESPECT TO THE ASSETS OF THE ISSUER OR ANY PERSON WHO PROVIDES INVESTMENT ADVICE FOR A FEE (DIRECT OR INDIRECT) WITH RESPECT TO SUCH ASSETS, OR ANY AFFILIATE OF SUCH A PERSON (A "CONTROLLING PERSON") AND (2) (A) IF IT IS A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF A CERTIFICATED SUBORDINATED NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE OR (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY FEDERAL, STATE, LOCAL OR NON-U.S. LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE, ITS ACQUISITION, HOLDING AND DISPOSITION OF A CERTIFICATED SUBORDINATED NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION UNDER ANY SUCH SUBSTANTIALLY SIMILAR LAW.  NO PURCHASE OR TRANSFER OF A CERTIFICATED SUBORDINATED NOTE WILL BE EFFECTIVE IF IT WOULD CAUSE 25% OR MORE OF THE VALUE OF THE SUBORDINATED NOTES TO BE HELD BY BENEFIT PLAN INVESTORS.  EACH PURCHASER AND TRANSFEREE FURTHER UNDERSTANDS AND AGREES THAT ANY PURPORTED TRANSFER OF THE CERTIFICATED SUBORDINATED NOTES, OR ANY INTEREST THEREIN, TO A PURCHASER OR TRANSFEREE THAT DOES NOT COMPLY WITH THE REQUIREMENTS AS SPECIFIED IN THE INDENTURE, THIS NOTE, THE OFFERING CIRCULAR AND ANY APPLICABLE TRANSFER CERTIFICATION, AS APPLICABLE, WILL BE OF NO FORCE AND EFFECT, SHALL BE NULL AND VOID *AB INITIO*, AND THE ISSUER WILL HAVE THE RIGHT TO DIRECT THE PURCHASER TO TRANSFER THE CERTIFICATED SUBORDINATED NOTES, OR ANY INTEREST THEREIN, AS APPLICABLE, TO A PERSON WHO MEETS THE FOREGOING CRITERIA.

DISTRIBUTIONS OF PRINCIPAL PROCEEDS AND INTEREST PROCEEDS TO THE HOLDER OF THE SUBORDINATED NOTES REPRESENTED HEREBY ARE SUBORDINATE TO THE PAYMENT ON EACH PAYMENT DATE OF PRINCIPAL OF AND INTEREST ON THE SECURED NOTES OF THE ISSUER AND THE PAYMENT OF CERTAIN OTHER AMOUNTS, TO THE EXTENT AND AS DESCRIBED IN THE INDENTURE GOVERNING SUCH SECURED NOTES.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE SUBORDINATED NOTES AS EQUITY FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM

PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE PORTFOLIO MANAGER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER OR PORTFOLIO MANAGER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE AND THE TREASURY REGULATIONS (AND ANY NOTICES, GUIDANCE OR OFFICIAL PRONOUNCEMENTS) PROMULGATED THEREUNDER, ANY AGREEMENT ENTERED INTO WITH RESPECT THERETO, ANY INTERGOVERNMENTAL AGREEMENT IN RESPECT THEREOF (INCLUDING THE CAYMAN IGA) AND ANY LAW, RULE OR REGULATION IMPLEMENTING SUCH AN INTERGOVERNMENTAL AGREEMENT, INCLUDING ANY REGULATIONS, RULES AND GUIDANCE NOTES OR OTHER APPROACH OR PRACTICES ADOPTED IN RESPECT THEREOF ("FATCA") AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE PORTFOLIO MANAGER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER OR AN AGENT ACTING ON ITS BEHALF IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AND (B) THE ISSUER OR AN AGENT ACTING ON ITS BEHALF WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELL ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER OR AN AGENT ACTING ON ITS BEHALF, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER OF NOTES AGREES TO INDEMNIFY THE ISSUER, THE TRUSTEE AND OTHER BENEFICIAL OWNERS OF NOTES FOR ALL DAMAGES, COSTS AND EXPENSES THAT RESULT FROM ITS FAILURE TO COMPLY WITH ITS OBLIGATION TO PROVIDE THE HOLDER FATCA INFORMATION. THIS INDEMNIFICATION WILL CONTINUE EVEN AFTER THE PERSON CEASES TO HAVE AN OWNERSHIP INTEREST IN THE NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT (I) THE ISSUER, THE PORTFOLIO MANAGER OR THE TRUSTEE MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY AND (II) THE TRUSTEE OR THE REGISTRAR MAY PROVIDE CERTAIN INFORMATION TO THE ISSUER, THE PORTFOLIO MANAGER OR ANY AGENT THEREOF PURSUANT TO THE INDENTURE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(a)(30) OF THE CODE WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(c)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT

ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN WITHIN THE MEANING OF TREASURY REGULATION SECTION 1.881-3.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE, THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT OR INTERGOVERNMENTAL AGREEMENT THEREUNDER OR IN RESPECT THEREOF, INCLUDING THE CAYMAN IGA) AND ANY OTHER LAW, RULE OR REGULATION IMPLEMENTING SUCH AGREEMENTS OR INTERGOVERNMENTAL AGREEMENTS, INCLUDING, ANY REGULATIONS, RULES AND GUIDANCE NOTES OR OTHER APPROACH OR PRACTICES ADOPTED IN RESPECT THEREOF, SIMILAR TO THE FOREGOING OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

EACH HOLDER AND BENEFICIAL OWNER OF THIS NOTE WILL NOT INSTITUTE AGAINST, OR JOIN ANY OTHER PERSON IN INSTITUTING AGAINST, EITHER OF THE ISSUERS OR ANY ETB SUBSIDIARY ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY, MORATORIUM OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS UNDER CAYMAN ISLANDS LAW, UNITED STATES FEDERAL OR STATE BANKRUPTCY LAW OR SIMILAR LAWS UNTIL THE DATE WHICH IS ONE YEAR (OR, IF LONGER, THE APPLICABLE PREFERENCE PERIOD THEN IN EFFECT) *PLUS* ONE DAY AFTER THE PAYMENT IN FULL OF ALL NOTES. EACH HOLDER AND BENEFICIAL OWNER OF THIS NOTE UNDERSTANDS THAT THE FOREGOING RESTRICTIONS ARE A MATERIAL INDUCEMENT FOR EACH OTHER HOLDER AND BENEFICIAL OWNER OF THE NOTES TO ACQUIRE SUCH NOTES AND FOR THE ISSUER, THE CO-ISSUER AND THE PORTFOLIO MANAGER TO ENTER INTO THE INDENTURE (IN THE CASE OF THE ISSUER AND THE CO-ISSUER) AND THE OTHER APPLICABLE TRANSACTION DOCUMENTS AND ARE AN ESSENTIAL TERM OF THE INDENTURE AND THAT ANY HOLDER OR BENEFICIAL OWNER OF A NOTE, THE PORTFOLIO MANAGER OR EITHER OF THE ISSUERS MAY SEEK AND OBTAIN SPECIFIC PERFORMANCE OF SUCH RESTRICTIONS (INCLUDING INJUNCTIVE RELIEF), INCLUDING, WITHOUT LIMITATION, IN ANY BANKRUPTCY, REORGANIZATION, ARRANGEMENT, INSOLVENCY, MORATORIUM OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS UNDER CAYMAN ISLANDS LAW, UNITED STATES FEDERAL OR STATE BANKRUPTCY LAW OR SIMILAR LAWS.

**Non-Permitted Holder/Non-Permitted Tax Holder/Non-Permitted ERISA Holder**

If any U.S. person that is not a Qualified Institutional Buyer (other than Institutional Accredited Investors purchasing Class E Notes or Accredited Investors purchasing Subordinated Notes) and a Qualified Purchaser (or, in the case of the Subordinated Notes, a Knowledgeable Employee with respect to the Issuer or an entity exclusively owned by Knowledgeable Employees with respect to the Issuer and/or Qualified Purchasers) shall become the beneficial owner of an interest in any Note (any such person a "**Non-Permitted Holder**") the Issuer may (in its sole discretion), promptly after discovery that such person is a Non-Permitted Holder by the Issuer (or upon notice from the Trustee or the Co-Issuer to the Issuer, if either of them makes the discovery (who, in each case, agrees to notify the Issuer of such discovery, if any)), send notice to such Non-Permitted Holder demanding that such Non-Permitted Holder transfer its interest to a person that is not a Non-Permitted Holder within 30 days of the date of such notice. If such Non-Permitted Holder fails to so transfer its Notes, as applicable, the Issuer shall (1) have the right to compel

such holder to sell its interest in the Notes, (2) assign to such Note a separate CUSIP number or numbers, or (3) have the right, without further notice to such Non-Permitted Holder to sell such Notes, as applicable, or interest in such Offered Securities to a purchaser selected by the Issuer that is not a Non-Permitted Holder on such terms as the Issuer may choose.  The Issuer, or the Portfolio Manager acting on behalf of the Issuer, may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the Notes, as applicable, and selling such Offered Securities to the highest such bidder.  However, the Issuer or the Portfolio Manager acting on behalf of the Issuer may select a purchaser by any other means determined by it in its sole discretion.  The holder of each Note, as applicable, the Non-Permitted Holder and each other person in the chain of title from the holder to the Non-Permitted Holder by its acceptance of an interest in the Notes, as applicable, agrees to cooperate with the Issuer and the Trustee to effect such transfers.  The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to the Non-Permitted Holder.  The terms and conditions of any sale shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to any person having an interest in the Offered Securities sold as a result of any such sale or the exercise of such discretion.

In addition, if a Holder fails for any reason to comply with its obligation to provide Holder FATCA Information or otherwise becomes a Holder or beneficial owner (a) that the Issuer reasonably determines that such Holder or holder's direct or indirect acquisition, holding or transfer of an interest in such Note would cause the Issuer to be unable to achieve FATCA Compliance or (b) that is or that the Issuer is required to treat as a "nonparticipating FFI" or a "recalcitrant account holder" of the Issuer, in each case as defined in FATCA (a "**Non-Permitted Tax Holder**"), the Issuer will have the right, in addition to withholding on "passthru payments" (as defined in the Code), to (x) compel such Holder to sell its interest in such Note and (y) sell such interest on such Holder's behalf in accordance with the procedures described in the preceding paragraph.  Moreover, each Holder will agree to indemnify the Issuer, the Trustee and other holders for all damages, costs and expenses that result from the failure of such Holder to comply with its obligation to provide Holder FATCA Information.  This indemnification will continue even after the applicable Holder ceases to have an ownership interest in the Notes.

If any person shall become the beneficial owner of an interest in Class E Notes or Subordinated Notes (collectively, "**ERISA Limited Notes**") who has made or is deemed to have made a prohibited transaction, Similar Law, Benefit Plan Investor or Controlling Person representation that is subsequently shown to be false or misleading or whose beneficial ownership otherwise causes a violation of the 25% Limitation (any such person a "**Non-Permitted ERISA Holder**"), the Issuer shall, promptly after discovery by the Issuer that such person is a Non-Permitted ERISA Holder (or upon notice from the Trustee if it makes the discovery (who agrees to notify the Issuer of such discovery, if any)), send notice to such Non-Permitted ERISA Holder demanding that such Non-Permitted ERISA Holder transfer its interest to a person that is not a Non-Permitted ERISA Holder within 10 days of the date of such notice.  If such Non-Permitted ERISA Holder fails to so transfer its ERISA Limited Notes, the Issuer shall have the right, without further notice to the Non-Permitted ERISA Holder, to sell such ERISA Limited Notes, or interest in such ERISA Limited Notes, to a purchaser selected by the Issuer that is not a Non-Permitted ERISA Holder on such terms as the Issuer may choose.  The Issuer may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the ERISA Limited Notes and selling such ERISA Limited Notes to the highest such bidder.  However, the Issuer or the Portfolio Manager acting on behalf of the Issuer may select a purchaser by any other means determined by it in its sole discretion.  The holder of each ERISA Limited Security, the Non-Permitted ERISA Holder and each other person in the chain of title from the holder to the Non-Permitted ERISA Holder, by its acceptance of an interest in the ERISA Limited Notes, agrees to cooperate with the Issuer and the Trustee to effect such transfers.  The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to the Non-Permitted ERISA Holder.  The terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to any person having an interest in the ERISA Limited Notes sold as a result of any such sale or the exercise of such discretion.

**Cayman Islands Placement Provisions**

The Initial Purchaser has agreed that it has not made and will not make any invitation to the public in the Cayman Islands to subscribe for the Offered Securities.

# LISTING AND GENERAL INFORMATION

1.  Application has been made to the Irish Stock Exchange for listing particulars in respect of the Notes to be approved. Application has been made to the Irish Stock Exchange for the Notes to be admitted to the Official List and trading on its Global Exchange Market. The total expenses related to admission of the Notes to the Irish Stock Exchange's Official List and trading on its Global Exchange Market are approximately €6,940. No assurances can be given that, following the Closing Date, the listing of the Notes on the Irish Stock Exchange will be obtained or, if obtained, maintained for the entire period that the Offered Securities are outstanding.

2.  For so long as any Class of Notes is listed on the Global Exchange Market of the Irish Stock Exchange, copies of the Memorandum and Articles of Association of the Issuer, the Certificate of Incorporation and By-laws of the Co-Issuer and the Indenture will be available for inspection (in electronic form) during the term of the Notes at the office of the Trustee.

3.  Since incorporation, neither the Issuer nor the Co-Issuer has commenced trading, established any accounts or declared any dividends, except for the transactions described herein.

4.  Neither of the Co-Issuers is, or has since incorporation been, involved in any governmental, legal or arbitration proceedings relating to claims in amounts which may have or have had a significant effect on the financial positions of the Co-Issuers, nor, so far as either Co-Issuer is aware, are any such governmental, legal or arbitration proceedings involving it pending or threatened.

5.  The issuance by the Issuer of the Notes is expected to be authorized by the Board of Directors of the Issuer by resolutions to be passed prior to the Closing Date and the issuance by the Co-Issuer of the Co-Issued Notes is expected to be authorized by the sole manager of the Co-Issuer by resolutions to be passed prior to the Closing Date.

6.  Neither of the Co-Issuers have since incorporation published annual reports and accounts. The Issuer is not required by Cayman Islands law, and the Issuer does not intend, to publish annual reports and accounts. The Co-Issuer is not required by Delaware State law, and the Co-Issuer does not intend, to publish annual reports and accounts. The Indenture, however, requires the Issuer to provide the Trustee with written confirmation, on an annual basis, that to the best of its knowledge following review of the activities of the prior year, no Event of Default has occurred or, if one has, specifying the same. Copies of the monthly reports and quarterly note valuation reports with respect to the Notes and the Collateral Obligations will be prepared by the Issuer in accordance with the Indenture and will be obtainable free of charge on a password protected website (the address for such website may be obtained from the Trustee). The monthly reports will be prepared each month (excluding any month in which a quarterly holder report is prepared), beginning with June 2015.

7.  The Co-Issuers have been established as special purpose vehicles for the purpose of issuing asset backed securities.

8.  Maples and Calder, as the Irish listing agent (in such capacity, the "**Irish Listing Agent**", is acting solely in its capacity as listing agent for the Issuer in connection with the Notes and is not itself seeking admission of the Notes to the Official List and trading on the Global Exchange Market of the Irish Stock Exchange.

9.  No website mentioned in this Offering Circular is incorporated in, or forms a part of, this Offering Circular.

10. The Secured Notes and the Subordinated Notes sold in offshore transactions in reliance on Regulation S under the Securities Act and represented by the Regulation S Global Notes have been accepted for clearance through Clearstream and Euroclear. The Secured Notes and Subordinated Notes sold to persons that are QIB/QPs in reliance on Rule 144A under the Securities Act and represented by Rule 144A Global Notes have been accepted for clearance through DTC. The CUSIP numbers, Common Codes and International Securities Identification Numbers (ISIN) for the Secured Notes represented by Global Notes are as indicated below, as applicable.

| | Regulation S Global | | | Rule 144A Global | | |
|---|---|---|---|---|---|---|
| | **Common Code** | **CUSIP** | **ISIN** | **CUSIP** | **ISIN** | **Common Code** |
| Class A-1 Notes | 120293249 | G0074WAA1 | USG0074WAA11 | 00452PAA5 | US00452PAA57 | 120293168 |
| Class A-2 Notes | 120293257 | G0074WAB9 | USG0074WAB93 | 00452PAD9 | US00452PAD96 | 120293150 |
| Class B-1 Notes | 120293222 | G0074WAC7 | USG0074WAC76 | 00452PAG2 | US00452PAG28 | 120293176 |
| Class B-2 Notes | 120293273 | G0074WAD5 | USG0074WAD59 | 00452PAK3 | US00452PAK30 | 120293192 |
| Class C Notes | 120293281 | G0074WAE3 | USG0074WAE33 | 00452PAN7 | US00452PAN78 | 120293184 |
| Class D Notes | 120293265 | G0074WAF0 | USG0074WAF08 | 00452PAR8 | US00452PAR82 | 120293206 |
| Class E Notes* | 120293290 | G00746AA8 | USG00746AA82 | 004524AA2 | US004524AA23 | 120293214 |
| Subordinated Notes** | 120293559 | G00746AB6 | USG00746AB65 | 004524AD6 | US004524AD61 | 120293478 |

\* Class E Notes sold to Institutional Accredited Investors have the following CUSIP Number:  004524AB0

\*\* Subordinated Notes sold to Accredited Investors have the following CUSIP Number:  004524AE4

# LEGAL MATTERS

Certain legal matters with respect to the Notes will be passed upon for the Co-Issuers by Dechert LLP. Certain matters with respect to Cayman Islands law will be passed upon for the Issuer by Maples and Calder. Certain legal matters with respect to the Portfolio Manager will be passed upon by Dechert LLP.

# GLOSSARY OF DEFINED TERMS

"**Accounts**" means (i) the Payment Account, (ii) the Collection Account, (iii) the Ramp-up Account, (iv) the Revolver Funding Account, (v) each Hedge Account, (vi) the Expense Reserve Account, (vii) the Custodial Account and (viii) the Interest Reserve Account.

"**Adjusted Collateral Principal Amount**" means as of any date of determination:

(a)   the Aggregate Principal Balance of the Collateral Obligations (other than (i) Defaulted Obligations, (ii) Deferring Obligations and (iii) Discount Obligations) *plus* any Principal Financed Accrued Interest; *plus*

(b)   without duplication, the amounts on deposit in the Accounts, excluding the Revolver Funding Account, (including Eligible Investments in such Accounts) representing Principal Proceeds; *plus*

(c)   the S&P Collateral Value of each Deferring Obligation; *plus*

(d)   the lesser of (x) the Market Value of each Defaulted Obligation and (y) the S&P Recovery Amount for each Defaulted Obligation; *provided* that Defaulted Obligations that have constituted Defaulted Obligations for a period of at least 3 years shall be deemed to have a value of 0; *plus*

(e)   the original purchase price (expressed as a percentage of par) multiplied by the current Principal Balance, excluding accrued interest, expressed as a dollar amount, of all Discount Obligations; *minus*

(f)   the Excess CCC/Caa Adjustment Amount;

*provided,* that with respect to any Collateral Obligation that would be subject to more than one of clauses (c) through (f) of this definition of "Adjusted Collateral Principal Amount," such Collateral Obligation shall, for the purposes of this definition, be treated as belonging to the category of Collateral Obligations which results in the lowest Adjusted Collateral Principal Amount on any date of determination; *provided further* that the Aggregate Principal Balance of any Deferring Obligation shall not include any deferred or capitalized interest for purposes of calculating the Adjusted Collateral Principal Amount. For the purposes of clause (a) above, Current Pay Obligations representing up to 2.5% of the Collateral Principal Amount shall be included in the calculation of the Aggregate Principal Balance of the Collateral Obligations.

"**Administrative Expense Cap**" means, an amount equal on any Payment Date (when taken together with any Administrative Expenses paid during the period since the preceding Payment Date or, in the case of the first Payment Date, the Closing Date (excluding Administrative Expenses paid by amounts in the Expense Reserve Account)) equal to the sum of (a) 0.02% *per annum* (prorated for the related Interest Accrual Period on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount on the Determination Date relating to the immediately preceding Payment Date and (b) $250,000 *per annum* (prorated for the related Interest Accrual Period on the basis of a 360-day year consisting of twelve 30-day months); *provided* that, if the amount of Administrative Expenses paid under the Administrative Expense Cap (including any excess applied in accordance with this proviso) on the three immediately preceding Payment Dates or during the related Collection Periods is less than the stated Administrative Expense Cap (without regard to any excess applied in accordance with this proviso) in the aggregate for such three preceding Payment Dates, the excess may be applied to the Administrative Expense Cap with respect to the then-current Payment Date; *provided further* that, in respect of the first three Payment Dates from the Closing Date, such excess amount shall be calculated based on the Payment Dates preceding such Payment Date; *provided further* that the Administrative Expense Cap shall not apply to the Petition Expense Amount or Petition Expenses (except as set forth in the Priority of Payments).

"**Administrative Expenses**" include fees, expenses (including indemnities) and other amounts due or accrued with respect to any Payment Date and payable in the following order by the Issuer, the Co-Issuer or any ETB Subsidiary: first *pro rata* to the Trustee and the Bank in each of its capacities pursuant to the Indenture and the Collateral Administrator for its fees and expenses under the Collateral Administration Agreement and then *pro rata* to:

(i)   the independent accountants, agents (other than the Portfolio Manager) and counsel of the Issuer and any ETB Subsidiary for fees and expenses and any taxes or government fees of the Issuer, the Co-Issuer or any ETB Subsidiary;

(ii)  the Rating Agency for fees and expenses (including surveillance fees) in connection with any rating of the Secured Notes or any Collateral Obligations;

(iii) any person in respect of Petition Expenses;

(iv) the Portfolio Manager under the Indenture and the Portfolio Management Agreement, including without limitation reasonable expenses of the Portfolio Manager (including fees for its accountants, agents and counsel) incurred in connection with the purchase or sale of any Collateral Obligations (including amounts owed to an Independent Review Party), any other expenses incurred in connection with the Collateral Obligations and amounts payable pursuant to the Portfolio Management Agreement but excluding the Management Fees;

(v)  the Administrator pursuant to the Administration Agreement and the Registered Office Agreement; and

(vi) any other person in respect of any other fees or expenses permitted under the Indenture and the documents delivered pursuant to or in connection with the Indenture (including the payment of facility rating fees and all legal and other fees and expenses incurred in connection with the purchase or sale of any Collateral Obligations and any other expenses incurred in connection with the Collateral Obligations) and the Offered Securities, including but not limited to, amounts owed to the Co-Issuer pursuant to the Indenture and any amounts due in respect of the listing of the Offered Securities on any stock exchange or trading system, any costs associated with producing Certificated Notes, any fees, taxes and expenses incurred in connection with complying with FATCA or the establishment and maintenance of any ETB Subsidiary (other than those amounts paid under clause (i));

*provided,* that amounts due in respect of actions taken on or before the Closing Date (or, at the Portfolio Manager's discretion, expenses incurred in connection with the acquisition of the initial portfolio of Collateral Obligations prior to the fourth Payment Date) shall not be payable as Administrative Expenses but shall be payable only from the Expense Reserve Account pursuant to the Indenture.

