IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 161 OF 2018 (NSJ)

IN THE MATTER OF THE COMPANIES LAW (2018 REVISION)
AND IN THE MATTER OF CHINA SHANSHUI CEMENT GROUP LIMITED

AND

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: 93 OF 2019 (NSJ)

BETWEEN:

TIANRUI (INTERNATIONAL) HOLDING COMPANY LIMITED

Plaintiff

AND

CHINA SHANSHUI CEMENT GROUP LIMITED

Defendant

| | |
|---|---|
| Appearances: | Vernon Flynn QC and Jern-Fei Ng QC of counsel and Maples and Calder for the Company |
| | Thomas Lowe QC of counsel and Ogier for Tianrui |
| Heard: | 26, 27 and 28 November 2019 |
| Hearing transcript Produced: | 17 and 29 December 2019 |
| Application to adduce new evidence: | 4 March 2020 |
| Further submissions: | 16 March 2020 |
| Draft judgment circulated: | 30 March 2020 |
| Judgment delivered: | 6 April 2020 |



**EXHIBIT**

**5**

*HEADNOTE*

*Applications to strike out contributory's winding up petition for abuse of process and to strike out a separate writ action by the petitioner on the ground that the petitioner as shareholder did not have standing to bring the action since the claim could only be maintained as a derivative action. Applications in the alternative for a case management stay of the petition and writ action to await the conclusion of proceedings in Hong Kong*

## JUDGMENT

### Introduction and outline of my decision

1.  This is the latest round in a long running, hotly contested and multi-jurisdictional dispute relating to the control and management of China Shanshui Cement Group Limited (the **Company**). The dispute has resulted in multiple proceedings (and decisions) in this jurisdiction and Hong Kong. This judgment deals with four further applications made by the Company.

2.  The Company is a Cayman Islands exempted company that is also registered in Hong Kong as a non-Hong Kong company. Its shares are listed on the Hong Kong Stock Exchange (**HKSE**). It is the holding company of a number of operating subsidiaries, which subsidiaries are registered in Hong Kong and the People's Republic of China (**PRC**). The most important of these is Shandong Shanshui Cement Group Company (**Shandong Shanshui**). The group is principally engaged in the production, distribution and supply of cement and related construction products.

3.  The underlying dispute arises out of a bitter and prolonged battle for control of the Company. The contest for control has been between two main groups of shareholders. First, Tianrui (International) Holding Company Limited (**Tianrui**), a company incorporated in the British Virgin Islands. Second, China National Building Material Holding Co. Limited (**CNBM**), a company incorporated in the PRC and Asia Cement Corporation (**ACC**), which is incorporated in Taiwan. Zhang Caikiu (**Mr. Zhang Senior**) and his son, Zhang Bin (**Mr. Zhang Junior**) (Mr. Zhang Senior and Mr. Zhang Junior being together the **Zhangs**) have also been involved. They were directors of the Company and Tianrui alleges that Mr. Zhang Senior at relevant times controlled the composition of

the Company's board and was a party to an unlawful means conspiracy with CNBM and ACC to damage Tianrui and the Company.

4.    Another significant shareholder in the Company, owning 25.09% of its shares, is China Shanshui Investments Co, Ltd (*CSI*). CSI is incorporated in Hong Kong and was part of an employees' stock ownership scheme for employees of the Company and its subsidiaries. Pursuant to the stock ownership scheme, Mr. Zhang Senior had become the holder of approximately 81.74% of the shares in CSI. The majority of these were held on trust for the employees who participated in the scheme (the *CSI Employee Beneficiaries*). In addition, there are a number of public shareholders (who are not involved in the disputes).

5.    In this jurisdiction, Tianrui has presented a winding up petition and subsequently commenced proceedings (by writ) against the Company. The winding up petition was originally dated 30 August 2018 (and issued on 4 September 2018). The writ was issued in May 2019.

6.    The Company has already unsuccessfully applied to have the petition struck out. In January 2019, before the filing by Tianrui of its writ action, the Court of Appeal allowed an appeal from the judgment of Mangatal J and held that if the allegations set out in the petition were true, they were capable of establishing that it would be just and equitable to wind up the Company. The Court of Appeal set out its reasons in a written judgment dated 5 April 2019 (the *Court of Appeal's Judgment*). The Privy Council has recently (on 20 February 2020) refused the Company's application for permission to appeal the Court of Appeal's Judgment.

7.    There have also been further proceedings in this jurisdiction arising out of and related to the petition. As I will shortly explain, one of Tianrui's complaints is that in carrying out their agreement to damage Tianrui, CNBM and ACC sought to dilute its shareholding in the Company by procuring the issue of convertible bonds and then new shares to their associates. Following the presentation of the petition, the Company sought a validation order to permit and validate the transfer of some of those new shares to the operator of the Hong Kong central clearing and settlement system. Tianrui contended that the transfer of shares would cause serious and irreversible consequences and would prejudice the outcome of the petition because it would become, if the transfer went ahead and the petition was successful, impossible to unwind the allegedly improper and dilutive share issue. Mangatal J made the validation order but the Court of

Appeal has recently (on 18 February 2020) allowed Tianrui's appeal and refused to validate the transfer.

8.   In Hong Kong, the Company has commenced two sets of proceedings (there have been a number of proceedings in Hong Kong commenced and determined during the course of the battle for control of the Company but two are of particular relevance to the applications now before me):

   (a).   on 4 December 2015, the Company (and various subsidiaries) issued proceedings (HCA2880/2015) (the *First Hong Kong Proceedings*) against CNBM, ACC and eight individuals who had been directors of the Company. These included Mr Zhang Senior, Mr Zhang Junior and directors nominated by CNBM and ACC.

   (b).   on 29 March 2019, the Company (and various subsidiaries) issued proceedings (HCA548/2019) (the *Second Hong Kong Proceedings*) against Tianrui (and its shareholders) and sixteen other defendants. The third to seventeenth defendants were at various times directors or officers of the Company while Tianrui was in control of the composition of the Company's board. These included Stephen Liu and David Yen of Ernst & Young who had, before taking an appointment as a director of the Company, been appointed by the Hong Kong court as receivers of the shares held by Mr. Zhang Senior in CSI (the *CSI Receivers*). The eighteenth defendant was Ernst & Young Transactions Limited (*EYTL*). Mr. Liu and Mr. Yen had been directors of EYTL.

9.   The various proceedings were therefore commenced in the following order: the First Hong Kong Proceedings; then the Cayman winding up petition; then the Second Hong Kong Proceedings and finally the Cayman writ action.

10.   On 12 August 2019, the Company filed two summonses. The first sought to strike out or stay the petition. The second sought to strike out or stay the Cayman writ action. After failing to strike out the petition on the grounds relied on in its earlier strike out application, and after failing to obtain a validation order, the Company now seeks to strike out the petition on the basis that having commenced the Cayman writ action it is now an abuse of process for Tianrui to continue to pursue the petition. In the alternative, the Company seeks a temporary case management stay of the petition pending the conclusion of both of the Hong Kong proceedings. In addition, it seeks to

strike out the Cayman writ action either on the basis that it is an abuse of process for Tianrui to pursue both the petition and the Cayman writ action or because the cause of action relied on in the Cayman writ action can only be constituted as a derivative claim on behalf of the Company and is currently improperly constituted as a personal claim by Tianrui qua shareholder (in its written submissions the Company argued that the Cayman Writ Action should be struck out as an abuse both because Tianrui does not have standing to bring a personal claim and separately because, in so far as the claim is a derivative claim, it failed to comply with the provisions in the Grand Court Rules regulating such actions). Alternatively, the Company seeks a case management stay of the Cayman writ action pending the conclusion of both of the Hong Kong proceedings.

11.   Accordingly, the Company's four applications are:

    (a).   for an order that the petition be struck out on the basis that it is an abuse of the process of the Court for Tianrui to continue its pursuit of the petition in view of the position it had taken in its appeal to the Court of Appeal (the ***Petition Strike Out Application***).

    (b).   in the alternative, for an order that Tianrui's writ be struck out on the basis that it is an abuse of the process of the Court for Tianrui to pursue both the writ and the petition simultaneously (the ***First Writ Strike Out Application***).

    (c).   further, or in the alternative, for an order that the writ be struck out on the basis that it is defective in so far as a derivative claim is being pursued, since it fails to comply with GCR O.15, r.12A. Since the issues arising are closely connected, I also deal under this heading with the Company's claim to strike out the Cayman writ action on the basis that it is not properly constituted as a personal claim (the ***Second Writ Strike Out Application***).

    (d).   further, or in the further alternative, for an order that the petition and/or the writ be stayed on case management grounds until the Hong Kong court has delivered judgment at trial in both of the outstanding proceedings in Hong Kong (the ***Stay of the Petition and Writ Action Application***).

12.   After having carefully considered the submissions made and evidence filed by both parties and for the reasons set out below, I have concluded as follows:

(a).    the Petition Strike Out Application should be dismissed.

(b).    the First Writ Strike Out Application should be dismissed on the basis that Tianrui has agreed that the Cayman writ action and the petition be heard together; that the evidence filed in relation to the petition stand as evidence in the Cayman writ action and that no orders for (further) discovery be made in the Cayman writ action.

(c).    the Second Writ Strike Out Application should be dismissed. The Company's claim to strike out the Cayman writ action on the basis that it is not properly constituted as a personal claim fails. In my view, both as a matter of principle and in accordance with the authorities, properly understood, Tianrui has standing to bring the claim set out in the Cayman writ action against the Company (in its capacity as shareholder, on its own or as a representative of all shareholders) for relief in respect of the alleged abuse and improper exercise of the directors' powers and the Company's breach of the statutory contract in the articles. But the declaratory relief available in the action can (as I understand Tianrui now accepts) only properly relate to the validity of the directors' exercise of their powers and cannot seek to affect the rights or position of third parties. Relief against or affecting third parties including a declaration that the issue by the Company of the convertible bonds and new shares challenged by Tianrui be set aside would require a derivative claim to which such third parties were joined (and satisfaction of other relevant procedural requirements applicable to such an action). The statement of claim in the Cayman writ action therefore needs to be amended and a suitable application needs to be made by Tianrui.

(d).    the Stay of the Petition and Writ Action Application should also be dismissed. On balance, I do not consider that the Company has met the very real burden and high threshold which needs to be satisfied to justify a case management stay either in relation to the petition or the Cayman writ action.

(e).    on this basis, the petition and the Cayman writ action should continue. Various further applications now need to be made promptly to allow this to happen. In particular, an application to amend the Cayman writ action needs to be made by Tianrui as soon as possible. And directions for the further conduct of the petition also need to made as soon as

possible. I decline to give directions in the form sought by Tianrui without the parties providing written submissions (and if required a further hearing) on certain important issues which arise on such a directions application.

(f).   I would ask counsel to prepare a suitable form of order for my approval and to file short written submissions of no more than five pages as to the appropriate costs order to be made, if the parties cannot agree on this.

13.   I should note that on 10 February I informed the parties (via my personal assistant) that since I had to be away from 21 February to 2 March judgment would be circulated by the end of the week of 2 March 2020. During that week, on 4 March, Tianrui's Cayman attorneys, Ogier, sent an email to the Court explaining that there had been recently developments in the Hong Kong proceedings, as a result of the coronavirus emergency, which they considered to be material and about which they wished to file further evidence. Subsequently, the Company's Cayman attorneys, Maples and Calder, indicated that their client considered that it was a matter for the Court to decide whether to permit further evidence to be adduced but that if the Court decided to do so the Company also wished to have permission to file further evidence and to file further written submissions as to the impact of the further evidence and the delays in Hong Kong to the Company's applications for a case management stay. I granted permission for the filing of further evidence and allowed the parties seven days in which to file further written submissions, which submissions I have taken into account in reaching my decision on the Company's applications.

**The background – the battle for control of the Company**

14.   The relevant background to and basis of the petition are set out in the Court of Appeal's Judgment. There is also some discussion of the background in the Court of Appeal's validation order judgment. While it would be convenient just to cross-refer to the relevant parts of the Court of Appeal's Judgment, and doing so would reduce the length of this long judgment, I consider that I need to review and rehearse the relevant background and procedural history since, in order to deal with the Company's applications, it is necessary to see the big picture and how each of the proceedings and the issues arising within them relate to one another. In addition, the Court of

Appeal's Judgment does not deal with the Hong Kong proceedings and various subsequent developments, including Tianrui's Cayman writ action.

15.  It appears that the trigger for the takeover battle was the decision of the PRC government, in November 2014, to prohibit any expansion of capacity or development of new projects in the cement industry. This meant that cement producers could not expand through the development of new projects; they could only do so by acquiring or merging with other existing producers. As a result, Tianrui, CNBM and ACC all identified the Company as a target and acquired or expanded their shareholdings in it.

16.  There followed the battle for control of the Company. As I have noted, this has ended up as a battle primarily between Tianrui on the one side and CNBM and ACC on the other (but has also included the Zhangs who Tianrui allege to have been in the CNBM/ACC camp). The initial or preliminary steps taken by the different parties appear to have started early in 2014 before the announcement of the PRC government's decision mentioned above. Since then, Tianrui, CNBM and ACC acquired shares in the Company and at different times appointed their representatives to the Company's board. Tianrui says that CNBM and ACC agreed to act together against it in order to prevent Tianrui obtaining control, to dilute its shareholding and to cause it (and the Company) loss and damage. Tianrui says that CNBM and ACC did so by acting unlawfully (and in combination at different times with the Zhangs and CNBM/ACC's nominees or representatives on the board, who also acted in breach of duty and unlawfully). In turn, CNBM and ACC allege that Tianrui's action in seeking to obtain control of the Company was improper and unlawful and caused the Company loss and damage. They also assert that Tianrui's nominees or representatives, when on the Company's board, acted unlawfully and in breach of duty and in combination with Tianrui and that they all caused loss and damage to the Company.

17.  During the period in which the battle has raged, different factions have been in control of the Company's board at different times and this explains why proceedings have been brought by the Company against both CNBM/ACC and Tianrui. In the period before 13 October 2015, according to Tianrui, Mr. Zhang Senior (assisted by Mr. Zhang Junior) controlled the composition of the Company's board. Mr. Zhang Senior was removed as a director of the Company at an extraordinary general meeting (*EGM*) of the Company's shareholders held on 13 October 2015. According to Tianrui, in the period from that date to 1 December 2015 Mr. Zhang Senior with CNBM and ACC

controlled the composition of the board (because they collaborated and were parties to an unlawful conspiracy). From 1 December 2015 until 23 May 2018, Tianrui controlled the composition of the board (and Tianrui appointed its own representatives to the board). The First Hong Kong Proceedings were commenced by the Company shortly after Tianrui took control and covered Tianrui's complaints about the conduct of the Company's directors (in particular Mr. Zhang Senior), CNBM and ACC during the period before 1 December 2015. On 23 May 2018, Tianrui lost control of the Company's board and its representatives were replaced by representatives of CNBM and ACC. The Second Hong Kong Proceedings were not commenced immediately but only in March 2019, after the presentation of the petition in August 2018. The Second Hong Kong Proceedings covered the Company's (CNBM's and ACC's) complaints about the conduct of Tianrui, and its representatives on the board, during the period in which Tianrui controlled the composition of the board.

18.   The petition (as I explain below) relied heavily on the conduct of CNBM, ACC and the Company's board in the period after Tianrui lost control of the Company, to demonstrate that CNBM and ACC had acted unfairly or oppressively towards Tianrui and/or that the Company's affairs had been conducted with a lack of probity. In particular, the petition covers conduct occurring in the period between August and October 2018 and avers that the Company's board (acting at the instigation of and in concert with CNBM and ACC) had caused the Company to enter into a number of convertible bond issues (and to issue new shares to the holders of such bonds, who were alleged to be connected with CNBM and ACC) to dilute Tianrui's shareholding in the Company. But the petition does not rely exclusively on conduct occurring after Tianrui lost control. In addition, reliance was also placed on the conduct of CNBM, ACC and their nominees on the board in the period before Tianrui took control of the board, once again to demonstrate unfair and oppressive conduct and improper management. Accordingly, as the Court of Appeal noted in the Court of Appeal Judgment, while Tianrui's presentation of its case on occasions gave the impression that the dilution of its shareholding was its sole complaint, when properly understood the case made in the petition went further and comprised serious allegations of conspiracy over a longer period by covert agreements and arrangements designed to damage Tianrui – so that the steps taken to dilute its shareholding were to be understood as merely the latest stage in the conspiracy.

19.   The Cayman writ action relates only to the conduct taking place between August and October 2018, after Tianrui lost control. It challenges the validity of the issue of the convertible bonds and

new shares and seeks orders declaring that they were issued for an improper purpose and are to be treated as void and of no effect.

20.   CNBM and ACC (and the Zhangs) have denied Tianrui's allegations. They assert that they acted properly in the period before Tianrui acquired control of the Company and that the Company's board acted properly when issuing the convertible bonds (and the new shares). They claim that the action that the Company took during the period they were in control of the board was a proper response to the financial problems caused by Tianrui's rapid acquisition of a large shareholding and to Tianrui's improper attempts to obtain and retain control. They deny that they acted unlawfully or that there was a conspiracy to damage Tianrui. They make counter allegations against Tianrui. They assert that Tianrui, and others, including the directors nominated by Tianrui to the Company's board during the period when Tianrui controlled the board conspired together, using unlawful means, to injure the Company (and its subsidiaries).

21.   I now turn to consider in further detail the basis of and factual allegations made in the four sets of proceedings to which the Company's applications relate. I do so in the order in which the proceedings were commenced since it is easier to see how they relate to one another if viewed chronologically.

**The First Hong Kong Proceedings**

22.   The board appointed by Tianrui on 1 December 2015 caused the Company, Shandong Shanshui and two other subsidiaries of the Company to bring the First Hong Kong Proceedings against the Zhangs and others who had acted as directors of the Company or the other plaintiff companies (together the ***Director Defendants***) as well as CNBM and ACC. The Director Defendants included Chang Zhangli (***Mr. Chang***) of CNBM (who had been nominated by CNBM and appointed a director of the Company in May 2015) and Wu Ling-Ling (***Ms. Wu***) of ACC (who had been nominated by ACC and appointed a director of the Company in October 2015). Initially, on 4 December 2015, the proceedings were issued against the Zhangs and James Li. Subsequently, on 17 December 2015, CNBM, ACC and the individuals associated with them were joined as defendants.

