**[1998 CILR 148]**

**ISLENA DE INVERSIONES S.A. DE C.V. (trading as ISLENA AIRLINES)**

*v.*

**JEFFERSON and JEFFERSON TRAVEL SERVICES LIMITED**

*Grand Court*

(Harre, C.J.)

**22 April 1998**

*Agency—duties and liabilities of agent—duty to account—agent to keep detailed accounts of receipts and disbursements on principal's business and keep own finances separate*

*Agency—duties and liabilities of agent—liability to principal—moneys due to principal held on implied trust by agent if certainty of intention, subject-matter and beneficiary disclosed by agency agreement*

The plaintiff brought proceedings to recover moneys due to it under an agency agreement.

The second defendant company was appointed as the plaintiff airline's Cayman agent. Its role was to collect moneys from ticket sales, express letters and excess baggage charges and pay them to the plaintiff after deduction of its commission and overheads. The first defendant, who owned the agent company, agreed to account to the plaintiff for the balance on a regular basis.

The agreement was terminated without notice on the grounds, *inter alia*, that the first defendant had failed to send regular accounts and cash remittances and had made deductions from revenue for expenses payment of which had not been made. The first defendant had conducted his company's dealings with the plaintiff's baggage handling agent through an account in the company's name, which was substantially overdrawn.

The plaintiff commenced proceedings to recover the moneys not accounted for and the defendants counterclaimed for losses incurred due to wrongful termination of the agency agreement. It was found by the Grand Court, as a preliminary issue, that the agreement had been between the plaintiff and the second defendant.

The plaintiff submitted that (a) since the second defendant had agreed to act as its agent under the terms of the agreement, the relationship between them was a fiduciary one, so that revenue collected by the defendants was held on trust for the plaintiff until it had been accounted for; (b) it was the duty of an agent to keep money due to the plaintiff separate from its own funds and to be able at all times to show detailed accounts of transactions conducted on the plaintiff's behalf; (c) by exceeding the credit limit with the baggage handlers and making deductions from revenue for expenses payments which could not be proved to have been made, the defendants had acted in breach of trust and

EXHIBIT

_____1_____

148

were liable to the plaintiff for the sums claimed; and (d) furthermore, these and other breaches had justified the termination without notice of the agency agreement, and there could be no claim by the defendants for breach of contract.

The defendants submitted in reply that (a) the terms of the agreement with the plaintiff did not give rise to a fiduciary relationship and, provided that all receipts and disbursements were ultimately accounted for, it was for the first defendant to regulate his company's business dealings with others as he chose; (b) the first defendant had now provided a statement and full accounts as agreed; and (c) any moneys found still to be owing to the plaintiff were to be set off against damages due to the company for breach of contract resulting from the premature termination of the agreement.

**Held,** giving judgment for the plaintiff:

(1) The plaintiff had properly terminated the agency agreement without notice, since the first defendant, acting through his company, had committed serious breaches of the express terms of the agreement as well as failing to observe the implied duties of an agent to his principal. The plaintiff was therefore not in breach of contract (page 157, lines 10–15).

(2) Furthermore, notwithstanding that no express trust was contained in the agency agreement, it appeared from the case law that it was the practice in the airline industry for moneys received by an agent to be held on trust for his principal. A trust could be implied in this case since the agency agreement disclosed such an intention, the subject-matter was clearly the revenue which the defendants had agreed to collect, and the plaintiff was to be the beneficiary. The first defendant had failed to keep his company's moneys separate from the plaintiff's by exceeding the credit limit on accounts through which its agents were paid and by omitting to keep regular accounts and send remittances. Accordingly, the moneys unaccounted for were held on an implied trust for the plaintiff (page 155, lines 33–45; page 157, lines 16–30; page 160, lines 20–37).

**Cases cited:**

(1) *Boston Deep Sea Fishing & Ice Co. v. Ansell* (1888), 34 Ch. D. 339; [1886–90] All E.R. Rep. 65.

(2) *Canadian Pacific Air Lines Ltd. v. Canadian Imperial Bank of Commerce* (1987), 42 D.L.R. (4th) 375; 61 O.R. (2d) 233, *dicta* of Maloney, J. applied.

(3) *Royal Brunei Airlines Sdn. Bhd. v. Tan*, [1995] 2 A.C. 378; [1995] 3 All E.R. 97, followed.

