**[1999 CILR 126]**

**IN THE MATTER OF OMNI SECURITIES LIMITED (No. 4)**

*Grand Court*

(Smellie, C.J.)

**31 March 1999**

*Civil Procedure—pleading—amendment—time-barred claims—new cause of action barred by Limitation Law (1996 Revision), s.41(3) is new allegation of new loss or injury for which new remedy sought—alleged breach of contract or duty of care may be new claim even though coincided in time with breaches already pleaded and in same legal category*

*Civil Procedure—pleading—amendment—time-barred claims—no leave to amend under Grand Court Rules, O.20, r.5(2) and (5) to introduce otherwise time-barred claim if minimal overlap with issues already pleaded and extensive new factual inquiries required to answer allegations*

*Civil Procedure—pleading—amendment—time-barred claims—leave granted to amend under Grand Court Rules, O.20, r.5(2) and (5) to restore abandoned cause of action outside limitation period if original case reasonably pleaded upon legal advice and amendment in interests of justice—potential disruption to proceedings and closeness to trial date to be balanced against benefit to plaintiff in raising all relevant matters*

The plaintiff brought an action to recover damages from the defendants for breach of contract and negligent misstatement in the preparation of audit reports.

The second defendant, DH&S (Cayman), was appointed as the

EXHIBIT

5

accounts and answered various statutory inquiries, and the preparation of the annual audit report was carried out by its associated firm in Switzerland, the eighth defendant, D&T (Zurich). In proceedings against the two firms and their various partners following the plaintiff's liquidation, it alleged in its statement of claim that DH&S (Cayman) had acted in breach of its contract and that both firms had breached their duty of care in tort in failing to alert it to the financial consequences of unsecured loans which it had made to or obtained on behalf of other affiliated companies during 1988 and 1989. The plaintiff claimed for losses in relation to these loans and to payments made after the issue of the 1989 audit report to the owner of the Omni Group, Werner Rey, and private companies owned by him. The general endorsement on the writ included a claim in contract against D&T (Zurich) which was omitted from the statement of claim.

The plaintiff applied to amend its statement of claim (i) to correct or clarify factual matters, (ii) to allege (outside the statutory limitation period) breach of contract by D&T (Zurich) and its principals, (iii) to include claims (also potentially time-barred) for further losses arising from loans or advances to Rey and his private companies during 1988 and 1989, and (iv) to allege that since these transactions were unauthorized by its board and since Rey was a shadow director or agent of the company, they were performed in breach of fiduciary duty and contrary to Cayman law.

The plaintiff submitted that (a) the further claims in respect of the Rey transactions did not represent new causes of action for the purposes of s.41(1) and (3) of the Limitation Law (1996 Revision), since they were merely further examples of, and had occurred simultaneously with, causes of action already pleaded, namely, breach of contract and negligence; (b) even if the claims did constitute new causes of action, which were time-barred, the court should grant them leave to amend their pleading under the Limitation Law (1996 Revision), s.41(4) and (5) and the Grand Court Rules, O.20, r.5(2) and (5), since the losses had arisen from the factual circumstances already pleaded; (c) although the contractual claim against D&T (Zurich) had been omitted from the statement of claim upon erroneous advice, it had not been abandoned and could now be restored, since the defence alleged that a contractual relationship existed between D&T (Zurich) and the plaintiff's parent company, and therefore no great inconvenience or expense would be occasioned in answering the claim; and (d) the remaining amendments would simply correct or further particularize existing claims.

The defendants submitted in reply that (a) the claims arising from the Rey transactions did not fall within the causes of action already pleaded even though they arose at the same time and were founded in contract and tort; (b) therefore these new causes of action, which were time-barred under the Limitation Law, could not now be pleaded and the court should not grant the plaintiff leave to do so under s.41(4) and (5) and O.20, r.5(2) and (5), since the alleged breaches of duty and resulting losses raised

issues which did not overlap with those pleaded; (c) the plaintiff should not now be permitted in response to D&T (Zurich)'s defence to allege that that firm had a contract with it, having staunchly denied that this was the case in related proceedings and having abandoned the claim as outlined in the writ; and (d) the addition of this claim (also time-barred) would cause unwarranted disruption to the time-tabling of the proceedings.

**Held,** making the following rulings:

(1) The plaintiff would be refused leave to amend its statement of claim to include claims in respect of the Rey transactions outside the limitation period, since they amounted to new causes of action for the purposes of the Limitation Law (1996 Revision), s.41(1) and (3). A new cause of action was defined as a new allegation giving rise to new loss or injury and for which a new remedy was sought, and since no claim had previously been made in respect of the Rey transactions during 1988–89, these were new claims in every respect, notwithstanding that the alleged breaches had coincided in time with those already pleaded and fell within the ambit of breach of contract and tort. Furthermore, the court had no jurisdiction to allow these amendments under O.20, r.5(2) and (5) of the Grand Court Rules as read with s.41(4) and (5) of the Law, since there was insufficient similarity between the factual issues now raised and those already pleaded, and the proposed amendments would require the defendants to answer new allegations relating to, *e.g.* shadow directorship, breach of fiduciary duty and agency, necessitating extensive and onerous new factual inquiries (page 133, lines 36–43; page 135, lines 3–9; page 136, line 14 – page 137, line 6; page 138, lines 15–36; page 139, line 23 – page 140, line 10).

(2) However, the plaintiff would be permitted to restore its claim in contract against D&T (Zurich) even though time-barred, since it arose from facts similar to those already pleaded and it was in the interests of justice that it should be revived. As the plaintiff had acted reasonably and diligently in pleading its case, given the different contractual positions adopted by both parties at different times in the history of the case, the fact that it had decided upon legal advice not to include the claim in the original statement of claim did not mean that it could not be added later. The court, in the exercise of its discretion, had to balance the interests of the plaintiff in raising all arguable issues for the court's consideration at trial, against the burden on the defendant of responding to the restored claim, any consequent disruption to the proceedings and whether any such disruption could be adequately compensated for by an order for costs against the plaintiff. The closer to the proposed trial date, the more disruptive such amendments were likely to be. Since the amendment could be made in this case without injustice to the defendant or other litigants from delay, the court would allow it (page 143, line 6 – page 144, line 4; page 145, lines 16–33; page 146, lines 22–42).

