**[1998 CILR 43]**

**HUTCHINSON LIMITED, CRAIN CREEK LIMITED, MOUNTAIN DEW LIMITED and FORUM LIMITED**

*v.*

**CITITRUST (CAYMAN) LIMITED and TEN OTHERS**

*Grand Court*

(Douglas, Ag. J.)

**30 January 1998**

*Civil Procedure—service of process—service out of jurisdiction—application to set aside service—Grand Court Rules, O.12, r.8(1) satisfied by filing application within time-limit for service of defence—re-service with supporting affidavit within general time-limit for service under O.32, r.3(2) satisfies r.8(3)*

*Civil Procedure—service of process—service out of jurisdiction—court may retrospectively validate leave to serve process outside jurisdiction granted contrary to Grand Court Rules, O.11, r.1(1)(c) if writ still valid and all conditions of leave later met*

*Civil Procedure—service of process—service out of jurisdiction—under Grand Court Rules, O.11, r.1(1)(f) plaintiff seeking leave to serve tortfeasor outside jurisdiction to show significant damage sustained within Islands if no tortious act committed here—liquidation of non-trading holding companies insufficient*

*Conflict of Laws—trusts—constructive trusts—knowing assistance—court may impose constructive trust over foreign assets of Cayman company even if acts giving rise to trust occurred outside jurisdiction—unlike knowing receipt based claims, knowing assistance claims governed by Cayman law*

*Companies—directors—de facto/shadow director—under Grand Court Rules, O.11, r.1(1)(ff), plaintiff seeking leave to serve corporate director of Cayman company outside jurisdiction to specify whether acted as de facto or shadow director—need not plead distinction if defendant is individual*

The plaintiff companies, in liquidation, brought proceedings against the defendants to recover moneys paid to creditors by way of fraudulent preferences.

The plaintiffs were Cayman companies owned by Cititrust (Cayman) Ltd. as trustee for the two N. family trusts, and were debtors of Mrs. N. Mountain Dew Ltd., the third plaintiff, paid the proceeds of the sale of shares in three English companies into a Swiss account with Citibank. At Mrs. N.'s request, the officers and nominee shareholders of Mountain

EXHIBIT

6

exhibitsticker.com

43

Dew instructed Citibank to pay sums from this account into Mrs. N.'s account as full repayment of its debt to her. These payments were later ratified by Mountain Dew's corporate directors in a Board meeting in The Bahamas.

When the payments had been made, Mountain Dew was unable to pay its debts to the first and second plaintiffs but advanced moneys to the fourth plaintiff which were in turn paid to Mrs. N. in satisfaction of debts to her. Ultimately, all the plaintiff companies were wound up.

The plaintiffs obtained leave to serve proceedings on Citibank and four other foreign-registered companies which had acted as officers of the plaintiffs or their owners, as well as three Swiss nationals employed by them. They alleged, *inter alia*, conspiracy to defraud and breach of fiduciary duty. They meanwhile served proceedings on Cititrust and the nominee shareholders in the Cayman Islands. The defendants acknowledged service and applied for orders under the Grand Court Rules, O.12, r.8 for the discharge of the court's leave, the setting aside of the writ in respect of the foreign defendants and a declaration that the court had no jurisdiction over them, all on the ground of *forum non conveniens*. Their application for an extension of time to serve affidavit evidence was withdrawn and they later re-served their summons with a supporting affidavit.

The plaintiffs applied for the dismissal of the summons and for the validation of the court's leave to serve their writ outside the jurisdiction.

They submitted that (a) since O.12, r.8(3) required that affidavit evidence supporting a challenge to the court's jurisdiction should be served with the summons, the defendants had, by filing a summons alone on the last day permitted for the service of their defences, failed to comply with r.8(1) that an application be made by that date; (b) accordingly, by r.8(6), the defendants' acknowledgements of service were irrevocable submissions to the jurisdiction of the court; (c) the defendants' withdrawal of their application for an extension of time also had this effect; (d) the court should not exercise its discretion to allow the defendants to proceed with their application despite late service of the affidavit, nor should it allow an extension of time retrospectively for service; and (e) the court had properly given leave to the plaintiffs to serve the foreign defendant outside the jurisdiction under any or all of sub-paras. (c), (e), (f), (ff) and (j) of O.11, r.1(1), and the order should therefore be validated.

The defendants submitted in reply that (a) since the meaning of "application" in O.12, r.8(1) was "filing with the court" and not "service," their challenge to the court's jurisdiction had been made within the time permitted for service of their defences, and the absence of affidavit evidence at that time did not nullify the application; (b) they had complied with the general time-limit for service of a summons and accompanying evidence under O.32, r.3, namely, service four days before the present hearing; (c) accordingly, their acknowledgements of service would not be treated as submissions to the jurisdiction under r. 8(6); (d) nor did the withdrawal of their application for an extension of time

constitute such a submission; (e) the Cayman Islands were not the proper forum for the hearing of the plaintiffs' claims and the plaintiffs had satisfied none of the conditions for leave to serve the foreign defendants outside the jurisdiction; (f) the plaintiffs had in fact failed to show any fiduciary, contractual or other relationship between themselves and the defendants that could give rise to a cause of action; (g) even if one or more of the grounds in O.11, r.1(1) were made out, the plaintiffs' claims would be largely unenforceable under Swiss law due to the operation of the Swiss Federal Act on International Private Law; and (h) the plaintiff had withheld relevant information about existing parallel English and Swiss litigation against two of the defendants in respect of the same assets and it would therefore be inequitable for the court to assume jurisdiction.

**Held,** discharging the leave to serve the defendants outside the jurisdiction:

(1) The defendants had not, by acknowledging service, submitted to the jurisdiction of the court for the purposes of O.12, r.8(6), since they had applied for the discharge of the court's leave to serve them outside the jurisdiction by filing their summons within the time specified by r.8(1). Rule 8(3) required only that affidavit evidence in support of the application be *served* with the summons, and since their summons had been re-served, together with supporting evidence, within the general time-limit for service under O.32, r.3(2), there was no irregularity. Furthermore, the defendants' withdrawal of their application for an extension of time for service was not inconsistent with their challenge to the court's jurisdiction (page 51, line 32 – page 52, line 14; page 53, lines 8–25).

(2) Although the plaintiffs had failed to serve the Cayman defendants before applying to serve the others outside the jurisdiction, contrary to O.11, r.1(1)(c), the court had power to grant retrospective leave during the currency of the writ, which had been extended. If granted, the plaintiffs need not re-apply for leave. However, the court would not validate the leave, since the plaintiffs had not shown that the Cayman Islands were the proper forum for the hearing of the proceedings (page 56, lines 11–16; page 56, line 33 – page 57, line 2; page 69, lines 28–35; page 70, lines 9–21).

(3) Since no tortious act had been committed within the Islands, the plaintiffs were required to show, for the purposes of O.11, r.1(1)(f), that they had sustained significant damage here. However, as holding companies, they had not carried on business in the jurisdiction and it was therefore doubtful that the insolvency and eventual winding up of the four companies would suffice. Accordingly, whilst the actions of the defendants abroad, when viewed as elements of a conspiracy to defraud, might have founded a claim in tort, and whilst they were clearly in breach of their fiduciary duties to the plaintiffs in preferring one creditor (Mrs. N.) over others (for which purposes no intention to injure the plaintiffs

need be proved), the court should not have granted leave under r.1(1)(f) (page 57, line 38 – page 58, line 6; page 58, lines 37–45; page 59, line 38 – page 60, line 6; page 60, line 41 – page 61, line 7; page 61, line 19 – page 62, line 3; page 68, line 44 – page 69, line 5).

(4) Whilst the court would not impose a constructive trust over foreign assets on the basis of Citibank's knowing *receipt* of funds (since such a claim would be governed by the law of Switzerland, where the proceeds of the English share sales were received), a claim based on the defendants' knowingly *assisting* each other would be governed by Cayman law. Since the law here did not require that the acts giving rise to a constructive trust should have occurred within the jurisdiction, the plaintiffs had raised triable issues for the purposes of obtaining leave under O.11, r.1(1)(j) (page 63, lines 14–26; page 64, line 25 – page 65, line 2).

(5) The plaintiffs were not required, for the purposes of O.11, r.1(1)(ff), to specify whether the Swiss nationals had acted as shadow or *de facto* directors when instructing Citibank to transfer funds to Mrs. N. Such a distinction need only be pleaded when the alleged director was a company. Accordingly, if it could be shown that those defendants had acted in person, there was a triable issue as to their participation in the conspiracy (page 66, line 36 – page 67, line 2).

