**[1997 CILR 527]**

**WAHR-HANSEN**

*v.*

**BRIDGE TRUST COMPANY LIMITED and FOUR OTHERS**

*Court of Appeal*

(Zacca, P., Kerr and Collett, JJ.A.)

**28 November 1997**

*Trusts—creation—obligation to distribute income—may infer intention to create trust despite absence of express obligation to distribute income if possible to give favourable construction to uphold charitable objects*

*Charities—charitable purposes—intention of settlor—no construction of general words ejusdem generis with class of other implicitly charitable objects unless trust instrument shows intention to benefit exclusively charitable objects—clause permitting amendments to benefit non-charitable objects may suggest contrary intention*

The parties applied to the Grand Court for a declaration to determine the validity of a trust.

The appellant represented the estate of the alleged owner of assets settled in The Bahamas on the trusts of the Continental Foundation ("CF"), of which the second respondent was the first trustee. By cl. 3 of the trust, the trustees, when not required by law to do so, were given "an absolute discretion to distribute income…to any one or more religious, charitable or educational institution or institutions or any organizations or institutions operating for the public good…the intention being to enable the trustees to endeavour to act for the good or for the benefit of mankind in general or any section of mankind in particular anywhere in the world or throughout the world."

The law governing the trust was changed from that of The Bahamas to that of the Cayman Islands under cl. 39 of the trust instrument.

The ostensible settlor of the CF trust was also the settlor of a second trust, the Aall Foundation, of which the first and second respondents were trustees, and to which the majority of the CF trust assets were transferred after the death of their alleged owner. The appellant brought proceedings in England alleging misappropriation of the trust assets by the first and second respondents, who in turn sought directions from the Grand Court on how best to proceed in the interests of the two trusts.

The Grand Court (Harre, C.J.) ruled, on the preliminary issues relating to the validity of the CF trust, that the governing law had changed from Bahamian to Cayman law, and that under the law relating to charitable trusts in the Cayman Islands (which was the same as that in England) the trust instrument created a trust the objects of which were exclusively charitable and which was not invalidated by its lack of geographical

527

limits. The last of the four categories of object listed, namely "any organizations or institutions operating for the public good" was to be read *ejusdem generis* with the preceding three heads of charity to achieve this construction. Accordingly, the trust was valid. The proceedings in the Grand Court are reported at *1996 CILR 52*.

On appeal, the appellant submitted that (a) regardless of the settlor's intentions, the trust instrument did not create a valid trust of any kind, since it imposed no obligation on the trustees to distribute income to the objects specified in cl. 3, but instead created a collection of powers without any duty to exercise them; (b) the objects of the trust, in any event, were not exclusively charitable since (i) the recitals expressed the settlor's wish to benefit "worthy *individuals*, organizations and *corporations*," an intention which could only be achieved by an amendment to cl. 3, which at present permitted only "organizations or institutions" to benefit, and (in contast to the Aall Foundation) amendments which might alter the charitable nature of the trust were not prohibited, (ii) although the first three categories of object specified in cl. 3 were charitable, the fourth could not be so construed as the words "or any organizations or institutions operating for the public good" suggested a disjunctive interpretation, allowing non-charitable bodies to benefit unless the context indicated otherwise, and (iii) the principle of *ejusdem generis* did not apply to extend the charitable nature of the first three categories to the fourth, since the terms of the trust as a whole did not imply an exclusively charitable intention; and (c) accordingly, there was no valid charitable trust and the assets of the CF trust were held on a resulting trust for the settlor.

The respondents submitted in reply that (a) since it was clear from the recitals and cl. 3 that the settlor had intended to create a trust and to make provision for the management and distribution of the trust fund, the court should construe the operative provisions favourably so as to uphold the charitable objects of the trust; (b) the trust instrument therefore created an implied trust to apply income for the benefit of the objects listed in cl. 3, together with a power to accumulate the income, which could be exercised indefinitely, so that a distribution might never be made; and (c) the objects of the trust were exclusively charitable since (i) the fourth category of objects in cl. 3, namely organizations and institutions operating for the public good, was to be construed as confined to objects within the spirit of the Preamble to the Charitable Uses Act 1601, as were the first three categories, by the application of the *ejusdem generis* principle, (ii) the court should uphold as charitable a gift in general words for the public benefit, provided there was nothing expressed to prevent such a construction, and (iii) given the draftsman's undoubted knowledge of the four heads of charity at common law, any other construction of the settlor's intention would be perverse.

**Held,** allowing the appeal:

(1) The court was satisfied that the change of the law governing the trust from that of The Bahamas to that of the Cayman Islands was valid

for the purposes of s.4 of the Trusts (Foreign Element) Law, 1987, and would adopt the reasoning of the Grand Court in this respect (page 532, lines 15–31).

(2) It was accepted by the parties, and the court agreed, that the law relating to charitable trusts was the same in the Cayman Islands as in England. Accordingly, no more liberal construction of charitable purposes was to be applied here than elsewhere for socio-economic reasons or otherwise (page 532, lines 32–45).

(3) The CF trust instrument had created a valid trust even though it imposed no express obligation on the trustees to distribute the income, since the recitals stated that the purpose of the instrument was to create a trust and it could be inferred from cl. 3 that that was the settlor's intention. Furthermore, since its objects were ostensibly charitable, the court would construe its provisions favourably so as to uphold those objects if possible (page 535, line 27 – page 536, line 12; page 536, lines 20–24).

