**[2018 (2) CILR 638]**

# RITTER and GENEVA INSURANCE SPC LIMITED (in voluntary liquidation) v. BUTTERFIELD BANK (CAYMAN) LIMITED

GRAND CT. (Williams, J.) December 31st, 2018

*Civil Procedure — costs — indemnity basis — defective pleading and lack of evidence for speculative dishonest assistance claim against bank highly unreasonable conduct justifying costs on indemnity basis — plaintiffs informed by defendant that pleadings defective and warned of negative costs implications*

The plaintiffs sought damages for, inter alia, breach of contract, negligence and breach of fiduciary duty/dishonest assistance.

The first plaintiff was a director, sole shareholder and beneficial owner of the second plaintiff, a captive insurance company incorporated in the Cayman Islands. In 2008, the second plaintiff opened a corporate bank account with the defendant bank. A director of the second plaintiff made fraudulent transactions on the account by forging the first plaintiff's signature. The payments were honoured by the bank. The plaintiffs brought proceedings against the defendant claiming damages for breach of contract, negligence and dishonest assistance. They contended that by allowing the withdrawals based on forged signatures the bank breached its mandate, with a resultant net loss of US$529,191.

The defendant denied liability. It claimed that the first plaintiff became aware of the fraudulent transactions in September 2011 but failed to inform it until August 2012, depriving it of the opportunity to prevent a number of other transactions and to recover the money wrongfully paid. The plaintiffs should therefore be estopped from asserting the forgeries on which the claims were based. The defendant also denied that it or any of its employees had acted dishonestly. It wrote to the plaintiffs inviting them to withdraw the claim of dishonest assistance because it was not properly pleaded and there was a lack of evidence, warning that it would seek costs on the indemnity basis if the plaintiffs persisted with the claim.

The Grand Court (Williams, J.) found in favour of the defendant. It held that the plaintiffs were estopped from bringing the claim and dismissed the dishonest assistance claim, which was not properly pleaded or evidenced (that judgment is reported at 2018 (1) CILR 529). The plaintiffs sought to appeal against the decision on estoppel.

The defendant applied pursuant to GCR O.62 for the plaintiffs to be ordered to pay its costs on the indemnity basis. The plaintiffs conceded

638

that costs should follow the event but sought an order that costs be taxed on the standard basis and an order capping them at a proportionate sum to the value of the claim.

The defendant submitted that (a) the claim of dishonest assistance was baseless and defective, and the plaintiffs' conduct in persisting with the claim was unreasonable to a high degree and justified an order for indemnity costs; and (b) indemnity costs were sought in relation to the whole of the proceedings on the basis of the plaintiff's improper and highly unreasonable conduct.

The plaintiffs submitted that (a) it had not been unreasonable to bring the claim of dishonest assistance; (b) an order for costs on the indemnity basis should only be made in exceptional circumstances; (c) even if a party lost on all points in a claim, that was not in itself sufficient to categorize the case as so exceptional as to justify indemnity costs; (d) if the court did make a costs order on the indemnity basis, it should only be in relation to the dishonest assistance claim; and (e) the costs of the proceedings should be capped at an amount proportionate to the claim in dispute.

**Held,** ordering as follows:

(1) The general rule in litigation was that costs followed the event and that the successful party would be awarded his costs. GCR O.62, r.4(11) provided that costs could be taxed on the indemnity basis if the court were satisfied that the paying party had conducted the proceedings, or that part of the proceedings to which the order related, improperly, unreasonably or negligently. The discretion under the rule was not fettered or circumscribed, and had to be exercised judicially in light of the facts of the case. Something special or unusual had to be demonstrated to justify a departure from the ordinary costs order, which included that the losing party misconducted itself in relation to the proceedings, where the institution of the proceedings was plainly unreasonable, or where the proceedings were issued for a collateral purpose. The court's focus should be primarily on the conduct of the losing party, not the merits of the case. Advancing a claim which was unlikely to succeed or did in fact fail would not in itself be sufficient to justify an award of indemnity costs; there should normally be an element in the losing party's conduct which deserved a mark of disapproval. Such conduct would need to be unreasonable to a high degree, though not necessarily deserving moral condemnation (paras. 36–43).

(2) The defendant's costs of the dishonest assistance element of the plaintiffs' claim should be assessed on the indemnity basis. When dismissing the plaintiffs' dishonest assistance claim the court had noted that due to their serious nature and the resultant tactical litigation pressure exerted on and consequences for the other party whether the allegations were proved or not, the principles of pleading had to be strictly observed from the outset. The plaintiffs' pleadings had been defective, which the defendant had drawn to their attention from an earlier stage of the proceedings,

and the plaintiffs had failed to provide sufficient evidence. The plaintiffs had been made aware of the potential negative costs implications if they persisted with the claim. A formal warning of an intention to seek indemnity costs could make the award of indemnity costs more likely. When considering whether the plaintiffs' conduct took the case out of the norm (*i.e.* outside the ordinary and reasonable conduct of proceedings), the test was not necessarily conduct attracting moral condemnation but rather unreasonableness. The court had regard to the plaintiffs' conduct throughout the proceedings, prior to and during the hearing, and also to whether it was reasonable for the plaintiffs to raise and pursue the dishonest assistance allegations, as well as the persistent and forceful manner in which they did so. The claim was clearly defectively pleaded, speculative, involving high risk, and evidentially very weak. The plaintiffs should have realized that in choosing to improperly pursue the serious allegations of dishonesty over an extended period of time, especially after the defendant's letter, they were taking a high risk and were aware of the risk of indemnity costs being sought if it failed. The plaintiffs advanced and aggressively pursued the dishonest assistance claim, despite the defective pleading and lack of supporting evidence, and maintained the allegations without apology to the end of the hearing. They recognized the potential damage that such an allegation could inflict on the bank. The nature of the claim and the plaintiffs' highly unreasonable conduct took the pursuit of the dishonest assistance element of the proceedings out of the norm (paras. 44–45; paras. 49–52).

(3) The costs of the balance of the proceedings should be taxed on the standard basis. The determination of the estoppel issue was not straightforward and required a careful application of the law to the relevant facts. It could not be said that the plaintiffs, who were victims of a fraud perpetrated by a third party in relation to funds held at the bank, had been unreasonable in initiating their primary claim and opposing the estoppel defence raised by the defendant. The court had not found that the first plaintiff was dishonest when giving evidence and in his actions, although some of his actions and the approach he took with the bank were questionable. His evidence was at times unconvincing but his reliance upon such evidence in defence of the estoppel argument did not amount to behaviour that was so unreasonable as to justify an order for indemnity costs. The court was not satisfied that the first plaintiff's conduct was highly unreasonable and out of the norm. It would therefore order costs on the standard basis in relation to the estoppel issue. The court suggested that the parties assist the Taxing Officer by providing schedules setting out which costs fell under which part of the claim (paras. 64–72).

(4) A costs capping order would not be made. The court was not satisfied that it had the power to introduce costs capping given the more limited case management and costs provisions in the Cayman Islands as compared with the more comprehensive provisions in England and Wales. There had been no move in the Cayman Islands to introduce provisions or

guidance in Practice Directions about costs that were consistent with an intent to widen the court's costs management powers to include the making of costs capping orders. Such a novel concept could only be introduced in this jurisdiction after detailed consideration by the Grand Court Rules Committee and codification by further clarifying costs provisions in the Grand Court Rules and guidance in a Practice Direction (paras. 94–95).

(5) If the court were wrong in considering that it lacked the power to make a costs capping order, it was not satisfied that it would be appropriate to make such an order in the present case. In England and Wales, the purpose of costs capping orders was to case manage costs before they were, or possibly as they were being, incurred. Such orders should be made prospectively rather than retrospectively, and as soon as possible in proceedings in order to enable the capped party to plan the appropriate level of expenditure (paras. 96–104).

**Cases cited:**

(1) *AB* v. *Leeds Teaching Hospitals NHS Trust*, [2003] EWHC 1034 (QB); [2003] 3 Costs L.R. 405; [2003] Lloyd's Rep. Med. 355, considered.

(2) *Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.*, 2013 (2) CILR 344, considered.

(3) *Arroyo* v. *Equion Energia Ltd. (formerly known as BP Exploration Co. (Colombia) Ltd.)*, [2016] EWHC 3348 (TCC); [2017] 1 Costs L.O. 31, *dicta* of Stuart-Smith, J. considered.

(4) *BDO Cayman Ltd., In re*, 2018 (1) CILR 187, considered.

(5) *Billson* v. *Residential Apts. Ltd.*, [1992] 1 A.C. 494; [1992] 2 W.L.R. 15; [1992] 1 All E.R. 141; (1992), 63 P. & C.R. 122; [1992] E.G.L.R. 43, referred to.

(6) *Black* v. *Arriva North East Ltd.*, [2014] EWCA Civ 1115, *dicta* of Briggs, L.J. considered.

(7) *Esure Servs. Ltd.* v. *Quarcoo*, [2009] EWCA Civ 595, referred to.

(8) *Euroption Strategic Fund Ltd.* v. *Skandinaviska Enskilda Banken AB*, [2012] EWHC 749 (Comm), followed.

(9) *Henry* v. *British Broadcasting Corp.*, [2005] EWHC 2503 (QB); [2006] 1 All E.R. 154; [2006] 3 Costs L.R. 412, considered.

(10) *Huntsman Chemical Co. Aust. Pty. Ltd.* v. *International Pools Aust. Pty. Ltd.* (1995), 36 NSWLR 242, referred to.

(11) *King* v. *Telegraph Group Ltd.*, [2004] EWCA Civ 613; [2005] 1 W.L.R. 2282; [2004] 3 Costs L.R. 449; [2004] E.M.L.R. 429, followed.

(12) *Leigh* v. *Michelin Tyre plc*, [2003] EWCA Civ 1766; [2004] 1 W.L.R. 846; [2004] 2 All E.R. 175; [2004] 1 Costs L.R. 148; [2004] C.P. Rep. 20, *dictum* of Dyson, L.J. referred to.

(13) *Petursson* v. *Hutchinson 3G UK Ltd.*, [2004] EWHC 2609 (TCC); [2005] BLR 210, followed.

(14) *Sagicor Gen. Ins. (Cayman) Ltd.* v. *Crawford Adjusters (Cayman) Ltd.*, 2011 (2) CILR 471, referred to.
(15) *Smart* v. *East Cheshire NHS Trust*, [2003] EWHC 2806 (QB), considered.
(16) *Solutia UK Ltd.* v. *Griffiths*, [2001] EWCA Civ 736; [2001] 2 Costs L.R. 247; [2001] C.P. Rep. 92; [2002] P.I.Q.R. P16, considered.
(17) *Talent Business Invs. Ltd.* v. *China Yinmore Sugar Co. Ltd.*, 2015 (2) CILR 113, followed.
(18) *Various Ledward Claimants* v. *Kent & Medway Health Auth.*, [2003] EWHC 2551 (QB); [2004] 1 Costs L.R. 101, referred to.
(19) *Willis* v. *Nicolson*, [2007] EWCA Civ 199, referred to.

