A                                    Supreme Court

# BTI 2014 LLC *v* Sequana SA and others

## [2022] UKSC 25

2021  May 4, 5;                                        Lord Reed PSC, Lord Hodge DPSC,
B    2022  Oct 5                                 Lord Briggs, Lord Kitchin JJSC, Lady Arden

*Company — Director — Breach of duty — Company becoming insolvent after*
*payment of substantial dividend — Company bringing claim against directors for*
*breach of averred duty to act in interests of company's creditors — Whether duty*
*existing — Point at which duty engaged — Content of duty — Whether duty*
*conflicting with shareholder ratification principle and statutory provisions*
C    *relating to unlawful trading and preferences — Whether applying to payment of*
*lawful dividend — Companies Act 2006 (c 46), s 172(3)*

The directors of A Ltd caused it to pay a dividend of €135m to its parent
company and sole shareholder.  The payment of the dividend was lawful in that it
complied with the statutory scheme regulating payment of dividends in Part 23 of the
Companies Act 2006[1] and with the common law rules about maintenance of capital.
At the time the dividend was paid, A Ltd was solvent but had uncertain long-term
D    contingent liabilities, which gave rise to a real risk, although not a probability, that it
might become insolvent at an uncertain but not imminent date in the future.  In the
event A Ltd went into insolvent administration almost ten years later.  A Ltd brought
a claim against its directors and the parent company, as constructive trustee, alleging
that the dividend had been paid in breach of section 172(3) of the Companies Act
2006, which made the general directorial duty to promote the success of the company
for the benefit of its members subject to any rule of law requiring directors to act in
E    the interests of the company's creditors.  The judge dismissed the claim on the ground
that A Ltd's risk of insolvency at the time the dividend was paid had not been such as
to trigger the duty under section 172(3) of the 2006 Act.  That decision was affirmed
by the Court of Appeal.  On A Ltd's appeal to the Supreme Court, the defendants
contended, inter alia, that there was no rule of law of the kind described in
section 172(3) to which the general duty was subject.

On the appeal—
F    *Held*, dismissing the appeal, that there was not a free-standing creditor duty, but
there was a rule, which was recognised or at least preserved by section 172(3) of the
Companies Act 2006, that in certain circumstances when a company was financially
distressed the directors' fiduciary duty to the company to act in its interests was
modified to include a duty to act in the interests of creditors as a whole; that the
rationale for that rule was based on a shift in the economic interests in the company;
that the shift occurred when (*per* Lord Reed PSC and Lady Arden) the company was
G    insolvent, bordering on insolvency or it was probable that the company would enter
into an insolvent liquidation or administration, or (*per* Lord Hodge DPSC, Lord
Briggs and Lord Kitchin JJSC) the directors knew or ought to have known that
insolvency was imminent or it was probable the company would enter into an
insolvent liquidation or administration; that the modified duty was consistent with the
shareholder ratification principle, there being no power to ratify transactions entered
into when the company was insolvent, and also with statutory provisions relating to
H    wrongful trading and preferences; that when the duty arose directors were required
(*per* Lord Reed PSC, Lord Hodge DPSC, Lord Briggs and Lord Kitchin JJSC) to take
into account and give appropriate weight to the interests of the company's creditors,

[1]  Companies Act 2006, s 172(1): see post, para 64.
S172(3): see post, para 68.

© 2022 The Incorporated Council of Law Reporting fo

EXHIBIT

9

exhibitsticker.com

A

and to balance them against shareholders' interests where they might conflict, or (*per* Lady Arden) not materially to harm creditors' interests; that where an insolvent liquidation or administration was inevitable, the shareholders ceased to retain any valuable interests in the company, with the consequence that the creditors' interests became paramount; that although the dividend paid by A Ltd had been lawful, that did not of itself prevent its payment amounting to a breach of the modified duty; but that at the time of the payment of the dividend, A Ltd had not been actually or imminently insolvent; and that, accordingly, in the present case the modified duty was not engaged (post, paras 10–14, 47–48, 51, 69, 71, 76, 81, 83, 86–88, 96–99, 108–109, 111, 138, 148–149, 153, 157, 164–165, 176, 191–194, 199, 203, 205, 206, 207, 209, 224, 227, 237–247, 248, 250, 257–258, 265, 279, 281, 283–284, 288, 291, 303, 306, 311, 326–327, 336, 342, 344, 349, 446, 451).

B

*West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250, CA applied.

Decision of the Court of Appeal sub nom *BAT Industries plc v Sequana SA* [2019] EWCA Civ 112; [2019] Bus LR 2178 affirmed.

C

The following cases are referred to in the judgments:

*AIB Group (UK) plc v Mark Redler & Co Solicitors* [2014] UKSC 58; [2015] AC 1503; [2014] 3 WLR 1367; [2015] 1 All ER 747; [2015] All ER (Comm) 189, SC(E)
*Aberdeen Railway v Blaikie Bros* (1854) 1 Macq 461, HL(Sc)
*Allen v Gold Reefs of West Africa Ltd* [1900] 1 Ch 656, CA

D

*Angas Law Services Pty Ltd v Carabelas* [2005] HCA 23; 226 CLR 507
*Attorney General for Canada v Standard Trust Co of New York* [1911] AC 498, PC
*Aveling Barford Ltd v Perion Ltd* [1989] BCLC 626
*Ayerst v C & K (Construction) Ltd* [1976] AC 167; [1975] 3 WLR 16; [1975] 2 All ER 537, HL(E)
*BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-3BL plc* [2013] UKSC 28; [2013] 1 WLR 1408; [2013] Bus LR 715; [2013] 3 All ER 271, [2013] 2 All ER (Comm) 531; [2013] 1 BCLC 613, SC(E)

E

*Bilta (UK) Ltd v Nazir (No 2)* [2015] UKSC 23; [2016] AC 1; [2015] 2 WLR 1168; [2015] 2 All ER 1083; [2015] 2 All ER (Comm) 281; [2015] 2 Lloyd's Rep 61; [2015] 1 BCLC 443, SC(E)
*Borland's Trustee v Steel Bros & Co Ltd* [1901] 1 Ch 279
*Bowthorpe Holdings Ltd v Hills* [2002] EWHC 2331 (Ch); [2003] 1 BCLC 226
*Brady v Brady* [1988] BCLC 20, CA

F

*Bristol and West Building Society v Mothew* [1998] Ch 1; [1997] 2 WLR 436; [1996] 4 All ER 698, CA
*British Eagle International Air Lines Ltd v Cie Nationale Air France* [1975] 1 WLR 758; [1975] 2 All ER 390; [1975] 2 Lloyd's Rep 43, HL(E)
*Byers v Chen* [2021] UKPC 4; [2021] BCC 462, PC
*Calgary and Edmonton Land Co Ltd, In re* [1975] 1 WLR 355; [1975] 1 All ER 1046
*Capitol Films Ltd, In re* [2010] EWHC 2240 (Ch)
*Carlyle Capital Corpn Ltd v Conway* (Judgment 38/2017) (unreported) 4 September 2017, Royal Court of Guernsey

G

*Cheyne Finance plc, In re (No 2)* [2007] EWHC 2402 (Ch); [2008] Bus LR 1562; [2008] 2 All ER 987; [2008] 1 BCLC 741
*Ciban Management Corpn v Citco (BVI) Ltd* [2020] UKPC 21; [2021] AC 122; [2020] 3 WLR 705; [2021] 1 All ER 983; [2021] 1 All ER (Comm) 1; [2020] 2 BCLC 405, PC
*City Equitable Fire Insurance Co Ltd, In re* [1925] Ch 407, CA

H

*Cityspan Ltd, In re* [2007] EWHC 751 (Ch); [2007] 2 BCLC 522
*Colin Gwyer & Associates Ltd v London Wharf (Limehouse) Ltd* [2002] EWHC 2748 (Ch); [2003] 2 BCLC 153
*Collins v Barker* [1893] 1 Ch 578
*Comr of Taxation v Linter Textiles Australia Ltd* [2005] HCA 20; 220 CLR 592

711

[2022] 3 WLR                                                              BTI 2014 LLC v Sequana SA (SC(E))

A    *Continental Assurance Co of London plc, In re (No 4)* [2007] 2 BCLC 287
     *Danka Business Systems plc, In re* [2013] EWCA Civ 92; [2013] Ch 506; [2013]
          2 WLR 1398; [2013] 2 BCLC 313, CA
     *Duomatic Ltd, In re* [1969] 2 Ch 365; [1969] 2 WLR 114; [1969] 1 All ER 161
     *Eclairs Group Ltd v JKX Oil & Gas plc* [2015] UKSC 71; [2015] Bus LR 1395;
          [2016] 3 All ER 641; [2016] 2 All ER (Comm) 413; [2016] 1 BCLC 1, SC(E)
     *Evling v Israel & Oppenheimer Ltd* [1918] 1 Ch 101
B    *Facia Footwear Ltd v Hinchliffe* [1998] 1 BCLC 218
     *Frederick Inns Ltd, In re* [1993] IESC 1; [1994] 1 ILRM 387
     *GHLM Trading Ltd v Maroo* [2012] EWHC 61 (Ch); [2012] 2 BCLC 369
     *Gaiman v National Association for Mental Health* [1971] Ch 317; [1970] 3 WLR 42;
          [1970] 2 All ER 362
     *Gramophone and Typewriter Ltd v Stanley* [1908] 2 KB 89, CA
     *Greenhalgh v Arderne Cinemas Ltd* [1951] Ch 286; [1950] 2 All ER 1120, CA
C    *Grove v Flavel* (1986) 11 ACLR 161
     *HLC Environmental Projects Ltd, In re* [2013] EWHC 2876 (Ch); [2014] BCC 337
     *Harris Simons Construction Ltd, In re* [1989] 1 WLR 368; [1989] BCLC 202
     *Hogg v Cramphorn Ltd* [1967] Ch 254; [1966] 3 WLR 995; [1966] 3 All ER 420
     *Horsley & Weight Ltd, In re* [1982] Ch 442; [1982] 3 WLR 431; [1982] 3 All ER
          1045, CA
     *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] AC 821; [1974] 2 WLR 689;
          [1974] 1 All ER 1126, PC
D    *Hutton v West Cork Railway Co* (1883) 23 Ch D 654, CA
     *Item Software (UK) Ltd v Fassihi* [2004] EWCA Civ 1244; [2005] ICR 450; [2005]
          2 BCLC 91, CA
     *Johnson v Unisys Ltd* [2001] UKHL 13; [2003] 1 AC 518; [2001] 2 WLR 1076;
          [2001] ICR 480; [2001] 2 All ER 801, HL(E)
     *Julien v Evolving Technologies and Enterprise Development Co Ltd* [2018] UKPC 2;
          [2018] BCC 376, PC
E    *Kalls Enterprises Pty Ltd v Baloglow* [2007] NSWCA 191; (2007) 25 ACLC 1094
     *Kinsela v Russell Kinsela Pty Ltd* (1986) 4 NSWLR 722
     *Knight v Frost* [1999] BCC 819
     *Kuwait Asia Bank EC v National Mutual Life Nominees Ltd* [1991] 1 AC 187; [1990]
          3 WLR 297; [1990] 3 All ER 404; [1990] 2 Lloyd's Rep 95; [1990] BCLC 868, PC
     *Lands Allotment Co, In re* [1894] 1 Ch 616, CA
     *Lawrence v West Somerset Mineral Railway Co* [1918] 2 Ch 250
F    *Lee v Neuchatel Asphalte Co* (1889) 41 Ch D 1, CA
     *Lehman Bros International (Europe), In re (No 4)* [2017] UKSC 38; [2018] AC 465;
          [2017] 2 WLR 1497; [2018] 1 All ER 205; [2018] 1 All ER (Comm) 629; [2017]
          2 BCLC 149, SC(E)
     *Leitch (William C) Bros Ltd, In re* [1932] 2 Ch 71
     *Lonrho Ltd v Shell Petroleum Co Ltd* [1980] 1 WLR 627, HL(E)
     *Loquitur Ltd, In re* [2003] EWHC 999 (Ch); [2003] 2 BCLC 442
G    *MDA Investment Management Ltd, In re* [2003] EWHC 2277 (Ch); [2004] 1 BCLC
          217
     *Macaura v Northern Assurance Co Ltd* [1925] AC 619, HL(E)
     *MacDonald v Carnbroe Estates Ltd* [2019] UKSC 57; [2020] 1 BCLC 419, SC(Sc)
     *Mackay, Ex p; Ex p Brown; In re Jeavons* (1873) LR 8 Ch App 643
     *MacPherson v European Strategic Bureau Ltd* [2000] 2 BCLC 683, CA
     *Malone v Brincat* (1998) 722 A 2d 5
H    *Marex Financial Ltd v Sevilleja* [2020] UKSC 31; [2021] AC 39; [2020] 3 WLR 255;
          [2021] 1 All ER 585; [2021] 1 All ER (Comm) 97; [2020] 2 Lloyd's Rep 165;
          [2020] 2 BCLC 319, SC(E)
     *Mercantile Trading Co, In re* (1869) LR 4 Ch App 475, CA
     *Moulin Global Eyecare Holdings Ltd v Lee Sin Mei* [2014] HKCFA 63; 17 HKFCAR
          466

© 2022 The Incorporated Council of Law Reporting for England and Wales

Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical     A
        Services Ltd [1983] Ch 258; [1983] 3 WLR 492; [1983] 2 All ER 563, CA
New World Alliance Pty Ltd, In re; Sycotex Pty Ltd v Baseler (1994) 122 ALR 531
Nicholson v Permakraft (NZ) Ltd [1985] 1 NZLR 242; 3 ACLC 453
Nordic Travel Ltd v Scotprint Ltd 1980 SLR 189, Ct of Sess
North American Catholic Educational Programming Foundation Inc v Gheewalla
        (2007) 930 A 2d 92
Northampton Borough Council v Cardoza [2017] EWHC 504 (Ch)                         B
Official Receiver v Stern (No 2) [2001] EWCA Civ 1787; [2002] 1 BCLC 119, CA
Parke v Daily News Ltd (No 2) [1962] Ch 927; [1962] 3 WLR 566; [1962] 2 All ER 929
Patel v Mirza [2016] UKSC 42; [2017] AC 467; [2016] 3 WLR 399; [2017] 1 All ER
        191; [2016] 2 Lloyd's Rep 300, SC(E)
Paterson v R Paterson & Sons Ltd 1917 SC (HL) 13, HL(Sc)
Peoples Department Stores Inc (Trustee of) v Wise 2004 SCC 68; [2004] 3 SCR 461
Percival v Wright [1902] 2 Ch 421                                                   C
Produce Marketing Consortium Ltd, In re [1989] 1 WLR 745; [1989] 3 All ER 1
Produce Marketing Consortium Ltd, In re (No 2) (1989) 5 BCC 569
Regal (Hastings) Ltd v Gulliver [1967] 2 AC 134; [1942] 1 All ER 378, HL(E)
Regentcrest plc v Cohen [2001] 2 BCLC 80
Roberts v Frohlich [2011] EWHC 257 (Ch); [2011] 2 BCLC 625
Rolled Steel Products (Holdings) Ltd v British Steel Corpn [1986] Ch 246; [1985]
        2 WLR 908; [1985] 3 All ER 52, CA                                          D
Rubin v Gunner [2004] EWHC 316 (Ch); [2004] 2 BCLC 110
Salomon v A Salomon & Co Ltd [1897] AC 22, HL(E)
Sarflax Ltd, In re [1979] Ch 592; [1979] 2 WLR 202; [1979] 1 All ER 529
Short v Treasury Comrs [1948] 1 KB 116; [1947] 2 All ER 298, CA; [1948] AC 534;
        [1948] 2 All ER 509, HL(E)
Smith and Fawcett Ltd, In re [1942] Ch 304; [1942] 1 All ER 542, CA
Sonatacus Ltd, In re [2007] EWCA Civ 31; [2007] 2 BCLC 627, CA                     E
Spies v The Queen [2000] HCA 43; 201 CLR 603
Stainton, In re, Ex p Board of Trade (1887) 4 Mor 242
Stanhope Pension Trust Ltd v Registrar of Companies [1994] BCC 84, CA
Stone & Rolls Ltd v Moore Stephens [2009] UKHL 39; [2009] AC 1391; [2009]
        3 WLR 455; [2009] Bus LR 1356; [2009] 4 All ER 431; [2010] 1 All ER (Comm)
        125; [2009] Lloyd's Rep 537; [2009] 2 BCLC 563, HL(E)
Trevor v Whitworth (1887) 12 App Cas 409, HL(E)                                     F
VGM Holdings Ltd, In re [1942] Ch 235, CA
Vivendi SA v Richards [2013] EWHC 3006 (Ch); [2013] BCC 771
Walker v Wimborne (1976) 137 CLR 1
Washington Diamond Mining Co, In re [1893] 3 Ch 95, CA
Welfab Engineers Ltd, In re [1990] BCLC 833
Wessely v White [2018] EWHC 1499 (Ch); [2019] BCC 289
West Mercia Safetywear Ltd v Dodd [1988] BCLC 250, CA                              G
Westmid Packing Services Ltd (No 3) [1998] 2 All ER 124; [1998] 2 BCLC 646, CA
Westpac Banking Corpn v Bell Group Ltd (No 3) [2008] WASC 239; [2012] WASCA
        157; 270 FLR 1
Wincham Shipbuilding, Boiler, and Salt Co, In re; Poole, Jackson and Whyte's case
        (1878) 9 Ch D 322, CA
Winkworth v Edward Baron Development Co Ltd [1986] 1 WLR 1512; [1987] 1 All
        ER 114; [1987] BCLC 193, HL(E)                                              H

The following additional cases were cited in argument:

Bairstow v Queens Moat Houses plc [2001] EWCA Civ 712; [2001] 2 BCLC 531, CA
Bamford v Bamford [1970] Ch 212; [1969] 2 WLR 1107; [1969] 1 All ER 969, CA

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   *Bath v Standard Land Co Ltd* [1911] 1 Ch 618, CA
*Charterbridge Corpn Ltd v Lloyds Bank Ltd* [1970] Ch 62; [1969] 3 WLR 122;
    [1969] 2 All ER 1185
*Colt Telecom Group plc, In re* [2002] EWHC 2815 (Ch); [2003] BPIR 324
*Hilton International Ltd v Hilton* [1989] 1 NZLR 442
*Liberty International plc, In re* [2010] EWHC 1060 (Ch); [2010] 2 BCLC 665

B   **APPEAL** from the Court of Appeal
        By a claim form issued on 9 May 2014, Arjo Wiggins Appleton Ltd, later
called Windward Prospects Ltd, brought an action against its directors, the
second to fifth individual defendants, Antoine Courteault, Pierre Martinet,
Clive Mountford and Martin Newell, and the sixth defendant, the company
Selarl C Basse, alleging that dividends paid in December 2008 and May
C   2009 to the first defendant parent company, Sequana SA, were, inter alia,
paid in breach of the directors' duty to have regard to the interests of the
creditors under section 172(3) of the Companies Act 2006.  By an
assignment effective as of 30 September 2014 Arjo Wiggins Appleton Ltd
assigned its claim to BTI 2014 LLC.  By a judgment given on 11 July 2016,
Rose J [2016] EWHC 1686 (Ch); [2017] Bus LR 82 dismissed the claim.  On
6 February 2019 the Court of Appeal (Longmore, David Richards and
D   Henderson LJJ) [2019] EWCA Civ 112; [2019] Bus LR 2178 dismissed the
claimant's appeal against the judge's decision on that issue.  With permission
of the Supreme Court (Lord Reed DPSC, Lord Briggs and Lord Sales JJSC)
given on 31 July 2019 the claimant appealed.
        The issues in the appeal were agreed to be: (1) Were the ordinary duties of
directors under English law ever modified such that they were required to
E   consider or act in the interests of creditors of the company (the "creditors'
interests duty")?  In other words, did the creditors' interests duty exist as a
matter of English law?  (2) If the creditors' interests duty existed, was the
payment of a dividend that was lawful (under Part 23 of the 2006 Act and/or
at common law) capable of constituting a breach, or falling within the scope,
of that duty?  (3) If the creditors' interests duty existed, when and in what
F   circumstances was it triggered?  In particular, did the creditors' interests
duty arise: (a) Only where the directors knew or should have known that the
company was actually insolvent?  (b) Only where the directors knew or
should have known that the company was likely to become insolvent (where
"likely" means "probable"), either before or as a result of a proposed course
of action?  (c) Where the directors knew or should have known that the
company faced at least a real risk of insolvency, either before or as a result of
G   a proposed course of action?  (d) At some other point and/or in some other
circumstances?(4) What was the content of the creditors' interests duty
when engaged, and did it vary depending on whether the company was
actually insolvent?  In particular, were directors required: (a) To give
paramount importance to creditors' interests?  (b) Merely to take account of
creditors' interests, without those interests necessarily being decisive? (c) To
H   give them paramount importance if the company was actually insolvent but
only to take them into account short of actual insolvency?  (d) To apply some
other approach?
        The facts are stated in the judgment of Lord Briggs JSC, at paras 115–116,
and Lady Arden, at paras 350–354.

© 2022 The Incorporated Council of Law Reporting for England and Wales

*Andrew Thompson KC* and *Ciaran Keller* (instructed by *Hogan Lovells    A
International LLP (London)*) for the claimant.

*Laurence Rabinowitz KC* and *Niranjan Venkatesan* (instructed by
*Skadden Arps Slate Meagher & Flom (UK) LLP*) for the first to third
defendants and (instructed by *Darrois Villey Maillot Brochier (Paris)*) for
the sixth defendant.

The fourth and fifth defendants were not parties to the appeal.
                                                                          B
5 October 2022.  The following judgments were handed down.

## LORD REED PSC

*1. Introduction*
                                                                          C
   **1**    This appeal raises questions of considerable importance for company
law.  It concerns the fiduciary duty of directors to act in good faith in the
interests of the company.  In this context, the interests of the company have
until recent times been treated as being the interests of its members as a
whole.  So understood, the duty has been given statutory expression in a
modified form in section 172(1) of the Companies Act 2006 ("the 2006
Act"), which requires directors to act in the way they consider, in good faith,
                                                                          D
would be most likely to promote the success of the company for the benefit
of its members as a whole.  However, where the company is insolvent or,
according to some authorities, is at some earlier point in the decline of its
fortunes, it has been said that the duty to act in the interests of the company
should not be interpreted as a duty to act in the interests of the members as a
whole, but should instead be understood as a duty to act in the interests of
the company's creditors as a whole, or as a duty to take the creditors'       E
interests into account together with those of the members.

   **2**    A number of justifications have been put forward for these
approaches.  The one which has received most attention in the authorities
proceeds on the basis that the ordinary equiparation of the company's
interests with the members' interests reflects the fact that it is ordinarily the
members who have a proprietary or quasi-proprietary interest in the
company's assets, based upon their entitlement to its residual assets upon its     F
dissolution.  Where, on the other hand, the company is insolvent or
bordering on insolvency, that interest is said to pass to its creditors, on the
basis of their prospective entitlement to the company's assets upon its
winding up.  It is therefore said to be imperative that directors are required
to manage the company in those circumstances in a way which does not
prejudice the creditors' interests: an objective which can only be achieved if,     G
in the performance of their duty to act in good faith in the interests of the
company, they treat the creditors' interests as paramount, or at least as
relevant.  It is said that section 172(3) of the 2006 Act, which makes the duty
under section 172(1) "subject to any enactment or rule of law requiring
directors, in certain circumstances, to consider or act in the interests of
creditors of the company", recognises or at least preserves this common law
rule.                                                                     H

   **3**    As will be apparent from that summary, the proposition that directors
are under a duty in respect of creditors' interests raises a number of
questions.  For example, is it correct to say that there is such a duty?  If it is,
when does the duty arise: on insolvency (however that may be defined), or at

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   some earlier point?  What is the content of the duty?  Is it a duty to treat the
creditors' interests as paramount, or are they merely to be treated as a
relevant consideration, along with others?  What are the consequences of a
breach of the duty?  In particular, what forms of relief are available?  These
are only a few of the questions which arise.

   4   Not all of these questions need to be decided in the present appeal, or
have been the subject of detailed submissions.  As this is also an area of the
B   law which is in the course of development, and many aspects of which
remain controversial, it would be unwise as well as inappropriate to attempt
to answer all these questions in the present case.  Nevertheless, as Lord
Briggs JSC rightly says, a principled analysis of the existence and
engagement of a duty of directors in relation to creditors' interests cannot
sensibly be carried out in a state of agnosticism about its content and
C   consequences.  In reality, these questions are to some extent inter-connected,
as the answers to some of them provide a basis for the answers to others.  It is
therefore necessary to express a provisional view about some issues which
do not call for a final decision.

   5   It is also necessary to take adequate account of other aspects of
company law which may be relevant: notably, the power of the members to
authorise or ratify acts committed by directors in breach of their duties, so as
D   to make them the company's acts.  It would scarcely be coherent for
company law to require directors to subordinate the interests of members to
those of creditors, or at least to take them into account, if at the same time
the members could ratify a breach of that duty.  Whatever view one takes of
the directors' duty to act in good faith in the interests of the company must
therefore be coherent with other relevant aspects of company law.

E   6   Regard must also be had to the interaction between any duty of
directors under company law in respect of creditors' interests and the
relevant provisions of insolvency law.  Judicial development of company law
should not trespass on areas which are intended by Parliament to be covered
by statutory regulation under insolvency law, or undermine the operation of
the insolvency provisions which Parliament has enacted.

F   7   This appeal is the first occasion on which any of these issues has had
to be decided by this country's highest court.  They go to the heart of our
understanding of company law, and are of considerable practical importance
to the management of companies.

## 2. This appeal

   8   This is not only the first occasion on which this court has to decide
G   whether there are circumstances in which directors must act in, or at least
consider, the interests of the company's creditors.  It is also the first case in
this jurisdiction in which the question is raised in relation to a company
which was unquestionably solvent at the material time.  The question
whether, if directors are under a duty in respect of creditors' interests, that
duty arises prior to insolvency, is therefore raised for decision for the first
time.
H   9   In order to succeed on the facts of the appeal, which are fully
described in the judgment of Lord Briggs JSC, the claimant seeks to establish
that the common law imposes a duty upon directors to have regard to the
interests of creditors, which is preserved by section 172(3) of the 2006 Act.
It is argued that the duty is owed to the company, and arises in circumstances

where the company is solvent but there is a real but not remote risk of its *A* becoming insolvent at some point in the future (with the onset of insolvency, the duty is said to alter to one requiring the directors to treat the creditors' interests as paramount).   On the basis that such a duty exists in those circumstances, the claimant, which is an assignee of a company's right of action in respect of an alleged breach of the duty, seeks to recover from the second and third defendants, who were at the material time the directors of *B* the company, an amount equivalent to a dividend which the company paid to the first defendant, which was its parent company and sole shareholder, almost ten years before the company went into insolvent administration. The company was neither insolvent nor on the verge of insolvency at the time of the payment.   It was not a trading company: it existed solely because it was liable to meet future environmental clean-up costs, which could not be precisely estimated, but for which it had made provision in its accounts.   It is *C* alleged that, since the ultimate liability might be considerably more (or considerably less) than the amount for which provision was made, the payment of the dividend created a real and not remote risk of the company's becoming insolvent at some point in the future, that the directors failed to have regard to the interests of creditors in deciding to declare the dividend, and that there was accordingly a breach of the duty.   The payment of the *D* dividend complied with the statutory requirements relating to distributions set out in Part 23 of the 2006 Act, and with the rules concerning the maintenance of capital.

10   All the members of the court agree that no duty of the kind described arose in those circumstances, and that the appeal should accordingly be dismissed.   The members of the court are also in broad agreement in the reasoning by which we reach that conclusion.   There *E* remain some differences in our reasoning, particularly on matters which do not directly arise for decision in this case, but that is not surprising when the court is dealing with a legal principle which has only emerged in recent times and whose basis and incidents have hitherto received little judicial attention in this jurisdiction.

11   In summary, I reject the contention, raised in some of the authorities, that there is a "creditor duty" distinct from the directors' fiduciary duty to *F* act in the interests of the company; but I have come to the conclusion that there are circumstances in which the interests of the company, for the purposes of the latter duty, should be understood as including the interests of its creditors as a whole.   As it seems to me, there is a risk of confusion if this is described as a creditor duty, as the parties described it, as there is not a duty owed to creditors, or any duty separate from the directors' fiduciary *G* duty to the company.   Rather, there is a rule which modifies the ordinary rule whereby, for the purposes of the director's fiduciary duty to act in good faith in the interests of the company, the company's interests are taken to be equivalent to the interests of its members as a whole.   I understand all the members of the court to be in agreement on that point.   Where the modifying rule applies—a rule which I shall describe as the rule in *West Mercia*, after *H* the leading case of *West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250—the company's interests are taken to include the interests of its creditors as a whole.   The duty remains the director's duty to act in good faith in the interests of the company.   The effect of the rule is to require the directors to consider the interests of creditors along with those of members.

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    The weight to be given to their interests, insofar as they may conflict with
those of the members, will increase as the company's financial problems
become increasingly serious.  Where insolvent liquidation or administration
is inevitable, the interests of the members cease to bear any weight, and the
rule consequently requires the company's interests to be treated as
equivalent to the interests of its creditors as a whole.

B    12    The rationale of the rule which modifies how the company's interests
are understood, for the purposes of the directors' duty of loyalty, does not
appear to me to be satisfactorily explained in terms of contingent quasi-
proprietary interests in the company's assets.  It can be explained more
simply and clearly on the basis that, where the rule in *West Mercia* applies,
the company's creditors have an economic interest in the company, based
upon their entitlement to be paid the debts owed to them, ultimately
C    enforceable against the proceeds of realisation of the company's assets,
which is distinct from the interests of its members and requires separate
consideration: something which can be taken to occur when the company is
insolvent or bordering on insolvency, or where an insolvent liquidation or
administration is probable, or where the transaction in question would place
the company in one of those situations.  I understand that also to be the view
of the other members of the court.
D    13    I consider that that rule of the common law was preserved by
section 172(3) of the 2006 Act.  In enacting section 172, Parliament can be
taken to have been aware of the many issues of policy which had been
discussed in the reports, White Papers and other documents which preceded
the legislation.  Since Parliament did not legislate so as to abolish the rule,
which had by then been applied in the case law for 19 years, but left its
E    future consideration to the courts, I do not regard the competing policy
considerations as determinative; especially as their evaluation is in principle
a matter better suited to Parliament than to the courts.
14    I am satisfied that the rule in *West Mercia* does not apply merely
because the company is at a real and not remote risk of insolvency at some
point in the future.  I therefore agree with the other members of the court
that the appeal falls to be dismissed, and the claim fails.
F    15    In addition to considering whether the rule in *West Mercia* exists,
and the circumstances in which it arises, I shall also consider briefly the
content of the directors' duty where the rule applies, the interaction of
the rule with the rules governing the authorisation and ratification by
members of directors' breaches of their duties, and, to a limited extent, the
relationship between the rule and certain rules of insolvency law.  I do so
G    because these issues are relevant to the questions which have to be decided in
this appeal as to the existence and application of such a rule, even if only a
provisional view about them can or should be expressed.  It should however
be emphasised that this is an area of the law which is of recent origin and
remains in the course of development.
16    I have thought it helpful to begin by considering, first, the director's
common law duty to act in the interests of the company as traditionally
H    understood (paras 17–22 below); secondly, the shareholders' power to
authorise or ratify acts of the directors which are in breach of that duty,
again as traditionally understood (paras 23–24); and thirdly, the approach
to the treatment of creditors which is reflected in the traditional approach to
those issues (paras 25–28).  I consider next the evolution of those areas of the

© 2022 The Incorporated Council of Law Reporting for England and Wales

law in the recent case law (paras 29–42), and the approach to the treatment
of creditors which underpins that evolution (paras 43–62). I will then
consider the impact of the relevant provisions of the 2006 Act (paras 63–75),
before turning finally to the following questions:

(i) (1) Is there a rule (the rule in *West Mercia*) that, in certain circumstances,
the interests of the company, for the purpose of the directors' duty to act in
good faith in its interests, are to be understood as including the interests of its
creditors as a whole? (paras 76–77)

(ii) (2) What is the content of the duty arising where the rule in *West
Mercia* applies? (paras 78–82)

(iii) (3) What are the circumstances in which the rule in *West Mercia*
applies? (paras 83–90)

(iv) (4) How does the rule in *West Mercia* interact with the principle of
shareholder authorisation or ratification? (para 91)

(v) (5) How does the rule in *West Mercia* interact with the protection
of creditors under sections 214 and 239 of the Insolvency Act 1986?
(paras 92–109)

(vi) (6) Can the rule in *West Mercia* apply to a decision by directors to pay
a dividend which is otherwise lawful? (para 110)

*3. The director's common law duty to act in the interests of the company*

*(1) The traditional approach to the company's interests*

17   Before considering the development of the idea that the director's
duty to act in good faith in the interests of the company can encompass the
interests of creditors, it is helpful to begin by examining the underpinning of
the traditional equation of the company's interests with those of its
members.

18   The law has always held that directors in the performance of their
duties stand in a fiduciary relationship with the company: *In re City
Equitable Fire Insurance Co Ltd* [1925] Ch 407, 426. That is because, as
directors, they manage the company's affairs on its behalf: see, for example,
*Aberdeen Railway v Blaikie Bros* (1854) 1 Macq 461, 471 and *In re Lands
Allotment Co* [1894] 1 Ch 616, 631. Since they are in a fiduciary position,
they must exercise their powers bona fide for the benefit of the company as a
whole (*Allen v Gold Reefs of West Africa Ltd* [1900] 1 Ch 656, 671), or, as it
is often put, bona fide in what they consider is in the interests of the
company: *In re Smith and Fawcett Ltd* [1942] Ch 304, 306.

19   The courts traditionally treated the interests of a company as being
the same as the interests of its members: that is to say, its shareholders, in the
case of a company with a share capital. The interests of other persons who
might be affected by the company's success or failure, such as its employees,
were treated as relevant only in so far as their treatment might affect the
company's interests, understood as the interests of its shareholders: *Hutton
v West Cork Railway Co* (1883) 23 Ch D 654. Although the separate
personality of the company was recognised long before it was authoritatively
established in *Salomon v A Salomon & Co Ltd* [1897] AC 22 ("*Salomon*"),
the company was nevertheless regarded, for the purposes of the directors'
duty to act in its interests, as being its collective membership.

20   As a matter of legal history, that approach appears to have been
influenced by the continuity of the joint stock company with its precursor, the

A   unincorporated deed of settlement company, in which the members were the company, and the directors were trustees.  There appears also to have been a view at one time that the substance of the relationship between the directors and the shareholders as a whole was that the shareholders, as the corporators, entrusted their property to the directors and conferred on them their powers of management.  In the eyes of equity, that relationship was analogous to the fiduciary relationship between the directors and the company.  That view is

B   illustrated, for example, by the statement in the 6th edition of *Lindley on Companies* (1902) that "Directors are not only agents, but to a certain extent trustees for the company *and its shareholders*" (vol 1, pp 509–510; emphasis added).  It is also illustrated by many judicial dicta.  In *In re Wincham Shipbuilding, Boiler, and Salt Co; Poole, Jackson and Whyte's case* (1878) 9 Ch D 322, 328, for example, Sir George Jessel MR stated:

C       "It has always been held that the directors are trustees for the shareholders, that is, for the company."

21    Even after the implications of the separate existence of the company became more clearly established, the courts were slow to treat the company as a distinct entity with interests of its own, and to develop rules for ascertaining those interests, as the logic of the company's separate

D   personality might have indicated.  Notwithstanding that the company was recognised as owning its own property (*Macaura v Northern Assurance Co Ltd* [1925] AC 619) and as carrying on its own business (*Gramophone and Typewriter Ltd v Stanley* [1908] 2 KB 89), its interests continued to be equiparated with those of its shareholders.  For example, in *Greenhalgh v Arderne Cinemas Ltd* [1951] Ch 286, 291, Lord Evershed MR, with whose

E   judgment the other members of the Court of Appeal agreed, said that the phrase "the company as a whole" did not mean the company as a commercial entity, but meant the corporators as a general body.  Although the case was not concerned with the director's duty to act in the interests of the company, Lord Evershed's dictum was nevertheless treated as applicable in that context.  To this effect, in *Parke v Daily News Ltd (No 2)* [1962] Ch 927, 963, it was said that the words "benefit of the company" meant the

F   benefit of the shareholders as a general body.  That approach has continued to have its adherents.  For example, Sir George Jessel MR's dictum in *In re Wincham Shipbuilding, Boiler, and Salt Co,* quoted in para 20 above, was cited with approval by the Privy Council in *Kuwait Asia Bank EC v National Mutual Life Nominees Ltd* [1991] 1 AC 187, 218.

22    A different approach, which has been influential in the modern case law, was adopted in *Gaiman v National Association for Mental Health*

G   [1971] Ch 317, where Megarry J said at p 330 that "[t]he [company] is, of course, an artificial legal entity, and it is not very easy to determine what is in the best interests of the [company] without paying due regard to the members of the [company]".  His Lordship went on to say that he "would accept the interests of both present and future members of the [company], as a whole, as being a helpful expression of a human equivalent".

H
        *(2) The traditional approach to the authorisation or ratification of breaches of duty*

23    It has long been established that a company is normally bound in a matter which is intra vires the company by a resolution of the shareholders

in general meeting.    Authorisation in advance of the directors' act or ratification after the event by the shareholders in general meeting, after full disclosure, results in the treatment of the directors' act as the act of the company, on principles of the law of agency, and therefore eliminates the possibility of the company bringing a claim against the directors for breach of their duties to the company.

24    Even in the absence of a formal resolution, "the company is bound in a matter intra vires by the unanimous agreement of its members": *Salomon* at p 57 per Lord Davey.  This principle, often referred to as the *Duomatic* principle (*In re Duomatic Ltd* [1969] 2 Ch 365), "is, in short, the principle that anything the members of a company can do by formal resolution in a general meeting, they can also do informally if all of them assent to it": *Ciban Management Corpn v Citco (BVI) Ltd* [2021] AC 122, para 31.  In particular, the shareholders can authorise or ratify the acts of directors informally, as well as formally: *Julien v Evolving Tecknologies and Enterprise Development Co Ltd* [2018] BCC 376, para 51.

### (3) The traditional approach to the interests of creditors

25    It is firmly established that the directors of a company do not owe any duty to its creditors, absent special circumstances giving rise to such a duty: see, for example, *In re Wincham Shipbuilding, Boiler, and Salt Co* at pp 328–329, *In re Horsley & Weight Ltd* [1982] Ch 442, 453–454, *Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical Services Ltd* [1983] Ch 258, 288 ("*Multinational Gas*"), and *Kuwait Asia Bank EC v National Mutual Life Nominees Ltd*, at p 218. A contrary view was expressed by Lord Templeman in *Winkworth v Edward Baron Development Co Ltd* [1986] 1 WLR 1512, 1516, and acquiesced in by the other members of the Appellate Committee, but his remarks to that effect were obiter and must be regarded as per incuriam.  On the other hand, company law has long contained (and continues to contain) principles which protect the interests of creditors.  Examples include the rule requiring the maintenance of the company's capital, the associated constraints on the payment of dividends and other forms of distribution, and the rules requiring the publication of information relevant to creditors' ability to protect their own interests (for example, the inclusion of "limited" in the company's name, and the registration of charges in a public register).

26    As has been explained, for the purposes of the director's duty to act in the interests of the company, the company's interests were traditionally equiparated with those of its shareholders, not its creditors.  The creditors had such rights against the company as they had contracted for.  They also received indirect protection from the directors' duty to act in the interests of the company, since it was in the shareholders' interests, and therefore in the company's interests, to pay the company's debts in order to carry on its business, and to preserve the company's reputation for creditworthiness and thus its access to future credit.

27    The traditional view was that, subject to any requirements imposed by statute, such as the rule that the company's subscribed capital must be maintained, creditors entering into a contractual relationship with a company must be the guardians of their own interests.  That view is illustrated by the case of *Salomon*.  It concerned a transaction in which a solvent company purchased the assets of the controlling shareholder and

A   managing director at a grossly overvalued price.  All the shareholders knew
of the overvaluation and assented to it.  As a result of a subsequent downturn
in business, the company became insolvent and went into liquidation.  The
transaction was held to be unassailable by the liquidator.  The speeches
emphasised that anyone giving credit to a limited company did so at their
own risk.  As Lord Herschell observed at p 44, the very object of the creation
B   of the company is that the liability of the members for the debts incurred by
the company shall be limited; see also, to similar effect, Lord Macnaghten at
p 52.  It is by limiting liability to creditors, through the interposition of a
separate legal person between the shareholders and the creditors, that
entrepreneurs are enabled to undertake business activities which they might
otherwise be deterred from undertaking by reason of the commercial risk
involved.  The speeches also emphasised that the protection of creditors lay
C   in their own hands, and that provision is made by statute for the publication
of information concerning the company's affairs in registers open to public
inspection.

      28   The rationale of this laissez faire approach is that creditors generally
give credit to companies in the knowledge that they are running a risk.  Some
creditors, such as commercial lenders and suppliers, can seek to protect
D   themselves against the risk of the company's insolvency.  For example, they
may insist upon guarantees or security for their debt, or seek to take account
of the risk in the terms on which they contract with the company, for
instance by providing for interest at a rate which reflects the risk involved.
Whether and to what extent creditors protect themselves, beyond any
protections (such as liens) arising by operation of law, is a matter of
E   commercial judgment and negotiation.  They can also avail themselves of the
weapon of a statutory demand for payment, carrying the threat of an
application for winding up and consequent damage to the company's
reputation.  Given the need for creditors to be the guardians of their own
interests vis-à-vis the company, with which they are in a contractual
relationship, it would be paradoxical if there were widely drawn
circumstances in which they had the benefit of unlimited liability as regards
F   the company's directors, with whom they have no direct legal relationship.
That, at least, was the traditional view.

### 4. Recent developments in the common law

#### (1) The company's interests

G      29   A number of significant developments have occurred in relatively
recent times.  An early pointer was an influential dictum in the Australian
case of *Walker v Wimborne* (1976) 137 CLR 1, where Mason J observed at
p 7 that "the directors of a company in discharging their duty to the
company must take account of the interest of its shareholders and its
creditors", explaining that "[a]ny failure by the directors to take into
account the interests of creditors will have adverse consequences for the
H   company as well as for them."  Another significant dictum, which pointed
more clearly in the direction the law was later to take, was that of Lord
Diplock in *Lonrho Ltd v Shell Petroleum Co Ltd* [1980] 1 WLR 627, 634
that the best interests of the company "are not exclusively those of its
shareholders but may include those of its creditors".  This dictum, albeit

brief and obiter, recognised that how the company's interests were understood might depend on the circumstances.

30   The idea that creditors' interests might be a relevant factor received more extended consideration in the New Zealand case of *Nicholson v Permakraft (NZ) Ltd* [1985] 1 NZLR 242 ("*Permakraft*"), where Cooke J expressed the view, obiter, that directors might owe a duty to the company to consider the interests of creditors "if the company is insolvent, or near-insolvent, or of doubtful solvency, or if a contemplated payment or other course of action would jeopardise its solvency" (p 249).  He considered that such a duty might apply in respect of the interests of "current and likely continuing trade creditors" (ibid), but not other creditors.  He stated that such a duty could be justified on the basis that "In a situation of marginal commercial solvency such creditors may fairly be seen as beneficially interested in the company or contingently so" (p 249).  In that regard, he referred to Viscount Haldane's judgment in *Attorney General for Canada v Standard Trust C o of New York* [1911] AC 498, 504–505, and to dicta in *In re Horsley & Weight Ltd* at pp 455–456, per Cumming-Bruce and Templeman LJJ.

31   That reasoning influenced the judgment of Street CJ in *Kinsela v Russell Kinsela Pty Ltd* (1986) 4 NSWLR 722 ("*Kinsela*"), a decision of the New South Wales Court of Appeal which heralded a more radical change in the way in which the law understands the concept of a company's interests. The case concerned a transaction entered into by a company with the approval of the shareholders at a time when it was balance sheet insolvent, and in anticipation of its imminent collapse, for the purpose and with the effect of placing its assets beyond the immediate reach of its creditors. Street CJ distinguished authorities to the effect that shareholder authorisation or ratification validated any intra vires act by the directors on the basis that they "were not intended to, and do not, apply in a situation in which the interests of the company as a whole involve the rights of creditors as distinct from the rights of shareholders" (p 730).  He continued:

"In a solvent company the proprietary interests of the shareholders entitle them as a general body to be regarded as the company when questions of the duty of directors arise.  If, as a general body, they authorise or ratify a particular action of the directors, there can be no challenge to the validity of what the directors have done.  But where a company is insolvent the interests of the creditors intrude.  They become prospectively entitled, through the mechanism of liquidation, to displace the power of the shareholders and directors to deal with the company's assets.  It is in a practical sense their assets and not the shareholders' assets that, through the medium of the company, are under the management of the directors pending either liquidation, return to solvency, or the imposition of some alternative administration."

32   Accordingly, he said, "Generally expressed statements of principle regarding the validating effect of shareholder approval are directed to solvent companies" (ibid).  As Street CJ noted, that point had previously been made by the Court of Appeal in *Multinational Gas* (where Dillon LJ remarked at p 288 that "*so long as the company is solvent* the shareholders are in substance the company" (emphasis added)) and in *Rolled Steel*

© 2022 The Incorporated Council of Law Reporting for England and Wales

A  *Products (Holdings) Ltd v British Steel Corpn* [1986] Ch 246, 296 ("*Rolled Steel*").

33   Street CJ concluded at p 732 that although a director's breach of fiduciary duty could be authorised or ratified by the shareholders where it affected their interests, the position was different where the interests at risk were those of creditors: "Once it is accepted, as in my view it must be, that the directors' duty to a company as a whole extends in an insolvency context
B  to not prejudicing the interests of creditors . . . the shareholders do not have the power or authority to absolve the directors from that breach".  Street CJ added at p 733 that he hesitated to formulate a general test of the degree of financial instability which would impose upon directors "an obligation to consider the interests of creditors", but observed that "the plainer it is that it is the creditors' money that is at risk, the lower may be the risk to which the
C  directors, regardless of the unanimous support of all of the shareholders, can justifiably expose the company".

34   That judgment was based upon the idea that the rationale of the traditional treatment of a company's interests as its shareholders' interests, for the purposes of the directors' duty to act in the company's interests, also justified a limitation of shareholder authorisation or ratification of directors'
D  breaches of that duty.  That rationale, inferred from authorities concerned with solvent companies, was that the shareholders were the persons with a "proprietary interest" in the company's assets.  Where, on the other hand, a company was insolvent, the creditors were prospectively entitled, through the mechanism of liquidation, to displace the power of the shareholders and directors to deal with the company's assets, with the result that "in a practical sense" it was "their assets and not the shareholders' assets that . . .
E  are under the management of the directors".

35   The reasoning in *Kinsela,* as set out in the dictum quoted at the end of para 31 above, was cited with approval by Dillon LJ, giving the judgment of the Court of Appeal, in *West Mercia*.  The case concerned the decision of a director of an insolvent company to authorise the payment of a debt owed by the company to its parent company, which was also
F  insolvent.  The motivation for the payment was to reduce the parent company's overdraft, which the director had personally guaranteed.  The payment was characterised as a fraudulent preference, but no proceedings were brought against the recipient company under the predecessor of section 239 of the 1986 Act, as it was not in a position to repay the money. Instead, the liquidator applied under the predecessor of section 212 of the
G  1986 Act for a declaration that the director was guilty of misfeasance, and an order that the director repay the money with interest.  In the County Court, the judge held that the director had committed no breach of duty in authorising the payment, since it discharged a debt which was due, and the application was dismissed.  That decision was overturned on appeal. Dillon LJ, in an unreserved judgment with which the other members of the court agreed, endorsed the approach adopted in *Kinsela* and concluded that
H  the director had acted in breach of his fiduciary duty when he authorised the payment of the debt "in disregard of the interests of the general creditors of this insolvent company" (p 253).  He was ordered to repay the money with interest, but allowed to rank in the liquidation for the amount due to the parent company before the payment had been made.

© 2022 The Incorporated Council of Law Reporting for England and Wales

36   Subsequent English cases, mostly at first instance, have followed *West Mercia*, although they reveal differing views as to some of its implications, including the circumstances in which a duty in respect of creditors' interests arises, and the content of the duty once it has arisen. A similar approach has also been followed in Australia and New Zealand, as I have explained, in Hong Kong (*Moulin Global Eyecare Holdings Ltd v Lee Sin Mei* (2014) 17 HKFCAR 466 ("*Moulin Global Eyecare*")), in Ireland (*In re Frederick Inns Ltd* [1994] 1 ILRM 387) and elsewhere.

*(2) The authorisation or ratification of breaches of duty*

37   The approach adopted to shareholders' authorisation or ratification of directors' breaches of their fiduciary duty has developed in step with the approach adopted to the company's interests: indeed, both *Kinsela* and the principal English authorities referred to in *Kinsela*, such as *Multinational Gas* and *Rolled Steel*, were primarily concerned with authorisation or ratification. Street CJ summarised the position in *Kinsela* at p 732, stating that it was legally and logically acceptable to recognise that, where directors were involved in a breach of duty to the company affecting the interests of shareholders, then shareholders could either authorise that breach or ratify it in retrospect. Where, however, the interests at risk were those of creditors, there was no reason in law or logic to recognise that the shareholders could authorise the breach. Once it was accepted that the directors' duty to a company as a whole extended in an insolvency context to not prejudicing the interests of creditors, the shareholders did not have the power or authority to absolve the directors from that breach.

38   In the later case of *In re New World Alliance Pty Ltd; Sycotex Pty Ltd v Baseler* (1994) 122 ALR 531, a decision of the Federal Court of Australia, Gummow J accepted that "[t]he circumstances in which the [directors'] duty to the company includes an obligation to take account of the interests of third parties appears from the decision of *Kinsela*": p 549. He continued at p 550:

"Where a company is insolvent or nearing insolvency, the creditors are to be seen as having a direct interest in the company and that interest cannot be overridden by the shareholders . . . the result is that there is a duty of imperfect obligation owed to creditors, one which the creditors cannot enforce save to the extent that the company acts on its own motion or through a liquidator."

39   That dictum was cited with approval by a majority of the High Court of Australia (Gaudron, McHugh, Gummow and Hayne JJ) in *Spies v The Queen* (2000) 201 CLR 603, para 94; see also *Westpac Banking Corpn v Bell Group Ltd (No 3)* (2012) 270 FLR 1 ("*Westpac*"), paras 2044–2046. *Kinsela* was again cited with approval in *Angas Law Services Pty Ltd v Carabelas* (2005) 226 CLR 507, para 67, in the concurring judgment of Gummow and Hayne JJ.

40   In our domestic law, in *Official Receiver v Stern (No 2)* [2002] 1 BCLC 119 the Court of Appeal (Sir Andrew Morritt V-C, Buxton and Arden LJJ) stated at para 32:

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    "In normal circumstances the shareholders of a company can by acting
     unanimously waive or ratify a breach of duty by the directors. However,
     if the company is insolvent this principle no longer applies."

That was taken to have been established by *West Mercia*. That approach
was also followed by Sir Andrew Morritt V-C in *Bowthorpe Holdings Ltd v
Hills* [2003] 1 BCLC 226, para 51, where he stated that the general principle
B    stated by Lord Davey in *Salomon* (para 24 above) was subject to the
     qualification that:

        "the transaction so authorised must not be likely to jeopardise the
        company's solvency or cause loss to its creditors."

     **41**   It is also relevant to note the obiter statement of Lord Mance JSC in
C    *Bilta (UK) Ltd v Nazir (No 2)* [2016] AC 1, para 38:

        "All the shareholders of a solvent company acting unanimously may in
        certain circumstances . . . be able to authorise what might otherwise be
        misconduct towards the company. But even the shareholders of a
        company which is insolvent or facing insolvency cannot do this to the
        prejudice of its creditors."

D    In *Ciban Management Corpn v Citco (BVI) Ltd* [2021] AC 122, para 40,
     Lord Burrows JSC, giving the judgment of the Board, referred to a
     "recognised qualification" to the *Duomatic* principle, namely "that the
     transaction must not jeopardise the company's solvency or cause loss to its
     creditors".
     **42**   This development in the law concerning authorisation and
E    ratification is consistent with the parallel development of the law concerning
     the directors' duty to act in the interests of the company. The rationale is the
     same: the shift of the predominant interest in the company from the
     shareholders alone, so as to include the creditors.

           *(3) The treatment of creditors*

F    **43**   These developments in the analysis of the company's interests and in
     the law governing shareholder authorisation and ratification reflect the
     development of thinking about the appropriate treatment of creditors by
     a company as it approaches or enters insolvency. Courts of different
     jurisdictions have come to the view that once a company becomes unable to
     meet its obligations to its creditors, or approaches that situation, the
     directors should consider its creditors' interests in deciding how the
G    company should be managed.
     **44**   The way in which that feeling has been expressed in the cases has
     involved a loose or perhaps metaphorical use of legal terminology, for
     example by describing creditors as "beneficially interested in the company or
     contingently so" (*Permakraft* at p 249), or by speaking of the company's
     assets becoming the creditors' assets "in a practical sense" (*Kinsela* at p 730),
     or by describing the situation where a company is insolvent or approaching
H    insolvency as one where "it is the creditors' money which is at risk" (*Kinsela*
     at p 733). That language suggests an analysis based upon the transfer of a
     proprietary or "quasi-proprietary" interest in the assets of the company from
     its shareholders to its creditors as the company approaches or enters
     insolvency. Whatever the position may be under the law of Australia or

© 2022 The Incorporated Council of Law Reporting for England and Wales

New Zealand (cf *Comr of Taxation v Linter Textiles Australia Ltd* (2005)    A
220 CLR 592), there is no transfer of a proprietary interest under English
law. A company's shareholders have no proprietary interest in its assets:
*Macaura v Northern Assurance Co Ltd* [1925] AC 619; *Short v Treasury
Comrs* [1948] 1 KB 116, affirmed [1948] AC 534; *Marex Financial Ltd v
Sevilleja* [2021] AC 39, paras 31 and 105. Nor do its creditors, even when
the company is being wound up, although they then have a statutory          B
entitlement to share in the proceeds of the realisation of its assets: *Ayerst v
C & K (Construction) Ltd* [1976] AC 167, 178–179.

45    The analysis may be clearer and more realistic if one thinks of
interests in an economic rather than legal sense. The essential points being
made in cases such as *Permakraft* and *Kinsela* are, first, that the creditors
have an economic interest in the company's assets where it is insolvent or
nearing insolvency (and, one might add, an interest also in its liabilities: the    C
amount which they may receive in a winding up depends on the company's
liabilities as well as its assets), and secondly, that the directors should
therefore manage the company's affairs in a way which takes their economic
interests into account and seeks to avoid prejudicing their interests.

46    I mentioned in para 22 above the approach to the company's
interests which was adopted by Megarry J in *Gaiman v National Association
for Mental Health*, and which sought to find an equivalent in the real world    D
to the interests of an "artificial" person. To similar effect, Nourse LJ stated
in *Brady v Brady* [1988] BCLC 20, 40:

> "The interests of a company, an artificial person, cannot be
> distinguished from the interests of the persons who are interested in it.
> Who are those persons? Where a company is both going and solvent, first    E
> and foremost come the shareholders, present and no doubt future as well.
> How material are the interests of creditors in such a case? Admittedly
> existing creditors are interested in the assets of the company as the only
> source for the satisfaction of their debts. But in a case where the assets are
> enormous and the debts minimal it is reasonable to suppose that the
> interests of the creditors ought not to count for very much."
>                                                                              F

47    That seems to me to be right, and not only where the company's
assets are enormous and its debts are minimal. So long as a company is
financially stable, and is therefore able to pay its creditors in a timely
manner, the interests of its shareholders as a whole, understood as a
continuing body, can be treated as the company's interests for the purposes
of the directors' duty to act in its interests. It is the shareholders whose    G
interests are affected by fluctuations in its profits and reserves, as they are the
persons entitled to share in its distributions and its surplus assets. Of course,
the directors also have to be mindful of creditors if they are going to act in
the company's interests, since the payment of its debts as they fall due forms
part of the conduct of its business. The company will suffer a loss of
reputation and creditworthiness, and ultimately will be unable to continue
its business, if its debts are not paid. But, so long as the company is          H
financially stable, the creditors' interests do not require to be considered as a
discrete aspect of the company's interests for the purposes of the directors'
fiduciary duty to the company. It is sufficient for the directors to promote the
interests of the shareholders in order for the company's business to be

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   carried on over the long term and for the company's debts to be paid as part of the conduct of its business.

48   That situation alters if the company is insolvent or bordering on insolvency. As losses are incurred, and the company's surplus of assets over liabilities disappears, the company's creditors as a whole become persons with a distinct interest (possibly, depending on the gravity of the company's financial difficulties, the predominant interest) in its affairs, as they are

B   dependent on its residual assets, or on the possibility of a turnaround in its fortunes, for repayment. I refer to the creditors "as a whole" for two reasons. First, individual creditors may be in different positions, and may even have conflicting interests: that may be the position, for example, of secured creditors as compared with unsecured creditors. Secondly, the interests of the company cannot be confined to the interests of current

C   creditors as at the time of a given decision by the directors, any more than they can be confined to the interests of current shareholders. Since the identities of the company's creditors constantly change so long as debts continue to be incurred and discharged, any consideration of the company's long term interests, where the rule in *West Mercia* applies, must include consideration of the interests of its creditors as a class rather than as a fixed group of individuals.

D   49   The resultant position seems to me to have been aptly summarised by Lord Toulson and Lord Hodge JJSC in *Bilta (UK) Ltd v Nazir (No 2)*, para 167:

"when a company is insolvent or on the border of insolvency its interests are not equated solely with the proprietary interests of its owners. Company law requires that the interests of creditors receive

E   proper consideration by the shareholders and directors. Although the creditors are not shareholders, as creditors they are recognised at that point as having a form of stakeholding in, or being a constituency of, the company which is under the management of the directors, and their interests are to be protected at law through the directors' fiduciary duty to the company, which encompasses proper regard for the creditors'

F   interests."

50   That is not, however, to say that the interests of the shareholders vanish whenever a company becomes insolvent or is bordering on insolvency. In *Brady v Brady*, Nourse LJ went on at p 40 to say that "where the company is insolvent, or even doubtfully solvent, the interests of the company are in reality the interests of existing creditors alone". That seems to me to overstate the position. It is only where an insolvent liquidation or

G   administration is unavoidable that the shareholders can be said to have no remaining interest in the company, since it is only in that eventuality that their shares become worthless. A company may become insolvent without there being any reason to believe that insolvency proceedings are inevitable (as, for example, in *Rubin v Gunner* [2004] 2 BCLC 110 and *In re Continental Assurance Co of London plc (No 4)* [2007] 2 BCLC 287).

H   Insolvency is not an uncommon phenomenon in the life of viable companies, and it need not be either permanent or fatal to long-term success.

51   Against that background, the nuanced approach adopted in *Kinsela* makes sense: that is to say, an approach which recognises that where a company is insolvent or bordering on insolvency, the way in which the

© 2022 The Incorporated Council of Law Reporting for England and Wales

interests of the company are understood, for the purposes of the directors'  A
duty to act in good faith in its interests, is extended so as to include the
interests of the company's creditors as a whole as well as those of its
shareholders.  Where the company's interests have to be understood in that
extended sense, it will be a breach of the directors' duty to the company for
them to act in disregard of the creditors' interests.

52   The question arises why, even if creditors have an interest in the  B
company which emerges distinctly when the company is nearing or entering
insolvency, it follows that the directors should manage the company's affairs
in a way which takes their interests into account.  As was explained in
paras 27–28 above, the traditional approach to the treatment of creditors
regards them as being responsible for the protection of their own interests.
That approach reflects, in the first place, the view that one of the principal
purposes of limited liability, and of the separate legal personality of the  C
company, is to cast upon creditors the risk of the company's failure.  It also
reflects the fact that the relationship between creditors and the company is
usually contractual.  In principle, contractual creditors can negotiate the
terms on which credit is given so as to charge a price which reflects the risk
undertaken.  Accordingly, subject to certain protections designed to ensure
the availability of the information necessary to price the risk, and the  D
maintenance of the company's share capital after the loan has been given, it
can be argued that the creditors can be expected to be the guardians of their
own interests.

53   It seems to me to be undeniable that limited liability, and the
interposition of a separate persona between the shareholders and the
creditors, are designed to protect shareholders against claims arising from
the company's failure, and accordingly expose creditors to a corresponding  E
risk.  But that does not entail that creditors should be bereft of legal
protection, as both company law and insolvency law have always recognised.
Acceptance of the need for limited liability to encourage entrepreneurial
activity does not in itself justify the view that, even when a company is
insolvent or in the vicinity of insolvency, the directors' duty to act in the
interests of the company requires them to act solely in the interests of its
shareholders.  F

54   That view rests on the second consideration mentioned in para 52
above: the theory that creditors are able, subject to certain conditions
underpinned by the law (such as the availability of relevant information
about a company's affairs, a guarantee that its share capital will be
maintained, and the absence of misrepresentation by the borrower),
accurately to price the risk of default on a debt, and to reflect it in the terms  G
on which credit is given.  Since interest is payment not only for the use of the
money lent but also for the risk that the borrower will fail to repay it, the
actual outcome (repayment or default) is in principle irrelevant.  Creditors
therefore deserve no consideration in the event that the company becomes
insolvent or approaches insolvency: that possibility has already been fully
taken into account, and they have been remunerated by the company, by the
payment of interest, for taking the risk of such an eventuality.  If they did not  H
charge an adequate rate of interest, they have no-one to blame but
themselves.  So the theory runs.

55   Both the empirical claims and the analytical basis of that theory have
long been controversial.  Economists and legal scholars remain divided

© 2022 The Incorporated Council of Law Reporting for England and Wales

729

A    between those who view the market, and some basic legal precautions, as
     providing all the protection creditors require, and those who consider the
     traditional forms of protection to be only partially effective. Those who take
     the latter view point out, for example, that the theory of self-protection
     cannot apply to some creditors, such as tort claimants, who have no contract
     with the company. They question whether it is realistic to expect some other
     categories of creditor, such as employees and consumers, to negotiate the
B    terms on which credit is given. They also point out that, although company
     law has long protected creditors against the risk of the company's capital
     being diminished after a loan has been made, thereby altering the basis on
     which interest might have been calculated, it has not provided comparable
     protection against the risk of the company's incurring additional liabilities
     after a loan has been made, which can be equally damaging to a prior lender.

C        56   This is not the place to explore that debate, let alone to attempt to
     resolve it. Whatever the merits or demerits of the rival theories, courts in this
     jurisdiction and in several other parts of the common law world have
     accepted that the company's insolvency or near-insolvency results in a
     significant change in the situation. In doing so, they appear to have been
     influenced primarily by the view that the company's interests should be
     understood in the light of the interests of the classes of person who have a
D    substantial economic interest in the company, as I have explained, and
     whose interests are accordingly liable to be placed at risk by the way in
     which the directors exercise their powers.

         57   The point can be illustrated by envisaging a company which is on the
     cusp of insolvency, and whose assets are exactly equal to its liabilities. If it
     ceases trading and is wound up, its creditors will be repaid in full, and its
E    shareholders will receive nothing. If it continues trading, its shareholders
     will usually be no worse off whatever happens, but have a chance (perhaps a
     small one) of being much better off, while its creditors will be no better off
     whatever happens, but have a chance (perhaps a large one) of being much
     worse off. In that regard, it is necessary to recall that creditors are being
     considered as a class: secured creditors may be no worse off, but unsecured
     creditors are at risk. Since continued trading will be primarily at the
F    creditors' risk, it is right that decisions as to whether to continue trading, and
     as to the level of risk to undertake, should be taken with regard to their
     interests.

         58   If one envisages the more realistic example of a company which is
     insolvent or facing insolvency, the position is more complex, but not
     fundamentally different. In practice, the general body of creditors may well
G    stand to benefit, as well as the shareholders, if the company can be turned
     around or its business can be disposed of advantageously, since they may
     have little prospect of receiving any significant distribution in an insolvent
     winding up. Nevertheless, the creditors will usually remain the primary
     bearers of the risks involved, and decisions in relation to a rescue strategy
     should therefore be taken with regard to their interests. That is not, of
     course, to say that a rescue strategy is ruled out: depending on the
H    circumstances, the directors may well consider in good faith that such a
     strategy is in the interests of the company, having regard to the interests both
     of the creditors and also of the shareholders as a whole.

         59   The treatment of the company's interests as equivalent to the
     shareholders' interests can therefore be regarded as justifiable while the

A

company is financially stable, since it results in the directors being under a duty to manage the company in the interests of those who primarily bear the commercial risks which the directors undertake; and, as explained in para 47 above, creditors are also protected. But that ceases to be true when the company is insolvent or nearing insolvency. To treat the company's interests as equivalent to the shareholders' interests in that situation encourages the taking of commercial risks which are borne primarily not by the shareholders but by the creditors, who will recover less in a winding up if the company's assets have been diminished or if it has taken on additional liabilities. In economic terms, treating the company's interests as equivalent to the shareholders' interests in a situation of insolvency or near-insolvency results in the externalisation of risk: losses resulting from risk-taking are borne wholly or mainly by third parties.

B

60    Other justifications have also been put forward for widening the focus of the directors' duty to include creditors' interests when the company is in the vicinity of insolvency. As the cases demonstrate, directors and shareholders (often, in the case law, the same individuals) have historically demonstrated remarkable ingenuity in devising means of preventing the company's assets from falling into the hands of non-insider creditors (i e creditors who are not themselves shareholders or directors of the company). The rule in *West Mercia* has played a role in constraining that behaviour, or at least in providing a remedy against directors who have been responsible for such conduct. Most of the cases in which the rule has been invoked, including *West Mercia* itself, have concerned behaviour of that kind. In the present case, for example, the claim for breach of fiduciary duty is brought against the directors in addition to a claim against the recipient of the payment in question under section 423 of the 1986 Act, which concerns transactions defrauding creditors, the latter claim having succeeded but being of questionable value because of the recipient's having entered insolvency proceedings.

C

D

E

61    Section 423 is one among a number of rules of insolvency law which provide creditors with protection against behaviour by directors which prejudices their interests. Such protection has been strengthened in recent times, particularly as the result of the introduction of provisions on wrongful trading, currently contained in sections 214 and 246ZB of the 1986 Act. It will be necessary to consider the implications of those provisions at a later point.

F

62    Another important development in insolvency law is also relevant. The Cork Committee's report on the reform of insolvency law, *Insolvency Law and Practice* (Cmnd 8558, 1982), treated the salvage of the enterprise as a going concern, where possible, as one of the priorities of insolvency. That reflected the good sense, both economically and socially, of keeping plant intact, avoiding redundancies, and preserving business connections. The 1986 Act contains a number of provisions designed to pursue those objectives, for example in relation to administration orders, compromises or arrangements with creditors, and, following amendments made by the orate Insolvency and Governance Act 2020, moratoriums, "payment holidays", and restrictions on insolvency proceedings. If, as some commentators have suggested, the rule in *West Mercia* encourages directors to consider the financial status of the company and the interests of its creditors, and to seek the assistance of insolvency practitioners at an earlier stage than they might

G

H

© 2022 The Incorporated Council of Law Reporting for England and Wales

A  otherwise have done in order to bring the company back from the brink of insolvency, it is consistent with the pursuit of those objectives.  It is also important to remember that, as Sir Richard Scott V-C explained in *Facia Footwear Ltd v Hinchliffe* [1998] 1 BCLC 218, being on the brink of insolvency does not necessarily require an immediate cessation of trade and the realisation of the company's assets.  Depending on the circumstances, continuing to trade may be honestly believed to offer the best prospect of the

B  creditors being paid, even if it also carries some further financial risk.  If so, that course of action will be consistent with the directors' performance of their fiduciary duty.

*5. The impact of the 2006 Act*

*(1) The directors' fiduciary duty to the company*

C
63    The general duties owed by a director to the company are now set out in sections 171 to 177 of the 2006 Act.  As section 170(3) explains, they are based on certain common law rules and equitable principles as they apply in relation to directors, and have effect in place of those rules and principles as regards the duties owed to a company by a director.  They are to be interpreted and applied in the same way as common law rules or equitable

D  principles, and regard is to be had to the corresponding common law rules and principles in their interpretation and application: section 170(4).  The remedial consequences of breaches of the general duties are the same as would apply if the corresponding common law rule or equitable principle applied: section 178.

64    The general duty which corresponds to the common law duty to act

E  in good faith in the interests of the company is the duty under section 172 to promote the success of the company.  In that regard, section 172(1) provides:

"A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole, and in doing so have regard (amongst other matters) to— (a) the likely consequences of any decision in the long

F  term, (b) the interests of the company's employees, (c) the need to foster the company's business relationships with suppliers, customers and others, (d) the impact of the company's operations on the community and the environment, (e) the desirability of the company maintaining a reputation for high standards of business conduct, and (f) the need to act fairly as between members of the company."

G  65    It is unnecessary for present purposes to undertake a detailed analysis of section 172(1).  A few points are however worth noting.  First, the primary duty imposed on directors by section 172(1) is expressed in terms of promoting "the success of the company for the benefit of its members as a whole".  Accordingly, the duty is no longer expressed by reference to the interests of the company, and the previous problem of identifying the interests of an artificial person is side-stepped.  Since the duty

H  under section 172(1) is focused on promoting the success of the company "for the benefit of its members as a whole", it is clear that, although the duty is owed to the company, the shareholders are the intended beneficiaries of that duty.  To that extent, the common law approach of shareholder primacy is carried forward into the 2006 Act.

© 2022 The Incorporated Council of Law Reporting for England and Wales

66   In carrying out their primary duty under section 172(1), the directors are also under a secondary obligation to have regard "amongst other matters" to the considerations listed in paragraphs (a) to (f). This reflects a recognition that the promotion of the company's success requires that consideration be given to such matters as the interests of its employees and the need to foster its business relationships with suppliers and customers. That is not a novel idea: at common law, it was accepted that the interests of employees could be relevant to the directors' fulfilment of their fiduciary duty in so far as they affected the interests of the company, and their relevance has also been recognised by statute since section 46 of the Companies Act 1980, subsequently re-enacted as section 309 of the Companies Act 1985. The principle accepted in *Hutton v West Cork Railway Co* in relation to the interests of employees ("The law does not say that there are to be no cakes and ale, but there are to be no cakes and ale except such as are required for the benefit of the company": p 673 per Bowen LJ) would also have applied to other stakeholders whose interests were relevant to the company's interests.

67   The considerations listed in paragraphs (a) to (f) are capable of including the treatment of certain creditors of the company. Creditors are liable to include employees, suppliers, customers and others with whom the company has business relationships; and their treatment may well affect the company's reputation and its creditworthiness, and have consequences for it in the long term. However, the primary duty imposed by section 172(1) remains focused on promoting the success of the company for the benefit of its members.

68   Section 172(3) adds the following qualification:

"The duty imposed by this section has effect subject to any enactment or rule of law requiring directors, in certain circumstances, to consider or act in the interests of creditors of the company."

69   This provision makes the duty imposed by section 172(1) subject to "any . . . rule of law requiring directors, in certain circumstances, to consider or act in the interests of creditors". The rule in *West Mercia* is a rule of law fitting that description. That common law rule is accordingly preserved.

70   As it seems to me, that conclusion follows from the terms of section 172(3) itself, and the state of the prior law. I do not find it necessary to consider pre-legislative materials. Nor do I find assistance in the explanatory notes prepared by the Department of Trade and Industry ("DTI"). It is the court's interpretation of the words used by Parliament, not that of an official at the DTI, which is important for present purposes.

71   I would not, however, go so far as to say that section 172(3) affirms the rule in *West Mercia*. Given the previous body of case law, as set out in *West Mercia* and the subsequent cases, it can be taken that Parliament was aware of that line of authority, and section 172(3) implies that Parliament was content to leave its further consideration and possible development to the courts; but I do not read section 172(3) as necessarily endorsing *West Mercia*. All the provision affirms is that the duty imposed by section 172(1) is subject to any rule of law of the kind described.

72   I note that the view that section 172(3) preserves the common law rule established in *West Mercia* was adopted in *Bilta (UK) Ltd v Nazir (No 2)* by Lord Sumption JSC at para 104 ("the common law duty is

733

A    preserved by section 172(3)"), and by Lord Toulson and Lord Hodge JJSC at
paras 123–124 ("The principle [that the fiduciary duty of a director of a
company which is insolvent or bordering on insolvency . . . requires him to
have proper regard for the interests of its creditors and prospective creditors]
now has statutory recognition").  The same view was also expressed by Lord
Hodge JSC, obiter, in a judgment with which the other members of the court
agreed, in *MacDonald v Carnbroe Estates Ltd* [2020] 1 BCLC 419, para 33.

B        73    I am not persuaded by the argument that other general duties of
directors, such as the duty under section 171 to "only exercise powers for the
purposes for which they have been conferred", are incompatible with this
interpretation of section 172(3).  The common law rule preserved by
section 172(3) was developed by the courts harmoniously with the common
law predecessors of the general duties now set out in sections 171–177, and
C    section 170(4) should ensure that such coherence continues.  In addition, it
seems to me that acceptance that the fiduciary duty of directors to the
company is re-oriented so as to encompass the interests of creditors, when
the company is insolvent or bordering on insolvency, must result in a similar
re-orientation of related duties.  The proper purposes for which powers can
be exercised, in accordance with section 171, include advancing the interests
of the company, which in those circumstances must be understood as
D    including the interests of its creditors, as was held in *In re HLC
Environmental Projects Ltd* [2014] BCC 337, para 99.  Similarly, the duty
under section 174 to exercise reasonable care, skill and diligence must be
directed, in those circumstances, to the interests of the company as
understood in that context, as appears to have been accepted in a number of
cases (e g *In re MDA Investment Management Ltd* [2004] 1 BCLC 217,
E    paras 70 and 75, and *Roberts v Frohlich* [2011] 2 BCLC 625, para 98).
        74    The only other observation that I would make in relation to this issue
is that care needs to be taken when applying section 174 together with the
duty to promote the success of the company in section 172(1) as modified by
the rule preserved by section 172(3).  The former is not a fiduciary duty: see
*Bristol and West Building Society v Mothew* [1998] Ch 1, 17.  It is concerned
with negligence, judged objectively.  The latter is concerned with good faith,
F    generally judged subjectively: *Regentcrest plc v Cohen* [2001] 2 BCLC 80,
para 120; cf *In re HLC Environmental Projects Ltd*, para 92(b).

        *(2) Authorisation and ratification*

        75    The 2006 Act preserves the common law relating to shareholders'
authorisation of acts undertaken by directors in breach of their duties.
G    Section 180(4)(a) provides that the general duties of directors (which include
the duty under section 172(1)) have effect "subject to any rule of law
enabling the company to give authority, specifically or generally, for
anything to be done (or omitted) by the directors, or any of them, that would
otherwise be a breach of duty".  Section 239 also recognises the common law
doctrine of ratification, while laying down certain procedural requirements.
Subsection (6)(a) preserves the *Duomatic* principle in this context, by
H    providing that nothing in the section affects the validity of a decision taken
by unanimous consent of the members of the company.  Section 281(4)(a)
also preserves the *Duomatic* principle, by providing that nothing in Part 13
of the Act, which concerns resolutions and meetings, affects any enactment
or rule of law as to things done otherwise than by passing a resolution.

© 2022 The Incorporated Council of Law Reporting for England and Wales

*6. The questions arising in the present appeal*                                    A

*(1) Is there a rule (the rule in West Mercia) that in certain circumstances the interests of the company, for the purpose of the directors' duty to act in good faith in its interests, are to be understood as including the interests of its creditors as a whole?*

**76**   This is the most fundamental question raised by this appeal. I answer it in the affirmative. It is clear that such a rule was recognised by the Court of Appeal and lower courts before the enactment of the 2006 Act. The existing law in this regard was preserved by section 172(3) of that Act, as this court has previously accepted in the cases of *Bilta (UK) Ltd v Nazir (No 2)* and *MacDonald v Carnbroe Estates Ltd*. I am satisfied that the rule has a sound legal basis, as explained in paras 46–51 above.                                    B

**77**   It is important to understand that the rule in *West Mercia* does not create any new duty: it merely adjusts the long-established fiduciary duty to act in good faith in the interests of the company. Where the rule applies, the way in which the company's interests are understood, for the purposes of that duty, is extended so as to encompass the interests of the general body of creditors as well as the interests of the general body of shareholders. That reflects a recognition that the traditional identification of the interests of the company with those of its shareholders, although satisfactory when the company is financially stable, needs to be widened when insolvency is imminent. The interests of the creditors as a whole should then also be taken into account and given appropriate weight, as explained in para 81 below. If insolvent liquidation or administration is unavoidable, the interests of the shareholders drop out of the picture, and the company's interests can be treated as equivalent to those of the creditors alone.                                    C

D

E

*(2) What is the content of the duty arising where the rule in West Mercia applies?*

**78**   It is unnecessary to consider the content of the duty in detail for the purpose of determining this appeal, but some general comments are appropriate, first because the content of the duty is relevant to determining the circumstances in which it arises, and secondly in order to address the argument that the duty is incompatible with certain provisions of the 1986 Act. I express my views only on a provisional basis, since this issue does not have to be determined in order to decide this appeal.                                    F

**79**   As I have explained, it seems to me that the effect of the rule in *West Mercia* is to preserve the directors' duty to act in the interests of the company, but to modify the sense of the latter expression so that, where the rule applies, the interests of the company are no longer regarded as solely those of its shareholders but are understood as including those of its creditors as a whole. That was the view adopted in *Kinsela* and approved in *West Mercia*. It was endorsed by Lord Toulson and Lord Hodge JJSC in *Bilta (UK) Ltd v Nazir (No 2)*, para 123, in remarks with which I agree:                                    G

"It is well established that the fiduciary duties of a director of a company which is insolvent or bordering on insolvency differ from the duties of a company which is able to meet its liabilities, because in the case of the former the director's duty towards the company requires him to have proper regard for the interest of its creditors and prospective                                    H

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   creditors.  The principle and the reasons for it were set out with great
clarity by Street CJ in *Kinsela* . . ."

They added, at para 126:

"the protection which the law gives to the creditors of an insolvent
company while it remains under the directors' management is through the
medium of the directors' fiduciary duty to the company, whose interests
B   are not to be treated as synonymous with those of the shareholders but
rather as embracing those of the creditors."

80   Some authorities have gone further.  In *Bilta (UK) Ltd v Nazir
(No 2)*, para 104, Lord Sumption JSC summarised the effect of the rule in
*West Mercia* as "treating the interests of an actually or prospectively
insolvent company as synonymous with those of its creditors".  A similar
C   view was expressed by Nourse LJ in *Brady v Brady* (para 50 above), and has
also been accepted in some of the more recent decisions at first instance.
However, those dicta appear to me to go further than is justified by the
rationale of the rule in *West Mercia*, as I explained at para 50 above.  It is
only where an insolvent liquidation or administration is unavoidable that
the shareholders cease to have any interest in the company, and their
D   interests can therefore be left out of account.

81   Where the company is insolvent or bordering on insolvency but is
not faced with an inevitable insolvent liquidation or administration, the
directors' fiduciary duty to act in the company's interests has to reflect
the fact that both the shareholders and the creditors have an interest in the
company's affairs.  In those circumstances, the directors should have regard
E   to the interests of the company's general body of creditors, as well as to the
interests of the general body of shareholders, and act accordingly.  Where
their interests are in conflict, a balancing exercise will be necessary.
Consistently with what was said in *Kinsela* at p 733 (para 33 above), and
with the reasoning in paras 48–59 above, it can I think be said as a general
rule that the more parlous the state of the company, the more the interests of
the creditors will predominate, and the greater the weight which should
F   therefore be given to their interests as against those of the shareholders.
That is most clearly the position where an insolvent liquidation or
administration is inevitable, and the shareholders consequently cease to
retain any valuable interest in the company.

82   I agree with Lord Briggs JSC that there is much to be said for an
approach to these issues which is sufficiently fact-specific to "take account
of differences, according to particular circumstances, in what it may be
G   reasonable and responsible for directors to do when they find that the
company is in a sufficiently weak financial situation that a conflict of interest
between its creditors and its shareholders appears to arise", as Lt Bailiff
Hazel Marshall QC said in *Carlyle Capital Corpn Ltd v Conway* (Judgment
38/2017) (unreported) 4 September 2017 (Royal Court of Guernsey),
para 456.
H
*(3) What are the circumstances in which the rule in West Mercia applies?*

83   For the purposes of the present appeal, the critical question is
whether the rule arises whenever there is a real and not remote risk of
insolvency: an idea derived from some Australian authorities, such as *Grove*

*v Flavel* (1986) 11 ACLR 161, 170 and *Kalls Enterprises Pty Ltd v Baloglow*     A
(2007) 25 ACLC 1094, para 162. In my view, it does not. That follows from
the rationale of the rule. It is premised, as was explained above, on a shift in
the economic interest in the company, and consequently in the distribution
of the risk of loss, from the shareholders as a whole to include the creditors
as a whole. As has been explained, as long as the company is financially
stable, its shareholders will normally have a predominant economic interest
in the manner in which its affairs are managed, and their interests will       B
normally be aligned with those of its creditors. When the company is in
financial difficulties, however, the economic interest of its creditors become
distinct from those of its shareholders, and are liable to become increasingly
predominant as the company's situation deteriorates. That shift in interests
does not occur merely because there is a real but not remote risk of
insolvency. In that eventuality, the predominant interest will normally       C
continue to be held by the shareholders, and the interests of creditors will not
require separate consideration.

    84    It is unnecessary to go much further for the purposes of this appeal,
but something more needs to be said in order to address, at a later point, the
argument that there is a conflict with insolvency law.

    85    In the Court of Appeal, David Richards LJ rejected the contention
that the rule in *West Mercia* applied only on insolvency, and preferred a test       D
of whether insolvency was likely, on the basis that the precise moment that a
company becomes insolvent is hard to pinpoint. I am not convinced by that
reasoning. It is true that the precise moment when a company becomes
insolvent can be difficult to pinpoint, although it is in principle ascertainable,
at least with the assistance of expert evidence. But the precise moment when
a company becomes likely to become insolvent is no easier to pinpoint. On       E
the contrary, substituting a relatively vague test (likely to become insolvent)
for a more exact test (insolvency) adds to the difficulty of pinpointing a
precise moment when the threshold is crossed. Nonetheless, I agree with
David Richards LJ's rejection of a test of insolvency, for a different reason.

    86    As a matter of principle, the explanation of the treatment of the
company's interests as involving, in some circumstances, the creditors'
interests is inconsistent with the restriction of those circumstances to       F
insolvency. As I have explained, the rationale for treating the company's
interests as involving the creditors' interests is not based on insolvency in
itself, but on a shift in the economic interests in the company, and
consequently in the risk of loss arising from the manner in which the
directors exercise their powers. That shift is discernible when insolvency is
imminent: the onset of insolvency is merely the clearest sign that such a shift       G
has occurred. It follows that the relevant question is not whether the
company is insolvent or will be rendered insolvent as a result of the
transaction in question.

    87    In principle, the critical factor is whether, given where the economic
interests lie, and the consequent distribution of risk, it continues to be
appropriate to treat the interests of the company as equivalent to the
interests of its shareholders alone. That principle has to be reflected in the       H
law in a way which can operate as a practical guide to the day to day conduct
of directors managing companies without the benefit of hindsight. This is an
area of the law where clarity and practicality must be prioritised: the
provisions of the 2006 Act concerning directors' duties are based on a

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   recognition that directors need clear standards to guide them, and relevant developments in the common law need to be based on the same recognition.

88   With that in mind, I am at present inclined to agree with the view expressed by Lord Toulson and Lord Hodge JJSC in *Bilta (UK) Ltd v Nazir (No 2)*, para 123, that it is sufficient if the company is "insolvent or bordering on insolvency". Other phrases to the same effect can be found in

B   many other cases decided since *West Mercia,* including *Brady v Brady* at p 40 ("insolvent, or even doubtfully solvent"), *Colin Gwyer & Associates Ltd v London Wharf (Limehouse) Ltd* [2003] 2 BCLC 153, para 74 ("insolvent or of doubtful solvency or on the verge of insolvency"), and *In re Loquitur Ltd* [2003] 2 BCLC 442, para 240 ("insolvent or potentially insolvent"). These phrases are broadly synonymous, and all convey a sense of imminence. As to what is meant by "insolvency", although the court

C   heard no submissions on the point, I am inclined to think that the term can conveniently and aptly be understood in this context in accordance with the tests laid down in section 123(1)(e) and (2) of the 1986 Act, i e cash flow or commercial insolvency, or balance sheet insolvency. I am inclined to agree with Lord Briggs JSC and Lord Hodge DPSC that the probability of an insolvent liquidation or administration is also sufficient for the creditors'

D   interests potentially to diverge from those of the shareholders and therefore to require separate consideration.

89   I am not inclined to agree with the view expressed by David Richards LJ in the Court of Appeal (paras 213–220) that it is sufficient that the company is likely to become insolvent at some point in the future. As it seems to me, such a likelihood may objectively exist before the interests of shareholders and creditors are in practice liable to diverge, so as to require

E   the interests of the latter to receive separate consideration. I also have a related concern that such a test, applied with the benefit of hindsight, might impose an impracticable burden upon directors.

90   I am less certain than Lord Briggs JSC and Lord Hodge DPSC (paras 203, 231 and 238 below) that it is essential that the directors "know or ought to know" that the company is insolvent or bordering on insolvency,

F   or that an insolvent liquidation or administration is probable, but it is unnecessary and inappropriate to express a concluded view without the benefit of argument. It should be borne in mind that directors are under a duty to inform themselves about the company's affairs (*In re Westmid Packing Services Ltd (No 3)* [1998] 2 BCLC 646, 653); and the rule in *West Mercia* will itself incentivise directors to keep the solvency of the company under careful review.

G

*(4) How does the rule in West Mercia interact with the principle of shareholder authorisation or ratification?*

91   As has been explained at paras 40–45, the law governing shareholder authorisation and ratification has developed in recent times in parallel with the law governing the directors' fiduciary duty, sometimes in

H   the same cases. As the law was stated in *Ciban Management Corpn v Citco (BVI) Ltd* [2021] AC 122, para 40, the shareholders cannot authorise or ratify a transaction which would jeopardise the company's solvency or cause loss to its creditors. That principle should ensure that, where the directors are under a duty to act in good faith in the interests of the creditors, the

© 2022 The Incorporated Council of Law Reporting for England and Wales

shareholders cannot authorise or ratify a transaction which is in breach of    A
that duty.

*(5) How does the rule in West Mercia interact with the protection of
creditors under sections 214 and 239 of the 1986 Act?*

92    The relationship between the directors' fiduciary duty of loyalty,
applied in accordance with the rule in *West Mercia,* and the various    B
statutory remedies available under the 1986 Act is a complex question,
whose resolution can and should be left to another day.  All that requires to
be decided for present purposes is a narrower question: whether the rule in
*West Mercia* is inherently incompatible with the statutory protection of
creditors' interests under the 1986 Act.  In that regard, the submissions
concerned two provisions: sections 214 (wrongful trading) and 239    C
(preferences).

(i) Section 214

93    Section 214 applies if, in the course of the winding up of a company,
it appears that three conditions are met in relation to a person who is or has
been a director of the company: (1) that the company has gone into insolvent
liquidation, (2) that at some time before the commencement of the winding    D
up, the person knew or ought to have concluded that there was no
reasonable prospect that the company would avoid going into insolvent
liquidation, and (3) that the person was a director of the company at that
time.  Where those conditions are met, the court, on the application of the
liquidator, may declare that the person is liable to make such contributions
(if any) to the company's assets as the court thinks proper.  No declaration is    E
to be made if, after the time when the second condition was satisfied, the
person took every step with a view to minimising the potential loss to the
company's creditors as he ought to have taken, on the assumption that he
knew that there was no reasonable prospect of avoiding insolvency
proceedings.  For these purposes, the facts which a director ought to know,
the conclusions which he ought to reach and the steps which he ought to take    F
are, put shortly and with some simplification, those which would be known,
reached or taken by a reasonably diligent person having both the general
knowledge, skill and experience to be expected of a person carrying out the
director's functions in relation to the company, and the general knowledge,
skill and experience that the particular director in fact has.  Section 246ZB
applies in a parallel way if the company is in insolvent administration.    G

94    It follows that section 214 differs from the directors' fiduciary duty
to the company, applied in accordance with the rule in *West Mercia*, in
important respects.

First, the points in time at which the relevant duties arise differ
considerably.  The fiduciary duty applies at all times, but if it is modified by
the rule in *West Mercia* from the point when the company is bordering on
insolvency or an insolvent liquidation or administration is probable, as    H
I have suggested, it therefore applies in that modified way before the time
when section 214 might become relevant, i e when a reasonably diligent and
competent director would know that there was no reasonable prospect of
avoiding insolvency proceedings.

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   Secondly, section 214 applies only where the directors know or ought to know that there is no reasonable prospect of avoiding insolvent liquidation or administration.  The directors do not require such knowledge in order for the rule in *West Mercia* to be engaged.

Thirdly, the contents of the duties are very different.  In the much more restricted circumstances where it applies, section 214 imposes a much more

B   onerous duty.  The contrast, put shortly, is between a duty to act in good faith in the interests of the company, usually judged subjectively, as explained in para 74 above, and a duty to take reasonable care to minimise the potential loss to the company's creditors, judged objectively: *In re Produce Marketing Consortium Ltd* [1989] 1 WLR 745, 750.

Fourthly, the remedies for a breach of the duty are different: on the one hand, the wide range of remedies available in equity for the breach of a

C   fiduciary duty; on the other hand, a liability to make a contribution to the company's assets, at the discretion of the court.

Fifthly, proceedings can only be brought under section 214 in the event that the company is wound up, whereas there is no such restriction on the bringing of proceedings for breach of fiduciary duty.

Sixthly, the range of persons who can bring proceedings for a breach of

D   the fiduciary duty extends beyond the liquidator, who is the only person who can bring proceedings under section 214.  Breach of the fiduciary duty, understood in accordance with the rule in *West Mercia*, may give rise to a remedy at the instance of the company itself, or its assignee, or a shareholder suing derivatively, or a creditor or contributory making an application under section 212 of the 1986 Act, or a liquidator or administrator.  That is not a technical or academic difference: the present proceedings, for example, were

E   brought by the company's assignee, long before the commencement of insolvency proceedings in relation to the company.

Seventhly, the range of persons against whom a remedy may be sought is also wider in respect of a breach of fiduciary duty than under section 214.  The latter provision only enables a remedy to be sought against a director or former director.  Remedies for a breach of fiduciary duty are potentially

F   available against a wider range of persons, including knowing recipients of payments made in breach of the duty.

95   It was argued on behalf of the defendants that the "creditor duty" for which the claimants argued was designed to address much the same problem as section 214, but enabled that provision to be circumvented.  If a claim against directors under section 214 would succeed, there was no need to invoke the creditor duty; but if a claim under section 214 would fail, there

G   was no reason why the claimant should be permitted to circumvent this.

96   On the approach which I have adopted, the rule in *West Mercia* is merely a modification of the directors' fiduciary duty to the company, widening the scope of the interests which are taken into account when considering the company's interests, so as to include creditors' interests as well as shareholders'.  Where those interests conflict, a balance has to be

H   struck between them, reflecting their respective weight in the light of the gravity of the company's financial difficulties.  So understood, the directors' fiduciary duty to the company, as so modified, reflects the reality of the economic interests in the company: that is to say, the fact that the interests of creditors acquire a discrete significance from those of shareholders, and

© 2022 The Incorporated Council of Law Reporting for England and Wales

require separate consideration, once the company's insolvency is imminent, or its insolvent liquidation or administration becomes probable.

97   I see no conflict between understanding the directors' fiduciary duty in that way, and the existence of section 214. I accept that there might be a conflict if the rule in *West Mercia* applied in the same circumstances as section 214 and produced a different result, or if the rule in *West Mercia* produced the same result as section 214 in circumstances in which that provision did not apply. But neither of those situations arises if the rule is understood in the way that I have proposed.

98   As to the first situation, in circumstances where section 214 applies—that is to say, where insolvent liquidation or administration is inevitable—the rule in *West Mercia* applies on the basis that the shareholders no longer have any interest in the company. The directors' duty to exercise their powers in a way which they believe, in good faith, will be in the interests of the company, understood in accordance with the rule in *West Mercia*, will therefore require them to act in that context in a way which they consider in good faith will be in the interests of the creditors as a whole. That duty is less stringent than, but is consistent with, section 214, which requires the directors (put shortly) to take reasonable care to minimise the potential loss to creditors. As to the second situation, the fiduciary duty, understood in accordance with the rule in *West Mercia*, does not produce the same result as section 214, or anything bearing any resemblance to the same result, in circumstances where section 214 does not apply.

99   In these circumstances, there is no reason to conclude that the existence of section 214 is incompatible with the existence of the fiduciary duty. That conclusion is fortified by the fact that section 172(3) of the 2006 Act preserves the development of the common law which took place in *West Mercia* and the subsequent case law and leaves its future consideration and possible development to the courts. If it had been considered that the rule in *West Mercia* was incompatible with section 214, one would not have expected Parliament to enact section 172(3). On the contrary, in view of the fact that Parliament preserved the existing state of the common law and enabled it to continue to evolve, the courts cannot proceed on the basis that Parliament has occupied the field.

(ii) Section 239

100   Section 239 of the 1986 Act affords protection to creditors where (1) a company enters administration or goes into liquidation, (2) a preference was given within a period of six months before the commencement of insolvency proceedings, or a period of two years in a case involving connected parties, and (3) the company was unable to pay its debts (within the meaning of section 123) at the time the preference was given or in consequence of it. The court, on the application of the administrator or liquidator, is to make such order as it thinks fit for restoring the position to what it would have been if the company had not given that preference. No such order is to be made unless the company was influenced in giving the preference by an intention to prefer the recipient. In a typical case, the order is for the recipient to repay the amount it received, thereby swelling the assets available for distribution, with a consequent revival of the debt due to the recipient, thereby increasing the amount of the company's liabilities by an equivalent sum.

© 2022 The Incorporated Council of Law Reporting for England and Wales

*A*  101  It follows that section 239 differs from the director's fiduciary duty to the company, applied in accordance with the rule in *West Mercia*, in important respects.

First, the transaction in question must have occurred within a specified period before the commencement of insolvency proceedings. The directors' fiduciary duty, applied in accordance with the rule in *West Mercia*, is not subject to such a limitation.

*B*  Secondly, the company must have been insolvent at the time of the transaction or in consequence of it. The circumstances in which the directors' fiduciary duty applies in accordance with the rule in *West Mercia* are somewhat broader, as explained earlier.

Thirdly, the company must have been influenced in giving the preference by an intention to prefer the recipient. The directors' fiduciary duty, applied

*C*  in accordance with the rule in *West Mercia*, is potentially broader in scope: the directors must have exercised their powers without believing in good faith that the transaction in question was in the interests of the company, understood in accordance with the rule in *West Mercia*. The fact that one creditor is paid in preference to others, at a time when the company is insolvent or bordering on insolvency, will not be a breach of fiduciary duty if the directors believe in good faith that they are acting in the interests of the

*D*  company, understood in accordance with the rule in *West Mercia*: for example, because they have decided on that basis that it is in the company's interests to continue trading, and therefore need to pay particular creditors: see, for example, *In re Sarflax Ltd* [1979] Ch 592, 602, and *Westpac* 270 FLR 1, at paras 2635–2636.

Fourthly, the remedy under section 239 is designed to restore the

*E*  company's position to what it would have been if the preference had not been given. The relief available for a breach of fiduciary duty is liable to differ, as explained below.

Fifthly, section 239 can provide a remedy only if there are insolvency proceedings. No such limitation applies to the directors' fiduciary duty, applied in accordance with the rule in *West Mercia*.

*F*  Sixthly, proceedings under section 239 can be brought only by a liquidator or administrator. Proceedings for breach of fiduciary duty can be brought by a wider range of claimants, as explained at para 94(6) above.

Seventhly, proceedings under section 239 are normally brought against the recipient of the preference, although section 241(2) enables orders to be made against other persons, and such an order has been made where the person had received a benefit from the preference: *In re Sonatacus Ltd*

*G*  [2007] 2 BCLC 627. Proceedings for breach of fiduciary duty are brought primarily against the directors responsible, although a third party might also be liable in some circumstances, such as a case of knowing receipt.

102  It was argued on behalf of the defendants that the "creditor duty" for which the claimants argued not only could but had in fact been used to reverse preferences in situations in which section 239 did not apply, thereby enabling the limitations inherent in section 239 to be circumvented. This

*H*  disturbed the balance achieved by Parliament between the integrity of the pari passu principle, which section 239 protects, and the security of transactions. If directors were ordered to repay the company, that also resulted in over-compensation, since the company recovered despite not suffering any loss (since the debt that was paid preferentially was properly

due). Furthermore, the fact that the company suffered no loss as the result of       A
a preferential payment, whereas the creditors as a whole did suffer a loss,
demonstrated that the quasi-proprietary rationale for equating the company
with its creditors, as suggested in *Kinsela* and accepted in *West Mercia,* was
flawed.

103   These submissions raise two important points, which are
essentially opposite sides of the same coin.  First, if a pecuniary remedy for a       B
breach of the fiduciary duty is designed to compensate the company for a
loss which it has suffered as a result of the breach, then it is argued that no
such pecuniary remedy can be granted to the company in respect of
preferential payments, since they do not cause the company (as distinct from
the general body of creditors) to suffer any loss.  If, on the other hand, a
pecuniary remedy for a breach of the fiduciary duty is available to the
company even where it has not suffered any loss, then it is argued that no       C
such remedy should be given in respect of preferential payments where a
remedy could not be given under section 239, in order to avoid undermining
that provision.

104   Both points have been the subject of some consideration in the
case law.  As explained in para 35 above, *West Mercia* was itself concerned
with proceedings brought by a liquidator against a director who had       D
authorised a preferential payment, in circumstances where a claim against
the recipient of the payment under the predecessor of section 239 would not
have been worthwhile.  The relief given against the director was not simply
an order that he repay the amount of the preference, since such an order
would have left the company better off than if no breach of duty had
occurred.  That was because, if there had been no breach of duty, while the
company's assets would have included the amount of the payment, its       E
liabilities would also have included the amount of the debt due to the
recipient of the payment.  Accordingly, while the director was ordered to
repay the amount which he had misapplied, with interest, the Court of
Appeal also ordered that the debt which had been discharged by the
payment should be included in the amount of the company's liabilities for
the purpose of calculating the distribution in the company's winding up,       F
with any dividend attributable to that debt being paid to the director.  The
overall effect was to produce a similar result for the unsecured creditors as
would have obtained if the preferential payment had not been made or if it
had been set aside as a preference, with the director being treated in the same
way as if he had personally paid the debt and been subrogated to the
creditor's right against the company.

105   My provisional view is that the court was correct in taking that       G
approach to the question of relief.  In order to obtain a pecuniary remedy, it
was not necessary for the company to have suffered a loss in the conventional,
balance sheet, sense.  The funds available to the company to meet the claims
of the general body of creditors were depleted as a result of the director's
breach of his fiduciary duty.  The court granted an equitable remedy, based on
the restoration of the misapplied monies to the company so as to reconstitute       H
its assets as they ought to have been.  By doing so, and treating the debt as
subsisting for the benefit of the director, the court achieved the equivalent, as
nearly as possible, of the director's performance of his fiduciary duty to the
company.

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    106   In subsequent cases decided at first instance, the courts were initially unwilling to accept that proceedings for breach of fiduciary duty could be brought against directors in respect of preferential payments unless proceedings could also have been brought under section 239: see, for example, *Knight v Frost* [1999] BCC 819, 834 (a derivative action brought by a shareholder) and *In re Continental Assurance Co of London plc (No 4)* [2007] 2 BCLC 287, para 420.   More recently, judges have taken the view

B    that whether the conditions of section 239 are satisfied cannot be determinative of whether there has been a breach of fiduciary duty.  They have accepted that a preferential payment may be open to challenge as a breach of fiduciary duty if, for example, it was made to advance the interests of a particular creditor without any belief that it was in the interests of the company, understood in accordance with the rule in *West Mercia*, even if it

C    would fall outside the scope of section 239: see, for example, *GHLM Trading Ltd v Maroo* [2012] 2 BCLC 369, para 168.

     107   Attention has turned instead in the more recent cases to the question of the remedy available, and in particular to the question whether pecuniary relief is available against the directors who authorised the payment.  The basis of such relief has been regarded by some judges as problematical, notwithstanding the decision in *West Mercia*, unless the

D    director has profited (e g if the debt was owed to himself, and he would not have been repaid if he had performed his fiduciary duty), in which case disgorgement can be ordered.  In the absence of a profit to be disgorged, it has been suggested that no pecuniary relief can be given, since the preferential payment does not occasion the company any loss, in the sense that its balance sheet position is unlikely to be affected: see, for example,

E    *GHLM Trading Ltd v Maroo*, para 169.  A different approach was adopted in *In re HLC Environmental Projects Ltd*, paras 141–142, where an analogy was drawn between a director who breaches his fiduciary duty by authorising a preferential payment and a trustee who has misapplied trust assets: just as the trustee can be ordered to restore the misapplied assets so as to reconstitute the trust fund, it was considered that the director could be ordered to restore the amount of the payment to the company.  An order was

F    made on that basis in the same form as in *West Mercia*.  More recently still, in *Northampton Borough Council v Cardoza* [2017] EWHC 504 (Ch) at [25]–[32], it was suggested, in the light of these authorities, that the remedies that should be granted where a director has acted in breach of duty by causing the company to prefer a particular creditor may be affected by a range of factors.

G    108   Plainly, whether the conditions of section 239 are satisfied cannot be determinative of whether there has been a breach of fiduciary duty.  I also note that section 241(4) of the 1986 Act provides:

> "The provisions of sections 238 to 241 apply without prejudice to the availability of any other remedy, even in relation to a transaction or preference which the company had no power to enter into or give."

H    The central question therefore appears to me to concern the remedies which may be available where a preferential payment is made in breach of the directors' fiduciary duty.  This is not the appropriate occasion on which to attempt a definitive resolution of that issue, although I have indicated a provisional view in relation to the relief granted in *West Mercia*.  It does not

directly arise for decision in this appeal, and it has not been the subject of full    A
argument.  The only question which requires to be decided is whether the
existence of section 239 is incompatible with the rule in *West Mercia*.

109    In my view it is not.  Notwithstanding some uncertainty in relation
to a number of issues, I see no reason to conclude that the existence of
section 239 is altogether incompatible with that rule, not least in the light of
section 241(4).  The point made in para 99 above also applies in this context.    B

### (6) Can the rule in West Mercia apply to a decision by directors to pay a dividend which is otherwise lawful?

110    In relation to this question, I agree with the judgment of Lord
Briggs JSC and there is nothing I can usefully add.

### 7. Conclusion    C

111    For the reasons which I have explained, I conclude that English law
recognises a rule, which I have referred to as the rule in *West Mercia*,
according to which the interests of a company, for the purposes of the
director's duty under the common law to act in good faith in its interests,
should in some circumstances be understood as including the interests of its
creditors.  I also conclude that the rule in *West Mercia* has been preserved by    D
section 172(3) of the 2006 Act.  However, I am satisfied that the rule does
not apply merely because the company is at a real and not remote risk of
insolvency at some point in the future.  It therefore does not apply in the
circumstances of the present case.  This appeal should accordingly be
dismissed.

E

**LORD BRIGGS JSC** (with whom **LORD KITCHIN JSC** agreed)

112    This appeal provides the first opportunity for this court to address
the existence, scope and engagement of an alleged duty of company directors
to consider, or to act in accordance with, the interests of the company's
creditors when the company becomes insolvent, or when it approaches, or is
at real risk of, insolvency.  It is common ground that, if this duty exists at all,
it arises from the common law rather than from statute and that it is owed to    F
the company rather than to the creditors directly.  Following the parties' lead
(and for want of a better label) I will call it "the creditor duty".

113    Following extensive deliberation by experts and lengthy
consultation Parliament undertook a codification of directors' general duties
in sections 170 to 177 of the Companies Act 2006 for the assistance of those
contemplating or undertaking company directorships.  But disagreement    G
about the nature and extent of the creditor duty led to its ambit being left to
the courts.  Section 172 set out in detail the general duty to promote the
success of the company for the benefit of its shareholders, and concluded, at
subsection (3):

> "The duty imposed by this section has effect subject to any enactment
> or rule of law requiring directors, in certain circumstances, to consider or    H
> act in the interests of creditors of the company."

114    Viewed against the centuries-old tapestry of the common law, the
creditor duty is a relatively recent arrival, being expressly articulated for the
first time as part of the ratio of an English case only in 1987, in *West Mercia*

© 2022 The Incorporated Council of Law Reporting for England and Wales

A     *Safetywear Ltd v Dodd* [1988] BCLC 250, and then in express reliance only upon the slightly earlier Australian authority of *Kinsela v Russell Kinsela Pty Ltd* (1986) 4 NSWLR 722. But the notion that a bankrupt person may owe some responsibility to their creditors may have much more ancient roots. The creditor duty has not been free from academic controversy since its arrival, although the principle laid down by the *West Mercia* case has been followed and applied in numerous first instance decisions, and several times in the Court of Appeal, without apparent judicial unease. Nonetheless the precise boundaries of the creditor duty remain to be settled and its very existence remains open to challenge, and has been challenged, in this court.

B

C     115    The resolution of the issues in this appeal is not fact-sensitive. In a nutshell, the facts concern a company called AWA. In May 2009 AWA's directors, who are the second and third defendants, caused it to distribute a dividend of €135m ("the May dividend") to its only shareholder, the first defendant Sequana SA, which extinguished by way of set-off almost the whole of a slightly larger debt which Sequana owed to AWA. It is common ground in this court that the May dividend was lawful, in the sense that it complied with the statutory scheme regulating payment of dividends in Part 23 of the 2006 Act and with the common law rules about maintenance of capital. Furthermore the May dividend was distributed at a time when AWA was solvent, on both a balance sheet and a commercial (or cash flow) basis. Its assets exceeded its liabilities and it was able to pay its debts as they fell due. But it had long-term pollution-related contingent liabilities of a very uncertain amount which, together with an uncertainty as to the value of one class of its assets (an insurance portfolio), gave rise to a real risk, although not a probability, that AWA might become insolvent at an uncertain but not imminent date in the future. In the event AWA went into insolvent administration almost ten years later, in October 2018. The claimant BTI 2014 LLC sought, as assignee of AWA's claims, to recover an amount equivalent to the May dividend from AWA's directors on the basis that their decision that AWA should distribute the May dividend was a breach of the creditor duty. Meanwhile AWA's main creditor applied to have the May dividend set aside as a transaction at an undervalue intended to prejudice creditors, under section 423 of the Insolvency Act 1986.

D

E

F     116    The two claims were heard together in the High Court before Rose J (as she then was). The May dividend was held to have fallen foul of section 423, although Sequana then went into insolvent liquidation and no part of it was repaid. But the claimant failed against the directors both before the judge and in the Court of Appeal. This was because, although they had not taken into account the interests of AWA's creditors, other than for the non-qualifying purpose of deliberately causing prejudice to them, the creditor duty had not become engaged by May 2009. AWA had not then been insolvent, nor was a future insolvency either imminent or probable, in the sense of being more likely than not, even though there was a real risk of it. In the judgment of the Court of Appeal, the creditor duty did not arise until a company was either actually insolvent, on the brink of insolvency or probably headed for insolvency. A risk of insolvency in the future, however real, was insufficient unless it amounted to a probability. Although the dividend was lawful, this did not of itself prevent its payment amounting to a breach of the creditor duty, had it arisen by May 2009.

G

H

© 2022 The Incorporated Council of Law Reporting for England and Wales

117   In this court the claimant argues that a real risk of insolvency is  A
sufficient to engage the creditor duty.  In response the director defendants
argue that the Court of Appeal was wrong to conclude:

(i) That the creditor duty existed at all.

(ii) That, if it did, it could apply to the payment of a dividend which was
lawful (in the sense described above).

(iii) Alternatively, that it could be engaged short of actual, or possibly  B
imminent, insolvency.

In the final alternative, the defendants argue that the Court of Appeal was
right to hold that a real risk of insolvency, falling short of a probability, was
not enough to engage the creditor duty.

118   The precise content of the creditor duty, once engaged, was also
among the issues put before the court by the parties but, in the event, we did
not hear much argument about it.  Furthermore that issue was carefully and  C
perfectly properly avoided by the Court of Appeal.   There is a large
difference between a duty merely to consider the interests of creditors as a
class of potential stakeholders and a duty to act in the interests of that class.
The former assumes a wide discretion as to the weight (if any) to be given to
those interests, in what may be a task of balancing them against the
potentially conflicting interests of another class, such as shareholders.  The  D
latter suggests that the creditors' interests predominate, if in conflict with
the interests of another class, a duty sometimes described as treating the
creditors' interests as paramount.  The difference between those distinct
duties, or levels of the same duty, is of no real consequence in the present
case because, on the unchallenged findings of the judge, the directors
complied with neither of them.  Nonetheless a principled analysis of the
issues about the existence and engagement of the creditor duty cannot  E
sensibly be carried out in a mental state of pure agnosticism about its content
and therefore its consequences.  It would for example be perfectly logical to
conclude, as the claimant submits, that a duty to consider the interests of
creditors arose earlier in a company's slide towards insolvent collapse than a
duty to treat those interests as paramount.

119   It is evident from the way in which the issues have been formulated,  F
and in particular the issue about when the creditor duty arises, that they all
depend on the concept of corporate insolvency.  All the alternative trigger
points for the engagement of the duty suggested to this court are insolvency-
related, whether insolvency is actual, imminent, inevitable, probable or the
subject of a real risk.  At a high level of generality insolvency is a familiar
concept, but it is and always has been quite precisely defined in the statutory  G
insolvency code now governed by the Insolvency Act 1986, although the
precise definition has changed slightly over time: see *In re Cheyne Finance
plc (No 2)* [2008] Bus LR 1562.  Many of the provisions for creditor
protection in that code depend critically upon the question whether a
company is or is not insolvent at a particular moment in time.  The most
obvious is the right of a creditor to seek a compulsory winding up of the
company on the ground that it is insolvent: see section 122(1)(f) of the 1986  H
Act.   A second group are the remedies for wrongful preferences and
transactions at an undervalue, which depend upon the company having been
insolvent at the time of the impugned transaction, or thereby rendered
insolvent: see section 240(2)(a) and (b) of the 1986 Act.  A third is the

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   condition for a members' voluntary winding-up, that there be a declaration of solvency: see section 89 of the 1986 Act.

120   Insolvency takes two forms.  Either may exist without the other. The first is usually called balance sheet insolvency, where the value of the company's assets is exceeded by the value of its liabilities: see section 123(2) of the 1986 Act.  The second is what is generally known as commercial insolvency, where the company is unable to pay its debts as they fall due: see

B   section 123(1)(e) of the 1986 Act and the *Cheyne Finance* case.  For present purposes what matters is that neither will necessarily be permanent, nor fatal to the long-term success of the company, although of course either may be, and commercial insolvency often is.  A company may experience short-term commercial insolvency due to a temporary adverse balance between the liquidity of its assets and the maturity of its debts.  Many start-up companies

C   are balance sheet insolvent before a new invention or business product is sufficiently developed to be brought to market so as to generate revenue or goodwill value, and yet the company later becomes spectacularly successful, and its shareholders become millionaires.  In both cases the directors may perceive that there is a reasonable prospect that the company will be able to trade out of insolvency, for the benefit of both creditors and shareholders, a perception often labelled as seeing light at the end of the tunnel.

D   121   Section 214 of the 1986 Act creates, or at least implicitly recognises, an obligation on directors to treat creditors' interests as paramount when, but only when, in colloquial parlance, there is no light at the end of the tunnel.  It provides (so far as is relevant):

"214 *Wrongful trading*

E   "(1) Subject to subsection (3) below, if in the course of the winding up of a company it appears that subsection (2) of this section applies in relation to a person who is or has been a director of the company, the court, on the application of the liquidator, may declare that that person is to be liable to make such contribution (if any) to the company's assets as the court thinks proper.

F   "(2) This subsection applies in relation to a person if— (a) the company has gone into insolvent liquidation, (b) at some time before the commencement of the winding up of the company, that person knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation or entering insolvent administration, and (c) that person was a director of the company at that time; but the court shall not make a declaration under this section in any case where the time mentioned in paragraph (b) above

G   was before 28 April 1986.

"(3) The court shall not make a declaration under this section with respect to any person if it is satisfied that after the condition specified in subsection (2)(b) was first satisfied in relation to him that person took every step with a view to minimising the potential loss to the company's creditors as (on the assumption that he had knowledge of the matter

H   mentioned in subsection (2)(b)) he ought to have taken."

122   This statutory obligation is not to be understood simply as the recognition of a common law creditor duty.  First, literally speaking, section 214 merely confers a discretionary power on the court to require a director to make a contribution to the assets of the company in the stated

© 2022 The Incorporated Council of Law Reporting for England and Wales

circumstances, while conferring a defence to such a liability if the director          A
took every step he ought to have taken to minimise the loss to creditors.
Secondly, the statutory liability is not to account or to make equitable
compensation for loss caused by an assumed breach of fiduciary duty, but to
make such contribution to the assets of the company as the court thinks fit.

123   But section 214 is a central plank in the statutory scheme of
creditor protection which has been in force during the whole of the period in
which the *West Mercia* case has stood as binding authority for the existence          B
of a common law creditor duty.  This court decided in *In re Lehman Bros
International (Europe) (No 4)* [2018] AC 465 that the statutory scheme is
the dominant element in the UK's framework of insolvency law, to which
purely judge-made rules or principles must either be accommodated or
abandoned: see per Lord Neuberger of Abbotsbury PSC at paras 12–13 and
83.                                                                                     C

124   It is to be noted that the trigger for the application of the
section 214 liability, looking backwards from an insolvent liquidation (or
administration, under section 246ZB of the 1986 Act) that has in fact
happened, is that it is such a liquidation or administration, not just an
insolvency, that has become inevitable.  In most although not necessarily all
cases insolvency will have happened some time before a liquidation or
administration became inevitable.  In what follows, for brevity, I will use the        D
term liquidation to include administration save where it is necessary to deal
with them separately.

125   Finally by way of introduction, no analysis of a common law
creditor duty can be carried out without close attention to the undoubted
(and much older) common law principle that the shareholders of a company
may, acting unanimously, procure the company to do anything within its          E
corporate capacity, and may also ratify (by making it the company's own
act) any decision of the directors to the same effect, so as to preclude any
claim by the company against the directors for breach of duty.  I will call it
the ratification principle, although that is only one aspect of it.  It was,
broadly, common ground between counsel that the two common law
principles could not both apply at the same moment in a company's
existence.  Just as the authorities on the creditor duty speak of it being          F
engaged by insolvency, so the authorities on the ratification principle (some
of which are the same cases) speak of it being disapplied by insolvency.

*Issue 1: Is there a common law creditor duty at all?*

126   Although going well beyond what they needed to do to shield their
clients from liability, Mr Laurence Rabinowitz KC and Mr Niranjan          G
Venkatesan for the director defendants mounted a full-frontal attack on the
very existence of the creditor duty, at the heart of which was the submission
that the only attempted justifications for its existence were contrary to
settled principle.  It is therefore convenient first to identify the supposed
justification for the creditor duty, as revealed by the leading authorities.  At
paras 125 to 191 of his judgment in the Court of Appeal, David Richards LJ
carried out a magisterial review of the United Kingdom and Commonwealth          H
authorities on the creditor duty, the detail of which it would be superfluous
for me to do otherwise than commend.  They begin with *Walker v Wimborne*
(1976) 137 CLR 1 and end with *Bilta (UK) Ltd (No 2) v Nazir* [2016] AC 1.
Three alternative potential justifications for the creditor duty may be said to

A    emerge, although only one of them has occupied the centre ground as a matter of binding authority, at least in the United Kingdom. None has been free from academic criticism.

    **127**   The first is that incorporation with limited liability is a privilege which carries with it an obligation to have regard to the propensity for the directors' decision-making to damage the interests of creditors as the company nears insolvency. Business ethics make it appropriate for directors

B    to consider whether what they do will prejudice the company's practical ability promptly to pay its debts. This was the justification relied upon by Cooke J in *Nicholson v Permakraft (NZ) Ltd* [1985] 1 NZLR 242, 249–250. He said that to translate this aspect of business ethics into a legal obligation

> "accords with the now pervasive concepts of duty to a neighbour and
C    the linking of power with obligation."

    **128**   This supposed justification may be said therefore to be a development of the neighbour principle underlying the law of negligence. It was in part based upon dicta of Templeman LJ in *In re Horsley & Weight Ltd* [1982] Ch 442, 455, and was cited with apparent approval by Street CJ in the *Kinsela* case although, as will appear, he provided his own separate

D    justification.

    **129**   The second justification is that the company itself owes responsibilities to its creditors once it is insolvent, so that the directors as the custodians of the conscience of the company are duty bound to the company to see that it performs those obligations. The notion that insolvent persons have responsibilities to their creditors goes back to Roman law, in the *Lex Paulina*. This basic principle has long since been given effect to by statutory

E    provision, both in England and Scotland, and is now to be found reflected in part in section 423 of the 1986 Act. It would not be right to say that either individuals or companies now owe duties to creditors which are strictly fiduciary in nature, but the concept of the existence of some responsibility towards creditors has survived. In *Winkworth v Edward Baron Development Ltd* [1986] 1 WLR 1512, 1516 Lord Templeman gave this reason for finding

F    that a director had acted in breach of duty to their insolvent company:

> "But a company owes a duty to its creditors, present and future. The company is not bound to pay off every debt as soon as it is incurred, and the company is not obliged to avoid all ventures which involve an element of risk but the company owes a duty to its creditors to keep its property inviolate and available for the repayment of its debts. The conscience of
G    the company, as well as its management, is confided to its directors. A duty is owed by the directors to the company and to the creditors of the company to ensure that the affairs of the company are properly administered and that its property is not dissipated or exploited for the benefit of the directors themselves to the prejudice of the creditors . . . These breaches of duty would not have mattered if . . . [the directors] had
H    been able to maintain the solvency of the company and to see that all its creditors were paid in full."

    **130**   The third justification, which has held centre stage, and which was the main bone of contention between counsel in this appeal, was that supplied by Street CJ in the following well-known passage in the *Kinsela*

case 4 NSWLR 722, 730, in rejecting a defence based on the ratification     A
principle;

> "In a solvent company the proprietary interests of the shareholders
> entitle them as a general body to be regarded as the company when
> questions of the duty of directors arise.  If, as a general body, they
> authorise or ratify a particular action of the directors, there can be no
> challenge to the validity of what the directors have done.  But where a     B
> company is insolvent the interests of the creditors intrude.  They become
> prospectively entitled, through the mechanism of liquidation, to displace
> the power of the shareholders and directors to deal with the company's
> assets.  It is in a practical sense their assets and not the shareholders' assets
> that, through the medium of the company, are under the management of
> the directors pending either liquidation, return to solvency, or the
> imposition of some alternative administration."                             C

131    In his extempore judgment in the *West Mercia* case Dillon LJ relied
on the above passage from the *Kinsela* case as, on its own, a full and
sufficient justification for his conclusion that the director Mr Dodd had
acted in breach of a creditor duty to his by then insolvent company.  He said
that the director Mr Dodd was
                                                                           D
> "guilty of breach of duty when, for his own purposes, he caused the
> £4,000 to be transferred in disregard of the interests of the general
> creditors of this insolvent company": see [1988] BCLC 250, 253.

It mattered that there was a creditor duty, because the County Court judge
had acquitted Mr Dodd of misfeasance for having brought about an
undoubted fraudulent preference because the money was due and payable to     E
the preferred creditor, so not mis-applied, even though it reduced a debt
which Mr Dodd had guaranteed.

132    Although there have since been many cases which have followed
both the *Kinsela* and *West Mercia* cases in recognising and enforcing the
creditor duty, in none of them (or at least those to which this court was
referred) was there any fundamental re-examination of its justification.  But
there was trenchant academic criticism: see in particular: Francis Dawson,     F
"Acting in the Best Interests of the Company—For whom are the Directors
'Trustees'?" (1984) 11 NZULR 68; Sarah Worthington, "Directors' Duties,
Creditors' Rights and Shareholder Intervention" (1991) 18 MULR 121;
Justice Hayne AC, "Directors' Duties and a Company's Creditors" (2014) 38
MULR 795.  The thrust of this criticism may be summarised as follows.  First,
it would be wrong to recognise a duty owed by directors directly to,
and therefore enforceable by, creditors.  This would be incompatible with a     G
fiduciary duty (involving single-minded loyalty) to the company itself, as a
separate entity distinct from even its shareholders and a fortiori from its
creditors.  Secondly, it is wrong to regard limited liability as a privilege (and
therefore with strings attached, such as a duty of care to creditors).  Rather it
is the essential basis of the commercial enterprise and risk-taking which
underpins the success of modern business in Western society.  Thirdly,     H
creditors (or at least voluntary creditors) deal at arms-length with limited
companies and may fairly be expected to form their own judgment about
whether to give credit to them and, if so, on what terms as to security.
Fourthly, creditors (or at least unsecured creditors) never have a proprietary

© 2022 The Incorporated Council of Law Reporting for England and Wales

A  interest in the assets of a company, even when it is in insolvent liquidation, any more than do shareholders. Creditors merely have statutory rights to share in the net proceeds of the liquidation process, with the priority given to them by the statutory code.

133  To these criticisms Mr Rabinowitz added the submission that the true basis of the directors' duty to act for the benefit of shareholders, expressly recognised in section 172(1) of the 2006 Act and in settled
B  authority, was that the shareholders were, as its corporators, to be identified with the company, and that the fiduciary trust and confidence between them and the directors arose because of their power to choose, appoint and remove them. This was, he submitted, fortified by the rationale behind the ratification principle, and the cases suggesting that it was disapplied by insolvency were all wrongly decided, being based on no more solid
C  foundations than the *West Mercia* case itself.

134  Finally Mr Rabinowitz submitted that the *West Mercia* case was decided without reference to the binding contrary authority of the Court of Appeal in *In re Wincham Shipbuilding, Boiler, and Salt Co* (sometimes called *Poole, Jackson and Whyte's* case) (1878) 9 Ch D 322. Three shareholder directors of an insolvent company, who were guarantors of the company's overdraft, paid to the company money due on their shares, which was then
D  credited at their direction to the company's overdrawn bank account eliminating their guarantee liability, two days before the presentation of a creditors' winding up petition. The payment was (in the view of the Court of Appeal) not a fraudulent preference, but the liquidator persuaded Bacon V-C at first instance that it amounted to a breach of trust by the directors, because it served their interests rather than the interests of the
E  company. Allowing the appeal, Jessel MR said this, at pp 328-329:

"The Vice-Chancellor decided the question on this ground, that the directors were trustees of all their powers. So, no doubt, they were . . . But it appears to me that the question is, for whom were they trustees? . . . It has always been held that the directors are trustees for the shareholders, that is, for the company . . . But directors are not trustees
F  for the creditors of the company. The creditors have certain rights against a company and its members, but they have no greater rights against the directors than against any other members of the company. They have only those statutory rights against the members which are given them in the winding-up."

It will be necessary to return to this dictum in due course, but what stands
G  out for present purposes is the way in which Jessel MR equated the company with its shareholders for the purpose of his analysis of the directors' duties in the phrase: "the directors are trustees for the shareholders, that is, for the company".

135  No-one now contends that directors owe duties direct to shareholders (in the sense that shareholders can enforce them directly) or, for that matter, directly to creditors. It is common ground that their duties
H  are owed to the company and to no one else. But this passage is illuminating, from a historical perspective, in suggesting that it was the perception in the mind of judges like Jessel MR that for these purposes the company and its shareholders were one and the same that led to their view that, in the discharge of duties to the company, directors needed only to have regard to

© 2022 The Incorporated Council of Law Reporting for England and Wales

the interests of shareholders, so that they did not owe a duty to consider or       A
act in accordance with the interests of creditors.

**136**   The cases from which the ratification principle has emerged do tend
to support the defendants' thesis that, for certain purposes, shareholders
may be regarded as the equivalent of the company ("the corporators" as
counsel put it).  The earliest is the famous decision of the House of Lords in
*Salomon v A Salomon & Co Ltd* [1897] AC 22, in which, overruling the
Court of Appeal, it was held that a purchase by the company of a solvent       B
business from its founder at a gross overvalue could not be challenged by its
liquidator, because it had been known of and approved, while the company
was itself solvent, by all its shareholders: see per Lord Davey at p 57.
Perhaps ironically that case is generally regarded as a leading authority
for the principle that a company is a distinct entity, separate from its
shareholders or any one of them, even if it is a "one man" company: see       C
e g per Lord Macnaghten at pp 51 and 53.  This emphasis arose from the
need for the House of Lords to disapprove the reasoning of the Court of
Appeal that, in the circumstances of that case, the separate personality of the
company should be ignored.  The justification which has emerged for the
ratification principle from the authorities is that the unanimous decision of a
company's shareholders about a matter within its corporate capacity makes       D
the decision the company's "own act" about which neither it nor its
liquidator on its behalf can thereafter complain.  If the relevant decision was
originally made by the directors, then its subsequent ratification by the
shareholders releases the directors from any liability for breach of duty.

**137**   This "own act" justification for the principle emerges most clearly
from the judgment of Lawton LJ in *Multinational Gas and Petrochemical Co
v Multinational Gas and Petrochemical Services Ltd* [1983] Ch 258, 269:       E

> "What the oil companies were doing was adopting the directors' acts
> and as shareholders, in agreement with each other, making those acts the
> plaintiff's acts."

By way of explanation, the oil companies were the only shareholders in the
company bringing claims against (inter alia) its directors.  The impugned
decisions were all made when the plaintiff company was solvent: see per       F
Dillon LJ at p 288D–E and 290A.

**138**   This combination of academic criticism, earlier inconsistent
authority and the undoubted parallel existence of the older ratification
principle do amount to a formidable basis for undertaking a re-appraisal of
the very existence of the creditor duty.  Nonetheless, for the reasons which
follow, I am persuaded that the undertaking of that re-appraisal shows that       G
the existence of a creditor duty at common law is sufficiently established,
and sufficiently well-founded on principle, for it to be appropriate for this
court to affirm it.

**139**   I would start by accepting that the original, historical, justification
for regarding the general duty of directors to their company as being to
manage its affairs for the benefit of its shareholders arose from a perception
that, as its corporators, shareholders could for that purpose be equated with       H
the company itself.  This emerges with striking clarity from the *Wincham*
case.  But the law has since moved on a long way from a view that the
interests of others in relation to the company, and its relationships with
others, are altogether irrelevant.  Put shortly, of the two strands in the

A   reasoning in the *Salomon* case, namely the company as a separate entity with its own interests and responsibilities and the company as an abstract equivalent of its shareholders, it is the first which has clearly prevailed over time.

140   Section 172(1) of the 2006 Act makes this clear in terms.   It provides:

B        "A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole, and in doing so have regard (amongst other matters) to— (a) the likely consequences of any decision in the long term, (b) the interests of the company's employees, (c) the need to foster the company's business relationships with suppliers, customers and others, (d) the impact of the company's operations on the community and the environment, (e) the desirability of the company maintaining a reputation for high standards of business conduct, and (f) the need to act fairly as between members of the company."

C

This provision recognises that, as a separate entity from its shareholders, a company has responsibilities of a legal, societal, environmental and, in a loose sense, moral or ethical nature, compliance with which is likely to secure rather than undermine its success.   These responsibilities are not those of its shareholders, even viewed as a whole.   But compliance with them is a matter for the directors, as custodians of what Lord Templeman memorably called the "conscience of the company" in the *Winkworth* case [1986] 1 WLR 1512, 1516.

D

E   141   Creditors are not mentioned in section 172(1), but the list of matters to which the directors are to have regard is not exclusive, and both employees and suppliers are likely to form important classes of a company's creditors as it approaches insolvency.   Furthermore the absence of an express mention of creditors as a class in section 172(1) is readily explained by Parliament's decision to leave consideration of their interests to the common law as reflected in section 172(3), having regard to the disagreement about the ambit and extent of the creditor duty among those providing expert assistance to the company law reform project of which the 2006 Act was the end product.

F

142   The passage of time has therefore given real force to this second justification for the creditor duty, provided that it can properly be said that consideration of the interests of creditors is a responsibility of the company which is, or is on the verge of being, insolvent.   That responsibility is one fortified by the most ancient lineage, even though its particular incidents have long since been codified in statute: see para 129 above.

G

143   I would however firmly reject the submission of the defendants that the fiduciary duty to advance shareholders' interests has anything to do with the fact that directors are, usually, selected, appointed and removed by shareholders, or that it arises from a sense of trust and confidence between them for that reason.   The power to appoint and remove directors is not invariably conferred upon all the shareholders.   It may be enjoyed only by a select class of them, and yet the statutory duty to manage the company for their benefit is clearly extended to all the shareholders, described as the "members as a whole" and section 172(1)(f) makes it clear that the directors

H

© 2022 The Incorporated Council of Law Reporting for England and Wales

may not confine their attention to benefitting only that sub-class of shareholders who happen to have the power to appoint and remove them.

144    More generally, trustees and other fiduciaries are very commonly appointed by persons other than the beneficiaries of the trust.  And the widespread existence within the beneficiary class of persons (including persons unborn) who have no relationship at all with the trustees of traditional trusts makes the notion that the trustee's fiduciary duty merely reflects a relationship of trust and confidence with their appointor impossible to accept.

145    I share the view of the academic critics that the first of the attempted justifications for a creditor duty, identified in *Nicholson v Permakraft* [1985] 1 NZLR 242, is unpersuasive.  The real rationale of limited liability is not to confer a privilege, but to encourage risk taking as an essential part of commercial enterprise.  Nor is there any view in my view for treating creditors as persons to whom the directors, through the company, may be said to owe a duty of care, or for converting into legal obligation a perception based on business ethics that creditors deserve protection from harm in any general sense.

146    The second justification is that directors may properly be required to observe a creditor duty because they do so as custodians of the conscience of the company.  This is more persuasive than the first, although it has nothing do with limited liability.  The responsibility of an insolvent company to its creditors is the same in principle as the responsibility of an individual: see para 129 above.  Viewed as a separate entity from its shareholders, the company does not enjoy limited liability at all.  It is the shareholders who have limited liability for the company's debts.  The company is liable for them in full, although the process of insolvent liquidation or administration will regulate how, and how far, that liability is to be discharged when the company's assets are insufficient for that to be achieved in full.  The bankruptcy process fulfils the same purpose for an individual, albeit in a different way.

147    It is however the third justification for the creditor duty which has thus far held sway in the United Kingdom.  Although it is correct that neither unsecured creditors or shareholders have a proprietary interest in the assets of a company, whether or not solvent or even in liquidation, it is not an abuse of language to describe creditors as having the main economic stake in the liquidation process which may be triggered by insolvency, and therefore as persons whose interests must be taken into account (albeit not necessarily as paramount) by the company's fiduciary managers, while still in control of the management of the insolvent company before the onset of liquidation.  In that respect the key word in Street CJ's expression of the justification in the *Kinsela* case 4 NSWLR 722, 730 is "prospectively" in the sentence:

> "They become *prospectively* entitled, through the mechanism of liquidation, to displace the power of the shareholders and directors to deal with the company's assets." (Emphasis added.)

148    When it is borne in mind that, once liquidation is inevitable, the directors face personal liability under section 214 of the 1986 Act if they do not treat minimising loss to creditors as their paramount responsibility, the prospect that creditors may eventually attain the status of paramount stakeholders in a statutory liquidation process once the company is exposed

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   to liquidation by insolvency seems to me to be a very sensible justification for the existence of a common law duty to the company at least to consider creditors' interests at that (usually earlier) stage.  I would accordingly reject the submission that the creditor duty lacks coherent or principled justification.

B   **149**   Nor do I regard the undoubted existence of the common law ratification principle as an obstacle to the recognition of a common law creditor duty, although I would accept that the two cannot sensibly co-exist at the same time in relation to the same company.  It is now settled that the ratification principle does not apply to a decision by shareholders which is either (i) made at a time when the company is already insolvent or (ii) the implementation of which would render the company insolvent: see *Bowthorpe Holdings Ltd v Hills* [2003] 1 BCLC 226, at paras 51 to 54 per C   Sir Andrew Morritt V-C after a review of the authorities on the ratification principle.  The defendants submit, correctly, that the *Bowthorpe* case and other authorities to the same effect such as *Official Receiver v Stern (No 2)* [2002] 1 BCLC 119, para 32 are themselves dependent upon both the *Kinsela* and *West Mercia* cases, but that misses the point, for two reasons. First they show how the ratification principle can (if necessary) readily adapt D   to the creditor duty on a principled basis.  Secondly, and perhaps more importantly, close study of the leading cases on the ratification principle prior to the *West Mercia* case, from the *Salomon* case onwards, shows how careful the courts have been to apply the principle only to a solvent company.  Thus in the *Salomon* case the evidence established that the business being acquired by the newly formed company was perfectly solvent: see [1897] AC 22, 25.  In *In re Horsley & Weight Ltd* [1982] Ch 442 the E   ratification principle was applied to the decision of shareholders in a solvent company.  At p 455, Templeman LJ said:

> "If the company had been doubtfully solvent at the date of the grant to the knowledge of the directors, the grant would have been both a misfeasance and a fraud on the creditors for which the directors would F   remain liable."

In the *West Mercia* case [1988] BCLC 250, 252, Dillon LJ distinguished the *Multinational Gas* case (in which the ratification principle had been applied) on the basis that the company in question had been "amply solvent". A conclusion that the ratification principle is not irreconcilable with the creditor duty is provided, albeit for slightly different reasons, in both the G   *Permakraft* and *Kinsela* cases.

**150**   Finally I would acknowledge that the *Wincham* case was Court of Appeal authority which, on its facts, is hard to reconcile with a creditor duty. It may not have been cited to, or is at least not expressly dealt with, in the *West Mercia* case or in any of the later cases which have followed it.  Strictly, the case was about the validity of the shareholder directors' early payment to the company of amounts due on their shares, rather than the company's H   payment of that money into its overdrawn bank account.  But the company was insolvent, and probably headed inevitably for liquidation, since it had ceased to trade some four weeks before the payments were made.  It is hard to see how the directors could have defended a claim under what is now section 214, had it been in force at the time.

© 2022 The Incorporated Council of Law Reporting for England and Wales

151   This court is of course free to choose between the *Wincham* and *West Mercia* cases. If forced to do so I would unhesitatingly prefer the latter. But the difference in approach to the recognition or otherwise of a creditor duty is better explained by the passage of time, and the development of thinking about both the separate personality of the company from its shareholders, and the company's separate responsibilities from those of its shareholders, as reflected in section 172(1), and described above. There can be no doubt that the existence rather than the denial of a creditor duty is more consistent with both company law, as reflected in the 2006 Act and with insolvency law as largely codified in the Insolvency Act 1986. It is also consistent with the development of the modern corporate rescue culture, in which securing the co-operation of the company's creditors (rather than ignoring them) can make all the difference between success and failure.

152   I have thus far been concerned to address the detailed and impressive submissions of the defendants as to why there is no creditor duty, rather than positive reasons why it should be affirmed. There are in my view two which are compelling, once it is recognised that there is no strong reason of principle to the contrary. The first is that there is now a long line of authority, both in the English courts and in Australia and New Zealand, beginning in the mid-1980s, which affirms the existence of the duty as settled law, albeit with uncertainties at the margins as to its precise content, scope and engagement. This is far from an area of conflicting authority. It is unnecessary to describe or even list the cases, that task having been accomplished by David Richards LJ in the Court of Appeal. But they include two cases in which, after the coming into force of the 2006 Act, the existence of the creditor duty was affirmed, albeit obiter, in this court: namely in *Stone & Rolls Ltd v Moore Stephens* [2009] AC 1391, para 236, per Lord Mance JSC and in *Bilta (UK) Ltd v Nazir (No 2)* [2016] AC 1, para 104, per Lord Sumption JSC, and para 167, per Lord Toulson and Lord Hodge JJSC. It was also mentioned, in passing, by the Judicial Committee of the Privy Council in *Byers v Chen* [2021] BCC 462, para 91.

153   Secondly, and conclusively in my view, the existence (although not the precise content and engagement) of the creditor duty was affirmed as existing at common law in section 172(3). That subsection needs to be interpreted in its historical context. It refers to "any enactment or rule of law" and makes the general duty set out in the rest of section 172 subject to it. It does not say "enactment or rule of law if any". Generally the formulation used would be construed as a reference to any rule of law in force at the time of the passing of the 2006 Act. Parliament must be taken to have understood the general state of the common law at that time, which by the binding Court of Appeal authority of the *West Mercia* case did clearly recognise a creditor duty, even if the precise content of that rule of law may have had fuzzy edges, and might thereafter be subject to further judicial development.

154   Lady Arden suggests that this analysis of section 172(3) is made without benefit of the Explanatory Notes and without considering their history, or the history of the White Papers. In my respectful view section 172(3) speaks for itself in sufficiently clear terms, and I note that Lord Reed PSC is of the same opinion. But I agree with Lord Hodge DPSC, for the reasons he gives, that those additional materials confirm the

© 2022 The Incorporated Council of Law Reporting for England and Wales

interpretation of section 172(3) which I have derived from reading its language in context.

**155** It must be acknowledged that whereas section 172(3) makes the section 172(1) duty subject to any creditor duty, the other duties referred to in sections 171 to 177 are not expressed to be so subjected. This was not a point addressed in the parties' submissions. In my view this point does not militate against the continuing recognition of a creditor duty, for the following reasons. First, it is only the duty in section 172(1) to promote the success of the company for the benefit of its members that is likely to come into serious conflict with a creditor duty, so that one needs to be regarded as subject to the other, in circumstances where both cannot be performed together.

**156** Secondly, and by contrast, performance of the other duties, in sections 171 and 173 to 177 give rise to no such likelihood of conflict. They are the duty to act within powers, to exercise independent judgment, to exercise reasonable care, to avoid conflicts of interest, not to accept third party benefits and to declare interests in proposed transactions. They may all co-exist with the performance of a creditor duty. Lord Hodge DPSC explains this point in more detail in his judgment, and I agree with it.

**157** For those reasons I would resolve the first issue against the defendants.

*Issue 2: Can the creditor duty apply to a decision by directors to pay a lawful dividend?*

**158** United Kingdom company law regulates the payment of dividends by a combination of very old common law rules and a modern statutory code. The common law rules are those which (apart from statutory authority) restrain a company from reducing its capital: see *Trevor v Whitworth* (1887) 12 App Cas 409. The modern statutory code is to be found in Part 23 of the 2006 Act. It provides that dividends may only be paid out of distributable profits, and then prescribes detailed rules for ascertaining what those are, at any given time, usually by reference to the company's last annual accounts. Those rules incorporate accounting standards which (in FRS 12) require provision to be made for probable future liabilities, but not for liabilities which, although there is a real risk that they may occur, are regarded as unlikely.

**159** The main thrust of the defendants' case on this issue (which is that the creditor duty can never apply to payment of a lawful dividend) is that if the creditor duty is triggered by a real risk of insolvency, by reason of the existence of contingent future liabilities which are unlikely to occur, this would run counter to the basis upon which Part 23 requires future liabilities to be provided for, as summarised above. In short, Parliament has prescribed that creditor protection against a company paying away assets to shareholders is to be delimited by reference to probable liabilities, not those falling below that threshold. It is pointed out that a similar threshold is applied to protect future creditors from the return of assets to shareholders in a members' voluntary liquidation: see section 89 of the Insolvency Act 1986, *Stanhope Pension Trust Ltd v Registrar of Companies* [1994] BCC 84, 89, per Hoffmann LJ and *In re Danka Business Systems plc* [2013] Ch 506, para 43, per Patten LJ.

© 2022 The Incorporated Council of Law Reporting for England and Wales

160    Leaving aside the question whether the creditor duty is engaged _A_
when there is only a real risk of insolvency (which I address later) there are
two reasons why the defendants' case on this issue must fail. The first is that,
subject to two irrelevant exceptions, the whole of Part 23, and the authority
which it provides to pay dividends, is subject to any rule of law to the
contrary: see section 851(1). If as I have concluded the creditor duty is part
of the common law, then it cannot be treated as ousted by Part 23. In that
context the defendants expressly concede that the general duty of directors _B_
in section 172(1) is not excluded by Part 23. There is no sensible reason why
the creditor duty recognised by section 172(3) should be either.

161    The second reason is that given by David Richards LJ in the Court
of Appeal for concluding that this argument is "unsustainable", at para 224.
Part 23 identifies profits available for distribution on a balance sheet basis.
A company may well have a balance sheet surplus while being commercially _C_
(i e cash flow) insolvent. It cannot be the case that directors of a company
already unable to pay its debts as they fall due could distribute a dividend, or
do so if the consequence of the payment was to bring about cash flow
insolvency. To do so in those circumstances would be to take a foolhardy
risk as to the long-term success of the company, by exposing it to the real risk
(or at least a gravely increased risk) of being wound up.

162    No different conclusion is to be derived from the fact that a _D_
proposed dividend would not offend the common law rules against
reduction of capital, and the contrary was not seriously suggested. There is
old authority that creditors have no cause of action to restrain a lawful
payment by way of distribution: see _Lee v Neuchatel Asphalte Co_ (1889) 41
Ch D 1 and _Lawrence v West Somerset Mineral Railway Co_ [1918] 2 Ch
250. But those were not cases about a creditor duty owed by directors to the _E_
company, and it is no part of the claimant's case that the creditor duty is
owed directly to, or enforceable by, creditors.

_Issue 3: What is the content of the creditor duty?_

163    The impressive unity of the authorities about the existence of the
creditor duty is not matched by any similar unanimity about its precise
content. It is clear from section 172(3) that it is not merely a duty to take _F_
account of the interests of creditors to the extent only that this may assist in
securing the success of the company for the benefit of its members, as is
required by section 172(1) in relation to the interests of employees, or the
company's relationships with its suppliers and customers. That type of duty
is no more than an aspect of the directors' general duty to manage the
company for the benefit of its shareholders. It cannot conflict with it and _G_
does not require the directors to advance the interests of (e g) employees if
this would conflict with acting for the long-term benefit of the members as a
whole.

164    Nor is it a duty, once engaged, always to treat creditors' interests as
paramount. Section 172(3) speaks in the alternative of a duty to consider
creditors' interests or a duty to act in accordance with them. Creditors are
not to be treated as having the main economic stake in the company at least _H_
while a company is solvent or, if insolvent, while there is still light at the end
of the tunnel. It is not enough to say that, once there is a risk of insolvency,
the implicit risk that they as a class will get hurt in their pockets is a sufficient
reason for elevating them to the status of paramount stakeholders, still less

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    as a class whose interests must always predominate. It is inherent in the law's encouragement of risk-taking and commercial enterprise under limited liability that creditors of limited companies will get hurt from time to time. Most creditors are voluntary. They are therefore able to make their own judgment about those risks and to take such precautions against them by a demand for security as they think fit, armed with such public information about the financial position of the company as the law makes available, or
B    the company chooses to provide.

165   It is only the onset of liquidation itself, rather than insolvency, that converts the creditors into the main economic stakeholders in the company. That is why section 214 only imposes liability upon directors for failure to act in their interests once liquidation becomes inevitable. That does make the creditors' interests paramount, but insolvency itself may not.

C    166   There is however a line of thought in some of the authorities and text-books that the substitution of a paramount creditor duty for a general duty to serve the interests of shareholders is the almost automatic consequence of the exhaustion of any surplus in the company's net assets (i e balance sheet insolvency). Once that surplus has gone, it is said, and the company is trading solely at the risk and benefit of the creditors, in the sense
D    that it is their funds which are alone at stake, a paramount duty to serve the creditors' interests necessarily follows, entirely replacing the former duty enshrined in section 172(1) to manage the company for the benefit of shareholders.

167   The clearest academic statement of that approach is to be found in *Goode on Principles of Corporate Insolvency Law*, 5th ed (2018),
E    para 14-21:

> "The true principle is not that the directors owe duties to creditors as well as to the company but that when the company is insolvent or 'bordering on' insolvency the directors, in discharging the general duties that they already owe to the company, must have regard predominantly to the interests of creditors, who now have the primary interest in the proper application of the company's assets and whose interest is mediated
F     through the company."

The authorities which advance that thinking begin with *Brady v Brady* [1988] BCLC 20. It was alleged that the giving of financial assistance in the purchase of a company's shares was in the company's interests within the meaning of section 153 of the Companies Act 1985. At p 40 Nourse LJ said:

G   
> "The interests of a company, an artificial person, cannot be distinguished from the interests of the persons who are interested in it. Who are those persons? Where a company is both going and solvent, first and foremost come the shareholders, present and no doubt future as well. How material are the interests of creditors in such a case? Admittedly existing creditors are interested in the assets of the company as the only
H     source for the satisfaction of their debts. But in a case where the assets are enormous and the debts minimal it is reasonable to suppose that the interests of the creditors ought not to count for very much. Conversely, where the company is insolvent, or even doubtfully solvent, the interests of the company are in reality the interests of existing creditors alone."

© 2022 The Incorporated Council of Law Reporting for England and Wales

168    In *Colin Gwyer & Associates Ltd v London Wharf (Limehouse) Ltd* [2003] 2 BCLC 153, para 74, Mr Leslie Kosmin QC (sitting as a deputy judge of the High Court) treated this dictum (together with the *West Mercia* and *Kinsela* cases) as authority for this proposition:

> "Where a company is insolvent or of doubtful solvency or on the verge of insolvency and it is the creditors' money which is at risk the directors, when carrying out their duty to the company, must consider the interests of the creditors as paramount and take those into account when exercising their discretion."

Mr Kosmin's dictum was followed by Norris J in *Roberts v Frohlich* [2011] 2 BCLC 625, para 85 and by John Randall QC (sitting as a deputy judge of the High Court) in *In re HLC Environmental Projects Ltd* [2014] BCC 337. It was referred to with approval by Newey J in *Vivendi SA v Richards* [2013] BCC 771, para 149, but only on the question whether the creditor duty could become engaged prior to actual insolvency. David Richards LJ cautiously espoused the same view, but expressly obiter, in the Court of Appeal in the present case, at para 222.

169    There are however dicta to the opposite effect: namely that, even when insolvency occurs, the creditors' interests may not necessarily be paramount. In most of the authorities the duty is expressed as requiring creditors' interests to be considered, or taken into account, with no mention of them being overriding. But the point is addressed more specifically in *Westpac Banking Corpn v Bell Group Ltd (No 3)* (2012) 270 FLR 1. At para 2046, Drummond AJA said:

> "Owen J was correct, in my opinion, when he said at paras 4438 and 4439 that when a company is in an insolvency context the interests of creditors are not in all circumstances paramount, to the exclusion of other interests including that of the shareholders. His conclusion at para 4440 was that directors could not properly commit their company to a transaction if the circumstances were such that 'the only reasonable conclusion to draw, once the interests of creditors have been taken into account, is that a contemplated transaction will be so prejudicial to creditors that it could not be in the interests of the company as a whole'. I would prefer to say that if the circumstances of the particular case are such that there is a real risk that the creditors of a company in an insolvency context would suffer significant prejudice if the directors undertook a certain course of action, that is sufficient to show that the contemplated course of action is not in the interests of the company."

170    The question was considered in detail by Lt Bailiff Hazel Marshall QC sitting in Guernsey in *Carlyle Capital Corpn Ltd v Conway* (Judgment 38/2017) (unreported) 4 September 2017. After a review of the authorities, including the judgment of Rose J in the present case, she rejected Mr Kosmin's formulation of the "paramount" duty as an overstatement of the true position, at para 452. She concluded at paras 455–456:

> "In my judgment the principle, as it applies in Guernsey law is that once it is recognised that the company is 'on the brink of insolvency', the directors' duty to act in the best interests of the company extends to embrace the interests of its creditors, and requires giving precedence to

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    those interests where that is necessary, in the particular circumstances of the case, to give proper recognition to the fact that the creditors will have priority of interest in the assets of the company over its shareholders if a subsequent winding up takes place.

"I formulate the principle in this way to take account of differences, according to particular circumstances, in what it may be reasonable and responsible for directors to do when they find that the company is in a B    sufficiently weak financial situation that a conflict of interest between its creditors and its shareholders appears to arise. The company is not—yet—in insolvent liquidation and remains under the management of the directors. Their duty is to decide what is in the extended best interests of the company in the particular case. It may well be that in some, possibly even most, situations, the company should thenceforth be run C    with regard to the best interests of its creditors alone, but that will not necessarily be true in all cases, and it is for that reason that I reject the word 'paramount'."

171    In my view the more nuanced analysis undertaken in the *Westpac* and *Carlyle* cases better reflects English law on this question than the more rigid expression of paramountcy of the interests of creditors on insolvency D    proposed in the *Colin Gwyer* case and those which have followed it. This is for three main reasons.

172    First, balance sheet insolvency will typically ante-date the section 214 trigger, namely inevitable liquidation. Thus to identify an earlier moment for the engagement of a common law duty to treat the creditors' interests as paramount, based on insolvency rather than inevitable E    liquidation, would appear to run contrary to the statutory insolvency scheme, and indeed to make section 214 largely redundant. Why, if creditors' interests become paramount on insolvency, should statute provide the liquidator with a discretionary remedy against the directors when, on the same facts, the directors would already have become liable to the company for breach of the creditor duty, from an earlier date, before section 214 became engaged?

F    173    Secondly, practical common-sense points strongly against a duty to treat creditors' interests as paramount at the onset of what may be only temporary insolvency, still less at some earlier moment, such as when insolvency is imminent. Why should the directors of a start-up company which is paying its debts as they fall due but is balance sheet insolvent by a small margin abandon the pursuit of the success of the company for the G    benefit of its shareholders? And why should the directors, faced with what they believe to be a temporary cash-flow shortage as the result of an unexpected event, like the present pandemic, give up the pursuit of the long-term success of a fundamentally viable, balance sheet solvent, business for the continuing benefit of shareholders?

174    If the fact of insolvency always and immediately rendered the interests of creditors paramount, then directors would be likely to decide, or H    to be advised for their own protection, to cause the company immediately to cease trading, because that course would usually minimise the risk of further loss to creditors, whereas continued trading with a view to a return to solvency might increase that risk. It would in my view be wrong for the common law to impose that fetter on the directors' business judgment.

© 2022 The Incorporated Council of Law Reporting for England and Wales

Section 214 is framed in terms which point to a very different parliamentary    A
intention, because it permits directors to cause a company to continue to
trade whilst insolvent, for as long as they reasonably discern light at the end
of the tunnel.

175   Thirdly, insolvency of either the balance sheet or commercial kind
does not of itself advance the status of creditors beyond being contingent
main stakeholders.  The contingency remains liquidation (when the statutory
priority of creditors cuts in) rather than insolvency (when it does not).  For as    B
long as there remains light at the end of the tunnel, that contingency may
never occur.  It follows that the justification for the recognition of the
creditor duty which has thus far prevailed in the United Kingdom does not
go so far as to render creditors' interests necessarily paramount upon
insolvency.

176   In my view, prior to the time when liquidation becomes inevitable    C
and section 214 becomes engaged, the creditor duty is a duty to consider
creditors' interests, to give them appropriate weight, and to balance them
against shareholders' interests where they may conflict.  Circumstances may
require the directors to treat shareholders' interests as subordinate to those
of the creditors.  This is implicit both in the recognition in section 172(3)
that the general duty in section 172(1) is "subject to" the creditor duty, and    D
in the recognition that, in some circumstances, the directors must "act in the
interests of creditors".  This is likely to be a fact sensitive question.  Much
will depend upon the brightness or otherwise of the light at the end of the
tunnel; i e upon what the directors reasonably regard as the degree of
likelihood that a proposed course of action will lead the company away from
threatened insolvency, or back out of actual insolvency.  It may well depend
upon a realistic appreciation of who, as between creditors and shareholders,    E
then have the most skin in the game: i e who risks the greatest damage if the
proposed course of action does not succeed.

177   There is nothing inconsistent with the fiduciary nature of the
directors' duty that it calls for a balancing of potentially competing
interests.  Much of the development of fiduciary duty arose in connection
with family settlements, where trustees charged with investment powers    F
faced the constant challenge of balancing the interests of life tenants and
remaindermen, the former being interested in maximising income, and the
latter in preserving and enhancing capital.  Similar questions attended the
exercise of dispositive powers, such as maintenance and advancement.

*Issue 4: When is the creditor duty engaged?*

                                                                               G
178   This is the issue upon which the claimant's case has thus far
foundered.  It is necessary on the facts found for the claimant to show that
the creditor duty is engaged (or triggered) whenever there is a real risk that
the company may in the future become insolvent, not at the (usually) later
date when insolvency is probable (as the Court of Appeal held) or only when
there is actual or imminent insolvency.  This is because, at the time of the
May dividend, AWA was not actually or imminently insolvent, nor was    H
insolvency even probable.  But there was a real risk of insolvency in the
medium to long term future, because of the large uncertainties affecting the
value of its contingent liabilities and of an important class of its unrealised
assets.

© 2022 The Incorporated Council of Law Reporting for England and Wales

A  **179**   As the thorough review of the relevant English and Commonwealth authorities by David Richards LJ demonstrates, there is not to be found in them any clear guidance as to a precise answer to the "when" question. Dicta can be found to support any of the competing alternatives, from real risk of insolvency as the earliest to actual insolvency as the latest, with various intermediate triggers such as probable or imminent insolvency, on the brink of insolvency, threatened with insolvency or of doubtful solvency,

B  or even a "parlous financial condition", all lying somewhere in between. But in most of the cases where the duty was held to have arisen the subject company was actually insolvent, so that the expression of the trigger as arising potentially at an earlier date was no more than an obiter dictum. For the same reason there is before the decision of the Court of Appeal in the present case no in-depth analysis of the "when" question as a matter of

C  principle, beyond the competing principled justifications for the existence of the creditor duty which I have already described.

**180**   I do not consider that it would serve any useful purpose to trawl again in writing through the authorities in a vain search for a hidden gem which eluded David Richards LJ and has eluded me. In fairness however to the claimant I will focus on the small number of authorities containing dicta said to be supportive of a "real risk" trigger. But I will mainly be concerned

D  in what follows with the underlying principles, as indeed were the parties.

**181**   The authorities which may be said to support a "real risk" trigger may be divided into two classes, Australian and English. Mr Thompson acknowledged that the English cases contained no more than obiter dicta, but he submitted that the Australian cases based themselves on a real risk as part of their ratio, and that the Court of Appeal in the present case

E  undervalued them. The first is *Grove v Flavel* (1986) 11 ACLR 161, a decision of the Supreme Court of South Australia on a case stated in a criminal appeal, in which the question was whether the defendant director had made improper use of company information, contrary to section 124(2) of the Companies Act 1962 (SA). The relevant information was that the company had been refused a loan which gave rise to a real risk of its insolvent liquidation. The company was not insolvent when the defendant

F  used that information to arrange transactions for his benefit (and that of other companies of which he was a director) to the eventual prejudice of the company's creditors when it later went into liquidation. After a review of the *Walker v Wimborne*, *Permakraft* and *Kinsela* cases, the court held that the use of such information was improper. Giving the leading judgment, Jacobs J said at p 170, that the principle which imposed a creditor duty on a

G  director was the proposed use of assets of a company which would otherwise be available to creditors in a liquidation, when the company was known to be insolvent. It was (following the *Permakraft* case) "the creditors' money that is at stake". If so there was no reason why the same duty should not apply when insolvency was perceived to be a real risk.

**182**   I would acknowledge that the real risk of insolvency trigger for the engagement of the creditor duty was part of the ratio of the case. But

H  I would be disinclined to treat it as persuasive. First, the analysis was heavily based on the justification for the creditor duty given in the *Permakraft* case, which I have found (for reasons already given) to be the least persuasive of the three which have been relied upon, and which forms no significant part of the justification for the creditor duty in the English cases. Secondly, there

© 2022 The Incorporated Council of Law Reporting for England and Wales

764
BTI 2014 LLC v Sequana SA (SC(E))                                    [2022] 3 WLR
Lord Briggs JSC

is little more than an assertion in Jacobs J's reasoning that a duty triggered    A
by actual insolvency should in principle be triggered also by a real risk of
insolvency.  Thirdly, the same conclusion could equally have been drawn, on
the facts of that case, from the fact that the director used the relevant
information to enable him to carry out a transaction deliberately designed to
prejudice the interests of creditors which, if it had happened in the United
Kingdom, would have been contrary to section 423.  It is, in passing, an       B
irony of the present case that the May dividend has been found to have
offended section 423 but no claim that it involved for that reason alone a
breach of duty by the defendant directors has ever been pursued.

    183   *Grove v Flavel* was followed by the Court of Appeal of New South
Wales in *Kalls Enterprises Pty Ltd v Baloglow* (2007) 25 ACLC 1094.  The
relevant question was whether, to the knowledge of the recipient, a payment
had been made from an already insolvent company by its director in breach    C
of duty.  As noted by David Richards LJ, at para 186, the paying company
was found to have been insolvent at the time of the payment, or was
rendered insolvent thereby.  But it was held to have been sufficient for the
payee to have known (as he did) that the payee company was at real risk of
insolvency as the result of the payment.  Giles JA said, at para 162:

        "It is sufficient for present purposes that, in accord with the reason for    D
    regard to the interests of creditors, the company need not be insolvent at
    the time and the directors must consider their interests if there is a real
    and not remote risk that they will be prejudiced by the dealing in
    question."

    184   The *Kalls* case adds little by way of principled analysis to *Grove v
Flavel*.  The reasoning appears to be that risk of insolvency means risk       E
to creditors with a consequential duty to protect creditors from that risk.
I will address that reasoning (which forms the claimant's main principled
submission) in due course.

    185   The *Westpac* case is the last in the Australian trilogy.  The relevant
companies were, again, actually insolvent at the time of the alleged
breaches of duty by the directors, so that the question whether the creditor
duty might be triggered short of insolvency did not arise.  But both the      F
judge (Owen J) [2008] WASC 239 and the Court of Appeal of Western
Australia [2012] WASCA 157 considered the question on an obiter basis.
Without committing himself to any precise description of when, prior to
actual insolvency, the duty would be triggered, Owen J offered this
principle, at para 4445:

        "The basic principle is that a decision that has adverse consequences    G
    for creditors might also be adverse to the interests of the company.
    Adversity might strike short of actual insolvency and might propel the
    company towards an insolvency administration.  And that is where the
    interests of creditors come to the fore."

I would agree with Owen J's focus on insolvency administration, rather than
just insolvency, as the moment when creditors' interests come to the fore.    H
But that statement of principle does nothing to advance the claimant's case
that the creditor duty is engaged by a real risk of insolvency.

    186   Nor do the dicta on the point given by Drummond AJA in the Court
of Appeal.  He acknowledged that the creditor duty was still in a process of

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   development, and was reluctant to commit to any more precise identification
of the trigger than that the company should be "insolvent or near insolvent".
His only reference to "real risk" was in para 2046 (already cited above).
This was not about real risk of insolvency but rather a real risk that a
proposed transaction would prejudice creditors.   I agree with David
Richards LJ at para 191 that the *Westpac* case provides no assistance to the
claimant.

B   187   The two English cases relied upon by the claimant in relation to this
question are the *Vivendi* [2013] BCC 771 and *HLC* [2014] BCC 337 cases
already cited.  In *Vivendi* the subject company was already insolvent: see per
Newey J at para 152.  At para 150 he cited both the passages from the *Kalls*
and *Westpac* cases which I have set out above, but under the comment that
they were to similar effect as Mr Kosmin's dictum in the *Colin Gwyer* case
C   about the creditor duty being engaged when a company is "insolvent or of
doubtful solvency or on the verge of insolvency".  In my view Newey J was
plainly not thinking in any precise terms about exactly when, prior to actual
insolvency, the creditor duty might be triggered, still less saying that a real
risk of insolvency would be sufficient.  All he was saying was that there
appeared to be developing a consensus in both England and Australia (as
there indeed was) that the duty could be engaged at some unspecified time
D   prior to actual insolvency.  That was more than sufficient for his purposes.

188   The *HLC* case takes the matter no further, for the reasons given by
David Richards LJ at para 175.  In short Mr Randall QC treated all the
various pre-insolvency triggers as in principle the same.  He had no need to
do otherwise, because the subject company was, again, actually insolvent at
the time of the impugned transactions, both on a balance sheet and cash flow
E   basis.  The facts of the present case demonstrate however that there can be a
very large difference between a real risk of insolvency on the one hand and
probable or imminent insolvency on the other as triggers for the engagement
of the creditor duty, and that they may occur in relation to the same
company at widely differing times.  In particular a company may face a real
risk of insolvency at a time when it is not in a parlous or distressed financial
position at all.  I agree with David Richards LJ that the two cannot simply be
F   assimilated.

189   Mr Thompson's main submission of principle for the adoption of
the real risk trigger for the engagement of the creditor duty was that it
tracked, better than any other trigger, the development of a real risk of
prejudice to creditors arising from the changing fortunes of the subject
company.  As already noted, this is echoed in the dictum of Giles JA in the
G   *Kalls* case, quoted above.  I acknowledge that it has an attractive logical
simplicity.  Furthermore the fact that, as I have already concluded, the
creditor duty is to consider the interests of creditors rather than to treat those
interests as paramount from the outset, means that the primary duty to
promote the success of the company for the benefit of its members is not (or
not necessarily) displaced at a stage when, prior to actual insolvency, they
still have skin in the game.
H   190   Mr Thompson buttressed his main submission with the argument
that if the interests of creditors became paramount once the company was
actually insolvent, then little room was left for a (logically prior in time) duty
merely to consider and balance their interests, unless the creditor duty in that
less stringent form was triggered at some much earlier time.  This would have

© 2022 The Incorporated Council of Law Reporting for England and Wales

A

been a powerful argument if I had not disagreed with its premise. For reasons already explained I do not consider that the interests of creditors necessarily become paramount at the point of actual insolvency. Nonetheless the absence of that buttress does not mean that the main submission loses any of its inherent logical force.

B

191   I would however reject real risk of insolvency as the appropriate trigger for the engagement of the creditor duty. My main reason for doing so is that it rests upon an unsound principle. It assumes that creditors of a limited company are always among its stakeholders, so that once the security of their stake in the company (i e their expectation of being repaid in full) is seen to be at real risk, there arises a duty of the directors to protect them. That may be said to be the assumption which underlies what I have labelled the *Permakraft* justification for the existence of the duty, and indeed those cases which have appeared to favour the real risk trigger.

C

192   The true principle by contrast is that creditors (or at least unsecured creditors) are not the main stakeholders in the company at any earlier date than when it goes into insolvent liquidation, at which point they acquire statutory priority in an entitlement to share pari passu in any distributions which that process may generate. It is that prospective entitlement which entitles them to have their interests considered, although not necessarily given paramountcy, when the onset of insolvency makes that prospect both much more likely and one which may be beyond the ability of the company to control, in the sense that insolvency immediately exposes a company to being wound up at the behest of any unpaid creditor.

D

193   Put in the language of real risk, it is insolvency itself which creates the very real risk that the prospective entitlement of creditors to share in distributions in a liquidation will come to pass. But a real risk of insolvency is at one very large remove. It is simply too remote from the event which turns a creditor's prospective entitlement into an actual one. When real risk is distinguished from probability (as it must be for present purposes) insolvency itself is by definition unlikely, and insolvent liquidation may only be a remote possibility.

E

194   I consider that a trigger of that degree of remoteness is insufficient in principle to displace the ordinary general duty of directors to promote the success of their company for the benefit of its shareholders. The present Covid-19 pandemic provides a practical template upon which the excessive remoteness of this trigger may be demonstrated. In March 2020 it must have appeared to the directors of innumerable companies in the travel and hospitality businesses that they faced a real risk of insolvency. During the two years which followed, some have no doubt become permanently insolvent (with no light at the end of the tunnel). Others have become temporarily insolvent, but kept open a realistic prospect of recovery by sensible negotiations with creditors, and may either have returned to solvency, or be confidently on the way to doing so as restrictions are lifted. Others have even avoided insolvency altogether, whether by seeking state loans, furlough payments for their employees, cutting their overheads or trying alternative types of business, such as take-away meals. Only for the companies in the first (permanently insolvent) group will their creditors have become entitled (actually or inevitably) to share in the proceeds of their winding-up or administration.

F

G

H

© 2022 The Incorporated Council of Law Reporting for England and Wales

767

A    195   Lest the pandemic be regarded as too much of a one-off event to be
a reliable guide, I repeat that risk taking is a fundamentally important reason
for the recognition of limited liability.  There will always be companies
formed for the purpose of undertaking a higher risk business than their
owners would be prepared to contemplate if failure would leave them
personally liable.  Such businesses may face a real risk of insolvency for most
of their trading existence, without ever becoming insolvent, still less going
B    into insolvent liquidation.
     196   A recollection that the trigger for the engagement of the creditor
duty must sensibly coincide with the moment when the ratification principle
ceases to apply also points away from a real risk trigger.  No case about the
limits of the ratification principle has gone that far, and I would regard the
disapplication of it whenever there was a real risk of insolvency as too great
C    an inroad into a principle that is nearly as old as company law itself.
     197   Mr Thompson sought to pray in aid, by way of analogy, the trigger
for the availability of an administration order, as interpreted by Hoffmann J
in *In re Harris Simons Construction Ltd* [1989] 1 WLR 368.  Section 8(1) of
the Insolvency Act 1986 gave the court power to make an administration
order if (a) it is satisfied that the company is or is likely to become unable to
pay its debts and (b) it considers that such an order "would be likely to
D    achieve" one of the purposes of administration stated in section 8(3).
Hoffmann J held that "likely" in (b) was satisfied if there was a real prospect
short of a probability.  Mr Thompson submitted that, by the same token, a
company was exposed to administration (which might well lead to a
distribution to creditors) if there was a real prospect of insolvency.  In that
case the company was already unable to pay its debts (i e commercially
E    insolvent) when the order was made, and the real issue was whether one of
the stated purposes of administration was likely to be achievable.
     198   I do not consider that this analogy helps the claimant, or points in
any way to a real risk trigger for the engagement of the creditor duty.
Hoffmann J was careful to distinguish between likelihood of insolvency and
likelihood that a purpose of administration could be achieved.  As he said, the
concept of likelihood took its precise meaning from its context.  Furthermore
F    only one of the purposes of administration involves the distribution of the
proceeds of the company's assets to creditors as in a liquidation (called a
distributing administration).  While I would not wish in any way to cast
doubt on the judgment it was not the product of adversarial argument.
     199   For the above reasons I would conclude that a real risk of
insolvency is not a sufficient trigger for the engagement of the creditor duty,
G    so that this appeal should be dismissed.  It is not necessary for this court
therefore to decide whether any other trigger earlier than insolvency itself
would be sufficient, any more than it was for the Court of Appeal.  The
candidates proposed in argument are probable insolvency and imminent
insolvency.  Both find support from dicta in the authorities.  In my view any
trigger earlier than actual insolvency needs clear justification.
     200   In the Court of Appeal David Richards LJ considered that there was
H    sufficient justification for a pre-insolvency trigger, which he identified as when
the directors know or should know that insolvency was probable (i e more
likely than not), for the following reasons.  First, directors might typically only
become aware of actual insolvency some time after it had occurred.  Secondly,
there was a preponderance of dicta that some pre-insolvency trigger was

© 2022 The Incorporated Council of Law Reporting for England and Wales

merited.  Thirdly, the alternative of "imminent" insolvency implied a very
short period in terms of time, whereas a probability of insolvency might affect
a company for a considerable time, during which creditors might well be
prejudiced by decisions taken without consideration of their interests.

201   I can see the force about the first and second of those reasons,
although directors who keep themselves properly informed about their
company's affairs ought to be aware of commercial insolvency (an inability
to pay debts when they fall due) broadly when it occurs, even if balance sheet
insolvency may be more insidious.  The proper treatment of the company's
creditors is always likely to be a matter of concern (whether or not of duty)
to directors, if only because the long-term success of a company is unlikely to
be secured if it develops a poor record of late payment.

202   I am more cautious about David Richards LJ's third reason.
Prejudice to creditors is not, in and of itself, a reason for the recognition of a
creditor duty, for the reasons already explained.  And the bare probability of
insolvency, which may only be temporary, does not of itself make a
liquidation probable.  It is liquidation rather than insolvency which converts
creditors into the main stakeholders in the company.

203   I would prefer a formulation in which either imminent insolvency
(i e an insolvency which directors know or ought to know is just round the
corner and going to happen) or the probability of an insolvent liquidation (or
administration) about which the directors know or ought to know, are
sufficient triggers for the engagement of the creditor duty.  It will not be in
every or even most cases when directors know or ought to know of a
probability of an insolvent liquidation, earlier than when the company is
already insolvent.  But that additional probability-based trigger may be
needed in cases where the probabilities about what lies at the end of the tunnel
are there for directors to see even before the tunnel of insolvency is entered.

204   I have read in draft the judgments of Lord Hodge DPSC and Lady
Arden.  I agree with Lord Hodge DPSC's reasoning.  On the points about
which he and Lady Arden disagree I respectfully prefer his view.  I hope that
the reasons for my disagreement with Lady Arden's analysis on those points
are sufficiently apparent from what I have already stated.  I mean no
disrespect by not engaging with them in more detail.

205   I have also read in draft the comprehensive judgment of Lord
Reed PSC upon these matters.  He reaches substantially the same conclusions
about the existence of the duty, its content and the time when it is triggered
as do Lord Hodge DPSC and I.  There is also a very large overlap in our
reasoning.  I hope it is clear that, although I have used 'creditor duty' as a
convenient label, it is as Lord Reed PSC explains in truth an aspect (where it
arises) of the director's fiduciary duty to the company, rather than a free-
standing duty of its own.  Beyond that I do not consider that such differences
in our respective reasoning as remain are sufficient to detract from the
substantive concurrence of our conclusions upon the issues which arise, or
therefore call for further detailed analysis on my part.

206   For those reasons I would dismiss this appeal.

## LORD HODGE DPSC

207   I agree, for the reasons given by Lord Briggs JSC and subject to my
comments below, that this appeal should be dismissed.  I am satisfied that
the directors of a company which is insolvent or is bordering on insolvency

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   owe a duty to the company to have proper regard to the interests of its
    creditors and prospective creditors.  In *Bilta (UK) Ltd v Nazir (No 2)* [2016]
    AC 1, para 123 Lord Toulson JSC and I stated:

>        "It is well established that the fiduciary duties of a director of a
>     company which is insolvent or bordering on insolvency differ from the
>     duties of a [director of a] company which is able to meet its liabilities,
B    because in the case of the former the director's duty towards the company
>     requires him to have proper regard for the interest of its creditors and
>     prospective creditors."

    When a company is insolvent or bordering on insolvency its creditors are
    recognised as having a form of stakeholding in the company, and its
    directors from that point must have a proper regard to the interests of the
C   company's creditors as a body: ibid para 167.  I repeated that view in an
    obiter passage in *MacDonald v Carnbroe Estates Ltd* [2020] 1 BCLC 419,
    para 33, in a judgment with which the other members of the court agreed.
    Having considered the written and oral submissions of counsel and having
    debated the matter with my colleagues on this court, I am satisfied that that
    remains good law.  While the law in this area has remained in a relatively
    undeveloped and ill-defined state, I was not aware, until this appeal, of any
D   serious challenge by company law practitioners to the existence of this
    fiduciary duty, which has been upheld by experienced commercial judges in
    a number of first instance decisions.
        208   In view of the importance in company law of the existence of a
    fiduciary duty of directors to their company in relation to the interests of its
    creditors, I add a few comments of my own, on two questions.  The first is
E   whether section 172(3) of the Companies Act 2006 ("the 2006 Act") gave at
    least tentative recognition to the existence such a duty in the common law.
    Because it is within the power of this court to alter the common law.  The
    second question is whether there are sound reasons for maintaining such a
    duty as part of the common law in relation to companies.  The latter
    question requires consideration of how far the courts should develop the
    common law duty in a field in which Parliament has already enacted a
F   remedy in section 15 of the Insolvency Act 1985 which was shortly
    afterwards superseded by section 214 of the Insolvency Act 1986 ("the 1986
    Act").
        209   In my view, in agreement with Lord Briggs JSC, the words of
    section 172(3) of the 2006 Act point towards the purpose of preserving the
    common law as it had been developed before the 2006 Act, particularly in
G   *West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250.  That interpretation
    of the subsection is supported by a consideration of its historical origins,
    which I now address.
        210   The Law Commissions produced a joint report, *Company
    Directors: Regulating Conflicts of Interest and Formulating a Statement of
    Duties* (Law Com No 261; Scot Law Com No 173) in September 1999.
    I had the privilege of working with Lady Arden and then with Lord
H   Carnwath on that report.  It recommended a statutory statement of the main
    fiduciary duties of directors and their duty of care and skill.  The statement
    was to be non-exhaustive; it was to be a partial codification because it was
    recognised that directors were subject to other duties which were not
    included in the proposed codification.

© 2022 The Incorporated Council of Law Reporting for England and Wales

211   The question whether there should be a statutory statement of a     A
duty of directors to consider foremost the interests of creditors when a
company is insolvent or threatened with insolvency was taken up by the
Company Law Review Steering Group ("CLRSG"), of which Lady Arden
was a member.  The CLRSG's initial view, recorded in *Modern Company
Law for a Competitive Economy; Developing the Framework*, published in
March 2000, was not to include an obligation to have regard separately to the     B
interests of creditors in such circumstances but to rely on insolvency
legislation.  The CLRSG consulted on that basis: *Developing the Framework*,
paras 3.72–3.73.

212   The CLRSG recorded its views in response to the consultation to
date in "Modern Company Law for a Competitive Economy: Completing
the Structure" which was the third wide-ranging consultation document
which the CLRSG published in November 2000.  It recorded an intention     C
that there should be a statement of the duties of directors at a high level of
generality and stated (para 3.12):

> "It is generally agreed that the duties must be subject to the overriding
> duties of directors towards creditors in an insolvency situation, but also
> that it is undesirable to lay down any detailed new rule in this area; the
> law is developing and there is already a carefully balanced statutory     D
> provision, which operates ex post in a liquidation, in the Insolvency Act
> 1986 section 214 (wrongful trading).  We propose that this issue should
> be dealt with in a general provision in the statement making it clear that
> the duties operate subject to the other provisions of the Act and to the
> supervening obligations to have regard to the interests of creditors when
> the company is insolvent or threatened by insolvency.  We propose that     E
> the details should be explored with the draftsman."

213   In the CLRSG's final report dated 26 July 2001 (*Modern Company
Law: Final Report*) it is stated that, in providing a high-level statement of
directors' duties, it was important to draw to the attention of directors that
different factors may need to be taken into consideration where a company is
insolvent or threatened with insolvency (para 3.12).  The report recorded     F
that arguments had been advanced on consultation in favour of a statement
of a duty towards creditors and there had been criticism that insufficient
attention had been given to the responsibility of management not to abuse
limited liability.  The report proposed that the statutory statement should
contain principles requiring directors to "have regard to the interests of
creditors in relation to threatened insolvency" (para 3.13).

214   In para 3.14 the CLRSG recognised that there was a key question:     G
when should the normal rule that a company is to be run in the interests of its
shareholders be modified by an obligation to have regard to the interests of
creditors or, in an extreme case, by an obligation to override the interests of
members entirely?  In para 3.15 the CLRSG stated that insolvency may
occur unexpectedly and that limited liability exposed creditors to the risk of
loss.  The report then set out an argument in favour of the protection of     H
creditors:

> "as insolvency becomes more imminent, the normal synergy between
> the interests of members, who seek the preservation and enhancement of
> the assets, and of creditors, whose interests are protected by that process,

© 2022 The Incorporated Council of Law Reporting for England and Wales

A     progressively disappears.  As the margin of assets reduces, so the incentive
on directors to avoid risky strategies which endanger the assets of
members also reduces; the worse the situation gets, the less members have
to lose and the more one-sided the case becomes for supporting risky,
perhaps desperate, strategies."

The law provided two solutions, namely (i) section 214 of the 1986 Act
B     which the CLRSG suggested should be included in the statement of duties
(para 3.16), and (ii) the arguable obligation on directors to take a balanced
view of the risks to creditors at an earlier stage in the onset of insolvency,
which was recognised in Australian case law and by the Court of Appeal in
*West Mercia Safetywear Ltd v Dodd*.

215     Commenting on the latter rule the Final Report stated (para 3.18):
C     "Such a rule may be regarded as of considerable merit, at least in principle.
It reflects what good directors should do.  Without it, directors would
apparently, at least, be bound to act in the ultimate interests of members
until all reasonable prospect of avoiding shipwreck had been lost.  Yet even
where insolvency is less than inevitable but the risk is substantial, directors
should, at least in theory, consider the interests of members and creditors
together."

D     216     As some members of the CLRSG were in favour of such a rule, the
report provided in Annex C a draft clause 8 which if enacted would have
imposed on a director who knew or ought to have known that "it is more
likely than not that the company will at some point be unable to pay its debts
as they fall due" a duty to:

"take such steps (excluding anything which would breach his duty
E     under para 1 or 5) as he believes will achieve a reasonable balance
between— (i) Reducing the risk that the company will be unable to pay its
debts as they fall due; and (ii) Promoting the success of the company for
the benefit of its members as a whole."

(Para 1 concerned the duty of a director to exercise his powers for a proper
purpose and para 5 concerned his duty to avoid conflicts of interest.)
F     217     In para 3.19 the report recorded the counter arguments, which
were that a requirement to reach a balanced judgment between members
and creditors would have a chilling effect as it would create the risk that
cautious directors, wishing to avoid personal liability, might run down or
abandon a viable going concern when the company was threatened with
insolvency.  The balanced judgment demanded was said to be "a difficult and
G     indeterminate one".  Directors of small companies might have to take
expensive professional advice, which might err on the side of caution; and
liquidation destroyed value where there were means of saving the business.
The report in para 3.20 recognised the validity of those concerns.

218     The members of the CLRSG, who were working under strict time
constraints, were not able to reach agreement on the inclusion in the
statutory statement of an obligation to consider the interests of creditors.
H     There was agreement that if there were to be such a statement, the law should
be clarified by providing that the duty only arose when the directors ought
in the exercise of due care and skill to recognise that a failure to meet
the company's liabilities was more probable than not.  Some members
considered the common law to be soundly based and that, with that

A

clarification, the duty should be included in the statement.  Others considered that the proposed statement gave inadequate guidance to directors, that the path to insolvency could be difficult to discern as insolvency could occur abruptly, and that the incorporation into the statement of duties of the rule in section 214 of the 1986 Act was sufficient in practice.  The report concluded its discussion of the possible inclusion of a statement of principle that directors owed a duty in relation to a company's creditors in the context of insolvency with a statement that the CLRSG had not reached an agreed position:

B

> "The advantages and disadvantages of such a principle are very much a matter of commercial judgment, on which we have not been able to reach an agreed view nor, in the time available, to consult on the basis of a clear draft.  We recommend that the [Department of Trade and Industry] should do so." (Para 3.20.)

C

The precise content of the directors' statement of duties was in this respect left open, as Arden LJ (as she then was) herself stated: "Reforming the Companies Act—The Way Ahead" [2002] JBL 579, 592.

**219**  The UK Government consulted on its proposals in a paper *Modernising Company Law* (Cm 5553), which it published in July 2002.  Later, in its White Paper, *Company Law Reform* (Cm 6456), which it published in March 2005, the Government included a precursor of section 172 of the 2006 Act, which included in section B3(1) a duty on a director to act in a way in which he or she considered, in good faith, would be most likely to promote the success of the company for the benefit of the members as a whole.  Subsection (4) of this draft section was in these terms, foreshadowing precisely what was later enacted as section 172(3) of the 2006 Act:

D

E

> "The duty imposed by this section has effect subject to any enactment or rule of law requiring directors, in certain circumstances, to consider or act in the interests of creditors of the company."

**220**  The Government provided explanatory notes to accompany the clauses published in its White Paper.  The relevant entry (para B19) stated that clause B3(4) (above) recognised that the normal rule that a company is to be run for the benefit of its members as a whole may need to be modified where the company is insolvent or threatened with insolvency.  It continued:

F

> "In doing so, it preserves the current legal position that, when the company is insolvent or is nearing insolvency, the interests of the members should be supplemented, or even replaced, by those of the creditors."

G

**221**  In Parliament the explanatory notes on the relevant section of the Company Law Reform Bill, which were prepared in March 2006, said this about what became section 172(3) of the 2006 Act:

H

> "313. *Subsection (3) recognises that the duty to promote the success of the company is displaced when the company is insolvent.* Section 214 of the Insolvency Act 1986 provides a mechanism under which the liquidator can require the directors to contribute towards the funds available to creditors in an insolvent winding up, where they ought to

© 2022 The Incorporated Council of Law Reporting for England and Wales

A have recognised that the company had no reasonable prospect of avoiding insolvent liquidation and then failed to take all reasonable steps to minimise the loss to creditors.

"314. It has been suggested that the duty to promote the success of the company may also be modified by an obligation to have regard to the interests of creditors as the company nears insolvency. *Subsection (3) will leave the law to develop in this area.*" (All emphasis added.)

B The relevant paragraphs of the explanatory notes published by Parliament for the 2006 Act after it had received Royal Assent are in identical terms, as Lady Arden has demonstrated in para 443 of her judgment.

222 To my mind the relevant background shows that the Government in introducing the Bill considered that it was preserving the then current legal position and, more significantly, that Parliament itself explained both C that section 172(3) was a recognition that the section 172(1) duty is displaced on insolvency (para 313) and that the subsection allowed the common law to be developed by modifying the section 172(1) duty when a company nears insolvency (para 314).

223 It is unfortunate that time did not permit the CLRSG to consult further and to resolve the differences among its members on the question of a D duty in relation to a company's creditors, particularly in the period as a company nears insolvency. In view of the undeveloped nature of the law set out in the *West Mercia* case and the disagreements among the members of the CLRSG as to the desirability as a matter of policy of such an obligation before the onset of irretrievable insolvency, the decision by Parliament to leave to the courts the development and refinement of such an obligation is E readily understandable. But I cannot detect in the explanatory statements issued by Parliament any licence to the courts to assert the supremacy of the section 172(1) duty in relation to an insolvent company or any green light to deny the existence of an obligation at common law to have regard to the interests of creditors.

224 In my view, this background supports the interpretation of F section 172(3) which Lord Briggs JSC has adopted having regard to the natural meaning of the words which Parliament used (para 153 of his judgment). I therefore agree with Lord Briggs JSC that Parliament endorsed the existence of an obligation to have regard to the interests of creditors in the context of the onset of insolvency of a company but left it to the courts to refine the law in this area.

225 Nor am I dissuaded from this view by the argument that G section 172(3) refers only to the duty on a director in section 172(1) to act in a way which he considers in good faith would be most likely to promote the success of the company for the benefit of its members as a whole and does not expressly qualify the other statements of directors' duties in the 2006 Act. In particular, it does not appear to me that the duty in section 171 that "a director of a company must . . . (b) only exercise powers for the purposes H for which they are conferred" in any sense enshrines a principle of shareholder primacy so as to neutralise the effect of section 172(3). This is because section 170(4) provides:

"The general duties shall be interpreted and applied in the same way as common law rules or equitable principles, and regard shall be had to the

774
BTI 2014 LLC v Sequana SA (SC(E))                                    [2022] 3 WLR
Lord Hodge DPSC

corresponding common law rules and equitable principles in interpreting   A
and applying the general duties."

This injunction to adopt common law techniques in interpreting and
applying the duties suggests to me that section 171(b) should be read
alongside and consistently with section 172 as a whole because it is the role of
the courts to reconcile and make coherent the rules of the common law and
equitable principles. Section 172(1) is the statutory statement of the duty of a   B
director to promote the success of the company for the benefit of its members
as a whole. It replaces the common law as section 170(3) provides that the
statutory general duties "have effect in place of" the common law rules and
principles on which they are based. In consequence it appears to me that the
qualification of section 172(1) in section 172(3), where it applies, prevents
any implication of the primacy of the interests of shareholders into the   C
statement of the other general rules in the circumstances in which
section 172(3) qualifies or disapplies section 172(1).

226   Expanding on this point, the duty of directors to exercise the
powers conferred on them for the purposes for which they were conferred
reflects the equitable doctrine that a trustee must use the powers conferred
by a trust for the legitimate purposes of the trust. The duty requires directors
to have regard to the real purpose and object of the powers conferred on   D
them. They must use a power for the purpose for which it was granted:
*Howard Smith Ltd v Ampol Petroleum Ltd* [1974] AC 821, 834, per Lord
Wilberforce, delivering the judgment of the Board; and *Eclairs Group Ltd v
JKX Oil & Gas plc* [2015] Bus LR 1395, paras 14–16, per Lord
Sumption JSC. The duty is concerned with preventing the abuse of a power,
as for example where directors misuse a power to influence the outcome of   E
a general meeting of shareholders, thereby offending the constitutional
distribution of powers between the different organs of a company. Another
example of an abuse of a power is the well-known case of *Hogg v
Cramphorn Ltd* [1967] Ch 254, in which Buckley J held that directors could
not exercise their power to issue shares to defeat an unwelcome takeover,
even if they genuinely believed that the continuance of their management   F
was in the company's interest. In most circumstances, section 172(3) would
be irrelevant to the operation of this duty, and it is readily understandable
why the 2006 Act did not state that it qualified the duty. Section 172(1) is a
modern formulation of the well-established duty of directors to act bona fide
in what they consider is in the interests of the company: *In re Smith and
Fawcett Ltd* [1942] Ch 304, 306, per Lord Greene MR. In my view it is that   G
reformulation in section 172(1) that is now relevant to the proper purpose
duty in section 171(b) in place of the prior judge-made formulation and it is
that reformulation which is made subject to section 172(3).

227   In agreement with Lord Briggs JSC, I am persuaded that the terms
of section 172 of the 2006 Act, when interpreted against the relevant
admissible background, recognise the existence of a common law rule that at
or near the onset of insolvency and during the insolvency of a company a   H
director's duty under section 172(1) becomes subject to an obligation to
consider and in certain circumstances act in the interests of its creditors.
Further, as he states (para 152) there is now a considerable line of authority,
including dicta in this court by Justices who were well aware of the reforms

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   of corporate insolvency law in 1985, endorsing such a duty. I also agree with his formulation of the trigger for the engagement of the duty which he sets out in para 203 of his judgment.

228   Turning to the second question, there are sound reasons for maintaining the legal duty of directors in relation to the interests of its creditors which section 172(3) recognises.

B   229   It is not in dispute that when performing his or her duty under section 172(1) a director is instructed to have regard to the interests of creditors to the extent that the director is directed to have regard to the interests of employees and to the need to foster the company's business relationships with suppliers, customers and others. It is also not in dispute that the matters which are set out in section 172(1) to which a director is to have regard are not exclusive as the subsection speaks of the director having regard to those matters "amongst other matters". In many circumstances the interests of a company's shareholders and the interests of its creditors will be aligned as both will have an interest in the preservation and enhancement of the company's assets. But it appears that there was a decision by the CLRSG not to propose the inclusion of the interests of creditors in the listed matters in section 172(1). This is because, as the CLSRG's last consultation document stated, "these interests are covered by contract while the company is solvent; but if insolvency threatens they *override* any consideration of the success of the company for members": "Modern Company Law for a Competitive Economy: Completing the Structure" (November 2000), para 3.12, fn 37.

230   Were there no such override on insolvency, our company law in relation to directors' duties would lack both clarity and coherence. Directors would remain under an apparently unqualified duty in section 172(1) to promote the success of the company for the benefit of its shareholders even when the company was insolvent. They would appear not to be entitled to consider or act in the interests of the company's creditors as a body in so far as those interests were in conflict with the interests of the company for the benefit of the shareholders. They would be exposed to a serious conflict between their duty under section 172(1) and their personal interest. This is because their duty under section 172(1) would be in conflict with their interest to avoid personal liability under section 214 of the 1986 Act. To my mind section 214 of the 1986 Act does not impose a duty, fiduciary or otherwise, on a director but enables him or her to avoid the liability which it imposes if he or she acts in the way the section specifies.

231   Further, it appears to me that in order to make sense of the power of the court to impose personal liability for wrongful trading in section 214 it is implicit that there is a point in time at or near the onset of insolvency at which directors are required to consider and in certain circumstances give priority to the interests of the company's creditors when they are in conflict with the interests of the company's shareholders. It is consistent with section 214 that where directors know or ought to know that the company has become irretrievably insolvent, they come under a duty to the company to give priority to the interests of its creditors as a body.

232   If this court were to overrule the *West Mercia* judgment it would be going against the recognition by Parliament of the existence of the common law duty to creditors and its expectation that the courts will develop the law

© 2022 The Incorporated Council of Law Reporting for England and Wales

A

in this area.  It would also be creating incoherence between our company law and our law of corporate insolvency and would place directors in a position in which their duties and their personal interest were in conflict.  Those are consequences which I cannot support.

B

233    A further, and to my mind very significant, reason in support of the existence of the common law duty is that it assists the professional advisers of company directors to encourage the directors to act responsibly when their company is bordering on insolvency.

234    But that does not mean that the courts should ignore the concerns expressed by some members of the CLRSG as to the uncertainty which this duty may create for directors in their decision-making.  The common law in this area must be developed with care and in a manner consistent with the predominant statutory regime for corporate insolvency.

C

235    In my view judges must have regard to the fact English common law first recognised the existence of a duty owed by directors of a company in relation to its creditors in the context of the company's insolvency at a time when Parliament had already occupied part of the field by the enactment of section 15 of the Insolvency Act 1985 which is now section 214 of the 1986 Act.  In particular, Parliament chose to give the court a discretionary power to order a director to make such a contribution to the company's assets as the court thinks fit.  It gave this power only in the context of a formal insolvency (a winding up or administration).  Parliament also imposed that liability only where at some time before the commencement of the formal insolvency the director "knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation" (section 214(2)(b)) and did not at that time take "every step with a view to minimising the potential loss to the company's creditors" (section 214(3)).  Parliament thus laid down clear boundaries to the potential liability which it created.  In a field occupied in part by Parliament it would be contrary to principle for the courts to develop the common law in a manner which went against the grain of the parliamentary provision.  As Lord Neuberger of Abbotsbury PSC recognised in *In re Lehman Bros International (Europe) (No 4)* [2018] AC 465, paras 12–13, judge-made rules and principles must be accommodated to the statutory insolvency scheme.  He stated (para 13):

D

E

F

"particularly in the light of the full and detailed nature of the current insolvency legislation and the need for certainty, any judge should think long and hard before extending or adapting an existing [common law] rule, and, even more, before formulating a new rule."

G

In a different context, in *Johnson v Unisys Ltd* [2003] 1 AC 518, para 37, Lord Hoffmann stated the principle in more general terms: judicial development of the law "must be consistent with legislative policy as expressed in statutes.  The courts may proceed in harmony with Parliament but there should be no discord".

H

236    A question therefore arises as to the extent to which the imposition on a director of liability for a breach of a common law duty in relation to the company's creditors in respect of acts and omissions before the onset of a formal insolvency process would be consistent with Parliament's demarcation of liability in section 214 of the 1986 Act.

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    237   In section 172(3) Parliament has in effect authorised the courts to
develop the common law duty of directors in relation to the interests of the
company's creditors as a company nears insolvency.  But that development
must take place against the backdrop of the pre-existing section 214 of the
1986 Act and the courts must have regard to the boundaries which
Parliament placed on the power which it conferred on the courts under that
B    section.  Section 214 is not concerned with the fiduciary duties of a director
to the company.  It creates a remedy where a director has failed to act in the
interests of the company's creditors in circumstances in which he or she
objectively should have so acted.  Nonetheless, questions will arise as to how
far section 214, in which Parliament has identified the circumstances in
which liability is to be imposed on directors in the context of insolvency,
constrains judicial development of the common law to impose liability and
C    give the company or its liquidator the remedies of an accounting or to order
the making of equitable compensation for a breach of a fiduciary duty to the
company in relation to the interests of its creditors in circumstances outside
those identified in section 214 of the 1986 Act.

238   It may be only in rare circumstances that such questions will arise.
In many cases when a company is bordering on insolvency, an obligation to
D    consider the interests of a company's creditors and balance them against the
interests of the shareholders will involve directors in making a commercial
judgment about the benefits and risks of a transaction or course of action
which may not readily be impugned.  A reasonable decision by directors to
attempt to rescue a company's business in the interests of both its members
and its creditors would not in my view involve a breach of the common law
duty.  But there may be more egregious circumstances in which the absence of
E    a remedy beyond section 214 would appear to be a lacuna in our law.  By way
of example, suppose (i) a company has been unsuccessful and the capital of
the shareholders has been lost through balance sheet insolvency; (ii) the
company's directors know or ought to be aware in the exercise of their duty
of skill and care that a formal insolvency process is more likely than not;
(iii) there is a prospect of avoiding the formal insolvency if the company were
F    to undertake a particularly risky transaction; but (iv) the company's assets
that remain and which would be put at risk by the transaction would be lost
to its creditors if the gamble were to fail.  The shareholders, whether present
or future, would probably have nothing to lose from the adoption of the
very risky transaction as a last roll of the die because the likely alternative
would be a formal insolvency from which they would receive nothing.
G    A requirement that the directors consider and, if the facts of the particular
case require it, give priority to the interests of the company's creditors in their
decision-making in such circumstances appears to be a necessary constraint
on the directors.  I am not persuaded that the directors' duty to exercise care
and skill set out in section 174 fills the gap in the law as, absent the *West
Mercia* duty, the directors would be required to exercise their skill and care to
achieve the purpose set out in section 172(1).  To my mind the law would be
H    open to justifiable criticism if it were to provide no remedy in respect of the
interests of such creditors where such a course of action was proposed or had
been adopted in the exclusive interest of the shareholders and to the probable
detriment of the company's creditors without a proper consideration of the
interests of the latter.

© 2022 The Incorporated Council of Law Reporting for England and Wales

239   It seems arguable at least that it would only be in such   A
extraordinary circumstances that the common law would provide a remedy
for breach of fiduciary duty to the company in respect of its creditors in
circumstances which occurred before the irretrievable insolvency which may
give rise to liability under section 214. But the precise circumstances in
which a remedy in an accounting or equitable compensation may exist have
not been the subject of any detailed discussion on this appeal and it is
appropriate therefore to leave the question of the scope of such liability to be   B
determined in future in a case in which the matter is relevant to the outcome
of the appeal.

*Lady Arden's judgment*

240   Lady Arden, who was involved in the work of the CLRSG, has
written a substantial judgement covering many aspects of company law. I do   C
not address her judgment in any detail but confine my comments to one
matter on which she expresses disagreement with my views.

241   I am not persuaded that section 172(1) imposes on directors a duty
to the company to have regard to the interests of the creditors as a body, and
it certainly does not impose such a duty which might be in conflict with the
duty to the company to promote the success of the company for the benefit   D
of its members at a whole.

242   As I understand Lady Arden's reasoning, she accepts that the
directors of a financially distressed company are bound to consider the
interests of the company's creditors in accordance with section 172(1) as one
of the matters relevant to their decision and to act in a way which is likely to
ensure the continued viability of the company. Where a company is in
financial difficulty both members and creditors may have a shared interest in   E
the directors' attempts to preserve some value in the company's undertaking
by attempting to trade out of its financial difficulties or by invoking a rescue
mechanism such as administration or a creditors' voluntary arrangement.
But I am not persuaded that the existing law without the directors' fiduciary
duty to the company to have proper regard to the interests of its creditors
covers the field adequately where there is a significant conflict between the
interests of the shareholders and the interests of the company's creditors   F
when it is insolvent or bordering on insolvency.

243   The CLRSG in their Final Report at para 3.15, which I have quoted
in para 214 above, recognised that there would be occasions where there
was little if any synergy between the interests of members and the interests of
creditors as insolvency becomes more imminent. Such a situation could
arise in the example which I have given in para 238 above. Lady Arden   G
argues that there is no need for the *West Mercia* duty in such a circumstance
as the mischief in my example would be addressed by the directors' duty of
skill and care spelt out in section 174 in addressing the long-term interests of
the company. I am not persuaded that this is an answer to the problem. The
directors in my example face the situation that the company has no long-
term viability unless they undertake the very risky short-term transaction or
speculation which, if successful, may benefit both present and future   H
shareholders and the company's creditors but which, if it fails, will be at the
sole cost of the creditors. If the duty under section 172(1), which focuses on
the benefit of the members, were unqualified, it would seem that in such
circumstances the directors could and should properly serve their interests at

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   the expense of the creditors.  That is the logic of "shareholder primacy" even
in the context of "Enlightened Shareholder Value".

244   If, on the other hand, one were to interpret the statutory duty of
skill and care as requiring the directors in this extreme circumstance to
balance the interests of the members and those of the creditors one would
(a) have the mischief of serving two masters which Lady Arden deprecates
B   and (b) have to construe section 172(1) as qualified in some way.  To my
mind, the duty of skill and care provides no answer and it is the *West Mercia*
duty which would oblige directors to give greater weight to the interests of
creditors in deciding on the appropriate course of action in such a
circumstance.

245   In my view the cases cited by Lady Arden do not support her
proposition that the duty under section 172(1) provides an answer to the
C   circumstance of the directors' last throw of the die in the interests of the
members of the company which I set out in para 238 above.  In *Colin Gwyer
& Associates Ltd v London Wharf (Limehouse) Ltd* [2003] 2 BCLC 153 the
directors' acceptance of a compromise to litigation was not in the interests of
the insolvent company and its stakeholders and was held to be a breach of
the directors' fiduciary duty.  Issue 5 in that case (discussed in paras 70–90
D   of the judgment) concerned the breach of fiduciary duty and Mr Leslie
Kosmin QC expressly relied on the *West Mercia* case as an integral part of
his reasoning in relation to the directors' failure to take account of the
interests of the creditors.  See in particular paras 74 and 80.

### Lord Reed PSC's judgment

E   246   Since I drafted this judgment I have had the pleasure of reading
Lord Reed PSC's lucid and comprehensive judgment which is closely aligned
to the conclusions which Lord Briggs JSC and I have reached.  I agree with
his suggestion that in explaining the rationale for the common law duty it is
preferable not to use the language of the earlier case law which may suggest
that there is a transfer of a proprietary interest in the assets of the company
F   to its creditors when the company is bordering on insolvency.  There is no
such transfer.  A company's creditors always have an economic interest in
its continued solvency so that it can pay its debts to them.  The relative
importance of that economic interest or stakeholding as against the
economic interest or stakeholding of the company's shareholders increases
when a company is bordering on insolvency.  It is this shift in relative
economic interest or, in Lord Briggs JSC' non-technical words, "skin in the
G   game", that gives rise to the fiduciary duty to the company to give separate
and proper consideration to the interests of a company's creditors.

### Conclusion

247   I would dismiss the appeal and would summarise the position as
follows: (i) The fact that a company faces a real risk of insolvency is not
H   sufficient to give rise to the *West Mercia* duty.  (ii) The *West Mercia* duty can
apply to a decision to pay a lawful dividend.  (iii) The *West Mercia* duty is a
recognition of the economic interests or stakeholding in the company of its
creditors when the company is bordering on insolvency or is insolvent.
(iv) Where a company is insolvent or bordering on insolvency the *West*

© 2022 The Incorporated Council of Law Reporting for England and Wales

*Mercia* duty involves a fiduciary duty of the directors to the company to take   A
into account and give appropriate weight to the interests of the company's
creditors as a body.  Where the company is irretrievably insolvent, the
interests of those creditors become a paramount consideration in the
directors' decision-making.

**LADY ARDEN**                                                                      B

*Overview*

  **248**   This is as momentous a decision for company law as this court's
recent decision in *Patel v Mirza* [2017] AC 467 was for the law of illegality
and whether claims are barred by illegality.  These judgments raise
fundamental questions.  Some major jurisdictions, such as Delaware and
many other states in the US, and Canada have taken the view that directors    C
owe no duty to creditors when a company becomes insolvent.  However,
Australia and New Zealand have adopted a different approach.  But the law
is far from fully developed.  This court is faced with the choice whether to
continue a line of existing jurisprudence or to conclude that it is contrary to
principle to have a special requirement in relation to creditors, who have a
very different relationship with the company from that of shareholders.  In    D
my judgment, the court should clearly approve a restriction on directors'
obligations to promote their company's success to provide a measure of
protection to creditors.  The restriction will not only determine the propriety
of directors' actions and reflect the high standards expected of them.  It will
also give important guidance for when directors of a company are facing
insolvency.  The matter should not be left to Draconian remedies against       E
directors in a liquidation.  So, in my judgment, the issue is not so much
whether there should be a restriction on directors but what it involves and
how far it goes.  In this connection, the law should in my judgment be
developed with caution and an awareness of the difficulties which experts in
the field have expressed, much as the great Lord Mansfield in deciding
commercial cases encouraged liaison between law and commerce.  Even in
judge-made law, there are questions of policy.  The court should in my         F
judgment bear in mind at least two matters.  First, the restriction plays a part
in the scheme of insolvency law.  Modern insolvency legislation encourages
the rescue of companies in financial difficulty rather than liquidating them.
To achieve a rescue, directors need to be able to take the necessary steps, for
instance to raise fresh funding even though the position of creditors is
precarious.  Second, in developing judge-made law, the courts should be       G
informed by the expert views in authoritative reports, such as the Final
Report in 2001 of the Company Law Review Steering Group ("CLRSG"), an
independent review body which was set up by the Department of Trade and
Industry in 1998 to make recommendations for the reform of company law,
and of which I was a member.

  **249**   This judgment consists of two sections. Section 1 is headed "The rule   H
in *West Mercia*" and it principally addresses the issues on this appeal as
formulated by Lord Reed PSC and my decision on those issues, and some
further fundamental issues.  It does not contain the background or other
relevant material, such as a summary of the case law to date, the legislative
framework, the underlying principle on which the 2006 Act is based on

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   "enlightened shareholder value" ("ESV"), which is relevant to the relationship between directors' duties and creditors, or the expert views in the Final Report mentioned at the end of para 248 above on the possible difficulties of the rule in *West Mercia*.  Section 2 therefore contains:

Part 1—Outline of the facts of this appeal and the judgment of the Court of Appeal

B   Part 2—The overarching legislative scheme

Part 3—The relevant provisions of the Companies Act 2006 ("the 2006 Act") and the Insolvency Act 1986 ("the 1986 Act")

Part 4—Legislative history and the principle of enlightened shareholder value

Part 5—Case law prior to the 2006 Act concerning a duty in relation to creditors

C   Part 6—Case law following *West Mercia* (before and after the 2006 Act)

Part 7—section 172(3): legislative history concerning section 172(3) showing the CLRSG's concerns

Part 8—Conclusion

250   My main conclusions are as follows.  The primary issues (and the only issues which need to be decided on this appeal) are (1) whether a rule of
D   law of the kind described in section 172(3) exists, and (2) whether under that rule directors are required to consider or act in the interests of creditors when there is simply a real and not remote prospect of insolvency.  In common with other members of this court, I answer those issues by holding that this court should now approve the rule of law that requires directors of financially distressed companies to consider, as one of the relevant factors,
E   the interests of creditors (paras 252 to 277).  That rule of law has yet to be finally fleshed out but would not apply simply because there is a real and not remote prospect of insolvency.  I go further and say that directors must not only consider creditors' interests but not materially harm them either (and this protects creditors against "insolvency-deepening" activity) (paras 289 to 290 below).  However, at a certain point in time the interests of creditors
F   will have to have priority over any other interest.  I say that point in time is not reached until the company becomes irreversibly insolvent and must enter liquidation or some formal insolvency procedure, most importantly a "rescue" procedure (see Section 2, paras 325 and 356 to 357 below).  This does not, as the claimant has suggested, amount at any stage to a duty to "promote the success of the company for the benefit of creditors", which I have called "a self-standing creditor duty" (paras 261 to 277 below).
G   Directors cannot have "two masters".  However, if a company becomes irreversibly insolvent, directors must disregard the interests of shareholders if they conflict with those of creditors (paras 305 to 311 below).  The meaning of "insolvency" must be contextual and appropriate to the rule in *West Mercia*.  There are practical difficulties which may arise as a result of any requirement placed on directors in this situation and the law should be
H   developed with an awareness of these potential difficulties and in addition the role of corporate rescues in modern insolvency legislation.  That in this context is the continuation of Lord Mansfield's wise approach.

251   References in Section 1 to numbered issues are therefore to the numbered issues set out in paras 76 to 111 of Lord Reed PSC's judgment.

SECTION 1                                           A

*The rule in West Mercia*

*Issue (1) Is there a rule (the rule in West Mercia) that in certain
circumstances the interests of the company, for the purpose of the directors'
duty of good faith in its interests are to be understood as including the
interests of its creditors as a whole?*

B

**252**   For the first time in the history of company law, the 2006 Act
contained a statement of directors' duties.  The duties were expressly stated
to be owed to the company.  They included a duty ("the success duty") to
promote the success of the company for the benefit of members as a whole
(section 172(1) of the 2006 Act).  Moreover, the success duty set out for the
first time a non-exhaustive list of relevant matters particularly interests in
the company and for the first time obliged directors as part of their fiduciary     C
duties to the company to have regard to those interests.  I have set out
the relevant parts of the statement of duties in para 365 below.  The
non-exhaustive list of interests does not expressly include the interests of the
general body of creditors, but by implication includes them.  However,
section 172(3) preserved the effect of any enactment or rule of law which
modified the success duty by requiring directors to consider, and act in, the     D
interests of creditors.

**253**   There is no enactment applicable to the circumstances in this case, so
the question is: is there a relevant rule of law?  This court has not considered
this question on any previous occasion.  Section 172(3) does not provide that
there is such a rule of law (see further paras 344 and 345 and Part 7 of
Section 2 below) which the courts must develop.  On this issue of statutory
interpretation, I prefer the submission of Mr Andrew Thompson KC to     E
that of Mr Laurence Rabinowitz KC, who both made able and helpful
submissions on this appeal.  It is therefore necessary to decide whether to
approve earlier decisions in this field.

**254**   Section 172(3) presupposes there will be some disjunction between
the success duty and this rule of law.  Parliament has framed the matter as
a rule of law which may operate to qualify the success duty and so any
obligation on directors in relation to creditors constitutes a restriction     F
arising as a matter of law.

**255**   An analogy can be drawn here with the cases in which contractual
stipulations have been held to be qualified because they are repugnant to
bankruptcy law.  The contract will take effect subject to any rule of law
holding that there is such repugnancy.  Examples are contractual terms
which offend against mandatory provisions of bankruptcy law or are
designed to evade the operation of bankruptcy law may also: see for example     G
*Borland's Trustee v Steel Bros & Co Ltd* [1901] 1 Ch 279, *Collins v Barker*
[1893] 1 Ch 578, *Ex p Mackay; Ex p Brown; In re Jeavons* (1873) LR 8 Ch
App 643, *British Eagle International Air Lines Ltd v Cie Nationale Air
France* [1975] 1 WLR 758.  For example, in the first case, where a company's
articles provided that shareholders becoming bankrupt could be compelled
to sell their shares to certain persons described in the articles at a fixed price,     H
Farwell J rejected the argument that the provision was obnoxious to the
bankruptcy law.  The price was a fair one.  However, he added: "If I came to
the conclusion that there was any provision in these articles compelling
persons to sell their shares in the event of bankruptcy at something less than

A   the price that they would otherwise obtain, such a provision would be repugnant to the bankruptcy law." ([1901] 1 Ch 279, 291).

256   However, the rule of law discussed in these cases is only an analogy and not a precedent. The motivation for a rule of law under section 172(3) is different since it does not apply to events within a formal insolvency. Since the interests of creditors (in the absence of some special agreement) are

B   economic rather than proprietary (see paras 346 to 348 below), it seems to me that the motivation for the rule of law is the need to redress the fact that, until formal insolvency procedures are initiated, creditors do not have control of the company's affairs. The governance position is asymmetric. As Lord Reed PSC explains (para 83 above), the rule in *West Mercia* applies when the economic position of the creditors changes: that analysis is an endorsement of the emphasis in the case law on the practical operation of the

C   law in this field. In my judgment it is implicit in that change that the rationale of the rule in *West Mercia* is the need to ensure, so far as practicable, that creditors are not harmed by the asymmetry in governance following on from the shift in the economic interest which Lord Reed PSC describes. I agree with Lord Reed PSC (para 48 above) that under the rule in *West Mercia* the "creditors" mean the general body of creditors. When

D   directors consider the interests of creditors, they do not have to consider separately the interests of creditors in a special position, for example because they are subordinated or the company's liabilities to them are long-term or contingent.

257   I have had the privilege of reading the judgments of other members of the panel. I agree with them that the interests which directors are obliged in law to consider may include the interests of creditors. As Lord Reed PSC

E   explains, the relevant rule of law is to be found in *West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250 ("*West Mercia*"). This approves a passage from the judgment of Street CJ in *Kinsela v Russell Kinsela Pty Ltd* (1986) 4 NSWLR 722, 730 *(Kinsela)* set out in para 399 below, which indicates that the purpose of the rule is as set out in para 256 above.

258   In my judgment, the rationale of the rule amply justifies that rule of

F   law. It is only right that the fiduciary duties of directors should be qualified to provide appropriate protection to creditors and approving the rule in *West Mercia* has the advantage of endorsing the high standards expected of directors. As explained below (paras 326 to 336), I do not consider that the position is changed by the fact that there is a panoply of provisions avoiding transactions and imposing liabilities in an insolvency. In addition, the CLRSG did not recommend a reversal of the rule in *West Mercia*: a major

G   issue was what any statutory rule should say: see further Section 2, Part 7 below.

259   Lord Lindley explained in *A Treatise on the Law of Companies*, 6th ed (1902), p 510, edited by Walter B Lindley:

"[The position of directors] is very different from that of ordinary trustees, whose primary duty it is to preserve the trust property, and not

H   to risk it. Directors have to carry on business, and this necessarily involves risk. The duty of directors to shareholders is so to conduct the business of the company as to obtain for the benefit of the shareholders the greatest advantages that can be obtained consistently with the trust reposed in them by the shareholders and with honesty to other people.

Directors should remember that they are not the masters but the servants   A
of the shareholders; and although it is true that the directors have more
power, both for good and for evil, than is possessed by the shareholders
individually, still that power is limited, and accompanied by a trust, and is
to be exercised bona fide for the purposes for which it was given, and in
the manner contemplated by those who gave it."

260   That passage was cited by the defendants and is echoed by the   B
defendants' submissions on *In re Wincham Shipbuilding, Boiler, and Salt
Co*; *Poole, Jackson, and Whyte's Case* (1878) 9 Ch D 322 ("*In re Wincham*")
(para 271 to 277 below).  However, the beneficiaries of the trust are not,
unless the financial difficulties are irreversible, the creditors, and fiduciary
duties are not owed to them.  That brings me to the next topic which I must
address.
                                                                       C

### The rule in West Mercia does not create a self-standing duty to creditors

261   As just stated, the rule in *West Mercia* does not create a duty owed
to the creditors.  The success duty remains a duty which is owed to the
company.  Mr Thompson KC submits that, when the relevant circumstances
arise, the success duty is by virtue of section 172(3) transformed into a duty
to promote the success of the company for the benefit of creditors.  He   D
accepts that any duty must be owed to the company, but he also submits that
at some point the interests of creditors become the interests of the company
in place of shareholders.  He submits that, when the duty in relation to
creditors arises, the success duty in section 172(1) is to be interpreted as
if the words "for the benefit of creditors" were substituted for the words "for
the benefit of shareholders" so there is an obligation on directors to promote   E
the success of the company for the benefit of creditors.  Lord Reed PSC notes
a submission to this effect in para 1 of his judgment.

262   The practical effect of this submission is to create a self-standing
creditor duty which removes shareholder gain as the objective of the success
duty and requires directors to manage the company's business for the
exclusive benefit of creditors rather than members.  That, however, is not
what section 172(3) says: it provides that the rule of law which is preserved   F
by that subsection must be one which in certain circumstances requires the
directors to consider and act in the interests of creditors, not one to promote
the success of the company for the benefit of creditors.  That is the textual
approach.  As appears below (paras 263 to 277 and Section 2, Part 4 below),
this submission is open to even greater and fundamental objection on a
purposive approach.  This irrefutably confirms the textual approach.   G

263   Moreover, Mr Thompson KC's formulation goes well beyond any
need, once the company is insolvent, to redress creditors' inability to control
how the directors exercise their powers.  The duty for which he contends
would also go beyond the protection provided by the rule in *West Mercia*.
As I have explained above, the purpose of the rule is to redress the situation
in which creditors, who now have a greater economic interest in the
company than shareholders, have no control over the conduct of its   H
business. If the directors owe a duty to promote the success of the company
for the benefit of creditors, this might require directors having to take steps
to maximise the value of the company's assets available for distribution in a
liquidation.  It was the creation of a self-standing duty which was the

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   concern of both the Supreme Court of Canada and of the Supreme Court of Delaware.

264   As explained above, the rule in *West Mercia* is concerned with protecting creditors from harm. It does not require directors to run the business for the benefit of creditors. The requirement is that the directors should consider creditors' interests and act on those interests in certain circumstances. The directors may make a decision that benefits shareholders,

B   but this would not be a breach of the requirement that they act in the interests of creditors if the creditors would not be worse off in a liquidation.

265   In my judgment, this court rightly rejects any self-standing creditor duty. It is inconsistent with the foundational principle of the statement of duties, which is that of ESV. I explain in Section 2, Part 4 of this judgment that the legislative history of the statement of duties shows that there was a

C   debate generated by the CLRSG as to whether companies should be founded on the basis of shareholder primacy, modified as ESV, or on a pluralist model. In the end, the Government accepted that the foundational principle should be ESV and the legislation was drafted on this basis. The first model involves that the duties of directors are to promote the success of the company for the benefit of members. This is a form of shareholder primacy

D   (explained in Section 2, Part 4). By contrast, under the pluralist model, a company is also responsible to several separate constituencies additional to shareholders, such as employees, suppliers, consumers and the community. If Section 172(3) of the 2006 Act has the effect for which Mr Thompson contends (albeit in only as a subsidiary part of his argument and only from the time that there was a real as opposed to a remote risk of insolvency), it is inconsistent with this fundamental feature of the statement of duties. The

E   true effect of section 172(3) is that when directors are discharging the success duty, they may be required to consider and act in creditors' interests. This restricts how directors perform their duty but does not substitute a new duty on directors to promote the success of the company for the benefit of creditors. Mr Rabinowitz KC spent the greater part of his oral submissions on this point, but what he argues for is shareholder primacy without

F   enlightenment in relation to creditors, i e without allowing creditors primacy even when the company's financial position was irreversible. He opposes any sort of "shift" in directors' duties. (I agree it is not a shift, merely a qualification arising from a rule of law). His principal authority was *In re Wincham* 9 Ch D 322, discussed at paras 271 to 277 below, which I consider reflects a superseded concept of the registered company.

G   266   To use the incisive, and characteristically measured, distillation of the point that I have just developed, as formulated by another legal member of the CLRSG, the late Richard Sykes QC, a distinguished and highly experienced company law specialist practitioner, which I would adopt without qualification: "A regime in which directors found themselves owing different duties to several different 'masters', some with interests conflicting with those of others, would make it extremely difficult for directors to decide

H   what weight to give to each of the duties concerned." (Company Law Review, CLR (SG) (98)7, para 6.) There may be situations in which it is possible to serve two masters, for example where duties to serve different masters fall to be performed separately from each other and do not collide, but this is not one of those situations.

© 2022 The Incorporated Council of Law Reporting for England and Wales

267    The rule in *West Mercia* does not entitle creditors, either directly or    A
derivatively through the company, to sue the directors if they do not comply
with it.  In fact, the creditors can neither sue for a breach of it nor recover any
losses that ensue for breach.  The remedies are those for a breach of the duty
under section 172(1).  Accordingly, any financial award resulting from a
breach of the obligations owed in relation to creditors would inure for the
benefit of the company, not for the creditors who were harmed by the breach.
Moreover, if the company has gone into liquidation, the proceedings to    B
enforce that cause of action would be commenced by the liquidator.  The
recoverable loss would incongruously be the loss which the company suffers
through the director's breach of this duty.   Any loss recovered by the
company would form part of the general assets of the company and would be
distributable among all the creditors of the company and not simply those of
the creditors who ought to have had their interests considered (as opposed to    C
subsequent creditors).   In *In re New World Alliance; Sycotex Pty Ltd v
Baseler* (1994) 122 ALR 531, 550, Gummow J describes the obligation as
"a duty of imperfect obligation", quoting a passage from a contribution made
by JD Heydon QC, later Heydon J of the High Court of Australia, "Directors'
Duties and the Company's Interests", to *Equity and Commercial
Relationships* (ed PD Finn) (1987), pp 120, 131:
                                                                                  D
      "The curious result is that on one view there is a duty of imperfect
   obligation owed to creditors: the directors must bear their interest in
   mind, and breaches of the duty cannot be forgiven without their consent,
   but they cannot enforce that duty save to the extent that the company
   acts, on its own motion or through a liquidator."

268    It would be very curious to have a self-standing duty in relation to    E
creditors obliging the directors to promote the success of the company for
the benefit of creditors if the remedies were only as described in the
preceding paragraph.  Moreover, if there is an independent self-standing
duty to creditors, there is a governance issue: the directors can act without
being made accountable for the way in which they perform it until
liquidation.  As Buckley LJ held in *In re Horsley & Weight Ltd* [1982] Ch
442, creditors can only bring claims in respect of unlawful repayments of    F
capital to shareholders or (it follows) other wrongful acts to them through
the liquidator in a liquidation:

      "It may be somewhat loosely said that the directors owe an indirect
   duty to the creditors not to permit any unlawful reduction of capital to
   occur, but I would regard it as more accurate to say that the directors owe
   a duty to the company in this respect and that, if the company is put into    G
   liquidation when paid-up capital has been improperly repaid, the
   liquidator owes a duty to the creditors to enforce any right to repayment
   which is available to the company": p 454.

269    This contrasts with the position if under the rule in *West Mercia*
obligations to creditors are by way of qualification to the success duty
and enforceable at all times (prior to liquidation) by the shareholders,    H
if necessary by way of derivative action.   This provides a clear line of
responsibility and accountability during what may be a critical period.  It is
most unlikely that Parliament would have intended to permit a period of
unaccountability.

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   270   The defendants' case is that statutory statement of directors' duties must also be read against the rather more ancient backcloth of the established principles of company law and one of those principles is, as the defendants submit, that directors are not trustees for creditors. The inconsistency between this principle and a self-standing creditor duty is critiqued in academic commentary cited by the defendants: see "Acting in the best interests of the company—for whom are directors 'trustees?'" by Professor

B   Francis Dawson (1984) 11 NZULR 68 and I A Renard, "Commentary", published in P D Finn, *Equity and Commercial Relationships*, referred to above, p 137.

271   Importantly, the defendants rely on *In re Wincham*. In this case, the liquidator claimed that directors, who had paid up the amounts due on their shares, were liable to make those payments again because they had used that

C   money to reduce the company's indebtedness to the bank, which they had guaranteed. A petition was presented for the winding up of the company two days after the payment to the bank.

272   The claim before the court was not one that the payment to the bank was a fraudulent preference of the bank but whether the directors could use the company's monies as they had done in a way which benefitted them. The bank was not a party to the proceedings and at the time the case

D   was decided the statutory provisions on fraudulent preference did not make fraudulent or void a payment made with a view to giving guarantors a preference.

273   The estate of the company in liquidation was worse off because, if the payment of the amounts unpaid on their shares had not been made, the liquidator could call up the amounts unpaid on their shares and the directors

E   would have had to prove in the liquidation for the amount that they had to pay under their guarantees for which they were entitled to be indemnified by the company. At the start of his judgment Bacon V-C pointed out that the directors had a conflict of interest between their position as directors and their interest as creditors. He held that the directors must pay the amount due on their shares a second time because in effect they made a payment for

F   their own benefit.

274   The Court of Appeal reversed the Vice-Chancellor's decision. They took the view the bank had not been fraudulently preferred and that all the directors had done was pay a liability for which the company was liable anyway and this could cause no harm to the shareholders. The directors were trustees for the shareholders representing the company and not trustees for the creditors. Jessel MR, with whom James and Bramwell LJJ agreed,

G   held:

>   "It has always been held that the directors are trustees for the shareholders, that is, for the company. They are the managing partners of the company, and if they abuse their powers, which they hold in trust for the company, to the damage of the company, for their own benefit, they are liable to make good the breach of trust to their cestuis que trust like any

H   other trustees. But directors are not trustees for the creditors of the company. The creditors have certain rights against a company and its members, but they have no greater rights against the directors than against any other members of the company. They have only those statutory rights against the members which are given them in the winding-up.

© 2022 The Incorporated Council of Law Reporting for England and Wales

A

"That being so, there was nothing to impose a duty on the directors not to pay a debt of the company, for which they were themselves liable, in priority to other debts, unless section 164 of the Act of 1862 applied, which it certainly does not in the present case. The payment to the bank was not a fraudulent preference; it was made in the ordinary course of business. It was a good payment, and could not be recovered back; therefore the directors, although they derived a collateral advantage to themselves, did not injure their cestuis que trust. The payment was not any breach of duty to the only persons for whom they were trustees": pp 328–329.

B

275   The defendants contend that this case established that creditors could never have predominant position over shareholders even where the company is in insolvent liquidation. But there is no mention either in *In re Wincham* of any requirement to consider the interests of creditors, and the defendants accept that that obligation exists. That is a more recent development. That indicates that this passage can no longer be relied on as a complete statement of the law.

C

276   The further fact is that the regulation of the conduct of directors in an insolvency has increased considerably since 1878, and, therefore, so has the protection for creditors. It was already becoming accepted by 1902 that directors owe their duties to the company as a separate legal entity, as it was held that the directors did not owe any duty to individual shareholders (*Percival v Wright* [1902] 2 Ch 421). Moreover, the new success duty particularly raises the importance of the interests of stakeholders in the company who are not shareholders by imposing an obligation to have regard to their interests. Creditors are not mentioned in the non-exhaustive list of factors which directors must consider but (as already mentioned in para 252 above and para 429 below) the list must clearly include the interests of creditors at least when the company is financially distressed. The rule in *West Mercia* is a natural development in this process. As Mr Thompson KC submitted: the 2006 Act "is a major reworking of company law and one cannot simply look past that in considering the effect of cases that long preceded it." (Day 2, p 132)

D

E

F

277   Accordingly, I welcome the court's endorsement that there is no self-standing creditor duty.

*The two parts of the rule in West Mercia and the level of directors' knowledge*

G

278   Lord Reed PSC raises the important question whether it is essential that the directors "know or ought to know" that the company is insolvent or bordering on insolvency, or that an insolvent liquidation or administration is probable, and holds that it is unnecessary and inappropriate to express a concluded view without the benefit of argument (para 90 and cf paras 231 and 238 of the judgment of Lord Hodge DPSC and para 203 of the judgment of Lord Briggs JSC).

H

279   In my judgment, the rule in *West Mercia* comprises two parts, and there is a distinction between them which applies not just to the question of knowledge but generally. The first part is the requirement for directors to consider creditors' interests. This arises whenever a company is financially distressed. By that I mean, as Lord Reed PSC puts it in para 12 of his

© 2022 The Incorporated Council of Law Reporting for England and Wales

A  judgment, the company is insolvent or bordering on insolvency, or an insolvent liquidation or administration is probable, or the directors plan to enter into a transaction in question would place the company in one of those situations. That requirement creates a responsibility not to harm creditors in the meantime. The rule also includes a second requirement. This requires directors to act predominantly in creditors' interests.

B  280  In this context, it might be said that, having regard to this distinction, in the former case, directors ought to know the company's financial position (see para 304 below) and that if they contend that they were not aware of this the onus should be on them to show that they reasonably ought to be excused, for example because of a third party's fraud: see section 1157 of the 2006 Act). Consistently with my view as to the distinction between the two parts of the rule, the level of knowledge that

C  creditors' interests were now paramount may be closer to section 214 of the 1986 Act.

281  Lord Hodge DPSC and Lord Briggs JSC have selected a test of knowledge which approximates to that in the "special duty" described below (para 428–432). Like Lord Reed PSC, I would leave the question of knowledge open for full submissions.

D  *The practical effect of the rule in West Mercia*

282  The success duty under section 172(1) imposes on directors an obligation to act in a way which they consider in good faith most likely to promote the continued prosperity or viability ("the success") of the company for the benefit of members. I agree with Lord Reed PSC and other members of the panel that creditors' interests are aligned with those of shareholders in

E  most circumstances (a point also made by the Supreme Court of Canada, as discussed in paras 298 to 300 below), but this appeal concerns what the law requires of directors in circumstances after the interests of creditors and shareholders cease to be aligned. If the company is not financially distressed, their duty would clearly include performing any legally binding obligation owed to a creditor.

F  283  Directors of financially distressed companies are bound to consider creditors' interests as one of the matters relevant to their decisions, and to act in a way which they consider in good faith most likely to ensure the continued viability or prosperity (that is, the success) of the company.

284  If they consider in good faith, and having performed their duty of skill and care, that they can and should take action to promote the continued viability of the company, and that there is a way out of the company's

G  financial difficulties, which will benefit shareholders and creditors, they are not obliged to treat the creditors' interests as the exclusive or primary determining factor in what they do next. However, since directors are obliged not materially to harm creditors' interests, they must be satisfied that the general body of creditors would be better off under that measure than if the company is immediately put into liquidation or equivalent process. Moreover, directors cannot prefer a particular creditor or enter into any

H  other transaction which would be avoided in a winding up under the 1986 Act or use their powers for the purpose of conferring a benefit on some other person (e g shareholders): the use of powers for this purpose would constitute the exercise of powers for an improper purpose. Nor may they trade wrongfully or fraudulently for the purposes of sections 213 (fraudulent

© 2022 The Incorporated Council of Law Reporting for England and Wales

trading) and 214 of the 1986 Act (wrongful trading, set out at para 366    A
below and considered below at paras 318 to 325 and 360 to 361). Nothing
prevents creditors who consider that they would be better off enforcing their
debts immediately, from doing so. The directors may then have to seek the
commencement of a formal insolvency procedure.

285   These principles are illustrated by *In re Welfab Engineers Ltd*
[1990] BCLC 833 in the context of the sale by a financially distressed    B
company of the whole of its business. The directors of a company which was
unable to continue to trade because it was insolvent sold its business to a
third party at a price which the liquidator contended was less than the fair
value. Hoffmann J held that the directors were not bound to liquidate the
company themselves. There was no reason why they should not have sold
the business on these terms because they genuinely believed that this was the
best way of saving the business. They could not have sold the business at an    C
undervalue simply to protect their own jobs or those of the company's
employees because that would clearly leave creditors in a worse position
than if there had been a liquidation. Their actions were not to be judged by a
higher standard than if they had invited the bank to appoint a receiver. The
financial position would not have been significantly different if they had
done so. Hoffmann J specifically had regard to "recent developments in
insolvency law, such as the institution of administration, which are intended    D
to encourage saving the business rather than destroy it": p 838.

286   Similarly, in *Facia Footwear Ltd v Hinchliffe* [1998] 1 BCLC 218,
where the directors had caused their financially distressed company, rather
than paying the creditors, to make payments to keep the trading operations
of the company on foot and to enable them to pursue refinancing proposals
which were essential for the continuation of the group. (This was not an    E
easy case as the payments included a payment of £150,000 to the principal
director's favourite football club, Sheffield United, but there was evidence
that this was as part of group treasury arrangements and the payment was
matched by a corresponding credit from another company.) Sir Richard
Scott V-C (who went no further than to say that counsel for the liquidator
was entitled to rely on *West Mercia*) refused summary judgment on a claim
that directors had acted contrary to creditors' interests (and in breach of the    F
rule in *West Mercia*) and held that there was a triable issue as to whether in
taking the actions they did the directors had in fact acted in the best interests
of creditors. There is no express mention of the new insolvency legislation
but Scott V-C clearly understood the implications of a restructuring. The
position was that:

> "The creditors' only chance of being paid in full lay in a continuation    G
> of trading. A continuation of trading might mean a reduction in the
> dividend eventually payable to creditors but it represented the creditors'
> only chance of full payment. It is, therefore, not in the least obvious that
> in continuing to trade in April and May the directors were ignoring the
> interests of creditors": p 228.

287   In both these cases, the directors had to consider the interests of    H
creditors but were not prevented simply because the company was insolvent
from carrying out a rescue of the company or its business which they
reasonably considered would have a better outcome for creditors and
members than a liquidation (see also the antepenultimate sentence of

© 2022 The Incorporated Council of Law Reporting for England and Wales

A     para 62 of Lord Reed PSC's judgment).  This is not a licence for activity which I describe as "insolvency-deepening" (see para 289 below).  Directors must act reasonably and not be over-optimistic, but success is not guaranteed.  Success may indeed depend on the unexpected actions of or withdrawal of support by a third party (e g a bank) in circumstances over which directors have no control.  I would in principle treat administration for the purpose of achieving a rescue in the same way as other forms of
B     rescue.

*Issue (2): What is the content of the duty arising where the rule in West Mercia applies?*

    288   In my judgment, where the rule in *West Mercia* applies, directors are not obliged to seek out ways in which to make profits, or act, for the
C     benefit of creditors (see the discussion of the self-standing creditor duty above).  The correct analysis is that they may not exercise any of their powers so as to harm creditors' interests.  This is in line with my conclusion, para 256 above, that the purpose of the rule in *West Mercia* is to redress the situation that creditors do not have any control over the management of the company at a time which is critical for the recovery of what is due to them.
D     Given this purpose, the requirement of the rule in *West Mercia* in practical terms is in my judgment a requirement on directors to consider creditors' interests at all material times and not to harm their interests.  It would therefore not be open to the directors to take any step which would materially and adversely prejudice the interests of creditors, or to omit to take a step which could reasonably be taken by them, and which would prevent or reduce such prejudice.  I consider the case law in detail in
E     paras Section 2, Parts 5 and 6.  In none of those cases was there found to be a duty which went beyond an obligation not to harm.  The seminal case of *Kinsela* provides support for my formulation as Street CJ describes the duty of the directors as "extend[ing] in an insolvency context to not prejudicing the interests of creditors" (p 732).  There is also support for my formulation in other cases, such as in *Bowthorpe Holdings Ltd v Hills* [2003] 1 BCLC
F     226, para 51 (cited by Lord Reed PSC at para 40 above) and the dictum of the Judicial Committee of the Privy Council, in relation to the *Duomatic* principle (para 314 below), in *Ciban Management Corpn v Citco (BVI) Ltd* [2021] AC 122, para 40 per Lord Burrows JSC giving the advice of the Board, where Lord Hodge DPSC presided and I was a member (the dictum did not need to be explored because it did not arise on the facts) (also cited by Lord Reed PSC at para 41 above).  My formulation still produces a duty
G     of some rigour, but as it is framed it has the additional advantage of sitting more easily with the rejection of the self-standing creditor duty.

    289   This formulation also addresses the specific problem of what I would call " 'insolvency-deepening' activity".  This problem was raised by Mr Thompson KC in his submissions and is discussed by Lord Hodge DPSC in his judgment (para 238 above).  The example (the "insolvency-deepening example") which Lord Hodge DPSC gives is of a financially distressed
H     company which the directors know or ought to know will probably have to enter some formal insolvency but there is a prospect of a return to solvency if the company undertakes a particularly risky transaction.  That transaction if it fails will deepen, not improve, the insolvency.  A critical feature of this example is the slimness of the chance of avoiding irreversible insolvency.

Creditors then have not even a sporting chance of gain.  Lord Hodge DPSC    A
concludes that in this situation directors should give creditors' interests
priority over shareholders' interests.

290   The duty not materially to harm creditors' interests would mean
that directors could not engage in insolvency-deepening activity while at the
same time they are not deprived of the chance of pursuing proper activity.
I consider that this is in accordance with the scheme of section 172(1) and    B
(3) as I have described it under Issue (1) above and in my rejection of the self-
standing creditor duty.  I would suggest that it
is difficult to see how outcomes such as those in *In re Welfab* and *Facia
Footwear* could be achieved if under the rule in *West Mercia* creditors'
interests become paramount before irreversible insolvency.

291   Lord Reed PSC is of the same view.  At paras 80 and 81 of this    C
judgment, he holds that "it is only where an insolvent liquidation or
administration is unavoidable that the shareholders cease to have any
interest in the company, and their interests can therefore be left out of
account."  I agree with this.  As Lord Reed PSC holds, the requirement to
consider their interests arises at a much earlier stage:

> "Where the company is insolvent or bordering on insolvency but is not    D
> faced with an inevitable insolvent liquidation or administration, the
> directors' fiduciary duty to act in the company's interests has to reflect the
> fact that both the shareholders and the creditors have an interest in
> the company's affairs": para 81.

292   In determining the content of the rule in *West Mercia*, there are    E
three further points that I would make.

293   First, the interests in a company are not limited to shareholders and
creditors.  This becomes relevant once the creditors' interests cease to be
aligned with those of shareholders.

294   Normally, the interests of shareholders and creditors row in the
same direction.  Lord Reed PSC, addressing the situation where they diverge
focuses on the interests of creditors in contrast to the interests of    F
shareholders.  I would respectfully say that the interests of shareholders and
creditors do not occupy the whole field.  A company is, as it were, polycentric.
When Bowen LJ, whom Lord Reed PSC quotes (para 66 above), in reference
to ex gratia employee benefits, famously said: "there are to be no cakes and
ale except . . . for the benefit of the company", he did not say: "there shall be
no cakes and ale because they all belong to the shareholders."  He recognised    G
that (in that case) the employees had a legitimate interest as well.

295   That leads to the question who should decide whether a particular
interest in the company should be favoured over another, assuming they are
both for the benefit of shareholders.  In my judgment, the prioritisation of
interests in a company is in general a matter for the directors' commercial
judgment.

296   When there is no question of creditors' interests being materially    H
and adversely prejudiced, it is for directors to prioritise the various interests
and the courts leave such matters to the commercial judgment of the
directors.  This is also the view of Lord Hodge DPSC (para 238 above) and
Lord Briggs JSC (para 176).

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    297   That is also a point which the Supreme Court of Canada has considered. Canada is of particular interest on this point because section 122 (1.1) of the Canadian Business Corporations Act 1985 incorporates a non-exhaustive list of relevant interests into the statutory duty of loyalty imposed on directors. (But there are differences. The consideration of the list is not obligatory. Creditors can with the leave of the court bring derivative claims on behalf of the corporation in certain circumstances.)

B    298   In *Trustee of Peoples Department Stores Inc v Wise* [2004] 3 SCR 461, the Supreme Court of Canada held that, in determining whether directors are acting with a view to the best interests of the corporation, it may be legitimate, given all the circumstances of a given case, for the board of directors to consider, inter alia, the interests of shareholders, employees, suppliers, creditors, consumers, governments and the environment. The

C    court added in relation to insolvency:

"42. This appeal does not relate to the non-statutory duty directors owe to shareholders. It is concerned only with the statutory duties owed under the CBCA. Insofar as the statutory fiduciary duty is concerned, it is clear that the phrase the 'best interests of the corporation' should be read not simply as the 'best interests of the shareholders'. . .

D    "43. The various shifts in interests that naturally occur as a corporation's fortunes rise and fall do not, however, affect the content of the fiduciary duty under section 122(1)(a) of the CBCA. At all times, directors and officers owe their fiduciary obligation to the corporation. The interests of the corporation are not to be confused with the interests of the creditors or those of any other stakeholders.

E    "44. The interests of shareholders, those of the creditors and those of the corporation may and will be consistent with each other if the corporation is profitable and well capitalized and has strong prospects. However, this can change if the corporation starts to struggle financially. The residual rights of the shareholders will generally become worthless if a corporation is declared bankrupt. Upon bankruptcy, the directors of the corporation transfer control to a trustee, who administers the

F    corporation's assets for the benefit of creditors . . .

"47. . . . In resolving these competing interests, it is incumbent upon the directors to act honestly and in good faith with a view to the best interests of the corporation. In using their skills for the benefit of the corporation when it is in troubled waters financially, the directors must be careful to attempt to act in its best interests by creating a 'better' corporation, and not to favour the interests of any one group of

G    stakeholders. If the stakeholders cannot avail themselves of the statutory fiduciary duty (the duty of loyalty, supra) to sue the directors for failing to take care of their interests, they have other means at their disposal."

299   The final paragraph of that citation emphasises that it is primarily for directors acting in good faith and in what they see as the company's best interests to consider how to manage and prioritise the various interests

H    which compose the interests of the company. It is not appropriate in general for the court to re-take the decisions which the directors have made, and the directors' actions must be assessed on the basis of whether the directors were reasonable to take the decision that they made on the basis of the information available to them. I understand Lord Reed PSC and Lord

© 2022 The Incorporated Council of Law Reporting for England and Wales

Briggs JSC to be of the same opinion (see para 82 above, which refers to    A
what it may be reasonable and responsible for directors to do).

300    It is to be noted that the Supreme Court of Canada went on to hold
that the interests of shareholders were never displaced prior to liquidation:

  "45. Short of bankruptcy, as the corporation approaches what has
  been described as the 'vicinity of insolvency', the residual claims of
  shareholders will be nearly exhausted.  While shareholders might well    B
  prefer that the directors pursue high-risk alternatives with a high
  potential payoff to maximize the shareholders' expected residual claim,
  creditors in the same circumstances might prefer that the directors steer a
  safer course so as to maximize the value of their claims against the assets
  of the corporation.

  "46. The directors' fiduciary duty does not change when a corporation    C
  is in the nebulous 'vicinity of insolvency'.  That phrase has not been
  defined; moreover, it is incapable of definition and has no legal meaning.
  What it is obviously intended to convey is a deterioration in the
  corporation's financial stability.  In assessing the actions of directors it is
  evident that any honest and good faith attempt to redress the
  corporation's financial problems will, if successful, both retain value for
  shareholders and improve the position of creditors.  If unsuccessful, it will    D
  not qualify as a breach of the statutory fiduciary duty."

301    The Supreme Court of Delaware has taken effectively the same
approach in rejecting any direct claim by creditors against directors for breach
of fiduciary duty when the company is insolvent or in "the zone of insolvency"
(*North American Catholic Educational Programming Foundation Inc v
Gheewalla* (2007) 930 A 2d 92).    E

302    By contrast, this court has reached the decision that they are
displaced as a matter of law at a certain point, and in my judgment that point
is where the company is irretrievably insolvent.  There are some signals
in this passage which suggest that the Supreme Court of Canada also
experienced difficulty in determining any trigger point.  I agree with Lord
Reed PSC that the court should not consider itself absolutely bound by its
obiter holdings on this appeal about the "trigger point" until the issue    F
actually arises.

303    If the interests in a company are seen in a bipolar way as either
those of shareholders or those of creditors, we arrive at the situation where,
as the financial position of the company deteriorates, the shareholders'
interests decrease in importance, and those of creditors increase in
importance.  In my judgment, a sliding scale provides some assistance, but    G
I would add that the analogy with any such scale should not be taken too
literally.  The progress towards insolvency may not be linear and may occur
not as a result of incremental developments but as a result of something
outside the company which has a sudden and major impact on it.  The task
for directors is not simply to weigh the interests of shareholders against
those of creditors.  It is to manage all the interests in the company unless
and until the point is reached whereby, they must treat creditors' interests    H
as predominant.  As I see, this is at a point when insolvency becomes
irreversible (see Issue (3)).

304    Directors should always have access to reasonably reliable
information about the company's financial position.  The message which

A  this judgment sends out is that directors should stay informed.  The company must maintain up to date accounting information itself though it may instruct others to do so on its behalf.  Directors can and should require the communication to them of warnings if the cash reserves or asset base of the company have been eroded so that creditors may or will not get paid when due.  It will not help to resign if they remain shadow directors.  In addition,
B  directors can these days without much difficulty undertake appropriate training about their responsibilities, and about the penalties if they disregard them.

*Issue (3): The "trigger" question: What are the circumstances in which the rule in West Mercia applies?*

C  305   I treat this issue as limited to the question: when under the rule in *West Mercia* do the interests of creditors override those of shareholders?

306   In my judgment, the interests of creditors can only supplant the interests of shareholders altogether when the company becomes irreversibly insolvent, making insolvent liquidation or an administration unavoidable. I agree with Lord Reed PSC that the test of a real and not remote risk of insolvency and the test of likelihood of becoming insolvent should be
D  rejected.

307   We had very little assistance in submissions on the meaning of "insolvency" for the purpose of the rule in *West Mercia*.  Lord Reed PSC expresses a provisional view that the tests in section 123(1)(e) (cash flow or commercial insolvency) and section 123(2) (balance sheet insolvency) of the 1986 Act are convenient and apt in this context (para 88).  Like Lord
E  Briggs JSC, I would start with the tests in these provisions, which provide as follows:

> "(1) A company is deemed unable to pay its debts— . . . (e) if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due.
F  > "(2) A company is also deemed unable to pay its debts if it is proved to the satisfaction of the court that the value of the company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities."

308   However, those tests must I think be applied with the degree of flexibility appropriate to the rationale and context of the rule in *West Mercia*.
G  To that end, it is helpful that in determining cash-flow insolvency this court has already held that the debts that will become due within a reasonably near future as well as present debts fall to be considered under section 123(1)(e) (*BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-3BL plc* [2013] 1 WLR 1408, para 37, per Lord Walker of Gestingthorpe, with whom Lord Mance, Lord Sumption and Lord Carnwath JJSC agreed).  It is obviously right that in this context too the directors should have regard to liabilities
H  which they can foresee will arise in the reasonably near future. In reality there has also to be some minor latitude allowed so that prompt payment is not insisted on.  Current obligations and obligations which a company may incur in trading out of any financial difficulty would be included.  It may be said that it is not satisfactory for directors to have to work on a non-specific

© 2022 The Incorporated Council of Law Reporting for England and Wales

time-limit, but I would answer that any specific time-limit would have to be a        A
matter for the legislature.

309    In the context of the rule in *West Mercia*, I agree with Lord
Briggs JSC that temporary commercial insolvency should be excluded. If it
had been the view of the court that a temporary cash flow insolvency might
have been sufficient on its own to trigger the duty, it is obvious that there
would be many directors to whom the rule in *West Mercia* will apply.
                                                                                        B
310    On balance sheet insolvency, this court held in the same paragraph
in *Eurosail* that the section 123(2) of the 1986 Act enables the court, when
taking prospective and future liabilities into account, to compare the present
value of the assets with the amount of the liabilities and the present value of
prospective and contingent liabilities. Thus, in determining insolvency for
present purposes, the prospects of any further addition to the company's
assets through refinancing, recapitalisation or restructuring would be left        C
out of account under section 123(2) of the 1986 Act.

311    In those circumstances, when dealing with the trigger for creditors'
interests to override those of shareholders, I prefer the test of irreversible
insolvency which makes insolvent liquidation unavoidable as this enables
those prospects to be taken into account if they are reasonable. It seems to
me that this better reflects the context in which this issue is likely to arise.        D
I do not believe that there is any great difference between Lord Briggs JSC
and myself on this since he treats the case where there is still "light at the end
of the tunnel" as not being one where the main economic interest in the
company has passed to the creditors and paramountcy is triggered (para 164
above). However, I do not consider that the paramountcy of creditors'
interests can depend simply on the directors' assessment of what is in the
best interests of the company if that is the way in which the final paragraph        E
of the citation from *Carlyle Corpn Ltd v Conway* (Judgment 38/2017),
(unreported) 4 September 2017, in para 170 of Lord Briggs JSC's judgment
is to be read.

*Issue (4) How does the rule in West Mercia interact with the principle of
shareholder authorisation or ratification?*                                            F

312    Historically the principle that shareholders can ratify a breach of
duty by directors ("the ratification principle") appears to have been an
inspiration for the rule in *West Mercia*: see the facts of the seminal case of
*Kinsela* a (see para 394 below) so the ratification principle and the rule in
*West Mercia* are clearly closely connected. Lord Reed PSC holds that his
conclusion as to the rule in *West Mercia* is reinforced by the principle of        G
authorisation and ratification (see para 91 above). The shareholders cannot
ratify an act of the directors at the time when the company is insolvent. I can
see the force of this, but the limits of ratification can be even stricter
than this, which supports the conclusion that ratification has a different
jurisprudential root, namely in the rule in *Trevor v Whitworth* (1887) 12
App Cas 409 on unlawful return of capital. The ratification principle long
preceded the rule in *West Mercia*. The ratification principle is now codified        H
in the 2006 Act (section 239). The principle is subject to any rule of law "as
to acts that are incapable of being ratified by the company" (section 239(7)),
and this would clearly include a rule of law which prevents the ratification
principle applying because the company is or would be rendered insolvent.

[2022] 3 WLR                                  BTI 2014 LLC v Sequana SA (SC(E))
                                                                    Lady Arden

A    **313**   The ratification principle is supported by long-standing authority. Shareholders cannot ratify a breach of duty by directors where this results in insolvency: *Regal (Hastings) Ltd v Gulliver* [1967] 2 AC 134, 150, per Lord Russell of Killowen; *Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical Services Ltd* [1983] Ch 258. This principle is recognised by section 180(4)(a) of the 2006 Act. *Regal (Hastings) Ltd v Gulliver* preceded *West Mercia* by some years. As mentioned, the limits

B    on ratification and the rule in *West Mercia* do not always dovetail.

**314**   There is also a separate principle (not one of ratification but of corporate action) that shareholders acting unanimously may agree on any matter which is intra vires the company (often called the *Duomatic* principle, which is preserved by section 281(4) of the 2006 Act): see, for example, *Salomon v A Salomon & Co Ltd* [1897] AC 22, 57, per Lord

C    Davey. It has a different theoretical underpinning: see per Dillon LJ in *Multinational Gas* at p 289F–H; and may apply to all actions that may be taken on behalf of a company, whereas the ratification principle concerns the ratification of acts of the directors under the law of agency.

**315**   Mr Rabinowitz KC does not accept that there are any limits on ratification unless there is an actual fraud on creditors. However, in my judgment, neither the ratification principle nor the authorisation principle

D    can be used to authorise a return of capital either in form or substance. That would happen if the effect of the resolution were to render the company balance sheet insolvent: *Aveling Barford Ltd v Perion Ltd* [1989] BCLC 626. But this limitation on unanimous consent and on ratification does not proceed on the basis of the rule in *West Mercia*. Ratification cannot be used in these situations because it would in substance amount to a return of

E    capital to shareholders (see, for example, *Aveling Barford* and the analysis of Buxton LJ in *MacPherson v European Strategic Bureau Ltd* [2000] 2 BCLC 683, para 60). Moreover, it follows that, where ratification purports to exceed this limitation, it is ineffective, and the directors remain in breach of duty. Whether they control the company in general meeting or not, the resolution is ineffective because the shareholders cannot lawfully release an asset (a cause of action) which renders the company insolvent. The limits on

F    what constitutes a distribution out of capital reduce the limits of ratification further than the rule in *West Mercia*.

**316**   In my judgment, this distinction must be kept in mind also when reading para 32 of *Official Receiver v Stern (No 2)* [2002] 1 BCLC 119 (Sir Andrew Morritt V-C, Buxton and Arden LJJ) and paras 51 to 54 of *Bowthorpe Holdings v Hills* [2003] 1 BCLC 226. The defendants rely in

G    addition for the limitations on ratification on the passage from the judgment of Street CJ in *Kinsela* which I set out in para 399 below, which also deals with both ratification and the duty to creditors as if they were part of the same principle.

**317**   Mr Rabinowitz KC has an additional submission on ratification. Normally, distributions are subject to an exercise by the directors of their discretion to pay or recommend them, but there is nothing to stop a

H    company from providing in its articles of association that, say, a preferential dividend of so much per cent shall automatically be paid in every year, provided that the automatic dividend is lawful under Part 23 and the common law maintenance of capital rules (see generally *Paterson v R Paterson & Sons Ltd* 1917 SC (HL) 13, *Evling v Israel & Oppenheimer*

© 2022 The Incorporated Council of Law Reporting for England and Wales

798
BTI 2014 LLC v Sequana SA (SC(E))                                                    [2022] 3 WLR
Lady Arden

*Ltd* [1918] 1 Ch 101).  He submits that this would not be subject to an       A
obligation in relation to creditors because it is not dependent on the exercise
by the directors of their discretion.  Therefore, he argues that it would be odd
if the same dividend is dependent on the exercise by the directors of their
discretion, and would be subject to that duty, and that means that the rule in
*West Mercia* cannot apply to distributions.  In my judgment, any dividend,
automatic or otherwise, will be unlawful (if not otherwise unlawful under
Part 23) if it renders the company insolvent because of the capital           B
maintenance rules (see section 851 of the 2006 Act and para 338 below).
The directors acting properly cannot in any event cause or permit it to be
paid.  This submission throws no light on the existence of the rule in *West
Mercia*.

*Issue (5): How does the rule in West Mercia interact with the protection of*   C
*creditors under sections 214 and 239 of the 1986 Act?*

318   I will take first section 214 of the 1986 Act(set out in para 366
below).   I summarise the provisions and explain the significance of
section 214 in paras 322 to 324.  Clearly the rule in *West Mercia* should not
be approved if it cuts across some other legislative provision: I agree with
para 235 of Lord Hodge DPSC's judgment, which cites a passage from the         D
judgment of Lord Neuberger PSC in *In re Lehman Bros International
(Europe) (No 4)* [2018] AC 465.

319   The effect of section 214 is that heavy liability is imposed on those
trading in limited liability companies ex post facto rather than ex ante.
Under the 2006 Act, companies may be set-up with very little initial share
capital and there is no requirement for a minimum share capital as in other
jurisdictions.  But this is not a signal by Parliament that those directors have  E
a licence to be irresponsible about the company's liabilities to creditors: see
in particular section 214, which imposes an explicit, very strict liability if the
company becomes insolvent.  An advantage of structuring liabilities in this
way is surely that creditors will have an assurance throughout the company's
life that their interests will be protected.   This point complements the
analysis of Lord Reed PSC and Lord Hodge DPSC about the compatibility of
the rule in *West Mercia* with other statute law.  That statutory assurance may  F
well make it easier for smaller companies, especially those starting out, to
raise capital.  As the CLRSG pointed out, there are vastly more smaller
companies than large companies.

320   Section 214 implements with modifications a recommendation
made in the *Report of the Review Committee on Insolvency Law and Practice*
under the chairmanship of Sir Kenneth Cork ("the Cork Committee") (Cmnd   G
8558) (1982), para 1980(7)).  This recommended that there should be a
provision to impose a liability on directors for irresponsible and thus
wrongful trading.  (For the modifications, see *A Revised Framework of
Insolvency Law*, Department of Trade (Cmnd 9175) (1984), ch 2 para 14.)
There was no similar provision applying in corporate insolvency unless there
was an intention to defraud (see now section 214 (wrongful trading) of the
1986 Act) and compare section 213 of that Act (fraudulent trading)).       H

321   Section 214 is finely calibrated.  Section 214 does not impose any
obligation in relation to creditors until the company's liquidation is
inevitable.  By implication, it rejects the idea that a liability as Draconian as
that found in section 214 can be fixed at any earlier date.  Section 214

© 2022 The Incorporated Council of Law Reporting for England and Wales

A  therefore gives the directors the necessary space to continue running the business if that is appropriate to enable them to pursue the possibilities of a rescue. Furthermore, there is a defence for directors who can show they took all reasonable steps to prevent any loss to creditors.

322   Section 214 of the 1986 Act is very important in practice because directors are not liable for wrongful trading if having acted with due care they do not know of the threat to the company's insolvency or, where they B  know or have reason to believe that the company is threatened with insolvency, they have reasonable grounds for believing that the company will overcome its difficulties.

323   Section 214 provides that when a company becomes irretrievably insolvent the court may make the directors liable for the losses to creditors unless the directors, from the time they should have known that to be the C  position, took "every step with a view to minimising the potential loss to company's creditors" that they ought to have taken. Under this duty the directors know precisely when they incur liability and what they must do to avoid it. The steps which they must take may involve a corporate rescue or restructuring or an injection of equity funding ranking behind creditors, or both. The liability can only be enforced in administration or liquidation, but directors will know prior to that event that they may be liable under D  section 214 if the company does go into liquidation or administration. (When l refer to liquidation in this judgment in the context of wrongful trading, it should be read as including administration unless otherwise stated.)

324   Under earlier bankruptcy law, there were different incentives to stop persons trading when insolvent. For example, the bankrupt's discharge E  might be refused where the bankrupt had continued to trade after knowing himself to be insolvent (Bankruptcy Act 1914, section 26). In connection with the Bankruptcy Act 1883 (46 & 47 Vict c 52), Cave J held:

"[A] man, of course, has a perfect right, as long as he is solvent, to determine that he will go on with a business, although it may be a losing business. He may trust that, before he becomes insolvent matters will F  change . . .

"But the moment he becomes insolvent, then he is no longer going on at his own risk in case of failure; he is going on at the risk of his creditors, in case things do not mend, as he hopes they will. In my judgment, a man has no right to do that. The moment things have got to such a pitch that he cannot pay 20 shillings in the pound, but he nevertheless thinks that if he goes on he may be able to retrieve his position, in my opinion, he ought G  to call his creditors together, and leave them, who will have to bear the loss in case his calculations are wrong, to determine whether that course of going on shall be proceeded with or not." (*In re Stainton, Ex p Board of Trade* (1887) 4 Mor 242, 251.)

325   The introduction of wrongful trading (which was achieved by the Insolvency Act 1985, later superseded by the 1986 Act) marks a change in H  this approach. As part of this new approach Parliament made another innovation, namely it passed legislation providing opportunities for companies to use "rescue regimes" (also first introduced by the Insolvency Act 1985). The principal rescue regimes are administration and company voluntary arrangements. Administration is an insolvency process which can

© 2022 The Incorporated Council of Law Reporting for England and Wales

be used where a company is already, or is likely to become, insolvent. The    A
process provides for protection from execution on the company's assets
while the company is reorganised and saved so that it can carry on in
business anew, or its assets can be realised in a more orderly fashion for the
benefit of its creditors. (So, it can include situations where neither the
company nor its business is rescued.) Company voluntary arrangements
enable a company to obtain its creditors' agreement to compromise on or
delay repayment of its debts. A rescue regime is a way of saving a company,    B
the employment of its employees and the future development of its products
and business. Liquidation and administrative receivership are not rescue
regimes. Rescue regimes cannot achieve their potential if directors, under a
perceived threat of liability, decide to cause their company to cease to trade.

326   In my judgment, the rule in *West Mercia* works harmoniously with
section 214. The rule and the section do not cover the same legal space. The    C
rule in *West Mercia* includes a requirement as to process rather than an
obligation of result whereas the remedy under section 214 is a requirement
of result and provides primarily for a compensatory remedy in default (see
*In re Produce Marketing Consortium Ltd (No 2)* (1989) 5 BCC 569,
597–598, per Knox J). Section 214 was part of the background against
which section 172 of the 2006 Act was enacted.

327   Section 239 invalidates transaction entered into within a certain    D
time prior to liquidation. It has few similarities with the rule in *West Mercia*.
I do not therefore see any possibility of overlap between these remedies.
Lord Reed PSC has examined both section 214 and section 239 in paras 92
to 109 above. Subject to a possible difference of emphasis on the rationale
for the rule in *West Mercia* (see para 256 above), I agree with him that those
sections are not incompatible with the rule in *West Mercia*. I also agree with    E
the provisional view which he expresses at para 105: see para 402 below.

328   I do not consider, however, that I can leave matters there. The
question is not only whether the rule in *West Mercia* is pre-empted by
sections 214 or 239 of the 1986 Act. There is a further issue as to whether
the rule is necessary at all given the panoply of remedies already available in
insolvency law and under the general law of fiduciary duties. After all, the
Cork Committee did not refer to it or make any recommendation in relation    F
to it. I have cited below an extract in which Professor LS Sealy expresses the
view that the decision in *West Mercia* would have been the same if the
normal fiduciary duties had applied. I express the same conclusion below.

329   I can further illustrate this point by further reference to the example
taken by Lord Hodge DPSC at para 238 of his judgment and first mentioned
at para 289 above. This is a case where the company is balance sheet    G
insolvent and liquidation is probable but there is a prospect that, if the
directors apply the entirety of the company's free assets for this purpose,
the company could be saved. However, in this example, "egregious"
circumstances occur. Shareholders have little if anything to lose when the
directors opportunistically wager the company's assets as the last throw of
the dice on a single venture which is very risky to creditors and is thus not in
their interests. Lord Hodge DPSC holds that "the law would be open to    H
justifiable criticism if it were to provide no remedy in respect to the interests
of such directors where such a course of action was proposed or had been
adopted in the exclusive interest of the shareholders and to the probable
detriment of the company's creditors without a proper consideration of the

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   interests of the latter:" para 238.  So he is contemplating that the directors
carry out, or threaten to carry out, an action in the interest of shareholders
exclusively and fail properly to consider the interests of creditors.

330   I respectfully disagree that there would be no remedy under the
general law.  There would be a remedy in misfeasance.  The directors have
clearly abused their position.  If they go ahead with their scheme, and the
company goes into liquidation as they foresaw with a larger deficiency than
B   before, the liquidator will say, in my judgment with some force, that the
scheme was a breach of duty for at least two reasons.  First, reasonably
diligent and skilful directors would not have implemented such a risky
and potentially disadvantageous scheme.  This is not a duty to balance
shareholders' and creditors' interests: cf para 244 of Lord Hodge DPSC's
judgment.  The second ground would be that the scheme was driven by a
C   desire to benefit current shareholders rather than for the benefit of the
company as a whole.  This point was made by the Supreme Court of Canada
in *Trustee of Peoples Department Stores Inc v Wise*, above, at paras 42 and
47: see also *Colin Gwyer & Associates Ltd v London Wharf (Limehouse)
Ltd* [2003] 2 BCLC 153, paras 411–412 below.  Professor LS Sealy made a
similar point about the insolvency-deepening activity of Mr Dodd in *West
Mercia* (see paras 406–407).
D   331   If this was the position before the statutory statement was enacted,
then it must be the position afterwards because, under section 170(3), the
duties in the statutory statement must be both interpreted and "appl[ied]" in
the same way as the duties under the previous law.

332   In my judgment, the words "for the benefit of its members as a
whole" in the success duty in section 172(1) do not in any event alter this
E   conclusion.  Under section 170(1), all the duties of directors in the statutory
statement are "owed . . . to the company".  This means the company as a
whole and as a separate legal entity.  Shareholder primacy is about the
entitlement to control and to profits.  The words "for the benefit of its
members as a whole" in section 172(1) must be read not in isolation but in
the context of the entirety of the statutory statement of the duties of
directors, including section 170.  The words in question do not replace the
F   concept of the company as a whole and as a separate legal entity.  Nor do
they mean that the directors can consistently with their duty to the company
and on the basis that they are promoting the success of their company "for
the benefit of its members as a whole" ignore either the other obligations
imposed by law or by contract on the company, or the relationships which
the company must have with its creditors and others if it is to continue to
G   trade.  Creditors have to be paid first before any scheme for (on this
hypothesis) the exclusive benefit of current members is implemented.  It
would accordingly still be a breach of duty under the general law for
directors to pursue a rescue to give shareholders a (slim) chance of a free-
rider gain with no sufficient benefit to the company or its creditors (thus
meeting the further point made by Lord Hodge DPSC that the creditors will
also benefit if the shareholders' speculation succeeds).  There are other
H   jurisdictions whose law of directors' duties is that same as that of the UK
prior to the 2006 Act and they may have to grapple with this point, so I make
it clear that this is my obiter view.  For the reasons given in this and the two
preceding paragraphs, it seems to me that the insolvency-deepening example
would be likely to involve a breach of duty by directors in any event and

© 2022 The Incorporated Council of Law Reporting for England and Wales

that, contrary to Mr Thompson KC's submission, it does not of itself   A
necessitate the rule in *West Mercia*.  The reasons why it should be approved
go wider than this.  In my judgment, they include the fact that it provides a
more transparent and more direct protection for creditors and meets
expectations as to best practice.  In addition, it may, as I explain below,
make the law more effective.

333   The decision in *Colin Gwyer* is in line with my approach.  The   B
directors of the insolvent company were in breach of duty for approving for
varying motives a compromise which was not in the company's best
interests.  They failed to consider its interests (at all) and/or gave their
approval for a collateral purpose.  That was the first basis for holding that
they were in breach of duty.  Leslie Kosmin QC separately considered that,
applying *West Mercia*, they were required to consider creditors' interests:
this was additional to their other duties (para 74).  So, for example, Leslie   C
Kosmin QC found that one director, Mr Howells, had failed to exercise
independent judgment and shown "wilful blindness" in considering the
company's interests (paras 78 and 83), as well as failing to consider the
interests of creditors (para 84).  He contrasted Mr Howells' position with
that of Mr Palmer.  Mr Palmer considered the interests of the company, but
he "also" failed to consider the interests of the creditors:

    "The test of what is a fiduciary duty applied by Millett LJ in *Bristol and*   D
*West Building Society v Mothew* can be seen to apply without difficulty to
the present case, at least in so far as Mr Howells is concerned.  However
well-meaning, he did not show single-minded loyalty to the company, nor
did he have regard to the interests of the creditors.  Mr Palmer, on the
other hand, although motivated by what he considered to be the interests
of the company in the sense of the shareholders also failed the latter test in   E
that he had no regard to the interests of the creditors.  He was unable to
explain in the witness box how the company would pay the creditors,
except that he assumed that the shareholders would eventually have to
raise the necessary funds": para 84.

334   I consider this to be an example of how fiduciary duties apply   F
irrespective of the rule in *West Mercia*.  Directors must perform their other
fiduciary duties and their duty of care as well as consider the interests of
creditors (the equivalent of "the latter test" per Leslie Kosmin QC), though
not as part of any self-standing duty to consider the interests of the creditors.
As Lord Hodge DPSC explains, Issue 5 in that case raised the question of
whether the directors were in breach of fiduciary duty to the company.
I agree that the judge relied on *West Mercia*.  My point, however, is that the   G
alleged misconduct by the directors was not limited to a failure to consider
creditors' interests.

335   There is also a wide range of other remedies available if directors
act improperly, including in appropriate circumstances section 423 of the
1986 Act.  A claim under that section was held to lie in these proceedings.
That claim was brought against A Ltd, and not, as here, its directors.  In the
same way, there are specific provisions avoiding certain transactions which   H
ante-date insolvency or administration, such as sections 238 (Transactions
at an undervalue: England and Wales), and section 239 (Preferences:
England and Wales), section 242 (Gratuitous transactions (Scotland)) and
section 243 (Unfair Preferences (Scotland)) of the 1986 Act.  Section 423 is

© 2022 The Incorporated Council of Law Reporting for England and Wales

803

[2022] 3 WLR

BTI 2014 LLC v Sequana SA (SC(E))

Lady Arden

A   derived (through the Fraudulent Conveyances Act 1571 (13 Eliz 1 c 5)) from the actio Pauliana.   There is a principle of bankruptcy law in Scotland, similarly so derived, but which unlike section 423(3) does not require a fraudulent intention to be shown.   Even so, this principle does not mean that the debtor becomes a trustee for his creditors: see *Nordic Travel Ltd v Scotprint Ltd* 1980 SLT 189, the Inner House (The Lord President, Lord Elmslie, Lord Cameron and Lord Stott), where the Inner House held that the

B   payment of a debt in the ordinary course of business was not a fraudulent preference which could be avoided in a subsequent insolvency either under the common law of Scotland or under the provisions of the Companies Act 1948.   Thus, it could not be said that this principle is the source of the rule in *West Mercia*.

336   There is accordingly a potential overlap between the rule in *West*

C   *Mercia* and other remedies but, in my judgment, there is nothing which makes the approval and development of that rule unprincipled or unjustified. There are snags in relying on the directors' fiduciary duties in the insolvency-deepening situation.   The liquidator may find it difficult to prove that directors' views of the prospects of success were unrealistic and the existence of an obligation properly to consider the creditors' interests may prove a more effective remedy.   A similar point applies to the objection on the

D   grounds of a panoply of remedies.   The fact that there are so many remedies for conduct in insolvency law underscores the need to have a range of sanctions to ensure directors act properly while there is an asymmetry in the governance of the company, as I have described it above.   That is an argument for having more, not less, of such remedies, and I consider it to be in accordance with the statutory policy in having such detailed insolvency law

E   as applies in the UK. The CLRSG did not reject it as a rule of judge-made law or recommend that Parliament should pass legislation rejecting it.   Moreover, a duty on these lines had in practice been accepted since before *West Mercia* was decided in 1987 (see the point made by Lord Hodge DPSC about section 15 of the Insolvency Act 1985).   Furthermore, the proposition that on insolvency directors should consider creditors' interests must surely represent the basis of good practice in any event.

F

*Issue (6) Can the rule in West Mercia apply to a decision by directors to pay a dividend which is otherwise lawful?*

337   The relevant statutory provision here is section 851(1) of the 2006 Act, which is set out at para 370 below.

338   Where a distribution causes a company's insolvency, section 851(1)

G   of the 2006 Act also serves to protect creditors.   Part 23 of the 2006 Act provides a detailed set of rules that must be followed to pay a lawful distribution.   Part 23 is derived from the Companies Act 1980.   Before that, the common law rules on dividends were much less strict and permitted, for example, the payment of dividends out of trading profits without bringing into account capital losses.   Compliance with the rules in Part 23 is not in itself enough if a person who has standing to sue (such as a liquidator)

H   can point to any additional rule under the general law.   This is because section 851(1), which is contained in Part 23 of the 2006 Act, provides (subject to immaterial exceptions) that the provisions of that Part are without prejudice to any other rule of law restricting the cases in which distributions can be made.   Under Part 23, distributions must be paid by

© 2022 The Incorporated Council of Law Reporting for England and Wales

reference to relevant accounts.  One example where section 851(1) applies is *A* where, after the date of the relevant accounts, the company incurs a loss which eliminates or reduces its distributable profits.  In those circumstances it is the general law and not Part 23 which precludes the making of a distribution otherwise than out of profits and prevents the distribution from being lawfully paid.

339   The significance of section 851(1) of the 2006 Act on this appeal is *B* that it serves to protect creditors from distributions being made which, though otherwise compliant with Part 23, cause the company to be insolvent.  When rejecting this argument, David Richards LJ (as he then was) gave the example of a company which makes a distribution which leaves it insolvent on a cash flow basis (judgment, para 224).  David Richards LJ held that this was a situation where the rule in *West Mercia* might come into play in relation to distributions.  This example is taken up by Lord Briggs JSC at *C* para 161 of his judgment.

340   This matter was not fully argued on this appeal.  For understandable reasons, Mr Thompson KC did not advance any alternative case that if the rule in *West Mercia* did not exist section 851 would in any event make the second distribution unlawful (and I leave open the question of the extent of the rules of law preserved by section 851(1)).  My provisional view is that the *D* example given by David Richards LJ at para 224 of his judgment would fall under section 851(1) in any event, as its wording is not on its natural reading confined to a return of capital.  But even if that were not correct, David Richards LJ's example would be an obvious act of mismanagement by the directors which would constitute a breach of the general fiduciary duties of the directors.

341   In *In re Loquitur Ltd* [2003] 2 BCLC 442, 489–490, para 240 *E* Etherton J reached the conclusion that a distribution which rendered a company insolvent would be unlawful under the rule in *West Mercia*, but the distribution was otherwise unlawful in any event under other provisions.  In determining insolvency for the purposes of a rule of law preserved by Section 851(1), assistance might now be gained from *Eurosail* (see paras 308 to 310 above).

342   Accordingly, I agree with Lord Briggs JSC (para 161 of his *F* judgment) that the making of a distribution which complies with Part 23 of the 2006 Act is not ipso facto outside the rule in *West Mercia*.  This is because section 851 of the 2006 Act preserves any rule of law that additionally makes a distribution unlawful.

*Further issue (A): Legislative history and pre-legislative materials*                    *G*

343   I have cited these extensively in Section 2, including the work of the Company Law Review, which was established by the Department of Trade and Industry (as it was then called) ("the DTI") (now the Department for Business, Energy and Industrial Strategy): see para 362 below.  The pre-legislative materials are therefore authoritative and a means whereby we can be better informed about the legal problems that arise on this appeal.  It is *H* not of course for the court as part of its task of interpretation to formulate or evaluate the policy, but the policy as set out in a report which the 2006 Act was designed to implement throws light as I say on the background to the legislation, sometimes called its mischief.  For that purpose, it is admissible as an aid to interpretation.  These materials show the circumstances against

© 2022 The Incorporated Council of Law Reporting for England and Wales

*A*   which Parliament enacted section 172 of the 2006 Act and the context within which it sits.  The Explanatory Notes show how there had been no resolution of the issue of the directors' duty in relation to creditors during the process of implementing the recommendations of the CLRSG.  There are restrictions on the use of Parliamentary and other materials as aids to statutory interpretation, but the present appeal is not solely about statutory interpretation.  It is also about the development of judge-made law, to which
*B*   the same restrictions do not necessarily apply.

*Further issue (B): does section 172(3) confirm the rule of law or leave it to the courts to decide?*

   **344**   It is a matter of some importance to answer this question so that the court and the reader can be fully aware of the issue which these judgments
*C*   decide.  I take the view that on its true construction section 172(3) does not require the courts to adopt or approve any rule of law in relation to creditors.  The reference in section 172(3) to "any . . . rule of law" was, in my judgment, a precautionary exercise when understood against the possibility of the development of the case law as it then stood.  The only relevant decision at appellate level was *West Mercia* which did not analyse
*D*   the legal position in any detail.  The courts were instead given authority to develop the law in this area, by implication in a way which "married up" with relevant legislation and existing principles of the common law.  Lord Reed PSC agrees with this interpretation (para 71 above).  Lord Briggs JSC holds that section 172(3) amounts to a recognition by Parliament that the duty exists (para 153).  I do not agree.  The natural meaning of those words is that section 172(1) is without prejudice to any rule of law, *if any*.  If
*E*   Parliament considered that such a duty existed but simply its scope was unclear, it would have used the definite article and described the rule of law as "the" rule of law.

   **345**   I feel no doubt about this interpretation, but the legislative history shows the reason why the legislature inserted section 172(3) and did not determine the duty for itself.  I have set this out in Section 2, Part 7 below.  It
*F*   confirms that Parliament is unlikely to have intended to legislate for such a duty itself.  If it had done so, it would have to have defined the content of the duty and the time when it arose.  The fact that it has done neither of these things reinforces the conclusion to which I have come on construction.

*Further issue (C): creditors of a financially distressed company do not have a proprietary interest in the company's assets*
*G*
   **346**   Contrary to Mr Thompson KC's submission, a duty in relation to creditors based on the notion that a creditor has a proprietary interest in the company's assets is unsound in law.  The correct position is that on winding up the company will no longer be entitled to its assets beneficially (see *Ayerst v C & K Construction Ltd* [1976] AC 167, 177–180).  But creditors do not acquire any beneficial interest in the assets when the company is wound up,
*H*   only the right to see that the assets are duly administered and distributed: *In re Calgary and Edmonton Land Ltd* [1975] 1 WLR 355.
   **347**   As Professor Worthington (as she became) wrote in "Directors Duties, Creditors' Rights and Shareholder Intervention" (1991) 18 MULR 121:

"3.2.3 What is the rationale for the duty's existence?                      *A*

"Where reasons were given for the existence of the duty, the one most favoured was that creditors may be seen as beneficially interested in the company, or at least contingently so, when the company is insolvent or marginally solvent.  This suggests that the directors' duty to creditors is dependent upon the creditors having a proprietary interest in the assets of the company, or being prospectively entitled to such a right in a 'practical sense'.  This requirement of a proprietary interest is a recurrent theme in   *B* equity jurisprudence.

"Such an analysis, while superficially attractive, is fundamentally flawed.  It is true that on winding-up the creditors acquire the right, for the first time, to participate directly in the administration of the affairs of the company.  In addition, the liquidator, acting as the agent of the company, owes fiduciary duties to the creditors.  This special position of   *C* the creditors, however, does not entail the concurrent acquisition of a proprietary interest in the assets of the company; moreover, it comes at a cost to the creditors: they are deprived of all their ordinary remedies against the company.  For these reasons it is impossible to draw the analogies suggested: they are wrong when winding-up has commenced; they are inappropriate beforehand, even in a situation of marginal   *D* insolvency": pp 140–141, footnotes omitted.

348   A feature common to both *Kinsela* and *Nicholson v Permakraft (NZ) Ltd* [1985] 1 NZLR 242 ("*Permakraft*")is that the judges rooted the obligations of directors at least in part in practicality, rather than strict law, and in the notion that creditors were prospectively entitled to the company's assets.  The references to "in a practical sense" and to business ethics are a   *E* concession that it is not possible to square the obligations in relation to creditors with the legal basis of directors' duties.

*Dismissal of the appeal*

349   I agree that, on the facts, this appeal must be dismissed.

SECTION 2                                         *F*

*Background and ancillary issues*

*Part 1: Outline of the facts and of the judgment of the Court of Appeal*

350   For my purposes it is sufficient to give a simplified version of the facts.  On 18 May 2009, A Ltd, a UK registered company, made a distribution of nearly all its net assets to its parent company, Sequana SA ("S SA"), the first   *G* defendant.  A Ltd had a major liability ("the environmental liability") in respect of clean-up costs as a result of the pollution of the Fox river in Wisconsin.  B plc was a contingent creditor of A Ltd as it had guaranteed the discharge of this liability.  A Ltd followed the statutory procedure in Part 23 of the 2006 Act for quantifying the amount that may be paid by way of distribution, including the preparation of relevant accounts.  Some years after the distribution was made, it emerged that the environmental liability, which   *H* had been a contingent liability of A Ltd at all material times, was much greater than originally estimated, and A Ltd became insolvent.  There were in fact two distributions, but I need not mention the first.  Further details can be found in the judgments of the courts below.

© 2022 The Incorporated Council of Law Reporting for England and Wales

807

A    351   There were two claims: (1) by the assignee of A Ltd's claim, against A Ltd's directors (being the second to fifth defendants) for breach of the duty in relation to creditors and (2) by B plc against A Ltd on the grounds that the May 2009 distribution was a transaction entered into with a view to defrauding creditors and thus fell within section 423 of the 1986 Act.

352   The former claim failed.   The trial judge, Rose J, as she then was, found that the distribution was lawfully made and that the risk of A Ltd's insolvency at the time of the distribution was not sufficient to trigger an obligation to creditors.   At the time of the distribution, A Ltd was not insolvent or likely to become insolvent.   There is nothing remarkable in the express requirements of Part 23 of the 2006 Act having this effect since it has long been established that, if the directors make a reasonable estimate of the financial position of the company and make a distribution on the basis of it, they will not be liable if the financial position is subsequently shown to have been materially overstated: see *In re Mercantile Trading Co* (1869) LR 4 Ch App 475.   In that case, the directors of a ship owning company, engaged in a "hazardous trade" with Confederates during the American Civil War, made a distribution out of profits then reasonably thought to exist (insurance not being available) notwithstanding that the company subsequently incurred substantial losses when, inter alia, one of its ships was lost while trying to run a Government blockade.   The point in this case is that at the time of the distributions the directors carefully considered the liabilities of the company and formed the judgment in good faith that the distributions would not prevent their payment.

353   The latter claim brought by B plc under section 423 of the 1986 Act succeeded in relation to the second distribution, and the trial judge's decision was upheld on appeal.   There is no further appeal relating to this claim before this court.

354   The Court of Appeal (Longmore, David Richards and Henderson LJJ) dismissed appeals against the judge's rulings on the May 2009 distribution and the claim under section 423 of the 1986 Act.   The reasons for the conclusions of the Court of Appeal are contained in the insightful and lucid judgment of David Richards LJ, with which Longmore and Henderson LJJ agreed.   David Richards LJ held that the Court of Appeal was bound by the decision in *West Mercia* to hold that the directors owed a duty to consider the interests of creditors and that the authorities showed that the duty in relation to creditors was triggered when the directors knew or should have known that the company was insolvent.   In his judgment, the duty arose immediately prior to insolvency.   The company was not insolvent when the distribution was paid.   The duty did not arise simply because there was a real, and not remote, risk of insolvency.   The question of the content of the duty, therefore, did not arise.   However, David Richards LJ held that he could see no alternative to its being paramount, i e that it displaced the duty to act for the benefit of members once the duty had itself been triggered.

H   *Part 2—The overarching legislative framework for the duties and liabilities of directors of financially distressed companies*

355   There is a clear legislative scheme for the duties of directors in financially distressed companies.   The purpose of the legislation is to encourage the rescue of companies rather than their liquidation.

© 2022 The Incorporated Council of Law Reporting for England and Wales

A

356   Since the 1980s, Parliament has legislated for various procedures to enable financially distressed companies to be rescued rather than put into liquidation.  The fact that the company is financially distressed does not necessarily mean that the directors have mismanaged it.  Nor does it mean that the company does not have a core business which is worth rescuing.

B

357   An example of the effects of the law when there were no such procedures is the famous case of Rolls Royce.  In 1971 Rolls-Royce went into receivership.  The circumstances were that it was developing advanced jet engines, including the RB211, but the costs became unmanageable, and Rolls-Royce went into receivership with thousands of redundancies both in that company and as a "domino" effect in other companies too.  As the Aviation Minister (Mr Frederick Corfield) explained in Parliament when asked by another member whether there was a threat of receivership (viz from the banks): "The hon Gentleman knows, or ought to know, as well as I do that the company was in the position, had it gone on trading that it would be incurring grave penalties under section 332 of the Companies Act 1948." (Section 332 imposed liability for fraudulent trading, which is now the subject of section 213 of the Insolvency Act 1986) Hansard (HC Debates), 8 February 1971, col 101).  The answer of the Aviation Minister clearly implies that, as was often the case when there were no rescue regimes, the directors had invited the banks to appoint receivers.  In the event the Government nationalised Rolls-Royce and part of the business was saved.  No director would want to risk personal liability for fraudulent trading, which might arise when what the directors knew was later found by a court to amount to there being no reasonable prospect of creditors being repaid (see *In re William C Leitch Bros Ltd* [1932] 2 Ch 71, 77).

C

D

358   The legislative changes include the introduction of administration (see para 325 above) and most recently the introduction of Part 26A of the 2006 Act, as amended by the Corporate Insolvency and Governance Act 2020 ("CIGA") to enable courts to sanction schemes of arrangement which have not been approved by every class of creditors, or "cross-class cram down."

E

359   To reinforce these changes, measures have been introduced to encourage directors to take early professional advice and to use the new procedures rather than put the company into liquidation.  Moreover, directors do not have a statutory duty to put their company into liquidation.

F

360   These measures importantly included the creation of liability for "wrongful trading", that is, for the harm caused by continuing to trade when the directors knew or should have known that liquidation was inevitable (section 214 of the 1986 Act).  I have already discussed this in paras 318 to 324 above.

G

361   Wrongful trading provides a powerful incentive for directors to take early action if their company is financially distressed, and not to throw the burden of the company's financial position and continued trading on to creditors.  Wrongful trading operates like a sword of Damocles over the heads of directors when their company is financially distressed.  Wrongful trading also reduces the possibility that directors will cause their company to enter exceptionally risky courses of action or simply do nothing.  Because it only applies when winding up has become inevitable, it also reduces the risk that directors will close down businesses too quickly, which causes loss to many, not just creditors.

H

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    362    The choice of which action to take is left with the directors. If their company is financially distressed, the directors must decide how to act in accordance with their duties laid down in the statutory statement of duties. This statement was new in the 2006 Act and was principally the work of the Law Commissions and the CLRSG. There were some 15 members of the CLRSG, and the membership was widely drawn from company directors, the legal and accounting professions, lawyers and
B    economists. As stated, I was a member of the CLRSG. The CLRSG adopted a multidisciplinary approach which meant that many areas were exposed to scrutiny by businesspeople and economists (*Modern Company Law For a Competitive Economy, Final Report*, June 2001, Final Report para 1.21). During the review it issued some nine consultation documents and one Final Report.

C    363    Under the statutory statement of duties, directors owe to their companies fiduciary duties, including the duty to promote the success of the company ("the success duty"). The success duty requires directors to promote the success of the company for the benefit of members on a long-term basis, having considered all relevant matters of which a non-exhaustive list is given (section 172(1) of the 2006 Act). The success of the company
D    means its continued viability, so clearly one of the matters to which directors must under section 172(1) consider is the timely payment to creditors of the amounts due to them. Non-compliance with the terms agreed with creditors is likely to cause the company loss of reputation at the least. The expression "for the benefit of its members" reflects the fact that if the company succeeds it will create funds which are distributable not to creditors but to members.
E    The success duty is the successor to the duty of directors as traditionally stated, namely, taking the well-known formulation of Lord Greene MR in *In re Smith and Fawcett Ltd* [1942] Ch 304, 306: a duty to act "bona fide in what they consider—not what the court may consider—is in the interests of the company and not for any collateral purpose" (but see further para 276 above and para 386 below).

F    364    The statement of duties must be read as a whole: the fact that a director may have performed or been exempted from one duty does not mean that he or she does not have to comply with other duties. There are further important and relevant duties set out in the statutory statement. These include the duty of care. They also include the duty to exercise their powers of management for the purpose for which they were conferred (section 171(b)), and not, for instance, for the benefit of themselves, or
G    shareholders in their individual capacity. It remains a duty to the company even after creditors' interests intrude and displace other interests.

*Part 3: The relevant provisions of the 2006 Act and the Insolvency Act 1986*

365    Section 172(3) of the 2006 Act forms part of the new statutory statement of directors' duties. There are some general provisions (notably
H    sections 170 and 180) and a list of general duties, which are described in some detail:

> "170 *Scope and nature of general duties*
> "(1) The general duties specified in sections 171 to 177 are owed by a director of a company to the company . . ."

© 2022 The Incorporated Council of Law Reporting for England and Wales

"(3) The general duties are based on certain common law rules and equitable principles as they apply in relation to directors and have effect in place of those rules and principles as regards the duties owed to a company by a director.

"(4) The general duties shall be interpreted and applied in the same way as common law rules or equitable principles, and regard shall be had to the corresponding common law rules and equitable principles in interpreting and applying the general duties . . .

"171 *Duty to act within powers*

"A director of a company must— (a) act in accordance with the company's constitution, and (b) only exercise powers for the purposes for which they are conferred.

"172 *Duty to promote the success of the company*

"(1) A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole, and in doing so have regard (amongst other matters) to— (a) the likely consequences of any decision in the long term, (b) the interests of the company's employees, (c) the need to foster the company's business relationships with suppliers, customers and others, (d) the impact of the company's operations on the community and the environment, (e) the desirability of the company maintaining a reputation for high standards of business conduct, and (f) the need to act fairly as between members of the company.

"(2) Where or to the extent that the purposes of the company consist of or include purposes other than the benefit of its members, subsection (1) has effect as if the reference to promoting the success of the company for the benefit of its members were to achieving those purposes.

"(3) The duty imposed by this section has effect subject to any enactment or rule of law requiring directors, in certain circumstances, to consider or act in the interests of creditors of the company.

"173 *Duty to exercise independent judgment* (. . .)

"174 *Duty to exercise reasonable care, skill and diligence*

"(1) A director of a company must exercise reasonable care, skill and diligence.

"(2) This means the care, skill and diligence that would be exercised by a reasonably diligent person with— (a) the general knowledge, skill and experience that may reasonably be expected of a person carrying out the functions carried out by the director in relation to the company, and (b) the general knowledge, skill and experience that the director has.

"175 *Duty to avoid conflicts of interest* (. . .)

"176 *Duty not to accept benefits from third parties* (. . .)

"177 *Duty to declare interest in proposed transaction or arrangement* (. . .)

"178 *Civil consequences of breach of general duties*

"(1) The consequences of breach (or threatened breach) of sections 171 to 177 are the same as would apply if the corresponding common law rule or equitable principle applied.

"(2) The duties in those sections (with the exception of section 174 (duty to exercise reasonable care, skill and diligence)) are, accordingly, enforceable in the same way as any other fiduciary duty owed to a company by its directors . . ."

© 2022 The Incorporated Council of Law Reporting for England and Wales

A        "180 *Consent, approval or authorisation by members*"

         "(4) The general duties— (a) have effect subject to any rule of law
enabling the company to give authority, specifically or generally, for
anything to be done (or omitted) by the directors, or any of them, that
would otherwise be a breach of duty . . ."

B    366   The 1986 Act (as amended by the Small Business, Enterprise and
Employment Act 2015), imposes liability on directors for wrongful trading
while insolvent:

         "214 *Wrongful trading*

         "(1) Subject to subsection (3) below, if in the course of the winding up
of a company it appears that subsection (2) of this section applies in
relation to a person who is or has been a director of the company, the
C    court, on the application of the liquidator, may declare that that person is
to be liable to make such contribution (if any) to the company's assets as
the court thinks proper.

         "(2) This subsection applies in relation to a person if— (a) the
company has gone into insolvent liquidation, (b) at some time before the
commencement of the winding up of the company, that person knew or
D    ought to have concluded that there was no reasonable prospect that
the company would avoid going into insolvent liquidation or entering
insolvent administration, and (c) that person was a director of the
company at that time; but the court shall not make a declaration under
this section in any case where the time mentioned in paragraph (b) above
was before 28th April 1986.

E        "(3) The court shall not make a declaration under this section with
respect to any person if it is satisfied that after the condition specified in
subsection (2)(b) was first satisfied in relation to him that person took
every step with a view to minimising the potential loss to the company's
creditors as (on the assumption that he had knowledge of the matter
mentioned in subsection (2)(b)) he ought to have taken.

F        "(4) For the purposes of subsections (2) and (3), the facts which a
director of a company ought to know or ascertain, the conclusions which
he ought to reach and the steps which he ought to take are those which
would be known or ascertained, or reached or taken, by a reasonably
diligent person having both— (a) the general knowledge, skill and
experience that may reasonably be expected of a person carrying out the
same functions as are carried out by that director in relation to the
G    company, and (b) the general knowledge, skill and experience that that
director has.

         "(5) The reference in subsection (4) to the functions carried out in
relation to a company by a director of the company includes any
functions which he does not carry out but which have been entrusted to
him . . ."

H        "(7) In this section 'director' includes a shadow director."

     367   By virtue of section 246ZB of the 1986 Act, the remedy for wrongful
trading may also be exercised by an administrator in an administration.
Thus, liability for wrongful trading cannot be avoided by putting the
company into administration rather than liquidation.

© 2022 The Incorporated Council of Law Reporting for England and Wales

368   Section 423 of the 1986 Act contains a remedy for transactions                 A
defrauding creditors, and it may be exercised at any time, not simply when a
company is insolvent or in an insolvency procedure:

> "423 *Transactions defrauding creditors*
> "(1) This section relates to transactions entered into at an undervalue;
> and a person enters into such a transaction with another person if— (a) he
> makes a gift to the other person or he otherwise enters into a transaction      B
> with the other on terms that provide for him to receive no consideration;
> (b) (. . .); or (c) he enters into a transaction with the other for a
> consideration the value of which, in money or money's worth, is
> significantly less than the value, in money or money's worth, of the
> consideration provided by himself . . ."
> "(3) In the case of a person entering into such a transaction, an order         C
> shall only be made if the court is satisfied that it was entered into by him
> for the purpose— (a) of putting assets beyond the reach of a person who is
> making, or may at some time make, a claim against him, or (b) of
> otherwise prejudicing the interests of such a person in relation to the
> claim which he is making or may make."

369   The 1986 Act contains several other provisions which are relevant,           D
such as section 213 (fraudulent trading), but it is not necessary to set
these provisions out.  The relevant provisions of the 2006 Act apply to the
whole of the United Kingdom (the 2006 Act, section 1299).  The relevant
provisions of the 1986 Act apply to England, Wales and Scotland except for
sections 238 to 241 (transactions at an undervalue and preferences) and
section 423, which extend to England and Wales only (section 440 of the
1986 Act).   This does not mean that the legislation on insolvency in         E
Northern Ireland is materially different.  We have only been addressed on the
law of England and Wales and observations on matters which affect
Scotland and Northern Ireland should be treated as provisional only.

370   Returning to the 2006 Act, I need to set out a section dealing with
distributions to shareholders. Part 23 of the 2006 Act sets out the rules with
which a company must comply to make a lawful distribution.  It is not
necessary to set out any of the provisions of Part 23 save for section 851(1).   F
This makes it clear that those rules are not exhaustive and that restrictions
imposed by the general law are not affected:

> "851 *Application of rules of law restricting distributions*
> "(1) Except as provided in this section, the provisions of this Part are
> without prejudice to any rule of law restricting the sums out of which, or
> the cases in which, a distribution may be made."                               G

*Part 4: Legislative history and the principle of enlightened shareholder value*

371   In this Part I set out some of the relevant legislative background
to section 172, which involves both the CLRSG and the DTI.    (For
convenience, I use the term "legislative history" to include pre-legislative
history without prejudice to their different roles as aids to statutory          H
interpretation).  Chronologically, there were three distinct periods: (i) the
Company Law Review period from 1998 to June 2001, in which the CLRSG
issued two relevant consultation documents and a Final Report considering
in detail the arguments for and against a specific duty on directors in relation

© 2022 The Incorporated Council of Law Reporting for England and Wales

A to creditors; (ii) the DTI's own consultation period from July 2002 to March 2005 when the DTI issued two relevant White Papers, both of which were consultation documents and the second of which contained a draft of what became section 172(3) and an explanatory note; and (iii) the period from 1 November 2005, when the Companies Bill was presented to Parliament, to 8 November 2006, when the Bill received Royal Assent, when there were

B relevant explanatory notes in identical terms published for the Bill and the Act, but in different terms from the explanatory note on which the Secretary of State sought consultees' views in March 2005. This history shows the importance of ESV and how it affected the statement of duties.

372   At an early stage in its review, the CLRSG considered the question also in whose interests should companies be run? The main argument was on the one hand for ESV, which involved companies being run for the

C ultimate benefit of shareholders (shareholder primacy), and, on the other hand, the argument that companies should be run for the purpose of benefiting a range of stakeholders, including shareholders, employees and the community. After consultation, the CLRSG decided that the appropriate model was enlightened shareholder value. In due course this was expressly accepted by the Government so there is no doubt that it was the intention

D that the 2006 Act should be based on that principle.

373   The CLRSG went on to consider directors' duties. It recommended that the duties of directors, then governed solely by the general law, should be set out in a statutory statement of duties. This too would be based on the enlightened shareholder model i e, shareholder primacy modified by an obligation to have regard to factors such as the interests of employees and the need to foster relationships with suppliers, customers and others.

E 374   Shareholder primacy has at least two aspects, a governance aspect, which means that shareholders appoint those who have control of the assets of the company, and a right to the residual equity. On liquidation control passes to the liquidator and that was, as I see it, a key point in the judgment of Street CJ in *Kinsela*.

375   Shareholder primacy does not mean that shareholders' interests

F exclude those of others with legitimate interests: see the non-exhaustive list of interests in section 172(1) of the 2006 Act.

376   It is inherent in shareholder primacy that other interests such as those of creditors will necessarily diminish the interests of shareholders. They are only ever residual claimants.

377   The statement of the duties of directors in the 2006 Act builds on

G work of both the Law Commission of England and Wales (of which I was at the relevant time first Chair and then a consultant) and the Scottish Law Commission, of which Lord Hodge was a Commissioner. I therefore had the privilege of working with him and the Scottish Law Commission on the project. The Law Commissions' joint report, *Company Directors: Regulating Conflicts of Interest and Formulating a Statement of Duties* (Law Com No 261, Scots Law Com No 173) recommended at para 16.1 that there should

H be such a statement. (The long history of unsuccessful attempts to enact such a statement is set out in the consultation paper: *Company Directors: Regulating Conflicts of Interests and Formulating a Statement of Duties* (Law Com Consultation Paper No 153, Scots Law Com Discussion Paper No 105)). But in relation to obligations to creditors the Law Commissions' Report has

© 2022 The Incorporated Council of Law Reporting for England and Wales

little to say as there was only a passing reference to a duty in relation to creditors (para 5.16).                                                                       A

378   With one exception the content of the duties contained in the statutory statement of duties was the product of the work of the CLRSG. That one exception relates to a director's duty to exercise reasonable care, skill and diligence, which forms part of the statutory statement of duties and is now in section 174 of the 2006 Act. The Law Commissions recommended a change in the law regarding the standard of care. The CLRSG agreed with                 B their recommendation and the Government accepted it. It was implemented almost verbatim in section 174. Under that section, the standard of care, skill and diligence which a director must show is to be judged by reference to both the general knowledge, skill and experience of that director and the general knowledge, skill and care reasonably to be expected of a person with the same functions. The important point is that the skill, care and diligence              C of directors is now judged not simply by their own talents (as at one time was the sole test) but also objectively according to the standards which are reasonably to be expected of a person in that position. This duty of care is of course one of the protections for creditors.

379   A key point is that the duties imposed by the statutory statement of duties are owed to the company. This is expressly stated: see section 170(1) of the 2006 Act. The company has two organs: (1) the board of directors;                D and (2) the company in general meeting. The articles may not enable all members to vote and the members of the company who can vote on any issues constitute the company in general meeting. Specifically, the duty imposed by section 172, to promote the success of the company for the benefit of members, is based on shareholder (or member) primacy, which I will explain in more detail below.                                                            E

380   The CLRSG issued two consultation documents at an early stage in the review. In the first of these, *Modern Company Law For a Competitive Economy—The Strategic Framework* (February 1999) the CLRSG asked respondents for their views as between two broad schools of thought about the current legal framework. The first was whether company should be run on the basis of ESV, where the ultimate goal is to generate maximum value             F for shareholders. The second was the pluralist approach, which considered that the existing framework of company law should be modified so that the company should "serve a wider range of interests, not subordinate to or a means of achieving shareholder value . . . but as valid in their own right": para 5.1.13. One of those interests would be the interests of suppliers:

> "Examples include a decision whether to close a plant, with associated
> redundancies, or to terminate a long term supply relationship, when          G
> continuation in either case is expected to make a negative contribution
> to shareholder returns. In such circumstances, the law must indicate
> whether shareholders, interests are to be regarded as overriding, or some
> other kind of balance should be struck": para 5.1.15.

381   The CLRSG considered that directors were already under an obligation to build long-term and trusting relationships with employees,                 H suppliers, customers and others in order to secure the success of the enterprise over time (para 5.1.22). The pluralist approach meant that directors should manage the company for the benefit of all contributors and not just shareholders. Following consultation, the CLRSG published a

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   summary of the responses.  In the next consultation document, *Modern Company Law For a Competitive Economy- Developing the Framework* (March 2000), the CLRSG explained that a very substantial majority of respondents favoured the basic rule that directors should operate companies for the benefit of members.  However, they should do so on an inclusive basis as there was a concern that in many companies there was not sufficient appreciation of the importance of long-term planning and making effective

B   relationships with employees, suppliers and others.  The CLRSG stated that it proposed to go forward on the basis of "an obligation on directors to achieve the success of the company for the benefit of shareholders by taking proper account of all relevant considerations for that purpose": para 2.19.

382   That is the obligation which was accepted by Government in its White Paper *Modernising Company Law* (Cm 5553–1) (July 2002).  The

C   Government agreed "the basic goal for directors should be the success of the company in the collective best interests of shareholders, but that directors should also recognise, as the circumstances require, the company's need to foster relationships with its employees, customers and suppliers": para 3.3.  There was no reference to the interests of creditors in the draft clauses forming part of this White Paper.

D   383   The consultation documents to which I have referred use the expression "employees" and "suppliers" and that may be because the CLRSG was most concerned to mention those who had trading relationships with the company which the directors needed to foster.  As the Trades Union Congress ("the TUC") put it: "A bank does not have the same kind of relationship with a company as does an employee or a supplier; indeed, the power in the relationship is reversed, with the bank being in a position of some power

E   over the company rather than the other way round." (the TUC, response to "Modernising Company Law", https://webarchive.nationalarchives.gov. uk/ukgwa/20050302025306/http:/www.dti.gov.uk/cld/modern/index.htm).

384   But the list of matters to which directors must have regard set out in section 172(1) is not exhaustive and as stated above I see no reason why in appropriate circumstances the duty to consider the wider range of interests than members would not include creditors more widely defined.  The other

F   general duties in the statutory statement of directors' duties are a duty to act within powers, including the duty to exercise powers for the purposes for which they were given (section 171), a duty to exercise independent judgment (section 173), a duty to avoid conflicts of interest (section 175), a duty not to accept benefits from third parties (section 176), and a duty to declare interests in a proposed transaction or arrangement with the

G   company (section 177).  These duties must be read with the new duty of care for directors contained in section 174.  The provisions are set out in para 365 above.

385   The most material departure in the 2006 Act from the recommendations of the CLRSG on the content of the statement of duties related to the duty of directors in relation to the company's creditors when the directors, acting in fulfilment of their duty of care to the company, know,

H   or ought to know, that the company was not able to pay all its debts as they fall due.  As explained below, in Part 7, the CLRSG was divided on the extent of such a duty, and ultimately proposed illustrative drafts of two clauses relating to insolvency as well as further consultation.  The Government rejected both clauses and instead ultimately proposed that what became the

© 2022 The Incorporated Council of Law Reporting for England and Wales

Companies Bill should contain what is now section 172(3) of the 2006 Act.   A
(The Bill as presented was the Company Law Reform Bill, which merely
made amendments to the Companies Act 1985 but during its passage through
Parliament it was itself heavily amended in effect to enable it to become a
consolidation Act, and it was renamed the Companies Bill.  References to the
Companies Bill in this judgment should be read accordingly.)

   **386**   The CLRSG recommended a major break with tradition when it   B
recommended that directors' duties should be set out in a statutory
statement and that the primary duty of directors should be to act in what the
directors consider to be the appropriate way to promote the success of the
company for the benefit of its members coupled with an obligation as part of
that duty to consider the interests of other persons who contributed to the
company's success.  This was in contrast to the long-established line of case
law, never made statutory, that the primary duty of directors was to act   C
in what they considered to be the best interests of the company with no such
obligation as I have mentioned.  This is not the place to describe the
statement of duties at length, but as the nature of this duty is often
misunderstood, I draw attention to the following key features:

   (i) **Shareholder primacy**: The statutory statement emphasises that
the duty is to promote the success of the company *for the benefit of the*
*members as a whole*, and that the duty is owed to the company.  Thus, the   D
shareholders are the directors' point of focus: the shareholders occupy prime
position.  This reflects the fact that the company will be managed by the
directors, whom the shareholders appoint, and it is the shareholders who in
general bear the risk that their capital will be lost first, and the further
fact, which is important from the point of view of ensuring corporate
competitiveness and the efficiency of the law, that the shareholders are in the   E
best position to monitor the actions of the directors and to enforce the duties
they owe.  Moreover, the 2006 Act adopts a new procedure for derivative
actions brought by shareholders against directors for the benefit of the
company.  The right to take such proceedings has only ever been vested
in shareholders while the company is a going concern.  The aim of the
company's existence is thus to maximise shareholder value, subject however
to the certain features, which result in the concept of ESV.   F

   (ii) There are three further points to make here.  First, as explained above,
shareholder primacy has at least two aspects, a governance aspect, which
means that shareholders appoint those who have control of the assets of the
company, and a right to the residual equity.  Second, shareholder primacy
does not mean that shareholders' interests exclude those of others with
legitimate interests.  Third, it is inherent in shareholder primacy that other   G
interests such as those of creditors will necessarily diminish the interests of
shareholders.

   (iii) The reference to "members" in the expression "for the benefit of its
members as a whole" is not to them in their capacity as individual investors
but to them collectively as the holders of the residual right to profits in the
company.  They are the persons who will benefit from the success of the
company because this results in funds in excess of those required to pay   H
creditors.  Accordingly, if the company is not formed for making profits, the
duty in section 172(1) is modified to exclude any reference to the success of
the company for the benefit of members: see section 172(2) (para 365
above).

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    (iv) However, shareholder primacy is not unqualified in section 172. In parallel with the decision to adopt ESV, shareholders are not given absolute superiority over other stakeholders. The directors are placed under an obligation to have regard to the other stakeholders' interests. ESV could have been called "modified shareholder primacy".

(v) The rule in *West Mercia* parallels this evolution of shareholder primacy by providing for a yet further qualification on the success duty where
B    creditors' interests are engaged. Thus, the rule in *West Mercia* forms quite naturally a part of the legislative scheme in section 172 of the 2006 Act.

(vi) **Long-termism**: Under the statutory statement the directors have the obligation, not simply the discretion, to consider the likely consequences of their decision in the long term, and to take into account the company's relationship with other stakeholders, such as employees, suppliers and local
C    communities. This feature, in common with "constituency" statutes in the US, a subject considered by the CLRSG, encourages companies to act as good citizens and to see their role on a long-term basis without affecting shareholder primacy (see *Principles of Corporate Governance: Analysis and Recommendations*, American Law Institute (1994), vol 1, p 410). As I explained in para 276 above, creditors come into this equation. The company must pay them promptly and treat them properly to maintain its
D    reputation and to obtain long-term benefits.

(vii) **Statement, rather than full codification, of duties**: Contrary to the submission of Mr Thompson KC, the statutory statement is not a codification of directors' duties in the usual sense of the word since subsections 170(3) and (4) explain the basis of the statement of duties and provide that the duties set out in the statute are to be interpreted and applied
E    in accordance with the existing law and principles of equity. As the CLRSG's Final Report acknowledged, the then "statutory structure is itself an overlay on a mass of case law, much of it still in operation . . . It is inevitable, indeed desirable, that this common law development should generally continue . . . but in some key areas it has produced major uncertainties and complexity": para 1.21. On the other hand, the statutory statement would not achieve the purpose of making the law accessible to
F    laypeople if it did not set out the principal duties owed by a director. Provision is made for continuity of interpretation (section 170(4) of the 2006 Act, above). This provision also permits the evolution of fiduciary duties because one of the principles adopted by equity is that they can be applied in new situations: see, for example, *Item Software (UK) Ltd v Fassihi* [2005] ICR 450, paras 41–44, where the Court of Appeal (Mummery and
G    Arden LJJ and Holman J) held that the director's duty of loyalty included a duty to disclose his own misconduct even though the duty of loyalty had never previously been applied in that situation.

(viii) **No obligation in relation to creditors**: The duty to promote the success of the company is not decisively qualified by any creditor duty. Section 172(3) merely preserves the possibility of a requirement in relation to creditors: see above, paras 344 to 345 above and Section 2, Part 7 below.
H
*Part 5: Case law prior to the 2006 Act concerning a duty in relation to creditors*

387   What is said is that *West Mercia* brought into UK law principles about the duties of directors of insolvent companies which had been

developed in the Antipodes, and so I will begin by considering the law from A
that source before I consider *West Mercia*. In my judgment, *West Mercia*
only approves a limited part of the Antipodean approach.

*(a) Case law in Australia and New Zealand from which developments in
UK law are said to be derived*

388   David Richards LJ considered the case law in detail in paras 130 to  B
157 of his judgment.

389   First in time was the decision of the High Court of Australia in
*Walker v Wimborne* (1976) 137 CLR 1 (Barwick CJ, and Mason and
Jacobs JJ), where the company had borrowed money on a secured basis from
one insolvent company and lent it to another. The majority judgment was
given by Mason J who held that the directors had a duty to consider the loan  C
in the interests of their company alone. He went on to add that the directors
also had a duty to consider the interests of shareholders and creditors.
Mason J clearly meant that the directors should consider the interests of
creditors as part of their duty to decide what was in the interests of the
company (see p 7).

390   The Court of Appeal of New Zealand gave further consideration to
the duty to creditors in 1985 in *Permakraft* [1985] 1 NZLR 242, 249, in  D
which Cooke J held:

    "The duties of directors are owed to the company. On the facts of
    particular cases this may require the directors to consider inter alia the
    interests of creditors. For instance creditors are entitled to consideration,
    in my opinion, if the company is insolvent, or near-insolvent, or of
    doubtful solvency, or if a contemplated payment or other course of action  E
    would jeopardise its solvency. The criterion should not be simply
    whether the step will leave a state of ultimate solvency according to the
    balance sheet, in that total assets will exceed total liabilities . . . Balance
    sheet solvency and the ability to pay a capital dividend are certainly
    important factors tending to justify proposed action. But as a matter of
    business ethics it is appropriate for directors to consider also whether  F
    what they do will prejudice their company's practical ability to discharge
    promptly debts owed to current and likely continuing trade creditors. To
    translate this into a legal obligation accords with the now pervasive
    concepts of duty to a neighbour and the linking of power with obligation.
    It is also consistent with the spirit of what Lord Haldane said [in *Attorney
    General of Canada v Standard Trust Co of New York* [1911] AC 498,
    503–505]. In a situation of marginal commercial solvency such creditors  G
    may fairly be seen as beneficially interested in the company or
    contingently so."

391   Cooke J clearly did seek to formulate a self-standing creditor duty.
In seeking to identify the source of or jurisprudential basis for this duty,
Cooke J drew an analogy between directors' fiduciary duties and the duty of
care to one's neighbour in tort. Unsurprisingly that analogy was not  H
approved in *West Mercia*. Cooke J went on to hold that the directors had to
consider the interests of "current and likely continuing trade creditors". The
duty was not owed to "future new creditors" (p 250). But directors would
have to consider the interests of creditors present and future in deciding

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   whether the company is solvent (compare David Richards LJ at para 149 of his judgment).

392   David Richards LJ also took the view that the tortious duty was ruled out by section 170(1) (para 149 of his judgment).  Cooke J clearly had in mind a duty in relation to creditors which would be paramount over other duties owed by directors to their company.

B   393   The passage from Cooke J's judgment cited above was also referred to in the paper by Richard Sykes QC referred to at para 266 above in the lead-up to making the point that he subsequently makes about "two masters".  The other members of the court in *Permakraft*, however, Richardson and Somers JJ, expressly reserved their position on the duty to have regard to creditors.  Richardson J held, at p 255:

C   "If this court is to move in that direction its decision to do so would need to be based on a thorough examination of the scheme and purpose of the companies' legislation.  I prefer to leave that for a case where this question, itself a difficult amalgam of principle, policy, precedent and pragmatism, must be decided."

394   *Kinsela v Russell Kinsela Pty Ltd* (1986) 4 NSWLR 722 (Street CJ, Hope and McHugh JAA) is a decision of the Court of Appeal of New South Wales, and Dillon LJ relied on a limited passage from the judgment of Street CJ in this case in *West Mercia* (see para 399 below).  The directors of a company in financial difficulties, with the unanimous assent of its shareholders, took a lease from the company of its business premises at a rent substantially below the real value.  The directors were the majority shareholders.  The court held that the approval of the transaction by the company in general meeting was ineffective to validate the lease.  I have set out the well-known passage from the judgment of Street CJ at p 730 of his judgment at para 399 below.  It was primarily directed to shareholder ratification of a director's breach of duty.  It is important, however, to note that Street CJ formulated the duty in more guarded terms than Cooke J.  He described it as a duty in the insolvency context not to prejudice the interests of creditors:

F   "Once it is accepted, as in my view it must be, that the directors' duty to a company as a whole extends in an insolvency context to not prejudicing the interests of creditors (*Nicholson v Permakraft (NZ) Ltd* and *Walker v Wimborne)* the shareholders do not have the power or authority to absolve the directors from that breach": p 732.

G   Street CJ hesitated "to attempt to formulate a general test of the degree of financial instability which would impose upon directors an obligation to consider the interests of creditors", citing the courts' traditional and proper caution about pronouncing on the commercial justification for a directors' decision (p 733).

395   Lord Reed PSC and Lord Briggs JSC describe subsequent case law in Australia.  I agree with what they have said and therefore do not H   summarise those cases here.  In addition, the High Court of Australia in *Spies v The Queen* (2000) 201 CLR 603, para 95 resolved for the purposes of the law of Australia the same point in relation to the rule in *West Mercia* as is resolved by this case, namely there is no independent duty in relation to creditors.

*(b) Domestic case law turns on West Mercia*                              A

**396** Until *West Mercia* was decided, there was little authority supporting any obligation in relation to creditors. In *Lonrho v Shell Petroleum Co Ltd* [1980] 1 WLR 627, 634, Lord Diplock, in reference to the directors' duty to act in the best interests of the company held, without further elaboration, that the interests of the company were not "exclusively those of its shareholders but may include those of its creditors". In *In re*   B
*Horsley & Weight Ltd* [1982] Ch 442, 455, Templeman LJ makes a brief reference to the duty not to make payments, which might cause a loss to creditors, when a company is "doubtfully solvent". A similar duty was considered to exist in *Winkworth v Edward Baron Development Co Ltd* [1986] 1 WLR 1512. The facts were complex. Mr and Mrs Wing were the shareholders and sole directors of a company. The company purchased a   C
property ("Hayes Lane") for them to use as their matrimonial home. They paid the proceeds of sale of their previous matrimonial home to the company (which paid them into its overdrawn bank account). Mr Wing procured a commercial lender, W, to lend £70,000 to the company charged on Hayes Lane (using Mrs Wing's forged signature). The company failed to repay W and went into liquidation. W brought proceedings to enforce the charge. Mrs Wing resisted W's proceedings, claiming that her interest in the   D
proceeds of sale of the previous matrimonial home gave her a prior interest in Hayes Lane. There was no finding that the purchase of Hayes Lane was referable to the contribution which she made. Lord Templeman, with whom the other members of the House agreed, rejected her claim. The company had admitted the validity of the charge. The couple had borrowed money from the company to buy shares in it and as a result they were jointly   E
indebted to the company for more than the contribution which she claimed they had made, and so the wife could not enforce her claim to a share in the house. The result of the case was not surprising, but the reasoning was wide-reaching: Lord Templeman held at p 1516 the company "owes a duty to its creditors to keep its property inviolate and available for the repayment of its debts". If that was so, the directors would owe a duty to ensure that the company performed this obligation. In neither *Horsley & Weight* nor   F
*Winkworth* was there any analysis of the relevant propositions. Lord Templeman goes on to refer to a company's duty to its creditors (see the passage cited by Lord Briggs JSC at para 129 of his judgment) but if this expression is read literally, which given the paucity of reasoning would not be appropriate, it is clearly not the duty under the 2006 Act as that expressly provides that all directors' duties are owed to the company (section 170(1)   G
set out in para 365 above). Lord Reed PSC agrees that some observations of Lord Templeman were per incuriam (para 25 above).

**397** In *Brady v Brady* [1988] BCLC 20, 40, Nourse LJ held that when an act was required to be done "in the interests of the company" that meant "in reality" in the interests of the creditors when the company was "or even doubtfully" insolvent. The claimant relied on that passage. As David   H
Richards LJ points out, at para 161, the House of Lords disagreed with Nourse LJ's judgment, but on this point the reason was that the House took a different view of the facts. I agree with Lord Reed PSC's rejection of an insolvency which is merely doubtful as a trigger for the interests of shareholders to be excluded (para 50 above).

© 2022 The Incorporated Council of Law Reporting for England and Wales

821

A        398    The most significant case in domestic law is therefore *West Mercia*,
to which I have already referred.  Mr Dodd, a director of a subsidiary which
was insolvent, caused a transfer of funds to be made by the subsidiary to its
parent company which was also insolvent in reduction of its indebtedness to
its parent company.  The director had had a meeting with his accountants at
which he had been advised that he should not make any payment out of the
bank account.  The payment was a breach of duty on any basis (*In re
B    Washington Diamond Mining Co* [1893] 3 Ch 95, 115, per Kay LJ who held
that orders for repayment could be made not only against the recipient of the
payments which were fraudulent preferences but also the other directors
who approved the transaction could be ordered to repay payments).  The
issue was whether the subsidiary could show any loss because the payment
resulted in an equivalent reduction in its liabilities.  The trial judge dismissed
C    the claim on this basis, citing the judgment of Dillon LJ in *Multinational
Gas*.  Dillon LJ distinguished that case, pointing out that in that case the
company concerned was amply solvent, and what the directors had done, at
the bidding of the shareholders, had merely been to make a business decision
in good faith, and to act on that decision.  It did not matter that the
transaction in that case subsequently turned out to be a bad decision, as
the position had to be decided on the facts at the time of the transaction.
D        399    In reaching his conclusion that Mr Dodd was liable to pay the
company substantial damages, Dillon LJ, with whom the other members of
the Court of Appeal agreed, held that he found helpful and would approve
the following statement of Street CJ in *Kinsela* 4 NSWLR 722, 730:

        "In a solvent company the proprietary interests of the shareholders
E        entitle them as a general body to be regarded as the company when
        questions of the duty of directors arise.  If, as a general body, they
        authorise or ratify a particular action of the directors, there can be no
        challenge to the validity of what the directors have done.  But where a
        company is insolvent the interests of the creditors intrude.  They become
        prospectively entitled, through the mechanism of liquidation, to displace
        the power of the shareholders and directors to deal with the company's
F        assets.  It is in a practical sense their assets and not the shareholders' assets
        that, through the medium of the company, are under the management of
        the directors pending either liquidation, return to solvency, or the
        imposition of some alternative administration."

        400    Dillon LJ had no difficulty in ordering that Mr Dodd should pay to
the liquidator the amount transferred and his reasoning is contained in this
G    short paragraph, at [1988] BCLC 250, 252, immediately following the
passage I have just quoted:

        "In the present case, therefore, in my judgment Mr Dodd was guilty of
        breach of duty when, for his own purposes, he caused the £4,000 to be
        transferred in disregard of the interests of the general creditors of this
        insolvent company.  Therefore the declaration sought in the notice of
H        motion ought to be made as against Mr Dodd."

        401    The thrust of the passage from *Kinsela* was that, in an insolvent
company, the shareholders could not ratify an act by the directors (I discuss
the ratification principle in more detail at paras 312 to 317 above).  Dillon LJ
did not approve any passage from *Permakraft*.  In addition, the thrust of

Dillon LJ's reasoning turned on improper purpose. Having now reflected on this passage since the hearing of this appeal, it seems to me that Dillon LJ relied on the general duties of directors, specifically the duty to exercise powers for a proper purpose, and not on any duty in relation to creditors.

402    Dillon LJ went on to order relief against Mr Dodd on the basis that he was liable for breach of duty and that he would be liable only for the loss to the transferring company. Accordingly he ordered Mr Dodd to compensate the company for the £4,000 but that dividends to creditors should be calculated on the basis that, for the purposes of the proof of debts, the debt owed by the subsidiary company to its parent company was not reduced by the amount which Mr Dodd had to repay and that any amount that would be distributable by way of dividend to unsecured creditors in respect of that part of the debt due to the parent company should be paid instead to Mr Dodd. In my judgment, there is nothing novel in this. Courts of equity granting relief on claims for misfeasance can mould remedies in an appropriate way to meet the circumstances of the case: see, for example, *In re VGM Holdings Ltd* [1942] Ch 235. The transfer did not benefit his company and there was no good corporate reason for making it. In those circumstances, the transfer was in breach of his duty to use his powers for a proper purpose. Mr Dodd would be liable to compensate the company and restore it to its previous position (see *AIB Group (UK) plc v Mark Redler & Co Solicitors* [2015] AC 1503).

403    In my judgment, the judgment of Dillon LJ states the rule of law with which this appeal is concerned at a formative stage. Dillon LJ was careful to approve only a short passage from the judgment of Street CJ in *Kinsela*. That passage addresses the ineffectiveness of unanimous consent of the corporators to authorise a transaction which benefits shareholders where the value transferred does not represent funds which shareholders are entitled to distribute because it amounts to a de facto distribution. Dillon LJ did not approve of any other passage from that case. He was not concerned with a duty to creditors but with a duty of directors not to enable shareholders to make a distribution to themselves in specie which was not out of lawfully distributable profits. He did not contemplate a duty which was paramount—only that the rights of creditors "*intrude*", not exclude.

404    Thus, when it comes to section 172(3) the concern of the legislation was not with the decision in *West Mercia* as such, but the introduction of a new duty as a result of borrowing from Antipodean jurisprudence. I refer at para 266 above to a 1998 paper by Richard Sykes QC as a member of the CLRSG which refers to *Permakraft*, which had not then been followed by any court in this jurisdiction. This too suggests that a concern of the CLRSG may have been not that *West Mercia* had actually changed the law but that UK courts might adopt the Antipodean approach, seen in cases such as *Permakraft*, in the future.

405    I have already made the point that Dillon LJ decided this case as a matter of the director's fiduciary duty to act in the best interests of the company and not for any collateral purpose. In my judgment, each of the UK cases I have cited which preceded it, and *Colin Gwyer*, which I consider below, treated the responsibility of directors in relation to creditors not as a separate self-standing creditor duty but as part of the fiduciary duty to act in the company's interests: see per Lord Diplock in *Lonrho* at para 396 above; per Lord Templeman in *Winkworth v Edward Baron* (as I suggest it should

[2022] 3 WLR                    BTI 2014 LLC v Sequana SA (SC(E))
                                                   Lady Arden

A  be read) at para 396 above; per Buckley LJ in *In re Horsley & Weight Ltd* at
   para 268 above; per Templeman LJ in the same case at p 455; per Nourse LJ
   in *Brady*, para 397 above; and per Leslie Kosmin QC in *Colin Gwyer*
   (paras 411–412 below at, for example, para 74 of his judgment).  They did
   not adopt the approach of Cooke J.  The passage which Lord Briggs JSC cites
   at para 167 of his judgment from *Goode on Principles of Corporate
   Insolvency Law*, 5th ed (2018) is to like effect, as is also *Bilta (UK) Ltd v*
B  *Nazir (No 2)* [2016] AC 1 which holds that creditors' interests are
   "protected at law through the directors' fiduciary duty to the company" (see
   para 414 below) and the judgments from Australia cited in para 389 to 391
   above.  below.  Although *Carlyle Capital Ltd v Conway* postdates *West
   Mercia* and the 2006 Act, the judgment of Lt Bailiff Hazel Marshall QC,
   which Lord Briggs JSC approves in para 171 of his judgment for another
C  purpose, treated the duty in relation to creditors as simply an extension of
   the duty to act in the best interests of the company, not some new duty.  This,
   in my judgment, was the position in the law when the Companies Bill was
   enacted.  As Richard Sykes QC put it in his paper, at para 2:

        "to look after the interests of the company the directors must have
        regard to the future prospects of the company and in so doing would be
D       foolish (or even in breach of duty) to ignore the company's relationships
        with employees, suppliers, customers and others."

   406   In a case note published shortly after *West Mercia* was decided,
   "Directors' duties—an unnecessary gloss" (1988) 47 CLJ 175, Professor
   LS Sealy wrote that the case was "not in itself a remarkable case".  He
   considered that judicial observations about directors having a duty to
E  consider the interests of creditors unless very cautiously expressed could
   strike at the very foundations of the policy of company law.  With reference
   to the observations of Lord Templeman in *Winkworth v Edward Baron* (see
   para 396 above) he wrote, at p 176:

        "It is not an exaggeration to say that if sentiments like this had
        prevailed over the past century and a half, the limited liability company
F       would never have got off the ground."

   407   Professor Sealy concluded, at p 177:

        "The law as it stands gives the courts ample scope to deal with all
        potential abuses of trust by company directors, without the need to invent
        any new cause of action based on phoney jurisprudential antecedents.  If
        this were not so prior to 1986, the novel 'wrongful trading' provisions of
G       the Insolvency Act 1986, section 214, will allow for developments on
        a statutory footing to proceed which are properly integrated with
        insolvency law as a whole.  Against this background, well-meant but ill-
        focused dicta about directors' 'duties' to creditors can be seen as both
        unnecessary and potentially pernicious."

H  408   The CLRSG referenced Professor Sealy's case note in footnote 24 to
   para 3.17 of "Modern Company Law: Final Report".
   409   Professor Sealy was not the first Antipodean to criticise the
   jurisprudence derived from New Zealand: see Professor Dawson and
   I A Renard, above, Professor Peter Watts QC "Why as a matter of English
   law principle directors do not owe a duty of loyalty to creditors upon

© 2022 The Incorporated Council of Law Reporting for England and Wales

insolvency" [2021] JBL 103, and Justice K M Hayne AC, then of the High      A
Court of Australia, "Directors' duties and a company's creditors" (2014) 38
MULR 795.  Justice Hayne emphasises that his views are personal and not
those of the High Court.  He subjects the cases in which the Australian and
New Zealand courts have found a duty to exist in relation to creditors to
critical examination and memorably concludes, citing the Supreme Court of
Delaware, that if a duty to consider the interests of creditors exists it is a      B
solution in search of a problem, namely that the acceptance of the duty into
the law will inevitably lead to further problems in the process of ingestion.

410   There was only one reported case which was decided after the Final
Report of the CLRSG and before the 2006 Act, and that was the first
instance decision of *Colin Gwyer*: see further, paras 411 to 412 below.

*Part 6: Case law following West Mercia (before and after the 2006 Act)*      C

411   In *Colin Gwyer*, decided between the decision in *West Mercia* and
the passing of the 2006 Act, the board of directors of a flat management
company, which was insolvent, released for no consideration the company's
claim for forfeiture against a tenant who had resisted forfeiture of his lease
and surrendered its contractual right to be paid its costs of possession
proceedings even in that event.  The company was rendered insolvent.  Leslie      D
Kosmin QC, sitting as a deputy judge of the High Court, found that no
reasonable board having regard to the interests of creditors would have
accepted the settlement without seeking to modify or improve its terms and
that the directors had acted in breach of their fiduciary duties to the
company to act in its best interests.  Leslie Kosmin QC further observed
obiter that because the creditors' money was at risk "the directors,when
carrying out their duty to the company, must consider the interests of      E
creditors as paramount and take those into account when exercising their
discretion" (para 74), and that "the directors when considering the
company's interests must have regard to the interests of the creditors"
(para 87).

412   Two important points emerge from this judgment: (1) that the duty
to consider creditors' interests was part of the directors' ordinary fiduciary      F
duty to act in the best interests of their company, and not some additional
duty, and (2) when the judge said that creditors' interests were "paramount"
they were still only a factor to be taken into account by the directors when
exercising their discretion.  I would not therefore consider this to have been a
"rigid" approach to paramountcy.  Leslie Kosmin QC is saying that the
interests of creditors are a primary consideration to be taken into the mix of
interests that the directors need to consider before they decide what is in the      G
company's best interests.

413   Subsequent cases tend to assume that *West Mercia* established a
duty and/or that a duty was referred to and saved or even created by
section 172(3) but without necessarily analysing that provision's meaning
and effect.  Thus, in the later case of *Stone & Rolls Ltd v Moore Stephens*
[2009] AC 1391, Lord Mance gave his approval to *West Mercia* (para 238)
as creating an "enforceable duty" but this part of his judgment does not form      H
part of the ratio of the case.  In any event Lord Mance did not engage with
the issue of the interpretation of section 172(3) of the 2006 Act, or the
question whether the rule in *West Mercia* displaced the duty to promote the
success of the company for the benefit of members.

825

A    **414**    In *Bilta (UK) Ltd v Nazir (No 2)* [2016] AC 1, Lord Toulson and
Lord Hodge JJSC in a joint judgment held that the law had developed a
"principle . . . for the protection of the creditors of an insolvent company by
requiring the directors to act in good faith with proper regard for their
interests" (para 128).  They went on to hold:

B        "167. Mr Maclean further submitted that Bilta's claims fall within the
     illegality principle because the claims are inextricably linked with, and it
     is relying on, its own dishonest actions.  The flaw in this argument is that
     *when a company is insolvent or on the border of insolvency its interests
     are not equated solely with the proprietary interests of its owners.
     Company law requires that the interests of creditors receive proper
     consideration by the shareholders and directors.  Although the creditors
C    are not shareholders, as creditors they are recognised at that point as
     having a form of stakeholding in, or being a constituency of, the company
     which is under the management of the directors, and their interests are to
     be protected at law through the directors' fiduciary duty to the company*,
     which encompasses proper regard for the creditors' interests.  It is
     therefore misleading to say that when the company, through the
     liquidators, brings an action against the directors for breach of that duty,
D    the company (whose interests ex hypothesi include the interests of those
     for whose benefit the duty is owed and the action is brought) is claiming
     in respect of 'its' dishonest actions." (Emphasis added.)

     **415**    It is clear that Lord Toulson and Lord Hodge JJSC considered that
directors owe a fiduciary duty to their company which may involve them
considering the interests of creditors among others.  It is an important
E    staging post in the development of the rule of law on which *West Mercia* is
based.
     **416**    There has been little further development in the case law until this
case.  According to Westlaw, there is only a handful of cases which have
previously considered or applied *West Mercia* on the question of the duty to
consider the interests of creditors, and they are all first instance decisions
F    where the court was bound by *West Mercia* in any event: *Colin Gwyer,
Wessely v White* [2019] BCC 289, *In re HLC Environmental Projects Ltd*
[2014] BCC 337, *GHLM Trading Ltd v Maroo* [2012] 2 BCLC 369, *In re
Capitol Films Ltd* [2010] EWHC 2240 (Ch), *In re Cityspan Ltd* [2007]
2 BCLC 522.  However, none of them has answered vital questions such as
when do directors come under any obligation in relation to creditors?  What
G    is the level of knowledge which directors must have to engage that
obligation?  How is the duty compatible with their duty to act for the benefit
of members?  Why are creditors treated as having the benefit of a contingent
proprietary interest in the company's assets at this point in time?  Which
creditors can assert that they are beneficiaries of the obligation duty?  Is it all
creditors at the time when the breach occurs or at some other date?  How
can the duty be enforced by them?  None of these decisions are in any event
H    binding on this court.
     **417**    The duty under section 172(1) is to promote the success of the
company "for the benefit of its members as a whole".  Several points must be
made about this phrase:
     (i) It embeds shareholder primacy (explained at para 386(i)) above.

© 2022 The Incorporated Council of Law Reporting for England and Wales

(ii) In relation to a company limited by shares, the members are the    A
shareholders.  The shareholders entitled to vote in a general meeting or
receive the profits need not be all the shareholders.

(iii) The word "members" and the word "shareholders" can be used in
different senses:

(a) It can be used, as Jessel MR in *In re Wincham* used it, to mean the
company as a separate legal entity.    B

(b) It can be used to mean the separate, internal organ of the company
known as the company in general meeting.  The functions of the company in
general meeting can be carried out without the formality of a duly convened
meeting in accordance with section 281(4) of the 2006 Act.

(c) It can be used to denote the persons entitled to the profits of the
company or a return of capital after the payment of creditors.

(iv) Sometimes "members" in sense (b) or (c) means members present and    C
future and sometimes it means the present members only, but it is not
necessary to elaborate that point here.

(v) In section 172(1) above, "members" has meaning (c).  The shareholders
are as I have explained "residual claimants".

(vi) The company (if it has limited liability), as a separate legal entity, is
solely responsible for the payment of its debts and liabilities, not the    D
members.

(vii) In the context of ratification in the sense of a release from breach of
duty, the members are members within meaning (b).  I deal with ratification
more fully at paras 312 to 317 above.

(viii) The case law prior to the 2006 Act treated the obligation on the
directors in relation to creditors as a duty.  Section 172(3) has not continued
this approach but has treated the obligations arising when a company    E
becomes insolvent as a restriction on their powers of management.  This
leads to the subject considered in the next Part, namely the debates that led
to section 172(3).

*Part 7: Section 172(3): Legislative history concerning section 172(3)
showing the CLRSG's concerns*    F

418   I now return to the legislative history leading to the enactment of
section 172(3) introduced in Part 4.  This background is important because,
together with the case law and the existing legislative framework, it shows
the evolution of the various proposals with respect to a director's duty in
relation to creditors, and that illumes what were considered to be the pros
and cons of such a duty.  Paras 419 to 423 below contain an overview of the    G
CLRSG's views.

419   The CLRSG considered whether the duties of directors should
change as a company became insolvent so that directors owed a duty to
protect creditors.  It noted that there was authority in Australia and in "one
case in our Court of Appeal" (Final Report, para 3.17).  It understood that
the principle would require directors, if there was a substantial probability
of liquidation, to take such steps as they considered in good faith    H
appropriate to reduce the risk without undue caution and thus continuing to
have in mind the interests of members.  This would involve a sliding scale:
the greater the risk of insolvency the more directors should take creditors'
interests into account.  The interests of creditors only overrode those of

A   members when there was no realistic possibility of avoiding insolvent liquidation.

420   The CLRSG considered that such a rule might be regarded as having considerable merit.

421   Some members considered that with appropriate provisions, such as that liquidation should be more probable than not, the common law duty was soundly based and should be included in the statement: "Without it, directors would apparently, at least, be bound to act in the ultimate interests of members until all reasonable prospect of avoiding shipwreck had been lost": para 3.18. The wrongful trading provisions would arguably cause directors to be more cautious (para 3.19).

B

422   The CLRSG then set out the counter arguments. The rule would have a chilling effect: fears of personal liability would lead to excessive caution. It would demand a difficult and indeterminate exercise of judgement. Liquidation could be as damaging to creditors as to members. The insuperable difficulty which could not be resolved by the drafting was that the principle gave inadequate guidance and depended on directors being able to discern an intermediate stage on the path to insolvency which was not identifiable in reality. The break from going concern to an insolvent basis of trading is normally rapid so that references to calculating probabilities and to sliding scales of benefit were considered unhelpful.

C

D

423   The CLRSG was perhaps unsurprisingly unable to reach an agreed view on this. A draft duty (set out in para 430 below) was produced on an illustrative basis. However, the CLRSG concluded that the advantages and disadvantages of such a principle were very much a matter for commercial judgement and that the DTI should consult on the basis of a clear draft.

E

424   When the Final Report of the CLRSG was delivered, the Government produced its first of two White Papers (see paras 433 and 437 below) in which it accepted most of the recommendations but rejected any duty in relation to creditors principally because a duty on directors in relation to creditors would cut across the provisions for the rescue of financially distressed companies. This occurred about a year after the Final Report was delivered. During that year and before the first White Paper was issued, I gave the lecture to which Lord Hodge DPSC has referred at the end of para 218 of his judgment where I stated that the Final Report had left the precise content of the statutory statement of directors' duties open in relation to creditors. In the context, that meant whether it would have to go beyond what section 214 provided (see further para 428 below). In it I also referred to the then uncertainty as to whether the CLRSG's recommendations would be implemented. I address further points made by Lord Hodge DPSC in the next paragraph, para 430, para 441 and para 444 below.

F

G

425   At a late stage prior to the Bill which became the 2006 Act being presented to Parliament, the Government produced its second White Paper, which included what is now section 172(3). The White Paper referred to commentary available on the DTI's website and this contained para B19, on which Lord Hodge DPSC lays emphasis and which he holds in para 222 above was intended to preserve the current legal position. But the Explanatory Notes which accompanied the Bill did not say this (see below para 443). As explained in paras 438 and 443 below, the explanatory notes said that it was suggested that there was a duty at common law in relation to

H

creditors.  Thus, the provision did no more than maintain the status quo and   A
left open the question whether there was any such rule.  In my judgment, the
wording of the explanatory note was plainly correct.  Until this appeal, it
was not clear what *West Mercia* does decide, and in some respects the rule in
*West Mercia* will remain unclear even after these judgments.  The only case
to consider *West Mercia* in a little more detail was *Colin Gwyer*, which is a
first instance case in which the matter was obiter.  *West Mercia* has never   B
previously been considered by the highest court.  It was therefore correct for
the Explanatory Notes to make it clear to Parliament that the rule was a
possible rule and not an established one.

426   The wording of section 172(3) was carefully devised to meet this
situation.  It did not state that there had to be a rule of law.  It did not say
that there was a new self-standing creditor duty.  If it had done either of these
things, it would under the principle of legality have to have defined the   C
trigger for the obligation in relation to creditors becoming paramount, and
the content of the obligation.  As it was, it did not stipulate the content of the
rule or set out the circumstances in which it arose.  Moreover, none of these
could be deduced from the case law.  Moreover, section 172(3) does not
provide for a duty in relation to creditors which may entirely supplant or
subordinate the interests of shareholders in favour of those of creditors.  It is   D
silent on that point.  In summary, section 172(3) cannot amount to a
confirmation by Parliament of any self-standing creditor duty or any duty
under the general law to consider their interests.

427   The CLRSG did not consider *West Mercia* to be determinative: see
para 3.17 of its Final Report, which described it as "one case in [the] Court of
Appeal".  The CLRSG referred in the same context to Antipodean case law,
including *Permakraft*, considered at paras 390 to 393 above.  This was a   E
possible source of the duty, but it was a decision of the New Zealand Court
of Appeal and so not binding on the UK courts at that time.

428   In its Final Report, the CLRSG made it clear that the members of
the CLRSG were divided as to whether any provision for a duty in relation to
creditors should be made in the statutory statement of directors' duties.  It is
helpful to examine in more detail what the CLRSG considered the difficulties   F
to be.  At the outset of the relevant passage, the CLRSG made it clear that
"a specific duty in relation to creditors . . . would displace, partially or
entirely, the normal shareholder-orientated loyalty duty at the onset of
insolvency".  The CLRSG considered that this raised a number of technical
problems and would risk cutting across insolvency law (para 3.12).  The
CLRSG's initial preference had been for a warning in the statement of duties   G
that other factors became relevant if the company was threatened with
insolvency, but the CLRSG changed its view following consultation.  The
CLRSG's Final Report suggested a draft clause based on section 214 of the
1986 Act and a further draft clause "Special duty where company more
likely than not to be unable to meet debts", described later in the Report as
"a codification of the *West Mercia* principle" (see p 347 (draft clause) and
p 354 (Explanatory Note)).  I examined the decision of the Court of Appeal   H
in the *West Mercia* case in paras 398 to 403 above.  Some members of
the CLRSG, however, were not in favour of including any provision in
relation to creditors in the new statement of duties: they considered that the
formulation of a duty based on section 214 of the 1986 Act would suffice.

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    429   The relevant draft clause (see para 430 below) provided that the directors should exercise their powers as they believed would achieve a reasonable balance between reducing the risk of insolvency and promoting the success of the company. In other words, the greater the risk of insolvency the more the directors were required to take account of creditors' interests and the less those of members. There is nothing untoward in the absence of any express reference in section 172(1) of creditors generally. The purpose

B    of section 172(1) was to consider the interests of those with whom the company has relationships. That would naturally include suppliers to the company, who are specifically mentioned in section 172(1), but there may be other creditors with whom the company has no relationship, such as the local authority to whom rates are payable or HMRC to whom tax is payable. That duty refers to at least one class of creditors, namely suppliers,

C    in any event.

430   Moreover, the footnote in the second consultation document on which Lord Hodge DPSC relies in para 229 above as showing that the CLRSG took the view that the existing law required the interests of members to be overridden if insolvency threatened, is inconsistent with this clause, which as I have explained required the interests of members to be balanced against those of creditors. Furthermore, the modification of the success duty

D    did not extend to other duties, including the duty to comply with the constitution and use powers only for their proper purpose (being the duty set out in "para 1"). Thus, the draft clause provided:

"*Special duty where company more likely than not to be unable to pay its debts*

E    "8. At a time when a director of a company knows, or would know but for a failure of his to exercise due care and skill, that it is more likely than not that the company will at some point be unable to pay its debts as they fall due— (a) the duty under para 2 does not apply to him; and (b) he must, in the exercise of his powers, take such steps (excluding anything which would breach his duty under para 1 or 5) as he believes will achieve a reasonable balance between— (i) reducing the risk that the company will be unable to pay its debts as they fall due; and (ii) promoting the

F    success of the company for the benefit of its members as a whole.

"Notes:

"(1) What is a reasonable balance between those things at any time must be decided in good faith by the director, but he must give more or less weight to the need to reduce the risk according as the risk is more or

G    less severe . . ." :"Final Report", Annex C.

431   The special duty would therefore arise as soon as the company was insolvent on any basis (even if capable of cure) and oblige directors to conduct a running exercise of sliding scales of benefit between shareholders and creditors. The CLRSG set out the arguments for and against such a clause. It noted that

H    "in practice such a 'balanced judgement' test will have a 'chilling' effect, bringing with it the risk that directors may run down or abandon a going concern at the first hint of insolvency. The balanced judgement demanded is a difficult and indeterminate one. Fears of personal liability may lead to excessive caution . . . These are valid concerns. That case law

© 2022 The Incorporated Council of Law Reporting for England and Wales

already imposes such a duty is not a sufficient reason for retaining it *A*
unless we can be confident that it will not in practice lead to failure of
viable businesses": paras 3.19–3.20.

432    The CLRSG gave the arguments in favour of the clause and then
observed that other members of the CLRSG believed that

"even as drafted the principle gives inadequate guidance to directors *B*
and depends on their being able to discern an intermediate stage on the
path to insolvency which is not identifiable in reality. In the view of these
members the break from a going concern to an insolvent basis of trading
is normally so abrupt and rapid in practice that references to calculating
the probabilities and to 'sliding scales' of risk and benefit are unhelpful
and potentially misleading. The incorporation of the section 214 rule in
the statement will, in their view, be sufficient in practice and would avoid *C*
the serious disadvantages of the broader and less precise principle. The
advantages and disadvantages of such a principle are very much a matter
of commercial judgement, on which we have not been able to reach an
agreed view nor, in the time available, to consult on the basis of a clear
draft. We recommend that the DTI should do so": para 3.20.

433    The Secretary of State for Trade and Industry, the Rt Hon Patricia *D*
Hewitt, responded in the White Paper *Modernising Company Law*,
presented to Parliament in July 2002 (Cm 5553–1), that the balance of
arguments came down against the inclusion of either duty in the new
statutory statement of duties. It would be incongruous to restate section 214
of the 1986 Act in the statement of duties, and the special duty in para 8 set
out in para 430 above was rejected because *E*

"Directors would need to take a finely balanced judgement, and fears
of personal liability might lead to excessive caution. This would run
counter to the 'rescue culture' which the Government is seeking to
promote through the Insolvency Act 2000 and the Enterprise Bill now
before Parliament": para 3.11.

434    The arguments of those who opposed such a clause on the CLRSG *F*
had prevailed. The White Paper then states that the Government favoured a
completely different course from the draft clause. Its proposal was to make
reference to obligations towards creditors in para 2 itself, that is, *as a
modification of the success duty*: para 3.14. In my judgment this was the
origin of the option which the Government adopted in the Companies Bill
and is now to be found in section 172(3). It preserves the ultimate goal of *G*
ensuring and enhancing the continued viability of the company as a profit-
making enterprise for shareholder gain, which may be essential for the
success of the rescue culture. As para 3.14 states, the Government's
approach:

"[does not] achieve the effect intended by the Review in putting
forward the duty in para 8 of the Schedule included in the Review's final *H*
report [para 430 above]."

435    Thus, in my judgment it is clear that the intention of section 172(3)
was that obligations to creditors would be inserted as a qualification to the
success duty only, and that they would be an aspect of that duty, not a

© 2022 The Incorporated Council of Law Reporting for England and Wales

[2022] 3 WLR    BTI 2014 LLC v Sequana SA (SC(E))
Lady Arden

A   separate and independent duty.  The "special duty where a company is more likely than not to be unable to pay its creditors", was rejected.  The result was endorsed by respondents to the White Paper, only four of whom referred to directors' general obligations on insolvency (Rio Tinto, the Confederation of British Industry, the TUC and Tesco plc).  (Each of them thought that the obligations should be left to companies legislation or insolvency law and not the statement of duties (*Responses to Modernising Company Law* (Cm

B   5553), Nationalarchives.gov.uk as referenced above para 383)).

436   It follows from para 3.11 of *Modernising Company Law* (see para 433 above) that Parliament must be taken to have been aware that the intention of the Bill presented to Parliament, and which led to the 2006 Act was to make no provision itself about obligations in relation to creditors. "Modernising Company Law" invited consultees' views on the draft clause

C   (Cm 5553–11), which contained no reference to any duty to take account of or act in accordance with the interests of creditors in the event of insolvency.

437   The second White Paper does not support the conclusion that Parliament intended to enact any duty in insolvency.  In March 2005, the Secretary of State published a further White Paper, *Company Law Reform* (Cm 6456).  As explained, this White Paper set out draft clauses, including a sub-clause in the same terms as was subsequently enacted in section 172(3).

D   The White Paper referred to commentary available on its website and this gave the following explanation of the new sub-clause:

"B19.  Subsection (4) recognises that the normal rule that a company is to be run for the benefit of its members as a whole may need to be modified where the company is insolvent or threatened by insolvency.  In doing so, it preserves the current legal position that, when the company is

E   insolvent or is nearing insolvency, the interests of the members should be supplemented, or even replaced, by those of the creditors."

438   This Note which refers to "preserv[ing] the current legal position" and uses the words "may need to be modified" expresses uncertainty as to what the law was and also contemplates that there might be some development or change in that position.  The note elides liability under

F   section 214 of the 1986 Act (wrongful trading) and liability under a possible duty at common law.  The CLRSG and the DTI would have been aware that the Appellate Committee of the House of Lords (the predecessor of this court) might overrule *West Mercia*.  But the significant point is that this was not in any event a note published by Parliament and was different from the Explanatory Notes later published by Parliament (see para 425 above and

G   paras 441 to 443 below).

439   In April 2003, the Select Committee of the House of Commons on Trade and Industry published a report on the White Paper, Sixth Report of Session 2002–03 (HC 439) (1 April 2003), and noted the disagreement between the DTI and CLRSG and concluded:

"We see no need to include a duty to creditors in the statement of

H   directors' duties.  This statement is intended to lay out a broad, generic set of obligations and not a detailed list of the legislation which directors might be required to adhere to under certain circumstances": para 25.

440   It is not possible to conclude from the first White Paper and the Select Committee report that Parliament intended to create or confirm a duty

© 2022 The Incorporated Council of Law Reporting for England and Wales

in relation to creditors in section 172.  Rightly or wrongly the view held at     A
the time was that there was doubt as to the existence of the rule in *West
Mercia*.

**441**   When Parliament published the Explanatory Notes to the Bill and
the Explanatory Notes to the 2006 Act, the text for the relevant provision
was rewritten in very different terms.  The first White Paper and the Select
Committee report both indicated that the rule in *West Mercia* was not settled     B
law.  The question is whether the Notes entertain the same doubt.  In
respectful disagreement with Lord Hodge DPSC, I consider that both the
Explanatory Notes to the Bill and the Explanatory Notes to the 2006 Act
separate out section 214 of the 1986 Act and show again that the mischief
for which Parliament legislated in section 172(3) was that the existence of
the rule in *West Mercia* was subject to doubt.  There was, moreover, no
agreement as to how the requirement should be expressed unless the courts     C
elucidated it and no agreement to reverse it.  In those circumstances, the
focus was the consequences of judicial development in the law.  The result
was that a provision had to be included to enable the courts to develop such
a rule, if indeed it did form part of the law.  The Notes left the existence, and
not simply the content, of any obligation to creditors as a matter for the
courts, as I will now explain.                                                     D

**442**   When the Companies Bill was published in November 2005 (with
clause 158(3) in the same form as section 172(3)), the Explanatory Notes to
the Bill stated that:

> "313. Subsection (3) recognises that the duty to promote the success of
> the company is displaced when the company is insolvent.  Section 214
> of the Insolvency Act 1986 provides a mechanism under which the     E
> liquidator can require the directors to contribute towards the funds
> available to creditors in an insolvent winding up, where they ought to
> have recognised that the company had no reasonable prospect of avoiding
> insolvent liquidation and then failed to take all reasonable steps to
> minimise the loss to creditors.
>
> "314. It has been suggested that the duty to promote the success of the
> company may also be modified by an obligation to have regard to the     F
> interests of creditors as the company nears insolvency.  Subsection (3) will
> leave the law to develop in this area."

**443**   Para 314 is, in my judgment, inconsistent with any intention on the
part of the promoters of the Bill that Parliament should give statutory
endorsement to any obligation on directors with regard to creditors as the
company approaches insolvency that could displace the success duty, as     G
opposed to a duty to the company which becomes aligned at a certain
point with the interests of creditors.  The word "modified" is used in
contradistinction to "displaced" in relation to wrongful trading in para 313.
The text of what became section 172(3) makes no reference to displacing the
success duty or to its being "paramount".  The wording remained the same
throughout the passage of the same when the Explanatory Notes for the     H
2006 Act were published, which state:

> "331. Subsection (3) recognises that the duty to promote the success of
> the company is displaced when the company is insolvent.  Section 214
> of the Insolvency Act 1986 provides a mechanism under which the

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   liquidator can require the directors to contribute towards the funds available to creditors in an insolvent winding up, where they ought to have recognised that the company had no reasonable prospect of avoiding insolvent liquidation and then failed to take all reasonable steps to minimise the loss to creditors.

"332. It has been suggested that the duty to promote the success of the company may also be modified by an obligation to have regard to the interests of creditors as the company nears insolvency. Subsection (3) will leave the law to develop in this area."

B

444   Lord Hodge DPSC holds (para 222 above) that the first sentence of para 331 above includes the judicially created duty described in para 322 above. I respectfully do not consider that that is so. There is nothing to indicate that the first sentence of para 331 should be read with para 332. On

C   the contrary, the two paragraphs are dealing with different situations: para 331 is dealing with the situation where the company "is insolvent" and para 332 is dealing with a different situation, namely the situation where the company "nears insolvency". The point is that para 332 is addressing a suggestion as to a possible requirement in relation to creditors, in which case the legislation would have to protect the position in case the common law

D   was developed in this direction.

445   Parliament accordingly left it to the courts to determine whether there was a rule of law requiring directors, in certain circumstances, to consider or act in the interests of creditors, rather than exercise their power to promote the success of the company for the benefit of members, and to develop the law. The reference to the law is quite general and therefore includes section 172(1) itself. Section 172(3), when duly read with the

E   Explanatory Notes, does not, in my judgment, affirm the existence of a duty under the general law when a company approaches insolvency. The Explanatory Notes are not a ringing endorsement of the existence of the duty but merely cautiously note a "suggestion" to that effect.

*Part 8: Conclusion*

F   446   Para 250 of Section 1 above already contains a summary of my conclusions on the issues on this appeal as identified by Lord Reed PSC, and certain other issues. I do not repeat that summary here. This Section 2 deals with background and ancillary issues. I have described the influential enlightened shareholder value principle as it impacts on the interpretation of section 172(1) and in particular the question whether the rule in *West*

G   *Mercia* creates what I have called a self-standing duty requiring the directors to promote the success of the company for the benefit of creditors when there is any prospect of insolvency (see Part 4 of this Section). In common with other members of the court I have answered that question in the negative.

447   Cases like that of *Facia Footwear* show that the rule in *West Mercia* does not necessarily prevent restructurings in financially distressed companies.

H   448   The court is of one mind that there needs to be certainty in this area as far as possible. Obviously, judge-made law does not have to and cannot make an obligation clear in every respect from the outset. Working out that obligation is part of the way the common law works. However, the important point is that the existence of the rule under the general law is now

© 2022 The Incorporated Council of Law Reporting for England and Wales

clear.  The consensus reached at this point in time is important.  Company
directors need clear guidance.  The Supreme Court of Delaware made this
point graphically and clearly in *Malone v Brincat* (1998) 722 A 2d 5, 10, in
which it observed, when deciding a question about directors' duties, that it
had endeavoured "to provide the directors with clear signal beacons and
brightly lined channel markers as they navigate with due care, good faith,
[and] loyalty on behalf of a Delaware corporation and its shareholders" and
also "to mark the safe harbors clearly".  Company law must be ascertainable
and applied in real time.  Decisions must be taken immediately and cannot
await the comparatively leisurely course of litigation.  Those are important
considerations.

449   As I have explained in Section 1, the core content of the rule and its
rationale does not undermine the ESV principle of the statutory statement of
duties, and it serves to require that directors have regard to creditors'
interests when they have the most at stake and that they act in the interests of
creditors when insolvency liquidation is unavoidable.

450   In this Section 2, I have also set out the legislative framework and
the case law to date, and the history behind section 172(3).  This is helpful in
at least two ways.  It shows the background against which Parliament was
legislating in section 172(3), and the background which caused the CLRSG
to fail to reach agreement on the rule in *West Mercia*.  That demonstrates the
difficulty and complexity of this area of law.  Lord Hodge DPSC considers
that the situations where it is alleged or proved that the directors did not
comply with the rule in *West Mercia* may be rare (para 238 above).  That
will be so if the law strikes the right balance between conflicting interests and
considerations.

451   As stated in Section 1, I would dismiss this appeal.

*Appeal dismissed.*

Ms B L Scully, Barrister