**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**CAUSE NO:  G15 OF 2015**

**BETWEEN:**



        **(1) ERNST & YOUNG LTD**
        **(2) MAPLESFS LIMITED**
        **(3) KPMG**
        **(4) BUTTERFIELD BANK (CAYMAN) LIMITED**

PLAINTIFFS

**AND**

        **THE INFORMATION MANAGER OF THE DEPARTMENT**
        **OF IMMIGRATION OF THE CAYMAN ISLANDS GOVERNMENT**
        **('the FOI Officer')**

DEFENDANT'

**CAUSE NO:  G20 OF 2015**

**BETWEEN:**

        **(1) ERNST & YOUNG LTD**
        **(2) MAPLESFS LIMITED**
        **(3) KPMG**
        **(4) BUTTERFIELD BANK (CAYMAN) LIMITED**

PLAINTIFFS

**AND**

        **(1) KERRY TIBBETTS**
        **(2) PERSONS UNKNOWN**

DEFENDANTS

IN CHAMBERS
BEFORE THE HON. ANTHONY SMELLIE

THE 30TH JANUARY 2015; THE 6TH FEBRUARY, 2015;
WRITTEN REASONS DELIVERED ON 12TH FEBRUARY 2015.

APPEARANCES:    ON 30TH JANUARY 2015:
                  Mr. Mac Imrie, Ms. Lara Kuehl and Ms. Krista-Lynn Wight of Maples
                  and Calder for the Plaintiffs

**EXHIBIT**

**12**

ON THE 6TH FEBRUARY 2015:
Mr. Mac Imrie, Ms. Lara Kuehl and Ms. Krista-Lynn Wight of Maples and Calder for the Applicants

(Also present on 6th February 2015:  Mr. Andrew Bolton of Appleby and Mr. David Legge of Pinnacle Publishing and – deponent of an affidavit considered on 30th January 2015) – as observers with the consent of the Plaintiffs.)

***General disclosure of personal and commercially sensitive information by FOI Officer-whether leave should be given for judicial review of the decision to disclose- whether injunction against further disclosure by the FOI Officer should be granted – whether injunction should be extended against persons unknown who may have come into possession of the information and further, contra mundum, to restrain anyone in the world at large who may come into possession of the information from further disclosure of it – whether rules of court allow writ to be issued against unnamed defendants.***

### REASONS FOR DECISIONS

### CAUSE NO. G15 OF 2015

1.  On 30th January 2015, upon an ex parte application by the Plaintiffs in the first of these two causes, I granted  them  leave to bring an application for judicial review of the decision of the defendant in that Cause (the "FOI Officer").  By that decision, the FOI Officer had disclosed to the *Cayman Compass*, a local newspaper, a Microsoft spread-sheet containing personal and commercially sensitive information about all work permit holders in the Cayman Islands ("the Spread-sheet").

2.  The Spread-sheet comprised the following kind of information about those 21,000 persons:

    (1)    The names of the employers



(2)     Personal information about the employees, not including their individual names but including:

    (i)     their individual salaries;

    (ii)    their nationalities;

    (iii)   their job titles;

    (iv)    their start dates.

3.   Injunctive orders were also granted to restrain the FOI Officer from publishing and/or disclosing to any person or entity external to the Department of Immigration the information in the Spread-sheet until further order and requiring the FOI Officer to disclose to the Plaintiffs and to the Court, the identities of any and all persons to whom the Spread-sheet had been disclosed, or any part of the information therein contained.

4.   The fact of the disclosure to the Cayman Compass had been brought to the attention of the Plaintiffs by none other than the publisher of the newspaper himself, Mr. David Legge.

5.   In his affidavit filed in support of the Plaintiffs' application, Mr. Legge explains that on 19th January 2015, a reporter employed by the Cayman Compass requested information about Cayman Islands work permit holders from the FOI Officer under the Freedom of Information Law 2007 Revision (the "FOI Law").

6.   In response, on 22nd January 2015, the FOI Officer provided the Cayman Compass with the Spread-sheet.

7.   Mr. Legge explains that the Cayman Compass has not published and does not intend to publish any information from the Spread-sheet that would identify or aid anyone in

identifying companies, individuals or employees.  On the basis of that assurance, the Cayman Compass has itself not been joined by the Plaintiffs as a party to these proceedings and no order has been sought as against it.

8.  The Plaintiff's application was also supported by a number of affidavits sworn by Chief Executive Officers and Senior Partners of a number of the employer entities whose information is contained in and disclosed in the Spread-sheet.

9.  These officers spoke in unison in their affidavits, to the prejudice that disclosure of the information would cause to the commercial interests of their respective businesses.  The affidavit of Mr. Layman Daniel Scott, the Senior Partner of Ernst & Young is in terms, the same in these regards as the affidavits sworn to on behalf of all the Plaintiffs:

> "*6.1  In common with the position in most companies, employees of Ernst & Young do not generally know what salaries other employees of Ernst & Young are paid.  If employees knew what every work permit holding employee was paid, this could lead to workplace disputes, bad morale and complaints.  It is also likely to put Ernst & Young at a disadvantage when hiring any future employees (whether or not they would be work permit holders) as prospective employees would be likely to insist upon receiving the highest level of salary available for employees holding the same job description, without regard to commercial factors and individual merits.*
>
> *6.2  If competitors and clients knew the number of work permit holders with a particular job description or knew how much the salaries of*



