**IN THE COURT OF APPEAL OF THE CAYMAN ISLANDS**

**ON APPEAL FROM THE GRAND COURT, FINANCIAL SERVICES DIVISION**

**CICA (Civil) Appeal Nos. 002 & 003 of 2022**
**(Grand Court Cause No. FSD 236 of 2020 (RPJ))**

**BETWEEN:**

**(1) KUWAIT PORTS AUTHORITY**
**(2) THE PUBLIC INSTITUTION FOR SOCIAL SECURITY**
**(3) THE PORT FUND L.P**.

Plaintiffs/Respondents

-and-

**(1) PORT LINK GP LTD.**
**(2) MARK ERIC WILLIAMS**
**(3) WELLSPRING CAPITAL GROUP, INC**
**(4) KGL INVESTMENT COMPANY ASIA**

Defendants/Appellants

**BEFORE:**

The Hon. Sir Richard Field JA
The Hon Sir Michael Birt JA
The Rt Hon Sir Jack Beatson JA

**Appearances:**      **Ms Clare Stanley KC and Mr Peter Tyers-Smith and Mr Thomas Wright of Kobre & Kim on behalf of the First Appellant**

**Mr Graham Chapman KC, Mr Andrew Pullinger and Mr Harry Shaw of Campbells LLP on behalf the Second-Fourth Appellants**

**Mr David Allison KC, Ms Jennifer Fox,  Mr Oliver Green and Mr Harry Clark of Ogier for the Respondents**

**Date of hearing:**            **25 and 26 May 2022**

**Date draft judgment circulated:**      **13 December 2022**

**Judgment Delivered:**          **20 January 2023**


**JUDGMENT**

**Sir Richard Field JA**


**Introduction**

1.      This is the judgment of the Court to which each member has contributed.

**EXHIBIT**

**13**

2.      There are two appeals before the Court. The first is brought by all the appellants from the order made by Justice Parker ("the judge") dismissing their summonses to strike out certain claims in the Amended Statement of Claim[1] (the "ASOC") (the "Strike Out Appeal"). The second appeal is brought by the first appellant against the dismissal of its summons for security for costs ("the SFC Appeal"). Hereinafter, we refer to the appellants as "the defendants" or "D1", "D2", "D3" and "D4" and to the respondents as "the plaintiffs".

The Strike Out Appeal

3.      This appeal raises important issues concerned with: (a) the nature of a Cayman Islands Exempted Limited Partnership ("ELP") established under the Exempted Limited Partnership Act (2021 Revision) ("the ELPA"); (b) whether a limited partner of an ELP can sue, independently of any of the other limited partners ,alleged wrongdoers, including the ELP's general partner, who are alleged to have been parties to the wrongful misappropriation of the ELP's assets held on trust by the general partner and, if so, what is the appropriate remedy to be granted by the court;  and (c) the circumstances in which a limited partner can bring a derivative action under section 33(3) of the ELPA in the name of the ELP against the general partner for  breaches of contractual, statutory and fiduciary duty.

4.      The ELP in question is The Port Fund L. P. ("TPF") which was registered on 21 March 2007. It was established as a vehicle for investments in port-related assets around the world.  It has one general partner and eleven limited partners including the two plaintiffs, the Kuwait Ports Authority ("KPA"), which it is alleged has invested USD 85 million giving it at least a 41% interest in TPF and The Public Institution for Social Security ("PIFSS"), which it is alleged invested USD 40 million (giving it a 23.77% interest in TPF). The total invested in TPF by the limited partners was USD 188,152,000.

5.      The first defendant, Port Link GP Limited ("the GP" or "D1"), is a Cayman Islands Exempted Limited Company incorporated on 8 March 2007. It was appointed the general partner of TPF pursuant to a limited partnership agreement ("the LPA") made on 21 March 2007 between it and the original limited partners of TPF. The whole of the GP's share capital is held by Port Link Holdings USA Inc ("PLH"), a Delaware company; and the whole of PLH's share capital is held by the Second Defendant ("Mr Williams"). Mr Williams is also CEO, CFO, President, Vice President, Treasurer and Secretary of the Third Defendant, Wellspring Capital Group Inc ("Wellspring"), a company incorporated in the US State of Georgia. Wellspring is owned by

---

[1] The Defendants' application to strike out those paragraphs of the ASOC that pleaded the criminal convictions in Kuwait of a Ms Lazareva and a Mr Dashti was not opposed and the judge so ordered.

the Mark E Williams Living Trust, the trustees of which are Mr Williams, his wife Laura Williams, and his brother, Dylan Williams.

6.      TPF's sponsor and placement agent was KGL Investment Company KSCC, a Kuwaiti company ("KGLI Kuwait"). From September 2007 until 2008, Mr Williams was KGLI Kuwait's Vice President and he was its Investment Director from 2009 to 2011. He was also a member of TPF's Investment Committee in the years 2009 – 2013.

7.      Pursuant to an agreement with the GP dated 28 June 2007 ("the IMA"), KGL Investment Cayman Limited was appointed TPF's investment manager. In July 2018, KGL Investment Cayman Limited changed its name to Emerging Markets PE Management Limited ("EMPEML"). The ultimate beneficial owner of EMPEML as at the date of the IMA and until around January 2018 was KGLI Kuwait, which is the 100% shareholder of the Fourth Defendant ("KGLI Asia").   KGLI Asia is said by the defendants to have provided administrative support to TPF between December 2017 and August 2020 pursuant to an agreement for the provision of such services dated 1 December 2017 ("the ASA").

8.      Briefly put, the plaintiffs plead in the ASOC that assets of TPF worth hundreds of millions of US Dollars held on trust by the GP have been misappropriated as part of an unlawful means conspiracy and/or dishonest breaches of trust and fiduciary duty and that each of the defendants has wrongfully participated in some or all of these defalcations, in some cases having knowingly received some or all of the proceeds thereof. Amongst the allegations made against the defendants is a claim that the GP made substantial improper payments using TPF monies that were not for the benefit of TPF.

9.      Two of the other limited partners in TPF, Gulf Investment Corporation ("GIC") and General Retirement and Social Insurance Authority of Qatar ("GRSIA"), who between them it is alleged invested 15.14 % of the total alleged investment in TPF, have brought claims against the Second and Third Defendants in the US State of Georgia alleging that those parties are guilty of dishonesty, deliberate breaches of fiduciary and unlawful means conspiracy.  GIC and GRSIA have consented to a stay of their claims in the courts of Georgia pending determination of the instant proceedings which they support.

10.     The two current directors of the GP ("the FFP Directors") are individuals recruited from FFP (Directors) Limited. Mr Andrew Childe ("Mr Childe") was appointed on 29 January 2020 and Mr Richard Lewis ("Mr Lewis") on 28 October 2020, replacing Mr Christopher Rowland ("Mr Rowland") who had been appointed at the same time as was Mr Childe.

11.    The FFP Directors have no connection to any of the wrongdoing alleged in the ASOC and describe themselves as "independent directors". In his third affidavit, Mr Lewis states that, fully cognisant of their fiduciary duties, they have conducted an intensive, forensic investigation into the actions of the GP and the former management team of TPF for the benefit of all the limited partners and not just the plaintiffs. The stated results of the FFP Directors' forensic investigation are set out in a series of memoranda issued to the limited partners in an update to the limited partners dated 29 May 2021, save for their investigations into the DIFC Proceedings Claim and the Lazareva Lobbying Campaign which are respectively dealt with in [300] –[345] and [346] – [399] of Mr Lewis's third affidavit. In their view, there is currently no cause to bring the derivative claims and even if TPF had meritorious claims, it would be necessary to consider whether the claims were worth pursuing on a cost/benefit analysis and, if so, whether TPF was in a position to pursue them or could raise funding to do so, and whether it would be in the best interests of TPF to do so.

12.    The plaintiffs plead individual direct claims against the defendants for losses each has suffered as a limited partner in TPF by reason of the defendants' actionable involvement in the wrongful misappropriation of assets held on trust by the GP. Relying on section 33(3) ELPA, they also plead derivative claims against the GP and the other defendants on behalf of TPF in respect of the aforesaid alleged misappropriation of assets.

**The direct claims and the applications to strike them out**

13.    We first consider the direct claims brought against the GP, (D1), Mr Williams (D2), and Wellspring (D3). It is not necessary to consider the plaintiffs' claims against KGLI Asia (D4) for their losses from payments made to that entity under the ASA because the plaintiffs' counsel, Mr Allison KC, accepted that there is no direct claim against D4; see respondents' skeleton [48].

14.    The plaintiffs plead that in breach of the statutory, contractual, common-law and fiduciary duties owed by the GP to TPF and the limited partners and pursuant to a conspiracy to injure TPF and the limited partners by unlawful means, the GP made very substantial payments using TPF monies that were not for the benefit of TPF and the limited partners. These payments were allegedly made to the following five recipients and/or for the following purposes: (i) Apache Asia Limited and its related Macau entity, Apache Asia Limitada ("Apache") which received USD 58,528,399 from the GP, of which USD 45,850,000 was purportedly for services under an advisory agreement and USD 14,550,000 was directed to be paid to KGLI Kuwait; (ii) Wilfredo Placino who received USD 2,920,000 purportedly by way of "advisor fees"; (iii)

lawyers and lobbyists acting for Ms Marsha Lazareva (a director of the GP from 8 March 2007 to 24 May 2018) and Mr Saeed Dashti (a director of the GP from 16 April 2007 to 24 May 2018); (iv) a group of Kuwaiti Service Providers, allegedly for services rendered, of which USD 14,070,000 was paid to Golden Shahin General & Trading Contracting Company ("Golden Shahin"), which is part of a group of companies associated with KGLI Kuwait and Mr Dashti; and (v) Wellspring, which received USD 59,990,461.30 ("the Wellspring Payment") by way of a payment alleged to be due under a judgment given in proceedings brought by EMPEML against the GP and TPF in the Dubai International Finance Centre Court ('the DIFCC").

15.     The alleged background to (v) is that on 15 November 2017, USD 496,429,767 (representing part of the net proceeds resulting from the sale by the GP of a TPF asset in the Philippines called "Clark City") were transferred to the GP's account with Noor Bank PJSC ("Noor Bank"). The same day, Noor Bank made a suspicious transaction report to the Financial Intelligence Function of the UAE which issued a report to the Dubai Public Prosecutor who successfully moved to freeze the transferred money, an order that remained in place until February 2019. On 9 July 2018, EMPEML commenced proceedings ("the DIFC Proceedings") against the GP and TPF in the DIFCC of First Instance claiming unpaid Carry in the sum of USD 45,462,000, compound interest on the unpaid Carry sum, and unpaid Management Fees of USD 8,106,386 with compound interest thereon at 8% pa. The GP acknowledged service of the claim, submitted to the jurisdiction of the DIFCC and admitted the claim in the sum of USD 56,808,005. The DIFCC then entered judgment ordering the GP and TPF to pay USD 56,999,978 and, at the request of EMPEML, the GP transferred USD 59,990,461.30 to Wellspring in satisfaction of the judgment. The plaintiffs claim, inter alia, that this payment was made by the GP in wilful and negligent breach of trust in that EMPEML had no entitlement to the claimed Management Fees having assigned its rights therein to KGLI Kuwait; there was no contractual right to interest; it was wrong to submit to the jurisdiction of the DIFCC when the law of the Cayman Islands governed the relationship between the GP and EMPEML; and the IMA contained an exclusive jurisdiction clause in favour of the courts of the Cayman Islands. The plaintiffs also allege that the payment made in satisfaction of the DIFCC judgment was made on the advice of the same legal counsel who, to the GP's knowledge, was also advising EMPEML with respect to its entitlement.

16.     The plaintiffs' direct claims against D1 and D3 are for relief under the Fraudulent Dispositions Act, 1996 Revision: (see ASOC [179] and [189]). They claim that these defendants culpably participated in the aforementioned imp roper payments made by the GP that are related in [14] and [15] above and/or dishonestly received such payments or the

traceable proceeds thereof. They maintain that Wellspring was party to an unlawful means conspiracy, dishonestly assisted in a breach of trust/duty by the GP, knowingly procured a breach of the contractual obligations the GP owes the limited partners, and is liable in knowing receipt for "the Wellspring Payment" holding "the Wellspring Payment" or its traceable proceeds on constructive trust for TPF. The plaintiffs also claim that Mr Williams conspired and dishonestly assisted in the GP's breaches of duty and was in breach of his fiduciary duties to TPF and the GP by orchestrating the DIFC Proceedings and the Wellspring Payment.

17.    The GP applied to strike out the direct and the derivative claims against it but not on the ground that they lacked merit.  Instead, it accepted that the pleaded allegations were arguable, but contended in relation to the direct claims that it is impermissible for two members of a class of eleven limited partners to claim damages from the GP to be paid directly to themselves except by seeking partnership accounts that would require the joinder of the other limited partners.

18.    D2-D4 applied to strike out the derivative claims against them but D2 and D3 did not apply to strike out the direct claims against them. They have not appealed the judge's decision, but do not admit that the plaintiffs have standing to bring the direct claims that they face. Like D1, they maintain that these claims "*ought to be pursued by way of a partnership account as against the GP*".

**The general rule as to who may bring proceedings by or against an ELP**

19.    Section 16 ELPA provides that all rights or property of an ELP shall be held on trust by the GP as an asset of the ELP and section 33 contains the general rule as to who can bring proceedings by or against an ELP. Section 16(1) reads:

> "*Any rights or property of every description of the exempted limited partnership, including all choses in action ... shall be held or deemed to be held by the general partner and if more than one by the general partners jointly, **upon trust as an asset of the exempted limited partnership** in accordance with the terms of the partnership agreement*" (emphasis added).

20.    The material provisions of section 33 are:

> "*(1)    Subject to subsection (3), legal proceedings by or against an exempted limited partnership may be instituted by or against any one or more of the general partners only, and a limited partner shall not be a party to or named in the proceedings.*
>
> *(2)    If the court considers it just and equitable any person or a general partner shall have the right to join in or otherwise institute proceedings against*

> *any one or more of the limited partners who may be liable under section 20(1) or to enforce the return of the contribution, if any, required by section 34(1).*
>
> *(3)    A limited partner may bring an action on behalf of an exempted limited partnership if any one or more of the general partners with authority to do so have, without cause, failed or refused to institute proceedings."*

21.    It is important to note that, as recognized in [2] and [6] of D2 – D4's skeleton argument for the appeal, the effect of ELPA section 33 is that *"ordinarily, actions **for and on behalf of an ELP** must by statute be brought by the general partner of that ELP"* and *"**a claim belonging to a limited partnership must be brought by the GP acting for and on behalf of the ELP**"* (emphasis added)*.* Sections 33 (1) and (3) thus apply only to claims brought by or on behalf of an ELP, that is to derivative claims. They therefore do not apply to direct claims brought by a limited partner in respect of its own right of action against the GP and others.

**The judge's decision on the direct claims**

22.    The judge dealt with direct claims by a limited partner at [60]-[65]. Before doing so, at [46]-[59] he helpfully considered and analysed the characteristics of an ELP, how it differs from an ordinary partnership and a company, and the statutory regime established by the ELPA.

23.    He stated at [46]-[47] that the rights and obligations of the limited partners and the general partner (or partners) *inter se* are regulated by the ELPA, the express provisions of which are to prevail where they are inconsistent with the rules of equity and of common law applicable to partnerships as modified by the Partnership Act (2013 Revision). He also referred at [46] to the provision in section 3 of the ELPA that absent such inconsistency those rules *"shall apply to an exempted limited partnership"*.

*(a) Characteristics of an ELP that differ from those of an ordinary partnership:*

24.    At [46]-[53] the judge identified the following characteristics of ELPs which he considered to be important points of distinction from an ordinary partnership, and which create different rights and obligations between the partners to those in an ordinary partnership:

(1)    By section 4(2) and 20 of the ELPA, the limited partners in an ELP have limited liability whereas the general partner is liable for all debts and obligations of the ELP: [48].

(2)     By section 14 of the ELPA limited partners have no active involvement in the business in their capacity as limited partners. The business is carried out by the general partner who enters into all contracts by or on behalf of the ELP: [49] and [52].

(3)     Section 19(1) of the ELPA imposes an express duty of good faith on the general partner of an ELP requiring the general partner to act in the interests of the ELP: [50].[2]

(4)     Whereas in an ordinary partnership, mutual and reciprocal rights and obligations are owed to each other by partners, section 19(2) of the ELPA provides that, unless the partnership agreement provides to the contrary, a limited partner owes no fiduciary duty either to the ELP or to other partners: [51].

*(b)     Characteristics of an ELP that differ from those of a company:*

25.     At [54]-[55] the judge stated that the fundamental legal distinction is that an ELP has no separate legal personality and exists only as its constituent partners and cannot own property in its own right. He stated that the consequence of the ELP not having a separate legal personality is that its general partner holds its rights and property, including choses in action, on trust for each of the partners. Because a limited partnership has no legal personality, the partnership as a whole is not able to enforce the general partner's obligations as trustee.

26.     The judge then identified other characteristics of ELPs which he considered to be important points of distinction from those of companies:

(1)     the general partner of an ELP owes its duties to all of the individual limited partners whereas the board of directors of a company only owe duties to the company (as the legal entity) and not to its shareholders: [56]-[57].

(2)     because in the case of a company directors' duties are owed to the company, any breach by them is generally only actionable by or on behalf of the company and not by shareholders, although there are important exceptions where the wrongdoer directors are in control of the company: [57]-[59].

(3)     by section 33(1) of the ELPA, the general partner in an ELP is the only entity who can institute proceedings <u>on behalf of the partnership,</u> whereas in the case of a company there are exceptions to the rule in *Foss v Harbottle* (1843) 2 Hare 461 where the wrongful directors are in control of the company. The judge stated that "*if the limited*

---

[2] The judge did not mention, but must have been aware, that this statutory duty is subject to any express provisions to the contrary in the partnership agreement.

*partners have claims against the GP it is in practice unworkable for it to bring proceedings against itself for breach of duty. If the GP is the arbiter of whether to bring claims against itself that clearly gives rise to a conflict of interest*": [60].[3]

(c)     *Direct claims by a limited partner:*

27.     The judge accepted the submissions of counsel for the plaintiffs, Mr Allison KC, based on the characteristics of an ELP which differ from those of an ordinary partnership and a company, in particular that an ELP has no separate legal personality and that a limited partner does not owe fiduciary duties to the ELP or to the other limited partners. He stated that:

> "*[T]he logical consequence of the aforesaid analysis of the nature and characteristics of an ELP is that the GP's obligations must be capable of enforcement by each of the partners to whom it owes duties individually. That is to be contrasted to the situation where directors of a company hold the company's assets and are treated as trustees because they owe fiduciary duties to the company. In that situation they hold the assets for the company, rather than the shareholders*": [61].

