1 Ch.            Prudential Assurance v. Newman Industries            Vinelott J.

**A**  members of the class who share a common interest in obtaining the declarations I have outlined are shareholders other than the second and fourth defendants as at July 29.  A person coming within that class will be entitled to rely on the declarations as res judicata, but will still have to establish damage in a separate action.

I therefore propose to allow the amendments in principle, but to invite Mr. Caplan to consider their form in the light of the judgment I have just **B**  given.

> *Leave to amend the writ and statement*
> *of claim in form appearing in judg-*
> *ment.*
> *Leave to appeal with extension of*
> *time sine die.*

**C**  Solicitors: *C. F. Whitehorn; Simmons & Simmons; Clifford-Turner.*

T. C. C. B.

———

**D**

PRUDENTIAL ASSURANCE CO. LTD. *v.*

NEWMAN INDUSTRIES LTD. AND OTHERS (NO. 2) †

[1976 P. No. 112]

**E**  1979   June 14, 15, 18–22, 25–29;                     Vinelott J.
       July 2, 3, 5, 6, 9–13, 16–18, 23, 25–27;
       Oct. 2–5, 8–12, 15–17, 22–26, 29–31;
       Nov. 1, 2, 5, 6, 9, 21–23, 26–30;
       Dec. 3–7, 10–12;

       1980   Feb. 18, 19

**F**  *Company—Shareholder—Rights against company or directors—*
*Minority shareholder's action—Directors deceiving majority of*
*shareholders into voting to acquire assets of another company*
*—Directors having no control over voting rights—Whether*
*minority shareholder entitled to bring action on behalf of*
*itself, the company and other shareholders suffering damage*

B was a director of N Ltd. and T.P.G. and he became the **G**  chairman of N Ltd. in 1973. L was a director of T.P.G. and he became a director of N Ltd. in 1974.   They also had a wholly owned company, S Ltd., which owned 35 per cent. of T.P.G. shares. Between 1972 and 1974, T.P.G. acquired the share capital or substantial holdings in a number of companies, including a 25 per cent. holding of the issued ordinary shares of N Ltd.  Where possible those acquisitions were financed by the issue of shares in T.P.G. but nearly £1,000,000 had been **H**  raised by borrowings. By the end of 1974, due partly to the decline of stock market prices, an overall deficiency of collateral to cover such borrowings had arisen and the financial

EXHIBIT

14

exhibitsticker.com

† At the time of going to press argument was proceeding in the Court of Appeal.

position of T.P.G. had become desperate. As S Ltd. was not in
a position to lend moneys to T.P.G., B and L conspired to use    A
£215,950 belonging to N Ltd. to aid T.P.G. without the
knowledge or authority of the board of directors of N Ltd.
However the use of that money did not alleviate T.P.G.'s
underlying problems.

B and L then embarked upon a plan by which B prepared
a memorandum (" the strategy document ") for consideration
by the board of directors of N Ltd. which recommended, inter   B
alia, a transaction whereby N Ltd. would acquire all the T.P.G.
assets, with the exception of its shareholding in N Ltd. and an
interest in a loan of £100,000 made by T.P.G. to S Ltd. The
consideration for the proposed transaction was to be the
assumption by N Ltd. of the liabilities of T.P.G. and a cash
payment of £325,000. The strategy document contained state-
ments known by B and L to be false and misleading. The
strategy document was supported by a pro forma balance sheet   C
of T.P.G. which represented the net assets to be acquired at a
value of not less than £350,000. The balance sheet was known
by B and L to be false and misleading in important respects.
By those means the board of directors of N Ltd., with one
dissentient member, were induced by B and L to approve the
transaction in principle on March 17, 1975. Shortly afterwards
the Stock Exchange Quotations Department was falsely
informed that the board of directors had agreed to the trans-   D
action subject to obtaining an independent valuation. The
valuation was prepared by a member of the firm of auditors
of N Ltd. relying largely on information provided by L, but
certain facts were either misrepresented or concealed from him.
The initial valuation of £235,000 was increased to £325,000
following persuasion by L.  B and L then procured the
execution of an agreement to acquire the appropriate assets of
T.P.G. knowing that the board of directors of N Ltd. had not   E
agreed to the proposed terms.  A tricky and misleading circular
was prepared and circulated to N Ltd.'s shareholders and at an
adjourned extraordinary general meeting held on July 29, 1975,
a resolution approving the transaction was agreed, after a poll,
by a small majority, the T.P.G. shareholding not voting.  The
opposition had been led by the plaintiff, a company holding
3·2 per cent. of the ordinary shares in N Ltd.                  F

The plaintiff brought an action, which after amendment to
the pleadings, claimed declaratory relief and as against B, L and
T.P.G. damages on behalf of the plaintiff itself, N Ltd. and all
shareholders of N Ltd. on July 29, 1975, who like the plaintiff
had suffered damage and were entitled to relief. The plaintiff
was thus claiming in a direct capacity, in a derivative action on
behalf of N Ltd., and in a representative capacity on behalf of
the shareholders.                                              G

On the questions whether the plaintiff could bring such an
action and whether they were entitled to the relief claimed: —

Held, (1) that B and L had conspired knowingly and wrong-
fully to injure N Ltd. and indirectly its shareholders, and had
as a result of the conspiracy caused N Ltd. to acquire T.P.G.'s
assets for £445,000 more than N Ltd. need have paid; that in
consequence the shareholders had suffered damage since          H
increased indebtedness arising from the transaction must
necessarily have reduced net earnings and thereby have affected
the prices paid for the shares of N Ltd. (post, pp. 294E—295C,
297H—298A, 302C–D, E—303D).

**1 Ch.**                 Prudential Assurance v. Newman Industries (No. 2)

A

*McConnel* v. *Wright* [1903] 1 Ch. 546, C.A. applied.

(2) That since the direct, derivative and representative claims were all founded on the allegation that B and L had conspired to injure N Ltd. and its shareholders by procuring that the shareholders voted in favour of a resolution by which the agreement to acquire T.P.G.'s assets became unconditional, there was no objection to those claims being joined in one action (post, p. 304c–e).

B

(3) That, although B and L did not have control of N Ltd., their actions had deceived all but one director to believe that they had adequate independent advice on the feasibility of acquiring the assets of T.P.G. and firmly to support and approve of the transaction; that, in those circumstances, there was no real prospect that the question whether proceedings should be brought by the company would ever be put to the shareholders in a way that would enable them to exercise a

C

proper judgment and, therefore, justice required that the court should entertain a claim by a minority shareholder and make an order for recovery of damage in the derivative action on behalf of N Ltd. against B, L and T.P.G. (post, pp. 326g—327c).

*Atwool* v. *Merryweather* (1867) L.R. 5 Eq. 464 and *Burrows* v. *Becker* (1967) 63 D.L.R. (2d) 100 applied.

D

*Foss* v. *Harbottle* (1843) 2 Hare 461; *Burland* v. *Earle* [1902] A.C. 83, P.C.; *Alexander* v. *Automatic Telegraph Co.* [1900] 2 Ch. 56, C.A.; *Edwards* v. *Halliwell* [1950] 2 All E.R. 1064, C.A. and *Daniels* v. *Daniels* [1978] Ch. 406 considered.

*Pavlides* v. *Jenson* [1956] Ch. 565 and *Heyting* v. *Dupont* [1964] 1 W.L.R. 843 distinguished.

E

The following cases are referred to in the judgment:

*Alexander* v. *Automatic Telephone Co.* [1900] 2 Ch. 56, C.A.
*Atwool* v. *Merryweather* (1867) L.R. 5 Eq. 464.
*Birch* v. *Sullivan* [1957] 1 W.L.R. 1247; [1958] 1 All E.R. 56.
*Burland* v. *Earle* [1902] A.C. 83, P.C.
*Burrows* v. *Becker* (1967) 63 D.L.R. (2d) 100.
*Clinch* v. *Financial Corporation* (1868) L.R. 5 Eq. 450.

F

*Cook* v. *Deeks* [1916] 1 A.C. 554, P.C.
*Daniels* v. *Daniels* [1978] Ch. 406; [1978] 2 W.L.R. 73; [1978] 2 All E.R. 89.
*East Pant Du United Lead Mining Co. Ltd.* v. *Merryweather* (1864) 2 Hem. & M. 254.
*Edwards* v. *Halliwell* [1950] 2 All E.R. 1064, C.A.
*Foss* v. *Harbottle* (1843) 2 Hare 461.

G

*Gething* v. *Kilner* [1972] 1 W.L.R. 337; [1972] 1 All E.R. 1166.
*Gray* v. *Lewis* (1873) 8 Ch.App. 1035.
*Heyting* v. *Dupont* [1963] 1 W.L.R. 1192; [1963] 3 All E.R. 97; [1964] 1 W.L.R. 843; [1964] 2 All E.R. 273, C.A.
*Kerry* v. *Maori Dream Gold Mines Ltd.* (1898) 14 T.L.R. 402, C.A.
*McConnel* v. *Wright* [1903] 1 Ch. 546, C.A.
*North-West Transportation Co.* v. *Beatty* (1887) 12 App.Cas. 589, P.C.

H

*Pavlides* v. *Jensen* [1956] Ch. 565; [1956] 3 W.L.R. 224; [1956] 2 All E.R. 518.
*Regal (Hastings) Ltd.* v. *Gulliver* [1942] 1 All E.R. 378; (Note) [1967] 2 A.C. 134, H.L.(E.).

*Russell* v. *Wakefield Waterworks Co.* (1875) L.R. 20 Eq. 474.
*Shaw (John) & Sons (Salford) Ltd.* v. *Shaw* [1935] 2 K.B. 113, C.A.      A
*Sproule, In re* (1886) 12 S.C.R. 140.
*Stroud* v. *Lawson* [1898] 2 Q.B. 44, C.A.
*Turquand* v. *Marshall* (1869) L.R. 4 Ch.App. 376.
*Wallersteiner* v. *Moir (No. 2)* [1975] Q.B. 373; [1975] 2 W.L.R. 389;
    [1975] 1 All E.R. 849, C.A.

                                                                          B

The following additional cases were cited in argument:

*Allen* v. *Flood* [1898] A.C. 1 H.L.(E.).
*Baillie* v. *Oriental Telephone and Electric Co. Ltd.* [1915] 1 Ch. 503, C.A.
*Bamford* v. *Bamford* [1970] Ch. 212; [1969] 2 W.L.R. 1107; [1969] 1 All
    E.R. 969, C.A.
*Bank voor Handel en Scheepvaart N.V.* v. *Slatford* [1953] 1 Q.B. 248;
    [1952] 2 All E.R. 956, C.A.                                           C
*Barnes* v. *Addy* (1874) 9 Ch.App. 244.
*Beddoe, In re* [1893] 1 Ch. 547, C.A.
*Bedford (Duke of)* v. *Ellis* [1901] A.C. 1, H.L.(E.).
*Beeching* v. *Lloyd* (1855) 3 Drew. 227.
*Belmont Finance Corporation Ltd.* v. *Williams Furniture Ltd.* [1979] Ch.
    250; [1978] 3 W.L.R. 712; [1979] 1 All E.R. 118, C.A.
*Burrows* v. *Becker* (1968) 70 D.L.R. (2d) 433.                          D
*Carl Zeiss Stiftung* v. *Herbert Smith & Co. (No. 2)* [1969] 2 Ch. 276; [1969]
    2 W.L.R. 427; [1969] 2 All E.R. 367, C.A.
*Cavendish Bentinck* v. *Fenn* (1887) 12 App.Cas. 652, H.L.(E.).
*Chillingworth* v. *Chambers* [1896] 1 Ch. 685, C.A.
*Clemens* v. *Clemens Bros. Ltd.* [1976] 2 All E.R. 268.
*Competitive Insurance Co.* v. *Davies Investments Ltd.* [1975] 1 W.L.R.
    1240; [1975] 3 All E.R. 254.                                          E
*Cotter* v. *National Union of Seamen* [1929] 2 Ch. 58, C.A.
*Dominion Cotton Mills Co. Ltd.* v. *Amyot* [1912] A.C. 546, P.C.
*Farrar* v. *Farrars Ltd.* (1888) 40 Ch.D. 395, C.A.
*Foley* v. *Burnell* (1783) 1 Bro.C.C. 274; (1785) 4 Bro.Parl.Cas. 319,
    H.L.(E.).
*Goldex Mines Ltd.* v. *Revill* (1974) 54 D.L.R. (3d) 672.
*Harmer* v. *Armstrong* [1934] Ch. 65, C.A.
*Hirsche* v. *Sims* [1894] A.C. 654, P.C.                                 F
*Hobbs* v. *Tinling* [1929] 2 K.B. 1, C.A.
*Hogg* v. *Cramphorn Ltd.* [1967] Ch. 254; [1966] 3 W.L.R. 995; [1966]
    3 All E.R. 420.
*Karak Rubber Co. Ltd.* v. *Burden (No. 2)* [1972] 1 W.L.R. 602; [1972]
    1 All E.R. 1210.
*Kaye* v. *Croydon Tramways Co.* [1898] 1 Ch. 358, C.A.
                                                                          G
*Macaura* v. *Northern Assurance Co. Ltd.* [1925] A.C. 619, H.L.(I.).
*MacDougall* v. *Gardiner* (1875) 1 Ch.D. 13, C.A.
*Markt & Co. Ltd.* v. *Knight Steamship Co. Ltd.* [1910] 2 K.B. 1021, C.A.
*Mason* v. *Harris* (1879) 11 Ch.D. 97, C.A.
*Menier* v. *Hooper's Telegraph Works* (1874) 9 Ch.App. 350.
*Mosely* v. *Koffyfontein Mines Ltd.* [1911] 1 Ch. 73, C.A.
*Moxham* v. *Grant* [1900] 1 Q.B. 88, C.A.                                H
*New Sombrero Phosphate Co.* v. *Erlanger* (1877) 5 Ch.D. 73, C.A.; (1878)
    3 App.Cas. 1218, H.L.(E.).
*Nocton* v. *Lord Ashburton* [1914] A.C. 932, H.L.(E.).

*Normandy* v. *Ind Coope & Co. Ltd.* [1908] 1 Ch. 84.

A   *Parke* v. *Daily News Ltd.* [1962] Ch. 927; [1962] 3 W.L.R. 566; [1962] 2
         All E.R. 929.

  *Parker* v. *Lewis* (1873) 8 Ch.App. 1035.

  *Pratt* v. *British Medical Association* [1919] 1 K.B. 244.

  *Pritchard* v. *Briggs* [1980] Ch. 338; [1978] 2 W.L.R. 317; [1978] 1 All
        E.R. 886; [1979] 3 W.L.R. 868, C.A.

  *Quinn* v. *Leathem* [1901] A.C. 495, H.L.(I.).

B   *Radstock Co-operative and Industrial Society Ltd.* v. *Norton-Radstock
        Urban District Council* [1968] Ch. 605; [1968] 2 W.L.R. 1214; [1968]
        2 All E.R. 59, C.A.

  *Rex* v. *Lord Kylsant* [1932] 1 K.B. 442, C.C.A.

  *Selangor United Rubber Estates Ltd.* v. *Cradock (No. 3)* [1968] 1 W.L.R.
        1555; [1968] 2 All E.R. 1073.

  *Spokes* v. *Grosvenor and West End Railway Terminus Hotel Co. Ltd.*
C       [1897] 2 Q.B. 124, C.A.

  *Tiessen* v. *Henderson* [1899] 1 Ch. 861.

  *Travis* v. *Milne* (1851) 9 Hare 141.

  *Vandepitte* v. *Preferred Accident Insurance Corporation of New York*
        [1933] A.C. 70, P.C.

  *Ving* v. *Robertson & Woodstock Ltd.* (1912) 56 S.J. 412.

D   *West Jewell Tin Mining Co., In re* (1879) 10 Ch.D. 579, C.A.

  *Woking Urban District Council (Basingstoke Canal) Act* 1911, *In re* [1914]
        1 Ch. 300, C.A.

  *Yeatman* v. *Yeatman* (1877) 7 Ch.D. 210.

ACTION

  By a writ and re-amended statement of claim, the plaintiff, Prudential
E Assurance Co. Ltd. (" Prudential "), sued (i) on behalf of itself and all the
other shareholders of the first defendant, Newman Industries Ltd.
(" Newman "), other than the second defendant, Alan Frank Bartlett, and
the fourth defendant, Thomas Poole & Gladstone China Ltd. (" T.P.G."),
(ii) in the plaintiff's personal capacity, and (iii) on behalf of all the share-
holders of Newman on July 29, 1975, who like the plaintiff had suffered
damage and were entitled to damages. Prudential claimed, inter alia, a
F declaration that the circular sent by Newman to its shareholders and signed
by the defendant Bartlett, as chairman and chief executive of Newman
was and had at all times been misleading and/or tricky; damages against
Bartlett and the third defendant, John Knox Laughton, for conspiracy and
breach of duty; and further or in the alternative as against the fourth
defendant T.P.G., a declaration that in entering into the agreement of
G June 3, 1975, or in the alternative in receiving the money under the terms
of the agreement when it knew or ought reasonably to have known that
for Newman to enter into the agreement upon the terms on which it did
so involved a conspiracy and breach of duty on the part of the defendants
Bartlett and Laughton, T.P.G. (a) acquired the benefit of the agreement
as constructive trustee for Newman and, accordingly, held the benefit of the
H agreement on trust for Newman and (b) was liable to account to Newman
for the full amount of the loss suffered by Newman as a result of the
acquisition of the benefit.

  By their defences, the defendants denied the allegations made by

Prudential and claimed that Prudential was not entitled to any of the
relief claimed. They sought to have heard as a preliminary issue whether
Prudential, as a minority shareholder in Newman, was entitled under the
rule in *Foss* v. *Harbottle* (1843) 2 Hare 461 to maintain the claim against
them. On June 28, 1979, Vinelott J. refused the defendants' application and
gave Prudential leave to amend the writ and statement of claim: see
ante, p. 229.

The facts are stated in the judgment.

*Richard Scott Q.C.*, *Alan Sebestyen* and *Judith Jackson* for the
second and third defendants, Bartlett and Laughton.   There should be
a preliminary issue.   The plaintiff has no locus standi, as a minority
shareholder in Newman Industries Ltd., to bring an action in a deriva-
tive form claiming unliquidated damages against Newman's directors,
Bartlett and Laughton, or against the fourth defendants, T.P.G.   The
proper plaintiff in a claim for injury to a company is the company itself.
The only exception is where the wrongdoers have control of the votes
and are preventing the launching of an action against themselves on
the company's behalf.   An exception was created to the rule in *Foss*
v. *Harbottle* (1843) 2 Hare 461, to cover that sort of case.   *Birch* v.
*Sullivan* [1957] 1 W.L.R. 1247 shows that where a misfeasance action
is brought by a minority shareholder on behalf of himself and other
shareholders in which the company and the remaining shareholders are
defendants, the statement of claim must, if it is not to be demurrable,
contain the necessary allegations showing that the action could not
have been brought in the name of the company and the facts support-
ing such a claim must be proved at the trial.   In *Heyting* v. *Dupont*
[1964] 1 W.L.R. 843, the Court of Appeal upheld the decision of
Plowman J. to the effect that since there was no allegation in that case
of ultra vires or of fraud, or of the appropriation of assets in fraud of the
minority, the court lacked jurisdiction to entertain the plaintiff's claim.
In the present case there is no allegation that Bartlett and Laughton were
in control of Newman either at board level or in general meeting.   Con-
siderations of justice and convenience require that the plaintiff's right to
bring the action should be decided at an early stage, as a preliminary
issue.   The only circumstances in which an action for damages can be
brought in a company's name by a minority shareholder is where the
wrongdoers are in a position to stifle, or are in fact stifling, the bringing
of an action.   It can be done in some cases where the company's property
is being withheld or is being wrongfully conveyed away, and something
which is ultra vires can also be prevented.

The existing statement of claim is demurrable and no amendment can
cure it, but even if an amendment were possible that is no reason why
the matter should not be dealt with by way of preliminary point, because
the defendants are entitled to have the case against them properly pleaded
before the case starts.   The court should therefore direct the trial of a
preliminary issue.

Generally preliminary points are decided on agreed facts: the pleadings
can of course be referred to, but the plaintiff would not be entitled to go

A   outside his pleading unless referring to something which was common ground.

    *Ian Edwards-Jones Q.C.*\* and *Robert Reid* for the first defendant, Newman. The company, Newman, is in an ambivalent position. The proceedings are brought by Prudential on Newman's behalf, but the board of Newman is concerned lest the company should be killed by kindness. The present board's view is that it is quite contrary to the company's

B  interests that the transaction, of acquiring T.P.G.'s assets, should be rescinded or criticised. The board therefore wishes to support the request for the trial of a preliminary issue, so that the action may be disposed of as speedily as possible.

    *Leonard Caplan Q.C.*, *Peter Curry Q.C.*, *Philip Heslop* and *John Brisby* for the plaintiff. Prudential has nothing to gain personally; the

C  action is brought on behalf of shareholders less financially equipped to fight an expensive action than Prudential, and because there are matters which Prudential considers should be exposed in the public interest. If a preliminary point is to be decided it should always be a point capable of decision without evidence, and such that whatever the evidence the point of law should be conclusive against the plaintiff. It

D  is inappropriate where the nature of the evidence indicated by the pleading may have a bearing on the legal question to be decided. If perchance the existing statement of claim were held to be defective, Prudential would seek an amendment, and if that were allowed it would be seen that the trial of a preliminary issue in this case would be inappropriate.

    In *Radstock Co-operative and Industrial Society Ltd.* [1968] Ch. 605,

E  624, Harman L.J. protested against the use of preliminary point procedure, in place of a motion to strike out, because it was unsatisfactory for the court to have to deal with a matter without evidence, and at p. 632 Sachs L.J. stated that the facts on which a preliminary issue was to be decided should be clearly ascertainable. If there had been a motion to strike out in the present case, and the pleadings were found to be amiss, an amendment would have been permitted.

F     The action is both derivative, on behalf of Newman, for injury done to the company, and personal for injury done to Prudential as a shareholder, and for other shareholders possibly, in a representative capacity. The reason for the rule in *Foss* v. *Harbottle*, 2 Hare 461, is the court's disinclination to become involved in the internal disputes and administration of companies, unless there is a good reason for so doing in exceptional

G  cases. A personal action against directors, permitted to a shareholder for injury to himself and/or other shareholders, though commonly spoken of as an exception to the rule in *Foss* v. *Harbottle*, is strictly not an exception at all, because the rule relates, strictly, only to the derivative action. Apart from special exceptions, namely for declarations that directors have acted ultra vires or that purported resolutions are invalid, there is only one other exception to the rule, that the rule does not

H  operate where justice otherwise requires, an instance being where there

    \* Reporter's note. Mr. Edwards-Jones ceased to appear on behalf of Newman after July 31, 1979, on his appointment as a Commissioner for National Insurance.

has been a fraud on a minority. This point emerges in the judgment of
Wigram V.-C. in *Foss* v. *Harbottle* itself. *Russell* v. *Wakefield Waterworks
Co.* (1875) L.R. 20 Eq. 474, 480, emphasises that the rule is not universal,
and must give way to the necessity for the court to do justice. *Baillie* v.
*Oriental Telephone and Electric Co. Ltd.* [1915] 1 Ch. 503, shows that
an individual shareholder can maintain an action where there had not
been full and frank disclosure to shareholders of the facts on which they
had been asked to vote. *Daniels* v. *Daniels* [1978] Ch. 406 shows that the
needs of justice may require that a shareholder should be allowed to sue
a director in the company's name, even though there was no fraud on the
minority. Justice requires that a minority shareholder should be allowed
to sue wherever there is reason to think that a decision on whether the
company should bring proceedings against the directors for a wrong done
to the company is one which cannot justly be left to the shareholders in
general meeting.

If the court had grounds for thinking that either honesty or full
information as to the facts were lacking to the shareholders in reaching
their decision, the court would not drive a minority shareholder from the
seat of judgment. Until the court hears the evidence, it cannot say that
the requirements of justice are not paramount, over the technical rule in
*Foss* v. *Harbottle,* 2 Hare 461. The question at issue here is neither one
of ultra vires, nor of the invalidity of any resolution, but whether pursuit
of delinquent directors should be left to the company in general meeting,
where the shareholders, because of a lack of full information, conduced
to by the directors, might decide not to sue. The plaintiff's pleaded case
alleges that two directors conspired to procure the issue by the company
of a tricky and misleading circular in order to deceive the shareholders.
The evidence might have a bearing on whether the rule in *Foss* v.
*Harbottle* applied, and therefore manifestly that question should not be
tried as a preliminary issue in advance of the evidence. The onus of
showing that the evidence could not conceivably have a bearing on the
preliminary issue rests on the defendants. The evidence may lead the
court to conclude that the technique of deception involved in producing
the circular was so sophisticated and devious that its exposure would have
been impossible without extended discovery. The circular achieved its
purpose so that the resolution benefiting the conspirators was duly passed.
The question therefore is whether there was any real prospect of the
shareholders deciding that the conspirators should be sued for their
delinquency. Without the aid of discovery in an action there was no way
in which the shareholders' minds could be disabused of the misconceptions
so sedulously and cunningly practised upon them.

As an example of the deceptions employed, the suggested price of
£325,000 for the assets was on the basis that it included £100,000 in respect
of promissory notes issued by Smithamcote Ltd. to T.P.G. In fact instead
of having a present value of that amount, there were ten separate notes,
each of £10,000 maturing yearly over ten years, and documentary evidence
discloses that Smithamcote's financial position was such that, as must have
been well known to both Bartlett and Laughton, it could not have
honoured the notes. The first note in fact fell due on June 28, 1975, a

A month before the meeting, and was not met, yet this fact was deliberately concealed.  If it was shown that the shareholders' consent, obtained at the meeting, was vitiated by fraud the court would not insist that the decision whether to sue the directors should be left to the shareholders. It would be wrong to direct a preliminary issue and refuse to hear the evidence.  Whether the question is one of procedure or of jurisdiction the same is true.

B The directors also owed a duty to the shareholders, or had an obligation towards them, to give advice in good faith and not by means of a tricky and misleading circular.  The directors are liable at the suit of shareholders for breach of that obligation, and the damages recoverable by the shareholders are not necessarily the same as those recoverable by the company: see *Baillie* v. *Oriental Telephone and Electric Co. Ltd.*

C [1915] 1 Ch. 503 and *Kaye* v. *Croydon Tramways Co.* [1898] 1 Ch. 358. What is recoverable is damages for conspiracy, with the special feature that they are not limited to the financial loss suffered by the plaintiff: see *Pratt* v. *British Medical Association* [1919] 1 K.B. 244.  Here the plaintiff's personal action will have to traverse the whole of the evidence and it would therefore be wrong to segregate the derivative action, when the court will have to deal later with the personal action.

