**EXHIBIT**

**15**

exhibitsticker.com

255

[2020] 3 WLR                                    Marex Financial Ltd v Sevilleja (SC(E))

*A*

Supreme Court

# Marex Financial Ltd *v* Sevilleja (All Party Parliamentary Group on Fair Business Banking intervening)

## [2020] UKSC 31

*B*
2019  May 8;                                    Lord Reed PSC, Lord Hodge DPSC,
2020  July 15                          Lady Black, Lord Lloyd-Jones, Lord Kitchin,
                                        Lord Sales JJSC, Baroness Hale of Richmond

*Company — Creditor's claim against beneficial owner — Rule against reflective loss — Claimant obtaining judgment against companies — Companies allegedly stripped of assets by defendant beneficial owner so that unable to pay judgment debt — Claimant's action in tort against defendant for damages to recover sums removed from companies equal to judgment debt — Defendant claiming action relating to same loss as that incurred by companies contrary to rule precluding recovery of reflective loss — Extent to which rule remaining good law — Whether extending to claims by unsecured creditors or limited to claims by shareholders for diminution in value of shares caused by actionable loss to company — Whether claimant entitled to pursue claim*

*C*

*D*
The claimant obtained judgment against two companies incorporated in the British Virgin Islands for sums due under a contract, but the companies' assets were found to be of an amount significantly below the judgment debt and the companies subsequently went into liquidation. The claimant alleged that, after the draft judgment had been released, the defendant, a resident of Dubai who was the ultimate beneficial owner and controller of the companies, had dishonestly stripped the companies of their wealth and moved it overseas out of the claimant's reach in order to prevent the judgment from being enforced. It also alleged that the companies' liquidator, funded by the defendant, had taken no steps to recover the companies' losses. The claimant issued proceedings against the defendant seeking damages in tort for inducing or procuring the violation of its rights under the judgment and intentionally causing it loss by unlawful means, and was given permission to serve the claim form on the defendant out of the jurisdiction. The defendant applied to set aside service of the claim form on the ground, inter alia, that since it remained open to the companies' liquidator to pursue any claim against the defendant for any sums unlawfully removed, the rule against reflective loss barred the claimant from making the same claim. The judge, having rejected that argument and the other grounds of objection, dismissed the application. The Court of Appeal allowed the defendant's appeal, holding that the rule against reflective loss was not limited to precluding a shareholder from claiming for a diminution in the value of its shareholding that was merely a reflection of a loss suffered by the company in consequence of a wrong done to it by the defendant, but also precluded a claim by an unsecured creditor of a company where each of the creditor and the company had its own cause of action against a third party defendant in respect of the same wrongful conduct by him.

*E*

*F*

*G*

On the claimant's appeal—

*Held*, allowing the appeal, that there was no justification for a reflective loss principle in the law of damages and to the extent that case law had purported to lay down such a principle it was not to be followed; that there were grounds, however, (Lord Kitchin, Lord Sales JJSC and Baroness Hale of Richmond dissenting) for upholding a more limited principle of company law, namely that shareholders in a company could not bring an action to make good a diminution in the value of their shareholding, or in the dividends they received, which flowed from loss suffered by the company for the recovery of which it had a cause of action, even if the company were to decline or fail to make good that loss; that the rationale for the rule was that,

*H*

© 2020 The Incorporated Council of Law Reporting for England and Wales

A

where it applied, the shareholder did not suffer a loss which was recognised in law as having an existence which was separate and distinct from the company's loss given the long-established principle of company law that the only person who could seek relief for an injury done to a company, where the company had a cause of action, was the company itself; that where a claim was brought in respect of a loss which did not fall within that description, whether by a shareholder or a creditor of the company, that claim fell to be adjudicated on by the courts in the ordinary way notwithstanding that the company had a right of action in respect of substantially the same loss; and that, accordingly, the claimant had been entitled to pursue its claim against the defendant and to do so irrespective of whether or not the companies' liquidator chose to pursue their own action against him (post, paras 10, 28, 39, 67, 79–84, 89, 92, 95, 98–100, 102, 109, 116, 211).

B

*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, CA and dicta of Lord Bingham of Cornhill in *Johnson v Gore Wood & Co* [2002] 2 AC 1, 35–36, HL(E) approved.

C

Dicta of Lord Millett in *Johnson v Gore Wood & Co* [2002] 2 AC 1, 62–67, HL(E) disapproved.

*Giles v Rhind* [2003] Ch 618, CA, *Gardner v Parker* [2004] 2 BCLC 554, CA and *Perry v Day* [2005] 2 BCLC 405 overruled.

*Per* Lord Reed PSC, Lord Hodge DPSC, Lady Black and Lord Lloyd-Jones JJSC. The court has not been addressed on the issue of double recovery, in so far as it might arise in relation to the claimant's claim.  But it should be borne in mind that the avoidance of double recovery does not entail that the company's claim must be given priority.  Nor does the pari passu principle entail that the company's claim must be given priority (paras 87, 93, 95).

D

Decision of the Court of Appeal [2018] EWCA Civ 1468; [2019] QB 173; [2018] 3 WLR 1412; [2019] 1 All ER (Comm) 522; [2018] 2 BCLC 601 reversed.

The following cases are referred to in the judgments:

E

*Alico Life International Ltd v Thema International Fund plc* [2016] IEHC 363
*Allen v Gold Reefs of West Africa Ltd* [1900] 1 Ch 656, CA
*Banque Financière de la Cité v Parc (Battersea) Ltd* [1999] 1 AC 221; [1998] 2 WLR 475; [1998] 1 All ER 737, HL(E)
*Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427, CA
*Birch v Cropper* (1889) 14 App Cas 525, HL(E)
*Chen v Karandonis* [2002] NSWCA 412

F

*Christensen v Scott* [1996] 1 NZLR 273
*Company (No 00709 of 1992), In re A* [1999] 1 WLR 1092; [1999] 2 All ER 961; [1999] 2 BCLC 1, HL(E)
*Cooper (Gerald) Chemicals Ltd, In re* [1978] Ch 262; [1978] 2 WLR 866; [1978] 2 All ER 49
*Creative Finance Ltd, In re* (2016) 543 BR 498, US Bankruptcy Court for the Southern District of New York

G

*Duncan, Fox, & Co v North and South Wales Bank* (1880) 6 App Cas 1, HL(E)
*Edwards v Halliwell* [1950] 2 All ER 1064, CA
*Fischer (George) (Great Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260, CA
*Foss v Harbottle* (1843) 2 Hare 461
*Freeman v Ansbacher Trustees (Jersey) Ltd* [2009] JRC 003; [2009] JLR 1
*Gardner v Parker* [2004] EWCA Civ 781; [2004] 2 BCLC 554, CA
*Gerber Garment Technology Inc v Lectra Systems Ltd* [1997] RPC 443, CA

H

*Giles v Rhind* [2002] EWCA Civ 1428; [2003] Ch 618; [2003] 2 WLR 237; [2002] 4 All ER 977; [2003] 1 BCLC 1, CA
*Golden Strait Corpn v Nippon Yusen Kubishika Kaisha (The Golden Victory)* [2007] UKHL 12; [2007] 2 AC 353; [2007] 2 WLR 691; [2007] Bus LR 997; [2007] 3 All ER 1; [2007] 2 All ER (Comm) 97; [2007] 2 Lloyd's Rep 164, HL(E)

257
[2020] 3 WLR                           Marex Financial Ltd v Sevilleja (SC(E))

A  *Gould v Vaggelas* [1984] HCA 68; 157 CLR 215
   *Greenhalgh v Arderne Cinemas Ltd* [1951] Ch 286; [1950] 2 All ER 1120, CA
   *Halcyon Skies, The* [1977] QB 14; [1976] 2 WLR 514; [1976] 1 All ER 856; [1976] 1 Lloyd's Rep 461
   *Heron International Ltd v Lord Grade* [1983] BCLC 244, CA
   *Hodges v Waters (No 7)* [2015] FCA 264; 232 FCR 97; 325 ALR 682
   *International Leisure Ltd v First National Trustee Co UK Ltd* [2012] EWHC 1971
B  (Ch); [2013] Ch 346; [2013] 2 WLR 466; [2014] 1 BCLC 128
   *Johnson v Gore Wood & Co* [1999] BCC 474; [1999] Lloyd's Rep PN 91; [1999] PNLR 426, CA; [2002] 2 AC 1; [2001] 2 WLR 72; [2001] 1 All ER 481, HL(E)
   *Latin American Investments Ltd v Maroil Trading Inc* [2017] EWHC 1254 (Comm); [2017] 2 CLC 45
   *Lee v Sheard* [1956] 1 QB 192: [1955] 3 WLR 951; [1955] 3 All ER 777, CA
C  *Liverpool, The (No 2)* [1963] P 64; [1960] 3 WLR 597; [1960] 3 All ER 307, CA
   *Lumley v Gye* (1853) 2 E & B 216
   *McAlpine (Alfred) Construction Ltd v Panatown Ltd* [2001] 1 AC 518; [2000] 3 WLR 946; [2000] 4 All ER 97, HL(E)
   *Macaura v Northern Assurance Co Ltd* [1925] AC 619, HL(NI)
   *Moule v Garrett* (1872) LR 7 Ex 101
   *OBG Ltd v Allan* [2007] UKHL 21; [2008] AC 1; [2007] 2 WLR 920; [2007] Bus LR
D  1600; [2007] 4 All ER 545; [2008] 1 All ER Comm 1, HL(E)
   *O'Sullivan v Williams* [1992] 3 All ER 385; [1992] RTR 402, CA
   *Peak Hotels and Resorts Ltd v Tarek Investments Ltd* [2015] EWHC 3048 (Ch)
   *Perry v Day* [2004] EWHC 3372 (Ch); [2005] 2 BCLC 405
   *Primeo Fund v Bank of Bermuda (Cayman) Ltd* (unreported) 13 June 2019, Cayman Islands Ct of Appeal
   *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1981] Ch 257;
E  [1980] 3 WLR 543; [1980] 2 All ER 841, Ch D; [1982] Ch 204; [1982] 2 WLR 31; [1982] 1 All ER 354, CA
   *Salomon v A Salomon & Co Ltd* [1897] AC 22, HL(E)
   *Shaker v Al-Bedrawi* [2002] EWCA Civ 1452; [2003] Ch 350; [2003] 2 WLR 922; [2002] 4 All ER 835; [2003] 1 BCLC 157, CA
   *Short v Treasury Comrs* [1948] 1 KB 116; [1947] 2 All ER 298, CA; [1948] AC 534; [1948] 2 All ER 509, HL(E)
F  *Stein v Blake* [1998] 1 AC 724; [1998] 1 BCLC 574, CA
   *Stratford (JT) & Son Ltd v Lindley* [1965] AC 269; [1964] 3 WLR 541; [1964] 3 All ER 102; [1964] 2 Lloyd's Rep 133, HL(E)
   *Swynson Ltd v Lowick Rose llp (formerly Hurst Morrison Thomson llp)* [2017] UKSC 32; [2018] AC 313; [2017] 2 WLR 1161; [2017] 3 All ER 785, HL(E)
   *Townsing v Jenton Overseas Investment Pte Ltd* [2007] SGCA 13; [2008] 1 LRC 231, Singapore Ct of Appeal
G  *Waddington Ltd v Thomas* [2008] HKCU 1381; [2009] 2 BCLC 82
   *Xie Zhikun v Xio GP Ltd* (unreported) 14 November 2018, Cayman Islands Ct of Appeal

   The following additional cases were cited in argument:

   *BAT Industries plc v Sequana SA (BTI 2014 llc v Sequana SA)* [2019] EWCA Civ
H  112; [2019] Bus LR 2178; [2019] 2 All ER 784; [2019] 2 All ER (Comm) 13; [2019] 1 BCLC 347, CA
   *Cherry v Boultbee* (1839) 4 My & Cr 442
   *Coote v Rubin* [2011] EWCA Civ 106; [2011] BCC 596, CA
   *Day v Cook* [2001] EWCA Civ 592; [2002] 1 BCLC 1, CA
   *Edennote Ltd, In re* [1996] 2 BCLC 389, CA

© 2020 The Incorporated Council of Law Reporting for England and Wales

*4 Eng Ltd v Harper (No 2)* [2009] EWHC 2633 (Ch); [2010] Bus LR D58; [2010]
   1 BCLC 176

*Hengwell Development Pte Ltd v Thing Chiang Ching* [2002] 4 SLR 902, Singapore
   High Ct

*Hockin v Royal Bank of Scotland* [2016] EWHC 925 (Ch)

*Jefcoate v Spread Trustee Co Ltd* (unreported) 31 October 2014, Royal Ct of
   Guernsey (Ordinary Division)

*Kaupthing Singer & Friedlander Ltd (No 2), In re* [2011] UKSC 48; [2012] 1 AC 804;
   [2011] 3 WLR 939; [2011] Bus LR 1644; [2012] 1 All ER 883; [2012] 1 BCLC
   227, SC(E)

*Kazakhstan Kagazy plc v Arip* [2014] EWCA Civ 381; [2014] 1 CLC 451, CA

*Kazakhstan Kagazy plc v Zhunus* [2016] EWHC 2363 (Comm); [2017] 1 WLR 467

*LF2 Ltd v Supperstone* [2018] EWHC 1776 (Ch); [2018] Bus LR 2303; [2019]
   1 BCLC 38, Ch D

*Lister v Hesley Hall Ltd* [2001] UKHL 22; [2002] 1 AC 215; [2001] 2 WLR 1311;
   [2001] ICR 665; [2001] 2 All ER 769; [2001] 2 FLR 307, HL(E)

*Longmeade, In re* [2016] EWHC 356 (Ch); [2016] Bus LR 506; [2017] 2 All ER 244;
   [2017] 2 All ER (Comm) 161; [2017] 1 BCLC 605

*McLeod v Rooney* [2009] CSOH 158; 2010 SLT 499

*St Vincent European General Partner Ltd v Robinson* [2018] EWHC 1230 (Comm);
   [2019] 1 BCLC 706

*Stichting Shell Pensioenfonds v Krys* [2014] UKPC 41; [2015] AC 616; [2015] 2 WLR
   289; [2015] 2 All ER (Comm) 97; [2015] 1 BCLC 597, PC

*Ultraframe (UK) Ltd v Rigby (Kenneth Brian)* [2005] EWCA Civ 276, CA

*Veron International Ltd v RCG Holdings Ltd* [2015] HKCFI 1246

*Watson, Laidlaw & Co Ltd v Pott, Cassels & Williamson* (1914) 31 RPC 104, HL(Sc)

**APPEAL** from the Court of Appeal

By a claim form dated 9 August 2016 the claimant, Marex Financial Ltd,
claimed against the defendant, Carlos Sevilleja Garcia, damages for (1) the
tort of inducing and/or procuring the violation by two British Virgin Islands
companies, Creative Finance Ltd and Cosmorex Ltd, of the claimant's rights
pursuant to a judgment obtained in its favour following a claim brought by
the claimant against the companies; and/or (2) the tort of intentionally
causing loss to the claimant by unlawful means, on the basis that the
defendant had deliberately procured the dissipation of millions of dollars
out of the accounts of those two companies, of which he was—according to
the claimant—beneficial owner and director, and into his personal control,
leaving the companies with minimal assets, unable to satisfy the judgment
obtained by the claimant, and in liquidation. On 11 August 2016 the
claimant obtained the permission of the court under CPR r 6.36 to serve the
claim form out of the jurisdiction on the defendant, a resident of Dubai, as
being a claim "made in tort" within paragraph 3.1(9) of CPR Practice
Direction 6B. By a judgment dated 25 April 2017 Knowles J [2017] EWHC
918 (Comm); [2017] 4 WLR 105 refused an application made by the
defendant under CPR Pt 11 challenging the jurisdiction of the court on a
number of grounds including a claim that the rule against reflective loss
barred the claimant's ability to show a completed cause of action in tort.

By an appellant's notice dated 16 May 2017 and with permission of the
Court of Appeal (Asplin LJ) granted on 16 October 2017 the defendant
appealed on the sole ground that the judge had erred in holding that the
defendant had not shown that the rule against reflective loss barred the
claimant's ability to show a completed cause of action in tort. By a

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   respondent's notice dated 31 October 2017 the claimant sought to uphold the judge's reasoning on the further or additional bases that, even if the rule against reflective loss were to apply, it did not apply to the entirety of the claimant's claims; but that, in any event, the exception to the rule against reflective loss in *Giles v Rhind* [2003] Ch 618 applied.

B   By a judgment dated 26 June 2018 the Court of Appeal (Lewison, Lindblom and Flaux LJJ) [2018] EWCA Civ 1468; [2019] QB 173; [2018] 3 WLR 1412 allowed the appeal, save in respect of the enforcement costs, and on 16 July 2018 gave the claimant permission to appeal to the Supreme Court whilst refusing the defendant permission to cross-appeal.

C   On 11 February 2019 the Supreme Court (Lord Reed DPSC, Lady Black and Lord Kitchin JJSC) refused an application by the defendant for permission to cross-appeal on the enforcement costs.  On 2 May 2019 the Supreme Court (Baroness Hale of Richmond PSC, Lord Reed DPSC and Lord Hodge JSC) gave the All Party Parliamentary Group on Fair Business Banking permission to intervene.  The issues for the court are set out in the judgment of Lord Reed PSC, post, para 22.

The facts are stated in the judgment of Lord Reed PSC, post, paras 15–21.

D   *George Bompas QC* and *Sophie Weber* (instructed by *Memery Crystal llp*) for the claimant.
*David Lewis QC* and *Richard Greenberg* (instructed by *Mackrell Turner Garrett, Woking*) for the defendant.
*Peter Knox QC*, *Simon Reevell*, *Richard Samuel*, *Amit Karia* and *Chloe Shuffrey* (instructed by *Trowers & Hamlins llp*) for the intervener.

E   The court took time for consideration.

15 July 2020.  The following judgments were handed down.

**LORD REED PSC** (with whom **LADY BLACK** and **LORD LLOYD-JONES JJSC** agreed)

F   1   This appeal concerns the supposed principle that "reflective loss" cannot be recovered.  Before describing the factual background, or entering into the details of the legal issues, it may be helpful to begin by considering some basic principles of our law.

*Introduction*

G   2   It is not uncommon for two persons, A and B, to suffer loss as a result of the conduct of a third person, C.  If that conduct was in breach of an obligation owed by C to A, then A will in principle have a cause of action against C.  If the conduct was also in breach of an obligation owed by C to B, then B will also have a cause of action against C.  A and B are both at liberty to sue C whenever they please, subject to rules as to limitation and prescription, and C is normally liable to compensate them both for the loss which they have suffered.  If A obtains and enforces a pecuniary award against C, and some time later B also seeks a similar award but C is unable to pay it, then in principle that is B's misfortune.  However, where C is insolvent at the time when the first claim is made against him, the law of insolvency protects the position of both A and B by imposing a regime for the distribution of C's assets among his creditors which ensures that they are

© 2020 The Incorporated Council of Law Reporting for England and Wales

treated equally, after the claims of secured or preferred creditors have been met.                                                                    A

3    The position can become more complicated where A and B have concurrent claims in respect of losses which are interrelated in such a way that a payment by C to one of them will have the practical effect of remedying the loss suffered by the other. The general position in situations of that kind was described by Brandon J in *The Halcyon Skies* [1977] QB 14, 32:                                                                                         B

> "There is no reason, as a matter of law, why two different persons should not have concurrent rights of recovery, based on different causes of action, in respect of what is in substance the same debt. The court will not allow double recovery or, in a case of insolvency, double proof against the insolvent estate: *The Liverpool (No 2)* [1963] P 64. Subject to this, however, either of the two persons is entitled to enforce his right independently of the other."                                         C

4    The principle that double recovery should be avoided does not prevent a claimant from bringing proceedings for the recovery of his loss. But the court will have to consider how to avoid double recovery in situations where the issue is properly before it. Procedurally, that may occur in a number of ways. For example, both claimants may bring proceedings concurrently, or the wrongdoer may raise the issue by way of defence to proceedings brought by one claimant, and join the other potential claimant as a defendant, or the court may itself direct the claimant to notify the other potential claimant so that he has an opportunity to intervene (as explained in *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262, 268–269).     D

5    The principle that double recovery should be avoided does not deflect the law from compensating both claimants, but affects the remedial route by which the law achieves that objective. There are a number of ways in which the law can avoid double recovery, or double proof in insolvency, where concurrent rights of recovery might otherwise have that result. In some circumstances, priority is given to the cause of action held by one person, and the claim of the other person is excluded so far as may be necessary to avoid double recovery. The rationale in such cases is that, by directly achieving its remedial objective in respect of the person who is permitted to bring the prior claim, the law indirectly achieves that objective in respect of the person whose claim is excluded.                                       F

6    That was the approach adopted, for example, in the decision cited by Brandon J, *The Liverpool (No 2)* [1963] P 64. In that case, a port authority sought to prove against an insolvent fund, established to meet the liabilities of the owners of one vessel, the *Liverpool*, for the cost of clearing the wreck of another, the *Ousel*, which had been damaged in a collision for which the *Liverpool* was responsible. The authority also made a statutory claim for the same cost against the owners of the *Ousel*, and they in turn sought to prove for that amount against the fund. The Court of Appeal held that the claim of the authority against the fund should be given priority over that of the owners of the *Ousel*, since the authority was actually out of pocket, while the claim of the owners of the *Ousel* against the fund should be disallowed. It also observed that it would be consonant with justice and good sense that, in the event that the authority sought to recover also from the owners of the *Ousel* (for any balance remaining after it had received a    H

© 2020 The Incorporated Council of Law Reporting for England and Wales

A    dividend out of the fund), it would have to give credit for the amount that it
     had already recovered.  In that way, the owners of the *Ousel* benefited from
     the authority's recovery from the fund to the same extent as they would have
     done if their claim against the fund had been allowed.  A similar approach, in
     the context of concurrent claims arising out of the breach of a construction
     contract, can be seen in *Alfred McAlpine Construction Ltd v Panatown Ltd*
     [2001] 1 AC 518, 595.
B
        7    There are also circumstances in which the law finds other means of
     avoiding double recovery, such as subrogation (as discussed, for example, in
     *Gould v Vaggelas* (1984) 157 CLR 215), or the imposition on one claimant
     of an obligation to account to the other out of the damages which the former
     has received (as, for example, in *O'Sullivan v Williams* [1992] 3 All ER 385).
     The most suitable approach to adopt in a particular case will depend upon
C    its circumstances.
        8    This appeal is concerned with a particular type of situation in which
     two persons, A and B, suffer loss as a result of the conduct of a third person,
     C.  The situation in question is one in which A is a company, B is a creditor of
     that company, and B's loss is consequential upon the loss suffered by A,
     because C's conduct has rendered A insolvent and unable to pay its debt to
     B.
D
        9    The fact that a claim lies at the instance of a company rather than a
     natural person, or some other kind of legal entity, does not in itself affect the
     claimant's entitlement to be compensated for wrongs done to it.  Nor does it
     usually affect the rights of other persons, legal or natural, with concurrent
     claims.  There is, however, one highly specific exception to that general rule.
     It was decided in the case of *Prudential Assurance Co Ltd v Newman*
E    *Industries Ltd (No 2)* [1982] Ch 204 that a shareholder cannot bring a claim
     in respect of a diminution in the value of his shareholding, or a reduction in
     the distributions which he receives by virtue of his shareholding, which is
     merely the result of a loss suffered by the company in consequence of a
     wrong done to it by the defendant, even if the defendant's conduct also
     involved the commission of a wrong against the shareholder, and even if no
     proceedings have been brought by the company.  As appears from that
F    summary, the decision in *Prudential* established a rule of company law,
     applying specifically to companies and their shareholders in the particular
     circumstances described, and having no wider ambit.
        10    The rule in *Prudential*, as I shall refer to it, is distinct from the
     general principle of the law of damages that double recovery should be
     avoided.  In particular, one consequence of the rule is that, where it applies,
G    the shareholder's claim against the wrongdoer is excluded even if the
     company does not pursue its own right of action, and there is accordingly no
     risk of double recovery.  That aspect of the rule is understandable on the
     basis of the reasoning in *Prudential*, since its rationale is that, where it
     applies, the shareholder does not suffer a loss which is recognised in law as
     having an existence distinct from the company's loss.  On that basis, a claim
     by the shareholder is barred by the principle of company law known as the
H    rule in *Foss v Harbottle* (1843) 2 Hare 461: a rule which (put shortly) states
     that the only person who can seek relief for an injury done to a company,
     where the company has a cause of action, is the company itself.
        11    Putting matters broadly at this stage, in *Johnson v Gore Wood & Co*
     [2002] 2 AC 1 the House of Lords purported to follow *Prudential*, but the

262
Marex Financial Ltd v Sevilleja (SC(E))                                         [2020] 3 WLR
Lord Reed PSC

reasoning of some members of the Appellate Committee was not clearly     A
confined to circumstances of the kind with which *Prudential* was concerned.
In particular, the reasoning of Lord Millett, which proved particularly
influential in subsequent cases, advanced a number of other justifications for
the exclusion of the shareholder's claim whenever the company had a
concurrent claim available to it, of wider scope than the approach adopted
in *Prudential*.

    **12**  The decision in *Johnson* has been interpreted in later cases as     B
establishing a principle, generally referred to as the "reflective loss" principle,
whose legal basis and scope are controversial.  This supposed principle has
been applied to claims brought by a claimant in the capacity of a creditor of a
company, where he also held shares in it, and the company had a concurrent
claim.  In the present case, the Court of Appeal held that the principle applied
to a claim brought by an ordinary creditor of a company (who was not a     C
shareholder), where the company had a concurrent claim.

