# IN THE GRAND COURT OF THE CAYMAN ISLANDS

## FSD CAUSE NO. 125 of 2012

BETWEEN



**TEMPO GROUP LIMITED**

**and others**

plaintiffs

And

**FORTUNA DEVELOPMENT CORPORATION**

**and others**

defendants

Mr. M. Green, QC instructed by
Mr. M. Imrie & Ms. L. Kuehl
of Maples & Calder for the Plaintiffs

Mr. R. Hacker, QC & Mr. R. Fisher instructed by
Mr. P. McMaster, QC & Ms. A. Gilbert
of Appleby for the Defendants

Henderson, J.

Trial: September 1 − 5, 8 − 12, 15 − 19, 22 − 23, 30; October 1 − 3; November 26 − 28;

   December 1 − 2, 2014

Judgment: March 31, 2015

*150331 Tempo v Fortuna Judgment*

**EXHIBIT**

**18**

exhibitsticker.com



**JUDGMENT**

**Contents** Page

1. Pleadings................................................................................................3

2. Evidence of Dr. Chen Ching Chih...........................................................6

3. Evidence of Chen Chao Hon.................................................................37

4. Evidence of Randy Chen......................................................................40

5. Evidence of Philip Niu.........................................................................41

6. Evidence of Lawrence Ting...................................................................54

7. Evidence of Ferdinand Tsien.................................................................55

8. Evidence of Gayle Tsien.......................................................................67

9. Evidence of Pearl Niu..........................................................................74

10. Evidence of Josephine Tsien................................................................78

11. Evidence of Albert Hsu........................................................................81

12. Evidence of Arthur Ting.......................................................................83

13. Evidence of Other Witnesses...............................................................85

14. Maxima Samoa....................................................................................88

15. Expert Evidence for the Plaintiffs.........................................................91

16. Expert Evidence for the Defendants.....................................................98

17. The Duomatic Principle......................................................................104

18. The Contract Claim............................................................................105

19. The Company Claim...........................................................................118

20. Conclusion.........................................................................................139

*150331 Tempo v Fortuna Judgment*

1. After an amicable relationship lasting many years, the three principal owners of Fortuna Development Corporation became embroiled in an acrimonious and bitter dispute which is now in its second decade of litigation. In this judgment I am to determine whether the three men agreed that Dr. Chen Ching Chih was to be guaranteed a seat on the board of directors and whether his subsequent removal from the board is valid.

## Pleadings

2. The first Defendant Fortuna Development Corporation ("Fortuna") is a Cayman Islands entity incorporated as a holding company in 1994 to hold various substantial Vietnamese investments including a power plant, a large land development and other infrastructure near Ho Chi Minh City. Its three major shareholders are holding companies owned by Dr. Chen Ching Chih ("Dr. Chen", the second Plaintiff), Mr. Lawrence Ting ("Mr. Ting") and Mr. Ferdinand Tsien ("Mr. Tsien").

3. The amended statement of claim alleges a "mutual understanding and agreement" between the three men that the Vietnamese investments "would be owned and operated as a joint venture and quasi-partnership between the three of them, and that each of them would be entitled to participate equally in the management of the venture, and that no party would be excluded from management without his consent." It is alleged that this agreement was reflected in a joint venture agreement dated September 20, 1989 between the three men and the Central Investment Corporation of



the Kuomintang ("the KMT") political party in Taiwan. The three men had agreed that each would be entitled to designate a director of a predecessor company known as CT & D Taiwan. It is alleged that when Fortuna was incorporated in February 1994 the three men, acting on behalf of their respective nominee companies Tempo Group Limited ("Tempo"), Wynner Group Limited ("Wynner") and New Frontier Development Corporation ("New Frontier"), agreed that these companies would be the registered shareholders of Fortuna. The plaintiffs say it was an express or implied term of this agreement that the personal rights and obligations of each of the three men would be accepted and assumed by the nominee companies. The result was that there came into existence an agreement between the three companies that they should "be entitled to participate equally in the management of Fortuna, and in particular to have equal representation on its board of directors, and that none of them would be excluded from the management of Fortuna without its consent".

4.      Mr. Green said in his opening that the plaintiffs do not allege a novation but assert an entirely new agreement involving Fortuna. Fortuna was operated as a "quasi-partnership in a corporate form". Dr. Chen says that he has an entitlement under this agreement to participate as Tempo's nominee on Fortuna's board of directors. He seeks an order, whether by specific performance or otherwise, requiring Wynner and New Frontier to procure his reinstatement to the board and an injunction restraining them from removing him from the board thereafter. There is also a claim in damages. When

*150331 Tempo v Fortuna Judgment*



asked at trial what role he wanted in management, Dr. Chen said "I just want to be on the board".

5.    The defendants say that the relationship between the three men was never the subject of any mutual understanding or agreement, express or implied, and never took the form of a quasi-partnership. In any event, say the defendants, if there was an agreement, Dr. Chen had repudiated that by his conduct late in 2003 and early in 2004. As for the claim in damages, the defendants say that any alleged loss is too remote, not of a kind which may be recovered, and that there has been a failure to mitigate.

6.    On June 22, 2004 an extraordinary general meeting of the shareholders of Fortuna ("the EGM") was held in Beijing. Over the objections of Dr. Chen, Mssrs. Ting and Tsien were successful in passing a series of special and ordinary resolutions which removed Dr. Chen from the board and greatly restricted his right to deal with his shares.

7.    The special resolutions could not have succeeded without the support of Maxima Resources Corporation (variously, "Maxima" and "Maxima Samoa") which owned 5% of the outstanding shares. Mr. Philip Niu ("Mr. Niu") claimed to be the sole director and owner of Maxima and sought admission to the EGM but was refused entry; he intended to support Dr. Chen and thus ensure the defeat of the special resolutions. Instead, Mr. Tsien voted pursuant to a proxy from Maxima in favour of all resolutions. The defendants say that the true beneficial owner of Maxima was Pearl Niu, Mr. Niu's

*150331 Tempo v Fortuna Judgment*

mother; that she had utilized bearer shares to give legal ownership of Maxima to Mr. Tsien and his wife; and that they had arranged for Maxima to give its proxy for the EGM to Mr. Tsien. The result, say the defendants, is that all of the special and ordinary resolutions are valid as Mr. Niu had no right to represent Maxima at the EGM. In any event, a 2011 shareholders meeting of Fortuna has ratified the impugned resolutions.

8.      The plaintiffs say that Mr. Niu, not his mother, was the beneficial owner of Maxima and its sole director. The bearer shares were not validly issued so the legal ownership of Maxima remained with Mr. Niu, its sole registered shareholder. The "issuance" of the bearer shares and the proxy to Mr. Tsien were not done in good faith. The deliberate and dishonest exclusion of Mr. Niu from the EGM rendered the meeting, and all business transacted at it, a nullity which is incapable of ratification.

## Evidence of Dr. Chen Ching Chih

9.      Dr. Chen is a citizen of Taiwan and of the United States with degrees from the Massachusetts Institute of Technology. Now 76, he has been involved in businesses in Taiwan and internationally for over 44 years. He has also acted as an advisor to the Ministry of Finance in Taiwan.

10.     The first Plaintiff, Tempo, is a company owned and controlled by Dr. Chen; it was incorporated to hold his 30% shareholding in Fortuna. The second defendant, Fortuna

*150331 Tempo v Fortuna Judgment*

East Asia Holding Corporation, was formerly known as New Frontier; it was, during the time material to this action, owned and controlled by Mr. Ting and was established to hold his 30% shareholding in Fortuna. The third defendant, Wynner, was owned and controlled by Mr. Tsien and holds his 25% shareholding in Fortuna. A fourth shareholder in Fortuna, Bates Group Limited ("Bates") (the fourth defendant) owned a 10% shareholding on behalf of Dr. Chen, Mr. Ting and Mr. Tsien equally. Finally, and crucially to the issues in this trial, Maxima, the third plaintiff, incorporated as a holding company in Samoa, owned the remaining 5% shareholding. The ownership of Maxima and the right to control it and vote its shareholding is a major issue in this case.

11. Both Mr. Ting and Mr. Tsien have passed away and have never given evidence expressly for use in this trial.

12. Fortuna has a number of subsidiaries, the most important of which are: Metropolitan Development Corporation ("MDC"), which owns indirectly the Hiep Phuoc Power Company Limited ("HPPC") in Ho Chi Minh City, Vietnam; the Tan Thuan Corporation ("TTC"), the developer of a large tract of land in the same area; and the Phu My Hung Corporation ("PMHC"), the developer of a parkway and other infrastructure in the Saigon South area near Ho Chi Minh City. The value of Fortuna and its various direct and indirect subsidiaries (collectively, "the Fortuna Group") is in excess of US $1 billion.



*150331 Tempo v Fortuna Judgment*

13.     Dr. Chen's involvement with Mssrs. Tsien and Ting commenced in relation to a predecessor company to Fortuna – CT & D Taiwan ("CT & D"). In the summer of 1989 Mr. Tsien arranged to meet with Dr. Chen in Taipei. The men had known each other since the mid-1970s. Mr. Tsien was the son-in law of Mrs. Pearl Niu; she had introduced Dr. Chen to the woman who would become his wife. Dr. Chen describes himself as a close friend of Phillip Niu, the son of Robert and Pearl Niu. Dr. Chen's father had had a long standing personal and business relationship with Mr. Robert Niu. Dr. Chen describes Mr. Tsien and the latter's wife, Josephine Tsien (formerly Niu), as "friends".

14.     Mr. Tsien explained to Dr. Chen that he and Mr. Ting were considering investing in a joint venture with the Kuomintang political party (the "KMT") for the purpose of investing in a Taiwanese investment company. That entity was already under the control of the KMT. Since Dr. Chen was not acquainted with Mr. Ting, Mr. Tsien explained that he was the son-in-law of a former Minister of Finance in Taiwan, had attended university in the U.S.A., and had returned to Taiwan to go into business. Mr. Ting had been approached by Mr. Albert Hsu, Chairman of the Central Investment Committee of the KMT and a former Deputy Premier of Taiwan, to take over the management of the investment company. The KMT would continue as the majority shareholder and would have a majority of directors on the board; it was proposed that Mssrs. Ting and Tsien and Dr. Chen would be minority shareholders and would each have a representative on the board. Mr. Tsien proposed that the three men meet with Albert Hsu, someone with whom Dr. Chen was already friendly.

*150331 Tempo v Fortuna Judgment*

15.     Not long after this first meeting Albert Hsu met with the three prospective investors in
        Taipei. Mr. Hsu proposed that the KMT would own a 75% shareholding, with Mssrs.
        Tsien and Ting each having 10% and Dr. Chen 5%. It was suggested that Mr. Ting "with
        the assistance of Mr. Tsien" would have control of the day-to-day business operations.
        Dr. Chen was to have no day-to-day role but was to be a board member of the joint
        venture company, which was to be known as CT & D Taiwan. Mr. Hsu closed the
        meeting by providing the three men with a draft joint venture contract for review.

16.     On September 20, 1989 the parties executed the joint venture agreement. It provides
        that each of the three men would be entitled to designate a director on the board of CT
        & D Taiwan. Dr. Chen says that the quasi-partnership which was created in January,
        1994 following the joint purchase by the three men of the majority shareholding in   CT
        & D Taiwan carried forward the "spirit" of the understandings and agreement
        manifested by the joint venture agreement. The defendants deny the existence of a
        quasi-partnership.

17.     In December, 1993 Mssrs. Tsien and Ting and Dr. Chen met at the American Club in
        Taipei to discuss the possibility of purchasing the KMT shareholding in CT & D Taiwan.
        Mr. Tsien told Dr. Chen that Albert Hsu had told him that the former president of
        Taiwan, Mr. Lee Teng-Hui, had requested that Dr. Chen be a shareholder and director.
        Mr. Lee and Dr. Chen were acquainted. Mr. Tsien explained that President Lee desired

150331 Tempo v Fortuna Judgment

the participation of Dr. Chen because of his independence from the KMT, his contacts in the Taiwanese business community and his personal financial resources. At the time, Dr. Chen's personal net worth was in the range of hundreds of millions of U.S. dollars. Mssrs. Ting and Tsien were both of "mainland Chinese descent" while     Dr. Chen was of Taiwanese descent; he felt this distinction was a motivating factor.

18.     Dr. Chen denies he was a passive investor in CT & D Taiwan. Although Mr. Ting and Mr. Tsien were responsible for management, Dr. Chen says he participated in decision making of a strategic nature. He held the title of Vice-Chairman. Between 1989 and 1991 he consulted with Mssrs. Ting and Tsien to determine the best location for investment. With the concurrence of Dr. Chen, they eventually settled upon Vietnam. Dr. Chen met "frequently" with Mssrs. Tsien and Ting to discuss possible investment opportunities, although the initial identification of such opportunities was "primarily" their responsibility. In his written evidence Dr. Chen said these discussions took place in the CT & D offices in Taipei but he agreed in cross-examination that this was incorrect. What Dr. Chen described as a "close working relationship" continued until early 2004. Once the three men had agreed upon a certain course of action, Mr. Ting (as board chairman) would communicate the proposal to Albert Hsu who would bring it to the entire CT & D board.

19.     Dr. Chen says that he travelled to the head offices of Fortuna's important subsidiaries once or twice per year until 2001. Beginning in 2002, he visited "more regularly". In

*150331 Tempo v Fortuno Judgment*

particular, he visited Vietnam on behalf of the Fortuna Group from time to time. On one occasion, he went there with the Chairman of the KMT (Professor Liu) and the two men jointly selected an architectural firm to design a set of plans. On another occasion Dr. Chen took the lead in acquiring a third party's 25% interest in a Fortuna subsidiary, Power JV.

20.   Around mid-November, 1993 Dr. Chen learned that Professor Liu was recommending that the Vietnamese investments (with one exception) be abandoned in favour of investment in Indonesia and in the Phillppines.  Dr. Chen met with Mssrs. Ting and Tsien; all three felt that Vietnam continued to offer good opportunities for investment. The men agreed that Dr. Chen would meet with President Lee to ask whether the KMT would be prepared to change its view.  It was also agreed that if the KMT maintained its intention to divest CT & D Taiwan of its Vietnamese investments, Dr. Chen would explore a sale by the KMT of its interest to the three men. Dr. Chen says that he was chosen to meet with President Lee because of their "close relationship". The meeting with President Lee took place at his home shortly afterwards.

21.   A few weeks later, President Lee telephoned Dr. Chen to say that the KMT would sell its shares to Dr. Chen and to Mssrs. Ting and Tsien.  Dr. Chen left the other two men to work out the details of the transaction.

*150331 Tempo v Fortuna Judgment*

22.     Around January 29, 1994 Dr. Chen met with Mssrs. Ting and Tsien at the American Club
        in Taipei to consider a draft purchase agreement. The KMT was to sell all but 10% of its
        75% interest in CT & D Taiwan to the three men. It was important that the KMT
        continue to be involved in order to maintain orderly relations with a lender. Mr. Ting
        advised Dr. Chen that the KMT would only enter into the purchase and sale agreement if
        Dr. Chen assumed personal liability for certain KMT bank loans and guarantees; he was
        also asked to issue promissory notes to cover the entire purchase price of the
        shareholding. In effect, Dr. Chen was to become the guarantor for all three of the
        partners.

23.     Dr. Chen told Mr. Tsien and Mr. Ting that he was prepared to enter into the agreement
        to purchase the KMT's interest "if we did so as equal partners". His witness statement
        continues:

            *Mr. Tsien and Mr. Ting both agreed and they confirmed that, if the
            purchase was to proceed, then our investments in CT & D Taiwan would
            be owned and operated as a joint venture and quasi-partnership between
            the three of us and that each of us would be entitled to have equal
            representation on the boards of directors of those companies and would
            not be excluded from management.*

24.     This alleged agreement between the three men in their personal capacities has been
        referred to in evidence as the "CT & D Taiwan Agreement". It was never reduced to
        writing by any of the three parties. It was agreed that Mr. Ting and Mr. Tsien would
        each acquire 20% of the KMT's shareholding and Dr. Chen would acquire the remaining

*150331 Tempo v Fortuna Judgment*

25%; the result was to be that each man would own an equal 30% interest in CT & D Taiwan.

25.     The share purchase agreement was signed on February 1, 1994.  As agreed, Dr. Chen issued promissory notes to the KMT for the full purchase price of the shareholding. Mr. Tsien and Dr. Chen were appointed co-vice-chairmen of the company.  Dr. Chen was also appointed to the boards of several subsidiaries.  As time passed, he says he became responsible for "resolving issues" between the KMT and the three partners.

26.     While the three men were discussing the buyout of the KMT's shareholding, they also considered establishing a new "tax efficient" company in which to hold the Vietnamese business interests. Dr. Chen describes their meetings as having been held "on an ad hoc basis, usually over lunch"; no written record was kept of what was said.  Mr. Tsien advised that he had received advice from Offshore Incorporations Limited ("OIL") to the effect that an offshore holding company should be created to hold the assets owned by CT & D Taiwan.  That holding company is Fortuna, the first defendant. The proposal was that CT & D Taiwan continue to manage the Group companies under a management agreement.

27.     In the first or second week of February, 1994 Dr. Chen, Mr. Tsien and Mr. Ting met at the CT & D offices in Taipei to discuss how the new holding company would be managed and controlled.  Dr. Chen's witness statement says:

150331 Tempo v Fortuna Judgment

> *Mr. Tsien told us that, because the company would simply be replacing CT & D Taiwan as the holding company for the group, he considered that the partnership arrangements that we had in place for CT & D Taiwan, governed by the CT & D Taiwan Agreement, could simply be carried over to the new entity.*

28.   In effect, because each man was entitled to participate equally in the "management" of CT & D and to have equal representation on its board of directors, it was proposed that none of the three could be excluded from the management of Fortuna or from its board without that individual's consent. Thus, each of the three families would own 30% of Fortuna and 10% would be reserved for the KMT if it decided to participate. Dr. Chen's witness statement says:

> *Mr. Tsien's proposal seemed entirely logical and both Mr. Ting and I agreed to the proposal without much discussion.*

29.   The discussion then turned to how the men would hold their investments in the new holding company. Mr. Tsien explained that he had had advice from OIL to the effect that they should establish offshore holding companies through which to own their interests. The motive was to minimize tax liability. There was some discussion about how these offshore vehicles would be established and then both Mr. Ting and Dr. Chen told Mr. Tsien that he should proceed to instruct OIL to put the plan into effect.

30.   Thus, on the evidence of Dr. Chen, there were three main elements to what has been referred to in evidence as the "Fortuna Agreement":

- Each of the three men would be entitled to equal representation on the Fortuna board of directors; and

- none of the three men would be excluded from "management" without that man's consent; and

- each of the three men would hold their shares in Fortuna in an offshore company rather than in their personal names.

31.    As was the case with the CT & D Taiwan Agreement, the Fortuna Agreement was never reduced to writing. Dr. Chen describes Mr. Ting and Mr. Tsien as being "very enthusiastic" about Dr. Chen joining the board.

32.    Fortuna was incorporated in the Cayman Islands as an exempted limited company on February 25, 1994. The articles of association, prepared by OIL, contain nothing which reflects the terms of the Fortuna Agreement. All three men were appointed to the board. The shareholdings in Fortuna were transferred to Tempo, Dr. Chen's company; to New Frontier, Mr. Ting's company; and to Wynner, the property of Mr. Tsien. As at June, 2004 Tempo owned 30% of Fortuna, New Frontier owned 30% and Wynner owned 25%. The remaining minority shareholders were Bates and Maxima. Tempo was owned by Dr. Chen, by his brother Mr. C.H. Chen and by Dr. Chen's son Randy Chen.



*150331 Tempo v Fortuna Judgment*

33.     Around January, 2002 Mr. Albert Hsu was invited to become a director and shareholder of Fortuna. This was to procure the continued involvement of the KMT in Fortuna by giving it a representative at board level.

34.     Bates was established by the three principals with the intention of inducing the KMT to take up (through Bates) a shareholding of up to 10% in Fortuna.   The original shareholders of Bates were Tempo, New Frontier, and Wynner in equal proportions.  In fact, the KMT did not take up this opportunity.

35.     The remaining Fortuna shareholder was Maxima Samoa, which held 5%.  In the summer of 1994 Mr. Tsien had told Mr. Ting and Dr. Chen that he proposed to transfer 5% of his own shareholding in Fortuna to a company owned by Phillip Niu; Dr. Chen later learned that the company was named Maxima.  Because of his close connections with Phillip Niu and with the Niu family Dr. Chen was happy to agree. Mr. Ting also agreed. Dr. Chen says that Mr. Tsien "confirmed that he would make the necessary arrangements regarding the transfer".

36.     Dr. Chen says he played a crucial role in the financing of Fortuna and its investments. He was instrumental in arranging for the KMT to agree to extend the period during which it would provide collateral for CT & D.  In 1996 each of the shareholders of Fortuna was required to make a pro rata contribution of additional capital. Mr. Ting found himself unable to do so. Dr. Chen arranged for a company under his control to loan the sum of

*150331 Tempo v Fortuna Judgment*

U.S. \$5 million to Mr. Ting; the loan was eventually repaid. In 1995 Fortuna borrowed U.S. \$40 million from a syndicate organized by First Commercial Bank Limited. Dr. Chen was one of several guarantors of Fortuna's obligation. He pledged a large and valuable shareholding. Dr. Chen says that, had Fortuna defaulted on the loan, the lender would have exercised its security rights over his shares in preference to pursuing the other guarantors. Fortuna borrowed an additional U.S. \$180 million from the same syndicate. Again, Dr. Chen was a personal guarantor and pledged a substantial shareholding as security. Again, he says that the lender viewed the shares he pledged as its primary security for the loan. In the event, the loans were repaid and the pledged shares were released. On a number of occasions, from June 1999 to April, 2002 Dr. Chen and his brother (Mr. C.H. Chen) loaned money to the Fortuna Group. These loans ranged from U.S. \$535,000 to U.S. \$10,500,000. They were to provide short term financing to Fortuna at a time when it was growing slowly and still required capital.

37.   In 2003, Dr. Chen, Mr. Ting and Mr. Tsien began to discuss bringing the next generation of members of their respective families into the business. Dr. Chen's son, Randy Chen; Mr. Tsien's daughter, Gayle Tsien; and Mr. Ting's son, Arthur Ting; were appointed to the board of directors. The gist of the discussion between the three principals was that each of them would introduce one successor onto the board. The three members of the next generation, together with Albert Hsu, attended their first board meeting as directors on January 16, 2004.

38.     Loans obtained from the First Commercial Bank Limited syndicate (referred to in evidence as the "MDC facility") required the pledging of shares by Dr. Chen and his brother, Mr. C.H. Chen. By 2001, Mr. C.H. Chen had become increasingly concerned about his conditional liability. He said to Dr. Chen that he wanted Mr. Ting and Mr. Tsien to agree in writing to a list of key corporate actions which they would not take without the approval of Dr. Chen and his brother. Mssrs. Tsien and Ting agreed. On July 4, 2001 a written agreement was executed by the three partners in their personal capacity and by Tempo, New Frontier and Wynner. This has been referred to in evidence as the "Shareholders Agreement". A recital in the agreement sets out its purpose: "to procure that C.H. Chen will cause the guarantees to be extended or renewed..." Dr. Chen's position is that the terms of the Shareholders Agreement were not intended to affect in any way the much earlier Fortuna Agreement upon which his claim is based.

