

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 165 OF 2019 (IKJ)**

**BETWEEN:**

**FAMILYMART CHINA HOLDING CO., LTD**

**Plaintiff**

**AND:**

**(1) YIN-HENG WEI**

**(2) SHIH-CHIEH WEI**

**(3) YING-CHIAO WEI**

**(4) YING-CHUN WEI**

**(5) NEXUS (CAYMAN ISLANDS) HOLDING CORP**

**(6) SHANGHAI NEXUS INFORMATION TECHNOLOGY CO., LTD**

**(7) GOOD CHOICE (CAYMAN ISLANDS) HOLDING CORP**

**(8) GOOD CHOICE (HONG KONG) HOLDING CO LTD**

**(9) SHANGHAI ZHENHUIXUAN ELECTRONIC COMMERCE LTD**

**(10) CHINA CVS (CAYMAN ISLANDS) HOLDINGS CORP.**

**Defendants**

**IN CHAMBERS**

| | |
|---|---|
| **Appearances:** | Mr Tom Lowe QC of counsel, Ms Gemma Lardner and Mr Corey Byrne of Ogier for the Plaintiff |
| | Mr Mac Imrie QC, Mr Paul Smith, and Mr Ryan Hallett of Maples and Calder (Cayman) LLP for the Defendants |
| **Before:** | The Hon. Justice Kawaley |
| **Heard:** | 8 August 2022 |
| **Draft Judgment Circulated:** | 1 September 2022 |
| **Judgment Delivered:** | 9 September 2022 |

**EXHIBIT**

**19**



**HEADNOTE**

*Summons for leave to continue derivative claim and ancillary directions - scope of 'fraud' exception to the rule in Foss-v-Harbottle - whether prima facie case requirement met - application to adjourn summons pending determination of Privy Council appeal in related petition proceedings - Grand Court Rules, Preamble, Orders 15 rule 12A and 32 rule 4*

# JUDGMENT

### Introductory

1.  The present proceedings were commenced as derivative proceedings by a Writ of Summons dated August 28, 2019. On January 22, 2020, this Court granted the Plaintiff leave to serve the proceedings out of the jurisdiction on the non-resident defendants who filed Acknowledgments of Service on September 30, 2020.  The proceedings were stayed by consent until the determination of an application for leave to appeal to the Privy Council by Ting Chuan (Cayman Islands) Holding Corporation ("Ting Chuan") against the Cayman Islands Court of Appeal's judgment dated April 23, 2020 (*In re China CVS* [2020(2) CILR 201]) in just and equitable winding proceedings commenced in this Court by the Plaintiff on October 12, 2022 in FSD 195/2018 (the "Privy Council Appeal" / the "Petition Proceedings").  The Privy Council granted leave to appeal on September 29, 2021 with the result that the consensual stay of these proceedings fell away.

2.  By an Amended Summons dated November 25, 2021, the Plaintiff sought the following principal orders and directions:

    "*1. Pursuant to Order 15, rule 12A (2) of the Grand Court Rules (1995 Revision) ('GCR') the Plaintiff have leave to continue the action…*

    *4. Discovery is to be made by the exchange of lists of documents within 60 days with inspection to take place within 7 days thereafter.*

    *5. The Plaintiff shall file and serve a summons for directions seeking further directions for the further progress of the proceedings 14 days after exchange of the list of documents.*



*6. The costs of this Summons be in the cause….*"

3.  By Summons dated December 30, 2021, the Defendants sought orders that the Plaintiff's Amended Summons be adjourned alternatively stayed until the determination of an arbitration before the International Chamber of Commerce ("ICC Arbitration") and the Privy Council Appeal in JCPC 2020/055. These two applications ("Applications") were initially listed for hearing on March 30-31, 2022, but by a Consent Order dated March 23, 2022 that hearing was vacated and the Applications were adjourned *sine die* with liberty to apply after the parties received the Award in relation to the ICC Arbitration. The Award was handed down on June 10, 2022.

4.  At the hearing on August 8, 2022, I decided to hear Mr Imrie QC's application for the Plaintiff's Summons to be adjourned or stayed first as it sought to forestall the need for full argument on the main substantive relief sought on the Plaintiff's Amended Summons. The most compelling argument advanced was the need for a composite case management approach to both the present proceedings and the Petition Proceedings. That argument did not to my mind justify postponing a hearing that had been listed for 2 days and which the parties had clearly prepared to argue on the assigned date, wasting both Court time and private costs. The combined case management argument did clearly justify adjourning the directions limb of the Plaintiff's Summons, after the leave to proceed application had been determined, assuming that leave was in fact granted.

5.  Accordingly, I rejected the Defendants' 'complete adjournment' application and proceeded to hear argument on the merits of paragraph 1 of the Plaintiff's Summons.

**Findings: governing legal principles**

6.   GCR Order 15 rule 12A provides so far as is relevant as follows:

*"(1) This rule applies to every action begun by writ by one or more shareholders of a company where the cause of action is vested in the company and relief is accordingly sought on its behalf (referred to in this rule as a "derivative action").*



*(2) Where a defendant in a derivative action has given notice of intention to defend, the plaintiff must apply to the Court for leave to continue the action.*

*(3) The application must be supported by an affidavit verifying the facts on which the claim and the entitlement to sue on behalf of the company are based…"*

7.  There was no substantial dispute as to the applicable general legal principles as opposed to how the relevant principles should be applied to the present case. The Plaintiff's Skeleton Argument summarised the principles concisely:

*"29 The principles governing the availability of derivative relief were set out in Schultz v Reynolds[1] and Renova[2] and the procedure is governed by O.15, r.12A of the Grand Court Rules.*

*30 The requirement for minority shareholders to obtain leave to continue a derivative claim is to prevent vexatious claims which have little or no prospect of success and which have been brought by an aggrieved shareholder for his own reasons rather than in the interests of the company: Renova. This is clearly not such a case.*

*31 A shareholder may bring proceedings for the benefit of the company to redress a wrong done to the company by its directors where there has been a 'fraud on the minority' as an exception to the rule in Foss v Harbottle. The purpose of the Derivative Proceedings here is to enable FMCH to recover a valuable asset for and on behalf of the Company.*

*Prima facie case*
*32 The court must be satisfied that the plaintiff has a prima facie case based on 'first impressions', which is a serious case brought bona fide on reasonable grounds as opposed to speculative, spurious or unfounded…*

*Wrongdoer Control*

---

[1] [1992-93 CILR 59].
[2] FSD 11 of 2013 (AJEF), Judgment dated July 22, 2014 (unreported).



