A. C.        AND PRIVY COUNCIL.                    83

[PRIVY COUNCIL.]

BURLAND AND OTHERS . . . . . . DEFENDANTS;        J. C.*

AND                            1901

EARLE AND OTHERS . . . . . . . PLAINTIFFS.       July 16, 17,
                                                      19;
CONSOLIDATED APPEAL AND CROSS-APPEAL.              Nov. 9.

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO.

*Law of Canada—Canadian Act 27 & 28 Vict. c. 23—Powers of Company—
Formation and Investment of Reserve Fund—Purchase by Director and
Resale to Company.*

It is an elementary principle that a Court has no jurisdiction to interfere
with the internal management of companies acting within their powers.

The company must sue to redress a wrong done to it; but if a majority
of its shares are controlled by those against whom relief is sought, the
complaining shareholders may sue in their own names, but must shew
that the acts complained of are either fraudulent or ultra vires.

A company formed by letters patent under Canadian Act 27 & 28 Vict.
c. 23 is not bound to divide all its profits on each occasion amongst its
shareholders. It can legally reserve any portion thereof at its own dis-
cretion, and a Court has no jurisdiction to regulate it. Whether the
undivided portion is retained to credit of profit and loss or carried to credit
of a reserve, it may lawfully, in the absence of any express power, be
invested on such securities as the directors may select subject to the
control of a general meeting, but not restricted to such investments as
trustees are authorized to make. It is not ultra vires for a company to
invest in the name of a sole trustee. He is strictly accountable, but the
dissentient shareholders are not entitled to an injunction against the
directors and the company in respect of such investment so long as it
appears to be bonâ fide.

Where a director purchased property without mandate from the com-
pany and under such circumstances as did not make him a trustee thereof
for the company, and thereafter resold the same to the company at a
profit :—

*Held,* that whether or not the company was entitled to a rescission of
the contract of resale, it was not entitled to affirm it and at the same time
treat the director as trustee of the profit made.

*In re Cape Breton Co.,* (1884) 26 Ch. D. 221 and (1885) 29 Ch. D.
795, approved.

CONSOLIDATED APPEAL and cross-appeal from a decree of the
Court of Appeal (Nov. 13, 1900) varying a decree (May 23,

* *Present:* LORD HOBHOUSE, LORD DAVEY, LORD ROBERTSON, and SIR
RICHARD COUCH.

                                    3      G 2

EXHIBIT

20

exhibitsticker.com

HOUSE OF LORDS                    [1902]

J. C.
1901

BURLAND
*v.*
EARLE.

1899) by the Chief Justice of the Queen's Bench Division of the High Court for Ontario.

The respondents, as shareholders in the American Bank Note Company, sued in December, 1897, under the circumstances stated in their Lordships' judgment, to compel the defendants, as directors, and the company to distribute in dividends a rest or reserve fund which, during a long course of years, had been accumulated. By an amended statement of claim on May 6 1898, they prayed, inter alia, for (1.) a declaration that certain investments of the company's funds in the sole name of Burland (a director), and also investments thereof by way of loan or otherwise, were illegal and ultra vires of the company, and that Burland be ordered to restore, with interest, all sums received by him for the purpose of such investments; (2.) a declaration that Burland purchased the plant and material of the insolvent Burland Lithographic Company as a trustee for the American Bank Note Company, and an order directing him to account for the profit made by him out of its resale to the company; (3.) a declaration that certain salaries had been paid wrongfully, and an order that they be refunded.

The principal question in the appeal was whether the majority of the shareholders have a right to retain the balance of profit and loss available for dividends instead of distributing the same as dividends, and as a consequence of such retention to invest such balance in shares and bonds of joint stock companies and other investments foreign to the business of the company.

The Chief Justice held that there was no express power given to the company to establish a reserve fund, and that the company had no implied power to do so, nor to invest such reserve fund upon securities or at all; but that it was unnecessary to determine whether the company had or had not such power, because no reserve fund was ever in fact set apart by the directors or the company, and that the sums at the credit of the profit and loss account in the balance-sheets were in reality net profits and as such available as dividends, and were applicable for that purpose only having regard to the powers of

**A. C.**               AND PRIVY COUNCIL.                    85

the company and the rights of the shareholders, and ought to
have been so applied.

He accordingly ordered distribution, "retaining for the use
of the company a reasonable sum for contingencies," the
amount thereof to be decided by himself in case of the parties
differing about the same. The Chief Justice further directed
that the defendant G. B. Burland should account as trustee for
his dealings and transactions with the net profits of the com-
pany during the six years prior to suit; and also for all profits
made by him from the sale by him to the company of the
plant, &c., of the lithographic company purchased by him.

