**[1992–93 CILR 59]**

**SCHULTZ**

*v.*

**REYNOLDS and NEWPORT LIMITED**

*Court of Appeal*

(Zacca, P., Georges and Kerr, JJ.A.)

**15 April 1992**

*Companies—minority shareholders—right to bring action—entitled to bring action on behalf of company against directors fraudulently or negligently benefiting themselves at company's expense—no action by beneficial owner unless registered shareholder*

*Companies—shares—beneficial owner—joint beneficial owners—beneficial owner bringing proceedings must join co-owner in proceedings*

*Civil Procedure—pleading—amendment—amendment of statement of claim to introduce new cause of action may be allowed by Court of Appeal even though statement of claim already struck out by Grand Court*

The appellant brought an action against the first respondent in the Grand Court for breach of trust.

The appellant alleged that D had agreed to pay her US$500,000 for certain business services she had performed for him. A company (the second respondent) was formed and the money deposited in an account in its name at the Canadian Imperial Bank of Commerce ("CIBC"). The shares in the company were held by a nominee shareholder, Commerce Management Services ("CMS"), jointly for the benefit of the appellant and D. CMS, a wholly-owned subsidiary of CIBC, managed the affairs of the new company, the directors of which were the first respondent (a trust officer with CIBC) and four other local employees of CIBC. They were also the subscribers to its memorandum of association. The first respondent explained that the purpose of this arrangement was to ensure that, should the appellant predecease D, any sums to the credit of the account would accrue to him but as long as she was alive the funds would be hers and under her control. Nonetheless, the printed nominee agreement form allowed "any one/all of the beneficial owners" to authorize the transfer of the shares.

The appellant suspected that the money was no longer in the account and discovered that the first respondent, acting on instructions from D, had transferred the money to another account in D's name. She brought the present proceedings on behalf of the company against the first respondent for breach of trust and, since it was a derivative action, she also named the company as a defendant.

The first respondent applied for the action to be struck out on the grounds that the appellant had no *locus standi* and her statement of claim disclosed no cause of action. The Grand Court (Malone, C.J.)

**EXHIBIT**

**21**

59

held that there was an arguable case that she was entitled to sue on the company's behalf but nevertheless struck out the statement of claim for disclosing no cause of action.

The appellant appealed but first sought an amendment to the statement of claim to include an allegation of conspiracy. The application for the amendment was heard in the course of the appeal.

The appellant submitted that (a) as a beneficial owner of the shares in the second respondent she was entitled to bring the action in her own name; (b) to bring a derivative action she needed to prove only that a fraud had been committed by the first respondent and that he was legally in control of the second respondent. She was not required to prove that he had personally benefited from the fraud; (c) his fraud stemmed from the fact that he knew that the money had been deposited in the account for her own use and had transferred it without her knowledge; (d) the action had been properly brought against the first respondent since in his capacity as one of the directors of the second respondent, all of whom were employees of the bank that ultimately controlled that company, he was in fact and law in control of it; and (e) there had been a conspiracy between the first respondent, the bank and the other beneficial owner of the shares to commit a breach of trust against the second respondent by unlawfully utilizing its funds against its interest.

The first respondent submitted in reply that (a) under the Companies Law (Revised), s.37 the appellant, being neither a member nor a shareholder of the second respondent, had no *locus standi* to bring or sustain an action on its behalf; (b) any wrong allegedly suffered would have been suffered by the company, which alone could sue; (c) even if the appellant were entitled to bring an action on behalf of the second respondent, she had failed in essence to establish a cause of action because it was clear that he did not control the second respondent and no facts had been pleaded to support a claim of fraud or negligent breach of trust nor to show what benefit he had derived from the act complained of; (d) it was essential to establish in a derivative action that the alleged wrongdoer was not only in control of the company on whose behalf the suit was brought but that the act complained of was committed with the intention of bringing some benefit to himself; and (e) the court had no jurisdiction on an appeal to grant the amendment sought since the appellant's defective statement of claim had already been struck out and, accordingly, there was no document which could be amended.

**Held**, dismissing the appeal:

(1) It was the general rule that the proper plaintiff in an action in respect of a wrong alleged to be done to a company was *prima facie* the company itself and, as an exception, a minority shareholder might bring a derivative action on behalf of the company against the wrongdoers if they used their controlling powers either fraudulently or negligently with the intention of benefiting themselves at the expense of the company. Accordingly, the appellant would have been able to bring a

derivative action if she had been a minority shareholder, but as she was not (being only the beneficial owner of shares in the company), she could not sue on its behalf and it was only the subsidiary company of the bank, in which name all the shares of the second respondent were registered, that could do so. In any case, as one of two joint beneficial owners, the appellant also lacked the capacity to sue on her own but would have had to join her co-owner. It would have been more appropriate to bring a different type of action naming her co-owner and the nominee shareholding company as defendants (page 63, line 40 – page 64, line 4; page 67, lines 3–7; page 69, lines 27–38; page 77, lines 1–15).

(2) Moreover, there seemed to be no justification for bringing proceedings against the first respondent. The first respondent was a director but not a shareholder of the second respondent, which was legally controlled by a nominee shareholding company, a subsidiary of the bank employing the first respondent and other directors of the second respondent. However, it did not follow from this that the first respondent controlled the second respondent. On the contrary, he was under a legal obligation to act independently in the interests of the second respondent and was under no obligation to heed the wishes of his employer, the bank. There was also nothing pleaded to establish fraud or that the first respondent had gained any benefit from his alleged breach of trust or wrongful exercise of authority *vis-a-vis* the second respondent and proof of improper benefit was essential—whether the act complained of was fraudulent or negligent—for the appellant to succeed. Accordingly, on the statement of claim as it stood, no cause of action had been established and it had been properly struck out (page 72, line 12 – page 73, line 8; page 79, line 17 – page 80, line 11).

(3) Since the Grand Court would certainly have been able to allow an amendment to the appellant's statement of claim to bring in a plea of conspiracy, the Court of Appeal, because it had all of the powers of the Grand Court, had the jurisdiction to entertain such an application, in spite of the striking out of the statement of claim. However, it would be unfair to the respondents to allow the amendment at such a stage of the proceedings and since, in any case, there were other courses of action open to the appellant by which she could more appropriately seek redress for the wrongs suffered, the application for amendment would be dismissed (page 73, lines 18–29; page 80, line 40 – page 81, line 16).

