IN THE COURT OF APPEAL OF THE CAYMAN ISLANDS
ON APPEAL FROM THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CICA (Civil) Appeal No. 14 of 2021
(Formerly FSD 162 of 2019 (RPJ))

BETWEEN:

**MERKANTI HOLDING P.L.C**
(formerly MFC Holding Ltd, a company incorporated in Malta)
First Appellant/Third Defendant

**1128349 B.C. LTD**
(a company incorporated in British Columbia, Canada)
Second Appellant/Sixth Defendant

-and-

**RAIFFEISEN BANK INTERNATIONAL AG**
(a body incorporated under the laws of Austria)
Respondent/Plaintiff

| | |
|---|---|
| BEFORE: | THE HON C. DENNIS MORRISON, JUSTICE OF APPEAL |
| | THE RT. HON SIR ALAN MOSES, JUSTICE OF APPEAL |
| | THE HON SIR MICHAEL BIRT, JUSTICE OF APPEAL |
| | |
| Appearances: | Mr John Wardell QC instructed by Mr Nicholas Fox and Mr Harry Rasmussen of Mourant for Appellants |
| | Mr Tim Penny QC instructed by Mr William Jones and Mr Christopher Levers of Ogier for Respondent |
| | |
| Heard: | 1 November 2021 |
| Draft circulated: | 29 December 2021 |
| Judgment delivered: | 16th March, 2022 |

### JUDGMENT

**The Rt. Hon Sir Alan Moses, Justice of Appeal**

1.  This is a renewed application for leave to appeal against the Order of Mr Justice Parker dated 23 March 2021. He had given his reasons on 12 March 2021. By that Order the Judge dismissed the Appellants' (D3 and D6) applications to set aside permission to serve proceedings against them outside the jurisdiction. The Appellants argued that there was no serious issue to be tried arising out of the causes of action alleged against them. In refusing leave to appeal, the President ordered that this court consider the appeal should permission be granted in relation

**EXHIBIT**

**23**

exhibitsticker.com

to any of the issues. Accordingly, we heard full argument, as if we were hearing the appeal. (References to the Judge's reasons are preceded by J and the paragraph number in the reasons).

2.     I have adopted the abbreviations used in our previous judgment, Scully Royalty Limited and Anor v Raiffeisen Bank International AG (Civil Appeal No 21 of 2020), which provides the background and context for this judgment. I have not repeated them, save where necessary to explain my own reasoning.

3.     At the outset, it should be recalled that it was common ground:

   a)   That there was a serious issue to be tried against D1 and D5, described in the Judge's judgment of 7 July 2020 as the "alter egos" of the MFC subsidiaries around which D2's assets were passed, at the apex of the conspiracy and owning or controlling D3 and D6, as well as D4 and D7 (J[50]);

   b)   That both D3 and D6 were necessary and proper parties to the proceedings; and

   c)   That the Cayman Islands is the proper forum.

4.     The relevant legal principles to be applied in deciding this application and, if necessary, the appeal were not in dispute. To establish that there was a serious issue to be tried the Respondent needed only to establish that there was a real, as opposed to a fanciful, chance of success. This is a lower standard than that which must be applied to establish a good arguable case. The test had to be applied to each of the causes of action alleged.

5.     Accordingly, for leave to be given, the Appellants had to establish that it was arguable that there was no realistic prospect of success in respect of the cause of action in question, a test indistinguishable from that to be applied were the Appellants seeking summary judgment.

6.     Nor was there any dispute as to the principles this court should apply in respect of this interlocutory appeal.  An application for leave to serve out of the jurisdiction, though important, is a matter pre-eminently for a judge at first instance, particularly in the light of the need to ensure that such an application does not turn into a 'mini-trial'. Appeals should be rare, and the appellate court must not substitute its judgment for the evaluative judgment of the court below, unless and until it is established that there was some error of law or the judge had taken into account immaterial factors or had omitted to take into account material factors or had reached a decision outwith the range of reasonable conclusion. (see *Aldi Stores Ltd v WSP Group Plc* [2007] EWCA Civ 1260 and *Hadmor Productions Ltd v Hamilton* [1982] 1 All ER 1042).

7.      Sir Michael Birt JA's judgment in Civil Appeal No 21 of 2020 described the complex process whereby there was, at least, a good arguable case to show that D2's assets were stripped and put beyond the reach of the Guarantee, in a Group milieu of silence and misrepresentation. This application concerns two other members of the same Group; it is asserted that there is no serious issue to be tried as to whether the transactions in which they were involved between 2017-2019 were voidable under s. 4 of the FDA or whether they were party to the conspiracy alleged.

## Ground 1: the meaning of disposition under the Fraudulent Dispositions Act (15 of 1989, 1996 Revision)

8.      The Appellants advanced two points of law as to the proper interpretation of the Fraudulent Dispositions Act (15 of 1989, 1996 Revision).  Although the Judge appears to have reached his conclusion in the same paragraph, they are distinct issues: the first concerns the case against D6 under the FDA, the second the case against D3 under the same Act.

9.      The Appellants contend that the hive-down of the Scully Mine interest from D2 to D6 on 26 October, 2017 was not at undervalue since D2 received as consideration shares in D6 which, they contend, was exactly equivalent to the value of the Scully Mine (see the facts set out at [148(i) of Civ App No 21 of 2020]).  Accordingly, this was not a disposition liable to be avoided under the FDA.

10.     The Respondent answers this contention, in two ways.  First that there is no warrant under the statute for limiting the disposition to the hive-down. On the same day as the hive-down, D2 sold the shares in D6 allotted to it to M Financial Corp for a cash sum of $40,918,726. That stated consideration was never paid to D2 but was paid later by M Financial Corp to D5. (see [148 (ii) and (iii) of Civ App No 21 of 2020]).

11.     Second, the Respondent says that even if the disposition for the purposes of the FDA only encompassed the hive-down, that alone was at an undervalue. Nothing of value was received since all that D2 ever received was an entitlement to the shares, a chose in action, but before it could exercise any rights as a shareholder it had transferred its rights to the shares in D6 to M Financial Corp. We disposed of this second issue at [150-151 of Civ App No 21 of 2020].

