H1:

# Action by Disgruntled Beneficiaries

*Dawn Goodman, Sarah Aughwane*

## Action by disgruntled beneficiaries – introduction

**[H1.1]**  If a beneficiary is disgruntled because of action which has been taken by their trustees, the beneficiary is likely to be considering whether to take action for breach of trust or fiduciary duty and/or to apply for the trustees to be removed and replaced by others.

But that does not mean that a beneficiary has to wait for something to go wrong in the administration of the trust before taking action. If trustees fail, for example, to call a meeting or ask for the beneficiaries' views on a particularly difficult issue (such as whether to support a failing company owned by the trust), to produce accounts or look set on making a decision which appears beyond their powers or is likely to lead to significant losses beneficiaries will want to take steps. Similarly, there may be an issue on which the trustees and beneficiaries (or some of them) have very different views as to what is best or where the beneficiary apprehends that the trustee is going to commit a breach of trust. In such cases, there are very good reasons – not least as to costs – why a beneficiary might wish to encourage the trustees to take the lead in making any necessary applications to the court for directions or other relief. That encouragement may be a very strong expression of concern or disagreement on the part of the beneficiary and the suggestion that the directions of the court should be sought. Trustees making such applications will be required to join the beneficiaries (or representatives of the beneficial class) as defendants so that they can make their views known.

The beneficiaries could themselves apply to the court, having urged the trustees to do so but no action having been taken. If notwithstanding the beneficiaries' encouragement the trustees do nothing, there is much the beneficiaries can do themselves to ensure proper administration rather than wait for the worst to happen and initiate proceedings for breach of trust. This chapter describes some of the steps which a dissatisfied beneficiary can take to ensure that the administration is running along the right lines; it also covers in outline actions for breach of trust and removal of trustees. One useful tool open to trustees, which is not – for obvious reasons – open to disgruntled beneficiaries, is applications to the court for blessing of trustee decisions or directions on a surrender of trustee discretion (as in *Public Trustee v Paul Cooper & Co* [2001] WTLR 901, [1999] All ER (D) 1524; *Womble Bond Dickinson (Trust Corp) Ltd v Glenn* [2021] EWHC 624 (Ch)). For that reason, such applications are not addressed in any detail in this chapter but are touched on elsewhere (see **B4.3** and **C3.4**). Of course, disgruntled beneficiaries do have an opportunity to make a significant impact in such applications by way of response.

EXHIBIT

24

This chapter makes several references to foreign case law, which although not binding on the courts of England and Wales, is of persuasive authority and may guide the judge in making a decision.

## Application for execution of a trust

**[H1.2]**  It used to be the case that, when difficult issues arose between beneficiaries and trustees about the execution of the trust, the only way of resolving the issue (apart from seeking to remove the trustees) was to apply to the court by an administration action for the execution of the trust under the direction of the court.

This procedure is still available (see Civil Procedure Rules ('CPR') Pt 64.2) but is discouraged. Administration by the court is cumbersome and expensive. In most cases, the better course is for a specific issue to be brought before the court and its directions sought in accordance with PD to CPR Pt 64B.

Administration may still be ordered where trustees constantly disagree or where there are recurring difficulties requiring frequent applications to the court for directions. However, in the first situation, the court is more likely to consider it appropriate to appoint fresh trustees; in the second, it is probable that frequent applications for directions would be regarded as preferable to administration by the court.

Proceedings will generally be issued in the High Court by issuing a claim form under CPR Pt 8. Any written evidence on which the claimant relies must be filed and served with the claim form. The written evidence may be in the form of a witness statement (or affidavit if offshore) verified by a statement of truth.

The trustees may apply for an administration order but equally a beneficiary may make such an application, in which case the trustees and other beneficiaries or representative beneficiaries will be defendants.

Proceedings may be issued in the county court where the value of the trust fund does not exceed the county court limit, currently £350,000 (section 23 of the County Courts Act 1984 (CCA 1984) and the County Courts Jurisdiction Order 2014). Parties may agree by a signed memorandum that the county court shall have unlimited jurisdiction (CCA 1984, s 24). Where there are a number of beneficiaries this may not be practicable.

## Other applications under CPR Part 64

### *Subject-matter of application*

**[H1.3]**  Where beneficiaries do decide to initiate proceedings, it will probably be viewed as a hostile step with the usual costs consequences unless the court considers that, in accordance with the guidelines set out in *Buckton, Re, Buckton v Buckton* [1907] 2 Ch 406, 76 LJ Ch 584, the proceedings are ones which could (or indeed should) properly have been brought by the trustees. An

example of such a situation occurred in *d'Abo v Carleton Paget* [2000] WTLR 863 where a construction summons was issued by a beneficiary, and all parties' costs met out of the trust fund. Before a beneficiary issues such an application, they should urge the trustees to seek directions. The application should be issued only if it is clear that the trustees will not do so, the situation is urgent, or the beneficiary perceives that the trustees are labouring under a conflict of interest.

Directions can be sought or applications made in a wide range of matters.

### Applications for information

**[H1.3A]** Beneficiaries may make applications against the trustee in order to secure information relating to the trust and its affairs, including:

(a) *Application for production of accounts* where trustees are delaying or declining to produce accounts. For details see **H1.8** below.

(b) *Application for inspection of trust documents*. Cases including *O'Rourke v Darbishire* [1920] AC 581, 89 LJ Ch 162, HL, [1920] All ER Rep 1 and *Londonderry's Settlement, Re, Peat v Walsh* [1965] Ch 918, [1964] 3 All ER 855, CA refer to of a beneficiary's rights to inspect trust documents. However, the Privy Council decision in *Schmidt v Rosewood Trust Ltd* [2003] UKPC 26, [2003] 2 AC 709, [2003] 3 All ER 76 makes clear that a beneficiary has no proprietary right to trust documents. Rather provision of documents is a necessary part of the trustees' obligation to account and the jurisdiction of the court to supervise trustees.

Disclosure is a matter of the trustee's discretion, subject to safeguards and issues of confidentiality. In *Breakspear v Ackland* [2008] EWHC 220 (Ch), [2009] Ch 32, [2008] 2 All ER (Comm) 62, Briggs J found that when a beneficiary makes a request for disclosure, trustees need not approach the request with any pre-disposition towards disclosure or non-disclosure but should give such weight to the making of, and reasons for, that request as they think fit. Further, trustees are not obliged to give reasons for their decisions and when struggling to reach a decision they may seek directions of the court but, before doing so, ought to consider the time and costs of doing so.

Beneficiaries under a discretionary trust have in the past been held entitled to inspect trust documents (*Murphy's Settlements, Re, Murphy v Murphy* [1998] 3 All ER 1, [1999] 1 WLR 282) – as have beneficiaries with only a contingent interest, but a would-be beneficiary who has not established his entitlement as a person interested in the trust has no such claim (see *O'Rourke v Darbishire*). Following the decision in *Schmidt v Rosewood* it is clear that facilities to inspect may not be granted to remote beneficiaries. However, *Schmidt v Rosewood* also opened up the possibility of inspection by objects of a mere power of appointment. Once again, this is not a prima facie right but is at the discretion of the court.

It is thought that a beneficiary or object of a power may request to see all documents relating to the administration of the trust except documents which are confidential and those which relate to the exercise by the trustees of a discretion (Re Londonderry's Settlement). *Lewis v Tamplin* [2018] EWHC 777 (Ch) clarifies that the exception for documents relating to the exercise by the trustees of a discretion is limited to exercise of dispositive, but not administrative, powers.

The Bermudian Court has considered what constitutes 'trust documents' and held that this term extends to any document produced in the course of the administration of a trust, including transactions with which the trustee or underlying companies had been involved (*Wingate v Butterfield Trust (Bermuda) Ltd* [2008] WTLR 357).

Confidential documents include communications passing between other beneficiaries and the trustees (as restated in the *Representation of Y* [2010] JRC 154 at [18]), and any documents which have come into the possession of the

trustees on a confidential basis. If trustees have given reasons for the exercise of their discretion, those reasons are no longer confidential, and a beneficiary may press for disclosure of all documents surrounding that decision.

In *Breakspear v Ackland*, the court confirmed that letters of wishes could be considered as having confidentiality (following the well-established principles in *Re Londonderry's Settlement*), which may be maintained, relaxed or abandoned at the discretion of the trustees on the basis of what they perceive to best serve the interests of the beneficiaries and the due administration of the trust.

However, in *Bathurst v Kleinwort Benson (Channel Islands) Trustees Ltd* [2007] WTLR 959, the Royal Court of Guernsey declined to follow received wisdom to the effect that a letter of wishes should not be disclosed.

In *Foreman v Kingstone* (2003) 6 ITELR 841, [2005] WTLR 823, the New Zealand High Court held that the trustees' obligation to be accountable to beneficiaries could not be compromised by a settlor's expressed desire for confidentiality, unless there are exceptional circumstances (risk of friction between beneficiaries not itself being a reason) which outweigh the right of the beneficiaries to be informed. However, if as a matter of practice, the parties were applying for a blessing then the letters of wishes would have to be disclosed in any event. Beneficiaries should be able to see all the vouchers supporting the accounts, documents relating to the management of trust assets, instructions to and advice of solicitors and counsel, and usually documents relating to a private company in which the trustees hold a majority shareholding (see *Butt v Kelson* [1952] 1 All ER 167, CA).

Accordingly, if a beneficiary or object of a power requests facilities to inspect such trust documents, either personally or through his solicitor, and the request is refused or facilities to inspect are long delayed, the beneficiary may seek a direction to the trustees to grant such facilities. Provided that the beneficiary has requested facilities on reasonable notice, his *locus* as a beneficiary is not in doubt and he has a substantial interest or a real expectation of benefit, and he has not sought to inspect documents which he is not normally entitled to inspect (such as documents relating to the exercise of discretion), it is likely that an order to inspect will be made in his favour. If the applicant is no longer a beneficiary, he may be able to secure disclosure of documents relating to the trust in the period before he ceased to be a beneficiary (see the Guernsey decision *Bathurst v Kleinwort Benson (Channel Islands) Trustees Ltd*). Conditions may be attached to inspection if there is good cause, such as concern that the documents would be used to attack the trust (as opposed to the trustees), as in the Cayman decision *Lemos v Coutts & Co (Cayman) Ltd* [1992–93] CILR 490 or used in a competing business as in the Australian case *Morris v Morris* (1993) 9 WAR 150. In this case, confidential business information was disclosed subject to the beneficiary undertaking in writing not to use/disclose information other than for the purpose authorised by the court. Beneficiaries will have to pay for any copies of documents which they request following inspection.

Recently, an alternative to applications for disclosure – particularly where the target is legal advice provided to the trustees – has received significant attention: Subject Access Requests under the Data Protection Acts 1998 and 2018. In *Dawson-Damer v Taylor Wessing LLP* [2020] EWCA Civ 352, the English court confirmed that while trustees of a Bermuda trust were entitled under Bermuda law to withhold legal advice provided to the trustees by English solicitors, when faced with a Subject Access Request under the Data Protection Act 1998 joint interest acted so as to preclude the operation of Legal Professional Privilege with the result that legal advice was disclosable to the beneficiary.

(c)   Application for disclosure to ascertain the whereabouts of trust property. The Court also has power to order disclosure to ascertain the whereabouts of the property or its traceable proceeds where it is alleged that a person is in possession of that trust property or its proceeds (see White Book Vol 2, para 15–75 (at p 3350) citing *Bankers Trust Co v Shapira* [1980] 3 All ER 353, [1980] 1 WLR 1274, CA).

**Applications relating to management of trust assets**

**[H1.3B]**  Sometimes a beneficiary's concern will relate to the trustees' management of a particular asset or class of assets in the trust portfolio. In those circumstances, they may consider an application on one or more of the following points:

(a)  *Whether and how assets should be sold*. This is a subject on which feelings may run very high and beneficiaries may feel strongly that trustees are not proposing to behave appropriately in relation to assets of particular emotional attachment, such as the family estate or chattels (see for example *Brudenell-Bruce, Earl of Cardigan v Moore* [2012] EWHC 1024 (Ch), 14 ITELR 967, [2012] NLJR 621. Trustees may make an application for their own protection and seek the approval of the court to the principle of sale and manner in which it should be effected. In the Guernsey case of *In the matter of the AAA Children's Trust* (Guernsey Judgment 29/2014), trustees sought the court's blessing in relation to sale of a trust property that the settlor had referred to as 'the finest jewel in the jewel box' and which he had said should only be sold in 'exceptional circumstances' and then 'at an appropriately extraordinary price such that the news will reach [him] even in heaven'. The beneficiaries unanimously opposed the sale. In that case, the court declined to make the blessing in circumstances where there were serious concerns as to the trustees' disclosure.

Alternatively, a beneficiary may consider it appropriate to seek a direction that an asset should or should not be sold and, if it is to be sold, how it should be sold, if he anticipates that the trustees will behave inappropriately or that it will not be marketed to achieve its true value.

It should be noted that under section 14 of the Trusts of Land and Appointment of Trustees Act 1996, the court has jurisdiction in relation to trusts of land to deal with any disputes concerning the land, the trustees' function in relation to the land and beneficiaries' interests.

(b)  *Applications as to investment policy*. Disputes may arise over whether the trust assets should be invested in accordance with ethical considerations (as in *Cowan v Scargill* [1985] Ch 270, [1984] 2 All ER 750), or the interests of income beneficiaries are being favoured over those of capital beneficiaries (as in *Nestle v National Westminster Bank plc* [1994] 1 All ER 118, [1993] 1 WLR 1260, CA) or vice versa. A beneficiary may seek directions to the trustees on investment policy if the trustees have been asked to but failed to bring their own application for guidance on the subject.

**Other applications for directions**

**[H1.3C]**  There are certain applications for directions which will most commonly be made by trustees, but which can be brought by beneficiaries if the trustees decline, including:

(a)  *Exercise of powers of appointment*. Trustees may be considering the exercise of particular powers of appointment, whether to beneficiaries absolutely or to other trusts, or may be considering the appointment of new trustees. They may make an application for directions, particularly if they are planning to appoint out to a new trust governed by a different law. If trustees are proposing to make an appointment which a beneficiary considers is not in the best interests of the trust, he may issue an application for directions as to whether it is a proper exercise of the power.

(b)  *Entering into compromises*. Trustees have power to settle claims by or against the trust estate and, provided they have discharged the duty of care set out in section 1(1) of the Trustee Act 2000, have power to enter into compromises (Trustee Act 1925, s 15) but may ask the court to sanction the compromise. If they are reluctant to do so and a beneficiary is dissatisfied with the proposed compromise, he can seek directions as to whether the trustees should compromise on the basis proposed. In *Schumacher v Clarke* [2020] EWHC 3381 (Ch), the trustees of Zaha Hadid's estate sought the

court's blessing of certain aspects of their decision to compromise a dispute as between themselves regarding the future administration of the trust. After hearing concerns raised by certain classes of beneficiaries, the court declined to give the blessing.

(c)   *Application for a Beddoe order*. If trustees are proposing to prosecute or defend third-party litigation affecting the trust, they will usually seek directions as to whether they should do so at the expense of the trust fund and may secure a Beddoe order (after *Beddoe, Re, Downes v Cottam* [1893] 1 Ch 547) (see CHAPTER **G1**: Authority to Trustees to Incur Costs of Litigation for details). Where a beneficiary considers that the trustees should issue proceedings against a third party but the trustees are reluctant to do so, exceptionally he may seek a direction as to whether the trustees should issue such proceedings. An opinion on merits should be produced so that the court can gauge whether or not the trust fund should be exposed to the expense of such proceedings.

(d)   *Application for a Benjamin order*. Concern over the identity of those entitled or whether there are any contingent liabilities may cause delay or indecision on the part of the trustees. These matters can be resolved by an application by the trustees, or exceptionally by a beneficiary, for a Benjamin order, which is a direction to the trustees authorising distribution on a particular footing. Directions can be given to distribute on the footing that a beneficiary is dead (as in *Benjamin, Re, Neville v Benjamin* [1902] 1 Ch 723), that a contingent liability should be ignored (as in *Yorke (decd), Re, Stone v Chataway* [1997] 4 All ER 907, [1997] 33 LS Gaz R 26; *Re Studdert (decd), King and another (as personal representatives of the decd) v Bewick and others (as trustees of the EAC Educational Trust)* [2020] EWHC 1869 (Ch)) or that, where an original settlement has been lost, the trusts are those established by secondary evidence. Another option is to take out a 'missing beneficiaries' insurance policy. This is more cost effective and seemingly approved by the courts where an estate/trust is small (*Evans, Re, Evans v Westcombe* [1999] 2 All ER 777, 143 Sol Jo LB 72).

