
Watson v Kea Investments Ltd

Overview | [2019] EWCA Civ 1759, | [2019] 4 WLR 145, | [2019] All ER (D) 147 (Oct)

# Watson v Kea Investments Ltd [2019] EWCA Civ 1759

Court of Appeal, Civil Division

McCombe, Hamblen LJJ and Sir Bernard Rix

23 October 2019

## Judgment

**Joseph Dalby (SC, Republic of Ireland) and Simon Harding** (instructed by Direct Access) for the Appellant

**Elizabeth Jones QC and Paul Adams** (instructed by Farrer & Co. LLP) for the Respondent

Hearing dates: 17 and 18 July 2019

- - - - - - - - - - - - - - - - - - - -

**Approved Judgment**

**Lord Justice McCombe:**

### <u>Introduction</u>

1. This is the appeal of Mr Eric Watson ("Mr Watson") from part of the Order of 13 September 2018 of Nugee J made after the trial of an action between the respondent, Kea Investments Limited ("Kea") and Sir Owen Glenn ("Sir Owen"), as claimants, against several defendants including Mr Watson and two companies called Novatrust Limited ("Novatrust") and Spartan Capital Limited ("Spartan"). Kea and Spartan were incorporated in the British Virgin Islands; Novatrust was incorporated in Jersey.

2. By paragraph 4 of his Order, the judge declared that Kea was entitled to equitable compensation from Mr Watson in the maximum sum of £43,495,891.33 as at 13 September 2018 and that interest should continue to accrue at a rate of 6.5% per annum compounded annually. In circumstances which I shall relate shortly, the figure of £43 million (+) reflected the unpaid liability of *Spartan* to Kea, including interest to 13 September 2018, with interest to continue to accrue thereafter at the stated rate and compounded.

3. The issue on this appeal raises the question whether the interest, payable by Spartan, and continuing to accrue, should properly have been fixed by the judge at 6.5% to reflect what the money to be recovered would have produced if invested in "proper trustee investments" - this would include an element of total return (including capital return) to the victim (Kea) - or should be fixed at some other (and if so, what) rate. The judge set the rate as a proxy for the rate of return that trustee investments would achieve. He did so based on performance indices of investment managers in different risk categories, as analysed by two (as was and is accepted) independent and reputable organisations, Asset Risk Consultants ("ARC") and the Society of Trust and Estate Practitioners ("STEP"). The judge adopted a medium-risk rate identified by reference to these two indices.

EXHIBIT

25

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

4.  For Mr Watson it is contended that the judge was wrong to approach the case on the basis that interest was to be calculated as against a defaulting trustee and that, in any event, an appropriate rate of interest, representing income yield only, should have been fixed. This summarises the ten formal grounds of appeal, which were drawn together in paragraph 6 of the skeleton argument settled by previous counsel for Mr Watson, Mr James Brightwell. The oral argument on the appeal was presented by Mr Dalby (newly instructed for Mr Watson for the hearing of the appeal) and was somewhat different from that appearing in Mr Brightwell's skeleton. I return to this below. Indeed, Mr Dalby did not pursue a number of the formal grounds of appeal before us (namely, grounds 6 to 9, and perhaps also 10).

5.  The judge granted Mr Watson permission to appeal because he considered that there was a compelling reason for this court to give guidance on the exercise of discretion by trial judges in fixing interest rates in cases of this type.

6.  As I will explain, I find that the judge exercised his discretion to award interest under the equitable jurisdiction of the court entirely in accord with the principles to be found in the decided cases and that his decision should be upheld. It was objected that an award of interest at that rate was without precedent. In my judgment, what is important is whether the award was in accord with equitable *principles*, rather than whether an award at the specific rate in question has been made before.

**Background Facts**

7.  The judge heard the trial of the action over 39 days in May, June and July 2017. He handed down his reserved judgment (of 186 pages and 581 paragraphs) ("the Trial Judgment") on 30 July 2018: [2018] EWHC 2016 (Ch). Consequential matters were argued out on 10 September 2018, with a further judgment, on the question of interest ("the Interest Judgment"), being delivered by the judge on 25 September 2018: [2018] EWHC 2483 (Ch). This was a highly complex action on its facts. What I will now set out is merely the bare bones of the case, in order to give an understanding of how the present dispute about interest arises.

8.  In April 2012 Mr Watson and Sir Owen agreed to participate in an investment joint venture, through Spartan as the joint venture vehicle. Mr Watson's participation was to be through Novatrust and that of Sir Owen was to be through Kea, a subsidiary of a trust known as the Corona Trust of which Sir Owen was the settlor. Between July and September 2012 Kea invested £129 million in the Spartan joint venture ("Project Spartan"). Relations between the parties deteriorated and in April 2014 Kea presented a petition for the winding-up of Spartan on the "just and equitable" ground. Novatrust, under an indemnity from Mr Watson, then brought a derivative claim on behalf of Spartan alleging that Kea had pursued a wrongful strategy, in breach of the joint venture agreements, designed to frustrate the investment through Project Spartan. On 29 April 2015, Sir Owen and Kea issued the Claim Form in the present proceedings, alleging deceit and breach of fiduciary duty on the part of Mr Watson and others and seeking the setting aside of the various joint venture agreements with Novatrust and Spartan. They also asked for accounts to be taken, restitution of the invested funds and/or payment of the sums found due on the taking of the accounts, together with equitable compensation. So far as interest was concerned, paragraph (17) of the Schedule to the claim form claimed:

"17. Compound, alternatively simple, interest pursuant to the court's equitable jurisdiction and/or section 35A of the Senior Courts Act 1981 on the sums found to be due to the Claimants at the rate which would have been obtained by Kea by investing in proper trustee investments, or at such other rate and for such period as the Court considers appropriate."

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

**The Trial and the Trial Judgment**

9.  The trial of the action began on 5 May 2017 and, during its course on 6 June 2017, Kea settled the proceedings between it and Novatrust/Spartan. The settlement provided for repayment to Kea by Spartan of the balance of the funds in its hands, without appropriation of the settlement money to any of the specific claims against Spartan. The underlying agreements between Kea, Novatrust and Spartan were set aside by consent. The consequence of the setting aside of the agreements, the judge held, was that Kea was entitled to treat Spartan as constructive trustee of the money (£129 million) that it had received and to re-claim that sum from it: see paragraph 540(5) of the Trial Judgment and paragraph 2(2) of the Interest Judgment. As the judge recorded in the Trial Judgment, it was common ground between the present parties that this gave Kea the right to interest on the sums to be recovered from Spartan under the equitable jurisdiction of the court or under s.35A of the Senior Courts Act 1981.

10.  After the settlement between Kea and Novatrust/Spartan the judge proceeded to try the outstanding claims against Mr Watson and, as already mentioned, the claims were broadly upheld and Mr Watson was found by the judge to be liable to pay equitable compensation to Kea for breaches of fiduciary duty owed to Kea. The measure of that liability was to be the balance of the money (including interest on it) which was due from Spartan and which Spartan itself proved unable to pay. The judge explained this in paragraphs 541-542 of the Trial Judgment which I should set out. He was there answering "Question 6" in his list of questions for answer which was: "Whether equitable compensation should in principle be awarded?" The relevant passage in the judgment was this:

"541. It is now possible to identify what the claim for equitable compensation is.  As has just been explained, Kea had a claim against Spartan to make it account as constructive trustee for the £129m and equitable interest.  But Kea always expected that Spartan would be unable to pay the entirety of that sum.  The claim for equitable compensation is a claim against Mr Watson for breach of fiduciary duty if the total recoverable from Spartan and the other parties falls short of that claim.  The way it was explained by Ms Jones in her closing submissions was as follows:

"The reason for that, my Lord, is it has always been obvious that Spartan is insolvent.  That is why it is no good getting an order for 129 million plus interest against Spartan, because it hasn't got it.  That is why the equitable compensation has always been in there: to recover from Mr Watson anything that couldn't be recovered from other parties."

542. It is now possible to answer Question 6 on the list, which is whether equitable compensation should in principle be awarded."

11.  Having decided that question, the judge had to fix the rate of interest which Kea was entitled to recover on sums owed to it by *Spartan*, as that would form part of the sum recoverable from Mr Watson by way of equitable compensation in respect of *his* breach of fiduciary duty. It is important to understand that the interest that fell to be determined was that which was payable by *Spartan* to Kea (and not interest payable by Mr Watson). Mr Watson's liability, consequent upon the judgment, is for the deficiency between Spartan's liability to Kea and those parts of the invested sums recovered by Kea from Spartan and from some other sources.

12.  As already mentioned, the claim form included a claim for interest under statute and under the equitable jurisdiction of the court. The issue as to the rate to be recovered was complicated by questions of pleading. An application was made by the claimants during the trial to amend further the relevant paragraphs of the Particulars of Claim. The pleading as it stood at the start of the trial was in paragraphs 265 and 266:

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

"265.  Insofar as any of the above sums claimed by way of        proprietary or restitutionary claim or by way of account    of profits or by way of personal claim against parties as     constructive trustees cannot be recovered together with    interest, then to the extent that Sir Owen and/or Kea has    suffered loss Sir Owen and or Kea are entitled to      equitable compensation from Mr Watson in respect of    his breaches of fiduciary duty. Sir Owen and Kea      reserve the right to amend their pleading in this regard     once further information has been received from the        Defendants.

