# EXHIBIT 3

sum of £10,000, and the objects of the recommendation were the children of the daughter. I am of opinion, that the husband could not have claimed the legacy in right of his wife, and that the wife could not have claimed it for her own use. A settlement upon the wife and children was intended by the testator to be made by the husband and wife. The wife being dead, the settlement cannot be made; and I of opinion, that the children are entitled equally. It was argued that the subject was uncertain, because the testator recommended, that besides the £10,000 of his own, something of the husband's to be settled also; but there being certainty as to that which was in the testator's power, the trust as to this does not fail, because the testator expressed a wish as to something over which he had no power. His wish or recommendation that the husband should settle something of his own is perfectly consistent with his wish or recommendation that the whole of the £10,000 should be settled, whether the husband settled anything or not.

[148] KNIGHT v. KNIGHT. *Dec.* 17, 18, 19, 20, 21, 1839; *August* 7, 1840.

[S. C. 9 L. J. Ch. (N. S.), 354; 4 Jur. 839; and in House of Lords (sub nom. *Knight v. Boughton*), 11 Cl. & F. 513; 8 E. R. 1195; 8 Jur. 923. See *Holmesdale v. West*, 1866, L. R. 3 Eq. 485; *Shelley v. Shelley*, 1868, L. R. 6 Eq. 544; *Ellis v. Ellis*, 1875, 44 L. J. Ch. 226; *In re Oldfield* [1904], 1 Ch. 553.]

Principles of construction, in cases of precatory words in wills, and the requisites to enable the Court to construe them as imperative.

Where property is given absolutely to one, who is by the donor recommended, intreated, or wished, to dispose of it in favour of another, the words create a trust, if they are such as ought to be construed imperative, and the subject and objects are certain: thus, if a testator gives £1000 to A. B., desiring, wishing, recommending, or hoping that A. B. will, at his death, give the same sum or any certain part to C. D., a trust is created in favour of C. D.

Bequest to A. B. of a residue, with a recommendation to him after his death to give it to his own relations, or such of his own relations as he shall think most deserving, or as he shall choose, has been considered sufficiently certain both as to subject and object, as to create a trust.

Where it is to be collected that the donor did not intend the words to be imperative, or if the first taker was to have a discretionary power of withdrawing any part of the subject from the object of the wish, or if the objects, or the interests they are to take, are not ascertained with sufficient certainty, no trust is created.

A testator, R. P. K., was entitled to real estates in tail male, with remainder to his cousins in tail, with remainder to himself in fee as right heir of the settlor, as to part under a settlement, made by his grandfather, and as to other part under the will of his same grandfather. R. P. K. suffered a recovery and acquired the fee-simple. He afterwards made his will, by which he devised all his estates, real and personal, to his brother T. A. K., if living at his decease, and if not to T. A. K.'s son, T. A. K. the younger, and in case he should die before the testator, to his eldest son or next descendant in the direct male line; and in case he should leave no such descendant, to the next male issue of his said brother, and his next descendant in the direct male line; but in case that no such issue or descendant of his said brother or nephew should be living at the time of his, the testator's decease, to the next descendant in the direct male line of his said grandfather, according to the purport of his will under which the testator inherited those estates which his industry had acquired, &c. He constituted the person who should inherit his said estates his sole executor and trustee, to carry the same and everything therein duly into execution, "confiding in the approved honour and integrity of his family to take no advantage of any technical inaccuracies, but to admit all the comparatively small reservations which he made out of so large a property according to the plain and obvious meaning of his words:" he then gave some small legacies, and proceeded thus: "*I trust to the liberality of my successors to reward*

*any others of my old servants and tenants according to their deserts, and to their justice in continuing the estates in the male succession, according to the will of the founder of the family, my above-named grandfather."* T. A. K. survived the testator. Held, that the words were not sufficiently imperative, and that the subject intended to be affected, and the interests to be enjoyed by the objects, were not sufficiently defined to create a trust in favour of the male line, and that T. A. K. took the property unfettered by any trust in favour of such male line.

Richard Knight being entitled to the manors of Leintwardine and Downton, executed an indenture of settlement, dated the 26th of April 1729, and made between himself and Elizabeth his wife of the **[149]** first part; his four sons, Richard Knight the younger, Thomas Knight, Edward Knight, and Ralph Knight, of the second part; and William Bradley and Joseph Cox of the third part: and it was thereby witnessed that the said Richard Knight, for the love and affection which he bore to his said wife and sons, and for settling an annuity by way of jointure upon his wife in lieu of dower, and *"for settling and assuring the hereditaments thereinafter mentioned, to continue in the name and blood of the said Richard Knight the elder, so long as it should please Almighty God,"* &c.; and to the end that the hereditaments might be settled and established to and for the uses, intents, and purposes, and upon and under the powers, provisoes, limitations, and agreements after expressed, he, the said R. Knight, conveyed the manors of Leintwardine and Downton, and the hereditaments therein described, to trustees, to the use of himself for life; and after his decease, to the use, intent, and purpose, that his wife might receive the annuity therein mentioned, with powers of distress and entry, and subject to the annuity, and the remedies for the recovery thereof, to the use of Richard Knight the younger and his assigns for life; with remainder to the use of the trustees, to preserve contingent remainders; with remainder to the use of the first, second, third, fourth, fifth, sixth, and all and every other sons of the body of the said Richard Knight the younger, on the body of his then wife to be begotten, and the heirs male of such sons; with remainder to the use of the sons of the body of the said Richard Knight the younger, begotten on the body of any other wife in tail male; with remainder to the use of his son Thomas for life; with remainder to the sons of Thomas successively in tail male; with remainder to the use of his son Edward and his assigns for his life; with remainder to the sons of Edward successively in tail male; with **[150]** remainder to the use of his son Ralph and his assigns for life; with remainder to the sons of Ralph successively in tail male; with remainder to the use of the right heirs of Richard Knight, the settlor himself; the deed contained powers of jointuring and leasing.

Richard Knight, by his will dated the 27th day of October 1744, devised his real estates to trustees, to the uses, trusts, intents, and with and upon and under the same powers, provisoes, limitations, and agreements as he had theretofore settled, conveyed, and assured the manor of Leintwardine; and he directed the residue of his personal estate to be laid out in the purchase of lands, to be settled to the same uses.

The testator died on the 6th of February 1745, leaving his four sons surviving him. Richard, the eldest son, died in 1765, without leaving any issue male. Thomas, the second son, who died in 1764, was the father of the testator Richard Payne Knight and of Thomas Andrew Knight. Edward, the third son, who died in 1780, was the grandfather of the Plaintiff John Knight, and of the Defendant Thomas Knight. Ralph, the fourth son, died in 1754, leaving two sons, both of whom died long ago without issue male. (See the pedigree in the next page.)

The eldest son, Richard Knight, enjoyed the estates until his death in 1765, and was succeeded by his nephew Richard Payne Knight, who held the estates until his death in 1824.

