# EXHIBIT 4

[COURT OF APPEAL]                                                A

*HUNTER v. MOSS

1993   Dec. 20, 21                              Dillon, Mann and Hirst L.JJ.

Trusts—Declaration of trust—Oral—Defendant holding 95 per cent. of
company's shares—Defendant declaring himself trustee of 5 per            B
cent. of company's issued share capital for plaintiff absolutely—
Shares not ascertained or identified—Whether sufficient certainty
of subject matter to constitute valid trust

The defendant was the registered holder of 950 shares in a
company with an issued share capital of 1,000 shares. Following
trial of an action the deputy judge held that the defendant had
made a valid oral declaration of trust constituting himself trustee    C
for the plaintiff of 5 per cent. of the company's issued share
capital, and that the trust applied to 50 of the defendant's 950
shares. The defendant applied by motion, within 28 days, for the
judgment to be recalled and set aside, inter alia on the ground,
which had not been argued at trial, that the purported trust had
failed for want of certainty of the subject matter. The deputy
judge dismissed the motion.                                            D
On the defendant's appeal:—
Held, dismissing the appeal, that in the case of a declaration
of trust of personalty the requirement of certainty of subject
matter did not necessarily entail segregation of the property
which was to form the subject matter of the trust; that the
declaration of trust by the defendant was sufficiently certain as
to subject matter, since the shares held by the defendant were
of such a nature as to be indistinguishable from each other and        E
were all therefore capable of satisfying the trust without
identifying any particular 50 shares; and that, accordingly, the
trust was not void for uncertainty of subject matter (post,
pp. 457B–C, 458A–C, 459E–F).
In re London Wine Co. (Shippers) Ltd. [1986] P.C.C. 121
distinguished.
Decision of Mr. Colin Rimer Q.C., sitting as deputy High
Court judge in the Chancery Division [1993] 1 W.L.R. 934               F
affirmed.

The following cases are referred to in the judgment of Dillon L.J.:

Cheadle, In re [1900] 2 Ch. 620, C.A.
Clifford, In re [1912] 1 Ch. 29
Diplock, In re [1948] Ch. 465; [1948] 2 All E.R. 318, C.A.
Earl of Lucan, In re (1890) 45 Ch. D 470                               G
Knight v. Knight (1840) 3 Beav. 148
London Wine Co. (Shippers) Ltd., In re [1986] P.C.C. 121
Mac-Jordan Construction Ltd. v. Brookmount Erostin Ltd. (1991) 56
    B.L.R. 1, C.A.
Milroy v. Lord (1862) 4 De G.F. & J. 264
Rose, In re [1952] Ch. 499; [1952] 1 All E.R. 1217, C.A.
                                                                       H

The following additional cases were cited in argument:

Arthur Sanders, In re (1981) 17 B.L.R. 131
Bizzey v. Flight (1876) 3 Ch. D. 269
Bond Worth Ltd., In re [1980] Ch. 228; [1979] 3 W.L.R. 629; [1979] 3 All
    E.R. 919
Cozens, In re [1913] 2 Ch. 478
Hallett's Estate, In re (1880) 13 Ch. D. 696

1 W.L.R.                    Hunter v. Moss (C.A.)

A
*Oldfield, In re* (1904) 1 Ch. 549
*Rayack Construction Ltd. v. Lampeter Meat Co. Ltd.* (1979) 12 B.L.R. 30
*Sinclair v. Brougham* [1914] A.C. 398, H.L.(E.)
*Taylor v. Plumer* (1815) 3 M. & S. 562
*Wait, In re* [1927] 1 Ch. 606
*Williams, In re* (1897) 2 Ch. 12

B
APPEAL from Mr. Colin Rimer Q.C. sitting as a deputy High Court judge in the Chancery Division.

By a judgment dated 16 October 1992 Mr. Colin Rimer Q.C., sitting as a deputy High Court judge in the Chancery Division, found that the defendant, Robert Joseph Moss, had declared himself to be a trustee for the plaintiff, David Morris Hunter, as to a 5 per cent. holding in the issued share capital of Moss Electrical Co. Ltd. to which the plaintiff had

C
thereupon become absolutely beneficially entitled. The company's issued share capital consisted of 1,000 shares of which the defendant was the registered holder of 950 and it was held that the trust applied to 50 of the defendant's 950 shares. Judgment was given for the plaintiff for £112,723·70.

