# EXHIBIT 5



**Michaelmas Term**
[2022] UKPC 47
**Privy Council Appeals No 0064 and 0065 of 2020**

# JUDGMENT

# Grand View Private Trust Co Ltd and another (Respondents) *v* Wen-Young Wong and others (Appellants) (Bermuda)
# Grand View Private Trust Co Ltd and others (Respondents) *v* Wong and others (Appellants) (No 2) (Bermuda)

## From the Court of Appeal for Bermuda

before

**Lord Hodge**
**Lord Sales**
**Lord Burrows**
**Lady Rose**
**Lord Richards**

**JUDGMENT GIVEN ON**
**8 December 2022**

**Heard on 8, 9 and 10 March 2022**

**JCPC 2020/0064**

*Appellants (Wong, Wen-Young, aka Winston Wong, and Wong, Ray-Tseng, aka Riley Wong)*
Elspeth Talbot Rice KC
Dakis Hagen KC
Rod Attride-Stirling
Emma Hargreaves
Stephanie Thompson
(Instructed by Baker & McKenzie LLP (London) and ASW Law Ltd (Bermuda))


*First Respondent (Grand View Private Trust Co Ltd)*
Mark Howard KC
Jonathan Adkin KC
Karyl Nairn KC
Paul Smith
Adil Mohamedbhai
Niranjan Venkatesan
(Instructed by Skadden Arps Slate Meagher & Flom (UK) LLP)


*Second Respondent (Wu Wang, Hsueh-Min, aka Jennifer Wang)* did not appear and was not
represented


*Third Respondent (Wang, Ven-Jiao, aka Tony Wang)*
Richard Wilson KC
James Weale
Fozeia Rana-Fahy
Charlotte Beynon
(Instructed by MJM Ltd (Bermuda) and Stewarts Law LLP)


**JCPC 2020/0065**

*Appellant (Wang, Ven-Jiao, aka Tony Wang)*
Richard Wilson KC
James Weale
Fozeia Rana-Fahy
Charlotte Beynon
(Instructed by MJM Ltd (Bermuda) and Stewarts Law LLP)


*First Respondent (Grand View Private Trust Co Ltd)*
Mark Howard KC
Jonathan Adkin KC
Karyl Nairn KC

Paul Smith
Adil Mohamedbhai
Niranjan Venkatesan
(Instructed by Skadden Arps Slate Meagher & Flom (UK) LLP)


*Second Respondent (Wu Wang, Hsueh-Min, aka Jennifer Wang)* did not appear and was not represented


*Third and Fourth Respondents (Wong, Wen-Young, aka Winston Wong, and Wong, Ray-Tseng, aka Riley Wong)*
Elspeth Talbot Rice KC
Dakis Hagen KC
Rod Attride-Stirling
Emma Hargreaves
Stephanie Thompson
(Instructed by Baker & McKenzie LLP (London) and ASW Law Ltd (Bermuda))

**LORD RICHARDS (with whom Lord Hodge, Lord Sales, Lord Burrows and Lady Rose agree):**

*Introduction*

1.      It is a fundamental principle of equity that a fiduciary power may be exercised only for a purpose for which the power has been conferred. The main issue on this appeal is whether the trustee of a settlement exercised for a proper purpose an express power contained in the trust deed to add and exclude discretionary objects, when it simultaneously added a purpose trust as an object and removed all the members of a family who had until then comprised the entire class of objects. This was immediately followed by the trustee's exercise of its discretionary dispositive power to appoint the whole trust fund to the purpose trust, thus bringing the settlement to an end.

2.      At first instance, Kawaley AJ (formerly Chief Justice), sitting in the Supreme Court of Bermuda, held, on a summary judgment application, that the trustee had invalidly exercised its powers to add and exclude discretionary objects and its powers of appointment, and declared the trustee's acts in those respects to be void and of no effect. An appeal against this decision was allowed by the Court of Appeal of Bermuda (Sir Christopher Clarke P, Smellie JA and Subair Williams JA), which also granted leave to appeal to the Board.

*The facts*

3.      Many of the relevant facts are not in dispute and, where they are in dispute, the appellants accept that, for the purposes of their application for summary judgment, they must accept as true the facts as stated in the respondent's evidence.

4.      The settlement was created by a declaration of trust dated 10 May 2001 (the GRT trust deed) which provided that it was to be known as The Global Resource Trust No 1 (the GRT). Although the trust deed was made, and the trusts declared, by the trustee, Global Resource Private Trust Co Ltd (the GRT trustee), it is accepted that the true economic settlors were two brothers, YC Wang and YT Wang (collectively, the Founders). Starting in the 1950s, they had built a group of companies, which came to be known as the Formosa Plastics Group (FPG), into one of the largest business conglomerates in Taiwan. YC Wang, who died in 2008, and YT Wang, who died in 2014, were respectively the chairman and president of FPG.

5.      Shortly after the GRT was established, Grid Investors Corp (Grid), an investment holding company which was ultimately owned by the Founders and which owned shares in FPG companies (FPG shares), was transferred to the GRT trustee and remained the principal asset of the GRT. Grid's holding of FPG shares was then worth some US$90 million but has since increased significantly in value, being worth some US$560 million at the time of the appeal in Bermuda.

6.      Reference to the detailed terms of the GRT trust deed is made below, but at this stage it is sufficient to note those persons identified in the trust deed as the beneficiaries and discretionary objects of the GRT. During the trust period of 100 years, the trustee had a discretionary power to apply the whole or part of the capital and income of the fund to or for the benefit of the children and remoter issue of the Founders. The power to add to or exclude from this class "any person or class or description of persons" is the power at issue on this appeal. No such power existed as regards the ultimate beneficiaries who had a fixed, contingent interest in the trust assets, if any, at the expiry of the trust period. They were specified as the children and remoter issue of the Founders then living, in terms which are set out later in this judgment.

7.      On the same day as the GRT was established, another Bermuda-based trust was established at the direction of the Founders. By a deed dated 10 May 2001, Grand View Private Trust Co Ltd (Grand View) as trustee declared the Wang Family Trust (the WFT). This was something of a misnomer, because it is a purpose trust conferring no benefit on members of the Wang family or any other persons. The purposes included holding and acquiring FPG shares with a view to ensuring the continued growth, prosperity and competitive edge of FPG; providing "mutual assistance to mankind and help to those in need" through assistance to the charities established by the Founders and "improving the standard of living for mankind"; and "to implement and accomplish the Founders Vision" as set out in a statement by the Founders reproduced in a recital to the WFT trust deed. The purposes of this trust are both charitable and non-charitable. Non-charitable purpose trusts are permissible under Bermudian law by virtue of the Trusts (Special Provisions) Act 1989, as amended by the Trusts (Special Provisions) Amendment Act 1998. The trust assets largely comprise shares in investment companies owning between them FPG shares with a total value in May 2001 of some US$567 million, worth over US$3.5 billion at the time of the hearing before the Court of Appeal, assuming the same increase in value as the GRT's indirect holding.

8.      The trustee companies, although separate entities, had common directors, of whom two (Susan Wang and Sandy Wang) were daughters of YC Wang, two (William Wong and Wilfred Wang) were sons of YT Wang, and the fifth (Wen-Hsiung Hung) had a close personal relationship with the Founders and had worked for many years

for the FPG group. Mr Hung died in 2015. The Founders' immediate families are complex and extensive. Between them, they had 17 children.

9.      The circumstances in which the GRT and the WFT were established were described in an affidavit sworn by Susan Wang in opposition to the appellants' application for summary judgment. Its contents are assumed to be true for the purposes of the application. She stated that the Founders "felt strongly that, wherever possible, one must give back to society" and "regarded FPG itself as one of their greatest legacies to Taiwanese society in view of its major contribution to the economic wellbeing of Taiwan". The Founders also established and made very substantial contributions to higher education institutions, hospitals and other charitable foundations.

10.     Significant holdings of FPG shares, worth some US$1.8 billion, were by 2000 held by a number of investment companies controlled by the Founders. Ms Wang says that her father made clear to her that neither of the Founders intended these FPG shares to form part of their estates on their deaths, and specifically that they did not wish to leave them to their heirs by way of inheritance. Instead, they wished them to be applied towards the perpetuation of FPG and the fulfilment of their vision of giving back to society. They hoped that their descendants would assume the role of caretakers or managers of that wealth for the greater good of society. By 2000, the Founders had turned their attention to succession planning, which included putting in place arrangements to perpetuate and formalise the basis on which the investment companies would be held, long into the future.

11.     Following many months of discussions, involving lawyers in New York and Bermuda, it was decided that a significant portion of the assets held by the investment companies should be placed into a Bermuda purpose trust. Ms Wang says that at that time the Founders had it in mind that, as well as providing for the intended purposes, the Bermuda purpose trust would make provision for those family members who served as directors of its corporate trustee to benefit personally in some very limited way, as a means of motivating them to carry out their duties in supporting the growth and prosperity of FPG and the various charitable foundations. In early 2001, the proposal was modified and, as Ms Wang explains:

> "28…At that time, it was decided that, instead of making provision within the Proposed Bermuda Purpose Trust for family members to be incentivised…there would be a separate private Bermuda discretionary trust from which those family members could potentially benefit ("the Proposed Beneficiary Trust"). In particular, it was proposed

that the purposes to which I have referred…should be accomplished by the proposed Bermuda Purpose Trust (which came to be known as the Wang Family Trust), and that any potential benefit for family members should be provided by means of a separate trust, namely the proposed Beneficiary Trust [which] came to be known as the Global Resource Trust and the trustee of that trust came to be known as Global Resource PTC.

