# EXHIBIT 7

Case No: HC12B04996

Neutral Citation Number: [2016] EWHC 1829 (Ch)
**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Rolls Building
Fetter Lane, London EC4A 1NL

Date: 22 July 2016

**Before** :

**MR JUSTICE ARNOLD**

**Between :**

| | |
|---|---|
| **HELENA GORBUNOVA** | <u>Claimant</u> |
| and | |
| **(1) The Estate of BORIS BEREZOVSKY (also known as PLATON ELENIN) (deceased)** | <u>Defendants</u> |
| **(2) SOCIETE D'INVESTISSMENTS FRANCE IMMEUBLES** | |
| **(3) OVACO AG** | |
| **(4) COMODO LIMITED** | |
| **(5) LMC TRUSTEES LIMITED** | |
| **(6) FOTOPARK LIMITED** | |
| **(7) STEELVILLE LIMITED** | |
| **(8) LEV KRANT** | |
| **(9) NICHOLAS STEWART WOOD (as Trustee of the Estate of BORIS BEREZOVSKY)** | |
| **(10)    KEVIN JOHN HELLARD (as Trustee of the Estate of BORIS BEREZOVSKY)** | |
| **(11)    MICHAEL THOMAS LEEDS (as Trustee of the Estate of BORIS BEREZOVSKY)** | |

**Henry Legge QC**, **Leon Sartin** and **Hugh Cumber** (instructed by **Withers LLP**) for the **Claimant**
**Elspeth Talbot Rice QC** and **Donald Lilly** (instructed by **Holman Fenwick Willan LLP**) for the **Ninth to Eleventh Defendants**

Hearing dates: 6-7 July 2016

**Judgment**

**MR JUSTICE ARNOLD :**

<u>Contents</u>

*Topic   Paragraphs*

| | |
|---|---|
| Introduction | 1 |
| Ms Gorbunova's evidence | 2-42 |
| The relationship between Ms Gorbunova and Mr Berezovsky | 3-9 |
| Death of Badri Patarkatsishvili in 2008 and subsequent litigation | 10-14 |
| End of the relationship in 2011 | 15-16 |
| The December 2011 conversation | 17-23 |
| The January 2012 conversation | 24-25 |
| The Litigation Deed | 26-31 |
| The Commercial Court judgment and settlement with the AP Family | 32-36 |
| The Litigation Agreement and the Settlement Agreement | 37-41 |
| Commencement of the proceedings | 42 |
| The death of Mr Berezovsky and the appointment of the Trustees | 43 |
| The proceedings | 44-46 |
| The Litigation Deed | 47 |
| The Litigation Agreement | 48-49 |
| Principles applicable to summary judgment applications | 50 |
| Principles applicable to the interpretation of written documents | 41-52 |
| Did either the Litigation Deed or the Litigation Agreement establish a trust? | 53-73 |
| The law | 55-59 |
| The Litigation Deed | 60-65 |
| The Litigation Agreement | 66-71 |
| Conclusion | 72-73 |
| Ms Gorbunova's amendment application | 74-75 |
| Did either the Litigation Deed or the Litigation Agreement constitute an equitable assignment? | 76-86 |
| The law | 79 |
| The Litigation Deed | 80-82 |
| The Litigation Agreement | 83-85 |
| Conclusion | 86 |
| Ms Gorbunova's claims for rectification | 87 |
| The law | 88 |
| The Litigation Deed | 89-94 |
| The Litigation Agreement | 95-97 |
| Conclusion | 98 |
| Ms Gorbunova's claims for proprietary estoppel and constructive trust | 99 |
| The law | 100 |
| The Litigation Deed | 101-105 |
| The Litigation Agreement | 106-110 |
| Conclusion | 111 |
| Other estoppels | 112 |
| Overall conclusions | 113 |

Introduction

1.      There are two applications before the Court. The first is an application by notice dated 20 May 2016 by the Ninth to Eleventh Defendants ("the Trustees"), who are the joint trustees of the insolvent estate of the late Boris Berezovsky ("the Estate") to strike out, alternatively for summary judgment dismissing, certain proprietary claims made by the Claimant ("Ms Gorbunova"), who was Mr Berezovsky's long-term partner. The second is an application by Ms Gorbunova to re-amend her Particulars of Claim to introduce claims of equitable assignment, rectification, proprietary estoppel and constructive trust and other estoppels. The second application was only foreshadowed during the course of, and made following the conclusion of, the hearing of the first application. I am grateful to the Trustees' counsel and solicitors for their readiness to argue the second application the following day, which avoided the need for a separate hearing possibly before a different judge.

Ms Gorbunova's evidence

2.      Counsel for Ms Gorbunova relied heavily for the purpose of resisting the Trustees' application upon a lengthy and detailed witness statement of Ms Gorbunova running to 221 paragraphs. This witness statement was also relied upon in support of Ms Gorbunova's own application, although as will be seen counsel for the Trustees submitted that significant parts of the draft Re-Amended Particulars of Claim are in fact inconsistent with it. There is no dispute that, for present purposes, Ms Gorbunova's account must be assumed to be true. Accordingly, I must summarise that account.

*The relationship between Ms Gorbunova and Mr Berezovsky*

3.      Mr Berezovsky had two marriages, to Nina Korotkova and Galina Besharova. Ms Gorbunova and Mr Berezovsky commenced their relationship in 1991 in Russia. They began cohabiting in 1993. In 1996 and 1997 they had two children together, their daughter Arina and their son Gleb. They had a wedding ceremony in 1999 and they exchanged wedding rings. They only discovered later that they had not been married, because Mr Berezovsky had not yet been divorced from Galina. Although they were technically never married, they were for all intents and purposes husband and wife for almost 20 years.

4.      Mr Berezovsky, a highly successful businessman, was the "breadwinner" of the relationship. From about 1993 to 1999 Mr Berezovsky was politically well connected. In common with many Russian oligarchs, Mr Berezovsky conducted many of his business dealings very informally, even when very large value transactions were taking place.

5.      Ms Gorbunova was at Mr Berezovsky's side as his business and political connections grew during the 1990s. She was his partner and his ally through these times. Mr Berezovsky treated her as a confidant. From her involvement with Mr Berezovsky's dealings she had a good understanding of their wealth, though she was not aware of the precise nature of the structures in which the family assets were held.

6.      Given their wealth as a couple, they enjoyed a luxurious lifestyle. Despite their wealth, the couple faced considerable difficulties during their lives together. Mr Berezovsky was the target of death threats and assassination attempts even before his political exile, which also threatened the lives of those around him. A driver was killed in a car bomb attempt which seriously injured Mr Berezovsky in 1994, and it was only good fortune which protected Ms Gorbunova from injury. From 1994 onwards, they required a high level of security at all times.

7.      In 1999 Mr Berezovsky told Ms Gorbunova that he viewed his family as having three branches, and that each would get a third if anything were to happen to him.

8.      In 2000 the family fled from Russia. They first lived in France, before moving to the United Kingdom in 2001. The family moved to a property known as Wentworth Park in Surrey, which was chosen and furnished by Ms Gorbunova. In 2003 Mr Berezovsky was able to obtain political asylum, and he changed his name to Platon Elenin. The threats against the couple continued during their time in the UK, and the reality of these threats was brought home by the murder of Alexander Litvinenko in 2006.

9.      Mr Berezovsky always assured Ms Gorbunova that she would be financially secure if he should die suddenly. It was important to the family that she should have a "*заначка*" (zanachka), which roughly translates as a "secret stash" or "secret nest-egg". In particular, Mr Berezovsky assured Ms Gorbunova that Wentworth Park and its contents were hers. A yacht known as Thunder B, and another yacht which was in the process of being constructed, the Darius, were also treated by the couple as belonging to Ms Gorbunova. She received about €50 million from the sale of the Darius in 2008.

