# EXHIBIT 9

## QUEEN'S BENCH DIVISION
## (COMMERCIAL COURT)

Mar. 7, 8, 9 and 10, 1983

---

NESTE OY
v.
LLOYDS BANK PLC

(THE "TIISKERI", "NESTEGAS" AND "ENSKERI")

Before Mr. Justice BINGHAM

**Banking — Set-off — Shipowners transferred funds to discharge liabilities incurred by vessels — Whether funds held in trust to be applied in specified way — Whether bank had notice of position — Whether bank precluded from exercising any right of set-off in respect of funds.**

The plaintiffs were the owners of *Tiiskeri*, *Nestegas* and *Enskeri* and from time to time employed PSL as their agents when one of their vessels entered a United Kingdom port. In such circumstances the plaintiffs would transfer to PSL funds to enable PSL to discharge liabilities incurred by the vessel such as jetty and river dues, pilotage, towage, berth fees and similar expenses. PSL was also paid an agency fee.

PSL had been a customer of the defendant bank's Middlesbrough branch since 1976 and on May 21, 1976, and on Feb. 4, 1980, executed documents expressly conferring on the bank a right to set-off or to consolidate credits and debits on accounts of the different companies making up the Peckston Group of which PSL was a member. By late 1979 to early 1980 the indebtedness of the group companies to the bank had become a source of concern both to the bank and to the companies.

Between Jan. 14, 1980, and Feb. 22, 1980, the plaintiffs carried out six transactions with PSL whereby funds were placed with PSL for the purpose of discharging liabilities incurred by their vessels.

On Feb. 20, the bank dishonoured a cheque (not one drawn by PSL) and on Feb. 21, the chairman of the group wrote to the bank to say that unless a temporary overdraft in excess of £1 million could be agreed it was doubtful whether the group could continue to trade. On Feb. 22, the directors of the group agreed that they could not honestly believe that the group and its companies could meet credit as it fell due and should therefore cease trading immediately. The bank was to be requested to appoint a receiver. A similar decision was taken by PSL the same day.

On Feb. 26, the plaintiffs' bank, in respect of the sixth transaction of Feb. 20, instructed their bank in London to cancel the payment and to refund to it the amount by which its account had been credited. The bank replied that the payment had been credited to PSL's account and the bank could not accede to the request for cancellation of the payment of £21,327.50.

On Mar. 3, the bank exercised its right of set-off by consolidation of the accounts of the group and demanded of PSL the net sum of £55,781.48.

The plaintiffs challenged the right of the bank to set-off against PSL's debt to the bank sums held by PSL for onward payment to United Kingdom creditors of the owners. The plaintiffs contended that these sums were not available for set-off because they were held by PSL on trust to apply in a particular way and no other, and the bank had notice of the position.

The issues for decision were (1) whether all or any of the funds transferred by the plaintiffs to the account of PSL between Jan. 14 and Feb. 22, 1980, were subject to a trust to pay the same to creditors of the plaintiffs in respect of expenses incurred by the plaintiffs' vessels? and (2) if so, did the bank have such notice that the funds were so held as to preclude it from exercising any right of set-off in respect of those funds?

———*Held*, by Q.B. (Com. Ct.) (BINGHAM, J.), that (1) as to the first five payments: the plaintiffs made their payments to an account of PSL which gave no indication that it was a trust or owners' account; there was no evidence that the plaintiffs intended any of the sums remitted on these five occasions to be kept in any way separate; PSL gave no indication that such funds would be held on the plaintiffs' behalf or to their order and there was nothing in the payment or receipt of the funds to show that they were paid or received on terms that they would be applied to the specified purpose and no other, and if not so applied, that they would be returned; in these circumstances there was no express trust in respect of these five payments and PSL and the plaintiffs were contracting solely on a debtor-creditor basis at a time when PSL was conducting a continuing shipping agency; there were no grounds for imposing on PSL the obligations of a constructive trustee (*see* p. 665, cols. 1 and 2);

(2) as to the last payment: since this payment had been credited to PSL at a time when the group had already resolved that it and its group companies should cease trading immediately, at a time when PSL had not paid for the services for which the sums had been remitted and at a time when in all the circumstances there was no chance that PSL could pay for the services in question, PSL could not in good conscience, at the time of receipt of the payment, retain it and accordingly a constructive trust was to be inferred; therefore PSL became constructive trustees for the plaintiffs of the last payment of £21,327.50 made on Feb. 22, 1980 (*see* p. 666, col. 1);

(3) if the funds had been held on trust, the plaintiffs had failed to establish that the bank had any knowledge that the first five payments were impressed with a trust (*see* p. 666, col. 2);

(4) the last payment could not in all probability have been credited to PSL's main account before the bank learned of the Peckston Group's decision that it and the group companies should cease trading at once and seek appointment of a receiver; although the bank did not know all the facts it did know that PSL would trade no more and it was at that point clearly put on enquiry which would have elicited the facts which led the Court to hold that there was a constructive trust; by the time the set-off was effected the bank was more clearly on notice and could not assert its right of set-off in respect of the last payment held by PSL on constructive trust for the plaintiffs (see p. 667, col. 1).