"**Affected**" means any Class of Notes which becomes subject to a tax as a result of a Tax Event.

"**Aggregate Outstanding Amount**" means, with respect to any of the Notes as of any date, the aggregate unpaid principal amount of such Notes outstanding (including any Deferred Interest previously added to the principal amount of any Class of Deferrable Notes that remains unpaid) on such date. Payments received on the Subordinated Notes shall not reduce the Aggregate Outstanding Amount of the Subordinated Notes prior to the Stated Maturity.

"**Aggregate Principal Balance**" means, when used with respect to all or a portion of the Collateral Obligations or the Pledged Obligations, the sum of the Principal Balances of all or of such portion of the Collateral Obligations or Pledged Obligations, respectively.

"**Asset-Backed Commercial Paper**" means commercial paper or other short-term obligations of a program that primarily issues externally rated commercial paper backed by assets or exposures held in a bankruptcy-remote special purpose entity.

"**Assigned Moody's Rating**" means the monitored publicly-available rating or the estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised; *provided* that, if such rating estimate has been issued or provided by Moody's for a period (x) longer than 13 months but not beyond 15 months, for purposes of the Moody's Default Probability Rating and Moody's Rating, as applicable, the "Assigned Moody's Rating" will be one subcategory lower than such rating estimate and (y) beyond 15 months, for purposes of the Moody's Default Probability Rating and Moody's Rating, as applicable, the "Assigned Moody's Rating" will be deemed to be "Caa3".

"**Assumed Reinvestment Rate**" means, for each Interest Accrual Period, LIBOR (as determined on the most recent Interest Determination Date) minus 0.50% per annum; *provided* that, if the calculation above results in an interest rate of less than zero, the Assumed Reinvestment Rate will be deemed to be zero for purposes of such calculation.

"**Bridge Loan**" means any loan or other obligation that (x) is incurred in connection with a merger, acquisition, consolidation, or sale of all or substantially all of the assets of a person or similar transaction and (y) by its terms, is required to be repaid within one year of the incurrence thereof with proceeds from additional borrowings or other refinancings (it being understood that any such loan or debt security that has a nominal maturity date of one year or less from the incurrence thereof but has a term-out or other provision whereby (automatically or at the sole option of the obligor thereof) the maturity of the indebtedness thereunder may be extended to a later date is not a Bridge Loan).

"**Business Day**" means any day other than (i) a Saturday or a Sunday or (ii) a day on which commercial banks are authorized or required by applicable law, regulation or executive order to close in New York, New York or in the city in which the corporate office of the Trustee is located or, for any final payment of principal, in the relevant place of presentation.

"**Caa Collateral Obligation**" means a Collateral Obligation (other than a Defaulted Obligation or a Deferring Obligation) with a Moody's Rating of "Caa1" or lower.

"**Cayman IGA**" means the intergovernmental agreement between the Cayman Islands and the United States signed on November 29, 2013, as the same may be amended from time to time.

"**CCC/Caa Excess**" means the greater of: (i) the excess, if any, by which the Aggregate Principal Balance of Caa Collateral Obligations *exceeds* 7.5% of the Collateral Principal Amount *and* (ii) the excess, if any, by which the Aggregate Principal Balance of CCC Collateral Obligations *exceeds* 7.5% of the Collateral Principal Amount; *provided* that in determining which of the CCC Collateral Obligations and the Caa Collateral Obligations shall be included in the CCC/Caa Excess, the CCC Collateral Obligations and the Caa Collateral Obligations with the lowest Market Value (expressed as a percentage of par) shall be deemed to constitute such CCC/Caa Excess; *provided further* that, if the greater of clause (i) or (ii) above does not result in the larger Excess CCC/Caa Adjustment Amount, then the lesser of clause (i) or (ii) shall be applicable for purposes of this definition.

"**CCC Collateral Obligation**" means a Collateral Obligation (other than a Defaulted Obligation or a Deferring Obligation) with an S&P Rating of "CCC+" or lower.

"**CFR**" means, with respect to an obligor of a Collateral Obligation, if such obligor has a corporate family rating by Moody's, then such corporate family rating; *provided* that, if such obligor does not have a corporate family rating by Moody's but any entity in the obligor's corporate family does have a corporate family rating, then the CFR is such corporate family rating.

"**Class A Notes**" means, collectively, the Class A-1 Notes and the Class A-2 Notes.

"**Class A-1 Notes**" means the Class A-1 Senior Secured Floating Rate Notes issued pursuant to the Indenture.

"**Class A-2 Notes**" means the Class A-2 Senior Secured Fixed Rate Notes issued pursuant to the Indenture.

"**Class B Notes**" means, collectively, the Class B-1 Notes and the Class B-2 Notes.

"**Class B-1 Notes**" means the Class B-1 Senior Secured Floating Rate Notes issued pursuant to the Indenture.

"**Class B-2 Notes**" means the Class B-2 Senior Secured Fixed Rate Notes issued pursuant to the Indenture.

"**Class Break-even Default Rate**" means, with respect to the most senior Class of Secured Notes outstanding then rated by S&P, the maximum percentage of defaults, at any time, that the Current Portfolio or the Proposed

Portfolio, as applicable, can sustain, determined through application of the applicable S&P CDO Monitor chosen by the Portfolio Manager in accordance with the definition of "S&P CDO Monitor" that is applicable to the portfolio of Collateral Obligations, which, after giving effect to S&P's assumptions on recoveries, defaults and timing and to the Priority of Payments, will result in sufficient funds remaining for the payment of such Class of Notes in full.  The S&P CDO Monitor is available at www.structuredfinanceinterface.com and S&P may provide the Portfolio Manager with any input files in connection therewith, in each case, pursuant to the definition of "S&P CDO Monitor" and based upon the Weighted Average Floating Spread and the Weighted Average S&P Recovery Rate to be associated with such S&P CDO Monitor as selected by the Portfolio Manager from Section 2 of <u>Annex A</u> or any other Weighted Average Floating Spread and Weighted Average S&P Recovery Rate selected by the Portfolio Manager from time to time.

"**Class C Notes**" means the Class C Secured Deferrable Floating Rate Notes issued pursuant to the Indenture.

"**Class D Notes**" means the Class D Secured Deferrable Floating Rate Notes issued pursuant to the Indenture.

"**Class Default Differential**" means, with respect to the most senior Class of Secured Notes outstanding then rated by S&P, at any time, the rate calculated by subtracting the Class Scenario Default Rate at such time for such Class of Secured Notes from the Class Break-even Default Rate for such Class of Secured Notes at such time.

"**Class E Notes**" means the Class E Secured Deferrable Floating Rate Notes issued pursuant to the Indenture.

"**Class Scenario Default Rate**" means, with respect to the most senior Class of Secured Notes outstanding then rated by S&P, at any time, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with S&P's initial rating of such Class of Secured Notes, determined by application by the Portfolio Manager and the Collateral Administrator of the S&P CDO Monitor at such time.

"**Closing Date**" means April 16, 2015.

"**Co-Issued Notes**" means the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes.

"**Collateral Interest Amount**" means, as of any date of determination, without duplication, an amount equal to:

(a)   the aggregate amount of Interest Proceeds in the Interest Collection Subaccount that have been received or that are expected to be received (other than Interest Proceeds expected to be received from Defaulted Obligations and Deferring Obligations, but including Interest Proceeds actually received from Defaulted Obligations and Deferring Obligations) during the Collection Period (and, if such Collection Period does not end on a Business Day, the next succeeding Business Day) in which such date of determination occurs; *plus*

(b)   in the case of the Hedge Agreements, any net payments expected to be received by the Issuer on or before the immediately following Payment Date (other than any payments that would be classified as Principal Proceeds).

"**Collateral Principal Amount**" means as of any date of determination, the sum of (a) the Aggregate Principal Balance of the Collateral Obligations (other than Defaulted Obligations) and (b) without duplication, the amounts on deposit in the Accounts, other than the Revolver Funding Account, (including Eligible Investments in such Accounts) representing Principal Proceeds.

"**Companies Law**" means The Companies Law (2013 Revision) of the Cayman Islands, as amended from time to time.

"**Consenting Holder of the Subordinated Notes**" means, with respect to any Payment Date, a Holder of Subordinated Notes that has consented by delivering an irrevocable written notice to the Paying Agent to a distribution of Equity Securities in lieu of payment of Interest Proceeds on such Payment Date.

"**Cov-Lite Loan**" means a loan that (i) does not contain any financial covenants or (ii) requires the borrower to comply with one or more financial covenants only upon the occurrence of certain actions of the borrower including,

but not limited to, a debt issuance, dividend payment, share purchase, merger, acquisition or divestiture (such covenant, an "**Incurrence Covenant**"), but contains no covenants requiring the borrower to comply with one or more financial covenants during each reporting period, whether or not it has taken any specified action (such covenant, a "**Maintenance Covenant**"); *provided* that, for all purposes other than the determination of the S&P Recovery Rate for such loan, a loan described in clause (i) or (ii) above which either contains a cross default provision to, or is *pari passu* with, another loan of the underlying obligor that requires the underlying obligor to comply with both an Incurrence Covenant and a Maintenance Covenant will be deemed not to be a Cov-Lite Loan.

"**Credit Improved Criteria**" means the criteria that will be met with respect to any Collateral Obligation (i) if such Collateral Obligation is a loan, the Loan Pricing Change since the date of purchase by the Issuer has been a percentage point increase of 0.25% or more, (ii) if such Collateral Obligation is a loan, the spread over the applicable reference rate for such Collateral Obligation has been decreased in accordance with the underlying instruments with respect to such Collateral Obligation since the date of acquisition by (a) 0.25% or more (in the case of a loan with a spread (prior to such decrease) less than or equal to 2.00%), (b) 0.375% or more (in the case of a loan with a spread (prior to such decrease) greater than 2.00% but less than or equal to 4.00%) or (c) 0.50% or more (in the case of a loan with a spread (prior to such decrease) greater than 4.00%) due, in each case, to an improvement in the related borrower's financial ratios or financial results or (iii) if it has a projected cash flow interest coverage ratio (earnings before interest and taxes *divided by* cash interest expense as estimated by the Portfolio Manager) of the underlying borrower or other obligor of such Collateral Obligation that is expected to be more than 1.15 times the current year's projected cash flow interest coverage ratio.

"**Credit Improved Obligation**" means a Collateral Obligation which, in the Portfolio Manager's reasonable commercial judgment, has significantly improved in credit quality after it was acquired by the Issuer, which improvement may (but need not) be evidenced by one of the following: (a) such Collateral Obligation satisfies at least one of the Credit Improved Criteria, (b) such Collateral Obligation has been upgraded at least one rating sub-category by either Rating Agency or has been placed and remains on credit watch with positive implication by any Rating Agency, (c) the issuer of such Collateral Obligation has raised equity capital or other capital subordinated to the Collateral Obligation or (d) the issuer of such Collateral Obligation has, in the Portfolio Manager's reasonable commercial judgment, shown improved results or possesses less credit risk, in each case since such Collateral Obligation was acquired by the Issuer; *provided* that, during a Restricted Trading Period, a Collateral Obligation will qualify as a Credit Improved Obligation only if (i) such Collateral Obligation has been upgraded by any Rating Agency at least one rating sub category or has been placed and remains on a credit watch with positive implication by any Rating Agency since it was acquired by the Issuer, (ii) at least one of the Credit Improved Criteria are satisfied with respect to such Collateral Obligation or (iii) a Majority of the Controlling Class vote to treat such Collateral Obligation as a Credit Improved Obligation.

"**Credit Risk Criteria**" means the criteria that will be met with respect to any Collateral Obligation (i) if such Collateral Obligation is a loan, the Loan Pricing Change since the date of purchase by the Issuer has been a percentage point decrease of 0.25% or more, (ii) if such Collateral Obligation is a loan, the spread over the applicable reference rate for such Collateral Obligation has been increased in accordance with the underlying instruments with respect to such Collateral Obligation since the date of acquisition by (a) 0.25% or more (in the case of a loan with a spread (prior to such increase) less than or equal to 2.00%), (b) 0.375% or more (in the case of a loan with a spread (prior to such increase) greater than 2.00% but less than or equal to 4.00%) or (c) 0.50% or more (in the case of a loan with a spread (prior to such increase) greater than 4.00%) due, in each case, to a deterioration in the related borrower's financial ratios or financial results or (iii) if it has a projected cash flow interest coverage ratio (earnings before interest and taxes *divided by* cash interest expense as estimated by the Portfolio Manager) of the underlying borrower or other obligor of such Collateral Obligation of less than 1.00 or that is expected to be less than 0.85 times the current year's projected cash flow interest coverage ratio.

"**Credit Risk Obligation**" means a Collateral Obligation that, in the Portfolio Manager's reasonable commercial judgment, has a significant risk of declining in credit quality or price unrelated to general market conditions; *provided* that, during a Restricted Trading Period, a Collateral Obligation will qualify as a Credit Risk Obligation only if (i) such Collateral Obligation has been downgraded by any Rating Agency at least one rating sub category or has been placed and remains on a credit watch with negative implication by any Rating Agency since it was acquired by the Issuer, (ii) at least one of the Credit Risk Criteria are satisfied with respect to such Collateral

Obligation or (iii) a Majority of the Controlling Class vote to treat such Collateral Obligation as a Credit Risk Obligation.

"**Current Pay Obligation**" means any Collateral Obligation (other than a DIP Collateral Obligation) that would otherwise be treated as a Defaulted Obligation but as to which no payments are due and payable that are unpaid (disregarding any forbearance or grace period in excess of 90 days with respect to any payment that is unpaid but would be due and payable but for such forbearance or grace period) and with respect to which the Portfolio Manager has certified to the Trustee (with a copy to the Collateral Administrator) in writing that it believes, in its reasonable business judgment, that (i) the issuer or obligor of such Collateral Obligation will continue to make scheduled payments of interest (and/or fees, as applicable, in the case of a Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation) thereon and will pay the principal thereof by maturity or as otherwise contractually due, (ii) if the issuer or obligor is subject to a bankruptcy proceeding, it has been the subject of an order of a bankruptcy court that authorizes payments on such Collateral Obligation and all interest (and/or fees, as applicable, in the case of a Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation) and principal payments and any other amounts due thereunder have been paid in cash when due, and (iii) the Market Value of such Collateral Obligation is at least 80% of the par value thereof; *provided* that the Aggregate Principal Balance of all Collateral Obligations which constitute "Current Pay Obligations" may not exceed 2.5% of the Collateral Principal Amount; *provided further* that, in determining which of the Collateral Obligations will be included in the preceding proviso as Current Pay Obligations, the Collateral Obligations with the highest Market Value expressed as a percentage will be deemed to constitute Current Pay Obligations. If the Market Value of a Collateral Obligation is determined pursuant to clause (E) of the definition of Market Value, such Collateral Obligation cannot be a Current Pay Obligation.

"**Current Portfolio**" means, at any time, the then current portfolio of Collateral Obligations and Eligible Investments representing Principal Proceeds (determined in accordance with certain assumptions included in the Indenture), then held by the Issuer.

"**Default**" means any Event of Default or any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"**Defaulted Obligation**" means a Collateral Obligation as to which:

(a)  a default as to the payment of principal and/or interest has occurred and is continuing with respect to such Collateral Obligation (without regard to any grace period applicable thereto, or waiver thereof, after the passage (in the case of a default that in the Portfolio Manager's judgment, as certified to the Trustee in writing, is not due to credit-related causes) of a three Business Day grace period);

(b)  a default known to a Responsible Officer of the Portfolio Manager as to the payment of principal and/or interest has occurred and is continuing on another debt obligation of the same issuer which is senior or *pari passu* in right of payment to such Collateral Obligation (without regard to any grace period applicable thereto, or waiver or forbearance thereof, after the passage (in the case of a default in the Portfolio Manager's judgment that is not due to credit-related causes) of five Business Days or seven calendar days, whichever is greater, but in no case beyond the passage of any grace period applicable thereto; *provided* that both the Collateral Obligation and such other debt obligation are full recourse obligations);

(c)  the issuer or others have instituted proceedings to have the issuer adjudicated as bankrupt or insolvent or placed into receivership and such proceedings have not been stayed or dismissed or such issuer has filed for protection under Chapter 11 of the United States Bankruptcy Code;

(d)  (x) such Collateral Obligation has an S&P Rating of "CC" or lower or "SD" or had such rating before such rating was withdrawn or (y) the obligor of such Collateral Obligation has a Moody's probability default rating (as published by Moody's) of "D" or "LD" or had such rating before such rating was withdrawn;

(e)  the Portfolio Manager has in its reasonable commercial judgment otherwise declared such Collateral Obligation to be a "Defaulted Obligation;"

153

(f)   such Collateral Obligation is a Participation Interest and (1) the related Selling Institution fails in any material respect in the performance of any of its payment obligations in accordance with the terms of such Participation Interest and such failure continues for seven Business Days, or (2) the Selling Institution has an S&P Rating of "CC" or lower or "SD" or a Moody's probability of default rating of "D" or "LD" or had either such rating before such rating was withdrawn;

(g)   such Collateral Obligation is *pari passu* or subordinate in right of payment as to the payment of principal and/or interest to another debt obligation of the same issuer that would constitute a Defaulted Obligation under clause (d) above were such other debt obligation owned by the Issuer; *provided* that both the debt obligation and such other debt obligation are full recourse obligations of the applicable issuer;

(h)   such obligation is a Deferring Obligation; or

(i)   such obligation is included in the excess, if any, of any Collateral Obligations that would qualify as Current Pay Obligations but for the provisos to the definition thereof;

*provided*, that a Collateral Obligation will not constitute a Defaulted Obligation pursuant to clauses (b) or (c) above if such Collateral Obligation is a DIP Collateral Obligation.

"**Deferrable Cash-Pay Interest**" means as to any Partial Deferrable Obligation, the portion of interest required to be paid in cash (and not permitted to be added to the balance of such Partial Deferrable Obligation or otherwise deferred and accrued) thereon pursuant to the terms of the related underlying instruments.

"**Deferrable Obligation**" means a Collateral Obligation which by its terms permits the deferral of payment of any accrued or unpaid interest.

"**Deferrable Notes**" means the Class C Notes, the Class D Notes and the Class E Notes.

"**Deferring Obligation**" means a Deferrable Obligation that is deferring the payment of interest due thereon and has been so deferring the payment of interest due thereon (i) with respect to Collateral Obligations that have a Moody's Rating of at least "Baa3," for the shorter of two consecutive accrual periods or one year and (ii) with respect to Collateral Obligations that have a Moody's Rating of "Ba1" or below, for the shorter of one accrual period or six consecutive months, which deferred capitalized interest has not, as of the date of determination, been paid in cash.

"**Delayed Drawdown Collateral Obligation**" means any Collateral Obligation that (a) requires the Issuer to make one or more future advances to the borrower under the underlying instruments relating thereto, (b) specifies a maximum amount that can be borrowed on one or more borrowing dates, and (c) does not permit the re-borrowing of any amount previously repaid by the borrower thereunder; but any such Collateral Obligation will be a Delayed Drawdown Collateral Obligation only until all commitments by the Issuer to make advances to the borrower expire or are terminated or reduced to zero.

"**Determination Date**" means, with respect to each Payment Date, the last day of the related Collection Period.

"**DIP Collateral Obligation**" means a loan paying interest on a current basis made to a debtor-in-possession pursuant to Section 364 of the U.S. Bankruptcy Code having the priority allowed by either Section 364(c) or 364(d) of the U.S. Bankruptcy Code and secured by senior liens.

"**Discount Obligation**" means any Collateral Obligation that was purchased (as determined without averaging prices of purchases on different dates and treating each portion of a Collateral Obligation purchased on different dates as a separate Collateral Obligation) for less than (a) 85.0% of its Principal Balance, if such Collateral Obligation has a Moody's Rating lower than "B3," or (b) 80.0% of its Principal Balance, if such Collateral Obligation has a Moody's Rating of "B3" or higher; *provided* that, solely for the purposes of the Effective Date Overcollateralization Test, until the date that is one year following the Closing Date, any Collateral Obligation that

is classified as "Oil and Gas" by S&P will be considered a Discount Obligation if such Collateral Obligation was purchased for less than 85% of its Principal Balance, irrespective of its Moody's Rating; *provided further* that:

(i)     such Collateral Obligation will cease to be a Discount Obligation at such time as the Market Value (expressed as a percentage of the par amount of such Collateral Obligation) determined for such Collateral Obligation on each day during any period of 30 consecutive days since the acquisition by the Issuer of such Collateral Obligation, equals or exceeds 90% of the Principal Balance of such Collateral Obligation;

(ii)    any Collateral Obligation that would otherwise be considered a Discount Obligation, but that is purchased in accordance with the Eligibility Criteria with the proceeds of sale of a Collateral Obligation that was not a Discount Obligation at the time of its purchase, so long as such purchased Collateral Obligation:

    (A)     is purchased or committed to be purchased within 20 Business Days of such sale,

    (B)     is purchased at a purchase price (expressed as a percentage of the par amount of such Collateral Obligation) equal to or greater than the sale price of the sold Collateral Obligation,

    (C)     is purchased at a purchase price (expressed as a percentage of the par amount of such Collateral Obligation) not less than 65%; and

    (D)     has a Moody's Default Probability Rating equal to or greater than the Moody's Default Probability Rating of the sold Collateral Obligation.

    Any Collateral Obligations described in clauses (A) through (D) above will not be considered to be Discount Obligations.

(iii)   clause (ii) above in this proviso shall not apply to any such Collateral Obligation at any time on or after the acquisition by the Issuer of such Collateral Obligation if, as determined at the time of such acquisition, such application would result in:

    (A)     more than 5% of the Collateral Principal Amount consisting of Collateral Obligations to which such clause (ii) has been applied; or

    (B)     the Aggregate Principal Balance of all Collateral Obligations to which such clause (ii) has been applied since the Closing Date being more than 10% of the Target Initial Par Amount.

"**Domicile**" means with respect to any issuer of, or obligor with respect to, a Collateral Obligation, its country of organization.

"**Exchanged Equity Security**" means any Equity Security received by the Issuer in exchange for a Defaulted Obligation and held by an ETB Subsidiary.

"**Effective Date**" means the date on which each of the Effective Date Conditions are met.

"**Effective Date Conditions**" means conditions that will be satisfied if the S&P Effective Date Rating Condition has been satisfied after the end of the Ramp-up Period.

"**Effective Date Overcollateralization Test**" means a test that is satisfied if, on any date of determination, the ratio of (x) the Adjusted Collateral Principal Amount *divided* by (y) the Aggregate Outstanding Amount of all Secured Notes is equal to or greater than the Target Initial Par Ratio.

"**Eligible Investment Required Ratings**" means (a) if such obligation or security (i) has both a long-term and a short-term credit rating from Moody's, such ratings are "Aa3" or higher (not on credit watch for possible downgrade) and "P-1" (not on credit watch for possible downgrade), respectively, (ii) has only a long-term credit rating from Moody's, such rating is at least equal to or higher than the current Moody's sovereign ratings of the U.S.

government, and (iii) has only a short-term credit rating from Moody's, such rating is "P-1" (not on credit watch for possible downgrade), and (b) a long-term credit rating of "A" or higher and a short-term credit rating of at least "A-1" (or, in the absence of a short-term credit rating, "A+" or higher) from S&P; *provided* that, if held by the Issuer for more that 60 days, such obligation or security has a long-term credit rating of at least "AA-" from S&P.