23.     I summarise below the claims and factual allegations made in these proceedings. In essence, the allegations focus on conduct from the first quarter of 2014 until 1 December 2015. The Company claims that for a time Mr. Zhang Senior controlled the Company's board and exercised control for his personal benefit, that he mismanaged and misappropriated assets from the Company and its subsidiaries and is liable to the Company for the resulting loss. The Company also claims that when action started to be taken against Mr. Zhang Senior, he sought and obtained support from CNBM, which eventually resulted in Mr. Zhang Senior (and Mr. Zhang Junior) and CNBM (and subsequently ACC) acting together as a concert party (as the term is defined in and such conduct is regulated by the Hong Kong Takeovers Code) and being parties to an unlawful means conspiracy. Their purpose was to enable the concert party's members unlawfully to obtain control of the Company without providing fair value to the Company's minority shareholders (namely Tianrui and CSI) and without making a general offer to shareholders in the terms and as required by the Takeovers Code. All the defendants have filed defences denying the allegations made against them and the account of events provided by the Company.

24.     The claims made in the First Hong Kong Proceedings are set out in the re-amended statement of claim dated 27 May 2017 (the *First Hong Kong Proceedings Statement of Claim*). The drafting is, I have to say, less than limpid and not always easy to follow. Subject to that qualification, I would summarise the factual allegations and the claims made as follows:

   (a).    claims were made against Mr. Zhang Senior and Mr. Zhang Junior based on mismanagement and misconduct and against other Director Defendants for assisting or failing to prevent such conduct. It was asserted that during the period in which Mr. Zhang Senior had controlled the Company's board (and the management of the Company and its subsidiaries), he had treated the Company (and CSI) as his own property and in breach of his fiduciary duties made and received improper payments from the Company's assets (and caused the Company to incur substantial losses). The other members of Company's board had failed to exercise meaningful control over him or take action with respect to his breaches of duty.

   (b).    claims were also made based on an alleged unlawful means conspiracy to which the Zhangs, CNBM and ACC (and some of the other Director Defendants) were parties and the formation of an undisclosed concert party:

(i).   it was alleged that the Zhangs (together with another executive director of the Company, Mr. James Li) in breach of their fiduciary duties, combined in a conspiracy with CNBM (which was later joined by ACC and the other Director Defendants) first, to assist Mr. Zhang Senior to retain management control of the Company and avoid liability for his breaches of duty and secondly, to help CNBM and ACC obtain control of the Company without complying with the requirements of Hong Kong company law or the Hong Kong Takeovers Code or Listing Rules.

(ii).   it was alleged that following complaints made in March 2014 by the CSI Employee Beneficiaries and the minority shareholders in CSI about Mr. Zhang Senior's conduct as a shareholder in CSI (and disputes as to the nature and extent of the trust on which Mr. Zhang Senior held the shares), Mr. Zhang Senior had approached CNBM (which was not then a shareholder in the Company) for assistance. Following this approach, it was agreed that in exchange for CNBM's support and assistance in dealing with the complaints and maintaining Mr. Zhang Senior's control of the Company, Mr. Zhang Senior would procure the Company to allot shares to CNBM at an undervalue so as to allow it to become the largest or second largest shareholder in the Company. Thereafter, the Zhangs (together with another executive director of the Company, Mr. James Li) in bad faith conspired together and with CNBM unlawfully to change the proportions in which the Company's shares were held. They did this by exercising CSI's voting rights as a shareholder of the Company, causing the Company in October 2014 to enter into a subscription agreement with CNBM for the issue of shares at an undervalue and granting new share options to the Zhangs.

(iii).   it was further alleged that the collaboration between CNBM, ACC and the Zhangs resulted in there being a concert party for the purpose of the Hong Kong Takeovers Code. The purpose of the concert party was as I have described above. The action taken pursuant to the concert party included the Zhangs (together with Mr. James Li) arranging in March and April 2015, for the amendment of existing loan notes so as to include, or including in new loan notes (issued by the Company to record the terms on which the Company received certain loans), a change of control clause whereby any removal of Mr. Zhang Junior as chairman or an increase in the shareholding of any shareholder in the Company above 30% would render the loan notes immediately

repayable; in May 2015, voting the shares under their control so as to change the composition of and exercise control over the Company's board; in June and July 2015, the Zhangs (together with Mr. James Li) dishonestly caused the Company to make a series of false and misleading public announcements in breach of the Takeovers Code (in particular in relation to the effect of shareholder resolutions proposed by Tianrui and by failing to disclose full details of the concert party relationship); in September 2015, the Zhangs (with Mr. James Li's assistance) caused a subsidiary of the Company to draw down funds under a loan facility that were not needed for operational reasons thereby incurring unnecessary interest expense; the Zhangs (together with Mr. James Li) engaged in improper and wasteful litigation (against Tianrui and others), thereby improperly incurring legal and unrelated expenses; and in October 2015 improperly and unlawfully managing, conducting and exercising votes at an EGM of the Company in order to reconstitute the Company's board so as to appoint directors who owed their allegiance to the members of the concert party and ensure that the other large shareholders in the Company (namely, Tianrui and CSI) had no representation on the board.

(c).   in addition, it was alleged that in anticipation of being removed from office by Tianrui and CSI:

   (i).   in October 2015, the Zhangs in bad faith and breach of duty improperly exercised their powers to change the articles of Shandong Shanshui so as to ensure that they remained, with an associate, and could not be removed, as directors of Shandong Shanshui. This was done to remove the Company's control over, and give to the concert party control of, the Company's most valuable subsidiary and asset. It amounted to an unlawful misappropriation of the Company's assets. The changes to the articles of Shandong Shanshui and the entrenchment of the position of the Zhangs was concealed until it was discovered by Tianrui after 1 December 2015. In addition, in the period up to 1 December 2015, funds and the books and records of Shandong Shanshui were also misappropriated.

   (ii).   in November 2015, the Company's board resolved to present a winding up petition in this Court and to apply for the appointment of provisional liquidators. It was alleged

that Mr. Zhang Junior (Mr. Zhang Senior was by then not a *de jure* director although he was alleged to be a shadow director and Mr. James Li was also no longer a director) and the other Defendant Directors had acted in bad faith and for the benefit of the concert party in exercising their powers and passing the relevant resolutions. They had acted to pre-empt the forthcoming EGM on 1 December 2015 at which they knew they would be removed from office. The petition and application were improper and made without proper authority and evidence was filed in bad faith in support of the petition and applications.

(d).   the plaintiff companies sought various types of relief against the Zhangs, the other Director Defendants, CNBM and ACC. The relief sought included a negative injunction against the Zhangs to prevent them from exercising the powers granted under the amended articles of Shandong Shanshui and a mandatory injunction requiring them to deliver up the books and records of Shandong Shanshui; an order that CNBM account as a constructive trustee for benefits improperly received in respect of the profits made as a result of the improper allotment in 2014 of shares at an undervalue; damages, restitution and/or equitable compensation against the Zhangs for property misapplied and for breaches of duty and against the other Defendant Directors for breach of duty; and damages, restitution and/or equitable compensation against CNBM and ACC as parties to the unlawful means conspiracy.

25.   The defendants to the First Hong Kong Proceedings have filed defences. In summary, they all deny the allegations made against them:

(a).   the Zhangs have denied all the allegations made against them. In particular, they deny that they collaborated or were parties to a conspiracy with CNBM or ACC or that they were able to control or decisively influence the composition of the Company's board. They deny the existence of a concert party, having acting in bad faith or having acted for the benefit of such a concert party.

(b).   ACC (after identifying what is asserts to be inconsistencies in the conspiracy allegations as it relates to ACC) deny that it was involved in unlawful collaboration with any conspiracy.

26.     The First Hong Kong Proceedings have been set down for a forty-one-day trial (8 weeks) in the
        Hong Kong High Court before Coleman J commencing on 19 April 2021 (and no application has
        been made to stay these proceedings).

27.     The First Hong Kong Proceedings involve the Company, whose board is controlled by
        CNBM/ACC, suing CNBM, ACC and their nominees on the board. Two current directors, Mr.
        Chang and Ms. Wu, are also Director Defendants. The Company's evidence is that, in order to deal
        with the obvious, conflict, and following the reconstitution of the board in May 2018, arrangements
        have been made to allow the Company's independent non-executive directors to manage the
        conduct of the litigation. The petition originally contained an averment that the Company had failed
        to take proper steps to advance these proceedings and resolve Mr. Chang's and Ms. Wu's conflict
        of interest but this was deleted in the Amended Petition. Nonetheless, Tianrui has filed evidence
        and made submissions challenging the adequacy and reliability of these arrangements.

**The Cayman winding up proceedings**

28.     The winding up petition was originally dated 30 August 2018 (and issued and served on 4
        September 2018). At the same time as presenting the petition, as required by Order 3 r.11(1) of the
        Companies Winding Up Rules (2018) (the *CWRs*), Tianrui filed a summons for directions (the
        *Summons for Directions*).

29.     On 11 September 2018, the Company applied for orders that the petition be struck out (the *First
        Strike Out Application*) on the grounds that it constituted an abuse of process, due to the alleged
        failure to pursue alternative remedies, presentation of the petition for a collateral purpose, and
        misleading the Court by non-disclosure.

30.     On 19 October 2018, Mangatal J dismissed the petition. She held that Tianrui had an alternative
        remedy that it had unreasonably failed to pursue and that the petition was presented for an improper
        purpose.

31.     On 16 January 2019, the Court of Appeal overturned the decision of Mangatal J. It gave its reasons
        for so deciding on 5 April 2019 in the Court of Appeal's Judgment. I summarise below the basis for
        the Court of Appeal's decision. An application to the Privy Council for permission to appeal the

Court of Appeal's decision was still pending and undecided at the date of the hearing of the Company's application but, as I have already noted, after the hearing, on 20 February, the parties were notified that the Privy Council had refused to give permission to appeal.

32. Following the Court of Appeal's Judgment, the petition was reinstated and on 4 July 2019, Tianrui's application (made on 27 May 2019) for leave to amend the petition was heard and granted. The petition was amended in the manner set out in the amended draft petition attached to Tianrui's amended summons for directions dated 27 May 2019 (the *Amended Petition*). The petition was amended so as, *inter alia*, to remove allegations based on the continued suspension of the Company's shares and the fact that the Company faced being delisted from the Hong Kong Stock Exchange.

33. The Amended Petition seeks a winding up order on the just and equitable ground. Tianrui's case is that there is a justifiable lack of confidence on Tianrui's part in the Company's management. Tianrui alleges that CNBM and ACC have acted unfairly and/or oppressively towards it and/or that the affairs of the Company have been conducted with a lack of probity and that as a result it no longer has confidence in the management of the Company (which is conducted by the board controlled by directors appointed by CNBM and ACC).

34. The Amended Petition sets out the factual basis for Tianrui's claims that justify Tianrui's loss of confidence in the Company's management. The facts relied on in the Amended Petition are substantially the same as, although not identical to, those contained in the petition. The Court of Appeal's discussion of the basis of Tianrui's case is therefore still applicable. The basis on which Tianrui seeks a winding up order can be summarised as follows:

(a). the Amended Petition states that since 2014, CNBM and ACC have exercised their rights as shareholders at EGMs and through their representatives appointed as directors to take control of and cause loss to the Company. The Amended Petition identifies conduct that Tianrui asserts demonstrates that CNBM and ACC have acted unfairly and/or oppressively towards it and/or that the Company's affairs have been conducted with a lack of probity. The particulars of the conduct complained of are set out under two headings "*Control of Shandong Shanshui*" and "*Improper Share Issue*" and cover two different periods.



(b).   in 2015, in the period leading up to its appointment of a new board on 1 December 2015, and while CNBM and ACC were in control of the Company's board, steps were taken to prevent the new board from having full oversight and control of Shandong Shanshui. In the period from 22 May 2015 to 1 December 2015, Mr. Chang of CNBM (*Mr. Chang*), and from 14 October 2015 to 1 December 2015, Ms. Wu of ACC (*Ms. Wu*), had been directors of the Company. After the new board had removed certain directors of Shandong Shanshui, Mr. Chang and Ms. Wu conspired with the former directors to oppose the action of the new board to regain control of Shandong Shanshui. In return for their support, Mr. Chang and Ms. Wu agreed to cause CNBM and ACC to support the re-appointment of the former directors to the board of Shandong Shanshui.

(c).   in the period between August and October 2018, the Company's board (with and controlled by CNBM and ACC) purported to issue convertible bonds on uncommercial, non-arm's length, terms, modified the terms governing the conversion of the bonds into the Company's shares and then issued shares pursuant thereto in order to dilute Tianrui's shareholding below twenty-five per cent of the Company's share capital, thereby preventing Tianrui from being able to block the passing of special resolutions:

   (i).   the Company entered into a subscription agreement on 8 August 2018 (the *First Subscription Agreement*) with Cithara Global Multi-Strategy SPC (*Cithara*) for the issue of convertible bonds and issued bonds pursuant. The total principal amount of these bonds was US$210,900,000 and the conversion price was HK$6.29. The Company has confirmed that Cithara held the bonds for the benefit of Guotai Junan International Holdings Ltd (*Guotai*).

   (ii).   on or about 30 August 2018, the Company entered into another subscription agreement with Cithara and six further subscription agreements with other parties for the issue of convertible bonds (the *Further Subscription Agreements*). The total principal amount of these bonds was US$320,700,000.

   (iii).   on or about 6 October 2018, the Company proposed to allot new shares in exchange for some of the convertible bonds and entered into deeds of amendment (the *Conversion Agreements*) with each of the subscribers to accelerate the conversion of

US$456,600,000 of the bonds into shares. Pursuant to the Conversion Agreements, each subscriber agreed that the Company had the right to convert the bonds at an early conversion date (being a date after which approval for the listing on the HKSE of the converted shares and shareholder approval in general meeting for the issue of the conversion shares had been obtained). The conversion price was reduced to HK$4.20.

(iv).   on 30 October 2018, at an EGM of the Company's shareholders, an ordinary resolution was passed (66.62% to 36.38% with CNBM, ACC and CSI voting in favour of the resolution) authorising the allotment and issue of 1,067,830,759 new shares at HK$4.20 per share. This involved the allotment and issue of new shares pursuant to the Conversion Agreements (980,352 shares representing US$456,600,000 of the bonds' aggregate principal of US$531,600,000) together with the issue of a further 85,845,636 shares to other subscribers (the *New Shares*). The resolution also approved the issue of further new shares to other subscribers who had yet to agree to the conversion terms. On the same day, the board completed the share conversion and issued the New Shares.

(v).    the effect of the issue the New Shares was to dilute Tianrui's interest in the Company from 28.16% to 21.85%. If new shares were also issued to the other subscribers who had yet to agree to the conversion terms, Tianrui's interest in the Company would be reduced to 21.40%.

(vi).   according to Tianrui, the bonds were not issued on arms' length terms and it can be inferred that Cithara (or Guotai or the ultimate owners of the bonds) and the other holders of the bonds were associated or otherwise connected with CNBM and ACC. Tianrui asserts that the issue of the bonds and the share conversion was done on uncommercial terms and for an improper purpose.

(d).   in these circumstances, there was a need for an independent insolvency practitioner to be appointed to investigate the availability of claims against the current and former directors of the Company (including those covered by the First Hong Kong Proceedings); the Company's financial position; the above mentioned transactions including the issue of the New Shares and the allegedly unlawful control of Shandong Shanshui.

35. The important parts of the Court of Appeal's Judgment appear in paragraphs [32] - [34] and [36] - [38] and [52] as follows:

> 32. *As we have indicated, the judge thought that both principles [the principle that (a) where there is an available alternative remedy that can be seen, without full examination of the facts, to be capable of satisfying the petitioner's concerns to an extent that would make it clearly impossible for him to persuade the court that it would be just and equitable to wind up the company, the petition should be struck out and (b) the principle that a winding up petition will be restrained or struck out if it is brought for an improper collateral purpose] applied. It is evident from the reasons she gave, however, that she understood Tianrui's complaint to relate only to the issue of the convertible bonds and the subsequent issue of shares. Thus the alternative remedies she identified - a writ action complaining of the dilution of Tianrui's shareholding; injunctions restraining use of the proceeds, or the issue of shares, or the holding of meetings to confirm or approve transactions; a derivative action on the basis of the alleged lack of commerciality of the bonds; and a writ action claiming declaratory relief - were all directed in one way or another at unravelling the issue of the bonds and shares and the consequent dilution of Tianrui's shareholding.*

> 33. *The judge can be forgiven for having understood that the dilution of its shareholding was Tianrui's sole complaint; even on appeal, Tianrui's skeleton argument said that its "complaint is, in summary, that the Board, aided by ACC and CNBM, have taken successive steps to dilute [Tianrui's] shareholding in the Company and issued shares to parties with whom ACC and CNBM has voting arrangements." It is plain, however, that the case made in the petition goes further than this; it comprises serious allegations of conspiracy by covert agreements and arrangements designed to damage Tianrui, the steps taken to dilute its shareholding being merely the latest stage in the conspiracy.*

> 34. *This is not simply a case where a minority is unhappy with the actions of the majority......*

> ......