(4) *Stephens Travel Serv. Intl. Pty. Ltd. v. Qantas Airways Ltd.* (1988), 13 NSWLR 331, followed.

*R. Henriquez, Q.C.* and *R.M. Clement* for the plaintiff;

*P. Lamontagne, Q.C.* and *G.W. Hampson* for the defendants.

**HARRE, C.J.:** By a letter dated August 2nd, 1991 the plaintiff, which operates an air service between George Town, Grand Cayman and Honduras, appointed new representatives in the Cayman Islands. That letter was addressed to Mr. John Jefferson Jr. of Jefferson Travel Services Ltd., George Town, Grand Cayman and read as follows:

> "Islena Airlines of Honduras, C.A. formally appoint you as representative of our airlines in the Cayman Islands as of August 30th, 1991.
>
> Islena Airlines will be conducting flights between Grand Cayman and La Ceiba, Honduras, and vice versa.
>
> Islena Airlines will pay Jefferson Travel Ltd. a 10% commission on all sales conducted by the above agency or your assistant, Mrs. Norma Jean Bennett, under the Cayman rules and Civil Aviation Regulations."

Mr. Wood is the President and General Manager of the plaintiff. I shall refer to the plaintiff as Islena and shall need to refer to other contemporary documents in some detail to indicate my view of the contractual arrangements between the parties.

A letter from Mr. Wood, dated the previous day, August 1st, 1991, relating to the appointment had been written to the Director of Civil Aviation. It read as follows:

> "Islena Airlines has decided to change its representative from Mr. Graham Thompson to Mr. John Jefferson Jr. and his assistant Mrs. Norma Jean Bennett (Jefferson Travel Services Ltd.) as of August 30th, 1991.
>
> I also request that you give Mr. Jefferson all the assistance you have rendered to our past agent, Mr. Thompson, to continue serving the Cayman Islands, with our airlines services uniting your country with Honduras and Latin America."

There was a further letter dated August 29th from Mr. Wood to the Acting Director of Civil Aviation, Mr. Pat Johnson, in the following terms:

> "I wish to confirm my request to have my permit No. 19/1991 reissued on No. 6 of said permit to read as our local representative Mr. John D. Jefferson Jr. (of Jefferson Travel Services Ltd.) to represent Islena Airlines as our new agent in the Cayman Islands as of August 30th, 1991: All others points should remain the same.
>
> If there is no inconvenience to you in this matter, we hope our request will be approved immediately."

There is an issue as to whether the appointment was for Jefferson Travel Services Ltd., Mr. John Jefferson Jr., or both. The present case concerns the termination of the agreement and its consequences.

The plaintiff's principal witness was Mr. Arturo Wood. He described the nature of the arrangement between the parties, and this is common ground to the extent which I now describe. Revenue was collected by the agent from ticket sales, express letters and excess baggage charges. From

the gross revenue the agent was entitled to deduct 10% commission and office expenses. There was some disagreement as to the extent of the latter entitlement but it is not significant. It was the agent's responsibility to pay from revenue banking fees, the price charged by Texaco for aviation fuel, and the cost of general services by Cayman Airways ("CAL") such as baggage handling and the checking in of passengers. CAL was responsible for collecting excess baggage charges and passing over the money to the agent.

According to Mr. Wood, the weekly balance was to be accounted for to Islena in a report. Mr. Jefferson's evidence was that that arrangement was changed to once every two weeks. In the event, neither arrangement was complied with. The evidence of Mr. Wood, which I believe, was that after a while his accountants repeatedly came to him asking him to speak to Mr. Jefferson to find out why the weekly reports and cash remittances were not arriving on time. Matters took a more serious turn in 1994. A letter dated February 9th, 1994 was sent in the following terms to Mr. Wood in Honduras by the Director of Civil Aviation in Cayman:

> "I refer to my fax of February 3rd, 1994 and write to confirm that the Civil Aviation Authority has no objection to Islena's proposed schedule effective from February 12th, 1994. However, we do note that your operating permit issued by the Air Transport Licensing Authority expired on December 31st, 1993. Please ensure that you received the necessary permits from the ATLA for your operation."

At the foot of the letter was the following hand-written note from Mr. Wood to Mr. Jefferson:

> "Please have an interview with ATLA at Civil Aviation concerning the above letter, follow-up and advise you are Islena representative and can sign for me."