**Cases cited:**

(1) *Cellular Clothing Co. Ltd. v. G. White & Co. Ltd.* (1952), 70 R.P.C. 9, not followed.

(2) *Hydrocarbons Great Britain Ltd. v. Cammell Laird Shipbuilders Ltd. (No. 2)* (1991), 58 BLR 123, considered.

(3) *Hydrodam (Corby) Ltd., Re,* [1994] 2 BCLC 180; *sub nom. Re Hydrodan (Corby) Ltd.*, [1994] BCC 161.

(4) *Johnson v. Deloitte & Touche A.G.*, 1997 CILR 120.

(5) *Leicester Wholesale Fruit Market Ltd. v. Grundy (No. 2)* (1990), 53 BLR 6, *dicta* of Glidewell, L.J. applied.

(6) *Letang v. Cooper*, [1965] 1 Q.B. 237; [1964] 2 All E.R. 929.

(7) *Marshall v. London Passenger Transp. Bd.*, [1936] 3 All E.R. 83, *dicta* of Lord Wright, M.R. applied.

(8) *Steamship Mutual Underwriting Assn. Ltd. v. Trollope & Colls (City) Ltd.* (1986), 33 BLR 77; 6 Con. L.R. 11, followed.

(9) *Sterman v. E.W. & W.J. Moore*, [1970] 1 Q.B. 596; [1970] 1 All E.R. 581, not followed.

(10) *Swiss Bank & Trust Corp. v. Iorgulescu*, 1994–95 CILR 149, applied.

(11) *Welsh Dev. Agency v. Redpath Dorman Long Ltd.*, [1994] 1 W.L.R. 1409; [1994] 4 All E.R. 10.

(12) *Worldwide Corp. Ltd. v. G.P.T. Ltd.*, English Court of Appeal, December 2nd, 1998, unreported, *dicta* of Waller, L.J. applied.

**Legislation construed:**

Grand Court Rules, O.20, r.5: The relevant terms of this rule are set out at page 134, line 31 – page 135, line 2.

Limitation Law (1996 Revision) (Law 12 of 1991), s.41: The relevant terms of this section are set out at page 134, lines 1–29.

Insolvency Act 1986 (c.45), s.214(7): The relevant terms of this sub-section are set out at page 139, lines 17–18.

s.251: The relevant terms of this section are set out at page 139, lines 13–15.

*A. Turner* and *D.T.J. McCahill* for the plaintiff;

*J. Smouha* and *G.F. Ritchie* for the eighth defendant;

*N.R.L. Clifford* for the first to seventh, ninth and tenth defendants.

**SMELLIE, C.J.:** We have now reached the point along the meandering course of this very complex case at which the plaintiff seeks leave to amend its statement of claim.

Notwithstanding that the amendments would affect more than 80 paragraphs and sub-paragraphs of the present pleading, the plaintiff contends that only one provision—that in the proposed new para. 17A which seeks to add a claim in contract against the eighth defendant

("D&T (Zurich)")—raises a new cause of action. The rest, Mr. Turner submitted, are simply intended to clarify and particularize the causes of action already pleaded and although they give rise to a claim for loss (for approximately SFr. 14.5m.) not previously pleaded, that that claim arises from 5 the factual circumstances already pleaded and so should be allowed. The loss derives from transactions in 1988 and 1989 which appear in the plaintiff's ledgers for those years and which relate to Mr. Werner Rey and are referred to as "the Rey transactions." The context will be explained below.

10   Many of the proposed amendments do not attract criticism. There are others which have drawn objection from the defendants but which I accept can readily be regarded as intended only to particularize the existing claims. Examples are in the proposed re-drafted paras. 22A and 22B. I intend to allow these. These do not, it is to be noted, involve the 15 Rey transactions. Thus it is that the proposed amendments relating to the Rey transactions and the proposed para. 17A give rise to the two main issues presented upon the present application:

   1. Whether the Rey transactions constitute a new cause of action and if so, as it would now be statute-barred, whether this court has jurisdiction 20 to allow the amendments to the pleadings. If satisfied that there is jurisdiction, I must then exercise my discretion as to whether to allow the amendments, and in that context criticisms of them—delay, illegality, inefficacy, inconsistency and embarrassment (in the technical sense)—would arise for consideration.

25   2. Notwithstanding that the proposed claim in contract against D&T (Zurich) (the proposed para. 17A) is acknowledged as arising from the same or substantially the same facts as already pleaded, D&T (Zurich) argues that it has been abandoned (having been asserted in the writ but not properly pleaded in the statement of claim) and now is statute-barred 30 and so should not be allowed. In this context also, objections arise for the court to resolve in the exercise of its discretion, namely, delay, costs and prejudice (in the widest sense) to D&T (Zurich) as the defendant affected. None the less, the primary objection raised by D&T (Zurich) is that the claim was abandoned upon the plaintiff's election not to include it in the 35 statement of claim.

   It is significant to emphasize that from that broad outline of the two main issues are important threshold points of jurisdiction to be resolved.

40 *Background*

   The plaintiff was a member of the world-wide Omni Group of companies based in Switzerland where the parent company, Omni Holdings A.G. ("OHAG"), had its headquarters.

The scale of the failure of the Omni group has assumed global and 45 notorious proportions. Very much at the helm was Mr. Werner Rey, an

entrepreneur who, by all accounts, was the controlling and dominant force behind the board of directors of OHAG and officially its chairman. Rey is now the subject of criminal proceedings in Switzerland arising from his allegedly fraudulent mismanagement of the Omni Group. Rey had also separately established a private empire of companies and portfolios which now comprise his estate in bankruptcy.

The Rey transactions relate to indebtedness which now stands in the books of the plaintiff, Omni Securities Ltd., as owing by Rey personally or by his private companies. They represent a deficit which at the end of 1988 and 1989 stood at the combined total sum of SFr. 14.5m. already mentioned. The pleadings also seek to allege that Rey was a shadow director and/or otherwise an agent of the plaintiff and owed it fiduciary duties which he breached by the abuse of his position for his own ends, and that this was or should have been known to the defendants and that they, as the plaintiff's auditors, failed in their duties in not advising the plaintiff's board of the impropriety of the Rey transactions. Furthermore, as the result of that failure, the opportunity to recover the resultant debts, to obtain adequate security for them, or to take preventive action to avoid them, was lost.