(6) However, since under arts. 149(2) and 165 of the Swiss Federal Act on Private International Law, the Swiss courts would not recognize or enforce a judgment of the Grand Court based on claims in tort, unjust enrichment or company law against defendants domiciled in Switzerland, it would be futile for the court to assume jurisdiction over the matters pleaded. Furthermore, by failing to reveal the existence of parallel proceedings in England against two of the defendants, the plaintiffs had breached their duty to make full and frank disclosure of relevant facts. It would be inequitable for the defendants to be held liable in respect of the same assets in two jurisdictions and therefore leave to serve them outside the jurisdiction would be discharged (page 54, lines 1–9; page 62, lines 6–26; page 65, lines 12–36; page 67, lines 5–25; page 68, lines 15–20; lines 36–39; page 69, lines 10–25).

**Cases cited:**

(1) *Barings PLC v. Coopers & Lybrand*, [1996] T.L.R. 498; (1996), 140 Sol. Jo. (L.B.) 210; on appeal, [1997] 1 BCLC 427; [1997] BCC 498.

(2) *Broken Hill Pty. Co. Ltd. v. Xenakis*, [1982] Lloyd's Rep. 304; [1982] Com. L.R. 152.

(3) *Carmel Exporters (Sales) Ltd. v. Sea-Land Services Inc.*, [1981] 1 W.L.R. 1068; [1981] 1 All E.R. 984, considered.

(4) *Chaplin v. Boys*, [1971] A.C. 356; [1969] 2 All E.R. 855, applied.

(5) *El Ajou v. Dollar Land Holdings PLC*, [1993] 3 All E.R. 717; [1993] BCLC 735; on appeal, [1994] 2 All E.R. 685; [1994] 1 BCLC 464, *dicta* of Millett, J. applied.

(6) *Fidelity & Guar. Intl. Ltd. v. Hakemian*, 1992–93 CILR *N*–6, distinguished.

(7) *Gulf East Intl. v. Parvoz Carder*, English Queen's Bench Division, March 23rd, 1994, unreported.

(8) *Hydrodam (Corby) Ltd., Re*, [1994] 2 BCLC 180; *sub nom. Re Hydrodan (Corby) Ltd.* [1994] BCC 161, considered.

(9) *Kuwait Oil Tanker Co. S.A.K. v. Al Bader*, [1997] 1 W.L.R. 1410; [1997] 2 All E.R. 855, *dicta* of Staughton, L.J. applied.

(10) *Lawson v. Midland Travellers Ltd.*, [1993] 1 W.L.R. 735; [1993] 1 All E.R. 989, followed.

(11) *Lonrho PLC v. Fayed*, [1992] 1 A.C. 448; [1991] 3 All E.R. 303, applied.

(12) *Prospect Properties Ltd. v. McNeill*, 1990–91 CILR 171, followed.

(13) *R. v. Kensington Income Tax Commrs, ex p. Princess Edmond de Polignac*, [1917] 1 K.B. 486, *dicta* of Viscount Reading applied.

(14) *Royal Brunei Airlines Sdn. Bhd. v. Tan*, [1995] 2 A.C. 378; [1995] 3 All E.R. 97, applied.

(15) *Spiliada Maritime Corp. v. Cansulex Ltd., The Spiliada*, [1987] A.C. 460; [1986] 3 All E.R. 843, applied.

**Legislation construed:**

Grand Court Rules, O.11, r.1(1): The relevant terms of this paragraph are set out at page 55, lines 39–41; page 57, lines 30–32; page 62, lines 30–34; and page 65, line 41 – page 66, line 2.

O.12, r.8:

"(1) A defendant who wishes to dispute the jurisdiction of the Court in the proceedings by reason of any irregularity [in any order giving leave to serve the writ out of the jurisdiction] . . . shall give notice of intention to defend the proceedings and shall within the time limited for service of a defence, apply to the Court for—

(a) an order setting aside the writ or service of the writ on him;

. . .

(c) the discharge of any order giving leave to serve the writ on him out of the jurisdiction. . . .

(3) An application under paragraph (1) must be supported by an affidavit verifying the facts on which the application is based and a copy of the affidavit must be served with the notice of motion or summons by which the application is made."

(6): The relevant terms of this paragraph are set out at page 51, lines 27–31.

O.32, r.3(2):

". . . [U]nless the Court otherwise orders or any of these Rules otherwise provides—

(a) a summons must be served on every other party not less than four days before the day specified in the summons for the hearing of the application;

(b) any evidence relied on in support of the application must be served with the summons."

*A. Turner* for the plaintiffs;

*N.R.F.C. Timms* for the defendants.

**DOUGLAS, Ag. J.:** Before me are 5 summonses involving 4 plaintiffs and 11 defendants. The statement of claim is not only lengthy but complex, comprising 31 pages involving numerous issues. In
10  addition, the plaintiffs seek 34 declarations. The attorneys representing the parties have vigorously argued each and every issue and have requested the court to look into each claim by each defendant against each plaintiff.

Although it is the duty of the court to examine each and every issue, all
15  that is required at this stage of the proceedings is for the court to determine whether or not to validate or discharge the order of Smellie, J. giving leave to serve the writ on the second, third, fourth, seventh, eighth, ninth, tenth and eleventh defendants. Much of the debate about the applicability of the rules will prove to be academic because of the outcome. However, I take
20  time to examine them because of the considerable discussion of the case law and principles which took place before me, in the event that this considered ruling may be useful on another occasion.

### The plaintiffs

25  The four plaintiffs, Hutchinson Ltd., Crain Creek Ltd., Mountain Dew Ltd. and Forum Ltd. are all limited companies registered in the Cayman Islands and are in liquidation. Mr. Cleaver of Ernst & Young, Grand Cayman, and Mr. Alain Winkelmann of ATAG Ernst & Young, Switzerland, are the joint official liquidators.

30  At all material times these plaintiffs were underlying companies owned by the first defendant, Cititrust (Cayman) Ltd., as trustee of the trusts for the benefit of the N. family. Hutchinson and Forum were underlying assets of the N. family settlements. Crain Creek and Mountain Dew were underlying assets of the "Hi-tech" settlement. Hutchinson, Crain Creek
35  and Forum were beneficially owned by Mrs. N. prior to settlement of their shares upon the relevant trusts. Mountain Dew was established as an underlying company to receive assets settled by Mrs. N. who was a major creditor of Hutchinson, Mountain Dew and Forum, having lent substantial demand loans.

40

### The defendants

Cititrust is a company registered in the Cayman Islands. The shares of each of the plaintiffs were held by the fifth and sixth defendants, Brennan Ltd. and Tyler Ltd., as nominees for and on behalf of Cititrust. Brennan
45  and Tyler, both companies registered in the Cayman Islands, were respec-

ively appointed as Secretary and President of each of the plaintiffs. Confidas Finance et Placement S.A., the seventh defendant, is a company which carries on business from its offices in Zurich and Geneva, administering the trust in Switzerland on behalf of Cititrust. Its officers acted in turn as officers and authorized signatories for Brennan and Tyler in carrying out instructions on behalf of Cititrust.

Mr. Y., Ms. G. and Mr. S., the eighth, ninth and tenth defendants respectively, were at all material times employees of Confidas; Mr. S. being a Vice-President of that company. Ms. G. has apparently not been served and has as yet played no part in the proceedings. Donat Investments, Madeleine Investments and Hitchcock Investments S.A., the second, third and fourth defendants respectively ("the Panamanian companies") are registered in Panama and owned by Cititrust (Bahamas) Ltd. They acted as directors for each of the plaintiffs. Their officers and directors included residents of the Cayman Islands. Citibank (Switzerland) ("CIBS"), the eleventh defendant, is incorporated in Switzerland and provides banking and related services there.

*Chronology*

In 1988 Mountain Dew purchased a substantial number of shares of the Harland Simon Group ("HSG") for which it borrowed money from Bank S.G. Warburg Solitic A.G. ("BSG"), but subsequently financing was provided by General Bank & Trust (Bahamas) Ltd. ("GBT"). Pursuant to the loan, Mountain Dew pledged certain of its shares in HSG to GBT as security. These shares were held by Credit Suisse.

On September 11th, 1990, Mountain Dew gave instructions for the sale of its shares in HSG. The instructions were first, to pay the necessary amount to Credit Suisse in London to obtain good title to the HSG shares held by Credit Suisse and, secondly, to transfer the net proceeds of the sale to the account of CIBS for the benefit of Mountain Dew.