(4) However, upon closer analysis, the trust was not charitable, since no intention was shown to benefit exclusively charitable objects. Although the first three categories of object described in cl. 3—namely religious, charitable (relief of poverty) and educational bodies—were accepted as being within the spirit and intendment of the Preamble to the Charitable Uses Act 1601 and were implicitly charitable, the fourth was not. Since not all bodies operating for the public good could be regarded as charitable, the respondents were required to show an intention to benefit only institutions of that kind which were also charitable. The phrase "or any organizations…" was *prima facie* disjunctive and could not be construed *ejusdem generis* with the preceding words as there was nothing in the trust as a whole to imply such an intention. On the contrary, there was no prohibition on amendments which might alter the charitable status of the trust, and the "worthy *individuals*, organizations and *corporations*" described in its recitals could only be benefited under it by precisely such an amendment. Accordingly, the assets of the CF trust were held on a resulting trust for the settlor (page 536, lines 29–43; page 537, lines 15–33; page 538, lines 21–31; page 539, lines 8–26; page 540, lines 27–43; page 541, line 28 – page 543, line 9; page 543, lines 26–31).

**Cases cited:**

(1) *Atkinson's Will Trusts, In re, Atkinson v. Hall*, [1978] 1 W.L.R. 586; [1978] 1 All E.R. 1275, applied.

(2) *Att.-Gen. v. Carlisle (Mayor & Corp.)* (1828), 2 Sim. 437; 57 E.R. 851.

(3) *Att.-Gen. v. Lonsdale (Earl)* (1827), 1 Sim. 105; 57 E.R. 518.

(4) *Att.-Gen. v. National Provncl. & Union Bank of England*, [1924] A.C. 262; [1923] All E.R. Rep. 123, *dicta* of Lord Cave applied.

(5) *Att.-Gen. (Bahamas) v. Royal Trust Co.* (1983), 36 W.I.R. 1; on appeal, [1986] 1 W.L.R. 1001; [1986] 3 All E.R. 423, *dicta* of Luckhoo, P. applied.

(6) *Att.-Gen. (New Zealand) v. Brown*, [1917] A.C. 393; [1916-17] All E.R. Rep. 245.

(7) *Blair v. Duncan*, [1902] A.C. 37; (1901), 71 L.J.P.C. 22.

(8) *Combe, In re, Combe v. Combe*, [1925] Ch. 210; [1925] All E.R. Rep. 159; *sub nom. In re Coombe, Coombe v. Coombe* (1925), 133 L.T. 473, distinguished.

(9) *Houston v. Burns*, [1918] A.C. 337; (1918), 87 L.J.P.C. 99.

(10) *Income Tax Special Purpose Commrs. v. Pemsel*, [1891] A.C. 531; [1891-4] All E.R. Rep. 28, *dicta* of Lord Macnaghten applied.

(11) *Incorporated Council of Law Reporting (England & Wales) v. Att.-Gen.*, [1972] Ch. 73; [1971] 3 All E.R. 1029, *dicta* of Russell, L.J. applied.

(12) *Incorporated Council of Law Reporting (Queensland) v. Commr. of Taxation (Australia)* (1971), 125 C.L.R. 659; 45 ALJR 552.

(13) *Inland Rev. Commrs. v. McMullen*, [1981] A.C. 1; [1980] 1 All E.R. 884.

(14) *Macduff, In re, Macduff v. Macduff*, [1896] 2 Ch. 451; [1895-9] All E.R. Rep. 154.

(15) *Mitford v. Reynolds* (1842), 1 Ph. 185; 41 E.R. 602; [1835-42] All E.R. Rep. 331.

(16) *Nightingale v. Goulburn* (1848), 2 Ph. 594; 41 E.R. 1072; [1843-60] All E.R. Rep. 420.

(17) *Ogden (H.J.), In re, Brydon v. Samuel*, [1933] Ch. 678; [1933] All E.R. Rep. 720, distinguished.

(18) *Pardoe, In re, McLaughlin v. Att.-Gen.*, [1906] 2 Ch. 184; (1906), 75 L.J. Ch. 455, considered.

(19) *Smith, In re, Public Trustee v. Smith*, [1932] 1 Ch. 153; [1931] All E.R. Rep. 617, distinguished.

(20) *Vandervell's Trusts (No. 2), In re, White v. Vandervell Trustees Ltd.*, [1974] Ch. 269; [1974] 3 All E.R. 205, applied.

(21) *Weekes' Settlement, In re*, [1897] 1 Ch. 289; (1897), 76 L.T. 112, distinguished.

(22) *West v. Knight* (1669), 1 Cas. in Ch. 134; 22 E.R. 729.

**Legislation construed:**

Trusts (Foreign Element) Law, 1987 (Law 17 of 1987), s.4(4):

"If the terms of a trust so provide, the governing law of the trust may be changed to or from the laws of the Islands provided that:

(i) in the case of a change to the law of the Islands, such change is recognised by the governing law of the trust previously in effect…."

Charitable Uses Act 1601 (43 Eliz. 1, c.4), Preamble: The relevant terms of this Preamble are set out at page 537, lines 2–6.