**Legislation construed:**
Grand Court Rules 1995 (Revised), O.62, r.4(2): The relevant terms of this sub-rule are set out at para. 32.
O.62, r.4(11): The relevant terms of this sub-rule are set out at para. 37.
*S. Dobbyn* for the plaintiffs;
*S. Said* for the defendant.

1   **WILLIAMS, J.:**

**The background**

This costs hearing arises in proceedings brought by the plaintiffs' amended writ of summons and statement of claim filed on November 2nd, 2016. The claim therein was that the defendant was liable for breach of contract, negligence and dishonest assistance in facilitating a fraud carried out on the second plaintiff's corporate account ("the Geneva account") which had been opened at the defendant bank in March 2008.

2   The second plaintiff, Geneva Insurance SPC Ltd. ("Geneva"), was incorporated in the Cayman Islands on March 28th, 2000 with the sole purpose to act as a captive insurance company serving the insurance needs of medical professionals practising in the United States. The first plaintiff, William Ritter ("Mr. Ritter"), was a director, sole shareholder and beneficial owner of Geneva.

3   The defendant is a bank which was incorporated in the Cayman Islands on November 22nd, 1967. In its amended defence filed on November 8th, 2016, the defendant denied any liability. It contended that the plaintiffs were estopped from asserting the forgeries upon which its claim was based, as the second plaintiff had failed to comply with its duties as the bank's customer by failing to notify the bank of forgeries that he was aware of. The defendant further denied that it, or any of its employees, had acted dishonestly in the operation of the Geneva account and sought a dismissal of the plaintiffs' dishonest assistance claim on the

basis that there is a lack of evidence to justify such serious findings and because the claim was "defectively pleaded."

4   On October 16th, 2015, the plaintiffs made a written offer to settle for US$600,000. On October 22nd, 2015, the defendant replied, setting out the weaknesses it saw in the plaintiffs' case and made an offer to settle the proceedings for a payment of US$150,000. Although the plaintiffs clearly recognized and warned the defendant that there would be damaging publicity for the bank if they issued proceedings,[1] the defendant pointed out in the October 22nd, 2015 letter that the matter had already been reported in the press and online and that litigation risks and the possibility of irrecoverable costs led to the offer to settle being made.

5   On September 8th, 2016, the defendant made an increased written offer to settle for US$200,000. On September 26th, 2016, the defendant wrote[2] to set out the weaknesses it saw in the plaintiffs' dishonest assistance claim and invited them to withdraw that claim.

6   On May 29th, 2018, I delivered my reserved written judgment ("the judgment") following an eight-day hearing spread over a period of seven months. The background of the case is set out at length in the judgment and I do not intend to repeat that detail herein, as the parties should be fully aware of the content. In the judgment I found that the plaintiffs were estopped from bringing the claims based upon the forgeries. I also dismissed the plaintiffs' dishonest assistance claim.

7   By a notice of appeal dated June 12th, 2018, the plaintiffs seek to challenge only the estoppel decision contained in the judgment. To date, the parties have not filed an order setting out the terms of the judgment for the court to perfect.

**The costs issues**

8   At para. 203 in the judgment under the heading "Costs," I expressed a provisional view on costs as follows (2018 (1) CILR 529, at para. 203):

"As the bank has been the successful party in this matter, as costs ordinarily follow the event, I am presently minded to make an order for the plaintiffs to pay the bank's costs. Having reviewed the manner in which the case has been argued, I am presently minded to make the order on the standard basis. However, if either party wishes to be

---

1   See para. 51 below concerning plaintiffs' counsel's observations in their October 16th, 2016 letter sent to the defendant six days earlier highlighting the adverse publicity for the bank resulting just from any publication of the writ and statement of claim.

2   See para. 47 below.

heard on the issue of costs they should, within 21 days of the circulation of the perfected version of this judgment, file and serve a summons seeking a costs hearing."

On June 14th, 2018, the defendant filed a summons in which it sought at para. 1:

"Pursuant to GCR O.62, the Plaintiffs to pay the Defendant's costs of and incidental to these proceedings, to be taxed on the indemnity basis if not agreed."

9   On June 15th, 2018, the plaintiffs filed their summons in which they sought, at para. 1, orders:

"Pursuant to section 24 of the Judicature Law (2017 Revision) and GCR O.62 that the Defendants' costs of and incidental to these proceedings as may be ordered to be paid by the Plaintiff shall be taxed on the standard basis if not agreed and shall be capped at such sum as the Court shall think fit to be proportionate to the value of the claim determined by the Court in these proceedings, namely US$529,191.72."

10   The parties submitted the listing form dated June 14th, 2018 to the listing officer on June 15th, 2018. The listing form clearly set out that the issues for the court to determine were those found in the two above-mentioned summonses. No other issues in relation to costs were mentioned in the listing form. It is clear that the summonses were issued with the date of August 7th, 2018 being set for the hearing based on the issues contained in the summonses and repeated in the listing form signed by both parties.

11   On July 16th, 2018, the defendant wrote to the plaintiffs. In the letter, a concern was expressed about the level of costs that may be incurred in relation to the appeal and that neither plaintiff had sufficient assets available to enforce any costs order that may be made against them in the appeal. The defendant invited the plaintiffs to provide financial information to meet an inference that they had insufficient assets and indicated that, if they failed to do so by July 20th, 2018, an application would be made for security for costs.

12   On July 16th, 2018, the plaintiffs' attorney responded, stating that it was impossible to substantially respond within four days and that, due to her workload, she requested that an extension be given until July 31st, 2018 for a response.

13   On July 17th, 2018, the defendant replied by email and refused to give an extension until July 31st, 2018. It indicated that, if a security for costs application needed to be heard, it should be heard at the hearing which is now before me. In the email the defendant suggested directions

and for the first time set out the orders sought, which are detailed in para. 17 below.

14   On July 18th, 2018, the plaintiffs' attorney responded to the email, reiterating that she could not comply with a deadline of July 20th, 2018 due to her pre-existing work commitments. She rightly highlighted that the notice of appeal had been filed and served on June 12th, 2018 and that the defendant, after a gap of five weeks, was now seeking this disclosure with a very tight deadline. She made clear that she would be opposed to the hearing being used in relation to any orders which were not contained in the two summonses and the listing form. She stated that the legal arguments for a security for costs application and the further orders would be different, requiring separate written submissions and preparation. Counsel indicated that she would complete a new listing form, as it would be sensible to deal with the further orders at the same time as any application for security of appeal costs.

15   On July 19th, 2018, the defendant's counsel responded. He indicated that his client agreed, with an apparent degree of reluctance, that the security for costs for the appeal application may be pursued at a later hearing. He also argued that no further summons was required in relation to the further consequential costs applications and that they logically fell to be determined together with the costs issues raised in the two filed summonses. Counsel was unsympathetic to the claims by the plaintiffs' counsel concerning her workload and he stated that she had ample time in the three weeks prior to this hearing to address the new issues.

16   On July 19th, 2018, the plaintiffs' attorney responded, indicating that Mr. Ritter was away on vacation and that no instructions would be received from him until July 30th, 2018.

17   On July 26th, 2018, an affidavit, sworn by Andrew Bolton on the same day, was filed. At para. 3 of the affidavit Mr. Bolton stated:

"Pursuant to the Summons, and as notified to the Plaintiffs' Attorneys on 17 August 2018, the defendant seeks the following further consequential costs orders:

(a) an order that the plaintiffs make a payment on account of the recoverable costs incurred by the defendant in these proceedings, within 28 days of the sealing of the Court's Order on the Summons;

(b) Certification by this Honourable Court, pursuant to paragraph 3 of Practice Direction No. 1 of 2011, that the allowable rates to be applied by the Taxing Officer in any taxation of the Defendant's costs incurred on these proceedings, shall be those applicable in the Financial Services Division of the Grand Court, on the basis that the proceedings can fairly be described as having been both unusually complex, and unusually important (the latter given the allegations of

dishonesty made against one of the Islands' leading, and highly reputable, Class A Banks); and

(c) an order that the Plaintiffs do pay interest on the recoverable costs incurred by the Defendant in these proceedings, from the date of the judgment until final payment (at the rate of 2.375% as per the Judgment Debts (Rates of Interest) Rules."

18   On August 1st, 2018, the defendant wrote to the plaintiffs, indicating that he had still not received a substantive response, despite the fact that the requested July 30th, 2018 extended deadline date had passed. As a consequence, a listing form was submitted in relation to a separate security for costs of the appeal application.

19   On August 1st, 2018, the plaintiffs' attorney responded, acknowledging receipt of the affidavit sworn by Mr. Bolton. She reiterated that the summonses before the court did not contain applications for the consequential relief set out in the affidavit, and argued that meant the applications were therefore not before the court. She made it clear that she did not consent to deal with the new applications, especially without service of a summons and the provision of a new listing form. Counsel stated that the applications were premature and that any hearing in relation to consequential orders should follow from the final determination of costs, at which time she agreed the application for the security for the costs of appeal could also be heard.

20   On August 2nd, 2018, the defendant's attorney responded indicating that he could not understand the plaintiffs' opposition to dealing with "these short and simple consequential costs application." He understandably, although without mentioning it by name, advocated the type of approach envisaged by the overriding objective.

21   The impasse between the parties concerning what should be dealt with at the hearing was reiterated by the plaintiffs in writing on August 2nd, 2018. Counsel stated that their written submissions would not address the further consequential costs issues, save to contend that they needed to be made as a separate application. She lamented the defendant's characterization of her approach to the proceedings as being "a lack of co-operation," and she again repeated the unrelated work that she had already been obligated to undertake following the listing of the two summonses which are now before me.

**The costs hearing**

22   On August 7th, 2018, I received lengthy oral submissions from both counsel on the issue of costs. At the hearing the court had before it a 31-page skeleton argument filed for the defendant and the plaintiffs' 11-page written submissions. The plaintiffs' written submissions were

considerably briefer, as they did not cover the issues raised by "the further consequential costs orders" rehearsed at para. 3 in Mr. Bolton's affidavit.

23    Due to the number of issues raised, some of which were not disclosed in the listing form, the hearing could not be concluded in the one day allotted. Therefore, following their request, the parties were permitted to submit further written submissions. Regrettably, the case then followed an unattractive, albeit familiar, path in this matter with a number of supplemental written submissions being filed, as well as the court receiving a number of emails, including inter-party correspondence in which each party sought to address points made in the latest written submissions filed by the other party. The court's concern about the procedural course being followed by the parties was pointed out to them in writing on September 4th, 2018. They were informed that, if there were any issues arising out of the written submissions received by that date which a party wished the court to deal with, then that party would need to file and serve the appropriate application before my return to the jurisdiction at the end of September 2018. The parties were told that, if no application was received by September 28th, 2018, the court would then embark upon the judgment writing exercise. Unfortunately, this has caused delay, especially as the judgment writing time allocated to me for this case in the court lists was lost due to the issues arising about the post-hearing written submissions. Following the September 4th, 2018 communication to the parties, no application or further submissions were received about the subject matter or concerning exclusion of any of the written submissions already received. This is the reserved written judgment following my review of all of the oral and written submissions received to date.[3]

24    At the outset of the hearing, the plaintiffs reiterated their opposition to the hearing being used to also determine the further costs orders sought. The court was referred to some of the correspondence which I have outlined in paras. 11–20 above. The plaintiffs' counsel again argued that the issues to be determined at the hearing should be those set out and agreed in the listing form.