> *work permit holders was costing Ernst & Young, they would be able to ascertain the likely scale of Ernst & Young's operations in the Cayman Islands and the cost of such operations.  Such detailed knowledge of Ernst & Young's operations is likely to damage its competitive advantage, given that such information would not normally be publicly available."*

10.   Mr. Scott, again in unison with the other officers, also explained the sensitivity of the information as to the personal information of employees:

> *7.   In addition to its own commercial interests, Ernst & Young is concerned about the rights of its employees to have their personal information kept private. As a responsible employer, Ernst & Young considers that it is under a duty to take steps to ensure that the personal information of its employees is protected from unauthorised disclosure.  Ernst & Young wishes to safeguard its employees, some of whom are likely to be identifiable from the information in the Spread-sheet, from facing a situation in which the exact level of their salaries is publicly available information (known by their acquaintances, family, professional rivals, future prospective employers etc.).*



> *8.   Neither Ernst & Young nor its employees were notified by the Defendant either before or after the Spread-sheet was disclosed to the Cayman Compass and no consent was sought to the same."*

11.   The sensitivity of the information was underscored by its obvious currency: start dates for employees included in the Spread-sheet are as recent as 22 January 2015.

**Leave to apply for judicial review**

12.   In presenting their applications for judicial review, the Plaintiffs emphasised the apparent breach of the FOI Law itself which is involved in the disclosure of the information contained in the Spread-sheet.

13.   As Mr. Imrie submitted, a fundamental point is that the information is not disclosable under the FOI Law, if it is clearly personal information.

14.   The same is true if the information is clearly commercially sensitive information. Sections 21 and 23 of the FOI Law apply in clear terms:

> "21(1) Subject to subsection (2), a record is exempt from disclosure if –
>
>> (a)   Its disclosure would reveal –
>>
>>> (i)   Trade secrets;
>>>
>>> (ii)   Any other information of a commercial value, which value would be, or could reasonably be expected to be destroyed or diminished if the information were disclosed.
>>
>> (b)   It contains information (other than that referred to in paragraph (a)) concerning the commercial interests of any person or organisation (including a public authority) and the disclosure of that information would prejudice those interests.
>
> (2) Subsection (1) shall not apply where the applicant for access is the person or organisation referred to in that subsection or a person acting on behalf of that person or organisation.
>
> ....
>
> 23(1)   Subject to the provisions of this section, a public authority shall not grant access to a record if it would involve the unreasonable disclosure of personal information of any person, whether living or dead.
>
> ....
>
> (3) Records relating to personal information shall be exempt without limitation as to time."

15.   The definition of "personal information" means information or an opinion (including information forming part of a data base) whether true or not, and whether recorded in a material form or not, <u>about an individual whose identity is apparent</u>, or <u>can reasonably be ascertained</u>, <u>from the information</u> or opinion, including but not limited to:

(a) …

(b) The <u>individual's</u> race, <u>national</u> or ethnic origin, …

….

(g) information about the individual's …<u>financial</u>, <u>employment</u> or criminal <u>history</u>….
    (emphases applied)."

16.   I was satisfied, having regard especially to the words in emphasis above, that for the purposes of deciding whether or not to grant leave to apply for judicial review of the FOI officer's decision to disclose the Spread-sheet, that it very arguably contains personal information within the meaning of the FOI Law and Regulations and as such, its disclosure is in *prima facie* breach of the FOI law.

17.   However, the prohibition against disclosure of personal information is not absolute, as section 23(4) provides that the extent to which third party rights are to be protected shall be set out in the Regulations made under the Law. Regulation 11 provides that where an information manager intends to give access to a record which he believes contains personal information, he shall, within fourteen calendar days of receipt of the application, send the third party written notice of the application for access. Although the expression "third party" is not defined, it can only mean the person whose information is to be affected by the disclosure.



18.     The subsequent sub-paragraphs of Regulation 11 set out an elaborate process by which the third party might object, including by way of appeal beyond the department which holds the information, to the Information Commissioner.  The notice periods of at least 60 days prescribed by the Regulations would allow the third party enough time also to seek relief before the courts, by way of judicial review of the decision to disclose.

19.     Nothing of that elaborate process was observed by the FOI officer here, in relation to the personal information of the approximately 21,000 "third parties" affected, the Spread-sheet having been disclosed within only three days of the request being presented to the FOI officer.

20.     In contrast to how the prohibition on disclosure of personal information is qualified by the Regulations, no such qualification appears in relation to the prohibition on the disclosure of commercially sensitive information.

21.     For instance, there is no provision in section 21, the equivalent of section 23(4), allowing for "third party" contact before disclosure of commercially sensitive information, as one would expect if disclosure of such proprietary information were allowed. This factor may therefore be regarded as reflecting the statutory intention to prohibit disclosure.

22.     In the light of the affidavits filed in support of the applications of the Plaintiffs, it is clear that they all believe that the Spread-sheet contains personal and as well as commercially sensitive information and are adamant as to the harm likely to result from its disclosure.

23.   I am satisfied, having regard to all the foregoing, that the Plaintiffs have the prerequisite standing to bring these applications, both as a matter of their own commercial interests and as a matter of their seeking to protect the personal information that relates to their employees.

24.   Accepting that the Plaintiffs have thus established a sufficient interest to protect, have shown a high prospect of success on both grounds on which they seek judicial review – illegality and Wednesbury unreasonableness tainting the FOI officer's decision to disclose the Spread-sheet – and have not delayed in bringing their application (all as required by Grand Court Rules Order 53); I acceded to their application for leave to apply for judicial review.