> "*The GP of an ELP owes fiduciary duties to each of the Limited Partners and any breaches are therefore enforceable by the Limited Partners themselves*": [62].

28.     The judge then stated:

> "*It follows that where an ELP is alleged to have suffered loss, as in this case, that is the loss of each of the Limited Partners. There is no distinct or separate loss in respect of 'the partnership' (TPF), which as an entity does not exist at law. The Limited Partners in enforcing their individual claims do not owe duties to each other*": [63].[4]

29.     He concluded at [64] that:

> "*[T]he direct claims in respect of the individual partners' losses are vested in the Limited Partners alone, and are not claims that can be brought on behalf of TPF derivatively, except in the circumstances permitted by section 33(3) of the ELPA where the Limited Partners … who wish to obtain redress for TPF are in effect put in the place of the GP, and bring claims on behalf of TPF*".

30.     The judge rejected the submission on behalf of the GP and the other defendants that sections 16(1) of the ELPA and clauses 3.1 and 3.3 of the LPA prevented such direct claims because the limited partners cannot usurp the function of the GP, who is the only authorized agent of the

---

[3] In [60] the judge does not mention section 33(3) of the ELPA which, as we have seen, permits a limited partner to bring a derivative action: "an action on behalf of an [ELP] if any one or more of the GPs with authority to do so have, without cause, failed or refused to do so".

[4] The last sentence, stating that, in enforcing their individual claims, limited partners do not owe duties to each other, contains a footnote referring to section 19(2) of the ELPA on which see para [24] (4) above.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

partnership, here TPF, able to sue. He stated that: "*the practical difficulty with that submission is that in practice the GP could obviously not sue itself and suffers from the conflict of interest*" that arises if the GP is the arbiter of whether to bring claims against itself which clearly gives rise to a conflict of interest: see [76] and (on the conflict of interest) [60].

*(d)     The Henderson case*

31.     At [66]-[78] the judge considered the decision of Cooke J in the English Commercial Court in *Certain Limited Partners in Henderson PFI Secondary Fund II LLP (A Firm) v Henderson PFI Secondary Fund II LLP (A Firm) & others* [2012] EWHC 3259 (Comm) (hereafter "*Henderson*"). That case concerned the similar but by no means identical UK statutory regime in the Limited Partnerships Act 1907 under which such partnerships also have no legal existence independent of their constituent partners. The focus of *Henderson* was whether limited partners were entitled to pursue derivative claims on behalf of the partnership, and, if so, the consequence of doing so.[5]   We therefore primarily consider it when giving our conclusion and reasons about the derivative claim against D1 at [147] – [148] below. But in considering entitlement to pursue a derivative claim, Cooke J also considered whether a limited partner could sue the general partner for "*its own loss under its own claim*" under the limited partnership agreement. He stated that it could because "*it has its own contractual or fiduciary claim for its own loss*": [2012] EWHC 3259 (Comm) at [28] and [31].

32.     In the present case, the judge stated that Cooke J held that:

    (i) "*each limited partner could in its own individual capacity sue … the general partner for its own losses in respect of liabilities under the limited partnership agreement*": [69];

    (ii) "*any claim brought by each limited partner as an individual contractual or fiduciary claim would not involve management of the partnership business*", [72]; and

    (iii) "*the partnership which consisted of the limited partners and the general partner together, had no form of joint right or claim against the general partner*": [72].

*(e)     Must direct claims by a Limited Partner be by seeking an order for partnership accounts?*

---

[5] i.e. whether the  pursuit of derivative  claims constituted taking part in the management of the business of the partnership so that, under section 6(1) of the 1907 Act, claimants doing so would forfeit their limited liability.

33.     The judge considered the GP's submission that direct claims by a limited partner can *only* be vindicated by the taking of partnership accounts at [79] ff. At [86]-[87], he rejected it and accepted the plaintiffs' submission that the claims advanced were principally direct claims vested in the individual limited partners rather than in TPF (the ELP itself) and that the taking of partnership accounts was not the only procedural route available to the plaintiffs.[6]

34.     The judge took into account the distinct characteristics of an ELP and the provisions of the ELPA: [80]-[81]. He considered that the English authorities on ordinary partnerships which Ms Stanley submitted were "*pellucidly clear*" in requiring rights and obligations between partners only to be procedurally adjudicated by the taking of partnership accounts had no direct application to Cayman Islands' ELPs. His reasons were that, unlike ordinary partnerships, under a Cayman Islands' ELP:

(ii)     there are no reciprocal fiduciary obligations or reciprocal duties between the limited partners unless the LPA provides otherwise: [84];

(iii)    the absence of reciprocal fiduciary obligations between the limited partners means that the joinder of all partners to any proceedings so that the necessary accounting for any monetary claims required by *Public Trustee v Elder* [1926] 1 Ch. 776 at 789 does not apply to a Cayman Islands' ELP: [82];

(iv)     the general partner owes fiduciary and contractual duties directly to the limited partners and those duties are enforceable directly by the limited partners: [ 83];

(v)      each limited partner is not, as is the case in an ordinary partnership, jointly and several liable for the partnership's liabilities; referring to sections 3[7], 4(3), 16(1) and 19(2) of the ELPA, the judge stated that "*the rules of equity and common law applicable to ordinary partnerships are in this respect inconsistent with express provisions of the ELP*": [85];

(vi)     claims against the general partner for a breach of the statutory, equitable, common law or contractual duties owed to the limited partners are vested in the limited partners themselves and may be brought directly: [87].

---

[6] His summary of the GP's submissions is at [2(i)&(ii)].

[7] "The rules of equity and of common law applicable to partnerships as modified by the Partnership Act (2013 Revision) but excluding sections 31, 45 to 54 and 56 to 57 shall apply to an exempted limited partnership, except where they are inconsistent with the express provisions of this Act".

**The questions before us and the submissions**

35.     We have stated that D2 and D3 did not apply to strike out the direct claims against them but do not accept that the plaintiffs have standing to bring such claims against them and, although D2 and D3 were not partners, maintain that their direct claims "*ought to be pursued by way of a partnership account as against the GP*". The result was that the focus of the submissions before us was on the judge's rejection of the application to strike out the direct claims against the GP. Little was said specifically about the direct claims against D2 and D3. Ms Stanley for D1, accepted in substance, that there are direct claims against the GP. But, supported by Mr Chapman, she submitted that the judge erred in two respects. The first was his finding that the rule/principle that claims by partners *inter se* can only be brought by the taking of partnership accounts does not apply to a limited partnership. She maintained that the judge erred in holding at [85] that the application of the rule/principle is inconsistent with the express provisions of the ELPA and that it has therefore been disapplied by section 3 of the ELPA. She submitted that his second error was in holding at [55] that the GP holds the property of the ELP "*on trust for each of the partners*". That, she submitted, was a clear misreading of ELPA section 16(1). However, she accepted that before the dissolution of a partnership, although there is jurisdiction to obtain a partnership account, "*it is an exceptional jurisdiction to allow an account pre-dissolution*": Transcript day 2 4/2-14.

36.     On behalf of the plaintiffs, Mr Allison submitted that the partnership accounts rule/principle does not apply to ELPs in this jurisdiction, in the same way that it does not apply to limited partnerships in England and Wales.[8] This, he maintained, is because the element of reciprocity of fiduciary duties in an ordinary partnership is absent in an ELP. Moreover, in an ordinary partnership, but not an ELP, all the partners have unlimited liability for the partnership's liabilities, and (subject to contrary agreement) are entitled to take part in the management of the partnership business. Mr Allison further argued that to apply the rule/principle would be inconsistent with ELPA section 32 (12) (c)[9] which makes it clear that partners in an ELP have a right to an account. Here the pleaded claims against the GP and D2 and D3 include claims for accounts and equitable compensation for the plaintiffs' individual losses. Mr Allison submitted that they are entitled to bring these against the GP because of the GP's position as a fiduciary and statutory trustee and its overarching duty to account. Although less clearly stated, it appears that the basis for the plaintiffs' entitlement to bring direct claims against D2 and D3 is their

---

[8] In fact the Limited Partnership Act 2007 applies throughout the U.K
[9] "A partnership agreement may provide that, as against any other partner, any assignment or other disposition by a partner of any right, debt or other chose in action arising under a partnership agreement shall confer economic rights only and for the purposes of this section "economic rights" are… The right to an account for the purpose of ascertaining the amount of share of any of the foregoing …"

knowing receipt of TPF's property or monies which the GP transferred to them in breach of its statutory, equitable and other obligations, and their participation in a conspiracy to cause loss to the plaintiffs by unlawful means. During Ms Stanley's oral submissions there was some debate as to whether, in a claim by a limited partner against the GP or against a third party, the court could order that the remedy against an unsuccessful defendant should be the restoration of the trust fund by analogy with the position where a claim is brought by the beneficiary of a trust: *Target Holdings Limited v Redferns* [1996] AC 421 (hereafter "*Target v Redferns*"). Ms Stanley accepted that this was possible in a claim against the GP (Transcript day 1 155/2-12) but did not accept that it was possible in a claim against a third party such as D2 and D3. She stated that the obvious way for a limited partner to make a claim against a third party would not be by a direct claim but, using the trust analogy, by a claim on behalf of the trust: see Transcript day 1 155/18-156/11. That appears to be a submission that the claim must be a derivative claim and thus subject to the requirements of ELPA section 33(3). Mr Chapman's written submissions on behalf of D2 and D3, to which we have referred, are to the same effect.

37.     In principle, two main questions arise in respect of the direct claims although, in the light of the way the appeal has proceeded, the second does not in fact arise. The first question is whether a direct claim by a limited partner against the general partner must be made by claiming partnership accounts in proceedings to which all the partners are parties as it must in an ordinary partnership. Can a limited partner claim an account against a general partner for breach of fiduciary or other duty without at the outset joining the other partners and, if the breach is established, may a limited partner obtain an order that the general partner restore the fund?

38.     The second question is whether the ELP itself, although not a legal entity, also has a claim against the GP or a third party such as D2 and D3 for breach of their fiduciary and other obligations. The judge stated at [63] (set out at [29] above) that there is no distinct or separate loss in respect of "the partnership" which does not exist in law as an entity. When dealing with the derivative claims later in this judgment, we state that, for the reasons we give at [145] below, we are not to be taken as agreeing that the judge was correct in concluding that the partnership has no claim against the GP. However, absent a Respondents' Notice in respect of the judge's finding or any submission by the plaintiffs that the judge was wrong, the question is not properly before us. But since it is accepted that a limited partner may have a direct claim against the GP for breach of its fiduciary and other duties, albeit only in the context of partnership accounts, uncertainty as to whether TPF itself also has a claim *qua* ELP does not affect our resolution of the dispute about the plaintiffs' direct claims.

39.     There were three limbs to Ms Stanley's submissions. The first was that the application of the partnership accounts rule/principle to limited partnerships is not inconsistent with the provisions of the ELPA and therefore is not disapplied by section 3. She accepted (skeleton [28]-[36] that there are obvious examples of inconsistency between the rules of equity and common law that apply to ordinary partnerships and the provisions of the ELPA governing limited partnerships. She gave three examples. The first is the disapplication by ELPA sections 4(2) and 16(2) of the rule that in ordinary partnerships each partner is liable jointly and severally with the other partners for all partnership liabilities. The second is section 32(11)'s provision that in limited partnerships the rule that a partner cannot assign its partnership interest to a third party without the consent of the other partners does not apply. The third is that, in the case of limited partnerships, the rule in ordinary partnerships that certain events cause a dissolution of the partnership does not apply to the events specified in ELPA section 35(a)(i)-(vi). But she submitted (skeleton [35]) that none of these "*shed light on the fundamental question at issue on Grounds 2 and 3, namely whether limited partners are entitled to bring direct claims against the GP*". It would appear this may require some reformulation in the light of her acceptance during her oral submissions in response to questions by Birt JA (Transcript day 2 3/21-4/2-14) that in a claim by a limited partner against the GP the court could order that the defendant restore the fund and that it is exceptional to obtain partnership accounts whilst the partnership is continuing.

40.     As to the meaning of "inconsistent", Ms Stanley relied on *Re Knight and Tabernacle BS* [1891] 2 QB 63 at 69. That case concerned a statutory provision that its provisions were to apply except where those provisions were inconsistent with those of another statute. She submitted that this approach applied where, as in the case of section 3 of the ELPA, the question is whether non-statutory rules and principles are inconsistent with the express provisions of a statute and that the partnership accounts rule/principle is not inconsistent with these provisions in the sense used in *Re Knight and Tabernacle BS.* That case stated that to be "inconsistent", the rule/principle must be so at variance with the machinery and procedure indicated by the statute that, if it is applied, the statute would not work. Ms Stanley argued (skeleton [43]) that this shows that "inconsistent" means "irreconcilable" rather than "different to", and that there is no such irreconcilability between the partnership accounts rule/principle and the provisions of the ELPA.

41.     Ms Stanley also referred to the judge's statement (at [86]) that there is "*no good reason why the taking of partnership accounts should be the only procedural route available to the Plaintiffs to obtain redress under the ELPA*". She submitted that the judge thus "*accepted that*

*partnership accounts **were a means of redress available***" which showed that there is no irreconcilability or inconsistency between the partnership accounts rule/principle and the provisions of the ELPA.

42.    Mr Allison's response to these submissions was that the reasons given by the judge at [82]-[85] (summarised at [34] above) for concluding that the partnership rule/ principle was disapplied by ELPA section 3 and is inconsistent with the scheme of the ELPA were correct. As to the scheme of the ELPA, he also submitted that the inconsistency is shown *inter alia* by section 16(1) which makes the GP trustee of an ELP's assets and by section 32(11) which permits the assignment of a limited partner's interest without the consent of the other partners, and section 32(12)(c) which gives a limited partner the right to claim an account.

43.    The second limb of Ms Stanley's submissions were the authorities which hold that claims by partners *inter se* can **only** be brought in the context of the taking of partnership accounts. She referred to the statements in *Meyer v Faber (No 2)* [1923] 2 Ch 421 at 439 and *Hurst v Bryk* [2002] 1 AC 185 at 194 respectively that in an action against a co-partner "*the only relief which the plaintiff could obtain would be an account*" and that "*the amount owing to a partner by his fellow partners is recoverable only by the taking of an account in equity after the partnership has been dissolved*". Mr Allison's response was that the cases relied on by Ms Stanley emphasise the reciprocity of personal obligation and trust and the mutuality of personal liability in an ordinary partnership, and Cooke J at [28] of *Henderson's* case emphasised the absence of this in a limited partnership.

44.    The third limb of Ms Stanley's submissions were considerations of "*practicality and policy*". She maintained (skeleton [49]) that there were sound practical reasons for the application of the partnership account rule/principle to Cayman Islands ELPs. The rule/principle ensures that the creditors of the partnership are paid first before the partners (as they should be) and that all the limited partners will be bound by the outcome. It, she argued, prevents a multiplicity of proceedings with resulting chaos by providing a mechanism for the orderly winding up of the affairs of the ELP.

45.    Ms Stanley submitted that if the partnership accounts rule/principle does not apply "*the limited partners would have to bear the additional burden of the costs of the GP dealing with a multiplicity of proceedings, rather than one*": skeleton [49(4)]. There was, she argued, no prejudice to the partners of an ELP by the application of the rule/principle because "*claims can all be dealt with in the managed process of the taking of partnership accounts*": skeleton [49(4)]. She relied on the statements in *Public Trustee v Elder* [1926] Ch 776 at 784 that all

partners needed to be joined "*to avoid multiplicity of actions*", in *Stevenson v Akt. Fur Carton-Nagen-Industrie* [1918] AC 329 at 247 that partners "*cannot sue each other excepting for the balance of the account taken in accordance with the principles which the courts of equity apply in working out the results of dissolution",* and on 29(1) *Atkins Court Forms on 'Partnerships, Limited Partnerships and LLPs* at [15].

46.    In his oral submissions, Mr Allison relied on *Golstein v Bishop* [2013] EWHC 881 (Ch.), [2014] Ch. 131 to show that in a partnership dispute it is not always necessary to have a claim for a partnership account at the outset. Mr Christopher Nugee QC, sitting as a Deputy High Court judge, stated at [2] and [24] that factual matters and the merits of the claim in that case, which included a claim for damages for breach of the partnership agreement,[10] would be determined but that dissolution accounts would be taken at a later stage. In the Court of Appeal, Briggs LJ, with whom Kay and Sullivan LJJ agreed, recognized that there are remedies other than the taking of a partnership account that might be available for breaches of duty in an ordinary partnership: see [2014] EWCA Civ 10 at [11]. Ms Stanley submitted that *Golstein v Bishop* was distinguishable for two reasons. The first was that the point before us did not arise in that case because the parties had agreed to this being dealt with by way of preliminary issue. Secondly, the substance of the partnership rule/principle was satisfied in that case because there were only two partners, and they were both before the court. Notwithstanding the force of those points, the case shows that, even in the case of an ordinary partnership, there is room for flexibility.

47.    As to misreading ELPA section 16(1), its material provisions are set out at [19] above. It expressly provides that the rights and property of an ELP, including all choses in action are held "***by the general partner upon trust as an asset of the exempted limited partnership** in accordance with the terms of the partnership agreement"* (emphasis added*).* Ms Stanley compared its wording with the judge's holding at [55] that the property of an ELP is held "*on* trust for each of the limited partners".

48.    She submitted that the judge's holding was clearly a misreading of section 16(1). The legislature has directed that the assets are those of "the partnership". Thus, giving full recognition to the fact that whilst an ELP has no independent legal personality, it provided for there to be a first call on the assets by the creditors of limited partnerships and that the limited partners stand behind those creditors. She argued that section 16(1) is consistent with the preservation of the operation of the partnership accounts rule/principle which enables the court to identify the

---

[10]  The Chancery Report omits [178] – [214] of the judgment which deal with the claim for damages for breach of the partnership agreement but those paragraphs are included in the neutral citation version available on the BAILLI website.

assets of the ELP which are "*actually available*" for distribution to limited partners after the creditors had been paid.

49.    Drawing on the analogy of the position under a non-partnership trust, she also relied on the statements in the decisions of the High Court of Australia in *Chief Commissioners of Stamp Duties v Buckle* [1998] HCA 4, 192 CLR 226 and *Commissioner of State Revenue v Rojoda* [2020] HCA 7, 268 CLR 281. In *Buckle's* case the High Court stated at [48] that "*the entitlement of the beneficiaries is confined to so much of those assets as is available after the liabilities in question had been discharged or provision has been made for them*". In *Rojoda's* case, the High Court stated at [33] that "*unlike the beneficiary of a fixed trust, it was well established that a partner's interest was not an interest in, or in relation to, any specific asset other than an entitlement to the partner's share of the net proceeds from the sale of each asset at the completion of winding up. In other words, the only right that the partners have, both before and after dissolution, in relation to each asset is a right to the account and distribution after sale of the proceeds of that asset – 'not to an individual proportion of a specific article, but to an account: the property to be made the most of, and divided'.*"

50.    In *Buckle's* case, the High Court also stated at [47] that in aid of the right of a trustee to reimbursement or exoneration for liabilities properly incurred by the trustee in the administration of the trust, "*the trustee cannot be compelled to surrender the trust property to the beneficiaries until the claim has been satisfied*". At the beginning of [48] it stated that, until such reimbursement or exoneration, "*it is impossible to say what the trust fund is*".