D *Scott Q.C.* in reply.  On a true analysis this action is purely derivative, and not personal.  The pleadings contain no allegations of breach by the directors of any duty to the shareholders, but only of breach of duty to the company.  The damages alleged to have been suffered by the shareholders are all consequential on the alleged breach of duty to the company.  If more is intended, the pleading is misleading.  A share-

E holder claiming in that capacity must relate the damages claimed to the value of his shares.  No particulars of such damages are given.  In fact, the value of the shares has risen three-fold since the acquisition of T.P.G.'s assets.

If there is a personal action which Prudential can bring for itself, it would have to be in respect of some duty which a director owed not qua

F director to the company, but imposed on the director arising out of the circular and the particular circumstances relating to the particular share-holders.  Each shareholder's claim would be different, depending on whether his loss arose from reduced dividends, or from sale at a loss. Such damages, if relied on, would have to be alleged, but here there is no such allegation, either of duty owed or damage suffered.  A representative action for shareholders claiming damages could not be brought since the

G claims to damage would differ inter se, if, as in conspiracy, damage is an ingredient in the cause of action.

[Reference was made to R.S.C., Ord. 15, r. 12, and to *Markt & Co. Ltd.* v. *Knight Steamship Co. Ltd.* [1910] 2 K.B. 1021.]  It is possible to claim a declaration in a representative action, but it is difficult to see that in tort one could ever establish a sufficient common interest to

H establish a representative action.  If a declaration were sought that the circular was tricky and misleading, a number of the shareholders on whose behalf it was sought might have no cause of action at all.  What the plaintiff has been seeking is payment of damages to the company; it may

Prudential Assurance v. Newman Industries (No. 2)            [1981]

be that Prudential has a personal cause of action, but that is not why the
action is brought.  If the claim on the company's behalf is wholly ill-    A
founded, the plaintiff should not be permitted to sue in that form.

[Reference was made to *Duke of Bedford* v. *Ellis* [1901] A.C. 1.]
*Beeching* v. *Lloyd* (1855) 3 Drew. 227 is difficult to support, but is dis-
tinguishable.

*Caplan Q.C.*  It is conceded that the plaintiff cannot pursue any claim
for damages in the representative personal action as opposed to the       B
derivative action.  What is pursued in the personal action is a declaration
that there is a liability to damages to Prudential, and a declaration that
there is a liability to damages to all other shareholders, who like
Prudential have suffered damage.  The point of such a declaration would
be to enable others who have suffered damage to come in and prove no
more than that they have suffered such damage.                            C

*Scott Q.C.*  It is a totally wrong approach to assume that it is permiss-
ible to investigate all the company's affairs, managing decisions and be-
haviour for the purpose of saying that the interests of justice require that a
minority shareholder should be allowed to sue, except possibly where the
alleged wrongdoers are in control.  If that is right it is a monstrous
injustice that the defendants should be subjected to such an inquisitorial
procedure.   The derivative action ought not to be allowed, and the       D
personal action, if the plaintiff is entitled to bring one, should be limited
to a claim against the second and third defendants, the first and fourth
defendants being struck out.  That is why, even if the pleadings could be
amended, it is no reason why the preliminary issue should not be tried,
to decide whether or not the derivative action can stand.

The philosophy behind the rule in *Foss* v. *Harbottle*, 2 Hare 461, was  E
that where a company was controlled by someone it was not just that he
should be able to prevent himself being sued, merely because he was in
control of the company.  But the exceptions allowed must be confined
to cases where fraud is alleged.  Other exceptions are where something
ultra vires or illegal is alleged, or where the company's property is being
given away.  It is for the board to decide whether to sue a prospective    F
defendant for fraud or in respect of defalcations by an employee, and in
the last resort it is a matter for the company in general meeting.  In an
action by the company itself, the same investigation could be undertaken
as in an action by a minority shareholder, so that it is wrong to suggest
that as being a reason for allowing a minority shareholder to sue.  [Ref-
erence was made to *Parke* v. *Daily News Ltd.* [1962] Ch. 927.]

The rule in *Foss* v. *Harbottle*, 2 Hare 461, establishes as a matter of  G
general principle that the court will not interfere in the internal affairs
of the company, and accordingly if some internal irregularity occurs in
administration which can be put right by a simple majority it is no use
for the minority or an individual shareholder to complain to court.  In
such cases the rule is one of practice and procedure rather than of juris-
diction: see *Kaye* v. *Croydon Tramways Co.* [1898] 1 Ch. 358; *Tiessen*  H
v. *Henderson* [1899] 1 Ch. 861 and *Baillie* v. *Oriental Telephone and
Electric Co. Ltd.* [1915] 1 Ch. 503.  Where the irregularity relates to a
special resolution the court will interfere, because that cannot be cured

A   by a simple majority.  The philosophy behind the rule is set out by
Mellish L.J. in *MacDougall* v. *Gardiner* (1875) 1 Ch.D. 13.

Cases where irregularities in administration of that sort have occurred
are easily distinguishable from cases where some wrong has been done to
the company, giving the company a cause of action against its directors or
others.  In such a case the rule is one of jurisdiction, since the court will
not in general listen to someone asserting a cause of action not vested in

B   himself: see *Normandy* v. *Ind Coope & Co. Ltd.* [1908] 1 Ch. 84.  In the
case of a wrong done to the company there is no question as to whether
the matter can be put right in general meeting, and if so by whom.  All
that is necessary is to know whether there is any reason why the company
itself cannot sue.  Since the abandonment of the claim to rescission it is
not relevant to ask whether an irregularity can be cured in general

C   meeting.  The relief claimed is confined to damages.  It is for the
company to decide whether to sue unless the wrongdoers are in control.
Unless there is control there is no majority oppressing a minority.
[Reference was made to *Atwool* v. *Merryweather* (1867) L.R. 5 Eq.
464; *Birch* v. *Sullivan* [1957] 1 W.L.R. 1247; *Burland* v. *Earle* [1902]
A.C. 83; *Menier* v. *Hooper's Telegraph Works* (1874) 9 Ch.App. 350;
*Russell* v. *Wakefield Waterworks Co.,* L.R. 20 Eq. 474; *Spokes* v.

D   *Grosvenor and West End Railway Terminus Hotel Co. Ltd.* [1897] 2 Q.B.
124; *Edwards* v. *Halliwell* [1950] 2 All E.R. 1064; *Daniels* v. *Daniels*
[1978] Ch. 406; *Heyting* v. *Dupont* [1964] 1 W.L.R. 843 and *Waller-
steiner* v. *Moir (No.* 2) [1975] Q.B. 373.]

If different causes of action are being pursued, one on behalf of the
company and another personally, it would not be a proper argument for

E   getting rid of the action against the company if it were shown to be not
maintainable, to say " Oh well, the other cause of action is good and can
be pursued, so let both be tried."  In *Stroud* v. *Lawson* [1898] 2 Q.B. 44,
the Court of Appeal ruled that where the plaintiff was suing in a personal
capacity in respect of a fraud inducing him to become a shareholder, and
in a representative capacity for himself and other shareholders in respect of

F   ultra vires acts by the directors in paying a dividend out of capital, it was
not permissible to join the two causes of action in the same proceedings,
because they did not arise out of the same transaction within the then
existing rule, R.S.C., Ord. 16, r. 1.  [Reference was made to *Mosely* v.
*Koffyfontein Mines Ltd.* [1911] 1 Ch. 73.]

Not only is there no particular ground of convenience for joining the
two causes of action in the present case, it is inconvenient to do so, since

G   completely separate causes of action are involved and the types of relief
sought are different.  The defendants have to deal on two fronts with un-
named plaintiffs, who may or may not have a cause of action against them
so far as the representative action is concerned.  If the derivative action is
not properly based it should be disposed of on a preliminary issue, leaving
a fairer and short action for the defendants to deal with.  The question of

H   Prudential's locus standi to bring the derivative action is one of jurisdiction.
If it were disposed of there would be no need for a new derivative action.

[VINELOTT J. gave judgment on the application for the trial of a pre-
liminary issue, holding that it was unnecessary to decide the issue, since

**Prudential Assurance v. Newman Industries (No. 2)**                    **[1981]**

whatever the outcome Prudential intended to pursue its personal claim
against Bartlett and Laughton for damages for conspiracy and would
also seek on behalf of all shareholders, as at the date of the passing of
the resolution, a declaration that the circular was tricky and misleading.
Thereafter argument continued and Caplan Q.C. sought leave to amend his
pleadings in regard to Prudential's claim to sue in a representative capacity
for other shareholders, as at July 29, 1975. Argument on this question
followed and judgment was delivered on June 28, 1979. This part of the
case is separately reported, *ante*, p. 229.]

    *Leonard Caplan Q.C., Peter Curry Q.C., Philip Heslop* and *John Brisby*
for the plaintiff in relation to the plaintiff's derivative action against
Bartlett and Laughton. A director holds his powers as a fiduciary or
trustee, and must therefore exercise those powers bona fide in the interests
of the company. He would be in breach of that duty if otherwise than
in good faith he supported, and a fortiori if he engineered, a transaction
which was not in the company's interests and under which he benefits
directly or indirectly. The word "support" in the above proposition
includes the exercise by a director of such influence as he may possess
with his fellow directors and with the general body of shareholders. If
two directors, by agreement, breach their duty in this way they are guilty
of a conspiracy to do a wrongful act. A transaction is not in the
interests of a company if it is a purchase at a price more than it was
necessary and proper in the company's interest to pay. A transaction
which is detrimental to the company and beneficial to the director is
not "supported" by him in "good faith," if his support includes, inter
alia, participation in the preparation and distribution of a circular which
he knows or ought to know is tricky and misleading, and which is
intended to persuade shareholders to sanction the transaction. A circular
may be misleading even though one cannot point to a single statement
in it which is untrue: see *Rex* v. *Lord Kylsant* [1932] 1 K.B. 442.

    In a transaction by a company in which a director has a conflict of
interest, and from which he stands to benefit directly or indirectly, and
which he has supported or engineered, the onus of proving that he did so
in good faith rests upon the director concerned. He can only discharge that
onus by showing that he acted fairly, or by showing that he had sufficient
reasons for bona fide believing that he had so acted. [Reference was made
to *Kerr on Fraud and Mistake*, 7th ed. (1952), p. 5 and *Gower, Modern
Company Law*, 3rd ed. (1969), p. 564, as to the meaning of "fraud" in
equity.] Possibly "fraud" is used in equity in cases where fraud has not
been proved affirmatively but where the defendant has not discharged the
onus placed upon him of disproving fraud. If there has been a breach of a
fiduciary obligation there is no need to show that the motive was an impure
motive. [Reference was made to *New Sombrero Phosphate Co.* v.
*Erlanger* (1877) 5 Ch.D. 73; (1878) 3 App.Cas. 1218; *In re West Jewell
Tin Mining Co.* (1879) 10 Ch.D. 579 and *Hirsche* v. *Sims* [1894] A.C.
654.] Bad faith cannot be rebutted by showing that somebody really did
believe something: it has to be shown that he reasonably believed it.

    The derivative action against T.P.G. is in the realm of constructive
trusteeship. A person is liable, quite apart from any question of knowl-

A  edge on his part of a fraudulent transaction, if he knows that a trust fund is being applied otherwise than where there is any authority for it to be so applied. Thus T.P.G. would be a constructive trustee of the £325,000 paid for the assets if at the time of payment T.P.G. had knowledge of the fraud, and that the money was being paid away pursuant to a void resolution, i.e. knew that the circular was tricky and misleading, and therefore did not give proper notice to the shareholders in accordance with the

B  Newman articles, of the nature of the business to be transacted: see *Barnes* v. *Addy* (1874) 9 Ch.App. 244; *Russell* v. *Wakefield Waterworks Co.*, L.R. 20 Eq. 474 and *Moxham* v.*Grant* [1900] 1 Q.B. 88.

Although Prudential would be entitled to claim rescission, it does not do so. It is entitled instead to treat T.P.G. as being a constructive trustee of the money received. As plaintiff, Prudential can choose the remedy

C  sought on behalf of the company. Where a company's money is paid away without proper authority to persons who know that there is no proper authority, those persons are constructive trustees. That proposition is quite independent of any participation in a fraudulent design such as is required by the second leg *of Barnes* v. *Addy*, 9 Ch.App. 244. [Reference was made to *Selangor United Rubber Estates Ltd.* v. *Cradock (No.* 3) [1968] 1 W.L.R. 1555; *Chillingworth* v. *Chambers* [1896] 1 Ch. 685;

D  *Karak Rubber Co. Ltd.* v. *Burden (No.* 2) [1972] 1 W.L.R. 602 and *Belmont Finance Corporation Ltd.* v. *Williams Furniture Ltd.* [1979] Ch. 250.]

The knowledge of a person other than a director does not make a company itself possessed of that knowledge. Even if Bartlett and Laughton had not been directors of T.P.G., T.P.G. would have known

E  that the transaction could not go through without the approval of Newman shareholders, and that a circular was needed, the terms of which were bound to be known to T.P.G. Having looked at that circular, T.P.G. would have known that things were said in it which were untrue. T.P.G. would at least have received a copy of the circular as a shareholder of Newman. As a constructive trustee T.P.G. is liable to give equitable

F  compensation over and beyond the £325,000 received which must include compensation for having taken over T.P.G.'s liabilities. It cannot be for a company's benefit to pay more than is necessary for assets. If the true effect of a transaction is to give away a company's assets, the transaction would be ultra vires and cannot be ratified.

Three types of conspiracy are alleged. The first, in the personal action, is conspiracy to do an unlawful act, being either a breach of a

G  director's duty to the company, or his duty to the shareholders. A breach by a single director of his duty to the company would be actionable only by the company, but if two or more directors conspired then any person injured by the conspiracy could sue, the gist of such person's action being (a) the unlawful act of conspiracy and (b) the damage suffered. The second type is a conspiracy to " injure," where both conspiracy and

H  damage are essential. The third type is a conspiracy to procure a breach of contract. Procuring a breach of contract without lawful excuse, even if committed by a single person, is actionable as a tort, in which case conspiracy really adds nothing to the cause of action. Where there is a

**Prudential Assurance v. Newman Industries (No. 2)**                    **[1981]**

proved or, as here, admitted duty to the shareholders, as distinct from the
duty to the company, the breach gives rise only to a personal and not to    A
a derivative action.  The question arises whether it would not be ultra
vires for the shareholders in general meeting to resolve that the company
should not claim from the directors money which the court has declared,
in a derivative action by a minority shareholder, that the directors are
liable to repay to the company for the losses sustained as a result of the
breach of duty owed to the company, since any resolution not to claim    B
the money would be equivalent to a giving away of the company's money.
Such a resolution might constitute a fraud on the minority, and be capable
of being upset on those grounds.

Even in regard to matters which are capable of ratification in general
meeting it is questionable whether it would be desirable to proceed on the
lines of the procedure in *Hogg* v. *Cramphorn* [1967] Ch. 254, bearing in    C
mind that if the decision in general meeting went one way that decision
might be invalid.  If the court were to hold that the transaction was
designedly a concealed way of giving away the company's property, then
the company in general meeting could not ratify it, without an article
which permitted that to be done, and such an article does not exist here.
If Prudential obtains judgment on behalf of the company in the derivative
action, it would not pursue its relief in the personal action, but Prudential    D
would wish to pursue its entitlement in the personal action if for some
reason the company did not wish to accept money which the court held
it was entitled to.  [Reference was made to *McConnel* v. *Wright* [1903]
1 Ch. 546.]

*Edwards-Jones Q.C.*  Newman was a necessary party to the action
but is neither prosecuting it, nor defending it.  The case is unique in    E
that although the action is framed in part as a minority shareholders
action, no control over the shareholders or over the board was vested
in the personal defendants.  Laughton ceased to be a director since
before the action commenced, and Bartlett, though still a director, is
only one of a number on the present board.  The board, which was
independent, took the view that while it was powerless to prevent    F
Prudential from pursuing the action, the action was not one which the
board of Newman wished to adopt.  Any advantage which might accrue
to the company is likely to be far outweighed by the harm being inflicted
on the company by the continuance of the action, with its adverse
publicity and other side effects.  The board has accepted counsel's advice
that counsel's attendance is an avoidable expense, unless the court other-
wise indicates, though instructing solicitors would continue to attend.    G
But one observation should be made: there must be a logical limit for
practical reasons to the concept that a company cannot give away its
property.

*Caplan Q.C.*  Clearly a company can give away its property for the
purpose of preserving its good image, and where if it did not do so its
image would suffer.                                                          H

*Richard Scott Q.C.*, *Alan Sebestyen* and *Judith Jackson* for the second
defendant Bartlett and, until July 18, for the third defendant, Laughton.
Prudential's case against Bartlett has been based upon mere inference

**1 Ch.**          **Prudential Assurance v. Newman Industries (No. 2)**

A  from documents.  The main thrust of their case is alleged fraudulent conspiracy.  Until March 1976, Prudential's case had been based solely on " honest disagreement of judgment " and there was no allegation that the circular was tricky and misleading or fraudulent, but such an allegation was raised for the first time in the statement of claim in the present proceedings.  No further material was, however, available than before, and the claim is entirely speculative.  Investigative procedure, such as is

B  involved in litigation of this sort, imposes a burden on defendants which even if they succeed and obtain party and party costs, is likely to bring financial ruin upon them, and, if they lose, ruin of reputation following upon financial ruin.  The pressure brought to bear upon them by a minority shareholder with a bottomless purse, such as Prudential, is apt to produce a totally unfair situation, which is contrary to public policy.

C  In some sorts of litigation defendants can protect themselves against the uncertainties of litigation by appropriate offers or by payment into court, but where directors in public life are charged with fraudulent conspiracy and with having knowingly issued a tricky and misleading circular, payment into court is not a practical proposition.  Directors can only resist such charges or accept being hounded from public life.  Prudential owes no duty to its fellow shareholders.  It has power without responsibility.

D  The arguments here advanced do not depend on the innocence or otherwise of the directors concerned.  It is not an argument in favour of such litigation to say " We think we can satisfy the judge on the balance of probabilities," if you thereby bring down innocent people.  Prudential claims to bring this complex and expensive litigation on behalf of other shareholders, but no single shareholder had been produced to support that

E  contention.  Prudential does not purport to bring the action for its own benefit; its main purpose is the derivative action.  If it succeeds in that, it will not, so it is said, pursue its personal claim.  It will not claim on behalf of other shareholders as at July 25, 1975, even though they may be different people from the current shareholders.  The shareholders as at July 25, 1975, would be bound by the result, because the action is in a representative form.  Prudential is only pursuing the action in the personal

F  and representative capacities in case the action in the derivative capacity should fail on account of the rule in Foss v. Harbottle, 2 Hare 461.

It ought not to be the law that a powerful individual shareholder can arrogate to himself the power of acting on behalf of a company and forcing the company to litigate.  Prudential's action, whether personal or representative, is brought simply for the purpose of investigation.  It is

G  cynical because it is not truly brought for Prudential's own sake.  Prudential has not produced any evidence to connect the company's alleged loss with loss in capital value of the shares or of the dividends.  The need for investigation in the personal action was used as a powerful argument for inducing the court to refuse the trial of a preliminary point in the derivative action alone.  Since March 1975 Prudential has sought to force

H  the investigation regardless of the damage to the company resulting from the litigation, or of the quantum of damages that might be recovered.  The litigation is an exercise of power without responsibility.

The case must in the end turn on the honesty or otherwise of Bartlett

and Laughton. Once Cooper, the auditor, had concluded that £325,000 **A**
was a fair value for the package transaction, they cannot be blamed for
relying on that figure. The position might be different had they deli-
berately misinformed Cooper or concealed matters from him affecting
the valuation. The second issue is whether, if the circular was tricky and
misleading, it was intended to be so. There was always a close working
connection between Newman and T.P.G., who shared offices and sec-
retarial staff. There never was an arms-length bargain, between totally **B**
unconnected parties. Directors would not expect shareholders to try to
value the assets themselves, and plainly it cannot be general Stock
Exchange practice that circulars should contain sufficient information for
the shareholders to attempt to do so, since otherwise Stock Exchange
requirements would be much stricter, and balance sheets of associated
companies would always have to be included. [Reference was made to **C**
*Farrar* v. *Farrars Ltd.* (1888) 40 Ch.D. 395; *Nocton* v. *Lord Ashburton*
[1914] A.C. 932; *Carl Zeiss Stiftung* v. *Herbert Smith & Co.* (*No.* 2)
[1969] 2 Ch. 276; *Competitive Insurance Co.* v. *Davies Investments Ltd.*
[1975] 1 W.L.R. 1240; *Quinn* v. *Leathem* [1901] A.C. 495 and *Allen*
v. *Flood* [1898] A.C. 1.]

Prudential's case against T.P.G. is one of constructive knowledge.
T.P.G. is alleged to have had knowledge of some dishonest and fraudulent **D**
design on the part of the individual defendants. T.P.G. must either have
had such knowledge or have participated in the particular breach of
fiduciary duty which is relied on. If what was done by Bartlett and
Laughton was not dishonest and fraudulent then no claim could be raised
against T.P.G., based on the second limb of *Barnes* v. *Addy,* 9 Ch.App.
244, i.e. actual participation in a dishonest and fraudulent design. The **E**
claim would have to be confined to the first limb, namely receiving the
money knowing it to be trust money. To show that the money received
was trust money it would be necessary to show that the resolution approv-
ing the transaction was void, and that would open the door to complete
rescission, which would, it is believed, damage Newman's interests
because, since the date of the transaction, the value of Newman's assets
has greatly increased. If the transaction was void, account must be **F**
taken, in assessing any damage that Newman might have suffered, of the
benefits derived from possessing T.P.G.'s assets.

Before there could be any equitable compensation it must be shown
that damage had been caused by the breach of duty. If a lower price
had been suggested for T.P.G.'s assets, T.P.G. might not have agreed to
sell, in which case damage would not have resulted at all even if the assets **G**
were worth less than the £325,000 that was paid for them. *Cavendish
Bentinck* v. *Fenn* (1887) 12 App.Cas. 652 shows that the onus of proving
misfeasance rests on the plaintiff, so that even if the misfeasance alleged
is non-disclosure of material facts, the plaintiffs must prove non-disclosure
so that in a case for rescission of a sale by a director of his own property
to the company it is not for the company to prove non-disclosure but for **H**
the director to prove disclosure affirmatively, but if the proceedings are
for misfeasance then it is for the company to prove non-disclosure. There
is no evidence justifying the inference that the approval by the share-

A   holders of the transaction was in fact procured by the nature of the circular, which is alleged to have been tricky and misleading. No shareholder has been called to show that he was misled into voting for the resolution by the circular.

It is not justifiable for the court, without expert evidence, to infer that a loss to the company must necessarily result in a loss to the shareholders in the market value of the shares. To succeed in the derivative

B   action, Prudential must establish (i) that the defendants conspired to make the shareholders of Newman adopt a transaction which was adverse to Newman's interests, (ii) that they did so with knowledge that the transaction was adverse to Newman's interests, and (iii) that the intention was thereby to relieve T.P.G.'s financial problems. The test is whether there was an honest belief that the transaction would benefit Newman, and

C   benefit it at that price, not whether the price was in fact a fair and proper one. Nothing short of common law fraud would suffice to bring the case within the exception to *Foss* v. *Harbottle*, 2 Hare 461. In no reported case has a minority shareholder succeeded in complaining of a wrong done to the company, where the director concerned was simply guilty of a breach of fiduciary duty without there being any evidence of dishonesty.

If the first two issues in the derivative action are decided against the

D   defendants, it is conceded that it would be necessary to see whether any damage had been caused to Newman. In the personal and representative actions Prudential would have to prove damage, because the cause of action in those cases is dependent on proof of damage. Plainly the company's assets do not belong to the shareholders. A capital loss to the company must not necessarily be taken to be a loss to the shareholders:

E   see *Bank Voor Handel En Scheepvaart N.V.* v. *Slatford* [1953] 1 Q.B. 248 and *Macaura* v. *Northern Assurance Co. Ltd.* [1925] A.C. 619. Prudential has not attempted to show that the value of the Newman shares has suffered. That should be the end of the personal and representative actions. It may be that if the minority cannot persuade the majority to bring an action there would be no remedy. The minority

F   cannot insist on a remedy. The majority should not be forced to accept an investigation into the company's affairs against the majority's wishes.

No evidence was given to show that Prudential's shares had suffered in market value in consequence of the take-over transaction. It is not justifiable for the court to infer, without expert evidence, that a loss to the company must necessarily result in a loss to the shareholders in respect of the market value of the shares. It is not a valid criticism that the

G   valuation of T.P.G.'s assets was carried out by Deloittes, who were Newman's auditors, rather than by an independent merchant bank. Bartlett had no knowledge of how Cooper of Deloittes arrived at his valuation. If the court were to disbelieve Bartlett's denial of knowledge, *Hobbs* v. *Tinling* [1929] 2 K.B. 1 shows that non-acceptance of a denial does not amount to establishing the affirmative contrary to the denial.

H   Failing to consider possible alternatives to the take-over transaction or failing to consider each asset in the package individually does not amount to a lack of caution on the part of Bartlett or Laughton. They were justified in leaving the valuation to experts. There is no evidence of

conspiracy between Bartlett and Laughton to fix the price of the package. A
[Reference was made to *Pritchard* v. *Briggs* [1980] Ch. 338.]    where
it is sought to show that a resolution is invalid, and to unscramble the
resulting transaction the words " tricky and misleading " are used in a
different sense from that in which they are used in pleadings for the
purpose of claiming damages in a personal action.  The test as to whether
a circular is tricky and misleading so as to render the notice convening a
meeting void and the meeting and resolutions passed thereat defective,   B
cannot depend on the state of mind of those directors who sent out the
circular; it must depend objectively on the contents of the circular itself.
Even if a circular were intended to mislead, it would not necessarily be a
bad notice for the purpose of complying with the company's articles, or
render the resolutions passed at the meeting null and void.