    **13**  In the present appeal, the court is invited to clarify, and if necessary
depart from, the approach adopted in *Johnson*, and to overrule some later
authorities.  It is also necessary for the court to examine the rationale and
effect of the decision in *Prudential*, in order to consider the reasoning in
*Johnson* and the later cases.     D

### The present appeal

    **14**  The appeal is brought against an order of the Court of Appeal
(Lewison, Lindblom and Flaux LJJ), allowing an appeal against an order
made by Knowles J in the Commercial Court.  In summary, an application
was made to Knowles J to set aside an order giving permission for service of
proceedings on the respondent, Mr Sevilleja, out of the jurisdiction.  One of     E
the arguments advanced by Mr Sevilleja in support of his application was
that the appellant, Marex, did not have a good arguable case against him
because the losses which Marex was seeking to recover were reflective of loss
suffered by two companies which had concurrent claims against him, and
were therefore not open to Marex to claim.  The judge held that Marex had a
good arguable case that its claim was not precluded by the "reflective loss"     F
principle, and therefore dismissed Mr Sevilleja's application [2017] 4 WLR
105.  On appeal, the Court of Appeal accepted that the "reflective loss"
principle applied to about 90% of Marex's claim [2019] QB 173.  The effect
of the Court of Appeal's decision is that although Marex's permission to
serve out was not set aside, it can pursue its claim only as regards the 10% of
its alleged losses which were conceded not to be "reflective".     G

### The facts

    **15**  It is common ground that, for the purposes of the present
proceedings, the facts must be taken to be as alleged by Marex in its
particulars of claim and supporting documents.  On that basis, the material
facts—which, it should be made clear, are disputed by Mr Sevilleja—can be
summarised as follows.     H

    **16**  Mr Sevilleja was the owner and controller of two companies
incorporated in the British Virgin Islands ("the BVI"), Creative Finance Ltd
and Cosmorex Ltd ("the Companies"), which he used as vehicles for trading
in foreign exchange.  Marex brought proceedings against the Companies in

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   the Commercial Court for amounts due to it under contracts which it had entered into with them. Following a trial before Field J in April 2013, Marex obtained judgment against the Companies for more than US$5·5m. It was also awarded costs which were later agreed at £1·65m.

17   Field J provided the parties with a confidential draft of his judgment on 19 July 2013, the judgment being handed down and orders for payment made on 25 July 2013. Over a few days starting on or shortly after 19 July

B   2013, Mr Sevilleja procured that more than US$9·5m was transferred offshore from the Companies' London accounts and placed under his personal control. By the end of August 2013, the Companies disclosed assets of US$4,329·48. The object of the transfers was to ensure that Marex did not receive payment of the amounts owed by the Companies. In procuring the transfers, Mr Sevilleja acted in breach of duties owed to the

C   Companies.

18   The Companies were placed into insolvent voluntary liquidation in the BVI by Mr Sevilleja in December 2013, with alleged debts exceeding US$30m owed to Mr Sevilleja and persons and entities associated with him or controlled by him. Marex was the only non-insider creditor.

19   According to Marex, the liquidator has been paid a retainer, and has

D   been indemnified against his fees and expenses, by an entity controlled by Mr Sevilleja or associated with him. The liquidation process has effectively been on hold. The liquidator has not taken any steps to investigate the Companies' missing funds or to investigate the claims submitted to him, including claims submitted by Marex. Nor has he issued any proceedings against Mr Sevilleja.

E   20   Marex refers in its pleadings to proceedings in the United States, where the court, after hearing evidence, refused to recognise the BVI liquidation as a main proceeding under Chapter 15 of the US Bankruptcy Code. It described the liquidation as "a device to thwart enforcement of a $5m judgment against the [Companies] that Marex won in the courts of England—and the most blatant effort to hinder, delay and defraud a creditor this court has ever seen": *In re Creative Finance Ltd* (2016) 543 BR 498, 502

F   (United States Bankruptcy Court for the Southern District of New York). It also found that "From beginning to end, Sevilleja's tactics were a paradigmatic example of bad faith, and the liquidator's actions—and inaction—facilitated them" (p 503). Mr Sevilleja was found to be guilty of "attempting (unfortunately, successfully) to control a BVI liquidator, who was supposed to act as an independent fiduciary, by the purse strings . . .

G   [and] depriving the liquidator of the resources he needed to properly do his job" (p 513).

21   In the present claim against Mr Sevilleja, Marex seeks damages in tort for (1) inducing or procuring the violation of its rights under the judgment and order of Field J dated 25 July 2013, and (2) intentionally causing it to suffer loss by unlawful means. The amounts claimed are (1) the amount of the judgment debt, interest and costs awarded by Field J, less an

H   amount recovered in US proceedings concerning the bankruptcy of a company which was indebted to the Companies, and (2) costs incurred by Marex in the US proceedings and in other attempts to obtain payment of the judgment debt. Mr Sevilleja concedes that those costs fall outside the scope of the "reflective loss" principle.

© 2020 The Incorporated Council of Law Reporting for England and Wales

A

22    The issues in the appeal are agreed by the parties to be the following:

"1. Whether the no reflective loss rule applies in the case of claims by company creditors, where their claims are in respect of loss suffered as unsecured creditors, and not solely to claims by shareholders.

"2. Whether there is any and if so what scope for the court to permit proceedings claiming for losses which are prima facie within the no reflective loss rule, where there would otherwise be injustice to the claimant through inability to recover, or practical difficulty in recovering, genuine losses intentionally inflicted on the claimant by the defendant in breach of duty both to the claimant and to a company with which the claimant has a connection, and where the losses are felt by the claimant through the claimant's connection with the company."

B

C

*Prudential Assurance v Newman Industries (No 2)*

23    Although incorporated companies have long existed, it was only towards the end of the 19th century that the independent legal personality of the company was conclusively established by the decision of the House of Lords in *Salomon v A Salomon & Co Ltd* [1897] AC 22.  During the 20th century, the implications of corporate personality for rights of property, and for the nature of a shareholder's interest, were addressed by the courts in a series of cases, including *Macaura v Northern Assurance Co Ltd* [1925] AC 619 and *Short v Treasury Comrs* [1948] 1 KB 116, affirmed [1948] AC 534. In more recent times, the courts have had to consider the position where a shareholder seeks to recover damages in respect of a diminution in the value of his shareholding or in the distributions received from the company, resulting from a loss suffered by the company in respect of which the company has its own cause of action.

D

E

24    The issue appears to have arisen for the first time in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204.  The case concerned a situation where the directors of a company were alleged to have made a fraudulent misrepresentation in a circular distributed to its shareholders, so as to induce them to approve the purchase of assets at an overvalue from another company in which the directors were interested. Prudential, which was a minority shareholder in the company, brought a personal and a derivative action against the directors, claiming that they had committed the tort of conspiracy against the company and its members. In relation to the personal claim, the Court of Appeal (Cumming-Bruce, Templeman and Brightman LJJ) concluded that, where a company and its shareholders had suffered wrongs which resulted in a loss to the company and a fall in the value of its shares, a shareholder could not bring a personal action against the wrongdoer.

F

G

25    The court devoted most of its judgment to the derivative action, and dealt with the personal action relatively briefly.  It approached the issue on the basis that the directors had acted in breach of their obligations to the shareholders (p 222), and that the loss suffered by the company had brought about a fall in the value of its shares.  It recorded at p 222 that no facts were relied upon in support of the personal claim which were not relied upon in support of the derivative claim.  It also expressed the opinion, at pp 223–224, that the plaintiffs were never concerned to recover in the personal action, and were only interested in it as a means of circumventing

H

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   the rule in *Foss v Harbottle*, which stood directly in the way of a derivative action. Nevertheless, it dealt with the personal action on the basis of general principles rather than on its particular facts; and the court's decision was treated by the House of Lords in *Johnson* [2002] 2 AC 1 as establishing principles of general application, which Lord Bingham of Cornhill set out at pp 35–36 (see para 41 below).

B   26   The court disallowed Prudential's claim on the ground that it had not suffered any personal loss. It stated [1982] Ch 204, 222–223:

> "But what he [the shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss'
C   is merely a reflection of the loss suffered by the company."

As that passage makes clear, the decision was concerned only with a diminution in the value of shares or in distributions, suffered by a shareholder merely because the company had itself suffered actionable damage. It was not concerned with other losses suffered by a shareholder, or with situations where the company had not suffered any actionable loss.

D   27   The court explained its reasoning as follows, at p 223:

> "The shareholder does not suffer any personal loss. His only 'loss' is through the company, in the diminution in the value of the net assets of the company . . . The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely
E   unencumbered property."

28   That reasoning requires elaboration. It is unrealistic to assert as a matter of fact that the shareholder does not suffer any personal loss: ex hypothesi, there has been a fall in the value of his shares. It is not immediately obvious what it means to say that his only loss is through the company. It is,
F   however, possible to explain the court's decision, particularly in the light of later passages in the judgment. As I understand its reasoning, what the court meant, put shortly, was that where a company suffers actionable loss, and that loss results in a fall in the value of its shares (or in its distributions), the fall in share value (or in distributions) is not a loss which the law recognises as being separate and distinct from the loss sustained by the company. It is for that reason that it does not give rise to an independent claim to damages on
G   the part of the shareholders.

29   The court provided at p 223 an illustration of its approach:

> "Suppose that the sole asset of a company is a cash box containing £100,000. The company has an issued share capital of 100 shares, of which 99 are held by the plaintiff. The plaintiff holds the key of the cash box. The defendant by a fraudulent misrepresentation persuades the
H   plaintiff to part with the key. The defendant then robs the company of all its money. The effect of the fraud and the subsequent robbery, assuming that the defendant successfully flees with his plunder, is (i) to denude the company of all its assets; and (ii) to reduce the sale value of the plaintiff's shares from a figure approaching £100,000 to nil. There are two wrongs,

© 2020 The Incorporated Council of Law Reporting for England and Wales

the deceit practised on the plaintiff and the robbery of the company. But    A
*the deceit on the plaintiff causes the plaintiff no loss which is separate and
distinct from the loss to the company* . . . The plaintiff obviously cannot
recover personally some £100,000 damages in addition to the £100,000
damages recoverable by the company." (Emphasis added.)

The court also made it clear that the company's failure to recover its loss
would not open the door to recovery by the shareholder, asking rhetorically    B
how the failure of the company to pursue its claim could entitle the
shareholder to recover the loss for himself.

30   The cash box example has been criticised for its artificiality.
Certainly, by envisaging a company whose only asset was cash, the court
greatly simplified a situation which, in real life, is likely to be more complex.
But the point being made has a rationale in real life as well as in the          C
simplified example.

31   The starting point is the nature of a share, and the attributes which
render it valuable. A share is not a proportionate part of a company's assets:
*Short v Treasury Comrs*. Nor does it confer on the shareholder any legal or
equitable interest in the company's assets: *Macaura v Northern Assurance
Co Ltd*. As the court stated in *Prudential*, a share is a right of participation
in the company on the terms of the articles of association. The articles         D
normally confer on a shareholder a number of rights, including a right to
vote on resolutions at general meetings, a right to participate in the
distributions which the company makes out of its profits, and a right to share
in its surplus assets in the event of its winding up.

32   Where a company suffers a loss, that loss may affect its current
distributions or the amount retained and invested in order to pay for           E
future distributions (or, if the company is wound up, the surplus, if any,
available for distribution among the shareholders). Since the value of a
company's shares is commonly calculated on the basis of anticipated future
distributions, it is possible that a loss may result in a fall in the value of
the shares. That is, however, far from being an inevitable consequence:
companies vary greatly, and the value of their shares can fluctuate upwards
or downwards in response to a wide variety of factors. In the case of a small   F
private company, there is likely to be a close correlation between losses
suffered by the company and the value of its shares. In the case of a large
public company whose shares are traded on a stock market, on the other
hand, a loss may have little or no impact on its share value. If there is an
impact on share value, it will reflect what Lord Millett described in *Johnson*
[2002] 2 AC 1, 62 as "market sentiment", and will not necessarily be            G
equivalent to the company's loss. If the company's loss does not affect the
value of its shares, then there is no claim (or at least no sustainable claim)
available to a shareholder, and in principle the problem addressed in
*Prudential* does not arise. A problem only arises where, as in *Prudential*, a
shareholder claims that the company's loss has had a knock-on effect on the
value of his shares.

33   Considering, then, the situation where a company suffers actionable      H
loss as the result of wrongdoing, the company then acquires a right of action.
If the company's loss results (or is claimed to result) in a fall in the value of
its shares, then, but for the rule in *Prudential*, the shareholder would
simultaneously acquire a concurrent right of action. The purpose of an

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   award of damages to the company is to restore it to the position in which it would have been if the wrongdoing had not occurred.  In circumstances where an award which restores the company's position to what it would have been if the wrongdoing had not occurred would also restore the value of the shares, the only remedy which the law would require to provide, in order to achieve its remedial objectives of compensating both the company and its shareholders, would be an award of damages to the company.  For

B   the shareholders to have a personal right of action, in addition to the company's right of action, would in those circumstances exceed what was necessary for the law to achieve those objectives, and would give rise to a problem of double recovery.  Most of the cases in which the rule in *Prudential* has been applied (but not *Prudential* itself) have concerned small private companies, where those circumstances are likely to have existed.  As

C   I have explained, however, there are also circumstances where there may not be a close correlation between the company's loss and any fall in share value.  The avoidance of double recovery cannot, therefore, be sufficient in itself to justify the rule in *Prudential*.

    34   That conclusion is also supported by another point.  What if the company fails to pursue a right of action which, in the opinion of a shareholder, ought to be pursued, or compromises its claim for an amount

D   which, in the opinion of a shareholder, is less than its full value?  If that opinion is shared by a majority of the shareholders, then the company's articles will normally enable them to direct the company's course of action by passing a suitable resolution at a general meeting.  Even if the shareholder finds himself in a minority, he has a variety of remedies available to him, including the bringing of a derivative action on the company's behalf,

E   equitable relief from unfairly prejudicial conduct, or a winding up on the "just and equitable" ground, if (put shortly) those in control of the company are abusing their powers.  But what if the company's powers of management are not being abused, and a majority of shareholders approve of the company's decision not to pursue the claim, or its decision to enter into a settlement?  Should the minority shareholder not then be able to pursue a personal action?

F     35   In *Prudential* [1982] Ch 204, the court answered that question in the negative, stating at p 224 that the rule in *Foss v Harbottle* would be subverted if the shareholder could pursue a personal action.  The rule, as stated in *Edwards v Halliwell* [1950] 2 All ER 1064 and restated in *Prudential* at pp 210–211, has two aspects.  The first is that "the proper plaintiff in an action in respect of a wrong alleged to be done to a corporation is, prima

G   facie, the corporation".  As was explained in *Prudential* at p 210, one of the consequences of that aspect of the rule is that a shareholder cannot, as a general rule, bring an action against a wrongdoer to recover damages or secure other relief for an injury done to the company.  The second aspect of the rule is that "Where the alleged wrong is a transaction which might be made binding on the corporation and on all its members by a simple majority of the members, no individual member of the corporation is allowed to

H   maintain an action in respect of that matter because, if the majority confirms the transaction, cadit quaestio [the question falls]; or, if the majority challenges the transaction, there is no valid reason why the company should not sue."  This second aspect of the rule reflects the fact that the management of a company's affairs is entrusted to the decision-making organs established

by its articles of association, subject to the exceptional remedies mentioned in
para 34 above.  When a shareholder invests in a company, he therefore
entrusts the company—ultimately, a majority of the members voting in a
general meeting—with the right to decide how his investment is to be
protected.  As the court stated in *Prudential* at p 224:

> "When a shareholder acquires a share he accepts the fact that the
> value of his investment follows the fortunes of the company and that he
> can only exercise his influence over the fortunes of the company by the
> exercise of his voting rights in general meeting."

36   Accordingly, in a situation where a shareholder claims that his shares
have fallen in value as a result of a loss suffered by the company, and the
company has a right of action in respect of that loss, the shareholder can
exercise such rights of control over its decision-making as have been granted
to him by the articles of association.  These normally provide for the
ultimate control of the company's affairs by a majority of the shareholders
voting at a general meeting.  A minority shareholder has other remedies
available to him if the company's management is acting improperly,
including a derivative action and an application for relief against unfairly
prejudicial conduct.

37   As the court observed in *Prudential*, to allow the shareholder in
addition to pursue a personal action would subvert the rule in *Foss v
Harbottle*.  This is not merely a theoretical concern.  Examples of the use of
personal actions, post-*Johnson*, to circumvent the rule in *Foss v Harbottle*
are discussed in paras 52–53 below.  The existence of concurrent claims
could also result in the shareholder's preventing the company's management
from dealing with its claim in the way they considered appropriate in the best
interests of the company, thereby undermining the rule in *Foss v Harbottle*.
That could occur, for example, where the company's management wanted to
compromise the company's claim but were prevented from doing so by the
shareholder's refusal to enter into a settlement with the wrongdoer.  One can
envisage other situations where the existence of concurrent claims could
result in the shareholder's acting contrary to the company's interests, for
example where the wrongdoer's assets were inadequate to satisfy both
claims.  But the effect of the rule in *Foss v Harbottle*, as the court said in
*Prudential* at p 224, is that "[the shareholder] accepts the fact that the value
of his investment follows the fortunes of the company".  It is for that reason
that the rule in *Prudential* has been said to recognise "the unity of economic
interests which bind a shareholder and his company": *Townsing v Jenton
Overseas Investment Pte Ltd* [2008] 1 LRC 231, para 77.

38   In addition to arguments based on *Foss v Harbottle*, there are also
pragmatic advantages in a clear rule that only the company can pursue a
right of action in circumstances falling within the ambit of the decision in
*Prudential*.  As Lord Hutton commented in *Johnson* [2002] 2 AC 1, 55, the
rule in *Prudential* has the advantage of establishing a clear principle, rather
than leaving the protection of creditors and other shareholders of the
company to be given by a judge in the complexities of a trial.  Those
complexities should not be underestimated.  Even without the complications
arising from the existence of concurrent claims, it would not be
straightforward to establish the extent, if any, to which a fall in the value of
a company's shares was attributable to a loss that it had suffered as a

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   consequence of the defendant's wrongdoing.  But the existence of a
concurrent claim by the company would add another dimension to the
difficulties.  It would be necessary, for example, to take account of the fact
that the wrongdoing had resulted in the company's acquiring an asset,
namely its right of action against the defendant, which might have offset any
detrimental effect of the wrongdoing on the value of his shares.  It would also
be necessary to consider the question of double recovery, and how it should
B   be addressed both procedurally and substantively.  Those issues might have
to be addressed in the context of a proliferation of claims, possibly in
different proceedings, at different times, and in different jurisdictions.  They
would also arise in a context where there might well be conflicts of interest
between the shareholder and the company's directors, its liquidator, other
shareholders, and creditors.

C   39   In summary, therefore, *Prudential* decided that a diminution in the
value of a shareholding or in distributions to shareholders, which is merely
the result of a loss suffered by the company in consequence of a wrong done
to it by the defendant, is not in the eyes of the law damage which is separate
and distinct from the damage suffered by the company, and is therefore not
recoverable.  Where there is no recoverable loss, it follows that the
shareholder cannot bring a claim, whether or not the company's cause of
D   action is pursued.  The decision had no application to losses suffered by a
shareholder which were distinct from the company's loss or to situations
where the company had no cause of action.

*Johnson v Gore Wood & Co*

E   40   The decision in *Prudential* was considered by the House of Lords in
*Johnson v Gore Wood & Co* [2002] 2 AC 1.  The case concerned alleged
negligence on the part of solicitors acting for a private company, which
caused it to suffer losses.  The company brought proceedings against the
solicitors, which were settled during the sixth week of the trial for a very
substantial proportion of the sum claimed, as Lord Bingham explained
at p 18.  Mr Johnson, who owned virtually all the shares in the company and
F   was its managing director, then brought proceedings against the solicitors in
which he alleged that they had also acted in breach of a duty owed to him
personally, and that he had suffered personal losses.  The claim was struck
out as an abuse of process.  Mr Johnson appealed against the striking out of
his claim, and the defendants cross-appealed to have certain heads of loss
struck out on the ground that Mr Johnson was seeking to recover for
damage which had been suffered by the company.  It is only the latter aspect
G   of the case which needs to be considered.

41   Lord Bingham stated at pp 35–36 that the authorities supported the
following statement of principle:

"(1) Where a company suffers loss caused by a breach of duty owed to
it, only the company may sue in respect of that loss.  No action lies at the
suit of a shareholder suing in that capacity and no other to make good a
H   diminution in the value of the shareholder's shareholding where that
merely reflects the loss suffered by the company.  A claim will not lie by a
shareholder to make good a loss which would be made good if the
company's assets were replenished through action against the party
responsible for the loss, even if the company, acting through its

© 2020 The Incorporated Council of Law Reporting for England and Wales

constitutional organs, has declined or failed to make good that loss. So    A
much is clear from *Prudential Assurance Co Ltd v Newman Industries
Ltd (No 2)* [1982] Ch 204, particularly at pp 222–223, *Heron
International* [*Heron International Ltd v Lord Grade* [1983] BCLC 244],
particularly at pp 261–262, *George Fischer* [*George Fischer (Great
Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260], particularly
at pp 266 and 270–271, *Gerber* [*Gerber Garment Technology Inc v
Lectra Systems Ltd* [1997] RPC 443] and *Stein v Blake* [[1998] 1 All ER    B
724], particularly at pp 726–729.

"(2) Where a company suffers loss but has no cause of action to sue to
recover that loss, the shareholder in the company may sue in respect of it
(if the shareholder has a cause of action to do so), even though the loss is a
diminution in the value of the shareholding. This is supported by *Lee v
Sheard* [1956] 1 QB 192, 195–196, *George Fischer* and *Gerber*.    C

"(3) Where a company suffers loss caused by a breach of duty to it, and
a shareholder suffers a loss separate and distinct from that suffered by
the company caused by breach of a duty independently owed to the
shareholder, each may sue to recover the loss caused to it by breach of the
duty owed to it but neither may recover loss caused to the other by breach
of the duty owed to that other. I take this to be the effect of *Lee v Sheard*,    D
at pp 195–196, *Heron International*, particularly at p 262, *R P Howard*
[*R P Howard Ltd v Woodman Matthews & Co* [1983] BCLC 117],
particularly at p 123, *Gerber* and *Stein v Blake*, particularly at p 726. I do
not think the observations of Leggatt LJ in *Barings* [*Barings plc v Coopers
& Lybrand* [1997] 1 BCLC 427] at p 435B and of the Court of Appeal of
New Zealand in *Christensen v Scott* [1996] 1 NZLR 273, 280, lines    E
25–35, can be reconciled with this statement of principle."

42    In Lord Bingham's proposition (1), the first sentence is a statement of
the rule in *Foss v Harbottle*. The second sentence encapsulates the reasoning
in *Prudential*, and explains why, in the circumstances described, a
shareholder who is "suing in that capacity and no other" cannot bring a
claim consistently with the rule in *Foss v Harbottle*. The third sentence
should not be understood as limiting the rule in *Prudential* to cases where    F
there is an exact correlation between the company's loss and the fall in share
value. As explained at paras 32–38 above, it is possible to envisage
cases where there is not a precise correlation, and where recovery by the
company might not therefore fully replenish the value of its shares, but
where the rule in *Prudential* would nevertheless apply.

43    Lord Bingham's proposition (2), stating that a shareholder can sue    G
for "reflective loss" where the company has no cause of action, on the
authority of *Lee v Sheard* [1956] 1 QB 192, *George Fischer (Great Britain)
Ltd v Multi Construction Ltd* [1995] 1 BCLC 260 and *Gerber Garment
Technology Inc v Lectra Systems Ltd* [1997] RPC 443, merits closer
consideration.

44    In *Lee v Sheard* the plaintiff was a company director and shareholder    H
who earned his living by working for the company and being remunerated
by distributions out of its profits. He suffered injuries in a road accident for
which the defendant was responsible. He was unable to work while he
recovered from his injuries, and as a result there was a fall in the company's
profits, which led to a reduction in the distributions paid to him. He

A  recovered damages for his loss of earnings.  The company had no cause of action against the negligent driver.  This was not, therefore, a case concerned with concurrent claims.  The plaintiff's loss of earnings took the form of a reduction in distributions, but it was not "merely a reflection of the loss suffered by the company", in the phrase used in *Prudential* (para 26 above).  He, not the company, had been injured in the road accident.  He, not the company, was entitled to recover damages for his loss.

B

45  In *George Fischer (Great Britain) Ltd v Multi Construction Ltd*, the defendant entered into a contract with the plaintiff company ("the shareholder") to install equipment at the premises of one of its subsidiaries ("the company").  When the equipment proved defective, causing the company to suffer a loss of profits, the shareholder was held to be entitled to damages for breach of contract in respect of the loss which it had suffered as

C  a result of the company's reduced profits.  That was another case where the wrong was committed against the shareholder, not the company.  Since the company had no cause of action, there was no reason why the shareholder should not recover its loss by means of an award of damages, in accordance with ordinary principles.

46  Similar observations apply to *Gerber Garment Technology Inc v Lectra Systems Ltd*.  The plaintiff company was the owner of a patent which
D  was infringed, causing it to suffer a loss of income.  As the commercial exploitation of the patent was carried on by its subsidiary, the plaintiff's loss of income took the form of a reduction in the distributions it received from its subsidiary.  But it was the plaintiff, not its subsidiary, whose patent was infringed, and which suffered a loss of income to which its ownership of the patent entitled it.

E  47  Lord Bingham's proposition (3), stating (put shortly) that a shareholder can sue to recover a loss which is separate and distinct from that suffered by the company, reflects the fact that the shareholder's loss, where it does not consist merely of a fall in the value of his shareholding, or in the distributions which he receives by virtue of his shareholding, does not fall within the ambit of the rule in *Prudential*.  This proposition also makes it clear that the rule renders certain heads of loss irrecoverable, rather than
F  barring a cause of action as such.

48  Lord Bingham went on to explain how courts should apply the relevant principles [2002] 2 AC 1, 36:

"On the one hand the court must respect the principle of company autonomy, ensure that the company's creditors are not prejudiced by the action of individual shareholders and ensure that a party does not recover
G  compensation for a loss which another party has suffered.  On the other, the court must be astute to ensure that the party who has in fact suffered loss is not arbitrarily denied fair compensation."