39.     By mid-2002 Fortuna was beginning to make a profit. In particular, the real estate market in and around Ho Chi Minh City was very buoyant. Fortuna had not been paying dividends but Mssrs. Ting and Tsien now wanted to change that. Mr. Ting suggested to Dr. Chen that U.S. $20 million should be paid out to the shareholders. Dr. Chen agreed although he had no immediate need for the money. Mr. Ting told Dr. Chen that it was "extremely important" to himself and to Mr. Tsien that a dividend be paid. Fortuna's lenders agreed to the dividend.

40.     Shortly after, Dr. Chen met with Jessie Hsu, the Chief Financial Officer of CT & D Taiwan and of Fortuna. Jessie Hsu presented a memorandum and supporting documents to, as he said, help explain the accounting aspects of the dividend payment. Dr. Chen found the material puzzling and troubling. The memorandum said that the sum of U.S. $5 million "will be used to cancel out the amount receivable" without presenting any explanation of how or in what circumstances this receivable had come into existence. It went on to say that the remaining U.S. $15 million "will be distributed to the three shareholders in equal shares." However, there were five shareholders not three. A line item in a table referred to U.S. $15 million as "other expenses". A note beside it said "deduct U.S $5 million each time from dividends distributed - 3 deductions in total." There were some cryptic notations beside the U.S. $15 million line item which in total amounted to U.S. $13.7 million but the circumstances in which these purported liabilities had been occurred were not revealed.

41.     Dr. Chen says that he raised many "questions" with Jessie Hsu but the latter said only that he was not in a position to answer them. He directed Dr. Chen to speak with Mssrs. Ting and Tsien. Shortly afterwards, Dr. Chen did meet with Mr. Ting but the latter said he would need to arrange another meeting at a later stage to discuss these questions. In the meantime, the formal board resolution authorizing the U.S. $20 million dividend was passed; the resolution makes no reference to the U.S. $5 million deduction. In the result, Tempo received significantly less than Dr. Chen believed was its entitlement.

*150331 Tempo v Fortuna Judgment*

42.    Dr. Chen says that he tried to speak with Mr. Ting and with Mr. Tsien about the confusing information presented to him by Jessie Hsu and about the U.S. $5 million deduction but they always "claimed" that they were unable to meet or unable to answer the questions. As a result, Dr. Chen's confidence in his partners began to evaporate.

43.    Gayle Tsien, who has acted as Fortuna's Vice-President of Finance, has examined the company records. She says that the amounts owed to Fortuna by its shareholders are recorded properly and that Dr. Chen has always been at liberty to examine these accounts. The accounts have been audited by KPMG without adverse comment.

44.    In December 2002 Mr. Ting and Dr. Chen travelled to Hanoi to meet with the Deputy Minister of Finance for Vietnam. A subsidiary in the Fortuna Group, PMHC, considered that it had an agreement to be taxed at an overall rate of 10%. When certain building permits were issued to it they stipulated that the tax rate on profit would be 25%. At the time, PMHC did not protest but the purpose of the meeting was to ask the government to reinstate the lower rate. During the meeting, the Deputy Minister of Finance suggested a compromise – the applicable rate should be 18%. Dr. Chen was about to accept this offer on behalf of Fortuna when Mr. Ting stopped him and told the government official that he and Dr. Chen would have to discuss the offer.



150331 Tempo v Fortuna Judgment

45.    After they had left the meeting and returned to their hotel, Mr. Ting, according to Dr.
       Chen, explained that they did not have to accept the 18% offer because an arrangement
       had already been made with other officials to reduce the tax rate back to the original
       10%. Dr. Chen says that Mr. Ting said that he had arranged for a payment of U.S. $10
       million to people connected with the Vietnamese government – in essence, a bribe of
       mammoth proportions.  Dr. Chen says he was stunned.  He asked Mr. Ting where the
       U.S. $10 million was coming from because he had seen no reference to it in the monthly
       financial reports.  Mr. Ting did not answer this question but said he would discuss it
       when they arrived back in Taiwan.

46.    After hearing from counsel at a case management hearing, I have ruled that the
       question of whether bribes were paid or money was misappropriated from Fortuna will
       not be resolved in this trial. The evidence of bribery or misappropriation is of limited
       relevance; it serves only to explain what Dr. Chen believed in 2003 and 2004 and thus
       provide an explanation for his actions at that time. It also serves to explain why Mssrs.
       Ting and Tsien wished to remove Dr. Chen from Fortuna's board; they would have been
       motivated to remove him whether his allegations were true or false. A determination of
       whether bribes were actually paid or money was truly misappropriated is simply
       unnecessary.

47.    From this point on, Dr. Chen began to take a much more active interest in the affairs of
       Fortuna and its subsidiaries. He travelled to Vietnam in December, 2002 in search of

*150331 Tempo v Fortuna Judgment*

information about some of the "other expenses" to which Jessie Hsu had referred. He visited the offices of SPCC, a major component of the Fortuna Group, requested access to certain business records and accounts, and formed the conclusion he was being put off.

48.     Upon Dr. Chen's arrival back in Taiwan, Mr. Tsien raised with him the possibility of another dividend payment. Dr. Chen was reluctant. The proposed dividend payment was U.S. $25 million, a figure which seemed inordinately high. At a meeting between the three partners Mr. Ting said that he thought that U.S. $10 million of the proposed dividend should be withheld to pay for certain "extraordinary expenses" of Fortuna. Dr. Chen had no knowledge of these extraordinary expenses and suspected that the deduction was linked to the alleged bribes to which Mr. Ting had referred a short time previously. Dr. Chen asked Mr. Ting to elaborate but found the explanation unclear. When Mr. Ting promised to provide full details of the extraordinary expenses Dr. Chen acquiesced in the declaration of the U.S. $25 million dividend. The sum of U.S. $10 million was withheld from the shareholders as Mr. Ting had suggested.

49.     Towards the end of December, 2002 Dr. Chen questioned Mr. Ting about the alleged bribes to Vietnamese officials. Dr. Chen has said in evidence that, by this point, he was "convinced" that no bribes had actually been paid; he considered the suggestions of bribery to be a way to explain what were actually misappropriations by Mssrs. Ting and Tsien. He quotes Mr. Ting as saying that U.S. $5 million had been paid directly to several

*150331 Tempo v Fortuna Judgment*

Vietnamese officials and the remaining U.S. $5 million had been deposited into a Swiss bank account. When Dr. Chen asked for the information regarding the "extraordinary expenses", Mr. Ting said that staff members were compiling the information and it would be provided to Dr. Chen in due course.

In January, 2003 Dr. Chen met with Mr. Tsien to pose to him the same questions he had asked earlier of Mr. Ting. Mr. Tsien responded that the matters under discussion were "very confidential" and that Dr. Chen should trust his partners to make the right decisions but "should not have been involved in any details".

51.    Around January, 2003 Mr. Jessie Hsu gave to Dr. Chen a table entitled "Northern Office Expenses". This table suggests that substantial cash payments were being withdrawn from CT & D Taiwan and from Warson, another group company, and then booked as "receivables" against the interests of the three main shareholders. Fortuna's financial statements make no reference to these receivables. The table suggests that payments totaling U.S. $14.475 million were made between May 2000 and November 2002. Neither the purpose of the payments nor the recipients are stated. The reference to the "Northern Office" is not explained. Dr. Chen speculated that it was a reference to the Fortuna group office in Hanoi. After receiving this document Dr. Chen says that he pressed Mr. Tsien for information about it on several occasions. Eventually, according to Dr. Chen, Mr. Tsien said in effect that the payments listed in the table were illegal;

they were "public relation expenses" and Dr. Chen should not enquire into the detail. Dr. Chen was dissatisfied and determined to investigate further.

52.     On April 28, 2003 a further dividend of U.S. $20 million was declared by Fortuna. Only U.S. $15 million was paid out to the shareholders. On August 14, 2003 Fortuna declared a dividend in the amount of U.S. $15 million. No deduction was taken from the dividend on this occasion. Again, on December 5, 2003, a dividend was declared – this time in the amount of U.S. $10 million. The board chairman (Mr. Ting) was authorized to set a time for distribution of the dividend; it was never distributed. Dr. Chen alleges that this latter "dividend" was, according to Mr. Ting, to be used to fund the payment of bribes to Vietnamese officials in order to resolve the tax issue. Dr. Chen says that Mr. Ting told him the money had already been paid out.

53.     In 2003 Dr. Chen made nine trips to Vietnam to try, as he said, to gain a better understanding of the operations of the main Vietnamese subsidiaries and to "try to investigate from where the source of funds for Mr. Ting's claims about bribery could be". Mr. Ting "assigned" a friend of his, General Zhang, to accompany Dr. Chen in Vietnam. Dr. Chen formed the view that both Mr. Ting and General Zhang were obstructing and frustrating his enquiries.



150331 Tempo v Fortuna Judgment

54.     Randy Chen was working at the offices of a Fortuna subsidiary in Vietnam in 2003. He
        has described in evidence the delivery of a large sum of cash to a Vietnamese official.
        Dr. Chen said that his son told him of this incident when it happened.

55.     In October 2003 at a Fortuna directors meeting Dr. Chen says that Mr. Ting told those
        present that he hoped the tax rate dispute would be resolved soon because of the
        payment of U.S. $10 million in bribes. Again, Dr. Chen asked for information about the
        source of funding and why the payment was necessary and, again, was told that the
        issue was sensitive and that he did not need to know anything more. Arthur Ting and
        Gayle Tsien, who were present, deny that any such conversation occurred.

56.     Towards the end of 2003 Mr. Ting provided a copy of a letter to Dr. Chen which was
        written in code. Dr. Chen says that Mr. Ting said that the document confirmed that
        bribes of U.S. $5 million and U.S. $2 million to certain named officials. Dr. Chen was
        skeptical about this explanation. He did not think the payment of such sizable bribes
        was consistent with his knowledge of business practices in Vietnam. He said in his
        witness statement:

        *What seemed more likely to me was that Mr. Ting and Mr. Tsien were
        using the excuse of paying bribes to cover up the fact that they were
        extracting more money from the group than they were entitled to. By
        referring to bribery and corruption of such senior officials, I believe they
        were hoping to deter me from investigating the accounting irregularities.*

Arthur Ting has examined the letter and says that it is not in his late father's handwriting

and, in any event, the translation of it in evidence is inaccurate. Gayle Tsien points out

*150331 Tempo v Fortuna Judgment*


that the "letter" is labeled a "draft", which seems an odd status to confer upon a document purporting to record payments already made.

57. Shortly after receiving the coded letter from Mr. Ting, Dr. Chen showed it to Mr. Tsien. Dr. Chen says that Mr. Tsien confirmed that the letter reflected his own understanding of the situation.

GRAND COURT · CAYMAN ISLANDS

58. Dr. Chen's evidence makes reference to a number of other entries in the books and records of Fortuna group which appeared irregular. By the end of 2003 Dr. Chen began to share his concerns with other trusted colleagues. He discussed the situation with his brother, with Mr. Albert Hsu and with Mr. Philip Niu. Mr. C.H. Chen wrote to Mr. Ting in January seeking details of the extraordinary expenses.

59. A board meeting of Fortuna was scheduled for February 23, 2004. Before the meeting, a preliminary meeting took place between Dr. Chen, Mr. C.H. Chen, Mr. Ting, Mr. Tsien and Mr. Albert Hsu. Dr. Chen says that Mr. Ting told those present that the extraordinary expenses were illegal payments in the form of bribes to Vietnamese officials. He said they had been recorded in Warson's accounts and those of other subsidiaries as "receivables". Dr. Chen says that Mr. Ting then presented a list of 80 payments allegedly made to various government officers and authorities between 2000 and 2003. He allegedly said that all of the payments had been approved by Mr. Tsien

and by himself. Mr. Tsien was silent throughout. Dr. Chen alleges that Mr. Ting then wrote on a blackboard the names of four Vietnamese government agencies and explained to whom each of the various sums had been paid. Dr. Chen took notes, which are in evidence. Again, all allegations of bribery and misappropriation are denied by the defendants and by their witnesses. Dr. Chen himself did not believe the allegations.

60.     At the ensuing board meeting Dr. Chen, at his own initiative, was appointed to "oversee finance matters". The actual resolution reads:

> *within the function of the board of directors, Dr. C.C. Chen shall oversee finance matters.*

Arthur Ting and Gayle Tsien, who were present, assert that the resolution was not intended to give Dr. Chen any rights in relation to subsidiaries; his entitlement was confined to Fortuna itself.

61.     Subsequently, there was a dispute about whether the intention of this resolution was to permit Dr. Chen access to books and records of the Fortuna Group subsidiaries.   Mr. Tsien advised Dr. Chen that Gayle Tsien, the Chief Financial Officer of CT & D Taiwan, would supply the information requested. Subsequently, Mr. C.H. Chen reported to his brother that he had been told by Gayle Tsien that most of the requested documentation had been destroyed (and some was stored in Kuala Lumpur and required review before Dr. Chen would be permitted access). This bit of news triggered a written demand by Dr. Chen for all of the records and for recognition of his right to approve all transactions

*150331 Tempo v Fortuna Judgment*

over U.S. \$100,000 including expenses exceeding that amount, among other things. Gayle Tsien denies that any of this came about for the purpose of preventing Dr. Chen from seeing the records.

62.     In April, 2004 Dr. Chen met with Mr. Ting and Mr. Tsien and again demanded access to the records concerning the receivables and the extraordinary expenses. Mr. Tsien replied that the books and records had been sent to Malaysia for "safekeeping". Dr. Chen says there was no good reason for that.

63.     Dr. Chen now instructed his attorneys in Hong Kong (Holman, Fenwick and Willan) to send a formal letter of demand to Fortuna for payment of Tempo's outstanding dividends and an accounting. The letter was not answered. On April 29, 2004 Holman's advised Fortuna and CT & D Taiwan that Fortuna had instructed attorneys in the Cayman Islands and Taiwan to commence legal proceedings.

64.     As of May, 2002 the MDC Facility was secured by, among other things, personal guarantees from Dr. Chen and Mr. C.H. Chen. Dr. Chen was experiencing doubts that the value of the underlying assets held as security for the facility could satisfy the indebtedness. He believed that the lenders would prefer to exercise their rights under the personal guarantees rather than try to realize assets in Vietnam. Moreover, since Mr. C.H. Chen was not a shareholder, he was receiving no benefit from the substantial dividends which had been declared. Those considerations led to discussions between

*150331 Tempo v Fortuna Judgment*

the three principals and Mr. C.H. Chen, who wished to be removed as a guarantor. The First Commercial Bank (the lead bank in the syndicate) said towards the end of 2003 that Mr. C.H. Chen's guarantee could be extinguished if all of the other lenders agreed. All but one did so.

65.    By early 2004, Dr. Chen had formed the view that he and his brother needed to be released from their guarantees. In light of his good relationship with the lenders, he felt he could induce them to encourage Mssrs. Ting and Tsien to co-operate with Dr. Chen and resolve their differences. Dr. Chen did not believe that any of the lenders would declare an act of default simply by his approaching them to discuss his current difficulties. He says that in none of his conversations with the lenders did he allude to fraudulent conduct or bribery.

66.    There is an attendance note of a meeting between Dr. Chen and his attorney on March 27, 2004 over which privilege has been waived. The note reads in part:

>    *(1)    The objective ultimately is to force out Dr. Chen's two co-investors, Mr. Tsien and Mr. Ting.*
>    *(2)    Then insert professional management.*
>    *(3)    Alternatively, if they can raise the finance, they can buy him out.*
>    *(4)    He believes that Mr. Tsien and Mr. Ting – who are the executives in the Company – are stealing from him.*

67.    In his oral evidence, Dr. Chen said that he wanted to force Mssrs. Ting and Tsien out of "management" but not force them off the board of directors.

68. On April 19, 2004 Dr. Chen's Taiwanese attorneys wrote to First Commercial Bank stating that it had "violated the loan agreement" by applying certain monies to pay down the principal. The letter also alleged that Fortuna was "suspected of falsely using loan borrowing to pay out cash dividends." The loan agreement contained terms constraining the ability of certain Fortuna subsidiaries from increasing their indebtedness. The letter also alleged that Fortuna "is suspected to have cause [sic] [a subsidiary] to increase new borrowings". Dr. Chen's attorneys said that since Dr. Chen had not acquiesced in these violations he intended to terminate his guarantee effective June 1, 2004.

69. Dr. Chen says that he did not intend to prejudice Fortuna's rights under the loan agreement. He conceded that at least one of his approaches to the lenders amounted to an act of default but said he "knew" that the loan would not be called as the lenders considered it secure.

70. In a letter dated April 29, 2004 the First Commercial Bank denied breaching the agreement and refused to accept a release of the personal guarantees. Dr. Chen's Taiwanese attorneys replied to the bank by letter dated May 12, 2004. This latest letter repeats the earlier allegations in somewhat more detail and then notes pointedly that when a guarantor requests a release of his guarantee "this would constitute an event of default and all the lenders may immediately take legal or other action". The letter then repeats a request for release of the guarantees. Somewhat ingenuously, Dr. Chen says

*150331 Tempo v Fortuna Judgment*



in his evidence "of course, we did not want this to happen, and nor did we think it would happen". His goal was to induce the syndicate banks to pressure Mssrs. Ting and Tsien to resolve their differences with Dr. Chen. In the event, the lenders neither treated the request as an act of default nor sought to pressure Dr. Chen's two partners. The guarantees were not released. Nonetheless, Dr. Chen said in evidence that "I felt that progress was being made ..." The syndicate did impose some additional terms upon Fortuna in relation to the distribution of dividends and timing of loan repayments.

71.    Before June, 2004 both board meetings and shareholders meetings of Fortuna had been arranged informally and by a consensus of the three men. They were usually held in Taipei at a mutually convenient time. In May Mr. Ting and Mr. Tsien decided to convene a board meeting to be held in Beijing on June 2, 2004. Taiwanese citizens require special visas for travel to Beijing, which can take over a week to obtain. A formal written notice of the meeting dated May 21, 2004 was mailed from a Fortuna subsidiary in Vietnam to Dr. Chen's address in Taipei. It came to his notice around May 28th while he was in the United States. Both the date and the location were inconvenient, as was the short notice. Contrary to the earlier practice, the notice did not identify the resolutions which would be proposed at the meeting. Dr. Chen requested that the meeting be put off to another time but this was refused. Despite requesting them, Dr. Chen did not receive a copy of the minutes of this meeting until the discovery phase of this action. Those present at the board meeting resolved to convene an extraordinary general meeting of Fortuna shareholders "within the next three months on such a date as is

*150331 Tempo v Fortuna Judgment*

determined appropriate by the chairman of the board [Mr. Tsien] or the chairman of this meeting [Mr. Ting] each acting individually." Because of the short notice, neither Randy Chen nor Albert Hsu attended the meeting.

Several days after the board meeting, Dr. Chen asked Mssrs. Ting and Tsien for a renewal of the 2001 Shareholders Agreement for an indefinite period of time. They refused. On June 17, 2004 Tempo issued proceedings in this Court (Cause No. 291 of 2004) against Fortuna seeking recovery of Tempo's unpaid share of the declared dividends.

73.    On June 18, 2004 Dr. Chen sent an email to Gayle Tsien and Phillip Niu suggesting that a Fortuna shareholders meeting be held on June 30, 2004. He received a reply from Gayle Tsien on June 20th, when he learned for the first time that an extraordinary general meeting of shareholders was planned for June 22nd in Beijing. She advised Dr. Chen of the place and time of the EGM. She did not advise him of the agenda or of the proposed resolutions. Formal notice of the EGM had been sent to Tempo's registered address in the British Virgin Islands (as is required by the Fortuna articles of association) but, in the past, such notices have been sent to Dr. Chen's address in Taipei. When Dr. Chen asked Gayle Tsien why the notice had not been sent to him by email, she did not answer.

74.    Despite the short notice, both Phillip Niu and Dr. Chen arrived in Beijing by June 22nd. The EGM was due to start at 9:00 a.m. Dr. Chen and Mr. Niu arrived at the meeting in

*150331 Tempo v Fortuna Judgment*

the company of Mr. Paul Hatzer, an attorney representing them both, and his assistant. Dr. Chen says that there were security guards at the door to the meeting room. Dr. Chen and Mr. Hatzer were admitted to the meeting but entry was barred to Mr. Niu. Gayle Tsien explained that Maxima was already represented at the meeting because it had granted its proxy for that purpose to Mr. Tsien. When Dr. Chen and Mr. Niu asked for a copy of the proxy, Gayle Tsien said she did not have one. Inside the meeting room, Mr. Tsien produced a minute of a board of directors meeting of Maxima dated June 14, 2004 which contained a resolution appointing Mr. Tsien as Maxima's proxy.

75.   This dispute over the right to represent Maxima was crucial because its votes were needed to pass the special resolutions to be proposed at the EGM. The articles of association of Fortuna required a two-thirds majority for a special resolution. New Frontier and Wynner (the Ting and Tsien holding companies) held a total of 55% of the shares. Bates, which at this time was controlled by Mssrs. Tsien and Ting, owned a further 10%. Thus, Maxima's 5% shareholding was vital to the success of any special resolution to which Dr. Chen might be opposed.

76.   Present at the EGM were: Mr. Tsien (acting as chairman), Gayle Tsien (acting as secretary), Mr. Ting, Arthur Ting, Dr. Chen, and Mr. Hatzer. Mr. Tsien began by announcing that 100% of the shares of the company were represented at the meeting. Mr. Hatzer protested on behalf of Tempo that Maxima had been wrongly excluded from

e meeting, that Inadequate notice of the meeting had been given, and that no agenda ad been received. A copy of the agenda was then provided.

77.   The first special resolution imposed upon shareholders a requirement to seek approval at a general meeting of shareholders for any transfer of share ownership. If the members were to withhold approval, the directors were empowered to require the member in question to transfer all of his shares to a party designated by the directors. Until he complied with such a direction, the member would be deprived of any rights and privileges attaching to his shareholding. This was passed.

78.   The second special resolution made changes to the articles of association. One change dealing with "confidentiality" prohibited a member from disclosing confidential information to any third party. Another change required a member to acquire the written consent of the chairman before speaking to any government authority, to the media or to the public about anything relating to the business of the company. A third change gave a power to the directors to determine if a member had breached these obligations; if so, the directors were empowered to require the member to sell his shareholding to a party designated by the directors. Despite Mr. Hatzer's protest, the resolution was passed.

79.   Other special resolutions, also opposed by Dr. Chen and Mr. Hatzer, were passed to increase the number of authorized shares, to decrease the required notice period for a

*150331 Tempo v Fortuna Judgment*

shareholders meeting, to amend the voting procedures for shareholders and directors meetings, and to change the quorum requirement for a general meeting from "two members entitled to vote" to "two members holding 50% of the issued shares and entitled to vote." The last-mentioned amendment gave Mr. Ting and      Mr. Tsien the ability to hold a meeting without Tempo's participation.   In every case, Dr. Chen and his legal advisor learned of the fundamental changes to be made for the first time in the meeting room.

80.   After the special resolutions had been passed, an ordinary resolution was proposed to reduce the number of directors to two. When Mr. Hatzer asked the reason for this, Mr. Tsien gave him a one word answer: "simplicity". A second ordinary resolution nominated Mr. Ting and Mr. Tsien as the sole directors of the company. Mr. Hatzer's protest that this was unfair to Dr. Chen, who still owned 30% of the company, was ignored. The resolution was passed.