*34 A plaintiff seeking leave to continue under O.15, r.12A must also prove wrongdoer control. Where the wrongdoers themselves control the company, an action can be brought on behalf of the company with the plaintiff seeking redress on its behalf. In the Derivative Proceedings, the Plaintiff, FMCH, is a minority shareholder and the Defendants are the Majority Directors and their related entities.*"

8.  In the Defendants' Skeleton Argument, the following main principles, *inter alia*, were set out:

*"49 The basic principle is that it is for the company, and not an individual shareholder, to enforce rights of action vested in the company and to sue for the wrongs done to it. This is the rule in Foss v Harbottle. A derivative action may only be brought if it is shown that one of the four exceptions to the rule in Foss v Harbottle applies. Templeman J in Daniels v Daniels [1978] Ch 406 at 408 stated that those exceptions were as follows (emphasis added):*

*'The exceptions are four in number, only one of which is of possible application in the present case. The first exception is that a shareholder can sue in respect of some attack on his individual rights as a shareholder; secondly, he can sue if the company, for example, is purporting to do by ordinary resolution that which its own constitution requires to be done by special resolution; thirdly, if the company has done or proposes to do something which is ultra vires; and, fourthly, if there is fraud and there is no other remedy. There must be a minority who are prevented from remedying the fraud or taking any proceedings because of the protection given to the fraudulent shareholders or directors by virtue of their majority.'*

*50 The Defendants presume that FMCH invokes the fourth exception, namely that there is fraud and no other remedy. In relation to derivative actions, the term 'fraud' is attributed a wide meaning which embraces both actual fraud (in the sense of a deliberate and dishonest breach of duty) and a breach of duty which confers a benefit on the directors at the expense of the Company. In Daniels v Daniels, Templeman J held (emphasis added)]:*

*'a minority shareholder who has no other remedy may sue where directors use their powers, intentionally or unintentionally, fraudulently or negligently, in a manner which benefits themselves at the expense of the company.'...*



*68. In Renova Resources Private Equity Limited v Gilbertson [2009] CILR 268, Foster J at para 32-35 summarised the test (emphasis added):*

*'32. In my opinion, the appropriate test for this court to adopt in considering an application for leave to continue a derivative action is the prima facie case test, that is, where a defendant in a derivative action has given notice of intention to defend, **the plaintiff must satisfy the court that the company has a prima facie case against the defendant (and that the action falls within an applicable exception to the rule in Foss v. Harbottle**). Even if I am wrong about this, there was anyway no evidence before me to indicate that a hypothetical honest, independent and prudent board of directors could or would not have proceeded with the claim of the company, if such a board was satisfied that there was a prima facie case. I propose to consider the plaintiff's application on the basis of the prima facie case test…*

*35. The purpose of requiring the plaintiff to obtain leave to continue the derivative action, as I understand it, is to prevent the expense and time of (and to protect the defendants against) vexatious or unfounded litigation which has little or no prospect of success or which is clearly brought by an aggrieved shareholder for his own reasons rather than in the interests of the company. The phrase 'prima facie' has various shades of meaning but literally means 'at first sight.' Given that there is not to be a mini-trial of the plaintiff's case, it seems to me that I must form a view of the plaintiff's case based on my first impressions, having regard to my assessment of all the evidence before me, including that submitted by the defendants. For the plaintiff to obtain leave to continue with the action, I consider that I must be satisfied in the exercise of my discretion that its **case is not spurious or unfounded, that it is a serious as opposed to a speculative case, that it is a case brought bona fide on reasonable grounds, on behalf of and in the interests of the company and that it is sufficiently strong to justify granting leave for the action to continue** rather than dismissing it at this preliminary stage.' "*

9. The fraud exception does not require proof of actual fraud, as a fuller reading of the *Daniels* case makes clear. It includes ultra vires acts as well. And, provided that the directors personally benefitted from the misconduct, it includes deliberate and negligent breaches of duty as well. As David Richards J (as he then was) opined in *Abouraya-v-Sigmund* [2015] B.C.C 503:



"*25. It follows, on the authorities as they stand, that financial or other loss to the shareholders, albeit normally of a reflective character, is essential to give a claimant shareholder sufficient interest in the proceedings to make the shareholder an appropriate claimant on behalf of the company, whether he is a member of that company or of its holding company. Equally, the authorities require that, in the absence of actual fraud or an ultra vires act, the wrongdoers should themselves have benefitted from the wrongdoing. The significance of this requirement is that their breach of duty cannot be ratified by a majority vote which depends on the votes of the wrongdoers. It is essential to the exception to the rule in Foss v Harbottle that the alleged wrongdoing is incapable of lawful ratification: see Smith v Croft (No 2) [1988] Ch 114.*" [Emphasis added]

10. One of the earlier authorities cited with approval in *Abouraya* was *Daniels –v-Daniels* [1978] 1 Ch 406 at 414A-D where Templeman J (as he then was) opined:

"*If minority shareholders can sue if there is fraud, I see no reason why they cannot sue where the action of the majority and the directors, though without fraud, confers some benefit on those directors and majority shareholders themselves. It would seem to me quite monstrous-particularly since fraud is so hard to plead and difficult to prove-if the confines of the exception to Foss v Harbottle, 2 Hare 461, were drawn so narrowly…The principle… is that a minority shareholder who has no other remedy may sue where directors use their powers, intentionally or unintentionally, fraudulently or negligently, in a manner which benefits themselves at the expense of the company*…"

**The Defendants' case as to why leave should be refused**

11. The Defendants' Skeleton Argument summarised  their grounds of opposition to the grant of leave as follows:

"*70. For the reasons set out more fully in paragraph 7 above, FMCH has not met this test, because, inter alia:*

*70.1 The ASOC is defective in that it does not meet the pleading requirements for an allegation of dishonesty, and any alleged loss to the Company and benefit to the Majority Directors is insufficiently particularised: see paragraph 7.1.*



*70.2 FMCH has not filed evidence to demonstrate that it has a substantial case: see paragraph 7.2. In particular, FMCH has not dispelled Mr Wei's strong statement that FMCH has always known about the Majority Directors' interest in the related parties or contradicted the significant body of evidence which demonstrated disclosure of the transactions on many occasions over an extended period of time. Further, FMCH has not identified a single example of the Majority Directors profiting at the Company's expense. All of the transactions in question are for the legitimate supply of good and services, which are on better terms than could be achieved had the Company transacted with third parties. This is borne out by the fact that FMCH has never suggested that any transactions with related parties should be terminated.*

*70.3 These proceedings are not being brought in the best interests of the Company: see paragraph 7.3. Rather, the proceedings have been brought by FMCH to put pressure on Ting Chuan in the context of the broader shareholder dispute.*

*70.4 These proceedings are unnecessary and abusive: see paragraph 7.4. FMCH has (at least) two alternative remedies: (i) an arbitration pursuant to the SHA; and (ii) a Winding Up Petition.*

*71 A further point that weighs in favour of refusing leave is the availability to FMCH of a just and equitable winding up petition seeking alternative relief under section 95(3) of the Companies Act. In a series of English decisions, the English High Court has held that, in circumstances where a shareholder can bring an unfair prejudice petition, that shareholder should, in general, not* [sic] *permitted to bring a derivative action as an alternative or at all. Ting Chuan's submission is that the availability of alternative relief in section 95(3) of the Companies Act means that a just and equitable winding up petition of this nature is sufficiently analogous to an English unfair prejudice petition such that the English authorities on this issue ought to be highly persuasive. Based on this line of authority, the Leave Application should be dismissed.*"

12. Issue was joined as to whether there was a fundamental difference between the alternative remedies position under Cayman Islands and English law, as the Plaintiff contended, or whether the Defendants were correct to contend that similar principles applied. The Plaintiff's position appeared at first blush to be more persuasive. Another point of principle was the construction of Articles 107-108 of the Articles of the 10th



Defendant ("the Company"). The Defendants submitted that it was fatal to the Plaintiff's case that the Articles did not prohibit related party transactions even if the relationship was not disclosed by the directors in circumstances where no vote was required. This construction seemed at first blush surprising. In fact, the Cayman Islands Court of Appeal has already considered (but not decided) the substance of this point and concluded, admittedly only for interlocutory purposes (*In re China CVS* [2020(2) CILR 201]) as follows:

"*59.... Their construction does not permit of any modification of the rules of disclosure and self-dealing. They are nowhere near specific enough to have the dramatic consequence of modifying the fundamental obligations of a director. As Mummery, L.J. said in* Gwembe Valley *(19) in relation to an article which provided that 'no director. . . shall be disqualified by his office from contracting with the company' ([2003] EWCA Civ 1048, at para. 51):*