On November 13, 1900, the Court of Appeal decreed—(1.) That
at the commencement of this action the sum of $264,167.21,
being the amount shewn by the balance-sheet for the year
1897 as at credit of profit and loss account, less the sum of
$44,022.32, which then formed the reserve fund, was undrawn
profits and as such was available for dividends, and should be
so applied; but this is not to affect the right of the directors
and shareholders of the said company to appropriate out of
future profits such further reserve as the needs of the company
may properly require. (2.) That the defendants do forthwith
proceed to take the proper steps for the distribution of the said
undrawn profits in dividends among the shareholders. (3.) That
the defendant George B. Burland is liable to account to the
defendant company for his dealings and transactions with its
net profits which, during the period of six years prior to the
commencement of the action, have come to his hands as
trustee for the company. (4.) That the defendant George B.
Burland is liable to account for and pay over to the company
all the profits made by him from the sale by him to the
company of the plant, machinery, and materials of the Bur-
land Lithographic Company, together with interest thereon.
(5.) That the defendant George B. Burland is trustee for the
company of and liable to account for all such parts of its net
profits as are now held by him or invested in his name, or
which he has received and converted to his own use. (6.) That
the defendant George B. Burland is liable to account for and
pay over to the company all moneys, with interest thereon,

J. C.
1901
BURLAND
*v.*
EARLE.

charged by him in respect of a loan made to one Bennett, unless he shall establish upon the reference hereinafter directed that the loan was made by the company. (7.) That the defendant George B. Burland is liable to account for and pay over to the company all sums which, since April 24, 1888, he has withdrawn from the said defendant company as salary in excess of the sum of $12,000 per annum. (8.) That the defendant Jeffrey H. Burland is liable to account for and pay over to the company all sums of money which he has withdrawn from the company as salary since May 28, 1895. (9.) An account of what is due from the defendants George B. Burland and Jeffrey H. Burland to the company, having regard to the declarations aforesaid. (10.) An injunction against the future employment of the net profits and earnings of the said company in the purchase of shares of the capital stocks of banks and other companies, and from using any portion thereof for the purpose of making loans to persons or corporations, and from in any way dealing with the said net profits already earned otherwise than in accordance with this judgment. (11.) An injunction against the defendant George B. Burland from investing in his own name or personally controlling any portion of the earnings or moneys of the company, or from dealing with the same otherwise than in accordance with the provisions of the judgment. (12.) and (13.) related to costs.

*Blake, K.C.*, and *R. C. Smith, K.C.*, for the appellants, contended, with regard to the main question of the reserve fund, that the Court of Appeal was right in holding that the power to create it existed in the company; but that the amount thereof was a question of internal management and policy to be decided by the directors or a majority of the shareholders acting in the legitimate exercise of their judgment. The company was absolute owner of all its profits, and incident thereto had the legal right to decide whether they should be distributed or reserved. The Court, in the absence of conduct amounting to fraud or oppression, had no right or duty of interference. The company was empowered to make by-laws,

and reference was made to No. 13, which authorized the directors, subject to approval of a general meeting, to create a reserve fund. In the case of this company the creation of a reserve had been its settled policy for thirty years, and had never been objected to by any shareholder, but had been voted for by the respondents.

There was no case of hardship. Reasonable dividends had not been withheld; and even if they had been, it would prim facie be a matter of internal management and policy, of which the majority of the shareholders are the judges. Reference was made to Brice on Ultra Vires, 3rd ed. p. 349; *Stringer's Case* (1); Lindley, 5th ed. p. 430. With regard to the investment of the reserve fund, it was contended that the power to invest was incident to the power to accumulate, and it was a part of internal management to invest in such securities as could be easily realized.

With regard to Burland's sale to the company of certain assets of an insolvent company purchased by him, it was contended that he did not act in any fiduciary character in making the purchase from the liquidator. There was no concealment. The price paid at the purchase and the price charged at the resale were known. The evidence shews that he bought as a creditor of the insolvent company to protect himself from loss, not with the intention of reselling to the company of which he was director. The company had not merely adopted the purchase, but it had resold on its own account. It was too late now to question the transaction. Even if the company had been entitled to rescind at any time, it never was entitled to affirm the transaction and at the same time to compel the vendor to accept a price less than that which had been stipulated. It was further contended that the appellant ought not to have been ordered to account for and pay over to the company all sums of money received by him since April 24, 1888, as salary over and above the stipulated amount thereof. He was a member of the staff of the company, and as such was within the meaning of a resolution of that date which authorized the payment of the sums which he had received,

(1) (1869) L. R. 4 Ch. 475.

J. C.
1901
BURLAND
v.
EARLE.

J. C.
1901

BURLAND
*v.*
EARLE.

and the company had for a series of years acquiesced in such payments.