**Cases cited:**

(1) *Bagshaw v. Eastern Union Ry. Co.* (1849), 7 Hare 114; 68 E.R. 46, considered.

(2) *Birch v. Sullivan*, [1957] 1 W.L.R. 1247; [1958] 1 All E.R. 56, *dicta* of Harman, J. considered.

(3) *Burland v. Earle*, [1902] A.C. 83; (1902), 71 L.J.P.C. 1, *dicta* of Lord Davey applied.

(4) *Daniels v. Daniels* , [1978] Ch. 406; [1978] 2 All E.R. 89, *dicta* of Templeman, J. applied.

(5) *Edwards v. Halliwell*, [1950] 2 All E.R. 1064; (1950), 94 Sol. Jo. 803, *dicta* of Jenkins, L.J. applied.

(6) *Estmanco (Kilner House) Ltd. v. G.L.C.*, [1982] 1 W.L.R. 2; [1982] 1 All E.R. 437, *dicta* of Megarry, V.-C. applied.

(7) *Exchange Travel (Holdings) Ltd., Re*, [1991] BCLC 728, *dictum* of Harman, J. applied.

(8) *Fargro Ltd. v. Godfroy*, [1986] 1 W.L.R. 1134; [1986] 3 All E.R. 279; [1986] BCLC 370, considered.

(9) *Foss v. Harbottle* (1843), 2 Hare 461; 67 E.R. 189, applied.

(10) *Great W. Ry. Co. v. Rushout* (1852), 5 De G. & Sm. 290; 64 E.R. 1121, distinguished.

(11) *Kuwait Asia Bank E.C. v. National Mutual Life Nominees Ltd.*, [1991] 1 A.C. 187; [1990] 3 All E.R. 404; [1990] 2 Lloyd's Rep. 95, considered.

(12) *Lonrho PLC v. Fayed*, [1992] 1 A.C. 448; [1991] 3 All E.R. 303; [1991] BCLC 779.

(13) *Lonhro Ltd. v. Shell Petroleum Co. Ltd.*, [1982] A.C. 173; [1981] 2 All E.R. 456.

(14) *Metall & Rohstoff AG v. Donaldson, Lufkin & Jenrette Inc.*, [1990] 1 Q.B. 391; [1989] 3 All E.R. 14.

(15) *Prudential Assur. Co. Ltd. v. Newman Indus. Ltd. (No. 2)*, [1981] Ch. 257; [1980] 2 All E.R. 841; on appeal, [1982] Ch. 204; [1982] 1 All E.R. 354, applied.

(16) *Stena Fin. BV v. Sea Containers Ltd.*, [1989] LRC (Comm.) 641, considered.

(17) *Telecommunications of Jamaica Ltd. v. Bernard*, Court of Appeal of Jamaica, Case No. 88 of 1990, unreported, applied.

(18) *Wallersteiner v. Moir (No. 2)*, [1975] Q.B. 373; [1975] 1 All E.R. 847, *dicta* of Lord Denning, M.R. applied.

(19) *Williams v. British Gas Corp.* (1980), 41 P. & C.R. 106; 257 E.G. 833.

**Legislation construed:**

Companies Law (Revised) (Laws of the Cayman Islands, 1963, *cap.* 22, revised 1990), s.37:

"The subscribers of the memorandum of association of any company shall be deemed to have agreed to become members of the company whose memorandum they have subscribed, and upon the registration of the company shall be entered as members on the Register of members hereinafter mentioned, and every other person who has agreed to become a member of a company and whose name is entered on the register of members, shall be deemed to be a member of the company."

*P. Lamontagne, Q.C.* and *D. Bannon* for the appellant;

*R.D. Alberga, Q.C.* and *N. Clifford* for the first respondent.

The second respondent did not appear and was not represented.

**ZACCA, P.:** This is an appeal against the order of the Grand Court Judge striking out a writ of summons and statement of claim filed by the appellant on the ground that she had no *locus standi*. The appellant in her statement of claim and in her affidavit
5  alleged that she performed certain services for one Robert Dupre and that he agreed to pay her US$500,000.

A meeting was arranged between the first respondent, herself and Dupre at the Canadian Imperial Bank of Commerce ("CIBC"). The first respondent was a senior trust officer with the
10  bank. It was agreed that a company was to be formed and the money was to be deposited to the account of that company. Newport Ltd., a Cayman company, was incorporated for the purpose. Another Cayman company called Commerce Management Sevices Ltd. ("CMS") was a subscriber to the memorandum
15  of association of Newport Ltd. Five persons, all employees of CIBC, were appointed directors of Newport Ltd. The respondent, Anthony Reynolds, was one of the directors so appointed. The same five directors were also directors of CMS.

100 shares in Newport Ltd. were issued to CMS. A nominee
20  agreement was executed in which CMS was to hold the 100 shares it had as nominee for the appellant and Robert DuPre. The agreement records that all the 100 shares are the joint property of the appellant and Dupre. The appellant and Dupre were therefore the beneficial owners of the shares.

25  It was also alleged that subsequent to the money being deposited in the account of Newport Ltd., it was transferred with the knowledge of the respondent to an account at CIBC in the name of Robert Dupre at his request. The transfer was done as if in repayment of a loan made by Dupre. No action has been
30  commenced against any of the alleged wrongdoers other than the respondent Reynolds. Dupre was not joined as a defendant.

It is not in dispute that the appellant has brought this claim on behalf of the second respondent, Newport Ltd. Nor is it in dispute that the appellant is bringing a derivative action for the
35  second respondent, Newport Ltd., and not on behalf of herself. It is well established that a minority shareholder can bring a derivative action on behalf of the company against wrongdoers who have committed a fraud on the company and who are in control of the company.

40  The general principle established in *Foss* v. *Harbottle* (9) is that where a wrong has been done to a company, *prima facie* the only

proper plaintiff is the company itself and that an action by a shareholder claiming relief for the company is not available. The plaintiff may only bring a derivative action if it falls within the exceptions to the rule in *Foss* v. *Harbottle*.