12.     The first contention raises an issue of construction as to the meaning of 'disposition'. This is defined in the FDA as:

        "*1. In this Law-*

            *...*

> *"disposition" has the same meaning as in Part VI of the Trusts Law (1996 Revision);*
>
> *………*
>
> *4. (1) Subject to this Law, every disposition of property made with an intent to defraud and at an undervalue shall be voidable at the instance of a creditor thereby prejudiced.*
>
> *(2) The burden of establishing an intent to defraud for the purposes of this Law shall be upon the creditor seeking to set aside the disposition.*
>
> *(3) No action or proceedings shall be commenced under this Law unless commenced within six years of the date of the relevant disposition."*

13.   S.83 in Pt VI of the Trusts Act provides:

> *"In this Part*
>
> *"dispose" and "disposition", in relation to property, connote every form of conveyance transfer, assignment, lease, mortgage, pledge or other transaction by which any legal or equitable interest in property is created, transferred or extinguished[.]"*

14.   The definition section in the Trusts Act uses the verb 'connotes' in relation to dispositions, but 'means' in relation to other definitions in that Act. But the difference is, to my mind, of little significance for the purposes of the argument.  In the context of a statute designed to avoid dispositions made with an intent to defraud, it is difficult to see why a disposition should not include a series of transactions. There is nothing in the language which compels the view that only the first transaction in a series of transactions should be identified as the disposition for the purposes of the Act. This is all the more so where the series is planned in advance by the disponer to take place sequentially.

15.   A wide definition of 'transaction' was adopted for the purposes of section 423 of the UK Insolvency Act 1986 (transactions at an undervalue) where to do so was "entirely consistent with the statutory objective of remedying the avoidance of debts" in *Feakins v DEFRA* [2006] Env.L.R. 1099, [2005] EWCA Civ 1513. There is every reason why a similarly broad approach should be adopted in relation to the FDA.

16.   The Appellants say that the language of the definition connotes the single act of transfer and not a chain. They contend that a definition which connotes a chain of transactions is too vague and gives rise to a problem as to how the beginning and end of the chain are to be identified. The language is, to my mind, broad enough; courts have had no difficulty in many contexts of recognising a sequence of transactions as being no more than the single process with a particular

end in view. This is all the more so where the attainment of that objective was planned as a series of transactions in advance.

17.     The Judge said:

> "*The definition of "disposition" as a matter of construction includes a series of transactions that make up a single disposition when looked at as a whole. To construe the FDA in a narrow way and to "salami slice" it, would also severely curtail the effect and scope of the Act so as to limit its application and would result in subsequent transfers in a related chain not being caught. I therefore reject Mr Wardell QC's argument that the question of whether any subsequent transfers should be set aside is a matter of general law, not the FSD.*" (J[138])

18.     I should note that the final sentence of that paragraph is not a consequence of the first two sentences. The "*therefore*" is misplaced because Mr Wardell QC's argument as to remedies is a separate argument, raised in Ground 2, with which I shall deal later. It suffices to say that as to the interpretation of "*disposition*" the Appellants are miles away from establishing that there is no serious issue as to the proper construction of FDA.

19.     Both sides seemed to suggest that this court ought to decide this point of construction. I decline, for my part, to do so. This is an application in an interlocutory appeal. To make a final ruling of law which would bind the trial judge and any Appellate Court later seems to me to be unwise; not least because it ignores the fact that we are not at trial, and not trying a preliminary issue. It is as well to underline that the only issue we are considering is whether it is arguable that there is no serious issue to be tried on this question of interpretation. In my view that there is a serious issue of construction is beyond argument and I would refuse leave to appeal under Ground 1. I am conscious that that is likely to send a message to the court who must try the case, but it is and should be no more than a message.

### Ground 3: Conspiracy claim against D6

20.     The other ground concerning D6 relates to the conspiracy claim. It is alleged that D6, a shell company, was formed as part of the means by which the Scully Mine asset was moved within the Group, fulfilling the intention of the directing wills and minds of the Group, Mr Smith and Mr Morrow.

21.     The judge set out D6's involvement as it appeared to him from the pleadings and from such evidence as he had:

"*D6's involvement in the transactions was extensive. It included being the transferee to whom D2 sold the interest in the Scully Mine in exchange for shares in D6, the beneficiary of the trust D2 declared over that interest in 2017, the recipient from D2 of the legal title to the interest in the Scully Mine in 2018 and the transactions which split the interest in the mine into the royalty interest (which had the largest value) and the leasehold interest which D6 still holds, also in 2018. The royalty interest found its way from D6 to 117BC to D4 in exchange for D6 receiving shares in 117BC. There is then a further transfer of D6's shareholdings in 117 BC to D4 which has only recently been explained.*" (J[151])

22.    He concluded:

"*[157] There is a serious issue to be tried concerning D6's involvement as set out above with the other entities to conspire and combine with a common intention to bring that about. There is an inference to be drawn from D6's involvement in the scheme and its participation in it that it knew about its purpose through the common directors who pulled the various strings to bring it about, through the entities they controlled, including D6.*

*[158] RBI does not need to show at this stage that D6 agreed with anybody that payment should be made to D5 or that it was involved from the outset in the scheme or had exactly the same involvement and specific aims as D1, D4 and D5.*

*[159] RBI has shown that there is a serious issue to be tried that there was a combination and concerted action which D6 participated in, which was unlawful because it had a dishonest intention and purpose of deriving a benefit at RBI's expense, namely the putting of D2's assets outside the reach of RBI's guarantee claim against D2.*

*[160] I am satisfied there is a serious issue to be tried against D6 on the unlawful means conspiracy claim.*"

23.    The Judge's conclusion that there was a serious issue to be tried was challenged on two bases. First, that the mere fact that D6 was a special purpose vehicle does not justify any conclusion that it was involved in the conspiracy.  It was irrelevant. I disagree; the controlling minds behind the alleged conspiracy plainly considered that it had a part to play.  That affords a sufficient basis for concluding that there was a serious issue of conspiracy to be tried.  That the conspiracy might have been carried out without D6, or that its inclusion in the pleaded allegations makes no difference to the Respondent's ability to recover damages, should its claim be successful, do not lead to the conclusion, even arguably, that there is no serious issue to be tried.