## Applications regarding the substance of the trust

**[H1.3D]**  Where beneficiaries are dissatisfied with the trust itself, as opposed or in addition to the trustees' stewardship, there are three 'nuclear' options available:

(a)   *Applications to terminate the trust*. (See also CHAPTER **E.4**.) Where all the beneficiaries of a trust are adults and of full capacity, they can agree to terminate the trust and require the trustees to distribute the trust assets to them *Saunders v Vautier* (1841) 41 ER 482. The principle applies to both fixed interest and discretionary trusts, but the position is more complicated in discretionary trusts where there is a power to add or remove beneficiaries. In Guernsey, it has been held that it is possible to terminate a Guernsey discretionary trust under s 53(3) of the Trusts (Guernsey) Law 2007, even where there is a power to add to beneficiaries in the trust (*Rusnano Capital AG (in liq) v Molard International (PTC) Ltd* [2019] GRC 01). There are similar provisions in the Jersey law, but it is thought that the position in England, where there is no such legislation, will be different. The point has not yet been decided by the English courts, but obiter comments in (*SFO v Litigation Capital* [2021] EWCH 1272) suggest that a power to add will prevent termination of an English discretionary trust under the rule in *Saunders v Vautier* unless the trustees first expressly release the power.

(b)   *Applications to vary the terms of the trust*. (See also CHAPTER **E.3**.) Adult beneficiaries, with full capacity, may also together agree to vary the terms of a trust. Where there are minor, unborn or unascertained beneficiaries, the court can be asked to consent to a variation on their behalf under the

Variation of Trust Act 1958. There are a number of reasons why a variation might be desirable, including tax or succession considerations and such applications are particularly common in landed estates and other dynastic trusts (*Wyndham v Egremont* [2009] EWHC 2076 (Ch), *The Most Noble John Michael Edward, Duke of Somerset DL v Fitzgerald* [2019] EWHC 726 (Ch), *Swan v Gibbs* [2020] EWHC 1226 (Ch)). Variation applications are usually consensual and may be brought by one adult beneficiary. The trustee(s) and other adult beneficiaries should be joined as defendants. An opinion of counsel explaining why the variation is in the minors and unborns' interests will be required.

(c)    *Construction Applications.* Where there is doubt as to the meaning of a provision or provisions in the trust the trustee, or if the trustee is unwilling a beneficiary, may seek the court's assistance as to how the words should be construed. Such applications can be non-hostile or hostile depending on the provision at issue and whether all the beneficiaries are affected in the same way. See also K1.40.

### Parties

**[H1.4]**  Where a beneficiary issues an application for directions the beneficiary will be the claimant. The trustees should be joined as defendants. It will be necessary to join other beneficiaries, or some of them, particularly if they are known to hold a different view. It should be noted that PD B supplementing CPR Pt 64 deals with the situation where applications for directions are brought by the trustees and accordingly does not provide assistance in relation to an application by beneficiaries. There may be concern as to which beneficiaries should be joined as defendants in which case an application can be made for directions as to which persons to join or to whom to give notice under CPR rule 19.8A to make judgments binding on non-parties.

If the issue concerns some only of the beneficiaries, they should be joined. Where there are numerous beneficiaries in a particular class which should be represented before the court, then a representation order should be sought. CPR rule 19.7 enables the court, if satisfied that it is expedient, to appoint one person or more to represent another person or class of people interested in the trust fund in situations where some of the class cannot readily be found or ascertained, or if the court considers that in all the circumstances it is right to appoint a representative beneficiary to save costs. If the court makes such an order, its decision is binding on those represented by the representative beneficiary.

A protected party (namely a party who lacks capacity to conduct proceedings) must have a litigation friend to conduct proceedings on his behalf (CPR 21).

It is not always necessary to join all beneficiaries or ensure that a representation order is made in respect of all beneficiaries. If they are not all joined or represented, it is the trustees' duty to put before the court any matters which may affect their interests. This is not feasible if the beneficiaries' interests are adverse to those of the trustees.

Where the trust is insolvent or potentially insolvent, consideration should be given to joining the creditors or a representative creditor of the trust.

At any stage in the proceedings the court can direct that notice of the proceedings is served on those beneficiaries (or creditors) who are not parties but who

will be affected by the court's decision. CPR rule 19.8A provides that notice of the claim may be served on non-parties and the recipients have 14 days in which to acknowledge service and become parties. If they fail to do so they are bound in any event by the court's decision.

Applications for directions should not be made in respect of charitable trusts without the approval of the Charity Commissioners or, on appeal from a refusal by the Commissioners, with permission of the court (CPR Part 64). Most issues which might require the assistance of the court can currently be resolved by an order made by the Charity Commissioners under section 105 of the Charities Act 2011 or by the provision of a letter of opinion or advice under section 110 of the Act. There are, however, rare circumstances in which it is appropriate to bring a *Beddoe* application (with the leave of the Commission) rather than simply seeking the approval of the Commission. See, for example, *Cawdron v Merchant Taylors' School* [2009] EWHC 1722 (Ch), [2010] PTSR 507 in which it was found to be appropriate to seek the court's determination and approval of a proposed settlement in circumstances where trustees were considering compromising a claim by sale of a property but there was uncertainty whether there might be other potential claimants to the ownership of the property. If an application for directions is to be made in the case of a charitable trust the Attorney-General is always the appropriate defendant and almost always the only defendant.

### Procedure

**[H1.5]** The overriding objective of the CPR – to which the court is obliged to give effect – is to enable the court to deal with cases justly and at proportionate cost. The court is actively involved in managing cases and stringent action may be taken, including striking out claims or defences, if time limits are allowed to slip unduly and the court deems this draconian sanction a proportionate response to the delay. The court is less ready to grant relief from sanctions following introduction of the provisions at CPR r 3.9(1)[1].

Although the Rules provide for the allocation of a case to one of three tracks – the small claims track, the fast track and the multi-track – it is probable that all the proceedings described in this chapter would be allocated to the multi-track (as involving sums in excess of £25,000 or issues of some complexity) and accordingly this chapter concentrates on multi-track procedure. All Part 8 claims are treated as allocated to the multi-track.

An application for directions is made by a Pt 8 claim in the Chancery Division of the High Court, or (infrequently) in the county court (see jurisdiction limits in **H1.2** above). The Pt 8 claim form states that CPR Pt 8 applies, details the question the court is to decide, and the remedy sought, and sets out the legal basis relied on, including any statutory provision. If any party is acting in a representative capacity that must also be stated (CPR r 8.2). The claim form must be verified by a statement of truth under CPR Pt 22: this is a statement to the effect that the claimant believes that the facts stated in the claim form are true and since April 2020 that they understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false

statement in a document verified by a statement of truth without an honest belief in its truth. The statement of truth is important because without it, the claim may be struck out.

The evidence in support of the claim form must be filed and served at the same time as the claim form (CPR r 8.5(1) and (2)). The evidence will be in the form of a witness statement, again verified by a statement of truth. The witness statement should give details of the trust (a copy of the settlement and any deeds of appointment), the value of the trust fund, describe the interests of the beneficiaries and set out in some detail the nature of the problem on which directions are sought. The evidence must explain what if any consultation there has been with the trustees and other beneficiaries and with what result. If the beneficiaries are numerous, the principal beneficiaries should be consulted. If a child is a defendant to the application, the court may well expect to have put before it instructions to, and the opinion of, an appropriately qualified lawyer to advise as to the benefits and disadvantages of the course of action proposed from the point of view of the child beneficiary.

Defendants who wish to participate in the proceedings or seek a different remedy must acknowledge service within 14 days of being served with the claim form and supporting evidence. If a defendant disagrees that Part 8 is the appropriate procedure (because, for example, there is a substantial dispute of fact) he must say so when acknowledging service (CPR r 8.8(1)). The court will then give directions and can order that the claim continues as an ordinary claim. This is unusual in the case of an application for directions unless there is a major dispute of fact between the trustees and the beneficiaries or there is an allegation of fraud.

The trustees and beneficiaries who are defendants must file and serve their evidence at the same time as acknowledging service. As with the claimant, the defendant's evidence is by witness statement verified by statement of truth. The claimant then has 14 days in which to file and serve further evidence (if any) in reply.

When the court receives the acknowledgement of service and any written evidence it will give directions as to the future management of the case (CPR r 8.8(2)). This will involve the Master deciding whether the application can be disposed of without a hearing. If directions leading to a hearing are needed, these will usually include setting a timetable, or fixing a case management conference or a pre-trial review or both (CPR r 29.2). It is important that, if the parties are legally represented, a lawyer with sufficient knowledge of the case is present at the case management conference or the pre-trial review.

In preparation for the case management conference or pre-trial review the parties should prepare a case summary, should consider whether the parties themselves should attend and should issue any necessary applications in accordance with CPR Pt 23. The claimant is usually responsible for preparing a bundle of relevant documents (including the Claim Form, Acknowledgements of Service, Evidence, Expert Reports etc) for any case management conference or pre-trial review.

Issues likely to be addressed at the case management conference include:

* filing and service of any further evidence;

- cost budgets;
- extended disclosure;
- whether parties should attend for cross examination;
- preparation of an agreed statement before trial (if applicable);
- any substantial discrepancy between the parties' respective costs estimates; and
- if possible, fixing a date for trial.

The court will always consider whether it is possible to deal with the application on paper without a hearing. If the court would be minded to refuse to give the directions asked for on a consideration of the papers alone, the parties will be notified and given the opportunity within a stated time to ask for a hearing. Examples of applications dealt with without a hearing are applications for a declaration as to the true construction of the trust in circumstances which are not contentious, under section 48 of the Administration of Justice Act 1985.

---

1   See *Mitchell v News Group Newspapers Ltd* [2013] EWCA Civ 1537, [2014] 2 All ER 430, [2014] 1 WLR 795 and guidance given subsequently as to the three-stage approach by Dyson MR in *Denton v TH White Ltd; Decadent Vapours Ltd v Bevan; Utilise TDS Ltd v Davies* [2014] EWCA Civ 906, [2015] 1 All ER 880, [2014] 1 WLR 3926.

---

### Costs implications

**[H1.6]** Pt 3 of the CPR and PD 3F have been differently interpreted but can be read to indicate that in any case where a party proposes to recover costs from the trust fund, notice to that effect must be filed and served, with the first statement of case (Pt 7 claim) or with the evidence (Pt 8 claim), together with a costs budget. This is so that the parties and the court can consider whether to make a costs capping order. (See **H1.44** for further details in relation to costs capping and costs estimates.)

The costs of all proceedings are at the discretion of the court (CPR r 44.2(1)(2)). While the general rule is that the unsuccessful party pays the costs of the successful party (CPR r 44.2(2)(a)) the court can make a different order. In deciding what order (if any) to make, the court must have regard to all the circumstances including the conduct of all the parties, whether a party succeeded in part of his case (even if not wholly successful), and any admissible offer to settle made by a party which is drawn to the court's attention, and which is not an offer to which costs consequences under Pt 36 apply (CPR r 44.2).

The conduct which the court takes into account is conduct before as well as during the proceedings, and in particular the extent to which the parties followed the Practice Direction – Pre-Action Conduct or any relevant pre action protocol, whether a party acted reasonably in raising, pursuing or contesting a particular allegation or, the manner in which the claim was pursued/defended, and whether a successful party exaggerated its claim (CPR r 44.2(5)).

CPR 3, section 2 entitled 'Cost Management' and PD 3E 'Costs Management' set out provisions which require parties in Pt 7 multi-track cases with a value of less than £10 million to file and exchange costs budgets (CPR 3.12 and 3.13

with exception set out at PD 3E). In cases not covered by CPR 3.12 and 3.13, the court has a discretion to make an order requiring the parties to file and exchange costs budgets (CPR PD 3E A2).

Unless the court orders otherwise, all parties (except litigants in person) must file and exchange budgets as required by the rules or as the court directs. Each party must do so by the date specified in the notice served under r 26.3(1) or, if no such date is specified, seven days before the first case management conference (r 3.13). There is a statement of truth that must be signed by a senior legal representative. Failure to file a budget despite being required to do so will be treated as having filed a budget comprising only the applicable court fees (CPR 3.14).

The court may decide to actively manage the costs of the dispute by way of a costs management order (r 3.15).

Where costs are subject to a costs management regime, on assessment the court will have regard to the last approved budget or any budgets previously filed (CPR 3.18).

Costs can be awarded on the standard or indemnity basis. Where costs are allowed on the standard basis they will only be allowed if proportionate to the matters in issue and generally, where costs are subject to a costs management regime, the court will not award costs that depart from budget unless satisfied there is a good reason for doing so (CPR r 3.18(b)). Any doubt as to whether costs were proportionately and reasonably incurred, or were of a proportionate and reasonable amount, is resolved in favour of the paying party (CPR r 44.3(2)(b)). Costs will be proportionate if they bear a reasonable relationship to: (a) the sums in issue; (b) the value of any non-monetary relief in issue in the proceedings; (c) the complexity of the litigation; (d) any additional work generated by the conduct of the paying party; (e) any wider factors involved in the proceedings such as reputation or public importance; and (f) any additional work undertaken or expense incurred due to the vulnerability of a party or any witness (CPR r 44.3(5)). The procedure for applying the test of proportionality is also set out in CPR r 44.3(2) and makes clear that costs that are disproportionate in amount may be disallowed or reduced even if they were reasonably or necessarily incurred. This reverses the guidance on proportionality set out by the Court of Appeal in *Lownds v Home Office* [2002] EWCA Civ 365, [2002] 4 All ER 775, [2002] 1 WLR 2450 (which allowed disproportionate costs if they were shown to be necessarily incurred).

Where costs are awarded on the indemnity basis any doubt as to whether the costs were reasonably incurred, or were reasonable in amount, is resolved in favour of the receiving party (CPR r 44.3(3)). The concept of proportionality does not apply to indemnity basis costs but whether on standard or indemnity basis, the court will not allow costs unreasonably incurred or unreasonable in amount.

If the court considers that the parties have failed to comply with any relevant pre-action protocol or section 4 of the Pre-Action Protocols Practice Direction (and at the time of writing no protocol relevant to directions proceedings has been published), or have failed to comply with the overriding objective of the Rules and that failure has led to the commencement of proceedings or costs

being incurred unnecessarily, the court can order the party at fault to pay the costs or part of them, can deprive him of costs, or can order him to pay costs on the indemnity basis.

The general principle is that, between trustees and beneficiaries, trustees are entitled to receive from the trust fund all proper costs incurred when acting on behalf of the trust (Trustee Act 2000, s 31). CPR r 46.3 provides that where a person is party to proceedings in the capacity of trustee the general rule is that where he is entitled to be paid those costs out of the fund, he should be reimbursed on the indemnity basis insofar as they are not recoverable from a third party. The court may order otherwise if a trustee has acted for a benefit other than that of the fund. While it is common for the costs of all parties to directions proceedings issued by the trustees to be met from the fund, if the proceedings are commenced by a beneficiary they are more likely to be construed as hostile, in which case costs usually, but not necessarily always, follow the event (CPR r 44.2). Accordingly, a beneficiary should try to persuade the trustees to issue the proceedings. If this is not possible the beneficiary should frame the proceedings on the basis that there is a difficult issue on which the court's guidance is required, rather than that his claim is aimed at preventing the trustees from adopting a particular course of action or goading them into adopting the desired course of action.

If the court considers that the trustees were at fault it may order that the trustees are not entitled to take their costs from the fund. They may also be ordered to pay the claimant's costs, if the trustees have behaved in such a way as to incur unnecessary costs. Alternatively, the court might disallow the trustees their costs but make no order in the claimant's favour. In recent decisions, the court had made it clear that it does not regard itself as restricted from ordering costs against trustees or depriving them from access to the trust fund. CPR r 46.3 (in combination with CPR r 46.1(3)) enables the court to exercise wide discretion in relation to costs incurred by trustees and to make such an order if it considers it appropriate to do so. Such an order was made in *Breadner v Granville-Grossman (costs)* [2001] Ch 523, [2000] 4 All ER 705 where, for a number of reasons (including that the action had only been necessitated by a fault on the part of the trustees or their predecessors and that the trustees had decided to adopt a partisan approach in the course of the construction proceedings), the court ordered that the trustees should not be allowed to take their costs out of the trust fund and that they should pay the beneficiaries' costs on the indemnity basis. This case was, however, described as exceptional. In *Green v Astor* [2013] EWHC 1857 (Ch), [2013] All ER (D) 06 (Jul), the court ordered that a tranche of costs be paid personally by the administrator, partly due to the fact that the relief sought was for her benefit rather than for the estate. The importance of being neutral in trust litigation was highlighted in *Raymond Saul & Co (a firm) v Holden (as personal representative of Hemming (decd)* [2008] EWHC 8565 (Ch), [2008] All ER (D) 168 (Dec) in which notwithstanding, the apparently 'friendly' nature of the claim (directions as to whom to distribute a fund), the deputy judge determined that because of the way in which the claimant firm had gone about the litigation, it should pay the costs of the trustee in bankruptcy without any indemnity out of the estates of either the bankrupt or his mother.