266.   The Claimants are entitled to compound, alternatively     simple, interest pursuant to the court's equitable jurisdiction and/or section 35A of the Senior Courts Act     1981 on the sums found to be due to them at such rate    as would have been obtained by Kea by investing in      proper trustee investments, or at such other rate and for    such period as the Court considers appropriate."

13.  As the judge recorded at paragraph 543 of the Trial Judgment, the application to amend this plea was left over to be dealt with in closing submissions and in the Trial Judgment. The judge set out the proposed amendment at paragraph 544 as follows:

"544. So far as equitable compensation is concerned, apart from a very minor change in paragraph 265 (replacing "cannot be recovered" with "are not recovered", the significance of which escapes me) the relevant draft amendment consists of new paragraphs 265A and 265B as follows:

"265A Sir Owen and Kea estimate the present value of their       claim for equitable compensation is in an amount of       £47,570,872, being the sum of:

    265A.1 the capital sums of £100,000, £24.9 million,        £25 million, £63 million, £12.5 million and £3.5 million paid by Kea to Spartan (and to Fladgates        acting as solicitors to Spartan) as pleaded at paragraphs 119, 148 and 167 above; plus

    265A.2 compound interest at 8% on the said capital        sums with annual rests from the date of the respective payments until the transfer out of        £34,197,800 in relation to Project Royal on 24 January 2013; plus

    265A.3 compound interest at 8% on the outstanding        balance of £94,802,200 with annual rests from 25 January 2013 to 24 July 2016; plus

    265A.5 the profit earned from the investment in Project        Royal in the sum of £9,631,647.43; but taking into account and giving credit for

    265A.6 the Spartan receipts.

    265A.7 Sir Owen's and Kea's claim for equitable        compensation continues to accrue on this basis at a daily rate of £10,426.49.

    265B Alternatively Sir Owen and Kea estimate the present     value of their claim for equitable compensation is a       minimum amount of £23,361,156.40, being the same      calculation as at 265A but with interest at a minimum     rate of 3% above BBR on the said capital sums, and a    claim continuing to accrue at a daily rate of £2080.10.     Sir Owen and Kea will say that 3% above BBR is the       minimum rate at which the Court should assess the loss     to Kea and/or Sir Owen by being kept out of funds.""

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

The judge then said that Mr Watson did not "quibble with the rate pleaded in paragraph 265B of the Particulars of Claim, being 3% above BBR (base rate)", but that he objected to the 8% sought in paragraphs 265A.2 in the proposed amendment. Mr Dalby in his argument before us did not seek to go back on this concession by Mr McCaughran QC at trial, although as indicated he submitted that the rate could arguably have gone as low as 1.5%. Mr Dalby accepted before us that he could not go back upon an interest rate of 3.5%.

14.  Kea's position at trial on the amendment was that it was strictly unnecessary to amend and that the new draft merely sought to give an estimated quantification of a claim already made in the original pleading. As the judge said in subsequent paragraphs in his Trial Judgment (particularly in paragraph 551), the 8% claim was founded upon evidence adduced at the trial of what Kea asserted it  would itself have done with the money, if left to its own investment devices without having been wrongfully deprived of it. The judge found that the original pleading did not fairly alert the reader to a claim of this type. The judge's view, expressed a little earlier (at paragraph 549) was that the relevant principle was to award a rate of interest which reflected,

"…a broad brush approach based upon what a person with the general characteristics of the claimant might have received by way of investment on trustee investments, not a rate that reflects what the individual claimant itself would have done".

In the same paragraph, he had said that while borrowing rates might be suitable in commercial cases, it would not necessarily be suitable in all cases and that was particularly so where the claimant is an "out of pocket" trustee who would not be borrowing to invest, but would have invested his money in proper trustee investments. He said this would apply to Kea which although not a trustee was a vehicle for trustee investment.

15.  Accordingly, he disallowed the amendment sought. However, in its present form before us, said to be amended in accordance with the judge's order of 14 September 2018, the Particulars of Claim include as the "estimate" of then present minimum value of the claim, in a format similar to that appearing in the draft amended paragraph 265A (quoted above), the figure in 265A.2 appearing as 3% rather than 8%.

16.  Question 9 on the judge's list at trial was:

"9. Whether the Claimants are entitled to interest at anything higher than BBR plus 3% either by way of damages or by equitable compensation. If so at what rate."

Having stated the question, the judge said this (at paragraph 562 of the Trial Judgment):

"562. I do not think this quite captures the relevant question.  Since I have not allowed the amendment to claim damages, the relevant question is what equitable compensation is payable.  But as the discussion above shows, what the Claimants (or rather Kea) claims by way of equitable compensation is the shortfall between what Kea claimed from Spartan, including interest, and has received from Spartan.  The relevant question I think is what rate of interest should be used for this purpose."

The judge invited submissions on whether he should fix a rate on the information already available to him or whether he should hear further submissions on the question. Kea indicated that it wished to make further submissions as to the rate of interest and subsequently supplied the materials from the ARC and STEP indices upon which it wished to rely. A hearing was fixed for 10 September 2018 to debate the issue.

**Hearing on 10 September 2018 and the Interest Judgment**

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

17.  Shortly before the hearing (on about 6 September 2018), the parties exchanged skeleton arguments for the further hearing from which it appeared that counsel for Mr Watson (Mr McGrath QC, then instructed in place of Mr McCaughran QC who had appeared at trial) was to argue that the interest to be awarded should be at *borrowing* rates rather than the rate on proper trustee investments that the judge had indicated in the Trial Judgment it was his intention to award. After argument the judge decided that he would permit Mr McGrath to revisit the nature of the interest to be awarded in addition to the question of the appropriate rate of interest.

18.  The judge's decision on the question of the basis upon which interest should be awarded appears in paragraph 12 of the Interest Judgment where he said (after dealing with two earlier points):

"12. Third, as appears below, Ms Jones' arguments were premised on the basis that the relevant principles could be found in the cases dealing with claims against defaulting trustees, the paradigm case being where a beneficiary sued a trustee for loss to the trust fund (whether by the trustee misappropriating money or investing it in unauthorised investments or otherwise). I did not understand Mr McGrath to contend that this was wrong in principle. In any event it does seem to me to be the right approach. Spartan received £129m from Kea as a result of deceit. Kea was therefore entitled to treat Spartan as a constructive trustee of the £129m for it. Kea was itself, as everyone knew, a vehicle for investment of trust monies. In those circumstances I do not see why Spartan's liability to account to Kea for interest should be any different from that of a trustee being sued by a beneficiary for misappropriating trust money or otherwise causing it to be lost to the fund. The relevant inquiry therefore is how equity should assess a rate of interest against a defaulting trustee."

19.  In addressing the question of the appropriate rate of interest on this basis, the judge said that Ms Jones QC for Kea had taken him,

"…on an extended historical journey through the authorities. That is not a criticism, as it was a helpful exercise…"

Ms Jones took us on what I believe was that same journey in responding to the appeal; I agree it was helpful and I will not dwell on the judge's own reminiscences of the journey; I will have to traverse some of the same route in this judgment. The judge's principal conclusions on how the rate should be determined, based upon the decided cases from 1834 onwards, which had been cited to him, were stated in paragraphs 45 to 49 of the Interest Judgment as follows:

"45. First, none of the recent cases have been concerned with the question I am concerned with, namely what is the appropriate rate of interest to be awarded against a defaulting trustee. The most recent case to address this question in the context of a conventional trust under which the trustee's obligation is to invest a fund for the benefit of others is *Bartlett.*

46. Second, I do not see any reason to adopt a rate based on the cost of borrowing in such a case. There appears to be no historical precedent for it, and I do not see any logical justification for it. Unlike the case of a trading business or commercial claimants (where the general presumption, as referred to by Hamblen LJ in *Carrasco*, that they would have borrowed less seems a realistic one) it seems entirely unrealistic to assume that a conventional trust fund would borrow at all. It is not the practice of such settlements to borrow to fund their investment activities, and there is therefore no logic in a presumption that they would have borrowed less.

47. Third for the reasons I have given above it seems to me both logically correct in principle, and consistent with the early cases, that the rate should reflect the fact that by depriving the fund of capital, the defaulting

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

trustee also deprives the fund, until the capital loss has been made good, of the income that such capital would have earned. That points to a rate based on a suitable investment return.

48. In *Bartlett* Brightman LJ used the short term investment account rate for that purpose. But that stood at 15% at the time and so was a very significant increase on the traditional rate of 4% which he described as "the modest rate of interest which was current in the stable times of our forefathers". The short term investment account is now called the special account. Ms Jones told me that the current special account rate is 0.1%. I am not sure that is accurate: according to the White Book 2018 (vol 2, §6A-220) it was last set in 2009 at 0.5%. That may be the product of current monetary policy, but whether it is or not on any view the rate is currently very low and not such as a prudent trustee would be content with for investment of trust funds on anything other than a very temporary basis. To award the special account rate in such circumstances does not seem to me to be either fair to the receiving party or appropriate (nor indeed did Mr McGrath suggest I should do so).