Richard Payne Knight being tenant in tail of the estates, suffered common recoveries thereof, and having thereby barred the entail, became the owner thereof in fee.

**[151]** On the 3d of June 1814 he made his will. At that time, his nearest relation, and the next male descendant from Richard Knight his grandfather, was his brother Thomas Andrew Knight, who had an only son, Thomas Andrew Knight, the younger; after his brother and nephew, the next male descendants from Richard

Case 1:21-cv-11059-GHW   Document 150-3   Filed 06/28/23   Page 4 of 16

Knight the grandfather, were the Plaintiff John Knight and his sons, and the Defendant Thomas Knight and his sons.(1)

The will was expressed as follows:—"I give and bequeath *all my estates*, real and personal (except such parts as are hereinafter excepted), to my brother Thomas Andrew Knight, should he be living at the time of my decease; and if not, to his son Thomas Andrew Knight the younger; and in case that he should die before me, to his eldest son or next descendant in the direct male line; and in case that he should leave no such descend-[152]-ant in the direct male line, to the next male issue of my said brother, and his next descendant in the direct male line; but in case that no such issue or descendant of my said brother or nephew shall be living at the time of my decease, to the *next descendant in the direct male line of my late grandfather, Richard Knight of Downton, according to the purport of his will, under which I have inherited those estates which his industry and abilities had acquired, and of which he had therefore the best right to dispose;* subject, nevertheless, and liable in every case to the following reservations and deductions out of the rents and profits thereof, which I give and bequeath to the purposes and in the manner following, viz.: in the first place, I give and bequeath the sum of £300, to be distributed, within one month after my decease, among the poor of the several parishes of Downton, Barrington, Aston, Elton, Leinthall, Starkes, and the northern division of Leintwardine, all in the county of Hereford, in such portions to each individual pauper or poor family as my executor, or such person as he shall appoint for that purpose, shall think equitable and expedient, on condition that no diminution of the parish allowance to any person receiving the same shall be made in consequence thereof."

"And I do hereby constitute and appoint the person who shall inherit my said estates under this my will *my sole executor and* TRUSTEE, *to carry the same and every thing contained therein duly into execution; confiding in the approved honour and integrity of my family, to take no advantage of any technical inaccuracies, but to admit all the comparatively small reservations which I make out of so large a property, according to the plain and obvious meaning of my words;* accordingly I give and bequeath in the second place, out of the said reserved rents and profits, the weekly sum of 25s. of good and



(1) PEDIGREE.
RICHARD KNIGHT (the founder) died 1745.

- Richard died s. p. in 1765.
- Thomas died 1764.
  - RICHARD PAYNE KNIGHT (the testator) born 1750, died s. p. 1824.
  - Thomas Andrew died 1838.
    - Thomas Andrew, died s. p. 1827.
    - Three daughters.
      - Five sons, who died s. p. the survivor in 1812.
- Edward died 1780.
  - Thomas of Henley Hall died s. p. 1803.
  - John of Lea Castle died 1795.
    - John of Wolverley (Plaintiff) born 1767.
      - Three sons (Plaintiffs).
    - Thomas of Pap Castle (a Defendant) born 1775.
      - Four sons and three grandsons (Defendants).
- Ralph died 1754.
  - Charles died s. p. 1763.

lawful money of Great Britain to my faithful old servant Ann Payne, **[153]** to be paid into her hands every seventh day, commencing from the day of my decease, so long as she shall live. And I also give and bequeath the sum of £3 weekly out of the said reserved rents and profits, to be paid in the same manner into the hands of Caroline Elizabeth Gregory, commonly called Ford, of No. 44 Wells Street, Oxford Road, London, as a reward for the affectionate kindness and sincerity with which she has always behaved towards me."

"And I moreover give and bequeath all coins and medals, and all wrought and sculptured articles in every kind of metal, ivory, and gems or precious stones, together with all descriptive catalogues of the same, and all drawings, and books of drawings of every kind, which shall be found in the gallery or western room of my house in Soho Square, to the British Museum, on condition that, within one year after my decease, *the next descendant in the direct male line then living of my above-named grandfather* be made an hereditary trustee, with all the privileges of the family trustees, to be continued in perpetual succession to his next descendants in the direct male line, so long as any shall exist (see 5 G. 4, c. 60); and in case of their failure, to the next in the female line; and also on condition that all duties and other expenses attending the taking possession of and removing the said articles be paid out of the funds of the said Museum. I had, in a will which I hereby revoke, bequeathed these articles to the Royal Academy; and it is not out of any change of sentiment or disrespect towards that body that I now alter that bequest, but because I think that, under the regulations now adopted in the Museum, they will be of more service to the academicians and students, as well as to the public at large, if added to those of my late respected friends Townley and Cratchrode, so as to **[154]** make one great collection, such as no other nation can boast, and afford a more complete comparative view of the rise and progress of imitative art than is anywhere else to be obtained. *I trust to the liberality of my successors, to reward any others of my old servants and tenants according to their deserts, and to their justice, in continuing the estates in the male succession, according to the will of the founder of the family, my above-named grandfather, Richard Knight.*"

Richard Payne Knight died the 29th of April 1824, and his brother Thomas A. Knight proved his will.

The state of the family was not altered during the time which elapsed between the date of this will and the death of Richard Payne Knight.

Thomas Andrew Knight took possession of the estates, and certain indentures, dated the 27th and 28th days of December 1825, and made between Thomas Andrew Knight of the first part, Thomas Andrew Knight the younger of the second part, and Thomas Pendarves Stackhouse of the third part, were executed: whereby after reciting that it was apprehended that Thomas Andrew Knight was not made subject to or bound by any trust of the will of R. P. Knight; or if bound by a trust, that he might exercise or perform the same trust, by settling the devised real estate on Thomas Andrew Knight the younger, his only son in tail male, and by settling the personal estate on him and the heirs male of his body, subject nevertheless to an estate for the life of himself therein; and that T. A. Knight, with the consent and approbation of his said son, had determined to settle the said real and personal estate accordingly; it was witnessed that he conveyed the said real estates to a trustee and his heirs, to the use of Thomas Andrew Knight for life, **[155]** without impeachment of waste; with remainder to the use of Thomas Andrew Knight the younger, and the heirs male of his body lawfully issuing; with remainder to the use of Thomas Andrew Knight in fee, subject nevertheless to the trusts, if any, created by the will of the said R. P. Knight, and which were not thereby performed and duly executed. By the same deeds the personal estate was limited to a trustee, in trust to permit Thomas Andrew Knight to use the same during his life; and after his death, in trust for Thomas Andrew Knight the younger and the heirs of his body.

In Trinity term 1826, a common recovery was suffered of such of the real estates as were situate in the county of Hereford, and Thomas Andrew Knight and his son Thomas Andrew Knight the younger were vouched therein, and the uses thereof were declared to be in favour of Thomas Andrew Knight in fee.