By a notice of motion dated 11 November 1992 the defendant applied

D
to the same deputy judge (but by different counsel) to have the judgment in the action recalled and set aside on the grounds, inter alia, that (1) the deputy judge had been wrong in law in holding that a voluntary express trust had been properly constituted by the oral statement of the defendant made in September 1986; and (2) the judge ought to have held that an unappropriated proportion amounting to 50 unidentified and similar shares out of 950 issued shares in Moss Electrical Co. Ltd. which were

E
held and owned by the defendant did not sufficiently identify the specific property to be held by the defendant as the property of the plaintiff and that the express trust claimed by the plaintiff thereby failed to be properly constituted by reason of uncertainty of the property. On 20 November 1992 the deputy judge dismissed the motion.

By a notice of appeal dated 26 November 1992, and subsequently

F
amended, the defendant appealed on the grounds that (1) the judge was wrong in law in holding that a voluntary express trust was properly constituted by the oral statement of the defendant; (2) the judge was wrong in law in finding that the fact that the defendant did not realise the legal and tax consequences of the making by him of the trust did not alter the position; and (3) in any event, the damages were too large.

The facts are stated in the judgment of Dillon L.J.

G
*Michael Hartman* for the defendant.
*Edward Davidson* for the plaintiff.

DILLON L.J. This is an appeal by the defendant in this action, Mr. Robert Joseph Moss, against the order made by Mr. Colin Rimer

H
Q.C. sitting as deputy High Court judge in the Chancery Division. The judge, in fact, delivered two judgments after the trial of the action. The first was judgment delivered on Friday, 16 October 1992 by way of reserved judgment after a trial which had taken place between 2 and 7 October. In that judgment the judge, as he said at the beginning of the second judgment, found as a fact that in the course of a conversation between the plaintiff, Mr. David Morris Hunter, and the defendant in early September 1986 the defendant declared himself to be a trustee for

the plaintiff of five per cent. of the issued share capital of a company     A
called Moss Electrical Co. Ltd. which has been referred to in the
judgments and the other documents as "M.E.L." Having reached that
conclusion, by his order made on that date the judge declared that the
defendant had held 50 shares out of the total of 1,000 issued shares in
M.E.L. on an express oral trust for the plaintiff and that such shares
were converted into the equivalent proportion of the consideration
received by the defendant on the sale of the entire share capital of     B
M.E.L. to a company called Bennett & Fountain Group Plc. ("Bennett
& Fountain").

The judge further ordered that the plaintiff was entitled to five per
cent. of the consideration which the defendant had received from Bennett
& Fountain amounting in total to a judgment sum of £112,723·70
including interest. So there was to be judgment for that sum with costs.     C

The first issue that arises on this appeal is that the conclusion that the
defendant had declared himself a trustee for the plaintiff of 50 shares in
M.E.L., being 5 per cent. of the share capital of that company, is
challenged. Apart from that, however, after the judge had pronounced
his order on 16 October 1992, and before his order was drawn up, he
was invited by Mr. Hartman of counsel, for the defendant, to withdraw
his order and reach a different conclusion on a point of law which had     D
not been argued in the trial prior to 16 October 1992. The position is
that Mr. Clark of counsel had appeared for the defendant at the trial.
Mr. Hartman, who appears on this appeal, only came on the scene after
the trial and he made the application on which the judge gave a further
judgment on 20 November 1992 rejecting the application.

The point taken by Mr. Hartman in that, as it were, second bite at     E
the cherry was that as there was no identification of the 50 shares in
M.E.L. out of the total of 1,000 issued shares in M.E.L. there was no
sufficient certainty as to what the trust property was to be and, therefore,
any attempt by the defendant to declare a trust was ineffective in law for
want of sufficient certainty as to the trust property. That is the second
point that is taken on this appeal.