29. In broad terms, the structure described in paragraph 28 was designed to align the interests of the Founders' children (as potential beneficiaries of the Global Resource Trust) with the continued growth and performance of the FPG Companies. As I have stated above, the perpetuation of the success of the FPG Companies was one of the primary purposes of the Wang Family Trust. The formation of the Global Resource Trust was intended to provide a basis to motivate the descendants of YC Wang and YT Wang to perpetuate the success of the FPG Companies."

12.     In April 2001, "when the proposals were close to being finalised", Ms Wang prepared a detailed memorandum (the April 2001 memorandum) to confirm with the Founders that the proposals reflected their wishes. In the memorandum, Ms Wang explained the structure of the purpose trust, and also explained that

"in addition to the Wang Family Trust, it was now being proposed that the Proposed Beneficiary Trust be established and that, although the planning of this trust had not yet been completed, it was envisaged that it should be for the benefit of the children of the Founders (it being understood that their children would serve as directors of the Wang Family Trust, with William Wong, Wilfred Wang, myself and Sandy Wang serving as the first directors)."

13.     The April 2001 memorandum stated as regards the Proposed Beneficiary Trust:

"The other trust is a private trust, the assets of which may be used for any purpose. The plan is [for the trust] to benefit the children of the Chairman and the President. As

matters stand the planning of this trust has not yet been
completed."

14.    Each of the Founders signed the April 2001 memorandum to signify that they
had read it and that they approved the proposals described in it. It was clear to Ms
Wang that they fully understood and appreciated the distinction between the effect
of the two proposed trusts.

15.    In late April or early May 2001, the Founders decided that Grid would be
placed in the GRT, as the Proposed Beneficiary Trust, and that seven other
investment companies would be transferred into the WFT. The remaining investment
companies would be retained but the Founders' intention was that, if the structure
of the WFT worked satisfactorily, those companies would be transferred into a
Bermuda purpose trust at a later date.

16.    As earlier noted, the GRT and WFT were established by the declarations of
trust made on 10 May 2001 and, shortly afterwards, the agreed transfers of
investment companies were made to their respective trustee companies.

17.    Further purpose trusts were established under Bermuda law – one in June
2002 and two in May 2005 – and investment companies owning FPG shares were
transferred to them.

18.    In September 2005, the GRT trustee resolved to exercise the powers to add
and exclude discretionary objects and to appoint the entire fund to the trustee of the
WFT. It is this decision and its implementation which are challenged in these
proceedings and, for convenience, they are referred to as "the challenged decision".

19.    By way of background to this decision, Ms Wang refers to "the Founders' firm
intention to leave the vast majority of their wealth to society, rather than to their
children and their wives, all of whom were then enjoying ample wealth and
privilege". In a letter sent to his children on 20 May 2004, YC Wang expressed the
hope that his children agreed and supported his decision "to leave my personal
wealth to the public, so that it can continue to promote social progress, improve
public welfare, and perpetuate the businesses that I founded, in a way that benefits
the staff and society long into the future." Ms Wang's understanding, based on
conversations with William Wong and Wilfred Wang, is that similar views were
expressed by YT Wang. She also understood from conversations with Mr Hung that
he was very much aware "of the Founders' views which were of course reflected in
the terms of the purpose trusts which were established in Bermuda".

20.     Ms Wang says that, at the time that further purpose trusts were established in May 2005, her father YC Wang explained to her that

> "(a) after discussing the position with each other and with Mr Hung, the Founders had concluded that it would be damaging to the public's confidence in FPG if the Founders were to relinquish the majority of their personal shareholdings in FPG;
>
> (b) by retaining their personal shareholdings in FPG, however, this meant that when the Founders died, their heirs (including their children) would inherit wealth which was very significantly in excess of the value of Grid Investors; and
>
> (c) the Founders had therefore concluded that there was no longer any need for a private trust for the benefit of their children, in addition to the personal wealth (largely in the form of FPG shareholdings) which their children would inherit upon the Founders' death, and which the Founders hoped would incentivise their children in any event to support FPG."

21.     Ms Wang says that it was apparent from this discussion that the Founders wished the GRT board to take these matters into account in determining the future appointment or distribution of the assets of the GRT. She says that the board gave careful consideration to the matter, after being informed of the Founders' decision to retain their substantial personal shareholdings in FPG, and that they took into account the Founders' view that there was no longer any need for a private trust from which their children could personally benefit. She continues by saying that

> "Having done so, the GRT Board decided that the appropriate course was for the assets of the Global Resource Trust to be transferred to the Wang Family Trust. We considered that there had been a change of circumstances which altered the basis on which the Global Resource Trust had been formed. In particular, (a) the Founders' children would now be inheriting substantial wealth from the Founders in any event; and (b) a private trust for the Founders' children was no longer needed to incentivise them to be interested in the success of FPG,

given that they would now be inheriting significant shareholdings in the FPG Companies upon the deaths of my father and my uncle….The decision to wind up the Global Resource Trust and to distribute the assets to the Wang Family Trust was supported by, and consistent with the wishes of my father and my uncle."

22.     On 9 May 2005, the directors of the GRT trustee resolved that it be authorised, pursuant to the powers contained in clauses 8 and 9 of the trust deed, to execute an irrevocable deed pursuant to which Grand View as trustee of the WFT would be added as a discretionary object, all the other discretionary objects (the children and remoter issue of the Founders) would be excluded, and all the assets of the GRT would be transferred to Grand View as trustee of the WFT. They further resolved to take all necessary steps to terminate the GRT.

23.     These resolutions were not implemented. Instead, the directors of the GRT trustee signed an instrument entitled "Written Consent of the Directors of [the GRT trustee]" dated 25 September 2005, which stated in recitals that the directors had on 9 May 2005 determined to transfer the assets of the GRT to Grand View as trustee of the WFT, that such transfer had not taken place, and that upon further analysis and discussion, the directors had concluded "that it is in the best interests of the [WFT], "as a beneficiary of the [GRT], that the Trust Fund of the [GRT] be paid and appointed to the [WFT] as a distribution pursuant to the power and authority contained in Sections 3.1 and 4.1 of the Trust". The instrument contained resolutions that the GRT trustee should execute an irrevocable deed pursuant to which all of the assets of the GRT were to be paid and appointed to the WFT and that, following that distribution, the GRT trustee should terminate the GRT.

24.     A further instrument, entitled "Irrevocable Deed by the Trustee of [the GRT]", was executed by the five directors of the GRT trustee. It declared that (i) from 26 September 2005, Grand View as trustee of the WFT was included as a discretionary object, (ii) from the same date, all current and future discretionary objects, with the exception of the WFT, were excluded, (iii) the GRT trustee should take all steps necessary to pay and appoint the assets of the GRT to the WFT, and (iv) following the distribution of all assets to the WFT, the GRT should be and was thereby terminated.

25.     In her affidavit, Ms Wang explains the change in September 2005 from the decisions in May 2005. After further consultations with the GRT trustee's lawyers (in respect of which no privilege has been waived), the GRT board decided that it was in the best interests of the WFT that the assets of the GRT should be paid and appointed to Grand View as trustee of the WFT as an appointment and distribution

under clauses 3.1 and 4.1 of the trust deed, rather than by way of exercise of the power in clause 9 to transfer capital or income to another trust.

26.     It was, Ms Wang says, "in these circumstances that the members of the GRT Board ultimately came to exercise Global Resource PTC's powers as trustee in the manner which is now challenged…".

27.     Although the steps taken by the GRT trustee in September 2005 clearly amounted to "a momentous decision" (see *Public Trustee v Cooper* [2001] WTLR 901, 922-923), the GRT trustee did not make any application to the court for approval. In any event, a trustee who is in genuine doubt about the propriety of any contemplated course of action in the exercise of fiduciary duties and discretions is always entitled to seek the guidance of the court: see *Marley v Mutual Security Merchant Bank and Trust Co Ltd* [1991] 3 All ER 198, 201 (PC) (Lord Oliver of Aylmerton). No application for guidance was made.

*The GRT Trust Deed*

28.     Recital (A) to the GRT trust deed states that the GRT trustee (called the Original Trustee in the trust deed) "has received the Initial Property [US$100] with the intention that it should create a private express trust, and pursuant to such intention, the Original Trustee wishes to make such declaration with respect to the Initial Property". Recital (B) states that it is anticipated that further property may be transferred to the GRT trustee by way of addition to the trust fund. This refers to Grid, the investment company owning FPG shares, which was transferred in May 2001.

29.     Clause 1 contains definitions, of which the following are significant for the purposes of this appeal. Clause 1.1 provides that "the "Beneficiaries" has the meaning attributed to it in the Second Schedule and "Beneficiary" means any one of the Beneficiaries." As will be seen, this definition in fact refers not to beneficiaries in the strict sense but to the objects of the discretionary dispositive powers given to the GRT trustee exercisable before the expiry of the trust period. The trust period is defined as 100 years commencing on the date of the trust deed, or such longer finite period, if any, as shall from time be allowed under the proper law of the trust. "Person" is defined as including "any individual, company, partnership and unincorporated association and any person acting in a fiduciary capacity".

30.     Clause 1.14 provides:

"references to the issue of any person shall include the children and remoter issue of such person through all degrees whether legitimate, legitimated or adopted, but shall exclude any person who is himself illegitimate and any person who is descended from such a person"

31.    Clause 2.2 provides that the proper law of the trust shall be the law of Bermuda, with the courts of Bermuda being the forum for the administration of the trust, subject to the power of the trustee under clause 21 to change the proper law to the law of any other jurisdiction and the forum to the courts of that jurisdiction. This power has not been exercised.