*Death of Badri Patarkatsishvili in 2008 and subsequent litigation*

10.     Mr Berezovsky faced considerable difficulties when his long-time business partner Arkady Patarkatsishvili (known as "Badri") died unexpectedly in February 2008. Badri and Mr Berezovsky were involved in business joint ventures together, and his death created cash-flow problems for Mr Berezovsky, as Badri had had control of many of Mr Berezovsky's assets. This led to Mr Berezovsky commencing proceedings against Badri's family ("the AP Family").

11.     In addition to his dispute with the AP Family, by 2009 Mr Berezovsky was conducting litigation on a number of other fronts, including a claim against Roman Abramovich, a claim against Vasily Anisimov relating to an entity called Metalloinvest and a claim concerning certain entities called Salford. These four claims are referred to as "the Litigation".

12.     It was understood that the outcome of Mr Berezovsky's litigation would benefit the family. He was concerned to ensure that his litigation should continue for his family's benefit if he should die suddenly, and attempted to make arrangements to that effect.

13.     Just as with his business dealings, Mr Berezovsky would discuss his litigation in detail with Ms Gorbunova. Ms Gorbunova permitted Mr Berezovsky to make use of large sums from her accounts to fund his litigation. It was always understood that he would repay these sums regardless of the outcome of the litigation. Ms Gorbunova

also permitted Mr Berezovsky to use her yacht, the Thunder B, to obtain a tape recording Mr Berezovsky thought would assist his case against Mr Abramovich.

14. In 2010 Ms Gorbunova agreed to Mr Berezovsky raising a mortgage over the family home at Wentworth Park.

*End of the relationship in 2011*

15. The relationship between Mr Berezovsky and Ms Gorbunova gradually deteriorated in 2011. However, in 2011 both Mr Berezovsky and Ms Gorbunova were heavily involved in the action against Mr Abramovich, the trial in which began in October 2011. Ms Gorbunova was a witness for Mr Berezovsky in the action and accompanied him to court every day.

16. Evidence in the trial concluded in early December 2011, removing the distraction of attending court. At the time Mr Berezovsky was pressing Ms Gorbunova to permit him to raise more money using the family home at Wentworth Park. This brought things to a head, and in late December 2011 Mr Berezovsky and Ms Gorbunova discussed a financial separation.

*The December 2011 conversation*

17. Both Mr Berezovsky and Ms Gorbunova were eager that there should be a clean break between them. This was particularly important to Mr Berezovsky, who wished to start afresh and get on with other matters. Although the couple were separating, things were relatively amicable and the couple were able to discuss matters pragmatically.

18. Moreover, it was very important to Mr Berezovsky that matters be dealt with quickly and quietly. He specifically asked Ms Gorbunova not to discuss their arrangements with anyone else. It was clearly in his interest that Ms Gorbunova should not instruct lawyers or bring proceedings against him in respect of claims she might have in respect of their family property or the children.

19. Mr Berezovsky repeated his earlier assurances that Ms Gorbunova would receive a third of his wealth. However, as he explained, his assets were tied up in litigation. It was therefore not possible for him to provide Ms Gorbunova with a lump sum immediately. Accordingly, as Ms Gorbunova puts it in paragraph 110 of her statement "he offered me a third of our family pot". She goes on to say in paragraph 111 that she "understood [the one-third figure] to relate to his major litigation", and that she had always understood that she would receive "some benefit from" the Abramovich case, and in paragraph 112 that this provided her with "a stake in the winnings of the litigation" which "would be worth around 1bn as we then thought".

20. They also discussed other aspects of their separation, including who would take care of the children. It was agreed that Ms Gorbunova would remain in the family home and take care of the children, who were still at school age at the time. Mr Berezovsky made clear that he accepted financial responsibility for the children and would provide for them in the future.

21. Prior to this discussion, Mr Berezovsky had been seeking Ms Gorbunova's agreement to a re-mortgage of Wentworth Park. During this discussion, however, Mr Berezovsky

raised the possibility that Wentworth Park might need to be sold to assist him in funding his litigation. Mr Berezovsky promised that, in the event that the house needed to be sold, which was only a possibility at this stage, he would purchase a similar home for her and the children to live in, and they would be comfortable until this could be achieved. Moreover, the sale of Wentworth Park would release further capital to make provision for Ms Gorbunova.

22.     During this conversation, Ms Gorbunova had full trust in Mr Berezovsky. Neither Mr Berezovsky nor Ms Gorbunova anticipated any difficulty in Mr Berezovsky fulfilling his promises as he was expecting large pay-outs from his various cases. They agreed that they needed to capture their agreement in writing, but at that stage nothing was done about this.

23.     Mr Berezovsky and Ms Gorbunova took separate holidays over the Christmas vacation and this led to an argument. During this time their children first became aware that their parents' relationship had come to an end. On their return from vacation in January 2012, Mr Berezovsky moved out of the family home.

*The January 2012 conversation*

24.     On 9 January 2012 Ms Gorbunova signed documents to enable Wentworth Park to be re-mortgaged. On or shortly after that date, Mr Berezovsky visited Wentworth Park to collect some belongings and he and Ms Gorbunova again discussed their relationship and finances.

25.     As Ms Gorbunova recounts in her statement:

"130.    …. We agreed that any recovery Boris received from his four litigation proceedings would be split as to one-third to me and two-thirds to Boris and the children. …

131.    We discussed what would happen with Boris' various claims, given his agreement to give me a third.  Boris said he would consult me in relation to any settlement of his claims.

132.    He was very clear that the one third was mine and that he wouldn't be able to use it for anything else.  This was very important as this was the main financial element of our separation.  Boris said that now that Christmas was over we could get something in writing reflecting our discussion about the litigation.

133.    At this time, Boris was assured by AG that he would win all of his litigation …. and he was keen to start his new life and wanted [to] put his family's affairs in order. As a result he said he would instruct his lawyers to draw up a deed which would satisfy me and guarantee mine and my children's financial future."

*The Litigation Deed*

26.     In March 2012 Mr Berezovsky asked Ms Gorbunova to agree to the sale of Wentworth Park due to the financial pressure he was experiencing. Ms Gorbunova agreed to this and signed the contract of sale. In this context they discussed the need for a document recording what had been discussed in December 2011 and January 2012.

27.     This document was drawn up by those acting for Mr Berezovsky in the form of a deed ("the Litigation Deed"). Mr Berezovsky and his in-house legal adviser, Michael Cotlick, brought the Litigation Deed to Wentworth Park in March 2012, and showed it to Ms Gorbunova. Mr Cotlick asked Ms Gorbunova if she was happy with the wording.  Ms Gorbunova says in paragraph 144 of her statement that "it looked like it reflected the agreement we had and I said that I was happy that it reflected what we had discussed".

28.     Mr Berezovsky signed the Litigation Deed and his signature was witnessed by Mr Cotlick, although the document was not dated. It was then presented to Ms Gorbunova to keep. She did not receive, nor was she offered, independent legal advice in relation to the Litigation Deed.

29.     As Ms Gorbunova recounts:

> "148.    At the time that this document was executed I presumed that this would give me financial stability and was effective. I thought Boris had done everything he needed to do to give full effect to our arrangement.