---

The following cases were referred to in the judgment:

Baden Delvaux and Lecuit v. Societe Generale pour Favouriser le Developpement du Commerce et du l'Industrie en France S.A., Unreported Dec. 20, 1982;

Barclays Bank Ltd. v. Quistclose Investments Ltd., [1970] A.C. 567;

Beatty v. Guggenheim Exploration Co., 225 N.Y. 380 (1919);

Bond Worth Ltd., In re, [1980] Ch. 228;

Burdick v. Garrick, (1870) 5 Ch. App. 233;

Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd., [1981] Ch. 105;

Gross, In re, (1871) 6 Ch. App. 632;

Hallett's Estate, In re, (1879) 13 Ch.D. 696;

Henry v. Hammond, [1913] 2 K.B. 515;

Kayford Ltd., In re, [1975] 1 W.L.R. 279;

Nanwa Gold Mines Ltd., In re, [1955] 1 W.L.R. 1080;

Rogers, In re, (1891) 8 Morr. 243;

Wilson and Furness-Leyland Line Ltd., The v. The British and Continental Shipping Co. Ltd. and Others, (1907) 23 T.L.R. 397.

---

This was an action by the plaintiffs, Neste Oy a shipowning company incorporated in Finland challenging the right of the defendants, Lloyds Bank plc, to set-off against Pekston Shipping Ltd.'s (PSL) debt to the bank sums held by PSL for onward payment to United Kingdom creditors of the plaintiffs.

Mr. J. Vallat (instructed by Messrs. Norton, Rose, Botterell & Roche) for the plaintiffs; Mr. M. Hutchison, Q.C. and Mr. J. Storey (instructed by Messrs. Cameron Markby) for the defendants.

The further facts are stated in the judgment of Mr. Justice Bingham.

Judgment was reserved.

Monday, Mar. 21, 1983

---

**JUDGMENT**

**Mr. Justice BINGHAM:** The plaintiffs in this action are a shipowning company incorporated in Finland. At the material time they owned three vessels named *Tiiskeri*, *Nestegas* and *Enskeri*. As agents in the United Kingdom the plaintiffs from time to time employed a company named Peckston Shipping Ltd. ("PSL"). When the plaintiffs' vessels put into United Kingdom ports and incurred liabilities in respect of jetty and river dues, pilotage, towage, berth fees and similar expenses, or when the masters of the vessels required cash, the plaintiffs transferred funds to PSL to discharge these liabilities and make advances of cash or sometimes perhaps to reimburse PSL for having done so. They also paid PSL an agency fee. Unfortunately PSL and the group to which it belonged found themselves in financial difficulties, and a time came when a receiver was appointed and Lloyds Bank plc. ("the bank"), bankers to PSL and other group companies, exercised a right of set-off between PSL's accounts which were in credit and those which were in debit.

The plaintiffs and other owners in a like position challenged the right of the bank to set-off against PSL's debt to the bank sums held by PSL for onward payment to United Kingdom creditors of the owners. The owners contended, putting the matter very shortly at this stage, that these funds were not available for set-off because they were held by PSL on trust to apply in a specified way and no other. The bank was said to have notice of the position. A number of actions were begun and it was very sensibly agreed that this action should proceed to trial as a means of resolving the central issues in all the actions.

At the outset of his opening of the case Counsel for the plaintiffs sought leave to make certain relatively minor amendments which were not opposed and for which I gave leave. He also sought to make other amendments which the bank did oppose as giving rise to factual issues which the bank had not prepared itself to meet. It was clearly wrong that the bank should be prejudiced in the presentation of its case by a late amendment. It was also, as it seemed to me, unsatisfactory that a test action should be decided on a basis which might not involve resolution of all seriously arguable issues. I

accordingly ordered, with the consent of the plaintiffs and without, as I understood, opposition by the bank that this trial should be limited to determination of two issues, the answers to which might, depending on the outcome, determine the action or at least pave the way to resolution of all issues.

The questions I have undertaken to answer are these: 1. Were all or any of the funds transferred by the plaintiffs to the account of PSL between Jan. 14 and Feb. 22, 1980, subject to a trust to pay the same to creditors of the plaintiffs in respect of expenses incurred by the plaintiffs' vessels? 2. If so, did the bank have such notice that the funds were so held as to preclude it from exercising any right of set-off in respect of those funds?

I should mention for the sake of completeness that I did not allow at a later stage of the trial an application by the plaintiffs to amend to rest their case that the funds were held on trust, in respect of the last payment, on an allegation that the payment was made by the plaintiffs under a mistake of fact. This question had been raised in another action at an early stage but not pursued in this. The plaintiffs had called no oral evidence, and the amendment seemed to me possibly to raise new factual questions closely related to the questions I was to answer which the bank should not be required to meet so late in the day.

PSL was one of about a dozen associated companies making up the Peckston group, the holding company of which was Peckston Group Ltd. Companies in the group had held accounts with the bank's Middlesbrough branch since the first company was incorporated in 1926, and the group taken as a whole was the largest customer of that branch. PSL had been a customer and had conducted a shipping agency business since 1976, but another group company had conducted shipping agency business for very many years before that. On May 21, 1976, and again on Feb. 4, 1980, a number of companies in the group (including PSL) executed documents expressly conferring on the bank a right to set-off or to consolidate credits and debits on accounts of the different group companies. In addition there were cross-guarantees between the different companies.