"**Eligible Investments**" means (A) cash and (B) any United States dollar denominated investment that, at the time it is delivered to the Trustee (directly or through an intermediary or bailee), is one or more of the following obligations or securities:

(i)   direct obligations of, and obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States of America or any agency or instrumentality of the United States of America the obligations of which are expressly backed by the full faith and credit of the United States of America and such obligations meet the criteria set forth in clause (b) of the definition of Eligible Investment Required Ratings;

(ii)  demand and time deposits in, certificates of deposit of, trust accounts with, bankers' acceptances issued by, or federal funds sold by any depository institution or trust company incorporated under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state banking authorities, so long as the commercial paper and/or the debt obligations of such depository institution or trust company at the time of such investment or contractual commitment providing for such investment have the Eligible Investment Required Ratings;

(iii) commercial paper or other short-term obligations (other than Asset-Backed Commercial Paper) with the Eligible Investment Required Ratings and that either bear interest or are sold at a discount from the face amount thereof and have a maturity of not more than 183 days from their date of issuance and such maturity is not extendable; and

(iv) shares of non-U.S. registered money market funds which funds have, at all times, credit ratings of "Aaa-mf" by Moody's and "AAAm" or "AAAm-G" by S&P, respectively;

*provided* that Eligible Investments purchased with funds in the Collection Account shall be held until maturity except as otherwise specifically provided herein and shall include only such obligations or securities, other than those referred to in clause (iv) above, as mature (or are putable at par to the issuer thereof) no later than the Business Day prior to the next Payment Date; and *provided, however,* that none of the foregoing obligations or securities shall constitute Eligible Investments if (a) such obligation or security has an "f," "r," "p," "pi," "q," "t" or "sf" subscript assigned by S&P, (b) all, or substantially all, of the remaining amounts payable thereunder consist of interest and not principal payments, (c) such obligation or security is subject to withholding tax unless (i) the issuer of the security is required to make "gross-up" payments for the full amount of such foreign withholding tax, or (ii) such withholding is imposed pursuant to FATCA, (d) such obligation or security is secured by real property, (e) such obligation or security is purchased at a price greater than 100% of the principal or face amount thereof, (f) in the Portfolio Manager's judgment, such obligation or security is subject to material non-credit related risks or (g) such obligation is a Structured Finance Obligation or Synthetic Security; *provided further* that each Eligible Investment, other than those referred to in clause (vii) above, must mature on the earlier of (A) 60 days following its acquisition or (B) the Business Day prior to the next Payment Date (subject to the limited exception set forth in the first proviso of this paragraph above).  Eligible Investments may include, without limitation, those investments for which the Trustee or an affiliate of the Trustee provides services and receives compensation.  For the avoidance of doubt, the Issuer shall not acquire any Eligible Investments that are not "cash equivalents" as defined in and subject to the Volcker Rule.

"**Equity Security**" means any security or debt obligation that at the time of acquisition, conversion or exchange does not satisfy one or more of the requirements of the definition of "Collateral Obligation" and is not an Eligible Investment.

"**Excepted Advances**" means customary advances made to protect or preserve rights against the borrower of or obligor under a Collateral Obligation or to indemnify an agent or representative for lenders pursuant to the underlying instrument.

"**Excess CCC/Caa Adjustment Amount**" means, as of any date of determination, an amount equal to the excess, if any, of:

(a)   the Aggregate Principal Balance of the Collateral Obligations included in the CCC/Caa Excess; *over*

(b)   the sum of the Market Values of all Collateral Obligations included in the CCC/Caa Excess.

"**FATCA**" means Sections 1471 through 1474 of the Code and the Treasury regulations (and any notices, guidance or official pronouncements) promulgated thereunder, any agreement entered into with respect thereto, any intergovernmental agreement in respect thereof (including the Cayman IGA), and any law, rule or regulation implementing such an intergovernmental agreement, including any regulations, rules and guidance notes or other approach or practices adopted in respect thereof.

"**FATCA Compliance**" means compliance with FATCA, as necessary so that no tax will be imposed or withheld thereunder in respect of payments to or for the benefit of, and no penalty will be imposed upon, the Issuer.

"**First-Lien Last-Out Loan**" means any assignment of or Participation Interest in a loan that: (a) may by its terms become subordinate in right of payment to any other obligation of the obligor of the loan solely upon the occurrence of a default or event of default by the obligor of the loan and (b) is secured by a valid perfected first priority security interest or lien in, to or on specified collateral securing the obligor's obligations under the loan.

"**Fixed Rate Notes**" means the Class A-2 Notes and the Class B-2 Notes, collectively.

"**Floating Rate Notes**" means all of the Secured Notes, collectively, other than the Class A-2 Notes and the Class B-2 Notes.

"**Group I Country**" means The Netherlands, Australia, New Zealand and the United Kingdom (or such other countries as may be notified by Moody's to the Portfolio Manager from time to time).

"**Group II Country**" means Germany, Sweden and Switzerland (or such other countries as may be notified by Moody's to the Portfolio Manager from time to time).

"**Group III Country**" means Austria, Belgium, Denmark, Finland, France, Iceland, Liechtenstein, Luxembourg and Norway (or such other countries as may be notified by Moody's to the Portfolio Manager from time to time).

"**Holder FATCA Information**" means information and documentation requested by the Issuer (or an authorized agent acting on behalf of the Issuer) to be provided by the holder of a Note to the Issuer (or an authorized agent acting on behalf of the Issuer) that may be required to enable the Issuer to comply with FATCA.

"**Indenture**" means the indenture to be dated as of the Closing Date among the Co-Issuers and the Trustee, as may be amended, modified or supplemented from time to time.

"**Interest Only Security**"   means any obligation or security that does not provide in the related underlying instruments for the payment or repayment of a stated principal amount in one or more installments on or prior to its stated maturity.

"**Interest Proceeds**" means, with respect to any Collection Period or Determination Date (without duplication and excluding with respect to (x) any Payment Date, amounts used to purchase or pay accrued interest in connection with the purchase of Collateral Obligations or Repurchased Notes, respectively, and (y) any date on which a Refinancing of some, but not all, of the Classes of Secured Notes occurs, Partial Refinancing Interest Proceeds), the sum of:

(i)   all payments of interest received by the Issuer during the related Collection Period on the Collateral Obligations and Eligible Investments, including the accrued interest received in connection with a sale thereof during the related Collection Period, *less* (x) any such amount that represents Principal Financed Accrued Interest

and (y) an amount designated by the Portfolio Manager in writing up to the amount of unpaid interest on the Collateral Obligations that accrued prior to the Closing Date and is owing to the Issuer and remains unpaid as of the Closing Date;

(ii)  all principal and interest payments on Eligible Investments purchased with Interest Proceeds;

(iii)  all amendment and waiver fees, late payment fees and other fees, except for any fee in connection with the reduction of the par of the related Collateral Obligation;

(iv)  any amounts deposited in the Interest Collection Subaccount of the Collection Account from the Expense Reserve Account as described in "*Security for the Secured Notes—The Expense Reserve Account*;"

(v)  commitment fees and other similar fees actually received by the Issuer during such Collection Period in respect of Revolving Collateral Obligations and Delayed Drawdown Collateral Obligations;

(vi)  any payment received with respect to any Hedge Agreement other than an upfront payment received upon entering into such Hedge Agreement or a payment received as a result of the termination of such Hedge Agreement (for this purpose, any such payment received or to be received on a Payment Date will be deemed received in respect of the preceding Collection Period and included in the calculation of Interest Proceeds received in such Collection Period);

(vii)  any funds transferred from the Ramp-up Account to the Interest Collection Subaccount of the Collection Account designated as Interest Proceeds by the Portfolio Manager to the Trustee in writing as described under "*Security for the Secured Notes—The Ramp-up Account*;"

(viii)  Designated Principal Proceeds; and

(ix)  any amount deposited in the Interest Collection Subaccount of the Collection Account from the Interest Reserve Account as described in "*Security for the Secured Notes—Interest Reserve Account*;"

*provided* that any amounts received in respect of any Defaulted Obligation or any Exchanged Equity Security will constitute (i) Principal Proceeds (and not Interest Proceeds) until the aggregate of all collections in respect of such Defaulted Obligation or Exchanged Equity Security, as applicable, since such Defaulted Obligation (or in the case of an Exchanged Equity Security, the related Underlying Exchanged Defaulted Obligation) became a Defaulted Obligation equals the outstanding Principal Balance of such Defaulted Obligation (or, in the case of an Exchanged Equity Security, the related Underlying Exchanged Defaulted Obligation) when it became a Defaulted Obligation, and then (ii) Interest Proceeds thereafter; *provided further* that any amounts received in respect of any Deferring Obligation will constitute Principal Proceeds (and not Interest Proceeds) until the aggregate of all collections in respect of such Deferring Obligation since it became a Deferring Obligation equals the outstanding Principal Balance of such Collateral Obligation (including any deferred or capitalized interest) when it became a Deferring Obligation, and thereafter any amounts received shall constitute Interest Proceeds.

With respect to any Payment Date, an amount equal to the Interest Proceeds due to the Consenting Holders of the Subordinated Notes that are paid in the form of Equity Securities in lieu of cash pursuant to the Indenture will be treated for all purposes by the Issuer and the Trustee as Principal Proceeds.

"**Investment Criteria Adjusted Balance**" means respect to each Collateral Obligation, the Principal Balance of such Collateral Obligation; *provided* that for all purposes the Investment Criteria Adjusted Balance of any:

(i)  Deferring Obligation will be the S&P Collateral Value of such Deferring Obligation;

(ii)  Discount Obligation will be the original purchase price (expressed as a percentage of par) multiplied by the current Principal Balance, excluding accrued interest, expressed as a dollar amount;

(iii)  CCC Collateral Obligations and Caa Collateral Obligations included in the CCC/Caa Excess will be the Market Value of such Collateral Obligation; and

(iv)  Defaulted Obligation will be the S&P Collateral Value for such Defaulted Obligations; *provided* that any such Defaulted Obligation that has constituted a Defaulted Obligation for a period of at least 3 years shall be deemed to have an Investment Criteria Adjusted Balance of zero;

*provided further* that, if any Collateral Obligation would be subject to more than one of clauses (i) through (iv) of this definition of "Investment Criteria Adjusted Balance," such Collateral Obligation shall, for the purposes of this definition, be treated as belonging to the clause that results in the lowest Investment Criteria Adjusted Balance.

"**Junior Class**" means, with respect to any specified Class of Notes, each Class of Notes that is subordinated to such Class, as indicated under "*Summary of Terms—Principal terms of the Offered Securities—Junior Class(es).*"

"**Loan Pricing Change**" means, with respect to a loan, the change in price of such loan (expressed as a percentage of par) relative to the S&P/LSTA U.S. Leveraged Loan 100 Index or any other nationally recognized index as calculated by the Portfolio Manager in its reasonable commercial judgment.

"**Majority**" means with respect to any Class of Notes, the holders of more than 50% of the Aggregate Outstanding Amount of the Notes of such Class.

"**Margin Loan**" means an extension of credit that is "purpose credit" within the meaning of Regulation U.

"**Margin Stock**" means "Margin Stock" as defined under Regulation U, including any debt security which is by its terms convertible into "Margin Stock."

"**Market Value**" means, as of any date of determination for any Collateral Obligation and as determined by the Portfolio Manager in the following manner:  (A) the average bid price value determined by an independent pricing service, (B) if the price described in clause (A) is not available, the average of the bid side prices determined by three independent broker-dealers active in the trading of such Collateral Obligation, (C) if a price or bid described in clause (A) or (B) is not available, the lowest of the bid side prices determined by two independent broker-dealers active in the trading of such Collateral Obligation, (D) if a price or bid described in clause (A), (B) or (C) is not available and the Portfolio Manager is a Registered Investment Adviser, the bid side price determined by one independent broker-dealer active in the trading of such Collateral Obligation or (E) if a price or bid described in clause (A), (B), (C) or (D) is not available, then the lower of (a) the bid side price of such Collateral Obligation determined by the Portfolio Manager in a manner consistent with reasonable and customary market practice and (b) the greater of (i) 70% of the par value of such Collateral Obligation and (ii) the S&P Recovery Rate; *provided* that (x) if the Market Value of any Collateral Obligation is determined pursuant to clause (E) above, the Portfolio Manager will use commercially reasonable efforts to obtain the Market Value of such Collateral Obligation in accordance with subclauses (A) through (D) above, and (y) if the Portfolio Manager is not a Registered Investment Adviser the Market Value of any Collateral Obligation that cannot be obtained in accordance with subclauses (A) through (D) above within 30 days of the date on which its Market Value was determined pursuant to clause (E) above, shall be deemed to be zero until determined in accordance with subclauses (A) through (D) above; *provided further* that any bid side price determined by the Portfolio Manager pursuant to clause (E)(a) above shall be used by the Portfolio Manager as the market value of such Collateral Obligation in all other portfolios it manages.

"**Maturity Amendment**" means with respect to any Collateral Obligation, any waiver, modification, amendment or variance that would extend the stated maturity date of such Collateral Obligation.  For the avoidance of doubt, a waiver, modification, amendment or variance that would extend the stated maturity date of the credit facility of which a Collateral Obligation is part, but would not extend the stated maturity date of the Collateral Obligation held by the Issuer, does not constitute a Maturity Amendment.

"**Moody's**" means Moody's Investor Service, Inc.

"**Moody's Default Probability Rating**" means:

(i)  With respect to a Collateral Obligation, if the obligor of such Collateral Obligation has a CFR, then such CFR;

(ii)  With respect to a Collateral Obligation if not determined pursuant to clause (i) above, if the obligor of such Collateral Obligation has one or more senior unsecured obligations with an Assigned Moody's Rating, then the Assigned Moody's Rating on any such obligation as selected by the Portfolio Manager in its sole discretion;

(iii)  With respect to a Collateral Obligation if not determined pursuant to clauses (i) or (ii) above, if the obligor of such Collateral Obligation has one or more senior secured obligations with an Assigned Moody's Rating, then the Moody's rating that is one subcategory lower than the Assigned Moody's Rating on any such senior secured obligation as selected by the Portfolio Manager in its sole discretion;

(iv)  With respect to a Collateral Obligation if not determined pursuant to clauses (i), (ii) or (iii) above, if a rating estimate has been assigned to such Collateral Obligation by Moody's upon the request of the Issuer, the Portfolio Manager or an affiliate of the Portfolio Manager, then the Moody's Default Probability Rating is such rating estimate as long as such rating estimate or a renewal for such rating estimate has been issued or provided by Moody's in each case within the 15 month period preceding the date on which the Moody's Default Probability Rating is being determined; *provided* that, if such rating estimate has been issued or provided by Moody's for a period (x) longer than 13 months but not beyond 15 months, the Moody's Default Probability Rating will be one subcategory lower than such rating estimate and (y) beyond 15 months, the Moody's Default Probability Rating will be deemed to be "Caa3";

(v)  With respect to any DIP Collateral Obligation, the Moody's Default Probability Rating of such Collateral Obligation shall be the rating which is one subcategory below the Assigned Moody's Rating of such DIP Collateral Obligation;

(vi)  With respect to a Collateral Obligation if not determined pursuant to any of clauses (i) through (v) above and at the election of the Portfolio Manager, the Moody's Derived Rating; and

(vii)  With respect to a Collateral Obligation if not determined pursuant to any of clauses (i) through (vi) above, the Collateral Obligation will be deemed to have a Moody's Default Probability Rating of "Caa3."

With respect to any rating estimate assigned by Moody's to a Collateral Obligation hereunder, the Issuer (or the Portfolio Manager on the Issuer's behalf) shall be required to send to Moody's the related obligor's updated financial information upon its receipt thereof from, or on behalf of, such obligor and shall use commercially reasonable efforts to obtain and provide to Moody's such information (x) upon any significant change in the financial condition of such obligor (as determined by the Portfolio Manager in its commercially reasonably business judgment), and (y) upon any material modification that would result in substantial changes to the terms of any loan document relating to such Collateral Obligation or any release of collateral thereunder not permitted thereby.

"**Moody's Derived Rating**" means, with respect to a Collateral Obligation whose Moody's Rating or Moody's Default Probability Rating is determined as the Moody's Derived Rating, the rating as determined in the manner set forth below:

(i)  By using one of the methods provided below:

(a)  if such Collateral Obligation is rated by S&P, then the Moody's Rating and Moody's Default Probability Rating (as applicable) of such Collateral Obligation will be determined, at the election of the Portfolio Manager, in accordance with the methodology set forth in the following table below:

| Type of Collateral Obligation | S&P Rating (Public and Monitored) | Collateral Obligation Rated by S&P | Number of Subcategories Relative to Moody's Equivalent of S&P Rating |
|---|---|---|---|
| Not Structured Finance Obligation | ≥BBB- | Not a Loan or Participation Interest in | −1 |

| Type of Collateral Obligation | S&P Rating (Public and Monitored) | Collateral Obligation Rated by S&P | Number of Subcategories Relative to Moody's Equivalent of S&P Rating |
|---|---|---|---|
| | | Loan | |
| Not Structured Finance Obligation | ≤BB+ | Not a Loan or Participation Interest in Loan | −2 |
| Not Structured Finance Obligation | | Loan or Participation Interest in Loan | −2 |

(b)  if such Collateral Obligation is not rated by S&P but another security or obligation of the obligor has a public and monitored rating by S&P (a "parallel security"), then the rating of such parallel security will at the election of the Portfolio Manager be determined in accordance with the table set forth in subclause (i)(a) above, and the Moody's Derived Rating for purposes of the definitions of Moody's Rating and Moody's Default Probability Rating (as applicable) of such Collateral Obligation will be determined in accordance with the methodology set forth in the following table (for such purposes treating the parallel security as if it were rated by Moody's at the rating determined pursuant to this subclause (i)(b));

| Obligation Category of Rated Obligation | Rating of Rated Obligation | Number of Subcategories Relative to Rated Obligation Rating |
|---|---|---|
| Senior secured obligation | greater than or equal to B2 | −1 |
| Senior secured obligation | less than B2 | −2 |
| Subordinated obligation | greater than or equal to B3 | +1 |
| Subordinated obligation | less than B3 | 0 |

or:

(c)  if such Collateral Obligation is a DIP Collateral Obligation, no Moody's Derived Rating may be determined based on a rating by S&P or any other rating agency;

*provided* that the Aggregate Principal Balance of the Collateral Obligations that may have a Moody's Rating derived from an S&P Rating as set forth in sub-clauses (a) or (b) of this clause (i) may not exceed 10% of the Collateral Principal Amount.

(ii)  If not determined pursuant to clause (i) above and such Collateral Obligation is not rated by Moody's or S&P and no other security or obligation of the issuer of such Collateral Obligation is rated by Moody's or S&P, and if Moody's has been requested by the Issuer, the Portfolio Manager or the issuer of such Collateral Obligation to assign a rating or rating estimate with respect to such Collateral Obligation but such rating or rating estimate has not been received, pending receipt of such estimate, the Moody's Derived Rating of such Collateral Obligation for purposes of the definitions of Moody's Rating or Moody's Default Probability Rating shall be (x) "B3" if the Portfolio Manager certifies to the Trustee and the Collateral Administrator that the Portfolio Manager believes that such estimate shall be at least "B3" and if the Aggregate Principal Balance of Collateral Obligations determined pursuant to this clause (ii)(x) and clause (i) above does not exceed 10% of the Collateral Principal Amount or (y) otherwise, "Caa1."

"**Moody's Rating**" means

(i)  With respect to a Collateral Obligation that is a Senior Secured Loan:

(a)  if such Collateral Obligation has an Assigned Moody's Rating, such Assigned Moody's Rating;

(b)  if such Collateral Obligation does not have an Assigned Moody's Rating but the obligor of such Collateral Obligation has a CFR, then the Moody's rating that is one subcategory higher than such CFR;

(c)  if neither clause (a) nor (b) above apply, if such Collateral Obligation does not have an Assigned Moody's Rating but the obligor of such Collateral Obligation has one or more senior unsecured obligations with an Assigned Moody's Rating, then the Moody's rating that is two subcategories higher than the Assigned Moody's Rating on any such obligation as selected by the Portfolio Manager in its sole discretion;

(d)  if none of clauses (a) through (c) above apply, at the election of the Portfolio Manager, the Moody's Derived Rating; and

(e)  if none of clauses (a) through (d) above apply, the Collateral Obligation will be deemed to have a Moody's Rating of "Caa3"; and

(ii)  With respect to a Collateral Obligation other than a Senior Secured Loan:

(a)  if such Collateral Obligation has an Assigned Moody's Rating, such Assigned Moody's Rating;

(b)  if such Collateral Obligation does not have an Assigned Moody's Rating but the obligor of such Collateral Obligation has one or more senior unsecured obligations with an Assigned Moody's Rating, then the Assigned Moody's Rating on any such obligation as selected by the Portfolio Manager in its sole discretion;

(c)  if neither clause (a) nor clause (b) above apply, if such Collateral Obligation does not have an Assigned Moody's Rating but the obligor of such Collateral Obligation has a CFR, then the Moody's rating that is one subcategory lower than such CFR;

(d)  if none of clauses (a), (b) or (c) above apply, if such Collateral Obligation does not have an Assigned Moody's Rating but the obligor of such Collateral Obligation has one or more subordinated debt obligations with an Assigned Moody's Rating, then the Moody's rating that is one subcategory higher than the Assigned Moody's Rating on any such obligation as selected by the Portfolio Manager in its sole discretion;

(e)  if none of clauses (a) through (d) above apply, at the election of the Portfolio Manager, the Moody's Derived Rating; and

(f)  if none of clauses (a) through (e) above apply, the Collateral Obligation will be deemed to have a Moody's Rating of "Caa3."

"**Non-Emerging Market Obligor**" means an obligor that is Domiciled either in (x) the United States or (y) any country that has a country ceiling for foreign currency bonds of at least "Aa2" by Moody's and a foreign currency issuer credit rating of at least "AA" by S&P.

"**Non-Quarterly Assets**" means Collateral Obligations (other than Deferrable Obligations) that pay interest less frequently than quarterly, but no less frequently than annually.

"**Notes**" or "**Offered Securities**" means, collectively, the Secured Notes and the Subordinated Notes authorized by, and authenticated and delivered under, the Indenture.

"**Offer**" means a tender offer, voluntary redemption, exchange offer, conversion or other similar action.

"**Pari Passu Class**" means, with respect to any specified Class of Notes, each Class of Notes that ranks *pari passu* with such Class, as indicated under "*Summary of Terms—Principal terms of the Offered Securities—Pari Passu Class(es)*."