> 36. *If the allegations set out in the petition are true, it seems to us clear that they are capable of establishing that it would be just and equitable to wind up the Company. Put simply, Tianrui's position as evinced by its petition is that it cannot be expected to remain in association with CNBM and ACC in light of their conduct towards it. None of the remedies identified by the judge deals with that underlying complaint.*

> 37. *The Company suggests that, if the underlying complaint is as we have identified, Tianrui can bring its association with CNBM and ACC, and with the Company, to an end by selling its shares on the Hong Kong stock exchange. It accepts that Tianrui could only sell the shareholding it now has, and that a 21.40% shareholding might fetch proportionately less than the 28.16% shareholding that Tianrui originally had, since its former shareholding enabled Tianrui to block special resolutions;*

Company says that the effect of selling would be to crystallise a claim for damages which could then be pursued by means of an action for conspiracy. *In our view, these assertions epitomise what is wrong with the Company's position. If the actions of the Company, prompted by directors appointed at the instance of a majority of its shareholders, have resulted in a justifiable loss of confidence in the management of the Company, Tianrui has a statutory right to petition for the winding up of the Company on the just and equitable ground. It cannot be deprived of that right merely because the Company can point to other remedies which, alone or in combination, might arguably go all or some of the way to compensating Tianrui for what has occurred. In our judgment, Tianrui may legitimately take the view that it prefers the Company to be wound up to having to pursue piecemeal a series of actions, by litigation or otherwise, or by a combination of litigation and other steps, that might be capable of redressing some, or even all, of its concerns. It is entitled to have the circumstances investigated in the context of a winding up petition that it is entitled to bring; and if it succeeds in establishing its complaints it is entitled under the statutory scheme to have the court consider at the end of the investigation whether the appropriate remedy is winding up or another of the remedies set out in section 95(3) of the Law. The suggestion that Tianrui need not have all the contents of the petition determined upon evidence because it is obvious that a derivative action, or some other combination of actions, will provide substantial justice to Tianrui is untenable in circumstances where the range of facts, and of inferences from fact, to which the petition gives rise have not been determined.*

38.   At paragraph 122 of the judgment, the judge said that an examination of Tianrui's complaints would require the kind of trial process carried out in Howard Smith v Ampol, and so would be more amenable to an action by writ or some other process that was not a just and equitable winding up petition. *This is to put the cart before the horse. If Tianrui is entitled to petition, as we consider it is, the procedures of the court will have to be adapted so that the issues of fact can be resolved in the petition. This is in fact commonplace in just and equitable petitions and (in England and Wales) in unfair prejudice petitions. It is illogical to say that, because the procedure adopted will be similar to that adopted in a writ action, therefore the matter should be determined by way of writ instead of by way of petition."*

.................

52.   There is no doubt that a shareholders' meeting is capable of ratifying an unauthorised act of the directors. *In the present case however, ratification of the issue of the bonds and shares addresses only part of Tianrui's complaints – just as the alternative remedies propounded by the judge fail to deal with the whole substance of the petition. Tianrui's complaint is about a course of conduct pursued by the Company at the instance of CNBM and ACC. Ratification by a majority including CNBM and ACC is not an answer to that complaint; it is a further instance of the conduct of which Tianrui complains.*

[underlining added]

36.   On 27 September 2019, the Company filed its defence to the Amended Petition (the ***Defence to the
      Petition***). In summary, the Company's position is as follows:

    (a).   the Company says that Tianrui's case is based on and arises from the issue of the convertible
      bonds, the subsequent conversion of the bonds into shares and the allotment and issue of the
      new shares

    (b).   the Company asserts that these actions were proper and justified in the circumstances:

        (i).   they were necessary to deal with the adverse impact of the de-listing of the Company's
            shares and the Company's financial problems which were caused by Tianrui's
            acquisition of shares and actions. In particular, the bond issues were needed to restore
            the public float (that is, remedy the breach by the Company of the requirement under
            the Main Board Listing Rules of the HKSE that at least 25% of the Company's issued
            shares must at all times be held by public investors - the ***HK Public Float Rule***) to
            enable the Company to resume trading in its shares on the HKSE and to raise funds to
            repurchase the 2020 Notes.

        (ii).   were all unanimously approved by the Company's board (including the executive
            directors and the independent non-executive directors).

    (c).   the Company also argues that the case pleaded by Tianrui in the Amended Petition was
      incomplete and misleading, in that it took a snapshot of selective events and omitted to plead
      adequately to all of the relevant circumstances which gave rise to the need for the convertible
      bond issues. In fact, the bond issues and the action taken by the Company's board were
      ultimately caused by Tianrui.

    (d).   Tianrui had been planning a hostile takeover of the Company from at least 2014 and took
      action to gain effective control of the Company to promote its own economic objectives and
      interests. During the execution of its hostile takeover plan and while Tianrui was in effective
      control of the Company, Tianrui caused and/or procured various improper steps to be taken
      on behalf of the Company which caused loss and damage to the Company. These included
      causing the Company to breach, and to continue to breach, the HK Public Float Rule (which

triggered the suspension in the trading of the Company's shares); causing the Company to default on US$500 million loan notes issued by the Company on 4 March 2015, which would otherwise only have been repayable in March 2020; causing the Company to default on other financial obligations thereby sending the Company into a financial crisis; and causing the Company to be exposed to the threat of being delisted by the HKSE.

(e).  in the period between February and April 2015, Tianrui acquired shares and became the largest shareholder in the Company. Subsequently, between August 2014 and August 2015, Tianrui took steps to obtain control over CSI (to control CSI's 25.09% shareholding in the Company). It did so by supporting and funding the action against Mr. Zhang Senior taken by the CSI Employee Beneficiaries and CSI's minority shareholders, thereby procuring the appointment of the CSI Receivers on 20 May 2015 and 14 July 2015. Between July and August 2015, the CSI Receivers appointed themselves and their/Tianrui's nominees as the majority of the directors of CSI and acted with and for the benefit of Tianrui. Tianrui therefore obtained effective control of CSI's 25.09% voting right in the Company and, when combined with its own shareholding, a majority shareholding in the Company. Having obtained the majority voting rights in the Company, Tianrui proceeded to take over and reconstitute the board of the Company and its subsidiaries. Between June and October 2015, Tianrui and/or CSI (controlled by the CSI Receivers) issued six requisitions for EGMs to reconstitute the Company's board. The sixth requisition was effective and an EGM was convened for 1 December 2015.

(f).  on 16 October 2015, the CSI Receivers obtained a direction from the Hong Kong High Court to vote at the EGM, including for the purpose of reconstituting the Company's board (although the Hong Kong court subsequently - on 31 January 2018 - found that there were material non-disclosures by the CSI Receivers on that application and ordered that the CSI Receivers be discharged).

(g).  before the EGM took place and prior to the replacement of the board, on 10 November 2015 the Company's directors presented a petition to this Court to wind up the Company and for provisional liquidators to be appointed to restructure the Company's finances. The applications were dismissed. On or about 17 November 2015, Tianrui provided an undertaking to the Company and the Cayman Court that if (i) the board were to be

reconstituted, (ii) the Company was not wound up and (iii) provisional liquidators were not appointed, Tianrui "*shall procure that [the Company] has sufficient funds to redeem the [2020] Notes in full within thirty (30) calendar days*" of Tianrui gaining effective control of the Company's board (the ***Cayman Undertaking***). However, Tianrui did not intend nor was it in a financial position to honour the Cayman Undertaking when it was given and ultimately did not honour the Cayman Undertaking when the conditions set out therein were satisfied.

(h). on 1 December 2015, the EGM was held and resolutions for the removal of the old and the appointment of new directors were passed.

(i). Tianrui's wrongful acts while it was in effective control of the Company's board left the Company on the verge of collapse. Throughout that period, steps were not taken to rescue the Company, resolve its financial problems, increase the percentage of the Company's share capital held by public investors to the level required by the HK Public Float Rule or resume the trading of the Company's shares. The board controlled by Tianrui's representatives only took steps calculated to benefit Tianrui with an agenda to facilitate Tianrui taking over the Company.

37.  During the hearing, I noted that procedural directions had yet to be given for the further conduct of the Amended Petition. The Summons For Directions had not yet been heard or dealt with. I noted that a number of important issues had to be dealt with on the hearing of the Summons For Directions, including the characterisation of the proceedings and who were to be the respondents to the Amended Petition. Until the Summons For Directions had been determined it was unclear who were the parties to the Amended Petition. It might well be the case, although a decision on the issue would need to await the hearing of and the filing of submissions, that the proper respondents in this case should be or include CNBM and ACC. And it might be relevant to the Company's applications for a case management stay to know what decision had been made with respect in particular to the proper parties to the Amended Petition. Mr. Lowe pointed out that in Tianrui's skeleton argument for the hearing, Tianrui had invited the Court, in the event that the Court decided to dismiss the Company's applications, to give directions now (without a further hearing) for the ongoing conduct of the Amended Petition and the Cayman Writ Action and that a draft order had been attached to the skeleton (the ***Draft Order***). The Draft Order sought to address the matters

covered by the Summons For Directions and required to be dealt with by Order 3 r.11(1) of the CWRs. It sought an order that the Amended Petition be treated as a proceeding against the Company and orders for the service of the Amended Petition, the filing of Tianrui's response to the Defence to the Petition by 8 December 2019, for discovery by list on 1 February 2020 and inspection within seven days; the filing of evidence to be completed by early April 2020 to be followed by the listing of a hearing with a time estimate of twenty days. In addition, the Draft Order included an order that the Amended Petition shall proceed and be heard in conjunction with the Cayman Writ Action. I discuss further below the impact of this proposed order on the Cayman Writ Action.

## The Second Hong Kong Proceedings

38.   In the Second Hong Kong Proceedings, the claims were set out in the statement of claim dated 29 March 2019 (the *Second Hong Kong Proceedings Statement of Claim*). This is a clear and well drafted document.

39.   This stated that the claims were based on an unlawful means conspiracy. It asserted that the defendants conspired by acting in concert using unlawful means with the intention of injuring the Company and its subsidiaries. The unlawful means were said to be breaches of fiduciary duty and other dishonest assistance and/or criminal intimidation or violence. The object of the conspiracy was the acquisition of control of the Company and its subsidiaries and illegitimately to maximise the economic benefits therefrom for the benefit of the conspirators (especially Tianrui) at the expense of the Company and its subsidiaries. The conspiracy was one whereby Tianrui could seize control of its competitor for its own benefit. The conspiracy would have continued, and the Company would have continued to suffer losses, had Tianrui not lost control of the Company's board on 23 May 2018.

40.   It was alleged that the conspiracy had been instigated by Tianrui and that Li Heping (*Mr. Li Heping*) (the former CEO of Tianrui's shareholder and one of the defendants) and Li Liufa (*Mr. Li Liufa*) (the chairman of Tianrui's shareholder and also a defendant) had been parties to the conspiracy from the outset. As a result of the conspiracy, the directors nominated by Tianrui (or CSI's receivers) had been paid excessive remuneration in breach of duty and had approved the decisions that had the effect of diverting assets to Tianrui.

41.  The conspiracy was said to have evolved over time and eventually involved the following twelve steps or phases (from sometime before August 2014 until May 2018):

(a).  the acquisition of shares in the Company so as to cause the Company to be in breach of the HK Public Float Rule and the suspension of trading in its shares.

(b).  acquiring control of the Company through the appointment of the CSI Receivers.

(c).  installing directors and officers aligned to Tianrui on the boards of the Company and its subsidiaries to enable decisions beneficial to Tianrui and disadvantageous to the Company to be approved.

(d).  embarking on litigation in Hong Kong against those who were opposed to Tianrui.

(e).  abandoning the Company's investigation of Tianrui's acquisition of the interests of the CSI Employee Beneficiaries.

(f).  procuring the Company (and its subsidiaries) to raise funds through wholly uncommercial means which would have had the effect of releasing Tianrui from the Cayman Undertaking; diluting the shareholding of non-Tianrui shareholders (to cement Tianrui's control and facilitating the diversion of assets to Tianrui) and driving down the Company's share price so as to make it easier for Tianrui and its associates to purchase more shares and reinforce its control.

(g).  releasing Tianrui from the Cayman Undertaking and instead (i) raising funds for the repurchase of the 2020 Notes through various attempted share-issuance and placement offers and (ii) causing the Company to pay interest on the 2020 Notes in the sum of US$85 million.

(h).  pledging away the assets of Shandong Shanshui.

(i).  procuring the Company to provide a corporate guarantee for a RMB 400 million loan facility advanced by the Bank of China to Tianrui.

(j).   orchestrating acts of criminal intimidation and violence in relation to the allegedly violent acts taken or orchestrated by Tianrui in March – April 2017 to seize control of Shandong Shanshui's premises at Jinan.

(k).   attempting to disguise or conceal Tianrui's intention of not honouring the Cayman Undertaking.

42.   The Second Hong Kong Proceedings Statement of Claim also alleges that the failure by Tianrui's nominees on the board to enforce the Cayman Undertaking resulted in the Company having to issue in 2018 the convertible bonds in order to raise funds for the repurchase of the 2020 Notes (see [135] - [137]). The Second Hong Kong Proceedings Statement of Claim includes a claim reimbursement by the defendants of the high rate interest paid by the Company on those bonds.

43.   The relief sought in the Second Hong Kong Proceedings was as follows:

(a).   as against Tianrui, a declaration that Tianrui was liable to account to the plaintiff companies as constructive trustee for benefits received as a result of the breaches of fiduciary duty, knowing receipt and conspiracy complained of and equitable compensation for dishonest assistance and/or knowing receipt or damages for unlawful means conspiracy.

(b).   as against the directors nominated by Tianrui, a declaration that the directors were liable to account to the plaintiff companies as constructive trustees for benefits received as a result of the breaches of fiduciary duty, knowing receipt and conspiracy complained of; equitable compensation for breach of fiduciary duty, dishonest assistance and/or knowing receipt or damages for unlawful means conspiracy and damages for breaches of their duty to use reasonable care, skill and diligence.

(c).   as against EYTL, relief in the same terms as that claimed against the Tianrui directors.

44.   On 14 August 2019, Tianrui issued an application in the Hong Kong court for an order staying the Second Hong Kong Proceedings in favour of the Amended Petition (the **Hong Kong Reverse Stay Application**). Tianrui has applied for:

(a).    a declaration that the Hong Kong court has no jurisdiction over Tianrui in respect of the subject matter of the Second Hong Kong Proceedings on the grounds that the plaintiffs have failed to show any serious issues to be tried; they have failed to demonstrate a good arguable case that their claims are within the gateways for service out or to demonstrate that Hong Kong is clearly and distinctly the more appropriate forum for the trial of the claims since Tianrui has presented the Amended Petition and there are substantial overlapping issues between the Second Hong Kong Proceedings and the Amended Petition, considering the best interests and convenience of the parties the issues raised in the Second Hong Kong Proceedings should be determined by this Court.

(b).    in the alternative, a case management stay against Tianrui pending the final determination of the Amended Petition, on the same grounds.

(c).    in the alternative, that the declaration or stay be granted in relation to Tianrui, Tianrui Group Company Limited and Mr. Li Liufa only.

45.    The Hong Kong Reverse Stay Application was originally listed to be heard before Keith Yeung J in the Hong Kong High Court on 10-11 March 2020. However, as I have noted above, on 4 March 2020 the Court was informed by the attorneys for Tianrui that they had been notified earlier in the week commencing 2 March by the Hong Kong court that the hearing had been vacated because of the public health crisis being experienced by Hong Kong (as a result of the coronavirus outbreak). The further evidence filed by both parties showed that the the Hong Kong Court had invited the parties to make submissions as to whether the hearing of the Hong Kong Reverse Stay Application was suitable for disposal on the papers. Tianrui and the Company were given the opportunity to, and did, make extensive submissions, including by reference to authorities, in response to the Hong Kong Court's letters. While the Company was prepared to consent to the application being dealt with on the papers, Tianrui considered that a hearing was required (which approach was criticised by the Company). Having considered the submissions, the Hong Kong Court decided that the Hong Kong Reverse Stay Application ought to be adjourned until a hearing could be scheduled. Subsequently, the Company's Hong Kong solicitors wrote to the Hong Kong court seeking an expedited hearing and Tianrui's Hong Kong solicitors confirmed that Tianrui agreed to an expedited hearing. An order granting an expedited hearing was then made on 12 March 2020.

(c).  the shareholder resolution passed at the EGM on 30 October 2018 could not have ratified the issue of the convertible bonds or the New Shares as CNBM, ACC and/or CSI were not acting bona fide and without their votes the resolution would not have been passed.

49.  The relief sought in the statement of claim in the Cayman Writ Action is as follows.

> *"(1).  A declaration that the Bond Issues and/or the Share Conversion and the New Share Issue and that all shares and securities issued after 1 August 2018 are void;*
>
> *(2).  An order setting aside the Bond Issues and/or the Share Conversion and the New Share Issue and/or all shares and securities issued after 1 August 2018."*

50.  In the Sixth Affirmation of Ms. Li Xuanqi (***Ms. Li***) sworn in August 2019 in opposition to the Company's applications, Ms. Li explains Tianrui's reasons for commencing the Cayman Writ Action:

> *"21.  The Petitioner commenced the Writ Action because the relief available in the Petition proceedings does not include an order that the Convertible Bond issue be unwound. Even where the Petition proceeding is stayed pending determination of one or both of the proceedings on foot in Hong Kong, there will nevertheless still need to be a full trial to determine whether the power to issue the Convertible Bonds was improperly exercised and what consequences follow from that.*
>
> *22.  The Writ Action by itself, while addressing the narrow question of the propriety of the Convertible Bond issue, could also not address the Petitioner's underlying loss of trust and confidence in the Company and its management. To the extent that there is commonality of issues between the Writ Action and the Petition proceedings, the Petitioner respectfully submits that the two proceedings should be heard together."*

51.  On 27 September 2019, the Company filed its defence to the Cayman Writ Action (the ***Defence to the Writ***). The facts pleaded in the Defence to the Writ are in substance the same as those pleaded and relied on in the Defence to the Petition.

52.  During the hearing I raised with Mr. Lowe some concerns regarding the nature (or at least the formulation and drafting) of the relief sought in the statement of claim in the Cayman Writ Action. I was doubtful, although since I had not heard submissions on the point was only expressing a preliminary view, that the Court could or should make a declaration in the terms sought. This was because the declarations in the statement of claim dealt with the validity of the bond issues, the share conversions and the issue of the New Shares and orders were sought that they be declared to

be void and set aside. Such orders would relate to and affect the position of the bondholders and holders of the New Shares who were not parties to the Cayman Writ Action. I said that I could see how a declaration could be framed to reflect the fact that the cause of action and claim relied on was only against the Company. This could be done by limiting the declaration to the validity of the corporate decision making process – that is, to the board's decision to approve the issuing of the bonds and the New Shares (and the conversion). The effect on third parties of a decision that the bond and New Share issues had not been validly or properly approved would then need to be dealt with in proceedings to which the third parties were joined. Mr. Lowe accepted that the statement of claim will need to be amended since, as currently formulated, the Court could not properly make the declarations in the terms sought.