The annual licence renewal was also the subject of a letter dated March 3rd, 1994 addressed to Mr. Jefferson by the Secretary of the Air Transport Licensing Authority. It approved his application dated March 1st and contained the following passage:

> "A sum of CI$700 or US$853.65 must be paid to the Civil Aviation Authority in respect of Air Operations Permit within 30 days, or this approval will become void."

No payment was made until after the agency agreement was terminated. Nevertheless, the agent's report to Islena dated April 30th, 1994 showed a deduction of $853.65 in respect of the "Islena Licence." Mr. Jefferson's explanation for this was that the payment had simply been overlooked. On any view, the failure to attend to such an important matter as the payment of the Air Operations Permit fee, even after reminders and the warning in the letter dated March 3rd from ATLA, was a serious default.

The next significant event took place some time in May 1994. Mr. Wood's evidence is that he was visited in Honduras by three officials of CAL—Mr. Mike Adams and two of his assistants, Mr. Watler and Mr.

5     Bodden. Their visit concerned amounts which they said were owed by Islena for ground-handling charges. Mr. Wood's response was to produce the agent's reports showing that the money had been deducted in Cayman. On seeing these, Mr. Adam refused to accept money from Mr. Wood and said he would take the matter up with Mr. Jefferson on his return to Cayman.

10    When giving evidence, Mr. Jefferson questioned whether Mr. Adams and his colleagues had visited Honduras in this way at all, but conceded that he had no knowledge one way or the other. There being no evidence to the contrary, I accept Mr. Wood's account.

15    Another issue between the parties arose in May 1994. On May 11th, Mr. Jefferson had written—on paper headed "John D. Jefferson Jr., MLA" but signed "John D. Jefferson Jr., MLA, Jefferson Travel Services Ltd., President/Chairman"—to the Airport Manager of CAL. It notified him that "*we* have agreed to allow Air Agencies Ltd. to serve as *our* customer and ground-handling agent." [Emphasis supplied.] Various complaints were set out in the letter as factors influencing the decision.

20    On receipt of a copy of this, Mr. Wood sent a fax to Mr. Jefferson saying that he urgently needed to talk with him about Air Agencies. His evidence was that he was so concerned that he wrote the message himself rather than getting his secretary to type it. On the same day, May 11th, 1994, Mr. Wood sent the following message to Mr. Jefferson with a copy to CAL:

   "No instructions from this office have been issued to you, or to Air Agencies Ltd. for ground services for Islena Airlines.

25    I have instructed via phone Mr. Mike Adams to continue giving my airline the necessary assistance while operating to and from the Cayman Islands. Please bring up to date all charges that you owe Cayman Airways for their services and also your balance to Islena Airlines. That is long overdue.

30    I will be travelling to Grand Cayman very shortly to take care of all matters personally."

      There were two more letters on this topic dated May 12th from Mr. Jefferson. One was to Mr. Wood and the other was to Mr. Adams of CAL. In each he referred to his dissatisfaction with the service provided by
35    CAL and also acknowledged that sums were due to CAL for handling charges. He disputed the amount but offered to make arrangements to pay once the correct amount had been determined.

      There is also correspondence addressed to Mr. Jefferson from the general accountant of Islena during May 1994, culminating in the
40    following on June 1st:

   "I'm to remind you again that you have not sent any sales transaction reports for the month of May, and haven't added interest to the value subtracted for the copy machine and the air conditioning, so please send me the transactions for May and the value subtracted.

45    Thank you for your attention."

Matters came to a head during the first week of June. On June 3rd, Mr. Wood wrote to Mr. Jefferson as follows:

> "With effect from June 4th, 1994, I have taken the decision to relieve you from the responsibility as Islena Airlines' representative in the Cayman Islands.
>
> Past correspondence between you and Cayman Airways and outstanding bills has forced me to take this step.
>
> Please bring up to date all moneys you have for Islena Airlines, and also accounts outstanding to Cayman Airways and all others."