*The pleadings*

The action is for breach of contract and negligence. As presently constituted the claims relate to the audit report for the financial year 1989. This report was dated March 16th, 1990.

The principal defendants are the second defendant ("DH&S (Cayman)") and D&T (Zurich). The allegations against the other defendants as partners or associates of DH&S (Cayman) (which is the successor firm to the first defendant) are derivative of and dependent upon any liability of DH&S (Cayman). DH&S (Cayman), D&T (Cayman) and their individual partners and associates are also referred to as "the Cayman practice" and D&T (Zurich) and its predecessor firm as "the Swiss practice." As the pleadings presently stand, a contract is alleged to exist between the plaintiff and DH&S (Cayman) and a duty of care in tort is alleged to be owed by DH&S (Cayman) and by D&T (Zurich).

By far the single largest head of loss claimed relates to what is called "the Harpener transaction," by which the plaintiff obtained loans totalling SFr. 563,637,000 on behalf of three German companies (affiliated within the Omni Group) to enable them to refinance the acquisition of 2.1m. shares on behalf of OHAG in a large German conglomerate called Harpener A.G. The loan to the three German affiliates was completely unsecured and yet constituted, on the plaintiff's balance sheets, its single largest asset by way of receivables.

Notwithstanding that the plaintiff had itself given no security for the loans (which were instead in the main secured by pledges of the Harpener

shares to the lending syndicate of banks and by a guarantee from the plaintiff's parent, OHAG), the plaintiff claims that the defendants' failure to advise its board about the true status of the loans resulted in a wholly misleading picture of the plaintiff's financial viability, and in the loss of
5    opportunity for redemptive action by its board to obtain security for or recovery of the loan.

The statement of claim as presently pleaded also includes claims relating to receivables due from other affiliate Omni companies, *i.e.* loans which the plaintiff claims should not have been advanced given the
10   plaintiff's financial position at the respective points in time. These loans ("the three receivables," representing SFr. 3.8m., SFr. 8.4m. and SFr. 17.7m.) are described in paras. 42–46 of the statement of claim and are significant losses claimed to be attributable to the alleged breaches of duty. More to the point, however, is the fact that the statement of claim
15   also contains claims against the defendants for payments made to Rey or to his companies subsequent to the 1989 audit. These include sums in the amount of SFr. 28m. (the value of Omni entities shares transferred through the plaintiff's balance sheets to Rey) and SFr. 121.320,000 by way of advances or loans to Rey or for his benefit.

20   It is primarily by way of comparison to these pleaded losses more so than the others alleging Rey's dominance over the Omni Group (Harpener and the three receivables) that I must decide whether the Rey transactions which arose in 1988 and 1989 are new causes of action or whether they relate to and arise from matters already pleaded.

25

*The proposed amendments*

For present purposes I can conveniently adopt the defendants' catego rization of the many proposed amendments by reference to whether or not they are opposed and the grounds for opposition. Thus they fall into four
30   broad categories and are helpfully described in an analytical schedule prepared by Mr. Smouha as follows:

*Category 1*: The amendments to which the defendants do not object. These involve 59 amendments which in the main are typographical or factual errors or merely clarifying in nature. Two of these—the re-drafted
35   paras. 23.3A and 63A—are averments of reliance upon the audit report by the plaintiff and were in fact allowed earlier during proceedings in March 1998.

Having considered the proposed amendments being raised in this category, I intend to allow them.

40   *Category 2*: Amendments objected to because they are described as seeking to add new causes of action after the expiry of the relevant limitation period. Those relating to Rey and to the Rey transactions are all objected to as falling within this category. So also are those in the proposed para. 17A which seek to plead the cause of action in contract
45   against D&T (Zurich).

*Category 3*: Amendments described as seeking to add claims which had been encompassed within the general endorsement of the writ but which were abandoned by their omission from the statement of claim. This is the principal ground of objection to the proposed para. 17A. It is also the basis for objection to the proposed para. 46F in so far as it would include Rey transactions during 1988 which were entered on the plaintiff's transactions ledger for that year.

As already noted, in the general endorsement to the writ there were claims both in contract and in tort against all defendants in respect of both audit years 1988 and 1989. The statement of claim omitted claims for 1988 and any claim in contract against D&T (Zurich). In his second affidavit, Mr. Johnson, one of the plaintiff's liquidators, explained that this was because after "extensive investigations" and consultations with his "expert advisers," he had concluded that "there was no basis for a claim based on [D&T (Zurich)'s] audit of the plaintiff's financial statements for the period ending December 31st, 1988."

*Category 4*: Amendments which should not be allowed for being contrary to the rules of pleadings because: (a) they would be bound to fail in law; (b) they have no consequence in terms of relief sought; (c) they are inconsistent with matters already pleaded; (d) they are not sufficiently particularized as to justify their inclusion in the pleading; and/or (e) they are for some other reason pointless, embarrassing (in the technical sense) *etc.* and therefore no purpose is to be served by allowing them.

There was considerable overlap between the categories into which some amendments were argued by Mr. Smouha as falling. I consider that for present purposes it would be tedious in the extreme to attempt an analysis of the impugned amendments by reference to each ground of objection. What I propose to do instead is to consider first those relating to the Rey transactions as a group, then those relating to the claim in contract against D&T (Zurich); first by reference to the threshold points of jurisdiction and then, depending on whether there is jurisdiction, by reference to the other grounds of objection.

*The Rey transactions*

*Jurisdiction*

The financial years of the plaintiff in issue here were 1988 and 1989 and it was in respect of the latter that the audit report dated March 16th, 1990 was issued. As a result, any claims in contract or tort arising now some 9–10 years later would be *prima facie* time-barred. The plaintiff accepts this to be so.

However, the Grand Court Rules, O.20, r.5, taken with s.41 of the Limitation Law (1996 Revision), vests jurisdiction in the court to allow a new cause of action if certain pre-conditions are satisfied. I set out the relevant provisions first of the Limitation Law (1996 Revision), then of the Grand Court Rules. Section 41 reads:

"(1) For the purposes of this Law, any new claim made in the course of an action shall be deemed to be a separate action and to have been commenced in the case of—

(a) a new claim made in or by way of third party proceedings…; and

(b) any other claim, on the same date as the original action.