From the sum of £23,240,521, which was the gross proceeds of the sale, Mountain Dew paid £12,190,068 to Credit Suisse as repayment of a loan. It also paid the sum of £115,000 to Singer & Friedlander as commission for selling its HSG shares, and a further £228,763.12 as an early payment discount. This is one of the amounts claimed by the plaintiffs from the defendants. Of the shares sold, 703,800 with a value of £3,358,316.37 were beneficially owned by Crain Creek, the second plaintiff. After the sale Mountain Dew held that amount on trust for Crain Creek.

In October 1990, Mountain Dew also owned 310,000 shares in Kewill Systems Ltd. At the request of Mrs. N., these were sold, the net proceeds being £406,753.42. The sum of £240,272.09 from that sale was paid to Vermar Ltd. to pay interest on a debt due to Vermar. This loan was treated as a reduction of Mountain Dew's indebtedness to Mrs. N. The balance of the proceeds was placed in a fixed deposit in Mountain Dew's account at CIBS with other available funds.

In September 1990, Mountain Dew owned shares in the News Cutting Bureau Ltd. On or about January 8th, 1990 Mountain Dew sold its shares in the company, the net income being £729,000 and £724,000. These amounts were combined with Mountain Dew's fixed deposit in CIBS.

5      On September 6th, 1990 Brennan and Tyler gave instructions to CIBS to debit Mountain Dew's account and transfer the sum of £8,692,000 to Mrs. N.'s account. Then on September 14th a further sum of £1,967,000 was debited from Mountain Dew's account in Switzerland and transferred to Mrs. N.'s account with CIBS. This instruction is alleged to have been 10   given by Mrs. N. to Confidas. There were no written instructions.

On February 18th, 1991 the directors of Mountain Dew, namely, Donat, Madeleine and Hitchcock, met in the Bahamas where they passed certain resolutions concerning the payments to Mrs. N. It is as a result of these resolutions that certain of the claims by the plaintiffs against these 15   defendants have arisen. I will deal with these resolutions at the appropriate time.

*Summonses*

On June 25th, 1996 the plaintiffs filed an *ex parte* summons applying 20   for leave to serve proceedings out of the jurisdiction upon the defendants. On August 27th, Smellie, J. granted leave for service out of the jurisdiction on the second to fourth and seventh to eleventh defendants. On December 11th, 1996 an acknowledgment of service on behalf of the first, fifth and sixth defendants was received, and on February 17th the 25   acknowledgments of service on behalf of the second to fourth, seventh, eighth, tenth and eleventh defendants were received. On that date also the plaintiffs obtained an order extending the validity of the writ of summons for a further 12 months from its date of expiry until February 28th, 1998.

On April 24th, 1997, the final date of the time allowed for the filing of 30   a defence by the defendants, a total of three summonses were filed by the various defendants. These were first, applications on behalf of Cititrust, Brennan and Tyler for a stay of the order of Smellie, J., on the ground of *forum non conveniens*; secondly, an application on behalf of the non-Caymanian defendants seeking various orders under the Grand Court 35   Rules, O.12, r.8; and thirdly, another summons by the non-Caymanian defendants seeking an extension of time for the service of the affidavit in support of the O.12, r.8 application. On May 9th, 1997, these defendants were granted leave to withdraw this last summons.

On May 15th, 1997, the plaintiffs filed a summons for the dismissal of 40   the O.12, r.8 application. On May 12th they were granted leave to amend the said summons. On May 20th the defendants re-served the O.12, r.8 summons along with supporting affidavits. On June 17th the plaintiffs filed their amended summons which will now be the first issue with which I will deal. However, before I proceed I must record that on July 45   8th the plaintiffs filed another summons, this time seeking, *inter alia*, the

retrospective validation of the leave granted by Smellie, J. on August 27th, 1996. This application of June 17th sought the following orders:

"1. That the second to fourth and seventh to eleventh defendants' O.12, r.8 summons filed herein on April 24th, 1997 be dismissed on the grounds that—

(a) the affidavits in support thereof were not filed by April 24th, 1997;

(b) the affidavits in support thereof were not served with the O.12, r.8 summons on April 24th, 1997; and

(c) the second to fourth and seventh to eleventh defendants voluntarily submitted to the jurisdiction of this honourable court by withdrawing their summons to extend time for service of their affidavit evidence in support of their O.12, r.8 summons, on May 9th, 1997.

2. That the second to fourth and seventh to eleventh defendants do file their defences forthwith."

The plaintiffs' case can be summarized as follows:

(a) Order 12, r.8(3) provides that the summons (challenging jurisdiction) and the affidavit in support must be served together and failure to do so renders the summons irregular;

(b) Withdrawal of a summons to extend time for service of an affidavit (supporting a summons challenging jurisdiction) constitutes a voluntary submission to the jurisdiction.

*The relevant rules*

Order 12, r.8(6) of the Grand Court Rules provides:

"Except where the defendant makes an application in accordance with paragraph (1) the acknowledgment by a defendant of service of a writ shall, unless the acknowledgment is withdrawn by leave of the Court under Order 12, rule 1, be treated as a submission by the defendant to the jurisdiction of the Court in the proceedings."

Order 12, r.8(1) provides that "a defendant who wishes to dispute jurisdiction of the Court . . . shall give notice of intention to defend the proceedings and shall within the time limited for service of a defence, apply to the Court for [relief]." "Apply" means the issue of a summons (*i.e.* receipt by the Courts Office, not when issued by the court) and not "issue and service." An application under the Grand Court Rules, O.12, r.8 is validly made when the summons is issued: see the Rules of the Supreme Court, O.12, r.8(2) and also *Gulf East Intl.* v. *Parvoz Carder* (7) and *Broken Hill Pty. Co. Ltd.* v. *Xenakis* (2).

Although the affidavit was not filed with the summons, the defendants filed their summons, and therefore "applied" within the time limited for service of a defence (*i.e.* on April 24th, 1997). There is therefore no irregularity in the timing of the application and no allegation that the summons is any way defective. Consequently, an application has been

made in accordance with the Grand Court Rules, O.12, r.8(1). Order 12, r.8(6) therefore has no application.

The plaintiffs are correct that by O.12, r.8(3) a copy of an affidavit in support of the application must be served with the summons. This was
5  done on May 20th, 1997. The defendants claimed that prior to that date the plaintiffs received courtesy faxed copies of the affidavit. I find that this service was by way of re-service of the summons which was originally served on April 24th, 1997 and was within the time-limit.

There are no provisions as to *service* of the summons within a specified
10  time-limit in O.12, r.8. The normal provisions of O.32, r.3(2) therefore apply (a summons and evidence must be served together not less than four days before the fixture). The hearing of the defendants' O.12, r.8 application was fixed for July 14th, 1997. Service on the plaintiffs was some eight weeks before the hearing.

15  The plaintiffs rely on the English case of *Carmel Exporters (Sales) Ltd.* v. *Sea-Land Services Inc.* (3). This case turned on O.12, r.8(2) of the Rules of the Supreme Court, which was revoked in 1983. The Grand Court Rules do not incorporate the revoked paragraph. The facts of the *Carmel* case were that a summons was issued and served within the
20  requisite period. The plaintiffs did not seek to set aside the application but opposed it on the grounds that it must fail because (a) the O.12, r.8 provisions had not been complied with; (b) the summons was defective in not stating the grounds of the application; (c) no copy of the supporting affidavit was served with the summons; and (d) the defendants had
25  submitted to the jurisdiction (not by reason of these irregularities but because of correspondence). Because of O.12, r.8(2) it was too late to remedy the situation.

It was admitted that the summons was defective and conceded that there was a failure to serve a copy of the affidavit with the summons.
30  None the less the court discussed the meaning of "apply." The court was willing to exercise its discretion under O.2, r.1 on the basis that each such failure should be treated as an irregularity which did not nullify the step in the proceeding and the court had the power to proceed with the application despite late service of an affidavit. The court decided it was an
35  obvious case to exercise its discretion to give leave to amend the summons (to state grounds) and to proceed despite late service of the affidavit. Though it was submitted that the irregularity resulted in a submission to the jurisdiction, this was rejected.