*P.H. Goldsmith, Q.C.*, *D.J. Close* and *G.F. Ritchie* for the appellant;

*T.M.E.B. Etherton, Q.C.*, *C.R.F. Tidmarsh* and *A.J.E. Foster* for the first and second respondents;

*M.C.C. Hart, Q.C.* and *W.J. Helfrecht* for the third respondent;

*A.G. Boyle, Q.C.*, *N.F. Harrison* and *N.R.L. Clifford* for the fourth respondent;

*S. Barrie* for the fifth respondent.

**COLLETT, J.A.**, delivering the judgment of the court: The subject matter of this appeal is the Continental Foundation and its validity or otherwise in law as a charitable trust. The foundation was set up by a memorandum of agreement under seal dated July 20th, 1976, made between Thorleif Monsen as the ostensible settlor, Robert Slatter of Nassau, The Bahamas, as the first trustee and three gentlemen described as advisors to the trustees, who are invested with certain supervisory powers thereunder.

We are concerned in this appeal essentially with the question of the proper construction of this agreement but a brief resumé of the history of the matter is necessary to set it in context. The appellant here represents the insolvent estate of one Andrew Jahre who died in 1982 and who is alleged by the appellant to have been the real and effective settlor, using Mr. Monsen as a front, and the substantial ultimate contributor of the funds made available to the Foundation after its establishment.

The first and second respondents are trustees of another allegedly charitable foundation, the Aall Foundation, set up by a separate memorandum of agreement dated October 7th, 1982 of which the ostensible settlor was also Thorleif Monsen. The connection between these two foundations is that, shortly after the death of Mr. Jahre, the vast majority of the assets then subsisting in the Continental Foundation were transferred to the trustees of the Aall Foundation, where they remain today.

Litigation having been commenced in the Grand Court in connection with these transactions, it was ordered that preliminary issues as to the validity of each of the Continental and Aall Foundation be tried, in which the present first and second respondents were the plaintiffs, and the defendants were respectively the Attorney General of the Cayman Islands, the present appellant, Compass Trust Co. Ltd., as legal personal representative of Thorleif Monsen, deceased, and various individual partners of a Canadian law firm engaged in the preparation of the trust deeds in question.

At the hearing of the preliminary issues in the Grand Court it appears to have been conceded by the present appellant that, as a matter of construction of the deed of October 7th, 1982, the Aall Foundation was a valid charitable trust in law and the court so found. No issue was therefore raised in this appeal as to the decision of the Grand Court in that

respect, and so we are now solely concerned with the validity or otherwise of the Continental Foundation.

It is also not in dispute that if the Continental Foundation is not valid as a charitable trust, it is void and of no effect in law. This is for two reasons, as counsel for the appellant has submitted. The first is that it would offend the relevant rule against perpetuities and the second, that it is a "purpose trust" whose beneficial objects are not identifiable. Only a trust which is exclusively charitable can be valid if it is capable of extending beyond the legal perpetuity period and only such a trust can avail of the services of the Attorney General on behalf of the Crown to enforce its provisions in the absence of identifiable beneficiaries. If, therefore, the Continental Foundation is not a valid charitable trust it must fail, and a resulting trust in favour of the settlor will arise instead (see *In re Vandervell's Trusts (No. 2)* (20)).

Before the Grand Court several issues were raised and decided with which we have not been greatly troubled on appeal. The first of these concerns the governing law. This law was, in accordance with cl. 39 of the memorandum of agreement, originally that of The Bahamas, being the place where the majority of the original trustees resided. That clause also empowered the trustees, in the exercise of their discretion, to transfer the *situs* and/or the governing law to another jurisdiction, and this they did by a further memorandum of agreement dated December 22nd, 1976. The validity of that transfer was in issue at the Grand Court hearing and after careful consideration of the Trusts (Foreign Element) Law, 1987 and in particular s.4(4) thereof, the learned Chief Justice concluded that it should be upheld as valid. In consequence the preliminary issue raised with respect to the Continental Foundation fell to be determined by Cayman rather than Bahamian or any other law. While this particular issue was not extensively canvassed before us for reasons which will be apparent, we see no reason to question or to depart from the Chief Justice's ruling in that respect and are content to adopt it and proceed accordingly.

At the Grand Court hearing further argument was advanced by those concerned to uphold the validity of the Foundation as to the extent to which the law relating to charitable trusts in England and Wales also applies in the Cayman Islands. A suggestion was advanced on behalf of the Attorney General that a more liberal construction was proper here than in England for various socio-economic reasons. That suggestion was rejected by the learned Chief Justice and his judgment in this respect has not been further challenged on appeal. Before this court it was generally accepted by all parties that, to paraphrase the judgment of Luckhoo, P. in *Att.-Gen. (Bahamas)* v. *Royal Trust Co.* (5) in the Bahamas Court of Appeal, the law of the Cayman Islands "is the same as that of England in relation to the broad legal principles by which a court exercising equitable jurisdiction should be guided in determining whether particular purposes are charitable in the eye of the law."