25    I agree with the defendant that, if feasible, the court should deal with as many applications as it can at one hearing. In certain circumstances such an approach may well be consistent with the court dealing with every cause in "an expeditious and economical" way, as the aim of the overriding objective of the Grand Court Rules is to enable the court to do so. The overriding objective also requires the court to deal with every

---

3    The parties were informed in writing on October 4th, 2018 that as no applications had been filed, the court would "take it that the parties are now content for [the court] to go ahead (when time permits) to commence the judgment writing based on *all* of the submissions/material which each party has submitted to date."

cause or matter in a "just way." It is this latter purpose upon which I see some merit in the plaintiffs' submissions, even though I may liberally construe the Rules "to give effect to the Overriding Objective to secure the just, most expeditious and least expensive determination of every cause or matter on its merits."

26   Ordinarily, one would expect a party to place substantive orders sought in the face of the relevant summons. The purpose of that is to enable the court, when fixing matters for hearing, to review the content of the summons, along with the listing form, to thereby ascertain that the time estimate is appropriate and how urgent the hearing is. The purpose is also to enable the other party to know from the time of service what issues it has to prepare for and, armed with that knowledge, to agree in an informed manner to a specific listing date and time estimate. In the Family Division, this has led to a development whereby a party that is seeking additional orders not set out in the original summons will frequently file an amended summons in a timely fashion. It may be that a similar approach should be followed in the Civil Division.

27   The absence of the specific applications in the summons and/or in a listing form does not in itself prevent a court making "such further order as the Court thinks fit," especially if both parties have had the opportunity to adequately prepare and present their arguments concerning orders that the court may consider making.

28   By June 15th, 2018, the parties were *ad idem* about the orders the other party was asking the court to make. On that basis, both parties agreed on that date about their available dates and ability to properly prepare for the hearing having regard to their wider court commitments. It was not until five weeks later that the defendant informed the plaintiffs that further consequential cost orders would also be sought at this hearing. I do not agree with the defendant's counsel's characterization of the applications, in his email of August 2nd, 2018, as being "short and simple." As soon as counsel for the plaintiffs was made aware of the intended application for consequential costs orders, she made it abundantly clear the basis upon which the agreed listing had been made, especially having regard to her busy workload. She is an experienced attorney, and I do not deem it appropriate for the court to explore what wider and unrelated case work this officer of the court had already been obliged to undertake at the time she was notified of the additional orders being sought.

29   I understand what motivates the defendant's position, as it simply seeks to have all the issues dealt with at the same time, thereby potentially saving court time and reducing costs. Of course some of the issues that it seeks determination of will only become relevant if it is successful in the determination of the issues actually set out in the two summonses.

30   Having considered all of the above, in the absence of agreement in the circumstances of this case for the court to consider making wider orders at this time, I deemed it appropriate for the court to limit its consideration to the contested orders set out in the two summonses.[4] I did not feel it just for me, in the circumstances of this case, to go on to make the further orders belatedly sought using my wide discretion when considering costs and the paragraph in the summonses which invited the court to make further other orders as it may think fit.

**Agreement between the parties concerning the general principle that costs follow the event**

31   The plaintiffs sensibly concede that costs should follow the event in accordance with GCR O.62, r.4(5). The plaintiffs also sensibly concede that the defendant has been the successful party and is therefore entitled to its costs. Accordingly, I am satisfied that the plaintiffs should pay the costs of the proceedings. The issue is what should be the nature of those costs orders.

32   I am conscious that GCR O.62, r.4(2) provides:

"The overriding objective of this Order is that a successful party to any proceeding should recover from the opposing party the reasonable costs incurred by him in conducting that proceeding in an economical, expeditious and proper manner unless otherwise ordered by the Court."

33   Accordingly, the present costs hearing concentrated on the different orders sought by each party. The defendant seeks an order that the costs be taxed on the indemnity basis. The plaintiffs, on the other hand, seek an order that the costs be taxed on the standard basis and be capped at a proportionate sum to the value of the claim, which they put at US$529,191.72.

34   In my judgment dated December 15th, 2016, I made costs orders in relation to the plaintiffs' applications for leave to amend their statement of claim and for an adjournment of the trial. At the costs hearing, the defendant had sought an order for its costs occasioned by the amendments to be made on the standard basis and an order for its costs thrown away in relation to the adjournment to be made on the indemnity basis. For the reasons set out in para. 69 in my judgment, I made no order for the costs thrown away in relation to the adjourned trial. I made an order that the plaintiffs do pay the defendant's costs occasioned by the amendments on the standard basis. I made no order for costs in relation to that costs

---

4   Save for the parties' agreement about the defendant's claim for interest set out at para. 3(c) in the affidavit sworn by Andrew Bolton on July 26th, 2018.

hearing. The parties agree that those orders, and any others made of a similar nature in the proceedings, remain in place and that they will not be displaced by any orders that I may now make.

35   The parties agree that the court may make an order that the plaintiffs do pay interest on the recoverable costs incurred by the defendant in these proceedings, from the date of the judgment until final payment (at the rate of 2.375% as per the Judgment Debts (Rates of Interest) Rules). Accordingly, I make such an order.

**Indemnity costs—general principles**

36   The general rule in litigation is that costs follow the event and that the successful party will be awarded costs. It is recognized that this can leave the successful party out of pocket. The gap between the amount of costs in fact paid by a successful litigant and the amount of party and party costs which are recoverable can be substantial.

37   As highlighted by Henderson, J. in *Sagicor Gen. Ins. (Cayman) Ltd.* v. *Crawford Adjusters (Cayman) Ltd.* (14), GCR O.62, r.4(11) provides an alternative basis upon which costs may be ordered. The rule provides in respect of costs ordered on an indemnity basis that—

"the Court may make an inter partes order for costs to be taxed on the indemnity basis only if it is satisfied that the paying party has conducted the proceedings, or that part of the proceedings to which the order relates, improperly, unreasonably or negligently."

38   The discretion under the rule is not fettered or circumscribed, and it must be exercised judicially in the light of the particular facts of each case. There are many cases which have considered the appropriate principles to be applied in exercising the discretion to award costs on the basis other than party and party. It is accepted that something special or unusual must be demonstrated in order to justify a departure from the ordinary costs order.[5] These include where a losing party has misconducted itself in relation to the proceedings, where the institution of the proceedings was plainly unreasonable or where the proceedings were issued for a collateral purpose.

39   The award of costs on the indemnity basis is often seen in cases where the court wishes to indicate its disapproval of the conduct of the paying party. In the words of 10 *Halsbury's Laws*, 4th ed., para. 22, at 22, n.8 (2007):

_____

5   *Billson* v. *Residential Apts. Ltd.* (5).

"Indemnity costs may be awarded against the party whose conduct has been unreasonable, even though the conduct could not properly be regarded as lacking moral probity or deserving moral condemnation: *Reid Minty (a firm)* v *Taylor* [2001] EWCA Civ 1723."

40   The defendant helpfully highlights the following parts of Smellie, C.J.'s summary of the principles in *Talent Business Invs. Ltd.* v. *China Yinmore Sugar Co. Ltd.* (17). I make no apology for setting out in detail the Chief Justice's insightful analysis (2015 (2) CILR 113, at paras. 35–41):

"35   . . . I shall set out the general principles that guide the application of the rule, as developed in the case law (and as helpfully presented by counsel in their written submissions).

36   In *Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.* . . . the following guidance was given, as summarized in the headnote (2013 (2) CILR at 346–347):

'In considering awards for indemnity costs, the court's focus should be primarily on the conduct of the losing party, not on the substantive merits of the case. Such an award should be made only in exceptional circumstances, *such as where the losing party had behaved improperly, negligently or unreasonably.* Advancing a claim which was unlikely to succeed, or which did in fact fail, was not by itself sufficient for the award of indemnity costs; to justify such an award, *there should normally be an element in the losing party's conduct which deserved a mark of disapproval. That conduct would need to be unreasonable to a high degree, though may fall short of deserving moral condemnation.*' [Emphasis supplied.]

37   In *Al Sadik* v. *Investcorp Bank BSC* . . . Jones, J., applying the same test, ordered (2012 (2) CILR 33, at para. 14 and paras. 16–17) the plaintiff to pay indemnity costs because he had conducted the proceedings improperly and unreasonably:

'14   In my judgment, a proceeding, or some identifiable part of it, can only be said to have been conducted 'improperly' within the meaning of r.4(11) if the court is satisfied, in all the circumstances of the case, that a party has invoked the court's jurisdiction illegitimately or abused the process in a way which attracts moral condemnation. *A party who asserts a cause of action when he knows that he has no legitimate basis for doing so is acting improperly* . . .

16   . . . The outcome of litigation frequently turns upon the court's findings of fact and it is not unusual for such findings to depend upon the court's assessment of the credibility and

truthfulness of the witnesses. By itself, this outcome does not lead to the conclusion that the losing party had no legitimate case and was abusing the court's process in some way. It can only be said that *Mr. Al Sadik is guilty of substantive misconduct to the extent that he advanced a case which he knew to be false*.

17    . . . I have come to the conclusion that the conduct of Mr. Al Sadik's case was "improper and unreasonable" only in one respect. His claim to have the benefit of a guaranteed return was raised after the market crash triggered by the Lehman Brothers bankruptcy and pursued relentlessly to the bitter end, notwithstanding that he knew in his own mind that he had not been given any enforceable guarantee. In this respect, I conclude that Mr. Al Sadik's case was conducted improperly and unreasonably within the meaning of r.4(11).'

38    This decision later received the approval of the Court of Appeal in *Asia Pacific Ltd.* v. *ARC Capital LLC* . . . Chadwick, P. stated (2015 (1) CILR 299, at para. 56):

'In my view, Jones, J. was correct to take the view, in the *Sadik* case, that "a party who asserts a cause of action when he knows that he has no legitimate basis for doing so is acting improperly" within the meaning of O.62, r.4(11). He was correct to draw the distinction between a party who is advancing an honest case—but who fails because the court finds the evidence which he has adduced in support of that case to be incredible or untruthful—and *a party who is advancing a case which he knows to be false*.'

39    That *the deliberate giving of false evidence can be sufficient to justify an award of costs on the indemnity basis* has been clear for some time. In *Nike Real Estate Ltd.* v. *De Bruyne* . . . (a case decided on the basis of the court's inherent jurisdiction prior to the coming into force of O.62, r.4(11)), the court found that two of the defendants had colluded in giving false evidence. In the circumstances, the court was of the view that the case justified the award on the indemnity basis and granted costs to the plaintiff on that basis, observing (2002 CILR 33, at para. 15, *per* Kellock, Ag. J.):

'I do not think that either the High Court in England or this court exists for the purposes of encouraging people to put forward such a case, and if they do I would have thought that the charge of abuse of process was made out, at least to the extent necessary to justify an award of indemnity costs.'