**Prohibitory and mandatory injunctive relief**

25.   Notwithstanding that the Cayman Compass has undertaken not to publish or otherwise disclose the information in the Spread-sheet, Mr. Imrie explained the Plaintiffs' concern to prevent disclosure by the FOI Officer to anyone else and to prohibit onward disclosure by anyone to whom the Spread-sheet might have been disclosed.

26.   There was, I accept, the obvious risk of the Spread-sheet or information it contains being posted on the Internet and of its "viral" dissemination from then on.

27.   The Court's jurisdiction to grant this kind of injunctive relief against an officer of the Crown in support of judicial review proceedings, is well established   In <u>M v Home Office</u> [1994] 1 AC 377, the House of Lords rejected the argument on behalf of the Home Secretary that mandatory interim injunctive relief could not be made against him to restrain him from removing M (an asylum seeker), from the jurisdiction. The



House of Lords held that although the Crown's immunity from injunctions had been preserved by the Crown Proceedings Act 1947, the Courts continued to have jurisdiction to grant mandatory interim injunctions in judicial review proceedings against officers of the Crown. And, in consequence of the breach of such an injunction, while the Crown cannot be held in contempt of court, a minister exercising his power on behalf of the Crown can be.

28.     Here, while no formal service of the Plaintiff's application was served upon the Crown, contact was made with the Solicitor General to inform her of the application. She made no application to intervene on behalf of the FOI Officer; instead she quite properly expressed a willingness to investigate the circumstances of the disclosure and to advise against any further disclosure, pending the outcome of this, the Plaintiffs' application.

29.     In view of the need for swift action to contain dissemination and check abuse, interim injunctions are of special importance in cases of disclosure of confidential information. The general principles – that there should be a serious issue to be tried and that the balance of convenience should be satisfied – apply. Applications for interim injunctions for breach of confidence must be considered also in the context of balancing the often conflicting rights guaranteed by the Human Rights Act 1998 of the United Kingdom (in this jurisdiction by the Constitutional Bill of Rights); especially the right to privacy on the one hand and the right to freedom of expression on the other: *Halsbury's Laws of England.* (5th Edition, Vol. 19, para. 84), citing inter alia: *American Cyanamid v Ethicon Ltd*. [1995] A.C. 396 and *A v B plc* [2002] EWCA 337.

30.     This being the interlocutory stage of this action, I needed to be satisfied that the balance of convenience weighed in favour of the right to privacy and so in favour of the injunction being imposed, pending the trial of the action.

31.     In keeping with the principles laid down in *American Cyanamid Co. v Ethicon Ltd.*, I accepted Mr. Imrie's submissions to the following effect:

> (i)     *There is a serious issue to be tried, i.e., whether it is permissible for a government body to disclose confidential and commercially sensitive and/or personal information in response to FOI Law requests.   This question is also of considerable public importance, given that it will impact on the approach taken by government bodies to protecting sensitive commercial or personal information in the government's care and given that it will affect public confidence in the government's approach.*

> (ii)    *Damages cannot adequately compensate the Plaintiffs (or other affected employers or the employees concerned) for the loss of their confidentiality which is in the information.  If the information became public, the confidentiality would be lost permanently.  Damages for the adverse effect on the Plaintiffs' commercial interests would be very difficult to quantify and monetary damages self-evidently could not compensate individuals for the violation of their right to have their personal information kept private.*



(iii)   *The balance of convenience clearly favours the Plaintiffs: the only entity which could be affected commercially by the injunctions being granted now is the Cayman Compass, but it has already voluntarily undertaken not to publish the Information.   The FOI officer as the Defendant has no commercial or other interest in dissemination of the Information and therefore there is no risk of harm to the Defendant.   By contrast, the harm to the Plaintiffs (and other employers and their employees) would be serious.*

(iv)   *The Plaintiffs' prospects of success are very high: the Defendant's decision to disclose the Information is plainly unlawful and/or unreasonable and (the Plaintiffs submit) is extremely likely to be quashed by the Court upon judicial review."*

32.   In granting the prohibitory and mandatory injunctive relief, I also accepted that there was no need to require an undertaking in damages from the Plaintiffs as a condition of obtaining the injunctions – there appeared to be no individual to be affected by the injunctions, except the Defendant FOI Officer herself - but she has no personal interest in the information itself or in its dissemination.   Nor was there discernible an immediate public interest in securing that the Spread-sheet is disclosed.   Any arguments to the contrary may, of course, be deployed at an *inter partes* hearing if the FOI Officer or anyone else, would seek to so argue.   Until then, I had to be guided by the manifest policy of the FOI Law itself, where it recognises that the general right of



every person to have access to information governed by the FOI Law, is subject to the provisions of the FOI Law itself.  In this regard, any argument that the personal and commercially sensitive information contained in the Spread-sheet should be disclosed "in the public interest" as that test is defined by section 26 of the FOI Law and regulation 2 of the Regulations, can be entertained by the Court at the *inter partes* stage.  Until the merits of such an argument are established, it was manifestly more appropriate that the injunctions should be granted to protect the information from further disclosure and to require the FOI Officer to identify anyone to whom the Spread-sheet has been disclosed.

33.     The prohibitory and mandatory injunctions were granted accordingly.

## CAUSE 20 OF 2015

34.     The foregoing orders having been made on 30th January, the Plaintiffs returned to Court on 6th February for further injunctive relief in this new Cause, in the context of the following new circumstances.