51.    Mr Allison submitted that because an ELP has no separate legal personality the only sensible construction of the words in ELPA section 16(1) is that the general partner of an ELP holds its assets on trust for all the limited partners. The judge was correct so to hold. Because the general partner owes fiduciary duties to all the limited partners, any breaches of those duties must be enforceable by the limited partners themselves. Where there is a claim against the general partner itself it cannot be only the general partner who can institute proceedings. The absence of separate legal personality means that, legally, it is the ELP's constituent limited partners who suffer loss directly and the general partner's fiduciary obligations "*must be capable of enforcement by the other partners (just as the obligations of any other trustee are enforceable at the suit of the beneficiaries)*": skeleton [83(3) – (5)].

**Conclusions on the direct claims**

52.    We first consider the direct claims brought by the plaintiffs against the GP and then consider the direct claims brought against D2 and D3.

*(a)*      *Direct claims by a limited partner against the GP*

53.     There is considerable force in the considerations of "*practicality and policy*" relied on by Ms Stanley and the need to protect the positions of the creditors of an ELP and of the other limited partners. But we have concluded that the differences between ordinary partnerships and ELPs mean that it is not appropriate to require that a direct claim by a limited partner against the GP must always be initially brought by way of a claim for partnership accounts and that it is not necessary to protect the positions of the creditors and of the other limited partners by requiring this. We have so concluded for the following reasons.

54.     First, we have borne in mind two related factors based on the wording of the ELPA. One is the inconsistency of the proposition that such a claim must be by way of partnership accounts with the right given to a limited partner under ELPA section 32(12)(c) to claim "an account". The legislature addressed the question and used the word "account" but not the term "partnership account". We agree with Mr Allison's submission (skeleton [92]) that it is difficult to see a principled justification for refusing a limited partner a claim to "an account" but permitting such a partner to claim "a partnership account" although there are no mutual and reciprocal rights and obligations between limited partners or fiduciary duties. The other is that ELPA section 16(1) provides that the general partner holds or is deemed to hold "[a]*ny rights or property of every description of the exempted limited partnership, including all choses in action ... **upon trust as an asset of the exempted limited partnership** in accordance with the terms of the partnership agreement*" (emphasis added). That in substance (see [56] below), provides that the assets of an ELP are held by the general partner on a statutory trust for the limited partners.

55.     Secondly, an ELP does not have the mutuality and reciprocity of obligations that is the hallmark of an ordinary partnership. This is because ELPA section 19(2) provides that, absent express provision in the partnership agreement, the limited partners owe no fiduciary duties. The statements in the cases relied on by Ms Stanley requiring the claim to be brought by way of a partnership account emphasise the reciprocity and mutuality that exists between conventional partners.

56.     We turn to Ms Stanley's submissions based on section 3 of the ELPA that, absent inconsistency with the rules of equity and of common law applicable to partnerships, those rules "*shall apply to an exempted limited partnership*" and *Re Knight and Tabernacle BS*. We bear in mind the modern purposive approach to statutory interpretation. We consider that, as well as provisions such as sections 16 (1) 19 (2) and 32 (12 (c), the scheme of the ELPA with the absence of

reciprocity and mutuality of rights and obligations is inconsistent with requiring claims by a limited partner to be brought by taking partnership accounts in proceedings to which all the limited partners are party. We accept Mr Allison's submission that because an ELP has no separate legal personality the only sensible construction of the words in ELPA section 16(1) is that the GP of an ELP holds its assets on trust for all the limited partners. On its own, the judge's use of the phrase "*on trust for each of the partners*" at [55] may leave some uncertainty as to whether he meant to treat the entitlement of each of the partners as totally individuated, but at [61] what he said was "*capable of enforcement by each of the partners to whom [the GP] owes duties individually".*

57.   Because a trust also has no separate legal personality, thus making the position similar to the statutory trust created by ELPA section 16(1), we also regard the position of a claim by a beneficiary of a trust against the trustee as important. The beneficiary of a subsisting trust including a discretionary trust is entitled to bring a claim against the trustee to recover loss suffered by the trustee's breach of trust, but the remedy is for an order to restore to the trust what ought to have been there: see *Target v Redferns*; *Lewin on Trusts*, 20th ed., [21-046] and *Snell's Equity*, 34th ed., [2-003] – [2-004] and 21-46.

58.   In *Target v Redferns* at 436D-E, Lord Browne-Wilkinson stated that the rule developed by equity reflected the fact that while each beneficiary had the right to claim, "*no one beneficiary was entitled to the trust property*" and there was a "*need to compensate all beneficiaries for the breach*". He had earlier stated at 434C-D that an order to restore was "*the only way in which all beneficiaries' rights [could] be protected*" (emphasis added). The remedy thus ensured that all the beneficiaries' rights were protected and that the beneficiary who issued the proceedings did not steal a march on the others and scoop the pool. There is no inconsistency between such an order and what was stated in *Chief Commissioners of Stamp Duties v Buckle* [1998] HCA 4, 192 CLR 226 and *Rojoda's* case because all that is ordered at that stage is restoration of the fund. Should there be a claim against the ELP, it can then be determined. There is also no inconsistency between such an order and what was said by the High Court of Australia in *Rojoda's* case about the nature of the partnership trust in an ordinary partnership and the difference between that and that of the beneficiary of a fixed trust because ordering restoration of the fund does not give an individual limited partner an interest in any specific asset.

59.   We consider that this approach and remedy is equally applicable in the case of the statutory trust created by section 16 (1) ELPA. We have had regard to the two factors based on the wording of the ELPA referred to at [54] and [55] above; the inconsistency of the proposition that such a claim must be by way of a partnership account with the right expressly given to a

limited partner under ELPA section 32(12)(c) to claim "an account" and the absence in an ELP of the mutuality and reciprocity of obligations that is the hallmark of an ordinary partnership. Whilst, as Ms Stanley submitted at [20] - [25] of her reply skeleton by reference to *Rojoda's* case, assets held by a partner of an ordinary partnership are also held on trust for the partnership, these factors lead to the conclusion that the partnership accounts rule/principle is inconsistent with the ELPA and the judge was correct in his conclusion. Mr Allison accepted that it was likely that the plaintiffs could not have as a remedy equitable compensation payable directly to them because that took no account of the other limited partners and of the ELP's creditors: Transcript day 2 75/12-23. We have concluded that in proceedings against the GP, a limited partner can recover for loss suffered by the breach of the statutory trust but that the remedy would be the restoration of the ELP's fund thus compensating the direct losses suffered by all the constituent limited partners. We discuss further aspects of ordering the restoration of the fund and its doctrinal underpinning when considering the plaintiffs' direct claims against D2 and D3. The important point is that while the individual partners, like the beneficiaries of a discretionary trust, have a direct claim, if established, the remedy for that claim reflects the fact that no one partner is entitled to all of the fund.

60.    This remedy prevents a limited partner claimant from benefitting alone from any recovery either at the expense of the other limited partners or of the ELP's creditors. It thus directly meets the "stealing a march" and "scooping the pool" elements of the practical and policy reasons relied on by Ms Stanley, the substantive elements of her case for requiring a claim by a limited partner against the GP to be by way of partnership accounts from the outset. As we have stated, *Golstein v Bishop* shows that even in the case of an ordinary partnership there is room for flexibility and that a trial of the merits of the claim may be held before taking a partnership account. It suggests that where there is no prejudice either to the creditors of the partnership or to other third parties it is possible to have a trial of the merits of a claim brought by a partner before a partnership account is taken.

61.    We consider that the problem of multiplicity of actions and what Mr Chapman referred to as an "ungated litigation superhighway" can be dealt with by robust case management. Later claims brought in a single jurisdiction can be stayed or consolidated and ordered to be heard together. Where claims are brought in more than one jurisdiction, stays or anti-suit injunctions can also be used to avoid the problems identified by Ms Stanley and Mr Chapman.

62.    Mr Allison's description (see skeleton [89]) of the insistence on the joinder of all the limited partners from the outset as "*unedifyingly formalistic*" may put it too highly. We, however, consider that insistence that a claim for partnership accounts always be made at the outset

reflects an entirely technical procedural approach. In her responses to questions by the Court, Ms Stanley at one stage suggested that the plaintiffs in effect should start again and now seek the taking of partnership accounts and that this either be by the Court now directing further pleadings or an inquiry to identify what is being alleged by the limited partners: Transcript day 1 136/9 -137/20. She argued that the taking of partnership accounts occurs "*in a much more court managed process than a fraud trial where anything goes ...*": Transcript day 1 137/21 – 138/10.

63.     Our rejection of the submission that the direct claims are defective in not at the outset joining all partners and seeking partnership accounts does not mean that the court cannot direct that there be such a procedure at a later stage as part of its case management powers if that proves necessary. If, after the merits of the plaintiffs' claims against the GP have been determined, it appears that an order to restore the fund should be made but that, given the GP's wrongdoing, steps such as placing the assets in escrow, appointing a Receiver, or taking partnership accounts are necessary, the court can make appropriate directions. Alternatively, if the plaintiffs so apply, we would allow them now to add a prayer for the taking of partnership accounts to their pleading, but that such accounting should take place only after the resolution of the issues in their current claims and only if, at that time, it appears necessary.

64.     In summary, for the reasons we have given, we dismiss the GP's appeal against the judge's refusal to strike out the plaintiffs' direct claims against the GP. The consequence is that the plaintiffs may bring their direct claim against the GP. We wish to make it clear that, in the event of success, the likely remedy would be an order to restore the trust fund rather than equitable compensation payable directly to the relevant limited partner.

*(b)     Direct claims by a limited partner against third parties such as D2 and D3*

65.     We have stated that there was no application by D2 and D3 to strike out the direct claims against them on the merits but they submit that the plaintiffs do not have standing to bring the direct claims against them and ought to have brought the claims against the GP seeking the taking of partnership accounts.

66.     The question is whether, if D2 and D3 are held liable to the plaintiffs for breach of their statutory, equitable and other obligations, it is open to the court to order that those defendants restore the fund rather than pay the plaintiffs. If the court is not able to order this, there will be a risk of prejudice to the creditors of the ELP and/or to the other limited partners in the ways we have discussed in the context of claims against the GP but concluded it did not exist in that context. Indeed, since different limited partners may bring claims against different third parties,

there may be a multiplicity of both plaintiffs and defendants and the risk of chaos referred to by Ms Stanley and Mr Chapman might well be greater. That risk would be avoided by a derivative action where the requirements of section 33(3), discussed at [94] – [98] below, are satisfied.

67.   Ms Stanley submitted that it is not possible to order D2 and D3 to restore the fund and that the only way that TPF would be entitled to anything is if the plaintiffs' claims are made on its behalf and are thus derivative claims: Transcript day 1 155/25 – 156/10. During an exchange primarily about the claims against the GP, it was put to Mr Allison that against the other defendants he might not be able to get an order restoring the trust. His response (see Transcript day 2 91/3-6) was "*arguably not*" but it is not altogether clear whether the exchanges related to the direct or the derivative claims against D2 and D3.

68.   Since D2 and D3 did not apply to strike out the direct claims against them, strictly the question of whether it is possible for the court to order D2 and D3 to restore the fund is one which falls for determination after the merits of the claims against them have been determined. Although we did not hear full argument on this question, in the light of the points that were made, we consider it appropriate to give our preliminary view on the question. We consider that the plaintiffs have a good arguable case that, where third parties are liable for breaches such as those claimed against D2 and D3, the court may order those defendants to restore the fund rather than pay the plaintiffs and thus avoid the risk of prejudice to other limited partners or creditors.

69.   As in the case of a claim against the general partner, the starting point is the position of a claim by a beneficiary of a trust. It is clear that the interest of the beneficiary of a discretionary trust is enforceable against a third party who received trust property which the trustee did not have authority to transfer and the third party knew enough to make it unconscionable to retain the asset for his own benefit: see *Lewin on Trusts*, 20th ed., [21-046] and *Snell's Equity*, 34th ed., [2-003] –[2-004] and 21-46.

70.   *Snell* also states that "*the beneficiary's only right would be to have the asset or its proceeds reinstated to the trustee …*": see [21-045] and to the same effect [22-005] and [30-015]. The reason given is that the beneficiary *"could not compel the third party to transfer the asset directly to himself since this would give him a greater equitable right against the third party than he had against the trustee … ".* At [2-004] of *Snell* it is stated that "*the third party's duty is to restore the trust asset to the properly appointed trustee*" and that this would happen "*if the original trust involved continuing duties to manage a fund and if the beneficiary did not have*

*the entire beneficial interest in the trust asset*". Nolan, "Equitable Property" (2006) 122 LQR 232 at 242-243 states that the cases on the rights of a beneficiary against the recipients of misapplied trust assets all acknowledge that a recipient is bound to restore the assets and their proceeds to the relevant trustees, or else transfer them at the direction of a beneficiary or beneficiaries who, being absolutely entitled to the assets in equity, may terminate the trust and direct such a transfer. At p. 255 he states that the cases provide a doctrinal basis for actions to restore the integrity of a pool of assets held in trust, should it be depleted without authority.

71.     That doctrinal basis explains why, given the analogy between a non-partnership trust, an ELP with no separate legal personality, and the statutory trust imposed by section 16(1) of the ELPA, it is possible to order third parties such as D2 and D3 to restore the fund where the claim against them succeeds. The analogy rests on the fact that, in cases of knowingly assisting a trustee in a fraudulent and dishonest disposition of the trust property, although the third party is not in fact a trustee, he is made liable in equity "**as if he were**" a trustee: *Selangor United Rubber Estates Ltd. v Craddock and others (No. 3)* [1968] 1 WLR 1555 at 1580 and 1582 citing Lord Esher MR in *Soar* v. *Ashwell* [1893] 2 Q.B. 390, 394-395 and Lord Selborne LC in *Barnes* v. *Addy* (1874) 9 Ch. App. 244 at 251. This reflects the fact that it is the fund which has suffered the loss and, in the words of Lord Browne-Wilkinson in *Target v Redferns,* an order to restore is "*the only way in which **all** beneficiaries' rights"* could be protected.

72.     For these reasons, had D2 and D3 applied to strike out the plaintiffs' direct claims against them, our preliminary view is that the objections raised to the plaintiffs' standing to bring the claims are unfounded. The consequence is that the plaintiffs may bring these claims against D2 and D3. It will be for the court hearing the claims to decide whether they are in fact made out on the merits and, if they are, whether, in the circumstances of this case, an order to restore the fund should be made and, given that the GP would be implicated in the wrongdoing, steps such as placing the assets in escrow, the appointment of a Receiver, or the taking of partnership accounts are necessary.

**The derivative claims**

73.     We turn to consider the derivative claims brought against D1 and D2-4.  This is the first occasion on which one or more limited partners of a Cayman Islands ELP have sought to bring a derivative claim pursuant to section 33(3) ELPA and accordingly we shall proceed to review the approach adopted by the judge and consider if we can provide any guidance for the future.

74.     We begin with a brief discussion of derivative claims generally before turning to consider the interpretation of section 33(3).   We shall then consider a number of specific matters of principle raised by the parties before turning to apply our conclusions on the law to the facts of this case.

*(a)      Derivative claims in general*

75.     The general rule is that the only person who can bring an action against another who has caused injury or damage is the person who has suffered that injury or damage.   As the Court of Appeal put it in the leading case of *Prudential Assurance Co Limited v Newman Industries Limited* [1982] 1 Ch 204 at 210:

> *"A derivative action is an exception to the elementary principle that A cannot, as a general rule, bring an action against B to recover damages or secure other relief on behalf of C for an injury done by B to C.   C is the proper plaintiff because C is the party injured, and, therefore, the person in whom the cause of action is vested.   This is sometimes referred to as the rule in Foss v Harbottle (1843) 2 Hare 461 when applied to corporations, but it has a wider scope and is fundamental to any rational system of jurisprudence."*

76.     The court went on to outline an exception to the rule in *Foss v Harbottle* in the following terms at p. 211:

> *"There is an exception to the rule where what has been done amounts to fraud and the wrongdoers are themselves in control of the company.   In this case the rule is relaxed in favour of the aggrieved minority, who are allowed to bring a minority shareholders' action on behalf of themselves and all others.   The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue."*

77.     A further helpful general description of a derivative claim in the context of companies is to be found in the judgment of Lewison J in *Iesini v Westrip Holdings Limited* [2009] EWHC 2526 (Ch) at [73]:

> *"I should begin by saying a little about derivative claims generally.   In the first place the new code has replaced the common law derivative action.   A derivative claim may 'only' be brought under the [Companies Act 2006].   As section 260(1) makes clear a derivative claim is one in which the cause of action is vested in the company, but where the claim is brought by a member of the company.   This reflects the old law in which a derivative action was an exception to the general principle (known as the rule in Foss v Harbottle….) that where an injury is done to a company only the company may bring proceedings to redress the wrong. Allied to this principle was the principle that whether a company should bring proceedings to redress a wrong was a matter that was to be decided by the company internally; that is to say by its board of directors, or by a majority of its shareholders if dissatisfied by the board's decision.   The Court would not second guess a decision made by the company in accordance with its own*

> *constitution. The exception to these principles was necessitated where the company's own constitution could not be properly operated. If the wrongdoers were in control of the company (because they were a majority of the shareholders) they would not in practice vote in favour of taking proceedings against themselves, even though the taking of proceedings would be in the company's best interest....*"

78. Derivative claims are not restricted to companies. They can also be brought, for example, in connection with trusts and limited partnerships.