Even if the court were to hold that Bartlett was dishonest, and lacked   C
bona fides in carrying out his duties towards Newman, he is nevertheless
entitled to judgment in his favour, both on the personal, and on the
derivative actions.  As to the personal action, any damage was suffered
by the company and not by the shareholders.  In partnerships, from which
joint stock companies evolved, it was always possible for decisions to be
taken by the majority of the partners, so as to bind the minority.  Without   D
such a contract, any one of those joining in a joint venture, could always
sue in his own name as plaintiff, joining the others who might not wish to
sue, as defendants.   If the majority were fraudulently or dishonestly
appropriating to themselves the partnership assets, or were preventing the
ventilation of a wrong the courts would permit the minority to sue.  When
joint ventures were superseded by companies, the contract was embodied
in the company's articles, but the cause of action became vested in the   E
company as a separate legal persona, and was no longer vested in the
members.  Cases still arise where the majority, by means of the company's
constitution, seek to prevent pursuit of themselves for their misdeeds, and
then the courts will permit the minority to sue by analogy with the pre-
incorporation position.   Shareholders in general meeting can decide to
overlook the defalcations of an agent of the company, and that being so   F
it is impossible for the minority to start an action against the fraudulent
agent, on the ground that although the majority entitled to ratify the
agent's actions, and let the wrong to the company go unredressed, such
majority has not in fact done so.  A distinction must be drawn between
cases where it is proper for the company to decide not to sue, and those
where it cannot properly so decide.  In the latter case, for instance, where
the wrongdoers are in control, there is an exception to the rule in *Foss* v.   G
*Harbottle*, 2 Hare 461.  But if the company has expressed disinterest in
suing, or has merely not decided, an action would be maintainable by a
minority *only* if it was a case where the company could not properly
decide not to sue; otherwise there would be nothing left of the rule in
*Foss* v. *Harbottle*.  The only case where a person with no cause of action
vested in himself has locus standi to sue is where it can be shown that it   H
would be fraudulent for those in control to prevent an action being
brought against themselves.  It is necessary to show that it would be futile
to ask the company in general meeting to decide, because one knows in

A  advance what the answer would be. It is for the company to decide whether it wishes to incur the cost and risks of litigation. [Reference was made to *Parker* v. *Lewis* (1873) 8 Ch.App. 1035.]

In *Burland* v. *Earle* [1902] A.C. 83, 93, Lord Davey stated the principles underlying the rule in *Foss* v. *Harbottle* as being that it is an elementary principle of the law relating to joint stock companies that the court will not interfere with the internal management of companies acting
B  within their powers, and in fact it has no jurisdiction to do so. Also that the company is the proper plaintiff in an action to redress a wrong done to the company. The exceptions to the rule are cases where there is fraud or ultra vires, or where the votes of the shareholders are controlled by the wrongdoers. [Reference was made to *Regal (Hastings) Ltd.* v. *Gulliver* [1942] 1 All E.R. 378.] The reason why Prudential's action is barred by
C  the rule, is not because the resolution approving the transaction was passed by the majority of the shareholders, but because the company could have sued on the cause of action regardless of the resolution. The vital question is not whether the resolution is impeachable, but whether there is any reason why the company itself should not bring the action. The very complexity of the action is a valid reason why the company might not wish to sue. *Clemens* v. *Clemens Bros. Ltd.* [1976] 2 All E.R.
D  268 shows that votes can be validly cast by a majority shareholder with a view to improving her own proprietary interests, and not those of the company.

An action which pleads fraud and looks upon discovery as a necessary process to ascertain whether the allegation is made out would plainly be improper. To start an action based on inference on the footing that it
E  would be dropped if discovery did not produce sufficient supporting evidence would be an abuse of process. Prudential should have put the question to the company in general meeting as to whether or not an action should be brought. [Reference was made to *Parker* v. *Lewis*, 8 Ch.App. 1035.] When Jessel M.R. said in *Russell* v. *Wakefield Waterworks Co.*, L.R. 20 Eq. 474, 480, that the rule in *Foss* v. *Harbottle* was not
F  universal, and was subject to exceptions which " depend very much on the necessity of the case," it did not correspond with the law at that time. [Reference was made to *Mason* v. *Harris* (1879) 11 Ch.D. 97; *Atwool* v. *Merryweather*, L.R. 5 Eq. 464; *MacDougall* v. *Gardiner*, 1 Ch.D. 13; *Menier* v. *Hooper's Telegraph Works* (1874) 9 Ch.App. 350 and *Cook* v. *Deeks* [1916] 1 A.C. 554.]

The common feature running through exceptions to the rule in *Foss*
G  v. *Harbottle* is that the exception exists where the control which the wrongdoers exercise over the company is preventing them from being sued by their company.

*Dominion Cotton Mills Co. Ltd.* v. *Amyot* [1912] A.C. 546 shows that on a true analysis the only true exception to the rule in *Foss* v. *Harbottle*, 2 Hare 461, is where there is unfair, fraudulent or improper abuse by the
H  majority of their position. [Reference was made to *Alexander* v. *Automatic Telephone Co.* [1900] 2 Ch. 56.] The authorities show that the true exception is not where there is merely an ingredient of fraud in the cause of action, but where there is wrongful oppression of the minority by

**Prudential Assurance v. Newman Industries (No. 2)**              **[1981]**

the wrongdoers.  In *Daniels* v. *Daniels* [1978] Ch. 406 a sale of the company's asset at an undervalue by two directors to one of their number in breach of duty could not be ratified since that would be fraudulent oppression by the majority of the minority.  In *Pavlides* v. *Jenson* [1956] Ch. 565 it was held that since there was no allegation of fraud or misappropriation of assets by the directors, the action did not fall within the exception to the rule in *Foss* v. *Harbottle*, and minority shareholders were not entitled to sue the directors and the company for damages for gross negligence.  [Reference was made to *Spokes* v. *Grosvenor and West End Railway Terminus Hotel Co. Ltd* [1897] 2 Q.B. 124; *Edwards* v. *Halliwell* [1950] 2 All E.R. 1064 and *Turquand* v. *Marshall* (1869) L.R. 4 Ch.App. 376.]

In *Birch* v. *Sullivan* [1957] 1 W.L.R. 1247 it was held that in a misfeasance action by a minority shareholder on behalf of himself and other shareholders it must be proved not only at the trial but also be stated in the statement of claim why the action cannot be brought in the name of the company and the allegations on which it is founded.  If that is correct it means that it must be shown that the wrongdoer is in control, otherwise there would be no way of showing why the company could not bring the action.  The case shows that it must be shown to be futile to call a general meeting *because* of the control enjoyed by the wrongdoers, not merely futile for some other reason, such as that the shareholders do not know enough about the proposed action to form a view as to whether or not it should be brought.  Any application to stay the proceedings would be a matter of discretion.  In *Heyting* v. *Dupont* [1963] 1 W.L.R. 1192; [1964] 1 W.L.R. 843, in the discussion of the rule in *Foss* v. *Harbottle*, again there is no suggestion that the exceptions require anything less than control by the wrongdoer to be shown.  [Reference was made to *Goldex Mines Ltd.* v. *Revill* (1974) 54 D.L.R. (3d) 672.]

In some cases minorities are allowed to stop the company from doing something, or to protest against the effective ratification by the company of something already done, as for instance in *Kaye* v. *Croydon Tramways Co.* [1898] 1 Ch. 358.  The provision in that case of an additional sum for the directors of the vendor company, over and above the sum payable by the purchasing company to the vendor company, reference to which was omitted from the notice of meeting, did not render the notice ultra vires, or the resolution voidable.  [Reference was made to *Baillie* v. *Oriental Telephone and Electric Co. Ltd.* [1915] 1 Ch. 503 and to *Goldex Mines Ltd.* v. *Revill*, 54 D.L.R. (3d) 672.]

The Canadian cases also show that the exceptions to the rule in *Foss* v. *Harbottle* are where the wrongdoers are in control: see *Burrows* v. *Becker* (1968) 70 D.L.R. (2d) 433.  See also *Ving* v. *Robertson & Woodstock Ltd.* (1912) 56 S.J. 412 and *In re Woking Urban District Council (Basingstoke Canal) Act* 1911 [1914] 1 Ch. 300.

To wait until the end of the trial and then to ask whether the needs of justice require a payment to be made to the company is to transpose the purpose for which the court needs to look at the needs of justice; they should be looked at in the beginning, in order to see whether the plaintiff is entitled to sue at all.  The court cannot logically decide that question by

A  the result of the case, or there could be no rule in *Foss* v. *Harbottle* at all.
At the end, the court would be considering convenience, not the interests
of justice. The question whether a minority shareholder is debarred from
suing is of its nature a preliminary point, to be dealt with before a full trial.
The rule in *Foss* v. *Harbottle,* 2 Hare 461, is more than a rule of pro-
cedure: see *Burland* v. *Earle* [1902] A.C. 83; *Cook* v. *Deeks* [1916] 1
A.C. 554 and *Dominion Cotton Mills Co. Ltd.* v. *Amyot* [1912] A.C. 546.

B  It is a rule of law, not of procedure. That view is supported by *Birch* v.
*Sullivan* [1957] 1 W.L.R. 1247 and *Heyting* v. *Dupont* [1963] 1 W.L.R.
1192; [1964] 1 W.L.R. 843. It cannot be right to treat the rule as a flexible
rule of procedure, such that a minority shareholder pleading a cause of
action in an unexceptionable way can have the case tried, as a matter of
convenience, together with a derivative action, which would not otherwise

C  be justifiable, and then for the court to allow the derivative action to
proceed while the personal action fails. If one could escape the impact of
the rule in *Foss* v. *Harbottle* simply by alleging fraud and oppression in a
personal action which demanded full investigation of the facts in a lengthy
trial, it would mean completely rejecting the rule itself. It would be a
strange result if, the personal action having failed, the court concluded that
the company had suffered an injury so that " in the interests of justice " the

D  plaintiff ought to be granted a remedy in the derivative action. If on the
other hand the personal action were to succeed, but the derivative action
failed on the ground that the minority shareholder had failed to show that
he was entitled to sue on the company's behalf, there would be no bar on
the company bringing an action since there would be no res judicata on the
cause of action point. The interests of justice do not necessarily require

E  that wrongs be righted, since the majority shareholders may decide that
the wrong done to the company need not be remedied. [Reference was
made to *Bamford* v. *Bamford* [1970] Ch. 212.]

The defendant Bartlett is entitled to succeed on the derivative action
for the reasons stated above. Prudential's contentions are contrary to a
well established and long accepted line of authority, and there is no basis

F  on which the court ought to make new law for a particular case. See
*Gething* v. *Kilner* [1972] 1 W.L.R. 337.

*Caplan Q.C.* in reply. The powers of the Department of Trade and of
the Stock Exchange take-over panel are much more limited than the
Securities and Exchange Commission in the United States of America.
Without the court's assistance there would be no reasonable prospect that,
in some instances, wrongdoers in relation to the affairs of joint stock

G  companies could be unmasked. An obvious defect of the self-regulating
and self-policing system adopted in this country is that unless there is
someone sufficiently public spirited and with a sufficiently deep purse to
shoulder the burden of court proceedings there may be circumstances
in which the policing system would prove abortive, and only an insti-
tutional investor could shoulder the burden, as Prudential has done here.

H  The importance of the case goes beyond its importance merely to the
parties.

The unlawful conspiracy entered into by Bartlett and Laughton was to
induce Newman's board and ultimately Newman's shareholders to accept

the package of T.P.G.'s assets and liabilities at any price, whether beneficial
to Newman or not.  It would have been unlawful even if no unlawful means      A
had been adopted, such as by misleading the valuer as to value of the
assets.  Laughton was appointed to the committee chosen to supply informa-
tion to the valuer of the assets of T.P.G. and played a principal part in their
task.  It is hard to imagine a more inappropriate appointment of someone
to deal with the valuer chosen on Newman's behalf than someone who had
conflicting loyalties and whose personal interests would be benefited the      B
higher the valuation turned out to be.  Conspiracy can properly be inferred
where two persons are found doing separate wrongs which conduce to a
personal benefit of the same kind to both.  The crucial question is not
whether Bartlett honestly believed that the price to be paid by Newman was
a fair one, and that Newman stood to benefit from the transaction, but
whether he believed that the price had been fairly arrived at and had been
given proper consideration by the board, based on the information which      C
the board should have had.  The advantages of acquiring T.P.G.'s assets
may have been put to the board but not the disadvantages of taking over
T.P.G.'s liabilities.  The outrageous conduct of Laughton as a director of
Newman inducing the valuer to T.P.G.'s assets in a telephone conversa-
tion to increase the proposed valuation by nearly £100,000, can hardly
be described in moderate language.                                            D

The overall impression conveyed by the circular submitted to Newman
shareholders was that £325,000 was a fair price to pay for the package of
T.P.G.'s assets and liabilities, which anyone else could have been expected
to pay, and that the transaction was recommended by the directors after
having had a proper opportunity to consider the valuation and based on
information provided by Deloittes which had been fairly arrived at without
improper influence having been exerted by Newman's directors adversely      E
to Newman's interests.     That was the impression which Bartlett and
Laughton knew and intended that it should convey, though they knew it
to be false in every respect.  Bartlett's words at the meeting on July 8, 1975,
further fostered the impression, and he failed at that meeting to disclose
that a promissory note forming part of T.P.G.'s assets had already been
dishonoured.                                                                  F

With regard to the personal and representative actions, a conspiracy to
injure without a legitimate interest to protect is itself a tort where damage
has been suffered as a result.  The defendants' contention that no damage
to the shareholders has been proved is negatived by three propositions:
(1) that in the absence of special circumstances such as a take-over bid,
the market price of shares is based on the expectation of profits; (2) that the
expectation of profits is based upon past history and the company's assets     G
being skilfully used, the larger the assets the larger the profit expected;
(3) that if the fair price for the assets had been less than in fact it was,
Newman would have had a larger asset base remaining available, which
would have produced a higher expectation of profits than if a larger sum
was paid, as in fact was the case.   The profits would have been greater
and the share quotation therefore higher.  These three propositions are self  H
evident to the extent that they have not been proved.  Possibly—though
this may be academic—if the derivative action succeeds the plaintiff in his
personal capacity will have obtained redress, and will therefore have

A suffered no damage, thus obviating the risk of double damages being awarded for the same injury; whereas if the derivative action were dismissed, leaving it still open to the company to sue, but the shareholders have, in their representative action, got their damages, it might be doubtful what defences the defendants would then have, if sued by the company. That, however, is a problem which does not arise here in view of Prudential's stated intention that if the derivative action succeeds they will not

B seek an order for damages. Shareholders who had sold their shares, since the transaction, would still have a right of action. If a purely personal action had been brought and had succeeded, and it was manifest from that that the company could sue if it desired, the problem arises in its most acute form, because there is probably no authority, entitling the court to say that a person injured by a conspiracy had no right of action because someone else, i.e., the company, might have a right of action against the

C same defendants. But again Prudential's attitude obviates the need to consider this interesting but academic situation.

The rule in *Foss* v. *Harbottle*, 2 Hare 461, applies to the derivative action against the individual defendants and that against T.P.G. in the same way. The tendency has been to regard the rule as a kind of incantation which automatically closes the door against an approaching litigant, but

D that " fraud on a minority " and " ultra vires " are other incantations which open the door. The rule does not in origin relate to non-interference with internal management of companies. Provided the articles are complied with, the majority is free to regulate the company's affairs in whatever way they think fit, but the rule is not the same as saying that the question whether to enforce a right of action should be left to the decision of the majority, though it is analogous to that. Where any persona, whether legal

E or natural, is possessed of a remedy, prima facie, it is at the instance of that persona that the law should be set in motion to obtain that remedy. [Reference was made to *Cotter* v. *National Union of Seamen* [1929] 2 Ch. 58.] The *Foss* v. *Harbottle* principle relates to jurisdiction only in the sense that it states a prima facie rule as to the circumstances in which the courts will decline to exercise jurisdiction. A substantive right relates to the right

F which a person has to a remedy; procedure deals with the way in which that person's right is to be enforced. If it can only be enforced by proceedings at his own instance, that is a matter of procedure, and if it can only be enforced by proceedings at someone else's instance on his behalf, that is still a matter of procedure. The rule is essentially one of demurrer.

Cases on the rule in *Foss* v. *Harbottle* can be classified into two cate-

G gories, those where the court sees no reason to depart from the rule, and those where the court finds a reason to depart from it. In the first category is *Foss* v. *Harbottle*, 2 Hare 461 itself. In considering the possible circumstances which might induce the court not to decline jurisdiction, Wigram V.-C. nowhere referred to "fraud on a minority" or to "ultra vires," and the case did not purport to lay down a complete and comprehensive state-

H ment of the relevant circumstances which would justify the court in not applying the prima facie rule.

A transaction which is ultra vires the company is void, not merely voidable; it cannot be ratified by the shareholders in general meeting, and

so in not declining jurisdiction and allowing a minority shareholder to sue in
such a case the court is not usurping the right of the majority of the share-   A
holders.  If the transaction has not been completely implemented the court
would not refuse a declaration of voidness and an injunction to restrain its
implementation.    The court allows a derivative action because it sees a
good reason for doing so, whether or not that reason comes within the
category of "the needs of justice."  If the transaction has been fully
implemented, the company may have a remedy in damages against some   B
of the directors, and while the shareholders in general meeting would have
no power to sanction it retrospectively, they could decide not to pursue the
directors for damages.  The most obvious reason for not applying the prima
facie rule would be the interests of justice, which are not bounded by fraud
on a minority or ultra vires.  A general meeting may always condone a
director's conduct whether in connection with implementing a void trans-
action or for some other breach of duty.  *Burland* v. *Earle* [1902] A.C. 83   C
falls into both categories, because part of the claim was on the basis that it
was ultra vires to establish a reserve fund out of profits rather than to
distribute them and part dealt with matters for which Burland was called
to account as a trustee, in respect of improper investment of the company's
money.  It is helpful in all these cases to look at the actual decision, and
not to look at the dicta too closely, which it is often hard to reconcile one   D
with another.  It is a fraud on a minority for a majority shareholder who
happens to be a trustee of the company's money to refuse to account, even
if there is no other fraud involved.  *MacDougall* v. *Gardiner*, 1 Ch.D. 13
falls squarely within the first category, so that anything said as to what
would be good reasons for not declining judgment would be purely obiter.
In *Menier* v. *Hooper's Telegraph Works*, 9 Ch.App. 350, the good reason
found by the court could be construed as a fraud on a minority or as a   E
threatened exercise of ultra vires powers, namely, giving the company's
property to the majority to the exclusion of the minority pursuant to a
resolution of the company in general meeting.  This case falls into the
second category.

   *Atwool* v. *Merryweather*, L.R. 5 Eq. 464, is a case of much interest and
importance.  Page Wood V.-C. decided the case, it appears, on two separate   F
grounds, one being that where it was alleged that a defendant had obtained
shares by fraud that was a good ground for exercising jurisdiction in a
derivative action since otherwise if the shares fraudulently issued consti-
tuted a majority there would be no way of putting matters right—the ratio
decidendi therefore appears to be that where the shares allegedly issued in
fraud were not a majority the casting of those shares at a general meeting
with other shares though not amounting to control could preclude the   G
possibility of a fairly arrived at decision.  The second ground may perhaps
be based on ultra vires, or on the fact that it might be said that the fraud
was practised both against the company with respect to the acquisition of
assets and against the shareholders for inducing them to purchase shares.
On that basis on both grounds the case is within the second category.  The
court's insistence on the right of a majority to be deceived, would be a very   H
popular one amongst those who are bent on deceit.

   *Gray* v. *Lewis* (1873) 8 Ch.App. 1035 was a case where the bill was
demurrable on almost every ground possible.  In *Russell* v. *Wakefield*

A *Waterworks Co.,* L.R. 20 Eq. 474, there is an obiter dictum that the exceptions to the rule depend very much on the need to do justice. There is also a reference at p. 482 to *Atwool* v. *Merryweather,* L.R. 5 Eq. 464. The use of the word " control " is important and demonstrates that the control which the court will not find tolerable is not limited to control by voting power of the wrongdoer; it can be control by deceit or the control which the wrongdoer is likely to be able to exercise. Where there has been a

B meeting at which the shareholders have once been deceived by the wrong-doers, the court cannot conclude that at another meeting they will not be similarly deceived. *Mason* v. *Harris,* 11 Ch.D. 97, and *Cook* v. *Deeks* [1916] 1 A.C. 554 were both cases in which the sufficient ground for departing from the prima facie rule was fraud on a minority, and relevant remarks will all be obiter dicta.

C In *Dominion Cotton Mills Co. Ltd.* v. *Amyot* [1912] A.C. 546 only two questions were decided, namely whether a certain lease was ultra vires and whether it was vitiated by fraud. Any observations on *Foss* v. *Harbottle* are entirely outside the actual grounds of decision. *Alexander* v. *Automatic Telephone Co.* [1902] 2 Ch. 56 was a case where the Court of Appeal found that the defendants had been guilty of a breach of fiduciary duty and they were in control. There was no attempt at demurrer and *Foss*

D v. *Harbottle* was not referred to in argument at all.

*Daniels* v. *Daniels* [1978] Ch. 406; *Pavlides* v. *Jenson* [1956] Ch. 565; *Heyting* v. *Dupont* [1963] 1 W.L.R. 1192; [1964] 1 W.L.R. 843 and *Birch* v. *Sullivan* [1957] 1 W.L.R. 1247, dealing with the question whether breaches of duty falling short of actual fraud but amounting to equitable fraud or negligence on the part of a majority of shareholders, or whether

E the withholding of assets of a company without fraud or ultra vires may be the subject of a derivative action, do not assist the court. If there has been actual or equitable fraud on a minority a derivative action will lie. The question whether a breach of duty by mere negligence would found an action is irrelevant.

F In *Kaye* v. *Croydon Tramways Co.* [1898] 1 Ch. 358 there was no reference to *Foss* v. *Harbottle* either in argument or in the judgment, and the case does not help. *Baillie* v. *Oriental Telephone and Electric Co. Ltd.* [1915] 1 Ch. 503 was not a case in which, on the facts, either the rule in *Foss* v. *Harbottle* or the exceptions to the rule were dealt with. The case shows that where a notice convening a meeting is required specifying the general nature of the business to be transacted, it fails to do so where it is accompanied by a tricky and misleading circular. A notice accompanied

G by a tricky and misleading circular fails to specify the general nature of the business properly, and a resolution passed at such a meeting would be void and would remain void although the transaction which it purported to approve may have been implemented, but equally it is a resolution the passing of which would form the basis for an action for damages against the wrongdoing directors.

H In *Burrows* v. *Becker,* 63 D.L.R. (2d) 100 the wrongdoing directors did not own the majority of the votes, and the question arose whether they could be said to have " control " or " command " of a majority because they had convincingly shown their ability to control the majority

of the votes in the past, so that it would be futile or a waste of time to call
a shareholders' meeting to decide whether an action should be instituted.   A
The case shows that if one can show that if a meeting were held it would
be futile because there was a degree of " control " or influence by the
wrongdoing directors which the court did not find acceptable, then the
court would allow a derivative action by a minority shareholder.   The
means of control which the court will not accept as tolerable for this
purpose are various; they may take the simple form of the delinquents   B
owning the majority of the votes.   They may take the form, as in *Atwool*
v. *Merryweather,* L.R. 5 Eq. 464, of the delinquents having such number
of votes as together with the votes of the others will " overwhelm " the
opposition.   They may take the form of a near bribe having been given
to the shareholders in the hope of inducing them to vote in favour of the
delinquents.   But these examples cannot and do not exhaust the class of   C
unacceptable means.   What is alleged in the pleadings is that at the time
of the commencement of this action there was no real prospect that the
shareholders would have voted for action.   There is no prospect that full
information would have been available.   The probability is that once again
the shareholders would have been duped.   The fact that no meeting was
held in December 1975 does not result in the court applying the rule in
*Foss* v. *Harbottle,* 2 Hare 461.                              D

Another reason for allowing the derivative action in the interests of
justice is that if the personal and representative action succeed alone, the
derivative action being rejected, the company might then sue the directors
with the risk that they would be liable for double damages, whereas if
the derivative action were allowed this risk would be obviated.

In regard to the action against T.P.G., Laughton's knowledge of the   E
conspiracy can be imputed to T.P.G.; it cannot be said that knowledge
which he gained as a director of Newman of the conspiracy was con-
fidential to Newman.

*Charles Turnbull* for the fourth defendant, T.P.G.   The action to
recover damages from T.P.G., as constructive trustee, on the basis of the
second limb of *Barnes* v. *Addy,* 9 Ch.App. 244, is misconceived for the   F
following reasons.   If, as is alleged, the circular was tricky and misleading,
then the notice convening the meeting was invalid, and the resolution
approving the transaction was void and was not properly authorised on
Newman's behalf.   The effect of that is that neither Newman nor T.P.G.
acquired a good title to what they received under the transaction and
therefore Newman cannot claim, on the basis of constructive trusteeship,
the difference in value between the consideration given and the considera-   G
tion received, measured as at the date of the transaction.   The submis-
sions based on *Baillie* v. *Oriental Telegraph and Electric Co. Ltd.* [1915]
1 Ch. 503 and *Kaye* v. *Croydon Tramways Co.* [1898] 1 Ch. 358 to the
effect that if the notice was accompanied by a tricky and misleading
circular which grossly misrepresented the merits of the transaction then
the notice was invalid and the resolution void are adopted.   If the resolu-   H
tion was void there was simply no authority to carry through the trans-
action.   In these circumstances T.P.G. could have sought a declaration
that the resolution was ineffective.   In the light of knowledge or alleged

**A**  knowledge or participation in the fraud, it would have been difficult for T.P.G. to have asked for the transaction to be unscrambled in any action brought by T.P.G., but this could have been done by way of counterclaim.   As to the transfer of the £325,000 from Newman to T.P.G. if Newman's agent had no actual or ostensible authority, then T.P.G. acquired no title to the money, and Newman could demand it back.   T.P.G.'s liabilities would simply not be dischargeable by Newman.

**B**  As to T.P.G.'s assets, Newman would have acquired no title thereto, and T.P.G. could by way of counterclaim demand their return, or their proceeds of sale if they have since been sold.   If the assets have been sold and the proceeds have become untraceable, then T.P.G. could claim damages for conversion or compensation for money had and received. A party cannot claim damages in respect of the difference in value between the consideration given and the consideration received where

**C**  no title passed because the transaction was void.

If the above propositions are wrong, and if Prudential is entitled to sue T.P.G. for loss, then the submissions for the second and third defendants as to the method of calculating the loss and as to *Foss* v. *Harbottle* are adopted.