The aims identified in the first sentence—respecting the principle of company autonomy, ensuring that the company's creditors are not prejudiced by the action of individual shareholders, and ensuring that a party does not recover
H  compensation for a loss which another party has suffered—are all objectives or consequences of the rule in *Foss v Harbottle*, and are consistent with the decision in *Prudential*.  The second sentence reflects the fact that deciding whether a loss falls within the scope of the rule may call for the exercise of judgement.

© 2020 The Incorporated Council of Law Reporting for England and Wales

49   Before turning to Lord Bingham's treatment of the losses claimed, it
is necessary to consider Lord Millett's speech, which lies at the origin of the
expansion of the supposed "reflective loss" principle in the subsequent
case law.  Lord Millett began by discussing the relationship between the
company's assets and the value of its shares.  A share, he said at p 62,
"represents a proportionate part of the company's net assets, and if these are
depleted the diminution in its assets will be reflected in the diminution in the
value of the shares".  But a share is not a proportionate part of the
company's net assets: see *Macaura*.  The idea that a diminution in the value
of a company's net assets will be reflected in the value of the shares is
therefore not an axiomatic truth, as was noted in para 32 above.  The rule in
*Prudential* is not premised on any necessary relationship between a
company's assets and the value of its shares (or its distributions).

50   Approaching the matter on the basis which he had described, Lord
Millett observed at p 62 that the problem which arose, where the company
suffered loss caused by the breach of a duty owed to it, and a shareholder
claimed to have suffered a consequent diminution in the value of his
shareholding or in distributions, caused by the breach of a duty owed to it by
the same wrongdoer, was the risk of double recovery, on the one hand, or a
risk to the company's creditors through the depletion of its assets, on the
other:

>   "If the shareholder is allowed to recover in respect of such loss, then
>   either there will be double recovery at the expense of the defendant or the
>   shareholder will recover at the expense of the company and its creditors
>   and other shareholders.  Neither course can be permitted . . . Justice to
>   the defendant requires the exclusion of one claim or the other; protection
>   of the interests of the company's creditors requires that it is the company
>   which is allowed to recover to the exclusion of the shareholder."

51   As explained at para 33 above, the principle that double recovery
should be avoided is not in itself a satisfactory explanation of the rule in
*Prudential*.  As was explained at paras 34–37 above, the unique position in
which a shareholder stands in relation to his company, reflected in the rule in
*Foss v Harbottle*, is a critical part of the explanation.  In addition, as was
explained at para 38 above, there are pragmatic advantages in adopting a
clear rule.  However, by treating the avoidance of double recovery—a
principle of wider application—as sufficient to justify the decision in
*Prudential*, Lord Millett paved the way for the expansion of the supposed
"reflective loss" principle beyond the narrow ambit of the rule in *Prudential*.

52   One problem with reasoning based on the avoidance of double
recovery is that the principle is one of the law of damages.  It does not deny
the existence of the shareholder's loss, as the rule in *Prudential* does, where
the loss falls within its ambit, but on the contrary is premised on the
recognition of that loss.  Applying an approach based on the avoidance of
double recovery, it is therefore possible for a shareholder to bring a personal
action based on a loss which would fall within the ambit of the decision in
*Prudential*, and to obtain a remedy which that decision would have barred
to him, provided the relief that he seeks is not an award of damages in his
own favour.  This device has been exploited in a number of cases subsequent
to *Johnson*, in ways which circumvent the rule in *Foss v Harbottle*: a rule

A   which is not confined to actions for damages but also applies to other remedies, as explained at para 35 above.

53   For example, in *Peak Hotels and Resorts Ltd v Tarek Investments Ltd* [2015] EWHC 3048 (Ch), the judge considered it arguable that the "reflective loss" principle, as explained by Lord Millett in *Johnson*, did not bar proceedings by a shareholder, who complained of a fall in the value of his shares resulting from loss suffered by the company in respect of which the

B   company had its own cause of action, where the relief that he sought was not damages but a mandatory injunction requiring the defendant to restore property to the company.  A similar view was taken in *Latin American Investments Ltd v Maroil Trading Inc* [2017] 2 CLC 45, where the shareholder complained of a fall in the value of its shares resulting from a breach of obligations owed to the company, which also involved a breach of

C   contractual obligations owed to itself.  It responded to the argument that its claim was for "reflective loss" by seeking an order for the payment of the contractual damages not to itself but to the company.  A further example is *Xie Zhikun v Xio GP Ltd* (unreported) 14 November 2018, Cayman Islands Court of Appeal.  Summarising complex facts, in that case the shareholder applied for a quia timet injunction to prevent the breach of fiduciary duties owed both to the company and to himself, which would cause the company

D   to suffer loss, and would consequently affect the value of his interest in it.  Sir Bernard Rix JA observed at para 66 that he did not see "how, other than perhaps in terms of pure formalism . . . the present case differs from . . . a derivative action".

54   Those cases demonstrate how right the Court of Appeal was in *Prudential* in considering that the rule established in that case, based on the

E   absence of separate and distinct loss, was necessary in order to avoid the circumvention of the rule in *Foss v Harbottle*.  The exception to that rule is the derivative action.  Whether a shareholder can bring such an action depends on whether the relevant conditions are satisfied.

55   The most obvious difficulty with the avoidance of double recovery, as an explanation of the judgment in *Prudential*, is perhaps its unrealistic assumption that there is a universal and necessary relationship between

F   changes in a company's net assets and changes in its share value.  Another serious problem is its inability to explain why the shareholder cannot be permitted to pursue a claim against a wrongdoer where the company has declined to pursue its claim or has settled it at an undervalue, and the risk of double recovery is therefore eliminated in whole or in part.

56   In addressing this point, Lord Millett relied on a number of

G   arguments, none of which, with respect, appears to me to be persuasive.  The first was based on causation.  Lord Millett stated [2002] 2 AC 1, 66 that, "if the company chooses not to exercise its remedy, the loss to the shareholder is caused by the company's decision not to pursue its remedy and not by the defendant's wrongdoing".  The same reasoning, he added, applies if the company settles for less than it might have done.  The logic of the argument is that it is impossible for the shareholder to suffer a loss caused by the

H   wrongdoer, since his actions result in the company's loss being balanced by a right of action of equivalent value, so that its net assets are unaffected.  It is only if the company fails to enforce its right of action that the shareholder can suffer a loss, and his loss will in that event be caused by the company.  That reasoning might be contrasted with the logic of the argument based on

the avoidance of double recovery, namely that the company's loss results in the shareholders suffering an equivalent loss, because their shares "represent" the company's net assets.

57   As Lord Hutton observed in *Johnson* at p 54, causation does not provide a satisfactory explanation. One difficulty is that the failure of the company to sue the wrongdoer, or its decision to settle with him for less than the full value of its claim, may be the result of its impecuniosity, caused by the defendant's wrongdoing. In those circumstances, the company's failure to recover its loss can hardly be regarded as interposing a novus actus interveniens between the defendant's wrongdoing and the shareholder's loss. Furthermore, in an economic tort case, where the shareholder's claim is based on an allegation that the wrongdoer committed the wrongdoing with the intention of causing the shareholder to suffer loss, it is bizarre to say that the loss which the defendant intended to cause, and which ensued from his wrongdoing, was nevertheless not caused by what he did.

58   In addition to the causation argument, Lord Millett put forward at p 66 two other reasons, which he described as policy considerations, for excluding the shareholder's claim where the company had settled its claim. The first was that the personal interests of the directors might otherwise conflict with their fiduciary duty to the company. Presumably Lord Millett was envisaging a situation where the directors were also shareholders, and might be tempted to settle the company's claim at an undervalue, or fail to pursue it altogether, in order to recover the balance of the loss for their personal benefit. This reasoning does not, however, explain why shareholders are generally prevented from pursuing a claim for a fall in share value which is consequential on the company's loss, when the company has its own cause of action: the principle is not confined to shareholders who are also directors. Nor is it apparent why, having prohibited directors from acting in breach of their fiduciary duties, the law should also impose a disability on shareholders (who normally owe the company no such duties) as an additional, indirect, and indiscriminate safeguard.

59   The second policy consideration was that it would be difficult for a liquidator to settle claims against wrongdoers for the benefit of the company's creditors, if the wrongdoers remained exposed to further claims brought by the shareholders: the conduct of the company's claims would effectively be taken out of the liquidator's hands. This point is addressed by the rule in *Prudential*, consistently with the underlying rule in *Foss v Harbottle*, as was explained in para 37 above.

60   The most serious difficulty with the approach favoured by Lord Millett is that the possibility of double recovery can arise where concurrent claims exist at the instance of companies and of persons who have suffered loss otherwise than as shareholders. As will be explained, Lord Millett's approach has been interpreted in subsequent cases as extending to such persons the same categorical exclusion of claims as he applied to shareholders. That is not the position on the approach adopted in *Prudential*: the loss suffered by a creditor, for example, when he cannot recover a debt owed to him by a company because of losses which it has incurred, stands in a different relationship to the company's loss from the loss sustained by a shareholder whose shares have fallen in value, and raises different issues. This is discussed at paras 62–63 and 84–85 below.

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   **61**   Lord Millett went on to express the opinion that the concept of reflective loss extended beyond the diminution of the value of shares and the loss of dividends, stating at p 66 (omitting the citation):

"it extends to . . . all other payments which the shareholder might have obtained from the company if it had not been deprived of its funds. All transactions or putative transactions between the company and its
B   shareholders must be disregarded.   Payment to the one diminishes the assets of the other.   In economic terms, *the shareholder has two pockets*, and cannot hold the defendant liable for his inability to transfer money from one pocket to the other." (Emphasis added.)

It appears from the passage cited in para 62 below that those observations may have been intended to apply only to payments receivable by
C   shareholders in that capacity, in which case they correctly recognise that distributions can take other forms besides the payment of dividends. However, the words that I have italicised repeat a point made earlier on p 66, when Lord Millett said:

"The test is not whether the company could have made a claim in respect of the loss in question; the question is whether, *treating the*
D   *company and the shareholder as one* for this purpose, the shareholder's loss is franked by that of the company." (Emphasis added.)

These passages appear to suggest that the separate legal personalities of the company and its shareholder are to be disregarded in this context. That would provide a simple explanation of why the company and its shareholders cannot have concurrent claims, but would also introduce an
E   important exception to the fundamental principle in *Salomon v A Salomon & Co Ltd* [1897] AC 22, with potentially significant ramifications.   That issue was not discussed.

**62**   In words which have had a particular influence on later developments, Lord Millett continued [2002] 2 AC 1, 67:

"The same applies to other payments which the company would have made if it had had the necessary funds even if the plaintiff would have
F   received them qua employee and not qua shareholder and even if he would have had a legal claim to be paid.   His loss is still an indirect and reflective loss which is included in the company's claim."

This is not altogether easy to follow.   Lord Millett's reasoning in the preceding passage, cited (first) in para 61 above, is not transferable to
G   persons whose claims are not brought as shareholders, but, for example, as employees or creditors of the company.   As Lord Millett had indicated, a company may be regarded in economic terms as the alter ego of its shareholders.   It cannot be regarded as the alter ego of its creditors or employees, or of shareholders whose claims are brought in the capacity of creditors or employees.

H   **63**   If Lord Millett meant that all claims against a wrongdoer in respect of amounts which the company would have paid to the claimant if it had had the necessary funds must be excluded where the company also has a cause of action, then I would respectfully regard the dictum as going further than was necessary for the decision of the appeal, and as being mistaken.   For example, one might envisage a situation in which a creditor of a company

has entered into a contract with the wrongdoer, the performance of which   A
would have preserved the company's solvency, and the wrongdoer then
breaches the contract and also his duties to the company, rendering it
insolvent and unable to pay the debt it owes to the creditor.  If the creditor
sues the wrongdoer for breach of contract, he is entitled to damages.  The
fact that the company also has a cause of action is no reason why the creditor
should be deprived of the benefit of his contract.  In the event that any issue
of double recovery arises, it will need to be addressed; but that possibility is   B
no reason for barring the creditor's claim, regardless of whether any such
issue arises in the particular case.  Where the creditor's claim against the
wrongdoer is based on tort, it is equally important that he should not be
deprived of the protection afforded by the law of tort, merely because the
debt in question is owed to him by a company rather than a natural person.

64   Turning to the remaining speeches in *Johnson*, Lord Goff of   C
Chieveley agreed with Lord Millett's analysis.  Lord Cooke of Thorndon
accepted the correctness of the decision in *Prudential*, and agreed that the
English authorities cited by Lord Bingham supported the three propositions
which he had stated.  He also concurred in the order proposed by Lord
Bingham.  On the other hand, some of his observations (at pp 45 and 47)
suggest that he regarded the avoidance of double recovery and of prejudice
to creditors as the critical considerations.  Lord Hutton also emphasised   D
those considerations (at p 54).  He considered that the *Prudential* principle
should be upheld, although he was critical of the reasoning in that case in so
far as it denied that the shareholder had suffered a personal loss.

65   The decision on the facts of *Johnson* is also important.  The House of
Lords concluded that two of the heads of loss should be struck out.  The first
of these was a claim for the fall in the value of Mr Johnson's shareholding in   E
the company.   Its being struck out followed from Lord Bingham's
proposition (1).  The second was a claim for loss in respect of the value of a
pension policy set up by the company for Mr Johnson's benefit.  Since the
striking out of this head of loss has featured prominently in the subsequent
case law, it is necessary to consider the matter in some detail.  Mr Johnson
claimed that he had suffered loss as a result of the company's failure to make
payments into the policy which it would have made out of its profits if it had   F
not suffered the losses caused by the defendants.  It was not suggested in any
of the speeches, or in the judgment of the court below [1999] BCC 474, that
the company was under any obligation to Mr Johnson to pay the pension
contributions.  That aspect of his claim was not, therefore, brought as a
creditor of the company.  It appears, instead, that the pension contributions
were a form of distribution of the company's profits to its 99% shareholder:   G
an alternative to the payment of dividends or bonuses.

66   Lord Bingham dealt with this aspect of the case extremely briefly: an
indication that he did not regard it as raising any issue which he had not
already addressed in his discussion of shareholders' claims.  He stated [2002]
2 AC 1, 36: "this claim relates to payments which the company would have
made into a pension fund for Mr Johnson: I think it plain that this claim is
merely a reflection of the company's loss and I would strike it out."  The   H
other members of the House agreed.  There is no indication in the speeches,
other than possibly in the passage in Lord Millett's speech cited at para 62
above, that the Appellate Committee intended, in its treatment of this
element of Mr Johnson's claim, to suggest that the principle which excluded

A  a shareholder's claim for a diminution in the value of his shares or in the distributions which he received should also apply to claims brought otherwise than in the capacity of a shareholder.  Lord Bingham clearly intended that the principle which he had explained should be confined to claims brought in that capacity: see the second sentence of his proposition (1), cited in para 41 above.  His conclusion that this head of loss should be struck out was consistent with the application of that proposition.

B  67   In summary, *Johnson* gives authoritative support to the decision in *Prudential* that a shareholder is normally unable to sue for the recovery of a diminution in the value of his shareholding or in the distributions he receives as a shareholder, which flows from loss suffered by the company, for the recovery of which it has a cause of action, even if it has declined or failed to make good that loss.  Lord Bingham's speech is consistent with the reasoning

C  in *Prudential*.  On the other hand, the reasoning in the other speeches, especially that of Lord Millett, departs from the reasoning in *Prudential* and should not be followed.

*Later cases*

68   *Johnson* has been followed by a multitude of cases in which litigants,
D  usually relying on the speech of Lord Millett, have sought either to establish exceptions to the general principles laid down by Lord Bingham, or to establish that the rule against the recovery of reflective loss extends more widely than *Johnson* had determined.  One of the issues which remained controversial was whether, notwithstanding Lord Bingham's analysis, there were circumstances in which a shareholder could recover for loss which
E  flowed from the company's loss where the company had a cause of action but failed to pursue it.

69   In *Giles v Rhind* [2003] Ch 618 the Court of Appeal decided that such circumstances existed.  The claimant was a former company director who was also a shareholder in the company.  He brought proceedings against a defendant who had conducted a business in competition with that of the company, in breach of contractual obligations owed to both the
F  claimant and the company.  The company's action for damages had been discontinued due to its inability to find security for costs, as a result of impecuniosity caused by the defendant's wrongdoing.  The terms on which the action was discontinued precluded the company from bringing any further proceedings in relation to its claim.  The claimant sought to recover for a variety of losses, including the loss of the value of his shares.  The Court
G  of Appeal allowed the claim to proceed to trial.  It considered that it would be unjust to allow a wrongdoer to defeat a claim by shareholders on the basis that the claim was trumped by a right of action held by the company which his own wrongful conduct had prevented the company from pursuing.  It concluded that the "reflective loss" principle, in so far as it was relevant, did not apply in those circumstances.

H  70   One can sympathise with the Court of Appeal's sense of the unattractiveness of the defendant's position, but the fact that a wrongdoer has unmeritoriously avoided his liability in damages to A is not a reason for requiring him to pay damages to B.  The basis of the decisions in *Prudential* and *Johnson* is that a shareholder, whose shares have fallen in value as the consequence of loss suffered by the company for the recovery of which it has

© 2020 The Incorporated Council of Law Reporting for England and Wales

278
Marex Financial Ltd v Sevilleja (SC(E))                                                    [2020] 3 WLR
Lord Reed PSC

a cause of action, has not suffered a recoverable loss. That conclusion does *A*
not depend on whether the company is financially able to bring proceedings
or not. If the shareholder has not suffered a recoverable loss, he has no claim
for damages, regardless of whether, or why, the company may have failed to
pursue its own cause of action.

71   The same criticism applies to the later decision in *Perry v Day* [2005]
2 BCLC 405, where the court followed *Giles v Rhind* in a situation where *B*
the wrongdoer had abused his powers as a director of the company so as to
prevent it from bringing a claim under which it could have recovered its loss.
The solution which company law provides, in a situation of that kind, is the
derivative action.

*Gardner v Parker*
                                                                                           *C*
72   A question left in doubt by Lord Millett's speech in *Johnson* was
how widely the bar on the recovery of reflective loss applied. That issue
came before the Court of Appeal in *Gardner v Parker* [2004] 2 BCLC 554.
The claim was brought by the assignee of rights of action held by a company
("the shareholder") which was both a shareholder and a creditor of a second
company ("the company"), against a defendant who was a director of both
the shareholder and the company. He was alleged to have sold the *D*
company's principal assets at an undervalue to another entity in which he
had an interest, rendering the company insolvent, and preventing the
shareholder from recovering the debt which the company owed it. In so
acting, the defendant had acted in breach of fiduciary duties owed separately
to the shareholder and to the company as a director of both of them. The
shareholder then sought to recover in respect of the fall in the value of its *E*
shareholding, and also in respect of the loss arising from its inability to
obtain repayment of the debt. Proceedings brought by another of the
company's creditors against the purchaser of the company's assets had been
resolved by a settlement, to which the company, acting by receivers
appointed by that creditor over its property, and the defendant, were both
party. Under the settlement, a payment was made to that creditor, and the *F*
defendant was released from all claims which the company might have
against him (other than claims vested solely in its liquidators; but the
company was not in liquidation).

73   The Court of Appeal considered three questions. The first was
whether the "reflective loss" principle applied where the wrongdoing took
the form of a breach of fiduciary duty rather than the breach of a duty arising
under the common law. The court held that it did, following its earlier *G*
decision in *Shaker v Al-Bedrawi* [2003] Ch 350. That aspect of the decision
is not challenged in the present appeal.

74   The second question was whether the exception established in *Giles
v Rhind* ought to be extended to a situation in which the company had
disabled itself, under a settlement with the wrongdoer, from bringing
proceedings against him for the recovery of its loss. The court held that it *H*
should not. As I have explained, I would hold that no such exception exists.

75   The third question was whether the "reflective loss" principle
applied to a claim arising from a creditor's inability to recover a debt owed
to it by a company in which the creditor was a shareholder. The court held

© 2020 The Incorporated Council of Law Reporting for England and Wales

[2020] 3 WLR                          Marex Financial Ltd v Sevilleja (SC(E))
                                                          Lord Reed PSC

A    that it did, relying on the treatment of the claim for loss of pension in
     *Johnson's* case, and applying Lord Millett's dictum, cited at para 62 above.
     Neuberger LJ stated [2004] 2 BCLC 554, para 70:

          "It is clear from those observations, and indeed from that aspect of the
          decision, in *Johnson's* case that the rule against reflective loss is not
          limited to claims brought by a shareholder in his capacity as such; it
B         would also apply to him in his capacity as an employee of the company
          with a right (or even an expectation) of receiving contributions to his
          pension fund. On that basis, there is no logical reason why it should not
          apply to a shareholder in his capacity as a creditor of the company
          expecting repayment of his debt."

C    The claim brought as a creditor was therefore dismissed. Taking this
     reasoning to its logical conclusion, Neuberger LJ added (ibid) that the same
     reasoning should apply even where the employee or creditor was not also a
     shareholder.
          76   As was explained in paras 65–66 above, on the facts of *Johnson* the
     claim in respect of lost pension contributions was a claim for a loss of
     distributions, brought by Mr Johnson in the capacity of a shareholder. It
D    therefore fell within the scope of the reasoning in *Prudential*, and Lord
     Bingham's proposition (1). The claim brought by the creditor-shareholder
     in *Gardner v Parker* did not fall within the scope of that reasoning, or Lord
     Bingham's proposition. It should not have been barred as reflective loss.
     The court might have had to consider the avoidance of double recovery,
     applying the general principles discussed in paras 2–7 above, if that issue had
E    been raised; but it was not.
          77   The cases since *Gardner v Parker* have followed the approach
     adopted in that case. The supposed "reflective loss" principle has been
     treated as being based primarily on the avoidance of double recovery and the
     protection of a company's unsecured creditors, and as being applicable in all
     situations where there are concurrent claims and one of the claimants is a
F    company. So understood, the "reflective loss" principle, as Sir Bernard Rix
     JA observed in *Xie Zhikun* at para 95, "seems to be extending its scope
     wider and wider". Sir Bernard added at para 96 that "a number of
     distinguished judges have commented on the uncertainties and difficulties of
     the reflective loss doctrine". Professor Andrew Tettenborn has rightly
     warned that "Today it promises to distort large areas of the ordinary law of
     obligations": "Creditors and Reflective Loss: A Bar Too Far?" (2019) 135
G    LQR 182. The decision of the Court of Appeal in the present case, applying
     the approach laid down by Lord Millett in *Johnson* and by the Court of
     Appeal in *Gardner v Parker*, confirms that threat. It is the first case in this
     jurisdiction in which the "reflective loss" principle has been applied to a
     claimant which is purely a creditor of a company. The extension of the
     principle to such cases has the potential to have a significant impact on the
H    law and on commercial life. The possibility of the further extension of
     the principle to creditors of natural persons, which the Court of Appeal
     considered, indicates the extent to which it has become difficult to confine.
     As the scope of the principle has expanded, so have the volume of litigation
     and the level of uncertainty.

© 2020 The Incorporated Council of Law Reporting for England and Wales

*Other jurisdictions*                                                                    A

78   Almost 40 years have passed since *Prudential* was decided.  The decisions in that case and in *Johnson* have been followed throughout much of the common law world, albeit sometimes on the basis of different reasoning.   Without attempting an exhaustive survey, they have, for example, been followed in Australia (see, for example, *Chen v Karandonis* [2002] NSWCA 412 and *Hodges v Waters (No 7)* (2015) 232 FCR 97); in    B the Cayman Islands (see *Xie Zhikun v Xio GP Ltd*, (unreported) 14 November 2018 and *Primeo Fund v Bank of Bermuda (Cayman) Ltd* (unreported) 13 June 2019, both Cayman Islands Court of Appeal); in Hong Kong (see, for example, *Waddington Ltd v Thomas* [2009] 2 BCLC 82, where Lord Millett's approach in *Johnson* was followed, in a judgment delivered by Lord Millett NPJ, and *Giles v Rhind* [2003] Ch 618 was    C doubted and not followed); in Ireland (see, for example, *Alico Life International Ltd v Thema International Fund plc* [2016] IEHC 363, where the court followed the reasoning in *Prudential*, and of Lord Bingham in *Johnson*, and rejected the reasoning in *Christensen v Scott* [1996] 1 NZLR 273); in Jersey (*Freeman v Ansbacher Trustees (Jersey) Ltd* [2009] JLR 1, where the principle was treated, consistently with the reasoning in *Prudential*, as an aspect of the rule in *Foss v Harbottle*); and in Singapore    D (see, for example, *Townsing v Jenton Overseas Investment Pte Ltd* [2008] 1 LRC 231, where the principle was explained as an aspect of the rule in *Foss v Harbottle*, and the reasoning in *Christensen* was rejected).

*Summary*

79   Summarising the discussion to this point, it is necessary to    E distinguish between (1) cases where claims are brought by a shareholder in respect of loss which he has suffered in that capacity, in the form of a diminution in share value or in distributions, which is the consequence of loss sustained by the company, in respect of which the company has a cause of action against the same wrongdoer, and (2) cases where claims are brought, whether by a shareholder or by anyone else, in respect of loss which does not fall within that description, but where the company has a right of    F action in respect of substantially the same loss.

80   In cases of the first kind, the shareholder cannot bring proceedings in respect of the company's loss, since he has no legal or equitable interest in the company's assets: *Macaura* and *Short v Treasury Comrs*.  It is only the company which has a cause of action in respect of its loss: *Foss v Harbottle*. However, depending on the circumstances, it is possible that the company's    G loss may result (or, at least, may be claimed to result) in a fall in the value of its shares.  Its shareholders may therefore claim to have suffered a loss as a consequence of the company's loss.  Depending on the circumstances, the company's recovery of its loss may have the effect of restoring the value of the shares.  In such circumstances, the only remedy which the law requires to provide, in order to achieve its remedial objectives of compensating both the company and its shareholders, is an award of damages to the company.    H

81   There may, however, be circumstances where the company's right of action is not sufficient to ensure that the value of the shares is fully replenished.  One example is where the market's valuation of the shares is not a simple reflection of the company's net assets, as discussed at para 32

A   above. Another is where the company fails to pursue a right of action which, in the opinion of a shareholder, ought to have been pursued, or compromises its claim for an amount which, in the opinion of a shareholder, is less than its full value.  But the effect of the rule in *Foss v Harbottle* is that the shareholder has entrusted the management of the company's right of action to its decision-making organs, including, ultimately, the majority of members voting in general meeting.  If such a decision is taken otherwise

B   than in the proper exercise of the relevant powers, then the law provides the shareholder with a number of remedies, including a derivative action, and equitable relief from unfairly prejudicial conduct.