81.   In its effect, the June 22nd EGM extinguished any ability of Dr. Chen and his company, Tempo, to influence the affairs of Fortuna. By removing Dr. Chen from the board, Mssrs. Ting and Tsien ensured that Dr. Chen's ability to obtain detailed information from the books and records was eliminated. By shareholders' resolutions dated June 28th and 30th, 2004 Dr. Chen was removed from the boards of various subsidiary companies.



82.   In July, 2004, Fortuna commenced proceedings against Dr. Chen in this Court alleging that he had breached his fiduciary duties as a director.  Dr. Chen filed a petition in this Court seeking a winding up of Fortuna.

83.   In August 2004, after he had been removed from the board of Fortuna, Dr. Chen made a complaint to the Taiwanese prosecuting authorities "about the conduct" of Mssrs. Ting and Tsien in relation to CT & D Taiwan.  His witness statement contains no further detail of the terms of his complaint.  The office of CT & D Taiwan and the home of Mr. Ting were searched and books and records were seized.  Mr. Ting then committed suicide.  Mr. Tsien passed away in April, 2006.

84.   The fifth defendant, Mr. Stephen Driscoll, was first appointed a director of Fortuna in September, 2004.  The sixth defendant, Mr. Lii San-Rong, became a director of Fortuna in April, 2007.  The two men are named as defendants simply to ensure that they are bound to implement any orders this Court might make in relation to Fortuna. The same is true of Bates.

85.   On April 13, 2011, after this action had been extant for some considerable time, Fortuna held an EGM.  Each of the ordinary resolutions passed at the EGM on June 22, 2004 was ratified with effect from the date of that earlier meeting.  In each case, Tempo and Maxima were opposed.  There was also an attempt to ratify each of the special resolutions passed at the June 22, 2004 meeting and now under attack in this action.  In

*150331 Tempo v Fortuna Judgment*

the case of each special resolution, the opposition of Tempo and Maxima ensured that ratification did not occur; these resolutions were rejected. Tempo's position is that the resolutions passed in 2004 (both ordinary and special) are incapable of ratification.

## Evidence of Chen Chao Hon

86.     Mr. Chen Chao Hon, the brother of Dr. Chen, is a former banker and has considerable experience in dealing with Taiwanese banks.   He has a number of useful relationships with Taiwanese banking officials.

87.     In 1994, Mr. Chen assisted the board of CT & D Taiwan to obtain financing.  Although not a board member, he attended some board meetings to discuss it. A syndicated loan agreement was obtained from First Commercial Bank Ltd in April, 1995 in the amount of US \$40 million.  A further loan in the amount of US \$180 million (later increased to US \$190 million) was obtained in 1998. Each of these lending agreements required that Mr. Chen and his brother pledge shares as security.  Some 39 million shares of Wan Hai Lines (a Chen family company) were pledged.   Dr. Chen and his brother provided personal guarantees.  Some 8.65 million shares in a company called SLPC were also pledged. In general, Mr. Chen asserts that his relationships and the Chen family wealth were of "considerably more importance" to the lenders than the personal guarantees provided by Mssrs. Ting and Tsien.

88.     By 2001 Mr. Chen became somewhat uneasy about his financial exposure in relation to
        Fortuna's borrowing. After consulting his brother (who concurred), he asked for a
        written agreement to which he would be a party. This has been referred to above as
        the "Shareholders Agreement"; the parties are Mssrs. Ting and Tsien, Mr. Chen and Dr.
        Chen, Tempo, New Frontier and Wynner. In consideration for Dr. Chen and his brother
        continuing to provide their personal guarantees, the agreement sets out a number of
        major decisions and actions of Fortuna which could only be taken with the express
        consent of the Chen brothers.

89.     Despite the Shareholders Agreement, by late 2003 Mr. Chen wished to approach the
        lending banks to ask for the release of his personal guarantee. The preliminary
        approach to the First Commercial Bank elicited the response that the personal
        guarantees could be released only if alternative security was provided. A second
        approach to the lending syndicate resulted in a concession that Mr. Chen's guarantee
        could be released once the indebtedness had been reduced to US. $140 million.
        However, the syndicate was not unanimous; one lender, Cosmos Bank, did not wish to
        release Mr. Chen at all. Mr. Chen spoke to the chairman of Cosmos Bank but was
        unsuccessful at extracting any concession. The Chen family has a small shareholding in
        this Bank.

90.     Mr. Chen also says that early in 2003 Dr. Chen began to "raise concerns with me" about
        his suspicions concerning improper payments and possible bribery. He recalls being told

*150331 Tempo v Fortuna Judgment*

about some U.S. $25 million being paid for "extraordinary expenses" which may have been linked to bribery payments to Vietnamese officials. On January 15, 2004 Mr. Chen wrote to Mr. Ting and asked for an explanation of the extraordinary expenses and of the memorandum produced by Mr. Jesse Hsu. Later, he met with Mr. Tsien who attempted to persuade him to withdraw his request.

91.     Mr. Chen attended the meeting on February 23rd, 2004 immediately prior to the board meeting and corroborates his brother's evidence of what was said at that meeting. Subsequently, Mr. Chen met with the various financial controllers in the Fortuna Group and explained that Dr. Chen's accounting team now required access to various original records. Gayle Tsien told him that most of the requested documentation had been "destroyed" and the remaining records were stored in Kuala Lumpur. She also said she needed to review the requested information (regarding shareholder transactions, dividends, expenses and paid up capital) before it could be shown to   Dr. Chen and his accounting staff. This unsatisfactory response resulted in a written request from Dr. Chen to Mssrs. Ting and Tsien for various accounting records of Fortuna and its subsidiaries.

92.     By April, 2004 Mr. Chen had decided that he needed to protect his financial position "by trying to put pressure on the banks for both of us to withdraw the guarantees or get assistance from the banks to pressure Mr. Ting and Mr. Tsien to start behaving properly". After discussing the situation with his brother, Mr. Chen formed the opinion

*150331 Tempo v Fortuna Judgment*

that if certain "minor breaches of the terms of the MDC Facility" were brought to the attention of the lenders, that would induce them to release the personal guarantees. He also believed that knowledge of these breaches would lead the banks to put the desired pressure upon Mr. Ting and Mr. Tsien to address the concerns of the Chen brothers.

## Evidence of Randy Chen

93.    Mr. Randy Chen has degrees from Duke University and M.I.T. in the United States. In 2002 he returned to Taipei to become involved in the family businesses. He worked in Vietnam and in Taiwan for entities within the Fortuna Group. He also served a brief term as a board member of Fortuna from January 16, 2004 until June 22, 2004.

94.    Around the beginning of 2003 Dr. Chen explained to his son that there were some accounting issues contained in documentation received from Jessie Hsu which he did not understand. Around the end of February, 2004 Randy Chen received a memorandum terminating his employment with PMHC, a Fortuna entity for which he had been working. The memo was signed by Mr. Ting. He remained in Vietnam and worked primarily on the affairs of HPPC, another Fortuna subsidiary. He gave evidence about certain activity he had witnessed in Vietnam which is suggestive of bribery.

95.     Randy Chen never received a notice of the board meeting held on June 2, 2004 in
        Beijing. He learned about it shortly before the meeting at a time when he was unable to
        obtain the necessary visa.

## Evidence of Philip Niu

96.     Philip Niu is the son of Mrs. Pearl Niu. His sister Josephine Niu Ping Tsien ("Mrs. Tsien")
        is the widow of Mr. Tsien; they were married in 1964. Mr. Niu's father, Robert Niu, died
        in 1974. Gayle Tsien is the daughter of Mr. Tsien and Mrs. Tsien. Philip Niu was
        educated in England and in the United States. He has lived and worked extensively in
        the United States but has also lived for periods of time in Guam and in Taipei. Since
        2002 he has resided in California.

97.     Mr. Niu made it clear in his evidence that he has retained few business records in
        relation to his ownership of assets and due to the passage of time his memory of events
        and transactions is poor. He has refreshed his memory by reviewing two earlier
        affidavits sworn by him in 2004 and in 2011.

98.     Robert Niu founded and operated various "family" businesses in Taipei. When Robert
        Niu passed away in 1974, the ownership of the family businesses fell under the control
        of his widow Mrs. Pearl Niu. Mr. Niu said in his witness statement that ownership of the

family businesses "passed to my mother, my two sisters and me." Jane Niu, the late sister of Philip Niu, passed away in 1986.

99.     After the death of Robert Niu, Mr. Tsien was entrusted with the management of many of the family businesses. Over time, says Philip Niu, Mr. Tsien became "an influential advisor" to the Niu family. It is clear that at least until 2003 Mr. Niu relied implicitly upon the advice of Mr. Tsien.

100.    In early 1994, upon the advice of Mr. Tsien, the two main businesses inherited from Robert Niu were sold for approximately US. \$28 million. Shortly thereafter a third business was sold for US \$10 million. According to Philip Niu, Mr. Tsien "retained all of the relevant documentation". Mr. Niu never received any "detailed records" of these transactions.

101.    Pearl Niu "arranged" for the cash proceeds of sale to be deposited at an account in her name at Deutsche Bank in Singapore. Philip Niu says the account was "managed" by Mr. Tsien on his mother's behalf. Bank statements were sent to Mr. Tsien's address and he provided instructions to the bank.

102.    According to Mr. Niu, there were frequent discussions between Pearl Niu, Mr. Tsien, and himself about how the sale proceeds (to which I shall refer as the "Family Funds") should be allocated and distributed. Mr. Niu says that a broad agreement was reached

*150331 Tempo v Fortuna Judgment*

that Pearl Niu, his sisters and himself would share the Family Funds equally.  Because none of the family members had a need for the money at the time, no distribution actually took place. Mr. Niu says that "we were content for the Family Funds to remain on deposit in the bank account". Josephine Tsien denies that any such discussion took place in her presence and says she was "almost always" present when her husband discussed family business with Pearl and Philip Niu. She denies there was an agreement to share the Family Funds equally. Gayle Tsien's evidence is to the same effect.

103.    Mr. Niu has a recollection of discussing on several occasions in 1993 or 1994 with    Mr. Tsien the possibility of Mr. Niu providing funding to a business venture – CT & D Taiwan. He recalls being told that the KMT had agreed to sell its shares in CT & D Taiwan to Mr. Tsien, to  Mr. Ting and to Dr. Chen. In early 1994 Mr. Tsien asked Mr. Niu for a loan of about U.S. $20 million from the Family Funds for the purpose of paying his portion of the buyout price.  Mr. Niu said he had no objection provided Pearl Niu agreed.  She did. There does not appear to have been any formal loan agreement.  Mrs. Tsien's evidence is that the loan was from Pearl Niu to Mr. Tsien and did not require Philip Niu's consent.

104.    At some time in the first half of 1994, another discussion took place.  Mr. Tsien, his wife, Pearl Niu and Philip Niu discussed the possibility that the latter would purchase an interest in CT & D Taiwan.  Mrs. Tsien suggested it and Mr. Tsien agreed.  Philip Niu was hesitant at first but became convinced that the investment was "potentially lucrative". The proposal was that Mr. Niu would buy a 5% shareholding in CT & D Taiwan.  The size

*150331 Tempo v Fortuna Judgment*

of the investment was eventually settled at US \$5 million but Mr. Niu does not say when that amount was agreed upon. This evidence is contradicted flatly by Mrs. Tsien; she says the investment opportunity was offered to Pearl Niu but not to her son Philip.

105.   Mr. Niu says that Mr. Tsien explained that he would arrange for an offshore company to be established to hold Philip Niu's investment. Mr. Tsien said that Philip Niu would be the sole director and shareholder of this company and that Mr. Niu's wife (Rosemarie Porschitz) could act as company secretary. OIL would arrange the incorporation. The purpose, said Mr. Tsien, was to minimize Mr. Niu's Taiwanese tax liabilities. On several occasions Mr. Tsien came to Philip Niu and had him sign documents in relation to the new offshore company. He rarely provided copies and Mr. Niu did not request them.

106.   Eventually, Mr. Niu came to understand that two offshore companies had been incorporated by OIL:   Maxima Samoa and Maxima Samoa Resources Corporation (Liberia) ("Maxima Liberia").   It appears that Maxima Liberia purchased the 5% shareholding in Fortuna and another 5% shareholding in CT & D Taiwan. The Fortuna shareholding was then transferred to Maxima Samoa in 1994. It is not a matter of dispute that Mr. Niu remains the sole shareholder and director of Maxima Liberia to this day. There is also evidence (to be discussed below) that a single ordinary registered share in Maxima Samoa was registered in the name of Mr. Niu. This registered share was then cancelled immediately after issuance. Mr. Niu says he does not know why this was done.

*150331 Tempo v Fortuna Judgment*

107.    Mr. Niu does have some recollection of attending the first directors meeting of Maxima Samoa in the company of Mr. Tsien. He recalls being appointed as the sole director of Maxima Samoa and consenting to act. The minutes of the first directors meeting record that Mr. Niu approved the allotment of a single bearer share in Maxima Samoa (a source of controversy which will be referred to in greater detail below). He said in evidence that he does not recall why he requested that a bearer share be allotted to him. Moreover, he does not recall taking any further steps to issue the bearer share and says he has never received a bearer share certificate.

108.    Mr. Niu gave Mr. Tsien verbal authority to represent Maxima Samoa at shareholders meetings of Fortuna. His witness statement says: "the authority was limited to representing Maxima Samoa at Fortuna shareholders meetings only; he had no authority to take any other steps in relation to Maxima Samoa without my consent".

109.    Mr. Niu rarely received minutes of Fortuna shareholders meetings but did receive telephone calls updating him on company affairs. He says that in the following years he visited the various Vietnam investments owned by the subsidiaries of Fortuna including the Saigon South development, the power station, the economic processing zone, and the forestry project. From time to time Mr. Tsien sent invoices for the cost of the administration of Maxima Samoa and Maxima Liberia to Mr. Niu, who says he paid them personally. One such invoice is in evidence.

*150331 Tempo v Fortuna Judgment*

110.    Over time, Mr. Niu (and, according to his evidence, Pearl Niu) became disenchanted with Mr. Tsien's manner of controlling the Family Funds. Increasingly, their requests for up to date information were not being complied with.  Mr. Niu expressed the belief that, with the benefit of hindsight, Mr. Tsien had come to believe that he was entitled to "control" the Family Funds absolutely because he had made a major contribution to the success of the family businesses.

111.    By early 2004, Philip Niu was pressing Mr. Tsien for information concerning the Family Funds.  He asked for a written statement setting out the balance in the bank account and the sources of the money. Mr. Niu says that Mr. Tsien acquiesced.

112.    Around March 20, 2004, Gayle Tsien provided a statement ("the Family Funds Statement") to Mr. Niu.  The statement (in the form of a spreadsheet) sets out that U.S. $21,964,102 was received from the sale of the "Cannon shares" owned by Robert Niu. There are four columns on the spreadsheet headed "Philip", "Josephine", "Jane", and "Pearl".  (Josephine is the Americanized name of Mrs. Tsien.)  These are the four family members entitled to claim an interest in Robert Niu's estate.  The sale proceeds are divided equally between Philip, Josephine and Pearl.  The second section of the Family Funds Statement shows the sum of U.S. $10 million derived from other shareholdings. This sum was divided equally between the four family members with Jane's estate receiving a one-quarter share.  Immediately underneath the sum allocated to Philip Niu

*150331 Tempo v Fortuna Judgment*

is a debit of U.S. $5 million; the line item description for this is "less: CT & D share purchase (P. Niu only)". Mr. Niu says that he had not asked Mr. Tsien to provide an allocation of the funds between family members "because the precise split had still not been determined". The line described as "total owed to shareholders" shows that the share to which Philip Niu would otherwise be entitled has been reduced by U.S. $5 million.

113.   Mrs. Josephine Tsien has said that she never received a copy of this document and that it is "entirely inconsistent" with how the Family Funds were regarded by the family – as the sole property of Pearl Niu. Gayle Tsien's position is that the so-called Family Funds Statement was actually created for the use of Pearl Niu and was for estate planning purposes. She also asserts that the copy of this document produced during the litigation by Philip Niu differs materially from the spreadsheet she created originally; the original was given to Pearl Niu and has since been lost.

114.   In 2002 and 2003 Fortuna declared a series of four dividends. The minutes of these meetings each list as being present "Maxima Resources Corporation (Western Samoa) as represented by: Mr. Niu Fei". (Niu Fei is Philip Niu's Chinese name.) Mr. Tsien has signed for Mr. Niu in each case indicating his authority to represent him.  Maxima Samoa's share of each dividend was: US $752,515.33, US $750,000.00, US $750,000.00 and US $814,731.60.  Three of the four dividends were paid into a bank account in Guam in the name of Mr. Niu and his wife; the third dividend was paid into a bank

150331 Tempo v Fortuna Judgment

account the couple kept at the Bank of America. Each of the four dividends is significantly less than what Maxima was entitled to receive for its 5% shareholding. Mr. Niu did not notice this at the time and no one alerted him to the fact. He trusted Mr. Tsien. In late 2003 and early 2004 Mr. Niu had a series of discussions with Dr. Chen during which he learned that Maxima had not received its full entitlement from the dividend payments. The total deficiency is U.S. $1 million.

115. Prior to receiving the third and fourth dividend payments Mr. Niu became concerned about his tax liability and induced his mother to provide him with an admittedly fraudulent letter asserting that these payments were a "gift" from her in the sum of U.S. $1.5 million (sic). There is an email message from Gayle Tsien to Philip Niu dated March 9, 2004 in which she states clearly that the dividend payments are being made "to you". This is significant because the position of the defendants is that Pearl Niu is the true owner of Maxima, the dividends were therefore owed to her, and she was transferring them to her son as gifts. In other words, the defendants do not accept that the gift letter mentioned above was fraudulent; they say it represented the true state of affairs.

116. As time passed and Dr. Chen's suspicions and concerns deepened he kept Mr. Niu informed of them. Mr. Niu assured Dr. Chen that he would "support his investigation". At the end of 2003, prompted by discussions he had had with Dr. Chen, Mr. Niu told Mr. Tsien verbally that "I wanted to attend Fortuna meetings on behalf of Maxima Samoa and I no longer wanted Mr. Tsien to hold himself out as representing Maxima Samoa or

*150331 Tempo v Fortuna Judgment*

my interest." Mr. Tsien tried to explain that any such change was unnecessary. Mr. Niu replied that "my decision had been made and that I expected him to act in accordance with the decision". Eventually, Mr. Tsien said he would inform Mr. Niu of the next Fortuna shareholders meeting. Mr. Niu told Dr. Chen of the change.

117.    On June 1ˢᵗ 2004 Mr. Niu sent an email to Gayle Tsien asking when the next Fortuna shareholders meeting would be held and requesting a copy of the agenda. He told her that he would attend in person. The following day, she responded by email saying that there would be a shareholders meeting sometime in the next few weeks on an undecided date. She asked that Mr. Niu grant a proxy in favour of Pearl Niu (sic) to vote the Maxima Samoa shares.    She warned her uncle that the meeting would be acrimonious and said: "the next meeting might put you in a difficult position re voting of your shares". Mr. Niu remained resolved to attend.

118.    On June 9, 2004 Mr. Niu received a telephone call from Gayle Tsien during which she reiterated what she had said in her earlier email and asked Mr. Niu to absent himself from the meeting. He said he would attend. The following day in another email Gayle Tsien told Mr. Niu that the shareholders meeting would take place between the 20ᵗʰ and 25ᵗʰ of June "in China". She said she wished to visit Mr. Niu in San Francisco before the meeting. He welcomed her proposed visit.

*150331 Tempo v Fortuna Judgment*

119.    On June 18, 2004 Mr. Niu met with Gayle Tsien and with his sister, Mrs. Josephine Tsien,
        in San Francisco. He was sufficiently concerned about what was to be discussed that he
        brought his son, an American attorney, with him. Mr. Niu says that Gayle Tsien and
        Mrs. Tsien asked that Mr. Niu's son leave the meeting. Mr. Niu refused. They deny this.

120.    Gayle Tsien then explained that the shareholders would be asked to remove Dr. Chen
        from the board of directors of Fortuna and to amend the articles of association because
        Dr. Chen was causing problems by interfering with Fortuna's lending arrangements and
        by conducting an unwarranted investigation into various accounting matters. Mr. Niu
        said he would not vote to remove Dr. Chen. Mrs. Tsien sat silently throughout the
        meeting. She never mentioned the purported directors meeting of Maxima Samoa of
        four days earlier at which Mr. Tsien was authorized to represent it at the Fortuna EGM.

121.    There was a further discussion between the four people the next day. Mr. Niu says that
        Gayle Tsien said she had decided that there was no need for him to grant a proxy in
        favour of Pearl Niu (which, in any event, he had refused to do). There was more
        discussion between Gayle Tsien and Philip Niu about the forthcoming shareholders
        meeting. She urged him not to attend. He said he wished to do so. He asked for the
        date and location of the meeting. She said that "she would in due course confirm the
        details of the meeting". Eventually, Dr. Chen advised Philip Niu that the meeting was
        scheduled for June 22, 2004 in Beijing. In his witness statement Mr. Niu says that Gayle
        Tsien never told him the date but an earlier affidavit of his contradicts that.

*150331 Tempo v Fortuna Judgment*

122.    Mr. Niu arrived in Beijing the day before the EGM. After some discussion with Dr. Chen
        and Paul Hatzer (Dr. Chen's lawyer) he met with Mssrs. Ting and Tsien. He told them he
        would attend the meeting the following day and that he would not support the removal
        of Dr. Chen as a director. Mr. Niu says that the other two men remained silent.

123.    On the morning of the EGM, Gayle Tsien told Mr. Niu that he could not attend the
        meeting because he "was not a shareholder of Fortuna". When he arrived at the
        meeting room he was prevented by security guards from entering the room. Gayle
        Tsien emerged from the meeting to tell Mr. Niu, again, that he could not attend. During
        the meeting Gayle Tsien produced a document dated June 14, 2004 purportedly signed
        by Mrs. Tsien as a director of Maxima Samoa granting authority to represent that
        company to Mr. Tsien. Mr. Niu has sworn that he never authorized such a document.

124.    Mr. Niu retained an attorney. After an exchange of correspondence, Fortuna's
        attorneys asserted that Mr. Niu was not the sole director of Maxima Samoa and had
        never been the legal and beneficial owner of its shares.

125.    The defendants rely in this action upon certain corporate records of Maxima Samoa
        including: the register of members, the bearer share certificates numbered B001 and
        B002, an unsigned and undated "directors resolution" approving the conversion of Mr.
        Niu's registered share into a bearer share, an unsigned letter to Maxima requesting the
        conversion of the registered share into a bearer share, minutes of the Maxima Samoa

*150331 Tempo v Fortuna Judgment*

shareholders meeting dated January 15, 2004, and minutes of the Maxima Samoa directors meeting dated June 14, 2004. Mr. Niu has sworn that he has "never seen" these documents until their disclosure in some related litigation in October 2004. He says that he never consented to the cancellation of his registered share, did not sign the two bearer share certificates, and believes that the signature on those certificates is that of his mother, Pearl Niu. He says he did not consent to the issuance of bearer shares. He was not notified of the meeting of Maxima's shareholders on January 15, 2004. He was also not notified of the directors meeting of June 14, 2004. He would have opposed the resolution to authorize Mr. Tsien to represent Maxima at Fortuna's EGM.