'*the relaxation in Article 89 of the strict doctrines of equity against unauthorised self-dealing and secret profits, applicable to directors as fiduciaries, is made on the basis of compliance with the director's duty of disclosure under Article 88, even though not expressed to be conditional on it.*'
*(See Gwembe Valley and Mummery, L.J.'s reliance on Movitex v. Bulfield (23) to support the proposition that modification of the duties in relation to self-dealing are subject to the obligation of full disclosure.)*"

13. The further submission that I should conclude at this stage that the Plaintiff had acquiesced in the wrongdoing seemed an ambitious one, at first blush, as a central complaint of the Plaintiff was that it was denied visibility of the impugned dealings. The submission that the Plaintiff had improper collateral motives for pursuing these proceedings seemed difficult, if not impossible, to properly accept at this stage in view of the conclusions reached on its motives and set out in the Award. The Defendants' most significant submissions appeared to me to relate to the need for a careful assessment of the evidence applying a more rigorous standard than I had applied at the leave to serve out stage:

"*69.2 A prima facie case is more than a good arguable case. This hearing is not a 'mini-trial', but the Court must nevertheless have sufficient evidence before it is able to make a*



*careful assessment of the merits. The Court does not assume that the evidence submitted by the plaintiff is true, nor does the Court ignore the evidence submitted by the defendants.*" [Emphasis added]

**Findings: adequacy of Plaintiff's pleaded case**

14. In Annexure B to the Plaintiff's Skeleton Argument, its claims are summarised as follows:

"*1. The causes of action in the Derivative Proceedings brought by FMCH on behalf of the Company are founded on breaches of fiduciary duty by the Majority Directors and knowing receipt and dishonest assistance by the Corporate Defendants. The pleaded claims against the Majority Directors are for breaches of the self-dealing rules, the failure to act bona fide in the interests of the Company, the misapplication of the Company's assets and the failure to disclose important or material information.*

*2. The relief claimed by FMCH in the Derivative Proceedings falls into two categories:*

*(a) the taking of account of secret profits made by the Majority Directors through the Company's and/or the Company's Operating Subsidiaries' dealings with the Corporate Defendants which occurred in (the Conflicts and Self-Dealing Claims); and*

*(b) an account of profits made from the corporate opportunities that were misused by the Majority Directors and from the Corporate Defendants as knowing beneficial recipients of those corporate opportunities and/or secret profits (the Misuse of Corporate Opportunities Claims).*"

15. It is common ground that because of Article 146, which indemnifies directors from any liability "*unless that liability arises through the wilful neglect or default*", the Plaintiff's claims for breach of duty must be pleaded with particularity. Paragraph 34 of the Amended Statement of Claim ("ASOC") sets out the common law duties it is said the 1st to 4th Defendants (the "Majority Directors") owed to the Company and it is alleged that the disclosure obligations could only be discharged by making disclosure to the Plaintiff (paragraph 35). The following particulars of wilful neglect or default are pleaded:



"76A the said liability of the Majority Directors was incurred by the wilful neglect or default of each of them in that:

(a) each Majority Director knew their fiduciary duties set out in paragraphs 34 or 35 or, if he did not, was wilfully neglected to do so; and

(b) the Majority Directors and/or each of them acted knowingly and intentionally in breach of the said duties, *such knowledge and intention being inferred from the nature of their acts and omissions* when:

  (i) the Majority Directors caused or allowed the Company's Operating Subsidiaries to enter into the Related Party Transactions and to do with the parties which they themselves controlled and/or with whom they were themselves connected and/or related;

  (ii) the Majority Directors caused or allowed the businesses of Shanghai Nexus and Shanghai Zhenhuixan to be established and indirectly took the economic benefit thereof through the companies which they controlled;

  (iii) the Majority Directors caused or allowed Shanghai Nexus and Shanghai Zhenhuixan to trade with the Company and take advantage of the good will and customer base of the Operating Subsidiaries;

  (iv) the Majority Directors failed and/or refused to make full and/or frank and/or timely disclosure to the Plaintiff of:

   (A) the Related Party Transactions between the Operating Subsidiaries and the Company; and

   (B) the dealings between Shanghai Nexus and Shanghai Zhenhuixan and the Company and/or interests of the Majority Directors in the manner set out in paragraph 64 above;

(c) the Majority Directors were reckless as to whether the acts and omissions referred to in (b) were in breach of their duties." [Emphasis added]



16. In oral argument, Mr Imrie QC focused his attack on the adequacy of the plea "*such knowledge and intention being inferred from the nature of their acts and omissions*". As knowledge and intention are generally established inferentially, the complaint only has traction if the primary facts relied upon clearly do not support the crucial inferences. In some factual matrices it might not be possible to draw an inference of knowledge and intention merely from the nature of the acts in question. However, if the Plaintiff is able to establish that (1) the Majority Directors were aware of (or wilfully neglected to be aware of) their common law duties to the Company, (2) that those duties included a duty of disclosing any related party transactions to the Plaintiff and (3) that the Majority Directors entered into related party transactions without making the requisite disclosure, it is in my judgment potentially possible to infer from "*the nature of their acts or omissions*" an intentional breach of the relevant duties.

17. For present purposes, I reject the Defendants' complaint that the ASOC fails to adequately plead deliberate breaches of the Majority Directors' common law duties to the Company.

18. No point was taken about the adequacy of the pleading as regards the 5th to 9th Defendants (the "Corporate Defendants") at Sections (D), (E) and (F) of the ASOC (knowing receipt and dishonest assistance claims). Those claims allege the knowing receipt by the Corporate Defendants of benefits obtained from the Majority Directors' breaches of duty and knowingly assisting them in relation to the relevant breaches of fiduciary duty. The Corporate Defendants are said to be ultimately beneficially owned by the four Wei brothers, three of whom (the 1st, 3rd and 4th Defendants) are directors of the Company (the 2nd Defendant is the 1st Defendant's son). The Corporate Defendants are alleged to have had the knowledge of the Majority Directors. The Defence responds to these claims with bare denials.

**Findings: adequacy of the Plaintiff's evidence on the merits of the claims**

**<u>Have the Articles modified the directors' common law duties?</u>**



19. I summarily reject the submission that, despite the fact that Court of Appeal has already expressed what I accept was merely an interlocutory view that Articles 107 and 108 do not modify the directors' common law duties, the critical reasoning is limited to circumstances where a vote is actually taken. The critical reasoning which resulted in the Court of Appeal in the Petition Proceedings rejecting (for strike-out purposes) the argument that the Articles relieved the directors from their general common law duties was taken from the English Court of Appeal decision (considering similar articles) in *Gwembe Valley Development-v-Koshy* [2004] 1 BCLC 131 at 148. In *Gwembe Valley* the same argument advanced by Ting Chuan was rejected. Mummery LJ (delivering the judgment of the Court) held:

"*51. We are unable to accept this submission. It is necessary to read Article 89 in its proper context and, in particular, in conjunction with Article 88, which requires a formal declaration of interest to be made by a director at a meeting of the board of the company. The profits intended to be made by the investing shareholders are beside the point. This case concerns unauthorised profits made by a director of GVDC. Further, the relaxation in Article 89 of the strict doctrines of equity against unauthorised self-dealing and secret profits, applicable to directors as fiduciaries, is made on the basis of compliance with the director's duty of disclosure under Article 88, even though not expressed to be conditional on it.*"

20. If the "*strict doctrines of equity against unauthorised self-dealing and secret profits, applicable to directors as fiduciaries*" are only modified to a limited extent by the terms of the Company's Articles expressly addressing the right to vote on related party transactions, it is impossible to see how the same Articles can be said to have a wider modifying effect in an arena they do not expressly address at all. If the impugned transactions were entered into by the Company without any formal Board approval at all, it is at first blush even clearer that the Articles cannot be said to have dis-applied the rules against self-dealing and secret profits altogether. Without of course seeking to finally determine this point, I find that the Plaintiff has established a *prima facie* case that the Company's Articles have not modified the rule against self-dealing and secret profits to any material extent.