*Haldane*, K.C., and *Chrysler*, K.C., for the respondents, contended that as a matter of fact a reserve fund had not been created, and that the accumulated amount standing to credit of the profit and loss account ought to be distributed as dividends. But assuming that the amount just mentioned was in reality a rest or reserve fund, it was contended that its formation was beyond the powers of the company or its directors. There was no express power in the Act under which this company was incorporated, or in the charter which issued thereunder, which authorized it to establish or accumulate a reserve fund, or to invest any of its capital in any business or enterprise save and except that described in its charter. See Canadian Act 27 & 28 Vict. c. 23, and the powers enumerated in s. 1. Prior to the British North America Act, 1867, the general Acts of the Province of Canada, including 27 & 28 Vict. c. 23, applied, not to trading companies generally, but only to manufacturing, mining, and other companies, including those within sub-ss. 8 and 9 of s. 1. After 1867, see Dominion Joint Stock Companies Act (32 & 33 Vict. c. 13), ss. 3 and 56, which did not repeal the Act of 1864 so far as regards companies already incorporated thereunder. This company was therefore subject to the general provisions contained in s. 5 of the Act of 1864, sub-ss. 1–34, which are recited in the company's charter. Sub-s. 7 authorized by-laws, and by-law No. 13 authorized a reserve fund, subject to the approval of a general meeting. But it was never acted upon. No reserve account was opened, and no reserve fund was alluded to in the annual balance-sheets or reports. It was contended that the company had no power to create a reserve fund either by by-law or otherwise. In England the general Acts under which nearly all companies are incorporated give power to create a reserve fund. See Companies Clauses Act, 8 Vict. c. 16, s. 122 ; Companies Act, 1862 (25 & 26 Vict. c. 89), Table A, 74. There is no corresponding provision in any Act applicable to this company, and accordingly the power does not exist. Even if the power to create a reserve fund exists, there is no foundation

A. C.                          AND PRIVY COUNCIL.                          89

J. C.
1901
BURLAND
v.
EARLE.

for any power to invest it except in the business of the company.
It was contended that the primary object of a manufacturing
company such as this is to earn and pay dividends, and a
majority of the shareholders have no power to divert to other
purposes a fund applicable thereto.  The minority have a
right, under the circumstances of an improper and oppressive
use of their powers by the majority, to bring this suit: see
*Atwool* v. *Merryweather* (1); *Russell* v. *Wakefield Waterworks
Co.* (2); *Mason* v. *Harris* (3); Lindley, b. 3, c. 2, s. 2.

With regard to the purchase by the appellant Burland of
the insolvent lithographic company's plant and its resale at a
profit to this company, they contended that the finding of the
Court of Appeal was right, that the appellant purchased with
a view to the resale, that he must be deemed to have purchased
as trustee or agent for the company, and that, under the cir-
cumstances, it was his duty to buy for the company and not
for himself.  It was his duty to disclose to the company and
his co-directors that he had bought for $21,564 that which he
sold for $60,000.   They also contended that the payments over
and above the stipulated salaries were not duly authorized.

*Blake, K.C.*, replied.

The judgment of their Lordships was delivered by

1901
Nov. 9.

LORD DAVEY.  The appellants and respondents in these two
appeals, which have been consolidated, are alike shareholders
in a joint stock company, called the British American Bank
Note Company.  In this judgment the term "appellants" will
mean the appellants in the first and principal appeal who are
defendants in the action, and "respondents" will mean the
respondents in the same appeal and plaintiffs in the action.

The company was incorporated by letters patent dated
June 16, 1866, under the provisions of an Act (27 & 28 Vict.
c. 23) of the old Province of Canada.  The objects for which
the company was formed were " to engrave and print bank
notes, debentures, bonds, postage and bill stamps, and bills of
exchange, and to carry on all other branches incidental thereto."

(1) (1867) L. R. 5 Eq. 464, n.          (2) (1875) L. R. 20 Eq. 474.
                    (3) (1879) 11 Ch. D. 97, 107.

90                          HOUSE OF LORDS                     **[1902]**

J. C.
1901
BURLAND
*v.*
EARLE.

The capital of the company was originally $100,000, divided into shares of $100 each, but was subsequently increased to $200,000, of which $170,000 only has been issued.

By s. 1 of the Act referred to, provision is made for the incorporation by letters patent of joint stock companies for the purpose (inter alia) of carrying on any kind of manufacturing business, and by s. 5 it was declared that every company incorporated under the authority of the Act should be subject to the general provisions set out in sub-ss. 1 to 34 thereof. Sub-s. 7, so far as material, is as follows:—

" 7. The directors of the company shall have full power in all things to administer the affairs of the company, and may make or cause to be made for the company any description of contract which the company may by law enter into ; and may from time to time make by-laws not contrary to law, to regulate (inter alia) the declaration and payment of dividends, the number of directors, their term of service, the amount of their stock qualification, the appointment, functions, duties and removal of all agents, officers, and servants of the company, the security to be given by them to the company, their remuneration and that (if any) of the directors, the time at which, and the place or places where the annual meetings of the company shall be held and where the business of the company shall be conducted."