5      In *Edwards* v. *Halliwell* (5) the rule in *Foss* v. *Harbottle* was considered. Jenkins, L.J. stated ([1950] 2 All E.R. at 1067):

> "The cases falling within the general ambit of the rule are subject to certain exceptions. It has been noted in the course of argument that in cases where the act complained of is wholly *ultra vires* the company or association the rule has no application because there is no question of the transaction being confirmed by any majority. It has been further pointed out that where what has been done amounts to what is generally called in these cases a fraud on the minority and the wrongdoers are themselves in charge of the company, the rule is relaxed in favour of the aggrieved minority who are allowed to bring what is known as a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue. Those exceptions are not directly in point in this case, but they show, especially the last one, that the rule is not an inflexible rule and it will be relaxed where necessary in the interests of justice."

In *Prudential Assur. Co. Ltd.* v. *Newman Indus. Ltd. (No. 2)* (15) the court, comprising Cumming-Bruce, Templeman and Brightman, L.JJ. stated ([1982] 1 All E.R. at 357–358):

> "The classic definition of the rule in *Foss v. Harbottle* is stated in the judgment of Jenkins, L.J. in *Edwards v. Halliwell* [1950] 2 All E.R. 1064 at 1066–1067 as follows. (1) The proper plaintiff in an action in respect of a wrong alleged to be done to a corporation is, prima facie, the corporation. (2) Where the alleged wrong is a transaction which might be made binding on the corporation and on all its members by a simple majority of the members, no individual member of the corporation is allowed to maintain an action in respect of the matter because, if the majority confirms the transaction, cadit quaestio; or, if the majority challenges the transaction, there is no valid reason why the company should not sue. (3) There is no room for the operation of the rule if the alleged

wrong is ultra vires the corporation, because the majority of members cannot confirm the transaction. (4) There is also no room for the operation of the rule if the transaction complained of could be validly done or sanctioned only by a special resolution or the like, because a simple majority cannot confirm a transaction which requires the concurrence of a greater majority. (5) There is an exception to the rule where what has been done amounts to fraud and the wrongdoers are themselves in control of the company. In this case the rule is relaxed in favour of the aggrieved minority, who are allowed to bring a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue."

In *Wallersteiner* v. *Moir (No. 2)* Lord Denning, M.R. stated ([1975] 1 All E.R. at 858):

"To avoid that circuity, Lord Hatherley, L.C. held that the minority shareholders themselves could bring an action in their own names (but in truth on behalf of the company) against the wrongdoing directors for the damage done by them to the company, provided always that it was impossible to get the company itself to sue them. He ordered the fraudulent directors in that case to repay the sums to the company, be it noted, with interest. His decision was emphatically approved by this court in *Menier v. Hoopers' Telegraph Works*; and *Mason v. Harris*. The form of the action is always 'AB (a minority shareholder) on behalf of himself and all other shareholders of the Company' against the wrongdoing directors and the company. That form of action was said by Lord Davey to be a 'mere matter of procedure in order to give a remedy for a wrong which would otherwise escape redress'; see *Burland v. Earle*. Stripped of mere procedure, the principle is that, where the wrongdoers themselves control the company, an action can be brought on behalf of the company by the minority shareholders, on the footing that they are its representatives, to obtain redress on its behalf. I am glad to find this principle well stated by Professor Gower in his book on companies in words which I would gratefully adopt:

'Where such an action is allowed the member is not

really suing on his own behalf nor on behalf of the members generally, but on behalf of the company itself. Although … he will have to frame his action as a representative one on behalf of himself and all the members other than the wrongdoers, this gives a misleading impression of what really occurs. The plaintiff shareholder is not acting as a representative of the other shareholders but as a representative of the company … in the United States … this type of action has been given the distinctive name of a "derivative action," recognising that its true nature is that the individual member sues on behalf of the company to enforce rights derived from it.' "

Mr. Alberga, Q.C. for the respondent submitted that unless the appellant can show that she is a shareholder of Newport Ltd., she has no *locus standi* and cannot sustain the action. Mr Lamontagne, Q.C. for the appellant submitted that she is a beneficial owner of the shares and as such is entitled to bring the action in her name.

CMS became the nominee of the appellant and Dupre under a nominee agreement of September 4th, 1989, which provides in part:

"The shares of the company will be transferred to the beneficial owners or their nominees in accordance with such directions as any one/all of the beneficial owners may give and for the aforesaid purposes the corporate nominee hereby authorizes any one/all of the beneficial owners to sign all such transfers or other forms as may be necessary for registration of the shares of the company in the name of the beneficial owners or that of their nominees."

The register of Newport Ltd. shows CMS to be the sole member of Newport Ltd.

Section 37 of the Companies Law (Revised) defines those who are members of a company. The section provides as follows:

"The subscribers of the memorandum of association of any company shall be deemed to have agreed to become members of the company whose memorandum they have subscribed, and upon the registration of the company shall be entered as members on the Register of members hereinafter mentioned, and every other person who has agreed to become a member of a company and whose name is entered

on the register of members, shall be deemed to be a member of the company."

The appellant is therefore not a member of the company in accordance with s.37 of the Companies Law (Revised). Can it therefore be said that the appellant is a shareholder of Newport Ltd.? In the alternative, if she is not a shareholder, can she as beneficial owner of the shares maintain this action?

In *Birch* v. *Sullivan* (2) the action was stayed because the plaintiff at the time of trial was not registered as a shareholder. The plaintiff was adjudged a bankrupt and the trustee in bankruptcy was regarded as the shareholder. Harman, J. stated ([1958] 1 All E.R. at 58):

"The circumstances are well settled in which a shareholder, if he be in the minority, may bring such an action in his own name. Supposing that all the conditions were satisfied and that the registered shareholder was in a position, if he were not bankrupt, to bring an action because of the wrongful act of the director in not paying money to the company, I am not satisfied that he could not maintain such an action as long as he remained registered. However that may be, he certainly can no longer maintain the action when he has ceased to be a registered holder. Therefore, on that part of the claim, I should certainly stay the action as long as the plaintiff alone remains the plaintiff, giving a reasonable opportunity to the trustee to put the matter right if he is minded to adopt the action."