24.    Of greater substance is the challenge to the Judge's conclusions as to the controlling minds behind the conspiracy, Messrs Smith and Morrow. The Appellants contend that that fact is irrelevant unless and until it is established that D6 participated in the conspiracy.  Unless that is established then the knowledge of the directors of those companies which were arguably involved in the conspiracy, namely D2, D5 and D8, cannot be imputed to D6, absent some duty imposed on them to impart that knowledge.

25.    The Appellants rely for these submissions on the principle identified in *In re Hampshire Land Co* [1986] 2 Ch 743 that the knowledge of a person acquired in his capacity as an officer of one company cannot be imputed to another company of which he is also an officer unless it can be shown that he is under a duty to communicate what he knows to that other company (per Vaughan Williams J at [748]).

26.    The principle was applied more recently in *Tsareva v Ananyev* [2019] EWHC 21 in which it was alleged that English companies had acted in combination with the Defendants to raise funds by means of worthless loan notes. But the claimants were unable to show that the English companies had done anything:

> "*[49] In any event, even were the Ananyevs capable of being regarded as directing minds or wills of their respective English companies, that does not arguably fix those companies with liability as a co-conspirator (if there was some conspiracy) … The question therefore was whose knowledge was the company's knowledge in respect of that conduct. Here, the claimants' insuperable difficulty is that there is no arguable case of conduct of any kind on the part of (or purportedly on the part of or on behalf of) the English companies (or Menrela).*"

27.    Mr Wardell QC, on behalf of the Appellants, contends that there is no evidence that D6 did anything relevant to the conspiracy. Accordingly, the fact that Mr Morrow and Mr Smith were its controlling minds is irrelevant. The Respondent relies upon the participation identified by the Judge in the passages I have cited above.

28.    Once there is some evidence of participation in the transactions by which the conspiracy was fulfilled, then the knowledge of the controlling minds of the participants will be attributed to the participant companies.  That has nothing to do with agency with which cases such as *Hampshire Land* and *Tsareva* are concerned, but, on the contrary, is a question of attribution.

29.    *El Ajou v Dollar Land Holdings* [1994] BCC 143 (EWCA) applied the principles of attribution. The victim of a fraud sought to trace the proceeds of the fraud to Dollar Land of which the

chairman was F.  His knowledge that Dollar Land had received proceeds of the fraud was acquired as a director of another company and he was, as agent, under no duty to disclose the source of the funds to Dollar Land.  But his knowledge could be attributed to that company once, as the Court of Appeal concluded, he was recognised as the controlling will and mind of Dollar Land.

30.     Once it is appreciated that there is a serious issue to be tried as to the participation of D6 in the process by which D2's interests in Scully Mine were transferred, it follows that there is a serious issue to be tried as to D6's participation in the alleged conspiracy. It is not disputed that there is an arguable case that Mr Morrow and Mr Smith were the controlling minds of all the members of the Group, including D6. Their knowledge and intention are accordingly to be attributed to D6 in relation to its alleged participation in the conspiracy. There is, at the very least, a serious issue to be tried as to the questions of participation and attribution and it is not arguable to the contrary.   I would, therefore, refuse leave to appeal under this ground.

31.     That disposes of the application so far as D6 is concerned. There remain issues which relate to D3, under Grounds 2 and 4-6.

### Ground 2: does the FDA itself avoid subsequent transactions?

32.     Parker J accepted the Respondent's submission that, on a proper construction of the FDA, once an initial disposition is shown to have been made by the transferor with an intent to defraud and at an undervalue, a creditor need not establish either that intent or undervalue in relation to subsequent transactions: section 4 confers power on the court to set aside all subsequent transactions.

33.     The first transfer of assets from D2 was the Dividend transfer of 21 August 2017. By that dividend in specie the shares in M Financial Corp and KHD were transferred to D5, an intermediary holding company wholly owned by D1. M Financial Corp held the shares in MFC A and D. (see our Judgment in Civ App No 21 of 2020 [13(ii)]). Those shares were subsequently transferred from M Financial Corp and D5 to D7, at a time and in circumstances which are not apparent.

34.     The Merchant Bank transfer took place two days later and consisted of the sale by D2 of its shares in D3 which owned the Merchant Bank (Civ App No 21 of 2020 at [13 (iii)]).

35.     Pursuant to a share purchase agreement dated 27 December 2018, D7 transferred 85% of the shares in MFC A and D to D3; the agreement was signed by Mr Smith for D7 and Mr Morrow for D3. Both D3 and D7 were and are ultimately owned by D5 and by D1. In about September 2019 (shortly before Mr Dellemann, Deputy Head of the Special Measures group of the RBI, swore his second affidavit) D3 issued and listed a €25m bond secured against MFC A and D and German industrial parks, which they owned.

36.     The total of the shareholdings was, as at 31 December 2018, valued at C$ 36.6m and C$14.3m. Thus the ultimate recipient of the shares, the subject-matter of the alleged fraudulent disposition in August 2017, was D3 whose Directors included Mr Morrow and Mr Smith in common with the other members of the re-shaped Group.

37.     Mr Wardell QC argues that it is necessary, under the FDA, to prove that D7 had a fraudulent intention as transferor and that the transfer was at an undervalue. Neither, he argues, can be established in relation to the transactions between D7 and D3, all of which took place long after the purpose of the alleged conspiracy, namely to divest D2 of its assets, had been achieved.

38.     The Respondent contends that, while both the fraudulent intention and undervalue can be established, it is not necessary to do so. Once the initial transfer in 2017 falls within section 4 of the FDA, the subsequent transaction in December 2018 may be avoided.

39.     At (J[177]) the Judge said:

> "*On undervalue I reject Mr Wardell QC's contention that the FDA requires that RBI needs to show an undervalue at each stage of the transfers from D7 and therefore cannot succeed against D3. On a proper construction of the FDA it is only the first immediate transfer that needs to be shown to be at an undervalue with the original transferor having the intent to defraud. Thereafter a claim can be brought against any successor in title subject to the protections in play at Section 5.*"

40.     I have already recalled that the Judge, in the different context of the meaning of 'disposition' had foreshadowed this view. (see citation of (J[138]) above).