If the court decides that the claimant's proceedings were unfounded, precipitate or inappropriate the claimant will probably be ordered to pay the other parties' costs on the standard basis (with the risk of an indemnity basis award) and the trustees be permitted their costs out of the fund on the indemnity basis.

The court can summarily assess any costs (usually when the hearing lasts less than one day) – except those of a child or patient – and require a party to pay those costs, usually within 14 days. This procedure has been successful as a major incentive to parties to avoid unnecessary interlocutory applications. Alternatively, the court can order a detailed assessment by a costs officer under CPR Part 47.

## Application for accounts

### Trustees' duty

**[H1.7]**  It is a well-known and fundamental duty of trustees to keep clear and accurate accounts of the trust property and be ready to provide (or at least allow inspection of) accounts to the beneficiaries upon reasonable notice (*Tillott, Re, Lee v Wilson* [1892] 1 Ch 86). If hard copies are sought the beneficiary should agree to pay any reasonable copying charges incurred (*Ottley v Gilby* (1845) 8 Beav 602). Accordingly, a beneficiary who has not received or been allowed access to accounts should request copies within a reasonable period, undertaking to pay photocopying charges. What is a reasonable time depends on the nature of the trust fund and the likelihood of accounts having been prepared for the period in question. The procedure in relation to rendering an account in particular is set out in the Practice Direction to CPR Part 40A.

The beneficiary may inspect the accounts, supporting vouchers and other documents relating to the administration of the trust. Accessing such documents can be useful, particularly if the accounts are inadequate. Asserting a request to inspect trust documents is covered in more detail at **H1.3** above.

### Application for accounts pursuant to CPR Part 64.2 and the Practice Direction to CPR Part 40A

**[H1.8]**  As detailed at **H1.3** above an application to the court can be made on a wide range of issues, including for the production of accounts. Accounting will, in some cases, require more than simply producing financial accounts and may include a requirement for trustees to provide a narrative explanation of their custodianship of trust assets.

It appears that no limitation period applies to a request for an account; *Henchley v Thompson* [2017] EWHC 225 (Ch). Section 23 of the Limitation Act 1980 provides that an action for an account shall not be brought after the expiration of any time limit under the Act applicable to the claim. Where the request for accounts is made on the basis that there is a fiduciary relationship which entails a duty to account, no statutory time limit applies (*A-G v Cocke* [1988] Ch 414, [1988] 2 All ER 391; *Nelson v Rye* [1996] 2 All ER 186, [1996]

1 WLR 1378) although, if the claim to an account could be founded in breach of trust proceedings or as a breach of contract the limitation period applicable to such a claim may be applied by analogy (*Coulthard v Disco Mix Club Ltd* [1999] 2 All ER 457, [2000] 1 WLR 707). In *Paragon Finance plc v D B Thakerar & Co* [1999] 1 All ER 400, 1 ITELR 735, CA, the court regarded claims of fraudulent breach of trust as the equitable counterparts of the common law claims of fraud and conspiracy to defraud and the limitation period applied by analogy. A similar analysis was used in relation to dishonest assistance in the Jersey case, *Nolan v Minerva* [2014] JRC 078A.

As mentioned before (see **H1.2** above), proceedings will generally be issued in the High Court, county court jurisdiction being limited to trusts holding funds which do not exceed the county court limit.

In view of the imperative nature of the duty to be ready with accounts, unless there are exceptional circumstances or the application is precipitate, the court is likely to order their production. In *Henchley v Thompson* [2017] EWHC 225 (Ch), the Master said: 'the court will, in the exercise of its discretion, ordinarily make an order for an account were an account has not been provided and furthermore, there may be very limited circumstances in which the court will decline to make such an order  . . .  even a lengthy delay in requesting an account may be of limited assistance to the trustees, in the absence of a release, because without an account the beneficiaries do not know what has happened to the trust income and assets  . . .  there is no doubt that the notion of an application for an account in common form, such as the application made here, is not dependent upon the party applying establishing grounds beyond there being a duty to account.'

Before issuing the application, the beneficiary should ensure that he has laid the appropriate 'paper trail' of requests for production of the account, together with accompanying offers to be responsible for photocopying charges if hard copies are requested. If trustees indicate that accounts are in the course of preparation the beneficiary must allow reasonable time to elapse before issuing proceedings. In accordance with the overriding objective of the Civil Procedure Rules, he must have behaved reasonably before as well as after commencing proceedings and have tried to settle the dispute, if he is not to be at risk as to costs.

The claimant beneficiary must join all the trustees as defendants. He may join some or all of the beneficiaries or representative beneficiaries (as to which see **H1.4** above). In the case of a charitable trust, proceedings should not be brought unless authorised by the Charity Commissioners or with the permission of the court for the reasons set out at **H1.4** above.

Proceedings are by Pt 8 claim (see **H1.5** for procedure). The supporting evidence should detail the requests which have been made for production of the account and any responses received. All supporting documentation should be appended to the witness statement. If an account on the footing of wilful default is sought an order may be made for the proceedings to be converted into an ordinary claim and directions made accordingly. It is inappropriate to seek an account on the footing of wilful default without particularising any action which is said to constitute the act of breach of trust. Such allegations are more appropriate to an ordinary claim for an account. If the trust has been com-

pletely administered and properly distributed any application for accounts (or any other relief) is likely to need to be brought by an ordinary claim and not under the Pt 8 procedure (*Wightman v Cousins* [1932] NI 61).

If a beneficiary has been driven to issue proceedings to ensure that trustees produce an account, the court may decide, when it considers how to exercise its discretion, that the costs incurred by the trustees in defending the proceedings should not be borne by the trust fund (as was the case in *Henchley v Thompson*). In that case, the court could disallow the trustees their costs from the trust fund and may consider that the trustees should meet the claimant's costs on the standard or indemnity basis. If the court considers the beneficiary's claim unfounded, precipitate or inappropriate (such as where the claimant cannot establish that he is a beneficiary and accordingly does not have the requisite *locus*) he would probably be ordered to pay the other parties' costs on the standard or possibly indemnity basis and the trustees be permitted their costs out of the fund on the indemnity basis.

### Summary judgment for accounts and enquiries (CPR Part 24)

**[H1.9]**  The court has wide powers to direct such accounts and enquiries as it considers necessary. The claim is brought by claim form (not under Pt 8) and summary judgment may be applied for, or the court may order such accounts and enquiries to be taken of its own initiative (CPR 24.6 and PD 24).

An order may be made for accounts produced by trustees to be verified, for the accounts to be prepared by another person or for an account on the footing of wilful default. Wilful default has been held to include negligence in the sense of a failure to do something which a prudent trustee would have done (*Bartlett v Barclays Bank Trust Co Ltd (No 2)* [1980] Ch 515, [1980] 2 All ER 92). In *Illiffe v Trafford* [2002] WTLR 507, Mr Justice Hart found that (in the context of that case, which involved a will trust) 'wilful default' meant nothing more than falling below the standards to be expected of a reasonably competent administrator. An account on the footing of wilful default is an account of what might have been received but for the wilful default and extends beyond actual sums received by the trustee. In order to secure an account on the footing of wilful default, breaches of trust must be particularised. An account on the footing of wilful default is often sought as part of the relief claimed in an action for breach of trust. The court is unlikely to order an account on the footing of wilful default unless past breaches of trust are established (*Tebbs, Re, Redfern v Tebbs* [1976] 2 All ER 858, [1975] 1 WLR 924).

If proceedings for an account on the footing of wilful default seek restitution to the trust fund on the basis that the trustees or their advisers have been paid excessive costs, it will be necessary for the excess (if any) to be determined. This is usually achieved by detailed assessment. The trustees' legal fees can be assessed pursuant to section 71 of the Solicitors Act 1974 without the necessity of applying for an account. In *Grimthorpe's Will Trusts, Re* [1958] Ch 615, [1958] 1 All ER 765 it was emphasised that expenses incurred by a fiduciary should only be reduced if the expenses were improperly incurred.

Since the proceedings are directed primarily to the trustees, the claimant beneficiary may not wish to join other beneficiaries. As with an application under CPR Part 64.2, all trustees should be joined as defendants.

Costs may be reserved on making an order for an account. The court can then consider how to exercise its discretion as to costs when the accounts have been prepared. If the court considers the trustees were at fault they are likely to be disallowed their costs from the trust fund and ordered to pay the claimant's costs on the standard or indemnity basis. If the claimant fails to secure an account or wrongfully maintains that an account on the footing of wilful default should be ordered, the claimant is likely to be ordered to pay the costs of the trustees on the standard basis, in which case the trustees will be at liberty (unless the court orders otherwise) to take the balance of their indemnity basis costs from the fund. Exceptionally the claimant may be ordered to pay other parties' costs on the indemnity basis. The order will usually provide that their costs should be assessed on a detailed assessment, although the court can assess them summarily if they are not agreed.

## Detailed assessment of trustees' legal costs

**[H1.10]** A beneficiary may be able to apply for detailed assessment of the trustees' legal costs under sections 70 and 71 of the Solicitors Act 1974. The beneficiary is not the client and accordingly the court has discretion whether or not to order detailed assessment. Each application will be looked at on its merits. The application should be made within one month of delivery of the bill. If the application is made after 12 months from delivery (or after the bill has been paid but before the expiration of 12 months from payment), the court will order detailed assessment only if there are special circumstances, such as where the bill has been paid under protest or the beneficiary has not been notified of the bill. The usual rule – that the court cannot order detailed assessment of a bill more than a year after payment – may be modified where the application is by a beneficiary, but the beneficiary is likely to have to establish special circumstances meriting the court exercising its discretion to permit a late application (*McIlwraith v McIlwraith* [2005] EWHC 90010 (Costs).If the bill was an on account bill, the 12-month period will run from the date of the final bill.

Where a bill has been paid without the trustees' authority by deduction from sums in hand, it is arguable that no bill has been rendered and the time period commences when the bill is brought to the attention of the trustees and beneficiaries. If the bill has been paid by transfer to the solicitor's office account with the knowledge and approval of the trustees, this constitutes payment and accordingly is subject to the 12-month rule (*Gough v Chivers & Jordan* [1996] 26 LS Gaz R 20).

## Action for breach of trust

### Introduction

**[H1.11]** Disaffected beneficiaries may wish to consider proceedings against their trustees to seek restitution to the trust fund or equitable compensation on the basis that the trustees have acted in violation of their duty as trustees

towards the beneficiaries and in so doing caused a loss. Before so doing there are numerous points which the beneficiaries must consider, not least whether:

- the act complained of constitutes a breach of trust (or breach of fiduciary duty);
- the breach has occasioned quantifiable loss and there is no difficulty establishing the causal link between the breach and the loss;
- the trustee is covered by professional indemnity insurance, trustee indemnity insurance (unusual) or has sufficient assets in his own right to render making a claim against him commercially worthwhile. For charitable trusts, there is a statutory power (see section 189 of the Charities Act 2011) to pay for such insurance out of the charity's funds, except where expressly prohibited in the trust deed or where considered by the trustees not to be in the charity's best interests)
- the claim is statute-barred or there is a *laches* defence;
- the trustee is able to rely on a widely drawn exculpatory clause;
- the trustee is likely to be relieved from liability pursuant to section 61 of the Trustee Act 1925;
- the claim may rebound on the beneficiary by the trustee alleging acquiescence, instigation or waiver and seeking to impound the beneficiary's interest.

### Breach of trust and breach of fiduciary duty/setting aside transactions distinguished

**[H1.12]**  A distinction should be drawn between a breach of trust (ie a breach of the duty imposed on the trustee by the trust instrument, by statute or by general equitable principles as developed in case law) and a breach of fiduciary duty. A fiduciary duty may also be owed by non-trustees who are in a fiduciary position, such as agent to principal, partner to fellow partners and solicitor to client. The duty encompasses the duty of loyalty and fidelity and a breach can include breach of the self-dealing and fair dealing rules. Although previously breaches of fiduciary obligations were not deemed to be caught by section 21 of the Limitation Act 1980 and therefore an action could be brought more than six years after the alleged breach, the Court of Appeal has since held that breaches of the self-dealing and fair-dealing rules will fall within the scope of section 21 (see **H1.36** for further details).

It should be noted that section 1 of the Trustee Act 2000 imposes a duty of care on trustees of English law trusts: to exercise such care and skill as is reasonable in all the circumstances (including whether the trustee is a professional or holds himself out as having particular skills) when performing particular trustee duties set out in Schedule 1, such as when investing trust funds or buying land. A breach of that duty of care constitutes a breach of trust.

The duty of care can be specifically excluded by the trust deed. However, it is unlikely that the section 1 duty will be excluded by common forms of exclusion clause (which usually limit liability rather than the duty itself).

The Act also imposes specific obligations on trustees in connection with investment, such as having regard to standard investment criteria, review of

investments and diversification. Again, failure to comply with those obligations amounts to a breach of trust.

A breach of trust may also arise in circumstances where a trustee has acted beyond the scope of their powers. If the transaction is void no limitation period will apply to an action to set it aside (although *laches* may be raised as a defence, as to which see **H1.36** below).

Breaches of fiduciary duty can include situations where the fiduciary personally benefits from their office. In *Sinclair Investments (UK) Ltd v Versailles Trade Finance Ltd (in admin)* [2011] EWCA Civ 347, [2012] Ch 453, [2011] 4 All ER 335, the Court of Appeal considered cases where a fiduciary takes for himself an asset which he was under a duty to take for a beneficiary (in that case, clearly the asset belongs to the beneficiary) and enriches himself by doing a wrong to the claimant. It was held that a claimant could not claim a proprietary interest in an asset purchased by a defaulting fiduciary with funds which, although they could not have been obtained if the fiduciary had not enjoyed fiduciary status, were not beneficially owned by the claimant. Instead, the claimant had a personal claim in equity to the funds. The court held that there was no case law in support of the notion that such a personal claim entitled the claimant to claim the value of the asset.

In *FHR European Ventures LLP v Cedar Capital Partners LLC* [2014] UKSC 45, [2014] 4 All ER 79, [2014] 3 WLR 535 the court held that a bribe or secret commission accepted by an agent is held on trust for the principal. The basis for the decision was that an agent 'owes a duty of undivided loyalty to the principal . . . the principal is thus entitled to the entire benefit of the agent's acts in the course of his agency' and that 'wider policy considerations also support the case that bribes and secret commissions received by an agent should be treated as the property of his principal, rather than merely giving rise to a claim for equitable compensation'. This has since been followed in *Lloyds Trust Company (Channel Islands Ltd) v Carlos Fragoso* [2013] JRC 211.

### Common breaches of trust

**[H1.13]**  The range of acts which may constitute breach of trust is very wide but will usually involve trustees acting in excess of their powers, acting improperly when exercising powers (such as not exercising their powers in good faith or reasonably for the legitimate purposes of the trust) or, by act or omission, breaching a core duty such as the duty to act as a prudent man of business would towards those for whom he has a moral obligation to provide (*Learoyd v Whiteley* (1887) 12 App Cas 727) in the absence of specific provisions in a particular trust deed which reduce the duties of the trustee. Examples of common breaches are:

- trustee failing to acquaint himself thoroughly with the terms of the trust and the extent of the trust assets and, where there has been a loss, to investigate;
- failure, where trust assets include shares in a private or public company, to exercise all the rights of a shareholder and take such further steps as they can (including appointing their own nominees as directors if

possible) to ensure that they receive sufficient information about the management of the company's affairs to enable them to intervene if necessary (*Bartlett v Barclays Bank Trust Co Ltd* [1980] 1 All ER 139).