49. I conclude that in the ordinary case of a defaulting trustee who is liable to make good a capital loss to the fund, the equitable interest to be awarded can be regarded as a means of compensating the fund for the income that has been lost to the fund; and that the rate of interest to be awarded can therefore be one that acts as a proxy for the investment return that trust funds with the general characteristics of the fund in question could expect to make. That is indeed the view I expressed in the main judgment, but I have approached the matter afresh in the light of the authorities cited to me and the arguments put forward; having done so, I see no reason to take a different view."

20.  Applying those principles to the instant case, the judge said this (at paragraph 50):

"50. As I have already indicated, although Kea's claim against Spartan is not the claim of a beneficiary against a defaulting trustee, it seems to me closely analogous to such a claim and that it is appropriate to award interest on the same principles. Kea's money was trust money, held as an asset of the Corona Trust and hence for the benefit of its beneficiaries. Kea was induced to part with the money in favour of Spartan by deceit in circumstances where Spartan knew that the money was trust money. If the money had not been paid to Spartan it would have remained in the fund where it was the duty of the trustee to invest it in suitable trustee investments. Spartan was liable as a result of the deceit to account to Kea for the capital sums as constructive trustee. In those circumstances it seems to me appropriate that it should also be regarded as liable to account to Kea for equitable interest on the same basis as if it had itself been a defaulting trustee who had caused loss to the fund, that is at a rate designed to compensate the fund for the loss of income arising from the loss of its capital. For reasons which I gave in the main judgment (and which are in line with the comments of Hamblen LJ in *Carrasco* at [27]) that is not to be determined by reference to evidence as to what Kea itself would have done had it not invested in Spartan, but by reference to the investment returns available generally to trusts with the same general characteristics as the Corona Trust, that is large private trusts with no special features."

21.  I find the judge's reasoning in these paragraphs to be in accord with the principles upon which the courts of equity have acted for almost 200 years and entirely compelling, even if economic conditions have led to different final rates of interest at different times.

22.  In settling upon the final figure, the judge decided it was appropriate to deploy the information from the ARC and STEP indices and having done this, he addressed Ms Jones' submission that the medium risk figure of 6.89% would be appropriate and Mr McGrath's argument that the lower risk rates of 4.46% (STEP) and 3.88% (ARC) was the correct guide. He then decided that he preferred Ms Jones' submission and said, at paragraphs 53 and 54:

"53. …It does seem to me that if I am trying to find a proxy for typical trustee investment returns it is preferable to look at the middle of the available data rather than simply the lower end, and at returns which strike a balance between caution and risk. The fact that the two sets of data produce very similar figures for this is

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

something that adds confidence that they do reflect the real world experience of funds invested on a discretionary basis by professional investment managers.

54. The authorities are consistent that one should adopt a broad brush approach. For that reason, and because I prefer to err on the side of caution, I did not adopt the precise rate of 6.886% that Ms Jones asked me to, but instead rounded it down to 6.5%."

23.  To give a fair representation of the judge's principled exercise of his discretion, I think I should also cite his final reasons, stated at paragraph 55. They were these:

"55. That may seem quite a high rate, and over 6 years undoubtedly produces a significant sum. It is interesting however to compare it with the traditional rates. It will be recalled that although 4% was the standard rate, the Court would award 5% (which might be compounded) in suitable cases, one of which was where there was fraud or serious misconduct, which is certainly an apt characterisation of the present case. A return of 5% compound in times of stable money is approximately the same in real terms as a return of 6.5% compound in times when the inflation rate is 1.5% per year (to be more precise, 5% interest at zero inflation is by my calculation the equivalent in real terms of 6.5% interest if inflation is 1.43% (ie 106.5/105 = 1.0143)). I have no evidence of the rate of inflation in the UK over the last 6 years, but although low by comparison with the high inflation prevalent at the time of *Wallersteiner* and *Bartlett*, I think I can take judicial notice that it has not been nil, and I suspect it has been at least in the order of 1.5% pa if not more. In those circumstances an award of 6.5% interest would not seem to be out of line with the traditional rates. Be that as it may, it is the rate which in the exercise of what I understand to be an unusually free discretion I have awarded for the reasons I have sought to explain."

## The Appeal and the Further Reasons for my Conclusions

24.  In my judgment, as I have said, the judge reached a correct result within the bounds of his undoubtedly wide discretion. Ideally, I would not wish to add more to his reasoning. However, in deference to the basis upon which he granted permission to appeal, I will set out why I find the decision to be not only within the proper ambit of discretion but also in accord with principle.

25.  I have summarised above the grounds of appeal advanced in the skeleton argument, settled by Mr Brightwell of counsel, who had not appeared at the trial but who did appear (as junior to Mr McGrath QC) at the hearing on 10 September 2018.

26.  That skeleton argument contends that the judge erred in treating the claim as a claim against a defaulting trustee. It also disputes the rate awarded generally. Even if the rate of return achievable on proper trustee investments was the correct proxy, it is said the rate awarded was too high. As one descends further into that written argument, it is submitted that it was wrong to treat Kea as a trust investment vehicle because it "participated in business and other investment ventures" (paragraphs 23 and following, especially paragraph 27) (grounds 1 and 2). The argument goes on to assert that the judge was wrong in treating Spartan as a constructive trustee "upon the setting aside of the relevant agreements for deceit" (paragraph 33) (ground 5).

27.  On this second point, the written argument relied upon two passages from the judgment of Millett LJ (as he then was) in *Thakerar v Paragon Finance* [1999] 1 All ER 400, at 409 and 412 as follows:

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

"(1)  In such a case the expressions 'constructive trust' and     'constructive trustee' are misleading, for there is no     trust and usually no possibility of a proprietary remedy;     they are 'nothing more than a formula for equitable       relief': *Selangor United Rubber Estates Ltd v Cradock (No 3)*[1968] 1 WLR 1555.

(2)  "Such persons have no trust powers or duties; they       cannot invest, sell or deal with the trust property; they     cannot retire or appoint new trustees; they have no trust     property in their possession or under their control, since     they became accountable as constructive trustees only     by parting with the trust property. They are in reality     neither trustees nor fiduciaries, but merely       wrongdoers."

Secondly, reliance was placed upon an extract from Lord Sumption's judgment in *Central Bank of Nigeria v Williams*[2014] UKSC 10 (paragraph 9), drawing a distinction between two types of constructive trustee, as follows:

"The first comprises persons who have lawfully assumed fiduciary obligations in relation to trust property, but without a formal appointment….They intended to act as trustees, if only as a matter of objective construction of their acts. They are true trustees, and if the assets are not applied in accordance with the trust, equity will enforce the obligations that they have assumed by virtue of their status exactly as if they had been appointed by deed…In its second meaning, the phrase 'constructive trustee' refers to something else. It comprises persons who never assumed and never intended to assume the status of trustee, whether formally or informally, but have exposed themselves to equitable remedies by virtue of their participation in the unlawful misapplication of trust assets."

28.  When one looks at the first passage cited from *Thakerar*, however, one sees that it is incomplete. It misses out the first part of the paragraph between *e* and *f* on page 409 of the report, which reads as follows:

"The second class of case is different. It arises when the defendant is implicated in a fraud. Equity has always given relief against fraud by making any person sufficiently implicated in the fraud accountable in equity. In such a case he is traditionally though I think unfortunately described as a constructive trustee and said to be 'liable to account as constructive trustee'. Such a person is not in fact a trustee at all, even though he may be liable to account as if he were. He never assumes the position of a trustee, and if he receives the trust property at all it is adversely to the plaintiff by an unlawful transaction which is impugned by the plaintiff. In such a case the expressions 'constructive trust' and 'constructive trustee' are misleading, for there is no trust and usually no possibility of a proprietary remedy; they are 'nothing more than a formula for equitable relief': *Selangor United Rubber Estates Ltd v Cradock (No 3)*[1968] 2 All ER 1073, [1968] 1 WLR 1555*per* Ungoed-Thomas J."

The authority cited by Millett LJ at the end of the paragraph is *Selangor* at [1968] 1 WLR at p. 1582. For present purposes, the short quotation ("nothing more than a formula for equitable relief") is also incomplete. The full passage from the judgment of Ungoed-Thomas J is this:

"It seems to me imperative to grasp and keep constantly in mind that the second category of constructive trusteeship (which is the only category with which we are concerned) is nothing more than a formula for equitable relief. The court of equity says that the defendant shall be liable in equity, as though he were a trustee. He is made liable in equity as trustee by the imposition or construction of the court of equity. This is done because in accordance with equitable principles applied by the court of equity it is equitable that he should be held liable as though he were a trustee. Trusteeship and constructive trusteeship are equitable conceptions."

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

29.  The citation from Lord Sumption's judgment in *Central Bank of Nigeria v Williams* takes the matter no further because at its end it states clearly that the second meaning of the phrase "constructive trustee" comprises persons who have never had the formal status of a trustee but have exposed themselves to equitable remedies by participation in unlawful misapplication of trust assets. This is precisely what the judge found that Spartan had done here.

30.  In oral argument, Mr Dalby advanced both these points (summarised in paragraph 26 above) - as to the categorisation of Kea and the "trusteeship" of Spartan - but it was not and is not always easy to discern (even with the benefit of a transcript) whether the argument was being presented on entirely the same basis as that propounded in the skeleton.