On the 30th of November 1827 Thomas Andrew Knight the younger died intestate and without issue, and his father Thomas Andrew Knight become his legal

62                          KNIGHT *v.* KNIGHT                    3 BEAV. 156.

personal representative. The trustee of the deeds of December 1825 afterwards died, and the Defendant, Edward W. W. Pendarves, was his legal personal representative.

Thomas Andrew Knight the elder afterwards executed certain indentures, dated the 24th and 25th of April 1835, the release being made between Thomas Andrew Knight of the one part and Sir William Edward Rouse Boughton of the other part; and after reciting that doubts were entertained whether Thomas Andrew Knight was not tenant in tail at law or in equity of the lands therein mentioned, being lands devised by the will of the said Richard P. Knight, and that he was desirous and had [156] determined to bar the same estate tail, if any, and enlarge his estate and interest therein to a fee-simple, it was witnessed that, in pursuance of the said determination and of the statute of the 3 & 4 W. 4, c. 74, Thomas Andrew Knight conveyed the lands in Middlesex, Salop, and Gloucester, discharged of all estates in tail and interests of the nature of estates tail, to Sir William Edward Rouse Boughton and his heirs, to the use of Thomas Andrew Knight in fee. The memorial of this deed was duly enrolled.

On the 5th of February 1838 Thomas A. Knight the elder made his will; and thereby, after bequeathing certain legacies, he stated that in the lifetime of his son they had fully considered and arranged as to the settlement and future disposition of the real and personal estate of which his late brother R. P. Knight had died seized and possessed, over which they had a disposing power, and accordingly had executed the deeds of the 27th and 28th of December 1825; and that it was the avowed and fixed determination of his said deceased son, expressed to him in conferences and consultations between them on the subject of their family interests and affairs, that if it had pleased God that his said son should survive him and become possessed of the said real estate, and have no issue, he, the said son, would, in that event, settle or otherwise devise or bequeath the property of the said R. P. Knight unto or amongst or for the benefit of his three sisters Frances Acton, Elizabeth Walpole, and Charlotte Lady Boughton, or their issues, &c., in such manner as he should, under existing circumstances, for the time being and from time to time think most fitting and expedient; his said son considering that it would be, on his part, an act contrary to every principle of natural and moral justice, if, in the events of his surviving him and leaving no issue, whereby the power [157] of disposing of the said real estate would reside and rest solely in himself, he should pass by and disinherit those so nearly connected in blood with him as his sisters and their issue and descendants, in order to prefer and benefit remote relations' descendants in the male line of his great grand-father Richard Knight; and that therefore, as under the calamitous and heavily afflicting event which had happened in the death of his son the power and right of disposing of the real estate of his brother, as well freeholds in fee and for lives, as copyholds, and also his personal estate, had devolved on him, he thereby, in accordance with the wishes and intentions of his son, &c., and in the events before mentioned, and also according to his own sense of justice, and wish and desire in all things, made his said will, and thereby devised and bequeathed all his real estates, comprising as well those which were his late brother's as his own (with certain exceptions), to Sir W. E. R. Boughton and Charlotte his wife, and such son as therein mentioned of the said Sir W. E. R. Boughton and Charlotte his wife. And in case it should thereafter be decided that he had not the power of disposing of the estates and property which belonged to his late brother, but which upon the assumption and full conviction that they did belong to him, and that he had such power, he had included in the aforesaid general devise, then he devised his own estate in the manner therein mentioned. He then stated his will to be, that the costs, &c., of the said Sir W. E. R. Boughton, and every other party interested in his will, in establishing his right to the estates of his late brother, and of any appeal to the House of Lords, should, in case the decision should be pronounced against his claim, and such costs should not be decreed to be paid out of such estate of his said late brother, be charged upon and payable out of his own copyhold and leasehold estates.

[158] And the same testator, after giving various other directions by his will, further provided, that if by the judgment it should be ultimately decided that he had not the right and power of disposing of the said real and personal estates of his said brother, &c., as he had done by that his will, then, and in such case only, and if under

any devise and bequest, limitation, or power in his said brother's will contained, he was, in consequence of failure of his own issue male, authorized and empowered to direct the order of succession, and appoint the real and personal estate, &c., to such one or more of the male descendants of his grandfather, Richard Knight, as he should think most proper, he thereby in exercise of his best judgment and discretion, and in order to continue and preserve the real estate in the male line of the family descended from Richard Knight, by limiting and appointing the same in manner after mentioned to the persons in succession, whom he considered the most likely to keep and preserve the same in the family, but subject to the previous devises and bequests, gave and devised the real estates which were the property of his late brother to his cousin the Defendant, Thomas Knight of Pap Castle, for life, and after his death to John Knight, his second son, and the heirs male of his body lawfully issuing, with other remainders over.

Thomas A. Knight the elder died in May 1838.

Previously, however, to this event, John Knight, who was the male heir of Richard Knight of Downton who died in 1745 (see pedigree, 3 Beav. 151 (n)), together with his three sons, filed this bill in May 1836, against Thomas Andrew Knight the elder and others; praying a declaration that according to the true construction of the will of Richard Payne **[159]** Knight deceased, all the real and all the residue of the personal estates of Richard Payne Knight ought to be conveyed and assigned in such manner as best to secure the enjoyment thereof to the male descendants of Richard Knight the grandfather, as long as the rules of law and equity would permit; and that the same ought to be so limited that Thomas Andrew Knight should have a life-estate therein, with such remainder to his issue male and to the Plaintiffs as might best answer the purposes aforesaid, and for accounts, &c.

Subsequently to the date of his will, Thomas Andrew Knight the elder put in his answer to the original bill in this cause, and thereby claimed under the will of Richard Payne Knight, with or without the aid of the further title derived under the indentures of the 27th and 28th of December 1825, and the indenture of the 23d day of March 1826, and the recovery suffered, and the said indentures of the 24th and 25th of April 1835, to be absolutely entitled to the whole of the real estates of the testator, Richard Payne Knight, in fee-simple and under the said will, or as next of kin of Thomas A. Knight the younger deceased, to be absolutely entitled to the leasehold and personal estate of the said testator.

Thomas Andrew Knight, as before stated, died on the 11th of May 1838, without having revoked or altered his will; and the necessary parties having been brought before the Court by a bill of revivor and supplement, and the preliminary enquiries having been made by the Master, the causes now came on for hearing.

The question in the cause was, whether the precatory words in the will of Richard P. Knight were imperative on Thomas A. Knight.

**[160]** Mr. Pemberton, Mr. G. Turner, Mr. J. Humphry, and Mr. Menteath, for the Plaintiffs. The dispositions contained in the will of the testator, Richard Payne Knight, imposed an imperative trust on his brother, Thomas Andrew Knight, to settle the property in the direct male line of the testator's grandfather, Richard Knight.