Thirdly, a further point is taken as to the calculation of the     F
compensation resulting in the sum of £112,723·70 which the judge
awarded by his order. It is said that that resulted from a wrong turn
taken by everyone—and, in particular, by Mr. Clark, the counsel then
acting for the defendant—at the end of the hearing before the judge
reserved to give his judgment of 16 October.

I should come first to the history of the matter which I take,     G
gratefully, from the chronology provided by Mr. Hartman. M.E.L. seems
to have been incorporated in 1962. Its business was that of a wholesaler
in industrial electrical equipment, trading from an address in East
London. It had one class of shares only—1,000 ordinary shares—and
by 1983 490 of these were held by the defendant. 410 were held by his
father, Mr. Max Moss, and 100 by his mother. In late 1983, the plaintiff
attended for interview. In January 1984 he commenced employment with     H
M.E.L. On 12 July 1985 he was appointed finance director for M.E.L.

At that time the managing director of M.E.L. was a Mr. Ravinder
Sood. In the course of 1984 50 ordinary shares in M.E.L. were sold to
Mr. Sood to give him a shareholding of 5 per cent. in M.E.L. In fact, it
seems that those shares came from the shareholding of Mr. Max Moss,
the defendant's father. What was done was that, as the value of the
shares at that stage was not as high as it subsequently, for a time at any

A   rate, became, there was a bonus provided for Mr. Sood which enabled him to purchase the 50 shares. In September 1985 Mr. Max Moss died and the balance of his shares in M.E.L. were transferred to the defendant.

    In June 1986 the defendant stated an intention to give the plaintiff 50 ordinary shares in M.E.L. The obvious object of that was to put the plaintiff in the same position as Mr. Sood. But it seems that the value of

B   the shares was thought to have risen somewhat and also there was a fear of what the fiscal consequences might be, particularly, perhaps, as at that time there were proposals by Bennett & Fountain to buy the share capital of M.E.L. One of the problems was whether there would be a capital gains tax liability on the defendant; another may have been whether there might be an income tax liability on the plaintiff. At any

C   rate, the defendant stated his intention to give the plaintiff 50 shares, and attempts were made to work out a scheme by which those shares would be transferred to the plaintiff without attracting any tax consequences. That scheme, however, proved abortive and in a discussion with the defendant in early September 1986, as the judge held, a trust was declared.

    Following that, on 30 September 1986 the agreement proposed for

D   the sale of the share capital to Bennett & Fountain was signed and completed fairly soon thereafter. I will go into the details of the transfer later.

    In 1988 and in 1989 there were dividends paid on the Bennett & Fountain shares and there was also a rights issue. In 1989 the defendant paid the plaintiff the net dividends on what was thought to be the

E   appropriate proportion attributable to the plaintiff's 5 per cent. in M.E.L. of the Bennett & Fountain shares which had been issued to the defendant. Unfortunately, thereafter the parties fell out and the writ in this action was issued on 17 July 1990.

    So far as the first point is concerned, whether there was a firm declaration of trust, the judge has set out his findings of fact very carefully in his October 1992 judgment (unreported). There were various

F   assertions in evidence by the plaintiff which were denied by the defendant. The judge had preferred the evidence of the plaintiff to that of the defendant. Mr. Hartman does not seek to go behind the judge's preference for the plaintiff's evidence, but he says that, even on the judge's findings of fact in favour of the plaintiff, the requisite degree of certainty of intention to declare an immediate trust cannot be inferred.

G   The judge sets out part of his summary of the plaintiff's evidence, at p. 15 of the transcript:

> "The plaintiff's evidence is that, by about early September 1986, the . . . scheme"—that was a scheme being considered with another company for getting around the fiscal problem—"was abandoned. Instead, the parties reverted to the original arrangement which had

H    > been proposed at the meeting of 22 June 1986"—the parties included Bennett & Fountain—"under which Bennett & Fountain would pay £3m in cash and shares for M.E.L. So far as his 5 per cent. in M.E.L. is concerned, the plaintiff says that, at about this time the defendant told him that, despite all efforts, a solution could not be found to what was regarded as being a problem with regard to it and it was getting in the way of the proposed sale. The plaintiff says that, during that conversation, the defendant asked him if he would

Dillon L.J.                Hunter v. Moss (C.A.)                [1994]

A

mind if he, the defendant, held on to the plaintiff's shares for him
until a solution was found and that, in the meantime, he would
ensure that the plaintiff received all the dividends that he was
entitled to. The plaintiff is unsure whether the defendant said in
terms that he would, in the meantime, hold the shares 'in trust' for
him, but he says that that is the sense of what the defendant said to
him. In summary he said that the defendant made clear to him that,
pending the finding of a solution to the perceived difficulties, he
would hold 5 per cent. of M.E.L.'s issued shares for the plaintiff
and would account to him for all dividends due in respect of such
holding."