32.    The discretionary dispositive powers exercisable prior to the expiry of the trust period are contained in clauses 3 and 4:

"3. Power of Appointment

3.1 The Trustees shall, during the Trust Period, hold the Trust Fund and the income thereof;

upon such trusts in favour or for the benefit of all or any one or more exclusively of the other or others of the Beneficiaries;

in such shares or proportions if more than one Beneficiary; and

with and subject to such:

powers and provisions for advancement, maintenance, education or other benefit or for the accumulation of income;

administrative powers;

and discretionary or protective powers or trusts

as the Trustees shall, in their discretion, appoint, provided that the exercise of this power of appointment shall:

> be subject to any applicable rule governing remoteness of vesting;

> be by deed or deeds revocable during the Trust Period or irrevocable and executed during the Trust Period; and

> not invalidate any prior payment or application of all or any part or parts of the capital or income of the Trust Fund made under any other power or powers conferred by this Settlement or by law.

3.2 The trusts and powers referred to in Clause 3.1 may be delegated to any extent to any person, whether or not including the Trustees or any of them.

4. Powers Regarding Capital and Income and Trust to Accumulate Surplus Income

4.1 In default of and subject to any appointment made under Clause 3, the Trustees may, during the Trust Period, pay, transfer, appropriate or apply the whole or any part of the capital or income of the Trust Fund to or for the maintenance, advancement, education or other benefit of all or such one or more exclusively of the other or others of the Beneficiaries in such shares and manner as the Trustees shall in their discretion and without being liable to account for the same think fit.

4.2 The Trustees shall, during the Trust Period, accumulate the whole or such part of the annual income of the Trust Fund as shall not have been paid or applied under Clause 4.1 as an accretion to the capital of the trust fund, by investing the same in or upon any of the investments

hereby authorised, with power to vary the same for others
so authorised.

4.3 The Trustees may, in exercise of their powers under any
provision of this declaration, to appoint, pay, transfer,
appropriate or apply any capital or income of the Trust
Fund for the benefit of a Beneficiary who is a minor, pay or
transfer the same to such minor's parent or guardian or
some other person for the time being having the care or
custody of such minor upon the recipient undertaking to
apply the same for the benefit of the minor. The trustees
shall not be under any obligation to see to the further
application of the capital or income paid or transferred
pursuant to this clause and the receipt of such parent,
guardian or other person shall be a full, sufficient and
complete discharge to the Trustees."

33.    "Beneficiaries", and "Beneficiary", (in each case with an upper-case B), carry
the meaning given in schedule 2. It is important to note that these terms refer not to
beneficiaries in the full sense of those with vested, even if defeasible or contingent,
interests, but to objects of the discretionary powers given to the trustee by clauses 3
and 4. In this judgment, as in the GRT trust deed, Beneficiaries and Beneficiary (with
an upper-case B) will be used to mean those objects. Schedule 2 provides:

"In the above-written declaration, the expression "the
Beneficiaries" shall, subject to any exercise of the powers
conferred upon the Trustees by Clause 8, mean the
following persons now living or hereafter born before the
expiration of the Trust Period:

The children and remoter issue of Y.C. Wang and the
children and remoter issue of Y.T. Wang."

34.    Clause 5, headed Ultimate Trust, provides:

"Subject as aforesaid, the trustees shall, at the expiration of
the Trust Period, hold the capital and income of the Trust
Fund upon the trusts set out in the Third Schedule."

35.    Schedule 3, setting out the beneficiaries of the ultimate trust, provides:

> "In default of and subject to the trusts and powers contained in Clauses 4 and 5 [*it is common ground that this is an error and should refer to Clauses 3 and 4*] respectively of the above-written Declaration, the Trustees shall, at the expiration of the Trust Period, divide the Trust Fund into equal parts so that there shall be one such equal share for each of the children of Y.C. Wang and Y.T. Wang and one such equal share for the issue, collectively, of each child of Y.C. Wang and Y.T. Wang who shall not then be living but who shall have left issue who shall then be living. Each share set apart for the issue, collectively, of a deceased child of Y.C. Wang or Y.T. Wang shall be further divided among such deceased child's issue as shall then be living per stirpes. The Trustee shall hold each such share upon trust for each such child or remoter issue, as the case may be of Y.C. Wang and Y.T. Wang."

36.    While schedule 2 sets out the objects of the GRT's discretionary powers, schedule 3 specifies beneficiaries in the strict sense of the word, as persons with a fixed, albeit defeasible, interest in the trust property. Their interests are defeasible in whole or in part, to the extent that the GRT trustee exercises its discretionary dispositive powers before the expiry of the trust period.

37.    Clause 8 contains the powers which lie at the heart of the appeal:

> "8. Addition and Exclusion of Beneficiaries
>
> 8.1 The Trustees may, at any time before the expiration of the Trust Period by deed revocable during the Trust Period or irrevocable, declare that:
>
> > 8.1.1 any person or class or description of persons shall, as from either the date of such deed or such later date as is therein specified and permanently or for such period as is therein mentioned, be included as a Beneficiary for the purposes of this Declaration, and any such declaration may be expressed to refer

either to the whole or to some part or share only of the Trust Fund and shall have effect accordingly; and

8.1.2 any person or class or description of persons then included as a Beneficiary shall, as from either the date of such deed or such later date as is therein specified and either permanently or for such period as is therein mentioned, cease to be a Beneficiary for the purposes of this Declaration, and any such declaration may be expressed to refer either to the whole or to some part or share only of the Trust Fund and shall have effect accordingly.

8.2 The powers referred to in Clause 8.1 may be delegated to any extent to any person, whether or not including the Trustees or any of them, provided, however, such person may not exercise the powers referred to in Clause 8.1 in his or her own favour, in favour of his or her creditors, in favour of his or her estate or the creditors of his or her estate."

38.     Clause 9 contains a power which is relevant to submissions made to the Board:

"9. Power to Transfer to Trustees of another Trust

Any power hereby or by law conferred on the Trustees to appoint, pay, transfer, appropriate or apply any capital or income of the Trust Fund to or for the benefit of any Beneficiary may, at the discretion of the Trustees, be validly exercised (without prejudice to the generality of any such power or to any other mode of application) by paying or transferring the same to the trustees of any settlement (wherever such trustees are resident and whether or not the proper law of such settlement is the Proper Law of this Declaration) the provisions of which are in the opinion of the Trustees for the benefit of such Beneficiary, notwithstanding that such settlement may also contain trusts, powers or provisions (discretionary or otherwise) in favour of some other person or object, but so that no such payment or transfer shall be made which would or might

> infringe any applicable rule governing remoteness of
> vesting."

39.    Clause 10 contains a power of amendment:

> "The Trustees may at any time and from time to time by
> deed supplemental hereto, amend in whole or in part any
> or all of the provisions of this Declaration except for the
> provisions of Clause 23, which may not be amended."

Clause 23, to which clause 10 refers, provides that: "This Declaration shall be
irrevocable."

40.    Clause 14 makes provision for the trustees' remuneration:

> "The Original Trustee and any successor or additional
> Trustee being a company shall be entitled to remuneration
> for its services in such amount as may from time to time be
> agreed between that Trustee and the adult beneficiaries or,
> in default of agreement, in accordance with its published
> terms and conditions from time to time in force."

41.    Clause 15 provides, among other things, that "[e]xcept as otherwise expressly
herein mentioned, every discretion or power hereby conferred upon the Trustees
shall be an absolute and unfettered discretion or power".

42.    Clause 19 provides:

> "19. Exclusion of Community Property Rules
>
> No benefit accruing to or devolving on any Beneficiary
> under this Declaration shall form or constitute a portion of
> any communal or joint estate or marital property of such
> Beneficiary, but such benefit shall be and remain the sole,
> separate and exclusive property of such Beneficiary. Should
> such Beneficiary be married or marry in community of
> property, any benefit so accruing or devolving shall be
> expressly excluded from the community; such benefit shall

> also be free from the interference, control or marital power
> of any spouse of such Beneficiary. The provisions of this
> Clause shall apply not only to benefits accruing to or
> devolving on any Beneficiary but also to the property of
> whatever nature for the time being representing the same
> and the income hereof."

43.     The GRT trust deed contains various other provisions, which are of no direct
relevance to the issues on this appeal. These include administrative provisions, such
as investment powers, provisions as regards a Protector and provisions regarding the
appointment and retirement of trustees.

*The proceedings*

44.     The proceedings were commenced in February 2018 by Dr Winston Wong, the
eldest son of YC Wang and a half-brother of Susan and Sandy Wang, against Grand
View. His grandson, Riley Wong, was joined as a plaintiff in January 2019. Further
family members were permitted to intervene in the proceedings, after Kawaley AJ
had given judgment: Tony Wang, a son of YT Wang and a half-brother of William
Wong and Wilfred Wang, in support of the claim against Grand View, and Jennifer
Wang, a daughter of YT Wang and sister of William Wong and Wilfred Wang, against
the claim. Both participated in the appeal before the Court of Appeal, but only Tony
Wang has appeared on the appeal to the Board.

45.     The writ alleges that the challenged decision was a breach of trust on four
grounds: (i) the trustee took irrelevant considerations into account and did not act
for the benefit of the beneficiaries of the GRT, (ii) it acted in excess of its powers, (iii)
it failed to exercise its powers for the purposes for which they were conferred, and
(iv) it acted in breach of the rule against remoteness of vesting in transferring trust
assets to the WFT, a purpose trust. The writ seeks a declaration that Grand View
holds the GRT assets transferred to it on resulting or constructive trust for the GRT,
an account of all dealings with the assets and further associated relief.

46.     In December 2018, Winston Wong issued a summons for summary judgment
under Order 14 of the Rules of the Supreme Court 1985. The application was made
on the basis that the steps comprised in the challenged decision were in excess of
the GRT trustee's powers under the GRT trust deed, were taken for an improper
purpose and were contrary to the rule against remoteness of vesting.