> 149.    Boris knew that I had a claim to a portion of the funds from the litigation with Abramovich. We both treated the four key litigations as a joint venture between us and part of the proceeds from the claims would be mine. He still regularly came to me with requests to pay translator fees and other expenses incurred in the course of the litigation."

30.     Despite what Ms Gorbunova says about Mr Berezovsky consulting her about the Litigation, she also says in paragraph 151:

> "When I discovered that [Mr Berezovsky] had dropped out of the Metalloinvest litigation and assigned the claim … to the AP Family, this was a great shock. Not only had he done this without telling me, but he previously had refused an offer of $450m."

31.     In July 2012 Ms Gorbunova moved to a property in Tite Street, London.

*The Commercial Court judgment and settlement with the AP Family*

32.     Against his and Ms Gorbunova's expectations, Mr Berezovsky suffered a very significant defeat in his claim against Mr Abramovich. Given the criticisms made of the credibility of Mr Berezovsky by Gloster J (as she then was) in her judgment, there

was an important practical consequence for Mr Berezovsky in relation to his other actions.

33.     Almost immediately, Mr Berezovsky entered into further settlement negotiations with the AP Family in relation to his claims against them. Although Ms Gorbunova was not present for these negotiations, again Mr Berezovsky kept her informed on their progress. Mr Berezovsky was excited that there might be certain non-financial benefits for him. In particular, he believed he would be able to return to Russia and make a fresh start. He was now willing to accept a much lower sum than had previously been offered by the AP Family and rejected by Mr Berezovsky.

34.     By 7 September 2012 the settlement agreement with the AP Family was all but concluded. On 7 September 2012 Mr Berezovsky visited Ms Gorbunova at Tite Street. He told her that he would receive 150 million (currency unspecified but understood to be $) under the terms of the settlement agreement (together with other funds which would be used to pay some of the costs of the Abramovich case, Mr Berezovsky's office costs and so on). As Ms Gorbunova puts in paragraph 174 of her statement "I understood that … my interest was in the 150 million …".

35.     However, Mr Berezovsky needed to obtain waivers on behalf of the beneficiaries of a settlement called the Belmont Settlement, which included Ms Gorbunova and her children. He therefore pressed Ms Gorbunova to sign letters disclaiming their interest. Ms Gorbunova was unwilling to do so.

36.     As Ms Gorbunova recounts:

        "179.   As we both knew that I was going to receive a third of the settlement amount under the … Litigation Deed, we both realised that if Boris accepted the settlement on offer, the sum I received would be significantly less than we originally discussed … I asked about the impact of these changing expectations on our original agreement.

        180.    He told me that if I refused, the AP Family would not settle and that his financial AND personal affairs would collapse. This was when he offered that he would give me the [150 million] in its entirety minus the retained sums for the balance of Abramovich's costs (£13 million) and AG's costs (£1.5 million), if I signed the waivers.  I was willing to agree to this."

*The Litigation Agreement and the Settlement Agreement*

37.     Mr Berezovsky arranged for Addleshaw Goddard to prepare a written agreement reflecting his agreement with Ms Gorbunova. On Saturday 8 September 2012 he contacted Ms Gorbunova to ask if she had received the written agreement. When she said that she had not, he forwarded to her an email he had received from Mark Hastings of Addleshaw Goddard attaching the draft agreement. Mr Hastings' covering email contained advice addressed to Mr Berezovsky about the effect of the document:

        "As I explained to you on the telephone just now:

1.    When viewed in isolation, this document is simply a promise to make a gift in the future. Accordingly, it is not a legally enforceable contract, as no consideration is flowing from Elena to you. Elena may seek to argue that the document should not be viewed in isolation and that she has provided good consideration by signing the separate letter consenting to the transfer of notes and/or by doing other things. You therefore have good arguments that you are under no obligation to act upon the terms of this letter in the future but we cannot advise you that a Court will certainly hold this to be the case.

2.    In the unlikely event that you were to become bankrupt during the qualifying period after gifting any settlement monies to Elena, your trustee in bankruptcy could easily set aside the gift on the basis that its purpose was to defraud your creditors.

3.    In the unlikely event that you were to become bankrupt before the monies were received from the Family Defendants pursuant to the terms of the settlement, the settlement monies would still form part of the pot available for distribution to your creditors.

Accordingly, this document is not worth a great deal.

When we spoke, you confirmed to me that you understood that but that Elena was insisting upon it. It would therefore be helpful to have the letter in any event."

38.    Ms Gorbunova had the opportunity to consider this covering email before Mr Berezovsky arrived at Tite Street. When he arrived, she confronted Mr Berezovsky about the draft agreement, stating that it did not appear to do what Mr Berezovsky had said that it would in light of Mr Hastings' advice. Mr Berezovsky assured her that the agreement would be binding. He also stated that there was no time to redraft the wording as the waivers would need to be signed immediately.

39.    In response to Ms Gorbunova's concerns, he promised Ms Gorbunova he would sign a more formal document drafted by her lawyers. Accordingly, he added a handwritten addendum to the draft agreement recording this. He then signed the agreement and Ms Gorbunova counter-signed it ("the Litigation Agreement"). Again, she did not receive independent legal advice.

40.    Later that day, a courier arrived with the Belmont Settlement paperwork, and Ms Gorbunova signed the waivers on behalf of herself and her children. Ms Gorbunova would not have done so without Mr Berezovsky having first entered into the Litigation Agreement.

41.    On 9 September 2012 Mr Berezovsky signed the settlement agreement with the AP Family ("the Settlement Agreement").

*Commencement of the proceedings*

42.     In October or November 2012 it became apparent that Mr Berezovsky might not honour the terms of his agreements with Ms Gorbunova. During the course of a heated discussion with Mr Cotlick, she was informed that there were many things she did not know. Ms Gorbunova discovered from Mr Cotlick that Mr Berezovsky had promised a percentage of the proceeds of litigation to his ex-wife Galina. This led Ms Gorbunova to seek independent legal advice for the first time, and ultimately to the issuing of these proceedings in December 2012. Ms Gorbunova applied for and was granted a freezing order against Mr Berezovsky's assets.

The death of Mr Berezovsky and the appointment of the Trustees

43.     On 14 March 2013 Mr Berezovsky made a new will under which Ms Gorbunova and their children were the major beneficiaries of his estate. Mr Berezovsky died on 23 March 2013. On 29 April 2013 the Ninth and Tenth Defendants were appointed as receivers of his Estate by Morgan J. The Ninth and Tenth Defendants were appointed as general administrators of the Estate on 10 April 2014. The Trustees were appointed as trustees of the insolvent estate after an insolvency administration order was made by Morgan J on 26 January 2015.

The proceedings

44.     Ms Gorbunova's claims against the Second to Sixth Defendants were stayed pursuant to a consent order made by Mann J on 7 May 2014. The Seventh and Eighth Defendants have retired from the fiduciary offices which led to them being joined as defendant and Ms Gorbunova seeks no relief against them. Thus the Trustees are the sole remaining effective defendants to the claim.

45.     The AP Family made a series of payments under the Settlement Agreement to Mr Berezovky and then the Estate, and in particular two payments totalling a little under $105 million to the Estate in March 2014. The Trustees have resolved proprietary claims made by Mr Abramovich and by Mr Berezovsky's solicitors Addleshaw Goddard. About £34 million remains, subject to the payment of bankruptcy and administration expenses, including legal costs, out of this sum. This sum is currently the Estate's only substantial asset. Since the Estate has substantial creditors running into hundreds of millions of pounds, it is hopelessly insolvent.