By late 1979 to early 1980, the indebtedness of group companies to the bank had become a source of concern both to the companies and the bank. On Jan. 4, 1980, the total group indebtedness stood at over £1 million against a temporary overdraft facility of £750,000. The difficulty of the situation was compounded by what the group itself described as "an accounting shambles of appalling magnitude".

There were no consolidated audited accounts of the group after 1974 and no audited accounts of PSL after March, 1977, and this made it very difficult to ascertain whether the group was trading profitably at all. These problems caused the bank to initiate action in two directions. First, from early in January, 1980, a daily conference took place on the telephone between Mr. Martin, the manager of the bank's Middlesbrough branch, and Mr. Lambert, the finance director of the group. Mr. Lambert would say what payments he had received, and Mr. Martin would say what cheques had been presented for payment. Mr. Lambert would indicate which payments it was essential to make, and Mr. Martin would indicate which payments he wished to be delayed. In this way close contact between the group and the bank was maintained. Secondly, at the instance of the bank, the group in early February, 1980, engaged Mr. Peter Barrows, a partner in Price Waterhouse, Newcastle, to investigate the group's affairs. Mr. Barrows' preliminary report, contained in a letter dated Feb. 5, 1980, was in the hands of the bank by the following day. Mr. Barrows advised that much further investigation of the group's financial position was needed, and one area singled out for mention was the pre-funding of PSL by some of their principals. Mr. Martin, the Middlesbrough manager, did not see this report at the time, but he was well aware that PSL sometimes received funds in advance from owners with which to discharge liabilities incurred in respect of the owners' vessels. How much of PSL's shipping agency business was conducted in this way, and how much by way of reimbursement for sums already expended, he did not know. He understood that it rested with the shipowner whether payment would be made in advance or in arrears, but believed that the agency fee was somewhat lower if payment was made in advance.

At the relevant time PSL itself had six accounts at the Middlesbrough branch of the bank. First, and most important, was its ordinary or main account through which its shipping agency business was conducted. Secondly, it had a Middle East Line account. The directors planned to establish a liner service from this country to the Middle East, and wished to segregate the costs of doing so in a separate account. This venture turned out very badly, and by Feb. 22, 1980, the overdraft on this account stood at over £350,000. Thirdly, there was a special funding account. This was initially credited with £52,000 which PSL had contracted to pay in monthly instalments of £10,400 to the previous operators of the Middle East Line. Fourthly, there was what was called a charter account; it related to a business carried

on in Grimsby, apparently of a freight forwarding nature. Lastly, fifthly and sixthly, there were two dollar accounts into which dollar payments were made.

I must now describe the six transactions which give rise to the plaintiffs' claim in this action.

(1) By a telex sent on Jan. 11, 1980, the plaintiffs appointed PSL as their agents in respect of the vessel *Tiiskeri* arriving that day to load a cargo of crude oil in the Tees. The cargo was numbered 1280. PSL replied, giving an estimate of £23,600 port costs for the call at Teesside, including an agency fee of £750. They added:

> . . . Please confirm you will place us in funds and when remitting to our bank include ship's name and cargo number in your advice. Bank details as usual.

It appears that the total of £23,600 requested was at some point increased by £500 to allow an advance of cash to the master. On Jan. 14 the plaintiffs' bank in Helsinki telexed PSL to say that by order of the plaintiffs it was remitting value Jan. 15 £24,100 through Lloyds Bank Ltd. London/Albert Road, Middlesbrough to PSL's main account (of which the number was given)—

> . . . ref advance on harbour dues cash to master telex 11.1.80 mt tiiskeri cargo no 1280.

The plaintiffs' bank also, on the same day, telexed the Overseas Division of the bank in London instructing it to transfer £24,100 to PSL's account 0075975 (the main account) at Middlesbrough—

> . . . advance on harbour dues, cash to master, telex 11.1 M.T. TIISKERI cargo No 1280.

In accordance with the normal practice the account of the plaintiffs' Finnish bank with the bank in London was debited with this sum and notice of the transaction was given by the Overseas Division of the bank in London to the payments branch of that division, which was decentralized in Birmingham. From there the information that the funds had been received was telephoned through to the Middlesbrough branch. That branch then advised PSL of the receipt and prepared a credit slip which credited PSL with the sum of £24,100 paid by the plaintiffs and recorded that PSL had been advised. PSL's account was credited forthwith, and the same amount was debited to the overseas suspense account of the Middlesbrough branch. This took place on Jan. 15. On that day also the bank's Overseas Centre in Birmingham prepared a confirmation slip which reached Middlesbrough on the 17th. It was addressed to the Middlesbrough branch. It showed the beneficiary as PSL. It referred to the transfer of £24,100 made by order of the plaintiffs on instructions from their bank. It carried the printed instruction—

> . . . Confirmation only — pass no entries. Payment already advised by telephone. [— And it added —] We have credited to you through bureau clearing. Details of payment Advance on harbour dues Cash to master 11.1 MT TIISKERI Cargo No. 1280.

This confirmed that an automated entry had been made by the Overseas Centre clearing off the debit on the branch's overseas suspense account.

(2) The same telex of Jan. 11, 1980, which appointed PSL agents for *Tiiskeri* appointed them also for *Nestegas* at Teesside. PSL gave an estimate of port costs amounting after amendment (and including agency fee) to £1445. The same procedure for making payment was followed, the nature of the payment of £1445 being described as "harbour dues cash to master", but with no cargo number given. PSL were credited on Jan. 16 and the confirmation by the Overseas Centre was dated the 17th. On this occasion the confirmation included the number of PSL's main account.