"**Partial Deferrable Obligation**" means any Collateral Obligation with respect to which under the related underlying instruments (i) a portion of the interest due thereon is required to be paid in cash on each payment date therefor and is not permitted to be deferred or capitalized (which portion will at least be equal to (A) in the case of floating rate assets, LIBOR and (B) in the case of fixed rate assets, 4.00%) and (ii) the issuer thereof or obligor thereon may defer or capitalize the remaining portion of the interest due thereon. Any component of a Partial

Deferrable Obligation that is paid "in kind" shall not be included for purposes of calculations related to the Minimum Floating Spread Test, the Weighted Average Coupon or the Weighted Average Floating Spread.

"**Partial Refinancing Interest Proceeds**" means, in connection with a Refinancing of one or more (but not all) of the Secured Notes, Interest Proceeds in an amount equal to the lesser of (a) the amount of accrued interest on the Classes being refinanced (after giving effect to payments under the Priority of Interest Proceeds if the Redemption Date would have been a Payment Date without regard to the Refinancing) and (b) the amount the Portfolio Manager reasonably determines would have been available for distribution under the Priority of Payments for the payment of accrued interest on the Classes being refinanced on the next subsequent Payment Date if such Notes had not been refinanced.

"**Participation Interest**" means a participation interest in a loan that at the time of acquisition, satisfies each of the following criteria: (i) such loan would constitute a Collateral Obligation were it acquired directly, (ii) the seller of the participation is a lender on the loan, (iii) the aggregate participation in the loan granted by such Selling Institution to any one or more participants does not exceed the principal amount or commitment with respect to which the Selling Institution is a lender under such loan, (iv) such participation does not grant, in the aggregate, to the participant in such participation a greater interest than the seller holds in the loan or commitment that is the subject of the participation, (v) the entire purchase price for such participation is paid in full (without the benefit of financing from the Selling Institution or its affiliates) at the time of its acquisition (or, in the case of a participation in a Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, at the time of the funding of such loan), (vi) the participation provides the participant all of the economic benefit and risk of the whole or part of the loan or commitment that is the subject of the loan participation, (vii) is represented by a contractual obligation of a Selling Institution that has at the time of acquisition (a) a long-term debt rating of at least "A" by S&P and a short-term debt rating of at least "A-1" by S&P or (b) a long-term-debt rating of at least "A+" by S&P and (viii) such participation is documented under a Loan Syndications and Trading Association, Loan Market Association or similar agreement standard for loan participation transactions among institutional market participants. Such Selling Institution must directly hold or own the relevant portion of the loan underlying such participation interest, and the Issuer may not acquire a participation interest in a participation. For the avoidance of doubt, a Participation Interest shall not include a sub-participation interest in any loan.

"**Permitted Offer**" means an offer (i) pursuant to the terms of which the offeror offers to acquire a debt obligation (including a Collateral Obligation) in exchange for consideration consisting solely of cash, other Eligible Investments and/or other Collateral Obligations in an amount equal to or greater than the full face amount of such debt obligation *plus* any accrued and unpaid interest and (ii) as to which the Portfolio Manager has determined in its judgment that the offeror has sufficient access to financing to consummate the offer.

"**Pledged Obligation**" means, as of any date of determination, the Collateral Obligations, the Eligible Investments and any Equity Security which forms part of the Assets granted to the Trustee pursuant to the Indenture.

"**Pre-funded Letter of Credit**" means any letter of credit facility that requires a lender party thereto to pre-fund in full its obligations thereunder.

"**Principal Balance**" means, with respect to (a) any Pledged Obligation other than a Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, as of any date of determination, the outstanding principal amount of such Pledged Obligation (excluding any capitalized interest), and (b) any Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, as of any date of determination, the outstanding principal amount of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, *plus* (except as expressly described herein) any undrawn commitments that have not been irrevocably reduced with respect to such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation; *provided* that for all purposes the Principal Balance of any Equity Security or Interest Only Security shall be deemed to be zero.

"**Principal Financed Accrued Interest**" means, with respect to any Collateral Obligation purchased during and after the Ramp-up Period, an amount equal to the amount of Principal Proceeds, if any, applied towards the purchase of accrued interest on such Collateral Obligation.

"**Principal Proceeds**" means, with respect to any Collection Period or Determination Date, all amounts received by the Issuer during the related Collection Period that do not constitute Interest Proceeds and any amounts that have been designated as Principal Proceeds pursuant to the terms of the Indenture.

"**Priority Class**" means, with respect to any specified Class of Notes, each Class of Notes that ranks senior to such Class, as indicated under "*Summary of Terms—Principal terms of the Offered Securities—Priority Class(es)*."

"**Priority Hedge Termination Event**" means the occurrence of (i) the Issuer's failure to make required payments or deliveries pursuant to a Hedge Agreement, (ii) certain events of bankruptcy, dissolution or insolvency with respect to the Issuer, (iii) the merger of the Issuer with or into another entity where such surviving entity fails to assume all obligations of the Issuer, (iv) the liquidation of the Assets due to an Event of Default under the Indenture, (v) a change in law after the Closing Date which makes it unlawful for the Issuer to perform its obligations under a Hedge Agreement, (vi) any termination of a Hedge Agreement by the Trustee (as directed by the Portfolio Manager); *provided* that the S&P Rating Condition has been satisfied or (vii) an "Additional Termination Event" (as defined in such Hedge Agreement) with respect to the Issuer.

"**Priority of Payments**" means the priorities specified under "*Summary of Terms—Priority of Payments*" (including, without limitation, the Acceleration Priority of Payments).

"**Proposed Portfolio**" means the portfolio of Collateral Obligations and Eligible Investments representing Principal Proceeds resulting from the proposed purchase, sale, maturity or other disposition of a Collateral Obligation or a proposed reinvestment in an additional Collateral Obligation, as the case may be.

"**Rating Agency**" means (i) with respect to the Notes, S&P, for so long as any Class of Notes is rated by S&P, and (ii) with respect to Assets generally, Moody's or S&P, and if at any time Moody's or S&P ceases to provide rating services with respect to debt obligations, any other nationally recognized investment rating agency selected by the Issuer (or the Portfolio Manager on behalf of the Issuer).  In the event that at any time either S&P or Moody's ceases to be a Rating Agency, references to rating categories of S&P or Moody's, as applicable, in the Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and S&P or Moody's, as applicable, published ratings for the type of obligation in respect of which such alternative rating agency is used.

"**Real Estate Loan**" means a loan which (a) a majority of the proceeds of which are used to finance (or refinance) the acquisition or development of real estate or to finance (or refinance) real estate construction or (b) is secured primarily by a mortgage, deed of trust or similar lien on real estate (or ownership interests therein) and the improvements thereon financed with such loan proceeds; *provided* that, notwithstanding the foregoing clauses (a) and (b), a loan secured by collateral consisting materially of an operating business in at least one other industry shall not be considered a "Real Estate Loan".

"**Redemption Date**" means the Business Day specified for the redemption of Notes in connection with an Optional Redemption (including a Refinancing) or a Clean-up Call Redemption.

"**Refinancing Proceeds**" means the proceeds from any Refinancing permitted under the Indenture.

"**Registered Investment Adviser**" means an investment adviser registered under the Investment Advisers Act.

"**Related Obligation**" means an obligation issued by the Portfolio Manager, any of its affiliates that are investment funds or any other person that is an investment fund whose investments are primarily managed by the Portfolio Manager or any such affiliate.

"**Responsible Officer**" means any officer, authorized person or employee of the Portfolio Manager set forth on the list provided by the Portfolio Manager to the Issuer and the Trustee which list shall include any portfolio manager having day-to-day responsibility for the performance of the Portfolio Manager under the Portfolio Management Agreement, as such list may be amended from time to time.

"**Restricted Trading Period**" means each day during any period in which either (i) the S&P rating of the Class A Notes is one or more sub-categories below its rating on the Closing Date or (ii) the S&P rating of the Class A Notes then outstanding has been withdrawn and not reinstated; *provided* that such period will not be a Restricted Trading Period upon the direction of a Majority of the Controlling Class (so long as the S&P rating of the Class A Notes has not been further downgraded, withdrawn or put on watch since the receipt of such direction).

"**Revolving Collateral Obligation**" means any Collateral Obligation (other than a Delayed Drawdown Collateral Obligation) that is a loan (including, without limitation, revolving loans, including funded and unfunded portions of revolving credit lines and letter of credit facilities, unfunded commitments under specific facilities and other similar loans and investments) that by its terms may require one or more future advances to be made to the borrower by the Issuer; *provided* that any such Collateral Obligation will be a Revolving Collateral Obligation only until all commitments to make advances to the borrower expire or are terminated or irrevocably reduced to zero.

"**S&P Asset Quality Matrix**" means, for purposes of determining compliance with the Minimum Floating Spread Test and the Minimum Weighted Average Coupon Test, the combination (as selected by the Portfolio Manager with notice to the Collateral Administrator) of a certain of the Minimum Floating Spread/Minimum Weighted Average Coupon Pairing and another case of the S&P Recovery Rate (that can be selected separately with respect to each Class of Secured Notes) chosen from Section 2 of Annex A (or the linear interpolation between two cases, as applicable).

"**S&P CDO Monitor**" means, each dynamic, analytical computer model developed by S&P and available at www.structuredfinanceinterface.com, used to calculate the default frequency in terms of the amount of debt assumed to default as a percentage of the original principal amount of the Collateral Obligations consistent with a specified benchmark rating level based upon certain assumptions (including the applicable Weighted Average S&P Recovery Rate) and S&P's proprietary corporate default studies, as may be amended by S&P from time to time.  Each S&P CDO Monitor shall be chosen by the Portfolio Manager and associated with either (x) a Weighted Average S&P Recovery Rate and a Minimum Floating Spread/Minimum Weighted Average Coupon Pairing from Section 2 of Annex A or (y) a Weighted Average S&P Recovery Rate, a Minimum Floating Spread and an Minimum Weighted Average Coupon confirmed by S&P; *provided* that as of any date of determination the Weighted Average S&P Recovery Rate for the most senior Class of Secured Notes outstanding then rated by S&P equals or exceeds the Weighted Average S&P Recovery Rate for such Class chosen by the Portfolio Manager, the Weighted Average Floating Spread equals or exceeds the Minimum Floating Spread chosen by the Portfolio Manager, and the Weighted Average Coupon equals or exceeds the Minimum Weighted Average Coupon chosen by the Portfolio Manager.

"**S&P Collateral Value**" means, with respect to any Defaulted Obligation or Deferring Obligation, the lesser of (i) the S&P Recovery Amount of such Defaulted Obligation or Deferring Obligation as of the relevant Measurement Date and (ii) the Market Value of such Defaulted Obligation or Deferring Obligation as of the relevant Measurement Date.

"**S&P Effective Date Rating Condition**" means a condition that is satisfied if, after the end of the Ramp-up Period, S&P has confirmed in writing to the Issuer (which confirmation may be in the form of an email to the Issuer or the Portfolio Manager or a press release), the Trustee and/or the Portfolio Manager its initial rating of each Class of Secured Notes; *provided* that the S&P Effective Date Rating Condition will be deemed to be satisfied if S&P makes a public announcement or informs the Issuer, the Portfolio Manager or the Trustee in writing (including by means of email notification or a press release) that (i) it believes satisfaction of the S&P Effective Date Rating Condition is not required or (ii) its practice is not to give such confirmation.

"**S&P Rating**" means, with respect to any Collateral Obligation, as of any date of determination, the rating determined in accordance with the following methodology:

(i)  (a) if there is an issuer credit rating of the issuer of such Collateral Obligation by S&P as published by S&P, or the guarantor which unconditionally and irrevocably guarantees such Collateral Obligation pursuant to a form of guaranty approved by S&P for use in connection with this transaction, then the S&P Rating shall be such rating (regardless of whether there is a published rating by S&P on the Collateral Obligations of such issuer held by the Issuer, *provided* that private ratings (that is, ratings provided at the request of the obligor) may be used for purposes

of this definition if the related obligor has consented to the disclosure thereof and a copy of such consent has been provided to S&P) or (b) if there is no issuer credit rating of the issuer by S&P but (1) there is a senior secured rating on any obligation or security of the issuer, then the S&P Rating of such Collateral Obligation shall be one sub-category below such rating; (2) if clause (1) above does not apply, but there is a senior unsecured rating on any obligation or security of the issuer, the S&P Rating of such Collateral Obligation shall equal such rating; and (3) if neither clause (1) nor clause (2) above applies, but there is a subordinated rating on any obligation or security of the issuer, then the S&P Rating of such Collateral Obligation shall be one sub-category above such rating if such rating is higher than "BB+," and shall be two sub-categories above such rating if such rating is "BB+" or lower;

(ii)  with respect to any Collateral Obligation that is a DIP Collateral Obligation, the S&P Rating thereof shall be the credit rating assigned to such issue by S&P;

(iii)  if there is not a rating by S&P on the issuer or on an obligation of the issuer, then the S&P Rating may be determined pursuant to clauses (a) through (c) below:

(a)  if an obligation of the issuer is not a DIP Collateral Obligation and is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Rating set forth above except that the S&P Rating of such obligation will be (1) one sub category below the S&P equivalent of the Moody's Rating if such Moody's Rating is "Baa3" or higher and (2) two sub-categories below the S&P equivalent of the Moody's Rating if such Moody's Rating is "Ba1" or lower;

(b)  the S&P Rating may be based on a credit estimate provided by S&P, and in connection therewith, the Issuer, the Portfolio Manager on behalf of the Issuer or the issuer of such Collateral Obligation shall, prior to or within 30 days after the acquisition of such Collateral Obligation, apply (and concurrently submit all available Information in respect of such application) to S&P for a credit estimate which shall be its S&P Rating; *provided* that, if such Information is submitted within such 30-day period, then, pending receipt from S&P of such estimate, such Collateral Obligation shall have an S&P Rating as determined by the Portfolio Manager in its sole discretion if the Portfolio Manager certifies to the Trustee and the Collateral Administrator that it believes that such S&P Rating determined by the Portfolio Manager is commercially reasonable and that the credit estimate provided by S&P will be at least equal to such S&P Rating determined by the Portfolio Manager; *provided further* that, if such Information is not submitted within such 30-day period, then, pending receipt from S&P of such estimate, the Collateral Obligation shall have (1) the S&P Rating as determined by the Portfolio Manager for a period of up to 90 days after the acquisition of such Collateral Obligation and (2) an S&P Rating of "CCC-" following such 90-day period; unless, during such 90-day period, the Portfolio Manager has requested the extension of such period and S&P, in its sole discretion, has granted such request; *provided further* that, if such 90-day period (or other extended period) elapses pending S&P's decision with respect to such application, the S&P Rating of such Collateral Obligation shall be "CCC-"; *provided further* that, if the Collateral Obligation has had a public rating by S&P that S&P has withdrawn or suspended within six months prior to the date of such application for a credit estimate in respect of such Collateral Obligation, the S&P Rating in respect thereof shall be "CCC-" pending receipt from S&P of such estimate, and S&P may elect not to provide such estimate until a period of six months have elapsed after the withdrawal or suspension of the public rating; *provided further* that the S&P Rating may not be determined pursuant to this clause (b) if the Collateral Obligation is a DIP Collateral Obligation; *provided further* that such credit estimate shall expire 12 months after the acquisition of such Collateral Obligation, following which such Collateral Obligation shall have an S&P Rating of "CCC-" unless, during such 12-month period, the Issuer applies for renewal thereof in accordance with the Indenture, in which case such credit estimate shall continue to be the S&P Rating of such Collateral Obligation until S&P has confirmed or revised such credit estimate, upon which such confirmed or revised credit estimate shall be the S&P Rating of such Collateral Obligation; *provided further* that such confirmed or revised credit estimate shall expire on the next succeeding 12-month anniversary of the date of the acquisition of such Collateral Obligation and (when renewed annually in accordance with the Indenture) on each 12-month anniversary thereafter; or

(c)  with respect to a Collateral Obligation that is not a Defaulted Obligation, the S&P Rating of such Collateral Obligation will at the election of the Issuer (at the direction of the Portfolio Manager) be "CCC-" provided (i) neither the issuer of such Collateral Obligation nor any of its affiliates are subject to any bankruptcy or reorganization proceedings and (ii) the issuer has not defaulted on any payment obligation in respect of any debt security or other obligation of the issuer at any time within the two year period ending on such date of

determination, all such debt securities and other obligations of the issuer that are *pari passu* with or senior to the Collateral Obligation are current and the Portfolio Manager reasonably expects them to remain current; or

(iv)  with respect to a DIP Collateral Obligation that has no issue rating by S&P or a Current Pay Obligation that is rated "D" or "SD" by S&P, the S&P Rating of such DIP Collateral Obligation or Current Pay Obligation, as applicable, will be, at the election of the Issuer (at the direction of the Portfolio Manager), "CCC-" or the S&P Rating determined pursuant to clause (iii)(b) above;

*provided* that, for purposes of the determination of the S&P Rating, (x) if the applicable rating assigned by S&P to an obligor or its obligations is on "credit watch positive" by S&P, such rating will be treated as being one sub category above such assigned rating and (y) if the applicable rating assigned by S&P to an obligor or its obligations is on "credit watch negative" by S&P, such rating will be treated as being one sub-category below such assigned rating.

As used in the definition of S&P Rating, "**Information**" means S&P's "Credit Estimate Information Requirements" dated April 2011 and any other available information S&P reasonably requests in order to produce a credit estimate for a particular asset.  The Portfolio Manager shall use commercially reasonable efforts to provide to S&P all available Information for any Collateral Obligation with an S&P Rating determined pursuant to clause (iii)(c) of this definition, prior to or within thirty (30) days after the acquisition of such Collateral Obligation.

"**S&P Rating Condition**" means, with respect to any action taken or to be taken by or on behalf of the Issuer, a condition that is satisfied if S&P has confirmed in writing to the Issuer (which confirmation may be in the form of a press release), the Trustee and/or the Portfolio Manager that no immediate withdrawal or reduction with respect to its then-current rating by S&P of any Class of Secured Notes will occur as a result of such action; *provided* that the S&P Rating Condition will be deemed to be satisfied if (x) no Class of Secured Notes outstanding is rated by S&P or (y) if S&P makes a public announcement or informs the Issuer, the Portfolio Manager or the Trustee that (i) it believes satisfaction of the S&P Rating Condition is not required with respect to the applicable action or (ii) its practice is not to give such confirmations.

"**S&P Recovery Amount**" means with respect to any Collateral Obligation, an amount equal to:

(a)  the applicable S&P Recovery Rate; *multiplied by*

(b)  the Principal Balance of such Collateral Obligation.

"**S&P Recovery Rate**" means, with respect to a Collateral Obligation, the recovery rate set forth in Section 1 of Annex A using the initial rating of the most senior Class of Secured Notes outstanding at the time of determination.

"**S&P Recovery Rating**" means, with respect to a Collateral Obligation for which an S&P Recovery Rate is being determined, the "Recovery Rating" assigned by S&P to such Collateral Obligation based upon the tables set forth in Annex A.

"**S&P Selling Institution Percentage**" means, with respect to any Participation Interest proposed to be entered into by the Issuer, criteria that will be met if immediately after giving effect to such acquisition, (x) the percentage of the Collateral Principal Amount that consists in the aggregate of Participation Interests with Selling Institutions that have the same or a lower S&P credit rating does not exceed the "Aggregate Selling Institution Percentage" set forth below for such S&P credit rating and (y) the percentage of the Collateral Principal Amount that consists in the aggregate of Participation Interests with any single Selling Institution that have the same or a lower S&P credit rating does not exceed the "Individual Selling Institution Percentage" set forth below for such S&P credit rating:

| Long-term Senior Unsecured Debt Rating of Selling Institution | Individual Selling Institution Percentage | Aggregate Selling Institution Percentage |
|---|---|---|
| S&P | | |
| "AAA" | 20% | 20% |
| "AA+" | 10% | 10% |

| Long-term Senior Unsecured Debt Rating of Selling Institution | Individual Selling Institution Percentage | Aggregate Selling Institution Percentage |
| --- | --- | --- |
| "AA" | 10% | 10% |
| "AA-" | 10% | 10% |
| "A+" | 5% | 5% |
| "A" | 5% | 5% |
| Below A | 0% | 0% |

_____

*provided* that a Selling Institution having an S&P credit rating of "A" must also have a short-term S&P rating of "A-1" otherwise its Individual Selling Institution Percentage and Aggregate Selling Institution Percentage shall be 0%.

"**Sale Proceeds**" means all proceeds (excluding accrued interest, if any) received with respect to Assets as a result of sales of such Assets in accordance with the restrictions described in "*Security for the Secured Notes—Sales of Collateral Obligations; Additional Collateral Obligations and Investment Criteria*," *less* any reasonable expenses incurred by the Portfolio Manager or the Trustee (other than amounts payable as Administrative Expenses) in connection with such sales. Sale Proceeds will include Principal Financed Accrued Interest received in respect of such a sale.

"**Second Lien Loan**" means any assignment of or Participation Interest in or other interest in a loan (x) that is required to be secured by a valid and perfected, second priority pledge of collateral (which pledge may be subject to customary permitted liens, such as, but not limited to, tax liens) and which has a senior (or, solely, with respect to any related first lien indebtedness, subordinated) pre-petition priority (including *pari passu* with other obligations of the obligor) in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, (y) with respect to which the Portfolio Manager determines in good faith that the value of the collateral securing the loan on or about the time of acquisition by the Issuer together with other attributes of the issuer of such loan (including, without limitation, its general financial condition, ability to generate cash flow available for debt service, refinancing ability and other demands for that cash flow) is adequate to repay the Principal Balance of the loan in accordance with its terms and to repay the Principal Balance of all other loans of equal or greater seniority secured by a security interest in the same collateral and (z) that is not secured solely or primarily by common stock or other equity interests; *provided* that the limitation set forth in this clause (z) shall not apply with respect to a loan made to a parent entity that is secured solely or primarily by the stock of one or more of the subsidiaries of such parent entity to the extent that the granting by any such subsidiary of a lien on its own property would violate law or regulations applicable to such subsidiary (whether the obligation secured is such loan or any other similar type of indebtedness owing to third parties); and *provided further* that, for a loan to which, due to the operation of the foregoing proviso, the limitation set forth in this clause (z) does not apply, the S&P Recovery Rate will be assigned by S&P on a case by case basis if there is no assigned S&P Recovery Rating.

"**Secured Notes**" means the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes.

"**Secured Parties**" means collectively the holders of the Secured Notes, the Trustee, each Hedge Counterparty, the Collateral Administrator and the Portfolio Manager.

"**Selling Institution**" means the entity obligated to make payments to the Issuer under the terms of a Participation Interest and, as to which the S&P Selling Institution Percentage is met.

"**Senior Notes**" means the Class A Notes and the Class B Notes.