53.   Tianrui also proposed in the Draft Order, as I have explained, that certain case management directions be given to ensure that the Cayman Writ Action proceeds in parallel with the Amended Petition. Mr. Lowe expanded on and explained Tianrui's position during the hearing. The following exchange took place during the second day of the hearing (see the transcript for 27 November, pages 11-12):

> "*Segal J*     *Do you submit the writ, as currently drafted, all the relief as set out in the statement of claim, is a proper claim with proper relief?*
>
> *Lowe QC:*     *Well, what .... we submit it's a proper claim and we disagree with my learned friend's submissions on [the Gao case, referred to below] ......*
>
> *Segal J:*     *That I understand.*
>
> *Lowe QC:*     *But the relief that's sought [in the statement of claim in the Cayman Writ Action]?*
>
> *Segal J:*     *Yes.*
>
> *Lowe QC:*     *The declaration would have to be, we have to amend that because as your lordship's, for the reasons your lordship said, that the second paragraph of that writ is not a claim we can make on the basis of the allegations made and the parties who are joined.*
>
> *Segal J:*     *Do I need to see the proposed amendment?*
>
> *Lowe QC:*     *We can produce, I mean at the moment we were dealing with a strike out based on whether the action could be constituted at all and we will have to amend, you will have to look at an amended declaration but not for the purpose of deciding what you're being asked to decide. And of course, an amendment like that we can formulate from... In the terms that your lordship suggested would*

*appropriate, with which we would respectfully agree………… What we have in mind with the writ is really this scenario. If we win hands down in the winding up, then the writ won't achieve anything because we'd have got the findings of improper purpose and so on. But the flip side to that is we won't have inconvenienced anybody very much because it'll have been tried together. There won't be any separate evidence. It won't take up any extra time or cost from here on in if it's case managed. Secondly, if we lose on the factual case in the winding up petition, then we would obviously lose the writ action as well. But again it will not have added to the costs in any real material sense, it won't have cost any more time. But the problem is that we could lose the winding up petition in a number of different ways. For example, my learned friend's leave to appeal might cause …. the petition to be struck out. Also when your lordship's, if the case goes ahead and your lordship decides on the winding up, you might as an exercise of discretion, not grant us any remedy and in the course of these proceedings we have no doubt that my learned friend's ingenuity would invent other reasons for the petition to fail, but they are obviously, we're at an early stage. There are obviously other reasons why the petition might not achieve what we want it to in terms of relief. The point is, if we have a judgment on the facts, your lordship, finds that the improper share issue is exactly that. But nevertheless refuses relief, you could give us the declaratory relief in the writ and then, of course, there's no liquidator and we would have to see whether we can then go on to establish anything in a derivative sense against anybody else. But we would have a declaration, which as far as the company's concerned would be final."*

[underlining added]

### The Petition Strike Out Application – the Company's submissions

54.   The Company argues that Tianrui resisted the First Strike Out Application on the basis that there were no viable and adequate alternative remedies to, and that it was thus not unreasonable for Tianrui to have filed, the petition. Tianrui's position had been that the petition was the only way in which it could seek adequate redress. However, it has now commenced proceedings seeking alternative remedies. Tianrui's approach is inconsistent with its previous position on the First Strike Out Application. In the circumstances, it would be an abuse of process for Tianrui to continue its pursuit of the Amended Petition, and the Amended Petition should be struck out.

55.   The Company submits that it is an abuse of process for a party to seek to advance its case in respect of an aspect of the litigation on a specific basis and then change its position on another aspect when it suited it to do so. It says that by commencing the Cayman Writ Action, Tianrui should be treated

as having elected to pursue the Cayman Writ Action as an adequate alternative remedy in substitution for the Amended Petition.

56.    The Company says that for many months Tianrui sought to persuade this Court, and succeeded in persuading the Court of Appeal, that the petition was the only manner in which it could seek adequate redress and asserted that a writ action would be pointless. Tianrui never gave the impression that it would be bringing the Cayman Writ Action, whether on its own or in conjunction with the Amended Petition.

57.    The Company relied on the following statement of the principle in the a judgment of the Court of Appeal in Singapore in *Suntech Power Investment Pte Ltd v Power Solar System Co Ltd (in liquidation)* [2019] SGCA 522:

> "...*This term [abuse of the process of the Court] signifies that the process of the court must be used bona fide and properly and must not be abused. The court will prevent the improper use of its machinery. It will prevent the judicial process from being used as a means of vexation and oppression in the process of litigation. The categories of conduct rendering a claim frivolous, vexatious or an abuse of process are not closed and will depend on all the relevant circumstances of the case. A type of conduct which has been judicially acknowledged as an abuse of process is the bringing of an action for a collateral purpose, as was raised by the respondents. In Lonrho plc v Flayed (No 5) [1993] 1 WLR 1489, Stuart-Smith LJ stated that, if an action was not brought bona fide for the purpose of obtaining relief but for some other ulterior or collateral purpose, it might be struck out as an abuse of the process of the court. [emphasis added]" (at [49], citing Gabriel Peter & Partners (suing as a firm) v Wee Chong Jin and others [1997] 3 SLR(R) 649 at [22])*

58.    In his written and oral submissions, Mr. Flynn QC for the Company reviewed Tianrui's case before both Mangatal J and the Court of Appeal:

   (a).   he noted that the argument which Tianrui advanced in its skeleton argument served for the hearing before Mangatal J on 10-11 October 2018 was that it had "*no alternative remedies*" and that "*in particular*" it could not have applied for an injunction. In other words, that it had no alternative remedies including, but not limited to, an injunction. He cited the flowing extract from that skeleton argument ([75] to [76]):

> *"75.   The question is whether there is an alternative remedy which it is unreasonable for [Tianrui] to refuse to pursue (see Asia Pacific Ltd v ARC Capital LLC [2015] (1) CILR 299). [Tianrui] has no alternative remedies available to it in this instance, notwithstanding the Company's suggestions to the contrary (Wu 1, paragraph 72 [A/16/15]).*
>
> *76.   In particular, [Tianrui] could not have issued injunctions after the event. The Company's suggestion that it could have sought an injunction to the extent that [Tianrui] "objects to the issue of the [convertible bonds]" fails to recognise that [Tianrui] had a 24-hour window between notification of the First Subscription Agreement's existence and confirmation that the [convertible bonds] had been issued. There was nothing left for [Tianrui] to injunct, which was no doubt the Company's intention in completing the transaction so rapidly." (emphasis added by the Company)"*

(b).   as regards the appeal to the Court of Appeal, Mr. Flynn submitted that Tianrui made it clear that it was not pursuing a writ action because: (a) it would need to join the holders of the convertible bonds as parties; (b) it would be more efficient and cost-effective for a liquidator to take such action as it saw fit; but (c) if the liquidator refused to take action, then Tianrui might do so "at a later date, at least with more information." He noted the following passages from Tianrui's skeleton argument in the appeal (with his highlighting in bold):

> *48.   The Appellant [Tianrui] accepted before the Judge (as it does now) that it could have attempted to set aside the share issues by means of a derivative claim or writ action. The Appellant [Tianrui] would have a direct claim based on an allegation that the power to dilute was not exercised for a proper purpose according to Howard Smith v Ampol...... The nature of such a claim was recently explored by the Supreme Court in Eclairs Group v JKX Oil [2016] BCC 79.*
>
> *49.   In terms of practicalities it is important to note that an action of that kind would achieve nothing unless the [convertible] Holders were joined.*
>
> > *(a)   The share issues could not be stopped or set aside unless the contractual rights of the [convertible] holders could be rescinded. The Company had already issued the [convertible bonds] and received consideration. The [convertible bonds] carried contractual rights for the holders to convert the same to shares, and a corresponding obligation on the Company to issue those shares;*
> >
> > *(b)   **The [convertible] holders would need to be joined and served overseas in their own jurisdiction.** Prior to the hearing the Company had not identified the CB holders and the true beneficial owners of the [convertible bonds] are still not known. The subscription agreements*

*eventually disclosed suggested that the nominal parties were in Hong Kong and Taiwan.*

50. **In contrast, a liquidator would have powers to investigate the true ownership and relationship of ACC and CNBM with the [convertible] holders and could challenge the [convertible] holders in the place of the liquidation in summary proceedings** *(see paragraph 62 below).*

... ... .....

62. *Moreover the setting aside of the share issue could be more efficiently achieved in a liquidation than by means of a Howard Smith v Ampol claim, coupled with a derivative claim against the [convertible] holders.* **A liquidator could attempt to set aside the share issue by separate action, or by using powers under Section 112 of the Companies Law....** *Section 112 allows a liquidator to settle a list of members and to adjust the rights of members.* **This represents a much more efficient and cost effective means of determining whether the share issue was proper. It does not, for example, require service of proceedings on the [convertible] holders overseas.**

63. *It might be the case that a liquidator would decline to take action,* **but in those circumstances the Appellant [Tianrui] could decide whether or not to do so directly itself at a later date, at least with more information.** *Finally, in circumstances where section 95(3)(c) of the Companies Law...contemplates a derivative claim as potential relief on a just and equitable winding up petition, a derivative claim is not an "alternative remedy" to a winding up." (emphasis added by the Company)*

59. During his oral submissions, Mr. Flynn QC formulated the submission as follows (see the transcript of the first day of the hearing at pages 98-99 and 102).

*"Now, in the Court of Appeal, Tianrui went so far as to say it would not bring a writ action and would only pursue the petition. And that is in our submission very important because it is wrong in principle for Tianrui to advance the case before the Court of Appeal that there is no adequate alternative remedy to the petition and that it can only pursue redress for its complaints via the petition as it said, and then by means of writ action and then once it's succeeded in persuading the Court of Appeal of that, it flipped its position and several months later, commenced the writ action.........in the circumstances of this case, it is...open to[the Court] to say that having procured [that] the petition be reinstated by the Court of Appeal, Tianrui......have ...chosen to pursue their writ, but they can't have both, they can only have one. And in the circumstance of this case, given*



> *the way in which they presented their case, they should be held by the writ and not the*
> *petition... "*[underlining added]

60. The Company argues that the Court of Appeal had been led to believe (indeed, the Court of Appeal's decision was premised on Tianrui's case being) that any writ action might only be brought if at all after the appointment of liquidators rather than concurrently with the petition itself (and that therefore there was no alternative remedy). The Company says that this is apparent from [37] of the Court of Appeal's Judgment. The Company accepts that it cannot seek to reverse or challenge the decision of the Court of Appeal by the side-wind of a further strike out application in this Court (the outcome of the appeal to the Court of Appeal could only have been changed by a successful appeal to the Privy Council – which is now not possible in view of the Privy Council's dismissal of the application for permission to appeal). However, it argues that it is not seeking to do so. It argues that it is seeking to strike out the Amended Petition without impugning or relying on a collateral attack on the Court of Appeal's Judgment. It does so by basing its application on the principle of election. The Company says, as I have noted, that Tianrui should be *treated as having elected* to pursue the Cayman Writ Action as an adequate alternative remedy in substitution for the Amended Petition. It does not elaborate as to whether such a deemed election is required because the Court is to infer that Tianrui's intention is now to rely on and obtain the relief it seeks by way only of the Cayman Writ Action or because it would be inconsistent for Tianrui to rely on both the Cayman Writ Action and the Amended Petition.

61. During oral argument, I sought to clarify the precise basis on which the Company put its case and how that case related to the Court of Appeal's Judgment. The following exchange with Mr. Flynn took place on day three of the hearing (see the transcript of the third day of the hearing at pages 41-43):

> Segal J      *[I can see that you could argue that the writ is abusive on the basis] that the appeal was decided on an improper basis. I could see why you could say, the Court of Appeal or Justice Mangatal, you've dealt with the strike out application on the basis of a case which has turned out to be improperly put or wrong or false. You shouldn't have decided the strike out application on the basis of a bad or improperly formulated case.*

> Flynn QC:   *Or the other way of putting is, had that been made clear, the result would have been a different one. So you procure your results on the basis of your argument, which is that there are no alternatives.*

*Segal J:*   Yes, but that's an issue in the strike out application. Query whether it gives rise to a right of appeal to revisit the decision that was made by the Court of Appeal. But moving beyond that, the Court of Appeal has decided what it's decided. We'll see what the Privy Council says as to your application for leave to appeal, but assuming the Court of Appeal's decision stands, the petition remains effective and continues. Why does the conduct of the petitioner in opposing the strike out application taint its continued maintenance of the petition? Why does that conduct in opposing the strike out application give rise to an abuse as it relates to the continued prosecution of the petition? That's the [issue] in question.

*Flynn QC:*   Yes, I suppose what it relates really to me is what is the remedy. On this hypothesis, there has been abuse. And the abuse is presenting a case on basis A and then changing it to basis B. And in my submission, the answer to Your Lordship's question is in those circumstances, what is the remedy? I think what Your Lordship is referring to is, well, the remedy must lie in an appeal or reopening of the decision.... And my submission is no, the court isn't bound in that way. If you, as in this case, you issue a writ and that is as a consequence, the court does not have to accept the issue of the writ. The court can conclude, as we're asking Your Lordship to do, that the issue of the writ is an abuse, is part of the abuse, and that should be prohibited. And that is why we say it could also apply to the petition because if you present a case to the court that they are alternatives, when you issue your writ you're electing between the two remedies because you presented that the case to the court as strictly alternatives.

And in my submission, the court isn't in any way prevented from reaching that conclusion as part of its policing of an abuse, and that is why my submission on the first day was I appreciate that it might be an ambitious submission because Your Lordship knows that the Court of Appeal have said you can continue with your petition, but in the light of that judgment, even accepting that judgment, in circumstances where you know that and you nevertheless issue a writ. In those circumstances, in my submission, the right analysis is to say, well these are alternatives. You cannot have both. You are therefore bound. You are choosing the writ in the alternative to the petition by serving that writ.

And there is a certain, if I could put it this way, poetic justice in that because you procure your result on the basis [that there are] alternatives. You choose one of the alternatives. You've effectively elected or otherwise chosen to pursue that alternative in the alternative to the petition. Now I see that Your Lordship may say that's a stretch too far, but that is open in my submission to Your Lordship, in terms of the powers of the court to police the abuse.........

But the court is not limited in its powers, in my submission. You're not limited to saying, if Your Lordship is with me, and it is an abuse, and it was presented in the way that we say it was, Your Lordship is not prevented from taking this course. So of course it's a matter for Your Lordship as to how you police that. But it is open to you and that is why. That is why we say it's even open to Your

*Lordship to say that they have chosen the writ in preference to the petition. But as I say, I accept that in practical terms, what that means is they've chosen their writ, their writ's defective, they've even given it up during the course of submissions, but that's a consequence of their own action. They should not have issued that writ. That's how we put it.*
[underlining added]

62. The Company argues that Tianrui's justification for needing the Cayman Writ Action in addition to the Amended Petition is flawed. Tianrui asserts (as I explain below) that if its shares in the Company were to be sold in the context of the winding up proceedings without obtaining the relief sought in the Cayman Writ Action it would be prejudiced as it would only have a 21% shareholding in the Company rather than a shareholding of 28%. The Company argues that if Tianrui succeeded in the Cayman Writ Action, and in setting aside the issue of the bond and new shares, then Tianrui's percentage shareholding would be restored and it could achieve the corporate divorce it desires by selling its shares without the need for a winding up.

63. The Company also submits that it is wrong for Tianrui to suggest that its case all along had been it could get different relief as between the Amended Petition and the Cayman Writ Action. That was not its case, whether before this Court in October 2018 or before the Court of Appeal in January 2019. Its case was that a writ action would not be viable and that it could achieve a set-aside of the issue of the bonds, their conversion into shares and the allotment and issue of new shares through the appointment of an independent liquidator via the petition (with the liquidator investigating and if appropriate, bringing claims in respect of the bond issues).

### The First Writ Strike Out Application – the Company's submissions

64. In the alternative, the Company submits that the Cayman Writ Action should be struck out on the basis that it is an abuse of the process for Tianrui to pursue both the Cayman Writ Action and the Petition simultaneously.

65. The Company argues that the Cayman Writ Action and the Amended Petition are directed at the same complaint (or at least, the Cayman Writ Action should be seen as covered by and a subset of complaints made in the Amended Petition). The Company submits that the averments in the Amended Petition, the evidence filed in support of the Amended Petition and the skeleton arguments filed for the hearings before Mangatal J and the Court of Appeal show that it was the

complaint about the bond issues, the conversion of the bonds and the allotment and issue of the new shares that gave rise to the Amended Petition. Tianrui's case is that these steps were inconsistent with the proper purpose rule and thus gave rise to a breach by the Company's board of the fiduciary duties owed to the Company which, in turn, justified Tianrui's petition to wind up the Company on just and equitable grounds.

66.   Furthermore, Tianrui also argued (and resisted the Company's application to strike out the petition on the basis) that it was seeking the appointment of an independent liquidator to conduct an investigation and bring such available claims as might arise out of that investigation – and the need for the investigation (and indeed the very basis on which it was said to be just and equitable for the Company to be wound up) arose, in essence, once again from the issue of the bonds, their conversion into and the issue of the new shares with the consequential dilution in Tianrui's shareholding below the blocking threshold of 25%.

67.   These claims are, the Company submits, in substance, the same as the complaint now made in the Cayman Writ Action. The statement of claim in the Cayman Writ Action deals with: (a) the acquisition of control by CNBM and ACC and the replacement of the board at the EGM on 23 May 2018 through votes cast by ACC, CNBM and CSI and (b) the bond issues, share conversion and the issue of the New Shares, following which Tianrui's shareholding was diluted to less than 25%. The gravamen of Tianrui's complaint in both the Amended Petition and the Cayman Writ Action is thus the same, namely that the current board of the Company allegedly exercised its powers in respect of these matters for the improper purpose of diluting Tianrui's shareholding and allowing CNBM and ACC to acquire control and that the action taken was not in the Company's best interests.

68.   The maintenance of concurrent proceedings which are directed at the same complaint is an abuse of process of the Court, in circumstances where the Court has an overriding obligation to make efficient use of judicial resources. The Company relied on the following statement of the position in *Jameel v Dow Jones & Co Inc* [2005] QB 946 at [54]13, per Lord Phillips of Worth Matravers MR (as he then was):

> "*An abuse of process is of concern not merely to the parties but to the court. It is no longer the role of the court simply to provide a level playing field and to referee whatever game the parties choose to play upon it. **The court is concerned to ensure that judicial and court***

*resources are appropriately and proportionately used in accordance with the requirements of justice." [emphasis added by the Company]*

69.    The Court should give short shrift, the Company argues, to any attempts by Tianrui to present its case on the acquisition of control of the Company (and Shandong Shanshui in particular) as being separate from its complaints about the bond issues and the resulting issue of new shares. That was not borne out by how Tianrui has pleaded and argued its case in the Amended Petition to date. Furthermore, the Company rejects Tianrui's argument, which I summarise below, that it needs and has a legitimate interest in seeking both a winding up order (so as to end its relationship with CNBM and ACC) and the setting aside of the new share issue (which improperly diluted its 28% shareholding in the Company). It does so on the ground that Tianrui cannot both obtain an order setting aside the new share issue at the same time as maintaining its claim to a winding up on the just and equitable ground. Were Tianrui to succeed in setting aside the new share issue and thereby reversing the share dilution it complains of, it would be able to achieve the divorce it seeks by selling its shares without the need for a winding up order (so that its ability to obtain a winding up order would be lost).