Mr. Wood and a colleague visited the office of Jefferson Travel Services Ltd. and removed records relating to the Islena agency. Mr. Jefferson's response is to be found in the following two letters which he wrote to Mr. Wood on paper headed "John Jefferson Jr., MLA." They are dated respectively June 4th and July 10th, 1994:

> "June 4th, 1994
>
> I refer to your letter of June 3rd, 1994 advising of the decision to terminate the agreement of me acting as the local agent of Islena Airlines. Our records indicate that all revenue from ticket sales and excess baggage has been accounted for and reported, with the exception of three weeks in May and the one flight in June 1994. While serving as your agents we have accomplished the following on behalf of Islena Airlines:
>
> 1. Improved the service and reputation of the airline locally among passengers; and
>
> 2. Achieved a monopoly for the airline on the La Ceiba to Grand Cayman route.
>
> Our plan of action was to give adequate notice and resign as agents with effect from August 31st, 1994, because we have not made any money as agents, and I refuse to work with unprofessionals like yourself. I have witnesses that have overheard you make remarks accusing my sister Norma Jean Bennett and myself of stealing from you, when there is no evidence to indicate that this is true. We both have good reputations locally and I am not prepared to let you or anybody else tarnish our reputations by irresponsible and careless remarks.
>
> As you are aware, our agency agreement called for notice with respect to termination by either party. I am prepared to accept an early termination of our agreement under the following conditions:
>
> 1. We are given US$30,000 in cash or credit against funds owed to Islena Airlines;
>
> 2. US$50,000 and a written letter of apology concerning remarks made by yourself with respect to the honesty/reputation of my sister, Norma Jean Bennett, and myself;
>
> 3. We are allowed to retain all assets acquired for office purposes since September 1990, when we took over as your agents.

     "If you continue to insist on the early termination of our agreement and fail to agree to the conditions as set out above, then I will have no alternative but to write to the Airport Transport Licensing Authority requesting termination of the licence granted to Islena Airlines which permits the airline to fly into the Cayman Islands, on the grounds of your being an undesirable person for doing business in these Islands. I will also bring a case against you before the courts on slander charges with respect to your recent remarks concerning the honesty, integrity and reputation of my sister, Norma Jean Bennett, and myself. Please advise me as soon as possible of your decision on these matters."

     "July 10th, 1994

     Further to my letter of June 3rd [*sic*], 1994, in which was mentioned certain penalties if our agency agreement was terminated without the required notice, there was also a claim with regard to slander concerning my reputation and that of my sister, Norma Jean Bennett. As the conditions have not been complied with within the time frame given, I hereby provide you with a final accounting as of July 10th, 1994:

|  | US$ |
|---|---|
| Ticket sales | 21,510.50 |
| Excess baggage revenue | 3,527.50 |
| Letter revenue | 1,775.00 |
| Photocopier/AC | 4,751.47 |
| Difference on manifest 7/5/94 | 1,998.80 |
| Balance due on manifest 27/5/94 | 6,914.05 |
| Total revenue due | 40,477.32 |
|  |  |
| Less: Rent (June, July, Aug.) | 1,250.01 |
| Less: 10% Commission | 3,372.69 |
| Less: Fax/Telephone | 523.57 |
| Net revenue due Islena Airlines | 35,331.05 |
|  |  |
| Final Position |  |
| Personal severance fees | 30,000.00 |
| Slander claim for comments made with respect to the honesty of myself and my sister, Mrs. Norma Jean Bennett | 50,000.00 |
|  | 80,000.00 |
| Less: Amount due Islena Airlines | 35,331.05 |
| Amount due to John D. Jefferson | 44,668.95 |

     I have made separate arrangements with Cayman Airways to repay what is owed to them by Jefferson Travel Services Ltd. for handling charges. You have until July 24th, 1994 to have the funds due to myself paid. Otherwise I will take legal proceedings

against you in court on slander charges and also submit a recommendation to the Airport Transport Licencing Board to have Islena Airlines' charter to fly to Grand Cayman cancelled. I look forward to receiving your check in settlement in due course."

5   These letters speak for themselves. It suffices for present purposes to say that Mr. Wood was not intimidated. His response dated July 15th enclosed documentation on the basis of which he claimed $59,897.78. Proceedings were issued on September 19th, 1994.