(2) In this section—

'new claim' means a claim by way of set-off or counterclaim, and a claim involving the addition or substitution of…a new cause of action….

(3) Except as provided by section 39 or by rules of court, a court shall not allow a new claim within paragraph (b) of subsection (1), other than an original set-off or original counterclaim, to be made in the course of an action after the expiry of any time limit under this Law which would affect a new action to enforce that claim….

(4) Rules of court may provide for allowing a new claim to which subsection (3) applies to be made as therein mentioned, but only if the conditions specified in subsection (5) are satisfied, and subject to any further restrictions the rules may impose.

(5) The conditions referred to in subsection (4) are in the case of a claim involving—

(a) a new cause of action, if the new cause of action arises out of the same facts or substantially the same facts as are already in issue on [*sic*] any claim previously made in the original action….

….

(9) In this section—

'rules of court' means rules made under section 19(3) of the Grand Court Law (1995 Revision)…."

The Grand Court Rules, O.20, r.5 provides as follows:

"(1)…[T]he Court may at any stage of the proceedings allow the plaintiff to amend his writ, or any party to amend his pleading, on such terms as to costs or otherwise as may be just and in such manner (if any) as it may direct.

(2) Where an application to the Court for leave to make the amendment mentioned in paragraph…(5) is made after any relevant period of limitation current at the date of issue of the writ has expired, the Court may nevertheless grant such leave in the circumstances mentioned in that paragraph if it thinks it just to do so.

….

(5) An amendment may be allowed under paragraph (2) notwithstanding that the effect of the amendment will be to add or substitute a new cause of action if [it] arises out of the same facts or substantially the same facts as a cause of action in respect of which relief

has already been claimed in the action by the party applying for
leave to make the amendment."

The effect of those provisions is first, that if the claim gives rise to a new
cause of action but does not arise out of the same or substantially the
5  same facts as are already in issue, the court has no jurisdiction to grant
leave to amend. Secondly, even if that first test is met, the court's
discretion is to be exercised by reference to what is necessary in the
interests of doing justice in the case and having regard particularly to
other grounds for objection.

10

*New cause of action*

The first issue then is whether the Rey transactions comprise a new
cause of action. Paragraphs 46A–F introduce for the first time in the
pleadings references to (I quote from proposed para. 46A) "a consid
15  erable number of transactions with Mr. Rey which are evidenced in the
general ledger accounts" of the plaintiff for 1988 and 1989.

The proposed para. 46B reads: "The debit transactions comprised
moneys advanced and/or lent to Mr. Rey or for his benefit, transfers of
shares to Mr. Rey and to companies and entities for the ultimate benefit of
20  Mr. Rey and interest on amounts owed by Mr. Rey."

The proposed paras. 46C–E then go on to allege that the indebtedness
was entirely unsecured, that the transactions were entered into without
authority on the part of the plaintiff as they were not approved by the
plaintiff's board and were, in the circumstances, in breach of Cayman
25  law, as Rey was also a shadow director and/or agent of the plaintiff.

In the proposed para. 46F the averments would go on to allege that the
pattern of movements on the balance sheets (which showed small deficit
balances at the end of 1988 and 1989 despite much larger deficits during
the year) was "probably orchestrated to hide the true extent of Rey's true
30  and/or typical indebtedness to the plaintiff during the course of the year."
From those alleged factual particulars, the pleadings progress to allege
breaches of duty in the proposed para. 61.11, by the averment that the
audit report failed to warn that the net deficits in Rey's accounts with the
plaintiff      (1988—SFr.   4,693,720;      1989—SFr.   11,645,863)   were
35  unsecured, interest-bearing and repayable on demand and failed to warn
of the real maxima which the transactions had attained throughout the
year. The defendants should have expressed their findings and
conclusions—had they conducted the audits in the manner required—that
the loans to Rey were not approved by the plaintiff's board of directors
40  and were improper, as the plaintiff had no interest in entering into them.
And, as the loans had been advanced to Mr. Rey in breach of Cayman
law, the outstanding balances ought to have been repaid by Mr. Rey or
proper security obtained.

Finally, the proposed pleadings go on to allege the consequences of the
45  breaches, namely, had the defendants not been in breach of their duties

they would have brought the attention of the plaintiff's board to the unlawfulness of the Rey transactions, and the Board would have taken all appropriate steps to recover the outstanding balances or to obtain security. Furthermore, as regards 1989 and thereafter, they would have taken steps to prevent any further transfers of shares or advances or loans for Rey's benefit in breach of Cayman law. A further consequence to be alleged would be the loss of opportunity to recover the sum of SFr. 14,593,363 plus interest—the balance on the Rey account prior to March 16th, 1990.

So we see for the first time in the pleadings reference to these transactions with Rey in 1988 and 1989 and the allegation that, as he was a shadow director and/or agent of the plaintiff, they were illegal and gave rise to duties, breaches of those duties on the part of the auditors, and consequential losses.

Mr. Turner submitted that these new pleadings do not raise a new cause of action, as they come within the context of those already pleaded in the writ: breach of contract, breach of duty, negligence, negligent misstatement and breach of statutory duty, in relation to the plaintiff's financial affairs. And in these new averments the plaintiff is merely giving further examples of the defendant's breach of contract and/or negligence.

On the contrary, I concluded that all the elements of the new pleadings—factual averments, alleged breaches and alleged losses—amount to a new cause of action not pleaded before. They go beyond the mere particularization of existing claims. As Diplock, L.J. (as he then was) stated in *Letang* v. *Cooper* (6) ([1965] 1 Q.B. at 242–243): "A cause of action is simply a factual situation the existence of which entitles one person to obtain from the court a remedy against another person." Lord Wright, M.R., in an earlier pre-O.20, r.5 case, *Marshall* v. *London Passenger Transp. Bd.* (7), said ([1936] 3 All E.R. at 88) that a new cause of action arises where—

"the proposed amendment [would involve] a quite different set of ideas, quite a different allegation of fact…. [It] would, if allowed… set up a new cause of action involving quite new considerations, quite new sets of facts, and quite new causes of damage and injury, and the only point of similarity would be that the plaintiff had suffered certain injuries."