In any event, this case does not support the propositions advanced by
40  the plaintiffs. Both the Rules of the Supreme Court and the Grand Court Rules, O.12, r.8 have since been changed by amendment to r.8(1) and by deletion (in the case of the Rules of the Supreme Court) and omission (in the case of the Grand Court Rules) of the former r.8(2). Under the former r.8(2) the court might extend time for the application only if an applica-
45  tion for an extension was made within 14 days after acknowledgment of

service. The arbitrary limit was criticized by the courts for being inflexible. The rule was subsequently amended and the Grand Court Rules reflect that a defendant can apply for an extension of time to file an O.12, r.8 application even after the time for such an application has expired. Even if the plaintiffs were right, this would be an obvious case for such an extension, as there is no possible prejudice even claimed by the plaintiffs.

I find that the application has been made in accordance with r.8(1) and therefore this is not a case where the acknowledgments of service should be treated as submissions to the jurisdiction. At worst, failure to serve the affidavit with the summons would be an irregularity. In *Carmel's case* (3) the court naturally assumed that in these circumstances the defendants would be allowed leave to continue in any event.

The plaintiffs have not been able to suggest that there is any case in which such an irregularity was deemed to be a submission to the jurisdiction. Non-compliance can be cured in the exercise of the court's discretion under the Grand Court Rules, O.2, r.1. This is the approach that the Cayman Court has adopted. In *Lawson* v. *Midland Travellers* (10) ([1993] 1 All E.R. at 994) the English Court of Appeal rejected an argument that the expiry of a primary time-limit under O.12, r.8 resulted in a submission to the jurisdiction. The court can grant a retrospective extension of time. The withdrawal of an application for an extension of time to serve an affidavit cannot be treated as a step in the proceedings inconsistent with a challenge to the jurisdiction. Accordingly this application has no merit and is therefore dismissed.

*The defendants' summonses*

I now come to those summonses filed by the defendants on April 24th and which must be determined. The first is an application by the first, fifth and sixth defendants seeking an order under the inherent jurisdiction of the court that all further proceedings in this action be stayed on the ground that the Cayman Islands is not the appropriate forum. The other is an application by the second, third, fourth, seventh, eighth, tenth and eleventh defendants pursuant to O.12, r.8 disputing the jurisdiction of the court.

There is, in fact, an overlap between the applications, as a principal ground under O.12, r.8 is that the plaintiffs must show that the Cayman court is the appropriate court in which to try the issues. The arguments on this issue can conveniently be heard together. A decision on the application for stay of proceedings on the ground of *forum non conveniens* can, however, only be made after the determination of which parties are properly before the court, *i.e.* after determining the O.12, r.8 application. This will enable the court to decide if there is some other forum available which is more suitable for the interests of all parties and the ends of justice (see *Spiliada Maritime Corp.* v. *Cansulex Ltd., The Spiliada* (15)).

Before going into the O.12, r.8 summons and the various issues and relevant law, it is necessary to mention the question of enforceability. It is axiomatic that it is an essential ingredient in deciding the issue of *forum conveniens.* The question of what is convenient in this regard applies not only to the parties but also to the ends of justice, which cannot be served should there be any doubt regarding enforceability of the court's judgment. In determining this issue it is therefore necessary to seek the assistance of the affidavits supplied by the Swiss attorneys, for whose guidance I am grateful. I will refer, in the first instance, to that of Alain Winkelmann, a lawyer and a partner of ATAG Ernst & Young in Geneva, Switzerland, whose affidavit is in support of the plaintiffs. He confirms that the opinions expressed by Dr. Peter Widmer are generally correct. Dr. Widmer is the Swiss lawyer who deposed in favour of the defendants. For this reason I will be guided by opinions in my quest to determine enforceability. As one would expect, Dr. Widmer's concern is with the Swiss defendants, Citibank (Switzerland), Confidas, Mr. Y. and Mr. S.

Dr. Widmer first identifies the claims against the Swiss defendants as contained in the action which, as we have seen, are all related to certain transactions carried out in the course of the management and administration of the assets of the plaintiff companies. Dr. Widmer has rendered opinions based on the provisions of the Federal Act on International Private Law of December 18th, 1987 ("the IPLA"). At present the Lugano Convention is not in force between Switzerland and the Cayman Islands and therefore the provisions of the IPLA are applicable. We will see how these provisions apply to each issue as this ruling progresses.

*The O.12, r.8 summons*

In this summons the foreign defendants seek the following orders and reliefs:

"1. An order discharging the order of Smellie, J. dated August 27th, 1996, giving leave to serve the writ herein on the second, third, fourth, seventh, eighth, ninth, tenth and eleventh defendants out of the jurisdiction pursuant to the Grand Court Rules, O.11 as against these defendants.

2. Further or alternatively, an order setting aside the service of the writ on the second, third, fourth, seventh, eighth, tenth and eleventh defendants.

3. A declaration that in the circumstances of the case the court has no jurisdiction over the second, third, fourth, seventh, eighth, tenth and eleventh defendants in respect of the subject-matter of the claim or the relief or remedies sought in the action.

The grounds of this application are as follows:

(a) The precondition for seeking leave to serve out of the jurisdiction under O.11, r.1(1)(c), namely that another defendant had been duly served, was not satisfied when the plaintiffs applied for leave.

(b) There was, and is, no issue between the plaintiffs and a person on whom the writ had been served when the said application was made.

(c) The evidence upon which the plaintiffs relied in support of the application for leave to serve out of the jurisdiction was insufficient to establish any ground under O.11, r.1(1) for leave to serve the second, third, fourth, seventh, eighth, tenth and eleventh defendants outside the jurisdiction or to show any claim against them, and in particular—

(i) failed to show a good arguable case establishing jurisdiction under O.11, r.1(1)(c), (e), (f) and (j);

(ii) failed to show any serious issue to be tried between the parties;

(iii) failed to show that the plaintiffs had any claim against the second, third, fourth, seventh, eighth, tenth and eleventh defendants; and

(iv) in respect of the seventh, eighth, tenth, and eleventh defendants, failed to show a good arguable case establishing jurisdiction under O.11, r.1(1)(ff).

Further, the writ lacked proper particularity of any fiduciary, contractual or other relationship giving rise to the duty of care alleged between the plaintiffs and the second, third, fourth, seventh, eighth, tenth and eleventh defendants or any of them or of any alleged tort or breach of duty.

(d) The affidavit in support of the application for leave to serve outside the jurisdiction failed to show that the Cayman Islands is the appropriate forum for trial.

(e) The affidavit in support of the application for leave to serve out of the jurisdiction failed to give full and frank disclosure of relevant facts and matters and, in particular, of the want of evidence of any fiduciary or contractual relationship between the plaintiffs and the second, third, fourth, seventh, eighth, tenth and eleventh defendants which may give rise to any of the liability alleged in respect of the facts and matters pleaded by the plaintiffs."

I will now deal with each ground in the order in which they appear above, examining the evidence as it relates to each of the sub-paragraphs under which it falls.

*Order 11, r.1(1)(c)*

This sub-paragraph reads as follows: "The claim is brought against a person duly served within or out of the jurisdiction and a person out of the jurisdiction is a necessary or proper party thereto. . . ." Apart from alleging that another defendant had not been duly served when the plaintiff applied for leave, these defendants also allege that at that time there was no issue between the plaintiffs and a person on whom the writ had been served.

This sub-paragraph requires the court to determine whether each of the defendants is a necessary or proper party. In order to do so, the court is required to do no more than (i) identify the common questions of law or fact which arise in the claim against the party duly served and the person

5   sought to be served and the transaction or series of transactions out of which the rights to relief arise, and (ii) satisfy itself that the questions of law or fact do merit consideration at a trial or, alternatively, raise real issues which the plaintiff may reasonably ask the court to try. This I propose to do in determining the merits of each ground pleaded in this

10  application (see *Barings PLC* v. *Coopers & Lybrand* (1)).

It is conceded by the plaintiffs that before leave to serve proceedings outside the jurisdiction pursuant to O.11, r.1(1)(c) was obtained by the plaintiffs, the first, fifth and sixth defendants should have been served with the writ of summons. This is strictly necessary, as O.11, r.1(1)(c)

15  suggests that the claim must already be brought against a person "duly served within or out of the jurisdiction." In *Kuwait Oil Tanker Co. S.A.K.* v. *Al Bader* (9), in which the Court of Appeal considered this particular aspect of O.11, r.1(1)(c) of the Rules of the Supreme Court, it was held that a plaintiff who relies on r.1(1)(c) to obtain leave to serve proceedings

20  outside the jurisdiction must have already served another party within or outside the jurisdiction. Staughton, L.J. stated as follows ([1997] 1 W.L.R. at 1415):

"I would on those grounds hold that Ord. 11, r.1(1)(c) requires another defendant to have been served before leave can be given

25  under that paragraph. That, as the judge held, was in line with the construction long adopted for the old rule, and that is an additional ground, to my mind, for reaching the conclusion which I have done on the wording of the rules."