It will shortly be necessary to examine those legal principles but before doing so the pertinent terms of the Continental Foundation should be set out so that the question of its proper construction may be examined in the light of the relevant authorities. These terms are as follows:

First Recital: "Whereas the settlor wishes to establish a trust for the benefit of worthy individuals, organizations and corporations all upon the terms and conditions hereinafter set forth, and to be known as the 'Continental Foundation.'"

Clause 3: "The trustees may accumulate and add to the capital, the net annual income derived from the trust fund for so long as the law applicable to the trustees permits them to do so. In any year that the law applicable to the trustees requires them to distribute income or in any year that the trustees not being required to distribute income decide in the exercise of an absolute discretion to distribute income then such income or any part thereof shall be paid to any one or more religious, charitable or educational institution or institutions or any organizations or institutions operating for the public good (and the trustees shall be sole and absolute judges of whether any organization or institution so qualifies are [*sic*] as a beneficiary hereunder) the intention being to enable the trustees to endeavour to act for the good or for the benefit of mankind in general or any section of mankind in particular anywhere in the world or throughout the world. In the case of any question as to the propriety of any distribution or selection by the trustees the written approval of the advisors to the trustees, if such exist, shall be an absolute and final determination which shall not be open to question."

Clause 4: "The trustees may at any time or from time to time prior to the date of final distribution provided they first obtain the written approval of the advisors but otherwise in their discretion, pay or transfer any part of the capital of the trust fund (and even if it shall result in a complete distribution of the entire trust fund) to any person, persons, institution or organization who at that time qualify as beneficiaries who are entitled or contingently or prospectively entitled to receive income as herein before provided."

Clause 31: "By unanimous agreement at any time between the trustees and upon obtaining the written approval of the advisors to the trustees any term or provision of the trust may be amended or revoked or additional terms may be added thereto provided always that in no event shall any amendment whatsoever be made which results in any part of the capital or income of the trust fund being paid to the settlor or to a person who is or has been a trustee hereunder."

Mention should also be made of cl. 5 of the agreement, which empowers the trustees, with the approval of the advisors, to transfer the whole or part of the trust fund for resettlement upon new trusts in favour of the

beneficiaries or prospective or contingent beneficiaries of the trust. This appears to have constituted the legal basis for the transfer of assets out of the Continental Foundation and into the Aall Foundation in 1982.

The argument for the appellant in this court essentially falls under two separate heads. The first introduces a new point which was not raised at the hearing in the Grand Court. This is of course no reflection upon its validity in law but the late stage at which it has now been raised deprives us of such assistance as we might have otherwise derived from a consideration of it by the trial judge. The point is contained in para. 1(5) of the memorandum of grounds of appeal. The appellant also contends that no exclusively charitable intent can be derived from the wording of the memorandum of July 20th, 1976 but, in this alternative new argument, he submits that, even if such a charitable intent could be found, the Continental Foundation still fails because, on its true construction, no trust is created but only a mere compendium of miscellaneous powers in the so-called trustees without any obligation to exercise them.

The argument proceeds upon this basis. An essential feature of every trust is that it is imperative—conferring a duty upon the trustee(s). A mere power is quite different in that it may or may not be exercised. For the Continental Foundation to be a valid charitable trust there must be a duty to distribute either capital or income or both to the allegedly charitable objects. No such duty, either express or implied, can be found, it is said, in the wording of the memorandum properly considered in its context. Accordingly, the trustees hold the capital of the trust fund upon a resulting trust in favour of the settlor, irrespective of whether or not the objects are legally charitable.

The operative clauses of the memorandum, including those already quoted, do not disclose the existence of any express obligation upon the trustees to stand possessed of the trust fund upon trust to apply the capital or distribute the income arising therefrom to any of the objects specified in cl. 3. Counsel for the respondents, however, point out that the trustees have by that clause only two options available to them, namely, to distribute income among those beneficiaries or to accumulate it to the extent that the governing law permits. They submit that a trust in favour of those beneficial objects ought to be implied and that the memorandum should be construed as a trust to apply the income to the beneficiaries coupled with a power to accumulate income for an indefinite period in the meantime subject to that limitation. Some analogy could perhaps be drawn with the statutory trust for sale of real property under the current English law of real property, when conveyed or devised to two or more beneficial owners, which is coupled with an indefinite power in the trustees to postpone sale. In such a case the sale may never happen. The same applies to the distribution here.

The authorities cited by counsel for the appellant in support of this argument do not greatly assist. *In re Weekes' Settlement* (21) and *In re*

*Combe* (8) were both instances of private will trusts in favour of those members of a defined class of objects who might be selected in the exercise of a limited power of appointment, the question being in each case whether the terms of the respective will disclosed an intention on the part of the testator to benefit the class as a whole in the absence of any exercise of that power. That is far from the present case, where the question is rather whether the settlor by deed *inter vivos* intended to impose upon his trustees an obligation to apply income arising from the trust fund in favour of objects which, *ex hypothesi* for the purpose of this ground of appeal, should be regarded as legally charitable and capable of taking benefit.

Nor is much assistance to be derived from *In re H.J. Ogden* (17) where the question was whether an immediate bequest of capital to a class of institutions, not necessarily charitable, was void for uncertainty or valid, where the executors were empowered to select those who should benefit. Indeed Lord Tomlin said ([1933] Ch. at 683): "I can find no trust at all" but nevertheless he upheld the validity of that gift in its context.