40   Further, I am satisfied that the court is entitled to consider *whether it was reasonable for a party to proceed with a particular defence, taking into account what should have been evident to the party as rendering it improper when filing that defence*: *Att. Gen.* v. *Bennett* . . . In that case, it was held, as summarized in the headnote (2010 (1) CILR 479).

'The plaintiff would not be awarded indemnity costs. Although a party's pursuit of a hopeless claim or maintaining a hopeless defence would justify an order for indemnity costs against it, proceeding with a merely weak claim or defence would not. It would be reasonable for a party with a merely weak claim or defence to seek the court's determination of the issue, and an award of indemnity costs—which were penal in nature—would therefore be inappropriate. Moreover, the court needed to avoid the use of hindsight. The question would be whether it was reasonable to proceed with the claim or defence based on the facts as they should have appeared to the party at the time. Since the respondent would not have understood the defence to be hopeless—indeed, the plaintiffs' attorney had estimated his chance of success at 50%—the plaintiff would only be awarded his costs on the standard basis.'

41   Whilst the jurisdiction to award indemnity costs in England is thought to be somewhat wider than that in the Cayman Islands, some of the leading English authorities nevertheless remain of assistance. In *Three Rivers D.C.* v. *Bank of England* . . . Tomlinson, J. summarized ([2006] 5 Costs L.R. 714, at para. 25) the principles upon which the court should determine any question of indemnity costs, elaborating upon the test of unreasonableness as follows:

'(1) The court should have regard to all the circumstances of the case and *the discretion to award indemnity costs is extremely wide*.

(2) The critical requirement before an indemnity order can be made in the successful [party's] favour is that *there must be some conduct or some circumstance which takes the case out of the norm*.

(3) Insofar as the conduct of the unsuccessful claimant is relied on as a ground for ordering indemnity costs, *the test is not conduct attracting moral condemnation, which is an a fortiori ground, but rather unreasonableness*.

(4) The court can and should have regard to the conduct of an unsuccessful claimant during the proceedings, both before and during the trial, as well as *whether it was reasonable for*

653

*the claimant to raise and pursue particular allegations and the manner in which the claimant pursued its case and its allegations.*

(5) Where a claim is *speculative, weak, opportunistic or thin*, a claimant who chooses to pursue it is taking a high risk and can expect to pay indemnity costs if it fails.

(6) *A fortiori*, where the claim includes allegations of dishonesty, let alone allegations of conduct meriting an award to the claimant of exemplary damages, and those allegations are pursued aggressively *inter alia* by hostile cross examination.

(7) *Where the unsuccessful allegations are the subject of extensive publicity*, especially where it has been courted by the unsuccessful claimant, that is a further ground.

(8) The following circumstances take a case out of the norm and justify an order for indemnity costs, particularly when taken in combination with the fact that a defendant has discontinued only at a very late stage in proceedings;

   (a) *Where the claimant advances and aggressively pursues serious and wide ranging allegations of dishonesty or impropriety over an extended period of time*;

   (b) *Where the claimant advances and aggressively pursues such allegations, despite the lack of any foundation in the documentary evidence for those allegations, and maintains the allegations, without apology, to the bitter end*;

   (c) Where the claimant actively seeks to court publicity for its serious allegations both before and during the trial in the international, national and local media;

   (d) Where the claimant, by its conduct, turns a case into an unprecedented factual enquiry by the pursuit of an unjustified case;

   (e) *Where the claimant pursues a claim which is, to put it most charitably, thin and, in some respects, far-fetched*;

   (f) *Where the claimant pursues a claim which is irreconcilable with the contemporaneous documents*;

   (g) *Where a claimant commences and pursues large-scale and expensive litigation in circumstances calculated to exert commercial pressure on a defendant, and during the course of the trial of the action, the claimant resorts to advancing a constantly changing case in order to justify*

> *the allegations which it has made, only then to suffer a resounding defeat.*"[6]

41   The defendant points out that at paras. 16–19 in *In re BDO Cayman Ltd. (4)*, Parker, J. highlighted such factors as a "root and branch" opposition, a "dogged defence," the pursuit of "every conceivable argument," as well as "thin and unconvincing" arguments and "imaginative arguments" on the law.

42   The plaintiffs helpfully highlight the following parts of Gloster, J.'s summary of the principles in *Euroption Strategic Fund Ltd.* v. *Skandinaviska Enskilda Banken AB* (8) ([2012] EWHC 749 (Comm), at paras. 11–14 and para. 17):

"11.  . . . The principles are well-known and have been exhaustively rehearsed in the relevant authorities. The following is no more than a headline summary.

12.   First, on either basis, the receiving party is only entitled to recover costs which it has actually incurred, and, further, is only entitled to receive costs which were reasonably incurred and were reasonable in amount. Second, the standard basis is the normal basis of assessment: see *Reed Minty v Taylor* [2002] 1 WLR 2800 at [28]; *Excelsior Commercial & Industrial Holdings Ltd v Salisbury Hammer Aspden & Johnson* [2002] EWCA (Civ) 879 at [19]. This means that there has to be something in the conduct of the action, or about the circumstances of the case in question, which takes it out of the norm in a way which justifies an order for indemnity costs: see *Excelsior* (*supra*) and *Noorani v Calver* [2009] EWCA 592 (QB) at [9], *per* Coulson J. Third, cases vary very considerably, and the Court of Appeal has declined to lay down guidelines on the subject: see *Excelsior* (*supra*) at [32]. It is obvious from a reading of the authorities that each case is highly fact-dependent.

13.   Fourth, to demonstrate that a case has gone outside the norm of behaviour, it is not necessary to show that the paying party's conduct lacked moral probity or deserved moral condemnation in order to attract recovery of costs on an indemnity basis: see *Balmoral Group Ltd v Borealis (UK) Ltd* [2006] EWHC 2531 (Comm) at [1], where Christopher Clarke J said:

'. . . The basic rule is that a successful party is entitled to his costs on the standard basis. The factors to be taken into account when deciding whether to order costs in the latter basis have been helpfully summarised by Tomlinson, J., in *Three Rivers*

---

6   Emphasis and highlights made by the defendant.

District Council v The Governor and Company of the Bank of England [2006] EWGC 816 (Comm) [*sic*]. The discretion is a wide one to be determined in the light of all the circumstances of the case. To award costs against an unsuccessful party on an indemnity scale is a departure from the norm. There must, therefore, be something—whether it be the conduct of the claimant or the circumstances of the case—which takes the case outside the norm. It is not necessary that the claimant should be guilty of dishonesty or moral blame. Unreasonableness in the conduct of the proceedings and the raising of particular allegations, or in the manner of raising them may suffice. So may the pursuit of a speculative claim involving a high risk of failure or the making of allegations of dishonesty that turn out to be misconceived, or the conduct of an extensive publicity campaign designed to drive the other party to settlement. The making of a grossly exaggerated claim may also be a ground for indemnity costs.'

14.   However, as Mr. Shivji emphasised, by reference to paragraph 8 of the decision in *Noorani* (*supra*), conduct must be unreasonable 'to a high degree' to attract indemnity costs. 'Unreasonable' in this context does not mean merely wrong or misguided in hindsight: see per Simon Brown LJ (as he then was) in *Kiam v MGN Limited (No 2)* [2002] 1 WLR 2810. In each case, it is a fact dependent question as to whether or not the paying party's conduct has been unreasonable to a high degree.

. . .

17.   In my judgment, for the purposes of the exercise of my discretion, it is necessary to stand back and look at the nature of Euroption's claim as a whole, rather than conduct a micro-analysis of particular aspects of particular claims."

43   With these uncontroversial general principles in mind, I move on to analyse the facts and their application to the law in the specific legal arguments advanced by each party concerning the issue of the appropriate basis of taxation.

**Basis of taxation of costs in relation to the dishonest assistance element of the plaintiffs' claim**

44   In the judgment I dismissed the plaintiffs' dishonest assistance claim. The plaintiffs contend that the dishonest assistance claim was interrelated with their estoppel claim. Although the plaintiffs have appealed other parts of the judgment, the court's ruling on the dishonest assistance element has not been appealed. It is submitted by the plaintiffs that the test for indemnity costs is "not predicated on a case being dismissed for want of

prosecution" as it "requires unreasonable or negligent conduct in bringing such a claim."

45   I noted in the judgment, due to their serious nature and the resultant tactical litigation pressure exerted on and consequences for the other party whether the allegations were proved or not, the particular importance in dishonesty claims that the principles of pleading must be strictly observed from the outset and be ongoing. I found that the pleadings were defective and that this had been drawn to the plaintiffs' attention from an earlier stage of these proceedings. I also found that the plaintiffs failed to provide sufficient evidence to prove the potentially very damaging allegation.

46   The defendant contends that the plaintiffs' conduct in persisting with its "wide-ranging" dishonesty claim against the defendant, which the bank characterizes based upon its interpretation of my judgment as being "baseless in fact" and "defective in law," amounts to "conduct deserving moral condemnation" and is "litigation conduct which is unreasonable to a high degree, justifying an order for indemnity costs." The defendant, prior to addressing other areas of the plaintiffs' case opined that "the issues surrounding the Plaintiffs' pleading and pursuit of the dishonesty claim are sufficient on their own to justify an order for indemnity costs."

47   In the letter dated September 26th, 2016 to the plaintiffs' attorney, the defendant gave a "formal invitation" to them to withdraw their "hopelessly defective" dishonest assistance claim.[7] The defendant set out eight reasons why the claim should have been withdrawn at that stage including the lack of evidence and defective pleadings. In the letter the following clear warning was then given:

> "We hereby put your clients on notice that if they persist in this claim despite the valid points we make above, we reserve the right to bring this correspondence to the attention of the Court on the question of costs, which we will seek (*in respect of this issue*) on the indemnity basis, given that it will have been pursued improperly, unreasonably and negligently (for the purposes of GCR O.65 [*sic*] r.4(11))."

48   In a letter dated October 6th, 2018, the defendant reiterated:

> "Our position to your clients' dishonest assistance claim remains as set out in our letter of 26 September 2018. If you are not prepared to withdraw that claim as requested, we will bring the defects pointed out in that letter to the courts' attention and seek appropriate relief."

---

7   See para. 5 above.

49   If one reviews the content of the defendant's above-mentioned letter of September 26th, 2016, it is clear that the plaintiffs were made aware of the inevitable outcome of this part of their claim and were warned of the potential negative costs implications if they persisted with bringing the same.

50   A formal warning of an intention to claim indemnity costs can make the awarding of indemnity costs more likely. This is illustrated by the non-binding Australian case of *Huntsman Chemical Co. Aust. Pty. Ltd.* v. *International Pools Aust. Pty. Ltd.* (10). As can be seen from the above, the defendant did give a formal costs warning to the plaintiffs relating to the flaws in the dishonest assistance claim, and this warning, which was not heeded, forms a part of my consideration of this application.