35.     On 2nd February 2015, the Solicitor General, on behalf of the FOI Officer, told the Plaintiffs that the Spread-sheet had not been disclosed to anyone other than the Cayman Compass.

36.     However, on 5 February 2015, the Plaintiffs became aware that what appeared to be information from the Spread-sheet was being published on the Internet through "Facebook": www.facebook.com  - by an Internet "community" describing itself as "I am Caymanian! Where are my rights?"

37.     Affidavits filed by Martin La Roda Thomas and Rachel Baxendale both of Maples and Calder (the Plaintiffs' attorneys), describe and exhibit "screen-shots" from this

Facebook Page, including a number of what appear to be excerpts from the Spread-sheet relating to a number of different Cayman Islands companies and their employees.

38.     One of the excerpts published on the Facebook Page included information about the salary of one of the Plaintiffs' (KPMG's), director of internal audit.

39.     The Plaintiffs subsequently received an affidavit from the FOI Officer in which she admits that the Spread-sheet was sent to another person and that her Department – upon later receiving notice of the injunctions granted on 30th January – had informed that other person that the publication or disclosure of the information was prohibited by the injunctions.

40.     It was learnt that that "other person", had submitted a request under the FOI Law to the Immigration Department on 27 January 2015 by email, identifying herself only as "Rosey Posey[1]" and although framing her request as seeking information in relation only to "Construction Companies" or "Real Estate Development Companies" and their employees; was provided with the Spread-sheet notwithstanding that it relates to all work permit holders and their employers.

41.     It appears from the search of the Facebook Page carried out by Rachel Baxendale, that the first defendant in this Cause, Kerry Tibbetts, may be the person or one of the persons responsible for the Facebook Page.  I quote from paragraphs 4 and 5 of the Baxendale affidavit:

---

[1] Schedule 1 to Regulation 3 stipulates the form for making a request and provides that "unless the request is for personal information you do not need to give your real name" but requires also that "If you are making a request for personal information (you must give): Identity Verification".  Thus, it appears, a further error was made in disclosing the Spread-sheet to someone providing only a pseudonym.

*"4.      Within the comments section of the Facebook Page, the author invites viewers to "email me [at] propertiesky@yahoo.com for further information.  A printed screenshot of that comment is exhibited (as "RCB – 1").  I have seen (another) page on www.facebook.com titled "The Cayman Islands Government" where an individual named Kerry Tibbetts posted a comment on 22 July 2013 providing both her mobile phone number and the same email address as active as her contact information.  A printed screenshot of that comment (is also exhibited).  This has led me to conclude that the email address mentioned above belongs to Kerry Tibbetts and consequently that she is the author of the Facebook Page.*

*5.      Save for the Facebook Page, email address and mobile phone number mentioned in paragraph 4 above, I have been unable to locate any further contact details for Kerry Tibbetts from publically available sources, including the Cayman Islands telephone directory and internet searches on databases such as Google and Bing."*

42.   A further implication of Ms. Baxendale's affidavit is that if not one and the same person, there must be a link between "Rosey Posey" and Kerry Tibbetts; that is: if the FOI Officer is correct that Rosey Posey is the only other person to whom the Spreadsheet has been disclosed.  And this is an inference that Mr. Imrie invited me to draw in presenting the application in this new Cause, for further injunctive orders,

including as against Kerry Tibbetts. Further discussion on this will be engaged below.

43. Having examined the screenshots from the Facebook Page myself, it is clear that the confidential information being published on it is of the kind contained in the Spread-sheet and presents the potential for the very kind of abuse that the Plaintiffs sought to prevent by the injunctive relief which they obtained on 30th January 2015.

44. Several of those pages apparently excerpted from the Spread-sheet, appear to have been photographed and posted on the Facebook Page. They have generated comments ranging from alarm to hostility at what the readers regard as the "Anti-Caymanian" developments perceived to be disclosed by the information. Some "bloggers" propose the commercial boycott of some of the businesses whose information is disclosed, out of the perception that they hire and pay foreign employees lucrative salaries while denying such employment opportunities and salaries to Caymanians.

45. Such sentiments, whatever the public interest may be in the proper and lawful disclosure of the information, certainly reveal its sensitivity and foreshadow the potential commercial harm that could arise from further disclosure.

46. The FOI Officer having now confirmed that the Spread-sheet was sent to "Rosey Posey" and that that person was informed – by way of her given email address at Rosey2010Posey2010@gmail.com – that publication or disclosure of the information was prohibited by the Injunction Orders of 30th January 2015 and that the disclosure was made in error; the Plaintiffs now apply for further injunctive orders in support of this their new writ action. The action is against (1) Kerry Tibbetts and (2) persons



currently unknown, seeking damages for breach of confidence and a permanent prohibitory injunction against further publication or disclosure of the information contained in the Spread-sheet.

47.    The basis for both  remedies of damages and injunctions says Mr. Imrie, is that a duty of confidence is owed by the Defendants to the Plaintiffs; and indeed, to all persons whose personal or commercially sensitive information is contained in the Spread-sheet.

48.    At this ex parte stage, the Plaintiffs seek interlocutory injunctions as they did in Cause G0015 of 20915, to preserve the confidentiality of the information until the Court determines whether a permanent injunction should be granted.