79. In relation to trusts, it is well-established that, although in general terms the only person who may bring an action against a third party on behalf of a trust is the trustee, a beneficiary can, in special circumstances, bring a derivative action so as to stand in the place of the trustee. In *Roberts v Gill and Co* [2011] 1 AC 240, Lord Collins of Mapesbury summarised the position as follows at [46]:

> "*The cases go back to the 18th century, and many of them were reviewed in Hayim v Citibank NA [1987] AC 730. The special circumstances which were identified in the earliest authorities as justifying a beneficiary's action were fraud on the part of the trustee, or collusion between the trustee and the third party, or the insolvency of the trustee, but it has always been clear that these are merely examples of special circumstances, and that the underlying question is whether the circumstances are sufficiently special to make it just for the beneficiary to have the remedy....*"

80. To like effect is the observation of Lord Walker of Gestingthorpe at [110] (omitting references):

> "*There is ample authority, comprehensively reviewed in the judgment of Lord Collins JSC, as to the need for special circumstances before the court will countenance a derivative action. Such actions are now relatively common in cases concerned with mismanaged companies, and in many jurisdictions actions by or on behalf of minority shareholders are now regulated by a statutory code... Derivative actions by beneficiaries under inter vivos trusts or wills are less common.... But in all these cases the unifying factor – what has to be special about the circumstances – is that the derivative action is needed to avoid injustice....*"

81. A helpful summary of the position in relation to trusts under the law of England and Wales is to be found in *Lewin on Trusts (20th Edition)* at [47-006] and [47-008]:

> "*47-006. However, as an alternative to proceedings brought in the name of trustees, a beneficiary may, sometimes, bring an action in his name on behalf of the trust against a third party. The fact that the action is brought in the name of the beneficiary rather than the name of the trustee does not alter its character. The action is a derivative action in which the beneficiary stands in the place of the trustees and sues in right of the trust, and does not enforce duties owed to him rather than the trustees; a beneficiary can be in no better position than trustees carrying out their duties in a proper manner....*

> 47-008. *A beneficiary can bring a derivative action only in special circumstances, <u>for example circumstances which tend to disable the trustees from suing (as where their acts and conduct with reference to the trust fund are impeached), or in circumstances rendering it difficult or inconvenient for the trustees to sue, as where there is a conflict between their interest and duty</u>. Special circumstances are not confined to circumstances of these kinds. The guiding principle is that there must be exceptional circumstances, which embrace a failure, excusable or inexcusable, by the trustees in the performance of a duty to the beneficiaries to protect the trust estate, or to protect the interests of the beneficiaries in the trust estate. The special circumstances relied on must have something to do with the willingness or ability of the trustee or alleged trustees to bring the action."* [Emphasis added]

As can be seen from the emphasised passage, circumstances where the trustees are inhibited from suing because their own conduct in relation to the trust is impeached or they are under a conflict of interest are leading examples of *'special circumstances'*.

82.  Turning to English limited partnerships, the question of whether and, if so, in what circumstances, a limited partner can bring a derivative claim on behalf of the limited partnership arose in *Henderson* referred to above in [31]. As we have already stated, although by no means identical, there are similarities between an English limited partnership and an ELP.  In particular, neither is a separate legal entity and, as in an ELP, the limited partners in an English limited partnership may not take part in the management of the partnership business, which is to be left in the exclusive hands of the general partner.  Thus, in the ordinary way, a limited partner cannot sue a third party in the name of the limited partnership; such action can only be taken by the general partner.

83.  In *Henderson*, a majority of limited partners instituted derivative proceedings on behalf of the partnership against the general partner and the manager of the partnership (who had been appointed as manager by the general partner on behalf of the partnership). The manager was a sister company of the general partner. The claims sought compensation in respect of various alleged breaches of duty by both the general partner and the manager.  It was directed that a preliminary issue should be tried as to whether the claimants could bring derivative claims on behalf of the partnership against the general partner and the manager, and it was this issue which came before Cooke J.

84.  For reasons discussed below, Cooke J held that the limited partners could not bring a derivative claim against the general partner.  However, having referred to *Roberts v Gill* and to the equivalent passage in the 18th edition of *Lewin* to that referred to at [81] above, he held that special circumstances existed which enabled the derivative claim to be brought against the manager.  The special circumstances were that the general partner had an irremediable conflict

of interest because it was a sister company of the manager and was therefore not in a position to be seen fairly to determine whether to sue the manager. Cooke J therefore allowed the derivative claim against the manager to proceed, but went on to hold that, under the relevant provision of the English statute, the limited partners would lose their limited liability as a consequence.

85.    In summary, Cooke J applied the '*special circumstances'* test concerning trusts (as summarised in *Lewin*) to limited partnerships.

86.    Although the ability to bring a derivative action in respect of a company is now governed by statute in England and by the Grand Court Rules in this jurisdiction, the principles governing such claims were developed as a matter of common law. Similarly, the requirement of special circumstances in connection with trusts and limited partnerships has been developed entirely by the courts.

87.    The position is different in relation to ELPs because of the terms of section 33(3) of the Act and accordingly we turn next to consider the correct interpretation of that provision.

**Interpretation of Section 33(3) of the ELPA**

88.    Unlike in the case of trusts or English limited partnerships, the legislature has prescribed in section 33 ELPA when a derivative action may be brought in respect of an ELP. For convenience we repeat the relevant provisions of section 33 at this stage:

> (1)    *Subject to sub-section (3), legal proceedings by or against an exempted limited partnership may be instituted by or against any one or more of the general partners only, and a limited partner shall not be a party to or named in the proceedings….*
>
> (2)    *….*
>
> (3)    *A limited partner may bring an action on behalf of an exempted limited partnership if any one or more of the general partners with authority to do so have, without cause, failed or refused to institute proceedings…."*

As can be seen, the key requirement is that the general partner must have *"without cause, failed or refused to institute proceedings"*.

89.    Before the Grand Court, the defendants argued that, when considering section 33(3), the court had to apply principles derived from cases dealing with derivative claims in other contexts. The judge rejected this submission. His conclusion is expressed at [98]-[101] of his judgment:

> *"98.   The terms of section 33(3) ELPA which allows a limited partner in an ELP to bring proceedings on behalf of the ELP if the general partner has <u>without cause failed or refused</u> to do so has no language requiring permission or special circumstances.  In my view the principles taken from the common law or equity for bringing derivative claims whether as regards companies, trusts, limited partnerships or associations are not applicable. [original emphasis]*
>
> *99.   In my judgment section 33(3) is sui generis and is not subject to the rules relating to permission or for special circumstances for derivative actions in other contexts.  I accept Mr Allison QC's submission that to this extent it can be said to 'occupy the field' in the Cayman Islands with respect to ELPs and there is no room for a case by case judge led formulation of a common law or equitable test.*
>
> *100.   I have in coming to this view had regard to the principles Ms Stanley QC and Mr Chapman QC referred me to relating to cases which dealt with failures or refusals to bring claims in other contexts, for example where the board of the company or the trustee had the relevant inhibition which prevented a decision to bring claims.  Whilst these principles provide helpful guidance, the company and trusts law cases to which I was referred do not directly apply to the position in this case which involves the application of a specific statutory test for Cayman Islands ELPs.*
>
> *101.   I note however that the common thread running through those cases is that where the authorised decision maker is inhibited, the Court may permit, in the interests of justice, derivative claims."*

90.   On appeal, the defendants have argued that the judge fell into error in stating at [98] and [99] that the principles applicable in other contexts, such as trusts and companies, are not applicable in relation to the statutory test.  At [68] of her skeleton argument, Ms Stanley submitted that *'without cause'* should be interpreted by reference to the well-established tests applied in all other derivative actions.  Similarly, at [8] of his skeleton argument, Mr Chapman submitted that the statutory gateway prescribed by section 33 did not oust the ordinary rules of common law and equity.  On the contrary, it provided a <u>further</u> statutory hurdle or threshold that had to be met, together with those imposed by the common law and equity, before a derivative claim would be permitted.  He submitted that this was a fundamental error in the judge's approach.

91.   Conversely, in his skeleton argument, Mr Allison submitted at [124] and [125] that the judge was correct to hold that section 33(3) *'occupies the field'* and that there was no scope or reason to import any *'special circumstances'* test or other common law or equitable principles that apply to derivative claims in respect of other entities or structures.  There was no reason to imply any requirements for derivative claims beyond those explicitly mentioned in section 33(3).

92.     It seems to us that, during the course of the hearing, both sides rather modified their submissions and were eventually not very far apart in relation to the proper construction of section 33(3). Thus Mr Chapman (who by agreement with Ms Stanley presented the main argument on the derivative claims on behalf of all the defendants) conceded that, to the extent that his written submissions had suggested that one imported wholesale the common law and equitable principles on derivative claims, this might go too far.  He accepted that one had to apply the statutory test set out in section 33(3), but submitted that this test was consistent with the established principles and that one derived assistance from those principles when construing and applying the statutory test.[11]

93.     Similarly, Mr Allison accepted that, when applying the statutory test and determining whether the failure by the general partner to institute proceedings was *'without cause'*, one could have regard to the principles established in other contexts, such as whether special circumstances existed.[12]

94.     In our judgment, in circumstances where the legislature has established a statutory criterion for bringing a derivative action in respect of an ELP, the courts are duty bound to apply that statutory test.  The test cannot be replaced by common law and equitable principles developed in other contexts even if, in the absence of a statutory test, the courts would no doubt have applied those principles to an ELP.  Nor can those principles form an additional threshold beyond the statutory test, as submitted by Mr Chapman in his skeleton argument referred to at [90] above.

95.     The statutory test is in general and imprecise terms and leaves open how the test should be applied in practice. However, we think that the expression "without cause" must carry the implication of "good" cause.  The legislature cannot have intended that a decision for <u>any</u> cause, no matter how inhibited or conflicted the decision-maker, would be sufficient to prevent a derivative action.  This is so notwithstanding the fact that, as originally enacted, the legislation referred to 'good cause' whereas, in its current form, the word 'good' is omitted.  No guidance as to the reason for this change is to be found in the legislative materials produced in relation to the revision of the statute and we cannot attribute any significance to the change.

96.     In these circumstances, we are of the view that the court is entitled to have regard to and may derive assistance from the developed principles in other contexts.  In particular, given the existence of the statutory trust imposed by section 16(1) of the ELPA (namely that the general

---

[11] Transcript, day 1 pp 48-50
[12] Transcript, day 2 pp 45-46 and 49

partner holds the property of the ELP *'upon trust as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement'*), the court is likely to derive assistance from considering whether special circumstances (as established in the contexts of trusts and English limited partnerships) exist.

97.     If special circumstances exist, this is likely to assist the Court in deciding whether a general partner's decision not to institute proceedings is *'without cause'*. Indeed, in opening his oral submissions on appeal, Mr Allison (rightly in our view) accepted that, if a general partner were under a relevant inhibition or conflict of interest – concepts which emerge strongly from consideration of special circumstances as stated in the emphasised passage from [47-008] of *Lewin* quoted at [81] above – his decision would necessarily and unavoidably be *'without cause'*.[13]

98.     We emphasise, however, that the court's duty is to apply the statutory test of *'without cause'*; it is not sufficient simply to consider whether there are special circumstances and, if so, then to allow a claim under section 33(3). Consideration of whether there are special circumstances, if it assists at all, is simply a step on the road to determining the statutory test. If the court decides that the facts would satisfy the special circumstances test, it must nevertheless go on and consider whether they therefore satisfy the '*without cause*' test in section 33(3). Conversely, we do not rule out the possibility of a case in which the facts enable the court to find that the general partner's decision is '*without cause*' without consideration of whether there are special circumstances. The two tests are not to be equated, although we envisage that consideration of whether there are special circumstances is likely in most cases to be of considerable assistance in determining whether the decision is *'without cause'*. Indeed, it was common ground before us that a decision by a decision-maker which is made under a relevant inhibition will be a decision *'without cause'*.

99.     Although there is some ambiguity and possible inconsistency between [98] and [99] of the judge's judgment on the one hand and [100] on the other, we do not see the judge's decision on this aspect as being essentially any different from our own. [98] and [99], when read in context, simply state that the court's duty is to apply the statutory test, not the common law and equitable principles, but [100] goes on to explain that, although they are not directly applicable, these principles provide helpful guidance. The fact that such helpful guidance may be obtained is emphasised by the fact that, when he goes on to consider the application of the statutory test to the facts of this case, the judge concentrates exclusively on the fact that, in his view, the GP

---

[13] Transcript day 2, p8

was subject to an inhibition because of its conflict of interest.  Inhibition is not a word which appears in section 33 but, as the judge correctly states at [101] of his judgment, it is a concept which is a common thread in the cases which allows the court to permit derivative claims in other contexts in the interests of justice.

100.    Having expressed our view as to the correct interpretation of section 33(3), we turn next to consider a number of supplementary points which were argued before us in relation to the statutory test.

**Procedure for determining the statutory test**

101.    Unlike in the case of companies, there is no requirement under section 33 for a limited partner to seek leave from the court to bring derivative proceedings under section 33(3).  It follows that a limited partner is free to commence derivative proceedings without leave.

102.    In this respect, the position is the same as derivative claims in respect of companies prior to the introduction by statute and/or rules of court of a requirement for leave and is the same as it remains in respect of trusts and English limited partnerships.  But, despite the historical lack of a requirement for leave in respect of companies, it was established as long ago as 1982 in *Prudential* that the question of whether a plaintiff should be permitted to bring a derivative action on behalf of a company should be determined at an early stage rather than left until trial. In *Prudential*, the defendant applied by summons to have heard as a preliminary issue whether the plaintiff was entitled to maintain the derivative action.  The judge dismissed the summons on the ground that it was more convenient to decide the issue after the action had been heard. The Court of Appeal was very critical of this decision saying at 221:

> *"First, as we have already said, we have no doubt whatever that Vinelott J erred in dismissing the summons of May 10, 1979.  He ought to have determined as a preliminary issue whether the plaintiffs were entitled to sue on behalf of Newman by bringing a derivative action.  It cannot have been right to have subjected the company to a 30-day action (as it was then estimated to be) in order to enable him to decide whether the plaintiffs were entitled in law to subject the company to a 30-day action.  Such an approach defeats the whole purpose of the rule in Foss v Harbottle and sanctions the very mischief that the rule is designed to prevent."*

103.    Following *Prudential*, it has been the practice that a plaintiff's standing to bring a derivative action is determined at an early stage in the proceedings rather than the issue being left to trial, with all the disadvantages which that course would bring as described in *Prudential*.  Where there is a leave requirement (e.g. for companies) the issue is dealt with on the application for leave.  Where there is no requirement to obtain leave, the matter is traditionally dealt with on

an application by the defendant to strike out the proceedings on the ground of a lack of standing on the part of the plaintiff or by the court ordering, at the request of the defendant, the trial of a preliminary issue as to whether the plaintiff has the necessary standing to bring a derivative action.

104.     The practice was conveniently summarised by Chadwick P in this court in the case of *Autumn Holdings Asset Inc v Renova Resources Private Equity Limited and Others* [2017] (2) CILR 136 at [26], where he quoted with approval from the judgment of Ribeiro PJ in the Hong Kong Final Court of Appeal in the case of *Waddington Limited v Chan Chun Hoo Thomas* [2008] HKCFA 63; [2009] 2 BCLC 82, where that learned judge said:

>        "[13]     ... Procedurally, there is no requirement at common law for a person seeking to sue derivatively first to obtain the leave of the court....
>
>        [14]     The time honoured practice at common law is for the plaintiff to issue proceedings 'on behalf of himself and the other shareholders other than the defendants', naming the company on whose behalf the proceedings are brought as one of the defendants.  A challenge to the plaintiff's locus generally takes the form of an application by the relevant defendants to strike out the claim or to have the court determine as a preliminary issue that the plaintiff has no locus to sue on the company's behalf."

105.     In our judgment, this is also the appropriate procedure to be followed in relation to proceedings brought under section 33(3).  The subsection is clear that a limited partner may only <u>bring</u> a derivative claim if the general partner has refused or failed to do so without cause.  It is therefore necessary for the court to decide at an early stage of the proceedings whether the limited partner can indeed bring himself within section 33(3) and therefore '*bring*' the claim.  For the reasons set out so graphically in *Prudential*, this is not a matter which should normally be left until trial. We agree therefore that a defendant wishing to challenge the right of a limited partner to have instituted proceedings on behalf of an ELP pursuant to section 33(3), should do so either by applying to strike out the proceedings on the ground of a lack of standing (as was done in this case) or by applying for the court to direct the trial of a preliminary issue as to the limited partner's ability to bring himself within subsection (3).

106.     The question then arises as to the approach which the court should adopt on such an application. In the first place, it is clear that the outcome cannot depend on which of the two courses a defendant chooses to follow.  The court's approach must therefore be the same whether there is a strike out application or the trial of a preliminary issue.

107.     The judge held that, as this was a strike out application, the normal approach on such an application should be adopted, with the result that the defendants had to show that it was certain

that, at trial, the plaintiffs would fail to bring themselves within the terms of section 33(3); see *Hughes v Colin Richards & Co* [2004] EWCA Civ 266, cited with approval in *Re Sphinx Group* [2010] 1 CILR 234, at para 37. The burden lay upon the defendants to show this and there was no burden on the plaintiffs to show that they came within section 33(3). If there was an arguable case that at trial the plaintiffs would be able to satisfy the requirements of that subsection, that was sufficient to enable the case to proceed.[14] It would only be at trial that it would be finally resolved whether the plaintiffs had brought themselves within section 33(3)[15]. Although at times the judge used slightly inconsistent language about his approach[16], we are satisfied that he essentially applied the test we have just described and which he spelt out at [33] of his judgment. Mr Allison submitted that the judge had followed the right approach.

108.    Mr Chapman, on the other hand, submitted that this was the wrong approach. In his submission, the onus lay upon the plaintiffs to satisfy the court that they came within section 33(3) i.e. that the GP had refused or failed to institute proceedings without cause.

109.    In other contexts, the onus lies upon a plaintiff to satisfy the court that he should be permitted to bring a derivative action. Thus in *Prudential*, after the passage cited above, the Court of Appeal went on to say at 221-222:

> *"...we do not think that the right to bring a derivative action should be decided as a preliminary issue upon the hypothesis that all the allegations in the statement of claim of 'fraud' and 'control' are facts, as they would be on the trial of a preliminary point of law. In our view, whatever may be the properly defined boundaries of the exception to the rule, the plaintiff ought at least to be required before proceeding with his action to establish a prima facie case (i) that the company is entitled to the relief claimed and, (ii) that the action falls within the proper boundaries of the exception to the rule in Foss v Harbottle."*

This approach has been followed in this jurisdiction in relation to companies; see *Top Jet Enterprises Limited v Sino Jet Holding Limited* [2018] (1) CILR 18 at [29] per Segal J.

110.    It is not entirely clear what standard the Court of Appeal in *Prudential* was intending to set by referring to a plaintiff *'at least'* being required to establish a *'prima facie'* case that he falls within the exception to the rule in *Foss v Harbottle*. Some assistance can be derived from the subsequent judgment of Knox J in *Smith v Croft (No 2)* [1988] Ch 114 at 138-139 (approved in *Top Jet* at [30]) as follows:

---

[14] Judgment [33], [119], [123]
[15] Judgment [33(ii)], [138]
[16] Thus at [102] the judge refers to *'good arguable case'* and [106] and [136] might be said to suggest that he was in fact making a clear finding that D1 had failed without cause to bring proceedings rather than that it was simply arguable.