**D**  *Robert Reid* for the first defendant, Newman.   Without abandoning Newman's position of neutrality, the point which does alarm the company is that if too wide an extension of the doctrine of *Foss* v. *Harbottle*, 2 Hare 461, is allowed it may lead to a multiplicity of actions by other minority shareholders, which would be of dubious utility to the company and which would prove extremely costly.   There is no realistic likelihood that if Bartlett and Laughton lose the case they will be able to pay Pru-

**E**  dential's costs, or to have anything left over to pay damages to Newman. The danger of such actions as this is that the company will be " killed by kindness."   The exceptions to the rule in *Foss* v. *Harbottle* are set forth in an unexceptionable way in *Daniels* v. *Daniels* [1978] Ch. 406, and they should not be extended.   The proper course for Prudential to have pursued if they indeed had evidence of fraud was to seek to get a meeting

**F**  of the company called and to have placed the evidence before the meeting. It is not right to assume that the meeting would have been deceived or misled again, if in truth they were misled in the first place.   If the Newman directors had refused to call a meeting and if Prudential failed to get sufficient support from other shareholders to force the calling of a meeting, Prudential could as a last resort have asked the Department of Trade to take action under section 37 of the Companies Act 1967.   If

**G**  a new exception is allowed on these lines the number of shareholders affected who are continuing shareholders must be shown and the matter must be dealt with in the pleadings.

*Scott Q.C.* in further argument.   *Lewin, Trusts,* 16th ed. (1964), pp. 637, 638 states the principle for which *Foley* v. *Burnell* (1783) 1 Bro.C.C. 274; (1785) 4 Bro.Parl.Cas. 319 is cited in support.   In *Travis* v. *Milne*

**H**  (1851) 9 Hare 141 it is said that the surviving partners of a testator dealing with the property of the testator with the knowledge that it belongs to the estate are bound to inquire into the trusts on which it is held and are liable as if they had actual knowledge of those trusts, but nevertheless a

suit by parties beneficially interested in the estate of a deceased partner
cannot be maintained against both his executors and surviving partners   A
in the absence of special circumstances, but collusion is not the only
ground for such a suit and it may be maintained where the relation
between the executors and surviving partners is such as to present a
substantial impediment to the prosecution by the executors of the rights
and parties' interests in the estate against such partners.   That is a very
different approach from that in the *Foss* v. *Harbottle* cases, where the   B
court is concerned to see that the wrongdoers should not be able to prevent
action being brought against themselves, by a manipulation of their
position in the company.   See also *Yeatman* v. *Yeatman* (1877) 7 Ch.D.
210 and *Harmer* v. *Armstrong* [1934] Ch. 65.   *Vandepitte* v. *Preferred
Accident Insurance Corporation of New York* [1933] A.C. 70 underlines
that there is no reason why the principle that where a person is entitled to   C
use the name of another the practice of allowing him to sue in that name
should not apply where the contract is one made under seal.

   The interesting point in these cases is that there is a flexibility wielded
by the court to avoid forcing potential plaintiffs through two different
sets of proceedings in order to produce the same obvious result.   Where
the court can see on the material before it what the result will be in the
preliminary proceedings of the *In re Beddoe's* type [1893] 1 Ch. 547, then   D
sensibly the court does not insist on such preliminary proceedings.   If that
is the right analysis of the principle, there is no analogy with the *Foss* v.
*Harbottle* line of cases, because there is no preliminary action that the
minority shareholder can bring, the necessity for which can be avoided by
the court, since what the court is concerned with is what the majority of
the shareholders may or may not decide for themselves.                    E

   Whilst the position of the beneficiary in an unadministered estate is
somewhat similar to that of a shareholder in that he has no legal or equit-
able interest in the assets of the company, there is nevertheless this
fundamental distinguishing feature, namely that in the beneficiary's case
the court has jurisdiction in equity to give directions for the administra-
tion of the estate, and, to give effect to such directions, may allow the   F
beneficiary to sue in his own name, joining the trustee as a defendant.
But there is no counterpart with regard to a company.   The cases do not
demonstrate any broad flexibility in procedure entitling the court to allow
a minority shareholder's action simply because it might be convenient
to do so.

   An infant's action is brought by a next friend, and similarly with a
mental patient but in neither case is there an exception to the rule that   G
the person having the cause of action must be the plaintiff.   There is no
provision for making an infant or a mental patient a defendant.   The
true plaintiff always brings the action.

   The exception to the rule in *Foss* v. *Harbottle*, 2 Hare 461, applies
and applies only where the wrongdoers are, by means of a manipulation of
their position in the company, in a position to prevent the action being   H
brought against themselves.   That principle covers the ordinary case
where they hold a majority of 51 per cent. or more, or sufficient control
to prevent what would otherwise be a majority from authorising the

A  action, or where they control the board and are thereby in control by means of proxies.

The effect of allowing a minority shareholder to bring an action would be an injustice to the majority.  A director owes two entirely separate duties, a fiduciary one to the company and a separate duty in certain circumstances to the shareholders, this latter duty being a " tortious " one. It is a coincidence if one finds that a particular act happens to be a breach

B  of both duties.  In no way can the majority deprive an individual shareholder of a right *vested in himself*.  If there was a breach of duty, but no damage to the shareholder, he has no right of action.  If there has been damage, the shareholder can sue irrespective of any derivative action. While success by a shareholder in a personal action might show the likelihood of success by the company in the company's action, it would not

C  necessarily be so, since the duties are different.  If dishonest advice is given by a director to the shareholders there is plainly a breach of duty.

Newman's expectation of profit, after the acquisition of T.P.G.'s assets for £325,000, was based on the fact that the market believed that Newman had received assets of that value.  The fallacy of the Prudential's submissions is in saying that there would necessarily have been a greater

D  *expectation* of profit if the assets had been bought for say only £125,000. There is no evidence as to what in fact the market's expectations were.

*Caplan Q.C.* replied.

*Cur. adv. vult.*

February 18 and 19, 1980.  VINELOTT J. read the following judgment.

E
*Introduction*

The plaintiff, Prudential Assurance Co. Ltd. (" Prudential ") is and has at all material times been the holder of 3·2 per cent. of the issued ordinary shares of the first defendant, Newman Industries Ltd. (" Newman "). At the material time the second defendant, Alan Frank Bartlett, was the

F  chairman and chief executive of Newman and the third defendant, John Knox Laughton, a non-executive director and vice-chairman of Newman. Mr. Bartlett and Mr. Laughton were also the non-executive chairman and the vice-chairman and chief executive respectively of the fourth defendant, Thomas Poole & Gladstone China Ltd. (" T.P.G."). T.P.G. held 25·6 per cent. of the issued ordinary shares of Newman. Another company, Strongpoint Ltd., all the shares of which were beneficially owned by Mr. Bartlett

G  and Mr. Laughton and of which they were directors, held over 35 per cent. of the issued ordinary shares of T.P.G.

By an agreement dated June 3, 1975, T.P.G. agreed to sell and Newman agreed to purchase a bundle of assets (" the package ") which comprised all the assets then owned by T.P.G. except its holding of shares of Newman and a debt of £100,000 owed to it by Strongpoint. The consideration for

H  the sale was the assumption by Newman of all the liabilities of T.P.G. consisting of bank overdrafts and loans amounting to £1,117,000, and the payment by Newman to T.P.G. of a balance of £325,000 cash. The agreement was conditional upon its approval in general meeting both by the

members of T.P.G. and by the members of Newman. Having regard to
the common directorships of Mr. Bartlett and Mr. Laughton (and others)   A
and to their beneficial ownership of Strongpoint, the Stock Exchange
regulations governing " Admission of Securities to Listing," embodied in
what is commonly known as the " Yellow Book," required that the
agreement should be subject to this condition. By a circular letter dated
June 21, 1975, Mr. Bartlett informed the shareholders of Newman that the
directors of Newman recommended them to vote in favour of a resolution   B
approving the agreement of June 3, 1975. The letter also informed the
shareholders that the directors recommended them to vote in favour of a
further resolution approving the exercise by Newman of an option to
acquire from Strongpoint 3,500,000 ordinary shares of 5p each of T.P.G.
amounting to 19·8 per cent. of the issued ordinary share capital of T.P.G.
at a price of 10p per share, making an aggregate consideration of £350,000,
of which £280,000 had been paid to Strongpoint on July 2, 1974, the date   C
of an agreement by which the option (which I shall refer to as " the
Strongpoint option ") was said to have been created. I shall for convenience
refer to that circular letter and its accompanying appendices as " the
Newman circular." The Newman circular was accompanied by a notice
convening an extraordinary general meeting of Newman on July 8, 1975,
for the purpose of considering and if thought fit passing the two resolutions   D
which I have mentioned. On or shortly before July 8, 1975, Prudential
persuaded the directors of Newman to adjourn the extraordinary general
meeting until July 29, 1975. The adjournment was agreed in the expectation,
disappointed in the event, that a report would be obtained before July 29,
1975, from an independent firm of merchant bankers on the merits of the
resolutions. On July 29, no report having been obtained from the merchant   E
bankers appointed, namely Schroder Wagg & Co. Ltd., Prudential again
proposed an adjournment. That proposal was defeated on a poll and the
resolution approving the agreement of June 3, 1975, was approved. The
resolution approving the exercise of the Strongpoint option was not put to
the extraordinary general meeting.

I shall return later in this judgment to the precise sequence of events   F
in June and July 1975 and to the subsequent history of the investigation
and report by Schroder Wagg & Co. Ltd. It is sufficient for the purpose of
these introductory remarks to say that Prudential claim that the Newman
circular was, and was known and intended by Mr. Bartlett and Mr.
Laughton to be, tricky and misleading, and that Mr. Bartlett and Mr.
Laughton conspired to procure this tricky and misleading circular to be
sent to the shareholders of Newman in order to induce them to approve   G
an agreement designed to benefit T.P.G. at the expense of Newman. The
claim is brought by Prudential on behalf of itself and all other share-
holders of Newman, except Mr. Bartlett and T.P.G., to recover damages
or compensation in favour of Newman; to that extent the claim is what is
now, following the practice in the United States of America, frequently
called a " derivative claim." But Prudential also makes a claim against   H
Mr. Bartlett and Mr. Laughton for damages for conspiracy. I shall refer to
this as the direct claim and in so far as Prudential seeks damages on its
own behalf, the direct personal claim. On June 18, 1979, I heard and

A  dismissed an application by Mr. Bartlett and Mr. Laughton that it be determined as a preliminary issue whether as a matter of law Prudential, as a minority shareholder, is entitled to maintain a derivative claim against defendants who do not control the majority of the votes capable of being cast in general meeting of the company on whose behalf the derivative claim is brought. On June 28 ([1980] 2 W.L.R. 339), I heard and allowed an application by Prudential to amend the title to the action and the relief

B  sought so as to join with the direct personal claim against Mr. Bartlett and Mr. Laughton a claim by Prudential as representing all shareholders of Newman, other than Mr. Bartlett and T.P.G., as at July 29, 1975, for declarations that the Newman circular was misleading and tricky, that Mr. Bartlett and Mr. Laughton conspired to procure the distribution of the Newman circular in order to induce the shareholders of Newman to vote

C  in favour of the resolution approving the agreement, and that that conspiracy was an unlawful conspiracy founding a claim for damages by any member of the class represented who was injured thereby. Common to the derivative claim and to the direct claims both personal and representative are the allegations that the Newman circular was deliberately tricky and misleading and that Mr. Bartlett and Mr. Laughton conspired to procure its circulation in order to secure the approval of an agreement

D  designed to benefit T.P.G. at the expense of Newman.

The evaluation of these claims requires a detailed examination not only of the terms of the Newman circular but also of the financial position of T.P.G. at the time that the agreement of June 3, 1975, was negotiated, of the history and method of valuation of the individual items comprised in the bundle of assets acquired by Newman and of the relationship

E  between, on the one hand, T.P.G. and Strongpoint and, on the other hand, T.P.G. and Newman. But there are two matters which are recurring themes in this history and of which some preliminary explanation is needed. These are, first, the requirement of the Yellow Book and, secondly, the proper treatment in the balance sheet of a company which holds what has been described as a " strategic stake " in another company—that is a hold-

F  ing of not less than 20 per cent. nor more than 50 per cent. of the shares of that company carrying voting rights coupled with representation on its board of directors—of the assets and undistributed profits of the company in which the strategic stake is held.

*The Yellow Book*

G  Chapter 4 of the Stock Exchange regulations, governing the " Admission of Securities to Listing," contains the requirements of the Stock Exchange concerning acquisitions and realisations of assets by companies which have the privilege of listing and quotation on the Stock Exchange and which have accordingly entered into a listing agreement. Chapter 4 deals with four categories of transactions of which only two are relevant. A class 1 transac-

H  tion includes one where the value of assets acquired or disposed of by a listed company amounts to 50 per cent. or more of the value of the other assets of the acquiring or disposing company. Such a transaction must (save in exceptional circumstances and with the approval of the Council

of the Stock Exchange) be explained to the members of the company concerned by a circular approved by the Quotations Department of the Stock **A** Exchange. The approval of shareholders is not required. A class 4 transaction includes one under which there is an acquisition or disposal of assets by a company or the subsidiary of a company from or to a director or substantial shareholder or from or to an associate of a director or substantial shareholder—including any company which is a subsidiary or holding company of such a substantial shareholder. Save in exceptional **B** circumstances and with the approval of the Council of the Stock Exchange such a transaction must be explained in a circular sent to the shareholders and must be made conditional on their approval in general meeting. The Council of the Stock Exchange reserve the right to require that any director or substantial shareholder or associate interested in the transaction abstain from voting. Although not specifically so provided in the Yellow **C** Book current in June 1975 in practice the Quotations Department of the Stock Exchange almost invariably require that a report by independent financial advisers on the merits of the acquisition or disposal be obtained and that the substance of that report be set out in the circular.

These provisions form a very important part of the voluntary system of regulation of the City administered by, amongst others, the Stock Exchange. The sanction for failure to comply with these regulations is, of course, a **D** suspension of the offending company from listing on the Stock Exchange.

*The accounting standards*

The Institute of Chartered Accountants from time to time issues statements of standard accounting practice which prescribe methods of accounting approved by the Council of the Institute. The standards **E** prescribed are not intended to be a comprehensive code of inflexible rules but they are intended as more than a guide or indicator of practice. Where, for some exceptional reason, they are impractical or inappropriate a departure from the standards must be disclosed and explained. They must, of course, be read subject to the overriding requirement that accounts must be so presented as to give a true and fair view of a company's affairs. **F**

In January 1971 a statement of standard accounting practice was issued dealing with the method of accounting for the results of associated companies. The Companies Act 1948 requires a company which has a subsidiary to produce group accounts, normally consolidated accounts, showing the combined assets and liabilities and the combined profits or losses of the parent and subsidiary companies. The 1971 statement noted: **G**

"In recent years there have been two important developments. One has been the growing practice of companies to conduct parts of their business through other companies (frequently consortium or joint venture companies) in which they have a substantial but not a controlling interest. The other is the importance which investors have come to attach to earnings (as distinct from dividends), the price/ **H** earnings ratio (P/E ratio) and, increasingly, earnings per share. Thus, in order that the investing companies' accounts as a whole may give information, and provide a total of earnings from which the most

A meaningful ratios can be calculated, it is considered necessary that the coverage of consolidated accounts be extended so that they should include (within the framework of the existing law), the share of earnings or losses of companies which are described in this statement as associated companies . . . "

B The description or definition of an " associated company " provides that a company is to be treated as an " associated company " of a group or company acquiring shares in it (referred to as the " investing group or company ") if (not being a subsidiary of the investing group or company) either

C
" (a) the investing group or company's interest in the associated company is effectively that of a partner in a joint venture or consortium; *or* (b) the investing group or company's interest in the associated company is for the long term and is substantial (i.e. not less than 20 per cent. of the equity voting rights), and, having regard to the disposition of the other shareholdings, the investing group of company is in a position to exercise a significant influence over the associated company."

D The standard requires that where the investing group or company produces consolidated accounts the investing group or company must show in its consolidated profit and loss account the aggregate of its share of pre-tax profits less losses of associated companies, the tax attributable thereto and the net profits retained by the associated companies.   The requirements concerning the consolidated balance sheet are as follows :

E
" Unless shown at a valuation, the amount at which the investing group's interests in associated companies should be shown in the consolidated balance sheet is: (a) The cost of the investments less any amounts written off *and* (b) the investing company or group's share of the post-acquisition retained profits and reserves of the associated companies . . . Information regarding associated companies' tangible and intangible assets and liabilities should be given, if materially
F relevant for the appreciation by the members of the investing company of the nature of their investment."

Two points should be noted. First the standard applies to quoted as well as to unquoted companies; as regards holdings in the equity share capital of unquoted companies the provisions of the standards overlap, and must not be read as derogating from, the provisions introduced
G by paragraph 5A of Schedule 2 to the Companies Act 1967. Secondly, there is nothing in the statement which requires or justifies the inclusion in the consolidated accounts of the investing group or company of a share of the net assets or liabilities of an associated company. Information regarding tangible and intangible assets and liabilities must be given " if materially relevant for the appreciation by the members of the investing
H company of the nature of their investment." Such information will ordinarily be given by a note in the accounts and not by consolidation of the assets and liabilities of the associated company in the consolidated accounts of the investing group or company.

One of the witnesses who gave evidence on behalf of Prudential was
Sir Charles Ball, a well known merchant banker who was for many years    A
vice-chairman of Kleinwort Benson & Co. Ltd. Sir Charles Ball was trained
as a chartered accountant becoming a member of the Institute in 1950
and a fellow in 1960. He said that he had never known a case where a
share of the underlying assets of an associated company had been brought
into the balance sheet of the investing group or company. It was suggested
to him in cross-examination that it was in fact common practice to do so    B
and Sir Charles Ball was referred to the published accounts of a number
of large public companies—such as General Electric Co., Beecham Group,
Taylor-Woodrow Group and Royal Dutch/Shell Group—in which shares
of the underlying assets of associated companies were so treated. However,
as Sir Charles pointed out, it is dangerous to draw conclusions from
published accounts alone without making investigation into the reasons for    C
a particular accounting treatment. There may be exceptional circumstances
which justify bringing a share of the underlying assets of associated com-
panies into consolidated accounts.   For instance, in the case of General
Electric Co. none of the associated companies was quoted on the London
Stock Exchange; most were unquoted though some were quoted on
overseas stock exchanges; it was apparent from the description that many,
if not all, the associated companies were in the nature of joint ventures,    D
many in foreign companies where the local laws required that a majority
of the voting shares be held by local residents. There may be good reasons
for including a share of underlying assets in the case of an associated
company formed as a joint venture with a foreign investor if the contribu-
tion made by each investor is made on terms that the aggregate will be
applied in the acquisition of assets which in turn will appear at cost in    E
the balance sheet of the associated company. Although Sir Charles Ball's
view may initially have been expressed in terms which were too categorical,
I accept his evidence that, in the absence of exceptional circumstances
such as those I have described, it is contrary to good accounting practice
to include in consolidated accounts a share of the underlying assets of an
associated company and that in the case, at least, of a trading or manu-
facturing company, the inclusion of a share of underlying assets in the    F
consolidated accounts of the investing group or company is likely to
produce a misleading, even a very misleading, impression of the true value
of the assets of the investing group or company. A share of the underlying
assets of an associated company is unlikely to provide any guide to the
market value of the shares of that company held by the investing group
or company—at least in those cases where the associated company is a    G
trading or manufacturing company: it may be different if the associated
company is a property holding or investment company, whose assets have
been recently revalued. As will be seen, in the present case the device of
including as assets of T.P.G. a share of the underlying assets of certain
of its associated companies played an important part in the original
formulation of the proposals for the acquisition by Newman of T.P.G.'s    H
assets and in the way in which the transaction was presented in the
Newman circular.

*Background history*

A
[The following is a summary of the facts stated by his Lordship. Mr. Bartlett, a management consultant and a director of several public companies, became a director of Newman in 1969 and its non-executive chairman in 1973. Newman's main business was the manufacture of electric motors but under Mr. Bartlett's direction it pursued a policy of expansion. That resulted in a liquidity problem and by the end of 1974

B Newman's current assets were valued at £14,789,619 and its liabilities, which included a bank overdraft exceeding £5 million, at £12,109,740. At the beginning of 1975 Newman, like other companies, faced a possible recession and a period of tight credit.

Mr. Laughton, a qualified chartered accountant and a management consultant, was on the board of a company of which Mr. Bartlett was

C deputy chairman. In 1971 Mr. Laughton became a director of T.P.G. which was then a small public company carrying on business manufacturing pottery and china. Subsequently he became chief executive of T.P.G. In October 1971 Mr. Bartlett became a director of T.P.G. In 1974 Mr. Laughton became a director of Newman.

Between 1972 and the end of 1974 T.P.G. acquired interests in various companies. In January 1973 it acquired the assets of Strongpoint Ltd.

D which had a substantial shareholding in T.P.G. and a shareholding in Newman. Subsequently Mr. Bartlett and Mr. Laughton transferred their shares in T.P.G. to Strongpoint which by December 31, 1974, held 35 per cent. of T.P.G.'s issued ordinary shares. T.P.G. acquired further shares in Newman giving it a 25 per cent. shareholding in Newman. It also acquired shareholdings in Alfred Clough Ltd. (" Clough "), in a private company,

E S. Newman Ltd , in various commercial radio companies (" the media interests "), in Dover Engineering Ltd. (" Dover "), in Metropole Industries Ltd. (" Metropole ") and in Agar Cross Ltd. (" Agar Cross "). T.P.G. also formed a new company, Smithamcote Ltd., to acquire shares in two other companies in exchange for shares in Smithamcote. T.P.G. took 49 per cent. of voting shares of Smithamcote and sold to Smithamcote for

F £100,000 (which remained outstanding as a debt due from Smithamcote) shares of an investment company into which had been put T.P.G.'s minority holding of shares of S. Newman Ltd. T.P.G.'s acquisitions were financed partly by the issue of shares in T.P.G. and partly by cash borrowings from banks. By the end of 1974 the cash borrowings amounted to about £1 million and included a loan from the Ulster Investment Bank Ltd. (" Ulster ") which was repayable by January 31, 1975. The bank

G borrowings were made on terms that T.P.G. deposited with the banks quoted investments having a market value exceeding the amount of the borrowing by a certain percentage. Due to the decline of the stock market at the end of 1974 T.P.G., by January 1975, was in serious financial difficulties; the overall collateral security provided by it for bank borrowings had become inadequate, its investment income was insufficient to meet

H its running expenses and interest on the borrowing and there was no other source of money to which it could resort; moreover the Ulster loan was due for repayment on January 31. In those circumstances agreements (" the January agreements ") were entered into by exchange of letters dated

January 7 which were not disclosed to the Newman board, whereby New-
man agreed to buy T.P.G.'s shareholdings in Metropole and Dover for $\quad$ A
£85,000 and £146,000 respectively, payable by instalments; the value of
those shareholdings on the Stock Exchange was £37,450 and £104,000
respectively. Under the January agreements Newman paid £215,950 to
T.P.G., without the knowledge of the Newman board, which T.P.G. used
to keep afloat; but its underlying difficulties were not alleviated, although it
was granted an extension of time, to March 31, 1975, to repay the Ulster $\quad$ B
loan. Mr. Bartlett therefore conceived another, bolder, plan, namely, to
sell T.P.G.'s entire portfolio to Newman whilst concealing the January
agreements and the payments made thereunder.

To implement the plan Mr. Bartlett prepared a memorandum (" the
strategy document ") for the Newman board which was supplied to board
members at or shortly before a Newman board meeting held on March 4, $\quad$ C
1975. The strategy document made two recommendations (" the package ");
first that Newman should purchase from T.P.G. all T.P.G.'s assets, except
for its shareholding in Newman and a loan to Strongpoint of £100,000, in
consideration for Newman assuming T.P.G.'s liabilities and making a
cash payment to T.P.G. of £350,000; and secondly, that Newman should
purchase three and a half million ordinary shares of T.P.G. from Strong-
point (i.e. approximately 20 per cent. of T.P.G.'s issued ordinary shares) $\quad$ D
on payment by Newman to Strongpoint of £70,000, in addition to a sum
of £280,000 already paid by Newman to Strongpoint for the Strongpoint
option, to purchase from Strongpoint shares in T.P.G. The strategy docu-
ment stated that it was within T.P.G.'s resources to mount a takeover bid
for Newman. That was a dishonest statement since T.P.G. was not in a
position to mount a takeover, and was made to induce the Newman board $\quad$ E
to accept the proposed transaction. Further, the document attributed a
value to T.P.G.'s assets which Mr. Bartlett and Mr. Laughton knew was
false and misleading.

At the board meeting held on March 4 at which Mr. Bartlett was
appointed chief executive of Newman and Mr. Laughton was appointed
vice-chairman " responsible to the board for negotiations," it was resolved, $\quad$ F
after some preliminary discussion of the package, to consider the strategy
document at a later board meeting on March 17 to enable the board
to give further thought to the document. At the meeting on March 17
Mr. Bartlett and Mr. Laughton persuaded all the members of the board
except for Mr. Angus Murray (a professional company director of wide
experience who regarded himself as watchdog for Newman shareholders)
to accept the package in principle, but no final agreement was reached $\quad$ G
to implement it and in particular there was no agreement as to the
detailed composition of the package. To protect Newman's interests
Mr. Murray ensured, at the meeting, that a report would be obtained
on the package from Newman's auditors, Deloitte & Co., and the board
agreed to appoint a sub-committee, which included Mr. Laughton, to
brief Deloitte on the matter. Mr. Murray thought that a final decision $\quad$ H
on the transaction would not be made until the board had considered
Deloitte's report but Mr. Bartlett and Mr. Laughton were determined
to press ahead with the transaction without giving the board further

A  opportunity to consider it. With this end in mind they instructed Mr. Cooper of Deloitte's to make a valuation of the net assets to be acquired by Newman under the package, and instructed solicitors to commence work on the necessary circular to Newman shareholders explaining the transaction. On March 24 Mr. Bartlett wrote to the Stock Exchange stating that the Newman board had unanimously approved the recommendations in the strategy document. Because Mr. Bartlett and Mr.