   82   As explained at paras 34–37 above, the company's control over its own cause of action would be compromised, and the rule in *Foss v Harbottle* could be circumvented, if the shareholder could bring a personal action for a

C   fall in share value consequent on the company's loss, where the company had a concurrent right of action in respect of its loss.  The same arguments apply to distributions which a shareholder might have received from the company if it had not sustained the loss (such as the pension contributions in *Johnson*).

   83   The critical point is that the shareholder has not suffered a loss which is regarded by the law as being separate and distinct from the company's

D   loss, and therefore has no claim to recover it.  As a shareholder (and unlike a creditor or an employee), he does, however, have a variety of other rights which may be relevant in a context of this kind, including the right to bring a derivative claim to enforce the company's rights if the relevant conditions are met, and the right to seek relief in respect of unfairly prejudicial conduct of the company's affairs.

E   84   The position is different in cases of the second kind.  One can take as an example cases where claims are brought in respect of loss suffered in the capacity of a creditor of the company.  The arguments which arise in the case of a shareholder have no application.  There is no analogous relationship between a creditor and the company.  There is no correlation between the value of the company's assets or profits and the "value" of the creditor's debt, analogous to the relationship on which a shareholder bases his claim

F   for a fall in share value.  The inverted commas around the word "value", when applied to a debt, reflect the fact that it is a different kind of entity from a share.

   85   Where a company suffers a loss, it is possible that its shareholders may also suffer a consequential loss in respect of the value of their shares, but its creditors will not suffer any loss so long as the company remains solvent.

G   Even where a loss causes the company to become insolvent, or occurs while it is insolvent, its shareholders and its creditors are not affected in the same way, either temporally or causally.  In an insolvency, the shareholders will recover only a pro rata share of the company's surplus assets, if any.  The value of their shares will reflect the value of that interest.  The extent to which the company's loss may affect a creditor's recovery of his debt, on the other hand, will depend not only on the company's assets but also on the value of any

H   security possessed by the creditor, on the rules governing the priority of debts, and on the manner in which the liquidation is conducted (for example, whether proceedings are brought by the liquidator against persons from whom funds might be ingathered, and whether such proceedings are successful).  Most importantly, even where the company's loss results in the

creditor also suffering a loss, he does not suffer the loss in the capacity of a    A
shareholder, and his pursuit of a claim in respect of that loss cannot therefore
give rise to any conflict with the rule in *Foss v Harbottle*.

86   The potential concern that arises in relation to claims brought by
creditors is not, therefore, the rule in *Foss v Harbottle*.  On the other hand,
the principle that double recovery should be avoided may be relevant,
although it is not necessarily engaged merely because the company and    B
the creditor have concurrent claims against the same defendant.   In
*International Leisure Ltd v First National Trustee Co UK Ltd* [2013] Ch
346, for example, the principle was not engaged where the company and a
secured creditor had concurrent claims against an administrative receiver
whom the creditor had appointed, since the company could only claim in
respect of any loss remaining after the secured creditor had been paid in
full.                                                                        C

87   Where the risk of double recovery arises, how it should be avoided
will depend on the circumstances.  It should be borne in mind that the
avoidance of double recovery does not entail that the company's claim must
be given priority.  Nor, contrary to the view expressed in a number of
authorities, including the decision of the Court of Appeal in the present case,
does the pari passu principle entail that the company's claim must be given    D
priority.  That principle requires that, in a winding-up, a company's assets
must be distributed rateably among its ordinary creditors.  The proceeds of
its recovery from a wrongdoer will form part of its assets available for
distribution (subject to the claims of secured and preferred creditors).  But
the pari passu principle does not give the company, or its liquidator, a
preferential claim on the assets of the wrongdoer, over the claim of any other
person with rights against the wrongdoer, even if that claimant is also a    E
creditor of the company.  In other words, the pari passu principle may
restrict a creditor of an insolvent company to the receipt of a dividend on the
amount which the company owes him, but it does not prevent him from
enforcing his own right to recover damages from a third party, or confer on
the company's right against the third party an automatic priority.  In the
event that the third party cannot satisfy all the claims made against him, the    F
position will be regulated by the law of (his) insolvency.

88   It is also necessary to consider whether double recovery may
properly be avoided by other means than the prioritising of one claim over
the other, such as those mentioned in paras 5–7 above.  The judgments of
Gibbs CJ and Brennan J in *Gould v Vaggelas* 157 CLR 215, at pp 229 and
258–259 respectively, raise the possibility that subrogation, in particular,    G
may provide a solution to issues of double recovery arising in connection
with creditors' claims.  That question has not, however, been discussed in
the present proceedings, and I express no view upon it.

89   I would therefore reaffirm the approach adopted in *Prudential*
[1982] Ch 204 and by Lord Bingham in *Johnson* [2002] 2 AC 1, and depart
from the reasoning in the other speeches in that case, and in later authorities,
so far as it is inconsistent with the foregoing.  It follows that *Giles v Rhind*    H
[2003] Ch 618, *Perry v Day* [2005] 2 BCLC 405 and *Gardner v Parker*
[2004] 2 BCLC 554 were wrongly decided.  The rule in *Prudential* is limited
to claims by shareholders that, as a result of actionable loss suffered by their
company, the value of their shares, or of the distributions they receive as

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   shareholders, has been diminished.  Other claims, whether by shareholders or anyone else, should be dealt with in the ordinary way.

*The present case*

90   In the light of the foregoing discussion, the present case can be addressed relatively briefly.  As explained earlier, Marex obtained judgment
B   against the Companies for US$5·5m.  Following the circulation of the judgment in draft, Mr Sevilleja is alleged to have stripped the Companies of their assets, rendering them insolvent.  That action is alleged to have involved the commission of economic torts against Marex, as well as a breach of fiduciary duties owed by Mr Sevilleja to the Companies.

91   Three issues arose before the Court of Appeal.  The first was whether
C   the "reflective loss" principle applied to creditors as well as shareholders.  Knowles J had held that it did not.  No authority, he said, compelled him to apply the principle to cases of knowingly procuring a third party to act in violation of a creditor's rights, or intentionally causing loss to a creditor by unlawful means directed against a debtor company.  The Court of Appeal disagreed.  In a careful judgment, Flaux LJ accepted that the rationale of the decision in *Prudential* was that a personal action by a shareholder would
D   subvert the rule in *Foss v Harbottle*, and that if the rule against "reflective loss" had rested there, it would only apply to claims by shareholders.  However, he correctly noted that the scope of the rule had been expanded in *Gardner v Parker*, following the approach of Lord Millett in *Johnson*.  The second issue was whether the *Giles v Rhind* exception applied.  The Court of Appeal held that it did not: it was a narrow exception which applied only
E   where the company's claim was barred by law as a result of the defendant's wrongdoing, rather than merely prevented on the facts.  The third issue was whether the "reflective loss" doctrine applied to intentional torts.  The court held that it did.  It also granted Marex permission to appeal, in order, as Lewison LJ explained at para 71, to enable this court to consider the coherence of the law in the current state of the authorities.  The appeal
F   concerns only the first and second issues.

92   For the reasons I have explained, the rule in *Prudential* has no application to the present case, since it does not concern a shareholder.  That disposes of the first issue.  It also disposes of the second, since no question arises of a possible exception.  In any event, as I have explained, there is no *Giles v Rhind* exception.  It follows that Marex should be permitted to pursue the entirety of its claim.
G   93   The court has not been addressed on the issue of double recovery, in so far as it might arise in relation to Marex's claim.  That issue may or may not arise on the facts of the case, bearing in mind that no claim has yet been brought against Mr Sevilleja on behalf of the Companies, and that Marex maintains that the other debts supposedly owed by the Companies are not genuine, and that the liquidation is merely part of Mr Sevilleja's scheme to
H   defeat its claim.  If the issue of double recovery does arise, the court will need to consider it in the light of the discussion at paras 2–7 and 86–88 above.

*Conclusion*

94   For the foregoing reasons, I would allow the appeal.

© 2020 The Incorporated Council of Law Reporting for England and Wales

LORD HODGE DPSC (agreeing with LORD REED PSC)                        A

95   I agree for the reasons given by Lord Reed PSC that this appeal should be allowed.  There is no disagreement within the court that the expansion of the so-called "principle" that reflective loss cannot be recovered has had unwelcome and unjustifiable effects on the law and that, if the facts alleged by Marex are established in this case, the exclusion of the bulk of its claim would result in a great injustice.  But because there is a  B division of view as to whether a shareholder can recover damages for the diminution in value of its shareholding in a company or for the loss of distributions which the company would have paid to it in circumstances where a wrong has been done both to the company and to the shareholder, I wish to add a few comments about the central role of company law in the Court of Appeal's judgment in *Prudential Assurance Co Ltd v Newman  C Industries Ltd (No 2)* [1982] Ch 204 which is the fons et origo of the principle.  In my view the problems and uncertainties which have emerged in the law have arisen because the "principle" of reflective loss has broken from its moorings in company law.

96   In the *Prudential* case the Court of Appeal's discussion of Prudential's personal claim comprised merely three pages of a long  D judgment, which was principally concerned with its derivative claim, and that discussion should be read in the context of the judgment as a whole.  The discussion of the personal claim followed a longer discussion of Prudential's derivative action which Newman opposed as being contrary to the interests of the company (p 211).  In its discussion of the rule in *Foss v Harbottle* (1843) 2 Hare 461 the Court of Appeal (p 210F–G) referred to the  E classic definition of the rule in the judgment of Jenkins LJ in *Edwards v Halliwell* [1950] 2 All ER 1064, 1066 which I quote in part:

"First, he proper plaintiff in an action in respect of a wrong alleged to be done to a corporation is, prima facie, the corporation.  Secondly, where the alleged wrong is a transaction which might be made binding on the corporation and on all its members by a simple majority of the members, no individual member of the corporation is allowed to  F maintain an action in respect of that matter because, if the majority confirms the transaction, cadit quaestio; or, if the majority challenges the transaction, there is no valid reason why the company should not sue . . ."

The court went on to state that the rule did not operate where the alleged wrong was ultra vires the company or if the transaction could be sanctioned  G only by a special majority of the members of the company and that there was an exception to the rule if those in control of the company committed a fraud on a minority of shareholders.

97   When the Court of Appeal turned to consider Prudential's personal action it held that the directors in advising the shareholders to support the resolution approving the impugned transaction owed the shareholders a  H duty to give advice in good faith and not fraudulently.  It continued:

"It is also correct that if directors convene a meeting on the basis of a fraudulent circular, a shareholder will have a right of action to recover any loss which he has been personally caused in consequence of the

A    fraudulent circular; this might include the expense of attending the meeting”: [1982] Ch 204, 222G–H.

The Court of Appeal in so stating clearly recognised that the allegedly fraudulent circular, on which Prudential founded its personal claim, could give rise to a right of action in damages by the shareholder. That was the context in which the court made the centrally important statement, which
B    Lord Reed PSC quotes at para 26 above but which bears repeating:

     “But what he [the shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a ‘loss’ is merely a reflection of the loss suffered by the company”: pp 222–223.

C
98    This exclusion, as Lord Reed PSC has stated, relates only to the diminution in value of shares or in distributions which the shareholder suffers in his capacity as a shareholder as a result of the company having itself suffered actionable damage. When a shareholder pursues a personal claim against a wrongdoer in another capacity, such as guarantor or creditor of the company, the exclusion has no application.

D
99    The court’s reasoning on p 223, which Lord Reed PSC has quoted at paras 27 and 29 above, has been criticised because the stark assertion, that the shareholder “does not suffer any personal loss” by the diminution in the value of its shares or of the distributions which it received, cannot be taken at face value—clearly the shareholder suffers economic loss—and because the example of a non-trading company whose only asset is a cash box
E    containing £100,000 is an oversimplification. But the reasoning is none the less clear where the court asserts (a) that the deceit on the shareholder causes the shareholder “no loss which is separate and distinct from the loss to the company” (p 223), (b) that “when the shareholder acquires a share he accepts the fact that the value of his investment follows the fortunes of the company and that he can only exercise his influence over the fortunes of the company by the exercise of his voting rights in general meeting” (p 224), and
F    (c) that “[a] personal action would subvert the rule in *Foss v Harbottle*”, a rule which “operates fairly by preserving the rights of the majority” (p 224). I agree with Lord Reed PSC (para 28 above) that what the court was saying is that where a company suffers a loss as a result of wrongdoing and that loss is reflected to some extent in a fall in the value of its shares or in its distributions, the fall in the share value or in the distributions is not a loss
G    which the law recognises as being separate and distinct from the loss sustained by the company.

100    That is the full extent of the “principle” of reflective loss which the *Prudential* case established. It was not articulated as a general principle to be applied in other contexts; it is a rule of company law arising from the nature of the shareholder’s investment and participation in a limited company and excludes a shareholder’s claim made in its capacity as
H    shareholder.

101    As this court has been invited to review the “principle” of reflective loss it is appropriate to ask whether this rule as formulated by Lord Reed PSC in para 28 above from his analysis of the *Prudential* case is supported by principle.

© 2020 The Incorporated Council of Law Reporting for England and Wales

102   In my view, the Court of Appeal's articulation of the rule in the *A*
*Prudential* case was a principled development of company law which should
be maintained.  Investment in or conducting a business through the medium
of a limited company brings advantages to the shareholder, principally in the
form of limited liability, which is a consequence of the separate personality
of the company: *Salomon v A Salomon & Co Ltd* [1897] AC 22.  As the
Court of Appeal stated in *Prudential* [1982] Ch 204, 224, "The company is
liable for its contracts and torts; the shareholder has no such liability".  The *B*
company owns its assets and the shareholders have no legal or equitable
interest in and are not part owners of those assets: *Macaura v Northern*
*Assurance Co Ltd* [1925] AC 619, 626, 630, 633, per Lord Buckmaster,
Lord Sumner and Lord Wrenbury; *Short v Treasury Comrs* [1948] 1 KB 116,
122, per Evershed MR.

103   A shareholding in a company confers a right of participation in the *C*
affairs of the company in accordance with the terms of the company's
articles of association, often in the form of voting on resolutions at general
meetings, and it entitles the shareholder to ensure that other shareholders
comply with the rules imposed on them by the articles of association:
section 33(1) of the Companies Act 2006 ("the 2006 Act").  A shareholder in
an unfair prejudice application under section 994 of the 2006 Act can *D*
also invoke equity to protect it from unfairness by restraining the exercise
by another shareholder of its legal rights which are contrary to the
understandings reached or promises made: *In re A Company (No 00709 of*
*1992)* [1999] 1 WLR 1092.  It is a significant principle of company law that,
in the absence of agreement to the contrary such as that expressed in the
terms of a share issue, shares confer the same rights and impose the same
liabilities: see for example section 284 of the 2006 Act and *Birch v Cropper* *E*
(1889) 14 App Cas 525, 543, per Lord MacNaghten.

104   A shareholding will usually entitle its holder to participate in the
success of the company's enterprise by receiving distributions from the
company out of its profits and to receive a return of its capital and a
proportionate share of any surplus assets of the company on its winding up:
*Macaura* [1925] AC 619, 626–627, per Lord Buckmaster; *Birch v Cropper*
14 App Cas 525, 543. *F*

105   A share confers rights in a company as well as rights against a
company.   The shareholders as a body have certain characteristics of
proprietorship of the company to the extent that they exercise ultimate
control over the direction of a company through their votes in general
meetings and have a claim to its surplus assets on a winding up.  But as the
*Short v Treasury Comrs* case has shown, they are not part owners of the *G*
undertaking.

106   Investment in a limited liability company through a shareholding
often involves the separation of management of the company from the
ownership of its shares.  This facilitates the transfer of the members' interests
as, absent contractual restrictions, shares in a public company can be bought
and sold without requiring the consent of others.

107   Investment in a company by means of a shareholding can also bring *H*
disadvantages.  A minority shareholder is liable to be outvoted by other
shareholders, who form a majority in a vote at a general meeting of the
company, in decisions concerning the company.  The shareholder in a large
company normally leaves it to the Board to make decisions about the

© 2020 The Incorporated Council of Law Reporting for England and Wales

[2020] 3 WLR                    Marex Financial Ltd v Sevilleja (SC(E))
                                                    Lord Hodge DPSC

A   business of the company, including whether to sue a wrongdoer for a wrong
    done to the company.  A minority shareholder would have to obtain the
    support of the holders of sufficient numbers of shares to create a majority in
    order to force the directors to adopt a policy towards the company's business
    which the Board did not support.  Further, unless the shareholder can sell its
    shareholding to a third party, there are restrictions on the ways in which it
B   can realise its investment in the company in order to protect the interests of
    the company's creditors.  In particular, the shareholder's entitlement to
    receive money from the company on its winding up is postponed to the
    claims of the creditors of the company: Insolvency Act 1986, sections 107
    and 143(1).

    108    The characteristics of a shareholding as a means of participation in a
    company's enterprise which are most directly relevant in the context of this
C   appeal are the default rule of equality among shareholders and the
    postponement of the shareholders' entitlements on a winding up to the claims
    of the company's creditors.  Against this background, the law's refusal to
    recognise the diminution in value of a shareholding or the reduction or loss of
    a distribution, which is the consequence of the company suffering loss as a
    result of wrongdoing against it, as being separate and distinct from the
D   company's loss is a principled development of company law.  It excludes the
    possibility of double recovery.  It avoids a scramble between shareholders to
    establish their private claims against a wrongdoer in case the wrongdoer does
    not have sufficient accessible assets to meet those claims.  It thereby upholds
    the default position of equality among shareholders in their participation in
    the company's enterprise: each shareholder's investment "follows the
    fortunes of the company".  It maintains the rights of the majority of the
E   shareholders, as the Court of Appeal stated in *Prudential* [1982] Ch 204, 224.
    And it preserves the interests of the company's creditors by maintaining the
    priority of their claims over those of the shareholders in the event of a
    winding up.

    109    It may well be, as Lord Sales JSC reasons, that the law can achieve
    some protection of those interests by other means such as case management
F   and equitable subrogation.  But the creation of a bright line legal rule, as the
    Court of Appeal did in the *Prudential* case, is principled.  That judgment has
    stood for almost 39 years; it was upheld by the House of Lords in *Johnson v
    Gore Wood & Co* [2002] 2 AC 1; and it has been adopted in other common
    law countries.  We should not depart from it now.

G   **LORD SALES JSC** (with whom **LORD KITCHIN JSC** and **BARONESS
    HALE OF RICHMOND** agreed)

    *Introduction*

    110    The facts in this case are relatively simple.  The legal issues are more
    complex.

H   111    By its claim form in these proceedings Marex claims damages
    against Mr Sevilleja for inducing or procuring violation of Marex's rights
    under the judgment of 25 July 2013 (based on the principle first recognised
    in *Lumley v Gye* (1853) 2 E & B 216: I will refer to this as the *Lumley v Gye*
    claim) and for intentionally causing loss to Marex by unlawful means (based
    on the principle recognised in *OBG Ltd v Allan* [2008] AC 1 ("*OBG*"): I will

refer to this as the *OBG* claim), by dissipating the assets of the Companies.   A
The judge found that, subject to the issue of reflected loss, these claims are arguable and suitable for service out of the jurisdiction. There has been no appeal to challenge this aspect of the judge's conclusions.

112    This appeal is concerned with a distinct argument for Mr Sevilleja, that the loss suffered by Marex reflected the loss suffered by the Companies a s a result of his alleged unlawful actions and that reflective loss of this kind is   B
irrecoverable. The result, says Mr Sevilleja, is that Marex is unable to contend that it has any completed cause of action in tort (save in respect of certain costs incurred by Marex in trying to obtain payment of the judgment debt). He contends that there is a principle established by the decision of the Court of Appeal in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204 ("*Prudential*") and the decision of the House of Lords in *Johnson v Gore Wood & Co* [2002] 2 AC 1 ("*Johnson*") which precludes   C
recovery of reflective loss of this kind ("the reflective loss principle"). The judge did not accept this argument.

113    Mr Sevilleja appealed to the Court of Appeal to challenge this part of the judge's reasoning. Marex filed a respondent's notice by which it submitted that if, contrary to its primary case, the reflective loss principle is applicable, its claims against Mr Sevilleja fell within the exception to that   D
principle established by the decision in *Giles v Rhind* [2003] Ch 618. In that case the Court of Appeal held that there is an exception to the reflective loss principle in certain circumstances where the action of the defendant who has unlawfully abstracted funds from a company makes it impossible for a claim to be pursued by the company itself. The Court of Appeal allowed Mr Sevilleja's appeal and rejected Marex's submission based on *Giles v Rhind*.   E

114    Marex now appeals to this court with permission granted by the Court of Appeal with the object of providing this court with the opportunity to review the scope of the reflective loss principle and the exception to it identified in *Giles v Rhind*. In view of the significance of the case, this court granted permission to the All Party Parliamentary Group on Fair Business Banking ("the APP Group") to intervene by oral and written submissions in   F
support of Marex's appeal. The first part of the appeal is concerned with the question whether the reflective loss principle applies to preclude recovery where the claimant is an unsecured creditor of the relevant company, but is not a shareholder in that company, where each of the creditor and the company has its own cause of action against a third party defendant in respect of the same wrongful conduct by him. However, in order to answer   G
that question it is necessary to examine what justification there is for the reflective loss principle in a shareholder case as well.

115    It is therefore necessary to examine whether the reasoning in *Prudential*, a shareholder case, can be sustained as a matter of principle. It is only if one subjects to critical examination the rationale for the reflective loss principle as stated in *Prudential* that one can see whether that rationale extends to cover a creditor case. This court has been convened as an   H
enlarged panel with the object of examining the rationale for the reflective loss principle and the coherence of the law in this area. The APP Group placed material before us which argued that the law had made a wrong turn in the *Prudential* case.

© 2020 The Incorporated Council of Law Reporting for England and Wales

A    116   I have come to the same conclusion as Lord Reed PSC and the majority that Marex's appeal should be allowed. But my reasoning differs from theirs. It may be helpful if I give a brief outline of where the differences lie.

117   Lord Reed PSC says that the reflective loss principle is justified in a shareholder case but that the rationale for it does not extend to cover a creditor case. On his account, the reflective loss principle laid down in
B   *Prudential* is a rule of law: the court deems that the loss suffered by a shareholder in relation to diminution in the value of shares or loss of dividends simply is to be regarded as irrecoverable in a case where the company has a parallel claim against the third party defendant (paras 9, 28–39 and 52). Lord Hodge DPSC likewise says that the Court of Appeal in *Prudential* laid down a rule of law (paras 99, 100 and 108) that loss suffered
C   by a shareholder is regarded as irrecoverable. Since it is a rule of law that the shareholder is deemed not to have suffered a loss different from that suffered by the company, it is not a matter of evidence whether he has or has not in fact suffered such a loss. It follows that, apart from this deeming effect, the reflective loss principle is not concerned with the issue of double recoverability against the third party defendant.

D   118   By contrast, in my opinion the Court of Appeal in *Prudential* did not lay down a rule of law that a shareholder with a claim against a third party defendant in parallel with, and reflective of, a claim by the company against the same defendant simply had to be deemed to suffer no different loss of his own which he could recover, whatever the true position on the facts. It did not purport to do so. Rather, the court set out reasoning why it thought the shareholder in such a case in fact suffered no loss. But as
E   I explain below, that reasoning cannot be supported. There clearly are some cases where the shareholder does suffer a loss which is different from the loss suffered by the company. In the face of this difficulty with the reasoning in *Prudential*, I do not think it is appropriate to re-characterise the court's decision as one laying down a new rule which simply deems that loss suffered by the shareholder to be irrecoverable as a matter of law. If a
F   shareholder has a valid cause of action against the third party defendant in respect of different loss which he has in fact suffered, it is not open to a court to rule it out as a matter of judicial fiat.

119   This means that, in common with many other courts and judges, I consider that the issue of double recovery is of importance in relation to shareholder claims as well as in relation to creditor claims. That was clearly the view of four of the Law Lords in *Johnson* [2002] 2 AC 1, who said so in
G   terms: see Lord Reed PSC's discussion above of the speech of Lord Millett (with whom Lord Goff of Chieveley agreed) and pp 45D–E and 47E per Lord Cooke of Thorndon and 54H–55D per Lord Hutton. I do not read Lord Bingham of Cornhill's speech as discounting the relevance of this factor in a shareholder case.

120   The idea of reflective loss was employed by the Court of Appeal in
H   *Prudential* as a way of addressing a number of points which the court grouped together. Some aspects of the idea are valid, but some are not. It is necessary to analyse with care what exactly is in issue when any specific proposition of law is advanced and is said to be justified on the basis of a principle relating to reflective loss.

© 2020 The Incorporated Council of Law Reporting for England and Wales

*The reflective loss principle and other principles*                         A

   121   In the case note cited by Lord Reed PSC at para 77, Professor
Tettenborn has likened the reflective loss principle to "some ghastly legal
Japanese knotweed" whose tentacles have spread alarmingly and which
threatens to distort large areas of the ordinary law of obligations: "Creditors
and Reflective Loss: A Bar Too Far?" (2019) 135 LQR 182, 183. The Court
of Appeal in this case loyally sought to identify and follow through the        B
rationale of the reflective loss principle first identified and relied upon in the
*Prudential* case, but in my opinion its decision shows how the reasoning in
that case leads to an unprincipled and unattractive terminus. In granting
permission to appeal to this court, the Court of Appeal has invited us to
consider the conceptual basis and extent of the reflective loss principle. That
requires consideration of principles of law which long predate 1981, when         C
the judgment in *Prudential* was handed down. In another article placed
before the court, Alan Steinfeld QC contends that "The law took a seriously
wrong turn when in *Prudential* the court elevated what was a relatively
simple everyday problem concerned with an assessment of damages into a
principle of causation"; he urges that this court should "now think it over
and wonder why it was ever thought to be necessary or just to have this rule
at all": "In the Looking Glass: Holding Companies and Reflective Loss"          D
(2016) 22(3) Trusts & Trustees 277, 285.