126.    Mr. Niu commenced an action in the Supreme Court of Samoa seeking a declaration that he was the sole beneficial and legal shareholder of Maxima Samoa and its sole director and that the two bearer shares were unauthorized and invalid. Eventually the action was settled on terms which prohibit Mr. Niu from referring to the settlement agreement.

127.    As a component of the settlement, Philip Niu sent a letter to Mr. and Mrs. Tsien and to Pearl Niu in which he (in his personal capacity, not on behalf of the company) conceded that the three addressees of the letter had held "an honest belief" that Pearl Niu was the beneficial owner of Maxima and, as a consequence, that all three had an honest belief in the validity of the appointment of Mr. and Mrs. Tsien as directors. He says it is acknowledged by the defendants that he is the current legal and beneficial owner of the

*150331 Tempo v Fortuna Judgment*

Maxima Samoa shares. He remains the sole shareholder and director of Maxima Liberia. I do not consider that I am bound, when deciding the claims of Tempo and Dr. Chen, to reach the conclusion conceded by Mr. Niu in the settlement. No rule of evidence or procedure would compel that result.

128. Philip Niu was 78 years of age when he gave evidence. He was clearly confused about many points of detail. The impression left by his witness statement that he recalls a reasonable amount of detail was displaced by his oral evidence. Mr. Niu readily admitted that he had discussed his evidence prior to trial with Dr. Chen; however, there was no indication whatsoever that Mr. Niu was shading his evidence to favour Dr. Chen or, for that matter, any of the plaintiffs including Maxima.

129. Mr. Niu said that except for Maxima he had never been involved with the incorporation of a company. He has no experience of corporate record keeping and matters of that kind. He has never until recently understood what a bearer share is and did not know at any material time that he was the owner or holder of bearer shares. He says he has no familiarity with how companies work and that he is not "a detail person". He agreed readily that some things in his memory are "reconstructed". Mr. Niu's desire to support Dr. Chen at the EGM was "emotional" because he thought Dr. Chen had been treated unfairly. Mr. Niu did not purport to understand the reasons for the dispute between the three men.

130.    Mr. Niu said he was certain that the assets of his father had passed not only to his
        mother but to himself and his two sisters. He said his father had no will and it is
        "normal" in Taiwanese families for the surviving spouse and children to take the
        property. He did say at one point in cross-examination that the "starting point" was
        that the money belonged entirely to his mother. At another point in cross-examination
        he was asked if it was all his mother's money and he replied that he did not know. Mr.
        Niu says there was never a decision reached on how the assets should be allocated to
        the various family members and that he did not know how much his share of the Family
        Funds was to be. With respect to documents, he said that he simply signed everything
        that he was asked to sign.

## Evidence of Lawrence Ting

131.    Because of Mr. Ting's untimely death, the only evidence from him which the defendants
        have been able to enter is a redacted transcript of an examination under oath by
        Fortuna's Inspectors. In 2004, Mssrs. Russell Smith and David Walker, who had been
        appointed Joint Inspectors under the *Companies Law* by this Court, conducted an
        examination of Mr. Ting.

132.    Mr. Ting took issue with Dr. Chen's claim that he was instrumental in the founding of CT
        & D Taiwan and Fortuna. Mr. Ting said that Dr. Chen had little involvement in the affairs
        of the group until 2002. The relationship between the three men was good until early in

*150331 Tempo v Fortuna Judgment*

2003, at which point it began to "sour irreparably". Mr. Ting said that Dr. Chen was trying to withdraw his personal guarantee which had been given to secure the syndicated loan agreement and that the "banks actually were really troubled" by this. He observed that pursuant to a request from Dr. Chen the "originally more informal and verbal agreements in the business operations" had to be put in writing starting from February 2004. He said that the removal of Dr. Chen from the board of directors was necessary to avoid additional damage to the Fortuna Group. Mr. Ting confirmed that he held a proxy from Bates and voted it at the June EGM.

133.   In various oral statements made by Mr. Ting to others prior to his death, he hotly denied the allegations of bribery and misappropriation made by Dr. Chen then and now.

## Evidence of Ferdinand Tsien

134.   Mr. Tsien has given no evidence in the present proceeding but he has sworn a lengthy affidavit on October 19, 2014 in a Petition action brought by Tempo to wind up Fortuna. Ultimately, the Petition was dismissed.

135.   Mr. Tsien was the chairman of Fortuna and a director of all of the Group's companies. Although his affidavit was directed at opposing Tempo's attempt to wind up Fortuna, it also addresses matters of relevance in the case at bar. In general, Mr. Tsien contradicts



many of the serious allegations made by Dr. Chen in his own affidavit on the winding up proceeding.

136.   Mr. Tsien refers in his affidavit to several sources of contention with Dr. Chen.  He says that Dr. Chen became aggrieved by the reluctance of Mssrs. Tsien and Ting to grant him a leading role in the management of the Fortuna Group.  He denies that the three men ever agreed that either CT & D Taiwan or Fortuna would be operated as a quasi-partnership.  However, in a hand written letter dated September 27, 1993 Mr. Tsien described the relationship as a "three-party partnership".  He says that after Dr. Chen his position with Wan Hai Lines Limited in 1999 he began to take a more active interest in the management of Fortuna.  Dr. Chen was annoyed by the refusal of Mssrs. Tsien and Ting to give Randy Chen "an extremely significant management role".  One company in the Fortuna Group, HPPC, commenced litigation arising from a US $35 million insurance claim against an insurer of which Dr. Chen was a director and significant shareholder.

137.   Mr. Tsien's position is that Dr. Chen has "vastly exaggerated" his role in the formation of CT & D Taiwan.  The idea to set up CT & D Taiwan came initially from Mr. Albert Hsu, who was then the chairman of the Finance Committee of the KMT.  Mr. Ting was appointed to the board of CT & D Taiwan "to represent the interests of the KMT".  Albert Hsu then decided to offer a shareholding to a "passive investor".  Mssrs. Ting and

Tsien proposed that Dr. Chen be offered a 5% shareholding and this was done. The KMT owned a 75% shareholding and Mssrs. Ting and Tsien owned 10% each.

138.    Mr. Tsien describes Dr. Chen's involvement in the process of buying out the KMT shareholding as "merely peripheral". Neither of the two men asked Dr. Chen to meet with President Lee.   Dr. Chen was, however, asked to assist Fortuna in obtaining financing which he did. In recognition of this, Mssrs. Ting and Tsien agreed that each of the three men should have a 30% shareholding in CT & D Taiwan after the departure of the KMT. During this period Dr. Chen's only active role was to facilitate the obtaining of financing. Mr. Tsien says that after the initial contacts with the lenders had been made, Dr. Chen played a "very limited role" in Fortuna's dealing with the banks.

139.    In Dr. Chen's petition affidavit he said that he issued certain promissory notes at the time of the formation of Fortuna and thus bore "primary liability" for CT & D Taiwan's debt. Mr. Tsien points out that Dr. Chen failed to mention that Mssrs. Ting and Tsien counter-signed the back of the notes and thus became jointly and severably liable under them.

140.    Mr. Tsien says that he "effectively ran CT & D Taiwan" together with Mr. Ting. Mr. Tsien says that Dr. Chen "played absolutely no part" in the research which led to the decision to invest heavily in Vietnam.   Dr. Chen was at this time a "passive shareholder with no executive responsibility".   In any event, his presidency of Wan Hai Lines kept him

occupied. He agrees that Dr. Chen was provided with periodic updates on the progress of the development in Vietnam. His agreement was sought on significant strategic issues of the sort which would typically be discussed at board level. Most of the board meetings were held at the American Club in Taipei. In general, the strategic decisions would be taken by Mssrs. Ting and Tsien and then brought to the board for approval.

141.    Mr. Tsien has denied categorically both the allegations of bribery and the allegations of misappropriation of funds. He says that by 2000 Fortuna had started to generate a positive cash flow. Around March 2000 the three men agreed that each of them would be granted an interest-free line of credit which could be drawn upon by way of shareholder advances. This collective decision was "not documented". He described it as a "gentleman's agreement". Mr. Tsien continued like this:



> There are many other examples of such 'gentlemen's agreements' between Mr. Chen, Mr. Ting and me prior to and up to this period since our relationship at that time was amicable. Business was therefore conducted informally. For instance, it was extremely rare for there to be any formal agreements between us and the company for the provision of security. The loans I made to the company were not always formally documented. Nor were sales of shares generally documented. ... at the time, that was the nature of the relationship.

142.    Mr. Tsien says it was understood that members of the family of the three principals could draw upon the line of credit. It was intended that each family would draw approximately the same amount. The indebtedness was to be repaid from dividends when they were declared. The limit on each family's line of credit was US $5 million. Once a dividend was agreed upon, Mr. Ting would tell Jesse Hsu of the decision and the

latter would then give instructions to Mr. Jeff Wang, Vice-Manager of Fortuna's finance department, to prepare documentation. The draft shareholders resolution would be signed by the three men. Mr. Tsien says that although there were five shareholders not three, Maxima and Bates were ignored for the purpose of the shareholder advance agreement because "in purely practical and economic terms ... it is appropriate to regard the company as having three shareholders belonging to each of Mr. Ting, Mr. Chen and me and our respective families." Mr. Tsien points out that Dr. Chen signed each of the resolutions approving the dividends and he accepted that deductions would be made to repay shareholder advances. In fact, Dr. Chen proposed that the dividend of January, 2003 be increased to US \$25 million to allow for a larger repayment.

143.   At the end of 2003 Mr. C.H. Chen asked Mr. Ting and Mr. Tsien if he could be released from his personal guarantee of the MDC Facility. He says that he was happy to accommodate this request but the banks would obviously have to agree. Fortuna wrote to First Commercial Bank asking for the release of C.H. Chen. Seven of the eight syndicate banks agreed to that. The lone holdout was Cosmos Bank, in which the Chen family itself had a 2% investment.

144.   Mr. Tsien characterized Dr. Chen's subsequent actions as a campaign to "destabilize" Fortuna. Mr. Tsien denies that any of the matters raised by Dr. Chen with the lending banks amount to breaches of the lending facility. In any event, he says that all of the matters which were complained of were approved by the banks in advance. Dr. Chen

*150331 Tempo v Fortuno Judgment*

had known about and approved all of them. Mr. Tsien exhibits some documentation to that effect. It is Mr. Tsien's case that Dr. Chen abused his position as a director of Fortuna by seeking to have the lenders call their loans. Mr. Tsien says that the attempts by Dr. Chen and his brother to demonstrate to the lenders that there had been an act of default "were taken seriously" by the banks. However, Fortuna explained to the lenders that it had fully complied with its obligations, that the incidents complained of by Dr. Chen did not amount to breaches of the lending agreement, and that Dr. Chen had in fact approved the impugned transactions. By the time of the petition action, Mr. Tsien was able to say that Dr. Chen's efforts "appeared to have failed for the moment".

145.    Mr. Tsien explained Fortuna's document retention policy. He said that all original records were retained until after the relevant audit had been finished and any queries arising from it had been dealt with. At that point, any documents which the company "no longer needed" were destroyed. This occurred in the normal course of the company's business. He also said that the new Taiwanese government which came to power in 2000 was beginning to show an unhealthy interest in the business affairs of companies affiliated with the KMT. Because of the danger of a "politically motivated investigation", the three men (including Dr. Chen) decided to keep any books and records which were not needed in Taipei in storage in Kuala Lumpur.

146.    Mr. Tsien has sworn that the allegations concerning the bribery of Vietnamese officials are completely untrue. Mr. Ting had never suggested any such thing. The table

*150331 Tempo v Fortuna Judgment*

prepared by Jesse Hsu records only the details of shareholder advances and repayments. The so called "northern office expenses" have nothing to do with Hanoi. The last three letters of "Taipei" formed the Chinese word for "north". Mr. Tsien says the term is a form of shorthand used by Fortuna staff (including Mr. Hsu) to refer to the shareholder advances. The table itself is nothing more than a summary of the advances which have been made. Mr. Tsien has denied expressly that he told Dr. Chen not to query these payments because some of them were illegal and has denied causing any illegal or improper payments to be made to Vietnamese or any other government officials.

147.  Mr. Tsien says that Dr. Chen's difficulty in obtaining information from Group companies in 2003 is attributable to his aggressive approach to Group employees combined with inappropriate verbal abuse. He says that General Zhang was an old friend of Dr. Chen's and the suggestion that General Zhang was his "minder" in Vietnam was ludicrous.

148.  Mr. Tsien mentioned the board meeting of January 16, 2004. He said the "next generation" of family members – Gayle Tsien, Arthur Ting and Randy Chen – were appointed to the board. When Mssrs. Ting and Tsien refused to promote Randy Chen to a position suggested by Dr. Chen, the latter showed that he was unhappy.

149.  Mr. Tsien contradicted Dr. Chen's version of events concerning the preliminary meeting on February 23, 2004 immediately before the board meeting that day. He denies that

*150331 Tempo v Fortuna Judgment*

the meeting was convened for the purpose of discussing the list of payments referred to by Dr. Chen. The real purpose of the meeting was to discuss the deteriorating relationship between the three shareholders. In the course of the discussion Mr. Ting (not Dr. Chen) produced the list of shareholder advances. Mr. Tsien says that Mr. Ting did not suggest that the "other expenses" were referable to bribes to Vietnamese government officials. Mr. Tsien confronted Dr. Chen about a conversation Mr. Driscoll had had with Dr. Chen that month in which the latter made serious allegations about Messrs. Ting and Tsien. The confrontation made Dr. Chen angry: he shouted, banged on the table and called Mr. Driscoll a liar.

150.   At the board meeting, a resolution was passed that "Dr. C.C. Chen shall oversee finance matters". Mr. Tsien says that this appointment was intended to be a "very limited one", confined to financial matters at board level. It was agreed expressly that Dr. Chen was not to be involved in the day to day management of the Group. There was no agreement that his accounting staff would be entitled to audit financial records. Mr. Tsien says the appointment was "essentially a gesture".

151.   During the spring of 2004 Mr. Tsien became increasingly concerned about Dr. Chen's approaches to the lending banks and the "rumours he was spreading in Vietnam". He mentions in particular a letter from Dr. Chen's lawyers to the company's auditors requesting that they investigate certain transactions. He says there was nothing needing investigation and the request was inappropriate.

*150331 Tempo v Fortuno Judgment*

152.    By June 2004 Mssrs. Tsien and Ting had decided that it was necessary to remove Dr.
        Chen from the board of directors. The board meeting of June 2, 2004 was called strictly
        in accordance with the articles of association of Fortuna. At the meeting it was decided
        that an EGM would be held at such time as the two men would decide. Subsequently,
        Mssrs. Tsien and Ting agreed that the meeting would be held on June 22, 2004. Mr.
        Tsien says that: "the primary purpose of the EGM was therefore to remove Mr. Chen
        from the board of directors in an attempt to limit his ability to continue trying to
        damage the group". He also says that the shares in Fortuna owned by Maxima Samoa
        were "always seen as part of my own family's holding."

153.    Mr. Tsien represented Maxima Samoa at the EGM.   He has provided a detailed
        explanation of how that came about.

154.    From 1971 until the death of Robert Niu in 1974, Mr. Tsien assisted him in
        "restructuring" one of the Niu family investments. After Mr. Robert Niu's death, Mr.
        Tsien continued to help Mrs. Pearl Niu in "managing the family's business affairs". When
        it came time to buy out the shareholding of the KMT in CT & D Taiwan, part of Mr.
        Tsien's funding for that included a "contribution" from Mrs. Pearl Niu. At the same
        time, she expressed an interest in investing on her own behalf. Mr. Tsien agreed to let
        her have a 5% shareholding in the company to be taken from his own 30% shareholding.
        He goes on to say:

150331 Tempo v Fortuna Judgment



*It was always anticipated by Mrs. Niu and me that these two shareholdings would effectively be treated as a single family block. Similarly, it was understood by Mrs. Niu and myself that I would be fulfilling a management role in the company and that I would protect her interests as well as my own.*

155. By this time Mrs. Niu was in her late 70s and was considering how the family assets "would eventually be divided". Mr. Tsien said that it was Mrs. Niu's stated intention that Philip Niu would receive the 5% shareholding in CT & D Taiwan "along with the rest of her assets" after her death.

156. Mr. Tsien arranged the mechanics of Pearl Niu's investment. He already had a Liberian shelf company known as Maxima Resources Corporation (Liberia). He paid the costs of incorporation and the annual fees. Mr. Tsien advanced the funding of the share purchase initially and was later reimbursed by Pearl Niu.

157. Shortly afterwards, Mr. Tsien decided to incorporate Maxima Samoa. He again paid the costs of incorporation and has made the annual fee payments. The "company kit" for Maxima Samoa "has been kept at all times by me and my wife on behalf of Mrs. Niu". On August 10, 1994 the Fortuna shares were transferred from Maxima Liberia to Maxima Samoa.

158. Mr. Tsien says that Mrs. Niu informed him that she wanted Philip Niu to be the "sole director" of Maxima Samoa. Philip Niu agreed. Mr. Tsien goes on to say:



*Although Philip Niu was appointed as a director and was, as a matter of formality, the transferee of the single ordinary (registered) share subscribed for on incorporation of Maxima, I understand that Mrs. Niu made it clear to Philip Niu that she would retain the family assets, including Maxima, under her control. I believe that it was for this reason that Mrs. Niu gave instructions for the initial (registered) ordinary share to be cancelled and for two bearer shares to be issued. The register of members confirms this. In part the creation of bearer shares was done since they would allow Mrs. Niu to retain control over Maxima and her interest in the company during her lifetime but would be easy to transfer to her son when the time came. Before that time Mrs. Niu retained her ownership of Maxima, while being represented by Philip Niu on its board of directors. ... Mrs. Niu took steps to ensure that the bearer shares remained in her control. Accordingly she asked me and my wife to keep them in our physical custody on her behalf, together with the common seal, company chop (an engraved seal used for authenticating documents) and corporate documents. Mrs. Niu has told me and my wife that these arrangements were expressly agreed to by Philip Niu. ... Philip Niu has never been the person who controls Maxima.*

159.   Mr. Tsien asserts that Philip Niu was not in a position between 1994 and 1998 to finance

a purchase of shares in Fortuna. His business ventures had been unsuccessful. He says:

*I normally represented Maxima and signed the relevant minutes on behalf of Maxima. When I did so I noted Philip Niu's name next to my signature as the director of Maxima to signify that I was acting in this capacity, and in recognition of Philip's position as the future shareholder, and who (unless Mrs. Niu decided otherwise) would ultimately inherit the Maxima shareholding. ... On each occasion on which a dividend was to be paid, I (or, on one occasion, Gayle Tsien) consulted Mrs. Niu and obtained her instructions as to where she wanted the dividend to be paid. In some instances, Mrs. Niu instructed me to leave the dividend funds with the company as a debt to Maxima (as a shareholder).*

160.   Mr. Tsien says that money received by Philip Niu in the form of dividends from Fortuna

were actually "gifts from his mother". He asserts that Pearl Niu gave the instructions to

*150331 Tempo v Fortuna Judgment*

remit each of the dividend payments to her son. One dividend remittance instruction carries the notation "re Mrs. Pearl Niu".

161.    Mr. Tsien says that by September 2003 both he and Mrs. Niu had a concern regarding the tax implications arising from any eventual distribution of her assets. Pearl Niu said that she wanted to make a gift of U.S. $1.5 million to her son Philip. She directed    Mr. Tsien to have the company remit this amount in two payments. There is an email dated September 26, 2003 in evidence in which Philip Niu says it was a gift.

162.    Mr. Tsien says that by the end of 2003 Pearl Niu had reached a reluctant decision that leaving her son as the sole director of Maxima Samoa might be a source of difficulty. He says that she asked Mr. Tsien and his wife to become additional directors of Maxima. She also "made it clear to me and my wife that the shares would remain under her control and that our votes would be subject to her directions". Mr. and Mrs. Tsien accepted the appointment. The shareholders resolution was "passed by Mrs. Niu". Mr. Tsien says that he understands from discussions with Pearl Niu that she "chose not to advise Philip Niu of the additional appointments as she was hopeful that it would not prove necessary to rely upon them". She was hoping that Philip Niu would decide not to support Dr. Chen and considered the appointment of Mr. and Mrs. Tsien as a sort of fallback position.

*150331 Tempo v Fortuna Judgment*

163. Gayle Tsien and Mrs. Josephine Tsien travelled to the United States in an unsuccessful attempt to dissuade Philip Niu from supporting Dr. Chen. When the result of this effort was reported to Pearl Niu, she instructed Gayle Tsien to advise her father to use the proxy "that had been prepared on 24 [sic] June, 2004". Mr. Tsien also says:

> At Mrs. Niu's direction, I was authorized by my wife (in her capacity as a director of Maxima) to attend and vote at the meeting.

In any event, Pearl Niu never authorized Philip Niu to attend the EGM.

164. Mr. Tsien notes that Dr. Chen made a false criminal complaint against Mssrs. Ting and Tsien to the Taiwanese prosecuting authority alleging a misuse of Fortuna's funds.

## Evidence of Gayle Tsien

165. Gayle Tsien, the daughter of Mr. Tsien and Mrs. Josephine Tsien has been a Certified Public Accountant since 1993. She has a Master of Science in Accounting degree from New York University. In 1993 she began to work in the planning department of CT & D Taiwan as a project manager. Between 2000 and 2004 she worked for PMHC, a Fortuna subsidiary, in Vietnam. On January 16, 2004 she became a director of Fortuna.

166. Understandably, Gayle Tsien has no personal knowledge of whether the three men entered into an agreement that each would be entitled to participate equally in the management of CT & D (and later Fortuna), that no one of them would be excluded

from management, and that each would have equal representation on the board of directors. In general terms, she has sworn that nothing she has been told by her father or by Mr. Ting has ever suggested to her that such an agreement was in existence. She says that she once clearly asked both Mr. Ting and her father whether there were any shareholder agreements with Tempo in place and each answered in the negative.

167. Gayle Tsien made reference to an executed joint venture agreement dated September 20, 1989 found in the records of Fortuna. The parties to this agreement are Mssrs. Ting and Tsien, Dr. Chen, and a company owned and controlled by the KMT. The parties agreed to establish CT & D Taiwan as a joint venture company with the KMT owning 75% of the shares. Dr. Chen was allotted a 5% shareholding (although the text of English translation of the agreement in evidence specifies it as "10%"). The parties agreed that there would be a board of nine directors, six to be designated by the KMT and one each by the other three men. Mr. Ting was appointed as the first chairman of the company. The management of the company was to be placed in the hands of a general manager and a financial accounting manager; the agreement does not allocate any management rights (beyond the right to nominate one director) to Dr. Chen.

168. In general terms, Gayle Tsien says that Dr. Chen took no role in the management of the Fortuna Group until he began to involve himself about 2002. After the incorporation of Fortuna, CT & D Taiwan had two residual purposes. It retained some of the "non-core" assets and it provided management services to Fortuna and to its subsidiaries.

*150331 Tempo v Fortuna Judgment*

169.    Gayle Tsien says she was involved in discussions with her grandmother (at which her
        parents were present) about the possibility of Pearl Niu investing in Fortuna. Eventually
        she "became aware" that her grandmother had purchased a 5% shareholding.