**The requisite evidential threshold**



21. I accept the central submission of Mr Imrie QC that the GCR Order 15 rule 12A jurisdiction requires a higher evidential threshold than that for granting leave to serve out under GCR Order 11.  As Foster J opined in *Renova Resources Private Equity Limited v Gilbertson* [2009 CILR 268], the Court is required to determine whether the Plaintiff's case "*is sufficiently strong to justify granting leave for the action to continue*". Where a litigant is required to obtain leave to pursue proceedings within the jurisdiction, against a party served within the jurisdiction or against parties served with leave abroad, the cogency of their case must logically be greater than a "good arguable case". The restraints on a litigant pursuing a substantive claim as of right ought in principle to be far looser than those imposed on a litigant asserting the right to pursue a representative claim which cannot be pursued to any material extent without leave of the Court.  Although the Plaintiff's counsel encouraged me to take my merits finding at the leave to serve out stage into account, he tacitly accepted that a stricter test applied. Mr Lowe QC referred to *Prudential Assurance-v- Newman* [1982] 1 Ch 204 at 221-222 where the English Court of Appeal (Cummings-Bruce, Templeman and Brightman L.JJ) opined as follows:

"…*In our view, whatever may be the properly defined boundaries to the rule, the plaintiff ought at least to be required before proceeding with his action to establish a prima facie case (i) that the company is entitled to the relief claimed, and (ii) that the action falls within the proper boundaries of the exception to the rule in Foss v. Harbottle…*"

22. Foster J in *Renova*, 13 years ago, was rightly reticent about attempting to precisely define what the term "*prima facie case*" means in the present legal context. More guidance has become available since.  The most clear and concise assistance provided by the authorities placed before the Court is the following passage from the judgment of David Richards J (as he then was) in *Abouraya-v-Sigmund* [2015] B.C.C 503:

"*53… A prima facie case is a higher test than a seriously arguable case and I take it to mean that, in the absence of an answer by the defendant, would entitle the claimant to judgment. In considering whether the claimant has shown a prima facie case, the court will have regard to the totality of the evidence placed before it on the application.*"



23. Mr Lowe QC contended that where there was a conflict between the Plaintiff's and the Defendants' evidence on an issue, that could not be resolved at this stage. Mr Imrie QC invited the Court to find that a *prima facie* case had not been made out if the Plaintiff had failed to respond to any material issue raised by the Defendants in their evidence. Both submissions are partly right. Having "*regard to the totality of the evidence*" clearly requires the Court to take into account all the material before it without making findings on controversial issues. But if a defendant raises a 'knockout' point without response that <u>may</u> entitle the Court to conclude that the claimant is unable to establish a *prima facie* case on the relevant issue on the basis that the issue is no longer subject to serious dispute. These conclusions are supported in a general sense by *dicta* found in a case not cited in argument, *Bhullar-v-Bhullar et al* [2015] EWHC 1943 (Ch) where Morgan J stated:

"*26. It is one thing to ask whether the claimant has shown a prima facie case in the absence of an answer from the defendant and another thing to ask whether the claimant has still shown a prima facie case when one takes into account the suggested answer. If the facts relied upon by either the claimant or the defendant are not disputed, there may be little difficulty. But what if the claim and the suggested answer depend, as they often will, on disputed facts? Further, what if the resolution of that dispute will in due course require the trial judge to reach conclusions as to the credibility of witnesses? I consider that the court has to recognise that it cannot resolve disputes of fact at a hearing which does not involve any cross-examination of witnesses and which takes place in advance of any formal disclosure of documents. It will not be unusual to find that the claimant can establish a prima facie case, if one ignores the evidence relied upon by the defendant, but yet the claimant would fail at trial if the defendant's evidence were to be accepted. In such a case, I consider that it is still open to the court to hold that the claimant has made out a prima facie case because it would be wrong to assume that the defendant's evidence will be accepted at the trial and it may simply not be possible to predict with any degree of confidence whether the defendant's evidence will be so accepted.*"

24. Accordingly, whether the Plaintiff has established a *prima facie* case on the merits of the derivative claims requires the Court to determine:



(a)  whether the Plaintiff would be entitled to judgment in the absence of any answer from the Defendants; and

(b)  if the first question is answered in the affirmative, whether that provisional view is undermined to a material extent by any answer from the Defendants, bearing in mind that any factual disputes are not to be determined at the leave stage.

### Would the Plaintiff be entitled to judgment on the merits in the absence of any answer?

25.  The Plaintiff's pleaded case is that the Company was established as a joint venture vehicle in 2003 to engage in the convenience store business in the People's Republic of China ("PRC") using the FamilyMart brand with two shareholders, the Plaintiff and Ting Hsin (Cayman Islands) Holding Corporation ("Ting Hsin"). Ting Hsin transferred its 50.5% shareholding in the company to Ting Chuan. Ting Chuan acquired a further 9.15% of the Company's shares from the Plaintiff in 2011, since which the shares have been held on a 59.65% / 40.35% basis by Ting Chuan and the Plaintiff respectively.  The Plaintiff alleges that after 2012 its ability to monitor related party transactions at the managerial level was circumscribed and the volume of such transactions substantially increased without the requisite disclosures being made by the Majority Directors.

26.  The legal sustainability of the Plaintiff's central case, which has substantial overlaps with the allegations advanced in the Petition Proceedings, has been tested in those proceedings.  An attempt to strike-out the Petition was rejected by the Court of Appeal on April 23, 2020 and that part of its decision does not apparently form part of the Privy Council Appeal, which concerns the arbitrability of matters relating to the Shareholders Agreement between the Plaintiff and Ting Chuan (the "SHA") and which form part of the case advanced in the Petition.

27.  The principal evidence directly relied upon by the Plaintiff as to the merits of its case is found in the First and Second Affirmations of Shuji Ogawa, affirmed in support of the Plaintiff's applications for leave to serve out and the present application respectively. The deponent is a Manager in the New Market Group of the Store Operation Division of FamilyMart Co., Ltd. It is averred in the First Ogawa Affirmation that:

220909 - *In the matter of FamilyMart China Holding Co. Ltd. v Yin Heng Wei & Ors - FSD 165 OF 2019 (IKJ)*



(a) The deponent has read the evidence filed by the Plaintiff in support of the Petition and the evidence filed in support of and in opposition to the strike-out application in those proceedings, as well as the Plaintiff's evidence in support of the Inspectorship Application. His evidence is based on his personal knowledge, information and belief and legal advice;

(b) the grounds of misconduct alleged against the Majority Directors in the Petition Proceedings "*cover the complaints made in these proceedings*" (paragraph 35). If the Petition proceeds, the Plaintiff will "*seek to ensure the issues can be tried together*" (paragraph 38);

(c) "*from an early stage of the joint venture, it was accepted that there would be some related party transactions....FMCH only accepted this on the condition that such transactions were transparent and that FMCH and the Minority Directors were provided with sufficient information to ascertain for themselves whether the terms were fair and equitable to the Company and to ensure that there were no related party transactions that were not in the best interests of the Company...until April 2012, disclosure of this kind was provided to FMCH and the Minority Directors because, by agreement, the FM Parties provided personnel ...to the Company to take on senior roles in the businesses being conducted by the Company and/or the Operating Subsidiaries...*" (paragraph 41);