The Act contains no express provisions as to the formation of a reserve fund, or as to the investment or application of the undivided profits of the company.

Shortly after the formation of the company the shareholders made a number of by-laws, of which the following are material for the purpose of this litigation :—

" 9. The shareholders of the company may, at any general meeting of the company, vote and award to the directors of the company, such compensation as they may think proper.

" 10. At all meetings of the company every shareholder shall be entitled to as many votes as he may own shares in the company, and may vote by proxy; but no shareholder shall be entitled to vote unless he has paid all calls in respect of his shares.

"11. The directors shall have the management of the affairs of the company, the appointment, control, and removal of all the officers and employees of the company, and shall, from time to time, regulate their several duties and remuneration.

"12. At every annual general meeting the directors shall present a report and abstract of the accounts of the company, a concise statement of their affairs, and a true and succinct statement of their assets and liabilities ; and, if they deem fit, shall recommend the declaration of a dividend of so much per cent. on the stock out of the earned profits of the company ; and in the interval between the annual general meetings of the company, the directors may, at any regular meeting, declare a dividend, whenever an actual cash balance in the hands of the secretary-treasurer from the earned profits of the company shall, in their judgment, warrant the payment of such dividend.

"13. The directors may set apart any portion of the profits for a reserve fund, subject to the approval of a general meeting, or to the appropriation of such sum by such meeting to any other purpose.

"14. The number of directors shall never be less than three, nor more than six.   Every new board of directors, as soon as elected, shall elect a president and a vice-president ; they shall also elect the president or vice-president, or any director, to be at the same time manager, and if any of the places of these officers become vacant, they may be filled by the board electing others in their place.

"16. At every board meeting three directors shall constitute a quorum.   The president shall preside, in his absence the vice-president, and, failing both, any director.   The president or chairman, as a director, shall have one vote."

The company was formed by the union of two groups, one represented by the appellant George B. Burland (who is hereafter referred to as Burland), and the other by a Mr. Smillie and the respondent Earle.   Mr. Smillie was the first president, and Burland and the respondent Earle were first directors. Mr. Smillie retired from the company in 1881 and sold his shares.   Burland from time to time increased his holding, and at the date of the commencement of the action he held 1077

J. C.

1901

BURLAND
v.
EARLE.

J. C.
1901

BURLAND
*v.*
EARLE.

shares. He was also the president and manager of the company.

The plaintiffs and respondents hold between them 433 shares. The respondent Earle continued on the board of directors (with two short intervals) until the year 1890, when he resigned. The respondent Mrs. Cunningham sues as the administratrix of James Cunningham, deceased, who was at one time the auditor, and from 1887 until his death in 1892 was a director of the company. The respondent Thomas J. Gillelan was from the year 1892, and at the commencement of the action, a director of the company.

The company's business has been extraordinarily successful. In some years it has paid to its shareholders a dividend exceeding 100 per cent., and the average of the dividends paid during the thirty years of its existence prior to the commencement of the action is said to exceed 40 per cent. per annum. In addition to the dividends so paid, the company has accumulated undivided profits to the amount (at the commencement of the action) of $264,167. This sum was not formally carried to the credit of a rest or reserve fund, but stood to the credit of the profit and loss account of the company. Shortly before the commencement of the action the company lost a valuable contract with the Dominion Government. The result was a serious diminution of the profits of its business.

The action was commenced by the respondents on December 7, 1897. By their amended statement of claim they prayed for a declaration that the accumulation by the defendants of a surplus or reserve fund was ultra vires, and for an immediate division and distribution amongst the shareholders of all sums of money accumulated and retained as a reserve fund over and above the authorized capital stock of the company, and various other items of relief. Their Lordships will confine their attention to the points which have been discussed on these appeals. These are—(1.) the formation of the rest or reserve fund; (2.) the investment of it; (3.) a claim by the respondents to treat Burland as a trustee of the plant and material of a certain insolvent company called the Burland Lithographic Company, which he purchased at a sale by auction and resold at an

enhanced price to this company, and to make him account to the company accordingly for the profit made by the resale ; (4.) a question as to certain sums drawn as salaries by Burland and the appellant J. H. Burland.