In *Fargro Ltd.* v. *Godfroy* (8) it was held that the plaintiff could not bring a minority shareholder's action because the company was in liquidation. If the company had not been in liquidation the plaintiff, being a shareholder of the company, would have been entitled to bring the action. Mr. Lamontagne submits that the appellant as a beneficial owner of the shares was entitled to bring this action. In support of his proposition he relies on the case of *Stena Fin. BV* v. *Sea Containers Ltd.* (16). In that case, a preliminary point was taken that the plaintiff, Temple, was not a registered holder of shares when the action was brought and therefore had no *locus standi*. However, it was pointed out that Temple had been registered as the owner of the shares at the time of trial. It was in these circumstances that Astwood, C.J. stated ([1989] LRC (Comm.) at 666):

"In the instant case no harm is done since I hold, on

reviewing   the   pleadings   and   having   considered   the   submis-
sions   of   counsel,   that   Temple   has   locus   since   they   were
absolute   beneficial   owners   of   the   shares   when   the   action   was
started   and   Stena   can   maintain   the   action   in   its   own   right   as   a
5      member of the company."

Mr. Lamontagne also relied on the case of *Great W. Ry. Co.* v.
*Rushout* (10).   In   that   case,   the   Great   Western   Railway   Co.
became      shareholders      holding      3,600      shares      in      the      company
standing   in   the   name   of   4   persons   who   were   defendants   in   the
10    suit,   upon   certain   trusts   in   an   indenture   dated   March   23rd,   1948.
It   was   contended   that   the   plaintiffs   had   no   right   to   sustain   the   suit
because   its   object   was   to   affect   the   internal   management   of   the
company,   and   the   plaintiffs   did   not   appear   in   the   share   list   as
shareholders.   In   his   judgment,   Parker,   V.-C.   stated   (5   De   G.   &
15    Sm. at 306–307; 64 E.R. at 1129):

"It   appears   by   the   bill,   and   upon   the   affidavits,   that   the
Plaintiffs   are   not   shareholders   in   their   own   name   in   this
company;   but   the   bill   states,   and   it   is   proved   by   affidavit,   that
they   have   got   a   large   number   of   shares   that   are   standing   in
20    the   names   of   four   persons,   who   are   trustees   for   the   Plaintiffs,
and   who   are   named   as   Defendants   to   this   record;   and   in   that
state   of   matters   it   was   contended   that   the   company   had   no
such   interest   as   enabled   them   to   maintain   this   suit,   suing   on
behalf of themselves and all other the shareholders.

25    With   reference   to   that   question,   I   think   they   have   an
interest   to   maintain   this   suit.   There   is   a   valid   trust,   beyond
all   doubt   valid,   on   which   these   shares   are   held   for   the   Great
Western   Railway   Company,   they   are   the   only   persons   who,
under   that   trust,   are   interested   in   the   shares.   They   have
30    therefore   an   interest   in   what   is   sought   by   this   bill   to   protect
the property and concerns of this company.

It   is   very   true   that,   for   many   purposes,   the   company   are
only   bound   to   regard   the   legal   title.   One   of   the   clauses   of   the
Act   is   that   the   company   shall   not   be   bound   to   see   to   the
35    execution   of   any   trust.   Now,   they   are   not   asked   here   to   see
to   the   execution   of   any   trust,   they   are   only   asked   to   act   on   a
title,   which   is   a   trust   executed,   and   is   an   equitable   not   a   legal
title;   and   enabling   these   parties   to   maintain   this   suit   does   not
in   any   way   change   the   jurisdiction   on   the   subject-matter:   so
40    that   I   must   assume   for   this   purpose   that   the   legal   share-
holders   themselves   could   maintain   this   bill.   It   is   not   like

those cases in which the *cestui que trust* suing in this Court, and making the trustee a Defendant, asserts a right against another party, which is a right to be asserted by the trustee in a Court of law. The trustee, or *cestui que trust*, can sue in this Court, and therefore that objection cannot apply; and, when it is added to this that the trustees themselves, the persons who are the legal owners of the shares, are parties to the suit, and bound by the proceedings, I confess I do not see any objection to the frame of the suit. Moreover, the Act of Parliament itself assumes that the Great Western Railway Company may have an equitable title in these shares; for it provides, in the 12th section, that, having taken these shares, they may guarantee interest on the money necessary to be raised to enable them to take the shares, on such conditions as the holders for the time being of the shares, or the parties in whose hands they may be placed as security, may agree upon. It appears that these shares are, in fact, placed in the hands of the trustees, subject to certain guarantees, and pursuant to that clause; so that we have the Great Western Railway Company here precisely in the position which the Act of Parliament regulating the Oxford, Worcester and Wolverhampton Railway Company contemplated, namely, having an equitable title in these shares, but subject to those guarantees held by the persons who are the owners of the shares. For these reasons, I think the suit is properly constituted as to its frame."

The Companies Law (Revised) recognizes only members who are registered. The appellant has no voting rights and as a beneficial owner of the shares has no rights under the Law. The instant case can therefore be distinguished from the *Great W. Railway* case.

In my view it is only CMS, the registered shareholder of Newport Ltd., who can institute an action against Newport Ltd. The appellant, as a beneficial owner of the shares, is not entitled to bring a derivative action against Newport Ltd.

Another hurdle for the appellant is that she is a joint beneficial holder of the shares with Dupre. She must therefore act jointly with Dupre and cannot pursue the action on her own. In *Williams* v. *British Gas Corp.* (19) it was held that one of two joint tenants cannot commence proceedings without the aid of the other. Again, in *Re Exchange Travel (Holdings) Ltd.* (7) it was held that

joint shareholders could only act together. Both Dupre and CMS would have to be joined as plaintiffs or as defendants. Obviously they would not consent to be joined as plaintiffs. The learned Chief Justice was therefore in error in holding that there was an
5    arguable case as to the appellant's right to bring this action. No reliance should have been placed on the case of *Bagshaw* v. *Eastern Union Ry. Co.* (1).