41.     The relevant provisions of the FDA, some of which I have already cited, are:

> "*2. In this Law-*
>
> *"creditor" means a person to whom an obligation is owed;*

*"disposition" has the same meaning as in Part VI of the Trusts Law (1996 Revision);*

*"intent to defraud" means an intention of a transferor wilfully to defeat an obligation owed to a creditor;*

*"obligation" means an obligation or liability (which shall include a contingent liability) which existed on or prior to the date of a relevant disposition and of which the transferor had notice;*

*"relevant disposition" means a disposition to which section 4(1) applies;*

*"transferor" means the person who, as owner or as the holder of a power in that  behalf directly or indirectly, makes a relevant disposition or causes it to be  made;*

*"transferee" means the person to whom a relevant disposition is made and shall include any successor in title; ...*

4. (1)  *Subject to this Law, every disposition of property made with an intent to defraud and at an undervalue shall be voidable at the instance of a creditor thereby prejudiced.*

(2)  *The burden of establishing an intent to defraud for the purposes of this Law shall be upon the creditor seeking to set aside the disposition.*

5.  *In the event that any disposition shall be set aside under this Law, then -*

   (a)  *if the Court is satisfied that the transferee has not acted in bad faith-*

   (i) *the transferee shall have a first and paramount charge over the  property, the subject of the disposition, of an amount equal to the entire costs properly incurred by the transferee in the defence of the action or proceedings to set aside (and not merely such  costs as might otherwise be allowed by the Court); and*

   (ii) *the relevant disposition shall be set aside subject to the proper fees, costs, pre-existing rights, claims and interests of the transferee (and of any predecessor transferee who has not acted in bad faith); and*

   (b)  *if the Court is satisfied that a beneficiary of a trust has not acted in bad faith the disposition shall only be set aside subject to the right of such beneficiary to retain any distribution made consequent upon the prior exercise of a trust, power or discretion vested in the trustee of such trust, or any other person, and otherwise properly exercised.*

6.  *A disposition shall be set aside under this Law only to the extent necessary to satisfy the obligation to a creditor at*

*whose instance the disposition has been set aside together with such costs as the Court may allow."*

42.   The Appellants' submission is founded on the express language of section 4 which refers only to one disposition and confers no power to avoid any succeeding dispositions. Where there is a chain of transactions, the Appellants contend that a creditor must rely on its common law rights to recover from any transferee who either as predecessor in title or as successor in title had acted in bad faith, but not from any transferee acting good faith. They illustrate this argument by an example:

   1) A (transferor) in order fraudulently to defeat a creditor X's rights makes a disposition of assets to B;

   2) B, acting in good faith, transfers those assets to C;

   3) C, acting in bad faith, transfers those assets to D, acting in good faith.

43.   The disposition at 1) may be set aside under section 4 of the FDA. Thus B, would have no good title to convey and the transaction at (2) would be invalid under common law. Nor would C have good title and thus the transaction at (3) would be invalid under common law. But both B and D would be protected against the rigours of the common law by section 5 (a)(ii).

44.   There is, submits Mr Wardell, no necessity to imply any additional statutory power to set aside. Absent such necessity, no power to invalidate subsequent transactions can be implied (see *R (on the application of Morgan Grenfell & Co Ltd) v Special Commissioners* [2003] 1 AC 563 [45]). He draws an analogy with the Privy Council's exposition of the Cayman Companies Act in *Skandinaviska Enskilda Banken AB v Conway & Anr* [2019] UKPC 36:

> *"[63] "Section 145 invalidates any conveyance or payment which falls within its scope, but is silent as to the consequences of that invalidation. It can be contrasted with a provision such as section 239 of the United Kingdom Insolvency Act 1986, which also deals with preferences, but requires the court, on an application by the relevant office-holder, to "make such order as it thinks fit for restoring the position to what it would have been if the company had not given that preference". Section 241 then lists seven types of order which may be made, without prejudice to the generality of section 239. By contrast, since section 145(1) of the Cayman Companies Law is silent as to the consequences of the invalidation, those consequences must therefore be regulated by the general law which applies in the situation resulting from the avoidance of the transfer or payment in question: that is to say, by any other statutory provisions which may be applicable, or in their absence by the common law."*
> *……………………………………..*
>
> *[71] ...On the contrary, both in his article and in his book Sir Roy [Goode] carefully distinguishes between statutory provisions which make express*

*provision for orders reversing the effect of a disposition, such as section 239 of the Insolvency Act 1986 (quoted at para 63 above), and those which contain no such provision, such as section 127 (quoted at para 69). In the article, he states at p 304 that in cases falling within provisions of the latter kind, "the consequences of invalidity are not spelled out and are left to rules of the common law". That point is repeated at p 310 ("section 127 ... says nothing about the consequences of invalidity, leaving these to be determined by the common law"), at p 311 ( "These [viz remedies consequent upon avoidance under section 127] are left to the common law and typically take the form ... where money was paid over and has been spent, [of] an order for repayment in a claim for money had and received"), and again at p 318 ("section 127 says nothing about the consequences of the invalidity of a disposition ... These are left to the common law.").*

45.    Thus there was no basis for saying that later transfers to D3 are liable to be set aside and there is no serious issue to be tried against D3 under the FDA.

46.    Mr Penny QC argues, on behalf of the Respondent, that, absent a statutory power, a creditor would not, under common law, be able to set aside transactions following the initial disposition. This is because the common law affords no right to restitution to a creditor who, obviously, will have taken no part in the dispositions between the fraudulent transferor and thereafter. The subsequent transactions, Mr Penny argues, did not lead to enrichment at the expense of RBI and thus RBI cannot bring any restitutionary claim (see e.g. *Prudential v HMRC* [2019] AC 929:

    "*[68] ...as a general rule, a cause of action based on unjust enrichment is only available in respect of a benefit which the claimant has provided directly to the defendant (the only true exception identified being subrogation following the discharge of a debt, which is arguably based on a different principle). A causal connection between the claimants incurring a loss (in the relevant sense) and the defendants receiving a benefit was not enough to establish a transfer of value.*"

47.    Such an express power is conferred, he submits, by the words of section 6.  Neither section 4 nor section 6 confines the power to avoid to an initial disposition, and they make no reference to transferees or transferors. Section 5 which refers to "any" disposition, not just an initial disposition, then provides some protection and defences for those transferees who have not acted in bad faith, on the assumption that transactions in which they have been concerned will be set aside.  That assumption is repeated in section 6.  Thus it is unnecessary to establish the transferor's dishonest intent at each subsequent transaction or that that succeeding transaction was at an undervalue.