- failure to act within the terms of the settlement, including paying out incorrect sums to beneficiaries or making payments to non-beneficiaries in circumstances where such payments cannot be justified as being for the benefit of beneficiaries;

- failure to act impartially between beneficiaries, particularly when making investment decisions which might benefit one class of beneficiaries more than another;

- failure to have regard not only to the suitability of prospective investments but also the need for diversification (Trustee Act 2000, s 4 and *Nestle v National Westminster Bank plc* [1994] 1 All ER 118);

- failure to preserve trust property, for example by retaining wasting assets, not taking steps to avoid loss to the trust assets, and paying unenforceable debts or excessive fees to advisers;

- failure to exercise due diligence and care as would an ordinary prudent man of business. Professional trustees, particularly those whose profession is the administration of trusts, are expected to have a higher standard of knowledge and to demonstrate a higher standard of diligence (*Bartlett v Barclays Bank Trust Co Ltd*, above and section 1 of the Trustee Act 2000);

- failure, when making a decision, to take into account matters that were relevant or mistakenly taking into account irrelevant considerations. Previously such circumstances would allow a court to set aside such an action by a trustee (*Re Hastings Bass (decd)* [1975] Ch 25). However, in *Futter v Revenue and Customs Comrs* [2013] UKSC 26, [2013] 2 AC 108, [2013] 3 All ER 429; *Pitt v Revenue and Customs Comrs* [2013] UKSC 26, [2013] 2 AC 108, [2013] 3 All ER 429, the Supreme Court upheld the decision of the Court of Appeal that such actions would only be voidable (ie the court can, at its discretion, set aside the decision subject to any defences that the trustees may raise) but there will be no breach of trust (and thus the decision will not be voidable) where the trustees have relied on competent professional advice. Pitt's case satisfied the test for setting aside a voluntary disposition on the grounds of mistake. The injustice of leaving a mistaken disposition uncorrected had to be viewed objectively. A mistake had to be distinguished from mere ignorance or inadvertence. Mere ignorance, even if causative, was insufficient to constitute mistake. The test for setting aside a voluntary disposition for mistake therefore centred on the gravity of the mistake and its consequences. Note that the position offshore may be different: in a number of jurisdictions legislation has been introduced to reinstate the breadth of the Hastings Bass remedy pre *Futter* and *Pitt*;

- failure to sue a third party. Beneficiaries may argue that this constitutes a breach of trust entitling them to sue the trustees and require them to restore the trust fund to the value it would have been but for the breach. Another alternative is that in 'special circumstances' (in *Roberts v Gill & Co* [2010] UKSC 22, [2011] 1 AC 240, [2010] 4 All ER 367, Lord Collins identified fraud, collusion between the trustee and third party, or the insolvency of the trustee as some examples of this), the

beneficiaries can invoke the trustees' right of action and directly sue the third party, joining the trustees, so that they will be bound by the judgment. In *Shell UK Ltd v Total UK Ltd* [2011] QB 86 – the Court of Appeal appears, on one interpretation at least, to have allowed a beneficiary to bring a direct claim to recover consequential economic losses (although it has been argued that the weaknesses and ambiguities in the court's reasoning means that the strength of this case as authority in this regard is limited);

- failure to invest within the powers given by the trust or by statute. The powers of trustees in relation to investment must be exercised in the best interests of the beneficiaries as a whole (*Cowan v Scargill* [1984] 2 All ER 750). The increasing popularity of ESG investing is a hot topic in this regard because the rule in *Cowan v Scargill* is that trustees must invest for maximum financial return, irrespective of other considerations. However, if ESG net returns can be demonstrated to be as good as (if not better than) non-ESG net returns, the *Cowan v Scargill* test should be satisfied and of course the trust deed may specifically permit ESG investment;

- delegating powers or duties where not authorised by the settlement or by statute. It used to be the case under section 23 of the Trustee Act 1925 that trustees could not, as a collective body, delegate their duties to distribute trust property to those entitled to it or their fiduciary discretions (namely their powers to select trust investments or to decide whether to sell or lease trust property) without authority under the trust instrument. The position under section 11 of the Trustee Act 2000 read with section 26 is that trustees may delegate their powers of administration in relation to the trust but do not have authority to delegate their decision-making powers in relation to the distribution of income or capital for the benefit of the objects of the trust;

- charging the trust fund in circumstances where neither the settlement nor the court authorised the trustees to charge. (Section 29 of the Trustee Act 2000 provides a mechanism for trustees to be paid in most circumstances);

- trustee selling trust property to himself (either alone or with his co-trustees). This action is in breach of the self-dealing rules and is consequently voidable by any beneficiary as of right, regardless of the fairness of the transaction;

- trustee buying the beneficial interest of any of his beneficiaries. This transaction is in breach of the fair-dealing rules and whilst not voidable as of right can be set aside by a beneficiary unless the trustee can show that he has not taken advantage of his position, full disclosure has been made to the beneficiary and the transaction is fair and honest.

Additional duties are imposed on trustees pursuant to the TLATA 1996. Where there are trusts of land, trustees will be in breach of their duties if they fail to consult beneficiaries of full age entitled to an interest in possession in so far as it is practicable for them to do so in the exercise of any function relating to land subject to the trust (s 11(1)) or fail to allow beneficiaries with an interest in possession to occupy the land subject to the trust, provided that the land is available for occupation (s 12(1)). Beneficiaries may find it difficult to establish

a loss as the result of not being consulted. If they have reason to believe that the trustees are proposing to exercise their functions without consultation, the beneficiaries could apply to the court for directions to the trustees as to how they should consult the beneficiaries. If beneficiaries do not discover that the trustees are exercising their functions relating to trust land without consultation until it is too late, the beneficiaries may seek the trustees' removal on account of their failure to comply with this duty.

### 'Dog-Leg' or derivative claims

**[H1.13A]** Aside from derivative claims by shareholders against their company's directors (which are dealt with under the Companies Act 2006) derivative claims are only permitted in 'special circumstances' (*Roberts v Gill & Co* above) where the Supreme Court's examples of special circumstances included breach of trust and conflicts of interest; see also *Certain Ltd Partners in Henderson PFI Secondary Fund II LLP (a firm) v Henderson PFI Secondary Fund II LP (a firm)* [2012] EWHC 3259 (Comm), [2013] QB 934, [2013] 3 All ER 887 and *Bayley v SG Associates* [2014] EWHC 782 (Ch)). It should be noted however, that although special circumstances will permit a beneficiary to bring a derivative claim, where the claim is against a director of the trustee the case law above suggests that an additional layer of exceptionality is required to show that the corporate trustee's right to sue its director is an asset held by the company on the particular trust which the beneficiary seeks to represent: corporate trustees frequently act as trustee of more than one trust.

### Extent and measure of loss

**[H1.14]** If: (i) the causal link between the loss and the breach of trust is established; and (ii) the trustee cannot mount a successful defence; and (iii) he is not relieved from liability, the trustee's obligation is: (a) to compensate the claimant beneficiary for the loss which has been suffered by the claimant alone; or (b) to restore to the trust fund the losses sustained. Loss in this context can include making a lesser profit than would otherwise have been made had there been no breach of trust (*Nestle v National Westminster Bank plc* above). The loss which is restored to the trust fund enables the beneficiaries as a whole (whether their interests are in possession, contingent, successive or discretionary) to benefit from the restored fund. It has generally been considered (as in *Target Holdings Ltd v Redferns* [1995] 3 All ER 785) that the remedy for breach of trust is restitution or compensation of a particular beneficiary who has been affected by the breach of trust (such as compensation paid to a life tenant for lost income) rather than damages and that assessment of damages, in accordance with normal contractual or tortious principles, is inappropriate to a claim for breach of trust so that, for example, issues of contributory negligence do not arise. There are, however, signs that the assessment of compensation for breach of the duty of care is moving closer to common law principles: in *Bristol and West Building Society v Mothew* [1996] 4 All ER 698, Millett LJ indicated that there was no reason, in principle, why the common law rules of causation, remoteness and so on should not apply when considering equitable compensation for breach of the duty of care and skill. Neuberger J came to a similar conclusion in *Wight v Olswang (No 2)*

[2000] WTLR 783, in which he held that trustees were not liable for breach of trust unless it could be established that no reasonable trustee would have acted in the way the trustees did, appearing to apply an objective, rather than a subjective, test to the trustees' fulfilment of their duties. The decision was overturned on appeal – [2001] WTLR 291 – when the Court of Appeal decided that the test was inapplicable to the main case as pleaded and that the claims should be allowed to proceed to trial. The Court of Appeal appeared to leave open the issue of whether the test promulgated by Neuberger J could apply in some circumstances. In *Hulbert v Avens* [2003] All ER (D) 309 (Jan), the court considered it appropriate to assess equitable compensation in light of all the facts known at the time of the trial and if, as in that case, the benefit had flowed from the non-payment of a debt which it was a breach of trust not to pay, it was appropriate for that benefit to be taken into account. *Watson v Kea Investments* [2019] EWCA Civ 1759 provides confirmation that where the breach of trust is a failure of investment, the courts can award equitable interest so as to put a trust claimant into the position it would have been in had its money been invested in proper trustee investments. In addition, the judgment sets out – by reference to investment indices – the formula for calculating such awards. (See also *Tuke v Hood* [2022] EWCA Civ 23.)

In relation to other breaches, interest is normally awarded at the current short-term investment account rate but in special circumstances, a higher rate of interest can be awarded. Where a trustee has used trust assets for his own purposes, he is likely to be ordered to pay a commercial rate of interest which may be compounded rather than simple (*Wallersteiner v Moir (No 2)* [1975] 1 All ER 849).

Where a trustee has misapplied trust funds to his own ends beneficiaries have a choice: they can either require restitution of the trust fund and compound interest at a commercial rate or they can claim the profit made by the defaulting trustee's use of trust funds. The House of Lords case *Foskett v McKeown* [2000] 3 All ER 97 decided that, where a person, who was effectively in the position of a trustee, misapplies trust funds and mixes them with his own in an asset which increases in value (in this case a life policy) the beneficiaries whose funds have been misapplied can claim a proportionate part of the enlarged asset. In *Shaker v Al-Bedrawi and others* [2002] 4 All ER 835, Mr Bedrawi allegedly made away with assets of a company and was sued by Mr Shaker whose shareholding in the company was held on trust by Mr Bedrawi. The question came up as to whether Mr Bedrawi, as trustee, was liable to account for the profit which reflected the loss by the company for which the company might have a cause of action. It was held that, to the extent that the trustee had taken money without being in breach of any fiduciary duty to the company, the trustee would have to account to the beneficiary for the profit as the profit was referable to the trust holding of shares in the company. Mr Shaker could bring an action as a beneficiary rather than a shareholder so long as it could not be shown that the whole of the claimed profit reflected what the company had lost and therefore that which the company had a cause of action to recover.

If the loss is continuing the beneficiaries may apply to the court for an injunction to prevent the trustees continuing in breach. Alternatively, they could seek a direction of the court under CPR Pt 64 as to whether or not the trustees should continue to act in the manner which is occasioning the loss.

*Joint and several liability*

**[H1.15]**  All trustees are liable for a breach of trust even though it has been committed by only one of their number. Innocent or less culpable trustees may seek a contribution or an indemnity from the guilty or more blameworthy trustees and can do so by making a claim for contribution or indemnity under CPR Pt 20 in the course of the breach of trust proceedings. If a lay trustee relied on a professional trustee, he is likely to seek an indemnity from the professional trustee. If one trustee is relieved from liability pursuant to section 61 of the Trustee Act 1925 the other trustees will have to bear the whole of the loss. Atypically, a claim of breach of the statutory duty of care under section 1 of the Trustee Act 2000 may be advanced against only one or some of the trustees.

*Parties*

**[H1.16]**  The complaining beneficiary or beneficiaries (or representatives of them: see CPR rules 19.6 and 19.7 (described at **H1.4** above)) will be claimant(s) and the trustees will be defendants (*Re Jordan* [1904] 1 Ch 260) (unless the claim is directed to only some of the trustees as having breached the statutory duty of care imposed on them by the Trustee Act 2000). The claim is against the trustees in their personal, not representative, capacities. It is not necessary to join the other beneficiaries or representatives of them as defendants. If the court considers that other beneficiaries should be given the opportunity to be joined as defendants, notice to non-parties may be served pursuant to CPR r 19.8A. This involves serving notice of the claim together with the statements of case on the other beneficiaries who, unless they acknowledge service within a given time, will be bound by the court's decision (see **H1.4** above).

If breach of a charitable trust is alleged, proceedings cannot be brought without either an order of the Charity Commissioners or the permission of the court. Where the Charity Commissioners or the court authorise such proceedings the Attorney-General should be asked whether he wishes to be joined.

If a request for removal of trustees is included in the breach of trust claim beneficiaries or representatives of different classes of beneficiaries (pursuant to a representation order) should be joined (see **H1.4** above).

*Gathering the evidence*

**[H1.17]**  The complaining beneficiary will wish to collate as much evidence as possible in advance of issuing proceedings. He may do so by:

•  a request for information from the trustees. The beneficiary may wish to secure details of the trust's investments to establish whether or not they are authorised by the settlement or statute. He may wish to ascertain the current value of an asset which is believed to be wasting or what steps the trustees are taking to ensure that they are acquainted with the affairs of a company in which the trust holds shares.

Such questions can legitimately be raised by the beneficiary or his lawyers and the trustees should provide a full response. If they fail to do so and the beneficiary commences action for breach of trust in conse-

quence of what he believes to be a breach (but has been unable to establish definitively because of the trustees' failure to respond to his enquiries), the court may take the trustees' failure to respond into consideration when considering the appropriate costs order;

- inspecting trust documents as outlined at **H1.3** above. Beneficiaries should access trust documents if possible to enable them to set out their claim accurately and to form a better view of its merits. A beneficiary's assertion of his 'right' to inspect trust documents (see **H1.3** above) is not the same as disclosure and inspection of an opponent's documents in the course of a hostile action. Issues of privilege arise in relation to the latter which cannot be raised in relation to the former; conversely, documents which relate to the exercise of a discretion and which a beneficiary is normally unable to see as trust documents (pursuant to *Re Londonderry's Settlement* [1964] 3 All ER 855) may be documents of the defendant trustees which the claimant beneficiary is entitled to inspect in the course of proceedings;

- procuring up-to-date accounts. These should establish the trust's financial position and provide some indication of the extent of losses incurred as a result of the alleged breaches.

The beneficiary may be able to secure some degree of pre-action disclosure under CPR r 31.16, which provides that the court may order disclosure in advance of proceedings if: (i) the court considers that the parties are likely to be parties to the proceedings; and (ii) that disclosure of the documents is desirable to assist, for example, in resolving the matter before proceedings are issued.

### *Procedure*

[**H1.18**]  Before issuing proceedings, the beneficiary should send a fully particularised (and documented) letter before action to the trustees and give them the opportunity to respond to the allegations made against them. The beneficiary should propose ADR unless there is a good reason not to.If a beneficiary issues proceedings without giving the trustees the opportunity to address his allegations and/or without being prepared to explore the possibility of settlement he may be penalized in costs (see **H1.44** below). Beneficiaries should take care to follow any applicable pre-action protocol.

### Statements of case

[**H1.19**]  Whether proceedings are issued in the county or High Court, the claimant will issue a claim form (in the High Court, Business and Property Courts, Property Trust and Probate List or in the county court).

'Standstill agreements' may be reached between the parties to prospective breach of trust claims so that time will not run for limitation purposes, allowing for pre-action steps and negotiations without risk of a claim becoming time barred.

Alternatively, a 'protective' claim form may be issued to stop time running against the claimant and must be served within four months of issue unless the period has been extended by the court (by way of consent order agreed between the parties or on the application of the claimant). The Civil Procedure Rules

contain a provision (CPR r 7.7) enabling a defendant who has not been served with a claim form to serve a notice on the claimant requiring him to serve or discontinue within a period of not less than 14 days after service of that notice.

The particulars of claim must be served with a form of acknowledgement of service and forms for the defendant to complete, indicating whether he admits or defends the claim. The particulars of claim must be served at the same time or served within 14 days after service of the claim form.

All statements of case must be verified by a statement of truth under CPR Pt 22 to the effect that the claimant believes that the facts stated in the statement of case are true and since April 2020 that they understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth. This applies not only to particulars of claim, defence and reply, but also to the claim form itself. Any amended statements of case must also be so verified. Failure to verify may result in the striking out of a statement of case. Proceedings for contempt of court may be brought against a person who makes a false statement in a document verified by a statement of truth without having an honest belief in the truth of the facts set out (CPR r 32.14). Because statements of case are verified by a statement of truth, the matters set out in the statements of case can be relied on in support of any application without the need for further evidence.

CPR rules 16.2 and 16.4 details what the claim form and particulars of claim must contain. The claim form must contain a concise statement of the nature of the claim, specify the remedy sought, contain a statement of the monetary value of the claim (CPR r 16.3) (if appropriate) and, if the particulars of claim are not contained in or served with the claim form, that they will follow. It must also set out whether any parties are acting in a representative capacity. The particulars of claim must specifically detail any allegation of fraud, breach of trust or wilful default. In order to make out his case properly, the claimant beneficiary should also state the nature of his interest, the nature of the trust and the loss alleged to have flowed from the breach of trust. The claimant will seek restitution of the fund or equitable compensation together with interest and an order for costs against the trustees personally, since the claim is brought against them in their personal and not representative capacities.