31.  As I have said, Mr Dalby opened his argument by saying that he was not going to contest an award of interest at 3.5% compound, about which his predecessor "did not quibble" before the judge at trial. However, he said that this was properly to be seen as a ceiling or cap for an award (Day 1, p.8, line 24) and that the assumed inflation rate of 1.5% should have been the starting point "because that protects a person from the erosion of the value of the money" (Day 1, page 4, lines 17-25).

32.  So far as Kea was concerned, the skeleton argument asserted (at paragraph 27) that:

"Kea was at the date of the relevant events a trust owned company, but no doubt the assets were held in a company rather than directly by the trustee so that commercial activities, not customarily undertaken by trustees, could be carried on by the company's directors. In no sense did the general characteristics of Kea lead to the conclusion that a proxy rate should have been based upon the returns obtained by professional trustees managing the investment portfolio of a private trust".

33.  Mr Dalby submitted that the evidence before the judge indicated that Kea had "a conservative investment profile" (Day 1, p. 12, lines 3-4) and he sought to bolster this by submissions about the extent to which Kea and/or Sir Owen were able to control Spartan's investments (Day 1, pp.13, line 24 to 14, line 2).

34.  So far as I can detect from the transcripts, Mr Dalby did not develop significantly the argument raised in writing about the judge's categorisation of Spartan as a defaulting trustee (ground 5). The principal submissions that I can find are recorded in two places. First, in the transcript for Day 1, p. 60, lines 10-23, Mr Dalby said:

"MR DALBY: My Lord, probably one point I could make and I observe the time. That's really just to summarise ground 5. That concerns, if I can call it that, the structure of trustee point, and the authorities referenced in the submissions, which I do reinforce that Spartan was not a trustee going into this. It came out as a constructive trustee. And there's the references in Thakerar and in Central Bank of Nigeria, emphasising that, in those situations, that classification as trustee or constructive trustee, is really for the purposes of enabling equitable remedies and is not in the same situation of someone who is, clearly, a - -a trustee with obligations that it did not undertake or carry out properly. It did not have the control expected of a trustee."

The second passage is recorded in the transcript for Day 2, pp. 7, line 12 to p.8, line 6:

"MR DALBY: Yes. So - - well, that's - - that is the focus of this appeal. So our point is, in relation to the constructive trust is it's not your de facto regular trust situation. It is there for the purposes of relief. That relief can include interest; and certainly the authorities are there - - and I accept this: that the authorities are there to hold a trustee, in those situations, in account for profits as a defaulting trustee. So I'm not distinguishing the authorities on those grounds.

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

The - - what the judge does, of course, is he determines the status of Spartan as a defaulting trustee. He then moves to the categorisation of the claimant in that context.

Now, both - - those points are answered really by the same observation - - is that when determining the rate of interest, in these circumstances, a claim effectively for restitution, interest on that, no other claim for loss, that the interest by - - effectively by default, is simply for being kept out of one's money and not to compensate for loss."

35.   So far as the characterisation of Kea is concerned, the judge was clearly best placed to assess the nature of its activity. After presiding over a long trial, he decided it was a vehicle for trust investment and that, if the money in issue had remained in place the duty would have been to invest in proper trustee investments: see again paragraph 50 of the Interest Judgment. He was clearly entitled to conclude that if the trust money that was transferred to it for the purpose of this joint venture investment through Spartan had not been so transferred it would have been invested in proper trustee investments. I consider that it is quite impossible to challenge this finding of *primary fact* by the trial judge. No basis has been advanced upon which this court could reach such a conclusion. Neither the written nor the oral argument scratched the surface of the evidence on the point. It is one of those findings which an appellate court can only reject if satisfied that it is plainly wrong: see in this context *Henderson v Foxworth* [2014] 1 WLR 2600. It is impossible to say that the judge was "plainly wrong" about this issue.

36.   Further, in my judgment, Ms Jones was correct in her submission that it is not open to Mr Watson on this appeal to argue points relating to Kea's allegedly conservative investment profile or any point arising out of the question whether Sir Owen was able to control Spartan's investments. No such argument was presented to the judge.

37.   The judge declined to entertain a rate of return said to be based upon what would actually have been done with the funds in Kea's hands. This was because he found that no sufficient case had been pleaded to alert the defendants that such a claim was being asserted. However, from the outset a claim had been made to interest on the basis of what would have been obtained by Kea in investing in proper trustee investments or such other rate as might be appropriate (paragraph 266 of the original Particulars of Claim) and the logic of such an assessment, on the facts of the present case, could hardly be contested. The question was whether such an approach could be justified in principle and on the authorities, accepting that there is no decided case in which this specific rate of interest had been adopted. The analogy was by reference to the principles emerging from cases of claims against defaulting trustees. The judge said, "I did not understand Mr McGrath to contend that this was wrong in principle". Nonetheless, his submission was that the rate should be determined by borrowing rates, even as against a constructive trustee or a defaulting express trustee.

38.   It seems clear to me from the passages of the Trial Judgment to which we were taken in argument that Spartan was held liable to account as a constructive trustee. This was because it had knowingly received £129 million which had been obtained by deceit and in breach of fiduciary duty owed to Kea by Mr Watson including unlawful inducements offered by Mr Watson to a director of Kea (Mr Peter Dickson). There were other liabilities which it is not necessary to set out here. Further, as Ms Jones convincingly demonstrated during submissions before us, by reference to the skeleton arguments and the transcript of the hearing on 10 September 2018, the basis of Spartan's liability as a constructive trustee was not contested by Mr McGrath in his submissions. His principal point was, by reference to *Challinor v Juliet Bellis & Co.* [2013] EWHC 620 (Ch) ("*Challinor*") where the rival contentions between the parties to that case were for a "borrowing rate" of 5% above base rate (by the claimants) and a deposit rate of 1% above base; he submitted that Nugee J should adopt a similar rate of 3.5%, as Hildyard J had fixed in *Challinor*. There was no contest as to the liability of Spartan to account as a

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

constructive trustee to Kea. Nor does it seem to have been said that the correct analogy was other than with a defaulting trustee's accounting liability.

39.  For my part, I would not be inclined to entertain Mr Dalby's shortly developed submission that Spartan's liability was not truly that of a constructive trustee since, even though it might be a pure question of law; it was not argued before the judge when the interest point was being debated.

40.  In any event, the remedies against a knowing recipient of trust money are usually those available against a constructive trustee: see Lewin on Trusts (19th Edn., 2015) at paragraphs 40-015 and 40-053 and 42-091- 42-096 (the latter paragraphs dealing specifically with "knowing receipt" constructive trusteeship). That liability is the same as that of an express trustee: see *Novoship (UK) Ltd. v Mikhailyuk*[2015] QB 499at paragraphs 67-83 and *El-Ajou v Dollar Land Holdings PLC* [1995] 2 All ER 213, cited in Lewin Op. Cit. 42-097 fn 332. The important point is that although the "knowing recipient" of trust property is not formally a trustee, but only a constructive trustee, he is liable to account for his wrongful receipt as if he were a formal trustee and in default: see above.

41.  In her oral submissions, Ms Jones argued that historically there were three bases on which a trustee in default (or a constructive trustee) was liable to pay interest on sums of which a trust had been wrongfully deprived. She said this (Day 2 p. 88 line 16 to p. 90 line 4):

"…the relief against a constructive trustee or, in any event, a constructive trustee which is a knowing recipient, as Spartan was - - and that's all I have to focus on - - is that it must account as if it were a trustee. That is a proposition that appears to be disputed both on the written evidence - - on the written submission and on the oral submission. So I'm going to come to that in a moment.

Then we say that historically the court has awarded interest on two different bases, both of which are proxies. The higher rate is designed to strip the - - the defendant of profit. And that - -  appears in a number of the cases that I'll show your Lordships in a moment.

And the reason that there's a proxy is that sometimes it's too difficult to work out what the actual - - the actual profit is, particularly if it's been invested in the defendant's trade, particularly perhaps in the older cases. And so the court gives the claimant the option of saying: well, I'll have 5% then, at the time.

And the slightly more moderate rate, one sees it as 4% in the older cases, is the rate which is intended to compensate if claimant for the return which would have been made if the trust fund had been invested in proper trustee investments. But the court tends to award the higher rate against the fraudster, whether or not he, in fact, made a profit.

So the three different bases are: you've had my money. Let's say you just failed to invest it. Well, you have to pay, by way of interest, what it would have made if you had invested it.

Secondly, you've had my money and you've used it in your business. I don't want to spend the time working out exactly what you've made in your business so I'm going to take 5%.

Thirdly, you've taken the money by fraud. You've kept it. I've no idea what you did with it. But I can elect for 5%, the higher rate, because you're a fraudster and you've had my money and kept it. I don't even have to go into what you've done with it."

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

In my judgment, those points, succinctly made, are borne out by the cases cited to us, most of which are referred to in the Interest Judgment, paragraphs 20 to 43.

42.   Some of this appeared uncontroversial so far as the liability of a formal trustee is concerned and, in my judgment, the same applies to the liability to account of a constructive trustee. See paragraph 44 of the skeleton argument for Mr Watson where one finds this:

"44.  The way in which interest against trustees was awarded    from the early 19th century through to the decision in    *Wallersteiner v Moir* was subject to a clear practice. In    summary:

   (a)  The general rule was that interest was awarded at      4% simple (as in *Alford*; see *Bartlett v Barclays Bank plc (No.2)*[1980] Ch 515G).