It has been now firmly established by a long series of decisions, "that whenever a person gives property, and points out the object, the property, and the way in which it shall go, that creates a trust; unless he shews clearly, that his desire expressed is to be controlled by the party, and that he shall have an option to defeat it." "If a testator shews a *desire* that a thing shall be done, unless there are plain express words or necessary implication, that he does not mean to take away the discretion, but intends to leave it to be defeated, the party shall be considered as acting under a trust;" *Malim* v. *Keighley* (2 Ves. jun. 335). To create by precatory words such a trust as the Court will carry into execution, there are three requisites; *first*, the precatory words must be sufficiently clear; *secondly*, there must be a certainty as to subject of the gift; and, *thirdly*, the objects to take must be certain; *Wright* v. *Atkyns* (Turner & Russ. 157), *Cary* v. *Cary* (2 Sch. & Lef. 189), *Cruwys* v. *Colman* (9 Ves. 322), *Morice* v. *The Bishop of Durham* (10 Ves. 535), *Paul* v. *Compton* (8 Ves. 380).

As to the first requisite, no particular form of words is necessary; it is sufficient for a testator "to express a *desire* as to the disposition of the property, and the desire

so expressed amounts to a command; *Cary* v. *Cary.* Thus "request," *Eade* v. *Eade* (5 Mad. 118); "desire," **[161]** *Harding* v. *Glyn* (1 Atk. 469); "my particular wish and request," *Foley* v. *Parry* (5 Sim. 138, and 2 Myl. & K. 138); "my last wish," *Hinxman* v. *Poynder* (5 Sim. 546); "recommend," *Tibbits* v. *Tibbits* (19 Ves. 656); *Horwood* v. *West* (1 Sim. & St. 387); *Malim* v. *Keighley* (2 Ves. jun. 333); "entreat," *Prevost* v. *Clarke* (2 Mad. 458, n.); "my dying request," *Pierson* v. *Garnet* (2 Bro. C. C. 38, and 226, and Pr. in Ch. 200, n.); "not doubting," *Parsons* v. *Baker* (18 Ves. 476); "trusting and wholly confiding," *Wood* v. *Cox* (1 Keen, 317, and 2 Myl. & Cr. 684); in short, "any words of recommendation and desire in a will are always expounded a devise," *Eales* v. *England* (Pr. Ch. 200). They also cited on this point *The Duchess of Buckingham's case* (2 Ves. jun. 530), and 1 Jarm. Pow. Devises, 355.

By the civil law, from which most probably the principle was adopted by Courts of Equity, "words of request or confidence *rogo, volo, mando, injungo, desidero, deprecor, fidei tuæ committo, scio te hæreditatem meam restituturum Titio,* are those by which a *fidei commissum* is created; but effect is given to a *fidei commissum,* if it can be collected from any expressions in the instrument that it was the grantor or testator's intention to create it" (2 Burges Comm. 106): and like a declaration of a use in equity, where there has been a transmutation of possession, "any expression whereby the mind of the party may be known that such a one shall have the land is sufficient;" *Jones* v. *Morley* (12 Mod. 159).

Secondly, the subject of the gift is sufficiently certain, being the estates and personal property devised and bequeathed by the will.

**[162]** Thirdly, the persons to take are sufficiently defined being persons in the male line in succession; a description much more perfect than the expressions "family," "relations," which have been held sufficiently certain to be carried into execution; *Harding* v. *Glyn* (1 Atk 470), *Cruwys* v. *Colman* (9 Ves. 322).

Applying these principles to the present case, the Court finds the testator "TRUSTS to the justice of his successors in continuing the estates in the male succession, according to the will of the founder of the family, his above-named grandfather Richard Knight;" and he "appoints the person who shall inherit his estates his sole executor and TRUSTEE, to carry the same and everything contained therein duly into execution, *confiding* in the approved honour and integrity of his family to take no advantage of technical inaccuracies." These words of trust and confidence are much stronger than many which have occurred, besides which, the person inheriting was also distinctly appointed a *trustee* to carry the will into execution. The clause respecting the hereditary trustee of the British Museum and the first gift over, in case of there being no issue of Thomas A. Knight and his son living at the testator's death, shew how anxious the testator was to keep up the distinction of the direct male line of his grandfather.

If, then, this be a trust binding on Thomas Andrew Knight, he was bound to carry it into effect by a settlement of the property, so as to run so far as was possible in the male order of succession. This was a trust to be executed by him; and the distinction between trusts executed and executory has always been recognised and admitted; *Mortimer* v. *West* (2 Sim. 282), *Jervoise* v. *The Duke of* **[163]** *Northumberland* (1 Jac. & W. 570), 1 Preston Abst. 135. The estate ought, therefore, to have been settled so as to give successive life-estates to the parties *in esse; Leonard* v. *The Earl of Suffolk* (2 Vern. 526), *Papillon* v. *Voice* (2 P. Williams, 470), *White* v. *Carter* (Amb. 670), *Humberston* v. *Humberston* (1 P. Williams, 332), *Hopkins* v. *Hopkins* (1 Atk. 593). In *Lord Dorchester* v. *The Earl of Effingham* (G. Coop. 319, and *post,* p. 180, n.; and see 2 Pow. Devises, 443), a testator, having a power of revocation and new appointment, directed "his estates to be attached to his title as closely as possible," it was held that the effect of his will was to abridge the estates of all persons *in esse,* in the line of the title, from estates tail to estates for life. In *Woolmore* v. *Burrows* (1 Sim. 512), lands were to be purchased and closely entailed to the family estate; and it was decided that every person *in esse* at the testator's death must have life-estates, and no more.

The difficulty of making a settlement so as to meet every event will probably be relied on by the other side; but the Court has frequently, as in several of the cases already referred to, overcome that objection. The same argument was used in *Pierson* v. *Garnet* (2 Bro. C. C. 38); but there it was met by the Court in these terms: the

difficulty and impracticability of carrying the trust into execution has been pressed: "That argument has no weight with me; because if an express trust had been raised, it must have been executed, though it would have been attended with all the same difficulties and impracticabilities stated in this case. However arduous the trust was, the Court must have carried it into execution."

[164] Mr. Spence, Mr. Coote, and Mr. Phillips, for the Defendant Thomas Knight of Pap Castle and his children, concurred in the argument of the Plaintiffs, that the precatory words used by the testator Richard Payne Knight were imperative upon Thomas Andrew Knight; but they contended that he had, by implication, a power of selection amongst the male descendants of the founder of the family; and that it had been duly executed by the will of Thomas Andrew Knight in favour of John Knight and his family; *Brown* v. *Higgs* (4 Ves. 708). That the only object of the testator R. P. Knight was to continue the property in the male line, to the exclusion of females; and there were many events which might happen, as the bankruptcy, insolvency or insanity of the elder male branches, which would render such a power of selection in T. A. Knight absolutely necessary to carry out the intention of the testator of continuing the estates in the family.