B

That is the crucial finding. It is also picked up at various other places in
the judgment. The judge said, at p. 36 of the transcript:

C

"I have found that, shortly afterwards (in about early September
1986), the defendant had a conversation with the plaintiff in which
he said words whose substantive sense was that he would henceforth
hold five per cent. of the M.E.L. shares either for, or in trust for,
the plaintiff, and that he would pay him the dividends due in respect
of such holding."

D

The judge said, at p. 37:

"I find that, as from that conversation in early September 1986, the
defendant held 5 per cent. of M.E.L.'s issued shares, i.e., 50 shares,
on trust for the plaintiff. Even if he did not in terms use the words
'in trust,' the sense of what he then said was that he would
thenceforth hold the shares on such a trust."

E

There is a similar passage in that judgment, at p. 34, which I need not
read. I find it impossible, in the context in which this matter comes
before us, to go behind the judge's summary, at p. 15:

"pending the finding of a solution to the perceived difficulties, he
would hold five per cent. of M.E.L.'s issued shares for the plaintiff
and would account to him for all dividends due in respect of such
holding."

F

I do not think we can prefer the view that the substance of the judge's
finding, or the evidence, was, at p. 15:

"the defendant asked [the plaintiff] if he would mind if he, the
defendant, held on to the plaintiff's shares for him until a solution
was found and that, in the meantime, he would ensure that the
plaintiff received all the dividends that he was entitled to."

G

The judge was, no doubt, working from his own notebook and
recollection of the witnesses' evidence, but the transcripts of the evidence
of the plaintiff have not been put before us.

I do not see that it is open to us to reject the judge's finding
repeatedly stated in the course of his judgment. One understands clearly
what is meant by "pending the finding of a solution to the perceived
difficulties." The whole purpose can only have been, however, that the
declaration of trust that the judge found was intended to be an immediate
declaration of trust to have effect so as to enable the sale to Bennett &
Fountain to go through in the hope that some other solution would come
to light, but it had to have an immediate effect. He could not have been

H

1 W.L.R.                          Hunter v. Moss (C.A.)                      Dillon L.J.

A  intending at that juncture to mean that he would simply shelve the idea of transferring shares and giving the plaintiff any rights in respect of what had been referred to as "the plaintiff's 5 per cent. in M.E.L." until a solution at some later date was hopefully found which would enable the defendant's favourable wishes to the plaintiff to be given effect to without adverse tax consequences for either of them. Therefore, I do not think it is open to Mr. Hartman to dispute the judge's conclusion of fact which is

B  the crucial conclusion which he seeks to challenge in this part of his notice of appeal. The finding must stand.

I pass then to the second point of uncertainty. It is well established that for the creation of a trust there must be the three certainties referred to by Lord Langdale in *Knight v. Knight* (1840) 3 Beav. 148. One of those is, of course, that there must be certainty of subject matter. All

C  these shares were identical in one class: 5 per cent. was 50 shares and the defendant held personally more than 50 shares. It is well known that a trust of personalty can be created orally. We were referred to the well known passage in the judgment of Turner L.J. in *Milroy v. Lord* (1862) 4 De G.F. & J. 264, 274–275, where he said:

"I take the law of this court to be well settled, that, in order to

D  render a voluntary settlement valid and effectual, the settlor must have done everything which, according to the nature of the property comprised in the settlement, was necessary to be done in order to transfer the property and render the settlement binding upon him. He may of course do this by actually transferring the property to the persons for whom he intends to provide, and the provision will then be effectual, and it will be equally effectual if he transfers the