47.      It was accepted that the case based on the GRT trustee taking irrelevant considerations into account raised factual disputes which could not be resolved on an application for summary judgment.

48.     Kawaley AJ considered that it was appropriate to decide the issues of law raised on the application, notwithstanding that it was for summary judgment. This has not been challenged. As the facts presented by Grand View are accepted for the purposes of the application and as there has been the fullest legal argument on all sides, the Board considers this to be the correct approach. Clarke P gave at para 226 as his sixteenth reason for allowing the appeal that the claim had not been shown to be unarguably correct, the test under RSC Order 14. However, neither the President nor the other members of the Court of Appeal otherwise approached the issues on that basis, and it appears to the Board that it is right to decide whether the claim, based on the assumed facts, is established as a matter of law.

49.     Kawaley AJ acceded to the application for summary judgment for the reasons given in his judgment dated 5 June 2019.

50.     The Court of Appeal allowed Grand View's appeal for the reasons given in the judgments delivered on 20 April 2020. The judgment of Clarke P contains an impressive survey of the relevant authorities and legal principles and, in common with the other judgments, gives clear reasons for allowing the appeal. In addressing the issues on this appeal, the Board will generally do so by reference to the submissions made to it and, in this way, hopes to address the grounds on which the Court of Appeal allowed the appeal.

*Duties in respect of fiduciary powers*

51.     It is not in dispute that the powers conferred on the GRT trustee under clause 8 of the GRT trust deed are fiduciary powers. As such, their exercise is subject to duties and restrictions imposed by equity. The issues raised by what are the most significant duties for the purposes of the present appeal were summarised by Clarke P in his judgment at para 168:

> "(a) Whether the way in which it has been exercised is not within, or contrary to, the express or implied terms of the power (the scope of the power rule);

(b) Whether the trustee has given adequate deliberation as
to whether and how he should exercise the power; and

(c) Whether the use of the power by the GRT Trustee,
although within its scope, was for an improper purpose i.e.
a purpose other than the one for which it was conferred
(the improper purpose rule)."

52.     This summary, based on a submission of Grand View, is derived from the
judgment of Lord Walker in *Pitt v Holt* [2013] UKSC 26, [2013] 2 AC 108 at paras 60-
61. It is, in the view of the Board, a helpful and accurate summary of three major
duties and restrictions applicable to the exercise of fiduciary powers, save only, as
regards paragraph (c), that a power may have more than one proper purpose.

53.     The second of the duties of trustees summarised by Clarke P in his judgment
at para 168, to give adequate deliberation as to whether and how to exercise a
power, does not arise on this appeal, although it is of course directly relevant to the
alternative basis for the appellants' challenge in these proceedings.

54.     The first and third duties are directly in point on this appeal. The expression
"the scope of the power rule", used to refer to the first duty, may lead to some
misunderstanding, as it is used in some authorities to refer to the improper purpose
rule. But, as Clarke P makes clear in paragraph (a), it is concerned with the express
and implied terms of the provision conferring the power in question. It is largely a
question of the construction of such provision.

55.     By contrast, the proper purpose rule, which Clarke P called the improper
purpose rule, involves identifying the purpose for which the power has been
exercised and asking whether such purpose is a purpose for which the power has
been given. While identification of the purpose of a power may well be relevant to
the construction of the provision conferring it, the question raised by the proper
purpose rule arises only once the scope of the power has been determined and once
it has been determined that the exercise of the power was within the terms, or
"scope", of the power. This was made clear by Lord Sumption in *Eclairs Group Ltd v
JKX Oil & Gas plc* [2015] UKSC 71, [2015] Bus LR 1395 (*Eclairs*) at paras 15 and 30:

"15…The important point for present purposes is that the
proper purpose rule is not concerned with excess of power
by doing an act which is beyond the scope of the
instrument creating it as a matter of construction or

implication. It is concerned with abuse of power, by doing acts which are within its scope but done for an improper reason."

"30…The rule is not a term of the contract and does not necessarily depend on any limitation on the scope of the power as a matter of construction. The proper purpose rule is a principle by which equity controls the exercise of a fiduciary's powers in respects which are not, or not necessarily, determined by the instrument."

On this, as on all other matters considered by Lord Sumption to which the Board refers in this judgment, the other members of the Supreme Court were in agreement.

56.     In the past, the proper purpose rule was generally referred to as "fraud on a power", a phrase that is still sometimes used. However, as repeatedly made clear in the authorities, it is not confined to cases involving some reprehensible conduct on the part of a trustee or other fiduciary but extends to any case where a fiduciary power is used for a purpose not falling within the purposes for which the power has been conferred, even though the trustee may have acted in good faith and genuinely with a view to benefiting the beneficiaries. "Fraud on a power" has been described as "historical language" (*Kain v Hutton* [2008] 3 NZLR 589, para 46) and Lord Sumption remarked in *Eclairs* at para 15 that it was an inappropriate term. The Board considers that there is much to be said for discarding this historical language and referring instead to the proper purpose rule.

57.     Little needs to be said at this stage about determining the "scope of the power". The familiar approach to the construction of legal documents applies to the construction of a trust deed as it does, for example, to contracts, with the necessary modification that it is the intention of the settlor (or, in the present case, the Founders), rather than the intention of contracting parties, which is to be objectively determined by the terms of the instrument, construed in light of the circumstances in which it was made.

58.     It is, however, helpful to say something about the proper purpose rule.

59.     In *Eclairs*, Lord Sumption at paras 14-15 traced the origins of the rule and referred to some of the earlier statements of the rule, such as those of Lord Westbury LC in *Duke of Portland v Topham* (1864) 11 HLC 32, 54 and Lord Parker of

Waddington in *Vatcher v Paull* [1915] AC 372, 378 (who said that it means "that the power has been exercised for a purpose, or with an intention, beyond the scope of or not justified by the instrument creating the power"). In *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] AC 821, 834, Lord Wilberforce, giving the judgment of the Board, said:

> "Thus, and this is not disputed, the issue [of shares] was clearly intra vires the directors. But, intra vires though the issue may have been, the directors' power under this article is a fiduciary power: and it remains the case that an exercise of such a power though formally valid, may be attacked on the ground that it was not exercised for the purpose for which it was granted."

60.     In *In re Courage Group's Pension Schemes* [1987] 1 WLR 495, 505, Millett J described as "trite law" that "a power can be exercised only for the purpose for which it is conferred, and not for any extraneous or ulterior purpose".

61.     It is common ground on this appeal that the proper purpose, or purposes, of a fiduciary power is to be determined as at the date of the instrument conferring the power and is to be objectively determined. In the case of a settlement such as the GRT trust, it is a question of determining objectively the intention of the settlor (or in this case the Founders). In *Eclairs*, Lord Sumption considered the approach to be adopted at [30]:

> "Ascertaining the purpose of a power where the instrument is silent depends on an inference from the mischief of the provision conferring it, which is itself deduced from its express terms, from an analysis of their effect, and from the court's understanding of the business context."

62.     The identification of the purpose of a power will also be informed by the rest of the instrument containing the power, as for example in *British Airways plc v Airways Pension Scheme Trustee Ltd* [2018] EWCA Civ 1533, [2018] Pens LR 19, para 70 (Patten LJ), paras 101-102 (Lewison LJ) and para 116 (Peter Jackson LJ).

63.     There was some debate before the Board as to the extent to which external materials may be admissible in determining the purpose of a fiduciary power. It was common ground, and in the Board's view correct, that documents which objectively inform the context of the instrument in question, such as in this case the WFT trust

deed, are admissible, as are substantially contemporaneous documents which are intended to be read with the trust deed, such as a letter of wishes provided by the settlor or economic settlor (although there was no letter of wishes in this case). It was common ground that, while trustees could legitimately have regard to wishes later expressed by the settlor, or in this case the Founders, as to how the trustees should exercise their dispositive powers, such wishes were not admissible in determining the purpose of those powers. There is a need for certainty, given that the terms and purpose of a trust instrument and the powers it confers create rights for beneficiaries and impose duties on trustees. Having regard to these factors and to what Lord Sumption said in *Eclairs* at para 30, the view of the Board is that the intention of the settlor in conferring a power is to be ascertained by applying ordinary rules of construction to the trust deed and in the light of the admissible factual matrix. However, as will appear, this is not critical to the decision on this appeal.

64.     With those observations, the Board turns to consider the issues arising on the appeal.

*The issues*

65.     Except for the separate issue concerning the rule against remoteness of vesting, all the matters argued before the Board concern the construction of clause 8 of the GRT trust deed and the proper purpose rule as it applies to the powers conferred by clause 8.

*The scope of clause 8 of the GRT trust deed*

66.     The powers conferred by clause 8 are expressed in very wide terms. The trustees may declare "any person or class or description of persons" to be included or excluded as a Beneficiary (as defined in schedule 2), i.e. as an object of the discretionary dispositive powers contained in the GRT trust deed. "Person" is also defined in very wide terms by clause 1.6, set out earlier in this judgment.

67.     Notwithstanding the breadth of these provisions, it was submitted on behalf of one of the appellants, Winston Wong, that the power to add a Beneficiary under clause 8.1.1 did not as a matter of construction permit the addition of the trustee(s) of a purpose trust. If well-founded, this would be fatal to the validity of the challenged decision.

68.     It was submitted, correctly, that clause 8 did not permit the addition of a purpose as a Beneficiary. Only a "person" (as defined) could be added. It followed, so it was submitted, that a trustee of a purpose trust could not be added as a Beneficiary. The immediate problem with this submission is that clause 1.6 defines "person" to include "any person acting in a fiduciary capacity" without any limitation. To overcome this difficulty, reliance was placed on the opening words of clause 1, which qualify all the definitions that follow: the definitions apply "wherever the context permits". It was submitted that the context of clause 8 did not permit "person", as there used, to include the trustee(s) of any trust.