46.     In these proceedings Ms Gorbunova asserts both proprietary claims and claims for damages against the Estate. The proprietary claims depend on the Litigation Deed and the Litigation Agreement. The objective of the Trustees' application is to dispose of the proprietary claims, which will enable the Trustees to distribute the money between the various creditors. Although the Trustees challenge the enforceability of both the Litigation Deed and the Litigation Agreement, for the purposes of these applications both must be assumed to be enforceable.

The Litigation Deed

47.     The Litigation Deed states:

              "This Deed is made on          2012 in London, United Kingdom

By Platon Elenin (formerly known as Boris Berezovsky) ("PE") of Wentworth Park, Prune Hill, Surrey TW20 9TR

Recitals

A       Helena Gorbunova (formerly known as Elena Gorbunova) ('HG') of Wentworth Park, Prune Hill, Egham, Surrey TW20 9TR is PE's civil partner.

B.      PE (under his former name) is currently involved in litigation in London, United Kingdom in the following cases ('the Litigation'):

    1.      Boris Abramovich Berezovsky v Roman Arkadievich Abramovich (2007 folio 942)

    2.      Boris Berezovsky v The Estate of A Patarkatsishviii, I Gudavadze and others (HC08CO3549)

    3.      Boris Berezovsky v A Hines, J Gibson, V Anisimov, Cliren Investments and others (HC09CO0494)

    4.      Boris Berezovsky v The Estate of A Patarkatsishvili, Salford and others (HC09CO0711)

Now this Deed witnesses as follows

(1)     PE hereby irrevocably and unconditionally covenants with HG that he will pay or procure the payment to HG of one third of the value of each item of property (whether in the form of cash or otherwise) recovered through the Litigation (whether recovered by way of settlement of the litigation or enforcement of a court judgment or otherwise).

(2)     The payment will become due immediately after each property is recovered by PE.

(3)     In the event that PE's interest in the property referred to in clause (1) above is held through a trust PE shall at the times his interest in the trust is secured:

    a.      Request that the trustees within 14 days transfer one third of the value of the assets comprised in the trust (valued at the date PE's interest is secured) to HG.

    b.      If the trustees do not comply with the request in clause 3(a) above within 14 days PE

> irrevocably and unconditionally covenants with HG to pay HG one third of the value of the assets comprised in the trust and such payment shall fall due for payment on the expiry of the 14 day period specified in clause 3(a) above.

(4) This Deed shall be governed by and construed in accordance with the laws of England and Wales.

> Executed as a deed and delivered on the date appearing at the beginning of this Deed."

The Litigation Agreement

48. The Litigation Agreement states:

> "If I receive monies pursuant to the terms of a settlement with [the AP Family], which monies are free of any encumbrances or restrictions, I hereby agree to transfer any and all such monies to any bank account as may be designated by you."

49. Mr Berezovsky's handwritten addendum reads:

> "PS I garanty that when Helena Gorbunova will get legal advice from her lawyer the new agreement I will take as only one wich is in power."

Principles applicable to summary judgment applications

50. The principles applicable to summary judgment applications were conveniently summarised by Lewison J (as he then was) in the context of defendants' applications in *Easyair Ltd v Opal Telecom Ltd* [2009] EWHC 339 (Ch) in a passage at [15] which was cited with approval by Etherton LJ (as he then was, with whom Sullivan LJ and Wilson LJ, as he then was, agreed) in *AC Ward & Son v Catlin (Five) Ltd* [2009] EWCA Civ 1098, [2010] Lloyds Rep IR 301 at [24]:

> "As Ms Anderson QC rightly reminded me, the court must be careful before giving summary judgment on a claim. The correct approach on applications by defendants is, in my judgment, as follows:
>
> i) The court must consider whether the claimant has a 'realistic' as opposed to a 'fanciful' prospect of success: *Swain v Hillman* [2001] 2 All ER 91;
>
> ii) A 'realistic' claim is one that carries some degree of conviction. This means a claim that is more than merely arguable: *ED & F Man Liquid Products v Patel* [2003] EWCA Civ 472 at [8].
>
> iii) In reaching its conclusion the court must not conduct a 'mini-trial': *Swain v Hillman*.

iv)    This does not mean that the court must take at face value and without analysis everything that a claimant says in his statements before the court. In some cases it may be clear that there is no real substance in factual assertions made, particularly if contradicted by contemporeous documents: *ED & F Man Liquid Products v Patel* at [10].

v)    However, in reaching its conclusion the court must take into account not only the evidence actually placed before it on the application for summary judgment, but also the evidence that can reasonably be expected to be available at trial: *Royal Brompton Hospital NHS Trust v Hammond (No 5)* [2001] EWCA Civ 550.

vi)    Although a case may turn out at trial not to be really complicated, it does not follow that it should be decided without the fuller investigation into the facts at trial than is possible or permissible on summary judgment. Thus the court should hesitate about making a final decision without a trial, even where there is no obvious conflict of fact at the time of the application, where reasonable grounds exist for believing that a fuller investigation into the facts of the case would add to or alter the evidence available to a trial judge and so affect the outcome of the case: *Doncaster Pharmaceuticals Group Ltd v Bolton Pharmaceutical Co 100 Ltd* [2007] FSR 63.

vii)    On the other hand it is not uncommon for an application under Part 24 to give rise to a short point of law or construction and, if the court is satisfied that it has before it all the evidence necessary for the proper determination of the question and that the parties have had an adequate opportunity to address it in argument, it should grasp the nettle and decide it. The reason is quite simple: if the respondent's case is bad in law, he will in truth have no real prospect of succeeding on his claim or successfully defending the claim against him, as the case may be. Similarly, if the applicant's case is bad in law, the sooner that is determined, the better. If it is possible to show by evidence that although material in the form of documents or oral evidence that would put the documents in another light is not currently before the court, such material is likely to exist and can be expected to be available at trial, it would be wrong to give summary judgment because there would be a real, as opposed to a fanciful, prospect of success. However, it is not enough simply to argue that the case should be allowed to go to trial because

something may turn up which would have a bearing on the question of construction: *ICI Chemicals & Polymers Ltd v TTE Training Ltd* [2007] EWCA Civ 725."

Principles applicable to the interpretation of written documents

51. The principles of contractual interpretation have been considered by the House of Lords and the Supreme Court in a series of recent cases, including *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101, *Re Sigma Finance Corp* [2009] UKSC 2, [2010] 1 All ER 571, *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50 [2011] 1 WLR 2900, *Aberdeen City Council v Stewart Milne Group Ltd* [2011] UKSC 56, [2012] SLT 205 and *Arnold v Britton* [2015] UKSC 36, [2015] AC 1619. In brief summary, the interpretation of a contract is an objective exercise in which the court's task is to ascertain the meaning that the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract. This does not include evidence as to the subjective intentions of one or both of the parties or the pre-contractual negotiations.

52. Although the Litigation Deed is a unilateral declaration rather than a contract, it is common ground that the same principles are applicable to the interpretation of this document.

Did either the Litigation Deed or the Litigation Agreement establish a trust?

53. Ms Gorbunova alleges in paragraph 64.3 of her Amended Particulars of Claim that "the Trustees hold one-third of [Mr Berezovsky's] rights under any compromise agreement with the [AP Family] and one-third of any property or sums received under such an agreement or agreements on trust for [Ms Gorbunova] by virtue of the Litigation Deed". She also alleges in paragraph 64.1 that by virtue of the Litigation Agreement "[Mr Berezovsky] held and the Trustees now hold any rights he had against the [AP Family] upon trust for [her] and, save for the Costs Element (as to which the Trustees are required to provide an account), holds the proceeds of any settlement agreement upon trust for her".