(3) On the 24th PSL were appointed as the plaintiffs' agents for the call of the vessel *Enskeri* at Teesside to load Ekofisk crude. PSL estimated the port costs at £27,600 (including the agency fee) and asked for that sum to be remitted with the ship's name and the cargo number. The payment was made by the machinery already noted, giving the cargo number. It was credited to PSL on Jan. 28, the name of the vessel being shown on the credit slip on this occasion, and the confirmation was dated the 29th. It described the payment as "ADVANCE ON HARBOUR DUES TELEX 24.1 MT ENSKERI CARGO NO. 1278". This was in accordance with the plaintiffs' bank's original instruction.

(4) The next appointment, made on Jan. 31, also involved *Enskeri*. The sum estimated was £23,600, including an agency fee, and this sum was paid by the plaintiffs on Feb. 1, being credited to PSL on the 5th. In this instance the payment was described in the telex of instruction to the bank's Overseas Division in London and in the confirmation as "TELEX 1.2.80 MT ENSKERI CARGO NO. 1300".

(5) The fifth appointment was made on Feb. 11 in respect of *Nestegas*. The sum asked for by PSL and remitted by the plaintiffs was £1315 (including an agency fee). The transfer was made in the same way, the payment

| 662 | LLOYD'S LAW REPORTS | [Q.B. (Com. Ct.) |
|---|---|---|
| [1983] VOL. 2] | The "Tiiskeri" | [BINGHAM, J. |

being described as "TELEX 12.2.1980 MT NESTEGAS". But there was one difference in procedure. It seems that there was on this occasion no telephone call from Birmingham to Middlesbrough. No credit slip was prepared at the Middlesbrough branch and no confirmation was sent from Birmingham. Instead a credit slip was sent from Birmingham by post to the Middlesbrough branch. It fulfilled the same purpose as a slip prepared by the branch would have done. The details on it were "TELEX 12.2.80 MT NESTEGAS".

(6) The sixth and last appointment of all was made on Feb. 20. The vessel was *Enskeri*. PSL estimated the cost (including agency fee) at £21,372.50. At 14 17 Helsinki time (12 17 London time) on Feb. 22 the plaintiffs' bank gave instructions to the bank in London to pay £21,327.50 to PSL value that day "ref advance on harbour dues telex 20.2.80 mt Enskeri". Fifteen minutes later the plaintiffs informed PSL of the transfer. The same procedure was adopted, the payment being described as "TELEX 20.2.1980 MT Enskeri". The branch credit note dated Feb. 22 showed the payment by the shipowners "HARBOUR DUES ON 20/2/80 MT ENSKERI". The Overseas Centre confirmation dated Feb. 25 showed the details of payment as "ADVANCE ON HARBOUR DUES TELEX 20.2.80 MT ENSKERI". On Feb. 25 also the plaintiffs' bank in Helsinki instructed the bank in London to cancel this payment and refund to it the amount by which its account had been debited. The bank replied on Feb. 26 that the payment had been credited to PSL's account and that the bank could not accede to the request for cancellation. The plaintiffs appointed new agents, and remitted £21,372.50 to them in order to pay the port costs (plus agency fee) for this call. (There seems during this transaction to have been some confusion in the figures between £21,327.50 and £21,372.50, but it does not matter and the first figure is what the plaintiffs paid to PSL.)

The reason for the plaintiffs' request (through their bank) for the refund of the last payment is not far to seek, but it is necessary to go back a little in time. At a meeting on Feb. 18 Mr. Barrows of Price Waterhouse was cautiously hopeful that it would be possible to keep the group alive, although the possibility of appointing a receiver was very much in his mind. On the 19th the directors of the group had lunch at the bank's Regional Office and a further meeting was arranged, to take place in Middlesbrough on the 22nd. On Feb. 20 the bank dishonoured a cheque (not, I understand, a cheque drawn by PSL) and on the 21st the chairman of the group wrote to the bank to say that unless a temporary overdraft in excess of £1 million could be agreed the directors were doubtful whether the group could properly continue to trade. It may be, as Mr. Martin suggested in evidence, that this letter was written with an eye to the meeting arranged for the 22nd, but if so it was overtaken by events. For reasons which are not entirely clear, a series of meetings of the boards of the group companies was arranged to take place on the morning of Friday, the 22nd. First was Peckston Group Ltd. The directors met at 11 30 a.m. and agreed that they could not honestly believe that the group and its companies could meet credit as it fell due and should therefore cease trading immediately. The bank was to be requested to appoint a receiver. A similar decision was made by the directors of PSL, apparently at about 3 50 p.m.