"**Senior Secured Loan**" means any assignment of or Participation Interest in or other interest in a loan (w) that is required to be secured by a valid and perfected, first priority pledge of collateral (which pledge may be subject to customary permitted liens, such as, but not limited to, tax liens) and which has a senior pre-petition priority (including *pari passu* with other obligations of the obligor) in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, (x) solely for purposes of calculating the Weighted Average S&P Recovery Rate, such loan cannot, by its terms, be subordinated to another obligation of the obligor and the value of the collateral securing such loan, as determined by the Portfolio Manager in good faith, on or about the time

of acquisition by the Issuer together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service, refinancing ability and other demands for that cash flow) is adequate to repay the Principal Balance of the loan in accordance with its terms and to repay the Principal Balance of all other loans of equal seniority secured by a security interest in the same collateral, (y) that is not secured solely or primarily by common stock or other equity interests; *provided* that the limitation set forth in this clause (y) shall not apply with respect to a loan made to a parent entity that is secured solely or primarily by the stock of one or more of the subsidiaries of such parent entity to the extent that the granting by any such subsidiary of a lien on its own property would violate law or regulations applicable to such subsidiary (whether the obligation secured is such loan or any other similar type of indebtedness owing to third parties); and *provided further* that, for a loan to which, due to the operation of the foregoing proviso, the limitation set forth in this clause (y) does not apply, the S&P Recovery Rate will be assigned by S&P on a case by case basis if there is no assigned S&P Recovery Rating and (z) is not a First-Lien Last-Out Loan.

"**Step-down Obligation**" means an obligation or security which by the terms of the related underlying instruments provides for a decrease in the *per annum* interest rate on such obligation or security (other than by reason of any change in the applicable index or benchmark rate used to determine such interest rate) or in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; *provided* that an obligation or security providing for payment of a constant rate of interest at all times after the date of acquisition by the Issuer shall not constitute a Step-down Obligation.

"**Step-up Obligation**" means an obligation or security which by the terms of the related underlying instruments provides for an increase in the *per annum* interest rate on such obligation or security, or in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; *provided* that an obligation or security providing for payment of a constant rate of interest at all times after the date of acquisition by the Issuer shall not constitute a Step-up Obligation.

"**Structured Finance Obligation**" means a non-recourse or limited-recourse debt obligation issued by a special purpose vehicle and secured solely by the assets thereof that is a mortgage backed security, an asset backed security, a collateralized bond obligation, a collateralized loan obligation, a repackaging of a bond (or a pool of bonds) of any of the foregoing or any similar securitization of an asset or a pool of assets (or any combination thereof).

"**Subordinated Notes**" means the Subordinated Notes issued pursuant to the Indenture.

"**Synthetic Security**" means a security or swap transaction other than a Participation Interest or a Pre-funded Letter of Credit that has payments associated with either payments of interest and/or principal on a reference obligation or the credit performance of a reference obligation or payments on, or the return of, an equity interest.

"**Target Balance**" An amount equal to (a) the Target Initial Par Amount, *minus* (b) the amount of any principal payments made on the Notes of any Class, *plus* (c) the aggregate amount of Principal Proceeds that result from any additional issuance of Subordinated Notes.

"**Target Initial Par Amount**" equals, with respect to the Collateral Obligations purchased by the Issuer or subject to binding agreements to purchase at the end of the Ramp-up Period, $564,000,000 in Aggregate Principal Balance of such Collateral Obligations.

"**Target Initial Par Ratio**" means 108.78%

"**Tax Event**" means  any (1) new, or change to (a) a U.S. or non-U.S. tax statute, treaty, regulation, rule, ruling, practice, procedure or judicial decision or interpretation which results in any portion of any payment due from any issuer or obligor under any Collateral Obligation becoming properly subject to the imposition of U.S. or non-U.S. tax, which in the case of withholding tax is not compensated for by a "gross-up" provision under the terms of the Collateral Obligation (other than withholding imposed on commitment fees, letter of credit fees or other similar fees), or (b) a Cayman Islands law that results in Holders becoming properly subject to the imposition of Cayman Islands withholding tax unless the Issuer has changed its governing jurisdiction to a jurisdiction that does not impose withholding tax on Holders of the Secured Notes within 90 days of becoming aware of such change in law and (2)

tax arising under or as a result of FATCA as a result of or with respect to any payment due from any issuer or obligor under any Collateral Obligation, which is not compensated for by a "gross-up" provision under the terms of the Collateral Obligation, but only, in each case, (1) or (2), if such tax or taxes amount, in the aggregate, to at least $1,000,000, during any 12 month period.

"**Tax Jurisdiction**" means the Bahamas, Bermuda, the British Virgin Islands, the Cayman Islands, Luxembourg or the Channel Islands, Ireland or the Netherlands Antilles and any other tax advantaged jurisdiction as may be notified by S&P to the Portfolio Manager from time to time; *provided* that, in the case of each such tax jurisdiction, in the Portfolio Manager's good faith business judgment, a majority of the assets, revenues or operations supporting the related Collateral Obligation are directly or through subsidiaries located in the United States of America.

"**Third Party Credit Exposure**" means as of any date of determination, the sum (without duplication) of the Principal Balance (or such lesser amount as may be determined by S&P) of each Collateral Obligation that consists of a Participation Interest.

"**Transaction Party**" means each of the Issuer, the Co-Issuer, the Initial Purchaser, the Collateral Administrator, the Trustee, the Registrar, the Share Trustee, the Administrator and the Portfolio Manager.

"**Weighted Average S&P Recovery Rate**" means, as of any date of determination, the number, expressed as a percentage and determined for  the most senior Class of Secured Notes outstanding then rated by S&P, obtained by *summing* the products obtained by *multiplying* the Principal Balance as of such time of each Collateral Obligation *by* its corresponding recovery rate as determined in accordance with Section 1 of <u>Annex A</u> hereto, *dividing* such sum *by* the Aggregate Principal Balance of all Collateral Obligations, and *rounding* to the nearest tenth of a percent.

"**Underlying Exchanged Defaulted Obligation**" means any Defaulted Obligation that was exchanged by the Issuer for an Equity Security.

"**Unscheduled Principal Payments**" means any principal payments received with respect to a Collateral Obligation as a result of optional redemptions, exchange offers, tender offers, consents or other payments or prepayments made at the option of the issuer thereof.

"**U.S. Tax Person**" means "United States person" within the meaning of Section 7701(a)(30) of the Code.

"**Volcker Rule**" means Section 13 of the U.S. Bank Holding Company Act of 1956, as amended, and the applicable rules and regulations thereof.

"**Volcker Rule Prohibited Asset**" means any Asset which the Portfolio Manager determines would cause the Issuer to be unable to qualify as a "loan securitization" under the Volcker Rule. No Asset shall be a Volcker Rule Prohibited Asset unless a Majority of the Controlling Class consents in writing to such designation.

"**Zero Coupon Security**" means any Collateral Obligation that at the time of purchase does not by its terms provide for the payment of cash interest; *provided* that, if after such purchase such Collateral Obligation provides for the payment of cash interest, it shall cease to be a Zero Coupon Security.

# INDEX OF DEFINED TERMS

Following is an index of defined terms used in this Offering Circular and the page number where each definition appears.

€ ........................................................ viii
2010 PD Amendment Directive ..................... viii
25% Limitation ............................................ 129
Acceleration Event ....................................... 11
Acceleration Priority of Payments ................. 11
Accounts ..................................................... 148
Accredited Investors ....................................... 2
accrued OID ................................................ 112
Acis ............................................................. 97
Actions ....................................................... 102
Adjusted Collateral Principal Amount ........... 148
Administration Agreement ........................... 109
Administrative Expense Cap ......................... 148
Administrative Expenses .............................. 148
Administrator .............................................. 109
Affected ...................................................... 149
Affiliate Transaction .................................... 104
Aggregate Outstanding Amount .................... 149
Aggregate Principal Balance ......................... 149
Aggregate Weighted Average Life ................. 87
AIFMD ........................................................ 30
AIFs ............................................................ 30
AML and Sanctions Laws .............................. 129
ASIC ............................................................. vi
Asset-Backed Commercial Paper .................. 149
Assets .......................................................... 84
Assigned Moody's Rating .............................. 149
Assumed Reinvestment Rate ......................... 150
Bankruptcy Subordination Agreement .......... 77
BBA ............................................................. 23
Benefit Plan Investors .................................. 121
Bridge Loan ................................................ 150
Business Day ............................................... 150
Caa Collateral Obligation ............................. 150
Calculation Agent ......................................... 63
Cayman IGA ................................................ 150
CCC Collateral Obligation ........................... 150
CCC/Caa Excess .......................................... 150
Certificated Class E Notes ............................ 78
Certificated Notes ........................................ 79
Certificated Subordinated Notes ................... 79
CFC ............................................................ 115
CFR ............................................................ 150
CFTC ........................................................... 25
Class ............................................................ 62

Class A Notes ........................................... i, 150
Class A/B Coverage Tests .............................. 19
Class A-1 Notes ........................................ i, 150
Class A-2 Notes ........................................ i, 150
Class B Notes ........................................... i, 150
Class B-1 Notes ............................................. i
Class B-2 Notes ............................................. i
Class Break-even Default Rate ...................... 150
Class C Coverage Tests ................................. 19
Class C Notes ........................................... i, 151
Class D Coverage Tests ................................. 19
Class D Notes ........................................... i, 151
Class Default Differential ............................ 151
Class E Coverage Tests ................................. 19
Class E Notes ........................................... i, 151
Class Scenario Default Rate ......................... 151
Clean-up Call Redemption ......................... 6, 67
Clean-up Call Redemption Date ..................... 67
Clean-up Call Redemption Price ..................... 67
Clearstream ................................................. 79
Closing Date ............................................. i, 151
Code ............................................................ 22
Co-Issued Notes ....................................... i, 151
Co-Issuer ................................................. i, 2
Co-Issuers ................................................ i, 2
Collateral Administration Agreement ........... 106
Collateral Administrator .............................. 109
Collateral Interest Amount ........................... 151
Collateral Obligation. ................................... 14
Collateral Principal Amount ......................... 151
Collateral Quality Test .................................. 17
Collection Account ....................................... 91
Collection Period .......................................... 62
Companies Law ........................................... 151
Company ..................................................... 118
Concentration Limitations ............................ 17
Consenting Holder of the Subordinated
Notes .......................................................... 151
Controlling Class .......................................... 71
Controlling Person ...................................... 122
Coverage Tests ............................................. 19
Cov-Lite Loan ............................................. 151
CPO ............................................................ 26
Credit Improved Criteria .............................. 152
Credit Improved Obligation .......................... 152

Credit Risk Criteria ........................................152
Credit Risk Obligation ..................................152
CTA .................................................................26
Current Pay Obligation .................................153
Current Portfolio ...........................................153
Custodial Account...........................................92
Declaration of Trust ......................................107
Default ...........................................................153
Defaulted Obligation.....................................153
Deferrable Cash-Pay Interest ........................154
Deferrable Notes ......................................i, 154
Deferrable Obligation ...................................154
Deferred Interest ...........................................62
Deferring Obligation .....................................154
Delayed Drawdown Collateral Obligation.....154
Designated Principal Proceeds.........................16
Designated Principal Proceeds Cut-off Date ...16
Determination Date .......................................154
DIP Collateral Obligation .............................154
Discount Obligation ......................................154
Dodd-Frank Act .............................................24
Dollars............................................................ viii
Domicile.........................................................155
DTC .................................................................21
EEA.................................................................29
EEA AIFs.........................................................30
Effective Date ...............................................155
Effective Date Conditions.............................155
Effective Date Overcollateralization Test......155
EFSF ................................................................27
EFSM ...............................................................27
Eligibility Criteria ...........................................14
Eligible Investment Required Ratings ...........155
Eligible Investments......................................156
Equity Security..............................................156
ERISA ......................................................43, 120
ERISA Limited Notes ....................................144
ERISA Plans ..................................................120
ESM ................................................................27
ETB Subsidiary..............................................109
Euroclear.........................................................79
Euros ............................................................. viii
Event of Default.............................................70
Excepted Advances........................................156
Excess CCC/Caa Adjustment Amount ..........157
Excess Weighted Average Coupon..................86
Excess Weighted Average Floating Spread .....85
Exchanged Equity Security............................155
Exit Date ........................................................101
Expense Reserve Account................................94
Expenses .......................................................102

FATCA ............................................................157
FATCA Compliance ........................................157
FCA .................................................................23
Fee Basis Amount..........................................101
Fee Election ...................................................101
Filing Holder...................................................77
FinCEN ............................................................44
First-Lien Last-Out Loan ...............................157
Fixed Rate Notes ...........................................157
Floating Rate Notes ......................................157
FRA .................................................................45
Global Notes...................................................79
Global Subordinated Notes..............................79
Group I Country ............................................157
Group II Country ...........................................157
Group III Country ..........................................157
Hedge Account ...............................................93
Hedge Agreement ...........................................94
Hedge Counterparty ........................................15
Highland ...........................................................2
holder............................................................. viii
Holder............................................................. viii
Holder FATCA Information ............................157
ICE...................................................................24
IGA..................................................................42
Incentive Management Fee............................100
Incentive Management Fee Threshold...........101
Incurrence Covenant .....................................152
Indemnified Party .........................................102
Indenture....................................................i, 157
Independent Review Party.............................104
Information ....................................................167
Initial Purchaser............................................i, 2
Institutional Accredited Investors.....................2
Interest Accrual Period..................................62
Interest Collection Subaccount .......................91
Interest Coverage Ratio ..................................20
Interest Coverage Test ....................................20
Interest Determination Date............................63
Interest Only Security ....................................157
Interest Proceeds...........................................157
Interest Rate ...................................................62
Interest Reinvestment Test ..............................21
Interest Reserve Account.................................94
Investment Company Act ..................................2
Investment Criteria .........................................89
Investment Criteria Adjusted Balance ..........158
Investor-Based Exemptions ...........................120
Irish Listing Agent.........................................145
IRS ..................................................................42
Issuer....................................................i, 2, 107

Issuer Notes......................................................i
Jefferies .........................................................i
Jefferies Entity ...............................................59
Junior Class..................................................159
knowledgeable employee................................iii
Knowledgeable Employees.........................i, 2
Liabilities ...................................................102
LIBOR ..........................................................63
LIBOR Floor Obligation.................................86
Loan Pricing Change....................................159
London Banking Day......................................63
Maintenance Covenant..................................152
Majority .......................................................159
Make-Whole Amount ......................................6
Make-Whole Class...........................................6
Management Fee............................................100
Mandatory Redemption ..................................66
Margin Loan.................................................159
Margin Stock................................................159
Market Value ...............................................159
Maturity Amendment....................................159
Measurement Date.........................................85
Minimum Floating Spread ..............................86
Minimum Floating Spread Test .......................85
Minimum Floating Spread/Minimum
Weighted Average Coupon Pairing .................86
Minimum Weighted Average Coupon.............85
Minimum Weighted Average Coupon Test.....85
Minimum Weighted Average S&P
Recovery Rate Test........................................87
Moody's .......................................................159
Moody's Default Probability Rating..............159
Moody's Derived Rating................................160
Moody's Rating ............................................161
Non-Call Period ..............................................3
non-EEA AIFs ...............................................30
Non-Emerging Market Obligor.....................162
Non-Permitted ERISA Holder .......................144
Non-Permitted Holder...................................143
Non-Permitted Tax Holder ...........................144
Non-Quarterly Assets....................................162
Non-U.S. Holder ..........................................110
Note Interest Amount......................................63
Note Payment Sequence .................................12
Noteholder .................................................. viii
Notes ...........................................................162
Notes............................................................. i
Notice of Default............................................71
NRSRO Reform Regulations ..........................36
NRSROs.........................................................35
Offer.............................................................162

Offered Securities .......................................i, 162
Offering .........................................................iii
Offering Circular ........................................i, iii
offshore transaction .......................................79
OID .............................................................112
Optional Redemption........................................3
Overcollateralization Ratio.............................20
Overcollateralization Ratio Test.....................20
Pari Passu Class ...........................................162
Partial Deferrable Obligation........................162
Partial Refinancing Interest Proceeds...........163
Participation Interest.....................................163
Party in Interest.............................................43
Paying Agent .................................................65
Payment Account ...........................................92
Payment Date ..................................................2
PCL...............................................................45
Permitted Offer ............................................163
Petition Expense Amount ...............................21
Petition Expenses...........................................78
PFIC............................................................114
Plan Asset Regulation.....................................43
Plan Asset Regulations .................................120
Plans ...........................................................120
Pledged Obligation .......................................163
Portfolio Management Agreement ..................15
Portfolio Manager............................................2
Portfolio Manager Information.......................iii
Post-Reinvestment Period Investment
Criteria .........................................................91
Pre-Closing Acquisitions ................................48
Pre-funded Letter of Credit...........................163
Principal Balance ..........................................163
Principal Collection Subaccount.....................91
Principal Financed Accrued Interest..............163
Principal Proceeds ........................................164
Priority Class ...............................................164
Priority Hedge Termination Event.................164
Priority of Payments .....................................164
Proposed Portfolio ........................................164
Prospective Directive.......................................vii
PTCE ...........................................................120
Purchase Agreement .....................................125
QEF..............................................................114
QIB/QP .........................................................79
Qualified Institutional Buyers......................i, 2
qualified purchaser ........................................iii
Qualified Purchasers........................................2
Ramp-up Account...........................................92
Ramp-up Period .............................................16
Rating Agency ..............................................164

Real Estate Loan ............................................164
Record Date ....................................................69
Redemption ......................................................3
Redemption Date ...........................................164
Redemption Price ..............................................5
Reference Banks ..............................................63
Refinancing ......................................................3
Refinancing Proceeds......................................164
Registered Investment Adviser ......................164
Registered Office Agreement.........................109
Regulation S......................................................2
Regulation S Global Notes...............................79
Regulation S Global Secured Notes.................78
Regulation S Global Subordinated Notes ........79
Regulations .....................................................44
Reinvestment Period .......................................17
Related Entities ..............................................56
Related Obligation .........................................164
Relevant Implementation Date...................... vii
Relevant Member State.................................. vii
Relevant Persons...............................................vi
Responsible Officer ......................................164
Restricted Trading Period ............................165
Reuters Screen ................................................63
Revolver Funding Account ..............................92
Revolving Collateral Obligation ...................165
Rule 144A Global Notes..................................79
Rule 144A Global Secured Notes ....................78
Rule 144A Global Subordinated Notes...........79
Rule 17g-7.......................................................36
S&P.....................................................................i
S&P Asset Quality Matrix ............................165
S&P CDO Monitor .......................................165
S&P CDO Monitor Test..................................87
S&P Collateral Value.....................................165
S&P Effective Date Rating Condition ...........165
S&P Rating .....................................................165
S&P Rating Condition ...................................167
S&P Recovery Amount...................................167
S&P Recovery Rate........................................167
S&P Recovery Rating ....................................167
S&P Selling Institution Percentage................167
Sale Proceeds .................................................168
SEC .................................................................24
Second Lien Loan ..........................................168
Secured Notes ..........................................i, 168
Secured Parties...............................................168
Securities Act .....................................................i
Selling Institution..........................................168
Senior Management Fee ................................100
Senior Notes..............................................i, 168
Senior Secured Loan......................................168
Service Agreements .........................................97
Service Provider Exemption ..........................120
Share Trustee ................................................107
Shared Services Agreement.............................97
Shares .............................................................107
Similar Law ...................................................121
Special Redemption .........................................67
Special Redemption Amount............................67
Special Redemption Date ................................67
Stabilizing Manager......................................viii
Stated Maturity ...............................................64
Step-down Obligation....................................169
Step-up Obligation.........................................169
Structured Finance Obligation......................169
Sub-Advisory Agreement .................................97
Subordinated Management Fee .....................100
Subordinated Notes....................................i, 169
Surrendered Notes ............................................6
Synthetic Security..........................................169
Target Balance ...............................................169
Target Initial Par Amount.............................169
Target Initial Par Condition ...........................16
Tax Event........................................................169
Tax Jurisdiction .............................................170
Third Party Credit Exposure .........................170
Trading Plan ....................................................90
Trading Plan Period ........................................90
Trading Restrictions ........................................41
Transaction Party ..........................................170
Transfer Restrictions........................................ii
Treasury ..........................................................44
Trustee .......................................................i, 2
U.S. ................................................................viii
U.S. Dollars ...................................................viii
U.S. Holder ....................................................110
U.S. person ......................................................79
U.S. Shareholder............................................115
U.S. Tax Person .............................................170
U.S.$................................................................viii
UBTI...............................................................117
Underlying Exchanged Defaulted
  Obligation ....................................................170
United States...................................................viii
Unscheduled Principal Payments .................170
Unsolicited Ratings.........................................35
US Risk Retention Regulations .......................26
USA PATRIOT Act........................................44
Volcker Rule ...........................................24, 170
Volcker Rule Prohibited Asset ......................170
Weighted Average Coupon...............................85

Weighted Average Floating Spread .................86

Weighted Average Life....................................87

Weighted Average Life Test............................87

Weighted Average S&P Recovery Rate ........ 170

Zero Coupon Security.................................... 170

Annex A

S&P RECOVERY RATE TABLES

**Section 1.**

(a)  (i)   If a Collateral Obligation has an S&P Recovery Rating, the S&P Recovery Rate for such Collateral Obligation shall be determined as follows (taking into account, for any Collateral Obligation with an S&P Recovery Rating of '2' through '5', the recovery range indicated in the S&P published report therefore):

| S&P Recovery Rating of a Collateral Obligation | Recovery Range from S&P published reports* | Initial Liability Rating | | | | | |
|---|---|---|---|---|---|---|---|
| | | "AAA" | "AA" | "A" | "BBB" | "BB" | "B" and below |
| 1+ | N/A | 75% | 85% | 88% | 90% | 92% | 95% |
| 1 | N/A | 65% | 75% | 80% | 85% | 90% | 95% |
| 2 | 80-90 | 60% | 70% | 75% | 81% | 86% | 90% |
| 2 | 70-80 | 50% | 60% | 66% | 73% | 79% | 80% |
| 3 | 60-70 | 40% | 50% | 56% | 63% | 67% | 70% |
| 3 | 50-60 | 30% | 40% | 46% | 53% | 59% | 60% |
| 4 | 40-50 | 27% | 35% | 42% | 46% | 48% | 50% |
| 4 | 30-40 | 20% | 26% | 33% | 39% | 40% | 40% |
| 5 | 20-30 | 15% | 20% | 24% | 26% | 28% | 30% |
| 5 | 10-20 | 5% | 10% | 15% | 20% | 20% | 20% |
| 6 | N/A | 2% | 4% | 6% | 8% | 10% | 10% |

\*    If a recovery range is not available from S&P's published reports for a given loan with an S&P Recovery Rating of '2' through '5', the lower range for the applicable recovery rating will be assumed.