## The Petition Strike Out Application and the First Writ Strike Out Application – Tianrui's position

70.    Tianrui submits that there is no abuse in pursuing the Amended Petition and the Cayman Strike Out concurrently because they seek different remedies. Tianrui argues that the need to bring both sets of proceedings concurrently is testament to the fact that the same relief cannot be obtained by either proceeding alone. Tianrui says that its position is explained and supported by the statements in paragraphs 21 to 22 of Mr. Li's Sixth Affirmation (quoted above). Accordingly, both the Petition Strike Out Application and the First Writ Strike Out Application should be dismissed.

71.    Tianrui submits that there is no inconsistency between the positions it adopted at the hearing before Mangatal J in October 2018, before the Court of Appeal in January 2019, before Mangatal J at the July 2019 hearing and the position it now adopts.

72.    The relief sought in the Cayman Writ Action should not be understood or treated as providing an alternative remedy to the Amended Petition. That relief is independent from and not available within the proceedings relating to the Amended Petition. The Court is unable to order that the issue of the new shares be set aside by way of relief in the Amended Petition. There is therefore no

improper duplication of relief in the two proceedings. Furthermore, Tianrui has a real and legitimate interest in pursuing both the Amended Petition and the Cayman Writ Action. If its shares were to be sold in the context of the proceedings relating to the Amended Petition or after the making of a winding up order without obtaining the relief sought in the Cayman Writ Action it would only have a 21% shareholding in the Company rather than a shareholding of 28%.

73.   A liquidator, if appointed, could bring proceedings to set aside the issue of the New Shares and Tianrui accepts that it had in previous hearings referred to this possibility and that such action would be one benefit to flow from a winding up. However, it submits that it was not required to defer bringing the Cayman Writ action simply because a liquidator if appointed in due course could and might commence similar proceedings and that its action in issuing the Cayman Writ Action was justified in circumstances where:

(a).   at the time that the Cayman Writ Action was commenced, there was no prospect of the Amended Petition being determined imminently. There was therefore also no prospect of proceedings being commenced by a liquidator to unwind the convertible bond transactions in the immediate future, and a delay in issuing such proceedings could be damaging (due to, among other things, the risk of the loss of evidence).

(b)    the Cayman Writ Action did not prejudice the position and if a winding up order is made a liquidator can decide whether or not to take over the, or commence similar, proceedings.

(c).   Tianrui considered that there were other risks in delaying the commencement of proceedings to set aside the issue of the New Shares. The Company, as I have previously explained, had made an application to validate the transfer of the New Shares into the Hong Kong clearing and settlement system, which in Tianrui's view risked putting the improperly issued shares beyond the reach of a liquidator. The fact that steps had already been taken and proceedings issued to validate or give effect to the share transfers highlighted the risks to Tianrui in waiting for a liquidator to bring the proceedings on behalf of the Company. It had concluded that it was important to initiate without further delay the challenge to the validity of the issuing of the bonds and shares.

74. In its written submissions with respect to the Company's applications, Tianrui argued that it was entitled both to seek an end to its association with CNBM and ACC (which could only be achieved by a winding up) and to set aside the allotment and issue of the new shares (which was the relief sought in the Cayman Writ Action). Tianrui submitted that this position was supported by the judgment of Martin JA when giving the Court of Appeal's reasons for refusing the Company's application for special leave to appeal to the Privy Council. Martin JA observed that Tianrui's goal in bringing the petition *"included achieving an end to its relationship with the company and its management, not just the unwinding of the share issue"*. The Court of Appeal, Tianrui says, was clearly alive to the availability of both forms of relief as alternative and equally legitimate means to remedy the conduct of the Company; and the fact that neither the Amended Petition nor a writ action alone could grant Tianrui all the available relief or the full range of relief it sought.

75. Tianrui submitted that nowhere in the argument during the hearing before Mangatal J did it assert that it could or would not bring a writ action. In fact, reference was made to the House of Lords' case of *Howard Smith v Ampol* [1974] AC 821 (***Howard Smith***) as authority in support of a personal claim. Nor did it assert that it only sought to reverse the issue of the bonds and the New Shares. Instead, it referred to its wish to have a corporate divorce. Both before Mangatal J and the Court of Appeal, Tianrui argued that there was no complete alternative to a winding up because one of the things it wanted was a divorce. The Cayman Writ Action only addressed the cause of the breakdown and did not provide the separation and divorce that would be the remedy for the breakdown.

76. Furthermore, its submissions were not to the effect that Tianrui did not have a claim but that injunctive relief in support of Tianrui's claim in this case would be difficult and complicated. Tianrui considered that it would be pointless trying to injunct the use of the proceeds of the bond issues and it would be very difficult to maintain a personal claim qua shareholder against the other shareholders in the circumstances of this case. This was the case in particular because Tianrui would need to show that each of the holders of the bonds had the requisite knowledge of the directors' improper purpose or show that the Company's board had no ostensible authority to issue the bonds and the new shares. This would involve additional and potentially difficult factual allegations.

77.   Mr. Lowe referred to the transcript of the hearing before Mangatal J at page 70, between letter A and C. Mr. Lowe had said as follows:

> "...*the justification is the improper use of the bond. But what that does is it leads to the loss of confidence. A Howard Smith claim might deal with the justification, but it does not deal with the fact that we have now lost confidence. It leaves us in a company, as a result of the misbehaviour, in which we have lost confidence. And the gravamen of our complaint, and the importance of a petition is that we want the company wound up because we have lost confidence, and the justification is - what my learned friend is doing is confusing the justification with the relief we are actually seeking......We are left, we are left with a 28 per cent, or a 20 per cent shareholding. In other words, even if Howard Smith is remedied, we are still stuck in the company. We are a major shareholder and we are still stuck, and that cannot be worked out simply by derivative action.*"

78.   Tianrui submits that its position before the Court of Appeal was the same as the position it has taken at this hearing. Tianrui had never said that it could not issue a writ. It had said that issuing a writ was complicated because of the need to join the bondholders. Tianrui had told the Court of Appeal that it accepted that it could not seek to set aside the bonds without joining the bondholders and that in any event the relief it sought it the petition was more than that. Tianrui says that it is clear from the Court of Appeal's Judgment that the Court of Appeal understood Tianrui's submissions and position in this way.

## The Petition Strike Out Application and the First Writ Strike Out Application – discussion and decision

*The Petition Strike Out Application*

79.   It seems to me, taking the Company's written and oral submissions together, that its argument, reduced to its essentials, can be summarised as follows:

(a).   in the First Strike Out Application, Tianrui adopted the position that there were no alternative remedies available to it.

(b).   Tianrui took the position that a writ action would not provide it with adequate and suitable remedies and therefore commencing a writ action would be pointless (save after the appointment of and by a liquidator).

(c).   Tianrui's position is to be understood as involving the proposition either that it would not commence a writ action or that a writ action would be an acceptable alternative remedy if it could be used to set aside the issue of the bonds and the new shares (in a manner binding on the holders of those bonds and new shares).

(d).   the Court of Appeal's Judgment was premised and based on Tianrui's position as so stated and these propositions.

(e).   Tianrui subsequently, by issuing the Cayman Writ Action, changed its position.

(f).   such a change of position is an abuse of process.

(g).   the Court has the power, when policing and granting remedies for such abuse, to prevent a party from taking advantage of such improper conduct and the misuse of the Court's processes by requiring the party to act properly and give effect to its stated position.

(h).   in the present case, since Tianrui had previously taken the position that it would not commence a writ action or that such an action if properly formulated, would be an adequate alternative remedy, by filing the Cayman Writ Action it had either (i) acted inconsistently with its previous position and should be prevented from changing its position or (ii) decided that the Cayman Writ Action would, in fact, provide acceptable and sufficient relief in respect of the matters complained of in the Amended Petition and therefore should be treated as having elected to pursue the Cayman Writ Action as an alternative remedy.

80.    The starting point of the argument is clear. It is based on the Company's view as to the position taken by Tianrui before Mangatal J and the Court of Appeal in the First Strike Out Application. However, the next stage in the argument – being the consequences that flow from Tianrui's position as so understood – was formulated in two slightly different ways, as summarised above. On one formulation, Tianrui's change of position is improper and an abuse, so that a remedy for that abuse should now be granted. Tianrui should be prevented from continuing with the Amended Petition since it would be unfair and improper for Tianrui to change its position after having represented to the Court of Appeal that a writ action would not provide it with an adequate

alternative remedy and thereby having procured the reinstatement of the petition. On the other formulation, since it was accepted in the First Strike Out Application that the petition could not proceed if a writ action provided an adequate alternative remedy, Tianrui's decision to go ahead with a writ action must be treated as an election (a choice) by it to pursue an alternative remedy. This is either because the Court should draw the inference, from Tianrui's conduct, that Tianrui had decided to rely on the alternative remedy of the Cayman Writ Action or because Tianrui is only entitled to pursue either the Amended Petition or the Cayman Writ Action (being an adequate alternative remedy) and so Tianrui must choose between them and is to be taken as having chosen the Cayman Writ Action as the later proceeding.

81.  In my view, the Company's claim – on either basis – fails and the Petition Strike Out Application should be dismissed.

(a).  I do not accept the Company's characterisation of the position adopted by Tianrui on the applications before the Court of Appeal (or Mangatal J). Instead, I accept the submissions of Tianrui on this issue. I would highlight the following points.

(b).  it seems to me that Tianrui did assert that it could bring a direct claim (based on *Howard Smith*) and did not represent or imply that it would never commence a writ action. Nor should Tianrui, by commencing the Cayman Writ Action, be treated as having decided that the writ action was a complete and preferred remedy for the matters of which it complained.

(c).  it also seems to me wrong to assert that Tianrui has materially changed its position. Nor is it an abuse or improper for Tianrui to bring the Amended Petition and the Cayman Writ Action in parallel, subject to the case management orders that should be made, and Tianrui accepts should be made, to ensure that the two proceedings are conducted in a manner that avoids unnecessary duplication and expense.

(d).  the way in which Tianrui presented its position in the appeal can best be tested by looking at its skeleton argument and the way in which the Court of Appeal summarised Tianrui's argument before it. In its skeleton argument Tianrui submitted (at [26]) that the list of alternative remedies identified by Mangatal J in her judgment were "*not at the date of the hearing viable or true alternatives to the relief sought by [Tianrui], which relief is only*

*available by way of a winding up petition.*" Martin JA summarised Tianrui's argument on the appeal by reflecting the written submissions: Tianrui had submitted that "*the alternative remedies identified by the judge were neither viable nor adequate to address the complaints that founded the petition.... Put simply, Tianrui's position as evinced by its petition is that it cannot be expected to remain in association with CNBM and ACC in light of their conduct towards it. None of the remedies identified by the judge deals with that underlying complaint.*" ([36]) (the complaint being based on "*serious allegations of conspiracy by covert agreements and arrangements designed to damage Tianrui, the steps taken to dilute its shareholding being merely the latest stage in the conspiracy*" (see [33]). It was only a winding up that would respond to and deal with Tianrui's complaint and its wish for a corporate divorce. A claim against the Company to declare that the board had abused its powers and had acted improperly and that the Company was in breach of its statutory contract with shareholders would not by itself allow the requisite separation and termination of the corporate association.

(e).  this is still Tianrui's position. The commencement of the Cayman Writ Action is merely a procedural device to permit additional and alternative relief to be granted after the trial of the Amended Petition if the claims made in the Cayman Writ Action are made out. By bringing the Cayman Writ Action, Tianrui is seeking to ensure that if it is unsuccessful on the Amended Petition, and so is unable to achieve the corporate divorce it seeks, it may be able to obtain the alternative relief that can properly be granted in the Cayman Writ Action. Alternatively, if it succeeds in showing that a winding up order should be made the Court can consider whether the claim in the Cayman Writ Action has been made out and whether relief in the Cayman Writ Action would provide Tianrui with an adequate alternative remedy. If a winding up order is made, and a declaration made that the board had acted unlawfully and abused its powers in issuing the bonds and New Shares, it would be open to a liquidator appointed by the Court to decide what further action should be taken and claims brought.

(f).  it does not follow from the proposition that the Amended Petition provides the principal relief sought by Tianrui that cannot be provided by the writ action, that a writ action is inconsistent with the application for a winding up or that by commencing such an action

Tianrui must be taken to have abandoned the proceeding that would provide it with the principal relief sought. Tianrui is not seeking inconsistent remedies.

(g).    nor is Tianrui acting in bad faith or improperly. I do not consider that it can fairly be said that Tianrui misled the Court of Appeal as to its position (it has not been suggested that Tianrui was asked to give or provided any undertaking or gave any clear confirmation that it would not subsequently issue a writ seeking additional and separate relief). Nor does it seem to me that Tianrui can be said to be misusing the Court's procedures by commencing the Cayman Writ Action.

(h).    the Court of Appeal considered that it was legitimate for Tianrui to exercise its statutory right to petition for a winding up order and have the question of alternative remedies (whether the appropriate remedy for the complaints made out at trial was a winding up order or one of the alternative remedies) decided after its complaints had been considered at the trial of the Amended Petition. It is consistent with this approach to allow the Amended Petition and Cayman Writ action to proceed in tandem.

(i).    nor is the argument which founded the successful claim of abuse in *Camulos Partners v Kathrein and Company* [2010 (1) CILR 303] applicable here. In that case, the evidence demonstrated that the petitioner had taken the view that the appropriate remedy for the matters complained of was by way of proceedings commenced by way of originating summons (see [87]). There is no evidence that Tianrui's real object is only to obtain the relief sought in the Cayman Writ Action and to use the Amended Petition as a means of putting the maximum pressure on the Company to assent to the relief so sought (see [97]).

(j).    Mr. Flynn was right in my view to say that this application was an ambitious submission in light of the Court of Appeal's Judgment.

*The First Writ Strike Out Application*

82.    It follows from the conclusions and analysis set out above that the First Writ Strike Out Application should also be dismissed. Tianrui is not seeking inconsistent remedies nor is there any abuse of process in bringing the Cayman Writ Action at the same time as the Amended Petition.

## The Second Writ Strike Out Application

*The Company's submissions*

83.  The Company argues that the Cayman Writ Action is an abuse of process because Tianrui does not have standing to sue the Company for what are essentially claims for breaches by the current board of the fiduciary duties owed by them to the Company. The Cayman Writ Action is in substance (if not in name) a claim by a minority shareholder for breaches by the Company's directors of those duties. The proper plaintiff is the Company. However, Tianrui has not constituted its claim as a claim by the Company and even if it had done so, it would require leave from the Court to pursue the claim, pursuant to GCR O.15, r. 12A, which leave it has not sought or obtained. GCR O.15, r. 12A requires a plaintiff to seek leave to continue an action which is commenced derivatively, that is, by a shareholder on behalf of the Company under the exception to the rule in *Foss v Harbottle* [1843] 67 ER 189.

84.  The Company relies on the recent judgment of Mr. Justice Kawaley in this Court in *Gao v China Biologic Products Holdings, Inc.* (unreported, FSD 157/2018, 10 December 2018) (*Gao*). The Company submits that it is common ground that *Gao* stands as authority for the proposition that a writ action by a minority shareholder (such as Tianrui) in respect of the exercise by the board of directors of the power to allot and issue shares falls to be struck out on the grounds that it did not disclose a reasonable cause of action and/or is an abuse of process.

85.  As regards *Gao*, the Company submits that:

(a).  the facts in *Gao* were similar to the present case – a minority shareholder (i.e. Mr. Gao) brought a writ action against the company in respect of the exercise by its board of directors of the power to allot and issue shares. The company contended that it did not owe any fiduciary, equitable, contractual and/or any other duty to Mr. Gao and applied to strike out the writ on the grounds that it did not disclose a reasonable cause of action and/or is an abuse of process.

(b).   the headnote to the judgment helpfully summarised the decision in, inter alia, these terms: *"whether duty to exercise power to issue new shares for a proper purpose owed to company or to individual shareholders"; "standing of beneficial owner of shares to assert shareholder claim against company"; and "whether action liable to be struck-out on abuse of process grounds".*

(c).   Mr. Justice Kawaley conducted a detailed review of relevant Cayman Islands, English and Australian case law (as well as practitioners' texts and articles) and ultimately struck out Mr Gao's claim for abuse of process, holding that individual minority shareholders have no standing to pursue personal claims against a company for an improperly motivated allotment of shares which dilutes his voting rights.

(d).   Mr. Justice Kawaley's analysis was set out in [29] - [49] of his judgment and was correct. The Company referred to Mr. Justice Kawaley's conclusions in [29] - [30] and [32] as follows:

> *"29.   I find that individual minority shareholders ordinarily have no legal standing to sue for breach of fiduciary duty in relation to a complaint that their voting power has been diluted by a share allotment approved by the directors for an improper purpose. The correct legal principle was accurately stated, strictly obiter, by Smellie J in Argentine Holding Ltd v Buenos Aires et al [1997] CILR 90 at 104. The position is most fully considered and persuasively articulated in the judgment of Harman LJ in Bamford v Bamford [1970] 1 Ch. 212. He regarded it as trite law that directors only ordinarily owe a duty to the company if they misuse their powers and that the company in general meeting can validate any such defects in the exercise of the directors' powers. The relevant analysis occurred in the context of considering an allotment of shares which it was complained was approved in order to dilute the voting power of the plaintiff shareholders. The statements in Bamford do not explain the exceptions to what is properly viewed as a general and perhaps almost invariable rule because these were not relevant to that case. However, Harman LJ (at 239) cited a passage from the Privy Council decision of North West Transportation Co v Beatty (1887) 12 App. Cas. 589 confirming that it is not every breach of fiduciary duty which the company in general meeting can approve.*
>
> *30.   In my judgment both the general rule and the exception are fundamental principles of company law which are central to the way in which companies limited by shares operate. Directors are only answerable to the company for intra vires breaches of fiduciary duty because they are agents of the company appointed on the explicit basis that they owe duties of loyalty to the company. Shareholders ordinarily acquire their shares on the explicit basis that their only*

*means of controlling the management of the company is by way of successfully passing resolutions in general meetings. It would be inconsistent with what is essentially a functional rule, and potentially expose companies to limitless litigation, if individual shareholders were permitted to enforce duties which are not owed to them. This would amount to permitting individual shareholders to participate in the management of the company by intruding into the company's proper sphere of supervising the conduct of the directors. The position is different as regards ultra vires acts because the company itself is not competent to ratify ultra vires acts and may only validly act within its powers. Section 28 of the Companies Law, for example, expressly permits shareholders to set aside ultra vires acts.*

.....................