Before going to the issues pleaded, I now refer to the evidence of Mr. 
10  Jefferson. His evidence about the financial arrangement which he had made with CAL accords with that of Mr. Wood about what Mr. Jefferson told him. He had opened an account with CAL on behalf of Jefferson Travel for handling fees incurred, with a credit limit of $5,000. That, Mr. Jefferson said, was so that the fees could be paid when the statement of 
15  what was owing was received by CAL which might be up to six weeks after the transaction concerned. He asserted that this arrangement was made with CAL and the money was owed by Jefferson Travel Services Ltd. to CAL and not by Islena, and he did not know why CAL would go to Islena. I shall refer to the way in which that was pleaded later. Mr. 
20  Jefferson also testified that the arrangement with Islena was with Jefferson Travel Services Ltd., not him personally. Having reviewed the correspondence and the course of dealing between the parties, I accept that.

Aspects of the arrangements which Mr. Jefferson explained included 
25  the practice of accepting fares and refunding cash to customers, the receipting of amounts paid for transporting letters and their inclusion on the manifest and the agent's responsibility for renewal of Islena's annual licence. He said that he had released to the plaintiff's attorneys all documents for which they had asked and acknowledged that he had given 
30  a draft for US$10,000 dated June 3rd, 1994 to Mr. Wood on the following day and that if his counterclaim were not taken into account there would then still have been money owing to Islena.

Everything, he said, was properly accounted for. He was taken through the documents to which I have referred and others, and did not dispute 
35  their authenticity. When cross-examined, he acknowledged the correctness of the figures pleaded by the plaintiff and sought to justify his credit arrangements with CAL and the increase of the indebtedness of Jefferson Travel above the agreed limit, saying that if he took care of the liability it was no business of Islena and in no way affected its operation. I do not 
40  accept that. If the money deducted from revenue had been properly paid over there would have been no excess debit balance. He acknowledged that certain business expenses had been paid out of revenue received and asserted that these related to commission to which the agent was entitled. He did not, however, "audit" the amounts weekly or monthly or, as he put 
45  it, "penny by penny."

There was evidence from Mr. Jefferson that after Mr. Wood and his colleague had collected the documentation on termination of the agreement an envelope of tickets representing a substantial amount of money which had not been reported was discovered. On June 3rd, 1994 he and Jefferson Travel had the ability to pay in full, but he refused to do so because of the way in which the agreement had been terminated. He insisted that a three-month notice period had been agreed. He acknowledged that he was Chairman and President of Jefferson Travel Services Ltd. and personally kept the account with Islena, that if (which he denied) he had paid out funds in excess of his 10% commission otherwise than in accordance with the agreement, they would be Islena funds and that would be improper, and that on June 3rd, 1994 money was owed to Islena and to CAL and that both the CI$ and US$ accounts of Jefferson Travel Services Ltd. were overdrawn.

I seek to summarize the plaintiff's pleaded claims as follows. They relate to moneys which it says were deducted from remittances to it and shown as having been paid on sales returns when they were not so paid, and failure properly to account for and pay moneys due to the plaintiff for the period April 8th, 1994 to June 3rd, 1994 at all. Particulars of these were set out in the statement of claim and were analysed and described as Schedules A, B and C in a report prepared for the plaintiff by an accountant, Mr. Julian Campbell, who at the material time worked for the firm of Moore Stephens. It was conceded that the figures contained in these particulars were accurate or, at any rate, substantially so.

It is denied in the amended defence and counterclaim that the first defendant, Mr. Jefferson, was a party to the agreement at all, that there was any trust in relation to moneys received or any obligation to hold them in a separate account, that the plaintiff's termination of the contract was lawful, that sums were fraudulently retained and that moneys owed by the plaintiff to CAL for handling charges were wrongfully retained. The defendants deny that anything is owed to the plaintiff, and the second defendant counterclaims for loss it alleges that it incurred by reason of the alleged wrongful termination of the agreement without notice. That is particularized as 10% of the plaintiff's ticket sales, express letter and excess baggage charges from June 5th, 1994 to September 4th, 1994. There is a claim for an account for this period and an alternative claim for damages for wrongful determination of the agreement. Finally, set-off is claimed.

The case therefore turns upon the resolution of a number of questions of law. They are these:

1. With what party or parties did the plaintiff conclude its agreement—John Jefferson Jr. or Jefferson Travel Services Ltd. or both?