I note here in passing that in adopting these definitions of a cause of action, I prefer them to the narrower meaning, adopted in other cases, *e.g. Sterman* v. *E.W. & W.J. Moore* (10), in reference only to the legal head of claim, *i.e.* a simple statement in an endorsement such as "breach of contract" or "deceit," and which is the meaning which Mr. Turner submits should be adopted. Apropos the test in *Marshall* v. *London Passenger Transp. Bd.*, a sufficiently pleaded allegation of breach of fiduciary duty is made for the first time in respect of the Rey transactions for 1988 and 1989 by the proposed amendments and, if approved, they would seek the

new remedy of damages in the amounts of the deficits from the Rey transactions—damages also not pleaded before.

I think that when the test is stated in this way it clearly illustrates the further error in the approach, which the plaintiff seeks to advance, that the issues fell to be examined by the defendants within the same audit year as those already pleaded and therefore are part of the same cause of action.

The experience of the courts in building disputes has given rise to a substantial body of case law in this area. One practical reason is that defects which give rise to causes of action often appear at different times notwithstanding that the breaches of duty occurred at the time of construction and so questions of further pleadings or new causes of action often arise in that context.

A leading case of the kind is *Steamship Mutual Underwriting Assn. Ltd.* v. *Trollope & Colls (City) Ltd.* (8), where, after the expiry of the period of limitation, the plaintiff sought to amend the statement of claim to add new claims in respect of defects which came to light only after the action based on other defects had begun. The plaintiff's arguments, which failed, included the proposition that as the later defects were after all only different defects to the same building, they should be regarded as consti tuting the same cause of action.

A similar decision is appropriate here in response to the argument that the breaches complained of in relation to the Rey transactions do not constitute a new cause of action because they occurred ultimately during the course of a single audit (that for the year 1989).

*Same or similar facts*

Upon that conclusion on the first aspect of the test, the amendments must be disallowed unless they arise from the same or similar facts. In the *Steamship Mutual* case the court was required also to consider this issue. I find the approach taken there to be helpful here in this respect also. Similar provisions of the English limitation statute were applied as are under consideration here and the decision of the court dealing with both aspects of the test appears from the following passage from the headnote to the case in the *Building Law Reports* (33 BLR at 78):

"(2) The amendments raised new claims for the purposes of section 35 of the Limitation Act 1980:

(a) whether or not a proposed amendment would introduce a new claim or claims within section 35 of the Limitation Acts 1980 was a mixed question of law and fact and a matter of degree. The original statement of claim narrowed the causes of action to those concerned with air-conditioning….

per May L.J.: 'In the light of the definitions of a cause of action already referred to, [citing *Letang* v. *Cooper*] I do not think one can look only to the duty [of] a party, but one

must look also at the nature and extent of the breach relied upon, as well as to the nature and extent of the damage complained of in deciding whether, as a matter of degree, a new cause of action is sought to be relied upon. The mere fact that one is considering what are, as it is said, after all only different defects to the same building, does not necessarily mean that in any way they are constituents of one and the same [cause] of action….'

(b) Further whether or not the cause of action the subject of the proposed amendment arose out of the same or substantially the same set of facts within the meaning of O.20 r.5(5) was also a question of degree; the judge had correctly determined that there was insufficient overlap and that therefore he had no jurisdiction to allow the amendments."

I should go further to explain that while the comparison to be made is "a matter of degree" and of "impression" (*Welsh Dev. Agency* v. *Redpath Dorman Long Ltd.* (11) ([1994] 1 W.L.R. at 1418, *per* Glidewell, L.J.), in this case I find the differences to be stark and obvious. Here I find there to be the clearest of distinctions between the present issues—the Rey transactions—and those already pleaded. And it is to be emphasized that that is indeed the test, *i.e.* whether the similarity is to be found between the present factual issues and those already pleaded and not, as the plaintiff's submissions would suggest, whether the legal heads of claim or types of causes of action which it seeks to plead are similar to those already pleaded, nor, as Mr. Turner argued, whether the alleged duties, breaches of duty and alleged losses are substantially the same.

Another manner of approaching the question is from the point of view of the degree of overlap between the issues, namely whether, and if so to what extent, the proposed amendments would result in prejudice to the eighth defendant or any of them in having to deal with the factual matters raised by them: see *Hydrocarbons Great Britain Ltd.* v. *Cammell Laird Shipbuilders Ltd.* (2).

In this case the wide extent of the factual investigations which the defendants would necessarily undertake to meet the new allegations is a fair indicator and, to my mind, illustrative of their dissimilarity to, or absence of overlap with the existing pleadings. Mr. Smouha described at least three areas of investigation which, I accept, would have to be undertaken in respect of just one of the proposed issues, *i.e.* whether Rey was a shadow director of the plaintiff (assuming for the moment the legality of such an averment). These would be: (a) whether in respect of each transaction the directors of the plaintiff accepted and acted upon an instruction from Rey as opposed to a request; (b) whether the instruction was carried out without the application of the *de jure* director's mind as to whether the instructions should (in the interests of the company) be complied with; and (c) whether the instructions form part of a pattern

within the context of the company's business as a whole. This inevitably involves consideration of the transaction by comparison with the totality of the company's transactions.

5   These are issues which would arise, as I have noted, assuming the legality of the proposed averment and by reference to the concept of "shadow director" as definitively encompassing those specific elements of the relationship between Rey and the plaintiff's board of directors: see *Re Hydrodam (Corby) Ltd.* (3) ([1994] 2 BCLC at 183, *per* Millett, J.), where those elements and the definitions of the concept of shadow
10   director are discussed.

The concept comes from the English Insolvency Act 1986, s.251, a provision for which there is no equivalent in Cayman statute law. Section 251 provides: "'[S]hadow director' in relation to a company, means a person in accordance with whose directions or instructions the directors
15   of the company are accustomed to act…." Section 214(7) provides that for certain purposes of the Act (including the imposition of responsi bilities and liabilities attached to the office of director) "'director' includes a shadow director."

Although I doubt that the concept separately exists at common law so
20   as to be part of Cayman law for the purposes of ascribing fiduciary responsibilities to persons who appear to be in the factual relationship of shadow directors, I need not and do not make any such finding now.