In the present case there was no doubt that the plaintiffs would be able to

30  serve the first, fifth and sixth defendants within the jurisdiction of this court. These defendants are Cayman companies and the plaintiffs did not perceive, and indeed did not encounter, any difficulty in serving them within the jurisdiction. However, the plaintiffs have technically failed to comply with O.11, r.1(1)(c) by failing to serve these defendants within

35  the jurisdiction before applying for leave to serve the second to fourth and seventh to eleventh defendants outside the jurisdiction.

The plaintiffs contend that this technical breach of the rules can be cured by this court and have now re-applied for leave to serve proceedings outside the jurisdiction pursuant to O.11, r.1(1)(c) on those

40  defendants on the basis that the writ of summons in the present case has been renewed by this court by an order of February 27th, 1997 for a period of 12 months, *i.e.* until February 28th, 1998. Contrary to a submission made by the defendants that the renewal was for a specific purpose, there is no evidence to support this and accordingly any leave, if

45  granted to the plaintiffs to serve the proceedings outside the jurisdiction,

would allow a valid service, provided it was done before February 28th, 1998.

As I have already stated, the issue of who is a necessary and proper party can only be determined after an analysis of the evidence which follows. It is the plaintiffs' case that all the defendants are necessary and proper parties in that if actions were brought by the plaintiffs against each defendant there would be common questions of law or fact to merit consideration at a trial. Alternatively, they argue, they have raised real issues which the plaintiffs may reasonably ask the court to try.

*Order 11, r.1(1)(e)*

This sub-paragraph constitutes the next ground of this application. It relates to a claim brought in respect of a breach committed within the jurisdiction of a contract within or without the jurisdiction. The plaintiffs do not appear to have produced any evidence which is capable of showing that they have a good arguable case as far as this sub-paragraph is concerned. They claim that there has been a breach of contract by Citibank (Switzerland). It is not denied that there was an exclusive jurisdiction clause in both the contract and the pledge agreements. They seem to have recognized that the proper law of contract is the system which the parties have agreed shall regulate the legally enforceable rights and duties to which their agreement gives rise. It follows therefore that, should the plaintiffs wish to pursue their claim in contract, the proper forum would be the Swiss court. However, from the arguments put forward, it does not appear that they intend to pursue this issue should it be determined that the Cayman Islands is the convenient forum for the hearing of this action.

*Order 11, r.1(1)(f)*

This sub-paragraph provides as follows: ". . . [T]he claim is founded on a tort, fraud or breach of duty . . . and the damage was sustained, or resulted from an act committed, within the jurisdiction. . . ." Under this paragraph, according to 1 *The Supreme Court Practice 1997*, para. 11/1/19, at 91–92:

". . . [T]he plaintiff must show that (a) his claim is founded on a tort, and either (b) damage has been sustained within the jurisdiction or (c) damage has resulted from an act committed within the jurisdiction. In deciding, for the purposes of requirement (a), whether a tort has been committed in this or another country, the court should look back over the series of events constituting the tort and ask where in substance the cause of action arises. . . . If the court finds that the tort has in substance been committed in this country, the fact that some of the relevant events have happened abroad is irrelevant, as is the law of the foreign country where such events may have happened. If, on the other hand, the tort has in substance

been committed in a foreign country, the court must apply the rule in *Boys* v. *Chaplin* . . . and give leave only if the act complained of is one which, if done in [this jurisdiction], would be a tort, and which is also actionable according to the law of the foreign country where it has been done. Under requirement (b) it is enough that some significant damage has been sustained in [this jurisdiction]. Requirement (c) obliges the court to look at the tort alleged in a common sense way, and to ask whether damage has resulted from substantial and efficacious acts committed within the jurisdiction, regardless of whether or not such acts have been committed elsewhere. . . ."

The tort alleged in the statement of claim is that of conspiracy, and involves all the defendants, and is to be found in paras. 43.16 to 43.19. of the statement of claim. It is essentially alleged that all of the defendants knew that Mountain Dew was insolvent and that it would be unlawful to transfer the sums alleged but despite this knowledge they transferred these amounts to Mrs. N.'s account with CIBS to enable Mrs. N. to pay debts to her other creditors including CIBS.

In determining where, if any, a cause of action in conspiracy arises, it is now necessary to look at the series of events which the plaintiffs claim constitute the tort. These are as follows:

1. The sale of HSG shares in the United Kingdom.

2. The sale of the Kewill System Ltd. shares in the United Kingdom.

3. The sale of News Cutting Bureau Ltd. shares in the United Kingdom.

4. The transfer of funds from the United Kingdom to Mountain Dew's account with CIBS in Switzerland.

5. The transfer of funds from the United Kingdom to Mountain Dew's account with CIBS to Mrs. N.'s account with CIBS in Switzerland.

6. The passing of the resolution of February 18th, 1991 in The Bahamas which purported to justify the payments to Mrs. N.'s account with CIBS in September, 1990.

7. The insolvency of Hutchinson as a result of Mountain Dew's inability to pay its debts to Hutchinson.

8. The winding up of Hutchinson and then Mountain Dew and Crain Creek.

It is conceded that in substance the tort alleged has been committed abroad. However, applying the rule in *Chaplin* v. *Boys* (4), the acts complained of, if committed in the Cayman Islands, would constitute a tort. There is no evidence to show that the acts complained of would not be actionable according to the law of England (*i.e.* where the shares were sold), or the law of The Bahamas (*i.e.* where the resolution was passed) or the law of Switzerland (*i.e.* where moneys were transferred to and eventually paid for Mrs. N.'s benefit). The common law of conspiracy in the Cayman Islands and The Bahamas is the same as in England.

It is the plaintiffs' case that damage has been sustained within the jurisdiction for the following reasons:

1. Mountain Dew was unable to repay a proportion of its indebtedness to Hutchinson, which indebtedness was payable in the Cayman Islands.

5     2. Mountain Dew was unable to make payments of the amount due to Crain Creek, which payment was also due in the Cayman Islands.

3. Mountain Dew was eventually wound up by the court because of its inability to make payments of its indebtedness to Hutchinson and Hitchcock.

10    What the plaintiffs are saying is this:

(a) Mountain Dew's main creditors were Hutchinson, Mrs. N. and Crain Creek;

(b) Hutchinson's main creditors were First National Bank of Chicago ("FNBC") and Mrs. N.;

15    (c) Mountain Dew paid its debt to Mrs. N. in full and advanced more than £2m. to Forum and Hayford to allow these companies to pay their debts to Mrs. N.;

(d) Mountain Dew paid only 49% of its debts due to Hutchinson.

It is the plaintiffs' position that the defendants in this case were well
20    aware or should have been well aware of their legal responsibilities but deliberately orchestrated matters to prefer certain creditors of Mountain Dew which would directly benefit Mrs. N. and/or CIBS. It is contended that the predominant purpose of the defendants was to benefit Mrs. N. and possibly CIBS.

25    As was held in *Lonrho PLC* v. *Fayed* (11), the tort of conspiracy to injure can be established either by showing that an intention to injure the plaintiff in his trade or business was the predominant purpose of the conspirators, even though the means used to inflict damage on the plaintiff were lawful and would not have been actionable if done by an
30    individual, or by showing that unlawful means were used. It is clear from the pleadings that the plaintiffs are not relying on intention to injure on the part of the defendants, but rather the use of unlawful means. This is borne out by the very nature of the pleadings.

I note that in support of their contention that the allegation of
35    conspiracy is defective, the defendants have relied heavily on the Rules of the Supreme Court. This is a misconception, as our Grand Court Rules, to which the plaintiffs have adhered, cover this tort comprehensively, thus precluding any application of the English rules. Here I must mention that leave to serve will not be denied on the ground that conspiracy to injure
40    every plaintiff has not been alleged. In fact, the plaintiffs' pleading does not appear to reflect any intent to injure, nor need it do so. However, this court will only give leave to serve a defendant against whom a proper ground has been alleged.

At this point it is necessary to look closely at the damage alleged to
45    have been suffered. Since no act was committed within the jurisdiction,

the sub-paragraph requires that damage must have been sustained here. The rule in *Chaplin* v. *Boys* (4) requires that the damage be significant. The damage alleged is confined to Mountain Dew's inability to pay its debts to other plaintiff companies. On reviewing the situation regarding these companies it is difficult to determine the exact nature of the damage alleged to have been suffered, and by whom. The affidavit of Mr. S., the tenth defendant, states that each of the plaintiff companies was a private investment company which had been beneficially owned by Mrs. N. prior to the settlement of the shares in the relevant trusts. The plaintiffs deny this. What cannot be denied is that all these companies were deeply indebted to this lady, that the amounts owed to Mrs. N. by Hutchinson, Mountain Dew and Forum were £4m., £4.8m. and £9.6m. respectively, and that the principal assets of the trust through their underlying companies were represented by PPI shares.