This question is ultimately to be answered by our seeking to discover, from the terms of the memorandum itself, whether it must have been the intention of the settlor that the trustees should apply at least the income of the trust fund to the objects specified in cl. 3. The fact that no positive obligation to distribute capital is included, as opposed to the discretionary power to do so contained in cl. 4, is of itself no bar to the validity of a charitable trust (see Tudor, *Charities*, 8th ed., at 140 (1995) and the cases there cited). Nor is the existence of a power of revocation, as for instance here in cl. 31, any bar to the validity of such a trust *pro tem*.

What indications, if any, exist in this memorandum as to the intentions of the settlor in this regard? One of the most powerful must be the opening words of the first recital, "Whereas the settlor wishes to establish a trust for the benefit of…." It must be apparent from these opening words that, if an imperative obligation has not been imposed upon his trustees by the succeeding words of the document, his overriding intention has been frustrated by the inattention of the draftsman. Is the obligation to invest and the carefully detailed provisions for management of the trust fund merely to give rise to a resulting trust in favour of the settlor himself? It is noteworthy that even the provision for amendment or revocation of the memorandum contained in cl. 31 is subject to a provision barring any future benefit for the settlor himself. We are, of course, concerned here with an exercise of interpretation of the deed itself and speculation as to the ultimate motives of Mr. Jahre, who is not even mentioned there, lies wholly outside its scope.

A further indication of the settlor's intentions occurs after the words in parenthesis in cl. 3 of the memorandum: "…[T]he intention being to enable the trustees to endeavour to act for the good of mankind in general or any section of mankind in particular…." "Enable" presumably refers

to the provision of the trust funds. If the stated intention is that the trustees should endeavour to use the funds for such a purpose, is it reasonable to suppose that they should have no obligation to do so but should be left to decide entirely in their discretion whether to pursue those endeavours or not? This seems extremely unlikely to have been the intention of the settlor.

Finally, if at the end of the day one is left in any doubt as to whether or not an intention to create a valid trust is imputable to the settlor of the Continental Foundation, it would be legitimate to invoke the benignant rule that the courts will strain to hold dispositions in favour of charitable objects valid rather than allow them to fail by adopting a narrow or conservative construction: "*Ut res magis valeat quam pereat!*" This rule was considered with approval by the learned Chief Justice in the Grand Court, admittedly in a different context, though he did not have to rely upon it. He cited a passage from the speech of Lord Hailsham, L.C. in *Inland Rev. Commrs.* v. *McMullen* (13) ([1981] A.C. at 14) which explains this doctrine and, since for the purposes of this particular issue the objects must be taken as charitable, it is right that it should be put into the balance here should any doubt remain as to the imperative nature of the deed.

As a result we are of the clear view that an intention to create a trust in favour of the objects specified in cl. 3 of the memorandum is to be implied and accordingly the points raised in para. 1(5) of the memorandum of grounds of appeal lack substance and afford no basis for disagreement with the judgment of the court below. We now, therefore, turn to the main complaints made against that judgment in sub-paras. (1) - (4) of ground 1 of that memorandum, namely the question whether exclusively charitable purposes are to be found in the memorandum of July 20th, 1976.

The law relating to charitable trusts in England and Wales, which as we have seen is also that of the Cayman Islands and of The Bahamas, is a creature of Equity and has developed over many centuries. As the learned Chief Justice observed in his judgment, a trust will only qualify as charitable if it falls within one or other of the four heads of charity established by case law and is "within the spirit and intendment of the Preamble to the Charitable Uses Act 1601, often referred to as 'the Statute of Elizabeth I.'" These four heads were comprehensively defined in the well known *dicta* of Lord Macnaghten in *Income Tax Special Purpose Commrs.* v. *Pemsel* (10) as follows ([1891] A.C. at 583):

> "'Charity' in its legal sense comprises four principal divisions: trusts for the relief of poverty; trusts for the advancement of education; trusts for the advancement of religion; and trusts for other purposes beneficial to the community, not falling under any of the preceding heads."

The four heads of Lord Macnaghten's classification are indeed a compendium of miscellaneous purposes. Reference to the Preamble to the

Statute of Elizabeth I itself shows quite how miscellaneous it is; it comprises specifically "the repair of bridges, ports, havens, causeways, churches, seabanks and highways…the relief, stock or maintenance of houses of correction…the supportation, aid and help of young tradesmen, handicraftsman and persons decayed; the relief or redemption of prisoners or captives"; apart from those specific purposes which can be grouped under one or other of the three other stated heads of that classification. Many further purposes not set out in the Preamble have subsequently been held by decisions of the courts of equity over the years to be charitable under the fourth head of the classification by a process of analogy. The promotion of health, the provision of recreational facilities, social rehabilitation and the protection of animals have, according to Picarda, *The Law & Practice Relating To Charities*, 2nd ed., at 11 (1995) been recognized by the courts as charitable purposes within the spirit and intendment of the Preamble. It is evident that the fourth head of Lord Macnaghten's classification is far from closed and this fact is generally recognized.