51   The court should have regard to all the circumstances of the case and the discretion to award indemnity costs is extremely wide. In relation to the dishonest assistance claim I have considered whether the plaintiffs' conduct took the case out of the norm. "Out of the norm" does not mean that the conduct or circumstance has to be a rare occurrence, but rather "something outside the ordinary and reasonable conduct of proceedings."[8] The test in relation to that conduct is not necessarily conduct attracting moral condemnation but rather unreasonableness. With this in mind I have regard to the plaintiffs' conduct throughout the proceedings, prior to and during the hearing. I also have regard as to whether it was reasonable for the plaintiffs to raise and pursue the dishonest assistance allegations, as well as the persistent and forceful manner in which they did so. The dishonest assistance claim was clearly defectively pleaded, a speculative claim involving high risk and evidentially very weak. Some of these are factors which Gloster, J., highlights at para. 13 of the *Euroption* case (8), a case actually greatly relied on in the plaintiffs' written submissions on costs dated August 3rd, 2018. The plaintiffs should have realized that, when choosing to improperly pursue the serious allegations of dishonesty over an extended period of time, especially after the defendant's letter of September 26th, 2016, they were taking a high risk and were aware of the risk of indemnity costs being sought if it failed. For indemnity costs to be awarded in such a situation there is no requirement for a judge to have drawn concerns about the pleadings or about the evidentiary strength of a claim to a plaintiff's attention during the proceedings or the hearing, although if a judge does that may also be a factor to take into account in a dishonesty claim. The plaintiffs advanced and aggressively pursued the dishonest assistance claim, despite the defective pleading and lack of supporting evidence, and maintained the allegations, without apology, right to the end of the hearing. It is evident that they recognized the

_____

   8   *Esure Servs. Ltd.* v. *Quarcoo* (7), Waller, L.J.

potential damage that such an allegation could inflict on the bank and that could be unattractively used as leverage in settlement negotiations. In the letter dated October 16th, 2015, in which an offer to settle for payment of $600,000 was made, the plaintiffs' counsel stated to the defendant's attorney:

> "Your client will no doubt be aware that the finalised writ and statement of claim will be published in Offshore Alert approximately 10 days after they are filed in the Grand Court. *Accordingly, in deciding whether to settle this matter the Bank will need to consider what value it places on such adverse publicity and on preserving its institutional reputation.*" [Emphasis supplied.]

**Conclusion on the basis of the taxation of the costs for the dishonest assistance claim**

52    The nature of the claim and the plaintiffs' highly unreasonable conduct takes the pursuance of dishonest assistance element of the proceedings out of the norm. Accordingly, I order an assessment on the indemnity basis of the costs related to that element of the proceedings. The fact that the plaintiffs now disclose that they relied upon their view that leading counsel in England, who reviewed their pleadings, did not consider the plaintiffs' dishonest assistance claim to have no prospect of success does not excuse their failure to withdraw the claim, especially following and in light of the correct observations made in correspondence in September 2016 by the defendant's attorney. That is not the same as the Chief Justice's consideration in *Ahmad Hamad Algosaibi & Bros. Co. v. Saad Invs. Co. Ltd. (2)* when not making an order for costs on the indemnity basis, of the effect of the forensic accountancy report upon which reliance was placed before bringing the claim in that matter.

**Basis of taxation of costs in relation to the balance of the proceedings**

53    Before I analyse the parties' submissions, I wish to clarify the content of para. 205 in the judgment (*2018 (1) CILR 529, at para. 205*). It is the final paragraph in the judgment where both counsel were deservedly commended for their hard work during the course of the proceedings. In that paragraph I mentioned that there were a number of complex issues which required counsels' and the court's attention. This case was heard at Grand Court level and it is not unusual for the Civil Division of this court and the parties to have to grapple with issues of this nature. The issues that arose and which were determined were not such as to cause this case to be regarded as being unusual in complexity or importance or a test case. My preliminary view is that the nature of the case does not merit a direction for an uplift of the allowable rates of the fees to the level permitted for

659

cases in the Financial Services Division.[9] However, I am aware that a summons has been issued for that point to be properly argued and I reserve my final decision on the issue when I have had the opportunity to receive more detailed submissions. An order for indemnity costs should not be made solely due to the nature of the subject matter or legal issues involved in this case.

54    The plaintiffs rightly point out that a decision to grant indemnity costs would concentrate on the conduct of the losing party and not the substantive merits, and that this was only in exceptional circumstances. The plaintiffs also rightly point out that even if a party loses on all points in a claim, that in itself does not lead to a categorization of the case as being one out of the norm and being so exceptional as to merit the making of an indemnity costs order. When reading the written submission the parties are in agreement about the above general principles. The plaintiffs seem to wrongly view that the defendant seeks indemnity costs not for unreasonable conduct reasons, but primarily based on a submission that it would be right to do so to penalize the plaintiffs for losing the case.

55    The defendant claims that indemnity costs are not sought simply on the basis of the merits of the case, but, in light of findings in the judgment, due to the first plaintiff's conduct which it is contended was improper and highly unreasonable "by advancing a defence to the estoppel case which he knew to be false, without legitimate basis and irreconcilable with contemporaneous documents." It is claimed that the first plaintiff gave false evidence to the court and that the plaintiffs conducted their case in "a manner which was unreasonable to a high degree."

56    The defendant points out that the first plaintiff, despite asserting from the start and in his evidence-in-chief that he did, must not have genuinely believed the story spun by Mr. Self that the money paid to him had come from family money, especially as stated in his evidence that he recognized that there was a real risk that it had been stolen from other customers. The defendant contends that there are a number of other reasons why the court should lay down a mark of disapproval for the plaintiffs' conduct which was "both unreasonable to a high degree, and deserving moral condemnation," by making an order for indemnity costs for those incurred in meeting all of the plaintiffs' unsuccessful claims. These include a contention that—

    (i) thin, unconvincing and far-fetched arguments on the facts were presented and persisted with by the plaintiffs despite contradictory evidence filed by the defendant that was accepted by the court;

---

    9    Paragraph 3, Practice Direction No. 1/2011.

(ii) the plaintiffs put forward and persisted with a number of imaginative and clearly misconceived arguments on the law;

(iii) the first plaintiff advanced parts of his case, in evidence, knowing that there was no factual basis for doing so;

(iv) the plaintiffs' case was constantly changing, resulting in inconsistency with positions previously taken in the proceedings and that on fundamental issues in the case, on their own case, there were inconsistencies;

(v) the plaintiffs' case was completely irreconcilable with contemporaneous documents which illustrated a disregard for the need to tell the truth; and

(vi) the plaintiffs sought to wrongly blame or criticize innocent third parties in an attempt to make the first plaintiff appear to be the only innocent party.

57   I have carefully reviewed the parts of the evidence and from my judgment highlighted by the defendant at paras. 16–21 of his written submissions and reiterated at para. 3 of his supplemental submissions.

58   In support of a submission that the plaintiffs presented "thin and unconvincing arguments on the facts" which were "far-fetched" and which were persisted with despite highly contradictory evidence from professionals who had previously been employed by the plaintiffs, such as Mr. Arbo of BDO and Mr. Krys of Krys Global,[10] the defendant highlights:

(i) the first plaintiff's evidence that he believed that BDO were going to "notify everyone who needed notifying" including the bank[11]; and

(ii) the first plaintiff's evidence that he concurrently believed that Krys Global were going to "notify everyone who needed notifying" including the bank. Those arguments were persisted in, even after the defendant served evidence from Mr. Arbo and Mr. Krys entirely contradicting these allegations.[12]

59   In support of its contention that the plaintiffs also put forward and persisted with a number of "imaginative" and "entirely and obviously misconceived arguments on the law," the defendant highlights:

_____

10   Paragraph 91 of the judgment.
11   As mentioned at para. 66 in the judgment.
12   Mr. Arbo's and Mr. Krys's evidence was preferred by the court—see para. 80 and 96 of the judgment.

(i) the point raised for the first time after the hearing had commenced that the *Greenwood* duty "might possibly be curtailed by a possibly conflicting duty under the proceeds of criminal conduct law"; and

(ii) the argument that the defendant's claim against Mr. Self was a claim in subrogation, rather than in deceit, despite there being no authority for such a position and the cases clearly referring to the claim being in fraud.

60   In support of the defendant's contention that the plaintiffs were constantly changing resulting in inconsistency with positions previously taken in the proceedings and that on fundamental issues in the case, on their own case, there were inconsistencies, the defendant highlighted:

(i) the first plaintiff's contention at the hearing that he had notified the defendant, which was entirely inconsistent with what the court found at para. 42 of the judgment to the other parts of his case, namely that he believed and expected that BDO and Krys Global would be notifying the bank;

(ii) that the first plaintiff knew throughout that he had not notified the defendant and that, as found at para. 71 of the judgment, he deliberately chose not to warn them about the forgery in order to prioritize the unhindered receipt of the funds into his USA account; and

(iii) that the first plaintiff still maintained at various points in pre-action correspondence, pleadings and evidence that there was "only a suspected fraud" on September 1st, 2011, until at trial, as mentioned at para. 48 of the judgment, he referred to his knowledge on September 1st, 2011 that the actions of Mr. Self constituted a fraud and a forgery.

61   In support of the defendant's contention that the plaintiffs' case was irreconcilable with contemporaneous documents and showed a disregard for the truth when seeking to provide an explanation after the event as to why he had failed in his responsibility to immediately inform the defendant about the forgeries, the defendant highlighted:

(i) that the first plaintiff's claim that he had notified the defendant on September 1st, 2011, when his contemporaneous email, as noted at para. 79 of the judgment (*ibid.*, at para. 79), stated that he had "not spoken with [the bank] at all on this matter"; and

(ii) that the first plaintiff's inaccurate evidence that he "never requested a delay in the SAR" in light of the contradictory contemporaneous email record made by Mr. Arbo which was referred to at para. 81 of the judgment.

62   In support of the defendant's contention that, in light of the court's finding at para. 71 of the judgment that the first plaintiff deliberately chose not to warn the bank by disclosing the forgery, the plaintiffs' conduct was improper due to the extent to which they sought to criticize or blame

innocent third parties to enable the first plaintiff to contend that he was the "wholly innocent" party, the defendant highlighted:

(i) that the first plaintiff publicly questioned the professional ethics of Mr. Arbo and Mr. Krys;

(ii) that the first plaintiff claimed that Mr. Arbo and Mr. Krys made certain statements which he must have known they had not made[13]; and

(iii) that, as set out at paras. 80, 81 and 104 in the judgment, the first plaintiff must have known that his attempts to criticize each of CIMA, BDO and Krys Global had no legitimate basis as he was aware that he had concealed crucial information from each of them.

63  I have carefully considered all of the above, which are provided by the defendant as examples of what is submitted to be highly unreasonable conduct of the first plaintiff sufficient to merit the making of an indemnity costs order.

**Conclusion on basis of taxation of costs in relation to the estoppel proceedings**

64  It is clear that the court has a wide discretion as to what costs orders may be made following a trial, and as to the basis upon which they are to be made. In relation to the issue as to whether the standard or indemnity basis should form the basis of any assessment, it is clear that the indemnity basis may be justified where either the facts of the case and/or the conduct of the parties is such as to take the situation away from the norm. In this regard, it is not always necessary to show deliberate misconduct, in some cases unreasonable conduct to a high degree will suffice.