### Breach of duty of confidence

49.    Mr. Imrie argued that at common law a duty of confidence arises when confidential information comes to the knowledge of a person  in circumstances where it would be unfair if that person disclosed the information to others.  And that this is a duty that the Courts can and will enforce.

50.    I accept that there is certainly a well-developed jurisdiction in the courts to protect confidence,: see: *A-G v Guardian Newspaper Ltd., A-G v Times Newspaper Ltd.* [1990] 1 AC 109. (*The" Spycatcher case"*)

51.    The obligation of confidence may be imposed not only by an express or implied term in a contract but it may also exist on the basis of an independent equitable principle of confidence,: see: *Saltman Engineering Co. Ltd. v Campbell Engineering Co. Ltd.* (1948) [1963] 3All.E.R.413n, 65 RPC 203 CA.



52.   The equitable jurisdiction may be invoked, among other circumstances, where information is received such that the recipient knows or ought to know that it is being imparted in breach of confidence. The test of the reasonable recipient can be invoked: *Coco v AN Clark (Engineers) Ltd* [1969] RPC 41 at 48, cited in Halsbury's Laws of England, op cit, Para 16.

53.   In some cases – such as where highly personal or commercially sensitive information is involved – the detriment to the person to whom the duty of confidence is owed is clear. Such is the situation contended for by the Plaintiffs here in their capacities as employers (on behalf of their employees); and as business owners. Mr. Scott and the other principals of the Plaintiffs have explained their concerns as set out above from his affidavit in terms identical to the others.

54.   In some cases, there may be no financial detriment to the person to whom the duty is owed but the breach of confidence results in an invasion of personal privacy. Such, as I understand it, is the detriment perceived to the employees who, although not identified by name, are identifiable by reference, in particular, to the positions they hold in the respective firms for which they work and their nationalities.

55.   So identified, their respective salaries then become discernible from the Spread-sheet and are obviously matters of potential personal embarrassment, including in the ways described in Mr. Scott's affidavit.

56.   The case law is well-established in declaring that "*the right to personal privacy is clearly one which the law should in this field seek to protect*": per Lord Keith in *A-G v Guardian Newspaper* (above) at 255 F-H; approving of *Duchess of Argyll v Duke of*



*Argyll* [1967] Ch. 302, the latter being a case in which the equitable jurisdiction was invoked to grant an injunction against the revelation of marital confidences.

57. However, depending on the circumstances, the right to equitable injunctive relief may not be absolute:  there may be competing public interests in the information being made public and there may be an argument in favour of the freedom of expression of the recipient of the information, to discuss or disseminate the information; the press being an important example. The court, as a public body, must act in accordance with the rights guaranteed  under the Human Rights Act 1998 (here the Constitutional Bill of Rights) even when adjudicating on common law  (or equitable) causes of action: *Venables  v News Group Newspapers* [2001] 1 All. E. R.  908.

58. The Court must also make a preliminary judgment as to whether "*the information in question is so generally accessible that, in all the circumstances, it cannot be regarded as confidential*" (in the words of Lord Goff's "first limiting principle*"* in *A-G v Guardian Newspaper, (*above), at 282.  "Limiting" in the sense that the right to an injunction may be limited having regard to the extent to which the information is already disclosed and in the public domain.

59. In my view there is however simply no basis for thinking that the information contained in the Spread-sheet was already in the public domain. The available evidence as to the extent of disclosure comes only from the FOI Officer's affidavit in which she affirms to disclosure having been made only to the Cayman Compass and to 'Rosey Posey".

60. Accepting as I do, that a final injunction may be granted but subject to the ordinary principles of equitable relief that apply in respect of both threatened and actual



breaches of confidence and arising from any of the sources of jurisdiction in which an obligation of confidence may be founded (*Halsbury's* op.cit, para 85); it follows that it may well be appropriate in circumstances such as these to grant interim injunctive relief. The final decision whether to invoke the jurisdiction being left to be taken at the inter partes stage, when any question as to the extent of the obligation and the need for its enforcement will be resolved.

61.   And so the question became whether, at this the interlocutory stage, the balance of convenience weighed in favour of restraining disclosure until after the competing arguments (if any) are heard and decided upon. As in Cause G0015 of 2015, in this new  Cause also I accepted  that this test is satisfied, having regard to the following further factors advanced by Mr. Imrie:

> *"(i)    There is a serious question to be tried in this new Cause; i.e.:, whether a duty of confidence is owed by the Defendants in respect of the information in the Spread-sheet, due to the inherent confidentiality of such information and/or the circumstances in which the Spread- sheet was disclosed to the Defendants.*
>
> *(ii)    Here too, damages cannot adequately compensate the Plaintiffs (or other affected employers or the employees concerned) for the loss of confidentiality in the Information. If the information became public, the confidentiality would be lost permanently. Damages for the adverse effect on the Plaintiffs' commercial interests would be very difficult to*



quantify and monetary damages self-evidently could not compensate individuals for the violation of their right to have their personal information kept private.

(iii)   The balance of convenience favours the Plaintiffs: if the Court subsequently decides that there is no duty of confidence owed by these Defendant or that public interest favours publication of the Information, it is difficult to see what prejudice would be caused to the Defendants in having had to wait a few weeks or months to publish the Information. The Plaintiffs are not aware that any person has an interest in immediate publication/disclosure (as opposed to waiting a short period until this matter is properly determined).