> *"My conclusion is that it is the question stated by the Court of Appeal that has to be decided as a preliminary matter, that it is a special form of procedure concerned with giving sensible operation to the rule in Foss v Harbottle, and which is concerned with avoiding the Scylla and Charybdis, on the one hand, of having a preliminary issue which effectively requires one to try the whole action where the rule serves no useful purpose and, on the other side of the strait, of assuming that everything the plaintiffs allege is necessarily correct as a matter of fact, which is of course the technique the court adopts when it has what was called a strict demurrer. The Court of Appeal, it seems to me, has laid down a halfway house for this very special type of case, one in which the legal issues in this particular case are sufficiently well defined for the parties to be able to argue them."*

In other words, the approach should be a halfway house between a strike out application and a full trial.

111.   When pressed during the hearing as to what he thought the Court of Appeal meant by a prima facie case, Mr Allison suggested that it meant a good arguable case and that was in fact an expression the judge used at [102] of his judgment, despite his references (see [107] above) to mere arguability being the test. This court recently had occasion to consider what was meant by the expression *'good arguable case'* in *Scully Royalty Limited v Raiffeisen Bank International AG* (30 December 2021) at [47]-[52]. In particular, the court approved the observation of Mustill J in *The Niedersachsen [1983]* 2 Lloyds Rep 600 at 605 where he said:

> *"I consider that the right course is to adopt the test of a good arguable case, in the sense of a case which is more than barely capable of serious argument, and yet not necessarily one which the judge believes to have a better than fifty percent chance of success."*

112.   During the hearing, the court invited counsel to ascertain whether recent English decisions in relation to derivative actions offered any assistance as to the standard to be applied when considering whether the grounds for permitting a derivative action had been made out. However, counsel's researches were unable to come up with anything of significant assistance.

113.   Mr Chapman referred us to the decision of the English Court of Appeal in *Barrett v Duckett* [1995] (1) BCLC 243, which was decided before the requirement for leave in relation to companies was introduced by statute. This was a case where B & D each held a 50% shareholding in a company. B instituted a derivative action against D and others on behalf of the company alleging wrongdoing by D and others, D being the sole director of the company. The defendants applied to strike out the claim on the basis that it was not a proper case for a derivative action. In the course of his judgment Peter Gibson LJ sought at p.249 to summarise the principles in relation to derivative actions concerning companies in the following terms (omitting passages not relevant for our purposes):

> "The general principles governing actions in respect of wrongs done to a company or irregularities in the conduct of its affairs are not in dispute:
>
> 1. The proper plaintiff is prima facie the company.
>
> 2. ...
>
> 3. There are however recognised exceptions, one of which is where the wrongdoer has control which is or would be exercised to prevent a proper action being brought against the wrongdoer: in such a case the shareholder may bring a derivative action (his rights being derived from the company) on behalf of the company.
>
> 4. When a challenge is made to the right claimed by a shareholder to bring a derivative action on behalf of the company, it is the duty of the court to decide as a preliminary issue the question whether or not the plaintiff should be allowed to sue in that capacity.
>
> 5. In taking that decision it is not enough for the court to say that there is no plain and obvious case for striking out; it is for the shareholder to establish to the satisfaction of the court that he should be allowed to sue on behalf of the company.
>
> 6. ..."

114.    Mr Chapman relied in particular on the second part of 5 above, namely that it is for the shareholder to establish to the satisfaction of the court that he should be allowed to sue on behalf of the company.  He submitted not simply that this places the onus on the shareholder, which we accept, but that it means that the shareholder must establish his ability to sue on the balance of probabilities.  He says that *Barrett* changed the test set out in *Prudential*, with its reference to a prima facie case.

115.    We are unable to place such weight on the decision in *Barrett*.  Peter Gibson LJ was simply recording general principles, which were not in dispute.  We do not think that it assists on how a shareholder satisfies the court that he should be allowed to sue on behalf the company.  What is made clear, however, in the first part of 5 above is that the court should not apply the normal strike out test.  It is therefore inconsistent with the approach which the judge adopted in the present case.

116.    It is perhaps of note that the relevant provisions of the English Companies Act set out a number of factors which the court should consider when deciding whether it should allow a derivative action, but the matter is ultimately left to the court as a matter of evaluation.  In our judgment, that approach is consistent with the observation of Lord Collins (*'the underlying question is whether the circumstances are sufficiently special to make it just for the beneficiary to have the remedy....'*) and Lord Walker (*'the unifying factor – what has to be special about the*

*circumstances – is that the derivative action is needed to avoid injustice....'*) in *Roberts v Gill* quoted above in relation to special circumstances.

117. It is clear that, whether the matter is being considered on a strike out application or on the trial of a preliminary issue, the court should not hold a mini trial in order to decide whether the criterion in section 33(3) is met. However, it should, as in the present case, permit the parties to adduce affidavit evidence on the topic. Ultimately, the court must then reach a view on the material provided to it.

118. Whilst reference to a *'good arguable case'* may in some cases be a helpful criterion, in our judgment the task is ultimately an evaluative one. The court must decide, on the basis of the material before it, whether the likelihood of the general partner having failed or refused to institute proceedings without cause is sufficient to lead the court to conclude that a derivative action should be permitted in the interests of justice. In reaching this evaluative conclusion, the court will no doubt have regard, inter alia, to the strength of the evidence that the general partner has failed or refused to institute proceedings without cause, the strength of the underlying claim which is sought to be brought and the likelihood and nature of any injustice if the derivative claim is not permitted.

119. For these reasons, we respectfully disagree with the judge that, because this was a strike out application, the burden was on the defendants and he only had to consider whether it was merely arguable that the plaintiffs met the statutory criterion in section 33(3). That was to set the bar too low. It follows that, as Mr. Chapman submitted, he erred in this respect.

120. However, we have before us the same affidavit evidence that was before the judge and accordingly we propose to reach our own decision, applying the approach we have just described.

**Timing**

121. As occurred in this case, and as will invariably be the position, given that there is no requirement for leave before commencing an action in reliance on section 33(3), the hearing of a strike-out application or a preliminary issue as to whether the claim falls within section 33(3) will take place at some point after the action is begun. The question then arises as to whether the court should assess compliance with section 33(3) by reference to the facts at the time of commencement of the action or as at the date of the hearing of the strike out or preliminary issue.

122.   The judge held at [127] and [128] that the question of whether the general partner had failed or refused to bring a claim without cause was to be judged on the relevant facts as they were at the time the proceedings were commenced.

123.   The plaintiffs support the judge's decision.  They point out that the words '*failed or refused*' in section 33(3) are in the past tense, which suggests that the relevant failure or refusal must have taken place before the date of institution of the derivative claim.

124.   We do not agree with the judge's decision on this point, essentially for the reasons advanced by Mr Chapman.  The plaintiffs' approach would require the court to ignore anything that has happened between the institution of the proceedings and the hearing of the relevant strike out application/preliminary issue.  This could lead to highly unsatisfactory results.  Thus, suppose that, after the institution of the proceedings, a new general partner was appointed with completely separate ownership, so there was no longer any question of an inhibition or conflict of interest.  Suppose further that the new general partner has reviewed the alleged claim and decided in good faith on commercial grounds to maintain the decision of the former general partner not to institute proceedings against the alleged wrongdoer.

125.   In our judgment, the legislature cannot have intended that the court should allow a derivative claim to proceed in circumstances where, as at the date of the hearing of the strike out or preliminary issue, the requirements of section 33(3) are not met because, for example, any inhibition of the general partner has disappeared.  In our judgment, the natural meaning of section 33(3) is that the court should consider the issue of whether the requirements of the subsection are met by reference to the facts as they are at the time of the hearing of the strike out or preliminary issue.  Mr Allison submitted that the court could surmount any difficulty which his construction of section 33(3) might cause by taking any change of circumstances into account when considering whether to exercise its discretion to allow the derivative claim to proceed.  However, we do not see that as a satisfactory solution, nor is it in our view consistent with the natural meaning of section 33(3).

126.   Whilst by no means determinative – because the legislation is not the same – we note that in England and Wales, in the context of derivative actions for companies, the court does take into account events which have occurred between the institution of the proceedings and the hearing before the court as to whether the derivative action should be allowed to proceed; see for example the decision of Newey J in *Kleanthous v Phaphitis [2011] EWHC 2287 (Ch)* where the judge placed great weight on the fact that, since the institution of the proceedings, the company had appointed a special committee of independent directors, who had decided that the

company should not bring or continue the claim which the plaintiff was seeking to bring derivatively.

127.    In our judgment therefore, a judge hearing a strike out application or preliminary issue in relation to an ELP should consider whether the test in section 33(3) is met by reference to the facts as they appear at the time of the relevant hearing.

**Pleading**

128.    In relation to the derivative claim against D1, [25] of the ASOC pleads:

> *"In the alternative, if and to the extent that the claims set out in this Statement of Claim (or any of them) are properly regarded as and/or must be brought as derivative claims on behalf of TPF, the Plaintiffs will contend that Port Link has without cause failed to initiate proceedings on behalf of TPF against itself (and there is no real prospect of it doing so) such that the requirements of section 33(3) of the Exempted Limited Partnership Act (2020 Revision) (the "ELP Act") are satisfied, such that the Plaintiffs should be permitted to prosecute the relevant claims on behalf of and in the name of TPF."*

129.    In relation to the derivative claims against D2, D3 and D4, para 25B of the ASOC pleads:

> *"The balance of the claims against Mr Williams and Wellspring and the claim against KGLI Asia are brought by the Plaintiffs as derivative claims on behalf of TPF in circumstances where Port Link has without cause failed to initiate proceedings on behalf of TPF against those parties and there is no real prospect of it doing so.  Not only did Port Link fail to commence such claims; as described in paragraph 4 above, it deliberately withheld from the Limited Partners the information upon which the claims are based.  In the premises, the requirements of section 33(3) of the ELP Act are satisfied such that the Plaintiffs should be permitted to prosecute these claims on behalf of and in the name of TPF."*

130.    The judge held at [127] that [25B] of the ASOC was sufficient to enable the defendants to understand the gist of the case, which had also been factually set out in the detailed evidence filed in the strike out applications.

131.    That conclusion was criticised by Mr Chapman.  He submitted that it was necessary for a limited partner to plead the facts and matters relied upon as allowing the limited partner to bring a derivative claim pursuant to section 33(3) and that the particulars in this case were wholly inadequate to serve that purpose. Thus, there was no pleading of the facts and matters relied upon to show that D1 as general partner was under an inhibition or suffered from a conflict of interest.

132.    Mr Allison, on the other hand, submitted that the facts and matters relied upon emerged with sufficient clarity from the detailed allegations of wrongdoing against D1 and the other defendants set out in the ASOC.

133.    In our judgment, the ASOC was inadequately pleaded in this respect.  In *Roberts v Gill* Lord Walker at [103] in relation to a derivative claim on the grounds of special circumstances concerning an estate or trust, said this:

> *"So while he need not obtain prior leave from the court, he must plead the special circumstances entitling him to the court's indulgence.   Those special circumstances are part of his cause of action."*

134.    In our judgment, the position is analogous in cases brought pursuant to section 33(3).  There is no requirement for leave but a limited partner may only bring a claim where the general partner has failed or refused to bring proceedings without cause.  The failure or refusal without cause is part of the cause of action brought by the limited partner and must therefore be pleaded.  In our judgment, it is not sufficient simply to plead the wording of section 33(3) as was done by the plaintiffs in this case.  A limited partner must plead the facts and matters relied upon as showing that he comes within the provisions of section 33(3).

135.    What is relied upon by the plaintiffs in this case is that D1 as general partner is under a clear inhibition arising from its conflict of interest.  The facts and matters relied upon as showing that this was so should therefore have been pleaded.  Accordingly, we differ from the judge's assessment that the pleading was adequate.  However, we are satisfied that no prejudice has been caused to the defendants by this failure.  As the judge correctly stated, the points of issue emerge very clearly from the evidence filed during the strike out applications and it is clear that the defendants knew the case which they had to meet.  We therefore decline to decide this case on a technical pleading point, although we emphasise, for the future, that simply pleading that a claim is brought pursuant to section 33(3) is not sufficient and that a plaintiff must plead the facts and matters relied upon as showing that he falls within the subsection.

**Need for a request to sue**

136.    It is common ground that the plaintiffs in this case did not request or demand that D1 as general partner bring proceedings against D2-D4.  Mr Chapman submits that there must be such a request before a general partner can be said to have failed or refused to bring such proceedings.  We agree that the word '*refused*' implies the existence of a request.  However, this is not so in relation to the word '*failed*'.  A general partner can be said to have '*failed*' to bring proceedings if he simply has not brought such proceedings.

137.   Whilst it will often be the case that, before instituting derivative proceedings under section 33(3), a limited partner will have requested the general partner to institute the relevant proceedings, it is not a necessary pre-condition that he has done so.  In this case, it is perfectly apparent from the evidence that D1 has not brought the relevant proceedings and has no intention of doing so. As outlined earlier, it has reached a decision not to institute proceedings even following the change in the board of directors by the appointment of the FFP Directors. The requirement of section 33(3) that the general partner has failed to bring proceedings on behalf TPF has obviously been satisfied.

**Discretion**

138.   It is well established in other contexts that the court has a discretion whether or not to allow a derivative claim even where the relevant ground for the bringing of such an action (e.g. an exception to the rule in *Foss v Harbottle* in the case of companies and *'special circumstances'* in the case of trusts or limited partnerships) is met.  Although there is no reference to the existence of a discretion in section 33(3) itself, the judge considered that he had such a discretion and it was common ground before us that there is such a discretion[17].

139.   Thus, even if it be satisfied that a plaintiff can bring himself within section 33(3), the court may in its discretion decide that he should not be permitted to continue the derivative claim. One relevant factor in the exercise of this discretion is likely to be whether the plaintiff has an alternative remedy, so that a derivative action is not required in order to avoid injustice.

**Summary**

140.   Pulling the threads of the above discussion together, we would attempt to summarise our conclusions in relation to section 33(3) as follows:

  (i)    There is no requirement for leave to bring derivative proceedings under section 33(3). A limited partner may simply institute such proceedings.

  (ii)   A limited partner must however plead the facts and matters relied upon as showing that he can bring himself within the requirements of the subsection because this forms an essential part of his cause of action.

---

[17] D2 – D4, skeleton argument,  [80(i)]; the plaintiffs, transcript, day 2 pp12,61.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

(iii)     If a defendant wishes to raise an issue as to the standing of a limited partner to bring such derivative proceedings, he should do so by means of a strike out application or seek the trial of a preliminary issue.

(iv)     Whichever of these routes is chosen does not affect the test which has to be applied in deciding whether section 33(3) is complied with and whether a limited partner should be permitted to continue with the derivative claim.

(v)      The decision of the court on such an application or preliminary issue is determinative (subject to appeal).  If the court holds that the derivative claim may be continued, the limited partner thereafter has the necessary standing to pursue the claim.  It is not an issue which is deferred until or revisited at trial (save possibly in the context of costs at the end of the trial).

(vi)     The court should not conduct a mini trial as to whether the requirements of section 33(3) are satisfied.  The court has to reach its decision on the basis of the material before it, which will be more limited than it will be following discovery and trial.

(vii)    At the hearing, the onus is on the limited partner to satisfy the court that the requirements of section 33(3) are met.  Reference to '*onus*' is not to be mistaken as a reference to a '*burden*' in the sense of having to show something on the balance of probabilities.

(viii)   The essential task for the court at such a hearing is to determine whether the limited partner has brought himself within the terms of section 33(3),  namely that the general partner has failed or refused to bring the relevant proceedings without cause.

(ix)     In determining this issue, the court is likely to be assisted by consideration of whether special circumstances (as developed in cases concerning trusts, limited partnerships and other entities) exist, but the court's task remains one of applying the statutory test set out in section 33(3).

(x)      Whilst reference to a '*good arguable case*' may be a helpful indicator of the level of comfort which the court should have when deciding whether the requirements of section 33(3) are met, the court's task is essentially an evaluative one having regard to the facts as they appear to the court at that stage of the proceedings from the material before the court and the need to avoid injustice balanced with the need to respect the fact that a derivative action is an exception to the general principle in the ELPA that

management (including decisions as to litigation) of an ELP is for the general partner, not the limited partners. As stated at [118] above, the court should consider, inter alia, the strength of the evidence that the general partner has failed or refused to institute proceedings without cause, the strength of the underlying claim which is sought to be brought and the likelihood and nature of any injustice if the derivative claim is not permitted.

(xi)     The court should reach its decision as to standing by reference to the facts as they appear at the date of the hearing of the strike out or preliminary issue.

(xii)     Even where the requirements of section 33(3) are met, the court has a discretion as to whether to permit a derivative claim to continue. One of the factors which is likely to be relevant in exercising that discretion is whether the plaintiff has an alternative remedy.

**Application to the facts**

(a)     <u>The claim against D1</u>

141.     It is to be recalled that, as described at [75] above, a derivative action allows a party to bring a claim in the name of and on behalf of a second party against a third party for loss and damage caused to the second party. It follows that the second party must have a claim against the third party before the first party can be permitted to bring such a claim derivatively.

142.     Ms Stanley submits that, regardless of whether the test in section 33(3) is otherwise met, (i.e. that D1 is subject to an inhibition which makes its decision in relation to potential proceedings one which is without cause), there is a more fundamental reason why the derivative claim against D1 should be struck out, namely that, on the judge's finding, the ELP has suffered no loss or damage and therefore has no claim of its own to bring.

143.     At [63] the judge said:

> "It follows that where an ELP is alleged to have suffered loss, as in this case, that is the loss of each of the Limited Partners. There is no distinct or separate loss in respect of 'the partnership' (TPF), which as an entity does not exist in law."

144.     To similar effect is the decision of Cooke J in *Henderson* in relation to limited partnerships at [28] – [32]. Thus at [28] he said:

> "The Partnership, unlike a limited company, does not possess a corporate legal personality. Like an ordinary partnership under the Partnership Act, 'the

> *Partnership', is simply a convenient way of referring to the body of partners as a whole.  In my judgment therefore, no difficulty arises for a Limited Partner's claim against the General Partner, regardless of whether or not removal and substitution of the General Partner is possible.  The claim to be made against the General Partner is that of the individual Limited Partners and is not a Partnership Asset.  Each Limited Partner has its own contractual or fiduciary claim for its own loss, where the inter-relationship with the General Partner is governed by the [Partnership Agreement].  <u>The Partnership, which consists of the Limited Partners and the General Partner together has no form of joint right or claim against the General Partner, as the claimants suggest.</u>"* [Emphasis added]

145.   We are not to be taken as agreeing that this is correct.  As already stated, section 16(1) of the Act provides that the general partner will hold the assets of the ELP upon trust.  In the case of a trust, whilst a beneficiary undoubtedly has a direct claim against the trustee for breach of trust, the appropriate remedy (as discussed above by reference to *Target v Redferns*) is for an order that the trustee restore the trust fund to what it would have been had the breach not been committed.  Such a claim may be brought by one or more beneficiaries, but a successor trustee will often bring such a claim against a former trustee for breach of trust on behalf of the trust as a whole and will hold any sums recovered from the former trustee upon the terms of the trust.  Thus, even though like an ELP, a trust is not a separate legal entity, it can properly be said that the trust as well as a beneficiary has a claim against a trustee for breach of trust and that such a claim can be considered as an asset of the trust.  It seems to us strongly arguable that the position is the same in relation to an ELP, particularly given that the general partner is also a trustee.