B  Laughton misled Mr. Cooper regarding the package and the assets to be acquired under it and led him to believe that it would be sufficient for him to produce a valuation of the transaction as a whole without attributing a value to each asset to be acquired, Mr. Cooper applied an improper process of valuation which resulted in a provisional valuation of the net value of the assets to be acquired at £235,000. At Mr. Laughton's persua-

C  sion Mr. Cooper increased valuation to £325,000. The latter figure exceeded by approximately £445,000 the market value of the package as a whole even on the footing that Newman as a willing purchaser would pay a premium of 10 per cent. over the mid-market price of the assets. Mr. Cooper's valuation of £325,000 was put to a Newman board meeting on May 6. Mr. Bartlett and Mr. Laughton by trickery and deceit induced the board to accept the valuation as a basis for negotiating the package and

D  having done that, determined to press ahead to procure the board to enter into a binding agreement with T.P.G. without giving the board any opportunity to examine the basis of Mr. Cooper's valuation. On June 3 Mr. Laughton, purporting to act on behalf of Newman, but without authorisation from the Newman board, signed an agreement implementing the package for a net consideration from Newman of £325,000. The

E  agreement was conditional on approval of it by Newman and T.P.G. in general meeting.

Newman's solicitors prepared the circular required to be sent to Newman shareholders explaining the transaction (" the Newman circular "), in conjunction with Deloitte and with the assistance of, inter alia, Mr. Bartlett and Mr. Laughton. On June 18 a committee of the Newman

F  board consisting of Mr. Bartlett, Mr. Laughton and two others approved the draft circular and also approved a notice convening on July 8 an extraordinary general meeting of Newman to consider two resolutions, one approving the agreement of June 3, and the other approving exercise by Newman of the Strongpoint option. The chairman's letter, forming the body of the circular, stated that the directors of Newman considered that the resolutions were in Newman's best interests and recommended share-

G  holders to vote in favour of them. Mr. Murray objected to the circular because it implied, contrary to the true position, that all the Newman directors had fully considered the transactions and unanimously approved them. He put pressure on Mr. Bartlett to postpone the meeting of July 8 to allow further investigation of the transactions by merchant bankers. An extraordinary general meeting was held on July 8 but Mr. Bartlett

H  decided to adjourn the meeting to July 29 having been threatened by institutional investors that unless the meeting was adjourned they would blacklist Newman shares. However Mr. Bartlett made a speech to the shareholders at the meeting on July 8 in which he made dishonest and misleading

statements. The Newman board resolved to appoint Schroder Wagg & Co. ("Schroder") to investigate and report on the transactions covered by the resolutions. Schroder were unable to complete their report in time for the meeting on July 29. Prudential pressed Mr. Bartlett to adjourn the meeting until Schroder's report was ready but by July 24 Mr. Bartlett had made it clear that he would not agree to a further adjournment. Prudential therefore issued a writ, on July 28, claiming, inter alia, an injunction restraining the Newman directors, except Mr. Murray, from considering proposing or voting on the resolutions in the circular and applied for an interlocutory injunction in those terms. On July 28 Walton J. dismissed that application. An extraordinary general meeting of Newman was duly held on July 29 (a resolution by Prudential to adjourn it until Schroder had reported being narrowly defeated on a poll) and at that meeting the resolution that the agreement of June 3 be approved was passed on a poll by a small majority. The resolution approving the exercise of the Strongpoint option was not put to the meeting.   On January 9, 1976, Prudential gave notice discontinuing the action commenced on July 28, 1975, and on the same date (January 9) issued the writ in the present action (which claimed that the Newman circular was, and was known and intended by Mr. Bartlett and Mr. Laughton to be, tricky and misleading and that they conspired to procure the circular to be sent to Newman shareholders to induce them to approve the agreement of June 3). In his Lordship's judgment the Newman circular was tricky and misleading in several respects and was known to Mr. Bartlett and Mr. Laughton to be so.   His Lordship continued: ]

*The conspiracy*

The case pleaded in the statement of claim is that (1) in addition to the fiduciary duty which Mr. Bartlett and Mr. Laughton owed to Newman as two of its directors: (a) Newman owed a contractual duty under article 55 of its articles of association which is in substantially the same terms as article 50 of Table A to specify in the case of special business to be transacted at a general meeting the general nature of that business; and (b) inasmuch as the Newman circular contained advice from Mr. Bartlett and Mr. Laughton to the shareholders to vote in favour of the proposed resolution approving the agreement of June 3 each of them owed an obligation to every shareholder to give that advice in good faith and not to advise in a tricky or misleading fashion.

(2) Mr. Bartlett and Mr. Laughton conspired to benefit T.P.G. at the expense of Newman and the shareholders of Newman by procuring the approval of the shareholders of Newman in general meeting to the agreement of June 3 by means of the distribution of a circular which they knew and intended to be misleading and tricky.

(3) The conspiracy was (a) a conspiracy to commit an unlawful act; (b) a conspiracy to injure Newman and the shareholders of Newman; and (c) a conspiracy to induce or procure a breach of Newman's contractual obligations to its shareholders.

(4) By means of such conspiracy Mr. Bartlett and Mr. Laughton procured the approval of the shareholders of Newman to the agreement

Case 1:21-cv-11059-GHW   Document 141-14   Filed 06/14/23   Page 39 of 76

295

1 Ch.         Prudential Assurance v. Newman Industries (No. 2)         Vinelott J.

A of June 3 and by reason of that approval Newman and its shareholders have suffered damage for which Mr. Bartlett and Mr. Laughton are liable to Newman and its shareholders.

Mr. Scott accepts, and in my judgment rightly, that Mr. Bartlett and Mr. Laughton as directors of Newman, in advising the shareholders of Newman to support the resolution for the approval of the agreement of June 3, owed them a duty to give such advice in good faith and not to do

B so in a tricky and misleading way: see *Gething* v. *Kilner* [1972] 1 W.L.R. 337. But Mr. Scott submitted that there is no evidence to support the only conspiracy pleaded in the statement of claim, that is, a conspiracy to procure the approval by the shareholders of Newman of the agreement of June 3 by means of the distribution of a circular which they knew and intended to be misleading and tricky. In my judgment Prudential has

C established the facts relied upon in the parts of the statement of claim which I have summarised. In my judgment the inception of the conspiracy and the steps taken in furtherance of it were as follows:

(1) In January 1975 in order to meet T.P.G.'s pressing obligations Mr. Bartlett and Mr. Laughton procured the execution of the January agreements and procured the payment by instalments between January 8 and April 18, 1975, of sums amounting to £215,950. The January agree-

D ments were executed and the instalments were paid without the authority of the board of Newman. In procuring the execution of the agreements and the payment of the instalments Mr. Bartlett and Mr. Laughton conspired to do an unlawful act, namely, to procure the improper use of Newman's money for the benefit of T.P.G.

(2) In February 1975 Mr. Bartlett and Mr. Laughton conceived a more

E extensive plan which was to (a) persuade the board of Newman to take over all the assets owned by T.P.G., except its holding of shares of Newman, the debt owed to T.P.G. by Strongpoint and any other assets of T.P.G. which they might succeed in selling at a favourable price to another purchaser; (b) use whatever means might transpire to be available to ensure that the highest possible value was attributed to the assets of T.P.G. acquired by Newman in the report by an independent valuer which

F they knew would be necessary before the approval of the transaction by the shareholders of Newman could be obtained; (c) take whatever steps might transpire to be available to secure the approval of a sale of the assets of T.P.G. to Newman at that price by the directors and in due course the shareholders of Newman.

Mr. Bartlett and Mr. Laughton had been accustomed to work together

G as a team. They had done so in relation to the January agreements and the payments made thereunder. Each knew that he could rely upon the other to use any means, proper or improper, which might become available to him to further this plan.

(3) The first step taken in furtherance of this plan was Mr. Bartlett's " strategy document." The strategy document contained statements known

H by Mr. Bartlett and Mr. Laughton to be false and misleading. First it was represented that T.P.G. was in a position to mount a takeover and might mount a takeover of Newman. Secondly, it was represented that the value of the package net of liabilities was at least £350,000.  That representation

was supported by a pro forma balance sheet of T.P.G. which attributed
a value to assets owned by T.P.G. which Mr. Bartlett and Mr. Laughton                    A
knew to be false and misleading in important respects. The strategy docu-
ment was to prove of crucial importance in furthering Mr. Bartlett and
Mr. Laughton's plan. In my judgment Mr. Cooper of Deloitte & Co. was
influenced in making his valuation by the belief that a sum of £350,000
net of liabilities was believed by the chairman and chief executive of
Newman to represent a fair price for Newman to pay and for T.P.G. to        B
accept and that the other directors of Newman had agreed, subject to
confirmation by independent valuation that the price was fair, that the
price was worth paying in order to secure the commercial advantages
advanced in the strategy document.

(4) At the meeting of the board of Newman on March 17 Mr. Bartlett
and Mr. Laughton used their influence on the board to ensure that the   C
necessary valuation would be carried out by the auditors of Newman and
not by a merchant bank in the belief (justified in the event) that they
would find it easier to persuade the auditors of Newman to accept a
valuation favourable to T.P.G. They also used their influence to procure
the appointment of a committee, including Mr. Laughton, which could be
used to supply the auditors with arguments and information supporting a   D
valuation favourable to T.P.G. The appointment of Mr. Laughton to the
committee was secured in the following way. The appointment of a
committee—with, as Mr. Murray was led to believe, terms of reference
limited to preparing a brief for Deloittes—having been agreed, Mr. Bartlett
asked for volunteers to serve on the committee well knowing Mr. Laughton
would be the first to volunteer.                                             E

(5) Shortly after the meeting of March 17 the Quotations Department
of the Stock Exchange was falsely informed that the board of Newman
had agreed the package deal subject only to obtaining the necessary
independent valuation.

(6) As was intended, Mr. Laughton played the leading role in supplying
information to Mr. Cooper. In so doing he put forward every fact and    F
argument that would favour a higher, and failed to put forward any fact
or argument that would favour a lower, valuation of the package. In the
strategy document and in the information supplied by Mr. Laughton
material facts were either deliberately misrepresented or concealed. In
particular, Mr. Cooper was led to believe that the current level of profits
earned by Metropole was £250,000, although at the time when he com-
pleted his valuation it was known to both Mr. Bartlett and Mr. Laughton   G
that the current level of profits of Metropole was far less.  He was led to
believe that the shares of S. Newman Ltd. formed an adequate security for
the debt owed to T.P.G. by Smithamcote and to attribute a value of
£100,000 to that debt although both Mr. Bartlett and Mr. Laughton knew
that the shares of S. Newman Ltd. were worth substantially less than
the £100,000 and that the market value of the debt on whatever basis it was   H
valued was not more than £35,000. Mr. Laughton concealed the fact,
known to him, that many unsuccessful attempts had been made to find a
buyer for the shares of S. Newman Ltd. and that the family which

A  controlled S. Newman Ltd. were unwilling either to join in a flotation or sale of the entire shareholding.

(7) In a telephone conversation on May 4 Mr. Laughton was informed by Mr. Cooper that he had provisionally valued the package net of liabilities at £235,000. Mr. Laughton induced him to increase that figure to £325,000 to the benefit of T.P.G. and the detriment of Newman. In doing so Mr. Cooper was induced to add £50,000 to the value of the

B  package as representing the alleged enhancement due to the inclusion of T.P.G.'s holding of shares of Smithamcote—which taken by themselves had no market value. Mr. Laughton knew that the inclusion of T.P.G.'s holding of shares of Smithamcote added nothing to the value of the package and that in agreeing the addition of this sum Mr. Cooper had made a serious error of judgment and had made an addition to the value of the package

C  which could not be justified on any basis of valuation which he was competent to make.

(8) At the meeting of the board of Newman on May 6 Mr. Laughton concealed from the board the fact that the valuation by Mr. Cooper had attributed a value to items in the package which he knew to be far in excess of the true value of those items and that Mr. Cooper had been led to add a sum of £50,000 as representing the enhancement of the package

D  due to the inclusion of T.P.G.'s holding of shares of Smithamcote. Mr. Laughton knew that the question whether the inclusion of T.P.G.'s shares of Smithamcote in the package enhanced the package and if so to what extent was a matter of commercial judgment which ought to be considered by the board and which it was beyond the competence of Mr. Cooper to assess. In my judgment Mr. Bartlett also knew the value attributed to the

E  items in the package by Mr. Cooper in his provisional valuation and the additions he had been induced to make by Mr. Laughton. But if he did not he knew that Mr. Cooper had been led either to put a value on T.P.G.'s shares of Smithamcote which was greatly in excess of their true market value or that he had been led to put a value on other items in the package which was in excess of their true market value.

F  (9) Having secured a favourable valuation from Mr. Cooper by these means Mr. Bartlett and Mr. Laughton agreed that they would take all means available to them to ensure that the transaction between T.P.G. and Newman was not further considered by the board and to procure the passing of a resolution by the shareholders approving the transaction. They procured the execution of the agreement of June 3 and the preparation and circulation of the Newman circular knowing that the board had

G  not finally agreed the acquisition of the package from T.P.G.

(10) The Newman circular was known by Mr. Bartlett and Mr. Laughton to be misleading and tricky in the respects which I have already summarised.

(11) At the extraordinary general meeting on July 8 Mr. Bartlett, in order to assuage the anxieties of shareholders to which press criticisms had given

H  rise, made the dishonest statements which I have already summarised.

In my judgment the plan, formulated and carried into effect in the way I have described, was a conspiracy knowingly and wrongfully to injure Newman and the shareholders of Newman. Each part of the plan, agreed

expressly or tacitly in the course of and to secure the accomplishment of
the overall plan, including the contributions to and the preparation and the
approval and circulation of the Newman circular, was in itself such a
conspiracy.

*The legal issues*
  *Introductory*

In the statement of claim as originally formulated the relief primarily
sought by Prudential comprised declarations that the Newman circular was
misleading and tricky, that the notice in the Newman circular convening
the extraordinary general meeting was invalid, that the adjourned extra-
ordinary general meeting on July 29 was not duly convened, that the
resolution approving the agreement of June 3 was invalid and that that
agreement should accordingly be, in a broad sense, rescinded—that is that
the parties should be restored to their original positions. It was agreed by
Prudential before the action came on for trial that restitutio in integrum
was no longer practicable. Thereafter the action proceeded as an action
for equitable compensation, as between Newman on the one hand and Mr.
Bartlett, Mr. Laughton and T.P.G. on the other hand, and for common
law damages as between Prudential and Mr. Bartlett and Mr. Laughton.
The central issue is whether Prudential, having abandoned its claim that
the agreement of June 3 never became unconditional and that there was
no valid transfer of property pursuant to it, is entitled to bring a derivative
action—that is an action on behalf of Newman—to recover equitable com-
pensation or damages. But before turning to that question there is a
preliminary question whether on the facts I have found it can be said that
Newman has suffered any loss.

*The loss suffered by Newman*

Mr. Caplan's submission was that Newman is entitled to recover from
Mr. Bartlett, Mr. Laughton and T.P.G. a sum equal to the difference
between the price paid for the package under the agreement of June 3
and the true market value of the assets acquired under that agreement
ascertained at the date when the resolution approving the agreement was
passed. He founded this submission upon the decision of the Court of
Appeal in *McConnel* v. *Wright* [1903] 1 Ch. 546. In that case the plaintiff
was induced by a fraudulent misrepresentation in a prospectus to subscribe
for shares in a company. The misrepresentation relied on was a statement
that the company had acquired shares in certain other companies. In fact,
those shares had not been acquired, at the date of the prospectus or at
the date of the allotment, but the shares were subsequently acquired by the
company. The argument for the defendant—the chairman of the company
—was that, as the representation upon which the plaintiff acted had been
made good shortly after the issuing of the prospectus, the company at the
time of the action contained all that the plaintiff had reason to suppose
it would contain and that the plaintiff could not, therefore, claim that he
had suffered damage as a result of any misrepresentation in the prospectus.
The company had been wound up and was hopelessly insolvent but it was
said that this was due to circumstances not existing at the date of the

A    allotment. In his judgment Sir Richard Henn Collins M.R. said, at pp.
554–555:

"That obliges me to say something as to the principle upon which
damages are assessed in these cases. There is no doubt about it now.
It has been laid down by several judges, and particularly by Cotton
L.J. in *Peek* v. *Derry* (1887) 37 Ch.D. 541; but the common sense and
principle of the thing is this. It is not an action for breach of contract,
B    and, therefore, no damages in respect of prospective gains which the
person contracting was entitled by his contract to expect come in, but
it is an action of tort—it is an action for a wrong done whereby the
plaintiff was tricked out of certain money in his pocket; and therefore,
prima facie, the highest limit of his damages is the whole extent of his
loss, and that loss is measured by the money which was in his pocket
C    and which is now in the pocket of the company.   That is the ultimate,
final, highest standard of his loss.   But in so far as he has got an
equivalent for that money, that loss is diminished; and I think, in
assessing the damages, prima facie the assets as represented are taken
to be an equivalent and no more for the money which was paid. So far
as the assets are an equivalent, he is not damaged; so far as they fall
D    short of being an equivalent, in that proportion he is damaged."

The inquiry directed was therefore an inquiry into the true value of the
shares at the date of the allotment, that is, before the misrepresentation was
made good. The action was brought under section 3 of the Directors
Liability Act 1890 but it is well settled that the measure of damage in an
action under that section is the same as in an action for deceit. The measure
E    of compensation in equity cannot be less.
Mr. Scott's answer to this submission was that Mr. Caplan's approach
obscures the all-important question—what was the cause of the loss? If the
true inference from the facts proved is that, but for the misconduct on
the part of Mr. Bartlett and Mr. Laughton, Newman could have acquired the
package at a lower price—which can be ascertained by reference to market
values of the assets comprised in the package at that time—then, said Mr.
F    Scott, Newman would be entitled to recover a sum equal to the difference
between the price paid under the agreement of June 3 and that aggregate
value. But, the argument continues, if the true inference from the facts
proved is that T.P.G. would never have been willing to sell the package at
a price less than £325,000 net of liabilities, then, while the measure of
damage is still the difference between the price paid under the agreement
G    of June 3 and the value of the assets acquired under it, the court, in
ascertaining that value, must have regard to all facts known at the date
when the value is assessed so far as those facts throw light upon the value
of the assets at the date of the transaction. This may be illustrated by the
following example. Suppose that a purchaser is induced to purchase a
horse for £40,000 on the faith of a fraudulent misrepresentation as to its
H    true pedigree. If he can show that the market value of that horse ascertained
in the light of all the facts known to the vendor at that time was £10,000,
that but for the misrepresentation he would only have been willing to
pay £10,000, and that the vendor would have been willing to sell the

horse for that price, then he can recover the difference of £30,000 as the
loss flowing from the fraudulent misrepresentation. If he cannot show that     A
the vendor would have been willing to sell the horse for £10,000 he can
recover the difference between £40,000 and the true value of the horse at
the date of the sale but in ascertaining that value subsequent events can be
looked at so far as they throw light upon the true value of the horse. If,
despite its humble pedigree, the horse, at the date of the action, has won
a classic race, the vendor is entitled to adduce evidence to show that the     B
true value of the horse, ascertained still at the date of the sale but in the
light of subsequent events, was in excess of £40,000 and that accordingly
the plaintiff has not suffered any damage.

    The application of that principle, if well founded, to the facts of the
present case gives rise to some difficult problems. The problems can be
illustrated by the subsequent history of Clough. The price attributed to    C
T.P.G.'s holding of shares of Clough by Mr. Cooper was £550,000, that is
£1·10 per share. The affairs of Clough did not prosper. In 1975 its profit
was less than in the preceding year and in 1976 it made a substantial loss.
In the course of 1976 Newman acquired Major Marley's 61 per cent. hold-
ing of shares in Clough at the price of 53p per share and made a public
offer for the outstanding shares at the same price which was accepted by
all shareholders except a small minority holding 1·6 per cent. In 1977 under   D
Newman's management Clough made a very large profit. The current level
of profitability of Clough and the value of Newman's present holding of
shares of Clough were relied on by Mr. Bartlett in his oral evidence as
showing the commercial advantages of the deal. I am not satisfied that,
even if it had been shown that T.P.G. would not in any circumstances
have been willing to sell the package at a sum less than £325,000 net of    E
liabilities, it would have been right, in ascertaining the damage to Newman,
to compare the price paid for T.P.G.'s minority holding of shares of Clough
with a proportionate part of the value of Newman's present holding of
shares of Clough or to take into account the subsequent history of Clough.
There are two reasons. First, it is by no means obvious that it is fair to
compare the present value of an appropriate proportion of Newman's 99
per cent. holding of the shares of Clough with the price it paid for the    F
34 per cent. it acquired from T.P.G. Even assuming, in favour of the
defendants, that the acquisition of the shares of Clough has proved a
successful investment—and Sir Charles Ball did not accept that it had—
it may be said that the benefit derives from Newman's own efforts and
that it was in effect compelled to acquire the outstanding shares of Clough
and put in its own management in order to salvage an investment for    G
which it had initially paid too much. Secondly, it is by no means obvious
that, if Newman had not acquired T.P.G.'s 34 per cent. holding in 1975
at £1·10 per share, it would none the less not have been able to acquire
Major Marley's 61 per cent. in Clough in 1976 at 53p per share and to
make a bid for the remaining 39 per cent. at the same price, which, in
practice, T.P.G. (or its successor) would have been bound to accept.    H

    However, I do not need to enter into this doubtful and difficult field
and I express no opinion on it. The true position, in my judgment, is that if
the package deal with Newman had been rejected by Newman at any time

Case 1:21-cv-11059-GHW   Document 141-14   Filed 06/14/23   Page 45 of 76

301
**1 Ch.**            Prudential Assurance v. Newman Industries (No. 2)            Vinelott J.

A between the date of the strategy document and July 29, 1975, T.P.G. would have been bound to sell substantially the whole of its portfolio of quoted investments. From January 1975 its position was steadily becoming worse as interest on its bank borrowings piled up. Its investment income was wholly insufficient to meet its administrative expenses, interest and other costs. The shares of S. Newman Ltd., the debt due from Smithamcote and the debts due from Mr. Abbott (chairman of Dover Engineering Group

B Ltd.) and Queen Square Securities were virtually unsaleable or, if saleable, could have been sold only at a substantial discount. Unsuccessful negotiations had taken place in and before March 1975 for the sale of T.P.G.'s " media interests." The price asked was less than the figure of cost which Sir Charles Ball was prepared to accept as a price that could have been obtained in an arm's length sale between T.P.G. and Newman. In a forced

C sale of T.P.G.'s portfolio of quoted investments under pressure from its bankers T.P.G. would have been fortunate if it could have placed its large minority holdings at prices equal to mid-market prices quoted on the Stock Exchange. Sir Charles Ball's evidence was that a vendor seeking a purchaser for a strategic stake will normally have to accept a discount from quoted prices. It is true that a sale to Newman suffered from the disadvantage that the transaction would be a class 4 transaction so that

D there would be delay in completion. But, in my judgment, a sale to Newman at a premium of 10 per cent. above mid-market prices quoted on the Stock Exchange would still have been favourable to T.P.G. In my judgment, if the agreement of June 3 had not been entered into and subsequently approved, T.P.G. would have been compelled to realise substantially the whole of its assets—including the larger part of its holding of shares of

E Newman, though T.P.G. would, I think, probably have retained as many of the shares of Newman as it could in order that T.P.G. might continue to exercise some influence in general meetings of Newman. In the course of that realisation, Newman would have been able to acquire T.P.G.'s portfolio of quoted investments, other than its holding of shares in Newman, at prices not exceeding 10 per cent. above mid-market prices quoted on

F the Stock Exchange. In addition it would have been able to acquire the media interests at a price not exceeding £120,000, the debt from Smithamcote at a price not exceeding £35,000 and the debts due from Mr. Abbott and Queen Square Securities at properly discounted values, assuming of course that it wanted them. Mr. Bartlett, in his oral evidence, insisted that apart from the package deal T.P.G. would have been able to negotiate sales of strategic stakes at prices substantially in excess of quoted prices

G and in particular might have been able to sell its holdings of shares in Newman at substantially more than quoted prices and might thereby have solved its financial problems without selling its other strategic stakes, except to the extent of completing the January agreements. He relied upon the letter of July 18, 1975, to a director of Lonrho, which was written after the extraordinary general meeting to approve the agreement of June 3

H had been adjourned and in which he indicated that T.P.G. might be willing to sell its holding of shares of Newman at 75p per share—more than twice the quoted price—and to sell its holding of shares of Newman

together with its holding of shares of Agar Cross for £1,500,000 " with an
additional £100,000 for Metropole." (It is noteworthy that, in this letter,   A
the current profits of Metropole are said to be £300,000 per annum.)
However, there is no evidence as to what happened as a result of this offer
and I disregard it. At a much later stage T.P.G. did sell its holding of
shares in Newman to Lonrho at a price substantially above quoted price
but, again, there is no evidence as to the circumstances in which this sale
was negotiated.  Turning to the other associated companies, there were   B
negotiations for the sale of T.P.G.'s holding of shares in Clough, in con-
junction with Major Marley's holding, which started in December 1974.
The price asked was £1 per share. It is true that this was 20 per cent. above
mid-market prices quoted on April 4, 1975, but the combined holding was
95 per cent. of the issued ordinary shares and a holding of that size would
command a substantial premium. Even then no firm offer was made and   C
Major Marley's shares were not sold until August 1976. There is no
evidence at all that any of T.P.G.'s other strategic stakes could have been
sold at figures higher than mid-market quoted prices. If there had been
any purchaser willing to purchase at a premium I have no doubt that
negotiations would have been vigorously pursued.

In my judgment, therefore, Prudential have established that if the
agreement of June 3 had not been entered into Newman would have been   D
able to acquire the package at a price at least £445,000 less than it in fact
paid under that agreement—that is, in effect, a nil price but with the
assumption of fewer of T.P.G.'s liabilities.