   122   Before turning to examine the authorities, it is relevant to have in
mind some very basic points. A company is a legal person distinct from its
shareholders, which has its own assets which are distinct from theirs.
A share in a company is an item of property owned by the shareholder,
which is distinct from the assets owned by the company. Typically, or at         E
least very often, a share in a company has a market value which reflects the
market's estimation of the future business prospects of the company, not
what its net asset position happens to be at any given point in time. There is
no simple correspondence between the value of a 1% shareholding and 1% of
the net assets of the company. This is true both in respect of a company
whose shares are publicly traded and in respect of a small private company.
In that regard, I respectfully disagree with the observation by Lord Millett in    F
*Johnson* [2002] 2 AC 1, 62A–B, where he said that a share "represents a
proportionate part of the company's net assets, and if these are depleted the
diminution in its assets will be reflected in the diminution in the value of the
shares" and stated that in the case of a small private company whose net
assets are diminished the correspondence with the diminution in the value of
the shares "is exact". The shares in both public and private companies are       G
marketable and their value reflects the view of the relevant market about the
future prospects of the company; it is just that in the former case it might be
easier to identify the market value. I expand on this below.

   123   A company which is wronged acquires its own cause of action in
respect of that wrong. That cause of action is a chose in action which is the
property of the company. What the company does with it is a matter for
decision by the relevant organs of the company; a shareholder has no right to     H
seek to vindicate the company's cause of action: *Foss v Harbottle* (1843)
2 Hare 461 and *Prudential* [1982] Ch 204, 224. That is subject to an
exception if the wrongdoer has control of the relevant decision-making
organs of the company, in which case a court may authorise a shareholder to

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   bring a derivative action on behalf of the company.  Litigation is an
expensive enterprise, especially if lost, and can have negative consequences
on trading relationships and business reputation.  It is not to be embarked
upon lightly and, subject to the exception to the rule, whether a company
should take on the risks of litigation is a matter to be decided by the relevant
decision-making organs of the company.

B   124  A person may act in ways such that several people acquire causes of
action against him.  Sometimes, the same actions by that person may give
rise to causes of action vested in different people, such as when he owes
different people duties of care in respect of the same activity—a type of
case discussed in *Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427
("*Barings*") and in *Johnson*—or where he breaches a duty owed to one
person with the intention of harming another, in circumstances where the
C   other person acquires his own right of action pursuant to the principle in the
*OBG* case.  The law lays down no general principle to govern the order in
which people who have causes of action against the wrongdoer should sue to
vindicate their rights against him.  Each may seek to sue and execute any
judgment he obtains without regard to the impact that may have on the
rights of others.

D   125  That is, of course, subject to any obligation a claimant may have
assumed in relation to those others.  But a shareholder in a company does
not, by becoming a shareholder, assume any obligation to anyone else
(whether the company itself, other shareholders in the company or creditors
of the company) to the effect that he will stay his hand as regards vindication
of his personal rights of action against a defendant in order to safeguard
theirs.  For example, if a shareholder in a company is run over by a driver
E   employed by the company acting in the course of his employment, the
shareholder is entitled to sue to obtain damages from the company even
though by doing so he might diminish the ability of the company to pay a
dividend to shareholders or to meet its obligations to its creditors.  Similarly,
if a shareholder and a company each have their own cause of action against a
third party defendant, the shareholder is entitled to seek to sue and obtain
F   recovery from that defendant in the usual way, even though by doing so he
may reduce the capacity of the defendant to satisfy the company's claim and
hence might diminish the ability of the company to pay a dividend or pay its
creditors.

126  The shareholder does not violate the pari passu principle by
proceeding in this way, because the vindication of his own cause of action is
G   not subject to that principle at the stage at which he brings his claim.  If the
third party defendant is insolvent, then during the insolvency process the
shareholder's claim and those of everyone else against the defendant will be
subject to that principle and any other insolvency rules which are applicable.
The insolvency rules constitute a regime for securing fair outcomes as
between competing claimants, if there is a risk that the defendant will not be
able to meet the claims of all.  There is, therefore, no obvious need to create
H   an a priori solution such as that which the reflective loss principle attempts
to provide by means of a crude bright line rule to exclude a shareholder's
claim.  As explained below, if the company and a shareholder have
overlapping claims against a third party defendant, there is scope at trial (if
an action is brought) or in the insolvency process for the relationship

© 2020 The Incorporated Council of Law Reporting for England and Wales

between those claims to be worked out in a practical way which secures      A
overall justice for all those parties.

127    Arising from the concept of the company as a society or *societas* of
its members and from the history of company law in the law of partnership,
it is recognised that shareholders may be subject to certain obligations owed
to their fellow shareholders other than those expressly stated in the articles
of association: see *In re A Company (No 00709 of 1992)* [1999] 1 WLR
1092, 1098–1099 (Lord Hoffmann).  These obligations are concerned with       B
the way in which the company's affairs are managed when the shareholders
act together, requiring that they use their powers as set out in the articles
of association for proper purposes and in good faith for the benefit of the
company as a whole: see e g *Allen v Gold Reefs of West Africa Ltd* [1900]
1 Ch 656, 671, per Lindley MR; *Greenhalgh v Arderne Cinemas Ltd* [1951]
Ch 286, CA.  Such obligations do not extend to limiting the ability of a      C
shareholder to take action to vindicate any cause of action he may himself
have sounding in damages against a third party defendant.  A general
obligation of good faith of this kind does not require that the shareholder
should regard himself as deprived of his property in the form of such a cause
of action.

128    A defendant may owe obligations in contract or tort to the           D
shareholder owner of a company where breach of those obligations results in
loss to the shareholder which is suffered in the form of a reduction in the
value of its shares in the company or a diminution of dividends which it
receives.   There is no inherent conceptual difficulty about recovery of
damages in respect of loss suffered in that way: see *Lee v Sheard* [1956] 1 QB
192, *George Fischer (Great Britain) Ltd v Multi Construction Ltd* [1995]
1 BCLC 260 and *Gerber Garment Technology Inc v Lectra Systems Ltd*          E
[1997] RPC 443 ("*Gerber*").  In such cases, the usual rules of contract or tort
apply: the claimant shareholder is to be put in the same position as if the
contract had been complied with or the tort had not been committed.

129    A defendant may owe obligations to the shareholder owner of a
company which are similar to those owed to the company itself.  This was
the situation addressed in *Barings*, in which it was alleged that auditors had
undertaken a duty owed to the parent shareholder company to audit its        F
subsidiary with reasonable care and also a duty owed to the subsidiary to
similar effect.  I discuss this case below.  The Court of Appeal declined to rule
out the parent's claim on the basis of the reflective loss principle.  If the
auditors failed to exercise reasonable care, that would constitute a breach of
the duty owed to the parent and at the same time a breach of the duty
owed to the subsidiary.  Each of them would have a cause of action.  The      G
subsidiary could sue for losses which it suffered as a result (these might
include, for example, loss of its property flowing from a failure by the
auditors to detect defalcations or unauthorised loss-making trading).  The
parent could sue for the different losses which it suffered as a result (these
might include a reduction in the value of the shares it owned or a loss of
dividends from the subsidiary).  It is difficult to see why the fact that the
subsidiary has its own claim for a different loss should preclude the parent    H
from being able to vindicate its own right of action in respect of the loss
which it has suffered.

130    In this latter type of case there is no difference from the position
described in para 128 above, save that in assessing the loss actually suffered

A    by the parent one would have to bring into account the fact that by reason of the auditors' lack of care the subsidiary would also have acquired its own cause of action against them. That would be an asset of the subsidiary to be set against its losses. Depending on the facts, it might be that the existence or vindication of that cause of action would prevent the parent from suffering any loss itself; but that would turn on the evidence in the case and could not simply be assumed.

B    131    Suppose that the subsidiary in this scenario waived its claim, or settled it for only a fraction of its value, or came to lose it by limitation arising through the lapse of time. That would in no way remove the parent's cause of action, assuming the parent had sued within the limitation period. The auditors undertook a separate duty of care owed to the parent to safeguard the parent against losses which it would suffer if the duty was not

C    satisfied and it might indeed have suffered loss. Subject to any argument about novus actus interveniens, the abandonment by the subsidiary of its claim, or its compromise or loss of that claim, would just affect the extent of the loss which the parent might be able to show it had suffered.

   132    In discussing the authorities, it is relevant to call attention to what I regard as unhelpfully slippery and imprecise language which has been used in them. Judges have talked about loss suffered by a shareholder in his

D    personal capacity which "reflects" the loss suffered by a company. This is a rather deceptive word. Where the company suffers loss and this affects the value of shares in it, there is obviously some relationship between the loss suffered by the company and the loss suffered by a shareholder, so that in a loose sense it might be said that the latter loss reflects the former. But the loss suffered by the shareholder is not *the same as* the loss suffered by the

E    company. There is no necessary, direct correlation between the two. The loss suffered by the shareholder does not reflect the loss suffered by the company, in the stricter sense of there being a one-to-one correspondence between them. These different senses of the word "reflects" have been conflated. A similar point may be made about references in the cases to whether the loss suffered by the shareholder is "separate and distinct" from the loss suffered by the company. In a loose sense of that phrase, it is not; but in a strict sense, it

F    may be.

   133    The reflective loss principle was first identified and relied upon in the judgment of the Court of Appeal in *Prudential* in 1981. It is striking that this occurred so late in the development of the law, despite the existence of joint stock companies for a very long time and the passage of more than 80 years after the decision of the House of Lords clarifying the position of

G    companies in *Salomon v A Salomon & Co Ltd* [1897] AC 22.

   134    The relevant facts in *Prudential* can be summarised as follows. The claimant, Prudential, held 3·2% of the issued ordinary shares in Newman Industries ("Newman"), a company whose shares were quoted on the stock exchange. Mr Bartlett was the chairman and chief executive of Newman and Mr Laughton was a non-executive director and its vice-chairman. They were also associated with another company, TPG. Prudential's case was

H    that Mr Bartlett and Mr Laughton conspired to make fraudulent statements to the board and shareholders of Newman by means of which they induced Newman, acting by its board and by its shareholders voting in general meeting (which was required to approve the transaction), to purchase assets of TPG at a price higher than their true value; and that by reason of that

© 2020 The Incorporated Council of Law Reporting for England and Wales

overpayment the value of Newman's shares was reduced.  In fact, however, the market value of shares in Newman had increased after the transaction (as pointed out by Mr Richard Scott QC, counsel for Mr Bartlett and Mr Laughton at first instance [1981] Ch 257, 265E) and Prudential had not pleaded particulars of its loss and did not adduce any evidence to show that the market value of shares in Newman had been in any way detrimentally affected by the alleged overpayment (as Mr Scott QC energetically emphasised in his submissions at first instance [1981] Ch 257, 265E–F, 271G, 273A, 273D–F and 285D).  Prudential adduced no expert evidence in relation to the impact, if any, of the overpayment on the market value of shares in Newman and no evidence in relation to market expectations regarding the performance of Newman and whether such expectations were in any way affected by the overpayment.  Prudential brought a claim against Mr Bartlett and Mr Laughton in its own capacity as shareholder for damages for the diminution in value of its shares (and also claiming to represent other shareholders with similar claims), and also sought to bring a derivative action against them in the name of Newman in respect of the loss which it suffered in the form of the overpayment for the assets of TPG.  Since proof of loss was a necessary element of Prudential's cause of action based on conspiracy, Mr Scott's submission was that Prudential had failed to establish that it had any cause of action of its own against Mr Bartlett and Mr Laughton.  Mr Caplan QC, counsel for Prudential, made it clear that Prudential's main objective was to pursue a derivative claim on behalf of Newman and indicated that if that claim succeeded Prudential would not be seeking any damages in respect of its own alleged cause of action in conspiracy [1981] Ch 257, 278H–279C; noted by Vinelott J at p 328C. Prudential's position on this serves to underline that in respect of its own cause of action it entirely relied on the loss suffered by the company, rather than seeking to prove any different loss suffered by itself.

135    Vinelott J found at trial that Prudential's case was made out on the facts and held that Prudential was entitled to sue in its own right for loss which it maintained it had suffered in respect of the diminution in value of its shares in Newman and was also entitled to bring a derivative action on behalf of Newman, under the exception to the rule in *Foss v Harbottle*.  As regards Prudential's own cause of action (and the representative claim it made on behalf of other shareholders), the judge was prepared to assume that the overpayment to TPG to acquire the relevant assets had caused a reduction in the value of shares in Newman, despite the absence of evidence about whether the overpayment had had any effect on their value [1981] Ch 257, 302E–303D.  He directed an inquiry as to the amount of the damages.

136    Mr Bartlett and Mr Laughton appealed.  By the time of the hearing in the Court of Appeal, Mr Scott had ceased to act for them and they appeared as litigants in person.  The Court of Appeal upheld certain of the judge's findings of fact to the effect that Mr Bartlett and Mr Laughton had made fraudulent statements which induced Newman to buy the assets of TPG at an overvalue (though this was only in the sum of £45,000 rather than £445,000 as had been found by the judge).  However, the court held that Prudential had no cause of action in its own right, because it was seeking to recover damages in respect of the loss in value of its shares in Newman on the basis that Newman had suffered damage, which claim fell foul of the

A   reflective loss principle.  The court also held that the judge ought to have
held a trial of a preliminary issue of whether this was an appropriate case for
a derivative action in the name of Newman; however, as the full trial of that
claim had taken place and Newman had indicated that it would take the
benefit of an order in its favour, in the particular circumstances of the case it
was not necessary to determine whether Prudential had been entitled to
bring a derivative action.

B        137   Both aspects of the court's judgment are significant for the
present discussion.  Again, Prudential's main objective was to succeed on the
derivative claim, rather than on its own cause of action (referred to as its
personal claim).  The court was scathing about Prudential's pleadings, which
it described as "vague and obscure" and confused [1982] Ch 204, 225–226,
and the whole presentation of its case.  As a prelude to the relevant part of
C   the court's reasoning on reflective loss, it noted [1982] Ch 204, 222D:
"Counsel for the plaintiffs [Mr Caplan QC] agreed before us that no facts are
relied upon in support of the personal claim which are not relied upon in
support of the derivative claim."  Thus, at this stage, Mr Caplan was not
seeking to argue in relation to Prudential's personal claim that any finding
could be made that Prudential had suffered any loss in the value of its shares
D   in Newman different from the part of Newman's own loss which was
proportionate to Prudential's shareholding in Newman.  This position no
doubt reflected the points made by Mr Scott at first instance, that Newman
had not given particulars of any different or distinct loss of its own and had
not adduced any evidence about such loss at trial.  The Court of Appeal was
not prepared to make the assumption which Vinelott J had made regarding
different loss suffered by Prudential, in the absence of a properly pleaded
E   case and evidence in support.  By reason of Mr Caplan's position at the
hearing in the Court of Appeal, there was no need for the court to deal with
the point which had been debated at first instance.

        138   In view of the importance of the judgment in *Prudential* as the
foundation for the reflective loss principle and the adoption of the reasoning
in it in *Johnson*, it is necessary to set out the court's reasoning at some length
F   [1982] Ch 204, 222E–224D:

"Vinelott J upheld the plaintiffs' personal claim . . . He began with the
proposition, which accorded with his findings, that Newman had been
induced by fraud to approve an agreement under which Newman paid
more (he thought about £445,000 more) than the value of the assets
acquired and thus £445,000 more than it needed to pay; therefore
G       Newman's indebtedness to its bankers immediately after the transaction
(about £5m) was £445,000 more than it would have been but for the
fraud; therefore the fraud caused a reduction in net profits, which must
have affected the quoted price of Newman shares; therefore, the plaintiffs
suffered some damage in consequence of the conspiracy and that was
sufficient to complete the cause of action, the quantum of damages being
left to an inquiry.

H       "In our judgment the personal claim is misconceived.  It is of course
correct, as the judge found and Mr Bartlett did not dispute, that he and
Mr Laughton, in advising the shareholders to support the resolution
approving the agreement, owed the shareholders a duty to give such
advice in good faith and not fraudulently.  It is also correct that if

© 2020 The Incorporated Council of Law Reporting for England and Wales

directors convene a meeting on the basis of a fraudulent circular, a
shareholder will have a right of action to recover any loss which he has
been personally caused in consequence of the fraudulent circular; this
might include the expense of attending the meeting.  But what he cannot
do is to recover damages merely because the company in which he is
interested has suffered damage.  He cannot recover a sum equal to the
diminution in the market value of his shares, or equal to the likely
diminution in dividend, because such a 'loss' is merely a reflection of the
loss suffered by the company.  The shareholder does not suffer any
personal loss. His only 'loss' is through the company, in the diminution in
the value of the net assets of the company, in which he has (say) a 3%
shareholding.  The plaintiff's shares are merely a right of participation in
the company on the terms of the articles of association.  The shares
themselves, his right of participation, are not directly affected by the
wrongdoing.  The plaintiff still holds all the shares as his own absolutely
unencumbered property.  The deceit practised upon the plaintiff does not
affect the shares; it merely enables the defendant to rob the company.
A simple illustration will prove the logic of this approach.  Suppose that
the sole asset of a company is a cash box containing £100,000.  The
company has an issued share capital of 100 shares, of which 99 are held
by the plaintiff.  The plaintiff holds the key of the cash box.  The
defendant by a fraudulent misrepresentation persuades the plaintiff to
part with the key.  The defendant then robs the company of all its money.
The effect of the fraud and the subsequent robbery, assuming that the
defendant successfully flees with his plunder, is (i) to denude the company
of all its assets; and (ii) to reduce the sale value of the plaintiff's shares
from a figure approaching £100,000 to nil.  There are two wrongs, the
deceit practised on the plaintiff and the robbery of the company.  But the
deceit on the plaintiff causes the plaintiff no loss which is separate and
distinct from the loss to the company.  The deceit was merely a step in
the robbery.  The plaintiff obviously cannot recover personally some
£100,000 damages in addition to the £100,000 damages recoverable by
the company.

"Counsel for the plaintiffs sought to answer this objection by agreeing
that there cannot be double recovery from the defendants, but suggesting
that the personal action will lie if the company's remedy is for some
reason not pursued.  But how can the failure of the company to pursue its
remedy against the robber entitle the shareholder to recover for himself?
What happens if the robbery takes place in year 1, the shareholder sues in
year 2, and the company makes up its mind in year 3 to pursue its
remedy?  Is the shareholder's action stayed, if still on foot?  Supposing
judgment has already been recovered by the shareholder and satisfied,
what then?

"A personal action could have the most unexpected consequences. If a
company with assets of £500m and an issued share capital of £50m were
defrauded of £500,000 the effect on dividends and share prices would not
be discernible.  If a company with assets of £10m were defrauded, there
would be no effect on share prices until the fraud was discovered; if it
were first reported that the company had been defrauded of £500,000 and
subsequently reported that the company had discovered oil in property
acquired by the company as part of the fraud and later still reported that

© 2020 The Incorporated Council of Law Reporting for England and Wales

A    the initial loss to the company could not have exceeded £50,000, the
     effect on share prices would be bewildering and the effect on dividends
     would either be negligible or beneficial.
          "The plaintiffs in this action were never concerned to recover in the
     personal action. The plaintiffs were only interested in the personal action
     as a means of circumventing the rule in *Foss v Harbottle*. The plaintiffs
B    succeeded. A personal action would subvert the rule in *Foss v Harbottle*
     and that rule is not merely a tiresome procedural obstacle placed in the
     path of a shareholder by a legalistic judiciary. The rule is the consequence
     of the fact that a corporation is a separate legal entity. Other consequences
     are limited liability and limited rights. The company is liable for its
     contracts and torts; the shareholder has no such liability. The company
     acquires causes of action for breaches of contract and for torts which
C    damage the company. No cause of action vests in the shareholder. When
     the shareholder acquires a share he accepts the fact that the value of his
     investment follows the fortunes of the company and that he can only
     exercise his influence over the fortunes of the company by the exercise of
     his voting rights in general meeting. The law confers on him the right to
     ensure that the company observes the limitations of its memorandum of
D    association and the right to ensure that other shareholders observe the
     rule, imposed upon them by the articles of association. If it is right that the
     law has conferred or should in certain restricted circumstances confer
     further rights on a shareholder the scope and consequences of such further
     rights require careful consideration. In this case it is neither necessary nor
     desirable to draw any general conclusions."

E    139   This reasoning of the Court of Appeal was a new departure in
     the case. At first instance it appears to have been common ground that
     (a) the loss suffered by a shareholder could not simply be equated with a
     proportionate part of the loss suffered by the company and (b) in order for
     the shareholder to have his own cause of action in tort (where damage was
     the gist of the action), it was necessary to show that there had been a
     diminution in the value of his shares by reason of the wrongdoing: for
F    Mr Scott's argument on behalf of the defendants, see the references above;
     for Mr Caplan's argument for Prudential, see [1981] Ch 257, 265B and
     278F–H; and for the judge's ruling that Prudential had made out its claim
     that there had been a diminution in the value of its shareholding, which was
     not equivalent to a proportionate part of the loss suffered by the company,
     see [1981] Ch 257, 302E–303D. Further, by setting out reasoning which
G    seemed to cover every case involving loss by a shareholder and loss by a
     company which are related, including those where they are not the same, the
     court went further than it needed to do and further than was justified on the
     case as presented to it: see para 137 above.
     140   As noted above, the rule in *Foss v Harbottle* is to the effect that
     where a company has a cause of action, it is for the relevant organs of the
     company to decide whether to sue upon it. In the present case, on the facts as
H    alleged by Marex, the Companies have their own causes of action against
     Mr Sevilleja in respect of misappropriation of their money by him. Marex
     has no right to sue in relation to those causes of action; nor would recovery
     by Marex in relation to its cause of action affect the ability of the Companies
     to recover the full extent of their losses in relation to their causes of action.

© 2020 The Incorporated Council of Law Reporting for England and Wales

Marex Financial Ltd v Sevilleja (SC(E))                                        [2020] 3 WLR
Lord Sales JSC

There is no great difficulty in answering the questions posed by the Court of    A
Appeal in *Prudential* when this distinction is borne in mind.  Since the
Companies are now in liquidation the relevant organ of the Companies is the
liquidator, who is an officer subject to the control of the courts in the BVI.  It
is for him to decide whether to prosecute such claims as the Companies may
have against Mr Sevilleja, taking into account the resources available for
that.  I see no reason to question the good faith of the present liquidator, who    B
is an insolvency practitioner from a reputable firm.  This is not a case in
which the relevant organ of a company is under the control of the wrongdoer
against whom the company has a cause of action, so there is no question of
the exception to the rule in *Foss v Harbottle* being applicable.  In the Court
of Appeal, Flaux LJ said, "there is no evidence that there is anything
preventing a claim against Mr Sevilleja by the present or another liquidator
or preventing Marex from taking an assignment of the Companies' claim"    C
[2019] QB 173, para 60.

141    However, Marex does not seek to sue Mr Sevilleja to vindicate the
Companies' causes of action against Mr Sevilleja, but to vindicate what it
maintains are its own causes of action against him comprising the *Lumley v
Gye* claim and the *OBG* claim.

142    The Court of Appeal in *Prudential* regarded the personal claim by    D
Prudential in respect of the diminution in the value of its shares in Newman
as misconceived and an illegitimate attempt to circumvent the rule in *Foss v
Harbottle*. The cause of action relied upon was conspiracy, and no facts were
relied on in support of the personal claim that were not relied on in support
of the derivative claim.  Further, as appears from the passage above, the
court's view was that Prudential was never concerned to recover in the
personal action, but was only interested in it as a means of circumventing    E
the rule in *Foss v Harbottle* ([1982] Ch 204, 223H–224A).  There was,
therefore, no real focus on the independent nature of the causes of action
which Prudential might have had in its personal capacity.  In the final part of
the passage quoted above, I respectfully consider that the court conflated the
rationale for the rule in *Foss v Harbottle* with the rationale for the reflective
loss principle, and assumed as correct what was actually in question
(namely, whether a personal action would in fact subvert the rule in *Foss v    F
Harbottle*); while at the same time the court left open the possibility that the
law might confer further rights on a shareholder.  Thus, the court did not
address the possibility that a shareholder might have a personal cause of
action based on intentional infliction of harm by unlawful means as
illustrated by the *OBG* case, which would depend upon the shareholder
establishing additional facts which would not be relevant to the company's    G
own cause of action (i e that there was deliberate action by the wrongdoer,
unlawful as against an intermediate party—the company—but aimed at
inflicting harm on the shareholder).

143    Be that as it may, earlier in the passage quoted the court offered
reasons of a general nature to justify the introduction of the reflective
loss principle.  I have already noted that the court went further in its reasoning
than it needed to do, on the case as presented to it by Prudential.  There is    H
no report of any argument which led it to do this.  Since Mr Caplan for
Prudential had made the concession referred to above and Mr Bartlett and
Mr Laughton were representing themselves, it must be doubted that the
court had the benefit of rigorous argument on this issue.  With respect, I do

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   not consider that the court's reasoning is sustainable.  Again, it conflates something which is undoubtedly correct (a shareholder cannot recover damages "merely because the company in which he is interested has suffered damage": of course not, because the mere fact that the company suffers damage does not create a cause of action for the shareholder), with something which is highly questionable (a shareholder "cannot recover a
B   sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss' is merely a reflection of the loss suffered by the company.  The shareholder does not suffer any personal loss").