170.    She says that all important operational decisions were taken by Mr. Ting and all the
        senior management reported to him. She swears that she cannot recall any occasion
        upon which Mr. Ting said that he needed to obtain consent from Dr. Chen.

171.    Gayle Tsien referred to a letter from Dr. Chen's Vietnamese lawyers to a government
        authority dated July 18, 2004 which says in part:

> *The Chen family entrusted Lawrence S. Ting and Ferdinand Tsien to be
> responsible for the management of CT & D Taiwan, Fortuna Cayman and
> the activities of the subsidiaries. Such subsidiaries include Tan Thuan
> Export Processing Zone, Hu Mei Hang Corporation and Hiep Phuoc Power
> Plant. The reason for such entrustment was that the Chen family already
> owned huge assets in Taiwan, which required direct management.*

172.    In a statement to the media dated September 24, 2004 Dr. Chen said that Mssrs. Ting
        and Tsien were responsible for the "operation and management of" Fortuna and its
        subsidiaries. He added that he had never participated in "any activity related to the
        operation and management of" Fortuna. Elsewhere he has said that he was not able to
        participate because he was "preoccupied" with the business of Wan Hai Lines.

173.    Gayle Tsien attended the board meeting of February 23, 2004. She says that the resolution giving to Dr. Chen the power to oversee "finance matters" was expressly limited to matters at board level. There was no discussion of any entitlement of Dr. Chen to audit the financial records of Fortuna.

174.    Throughout the spring of 2004 Dr. Chen's conduct was "extremely damaging and disruptive" and, in addition to troubling the relationship with the company's lenders, resulted in Vietnamese government officials "becoming reluctant to meet" with Mssrs. Ting and Tsien. When Dr. Chen's allegations against Mssrs. Ting and Tsien came to their attention, both men were shocked and angry. Bribery had never been discussed in her presence but, as a director, she would have been aware of it if it had been contemplated. On May 5, 2004 (and again on May 28, 2004) notices were published in the Taiwanese and Vietnamese press by the Fortuna Group stating that because of certain disagreements between management and shareholders the Group would "not be responsible for any acts, any means of communications or any kind of promises" made by Dr. Chen or Randy Chen.

175.    The June 2, 2004 board meeting was held in Beijing because Mr. Ting, Arthur Ting and Gayle Tsien had meetings scheduled there with a Chinese power company. On the evening of June 2, 2004 (within hours of the board meeting of that day) Gayle Tsien sent the notice and agenda for the June 22nd EGM by air mail to the shareholders. These

were mailed from a Beijing post office. The letters were sent to the address of each shareholder recorded in the register of members as is required by the Fortuna articles.

176. On June 18, 2004 Gayle Tsien received an email message from Dr. Chen suggesting a shareholders meeting on June 30th. She then realized that Dr. Chen was unaware of the EGM scheduled for June 22nd. On June 20th she sent Dr. Chen by email a copy of the notice of the EGM but did not include the agenda. She says: "I confirm that this was an oversight on my part". Eventually, but prior to the EGM itself, she sent the agenda to Dr. Chen by fax.

177. As secretary to the meeting on June 22nd, it was Gayle Tsien's responsibility to ensure that the attending shareholders "had the correct authorizations". Wynner was represented by Mr. Tsien and by Gayle Tsien. New Frontier was represented by Mr. Ting and by Arthur Ting. Tempo was represented by Dr. Chen's attorney, Paul Hatzer (although Dr. Chen was also present). Bates was represented by Mr. Ting pursuant to a resolution of the directors of Bates dated June 10, 2004.

178. Gayle Tsien says that her father represented Maxima pursuant to an authorization of June 14, 2004. He acted as chairman of the meeting. She recalls informing Philip Niu that he was not entitled to attend the meeting because Maxima had authorized her father to represent it. She has no recollection of meeting him in the lobby of the hotel

*150331 Tempo v Fortuna Judgment*

on the morning of the meeting. She said that she prepared the minutes right after the meeting in order to do so while the events were fresh in her recollection.

179.    Gayle Tsien says that her understanding "for as long as I can remember" is that the family businesses were owned by Pearl Niu. The contention by Philip Niu that there had been a division of the sale proceeds resulting in an allocation of a share to him is contrary to Gayle Tsien's understanding. She agrees that she had not been involved in the legal formalities in respect of Robert Niu's estate and resulting assets.

180.    Gayle Tsien does say that she understood from conversations with her mother that Pearl Niu intended Philip Niu to inherit the shares in Maxima after her death. She says this was "generally known" within the family. The prospective inheritance was the reason for the appointment of Philip Niu as sole director. In general, Gayle Tsien says she was aware from discussions within the family that Pearl Niu had asked Mr. and Mrs. Tsien to become additional directors of Maxima although Pearl Niu did not inform her son of this. She was also aware that her parents had physical possession of the bearer shares.

181.    Gayle Tsien says that around September, 2003 Pearl Niu instructed her to pay the sum of U.S. $1.5 million (in the form of two Fortuna dividends) to Philip Niu. She says this was a gift. This was the only occasion upon which she spoke with Pearl Niu about

*150331 Tempo v Fortuna Judgment*

dividends owed to Maxima. She mentioned her email message of February 24, 2004 to Philip Niu regarding the family funds which says in part:

*Provided Grandma is in agreement, your portion is 5 mm plus one year of interest.*

182. She says this illustrates the need for the agreement of Pearl Niu before any payment from the family funds could be made to Philip Niu. She also said that she had an understanding that Pearl Niu had instructed that all dividend payments owing to Maxima should be paid to Philip Niu. In an email to Philip Niu shortly before the June 22nd EGM, Gayle Tsien referred to the "voting of your shares". She explains this by pointing out that Philip Niu would inherit the shares eventually and was the sole director of Maxima; she accepted that the emails "were not worded well". She says these were "colloquial references".

183. She wanted to obtain a proxy from Philip Niu so that Mr. Tsien would not have to use his authority from Maxima granted to him by Pearl Niu and thus reveal to Philip Niu that his mother did not fully trust him in the matter. Gayle Tsien says that during their conversations in San Francisco Philip Niu at first promised that he would not attend the June 22nd EGM but later changed his mind. She denies saying to Philip Niu on the evening of June 19th that she would inform Dr. Chen of the details of the forthcoming meeting if Philip Niu agreed not to attend.

184.    On the evening of June 21, 2004 Gayle Tsien spoke with Pearl Niu who then instructed

her to authorize Mr. Tsien to represent Maxima at the meeting.  She relayed this

instruction to Mr. Tsien and to Mr. Ting.

## Evidence of Pearl Niu

185.    Pearl Niu is now 101 years of age.   Although her evidence and an assessment of her

credibility are crucial to the second major issue in this case, I have accepted the advice

of counsel that her health now prevents her from giving evidence either in person or by

video link.  One of her doctors has given his opinion to that effect.

186.    Mrs. Pearl Niu has a degree in economics from the University of Shanghai.  Her three

children with Robert Niu are Philip, Josephine (who married Mr. Tsien) and Jane, who

passed away in 1986.

187.    Mrs. Niu has provided one brief witness statement in this proceeding which

incorporates by reference a series of six affidavits sworn by her in 2004 and 2005 in

proceedings in Samoa.  The Samoa proceeding was an attempt by Philip Niu to obtain a

declaration confirming his beneficial ownership of Maxima Samoa.  He obtained a

preliminary ruling to that effect, after which Pearl Niu intervened and requested a re-

hearing.  Before the issue could be reconsidered, the proceeding was settled on terms

which remain confidential.

*150331 Tempo v Fortuna Judgment*

Case 1:21-cv-11059-GHW   Document 141-18   Filed 06/14/23   Page 75 of 139

188. Mrs. Niu says that after her husband Robert passed away she decided to allow Mr. Tsien to manage her financial affairs for her. She found him trustworthy and believes he gave very useful investment advice. Upon his recommendation, she instructed Mr. Tsien to use some of the Family Funds to purchase a 5% shareholding in Fortuna for her. Philip Niu was not involved in this decision and did not contribute to the purchase price.

189. Mrs. Niu decided that after her passing Philip "may" receive the 5% investment in Fortuna. She says she did not and has not made any irrevocable decision on that question. Mrs. Niu says she speaks fluent English. Mrs. Niu's daughter Josephine looks after her daily needs. She says "I rely heavily" upon her. Josephine Tsien accompanies Mrs. Niu whenever she leaves her residence and ensures that she receives her daily meals. Mrs. Niu describes her as "my full time carer".

190. After deciding to invest in Fortuna, Mrs. Niu instructed Mr. Tsien to arrange the transaction for her. She said that she instructed him to set up a company in Samoa, Maxima Samoa. She describes the decisions she made concerning Maxima as follows:

> *Consistent with my intention that Maxima's stake in Fortuna may ultimately be passed on to Philip, I informed Mr. Tsien that I intended to nominate Philip as the sole director of Maxima. There was no arrangement that the company fees for Maxima be taken from my son's prospective inheritance for I had made no decision at that time as to what his inheritance would be. Accordingly, Philip was appointed as a director. As a matter of formality, he was the holder of the single share subscribed for on the incorporation of Maxima. However, I made it clear to him that I would retain the family assets, including Maxima, under my control. Further, the company documents from Maxima have been kept at all times by Mr. Tsien on my behalf. At the same time, I instructed Mr.*

*150331 Tempo v Fortuna Judgment*

Page 75 of 139

> *Tsien to cancel the original share in Maxima and to issue two bearer
> shares to give me greater flexibility over any future distribution of
> Maxima that may be necessary. I thought that the creation of bearer
> shares would allow me to retain control over Maxima and my interest in
> Fortuna during my lifetime but would be easy to transfer to my son, if
> appropriate, when the time came. I took steps to ensure that the bearer
> shares remained in my control by asking Mr. Tsien and my daughter to
> keep them in their custody on my behalf, together with the common seal
> and corporate documents. At the time I informed Philip of these
> arrangements. I confirm that the signatures on the bearer shares are
> mine.*
>
> [paragraphs 20 to 24 in Pearl Niu's affidavit of December 10, 2004]

191.    Mrs. Pearl Niu says that she instructed Mr. Tsien about the disposition of dividends

        owed to Maxima Samoa. Some were left with Fortuna (as a debt owed to Maxima

        Samoa) and some were paid to Philip Niu as a "gift". Philip Niu denies that he has ever

        discussed the question of bearer shares with his mother and says that she would not

        have had any knowledge of such matters. He first became aware of her claim to be the

        beneficial owner of Maxima Samoa from evidence filed in the winding up proceeding in

        October, 2004.

192.    By 2003 Mrs. Niu had begun to "resent deeply" various aspects of Dr. Chen's conduct.

        One of her objections was that she understood Dr. Chen had been seeking to buy

        Maxima Samoa's shares from her son. This annoyed her because they were not his

        shares and he had no authority to sell them. This allegation is denied by Dr. Chen.

193.    By the end of 2003 Mrs. Niu decided to add Mr. Tsien and Mrs. Josephine Tsien to the
        board of directors of Maxima Samoa. She instructed them that the bearer shares would
        remain under her control and that she would give directions as to how Maxima Samoa
        would vote at Fortuna shareholder meetings. She did not advise her son Philip of the
        additional appointments because she hoped to avoid additional family strife.

194.    Mrs. Niu gave her instructions on June 14, 2004 that a proxy should be granted to Mr.
        Tsien to represent Maxima Samoa at the Fortuna EGM. This occurred after Mrs. Niu had
        learned that Gayle Tsien and Josephine Tsien had been unsuccessful in convincing Philip
        Niu to abandon Dr. Chen. Mrs. Niu says that she told Philip Niu that Mr. Tsien would be
        representing Maxima Samoa at the meeting.

195.    In her affidavit of December 17, 2004 Mrs. Niu said that she had "physical possession"
        of the two bearer shares of Maxima Samoa. In her affidavit of January 13, 2005 Mrs.
        Niu said that she paid US $1.5 million for the Fortuna shares. She did this by using
        Maxima Liberia for the purpose. It was upon her instruction to Mr. Tsien that Maxima
        Liberia acquired the Fortuna shares and subsequently transferred them to Maxima
        Samoa. In this subsequent affidavit Mrs. Niu said:

>       *Philip was nominally named as the shareholder simply for the purposes of*
>       *effecting the transfer of Maxima to me from OIL Samoa and held the*
>       *position, as nominee, for less than a day. … At the time of the*
>       *incorporation of Maxima Samoa, Philip well knew that he was not the*
>       *true owner of the Fortuna shares but that his name would be used to*
>       *effect the transfer of Maxima Samoa to me from OIL Samoa and that his*
>       *name would be removed as a shareholder almost immediately.*

196.    Mrs. Niu says that the subscriber share which had been transferred to Philip Niu was cancelled and the two bearer shares were created upon her instructions. Her evidence does not suggest any cogent reason for the issuance of bearer shares.

197.    In March 2004 Mrs. Niu instructed Gayle Tsien to assist her in preparing a spreadsheet setting out the source of the Family Funds. She says in her affidavit of July 1st 2005 that this was prepared "in accordance with my intention at the time for my own estate planning purposes..." When she swore the last-mentioned affidavit, she said she was unable to locate the spreadsheet. She took issue with the version of the spreadsheet produced by Philip Niu in the Samoan proceedings which suggested that U.S. $5 million had been deducted from his share of the family funds to purchase Maxima Samoa's shareholding in Fortuna.

## Evidence of Josephine Tsien

198.    Mrs. Josephine Tsien (born Niu Ping) attended university in Taipei and then pursued postgraduate studies in education in the United States. During her marriage to Mr. Tsien she often discussed his business affairs with him but did not seek to influence him or to participate herself. Thus her evidence was necessarily general and impressionistic, based largely upon things which had been said to her by others.

*150331 Tempo v Fortuna Judgment*

199.    She said in her evidence that Mr. Tsien came from a wealthy family in Shanghai but left

China in 1949. The couple met and married in the United States and returned to Taiwan

in 1971. At this time the family businesses of Robert Niu were "heavily debt- ridden"

but Mr. Tsien gradually changed that. After the death of Mr. Niu, debts were repaid by

Mrs. Pearl Niu from the Family Funds.


200.    Josephine Tsien said:

> *The nature of our family businesses are such that my father was, and now my mother is, the actual beneficial shareholder at all times of any company or investments owned by the family. While Philip and I (or others) may appear on the face of the corporate records as a shareholder or as directors, our names do not represent any beneficial interest or entitlement. In fact, I would say that my mother borrowed our names as she deemed convenient for whatever particular purposes she had in mind.*


201.    Mrs. Tsien said that Mrs. Pearl Niu sometimes gave gifts to her children and

grandchildren using income from the family businesses, at her discretion.


202.    Mrs. Tsien's evidence makes it clear that she has always regarded Maxima Samoa as

being the property of her mother. She was aware, however, that Mrs. Pearl Niu's

intention was to leave the Maxima Samoa investment eventually to Philip Niu as a

bequest. Pearl Niu asked Mr. and Mrs. Tsien to look after the Maxima Samoa bearer

shares, seal, and incorporation documents. These were kept in a safe in Mr. Tsien's

office to which both Mr. and Mrs. Tsien had access. Around the end of 2003      Mrs.


*150331 Tempo v Fortuna Judgment*

Tsien agreed to become an additional director of Maxima Samoa at her mother's

request. She said that:

> When Ferdinand [Tsien] asked me to attend meetings and sign documents
> I would make myself available to do so. Consistent with my typical
> practice on such occasions I ensured that I signed the minutes based on
> Ferdinand's instruction.

203. There is in evidence a letter dated July 5, 2004 signed by Mrs. Tsien and addressed to

Pearl Niu. In it, Mrs. Tsien says that she is the custodian of the two bearer shares

numbered B001 and B002; she acknowledges that Pearl Niu is the beneficial owner and

the shares are being held in trust for her. The letter goes on to assert that Mrs. Tsien

will be responsible for exercising Maxima Samoa's voting rights in the future. There is

no mention at all in this letter of Mr. Tsien. Mrs. Tsien says that she signed this letter at

her husband's suggestion. More generally, she says:

> I wish to emphasize that the meetings I attended and the documents I
> signed were as a result of requests made of me by Ferdinand [Tsien] and
> my mother.

204. Mrs. Tsien confirms that on June 14, 2004 she acted upon an instruction from her

mother and signed an authorization to Mr. Tsien to represent Maxima at the Fortuna

EGM. She says her husband prepared the document.

205. Josephine Tsien displayed almost no recollection or understanding of relevant events.

Nonetheless, she provided a number of answers which she must have known would

assist the defendant's cause. She said that Pearl Niu instructed Mr. Tsien to make   Mr.

and Mrs. Tsien directors of Maxima Samoa. She said that although Pearl Niu is 101 years of age she is fully aware of what is happening in the dispute between the two families. Mrs. Tsien was asked if she had ever told Philip Niu that she had become a director of Maxima Samoa and that Mr. Tsien had been appointed to represent it at the Fortuna EGM. She answered both questions in the negative.

206.   Mrs. Tsien was cross-examined about the affairs of Wynner, of which she is the sole director. She displayed no knowledge of those matters. She said she did not know what Wynner's function was and did not know where Wynner's bearer share is kept. She did display an awareness that Wynner owns shares in Fortuna. She summed up her role by saying "my husband put my name down – I am just a housewife".

## Evidence of Albert Hsu

207.   Mr. Albert Hsu has provided two witness statements which I have considered but he did not submit to cross-examination in court although the plaintiffs requested that.   Mr. Hsu is resident in Taipei. He has provided two reasons for his reluctance to attend the trial: he did not believe that he could devote the necessary time to preparing to give evidence; and did not wish to appear to take sides in what he has characterized as a "private matter between the shareholders". In my ruling of September 10, 2014 I held that his witness statements are admissible. The absence of cross-examination must be taken into account in deciding how much weight to give to his evidence.

208. Mr. Hsu has university degrees in public administration and political science. He has held a number of very senior government positions in Taiwan, including the chairmanship of the finance committee of the KMT and the office of Vice- Premier. He has also acted as a director of a number of corporations.

209. As chairman of the KMT finance committee between 1988 and 1993, Mr. Hsu was instrumental in the creation of CT & D Taiwan. A company owned and controlled by the KMT – China Trading Corporation – was not performing to Mr. Hsu's expectations so he recruited Mr. Ting to become its chairman. Mr. Hsu then accepted the suggestion of Mr. Ting that the KMT's overseas investments be placed in a new entity, CT & D Taiwan. Mr. Hsu executed the joint venture agreement dated September 20, 1989 on behalf of the KMT.

GRAND COURT · CAYMAN ISLANDS

210. Mr. Hsu asserts that he was not made aware at any time of the existence of an understanding or agreement between Mssrs. Ting, Tsien and Chen that

> *each would be entitled to participate equally in the management of the investments (and that no party would be excluded from so managing, without his consent).*

211. In any event, the KMT owned 75% of CT & D Taiwan in 1989 so any such agreement would have been inconsistent with that in Mr. Hsu's view. The KMT retained the power to appoint six of the nine directors. It also retained control over the identity of CT & D Taiwan's minority shareholders. During this period, Mr. Ting reported to the KMT; Mr.

Hsu was not aware of any involvement of Dr. Chen in the management of the company. When Mr. Hsu became Vice-Premier of Taiwan in 1993 his involvement with CT & D Taiwan ceased. Mr. Hsu denied that the KMT had any particular interest in Dr. Chen's involvement in CT & D Taiwan. He said that he cannot recall any contribution made "directly or indirectly" by Dr. Chen.

212. In January 2004 Mr. Hsu was appointed a director of Fortuna but says that he did not play any active role. He has no recollection of the events leading up to the board meeting of June 2, 2004 or the EGM of June 22, 2004. He was unavailable to attend those meetings. He also denied that his appointment to the board of Fortuna was for the purpose of investigating the veracity of Dr. Chen's allegations. He did say that he had attempted to act as mediator between Dr. Chen and Mssrs. Ting and Tsien from time to time.

## Evidence of Arthur Ting

213. Arthur Ting is now the Chairman of CT & D Taiwan. He has a degree in management and finance from Boston College in the United States. Mr. Ting was appointed to the Fortuna board of directors on January 16, 2004 together with the other members of the "second generation".

*150331 Tempo v Fortuna Judgment*

214. As with the evidence of Gayle Tsien, most of Mr. Ting's evidence describes things he has been told by others and impressions he has gained. In general, he understood Dr. Chen to have no executive role in Fortuna; he was a passive investor. Arthur Ting says that he has never heard, until the present litigation, of any suggestion that the agreement alleged by Dr. Chen was made.

215. Mr. Ting described several examples of what he termed aggressive and inappropriate behavior by Dr. Chen. At the board meeting of January 16, 2004 he recalls Dr. Chen proposing that Randy Chen be appointed the General Manager of PMHC, to replace Frances Ba; this allegation is denied by Dr. Chen. The proposal was rejected. Mr. Ting said that Dr. Chen was bypassing the chain of command within the Fortuna group by requesting documents directly from employees of subsidiary companies; Dr. Chen says that, as a director of Fortuna and many of its subsidiaries, he was entitled to do that. In addition, by the end of 2003 Dr. Chen was spreading rumours intended to discredit Mr. Ting (Senior) and Mr. Tsien.

216. Arthur Ting confirms that the board meeting of June 2nd 2004 was held in Beijing because a number of other meetings had already been scheduled there. He recalls mailing notice of this board meeting to the registered addresses of the directors from Vietnam on May 22nd 2004. After the board meeting, he recalls accompanying Gayle Tsien to the post office while she mailed notices of the June 22 EGM to the shareholders at their registered addresses in accordance with the Fortuna articles.

*150331 Tempo v Fortuna Judgment*

## Evidence of Other Witnesses

217.    Ms. Frances Ba is the General Manager for the Vietnamese region of Fortuna.  She
        began working with CT & D Taiwan at its formation and has worked within the group
        ever since. She said she does not recall any change in the way the Fortuna Group was
        managed around the time of the agreement alleged by Dr. Chen. In general terms, she
        says that Dr. Chen did not participate in the management of any of the Vietnamese
        projects until he tried to involve himself around 2002.  Ms. Ba has never been aware of
        any agreement that Dr. Chen had a right to participate in the management of group
        entities. She believes that because she attended many CT & D Taiwan board meetings
        she would have learned of such an agreement if it existed. By 2002 Dr. Chen was making
        pointed demands for access to accounting records of the Vietnamese subsidiaries and
        having a disruptive effect. He "regularly caused considerable disruption at a staff level
        by verbally and physically harassing staff".

218.    Mr. Steven Driscoll was educated in the United States and has an MBA from Columbia
        University. In 1994 he joined CT & D Taiwan as its Vice-President and worked full time
        within the group until 2001. He is now a director of Fortuna and a nominal defendant in
        this proceeding. Mr. Driscoll characterized Dr. Chen's role as that of "a substantial
        shareholder and non-executive director". Dr. Chen did not participate in management
        of group entities.  Mr. Driscoll has no recollection of hearing of any agreement, oral or

*150331 Tempo v Fortuna Judgment*

written, between Mssrs. Ting and Tsien and Dr. Chen except the agreement to consult Dr. Chen in relation to expenditures over US $100,000.