(d) the deponent has been informed by Mr Kurakake, a director of certain subsidiaries of the Company engaged in the convenience store business in the PRC (the "Operating Subsidiaries") since 2014, that his role was restricted until his expulsion from the Company's premises with effect from May 15, 2017 (paragraphs 44-46). The deponent avers that Mr Hsueh informs him he was "squeezed out" of his role as general manager of the Company by the 1st Defendant (who replaced him) in 2012. Prior to that, Mr Hsueh was able to monitor activities for the Plaintiff. Visibility was further blocked because no Board meetings were held between 2014 and 2017 (paragraphs 51-54); and

(e) the Plaintiff made formal complaints about related party transactions in a May 14, 2018 letter. The Majority Directors provided a June 7, 2018 document entitled 'Summary of Related Party Transactions', covering the period 2012 to 2017. The



Plaintiff's case is based on investigations carried out after receiving this material. A central complaint is the level of profits said to be generated by the Maxxipoint System for the individual Defendants and their families, relative to what the system generated for the Company. The deponent has been advised and believes that the Majority Directors breached their duties by failing to give prior disclosure of their interests in five companies (Nexus Cayman, Shanghai Nexus, Good Choice Cayman, Good Choice   Hong Kong, Shanghai Zhenhuixuan) or their interests in the TH Maxxipoint Merchants (paragraphs 57-95).

28. In the Second Ogawa Affirmation, the deponent expressly supports the Plaintiff's present application for leave to continue but, as regards the merits of the substantive claims, essentially confirms the contents of his First Affirmation. He expresses his belief based on advice "*that there is a real issue to be tried*" in relation to the claims against both the Majority Directors and the Corporate Defendants (paragraph 27) and that he is "*further advised that the Court must be satisfied that FMCH has a good arguable case…I believe, based on the facts set out in Ogawa -1 and herein that the Derivative Action satisfies this test*" (paragraph 28).  No point was taken on the fact that the deponent has applied the wrong test, no doubt because his belief that the Plaintiff meets the applicable legal threshold is not dispositive. That is an assessment for the Court to make. In any event, the Second Ogawa Affirmation concludes (at paragraph 35) with the following more expansive averments:

"…*I believe that the Derivative Action is not spurious or unfounded, that it is a serious as opposed to [a] speculative case, that it is a case brought bona fide and on reasonable grounds, for and in the interests of the Company, and that it is sufficiently strong to justify granting leave for the action to continue rather than dismissing it at this preliminary stage.*"

29.  Mr Ogawa does not give evidence about the central non-disclosure allegations based on his personal knowledge. However, the Plaintiff also relies on the First Affirmation of Jin-Tin Pan affirmed on January 26, 2022, a director of the Company since February 17, 2003 and one of the three directors nominated by the Plaintiff (the "Minority Directors"). Mr Pan deposes that prior to June 7, 2018 the Majority Directors had not disclosed their interests in the 6th and 9th Defendants, even though the names of those entities had



previously appeared in Company reports. Although the June 7, 2018 a document entitled 'Summary of CCH's related party transactions from 2012 to 2017' was provided, the Minority Directors have not "*been given full unfettered access to the underlying transaction agreements*" (paragraph 8). The deponent concludes:

"*9. I believe that the Majority Directors failed to comply with their duties of disclosure to the Company in relation to the following matters: (i) inter alias, their relationship with the Fifth to Ninth Defendants; (ii) the profits that they intended to make in relation to the transactions with the Fifth to Ninth Defendants; or (iii) to obtain FMCH's consent in relation to those transactions…*

*10. For the reasons given above, I do believe that the Derivative Action is in the Company's best interest and the Plaintiff's case is not spurious or unfounded.*"

30. The Pan Affirmation is significant in evidential terms because he has been a Minority Director of the Company throughout the period covered by the Plaintiff's claim, from the inception of the joint venture enterprise until the post-2012 period when it is complained the relevant breaches of duty were committed by the Majority Directors. He gives direct evidence in support of an important aspect of the Plaintiff's breach of fiduciary duty claims, namely the alleged non-disclosure of what were belatedly disclosed to be related party transactions approved by the Majority Directors. The director's belief that "*the Plaintiff's case is not spurious or unfounded*" carries more weight than the corresponding statements of belief made by Mr Ogawa, which is based to a material extent on information others have supplied to him.

31. The May 31, 2022 Award of the arbitral tribunal (the "Tribunal") in the ICC Arbitration addressed various complaints made by Ting Chuan and Ting Hsin about the Plaintiff's conduct in relation to the Company, including the complaint that the Plaintiff had commenced the Petition Proceedings for an ulterior motive. Those claims were all dismissed after hearing oral evidence from witnesses including Mr Ogawa.  The Award suggests that Mr Ogawa was found to be a credible witness, or at least that the Tribunal did not accept criticisms of his evidence (see e.g. paragraphs 164-168).  The Award provides some further general, indirect support for the genuineness of the Plaintiff's beliefs in the viability of their claims (see e.g. paragraphs 187-190).



32. I find that the Plaintiff has clearly established a *prima facie* case on the merits of its derivative claims against the Majority Directors. In other words, the evidence is sufficiently strong to entitle the Plaintiff to enter judgment on those claims if they were unopposed. The evidence is somewhat less clear as regards the accessory claims, but taking the pleaded case into account, it is obvious that the knowledge-based accessory claims are almost the mirror image of the main claims against the Majority Directors whose knowledge is imputed to the Corporate Defendants. As the Defence raises no positive case as to why such imputation of knowledge should not occur, on balance I would find that a *prima facie* case has been made out in respect of the claims against the Corporate Defendants as well.

**The impact of the Defendants' evidence and submissions**

33. The principal submissions advanced by the Defendants on the inadequacy of the Plaintiff's evidential case were the following:

*"7.2…at this stage of seeking leave to continue the action, the hearing of the application 'must not be allowed to turn into a mini-trial, but the Court must nevertheless have sufficient evidence before it is able to make a careful assessment of the merits '[3]. FMCH has not provided sufficient evidence to support its claims. There are a number of fatal deficiencies in the way FMCH has approached this application on key aspects of its claim. For example:*

*(a) FMCH has failed to put forward any evidence in support of its application that the Majority Directors have acted in deliberate and dishonest breach of fiduciary duty or that such breach was the result of the Majority Directors' wilful neglect [or] default. For example, there is no evidence that the Majority Directors sought to conceal their ownership of related parties (assuming an allegation of concealment is made, which it is not on the face of the ASOC). Such evidence would be essential to establish that*

---

[3] *Renova Resources Private Equity Limited v Gilbertson* [2009] CILR 268 para 35.