It is an elementary principle of the law relating to joint stock companies that the Court will not interfere with the internal management of companies acting within their powers, and in fact has no jurisdiction to do so. Again, it is clear law that in order to redress a wrong done to the company or to recover moneys or damages alleged to be due to the company, the action should primâ facie be brought by the company itself. These cardinal principles are laid down in the well-known cases of *Foss* v. *Harbottle* (1) and *Mozley* v. *Alston* (2), and in numerous later cases which it is unnecessary to cite. But an exception is made to the second rule, where the persons against whom the relief is sought themselves hold and control the majority of the shares in the company, and will not permit an action to be brought in the name of the company. In that case the Courts allow the shareholders complaining to bring an action in their own names. This, however, is mere matter of procedure in order to give a remedy for a wrong which would otherwise escape redress, and it is obvious that in such an action the plaintiffs cannot have a larger right to relief than the company itself would have if it were plaintiff, and cannot complain of acts which are valid if done with the approval of the majority of the shareholders, or are capable of being confirmed by the majority. The cases in which the minority can maintain such an action are, therefore, confined to those in which the acts complained of are of a fraudulent character or beyond the powers of the company. A familiar example is where the majority are endeavouring directly or indirectly to appropriate to themselves money, property, or advantages which belong to the company, or in which the other shareholders are entitled to participate, as was alleged in the case of *Menier* v. *Hooper's Telegraph Works*. (3) It should be added that no mere informality or irregularity which can be remedied

(1) (1843) 2 Hare, 461.          (2) (1847) 1 Ph. 790.
(3) (1874) L. R. 9 Ch. 350.

J. C.
1901
BURLAND
*v.*
EARLE.

by the majority will entitle the minority to sue, if the act when done regularly would be within the powers of the company and the intention of the majority of the shareholders is clear. This may be illustrated by the judgment of Mellish L.J. in *MacDougall* v. *Gardiner.* (1)

There is yet a third principle which is important for the decision of this case. Unless otherwise provided by the regulations of the company, a shareholder is not debarred from voting or using his voting power to carry a resolution by the circumstance of his having a particular interest in the subject-matter of the vote. This is shewn by the case before this Board of the *North-West Transportation Co., Ld.* v. *Beatty.* (2) In that case the resolution of a general meeting to purchase a vessel at the vendor's price was held to be valid, notwithstanding that the vendor himself held the majority of the shares in the company, and the resolution was carried by his votes against the minority who complained.

If these elementary considerations are borne in mind, the solution of the principal questions arising in these appeals will not present any real difficulty. It was originally maintained by the plaintiffs that art. 13 of the by-laws was beyond the powers of the company, or, in other words, that a company formed by letters patent under the Act 27 & 28 Vict. c. 23 was bound to divide all its profits on each occasion, and could not by law reserve any portion thereof either to meet contingencies, or for future division, or for any other purpose of a reserve fund. The Chief Justice who tried the action held that the company had no implied power to create a reserve fund, or, "least of all," to invest a reserve fund upon securities; but he thought the question immaterial, as the company had not, in his opinion, set apart or appropriated a reserve fund, and he held that the whole of the sum to the credit of profit and loss ought to be distributed amongst the shareholders. But in his formal judgment or decree he allowed the company to deduct and retain " a reasonable sum for contingencies, the amount, in case the parties differed, to be settled by the Chief Justice." In the Court of Appeal it was held that it was within the

(1) (1875) 1 Ch. D. 13, at p. 25.        (2) (1887) 12 App. Cas. 589.

powers of the company to set apart " a fair and reasonable sum " out of the profits as a reserve fund, and it was the duty of the directors to invest it in a proper manner.   But the learned judges seem to have thought that the company had not exercised the power except as to a sum of $44,022, and they held that the balance in question, after deducting that amount, was distributable amongst the shareholders.   In their formal judgment the Court inserted a saving for the right of the directors and shareholders to appropriate out of future profits " such further reserve fund as the needs of the company may properly require."

J. C.
1901

BURLAND
v.
EARLE.

Their Lordships are not aware of any principle which compels a joint stock company while a going concern to divide the whole of its profits amongst its shareholders.   Whether the whole or any part should be divided, or what portion should be divided and what portion retained, are entirely questions of internal management which the shareholders must decide for themselves, and the Court has no jurisdiction to control or review their decision, or to say what is a " fair " or " reasonable " sum to retain undivided, or what reserve fund may be " properly " required.   And it makes no difference whether the undivided balance is retained to the credit of profit and loss account, or carried to the credit of a rest or reserve fund, or appropriated to any other use of the company.   These are questions for the shareholders to decide subject to any restrictions or directions contained in the articles of association or by-laws of the company.

If the company may form a reserve fund or retain a balance of undivided profits, it must, it would seem, have power to invest the moneys so retained.   The junior counsel for the respondents contended that the company, in the absence of express power to invest, could employ the money only in its own business.   This contention has no support either in principle or in authority, and, if it were sound, the objects for which a reserve fund is needed would in many cases be defeated. The business of this company affords a cogent instance.   In order to obtain a Government contract, it may be called upon to make a large deposit, or purchase new and expensive plant.