The Chief Justice in his judgment concluded that wrongdoers cannot be held to have committed a "fraud upon the minority"
10   unless it can be shown that the wrongdoers have obtained a benefit as a result of their actions. This was necessary to bring the case within the exception to the rule in *Foss* v. *Harbottle* (9). Mr. Lamontagne submitted that where fraud was proved, the element of personal gain from the fraud need not be established. It is not
15   contended that the respondent received any personal benefit by paying out the money from the accounts of Newport Ltd. to Dupre. It was, however, argued by Mr. Lamontagne that his action amounted to fraud as a result of the misappropriation of the company's funds.

20   In *Burland* v. *Earle* (3) Lord Davey stated ([1902] A.C. at 93):

"Again, it is clear law that in order to redress a wrong done to the company or to recover moneys or damages alleged to be due to the company, the action should primâ facie be brought by the company itself. These cardinal principles are
25       laid down in the well-known cases of *Foss* v. *Harbottle* . . . and *Mozley* v. *Alston* . . . and in numerous later cases which it is unnecesary to cite. But an exception is made to the second rule, where the persons against whom the relief is sought themselves hold and control the majority of the
30       shares in the company, and will not permit an action to be brought in the name of the company. In that case the Courts allow the shareholders complaining to bring an action in their own names. This, however, is mere matter of pro-cedure in order to give a remedy for a wrong which would
35       otherwise escape redress, and it is obvious that in such an action the plaintiffs cannot have a larger right to relief than the company itself would have if it were the plaintiff, and cannot complain of acts which are valid if done with the approval of the majority of the shareholders, or are capable
40       of being confirmed by the majority. The cases in which the minority can maintain such an action are, therefore, confined

to those in which the acts complained of are of a fraudulent character or beyond the powers of the company. A familiar example is where the majority are endeavouring directly or indirectly to appropriate to themselves money, property, or advantages which belong to the company, or in which the other shareholders are entitled to participate, as was alleged in the case of *Menier* v. *Hooper's Telegraph Works.* . . .”

In considering the exception to the rule in *Foss* v. *Harbottle* (9) which requires the plaintiff in a minority shareholder's action to establish fraud on the part of the wrongdoer and that the wrongdoers were in control of the company, Vinelott, J. in *Prudential Assur. Co. Ltd.* v. *Newman Indus. Ltd. (No. 2)* (15) stated ([1980] 2 All E.R. at 869):

"Thus the authorities show that the exception applies not only where the allegation is that directors who control a company have improperly appropriated to themselves money, property or advantages which belong to the company or, in breach of their duty to the company, have diverted business to themselves which ought to have been given to the company, but more generally where it is alleged that directors though acting 'in the belief that they were doing nothing wrong' (per Lord Lindley, M.R. in *Alexander v. Automatic Telephone Co.*, [1900] 2 Ch. 56 at 65) are guilty of a breach of duty to the company (including their duty to exercise proper care) and as a result of that breach obtain some benefit. In the latter case it must be unnecessary to allege and prove that the directors in breaking their duty to the company acted with a view to benefiting themselves at the expense of the company; for such an allegation would be an allegation of misappropriation of the company's property. On the other hand, the exception does not apply if all that is alleged is that directors who control a company are liable to the company for damages for negligence it not being shown that the transaction was one in which they were interested or that they have in fact obtained any benefit from it."

In *Daniels* v. *Daniels* (4) Templeman, J. said ([1978] 2 All E.R. at 96):

"The principle which may be gleaned from *Alexander v. Automatic Telephone Co.* (directors benefiting themselves) from *Cook v. Deeks* (directors diverting business in their own favour) and from dicta in *Pavlides v. Jensen* (directors

appropriating assets of the company) is that a minority shareholder who has no other remedy may sue where directors use their powers intentionally or unintentionally, fraudulently or negligently in a manner which benefits themselves at the expense of the company. This principle is not contrary to *Turquand v. Marshal* because in that case the powers of the directors were effectively wielded not by the director who benefited but by the majority of independent directors who were acting bona fide and did not benefit."

In *Estmanco (Kilner House) Ltd.* v. *G.L.C.* (6) Megarry, V.-C. accepted the principle laid down by Templeman, J. in *Daniels* v. *Daniels*. The Court of Appeal in Jamaica in the case of *Telecommunications of Jamaica Ltd.* v. *Bernard* (17) was also of the view that it must be shown that there was a benefit to the directors whose wrongdoing is the subject of the complaint. I see no reason for departing from this conclusion and would hold that the decision was a correct one.

The only person against whom wrongdoing is alleged is the respondent Reynolds. No evidence has been established to suggest that Reynolds received any benefit from his actions in having the money transferred from Newport's account to Dupre. The facts do not fall within the exception to the rule in *Foss* v. *Harbottle* (9). The appellant has not established the essential element of fraud which is necessary to bring the claim within the exception to the rule in *Foss* v. *Harbottle*.

Another issue was whether the alleged wrongdoer controls Newport Ltd. The appellant must show not only that there was fraud on the part of Reynolds but that he controlled Newport Ltd. This is necessary to bring the claim within the exception to the rule in *Foss* v. *Harbottle*. The evidence does not disclose that Reynolds is in control of the company. He is not a shareholder in the company. He is one of five directors and has no voting rights. The shares in the company are held by CMS. The register of Newport Ltd. shows this to be so. It has been suggested by Mr. Lamontagne that CMS is a subsidiary of CIBC and since all the directors of Newport Ltd. and CMS are employees of CIBC, that consequently CIBC controls the board of Newport Ltd. and CMS. This submission cannot be accepted as a correct one.

Mr. Lamontagne referred the court to *Kuwait Asia Bank E.C.* v. *National Mutual Life Nominees Ltd.* (11). In that case the Privy Council held that nominee directors of a company were under a

duty to exercise such diligence and skill as may be required of them in the interest of the company of which they were directors. However, they were bound to ignore the interests of their employer. The directors of Newport Ltd. have a duty to act in the best interest of the company regardless of the wishes of CIBC.

There can be no legal control of Newport Ltd. by CIBC. It cannot therefore be said that Reynolds controls Newport Ltd. Such legal control is vested in CMS.