48.     It seems to me that the issues of construction are clearly serious issues to be tried. They should not be resolved in relation to the interlocutory question of serving parties outside the jurisdiction.  Mr Wardell QC has powerful arguments to deploy as to the proper construction of the FDA but that is by no means the same as saying it is arguable that the Respondent's argument is bound to fail. Both parties have reasonable arguments and it is not arguable that there is no serious issue to be tried.   The judge was right in so far as he is to be understood as accepting there is a serious issue to be tried on this question of construction and it is not arguable to the contrary.  In those circumstances I would refuse leave to appeal on this point.

49.     This conclusion makes it unnecessary to consider further the argument under ground 4. Since I would rule that D3 should be served in relation to the cause of action under the FDA there is no need at this stage to be concerned further with any other basis for a cause of action under that Act. I shall, however deal with the issues which arise under Ground 4, had the Court given leave and allowed the appeal on the point of construction, when I consider the other Grounds, 5 and 6. Under Ground 4, were they to succeed on the point of construction, the Appellants contended that there was no serious issue as to whether the transfers from D7 to D3 were at undervalue.

### Grounds 5 and 6: D3's involvement in the Conspiracy

50.     The essence of the Appellants' submission that there is no serious issue to be tried as to D3's participation in the conspiracy is that D3 only became involved in transactions in 2018 after the alleged conspiracy was over and after its purported objective had been achieved.  In those circumstances there is no basis on which D3 could be liable for any losses sustained in consequence of the conspiracy.

51.     Ground 5 identifies what is said to be an error of law by the judge, namely that he had taken the view that a party coming late to a conspiracy could be liable for losses which pre-dated its involvement. Ground 6 focusses on the absence of any pleaded or evidential basis for the contention that D3 had joined the unlawful means conspiracy.

52.     There was no dispute that a conspirator is not liable for losses caused before his participation started (the Appellants cited *Kuwait Oil Tanker v Al Bader* [2000] 2 All ER (Comm) 271, where the Court of Appeal implicitly approved Moore-Bick J's decision on that point: see *Colliers CRE Plc v Pandya* [2009] EWHC 211 (QB) and *Civil Fraud: Law, Practice & Procedure (1st Edn)*). Under Ground 5 the real issue was whether the judge had fallen into that error.

53.     The Judge's ruling as to D3's participation in the conspiracy was as follows:

[173] "There is a serious issue to be tried against D3 because D3 is a successor in title transferee to the shares that were transferred under the dividend. The court has held in the 7 July 2020 judgment that the dividend was unlawful and at an undervalue and the subject of an FDA and conspiracy claim

[174] The majority of the shares in MFC A and MFC D were transferred to D3, which has since charged them as security to third parties in a bond issue.

[175] There is a plausible evidential case which gives rise to a serious issue to be tried that the transfer was unlawful. The dividend on 21 August 2017 provided that 100% of the shares in those entities were transferred indirectly from D2 to D5 by way of the in specie dividend and transfer of the shares in M Financial Corp from D2 to D5, for no apparent consideration. At some point thereafter at least 85% of those shares were held by D7 and it then transferred that 85% shareholding to D3 on 27 December 2018.67

[176] On dishonesty, the FDA does not require RBI to establish an intent to defraud against D3, only D2. D3 is a successor in title to D2 and D7 in respect of the transfer of shares in MFC A and MFC D which were transferred away from D2 by way of the dividend.

[177] On undervalue I reject Mr Wardell QC's contention that the FDA requires that RBI needs to show an undervalue at each stage of the transfers from D7 and therefore cannot succeed against D3. On a proper construction of the FDA it is only the first immediate transfer that needs to be shown to be at an undervalue with the original transferor having the intent to defraud. Thereafter a claim can be brought against any successor in title subject to the protections in play at Section 5. [already cited]

[178] In this case the immediate transfer is the dividend and there is a serious issue to be tried that it was not for value. There is no evidence before the court as to what consideration if any was provided as to the transfer from D7 to D3. In my judgment there is a serious issue to be tried that the transfer by D7 to D3 was at an undervalue.

[179] Mr Wardell QC submits that a party coming late to a conspiracy cannot be liable for losses that pre dated its involvement or losses incurred after it left. It follows from this, he contends, that any claim that a particular defendant joined a conspiracy after the relevant asset left D2 cannot succeed. He submits that on the facts the assets had left D2 well before D3 was alleged to have been part of the conspiracy in 2018.

[180] I do not accept this argument. There is a plausible evidential basis to give rise to a serious issue to be tried that D3 joined the conspiracy when it acquired

> *the relevant shares. The conspiracy continued beyond the immediate transfers of shares in August to October 2017 and the transaction in December 2018 demonstrates that there is a serious issue to be tried that those earlier transfers were made for a purpose of putting the assets further beyond the reach of D2's creditors. It was a continuing process and it will be for assessment at trial as to what damage was caused and when*."

54.     I do not think the Judge fell into any error of law. On a proper reading of his Judgment, he was not saying that D3 could be liable for losses arising before it participated in the conspiracy but rather that there was a serious issue to be tried as to its participation in December 2018 and thereafter and when any losses were suffered. I would, therefore, refuse leave under Ground 5.

55.     The Respondent includes those transfers in which D3 participated (to which I have referred above at [32]-[36]) amongst those transfers which it seeks to impugn (see e.g. Paragraph 60 of the Amended Statement of Claim). At Paragraph 63 of that pleading it is alleged:

> "*It is to be inferred that each of the Transfers was made at an undervalue and pursuant to a conspiracy in bad faith and with an intent to defraud so as to defeat the obligations owed by Old MFC [D2] to RBI pursuant to the Guarantee….*"

56.     The Amended Statement of Claim relies on "the apparent secrecy", the absence of notice to RBI and continuing misrepresentations on the part of all or any of the First to Seventh Defendants at the time those Defendants decided to effect the transfers in which they were involved (63.4.1) and (63.5) and D3's complicity in the Plan of Arrangement (63.6). It relies at (63.7) on:

> "*The lack of candour and/or evasive conduct of representatives of the MFC Group following the Restructure, both before and following the Transfers, including in particular that of Mr Smith and Mr Morrow and which is to be attributed to, [amongst others, D3]*".