Under the Disclosure Pilot Scheme for the Business and Property Courts (CPR PD 51U), there is now an obligation for the claimant to provide certain disclosure when serving the Particulars of Claim (see **H1.21** below).

The defendant need take no action until served with the particulars of claim, whereupon he can either file and serve an admission, a defence or an acknowledgement of service within 14 days of service of the particulars of claim. If he acknowledges service he must serve the defence within 28 days of service of the particulars of claim. Accordingly, by acknowledging service the defendant gains an extra 14 days in which to serve his defence (see CPR Parts 9, 10 and 15). The parties can agree to extend the time for filing of the defence for up to 28 days (CPR r 15.5) and the defendant must notify the court in writing if they do so (CPR r 15.5(2)). If the defendant fails to acknowledge, serve the defence or admit within the time specified by the Rules or extended by the parties by

agreement, he risks judgment in default being entered against him under CPR Part 12. As with any other statement of case, the defence must be verified by a statement of truth in accordance with CPR Part 22.

Any reply must be verified by a statement of truth and filed and served at the same time as filing the directions questionnaire (r 15.8). Where a counterclaim has been made and the claimant wishes to defend the counterclaim, the reply and defence to counterclaim should normally form one document.

**The case management system**

**[H1.20]** In accordance with the CPR, the court actively manages cases to ensure that the overriding objective – to enable the court to deal with cases justly and at proportionate cost – is put into effect. The court may adopt a very firm approach towards delay and there are wide powers to strike out claims or defences if time limits are allowed to slip unduly or if statements of case are not verified by a statement of truth. The Rules provide for the allocation of a case to one of three tracks – the small claims track, the fast track and the multi-track.

Under the CPR, all statements of case must not only be served on the other parties, but also be filed with the court. When a defendant files a defence, the court will generally serve a notice of proposed allocation requiring the parties to file a directions questionnaire and serve copies on all parties. Each party must file the completed directions questionnaire no later than the date specified in the notice which will be at least 28 days (in the case of a multi-track claim) after it is deemed served (CPR r 26.3(6)). When completing the directions questionnaire a party can make a written request for the proceedings to be stayed while alternative methods of resolving the case are attempted (CPR r 26.4). Where all parties request a stay, or the court considers that it would be appropriate, the court will direct that the proceedings be stayed, in whole or in part, for one month or such period as the court considers appropriate. The stay can be extended if the court considers it appropriate (CPR r 26.4(3)), but the claimant must tell the court if a settlement is reached.

On receipt of the directions questionnaire or the expiry of the period of the stay, the court will allocate the claim to a track; the rest of this chapter proceeds on the assumption that it will be allocated to the multi-track, as claims for breach of trust are likely to involve sums in excess of £25,000 and/or issues of some complexity. On allocating the case to the multi-track, the court will give directions for the management of the case and: (i) set out a timetable of the steps to be taken; or (ii) will fix a case management conference or pre-trial review or both (CPR r 29.2). The date for the trial or the period in which the trial is to take place will be fixed by the court as soon as possible and notice given to the parties.

It is important that, if a party is legally represented, a lawyer with sufficient knowledge of his case attends the management conference or the pre-trial review, which will generally be heard by a Master in the High Court. A case summary should be prepared before the case management conference and the lawyers should consider whether the parties should attend. They should bring with them any witness statements or experts reports, and any necessary applications or notices should be issued to be heard at the case management conference. Under CPR r 29.4 the parties must endeavour to agree directions

and submit them to the court at least seven days before the case management conference. At the case management stage, the likely directions are for:

- • filing and service of further information (as to which, see **H1.27** below);
- • disclosure (as to which, see **H1.21** below);
- • exchange of witness statements by way of simultaneous exchange;
- • with the consent of the parties, the appointment of a single joint expert, or, alternatively, exchange of experts' reports and, if not agreed, discussions between experts and preparation of an agreed statement;
- • (in some cases) costs capping (see **H1.44** for further details).

Other factors the court will want to consider are set out in the Practice Direction to CPR 29.

The Master will also consider whether there are any preliminary issues to be determined. It may be appropriate to determine the efficacy of an exculpatory clause and whether or not the claim is statute barred as preliminary issues in order to save wasted costs: as in *Armitage v Nurse* [1997] 2 All ER 705.

At the case management conference a date will also have been specified for a pre-trial checklist to be completed. The court will then send out the pre-trial checklist (unless it decides to dispense with it and proceed to trial in any event) in good time for completion by the date specified at the case management conference. On receipt of the pre-trial checklist the court may decide to hold the pre-trial review already fixed or cancel any pre-trial review already fixed and simply set a timetable for trial. If a pre-trial review is held the date for the trial will be fixed (if not already fixed) and any further directions dealt with, such as for preparation of the trial bundle and the manner in which evidence is to be taken.

**Disclosure**

**[H1.21]** Disclosure may take place in advance of proceedings if the court considers that the parties are likely to be parties to the proceedings and that disclosure of the document is desirable to assist by, for example, resolving the matter before the proceedings (CPR r 31.16).

Otherwise, under the Disclosure Pilot Scheme for the Business and Property Courts (CPR PD 51U), a claimant must at the same time as serving Particulars of Claim also serve an Initial Disclosure List of Documents that lists and is accompanied by the key documents on which the claimant has relied in support of its claim and the key documents the defendant needs to understand the claims. In certain circumstances, the requirement for an Initial Disclosure List and Initial Disclosure may be dispensed with.

Where Initial Disclosure applies, a defendant is obliged to serve an Initial Disclosure list and accompanying documents with his/her Defence (and Counter-Claim if applicable).

Any complaints as to the scope of the Initial Disclosure are generally dealt with at the first Case Management Conference and only in exceptional circumstances (and on application) at an earlier hearing (CPR PD 51U para 5.12).

Within 28 days of the final statement of case, the parties are required to write to each other stating whether they will seek extended disclosure, being disclosure

beyond those documents included in the Initial Disclosure. There are a number of 'disclosure models' which the parties may seek including search-based disclosure models resembling the old Standard Basis disclosure system. However, the court will only consent to order a search-based disclosure model where it considers it proportionate to do so.

Prior to the first case management conference, the parties are expected to work together to complete a Disclosure Review Document and to try to agree issues for disclosure, appropriate disclosure models and search parameters (CPR PD51U paras 7 and following). The disclosure review document is filed prior to the CMC and irreconcilable differences between the parties are argued before the Master who will then make a disclosure order he/she considers appropriate.

Even where there is agreement between the parties as to the appropriate disclosure model and parameters, it is open to the Master to make an alternative order if he/she considers it proportionate to do so.

If the court considers that the level of disclosure is inadequate, specific disclosure can be ordered pursuant to CPR r 31.12.

In general a party to whom the document is being disclosed has the right to inspect it, although CPR r 31.3 does impose certain restrictions on the right if the document is no longer in the possession of the person disclosing, or he has a right or duty to withhold inspection of it (CPR r 31.3(1)(b)), or if the expense involved in inspection would be disproportionate to the issues in the case. Documents that are privileged are also not available for inspection in disclosure in hostile litigation, in contrast to the position which may obtain where disclosure of trust documents is sought.

From the claimant beneficiary's point of view, the facility following disclosure to inspect the trustees' documents relating to the alleged breach of a trust is extremely valuable, particularly if the beneficiary has not previously inspected trust documents pursuant to his right as beneficiary (as to which, see H1.3 above). Inspection may provide the beneficiary with clear proof of breaches, or demonstrate that what he had thought was a clear-cut breach is far less certain. Disclosure and inspection give all parties the opportunity of re-evaluating the merits of their claim or defence.

**Interim applications**

**[H1.22]** *Summary judgment:* The claimant beneficiary may have been advised that the case against the trustees is such that there is no real prospect of a successful defence and that the claimant should apply for summary judgment under CPR Pt 24. The application is made by an application notice in accordance with CPR Pt 23 and the party making the application should state whether or not he wishes the matter to be dealt with on a hearing. Any evidence upon which the claimant wishes to rely (apart from the statements of case, which can be relied upon because they have been verified by a statement of truth) must be filed and served with the application notice. The evidence is usually in the form of a witness statement verified by a statement of truth. The application notice must also be accompanied by a draft order. In accordance with CPR r 23.8, the court can deal with the application without a hearing if the parties agree, or if the court considers that a hearing is not appropriate. The

court can give summary judgment on the whole or a part of the claim if the court considers that there is no real prospect of success of the defence and no compelling reason why there should be a trial (such as to determine a point of general importance). It should be noted that summary judgment can be given against a claimant if the court considers that there is no real prospect of the claim succeeding and no other compelling reason why there should be a trial. Such an application was made by trustee defendants in both *Wight v Olswang* and *Walker v Stones* and in both cases the judgment for the defendant on the primary claim at first instance was revised on appeal (*Wight v Olswang (No 2)* [2001] WTLR 291 and *Walker v Stones* [2001] QB 902). In *Taylor v Midland Bank Trust Co Ltd* [1999] All ER (D) 831, Stuart-Smith LJ said 'it is not sufficient to look and see whether the pleading technically discloses a cause of action. Particularly in the light of the Civil Procedure Rules, the court should look to see what will happen at trial. If the case is so weak that it has no reasonable prospect of success, it should be stopped before great expense is incurred'. The court may decide to fix a date for a hearing for summary judgment of its own initiative. As with other applications, an application for summary judgment can be dealt with by a telephone hearing in accordance with PD 23A.6.1–10 if all parties agree. If the court has dispensed with the need for a hearing, the party who is aggrieved by the order can apply to set it aside within seven days (CPR r 23.10).

At the hearing of any application the court may review the conduct of the whole case and give further directions (CPR PD 23A.2.9).

Summary judgment may be on the point of law (such as on the construction of a particular provision of the trust deed) or for the taking of account and enquiries (CPR PD 24.1.3).

The applicant should bear in mind the likelihood of summary assessment of costs against him or her if the application is unsuccessful (see **H1.6**).

**[H1.23]**  *Other interim remedies:* Under CPR Part 25 interim remedies can be given in a wide range of circumstances. The remedies which can be ordered under this Part include the preparation and filing of accounts, the payment of a disputed fund into court, the application of a receiver and injunctions. Interim remedies can be ordered without notice to the affected party if there is good reason to do so and may be made at any time, including before proceedings are started and after judgment has been given CPR r 44.2.

**[H1.24]**  *Security for costs*: A claimant beneficiary without assets in the jurisdiction should be aware that the defendants can apply for an order that he should provide security for costs pursuant to CPR Pt 25. This step is not usually taken by trustees who are likely to have the beneficiary's interest in the trust fund to fall back on to meet their costs if awarded against the claimant beneficiary. *Sir Lindsay Parkinson & Co Ltd v Triplan Ltd* [1973] 2 All ER 273 sets out the factors which the court is likely to take into account in considering a security for costs application, but note that it may be regarded as discriminatory to make an order, purely on the basis that the claimant is not within a contracting state under the Brussels/Lugano Conventions (*Somerset-Leeke v Kay Trustees Ltd* [2004] 3 All ER 406).

**[H1.25]**  *Pre-emptive or protective costs orders*: The court can make an order as to the ultimate costs of the proceedings in advance of the outcome CPR

r 44.2. This jurisdiction is exercised very sparingly in the case of claims by beneficiaries against trustees. It is only likely to be exercised where: (i) the claimant beneficiary's case appears to be a strong one; (ii) the beneficiary is acting in a quasi-trustee capacity in attempting to ensure that losses are restored to the trust fund for the benefit of all beneficiaries; and (iii) he would be unable to proceed with the litigation unless an order were made that his costs be funded by the trust (*McDonald v Horn* [1995] 1 All ER 961 and *Machin v National Power plc* [2001] WTLR 741) (pre-emptive costs; Court of Appeal). In *Re IMG Pension Plan* [2010] 3 Costs LR 443, the court found that before granting a pre-emptive application in ordinary trust litigation a judge had to satisfy himself that the eventual trial judge could properly exercise his discretion by ordering that the applicant's costs be paid out of the fund.

**[H1.26]** *Injunctions*: If the beneficiary considers that the trustees will continue to commit breaches of trust, he may seek an interim injunction pursuant to section 37(1) of the Senior Courts Act 1981, under CPR Part 25 (CPR r 25.1). Such an injunction could prevent trustees from continuing to distribute trust assets in breach of trust. An injunction could also be sought to prevent trustees funding their defence to a breach of trust action – which is a personal claim against the trustees – from the trust fund.

In exceptional circumstances, the court may be prepared to make a freezing order, freezing the defendant's assets. Even more exceptionally, a search order may be granted, enabling seizure of the defendant's documents. The claimant beneficiary would need to satisfy the court that his claim for breach of trust has merit and that there is a real risk that the trustees or some of them might dissipate or make away with their assets in order to avoid meeting any judgment or that there is a real risk of disposal of evidence.

It is also possible for beneficiaries to apply for injunctions preventing the trustees from exercising certain powers, for example, the power to sell assets or to make loans (**H1.41** below).

Applying for a freezing order is a high-risk process because it is expensive (it usually involves two hearings) and because the claimant will be required to undertake to be responsible for any loss sustained by the defendant if the court ultimately considers that the injunction should not have been granted. Search orders and other injunctions are rare and expensive to obtain and put into effect.

**[H1.27]** *Specific disclosure and further information*: As detailed in **H1.21** above, the court can order specific disclosure of particular documents (CPR r 31.12). The procedure for securing further information is set out in CPR Pt 18. This rule enables the court at any time to order that a party clarifies any matter in dispute or provides additional information, whether contained or referred to in a statement of his case or not. An application for further information should be preceded by written request for the information (in accordance with CPR PD 18.1). If the recipient of the request objects to it, he must notify the requesting party within the time stipulated in the request, in which case the requesting party can issue an application notice for an order under CPR Pt 18. The party against whom the order is made must file and serve a response within the time stipulated by the court and the response must be verified by a statement of truth (as defined in Pt 2 of the rules) in accordance with CPR Pt 22.

This procedure is likely to be very useful to clarify issues between the parties. A claimant beneficiary is likely to find it helpful as a means of finding out information which the trustees have but to which he has not had access.

**[H1.28]** *Striking out:* If a claimant beneficiary advances a wholly novel, statute barred or unparticularised claim, or one which is frivolous, vexatious, has failed to comply with a rule, Practice Direction or Court Order or is an abuse of process, the court can be asked to strike it or parts of it out. Under CPR r 3.4, the court can also strike out a statement of case, or any part of it, if it considers that it is an abuse of process, or there are no reasonable grounds for bringing the claim, or, under CPR Part 24 (summary judgment), if there is no real prospect of success of the claim and no other reason why there should be a trial (see also **H1.22**). The court appears to be reluctant to strike out if there is, at least, a triable issue – *Walker v Stones* [2000] 4 All ER 412 and *Wight v Olswang (No 2)* [2001] WTLR 291. The court also has very wide powers to strike out a claim if there has been a failure to comply with the Rules, Practice Directions or a court order. Other sanctions, such as costs penalties, should be considered first.

Similar provisions apply to defences so that if a trustee really has no sensible ground upon which to defend, his defence may well be at risk of being struck out.

### Evidence

**[H1.29]** As with any other hostile action, the marshalling of evidence in support is vitally important if the beneficiary is to have the best chance of success. Oral evidence is received at trial unless evidence in another form is to be permitted pursuant to the directions of the court. CPR Pt 32 provides for evidence to be adduced, if the court so permits, by witness statement verified by a statement of truth (unless an affidavit is required by the court, the Rules, Practice Directions or by statute). The parties' statements of case can also be relied on as evidence if they have been verified by a statement of truth. Notices to admit facts may be served no later than 21 days before the trial (CPR r 32.18) to try to elicit admission of a particular fact or facts. Responses to requests for further information can also be received as evidence.

Under CPR r 34.8, a party can apply for a deposition to be taken prior to trial. This can be used in evidence unless the court otherwise orders, provided that notice has been served at least 21 days before the day fixed for the hearing on the other parties of the intention to do so (CPR r 34.11). Letters of request can be issued by the court to a foreign court to assist in securing evidence from witnesses abroad. A witness summons to attend the court to give evidence or to produce documents can be issued; such a witness summons can be issued returnable on a date before the commencement of the trial but the court prefers an application to be made under CPR Pt 31 for third party disclosure (CPR r 31.17).