   (b)  Interest might be awarded at 5% where the       defendant had made a profit on it by applying to      his own use (*Alford*; *Burdick v Garrick* (1869-70)       LR 5 Ch App 233).

   (c)  If a trustee had wrongly sold out an investment in       breach of trust, the court might award interest that would have been earned on that investment but     that is a different matter: see *Jones v Foxall*       (1852) 15 Beav 388.

   (d)  If a trustee wrongly employed the trust moneys in       trade or speculative transactions, interest would be awarded at 5%: *Davis v Davis*[1902] 2 Ch 314(i.e. as a fixed rate alternative to a claim to the       profits actually made).

   (e)  Compound interest may be awarded where the       trustee used the money in his own business: *Wallersteiner v Moir (No.2)*[1975] 1 QB 373 ⧉."

The reference to "*Alford*" is to *A-G v Alford* (1855) 4 De GM & G 843. I shall refer to some of these cases below.

43.  The 4% and 5% rates awarded in Victorian times reflected (respectively) what might have been expected if the trust money had been properly invested and what could be obtained if used in the defaulting trustee's business. The alternative rate was awarded to deprive the defaulting trustee of the profit he had made or was to be deemed to have made. In those days, it seems that trustees would invest in interest bearing securities at fixed rates. Investment habits (and indeed trustee investment duties) have changed over time.

44.  Ms Jones founded the origin of her three categories of liability, set out in paragraph 41 above, upon a number of cases, beginning with *Docker v Somes* (1834) 2 My & K 656.

45.  This was a case in which executors had mingled estate money with their own and had lent it to themselves at a notional 5%. The argument was whether it was open to the beneficiaries to claim an account of the profits obtained from the misapplied sums, rather than interest. It was recognised that where a trustee mixed trust money with his own and used it in trade, he was charged with interest at 5%: an account of profits had not, it seems, been previously ordered in such a case. Lord Brougham LC, affirming the Vice-Chancellor's order for an enquiry as to the profits earned from the use of the estate funds, noted the cases in which interest at 5% had

been awarded in cases of gross breach of trust. In the absence of previous precedent for the order for an inquiry as to profit, he said (at p.664),

"Let us, however, refer for a moment to the undoubted principles that regulate the dealings of the Court with breaches of trust, and see to what these plainly lead us…".

He continued:

"Wherever a trustee, or one standing in the relation of a trustee, violates his duty, and deals with the trust estate for his own behoof, the rule is that he shall account to the cestui que trust for all the gain which he has made. Thus, if trust money is laid out in buying and selling land, and a profit made by the transaction, that shall go not to the trustee who has so applied the money, but to the cestui que trust whose money has been thus applied. In like manner (and cases of this kind are more numerous), where a trustee or executor has used the fund committed to his care in stock speculations, though the loss, if any, must fall upon himself, yet for every farthing of profit he may make he shall be accountable to the trust estate. So, if he lay out the trust money in a commercial adventure, as in buying or fitting out a vessel for a voyage, or put it in the trade of another person, from which he is to derive a certain stipulated profit, although I will not say that this has been decided, I hold it to be quite clear that he must account for the profits received by the adventure or from the concern. In all these cases it is easy to tell what the gains are; the fund is kept distinct from the trustee's other monies, and whatever he gets he must account for and pay over. It is so much fruit, so much increase on the estate or chattel of another, and must follow the ownership of the property and go to the proprietor. So it is also where one not expressly a trustee has bought or trafficked with another's money. The law raises a trust by implication, clothing him, though a stranger, with the fiduciary character, for the purpose of making him accountable. If a person has purchased land in his own name with my money, there is a resulting trust for me; if he has invested my money in any other speculation without my consent, he is held a trustee for my benefit; and so an attorney, guardian, or other person standing in a like situation to another gains not for himself, but for the client, or infant, or other party whose confidence has been abused.

Such being the undeniable principle of equity, such the rule by which breach of trust is discouraged and punished—discouraged by intercepting its gains, and thus frustrating the intentions that caused it; punished by charging all losses on the wrongdoer, while no profit can ever accrue to him—can the Court consistently draw the line as the cases would seem to draw it, and except from the general rule those instances where the risk of the malversation is most imminent; those instances where the trustee is most likely to misappropriate; namely, those in which he uses the trust funds in his own traffic? At first sight, this seems grossly absurd, and some reflection is required to understand how the Court could ever, even in appearance, countenance such an anomaly."

This anomaly, he found, was explained by the fact that profits from the trust money used could not be readily identified from the whole of the return on the capital employed. In such cases, the convenient course of ordering interest at a higher rate than customary had been adopted. The Lord Chancellor said,

"But where, having engaged in some trade himself, he had invested the trust money in that trade along with his own, there was so much difficulty in severing the profits which might be supposed to come from the money misapplied from those which came from the rest of the capital embarked, that it was deemed more convenient to take another course, and instead of endeavouring to ascertain what profit had been really made, to fix upon certain rates of interest as the supposed measure or representative of the profits, and assign that to the trust estate."

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

He went on to point out that such a convenience was at a price of potentially allowing a defaulting trustee to get away with a substantial real gain, while taking the easy course of paying only 5%. In a colourful passage, he then said:

"But the principal objection which I have to the rule is founded upon its tendency to cripple the just power of this Court in by far the most wholesome, and, indeed, necessary exercise of its functions, and the encouragement thus held out to fraud and breach of trust. What avails it towards preventing such malversations, that the contrivers of sordid injustice feel the power of the Court only where they are clumsy enough to keep the gains of their dishonesty severed from the rest of their stores. It is in vain they are told of the Court's arm being long enough to reach them, and strong enough to hold them, if they know that a certain delicacy of touch is required, without which the hand might as well be paralysed or shrink up. The distinction, I will not say sanctioned, but pointed at by the negative authority of the cases, proclaims to executors and trustees that they have only to invest the trust money in the speculations, and expose it to the hazards of their own commerce, and be charged 5 per cent. on it; and then they may pocket 15 or 20 per cent, by a successful adventure. Surely the supposed difficulty of ascertaining the real gain made by the misapplication is as nothing compared with the mischiefs likely to arise from admitting this rule, or rather this exception to one of the most general rules of equitable jurisdiction."

46.   The Lord Chancellor then examined cases that were said to show that in such cases the only option was to award interest. He rejected that proposition and concluded (at p. 673) as follows:

"It was right that I should advert to these authorities; at the same time I am ready to admit that my opinion in the present case is founded much more upon principle than upon decision. In affirming the decree of His Honour, I am sure that I overrule nothing ever actually decided, and that I only extend an undeniable principle of the Court to a case where its application appears to be peculiarly called for by the most pressing considerations both of consistency in principle and expediency in practice. That the parties whose funds have been misapplied should, in every case, have their option of receiving either the actual profits made, or interest at 4 or 5 per cent, according to circumstances, appears a rule exposed to no serious objection; and although the Court, moved by special circumstances, may allow rests with compound interest, yet this seems, generally speaking, much less advisable than an account of actual profits. Should in any case a serious difficulty arise in tracing and apportioning the profits, this may be a reason for preferring a fixed rate of interest in that case."

47.   I have taken a little time with this case not merely to show that a defaulting trustee (and, it follows, a constructive trustee) can be liable for an account of profit or interest, but also to show that in cases of this type, the underlying equitable principles are just as important as precedent, and possibly more so. As one reads through the cases, one notes that the courts' awards of interest in equity, while proceeding from certain basics, have been astute to adapt to developments in contemporary economic conditions, in giving weight to the arguments presented to them by the parties. This feature of adaptability recalls the comment made by Lord Scarman, in an entirely different context, in *Gillick v West Norfolk AHA* [1986] AC 112B-D. about changing social conditions. His Lordship said:

"The law ignores these developments at its peril. The House's task, therefore, as the supreme court in a legal system largely based on rules of law evolved over the years by the judicial process, is to search the overfull and cluttered shelves of the law reports for a principle, or set of principles recognised by the judges over the years but stripped of the detail which, however appropriate in their day, would, if applied today, lay the judges open to a justified criticism for failing to keep the law abreast of the society in which they live and work."

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

I see much the same exercise being conducted by the equity courts in adapting awards of interest to changing economic conditions. In exercising that wide discretionary jurisdiction, the courts have been clearly as free as a supreme court in Lord Scarman's example.

48.  The next case to which we were taken, *A-G v Alford* (1855) 4 De GM & G 843, illustrates the principle that the defaulting trustee must account for profit actually received, or for the money that he must be presumed to have earned (and which has been lost to the trust) or pay interest instead. In that case the trustee had for several years retained trust funds uninvested which he ought to have invested. He was found liable to account and chargeable with simple interest at 4% because there was nothing to show that he had profited by misconduct. He was only liable for what would have been earned on proper trust investment, i.e. at the usual rate of 4% simple. Lord Cranworth LC said (at p.851):

"What the Court ought to do, I think, is to charge him only with the interest which he has received, or which it is justly entitled to say he ought to have received, or which it is so fairly to be presumed that he did receive that he estopped from saying that he did not receive it. I do not think there is any other intelligible ground for charging an executor with more interest than he has made, than one of those I have mentioned. Misconduct does not seem to me to warrant the conclusion, that the executor did in point of fact receive, or is estopped from saying that he did not receive, the interest, or that he is to be charged with anything he did not receive, if it is not misconduct contributing to that particular result."