The Attorney-General [Campbell], Mr. Tinney, Mr. Wilbraham, and Mr. Hodgson, for the widow of the testator and for Mrs. Acton, his daughter, and Pendarves, a trustee;

Mr. Kindersley and Mr. K. Parker, for Sir W. Boughton and children; and

Mr. Richards and Mr. Torriano, for Mrs. Walpole, who claimed under the will of Thomas Andrew Knight, *contrà*, argued to the effect following. The testator, Thomas Andrew Knight, became absolutely entitled to the real and personal estate of his brother Richard Payne Knight, under the will of the latter, unfettered with any trust; or, supposing him to have taken an estate tail under the will, yet by means of [165] the recoveries it became afterwards converted in a fee-simple absolute.

The principle of holding precatory words to be imperative has been frequently disapproved of, and the current of modern authority is strongly against it. Lord Chief Baron Richards, speaking of the former decisions on the subject, thus expressed himself (10 Price, 265), "I hope to be forgiven if I entertain a strong doubt whether, in many, or perhaps in most of the cases, the construction was not adverse to the real intention of the testator.

"It seems to me very singular, that a person who really meant to impose the obligation established by the cases, should use a course so circuitous, and a language so inappropriate and also obscure, to express what might have been conveyed in the clearest and most usual terms—terms the most familiar to the testator himself, and to the professional or any other person who might prepare his will. In considering these cases, it has always occurred to me, that if I had myself made such a will as has generally been considered imperative, I should have never intended it to be imperative; but, on the contrary, a mere intimation of my wish that the person to whom I had given my property should, if he pleased, prefer these whom I postponed to him, and who, next to him, were at the time the principal objects of my regard.

"I am happy to be enabled to state, that in this opinion I have the concurrence of a noble Judge, than whom there has never been, and, I believe, never can be, a person more active and acute in investigating the principles of the law in all its bearings, or more extensively learned on every legal subject."

[166] "In *Wright* v. *Atkyns* (1 Ves. & B. 315), Lord Eldon says, 'This sort of trust is generally a surprise on the intention, but it is too late to correct that.' Again, he says, 'We know the question was, what the word family meant? I do not believe that the testator intended a mere trust, but that must be the construction, if the word "family" is properly construed.' I have said so much as a justification, or rather the foundation, of the opinion which I entertain, that, though I hold myself bound by the decisions, and obliged to follow them, I do not consider it to be my duty to extend the rule of construction which has been adopted in them, and to add to the number of those where the Court appears to me rather to have made than to have given effect to the wills of testators."

In the same case Lord Redesdale said, that "all cases of this description were to be considered with very considerable strictness, as it was a very inconvenient mode of disposition:" *Meredith* v. *Heneage* (1 Sim. 566). And Sir Anthony Hart observes, as

R. II.—3

to this equity, that "The first case that construed words of recommendation into a command, made a will for the testator; for every one knows the distinction between them. The current of decisions has, of late years, been against converting the legatee into a trustee:" *Sale* v. *Moore* (1 Sim. 540), and see *Lawless* v. *Shaw* (1 Lloyd & Goold, 154, and 165, n.; 5 Cl. & Fin. 129; 1 Drury & W. 512).

The words used by the testator are not, and were not, intended to be, imperative upon his successors. There are three instances in which he expresses his confidence; first, he "*confides* in the *approved honour and integrity* of his family to take no advantage of tech-[167]-nical inaccuracies, but to admit all the small reservations out of the property.; secondly, he *trusts* to the *liberality* of his successors to reward old tenants and servants; and, thirdly, he trusts to their *justice* in continuing the estates in the male succession." In neither of these cases was it the intention of the testator to bind his family, and in every of them he would have deprecated the interference of this Court. If his wishes had been consulted, they undoubtedly would have been to have continued the estate in the family *for ever*. He was aware that this could not be effected by any legal means; he knew that he could not effectually settle his estate so as to be unalienable, further than the minority of the first tenant in tail; and he therefore considered the best mode to accomplish his wishes was to trust to the *honour* of his successors, and to impose on them what is termed "an imperfect obligation," which was to be binding morally only.

His intention, so far as can be collected, was to create a perpetuity, which the law will not allow, and which the Court cannot carry into execution; but taking it to be his wish to settle the estates "according to the will of the founder of the family," then the will of 1744 must be the scheme and model for effecting it. Under that will, Thomas Andrew Knight the elder would have been tenant in tail, and that estate has been barred, and converted into a fee-simple absolute. Again, at the date of the will of 1744, Richard Knight appears to have had seven grandchildren living, who were the children of his son Edward, yet he did not attempt to limit life-estates to the two generations, but gave estates tail to the children of Edward. If then this will is to be taken as a model, the settlement to be made would be very different from that asked by the Plaintiffs, namely, to limit successive life-estates to all the persons *in esse;* [168] or, as is stated in the prayer of the bill, to convey estates "in such manner as best to secure the enjoyment thereof to the male descendants of Richard Knight the grandfather of the testator, *so long as the rules of law and equity will permit;*" but would have been to Thomas A. Knight for life, with remainder to T. A. Knight the younger in tail.

This case has none of the requisites for enabling the Court to say, that the property is fixed with a positive trust in favour of the Plaintiffs.

First, the words are not sufficiently strong to be construed imperative. The testator trusts to their *justice*, a word clearly importing no legal obligation.

In *Harland* v. *Trigg* (1 Bro. C. C. 142) there was a gift to his brother of leaseholds, hoping he would continue them in the family, and it was held that no trust had been created. *Cunliffe* v. *Cunliffe* (Ambler, 686) was a devise to his son, recommending him if he died without issue to give and devise it to his brother the Plaintiff, and it was held that no trust had been created. In *Bland* v. *Bland* (2 Cox, 351), the testator earnestly requested the party by will to settle, and there no trust was created. In *Sale* v. *Moore* (1 Sim. 534), there was a gift to wife of a residue, recommending to her, and not doubting she would consider his near relatives, and there the decision was against there being any trust. In *Curtis* v. *Rippon* (5 Mad. 434), the testator trusted that the devisee would make such use of it as should be for her own and her children's spiritual and temporal good; remembering always, according to circumstances, the Church of God and the poor; and in *Lechmere* v. *Lavie* (2 Myl. & K. 197) where the [169] words were "of course they will leave what they have," &c.; and *Ex parte Payne* (2 Younge & C. 636), where the expressions were "I strongly recommend her to execute a settlement;" and *Meredith* v. *Heneage* (10 Price, 306, and 1 Sim. 542), it was successively held that no trust had been created.

The second requisite, namely, certainty in the subject, is also wanting; the property to be subject to the supposed trust is in the greatest degree of uncertainty. From the word "*continue*," one would suppose that those estates which passed by the will of Richard Knight the founder were alone to be included; as to which, however,

it seems strange that Richard Payne Knight should himself have defeated the will of his grandfather, by suffering recovery of those estates. There are, however, five distinct properties which may be the subject of the supposed trust: first, the realty settled by the deed of 1729; secondly, the realty afterwards acquired by Richard Knight, and devised by his will; thirdly, the personal estate of Richard Knight; fourthly, the real estates acquired by Richard Payne Knight; and fifthly, his personal estate. It is impossible to say, whether all or any, and which, of these different descriptions of property are to be included in the supposed trust. Again, it is clear, that the successors are to have the right of rewarding the old servants and tenants out of the property; and this, then, will have the effect of rendering the residue uncertain, and of making the trust void. *Wynne* v. *Hawkins* (1 Bro. C. C. 179); *Eade* v. *Eade* (5 Madd. 118).