E  property to a trustee for the purposes of the settlement, or declares that he himself holds it in trust for those purposes; and if the property be personal, the trust may, as I apprehend, be declared either in writing or by parol; but, in order to render the settlement binding, one or other of these modes must, as I understand the law of this court, be resorted to, for there is no equity in this court to perfect an imperfect gift. The cases I think go further to this extent,

F  that if the settlement is intended to be effectuated by one of the modes to which I have referred, the court will not give effect to it by applying another of those modes. If it is intended to take effect by transfer, the court will not hold the intended transfer to operate as a declaration of trust, for then every imperfect instrument would be made effectual by being converted into a perfect trust."

G  In the present case there was no question of an imperfect transfer. What is relied on is an oral declaration of trust. Again, it would not be good enough for a settlor to say, "I declare that I hold 50 of my shares on trust for B," without indicating the company he had in mind of the various companies in which he held shares. There would be no sufficient certainty as to the subject matter of the trust. But here the discussion is

H  solely about the shares of one class in the one company.

It is plain that a bequest by the defendant to the plaintiff of 50 of his ordinary shares in M.E.L. would be a valid bequest on the defendant's death which his executors or administrators would be bound to carry into effect. Mr. Hartman sought to dispute that and to say that if, for instance, a shareholder had 200 ordinary shares in I.C.I. and wanted to give them to A, B, C and D equally he could do it by giving 200 shares to A, B, C and D as tenants in common, but he could not validly do it

458

Dillon L.J.              Hunter v. Moss (C.A.)                [1994]

by giving 50 shares to A, 50 shares to B, 50 shares to C and 50 shares to
D, because he has not indicated which of the identical shares A is to
have and which B is to have. I do not accept that. That such a
testamentary bequest is valid, appears sufficiently from *In re Clifford*
[1912] 1 Ch. 29 and *In re Cheadle* [1900] 2 Ch. 620. It seems to me,
again, that if a person holds, say, 200 ordinary shares in I.C.I. and he
executes a transfer of 50 ordinary shares in I.C.I. either to an individual
donee or to trustees, and hands over the certificate for his 200 shares and
the transfer to the transferees or to brokers to give effect to the transfer,
there is a valid gift to the individual or trustees/transferees of the 50
shares without any further identification of their numbers. It would be a
completed gift without waiting for registration of the transfer: see *In re
Rose* [1952] Ch. 499. In the ordinary way a new certificate would be
issued for the 50 shares to the transferee and the transferor would receive
a balance certificate in respect of the rest of his holding. I see no
uncertainty at all in those circumstances.

Mr. Hartman, however, relied on two authorities in particular. One
is a decision of Oliver J. in *In re London Wine Co. (Shippers) Ltd.* [1986]
P.C.C. 121 which was decided in 1975. That was a case in which the
business of the company was that of dealers in wine and over a period it
had acquired stocks of wine which were deposited in various warehouses
in England. Quantities were then sold to customers by the company, but
in many instances the wine remained at the warehouse. There was no
appropriation—on the ground, as it were—from bulk, of any wine, to
answer particular contracts. But the customer received from the company
a certificate of title for wine for which he had paid which decribed him
as the sole and beneficial owner of such-and-such wine of such-and-such
a vintage. The customer was charged for storage and insurance, but
specific cases were not segregated or identified.

Subsequently, at a stage when large stocks of wine were held in
various warehouses to the order of the company and its customers, a
receiver was appointed by a debenture holder. The question that arose
was whether the customers who had received these certificates of title
had a good title to the quantity of wine referred to in the certificate as
against the receiver appointed under a floating charge. The judge held
that it could not be said that the legal title to the wine had passed to
individual customers and the description of the wine did not adequately
link it with any given consignment or warehouse. And, furthermore, it
appeared that there was a lack of comparison at the time the certificates
were issued in that, in some cases, the certificates were issued before the
wine which had been ordered by the company had actually been received
by the company. It seems to me that that case is a long way from the
present. It is concerned with the appropriation of chattels and when the
property in chattels passes. We are concerned with a declaration of trust,
accepting that the legal title remained in the defendant and was not
intended, at the time the trust was declared, to pass immediately to the
plaintiff. The defendant was to retain the shares as trustee for the
plaintiff.