69.     This was based on the further submissions that the only point of adding a Beneficiary is to permit the trustee to consider exercising its discretionary dispositive powers in favour of that Beneficiary and that any such disposition must confer a benefit on the added Beneficiary. It was said that a payment to a trustee confers a benefit, not on the trustee, but on the beneficiaries or objects of the trust and that, therefore, the powers under clauses 3 and 4 of the GRT trust deed could not be exercised in favour of a trustee in its capacity as such nor could a trustee in its capacity as such be added as a Beneficiary. The proper course would be to add the beneficiaries or objects of the other trust as Beneficiaries of the GRT trust, but that of course could not be done in the case of a purpose trust.

70.     The Board does not accept this submission. There is no justification for construing a discretionary power in the terms of clause 4 so narrowly as to rule out the exercise of the power to add a trustee of another trust. Clause 4 permits payments and transfers to be made "to" as well as "for the…benefit" of a Beneficiary. Further, it is established that a power to appoint in favour of a "person" will generally include a power to benefit a purpose, because it is only through persons that purposes can be benefitted: see *In re Harvey (dec'd)* [1950] 1 All ER 491, *In re Triffitt's Settlement* [1958] Ch 852, 862. In these circumstances, where there is nothing in clause 8 to suggest that "person" is not to carry its defined meaning, there is no justification for excluding a person acting in a fiduciary capacity. There is no parallel with, for example, clause 22.3 where the context clearly does not permit the definition in clause 1.6 to apply; reference is there made to a "person…appointed as a Protector" but clause 22.2 provides that only individuals may be appointed as a Protector. Moreover, this submission would have the effect of preventing the GRT trustee from exercising the power so as to add the trustees of a charitable or other purpose trust, when to do so would, for example, enable the GRT trustee to give effect to a moral obligation of an existing Beneficiary. There may well be cases in which the exercise of the discretionary powers in favour of a trustee would be improper. For example, a payment to a bare trustee for A, when A is not an object of the power, would be objectionable. But that is a question not of the construction of

the scope of the clause but as to its purpose or as to the propriety of a particular exercise by the trustee of the power.

71.     As an alternative to the case based on construction, it was briefly submitted for Winston Wong that a term should be implied into clause 8 that the power of addition was not to be used to add the trustee of a purpose trust. It was submitted that such a term was obvious because, as it was not possible to add a purpose as a Beneficiary, it went without saying that it should not be possible to add the trustee of a purpose trust. The Board has no hesitation in rejecting this submission, for the same reasons as it rejects the submissions on construction.

*Was the challenged decision taken for a proper purpose?*

72.     The appellants' case that the GRT trustee exercised its powers under clause 8 of the GRT trust deed for an improper purpose was put in several ways, to which the Board refers below. However, the Board is of the view that the relevant question is whether the purpose for which the power was exercised was outside the purpose, or the range of purposes, for which the power was conferred. The purpose for which a power has been exercised in any particular case is a question of fact, namely the subjective purpose of the decision-maker(s): see *Eclairs* at para 15**.**

73.     In some cases, this will be controversial. In the present case, it is not disputed that the GRT trustee's purpose was to exclude all the children and remoter issue of the Founders as the entire existing class of Beneficiary and to substitute a purpose trust, the WFT, as the sole Beneficiary with a view to appointing the entire trust fund to the WFT and bringing the GRT to an end. The reason that the Board of the GRT trustee exercised its powers in this way, as it appears from the evidence filed on the summary judgment application, was prompted by the Founders' decision to retain their own substantial personal FPG shareholdings, from which their children could expect to benefit when the Founders died. The Founders considered that there was no longer any need for a private trust from which their children might benefit. The GRT board considered that there had been a change of circumstances which altered the basis on which the GRT had been formed. In particular, (a) the Founders' children would now be inheriting substantial wealth from the Founders in any event and, therefore, (b) a private trust for them was no longer needed to incentivise them to be interested in the success of FPG. In those circumstances, the board of the GRT trustee, again reflecting the Founders' views, considered that the appropriate course was for the assets of the GRT to be transferred to the WFT.

74.     The question in this case is therefore whether this purpose of the GRT trustee was outside the purpose or purposes for which the powers of addition and exclusion of Beneficiaries under clause 8 had been conferred.

75.     In submitting that the challenged decision was made for a proper purpose, Grand View laid great emphasis, as did the Court of Appeal, on the very broad terms of clause 8 and of the definition of "person" in clause 1.6, together with the qualification "subject to any exercise of the powers conferred upon the trustees by Clause 8" to the definition of Beneficiary in schedule 2 and with the provision in clause 15 that the discretions and powers conferred on the GRT trustee by the trust deed were "absolute and unfettered". It submitted, correctly, that there is no restriction in the trust deed on the identity of any person who may added, or excluded, as a Beneficiary.

76.     Grand View submitted that, consistently with the broad language of clause 8, the purpose of the powers in clause 8 was to confer the widest discretion on the GRT trustee to add or exclude Beneficiaries as it thought fit, after proper deliberation and taking account of the views of the Founders or what the GRT trustee believed would have been their views. Given that the GRT had a trust period of 100 years, the actual views of the Founders would be available for a relatively short time. The GRT trustee was to be guided not by the interests of the Beneficiaries and the default beneficiaries but by their understanding of what the Founders wanted or would have wanted in any circumstances that may arise. Although the submission was frequently put in terms of a power to respond to changing circumstances, this was given as an example of the circumstances, not a limitation on the circumstances, in which the GRT trustee might consider it appropriate to exercise its powers under clause 8.

77.     The problem facing Grand View's basic proposition that the purpose of the powers in clause 8 is to be derived from the breadth of the language used in that clause is that, while the terms of clause 8 are of course highly relevant to the determination of the purpose of the powers conferred by it, they are only part of the enquiry. It is common for powers expressed in the widest of language, and hence of the widest possible scope, to be restricted as to their permissible exercise by their proper purpose. For example, the power of directors to issue shares was stated in the widest terms, with no relevant express or implied restrictions, in *Howard Smith Ltd v Ampol Petroleum Ltd*.

78.     The Board does not consider that Grand View's reliance on the width of the language of clause 8 gains much additional support from the other provisions of the GRT trust deed on which it relies. The express qualification in schedule 2 to the definition of Beneficiary ("subject to any exercise of the powers conferred upon the

trustees by Clause 8") does no more than state what would in any event necessarily be implicit. It follows from the existence of the powers of addition and exclusion in clause 8 that there may be alterations to the Beneficiaries as stated in schedule 2. Although clause 15 provides that every discretion and power conferred on the trustee is "absolute and unfettered", Grand View accepts that it does not displace the proper purpose rule. As the observations of Lord Cairns LC in *Gisborne v Gisborne* (1877) 2 App Cas 300, 305 suggest, a provision such as clause 15 is directed at the discretion enjoyed by a trustee in the exercise of a power, not at either the scope of the power or its purpose. For reasons appearing below, the breadth of the definition of "person" is not in any way inconsistent with a narrower purpose than that for which Grand View contends.

79.     It is necessary to set clause 8 in the context of the GRT trust deed as a whole, and in the context of the circumstances in which the GRT trust was established, to determine whether the challenged decision was outside the proper purposes of the powers of addition and exclusion. It is not, in the view of the Board, correct to rely on a general proposition or default rule, such as that stated by Clarke P at para 181 of his judgment that "[g]iving effect to the settlor's wishes in non-commercial trusts in which the beneficiaries have provided no consideration will not usually constitute a fraud on the power".

80.     In the Board's view, the natural reading of the GRT trust deed as a whole demonstrates that it established a family trust, for the benefit of the direct descendants of the Founders. This family character is emphasised by the terms of the trust deed, to a degree which may be unusual in the world of discretionary trusts. The only specified objects of the discretionary dispositive powers are the children and remoter issue of the Founders, as provided in Schedule 2. Likewise, the ultimate beneficiaries who have fixed but defeasible interests are the same as those within the class of specified objects who are living at the expiry of the trust period: see Schedule 3. Mr Wilson, counsel for Tony Wang, was right to comment that real thought had gone into the way in which the trust fund should be distributed on the termination of the trust, in default of prior discretionary appointment or distribution. This is not a case in which the ultimate beneficiaries are, for example charities with no connection with the settlor (or Founders) or individuals who, it could confidently be said, the settlor (or Founders) had no intention of benefitting (contrast the terms of the trust in *Sofer v SwissIndependent Trustees SA* [2019] EWHC 2071 (Ch), reversed [2020] EWCA Civ 699; [2020] WTLR 1075, under which the ultimate beneficiaries were identified as the youngest partners in two law firms at the date of the trust). Recital (A) to the GRT refers to it as "a private express trust", language not found in the WFT trust deed, which in Recital (A) refers to "a trust for certain charitable and non-charitable purposes". Clause 14 provides for the trustee's remuneration to be agreed between the trustee and the adult beneficiaries, or in

default of agreement, in accordance with the trustee's published terms and conditions. It does not envisage that the GRT will be without individuals as beneficiaries. While the terms of clause 19, quoted above, are of limited significance, they serve to emphasise the nature of the trust as being for the benefit of individuals.

81.     By contrast, there is nothing in the GRT trust deed, beyond the use of the word "any" in clause 8 and the wide definition of "person", to suggest that clause 8 was intended to confer on the trustee the power to deprive all the children and remoter issue of the Founders of any benefit under the trust and to substitute a trust whose purpose was wholly different and which was incapable of conferring any benefit on the Founders' children and remoter issue.