54. In each case, the Trustees dispute these contentions for three reasons: first, because the words used do not create any trust; secondly, because the subject matter of the supposed trust is too uncertain; and thirdly, because any trust would be void pursuant to section 284 of the Insolvency Act 1986. The Trustees contend that each of these objections suffices to establish that Ms Gorbunova's claim has no real prospect of success.

*The law*

55. So far as the Trustees' first objection is concerned, it is well established that it is not necessary for the settlor to use words such as "I declare myself a trustee". But the words used must show that the settlor intended to dispose of property so that someone else acquired the beneficial interest to the exclusion of himself: see *Richards v Delbridge* (1874) LR 18 Eq 11 at 14 (Sir George Jessel MR), *Re Schebsman* [1944]

Ch 83 at 104 (du Parcq LJ), *Paul v Constance* [1977] 1 WLR 527 at 531 (Scarman LJ) and *Tradegro (UK) Ltd v Wigmore Street Investments Ltd* [2011] EWCA Civ 268, [2011] 2 BCLC 616 at [36] (Lord Neuberger of Abbotsbury MR). A mere intention to make a gift is insufficient for this purpose.

56.     Turning to the second objection, it is also well established that, in order for a trust to be properly constituted, the property the subject-matter of the trust must be identified with sufficient certainty: see *Knight v Knight* (1840) 3 Beav 148 at 173-174 (Lord Langdale MR), *Mussoorie Bank v Raynor* (1882) 7 App Cas 321 at 331 (Sir Arthur Hobhouse) and *Re Snowdon (Deceased)* [1979] Ch 528 at 534 (Sir Robert Megarry V-C).

57.     As for the third objection, section 284 provides, so far as relevant:

"(1)     Where a person is adjudged bankrupt, any disposition of property made by that person in the period to which this section applies is void except to the extent that it is or was made with the consent of the court, or is or was subsequently ratified by the court.

…

(3)     This section applies to the *period* after the presentation of the petition for the bankruptcy order and ending with the vesting, under Chapter IV of this Part, of the bankrupt's estate in a trustee.

…"

58.     Article 3 of the Administration of Insolvent Estates of Deceased Persons Order 1986, SI 1999/1986, provides that the provisions of the Insolvency Act 1986 apply to insolvent estates with the amendments as set out under Schedule 1 of the Order. Article 12 of Part II of that Schedule provides that section 284 shall apply to insolvent estates:

"...with the modification that they shall have effect as if the petition had been presented and the insolvency administration order had been made on the date of death of the deceased debtor."

59.     The effect of these provisions is accordingly that any disposition of the deceased insolvent's property after the date of his death is void: see *Re Vos (Deceased)* [2006] BPIR 348 (Chief Registrar Baister).

*The Litigation Deed*

60.     So far as the first objection is concerned, counsel for the Trustees submitted that the words used did not evidence an intention to make an immediate disposition of the beneficial interest in specified property, whether the prospective receipts from the Litigation or Mr Berezovsky's rights under the Settlement Agreement. On the contrary, they amounted to a promise to pay: the obligation was described in clause 1

as a "covenant", the covenant was to "pay or procure the payment" of money and clause 2 fixed the time the payment was due, which would be unnecessary if the Litigation Deed created a trust. Furthermore, the payment promised was of one third of "the value of" property recovered, which was inconsistent with a declaration of trust of the recovered property. Still further, clauses 1 and 3 both showed that it was intended that Mr Berezovsky should receive any property recovered through the Litigation beneficially, and not as trustee for Ms Gorbunova.

61.    Counsel for Ms Gorbunova submitted that, construed in the light of the relevant background, the substantive sense of the words used was that Mr Berezovsky intended to create a trust. I do not accept this submission. In my judgment the wording of the Litigation Deed does not evidence an intention to create a trust on the part of Mr Berezovsky of any property recovered through the Litigation, let alone of Mr Berezovsky's rights under the Settlement Agreement, for all the reasons given by counsel for the Trustees. Ms Gorbunova's case amounts to an attempt to re-write the Litigation Deed to say something it does not say.

62.    Turning to the second objection, counsel for the Trustees submitted that the subject matter of the purported trust was uncertain because it was not specific property, but rather one third of "the value of" whatever property might be recovered through the Litigation. Accordingly, Mr Berezovsky could have discharged his obligation by paying the appropriate amount from any source.

63.    Counsel for Ms Gorbunova accepted that the presence of the words "the value of" on the face of it made it difficult for Ms Gorbunova to contend that the Litigation Deed created a trust because those words did not refer to specific property. He submitted, however that, in the light of the relevant background, the Litigation Deed should be construed as if those words were not present. He argued that it was evident that something had gone wrong with the drafting of the Litigation Deed, and this could be cured by disregarding those words. I do not accept this argument. The Litigation Deed was drafted by Mr Berezovsky's lawyer(s). It is a formal document which appears to have been carefully worded. Counsel for Ms Gorbunova was unable to point to anything in either the wording of the Litigation Deed itself or in the admissible background which suggests that the inclusion of "the value of" was a mistake. The argument amounts to a plea that the court should ignore part of the document because it is inconsistent with Ms Gorbunova's case.

64.    As for the third objection, counsel for the Trustees submitted that, since it was clear from clauses 2 and 3 of the Litigation Deed that the obligation to pay only arose upon receipt of a recovery, any trust could only be of (one third of the value of) the recovered property once received by Mr Berezovsky. Accordingly, the trust would only be established upon receipt. Given that all of the monies in respect of which Ms Gorbunova asserted her trust claims were paid by the AP Family to the Estate in March 2014, the establishment of any trust in respect of those monies would amount to a disposition of Mr Berezovsky's beneficial interest in those monies after his death. It would therefore be void.

65.    Counsel for Ms Gorbunova submitted that the Litigation Deed had created a trust of Mr Berezovsky's rights under the Settlement Agreement. That trust had come into existence at the time of the Settlement Agreement, which was before Mr Berezovsky's death. Again, I do not accept this argument. The Litigation Deed does

not refer to the Settlement Agreement, which was not at that date in prospect. Nor does it refer to Mr Berezovsky's rights under any settlement of any of the Litigation. What it refers to is (one third of the value of) property recovered through the Litigation Agreement. Accordingly, in my judgment any trust was of the property when received. In the case of the monies received from the AP Family after Mr Berezovsky's death, any such trust was void by virtue of section 284.

*The Litigation Agreement*

66.     Before turning to the Litigation Agreement itself, it is first necessary to say a few words about Mr Hastings' email. Although both sides relied upon it to some extent, albeit for different purposes, I do not consider that it is admissible evidence as to the construction of the Litigation Agreement. This is because it is evidence of Mr Berezovsky's subjective intentions and/or part of the pre-contractual negotiations. Even if I am wrong about that, however, I do not consider that it would make any difference to the conclusions I have reached.

67.     So far as the Trustees' first objection is concerned, counsel for the Trustees submitted that, assuming it was enforceable, the words used did not evidence an intention to make an immediate disposition of the beneficial interest in specified property, whether the prospective receipts from the Settlement Agreement or Mr Berezovsky's rights under the Settlement Agreement. On the contrary, they amounted to a conditional agreement on the part of Mr Berezovsky to transfer any monies received under the Settlement Agreement which were free of encumbrances or restrictions. Thus it was predicated upon receipt of the monies by Mr Berezovsky beneficially, which was inconsistent with Mr Berezovsky declaring himself a trustee of such monies. Furthermore, the Litigation Agreement was a promise to make a gift of monies in the future, if and when those monies were received. At the very most, it was a promise to declare a trust in the future, once the "new agreement" had been drawn up following the receipt by Ms Gorbunova of legal advice.