Mr. Martin heard of the Peckston Group Ltd. decision at about 12 30 to 12 45 on the 22nd, just as he and the Regional General Manager were on their way to meet the Peckston Group directors. A telephone call was made to London to seek advice from the controller of the realizations department, who said that a formal demand on all of the principal debtors in the group should be prepared and delivered that day. Mr. Martin and Mr. Griffiths then met the group directors, returning to the branch at about 2 30 p.m. On his return Mr. Martin set about calculating the net debt owed to the bank by (among other companies) PSL. The first task was to convert the two dollar balances on the dollar accounts into sterling. These sums, when converted, were carried into the charter account and the Middle East Line account respectively. Mr. Martin then added the credits on the main, charter and special funding accounts, to achieve a total of £303,607.07. This included the last payment made by the plaintiffs. This credit balance was then deducted from the total debit on the Middle East Line account, which stood at £353,445.60. After some adjustment the net debit was £55,781.48. At 5 24 p.m. on Feb. 22 the bank delivered to PSL a demand for this sum, being the sum outstanding at close of business that day. No doubt preliminary calculations were made earlier, but the final sum due on close of business could not be worked out before the close of business. For some days the pass sheets for the separate accounts continued to record cheques presented for payment and dishonoured, and service charges up to the 22nd, but on Mar. 3 the credits in the PSL accounts were paid into the Middle East Line account which was in debit. The reason for the delay in doing this was, according to Mr. Martin, administrative convenience and pressure of work. In his view it made no difference. The bank had exercised its right of set-off in respect of the PSL account when it

demanded, on Feb. 22, a net sum which could only have become due upon consolidation of the accounts.

Paragraph 5 of the reamended points of claim shows what, in the plaintiffs' contention, became of the six payments in issue. Thus of the first payment of £24,100 they allege that some £19,000 odd was applied to their purposes and some £5000 odd was not. Of the second payment PSL disbursed some £343 more than they received. Of the third, fourth and fifth payments some money was applied to the plaintiffs' purposes but most was not. Of the last payment, which was made just after the Peckston Group Ltd. resolution to cease trading, no part was applied to the plaintiffs' purposes. Neither party called evidence to prove or disprove the payments allegedly made and not made out of the sums remitted, and I am not concerned with the detailed figures. It suffices to note, first, that after various adjustments the plaintiffs contended that £58,872.62 of the sums which they remitted were not applied to their intended purpose and were not available for set-off by the bank, and secondly that the right of the bank to set-off their claim against sums which PSL held in their own right — such as agency fees — was admitted.

I turn to the two questions for decision.

*The first question*

Were all or any of the funds transferred by the plaintiffs to the account of PSL between Jan. 14 and Feb. 22, 1980, subject to a trust to pay the same to creditors of the plaintiffs in respect of expenses incurred by the plaintiffs' vessels?

The major legal submission of Mr. Vallat, who appeared for the plaintiffs, on this question was to the effect that where an agent receives funds from his principal for the specific purpose of paying those funds to a third party in discharge of an obligation owed by the principal to the third party, the agent holds them on trust to pay the funds to that third party and not to apply them to any other purpose. If for any reason the funds cannot be paid to the third party creditor then they are held on a resulting trust for the principal. At no time are they the property of the agent, available for set-off by any creditor of the agent. The facts in this case were such, Counsel submitted, as to show that the agent PSL held the funds on an express trust, alternatively as constructive trustees.

As his point of legal embarkation, Counsel took the principles that every agent owes his principal fiduciary duties and is bound to keep money beneficially owned by his principal separate from his own money and from money belonging to others (Bowstead on Agency, 14th ed. pp. 125, 159). Counsel relied on a number of cases in support of his submission, the most pertinent of these being *Burdick v. Garrick*, (1870) 5 Ch. App. 233; *In re Gross* (1871) 6 Ch. App. 632; *In re Hallett's Estate*, (1879) 13 Ch.D. 696; *In re Rogers*, (1891) 8 Morr. 243; and *Barclays Bank Ltd. v. Quistclose Investments Ltd.*, [1970] A.C. 567. The nub of the plaintiffs' argument was contained in a statement by Lord Hatherley, Lord Chancellor, in *Burdick's* case, when he said (at p. 240;

> . . . But in the present case we have an agent who is intrusted with these funds, not for the purpose of being remitted when received to the principal, but for the purpose of being employed in a particular manner, in the purchase of land or stock; and which moneys the factor or agent is bound to keep totally distinct and separate from his own money; and in no way whatever to deal with or make use of them. How a person who is intrusted with funds under such circumstance differs from one in an ordinary fiduciary position I am unable to see.

Later cases, such as *In re Rogers* and *Quistclose*, provided illustrations of cases where money had been received, clearly impressed with a trust to pay it to a third party or (if not so paid) to be repaid to the payor, and showed that the existence of a debtor-creditor relationship did not preclude a co-existing relationship of trustee and cestui que trust. In support of his factual submission Counsel for the plaintiffs pointed to PSL's role as agents; to their request for payment in advance; to the fact that the moneys were required for payment to the plaintiffs' creditors and prospective creditors, and sometimes for cash advances to the masters of the plaintiffs' vessels; to the statements which accompanied the payments, making reference to specific vessels and cargoes and (in three of the six cases) using the word "advance"; and to the fact that these were moneys which (leaving aside the agency fee) were never intended to become the moneys of the agents.