(ii)   If (x) a Collateral Obligation does not have an S&P Recovery Rating and such Collateral Obligation is a senior unsecured loan or second lien loan and (y) the issuer of such Collateral Obligation has issued another debt instrument that is outstanding and senior to such Collateral Obligation that is a Senior Secured Loan or senior secured note (a "**Senior Secured Debt Instrument**") that has an S&P Recovery Rating, the S&P Recovery Rate for such Collateral Obligation shall be determined as follows:

For Collateral Obligations Domiciled in Group A

| S&P Recovery Rating of a Collateral Obligation | Initial Liability Rating | | | | | |
|---|---|---|---|---|---|---|
| | "AAA" | "AA" | "A" | "BBB" | "BB" | "B" and below |
| 1+ | 18% | 20% | 23% | 26% | 29% | 31% |
| 1 | 18% | 20% | 23% | 26% | 29% | 31% |
| 2 | 18% | 20% | 23% | 26% | 29% | 31% |
| 3 | 12% | 15% | 18% | 21% | 22% | 23% |
| 4 | 5% | 8% | 11% | 13% | 14% | 15% |
| 5 | 2% | 4% | 6% | 8% | 9% | 10% |
| 6 | -% | -% | -% | -% | -% | -% |

For Collateral Obligations Domiciled in Group B

A-1

| S&P Recovery Rating of a Collateral Obligation | Initial Liability Rating | | | | | |
|---|---|---|---|---|---|---|
| | "AAA" | "AA" | "A" | "BBB" | "BB" | "B" and below |
| 1+ | 16% | 18% | 21% | 24% | 27% | 29% |
| 1 | 16% | 18% | 21% | 24% | 27% | 29% |
| 2 | 16% | 18% | 21% | 24% | 27% | 29% |
| 3 | 10% | 13% | 15% | 18% | 19% | 20% |
| 4 | 5% | 5% | 5% | 5% | 5% | 5% |
| 5 | 2% | 2% | 2% | 2% | 2% | 2% |
| 6 | -% | -% | -% | -% | -% | -% |

For Collateral Obligations Domiciled in Group C

| S&P Recovery Rating of a Collateral Obligation | Initial Liability Rating | | | | | |
|---|---|---|---|---|---|---|
| | "AAA" | "AA" | "A" | "BBB" | "BB" | "B" and below |
| 1+ | 13% | 16% | 18% | 21% | 23% | 25% |
| 1 | 13% | 16% | 18% | 21% | 23% | 25% |
| 2 | 13% | 16% | 18% | 21% | 23% | 25% |
| 3 | 8% | 11% | 13% | 15% | 16% | 17% |
| 4 | 5% | 5% | 5% | 5% | 5% | 5% |
| 5 | 2% | 2% | 2% | 2% | 2% | 2% |
| 6 | -% | -% | -% | -% | -% | -% |

(iii) If (x) a Collateral Obligation does not have an S&P Recovery Rating and such Collateral Obligation is a subordinated loan and (y) the issuer of such Collateral Obligation has issued another debt instrument that is outstanding and senior to such Collateral Obligation that is a Senior Secured Debt Instrument that has an S&P Recovery Rating, the S&P Recovery Rate for such Collateral Obligation shall be determined as follows:

For Collateral Obligations Domiciled in Groups A, B and C

| S&P Recovery Rating of a Collateral Obligation | Initial Liability Rating | | | | | |
|---|---|---|---|---|---|---|
| | "AAA" | "AA" | "A" | "BBB" | "BB" | "B" and below |
| 1+ | 8% | 8% | 8% | 8% | 8% | 8% |
| 1 | 8% | 8% | 8% | 8% | 8% | 8% |
| 2 | 8% | 8% | 8% | 8% | 8% | 8% |
| 3 | 5% | 5% | 5% | 5% | 5% | 5% |
| 4 | 2% | 2% | 2% | 2% | 2% | 2% |
| 5 | -% | -% | -% | -% | -% | -% |
| 6 | -% | -% | -% | -% | -% | -% |

(b)  If a recovery rate cannot be determined using clause (a) and the Collateral Obligation is secured solely or primarily by common stock, other equity interests and goodwill, and the issuer of such Collateral Obligation has issued another debt instrument that is a senior unsecured loan, then the S&P Recovery Rate for such Collateral Obligation will be equal to the S&P Recovery Rate for such senior unsecured loan (or such other S&P Recovery Rate as S&P may provide, at the request of the Portfolio Manager, on a case-by-case basis).

A-2

(c)  If a recovery rate cannot be determined using clause (a) or clause (b) and the Collateral Obligation is secured solely or primarily by common stock, other equity interests and goodwill, then the recovery rate shall be determined using the table following clause (d) as if such Collateral Obligation were an Unsecured Loan.

(d)  If a recovery rate cannot be determined using clause (a), clause (b) or clause (c), the recovery rate shall be determined using the following table:

Recovery rates for obligors Domiciled in Group A, B, C or D:

| Priority Category | Initial Liability Rating | | | | | |
|---|---|---|---|---|---|---|
| | "AAA" | "AA" | "A" | "BBB" | "BB" | "B" and "CCC" |
| **Senior Secured Loans** | | | | | | |
| Group A | 50% | 55% | 59% | 63% | 75% | 79% |
| Group B | 45% | 49% | 53% | 58% | 70% | 74% |
| Group C | 39% | 42% | 46% | 49% | 60% | 63% |
| Group D | 17% | 19% | 27% | 29% | 31% | 34% |
| **Senior Secured Loans (Cov-Lite Loans)[7]** | | | | | | |
| Group A | 41% | 46% | 49% | 53% | 63% | 67% |
| Group B | 37% | 41% | 44% | 49% | 59% | 62% |
| Group C | 32% | 35% | 39% | 41% | 50% | 53% |
| Group D | 17% | 19% | 27% | 29% | 31% | 34% |
| **Unsecured loans and Second Lien Loans[8]** | | | | | | |
| Group A | 18% | 20% | 23% | 26% | 29% | 31% |
| Group B | 16% | 18% | 21% | 24% | 27% | 29% |
| Group C | 13% | 16% | 18% | 21% | 23% | 25% |
| Group D | 10% | 12% | 14% | 16% | 18% | 20% |
| **Subordinated loans** | | | | | | |
| Group A | 8% | 8% | 8% | 8% | 8% | 8% |
| Group B | 10% | 10% | 10% | 10% | 10% | 10% |
| Group C | 9% | 9% | 9% | 9% | 9% | 9% |
| Group D | 5% | 5% | 5% | 5% | 5% | 5% |

_____

*Group A:  Australia, Denmark, Finland, Hong Kong, Ireland, The Netherlands, New Zealand, Norway, Singapore, Sweden, U.K.*

*Group B:  Austria, Belgium, Canada, Germany, Israel, Japan, Luxembourg, Portugal, South Africa, Switzerland, U.S.*

*Group C:  Brazil, France, Greece, Italy, Mexico, South Korea, Spain, Taiwan, Turkey, United Arab Emirates.*

*Group D:  Kazakhstan, Russia, Ukraine, others*

[7]    Solely for purposes of the calculations by S&P pursuant hereto, the definition of "Cov-Lite Loan" shall be read to exclude the proviso thereto.

[8]    Second Lien Loans with an aggregate principal balance in excess of 15% of the Collateral Principal Amount shall use the "Subordinated loans" Priority Category for the purpose of determining their S&P Recovery Rate.  Additionally, First-Lien Last-Out Loans shall be treated as Second Liens Loans for the purpose of determining their S&P Recovery Rate.

**Section 2.**

**S&P CDO Monitor**

| Liability Rating<br><br>Weighted Average<br>S&P Recovery<br>Rate: | "AAA" | "AA" | "A" | "BBB" | "BB" |
|---|---|---|---|---|---|
| 1 | 37.000% | 46.500% | 52.000% | 58.000% | 62.500% |
| 2 | 37.125% | 46.625% | 52.125% | 58.125% | 62.625% |
| 3 | 37.250% | 46.750% | 52.250% | 58.250% | 62.750% |
| 4 | 37.375% | 46.875% | 52.375% | 58.375% | 62.875% |
| 5 | 37.500% | 47.000% | 52.500% | 58.500% | 63.000% |
| 6 | 37.625% | 47.125% | 52.625% | 58.625% | 63.125% |
| 7 | 37.750% | 47.250% | 52.750% | 58.750% | 63.250% |
| 8 | 37.875% | 47.375% | 52.875% | 58.875% | 63.375% |
| 9 | 38.000% | 47.500% | 53.000% | 59.000% | 63.500% |
| 10 | 38.125% | 47.625% | 53.125% | 59.125% | 63.625% |
| 11 | 38.250% | 47.750% | 53.250% | 59.250% | 63.750% |
| 12 | 38.375% | 47.875% | 53.375% | 59.375% | 63.875% |
| 13 | 38.500% | 48.000% | 53.500% | 59.500% | 64.000% |
| 14 | 38.625% | 48.125% | 53.625% | 59.625% | 64.125% |
| 15 | 38.750% | 48.250% | 53.750% | 59.750% | 64.250% |
| 16 | 38.875% | 48.375% | 53.875% | 59.875% | 64.375% |
| 17 | 39.000% | 48.500% | 54.000% | 60.000% | 64.500% |
| 18 | 39.125% | 48.625% | 54.125% | 60.125% | 64.625% |
| 19 | 39.250% | 48.750% | 54.250% | 60.250% | 64.750% |
| 20 | 39.375% | 48.875% | 54.375% | 60.375% | 64.875% |
| 21 | 39.500% | 49.000% | 54.500% | 60.500% | 65.000% |
| 22 | 39.625% | 49.125% | 54.625% | 60.625% | 65.125% |
| 23 | 39.750% | 49.250% | 54.750% | 60.750% | 65.250% |
| 24 | 39.875% | 49.375% | 54.875% | 60.875% | 65.375% |
| 25 | 40.000% | 49.500% | 55.000% | 61.000% | 65.500% |
| 26 | 40.125% | 49.625% | 55.125% | 61.125% | 65.625% |
| 27 | 40.250% | 49.750% | 55.250% | 61.250% | 65.750% |
| 28 | 40.375% | 49.875% | 55.375% | 61.375% | 65.875% |
| 29 | 40.500% | 50.000% | 55.500% | 61.500% | 66.000% |
| 30 | 40.625% | 50.125% | 55.625% | 61.625% | 66.125% |
| 31 | 40.750% | 50.250% | 55.750% | 61.750% | 66.250% |
| 32 | 40.875% | 50.375% | 55.875% | 61.875% | 66.375% |
| 33 | 41.000% | 50.500% | 56.000% | 62.000% | 66.500% |
| 34 | 41.125% | 50.625% | 56.125% | 62.125% | 66.625% |
| 35 | 41.250% | 50.750% | 56.250% | 62.250% | 66.750% |
| 36 | 41.375% | 50.875% | 56.375% | 62.375% | 66.875% |
| 37 | 41.500% | 51.000% | 56.500% | 62.500% | 67.000% |
| 38 | 41.625% | 51.125% | 56.625% | 62.625% | 67.125% |
| 39 | 41.750% | 51.250% | 56.750% | 62.750% | 67.250% |
| 40 | 41.875% | 51.375% | 56.875% | 62.875% | 67.375% |
| 41 | 42.000% | 51.500% | 57.000% | 63.000% | 67.500% |
| 42 | 42.125% | 51.625% | 57.125% | 63.125% | 67.625% |
| 43 | 42.250% | 51.750% | 57.250% | 63.250% | 67.750% |
| 44 | 42.375% | 51.875% | 57.375% | 63.375% | 67.875% |

| Liability Rating | "AAA" | "AA" | "A" | "BBB" | "BB" |
|---|---|---|---|---|---|
| **Weighted Average S&P Recovery Rate:** | | | | | |
| 45 | 42.500% | 52.000% | 57.500% | 63.500% | 68.000% |
| 46 | 42.625% | 52.125% | 57.625% | 63.625% | 68.125% |
| 47 | 42.750% | 52.250% | 57.750% | 63.750% | 68.250% |
| 48 | 42.875% | 52.375% | 57.875% | 63.875% | 68.375% |
| 49 | 43.000% | 52.500% | 58.000% | 64.000% | 68.500% |
| 50 | 43.125% | 52.625% | 58.125% | 64.125% | 68.625% |
| 51 | 43.250% | 52.750% | 58.250% | 64.250% | 68.750% |
| 52 | 43.375% | 52.875% | 58.375% | 64.375% | 68.875% |
| 53 | 43.500% | 53.000% | 58.500% | 64.500% | 69.000% |
| 54 | 43.625% | 53.125% | 58.625% | 64.625% | 69.125% |
| 55 | 43.750% | 53.250% | 58.750% | 64.750% | 69.250% |
| 56 | 43.875% | 53.375% | 58.875% | 64.875% | 69.375% |
| 57 | 44.000% | 53.500% | 59.000% | 65.000% | 69.500% |
| 58 | 44.125% | 53.625% | 59.125% | 65.125% | 69.625% |
| 59 | 44.250% | 53.750% | 59.250% | 65.250% | 69.750% |
| 60 | 44.375% | 53.875% | 59.375% | 65.375% | 69.875% |
| 61 | 44.500% | 54.000% | 59.500% | 65.500% | 70.000% |
| 62 | 44.625% | 54.125% | 59.625% | 65.625% | 70.125% |
| 63 | 44.750% | 54.250% | 59.750% | 65.750% | 70.250% |
| 64 | 44.875% | 54.375% | 59.875% | 65.875% | 70.375% |
| 65 | 45.000% | 54.500% | 60.000% | 66.000% | 70.500% |
| 66 | 45.125% | 54.625% | 60.125% | 66.125% | 70.625% |
| 67 | 45.250% | 54.750% | 60.250% | 66.250% | 70.750% |
| 68 | 45.375% | 54.875% | 60.375% | 66.375% | 70.875% |
| 69 | 45.500% | 55.000% | 60.500% | 66.500% | 71.000% |
| 70 | 45.625% | 55.125% | 60.625% | 66.625% | 71.125% |
| 71 | 45.750% | 55.250% | 60.750% | 66.750% | 71.250% |
| 72 | 45.875% | 55.375% | 60.875% | 66.875% | 71.375% |
| 73 | 46.000% | 55.500% | 61.000% | 67.000% | 71.500% |
| 74 | 46.125% | 55.625% | 61.125% | 67.125% | 71.625% |
| 75 | 46.250% | 55.750% | 61.250% | 67.250% | 71.750% |
| 76 | 46.375% | 55.875% | 61.375% | 67.375% | 71.875% |
| 77 | 46.500% | 56.000% | 61.500% | 67.500% | 72.000% |
| 78 | 46.625% | 56.125% | 61.625% | 67.625% | 72.125% |
| 79 | 46.750% | 56.250% | 61.750% | 67.750% | 72.250% |
| 80 | 46.875% | 56.375% | 61.875% | 67.875% | 72.375% |
| 81 | 47.000% | 56.500% | 62.000% | 68.000% | 72.500% |
| 82 | 47.125% | 56.625% | 62.125% | 68.125% | 72.625% |
| 83 | 47.250% | 56.750% | 62.250% | 68.250% | 72.750% |
| 84 | 47.375% | 56.875% | 62.375% | 68.375% | 72.875% |
| 85 | 47.500% | 57.000% | 62.500% | 68.500% | 73.000% |
| 86 | 47.625% | 57.125% | 62.625% | 68.625% | 73.125% |
| 87 | 47.750% | 57.250% | 62.750% | 68.750% | 73.250% |
| 88 | 47.875% | 57.375% | 62.875% | 68.875% | 73.375% |
| 89 | 48.000% | 57.500% | 63.000% | 69.000% | 73.500% |
| 90 | 48.125% | 57.625% | 63.125% | 69.125% | 73.625% |
| 91 | 48.250% | 57.750% | 63.250% | 69.250% | 73.750% |
| 92 | 48.375% | 57.875% | 63.375% | 69.375% | 73.875% |

| Liability Rating | "AAA" | "AA" | "A" | "BBB" | "BB" |
|---|---|---|---|---|---|
| **Weighted Average S&P Recovery Rate:** | | | | | |
| 93 | 48.500% | 58.000% | 63.500% | 69.500% | 74.000% |
| 94 | 48.625% | 58.125% | 63.625% | 69.625% | 74.125% |
| 95 | 48.750% | 58.250% | 63.750% | 69.750% | 74.250% |
| 96 | 48.875% | 58.375% | 63.875% | 69.875% | 74.375% |
| 97 | 49.000% | 58.500% | 64.000% | 70.000% | 74.500% |
| 98 | 49.125% | 58.625% | 64.125% | 70.125% | 74.625% |
| 99 | 49.250% | 58.750% | 64.250% | 70.250% | 74.750% |
| 100 | 49.375% | 58.875% | 64.375% | 70.375% | 74.875% |
| 101 | 49.500% | 59.000% | 64.500% | 70.500% | 75.000% |
| 102 | 49.625% | 59.125% | 64.625% | 70.625% | 75.125% |
| 103 | 49.750% | 59.250% | 64.750% | 70.750% | 75.250% |
| 104 | 49.875% | 59.375% | 64.875% | 70.875% | 75.375% |
| 105 | 50.000% | 59.500% | 65.000% | 71.000% | 75.500% |
| 106 | 50.125% | 59.625% | 65.125% | 71.125% | 75.625% |
| 107 | 50.250% | 59.750% | 65.250% | 71.250% | 75.750% |
| 108 | 50.375% | 59.875% | 65.375% | 71.375% | 75.875% |
| 109 | 50.500% | 60.000% | 65.500% | 71.500% | 76.000% |
| 110 | 50.625% | 60.125% | 65.625% | 71.625% | 76.125% |
| 111 | 50.750% | 60.250% | 65.750% | 71.750% | 76.250% |
| 112 | 50.875% | 60.375% | 65.875% | 71.875% | 76.375% |
| 113 | 51.000% | 60.500% | 66.000% | 72.000% | 76.500% |
| 114 | 51.125% | 60.625% | 66.125% | 72.125% | 76.625% |
| 115 | 51.250% | 60.750% | 66.250% | 72.250% | 76.750% |
| 116 | 51.375% | 60.875% | 66.375% | 72.375% | 76.875% |
| 117 | 51.500% | 61.000% | 66.500% | 72.500% | 77.000% |
| 118 | 51.625% | 61.125% | 66.625% | 72.625% | 77.125% |
| 119 | 51.750% | 61.250% | 66.750% | 72.750% | 77.250% |
| 120 | 51.875% | 61.375% | 66.875% | 72.875% | 77.375% |
| 121 | 52.000% | 61.500% | 67.000% | 73.000% | 77.500% |

**Minimum Floating Spread/Minimum Weighted Average Coupon Pairing**

| Case | Minimum Floating Spread | Minimum Weighted Average Coupon |
|---|---|---|
| 1. | 2.80% | 4.40% |
| 2. | 2.90% | 4.50% |
| 3. | 3.00% | 4.60% |
| 4. | 3.10% | 4.70% |
| 5. | 3.20% | 4.80% |
| 6. | 3.30% | 4.90% |
| 7. | 3.40% | 5.00% |
| 8. | 3.50% | 5.10% |
| 9. | 3.60% | 5.20% |
| 10. | 3.70% | 5.30% |
| 11. | 3.80% | 5.40% |
| 12. | 3.90% | 5.50% |
| 13. | 4.00% | 5.60% |
| 14. | 4.10% | 5.70% |

| Case | Minimum Floating Spread | Minimum Weighted Average Coupon |
|---|---|---|
| 15. | 4.20% | 5.80% |
| 16. | 4.30% | 5.90% |
| 17. | 4.40% | 6.00% |
| 18. | 4.50% | 6.10% |
| 19. | 4.60% | 6.20% |
| 20. | 4.70% | 6.30% |
| 21. | 4.80% | 6.40% |
| 22. | 4.90% | 6.50% |
| 23. | 5.00% | 6.60% |
| 24. | 5.10% | 6.70% |
| 25. | 5.20% | 6.80% |

Unless the Portfolio Manager otherwise notifies S&P in writing on or prior to the Effective Date, as of the Effective Date the Portfolio Manager will elect the following Weighted Average S&P Recovery Rates:

| Liability Rating | "AAA" | "AA" | "AA" | "BBB" | "BB" |
|---|---|---|---|---|---|
| Weighted Average S&P Recovery Rate | 48.00% | 57.50% | 63.00% | 69.00% | 73.50% |

A-7

**Annex B**

**Sub-Advisory Agreement between Acis Capital Management, L.P. and Highland Capital Management, L.P.**

EXECUTION VERSION

**AMENDED AND RESTATED
SUB-ADVISORY AGREEMENT**

This **AMENDED AND RESTATED SUB-ADVISORY AGREEMENT** by and among **Acis Capital Management, L.P.**, a Delaware Limited Partnership ("***Investment Manager***"), and **Highland Capital Management, L.P.** ("***Sub-Advisor***"), a Delaware limited partnership, is made this 5th day of May, 2011 to be effective January 1, 2011.

**WHEREAS**, one or more funds and/or accounts (collectively, the "***Accounts***") has retained the Investment Manager to render investment management services to the Accounts pursuant to an investment or collateral management agreement and each such agreement authorizes the Investment Manager to engage a sub-advisor to assist the Investment Manager with its responsibilities with respect to the investment management of such Accounts;

**WHEREAS**, the Investment Manager retained the Sub-Advisor to furnish certain services to the Accounts in accordance with the original Sub-Advisory Agreement between the parties effective January 1, 2011 (the "***Original Agreement***"); and

**WHEREAS**, the parties now desire to amend and restate the Original Agreement to read in its entirety as follows:

**NOW THEREFORE,** in consideration of the promises and mutual covenants herein contained, it is agreed between the Investment Manager and the Sub-Advisor as follows:

**1.      Appointment**.   The Investment Manager hereby appoints Highland Capital Management, L.P. ("***HCM***"), to act as Sub-Advisor to provide Services (defined below) to the Accounts for the periods and on the terms set forth in this Agreement.  The Sub-Advisor accepts such appointment and agrees to furnish the Services for the compensation herein provided.

**2.      Sub-Advisor Duties.**  Subject to the supervision and direction of the Investment Manager, the Sub-Advisor will provide (i) the shared services described in the Shared Services Agreement attached hereto as **Exhibit A** (the "***Shared Services***"), investment research and analysis, which may include computerized investment methodology, and (ii) will conduct a continuous program of evaluation, investment, sales, and reinvestment support with respect to each Account's assets.  All services provided by the Sub-Advisor herein other than the Shared Services shall be collectively referred to herein as the "***Advisory Services***."

In performing the Advisory Services, the Sub-Advisor:

(a)      will conform with (1) the Advisers Act and all rules and regulations thereunder, and releases and interpretations related thereto, (2) all other applicable federal and state laws and regulations, (3) any applicable written procedures, policies and guidelines adopted by the applicable Account or, except as expressly provided in Section 2 to the contrary, the Investment Manager and furnished to the Sub-Advisor, and (4) the Account's objectives, policies and restrictions as stated in the Account's Private Offering Memorandum, as supplemented or amended from time to time, as furnished to the Sub-Advisor or if no such offering memoranda exists, the investment or collateral management agreement applicable to such Account (such governing document, the "***Applicable Restrictions***").  Until the Investment Manager delivers any supplements or amendments to the Sub-Advisor, the Sub-Advisor shall be fully protected in relying on the Applicable Restrictions previously furnished by the Investment Manager to the Sub-Advisor.  In providing the Services in accordance with the requirements of this Section 2, the Sub-

Advisor shall be entitled to receive and act upon advice of counsel to the Accounts, to the Investment Manager or to the Sub-Advisor that is also acceptable to the Investment Manager.