32   *A further consideration which weights (sic) against the existence of standing to assert a personal claim with a view to challenging the August 24 Decision is that share allotments will usually affect all shareholders of the affected class in the same way and that there is accordingly no identifiable principled basis upon which to treat this category of breach of an equitable duty as a sui generis one giving rise to concurrent duties being owed to the company and individual shareholders. Directors' fiduciary duties are quintessentially owed to the company and their breach is actionable by or on behalf of the company. I reject the suggestion that the dilution of share voting rights constitutes a freestanding exception to the rule in Foss v Harbottle, which establishes the general rule that claims for damage caused to a company must ordinarily be brought by or on behalf of the company." (emphasis added)*

(e).   Mr. Justice Kawaley had considered each of the authorities relied on by Tianrui, in particular the judgment of Hoffmann J in *Re Sherborne Park Residents Co* [1987] BCLC 82 (**Sherborne Park**), the Privy Council in *Howard Smith*, the decision of the South Australian Supreme Court in *Residues Treatment and Trading Co Ltd v Southern Resources* [1988] 6 ACLC 1160 (**Residues**) and the judgment of the Supreme Court in *Eclairs Group Ltd and another v JKX Oil and Gas plc* [2016] 3 All ER 641 (**Eclairs**). He distinguished them, demonstrated that the issue of whether the shareholder had a personal right had not been argued at all or, if raised, it had not been fully argued, or showed why the reasoning could not be supported. The Company submitted that Mr. Justice Kawaley's approach to these authorities was correct and should be followed. His approach can be summarised as follows:

(i).   as regards *Sherborne Park*, Mr. Justice Kawaley had said the following (at [43(c)]):

> *"However, the petitioner was pursuing a statutory unfair prejudice claim so the issue of standing to advance an equitable claim did not arise for consideration. The decision does admittedly support the view that a personal statutory claim can be pursued to challenge an improperly motivated share allotment. But, as already noted, this was an ex parte application for a pre-emptive costs order so the obiter remarks relied on provide only slight potential support for the principle in support of which it is cited. Moreover, to the extent that Hoffmann J described the personal claim as a means of enforcing the articles, this type of claim is a classic instance of the special circumstances justifying a minority shareholder asserting a personal claim for breach of duties generally owed solely to the company."*

(ii).   *Sherborne Park* involved only *obiter dicta* and "*one should accord far greater weight to judicial statements made in the context of deciding a controversial issue than to mere obiter dicta.*" Furthermore, he did not accept that it had not been approved by the English Court of Appeal in *Peskin v Anderson* [2001] 1 BCLC 372 (*Peskin*). In fact, *Peskin* showed that "special circumstances" were needed to justify an individual right of action by a minority shareholder.

(iii).   *Howard Smith*, when properly understood, offered no support for the existence of a personal right of action by minority shareholders because the issue of standing by a minority shareholder to bring an action was not considered or decided. He said:

> *"41.    It remains to consider the text writers upon whom the Plaintiff's counsel understandably heavily relied. 'Gore-Browne on Companies', Issue 142, July 2018, paragraph [44] confidently asserts that "where the directors of the company have exercised their powers for an improper purpose ... the shareholder himself has a personal cause of action..." The only authority cited in support of this proposition by the learned authors is Howard Smith -v- Ampol Petroleum Ltd. [1974] AC 821, which, with respect, provides next to no support for the statement. The House of Lords merely noted that the standing of the shareholder to bring a personal claim was not disputed. Mr Green QC pointed out what I consider [to be the] crucial factor consideration in that case. <u>The plaintiffs were majority shareholders holding 55% of the shares. The central holding in Howard Smith was entirely consistent with the Defendant's central thesis, which I unreservedly accept, that majority shareholders have the right (by way of expressing the will of the company) to disapprove or ratify any intra vires breach of fiduciary duty by the directors.</u>*
>
> *42.    <u>There is a fundamental distinction between the rights of the majority and the minority in this regard.</u> It may well be that the most formal way of proceeding would have been for the majority shareholders to have issued derivative proceedings but it is easy to see why no standing challenge was raised. Howard*

> *Smith, properly understood, is in no material way inconsistent with the notion that minority shareholders ordinarily have no standing to assert a personal claim in relation to a share allotment which is improperly motivated."*
>
> [underlining added]

(iv).  as regards the decision in *Residues*, Mr. Justice Kawaley explained why he declined to follow the reasoning of King CJ:

> *"33.  Before dealing with the special circumstances point, I should explain why I decline to follow [Residues].....In my judgment this decision represents a departure from the mainstream of British Commonwealth company law which is not supported by any previous or subsequent authorities to which I was referred. Nor is Residues supported by any coherent principle. King CJ's central thesis was that a shareholder's voting rights were so fundamental that they deserved special protection in the form of a personal action against the company for breach of fiduciary duty. With the greatest of respect, this reasoning fails to acknowledge that individual shareholders can sue the company to set aside ultra vires acts (Companies Law, section 28), and can challenge intra vires share allotments which they consider improperly dilute their voting rights either (a) through a derivative action, or (b) through the instrumentality of a general meeting. The contrary argument also fails to explain how as a general rule a share allotment affects some existing shareholders differently to others. King CJ himself acknowledged (at 201), after referring to various cases which he considered provided some support for his conclusion, that "[n]one of the above cases is decisive of the present point". Mr. Meeson QC suggested that various previous decisions supported the individual shareholder's right to challenge an improperly motivated share allotment, but on careful reading they provided no direct support (as King CJ himself accepted)."*

(v).  he did not accept that *Residues* had been applied by Mr. Justice Harris in Hong Kong in *Artan Investments Limited v Bank of East Asia Limited* HCMP 125/2015. He considered that the judge's statements to the effect that shareholders had standing to prosecute proceedings to protect their personal right not to have the voting power of their shares diminished was of minimal persuasive value in relation to the claimed personal claim in equity since Harris J was dealing with a statutory right (a statutory application for discovery).

(vi).  as regards *Eclairs*, Mr. Justice Kawaley did not regard the case as supporting the personal right argument as it involved only a derivative claim (see [40(a)]) and did not concern an allotment of shares (see [43(a)]).

(f).   *Gao* was part of Cayman law and should be applied by this Court unless this Court was convinced that the judgment was wrong. The proper approach was set out in *In the matter of Alibaba.com Ltd* [2012] (1) CILR 273, per Cresswell J at [63]:

> *"Decisions of co-ordinate courts*
>
> 63   *I refer to 11 Halsbury's Laws of England, 5th ed., at para. 98 (2009):*
>
> > *"There is no statute or common law rule by which one court is bound to abide by the decision of another court of co-ordinate jurisdiction. **Where, however, a judge of first instance after consideration has come to a definite decision on a matter arising out of a complicated and difficult enactment, the opinion has been expressed that a second judge of first instance of co-ordinate jurisdiction should follow that decision; and the modern practice is that a judge of first instance will as a matter of judicial comity usually follow the decision of another judge of first instance unless he is convinced that that judgment was wrong.** Where there are conflicting decisions of courts of co-ordinate jurisdiction the later decision is to be preferred if reached after full consideration of early decisions." [emphasis added by the Company]*

(g).   in any event, the reasoning and decision in *Gao* was correct and to be preferred to the reasoning in *Sherborne Park*.

86.   The Company submitted that the Cayman Writ Action should therefore be struck out for being an abuse of process. Were it otherwise, it would always be open to a minority shareholder to sue the directors for alleged breaches of fiduciary duties by framing it as an action for breach of terms in or implied into the articles, thus upending the well-established principles of law that make it clear that the Company is the proper plaintiff for claims against the directors in respect of breaches of duties owed to it.

87.   The Company submits that to the extent that Tianrui is bringing the Cayman Writ Action as a derivative action (which it needs to do in light of *Gao*, but which it has not done), it should be struck out since Tianrui has failed to comply with the requirements of GCR, O.15, r.12A. By failing to structure its claim properly or to seek leave to continue the claim, Tianrui was seeking to do an end run around this important procedural gateway and this amounted to yet further abuse.



88.     The Court ought not to permit this disregard of the rules. O.15 r.12A is not simply a technical box
        to tick. Rather, it is a real and substantive test, which includes requirements that the plaintiff
        persuade the Court on an *inter partes* hearing that: (a) the plaintiff has a prima facie case on the
        merits; (b) one of the exceptions to the rule in *Foss v Harbottle* applies; and (c) the plaintiff is
        acting bona fide (the so-called test in *Nurcombe v Nurcombe*). As noted by Foster J in *Renova
        Resources Private Equity Limited v Gilbertson*: "*The reason for its introduction was to provide a
        safeguard to prevent vexatious or inappropriate claims, which were not in the interests of the
        company concerned to pursue.*" Tianrui ought not to be rewarded for its attempts to work around
        that safeguard.


*Tianrui's submissions*

89.     Tianrui submits that (a) GCR O.15, r.12A is not engaged in this case, as the cause of action on
        which it relies in the Cayman Writ Action is its own, personal and not a derivative claim; (b) the
        decision in *Gao* was plainly wrong and should not be followed; (c) this is because, as a matter of
        principle, a shareholder has a personal claim against the company to challenge an improper
        exercise by the directors of the power to issue shares, as breach of the company's constitution and
        the statutory contract to which the shareholder and company are parties; and (d) even if these
        arguments are not accepted and it can only proceed by way of derivative claim then it should be
        given the opportunity to apply to amend its statement of claim in the Cayman Writ Action to
        reconstitute that action as a derivative claim (and then to apply for permission to continue) – and if
        a claim can be cured by amendment, then it is not appropriate to strike it out.


90.     Tianrui argues that a member is entitled to commence proceedings in a personal capacity where: (i)
        the right being enforced is a personal right conferred on the member in their capacity as a
        shareholder of the company; and (ii) the matter that the shareholder is complaining about is not
        merely a procedural irregularity (see *Edwards v Halliwell* [1950] 2 AER 1064 at 1066-1069 and
        Gower's Principles of Company Law (8th Ed) at [16-22]).

91.     Tianrui relies in particular, as I have explained above, on the judgments in *Howard Smith,*
        *Sherborne Park, Residues* and *Eclairs.*

92.     *Howard Smith* was an appeal to the Privy Council against a judgment of the Supreme Court of New
        South Wales invalidating an allotment of shares made for the improper purpose of reducing the
        proportionate shareholding of the plaintiff and an associated company in order to facilitate a take-
        over by another company. The plaintiff and its associate company between them held a majority of
        the shares and the effect of the impugned allotment would have been to convert their majority
        shareholding into a minority shareholding. The plaintiff appears to have sued in an individual
        capacity and its standing was not challenged. Mr. Lowe submitted that nonetheless the dicta and
        reasoning in the case were high authority that supported the existence of and explained the juridical
        basis of the shareholder's personal claim. During his oral submissions Mr. Lowe referred me to and
        relied on the following passage in the speech of Lord Wilberforce (at 837C – 838C):

        "*The purpose found by the judge is simply and solely to dilute the majority voting power
        held by Ampol and Bulkships so as to enable a then minority of shareholders to sell their
        shares more advantageously. So far as authority goes, an issue of shares purely for the
        purpose of creating voting power has repeatedly been condemned: Fraser v. Whalley, 2
        Hem. & M. 10; Punt v. Symons & Co. Ltd. [1903] 2 Ch. 506; Piercy v. S. Mills & Co. Ltd.
        [1920] 1 Ch. 177 (" merely for the purpose of defeating the wishes of the existing majority of
        shareholders") and Hogg v. Cramphorn Ltd. [1967] Ch. 254. In the leading Australian case
        of Mills v. Mills, 60 C.L.R. 150, it was accepted in the High Court that if the purpose of E
        issuing shares was solely to alter the voting power the issue would be invalid. And, though
        the reported decisions, naturally enough, are expressed in terms of their own facts, there are
        clear considerations of principle which support the trend they establish. The constitution of a
        limited company normally provides for directors, with powers of management, and
        shareholders, with defined voting powers having power to appoint the directors, and to take,
        in general meeting, by majority vote, decisions on matters not reserved for management. Just
        as it is established that directors, within their management powers, may take decisions
        against the wishes of the majority of shareholders, and indeed that the majority of
        shareholders cannot control them in the exercise of these powers while they remain in office
        (Automatic Self-Cleansing Filter Syndicate Co. Ltd. v. Cuninghame [1906] 2 Ch. 34), so it
        must be unconstitutional for directors to use their fiduciary powers over the shares in the
        company purely for the purpose of destroying an existing majority, or creating a new
        majority which did not previously exist. To do so is to interfere with that element of the
        company's constitution which is separate from and set against their powers. If there is
        added, moreover, to this immediate purpose, an ulterior purpose to enable an offer for
        shares to proceed which the existing majority was in a position to block, the departure from
        the legitimate use of the fiduciary power becomes not less, but all the greater. The right to
        dispose of shares at a given price is essentially an individual right to be exercised on*"

*individual decision and on which a majority, in the absence of oppression or similar impropriety, is entitled to prevail. Directors are of course entitled to offer advice, and bound to supply information, relevant to the making of such a decision, but to use their fiduciary power solely for the purpose of shifting the power to decide to whom and at what price shares are to be sold cannot be related to any purpose for which the power over the share capital was conferred upon them. That this is the position in law was in effect recognised by the majority directors themselves when they attempted to justify the issue as made primarily in order to obtain much needed capital for the company. And once this primary purpose was rejected, as it was by Street J., there is nothing legitimate left as a basis for their action, except honest behaviour. That is not, in itself, enough.*

*Their Lordships therefore agree entirely with the conclusion of Street J. that the power to issue and allot shares was improperly exercised by the issue of shares to Howard Smith. It was not disputed that an action to set aside the allotment and for rectification of the register was properly brought by Ampol as plaintiff.*

[emphasis added]

93. Mr. Lowe also relied on the following passage in the judgment of Hoffmann J. in *Sherborne Park*:

*I have not heard any opposing argument but I am provisionally inclined to accept all of submissions of counsel for the petition except [the proposition a claim based on a wrongful share issue of the type made in this case can be brought by way of a derivative action]. Although the alleged breach of fiduciary duty by the board is in theory a breach of its duty to the company, the wrong to the company is not the substance of the complaint. The company is not particularly concerned with who its shareholders are. The true basis of the action is an alleged infringement of the petitioner's individual rights as a shareholder. The allotment is alleged to be an improper and unlawful exercise of the powers granted to the board by the articles of association, which constitute a contract between the company and its members. These are fiduciary powers, not to be exercised for an improper purpose, and it is generally speaking improper-*

*"for the directors to use their fiduciary powers over the shares in the company purely for the purpose of destroying an existing majority, or creating a new majority which did not previously exist". (See Lord Wilberforce in Howard Smith Ltd. v. Ampol Petroleum Ltd. [1974] A.C. 821, at p. 837)."*

*An abuse of these powers is an infringement of a member's contractual rights under the articles. Professor Gower in his Principles of Modern Company Law (4th ed.,1979, at pp. 647–656) distinguishes between the derivative action and the member's personal action. The former is brought when-*

*"...a wrong has been done to the company and action is brought to restrain its continuance, or to recover the company's property or compensation due to it".*

*In such a case, says Professor Gower, the company is the only true plaintiff. In the member's personal action the dispute is an internal one between those interested in the company. A shareholder in such an action may sue as representative of himself and other shareholders*

*who have identical interests but he does not in substance assert a right which belongs to the company alone. It is perhaps worth observing that in cases concerning the improper allotment of shares like Howard Smith Ltd. v. Ampol Petroleum Ltd. there is no suggestion that the plaintiff sues on behalf of the company or in any capacity other than individual shareholder."*

[emphasis added]

94.   Tianrui argues that the reasoning in *Residues* is also correct and should be followed. Mr. Lowe took me to the judgment of King CJ in which, after referring to and discussing *Howard Smith* and various Australian decisions, King CJ said as follows:

> *"None of the above cases is decisive of the present point. There are strong indications in them to my mind, however, of the recognition of a personal right in a shareholder to be protected against dilution of his voting rights in the company by improper action on the part of the directors. This is clearly so where that dilution has the effect of destroying an existing majority and creating a new one......The personal right of a shareholder to which I refer is founded, in my opinion, upon general equitable considerations referred to in the cases cited above arising out of membership of a body whose management is in the hands of directors having fiduciary obligations. It is fortified by the nature of the contract between the company and the members constituted by the memorandum and articles of association and given statutory force by sec. 78(1) of the Companies Code. I do not mean that the relevant right of a shareholder is founded in contract or that his remedies for infringement are remedies for breach of contract. The shareholder's right is founded in equity and is a right to have the say in the company which accrues to him by virtue of the voting rights which are attached to his shares by his contract with the company, preserved against improper actions by the company or the directors who manage its affairs. It is true, as the learned Judge appealed from observed, that a person taking shares in a company must be taken to have agreed to suffer such effects as may flow from the allotment of further shares made by the company, but that is not to say that he is without rights in relation to such further allotment as may be made by the directors for improper purposes.*
>
> *The rule in Foss v. Harbottle (supra) clearly operates to preclude a shareholder from suing in his personal capacity in respect of a detriment which he suffers in common with other shareholders in consequence of a wrong done to the company. There is a clear distinction, however, between such a detriment and the diminution of a shareholder's effective voting power by an improper allotment of shares by directors acting on behalf of the company. The latter is not merely a breach of duty by the directors to the company, it is also a wrong done to the shareholder by the company acting through its agents. To make that distinction is not necessarily to subscribe to the view that a shareholder has a personal right not to be affected detrimentally by any breach of what is said to be an implied term in the contract between the member and the company that the affairs of the company will be managed without impropriety on the part of the directors. Diminution of voting power stands on a fundamentally different footing from other detriments resulting from abuse of power by directors. A member's voting rights and the rights of participation which they provide in the decision-making of the company are a fundamental attribute of membership and are rights which the member should be able to protect by legal action against improper diminution*