2. What was the period of notice of termination applicable to the agreement?

3. Was the plaintiff entitled in any event to terminate the agreement without notice by reason of breach?

4. Did the agreement give rise to a trust or merely a debtor/creditor relationship?

5. What will be the appropriate orders in relation to any sums found to be owing?

With regard to the first issue, I have already expressed my finding that the agreement was concluded with Jefferson Travel Services Ltd. and not with Mr. Jefferson personally.

With regard to the second and third issues, I find that the period of notice applicable to the contract, whether by express agreement or by implication of a reasonable period, was three months. However, the breaches of the agreement revealed by the evidence were of such a serious nature that the plaintiff was justified in terminating it without notice.

With regard to the fourth issue, it is common ground that the existence or otherwise of a trust depends on the terms of the agreement. Each party relied on a number of the same authorities but drew very different conclusions from them. It is, I think, well established that the duties of an agent include the following:

> "It is the duty of an agent
>
> (a) to keep the money and property of his principal separate from his own and from that of other persons;
>
> (b) to preserve and be constantly ready with correct accounts of all his dealings and transactions in the course of his agency;
>
> (c) to produce to the principal, or to a proper person appointed by the principal, all books and documents in his hands relating to the principal's affairs." (See *Bowstead on Agency*, 15th ed., art. 51, at 191 (1985)).

*Boston Deep Sea Fishing & Ice Co.* v. *Ansell* (1) was cited by the plaintiff for the proposition, which is conceded, that where a principal dismisses an agent, even if he does not know of all the agent's derelictions at the time, he can rely on what he discovers afterwards. With regard to other aspects of that case, I shall simply say that I shall not be making orders for refunds of commission under paras. 5 and 6 of the statement of claim.

I therefore turn next to three modern cases. All involved arrangements between airlines and travel agents. In *Stephens Travel Serv. Intl. Pty. Ltd.* v. *Qantas Airways Ltd.* (4), the facts, as taken from the headnote to the case in the *New South Wales Law Reports* (13 NSWLR at 331) are as follows:

> "Qantas as a member of the International Air Transport Association (IATA) was party to a travel agency contract, the terms of which provided, inter alia, that airline tickets and transportation orders owned by Qantas could be sold and issued by the travel agent

for Qantas and [the contract] specifically provided that unless already accounted for 'all moneys collected by the agent for transportation and ancillary services sold under this agreement . . . shall be the property of the carrier and shall be held by the agent in trust for the carrier or on behalf of the carrier until satisfactorily accounted for to the carrier and settlement made . . . .'

Incorporated into the contract by the adoption of Sales Agency Rules were machinery provisions for the payment by the agent of moneys received by it for tickets issued by it, at fortnightly intervals, to a clearing bank and to be paid by that bank to Qantas.

The agent paid moneys received by it for airline tickets and transportation orders into an overdraft account with its bank; each fortnight it drew on this account for payment to Qantas. The bank refused to pay on one such cheque, closed the account, appointed receivers and used what moneys were in the account in reduction of its overdraft.

Moneys received for tickets and transportation orders after the appointment of receivers were paid into a trust account in the joint names of the receivers and the administrator appointed under the *Travel Agents Act* 1973.

Qantas sought to recover all moneys received by the agent and the receivers for airline tickets and transportation orders not accounted for.

*Held:* (1) Where parties have agreed that legal and equitable rights and remedies should co-exist in the one transaction, the court will give effect to that agreement . . . .

(2) Having regard to the terms of the travel agency contract the moneys received by the travel agent in respect of tickets issued by Qantas (in respect of which or to the extent to which Qantas had not been paid) were to be held on trust by the travel agent . . . ." In *Canadian Pacific Air Lines Ltd.* v. *Canadian Imperial Bank of Commerce* (2) the arrangements between the parties were substantially similar. As noted by Maloney, J., the case reduced to two primary issues which he described as follows (42 D.L.R. (4th) at 378–379):

"The plaintiff's position is that the relationship is one of principal and agent, with an express trust created by the agreement, requiring proceeds of ticket sales to be held in trust for CP. The financial statements of the agents (which were seen by the bank) do not show ticket sales as income. The only income recorded thereon is commission income. Also, the agreement provides that the blank ticket stock remains the property of CP until sold.