For present purposes, reference to the proposed pleading that raises this entirely new legal issue suffices to give an example of the extent to
25   which departures from the existing pleadings would occur. Currently there is only a general reference to Mr. Rey's "dominance" over OHAG and hence over the Omni Group, including the plaintiff.

Mr. Turner conceded that for the averment of shadow directorship to succeed, the court would need to rely upon the definition of that concept
30   as developed in English law. That, as we have seen, carries different legal consequences from a general averment of "dominance." And a fiduciary relationship between Rey and the plaintiff would be essential to liability in respect of the Rey transactions, for otherwise there would be no *prima facie* illegality or impropriety in the transaction upon which the auditors
35   were obliged to report or advise. Thus inevitably an inquiry into the entirely new issue of shadow directorship would arise. The same is true of the alternative pleading of a relationship of agency between Rey and the plaintiff.

I consider that those findings serve adequately to illustrate why I am
40   unable to accept the plaintiff's contention that the new claims based on the Rey transactions arise out of the same or similar facts already at issue in the pleadings. In summary, the facts already pleaded relate to the Harpener transaction, the three receivables and advances to Rey made post-March 1990. No reference is made to the Rey transactions in 1988 or
45   1989. On the face of the ledgers taken by themselves, this would call for

inquiries into whether over 70 separate transactions were somehow conducted in breach of the alleged fiduciary duties of Rey as shadow director or, for that matter, as agent of the plaintiff. The Rey transactions cited in the present schedule to the statement of claim are all post-March 16th, 1990—the date of the audit report—and, by contrast, do not rely for proof upon any alleged breach of fiduciary duty on his part.

Upon the conclusion that there is no overlap or similarity between the issues, the result is that I have no jurisdiction to allow the proposed amendments in respect of the Rey transactions and so the application for leave to that extent must be refused.

### The claim in contract against D&T (Zurich) (amended para. 17A)

The plaintiff's case as it stands is that it entered a contract with the Cayman defendants (through the second defendant) but that to the extent that D&T (Zurich) carried out part of the audit field work, D&T (Zurich) owed a duty *in tort* to the plaintiff in respect of that work. Thus, at present and as already noted, there is no claim *in contract* against D&T (Zurich) and the proposed para. 17A would seek to plead that claim.

In its defence the second defendant denies that it was a party to a contract with the plaintiff. D&T (Zurich), for its part, denies that a contract was made with the plaintiff as opposed to the plaintiff's parent company OHAG, but accepts that if the plaintiff was a party to a contract, it was with D&T (Zurich). Given that state of uncertainty in the present state of the pleadings, it is not surprising that the plaintiff would wish to plead in the alternative that D&T (Zurich) was party to a contract with it.

The issue now—that of whether the plaintiff has abandoned that claim—can only be resolved by further reference to the history of the pleadings. The case, as originally broadly formulated in the general endorsement to the writ, included in para. 1 a claim in damages for breach of contract against D&T (Zurich). However, as was noted above, a deliberate decision was taken not to include that claim in the statement of claim. Mr. Johnson explains in his affidavits that after "extensive investigations" and after having consulted his "expert advisers" he was satisfied that the alternative claim in contract against D&T (Zurich) should not be pleaded but that the statement of claim should include the claim that the second defendant was in fact the plaintiff's auditor.

Among the factors taken into account then was, importantly, that the second defendant had actually signed and issued the audit reports for 1988 and 1989 in unqualified terms. Mr. Johnson also asserts his own surprise that D&T (Zurich), in its defence, now admits that it had a contract with OHAG to conduct the plaintiff's audit or that it might arguably be regarded as owing such contractual duties to the plaintiff itself. This form of defence would, of course, serve to refute the claim in contract against the Cayman defendants.

Much was made of this matter of Mr. Johnson's "surprise" in the

arguments for D&T (Zurich). Mr. Smouha in particular sought to lay emphasis on the circumstances which would suggest the contrary. These are described in detail in Mr. Ritchie's second affidavit. This contains a narrative of the plaintiff's assertions in relation to the contractual relationships in this and in two other related causes of action: Cause No. 93 of 1992 and Cause No. 147 of 1996. Cause No. 93 of 1992 was an application by the plaintiff's liquidators against the Cayman defendants, as the former auditors of the plaintiff, for the production of documents relating to the plaintiff's affairs.

From my review of the correspondence exchanged between the liquidators and the Cayman defendants in that case, it is clear that issue was taken over the status of the defendants as a result of which it emerged, on the part of the Cayman defendants, that they asserted that D&T (Zurich) was the primary auditor and the Cayman defendants the secondary auditors of the plaintiff. But this assertion did not emerge without some confusion, as I think is shown from the affidavit of Mr. Michael Pilling (a partner in the first defendant) filed in Cause No. 93 of 1992 on September 11th, 1995: "In the Omni situation the Swiss firm is clearly 'primary' *as auditor of the parent company* of Omni Securities whereas Cayman is 'secondary' as auditor of record of the subsidiary…." [Emphasis supplied.]

On that occasion neither the second defendant nor D&T (Zurich) itself responded (although not a party, the latter could have) by way of asserting an unqualified contractual relationship either with OHAG or the plaintiff. I think it is fair to say that confusion reigned over this issue throughout Cause No. 147 of 1996 as well. In that action, *Johnson* v. *Deloitte & Touche A.G.* (4), D&T (Zurich) claimed *locus standi* as the former auditor of the plaintiff to apply to remove the liquidators on the basis of the liquidators' alleged conflict of interests. D&T (Zurich) relied on the evidence of Mr. David Wilson, who stated in his affidavit:

"The audit report was signed by the Cayman practice on March 23rd, 1990. However, as I have already explained, it was in fact the Swiss practice which actually carried out the audit work and the Cayman practice signed the audit report in reliance on that work. A similar arrangement applied for the non-consolidated financial statements as at December 31st, 1989."

To my mind, the fact that this passage distinguished the roles of the Cayman and Swiss practices (the Cayman defendants and D&T (Zurich), respectively) without going so far as to admit in unequivocal terms the respective contractual relationships, is significant to understanding the liquidators' attitude to the pleading of the claim in contract. At no stage prior to the filing of D&T (Zurich)'s defence was there a positive acceptance of an arguable claim in contract as between the plaintiff itself (as distinct from OHAG) and D&T (Zurich).