This affidavit also shows that following a failed move by Mrs. N. to privatize PPI in August 1990, there was considerable pressure on the PPI share price, which an announcement of record earnings did not halt. The N. family found itself in urgent need of money to prevent sales of PPI stock by banks that had made margin loans. Mrs. N. was owed substantial sums by various companies including Hutchinson, Mountain Dew and Forum and she pressed for immediate repayment of those loans. That resulted in assets held by those companies being sold to fund the repayment of loans to Mrs. N. On September 20th, 1990 news of an investigation by the UK Serious Fraud Office caused sales of substantial quantities of PPI shares and the suspension of PPI shares by the London Stock Exchange.

The administrators of PPI, appointed by the English court, have alleged that the whole structure of the N. family trust and companies was a device by which approximately £75m. was misappropriated from PPI, passed to Mrs. N. and into the trusts and companies. There is currently litigation in England and in Switzerland between the administrators of PPI on the one hand and CIBS, Confidas and Citibank N.A. on the other hand, and following a decision on the appropriate forum, the allegation will be determined by the English or Swiss courts. This has not been denied by the plaintiffs and indeed, is one of the most potent arguments put forward by the defendants against the Cayman Islands as the *forum conveniens.*

No indication has been given by the plaintiffs as to the parties who petitioned to place the plaintiffs in liquidation. Records show that the only two Cayman petitioners were Hutchinson and Mountain Dew. If and when this matter comes to trial the onus will be on the plaintiffs to prove that these plaintiffs suffered significant damage. The defendants have contended that being placed in liquidation cannot be considered to be damage. This of course is a defence. At this stage it is not for the court to determine whether there has been significant damage, but merely to determine whether there is a triable issue.

It is therefore in this context that the court will be required to decide whether the defendants acted dishonestly in relation to companies such as Mountain Dew which the plaintiffs allege was insolvent by reason of a debt owed to Mrs. N. and Hutchinson, and whether any significant
5   damage has been sustained within the jurisdiction to justify this court assuming jurisdiction. In this regard the plaintiffs have cited the case of *Fidelity & Guar. Intl. Ltd.* v. *Hakemian* (6) in which Schofield, J. held that damage had been sustained within the Cayman Islands in the case of the plaintiff company which was rendered insolvent as result of fraud and
10  breaches of fiduciary duty committed by its former director who was assisted by his wife. As a result of the fraud or breach of fiduciary duty, the plaintiff company could not pay its creditors and was wound up. Schofield, J. stated in his judgment:

"It would be a sorry day for the financial reputation of these
15  Islands if a company were permitted to be formed here by a foreign national with a view to carrying on business in Cayman, and when that company was raped of its assets the Grand Court refused claimants access to any remedy within these Islands."

In view of the facts surrounding the plaintiff companies in this action, the
20  *Fidelity* case cannot be said to be analogous to the present matter. The case cited involved a straightforward allegation of fraud directed at a Cayman company of which the first defendant was the sole shareholder. The first defendant and the second defendant, his wife, transferred funds of the plaintiff company to the first defendant's own account. In his
25  judgment Schofield, J. specifically alluded to the Cayman company carrying on business within these Islands. This could not be said of the plaintiff companies in the present action. In addition there is no such allegation of a director fraudulently enriching himself at the expense of the company. What we have in this action appears to be a case of the
30  directors and trustees of the plaintiffs selling the plaintiffs' shares in order to pay the plaintiffs' debts. There is evidence of a fraudulent preference, all of which the plaintiffs would have to prove. Furthermore, the defendants have referred to them as mere "holding companies," a few of a number of private investment companies which are underlying assets of
35  the trust set up by the N. family. The issues involved are far more complicated, and it would require no less than an extreme simplification of the issues involved for anyone to draw any form of comparison between this matter and the *Fidelity* case (6).

It is settled law in the Cayman Islands and England that when a
40  company is insolvent or doubtfully solvent it is incumbent upon its directors to keep its assets inviolate for its creditors. If directors fail to perform this duty they will be in breach of their fiduciary duties and may in certain circumstances be acting dishonestly (see *Prospect Properties Ltd.* v. *McNeill* (12) (*1990–91 CILR at 201–203*)). As far as
45  the Panamanian directors are concerned there is no evidence that they

knew of the conspiracy. It can only be claimed that they failed in their fiduciary duty and, by the resolution, preferred one creditor over another.

5    *Enforceability*

This brings me to the issue of enforceability and the applicable law as raised by Dr. Widmer in his affidavit. He has drawn the court's attention to the IPLA. Breach of contract and tort claims are governed by art. 149 and, as such, are regarded as claims based on the law of obligations.
10   Article 149(1) reads as follows: "Foreign decisions concerning claims based on the law of obligations shall be recognized in Switzerland if they have been rendered in the state. . . ." Article 149(2)(a) and (f) contain special provisions for contract and tort claims respectively:

"Furthermore, a foreign decision shall be recognized:

15   (a) if it concerns a contractual performance and was rendered in the state of such performance, and if the defendant did not have its domicile in Switzerland;

. . .

(f) if it concerns claims based on tort and was rendered at
20   the place where the act was committed or had its effects, and if the defendant did not have its domicile in Switzerland."

Because CIBS, Confidas, Mr. Y., Ms. G. and Mr. S. are domiciled in Switzerland, according to art. 149(2)(a) and (f) of the IPLA, the Swiss
25   courts will not recognize and enforce a judgment based on either tort or contractual claims rendered by the Cayman courts.

*Order 11, r.1(1)(j)*

This sub-paragraph provides:

30   ". . . [T]he claim is brought for any relief or remedy in respect of any trust, whether express, implied or constructive, that is governed by or ought to be executed according to the laws of the Islands or in respect of the status, rights or duties of any trustee thereof in relation thereto. . . ."

35   The statement of claim alleges that—

"CIBS at all material times acted dishonestly and thereby *knowingly assisted* Cititrust, Donat, Madeleine, Hitchcock, Brennan, Tyler, Confidas, Mr. Y., Ms. G. and Mr. S. or one or more of them to act dishonestly and/or to breach their fiduciary duties and/or duties of
40   care to Hutchinson, Crain Creek and Mountain Dew by transferring the sums of £8,692,000 and £1,967,000 from Mountain Dew's Account No. 0/127048/002 with CIBS to Mrs. N.'s Account No. 0/128248/005 with CIBS, and CIBS is a constructive trustee of these amounts and is liable to account for them to Mountain Dew, Crain
45   Creek and/or Hutchinson." [Emphasis supplied.]

It alleges further that—

"Cititrust, Confidas, Mr. Y., Ms. G. and Mr. S. acted dishonestly and/or *knowingly assisted* Donat, Madeleine, Hitchcock, Brennan and Tyler to act dishonestly and/or to breach their fiduciary duties and/or their duties of care to Hutchinson, Crain Creek and Mountain Dew by transferring, and/or orchestrating and/or allowing the transfers of £8,692,000 and £1,967,000 from Mountain Dew's Account No. 0/127048/002 with CIBS to Mrs. N.'s Account No. 0/128248/005 with CIBS and the payment of £248,272.09 for the benefit of Vermar and Cititrust, Confidas, Mr. Y., Ms. G. and Mr. S. are constructive trustees of these amounts and liable to account for them to Mountain Dew, Crain Creek and/or Hutchinson." [Emphasis supplied.]

It is conceded by the defendants that should the court accept jurisdiction it would impose any constructive trust in accordance with Cayman law. A cause of action founded on receipt of funds at the time known to be trust funds is complete when the funds are received and the proper law governing the cause of action is the law of the place where they are received. Knowing receipt and its common law counterpart, money had and received (*e.g.* an allegation against CIBS), are receipt-based restitutionary claims. "The law governing such claims is the law of the country where the defendant received the money"—in this case, Switzerland (see *El Ajou* v. *Dollar Land Holdings PLC* (5) ([1993] 3 All E.R. at 736, *per* Millett, J.). In that case the learned judge was dealing with a receipt-based constructive trust and, indeed, the law governing such claims is the law of the country where the defendant received the money. However, the defendants have directed their written submissions towards constructive trusts which they themselves have identified, although not stated in the claim itself. Although they claim to have identified three different forms of constructive trust—one over assets, another the imposition of a personal liability on a receipt-based claim, and the third an imposition of personal liability on a "knowing assistance" claim—they immediately thereafter acknowledge that the plaintiffs seek declarations in respect of the first category, *i.e.* over assets.