Nevertheless, it is also clear from the authorities that, although new purposes may be held to be legally charitable under the fourth head of classification, that head is by no means co-extensive with every purpose which is for the public good or public benefit. As Lord Cave pointed out in *Att.-Gen.* v. *National Provncl. & Union Bank of England* (4) ([1924] A.C. at 265):

> "My lords, it has been pointed out more than once, and particularly by the members of the Court of Appeal in *Re Macduff*…that Lord Macnaghten did not mean that all trusts for purposes beneficial to the community are charitable, but that there were certain charitable trusts which fell within that category; and accordingly to argue that because a trust is for a purpose beneficial to the community it is therefore a charitable trust is to turn round his sentence and to give it a different meaning. So here it is not enough to say that the trust in question is for public purposes beneficial to the community or for the public welfare; you must also show it to be a charitable trust."

In perhaps the most recent extension of the fourth head of legal charity, the courts both in England and Australia have held the purpose of the gratuitous editing and publication of the reports of their legal decisions to be both for the public benefit and also, by analogy, within the spirit and intendment of the Preamble: see *Incorporated Council of Law Reporting (England & Wales)* v. *Att.-Gen.* (11) and *Incorporated Council of Law Reporting (Queensland)* v. *Commr. of Taxation (Australia)* (12). Russell, L.J. in the former case had this to say ([1972] Ch. at 88):

> "The Statute of Elizabeth I was a statute to reform abuses: in such circumstances and in that age the courts of this country were not inclined to be restricted in their implementation of Parliament's desire for reform to particular examples given by the Statute and

>       they deliberately kept open their ability to intervene when they
>       thought necessary in cases not specifically mentioned, by applying
>       as the test whether any particular case of abuse of funds or property
>       was within the 'mischief' or 'equity' of the Statute.

5   For myself I believe that this rather vague and undefined approach is the correct one, with analogy its handmaid, and that when considering Lord Macnaghten's fourth category in *Pemsel's* case… of 'other purposes beneficial to the community' (or as phrased by Sir Samuel Romilly (then Mr. Romilly) in argument in *Morice* v.
10  *Bishop of Durham*…'objects of general public utility') the courts, in consistently saying that not all such are necessarily charitable in law, are in substance accepting that if a purpose is shown to be so beneficial or of such utility it is prima facie charitable in law, but have left open a line of retreat based on the equity of the Statute in
15  case they are faced with a purpose (*e.g.* a political purpose) which could not have been within the contemplation of the Statute even if the then legislators had been endowed with the gift of foresight into the circumstances of later centuries."

    We are content to adopt that formulation as the right approach to the
20  difficult question of defining the extent of the fourth head of classification of legal charity. However, the problem of construction which arises in the instant case is not to determine whether a particular purpose or object, such as law reporting, can be considered charitable as being of undeniable public utility and within the spirit and intendment
25  of the Preamble by analogy. Rather it is to decide whether the phraseology adopted by the draftsman of the memorandum of July 20th, 1976 in cl. 3 and elsewhere in that document discloses an intention to confine the objects and purposes which the trustees are empowered to benefit to such as are legally charitable not only under the first three but
30  also under the fourth and last of Lord Macnaghten's heads of classification. Such a task requires a close analysis of the text of the document. Before undertaking it, however, a brief review can profitably be made of some of the authorities which were cited and relied upon by counsel in argument.

35  There is a particular line of authority which might perhaps be designated as the "disjunctive purpose" cases, where the mention of legally charitable purposes has been coupled by the draftsman of the relevant instrument, often by use of the word "or" with mention of public purposes of a different kind. Examples are *In re Macduff* (14)—
40  "charitable or philanthropic purposes"; *Att.-Gen. (Bahamas)* v. *Royal Trust Co.* (5)—"education and welfare of Bahamian children"; *Att.-Gen.* v. *National Provncl. & Union Bank of England* (4)—"patriotic purposes …or charitable objects"; *Blair* v. *Duncan* (7)—"such charitable or public purposes as my trustee thinks proper"; and *Houston* v. *Burns* (9)—
45  "public, benevolent, or charitable purposes."

The principle underlying the decisions in each of these cases is that, once the different purposes are shown by the process of interpretation to have been used disjunctively, logic then requires the court to conclude that mention of the non-charitable purposes is intended to extend the ambit of the beneficial objects of the trust beyond the grounds of legal charity. Hence, the objects cannot be viewed as exclusively charitable and the instrument is not a valid charitable trust.

The words used in the dispositive part of cl. 3 of the memorandum of July 20th, 1976, before the parenthesis to describe the objects of the trust are "one or more religious, charitable or educational institutions or institutions or any organizations or institutions operating for the public good." It was common ground between the parties that the reference in this passage to "charitable" was to its alternative eleemosynary meaning of "for the relief of poverty," which seems to be the proper explanation for its use in this context. The first three of these objects, corresponding to the first three heads of Lord Macnaghten's classification, albeit in a different order, are therefore *prima facie* charitable in law but the question remains: Is the object comprised in the "organizations or institutions operating for the public good" necessarily limited to such as are legally charitable? Certainly the words "or any" which precede that particular phrase are such as to point to a disjunctive intent. The phrase stands on its own. It follows that unless the context in which it appears can be seen to confine its ambit to legally charitable objects, this phrase must be regarded as comprising both charitable and non-charitable objects, given that not all public purposes beneficial to the community can be accepted as being charitable in law, which we have already seen.