65  I remind myself, as did Stuart Smith, J. in *Arroyo* v. *Equion Energia Ltd. (formerly BP Exploration Co. (Colombia) Ltd.)* (3) ([2016] EWHC 3348 (TCC), at para. 72), "not to cherry-pick but to see the litigation as a whole and to have regard to all the circumstances of the case" and that to obtain indemnity costs a "high threshold" has to be passed and because "there are facts that take the case out of the norm does not automatically or even probably lead to an order for indemnity costs."

66  The estoppel issue was one that involved a full review of the relevant case law in relation to each of the elements. The determination of the estoppel argument was not straightforward or clear cut. It also required a careful application of the relevant facts to the law. It cannot be said that the plaintiffs, who are victims of a fraud perpetrated by a third party in

---

13  Paragraphs 56, 57 and 74 of the judgment.

relation to funds held in the bank, were unreasonable in initiating their primary claim and opposing the estoppel defence raised by the defendant.

67   However, the defendant contends that it is their conduct, the manner in which they approached and conducted themselves during the proceedings, which should be viewed as being highly unreasonable. The defendant characterizes the first plaintiff as being a dishonest witness who deliberately gave false evidence, advancing a defence to the estoppel case that he knew to be false.

68   The defendant, as outlined above, rightly highlights parts of the judgment where the court:

   (i) rejected parts of the first plaintiff's evidence;

   (ii) preferred the evidence of particularly Mr. Arbo and Mr. Krys to the inconsistent evidence of the first plaintiff;

   (iii) found that the first plaintiff had failed to notify the bank; and

   (iv) stated that parts of the first plaintiff's evidence had the character of someone searching for and creating excuses after the event for his failure to notify the bank.

However, I am conscious that at the time the first plaintiff was under a great deal of pressure and that all of his actions at the time primarily were driven by his desire to restore the funds which had been wrongly removed. I did not express a finding in the judgment that the first plaintiff was dishonest when giving evidence and in his actions, although some of his actions and the approach he took with the bank were questionable. His evidence was at times unconvincing, but the fact that he relied upon such evidence in the defence of the estoppel argument does not amount to behaviour so unreasonable to justify an order for indemnity costs. Unlike in the dishonest assistance claim, the detailed and full legal arguments raised in relation to the technical estoppel claim that understandably required careful consideration of both parties' arguments by the court, albeit one of two of which were raised belatedly, should not be viewed as being unreasonable when considering the complexities of the law to be addressed in such claims.

69   In relation to the estoppel part of the proceedings, I am satisfied that the order should be for the costs to be taxed on the standard basis. Mr. Said has argued most forcefully for indemnity costs and this is a case where one could rightly characterize the first plaintiff's conduct highlighted by him as having been unreasonable, but I am not satisfied that it is so highly unreasonable and out of the norm that the court should impose an order for costs on the indemnity basis for that claim.

70   I remind myself of the oral submissions made by Ms. Dobbyn, where she correctly reminded the court that the estoppel claim occupied the

majority of the time at the hearing. She contended that about 20% of the time would have been spent on the dishonest assistance claim. During the hearing I mentioned to the parties that one option for the court might be to make a split costs order with indemnity costs being ordered on the dishonest assistance claim and on the standard basis in relation to the estoppel defence. Ms. Dobbyn contended that, if the court did feel that such an approach to costs was appropriate, it should take a "broad brush approach" with "back of the envelope convenient percentages" and it would be reasonable to split the costs order to be indemnity costs at 20% of the costs for the dishonest assistance claim and that the estoppel claim be taxed on the standard basis in relation to the remaining 80% of the costs.

71    It is clear that the defendant's argument is that the total costs should be taxed on the indemnity basis. I accept that, due to the late hour at the hearing, the defendant did not have time to make oral submissions in reply to those made on behalf of the plaintiffs. With that in mind, the parties were afforded the opportunity to file further written submissions. The defendant took the opportunity to do so on issues of indemnity and any capping of a costs order. On p.5 of his supplemental submissions, the defendant contends that the informal approach to setting a percentage is not appropriate and that, in any event, the percentage would be greater than the suggested 20% for the dishonest assistance claim. The defendant further submits that, if the court decided to make a split costs order, the percentage approach would be unworkable as each line item would need to be considered by the Taxing Officer on the two bases of taxation. I agree with the defendant that such an order would not be feasible unless the parties were able to agree a percentage and a mechanism for the Taxing Officer to operate under.

72    Having made a finding at para. 52 herein that the dishonest assistance claim should be taxed on the indemnity basis and at para. 69 herein that the balance of the proceedings should be taxed on the standard basis, I have considered whether there are any helpful directions that I may give to the Taxing Officer. I respectfully suggest that, prior to the taxation, the parties assist the Taxing Officer by providing schedules in which they set out which costs fall under which part of the claim. This is not one of those cases where I am able to provide a date from which a certain basis of costs will be paid from or up to.

**Costs capping application made by the plaintiffs**

73    In light of the defendant's disclosure that its costs are a little under $1.2m. and the plaintiffs stating that their costs are lower than $600,000, I am invited to cap the defendant's costs to an amount proportionate to the claim in dispute, which the plaintiffs put to be in the region of US$550,000 to US$600,000. This figure is not agreed by the defendant

who contends that the claim of US$371,286.07 in consequential losses and the claim for compound interest, although not argued at the hearing, should be included.[14]

74   The defendant rightly states that the costs of and incidental to all civil proceedings in the Grand Court are in the discretion of the court. The defendant adds that, pursuant to s.24(3) of the Judicature Law (2017 Revision), the Grand Court has the power to determine by whom and to what extent the costs are to be paid. The defendant further adds that the powers or discretion of the court are exercised subject to and in accordance with O.62 of the Grand Court Rules. It is submitted that the discretion of the court is wide and unfettered and thereby enables costs capping orders to be made. It is contended that costs should be reasonable and proportionate and that is consistent with the overriding objective of O.62, found at O.62, r.4(2).[15]

75   The introduction of the Civil Proceedings Rules 1998 ("the CPR") in England and Wales introduced fundamental reforms to the case management of cases, including the management of costs. Costs capping orders began to be made in cases where the courts found that the power to do so arose under their case management powers. The costs capping orders were made in high value cases and the cap was almost always imposed before the relevant costs were incurred. I will analyse some of those cases below as they were decided at a time, as is the case now in the Cayman Islands, where the rules did not contain specific costs capping provisions. The intention behind the reformed approach to costs was that the courts would take an active role, from the outset of the proceedings, in "keeping costs within bounds" and proportional. To enable this costs management function to effectively operate there was an integral requirement for the parties, at different stages of the proceedings, to file details or a budget about costs incurred and an estimate of costs of proposed further work.

76   In 2008, a consultation process was carried out by the Civil Procedure Rule Committee ("the Committee"). The Committee sought views on proposals to amend Part 44 of the CPR ("General Rules About Costs") by inserting rules on costs capping orders and to amend the Practice Direction About Costs to provide guidance on costs capping.

77   As a consequence, the courts' costs management function was developed in England and Wales by the Civil Procedure (Amendment No. 3) Rules 2008 applicable from April 6th, 2009 which introduced a new

---

14   The defendant points out that in December 2015 the plaintiffs pleaded the total value of their claim against the defendant, excluding interest and costs, as US$900,477.79.

15   The rule is set out at para. 32 herein.

CPR, rr. 44.18–20 provision for a procedural regime for making costs capping orders. Rule 44.18 provided that:

"(1) A costs capping order is *an order limiting the amount of future costs* (including disbursements) which a party may recover pursuant to an order for costs subsequently made.

(2) In this rule, '*future costs*' *means costs incurred in respect of work done after the date of the costs capping order* but excluding the amount of any additional liability.

. . .

(5) The court may at any stage of proceedings make a costs capping order against all or any of the parties, if—

  (a)  it is in the interests of justice to do so;

  (b)  there is a substantial risk that without such an order costs will be disproportionately incurred; and

  (c)  it is not satisfied that the risk in sub-paragraph (b) can be adequately controlled by—

    (i)  case management directions or orders made under Part 3; and

    (ii)  detailed assessment of costs.

(6) In considering whether to exercise its discretion under this rule, the court will consider all the circumstances of the case, including—

  (a)  whether there is a substantial imbalance between the financial position of the parties;

  (b)  whether the costs of determining the amount of the cap are likely to be proportionate to the overall costs of the litigation;

  (c)  the stage which the proceedings have reached; and

  (d)  the costs which have been incurred to date and the future costs." [Emphasis supplied.]

78   The Costs Practice Direction included new provisions at s.23A in relation to costs capping orders. It gave guidance as to the procedure, including the requirements for estimate and schedule of costs, as well as the factors to be taken into account when assessing the quantum of the costs cap. Under the heading "When to make an application" it stated that the courts would make costs capping orders only in exceptional circumstances. It also stated that the application must be made as soon as possible before or at the first case management hearing or shortly afterwards and that the stage which the proceedings have reached at the

time of the application will be one of the factors the court will consider when deciding whether to make a costs capping order.

79   The costs management function of the courts was further developed in 2013 by costs capping rules found at CPR rr. 3.19–3.21 which replaced the provisions found at Part 44. In 2016 these were amended by the Civil Procedure (Amendment No. 2 Rules) 2016. The new provisions were almost identical to those set out in para. 78 above.

80   The consultation that led to the above rules which set out a procedural regime for making costs capping orders followed the Court of Appeal's observation in *Willis* v. *Nicolson* (19) ([2007] EWCA Civ 199, at para. 24), that it should be for the Committee and not the court to provide guidance on costs capping. Buxton, L.J. made a number of insightful general comments about costs capping. Buxton, L.J. stated (*ibid.*, at para. 7) that—

"... after some uncertainty as to the exact basis for such an order in an individual case, such as the present, it is now settled that the various weapons of the Civil Procedure Rules give the court ample powers to make an order at any stage of the proceedings: *King v Telegraph Group Ltd* [2005] 1 WLR 2282 [85]. The effect of a costs capping order is to advance the process of assessment and limitation of costs from the assessment after trial to an earlier point in the process; and to limit the amount of recoverable costs prospectively and not merely by an exercise conducted after the costs have been incurred. Unless a successful application is made to increase the cap, the party against whom an order has been made cannot recover on final assessment more than the amount of the order. That does not prevent the paying party from attempting on final assessment to reduce that amount, but the Senior Costs Judge indicated to us that his colleagues, having assessed the costs once, would look for good reasons, usually founded in a change of circumstances, before they intervened further."

81   Buxton, L.J. spoke about how the courts had approached costs capping when he stated (*ibid.*, at para. 8):

"Such orders are essentially case-management decisions, depending heavily on the judge's perception of the needs of his case, and general statements about when and in what circumstances a costs capping order should be made can only be general statements. We were shown some observations of first-instance judges, some of them of great experience in this field, that orders should only be made in limited circumstances, of which the most conspicuous is the dictum of Gage J (as he then was) in *Smart v East Cheshire NHS Trust* [2003] EWHC 2806 (QB) [22]:

the court should only consider making a costs cap order in [single] cases where the applicant shows by evidence that there is a real and substantial risk that without such an order costs will be disproportionately or unreasonably incurred; and that this risk may not be managed by conventional case management and a detailed assessment of costs after a trial.