(iv)   The Plaintiffs' prospects of success are high: it is likely that the Defendants received the Spread-sheet in dubious circumstances in which the confidentiality of the Information would have been obvious to the Defendants and therefore a duty of confidence attaches to the Information."

62.   I am cognisant that in *Cream Holdings v Banergee* [2005] 1 AC 253, the House of Lords declared that the threshold usually to be passed, where the competing human rights interests in the disclosure of information are engaged, is not that an "arguable case" or even a "strong *prima facie* case", must be shown by the applicant for an injunction, but rather whether the applicant is "likely to succeed" ultimately in



restraining publication if there is a contest at trial. Applying that test here, I would nonetheless have been satisfied that the injunctions should issue.

### Injunctions against Persons Unknown and Against the World.

63.   Further questions arose whether the Court has jurisdiction to grant an injunction in the particular terms sought that is: (a) against persons unknown where the Plaintiffs do not currently know the identities of all defendants who have possession of the relevant information and (b) in the context of varying the injunction granted on the 30 January in Cause G0015 of 2015, to restrain the world at large; that is: to restrain anyone who may come into possession of the information having received notice of this injunction, from further publication or dissemination of it. Such an order has come in the case law to be called an injunction *contra mundum* and I will come below to elaborate upon my reasons for granting it.

64.    First I note that I accepted, on the authority of the case law, that the Court has jurisdiction to award an injunction against "persons unknown", where plaintiffs do not currently know the identity of all defendants who have possession of the information, the confidentiality of which is properly sought to be protected.

65.   This is a jurisdiction which Eady J., in an expansive and instructive judgment, described as a "recently developing area of law and practice" in which the interpretation of provisions of the Human Rights Act 1998 is being implemented in a rather experimental environment: *X and another v Persons Unknown* [2006] EWHC 2783 (QB) at [55]. The guiding thesis of his judgment – which follows and expands upon the seminal reasoning of Sir Andrew Morritt V-C in *Bloomsbury Publishing Group Ltd. v. News Group Newspaper Ltd.* [2003] EWHC 1205 (Ch.) – is that in the

exercise of the broad and developing jurisdiction to restrain publication of information, the Court must be ever mindful of the competing interests and the necessary scope and duration of any injunction that it might make. Specifically also at [62], Eady J. advised that it is now recognised that generally speaking, an order restricting the communication of ideas and information should include a "public domain proviso": citing: *Attorney General v Times Newspaper Ltd.* [2001] EWCA Civ. 97; *Harris v Harris; Attorney General v Harris* [2001] 2 FLR at 208 and 353 (Munby J.) and *A v B, C, and D* [2005] EMLR 36 at 16-17. In practice, this would mean excluding from the reach of the injunction, aspects of the information which are already in the public domain.

66.   No such public domain proviso was included in the orders made by me on either the 30th January or 6th February 2015 because, as already explained; there was no basis for thinking that the personal and commercially sensitive information involved here was, otherwise than by those to be restrained from doing so, already placed in the public domain.

67.   Consideration was however given by me to the appropriate scope, particularization and duration of the order – recognising that no injunction may be granted when there is inadequate particularity as to what material is confidential. The application must provide full and proper particulars of the confidential information sought to be protected, so that an injunction is enforceable and of a certain scope discernible to those who are to be restrained.



68.   For that reason, there are Schedules to the Orders which describe the nature of the specific information to be protected and the interim nature of the order, which

implicitly allows access to the Court to anyone who would wish to apply for the discharge of the injunctions.

69.   Having regard – not only to the potentially competing interests of the press in getting it and of the freedom of expression of those who may come to see this information – but also to the rights and needs of those to whom the information relates for the protection of their privacy, the Orders, framed in terms of the Schedules, are regarded as providing a proportional and fair response.  They restrain further publication, for the time being, not only by the named Defendant Kerry Tibbetts, but also by persons unknown who may come into possession of the information.

70.   I must note a further matter of pleading which required to be addressed before these orders could have been made. It is the identification of defendants other than by name, as "persons unknown". This was the specific issue addressed by Vice-Chancellor Morritt in *Bloomsbury Publishing* (above), where, in granting injunctions to prevent breach of copyright by the unauthorised publication or dissemination of copies of the fifth in the well-known Harry Potter series of books,  he accepted (at [17]) that joining "persons unknown" among the defendants was a permissible form of pleading and that the issuance of an injunction in such terms cannot cause confusion because "*anyone to whom it is shown will know immediately whether or not it is descriptive of and therefore directed to him or her.*"

71.   In *Bloomsbury Publishing*, it was also a part of the learned Vice-Chancellor's reasoning that the Civil Procedure Rules in England and Wales no longer require in the prescribed claim form, that defendants must be named, only that they "should". In light of the mandate of the over-riding objectives of the rules for "*enabling the*



*court to deal with cases justly*", he concluded (at [19]) that "*The over-riding objectives and the obligations cast on the court are inconsistent with an undue reliance on form over substance. The proper application of Rule 3.10 is incompatible with a conclusion that the joinder of a defendant by description  rather than by name is for that reason alone impermissible.*"

72.   This is reasoning that I readily adopt here, notwithstanding that our GCRs (like the old Rules of the Supreme Court upon which they are based) prescribe a form of writ that requires to be addressed to a named defendant or defendants.

73.   I am fortified in this approach by the fact that the Rules Committee has, in its wisdom, sought to adopt and superimpose in the Preamble to the GCRs, similar over-riding objectives as those which guide the application of the Civil Procedure Rules.