146.   However, there has been no Respondents' Notice in respect of the above finding of the judge and indeed the plaintiffs have not sought to argue that the judge was wrong in this respect.  What they say is that the judge was correct in what he said at [64] where, immediately following the passage quoted above in [143] above from [63] he said:

> "64.   *I therefore find that the direct claims in respect of the individual partners' losses are vested in the Limited Partners alone, and are not claims that can be brought on behalf of TPF derivatively, except in the circumstances permitted by section 33(3) of the ELPA where the Limited Partners who wish to obtain redress for TPF are in effect put in the place of the GP and bring claims on behalf of TPF".*

147.   With respect to the learned judge we cannot accept that section 33(3) permits a claim in such circumstances. The subsection pre-supposes that there is a claim to be brought by the general partner on behalf of the partnership. If, as the judge held, the partnership has no claim against the general partner, there can be no failure by the general partner to bring such a claim without cause.

148.    Even if we are wrong on this point, there is a second reason for not permitting the derivative claim against D1 as a matter of discretion; that is because the plaintiffs as limited partners have an adequate alternative remedy.

149.    As we have held earlier in this judgment, a limited partner has the right to claim against a general partner for breach of duty on the part of the general partner.  In the event of such a claim succeeding, the appropriate remedy will almost certainly not be an award of equitable compensation to the particular limited partners who have sued (thereby potentially causing difficulties in relation to those who have not also joined in the action and in respect of creditors of the ELP), but instead an order that the general partner restore the trust fund as outlined in *Target v Redferns*.

150.    In these circumstances, exactly the same will be achieved by a direct claim as would be the case in a derivative action. In the event of the plaintiffs succeeding in their direct claim, the estate of the ELP will be made whole by payment from the general partner pursuant to an order for restoration of the trust fund.  Success in a derivative action would have the same result. Accordingly, there is simply no need for a derivative action; it would add nothing to the direct claims brought by the limited partners coupled with an order for restoration of the trust fund in the event of such claims succeeding.  Indeed, during oral argument, Mr Allison accepted that, if the plaintiffs have a valid direct claim against D1 for which restoration of the trust fund can be awarded, there would be no need for the derivative action[18]. In those circumstances, we conclude that, as a matter of discretion, the derivative claim against D1 should not be permitted.

151.    Accordingly, for both of the above reasons, we strike out the derivative claim of the plaintiffs against D1.

(b)    The claims against D2 – D4

152.    We have described the claims brought against the various defendants at [13] to [16] above.  The relevant features for present purposes can be summarised as follows:

   (i)    The plaintiffs invested some 65% of the total amount invested in TPF.

   (ii)    Other limited partners, who invested 15.14%, have instituted broadly similar claims against D2 and D3 in the State of Georgia, USA.  Thus a total of 80.3% by value of

---

[18] Transcript day 2 pp 90(22) - 92(11)

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

limited partners are litigating on the basis of alleged serious wrongdoing on the part of the GP.

(iii)     Of the remaining 19.7% (by value), 14% are associated with the GP.

(iv)     The plaintiffs allege that D1 as the general partner has been guilty of wrongdoing which has caused TPF loss said to be well in excess of US $100m.

(v)      The claims against D1 essentially allege that, in breach of its fiduciary, contractual and other duties, it acted contrary to the interests of TPF and the limited partners by making substantial payments, using TPF's monies, that were not for the benefit of TPF and/or the limited partners. Amongst these is the alleged sham settlement of the DIFC Proceedings brought against it in the DIFCC as a result of which the Wellspring Payment of US $59,990,461.30 was paid to D3. The ASOC alleges that D1 conspired with, amongst others, D2 (Mr Williams) and D3 (Wellspring) to cause loss to TPF and/or the limited partners by unlawful means in relation to the DIFC Proceedings and the Wellspring Payment.

(vi)     The claims against D2 are that he orchestrated the DIFC Proceedings and the Wellspring Payment and was accordingly party to the above conspiracy.  It is further alleged that he dishonestly assisted in D1's breach of trust/fiduciary duty, knowingly procured D1 to breach its contractual duties and was in breach of fiduciary duties he owed to TPF and/or D1.

(vii)    The claims against D3 are for knowing receipt of the Wellspring Payment, conspiracy in relation to the Wellspring Payment and the DIFC Proceedings and for repayment of the Wellspring Payment pursuant to Section 4 of the Fraudulent Dispositions Act (1996 Revision).

(viii)   The claim against D4 is for knowing receipt in respect of a number of payments said to have been made to it in breach of trust and/or fiduciary duty by D1 as general partner.

153.    The judge held at [106] that section 33(3) required a finding as to whether the GP (i.e. the relevant corporate entity) has failed or refused to institute the proceedings without cause, not the directors at the relevant time.  He concluded at [102] that there was a good arguable case that D1 had and still has a relevant inhibition because it is conflicted in relation to the plaintiffs' claims.  Its decision not to bring the claims against D2 – D4 was infected and made unsafe by the facts giving rise to its conflict of interest.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

154.    The underlying facts in relation to the inhibition were not disputed before us and would appear to be as follows:

(i)      Mr Williams, D2, is the sole shareholder of PLH, a Delaware company, which in turn is the sole shareholder of D1.  Thus Mr Williams is the sole ultimate beneficial owner of the general partner of TPF.  He was the investment director of TPF's sponsor and placement agent from 2009 – 2011 and a member of the Investment Committee of TPF from 2009 – 2013.

(ii)     On 23 January 2020, he was appointed as the authorised representative of D1 in relation to proceedings against D1 by certain limited partners (including the first plaintiff) pursuant to section 22 of the ELPA seeking disclosure of full information regarding the state of the business and financial condition of TPF. The resolution conferred full authority on Mr. Williams to take all necessary actions in relation to the section 22 proceedings.  The application of the limited partners under section 22 was opposed by D1 at a time when the FFP Directors were in post and eventually Parker J ruled against D1 and ordered it to make disclosure.  Thereafter, D1 sought to appeal that decision but the appeal was eventually compromised and D1 agreed to provide the necessary information.

(iii)    Mr Williams is the CEO, CFO, President, Vice-President, Treasurer and Secretary of D3, Wellspring.  The company is owned by the Mark E Williams Living Trust, of which Mr Williams, his wife and brother are the trustees.  The ASOC pleads that it is to be inferred that the beneficiaries are also Mr Williams' family.

(iv)    D4, KGLI Asia is a company incorporated in the Cayman Islands and Mr Williams was its CEO from 1 January 2012.

155.    As can be seen therefore, Mr Williams is the ultimate beneficial owner of the GP and has very close connections with Wellspring and KGLI Asia.

156.    In considering whether D1 as the general partner would be under an inhibition in relation to the taking of proceedings against D2 – D4, it is useful to refer to the case of *Henderson*.  The facts of that case are summarised at [83] to [84] above.  Certain limited partners of an English limited partnership sought to bring a derivative action against, inter alia, the manager, who had been appointed by the general partner and was a sister company of the general partner.

157.    Cooke J held at [59] that as a result the general partner had an irreconcilable conflict of interest in relation to whether to institute proceedings against the manager and this constituted *'special circumstances'* which therefore justified the limited partners being able to bring a derivative claim.  In coming to that conclusion, he held that (i) the ability (which was not straightforward) under the limited partnership agreement for the limited partners to remove and replace the general partner and (ii) the ability of the limited partners to sue the general partner for wrongly failing to institute proceedings against the manager, were not satisfactory alternative remedies so as to refuse the limited partners the ability to bring a derivative claim.

158.    We respectfully agree with the decision of Cooke J in *Henderson*. In our judgment there is a similar conflict of interest in the present case.  On the plaintiffs' case, D1 as the general partner was deeply involved in all the alleged wrongdoing as was Mr Williams. D1 has to decide whether to institute proceedings against D2 – D4 in circumstances where:

(i)     The essential wrongdoing giving rise to the claims against D2 – D4 was that of D1 itself in making the various payments and where it is said to be part of the unlawful means conspiracy to injure TPF involving Mr Williams and Wellspring.

(ii)    The contemplated proceedings would have to be brought against the beneficial owner of the GP and against two companies in which Mr Williams is deeply and closely involved, namely Wellspring and KGLI Asia.

(iii)   D1 would also have to consider whether (as general partner) it should sue itself (in its own right) as a co-conspirator in the alleged unlawful means conspiracy.

159.    On the face of it, by reason of the obvious and serious conflict of interest, D1 is under an inhibition which would amount to special circumstances in the context of a trust or limited partnership and this inhibition also means that the failure by D1 to bring proceedings against D2 – D4 is without cause for the purposes of section 33(3).

160.    However, the defendants say that this is not the position for two associated reasons.  First, they point out that the present directors of D1, namely the FFP Directors, are wholly independent and were not in office at the time of the alleged wrongdoing on the part of D1.  They do not therefore suffer from any conflict of interest.  They are in a position to bring an independent and impartial view to bear on whether claims should be brought against D2 – D4 and in this respect are in the same position as a liquidator of a company, who has to decide whether to bring a claim against former directors or other parties for injury caused to a company.  The defendants point out that, as summarised in the third affidavit of Mr Lewis, the FFP Directors

have reviewed the position thoroughly with the benefit of legal advice and have concluded that the interests of TPF are best served by not instituting any claims against D2 – D4 for the reasons there set out.

161. It is clear, submit the defendants, that the court must give great weight to the commercial judgment of those who have responsibility for the management of the relevant entity under the constitutive documents; see for example the observation of the Lewison J in *Iesini* quoted at [77] above.

162. Secondly, they submit that the independence of the FFP Directors is fortified by the fact that Mr Williams has given an undertaking that the shareholder of the GP will not exercise any powers so as to remove the FFP Directors or interfere in any way in the exercise of their functions. Thus, submit the defendants, the FFP Directors are, and are seen to be, free to act independently.

163. In our judgment, these submissions do not overcome the inhibition referred to earlier. In relation to the first point, the judge was in our view correct to focus on the entity which is the general partner rather than the directors for the time being of that entity. Section 33(3) refers to the 'general partner' having failed or refused to bring proceedings without cause. The general partner is the legal entity D1. D1 is subject to the conflicts of interest we have summarised above and thus cannot be seen to be in a position to take a fair and independent decision about the potential litigation. New directors are not in the same position as a liquidator, who is appointed by and subject to the supervision of the court and therefore clearly is and is seen to be independent of the company, its directors and shareholders. The FFP Directors owe a fiduciary duty to act in the best interests of D1. The defendants submitted that because D1 owes fiduciary duties to act in the best interests of the partnership, the FFP Directors therefore have a duty to act in the best interests of TPF. However, there is certainly the potential for conflict between acting in the best interests of TPF (which might include taking action against D1 as a co-conspirator) and acting in the best interests of D1 (which might be said to include the avoidance of being sued).

164. In connection with the undertaking, we were referred to the case of *St. John's Trust Company (PVT) Limited v Medlands (PTC) Limited and Others* [2021] CA (Bda) 20 Civ, ("the B Trust"), a decision of the Court of Appeal of Bermuda. That was a case which involved a number of issues but, for present purposes, it is sufficient to say that one of the issues before that court was whether it would be appropriate to reappoint St. John's Trust Company (PVT) Limited ("SJTC") as trustee of the B Trust. SJTC was wholly owned by a company, Cabarita, which

was in turn wholly owned by a Mr T.  Mr T was said to have misappropriated funds from the B Trust and there were ongoing proceedings against him in this respect.

165.   Mr T had appointed two independent directors of SJTC and, before the Bermuda Court of Appeal, he proffered an undertaking not to interfere with the appointment of these two individuals.  Despite this, the Bermuda Court of Appeal held at [62] that it was clearly not appropriate for SJTC to be trustee.  It would be contrary to the interests of the beneficiaries for Mr T to have any control or influence over the B Trust.  This would be possible, despite his undertaking, by reason of his ownership of Cabarita which owned SJTC. The undertaking did not meet the fundamental issue of Mr T's potential influence.

166.   Mr Chapman sought to distinguish re *B Trust* on three grounds.  First, he pointed out that Mr Williams is only an <u>indirect</u> beneficial owner of the D1; but that was also the case in the *B Trust* as Mr T owned Cabarita which owned SJTC.  Secondly, he referred to the undertaking by Mr Williams not to interfere.  However, an undertaking was also given by Mr T in the *B Trust* and this did not persuade the Bermuda Court of Appeal that his potential influence was thereby negated.  Thirdly, he submitted that the *B Trust* was concerned with whether there might be interference in the future by Mr T whereas the present case was concerned with a decision (namely not to issue proceedings) which had already been taken.  However, we do not see that this is a significant point of difference.  The fact is that the decision as to whether to institute proceedings on behalf of TPF involved consideration by the GP of whether to sue itself as an alleged co-conspirator and whether to sue its beneficial owner and two closely linked companies in circumstances where the claims were said to arise on the basis of the wrongdoing of the GP and its beneficial owner.

167.   We find the reasoning of the Court of Appeal of Bermuda to be persuasive.  In our judgment, the undertaking given by Mr Williams is insufficient to overcome the inhibition from which D1 as general partner suffers.  If one stands back and considers how it would appear to the plaintiffs (who allege that there has been serious wrongdoing by D1 – D4 which has cost TPF over US $100m) for the decision as to whether to seek recompense from any one or more of D1 – D4 to be left in the hands of D1, they would have no confidence that a fair and independent decision had been taken, even following the appointment of the FFP Directors.  In our judgment, they would be justified in this lack of confidence.  There is no doubt in our view that D1 was and is suffering from an inhibition which leads to the conclusion that, subject to the exercise of any discretion, it is appropriate for the plaintiffs to bring derivative claims on behalf of TPF pursuant to section 33(3) against D2 – D4.

168.    Given our decision to uphold the judge's conclusion that it is the position of D1 as the general partner which must be considered in relation to any inhibition rather than the position of the directors from time to time, it is not necessary for us to address his finding about the position of the FFP Directors.  Suffice it to say that, if we had found it necessary to do so, we would have considered that the judge was entitled to reach the conclusions which he did in this respect.

169.    As to discretion, the defendants submit that, because the plaintiffs are bringing direct claims against D2 and D3, they have an alternative remedy in respect of those two defendants and there is no need for them to bring a derivative action.  They point out that they have not sought to strike out the direct claims against D2 and D3.  That is so, but it is of note that footnote 10 to [15] of the skeleton argument of D2 – D4 states:

> "For the avoidance of doubt, [D2 – D4] do not admit that the Respondents, in
> particular KPA, have standing to bring the direct claims, and expressly reserve
> the right to challenge the Respondents' standing to bring such claims, including
> on the basis of a lack of authority in the case of KPA."

170.    As stated at [67] above, Ms Stanley asserted in oral argument that the only way to get the proceeds of any successful claim against D2 and D3 into TPF is by way of a derivative claim. Furthermore, despite the defendants' explanation, submitted in response to the draft of this judgment, that footnote 10 was only intended to cover the KPA lack of authority point and the partnership accounting point, the fact remains that the footnote expressly reserves the right to challenge the plaintiffs' standing to bring the direct claims in general terms and the KPA point is merely mentioned by way of inclusion as a ground of challenge. We bear in mind the overriding objective and, in our view, it would be inconsistent with that objective and highly undesirable to run the risk of the court eventually finding against D2 and D3 on the underlying merits of the claims but finding that the plaintiffs did not have standing for the direct claims or that it could not make an order for restoration of the trust fund in the absence of a derivative claim on behalf of TPF. The existence of an alternative remedy is a matter to be taken into account when determining whether to allow a derivative claim to proceed although its existence is not conclusive of the matter; see *Henderson* at [39]. In our judgment, whilst we have expressed certain preliminary views at [65]-[72] above, in the light of the above matters there is sufficient uncertainty about whether the plaintiffs have direct claims against D2 and D3 or whether the court could order restoration of the trust fund on the success of such claims that, as a matter of discretion, it is just and fair to allow the derivative claims to proceed alongside the direct claims so that they are all heard at the same time. If, following a trial, the direct claims are upheld and the court also holds that it can order restoration of the trust fund as a remedy for such claims, then there will be no need to make any award on the derivative claims; if on the

other hand the direct claims are found not to be maintainable or restoration of the trust fund cannot be ordered, the derivative claims will be necessary to provide a remedy, assuming that the underlying allegations against the defendants are upheld.

171.   We add by way of postscript, that both sides sought to raise arguments based on the position of the Cayman Islands as a leading centre for the establishment of investment funds.  Thus the defendants argued that, by setting the bar for derivative actions too low, the judge had rendered it less likely that promotors of investment funds in the form of ELPs would choose the Cayman Islands as the location of their funds because of the comparatively easy exposure to derivative claims.

172.   Conversely, the plaintiffs argued that it was important for the reputation of the Cayman Islands as a centre for investment funds that persons who have invested in ELPs should have a remedy when the general partner is alleged to have been guilty of wrongdoing and that a derivative action is the only remedy in such circumstances.  It should not therefore be too difficult to bring such an action.

173.   Whilst noting these arguments, we have not decided this case by reference to the arguments' respective merits, which are more matters for the legislature.  We have confined ourselves to construing section 33(3) in the light of the words used against the background of the law on derivative claims generally.

**Summary of conclusions reached on the derivative claims**

174.   In respect of D1, for the reasons which we have given above, we allow the appeal to the extent of striking out the plaintiffs' derivative claims against it.

175.   In relation to the derivative claims against D2 – D4, we dismiss the appeals brought by these defendants, with the consequence that the plaintiffs may bring those claims under section 33(3).