*The direct representative claim*

As I have said, Mr. Scott accepts, in my judgment rightly, that Mr.   E
Bartlett and Mr. Laughton, in advising the shareholders of Newman to
support the resolution for the approval of the agreement of June 3, owed
them a duty to give such advice in good faith and not to do so in a tricky
and misleading way. But, said Mr. Scott, that duty is a duty of general
obligation. It is no more than a particular application, to directors who
assume responsibility for giving advice to shareholders, of the general   F
duty to act honestly and with due care. An action for breach of that duty
sounds in tort and proof of damage is a necessary ingredient of the cause
of action. But, the argument continues, although Prudential has adduced
evidence to show that Newman was injured by having foisted upon it,
by means of an unlawful conspiracy, a bundle of assets which, apart from
the conspiracy, it could have acquired, if it had wanted them, for some
£445,000 less than it paid, no evidence has been adduced to show that the   G
shareholders of Newman have suffered any loss. As the shares of Newman
are quoted on the Stock Exchange such loss, it is said, could only have
been the difference between the prices actually quoted (that is, at which
shares were actually bought and sold) and the prices that would have
been quoted if the resolution had not been passed; and to establish such a
loss, expert evidence should have been adduced. In my judgment this   H
argument presses the division between a company and its shareholders too
far.  Given that the shareholders of Newman were induced by deceit to

A approve an agreement under which Newman paid some £445,000 more than the value of the assets it acquired under that agreement and £445,000 more than it needed to pay to acquire those same assets, then it follows that Newman's indebtedness immediately after the transaction was at least £445,000 more than it would have been apart from the deceit. At all material times Newman owed its bankers sums in excess of £5,000,000. Newman therefore lost the interest on £445,000 and to the extent of that

B interest its profits were less than they would otherwise have been. That reduction in profit or net earnings must, in turn, have affected the prices at which shares of Newman changed hands and, therefore, the quoted price. One point on which Sir Charles Ball and Mr. Cooper are agreed is that an important factor, if not the most important factor, affecting the price at which shares, quoted or unquoted, change hands is the historic

C and expected level of earnings, the price being frequently calculated and expressed in terms of a price/earnings ratio. Of course, the amount of damage suffered by Prudential (and other shareholders) is a matter which can only be determined in the light of expert evidence. But the evidence adduced by Prudential is in my judgment sufficient to show that it (and other shareholders) have suffered some damage in consequence of the conspiracy and that is sufficient to complete their cause of action, the

D amount of the damage being, if necessary, referred to an inquiry.

Before leaving the direct personal representative claims there is one other matter which I should mention. It is often said that a derivative action cannot be combined with an action for a wrong done to a shareholder personally: see e.g. *Gore-Browne on Companies*, 43rd ed. (1977), para. 28.6. But the case cited, *Stroud* v. *Lawson* [1898] 2 Q.B. 44, does not

E support this broad formulation. In that case the plaintiffs claimed damages from the directors of a company for inducing him to purchase shares in the company by fraud. In the particulars of fraud, one allegation made was that the defendant directors had declared and paid a dividend when there were no profits. He sought on behalf of himself and the other shareholders a declaration that the dividend was ultra vires and illegal and for repayment of the dividend by the defendants. It was held in the Court of Appeal

F that the personal and representative claims could not be combined in one action. A. L. Smith L.J. said, at p. 49:

"Thus he is joining with the well-known common law action of deceit another kind of action altogether, well known in the Chancery Division. In my opinion these are wholly separate and distinct causes of action which do not arise out of the same transaction, or series of

G transactions. With regard to one of them, in respect of which the plaintiff sues in his personal capacity, he has to prove fraud. With regard to the other, in respect of which he sues in a representative capacity, he has not to prove fraud but merely that the act of the directors was ultra vires."

H Then, after referring, at p. 50, to R.S.C., Ord. 16, r. 1, which provided:

"All persons may be joined in one action as plaintiffs, in whom any right to relief in respect of or arising out of the same transaction or series of transactions is alleged to exist, whether jointly, severally or

in the alternative, where if such persons brought separate actions,
any common question of law or fact would arise,"                        A

he said:

"... the plaintiff in this case cannot join the two causes of action which
he is putting forward in different capacities, unless he can shew that
they both arise out of the same transaction. It is not enough for him
to shew that, if separate actions were brought, 'a common question    B
of law or fact would arise,' for those words do not apply, unless the
right to relief in each case arises out of the same transaction. I do not
think that is so in the present case. The right to relief which the
plaintiff claims on his own behalf in the first part of the statement
of claim depends wholly on the existence of fraud. The right to relief
which he claims in a representative capacity in the second part of the
statement of claim is quite independent of any fraud on the part of   C
the defendants."

Mr. Scott has not sought to argue that in the present case the derivative
claim and the direct personal (that is, non-representative) claims do not
" arise out of the same transaction." In my view he was right not to
pursue that point. Both the derivative and the direct claims are founded  D
upon the same allegation, namely, that Mr. Bartlett and Mr. Laughton
conspired to injure Newman and its shareholders by procuring the share-
holders to vote in favour of a resolution by virtue of which, and by virtue
of which alone, the agreement of June 3 became unconditional. Equally,
in my judgment, there is no objection to joining the derivative claim and
the direct claim so far as brought by Prudential as representative of share-
holders as at July 29, 1975. It is true that a derivative action is, in form,  E
an action brought on behalf of the members of the defendant company
except the persons against whom relief is sought and it may seem odd at
first sight that a plaintiff should seek to represent two different sets of
shareholders—those as at July 29, 1975, and those as at the date of the
action—which may not coincide. Shares may have changed hands between
July 29, 1975, and the issue of the second writ. But although a derivative  F
action is in form a representative action it differs from other representative
actions in that if the action succeeds property or damages are recovered
not by the plaintiff or the class whom he claims to represent but by the
company—and only indirectly by the shareholders through the accretion
to the company's assets: see *Wallersteiner* v. *Moir (No. 2)* [1975] Q.B. 373
*per* Lord Denning M.R. at p. 391. In substance there is only one truly  G
representative action—the direct action—which is joined with a derivative
action brought on behalf of the company. The relationship between the
direct action and the derivative action and the question whether they are
cumulative or strictly alternative is one to which I shall return later in this
judgment.

*The derivative claim*                                                  H

The real issue in this action is whether the derivative claim is barred by
the rule commonly known as the rule in *Foss* v. *Harbottle* (1843) 2 Hare

Case 1:21-cv-11059-GHW   Document 141-14   Filed 06/14/23   Page 49 of 76

305
1 Ch.        Prudential Assurance v. Newman Industries (No. 2)        Vinelott J.

A  461. This rule was stated by Jenkins L.J. in *Edwards* v. *Halliwell* [1950]
   2 All E.R. 1064, 1066–1067, in the following terms:

       " The rule in *Foss* v. *Harbottle*, 2 Hare 461, as I understand it, comes
       to no more than this. First, the proper plaintiff in an action in respect
       of a wrong alleged to be done to a company or association of persons
       is prima facie the company or the association of persons itself.
       Secondly, where the alleged wrong is a transaction which might be
B      made binding on the company or association and on all its members
       by a simple majority of the members, no individual member of the
       company is allowed to maintain an action in respect of that matter
       for the simple reason that, if a mere majority of the members of the
       company or association is in favour of what has been done, then
       cadit quaestio. No wrong has been done to the company or association
C      and there is nothing in respect of which anyone can sue. If, on the
       other hand, a simple majority of members of the company or associa-
       tion is against what has been done, then there is no valid reason
       why the company or association itself should not sue. In my judgment,
       it is implicit in the rule that the matter relied on as constituting the
       cause of action shall be a cause of action properly belonging to the
       general body of corporators or members of the company or association
D      as opposed to a cause of action which some individual member can
       assert in his own right."

   Jenkins L.J. went on to point out that the rule so formulated can have
   no application unless the members of the company can by ordinary resolu-
   tion, passed in general meeting, validly resolve that no proceedings should
E  be instituted to remedy the wrong to the company. Thus, the rule cannot
   apply (a) to cases where the minority seek to restrain the commission of
   an act which is ultra vires or illegal or to recover on behalf of the company
   property disposed of under an ultra vires or illegal transaction; (b) to cases
   where the minority seeks to have a resolution of the company in general
   meeting declared void upon the ground that the resolution was one which
   could only be passed by a special resolution; or (c) to cases where the
F  wrong done to the company is also an infringement of the minority's own
   individual rights, whether as members or otherwise.
       These three categories of cases are sometimes referred to as exceptions
   from the rule in *Foss* v. *Harbottle*, 2 Hare 461.  They are exceptions only
   in the sense that cases within these categories fall outside the ambit of the
   rule as formulated by Jenkins L.J. There is another exception which is an
G  exception in a different sense, namely, that it operates to exclude from the
   rule cases which would otherwise fall within its apparent scope. This
   exception, which I shall call simply " the exception," is stated by Jenkins
   L.J. in these terms, at p. 1067:

       " It has been further pointed out that where what has been done
       amounts to what is generally called in these cases a fraud on the
H      minority and the wrongdoers are themselves in control of the com-
       pany, the rule is relaxed in favour of the aggrieved minority who are
       allowed to bring what is known as a minority shareholders' action on
       behalf of themselves and all others. The reason for this is that, if they

were denied that right, their grievance could never reach the court
because the wrongdoers themselves, being in control, would not allow
the company to sue."                                                              A

The exception is commonly stated in terms which require the plaintiff
in a minority shareholders' action to establish two things. First, that the
wrong to the company which it is sought to remedy was a wrong of a
fraudulent character and, secondly, that the wrongdoers are in control of
the company. I shall examine each of these two requirements in turn.          B

*Fraud*

A convenient starting point is a passage, frequently cited, in the speech
of Lord Davey giving the advice of the Judicial Committee in *Burland* v.
*Earle* [1902] A.C. 83, where he said, at pp. 93-94:
                                                                                 C

"It is an elementary principle of the law relating to joint stock
companies that the court will not interfere with the internal manage-
ment of companies acting within their powers, and in fact has no
jurisdiction to do so. Again, it is clear law that in order to redress a
wrong done to the company or to recover moneys or damages alleged
to be due to the company, the action should prima facie be brought    D
by the company itself. These cardinal principles are laid down in the
well-known cases of *Foss* v. *Harbottle,* 2 Hare 461 and *Mozley* v.
*Alston* (1847) 1 Ph. 790, and in numerous later cases which it is un-
necessary to cite. But an exception is made to the second rule, where
the persons against whom the relief is sought themselves hold and
control the majority of the shares in the company, and will not permit
an action to be brought in the name of the company. In that case     E
the courts allow the shareholders complaining to bring an action in
their own names.   This, however, is mere matter of procedure in order
to give a remedy to a wrong which would otherwise escape redress,
and it is obvious that in such an action the plaintiffs cannot have a
larger right to relief than the company itself would have if it were
plaintiff, and cannot complain of acts which are valid if done with the    F
approval of the majority of the shareholders, or are capable of being
confirmed by the majority. The cases in which the minority can
maintain such an action are, therefore, confined to those in which
the acts complained of are of a fraudulent character or beyond the
powers of the company.   A familiar example is where the majority are
endeavouring directly or indirectly to appropriate to themselves money,
property, or advantages which belong to the company, or in which    G
the other shareholders are entitled to participate, as was alleged in the
case of *Menier* v. *Hooper's Telegraph Works* (1874) L.R. 9 Ch. 350.
It should be added that no mere informality or irregularity which can
be remedied by the majority will entitle the minority to sue, if the
act when done regularly would be within the powers of the company
and the intention of the majority of the shareholders is clear. This may    H
be illustrated by the judgment of Mellish L.J. in *MacDougall* v.
*Gardiner* (1875) 1 Ch.D. 13, 25. There is yet a third principle which
is important for the decision of this case. Unless otherwise provided

**A**  by the regulations of the company, a shareholder is not debarred from voting or using his voting power to carry a resolution by the circumstance of his having a particular interest in the subject-matter of the vote. This is shewn by the case before this Board of the *North-West Transportation Co.* v. *Beatty* (1887) 12 App.Cas. 589. In that case the resolution of a general meeting to purchase a vessel at the vendor's price was held to be valid, notwithstanding that the vendor himself held

**B**  the majority of the shares in the company, and the resolution was carried by his votes against the minority who complained."

It is not easy to see why the statement of the rule in *Foss* v. *Harbottle,* 2 Hare 461, the " second rule," of the exception to it, and of the principle that the minority

**C**  " cannot complain of acts which are valid if done with the approval of the majority of shareholders, or are capable of being confirmed by the majority "

alone or in conjunction with Lord Davey's " third principle," compel the conclusion that the cases where the minority can maintain an action are confined to those where the act complained of, not being ultra vires or

**D**  unlawful, is of a fraudulent character. On the one hand, the company's cause of action is a form of property and there is, on the face of it, something unconscionable in the conduct of the majority if they use their voting power in general meeting to prevent an action being brought against them. The " fraud " lies in their use of their voting power, not in the character of the act or transaction giving rise to the cause of action. On

**E**  the other hand, if the persons against whom an action might be brought do not control the company there is no obvious limit to the power of the majority to resolve in general meeting to condone the injury to the company, or not to pursue the action whatever may have been the act or transaction giving rise to the cause of action and whether fraudulent or not there may be good practical reasons why the claim should not be pursued,

**F**  for instance, because of the potential injury to the reputation of the company or because the prospect of recovery would not justify the expense of litigation. The difficulty cannot be resolved by defining the limit of the exception to the rule in *Foss* v. *Harbottle,* 2 Hare 461, by reference to any category of acts or transactions which are incapable of being authorised or ratified by the majority in general meeting. For, again, there is no obvious limit to the power of the majority to authorise or ratify any act or

**G**  transaction whatever its character provided that it is not ultra vires or unlawful and provided that the majority does not have an interest which conflicts with that of the company. In *Regal (Hastings) Ltd.* v. *Gulliver (Note)* [1967] 2 A.C. 134, the appellant company sought to recover a profit, made on the sale of shares of another company, which the directors had obtained only by reason of the fact that they were directors of the

**H**  appellant company. Lord Russell of Killowen said, at p. 150, that the directors " could, had they wished, have protected themselves by a resolution (either antecedent or subsequent) of the Regal shareholders in general meeting."

It is suggested in the editor's note in the report at [1942] 1 All E.R. 378, 379, that the resolution " would have been a mere matter of form, since A [the defendant directors] doubtless controlled the voting." I can see nothing in the report which indicates that the defendant directors controlled the voting and, as I understand this passage in the speech of Lord Russell of Killowen, he contemplated that the defendant directors might have protected themselves by a resolution in general meeting precisely because they had not control of the majority of the votes. This passage would B otherwise conflict with the decision of the Privy Council in *Cook* v. *Deeks* [1916] 1 A.C. 554, where directors who controlled a majority of shares of a company were not permitted by a resolution in general meeting to deprive the company of the benefit of a contract which in equity belonged to the company. It may be that in drawing the conclusion that the cases where the majority can sue are limited to those where the act complained C of is of a fraudulent character or ultra vires Lord Davey had in mind the decision of the Privy Council in *North-West Transportation Co.* v. *Beatty* (1887) 12 App.Cas. 589, which he cites in support of the "third principle." I shall return to this case later in this judgment.

It is important to bear in mind in reading this passage in Lord Davey's speech that Lord Davey was not expressing the opinion of the Board on the issues raised on the appeal and was not attempting to set out an D exhaustive statement of the rule in *Foss* v. *Harbottle*, 2 Hare 461 and the exception to it. This passage forms a brief preface to the detailed discussion of the issues in the appeal which follows. Detailed analysis of the facts and of the actual decision shows that Lord Davey did not intend to confine the exception within any narrow limits. In *Burland* v. *Earle* [1902] A.C. 83, one George Burland, referred to in the report as "Burland," controlled E the defendant company; at the date of the action he held 1,077 ordinary shares of 100 dollars each out of an issued share capital of 1,700 shares of 100 dollars each. There were two main complaints made in the action, which was brought by minority shareholders. The first was that the defendant company had no power to establish a reserve fund and that a balance on profit and loss account ought to be distributed amongst the shareholders. That claim, though ill founded, would, if well founded, have F fallen within the ultra vires exception. The second main claim was that Burland, who had bid for the assets of another company at an auction and afterwards sold them to the defendant company at a profit, had bought the assets on behalf of the company or had otherwise constituted himself a trustee of them for the company. Lord Davey said, at p. 98:

" . . . the relief prayed by the amended statement of claim, . . . is G altogether misconceived. There is no evidence whatever of any commission or mandate to Burland to purchase on behalf of the company, or that he was in any sense a trustee for the company of the purchased property."

Two points should be noted. First, it is clear that Lord Davey took the H view that the plaintiffs would have been entitled to succeed if they could have shown that Burland had purchased the assets on behalf of the company or had otherwise constituted himself a trustee of them for the

A  company. On that footing there would have been no material distinction between the assets purchased by Burland and the benefit of the contract obtained by the directors and held as trustees for the company which fell to be reconsidered in the subsequent decision in *Cook* v. *Deeks* [1916] 1 A.C. 554. Secondly, the claim for an account of the profits allegedly made by Burland by selling to the company assets which he held as trustee for the company was the only claim made in respect of that transaction. It

B  was not alleged, and on the facts stated could not have been alleged, that the company had a claim for damages. The company had not suffered any loss—the assets had been resold with other property at an advantageous price—and there was no evidence that Burland had sold at an excessive price; indeed, Lord Davey refers to evidence called by Burland to establish the fairness of the sale to the company. It was, of course, too late to claim

C  rescission. But Lord Davey did not dismiss the possibility that, if the company had not sold the assets, the minority shareholders might have been entitled to claim rescission. He said, at p. 99:

"Let it be assumed that the company or the dissentient shareholders might by appropriate proceedings have at one time obtained a decree for rescission of the contract. But that is not the relief which they ask

D  or could in the circumstances obtain in this suit."

In making that observation Lord Davey may have had in mind an observation by Sir Richard Baggallay in *North-West Transportation Co.* v. *Beatty,* 12 App.Cas. 589. There the defendant director sold a steamship to a company which he controlled. The purchase which was made by the board was afterwards confirmed and adopted by a resolution of the

E  company in general meeting. It was held by the trial judge in an action by a minority shareholder to set aside the sale that there was no evidence of any fraud or unfair dealing. In the Privy Council it was held that the controlling shareholder was entitled to vote on the resolution adopting and confirming the purchase and that the resolution destroyed the right of rescission which would otherwise have arisen from the circumstance that the defendant was one of the directors. But at the end of his judgment

F  Sir Richard Baggallay said, at pp. 600–601:

"It may be quite right that, in such a case, the opposing minority should be able, in a suit like this, to challenge the transaction, and to shew that it is an improper one, and to be freed from the objection that a suit with such an object can only be maintained by the company

G  itself."

It seems, therefore, that Sir Richard Baggallay did not consider that the resolution of the company in general meeting would be a bar to an action to set aside the transaction on the ground that it was an "improper" one. Prima facie, the transaction would have been an improper one if no steps had been taken to ensure that the price was within the range of what could be reasonably considered a fair price, and that the transaction was

H  in other respects within the range of what could be considered a commercial transaction. As I see it all that *Beatty's* case shows is that a contract between a company and a majority shareholder which is authorised

or ratified in general meeting, the resolution being passed by the use of the
controlling shareholder's votes, will not be set aside unless it is shown to
have been an improper one. That proposition follows from the principle
that a majority shareholder in exercising his votes in general meeting in
relation to a transaction in which he is involved does not owe any fiduciary
duty to the company or to the other shareholders. It was an irrelevant
circumstance that the original sale was one by a director and entered into
on behalf of the company by a board of which he was a member and one
which, apart from its adoption or ratification by the company in general
meeting, might, under the ordinary rules of equity, have been set aside
without proof of any unfairness. *Beatty's* case is not, as I see it, authority
for the more general proposition that a controlling shareholder who is also
a director can, by using his votes in general meeting, confirm or ratify an
act or transaction, not being of a fraudulent character or ultra vires, which
was a breach of his duty as a director and thereby prevent the minority
from bringing a derivative action. The resolution in general meeting super-
seded the resolution of the directors and there was, therefore, no question
of the majority using their votes to prevent an action being brought to set
aside a transaction between the board of directors and one of their number.

That Lord Davey did not intend to confine cases where a minority
shareholder can bring an action on behalf of the company within any
narrow limits is confirmed by analysis of the minor claims made in the
action. One of the orders made in the Court of Appeal was that Burland,
who had invested the company's reserve funds in his own name, was liable
to account to the company for his dealings and transactions: see paragraph
(3) of the summary of this order made in the Court of Appeal [1902] A.C.
83, 85. Another was that he was liable to account for all moneys and
interest on a bad debt which it was alleged he had foisted upon the
company: see paragraph (6) of the summary. There was no appeal against
these orders, but Lord Davey referred to them without criticism. The claim
in paragraph (6) was, of course a claim for an account on the footing of a
wilful default. But the claim in paragraph (3) was for the ordinary account
to which a beneficiary is entitled against a trustee without any allegation
of misconduct. The Court of Appeal had granted an injunction against
Burland restraining him from " personally controlling " the moneys of the
company. As to that Lord Davey said, at p. 97:

" And it is equally clear that the injunction against Burland cannot be
maintained. It is not ultra vires for the company, if it thinks fit to do
so, to invest in the name of a sole trustee, however imprudent and
undesirable such a course may be. Nor can Burland as shareholder,
manager, and president of the company be restrained from exercising
any personal control over any portion of the company's earnings, in
which, indeed, he has the largest interest. If it appeared that under
the guise of investing undivided profits or the reserve fund the directors
were, in fact, embarking the moneys of the company in speculative
transactions, or otherwise abusing the powers vested in them for the
management of the company's business, different considerations would
of course arise. But it does not appear to their Lordships that the
investment of the surplus profits in bank shares or bonds of trading

Case 1:21-cv-11059-GHW   Document 141-14   Filed 06/14/23   Page 55 of 76

311

1 Ch.          Prudential Assurance v. Newman Industries (No. 2)          Vinelott J.

A    companies really bears that character, or was intended to be or was
     otherwise than a bona fide exercise of the powers of the company
     and the directors."

It seems clear from this passage that Lord Davey thought that the action
would have come within the exception if it had been shown that Burland
had been embarking the moneys of the company in " speculative transac-
B tions." He clearly did not have in mind only the possibility that the
minority might have been entitled to maintain the action if it had been
alleged and proved that Burland had speculated with the company's money
for his own benefit. That would have been obvious misconduct. Lord
Davey must, I think, also have had in mind the possibility that the minority
would have been entitled to maintain the action if it could have been shown
that Burland had speculated with the company's money in breach of his
C fiduciary duty to invest the company's moneys prudently. Such a breach
of duty would not necessarily import bad faith.

Further, two years before *Burland* v. *Earle* [1902] A.C. 83 was decided
*Alexander* v. *Automatic Telephone Co.* [1900] 2 Ch. 56 was decided
by a Court of Appeal consisting of Lindley M.R., Rigby and Williams
L.JJ. In that case the directors who subscribed to the memorandum of
·D association of a company subscribed for a large number of shares which
gave them together a controlling interest. They then issued shares to other
persons on terms that 6d. per share should be paid on application and
2s. 6d. on allotment. The directors paid nothing on their own shares.
Lindley M.R. summarised the position in his judgment in these words,
at pp. 64–65:

E    " The directors, in fact, so managed matters as to place themselves in
     a better position as regards payment than the other shareholders, and
     they did so without informing the other shareholders of the fact.
     This, the plaintiffs contend, was a breach of duty on the part of the
     directors to those who applied for and took shares upon the faith that
     the directors were not obtaining advantages at their expense. It is no
F    answer to the plaintiffs' case so put to appeal to the contracts alone,
     for the charge is that the directors were guilty of a breach of duty
     in procuring those contracts and in taking advantage of them so as to
     benefit themselves at the expense of the other shareholders. In the
     statement of claim and in the court below the defendants were charged
     with deliberate fraud; but this charge was ultimately abandoned in the
     court below, and, having been abandoned, it cannot be brought forward
G    again, or be listened to on the appeal. But, apart from all fraud, and
     although the directors acted in the belief that they were doing nothing
     wrong, there may, nevertheless, have been a breach of duty such as
     is relied upon, and it is necessary to consider whether there was or
     was not such a breach of duty."

Lindley M.R. having later found there was a breach of duty expressed his
H conclusion, at p. 69:

     " It is necessary, however, to consider the form of the action, and the
     relief which can be given. The breach of duty to the company consists

in depriving it of the use of the money which the directors ought to have
paid up sooner than they did. I cannot regard the case as one of mere      A
internal management which, according to *Foss* v. *Harbottle*, 2 Hare 461
and numerous other cases, the court leaves the shareholders to settle
amongst themselves. It was ascertained and admitted at the trial that,
when this action was commenced, the defendants held such a pre-
ponderance of shares that they could not be controlled by the other
shareholders. Under these circumstances an action by some share-      B
holders on behalf of themselves and the others against the defendants
is in accordance with the authorities, and is unobjectionable in form:
see *Menier* v. *Hooper's Telegraph Works*, L.R. 9 Ch. 350. An action
in this form is far preferable to an action in the name of the company,
and then a fight as to the right to use its name. But this last mode
of procedure is the only other open to a minority of shareholders      C
in cases like the present."

The decision in *Alexander* v. *Automatic Telegraph Co.* [1900] 2 Ch. 56,
shows that a minority shareholders' action may fall within the exception
if controlling directors though " acting in the belief that they were doing
nothing wrong," acted in breach of their fiduciary duty and in a way
which benefited themselves and deprived the company of the use of moneys      D
which it would have had if an equal call had been made on all the shares.
*Alexander* v. *Automatic Telegraph Co.* was not cited in *Burland* v.
*Earle* [1902] A.C. 83 but Lord Davey can hardly have been unaware of it.
As I see it, it is consistent with the actual decision of the Privy Council
in respect of the minor claims which I have mentioned and shows that the
exception is not limited to cases where there is any conscious and deliberate      E
wrongdoing on the part of the directors who are alleged to be liable to the
company for breach of their fiduciary duty or improper retention or
appropriation of property or advantages belonging to the company.

There are many dicta in early cases, which indicate that a minority
shareholders' action will not be permitted, if all that is alleged is negligence
on the part of controlling directors: see for instance *Turquand* v. *Marshall*      F
(1869) L.R. 4 Ch.App. 376, 386. These cases ante-date the modern develop-
ments of the law of negligence. However, in two comparatively modern
cases actions by minority shareholders have been held to be barred by the
rule in *Foss* v. *Harbottle*, 2 Hare 461 upon the ground that the acts
complained of were not of a fraudulent character. The first is the decision
of Danckwerts J. in *Pavlides* v. *Jensen* [1956] Ch. 565. In that case the
minority shareholder sought to bring a derivative action against directors      G
for damages for what was described as " gross " negligence consisting in
the sale of an asbestos mine by the defendant company, Tunnel Asbestos
Ltd., to another company, Cyprus Asbestos Mines Ltd. (" the Cyprus com-
pany "), at a price greatly below its true value. Tunnel Asbestos was a
subsidiary, though not wholly owned, of another company, Tunnel Portland
Ltd. The directors of Tunnel Asbestos were also directors of Tunnel      H
Portland. Tunnel Asbestos held 25 per cent. of the issued capital of the
Cyprus company but it does not appear from the report that Tunnel Portland
or its directors were shareholders or directors of the Cyprus company.