144   In fact, however, the third party defendant's actions may include elements which, in combination with his unlawful action vis-à-vis the company, give rise to a cause of action vested in the shareholder.  That may
C   be so if the defendant has acted with the intention of using his unlawful actions vis-à-vis the company to harm the shareholder, so as to give rise to a cause of action vested personally in the shareholder for the tort of intentional infliction of harm by unlawful means as discussed in the *OBG* case [2008] AC 1 (see also *JT Stratford & Son v Lindley* [1965] AC 269, noted by Lord Hoffmann at para 48 in the *OBG* case, regarding the ability
D   of a claimant to rely on breaches or threatened breaches by a defendant of contractual duties owed by the defendant to a third party as the relevant unlawful means for the purposes of this tort, if the defendant acted with the requisite intention of harming the claimant).  Furthermore, the shareholder may well have suffered loss as a result of the commission of that tort (particularly in the form of a reduction in the market value of his shares or a reduction in dividend payments) which is different from, and does not have a
E   simple one-to-one correspondence with, the loss suffered by the company itself.

145   The reasoning in relation to the cash box example is in my view flawed.  Companies come in many varieties and there are several methodologies for valuing their shares, which may be more or less appropriate in a particular case depending on the context.  The cash box
F   example assumes a company which is not trading and has no liabilities, where the market value of the shares is equivalent to the value of the assets in the cash box.  I will return to this example below, but for the purposes of analysis it should be emphasised that this is an unusual scenario.  In the case of a trading company, especially one whose shares are quoted and freely traded on a public exchange, common valuation methodologies for shares include application of price/earnings ratios and discounted cashflow
G   models.  What is important for the calculation of value under these methodologies is the future income or profits of the company, not its current net asset position (see Charles Mitchell, "Shareholders' Claims for Reflective Loss" (2004) 120 LQR 457, 475–478).  A company may be predicted to have strong prospects of future income or future profits which may support a high valuation of its shares; and that may be so even though
H   its net asset value is relatively low.  Often, the predicted future income or profits of a trading company will reflect a judgment about its capacity to enter into new contracts in the future, which are not yet reflected in its balance sheet.  When a person buys a share in a trading company in the market, he pays both for a capital asset (the share itself, which he can sell

the next day if he chooses) and for the right to participate in the future   A
commercial performance of the company.

146   In this sense, the Court of Appeal in *Prudential* was right to say
that "When the shareholder acquires a share he accepts the fact that the
value of his investment follows the fortunes of the company", p 224; but in
my view it was wrong to conflate this with the erroneous idea implicit in
the cash box example that the shareholder's interest and the value of his   B
shares is confined to a right to participate in the assets of the company as
they happen to stand at any given point of time.  It is only on this basis that
the court could say in relation to that example that two wrongs were
committed (one against the shareholder and one against the company), yet
the wrong against the shareholder plaintiff "causes the plaintiff no loss
which is separate and distinct from the loss to the company", p 223.  The
court states this proposition as if it is a logical conclusion applicable in all   C
cases, whereas the question whether the shareholder suffers a different loss
of his own is a matter of fact.  In the more typical case, the position may
well be that the shareholder suffers a different loss with reference to the
value of his shares in the company whose assets have been stolen.  (Even if
the company has a claim against the defendant wrongdoer for loss of profits
as well as loss of assets, the recoverable profits which might be awarded as
compensation by a court are not necessarily the same as the market's   D
estimation of future profits which supports the market value of a share in
that company: see in that regard the comments by Waller LJ in *Giles v
Rhind* [2003] Ch 618, para 28).

147   This point has been made in the scholarly literature and later
cases—in particular *Christensen v Scott* [1996] 1 NZLR 273, 280 (NZCA),
per Thomas J, delivering the judgment of the court, and *Gerber* [1997] RPC   E
443, 475 and 479 (per Hobhouse LJ) and 482-483 (per Hutchinson LJ)—as
reviewed in Mitchell 120 LQR 457.   Mitchell rightly criticises the
explanation in *Prudential* as (p 459):

> "an indefensibly narrow view of the value inherent in shares.  No one
> would dispute that shares are valuable because they are contractual rights
> of participation in a company, but it does not follow from this they   F
> have no other value—and if one accepts that shares are also valuable as
> property which generates income and can be sold to others, then one must
> conclude that a shareholder suffers a personal loss when the value of his
> shares or the amount of dividends he receives goes down."

(Joyce Lee Suet Lin, "Barring Recovery for Diminution in Value of Shares on
the Reflective Loss Principle" [2007] CLJ 537, 539–552, also points out that   G
the value of the shares in a company may well be different from the net assets
of the company.)

148   In my view, the Court of Appeal in *Prudential* was right to say that
Prudential had no good cause of action in respect of the diminution in value
of its shares in Newman; but this was for a different, and narrower, reason
than the one it gave.  As explained above, at the hearing in the Court of
Appeal Prudential's only argument was that it was entitled to say that it   H
sustained damage in relation to the value of its shares equivalent to that part
of the loss suffered by Newman which was proportionate to its shareholding
in Newman.  It did not attempt to establish that there had in fact been a fall
in the market value of its shareholding and had adduced no evidence to that

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   effect. On the case as presented by Prudential, the Court of Appeal was right to hold that Prudential had failed to show that it had suffered any loss which was different from the loss suffered by Newman. The distinction drawn by the court between Prudential's personal claim and the claim a shareholder might have to recover loss he has personally been caused when acting on his own behalf in consequence of a fraudulent circular, such as the expense of attending the meeting, is a valid one. By contrast, by reason of the way in

B   which it presented its personal claim, Prudential had failed to show that it had suffered any loss in respect of the value of its shareholding and so could not establish that it had any cause of action. Its attempt to say that it had suffered loss equivalent to a proportionate share of Newman's loss was rightly dismissed by the Court of Appeal. That loss, on which Prudential sought to rely for the purposes of its personal claim, was not loss in respect

C   of which it had any cause of action. The only person with a cause of action in relation to that loss was the company, Newman.

    **149**   What, then, is to happen in a case where the actions of a third party defendant constitute two wrongs (one as against the company and one as against the shareholder) with different loss in each case, so that the company and the shareholder each have their own distinct fully established cause of

D   action against him?

    **150**   In principle, as mentioned above, if a person has a cause of action against another he is entitled to bring proceedings to vindicate his rights. He may proceed as quickly as he chooses and with a view to maximising his prospects of securing recovery from the defendant. If he is a shareholder with a personal cause of action, nothing in the articles of association constitutes a promise by him that he will not act to vindicate his own

E   personal rights against a defendant against whom the company also has its own cause of action; and there is no other obligation to that effect arising out of his membership of the company.

    **151**   It is sometimes said that in a case where a wrong is done to the company which has an impact on the value of its shares, in circumstances capable of giving rise to independent causes of action for the company and for

F   a shareholder, the shareholder's claim fails for reasons of causation. It is suggested that the cause of the loss suffered by the shareholder in the form of diminution in the value of his shares or loss of dividend payments which would otherwise have been made to him is not the wrong committed by the defendant wrongdoer, but the decision of the company not to sue to recover in respect of the loss it has suffered: *Gerber* [1997] RPC 443, 471, per

G   Hobhouse LJ; *Johnson* [2002] 2 AC 1, 66, per Lord Millett; *Giles v Rhind* [2003] Ch 618, para 78, per Chadwick LJ. In my view, this reasoning cannot be sustained. As explained above, the loss suffered by the shareholder is not the same as the loss suffered by the company, and it does not follow that eventual recovery by the company will have the effect of eliminating the loss suffered by the shareholder.

H     **152**   As Charles Mitchell points out in his article 120 LQR 457, 469–470, the causation argument begs the important question. It presupposes that the shareholder will suffer a reflective loss when the company decides not to pursue its remedy, because the shareholder cannot recover this loss for himself. The argument does not show why the shareholder should be disabled from claiming in the first place.

© 2020 The Incorporated Council of Law Reporting for England and Wales

153   The absence of any necessary correspondence between the loss to a shareholder and the loss to the company which follows from a wrong done to the company which also forms part of a parallel wrong done to the shareholder can be demonstrated in various ways.  Knowledge in the market that the company had been made a victim of the wrong might have the effect of undermining market confidence in its management, thereby reducing the market value of shares in it even if the company made a full recovery of what it had lost.  Further, in other cases, the timing of recovery by the company may be important.  If a wrong done to the company were instantaneously and automatically corrected, a shareholder might suffer no diminution in the value of his shares as a result of that wrong.  But that is not the real world.  The law has to address the real world, not an imaginary one (see e g *Gould v Vaggelas* (1984) 157 CLR 215, 225, per Gibbs CJ; p 232, per Murphy J; pp 242 and 244–246, per Wilson J).  In reality, a shareholder may be able to prove that, but for the defendant's wrongful actions which gave rise to independent causes of action vested in the company and in the shareholder respectively, he would have been paid a dividend or his shares would have had a higher value which he could have realised in the market.  It does not follow that if the company sues to vindicate its rights and is successful years later in obtaining a judgment against the third party defendant and in obtaining execution of that judgment that it would, in the changed circumstances then prevailing, choose then to make the same dividend payment it would have made previously but for the defendant's wrongdoing.  Nor does it follow that the value of the shares held will automatically be restored to what it would have been previously but for the defendant's wrongdoing.  The company's prospects, as judged by the market, may be radically different at the later point in time.  Or the shareholder may already have sold the shares at a price discounted for uncertainty regarding possible recovery by the company.  In many cases the company's recovery of its loss will not have the effect of restoring the value of the shares.  Since the company's recovery may not put the shareholder back in the position he would have been in but for the defendant's wrongdoing, it cannot be said that it is the decision of the company whether to sue or not which has a determinative causative effect in relation to whether the shareholder suffers loss as a result of such wrongdoing.

154   Further and in any event, whether the company decides to sue, compromise or waive its rights in respect of the cause of action with which it is vested as a result of the defendant's wrongdoing is res inter alios acta so far as concerns the entitlement of the shareholder to sue in relation to the separate cause of action vested in him as a result of that wrongdoing.  The company does not control what the shareholder may do in relation to vindicating his own cause of action.  He is entitled to sue in relation to his own cause of action if he thinks he can prove he has suffered a loss.  If the company makes recovery in respect of its loss, that may have an effect on the extent of the loss suffered by the shareholder, but may well not eliminate it.  If the company decides to settle its claim for less than its whole value or decides not to sue, that does not affect the entitlement of the shareholder to sue on his own cause of action in respect of the loss suffered by him as a result of the defendant's wrongdoing.  As Peter Watts observes in his case note on *Johnson* in "The Shareholder as Co-promisee" (2001) 117 LQR 388, 391:

© 2020 The Incorporated Council of Law Reporting for England and Wales

A    "It is difficult to see that the firm [Gore Wood, the defendant firm of
     solicitors which had advised both the company and the shareholder]
     could be relieved from its obligation to the shareholder by laying the
     blame for the shareholder's not being indemnified on the company's
     having settled its claim, an outcome achieved only with the firm's
     concurrence."

B    In particular, in relation to a claim based on *OBG*, where the defendant has
     acted with the intention of harming the shareholder claimant and has
     succeeded, it would be contrary to justice to hold that the claimant cannot
     sue the defendant in relation to his cause of action just because the company
     has decided not to pursue its own cause of action. In fact, if the company
     foregoes recovery in respect of the wrong done to it, the effect may be to
C    make it easier for the shareholder to establish the extent of his loss and to
     meet another objection to his claim, to which I now turn.
         **155**   As a matter of basic justice, the defendant ought not to be liable
     twice for the same loss, once to a shareholder with a personal claim and
     again to the company. But in the situation under review the wrongs and also
     the losses suffered by the claimant shareholder and the company respectively
     are different. The claimant and the company each have distinct causes of
D    action of their own. The company can recover for its losses, e g depletion of
     its assets stolen by the defendant and consequential loss of profits. The
     claimant can recover for diminution in the value of his shares, which is a
     function of how the market values them, and for loss of dividends he might
     have received but for the wrong in relation to himself. These losses may have
     some relationship to the losses suffered by the company, but are not the same
E    as those losses. The loss suffered by the company as a result of theft of its
     assets may represent a substantial loss of the working capital it needs to
     generate future profits; and if so, that may have an effect on the value which
     the market places on shares in the company (but, contrary to what is said to
     be demonstrated by the cash box example, the loss will be different from that
     suffered by the shareholder and there is unlikely to be direct correspondence
F    between what the company has lost and the reduction in the value of the
     shareholder's shares). On the other hand, the loss suffered by the company
     might be insignificant in terms of any effect on its ability to generate profits
     in future, in which case the impact on share value might be practically
     nothing.
         **156**   If, after the wrongdoing of the defendant, the company is still
G    trading and the claimant shareholder has not sold his shares, he retains
     shares of some worth in the market which reflects, among other things, the
     value of the company's own claims against the defendant. In my view, the
     claimant would then be entitled to claim damages in respect of the reduced
     market value of his shares due to the wrong against him committed by the
     defendant (by the means of or in parallel with his commission of a wrong
     against the company), i e their market value absent the wrong done to the
H    company (and to the shareholder) less their actual current market value,
     reflecting among other things the company's claims against the defendant.
     Accordingly, it can be said that in such a case due allowance in respect of the
     company's claims against the defendant is reflected in what is recoverable by
     the claimant. It does not, then, seem to me to be unjust to allow both the

claimant and the company to pursue their separate claims for their different          A
losses against the defendant.

157   In the cash box example given in *Prudential*, in the case of an inert,
non-trading company, the market would presumably value each share as
equivalent to a proportionate part of the assets of the company, namely
the cash in the cash box.  The result would be that the loss suffered by the
claimant personally would be directly reduced pound for pound by the         B
company's own claim against the defendant, so there would be no question
of the defendant being liable twice over for the same loss (if for some reason
the company does not sue, the claimant's loss will not have been reduced and
he would be able to pursue his own cause of action: see paras 131 and 154
above).  In more typical situations, the relationship between the company's
loss and the claimant's loss will not be direct like this, but due allowance for
the company's potential to make recovery for its losses (albeit possibly      C
discounted to a degree to allow for the hazards of litigation) will still be
reflected in the calculation of the claimant's loss.

158   One could also envisage a situation in which, after the defendant's
wrongdoing, a claimant shareholder decided to sell his shares in the
company, and in consequence of that wrongdoing received a lesser price
than he otherwise would have done.  In that case the claimant could recover
for the crystallised loss he has suffered by way of the diminution in the      D
shares' value due to the wrong committed by the defendant.  Lord Millett
appears to have contemplated that this might be so, since in explaining *Stein
v Blake* [1998] 1 All ER 724 in *Johnson* [2002] 2 AC 1, 64B he emphasised
that the shareholder had not disposed of his shares in the company.  In
*Heron International Ltd v Lord Grade* [1983] BCLC 244 the Court of
Appeal would have been prepared to distinguish *Prudential* and allow        E
shareholders to sue for damages in a situation where breaches of fiduciary
duty by a company's directors caused a diminution in the value of its assets
resulting in a reduction in the value of its shares as sold by the shareholders
in the market, albeit on the facts this had not occurred and would not occur:
see p 262A–H; and see Joyce Lee Suet Lin [2007] CLJ 537, 554.  In this
situation, what the claimant has received for his shares by selling them in the
market will have reflected the market's view of the value of the company's    F
claims against the defendant (alongside its other assets and its general
trading prospects).  The company's claims against the defendant will have
been brought into account for the credit of the defendant in this way, to the
extent that they are material to valuing the claimant's loss, and it would not
be unjust to allow the claimant to recover the full amount of his crystallised
loss.  It should not make any difference to the position whether the claimant   G
has sold his shares or has decided to retain them.  (In *Johnson* the House of
Lords held that the claimant shareholder was entitled to claim in respect of
his loss of a 12·5% shareholding in the company, transferred to a lender as
security for a loan which, by reason of his lack of funds attributable to the
defendant's wrongdoing, he was unable to redeem: [2002] 2 AC 1, 37A:
presumably the value of what the claimant had lost would reflect the value
which the relevant market would place upon the company as a company       H
having amongst its assets its own cause of action against the defendant.)

159   Moreover, if there remains a concern about the risk of the
defendant being liable twice over by virtue of the relationship between the
company's loss and the loss suffered by the claimant shareholder, that has to

© 2020 The Incorporated Council of Law Reporting for England and Wales

A  be balanced against a concern that if one excludes the liability of the defendant to the claimant, then the claimant may well be undercompensated in respect of a real and different loss which he has suffered as a result of the defendant's wrong against him.  The claimant would have to prove on the balance of probabilities that he has indeed suffered a loss which is different from the loss suffered by the company.  If he can do so, then given the choice between ensuring that the claimant is fully compensated for the wrong done

B  to him and eliminating any risk that the defendant might have to pay excessive compensation, I consider that the choice should be in favour of giving priority to protecting the interests of the innocent claimant rather than to giving priority to protecting the interests of the wrongdoing defendant.  Compare Watts's case note on *Johnson* 117 LQR 388, 390: referring to a case where a defendant has given the same promise of

C  performance to the company and the shareholder, he says "If, as a fact, a promisor has undertaken obligations which might contemplate its having a double liability upon default, it is not plain that the law should be unduly concerned"; and Joyce Lee Suet Lin [2007] CLJ 537, 556 makes the same point.  In the context of a claim based on *OBG* (and also, in the context of a claim by a creditor of the company, as discussed below, based on *Lumley v Gye*) the wrongdoer has likewise engaged in deliberate conduct which

D  engages the right of the claimant shareholder to sue him alongside any right of action the company might have.

    160   In some cases, the relationship between the loss suffered by the company and the loss suffered by the claimant shareholder may be more direct.   Perhaps the cash stolen in the cash box example was being earmarked by the company for payment of a dividend to shareholders, and

E  in stealing it the defendant had the requisite intention to harm the claimant shareholder (as required for an *OBG*-type claim by him) by depriving him of his share of the dividend.  Two points may be made about this.  First, it would still be the case that the claimant has a distinct cause of action against the defendant in respect of losses suffered personally by him, assessed by reference to what would have happened if the defendant had committed no wrong.  The claimant's case would be that if the cash had remained in the

F  cash box, the company would in fact have chosen to distribute it by way of payment of a dividend.  The fact that the company, when actually faced with the loss of the cash, might decide not to pursue its own cause of action against the defendant does not undermine that case; and if the company so decides, any concern regarding double liability of the defendant is thereby removed.  Even if the company decided to pursue its own claim as well, that

G  would not necessarily undermine the claimant's case either.  If and when the company makes recovery for its loss, circumstances will be different and it may be that the company will not at that stage decide to use the money so recovered to make any dividend payment.  So the claimant will again have suffered a real loss which would not be eliminated by the award of a remedy to the company.

H      161   Secondly, the court can take steps to manage the coincidence of claims by the claimant and by the company by procedural means.   For instance, it could, if it were thought necessary, direct the claimant to give the company notice of the claim he is bringing against the defendant so that the company can choose to join in the proceedings and bring its own claim if it wants to.   The court could then work through the interaction of the two

© 2020 The Incorporated Council of Law Reporting for England and Wales

claims, in so far as there is found to be any concrete and relevant relationship between them, in a pragmatic way with full information as the proceedings progress. For example, if it became clear that the company would recover in the proceedings the money stolen from the cash box and would use it to make a belated dividend payment, as it had intended to do previously, the claimant's own loss might be reduced to the value to be ascribed to being deprived of the money for a period of time, rather than altogether. Alternatively, if the money recovered by the company was going to be retained by it, the claimant would have to give credit for any increase in the market value of his shares attributable to the fact that the company's assets will have been swelled to that extent. This is an aspect of working out the application of the principle of compensation in the light of what is known by the time of the judicial decision: cf *Golden Strait Corpn v Nippon Yusen Kubishika Kaisha (The Golden Victory)* [2007] 2 AC 353; *Gould v Vaggelas* 157 CLR 215, in particular at pp 254–255, per Brennan J.

162 Courts considering the issue prior to the decision in *Johnson* considered that procedural ways of managing the coincidence of claims would generally be possible (even if not available in every case) and appropriate: *Christensen v Scott* [1996] 1 NZLR 273, 281; *Barings* [1997] 1 BCLC 427, 435; see also Mitchell 120 LQR 457, 465; and Joyce Lee Suet Lin [2007] CLJ 537, 554–555. Similarly, at first instance in *Prudential*, Vinelott J (who, unlike the Court of Appeal, was confronted with the argument that there would be situations in which a shareholder had a cause of action and suffered a loss different from that suffered by the company) proposed as a procedural solution that the company might be joined as a defendant in such cases: [1981] Ch 257, 328b–e. If the company is joined as a party and does not advance its own claim at trial, it may be estopped from doing so in later proceedings. On the other hand, if the company does wish to pursue its claim, it may be beneficial in case management terms to allow the company's claim to be tried first or at the same time as the shareholder's claim, since then the extent of the company's recovery can be brought into account when valuing the loss suffered by the shareholder claimant. A procedural approach allows for nuanced adjustment of the vindication of parallel claims in the light of all relevant evidence about the circumstances regarding the interests of the company and the shareholder. The court can ensure that there is no double recovery and that the shareholder by his action does not deprive the company of sums properly due to it. The decision of the High Court of Australia in *Gould v Vaggelas*, discussed below, provides an example of how a court can work through the practical implications where a company and its shareholders both have claims against the same defendant and where the liquidator of the company fails to take steps to vindicate its claim against the defendant.

163 Similarly, in *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262, Templeman J envisaged that a procedural solution would be appropriate for managing the coincidence of claims in respect of carrying on the business of a company with intent to defraud creditors, in contravention of section 332 of the Companies Act 1948 (see now sections 213 and 214 of the Insolvency Act 1986), available both to the liquidator of the company and to a supplier/creditor dealing with it, as against persons involved in carrying on its business: pp 268–269. To avoid the defendants being placed in double jeopardy for the loss, the liquidator was to be informed of a claim brought

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   by the supplier/creditor to allow the liquidator the option of bringing a claim himself. In reviewing the statutory insolvency regime and making recommendations, the Cork Committee emphasised the desirability of flexibility for courts with regard to beneficiaries in relation to awards in respect of what are now sections 213 and 214 of the 1986 Act, in view of the diversity of situations which can arise: *Insolvency Law and Practice*, Report of the Review Committee (1982) (Cmnd 8558), para 1797.

B   164   A focus on procedural solutions also emerges in the decision of the Court of Appeal of Singapore in *Townsing v Jenton Overseas Investment Pte Ltd* [2008] 1 LRC 231. This concerned a misapplication of funds of a company by its director in breach of his fiduciary duty owed to the company and also in breach of duty which he owed directly to the shareholder owner of that company. The shareholder sued the director for loss which it had

C   suffered as a result of the wrong done to it, claiming that the loss was equivalent to the amount of the funds of the company which had been misapplied. Thus in its action, much as happened in the *Prudential* case in the Court of Appeal, the shareholder simply equated the loss it suffered with the loss suffered by the company and made no attempt to identify a different loss: para 29. The court's judgment has to be read with this in mind. In these circumstances the court decided that the reflective loss principle

D   accepted in *Johnson* should apply in Singapore, in preference to the position set out in *Christenson v Scott*: paras 77–79. This was on the basis that (in light of the way in which the shareholder presented its claim and following Lord Millett in *Johnson* [2002] AC 1, 66–67) there was a unity of the economic interests of a shareholder and his company; that the "no reflective loss" rule is a variant of the proper plaintiff rule in *Foss v Harbottle*; and that

E   it protects against the risk of double recovery and prejudice to the creditors and shareholders of the company. In my opinion, for reasons set out above, the unity of interests point and the "proper plaintiff" point do not support the reflective loss principle, in so far as it is sought to be applied in relation to a different loss suffered by a shareholder in relation to which he has his own cause of action. As to protection against the risk of double recovery and

F   prejudice to shareholders and creditors, the court recognised that these points could be met by procedural means, such as by the shareholder obtaining an undertaking from the liquidator of the company that it would not sue on the wrong done to it: paras 85–86. At para 85 the court also noted with approval that in *Christensen* "the court was prepared to deal with the problem of double recovery in several ways, such as staying one proceeding or staying execution against one or other of the parties". Since

G   the appellant director had not pleaded the reflective loss principle as a defence to a claim by the shareholder, he had deprived the shareholder of procedural opportunities of this kind by which it might have met such a defence and he was not permitted to introduce the plea for the first time on the appeal. The reflective loss principle was not treated as a rule of law which had the effect of stipulating that the shareholder could not be regarded as suffering any loss at all.

H   165   Are there any reasons of public policy why the shareholder's cause of action should be eliminated altogether in order to ensure priority for the company's claim? Lord Reed PSC says (para 38), with reference to the speech of Lord Hutton in *Johnson*, that there are pragmatic advantages which justify having a rule of law that a shareholder cannot sue to recover

© 2020 The Incorporated Council of Law Reporting for England and Wales

his own loss.  However, as I set out below, none of the other law lords in   A
*Johnson* agreed with Lord Hutton.  In my view, there are no sound reasons
why the shareholder's personal cause of action should be eliminated in this
way.  The cause of action is personal, so there is no reason why it should be
subjected to the collective decision-making procedures which apply when
the company decides what to do in relation to any cause of action it may
have.  The shareholder's cause of action falls outside the rule in *Foss v*
*Harbottle*.  To say he is to be denied being able to vindicate his own cause of   B
action by reason of his position as shareholder in the company seems to me
to erode the principle of the separate legal personality of the company
established in the *Salomon* case without good justification.

166   There is no question of the shareholder being entitled to recover
damages due to the company in respect of the company's own cause of
action and in that way reducing the assets of the company which are   C
available for paying its creditors or distributing to its shareholders.  It is,
however, possible that if the claimant shareholder sues to vindicate his
personal cause of action and succeeds in making recovery from the
defendant wrongdoer, that may so diminish the defendant's fund of assets
that when the company sues to vindicate its cause of action against him, it is
unable to make full recovery in respect of its claim.  That may mean that the
company's shareholders and creditors lose out.  But in my view, this is not a   D
reason to prevent the claimant shareholder from recovering in respect of his
cause of action.  As observed above, he owes no duty to the company, its
creditors or the other shareholders to hold off from seeking to vindicate his
own rights.  The risk that those other persons might suffer if he acts to
vindicate his rights is simply a risk inherent in the general situation where
a defendant has liabilities owed to different persons.  The shareholder is   E
exposed to the same risk in reverse, if the company obtains judgment and
execution before the shareholder vindicates his rights.  Moreover, these
types of risk can be managed by procedural means and also fall to be
addressed by the law of insolvency, so there is no sound basis for recognition
of a principle of reflective loss on these grounds.  There is also no good
reason of public policy why a shareholder's personal right of action should
be deprived of effect in order to protect the wrongdoing defendant: see   F
para 159 above.