219.    Mr. Lii-San Rong has worked for over forty years in the banking industry in Taiwan. He has been a director of Fortuna since 2007 and is a nominal defendant in this proceeding. Mr. Lii recounted an incident which occurred around June 2004. He received a telephone call from Mr. C.H. Chen who asked Mr. Lii to sign a "pre-drafted" letter stating that while he had been general manager of the First Commercial Bank he had approved the 1995 MDC loan facility for Fortuna. That part of the letter was factual. The pre-drafted letter went on to say that Mr. Lii had done so "because of the availability of the Wan Hai shares as security". Mr. Lii said that, in accordance with usual banking practice, he had considered a variety of factors before approving the loan. He refused to sign the letter. Later on the same day Dr. Chen asked Mr. Lii to come to his office. Dr. Chen presented the pre-drafted letter again and requested that Mr. Lii sign it. He refused. Later that evening he received telephone calls from two prominent figures in the banking community pressuring him to sign the letter. He said that Dr. Chen was "very angry" at his continuing refusal to sign. In general,      Mr. Lii says that he was never aware of any agreement between the three Fortuna shareholders about participation in management and equal representation on the board of directors.

220.    Mr. Phan Chanh Duong is a Vietnamese official who worked for a joint venture partner in Vietnam of two Fortuna subsidiaries. He said that Dr. Chen was not involved in

*150331 Tempo v Fortuna Judgment*

management activities in Vietnam and that he was unaware of any agreement between the three men about participation in management.

221.   Mr. Phan Hon Quan, another Vietnamese government official, gave evidence to the same effect. He also said that Dr. Chen's allegations about Mr. Ting tended to poison the relationship between Fortuna and the Vietnamese Government. Around July 2004 Dr. Chen alleged that the transfer of assets from CT & D Taiwan to Fortuna violated the rights of IPC, a Vietnamese venture partner for which Mr. Phan was working.      Mr. Phan said in his witness statement that the allegations were "baseless". IPC had had no objection to the transfer and suffered no detriment by it. He characterized Dr. Chen's assertions as a "smear campaign".

222.   Mr. Wang Li Sheng has been the director of finance at CT & D Taiwan since 2001. His evidence responded to the allegations made by Dr. Chen to the banks in April, 2004 concerning events of default. Mr. Wang said that the early repaying of U.S. \$20 million to redeem Wan Hai shares had been approved of by Dr. Chen in writing.      The distribution of dividends by Fortuna was in compliance with the MDC Facility and      Dr. Chen had signed the relevant memorandum. In October 2001 the syndicate banks agreed that HPPC could obtain new borrowings of up to U.S. \$20 million. Dr. Chen consented in writing to this. Evidently, Mr. Wang had a stormy relationship with      Dr. Chen.

223.   Mr. Young Yun-Ti is the president of Tan Thuan Corporation, a Fortuna subsidiary. He said that Mssrs. Ting and Tsien both played active roles in managing this subsidiary but that Dr. Chen was not involved. He was not aware of any agreement between the three men that Dr. Chen would participate equally in the management of Fortuna.

224.   Mr. Murray Drake, the solicitor representing Maxima in Samoa, has said in evidence that he only received the company's corporate records from OIL after the settlement of the Samoa litigation.

225.   Paul Hatzer, Dr. Chen's attorney, provided a description of the EGM and events leading to it which was essentially the same as Dr. Chen's evidence.

## Maxima Samoa

226.   Until the incorporation of Maxima Samoa, Maxima Liberia owned a 5% shareholding in both CT & D Taiwan and in Fortuna. There is evidence that both Mr. Tsien and Philip Niu paid the incorporation fees for Maxima Liberia at various times. Philip Niu was the sole director and shareholder of Maxima Liberia at all times material to this action. By an instrument of transfer dated August 10, 1994 Maxima Liberia transferred 1,500,000 shares in Fortuna to Maxima Samoa.

*150331 Tempo v Fortuna Judgment*

227.    Maxima Samoa was incorporated as an international company under the Samoan *International Companies Act 1987* on August 4, 1994. The register of members shows that OIL subscribed for a single subscriber share; this was the only share issued at the time of incorporation.



228.    By an instrument of transfer dated August 6, 1994 the sole registered share in Maxima Samoa was transferred from OIL to Philip Niu. This single registered share was then surrendered by him on the same day and cancelled. The register of members reflects that. Finally, according to the register, on August 6, 1994 share certificates numbered B002 and B003 in the form of bearer shares were issued.

229.    OIL appointed Philip Niu as the sole director of Maxima Samoa and he agreed to act. The first directors meeting of Maxima Samoa was held on August 6, 1994. Only the sole director, Philip Niu, was present. Mr. Niu's wife was appointed secretary of the company. The registered address of the company was set at the premises of OIL and the location of the books and records of the company was stated to be Mr. Tsien's office address in Taiwan. These minutes are signed by Philip Niu. The register of directors records his appointment. It also records that on January 15, 2004 Mr. Tsien and his wife Josephine were added as directors.

230.    The minutes of the directors meeting of August 6, 1994 also record that an application for the issuance of a single bearer share was received and approved.    There is in

*150331 Tempo v Fortuna Judgment*

evidence an unsigned copy of a "letter" dated August 6, 1994 purporting to be from Philip Niu to himself (i.e. to "the director, Maxima Resources Corporation") asserting that he is the holder of registered share certificate number 001 for one share and requesting that this share be converted into a bearer share. The defendants say that this document shows on its face that it was sent by fax from Philip Niu's fax number in 2004, suggesting that it had been in his possession at that time. There is also in evidence an unsigned copy of a purported resolution by Philip Niu as the sole director of Maxima Samoa approving the conversion of the registered share certificate into a bearer share in satisfaction of a request from himself.

231.    The two original bearer shares have been entered in evidence. They each have been impressed with the common seal of Maxima Samoa but are signed only by Pearl Niu. Each certificate form contains spaces for two directors' signatures but the second space has been left blank. The rights and obligations conveyed to the bearer by virtue of his possession of the share certificate are set out on the backs of the certificates.

232.    There is in evidence what purports to be a minute of a general meeting of shareholders of Maxima Samoa on January 15, 2004. The minute shows that Mrs. Tsien was present by virtue of being the holder of bearer share certificates numbers B001 and B002. Her husband, Mr. Tsien, was also present in an unexplained capacity. The document contains no mention of Philip Niu. The only business which took place at the meeting

was the appointment of both Mr. and Mrs. Tsien as additional directors of Maxima Samoa. The minutes are signed by Mrs. Tsien.

233.    Also in evidence is a purported minute of a directors meeting of Maxima Samoa held on June 14, 2004. The minutes show that Mr. and Mrs. Tsien were both present. The only act recorded in the minutes is the appointment of Mr. Tsien to represent the company at Fortuna's EGM on June 22, 2004 and "to vote for or against any resolution presented in such a way as he thinks fit". These minutes are signed by Mrs. Tsien. There is also a document addressed to Fortuna and signed by Mrs. Tsien on June 14, 2004 "for and on behalf of Maxima". In this document she repeats the authorization to her husband to represent Maxima Samoa at the Fortuna EGM.

234.    On July 5, 2004, after the Fortuna EGM, Mrs. Tsien wrote to her mother, Pearl Niu, and acknowledged that Pearl Niu was the beneficial owner of the two bearer shares; the letter says that Mrs. Tsien is holding those shares "in trust for you pending your instruction as to their disposal in the future".

## Expert Evidence for the Plaintiffs

235.    The question of whether Fortuna was entitled to accept Mr. Tsien in preference to Mr. Niu as the authorized representative of Maxima Samoa is strictly a question of Cayman Islands law and therefore not amenable to expert evidence. However, the questions of

*150331 Tempo v Fortuna Judgment*

who owned Maxima Samoa, who were its legitimate directors, and whether Mr. Tsien was authorized by it to vote at the Fortuna EGM are matters of Samoan law. The plaintiffs and the defendants have adduced expert evidence about the law of Samoa in support of their respective arguments that Philip Niu, or alternatively Mr. Tsien, was authorized by Maxima Samoa to represent it at the Fortuna EGM. The plaintiffs called Ms. Fiona Ey and the defendants called Mr. David Goddard, Q.C. There was a significant amount of agreement between the two experts.

236.    The plaintiffs' expert, Ms. Ey, is a barrister and solicitor of the Supreme Court of Samoa and is also entitled to practice in Australia. She has been practicing law in Samoa since 2002.

237.    The country generally referred to as "Samoa" or "Western Samoa" became an independent nation in 1962, having formerly been administered since 1919 (1921 on the evidence of Mr. Goddard) by New Zealand. Samoa is a common law jurisdiction which derives its law from English and Commonwealth statutory and common law. In addition to local precedents, court decisions from other Commonwealth jurisdictions ("particularly New Zealand, Australia and the United Kingdom") are persuasive.

238.    Maxima Samoa was incorporated under the *International Companies Act* 1987 ("the Act"). This statute is based upon the analogous British Virgin Islands legislation according to Mr. Goddard. New Zealand company law has had a major influence on the

*150331 Tempo v Fortuna Judgment*

domestic company law of Samoa but it differs in significant ways from the *Act* in relation
to bearer shares.

239.   Ms. Ey began by noting that under Samoan law both the register of members and the
share certificates provide *prima facie* evidence of a person's entitlement to be regarded
as a member of a company. This is a rebuttable presumption, as it would be under the
law of the Cayman Islands. The register of members shows that Philip Niu became a
member of Maxima Samoa on August 6, 1994. There is no evidence in Maxima Samoa's
corporate records supporting the possibility that Pearl Niu has ever been a legal owner
of a registered share in Maxima Samoa.

240.   Ms. Ey said that Samoan law recognizes the separation of legal and beneficial ownership
of shares. Moreover, this separation applies equally to registered shares and to bearer
shares. A trust in relation to share ownership need not be recorded in a company's
register of members. There is no particular formality necessary for the establishment of
a trust regarding shares. Although the ownership of shares may be transferred by an
instrument of transfer which is then registered, there is no requirement that a trust
which effects a separation between legal and beneficial ownership be registered with
the company.

241.   Section 2(2) of the *Act* provides that a person is deemed to hold a beneficial interest in a
share if that person is entitled either to receive (directly or indirectly) any dividends in

*150331 Tempo v Fortuna Judgment*



respect of that share or to control the exercise of any rights attaching to that share. This deeming provision is in addition to the possibility of separation of the legal and beneficial interests by means of a trust. Mr. Goddard said that evidence of payment of Fortuna dividends to Mr. Niu was not evidence from which one can infer that he was the beneficial owner of Maxima Samoa's shares.

242.   The *Act* (in the form it took at the time of Maxima Samoa's incorporation) permitted the redenomination of a registered share as a bearer share. Section 35(8) of the *Act* provides that a bearer share "may be transferred by the delivery of the certificate". Article 7 of Maxima Samoa's memorandum of association permits the redenomination of registered shares to bearer shares. The holder of the registered share must make a written request to the company for redenomination and surrender up the registered share certificate. Following a resolution of the directors to permit the redenomination, the company may issue the bearer share.

243.   Ms. Ey noted that the request for redenomination in evidence has not been signed by Philip Niu. In her opinion, it is "questionable" whether the procedural requirements for redenomination have been satisfied. In any event, Ms. Ey says that the holder of the registered share must necessarily consent to its redenomination to a bearer share. She was asked to consider whether a beneficial owner of a registered share (hypothetically, Pearl Niu) could give a valid consent to the redenomination of that share as a bearer share. She said that this would depend upon the terms of the trust arrangement

*150331 Tempo v Fortuna Judgment*

between the beneficial and legal owners. Whether or not the beneficial owner consents

to the redenomination, the "general principles of law in force in Samoa" would require

the legal owner's consent also. Ms. Ey said:

> *It would not be sufficient or adequate to solely rely on the beneficial owners consent without the legal owner's consent. Further, the beneficial owner's consent could not override or be inconsistent with the legal owner's consent. The opinion in this paragraph is based on general principles of law and my general understanding and knowledge of Samoan common law. There is no particular authority for this point.*

244.    Ms. Ey noted that both bearer share certificates were signed by Pearl Niu although

Philip Niu was, at the date of issuance of the certificates, Maxima Samoa's sole director.

There is no evidence that Philip Niu authorized his mother to sign the bearer share

certificates on his behalf.    Since the sole director was not consenting to the

redenomination, "little reliance could be placed on the apparent bearer share

certificates." Alternatively, if the bearer shares were to be regarded as valid

instruments, they are to be regarded as held on constructive trust for Philip Niu.

245.    Ms. Ey gave evidence about the January 15, 2004 meeting of shareholders.  Assuming

that Mrs. Tsien was the holder of two legitimate bearer share certificates, she was

entitled to call for a shareholders meeting by addressing a requisition for that to the

directors of the company. The directors would then cause notice of the general meeting

to be provided to the holders of both registered and bearer shares.  At least fourteen

days written notice must be given. The necessary quorum for a general meeting is one



member holding more that 50% of the issued shares or two members. Although accidental omission to give notice of a meeting to a member would not invalidate the subsequent proceeding, an "intentional omission" to give such notice would not be saved by the curative provision in the *Act*.

246. Applying these rules to the present case, Ms. Ey said that the presumed holder of the bearer shares (Mrs. Tsien) would have had to make a requisition to Philip Niu requesting a general meeting. In the absence of any evidence of such a requisition, the conclusion must be that the meeting was not validly requisitioned. Moreover, if Mr. Niu was still the lawful owner of one registered share in Maxima Samoa at this time he had an entitlement to be given notice of the general meeting. While accidental omission to give such notices will not invalidate a meeting, the relevant curative provisions do not extend to intentional omission to give notice.

247. As for the meeting itself, Mrs. Tsien was required by article 10(a) of Maxima Samoa's articles to produce the bearer share certificates at the meeting and so establish her entitlement to be present. The minutes do not record that she did this. Section 103(4) of the *Act* provides that where minutes of a directors or shareholders meeting have been entered into the company registers and signed by the chair of the meeting, certain presumptions apply until the contrary is proved. The meeting is taken to have been duly held and all proceedings are viewed as valid. Thus the burden of proving that the directors meeting and the general meeting of Maxima Samoa were invalid rests with the

*150331 Tempo v Fortuna Judgment*

plaintiffs. Moreover, section 86 of the *Act* states that the acts of a person acting in the capacity of a director are valid despite any defect in the person's appointment. Ms. Ey says that this curative provision is not absolute:

> *Persuasive Commonwealth precedents provide that this protection does not extend to a situation where there has been no appointment of a director at all (such as where a shareholder who purports to appoint a director had no entitlement to do so).*

248. The minutes of the directors meeting held on June 14, 2004 appoint Mr. Tsien as Maxima Samoa's representative at the Fortuna EGM. Philip Niu says he was never told about this directors meeting. Ms. Ey notes that there is no express requirement in the *Act* or in the articles that all directors receive notice of a directors meeting; however, in her view it is necessarily implied in the requirement in the articles to "summon a meeting of the directors". Ms. Ey also mentions common law authority that a deliberate attempt to exclude a director from a meeting is a breach of the rights of that director. Moreover, if the appointment of Mr. and Mrs. Tsien as additional directors was invalid, then the only validly appointed director (Philip Niu) was absent from the June 14 meeting. Ms. Ey concluded this part of her opinion by saying:

> *Without proper requisition and notice, the directors meeting held on 14 June 2004 could not have been validly convened. Consequently, any decision purportedly made at that meeting to appoint Mr. Tsien as Maxima's authorized representative at the 2004 EGM would not have been lawful and valid.*

249.    Although the other directors of Fortuna would be entitled to rely on the appointment of

Mr. Tsien as the representative of Maxima Samoa and assume that he had been validly

appointed, that assumption would be negated "by actual knowledge or suspicion that

the appointment was not duly made". On the subject of revocation of a person's right

to act as a representative of the company, Ms. Ey said that this was governed by the

general law of agency. No particular formality is required. Mr. Niu's attempt to attend

the June 22nd EGM is sufficient evidence of his intention to revoke any authority which

may have been conferred upon Mr. Tsien. To rebut the presumption of Mr. Tsien's

authority, one would have to show actual knowledge on the part of the other Fortuna

directors or reason to suspect and a lack of good faith.

## Expert Evidence for the Defendants

250.    The defendants relied upon the expert opinion evidence of Mr. David Goddard, Q.C.

Mr. Goddard was admitted to the bar of New Zealand in 1989 and was appointed

Queens Counsel in 2003. He has practiced as a barrister in New Zealand and has

appeared as counsel at proceedings in Samoa. On two occasions he has been retained

by the Samoan Government to advise it on matters pertaining to corporate activity and

domestic company law reform.

*150331 Tempo v Fortuna Judgment*

251. Mr. Goddard emphasizes that Samoan company law focuses on substance in preference to form. His evidence stressed the well-known principle articulated in *Re Duomatic Ltd.* [1969] 2 CH 365 and summarized by Mr. Goddard in this way:

> *"The assent of all members is effective to bind the company even if there is a failure to comply with formalities prescribed by companies legislation or by the company's articles."*

252. An important qualification is that the transaction in question must be "honest": per Neuberger, J. in *EIC Services v. Phipps* [2003] EWHC 1507 (Ch).

253. The register of members is prima facie evidence of a person's membership in the company. A party seeking to contradict the register must produce sufficient relevant and admissible evidence to satisfy a court on the balance of probabilities that the entry is incorrect.

254. A company cannot rely upon its own failure to comply with relevant formalities and so deny a member the ability to exercise the rights attached to his shareholding. Section 63(3) of the *Act* makes it clear that the rights of the holder of a share are not affected by the company's failure to issue a share certificate. This applies to bearer shares as well as to registered shares. On the other hand, a bearer share cannot be transferred (for obvious reasons) until such time as a bearer share certificate has been issued to the initial holder.

*150331 Tempo v Fortuna Judgment*

255. Article 113 of Maxima Samoa's articles provides that a share certificate must be signed

by or on behalf of a director or by some other person appointed by the directors for that

purpose. Mr. Goddard says:

> .. *section 63(3) confirms that failure to comply with the sealing requirement does not affect the rights of the holder of the share. It follows that the absence of a signature, or a signature by the wrong person, could not affect the rights of the holder of the share.*

256. Once a valid decision had been made to issue a bearer share or shares, the directors of

Maxima Samoa could delegate the authority to issue the share certificate to some other

person. There is express provision for that in the articles. Moreover, by an application of

the *Duomatic* principle, if the sole shareholder of Maxima Samoa authorized another

person to sign and issue bearer share certificates under the seal on his behalf, and this

was done, the share certificates would be validly issued pursuant to the articles. He

expanded on this as follows:

> *If the sole director of Maxima authorized the issue of a bearer share or the sole shareholder acquiesced in its issue, formal defects or failure to comply with the requirements of the articles would be unlikely to be regarded by a Samoan court as rendering the issue of the bearer share invalid or ineffective. Similarly, if a valid decision was made by the sole director to convert a registered share to a bearer share, or the sole shareholder approved or acquiesced in that conversion, formal defects or failure to comply with the requirements of the articles would be unlikely to be regarded by a Samoan court as rendering the conversion of the share invalid or ineffective.*

257. In short, a defect in the form of the bearer share certificate would not affect the validity

of the prior decision to issue it.

*150331 Tempo v Fortuna Judgment*

258.    As for the validity of the decision to issue a bearer share or shares, this would depend

upon whether that decision has been "authorized or acquiesced in" by the sole director

"or" the sole shareholder of the company, Mr. Niu. Mr. Goddard says:



*I consider that a court in Samoa would focus on whether the decision to
issue/convert the share had as a matter of substance been authorized or
acquiesced in by the sole director and shareholder, Mr. Niu. If Mr. Niu
had authorized or acquiesced in the issue of the share, formally or
informally, then the issue of that share would be treated as valid. It
would not matter whether that authorization/acquiescence took place
before or after the issue. Provided there was such authorization or
acquiescence, a failure by Mr. Niu to pass a formal resolution would not
mean that the share had not been validly issued. Under* Duomatic, *'the
only person entitled to insist on compliance with the articles would have
acquiesced in the making of the decision without such compliance, and
could not later challenge the effectiveness of the decision.*

259.    If the issuance of the bearer share was not valid, "the share simply would not exist". If

the redenomination of the registered share to a bearer share was not valid, then the

registered share would continue in existence in the name of Mr. Niu. He agreed that the

ownership of a bearer share can be separated into legal and beneficial ownership under

a trust but observed that Samoan company law generally concerns itself only with the

legal owner of shares, that is, the person entitled to exercise the rights attaching to the

shares.

260.    It is Mr. Goddard's position that if Mr. Niu approved "or acquiesced in" the conversion

of the registered share to a bearer share on August 6, 1994 the conversion was valid

regardless of any non-compliance with the formal requirements. Mr. Goddard went on

*150331 Tempo v Fortuna Judgment*

to examine certain questions on the assumption that the two bearer shares had been validly issued.

261.   Mr. Goddard noted that the articles of Maxima Samoa require that notice be given to all members at least fourteen days before a general meeting of shareholders but said that "accidental omission" to give notice would not invalidate the meeting. A director who is not a member of a company has no entitlement to be given notice of a general meeting of shareholders; therefore, the lack of notice to Mr. Niu of the January 2004 shareholders meeting of Maxima Samoa would not invalidate the appointment of Mr. and Mrs. Tsien as directors. It is Mr. Goddard's opinion that the holder of the bearer shares in Maxima Samoa (allegedly Mrs. Tsien) was entitled to appoint additional directors and their appointment would be regarded as valid whether or not the necessary formalities were complied with. If the holder of the bearer shares in January 2004 made a decision to appoint Mr. and Mrs. Tsien as directors, a Samoan court would uphold that.

262.   He said the validity of the appointment of Mr. and Mrs. Tsien to the board of Maxima Samoa turns upon who the members of the company were in January 2004. Similarly, the validity of Mr. Tsien's appointment as the authorized representative of Maxima Samoa for the Fortuna EGM turns upon who the members of Maxima were in June 2004.

263. All of the directors of Maxima Samoa were entitled to receive notice of a directors meeting; the failure to give notice of the June 2004 directors meeting to Mr. Niu was an irregularity. That is the position at common law and is the implication derived from article 106 of Maxima Samoa's articles. However, the *Duomatic* principle has application to the validity to the appointment of Mr. Tsien at this meeting as Maxima Samoa's representative to the Fortuna EGM. It is Mr. Goddard's opinion that, if all of the members of Maxima Samoa have acquiesced in the appointment of Mr. Tsien, his appointment would be recognized as valid. He said:

> *"Unanimous shareholder assent to the appointment of a representative would, as a matter of Samoan law, cure any irregularities associated with the board meeting at which directors purported to appoint the representative."*

264. The appointment of Mr. Tsien to represent Maxima Samoa at the Fortuna EGM would be regarded by a Samoan court as effective under the *Duomatic* principle if the decision was "approved or acquiesced in" by all of the members of the company. In this context, if the holder of the bearer shares (allegedly Mrs. Tsien) approved or acquiesced in the appointment of Mr. Tsien, the lack of notice to Mr. Niu would not be effective to invalidate this decision.