*there had been a deliberate and dishonest breach of duty to disclose the Majority Directors' interest in related parties. In fact, the evidence before the Court shows that over the course of many years, on numerous occasions, the Majority Directors' ownership of related parties has been known to FMCH.*

*(b) FMCH has also failed to put forward any evidence in support of its application that the Majority Directors have received a personal benefit at the expense of the Company. It is not necessarily the case that the mere fact of a transaction with a counterparty entails that counterparty receiving any improper profit, or of such profit being at the expense of the Company. Even assuming that the Majority Directors' interest in the related parties had not been appropriately disclosed (which is denied), FMCH is required to show (at a minimum) that it has a substantial case that the Company could and would have obtained a better outcome if it had transacted with unrelated third parties, or taken advantage itself of any corporate opportunity (in fact, the opposite would have been true given that the Infra Companies were for the most part loss making). FMCH has not identified a single example of where that would have been the case. In fact, and as noted above, even at this juncture, FMCH has never suggested that the Company should terminate its transactions with related parties nor alleged that the Company could achieve better results another way.*

*(c) Moreover, Mr Wei's strong statement that FMCH had always known that he and his brothers were the ultimate owners of the related parties in his first affirmation at paragraph 4 is not refuted by FMCH's evidence. In those circumstances, and in accordance with the Duomatic principle, FMCH has acquiesced in respect of any failure to make formal disclosure at a board meeting of the Majority Directors' interest in the related parties.*

*(d) There is a glaring absence of evidence regarding conduct and knowledge of the Second, Third and Fourth Defendants. Further, FMCH has not explained which individual(s)' acts and knowledge are attributable to the Fifth to Ninth Defendants (and how and why such attribution arises).*

*These points are apposite in light of the time and documents/evidence that have been available to FMCH between the date of commencing these proceedings and the date on which FMCH made the Leave Application (and the passage of further time since).*"



34. Dealing with these points in turn:

(a) it is <u>not</u> legally necessary for the Plaintiff to adduce evidence of deliberate <u>and</u> dishonest breach of fiduciary duty. The Plaintiff has adduced evidence, the veracity of which the Defendants challenge through their evidence, of deliberate breaches of fiduciary duty on the Majority Directors' part by, *inter alia*, (1) failing to adequately disclose their personal interests in the relevant related party transactions between 2012 and 2018 and (2) depriving the Minority Directors of the ability to monitor the terms and effect of those transactions for themselves;

(b) it <u>is</u> necessary for the Plaintiff to adduce evidence of personal benefits received by the Majority Directors. It has adduced such evidence, understandably not particularised, by simply asserting that (1) the Majority Directors prevented the Minority Directors from monitoring related party transactions with entities which they beneficially own, (2) the value of such transactions has significantly increased and (3) it is self-evident that personal benefits accrued to them as a result. The personal benefit is self-evident if the Company is transacting with entities ultimately beneficially owned by the Majority Directors and which are believed (or assumed) to be solvent. The Majority Directors' interests in the Corporate Defendants are not disputed. It is also necessary for the Plaintiff to establish a loss to the Company and the Defendants submit the Plaintiff must establish that the related party transactions were prejudicial based on their terms. In the Company Chairman Wei Yin-Heng's First and Second Affirmations, he denies any breaches of duty and avers that, *inter alia*, the Maxxipoint System has been favourable rather than prejudicial to the Company. This is simply disputing the Plaintiff's case (e.g. First Ogawa Affirmation, paragraph 69) that the scheme operates at the expense of the Company. The Plaintiff's case, practically understood, is that the Majority Directors were deliberately 'ramping up' the related party transactions and entering into them in a manner which lacked the expected transparency to conceal the otherwise obvious prejudice being suffered by the Company which the Minority Directors would (if fully informed) have objected to. The Court cannot determine at this stage whether the Plaintiff's assertions that the impugned transactions damaged the Company, or the Defendants' assertions that they did not, are correct;



(c) there is a clear conflict on the evidence between the Plaintiff's nuanced account of the limited extent to which they were aware of the nature and extent of the related party transactions after 2012, on the one hand, and the Defendants' largely non-responsive flat assertion that the Minority Directors were always aware of the Wei brothers' interests in the related parties. The Plaintiff's case is clearly inconsistent with acquiescence on their part. There is no need for the Plaintiff to reply to an evidential answer by the Defendants which falls far short of being a knock-out point which undermines a central plank of their case; and

(d) it is true that the Plaintiff's evidence says little with any specificity about the 2nd-4th Defendants. However, there is nothing in the Defence or the Defendants' evidence which seriously undermines the broad assertions the Plaintiff makes about all Majority Directors approving and benefitting from the related party transactions in general terms. It is also true that the case on the attribution of knowledge is pleaded in somewhat threadbare terms.  However, the Corporate Defendants have themselves responded to the accessory claims in their Defence with bare denials and failed to adduce any positive evidence in opposing the present application which seriously undermines the Plaintiff's admittedly broad-brush case on attribution of knowledge.

35. In summary, I find that the Defendants' evidence does not undermine the *prima facie* case established by the Plaintiff bearing in mind the Court's duty to avoid engaging in a 'mini-trial' or to resolve contentious factual issues at this stage.


**Findings: are the present proceedings improperly motivated?**


36. The Defendants submitted in their Skeleton Argument:


"*7.3…FMCH is not bringing these proceedings in the best interests of the Company. They have been brought as part of a campaign by FMCH to place pressure on Ting Chuan in the context of the broader shareholder dispute.*"



37. This point did not appear to me to be pursued with any conviction. The broad collateral purposes complaint, advanced in the ICC Arbitration (albeit in relation to the Petition Proceedings), was expressly rejected by the Tribunal in the Award.  In these circumstances, and having found that the Plaintiff has established a *prima facie* case on the merits of the derivative claim, I further find that the Plaintiff has at this interlocutory stage established a *prima facie* case that the proceedings are being brought in the best interests of the Company.

**Findings: should leave be refused on the grounds that the Plaintiff should be left to pursue alternative remedies?**

38. In paragraph 7.4 of the Defendants' Skeleton, it was submitted:

"*(a) FMCH has two alternative remedies which should be pursued: (i) an arbitration against Ting Chuan under the SHA alleging a breach of Ting Chuan's contractual obligation to procure that the Majority Directors act in the best interests of the Company; or (ii) (subject to the outcome of the JCPC Appeal) a winding up petition on the just and equitable basis. FMCH has availed itself of the latter alternative remedy, but the pleaded complaints in the ASOC merely replicate those made in the Winding Up Petition. If FMCH is able to make its complaints good, the Winding Up Petition (assuming it was properly commenced) would afford FMCH sufficient recourse. More particularly, FMCH can commence arbitral proceedings against Ting Chuan. Whatever FMCH's motivations or particular objectives in bringing these proceedings, as will be developed below, there is clear English authority that in circumstances where a shareholder can bring an unfair prejudice petition, that shareholder should not  be permitted to bring a derivative action as an alternative or at all. While, for the purposes of this hearing, the Grand Court is bound by Court of Appeal  authority to the effect that the Cayman Islands does not have an unfair  prejudice regime of the kind that exists in England, Ting Chuan's submission is that the availability of alternative relief in section 95(3) of the Companies Act means that a just and equitable winding up petition of this nature is sufficiently analogous to an English unfair prejudice petition such that the English authorities on this issue ought to be highly persuasive. Based on this line of authority, the Leave Application should be dismissed, because the stated goal of FMCH is not to seek a liquidation and dissolution of the Company, but rather is to obtain the alternative relief akin to that available in unfair prejudice petitions in the United*



*Kingdom and elsewhere.*"

39. Dealing firstly with the arbitration clause point, the Plaintiff submitted in its Skeleton Argument:

"*22 There is no common identity of parties in this case and in its absence, the mere existence of a 'matter' that might be connected to an arbitration clause is not sufficient to justify a case management stay. Neither the Majority Directors nor the Corporate Defendants were parties to the SHA.*

*23 Although the SHA contained an arbitration clause, the Articles of Association of the Company (the Articles) contain no such arbitration clause. Other contracts between certain of the parties (the Franchise and Trade Mark Sub-Licence Agreements) contain entirely different arbitration clauses. Accordingly, no inference can sensibly be drawn to the effect that the parties intended that all disputes in relation to the Company ought to be resolved by arbitration consistent with the SHA.*

*24 In BNP Paribas v Trattamento Rifiuti Metropolitani SpA, the Court of Appeal summarised the appropriate approach, the first principle of which is that: 'Where the parties' overall contractual arrangements contain two competing jurisdiction clauses the starting point is that a jurisdiction clause in one contract was probably not intended to capture disputes more naturally seen as arising under a related contract'.*"

40. I accept these submissions and find no basis for concluding that the present derivative claims are arbitrable and refusing leave on this basis.