J. C.
1901
BURLAND
v.
EARLE.
———

It has no power to borrow, and, if it had no rest or reserve fund, it would have no funds out of which to make the necessary expenditure. Upon what securities, then, may the company invest its undivided profits or reserve fund? It is conceded at the bar that the company is not confined to such investments as trustees are authorized to make. The answer, therefore, can only be that the reserve fund may lawfully be invested on such securities as the directors may select subject to the control of a general meeting.

The annual accounts of the company from the year 1873 onwards are in evidence. They consist of a profit and loss account and a balance-sheet. These accounts were regularly placed before the general meeting. The balance-sheets shew under a separate heading the investments from time to time held by the company, consisting for the most part of bank shares and mortgages. It is not for their Lordships to judge of the propriety or sufficiency of these investments. It may have been expedient for business reasons for the company to hold an interest in the various Canadian banks. The investments when made reappear in subsequent balance-sheets, and seem to have been of a permanent character. There is, therefore, no ground for the suggestion of the directors using the reserve fund for the purpose of trafficking or speculation in stocks and shares.

The investments were wholly or for the most part made in the name of Burland alone. This was, for obvious reasons, unwise and imprudent; but it must have been within the knowledge of the respondent Earle, the late Mr. Cunningham, and the respondent Gillelan, and no complaint or remonstrance seems to have been made until the institution of the present suit. Burland is of course bound to account for all the moneys of the company come to his hands. Very full accounts are directed by the judgment of the Court of Appeal, including special directions as to a loan made to one Bennett, with respect to which Burland is charged with foisting upon the company a bad debt of his own. There is no appeal from this portion of the judgment, and the accounts and inquiries will be prosecuted accordingly. Mr. Haldane asked for some injunc-

tion with respect to these matters, but did not make clear to
their Lordships the form or extent of the injunction to which
he considered his clients were entitled.   The Court of Appeal
granted an injunction to restrain the appellants and the com-
pany from employing the net profits and earnings of the
company already, or which may hereafter be, earned in the
purchase of shares of the capital stocks of banks or other com-
panies, and from using any portion of the net earnings and
profits for the purpose of making loans to persons or corpora-
tions, and also an injunction to restrain the appellant Burland
from investing in his own name or " personally controlling "
any portion of the earnings or moneys of the company, or from
dealing with the same otherwise than in accordance with the
judgment.   For the reasons which have already been given, it
is clear that so sweeping an injunction against the directors
and the company cannot be maintained.   And it is equally
clear that the injunction against Burland cannot be maintained.
It is not ultra vires for the company, if it thinks fit to do so, to
invest in the name of a sole trustee, however imprudent and
undesirable such a course may be.   Nor can Burland as share-
holder, manager, and president of the company be restrained
from exercising any personal control over any portion of the
company's earnings, in which, indeed, he has the largest interest.

If it appeared that under the guise of investing undivided
profits or the reserve fund the directors were, in fact, embarking
the moneys of the company in speculative transactions, or other-
wise abusing the powers vested in them for the management of
the company's business, different considerations would of
course arise.   But it does not appear to their Lordships that
the investment of the surplus profits in bank shares or bonds of
trading companies really bears that character, or was intended
to be or was otherwise than a bonâ fide exercise of the powers
of the company and the directors.   The temporary investment
of $50,000 in the Lachine Rapids Hydraulic and Land Com-
pany was more open to criticism ; but on objection being made
Burland took this investment to his own account, and it is a
little remarkable that his having done so is now made a topic
of complaint against him.

J. C.
1901
BURLAND
*v.*
EARLE.

The next matter to which the appeal relates is the sale to the company by Burland of the lithographic plant, &c., of the Burland Lithographic Company.  It appears that that company had been carrying on business in Montreal, and, having become insolvent, was wound up under the provisions of the Winding-up Act.  Burland was interested in the company as a stock-holder and a creditor.  At the public sale by the liquidator on May 10, 1892, Burland bid for and purchased all the assets of the company in four lots.  The price paid by him for lot 1 was $21,564, and he shortly afterwards sold the property comprised in that lot to the appellant company for $60,000.  The property, together with some other plant purchased from another company, was subsequently sold to a company formed for the purpose at an enhanced price payable in shares, which were distributed as a bonus amongst the shareholders of the company.