In order to cure the defect of the appellant's claim against Reynolds for fraud, the appellant sought to amend the statement of claim by adding a new para. 27 as follows:

"Further and in the alternative, Reynolds, CIBC, and Dupre have conspired together and with each other to deprive Newport Ltd., by the unlawful means set out in paras. 20, 21, 22, 23, 25 and 26 hereof, of the funds held in its account with CIBC and to transfer the said funds to Dupre by the said unlawful means."

Mr Alberga argued that the court had no jurisdiction to entertain the amendment. This court has all the powers of the Grand Court and there is no doubt that had the application been made to the Grand Court, the court would have had the jurisdiction to entertain the application. The reasons given by the appellant for not including the claim of conspiracy in the original pleadings are no longer applicable having regard to the decision in the House of Lords in *Lonrho PLC* v. *Fayed* (12).

Having regard to the circumstances of the instant case, I would not allow the application for the amendment. The appellant may yet be able to bring a new action for the wrong alleged to be suffered by her.

I would, for the reasons stated above, dismiss the appeal with costs to the respondent to be taxed or agreed.

**GEORGES, J.A.:** The dispute in this case arises from a promise alleged to have been made by an American businessman, Robert Dupre, to the appellant, Kirsten Schultz, to pay her US$500,000 for services rendered with respect to certain projects. The money was to have been deposited into a bank account in Grand Cayman in her name. No such deposit was ever made, but on September 4th, 1989 the appellant and Dupre met at the office of the Canadian Imperial Bank of Commerce ("CIBC") in Grand Cayman. Dupre was a customer of CIBC and it would appear

that the purpose of the meeting was to arrange the implementation of the promise. Present at the meeting was Anthony Reynolds, the first respondent, then a senior trust officer on the trust side of the operations of CIBC in Grand Cayman. The appellant states that Reynolds well knew that Dupre was to pay to her for her own use the sum of $500,000.

She further states that Reynolds advised that the payment should be arranged in the following way. A company would be incorporated under the name Newport Ltd. The shares in that company would be held by a nominee shareholder, Commerce Management Services ("CMS"), jointly for the benefit of the appellant and Dupre. CMS, a wholly owned subsidiary of CIBC, would manage Newport Ltd. The directors of Newport Ltd. would be himself, Reynolds and four other employees of CIBC. Newport Ltd. would open an account with CIBC and the $500,000 would be deposited into that account. Reynolds explained that the purpose of the arrangement was to ensure that should the appellant predecease Dupre any sums to the credit of the account would accrue to Dupre, but so long as she was alive the funds to the credit of the account would be hers and under her control. She knew nothing about the operation of offshore accounts so she accepted Reynolds' advice and relied on his assurances.

The appellant and Dupre signed a nominee agreement, a printed form, appointing CMS, their nominee, to hold 100 shares of Newport Ltd. for them as beneficial owners. The shares were declared to be the joint property of the appellant and Dupre and were held for the benefit of the survivor. The shares could be transferred—

"in accordance with such directions as any one/all of the beneficial owners may give and for the aforesaid purposes the corporate nominee hereby authorizes any one/all of the beneficial owners . . . to sign such transfers. . . ."

There was clearly an intention that either "any one" or "all" should have been deleted but this was not done.

Newport Ltd., the second respondent, was in fact incorporated, the subscribers to the memorandum being Reynolds and four other employees of CIBC. The first meeting was held. Reynolds was appointed President. Share certificates were issued to CMS. Reynolds and the four other subscribers were named directors. A resolution was passed appointing CIBC bankers. On

September 4th, 1989 Dupre gave instructions for the transfer of $500,000 to the account of Newport Ltd. when it was incorporated.

5 The appellant in the course of time became suspicious that the sum deposited in the account of Newport Ltd. might no longer be there. Accompanied by her lawyer she went to see Reynolds at the offices of CIBC in Grand Cayman on August 23rd, 1990. He told her that in January 1990 he had transferred money from the account of Newport Ltd. on the verbal instructions of Dupre
10 without informing her. She instructed Reynolds to transfer the Newport Ltd. shares held by CMS to another management company. She received a letter from CIBC dated September 6th, 1990 stating her instructions were ineffective.

15 The statement of claim was filed in February 1991. The appellant was the plaintiff and it is not in dispute that it was a "derivative" action filed by the appellant not to obtain remedies for herself but rather for the company Newport Ltd. in which she held shares beneficially through the nominee CMS jointly with Dupre. Newport Ltd. was named as a defendant.

20 An application was filed on behalf of Reynolds to have the statement of claim struck out on the ground that it disclosed no cause of action. In effect, the contention was that the wrong allegedly suffered had been suffered by Newport Ltd. which alone could sue and that the plaintiff could not file a claim on
25 behalf of Newport Ltd. unless it could be shown that the case fell within one of the exceptions to the rule in *Foss* v. *Harbottle* (9).

In *Edwards* v. *Halliwell* (5) Jenkins, L.J. restated that rule thus ([1950] 2 All E.R. at 1066):

30 "The rule in *Foss* v. *Harbottle* . . . as I understand it, comes to no more than this. First, the proper plaintiff in an action in respect of a wrong alleged to be done to a company or association of persons is *prima facie* the company or the association of persons itself. Secondly, where the alleged wrong is a transaction which might be made binding on the
35 company or association and on all its members by a simple majority of the members, no indivudual member of the company is allowed to maintain an action in respect of that matter for the simple reason that, if a mere majority of the members of the company or association is in favour of what
40 has been done, then *cadit quaestio*. No wrong had been done to the company or association and there is nothing in respect

of which anyone can sue. If, on the other hand, a simple majority of members of the company or association is against what has been done, then there is no valid reason why the company or association itself should not sue."

5    It was also contended that even before the rule itself came to be considered, the appellant lacked the status to sue because she was not a member of the company, Newport Ltd. The register of shareholders showed that all the shares in that company were held by CMS. Section 37 of the Companies Law (Revised) identified as members of a company those persons whose names appeared in the register. In *Birch* v. *Sullivan* (2) the plaintiff had been adjudicated a bankrupt and a trustee in bankruptcy had been appointed. His name still appeared on the register of members of a company in which he held shares. He issued a writ against Sullivan who was a director of the defendant company claiming declarations for misfeasance as a director. The action was stayed so long as the plaintiff remained on the record as the plaintiff. Liberty was granted to have the action dismissed if the trustee in bankruptcy did not apply to be substituted as plaintiff within a fixed time.