57.     The relief sought seeks an order for transfers of the shares transferred to D3 back to D2 under the FDA (73.1.1). It alleges under the heading "Tort of Unlawful Means Conspiracy":

> "*It is to be inferred that over the period from around January 2016 to at least around August 2019 each of the First to Eighth Defendants…at or around the time they respectively joined the combination and/or agreement) combined and/or agreed to act with the intention to injure RBI by divesting old MFC [D2] of substantially all its assets, such that its former valuable assets, and in particular the Shares and the interest in the Scully Mine, are no longer available to it so as to allow it to satisfy its obligations to RBI pursuant to the Guarantee*".(74.1)

58.    The essence of Appellants' case is that there was no basis for the allegation that D3 was party to any conspiracy. D3's only participation was the transfer from D7 to D3 of the shares in MFC A and D in December 2018.  Those shares had left D2's ownership by 21 August 2017 and thereby had already been placed beyond the reach of the Respondent.  On the Respondent's case the asset stripping scheme alleged had been undertaken about a year and a half before D3 was involved. There is, accordingly, no basis for saying that D3 participated in the conspiracy or could be held liable for any losses, if any, all of which must have been caused in the previous year when the assets were stripped from D2. Any damage flowing from that conspiracy had all occurred back in 2017 and all the losses had crystallised in 2017.

59.    Bearing in mind that, in order to serve D3 out of the jurisdiction, the Respondent does not have to establish a good arguable case, the Judge was right not to assume that the conspiracy was completed in 2017 and all losses had crystallised by then. To echo what was said in relation to dissipation of assets at [165 (v) and (vi)] of Sir Michael Birt's judgment (in Civ App No 21 of 2020), the transactions which are impugned amounted to a considerable, expensive and time-consuming process whereby D2 was rendered incapable of meeting its obligations while all the assets of which it was stripped were retained within the MFC Group. There is a serious issue to be tried as to whether all the participants in that process conspired to achieve that end.

60.    The Judge's ruling that there was a serious issue to be tried in relation to D3's participation in the conspiracy rested on his view that it was arguable that the conspiracy continued beyond the moment when the assets were first stripped from D2. He was entitled to take the view that the participation of D3 was part of a process whereby the assets within the Group were to be put beyond the reach of D2's creditors but retained within the Group.  There was a serious issue to be tried as to how long the conspiracy lasted and what damage occurred when.

61.    There seems to me another, more general, but powerful reason why there is a serious issue to be tried in relation to D3's participation whether in relation to the claim under the FDA or as to conspiracy.

62.    It was a constant and forcefully expressed theme running through Mr Wardell's submissions that the allegations made against D3 were not only vague and confused but had sought to taint innocent intra-group transfers with the alleged fraud of other members of the same group.  He protested at the Respondent's tendency, exhibited, so he said, subsequently by the Judge, to be suspicious, and assume guilt merely because there was a good arguable case in relation to the activities of other members of the Group involved in the divestment of assets in 2017.

63.     I do not disagree that all the intra-group transactions have become clouded in suspicion and cloaked in mistrust.  Nor do I dispute that the accusations are from time to time vague and confused. But to my mind that taint, those suspicions, and what may be described as accusations of guilt by association arise from a justifiable foundation. In light of the behaviour of the two controlling minds of the Group, namely Mr Smith and Mr Morrow, it is not surprising that the assertion of innocence in relation to inter-group transactions, after the initial stripping of the assets from D2 and after D2 was spirited out of the Group, is not accepted. The judgment in Civ App No 21 of 2020 is replete with examples of secrecy and misrepresentation (see e.g. [105(ii) and 165(ii)]). That behaviour dictates the need for great caution before accepting the legitimacy of the conduct of other members of the Group, directed by the same controlling minds, at least before full discovery and a full trial. In short, there is a serious issue to be tried as to whether the conspiracy was over by 2017 and as to whether the subsequent activities of other members of the Group amounted to participation in the conspiracy.

64.     There is a further, distinct basis on which I would reject Mr Wardell's submissions that the allegations against D3 and, for that matter D6, should, in effect, be summarily dismissed. In my judgment the complexity and convoluted nature of the transactions, throughout the period of 2017-2019, make this an inappropriate case in which to entertain the application for leave to appeal under Grounds 3-6. I refer  to the approach of Etherton J, as he then was, in *CIBC Mellon Trust Company & Ors v Stolzenberg & Ors* [2003] EWHC 13 (Ch):

> "*79. In any event, however, even if I am wrong on that conclusion of law, I would not regard this as a suitable case for forming a view, at this stage of the proceedings, that, if the judgments against Mora and Chascona were set aside, the Claimants' case in conspiracy would have no real prospect of success. The frauds, of which the Claimants complain, are immensely complex. They concern matters which took place from at least 1984 until 1992, require investigation and analysis of complex relationships between individuals and many corporations, and close scrutiny of a vast number of documents. The re-re-re-re-re-amended statement of claim runs to one hundred and six pages. There were more than sixty lever-arch files placed before me, for the purposes of the Applications. The hearing before me lasted six days, and undoubtedly would have lasted considerably longer had the rigours of efficiency and discipline not been imposed on the hearing by the need of Mr Wardell to appear in another case on the eighth day and had I not prevented Mr Carr from seeking to establish, by reference to a very wide selection of documents, that the Claimants would be bound to win on any trial on the merits. In a fraud case of this complexity, it is obvious that the Court must be very wary indeed of reaching conclusions on the facts, where there has been no oral evidence, and no cross-examination, and disclosure of documents has not been completed.* "

65.   During the course of a seven hour oral hearing, amidst numerous bundles of documents, transcripts and authorities, in which both sides were astute to avoid a mini-trial, one example will suffice to underline the wisdom of Etherton J's approach and the danger of reaching the concluded view the Appellants seek. The Respondent sought to rely on two documents: the Share Purchase Agreement between D7 and D3 dated 27 December 2018 and an earlier waiver and limited recourse agreement between D1 and D3 dated 11 September 2018:

> *"THIS SHARE PURCHASE AGREEMENT ("Agreement") is made as of December 27, 2018*
>
> *BETWEEN*
> *MERCHANTS FINANCIAL CORP, Room 2409 Shanghai Mar Tower, 2299 Yan An Road West, Changning District, Shanghai 200336, People's Republic of China ("MFC")*
>
> *AND*
>
> *MFC HOLDING LTD, 171, Old Bakery Street, Valletta, Malta ("MFCH") (each a "Party" and collectively, the "Parties").*
>
> *WHEREAS*
>
> *A. MFC wishes to sell to, and MFCH wishes to purchase from MFC, 850 (of a total of 1,000 issued and outstanding) common shares that MFC holds in each of MFC(A) Ltd (the "MRC(A) Shares") and MFC(D) Ltd (the "MFC(D) Shares", and together the MFC(A) and MFC(D) Shares, the "Shares");*
>
> *B  The Parties have assessed the value of the net assets of MFC(A) Ltd to be EUR 26,030,240.92, and the value of 85% of the net assets of MFC(A) Ltd to be EUR 22,125,704.78.  The Parties have assessed the value of the net assets of MFC(D) Ltd to be EUR 7,783,759.07;*
>
> *C. MFCH has inter alia a long term loan receivable from MFC Bancorp Ltd of EUR 29,948,584.00 of which EUR 29,909,463.85 shall be utilised as consideration herein (the latter amount referred to as the "Assigned Receivable" and the documents relating to the Assigned Receivable attached in Annex A); and*
>
> *D. MFC wishes to sell and transfer and MFCH wishes to purchase and get transferred the Shares on the terms and conditions herein.*
>
> *NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration (the receipt and sufficiency of which*

*are hereby acknowledged by each of the Parties), the Parties covenant and agree as follows:*

1. SALE AND PURCHASE

1.1 *MFC herewith sells, assigns and transfers to MFCH, and MFCH purchases and accepts the assignment and transfer from MFC of, the Shares with effect as of the day hereof.*

1.2. *MFCH shall pay to MFC a purchase price in the aggregate of EUR 29,909,463.85 ("Purchase Price") of which EUR 22,125,704.78 shall be allotted to the purchase of the MFC(A) Shares and EUR 7,783,759.07 to the purchase of the MFC(D) Shares.*

1.3 *As full and final settlement and discharge of the Purchase Price MFCH, in lieu of cash, herewith assigns to MFC a first ranking portion of EUR 29,909,463.85 of its long-term loan from MFC Bancorp Ltd.*

2. COLLECTION

2.1 **Entitlement.** *As of the date of this Agreement, MFCH shall no longer be entitled to collect any portion of the Assigned Receivable unless an amount equal to the Purchase Price has been paid by MFC Bancorp Ltd to MFC.*

2.2 **Incorrect Payments.** *In case that MFCH receives any monies relating to the Assigned Receivable, it shall hold such amount in trust for and on behalf of MFC and forthwith transfer the amounts so collected to MFC together with full and proper documentation related thereto.*

3. NOTICE

3.1 **Joint Notice.** *The Parties shall jointly notify MFC Bancorp Ltd of the assignment of the Assigned Receivables as set forth in Annex B.*

4. REPRESENTATIONS AND WARRANTIES

4.1 *MFC represents and warrants to MFCH with the intent that MFCH will rely thereon in entering into this Agreement that:*

(a) *The transfer of the beneficial and registered ownership of the Shares is free and clear of all liens, charges and encumbrances of any kind whatsoever;*

(b)     It has the power and capacity and good and sufficient right and authority to enter in to this Agreement on the terms and conditions set forth in this Agreement and to transfer the legal and beneficial title and ownership of the Shares;

(c)     No person, firm, corporation or entity of any kind has or will have any agreement or option or any right capable at any time of becoming an agreement to:

    (i)     purchase or otherwise acquire Shares; or

    (ii)     require MFCH to sell, transfer, assign, pledge, charge, mortgage or in any other way dispose of or encumber any Share other than under this Agreement.

4.2   MFCH represents and warrants to MFC that it has good and marketable title to the Receivables, that same are free from any encumbrance or the like, assignable and no right to set-off or any counterclaim exits.

5.   MISCELLANEOUS

5.1.   **Amendments**.  Any amendment and supplement to this Agreement must be in writing and signed by the Parties.  Same applies to an amendment of waiver of this written form requirement.

5.2   **Invalidity.**  If any provision of this Agreement is invalid, the validity of the remaining provisions shall remain unaffected and the invalid provision shall automatically be replaced by such valid provisions as comes closest to the economic purpose of the Agreement.  The same applies mutatis mutandis in case this Agreement contains any unintended gap.

5.3   **Confidentiality**.  Both Parties agree to keep the terms of this Agreement confidential, except where a disclosure is required by law or applicable rules of a stock exchange, in which event the disclosing Party shall keep the other Party informed prior to any disclosure.  This obligation shall survive the Agreement.

5.4   **Place of Venue**.  The venue for all disputes arising from the Agreement and any transactions executed hereunder shall be Valetta, Malta.  Either Party shall be entitled, however, to take legal action before the competent court having jurisdiction for the other Party's registered office.

5.5 **Applicable Law.** The laws of Malta with the exception of the UN Convention on Contracts for the International Sale of Goods (CISG) shall be applicable to the Agreement and any transactions executed hereunder, provided however, that the Assignment shall be subject to mandatory provisions of the laws governing the Assignment respectively the Receivables so assigned.

Signed

Merchants Financial Corp.                    MFC Holding Ltd."