The court is likely to have given directions for exchange of witness statements on a specified date. Such statements should deal with each alleged breach of trust, the causation, and the loss which the beneficiary alleges flowed from the breach. The starting point is that CPR PD 57AC, which relates to the content and preparation of trial witness statements in the Business and Property Courts of England and Wales, does not apply to applications under CPR Pt 64 (ie the

majority of the applications covered in this chapter). However, it is open to the court to order that PD 57AC should apply and if so care should be taken to ensure that evidence is compliant.

Expert evidence may be required to establish the breach of trust or the extent of the loss. For example, evidence may be needed on the standard of care a prudent man of business would have demonstrated given the circumstances, the value of an asset, or the quality of an investment. Experts cannot be called to give evidence without the court's permission under CPR Pt 35. When parties apply for permission, they must provide an estimate of the costs of the proposed expert evidence and identify – (a) the field in which expert evidence is required and the issues which the expert evidence will address; and (b) where practicable, the name of the proposed expert (CPR r 35.4).

The court may limit the fees of experts and expenses that may be recovered and can direct that there should be only one expert. The court has power to order a party to provide information to enable an expert to be instructed if that party has access to information which is not reasonably available to the other. The parties can put written questions to the expert of the other party or to a single joint expert in order to clarify the expert's report (which must be proportionate) within 28 days of service of the report (CPR r 35.6). Such questions must be put once only and must be for the purpose of clarification of the report. The court can direct discussions between experts to identify or narrow the issues and reach agreement if possible. The court may also direct the preparation of a statement as to the issues agreed between the experts. If they have been unable to agree, they may be obliged to state their reasons (CPR r 35.12). Where experts reach agreement on an issue during their discussions, the agreement shall not bind the parties unless the parties expressly agree to be bound by it (CPR r 35.12(5)).

It is open to the court to direct that experts give their evidence concurrently (known as 'hot tubbing'). CPR PD 35 11.2 to 11.4 sets out the procedure for the giving of concurrent expert evidence.

Experts' reports must be verified by statements of truth (CPR PD 35.3.3). An expert must state that he understands his duty to the court (and it is quite clear under the Rules that an expert's overriding duty is to assist the court) and provide a summary of his instructions (CPR PD 35.3.2(3) and 35.3.2(9)(a)), as well as complying with the other requirements of CPR PD 35.3.1, 3.2 and 3.3.

**Preparation for trial**

**[H1.30]**  Preparation for trial will take place in accordance with the directions given by the court pursuant to receiving a pre-trial checklist, or at a pre-trial review. Unless the court otherwise orders, the claimant must file the trial bundle not more than seven and not less than three days before the trial. Practice Direction 39A.3.2 sets out in detail what the trial bundle is to consist of. The originals of any documents in the trial bundle should be available at the trial (CPR PD 39A.3.3).

The claimant beneficiary should check that all the steps which should be taken in advance of the trial have been taken such as whether:

•  all relevant documents have been disclosed and the opponent's documents inspected;

- all relevant statements (verified by statement of truth) have been exchanged and witnesses warned as to when they may be required to testify;
- any further information needed has been requested from the trustees;
- any necessary amendments have been made to the statements of case (verified by statement of truth);
- expert reports have been exchanged (verified by statement of truth), questions asked of the trustees' experts and any directions as to meetings and preparation of statements complied with;
- notices to admit facts or Civil Evidence Act notices have been served; and
- trial bundles and, if these are voluminous, a small core bundle of key documents has been prepared.

## Grounds of defence by trustees

**[H1.31]**  A number of defences may be raised by defendant trustees:

### On the merits of the claim

**[H1.32]**  The trustees' defence may be that there was no breach of duty or that, if there was, no loss resulted. The beneficiary may be unable to prove the causative link between the breach complained of and the loss.

### Consent/waiver/acquiescence/impounding

**[H1.33]**  If a beneficiary consents to or acquiesces in a breach of trust he cannot subsequently complain about it. A trustee will not be able to defend on this basis unless the beneficiary was competent to acquiesce, knowing the facts and surrounding circumstances. Beneficiaries should be aware that trustees can exercise their right to impound the interest of any beneficiary who has instigated a breach of trust. Generally, trustees are wary of exercising their equitable right to impound rather than seek a direction of the court to impound under section 62 of the Trustee Act 1925: this can be ordered only if the instigation, request or consent is in writing. A trustee is unlikely to exercise his right to impound where the beneficiary's interest is not in possession or he is a discretionary object. Acquiescence or consent on the part of one beneficiary does not prevent action being taken by others.

If a beneficiary confirms a trustee's actions or releases him from liability the trustee is protected from subsequent action by that beneficiary. A release may be inferred from conduct. A beneficiary who has consented or acquiesced in a breach of trust or released the trustee from liability should not be able to benefit from breach of trust proceedings brought by other beneficiaries (*Re Somerset* [1894] 1 Ch 231).

### Court order

**[H1.34]**  If the action complained of has been specifically authorised by the court the trustees will be able successfully to defend the action provided that in

seeking the order of the court they brought the full relevant matters to its attention. The order may have been a direction pursuant to CPR Pt 64.2 or approval of a specific course of action pursuant to section 57 of the Trustee Act 1925. However, *AAA Children's Trust, In the matter of (Judgment 292/2014)*, (2014), unreported, a decision from 2014 (judgement 292/2014) the court held it was impossible to bless the proposed transaction as, although the court could not conclude that the decision was one that no reasonable trustee could properly take, the lack of contemporaneous evidence provided by the trustee meant that the court could not bless it.

Other court orders that may be relied upon by trustees in defending breach of trust actions, include authorisation by the court (pursuant to its inherent jurisdiction) to take remuneration or orders varying the trust under the Variation of Trusts Act 1958.

### *Exemption or exculpation clauses*

**[H1.35]**   The settlor may have provided that the scope of the trustees' duties in respect of certain matters – such as the oversight of a private limited company in which the trust held a majority shareholding – should be limited or may have inserted an exculpatory or exoneration clause relieving trustees from liability to make good loss as the result of breach of trust occasioned other than through, for example, gross negligence, wilful default or fraud.

Under English law exculpation clauses are valid provided that the trustees are not thereby relieved from liability for dishonesty or fraud (*Armitage v Nurse* [1997] 2 All ER 705 and *Bogg v Raper* (1998/99) 1 ITELR 267). But see Lady Hales' judgment in *Spread Trustee Co Ltd v Hutcheson* [2011] UKPC 13, [2012] 2 AC 194, [2012] 1 All ER 251 in which she held that the law of England at the relevant time of the claim (1989) was not clear as to whether liability for gross negligence could be excluded and that the reasoning of Millett LJ in *Armitage v Nurse* was open to criticism, implicitly implying that she considered it may not have been correctly decided (particularly para 137). 'Dishonesty' means acting in a way the trustee appreciated was not in the interests of the beneficiaries or where he was reckless as to whether or not it was in the interests of the beneficiaries as a whole. Such a clause will be construed in favour of the beneficiaries in the event of ambiguity (*Wight v Olswang (No 2)* [2001] WTLR 291). An exoneration clause relieving a trustee of liability for acts, except wilful default or fraud, will not protect a trustee from acts of dishonesty, such as committing a breach of trust knowing that it is contrary to the interests of the beneficiaries or being recklessly indifferent whether it is contrary to their interests or not (*Armitage v Nurse* [1997] 2 All ER 705 and *Walker v Stones* [2000] 4 All ER 412 and in the Jersey case of *Fattal v Walbrook Trustees (Jersey) Ltd* [2010] EWHC 2767 (Ch), and subsequently *Sofer v SwissIndependent Trustees SA* [2020] EWCA Civ 699).

'Anti-Bartlett' clauses arising in response to *Bartlett v Barclays Bank Trust Co Ltd (No 2)* [1980] 2 All ER 92 and limiting a trustee's obligation to intervene in the affairs of a private limited company in which the trust holds a majority shareholding are also commonly relied upon by trustees defending breach of duty claims. In *Zhang Hong Li v DBS Bank (Hong Kong) Ltd* [2019]

HKCFA 45, the Hong Kong Court of final appeal overturned a decision of the first instance court in which the trustee was found to be liable for investment losses incurred in an underlying investment company because it had failed to exercise its 'high level supervisory' function. At Court of Appeal level, the trustee successfully relied on the widely worded anti-bartlett clause in the trust deed which arguably excluded both the trustee's obligation and power to intervene in the affairs of the investment company. It is worth noting that the terms of that particular clause were unusually wide, and aspects of the wider claim quite unattractive which may have contributed to the result.

Law Commission guidance is that professional bodies should adopt a model rule to the effect that 'a paid trustee or trust draftsman proposing to include such a clause should take reasonable steps to ensure that the person creating the trust is aware of the meaning and effect of the clause before the trust is created'. This guidance has been accepted by the Society of Trust and Estate Practitioners (STEP).

Beneficiaries of a trust which incorporates a widely drawn exculpatory clause should be very wary of issuing proceedings or, if in doubt as to the effect of the clause, should seek the court's decision on this point as a preliminary issue.

### *Limitation/laches*

**[H1.36]** A breach of trust will be statute-barred if proceedings are brought more than six years after the date on which the right of action accrued (Limitation Act 1980 ('LA 1980'), s 21(3)).

If a beneficiary could not bring a claim because it is statute-barred as against him he cannot benefit from judgment secured by another beneficiary (LA 1980, s 21(4) and *Re Somerset* [1894] 1 Ch 231).

The six-year time bar does not apply:

* where the beneficiary has a future interest which has not yet fallen in (LA 1980, s 21(3) and *Armitage v Nurse* [1997] 2 All ER 705);
* in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy (LA 1980, s 21(1));
* to actions to recover trust property or the proceeds of trust property in the possession of the trustee or previously received by him and converted to his use (LA 1980, s 21(1));
* where an action is brought for an account on the basis of an ongoing fiduciary relationship rather than because of a breach of trust which is statute-barred (see **H1.8** above);
* where the trustees have deliberately concealed from the claimant his right of action, in which case the limitation period does not start to run until the beneficiary has discovered the right of action, or could with reasonable diligence have discovered it (LA 1980, s 32(1)). 'Reasonable diligence' may not require a claimant to have carried out searches, such as at the Land Registry or Companies House when conducting his enquiries (*Arif v Sanger* [2021] EWHC 1183 (QB)). In *Cave v Robinson Jarvis & Rolf (a firm)* [2002] 2 All ER 641, the House of Lords

confirmed that this deprivation of a limitation defence only applies where the defendant takes active steps to conceal his own breach of duty after he has become aware of it and where he is guilty of deliberate wrongdoing and conceals it or fails to disclose it in circumstances where it is unlikely to be discovered for some time: it does not apply where the defendant does not realise that he is in error. See, for example, *A-G of Zambia (for and on behalf of the Republic of Zambia) v Meer Care & Desai (a firm)* [2007] EWHC 952 (Ch), [2007] All ER (D) 97 (May) particularly paras 388–393 and 410 (and in general the 'Limitation Section' of the judgment) and *Canada Square Operations Ltd v Potter* [2021] EWCA Civ 339. Further in *Sheldon v RHM Outhwaite (Underwriting Agencies) Ltd* [1995] 2 WLR 570, the House of Lords made it clear that section 32(1) covered both the situation where the concealment happened at the same time as the accrual of the cause of action and the situation where it occurred subsequently;

- where the action is for relief from the consequences of a mistake (whether of fact or law), in which case time does not start to run until the mistake is discovered or could with reasonable diligence have been discovered by the beneficiary (LA 1980, s 32(1));
- where the beneficiary was under a disability (a child or patient) when the cause of action accrued, in which case time does not start to run until the disability ceases or the person under disability has died (LA 1980, s 28(1)) see, for example, *Seaton v Seddon* [2012] EWHC 735 (Ch), [2013] 1 All ER 29, [2012] 1 WLR 3636 as to s 28(1) but also s 38(2) of the Limitation Act 1980;
- where the action is for a declaration that a particular transaction was invalid, such as where there has been a fraud on a power of appointment.

Previously where a trustee had committed a breach of fiduciary duty rather than a breach of trust, such as by purchasing property from the trust or otherwise profiting by the trust property, the six-year bar would not apply (see *Tito v Waddell (No 2)* [1977] 3 All ER 129). However, in *Gwembe Valley Development Co Ltd v Koshy* [2004] WTLR 97, the Court of Appeal made clear that breaches of the self-dealing rule and fair-dealing rule will fall within the scope of section 21 of the Limitation Act 1980 (see also *First Subsea Ltd (formerly BSW Ltd) v Balltec Ltd* [2017] EWCA Civ 186, [2018] Ch 25 and the subsequent discussion on these principles in *Davies v Ford* [2020] EWHC 686 (Ch)).

The six-year time rule is much less likely to bar action against trustees for breach of trust than it would in making a contractual or tortious claim, not least because it is common for children to be affected by the breach of trust and time will not run against them until they become of age.

Claims in respect of which no limitation period is prescribed by statute (such as claims arising from a breach of the self-dealing or fair dealing rules) may be prevented from being brought by the application of the equitable doctrine of *laches*. *Laches* may be pleaded where there has been a considerable lapse of time and the circumstances are such that either the person complaining has effectively waived the breach or his neglect of pursuing his remedy has placed the trustee in a position where it would not be reasonable to require him to compensate for the breach (*Lindsay Petroleum Co v Hurd* (1874) LR 5 PC 221

and *Nelson v Rye* [1996] 2 All ER 186). If the court finds that *laches* applies, the claimant will be unable to pursue his claim: the effect is similar to that where a claim is held to be statute barred. If the claim is analogous to a breach of trust or breach of contract claim which is statue barred, the claimant may not be able to pursue his claim (*Coulthard v Disco Mix Club Ltd* [1999] 2 All ER 457).

The position in relation to limitation on dishonest assistance and knowing receipt was addressed by the Supreme Court in *Williams v Central Bank of Nigeria* [2014] UKSC 10, [2014] 2 All ER 489, [2014] 2 WLR 355. The court considered two questions – (1) Does the term 'trustee' for the purposes of s 21(1)(a) of the Limitation Act 1980 include a stranger to the trust who is liable to account on the grounds of either knowing receipt or dishonest assistance? (2) Does an action 'in respect of' any fraud or fraudulent breach of trust under section 21(1)(a) of the Limitation Act 1980 to which the trustee was a party or privy, include an action against a party which is not itself a trustee? The answer to both questions was 'no' and therefore claims against the Central Bank were time barred. The question of limitation in dishonest assistance was looked at again in *Nolan v Minerva* [2014] JRC 078A (Jersey). In that case the court found that the nature of a dishonest assistance claim is so close to that of accessory liability in the context of economic torts that it was appropriate to apply a three-year limitation period by analogy rather than the ten-year period under the Jersey provision that ten years is the period for all personal actions save those where an alternative limitation period had been held to be subject to a different period or where some other period is clearly applicable by analogy.

### Reimbursement and indemnity under the Trustee Act 2000

**[H1.37]** Under section 30 of the Trustee Act 1925, which has now been repealed, a trustee was responsible only for assets actually received by him and accordingly not for the actions of another trustee or an agent unless he is also at fault, such as where he does not take proper steps to ensure that a co-trustee to whom he has given trust property deals with it properly. This section protected an innocent trustee from actions by beneficiaries but did not afford protection against third party claims. Under section 31 of the Trustee Act 2000 a trustee is entitled to his expenses incurred when acting on behalf of the trust. The provision applies in relation to trustees exercising a duly authorised function as an agent, nominee or custodian. Where there is a simple trust, the beneficiaries are under an obligation to indemnify the trustees. Again, this offers protection to a trustee from actions by beneficiaries but not necessarily against third party claims.

### Advertisement under section 27 of the Trustee Act 1925

**[H1.38]** Before distributing trustees may have placed an advertisement in the *Gazette* and a local newspaper for claims to be notified to them within a limited period. If they received no notification of claims pursuant to the advertisement they are not liable to claimants who appear subsequently unless they had some notice of the claim at the time of distribution.

### Relief from liability under section 61 of the Trustee Act 1925

**[H1.39]** If trustees can satisfy the court that they acted honestly and reasonably and ought fairly to be excused not only for the breach of trust but also for failing to obtain the court's directions on the matter in question the court has a discretion as to whether or not to relieve them from liability either wholly or in part (Trustee Act 1925, s 61). It is more difficult for a professional trustee to secure relief (*Re Waterman's Will Trust* [1952] 2 All ER 1054 and *Bartlett v Barclays Bank Trust Co Ltd (No 2)* [1980] 2 All ER 92).

It is common for trustees to seek relief from liability under section 61 in circumstances where they were honest and may have been reasonable in relation to the breach of trust but where they will have considerable difficulty showing that they acted reasonably in failing to secure the court's directions. In such cases the court may not exercise its discretion in their favour. In the case of charitable trusts, partial and/ or conditional relief may be granted under section 191 of the Charities Act 2011.