As Nugee J observed this was a case where the trustee was made liable for interest on the basis of what he ought to have received on the uninvested funds: see paragraph 22 of the Interest Judgment.

49.  In *Re Emmet's Estate* (1881) 17 Ch. D. 142a trustee was ordered to pay interest at 4% compound in respect of a portion of a fund invested in unauthorised investments (and in respect of some funds not invested at all). The original trust had also required the trustee during the beneficiary's minority to accumulate surplus income. The award seems to have been made on the basis of the failure to invest in the way that he should have done and to compensate for the absence of accumulation after the fund should have been handed over on the beneficiary's attaining majority, i.e. to compensate for loss of return that the trust fund would otherwise have achieved. In the course of his judgment, Hall V-C said (at p. 149-150):

"There being, then, no trust for accumulation directed beyond the time of minority, we must now consider what is the obligation so created. There is, I consider, a liability and obligation to accumulate the income subject only to such application as might be made of any part of it, less or more, for the specified purposes of maintenance, education, or advancement. The trust comes to an end when a child attains twenty-one. So far I hold the trustee liable to account at compound interest for non-accumulation. Does his liability go beyond the date when a child attains twenty-one? After a child attains twenty-one there is no duty undischarged, except to hand over to the child the fund with the accumulations. The trustee did not so hand it over, nor did he explain to the child that he was entitled to call for and have transferred to him the fund, with the accumulations upon it, in his hands, but he left things in exactly the same position as they were in when the child attained twenty-one. Can I then allow a trustee, under such circumstances, to say, "I am, now that the child has attained twenty-one, holding the fund on a different trust, which does not require any accumulation at all, but merely makes me liable for simple interest; and I can keep it in my hands and use it, and only charge myself with simple interest"? That would be inconsistent with the duties the trustee had undertaken. The accumulations should have gone on until the trustee transferred the fund. In my opinion, if he does not hand it over when he ought to do, he must be taken to be holding it still on the same trust and subject to the same obligations as before."

50.  It is instructive to note that from the end of the 19th century it was clear that the set rate of 4% was (a) based upon the rate expected that trustees might be expected to achieve, and (b) liable to change with

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

changing economic conditions. *Re Lambert* [1897] 2 Ch. 169, which was not a breach of trust case, illustrates the principle. Commenting on the earlier case of *Re Rees* (1881) 17 Ch. D. 701, Stirling J said (at [1897] 2 Ch. At 180):

"*In re Rees* (1) that rate of interest had been adopted by the Court of Chancery as representing the average rate of interest payable in respect of investments such as trustees were authorized by the Court to invest in; it is also a rate of interest which is charged according to the rules on debts which are provable in administrations, and as to which there is no special provision as to their bearing interest. The rule as to the interest payable on debts has not yet been altered, and that remains the rate at which interest is charged on debts; but as regards other applications of the rule charging 4 per cent., it has in recent times been thought that it is excessive, inasmuch as in these days trust investments do not yield anything like 4 per cent., and several judges, I think North J. and Kekewich J. particularly in the number, have under circumstances such as these said that only 3 per cent. ought to be charged."

51.   In *Re Beech* [1920] 1 Ch 40, Eve J said (at p. 44) this:

"In *In re Woods* Kekewich J. allowed only 3 per cent. interest, and in so doing he expressly took into consideration two factors, the one that the securities were of a wasting nature, and the other that the value of money had then materially altered since the date when 4 per cent. had been fixed as the correct rate. In 1905, in *In re Chaytor*, Warrington J. not only followed what had been done in *In re Woods* as to unauthorized securities of a wasting nature, but fixed 3 per cent. as the interest to be paid on the value of all unauthorized securities, whether wasting or not. There can be no doubt that in 1904 and 1905 the income derivable from trust securities was very much less than it had been in the days when *Meyer v. Simonsen* was decided, but subsequent experience perhaps provokes the observation that a departure from a salutary rule in matters of this kind - introducing as it does an element of uncertainty in practice and administration - can only be justified if the changed conditions on which it is founded continue at least as constant as those upon which the rule was itself framed. Had the value of money remained till to-day the same as it was in 1904 and 1905 I might have felt myself constrained to follow these last two cases, and to hold that as between tenant for life and remainder man 3 per cent., and not 4 per cent., was now the proper rate of interest. But the conditions have materially changed since 1904 and 1905, and at the present date, when first-class investments can be obtained for trust moneys yielding interest at 5 per cent., matters approach much more near to the condition of things subsisting when *Meyer v. Simonsen* was decided than to those obtaining when *In re Woods* and *In re Chaytor* introduced exceptions to the rule laid down in the earlier case, and on these grounds I think much of the reasoning on which these later decisions were based has no application to-day."

The judge reverted to 4%. Again, it seems to me the Chancery court was astute to fix interest rates in varying types of trustee cases in accordance with the economic realities of the day. The idea that the court should be hidebound to any rigid rate, irrespective of the loss caused to a trust by a trustee's default, seems to be contrary to the principle emerging from such cases.

52.   In *Wallersteiner v Moir (No.2)* [1975] QB 373 the court was faced with an argument that it had no jurisdiction to award interest under the statutory jurisdiction conferred by the Law Reform (Miscellaneous Provisions) Act 1934 on a default judgment and, therefore, that it had no jurisdiction to award interest at all. The court held that, whatever the true range of the statutory power, it would award interest under the equitable jurisdiction of the court. The judgments do not discuss the rate, however it can be seen from the report that the judgment was to bear compound interest at one per cent over bank rate or minimum lending rate with yearly rests from time to time from the date of original indebtedness and at 7 ½ % from judgment.

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

53.  The judgments in that case discuss the principles upon which the courts of equity award interest. At p. 388B-H, Lord Denning MR said:

"The principles on which the courts of equity acted are expounded in a series of cases of which I would take the judgment of Sir John Romilly M.R. in *Jones v. Foxall* (1852) 15 Beav. 388, 391: of Lord Cranworth L.C. in *Attorney-General v. Alford* (1855) 4 De G.M. & G. 843, 851: of Lord Hatherley L.C. in *Burdick v. Garrick*(1870) 5 Ch.App. 233, 241-242 and of Sir W. M. James L.J. in *Vyse v. Foster*(1872) 8 Ch.App. 309, 333; (1874) L.R. 7 H.L. 318. Those judgments show that, in equity, interest is never awarded by way of punishment. Equity awards it whenever money is misused by an executor or a trustee or anyone else in a fiduciary position - who has misapplied the money and made use of it himself for his own benefit. The court:

"presumes that the party against whom relief is sought has made that amount of profit which persons ordinarily do make in trade, and in these cases the court directs rests to be made," i.e., compound interest: see *Burdick v. Garrick*, 5 Ch.App. 233, 242, *per* Lord Hatherley L.C.

The reason is because a person in a fiduciary position is not allowed to make a profit out of his trust: and, if he does, he is liable to account for that profit or interest in lieu thereof.

In addition, in equity interest is awarded whenever a wrongdoer deprives a company of money which it needs for use in its business. It is plain that the company should be compensated for the loss thereby occasioned to it. Mere replacement of the money - years later - is by no means adequate compensation, especially in days of inflation. The company should be compensated by the award of interest. That was done by Sir William Page Wood V.-C. (afterwards Lord Hatherley) in one of the leading cases on the subject, *Atwool v. Merryweather*(1867) L.R. 5 Eq. 464n., 468-469. But the question arises: should it be simple interest or compound interest? On general principles I think it should be presumed that the company (had it not been deprived of the money) would have made the most beneficial use open to it: cf. *Armory v. Delamirie* (1723) 1 Stra. 505. It may be that the company would have used it in its own trading operations; or that it would have used it to help its subsidiaries. Alternatively, it should be presumed that the wrongdoer made the most beneficial use of it. But, whichever it is, in order to give adequate compensation, the money should be replaced at interest with yearly rests, i.e., compound interest."

Buckley LJ (at p. 397B-F) said:

"It is well established in equity that a trustee who in breach of trust misapplies trust funds will be liable not only to replace the misapplied principal fund but to do so with interest from the date of the misapplication. This is on the notional ground that the money so applied was in fact the trustee's own money and that he has retained the misapplied trust money in his own hands and used it for his own purposes. Where a trustee has retained trust money in his own hands, he will be accountable for the profit which he has made or which he is assumed to have made from the use of the money. In *Attorney-General v. Alford*, 4 De G.M. & G. 843, 851, Lord Cranworth L.C. said:

"What the court ought to do, I think, is to charge him only with the interest which he has received, or which it is justly entitled to say he ought to have received, or which it is so fairly to be presumed that he did receive that he is estopped from saying that he did not receive it."