Thirdly, the persons to take; the extent of their interest, and the estates they are severally to enjoy is in no way defined. How is this Court to carry such a trust into execution? What provision is to be made for jointures, [170] portions, leasing-powers, &c.? When are the daughters to be let in to take in default of male issue? It is impossible to carry anything so vague and uncertain into execution; and to effectuate the wish fully, a perpetuity must be created, which is contrary to law.

The wish is addressed to all successors in the most remote line; why is it to bind the first taker only?

The distinction between trusts executed and trust executory has always been admitted, but here the testator had no reference to any settlement to be executed, there is no conveyance to execute. It is true, that where a deed is to be executed, the Court will mould the limitation, so as to effectuate the general intention, "but if a party will be his own conveyancer and create the estate, the Court has no jurisdiction to alter it." *The Countess of Lincoln* v. *The Duke of Newcastle* (12 Ves. 238), *Douglas* v. *Congreve* (1 Beavan, 59). In *Gower* v. *Grosvenor*, as reported in Barnardiston (page 62), the Court seems to have considered that a conveyance was to be executed. *Humberston* v. *Humberston* was a gift to trustees to convey. In *Woolmore* v. *Burrows*, there was a direct gift to the executors to be laid out, and closely entailed to the family estate. *Lord Dorchester* v. *The Earl of Effingham* appears to have been a legal devise under a power, and the estate was to be attached to the title as closely as possible.

There is no reported case in which the Court has directed a settlement to be executed upon precatory words, and no case in which words of request have been addressed to so indefinite a series of persons as successors.

Mr. Pemberton, in reply.

[171] *August* 7. THE MASTER OF THE ROLLS [Lord Langdale] (after stating the circumstances of the case, proceeded): The Plaintiff, John Knight of Wolverley, contends, that, under the will of Richard Payne Knight, his brother Thomas Andrew Knight was bound to make a strict settlement of the real and personal estates upon the male descendants of Richard Knight the grandfather.

The Defendant Thomas Knight of Pap Castle contends, that Thomas Andrew Knight was not bound to make a strict settlement of the estates, but was bound to make some settlement thereof upon one or more of the male descendants of Richard Knight, among whom he had a power of selection, which he has duly exercised by his will.

The Defendant Sir William Edward Rouse Boughton, and the widow and daughters of Thomas A. Knight, who claim under his will contend, that he had an absolute estate and interest in the property in question, and had a power of disposition, unfettered by any trust or obligation whatever.

The principal question is, whether a trust in favour of the male descendants of Richard Knight is created by the will of the testator Richard Payne Knight.

That the testator wished that his estates, or at least, that some estates should be preserved in the male line of his grandfather, and had a reliance, or in the popular sense, a trust, that the person to whom he gave his property, and those who should succeed to it, would act upon and realise that wish, admits of no doubt. He has expressed his wish and his reliance in terms which are, to that extent, sufficiently clear.

[172] But it is not every wish or expectation which a testator may express, nor every act which he may wish his successors to do, that can or ought to be executed or

enforced as a trust in this Court; and in the infinite variety of expressions which are employed, and of cases which thereupon arise, there is often the greatest difficulty in determining, whether the act desired or recommended is an act which the testator intended to be executed as a trust, or which this Court ought to deem fit to be, or capable of being enforced as such. In the construction and execution of wills, it is undoubtedly the duty of this Court to give effect to the intention of the testator whenever it can be ascertained: but in cases of this nature, and in the examination of the authorities which are to be consulted in relation to them, it is, unfortunately, necessary to make some distinction between the intention of the testator and that which the Court has deemed it to be its duty to perform; for of late years it has frequently been admitted by Judges of great eminence that, by interfering in such cases, the Court has sometimes rather made a will for the testator, than executed the testator's will according to his intention; and the observation shews the necessity of being extremely cautious in admitting any, the least, extension of the principle to be extracted from a long series of authorities, in respect of which such admissions have been made.

As a general rule, it has been laid down, that when property is given absolutely to any person, and the same person is, by the giver who has power to command, recommended, or entreated, or wished, to dispose of that property in favour of another, the recommendation, entreaty, or wish shall be held to create a trust.

[173] First, if the words are so used, that upon the whole, they ought to be construed as imperative;

Secondly, if the subject of the recommendation or wish be certain; and,

Thirdly, if the objects or persons intended to have the benefit of the recommendation or wish be also certain.

In simple cases there is no difficulty in the application of the rule thus stated.

If a testator gives £1000 to A. B., desiring, wishing, recommending, or hoping that A. B. will, at his death, give the same sum or any certain part of it to C. D., it is considered that C. D. is an object of the testator's bounty, and A. B. is a trustee for him. No question arises upon the intention of the testator, upon the sum or subject intended to be given, or upon the person or object of the wish.

So, if a testator gives the residue of his estate, after certain purposes are answered, to A. B., recommending A. B., after his death, to give it to his own relations, or such of his own relations as he shall think most deserving, or as he shall choose, it has been considered that the residue of the property, though a subject to be ascertained, and that the relations to be selected, though persons or objects to be ascertained, are nevertheless so clearly and certainly ascertainable—so capable of being made certain, that the rule is applicable to such cases.

On the other hand, if the giver accompanies his expression of wish, or request by other words, from which it is to be collected, that he did not intend the wish to [174] be imperative: or if it appears from the context that the first taker was intended to have a discretionary power to withdraw any part of the subject from the object of the wish or request: or if the objects are not such as may be ascertained with sufficient certainty, it has been held that no trust is created. Thus the words "free and unfettered," accompanying the strongest expression of request, were held to prevent the words of the request being imperative. Any words by which it is expressed or from which it may be implied, that the first taker may apply any part of the subject to his own use, are held to prevent the subject of the gift from being considered certain; and a vague description of the object, that is, a description by which the giver neither clearly defines the object himself nor names a distinct class out of which the first taker is to select, or which leaves it doubtful what interest the object or class of objects is to take, will prevent the objects from being certain within the meaning of the rule; and in such cases we are told (2 Ves. jun. 632, 633) that the question " never turns upon the grammatical import of words—they may be imperative, but not necessarily so; the subject-matter, the situation of the parties, and the probable intent must be considered." And (10 Ves. 536) " wherever the subject, to be administered as trust property, and the objects, for whose benefit it is to be administered, are to be found in a will, not expressly creating a trust, the indefinite nature and *quantum* of the subject, and the indefinite nature of the objects, are always used by the Court as evidence, that the mind of the testator was not to create a trust;

and the difficulty, that would be imposed upon the Court to say what should be so applied, or to what objects, has been the foundation of the argument, that no trust was intended;" or, as Lord Eldon expresses it in another **[175]** case (Turn. & Russ. 159), "Where a trust is to be raised characterised by certainty, the very difficulty of doing it is an argument which goes, to a certain extent, towards inducing the Court to say, it is not sufficiently clear what the testator intended."