Mr. Hartman also referred to *Mac-Jordan Construction Ltd. v.
Brookmount Erostin Ltd.* (1991) 56 B.L.R. 1, a decision of this court.
The position there was that Mac-Jordan were sub-contractors for
Brookmount as main contractors. There was retention money kept back
by Brookmount which, on the documents, was to be held on a trust for
the sub-contractors, but it had not been set aside as a separate fund

A    when a receiver was appointed by the main contractor, Brookmount's,
bank. It was, consequently, held that Mac-Jordan were not entitled to
payment in full of the retention moneys in priority to the receiver and
the secured creditor. It was common ground in that case that, prior to
the appointment of the receivers, there were no identifiable assets of
Brookmount impressed with the trust applicable to the retention fund.
At best, there was merely a general bank account.

B        In reliance on that case Mr. Hartman submitted that no fiduciary
relationship can attach to an unappropriated portion of a mixed fund.
The only remedy is that of a floating charge. He referred to a passage in
the judgment of Lord Greene M.R. in In re Diplock [1948] Ch. 465,
519–520 where he said:

C        "The narrowness of the limits within which the common law operated
may be linked with the limited nature of the remedies available to it
. . . In particular, the device of a declaration of charge was unknown
to the common law and it was the availability of that device which
enabled equity to give effect to its wider conception of equitable
rights."

D        So Mr. Hartman submitted that the most that the plaintiff could claim
is to have an equitable charge on a blended fund. He mentioned the
decision of Chitty J. in In re Earl of Lucan (1890) 45 Ch.D. 470 which
points out that, where there was merely an equitable charge which did
not grant perfect and complete rights to the chargee and it was given by
way of gift to a volunteer, there could be no specific performance in
favour of the volunteer who would have no priority over the creditors of
E    the grantor. As I see it, however, we are not concerned in this case with
a mere equitable charge over a mixed fund. Just as a person can give, by
will, a specified number of his shares of a certain class in a certain
company, so equally, in my judgment, he can declare himself trustee of
50 of his ordinary shares in M.E.L. or whatever the company may be
and that is effective to give a beneficial proprietary interest to the
beneficiary under the trust. No question of a blended fund thereafter
F    arises and we are not in the field of equitable charge.
        Therefore, I agree with the deputy judge on the conclusion of the
uncertainty point which he dealt with in his November 1992 judgment
[1993] 1 W.L.R. 934.
        There then rests the slightly tangled question of what the relief to be
granted should be. As I have said in dealing with the history, Mr. Sood,
G    the managing director, was granted 50 shares in M.E.L. and, when the
share capital of M.E.L. was sold to Bennett & Fountain, Mr. Sood
received 187,500 Bennett & Fountain shares in exchange for his 50
M.E.L. shares. The claim for the plaintiff in his pleaded case at all stages
until the end of the trial was that he, like Mr. Sood, should be entitled
to 187,500 Bennett & Fountain shares or, rather, to their equivalent at
the agreed price under the sale of Bennett & Fountain. The defendant in
H    respect of his shares in M.E.L.—which, by then, were all the shares
except Mr. Sood's because he held, as trustee, the plaintiff's shares and
it seems that he had received his mother's shares—received for his whole
holding 13,500,000 shares in Bennett & Fountain plus £150,000 in cash.
        We have the position, therefore, that Mr. Sood received, and the
plaintiff was claiming, 187,500 shares. However, the defendant's receipt
included a cash sum. The question, therefore, arose whether the plaintiff
should receive the proportion of shares that Mr. Sood received or a

460

Dillon L.J.                    Hunter v. Moss (C.A.)                    [1994]

proportion of the cash sum and a proportion of the shares which the    A
defendant had received. By the time of the trial I think the defendant
had disposed of all his shares, but nothing turns on that. The judge said
in his October 1992 judgment:

> "It was not disputed by Mr. Clarke"—then the counsel for the
> defendant—"that, if I were so to find, the plaintiff's beneficial
> interest in the 50 M.E.L. shares became translated, upon the    B
> completion of the M.E.L. acquisition by Bennett & Fountain on
> 28 October 1986 into, at any rate for the most part, a corresponding
> proportion of the Bennett & Fountain shares which the defendant
> received in exchange for his M.E.L. shares. The plaintiff's pleaded
> case is that he became entitled to 750,000 10p Bennett & Fountain
> shares, now represented by 187,500 20p shares. As I have said, that
> is the holding which Mr. Sood acquired in exchange for his 50    C
> M.E.L. shares. However, Mr. Clarke submits that, in this respect,
> the plaintiff's pleaded case is inaccurate. He says that the correct
> position is that the plaintiff is more properly to be regarded as
> having become entitled in equity to 5 per cent. of the total
> consideration paid by Bennett & Fountain for the M.E.L. shares,
> i.e., 5 per cent. of the cash sum of £150,000 paid to the defendant,    D
> or £7,500; and 177,631·57 20p Bennett & Fountain shares—that
> number of shares being the post-consolidation equivalent of the
> number of Bennett & Fountain shares which the defendant received
> for each 50 M.E.L. shares. Mr. Davidson agreed that that was
> probably the more correct way of identifying the plaintiff's
> entitlement, and agreed Mr. Clarke's figures. For my part, having
> considered the matter further whilst preparing this judgment, it    E
> appears to me that, strictly, the cash element of the plaintiff's
> entitlement is £7,894·73 rather than £7,500, that sum being the cash
> amount received by the defendant in respect of each 50 of his 950
> M.E.L. shares. I will give Mr. Clarke the opportunity of pointing
> out any error in that reasoning but, subject to that, I proceed on the
> basis that the plaintiff's equitable interest in 5 per cent. of M.E.L.'s    F
> issued shares became translated upon its acquisition by Bennett &
> Fountain and after adjustments to take account of Bennett &
> Fountain's subsequent share consolidation, into (1) £7,894·73 in
> cash, and (2) 177,631·57 20p Bennett & Fountain shares."

The judge then proceeded to hold that the appropriate remedy by    G
way of monetary compensation in place of his beneficial interest in
177,631·57 shares was 39p per share. That is the mid-market price on
30 November 1989.

Then he, again, returns to the point that no cash sum has been
claimed in the pleadings and the case was exclusively put forward on the
basis of 187,500 shares. It was, however, not suggested by Mr. Clarke
that any deficiency in the pleading put the plaintiff out of court on the    H
point. And, indeed, the judge understood Mr. Clarke to accept that if he
were, in principle, to find in favour of the plaintiff then it would be right
also to award him the cash sum. The judge then held that it would be
right to do so. It is relief which the plaintiff is entitled to as a consequence
of having established his beneficial interest in 5 per cent. of M.E.L.'s
shares. He goes on then to deal with interest and there are calculations
of interest.

A    Then there is discussion after judgment in which it appears that the judge had miscalculated the number of days for which interest would be running on the basis, which was common to the parties, on which the award should be made. Accordingly, that was adjusted to produce the figure of £112,723·70. Mr. Clarke specifically said, subject to that interest adjustment, that he agreed with the judge's calculation on the case sum which he had checked, that it did seem to be right. He is, therefore,

B    clearly accepting the basis on which the judge was following Mr. Clarke's suggestion, proceeding with the agreement of Mr. Davidson, picking up any mathematical errors on anyone's part en route.

Mr. Hartman says that the true calculation is the calculation which was pleaded of 187,500 shares and he adds in relation to that that when net dividends were paid in 1989 they were paid on the equivalent of

C    187,500 shares. What actually happened at that time was that the defendant said to the plaintiff, "I owe you some dividends. You must calculate them." They were calculated by the plaintiff on the footing that his notional shareholding in Bennett & Fountain was the same as Mr. Sood's. This would actually produce in total, for mathematical reasons which it is unnecessary to go into, a smaller sum than the £112,000 the judge awarded. It comes down, as set out in the revised

D    notice of appeal, from the £112,723·70 to £104,707·55. As I see it, however, Mr. Clarke put forward the methodology that the plaintiff was entitled to his percentage of the consideration which the defendant received on the sale to Bennett & Fountain, that is to say, to the proportion attributable to 50 shares of cash and shares received by the defendant for his holding. That seems to me to have been, in principle,

E    correct unless there was some other arrangement made whereby the plaintiff had agreed that he would have, on the transfer, shares only as Mr. Sood was, apparently, willing to have. But, although the claim was put forward on a basis of shares only, and the dividends were accounted for, without considering the problem, on that basis, I do not see any evidence of any supplementary agreement which would have prevented the ordinary tracing rule applying, that he would be entitled to the due

F    portion of the consideration received by the defendant.