82.     The breadth of the language of those two provisions of the GRT trust deed would provide a more solid basis for Grand View's case if there were no other reasonable explanation for them. However, the language is consistent with a narrower identification of the purpose of the powers under clause 8. There are many instances, involving a wide range of possible persons, where a power of addition and exclusion could reasonably be used in conformity with the family nature of the trust to benefit all or some of the Beneficiaries. It is not necessary in this case, where the issue is whether the challenged decision was outside the purposes of the power, to define the precise boundaries of the power, but examples where the power could be properly exercised are not hard to envisage. Examples of additions which could benefit one or more existing Beneficiaries are spouses, other dependants, unmarried partners, stepchildren, and other individuals to whom a moral duty may be owed by one or more Beneficiaries. Other examples include charities or other organisations to which a Beneficiary owes a moral obligation: see, for example, *In re Clore's Settlement Trusts* [1966] 1 WLR 955. The statement in *Re Shiu Pak Nin* [2014] (1) CILR 173 (Grand Court of the Cayman Islands, Cresswell J) at para 147 that "the exercise of a power of addition [to a discretionary class] will, by definition, never be in the interests of an existing class (as their beneficial interest will be diluted)" cannot be supported. For these purposes, it is important that the power of addition under clause 8 is exercisable in favour of "any" person and is not therefore subject to any limitation which would prevent the addition of any appropriate person as a Beneficiary. Likewise, "person" needs to be defined in broad terms. The power to exclude a Beneficiary is likewise capable of benefitting other Beneficiaries or the excluded Beneficiary, for example where their continued inclusion in the class has adverse tax consequences for some or all of the other Beneficiaries or for the excluded Beneficiary.

83.     It is no answer to this to say, as Grand View does, that benefits could be conferred on "persons" who are not objects if to do so would benefit existing

Beneficiaries, without adding them as Beneficiaries. It may nevertheless be advantageous to add them as Beneficiaries. Ironically, this is a point that is made by Grand View in opposition to Winston Wong's case on the construction of clause 8. Moreover, there are cases where it might not otherwise be possible to provide benefits to a non-object. For example, if the spouse of a child or remoter issue of a Founder were added as a Beneficiary, benefits could unquestionably be provided to the spouse if they were widowed.

84.    When reference is made to the context in which the GRT trust was established, the case for limiting the purpose of the powers under clause 8 is all the stronger. It is very significant that the Founders established the WFT at the same time as the GRT. Objectively, it can be seen that at that time, they were dividing the FPG shares owned by the investment companies into two parts. By a large margin, the greater part in value of those shares was to be owned by the WFT and other purpose trusts. Members of the Wang family were not to benefit from those trusts. The smaller part, no more than one sixth in value and a good deal less when the subsequent purpose trusts were established, was to be held in the GRT for the benefit of the children and remoter issue of the Founders. The division of wealth into these two parts, with wholly separate purposes and no suggestion in either trust deed that there was to be any link between them, is striking.

85.    The fact that the Founders held strong views as to the purposes to which wealth should be put, evidenced by the lengthy citation of the Founders' statement in recital (C) to the WFT trust deed, provides further support for a narrow analysis of the purpose of the GRT and the powers contained in clause 8. It was notwithstanding those views that the Founders established the GRT with its sole focus in the terms of the trust deed on benefit to their children and remoter issue.

86.    Grand View places reliance on the evidence of Susan Wang and the April 2001 memorandum. It is unnecessary to debate the admissibility of the April 2001 memorandum or Ms Wang's evidence, particularly as to her conversations with the Founders shortly before the GRT and the WFT were established. Kawaley AJ recorded in his judgment at para 124 that counsel for Winston Wong was content for the court to proceed on the basis that all the evidence was admissible.

87.    In the Board's view, this evidence, like the Founders' statement cited in Recital (A) to the WFT trust deed, supports the appellants' case. Ms Wang gives evidence that in 2000 the Founders were planning to establish a single purpose trust, with no beneficiaries, to hold a significant proportion of the investment companies which owned FPG shares. The only personal benefit to family members from the trust would be to "make provision for those family members who served as directors of

the [trustee company] to benefit personally in some very limited way". This was not the proposal that was put into effect. Instead, ownership of the holding companies was divided in the way described above and the GRT was established, not to benefit in some very limited way only those family members who served as directors of the trustee of the purpose trust, but for the benefit of all the children and remoter issue of the Founders, with no link of any sort being made to the WFT.

88.     Ms Wang says in her affidavit that in broad terms the establishment of the GRT "was designed to align the interests of the Founders' children (as potential beneficiaries of the [GRT]) with the continued growth and performance of the FPG Companies…[and] to provide a basis to motivate the descendants of YC Wang and YT Wang to perpetuate the success of the FPG Companies", an aim which of course was achieved by making them the objects and beneficiaries of a trust whose sole or principal asset was a valuable holding of FPG shares. There is nothing in the terms of the GRT trust deed, or in the surrounding circumstances at the time that it was made, to suggest that the actual and potential interests of the Founders' children and remoter issue were intended to terminate if, in the view of the GRT trustee, the trust in their favour was no longer needed to provide such alignment and motivation. Nor does Grand View submit that the powers of the GRT trustee under clause 8 are limited to such a situation. As earlier noted, its case is that the GRT trustee had the broadest possible discretion under clause 8.

89.     The establishment of two separate trusts, with quite different purposes, was fully understood by the Founders, as evidenced by their signing the April 2001 memorandum. Mr Howard, on behalf of Grand View, laid stress on the emphasised sentence in the following passage:

> "*The other trust is a private trust, the assets of which may be used for any purpose.* The plan is [for the trust] to benefit the children of the Chairman and the President. As matters stand the planning of this trust has not yet been completed." (emphasis added)

90.     Grand View relied on the emphasised sentence to show that it was intended that there was not to be any limit to the purposes to which the proposed private trust, once established, could be put and that this provides a guide to the intended purpose of the powers conferred by clause 8. In the Board's view, that sentence will not bear the weight that Grand View seeks to place on it. The immediately following sentence makes clear that the plan is for the trust to benefit the Founders' children. The passage also makes clear that the planning of the trust was not complete. There

is nothing in the GRT trust deed that provides, or even suggests, that the trust assets may be used for any purpose whatsoever.

91.     Grand View relied on statements as to the breadth of powers of addition to be found in modern discretionary trusts: see *Schmidt v Rosewood Trust Ltd* [2003] UKPC 26, [2003] 2 AC 709 (*Schmidt*) at para 1 per Lord Walker and *Re TR Technology Investment Trust plc* (1988) BCC 244, 251 per Hoffmann J. The flavour of the trusts referred to is well illustrated by Lord Walker in *Schmidt* at para 1:

> "It has become common for wealthy individuals in many parts of the world (including countries which have no indigenous law of trusts) to place funds at their disposition into trusts (often with a network of underlying companies) regulated by the law of, and managed by trustees resident in, territories with which the settlor (who may be also a beneficiary) has no substantial connection. These territories (sometimes called tax havens) are chosen not for their geographical convenience (indeed face to face meetings between the settlor and his trustees are often very inconvenient) but because they are supposed to offer special advantages in terms of confidentiality and protection from fiscal demands (and sometimes from problems under the insolvency laws, or laws restricting freedom of testamentary disposition, in the country of the settlor's domicile). The trusts and powers contained in a settlement established in such circumstances may give no reliable indication of who will in the event benefit from the settlement. Typically it will contain very wide discretions exercisable by the trustees (sometimes only with the consent of a so-called protector) in favour of a widely-defined class of beneficiaries. The exercise of those discretions may depend on the settlor's wishes as confidentially imparted to the trustees and the protector. As a further cloak against transparency, the identity of the true settlor or settlors may be concealed behind some corporate figurehead."

92.     Reference to this type of trust does not assist Grand View. The GRT, with its carefully prescribed classes of objects and default beneficiaries, bears no similarity to such trusts. It formed part of Mr Wilson's submissions that, if Grand View were correct that the purpose of the powers under clause 8 was to permit the trustee to add any person as a Beneficiary provided only that it thought it appropriate to do so,

such power was void. This in turn led to submissions on the law as to the permissible extent of the class of objects of a trust or power and warnings on the potential impact on the business of establishing and managing trusts in Bermuda and other jurisdictions if Mr Wilson's submissions were accepted. None of this arises in the present case, given what, in the Board's view, is the limited purpose of the powers under clause 8.

93.     Grand View relied on several authorities to support its case for a very broad definition of the purpose of the powers contained in clause 8: *Schmidt v Rosewood Trust Ltd (supra)*, *In re Manisty's Settlement* [1974] Ch 17, *In re Beatty (decd)* [1990] 1 WLR 1503, *In re Hay's Settlement Trusts* [1982] 1 WLR 202 and *Tam v HSBC International Trustee Ltd* [2008] HKCFI 496, (2008) 11 ITELR 246. In the Board's view they are of little, if any, assistance. First, the question whether the addition of beneficiaries or the appointment in favour of persons not named as beneficiaries was an exercise of the relevant power for a proper purpose was not argued or considered. Second, the terms of the relevant trusts were different in each case and different from the terms of the GRT trust deed. As the High Court of Australia said in *CPT Custodian Pty Ltd v Commissioner of State Revenue* (2005) 224 CLR 98, a case concerning a unit trust, "a priori assumptions as to the nature of unit trusts under the general law and principles of equity would not assist and would be apt to mislead. All depends…upon the terms of the particular trust" (para 15). Third, the proposed additional beneficiaries or disponees were either closely connected to identified beneficiaries (*Schmidt v Rosewood Trust Ltd*, *In re Manisty's Settlement*) or named in a contemporaneous letter of wishes (*In re Beatty, Tam v HSBC International Trustee Ltd*).

94.     It is the view of the Board, in the light of the focus of the GRT trust deed on the children and remoter issue of the Founders and the circumstances in which the GRT was established referred to above, that the purpose of the powers of addition and exclusion was to further the interests of the Beneficiaries, or one or more of them.