68.     Counsel for Ms Gorbunova submitted that, construed in the light of the relevant background, the substantive sense of the words used was that Mr Berezovsky intended to create a trust. I do not accept this submission. In my judgment the wording of the Litigation Agreement does not evidence an intention to create a trust on the part of Mr Berezovsky of any monies received under the Settlement Agreement, let alone of Mr Berezovsky's rights under the Settlement Agreement, for all the reasons given by counsel for the Trustees. Ms Gorbunova's case again amounts to an attempt to re-write the Litigation Agreement to say something it does not say.

69.     Turning to the second objection, counsel for the Trustees submitted that the subject-matter of the supposed trust was uncertain because of the words "free from encumbrances and restrictions". Not only was it was unclear what "encumbrances and restrictions" there were, but also it was not clear what the amount would be subject to such encumbrances and restrictions. In this regard, counsel pointed out that, in her Amended Particulars of Claim, Ms Gorbunova appears to admit that, although she had understood at the time of the Litigation Agreement that sums of £13 million would be paid to Mr Abramovich and £1.5 million to Addleshaw Goddard (referred to as "the Costs Elements") out of the sums payable under the Settlement Agreement, debts of £35 million to Mr Abramovich and about £13.7 million to Addleshaw Goddard were encumbrances or restrictions on the sums received under the Settlement Agreement. It

would not have been possible to quantify those sums at the date of the Litigation Agreement, however.

70. Counsel for Ms Gorbunova submitted that the need to quantify the amount subject to encumbrances and restrictions did not mean that the subject-matter of the trust was uncertain, since it was essentially a mechanical exercise and the trust bit on whatever was left over. I do not accept this argument. In my judgment the subject-matter of the supposed trust is uncertain for the reasons given by counsel for the Trustees.

71. As for the third objection, counsel for the Trustees submitted that any trust of the monies received under the Settlement Agreement was void for the same reasons as outlined above. Counsel for Ms Gorbunova submitted that, like the Litigation Deed, the Litigation Agreement had created a trust of Mr Berezovsky's rights under the Settlement Agreement. Again, I do not accept this argument.

*Conclusion*

72. For the reasons given above, I conclude that Ms Gorbunova has no real prospect of successfully contending that either the Litigation Deed or the Litigation Agreement created a trust of monies recovered from the Litigation or under the Settlement Agreement, let alone a trust of Mr Berezovsky's rights in respect of the Litigation or under the Settlement Agreement. Accordingly, I will grant the Trustees summary judgment dismissing these claims.

73. By way of a postscript to the preceding discussion, I should record that, following the conclusion of the argument on the Trustees' application and in the context of Ms Gorbunova's application, counsel for the Trustees submitted that it was not possible to create a trust of future property, as opposed to an equitable assignment, relying upon *Re Ellenborough* [1903] 1 Ch 697. Counsel for Ms Gorbunova submitted that it was possible to circumvent this rule, relying upon *Lewin on Trusts* (19th ed) at 2-38. Having regard to the conclusions reached above, it is not necessary for me to resolve this point.

Ms Gorbunova's amendment application

74. The Trustees do not oppose certain aspects of the amendment application, but they do oppose it in so far as it seeks to introduce claims for equitable assignment, rectification, proprietary estoppel and other estoppels on the ground that these new claims stand no real prospect of success. Counsel for the Trustees divided the amendments into three categories: first, allegations which suffered from essentially the same defects as, or added nothing to, the claims which were the subject of the Trustees' application; secondly, allegations which were unsupported by evidence; and thirdly, allegations which were inconsistent with Ms Gorbunova's evidence in her witness statement. So far as the second objection is concerned, I will say straightaway that in my judgment this is not a valid objection. Ms Gorbunova is prepared to sign a statement of truth in respect of the Re-Amended Particulars of Claim, and thus the statement of case will itself constitute evidence in support of the allegation. As for the other objections, I will consider them separately in relation to each cause of action.

75. Before proceeding to consider the new causes of action sought to be introduced by the amendments, I should record for completeness that the amendments include a new

allegation that the Litigation Deed established a trust of Mr Berezovsky's rights in respect of the Litigation. Even if it assumed that it is intended to allege that it established a trust of one-third of Mr Berezovsky's rights in respect of the Litigation, I do not consider that this allegation is any more viable than those I have already rejected above. (If that is not the intention, the allegation is even more hopeless: "one third" cannot possibly mean all.) I will therefore refuse permission to introduce it.

### Did either the Litigation Deed or the Litigation Agreement constitute an equitable assignment?

76. In the alternative to her claims that the Litigation Deed and the Litigation Agreement created trusts, Ms Gorbunova contends that they took effect as equitable assignments. This contention was first advanced in her Reply and is now sought to be introduced into the Particulars of Claim by amendment. Specifically, new paragraph 28B alleges *inter alia* that the Litigation Deed "took effect as an immediate assignment to [Ms Gorbunova] in equity of [Mr Berezovsky's rights in the Litigation]" or in the alternative "took effect as an assignment for value of the future proceeds of [the Litigation]". Again, I will assume that the words "one third of" have in each case been inadvertently omitted. New paragraph 34B alleges *inter alia* that the Litigation Agreement "took effect as an immediate assignment to [Ms Gorbunova] in equity of the benefit of [Mr Berezovsky's] rights against the [AP Family] and/or under [the Settlement Agreement]" or in the alternative "took effect as an assignment for value of the future proceeds of [the Settlement Agreement]".

77. Although the Trustees do not accept that Ms Gorbunova gave consideration or value for any such assignments, so as to make them enforceable if they concerned future property, the Trustees do not dispute that Ms Gorbunova has a real prospect of success on this issue. I will therefore assume for present purposes that Ms Gorbunova did give consideration or value.

78. The Trustees contend, however, that neither the Litigation Deed nor the Litigation Agreement on their construction amounts to an equitable assignment as alleged.

*The law*

79. No particular form is required for a valid equitable assignment. Equity has always looked to the intent rather than the form, and all that is needed is a sufficient outward expression of an intention to make an immediate disposition of the assignor's right: see *Snell's Equity* (33rd ed) at 3-014.

*The Litigation Deed*

80. Counsel for the Trustees submitted that the Litigation Deed did not express any intention on the part of Mr Berezovsky to assign any right of his to Ms Gorbunova, nor to assign one third of the future proceeds of the Litigation. Rather, as discussed above, it was merely a promise to pay her one third of the value of the property recovered from the Litigation.

81. Counsel for Ms Gorbunova submitted that, construed in the light of the relevant background, the Litigation Deed did express an intention on the part of Mr Berezovsky to assign (one third of) his rights in the Litigation to Ms Gorbunova, or at

least (one third of) the future proceeds. I do not accept this argument. There is nothing in the wording of the Litigation Deed to support the suggestion that it was intended to amount to an assignment of Mr Berezovsky's rights in the Litigation. Nor does the wording evince an intention to assign the future proceeds of the Litigation. As counsel for the Trustees submitted, it is simply a promise to pay one third of the value of the future recoveries.

82.     Counsel for the Trustees also submitted that, in so far it was alleged that the assignment was of the future proceeds of the Litigation, it was void pursuant to section 284. I accept that submission.

*The Litigation Agreement*

83.     Counsel for the Trustees submitted that the Litigation Agreement did not express any intention on the part of Mr Berezovsky to assign any right of his to Ms Gorbunova, nor to assign the proceeds of the Settlement Agreement. Rather, as discussed above, it was merely a conditional promise to pay her any sum Mr Berezovsky received from the Settlement Agreement which was free from encumbrances and restrictions.