Mr. Hutchison, Q.C., for the bank did not make a frontal assault on the plaintiffs' major legal submission as summarized above. He of course accepted that agents owe their principals duties of a fiduciary character but urged that agents funded by their principals do not necessarily hold the funds as trustees: whether in a particular case an agent is a trustee depends on all the circumstances including the intention of the parties, express or to be inferred. Counsel relied in particular on *Henry v. Hammond*, [1913] 2 K.B. 515 at p. 521, where Mr. Justice Channell said:

It is clear that if the terms upon which the person receives the money are that he is bound to keep it separate, either in a bank or elsewhere, and to hand that money so kept as a separate fund to the person entitled to it, then he is a trustee of that money and must hand it over to the person who is his cestui que trust. If on the other hand he is not bound to keep the money separate, but is entitled to mix it with his own money and deal with it as he pleases, and when called upon to hand over an equivalent sum of money, then, in my opinion, he is not a trustee of the money, but merely a debtor. All the authorities seem to me to be consistent with that statement of the law. I agree with the observation of Bramwell L.J. in *New Zealand and Australian Land Co. v. Watson* when he said that he would be very sorry to see the intricacies and doctrines connected with trusts introduced into commercial transactions. A shipping agent carries on a well understood business, and it cannot possibly be said that he is bound to keep the money of each of the persons by whom he is employed in the course of that business separate. There is not in this case the element that there was in *Lyell v. Kennedy* of the moneys being in fact kept separate. I am aware that, if the defendant was bound to keep the money separate, the fact that he did not do so cannot assist him; he has committed a breach of his obligation. The only use of looking at the facts to see whether in the particular case he has kept the money as a separate fund is to see whether he has recognized his obligation, the obligation itself being the essential thing. This principle seems to me to reconcile all the cases.

The case was important not because it happened to concern shipping agents but because it showed the proper approach to be followed by the Court in a commercial context such as this. The importance of a separate account as reflecting the terms upon which money was paid was underlined further in such cases as *In re Nanwa Gold Mines Ltd.*, [1955] 1 W.L.R. 1080; *Quistclose*, sup.; and *In re Kayford Ltd.*, [1975] 1 W.L.R. 279. *The Wilsons and Furness-Leyland Line Ltd. v. The British and Continental Shipping Co. Ltd. and Others*, (1907) 23 T.L.R. 397, showed that where money was with the consent of the principal paid by agents into a general account containing their own funds the proper inference was that the relationship was one of debtor and creditor, not trustee and beneficiary. Reliance was placed on the proposition formulated by Mr. Justice Slade in *In re Bond Worth Ltd.*, [1980] Ch. 228, at p. 261B that—

> . . . where an alleged trustee has the right to mix tangible assets or moneys with his own other assets or moneys and to deal with them as he pleases, this is incompatible with the existence of a *presently* subsisting fiduciary relationship in regard to such particular assets or moneys . . .

Here, submitted Counsel, sums were paid by a principal to an agent who in the course of his business received money sometimes in advance, sometimes in arrears; there was no evidence that the plaintiffs always paid in advance, although they asserted a relationship going back to 1977; the sums were paid into the agent's main account, with no suggestion that the plaintiffs thought these moneys were segregated in any way or wished that they should be; the existence of a continuing commercial agency over a period supported the inference that the parties never regarded or treated the payments received as themselves the subject of any fiduciary obligation.

I have been very greatly assisted by the legal submissions made to me, and there is very little in the submissions of either party on the questions of principle with which I disagree. The problem is not, I think, to ascertain the relevant principles but to apply them to the case in hand. The decided cases provide valuable illustrations of the application of these principles to the differing facts with which they were concerned, but in many of them the outcome appears almost inevitable once the facts are fully understood. How, then, should the principles apply to the facts of this case?

I shall begin by considering the first five payments because different considerations are said to apply to the last. It seems safe to infer, although there is really no evidence, that PSL were paid sometimes in advance and sometimes in arrears. It may well be that their agency fee was reduced where they were not required to finance a shipowner's payment, but this again was not the subject of direct evidence. Certainly, as the position of the Peckston Group deteriorated, the pre-funding of PSL must have become increasingly attractive to them. It is, however, apparent from the documents that only one of the first five payments (the fifth) was made on a date earlier than the estimated date of arrival of the vessel at the port in question (although the second payment was made on the same date). It is of course possible that vessels always arrived behind schedule, although this seems very unlikely on the first occasion, or that PSL refused to make any disbursement whatever until they were put in funds, but if a vessel arrived in port before funds were received and the master required cash or the crew required transport to carry them to the nearest centre of cultural activity, and PSL knew that funds were coming from the plaintiffs, it seems to me rather

more likely that PSL would make the necessary advance and that the plaintiffs would expect them to do so. If this is so (and in the absence of evidence I am necessarily in a realm of speculation to a large extent) the natural thing would be for PSL to treat themselves as reimbursed pro tanto when the expected funds were received. The inference that PSL might do this, and might be entitled to do it, however, radically undermines the plaintiffs' argument which involved the holding on a resulting trust for the plaintiffs of any money which PSL could not apply to the plaintiffs' specified purposes; it would certainly be improper (on the plaintiffs' argument) for PSL to treat any of these sums as reimbursement of themselves, certainly without explicit instructions from the plaintiffs.

The unlikelihood of this conclusion (speculative though it is) representing the intention or understanding of commercial parties in the real world makes me doubt the correctness of the plaintiffs' argument. But I must base my decision on the facts proved and not on speculation. I start from a general disinclination, shared with Lord Justice Bramwell and Mr. Justice Channell, to see the intricacies and doctrines connected with trusts introduced into everyday commercial transactions. Sometimes, of course, those principles clearly apply to the commercial transaction in question. The following features of this case lead me to the conclusion that they do not here:

(1) The plaintiffs made their payments to an account of PSL which gave no indication whatever that it was a trust or owners' account. It may well be that in the past the plaintiffs had made payments in arrears to the same account.