(b)     as directed by the Investment Manager may assist the Investment Manager with the decisions of the Investment Manager to buy and sell securities and other investments for the Accounts, for broker-dealer and futures commission merchant ("*FCM*") selection, and for negotiation of commission rates.  The Sub-Advisor acknowledges that the Services will be provided with the goal of supporting the Investment Manager with the Investment Manager's obligation to obtain the best execution for the Accounts, taking into account the factors and subject to the limitations specified in the Applicable Restrictions, as they may be amended or supplemented from time to time and furnished to the Sub-Advisor. The Sub-Advisor is further authorized to place orders on behalf of the Accounts through the Sub-Advisor if such orders are directed by the Investment Manager and the Sub-Advisor is registered as a broker or dealer with the SEC or as a FCM with the Commodities Futures Trading Commission ("*CFTC*"), through any of its affiliates that are brokers or dealers or FCMs or such other entities which provide similar services in foreign countries, or through such brokers and dealers that also provide research or statistical research and material, or other services to the Accounts or the Sub-Advisor. Such allocation shall be in such amounts and proportions as the Investment Manager's Allocation Committee shall determine consistent with the above standards, and, upon request, the Sub-Advisor will report on said orders to the Investment Manager, indicating the brokers, dealers or FCMs to which such orders have been made.  If directed by the Investment Manager, the Sub-Advisor is authorized to open brokerage accounts on behalf of the Accounts in accordance with Account procedures.

(c)     may, to the extent permitted by applicable laws and regulations, but shall not be obligated to, aggregate the securities to be so sold or purchased with those of its other clients where such aggregation is not inconsistent with the policies set forth in the Applicable Restrictions as furnished to the Sub-Advisor.  In such event, allocation of the securities so purchased or sold, as well as the expenses incurred in the transaction, will be made by the Allocations Committee of the Investment Manager in a manner that is fair and equitable over time.

(d)     will, in connection with the purchase and sale of securities for the Accounts, as directed by the Investment Manager, arrange for the transmission to the custodian and recordkeeping agent for the Accounts, on a daily basis, such confirmation(s), trade tickets, and other documents and information, including, but not limited to, CUSIP, SEDOL, or other numbers that identify securities to be purchased or sold on behalf of the Accounts, as may be reasonably necessary to enable the custodian and recordkeeping agent to perform its administrative and recordkeeping responsibilities with respect to the Accounts, and with respect to Account securities to be purchased or sold through the Depository Trust Company, will arrange for the automatic transmission of the confirmation of such trades to the applicable Account's custodian and recordkeeping agent, and, if required, the Investment Manager. The Sub-Advisor agrees to comply with such rules, procedures and time frames as the Investment Manager or applicable Account's custodian may reasonably set or provide with respect to the clearance and settlement of transactions for an Account, including but not limited to submission of trade tickets; provided that the custodian follows Loan Syndication and Trading Association or other standardized clearance and settlement guidelines.  Any Account assets shall be delivered directly to the applicable Account's custodian, or in the case of loans, copies of sufficient documentation as the Investment Manager or custodian may agree from time to time, to demonstrate the purchase, ownership or sale, as applicable, of loans.

(e)     will provide reasonable assistance to the Investment Manager, custodian or recordkeeping agent for the Accounts in determining or confirming, consistent with the procedures and policies stated in the Applicable Restrictions, the value of any Account securities or other assets of the Accounts for which the Investment Manager, custodian or recordkeeping agent seeks assistance from the Sub-Advisor or identifies for review by the Sub-Advisor.  Such reasonable assistance shall include (but is

not limited to): (i) designating and providing timely access, on an as-needed basis and upon the reasonable request of the Investment Manager or custodian, to one or more employees of the Sub-Advisor who are knowledgeable about the security/issuer, its financial condition, trading and/or other relevant factors for valuation; (ii) notifying the Investment Manager in the event any Account security's value does not appear to reflect corporate actions, news, significant events or such security otherwise requires review to determine if fair valuation is necessary under the applicable Account's procedures; (iii) applying to the Account's assets the procedures of the Sub-Advisor used for valuing the assets held by other accounts under management of the Sub-Advisor and notifying the Investment Manager of the valuation of such assets determined under such procedures, including in the event that the application of such procedures would result in a determination of fair value with respect to any asset held by the Accounts where a market quotation is not readily available or is deemed to be unreliable with respect to such asset; (iv) upon the request of the Investment Manager or custodian, assisting in obtaining bids and offers or quotes from broker/dealers or market-makers with respect to securities held by the Accounts; (v) at the request of the Investment Manager verifying pricing and providing fair valuations or recommendations for fair valuations in accordance with the Accounts' valuation procedures, as they may be amended from time to time; and (vi) maintaining adequate records and written backup information with respect to the securities valuation services provided hereunder, and providing such information to the Investment Manager or the Accounts upon request. Such records shall be deemed to be Account records.

(f)     will maintain and preserve such records related to each Account's as required by the Investment Manager and under the Advisers Act. The Sub-Advisor will make available to the Accounts and the Investment Manager promptly upon request, any Account's records and ledgers maintained by the Sub-Advisor (which shall not include the records and ledgers maintained by the custodian and recordkeeping agent for the Accounts), as are necessary to assist the Accounts and the Investment Manager in complying with requirements of the Advisers Act, as well as other applicable laws, and will furnish to regulatory authorities having the requisite authority any information or reports in connection with such services which may be requested in order to ascertain whether the operations of the Accounts are being conducted in a manner consistent with applicable laws and regulations.

(g)     will regularly provide such reports or certifications that the Investment Manager may reasonably request from time to time.

(h)     will maintain or adopt a written Code of Ethics complying with the requirements of Rule 204A-l under the Advisers Act and will provide the Investment Manager and the Accounts with a copy of the Code of Ethics, together with evidence of its adoption. Upon written request of the Investment Manager, the Sub-Advisor shall permit representatives of the Investment Manager and the Accounts to examine the reports (or summaries of the reports) required to be made under the Code of Ethics and other records evidencing enforcement of the Code of Ethics.

(i)     will provide to the Investment Manager a copy of the Sub-Advisor's Form ADV, and any supplements or amendments thereto, as filed with the SEC, on an annual basis (or more frequently if requested by the Investment Manager) including any portion which contains disclosure of legal or regulatory actions. The Sub-Advisor represents and warrants that it is a duly registered Investment Manager under the Advisers Act and will notify the Investment Manager immediately if any action is brought by any regulatory body which would affect that registration. The Sub-Advisor will provide a list of persons whom the Sub-Advisor wishes to have authorized to give written and/or oral instructions to Custodians of assets for the Accounts.

(j)     if requested by the Investment Manager, will assist with the preparation and filing of Schedule 13G and Form 13F with respect to the assets of the Accounts.

(k)    will not permit any employee of the Sub-Advisor to have any material involvement with the Accounts if such employee has:

(i)    been, within the last ten (10) years, convicted of or acknowledged commission of any felony or misdemeanor (a) involving the purchase or sale of any security, (b) involving embezzlement, fraudulent conversion, or misappropriation of funds or securities, (c) involving sections 1341, 1342 or 1343 of Title 18 of the U.S. Code, or (d) arising out of such person's conduct as an underwriter, broker, dealer, investment manager, municipal securities dealer, government securities broker, government securities dealer, transfer agent, or entity or person required to be registered under the Commodity Exchange Act, or as an affiliated person, salesman, or employee or officer or director of any investment company, bank, insurance company, or entity or person required to be registered under the Commodity Exchange Act;

(ii)    been permanently or temporarily enjoined by reason of any misconduct, by order, judgment, or decree of any court of competent jurisdiction, from acting as an underwriter, broker, dealer, investment manager, municipal securities dealer, government securities broker, government securities dealer, transfer agent, or entity or person required to be registered under the Commodity Exchange Act, or as an affiliated person, salesman or employee of any investment company, bank, insurance company, or entity or person required to be registered under the Commodity Exchange Act, or from engaging in or continuing any conduct or practice in connection with any such activity or in connection with the purchase or sale of any security.

(l)    will not disclose or use any records or information obtained pursuant to this Agreement (excluding investment research and investment advice) in any manner whatsoever except as expressly authorized in this Agreement or in the ordinary course of business in connection with placing orders for the purchase and sale of securities or obtaining investment licenses in various countries or the opening of custody accounts and dealing with settlement agents in various countries, and will keep confidential any information obtained pursuant to the Agreement, and disclose such information only if the Accounts have authorized such disclosure, or if such disclosure is required by applicable federal or state law or regulations or regulatory authorities having the requisite authority.  The Investment Manager will not disclose or use any records or information with respect to the Sub-Advisor obtained pursuant to this Agreement, in any manner whatsoever except as expressly authorized in this Agreement, and will keep confidential any information obtained pursuant to this Agreement, and disclose such information only as expressly authorized in this Agreement, if the applicable Accounts have authorized such disclosure, or if such disclosure is required by applicable federal or state law or regulations or regulatory authorities having the requisite authority.

(m)    the Sub-Advisor represents and warrants that it shall maintain a compliance program in accordance with the requirements of Rule 206(4)-7 under the Advisers Act, and shall provide the Accounts with reasonable access to information regarding the Sub-Advisor's compliance program, which access shall include on-site visits with the Sub-Advisor as may be reasonably requested from time to time.  The Sub-Advisor agrees to provide certifications as may be reasonably requested by the Accounts related to the design and implementation of the Sub-Advisor's compliance program.

(n)    will notify the Investment Manager promptly in the event that, in the judgment of the Sub-Advisor, Account activity becomes disruptive to the ability of the Sub-Advisor to effectively provide the Services.

(o)    will provide assistance as may be reasonably requested by the Investment Manager in connection with compliance by the Accounts with any current or future legal and regulatory requirements related to the services provided by the Sub-Advisor hereunder.

(p)      will provide such certifications to the Accounts as the Accounts or the Investment Manager may reasonably request related to the services provided by the Sub-Advisor hereunder, including (but not limited to) certifications of compliance with Account procedures, the Applicable Restrictions, and applicable securities regulations,

(q)      will process any paperwork reasonably requested for any security held within the portfolio managed by Sub-Advisor during its management at the direction of the Investment Manager, as the Investment Manager may direct from time to time.

(r)      will provide reasonable assistance to the Investment Manager with respect to any annual audit of the Accounts' financial statements, including, but not limited to: (i) providing broker contacts as needed for obtaining trade confirmations (in particular with respect to investments in loans (including participations and assignments) and all derivatives, including swaps); (ii) providing copies of all documentation relating to investments in loans (including participations and assignments) and derivative contracts, within a reasonable time after the execution of such documentation; (iii) providing assistance in obtaining trade confirmations in the event an Account or its independent registered public accounting firm is unable to obtain such confirmations directly from the brokers; and (iv) obtaining market quotations for investments (including investments in loans (including participations and assignments) and derivatives) that are not readily ascertainable in the event an Account or its independent registered public accounting firm is unable to obtain such market quotations through independent means.

**3.      Disclosure about Sub-Advisor and Accounts.**  The Sub-Advisor has reviewed the current Applicable Restrictions and agrees to promptly review future amendments to the Applicable Restrictions provided to it by the Investment Manager, including any supplements thereto, which relate to the Sub-Advisor or the Accounts.  The Sub-Advisor further agrees to notify the Investment Manager promptly of any fact known to the Sub-Advisor respecting or relating to the Sub-Advisor that could materially and adversely impact the Sub-Advisor's ability to provide the Services.  The Sub-Advisor further agrees to notify the Investment Manager promptly in the event that the Sub-Advisor becomes aware that the disclosures in the Applicable Restrictions are inconsistent in any material respect with the manner in which the Sub-Advisor is providing the Services.  In addition, the Sub-Advisor agrees to comply with the Investment Manager's reasonable request for information regarding the personnel of the Sub-Advisor who are responsible for provision of the Services.

**4.      Expenses.**  All expenses borne by the Sub-Advisor on behalf of or for the benefit of any of the Accounts in accordance with the Applicable Restrictions shall be reimbursed by the applicable Accounts on the same basis that such expenses would otherwise have been reimbursed had they been borne by the Investment Manager.

**5.      Compensation.**  The compensation for the Shared Services shall be set forth in the Shared Services Agreement attached hereto as **Exhibit A**, as amended from time to time.  For the Services provided and the expenses borne by the Sub-Advisor pursuant to this Agreement, the Investment Manager will pay to the Sub-Advisor a fee in accordance with **Schedule A** attached to this Agreement, as such schedule may be amended by the parties from time to time to reflect the then fair market value of the Services.

**6.      Seed Money.**  The Investment Manager agrees that the Sub-Advisor shall not be responsible for providing money for the initial capitalization of any of the Accounts.

7.     **Compliance.**

(a)     The Sub-Advisor agrees that it shall immediately notify the Investment Manager and the Accounts in the event that the SEC, CFTC, or any banking or other regulatory body has censured the Sub-Advisor; placed limitations upon its activities, functions or operations; suspended or revoked its registration, if any, or ability to serve as an investment adviser; or has commenced proceedings or an investigation that can reasonably be expected to result in any of these actions.

(b)     The Investment Manager agrees that it shall immediately notify the Sub-Advisor in the event that the SEC has censured the Investment Manager or any of the Accounts; placed limitations upon any of their activities, functions, or operations; denied, suspended or revoked the Investment Manager's registration as an investment adviser; or has commenced proceedings or an investigation that may result in any of these actions.

**8.     Independent Contractor.**  The Sub-Advisor shall for all purposes herein be deemed to be an independent contractor and shall, unless otherwise expressly provided herein or authorized by the Investment Manager from time to time, have no authority to act for or represent the Investment Manager in any way or otherwise be deemed its agent.

**9.     Books and Records.**  The Sub-Advisor hereby agrees that all records which it maintains for the Accounts are the property of the Accounts and further agrees to surrender promptly to the Investment Manager   any of such records upon the Investment Manager's request, although the Sub-Advisor may, at its own expense, make and retain a copy of such records.

**10.     Cooperation.**  Each party to this Agreement agrees to cooperate with each other party and with all appropriate governmental authorities having the requisite jurisdiction (including, but not limited to, the SEC and state insurance authorities) in connection with any investigation or inquiry relating to this Agreement or the Accounts.

**11.     Responsibility and Control.**  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, IT IS UNDERSTOOD AND AGREED THAT THE INVESTMENT MANAGER IS SOLELY RESPONSIBLE FOR ALL DECISIONS RELATED TO THE MANAGEMENT OF THE ACCOUNTS AND SUB-ADVISOR'S SERVICES ARE BEING PROVIDED HEREUNDER MERELY TO SUPPORT AND ASSIST INVESTMENT MANAGER IN THE PERFORMANCE OF ITS DUTIES AND IN NO EVENT SHALL ANY OF THE PROVISIONS HEREOF BE CONSTRUED AS A DELEGATION OF ANY DUTIES OF INVESTMENT MANAGER TO SUB-ADVISOR.  In furtherance of the foregoing, Investment Manager reserves the right to direct, approve or disapprove any action hereunder taken on their behalf by the Sub-Advisor, provided, however, that the Sub-Advisor shall not be liable for any losses to the Accounts resulting from any Account's direction, or from an Account's disapproval of any action proposed to be taken by the Sub-Advisor.

**12.     Services Not Exclusive.**  It is understood that the services of the Sub-Advisor and its employees are not exclusive, and nothing in this Agreement shall prevent the Sub-Advisor (or its employees or affiliates) from providing similar services to other clients, including investment companies (whether or not their investment objectives and policies are similar to those of the Accounts) or from engaging in other activities.

**13.     Liability.**  Except as may otherwise be required under applicable law, the Investment Manager agrees that the Sub-Advisor, any affiliated person of the Sub-Advisor, and each person, if any, who, within the meaning of Section 15 of the 1933 Act, controls the Sub-Advisor, shall not be liable for, or subject to any damages, expenses, or losses in connection with, any act or omission connected with or

arising out of any services rendered under this Agreement, except by reason of willful misfeasance, bad faith, or gross negligence in the performance of the Sub-Advisor's duties, or by reason of reckless disregard of the Sub-Advisor's obligations and duties under this Agreement.

**14.   Duration and Termination.**  This Agreement shall become effective as of the date of execution first written above, and shall continue in effect for 10 years and continue thereafter on an annual basis with respect to each Account unless notice of termination is provided at least 60 days prior to the date of renewal.

This Agreement may be terminated with respect to any Accounts:

(a)   by the Sub-Advisor at any time, without the payment of any penalty, upon sixty (60) days' prior written notice to the Investment Manager and the Accounts.

(b)   by the Investment Manager at any time, without the payment of any penalty, upon sixty (60) days' prior written notice to the Sub-Advisor and the Accounts.

**15.   Notices.**  All notices and other communications hereunder shall be in writing sent by facsimile first, if practicable, but shall only be deemed given if delivered in person or by messenger, cable, certified mail with return receipt, or by a reputable overnight delivery service which provides evidence of receipt to the parties at the following addresses (or at such other address or number for a party as shall be specified by like notice):

A.   if to the Sub-Advisor, to:

Highland Capital Management, L.P.
13455 Noel Road, Suite 800
Dallas, TX 75240
Facsimile transmission number: 972-628-4147
Attention:  General Counsel

B.   if to the Investment Manager, to:

Acis Capital Management, L.P.
13455 Noel Road, Suite 800
Dallas, TX 75240
Facsimile transmission number: 972-628-4147
Attention:  Acis Capital Management

**16.   Miscellaneous.**

(a)   This Agreement shall be governed by the laws of Texas, without regard to the conflict of law principles thereof.

(b)   The captions of this Agreement are included for convenience only and in no way define or limit any of the provisions hereof or otherwise affect their construction or effect.

(c)   This Agreement may only be assigned by any party to any affiliate of such party with prior written consent of the other parties.

(d)     If any provision of this Agreement shall be held or made invalid by a court decision, statute, rule, or otherwise, the remainder of this Agreement shall not be affected thereby, and to this extent, the provisions of this Agreement shall be deemed to be severable. To the extent that any provision of this Agreement shall be held or made invalid by a court decision, statute, rule or otherwise with regard to any party hereunder, such provisions with respect to other parties hereto shall not be affected thereby.

(e)     This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all such counterparts shall together constitute one and the same Agreement.

(f)     Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the parties or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other parties hereto, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. The Arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service. The arbitrator(s) shall be duly licensed to practice law in the State of Texas. The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. No arbitrator will have authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules. The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF,** the parties hereto have caused this agreement to be executed as of the day and year first written above.

<u>**INVESTMENT MANAGER**</u>:

**ACIS CAPITAL MANAGEMENT, L.P.**
By:   Acis Capital Management GP, LLC,
       its general partner

By:_____
Name:  James Dondero
Title:  President

<u>**SUB-ADVISOR**</u>:

**HIGHLAND CAPITAL MANAGEMENT, L.P.**
By:   Strand Advisors, Inc., its general partner

By:_____
Name:  James Dondero
Title:  President

**AMENDMENT**

**TO**

**AMENDED AND RESTATED SUB-ADVISORY AGREEMENT**

THIS AMENDMENT (this "*Amendment*") to the Amended and Restated Sub-Advisory Agreement between Acis Capital Management, L.P. (the "*Investment Manager*") and Highland Capital Management, L.P. (the "*Sub-Advisor*" and together with the Investment Manager, the "*Parties*"), dated May 5, 2011 to be effective January 1, 2011 (the "*Sub-Advisory Agreement*"), is entered into as of 1st day of July, 2011 (the "*Effective Date*") between the Parties.  All capitalized terms used, but not defined in this Amendment and defined in the Sub-Advisory Agreement, shall have the meanings ascribed to them in the Sub-Advisory Agreement.

WHEREAS, the Parties have entered into that certain Sub-Advisory Agreement described above; and

WHEREAS, the Parties now desire to amend the Sub-Advisory Agreement as follows:

NOW, THEREFORE, in consideration of the premises and the agreements contained herein and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto amend the Sub-Advisory Agreement as follows as of the Effective Date:

1.     Clause (a) of Section 2 under the "**Sub-Advisor Duties**" of the Sub-Advisory Agreement shall be hereby amended and replaced in its entirety as follows:

(a)     will conform with (1) the Advisers Act and all rules and regulations thereunder, and releases and interpretations related thereto, (2) all other applicable federal and state laws and regulations, (3) any applicable written procedures, policies and guidelines adopted by the applicable Account or, except as expressly provided in Section 2 to the contrary, the Investment Manager and furnished to the Sub-Advisor, and (4) the Account's objectives, policies and restrictions as stated in the Account's Indenture, Management Agreement, Partnership Agreement, Bye-laws, and/or other governing documents, as applicable, each as supplemented or amended from time to time, as furnished to the Sub-Advisor (such governing document, the "*Applicable Restrictions*").    Until the Investment Manager delivers any supplements or amendments to the Sub-Advisor, the Sub-Advisor shall be fully protected in relying on the Applicable Restrictions previously furnished by the Investment Manager to the Sub-Advisor.  In providing the Services in accordance with the requirements of this Section 2, the Sub-Advisor shall be entitled to receive and act upon advice of counsel to the Accounts, to the Investment Manager or to the Sub-Advisor that is also acceptable to the Investment Manager.

2.     Section 14 of the Sub-Advisory Agreement shall be hereby amended and replaced in its entirety as follows:

14.     **Duration and Termination**.    (a) Subject to Section 14(b), this Agreement shall become effective as of the date of execution first written above, and shall continue in effect for 10 years and continue thereafter on an annual basis with respect to each Account unless notice of termination is provided at least 60 days prior to the date of renewal.

Subject to Section 14(b), this Agreement may be terminated with respect to any Accounts:

      (i)     by the Sub-Advisor at any time, without the payment of any penalty, upon sixty (60) days' prior written notice to the Investment Manager and the Accounts; and

      (ii)     by the Investment Manager at any time, without the payment of any penalty, upon sixty (60) days' prior written notice to the Sub-Advisor and the Accounts.

      (b)     In the event of any proposed termination of this Agreement while services are being rendered hereunder with respect to one or more Accounts, the effectiveness of such termination shall be conditioned on either (i) the Investment Manager confirming, in a manner reasonably satisfactory to such Accounts, that the termination of this Agreement would not cause an Adverse Account Event (as defined below), or (ii) the continued provision of the Advisory Services on substantially the terms provided herein until such time as a replacement provider or providers of the Advisory Services can be engaged by Investment Manager on terms that would not cause an Adverse Account Event. As used herein, "***Adverse Account Event***" means (i) any event that would constitute a violation of the Applicable Restrictions of an Account, (ii) any event that would result in a material adverse deviation from the standard of services rendered to an Account immediately prior to such event, or (iii) in the case of any Account that is an issuer of structured finance securities under an indenture with notes rated by S&P or Moody's, the failure to receive rating agency confirmation consistent with the terms of such indenture that the termination of this Agreement would not cause either S&P or Moody's to effect a withdrawal, reduction, suspension or other adverse action with respect to any then current rating of any class of notes of such Account issued under such indenture. In the event Investment Manager relies on clause (ii) above to avoid termination of this Agreement, Investment Manager agrees to use its commercially reasonable efforts to procure such replacement Advisory Services as soon as reasonably practicable following the Sub-Advisor's notice of its desire to terminate this Agreement.

3.     This Amendment may be executed in multiple counterparts, each of which, when assembled to include an original or faxed signature for each party contemplated to sign this Amendment, will constitute a complete and fully executed agreement. All such fully executed original or faxed counterparts will collectively constitute a single agreement.