*The rule in Foss v. Harbottle has no application where individual membership rights as opposed to corporate rights are involved….:*

*It must be acknowledged that there has often been a lack of clear differentiation in the cases between the situations in which the company is the only proper plaintiff, the situations in which a shareholder may prosecute a derivative action for a remedy in favour of the company and situations in which a shareholder may bring an action on his own behalf for a personal remedy. There is also a lack of clarity as to the basis upon which individual shareholders have been allowed to sue to have allotments of shares made for improper purposes set aside. I think, however, that there is a clear trend in cases of the highest authority tending to indicate the existence of a personal right in a shareholder, grounded upon equitable principles, to have the voting power of his shares undiminished by improper actions on the part of the directors and of his locus standi to institute and prosecute proceedings to protect that right. I think that the time has come for the courts to give unequivocal recognition to such a right. The view at which I have arrived, that this point in the development of the law has been reached, is reinforced by considered dicta of two single Judges in the past two years [King CJ then refers to Hoffmann J in Sherborne Park and Malcolm C.J. in the Supreme Court of Western Australia in Eromanga Hydrocarbons N.L. v. Australis Mining N.L. & Ors (1988) 6 ACLC 906]…….*

*It has been argued, however, that there is a firm rule of law that a shareholder does not have standing to seek relief in respect of any act of the directors which is capable of ratification by the members in general meeting. My first comment on that proposition is that it is by no means clear to me that the allotment in question, if made for the improper purpose alleged, is capable of ratification. It is clear law that the voting power of a majority may not be exercised in a way which is oppressive of or in fraud of minority shareholders, Allen v. Gold Reefs of West Africa Ltd. (1900) 1 Ch. 656 at p. 671; Peters' American Delicacy Co. Ltd. v. Heath & Ors (1938-1939) 61 C.L.R. 457 at p. 504 et seq. Those cases were concerned with alterations to the articles of association but there appears to be no reason why a similar restraint on the exercise of majority voting power should not exist in relation to other resolutions. In Winthrop Investments Ltd. v. Winns Ltd. (supra) the Court of Appeal of New South Wales held that a general meeting could ratify an exercise of the powers of directors to allot shares which had been made for an improper purpose. An important factor in that decision, however, was that the Court felt constrained to follow a decision to the same effect of the English Court of Appeal in Bamford v. Bamford (1970) Ch. 212, a constraint which is now recognised not to apply to the Supreme Courts of the Australian States[because the High Court of Australia had held that voting powers conferred on shareholders and powers conferred on directors by the articles of association of companies must be used bona fide for the benefit of the company as a whole].*

*If it is correct that a shareholder has a personal right to have the voting power of his shares undiminished by an allotment of shares made for an improper purpose, there is to my mind a substantial argument that an exercise of the voting power of the majority to ratify such an allotment would be beyond the scope of the purpose for which that power exists. This is an issue which may have to be resolved at trial. I have adverted to the issue because I do not wish it to be assumed from my consideration of the submission as to locus standi that I necessarily accept that the allotment is capable of ratification. I think, however, that the*

*submission as to locus standi can be disposed of without resolving the issue as to the capacity of a general meeting to ratify the allotment.*

*The submission as to locus standi is based upon the principle enunciated in MacDougall v. Gardiner (1875) 1 Ch.D. 13 that if an irregularity is capable of being cured by resolution of a general meeting, an individual shareholder may not sue on his own behalf or on behalf of himself and other shareholders to complain of that irregularity. There is no difficulty with that principle where the complaint is of an irregularity in a matter concerning the internal management of the company. <u>The English Court of Appeal in Bamford v. Bamford (supra) applied the principle to an improper allotment of shares. If, however, such an allotment infringes the personal rights of shareholders, it is difficult to see how the potential for ratification can deprive the wronged shareholder of locus standi while the infringement continues. Even if the shareholder's action can be defeated by ratification of the allotment by a general meeting on the basis that the infringement ceases because the shareholder has no right to have the voting power of his shares remain unaffected by the lawful issue of further shares by the company, there appears to be no reason in principle why his locus standi should not exist until the infringement is expunged by ratification. I do not think that the potential for ratification, if it exists, is sufficient reason for depriving the plaintiffs of locus standi.</u>"*

[underlining added]

95.  Mr. Lowe submits that the constitutional analysis is supported by *Eclairs* – that a claim based on an abuse of the directors' powers to allot shares is connected with or arises out of the company's articles themselves. Lord Sumption said the following:

> *"15.  The important point for present purposes is that the proper purpose rule is not concerned with excess of power by doing an act which is beyond the scope of the instrument creating it as a matter of construction or implication. It is concerned with abuse of power, by doing acts, which are within its scope, but done for an improper reason. It follows that the test is necessarily subjective. 'Where the question is one of abuse of powers,' said Viscount Finlay in Hindle v John Cotton Ltd 1919 56 SLR 625 at 630, 'the state of mind of those who acted, and the motive on which they acted, are all important'.*
>
> *16.  A company director differs from an express trustee in having no title to the company's assets. But he is unquestionably a fiduciary and has always been treated as a trustee for the company of his powers. Their exercise is limited to the purpose for which they were conferred. One of the commonest applications of the principle in company law is to prevent the <u>use of the directors' powers for the purpose of influencing the outcome of a general meeting. This is not only an abuse of a power for a collateral purpose. It also offends the constitutional distribution of powers between the different organs of the company, because it involves the use of the board's powers to control or influence a decision which the company's constitution assigns to the general body of shareholders. Thus in Fraser v Whalley (1864) 2 H & M 10 the directors of a statutory railway company were restrained from exercising a power to issue shares for the purpose of defeating a shareholders' resolution for their removal.</u>*

Case 1:21-cv-11059-GHW   Document 140-5   Filed 06/14/23   Page 59 of 73

[underlining added]

96.   Mr. Lowe submitted that *Bamford v Bamford* [1970] Ch 212 (*Bamford*) and *Hogg v Cramphorn* [1967] Ch. 254 (*Hogg*), the former a decision of the English Court of Appeal, were distinguishable or should not now be followed. He accepted that these cases indicated that the duty to allot shares for a proper purpose is a duty owed to the Company and that an action for breach could only be brought by the company and that generally no action was available where the breach had been ratified by the general meeting. However, both cases, and in particular, *Bamford* predated the discussion and analysis of the rights of shareholders in *Howard Smith*. It was clear from Lord Wilberforce's analysis in *Howard Smith* that the shareholders complaining of an improperly exercised power to issue shares did not need to proceed by way of derivative claim.

97.   Mr. Lowe also submitted that:

(a).   Hoffmann J's reasoning in *Sherborne Park* was approved by the English Court of Appeal in *Peskin* at [36].

(b).   the Australian Courts had applied the *Sherborne Park* analysis (see *Residues*) as had courts in Hong Kong (see *Tsang Wai Lun v Chu King Fai* [2009] 5 HK LRD 105, and *Artan Investments Ltd V Bank of East Asia* [2015] HCMP 125/2015).

(c).   *Gao* dismissed the argument in *Sherborne Park* as being obiter without noting that it had been approved specifically in *Peskin* (see per Kawaley at 13-14 [34](d)], 16 [39], 17 [43(c)]). Moreover, the fact that Lord Hoffmann's analysis had been obiter did not render it any less cogent.

(d).   shareholders cannot ratify improper share issues when they themselves share the improper purpose, as is here alleged to be the case (see *North West Transportation Co Ltd v Beatty* (1887) 12 App.Cas 589, PC, *Bamford* at 239, *Clemens v Clemens* [1976] 2 All ER 268, *Winthrop Investments v Winns Ltd* [1975] 2 NSWLR 666, *Ngurli Ltd v McCann* (1954) 90 CLR 425 and *Franbar Holdings v Patel* [2008] BCC 885). This was not the case in *Gao* (see [29]).

*200406  In the Matter of Tianrui v China Shanshui FSD 161 of 2018 (NSJ) and FSD 93 of 2019 (NSJ) – Judgment*

59

(e).  the existence of a personal claim was supported by a number of leading textbooks. In particular, Chivers, Shaw, Bryant and Staynings in *The Law of Majority Power: Use and Abuse* (OUP, 2nd edition, 2018) where it was stated (at [5.20] – [5.22]) that *"The authorities establish that a minority shareholder may bring a personal action if directors allot shares for an improper purpose"* (citing in footnote 15 *Eclairs, Bamford* and *Sherborne Park*). This text had been cited to Mr. Justice Kawaley who had declined to follow the conclusions reached by the authors since, for the reasons explained above, none of the authorities relied on supported the existence of the shareholders' personal right of action. However, Mr. Lowe submitted that Mr. Justice Kawaley had been wrong to reject the conclusions of Messrs. Chivers, Shaw, Bryant and Staynings which gave important textbook support for the existence of the personal claim.  Mr. Lowe also referred to the current edition of Gower's *Principles of Modern Company Law* (Sweet & Maxwell, 10th ed., 2016 written by Professors Paul L. Davies and Sarah Worthington). Gower stated that:

> *"It is clear that [the statutory duty on directors to act within their powers is] owed to the company....and so may be pursued by the company directly or by the shareholders in a derivative claim. But can the defaulting directors be sued by parties other than the company? A failure on the part of the directors to observe express limits on their powers contained in the company's constitution may also put the company in breach of the contract with the shareholders created by the articles...at least some breaches of the articles by the company can be complained of by a shareholder…...Where the breach is of a duty to act for proper purposes...however then allowing a wider class of people to complain has been more poorly defended; no case seems to have turned on standing. In some cases, minority shareholders have been allowed to sue but the question of their standing has often not been argued nor its basis explained [citing Howard Smith]. As a matter of logic and equitable precedent this duty to act for proper purposes owed by directors to the company may also be owed (at common law...) by the directors to a wider class of people entitling this wider class to seek common law or equitable remedies from the directors for breach. Alternatively, or in addition....* <u>*the director's wrongs to the company may entitle the shareholders to pursue related or parasitic remedies, such as for breach of the contract in the articles (although note the arguments against) or a claim in unfair prejudice [citing Sherborne Park....[and in the footnote relating to the arguments against: But for the perhaps preferable view that acting for an improper purpose is an abuse of power but not a breach of the articles see Winthrop Investments v Winns [1975] NSWLR 666....[and] also see Rolled Steel Products v British Steel [1986] Ch. 246].*</u>

[underlining added]

During the hearing, I directed Mr. Lowe's attention to the reference in this passage (underlined) to there being arguments against shareholders having standing to bring a claim

for breach of the articles and the suggestion that the exercise of a power for an improper purpose did not result in a breach of the articles. Mr. Lowe submitted that this approach was not right. Where the articles gave the directors a power which impacted on the constitutional rights of shareholders, the exercise of such a power for an improper purpose was impermissible in the same way as the exercise of a power beyond a stated limitation and gave rise to a breach of the articles.

98.    At the hearing, as I have explained above, Tianrui accepted that there were problems with the Cayman Writ Action in its current form. Mr. Lowe accepted that the relief sought (setting aside and declaring to be void the convertible bonds and the New Shares so as to affect the rights of the holders of the bonds and New Shares) was not available in a claim against the Company. He also accepted that Tianrui would need to apply for permission to amend the Cayman Writ Action. However, the cause of action against the Company was properly claimed and it would be wrong to strike out the Cayman Writ Action merely because an amendment to the form of relief sought was needed. He submitted (as I understand his submissions, which were not included in any written submissions) that it was not necessary to file a draft of the amended writ and statement of claim at this stage on the basis that the challenge to the Cayman Writ Action was to the basis of the claim and cause of action (the personal claim by Tianrui) and not to the remedy sought. That challenge failed and the remedial issues could be dealt with on the subsequent application for permission to amend.

*Discussion and decision*

99.    Mr. Justice Kawaley started his judgment in *Gao* by noting that the propriety of the issue of new shares where the voting power of shareholders is diluted had been the subject of litigation for over one hundred years and that the question of the capacity in which a shareholder could seek relief, personally or derivatively on behalf of the company, had elicited different views from judges and textbook writers over the years. I would go further and echo the comments made by a leading academic (Professor Wedderburn) over forty years ago when he referred to a "*conceptual muddle which has overcome company law in the courts*" in this area (see 32 MLR 563, at 563).

100.   The key question that arises on the Second Writ Strike Out Application is as follows: can a shareholder bring a personal claim against the company where the directors allot shares for the

improper purpose of diluting the shareholding of a minority shareholder from above to below 25% where it is alleged that the directors were acting in concert (and were part of a conspiracy with) the majority shareholders in order to achieve that dilution (the ***Standing Question***)?

101.   There is a related question: can the majority shareholders ratify the allotment and the breach in such circumstances and if they can do so, does ratification preclude the shareholders' personal claim (the ***Ratification Question***)? The Second Writ Strike Out Application invites the Court to decide that the Standing Question should be answered in the negative and to strike out the Cayman Writ Action for that reason. The Ratification Question does not directly arise on this application. It does arise and is a live issue in the Cayman Writ Action. Tianrui has pleaded (see [64] and [65] of the statement of claim in the Cayman Writ Action, quoted above) that the resolutions passed at the EGM held on 30 October 2018 were not effective to ratify the board's improper issuing of the bonds and the New Shares. The Company has denied this (see [211] of the Defence to the Writ). Even if ratification is in principle effective to preclude the shareholder's personal claim, and it is clearly arguable that it is not on the facts as pleaded in the statement of claim, there are substantial issues of fact that will need to be decided at trial which are relevant to the issue of whether there was an effective and proper ratification. The Ratification Question is however indirectly relevant since it can be argued that *Bamford* and *Hogg* address the Standing Question in the context of a discussion of the ratification issue. Furthermore, one issue arising in relation to the Standing Question is whether the mere availability of ratification precludes a personal claim. In my view, for the reasons explained below, that is not the case (although it is open to the Court in some circumstances to give the shareholders an opportunity to ratify the directors breach of duty, as Buckley J did in *Hogg* when he decided to stand the action over for a period to allow the directors to convene an EGM to vote on the allotment). It also seems to me that to the extent that a shareholder has a personal claim, ratification cannot defeat it.

102.   In my view, the answer to the Standing Question is yes. While, save for the decision in *Gao*, the scope and basis of the decisions in the key cases is unclear or disputed, and while the analysis in the leading textbooks is not uniform or always fully argued (the textbook discussions are, with some notable exceptions to which I shall refer, often brief and inconclusive), authoritative dicta in the cases and principle support such a view (I agree with King CJ's comment that *"None of the cases [cited] is decisive of the present point. There are strong indications in them to my mind, however, [at least in cases where the dilution has the effect of destroying an existing majority and*

*creating a new one] of the recognition of a personal right in a shareholder to be protected against dilution of his voting rights in the company by improper action on the part of the directors.").* I accept Tianrui's submissions on this issue. Accordingly, I find that I must disagree with the judgment of Mr. Justice Kawaley. I do so with hesitation, reluctantly and with great respect, as I would usually follow his decisions without demur. However, the requirements set out by Cresswell J in *In the matter of Alibaba.com Ltd* are, in my view satisfied.

103.   I would make the following comments in relation to Mr. Justice Kawaley's judgment in *Gao*:

   (a).   it seems to me that the discussion contained in paragraphs [30]-[31] and [44]-[48] of Mr. Justice Kawaley's judgment is important for understanding his analysis and approach. Paragraph 30 was relied on by the Company and is quoted above. Mr. Justice Kawaley referred to the core principle that directors' duties are owed to the company and that directors are only answerable to the company for intra vires breaches of fiduciary duties and stated that it would be inconsistent with this functional rule if individual shareholders were able to enforce duties not owed to them. In paragraph 31, the judge said that the position was different when *"special circumstances"* give rise to an individual right of action in respect of a transaction that affects the shareholder in its own right. This analysis is reiterated and expanded (particularly as regards the meaning of special circumstances) in [44] – [48] as follows:

> *"44.   ………the general rule is that minority shareholders do not (absent special circumstances) have standing to pursue a personal action to set aside or restrain an improperly motivated allotment of shares which would dilute their voting power. Any such breach of fiduciary duty would be actionable by or derivatively on behalf of the company, because the company in general meeting has the right to decide whether or not to affirm or disapprove the improper intra vires actions the directors have taken purportedly on behalf of the company.*
>
> *45.   What then potentially qualifies as special circumstances ousting this general rule? Clearly not the mere fact that a minority shareholder's voting power has been diluted………*
>
> *46.   ……….the special circumstances principle was perhaps most lucidly explained ……in Peskin-v-Anderson [where Mummery LJ said in a passage underlined by Mr. Justice Kawaley that directors' fiduciary duties owed to the company arise from the legal relationship between the directors and the company and that fiduciary duties owed to the shareholders do not arise from that legal*

*relationship. They are dependent on establishing a special factual relationship between the directors and the shareholders in the particular case.]*

47.   *This clear and cogent reasoning is entirely consistent with what I regard as the mainstream view of this somewhat bedeviled area of the law. The notion that some special relationship is required to result in directors owing fiduciary duties to individual shareholders as opposed to the company (i.e. the shareholders as a whole) has echoes for me of an analogous insolvency law rule. In the context of an insolvent company and challenges to antecedent transactions, it is well understood that the directors are generally liable to the company for breaches of duty, and it is only in special circumstances that directors are directly liable to creditors.*

48.   *It is in my judgment impossible to extract from any of the authorities cited before me support for the Plaintiff's counsel's ambitious submissions. Namely, that what I regard as a generic position of a minority shareholder facing a dilution of his voting power through an improperly motivated share allotment constitutes special circumstances giving rise to a fiduciary duty being owed to the shareholder on the directors' part."*

[underlining added]

(b).   Mr. Justice Kawaley's analysis appears to regard the key question as being whether minority shareholders have direct claims *against the directors*. Paragraph 44 says that the test for deciding whether and when minority shareholders have standing to pursue a personal action to set aside or restrain an improperly motivated allotment of shares is based on whether the special circumstances principle is satisfied. Paragraph 48 characterises the core submission made by counsel for the Plaintiff as raising the question of whether special circumstances, of the kind identified by Mr. Justice Kawaley, existed to justify the plaintiff's personal claim. Paragraph 46 then defines the nature of the requisite special relationship by reference to the judgment in *Peskin* where the test discussed is based on a direct relationship between director and shareholder which may generate, for example by reason of reliance or assumption of responsibility, a separate and independent duty to that owed to the company.