The defendant CIBC argues that the relationship is not fiduciary but rather debtor-creditor, the three certainties of a trust relationship not being present. The agreement provides, in subpara. 16(a), that the agent must remit to the airline the price of all tickets sold,

regardless of how much of that price the agent eventually collects. The defendant argues that this renders the agency a mere debtor to the airline, responsible only to pay it a specified sum of money from an unspecified source. In order for a trust relationship to exist, argues the bank, the source of the trust must be certain, as otherwise there is no certainty as to the subject-matter of the trust."

Sub-paragraph 16(b) of the agreement provided as follows (*ibid.*, at 377):

". . . 'All money collected by the agent for transportation and ancillary services sold under this Agreement, including applicable commissions which the Agent is entitled to claim thereunder, shall be the property of the Carrier and shall be held by the Agent *in trust* for the Carrier or on behalf of the Carrier, until satisfactorily accounted for to the Carrier, and settlement made.'"

As Maloney, J. observed, in order to constitute a trust, an arrangement must have three characteristics, known as the three certainties: certainty of intent, of subject-matter and of object. He found that the agreement in sub-para. 16(b) was certain in its intent to create a trust, the subject-matter was to be the funds collected for ticket sales and the object (or beneficiary) of the trust was also clear—it was to be the airline. The necessary elements for the creation of a trust relationship were all present and Maloney, J. so found.

The most recent of the cases and the highest of the authorities on which the plaintiff relied was *Royal Brunei Airlines Sdn. Bhd.* v. *Tan* (3). The facts were that the plaintiff airline appointed as its agent in a particular area for the sale of passenger and cargo transportation, a company of which the defendant was the managing director and principal shareholder. Under the agreement the company was to hold money received from such sales in trust for the airline until it was accounted for by the company to the airline. With the defendant's knowledge and assistance, the company paid the money into its current bank account instead of into a separate account and, in breach of trust, the company used that money for its own business purposes. The company failed to pay to the airline sums due within the time specified by the agreement. The airline terminated the agreement and, the company having become insolvent, commenced proceedings against the defendant to recover the money owed by the company.

The judge held that the defendant was liable as constructive trustee to pay that amount to the airline. On appeal, the Court of Appeal of Brunei Darussalam reversed that decision, holding that the defendant could not be so liable because it had not been established that the company was guilty of fraud or dishonesty in relation to the money held in trust for the airline. On the airline's further appeal to the Judicial Committee of the Privy Council, it was held, allowing the appeal, that where a third party dishonestly assisted a trustee to commit a breach of trust or procured that he do so, the third party would be liable to the beneficiary for the loss

occasioned by the breach of trust, even though the third party had received no trust property and irrespective of whether the trustee had been dishonest or fraudulent.

In the context of such liability, honesty was to be judged objectively, and acting dishonestly, or with a lack of probity, which was synonymous, meant not acting as an honest person would act in the circumstances and could usually be equated with conscious impropriety as distinct from inadvertent or negligent conduct or carelessness—although a third party might be acting dishonestly if he recklessly disregarded the rights of others. The third party's conduct had to be assessed on the basis of his actual knowledge at the time and not on what a reasonable person would have known or appreciated, and regard could be had to his personal attributes including experience and intelligence and the reason for his acting in that way. Accordingly, since the defendant had caused or permitted the company to commit a breach of trust by using, in the conduct of its business, money held in trust for the airline, when he knew that the company was not authorized to do so by the terms of the trust, the defendant had acted dishonestly and was therefore liable to the airline for the amount owed to it by the company.

The judgment of their Lordships was delivered by Lord Nicholls of Birkenhead and contained this telling passage ([1995] 3 All E.R. at 106):

> "In most cases there is little difficulty in identifying how an honest person would behave. Honest people do not intentionally deceive others to their detriment. Honest people do not knowingly take others' property. Unless there is a very good and compelling reason, an honest person does not participate in a transaction if he knows it involves a misapplication of trust assets to the detriment of the beneficiaries."

In each of the three cases to which I have just referred, the establishment of a trust was an express term of the agreement. In that respect all are distinguishable from the present case. Nevertheless, having reviewed the nature of the arrangements between the parties against the background of industry practice in different parts of the world which these cases reveal, I find that the three certainties were present and that a trust existed. The first defendant acted dishonestly in causing or permitting the second defendant, the company in which he was the controlling mind, to commit breaches of trust and I find both defendants to be liable to the plaintiff.

*Judgment for the plaintiff.*

*Ritch & Conolly* for the plaintiff; *Quin & Hampson* for the defendants.