In *Johnson* v. *Deloitte & Touche A.G. (4)* the Court of Appeal was

invited to assume the correctness of the evidence relied upon by D&T (Zurich) and so to regard D&T (Zurich) as the primary auditor of the plaintiff. The conflict application proceeded on that basis. This, however, was against the background also asserted, that the Cayman practice had
5  actually signed off the relevant auditor reports.

Now that the plaintiff is asserting in this action the alternative duty in contract against D&T (Zurich), it has had to abandon, at my insistence, the assertion—maintained in *Johnson v. Deloitte & Touche A.G.* even up to the appeal by D&T (Zurich) before the Privy Council—that D&T
10  (Zurich) was not its auditor.

The fact that there was not, before the filing of its defence, any positive assertion that D&T (Zurich) was *contractually* responsible for the plaintiff's audit does not necessarily imply deliberate equivocation on the part of the defendants. They have consistently asserted that D&T (Zurich)
15  was the *primary* auditor of the Omni Group and thus of the plaintiff.

But that, to my mind, is an insufficient basis for concluding, as I am being asked by the defendants to conclude, that the liquidators were or should always have been aware that the defendants would aver that D&T (Zurich) was, to the exclusion of the Cayman defendants, contractually
20  responsible for the audits. A passage from an affidavit sworn by Mr. Johnson on March 13th, 1995 (in support of his application for leave to serve the writ outside the jurisdiction upon D&T (Zurich)) is illustrative of the fluid mental state which I find existed over this issue from the earliest stages:

25      "Deloitte & Touche A.G. [D&T (Zurich)] audited the intended plaintiff's financial statements for the year ended December 31st, 1990…. Although [D&T (Cayman)] signed the audit reports relating to the financial statements for the years ending December 31st, 1988 and December 31st, 1990, *it is likely that* Deloitte &
30      Touche A.G. provided assistance to [D&T (Cayman)] in the preparations of the audit reports relating to the financial statements for the year ended December 31st, 1988 and December 31st, 1989. The company (*i.e.* the plaintiff) is part of the Omni Group of companies based in Switzerland. The primary auditor of the *Omni*
35      *Group* was Deloitte & Touche A.G." [Emphasis supplied.]

The distinction between its relationship with OHAG as the parent company and the plaintiff as subsidiary is still maintained even on the present state of D&T (Zurich)'s defence. Given that background, the issue for me now is whether I should regard the decision of the liquidators
40  not to plead the claim in contract against D&T (Zurich), when settling the statement of claim, as an abandonment of that claim.

It is to my mind not insignificant here that we are considering the decision of professional men acting in an official, not personal, capacity and in so doing, upon the advice of other professionals as to the
45  significance within the accounting profession of the inter-practice

relationships of primary and secondary audit functions. These are relationships giving rise to contractual roles in regard to which—given the modern and relatively recent phenomenon of transnational audits and liquidations—there were no determinative judicial pronouncements to
5   guide their decisions.

The real question then is whether Mr. Johnson, having determined upon advice, primarily because the Cayman practice signed off the audits, that they and not D&T (Zurich) were contractually responsible, should be deemed to have abandoned any such claim in contract against D&T
10  (Zurich). A brief overview of the legal principles will, I believe, help to inform the decision to the contrary at which I have arrived.

The claim in contract against D&T (Zurich), not having been included in the statement of claim, is now time-barred and the right to plead this in defence to that claim has accrued to D&T (Zurich). The court none the
15  less has the power to allow the claim at this stage arising as it does—and as is conceded by D&T (Zurich)—from the same or similar facts already in issue on the existing claim.

But not to be overlooked are the renewed strain and expense which a restored claim in contract will visit, ultimately, upon the individual
20  members of D&T (Zurich) against whose professional conduct the allegations are levelled. Just what should be the proper scope of contractual duties—assuming such duties were owed—will be a matter of considerable complexity in the circumstances of this case as will the issues which D&T (Zurich) will have to address. Allowing the
25  amendment will therefore be a matter of great concern to them. That, however, is only one side of the balance to be struck in the assessment of the interests of justice.

As yet, no procedural consequences of the amendment have been identified by D&T (Zurich) which cannot be addressed by an order for
30  costs. Thus, this is not a case where the amendment will greatly disrupt the procedural steps remaining until trial or result in the vacating of any fixture already made. There will be no need, given the similarity of the issues to those already pleaded, for a fundamental change in approach to the preparations for trial. While the modern approach to judicial case
35  management requires the court to be more vigilant against abuses of the system, it is still the law in the Cayman Islands that an amendment which is necessary to allow a party properly to plead his case without injustice to the other side will normally be made: see *Swiss Bank & Trust Corp.* Ltd. v. *Iorgulescu (10)*.

40  I do accept, though, that this statement of principle is to be qualified by appropriate sanctions in the light of the modern approach to litigation, including refusal where a party has so disrupted the flow of the proceedings as to visit hardship and inconvenience upon the other side which cannot adequately be addressed by an order for costs. Moreover,
45  the modern approach will take into account not just the disruption to the

affairs of the present parties but also the effect upon other litigants whose access to justice may be delayed. The closer the amendments proposed come to the actual date for trial, the more disruptive all round they are likely to be and so are more likely to be refused.

5      An example of such disruption and of the modern approach of dealing with it by refusal can be found in *Worldwide Corp. Ltd.* v. *G.P.T. Ltd.* (12) in the English Court of Appeal. The following passage, which I find to be compelling, appears in the judgment of Waller, L.J.:

> "…[I]n previous eras it was more readily assumed that if the
> 10  amending party paid his opponent the costs of an adjournment that
> was sufficient compensation to that opponent. In the modern era it is
> more readily recognized that in truth, payment of the costs of an
> adjournment may well not adequately compensate someone who is
> desirous of being rid of a piece of litigation which has been hanging
> 15  over his head for some time, and may not adequately compensate
> him for being totally (and we are afraid there is no better word for it)
> 'mucked around' at the last moment. Furthermore, the courts are
> now much more conscious that in assessing the justice of a
> particular case, the disruption caused to other litigants by last-
> 20  minute adjournments and last-minute applications have also to be
> brought into the scales.
>
>    Take this very case. By attempting a last-minute amendment a
> trial has had to be interrupted by argument over some days, the
> challenge to the judge's order has to be dealt with by the Court of
> 25  Appeal as a matter of urgency, with serious disruption to its list and
> other litigants, and if the amendment were allowed there would have
> to be a further delay in the trial coming on and/or a last-minute
> lengthening of the trial which may cause serious inconvenience in
> the Commercial Court and thus to other litigants."