Whether or not they are correct in reading into the plaintiffs' claim a receipt-based constructive trust, this would be of no consequence. The plaintiffs themselves have repeatedly alleged that Cititrust, Confidas, Mr. Y., Ms. G. and Mr. S. acted dishonestly and/or *knowingly assisted* Donat, Madeleine, Hitchcock, Brennan and Tyler to act dishonestly.

The Privy Council dealt with this type of trust in *Royal Brunei Airlines Sdn. Bd.* v. *Tan* (14). It was held as taken from the headnote to the case in *The All England Law Reports* ([1995] 3 All E.R. at 97):

"A person who dishonestly procured or assisted in a breach of trust or fiduciary obligation was liable in equity to make good any resulting loss and although dishonesty was both a necessary and a

sufficient ingredient of accessory liability the breach of trust which was prerequisite for accessory liability need not itself be a dishonest and fraudulent breach of trust by the trustee. Accordingly, in order for liability to attach to the accessory it was not necessary that, in addition, the trustee or fiduciary was acting dishonestly, although this would usually be so where the third party who as assisting him was acting dishonestly. . . .”

Lord Nicholls of Birkenhead said (*ibid.*, at *105–106*):

“[Dishonesty] means simply not acting as an honest person would in the circumstances. . . . Honesty has a connotation of subjectivity, as distinct from the objectivity of negligence. . . . Carelessness is not dishonesty. . . .

. . . If a person knowingly appropriates another’s property, he will not escape a finding of dishonesty simply because he sees nothing wrong in such behaviour.

. . . [A]n honest person does not participate in a transaction if he knows it involves a misapplication of trust assets to the detriment of the beneficiaries.”

In the present case there is no question of Confidas, Mr. Y., Mr. S. or CIBS receiving the various sums which were transferred to Mrs. N. or to Vermar. If the court accepts jurisdiction over these defendants it will then apply Cayman law to determine whether or not a constructive trust arose from knowing assistance and whether or not the various defendants should in equity repay the amount claimed by the plaintiffs.

Under the English rule it would be necessary to consider where the knowing assistance took place. The Cayman sub-paragraph is very different from the corresponding English sub-paragraph. In England the acts giving rise to the constructive trust must occur in England, although recent authorities state that not all acts must take place in England. These difficulties do not exist under the Grand Court Rules, O.11, r.1(1)(j). Under this rule it is not necessary for the alleged constructive trustee to have done anything in the Cayman Islands before jurisdiction can be founded. The defendants seek to argue that this court should not grant leave to serve proceedings outside the jurisdiction in respect of any constructive trust which is governed by foreign law. This approach is wrong in principle and is not warranted by the wording of O.11, r.1(1)(j) of the Grand Court Rules.

The sub-paragraph also permits this court to accept jurisdiction when the constructive trust in question is to be executed according to Cayman law. In their submissions the defendants concede that “if the Cayman court accepted jurisdiction, it would impose any constructive trust in accordance with Cayman law.” Therefore if the court accepts jurisdiction under this sub-paragraph the constructive trust which it imposes will be executed according to Cayman law. Although the Cayman court will not impose a constructive trust on foreign assets on a “knowing receipt”

claim, the court can under the sub-paragraph impose such a trust on a "knowing assistance" claim.

It should also be noted that the sub-paragraph provides for service outside the jurisdiction when the litigation in the Cayman Islands raises issues as to the status, rights or duties of a constructive trustee. It cannot seriously be argued, and the defendants have not sought to argue, that the present proceedings do not raise issues as to the status, rights or duties of various defendants in relation to the constructive trust alleged, as in all these issues the question of enforceability arises.

*Enforceability*

The concept of either trust or constructive trust (*i.e.* trusts created by operation of law) is not known under Swiss law. In this particular case, the constructive trust claim would most likely be regarded as an unjust enrichment claim in Switzerland. Constructive trusts are not considered company-law-related claims relative to art. 150(2) of the IPLA: see Vischer, *IPRG–Kommentar*, note 15 to art. 150 (1993).

Article 149(2)(e) of the IPLA provides:

"Furthermore a foreign decision shall be recognized;

. . .

(e) if it concerns claims based on unjust enrichment and was rendered at the place where the act was committed or had its effects, and if the defendant did not have its domicile in Switzerland. . . ."

Although, as has already been determined, the plaintiffs' claim in constructive trust is not based on unjust enrichment but knowing assistance, it is unlikely that a judgment rendered by a Cayman court on such a claim would be enforceable in Switzerland against the Swiss defendants. Mr. Winkelmann, although confirming the above opinions of Dr. Widmer, suggests that there are assets of CIBS in England, without making any effort to identify any. There is also no mention of the availability of the assets of the other defendants. Accordingly, I am of the opinion that a judgment rendered in a court of these Islands against the Swiss defendants would serve no further purpose than to satisfy the liquidators that they have made a reasonable effort in their duty to gather the assets of the four plaintiff companies.

*Order 11, r.1(1)(ff)*

This ground is in respect of the seventh, eighth, tenth and eleventh defendants. The wording of this sub-paragraph is as follows:

". . . [T]he claim is brought against a person who is or was a director, officer or member of a company registered within the jurisdiction or who is or was a partner of a partnership, whether general or limited, which is governed by the laws of the Islands and the subject matter of the claim relates in any way to such company

or partnership or to the status, rights or duties of such director, officer, member or partner in relation thereto. . . ."

On this issue, the statement of claim reads as follows:

"Hutchinson, Crain Creek, Mountain Dew and Forum say that
5   Cititrust, Confidas, Mr. Y., Ms. G., Mr. S., Brennan and Tyler were at all material times either *de facto* or shadow directors of Hutchinson, Crain Creek, Mountain Dew and Forum."

The plaintiffs have now to show that there is an arguable case against them under this claim, *i.e.* that the defendants were at the material time
10   directors of the plaintiffs. The plaintiffs allege that Confidas is a shadow director, while Mr. Y. and Ms. G. are alleged to be *de facto* and/or shadow directors. It is argued by the defendants that the plaintiffs' claim that a defendant acted as a *de facto* and/or shadow director without distinguishing between the two is wrong at law. The definitions of *de facto* and
15   shadow directors were enunciated by Millett, J. in the case of *Re Hydrodam (Corby) Ltd.* (8) when he said ([1994] 2 BCLC at 183):

"A *de facto* director, I repeat, is one who claims to act and purports to act as a director, although not validly appointed as such. A shadow director, by contrast, does not claim or purport to act as a
20   director. On the contrary, he claims not to be a director. He lurks in the shadows, sheltering behind others who, he claims, are the only directors of the company to the exclusion of himself. He is not held out as a director by the company. To establish that a defendant is a shadow director of a company it is necessary to allege and prove: (1)
25   who are the directors of the company, whether de facto or de jure; (2), that the defendant directed those directors how to act in relation to the company or that he was one of the persons who did so; (3) that those directors acted in accordance with such directions; and (4) that they were accustomed so to act."

30   Before me now is an entirely different situation. There is no evidence of a resolution being passed, either by Brennan, Tyler or the Board of Confidas authorizing the transfer of £8,692,000 in September 1990. The instructions were issued by Mr. Y. and Ms. G. The plaintiffs contend that the statement of claim alleges sufficient facts to show that Cititrust,
35   Brennan, Tyler, Confidas, Mr. Y., Ms. G. and Mr. S. were *de facto* and/or shadow directors of the plaintiffs.

The principle outlined in the *Hydrodam* case is straightforward. One cannot claim that a company is either a *de facto* director and/or a shadow director. It cannot be both and a plaintiff must make such a distinction in
40   his claim. The situation is different regarding an officer of the company. A director of the directing company does not become either a *de facto* director or a shadow director of the instructed company if he acts through the board. It is then an instruction of the directing company. On the other hand, if he has given instruction to the instructed company there is
45   nothing wrong in alleging that he was either a *de facto* and/or a shadow

director to that other company. Such is the position in the plaintiffs'
allegation in this present case. I find this to be a triable issue.