Another line of authority which was considered by the learned Chief Justice in this connection comprises what are known as the "locality cases." An outright gift to or for the benefit of the inhabitants of a particular locality is presumed to be implicitly limited to charitable purposes and is good. This doctrine reached its apogee in *In re Smith* (19), a decision of the English Court of Appeal in which many of the earlier cases were reviewed. Amongst these were *West* v. *Knight* (23), which featured a gift to the parish of the testator's birth; *Att.-Gen.* v. *Earl of Lonsdale* (3) in which a gift was made "to the good of the county of Westmorland"; *Att.-Gen.* v. *Mayor & Corp. of Carlisle* (2)—"defence of and preservation of the peace within a city"; *Mitford* v. *Reynolds* (15)—a gift "to the Government of Bengal for the benefit of the native inhabitants"; and *Nightingale* v. *Goulburn* (16)—a bequest to the Chancellor of the Exchequer "to be by him appointed to the benefit and advantage of Great Britain." Each of these gifts were upheld as charitable gifts which were not bad for uncertainty. In *In re Smith* the bequest was simply "unto my country England for own use and benefit absolutely" and this also was upheld as a good gift to be applied to charitable purposes for the benefit of the country as a whole.

The relevance of this line of authority culminating in *In re Smith* (19) to the question of construction which faces us in this case is not readily apparent, for this is not a locality case. The discretion of the trustees is at large and not confined to the inhabitants of any particular locality. So much is quite apparent from the words in cl. 3 which immediately follow the parenthesis: "to enable the trustees to act for the good or for the benefit of mankind in general or any section of mankind in particular anywhere in the world or throughout the world." Such a dedication is almost the direct antithesis of a gift to a defined locality, be that a parish, city, county or a country.

The learned Chief Justice found in certain observations of Lord Hanworth, M.R. in *In re Smith* (19) support for a general proposition that "very general words of gift may in some instances be interpreted as being confined to charitable purposes" although he did not rely upon it in coming to his conclusion. In view of this passage it is perhaps necessary to point out that such a proposition was not the *ratio* of the decision of the Court of Appeal in *In re Smith*. Lawrence, L.J. stated his conclusion thus ([1932] 1 Ch. at 173):

> "…[T]he present case falls within the principle of the cases in which the gift is for the benefit of a *particular class* and, therefore, for a *specified* public purpose and not within the line of cases in which the gift is for public purposes of a *general* and *wholly unrestricted* nature." [Emphasis supplied.]

Romer, L.J. (*ibid.*, at 176) was content to rest his conclusion by analogy with the cases which establish the principle that a gift of trust for the inhabitants of a particular place is a good charitable gift or trust.

Counsel for the first and second respondents sought to urge upon us an extension of that general proposition by inviting the court to hold that, where there is a gift in very general words for the public benefit and there is nothing which renders it impossible to imply a dedication to exclusively charitable purposes, then such a dedication ought to be presumed. This proposition must be regarded as an attempt substantially to extend the law of charitable trusts by extrapolating from the locality cases a doctrine of general application to cases of a different nature. If accepted, it would also extend the rebuttable presumption which applies to the first three heads of Lord Macnaghten's classification—that they are charitable unless it can be shown that no public benefit will ensue—to the fourth head also. But it is precisely because these first three heads are recognized as specifically charitable in nature and because the fourth contains a miscellany which *may or may not* be charitable that such a presumption cannot rightly be applied to general words of public benefit not referable to any such recognized charitable head. If it were to be so applied, the floodgates would be opened. This proposition must therefore be rejected.

We come then finally to the question of construction and the reasons which led the Grand Court to impute to the Continental Foundation the

status of a valid charitable trust. It is evident from passages in the latter part of the Chief Justice's judgment that he founded it essentially upon an application of the canon of construction known as "*ejusdem generis*" and "*noscitur a sociis*." The passages are as follows (*1996 CILR at 80-81*):

> "We have four categories set out in cl. 3, each represented by the word 'or.' It is clearly disjunctive in the sense that it enumerates them separately but not in the sense that it treats institutions operating for the public good as different from, and alternatives to, the preceding three categories which are clearly charitable. What it does is define a fourth category which, like the other three, is limited to the spirit and intendment of the Preamble to the statute of Elizabeth I. Lord Macnaghten must have intended that. So must the draftsman of CF, in the sense in which that phrase has been interpreted in the intervening years. The context overwhelmingly imports that meaning. It is a classic case for an *ejusdem generis* construction, the genus being 'charity.'"

Counsel for the first and second respondents in argument put the same point in this way:

> "The public good object, in the context of an express reference to three of the four heads of charity, is so evocative of Lord Macnaghten's fourth head of charity that it would be perverse not to credit the draftsmen with a knowledge of those four heads and an intention to repeat them in cl. 3."

In support of his application of the *ejusdem generis* rule, the learned Chief Justice referred to *In re Pardoe* (18), where a residuary gift "to and amongst such public charities and institutions or for such charitable purposes for the public advantage or benefit" as the trustees should in their discretion select was upheld. Kekewich, J., although not holding all public institutions to be necessarily charitable, found in the context a clear indication that a limitation to such public institutions as are legally charitable should be implied in the will ([1906] 2 Ch. at 191): "[I]t is all coloured," he said, "with the notion of charity."