By contrast, there have been various indications in this court encouraging the use of costs capping. Those indications include the observations of Sir Christopher Staughton in *Solutia UK Ltd v Griffiths* [2002] PIQR P176 [27]–[30]; Dyson LJ in *Leigh v Michelin Tyre plc* [2004] 1 WLR 846 [34]; and in particular Brooke LJ in *King v Telegraph Group Ltd* [2005] 1 WLR 2282 [92]:

> it would be very much better for the court to exercise control over costs in advance, rather than to wait reactively until after the case is over and the costs are being assessed.

This difference of opinion is in need of resolution, but for the reason given in §24 it is not resolved in this judgment."

82    Buxton, L.J. added (*ibid.*, at paras. 18–19 and paras. 21–23):

"18.    . . . When the Civil Procedure Rules replaced the Rules of the Supreme Court, and encouraged active intervention by the court and the application of public values and not merely those values with which the parties were comfortable, it was hoped that that practice might change; and that hope was reinforced when this court said, in §2 of its judgment in *Lownds v Home Office (Practice Note)* [2002] 1 WLR 2450:

> Proportionality played no part in the taxation of costs under the Rules of the Supreme Court. The only test was that of reasonableness. The problem with that test, standing on its own, was that it institutionalised, as reasonable, the level of costs which were generally charged by the profession at the time when professional services were rendered. If a rate of charges was commonly adopted it was taken to be reasonable and so allowed on taxation even though the result was far from reasonable.

19.    However, in the event nothing seems to have changed. That is because, as explained in §29 of the same judgment, 'proportionality' is achieved by determining whether it was necessary to incur any particular item of costs. And then 'When an item of costs is necessarily incurred then a reasonable amount for the item should normally be allowed': and the reasonable amount per hour of the professional's time continues to be determined by the market . . .

669

21.   The focus of costs limitation thus has to be on the way in which the professionals intend to conduct the case because, as we have seen, the amount recoverable on assessment is fixed, as to rates, by the standard amounts allowed . . .

22.   To limit the way in which the professionals intend to conduct the case is a delicate matter. As Lindsay J put it at §28 of his judgment in *Weir v Secretary of State for Transport*

> If there is to be a cap in any case, the party capped is likely to be required to alter its conduct in relation to costs, if that were not part of the intent behind the cap then there would probably be no point in having a cap.

The court will be careful before imposing such a restriction, particularly when those restricted are, as in the present case, acting for a claimant who has suffered catastrophic injuries. To conduct the exercise properly the court will need reliable information about, and understanding of, the nature of the particular case and the general demands of that type of litigation. And both for reasons of fairness and for reasons of practicality *a cap cannot be imposed retrospectively, so the enquiry must take place at a sufficiently early stage to have a real effect on expenditure: the present case demonstrates the hopelessness of leaving an application until close to the date of trial.* As Gray J said in *Henry v BBC* [2006] 1 All ER 154 [39]:

> *the purpose of a capping order is to enable the capped party to plan ahead* the appropriate level of expenditure to bring the case to trial at a cost which is in line with the amount of the cap.

There has, accordingly, to be careful selection of the right moment in the litigation process for the consideration of a costs cap.

23.   And further reasons why the exercise of costs capping should not be entered upon lightly are that amount of the cap has to be determined by a costs judge, a scarce resource; and if the exercise is to be done properly it is likely, as in effect a substitute for final assessment, to be as expensive and time-consuming as a final assessment itself." [Emphasis supplied.]

Although setting out Buxton, L.J.'s view concerning the existence of a power to make costs capping orders, I have also highlighted certain parts of the judgment relating to the timing of the application and whether a cap can be imposed retrospectively. Buxton, L.J.'s view that applications should be made earlier in proceedings and that orders should not be retrospective are consistent with the cases mentioned from para. 97 below where I go on to deal with such issues in more detail.

83   As I mentioned above, there were, prior to the addition of costs capping provisions in the CPR, a number of post-CPR cases in which costs capping orders were made. In *AB* v. *Leeds Teaching Hospitals NHS Trust* (1) Gage, J. made an order capping costs under the CPR, which at the time was considered to be ground breaking. Gage, J. held that in group litigation there was a clear risk that costs may become disproportionate and excessive and therefore a costs cap order was necessary to manage costs. Gage, J. set a budget in respect of the claimants' publicly funded costs in order to guide them as to the proportionality of their costs expenditure and to provide a cap on costs which they would recover if successful. It is important to note that since the inception of the CPR parties are required to provide estimates at different stages of the proceedings as to the likely costs to be incurred. The courts have regard to the costs estimates as an integral part of their case management functions in relation to costs. This was highlighted by the Court of Appeal in *Leigh* v. *Michelin Tyre plc* (12), in which Dyson, L.J. observed ([2003] EWCA Civ 1766, at para. 1) that "One of the principal objects of the Woolf reforms was the control of costs . . ." and the costs estimates are a fundamental part of the machinery of costs management.

84   Gage, J., before making the order, considered whether the court had the power to make a costs cap order. He acknowledged that the CPR gave the court no specific power to make a costs cap order. That is the same as the GCR. Gage, J. noted the Supreme Court Act 1981 (as amended) gave the court wide powers in relation to costs. Section 24 of the Judicature Law is a very similar provision and also provides that costs in civil proceedings "shall be in the discretion of the relevant court" and that the "court shall have full power to determine by whom and to what extent the costs are to be paid." Gage, J. also highlighted that the CPR also provided the court with extensive and wide-ranging general case management powers to be carried out in accordance with the overriding objective in Part 1 of the CPR. There is a great similarity between CPR Part 1 and paras. 1–3 in the Preamble to the GCR.

85   Gage, J. highlighted that the court's general case management powers were contained in Part 3 of the CPR and that its powers in relation to costs were in Parts 43 and 44. Gage, J. highlighted that s.6 of the Practice Direction About Costs also dealt with estimates of costs and directed parties and their lawyers to take certain steps to keep the parties informed about their potential liabilities to costs and in order to assist the court to decide what, if any, order to make about costs and case management.

86   In light of all of these various provisions, Gage, J. concluded that he had the jurisdiction to make a costs cap order, stating ([2003] EWHC 1034 (QB), at paras. 17–18):

"17.   Section 6 of the Practice Direction about Costs under the heading 'Estimates of Costs' provides that parties and their legal representatives must take certain steps to keep the parties informed about their potential liability to costs and in order to assist the court to decide what, if any, order to make about costs and case management.

18.   Having referred to section 51 of the 1981 Act, to the various Parts of the CPR which deal with costs, and giving full effect to the overriding objective of the CPR, in my judgment, the court has power to make a costs cap order. In my opinion the general powers of case management and in particular CPR 3.1(2)(m) and 44.3 are sufficiently wide to encompass the making of such an order in both GLOs[16] and other actions. In addition, the provision for Estimates of Costs in the Practice Direction about Costs is, in my view, in keeping with such a power. Further, I am fortified by the encouragement provided by the Court of Appeal in *Solutia UK Limited v Griffiths* to conclude that in appropriate cases, of which GLOs are prime examples (see those parts of the Woolf Report to which I have previously referred), the court should do so."

87   In reaching his conclusion, Gage, J. had regard to Sir Christopher Staughton's following remarks in *Solutia UK Ltd.* v. *Griffiths* (16) ([2001] EWCA Civ 736, at para. 29): "So surely case management powers will allow a judge in the future to exercise the power of limiting costs, either indirectly or even directly, so that they are proportionate to the amount involved."

88   Gage, J. also referred to Mance, L.J.'s comments in *Solutia* (*ibid.*, at para. 33):

   "The present litigation was conducted under the old rules preceding the Woolf reforms. It is to be hoped that subsequent to the Woolf reforms judges conducting cases will make full use of their powers under the Practice Direction about costs, section 6, which appears in the Civil Procedure White Book 43/PD–006, to obtain estimates of costs and to exercise their powers in respect of cost and case management to keep costs within the bounds of the proportionate in accordance with the overriding objective."

Section 6 in the Practice Direction sets out the requirements concerning the filing of costs estimates and s.6.6 provides that in an assessment of costs of a party the court may have regard to any estimate filed in the proceedings and that the estimate can be taken into account as a factor

───────────────────

   16  Group litigation orders.

when assessing the reasonableness of any costs claimed. Mance, L.J.'s *obiter* view about judges making full use of their powers under s.6 when exercising their powers in respect of costs and case management does not apply in the Cayman Islands where no such provision exists.

89   The Preamble in the GCR is similar to Part 1 of the CPR. However, the GCR do not contain provisions that mirror those found at Part 3 CPR, which it is well recognized "provides the court with extensive and wide-ranging general powers of case management to be carried out in accordance with the overriding objective."[17] The GCR do not have a provision that fully mirrors CPR 3.1(2)(m) which provides that the court may "take any other step or make any other order for the purpose of managing the case and furthering the overriding objective," although it is right to recognize that para. 4.3 in the Preamble to the GCR states "whenever a proceeding comes before the Court, whether on a summons for directions or otherwise, the Court will consider making orders on its own motion for the purpose of giving effect to the overriding objective of the rules." The GCR do not include a provision mirroring Part 44.3 CPR, although it is right to say that GCR O.62 is a detailed costs provision. I note that the latter part of GCR O.62, r.4(2)[18] indicates that the way that the successful party has conducted the proceedings may be a relevant factor when recovering costs. The way that the defendant has conducted the proceedings in an expeditious and proper manner and the way in which they conducted themselves in the actual proceedings cannot be said to have increased the expenditure required in the case. However, that is not to say that during taxation any claims they make may not be taxed down by a Taxing Officer—that is what is envisaged by GCR O.13(2) where the Taxing Officer may have regard to the amount of money involved, the importance of the case and the complexity of the issues during a taxation on the standard basis.

90   It is important to note that Gage, J. in *AB* (1) had regard to all of the mentioned provisions and the Practice Direction About Costs when reaching his conclusion that the case management powers were wide enough to enable the court to make costs capping orders. Although the Cayman Islands has some provisions similar to those in England and Wales, especially in the Preamble to the GCR and to some extent in GCR O.62, they cannot be said to be as wide ranging and comprehensive as those found in England and Wales post the introduction of the CPR as well as pre and post the introduction of specific costs capping provisions in the CPR.

---

17  Gage, J. in *AB* v. *Leeds Teaching Hospitals NHS Trust* (1) ([2003] EWHC 1034 (QB), at para. 12).
18  Rule set out at para. 32 above.

91   I am satisfied that the cases decided pre the 2008 amendments to the CPR made it clear that, under the costs regime contained in the Supreme Court Act, the CPR and the Practice Direction About Costs, the courts in England and Wales had the power to make costs capping orders. As stated by Gage, J. in *Smart* v. *East Cheshire* (15) ([2003] EWHC 2806 (QB), at para. 22) the function of the jurisdiction is to place a prospective limit on recoverable costs when "there is a real and substantial risk that without such an order costs will be disproportionately or unreasonably incurred; and that this risk may not be managed by conventional case management and a detailed assessment of costs after a trial." Therefore, the jurisdiction was exercisable if there was a real risk that the costs incurred by a party may get out of hand. The existence of a risk would come to the fore in proceedings because the provisions required parties to file costs estimates.