74.   This court must therefore always be mindful that, as the Vice-Chancellor also recognised (at [14]) (citing with approval the dictum of Anderson J. from *Tony Blain Pty Ltd v Splain* [1994] FSR 497, 499):

> "*It is an ancient maxim of the law that where there is a right there is a remedy: Ubi jus ibi remedium. In circumstances where it is plain that persons are infringing proprietary interests which the law recognises, or deceiving the public by way of trade in a manner which indirectly affects the commercial interests of others, the law should, if it reasonably can, provide a remedy.*"



**Variation of the orders of 30th January 2014 issued in**
**Cause G0015 of 2015: Injunction *contra mundum***

75. Similar considerations informed my decision to accede to the Plaintiffs' application to vary the injunction Order of 30th January so as to allow it to operate *contra mundum*.

76. The Plaintiffs, not being aware of the identity of all persons who may have come into possession of the Spread-sheet (and being reasonably concerned from its dissemination on the Facebook Page that such wider dissemination may have occurred); applied to vary the Order such that the injunction applies, in terms perhaps to regarded as wider than to "persons unknown", but also to all persons receiving notice of the injunction, wherever they may be.

77. Although an injunction operates on the party to whom the injunction is addressed, third parties may be liable for contempt if they act in a manner which is contrary to the terms of an injunction of which they have notice so as to frustrate the purpose of the judge in making the order. This is the so-called "Spycatcher principle": *Halsbury's* op cit. para 84.

78. While still an emerging area of jurisprudence, it now appears settled that occasionally and where the circumstances justify – such as where the importance of the material warrants it – an injunction (including ultimately a final injunction) may be made *contra mundum*: *Attorney General v Barker* [1990] 3 All. E.R. 257; and see, for a general discussion of the principles: *Carter-Ruck on Libel and Privacy* (6th Edition) London: LexisNexis.

79. The textbook states (at [21.61] - [21.63]) that the possibility of making such an injunction first arose in the context of the wardship jurisdiction of the English courts



in *X (a minor), Re, X County Council v A* [1985] 1 All E.R. 53 and that injunctions *contra mundum* are now regularly used in that context where necessary for the protection of the identity and family life of minors and those responsible for their care and personal safety.

80.  This jurisdiction is said by the authors to have been opened with respect to adult claimants by the decision of the Family Division of the High Court (now Senior Court) of England and Wales in *Venables v News Group Newspaper Ltd.* (above). To quote from the text at [21.60]:

> *"In that case Dame Elizabeth Butler-Sloss P. was faced with apparently settled law to the effect that injunctions could be made only against a party to a suit. She explained, however, that the position had shifted on account of the coming into force of the Human Rights Act 1998. Having recognised the incipience of a positive duty on the court as a public authority to take steps to protect individuals from the criminal acts of others (following Osman v United Kingdom (1998) 29 EHRR 245), and having been persuaded that on the facts there was a real possibility that the claimants would be in danger of revenge attacks if their identities (that is: personal private information) were disclosed such as to make the instant case an exceptional one, she was satisfied that injunctive relief could "be granted openly against the world."*



81.  In *X (a woman formerly known as Mary Bell and Y v O'Brien* [2003] EWHC 1101 (QB) a similar injunction securing lifetime anonymity was granted. This was

notwithstanding the fact that there was no proven threat to the Article 2 right to life of either the mother or daughter to whom the injunction would relate.  But press intrusion had previously forced X, her husband B and her daughter Y, to relocate five times and to change their identities twice.  Moreover, it was adduced that absent an injunction the family would be at considerable risk of press intrusion and harassment, public stigma and ostracism.  This was all on account of the fact that X, many years before when 11 years old and suffering from dementia had killed two small children, three and four years old.  Having been convicted of manslaughter by reason of diminished responsibility, she was sentenced to detention for life under the provisions of section 53(1) of the Children and Young Persons Act 1933.  Having been released from prison as an adult, considerable public interest was generated by the press in revealing her identity within any community in which she sought to re-establish her life.

82.   From the medical evidence, the prospect of identification had caused an adverse effect upon X's mental and physical health which could be expected to be further exacerbated in the absence of injunctive relief.  In light of these factors the Court (again per Madam Justice Butler-Sloss P.) deemed the serious breach of Article 8 rights to privacy to be enough for treating the case as exceptional.

83.   The development of the law reflected in these two judgments of Madam Justice Butler-Sloss P. has been noted by Lord Phillips MR. as "*exemplifying ...the manner in which the courts have extended both the scope of confidential information and the use of the injunction to protect this, thereby giving effect to the right to respect for*



*private life conferred by Article 8 of the Human Rights Convention: Re S (a child)*

*(identification: restriction on publication), [2003] EWCA Civ. 963 at [99]."*

84.     This was notwithstanding the importance of the balancing exercise required by the

conflicting fundamental rights.  Having approved at [30], of Lord Donaldson's earlier

distinction drawn – in *Re M and N (minors) (Wardship: Publication of Information*)

[1990] FAM 211 – between "the public interest and the public's curiosity" Lord

Phillips came later to express his concluded views on how the balance should be

struck in the case then before the Court of Appeal, dealing also with the publication

of information that could affect the welfare of a child but in which the press and the

public would be interested.  At [53 and [54] he declared as follows:

In *A v B plc* [2003] 3 WLR 542 [(cited above at para 28 of this judgment)] Lord

Woolf CJ observed at para 6:

> *"There is a tension between the two articles (of the Convention*
>
> *and Fundamental Rights) which requires the court to hold the*
>
> *balance between the conflicting interests they are designed to*
>
> *protect. This is not an easy task but it can be achieved by the*
>
> *courts if, when holding the balance, they attach proper weight*
>
> *to the important rights which both articles are designed to*
>
> *protect. Each article is qualified expressly in a way which*
>
> *allows the interests under the other article to be taken into*
>
> *account."*

This is the approach which should have been followed in this case. The

concept of proportionality means that the proposed interference or restriction

[of publication] must be supported by 'relevant and sufficient grounds'; it must respond to a 'pressing social need'; and it must be no greater than necessary to meet the legitimate aim pursued".