**The SFC Appeal**

176.   At the hearing below, the GP (D1) applied for security of costs ("SFC") in the sum of USD 5,536,025.50 and the sum sought by D2 – D4 was USD 2,720,000. It is and was common ground that the plaintiffs are both Kuwait state-owned enterprises ordinarily resident out of the jurisdiction and accordingly the judge had jurisdiction to exercise the discretion conferred on the court by GCR O.23 r.1(1), which reads in relevant part:

> "*Where on the application of a defendant to an action or other proceedings it appears to the Court – (a) that the plaintiff is ordinarily resident out of the*

> *jurisdiction; ... then, if having regard to all the circumstances of the case, the Court thinks that it is just to do so, it may order the plaintiff to give such security for the defendant's costs of the action or other proceedings as it thinks just."*

177.    Briefly summarised the defendants' case was that there were substantial obstacles to the enforcement in Kuwait of an adverse costs order since there was no treaty between Kuwait and the Cayman Islands for the mutual enforcement of judgments and as a matter of Kuwaiti law even a judgment of the Kuwaiti courts was incapable of enforcement against the plaintiffs because they were state entities.

178.    In dismissing the SFC applications, the judge began by setting out the legal principles he found to be applicable. He then analysed the principles and applied them to the case before him and then proceeded to give the reasons for his decision. The key elements of this part of his judgment can be summarised as follows:

<u>The applicable principles</u>

179.    (i)    There is no presumption that the court will ordinarily require a foreign plaintiff to give SFC; rather the discretion "is to be exercised on a case-by-case basis, as the rule states, having regard to all the circumstances of the case"; (see *Re Cybervest Fund* [2006 CILR 80], per Smellie CJ at [23]). [149]

(ii)    The court should follow the guidance on the interpretation of O. 23 r.1(1) provided by the following passage in the judgment of Smellie CJ in *Tasarruf Mevduati Sigorta Fonu v Wisteria Bay Limited [2006 CILR 351 at [14]]:* [150].

> *"There is no hard and fast rule that every foreign plaintiff must be required to put up security. The matter is one, as already stated, of discretion to be exercised in every case. All the circumstances will be considered including the means and ability of the plaintiff to pay and even, in an appropriate case the relative strength or weakness of the case for each side provided those factors are clearly discernible from the evidence. See, for these propositions, the leading case of Sir Lindsay Parkinson & Co Ltd v Triplan.."*

(iii)    The court's discretion must be exercised impartially and must not be exercised discriminately; see eg *Ahab v Saad* [2017 (2) CILR 602 at [21]. [151]

(iv)    The merits of the case will only be relevant if: (i) either party can clearly demonstrate a strong probability of success or (ii) the Court is considering a summary judgment application at the same time. [152]

<u>Analysis and application of the principles to this case</u>

(v)   In this case, the merits could not be properly determined at this stage. [153]

(vi)  The issue to be decided was whether the defendants had shown there are objectively justified grounds for concluding that there are obstacles or burdens to the enforcement of a costs order against the plaintiffs, such that there is a real risk of non-enforcement and whether, if there are such real risks, it is just in the circumstances to order security and if so, on what terms. [154]. (This proposition, like principle (iii) above, is based on *Ahab v Saad* [2017(2) CILR 602] where Smellie CJ stated at [15]-[16]

> "*the focal concern of the modern case law [on security for costs] is not to ensure that a plaintiff is seldom required to provide security or that orders for security are only exceptionally made but to ensure that such orders are not imposed in an arbitrary or discriminatory manner. Accordingly, the making of such orders against a non-resident plaintiff would be appropriate, and may now be justified, not simply on the discriminatory basis of the plaintiff's foreign status but because real risks of unenforceability are shown "on objectively justified grounds" to exist: per Gloster, L.J. in her dictum cited above from Bestfort (1), applying the dictum of Mance, L.J. from Nasser (7). This approach dictated by the modern cases is aimed at addressing not only basic tenets of fairness but more particularly, the requirements of the Constitutional Bill of Rights where, in s.16, it is mandated that "government shall not treat any person in a discriminatory manner in respect of the rights under this Part of the Constitution"—the most directly operative here being that right to a fair and public trial guaranteed by s.7 which states that "Everyone has the right to a fair and public hearing in the determination of his or her legal rights and obligations by an independent and impartial court within a reasonable time.")*

(vii) Where the plaintiff is a foreign government or state agency, there is a presumption that SFC should not be awarded, although each case will turn on its own facts. The presumption arises from comity and common sense and may be displaced by the evidence; see *Tasarruf* at [22].[156].

(viii) As Smellie CJ observed in *Tasarruf*, the only modern reported case in   which SFC had been ordered against a foreign government was *Sierra Leone Govt. v Davenport* [2003] EWHC 1913 (Ch) where the circumstances were exceptional in that Sierra Leone had recently emerged from a civil war. [157].

(ix)  PIFSS (the second plaintiff) was the subject of the SFC application determined in *Cybervest* where PIFSS was petitioning as a shareholder for the winding up of a Cayman incorporated investment fund. In giving judgment in this case, Smellie CJ noted that PIFSS

had "immensely valuable assets to be regarded as being within the jurisdiction" and so if PIFSS failed to pay an order for costs it would be open to the applicant to seek recourse. The SFC application was dismissed on the grounds that: (a) PIFSS's very valuable shareholding in the fund was to be treated as assets within the jurisdiction; and (b) PIFSS was *"a state agency of a foreign government of undoubted resources and enjoying a high reputation in the global financial and commercial community'' [that was] relevant insofar as it would tend to negate any concern the plaintiff would be likely to obey an order for costs made in favour of the respondent."*

(x)  Security will not be required of a foreign plaintiff who has substantial assets within the jurisdiction; see *Cybervest* at [25]. [160].

(xi)  Where any liability for costs on the plaintiffs' part will inevitably be joint and several, security will not be required if at least one plaintiff has substantial assets within the jurisdiction. [160].

(xii)  A foreign plaintiff does not have the burden of establishing that it has fixed and permanent property within the jurisdiction. [161]. See the following extract from the judgment of Lightman J in *Oded Moshe Leyvand v Amnon Barasch & Ors* [2000] WL 191256 at [6]:

> *"The commonsense principle applies that the existence of assets within the jurisdiction, their fixity and performance, are among a number of potentially relevant factors, their importance depending on the particular facts of the case. The Court will not infer the existence of a real risk that assets within this country will be dissipated or shipped abroad to avoid their being available to satisfy a judgement for costs unless there is a reason to question the probity of the claimant: there is no such reason in this case. If there is a reason to question the claimant's probity, the character of his property within the jurisdiction is relevant in assessing the risk: the risk may be greater if the property is cash or immediately realisable or transportable, and less if fixed and permanent".*

(xiii)  Undertakings given by a plaintiff that it will not raise any of the potential defences in their home jurisdiction should an award of costs be made against it would be very persuasive evidence in any court in the plaintiff's home jurisdiction [162]. See Sanderson Ag. J in *Elliott v Cayman Islands Health Service* Authority [2007 CILR 163] at [18].

<u>The judge's reasons why, on the application of the foregoing principles, the SFC application would be refused.</u>

(xiv)  The plaintiffs are both wholly owned by, and are the agents of, the State of Kuwait. There is therefore on the decided cases a rebuttable presumption that security for costs should

not be ordered (see *Tasarruf* at [23]). This presumption has not been rebutted on the evidence adduced. The plaintiffs appeared to have ready access to funds and would be able to satisfy any adverse costs order in a timely manner. [164] – [166].

(xv)   KPA is an internationally recognised commercial organisation and relies on its international reputation to do business. Its profit for the financial year 2020 – 2021 was KWD 56,450,000 (about USD 187,522,553 based on the exchange rate on 9 August 2021).The Director General of KPA has confirmed that it has sufficient resources to meet any costs order made against it in these proceedings, and will comply with any such costs orders in a timely fashion, a position that has been reconfirmed by the Kuwaiti Department for Legal Advice and Legislation ("DLAL"). In addition, KPA has provided a written undertaking to this effect to the Court on 27 May 2021. [167] – [169].

(xvi)   PIFSS is a public institution which administers Kuwait's pension fund for all Kuwaiti citizens in the workforce, both in public and private sectors. It operates independently from the State of Kuwait and has its own budget and board of directors. It has a global investment asset portfolio worth approximately USD 133.7 billion (as at 31 March 2021). Its profit for the period March 2020 to December was USD 18.9 billion. An officer in PIFSS's Compliance and Government Department had confirmed that PIFSS had sufficient resources to meet any costs order made in these proceedings and will comply with any such orders in a timely fashion. PIFSS has provided a written undertaking to this effect to the Court. In addition, PIFSS has been party to several sets of proceedings before the Cayman Islands Courts and has never failed to comply with any costs order. [170] - [172].

(xvii)   It would be clearly detrimental to PIFSS's ongoing commercial reputation and business to be in breach of an order of the Cayman Islands Courts.[173].

(xviii)   Accordingly, after a careful consideration of the evidence, the presumption against ordering security against agents of a foreign state has not been rebutted. Accordingly, it would not be just to grant the SFC applications against the plaintiffs. [174].

(xix)   It is well established that security will not be ordered against a foreign plaintiff who has substantial assets within the jurisdiction (see *Cybervest*) and PIFSS is such a plaintiff by reason of its interest valued at EUR 35,074,942 as a 31 March 2021 in the Jermyn Street Commercial Real Estate Fund ("the Jermyn Street Fund"), of which PIFSS is a limited partner. [175] – [176].

(xx)   There is no reason to doubt the probity of PIFSS, which is an agent of the State of Kuwait and familiar with conducting international litigation (including in the Cayman Islands). [177].

(xxi)   There is no reason to conclude that PIFSS's interest in the Jermyn Street Fund is encumbered, or not amenable to enforcement if necessary, and no reason to conclude that PIFSS would dispose of or otherwise encumber its interest to attempt to defeat an order as to costs. [177].

(xxii)   Accordingly, since PIFSS has sufficient assets within the jurisdiction to cover any costs order that is made against the plaintiffs (in respect of which they would be jointly and severally liable), and in circumstances where both plaintiffs have given written undertakings to the court, it would not be just to require the plaintiffs to pay security for costs (even if they were not agents of the State of Kuwait). [178].

(xxiii)   In light of the correspondence between Campbells (for D2-D4) and Ogier (for the plaintiffs) there was no basis to form the view that PIFSS would seek to frustrate the enforcement of a cost order against it by disposing of its interest in the Jermyn Street Fund, even if it were able to do so. [179].

(xxiv)   The enforceability of Cayman Islands judgments in Kuwait does not therefore arise for determination. [189].

The case advanced by the GP (D1)

180.   (i)   By reason of the errors made by the judge in reaching his decision to refuse to order SFC, his decision should be set aside and the SFC summons remitted to another judge of the Grand Court or alternatively the judge himself.

(ii)   Although the discretion under GCR O.23, r.1(a) is at large, it can only be properly exercised when **all** of the circumstances are taken into account, and this the judge failed to do because he did not consider the obstacles of enforcement in Kuwait. Instead, he appears to have been satisfied that the plaintiffs could and would pay adverse costs order without question and the defendants had not proved otherwise.

(iii)   The judge erred in principle in proceeding on the basis that there was a presumption that a foreign government or state agency will not be ordered to provide security for costs unless the applicant "rebuts" the presumption. The authorities the judge relied for the presumption -- *Cyberfest* and *Tasarruf* -- laid down no such principle. Instead, Smellie

CJ in the former case decided it on the basis that the Court had a wide discretion which fell to be exercised on a case-by-case basis and in the latter case, Smellie CJ highlighted that it was all a matter of discretion taking into account all the circumstances. The true ratio was that the Court does not apply the rules for SFC differently depending on whether the plaintiff is a state or an individual but on the basis that all plaintiffs who seek to engage the Court's jurisdiction must play by the same rules. This, after all, is the position in England (see *Sierra Leone (Govt) v Davenport* [2003] EWHC 1913 (Ch) ) and in Australia (see eg *Papua New Guinea v Sandline* [1998] QDC 298 (per Andrews J) and *Ministry of Foreign Affairs of the Republic of Italy v Simeone* [2016] QDC 160.

(iv)   Where there is joint and several liability between plaintiffs for costs and one of them is in the jurisdiction, it is the practice not to make a SFC order against the plaintiff who is resident outside the jurisdiction if it is inevitably to be inferred by the Court that there will be joint liability for costs between the plaintiffs. Assuming that this practice can apply to a situation where both plaintiffs are outside the jurisdiction but one has substantial assets within the jurisdiction, D1 submits that there were no sufficient grounds for the judge to have concluded that the plaintiffs would be jointly and severally liable for the costs. Indeed, D1 pleads a defence against KPA that it commenced and carried on its claims against them without due authority, and ratification of these acts is not possible under Kuwaiti law.

(v)   The judge erred in taking into account the confirmation from the Director General of KPA, Mr Al-Sabah, which was related to Mr Florent, who in turn related it in paragraph 18 of his Third Affidavit, that KPA had sufficient resources to meet a costs order made against it in these proceedings, and would comply with any such costs order in a timely fashion. Mr Florent's Third Affidavit was sworn on 27 August 2021 but Mr Al Sabah had been suspended from the position of Director General of KPA by the Minister of Commerce and Industry on 24 October 2021 pending investigations of "violations" attributed to him. The expert evidence before the judge was that during his suspension, Mr Al-Sabah was not authorised to represent KPA in any capacity or exercise any powers on behalf of KPA.

(vi)   The judge erred in treating the letters he called "undertakings" to pay an adverse costs order as if they were indeed "undertakings" when they were merely "comfort letters" since they contained the words, ***"Without prejudice to the exercise of KPA's legal rights"*** and stated *"**we confirm** that KPA will comply with any final and binding costs orders …"* Even if the letters had contained express undertakings on behalf of the plaintiffs to pay an adverse costs order the judge should have considered whether there remained a significant

risk that such a costs order would not be paid and gone on to find that there was such a risk because the undertaking could only be enforced by committal or sequestration proceedings in the jurisdiction and such an order would not be enforceable in any other court. Nor was it clear that the comfort letters would be enforced by the Courts of Kuwait.

(vii) The judge erred in placing reliance on the evidence given in Mr Florent's third affidavit to the effect that PIFSS had never failed to comply with any costs order made in proceedings before the courts of the Cayman Islands when there was no evidence that any adverse costs order had ever been made against PIFSS in any Cayman Island proceedings. What the judge should have done was to require production of examples of Cayman Islands costs orders that had been honoured by PIFSS.

(viii) The judge made the following errors in giving the weight he did to PIFSS's assets within the jurisdiction:

(a) He stated that the plaintiff does not have the burden of establishing that it has fixed and permanent property within the jurisdiction when that burden in fact lay upon the plaintiffs and he should have taken note of the fact that PIFSS's interest in the Jermyn Street Fund was not of a fixed or permanent nature but was in the nature of a receivable in the event that a distribution were to be made and/or the Fund were wound up.

(b) He was wrong to consider whether there was any reason to doubt the probity of PIFSS when the question to be considered was whether there was a real risk that the assets in the jurisdiction may not be available if and when a case of enforcement arises; see Butcher J in PJSC *Tatneft v Bogolybov* [Costs LR 977 at [49]] and Henshaw J in *Pisante v Logothetis* [2020] EWHC 3332 (Comm) at [65]-[66].

*Discussion and decision*

181. We deal first with D1's submission that the judge erred in proceeding on the basis there was a presumption that a foreign government or state agency will not be ordered to provide security for costs unless the applicant "rebuts" the presumption.

182. The principal authority relied on by the judge for the aforesaid presumption was *Tasarruf*. Here, as related in [2] and [3] of Smellie CJ's judgment in that case, the plaintiff was a Turkish state entity authorised by statute to recover deficiencies in the accounts of insolvent banks by, among

other things, the seizure and sale of the assets of their managers, shareholders or auditors. This authorisation was given as part of a regulatory scheme to protect depositors against bank failure. In March 2004, the plaintiff seized in Turkish waters two motor yachts registered in the Cayman Islands Shipping Registry in the names of the corporate defendants. These yachts were said to belong to the controlling shareholders of a leading Turkish bank now in the administration of the plaintiff. In December 2004, the plaintiff brought an action in the Grand Court to prevent the completion of registration of mortgages for amounts in excess of their total value, granted against each vessel in favour of the third defendant in person.

183.   On the question whether the plaintiff should be ordered to provide SFC, in *Tasarruf* the Chief Justice said that the fundamental question was whether an agency of a friendly foreign state, enjoying good standing in the international community and which has invoked the jurisdiction of this court, should be required to put up security for a defendant's costs of the action [14]. In earlier times there had been a practice that a foreign plaintiff should be ordered to provide SFC[19] but given the changes to the Rules since then and the discretionary nature of the exercise requiring the court to consider all the circumstances, a modern and different approach where the plaintiff is a foreign state, was discernible from the judgments in *Banco Economico S.A.* v *Allied Leasing & Fin. Corp* [1998 CILR 102] and *Ministère de la Culture &c. de France* v. *Lielb* [1981] 1 WLUK 253 at [16] – [18]. This modern principle was *"that where the plaintiff is the government (or a state agency) of a foreign state enjoying good standing in the international community (in particular from this court's point of view, enjoying diplomatic relations with H.M. Government) it should be assumed as a matter of comity and common sense, in the absence of anything to the contrary, that it will honour its obligations for costs made against it. Nonetheless, as the question remains one to be decided on a case by case basis in the discretion of the court, an order for security for costs could undoubtedly be made against a foreign state in appropriate circumstances".* [22]

184.   In *Banco Economico S.A.* v *Allied Leasing & Fin. Corp.* the plaintiff, a Brazilian bank, itself in liquidation and under the control of a liquidator appointed by the Brazilian Government, petitioned for the winding up of the respondent. Mr Justice Smellie (as he then was) was of the prima facie view that there was merit in the petition [p. 112] and he concluded:

> *"that the proper balance is struck when account is taken of the consideration that the petitioner is now under the control of a liquidator who is appointed by the Brazilian Government. Even in the ordinary case, the fact of insolvency will not by itself dictate an order for security. When the entity is a large bank, as the petitioner is, any such presumption becomes even less appropriate as grounds*

---

[19] See e.g. *Costa Rica (Republic) v Erlanger* (1876) 3 Ch D 62

> *for ordering security for costs: see Dartmouth Harbour Commrs. v. Mayor of Dartmouth Hardness (3) and the notes in 1 The Supreme Court Practice 1997, para. 23/1–3/13, at 412. Although Ms. Collins (who argued the aspect of the matter for the petitioner) had no instructions to give an undertaking as to costs, I have nothing at all before me to support any suggestion that the Brazilian Government would not ensure that its obligations for costs (to be incurred if its appointed officer proves unsuccessful before this court) would not be honoured. In the interest of comity, I would consider that any presumptions would arise in favour of such obligations being met and not the other way around. The rule in the Dartmouth Harbour Commrs. case applies, a fortiori, to the present circumstances".*

185. As related in [179 (ix)] above, *Cybervest* concerned a petition to wind up a fund incorporated in the Cayman Islands presented by PIFSS which faced a SFC application. In [22]-[23] of his judgment Smellie CJ said:

> *"The wording of [O.23, r.1 (1)] plainly reveals the wide discretion to be exercised in the making of an order. The wording does not admit any judicial policy that would mandate the making of an order simply because the plaintiff is a foreign plaintiff; the requirement that the plaintiff is ordinarily resident outside the jurisdiction is simply a pre-condition to the making of an order under the particular O.23, r. 1(1) (a). It is a precondition just like those stipulated in (b) – (d), the other sub-rules, which are aimed at plaintiffs who may not ordinarily reside out of the jurisdiction. ... I would simply add that discretion is to be exercised on a case-by-case basis, as the rule states, having regard to all the circumstances of the case."*

186. After noting the significant fact that PIFSS had immensely valuable assets (its shares in the fund PIFSS was seeking to have wound up) that were to be regarded as being within the jurisdiction, Smellie CJ went on to say,

> *"Another circumstance, of some weight, is the fact that the petitioner is a state agency of a foreign government of undoubted resources and enjoying a high reputation in the global financial and commercial community. This is relevant insofar as it would tend to negate any concern that the plaintiff would be unlikely to obey an order for costs made in favour of the respondent. To my mind, it also addresses the concern raised by Mr. Farrow, that efforts to enforce an order in Kuwait, if it ever came to that, could be met with a plea of state immunity".*

187. The judge supported his statement in [165] of his judgment that there was a rebuttable presumption that SFC should not be ordered by reason of the plaintiffs being the agent of, and wholly owned by, the State of Kuwait by footnote 87 which reads "*Tasarruf at §23*". However, it is clear that the paragraph of the judgment in *Tasarruf* to which the judge intended to refer was [22] which reads:

> *"Taken together, there is a common practical principle to be discerned from these last cited three cases which is that where the plaintiff is the government (or a state agency) of a foreign state enjoying good standing in the international*

> *community (in particular from this court's point of view, enjoying diplomatic relations with H.M. Government)* **it should be assumed** *as a matter of comity and common sense,* **in the absence of anything to the contrary**, *that it will honour its obligations for costs made against it. Nonetheless, as the question remains one to be decided on a case by case basis in the discretion of the court, an order for security for costs could undoubtedly be made against a foreign state in appropriate circumstances."* [ Emphasis supplied]

188.    It was no doubt in light of the emphasised words in this passage that the judge expressed himself as he did in [165] of his judgment. In our view, with respect to the judge, the Chief Justice is not to be taken here as laying down a principle based on a presumption that was to prevail unless it was rebutted. We say this having regard to the words used in the following sentence in the quoted passage that stress that the court is exercising a broad discretion on a case-by-case basis. It follows, in our opinion, that the judge erred in law in proceeding as he did on the basis that there was a presumption arising from comity and common sense that security for costs should not be awarded against the plaintiffs, although each case will be decided on its own facts.