**1 Ch.**        **Prudential Assurance v. Newman Industries (No. 2)**        **Vinelott J.**

A   One question raised was whether the control of Tunnel Asbestos in general meeting—which was, in effect, exercised by the directors on behalf of Tunnel Portland as shareholder—was of a kind which came within the exception. The second question was whether the action was maintainable in the absence of any allegation of fraud. Danckwerts J. held that in the absence of an allegation of fraud in the statement of claim the action was not maintainable and the action was accordingly struck out. He said, at

B   p. 576:

> " On the facts of the present case, the sale of the company's mine was not beyond the powers of the company, and it is not alleged to be ultra vires. There is no allegation of fraud on the part of the directors or appropriation of assets of the company by the majority share-holders in fraud of the minority. It was open to the company, on the
>
C   resolution of a majority of the shareholders, to sell the mine at a price decided by the company in that manner, and it was open to the company by vote of the majority to decide that, if the directors by their negligence or error of judgment had sold the company's mine at an undervalue, proceedings should not be taken by the company against the directors. Applying, therefore, the principles as stated by
>
D   Lord Davey, it is impossible to see how the present action can be maintained."

It should be noted that, although it was alleged in the statement of claim that the sale was a breach of duty by the directors, it was not a breach of duty which, on the facts pleaded, benefited the directors or the company, Tunnel Portland, which controlled Tunnel Asbestos in general meeting

E   and which, accordingly, had power to appoint directors of Tunnel Asbestos.

The other case is *Heyting* v. *Dupont* [1963] 1 W.L.R. 1192. The facts of that case are very complex. It is sufficient to say that the action was brought by a minority shareholder and was, in part, a derivative action brought on behalf of the defendant company against the individual defendant who was the majority shareholder. There was a counterclaim by the indi-

F   vidual defendant which was also brought on behalf of the company. In both the claim and counterclaim the claims on behalf of the company were com-bined with personal or direct claims. Plowman J. treated the action as one which made no allegation of ultra vires or fraud on the part of the individual defendant or of appropriation of assets by the individual defendant in fraud of the minority. Although the action had come on for trial and although no objection was taken on the part of the individual defendant to

G   the form of the proceedings, Plowman J. himself raised the objection that the case was not within the exception to the rule in *Foss* v. *Harbottle*, 2 Hare 461 and that accordingly the court had no jurisdiction. He also held that the court had no jurisdiction to entertain the counterclaim upon the additional ground that the individual defendant did not and could not allege that the plaintiff controlled the defendant company. It is not easy

H   to see why the rule in *Foss* v. *Harbottle* should be applied to bar a claim by a minority shareholder if the majority shareholder and the company are both defendants to the proceedings. If the objection was that the counter-claim ought to have been made by the company and not by the minority

314

shareholder on its behalf the objection could have been met by amending
the counterclaim so as to make it a claim by the company.

    There was an appeal from the decision of Plowman J.  In the Court of
Appeal [1964] 1 W.L.R. 843 it was argued that two of the allegations made
in the statement of claim were allegations that the individual defendant had
wrongfully withheld property of the company. As to one of these allegations,
the Court of Appeal held that the allegation as pleaded did not set out a case
of damage caused to the company. As to the other allegation Russell L.J.
said, at pp. 849–850:

> " The allegation of damage to the company of the character alleged
> is at least in theory sufficiently plausible for the pleading of mis-
> feasance to hold water."

Russell L.J. went on to refer to a number of cases which I shall examine
later in this judgment in which the rule in *Foss* v. *Harbottle* has been des-
cribed as a flexible rule, which " will be relaxed where necessary in the
interests of justice." He said at p. 851:

> " I am prepared to assume for the purposes of this case (though
> I must not be understood as accepting it as a proposition of law)
> that there may be occasions in which justice requires departure from
> the rule when all that is asserted is damage to the company arising
> from misfeasance in withholding an asset of the company without
> fraud or ultra vires. But to my mind it is quite plain that justice does
> not require it in the present case."

He held that looking at all the circumstances of the case, that allegation
was " wholly visionary " and at p. 852:

> " . . . it cannot by any stretch of imagination be said that the interests
> of justice require that the ordinary rule should be departed from so
> as to permit such barren litigation."

    Davies L.J. concurred in the judgment of Russell L.J. Harman L.J.,
having summarised the grounds of the decision of Plowman J., said, at
p. 854:

> " For myself, I incline to the view that this was right. At any rate,
> to decide the other way would be to extend still further the exceptions
> to the rule that a company alone can complain of a wrong done to it.
> As Russell L.J.'s judgment shows, there are cases which suggest that
> the rule is not a rigid one and that exception will be made where the
> justice of the case demands it. I am content, as my brethren are, to
> assume that there may be misfeasance in respect of which the excep-
> tion should be allowed, but I also agree with them that this is
> emphatically not a case where the rule should be further stretched."

The Court of Appeal thus left open the question whether the exception
applies in a case where the allegation is of damage to the company by the
withholding of property of the company but there is no other allegation of
fraud on the part of the person against whom the claim is made. However,
the decision of the Court of Appeal shows that a derivative claim may be
struck out at an early stage if, notwithstanding that an allegation is made

A which would bring the case within the exception, the court takes the view that the allegation is plainly ill founded.

More recently in *Daniels* v. *Daniels* [1978] Ch. 406 a minority share-holder sought to bring a derivative action on behalf of a defendant com-pany against two directors who were husband and wife and who together controlled the company. It was alleged that on their instructions land belonging to the company had been sold to one of the directors in 1970

B for £4,250, that the sale was made at probate value which the defendant directors knew or ought to have known was below market value, and that the land was resold by the purchasing director in 1974 for £120,000. It was conceded by Mr. Blackburne for the plaintiff that the statement of claim did not allege fraud. Templeman J., after a very full review of the authorities including *Pavlides* v. *Jensen* [1956] Ch. 565 and *Heyting* v.

C *Dupont* [1964] 1 W.L.R. 843, said, at pp. 413–414:

"The authorities which deal with simple fraud on the one hand and gross negligence on the other do not cover the situation which arises where, without fraud, the directors and majority shareholders are guilty of a breach of duty which they owe to the company, and that breach of duty not only harms the company but benefits the directors.

D In that case it seems to me that different considerations apply. If minority shareholders can sue if there is fraud, I see no reason why they cannot sue where the action of the majority and the directors, though without fraud, confers some benefit on those directors and majority shareholders themselves. It would seem to me quite monstrous —particularly as fraud is so hard to plead and difficult to prove—if the confines of the exception to *Foss* v. *Harbottle*, 2 Hare 461,

E were drawn so narrowly that directors could make a profit out of their negligence. Lord Hatherley L.C., in *Turquand* v. *Marshall*, L.R. 4 Ch.App. 376, 386, opined that shareholders must put up with foolish or unwise directors. Danckwerts J. in *Pavlides* v. *Jensen* [1956] Ch. 565, accepted that the forbearance of shareholders extends to directors who are 'an amiable set of lunatics.' Examples, ancient and modern,

F abound. To put up with foolish directors is one thing; to put up with directors who are so foolish that they make a profit of £115,000 odd at the expense of the company is something entirely different. The principle which may be gleaned from *Alexander* v. *Automatic Tele-phone Co.* [1900] 2 Ch. 56 (directors benefiting themselves), from *Cook* v. *Deeks* [1916] 1 A.C. 554 (directors diverting business in their own favour) and from dicta in *Pavlides* v. *Jensen* [1956] Ch. 565

G (directors appropriating assets of the company) is that a minority shareholder who has no other remedy may sue where directors use their powers, intentionally or unintentionally, fraudulently or negli-gently, in a manner which benefits themselves at the expense of the company. This principle is not contrary to *Turquand* v. *Marshall*, L.R. 4 Ch.App. 376, because in that case the powers of the directors

H were effectively wielded not by the director who benefited but by the majority of independent directors who were acting bona fide and did not benefit. I need not consider the wider proposition for which Mr. Blackburne against some formidable opposition from the authorities

316
Vinelott J.          Prudential Assurance v. Newman Industries (No. 2)          [1981]

contends that any breach of duty may be made the subject of a  A
minority shareholder's action."

It is clear, as Templeman J. points out, that an action against directors
who sell the company's property to one of their number without taking
steps to ensure that the transaction is fair by obtaining a proper valuation
is not to be equated with a common law action for negligence. The decision,
as I see it, is clearly in accord with the principles to be extracted from *Burland*  B
v. *Earle* [1902] A.C. 83 on a proper analysis of that case and indeed the
transaction would appear to be the kind of improper transaction which
Sir Richard Baggallay in *North-West Transportation Co.* v. *Beatty*, 12
App.Cas. 589 thought might be attacked by a minority shareholder.

Thus the authorities show that the exception applies not only where
the allegation is that directors who control a company have improperly
appropriated to themselves money, property or advantages which belong to  C
the company or, in breach of their duty to the company, have diverted
business to themselves which ought to have been given to the company,
but more generally where it is alleged that directors though acting " in the
belief that they were doing nothing wrong " (*per* Lindley M.R. in *Alexander*
v. *Automatic Telephone Co.* [1900] 2 Ch. 56, 65) are guilty of a breach  D
of duty to the company, including their duty to exercise proper care, and
as a result of that breach obtain some benefit. In the latter case it must be
unnecessary to allege and prove that the directors in breaking their duty to
the company acted with a view to benefiting themselves at the expense of
the company; for such an allegation would be an allegation of misappropria-
tion of the company's property. On the other hand, the exception does not
apply if all that is alleged is that directors who control a company are  E
liable to the company for damages for negligence it not being shown that
the transaction was one in which they were interested or that they have in
fact obtained any benefit from it. It is not easy to see precisely where the
line between these cases is to be drawn. For instance, is an action to be
allowed to proceed if the allegation is that the controlling director is liable
to the company for damages for negligence and that as a result of his  F
negligence a benefit has been obtained by his wife or a friend or by a
company in which he has a substantial shareholding? In *Pavlides* v. *Jensen*
[1956] Ch. 565 would it have been enough if, in addition to the allegation
of negligence, it had been alleged that Portland Tunnel had a substantial
shareholding in the Cyprus company and therefore benefited indirectly?
It is also not easy to see what principle underlies the distinction. Whether
the claim is for property improperly withheld or for damages for negligence  G
or breach of fiduciary duty and, in the latter case, whether those controlling
the company have or have not obtained some benefit the reason for the
exception is the same, namely that the claim is brought against persons
whose interests conflict with the interest of the company. It may be said,
in a perfectly intelligible sense, to be a fraud on the minority that those
against whom the claim would be brought are in a position to procure,  H
and, if the derivative claim is not brought, will procure, that the com-
pany's claim, however strong it may appear to be, will not be enforced.
Mr. Scott, very frankly, admitted that he could not put forward any valid

Case 1:21-cv-11059-GHW Document 141-14 Filed 06/14/23 Page 61 of 76

317

1 Ch.          Prudential Assurance v. Newman Industries (No. 2)          Vinelott J.

A   ground of distinction between a case where the claim by the company is of a proprietary nature and one where it is for damages only, nor between a claim for damages for negligence where the loss to the company is matched by a benefit to those in control and a claim for damages for negligence where the loss to the company is either not matched by any benefit to anybody or is not matched by a benefit to those in control. However, Mr. Scott also conceded that the claim by Prudential is a claim

B   founded on acts of a " fraudulent character," whatever meaning is attributed to those words. I have endeavoured to state the principle which underlies the first limb of the exception, because the second limb cannot be construed in isolation from it, but it is unnecessary for me to decide precisely where the boundary limiting the category of cases which permit of a minority shareholders' action is to be drawn and it would be wrong

C   for me to attempt to do so.

*Control*

   The central issue in this case is whether a derivative action can be brought against defendants who do not have voting control of the company on whose behalf the derivative claim is brought and, if it can, in precisely what circumstances such a claim will be allowed to proceed.

D   At an early stage in these proceedings, in the course of his argument in support of the application by Mr. Bartlett and Mr. Laughton that the question whether a minority shareholder can bring a derivative action against defendants who are not alleged to control a majority of the votes capable of being cast in general meeting should be determined as a preliminary issue, Mr. Scott, who then appeared for both Mr. Bartlett and

E   Mr. Laughton, indicated that it would be his submission that the court has no jurisdiction to entertain a derivative action at the suit of a minority shareholder unless the persons against whom relief is sought on behalf of the company are able to control a majority of votes capable of being cast in general meeting.

   The rule and the exception have sometimes been expressed in terms

F   of jurisdiction. In *Heyting* v. *Dupont* [1963] 1 W.L.R. 1192 Plowman J., of his own motion, raised and decided the question whether the court could entertain the action. In the Canadian case of *Burrows* v. *Becker* (1967) 63 D.L.R. (2d), 100, Norris J.A. said, at p. 121: " . . . once the rule is applied, any judgment or order that the learned trial judge may purport to give must be void and of no effect," and he cited with approval an observation of Taschereau J. in *In re Sproule* (1886) 12 S.C.R. 140, 242, that proceedings

G   brought in breach of the rule, were " a complete nullity, a nullity of non esse." However, it became clear as Mr. Scott's argument later developed that his initial simple and rigid formulation of the rule and of the exception to it is inconsistent with early authorities, in particular *Atwool* v. *Merryweather* (1868) L.R. 5 Eq. 464 which was decided in 1864 but is reported only as a note to *Clinch* v. *Financial Corporation* (1868) L.R. 5 Eq. 450.

H   The decision of Sir William Page Wood V.-C. in *Atwool* v. *Merryweather* is of crucial importance and the facts and history of the litigation require careful examination. The facts as found by Page Wood V.-C. at the trial (which took place after some preliminary skirmishing) were

shortly as follows. The defendant Merryweather had a leasehold interest in
the East Pant Du Mine which he knew had little, if any, value. He arranged      A
in conjunction with the defendant Whitworth to form a company, the East
Pant Du United Lead Mining Co. Ltd., for the purpose of purchasing and
working the mine which was to be sold to the company for £7,000. The
£7,000 was then to be divided and paid as to £4,000 to Merryweather and
as to £3,000 to Whitworth. The company was formed and 2,000 shares of
£5 each were subscribed for but of that sum only £3,940 was paid to the      B
company. The plaintiff Atwool was one of the subscribers. The £3,940 was
paid to Merryweather and in addition 600 shares were registered in his
name and credited as fully paid in satisfaction of £3,000 of the balance of
the £7,000. The agreement between Merryweather and Whitworth under
which Merryweather was to get £4,000 and Whitworth was to get £3,000
for his assistance in the scheme was concealed from the other directors of      C
the company who were thus led to believe that £7,000 was bona fide paid
as the purchase price of the mine. Very shortly afterwards the mine was
found to be worthless. A committee of the shareholders reported that the
undertaking should be abandoned and steps taken to recover back moneys
paid by the shareholders. On June 16, 1864, at an extraordinary general
meeting a resolution was passed that the report be received and entered
in the minutes but no resolution was passed formally adopting it. On      D
June 30, 1864, a bill was filed in the name of the company alleging that the
contract for the purchase of the mine by the company from Merryweather
had been fraudulently obtained and was void. On August 1 Merryweather
applied to the court for an order that the bill be taken off the file on the
ground that there had been no resolution of a majority of the shareholders
authorising the use of the company's name. That motion was stood over      E
until the next term so that the shareholders might have an opportunity of
expressing their opinion whether they would adopt the bill or not. An
extraordinary general meeting was held on October 12, 1864. A resolution
was proposed adopting the proceedings, whereupon Whitworth proposed
an amendment referring all matters in dispute to arbitration and staying
the proceedings. The amendment was lost and the original resolution was
carried on a show of hands but, on a poll, proxies were produced and the      F
resolution was defeated and the amendment carried. However, excluding
the votes of Merryweather and Whitworth, there was a majority of 86
votes and excluding the votes of Merryweather alone a majority of 58 votes
against the amendment and in favour of the original resolution. At that
stage Page Wood V.-C. ordered that the bill be taken off the file on the
ground that Merryweather was entitled to vote as shareholder despite his      G
contrary interest, and that the company had accordingly not given authority
for the proceedings to be continued. That earlier decision is reported:
see *East Pant Du United Lead Mining Co. Ltd.* v. *Merryweather* (1864)
2 Hem. & M., 254.

   Atwool then commenced proceedings joining the company, Merry-      H
weather and Whitworth as defendants. That action succeeded and Page
Wood V.-C. ordered that the agreement for the purchase of the mine be
set aside, the purchase price repaid and the share certificate issued to

**A** Merryweather cancelled. He also directed that the company be wound up. He based his decision upon two grounds. The first was:

"... that it would not be competent for a majority of the shareholders against a minority to say that they insist upon a matter of that kind where the whole inception of the company is simply a motion by a fraudulent agent, qua director, to confirm a purchase as made for £7,000, which was made for £4,000. The whole thing was obtained by **B** fraud, and the persons who may possibly form a majority of the shareholders, could not in any way sanction a transaction of that kind."

But the second and independent ground was:

"... it is hardly necessary to rely upon that, because, having it **C** plainly before me that I have a majority of the shareholders, independent of those implicated in the fraud, supporting the bill, it would be idle to go through the circuitous course of saying that leave must be obtained to file a bill for the company, and pro forma have a totally different litigation." (See L.R. 5 Eq. 464, 468.)

The contrast between Page Wood V.-C.'s two decisions is important. The **D** first shows that a minority shareholder cannot bring an action in the company's name if the wrongdoers are in control, and can by the use of their own votes procure the passing of a resolution that no proceedings be brought by the company. The second shows that the use of a wrongdoer's votes to prevent proceedings being taken by a company to remedy a wrong done to it may justify a minority shareholder bringing a derivative action.

**E** *Atwool* v. *Merryweather*, L.R. 5 Eq. 464, has been frequently cited without any doubts being expressed as to its correctness. Both decisions were cited in argument in *Beatty's* case, 12 App.Cas. 589. *Atwool* v. *Merryweather* was cited in argument in *Burland* v. *Earle* [1902] A.C. 83. It is referred to in the judgment in *Gray* v. *Lewis* (1873) 8 Ch.App. 1035, in the Court of Appeal in Chancery, where, however, a careful reading of **F** the facts will show that the individual defendants had voting control of the defendant company. It is also referred to in the judgment of Sir George Jessell M.R. in *Russell* v. *Wakefield Waterworks Co.* (1875) L.R. 20 Eq. 474, to which I shall later refer. The second ground of the decision in *Atwool* v. *Merryweather*, L.R. 5 Eq. 464, is inconsistent with the proposition that the exception to the rule in *Foss* v. *Harbottle*, 2 Hare 461 is limited to cases where the persons against whom relief is sought control a **G** majority of the votes in general meeting. It is also inconsistent, as I see it, with the proposition that the rule, and the exception to it, are founded upon any limitation in the court's jurisdiction, if by that is meant jurisdiction in the strict sense of the power of the court to enter upon and determine a dispute. It might be possible to argue that the rule and the exception are founded upon jurisdiction in the strict sense if the exception only extended **H** to cases where the persons against whom relief is sought control a majority of the votes in general meeting of the company; it might then be possible to argue that the jurisdiction of the court to entertain a case within the exception is to be found in the fact that those who control the company

are defendants to the action. But *Atwool* v. *Merryweather*, L.R. 5 Eq. 464 A
shows that the court has jurisdiction to entertain a claim by a minority
shareholder and to make an order in favour of the defendant company
even where the other defendants, alone or together with the plaintiff, do
not have a majority of votes in general meeting and where the other
shareholders are not parties. If that is so, then as I see it, the exception
can only be founded on a general jurisdiction of the court to make an order
for recovery of property or damages in favour of a defendant company    B
against co-defendants where the jurisdiction is invoked by a minority
shareholder. The question is then whether, in any given case, the jurisdic-
tion is properly invoked. But that is a question not of jurisdiction but of
the circumstances in which the court will allow the action to proceed and
will make an order for the recovery of property or damages by the
company.                                                                C

In *Burrows* v. *Becker* (1967) 63 D.L.R. (2d) 100 the Canadian courts
have taken a further step. That case was heard shortly before Canadian
legislation was passed giving the court power in certain circumstances to
permit a minority shareholder to sue in the name of the company. At the
time when *Burrows* v. *Becker* was heard there was no material distinction
between English and Canadian law. The facts in *Burrows* v. *Becker* were
very complex. Briefly summarised, the position was that the plaintiffs   D
were shareholders in a company, Ocean Towers Ltd., which owned what
was described at p. 101 as a " self-owned apartment building." A person
who wished to take an apartment in the block was required to take an
allotment of shares equal in nominal value to the price of the apartment;
at the same time, he was granted a lease of the apartment for 50 years at a
nominal rent plus a share of the expenses of maintaining the block. At the  E
relevant time a large block of shares was retained under the control of
the original promoters. In the action, which was derivative in form, the
plaintiffs as minority shareholders claimed on behalf of the company
against the promoters relief in regard to alleged fraudulent concealment
of breaches of duty and also claimed, against a group of former directors,
damages for breach of fiduciary duty. Apart from promoters or repre-
sentatives of corporate promoters who were directors there was a majority  F
of independent directors who, however, were also shareholders. The trial
judge, Munroe J., found that none of those independent directors had been
guilty of any fraud or breach of fiduciary duty. A careful analysis of the
distribution of the shareholding at the date when the action was brought is
made in the judgment of Tysoe J.A. at p. 151 and shows that the promoters,
even in conjunction with the directors, did not have voting control of the  G
company. The directors had resolved that the company should not com-
mence litigation against the promoters and the former directors. The trial
judge held that it would have been " futile and a waste of time " (see
p. 115) for the minority shareholders to have convened a general meeting
with a view to reversing that decision upon the ground that on earlier
occasions the directors and promoters had (see p. 152) " demonstrated their
ability to command a majority of poll votes . . ." and at pp. 147–148:   H

" the directors and promoters have demonstrated to my satisfaction . . .
    (at the date of the action) . . . and at all times since that they would

1 Ch.        Prudential Assurance v. Newman Industries (No. 2)        Vinelott J.

A   act in unison and that they held and controlled the majority of the shares in Ocean upon a poll vote, and that they would have used such voting power at any meeting of shareholders to defeat any motion designed to authorise or direct Ocean to sue the promoters or the directors."

It is clear from the analysis of the distribution of the shareholdings by
B   Tysoe J.A. that the trial judge, when he said that the promoters and directors "controlled the majority of the shares on a poll vote," did not mean that they were holders or beneficial owners of shares carrying voting rights or otherwise able to direct how a majority of the votes were cast. Tysoe J.A. after a very long review of all the facts held there was no justification for the inference that the directors and promoters were other-wise able to "command a majority of poll votes" or that the promoters
C   and independent directors would always "act in unison." He and the other members of the Court of Appeal held that in those circumstances there was no ground for excluding the rule in Foss v. Harbottle, 2 Hare 461. What is significant is that it was not suggested in the judgment of Tysoe J.A. nor in either of the other judgments that the case would have fallen outside the exception to the rule in Foss v. Harbottle if the trial judge had been
D   right in his finding that it would have been futile to have held a general meeting upon the ground that the promoters, the former directors and the independent directors would have acted in unison in order to prevent action being brought against the promoters and would have succeeded in preventing action being brought against the promoters by the use of their own votes or by the use of those votes with proxies given to directors. Burrows v. Becker (1967) 63 D.L.R. (2d) 100 thus shows that the exception
E   applies—at least in Canada—where the persons alleged to have wronged the company do not control the company in general meeting, and are not a majority of the board of directors, and where it is not shown, as in Atwool v. Merryweather, L.R. 5 Eq. 464, that a resolution has been passed by the use of the votes of the wrongdoers that no proceedings should be brought by the company but where it is otherwise shown that it would be
F   "futile" to call a general meeting because of the influence exercised by the wrongdoers over the board of directors, and directly or indirectly, through the use of proxy votes, over the votes capable of being cast in general meeting.

These two cases are consistent with observations in another strand of authority where the rule in Foss v. Harbottle, 2 Hare 461, has been
G   described as a flexible rule. In Foss v. Harbottle itself Sir James Wigram V.-C. said, at p. 492:

"If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained, except that of a suit by individual corporators in their private characters, and asking in such character the protection of those rights to which in their
H   corporate character they were entitled, I cannot but think that the principle so forcibly laid down by Lord Cottenham [L.C.] in Wall-worth v. Holt (1840) 4 Myl. & Cr. 619, 635 and other cases, would apply, and the claims of justice would be found superior to any

difficulties arising out of technical rules respecting the mode in which
corporations are required to sue."          A

In *Edwards* v. *Halliwell* [1950] 2 All E.R. 1064 Jenkins L.J. said, at
p. 1067, of the exception that it showed " that the rule is not an inflexible
rule and that it will be relaxed where necessary in the interests of justice."
In *Burland* v. *Earle* [1902] A.C. 83, 93, Lord Davey, in stating the " ele-
mentary " rule, that the court would not interfere with the management          B
of companies acting within their powers, added: " and in fact has no
jurisdiction to do so "; but he stated the narrower rule, that in an action to
redress a wrong to a company the company must be the plaintiff, as a
prima facie rule only.

In *Russell* v. *Wakefield Waterworks Co.*, L.R. 20 Eq. 474, a minority
shareholder sought on behalf of a company to recover against its directors
and against the promoters of a bill in Parliament of a rival concern a          C
payment said to have been made by the directors to the promoters to buy
off opposition by the promoters of the new undertaking to an application
by the defendant company in Parliament for enlarged powers which would
compete with the proposed new undertaking. Such a payment might have
been illegal if made fraudulently, and if so would have been ultra vires;
but, unless illegal, it was clearly not a matter of which any complaint          D
could be made since the directors of the defendant company might
reasonably think it in the interests of the company to buy off opposition
in that way. Sir George Jessel M.R. summarised two objections to the
action which he said were well founded. The first was that:

" . . . there is no case made by the bill shewing that the act complained
of was beyond the powers of the old company, there being no direct          E
allegation of fraud, although the word ' corrupt ' is used ": see p. 478.

As I read that passage in relation to the facts of that case, Jessel M.R. was
not intending to lay it down as a general rule that a case does not fall
within the exception to the rule in *Foss* v. *Harbottle*, 2 Hare 461, unless
there is an allegation of fraud but only to say that on the facts of that case
the payment would be unobjectionable unless made fraudulently, but if          F
made fraudulently might be ultra vires. He gave leave to amend on this
point. He then continued to make some general observations upon the rule
in *Foss* v. *Harbottle* and the exceptions to it. Having stated the general
rule he said in a passage often cited, at p. 480:

" But that is not a universal rule; that is, it is a rule subject to excep-
tions, and the exceptions depend very much on the necessity of the          G
case; that is, the necessity for the court doing justice."