167   It is true that adoption of the rule of law identified by Lord
Reed PSC and Lord Hodge DPSC would eliminate the need for debate about
the interaction of the company's cause of action and the shareholder's cause
of action, and in that way would reduce complexity.  Bright line rules have
that effect.  But the rule only achieves this by deeming that the shareholder   G
has suffered no loss, when in fact he has, and deeming that the shareholder
does not have a cause of action, when according to ordinary common law
principles he should have.  In my respectful opinion, the rule would therefore
produce simplicity at the cost of working serious injustice in relation to a
shareholder who (apart from the rule) has a good cause of action and has
suffered loss which is real and is different from any loss suffered by the
company.  Common law courts are used to working through complex   H
situations in nuanced and pragmatic ways, to achieve practical justice.  In
my opinion, the fact that the interaction between the company's cause of
action in respect of its loss and the shareholder's cause of action in respect of
his own loss gives rise to complexity is more a reason for *not* adopting a

© 2020 The Incorporated Council of Law Reporting for England and Wales

A crude bright line rule which will inevitably produce injustice, and requiring instead that the position be fully explored case by case in the light of all the facts, with the benefit of expert evidence in relation to valuation of shares and with due sensitivity to the procedural options which are available.

168   In *Christensen v Scott* [1996] 1 NZLR 273 the New Zealand Court of Appeal, sitting as a five-judge court, declined to apply the reflective loss principle.  The defendants were chartered accountants and solicitors who

B acted for the claimants personally in advising them on channelling their assets into a company taking a lease of farmland.  The defendants came to act for the company as well.  The claimants alleged that negligence on the part of the defendants meant that the consent of the landlord's mortgagees was not obtained, nor was a caveat registered against the title.  Consequently the land was lost and the company failed.  The company's claim against the

C defendants was settled by the liquidator for a sum alleged by the plaintiffs to be totally inadequate.  The Court of Appeal held that the personal claims of the claimants should not be struck out before trial.  Thomas J, giving the judgment of the court, said at pp 280–281:

"We do not need to enter upon a close examination of the [*Prudential*] decision.  It has attracted not insignificant and, at times, critical comment.

D See e g *Gower's Principles of Modern Company Law*, 5th ed (1992), pp 647–653; LS Sealy, 'Problems of Standing, Pleading and Proof in Corporate Litigation' [in *Company Law in Change*, ed BG Pettit], p 1, esp pp 6–10; and MJ Sterling, 'The Theory and Policy of Shareholder Actions in Tort' (1987) 50 MLR 468, esp pp 470–474.  It may be accepted that the Court of Appeal was correct, however, in concluding that a member has

E no right to sue directly in respect of a breach of duty owed to the company or in respect of a tort committed against the company.  Such claims can only be brought by the company itself or by a member in a derivative action under an exception to the rule in *Foss v Harbottle* (1843) 2 Hare 461.  But this is not necessarily to exclude a claim brought by a party, who may also be a member, to whom a separate duty is owed and who suffers a personal loss as a result of a breach of that duty.  Where such a party,

F irrespective that he or she is a member, has personal rights and these rights are invaded, the rule in *Foss v Harbottle* is irrelevant.  Nor would the claim necessarily have the calamitous consequences predicted by counsel in respect of the concept of corporate personality and limited liability.  The loss arises not from a breach of the duty owed to the company but from a breach of duty owed to the individuals.  The

G individual is simply suing to vindicate his own right or redress a wrong done to him or her giving rise to a personal loss.

"We consider, therefore, that it is certainly arguable that, where there is an independent duty owed to the plaintiff and a breach of that duty occurs, the resulting loss may be recovered by the plaintiff.  The fact that the loss may also be suffered by the company does not mean that it is not also a personal loss to the individual.  Indeed, the diminution in the

H value of Mr and Mrs Christensen's shares in the company is by definition a personal loss and not a corporate loss.  The loss suffered by the company is the loss of the lease and the profit which would have been obtained from harvesting the potato crop.  That loss is reflected in the diminution in the value of Mr and Mrs Christensen's shares.  They can

© 2020 The Incorporated Council of Law Reporting for England and Wales

no longer realise their shares at the value they enjoyed prior to the
alleged default of their accountants and solicitors. (For a discussion of
the policy issues which arise in considering these questions, see Sterling,
at pp 474–491.)

"In circumstances of this kind the possibility that the company and the
member may seek to hold the same party liable for the same loss may pose
a difficulty. Double recovery, of course, cannot be permitted. The
problem does not arise in this case, however, as the company has
chosen to settle its claim. Peat Marwick and McCaw Lewis accepted a
compromise in the knowledge that Mr and Mrs Christensen's claim was
outstanding. It may well be, as was acknowledged by Mr Pidgeon in
the course of argument, that an allowance will need to be made for the
amount already paid to the liquidator in settlement of the company's
claim.

"It is to be acknowledged, however, that the problem of double
recovery may well arise in other cases. No doubt, such a possibility is
most likely with smaller private companies where the interrelationship
between the company, the directors and the shareholders may give rise to
independent duties on the part of the professional advisers involved. But
the situation where one defendant owes a duty to two persons who suffer
a common loss is not unknown in the law, and it will need to be examined
in this context. It may be found that there is no necessary reason why the
company's loss should take precedence over the loss of the individuals
who are owed a separate duty of care. To meet the problem of double
recovery in such circumstances it will be necessary to evolve principles to
determine which party or parties will be able to seek or obtain recovery.
A stay of one proceeding may be required. Judgment, with a stay of
execution against one or other of the parties, may be in order. An
obligation to account in whole or in part may be appropriate. The
interest of creditors who may benefit if one party recovers and not the
other may require consideration. As the problem of double recovery does
not arise in this case, however, it is preferable to leave an examination of
these issues to a case where that problem is squarely in point.

"Essentially, Mr and Mrs Christensen are alleging that as a result
of Peat Marwick and McCaw Lewis's breach of duty owed to them
personally they suffered a personal loss, that is, a reduction in the value of
their assets. Their assets in this case had been channelled into their
company. Thus, it is arguable that the diminution in the value of their
shareholding is the measure of that loss. It may well be that when the
evidence is heard it will be apparent that Mr and Mrs Christensen's claim
is inflated, but that is a matter for the trial.

"We are not prepared to hold at this stage that they do not have an
arguable case to recover damages for the breach of an acknowledged
duty."

**169** It will be clear from what I have said about *Prudential* [1982] Ch
204 that I consider that there is considerable force in this reasoning. The
law as stated in *Christensen v Scott* [1996] 1 NZLR 273 was in substance
affirmed by Leggatt LJ in *Barings* [1997] 1 BCLC 427, 435. That case was
concerned with negligence of auditors in relation to the audit of a subsidiary
company, in relation to which they were alleged to owe a similar duty of care

A   to both that company and its ultimate parent company. The Court of Appeal held that the parent company's claim against the auditors was an arguable claim fit for service out of the jurisdiction and that the *Prudential* case provided no answer to it.

170   I find the decision of the High Court of Australia in *Gould v Vaggelas* 157 CLR 215 helpful in relation to the issues which arise on this appeal. That case concerned the purchase by a company of a holiday resort

B   business as a result of fraudulent representations by the vendors regarding its trading history and prospects made to the claimant shareholders/controllers of the company. Induced by those fraudulent representations, the claimant shareholders entered into transactions which had the practical effect that they lent the company $733,212·12 to enable it to pay part of the purchase price to the vendors; they also mortgaged certain properties of theirs to the

C   vendors and provided the vendors with personal guarantees in respect of outstanding parts of the purchase price which were to be paid by the company over a period of time after completion. Later, as the business faltered, the claimant shareholders lent the company further sums to enable it to continue trading. It was found by the trial judge and by a majority in the High Court that the claimant shareholders acted reasonably and without knowledge of the fraud when providing this further lending to support the

D   business. The business eventually failed, the mortgaged properties were lost and the claimant shareholders incurred a substantial liability under their personal guarantees. The company did not repay them the sums they had lent it. The claimant shareholders came to realise that they had been deceived. In their own right they sued the vendors in deceit, claiming as damages the original sum lent to the company for the purchase, the further

E   sums lent by them to support its continued trading, the value of the securities lost by reason of the failure of the company to repay the bank lending and the amount they had to pay under the guarantees they had given. The liquidator of the company, which had its own right of action against the defendants in deceit for being induced to purchase the business, for want of resources originally chose not to commence proceedings against the defendants and only issued a claim against them after the decision at first

F   instance on the claimant shareholders' claim.

171   The trial judge awarded the claimant shareholders the damages claimed by them. His decision was overturned by the full court on appeal as regards the damages claimed, but on further appeal to the High Court his decision was upheld by a majority. The losses suffered by the claimant shareholders in providing the company with funds to acquire the business

G   and to keep it trading were recoverable even though the company had its own claim against the vendors in respect of the price it paid (using the funds provided by the shareholders) and the sums it spent (using funds provided by the shareholders) to keep the business going. The approach of the majority in the full court to identify the claimant shareholders with the company was disapproved: see pp 240–241, 256–257 and 264. The shareholders had suffered personal losses in respect of which they were entitled to damages

H   from the vendors notwithstanding that the company had its own parallel claim against the vendors.

172   Although the *Prudential* case was referred to, only Dawson J in a minority opinion and without any critical examination of the reasoning in the case thought that the claimant shareholders' claim should be excluded by

© 2020 The Incorporated Council of Law Reporting for England and Wales

reason of the reflective loss principle: pp 269–270.  On the other hand, Gibbs CJ (p 220), Murphy J (pp 231–232), Wilson J (pp 245–246) and Brennan J (p 253) all treated *Prudential* as distinguishable, because the claimant shareholders sued in their personal capacity for losses suffered by them by spending their own resources in reliance on the fraudulent representations made to them, and not on behalf of the company in respect of its loss.  This is in line with my own view regarding the *Prudential* decision: para 148 above.  Although on the facts the company was funded by debt rather than equity (other than to a negligible extent), according to the reasoning by the majority I do not think that it would have made any difference to the right of recovery of the claimant shareholders if they had been induced to fund the company's purchase and continued trading by subscribing for shares in it rather than lending it money.  That is the view taken in *Spencer Bower & Handley*, *Actionable Misrepresentation*, 5th ed (2014), para 12.26: it is pointed out that issues of double recovery can be addressed by treating the defendant as subrogated to the shareholders' rights to the extent that the defendant satisfies a judgment which they obtain against him, in a manner similar to the solution proposed in the case of a creditor in *Gould v Vaggelas* itself (see below).

173   The majority recognised that in principle the claimant shareholders had to bring into account as a credit the value of their rights against the company as shareholders and creditors, but on the facts the company's only value and only means of repaying them depended on its vindicating its own claim against the vendors, which in view of the conduct of the liquidator and as events had transpired had to be treated as nil. See pp 226–229 per Gibbs CJ (focusing on the rights of the claimant shareholders as creditors of the company); p 232 per Murphy J (referring both to the value of the shareholders' shares and of their rights as creditors of the company); p 246 per Wilson J (focusing on their rights as creditors, but to be assessed at an earlier point in time when he considered they became aware of the fraud); pp 254–258 per Brennan J (focusing on their rights as creditors).

*Johnson v Gore Wood*

174   However, the leading English authority is now the decision of the House of Lords in *Johnson* [2002] 2 AC 1.  The case is primarily concerned with other issues, of abuse of process and estoppel by convention.  It appears that there was only comparatively limited argument about the reflective loss principle and it seems that it was not suggested that *Prudential* was wrongly decided by reference to that principle, only that it was distinguishable. A difficulty with the case is that the law lords produced separate speeches in which the reasoning on the subject of reflective loss is materially different.  Although on various other issues which arose in the case (including on the question of abuse of process, on which the case is the leading authority) agreement was expressed with the reasoning of Lord Bingham, no member of the appellate committee expressed agreement with his reasoning in relation to the issue of reflective loss.  Lord Bingham and Lord Millett, in their separate speeches, accepted the approach and reasoning in *Prudential* without question.  However, there was in fact no agreement between them on the reasoning applicable in relation to the reflective loss issue, nor any

© 2020 The Incorporated Council of Law Reporting for England and Wales

A  majority for any particular analysis.  Therefore, I do not think that the case can be regarded as authority for the special rule of law identified by Lord Reed PSC and Lord Hodge DPSC.  It is necessary to examine the relevant reasoning in the separate speeches on its merits in each case to determine what weight is to be given.  The one point on which at least four of the law lords were agreed (and Lord Bingham as well, as I read his speech) was that the issues of double recoverability and prejudice to creditors were

B  relevant factors driving the application of the reflective loss principle: see para 119 above.  For present purposes the facts can be summarised as follows.

175  The claimant, Mr Johnson, was a businessman who conducted certain of his business affairs through a company, W Ltd, in which he held all but two of the shares.  On behalf of W Ltd he instructed the defendant firm

C  of solicitors, GW, in connection with the purchase of land for development. W Ltd had an option to purchase the land, and GW were instructed to serve a notice exercising the option.  Service of the notice was followed by a dispute as to its validity and consequent legal proceedings which resulted in an order for specific performance against the vendor.  The need for legal proceedings meant there was a long delay before completion of the

D  conveyance and the property market collapsed in the interim, with the result that W Ltd suffered a loss of profit on its development project; W Ltd also suffered the loss of legal expenses from having to litigate in a lengthy trial against the vendor, who was legally aided.  W Ltd claimed against GW that they had breached a duty of care owed to W Ltd to ensure that the notice to exercise the option was served in such a way as to avoid argument regarding its validity.  Mr Johnson also alleged in correspondence that GW owed him

E  personally a duty of care to like effect and intimated that he would in due course claim to recover damages.  W Ltd commenced proceedings, but for particular reasons Mr Johnson held off bringing his own claim at the same time.  GW settled W Ltd's claim.  After that, Mr Johnson commenced his personal claim against them.  GW applied to strike out his claim on grounds of abuse of process and in reliance on the reflective loss principle.  The House

F  of Lords held that Mr Johnson had committed no abuse of process.  By application of the reflective loss principle it struck out certain heads of damages claimed by Mr Johnson, but allowed his claim to proceed in relation to other heads of claim.

176  Lord Bingham addressed the reflective loss principle at [2002] 2 AC 1, 35–37.  After the passage quoted by Lord Reed PSC at para 41 above, Lord Bingham continued:

G  "These principles do not resolve the crucial decision which a court must make on a strike-out application, whether on the facts pleaded a shareholder's claim is sustainable in principle, nor the decision which the trial court must make, whether on the facts proved the shareholder's claim should be upheld.  On the one hand the court must respect the principle of company autonomy, ensure that the company's creditors are

H  not prejudiced by the action of individual shareholders and ensure that a party does not recover compensation for a loss which another party has suffered.  On the other, the court must be astute to ensure that the party who has in fact suffered loss is not arbitrarily denied fair compensation. The problem can be resolved only by close scrutiny of the pleadings at the

strike-out stage and all the proven facts at the trial stage: the object is to ascertain whether the loss claimed appears to be or is one which would be made good if the company had enforced its full rights against the party responsible, and whether (to use the language of [*Prudential*] [1982] Ch 204, 223) the loss claimed is 'merely a reflection of the loss suffered by the company'. In some cases the answer will be clear, as where the shareholder claims the loss of dividend or a diminution in the value of a shareholding attributable solely to depletion of the company's assets, or a loss unrelated to the business of the company. In other cases, inevitably, a finer judgment will be called for. At the strike-out stage any reasonable doubt must be resolved in favour of the claimant.

"I turn to consider the heads of claim now pleaded by Mr Johnson. (1) Collector Piece Video Ltd and Adfocus Ltd. The claim is for sums which Mr Johnson, acting on GW's advice, invested in these companies and lost. This claim is unobjectionable in principle, as Mr Steinfeld came close to accepting. (2) Cost of personal borrowings: loan capital and interest. The claim is for sums which Mr Johnson claims he was obliged to borrow at punitive rates of interest to fund his personal outgoings and those of his businesses. Both the ingredients and the quantum of this claim will call for close examination, among other things to be sure that it is not a disguised claim for loss of dividend, but it cannot at this stage be struck out as bad on its face. The same is true of Mr Johnson's claims for bank interest and charges and mortgage charges and interest (which will raise obvious questions of remoteness). (3) Diminution in value of Mr Johnson's pension and majority shareholding in WWH. In part this claim relates to payments which the company would have made into a pension fund for Mr Johnson: I think it plain that this claim is merely a reflection of the company's loss and I would strike it out. In part the claim relates to enhancement of the value of Mr Johnson's pension if the payments had been duly made. I do not regard this part of the claim as objectionable in principle. An alternative claim, based on the supposition that the company would not have made the pension payments, that its assets would thereby have been increased and that the value of Mr Johnson's shareholding would thereby have been enhanced, is also a reflection of the company's loss and I would strike it out. (4) Loss of 12·5% of Mr Johnson's shareholding in WWH. Mr Johnson claims that he transferred these shares to a lender as security for a loan and that because of his lack of funds, caused by GW's breach of duty, he was unable to buy them back. This claim is not in my view objectionable in principle. (5) Additional tax liability. If proved, this is a personal loss and I would not strike it out."

177   With respect to Lord Bingham, he takes the reasoning of the Court of Appeal in *Prudential* to be correct without subjecting it to critical examination. The authorities the effect of which he summarises essentially did the same, save for *Christensen v Scott* and *Barings*. In my view, following as they do the reasoning in *Prudential*, Lord Bingham's propositions inaccurately equate the loss suffered by a company and the loss in the value of its shares (or from non-payment of a dividend) suffered by a shareholder.

315

A    178    Lord Goff agreed with the analysis of Lord Millett on this part of
the case.  In my view, the reasoning of Lord Millett again assumes, without
questioning it, that the reasoning in *Prudential* is correct and he inaccurately
equates the loss suffered by a company and the loss suffered by the
shareholder.  Lord Millett's discussion of the reflective loss principle begins
by noting that a company's cause of action is its property for it to decide
what to do with, that shares in a company are the property of the
B    shareholder, "and if he suffers loss as a result of an actionable wrong done to
him, then prima facie he alone can sue and the company cannot" [2002]
2 AC 1, 61–62.  He goes on at p 62:

> "On the other hand, although a share is an identifiable piece of
> property which belongs to the shareholder and has an ascertainable value,
C    it also represents a proportionate part of the company's net assets, and if
> these are depleted the diminution in its assets will be reflected in the
> diminution in the value of the shares.  The correspondence may not be
> exact, especially in the case of a company whose shares are publicly
> traded, since their value depends on market sentiment.  But in the case of
> a small private company like this company, the correspondence is exact."

D    179    Lord Millett's comment regarding a company whose shares are
publicly traded recognises that, contrary to the suggestion in *Prudential*,
there is no necessary correspondence between the value of shares in the
hands of a shareholder and the value of the company's assets.  However, he
did not subject the reasoning in *Prudential* to critical examination in the
light of this.  His comment regarding the correspondence between the value
of shares in a small private company and its net assets reflects the reasoning
E    in *Prudential* case.  This is made clear a little further on, when Lord
Millett sets out the passage in that judgment dealing with the cash box
example [2002] 2 AC 1, 62–63.  This is fundamental to Lord Millett's whole
approach in his speech.  As stated above, however, I do not consider that this
reasoning can be supported.  When it is appreciated that a shareholder has
his own cause of action in respect of a loss which is not identical with the loss
F    suffered by the company, as a matter of principle it is not possible to treat the
shareholder's cause of action as something eliminated by virtue of the fact
that the company has its own cause of action in respect of loss which it
suffers.

180    Lord Millett points out that the problem of corresponding loss
which he postulated causes no difficulty if the company has a cause of action
in respect of that loss, but the shareholder does not; or if the shareholder has
G    a cause of action in respect of it, but the company does not [2002] 2 AC 1,
62B–D.  He continues, at p 62D–F:

> "The position is, however, different where the company suffers loss
> caused by the breach of a duty owed both to the company and to the
> shareholder.  In such a case the shareholder's loss, in so far as this is
> measured by the diminution in value of his shareholding or the loss of
H    dividends, merely reflects the loss suffered by the company in respect of
> which the company has its own cause of action.  If the shareholder is
> allowed to recover in respect of such loss, then either there will be double
> recovery at the expense of the defendant or the shareholder will recover at
> the expense of the company and its creditors and other shareholders.

© 2020 The Incorporated Council of Law Reporting for England and Wales

*A*

"Neither course can be permitted.  This is a matter of principle; there is no discretion involved.  Justice to the defendant requires the exclusion of one claim or the other; protection of the interests of the company's creditors requires that it is the company which is allowed to recover to the exclusion of the shareholder."

*B*

This reasoning is predicated on the loss suffered by the company and the loss suffered by the shareholder being identical, as is also made clear by his citation of the cash box example in *Prudential* as the principal authority in support of his statement of principle [2002] 2 AC 1, 62G–63D.  In my respectful opinion, that is a false premise.

181    The same false premise is evident again in Lord Millett's treatment of his own previous judgment in *Stein v Blake* [1998] 1 All ER 724.  The case concerned the misappropriation of assets belonging to certain companies ("the old companies") by a director, where the claimant shareholder alleged that the director also owed a duty to him personally and that he had suffered loss.  The Court of Appeal affirmed the decision that the claim should be struck out.  Lord Millett explained [2002] 2 AC 1, 64A–D:

*C*

*D*

"The problem [for the plaintiff] was that the only conduct relied upon as constituting a breach of that duty was the misappropriation of assets belonging to the old companies, so that the only loss suffered by the plaintiff consisted of the diminution in the value of his shareholding which reflected the depletion of the assets of the old companies.  The old companies had their own cause of action to recover their loss, and the plaintiff's own loss would be fully remedied by the restitution to the companies of the value of the misappropriated assets.  It was not alleged that the plaintiff had been induced or compelled to dispose of his shares in the companies; he still had them.  If he were allowed to recover for the diminution in their value, and the companies for the depletion of their assets, there would be double recovery.  Moreover, if the action were allowed to proceed and the plaintiff were to recover for the lost value of his shares, the defendant's ability to meet any judgment which the old companies or their liquidators might obtain against him would be impaired to the prejudice of their creditors.  The plaintiff would have obtained by a judgment of the court the very same extraction of value from the old companies at the expense of their creditors as the defendant was alleged to have obtained by fraud."

*E*

*F*

182    The court assumed that if the old companies recovered in respect of their loss, the claimant's loss would be "fully remedied".  But that would only be so if the loss was identical.  Since the losses were not identical, double recovery would not necessarily follow from allowing the claimant to bring his personal claim.  Also, as I have sought to explain, he would have to give credit for the effect on the value of his shares due to the old companies having their own causes of action against the defendant.  There was no principled reason why the claimant should not be entitled to seek to vindicate his own cause of action against the defendant.  That would not prevent the old companies from obtaining recovery in respect of their cause of action and their loss.

*G*

*H*

183    In my opinion, the same false premise underlies Lord Millett's criticism of the decisions in *Barings* [1997] 1 BCLC 427 and in *Christensen v*

© 2020 The Incorporated Council of Law Reporting for England and Wales

[2020] 3 WLR                              Marex Financial Ltd v Sevilleja (SC(E))
                                                                Lord Sales JSC

A   *Scott* [1996] 1 NZLR 273. In respect of the latter, he said that he could not
accept the reasoning of Thomas J [2002] 2 AC 1, 66B–C:

> "It is of course correct that the diminution in the value of the plaintiffs'
> shares was by definition a personal loss and not the company's loss, but
> that is not the point. The point is that it merely reflected the diminution
> of the company's assets. The test is not whether the company could have
> made a claim in respect of the loss in question; the question is whether,
B   treating the company and the shareholder as one for this purpose, the
> shareholder's loss is franked by that of the company. If so, such reflected
> loss is recoverable by the company and not by the shareholders."

**184** However, with respect, I consider that the error is Lord Millett's.
The claimants' personal loss did not "merely reflect" the company's loss; it
C   was not identical with that loss, and the company could not make a claim in
respect of the loss which the claimants had suffered. There is no good reason
to treat the company and the shareholder "as one" for the purpose of
working out who could sue for the losses in question, since there is not a
single loss. Similarly, for the reasons given above, I do not think that Lord
Millett's further reliance on the causation point [2002] 2 AC 1, 66D–E can be
supported.

D   **185** Lord Millett continued at p 66F–G:

> "But there is more to it than causation. The disallowance of the
> shareholder's claim in respect of reflective loss is driven by policy
> considerations. In my opinion, these preclude the shareholder from going
> behind the settlement of the company's claim. If he were allowed to do so
> then, if the company's action were brought by its directors, they would be
E   placed in a position where their interest conflicted with their duty; while if
> it were brought by the liquidator, it would make it difficult for him to
> settle the action and would effectively take the conduct of the litigation
> out of his hands . . ."

**186** I do not consider that these policy considerations can justify the
reflective loss principle. Again, the underlying point is that the company and
F   the shareholder each have their own cause of action and that the loss suffered
by the company and the loss suffered by the shareholder are not one and the
same. If the company settles its claim, the shareholder will have to give
appropriate credit for that to the extent that it has reduced his loss (which
might or might not be significant, depending on the facts of the case). In
bringing his claim he would not go behind nor undo the settlement of the
G   company's claim. If the shareholder is also a director of the company, that
could give rise to a conflict of interest and duty in deciding how the company
should prosecute its claim; but as pointed out by Mitchell 120 LQR 457,
470, there will be cases which do not involve shareholders who are directors.
In any event, company law has procedures for coping with similar conflicts
of interest and duty on the part of directors and this point does not amount
to a good reason to eliminate the shareholder's properly constituted cause of
H   action. If a director has been run over by an employee of the company or has
a contract claim against it, one would not say that he was prevented from
suing the company because he would thereby be placed in a position where
his interests and those of the company would conflict. If exposed to the
possibility of claims by a shareholder and a company, a defendant would still

have an interest to settle with the liquidator of the company in order to cap    A
his liability to the company and there is no good reason why the liquidator,
by his conduct of the company's claim, should be able to defeat a viable
cause of action vested in the shareholder.