265. Finally, it was Mr. Goddard's opinion that, if Mr. Tsien was not properly appointed as Maxima Samoa's representative, a Samoan court would not treat Mr. Niu as authorized to represent it unless Mr. Niu had been so appointed at a valid directors meeting or his appointment had been approved of or acquiesced in by the shareholder or

*150331 Tempo v Fortuna Judgment*

shareholders. He did agree that if Mr. Niu was the only director of Maxima Samoa at the relevant time, he was entitled to appoint himself (informally) as its representative. Mr. Goddard also agreed that a representative's authority to act for a company at a shareholders meeting could be revoked by a unanimous decision of the members of the company pursuant to the *Duomatic* principle.

## The Duomatic Principle

266. Ms. Ey says that the courts of Samoa have not made any decisions in which the *Duomatic* principle has been relied upon. One line of authority (from Commonwealth jurisdictions) requires that the shareholders must be fully informed of the issue upon which their consent is sought before the *Duomatic* principle will apply. The *Duomatic* principle is limited to approval of matters which are *intra vires* and for the benefit of the corporation. Ms. Ey quoted from *Gibbins Investments PTY Ltd. v. Savage* [2011] FCA 527 in which the court said:

> [The *Duomatic* principle] *requires actual, not merely potential assent, and the assent must be informed assent. Meagher, JA spoke of the need for "full knowledge and consent" in Herrman v. Simon at 83, and noted that 'it would be a very odd result if one could waive the destruction of rights of whose destruction one was ignorant.*

267. She went on to say that this view "could well be applied by the Samoan courts as it derives from persuasive common law authorities". She accepted that some other authorities do not appear to go so far. The leading Australian case on the issue is

*Herrman v. Simon* (1990) 4 ACSR 81, a unanimous decision of the New South Wales Court of Appeal. The Court said that "full knowledge and consent" on the part of the shareholders was required. This view has been endorsed and adopted by a number of Australian state and federal court decisions including appellate courts.

268. I am satisfied that the *Duomatic* principle is a part of the law of Samoa. To what degree must the authorizing shareholders understand the step they are taking? There is not much distance between Mr. Goddard's formulation ("authorization") and that of Ms. Ey ("full knowledge and consent"). The question is fact-specific; the authorizing shareholders must have an understanding that is sufficient to demonstrate that they took the step with a reasonable appreciation of what they were doing and the likely consequences.

## The Contract Claim

269. The alleged Fortuna Agreement is that each of Tempo, New Frontier and Wynner would be "entitled to participate equally in the management of Fortuna, and in particular to have equal representation on its board of directors". Since Mssrs. Ting and Tsien are now deceased, it is not enough for Dr. Chen to prove that each of them entered into the alleged agreement in his personal capacity. It is necessary to show by a preponderance of evidence that the three corporate entities controlled by the three men entered into the same agreement.

270.    Fortuna was never anything more than a holding company. Its management rested with
        the board of directors at all times. Thus I consider the reference to "management" in
        paragraph 12(a) of the amended statement of claim to be superfluous. Mr. Green
        admitted as much during argument. The essence of the Fortuna Agreement is equal
        board representation. Broadly, it is alleged that each of the three men was bound to
        cause his holding company to support the election from time to time of the other two
        en to the board to directors. If that was agreed, then each would have accepted
        implicitly that the other two would have a right to participate in the "management" of
        this holding company.

271.    The plaintiffs bear the burden of proving the existence of the Fortuna Agreement on the
        balance of probabilities. The absence of any written record of the Fortuna Agreement is
        a tactical difficulty for the plaintiffs but it does not alter their burden of proof. I also
        disagree with a suggestion in the defendants' closing submission (at paragraph 157) that
        the burden of proof is affected in any way by the fact that two of the three parties to
        the alleged conversation are deceased.

272.    Each of the three men has referred to his preference, in accordance with the traditional
        Chinese approach to business dealings, for informal and verbal agreements. Mr. Ting
        said to the Joint Inspectors that agreements "in the business operations" of Fortuna
        were originally "informal and verbal" but that this changed commencing in February

*150331 Tempo v Fortuna Judgment*

2004. Mr. Tsien said in his affidavit that business was conducted "informally" which, in context, appears to mean in the absence of a written agreement. Dr. Chen spoke in detail in his evidence of the reluctance to reduce agreements to writing. I accept the general proposition that important business agreements in Taiwan are (or at least have been in the past) often concluded verbally and not reduced to writing.

273.    The Fortuna Agreement was never reduced to writing. There is no reference in any document before me to the existence of the Fortuna Agreement. Fortuna's articles contain no hint of any agreement between the shareholders about equal board representation. No board minutes of the holding companies contain a resolution ratifying such an agreement.

274.    There is direct evidence for the existence of the Fortuna Agreement from Dr. Chen and direct evidence denying its existence from Mr. Tsien. Dr. Chen's evidence was lacking in circumstantial detail. He displayed a tendency in cross-examination to overstate the precision with which he could recall distant past events. Mr. Tsien was not of course cross-examined. His affidavit contains a denial that the three men ever agreed to a partnership or quasi-partnership but there is a letter in his own hand dated September 27, 1993 in which he described the relationship as a "three-party partnership". Each witness was advancing a version of events that accorded closely with his own financial interests. I would not accept the evidence of either man unreservedly.

*150331 Tempo v Fortuna Judgment*

275.    Both the plaintiffs and the defendants each characterized the evidence of the other side
        as having been "heavily lawyered". Both are correct. Aside from Dr. Chen, none of the
        witnesses had any useful evidence to offer concerning the existence of the Fortuna
        Agreement. What was offered was typically vague and impressionistic. A number of
        witnesses said they were not aware of the Fortuna Agreement and had the impression
        that no such agreement had been entered into. I cannot derive any real assistance from
        this evidence. In short, I must look to the reliable circumstantial evidence to resolve this
        question.

276.    The plaintiffs emphasize that the three men and their holding companies acted in a
        manner entirely consistent with the existence of the Fortuna Agreement between 1994
        and 2004. In general, each holding company had one representative on the board during
        that period of time. Each man was content to have the other two as his fellow directors.
        When the second generation of family members – Randy Chen, Gayle Tsien and Arthur
        Ting – was appointed to the board the existing equality between the three families was
        maintained. Arthur Ting referred in his witness statement to Twenty First Century, Inc.
        as "a corporate director appointed by Wynner". Gayle Tsien said in an email of June 2,
        2004 that the Tsien family had three directors on the board while the other two families
        had just two directors. "Thus", she said, "there will be a proposal for a reduction of
        directors tabled at the meeting". I am satisfied that there was a pattern of conduct
        from 1994 onwards in which each of the three men and their companies enjoyed equal

*150331 Tempo v Fortuna Judgment*

board representation. I am satisfied that the younger family members – the so-called second generation – enjoyed equal representation for the three families also.

277.    This established pattern of conduct is some evidence for the existence of the Fortuna Agreement but it is not In my estimation particularly weighty. Each of the three men may well have decided, for reasons personal to him and in his own best Interest, to support the election of the other two to the board of directors. Each man may well have acted throughout the ensuing decade consciously in parallel with the other two principals without having committed himself to an enforceable obligation. The crucial question is not whether each of the men acquiesced in equal board representation as long as relations between them were good but whether each man bound his holding company by an enforceable agreement to guarantee equal representation even if the relationship soured. In other words, was there an exchange of promises In 1994 by which each of the three holding companies acquired a right to equal board representation combined with an enforceable obligation to support equal board representation? The pattern of conduct throughout the period 1994 to 2004 is consistent with the existence of the Fortuna Agreement but equally consistent with individual and voluntary decisions on the part of the three principals that equal board representation was appropriate and beneficial.



278.    As the plaintiffs have said, an agreement on equal board representation is entirely plausible in the circumstances. Each man was making an investment of a substantial

*150331 Tempo v Fortuna Judgment*

size. Each was engaged in posting security for Fortuna's borrowing and each was putting his own personal fortune at risk. It would not be unusual for three investors in this situation to enter into an express agreement about equal board representation. I do not consider such an agreement inevitable. An investor with a significant degree of trust in his fellow investors might well be content to leave the strategic decision-making ("management" if you like) of the company in their hands. He might prefer to apply his energy to other projects and remain a passive investor. Moreover, in light of the evidence I have heard about the traditional Chinese approach to business relationships, it is plausible that each of the three men may have simply assumed that each would have equal board representation without the need for an express agreement. Each man would have had a natural expectation to sit on the board of directors. I am satisfied that each man would have felt in 1994, and would have continued to feel as time passed, an entitlement to sit on the board or to designate a substitute. This circumstance – the sense of entitlement – does not advance the plaintiffs' case very far. While the three men may have decided to guarantee their right to sit on the board by entering into the Fortuna Agreement, it is also plausible that they chose to rely upon the good will and spirit of co-operation which no doubt existed at the time. In other words, they may have been content to rely upon each other to do the "right thing" without legal compulsion.

279. At one point in his evidence Dr. Chen referred to the Fortuna Agreement as a "gentleman's agreement". Historically, this phrase has been applied to agreements which are not intended to be enforceable in a court of law; the parties to a gentleman's

*150331 Tempo v Fortuna Judgment*

agreement depend upon the sense of honour and obligation of the other parties to ensure the agreement is honoured. Dr. Chen did not intend to use the phrase in that sense (and I am conscious that English is not his first language) but it seems to me there is but a narrow line between a gentleman's agreement and the sort of conscious parallelism I have described above. In short, it is certainly plausible in the circumstances that the three men entered into an express oral agreement on equal board representation but the possibility that they simply went forward assuming that each would act in such a way as to allow equal board representation is by no means implausible. The question is not whether the Fortuna Agreement was a natural one for them to have made in the circumstances but whether they actually did come to such an agreement. If each of the three men assumed that the atmosphere of goodwill would continue and that each man would have a seat on the board, an agreement to that effect would have been unnecessary. My task is to determine whether the three men not only assumed that equal representation would be appropriate and fair, as they obviously did, but whether they each acquired legal rights and obligations arising from an exchange of promises.

280.    The defendants advance a number of arguments against the existence of the Fortuna Agreement. The amended statement of claim alleges that the Fortuna Agreement originated in 1989 and was "carried over and/or transferred" to the three holding companies in 1994. This pleading introduces a note of confusion because in 1989 the KMT controlled CT & D Taiwan and was entitled by written agreement to six of the nine

*150331 Tempo v Fortuna Judgment*

board seats. Although the KMT accepted that each of Mssrs. Chen, Tsien and Ting would have a seat on the board, the three men could not on their own have brought that about. There would have been little point in the three men agreeing to equal board representation between them; it was the KMT which had to and did accept that stipulation.

281.    The primary case for the plaintiffs (which evolved somewhat during the course of the action) is that there was a fresh agreement concluded between the three holding companies in 1994. Dr. Chen's evidence is that the Fortuna Agreement was entered into around January 29, 1994. However, one of the companies – New Frontier – did not exist until August 9, 1994 and could not have been a party. There is no evidence of a later ratification by New Frontier of any pre-incorporation contract.

282.    Moreover, Dr. Chen told the Joint Inspectors that he was unaware of Tempo's existence until after 1994; Tempo was acquired for him by Mr. Tsien. At trial he sought to explain this away as a mistake but I am satisfied it was not. The context in which the statement was made leads me to that conclusion. Tempo was a shelf company acquired from OIL at the behest of Mr. Tsien. It was Mr. Tsien who arranged for Dr. Chen to hold his Fortuna shareholding in a company incorporated offshore in the British Virgin Islands. Dr. Chen was telling the Joint Inspectors that Tempo could not have consented to certain shareholder advances because he had not yet learned of its existence. The point

*150331 Tempo v Fortuna Judgment*

was of considerable importance to Dr. Chen and to the Joint Inspectors. The assertion was not accidental.

283. There are occasions upon which, if the Fortuna Agreement had been made, one would expect Dr. Chen to have said so clearly. In 2004 Dr. Chen filed a petition seeking the winding up of Fortuna. He did not at that time seek injunctive relief as would have been his right if the Fortuna Agreement existed. He said in his winding up petition affidavit (at para. 231) that a winding up was his "only" remedy.

284. Neither the winding up petition nor Dr. Chen's affidavit in support describes the Fortuna Agreement in express terms. His petition (which was drafted by experienced counsel) asserts that there was a personal relationship of mutual trust and confidence between three men which had broken down and that Dr. Chen had "justifiably" lost confidence in them. The petition and affidavit in support refer broadly to "a mutual understanding and agreement" and to a "partnership-type relationship" or a "quasi-partnership". The agreement about equal board representation is said to have been "an inherent part of the understanding between" the three men. The petition says that Mssrs. Ting and Tsien have acted in an oppressive and prejudicial manner towards Tempo and Dr. Chen. In light of these claims, it cannot be argued (as the plaintiffs sought to do) that a clear description of the Fortuna Agreement and its breach were immaterial to the issues raised in the petition. The implication left by the winding up petition and its supporting material is that there was no clear, express, enforceable

150331 Tempo v Fortuna Judgment

agreement: If there was, Dr. Chen would have said so and would have provided a narrative of how the agreement had been reached.

285.   Dr. Chen's lawyer, Mr. Hatzer, engaged in a significant amount of correspondence with the attorneys for Mr. Tsien and Mr. Ting in 2004 but made no mention of the Fortuna Agreement. It would have been in the interests of both Dr. Chen and Maxima Samoa (which was also represented by Mr. Hatzer) to invoke the terms of the Fortuna Agreement if it existed.

286.   On balance, I consider that the circumstantial evidence taken as a whole is more consistent with the absence of an express agreement than with the existence of one. When I weigh the oral evidence together with my assessment of the reliable circumstantial evidence, I find I have not been satisfied on the balance of probabilities that the Fortuna Agreement was ever made. It is more probable than not that the three men simply acted throughout the years in a spirit of mutual cooperation while there was harmony between them, resulting in each of them having equal board representation. I am satisfied, however, that they did not engage in an express exchange of promises creating enforceable legal obligations.

287.   As an alternative argument the defendants say that, if there was an express agreement for equal participation in management and equal board representation, the terms are too uncertain to be enforceable. If the term about equal participation in management

*150331 Tempo v Fortuna Judgment*

were to be viewed in isolation, I would agree that it lacks sufficient certainty. However, as I have said above, this aspect of the Fortuna Agreement is redundant. Given Fortuna's single and narrow purpose (to act as a holding company), participation in Fortuna's management equates to having a seat on its board of directors.

288.   I see no difficulty with certainty in a term that board representation must be "equal". Each of the three principals had an approximately equal shareholding (although Mr. Tsien had relinquished a 5% shareholding to Maxima). Each of the three holding companies would be entitled but not obliged to designate one-third of the board members.

289.   I am equally unconvinced that the lack of a term setting out the duration of the Fortuna Agreement renders such an agreement unenforceable. The clear implication in any agreement for equal board representation arising from equal shareholdings is that the equality would be maintained for so long as the shareholdings remained roughly equivalent.

290.   The plaintiffs have also pleaded in the alternative that an agreement for equal board representation is implied. The plaintiffs devoted just three paragraphs of their argument to this proposition and said little about it in argument.



291.    The question is whether an implied term for equal board representation "is essential to give effect to the reasonable expectations of the parties": per Lord Steyn in *Equitable Life Assurance Society v. Hyman* [2002] 1 AC 408 (HL). There is a presumption against the implication of terms in commercial agreements: Lewison, *Interpretation of Contracts*, at page 286.

292.    I do not consider the provision of equal board representation "essential" to give effect to the reasonable expectations, viewed objectively, of Dr. Chen, Mr. Ting and Mr. Tsien or their respective holding companies.  It was well understood that Mssrs. Ting and Tsien would be managing the various entities of the Fortuna Group while Dr. Chen remained, for the most part (and despite his denial of it), a passive investor.  Dr. Chen no doubt had an expectation that he would be a director of Fortuna but I am not persuaded that the nature of the relationship made it "essential" that he have one.  Dr. Chen was to play a leading role in the provision of security for Fortuna's indebtedness but that function does not require that he have a directorship.

293.    Finally, there is nothing in the authorities cited to me which suggests that whenever a small number of investors have equal shareholdings in a company it is essential that they have equal board representation. No such broad rule exists.

294.    A further difficulty in the contract claim is the lack of any evidence regarding how the three holding companies acquired the alleged contractual rights. There is no evidence of

*150331 Tempo v Fortuna Judgment*

an assignment of rights by any of the three men to his holding company and no evidence of ratification by Tempo and New Frontier of the Fortuna Agreement which, if it was made at all, must have preceded the incorporation of those two entities. On this basis, also, I would dismiss the claim.

295.   The defendants also argue that if the contract was entered into Dr. Chen repudiated his contractual obligations by his behavior and activities in the spring of 2004.      Dr. Chen's heavy-handed communications with Fortuna's lenders during that period created a risk that the lenders would declare an event of default. They did not do so, but Dr. Chen's willing assumption of that risk was arguably in breach of his fiduciary obligations to Fortuna and its shareholders.

296.   The alleged Fortuna agreement was a simple exchange of promises that each of the three holding companies would have the right to designate an equal number of directors. To repudiate this agreement, Dr. Chen would have had to act in such a manner as to show unequivocally that he did not intend to support the continuing presence on the board of directors of Mr. Ting or Mr. Tsien or both of them. An act of repudiation must go to the root of the contract: *Molena Alpha Inc. et al v. Federal Commerce and Navigation Co. Ltd.* [1979] AC 757 (HL). The repudiatory breach must deprive the innocent parties of substantially the whole benefit which they would have obtained from due performance of the contract: *Hong Kong Fir Shipping Co. Ltd. v. Kawasaki Kisen Kaisha Ltd* [1962] QB 26 at 72 (HL). There is no suggestion in the

evidence that Dr. Chen threatened or attempted to withdraw his support for a board of directors made up of equal representation from the three holding companies. Nothing less than that can amount to a repudiation of his obligations. Had I found that the Fortuna Agreement was made, I would not have dismissed the plaintiffs' claim on the ground that Dr. Chen repudiated the contract afterwards.

297.  For these reasons, the plaintiffs' claims concerning the Fortuna Agreement are dismissed.

## The Company Claim

298.  At an extraordinary general meeting of the shareholders of Fortuna held on June 22, 2004 a number of ordinary and special resolutions were passed over the objections of Dr. Chen. The effect of these resolutions was to remove Dr. Chen from the Board of Directors and to impose severe restrictions upon his right to deal with his shares. The special resolutions required a two-thirds majority of votes to pass, measured by the shareholdings of the persons voting. Messrs. Tsien and Ting, who were both present and voting, held (through Wynner and New Frontier) 55% of the shares between them. Bates, which was controlled by Messrs. Tsien and Ting, owned a further 10% of the shares. Since Dr. Chen was clearly opposed to the special resolutions, the support of Philip Niu was vital; he controlled Maxima Samoa's 5% shareholding, which would have enabled Mssrs. Tsien and Ting to satisfy the two-thirds majority requirement.

*150331 Tempo v Fortuna Judgment*

299.    Mr. Niu attempted to attend the meeting but was denied entrance. Everyone present
        was well aware that he intended to support Dr. Chen and that, if he was admitted, the
        special resolutions would fail. The plaintiffs say that Mr. Niu was "entitled at all material
        times to exercise the voting rights of the Fortuna shares held by Maxima".

300.    When Mr. Niu was refused entry, Gayle Tsien told him that Maxima Samoa had already
        granted a proxy for the EGM to Mr. Tsien. At the meeting Mr. Tsien produced minutes
        of the board of directors of Maxima Samoa dated June 14, 2004 purporting to appoint
        himself as its proxy. The plaintiffs say that this was a false document and that the
        exclusion of Mr. Niu from the EGM was a deliberate act by New Frontier and Wynner "in
        their attempt to falsely engineer a special majority". The plaintiffs argue that Mr. Tsien
        had no authority to represent Maxima Samoa at this meeting. Since these acts were
        deliberate, there was a lack of good faith on the part of Mssrs. Tsien and Ting and all
        business transacted at the EGM should be regarded as a nullity.

301.    Resolution of this issue starts with a consideration of whether Philip Niu was, at all
        material times, the beneficial owner of the shares of Maxima Samoa. He says he was.
        The case for the defendants is that Maxima Samoa was owned beneficially at all
        material times by Pearl Niu and the legal owner of its shares "throughout" was Mrs.
        Josephine Tsien.



150331 *Tempo v Fortuna Judgment*

302.    When Mr. Robert Niu passed away in 1974, his assets fell under the control of his surviving wife, Pearl. Neither side has produced any evidence explaining the law of succession in Taiwan. The defendants say that Pearl Niu became the owner of the entire estate and the plaintiffs have been content to advance their claim on that basis.

303.    The plaintiffs argue that the U.S. $5,000,000 investment in Maxima Samoa by Philip Niu was a gift from Pearl Niu, probably to be debited against his ultimate share of her estate. The defendants say that the money belonged to Pearl Niu, that she did not give it to her son, and that she made the investment on her own account for her own benefit. The defendants argue that she made Philip Niu (briefly) a shareholder of Maxima Samoa and appointed him as a director in recognition of her expectation that the shareholding would ultimately become his through inheritance. Until her death, she intended to remain the beneficial owner of Maxima Samoa.

304.    Philip Niu's evidence was confused, lacking in detail, and subject to some internal contradictions. However, my assessment of his veracity is that he was at all times speaking the truth as he perceived it to be. I saw no sign that he was embellishing his evidence or purporting to remember things which he had in fact forgotten. The gist of his evidence is that he always understood that he was the beneficial owner of Maxima Samoa because his mother had given him the U.S. $5,000,000 as an advance upon his share of his father's estate. The spreadsheet prepared by Gayle Tsien at Pearl Niu's direction in March 2004 accords with Philip Niu's evidence. It shows a debit of U.S.

*150331 Tempo v Fortuna Judgment*

$5,000,000 against his share of the Family Funds with a line item description reading "less: CT & D share purchase (P. Niu only)". In context, this refers to a purchase by Philip Niu not by Pearl Niu. The figures in the spreadsheet appear to be derived from an earlier document in the handwriting of Mr. Tsien. Whether or not the spreadsheet was prepared (as Pearl Niu and Gayle Tsien allege) for the purpose of estate planning, I accept it as some confirmation of Philip Niu's evidence that he was given the sum of U.S. $5,000,000 by his mother. I am satisfied that Mr. Niu's evidence that he was Maxima Samoa's beneficial owner is the product of an honest and sincere belief, uninfluenced by his personal financial interests. Mr. Niu was not told by anyone, at any relevant time, that he was not the beneficial owner of the company.



305.    The remaining question is whether Mr. Niu could have been mistaken. In light of his lack of business experience and general lack of interest in financial matters, there is room for a conclusion that he was wrong to think that beneficial ownership of Maxima Samoa had been given to him.

306.    The primary evidence of Pearl Niu's beneficial ownership comes from Pearl Niu herself. She was not cross-examined but I must make an assessment of her credibility in any event.

307.    Pearl Niu is now 101 years of age. At the time of the investment in Maxima Samoa she would have been about 80 years of age. She appears to have been heavily influenced by

*150331 Tempo v Fortuna Judgment*

Mr. Tsien during his lifetime. She has described Mrs. Josephine Tsien as "my full-time carer" upon whom "I rely heavily". I infer that as Mrs. Niu advanced in years she fell increasingly under the influence of her daughter and son-in-law.