41. The Plaintiff's counsel responded to the alternative winding-up remedy point as follows:

"*36. In the Cayman Islands, it is accepted that derivative proceedings and winding up proceedings (akin to unfair prejudice proceedings) are not, in any event, true alternatives: Re China Shanshui Cement Group Limited. Section 95(3) of the Cayman Islands Companies Act lists the alternative remedies that are available where the Court*



*is satisfied that the company should be wound up on just and equitable grounds. None of these alternative remedies permit the Court to grant the same financial relief as could be claimed by way of a derivative claim, or against third parties at all. This is a key difference with unfair prejudice proceedings under the English Companies Act 2006 which provides, pursuant to section 996(1), that where the Court is satisfied that an unfair prejudice petition is well-founded, 'it may make such order as it thinks fit for giving relief in respect of the matters complained of' which means that, under the English legislation, the Court can grant the same financial relief as could be obtained by way of a derivative action (by way of example, see Phillips v Fryer).*

*37. Insofar as the Derivative Proceedings seek relief against third parties, who cannot be joined to the Winding-up Proceedings, the determination of the Petition is self-evidently not an appropriate alternative to the Derivative Proceedings.*"

42. I accept these submissions. Section 95 of the Companies Act (2022 Revision) provides:

"*(3) If the petition is presented by members of the company as contributories on the ground that it is just and equitable that the company should be wound up, the Court shall have jurisdiction to make the following orders, as an alternative to a winding-up order, namely* —

*(a) an order regulating the conduct of the company's affairs in the future;*

*(b) an order requiring the company to refrain from doing or continuing an act complained of by the petitioner or to do an act which the petitioner has complained it has omitted to do;*

*(c) an order authorising civil proceedings to be brought in the name and on behalf of the company by the petitioner on such terms as the Court may direct; or*

*(d) an order providing for the purchase of the shares of any members of the company by other members or by the company itself and, in the case of a purchase by the company itself, a reduction of the company's capital accordingly.*" [Emphasis added]



43. In oral argument Mr Imrie QC referred to the fact that in the Petition, the Plaintiff (*qua* Petitioner) had expressly evinced an intention of seeking relief under section 95(3) (c):

   "*113. Alternatively, the Petitioner will seek an order that proceedings are authorised to be commenced against members of the Ting Hsin Group or the Majority Directors pursuant to section 95(3) (c).*"

44. The Petition was dated October 9, 2018, almost four years ago. Ting Chuan and Ting Hsin commenced the ICC Arbitration on November 29, 2018 seeking, *inter alia*, an order that the Petitioner discontinue the Petition Proceedings.  I stayed the Petition in favour of arbitration on February 25, 2019 under the SHA between the joint venture partners regulating their relationship with the Company. The Petitioner successfully appealed this stay order and a partial strike-out order obtaining a favourable judgment from the Court of Appeal on April 23, 2020, following a hearing in mid-November 2019. On September 21, 2021, the Privy Council granted Ting Chuan permission to appeal. The present proceedings were commenced on August 28, 2019 by which time one would not need to be a clairvoyant to anticipate that the progress of the Petition was likely to be still mired in vigorous interlocutory skirmishes for a considerable period of time.

45. Against this background, it was hardly abusive for the Plaintiff to elect to commence the present derivative proceedings rather than deferring seeking such relief until the relief stage was reached (if at all) in the Petition Proceedings. The present position is that the Tribunal in May 2022 refused the claims asserted by Ting Chuan and Ting Hsin seeking to, *inter alia*, restrain the Plaintiff from pursuing the Petition Proceedings, primarily on contractual grounds. Meanwhile the Privy Council Appeal is expected to be heard in the Cayman Islands in November this year and to decide whether the Petition should be stayed to permit its grounds to be determined in accordance with the arbitration clause in the SHA, or whether its grounds are fully justiciable by this Court.

46. The fact that section 95(3) potentially enables the Court to authorise derivative proceedings to be brought in the name of and on behalf of the respondent company as relief alternative to winding-up is the most compelling indicator that derivative proceedings are different in character to a just and equitable winding-up petition. A petitioner would have to establish a case for a just and equitable winding-up and then, at



the relief stage, seek permission to commence derivative proceedings. There may be cases where it is appropriate to exclusively rely upon this indirect route to the commencement of derivative proceedings. So far as I am aware, it has never been suggested that section 95(3) (c) operates so as to exclude the right to pursue a common law derivative claim *in tandem* with a just and equitable petition. The Petition Proceedings are not in any meaningful or practical sense a <u>presently available</u> alternative for obtaining the same relief which the Plaintiff seeks to be obtain through <u>presently</u> prosecuting the present claims.  Further and in any event, the character of the present derivative proceedings and the Petition Proceedings is fundamentally different.

47.  The Plaintiff has (1) pleaded causes of action not relied upon in the Petition Proceedings, (2) is seeking an accounting of profits from persons and entities who are not parties to the Petition Proceedings, (3) is seeking relief which the Court in its winding-up jurisdiction is not empowered by section 95(3) to substantively grant and (4) sues in an entirely different capacity. Moreover, there is a substantive difference in the legal character of a civil claim such as breach of fiduciary duty and a statutory remedy such as a just and equitable winding-up.   While the Court of Appeal in the Petition Proceedings was not directly considering the different character of the Petition Proceedings contrasted with the present derivative proceedings, it is instructive for present purposes that Moses JA recorded the following findings in relation to the strike-out issue (which are not the subject of the Privy Council Appeal) in *In re China CVS* [2020(2) CILR 201] at 220:

"*50  <u>The judge appears to have thought, as submitted by counsel for Ting Chuan, that he needed to identify a cause of action, the breach of which would form the basis of the winding up.</u> It was this view which led him to place such reliance on the allegations of procurement by the majority shareholders and to regard the references to breaches of the understanding as being allegations of breaches of contract.*

*51  <u>This approach betrays a significant misunderstanding and mis-characterization of the petition and its two bases. Neither of those two bases are a cause of action, rather, they are a description of the foundations on which the petition relies in support of its assertions that the company should be wound up on the just and equitable ground, namely loss of confidence on the ground of lack of probity and a breakdown in the fundamental relationship between the main shareholders.</u> These pleadings amounted to no more nor less than those which a petition for winding up is required to disclose: 'a concise statement of the grounds upon which the petitioner claims to be entitled to a*



*winding up order' (Companies Law (2016 Revision) (as amended), Companies Winding Up Rules 2018) (CWR Form No. 2, para. 4).*" [Emphasis added]

48. For all of the above reasons, I reject the Defendants' alternative remedies grounds for refusing the Plaintiff leave to proceed with its derivative claims.

**Findings: should the balance of Petitioner's Summons be adjourned for joint case management with the Petition Proceedings after the hearing of the Privy Council Appeal?**

49. In refusing the Defendants' application to adjourn the Plaintiff's Amended Summons altogether, I expressed my clear provisional view that if the substantive leave application was granted, the directions limbs of that Summons should be adjourned until at least after the Privy Council Appeal had been heard in November this year.  Mr Imrie QC in making the case for joint case management relied on two irresistible considerations:

(a) the following averments in paragraphs 35 and 38 of the First Ogawa Affirmation:

"… *As matters stand, the grounds of misconduct by the Majority Directors which are relied upon for a winding up cover the complaints made in these proceedings…If the Petition is allowed to proceed in due course, FMCH will seek to ensure that the issues can be tried together…*";

(b) on the ex parte application for leave to serve out, Mr Lowe QC confirmed similar joint case management intentions.