In these circumstances Burland has been ordered to pay to the company the sum of $38,436, being the amount of the profit realized by him on the resale.  Both Courts have held that the resale was by Burland's advice and influence, and was made without disclosing to the company the price at which he had purchased.  It was also held in the Court of Appeal that Burland had bought the property with the intention and for the purpose of reselling it to the company.  It appears from the evidence of the respondent Earle, who was then the next largest shareholder to Burland and a director, that he was present at the sale and knew all about the transaction, and from the evidence of Gillelan that he knew what Burland had paid " very shortly after."  There was evidence of two witnesses, Reinhold and Monk, that the price to the company was not unfair.  But their Lordships do not think it necessary to pursue these topics, because they are of opinion that the relief prayed by the amended statement of claim, and granted in the Courts below, is altogether miscon-ceived.  There is no evidence whatever of any commission or mandate to Burland to purchase on behalf of the company, or that he was in any sense a trustee for the company of the purchased property.  It may be that he had an intention in his

own mind to resell it to the company ; but it was an intention which he was at liberty to carry out or abandon at his own will.  It may be also that a person of a more refined self-respect and a more generous regard for the company of which he was president would have been disposed to give the company the benefit of his purchase.  But their Lordships have not to decide questions of that character.  The sole question is whether he was under any legal obligation to do so.  Let it be assumed that the company or the dissentient shareholders might by appropriate proceedings have at one time obtained a decree for rescission of the contract.  But that is not the relief which they ask or could in the circumstances obtain in this suit.  The case seems to their Lordships to be exactly that put by Lord Cairns in *Erlanger* v. *New Sombrero Phosphate Co.* (1)  In that case the bill prayed for rescission, or alternatively for the profit made by Erlanger and his syndicate on the resale to the company.  Lord Cairns said (2) : " It may well be that the prevailing idea in their mind was not to retain or work the island, but to sell it again at an increase of price, and very possibly to promote or get up a company to purchase the island from them ; but they were, as it seems to me, after their purchase was made, perfectly free to do with the island whatever they liked, to use it as they liked, and to sell it how and to whom and for what price they liked.  The part of the case of the respondents which as an alternative sought to make the appellants account for the profit which they made on the resale of the property to the respondents, on an allegation that the appellants acted in a fiduciary position at the time they made the contract of August 30, 1871, is not, as I think, capable of being supported ; and this, as I understand, was the view of all the judges in the Courts below."

Reference may also be made to the judgments of Pearson J. and Cotton and Fry L.JJ. in *In re Cape Breton Co.* (3)  To rescind the sale is one thing, but to force on the vendor a contract to sell at another price is a totally different thing.

The question of salaries stands in this wise.  Burland's

J. C.
1901
BURLAND
*v.*
EARLE.

(1) (1878) 3 App. Cas. 1218.          (2) 3 App. Cas. at p. 1235.
(3) 26 Ch. D. 221 ; 29 Ch. D. 795.

J. C.
1901
BURLAND
*v.*
EARLE.

salary as manager was fixed in the year 1879 at $5000 per annum. This was increased from time to time to $12,000. It was not disputed that he is entitled to draw a salary of that amount, and both Courts have so held. But, in addition to this fixed salary, he has since 1888 drawn a further sum of large amount to which he claims to be entitled under the terms of a resolution of the board of directors of April 24, 1888. The Chief Justice held that the title to this increment, as well as to the fixed salary, was a question of internal management, and dismissed this part of the respondents' claim. The Court of Appeal thought that the question turned on the true construction of the resolution referred to, and, holding that Burland was not entitled to the increment under the terms of the resolution, ordered him to repay the amount thereof drawn by him since the date of the resolution. The amount which he is directed to repay on this account is $53,000 or thereabouts. Their Lordships agree with the Court of Appeal that Burland's right to retain this sum depends on the construction of the resolution, and it was so put by his counsel, Mr. Blake. The resolution is in the following terms : " The manager read letters from Mr. Goodeve and Mr. Ross with reference to their salaries and removal to Ottawa, and, having made explanations of the difficulties arising out of necessity for removal to Ottawa, it was " Resolved that the manager be requested to make the best arrangement he can with reference to the assistance given the employees, and that an increase of salary be given the staff equal to 5 per cent. on the capital stock held by each of them to meet all difficulties incurred owing to such removal."

The first observation which arises on this resolution is, that primâ facie the amount of stock held by the members of the " staff" bears no relation to the value of their services. But it was not contended that the resolution was ultra vires, and Mr. Blake was perhaps right in saying that it must be looked at in the concrete, and that the directors who passed it probably knew the holdings of the members of the " staff" and how it would work. But what is the effect and construction of the resolution? Who are the " employees"? Who are the " staff"? Are they the same or a different set of

A. C.                    AND PRIVY COUNCIL.                    101

people? And is the manager a member of the "staff" within the meaning of the resolution? This question is one of considerable difficulty. Some, but, having regard to Burland's position in the company, not much, weight is to be given to the company having acted on his construction for ten years or more. On the whole their Lordships are not prepared to differ from the Court of Appeal on this point. In the circumstances they think that Burland cannot have been intended to be included in the "staff." At best the resolution is ambiguous, and, considering Burland's position, it is not unfair to invoke against him the rule of construction contra proferentem. He was the leading man in these transactions, and it rested on him to make it clear that a resolution under which he claims a much larger benefit than anybody else should carry that meaning on the face of it.