The Chief Justice rejected the submission that the appellant had no *locus standi*. He relied on a statement in *Bagshaw* v. *Eastern Union Ry. Co.* (1) that the holder of a "scrip" in a company had an "inchoate right to become a registered holder of the perpetual stock" and for that reason could sue on its behalf. It was emphasized in that case (7 Hare at 130; 68 E.R. at 53) that it was not argued that—

"the holders of scrip certificates in the perpetual stock had not such an interest in the application of the capital of the company as was necessary to enable them to maintain a bill properly framed, to prevent a misapplication of the capital of the company."

The only issue was whether such persons could represent both scrip holders and holders of regular stock. The statement was, therefore, *obiter* and was made without the benefit of argument.

There is some further support in *Stena Fin. BV* v. *Sea Containers Ltd.* (16). In that case, however, the plaintiff had become a registered shareholder by the date of hearing. The authority cited, *Great W. Ry. Co.* v. *Rushout* (10), had decided that the beneficial owner of shares could sue if he joined the registered shareholder as a defendant.

In this case, however, there is an additional complication. The plaintiff, though a beneficial owner, is a joint beneficial owner with Dupre. It is clear law that although as between themselves joint tenants and joint owners had separate rights, as against

5   everyone else they were in the position of a single owner. There was absolute unity between them. Together they formed one person and could not commence proceedings without the aid of the other or others. As regards joint shareholders this principle was recently restated by Harman, J. in *Re Exchange Travel*

10  *(Holdings) Ltd.* (7) ([1991] BCLC at 735) to the effect that—"joint tenants of a share are joint covenanters and can only act together. . . ." This suit is, therefore, not properly constituted in the absence of CMS and Dupre as plaintiffs. Neither would, of course, consent to be joined as plaintiffs. Consequently, they

15  should have been named as defendants.

The substantive issue in this appeal is the correctness of the conclusion by the Chief Justice that wrongdoers cannot be held to have committed a "fraud upon the minority" within the meaning of the exception to the rule in *Foss* v. *Harbottle* (9) as stated

20  above unless the wrongdoers have used their powers to benefit themselves. Mr. Lamontagne's submission was that where the acts of wrongdoers which result in loss to the company were merely negligent then personal gain to themselves must be proved to make applicable the exception to the rule in *Foss* v.

25  *Harbottle*. Where, however, fraud on the part of the wrongdoers has been proved the element of personal gain from the fraud need not be established. Whilst it was not contended that Reynolds received any personal benefit from paying out money in the account of Newport Ltd. to Dupre, it was urged that his act was

30  plainly a misappropriation of the company's funds which was intentional and could be categorized as "fraud."

Mr. Lamontagne's submission, in my view, proposes an extension of the principles enunciated in the authorities. In his judgment in *Prudential Assur. Co. Ltd.* v. *Newman Indus. Ltd.*

35  *(No. 2)* (15) Vinelott, J. summarized the authorities in these words ([1980] 2 All E.R. at 869):

"Thus the authorities show that the exception applies not only where the allegation is that directors who control a company have improperly appropriated *to themselves* money,

40  property or advantages which belong to the company or, in breach of their duty to the company, have diverted business

to themselves which ought to have been given to the company, but more generally where it is alleged that directors, though 'acting in the belief that they were doing nothing wrong' (per Lord Lindley, M.R. in *Alexander v. Automatic Telephone Co.* [1900] 2 Ch. 56 at 65) are guilty of a breach of duty to the company (including their duty to exercise proper care) and as a result of that breach obtain some benefit. In the latter case it must be unnecessary to allege and prove that the directors in breaking their duty to the company acted with a view to benefiting themselves at the expense of the company; for such an allegation would be an allegation of misappropriation of the company's property [Emphasis supplied]."

It will be noted that the reference to "improper appropriation" is followed by the qualification "to themselves" and that the distinction between negligence and fraud is based on proof of an intention on the part of the directors to benefit themselves when they acted in the negligent manner alleged.

In *Estmanco (Kilner House) Ltd.* v. *G.L.C.* (6) the company concerned was a non-profit company and no issue of monetary gain arose. All but 12 of the shares in the company were owned by the Greater London Council. The Council had set the company up to manage a block of 60 flats, Kilner House, which it owned. The Council intended to sell the flats on long lease to tenants. On the purchase of a flat, the purchaser would receive a share in the company but the right to cast a vote in respect of that share at meetings of the company would be exercisable only when all the flats had been sold and all the shares issued. Under this arrangement 12 flats had been sold and 12 shares issued when a change in control of the Council led to a change in policy. The Council no longer wished to sell the flats. It wished to let them to applicants on the housing list. The company, though controlled by the Council, sued the Council to restrain it from disposing of the unsold flats except on long lease in accordance with the agreement. The Council, using its voting power, ordered the directors to discontinue the action. The holder of one of the allotted shares sought leave to be substituted as a plaintiff suing on behalf of the company and to have the company named as a defendant.

Megarry, V.-C. granted the order prayed. He accepted as correct the principle formulated by Templeman, J. in *Daniels* v.

*Daniels* (4) after an analysis of the case. He said ([1982] 1 All E.R. at 445):

> "The principle which he derived from the cases was that 'a minority shareholder who has no other remedy may sue where directors use their powers, intentionally or uninten-tionally, fraudulently or negligently, in a manner which benefits themselves at the expense of the company' (see [1978] 2 All E.R. 89 at 96 . . . ). Apart from the benefit to themselves at the company's expense, the essence of the matter seems to be an abuse or misuse of power."

Clearly the phrase "which benefits themselves at the expense of the company" is intended to apply to action on the part of the parties whether fraudulent or negligent. This was certainly the view taken by the Court of Appeal for Jamaica in *Tele communications of Jamaica Ltd.* v. *Bernard* (17) which, with respect, seems correct.

The facts of this case do not establish any personal advantage to Reynolds in the payment out to Dupre of the funds in the account of Newport Ltd. and accordingly the facts do not fit into the exception to the rule in *Foss* v. *Harbottle* (9).