-------------------------------------------------------------------------------------------------------

"THIS AGREEMENT ("Agreement") is made this September 11, 2018 between:

(1) MFC HOLDING MALTA LTD ("MFC"), a corporation under the laws of Malta; and

(2) MFC BANCORP LTD. ("Bancorp"), a corporation under the laws of the Cayman Islands (each a Party: and collectively the "Parties")

WHEREAS

(A) On August 23, 2017, Bancorp entered into a share purchase agreement with 0778539 B.C. Ltd ("077") for the purchase of Bancorp from 077 of all the shares of MFC ("SPA") for a consideration of EUR 12,214,306;

(B) On September 28, 2017, the Parties to the SPA entered into a clarification agreement in order to rectify certain mutual errors;

(C) On September 29, 2017, MFC and 077 entered into a Conditional Waiver Agreement pursuant to which: (i) MFC and 077 first offset certain reciprocal debts resulting in a remaining debt of 077 to MFC of EUR 35,054,537 ("Post Offset 077 Debts"); and (ii) subsequently MFC waived such portion of the Post Offset 077 Debts to MFC totalling EUR 5,105,953 ("Remaining 077 Debt") remained ("Waiver");

(D) The parties to this Agreement have determined that the amount of the Post Offset 077 Debts which was declared to be waived had been erroneously stated to be EUR 24,606,788 while it should have been EUR 29,948,584 ("Waived Loan"), i.e. the amount which deducted from EUR 35,054,537 produces the Remaining 077 Debt;

(E) *The Waived Loan was intended to be settled by offsetting a corresponding receivable of MFC's parent upon a reduction of capital by MFC. As a result of the disposition by 077 of MFC such offset ("Offset") was not be possible anymore;*

(F) *Further, the Waiver is subject to certain conditions ("Conditions") which, if they would be met at any time in the future, would result in 077 owing MFC a total of EUR 29,948,537 and consequently, 077 having recourse against Bancorp in the same amount under Clause 4.11 of the SPA ("Recourse") which provided for Bancorp's obligation to procure the Waiver;*

(G) *Finally, had MFC not waived the Waived Loan, the purchase price payable under the SPA would have been higher by the respective amount with such amount to be utilised only to repay the respective debts; and*

(H) *In order to: (i) eliminate the potential for a Recourse; (ii) to maintain the possibility of an Offset; and (iii) avoid an unnecessary increase of the purchase price to be utilized by the recipient 077 only to repay the respective debts to MFC, Bancorp undertook to MFC prior to the Waiver to acceded as a primary debtor to that portion of the Post Offset 077 Debts which was to be waived (i.e. the Waived Loan) ("Debt Accession") on the terms and conditions now documented herein.*

1. *DEBT ACCESSION*

1.1 ***Accession.*** *The Parties herewith confirm that Bancorp, prior to the Waiver, acceded to the Waived Loan such that Bancorp will owe to MFC the Waived Loan, i.e. an amount of EUR 29,948,584, plus the original interest going forward, and since then was an additional counterparty to the loan ("Restated Loan").*

1.2 ***Maturity.*** *The Restated Loan shall be due and payable on demand.*

1.3 ***Limited Resources.*** *MFC shall have recourse against Bancorp in respect of the Restated Loan only if, and to the extent that, the demanded amounts can be offset against a potential receivable of Bancorp from MFC resulting from a reduction by MFC of its capital.*

1.4 ***Third Party Beneficiary.*** *The Parties specifically agree that the Debt Accession has been, and this Agreement shall be, an agreement for the benefit of a third party, 077. Consequently, the Conditions are cancelled for the benefit of 077.*

2    MISCELLANEOUS

2.1 **Amendments**.  Any amendments and supplements to this Agreement must be in writing.

2.2 **Invalidity.** If any provision of this Agreement is invalid, the validity of the remaining provisions shall remain unaffected.  The same shall apply in the event that the Agreement is incomplete.  If the Agreement contains an invalid provision or is incomplete, the invalid or missing provision shall automatically be replaced by such valid provision as comes closest to the economic purpose of the Agreement.

2.3 **Confidentiality.**  Both Parties agree to keep the terms of this Agreement confidential, except where a disclosing Party shall keep the other Party informed prior to any disclosure.  This obligation shall survive the Agreement.

2.4 **Place of Venue.**  The venue for all disputes arising from the Agreement and any transactions executed hereunder shall be the courts of Malta.

2.5 **Applicable Law.**  The laws of Malta, with the execution of the UN Convention on Contracts for the International Sale of Good (CISG), shall be applicable to the Agreement and any transactions executed hereunder, provided however, that the assignment and transfer of any claim or receivable hereunder shall be subject to the mandatory provisions of the laws governing such claim or receivable.

Signed

MFC Bancorp Ltd                              MFC Holding Malta Ltd"

66.    The Respondent makes two points in relation to these documents, which it was accepted are in places opaque and hard to understand. The first is to demonstrate the limited value of the receivable because it can only be demanded by D3 from D1 if it is set off against the receivable that flows from a reduction of D3's capital (clause 1.3, agreement 11 September 2018). It thus has no value as a receivable when transferred to D7.

67.    The second point the Respondent seeks to make is that D3 was involved at the time D2 was being transferred out of the Group in about September 2017 (see Recital C of 11 September 2018 agreement). This speaks of an involvement in the conspiracy well before the December 2018 date which the Respondent had previously accepted was D3's first involvement and which had been accepted by the Judge.

68.     Mr Penny QC's reliance on these documents to change the Respondent's case as against D3 was met by strong protest from Mr Wardell QC. It was, he contended, far too late to be raising points about documents which had been exhibited previously. Mr Penny QC said that was true but they had only been exhibited as two pages within a 123 page exhibit which had been referred to briefly in three paragraphs in the forensic accounting report of Lepage Marcil David. Mr Penny sought to justify his late reliance on these documents because they had been referred to by Mr Wardell only in his reply before the Judge.

69.     I refer to these documents and the oral dispute as to their deployment not for the purpose of elucidating their meaning, still less to resolve the question of their significance but merely as an illustration of how dangerous it is, in a case like this, to take anything at face value and how unwise to attempt to resolve questions in advance of a full hearing where witnesses' explanations may be challenged.

70.     The issue of when D3 first participated, and the nature of the consideration, if any, which passed in the transaction between D7 and D3 should not be resolved in an interlocutory hearing or appeal. One thing is clear: the documents and arguments about them underline that there are serious issues to be tried as to D3's participation in the alleged conspiracy and in relation to whether the transaction in December 2018 falls to be set aside, should the Respondent's interpretation of the FDA fail.

71.     For those reasons I think the Judge did not err in concluding that there were serious issues to be tried both in relation to both FDA and conspiracy so far as D3 is concerned and I would refuse leave to appeal in relation to D3.

72.     In the end, I would refuse leave to appeal in relation to all the Grounds advanced by the Appellants.

**The Hon Sir Michael Birt, Justice of Appeal**

73.     I agree.

**The Hon C. Dennis Morrison, Justice of Appeal**

74.     I also agree.