## Remedies

### Restitution of the trust fund/equitable compensation

**[H1.40]** As detailed at **H1.14** above, the liability of a trustee who is not relieved pursuant to section 61 of the Trustee Act 1925 is to restore to the trust fund the losses sustained or to pay equitable compensation to a particular beneficiary who has suffered loss. Liability for breach of trust can be more extensive than liability for damages: it will be based on the actual loss required to be restored to the fund or paid by way of equitable compensation to a particular beneficiary who has lost out. (An example of the latter is where only income has been lost and the loss can be made good by paying compensation to the life tenant.)

Where a trustee has used trust money for his own purposes the beneficiary has a choice as to whether to require the trustee to restore the trust fund or to account for the profit resulting from the use of the funds.

Interest on income lost to the trust fund is usually awarded at the short-term investment account rate (*Bartlett v Barclays Bank Trust Co Ltd (No 2)* [1980] 2 All ER 92). But if there has been positive misapplication of trust funds (such as the trustee using the trust money for his own purposes) a commercial rate of interest (usually 1% above base rate) is usually awarded, to be compounded yearly (*Wallersteiner v Moir (No 2)* [1975] 1 All ER 849).

As noted above, *Watson v Kea Investments* [2019] EWCA Civ 1759 provides confirmation that the courts can award equitable interest so as to put a trust claimant into the position it would have been in had its money been invested in proper trustee investments. In addition, the judgment sets out – by reference to investment indices – the formula for calculating such awards. (See also *Tuke v Hood* [2021] EWCA Civ 23.)

### Injunction

**[H1.41]**  The court can grant interim and final injunctions pursuant to section 37(1) of the Senior Courts Act 1981. An interim injunction may be granted at an early stage to prevent a continuing breach of trust, to preserve a trust fund or to prevent potential dissipation of assets (a freezing injunction) (see **H1.26** above).

A lighter touch alternative to an injunction might be for a beneficiary to apply to the court for a determination of whether a proposed action is within the trustee's powers. There will be relatively limited circumstances where a beneficiary has notice that the action is sufficiently imminent for an application to be justified, but has sufficient time to make that application.

### Removal

**[H1.42]**  The trustees will not be removed simply because they have committed a breach of trust unless the court considers that otherwise the trust will not be properly executed in the interests of the beneficiaries (*Re Wrightson* [1908] 1 Ch 789). Removal is dealt with in more detail at **H1.45** below. As detailed at **H1.16** above if a beneficiary wishes to seek the removal of a trustee, other beneficiaries or representatives of them will need to be joined to the proceedings.

### Compromise

**[H1.43]**  At any stage up to the delivery of judgment parties to a breach of trust action may decide to compromise a claim. The consent of all parties to the proceedings is necessary to bring the proceedings to an end. If the claimant beneficiary wishes to accept an offer from only one of the trustee defendants he should try to secure the agreement of the other defendants to the compromise, failing which he may have to discontinue proceedings against them and bear their costs.

Parties to proceedings who are not under a disability can settle their claims without approval of the court although it is common to seek an order encapsulating the compromise or an order providing for the proceedings to be stayed upon terms agreed and set out in a schedule (known as a Tomlin order). If the compromise affects the interests of children or patients the court's approval should be secured in accordance with CPR Part 21. An application is made, returnable before a Master (or, if during the course of the trial, before the judge) seeking the court's approval on behalf of the child or patient. Representations are made by the lawyers for the child or patient as to whether the proposed compromise is in their interest. It is usual for the court to wish to hear the views of counsel instructed for the child/patient or to receive his opinion and to see a copy of any financial advice. The hearing should take place without the representatives of other parties being present: see *Federated Pension Services Ltd v Midland Bank Trustee (Jersey) Ltd* (unreported, 1997 (PC)).

In the case of a patient who is subject to the Court of Protection, that court's approval must be sought (CPR r 21.10).

Charities can agree to compromise. They may wish to secure an order or letter of opinion and advice pursuant to sections 105 and 110 of the Charities Act 2011. If the Attorney-General is involved in the proceedings his consent must also be obtained.

## Costs

**[H1.44]**  The court has, as always, a discretion as to whether to order costs, and if so, what order to make. The general rule remains that the unsuccessful party pays the costs of the successful party, but CPR r 44.2 makes it clear the court can make a different order. In deciding what (if any) order to make the court must have regard to all the circumstances, including the conduct of all the parties, whether a party has succeeded in only part of the case (even if not wholly successful), and any admissible offer to settle made by a party which is drawn to the court's attention, and which is not an offer to which costs consequences under Part 36 apply (CPR r 44.2).

The conduct which the court takes into account is conduct before as well as during the proceedings, and in particular the extent to which the parties followed the Practice Direction – Pre-Action Conduct or any relevant pre-action protocol, whether a party acted reasonably in raising, pursuing or contesting an issue, the manner in which the claim was pursued/defended, and whether a successful party exaggerated its claim (CPR r 44.2(5)).

The rules require parties in Pt 7 of multi-track cases with a value of less than £10 million to file and exchange costs budgets (CPR 3.12 and 3.13 and PD 3E A1). In cases not covered by CPR 3.12 and 3.13, the court has a discretion to make an order requiring the parties to file and exchange costs budgets (CPR PD 3E A2).

Unless the court orders otherwise, all parties (except litigants in person) must file and exchange budgets as required by the rules or as the court directs. Each party must do so by the date specified in the notice served under r 26.3(1) or, if no such date is specified, seven days before the first case management conference (r 3.13). There is a statement of truth that must be signed by a senior legal representative. Failure to file a budget despite being required to do so will be treated as having filed a budget comprising only the applicable court fees (CPR 3.14).

The court may decide to actively manage the costs of the dispute by way of a costs management order (r 3.15).

On assessment on the standard basis, the court will have regard to the last approved budget or any budgets previously filed (CPR r 3.18).

Costs can be awarded on the standard or indemnity basis. Where costs are allowed on the standard basis they will only be allowed if proportionate to the matters in issue and generally, where costs are subject to a costs management regime, the court will not award costs that depart from budget unless satisfied there is a good reason for doing so (CPR r 3.18(b)). Any doubt as to whether costs were proportionately and reasonably incurred, or were of a proportionate

and reasonable amount, is resolved in favour of the paying party (CPR r 44.3(2)(b)). Costs will be proportionate if they bear a reasonable relationship to: (a) the sums in issue; (b) the value of any non-monetary relief in issue in the proceedings; (c) the complexity of the litigation; (d) any additional work generated by the conduct of the paying party; (e) any wider factors involved in the proceedings such as reputation or public importance (CPR r 44.3(5)). The procedure for applying the test of proportionality is also set out in CPR r 44.3(2) and makes clear that costs that are disproportionate in amount may be disallowed or reduced even if they were reasonably or necessarily incurred. This reverses the guidance on proportionality set out by the Court of Appeal in *Lownds v Home Office* [2002] EWCA Civ 365, [2002] 4 All ER 775, [2002] 1 WLR 2450 (which allowed disproportionate costs if they were shown to be necessarily incurred).

Where costs are awarded on the indemnity basis any doubt as to whether the costs were reasonably incurred, or were reasonable in amount, is resolved in favour of the receiving party (CPR r 44.3(3)). The concept of proportionality does not apply to indemnity basis costs (but see para 42 of judgment in *Courtwell Properties Ltd v Glencore PF (UK) Ltd* [2014] EWHC 184 (TCC), [2014] All ER (D) 107 (Mar). It does however apply on the standard or indemnity basis where the court will not allow costs unreasonably incurred or unreasonable in amount.

The Practice Direction on pre-action conduct makes it clear that if, in the opinion of the court, failure to act in compliance with any protocol (or, if the case is not covered by a protocol, in accordance with the requirements of section 4 of the Practice Direction on pre-action conduct) has led to the commencement of unnecessary proceedings, or to costs being unnecessarily incurred, the party at fault can be ordered to pay part or all of the costs of the proceedings on the indemnity basis, can be deprived of costs, or can be ordered to pay a higher rate of interest than usual. Accordingly, if trustees have behaved in a manner which the court considers is not in accordance with the overriding objective (such as by withholding documentation and information which could have assisted in resolving the claim, or have otherwise conducted proceedings in a high-handed manner) they may be ordered to pay the claimant beneficiary's costs on the indemnity basis. Conversely, if the beneficiary does not endeavour to resolve the issue amicably before issuing proceedings, or has unreasonably declined any attempt at mediation, or conducts proceedings in an unnecessarily aggressive and expensive fashion, he may be disallowed some or all of his costs. If he is awarded standard basis costs a substantial portion of his costs may not be allowed on the basis that they were disproportionate: this is an issue which may be addressed on assessment.

If the claimant beneficiary does not succeed in making out his claims, he is most likely to be ordered to pay the defendant trustees' costs on the standard basis, but, as detailed above, could be ordered to pay them on the indemnity basis. If, as is usual, standard basis costs are awarded, the trustees will almost invariably be allowed to collect the difference between the costs recovered from the claimant and their indemnity basis costs (usually subject to detailed assessment) from the trust fund. The trustees may, in exceptional circumstances, be separately represented and each allowed their costs. The claimant beneficiary may also be ordered to pay the costs of the other parties joined to the proceedings, or

**[H1.44]**  Action by Disgruntled Beneficiaries

their costs may be allowed from the fund, usually on the standard basis. Accordingly, the financial impact on the losing claimant's own resources may be considerable. The trust fund may also be depleted. (See below for details on costs capping and the requirement to file and serve a notice of intention to recover costs from a trust fund with the first statement of case (Pt 7 claim) or with the evidence (Pt 8 claim), along with a costs budget.) The claimant beneficiary should also be aware that he may have to pay any costs ordered against him very quickly after judgment. In accordance with CPR r 44.6, the court can order summary assessment of costs at the trial – if it is less than a day in length – as an alternative to detailed assessment. Although detailed assessment can take some time, the court may issue an interim costs certificate or order that a sum on account of costs be paid into court.

The claimant beneficiary must also be very careful to give proper consideration to the effect of any offer under CPR Part 36 to settle. Such an offer could be to accept liability up to a given proportion or to pay a specific sum to the trust fund or by way of equitable compensation. If the claimant fails to beat the offer the court is likely to order the claimant to pay the costs plus interest not exceeding 10% above base cost as well as interest on any sum of money awarded of the defendants from the latest date on which he could have accepted the offer.

A claimant beneficiary can also put the trustees at risk on costs and interest by making a Part 36 offer to settle on specific terms. If the trustees are held liable to pay more than the claimant beneficiary was prepared to accept the courts can order the trustees to pay the claimant beneficiary's costs on the indemnity basis. The court can also penalise the trustees by ordering them to pay a considerably higher than normal rate of interest, not exceeding 10% over base rate. Further the court can award interest on the whole or part of any sum of money awarded at a rate not exceeding 10% over base rate. Finally, additional sanctions were introduced in 2013 for defendants failing to beat a claimant's offer whereby an additional amount not exceeding £75,000 is payable to the claimant. The additional amount will depend on the type of claim (whether money or non-money) and is calculated by applying a gradated percentage on the amount awarded according to a formula set out in CPR 36.14(3)(d).

In exceptional cases, the court may make a prospective costs order in favour of the beneficiary(ies) bringing the action against the trustee(s) for the benefit of the trust fund. The court will require to be satisfied that there is a sufficient case for investigation such as to warrant the trust fund paying the costs of the beneficiary(ies) (see *McDonald v Horn* [1995] 1 All ER 961, [1995] ICR 685, CA and *Machin v National Power plc* [2001] WTLR 741). Where a claim analogous to a derivative action brought by a shareholder under an exception to the rule in *Foss v Harbottle* [1843] 2 Hare 461 is made, then those costs principles have been applied to a claim by a beneficiary on behalf of a trust (*McDonald v Horn* [1995] 1 All ER 961) as well as a minority shareholder having reasonable grounds for a claim, being indemnified by the company for costs incurred (*Wallersteiner v Moir (No 2)* 1975 QB 373, [1975] 1 All ER 849, CA). An example of beneficiaries suing in the trusts' interest is *Bayley v SG Associates* [2014] EWHC 782 (Ch), [2014] WTLR 1315, the court held that an investment adviser was in breach of its contractual and tortuous duties to a corporate trustee and the beneficiaries were able to enforce the trustee's claims against the adviser as derivative claims. The Jersey case, *In the Matter of the X*

*Trust* [2012] JRC 171 establishes that there will be instances where beneficiaries bringing a claim against trustees are entitled to seek orders that they be funded by the trust fund, where it is in the best interests of the trust and the beneficiaries as a whole to do so. The application must be made by the beneficiary(ies) on notice to the trustee(s).

Breach of trust proceedings are complex and expensive. A disgruntled beneficiary should consider the potential costs implications very carefully before launching proceedings where the merits are not reasonably clear. The beneficiary should also have attempted to settle or mediate (see **H1.54**). During the course of the proceedings, the beneficiary must ensure that he/she conducts him/herself reasonably and does not incur costs which are disproportionate to the matters at issue if the beneficiary is to have the best chance of recovering most of his costs.

In some circumstances, cost capping orders may be made. CPR rule 3.19 defines a costs capping order as limiting the amount of future costs (including disbursements) which a party may recover under an order for costs subsequently made. 'Future costs' means costs incurred in respect of work done after the date of the costs capping order but excluding the amount of any additional liability. The court may consider whether to make a costs capping order at its own initiative. Such orders can be made for the whole litigation or for particular issues. PD 3F provides that the court will only make a costs capping order in exceptional circumstances. The party must show that it would be in the interests of justice to grant the costs capping order and that, without such an order, there is a substantial risk that costs will be disproportionately incurred and the court is not satisfied that this risk can be adequately controlled by case management and detailed assessment of costs (CPR r 44.18(5)). If the costs capping order is granted, then the paying party cannot be expected to pay more than the amount of the cap unless the party successfully applies to vary the order.

PD 3F requires that, in order that the parties may consider whether to apply for a costs capping order, any party to proceedings relating to trust funds, who intends to apply for such an order, must file and serve on all other parties written notice of that intention together with a budget of costs likely to be incurred by that party either with the first statement of case (in a Part 7 claim) or with the evidence (in a Part 8 claim). The rules have been differently interpreted but can be read to indicate that even where a costs capping order is not anticipated by the parties, in any case where a party proposes to recover costs from the trust fund, notice must be served of that intention, together with a costs estimate.

## Action for removal of trustees

### *Grounds for removal*

**[H1.45]** Disaffected beneficiaries often wish to remove trustees or protectors from office. If a trustee/protector recognises that the relationship of trust and confidence between him and the beneficiaries has broken down, he should be prepared to retire: if not, the court may remove him (*Letterstedt v Broers* (1884) 9 App Cas 371; the Jersey cases of and *Carafe Trust v Guardian Trust Co Ltd*

**[H1.45]**  Action by Disgruntled Beneficiaries

[2005] JRC 63; *Walker v Walker* [2010] WTLR 1617; and *In the Matter of the Re A Trust* [2012] JRC 169A). In the Carafe Trust case, a breakdown of confidence was only one of the factors contributing to the removal of the trustee. Indeed, in *Kershaw v Micklethwaite* [2010] EWHC 506 (Ch) [at 11], a breakdown in confidence between a beneficiary and an executor was not, of itself, a good reason for removing the executor – but was a factor to be taken into account, although in the instant case, it was not enough to have the executor removed. Other factors were a breach of trust by the trustee, a refusal to retire when asked and charging excessive fees. For further examples of this principle, see *Brookman (decd), Re* [2021] EWHC 2861 (Ch); *Otubu (decd), Re* [2021] EWHC 1354 (Ch).

As a matter of interest, the same principles apply to the removal of protectors. See *In the Matter of the Re A Trust* [2012] JRC 169A where the Jersey Court removed a protector, applying the principles in *Letterstedt v Broers*. And also *Re The K Trust* Guernsey Judgment 31/2015.

A trustee may be removed without the assistance of the court. There may be an express power in the settlement. The statutory powers under sections 36 and 37 of the Trustee Act 1925 may provide a remedy and enable a trustee to be replaced if they: (i) have remained out of the jurisdiction for more than 12 months consecutively; (ii) refuse or are unfit to act; (iii) are dead; or (iv) are incapable of acting. (It should be noted that the Court of Protection may be involved if a trustee lacks the mental capacity to act – see sections 36(9) and 54(2) of the Trustee Act 1925). Where all beneficiaries are of full age and capacity, and together are absolutely entitled, they are permitted under sections 19 and 20 of the TLATA 1996 to unanimously agree to the retirement of a trustee or trustees and the appointment of some other person (either in addition or in substitution for such trustees). However, this power will not be available to trustees where the trust deed excludes the operation of section 19.