This is an application of the doctrine that the court will not allow a trustee to make any profit from his trust. The defaulting trustee is normally charged with simple interest only, but if it is established that he has used the money in trade he may be charged compound interest: see *Burdick v. Garrick*. 5 Ch.App. 233, *per* Lord

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

Hatherley L.C., at p. 241, and *Lewin, Trusts*, 16th ed. (1964), p. 226, and the cases there noted. The justification for charging compound interest normally lies in the fact that profits earned in trade would be likely to be used as working capital for earning further profits. Precisely similar equitable principles apply to an agent who has retained moneys of his principal in his hands and used them for his own purposes: *Burdick v. Garrick.*"

Buckley LJ said that the court in that case should not work on the basis that the moneys were working capital of the victim companies as interest was not normally to be paid to compensate for loss but to ensure that the defendant does not retain a profit. In any event, it had not been shown that the moneys were working capital. (p.398F-399A).

54.  At p. 406 of the report there is the judgment of Scarman LJ (as he then was) to similar effect as to the equitable principles set out by Lord Denning and Buckley LJ, which I do not think it is necessary to quote here.

55.  The next case to which I should refer is *Bartlett v Barclays Bank Trust Co. Ltd.* [1980] Ch 515. This was a case where a professional trustee had permitted a company in which it was a majority shareholder to invest in property development of a speculative character which it could have stopped and which Brightman LJ (as he had become between trial and judgment) held it should have stopped. The trustee was held liable to compensate the trust fund for its loss until such time as restitution of the fund had been achieved. As for interest on the sum to be recovered, the plaintiffs sought interest at a borrowing rate currently obtainable by reference to *Wallersteiner*: see per the late Mr Nugee QC (senior; our judge's father) and Mr Sher for the plaintiffs at p.540C. For the defendant, Mr Sebestyen referred to the old standard rate of 4% and said that to fix a rate pre-empted the enquiry as to damages. Interestingly, Brightman LJ referred to the help he had gained from the tables of borrowing and deposit rates provided to him by one of the parties. Compare here the use of the ARC and STEP materials upon which Nugee J (junior) relied.

56.  Brightman LJ awarded interest at the rate available on the courts' short-term investment account. At pp.546G-547D, he said this:

"I turn now to the question of interest. It is common ground that interest can be claimed on the compensation which is found due. Dispute only arises on the rate of interest to be charged. In former days a trustee was as a rule charged only with interest of 4 per cent. unless there were special circumstances. That rate seems to have prevailed as the general rule until recent years. The defendant has helpfully supplied the court with a table of bank and minimum lending rates, and bank deposit rates. Between 1963, the year in which the Old Bailey scheme began, and the present day there have been nearly 80 changes of bank rate of minimum lending rate and nearly 70 changes in Barclays Bank deposit rate. The bank or minimum lending rate during this period has varied between 4 per cent. and 17 per cent. and deposit rate has varied between two per cent. and 15 per cent. In these days of huge and constantly changing interest rates (the movement being usually upwards so far) I think it would be unrealistic for a court of equity to abide by the modest rate of interest which was current in the stable times of our forefathers.

In my judgment, a proper rate of interest to be awarded, in the absence of special circumstances, to compensate beneficiaries and trust funds for non-receipt from a trustee of money that ought to have been received is that allowed from time to time on the courts' short-term investment account, established under section 6 (1) of the Administration of Justice Act 1965. To some extent the high interest rates payable on money lent reflect and compensate for the continual erosion in the value of money by reason of galloping inflation. It seems to me arguable, therefore, that if a high rate of interest is payable in such circumstances, a proportion of that interest should be added to capital in order to help maintain the value of the corpus of the trust estate. It may be, therefore, that there will have to be some adjustment as between life tenant and remaindermen. I do not decide this point and I express no view upon it. I merely mention it as something which may have to be considered by the trustees and their legal advisers."

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

57.  The principle for Brightman LJ was to "… compensate beneficiaries and trust funds for non-receipt from a trustee of money that ought to have been received…". The rate was not that which had been awarded in any previous case. It was not the old 4%, nor was it the proxy for a borrowing rate that had been awarded in *Wallersteiner*. It was a rate to provide for both capital and income loss which would need to be apportioned between life tenant and remaindermen accordingly.

58.  I should mention briefly *Re Duckwari PLC*[1999] Ch 268, in which a company sought successfully to recover from a director a loss incurred in respect of a transaction entered into by the company in contravention of section 320 of the Companies Act 1985. That section prohibited transactions with persons connected with the company unless approved by the company in general meeting. A question arose as to the proper rate of interest to be awarded on the compensation. The defendants' counsel, somewhat hesitantly it seems, advanced the old 4% rate as being appropriate, but he accepted that in recent years that rate had been departed from; he suggested base rate less 0.5% would be correct on that basis. The claimant's counsel argued for a rate reflecting the amount that the company would have had to pay to borrow the money, i.e. base rate + 3%. The court awarded base rate, plus 1%.

59.  Nourse LJ (with whom Pill and Thorpe LJJ agreed) said (at p. 273C-H):

"There remains the question of interest. Mr. Hoser's formal position is that we should follow the established practice, dating from before the time of *Knott v. Cottee*, 16 Beav. 77, which was to charge the trustee with simple interest at 4 per cent. unless there was misconduct. More realistically, he accepts that in recent years the court has regularly departed from that rate. His alternative submission is that Duckwari should be held to the notional interest rate (base rate less 0.5 per cent., simple not compound) which it has claimed in respect of the £155,923 applied in part payment of the purchase price. I will say at once that no case has been made out for compound interest.

On the other side, Mr. Richards has relied on the judgment of Forbes J. in *Tate & Lyle Food and Distribution Ltd. v. Greater London Council* [1982] 1 W.L.R. 149, 154 for the proposition that interest should be payable at a commercial rate, i.e. at the rate Duckwari would have had to pay in order to borrow the money, and that in the case of a small concern such as Duckwari the rate should be taken to be as high as base rate plus 3 per cent. My impression is that Forbes J.'s suggestion that the rate should vary according to the size and prestige of the concern which is taken to have borrowed the money has not won general acceptance. The practice of the Commercial Court is to award interest at base rate plus 1 per cent.

In *Bartlett v. Barclays Bank Trust Co. Ltd. (No. 2)*[1980] Ch. 515, 547 Brightman J. was of the opinion that a proper rate of interest to be awarded, in the absence of special circumstances, to compensate beneficiaries and trust funds for non-receipt from a trustee of money that ought to have been received was that allowed from time to time on the short term investment account, a rate which may be taken to be not more favourable than base rate less 0.5 per cent. However, such a rate is not appropriate where the entity which is out of pocket is not a private trust but a commercial concern. In such a case interest ought to be awarded at a commercial rate. A precedent is at hand in the shape of *Belmont Finance Corporation Ltd. v. Williams Furniture Ltd. (No. 2)* [1980] 1 All E.R. 393, 419, to which reference was made in my earlier judgment [1998] 3 W.L.R. 913, 920G. There simple interest was awarded on the sum recoverable by the company in constructive trust at base rate plus 1 per cent. I propose that we should award it at the same rate here."

60.  That was a case in which each side was contending for a borrowing rate in respect of a company which would not have been investing the money but would have been using it for its own business purposes. Thus, the rate awarded was a percentage over base borrowing rates. Again, this was a case where the court resolved the dispute by reference to the nature of the claimant with which it was concerned and the respective arguments presented. There was no argument that anything other than a borrowing rate should be adopted.

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

61.   The next case is another in which each of the parties was contending for different borrowing rates to be awarded. This is *Fiona Trust v Privalov* [2011] EWHC 664 (Comm) (Andrew Smith J). There was no argument that the rate should be fixed by what return the claimants might have made from investing the funds to which they were entitled: see paragraph 14 of the judgment. In such circumstances, it is not surprising that the judge should have said that the court usually decides at what rate of interest the recipient could have borrowed the funds in question or that he should have referred to cases where that was the issue: see paragraph 14 of the judgment. Further, as Nugee J pointed out in the Interest Judgment (paragraph 32) the *Fiona Trust* case did not involve a claim against a defaulting trustee and it involved losses to a trading company. That case and the ones referred to by Andrew Smith J involved claims by trading companies for losses incurred in their businesses.

62.   I turn to *Challinor*, to which I have referred in another context above. This was a case where solicitors were held to have paid away clients' money without authority and in breach of trust. They were liable to restore the lost fund by way of equitable compensation. Argument arose as to the proper rate of interest. The rival contentions were for a borrowing rate of 5% over base by the claimants and a deposit rate, i.e. not more than 1% over base, by the defendant.

63.   Hildyard J compared cases where there had been loss in relation to the conduct of a business, where it was assumed that money would be borrowed to replace it, with cases where the award amounted to an increase in the claimant's funds rather than a replacement of what he had previously had (e.g. personal injury cases) where minimum return on deposit would be the norm. At paragraphs 33 and 34 of his judgment, Hildyard J said:

"33. This case does not really fit easily into either category. It seems to me an example of a third type of case, which is where the claimant is not running a business that depends upon credit, and where the loss of the money is likely to deprive the claimant of other opportunities, but where any ordinary presumption of the need for credit is weak or non-existent.

34. In cases of this third type, in my view, neither a minimum investment basis nor a proxy borrowing cost basis, is really a logical proxy. Thus, it is unlikely that any of the Claimants in this case, being sophisticated investors, would have left money on bank deposit at such low rates of return; but it is also unlikely that any of them would have borrowed at (say) 5% over base rate to make further investments: even someone with an unusual appetite for geared investment would be likely to be put off. Further, neither reflects the larger reality that in this case the Claimants' real loss is the opportunity denied for further investment: and that is not measurable."