I must admit, that in the endeavour to apply these rules and principles to the present case, I have found very great difficulty; that in the repeated consideration which I have given to the subject, I have found myself, at different times, inclined to adopt different conclusions; and that the result to which I have finally arrived has been attended with much doubt and hesitation.

The testator, at the date of his will, was entitled in fee to a large real estate, and absolutely entitled to a very considerable personal estate. Of the largest part of the real estate he had been tenant in tail, under the dispositions made by his grandfather Richard Knight; he had suffered recoveries, whereby he became entitled to the same estate in fee; and the question is, whether by the will he meant to impose on his brother, Thomas Andrew Knight, the trust or duty of making such a settlement as is alleged by the Plaintiffs; or such a settlement upon some of the male descendants of the grandfather as would, under the will of Thomas Andrew Knight, give a right to the Defendant, Thomas Knight of Pap Castle; or did he mean that his brother was to have over the estate the same power which he himself had acquired and enjoyed; and which by his will he exercised for the purpose of transmitting the estate to the next male heir of his grandfather, and which he wished his successors to use in the same manner for the further transmission of the estates in the same line. And I **[176]** am of opinion, though, I admit, after great doubt and hesitation, that the testator did not intend to impose an imperative trust on his successor, and that his will ought not to be construed to have that effect.

As he who had made himself absolute owner of the property had conceived himself bound in honour to transmit it to the male line of his grandfather, so he wished the same sentiment to govern his successors. He was pleased to speak of the honour and integrity of his family, and he expressed his trust or reliance on the justice of his successors; but it does not appear to me that he intended to subject them, as trustees, to the power of this Court, so that they were to be compelled to do the same thing which he states he trusted their own sense of justice would induce them to do.

It is a common observation in all such cases, that the testator might, if he had intended it, have created an express trust; but the authorities shew that if there be sufficient certainty, and nothing in the context of the will to oppose the conclusion, the trust may and must be implied; and the question is, whether there is a trust by implication.

He gave all his estates, real and personal (except as therein mentioned), to his brother, or to the next descendant in the direct male line of his grandfather, who should be living at the time of his death. The gift is in terms which make the devisee the absolute owner, and give him the power of disposing of the whole property (with such exceptions as are mentioned) as he pleases. The exceptions, deductions, or reservations consist of certain gifts for charitable and other purposes; and he constitutes his devisee sole executor and trustee to carry his will into execution, "confiding in the ap-**[177]**-proved honour and integrity of his family to take no advantage of any technical inaccuracies;" and the context appears to me to shew, that these words relate to the reservations which he had made out of the general devise and bequest to his brother or the next descendant in the direct male line of his grandfather. The expressions used in his great bequest to the British Museum, afford additional evidence of his wish to maintain the distinction of his family in the same line; but I think that the question in the cause depends on the effect to be given to the last sentence in the will. Having given all his estates, real and personal, to his successor, that is, the next male descendant, and having given a few legacies, he says, "I trust to the liberality of my successors to reward any others of my old servants and tenants according to their deserts, and to their justice in continuing the estates in the male succession, according to the will of the founder of the family, my above-named grandfather Richard Knight."

In this passage there is no doubt of the wish, or of the line of succession, in which

the testator desired the estates (whatever he meant by that term) to devolve or be transmitted.

Contemplating his successors, and, as it would seem, all his successors without limit in that line, he says, that he trusts to their liberality for one purpose, and to their justice for another. So far as he trusts to their liberality to reward any of his old servants or tenants, according to their deserts, he cannot be understood to have intended to create an imperative trust. Notwithstanding the use made of the word "trust," an indefinite discretion was, in that respect, left with the successors; and it is difficult to suppose, that having in this sentence used the word "trust" in a sense consistent with an [178] indefinite discretion in the person trusted, he should, in the same sentence, use the word "trust" in a sense wholly inconsistent with such discretion;—in a sense which imposed an absolute obligation to resort to the most refined subtleties of the law for the purpose of executing a trust in such a manner as to preserve, by compulsion, the succession to the estate in the same line for the longest time possible. Admitting the wishes of the testator, which seem to me sufficiently expressed, I have found an insuperable difficulty in coming to a satisfactory conclusion that he did not intend to rely on the honour, integrity, or justice of his family or successors for the performance of his wishes, but did intend to impose upon his successors an obligation to be enforced by legal sanction: and the impression arising from the last words in the will appears to me to be increased by a consideration of the preceding parts. He gave absolute estates; as to the gifts to other persons, he confides in the approved honour and integrity of his family that no advantage will be taken of technical inaccuracies to defeat them; and as to the succession of the estates intended to pass in the line he had chosen, he trusts to their justice. It seems to me, as if he had said, "you see my sense of what is due to the founder of the family; under his will, I have inherited the estates which his industry and abilities acquired, and of which he had, therefore, the best right to dispose. I have, by my own act, made myself absolute master of the estates, but I think it just to continue the succession in the same manner: this I do by my will, and I trust to your justice to do the like." If this were his meaning, it is consistent with an intention that each successor should take from his immediate predecessor, by gift proceeding from a sense of justice, or by descent from the same motive, an absolute interest in the estates; and that the continuance in the line designated should be provided for in that way.

[179] I think, therefore, that there is great reason to doubt the intention to create an imperative trust: and looking to the subject to which his wishes were directed—observing the absolute gift of all his estates, real and personal, with certain exceptions; and that, in the last clause, he has not used the words "my said estate," or any words clearly and certainly indicating all that he had given to those whom he has called his successors, but had simply used the words, "the estates," leaving it be matter of by no means easy construction, whether he intended under that expression to include the personal estate as well as the real; and it not being certain, having regard to the subsequent reference to the will of his grandfather, whether he meant to include more than the estates of his grandfather, to which he had himself succeeded; and observing that some part of the personal estate, at least, was subjected to the liberality of his successors, I think that there is reason to doubt whether the subject is sufficiently certain for a trust of this nature.

The objects do appear to me to be indicated with sufficient certainty, and it seems to me clear in what order he wished them to take. But, unless they were to take successively as absolute owners, I cannot discover what estates they were intended to take. I have not been able to persuade myself that the testator meant to tie down his successor to make such a settlement as is proposed by the Plaintiffs, and nothing less would give the Plaintiffs any right to ask for a decree of this Court in their favour; and if I might be permitted to adapt the words of Lord Rosslyn, in the case of *Meggison* and *Moore* (2 Ves. jun. 633), to the circumstances of this case, I should say, that "if I were imperatively to declare that the successors designated by the will should take only [180] for life and their issue in strict settlement, I should do a thing most foreign to the testator's intention. His successor might have done what is suggested. The testator intimated a wish to him, and gave sufficient power; but I cannot say that he has left it to the Court of Chancery to accomplish his wishes."