Mr. Davidson accepted, though it had not been pleaded, Mr. Clarke's proposal and when the mathematics had been ironed out that was something in which the judge's order was really representing the consent of the parties to the proper way of giving effect to the judge's finding that a trust for 50 ordinary shares in M.E.L. had been validly created by the defendant in favour of the plaintiff. The consent swept out of the

G    way any other possible arguments that there might have been. It has been suggested that, therefore, any interference with the judge's finding as to the amount to be awarded would require the consent of the judge below, or of this court, under the recently inserted R.S.C., Ord. 59, r. 1B and Mr. Hartman asks us, so far as is necessary, to grant such consent. If I were with him on the substantive conclusion I would, indeed, be prepared to grant leave. But it seems to me that there was,

H    indeed, consent between the parties to this way of doing it which was also, as I see it, a correct way.

Therefore, I would not interfere with the financial award by the judge except for correcting yet one more minor point which has come to light, and that is that Mr. Davidson has discovered—and the point is put forward at the end of his skeleton argument—that the net dividend payments which the plaintiff received in 1989 were calculated on an

462

Dillon L.J.                    Hunter v. Moss (C.A.)                    [1994]

assumed beneficial holding of 187,500 Bennett & Fountain shares    A
whereas, on the judge's conclusion, he was only the beneficial owner of
177,631·57 such shares. Consequently, there was, when the net dividends
were paid by the defendant, an overpayment of £498·95 for which the
plaintiff should give credit. That is best done by adjusting the figure
which the judge awarded of £112,723·70 by deducting £498·95. Subject
to that very minor adjustment, I would dismiss this appeal.
                                                                   B

    MANN L.J.   I agree.

    HIRST L.J.   I also agree.

                           *Appeal dismissed with costs.*
                           *Legal aid taxation of plaintiff's costs.*    C
                           *Leave to appeal refused.*

    *Solicitors: Nabarro Nathanson; Hewitson Becke & Shaw, Cambridge.*

                                                        G. F.

                                                                   D

─────────

                                                                   E
                        [PRIVY COUNCIL]

*MOTOR AND GENERAL
INSURANCE CO. LTD.     .    .    .    .    .    .    APPELLANTS
                        AND
PAVY    .    .    .    .    .    .    .    .    .    .    RESPONDENT    F

        [APPEAL FROM THE COURT OF APPEAL OF TRINIDAD AND TOBAGO]

1993   July 21; Dec. 15              Lord Griffiths, Lord Goff of Chieveley,
                                        Lord Lowry, Lord Slynn of Hadley
                                                    and Lord Woolf
                                                                   G

        *Trinidad and Tobago—Road traffic—Third party insurance—Insurers'*
            *liability to pay insured's judgment debt—Third party issuing writ*
            *for damages against insured in respect of damage to vehicle after*
            *collision—Insured failing to forward writ to insurers in breach of*
            *condition in policy—Third party obtaining judgment and claiming*
            *payment from insurers—Whether insured's breach of condition*
            *giving insurers defence to claim for damage to property—Motor*    H
            *Vehicles Insurance (Third Party Risks) Act (Laws of Trinidad*
            *and Tobago, 1983 ed., c. 48:51), ss. 4(1)(b)(5), 8, 10(1)*

            Section 4(1)(b) of the Motor Vehicles (Third Party Risks)
        Act[1] required the drivers of motor vehicles in Trinidad and

─────────
[1] Motor Vehicles Insurance (Third-Party Risks) Act, s. 4(1)(b)(5): see post, p. 465A–C.
S. 8: see post, p. 465D–E.
S. 10(1): see post, p.465F–G.