*The "substratum rule"*

95.     A principal part of the submissions made on behalf of Winston Wong was that the powers under clause 8 of the GRT trust deed could not be exercised so as to destroy the nature or character, or the substratum, of the trust. This was referred to in submissions and in the judgments below as the substratum rule. The substratum rule was, it was submitted, applicable to powers of amendment, such as those contained in clause 10 of the GRT trust deed. The powers under clause 8 were a

specific type of powers of amendment, and the substratum rule accordingly applied to their exercise.

96.     As presented on behalf of Winston Wong, the substratum rule was an absolute rule which in all cases circumscribed powers of amendment and powers such as those conferred by clause 8. The existence of the rule was supported, it was submitted, generally by several authorities dealing with powers of amendment, and specifically by decisions under the Variation of Trusts Act 1958. It was submitted that the application of the rule would, in the present case, invalidate the challenged decision since the substratum of the GRT trust was to benefit the Founders' families and this was destroyed by that decision.

97.     The Board does not accept these submissions, which fail on two grounds.

98.     First, it is not correct to regard the powers under clause 8 as a species of, or even analogous to, a power of amendment. The exercise of those powers involves no amendment to the provisions of the GRT trust deed. Clause 8 specifically empowers the trustee to add persons to or exclude persons from the class of Beneficiaries, being those persons who may benefit from an exercise of the discretionary dispositive powers under clauses 3 and 4. The definition of Beneficiaries has, implicitly and explicitly, built into it the possibility of changes resulting from an exercise of the clause 8 powers.

99.     Second, there is no absolute substratum rule as put forward by Winston Wong.

100.    It was submitted that the substratum rule could be viewed either as a rule of construction, going to "the scope" of the amendment power as defined by Lord Walker in *Pitt v Holt*, or as a refinement of the proper purpose rule.

101.    Some of the authorities relied on were directed to the scope of an amendment power, as determined by its proper construction, rather than to the identification of the purpose of the power. For example, *Hole v Garnsey* [1930] AC 472 concerned the validity of a resolution of the members of a registered Industrial and Provident Society purporting to amend the society's rules so as to require members to subscribe for additional shares. This was not a fiduciary power. The issue was whether, on the proper construction of the power of amendment contained in the rules, the majority could bind the minority so as to impose this additional liability on members. Lord Atkin at pp.493-94 stated the applicable principle to be that: "If a man enters into association with others for a business venture he commits himself to

be bound by the decision of the majority of his associates on matters within the contemplated scope of the venture. But outside that scope he remains dominus, and cannot be bound against his will". This is applicable "unless there is reasonably clear indication in contractual terms" (p.495). Lord Tomlin said at p.500 that the issue was "whether, having regard to the general principles governing contracts inter partes, amendments are effective as against members who have not assented to them". He went on to say:

> "In construing such a power as this, it must, I think, be confined to such amendments as can reasonably be considered to have been within the contemplation of the parties when the contract was made, having regard to the nature and circumstances of the contract. I do not base this conclusion upon any narrow construction of the word 'amend' in Rule 64, but upon a broad general principle applicable to all such powers."

102.    There is no discussion in *Hole v Garnsey* of the proper purpose rule applicable to the exercise of fiduciary powers and the reasoning in the House of Lords was firmly based in the principles of contractual construction against the background of the nature and purpose of the business venture.

103.    If advanced as a rule of construction, the substratum rule would necessarily be subject to all the factors which are taken into account in construing any provision. It may appear from the other terms of the instrument, or from the circumstances in which it was made, that the amendment power was not intended to be restricted so as to prevent changes to the underlying purpose as it originally appeared: see *Kearns v Hill* (1990) 21 NSWLR 107, 108, quoted below.

104.    If a trust has a discernible overall purpose, it will be a very powerful factor in deciding the scope of a power of amendment contained in the trust deed. It is not, however, an overriding factor which, notwithstanding all other considerations, determines the proper construction of the power.

105.    In other cases where the power of amendment is a fiduciary power, limits on its exercise have been imposed as an application of the proper purpose rule.

106.    The relevant issue in *In re Courage Group's Pension Schemes* [1987] 1 WLR 495 was whether the committee of management of three pension schemes could properly join in executing deeds making amendments to the schemes. The trust

deeds constituting the schemes conferred powers of amendment by deeds to be executed by participating companies and by the committee of management of each scheme. The committees stood in a fiduciary position and their power to agree to amendments was a fiduciary power. The powers of amendment were subject to an express restriction that no amendment should "have the effect of altering the main purpose of the fund namely the provision of pensions on retirement at a specified age for members". In a passage on which Winston Wong relies, Millett J said, at p.505:

> "The next question is whether the plaintiffs are entitled, if so minded, to join in executing the amending deeds. They may do so only if the proposed amendments are within the power to amend the trust deeds and rules, and can properly be made. They must not infringe the provisos to the rule-amending power, particularly the express prohibition to be found in all three schemes against altering the main purpose of the schemes, namely, the provision of pensions on retirement at a specified age for members. This is a restriction which cannot be deleted by amendment, since it would be implicit anyway. It is trite law that a power can be exercised only for the purpose for which it is conferred, and not for any extraneous or ulterior purpose. The rule-amending power is given for the purpose of promoting the purposes of the scheme, not altering them."

107.    In *Bank of New Zealand v Board of Management of the Bank of New Zealand Officers' Provident Association* [2003] UKPC 58, Lord Walker, giving the judgment of the Board, quoted the last two sentences of the above passage in Millett J's judgment. The case concerned a power to amend the rules of an incorporated association, whose purpose was to provide a superannuation fund for the bank's employees. The power was vested in the association's board of management, and it was therefore a fiduciary power. Lord Walker said at para 18 that the crucial issue was the scope of the power of amendment contained in the rules. The challenged amendment did not infringe the express restrictions to which the power was subject, so that: "Any relevant restriction is to be derived from the general principle that a power must be used only for the purpose for which it must be supposed to have been intended." This classic statement of the proper purpose rule echoed the penultimate sentence in the quoted passage from Millett J's judgment. The last sentence, that the power of amendment "is given for the purpose of promoting the purposes of the scheme, not altering it" is directed to the amendment powers in the Courage pension schemes. Lord Walker commented at para 21 that "the

amendments proposed in the *Courage* case were not permissible because they were part of an unnatural and manipulative plan which would have severed the pension fund from the workforce for whom it was established".

108.   These authorities confirm the central importance of the purpose of a trust to the determination of the proper purpose of a fiduciary power to amend the trust deed, but they do not provide support for the substratum rule, in its absolute terms, advanced on behalf of Winston Wong. Determination of the proper purpose of any power, including a power of amendment, is to be achieved by reference to the factors considered earlier in this judgment, with no doubt a strong presumption that a power of amendment is not to be used to alter the purpose of the trust.

109.   The absolute nature of the substratum rule advanced by Winston Wong is not consistent with Australian authority. In *Kearns v Hill* (1990) 21 NSWLR 107, a decision of the Court of Appeal of New South Wales, Mahoney JA said at p.108:

> "In earlier times, the view was taken in some cases that…the intention of the settler was that the alterations to be made should not alter the main structure of the trust or the beneficial entitlements under it. I doubt that that would be seen as the intention of such a clause at the present time. As the precedent books show, discretionary trusts have in more recent times been used to provide to the settler or the person having the benefit of the power of variation the power to make fundamental changes in the structure of the trust document and the entitlements under it."

110.   The issue in *Permanent Trustee Co Ltd v National Australia Managers Ltd* (1998, unreported), a first instance decision of the New South Wales Supreme Court, was whether a power of amendment in the trust deed constituting a unit trust permitted the termination of the unit trust and the cancellation of the units in consideration of the issue to the unitholders of shares in a new company holding the assets and carrying on the business of the unit trust. McLelland CJ in Eq held that the proposal was within the power of amendment which was "expressed very widely, one would presume, to provide machinery to meet any contingency, foreseeable or otherwise". The contrary argument was based on the principle expressed in *Hole v Garnsey* which was "really no more than that a widely expressed power may be subject to limitations implied from the context and surrounding circumstances, including its evident purpose. The same applied to implied limitations precluding the 'destruction of the substratum', as it has been expressed, of a contract or trust". This

decision was cited and applied in *Mirvac v Mirvac Funds Ltd* [1999] NSWSC 457, (1999) 32 ACSR 107.

111.    The reference to the substratum of a trust appears to have originated in the judgment of Martin J in *In re Dyer* [1935] VLR 273, on appeal to the Full Court of the Victoria Supreme Court. The settlor established a trust for the express purpose of raising funds from donors, of which the settlor was one, for a permanent fund to assist the establishment and maintenance of an orchestra in the State of Victoria. Faced with difficulties in achieving this purpose, the court was asked to rule whether the objects of the trust could be altered to provide instead for the income to be paid to various musical associations. Under the terms of the trust deed, the settlor reserved the power to vary all or any part of the trusts and powers under the deed. It was held at first instance that the power did not permit the settlor to vary the trusts so as to apply the fund in a way which would depart from the original purpose of the trust. Although the Full Court upheld the first instance decision on a different ground, the three judges expressed agreement with this reasoning. Irvine CJ and Gavan Duffy J said that the power to "vary" was "not apt enough to describe the substitution of one trust for another". Martin J said at pp.290 - 291:

> "It would be strange if the donor who desired to help in founding a fund for a particular purpose, and who expected others to contribute to that fund, attempted to reserve to himself a power to change the whole substratum of the gift, not only as regards his own donation, but also the donations of others who subscribed…What are the limits of the power to vary is a very difficult question, which does not call for determination here…".