84.     Counsel for Ms Gorbunova submitted that, construed in the light of the relevant background, the Litigation Agreement did express an intention on the part of Mr Berezovsky to assign his rights against the AP Family or under the Settlement Agreement to Ms Gorbunova, or at least the future proceeds. I do not accept this argument. There is nothing in the wording of the Litigation Agreement to support the suggestion that it was intended to amount to an assignment of Mr Berezovsky's rights against the AP Family or under the Settlement Agreement. Nor does the wording evince an intention to assign the future proceeds of the Settlement Agreement.

85.     Counsel for the Trustees also submitted that, in so far it was alleged that the assignment was of the future proceeds of the Settlement Agreement, it was void pursuant to section 284. Again I accept that submission.

*Conclusion*

86.     For the reasons given above, I conclude that Ms Gorbunova has no real prospect of successfully contending that either the Litigation Deed or the Litigation Agreement amounted to an equitable assignment as alleged. Accordingly, I will refuse Ms Gorbunova permission to re-amend her Particulars of Claim to introduce these claims.

Ms Gorbunova's claims for rectification

87.     In the alternative to her claims that, on their true construction, the Litigation Deed and the Litigation Agreement created trusts, Ms Gorbunova contends that they should be rectified to do so.

*The law*

88.     It is not necessary to discuss the law as to rectification of documents in any detail, because counsel for the Trustees' principal submission was that the proposed amendments were inconsistent with Ms Gorbunova's evidence. Rectification is available both for contracts and for voluntary settlements. Rectification may be based

upon either common mistake or unilateral mistake. A claim for rectification of a contract on the ground of common mistake will succeed only if it is established, first, that there was some prior agreement between the parties; secondly, that this was still effective when the instrument was executed; thirdly, that by mistake the instrument fails to carry out that agreement; and fourthly, that if rectified as claimed, the instrument would carry out the agreement: see *Snell's Equity* at 16-013. A claim for rectification of a contract on the ground of unilateral mistake will only succeed if it is established that one party to the transaction knows that the instrument contains a mistake in his favour, but does nothing to correct it and seeks to take advantage of the other's mistake: see *Snell's Equity* at 16-019. Rectification of a voluntary settlement on the ground of unilateral mistake is possible upon sufficient proof of a mistake in carrying into effect the settlor's intention: see *Snell's Equity* at 16-021.

*The Litigation Deed*

89.   In new paragraph 28D of the proposed Re-Amended Particulars of Claim Ms Gorbunova alleges that:

> "… to the extent that the words used in the Litigation Deed do not record the intention of [Mr Berezovsky] (and [Ms Gorbunova]) to hold his rights in the litigation irrevocably and absolutely for the benefit of [Ms Gorbunova] (giving rise to a trust in favour of [Ms Gorbunova]), [Ms Gorbunova] seeks rectification of the Litigation Deed to record this intention. It was [Mr Berezovsky's] intention, communicated to [Ms Gorbunova] both before and after the execution of the Litigation Deed that the effect of the Litigation Deed was that [Mr Berezovsky] would hold one third of his rights in respect of the named litigation for [Ms Gorbunova] absolutely."

This allegation is supported by a series of particulars pleaded in new paragraphs 28C-28C-6 and 28D.1-28.10.

90.   On this basis Ms Gorbunova claims the following relief in new paragraph 64.3A:

> "to the extent that the Litigation Deed does not reflect the intention of [Mr Berezovsky] (and [Ms Gorbunova]) that it would give rise to an immediate trust in favour of [Ms Gorbunova], rectification of the same by replacing the words 'pay or procure the payment to HG of' with 'hold for HG's benefit absolutely' and (if necessary) deleting the words 'the value of'."

91.   Counsel for the Trustees submitted that there were two problems with this pleading. First, the intention pleaded in paragraph 28D and its supporting particulars did not support the rectification claimed in paragraph 64.3A: the former concerned the rights in the Litigation, whereas the latter still concerned the property recovered through the litigation. Secondly, and more fundamentally, the intention pleaded in paragraph 28D and its supporting particulars was inconsistent with Ms Gorbunova's evidence, which was that Mr Berezovsky's intention was to give her one third of the recoveries from the Litigation.

92.   So far as the first point is concerned, counsel for Ms Gorbunova did not seriously dispute that there was a mismatch between the prayer for relief and the body of the pleadings, but submitted that the form of relief would be a matter for trial and that what mattered was the pleaded intention. In my view it is not satisfactory for the pleading not properly to set out the relief which Ms Gorbunova claims, but this is a matter that can be simply cured. I will proceed on the basis that what Ms Gorbunova seeks is rectification of the Litigation Deed so as to give effect to the intention pleaded in the second sentence of paragraph 28D. (I note in passing that paragraph 28D is internally inconsistent, because the first sentence alleges an intention in respect of "his rights in the litigation" i.e. all of them, whereas the second sentence alleges an intention in respect of "one third of his rights". As I understand Ms Gorbunova's case, it is the latter formulation which reflects it.)

93.   Turning to the second point, counsel for Ms Gorbunova submitted that this was not a question which was susceptible of summary determination. At the trial the court would be able to take into account all the evidence bearing upon Mr Berezovsky's intention. It would not be limited to the evidence of Ms Gorbunova in her witness statement. Moreover, it would be entitled to draw inferences from the available evidence. In substance, he argued, the Trustees were inviting the court to engage in a mini-trial of the issue on incomplete evidence, which was impermissible.

94.   I fully accept that the court is not entitled to conduct a mini-trial of this issue without the benefit of disclosure and oral evidence. Nevertheless, I do not consider that Ms Gorbunova stands a real prospect of establishing that Mr Berezovsky's intention was as pleaded in paragraph 28D. Mr Berezovsky is of course dead. It is plain that the principal witness on whose evidence Ms Gorbunova will rely to establish that Mr Berezovsky's intention was not correctly recorded in the Litigation Deed is herself. But Ms Gorbunova's evidence, particularly in paragraph 130 of her witness statement, but also in other paragraphs such as paragraph 149, is that Mr Berezovsky's intention was that Ms Gorbunova should receive one third of "any recovery [he] received from" the Litigation, not that she should have one third of his rights in the Litigation. Consistently with this, it is her evidence that Mr Berezovsky consulted her about the Litigation, but she does not suggest that she had the final say. On the contrary, it is clear from her account (e.g. at paragraph 151) that Mr Berezovsky did.

*The Litigation Agreement*

95.   In new paragraph 34D of the proposed Re-Amended Particulars of Claim Ms Gorbunova alleges that:

> "It was [Mr Berezovsky] and [Ms Gorbunova]'s shared common intention that the effect of the Litigation Agreement was that [Ms Gorbunova] would receive [Mr Berezovsky's] rights against the [AP Family] and/or under the Settlement Agreement. That intention was communicated between [Mr Berezovsky] and [Ms Gorbunova]. To the extent that the Litigation Agreement does not reflect that common intention, [Ms Gorbunova] seeks rectification of the Litigation Deed to reflect this intention. In the alternative, [Mr Berezovsky] knew of [Ms Gorbunova's] mistake and acted unconscionably in seeking to take advantage of it."

This allegation is supported by particulars pleaded in new paragraphs 34A-34A.3.