(2) There is no evidence that the plaintiffs expected or intended any of the sums remitted on these first five occasions to be kept in any way separate.

(3) In seeking these payments PSL gave no indication that the funds would be held on the plaintiffs' behalf or to their account or to their order.

(4) I do not regard the use of the word "advance" in two of these five cases as more helpful to the plaintiffs than its absence in the other three cases is helpful to the bank. It would be surprising, and not very satisfactory, if the outcome depended on whether these words happened to be used or not. The truth is, in my view, that when a banker uses the term "advance" he is not concerned with chronology and often means little more than "pay" or "lend".

(5) The facts relied on by the plaintiffs in relation to the second payment show that PSL were willing to make disbursements even though inadequately funded. This is, I think, some slight indication that transactions were conducted on a debtor-creditor basis.

(6) There was nothing in the payment or the receipt of these funds to show that they were paid or received on terms that they would be applied to the specified purpose and no other, and, if not so applied, would be returned.

For these reasons I conclude that there was no express trust in respect of these five payments. If that conclusion is correct, the plaintiffs and PSL were contracting solely on a debtor-creditor basis at a time when PSL was conducting a continuing shipping agency business. In this situation I can see no grounds for imposing on PSL the obligations of a constructive trustee.

My conclusion that there was no express trust in respect of the first five payments must, if correct, apply to the last payment also. But Counsel for the plaintiffs contended that PSL were constructive trustees of this last payment, whether or not they were constructive trustees of the earlier payments. He founded this distinction not on a mistake of fact by the plaintiffs (which he was refused leave to amend to allege) but on the fact that this payment was credited to PSL at a time when Peckston Group Ltd. had already resolved that it and its group companies should cease trading immediately (one of the directors supporting that resolution being a director of PSL), at a time when PSL had not paid for the services for which the funds had been remitted and at a time when, in all the circumstances, there was no chance that PSL could pay for the services in question. This, submitted Counsel, was a case falling within the statement of Mr. Justice Cardozo in *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380 (1919) at p. 386, and quoted in Snell's Principles of Equity (28th ed.) at p. 192:

> ... A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.

Counsel also relied on the general principles contained in a passage from Story's Commentaries on Equity Jurisprudence, 2nd ed. (1839) vol. 2, par. 1255, accepted as correctly stating the law of England by Mr. Justice Goulding in *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.*, [1981] Ch. 105, at pp. 117C and 118E:

> 1255. One of the most common cases in which a Court of Equity acts upon the ground

| 666 | LLOYD'S LAW REPORTS | [Q.B. (Com. Ct.) |
|---|---|---|
| [1983] VOL. 2] | The "Tiiskeri" | [BINGHAM, J. |

of implied trusts in invitum, is where a party has received money which he cannot conscientiously withhold from another party. It has been well remarked, that the receiving of money which consistently with conscience cannot be retained is, in Equity, sufficient to raise a trust in favour of the party for whom or on whose account it was received. This is the governing principle in all such cases. And therefore, whenever any controversy arises, the true question is, not whether money has been received by a party of which he could not have compelled the payment, but whether he can now, with a safe conscience, ex aequo et bono, retain it. Illustrations of this doctrine are familiar in cases of money paid by accident, or mistake, or fraud. And the difference between the payment of money under a mistake of fact, and a payment under a mistake of law, in its operation upon the conscience of the party, presents the equitable qualifications of the doctrine in a striking manner.

Counsel for the bank contended that no relevant distinction could be drawn between the first five payments and the last. While naturally diffident at entering seas so little chart, and regarded with great caution by mariners much more expert than I, it seems to me that there is a relevant distinction. Given the situation of PSL when the last payment was received, any resonable and honest directors of that company (or the actual directors had they known of it) would, I feel sure, have arranged for the repayment of that sum to the plaintiffs without hesitation or delay. It would have seemed little short of sharp practice for PSL to take any benefit from the payment, and it would have seemed contrary to any ordinary notion of fairness that the general body of creditors should profit from the accident of a payment made at a time when there was bound to be a total failure of consideration. Of course it is true that insolvency always causes loss and perfect fairness is unattainable. The bank, and other creditors, have their legitimate claims. It nonetheless seems to me that at the time of its receipt PSL could not in good conscience retain this payment and that accordingly a constructive trust is to be inferred.

I thus answer this first question: No, but PSL became constructive trustees for the plaintiffs of the last payment of £21,327.50 made on Feb. 22, 1980.

*The second question*

If so, did the bank have such notice that the funds were so held as to preclude it from exercising any right of set-off in respect of these funds?

If the answer I have already given is correct, this question arises for decision only in respect of the last payment. But in case I am wrong I should indicate the answer I would give to the question on that hypothesis.