4.     Except as modified hereby, the Sub-Advisory Agreement shall remain in full effect and the Amendment shall be binding upon the Parties and their respective successors and assigns. If any inconsistency exists or arises between the terms of the Amendment and the terms of the Sub-Advisory Agreement, the Amendment shall prevail.

*[Signature page follows]*

2

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed as of the day and year first above written.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., its general partner

By: _____

Name:  James Dondero
Title:    President


ACIS CAPITAL MANAGEMENT, L.P.

By:    Acis Capital Management GP, LLC.,
       its general partner

By: _____

Name:  James Dondero
Title:    President

**Annex C**

**Shared Services Agreement between Acis Capital Management, L.P. and Highland Capital Management, L.P.**

## SHARED SERVICES AGREEMENT

This Shared Services Agreement (this "*Agreement*") by and among Highland Capital Management, L.P., a Delaware limited partnership ("*HCMLP*") and Acis Capital Management, L.P., a Delaware limited partnership ("*Acis*"), and any affiliate of Acis that becomes a party hereto, is effective as of January 1, 2011 (the "*Effective Date*").  Each of the signatories hereto is individually a "*Party*" and collectively the "*Parties*".

### RECITALS

A.       During the Term, HCMLP will provide to Acis certain services as more fully described herein and the Parties desire to allocate the costs incurred for such services and assets among them in accordance with the terms and conditions in this Agreement.

### AGREEMENT

In consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties agree, intending to be legally bound, as follows:

### ARTICLE I
### DEFINITIONS

"*Actual Cost*" means, with respect to any period hereunder, one hundred percent (100%) of the actual costs and expenses caused by, incurred or otherwise arising from or relating to (i) the Shared Services and (ii) the Shared Assets, in each case during such period.

"*Affiliate*" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person.  The term "*control*" (including, with correlative meanings, the terms "*controlled by*" and "*under common control with*") means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract or otherwise.

"*Agreement*" has the meaning set forth in the preamble.

"*Allocation Percentage*" has the meaning set forth in Section 4.01.

"*Annual Revenue*" means for any fiscal year the aggregate revenue of HCMLP or Acis, as applicable, on a consolidated basis as reflected on its audited financial statements for such fiscal year.

"*Applicable Margin*" shall mean an additional amount equal to 5% of all costs allocated by Service Provider to the other parties hereto under Article IV; provided that the parties may agree on a different margin percentage as to any allocation item or items to the extent the above margin percentage, together with the allocated cost of such item or service, would not reflect an arm's length value of the particular service or item allocated.

"*Change*" has the meaning set forth in Section 2.02(a).

"*Change Request*" has the meaning set forth in Section 2.02(b).

"*Code*" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations.

"*Effective Date*" has the meaning set forth in the preamble.

"*Governmental Entity*" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"*Indemnified Party*" has the meaning set forth in Section 8.03.

"*Indemnifying Party*" has the meaning set forth in Section 8.03.

"*Liabilities*" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"*Loss*" means any cost, damage, disbursement, expense, liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "*Loss*" will not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"*Monthly Report*" has the meaning set forth in Section 5.02.

"*New Shared Service*" has the meaning set forth in Section 2.03.

"*Notice of Claim*" has the meaning set forth in Section 8.03.

"*Party*" or "*Parties*" has the meaning set forth in the preamble.

"*Person*" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"*Recipient*" means Acis and any of Acis' direct or indirect Subsidiaries or managed funds or accounts in their capacity as a recipient of the Shared Services and/or Shared Assets.

"*Service Provider*" means any of HCMLP and its direct or indirect Subsidiaries in its capacity as a provider of Shared Services or Shared Assets.

"*Service Standards*" has the meaning set forth in Section 6.01.

"*Shared Assets*" shall have the meaning set forth in Section 3.03.

"*Shared Services*" shall have the meaning set forth in Section 2.01.

"*Shared Services and Employees Agreement*" has the meaning set forth in the recitals.

"*Subsidiary*" means, with respect to any Person, any Person in which such Person has a direct or indirect equity ownership interest in excess of 50%.

"*Tax*" or "*Taxes*" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other

similar tax-like charges lawfully levied by a duly constituted taxing authority against or upon the Shared Services and the Shared Assets; and (ii) tax-related surcharges or fees that are related to the Shared Services and the Shared Assets identified and authorized by applicable tariffs.

"***Term***" has the meaning set forth in Section 7.01.

ARTICLE II
SHARED SERVICES

Section 2.01    <u>Services</u>.  During the Term, Service Provider will provide Recipient with Shared Services, including without limitation, all of the (i) finance and accounting services, (ii) human resources services, (iii) marketing services, (iv) legal services, (v) corporate services, (vi) information technology services, and (vii) operations services; each as described more fully on **Annex A** attached hereto, the "***Shared Services***")

Section 2.02    <u>Changes to the Shared Services</u>.

(a)    During the Term, the Parties may agree to modify the terms and conditions of a Service Provider's performance of any Shared Service in order to reflect new procedures, processes or other methods of providing such Shared Service, including modifying the applicable fees for such Shared Service to reflect the then current fair market value of such service (a "***Change***").  The Parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Shared Service to Recipient.

(b)    The Party requesting a Change will deliver a description of the Change requested (a "***Change Request***") and no Party receiving a Change Request may unreasonably withhold, condition or delay its consent to the proposed Change.

(c)    Notwithstanding any provision of this Agreement to the contrary, a Service Provider may make: (i) Changes to the process of performing a particular Shared Service that do not adversely affect the benefits to Recipient of Service Provider's provision or quality of such Shared Service in any material respect or increase Recipient's cost for such Shared Service; (ii) emergency Changes on a temporary and short-term basis; and/or (iii) Changes to a particular Shared Service in order to comply with applicable law or regulatory requirements, in each case without obtaining the prior consent of Recipient.  A Service Provider will notify Recipient in writing of any such Change as follows: in the case of clauses (i) and (iii) above, prior to the implementation of such Change, and, in the case of clause (ii) above, as soon as reasonably practicable thereafter.

Section 2.03    <u>New Shared Services</u>.  The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Shared Services not otherwise specifically listed in Section 2.01 (a "***New Shared Service***").  Any agreement between the Parties on the terms for a New Shared Service must be in accordance with the provisions of Article IV and Article V hereof, will be deemed to be an amendment to this Agreement and such New Shared Service will then be a "***Shared Service***" for all purposes of this Agreement.

Section 2.04    <u>Subcontractors</u>.  Nothing in this Agreement will prevent Service Provider from, upon notice to Recipient, using subcontractors, hired with due care, to perform all or any part of a Shared Service hereunder.  A Service Provider will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through subcontractors, and a Service Provider will be solely responsible for payments due to its subcontractors.

3

ARTICLE III
SHARED ASSETS

Section 3.01    Shared IP Rights.    Each Service Provider hereby grants to Recipient a non-exclusive right and license to use the intellectual property and other rights granted or licensed, directly or indirectly, to such Service Provider (the "**Shared IP Rights**") pursuant to third party intellectual property Agreements ("**Third Party IP Agreements**"), provided that the rights granted to Recipient hereunder are subject to the terms and conditions of the applicable Third Party IP Agreement, and that such rights shall terminate, as applicable, upon the expiration or termination of the applicable Third Party IP Agreement. Recipient shall be licensed to use the Shared IP Rights only for so long as it remains an Affiliate of HCMLP.  In consideration of the foregoing licenses, Recipient agrees to take such further actions as a Service Provider deems to be necessary or desirable to comply with its obligations under the Third Party IP Agreements.

Section 3.02    Other Shared Assets.    Subject to Section 3.01, each Service Provider hereby grants Recipient the right, license or permission, as applicable, to use and access the benefits under the agreements, contracts and licenses that such Service Provider will purchase, acquire, become a party or beneficiary to or license on behalf of Recipient (the "**Future Shared Assets**" and collectively with the Shared IP Rights, the "**Shared Assets**").

ARTICLE IV
COST ALLOCATION

Section 4.01    Actual Cost Allocation Formula.    The Actual Cost of any item relating to any Shared Services or Shared Assets shall be allocated based on the Allocation Percentage.  For purposes of this Agreement, "**Allocation Percentage**" means:

(a)    To the extent 100% of such item is demonstrably attributable to the Acis, 100% of the Actual Cost of such item shall be allocated to Acis;

(b)    To the extent a specific percentage of use of such item can be determined (e.g., 70% for HCMLP and 30% for Acis), that specific percentage of the Actual Cost of such item will be allocated to HCMLP or Acis, as applicable; and

(c)    All other portions of the Actual Cost of any item that cannot be allocated pursuant to clause (a) or (b) above shall be allocated between HCMLP and Acis in such proportion as is agreed in good faith between the parties.

Section 4.02    Non-Cash Cost Allocation.    The actual, fully burdened cost of any item relating to any Shared Services or Shared Assets that does not result in a direct, out of pocket cash expense may be allocated to HCMLP and Acis for financial statement purposes only, without any corresponding cash reimbursement required, in accordance with generally accepted accounting principles, based on the Allocation Percentage principles described in Section 4.01 hereof.

ARTICLE V
PAYMENT OF COST AND REVENUE SHARE; TAXES

Section 5.01    Monthly Statements.    Within thirty (30) days following the end of each month during the Term (or at such time as may be otherwise agreed by the parties), each Service Provider shall furnish the other Parties hereto with a written statement with respect to the Actual Cost paid by it in respect of Shared Services and Shared Assets provided by it, in each case, during such period, setting

4

forth (i) the cost allocation in accordance with Article IV hereof together with the Applicable Margin on such allocated amounts, and (ii) any amounts paid pursuant to Section 5.02 hereof, together with such other data and information necessary to complete the items described in Section 5.03 hereof (hereinafter referred to as the "*Monthly Report*").

Section 5.02   Settlement Payments.   At any time during the Term, any Party may make payment of the amounts that are allocable to such Party together with the Applicable Margin related thereto, regardless of whether an invoice pursuant to Section 5.03 hereof has been issued with respect to such amounts.

Section 5.03   Determination and Payment of Cost and Revenue Share.

(a)   Within ten (10) days of the submission of the Monthly Report described in Section 5.02 hereof (or at such other time as may be agreed by the parties), the Parties shall (i) agree on the cost share of each of the Parties and Applicable Margin as calculated pursuant to the provisions of this Agreement; and (ii) prepare and issue invoices for the cost share and Applicable Margin payments that are payable by any of the Parties.

(b)   Within ten (10) days of preparation of the agreement and the issuance of the invoice described in Section 5.03(a) (or at such other time as may be agreed by the parties), the Parties shall promptly make payment of the amounts that are set forth on such cost allocation invoice.

Section 5.04   Taxes.

(a)   Recipient is responsible for and will pay all Taxes applicable to the Shared Services and the Shared Assets provided to Recipient, provided, that such payments by Recipient to Service Provider will be made in the most tax-efficient manner and provided further, that Service Provider will not be subject to any liability for Taxes applicable to the Shared Services and the Shared Assets as a result of such payment by Recipient. Service Provider will collect such Tax from Recipient in the same manner it collects such Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time it invoices Recipient for the Shared Services and Shared Assets, costs for which such Taxes are levied. Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or liability for such Taxes.

(b)   Service Provider will reimburse Recipient for any Taxes collected from Recipient and refunded to Service Provider. In the event a Tax is assessed against Service Provider that is solely the responsibility of Recipient and Recipient desires to protest such assessment, Recipient will submit to Service Provider a statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name. Service Provider's authorization will not be unreasonably withheld. Recipient will finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings. However, the authorization will be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider will have the right to reasonably withdraw such authority at any time. Upon notice by Service Provider that it is so withdrawing such authority, Recipient will expeditiously terminate all proceedings. Any adverse consequences suffered by Recipient as a result of the withdrawal will be submitted to arbitration pursuant to Section 9.14. Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property. Recipient agrees to indemnify Service Provider for all Losses that Service Provider incurs as a result of any such contest by Recipient.

(c)     The provisions of this Section 5.04 will govern the treatment of all Taxes arising as a result of or in connection with this Agreement notwithstanding any other Article of this Agreement to the contrary.

## ARTICLE VI
## SERVICE PROVIDER RESPONSIBILITIES

Section 6.01     <u>Service Provider General Obligations</u>.  Service Provider will provide the Shared Services and the Shared Assets to Recipient on a non-discriminatory basis and will use commercially reasonable efforts to provide the Shared Services and the Shared Assets in the same manner as if it were providing such services and assets on its own account (the "***Service Standards***").  Service Provider will use its commercially reasonable efforts to conduct its duties hereunder in a lawful manner in compliance with applicable laws, statutes, rules and regulations and in accordance with the Service Standards.

Section 6.02     <u>Books and Records; Access to Information</u>.  Service Provider will keep and maintain books and records on behalf of Recipient in accordance with past practices and internal control procedures.  Recipient will have the right, at any time and from time to time upon reasonable prior notice to Service Provider, to inspect and copy (at its expense) during normal business hours at the offices of Service Provider the books and records relating to the Shared Services and Shared Assets, with respect to Service Provider's performance of its obligations hereunder.  This inspection right will include the ability of Recipient's financial auditors to review such books and records in the ordinary course of performing standard financial auditing services for Recipient (but subject to Service Provider imposing reasonable access restrictions to Service Provider's and its Affiliates' proprietary information and such financial auditors executing appropriate confidentiality agreements reasonably acceptable to Service Provider).  Service Provider will promptly respond to any reasonable requests for information or access.

Section 6.03     <u>Return of Property and Equipment</u>.  Upon expiration or termination of this Agreement, Service Provider will be obligated to return to Recipient, as soon as is reasonably practicable, any equipment or other property or materials of Recipient that is in Service Provider's control or possession.

## ARTICLE VII
## TERM AND TERMINATION

Section 7.01     <u>Term</u>.  The term of this Agreement will commence as of the Effective Date and will continue in full force and effect until the first anniversary of the Effective Date (the "***Term***"), unless terminated earlier in accordance with Section 9.02.  The Term shall automatically renew for successive one year periods unless sooner terminated under Section 7.02.

Section 7.02     <u>Termination</u>.  Either Party may terminate this Agreement upon at least 30 days advance written notice at any time prior to the expiration of the Term.

## ARTICLE VIII
## LIMITED WARRANTY; LIMITATION ON LIABILITY; INDEMNIFICATION

Section 8.01     <u>Limited Warranty</u>.  Service Provider will perform the Shared Services hereunder in accordance with the Service Standards.  Except as specifically provided in this Agreement, Service Provider makes no express or implied representations, warranties or guarantees relating to its performance of the Shared Services and the granting of the Shared Assets under this Agreement, including any warranty of merchantability, fitness, quality, non-infringement of third party rights, suitability or adequacy of the Shared Services and the Shared Assets for any purpose or use or purpose.  Service

6

Provider will (to the extent possible and subject to Service Provider's contractual obligations) pass through the benefits of any express warranties received from third parties relating to any Shared Service and Shared Asset, and will (at Recipient's expense) assist Recipient with any warranty claims related thereto.

Section 8.02    Indemnification.  Subject to the limitations of liability set forth in Section 8.04, Service Provider and Recipient will indemnify and hold each other harmless against all Losses resulting from: (i) such Party's performance or failure to perform, in any material manner, any of its obligations under this Agreement; (ii) the breach by such Party, in any material manner, of any representation, warranty, covenant or agreement contained herein; (iii) loss of or damage to tangible real or tangible personal property (including damage to their property), in any material manner, in each case to the extent that such Loss was proximately caused by any negligent or willful act or omission by the Party from whom indemnity is sought, its agents, employees or subcontractors, in connection with the provision or receipt of the Shared Services or the Shared Assets; (iv) such Party's use of the Shared Services and Shared Assets; (v) the breach by such Party of the license granted in Section 3.01; or (vi) the breach by such party of the Third Party IP Agreements.

Section 8.03    Notice and Procedures.  A Party seeking indemnification pursuant to Section 8.02 (the "*Indemnified Party*") will give prompt written notice in reasonable detail (the "*Notice of Claim*") to the indemnifying Party (the "*Indemnifying Party*") stating the basis of any claim for which indemnification is being sought hereunder within thirty (30) days after its knowledge thereof; provided, however, that the Indemnified Party's failure to provide any such notice to the Indemnifying Party will not relieve the Indemnifying Party of or from any of its obligations hereunder, except to the extent that the Indemnifying Party suffers prejudice as a result of such failure.  If the facts giving rise to such indemnification involve an actual or threatened claim by or against a third party:

(a)    the Parties will cooperate in the prosecution or defense of such claim and will furnish such records, information and testimony and attend to such proceedings as may be reasonably requested in connection therewith; and

(b)    the Indemnified Party will make no settlement of any claim that would give rise to liability on the part of the Indemnifying Party without the latter's prior written consent which will not be unreasonably withheld or delayed, and the Indemnifying Party will not be liable for the amount of any settlement affected without its prior written consent.

Section 8.04    Consequential Damages.  Except with respect to a Party's fraud or willful misconduct, and except with respect to damages sought by a third party in connection with a third party claim, none of the Parties, or their Affiliates, will be liable to the other Parties, or their Affiliates, for any damages other than direct damages.  Each Party agrees that it is not entitled to recover and agrees to waive any claim with respect to, and will not seek, consequential, punitive or any other special damages as to any matter under, relating to or arising out of the transactions contemplated by this Agreement, except with respect to such claims and damages arising directly out of a Party's fraud or willful misconduct, or with respect to damages sought by third parties in connection with third party claims.

ARTICLE IX
MISCELLANEOUS

Section 9.01    No Partnership or Joint Venture; Independent Contractor.  Nothing contained in this Agreement will constitute or be construed to be or create a partnership or joint venture between or among HCMLP or Acis or their respective successors or assigns.  The Parties understand and agree that, with the exception of the procurement by Service Provider of licenses or other rights on behalf of

Recipient pursuant to Section 3.01, this Agreement does not make any of them an agent or legal representative of the other for any purpose whatsoever.  With the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, no Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner whatsoever.  The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Recipient in all respects, including with respect to the provision of the Shared Services.

Section 9.02    Amendments; Waivers.  Except as expressly provided herein, this Agreement may be amended only by agreement in writing of all Parties.  No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby will be effective unless in writing and signed by all of the Parties affected and then only to the specific purpose, extent and instance so provided.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.03    Schedules and Exhibits; Integration.  Each Schedule and Exhibit delivered pursuant to the terms of this Agreement must be in writing and will constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement.  This Agreement, together with such Schedules and Exhibits constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

Section 9.04    Further Assurances.  Each Party will take such actions as any other Party may reasonably request or as may be necessary or appropriate to consummate or implement the transactions contemplated by this Agreement or to evidence such events or matters.

Section 9.05    Governing Law.  This Agreement and the legal relations between the Parties will be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in such State and without regard to conflicts of law doctrines unless certain matters are preempted by federal law.

Section 9.06    Assignment.  Except as otherwise provided hereunder, neither this Agreement nor any rights or obligations hereunder are assignable by one Party without the express prior written consent of the other Parties.

Section 9.07    Headings.  The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

Section 9.08    Counterparts.  This Agreement and any amendment hereto or any other agreement delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts.  All counterparts will constitute one and the same agreement and will become effective when one or more counterparts have been signed by each Party and delivered to the other Parties.

Section 9.09    Successors and Assigns; No Third Party Beneficiaries.  This Agreement is binding upon and will inure to the benefit of each Party and its successors or assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other Person or Governmental Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

8

Section 9.10    Notices.   All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given: (i)immediately when personally delivered; (ii) when received by first class mail, return receipt requested; (iii) one day after being sent for overnight delivery by Federal Express or other overnight delivery service; or (iv) when receipt is acknowledged, either electronically or otherwise, if sent by facsimile, telecopy or other electronic transmission device.  Notices, demands and communications to the other Parties will, unless another address is specified by such Parties in writing, be sent to the addresses indicated below:

> If to HCMLP, addressed to:
>
> Highland Capital Management, L.P.
> 13455 Noel Road, Suite 800
> Dallas, Texas 75240
> Attention:  General Counsel
> Fax:  (972) 628-4147
>
> If to Acis, addressed to:
>
> Acis Capital Management, L.P.
> 13455 Noel Road, Suite 800
> Dallas, Texas 75240
> Attention:  General Counsel
> Fax:  (972)628-4147

Section 9.11    Expenses.   Except as otherwise provided herein, the Parties will each pay their own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

Section 9.12    Waiver.   No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.13    Severability.   If any provision of this Agreement is held to be unenforceable for any reason, it will be adjusted rather than voided, if possible, to achieve the intent of the Parties.  All other provisions of this Agreement will be deemed valid and enforceable to the extent possible.

Section 9.14    Arbitration; Jurisdiction.   Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that either party or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief.  The Arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service.  The arbitrator(s) shall be duly licensed to practice law in the State of Texas.  The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each.  Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production.  In

9

response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. No arbitrator will have authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules. The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

Section 9.15   General Rules of Construction. For all purposes of this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement: (i) the terms defined in Article I have the meanings assigned to them in Article I and include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings assigned under GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement; (iv) pronouns of either gender or neuter will include, as appropriate, the other pronoun forms; (v) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) "or" is not exclusive; (vii) "including" and "includes" will be deemed to be followed by "but not limited to" and "but is not limited to, "respectively; (viii) any definition of or reference to any law, agreement, instrument or other document herein will be construed as referring to such law, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; and (ix) any definition of or reference to any statute will be construed as referring also to any rules and regulations promulgated thereunder.

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:   Strand Advisors, Inc., its general partner

By:_____

Name:_____James D. Dondero_____

Title:_____President_____

ACIS CAPITAL MANAGEMENT, L.P.

By:   Acis Capital Management GP, LLC,
      its general partner

By:_____

Name:_____James D. Dondero_____

Title:_____President_____

11

**Principal Office of Issuer**
ACIS CLO 2015-6 Ltd.
c/o MaplesFS Limited
P.O. Box 1093, Boundary Hall, Cricket Square
Grand Cayman, KY1-1102, Cayman Islands
Facsimile Number: 345-945-7100

**Principal Office of Co-Issuer**
ACIS CLO 2015-6 LLC
c/o Puglisi & Associates
850 Library Avenue, Ste. 204
Newark, Delaware 19711

**Trustee, Collateral Administrator**
**and Paying Agent**
U.S. Bank National Association
190 South LaSalle, 8th Floor, Chicago, Illinois 60603

**Portfolio Manager**
Acis Capital Management, L.P.
300 Crescent Court Suite 700
Dallas, TX 75201

**Irish Listing Agent**
Maples and Calder
75 St Stephen's Green
Dublin 2
Ireland

**Legal Advisors**

*To the Initial Purchaser*                          *To the Issuer as to*
*as to United States law*                           *Cayman Islands law*
Morgan, Lewis & Bockius LLP                          Maples and Calder
399 Park Avenue                                      P.O. Box 309, Ugland House
New York, NY 10022-4689                  Grand Cayman KY1-1104, Cayman Islands

*To the Co-Issuers and the Portfolio Manager*
*as to United States law*
Dechert LLP
1000 N. Tryon Street, Suite 4000
Charlotte, NC 28202