(c).   this, however, does not seem to me to be the right approach. The issue is not whether and when directors owe duties directly to shareholders. The minority shareholder in the present case is not making a claim or asserting a direct cause of action against the directors. The issue is whether and when a shareholder can bring proceedings against the company. Can a shareholder bring a claim in his own name - and therefore does he

have a personal claim - for a breach *by the company* of the statutory contract and the corporate constitution? The position (and the risk of confusion) is summarised by Professor Paul Davies in the recent third edition of his *Introduction to Company Law* (OUP, 2020) at page 282 (a textbook not cited by either Mr Lowe or Mr Flynn as it has only been published after the hearing but one based on the same authorities and arguments they relied on):

> "...[there] seems to have been... a failure by the courts to distinguish between two different aspects of a breach of the articles. If the directors fail to observe the articles they will be in breach of duty to the company...On the other hand, if the directors cause the company to act in breach of its articles, the company will be in breach of [the statutory contract] with the shareholders. In the first case, the company is the claimant and the individual can enforce the company's rights only if she has standing to bring a derivative action. In the second case, the individual shareholder is the claimant and the company is the defendant and the individual's standing to bring a derivative claim is simply irrelevant."

(d).    there is (and can be) no challenge to the basic point that the directors owe their duties to the company (absent an assumption of a direct duty to shareholders in particular circumstances). A breach of such duties will give the company a claim against the directors. But there is a further issue. Where the directors improperly exercise a power given to them by the corporate constitution to take action on behalf of the company, can *the company* be liable to a shareholder whose rights are adversely affected (or focussing on the remedial aspects, can the shareholder bring a claim against the company seeking declaratory relief that the exercise of the powers – the allotment – was unlawful and invalid)?

(e).    if the company can be so liable (can be in breach of the corporate constitution), it becomes necessary to consider when it becomes liable. Can the company be liable before another organ of the company has ratified and assumed responsibility for the improper actions of the directors? It would seem that since the improper action taken by the directors is only voidable (where not ultra vires the company), the action is to be regarded as effective and an act of the company unless and until set aside. Accordingly, the company is in breach of the articles and liable to be sued once the powers have been improperly exercised.

104.  It has been argued (and held, as we will see when I consider *Bamford* below) that a shareholder does not have a personal right to enforce all the provisions of the articles. This is the case where a breach of the articles can be characterised as a mere internal irregularity (which should be left to the majority of the shareholders to deal with either by ratification or action). But I note and agree with what is said on this issue by Professor Davies in the *Introduction to Company Law* (at page 281-282):

> "*Suppose a shareholder does wish to sue directly on the breach of the articles. As with individual claims against directors, the courts have adapted the shareholders' claims against the company to what they see as the exigencies of the company as a collective organisation…..[and] have generated two hurdles for the shareholder who wishes to enforce [the statutory contract] directly of which the first is [that only membership rights can be enforced and this is possibly justifiable] and the second is not and, indeed, is incoherent….[the passage quoted above then follows, being the second hurdle]…the courts have analysed what appear to be similar cases of breaches of the articles sometimes as a complaint of a mere internal irregularity (which can be put right by a decision of the majority of the shareholders i.e. they have applied common law derivative action reasoning)…Even worse the cases have failed to produce a reliable test for predicting which breaches of the articles will be regarded as giving rise to complaints of mere irregularities and which of rights. In principle, the individual shareholder should always be able to insist on correct procedure being followed unless it is clear that even if the proper procedure had been followed the outcome would have been the same. This last point can be catered for by the court not granting a remedy in any case where this is the situation, rather than by depriving the individual shareholder of the right to sue by reference to some ex ante and arbitrary categorisation of the articles into those generating rights and those not.*"

[underlining added]

105.  As a matter of principle:

   (a).   I, for my part, find Hoffmann J's analysis in *Sherborne Park* compelling. The shareholder's cause of action in the case of an improper allotment of shares is based on the statutory contract and is to be treated as a personal right because "*the wrong to the company is not the substance of the complaint. The company is not particularly concerned with who its shareholders are. The true basis of the action is an alleged infringement of the petitioner's individual rights as a shareholder.*" This might be classified as the real parties in interest analysis. Where the improper allotment directly affects the rights of a shareholder, and results in the increase in the shareholding of one shareholder (or group of shareholders) and the diminution of the shareholding of another shareholder (or group of shareholders), the real dispute is between the shareholders and it is the shareholders' rights, and not the company's

rights, that have been interfered with. This approach seems to me to be consistent with Professor Davies' analysis.

(b).  where the shareholders who have suffered from the improper allotment have control rights, even negative control rights, because they have a sufficient shareholding to block special resolutions the position is *a fortiori*. So even if it were right that improper allotments which did not affect control rights did not result in personal claims, such claims would arise where control was in issue. An interference with a shareholder's right to block special resolutions (to exercise negative control) by dilution of his shareholding seems to me to affect a core entitlement granted by the corporate constitution to the shareholder and the constitutional balance of power *between shareholders* thereby affecting fundamental rules regulating corporate governance. This is why Lord Wilberforce in *Howard Smith* referred to the use by directors of their fiduciary powers over the shares in the company for the purpose of destroying an existing majority, or creating a new majority which did not previously exist, which interfered with that element of the *company's constitution* which *is separate from* and set against their powers and King CJ followed him in saying that the indication in the authorities that a personal claim existed was clear where the challenged dilution had the effect of destroying an existing majority and creating a new one.

(c).  I find the analysis of King CJ in *Residues* persuasive (which does heavily rely on Hoffmann J's reasoning) and the suggestion that his judgment has been critically received as unfounded. Before Mr. Justice Kawaley, it was argued and Mr. Justice Kawaley accepted, that *Residues* had "*not exactly received a ringing endorsement*" and, by reference to one article in 1989, had been "*academically doubted*." However, that criticism seems to me to be overstated. I would note, for example, that it is cited without criticism in the latest (Australian) edition of Ford, Austin and Ramsay's *Principles of Corporation Law* (LexisNexis, 18th ed., 2018 at 10.235.15]). The judgment of King CJ seems to me to be right and to address in a convincing way most of the arguments against the existence of a personal claim (which is why I have quoted extensively from it and underlined the key passages above).

(d).  I note the hesitation in Gower and the authors' tentative argument (that perhaps the preferable view was) that acting for an improper purpose is an abuse of power but not a

breach of the articles. It seems to me that Lord Sumption's analysis in *Eclairs* supports a contrary conclusion. Lord Sumption (in the passage quoted and highlighted above) was discussing the use of the directors' powers for the purpose of influencing the outcome of a general meeting. This he said was not only an abuse of a power for a collateral purpose but also a breach of the company's constitution, because it involved the use of the board's powers to control or influence a decision which the company's constitution assigned to the general body of shareholders (and he cited *Fraser v Whalley* (1864) 2 H & M 10, being a case where the directors were restrained from exercising a power to issue shares for the purpose of defeating a shareholders' resolution for their removal). An improper allotment in order to dilute the shareholding of a shareholder with negative control also seems to me to result in a breach of the corporate constitution and the articles. It may not undermine the decision making process established by the corporate constitution quite as directly as the case where the allotment is designed to affect voting at a specific and forthcoming meeting but it does so nonetheless by affecting such shareholder's ability to block special resolutions and its voting at meetings which are no doubt in the contemplation of the board (and their associates) making the allotment. Furthermore, such an allotment affects the constitutional balance of power in the company.

106.  As a matter of authority, as I have said, I think the position is summarised well by King CJ in *Residues*. There are strong indications in the authorities, at least in cases where the dilution has the effect of destroying an existing majority and creating a new one, of the recognition of a personal right in a shareholder.

(a).  support for this analysis can be found from the various cases in which individual shareholders have been permitted to bring a claim, individually or as a representative of other shareholders and in which their standing to do so has not been challenged. I accept that, as Mr. Justice Kawaley explained, reduced weight is to be given to cases in which issues are either not decided either because there was no challenge to a claimant's standing or arguments or not part of or necessary to the court's decision and therefore *obiter*. But it does not follow that no weight is to be given to decisions in which a point is assumed to be correct and in which, if the point was considered to be doubtful, a challenge could have been expected and would have been an obvious point to take. The main cases I have in mind are the following:

(b).   in *Mutual Life v Rank* [1985] BCLC 11 (an authority which I drew to the attention of counsel during the hearing) there was no challenge to the standing of individual shareholders to bring a claim against the company (for damages) seeking to invalidate an alleged improper exercise of the power to allot shares (on the basis that an offer and allotment of shares discriminated against shareholders resident in the US and Canada in breach of the statutory contract contained in the company's constitution).

(c).   in *Fraser v Whalley* (1864) 2 H&M 10, 71 ER 361 (one of the earliest cases to challenge an improper issue of shares) Page Wood V-C indicated that a shareholder's right to challenge an improper share issue was not subject to company control and the rule in *Foss v Harbottle*. The case involved an issue of shares for the express purpose of creating votes to influence an upcoming general meeting. The court held that an injunction would be granted on an application by a shareholder to restrain the issue of such shares since the issue was not one relating to the internal management of the company, but an attempt on the part of the directors to prevent such management from being legitimately carried on. However, it appears that the shareholder plaintiff and his nominees were in effect the majority shareholders (they were said to control approximately £140,000 of the £240,000 of issued shares).

(d).   *Fraser v Whalley* was applied in *Punt v Symons* [1903] 2 Ch 506 where shares had been issued by the directors, not for the general benefit of the company, but for the purpose of controlling the holders of the greater number of shares by obtaining a majority of voting power. Byrne J said:

> "On the evidence I am quite clear that these shares were not issued bona fide for the general advantage of the company, but that they were issued with the immediate object of controlling the holders of the greater number of shares in the company, and of obtaining the necessary statutory majority for passing a special resolution while, at the same time, not conferring upon the minority the power to demand a poll. I need not go through the affidavits. I am quite satisfied that the meaning, object, and intention of the issue of these shares was to enable the shareholders holding the smaller amount of shares to control the holders of a very considerable majority. A power of the kind exercised by the directors in this case is one which must be exercised for the benefit of the company...... [in] Fraser v. Whalley......the directors of a railway company acted on an old resolution which authorized the issue of shares

*for a particular purpose. The particular purpose had ceased, and, the directors being afraid that at a general meeting they would be removed, were attempting to issue shares to enable them to be supported, and kept in office.........It is true that [Fraser v. Whalley] is a case relating to a railway company, and not to a company under the Joint Stock Companies Act, and it is also true that the plaintiffs were in time to prevent the issue of the shares in question; but the principle appears to me to apply. If I find as I do that shares have been issued under the general and fiduciary power of the directors for the express purpose of acquiring an unfair majority for the purpose of altering the rights of parties under the articles, I think I ought to interfere. I propose to grant an injunction, but to confine it to restraining the defendants from holding this confirmatory meeting.*

[underlining added]

(e).  in *Howard Smith* an individual shareholder was allowed to bring proceedings against the company, its directors and a bidder to challenge an allotment of new shares to the bidder. Two companies, Ampol (*A*) and Bulkships (*B*), held 55 per cent of the issued shares of Millers (*M*), which required more capital. A made an offer for all the issued shares of M, and another company, Howard Smith, announced an intention to make a higher offer for those shares. M's directors considered A's offer too low and decided to recommend that the offer be rejected. A and B then stated that they intended to act jointly in the future operations of M and would reject any offer for their shares. Howard Smith then applied to M for an allotment of 4.5 million ordinary shares; M's directors decided by a majority to make the allotment and immediately issued the shares. The effect of that issue was that M had much needed capital; A and B's shareholding was reduced to 36.6 per cent of the issued shares and H was in a position to make an effective takeover offer. A challenged the validity of the issue of the shares to H. A sued as plaintiff against fourteen defendants, which included Howard Smith, Millers and eleven directors or alternative directors of Millers.

(f).  I do accept, however, that Tianrui is going too far when it argued that *Sherborne Park* had been approved by the Court of Appeal in *Peskin* - the most that can be said is that it was referred to without disapproval.

107.  There is a further and important point on the authorities. The question arises as to whether *Bamford* (and *Hogg*) compel a different conclusion because they hold that in at least some cases the directors' breach of duty resulting from an improper allotment can be ratified and that because of the ability to ratify or actual ratification, the shareholder cannot sue to challenge the allotment;

(a).    in my view neither *Hogg* nor *Bamford* compel the conclusion that a shareholder is unable to
sue in his personal capacity. They do, I accept, raise the separate (and, as I have
characterised it, the second) question, namely whether such a personal claim can be defeated
by ratification (to which question I shall revert shortly).

(b).    *Hogg* supports the existence of the shareholder's personal (or at least a representative) claim.
In *Hogg* an individual shareholder suing in a representative capacity was allowed to bring
proceedings against the company and certain shareholders to challenge an allotment of new
shares – although he did not have standing to bring proceedings against the allottee to set
aside the allotment. The company's directors, after a general offer had been made to acquire
all the company's shares, acting in good faith and what they believed to be the company's
best interests, implemented a scheme whose purpose was to ensure that the bid would fail.
They established an employee share trust and issued preference shares to the trustees.
Attached to the shares was 10 votes per share on a poll. They also caused the company to
lend the purchase price to the trustees. As a result, the directors could rely on the support of
more than half the total votes at an EGM. Proceedings were commenced by a shareholder on
behalf of all but three of the shareholders against the company and those other three
shareholders, who were also directors. The plaintiff only sought declaratory relief (although
they did seek a declaration that would be binding on third parties). The plaintiff claimed and
Buckley J agreed that, on the true construction of the articles, the directors had no power to
attach the special voting rights to the shares issued to the trustees. But the plaintiff did not
thereby have the right to have the allotment set aside. That was a matter as between and for
the company and trustees. The plaintiff, whether suing on his own behalf or in a
representative capacity was not competent to procure the allotment to be set aside (264G –
265A). The plaintiff also claimed that the allotment had been made for an improper purpose.
Buckley J asked himself whether such a manipulation of the voting position was a legitimate
act on the part of the directors. He held it was not. The court would not permit directors to
exercise fiduciary powers in such a way as to interfere with the exercise by the majority
shareholders of their constitutional rights. It was not open to the directors to justify their
actions by saying that they genuinely believed that their seeking to prevent the majority
doing harm to the company (a majority was entitled to pursue what course it chose within the
company's powers provided it does not unfairly oppress other members). He also rejected

the defendants' challenge to the plaintiff's standing to bring the action, both with respect to the allotment on the one hand and the establishment of the trust and advance of the loan on the other. All were elements of one scheme whose primary object had been to deprive members who did not support the board of their position as a majority in the company. So a representative claim was justified even as regards the advance of the loans (the company's money) in respect of which the company would prima facie be the proper plaintiff.

(c).  in *Bamford* a claim by shareholders which they considered to be made in their personal capacity was not struck out on standing grounds and was allowed to proceed, subject to the ratification point, although the precise characterisation of the claim being made was not clearly dealt with. It appears that counsel for the plaintiffs argued that the shareholders were making a personal claim; counsel for the defendants argued that the plaintiffs were making a derivative claim that could have been challenged, but was not, on the basis that it did not come within an exception to *Foss v Harbottle* and that the Court of Appeal accepted that the claim was the company's claim for which the company was the proper plaintiff and for which ratification was available (although at first instance Plowman J regarded the action as a derivative action).

(d).  *Bamford* involved a family business owned and run by members of the Bamford family. The plaintiffs were Rupert and Anthony, who were shareholders. The first three defendants were Henry, Richard and John, shareholders and directors of the company. Proposals for an amalgamation had been received from another Bamford company (*JCB*), controlled by a cousin of the plaintiffs and defendants. The proposals had not been favourably received by the board. Nonetheless, JCB went ahead and made a bid to acquire all the company's shares. To defeat the bid, the directors allotted shares to the company's principal distributor, who was considered to be supportive. The plaintiffs issued a writ against the three defendants as directors, as well as the company and the distributor, claiming a declaration that the allotment was invalid (void) and of no effect on the ground that the directors in making the allotment had made it as a tactical move to block the bid from JCB (and so had acted in bad faith and from an improper motive). The case involved a trial of a preliminary point of law as to whether, assuming that the directors had acted in bad faith as alleged by the plaintiffs, the allotment was capable of being ratified by a general meeting of shareholders (and it was held

by the English Court of Appeal that any impropriety on the directors' part could be and had been waived by a majority of the votes of the shareholders at a general meeting).

(c).    the standing point was directly raised and the claim was not struck out on that ground. At first instance, the plaintiffs said that they were suing in respect of their own individual contractual rights so that the rule in *Foss v Harbottle* did not apply, and the defendants did not challenge that proposition (see the judgment of Plowman J at 217). In the Court of Appeal, counsel for the plaintiffs (the minority shareholders) argued (at 231D) that "*the rule in Foss v Harbottle [did] not preclude the bringing of these proceedings because the minority shareholders…. are suing in respect of their own individual contractual rights and also in a representative capacity to enforce their contractual rights, and therefore can bring these actions.*" Counsel for the directors argued (at 234F) that the directors could have challenged the minority shareholders' right to bring the representative action on the ground that it did not come within an exception to *Foss v Harbottle*.

(f).    Russell LJ said that the defence was not explicitly based on the argument that the claim was bad because it was a derivative claim which failed on *Foss v Harbottle* grounds. But it was closely related to the principles underlying *Foss v Harbottle*. The harm done by the improper allotment was done to the company and only the company could complain. He said as follows (at 242E-H):

> "*It is true that the point before us is not an objection to the proceedings on Foss v Harbottle grounds. But it seems to me to march in step with the principles that underlie the rule in that case. None of the factors that admit exceptions to that rule appear to exist here. The harm done by the assumed improperly-motivated allotment is a harm done to the company of which only the company can complain. It would be for the company by ordinary resolution to decide whether or not to proceed against the directors for compensation for misfeasance. Equally, assuming that the allottee could not rely upon Royal British Bank v Turquand…it would be for the company to decide whether to institute proceedings to avoid the voidable allotment; and again this decision would be one for the company in general meeting to decide by ordinary resolution. To litigate or not to litigate, apart from very special circumstances, is for decision by such a resolution. If, as I consider, the company could validly decide by ordinary resolution not to institute proceedings to avoid the voidable allotment – a resolution which could not possibly be said to contradict or alter the articles – it seems to me to support entirely the view that an ordinary resolution…. would be effective, having as it would the same purpose and effect as a resolution not to bring proceedings to avoid the allotment.*"