30      There is, to my mind, nothing in the law and rules of procedure of our courts which would preclude the application of those considerations and a similar result in an appropriate case. In the *Iorgulescu* case (10) itself, the court laid emphasis upon the consideration of potential prejudice to the other parties as a result of the amendment allowed.

35      I note also that even in the eight short years since that case was decided, litigation has developed apace in this jurisdiction and the demands upon the system now more than ever justify the consideration of potential disruption and prejudice to other cases and litigants. Those comments are, however, made *de bene esse* and in passing.

40      Here, it is in the plaintiff's favour that the more egregious consequences of amendment such as would have followed in the *Worldwide Corp.* case (12) will not arise. But there are other legal issues to address. *Dicta* from the still developing case law in this area would suggest that once abandoned after a deliberate election, a claim remains
45  abandoned.

This was the view expressed by Harman, J. after a review of the earlier cases, in *Cellular Clothing Co. Ltd.* v. *G. White & Co. Ltd.* (1) (70 R.P.C. at 12):

> "Once abandoned, the claim remains abandoned, and it does not lie
> in the mouth of the Plaintiff to say 'Now I should like to put it back
> again.' If it be, as I think it probably is, a matter of discretion, I
> refuse leave, because the Plaintiffs, having deliberately taken the
> course they did and announced to the world and to the Defendants
> that the only particulars which they were going to rely upon were
> such and such, now sought to rely on other particulars altogether,
> which either were, or ought to have been, within their knowledge
> before they issued their writ, and, indeed, were the reason, so it is
> said, why the writ was originally issued. In my judgment, it would
> be quite wrong to allow an amendment of this sort under those
> circumstances."

That test would ascribe a strict responsibility to a claimant who has made an informed (or deemed informed) election not to plead a claim and rejects the court's discretion to look objectively at the requisites of justice in the particular case.

When it is viewed in that way I do not regard that to be the appropriate test. I do not think that the test is so strict as to preclude the exercise of discretion in an appropriate case, notwithstanding that a deliberate election has been made. This must be so where—as I find to be the case here—the election was one made reasonably, if mistakenly, in the exercise of professional judgment in their official capacity and before the wisdom of pleading the alternative claim in contract against D&T (Zurich) became clear to them. No question of the earlier conflict allegation against the liquidators has arisen here.

The existence of the discretionary power to be exercised in the interests of justice is also recognized in the *Iorgulescu* case (10) It appears also to be recognized in the English Court of Appeal decision in *Leicester Wholesale Fruit Market Ltd.* v. *Grundy (No. 2)* (5), where the *Cellular Clothing* decision was considered. The following appears in the judgment of Glidewell, L.J. (53 BLR at 14–15):

> "The argument relating to abandonment requires more detailed
> consideration.
>
> The judge's approach to the problem [at first instance] is set out
> [in] the judgment. He said:
>
> 'I think that the true principle, whether a plaintiff abandons or
> elects not to proceed with a claim made in the statement of
> claim, is that the court has the discretion to allow the claim to
> be revived, but will not exercise it in favour of the plaintiff
> unless a good explanation is given for the dropping of the
> claim and the desire to revive it'.
>
> Applying that principle he considered whether the plaintiff had a

good explanation, decided that it had, and therefore allowed the amendment.

5   Mr. Knight submits that the judge was in error in adopting this principle. He argues that the question the judge should have asked himself was, had the plaintiff discovered, or might it with reasonable diligence have discovered, before abandoning the claim for breach of contract [the particular facts disclosing the breach]? If so, then the plaintiff should not be allowed to reinstate its claim in this respect.

10   Mr. Knight relies on a passage in the judgment of Harman, J. in *Cellular Clothing Co. Ltd.* v. *White & Co. Ltd.*…" He then referred to the judgment of Harman, J. quoted above and continued (*ibid.*, at 17):

15   "The only task for this court is to decide whether the judge was right to allow amendments so as to permit the plaintiff to seek to establish that the cause of action against [the defendant] did not arise until the facts alleged to have been concealed were discovered, or could with reasonable diligence have been discovered, i.e. in October 1986 at the earliest.

20   …[I] think that the learned judge applied the correct test, and came to the correct conclusion on this issue."

Stated in that manner, the discretion to be exercised is certainly not without its limits. The claimant must show that he has acted reasonably and diligently in the case he had chosen to plead. Those strictures are only 25 fair, particularly in a case where the claim to be revived is one which is time-barred and so has given rise to an accrued defence of limitation. But that having been said, the discretion is to be exercised ultimately in the interests of justice—that is the rationale for the power given in the Law and the Rules. The requirement that the same or similar factual premises 30 must exist is in and of itself a protection for defendants against the prejudice of having to respond to new or amended claims which they could not anticipate.

Although in this case it cannot be said that the defendants in any way concealed the full and true nature of the contractual relationships from the 35 plaintiff, given the nature of the intra-relationships of the plaintiff within the Omni Group, uncertainty or indecisiveness on the part of the liquidators about that matter is understandable. And, as the evidence shows, there were and continue to be strategic positions taken on both sides in the pleadings and affidavits on this very issue.

40   For all the foregoing reasons, I conclude that it would be in the interests of justice in this case to allow the plaintiff to restore its claim in contract against D&T (Zurich).

As regards the various other proposed amendments not yet specifically addressed, I think I need only make specific mention of those in paras. 45 34A, 60.1, 61.2 and 61.6, which I will allow. I consider those to be

nothing more than an elaboration of the existing pleadings re Harpener and the three receivables.

Other proposed amendments, many not objected to, I will deal with as shown by reference to the schedule in the analysis prepared by Mr. Smouha.

*Order accordingly.*

*W.S. Walker & Co.* for the plaintiff; *Charles Adams, Ritchie, Duckworth& Co.* for the eighth defendant; *Hunter & Hunter* for the other defendants.