*Enforceability*

5    I now come to the question of enforceability. For this purpose I return
to Dr. Widmer's affidavit as it relates to directors' liability. His opinion is
founded in the provisions of art. 165(1) of the IPLA which reads as
follows:

"Foreign      decisions     concerning     claims     based     on     company     law
10   shall be recognized in Switzerland if they were rendered in the state:

(a) of the company's registered office or if they are recognized
there     and     the     defendant     did     not     have     its     domicile     in
Switzerland. . . ."

This concept is derived from art. 59 of the Swiss Constitution whereby
15   defendants domiciled in Switzerland have a constitutional right to be
taken to trial before the Swiss courts: see Vischer, *IPRG–Kommentar* (*op.
cit.*, note 2 to art. 165) or Girsberger, *Kommentar Zum-Schweizerischen
Privatrecht, Internationales Privatrecht*, note 13 to art. 165 (1995).
Further, claims based on company law also include claims regarding
20   officers' and directors' liability (see Vischer (*op. cit.*, note 1 to art. 165) or
Girsberger (*op. cit.*, note 3 to art. 165)).

Consequently, a decision by the Cayman courts rendered against the
defendants domiciled in Switzerland based on breach of the defendants'
duties as *de facto* or shadow directors will not be recognized and enforced
25   in Switzerland. The result would not have been different had the current
revision to art. 59 of the Swiss Constitution been in force at the time of
the decision. The revision of art. 59 entails the reinforcement of the
general principle under Swiss law whereby civil claims should be decided
in the country of the defendant's domicile. Although there are exceptions
30   to this rule, they do not relate to art. 165(1) of the IPLA.

The second limb of this ground of the defendants' O.12, r.8 application
is directed at what the defendants consider to be a lack of any fiduciary,
contractual or other relationship giving rise to the duty of care alleged
between the plaintiffs and the second, third, fourth, seventh, eighth, tenth
35   and eleventh defendants or any of them. The existence of any alleged tort
or breach of duty has already been determined under the other sub-
paragraphs.

It is the defendants' contention that the affidavit in support of the
application for leave to serve them outside the jurisdiction failed to give
40   full and frank disclosure of relevant facts and matters. The writ, which is
itself a virtual carbon copy of the affidavit in support, contains claims of
contractual and fiduciary relationships. They have already been examined
under their respective sub-paragraphs. Where the affidavit appears to fall
short in giving full and frank disclosure is regarding the background to
45   the plaintiffs' claims. This would certainly be the case if, as the

defendants allege, the plaintiffs were aware of an administration order made in respect of PPI by the High Court in London on October 25th, 1990. The administrators have subsequently commenced High Court proceedings against CIBS and Confidas to recover moneys which the 5 administrators are claiming were stolen from PPI by Mr. N., including moneys paid through an account in the name of Mrs. N. at CIBS.

Litigation in England and Switzerland and the claims made by the administrators of PPI are material to the background of the collapse of PPI's shares. The defendants argue that as the plaintiffs claim equitable 10 relief, it is necessary to show that they are entitled in equity to make the claims asserted notwithstanding what Mr. S. says in his affidavits. It cannot be denied that it would be inequitable for the defendants to be held personally liable in respect of the same assets to different claimants in different courts.

15 These are all matters which the plaintiffs are alleged to have known but failed to put before the court. It is an axiomatic principle of law that the applicant in an *ex parte* summons must make a full and frank disclosure of any facts known to him which might lead the court not to grant relief *ex parte*. In this regard the court has a discretion which ought to be exercised 20 to protect its own process from abuse. The manner in which the power ought to be exercised was enunciated by Viscount Reading, C.J. in *R.* v. *Kensington Income Tax Commrs, ex p. Princess Edmond de Polignac* (13). In his judgment, which was approved on appeal by the Court of Appeal, the learned Lord Chief Justice said ([1917] 1 K.B. at 496):

25 "This is a power inherent in the Court, but one which should only be used in cases which bring conviction to the mind of the Court that it has been deceived. Before coming to this conclusion a careful examination will be made of the facts as they are and as they have been stated in the applicant's affidavit, and everything will be heard 30 that can be urged to influence the view of the Court when it reads the affidavit and knows the true facts. But if the result of this examination and hearing is to leave no doubt that the Court has been deceived, then it will refuse to hear anything further from the applicant in a proceeding which has only been set in motion by 35 means of a misleading affidavit."

Certainly the litigation in England and Switzerland relating to this matter and the possibility that the defendants could be held personally liable in respect of the same assets to different claimants in different courts may very well have led the court not to grant the application.

40 In conclusion, although the four plaintiffs are Cayman companies and the plaintiffs have raised real issues which they may reasonably ask the court to try, it is abundantly clear to me that the Cayman Islands are not the proper forum for the trial of this action. I am drawn to the conclusion of this action and the events leading up to it. Of significance is the very 45 nature of the plaintiffs which may well be classified as shell companies.

Although registered in the Cayman Islands and therefore considered Cayman companies, they all appear to be holding companies. There is no evidence that any of them carried on business within these Islands. On the contrary, the purchase and realization of assets did not occur in the Cayman Islands, nor were the assets held here. Furthermore, the defendants who are alleged to have played the most active role in this action were all in Switzerland, along with their papers. In addition, there were Swiss liquidators making it possible and convenient for claims to be made in that country.

There is also the plaintiffs' failure to make a full and frank disclosure to the court at the hearing of the *ex parte* application. No doubt had the court been apprised of the true situation on the application for leave to serve the writ outside the jurisdiction, it would not have been granted. It has not been denied that there is pending litigation before the Swiss and English courts which will decide the forum relating to issues which may affect the outcome of the action. There is, to my mind, a possibility that by exercising jurisdiction over this matter, the Cayman court will risk inconsistency between decisions in different jurisdictions.

Most important of all is the likely enforceability of this court's judgment in this matter. The plaintiffs have complained of procedural difficulties which would arise should they find it necessary to proceed in Switzerland. This is of no great significance when compared with the exercise in futility and embarrassment to a court in the Cayman Islands should it be asked to assume jurisdiction over a matter the judgment in which is unenforceable.

Finally, I come to the last summons filed, that on behalf of the plaintiffs seeking retrospective validation of the order of Smellie, J. In keeping with much of this ruling, what follows is purely academic. Following the principle laid down in the recent case of *Kuwait Oil Tanker Co. S.A.K.* v. *Al Bader* (9), the defendants concede that leave was granted without satisfying the requirement of O.11, r.1(1)(c) that one defendant is duly served within or out of the jurisdiction before leave can be granted to serve another defendant out of the jurisdiction. In that case leave was validated retrospectively because the court found that there were a number of special cirumstances which warranted such validation.

It is submitted by the defendants that the circumstances in this case are substantially different. In the *Kuwait* case, service on a defendant within the jurisdiction was effected on the same day that leave was granted to serve the writ out of the jurisdiction. In the present case leave to serve out of the jurisdiction was granted on August 27th, 1996. Service was effected for the first time in the Cayman Islands on November 28th, 1996, three months later. In the *Kuwait* case, at the time when the leave to serve out of the jurisdiction was challenged, the plaintiffs were still in time to make an application to extend the writ in order to make a further application for leave to serve out of the jurisdiction, having fulfilled the

requirements as to due service. Accordingly, they could easily have cured their earlier mistakes. In this regard there seems to be little, if any, difference between this and the present case. Here the writ was extended on February 27th, 1997.

5   Contrary to the defendants' submission that the writ was extended for the purpose of re-applying for leave to serve the ninth defendant, there is no indication, either in the affidavit of Guy Locke supporting the summons, or on the summons itself, or the order, that the extension was for any special purpose. As prayed, the order merely states that the

10  validity of the writ of summons be extended for a further period of 12 months from its present date of expiry until February 28th, 1998. The validity of the leave was retrospective, going back to February 17th, the very day on which service was effected outside the jurisdiction. It appears to me, from the chronology of events, that the present application for

15  leave to serve falls well within the time extended for service. It stands to reason that the plaintiffs need not, under this extension, re-apply for leave to serve. This would entail repeating the process once more.

It follows, therefore, that the required leave could have been granted to validate retrospectively the order of Smellie, J. However, the order sought

20  cannot be granted as the plaintiffs have not shown that the Cayman Islands are the appropriate forum in which this action can be brought. In the circumstances of the case the court has no jurisdiction over the second, third, fourth, seventh, eighth, tenth and eleventh defendants in respect of the subject-matter of the claim. Accordingly, the order of

25  Smellie, J. dated August 27th, 1996 is hereby discharged.

*Orders accordingly.*

*W.S. Walker & Co.* for the plaintiffs; *Maples & Calder* for the defendants.