Attractive as this line of argument is at first sight, there are on close examination formidable difficulties about its adoption in the present case. Clause 3 of the Continental Foundation memorandum is not notably coloured with the notion of legal charity. The only mention of the word in the clause is in its other eleemosynary sense. The charitable context, if it exists, can only be gathered by regarding the whole of that part of the clause as a restatement in a somewhat different order and in different language of Lord Macnaghten's classification of charitable heads.

It is interesting to compare the language of cl. 3 of the Continental Foundation memorandum with the corresponding language of the Aall Foundation memorandum of October 7th, 1982 because there are clear similarities in the scheme of the two deeds, though significant differences in the language employed. In defining the beneficial interests in its cl. 3,

the Aall Foundation memorandum specifies them thus: "The beneficiaries shall be any charitable, religious or educational organizations, institutions or other such objects anywhere in the world." This admirably brief description leaves no doubt as to the charitable context in which it is employed, by contrast with cl. 3 of the Continental Foundation memorandum, which leaves the question open.

Nevertheless, had cl. 3 of the latter deed stood alone, it might have been possible to resolve the patent ambiguity which it presents in favour of a restriction to purely charitable objects by adopting the rule as to a benignant construction in favour of charity, reference to which has already been made in a different context. But it does not stand alone. When seeking to discern whether the intent is to benefit purely charitable objects, all relevant parts of the document require consideration as part of the context. This requires us to examine also the first recital and cl. 31.

In the recitals the settlor has expressed an intention to benefit "worthy individuals, organizations and corporations." In the first place, it is impossible to equate "worthy" with "charitable" (see *In re Atkinson's Will Trusts* (1)). Secondly, as all parties seem to agree, the reference to individuals and perhaps also to corporations can only be given effect to by operation of cl. 31, and this consideration counters the argument that until that clause is actually implemented, it has no bearing upon the real intent of the settlor as to the nature of the beneficial objects.

When one turns to the terms of cl. 31 itself it becomes apparent that its scope is not merely limited to amendment of the machinery for implementing the trust or to its eventual revocation. The clause extends to any alterations which the trustees with the consent of the advisors may wish to make to the beneficial objects of the trust, subject to the sole limitation that the settlor himself and past and present trustees can take no benefit. No restriction to exclusively charitable objects is expressed and none may be implied because it is only by including non-charitable objects in any such alteration that the trustees could give effect to the settlor's earlier expressed desire to benefit worthy individuals and most (*e.g.* trading) corporations considered worthy. Once again comparison with the Aall Foundation memorandum is instructive. Clause 39 of that trust (as amended) empowers the trustees and advisors of that Foundation also to amend or revoke any provision of the deed but subject to the express limitation that "in no event shall any amendment whatsoever be made which alters the charitable nature of the trust."

It is therefore impossible in our judgment to dismiss as irrelevant the terms of the first recital and cl. 31 of the Continental Foundation deed when considering whether or not its objects are intended to be confined to such as are legally charitable only. When the effect of these provisions is taken into account, one is driven to the conclusion that the settlor did not intend so to confine them and that, by giving his trustees a discretion under cl. 3 to select institutions or organizations operating for the public

good so as to benefit mankind in general or any section of mankind in particular anywhere in the world or throughout the world, he meant them to have and ensured that they did have power to do so on a virtually unrestricted basis. The *ejusdem generis* canon of construction cannot operate in such a context. Just as in *Att.-Gen. (New Zealand)* v. *Brown* (6), references in other parts of the deed have destroyed the context in which it could have otherwise been applied. Philanthropic the intention may well have been, but not necessarily charitable in the legal connotation of that word; and that, of course, is not enough.

Various sophisticated arguments have been deployed to persuade the court that a charitable intent is nevertheless implicit in this memorandum. But the answer to all of them becomes apparent when one asks, if its validity as a charitable trust is upheld, how would our courts restrain the trustees from applying income to objects clearly not within Lord Macnaghten's classification? If, for instance, with the blessing of the advisors they were to devote the entire income to the campaign against further oil exploration in the world's oceans, clearly a controversial political and therefore not a charitable object, how could it be said to be a breach of trust? Many would vehemently declare that in the interest of environmental conservation, a ban upon such exploration is for the general public good. Others would equally vehemently disagree. The courts would find themselves ensnared in a political debate which they could not sensibly resolve because the issue which it raises is not a justiciable issue. This is precisely the dilemma which the sometimes difficult and technical rules of charity law are designed to avoid.

With some reluctance, therefore, we feel obliged to differ from the conclusion reached in the Grand Court that, on the true construction of the memorandum of agreement dated July 20th, 1976 (known as the Continental Foundation), the trusts declared therein are valid. The appeal is allowed and that declaration is now revoked. In its place there will be a declaration that the said trusts are not valid charitable trusts.

The appellants must have their costs of this appeal to be paid by the first and second respondents. We shall hear counsel further as to the incidence of the costs of the other respondents to the appeal and also as to the incidence of the costs of the hearing in the Grand Court in substitution for the orders made therein.

*Appeal allowed.*

*Charles Adams, Ritchie & Duckworth* for the appellant; *W.S. Walker & Co.*, *Ian Boxall & Co., Hunter & Hunter* and *C.S. Gill & Co.* for the respondents.