92   The purpose of the Preamble in the GCR is to enable the civil litigation process to be fair, fast and inexpensive. It is intended to promote the responsibility of the court to case manage proceedings before it. Therefore, there is some force in the plaintiff's submission that the overriding objective promotes the court case managing costs in a case. The issue is to what degree the court can do that under the existing provisions. In the Cayman Islands there are no specific costs capping provisions or procedures like those that exist now in England and Wales and there appears to be no Cayman Islands case in which a costs capping order has been made. As I have indicated herein, the provisions in the Cayman Islands are not even as comprehensive as they were in England and Wales when the courts there found that they had the power to order caps on costs.

93   Importantly, apart from the Practice Direction No. 1/11 Guidelines Relating to the Taxation of Costs, there are no Practice Directions about costs in the Cayman Islands. As a consequence, for example, there is no supporting mechanism for costs capping in place, such as the requirement for a party to file costs estimates. In the absence of the need to file estimates, a party would likely not be in position to apply at an early stage in any proceedings for a costs capping order as it would not have been informed about the escalating costs earlier. If a party had no knowledge of the detail that would appear in a costs estimate, it may not have a reason to apply and may not be able to support such application.

**Conclusions on the court's power to make costs capping orders**

94   In the absence of the more comprehensive package of provisions and costs procedures set out in relevant Practice Directions found in England and Wales which their courts relied upon when finding that they had the power to make capping orders post-1998, I am not satisfied that, at this time, the Cayman Islands' more limited case management and costs provisions highlighted by the plaintiffs and mentioned by me are sufficient

to enable me to now find that a judge has the power to introduce the concept of costs capping for the first time. Accordingly, I decline to make the costs capping order sought.

95   From soon after the CPR coming into force, the English courts recognized that their provisions enabled them to cap costs, and they have made later provisions to develop and give more certainty to this power. Despite the knowledge about the power in England and following the introduction of the overriding objective in the GCR Preamble, there has been no such move in the Cayman Islands to introduce provisions or guidance in Practice Directions about costs that are consistent with an intent to widen the court's cost management powers to include the making of costs capping orders. For such a novel concept, for this jurisdiction at least, to be introduced here, when one considers our cost provisions and the Preamble to the GCR, such an advancement could, I suggest, only occur after detailed consideration by the Grand Court Rules Committee and codification by further clarifying costs provisions in the GCR and guidance in a Practice Direction about costs.

**Costs capping—retrospectivity**

96   If I am wrong in my conclusion about the lack of a power to make costs capping orders, I am not satisfied that this would be an appropriate case for an order to be made due to the timing of the application. It is evident that Gage, J. in *AB* (1) approached costs capping in a prospective rather than a retroactive sense. He rightly pointed out that Part 3.1.8 CPR mentioned "Costs Budgeting" and that the Woolf Report made reference to para. 12 entitled "Prospective Budget Setting" in Zuckerman ["Devices for Controlling the Cost of Litigation Through Costs Taxation" (presented to the Woolf Inquiry)] where the author wrote:

"One option to be considered is replacing retrospective taxation with prospective budget setting. Under this regime budgets would be set in advance so that the process would have to conform to budgetary constraints, rather than the cost following the process as at present."

97   In *King* v. *Telegraph Group Ltd.* (11), Brooke, L.J. reviewed the provisions and recognized the merit of the costs capping power when he said ([2005] 1 W.L.R. 2282, at para. 83):

"It is, after all, an important feature of the overriding objective that the court must be enabled to save expense and deal with a case in ways which are proportionate to the amount of money involved, the importance of the case, the complexity of the issues and the financial position of each party (CPR r 1.1), and the parties are required to help the court to further the overriding objective: CPR r 1.3."

98   However, at paras. 79–80, Brooke, L.J. after also referring to the costs in the *Solutia* case (16) made comment about the timing of the application for a capping order when he stated (*ibid.*, at para. 80):

"The fact that the court was uneasy about the sheer size of this legal bill, judged retrospectively, led two of its members to draw attention to the desirability of a judge being able to control legal expenditure on a piece of litigation prospectively. Sir Christopher drew attention (in para 27) to the statutory power possessed by an arbitral tribunal under section 65 of the Arbitration Act 1996 to limit the amount the parties to an arbitration could incur by way of costs. *This is a power which must be exercised, if at all, at an early stage, so that a party does not find that it has spent more than the limit if a costs cap was directed later on.*" [Emphasis supplied.]

99   Brooke, L.J. then added (*ibid.*, at para. 105):

"There are three main weapons available to a party who is concerned about extravagant conduct by the other side, or the risk of such extravagance. The first is a *prospective* costs capping order of the type I have discussed in this judgment. The second is a retrospective assessment of costs conducted toughly [*sic*] in accordance with CPR principles. The third is a wasted costs order against the other party's lawyer . . ." [Emphasis supplied.]

In the matter before me, as a costs capping order with retrospective effect is sought, the "weapon" that should be used by the plaintiffs is the second one mentioned by Brooke, L.J., albeit in accordance with the GCR provisions.

100   In *Henry* v. *British Broadcasting Corp.* (9), a costs capping order was sought but was opposed due to the late timing of the application. Although Gray, J. felt that the case was a "prime candidate" for a costs capping order, the court refused to make a costs capping order finding that the application was made too late as it resulted in the exercise being prospective and not retrospective by nature. The court held that the purpose of a capping order was to enable the capped party to plan ahead the appropriate level of expenditure in line with the amount of the cap. Gray, J. stated ([2005] EWHC 2503 (QB), at paras. 39–40):

"39.   . . . It does not, however, follow that it would be right for me at this stage in the proceedings to impose a costs cap. *Mr Caldecott has, as I have said, accepted that any cap would have to be prospective. He is in my view right to adopt that stance. There is ample authority that cost capping orders should invariably operate prospectively and not retrospectively*: see *King v. Telegraph Group plc* per Brooke LJ at paragraph 80; *Weir v. Secretary of State for Transport* (Ch D 20.4.05) per Lindsay J at paragraph 28. I see

676

considerable force in the point made by Mr Rampton that the imposition of a costs cap so close to trial would in effect penalise the Claimant, or perhaps more accurately her legal advisers, when, as has often been said, *the purpose of a capping order is to enable the capped party to plan ahead the appropriate level of expenditure to bring the case to trial at a cost which is in line with the amount of the cap.*[19][] It would in my opinion be wrong to use the cost capping jurisdiction in a way which would deny the Claimant the benefit of the CFA to which she is statutorily entitled.

40.   I would therefore with some reluctance decline to make a cost capping order on the ground that the application is made too late." [Emphasis supplied.]

101   On the issue of whether a costs capping order could be retrospective, helpful guidance was also given by Judge Kirkham in *Petursson* v. *Hutchinson 3G UK Ltd.* (13). The learned judge rightly distinguished *Smart* v. *East Cheshire NHS Trust* (15) and *Various Ledward Claimants* v. *Kent & Medway Health Auth.* (18) where the costs cap orders had a retrospective and prospective effect. In both of those cases "the element of retrospectivity was limited" due to the areas of agreement reached. Judge Kirkham rightly stated that a costs cap should "normally be prospective and not retrospective." She also rightly highlighted that the case authorities, a number of which she reviewed ([2004] EWHC 2609 (TCC), at para. 42) "suggest that the court expects an order capping costs to be made at an early stage. A party should know in advance if its costs are to be capped so that it can tailor its case accordingly." Judge Kirkham added that (*ibid.*, at para. 43):

"Both sides have the right to a fair hearing. To impose a retrospective limit on costs in this case would . . . amount to a breach of the defendant's right to a fair hearing . . . it would be a wholly exceptional case where it would be appropriate to order a cap retrospectively."

And (*ibid.*, at para. 51):

"The appropriate time to consider a costs cap is at the early stages of an action where the parties and the court can together plan the steps needed to bring the matter to trial, the costs implications of those steps and whether a cap is appropriate. In this case, that stage has long since passed."

---

19  See this extract from Gray, J.'s judgment at para. 83 above where mentioned by Buxton, L.J. in *Willis* v. *Nicholson* (19).

102    As mentioned above at para. 78, in England and Wales the Civil Procedure (Amendment No. 3) Rules 2008 applicable from April 6th, 2009 introduced a new CPR 44.18–20. It made clear that costs capping orders would only apply to "future costs." These were defined as costs incurred in respect of work done after the date of the costs capping order but excluding the amount of any additional liability. This intended to prevent attempts to reduce costs already incurred and to make clear that the order could not be retrospective.

103    In the more recent case of *Black* v. *Arriva North East Ltd.* (6), Briggs, L.J. took into account the timing of the application. Briggs, L.J. stated that ([2014] EWCA Civ 1115, at para. 25):

   "The effect of what I have described is that by the time of the application, the major part of the solicitor's costs of the appeal had been incurred. The effect of the order sought would, therefore, be that the Respondents will have already have spent what is, if a costs capping order is made, in substance a budget laid down by the court without knowing that it had to stick to that insofar as it sought to recover its costs. In principle, the person who is the subject of the costs capping order ought, so far as possible, to know the budget to which he must work in advance."

104    In England and Wales, Practice Direction 3F—Costs Capping, dated January 2017 at Section I under the heading "General Rules about Costs Capping" and the sub-heading "When to make an application" the following is again stated:

   "**1.1** The court will make a costs capping order only in exceptional circumstances.

   **1.2** An application for a costs capping order must be made as soon as possible, preferably before or at the first case management hearing or shortly afterwards. The stage which the proceedings have reached at the time of the application will be one of the factors the court will consider when deciding whether to make a costs capping order."

This is consistent with all of the previous Practice Directions in which guidance has been given about costs capping. It makes clear that in England and Wales the intention was and remains that the purpose of costs capping orders is to case manage costs before they are, or possibly as they are being, incurred.

### General comments

105    As noted, the standard basis is less generous than the indemnity basis. In both cases, costs which have been unreasonably incurred, or which are unreasonable in amount, will not be allowed at taxation. On an indemnity basis, doubt as to reasonableness is resolved in the favour of the

GRAND CT.                                      RITTER v. BUTTERFIELD BANK

successful party. On the standard basis, doubt as to reasonableness is resolved in favour of the losing party. Further, on the standard basis, the Taxing Officer will only order the other party to pay costs which are proportionate. When considering whether costs are proportionate, the Taxing Officer will assess whether they bear a reasonable relationship to factors such as the sums in issue, the value of any non-monetary relief, the complexity of the litigation and conduct. I am satisfied, in line with the options outlined by Brooke, L.J. at para. 105 in *King* (11), that the Taxing Officer will be able to carefully consider the merit, if any, of the concerns about proportionality and reasonableness raised by the plaintiff and that that is the appropriate "weapon" for the plaintiffs to resolve those issues.

***Order accordingly.***

Attorneys: *Sinclairs* for the plaintiffs; *Appleby* for the defendant.

———————————————