85.    It must be acknowledged  that the jurisdiction to grant an injunction *contra mundum* is a developing one and the defining principles are not yet expositively settled by the highest courts.

86.    It nonetheless appears from the existing case authorities, some as discussed above, that an injunction *contra mundum* can granted in exceptional circumstances (such as risk to life, risk of harassment from  press intrusion, etc.).  The case law suggests that it is necessary for this Court to consider any countervailing public interest in disclosure or the general right of persons to freedom of expression and freedom of information, against the right of the Plaintiffs (and their employees) in the protection of their confidential personal and commercially sensitive information.

87.    Given the number of persons who could be adversely affected here (some 21,000 work permit holders) and the large number of businesses (all  employers who employ work permit holders); the Plaintiffs submit, and I accept, that there is sufficient private and public interest in preventing publication and potential abuse of the information to constitute exceptional circumstances justifying the grant of an injunction *contra mundum*, "against the world at large".



88.    To the extent that there are to be genuine concerns about the granting of such an injunction on a permanent basis and/or any concerns about how the competing public interests and issues such as freedom of expression should be weighed (Article 11 of

the Constitutional Bill of Rights), those may be considered more fully at any later *inter partes* stage of these proceedings.

89.  I accepted that at this stage, the balance of convenience, as applied in keeping with *American Cyanamid* (and as still further discussed in this last context below) is struck in favour of granting the injunction, given that (again as I observed when making the 30th January Orders - as far as the Plaintiffs say they are aware) no persons would be adversely affected by being required to wait until the matter is finally determined before publishing this information; and assuming that a permanent injunction is not to be granted at that stage.

**The test for varying the grant of interlocutory injunctions is met**

90.  There is no specific test for varying interlocutory injunctions. I considered that, in effect, I am granting a new injunction on the same terms as the previous injunction. The new (varied) injunction must therefore meet the original test for the grant of an interlocutory injunction.

91.  The test for the grant of (a varied) interlocutory injunction, is therefore the same as that applied above in the earlier contexts: there must be a serious issue to be tried; it must appear that damages may not be an adequate remedy to compensate the Plaintiffs and that the balance of convenience is in favour of granting the injunctions to "hold the ring", until the issues may be resolved (see *American Cyanamid Co*. above). This was the test recognised in granting the injunctions on 30th January. I accept and find now that the test continues to be met; even more so in light now of the publication of some of the information on the Facebook Page.

92.   Specifically as to the balance of convenience, I find that it favours the Plaintiffs: the
      only entity which could be affected commercially by the injunctions is the Cayman
      Compass but it has already voluntarily undertaken not to publish the Information.  The
      Defendant, Ms Tibbetts has no commercial or other interest in dissemination of the
      Information and therefore there is no risk of harm to her.  In respect of an injunction
      against the world, no person who may assert an interest will be prejudiced by waiting
      until this matter is finally determined before knowing whether it is lawful to publish the
      Information.  By contrast, the harm to the Plaintiffs (and other employers and their
      employees) to arise from disclosure would be serious.

93.   I also recognized that the Plaintiffs' prospects of success are very high:  the FOI
      Officer's decision to disclose the Information is very arguably unlawful and/or
      unreasonable and is arguably very likely to be quashed by the Court upon judicial
      review.  The FOI Officer has admitted in her affidavit that "appropriate redactions
      should have been made to the Spread-sheet to ensure that personal information and
      legitimate commercial interests were adequately protected."

94.   These are factors which could be important also in the event the grant of what are
      intended now to be injunctions by way of interim relief, prove to be finally
      determinative. This could  happen here in the event no one seeks to challenge the
      injunctions. It is for this reason that the law regards the *American Cyanamid* principles
      as stated above, as being of qualified applicability in cases which involve the freedom of
      expression. In such cases, and where it appears to the court that no one may actually
      seek to challenge the injunctions, the test goes beyond *American Cyanamid*, to require
      that the court is satisfied that the applicant for interim injunctive relief – relief which



may turn out to be final and determinative – has a strong case: Halsbury's; op cit para 84, citing *Cream Holdings Ltd v Banerjee* (above) and *Dunford & Elliott Ltd v Johnson & Firth Brown Ltd* [1977] 1 Lloyds Rep 505.

95.    With all the foregoing considerations in mind, it remained clear that the different forms of injunctive relief sought by the Plaintiffs would be necessary and proportionate responses to the difficulties presented in this case by the unwarranted disclosure of the Spread-sheet and so they were accordingly granted in the terms expressed in the Orders.

96.    No order for costs was sought or made in Cause 15 of 2015. The costs in Cause 20 of 2015 were reserved.

Hon. Anthony Smellie
Chief Justice

February 12, 2015