189.    In our opinion, the approach of the court when dealing with an SFC application against a foreign state or foreign state agency that enjoys good standing in the international community should be that it can treat this as a factor in favour of such of a plaintiff to go into the scales but on the basis that it is just one amongst all the other factors that must be weighed by the court when exercising the discretion conferred upon it.

190.    We also accept Ms Stanley's submission that the judge erred in stating that a foreign plaintiff does not have the burden of establishing that it has fixed and permanent property within the jurisdiction. The judge supported this statement by citing Lightman J's dictum in *Oded Moshe Leyvand v Amnon Barasch et al* [2000] WL 191256 that the court will not infer a real risk that assets within the jurisdiction will be dissipated or moved abroad in the absence of a question over the plaintiff's probity.  Whilst the judge clearly intended this statement to apply to a situation where the evidence showed that a foreign plaintiff had property within the jurisdiction but there was nothing or very little about the property's permanency or freedom from encumbrances, we find it to have been too broadly expressed. Evidence that a foreign plaintiff has valuable property within the jurisdiction will obviously be of relevance but the significance of this evidence will depend on all the facts of the case, including any evidence as to the permanency of the property and its freedom from encumbrances (or the lack of such evidence) and other evidence tending to show that the plaintiff can be trusted to honour an adverse costs order. We also respectfully disagree with Lightman J's dictum in *Oded Moshe Leyland v Amnon Barasch*. In our view, the approach adopted by Butcher J in  PJSC *Tatneft v Bogolyubov* [2019]

Costs LR 977 at [49] and Henshaw J in *Pisante v Logothetis* [2020] 3332 (Comm) at [65]- [66]: "the question is not whether a lack of probity has been shown, but whether there is a real risk that the assets in a Contracting State may no longer be available if and when an asset enforcement arises," is to be preferred.

191.   We turn to Ms Stanley's submission challenging the finding by the judge in [178] that, if the plaintiffs' claims against the defendants all fail, there will be a costs order in respect of which KPA and PIFSS will be jointly and severally liable, the latter having substantial assets within the jurisdiction. Ms Stanley's submission is based on the contention now pleaded in [12] of D1's Defence that KPA'S claim is a nullity because it was not authorised by the Chairman of KPA, who, as a matter of  Kuwaiti law (having regard to KPA's constitution) is the only officer of KPA who can authorise the bringing of claims by the company and who has no authority to delegate this power or to ratify an earlier unauthorised issue of proceedings.

192.   D1's Defence and Counterclaim to KPA's Claim was served and filed on 31 January 2022, over three months after the hearing below. In her skeleton argument for this appeal, Ms Stanley submits that, "As recorded in the evidence [the fourth affidavit of Mr Lewis] and then set out in the GP's Defence at [12], there is a major factual dispute in this case as between KPA and the Appellants as to whether these proceedings have been commenced and continued on behalf of KPA with its authority (there being no power under Kuwaiti law to ratify proceedings if brought without authority.)"

193.   Attention was first drawn to the significance of the plaintiffs being joint and several debtors under an adverse costs order in paragraph 20 of Mr Florent's third affidavit dated 27 August 2021, where he deposed that he had alerted PIFSS to the possibility that, owing to the joint and several nature of costs orders in the Cayman Islands, it was possible that PIFSS would be required to satisfy any costs order that may be made in these proceedings in full from its own resources.

194.   In [42] – [47] of his fourth affidavit dated 17 September 2021, Mr Lewis deposed that the FFP Directors had been sent an opinion of Mr Omar Al Qahtani of the Turkey office of Al Tamimi & Co ("the Al Tamimi Opinion") stating that only the Chairman of KPA had authority to approve the issuance of proceedings by KPA and this authority was not capable of being delegated; nor could an unauthorised issuance of proceedings be ratified by the KPA's Chairman. Reference was also made to the suspension of Mr Al Sabah on 24 August 2021 from his position as Director General KPA.

195.    Curious as to how this lack of authority contention was deployed below, the Court has perused the skeleton arguments relied on before the judge and the transcript of the oral submissions advanced below by Ms Stanley for D1, Mr Chapman for D2 – D3 and Mr Allison for the plaintiffs.

196.    In [245] of his skeleton argument for the hearing below, Mr Allison contended that PIFSS had sufficient assets within the jurisdiction to cover any costs order that might be made against the plaintiffs in respect of which they would be jointly and severally liable.

197.    Mr Chapman did not contend in either his skeleton argument or his oral opening submissions that one of the consequences of the Tamimi Opinion was that it was not inevitable that if the plaintiffs' claims were dismissed they would both be jointly and severally liable for the costs of the proceedings.

198.    Ms Stanley also did not contend in her skeleton argument or in her opening or closing submissions that, in light of the Tamimi Opinion, KPA's claim was a nullity so that it could not be said that it was inevitable that if KPA's and PIFSS's respective claims were dismissed, the plaintiffs would be jointly and severally liable for the proceedings. Instead, she contended that the effect of the Tamimi Opinion was that it undermined the plaintiffs' contention that an adverse costs order would be enforceable in Kuwait and undermined KPA's reliance on assurances given by KPA's Director General, Mr Al Sabah, both before and after he was suspended from that office, that KPA would honour any costs order made against it.

199.    In his oral submissions in reply, Mr Allison observed that the defendants had not taken the point that it was only one of the plaintiffs, PIFSS, that had assets within the jurisdiction and contended that, even if it had been taken, as Mr Florent explained in paragraph 30 of his third affidavit, PIFSS was well aware of the joint and several nature of costs orders so that it may have to pay the whole sum from its own resources. Mr Allison also submitted that the "lack of authority issue" was not a live issue in the proceedings before the Court because there had been no application to strike out KPA's claim on that basis or to seek the determination of a preliminary issue.

200.    In the course of his reply submissions made ahead of Ms Stanley's reply submissions, Mr Chapman accepted that, if the plaintiffs' claims were dismissed, the likely costs order would be a joint and several one, subject to the possibility that PIFSS might well argue that joint and several liability should not apply if KPA's claim was found to have been brought without authority.

201.    Whilst Ms Stanley had expressly adopted Mr Chapman's opening oral submissions when she made her own opening oral submissions, she did not adopt the same course when she delivered her oral closing submissions, in the course of which she said she was going to deal just with the Al Tamimi/authority/suspension point and the point she wished to make was not the lack of authority to commence KPA's proceedings but the suspension of Mr Al Sabah as Director General of KPA and the resulting loss of his authority to provide information to Mr Florent upon which Mr Florent had purported to rely in advancing KPA's case.[20]

202.    In our judgment, since the point now taken by D1[21] as to the impact of the lack of authority contention on what the judge said in [178] of his judgment was not taken on behalf of D1 below, when it plainly could have been, it is not open to D1 to take the point in this appeal in support of D1's case that the judge's decision refusing the Defendants' SFC applications should be set aside.

203.    In our judgment, the errors of the judge identified in [188] and [190] above played such a significant role in the exercise of his discretion (see eg [155], [165], [166] and [176]) that his decision must be set aside.

204.    In these circumstances, it is open to us to exercise the discretion conferred by GCR O. 23, r. 1 (1) and since we have before us all the evidence and the parties' skeleton arguments that were before the judge and the transcript of the oral submissions the judge heard on the SFC issue, we propose to decide whether SFC should or should not be ordered against each of the plaintiffs.

205.    We proceed on the assumption that the defendants are correct in their submission that there would be very real difficulties indeed in enforcing in Kuwait costs orders made against the plaintiffs if their claims against the defendants are dismissed.

206.    Although it is a necessary condition for the ordering of SFC that there is a real risk that an adverse costs order would not be enforced against the postulated foreign plaintiff in his/its home jurisdiction, this is not a sufficient condition for ordering SFC whatever the other circumstances of the case. Instead, it is open to the court, if there is sufficient evidence to support such a conclusion, to find that there is no real risk that the plaintiff will not honour an adverse costs order and for this reason to decline to order SFC. In our judgment, this is such a case having regard to the following matters.

---

[20] Day 5, p.139
[21] See paragraph 180 (iv) above

207.   As is common ground, the plaintiffs are agencies of a foreign state, Kuwait, which is of good standing in the international community and enjoys diplomatic relations with HM Government. Further, as related above, an instrumentality of the State of Kuwait, the DLAL, acting by the Head of its International Arbitration and Litigation Sector, sent a formal letter to the judge on behalf not only of KPA and PIFSS but also the State of Kuwait that reads in relevant part:

> "Dear Sirs.
>
> Cause No. FSD 236 of 2020 ( RPJ ) - ( l ) Kuwait Ports Authority and (2 ) The Public institution for Social Security v ( 1 ) Port Link GP Ltd ., (2) Mark Eric Williams, ( 3 )  Wellspring Capital Group, Inc and (4) KGL Investment Company Asia (the "Proceedings")
>
> I am the Head of the International Arbitration and Litigation Sector for the Department of Legal Advice and Legislation (the "Department") of the State of Kuwait.
>
> One of the responsibilities of the Department is to act as legal adviser to the State of Kuwait as well as to certain State entities and/or incarnations of the State. In particular, the Department currently advises and represents each of the Kuwait Ports Authority ("KPA") and The Public Institution for Social Security ("PIFSS") in connection with the Proceedings.
>
> I hereby confirm, on behalf of the Department, that KPA and PIFSS are wholly owned by the State of Kuwait and bring to your attention the attached letters, duly signed by authorised representatives of KPA and PIFSS confirming that they will comply with any final and binding costs orders made against them in the Proceedings ("Costs Orders").
>
> We respectfully request, on behalf of KPA and PIFSS [and the State of Kuwait][22] that the Grand Court take these letters into consideration in determining whether or not KPA and/or PIFSS should be required to provide security for costs in the Proceedings".
>
> [Emphasis supplied]

208.   The letters (also addressed to the judge) that were sent with the DLAL letter on behalf of PIFSS and KPA were in common form. In relevant part, they read:

> "Dear Sirs
>
> We refer to the abovementioned Proceedings before the Grand Court of the Cayman Islands, in which Kuwait Ports Authority ("KPA") [PIFSS] is a Plaintiff.
>
> Without prejudice to the exercise of KPA's [PIFSS's] legal rights, including without limitation its right to appeal, or to seek leave to appeal, any decision of the Grand Court, we confirm that KPA will comply with any final and binding

[22] The brackets do not signify that the words they contain were not part of the original letter, they were.

> costs order(s) made against KPA in the course of the Proceedings ("Costs Orders").
>
> Yours faithfully"

209.    The KPA letter is signed by Mr Al Sabah in his capacity as KPA's Director General. The letter is dated 27 May 2021, which was at least two months before Mr Al Sabah was suspended from this office on 24 August 2021.

210.    Ms Stanley criticises the judge for placing the reliance he did on these letters. Focusing on the words, "Without prejudice to the exercise of KPA's [PIFSS's] legal rights, including without limitation to its right to appeal, or to seek leave to appeal, any decision of the Grand Court", she submits that the letters were merely "comfort letters"  and further contends that the judge should have found there remained a significant risk that an adverse costs order would not be paid because the confirmation expressed in the letters could only be enforced by committal or sequestration proceedings in the jurisdiction and such an order would not be enforceable in any other court; nor was it clear that the comfort letters would be enforced by the Courts of Kuwait.

211.    We do not accept these criticisms. In our judgment the three letters amount to a representation intended to be relied on by the Grand Court that the plaintiffs would honour any final and binding costs order made against them and we regard the letters as providing strong support for the conclusion that there is no real risk that such costs orders would not be paid. We say this because we have no doubt that the State of Kuwait and its agencies, KPA and PIFSS, would suffer very significant reputational damage if the plaintiffs were to depart from the confirmations given in the letters. Also, further support for this "no real risk" conclusion comes from the evidence as to the financial resources of the plaintiffs that shows that each could be expected to have the ready funds to honour an adverse costs award.

212.    As related by the judge, the unchallenged evidence is that PIFSS, which administers independently Kuwait's pension fund for all Kuwaiti citizens in the workforce, had a global investment asset portfolio worth approximately USD 133.7 billion as at 31 March 2021 and earned a profit for the period March 2020 to December 2020 of USD 18.9 billion. Included in these assets is its investment in the Jermyn Street Fund, a Cayman Islands ELP, which was valued at EUR 35,074,942 as at 31 March 2021. It is true that PIFSS is likely to be entitled to redeem this investment under the partnership agreement and to do so without publicity but there are no reasons to think that PIFSS would set about redeeming its investment and transferring the proceeds out of the jurisdiction to avoid having to satisfy a costs order: accordingly its existence provides reassurance that PIFSS is going to have amply sufficient resources over at

least the next five to six years to meet an adverse costs order should its claims against the Defendants be dismissed.

213.    When setting out KPA's financial details that are recorded in [179 (xv)] above when relating the his reasons why the SFC applications should be dismissed, the judge was relying on the evidence given in Mr Florent's Third Affidavit which was based in part on information that had come from Mr Al Sabah. Ms Stanley submits that this evidence was and is inadmissible because it is hearsay and Mr Florent's Third Affidavit was sworn on 27 August 2021 after Mr Al Sabah was suspended on 24 August 2021. We are not impressed by this submission. Even assuming that the information from Mr Al Sabah was provided to Mr Florent after Mr Al Sabah had been suspended (which we think unlikely), Mr Al Sabah would have been in a position to provide reliable figures showing that KPA's profit for the financial year 2020 – 2021 was KWD 56,450,000, the equivalent to c.USD 187,522,553 (based on a foreign exchange currency conversion of KWD 1: USD 3.32 as at 9 August 2021). Further, Mr Florent exhibits at pp. 171 -172 of MEF-4 a public announcement made by KPA on 4 April 2021 that KPA's profit for the financial year 2020 – 2021 was KWD 56,450,000.

214.    Apart from its interest in the assets held on trust for it and TPF by the GP, KPA has no assets within the jurisdiction but it is clear to us from the level of profit earned by KPA for the year 2020 – 2021 that it is extremely likely to have ample resources to honour an adverse costs order over the next five to six years.

215.    It was argued below by the defendants that the plaintiffs could not be trusted to honour an adverse costs order on two particular grounds: the attempts by the Attorney General of Kuwait to obtain the monies that had been paid into the account held at the Noor Bank that were part of the proceeds from the sale of Clark City, TPF's asset in the Philippines; and the manner in which the defendants had conducted the proceedings, including the bringing of proceedings against Walkers, the defendants' previous attorneys, the bringing of derivative claims for proceeds that would be paid to the plaintiffs and the plaintiffs' alleged refusal to compromise the SFC issue. These contentions are not advanced by Ms Stanley. Had they been, they would have found no favour with the Court.

216.    For the reasons given in [205] – [215] above, we find that there is no real risk that the plaintiffs will not honour their confirmations that they will pay any final and binding costs order made against them and accordingly we order that the plaintiffs should not be ordered to provide security for costs.

217.    It follows that D1's appeal against the judge's refusal to order SFC must be and is dismissed.

**Summary of conclusions**

218.    We would summarise our conclusions as follows:

(i)      D1's appeal against the refusal of the judge to strike out the plaintiffs' direct claims against D1 is dismissed.

(ii)     D1's appeal against the refusal of the judge to strike out the plaintiffs' derivative claims against D1 is allowed and the claims are struck out.

(iii)    The appeals of D2, D3 and D4 against the refusal of the judge to strike out the plaintiffs' derivative claims against them are dismissed.

(iv)    The appeal of D1 against the refusal of the judge to order the plaintiffs to provide security for costs is dismissed.

219.    Our preliminary view as to costs is:

(i)      There should be no order as to costs in respect of D1's strike out appeal. Although D1 succeeded in having the derivative claim against it struck out, it did not succeed on its argument that the plaintiffs' claims were misconceived because they were not in the form of an application for partnership accounts.

(ii)     D2, D3 and D4 should pay the costs of their strike out appeals.

(iii)    D1 should pay the costs of its SFC appeal.

(iv)    The parties are at liberty to contend for different costs orders than those set out in (i) – (iii) but they must serve (concise) written submissions in support thereof within 10 days of the issuance of this judgment.

**Sir Michael Birt JA**

220.    I agree.

**Sir Jack Beatson JA**

221.    I also agree.