Mr. Scott suggested that in that passage read in its context Jessel M.R. is
not suggesting that the relevant exception is flexible or depends " on the
necessity of the case," but only that the range of possible exceptions is not
fixed. But that explanation will not, I think, stand with a later passage in
the judgment on p. 482 where Jessel M.R., having referred to *Atwool* v.          H
*Merryweather*, L.R. 5 Eq. 464, which is referred to as a case " . . . in which
the corporation was controlled by the evildoer, and would not allow its
name to be used as plaintiff in the suit " said:

Case 1:21-cv-11059-GHW   Document 141-14   Filed 06/14/23   Page 67 of 76

323

1 Ch.          **Prudential Assurance v. Newman Industries (No. 2)**          Vinelott J.

A
" It is not necessary that the corporation should absolutely refuse by vote at the general meeting, if it can be shewn either that the wrong-doer had command of the majority of the votes, so that it would be absurd to call the meeting; or if it can be shewn that there has been a general meeting substantially approving of what has been done; or if it can be shewn from the acts of the corporation as a corporation, distinguished from the mere acts of the directors of it, that they have

B
approved of what has been done, and have allowed a long time to elapse without interfering, so that they do not intend and are not willing to sue. In all those cases the same doctrine applies, and the individual corporator may maintain the suit. As I have said before, the rule is a general one, but it does not apply to a case where the interests of justice require the rule to be dispensed with."

C
In that passage, as it seems to me, Jessel M.R. clearly contemplates that the relevant or " true " exception may apply not only where the wrong-doers are a majority but where some other reason can be shown for saying that unless the minority are allowed to sue on behalf of the company the interests of justice will be defeated in that an action which ought to be pursued on behalf of the company will not be pursued.

D
If the rule and the exception cannot be confined within the rigid formulation expressed in terms of voting control by the persons against whom relief is sought on behalf of the company, then the question whether a given case falls within the exception can only be answered by reference to the principle which underlies the rule and the exception to it. Mr. Scott submitted, I think rightly, that the principle which underlies the rule is that

E
it would be wrong to allow a minority shareholder to bring proceedings joining the company as defendant and claiming against other defendants relief on behalf of the company for a wrong alleged to have been done to it if the majority of the members of the company take the view that it is not in the interests of the company that the proceedings should be pursued. Indeed, it would be so plainly wrong that it might be said that, in a broad sense, the court would have no jurisdiction to allow the wishes of the

F
minority to override the wishes of the majority in that way. The principle which underlies the exception to the rule is that in ascertaining the view of the majority whether it is in the interests of the company that the claim be pursued, the court will disregard votes cast or capable of being cast by shareholders who have an interest which directly conflicts with the interest of the company. Those are general principles of substantive law and are not

G
mere rules of procedure. But in any derivative action the plaintiff must allege in his statement of claim some ground which, if established at the trial, would bring the case within the exception and justify an order that the company recover damages or property from the other defendants: see *Birch* v. *Sullivan* [1957] 1 W.L.R. 1247. Thus the question whether an action falls within the exception will normally be tested at an early stage.

H
So, if the defendants against whom relief is sought on behalf of the company control the majority of votes, the action will be allowed to proceed whether a resolution that no action should be brought by the company has been passed or not; so also, if the persons against whom relief is sought

do not control a majority of the votes but it is shown that a resolution has
been passed and passed only by the use of their votes. By contrast if a
resolution has been passed that no proceedings should be started by the
company or if the matter has not been put to the shareholders in general
meeting and if no good reason is advanced in the statement of claim why
the wishes of the majority should not be given effect the action will be
struck out or, possibly, in the latter case, stood over while a general meeting
is called, as in *East Pant Du United Lead Mining Co. Ltd.* v. *Merryweather*
2 Hem. & M. 254.

But there are an infinite variety of possible circumstances which fall
within these two extremes. If shareholders having a majority of votes in
general meeting are nominees, the court will look behind the register to the
beneficial owners to see whether they are the persons against whom relief
is sought: see *Pavlides* v. *Jensen* [1956] Ch. 565, 577. There seems no good
reason why the court should not have regard to any other circumstances
which show that the majority cannot be relied upon to determine in a
disinterested way whether it is truly in the interests of the company that
proceedings should be brought. For instance, some shareholders able to
exercise decisive votes may have been offered an inducement to vote in
favour of the wrongdoers. In *Atwool* v. *Merryweather*, L.R. 5 Eq. 464,
it was suggested that some shareholders who voted against the resolution
authorising proceedings had been offered an indemnity by Merryweather.
In *Kerry* v. *Maori Dream Gold Mines Ltd.* (1898) 14 T.L.R. 402, a
derivative action was allowed upon the ground that the majority had been
given a benefit denied to the minority. Moreover, today it would be un-
common for any large number of shareholders to attend and vote in person
at a general meeting of a large public company, and—an instance suggested
by Mr. Scott—directors alleged to be liable to the company might be able
to determine the outcome of a resolution in general meeting in their own
favour by the use of proxy votes. Similarly, most modern articles confide
to the directors, the management of the business of the company (see e.g.,
article 80 of Table A) and it is possible that an article in these terms vests
in the directors a discretion whether proceedings should be commenced by the
company which cannot be overridden by resolution in general meeting: see
*Buckley on the Companies Acts,* 13th ed. (1957), p. 860 and *John Shaw and
Sons (Salford) Ltd.* v. *Shaw* [1935] 2 K.B. 113, 134, where an earlier passage in
*Buckley* in the same terms was approved in the Court of Appeal. If directors
who have an interest direct or indirect in the question whether proceedings
should be commenced refuse to submit that question to the shareholders
in general meeting, the majority could in theory remove the directors, but
might only be able to ensure that the question whether proceedings should
be commenced is properly considered by a disinterested board by taking
that extreme step, which, in turn, they might consider would involve
damage to the company greater than any benefits to be derived from the
action against the directors. Mr. Scott at the end of his very clear and
helpful argument summarised the principle that underlies the exception
to the rule in these terms: it applies wherever the persons against whom
the action is sought to be brought on behalf of the company are shown to

**A**  be able " by any means of manipulation of their position in the company "
to ensure that the action is not brought by the company. That broad
formulation I accept, provided that the means of manipulation of the
defendant's position in the company are not too narrowly defined. The
question is how this test applies to the grounds advanced in the statement
of claim for bringing the present action within the exception.

**B**  It is alleged in paragraph 24 of the amended statement of claim that the
deceptions which resulted from the tricky and misleading character of the
circular:

> " ... were such that at the time of the commencement of his action
> there was no real prospect that, without recourse to legal proceedings,
> they could have been exposed so as to give the majority of the share-
> holders the full information with regard to the facts upon which a
> **C**  decision could be made in general meeting as to the company bringing
> legal proceedings against the said defendants. Without exposure of the
> said deceptions a decision of the majority of the shareholders not to
> sanction such proceedings would have been thereby vitiated, and such
> decision would thereby have been under the control of the said
> defendants through the operation of their said deceptions."

**D**

Mr. Scott submitted that in this paragraph two distinct questions are
elided and confused. The first and relevant question is whether on the
facts known to Prudential it was truly in the interests of the company that
the action should be commenced by the company. That, it is said, is the
question which the majority of the shareholders are entitled to decide in
**E**  general meeting, and in deciding that question the members are entitled to
weigh the potential injury to the company of having its affairs publicly
investigated, the uncertainty of the litigation, the disruption to its business
by the litigation in which far-reaching discovery may have to be made, the
time during which its officers may be occupied in preparing for the hearing
and attending to give evidence, and the potential liability of the company
**F**  for costs which might prove irrecoverable—though that last consideration
clearly does not weigh in the present case. The question whether, at the
end of the litigation, it is established that the passing of the resolution was
procured by the fraud of the individual defendants is, it is said, a different
question. A minority should not be allowed, by the device of bringing a
direct (personal and representative) claim against the individual defendants,
to remove from the decision of the members in general meeting the
**G**  question which should be asked at an early stage, namely, whether the
company should or should not join in the litigation as plaintiffs. It would,
said Mr. Scott, be unjust that an action which could have been stayed
in limine upon the ground that the members of the company had not been
consulted, had it not been joined with direct personal and representative
claims, thereby necessitating a full inquiry into the allegations made in the
**H**  statement of claim, should, when those allegations have been fully in-
vestigated and proved, result in a judgment in favour of the company.
I see considerable force in these submissions. But on the facts of the present
case they bear a somewhat unreal air. At all times after Mr. Murray

326
Vinelott  J.          Prudential Assurance v. Newman Industries (No. 2)          **[1981]**

released his letter to the financial press in July 1975 the other members of
the board of Newman have sided with Mr. Bartlett. Mr. Murray's criticism   **A**
of the transaction was regarded by them as tardy and motivated by improper
considerations. In fact Mr. Murray's criticisms were wholly justified even
on the facts known to Mr. Murray at that time. The evidence adduced in
these proceedings shows that there were even more severe criticisms that
could have been made. Mr. Murray saw himself as the watchdog for the
shareholders and throughout acted with integrity and courage in his   **B**
endeavours to see that their interests were protected. The other members
of the board in my judgment were tricked into believing that a valuation
had been obtained by Deloittes supporting the values attributed to the
assets in the package in Mr. Bartlett's original strategy document and,
having once taken sides, were not in any position to exercise a dispassionate
judgment. That this was so may be illustrated by the history of the   **C**
Schroders/Harman report. On February 6, 1976, there was a meeting of
the board of Newman. Mr. Bartlett reported that there had been a meeting
on January 21, 1976, between representatives of Schroders and Mr.
Harman on the one hand and of himself, Mr. Bush and Mr. Baldwin on
behalf of Newman, with their legal adviser, on the other hand and that
Schroders and Mr. Harman were in a position to present their conclusions.
The effect but not the full report was then stated, namely:   **D**

> " that on the balance of the evidence we have examined, it was not
> unreasonable for the board of Newman to have recommended the
> transaction to shareholders."

Mr. Murray asked for more documentary evidence and said that he was
" not prepared to accept the opinion and wished to check the facts." Mr.   **E**
Murray was then, in effect, removed as a director. It seems that after he
had left the meeting the full report was distributed to the other members
of the board. No evidence has been called to show the course of the
investigations made by Schroders and Mr. Harman and the process which
led to the conclusions which I have cited earlier in this judgment. This
must be, to some extent, a matter of speculation. However, it is to my mind   **F**
clear beyond doubt that Schroders and Mr. Harman did not know of the
January agreements or of the misstatements of fact made to Mr. Cooper,
and could not have known of the detailed attributions of value made by
Mr. Cooper or the way in which he had been induced to increase his
original value in the course of the telephone conversation on May 5. For
in paragraph 9.12 of the report Schroders and Mr. Harman explain that   **G**
the independent directors of Newman: " were entitled to accept, on the
basis of independent professional advice, that the price proposed was a
proper one " and that " the board of Newman were entitled to consider
that they had received adequate independent advice on this aspect." Given
that the board were deceived and, at least in part, as a result of that
deception viewed Mr. Murray's conduct in this hostile way, there was in my   **H**
view no real possibility that the question whether proceedings should be
commenced by the company would ever be put to the shareholders in a way
which would enable them to exercise a proper judgment as to whether

A   it was in the interests of the company that the litigation should be commenced. The shareholders would inevitably look to the directors for guidance. No doubt Prudential could, in theory, have proposed the appointment of additional directors with a view to entrusting to them alone the task of investigating and advising shareholders whether an action should be brought by Newman. Bearing in mind the size of T.P.G.'s shareholding and what happened to Mr. Murray when he suggested further inquiry, the

B   prospect of their succeeding in this course is so remote as to be merely fanciful. I am satisfied on the evidence as a whole that there was no way in which Prudential could have ensured that the question whether proceedings should be brought by Newman would be fairly put to the shareholders or even that a full investigation would be made into all the circumstances surrounding the transaction including in particular Mr. Cooper's valuation.

C   In those circumstances, in my judgment Prudential have shown that the interests of justice do require that a minority action should be permitted.

In his reply Mr. Caplan submitted that the derivative action should be allowed upon another ground. If the derivative claim is dismissed Prudential will be entitled to judgment, in the direct claim, for damages to be assessed in an inquiry, and entitled, so far as they sue as representatives, to declarations entitling any other shareholders at July 29, 1975, who can

D   establish that they have suffered damage, to recover damage. But there is no reason why Newman should not itself commence proceedings and, indeed, if the shareholders look solely to the financial interests of Newman and if there is any real prospect of recovery, they could be expected to do so. The result would be that Prudential will in substance be compensated twice in respect of the same wrong, first, by recovering damages in the

E   direct claim and, secondly, by the restoration of the loss suffered by the company, unless, possibly, the possibility of recovery in an action by Newman is taken into account in assessing the damage to a shareholder who, like Prudential, remains a shareholder. It would clearly be wrong that Prudential should recover damages for the loss it has indirectly suffered as a shareholder if the loss suffered directly by Newman is subsequently made good, and it would be unjust to Prudential to bring the damages

F   capable of being recovered by the company into account in evaluating the loss indirectly suffered by the shareholders when it cannot be certain that an action will be brought by Newman. Of course, there must inevitably be a danger that the individual defendants will suffer a double claim for damages in that, if Newman recovers damages, they may still be liable to a

G   shareholder as at July 29 who has since disposed of his shares and could show that he sold his shares at a price lower than that which he could have obtained had not the package been foisted on Newman at an excessive price. But that element of duplication is unavoidable.

Mr. Scott stressed that Mr. Bartlett and Mr. Laughton owed a fiduciary duty to the company but owed to its shareholders only the common obligation to act honestly and with due care. It was, he said, in a

H   sense a coincidence that the shareholders' cause of action in tort coincided with the company's cause of action based on equitable fraud. The two do not necessarily run together. Directors might conclude in good faith that a

particular transaction was to the benefit of their company and yet
deliberately mislead shareholders into approving it by a dishonest circular.   A
This nice discrimination seems to be over-refined on the facts of the
present case. The charge made by Prudential is that Mr. Bartlett and Mr.
Laughton conspired to injure Newman, and indirectly its shareholders,
by procuring Newman to enter into a transaction designed to benefit T.P.G.
at its expense which—because of the requirements of the Stock Exchange—
could only be made binding on Newman by a resolution of the shareholders   B
of Newman. By putting out a deliberately misleading circular they injured
Newman and its shareholders. As at present advised I think there is much
to be said for the view that in circumstances such as these the company
should be made a defendant unless the company has by resolution in
general meeting effectively released its cause of action—which it might do
for instance by approving a compromise. But a decision on this point may   C
have far-reaching consequences and, as I have reached the conclusion that
the derivative claim should be allowed on other grounds, I do not propose
to express any final conclusion on it. Mr. Caplan made it clear at a very
early stage that if Prudential succeeded in the derivative claim it would
not wish to persist in the direct claim whether personal or representative.
As I see it, it would be wrong to dismiss the direct claim altogether. There
is a theoretical possibility, however remote, that the majority of the   D
members of Newman, after full consideration of the facts disclosed in this
litigation, may resolve not to take advantage of the judgment in favour
of the company. The right course, as I see it, is to direct that no further
proceedings be taken in the direct personal or representative claims without
the leave of the court. But this is a matter upon which counsel may wish
to address me further.   E

### The claim against T.P.G.

It is conceded by Mr. Turnbull, who appeared for the T.P.G., that
T.P.G. must be taken as having actual knowledge of the fraud practised
upon Newman, which knowledge is to be imputed to T.P.G. because T.P.G.'s
managing director and deputy chairman, Mr. Laughton, and its chairman,   F
Mr. Bartlett, were concerned in a fraud designed to benefit T.P.G. at the
expense of Newman. Mr. Turnbull concedes, therefore, that T.P.G. is
prima facie liable to make good any loss suffered by Newman as a result
of the breach of fiduciary duty on the part of Mr. Bartlett and Mr.
Laughton. But he argued that T.P.G. are entitled by way of defence to
say that the facts relied upon by Prudential as establishing their claim
against Mr. Bartlett and Mr. Laughton show of necessity that the resolution   G
approving the agreement of June 3 was void, that the agreement of June 3
never became unconditional, and that all transfers of property purportedly
made pursuant to it, were made without authority. The argument, as I
understand it, is that in these circumstances T.P.G. is entitled to assert
by way of defence that Newman's only remedy is to seek declarations that
the transfers of property made purportedly in pursuance of the agreement   H
of June 3 were void and that the transaction be unscrambled. Mr. Turnbull
accepts, as I understand his argument, that if the transaction had been
voidable Newman could have elected not to avoid it but to claim com-

A    pensation from Mr. Bartlett and Mr. Laughton and that T.P.G., having knowledge of and through Mr. Bartlett, and Mr. Laughton having participated in the fraud, would be equally liable with Mr. Bartlett and Mr. Laughton to make good any loss suffered by Newman. But, he says, a void transaction is not capable of being confirmed and the alternative claim is not available. I hope I have correctly summarised this argument. I confess that I have felt some difficulty in following it. I can see no reason

B    why, given that the resolution was void, that the agreement of June 3 did not become unconditional, and that all transfers of property made in purported pursuance of it were made without proper authority, Newman should not say that the transaction though void cannot now be unscrambled and that Newman has suffered damage in consequence of a breach of fiduciary duty by Mr. Bartlett and Mr. Laughton in procuring the resolution to be passed, and therefore, in turn, in procuring the transfers of property

C    to be made. If Newman can claim compensation from Mr. Bartlett and Mr. Laughton upon this ground then as I see it T.P.G. is equally liable to make compensation.

*Concluding observations*

     I have felt compelled to the conclusion that Mr. Bartlett and Mr.
D    Laughton together pursued a plan designed to benefit T.P.G. at the expense of Newman and did so by means which included the deception of the board and the shareholders of Newman as to their true motives in propounding the transaction between the two companies and as to the market value of the assets acquired by Newman. I reach this conclusion with regret. The motives which inspire human conduct are rarely unmixed

E    and Mr. Bartlett may well have persuaded himself that the end at which he aimed justified the means to which he resorted. As I see it Mr. Bartlett, during his years as a management consultant, persuaded himself that a combination of large minority holdings or strategic stakes in public companies with the resources of a management consultancy business could be used to the advantage of the companies concerned. His plan was to acquire strategic stakes in a number of companies with overlapping interests

F    which, with the assistance of a team of management consultants, would enter into new trading relationships for the benefit of the group as a whole, and whose financial resources would be combined—a process which could be facilitated in some cases by transferring subsidiary companies of one company short of cash to another with surplus cash. At the centre of the spider's web controlling the axial threads would sit T.P.G., and, controlling

G    T.P.G., Strongpoint. I doubt whether Mr. Bartlett ever fully understood the difficulties and dangers inherent in the conflicts which were bound to arise between the interests of associated companies. But the scheme suffered from a defect of another kind. The acquisition of this group of associated companies was to be financed, except where shares of T.P.G. could be offered in exchange for strategic stakes, by bank borrowing, which would

H    be replaced in time by the sale of strategic stakes in successful companies which were no longer needed as part of the group, or by raising loan capital, or by a rights issue. Financing the acquisition of strategic stakes,

for which a premium above quoted price would be required, by bank borrowing was inevitably a risky course. To finance such acquisitions **A** against a falling market at a time when credit was tight and expensive proved a highway to disaster. When disaster loomed unmistakably ahead Mr. Bartlett saw the destruction of what he genuinely believed to be a potentially valuable scheme and a potentially valuable network of associated companies. I think he may well have believed that it would be for the ultimate benefit of Newman that it should be placed in relation to the **B** network of associated companies in the central position which was originally to have been occupied by T.P.G. He and Mr. Laughton would still have the ultimate control and would not see the destruction or disintegration of the interlocking group. But to say that Mr. Bartlett was motivated at least in part by his desire to keep the package together as an entity and that he believed that benefits would ultimately flow from it, **C** is not to excuse his conduct. He knew that if the true facts as to the financial position of T.P.G. and the market value of its assets became known to the board and shareholders of Newman there would be no prospect that they could be persuaded to accept them at a price sufficient to enable him to salvage T.P.G. and so avoid embarrassing disclosures as to the use made of T.P.G.'s and Newman's moneys for the benefit of Strongpoint. Having embarked upon the scheme for transferring the package to Newman it was **D** carried through with the co-operation of Mr. Laughton by means which involved the deliberate deception of the board and shareholders of Newman.

  ·  It is, I think, probable that but for two circumstances the scheme would not have succeeded. First, Mr. Cooper did not in my judgment approach his task of valuation in a sufficiently critical way. He should not have **E** accepted insider information from Mr. Laughton, without making some effort to confirm it, and he should not have made the additions he made in the course of the telephone conversation on May 5 without ensuring that those additions and the reasons for them were known to the board. But Mr. Cooper was placed in a difficult position. He was confronted with a transaction apparently approved in principle by the board and based upon **F** a valuation put forward by the chairman and the vice-chairman of a public company of which his firm were auditors. His main channel of communication was through one of the two persons who were effectively vendors of the package. The history of this case raises the question whether the Stock Exchange should accept that the auditor of a company is a sufficiently independent adviser to evaluate and, in effect, advise shareholders as to the financial merits of a class 4 transaction.   **G**

  .  The second and related point is this. Article 93 of Newman's articles of association—which is in substantially the same terms as article 84 of Table A—modifies the strict rule that the board of directors of a company cannot enter into a transaction with one of their members in which he has an interest by providing, in general terms, that a director who is interested in any contract with the company shall declare his interest and shall not **H** vote in respect of the contract. But there is an exception from the requirement that the director shall not vote where, amongst other things, the contract is

Case 1:21-cv-11059-GHW    Document 141-14    Filed 06/14/23    Page 75 of 76

331
1 Ch.          Prudential Assurance v. Newman Industries (No. 2)          Vinelott J.

A        " with any other corporation or firm and the sole interest of the
         director is that he is a director, member, partner, employer or creditor
         or otherwise interested in any such corporation or firm."

Given that many transactions in which a director is interested will be
transactions with companies in which he has a substantial shareholding—
or is even the sole shareholder—this exception seems to me far too wide.
B  If article 93 had not been qualified by this exception Mr. Bartlett and Mr.
Laughton would not have been entitled to vote at any of the board meetings
at which the package deal or the Strongpoint option were considered, and
it must be at least doubtful whether Mr. Laughton would have been
appointed to the committee which dealt with Mr. Cooper. I suggest that
the Stock Exchange should consider whether the requirements of the
Yellow Book concerning class 4 transactions should not be modified so as
C  to give the Council of the Stock Exchange power to require that class 4
transactions be considered solely by directors who do not have an interest
which conflicts with the company on whose behalf a circular seeking
shareholders' approval is sought and do not take any part in the prepara-
tion of such a circular. The Council, of course, already have power to
insist that such a director or a company in which he is interested shall not
D  vote on a resolution to approve the transaction.

*Proceedings adjourned.*

March 17 and 18. Counsel addressed the court as to the appropriate
orders to be made. The order as drawn up provided:
E      (1) Declaration that the circular dated June 21, 1975, sent by Newman
to its shareholders and signed by Mr. Bartlett was tricky and misleading.

(2) Declaration (*a*) that as against the second and third defendants, Mr.
Bartlett and Mr. Laughton, the plaintiff in its personal capacity was
entitled to damages for conspiracy, and (*b*) that all other shareholders in
Newman, who, like the plaintiff, had suffered damage and were entitled
to damages, were entitled to damages against the defendants Mr. Bartlett
F  and Mr. Laughton for conspiracy, and (*c*) that the first defendant, Newman,
was entitled to damages for conspiracy and breach of fiduciary duty.

(3) Declaration that the fourth defendant, T.P.G., was liable to pay
compensation to Newman in consequence of the breach of fiduciary duty
by the defendants Mr. Bartlett and Mr. Laughton.

(4) Inquiry as to the amount of compensation to Newman payable
G  jointly and severally by Mr. Bartlett, Mr. Laughton and T.P.G. respectively,
in respect of fiduciary duty by the defendants, Mr. Bartlett and Mr.
Laughton.

(5) Order for payment of the amounts so found due, respectively, in
the appropriate proportions.

(6) Stay of all proceedings pursuant to paragraphs 2 (*a*) and (*b*) above,
H  without leave of the court.

(7) Order that the defendants, other than Newman, do pay to the
plaintiff and Newman respectively their costs of the action except as other-
wise specifically provided, save (i) that as against T.P.G. such costs should

332

Vinelott J.      Prudential Assurance v. Newman Industries (No. 2)      [1981]

not include those attributable to the plaintiff's personal claim at 5 per cent. **A**
of such costs (other than those referred to in paragraph 8 below) and 5
per cent. of Newman's costs, and (ii) as against the defendants other than
Newman such costs should not include those attributable to the plaintiff's
amendment of the statement of claim and in taxing the costs of the plaintiff
the taxing master should allow the attendance of three counsel for the
plaintiff, provided always that any sums recovered should be applied
between the plaintiff and Newman in proportion that their respective costs **B**
bear to their combined costs.

(8) Order that the costs of the preliminary issue and of the application
to amend the statement of claim be the plaintiff's costs in cause.

(9) Order that the defendants other than Newman do pay to the
plaintiff and Newman respectively their costs of taking a shorthand note of
the evidence and of supplying expedited transcripts and copies thereof. **C**

(10) Order that the taxing master tax the costs of Newman as between
party and party, and the plaintiff's costs as between party and party and
on the common fund basis, and to certify the difference.

(11) Order that Newman do indemnify the plaintiff as to the difference
between (a) 95 per cent. of the costs incurred by the plaintiff (other than
those in paragraph 8 above) together with the whole of the costs referred **D**
to in paragraph 8 both taxed on a common fund basis and (b) the costs
recovered from the other defendants, provided always that the amount
so recovered by way of indemnity shall not exceed the amount recovered
on behalf of Newman by way of damages and equitable compensation from
the second, third and fourth defendants.

(12) Costs of the inquiry reserved.

(13) Stay of proceedings to enforce the order until after time for appeal **E**
expired.

(14) In the event of an appeal a further stay until the appeal be dis-
posed of.

(15) Liberty to apply.

Solicitors: *C. F. Whitehorn; Simmons & Simmons*, until judgment **F**
on February 18 and 19, thereafter *Macfarlanes; Simmons & Simmons;*
*Clifford-Turner.*

T. C. C. B.

**G**

**H**