187   In my view, the same flawed premise underlies the following two
paragraphs in Lord Millett's speech, which have particular relevance in the
context of the present appeal concerning the application of the reflective loss    B
principle to claims brought by a creditor of a company [2002] 2 AC 1,
66G–67C:

> "Reflective loss extends beyond the diminution of the value of the
> shares; it extends to the loss of dividends (specifically mentioned in
> [*Prudential*]) and all other payments which the shareholder might have
> obtained from the company if it had not been deprived of its funds. All
> transactions or putative transactions between the company and its    C
> shareholders must be disregarded. Payment to the one diminishes the
> assets of the other. In economic terms, the shareholder has two pockets,
> and cannot hold the defendant liable for his inability to transfer money
> from one pocket to the other. In principle, the company and the
> shareholder cannot together recover more than the shareholder would
> have recovered if he had carried on business in his own name instead of    D
> through the medium of a company. On the other hand, he is entitled
> (subject to the rules on remoteness of damage) to recover in respect of a
> loss which he has sustained by reason of his inability to have recourse to
> the company's funds and which the company would not have sustained
> itself. The same applies to other payments which the company would
> have made if it had had the necessary funds even if the plaintiff would    E
> have received them qua employee and not qua shareholder and even if
> he would have had a legal claim to be paid. His loss is still an indirect
> and reflective loss which is included in the company's claim. The
> plaintiff's primary claim lies against the company, and the existence of
> the liability does not increase the total recoverable by the company, for
> this already includes the amount necessary to enable the company to
> meet it."    F

188   The analogy with a shareholder with two pockets does not give
appropriate recognition to the separate legal personality of a company, as
emphasised in the *Salomon* case. The analogy assumes, incorrectly, that
the loss suffered by the company is identical with the loss suffered by the
shareholder. Starting from that assumption, Lord Millett would extend
the reflective loss principle to prevent recovery from a wrongdoing    G
defendant by a creditor of the company who suffers the loss of being
unable to recover what he is owed by the company as a result of the wrong
done at the same time by the defendant to him and the company. His
speech therefore provides support for Mr Sevilleja's case on this appeal.
I will discuss the position of creditors after finishing this discussion of
*Johnson*.

189   Lord Cooke stated that he had difficulty with the part of    H
Lord Bingham's speech dealing with the recoverability of damages by
Mr Johnson on his personal claim against GW. Although he was at pains
not to criticise the decision in *Prudential* [2002] 2 AC 1, 43A and 45F, he
observed that the cash box illustration was not helpful in the *Johnson* case

© 2020 The Incorporated Council of Law Reporting for England and Wales

A "because it does not envisage any loss except of the company's £100,000":
pp 42G–43B. In other words, the illustration proceeds on the basis that the
company's loss and the shareholder's loss are identical, as was also true
of the analysis in *Stein v Blake*. Lord Cooke agreed that the English
authorities cited by Lord Bingham supported the three propositions stated
by him. None the less, Lord Cooke was not willing to dismiss the statement
of the law by Thomas J in *Christensen v Scott* and pointed out that
B Leggatt LJ in *Barings* and Hobhouse LJ in *Gerber* (at [1997] RPC 443, 475)
had regarded it as in line with English legal principles. Lord Cooke
observed that the court in *Christensen v Scott* had been guarded in its
approach and he stated that if a client is suing his own solicitor, "it would
appear that only the problems of double recovery or prejudice to the
company's creditors would justify denying or limiting the right to recover
C personal damages which, on ordinary principles of foreseeability, would
otherwise arise" [2002] 2 AC 1, 45D–E; also pp 47E and 48B. Despite his
reservations about Lord Bingham's reasoning, however, Lord Cooke was
prepared to agree the order proposed by him, as were the other members of
the appellate committee: p 48B–E.

190 Lord Hutton also agreed with the order proposed by Lord
Bingham, but his analysis was different from the others. Lord Hutton noted
D that the basis on which *Prudential* had been distinguished by Hobhouse LJ
in *Gerber* (on the footing that the shareholder claimants in *Prudential* did
not have an individual cause of action) was invalid, since the Court of
Appeal considered that they did have such a cause of action (however, see
para 148 above); contrary to the view of Hobhouse LJ in *Gerber*, Lord
Hutton stated (correctly, in my view) that the ruling against the shareholder
E claimants in *Prudential* could not be explained on the ground of causation;
and he agreed (again correctly, in my view) with the court in *Christensen v
Scott* that the shareholders could be regarded as suffering a personal loss
caused by breach of duty of the defendant, different from the loss of the
company, and considered that the reasoning in *Prudential* on this point was
open to criticism [2002] 2 AC 1, 54. However, he stated that there is a need
to ensure that there is no double recovery and that creditors and the other
F shareholders of the company are protected: pp 54H–55D. On that basis,
faced with the conflict between *Prudential* and *Christensen v Scott*, Lord
Hutton preferred to endorse the approach in *Prudential* despite the flaws in
its reasoning, since it provided a bright line rule to debar a shareholder from
bringing a claim without the need for "the complexities of a trial" to
examine the extent of overlap between the loss of the claimant shareholder
G and the loss of the company. A bright line rule of this character would
ensure that there would be no double recovery and that the creditors and
other shareholders would be protected; it would also avoid the possibility of
conflicts of interest between directors and some shareholders or between
liquidator and some shareholders: p 55C–G.

191 I disagree with this last step in the reasoning of Lord Hutton. None
of the other law lords endorsed this. The problem, as I see it, is that the
H factors mentioned by Lord Hutton do not justify depriving a claimant
shareholder who has suffered a loss different from the loss suffered by the
company of what Lord Hutton accepted would otherwise be a perfectly
valid cause of action in his own right. I also agree with Mitchell's criticism
of Lord Hutton's bright line approach, that it proves too much, in that it

© 2020 The Incorporated Council of Law Reporting for England and Wales

would prevent recovery by a shareholder even if there is no policy reason to    A
support this, e g in a case where the company itself never had a cause of
action against the defendant 120 LQR 457, 460.

192   It is a very strong thing for a bright line rule to be introduced in the
common law as a matter of policy to preclude what are otherwise, according
to ordinary common law principles, valid causes of action; especially on the
basis of the very summary explanation given by Lord Hutton.  Whilst, as          B
noted above, it would allow for simple and speedy resolution of disputes, the
price to be paid for that is too high.  The effect of Lord Hutton's bright line
rule would be disproportionate and arbitrary.  So long as there is any degree
of overlap between the company's loss and the shareholder's loss, however
small the degree of overlap and however large the shareholder's loss might
be, it seems that the shareholder's claim must fail in limine.  And this is so
even though, as explained above, the claimant shareholder's loss would be       C
calculated after due allowance for the effect of rights of action which the
company would have against the wrongdoing defendant and even though
the law has other techniques available to deal with issues of conflict of
interest which might arise.

193   It is also a rule which, in my view, gives undue priority to the
interests of other shareholders and creditors of the company in circumstances
where the claimant shareholder is not subject to any obligation to            D
subordinate his interest in vindicating his personal rights to their interests.
Insolvency law is a regime which already makes appropriate provision to
cater for the possibility that the defendant does not have sufficient assets to
meet all claims against him, and there is no good policy basis for recognition
of the reflective loss principle at common law to supplement that regime.
Further, there will be cases where there is in fact no difficulty in the defendant    E
being able to meet all claims.

194   In summary, in my respectful opinion the reasoning in *Johnson*, in
so far as it endorses the reflective loss principle as a principle debarring
shareholders from recovery of personal loss which is different from the loss
suffered by the company, ought not to be followed.  The reasoning of
Lords Bingham, Goff and Millett purports to be based on the logic in
the *Prudential* case, which on critical examination is not sustainable.  The    F
reasoning of Lord Hutton relies on a policy-based bright line exclusionary
rule which is not justified.  The reasoning of Lord Cooke is suspended
uneasily between the majority and Lord Hutton.  Lord Cooke endorsed the
decision in *Prudential* (and in my opinion was right to do so as to the result:
para 148 above), albeit he was unwilling to disclaim the judgment in
*Christensen v Scott* (even though the reasoning in the two cases cannot be    G
reconciled, a fact which he was not prepared to acknowledge); and to the
extent that, like Lord Hutton, he emphasised that there should not be double
recovery and that the company's other shareholders and creditors should be
protected, in my view he gave insufficient attention to the ways in which the
law already allows for the risk of double recovery to be taken into account
and did not explain why the interests of the company's other shareholders
and creditors should take priority over the interests of the claimant          H
shareholder suing to vindicate a personal cause of action.

195   Lord Reed PSC points out (para 78) that the decisions in *Prudential*
and *Johnson* have been followed in other common law jurisdictions.
However, whilst there is some variation in the reasoning which is deployed,

© 2020 The Incorporated Council of Law Reporting for England and Wales

A  the courts in those jurisdictions have not given *Prudential* and *Johnson* the same interpretation as Lord Reed PSC gives them.  To a substantial degree they have regarded them as being concerned with the issues of double recovery and protection of the interests of creditors and other shareholders of the company, which I have addressed above: see e g the discussion at para 164 above of the judgment of the Court of Appeal of Singapore in

B  *Townsing v Jenton Overseas Investment Pte Ltd* [2008] 1 LRC 231.  This is not surprising, given that in *Johnson* Lords Millett, Goff, Cooke and Hutton all identified these as the important issues by reference to which the reflective loss principle fell to be justified, and Lord Bingham (as I read his speech) did not dispute this.

**196**  Flaux LJ in his judgment in the Court of Appeal in the present case

C  [2019] QB 173, para 32 distilled a four-fold justification for the reflective loss principle, principally derived from the speech of Lord Millett in *Johnson*: (i) the need to avoid double recovery by the claimant shareholder and the company from the defendant; (ii) causation, in the sense that if the company chooses not to claim against the wrongdoer, the loss to the claimant is caused by the company's decision not by the defendant's wrongdoing ([2002] 2 AC 1, 66; also per Chadwick LJ in *Giles v Rhind*

D  [2003] Ch 618, para 78); (iii) the public policy of avoiding conflicts of interest, particularly that if the claimant had a separate right to claim it would discourage the company from making settlements; and (iv) the need to preserve company autonomy and avoid prejudice to minority shareholders and other creditors.

**197**  In my opinion, none of these considerations in fact provides a viable justification for the reflective loss principle.  Points (i) and (ii) reflect

E  Lord Millett's incorrect view that the loss suffered by the company is the same as the loss suffered by the shareholder (to the extent of his shareholding), and ignore the ways in which the law takes account of the need to avoid double recovery by other means.  Point (iii) also reflects Lord Millett's view regarding the identity of the loss suffered by the company and the loss suffered by the shareholder, and ignores the availability of other

F  mechanisms to deal with conflicts of interest on the part of directors and the interest that a defendant would have in settling with a company which makes a claim in parallel with a personal claim made by a shareholder. Point (iv) again reflects Lord Millett's view regarding identity of loss; it ignores the fact that company autonomy (safeguarded by the rule in *Foss v Harbottle*) remains in place as regards any cause of action vested in the

G  company; and it gives undue weight to protection of other shareholders and other creditors.

### The reflective loss principle and claims by creditors of the company

**198**  The discussion above indicates that the reflective loss principle as stated in *Prudential* is a flimsy foundation on which to build outwards into other areas of the law, and particularly when it is sought to be deployed in

H  answer to Marex's claim in the present case.  Marex was not a shareholder in the Companies, but their creditor.  In my view this means that there is even less reason for saying that its interest in obtaining recovery directly from Mr Sevilleja should be eliminated by virtue of the fact that the Companies also have claims against him.  A creditor of a company has not

© 2020 The Incorporated Council of Law Reporting for England and Wales

chosen to be in a position where he is required to follow the fortunes of the
company in the same way as a shareholder. Subject to the company having
sufficient assets, whether the creditor gets paid or not does not depend on
the decision of the directors, as payment of a dividend to a shareholder
does: when armed with a court judgment the creditor can execute it against
the assets of the company. Moreover, there is a clear mechanism available
to meet the problem of possible double recovery against the defendant
in respect of the loss suffered by Marex and the loss suffered by the
Companies. To the extent that Marex sues Mr Sevilleja and obtains
recovery from him for the judgment sum, Mr Sevilleja can be subrogated to
Marex's rights against the Companies or allowed a right of reimbursement
in respect of them.

199   If Marex's debtor had been an individual and Mr Sevilleja had
stolen all his assets with a view to preventing him paying the debt due to
Marex, it would be possible for Marex to bring an *OBG* claim against him,
in line with the part of the judgment of Knowles J which is not under appeal.
Also, in line with that part of the judge's judgment, Marex would arguably
have been able to bring a *Lumley v Gye* claim against him. By his tortious
actions, Mr Sevilleja would have made himself, in a practical sense, jointly
and severally liable with the individual debtor in respect of the amount of the
unpaid debt and Marex could sue either or both of them. Marex would not
be required to sue the individual debtor to make him bankrupt and then seek
to procure his trustee in bankruptcy to pursue Mr Sevilleja in the hope that a
recovery would eventually lead to it receiving a dividend in the bankruptcy
(after deduction of the trustee's fees). Mr Sevilleja's torts in respect of
Marex would create a direct nexus between them of such force that Marex's
rights against him would not have to be postponed behind any proof in
the individual debtor's bankruptcy in this way.

200   To the extent that the individual debtor or Mr Sevilleja paid the
money due, Marex would have to give credit in pursuing the other. To the
extent that Mr Sevilleja paid Marex a sum representing money owed
by the individual debtor (which he would have had to pay Marex had
Mr Sevilleja not stolen all his assets), the justice of the case would require
that the individual debtor should give credit for that when suing Mr Sevilleja
in relation to the theft. In my view, this outcome could readily be achieved in
a case involving an individual debtor.

201   The question which arises, therefore, is whether the fact that
Marex's debtor is a company rather than an individual should make any
difference. In my view, there is no good reason why it should.

202   Mr Sevilleja's position would be protected if Marex assigned its
rights against the Companies to him, to the extent any payment he made
to Marex was in respect of the debts owed. Alternatively, if by making
payment in respect of the Companies' debts to Marex Mr Sevilleja was able
to discharge them, he would have a right of reimbursement against the
Companies, as they are the primary obligee in respect of the debt obligations:
*Moule v Garrett* (1872) LR 7 Ex 101; *Duncan, Fox & Co v North and South
Wales Bank* (1880) 6 App Cas 1, 10 per Lord Selborne LC; *Goff & Jones,
The Law of Unjust Enrichment*, 9th ed (2016), paras 19-19–19-21. If
Mr Sevilleja seeks to compromise Marex's claim, he could make it a term of
their agreement that he takes an assignment of Marex's rights as creditor.
Absent such agreement, a court ruling on Marex's claim against him could

A    impose as a condition for the grant of relief that Marex should assign its rights to him to an appropriate extent or that it should acknowledge his payment as discharging the debt to that extent, thereby bringing into effect a right of reimbursement in favour of Mr Sevilleja pursuant to *Moule v Garrett*.

203    Even if these mechanisms were not pursued and payment by Mr Sevilleja did not discharge the debts of the Companies, in my view Mr Sevilleja would have a right to be subrogated to an appropriate extent to the rights of Marex as against the Companies. In my opinion, this would in fact be the simplest and most appropriate solution. Subrogation is a flexible equitable remedy which would be available in this case for basic reasons of equity and natural justice similar to those which underlie the rule in *Moule v Garrett*, in order to ensure that neither the Companies (if Marex did not sue them on the debts) nor Marex (if it did sue them on the debts) would receive a windfall enrichment by virtue of the payment by Mr Sevilleja of the judgment sum or part thereof: see *Banque Financière de la Cité v Parc (Battersea) Ltd* [1999] 1 AC 221 and *Swynson Ltd v Lowick Rose llp (formerly Hurst Morrison Thomson llp)* [2018] AC 313, paras 18–19, per Lord Sumption JSC; and *Mitchell & Watterson*, *Subrogation Law and Practice* (2007), paras 1.01–1.03, 1.07 and 1.08.

204    Again, the decision of the High Court in *Gould v Vaggelas* 157 CLR 215 provides a helpful illustration. The case was concerned with a situation in which a company owed money to creditors (who happened to be shareholders, but who sued the defendants relying on their capacity as creditors of the company), which the company had been prevented from repaying by reason of losses suffered as a result of a deceit practised on it by the defendants. As Brennan J put it at p 253: "The [claimants'] loss is the loss suffered by a creditor of the company which, apart from its cause of action in deceit, is worthless". The position was in my view analogous to that in the present case. The High Court held that the claimants were entitled to sue the defendants to vindicate their personal rights in respect of the loss suffered by them as a result of the failure of the company to repay the loans. The justices who directly considered the question of what would happen if the defendants paid the claimants the equivalent of the money owed to them by the company while claims against the defendants by the company remained on foot were clear that the justice of the case would require that the claimants could not take the benefit of sums which the company might later be able to repay: see p 246 per Wilson J and pp 258–259 per Brennan J. Gibbs CJ at p 229 referred to the possibility of there being a right of subrogation for the defendants should the company later be able to pay back the loans.

205    The most considered discussion was that by Brennan J, who observed that since satisfaction of the claimants' judgment against the defendant would not discharge the company from liability for the company's debt, a right of reimbursement under the principle in *Moule v Garrett* would not arise; but said that the defendant would be subrogated to the claimants' rights against the company in respect of the loans (p 259). Save that, as indicated above, I think there would be ways in which the principle in *Moule v Garrett* might be brought into operation, I agree with Brennan J's analysis.

© 2020 The Incorporated Council of Law Reporting for England and Wales

206   Turning to address the four considerations identified by Flaux LJ at para 32 of his judgment, this time in the context of liability in respect of a claim by a creditor of a company, I do not consider that they justify excluding Marex's claim against Mr Sevilleja, even if (contrary to my view above) they might have force in respect of a claimant shareholder's claim. Point (i) (the need to avoid double recovery) is satisfied by recognising that Mr Sevilleja will have a right to be subrogated to Marex's right of action against the Companies, to the extent that he makes a payment referable to the debts they owe Marex.   Point (ii) (absence of causation, because the claimant's rights depend on the company's decision) has no force, because Marex's right to seek payment from the Companies had already accrued and was not dependent on a choice to be made by the Companies.  Mr Sevilleja's wrongdoing clearly caused loss to Marex because it prevented Marex from being able to execute a judgment in respect of the judgment sum against the Companies' assets.   Point (iii) (avoidance of conflicts of interest and discouraging settlements by the company) similarly has no force.   The Companies were obliged to pay Marex to satisfy its accrued rights against them, so it was out of the hands of their directors and not a matter of discretion whether they should do so or not.   If the liquidator of the Companies seeks a compromise of their claims against Mr Sevilleja, it is open to Mr Sevilleja to bargain for protection against double liability if Marex is also successful in obtaining payment from him.   Point (iv) (preservation of company autonomy and avoidance of prejudice to minority shareholders and other creditors) also cannot justify dismissing Marex's claim.   The Companies have no autonomy to exercise as regards the debt claim against them, and have no right or power of control in respect of Marex's own property in the form of its rights of action against Mr Sevilleja. If the Companies had been insolvent at the time of Mr Sevilleja's wrongdoing so that, but for his actions, Marex would only have received, say, 50% of the value of what was due to it, its claim for damages against Mr Sevilleja would be limited to that amount.   It is not apparent that minority shareholders or other creditors of the Companies would suffer unacceptable detriment from allowing Marex to proceed directly against Mr Sevilleja.   In any event, as explained above, there is no rule which governs the order in which people can seek to vindicate their rights against others; and even less than in the case of a shareholder can it be said that an ordinary creditor of a company has undertaken not to seek to enforce his rights against the wrongdoing defendant in order to safeguard the interests of the shareholders and other creditors of that company.

207   There is an additional consideration in respect of point (iv) which arises on the facts of this case which I should mention, albeit I prefer to state the reasons why Marex's appeal should succeed in more general terms.   It appears that Mr Sevilleja is very wealthy and both for that reason and because there is no indication that the liquidator proposes to pursue the Companies' claims against him, it does not seem that there is any real risk that the creditors of the Companies will in fact find themselves less well off if Marex's claim against him is allowed to proceed than they would otherwise have been.

208   There is support from Lord Millett's speech in *Johnson* (at [2002] 2 AC 1, 66G–67C, quoted above) for Mr Sevilleja's submission that the reflective loss principle precludes a claim against him by Marex, as a creditor

[2020] 3 WLR                                     Marex Financial Ltd v Sevilleja (SC(E))
                                                                    Lord Sales JSC

A   of the Companies, in respect of loss suffered by Marex as a result of the
    non-payment by the Companies of the judgment sum.  Lord Bingham also
    arguably provides implicit support for Mr Sevilleja's submission, in that he
    struck out Mr Johnson's claim under head (3) for payments which the
    company would have made into a pension fund for his benefit.  It seems that
    these would have been discretionary, non-contractual payments for
    Mr Johnson's benefit as part of his remuneration, not payments by way of
B   dividend.  Lord Bingham did not suggest that it would make a difference
    if these payments constituted remuneration to which Mr Johnson was
    contractually entitled.

    209   There is also support for Mr Sevilleja's submission in the judgment
    of Neuberger LJ in *Gardner v Parker* [2004] 2 BCLC 554, with which
    Mance LJ and Bodey J agreed.  The case concerned the claim of a company
C   (BDC), as assigned to the claimant in the proceedings, against its sole
    director, Mr Parker.  BDC's principal assets were a 9% shareholding in
    another company, S Ltd (of which Mr Parker was also the sole director and
    in which he held 91% of the shares), and a debt of £799,000 owed to BDC by
    S Ltd.  The claimant alleged that, in breach of the fiduciary duties he owed to
    BDC and S Ltd, Mr Parker procured the sale by S Ltd of its principal asset at
    an undervalue to another company in which Mr Parker had an interest; that
D   his purpose in doing so was to extract from S Ltd its most valuable asset to
    the detriment of BDC or to damage BDC; and that as a consequence of the
    sale S Ltd became insolvent.  It was pleaded that, as a consequence, the value
    of BDC's 9% shareholding in S Ltd was reduced to nil and the value of the
    loan due from S Ltd was also reduced to nil.  Neuberger LJ held that the
    losses claimed by BDC in its capacity as creditor of S Ltd were caught by
E   the reflective loss principle, as were BDC's claims in its capacity as
    shareholder in S Ltd, with the result that it could not claim in respect of
    them: paras 35 and 67–75.  Neuberger LJ relied on the speeches of Lord
    Bingham and, in particular, Lord Millett in *Johnson*.  Proceeding on the
    basis of the reasoning in those speeches, Neuberger LJ observed that there
    was no logical reason why the reflective loss principle should not apply to
    a shareholder in his capacity as a creditor of the company and added that
F   "it is hard to see why the [reflective loss principle] should not apply to a
    claim brought by a creditor (or indeed, an employee) of the company
    concerned, even if he is not a shareholder" (para 70).   According to
    Neuberger LJ, the creditor would not be without remedies; he "can put the
    company into liquidation (if that has not already happened) and can either
    fund a claim by the liquidator against the defendant or, as Mr Gardner did
G   in relation to BDC, he can take an assignment of the company's claim"
    (para 74).  Neuberger LJ observed that the arguments for the claimant
    were more consistent with the approach in *Christensen v Scott*, but that
    decision had been disapproved in *Johnson*.  Accordingly, in his view,
    although the claimants' arguments were "not without force, although not
    without difficulties either", they could only be accepted at the highest level
    if it was thought appropriate to reconsider the reflective loss principle
H   (para 75).

    210   The Court of Appeal in the present case followed these authorities
    in respect of Marex's claims, based as they are on its being a creditor of the
    Companies.  In this court, it is open to us to re-examine them from the point
    of view of principle, rather than to treat them as binding authority.

© 2020 The Incorporated Council of Law Reporting for England and Wales

326
**Marex Financial Ltd v Sevilleja (SC(E))**                    [2020] 3 WLR
**Lord Sales JSC**

A

211   In my judgment, the foundation in the reasoning of Lord Bingham and Lord Millett regarding the reflective loss principle in respect of shareholder claimants is not sustainable. I would not follow *Johnson* in so far as it endorsed the reflective loss principle identified in *Prudential* in relation to claims by shareholder claimants. But even if the principle is to be preserved in relation to such claimants, the questionable nature of the justification for it means that it is appropriate for this court to stand back and ask afresh whether it can be justified as a principle to exclude otherwise valid claims made by a person who is a creditor of the company. We are not trapped by *Prudential* and the speeches of Lord Bingham and Lord Millett in *Johnson* in the way in which the Court of Appeal in *Gardner v Parker* felt that it was bound by their reasoning. For the reasons given above, I would hold that the reflective loss principle, if it exists, does not apply in the present case.

B

C

*The exception in Giles v Rhind*

212   In view of my conclusion that the reflective loss principle does not apply in this case, the question regarding the ambit of the exception to that principle which was identified in *Giles v Rhind* [2003] Ch 618 does not arise. However, it is worth pointing out that the exception was identified in an effort to achieve practical justice against the backdrop of an assumption that the reflective loss principle stated in *Prudential* was valid. If *Prudential* is held to lay down a bright line rule of law deeming reflective loss not to be a loss, whatever the true position on the facts, and that bright line rule is endorsed, cases such as *Giles v Rhind*, exemplifying the dissonance between the rule and practical justice on the facts, will continue to arise. This will put pressure on the acceptability of the rule itself.

D

E

*Conclusion*

213   For the reasons set out above, I would allow Marex's appeal and permit it to proceed with its *OBG* claim and *Lumley v Gye* claim directly against Mr Sevilleja.

F

*Appeal allowed.*

Colin Beresford, *Barrister*

G

H

© 2020 The Incorporated Council of Law Reporting for England and Wales