308. The explanation advanced by Mrs. Niu in her evidence (which includes her witness statement and her previous affidavits) to explain the investment in Maxima Samoa lacks plausibility. She says that she decided to make the investment on her own behalf and although the shareholding "may ultimately be passed on to Philip" she had made no decision about that. She then says "accordingly, Philip was appointed as a director". No convincing rationale is offered for why she decided upon this appointment if the company was hers. Philip Niu was entirely uninterested in matters of business and at that time was quite content to have Mr. Tsien manage the family's affairs. Since Maxima Samoa was merely a holding company for an investment in Fortuna, making Philip Niu a director would not provide him with any useful experience.

309. Pearl Niu goes on to say: "as a matter of formality, he was the holder of the single share subscribed for on the incorporation of Maxima". No further explanation is given. Why, if the investment was to be hers, would she place the single share of Maxima Samoa in the name of her son? Pearl Niu's evidence then asserts that she left the "company documents" of the company in the keeping of Mr. Tsien. In her affidavit of January 13, 2005 Mrs. Niu said that her son Philip was named as the registered shareholder of Maxima Samoa "simply for the purposes of effecting the transfer of Maxima to me from

OIL Samoa..." The transfer of the share from OIL could have been effected with equal ease whether the transferee was Philip Niu or Pearl Niu.

310.    Pearl Niu says she instructed Mr. Tsien to cancel the registered share in Maxima (in the name of Philip Niu) and to issue two bearer shares "to give me greater flexibility over any future distribution of Maxima that may be necessary". This makes little sense and is left unexplained. If, as she says, Pearl Niu intended to retain the beneficial ownership in Maxima Samoa she would have instructed OIL to issue the single registered share in her name. There is no convincing reason why the issuance of two bearer shares would give her "greater flexibility" in the "future distribution" of the company's ownership. Her evidence then says: "I thought that the creation of bearer shares would allow me to retain control over Maxima and my interest in Fortuna during my lifetime but would be easy to transfer to my son..." How did she retain control? She says: "I took steps to ensure that the bearer shares remained in my control by asking Mr. Tsien and my daughter to keep them in their custody on my behalf..." Since possession of a bearer share gives legal ownership to the bearer, giving the certificates to Mr. and Mrs. Tsien is relinquishing control not retaining it. No sensible explanation is offered for why this tortuous arrangement would constitute an improvement upon a straightforward issuance of a single registered share in the name of Pearl Niu. Mrs. Niu also said (in her affidavit of December 17, 2004) that she had "physical possession" of the two bearer shares; in fact, it was her daughter and son-in-law who had them in their possession. As for the signatures on the two bearer share forms, Pearl Niu confirms that

*150331 Tempo v Fortuna Judgment*

they are hers but offers no explanation whatever for why she signed them after having transferred legal ownership of Maxima Samoa to Mr. Tsien or to Mrs. Joseph (or both).

311.    Having said, essentially, that Maxima Samoa was not a gift to Philip Niu because she had yet to make any decision about that, Pearl Niu then instructed Mr. Tsien to pay dividends totaling over U.S. $3,000,000 to Mr. Niu (and to his wife) as a "gift". This "gift" is roughly 60% of the value of the original investment. Thus, although (on her evidence) she retained beneficial ownership of the company at all times, her son was the sole director, the sole registered shareholder, and the ultimate recipient of over U.S. $3,000,000 in dividend income. One of the dividend payments was recorded as "re payment of Pearl Niu" but the other three had no such notation. This notation was not explained further in the evidence; the "beneficiary" (sic) of the payment was described as Philip and Rosemarie Niu. I regard the receipt of these large dividend payments as evidence inconsistent with Pearl Niu's beneficial ownership of the shares.

312.    Mrs. Niu claims that by the end of 2003 she decided to add Mr. and Mrs. Tsien to the board of directors of Maxima Samoa. She says she instructed them that the bearer shares would remain under her "control" and that she would give directions as to how the company would vote at Fortuna shareholder meetings. The bearer shares were not under her control; they were locked in a safe to which only Mr. and Mrs. Tsien had access. If the bearer shares were validly issued, their possession by Mr. and Mrs. Tsien

gave them legal ownership of the company. That means they would be entitled to determine how Maxima Samoa would vote (although they may have had some obligation to consult the beneficial owner before making that decision).

313.    Pearl Niu says she did not advise her son that he was now to be joined on the board of directors by two new directors because she hoped to avoid strife in her family. This makes no sense; no matter how diplomatically it may be put, Mr. Niu had to be told that the board of directors now contained two additional directors.

314.    Pearl Niu's evidence is a mass of implausible, inconsistent, and insufficiently explained assertions. I do not believe it. Where her evidence conflicts with that of her son, I prefer his evidence to hers. I do not believe that Pearl Niu has the degree of understanding suggested by her evidence of the matters she describes. I accept the evidence of Philip Niu that he has never discussed the question of bearer shares with his mother, that she would not have had any knowledge of bearer shares, and that he first became aware of her claim to be the beneficial owner of Maxima Samoa from evidence filed in the winding-up proceeding.

315.    The evidence of Josephine Tsien adds little to the defendant's case. It is obvious that she did what was asked of her by her husband and signed whatever he put in front of her. Mrs. Tsien does not pretend it was otherwise. She has said in evidence that she always understood that Maxima Samoa was owned by her mother. She took instructions from

*150331 Tempo v Fortuna Judgment*

her mother from time to time.   Overall, nothing in the evidence of Mrs. Tsien contributes anything of substance to the question of beneficial ownership.

316.    As in the case of Pearl Niu, I must make an assessment of the credibility of the evidence given in the winding-up proceeding) of Mr. Ferdinand Tsien although he has never been cross-examined. Mr. Tsien's narrative bears a strong resemblance to that of Pearl Niu – so strong, in fact, that this in itself raises doubt about his credibility.

317.    He says that Pearl Niu was always the beneficial owner of Maxima Samoa. She intended that Philip Niu would inherit the company after her death. When addressing Philip Niu's acquisition of the single registered share, Mr. Tsien says that he was "as a matter of formality" made the transferee of the single ordinary registered share.   Here he uses the same odd phrase ("as a matter of formality") as is found in the evidence of Pearl Niu; like Mrs. Niu, he fails to explain what he means.

318.    Mr. Tsien goes on to say that he understood that Mrs. Niu told Philip Niu that she would retain Maxima Samoa "under her control". His evidence repeats the same assertion found in Pearl Niu's evidence that she "took steps to ensure that the bearer shares remained in her control". He says: "I believe that it was for this reason that Mrs. Niu gave instructions for the initial (registered) ordinary share to be cancelled and for two bearer shares to be issued". He says this was done to "allow Mrs. Niu to retain control

over Maxima" and also because it would "be easy to transfer" Maxima to her son in due course.

319. Like Pearl Niu, Mr. Tsien gives no plausible or sensible explanation for the issuance of the bearer shares. He implies that it was Pearl Niu's idea; in fact, I am confident the idea originated with Mr. Tsien. Unlike Mrs. Niu, Mr. Tsien was a man with very substantial business experience and sophistication; if there was a cogent explanation for the issuance of the bearer shares, he would have known it.

320. Mr. Tsien says that sometime late in 2003 Pearl Niu asked him and his wife to become additional directors of Maxima Samoa. He says she made it clear that "our votes would be subject to her directions". This evidence suggests that in late 2003 (at the age of 89 or 90) Pearl Niu was still robust enough to exercise firm control over her assets and over the company's affairs. Despite her alleged ability to give firm instructions to the two new directors, she was unable to summon the initiative to advise the sole current director that the board had been expanded.

321. In general, Mr. Tsien's evidence follows the narrative of Pearl Niu's story very closely. My assessment of his credibility is the same as that for Pearl Niu. I do not believe his evidence where it contradicts the evidence of Philip Niu.

322. Gayle Tsien has testified that she always understood that it was Pearl Niu, not Philip Niu, who invested in Maxima. In general, Gayle Tsien's evidence is reflective of things she was told by others; she has little personal knowledge of the ownership question.

323. Some of Gayle Tsien's contemporaneous emails tend to contradict her evidence. In one email shortly before the June 22 EGM, she referred in an email to Philip Niu to the "voting of your shares" (underlining added). Her explanation that this was just a "colloquial reference" and "not worded well" is not credible. I also do not accept Gayle Tsien's explanations for her trip to San Francisco in June, 2004. I am satisfied that she would not have travelled from Taiwan to San Francisco to attempt to convince Philip Niu to provide his proxy to Mr. Tsien if she was certain, as she says, that the true beneficial owner was her grandmother. The only plausible explanation for the trip to San Francisco is that both Gayle and Josephine Tsien were well aware that Philip Niu, as Maxima Samoa's validly appointed director and beneficial owner, intended to support Dr. Wen at the EGM.

324. I find that Pearl Niu made a gift of U.S. $5,000,000 to Philip Niu in 1994 which was used to acquire a shareholding in Maxima Samoa. Mr. Niu is and always has been the beneficial owner of the company. Pearl Niu has never been the beneficial or legal owner of Maxima Samoa. It follows that the *Duomatic* principle, so heavily relied upon by the defendants in argument, can have application only to acts and transactions undertaken by Philip Niu on behalf of his company.

325.    The next question of substance is whether the bearer shares were validly issued or whether Mr. Niu continued to be the legal owner by virtue of the single share registered name. If the bearer shares were never validly issued the cancellation of the red share would be invalid for the same reasons.

326.    If the bearer shares were issued validly, then Mrs. Tsien (as the defendants argue) or Mr. Tsien (who controlled her actions) became the legal owners of Maxima Samoa by virtue of their possession of these negotiable instruments. Mrs. Tsien was a simple nominee for Mr. Tsien at all times. As the legal owners, Mr. and Mrs. Tsien were entitled to appoint themselves to the board of directors of Maxima Samoa in January 2004. As the legal owners, they were entitled under the *Duomatic* principle to designate Mr. Tsien in June 2004 as the authorized representative of Maxima Samoa for the Fortuna EGM. As directors, they had (if validly appointed) the same authority. Fortuna was obliged to recognize anyone appointed by Maxima's board as its representative even if, to Fortuna's knowledge, Philip Niu retained beneficial ownership of Maxima. That is one consequence of the division between legal and beneficial ownership: it is only the legal owner who is entitled to be regarded as the owner by third parties. For these reasons, I must resolve the validity of the bearer share issuance even though I am satisfied that Mr. Niu remained the beneficial owner of Maxima at all relevant times.

327.    Maxima's register of members records that share certificate no. 1 in the name of Philip Niu was cancelled on August 6, 1994. The register contains entries on the same day

*150331 Tempo v Fortuna Judgment*

asserting that share certificates no. B001 and B002 in bearer form were issued. I accept the general proposition, upon which the defendants have placed heavy reliance, that the state of the register creates a rebuttable presumption that the bearer shares were validly issued (and the registered share cancelled) under the law of Samoa. The plaintiffs bear the burden of showing on the balance of probabilities that the bearer shares and the cancellation were invalid.

328.    I accept the evidence of both Samoan law experts to the effect that the real question is one of substance not form. If the director of Maxima Samoa on August 6, 1994 (Philip Niu) or, for that matter, the sole shareholder on that date (also Philip Niu) made a conscious decision to convert his registered share into bearer shares then any deficiency in the formalities would not render the shares invalid. Mr. Goddard said that the bearer shares were validly issued if the sole shareholder "authorized" or "acquiesced" in their issue. While I entertain some doubt that acquiescence in these peculiar circumstances would be sufficient, I am content to approach the question on that basis.

329.    What was Philip Niu's state of mind in August, 1994? His evidence on this subject, which I accept as truthful in its entirety, was:

> *Q. And you are obviously now familiar, Mr Niu, with what a bearer share is, and can you recollect when you first learnt about the existence of bearer shares and what they are?*
>
> *A.    I don't think I ever had bearer share. I didn't know that, actually. There's – it's only quite recently I said before, Ferdie was still living, though, at that time, quite a while ago, 94/93, something like that. That's*

*the first time I ever had contact with offshore corporation. He introduced
me to this.*

*Q. What you told the inspectors in 2004, and I can show you to remind
you, if we can go to bundle E at page 2. Do you remember that you were
interviewed twice by the inspectors? Do you remember -- do you
remember, Mr Niu, that you were interviewed twice by the inspectors?*



*A. Yes.*

*Q. And there are records of what you told the inspectors, and the first of
those is your interview in September 2004. And if you go to bundle E in
divider 2 at page 30.*

*A. Divider 2.*

*Q. So at the bottom of the page, the last but one question asked by Mr
Walker, the inspector, was:*

*"What is your understanding with respect to in terms of the shares
issued? The documents we have show there's a bearer share. Is it your
understanding that the share that was issued to you was a bearer share?*

*Answer: No, not until maybe just recently. I have no idea what a bearer
share is."*

*So I am going to suggest to you, Mr Niu, that it wasn't until the whole
dispute about who owned Maxima that you even came to know what a
bearer share was. Is that correct?*

*A. I think that's true, yeah.*

*Q. That's true. Thank you. So it follows from that that when Maxima was
incorporated ten years before, you didn't know the difference between a
registered share and a bearer share?*

*A. No, sir.*

*Q. Thank you. And so would it be a fair summary, Mr Niu, that apart
from what you have learnt by reason of your involvement in the dispute
about who owns Maxima, you really have no familiarity with the internal
workings of companies?*

*A. No.*

330.  As this evidence shows, Mr. Niu did not know what a bearer share was in that there was no intention of issuing any. I am satisfied that Mr. Tsien took no step to explain to Mr. Niu the nature of bearer shares or his reason for wanting to issue them and take them into his own possession.

331.  By "cancelling" the registered share in his own name, by "issuing" bearer shares, and by delivering the bearer share certificates into the hands of Mr. and Mrs. Tsien, Philip Niu was surrendering legal ownership of Maxima Samoa. There was no conceivable reason for him to do this. He derived no benefit whatsoever from it. Neither did the company. Mr. Niu was happy to have Mr. Tsien's advice and content to have Mr. Tsien do the minimal amount of work necessary to maintain Maxima Samoa in good standing. Until the dispute with Dr. Chen came to a head, Mr. Niu was content to have Mr. Tsien represent Maxima Samoa at Fortuna shareholder meetings. None of that required or was assisted in any way by the issuance of bearer shares. A simple letter or power of attorney could have clothed Mr. Tsien with the authority he needed. Mr. Tsien engineered the "issuance" of the bearer shares to give himself control over Maxima Samoa's affairs; he was not in any sense serving the interests of Mr. Niu. Mr. Tsien wished to control Maxima Samoa's voting at Fortuna shareholder meetings and wished to ensure that the shareholding remained in safe hands.

332. I am satisfied that Mr. Niu had no intention of surrendering legal ownership of Maxima Samoa to Mr. Tsien at any time. He understood that Mr. Tsien was representing the company at Fortuna shareholder meetings and had no objection to that. He never agreed to or even acquiesced in any broader transfer of rights to Mr. or Mrs. Tsien. Having no understanding of the nature of bearer shares, Mr. Niu cannot be said to have "authorized" or "acquiesced in" their issuance in any meaningful sense.

333. Philip Niu did sign two documents presented to him by Mr. Tsien which make reference to bearer shares. There is an undated letter from Mr. Niu to "the board of directors" of Maxima Samoa, i.e., to himself. The letter reads:

> On behalf of the bearer, I hereby apply for one share of US$1 each in the capital of the company and undertake to pay in full in cash for the said share upon allotment.
>
> Yours faithfully, for and on behalf of bearer
>
> [Philip Niu's signature]

334. The other document is the minute of the first directors meeting held on August 6, 1994. A number of matters were dealt with at the meeting, most of which are routine and necessary tasks upon the incorporation of a company. Item no. 7 is unusual; it reads:

*Application for an allotment of shares*

*The following applications for shares in the company were submitted:*

| Applicant | No. of Shares | Consideration |
|---|---|---|
| Bearer | 1 | US $1 |

*It was resolved that the applications be approved and that the shares be issued accordingly. It was further resolved that the common seal of the company be affixed to the share certificates to be issued and that details be entered into the register of members.*

se minutes are signed by Philip Niu.

335.    Also in evidence are two pieces of paper purporting to be bearer share certificates no. B001 and B002. Each of these contains the signature of Pearl Niu, signing as a "director". She was never a director and has never explained why she signed these certificates. Mr. Niu says he has never seen the bearer share certificates until recently; I believe his evidence to that effect.

336.    There is an unsigned draft of a letter dated August 6, 1994 from Philip Niu to himself as director of Maxima Samoa whereby he requests himself to convert his registered share into a bearer share. I place no reliance upon this document. The defendants argue that the existence of an unsigned letter is some evidence that the original of the letter was signed but has since been lost. It is not. When the genuineness of a document is questioned, an unsigned copy cannot substitute for the original.

337.    Josephine Tsien's letter of July 5, 2004 is a self-serving attempt to create evidence favouring the defendants at a time when Dr. Chen was initiating litigation over the validity of the June 22 EGM. I consider it devoid of evidentiary value.

*150331 Tempo v Fortuna Judgment*

338.    I am satisfied that Philip Niu had no understanding of the significance of the undated
        application letter when he signed it. I am also satisfied that he had no understanding of
        the significance of item 7 of the minutes of the first directors meeting, even assuming
        that he read the minutes before signing them (which I doubt). Mr. Niu signed these
        documents because he trusted Mr. Tsien, who presented the documents to him for
        signature.

339.    Moreover, I find Mr. Tsien's failure to present the bearer share certificates to Philip Niu
        for his signature to be suspicious. Mr. Green argues that these certificates were created
        shortly before the EGM, at a time when Philip Niu was no longer willing to sign whatever
        Mr. Tsien put in front of him. From Mr. Tsien's point of view at that time, the best
        alternative was to have Pearl Niu, the alleged beneficial owner of the company, sign the
        two certificates. Mr. Green notes that Mr. Tsien had possession of the registers of
        members and directors and could easily have made the appropriate register entries
        himself. Mr. Green may be right but it is unnecessary for me to determine when the
        bearer share certificates were created and the register entries made.

340.    On balance, I am satisfied that the evidence of Philip Niu considered together with the
        relevant documents is sufficient to rebut the presumption of regularity of the register. It
        is more probable than not that Philip Niu, Maxima Samoa's sole director and sole
        beneficial owner, never gave a valid authorization for the issuance of bearer shares and
        did not in any meaningful sense acquiesce in their issuance. He had no intention of

*150331 Tempo v Fortuna Judgment*

parting with legal title to his company. I find that the two bearer shares were never validly issued and the registered share was never cancelled.

341.    Since the bearer shares were never validly issued, Mr. Niu was the only person who could appoint Mr. and Mrs. Tsien to the board of directors. He did not do so and their appointments are invalid. As a result, Mr. Tsien had no authority to represent Maxima Samoa at the EGM; his right to do so had been revoked earlier (orally) by Philip Niu. Mr. Niu, as the only legal and beneficial owner of the company, could under the *Duomatic* principle revoke Mr. Tsien's authority and appoint himself to represent Maxima Samoa at the EGM; in substance, he did so.

342.    I am satisfied that Mr. Tsien did not at any time have an honest belief that Pearl Niu was the beneficial owner of Maxima Samoa; he knew that it belonged to Philip Niu. He never had an honest belief that Philip Niu had authorized or acquiesced in the issuance of the bearer shares. He had no honest belief in the validity of his (and his wife's) appointment as a director. He knew that he had no valid proxy from Maxima Samoa.

343.    Gayle Tsien would not have travelled from Taiwan to San Francisco to attempt to induce Philip Niu to provide a proxy if she believed that Pearl Niu owned Maxima Samoa and that her parents' appointments as directors were valid. She, also, had no honest belief in her father's right to represent the company at the EGM.

*150331 Tempo v Fortuna Judgment*

344.   The defendants argue that the indoor management rule (established in *Foss v Harbottle* 67 ER 189; and see *MacDougall v Gardiner* [1875] 1 Ch D 13) has application here; if the ouster of Dr. Chen could in any event have been achieved by the majority acting regularly, the Court should not interfere. Moreover, they say that the resolutions are ~~saved~~ by article 19.6 of Fortuna's articles, which reads:

> *If any votes are counted which ought not to have been counted, or which might have been rejected, the error shall not vitiate the resolution unless pointed out at the same meeting, or at any adjournment thereof and not in that case unless in the opinion of the chairman (whose decision shall be final and conclusive) it is of sufficient magnitude to vitiate the resolution.*

345.   The exclusion of Philip Niu from the EGM was not the result of an accident, mistake or technical misunderstanding; it was deliberate. Mr. Tsien (the meeting's chairman), assisted to some extent by Gayle Tsien (the meeting's secretary), made a deliberate decision to exclude Mr. Niu knowing that his exclusion was illegitimate. Mr. Tsien was well aware that Mr. Niu was the owner of Maxima Samoa and its sole director and that Mr. Tsien's own authority to vote for the company had been revoked. In bad faith, he pretended otherwise in order to ensure that the special resolutions would pass. Those resolutions were an integral part of the scheme.

346.   The scope of article 19.6 is confined to "errors" which, in the opinion of the chairman acting in good faith, are not of sufficient magnitude to vitiate the resolution. The failure to count the vote of Maxima's true representative was no error and, in any event, the meeting's chairman did not act in good faith. The indoor management rule, which is also

concerned with actions taken in good faith, has no application. I adopt the words of

Chitty, J in *Harben v Phillips* (1883) 23 Ch D 14, who said in the course of holding a board

meeting invalid:



> *Now, in this state of things, I hold that the exclusion on the 28th of those who, as I have already said, were duly elected directors, was unlawful. I consider that the meeting of the 28th therefore was an unlawful meeting, that it was not properly constituted, and that <u>everything that was done at it is invalid</u>. The adjourned meeting was invalid, and the notice convening the meeting is invalid.* [underlining added]

347.    I find that the EGM was a nullity. Nothing decided at the EGM was decided validly. It is

as if the meeting was never held. I derive further support for this position from: *Pender*

*v Lushington* [1877] 6 Ch D 70; *Edwards v Halliwell* [1950] 2 All E R 1064; and *Byng v*

*London Life Association* [1990] 1 Ch 170 (CA).

348.    Finally, the defendants say that the ratification of the ordinary resolutions in 2011 and

their expressed willingness to abandon the special resolutions justify a dismissal of the

company claim. Board resolutions which have been passed irregularly but in good faith

may be ratified subsequently by the shareholders. "Resolutions" passed in bad faith at a

meeting which is itself a nullity are incapable of ratification. This principle emerges

clearly from: *Northwest Transportation Company v Beatty* (1887) 12 App Cas 589;

*Burland v Earle* [1902] AC 83 (PC); *Clemens v Clemens Bros Ltd* [1976] 2 All E R 268; and

*Gore-Browne On Companies*; 45th edition; at 17[2A]. I find that the ordinary resolutions

were and are incapable of ratification.

## Conclusion

349.    The contract claim is dismissed.

350.    I have decided that the EGM was invalid in its entirety and all resolutions passed at it are void. The purported ratification of the ordinary resolutions is invalid. The result is that Dr. Chen has been since the EGM and is still a director of Fortuna, and that the articles have not been amended in the manner proposed at the EGM. Dr. Chen has a present right to receive all the information to which he would have been entitled since the EGM by virtue of his directorship. He may not be removed from the board except by strict compliance with Fortuna's articles and the law of the Cayman Islands.

351.    The parties are at liberty to speak to costs if they are unable to agree.

Henderson, J.

**Henderson, J.**



*150331 Tempo v Fortuna Judgment*