50. It is effectively common ground that there is considerable evidential overlap between the grounds relied upon for seeking a winding-up order in the Petition and the factual basis for the Plaintiff's derivative breach of fiduciary duty claim. In the Petition Proceedings it is alleged that Ting Chuan procured the same breaches of duty by the Majority Directors which the Majority Directors are alleged to have committed in the present proceedings. It makes eminent sense in terms of efficiency and expedition to have the trial of these overlapping issues in two proceedings take place at the same time, if at all possible. It follows from this conclusion that joint case management should also occur.



51.  It is also obvious that these assumptions can only be made on a preliminary basis in light of the current status quo as the Privy Council Appeal will finally determine whether either (a) (if the Court of Appeal's decision is upheld) the Petition can be prosecuted without further delay or (b) (if the appeal is allowed) the central issue of whether or not Ting Chuan procured breaches of fiduciary duty is an arbitrable dispute as between the parties to the SHA which should be referred to arbitration.  Because of the limited scope of the Privy Council Appeal, I rejected the Defendants' primary contention that the Plaintiff's Amended Summons should be completely adjourned pending the outcome of the Privy Council Appeal. That appeal was only discernibly relevant to what directions should be ordered for the further conduct of these derivative proceedings. It had no plausible bearing on whether or not leave to proceed should be given. In these circumstances it makes no sense to order directions for the further conduct of the present proceedings, having decided that it is appropriate to grant leave to the Plaintiff to pursue them, at the present stage.

52.  This Court's jurisdiction to adjourn interlocutory summonses is a broad and flexible one and the Defendants very properly (when seeking to adjourn the Amended Summons altogether) primarily sought an adjournment and only alternatively a stay. The restrictive principles applicable to a so-called 'case management stay', relied upon by the Plaintiff in the present case, in my judgment have no application when a party is merely seeking to adjourn the hearing of a summons within a proceeding as opposed to seeking to stay (in the sense of suspend) an action altogether.   As I observed in *Arcelormittal-v- Essar Global Funds Limited and Essar Capital Limited*, FSD 2/2019 (IKJ), Judgment dated October 5, 2022 (unreported):

   "26... The Plaintiff's counsel, relying upon paragraph 141(a) in *Tianrui (International) Holding Company Limited*, FSD 161/2018 and 19/2019 (NSJ), Judgment dated  April 6, 2020  (Segal J) (unreported),  accurately (subject to one qualification) summarised the overarching legal principles and identified their legal source in their Skeleton Argument as follows:

      '41. There is no specific power contained within Cayman Islands legislation for the imposition of a case management stay.  Instead, the courts invoke their inherent jurisdiction and their general case management powers from the preamble to the



*Grand Court Rules (GCR).  The Court must consider what would be most likely to further the interests of justice in the case at hand.*

*42. The overriding objective of the GCR is to enable the Court to deal with every cause or matter in a just, expeditious and economical way.  <u>The Court must further the overriding objective by actively managing proceedings, which may include deciding the order in which issues are to be resolved.</u>'* [Emphasis added]

*27.The qualification I would make to the first of the above two submissions is as follows. If reference is being made to the jurisdiction to stay an entire action before it is heard on its merits, it is correct to assert that: "There is no specific power contained within Cayman Islands legislation for the imposition of a case management stay".  If, as is the case here, one is considering in reality the power to adjourn an interlocutory summons, then the GCR does provide a legislative basis for granting a case management stay. This is through the interaction of the Overriding Objective set out in the Preamble with GCR Order 32 rule 4, which confers a statutory power to adjourn interlocutory summonses…*

*34. The relevant procedural power which the Plaintiff's Summons engages is so well known that it is routinely exercised without any need to consciously reflect upon or even refer to the rule's actual terms. Order 32 rule 4 is extremely broadly drafted in the following terms:*

*'4. (1) The hearing of a summons may be adjourned from time to time either generally or to a particular date, as may be appropriate.*

*(2) If the hearing is adjourned generally, the party by whom the summons was taken out may restore it to the list on 4 clear days' notice to all the other parties on whom the summons was served.'*



> *35. GCR Order 32 rule 4 confirms that this Court has a broad discretion to 'adjourn' (some might prefer the word 'stay') an interlocutory summons with a view to achieving the case management objectives of the Overriding Objective, unconstrained by the restrictions imposed by judge-made law on staying an entire action. This does not mean that the starting assumption in many (if not most) cases may well be that in the ordinary course of events, a litigant who files an interlocutory application will be entitled to have it promptly and substantively heard.*"

53. It must be acknowledged that because the Plaintiff's Amended Summons seeks leave to pursue derivative proceedings, the primary adjournment of the entire Summons as sought by the Defendants was more analogous to an application to stay an entire action than many adjournment applications might be. I refused the application to adjourn the entire Summons in part because "*in the ordinary course of events, a litigant who files an interlocutory application will be entitled to have it promptly and substantively heard*". However, having heard the application on its merits, the Court has even more scope for flexibility when considering whether it should adjourn the hearing of prayers for subsidiary relief set out in an interlocutory summons.  In the final analysis, the case for postponing making pre-trial directions until more is known about the likely course of the Petition Proceedings was compelling. It seems at least possible, if not probable, that after the hearing of the Privy Council Appeal a decision may have been given with reasons to follow. Accordingly this is the earliest point at which this Court may be in a position to more fully assess whether joint case management of the Petition Proceedings and the present derivative proceedings is viable and desirable or whether freestanding directions should be given in relation to the present action alone.

54.  Having decided that the Plaintiff is entitled to the relief sought under paragraph 1 of its Amended Summons, I find that that the application for the following supplementary relief should be adjourned generally with liberty to apply after the conclusion of the hearing of the Privy Council Appeal:

"*4. Discovery is to be made by the exchange of lists of documents within 60 days with inspection to take place within 7 days thereafter.*

*5. The Plaintiff shall file and serve a summons for directions seeking further directions for the further progress of the proceedings 14 days after exchange of the list of documents.*"

**Summary**

55.  The Plaintiff is granted leave to pursue the present derivative proceedings against the 1st -9th Defendants on behalf of the 10th Defendant pursuant to paragraph 1 of its Amended Summons dated November 25, 2022. It has established a *prima facie* case on the merits of its breach of fiduciary and accessory claims and a *prima facie* case that the other requirements of the 'fraud' exception to the rule in *Foss-v-Harbottle* have been met. There is considerable factual overlap between the allegations of procuring the Majority Directors to commit breaches of fiduciary duty, which are asserted against Ting Chuan in the Petition Proceedings as grounds for obtaining statutory relief, and the claims asserted herein against the same Majority Directors for committing the same alleged breaches of fiduciary duty. It is common ground that if these overlapping factual inquiries are to be pursued in these two sets of proceedings, joint case management is desirable. Whether this will be feasible depends on the outcome of the Privy Council Appeal listed for hearing in the Cayman Islands in November 2022. The Judicial Committee is expected to decide whether the dispute the Plaintiff seeks to have this Court adjudicate in the Petition Proceedings can be determined by this Court or must be arbitrated.  Accordingly, the application for the relief sought under paragraphs 4 and 5 of the Amended Summons (discovery and consequential directions) shall be adjourned with liberty to apply until after the hearing of the Privy Council Appeal.

56. I shall hear counsel if required as to the terms of the Order and costs. However, it appeared to be common ground at the hearing that the costs of the respective Summonses should be in the cause.



_____
THE HONOURABLE MR JUSTICE IAN RC KAWALEY
JUDGE OF THE GRAND COURT