The same question arises with regard to the appellant J. H. Burland, though in his case the sum in question is not so large. The last-named appellant was at the date of the resolution secretary of the company, and there does not seem to be any valid reason why he should not be included in the "staff." There is, however, a further point with regard to J. H. Burland. It appears that he ceased to hold the office of secretary in 1895, when he was appointed vice-president; but in the resolution appointing him to the latter office there is no mention of salary. Therefore, say the respondents, he is not entitled as vice-president to any salary, or to the increment under the resolution of April 24, 1888. There is evidence that there was a change in the distribution of offices in 1895, and that J. H. Burland continued to do the same class of work as he had done as secretary, that office having been united with that of treasurer. He was allowed by the directors to continue to draw his former salary without any observation until the commencement of the present action; and their Lordships think that the inference may fairly be drawn, from all the circumstances of the case, that he was intended to retain his salary although there was a shifting of the offices.

The order of the Court of Appeal which is under review is dated November 13, 1900. The declarations and directions

Case 1:21-cv-11059-GHW   Document 141-20   Filed 06/14/23   Page 20 of 21

J. C.
1901
BURLAND
*v.*
EARLE.

contained in it are conveniently divided into numbered paragraphs. The result of their Lordships' judgment on the first and principal appeal may be stated thus: Paragraphs 1, 2, 4, 8, 10, 11, 12, and 13 should be discharged. Paragraph 9 should be varied by substituting " defendant " for " defendants " in the third line, and omitting the words " and Jeffrey H. Burland " in the fourth line. There should be an order that the action be dismissed with costs in both Courts, so far as relates to (1.) the questions of undrawn profits and the investment of the reserve fund; (2.) the claim to the profits made by the appellant George B. Burland from the sale to the company of the plant, machinery, and materials of the Burland Lithographic Company; (3.) the claim against the appellant Jeffrey H. Burland in respect of the sums drawn by him as salary since May 28, 1895; and (4.) so far as any injunction was prayed against the defendants in the action, or any of them.

The disposal of the costs of the action involves some complication and difficulty of adjustment. By the decree of the Chief Justice the defendants were ordered to pay to the plaintiffs their costs of the action. This decree, however, was superseded by the order of the Court of Appeal. By that order (paragraph 12) Burland and J. H. Burland were ordered to pay the costs occasioned by the plaintiffs' appeal to the Court of Appeal in respect of the salaries withdrawn by them, and by (13.) so much of the costs of the plaintiffs up to and including the trial as were attributable to the question of the rights of the parties in respect of the accumulated fund, and the costs of the appeal to the Court of Appeal for Ontario (meaning apparently the whole costs of both parties of the appeal of the defendants) were ordered to be paid out of the said fund. There is no mention in the order of the Court of Appeal of the costs of the action up to trial, so far as relates to the question of salaries, the question as to the resale of the lithographic plant, and the account directed by paragraphs 3, 5, and 6. There is, therefore, no subsisting order as to the costs of those portions of the action.

The defendants have now succeeded on all questions relating to the accumulated fund and as to the sale of the lithographic

plant.  On the other hand, they have failed as to Burland's
salary and succeeded as to J. H. Burland's salary.  It would
be almost impossible to do justice by a strict apportionment of
the costs of the action up to trial, and to endeavour to do so
would lead to certain inconvenience and consequent expense
in taxation.  On the consideration of all the circumstances,
their Lordships think that justice will be met by (1.) dis-
charging all orders as to costs made in the Courts below;
(2.) directing the plaintiffs to pay to the defendants two-thirds
of their costs of the action up to and including the trial;
(3.) directing the defendants to pay to the plaintiffs two-thirds
of the costs of the plaintiffs' appeal to the Court of Appeal,
which rightly succeeded as to Burland, but ought to have
failed as to J. H. Burland, and the plaintiffs to pay to the
defendants two-thirds of the costs of the defendants' appeal to
the Court of Appeal, which ought to have succeeded except as
to the directions for Burland accounting.  Paragraph 14 of
the order of the Court of Appeal as to subsequent costs will
stand.

J. C.
1901
BURLAND
v.
EARLE.

Their Lordships will humbly advise His Majesty that the
order of the Court of Appeal be varied in the manner above
stated as to substance and costs.

The respondents in the principal appeal will pay to the
appellants two-thirds of their costs of that appeal, and the
appellants will pay to the respondents one-third of their costs
of the same appeal.  The costs of the cross-appeal will be paid
by the appellants therein.

In the Court below the greater part of the plaintiffs' costs
up to trial and the costs of the defendants' appeal were
ordered to be paid out of the accumulated fund.  If the parties
agree, their Lordships think it would be a proper case in which
to make that order as to all the costs in the Courts below and
of the principal appeal to this Board.

Solicitors for appellants : *Ingle, Holmes & Sons.*
Solicitors for respondents : *Harrison & Powell.*