There is the further issue as to whether the alleged "wrong-doers" control Newport Ltd. The exceptions to *Foss* v. *Harbottle* are based on the premise that the wrongdoers control the company and use their power of control to prevent themselves being sued. Mr. Lamontagne concedes, as indeed he must, that it cannot be contended that Reynolds controls Newport Ltd. He is one of five directors and he holds no shares. All the shares are held by CMS which has not been joined as a defendant. CMS itself is a wholly-owned subsidiary of CIBC.

In *Kuwait Asia Bank E.C.* v. *National Mutual Life Nominees Ltd.* (11) the Privy Council decided that nominee directors, in the exercise of their duties as directors, were bound to ignore the interests of the persons who had nominated them or who employed them. Their duty was to act in the best interests of their company. Reynolds would be under no obligation to heed the wishes of CIBC in this matter.

The application of these established principles to "offshore" companies managed by directors who have been appointed solely for the purpose of carrying out the wishes of the beneficial owners to whom the company really belongs must inevitably result in contradictions. The advantages of anonymity which beneficial

owners perceive as accruing from these arrangements may well carry with them concealed problems.

While reality has to be taken into account in deciding control, in the sense that a tally may have to be made of the votes held by the wrongdoers and the votes they may be able for one reason or another to control, legal principles cannot be ignored. The shares in Newport Ltd. were held by CMS. It controlled that company by reason of its having the power to dismiss all the directors and to replace them. Reynolds and his co-directors would be under a legal obligation to act independently in the interests of Newport Ltd. No doubt if they sought to sue, CMS (like the Greater London Council in the *Kilner House* case (6)) could use its power to order discontinuance of any such action, though in this case there might be difficulties if CMS gave due heed to the instructions of both joint beneficial shareholders.

The statement of claim as originally filed is thus defective in three important respects, namely (a) the appellant, as plaintiff, lacks the capacity as one of two joint shareholders to sue alone and has not named her co-owner as a defendant; (b) there are no facts pleaded to establish that Reynolds gained any benefit from his alleged breach of trust or wrongful exercise of authority vis-a-vis the company; and (c) it erroneously avers that Reynolds and/or the directors of Newport Ltd. control Newport Ltd. when in fact legal control was vested in CMS which is not named as a defendant.

The first defect is concerned solely with the failure to have proper parties before the court. It could be remedied by an amendment and would not justify striking out the action.

The second defect is more fundamental. Guarding against the possibility that the submission might succeed, Mr. Lamontagne sought, before opening the appeal, to apply for an amendment, the granting of which he contended would remedy the defect. The amendment consisted of the addition of an entirely new para. 27 to the statement of claim which read:

> "Further and in the alternative, Reynolds, CIBC and Dupre have conspired together and with each other to deprive Newport, by the unlawful means set out in paras. 20, 21, 22, 23, 25 and 26 hereof, of the funds held in its account with CIBC and to transfer the said funds to Dupre by the said unlawful means."

Mr. Alberga submitted that the court had no jurisdiction to grant the amendment prayed since the statement of claim had

been struck out by the Chief Justice so that there was no document which could be amended. That argument is, in my view, misconceived. Once an appeal has been filed, the dispute decided at the first instance hearing remains open for any action

5 which the appellate tribunal thinks necessary in the proper exercise of its powers. There is no basis for the distinction sought to be made between an action dismissed on the merits and an action which fails on the ground that the statement of claim discloses no cause of action and is, for that reason, struck out. It

10 is conceded that this court has all the powers of the Grand Court in relation to amendments and the Grand Court could certainly have granted the amendment sought had the application been made there and had the court exercised its discretion favour-ably. However, while the court does have the power, I see no

15 good reason for exercising it in favour of the appellant in this case.

The reason stated in the affidavit for not including the conspiracy claim in the original pleading was the view held by counsel that a claim for conspiracy could not succeed unless the

20 sole or dominant purpose was to harm the plaintiff. This was based on a decision of the Court of Appeal in *Metall & Rohstoff AG* v. *Donaldson, Lufkin & Jenrette Inc.* (14) in which Slade, L.J. so interpreted passages in a speech of Lord Diplock in *Lonrho Ltd.* v. *Shell Petroleum Co. Ltd.* (13). There was no

25 appeal in the *Metall* case but subsequent to the filing of the statement of claim in this matter the House of Lords in *Lonrho PLC* v. *Fayed* (12) held that this interpretation was not acceptable. There seems to be no good reason why the interpretation placed by the Court of Appeal on Lord Diplock's

30 judgment should not have been challenged in the courts of Grand Cayman.

I have difficulty in quieting the suspicion that the plea of conspiracy became important when it became clear that the need to allege personal benefit to the wrongdoer might be accepted as

35 crucial. The allegation of a conspiracy could arguably fulfil that need. It would be correct also to say that the allegation raised in the amendment is vague. Accordingly, I would refuse the application to amend at this stage. In any event much recasting of the statement of claim would be needed to cure the defect arising

40 from the failure properly to identify the wrongdoers in control of the company.

Mr. Lamontagne stressed that the justice of the case required that some method be found to facilitate Newport Ltd. in remedying the wrong which it had suffered. The fact is that Newport Ltd. was a mere shell. The person who in fact suffered, if the allegations are correct, would be the appellant. There would appear to be far simpler courses of action open to her should she wish to claim remedies for the wrongs suffered.

Accordingly, I would dismiss the appeal with costs to the respondent to be agreed or taxed.

**KERR, J.A.:** I have had the benefit of reading the draft judgment of Georges, J.A. and am in agreement with his reasoning and his conclusion that the appeal should be dismissed with costs to the respondent to be agreed or taxed.

With respect to the application on behalf of the plaintiff/appellant to amend the statement of claim, I agree that having regard to the nature of the amendment sought, it would be clearly unfair to the respondent to entertain the application at this late stage. I am in agreement with the observations of Zacca, P. in his judgment to the effect that the amendment sought to be introduced by the application may be pursued by fresh and independent proceedings.

*Appeal dismissed and amendment refused.*

Attorneys: *C.S. Gill & Co.* for the plaintiff/appellant; *Hunter & Hunter* for the first defendant/respondent.