But if none of these provisions affords the dissatisfied beneficiary a remedy, he will wish to look to the court's inherent jurisdiction over trustees and section 41 of the Trustee Act 1925. The court will not remove a trustee from office lightly, even if a breach of trust has been committed, unless it considers that the trust property will be unsafe or that the trust will not be properly executed in the interests of the beneficiaries if the trustee remains in office. It is not necessary for an applicant to show deliberate default on the part of the trustees (*Jones v Firkin-Flood* [2008] EWHC 2417 (Ch), *Caldicott v Richards* [2020] EWHC 767 (Ch)) and merely proving breaches of trust have been committed may be insufficient to justify removal of trustees (as indicated by the New Zealand case of *Kain v Hutton* [2007] NZCA 199; affirmed in *Little v Howick Trustee DL Ltd* [2018] NZHC 1884). In the absence of dishonesty or deliberate breach, demonstration of collective unfitness will suffice, although notably in *Rafferty v Philp* [2011] EWHC 709 (Ch), the court did not remove the trustee despite having improperly claimed the trust property for herself; she was given a second chance with the benefit of having had her duty explained to her.

### *Judicial trustees*

**[H1.46]**  If necessary, a beneficiary may apply by way of a Pt 8 claim or as an application in existing proceedings for the appointment of a judicial trustee

(Judicial Trustees Act 1896). For instance, it may be necessary where an urgent situation arises, particularly where the trustees cannot pull together or where the trustees are about to act while labouring under a conflict of interest or duty. Beneficiaries may also apply to the court in reliance of this statute on the basis that the trustee has failed to execute a trust properly for the welfare of the beneficial class (*Thomas & Agnes Carvel Foundation v Carvel* [2007] EWHC 1314 (Ch)). A judicial trustee can seek the court's directions informally and quickly without attending court. The disadvantage of having to provide security has largely fallen away, given that most judicial trustees are professionals carrying indemnity insurance. However, the procedure is still rather more expensive than the appointment of an ordinary replacement trustee because a judicial trustee must submit his accounts for court approval.

### Removal under section 41 of the Trustee Act 1925 or court's inherent power

#### Procedure

**[H1.47]** A detailed letter before action, setting out the grounds for removal and inviting the trustees to retire is essential. It is also essential to give sufficient time for the trustees to consider and respond before issuing.

For the court to remove trustees pursuant to a Pt 8 claim under section 41 of the Trustee Act 1925, there must be no real dispute as to fact and no other means by which a trustee may be substituted. See, for example, *Barclay v Smith* [2016] EWHC 210 (Ch) where substitution and re-appointment of trustees were ordered under the inherent jurisdiction of the court to avoid the 'restrictions' imposed by s 41(1) of the Trustee Act 1925. However, the court also held that it would have found that it was 'inexpedient and impracticable, in the circumstances, to make the appointment out of Court . . . ' so that the court could have made the substitutions and re-appointments under section 41. Where facts are in dispute the beneficiary needs to invoke the court's inherent jurisdiction over trustees by an action for administration (CPR 64.2) or an ordinary claim, usually also seeking restitution/equitable compensation for breach of trust. The proceedings will be commenced in the Chancery Division of the High Court, or the county court if the trust fund does not exceed £350,000 in value (County Courts Act 1984, section 23). Ordinary claim procedure has been described briefly at **H1.19** above and Pt 8 procedure at **H1.5**. Evidence must be produced that the proposed replacement trustee(s) is/are willing to act. A document purporting to contain the written consent of a person to act as a trustee and to bear his signature, verified by some other person, is evidence of his consent to act. A witness statement of fitness (by a responsible, usually professional, person who has known the proposed trustee for a number of years and confirms that he has a good reputation and is suitable to act as a fiduciary) must be lodged and served. If a corporate trustee is proposed details of its scales of charging should be provided to the court. Under section 42 of the Trustee Act 1925, the court can authorise a replacement corporate trustee to charge remuneration.

The beneficiary will also wish to seek an order vesting the trust property in the new trustees to avoid difficulties arising subsequently as to handing over the

trust assets (see Trustee Act 1925, ss 44–56 and 58). Sections 54 and 55 of the Act, which deal with 'Jurisdiction in regard to mental patients' and 'Orders made upon certain allegations . . . ' (including lack of capacity) have been updated to reflect the Mental Capacity Act 2005.

The beneficiary wishing to remove the trustees will be the claimant and all trustees will be defendants. Since this is an application which affects beneficiaries generally, they should be joined or representatives of each class of beneficiary should be joined as defendants (see **H1.4** on representation orders).

It is common for the trustees' removal to be sought in a breach of trust action. The claimant(s) should consider whether to burden the proceedings by joining other beneficiaries or seeking representation orders or whether they should restrict the claim to the alleged breach of trust and only join the trustees. If a breach of trust is established or the trustees are criticised by the court the beneficiary could then issue proceedings (likely as a Pt 8 claim) seeking the trustees' removal. The other beneficiaries must then be joined or represented.

**Costs**

**[H1.48]**  An application for removal of trustees is a very hostile application and the usual rule, that costs follow the event, is likely to apply. If trustees are removed they will probably be ordered to pay the claimant's costs on the standard basis and an order will be made disentitling them from recovering their own costs from the trust fund. If they have acted unreasonably in the course of litigation resulting in unnecessary costs being incurred they may be ordered to pay the claimant beneficiary's costs on the indemnity basis. Similarly, if the court considers that the trustees should have retired at the outset instead of failing to comply with the complainant beneficiary's initial request, the trustees may be ordered to pay the claimant beneficiary's costs of having to bring the matter before the court. (See **H1.6** for a description of standard and indemnity basis costs.)

If the court considers that the application was unmeritorious the trustees will usually be allowed their costs from the fund on the indemnity basis in so far as not recovered from the claimant. The loser may also have to pay the costs of other parties, such as defendant beneficiaries, on the standard or possibly indemnity basis. The court may make no order as to costs in appropriate cases since it has a wide discretion as to what, if any, costs orders to make (CPR 44.2(1)). See, for example, *Fielden v Christie-Miller* [2015] EWHC 2940 (Ch) in relation to a Pt 20 claim, inter alia to remove trustees.

A beneficiary making such an application who intends to recover costs from the trust fund should ensure that intention to do so is served on the other parties, along with a costs estimate (as outlined at **H1.44**).

**Indemnity and liens**

**[H1.49]**  Problems frequently arise on retirement of trustees as to the scope of the indemnity to be given to them and disputed administration costs. There may also be a dispute as to which documents the outgoing trustee is obliged to hand over to his successor. Directions should be sought when applying for removal. It is always advisable to seek a vesting order.

Trustees are entitled to be paid their costs, charges and expenses in priority to the beneficiaries (and at least in Jersey, and pending a judgment of the Privy Council, in priority to creditors (*Representation of Rawlinson & Hunter Trustees SA re Z Trusts* [2019] (1) JLR 87)).They have a lien on the trust property in respect of such expenses and may be able to refuse to transfer property to new trustees until the lien is satisfied (see *Re Paulin's Settlement Trusts (No 2)* [1963] 1 All ER 857). The outgoing trustee usually seeks an indemnity from the new trustees before transferring trust property. Trustees might ask for payment of their costs and expenses, even if disputed, as a pre-condition to handing over the trust assets. Alternatively, they may seek an indemnity in much wider terms than necessary to protect their legitimate interests. See, for example, *Oakhurst Property Developments (Lowndes Sq No 2) Ltd v Blackstar (Isle of Man Ltd)* [2012] EWHC 1131 (Ch) where the outgoing trustee believed it might incur a future tax liability and the Court considered the risk sufficient to make an unusual order for their protection. Trustees will probably be regarded as behaving unreasonably if they refuse to hand over the trust assets until their disputed costs are paid in full but they can legitimately insist on security being provided for their costs pending determination of quantum, such as by taking an account or by detailed assessment by a costs judge. A beneficiary will not wish the outgoing trustee to be given an indemnity which protects him from breach of trust proceedings and/or in respect of all expenses however incurred and new trustees giving such an indemnity are probably committing a fraud on a power because they are benefiting a non-beneficiary. The beneficiary should be prepared for new trustees to give an indemnity for all proper trust expenses including contingent liabilities properly referable to the execution of the trust.

In *Close Trustees (Switzerland) SA v Castro* [2008] EWHC 1267 (Ch), the court considered whether it would be reasonable for trustees to exercise their power to retain income (in the context of breach of trust proceedings brought by the life tenant). It found that the reasonableness of the decision depended on various factors, including the uncertainty of whether the costs would be held to fall on income or capital, the likely amount of the costs, the life tenant's needs and her life expectancy.

**Trust records**

**[H1.50]** A further cause of disagreement may be handing over the trust files. Outgoing trustees may be reluctant to hand over all their files. If the new trustees do not receive the files they may not be alerted to the existence of a breach of trust committed by the outgoing trustees. *Tiger v Barclays Bank Ltd* [1952] 1 All ER 85 makes it clear that, to enable the new trustees to carry out their duties in respect of these breaches, the outgoing trustees can be required to produce trust documents. The precise documents to be handed over will depend on the circumstances of each case and the nature of the documents.

In the Jersey case of *Bird Charitable Trust and the Bird Purpose Trust, Re; Basel Trust Corpn (Channel Islands) Ltd v Ghirlandina Anstalt* [2012] JRC 006, 11 ITELR 157, the court found that as a successor trustee is stepping into the shoes of the retiring trustee, it is prima facie entitled to be placed in the same position

as the retiring trustee as far as possible; the onus is on the outgoing trustee to show that is not reasonably necessary for such disclosure to be made to the incoming trustee.

## Non-contentious methods

### *Voluntary retirement of trustees/removal without the assistance of the court*

**[H1.51]**  As detailed at **H1.45** above, if the relationship between beneficiaries and trustees has broken down the trustees should be prepared to retire voluntarily. Alternatively, they may be removed by the beneficiaries acting together, by express power or the statutory powers contained in sections 36–38 of the Trustee Act 1925 and sections 19 and 20 of the TLATA 1996. For section 20 to apply, the trustee to be replaced must lack capacity (within the meaning of the Mental Capacity Act 2005) to exercise his functions as a trustee.

### *Inspection of trust documents*

**[H1.52]**  The possibility of a beneficiary inspecting trust documents (unless curtailed by the settlement) is extremely useful and enables a disaffected beneficiary to check for himself (or through his solicitor) what steps have been and are being taken in the administration of the trust.

As set out at **H1.3** above, it has been said that a beneficiary has a 'right' to inspect such documents as part of his right to ensure that trustees account for their trusteeship and/or that beneficiaries have a quasi-proprietary interest in trust documents, as defined in the cases of *O'Rourke v Darbishire* [1920] All ER Rep 1 and *Re Londonderry's Settlement* [1964] 3 All ER 855. This principle is limited to the dispositive functions and cannot be used to withhold documents relating to trustees' administrative functions (*Lewis v Tamplin* [2018] EWHC 777 (Ch)).

As discussed at **H1.3** above, if the Privy Council decision in *Schmidt v Rosewood Trust Ltd* [2003] 3 All ER 76 is to be followed, the 'right' is no longer to be considered a right and certainly not a proprietary right, but rather a necessary part of the jurisdiction of the court to supervise trustees. It is arguable that there is a judicial trend towards disclosure but the question as to whether the *Schmidt* approach has ousted that outlined in *Re Londonderry* will not be resolved until the English Court of Appeal has considered the matter; *Breakspear* was a powerful although first instance judgment. The *Schmidt* decision also sets out that objects of a mere power under the trust may be able to inspect trust documents in appropriate circumstances. 'Trust documents' encompass all the formal settlement documents, accounts and vouchers, instructions to solicitors and counsel, legal advice and documents relating to the administration of the trust assets but not confidential documents and not usually documents revealing reasons for the exercise of the trustees' discretion. Accordingly, a beneficiary has no right to inspect letters of wishes unless they

can provide a compelling reason to depart from the general principle in *Re Londonderry's Settlement* (*Breakspear v Ackland* [2008] EWHC 220 (Ch)). Inspection of documents may reveal that the administration of the trust is in good order and that the problem is simply one of lack of communication between trustees and beneficiaries. Alternatively, it may reveal that some matters have been handled less than satisfactorily but no real loss has been sustained, that powers have not been exercised in accordance with the trust instrument, that the accounts are out of date or that a major breach of trust has occurred and substantial loss resulted. In the latter case, the beneficiary will have the considerable advantage of being able to collate most of the evidence needed to support a claim in advance of his claim.

Beneficiaries seeking to inspect trust documents should agree to be responsible for the cost of any photocopies requested during the course of or as a result of inspection. It is becoming common for trustees to require the file to be vetted in advance by the trust's solicitors to ensure that confidential material and documents relating to exercise of discretions are not inadvertently left with the papers. Some trustees ask the beneficiaries to defray those costs as a pre-condition to inspection. There does not appear to be any authority for a trustee to charge a beneficiary for putting his papers in order prior to inspection.

### Vetting of accounts by third party

**[H1.53]** Problems between trustees and beneficiaries often concern lack of accounts. If lay trustees are really out of their depth in providing accounting information the problem may be resolved by the trustees and beneficiary agreeing that an accountant or other professional should prepare or audit the accounts.

Section 13 of the Public Trustee Act 1906 provides that, unless the court orders otherwise, if an application is made to the Public Trustee (with notice to the trustees and beneficiaries), the accounts of a trust must be investigated and audited by a solicitor or accountant agreed on by the applicant and the trustees or, in default of agreement, by the Public Trustee or his appointee. This procedure has been rarely in recent times but can prove useful if the beneficiary has queries on the accounts. The investigation and audit cannot be carried out more frequently than once a year and the cost (including the remuneration of the auditor) will usually be borne out of the trust fund. The Public Trustee can order this general rule to be varied, ordering them to be borne by one or more of the parties. An appeal lies to a judge of the Chancery Division.

### Alternative dispute resolution

**[H1.54]** Where the parties to a potential trust dispute agree to resolve their differences without recourse to the courts ADR may be appropriate. This may involve arbitration, which may be binding on the parties to the arbitration, or the non-binding mediation process. If successful, these lead parties to binding and non-binding compromise agreements respectively. The parties should ensure that the arbitrator or mediator is a qualified arbitrator or mediator and it is usually advisable for him/her to be well-versed in trust law.

**[H1.54]** Action by Disgruntled Beneficiaries

ADR is not appropriate if one party is uncooperative or likely to obstruct or delay the dispute resolution; there are also serious problems with binding beneficiaries who are not parties to the ADR and with children and patients who are beneficiaries.

Given these problems, ADR is not used as frequently as it is in relation to commercial disputes. It will not always be the most appropriate in trust cases but where the beneficiaries are limited in number and both the beneficiaries and trustees are willing to participate, it may be a useful alternative to litigation. However, the Civil Procedure Rules make it clear that a party who conducts himself unreasonably before the proceedings are commenced is at risk as to costs (CPR r 44.2(5)) and all parties are urged to comply with the overriding objective of the Rules (see **H1.5** above). A party who is found to have unreasonably refused to participate in mediation may be denied costs that would otherwise have been awarded to him (*Halsey v Milton Keynes General NHS Trust; Steel v Joy* [2004] 4 All ER 920). See also *Garritt-Critchley v Rounan and Solarpower PV Ltd* [2014] EWHC 1774 (Ch) where defendants were ordered to pay claimants' costs on an indemnity basis for failure to engage in mediation and similarly in *BXB v Watch Tower and Bible Tract Society of Pennsylvania* [2020] EWHC 656 (QB) where a failure by the defendants to explain their refusal to engage in ADR led to the claimant's costs being assessed on the indemnity basis. See further *Wales (t/a Selective Investment Services) v CBRE Managed Services Ltd* [2020] EWHC 1050 (Comm) where a proportion of the defendant's costs were disallowed to penalise his repeated refusal to engage in mediation. The court's approach is clear.

The court will also consider applying a costs penalty for failing to engage in mediation in a timely manner although following *Car Giant Ltd v Mayor and Burgesses of the London Borough of Hammersmith* [2017] EWHC 464 (TCC), the court will consider there may be legitimate strategic decisions governing the timing of mediation. The claimants were entitled to take the strategic decision that delaying mediation to allow experts' views to be fully set out was justified to increase the mediation's chance of success. Accordingly, even if there is no relevant pre-action protocol with which the parties are expected to comply, they are expected to act reasonably in exchanging relevant information and documentation and try to avoid the necessity for litigation.