He continued (at paragraphs 36 to 38) as follows:

"36. However, I have concluded that in this case, neither the investment rate nor the unsecured borrowing rate really provides a fair answer; and that the appropriate rate is such rate as is reasonable to assume that persons in the position of the Claimants would have had to pay for monies for geared investment. I have no direct evidence of applicable rates in such a context: and I suspect there are fairly broad variations according to personal circumstances.

37.That brings me to issue (2) in paragraph 30 above: what rate would be fair across the board. Again, a broad brush is required: in assessing any special rate the Court disclaims the task of determining what each claimant's financial position is and at what rate that claimant could have borrowed money. It seeks to assess a reasonably representative or proxy rate which can without apparent injustice be applied across the class of claimants.

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

38.The fashioning and calculation of a representative or proxy rate is more art than science; and it is more in the nature of "one size fits all" than "made to measure". It is an exercise of discretion rather than of settled rules. The Court must do its best to fashion a proxy which suits the nature of the case and the claimants as a whole, though it does not and cannot reflect the individual financial position of each claimant."

64.  As can be seen, Hildyard J had no evidence as to the applicable rates for the type of investment that he considered to be the most appropriate proxy. The judge reviewed such evidence as he had about the claimants as a whole and then reverted to what borrowing rates might be available. In the end his award was 3% above base. At paragraph 46, he set out his underlying thinking in setting this rate:

"46. …It is intended to reflect my assessment of (a) the general characteristics of the Claimants as appears likely from the nature of the activity in which they were all engaged, (b) the likelihood that they were as a class in a marginally better position than most to obtain credit in light of their likely standing and financial sophistication, and (c) an element of blending between rates available to borrowers and savers. It is, in a sense, intended to represent a pragmatically enhanced version of the old Commercial Court rate, taking into account the present unusual financial and economic circumstances."

65.  This seems to me to be a case where a judge had to award interest on what he saw to be inadequate evidential materials for his purposes. He did his best to assess the circumstances of a number of different types of claimant, but he recognised that none of the available proxies entirely filled the bill. That is not our case, however. Here the judge had very precise and reputable information from two sources by which to assess what would be returned on proper trust investments.

66.  Finally, I would refer to *Carrasco v Johnson*[2018] EWCA Civ 87, in which the leading judgment was given by my Lord, Hamblen LJ, with whom Kitchin LJ (as he then was) agreed. The claim was to recover a balance of two unsecured loans. The claimant abandoned her original claim to contractual interest and claimed interest pursuant to statute. The District Judge awarded interest at the rate of 3% per annum. This represented between 2.5% and 2.75% over base rate in the relevant period. On the claimant's appeal it was argued that the rate did not reflect the evidence as to the actual cost to her of being kept out of her money; no proper account had been taken of the expert evidence as to borrowing rates; and while the judge accepted that the parties were private individuals and not commercial concerns she had awarded interest at a commercial rate. Two other grounds arose which do not need separate mention.

67.  This was, of course, a statutory interest case and did not involve equitable compensation and interest thereon at all. The defendant was not a defaulting trustee. The claimant was not a beneficiary of a trust fund. The cases referred to by my Lord in his judgment in that case (at paragraph 16) reflect those facts. Apart from *Challinor*, none of the cited authorities involved the equitable jurisdiction to award interest. At paragraphs 17 and 18, Hamblen LJ set out the guidance to be derived from the cases cited as follows:

"17.  The guidance to be derived from these cases includes     the following:

    (1)   Interest is awarded to compensate claimants for     being kept   out of money which ought to have been paid to them rather than as compensation for     damage done or to deprive defendants of profit     they may have made from the use of the money.

    (2)   This is a question to be approached broadly. The     court will consider the position of persons with the claimants' general attributes, but will not have     regard to claimants' particular attributes or any     special position in which they may have been.

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

(3)  In relation to commercial claimants the general      presumption will be that they would have borrowed less and so the court will have   regard     to the rate at which persons with the general attributes of the claimant could have borrowed.     This is likely to be a percentage over base rate and      may be higher for small businesses than for first     class borrowers.

(4)  In relation to personal injury claimants the general      presumption will be that the appropriate rate of interest is the investment rate.

(5)  Many claimants will not fall clearly into a      category of those who would have borrowed or     those who would have put money on deposit and     a fair rate for them may often fall somewhere      between those two rates.

18.  Challinor and Reinhard are examples of cases which     were held to fall within that mid-category, justifying a    blending between rates, and in both cases interest was     awarded at 3% over base rate."

Applying those principles, the court dismissed the appeal.

68.  In my judgment, while *Carrasco* provides an extremely useful and succinct statement of the principles governing the award of interest in the type of case there considered, it does not concern interest upon equitable compensation in general or the liabilities of constructive trustees in particular.

69.  The cases in equity, some of which I have sought to summarise, do not concern cases of that type in issue in *Carrasco*. The courts of equity and later the Chancery Division have applied the principles developed in the trust cases over the years to fix interest rates appropriate to such cases.

70.  A trustee's position affords the ability to act in ways distinctly inimical to the interests of his beneficiaries and without necessarily the signs of default being readily discernible by the beneficiaries (a fortiori, if the beneficiaries are minors). The investing parties in this present case were sophisticated businesspeople but were entitled to similar protections for their trust funds as every beneficiary of a trust or of another fiduciary duty, once the funds came into the hands of a person (natural or legal) who owed trustee duties, including actual or notional investment duties. The principles governing recovery of equitable compensation are not, and need not be, the same as those governing damages or restitutionary claims arising between commercial parties or parties in "arms length" relationships (as in *Carrasco*).

71.  In my judgment, in dealing with questions of interest on equitable compensation in trust cases, the courts have consistently tried to make awards that were suited to investment of trust funds and the economic realities of the times. In the 19th century the task was relatively simple; trust investments could be expected to yield 4%; trustees who mixed trust assets with their own for the purposes of commerce could safely be presumed to have earned at least 5% which they should restore to the trust. If they are thought to have offered 5% as a cheap price of their true profit, an account of that profit would be ordered, as in *Docker v Somes* (supra).

72.  Reality required interest rates to change with the times: see the early 20th century cases cited above. Then in a very different economic climate in 1974, at the time of *Wallersteiner v Moir*, the traditional rates were simply not high enough. The court sought to deprive Dr Wallersteiner of his profit. It did so by reference to a convenient borrowing rate. The victims of his wrongdoing were commercial concerns. I do not read that case as laying down for all time a rule that borrowing rates were the appropriate ones in all cases. Indeed, later cases

Watson v Kea Investments Ltd [2019] EWCA Civ 1759

(even at common law – see the *Carrasco* principles) debate the relative merit of borrowing rates and deposit rates in various types of case. There can be no doubt, however, that the courts have sought to find, in each individual case, a suitable proxy rate for the general characteristics of the claimant entitled to the equitable remedy. As Nugee J pointed out, in paragraph 50 of the Interest Judgment, quoted above, this is entirely in accord with the approach to the interest award, in different circumstances, in *Carrasco*: see paragraph 27 of Hamblen LJ's judgment.

73.   A borrowing rate is simply not the realistic proxy in a case of this sort. It is unrealistic to assume that the deprived fund would have borrowed to invest; it would not have done so. It is unrealistic to assume that the trust fund, duly replaced, would have been placed (in breach of trust, one might add) on deposit with no regard to capital accretion; it would not have been so placed. That is simply not the real world of trustee investment and it is also unlike the world in the 19th century when trustees' investment powers were substantially more restricted.

74.   The material before the judge (ARC/STEP) illustrated precisely what a deprived fund of this type would have done with the misappropriated money. (Brightman LJ had such materials to assist with different rival arguments in *Bartlett*.) There was no need to work in a way contrary to reality or to embark on an element of speculation, as Hildyard J was constrained to do in *Challinor*. Why ignore reality? In my judgment, there was no need do so in this case and Nugee J did not do so.

75.   As I said at the outset, in my judgment, Nugee J (long experienced and highly respected trust and equity practitioner and judge that he is) reached an answer in this case that was well within his wide discretion and in accord with the principles to be derived from, the relevant cases. I regret having had to expand on his reasoning which I would have liked to adopt without more ado. In this judgment, I have intended to say nothing inconsistent or in conflict with Nugee J's judgment.

**Conclusion**

76.   For these reasons, I would dismiss this appeal.

**Lord Justice Hamblen:**

77.   I agree with the judgment of McCombe LJ and that the judge reached a decision that was within his discretion and in accord with the principles to be derived from the relevant cases.

78.   In particular, I agree that Carrasco did not concern interest in relation to equitable compensation or the liabilities of defaulting trustees and that the principles I there summarised did not address such cases.

79.   I was initially troubled by the idea that a claim for interest could include any element of capital return, as reflected in the total return figures used in this case.  As explained by McCombe LJ, however, interest awarded against a defaulting trustee is awarded as a proxy for profit.  If, as the case law shows, interest is meant to reflect the return that should have been obtained on the trust funds then, in the modern world of trustee investment, there is no reason why in an appropriate case it should not reflect total return.

**Sir Bernard Rix:**

80.   I agree with both judgments.