On the whole, I am under the necessity of saying, that for the creation of a trust, which ought to be characterised by certainty, there is not sufficient clearness to make it certain that the words of trust were intended to be imperative, or to make it certain what was precisely the subject intended to be affected, or to make it certain what were the interests to be enjoyed by the objects.

It appears to me, therefore, that the Plaintiffs have not made out any title, and that the bill ought to be dismissed.(1)

Bill dismissed with costs.

(1) Lord Dorchester v. The Earl of Effingham. Rolls. *Feb.* 18, 19, *March* 9, 1813.

[See cases in note to *Knight* v. *Knight*, 3 Beav. 148.]

A. having a power of revocation and new appointment over an estate, of which B., his heir, was tenant in tail, by his will directed the estate "to be attached to his title as closely as possible." Held, that the estate of B. and all other tenants in tail *in esse* at A.'s death (being in line of the title) were abridged to estates for life only.

The facts of the case, as appearing by the decree, were as follows: under certain indentures, real estates were limited to the use of Guy Lord Dorchester for life, with remainder to his then eldest son Christopher for life, with remainder to Christopher's first and other sons in tail male, with remainder in succession to the other children of Guy Lord Dorchester for life, with remainder to their first and other sons in tail. A power of revocation of their uses, and of making a new appointment by deed or will, was reserved to Guy Lord Dorchester.

Christopher died in 1806, leaving the Plaintiff Arthur Henry, his eldest son, an infant.

Guy Lord Dorchester died in 1808. By his will, attested so as to pass real estate, he expressed himself as follows:—"*All my landed estates to be attached to my title as closely as possible;* all the timber woods **[181]** and trees on my estates I leave to my executors in trust to increase my landed property; all debts due to me from Government, and all my personal property not otherwise disposed of, I leave to my executors in trust to increase my landed property, all which trust shall be lodged in Bank stock, there to accumulate principal and interest, and profits arising therefrom, till my executors find an adviseable purchase adjoining to or near my estates. The executors to have a power, with the consent and approbation of Lady Dorchester, to sell my estates for the purpose of buying others, which may unite or approximate the landed property."

By a codicil unattested, he gave all the timber on his estates, and all his personal property not otherwise disposed of, to his executors in trust to increase his landed property.

After the death of Guy Lord Dorchester, his grandson Arthur Henry, then Lord Dorchester, who, under the limitations in the deeds, taken independently of the will, would have been tenant in tail, filed this bill by his guardian, praying that he "might be declared to be tenant in tail of the said settled estates, under and by virtue of the limitations of the said deeds;" that the deeds and will might be carried into execution, and for a declaration of the rights of the parties.

The parties entitled in remainder, after the limitations to the Plaintiff and his issue, insisted "that the said testator did by his said will alter the uses of the said settlement, and that he had full right and power so to do; and that upon the true construction of the said will, the Plaintiff ought to be declared to be tenant for life of the estates of the said Guy Lord Dorchester; and that they would become entitled upon the death of the said Plaintiff to successive estates for life therein, with remainder to their respective sons in tail male; and the Defendant Guy Carlton claimed to be the first tenant in tail in being of the said estates."

It appears from the registrar's note-book, that the cause came on upon the 18th and 19th of February 1813, when it was ordered to stand over for a fortnight, with liberty for the Plaintiff to amend the bill, and bring the cause again to a hearing as

he should be advised. The cause accordingly came on upon the 9th of March 1813, when

Sir S. Romilly and Mr. Trower appeared for the Plaintiff.

Mr. Leach and Mr. Courtenay, for Lady Dorchester and the Defendants to the amended bill.

Mr. Richards, for the executors.

Sir William Grant, Master of the Rolls, declared "that by the effect of the said testator's will, the estate tail of the said Plaintiff Lord Dorchester, in the said settled estates, and the estates tail of all other the male issue [182] or descendants (if any) of the testator *in esse*, at the time of the testator's death, in the same estates were abridged to estates for life only, with remainder to their first and other sons successively in tail male in strict settlement." (NOTE.—See this case reported on another point in G. Cooper, 319; where the former part of the will is stated.)

[182] FRANKS v. PRICE. *Dec.* 6, 7, 10, 11, 13, 14, 1839; *August* 8, 1840.

[S. C. 9 L. J. Ch. (N. S.), 383; and at law, 5 Bing. (N. C.), 37; 6 Scott. 710.]

A testator gave life interests in real and personal estate to A. and B., with interests to their issue male in certain events only, and the estate was given over to the heir of the testator on a general failure of issue male of A. and B. Held, that A. and B. took estates tail by implication.

A testator devised his real and personal estate to trustees, and gave life-estates therein to several persons, namely, A., B., &c.; and after their deaths he directed the trustees to pay the income to Moses and Naphthali, during their respective lives, share and share alike; and in case either of them should, *after the deaths of A., B., &c.*, depart this life without leaving issue male of his body, in trust to pay the whole income to the survivor for life; and he directed that if Moses should, *after the deaths of A., B., &c.*, die *before Naphthali, leaving issue male*, then the trustees should *convey*, a moiety of the real estate, to the use of the first and other sons of Moses in tail male, with remainder to Naphthali for life, with remainder to his first and other sons in tail, and in default to the testator's right heirs, and lay out a moiety of the personal estate in land, and convey the same to trustees to the like uses. The testator made a similar disposition *mutatis mutandis* of the other moiety in case of the death of *Naphthali, after the death of A., B., leaving issue male*, and he provided that in case Moses and Naphthali should die without leaving issue male, or if such issue male should die without leaving any issue male, the trustees should convey the property to such person as should, at the death of the survivor of Moses and Naphthali, be the right heir of the testator. It will be seen that no provision was made for the event (which happened), of *Moses dying without issue before the death of A., B.* Naphthali survived Moses and A., B., &c., and Moses died without issue. Held, first, that the words "after the deaths of A., B.," &c., did not import contingency, but were merely words of reference, shewing that the gifts then in course of expression were subject to the prior gifts, and were not to have effect in possession until those prior gifts were satisfied or had become inoperative. Secondly, that the words, "if Moses should die before the death of Naphthali, leaving issue male," must have their natural meaning, and be taken to provide only for the particular cases expressly described. Thirdly, that to effectuate the general intent, Naphthali took an estate tail by implication in both moieties of the realty, and an absolute interest in the personalty. And, fourthly, that the trusts on which the question arose were not executory so as to alter the construction as arising on an executed trust.

The question in this case arose on the will of the testator Moses Hart, and was, whether, under the will and in the events which had happened, Naphthali Hart took an estate for life, or an estate tail by implica-[183]-tion, in the real and personal estate of the testator. In the former case alone the Plaintiff would be entitled.

The testator, by his will, dated the 2d of April 1756 (after bequeathing several annuities and certain legacies, and specifying various personal property to which he