112.    The settlor's power of variation was not a fiduciary power, so the issue was one of construction of the provision conferring the power in the context of the deed as a whole, including in particular that the fund was intended to attract contributions from other donors. Martin J's reference to substratum was picked up by Megarry J in *In re Ball's Settlement Trusts* [1968] 1 WLR 899. The issue was whether an arrangement revoking the existing trusts of a settlement and resettling the fund could be approved by the court under section 1(1) of the Variation of Trusts Act 1958. In *In re T's Settlement Trusts* [1964] Ch 158, Wilberforce J had held that a resettlement was outside the scope of a variation which the court could approve. In *In re Holt's Settlement* [1969] Ch 100, Megarry J had held that a resettlement was within section 1(1) if in substance the new trusts were recognisable as the former trusts, though with variations. In *Re Ball's Settlement Trusts*, the arrangement would result in new trusts which were very different from the old, leaving only "the general drift or purport" of the old trusts. Megarry J held that such an arrangement was

nonetheless a variation that the court could approve. In identifying what had to remain of the old trusts for the arrangement to qualify as a variation, he said at p.905:

> "I borrow with gratitude from the language of Martin J [in *In re Dyer*]. If an arrangement changes the whole substratum of the trust, then it may well be that it cannot be regarded merely as varying that trust. But if an arrangement, while leaving the substratum, effectuates the purpose of the original trust by other means, it may still be possible to regard that arrangement as merely varying the original trusts, even though the means employed are wholly different and even though the form is completely changed."

113.    These cases were concerned with the scope of the court's jurisdiction under the Variation of Trusts Act 1958. They were not dealing with the construction, or with the proper purposes, of powers of amendment contained in a trust deed.

114.    While the Board rejects the substratum rule as an absolute principle, the purpose of a trust is of central importance in determining the purpose of a power to amend it, as it is indeed also for determining the purpose of powers to add or exclude objects or beneficiaries, such as that contained in clause 8 of the GRT trust deed. It is by focusing on the purpose of the clause 8 powers, rather than applying an absolute substratum rule, that the Board has concluded that the exercise of those powers in September 2005 was invalid.

*The best interests of the identified objects and beneficiaries*

115.    On behalf of Tony Wang, it was submitted that the central question was whether the GRT trustee could validly use its powers under clause 8 to destroy, rather than to advance, the interests of the identified Beneficiaries and the default beneficiaries. The central legal submission was that the purpose of all fiduciary powers conferred on a trustee of private trust with identified beneficiaries, such as a typical family trust, was to advance the interests of the objects and beneficiaries (for convenience, together referred to as "beneficiaries") as they are constituted at the time the power is exercised. The purpose of a typical family trust is coterminous with its identified beneficiaries. Radical changes may properly be made to such a trust, or to the beneficial interests under it, provided the changes are in the interests of one or more identified beneficiaries. The only possible exception was if the trust

instrument expressly provided that the power could be exercised for purposes other than the best interests of the identified beneficiaries.

116.    In his analysis of the purpose of a fiduciary power, Mr Wilson distinguished two types of purpose, the overall purpose of the trust (which he called the fundamental purpose) and the purpose specific to a particular power (which he called the power-specific purpose). A power-specific purpose must be consistent with the fundamental purpose. In the case of many powers, there may be no distinction between these purposes.

117.    Applying this analysis to a typical family trust for identified beneficiaries, it was submitted that the fundamental purpose is to advance the interests of those beneficiaries and all powers under the trust deed must be exercised in furtherance of that purpose. This applied to powers to add or to exclude beneficiaries, such as those under clause 8 of the GRT trust deed, as much as to any other power.

118.    Authorities cited in support of this principle included *Cowan v Scargill* [1985] Ch 270, 286-287 per Sir Robert Megarry V-C, *Merchant Navy Ratings Pension Fund Trustees v Stena Line* [2015] EWHC 448 (Ch), [2015] Pens LR 239 per Asplin J at paras 228-229 and an article by Lord Nicholls of Birkenhead, "Trustees and their broader community: where duty, morality and ethics converge" (1995) 9(3) TLI 71.

119.    Mr Wilson submitted that the fundamental purpose of the GRT was to benefit the beneficiaries identified in schedules 2 and 3 to the trust deed, together with any further persons legitimately added to schedule 2. It followed, he submitted, that any exercise of the powers under clause 8 had to be for the benefit of those beneficiaries, or at least one of them. As the purpose of the addition of the WFT trustee and the exclusion of the children and remoter issue of the Founders was not to benefit the latter but to deprive them of any possibility of benefit under the GRT, the challenged decision was made for an improper purpose.

120.     In the Board's view, it is generally the case that fiduciary powers conferred on a trustee of a trust with identified beneficiaries must be exercised to further the interests of the beneficiaries. This is clearly the case with essentially administrative powers, such as the powers of investment. It should be noted that both *Cowan v Scargill* and Lord Nicholls' article were concerned with powers of investment.

121.    The power to add or to exclude beneficiaries is, however, a power of a potentially different character. It has the capacity to effect significant, even fundamental, changes to a trust. The question is whether, in the case of such a

power contained in any particular trust deed, it is intended to have that capacity, or indeed to have any purpose that goes wider than simply furthering the interests of the identified beneficiaries. In the view of the Board, the question of the purpose of such a power is not to be answered by applying, as an overriding principle, a rule that all powers must be exercised in the interests of some or all of the beneficiaries, unless express provision to the contrary is made. The task is to discern the intended purpose of the particular power of addition and exclusion in the context of the particular trust. This requires the approach of considering the power in the context of the trust instrument, and of the circumstances surrounding it, which the Board has earlier set out and applied. The concept of a fundamental purpose of a trust, for which Mr Wilson argued, seems to come close to the substratum rule for which Mrs Talbot Rice contended. In a case such as the present, where it appears to the Board that the GRT has a clear purpose, it has a decisive effect on identifying the purpose of the clause 8 powers, but the purpose of a trust must be judged by reference to all the terms of the trust instrument, including any powers of addition and exclusion of beneficiaries, and to the circumstances in which the trust was created.

*Conclusion on proper purpose*

122.   For the reasons given above, the Board concludes that the challenged decision was taken by the GRT trustee for an improper purpose, but does not do so by the application of the rigid approaches which formed a major part of the cases for the appellants. As regards the consequence in law of this conclusion, there has been debate as to whether the exercise of a fiduciary power for an improper purpose renders the exercise void or voidable, as to which see *Pitt v Holt* at para 62 (Lord Walker), but the parties are agreed that in the present case the consequence is that the challenged decision was void.

*Remoteness of vesting*

123.   Clarke P dealt fully and carefully with the appellants' case, as it was presented to the Court of Appeal, that the transfer of the assets of the GRT to the WFT trustee infringed the rule against remoteness of vesting. The case as presented to the Board depends, in the first instance, on either construing clause 4 of the GRT trust (under which the transfer of assets was made) as being subject to the express restriction contained at the end of clause 9, or on implying into clause 4 a restriction in the same terms. The express restriction in clause 9 was: "no such payment or transfer shall be made which would *or might* infringe any applicable rule governing remoteness of vesting" (emphasis added).

124.    The significance of the emphasised words is, as the appellants submit and may for present purposes be accepted, that it applies the equitable rule against remoteness of vesting, which prohibited a transfer to the trustee of a different trust not only where an interest in the property would definitely not vest within the perpetuity period applicable to the transferor trust but also where it might not do so. The equitable rule was modified in Bermuda by the Perpetuities and Accumulations Act 1989 by the introduction of a "wait and see" provision, so that a transfer was not immediately void if an interest in the property might not vest until after the expiry of the perpetuity period. It would be void only if an interest in the assets in fact did not vest within the perpetuity period applicable to the transferor trust.

125.    The appellants submit that if the power of transfer under clause 4 was subject only to the statutory rule, it would produce a very unsatisfactory result. If it transpired that an interest in the transferred assets did not vest within the perpetuity period, the transfer of the assets would be void and the assets would revert to the GRT. This could be damaging to subsequent arrangements which might have been made in relation to the trust or, as in the present case, the assets would revert many years after the trust had been brought to an end. This possibility would create an undesirable degree of uncertainty. Further, it is submitted that if the restriction in clause 9 is confined to transfers to which clause 9 applies, it would be easy to avoid that restriction by the expedient of adding a trustee as a Beneficiary under clause 8 and making a transfer of assets to it under clause 4. For these reasons, the appellants submit either that, construing the GRT trust deed as a whole, the express restriction in clause 9 should be read as applying also to clause 4 or a restriction in the same terms should be implied in clause 4.

126.    The Board is unable to see any basis on which either of these submissions can be accepted. Whatever the reason for including the express restriction in clause 9, which applies the stricter equitable rule against remoteness of vesting in place of the usual statutory rule, there are no grounds for reading the stricter restriction into clause 4. Construction of the GRT trust deed must proceed on the assumption that a decision was taken to include it in clause 9, but not in clause 4. There is nothing in the terms of the trust deed to suggest that this was an oversight or mistake, as opposed to a deliberate choice. Nor is there any necessity, whether on grounds of business efficacy or otherwise, for implying the restriction into clause 4.

127.    On this basis, the appellants' case on remoteness of vesting fails. If clause 4 was properly to be read as subject to the restriction, further issues on the application of the rule against remoteness of vesting would arise. As Clarke P observed, these issues are recondite and not without difficulty. Having decided against the appellants on the applicability of the restriction, he set out his conclusions on these issues by

way of a preliminary analysis only. On this appeal, it is not necessary for the Board to address those issues and it does not do so.

*Conclusion*

128.   The Board concludes that the appeal succeeds, for the reasons given in this judgment, as regards the application of the proper purpose rule to the challenged decision. The Board will accordingly humbly advise His Majesty to allow the appeal.