96.     Counsel for the Trustees submitted that the intention pleaded in paragraph 34D and its supporting particulars was inconsistent with Ms Gorbunova's evidence, which was that the parties' intention was that Mr Berezovsky would give Ms Gorbunova the proceeds from the Settlement Agreement less the sums he had to pay Mr Abramovich and Addleshaw Goddard. Counsel for Ms Gorbunova again submitted that this issue was not susceptible of summary determination for the reasons given above.

97.     Again I accept that the court is not entitled to conduct a mini-trial of this issue, but I do not consider that Ms Gorbunova stands a real prospect of establishing that Mr Berezovsky's intention was as pleaded in paragraph 34D. It is not her evidence that the parties' intention was that Ms Gorbunova would receive Mr Berezovsky's rights. Rather, it is her evidence particularly in paragraph 180 of her witness statement, that their intention was for Mr Berezovsky to give her the proceeds of the Settlement Agreement less the sums retained for Mr Abramovich and Addleshaw Goddard.

*Conclusion*

98.     For the reasons given above, I conclude that Ms Gorbunova's claims for rectification have no real prospect of success. Accordingly, I will refuse Ms Gorbunova permission to re-amend her Particulars of Claim to introduce these claims.

Ms Gorbunova's claims for proprietary estoppel and constructive trust

99.     In the alternative to her claims that, on their true construction or as rectified, the Litigation Deed and the Litigation Agreement created trusts, alternatively amounted to equitable assignments, Ms Gorbunova advances claims of proprietary estoppel and constructive trust.

*The law*

100.    Again, it is not necessary to go into the law in detail for present purposes. In broad terms, the three main elements of a claim for proprietary estoppel are a representation or assurance made to the claimant, reliance on that representation or assurance by the claimant and detriment to the claimant as a result of such reliance: see *Snells' Equity* at 12-038. As will appear, the constructive trust asserted by Ms Gorbunova appears to be a common intention constructive trust. This is a doctrine which is normally applied to land, rather than personalty: see *Snells' Equity* at 24-041. Even assuming that it can apply to personalty (as claims founded on proprietary estoppel can: see *Fisher v Brooker* [2009] UKHL 41, [2009] 1 WLR 1764), there is little difference between a common intention constructive trust and a claim founded on proprietary estoppel: see *Snell's Equity* at 24-047. In the present case I cannot see what the common intention constructive trust claim adds to the proprietary estoppel claim, and I will therefore concentrate on the latter.

*The Litigation Deed*

101.    In new paragraph 28E of the proposed Re-Amended Particulars of Claim Ms Gorbunova alleges that:

> "… [the Trustees] hold the assets in their hands deriving from [the Settlement Agreement] on constructive trust to give effect to the terms of [the Litigation Deed] and to give effect to [Mr Berezovsky's] intention (shared with [Ms Gorbunova]. Further or in the alternative, [Ms Gorbunova] has established an equity by proprietary estoppel in the causes of action described in the Litigation Deed and the proceeds of those causes of action to give effect to the assurances of [Mr Berezovsky] pleaded at paragraph 28C."

102.    New paragraph 28C alleges that:

> "[Mr Berezovsky] by his words and conduct assured [Ms Gorbunova] that the Litigation Deed was enforceable and had the effect set out above, and in particular gave rise to beneficial rights in [Ms Gorbunova's] favour in respect of the litigation identified in the Litigation Deed. …"

Particulars are then given of assurances alleged to have been given in December 2011, January 2012 and March 2012.

103.    Paragraph 28C concludes by alleging that:

> "… [Ms Gorbunova] relied on these assurances … to her detriment by signing the documents for the sale of Wentworth Park, taking no further steps in relation to pursuing any claims against [Mr Berezovsky] and by forbearing to sue in respect of any such claims."

104.    Counsel for the Trustees again submitted that pleaded assurances by Mr Berezovsky relied upon were inconsistent with Ms Gorbunova's evidence. Counsel for Ms Gorbunova again submitted that this was not an issue susceptible of summary determination.

105.    Again, I am conscious that it is not permissible to conduct a mini-trial at this stage. Nevertheless, I agree with counsel for the Trustees that the case sought to be pleaded is inconsistent with Ms Gorbunova's evidence. She does not say in her witness statement that Mr Berezovsky gave her any assurance in the December 2011 conversation, the January 2012 conversation or March 2012 that she would receive any beneficial rights in respect of the Litigation or its proceeds. Rather, her evidence, particularly in paragraphs 110-112 and 130, is that what Mr Berezovsky promised her was that she would get a one-third share of any recovery he received from the Litigation.

*The Litigation Agreement*

106.    In new paragraph 34C of the proposed Re-Amended Particulars of Claim Ms Gorbunova alleges that:

> "… [the Trustees] hold the assets in their hands deriving from [the Settlement Agreement] on constructive trust to give effect

> to the terms of [the Litigation Agreement]. Further or in the alternative, [Ms Gorbunova] has established an equity by proprietary estoppel in the claims against the [AP Family] and/or the benefit accruing to [Mr Berezovsky] under the [Settlement Agreement]."

107.    New paragraph 34A alleges that:

> "[Mr Berezovsky] by his words and conduct assured [Ms Gorbunova] … that the Litigation Agreement was enforceable and gave rise to beneficial rights in [Ms Gorbunova's] favour in respect of [Mr Berezovsky's] rights against the [AP Family] and/or under the [Settlement Agreement] . …"

Particulars are then given in paragraphs 34A.1-34A.3 of assurances alleged to have been given on 7 and 8 September 2012.

108.    Paragraph 34A concludes by alleging that:

> "… [Ms Gorbunova] relied on these assurances … to her detriment by signing the letters of consent and by forbearing to sue in respect of any claims she might have had against [Mr Berezovsky] or his property following the end of their relationship in late 2011."

109.    Counsel for the Trustees again submitted that pleaded assurances by Mr Berezovsky relied upon were inconsistent with Ms Gorbunova's evidence. Counsel for Ms Gorbunova again submitted that this was not an issue susceptible of summary determination.

110.    Again, I am conscious that it is not permissible to conduct a mini-trial at this stage. Nevertheless, I agree with counsel for the Trustees that the case sought to be pleaded is inconsistent with Ms Gorbunova's evidence. She does not say in her witness statement that Mr Berezovsky gave her any assurance on 7 or 8 September 2012 that she would receive any of Mr Berezovsky's rights against the AP Family or under the Settlement Agreement. Rather, her evidence, particularly in paragraph 180, is that what Mr Berezovsky promised her was that he would give her the money he received under the Settlement Agreement less the sums owed to Mr Abramovich and Addleshaw Goddard. I would add that the particulars pleaded in new paragraphs 34A.1-34A.3 are consistent with Ms Gorbunova's evidence and thus do not support the plea in paragraph 34A.

*Conclusion*

111.    For the reasons given above, I conclude that Ms Gorbunova's claims for proprietary estoppel and constructive trust have no real prospect of success. Accordingly, I will refuse Ms Gorbunova permission to re-amend her Particulars of Claim to introduce these claims.

Other estoppels

112.    Although the draft Re-Amended Particulars of Claim includes allegations of estoppel by convention in relation to both the Litigation Deed and the Litigation Agreement, these allegations were not pursued by counsel for Ms Gorbunova. If and to the extent that any of the other estoppels sought to be introduced by the draft Re-Amended Particulars of Claim are still pursued and have not already been dealt with, they do not appear to add anything to Ms Gorbunova's case. If there are any points of substance which I have failed to deal with, however, I will hear further argument when this judgment is handed down.

Overall conclusions

113.    For the reasons given above, I will grant the Trustees summary judgment as sought by their application. Save to the extent that it is consented to, I will refuse Ms Gorbunova's application to re-amend the Particulars of Claim.