Counsel for the plaintiffs submitted (in my judgment rightly) that if PSL held these funds as trustee the bank was not entitled to take the benefit of them unless the bank was at the time of doing so a bona fide purchaser for value without notice of the trust. Counsel further submitted, with reference to the recent judgment of Mr. Justice Peter Gibson in *Baden Delvaux and Lecuit v. Societe General pour Favouriser le Developpement du Commerce et du l'Industrie en France S.A.* (unreported, Dec. 20, 1982), that it was enough for the plaintiffs to establish the requisite notice by showing, as he contended they did here, that the bank wilfully shut its eyes to the obvious or wilfuly and recklessly failed to make such enquiries as an honest and reasonable man would have made or knew of circumstances which would have indicated the facts to an honest and reasonable man. As the source of such notice the plaintiffs relied on the bank's knowledge (through Mr. Martin) of PSL's mode of business and (from Mr. Barrows) of PSL's pre-funding; on the daily contact between Mr. Martin and Mr. Lambert; on the transfer of (on the whole) round sums, not suggestive of precisely calculated invoice amounts; and on the details accompanying the payments, particularly where the word "advance" was used. Reliance was naturally placed on an answer by Mr. Martin in cross-examination when he agreed that the use of the word "advance" showed that a payment was being made in advance, not in arrears, as would have occurred to him had he seen the documents (which he had not done at the time).

The plaintiffs did not contend that the bank at any time had actual knowledge that the first five payments were held on trust nor did they contend that the bank had knowledge of circumstances which would put an honest and reasonable man on enquiry. I need not examine the differences between the types of notice on which they did rely because in my judgment the facts which the plaintiffs proved did not establish knowledge falling into any of these categories. Mr. Martin and the bank did, indeed, know of PSL's mode of business and pre-funding, but there was nothing whatever in the operation of PSL's main account to suggest that any funds paid into it were trust moneys. The daily telephone conversation between Mr. Martin and Mr. Lambert did not, on the evidence, touch on the nature or terms of the payments made by the plaintiffs or other

shipowners, and I do not conclude that Mr. Martin was in the circumstances unreasonably slow to make enquiries, still less that there was any element of wilfulness or recklessness in his behaviour. The sums remitted were not in my view so round as to suggest that they represented payments in advance rather than arrears. Even on the assumption I am now making, I do not think that the use of the word "advance" should reasonably have alerted the bank to the trust nature of these payments. When examined in chief Mr. Martin said that the use of this word would not convey to him that PSL had not paid the harbour dues before receipt of the funds and I accept this as a reasonable response to the narrative accompanying the payments, despite his later answer. It appears to me that the bank gave value when these first five payments were credited to PSL's account, certainly when the bank continued lending in the belief that the group's overall debt was reduced by the sum of the payments, and at that time I conclude that the bank had no notice that these payments were impressed with a trust (even if, contrary to my view, they were).

It remains to consider the last payment, which I have held to have been subject to a constructive trust. This payment cannot in all probability have been credited to PSL's main account before the bank had learned of the Peckston Group Ltd. decision that it and the group companies should cease trading at once and seek appointment of a receiver. The bank did not then know all the facts but it did know that PSL would trade no more and I think it was at that point clearly put on enquiry. An enquiry then would have elicited the facts which have led me to conclude that a constructive trust arose. It had not at that point given value. By the time the set-off was effected the bank was even more clearly on notice. The result is, in my opinion, that the bank cannot assert its right to set-off in respect of this last payment held by PSL upon a constructive trust for the plaintiffs.

I accordingly answer this second question: No, save in respect of the last payment of £21,327.50 held by PSL as constructive trustees for the plaintiffs.

## QUEEN'S BENCH DIVISION
Dec. 15, 16 and 17, 1982

HAIR
v.
THE PRUDENTIAL ASSURANCE CO. LTD.

Before Mr. Justice WOOLF

Insurance (Houseowners) — Non-disclosure — Breach of warranty — Serious fire occurred — Insurers denied liability — Whether plaintiffs in breach of warranties — Whether plaintiffs failed to disclose material facts — Whether plaintiffs could claim under policy.

In May, 1971, the plaintiff purchased 272 London Road, Dover, for £250. The property was subject to a closing order which had been made in 1969 and the plaintiffs carried out various improvements to the property.

On Sept. 26, 1977, the plaintiff completed a proposal for a private combined Hearth and Home insurance with the defendants, and stated inter alia in answer to the questions raised in the proposal form that the buildings were kept in good state of repair; that the property was occupied by the insured's son but owned by the proposer; and that the premises were left unattended regularly apart from holidays for eight hours daily approximately (weekdays). The value of the property was stated as £8000.

On Nov. 5, 1978, a very serious fire occurred at the property. Arson was suspected but no evidence was available as to who was responsible and the interior of the property was gutted.

The plaintiff claimed under the policy but the defendants denied liability contending that the plaintiff was in breach of warranties contained in the proposal form in that the premises were not in a good state of repair, the building was in the occupation of neither the plaintiff nor her son and was unoccupied and uninhabitable and the premises were left unattended for long periods other than for holidays. The defendants also argued that the plaintiffs had failed to disclose to the defendants material facts which ought to have been disclosed, i.e., the fact that she paid £250 for the property and that there was a closing order in existence.

————————*Held*, by Q.B. (WOOLF, J.), that (1) on the evidence the question to be asked was "What was the manner in which the building was kept at the time the answer was given from the point of view of a good state of repair? Was it kept in a good state of repair?"; here the conclusion was on a balance of probability on all the evidence that it was so kept and there was no evidence to suggest that the condition of the premises thereafter materially altered (*see* p. 672, col. 1);