# EXHIBIT 10

Neutral Citation Number: [2010] EWHC 2914 (Ch)

Case No: 7942 of 2008

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

**IN THE MATTER OF LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)**
**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 19/11/2010

Before :

**MR JUSTICE BRIGGS**
- - - - - - - - - - - - - - - - - - - -
Between:

**(1)  STEVEN ANTHONY PEARSON**
**(2)  ANTHONY VICTOR LOMAS**
**(3)  MICHAEL JOHN ANDREW JERVIS**
**(4)  DAN YORAM SCHWARZMANN**
**(5)  DEREK ANTHONY HOWELL**
**(The Joint Administrators of Lehman Brothers International (Europe)**
**(In Administration))**

**Applicants**

- and -

**(1)  LEHMAN BROTHERS FINANCE SA**
**(2)  LEHMAN BROTHERS COMMERCIAL CORPORATION ASIA**
**LIMITED**
**(3)  LEHMAN BROTHERS ASIA HOLDINGS LIMITED**
**(4)  LEHMAN BROTHERS INC.**
**(5)  LEHMAN BROTHERS SPECIAL FINANCING INC.**

**Respondents**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -
Hearing dates: 11th – 29th October 2010

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

MR JUSTICE BRIGGS

**Mr Iain Milligan QC, Mr Guy Morpuss QC, Mr Daniel Bayfield & Mr Socrates**
**Papadopoulos** (instructed by **Linklaters LLP**) for the Joint Administrators

**Mr Gabriel Moss QC & Mr William Willson** (instructed by **Herbert Smith LLP**)
for Lehman Brothers Finance SA

**Mr Robin Dicker QC & Mr Tom Smith** (instructed by **Mayer Brown International LLP**)

for Lehman Brothers Commercial Corporation Asia Limited and Lehman Brothers Asia
Holdings Limited

**Mr Michael Brindle QC & Mr Nik Yeo (**instructed by **Norton Rose LLP**) for Lehman
Brothers Inc

**Mr Philip Jones QC & Mr Giles Richardson** (instructed by **Weil, Gotshal & Manges LLP**)
for Lehman Brothers Special Financing Inc

**Mr Justice Briggs:**

## <u>INTRODUCTION</u>

1.  This application by the Administrators of Lehman Brothers International (Europe) ("LBIE") seeks the court's directions as to the principles governing the beneficial ownership, as between LBIE and a number of its affiliates within the Lehman group, of securities which LBIE had, prior to the onset of its administration, acquired from third parties ("the street") for the account of those affiliates and which, vis-à-vis the rest of the world, still remain vested in LBIE.

2.  The securities comprise a broad range, including both fixed income and equities. The overwhelming majority of them are in dematerialised form, in relation to which LBIE's ownership, as against the rest of the world, consists of a chose in action represented by a credit in LBIE's account (a "depot") with a clearing house, depository or custodian (collectively "depositories"). A small minority consist of shares with physical documentary title, either registered or bearer, in respect of which legal title was generally vested in a nominee, which may also be regarded as a depository for present purposes.

3.  LBIE acquired the relevant securities pursuant to a global settlements practice which had been instituted generally within the Lehman Brothers group ("the Group") in the early 1990s. By then, the Group conducted a truly worldwide securities business, operating in numerous different and widely separated time zones including, most importantly for present purposes, Europe, the USA and the Far East. Put shortly, the essence of the global settlements practice was that the Group identified a single group company (a "hub company") in each main time zone into which all securities acquired in that time zone were settled on acquisition, and from which all such securities were transferred on re-sale to the street. LBIE was the designated hub company for securities bought and sold in Europe, regardless of whether it or one of its affiliates around the world was to enjoy the economic risks and rewards of ownership, including rises and falls in value, and the intermediate income, whether by way of coupon or dividend.

4.  The global settlements practice applied not merely to securities bought and sold as part of a trading strategy designed to yield profits in its own right, but also to securities bought and sold by way of the hedging of the risks arising from the derivatives businesses of particular affiliates.

5.  It was also (or became) Group policy not merely to hold securities between acquisition and re-sale, but to use them for the raising of finance for the Group by lending them to the street in the meantime. Again, the Group designated the same hub companies for the carrying on of this activity as it did to the acquisition and sale of the underlying securities, regardless of the identity of the affiliate for which the securities had been acquired and were held. Thus, all lending of securities to the street in Europe for the raising of finance was carried out by LBIE, and LBIE did not account to specific affiliates for the substantial economic benefits obtained by the use of securities acquired for the affiliate's account in connection with that activity. By contrast, LBIE did account to affiliates for all intermediate income received from securities held for their account between acquisition and re-sale.

6.    The concentration of the acquisition, sale and lending of securities within one Lehman hub company within each main geographical area of the Group's activities was perceived to be very beneficial to the Group in terms of efficiency and economy, but it was also perceived to create, at least potentially, three problems for the hub company.  The first ("the capital charge problem") was that to the extent that the hub company paid the acquisition price for securities on settlement with the street, against an unsecured debt for the same acquisition price owed to it by the affiliate for which it had been purchased, the hub company faced a regulatory capital charge which, at least in the case of LBIE and Lehman Brothers Inc ("LBI"), the New York hub company, amounted to 100% of the amount of the unsecured debt.

7.    The second problem ("the segregation problem") was that the hub company might, unless a regulatory exception applied, be required to segregate securities acquired for the account of third parties (including affiliates) rather than, as was the Group's practice, for the hub company to hold all securities acquired both for itself and its affiliates in un-segregated house accounts.

8.    The third problem ("the financing problem") was that the use of securities for the raising of finance by lending to the street required the hub company to be able to transfer absolute and unencumbered title to its street counterparty, whether under re-purchase transactions ("repos") or stock loans, and it was perceived that if the effect of the acquisition of securities by a hub company for an affiliate was to confer beneficial title to the securities upon the affiliate, then the hub company might be in difficulty giving good title to the street as necessitated by financing transactions.

9.    I have described these as potential problems because it is far from clear, in the early 1990s at least, that they, or any of them, rendered LBIE's centralised activities in the acquisition and sale of securities for its affiliates, or by lending to the street, impracticable, still less unlawful in regulatory terms.  Nonetheless they were perceived to be of sufficient gravity, either immediately or in the near future, to give rise to the setting up of a small project group of persons within LBIE known as the Regulation and Administration of Safe Custody and Global Settlement working party, or "Rascals" for short, tasked with devising a solution to them.  That catchy acronym became the label used for the identification of the processes adopted to address those three perceived problems and, in due course, as the name for this litigation.

10.    The Rascals project was initiated in 1993. Following negotiations between LBIE and the affiliates for which it dealt in securities, the Rascals processes recommended by the working party began to be applied from about 1996.  Rascals processes continued to be applied between LBIE and various of its affiliates until, and indeed after, LBIE went into administration on the morning of 15th September 2008.  Although those processes shared certain common features, they were by no means uniform, as between LBIE and different affiliates, or in relation to different types of securities.

11.    Nonetheless, and at the risk of oversimplification, the Rascals processes shared the following common features:

i)      They were applied to large classes of securities acquired by LBIE, acting as hub company, for the account of affiliates.

     ii)     In each case the affiliate purported to confer upon LBIE its proprietary interest (if any) in the underlying security in exchange for monetary consideration in the form of a purchase price or the deposit of monetary collateral, leaving the affiliate with a contractual right against LBIE to recover its proprietary interest in equivalent securities, again for monetary consideration, at a future date.

     iii)    The commercial intent (albeit not contractual obligation) of the processes was usually that they should apply for the whole or substantially the whole of the period between the acquisition of the security from the street by LBIE and its eventual re-sale to the street.

     iv)    The intended effect of the processes (whether or not successful) was to replace an unsecured obligation by the affiliate to refund LBIE the purchase price for the acquisition of the security from the street with a secured obligation of the affiliate to pay for its re-acquisition from LBIE of an equivalent security under the Rascals processes, whether by paying the repurchase price under the off-leg of a repo or paying back the collateral lodged during the currency of a stock loan (repos and stock loans being the two types transaction alternatively used by all the Rascals processes).

12.    It will be unnecessary for me to describe every form of Rascals processing used within the Group between the mid-1990s and its collapse in 2008. Nonetheless a brief description of the two principal methods of Rascals processing extant immediately prior to the collapse will serve by way of introduction to make intelligible the issues which have arisen thereafter. The first, Automatic Rascals, was applied mainly to fixed income securities. As its name implies, it was not merely automatic by 2008, but fully computerised, so that the series of daily repeated transactions between LBIE and the relevant affiliates were entered into and settled entirely electronically, without the need for any human intervention on either side.

13.    On the day of the settlement of LBIE's acquisition of the security from the street, LBIE and the affiliate entered into a repo contract, providing for the immediate sale of the security by the affiliate to LBIE for a fixed price in fact equivalent to its value that day ("the on-leg"), followed by a sale back of an equivalent security by LBIE to the affiliate on the following day at the same price plus an interest charge or fee ("the off-leg"), with LBIE having the right of use of the security in the meantime.

14.    On the following day LBIE and the affiliate would enter into a replacement repo, in all respects identical to the first, save that the price would be fixed by reference to the marked to market value of the security on that day. This process would then be repeated on every subsequent day of the period during which the security (or its equivalent) was held, until and including the day before the settlement of the eventual sale of the security back to the street. Thus, the settlement of that sale would coincide with the off-leg of the last in the series of computer-generated repo transactions between LBIE and the affiliate.

15.    Pursuant to master agreements between LBIE and each of its relevant affiliates, the repo transactions under Automatic Rascals were on industry standard terms, pursuant to which title to the underlying security was not to pass either under the on-leg or the off-leg of the repo until payment. I note in passing that this feature of Automatic Rascals was common ground before me, save that it was challenged by Lehman

Brothers Finance SA. ("LBF") in relation to the off-leg.   As will appear, I have rejected that challenge, for reasons which will follow.

16.   It was not the intention of the designers of Automatic Rascals that the purchases and re-purchases constituted by the on and off-legs should be cash settled.   Rather, payment and repayment was intended to be achieved, in form by what I shall loosely call book entries, but in substance by a series of successive offsets.   Thus, the affiliate's debt to LBIE for the acquisition price of the security from the street was largely offset by LBIE's debt to the affiliate on the on-leg of the first repo.   The affiliate's debt to LBIE under the off-leg of the first repo was in turn largely offset by LBIE's debt to the affiliate on the on-leg of the second repo.   These offsets continued until the settlement of the sale of the security to the street, whereupon the affiliate's debt on the off-leg of the last repo was largely offset by LBIE's obligation to account to the affiliate for the proceeds of the sale of the security back to the street.

17.   I have throughout that summary used the phrase "largely offset" to reflect the fact that the cross debts were not necessarily, or even usually, identical. Differences would arise from the constantly changing value of the underlying security, and the fixing of the repo prices by reference to its marked to market value from time to time.   Thus for example, a rise in the value of the security between the trade date and the settlement date of the acquisition from the street would mean that LBIE's debt on the first on-leg would exceed the affiliate's debt in relation to the purchase price, and vice versa. Similar changes were caused by marked to market movements during the series of daily repos, and by any disparity between the sale price of the security on the trade date, and its marked to market value on the settlement date, back to the street.   Other differences would arise from fees and interest charges arising under the repos being added to the amounts payable.

18.   I have in the same phrase used "offset" rather than set-off to record the fact that, in the parties' accounting records, the nearly equal but opposite credits and debits between LBIE and each affiliate were not immediately cancelled by journals and replaced by a net balance. I shall describe in due course how the opposing entries were in due course dealt with. The question whether the offsetting entry (such as LBIE's debt to an affiliate for the on-leg of the first repo) can properly be said to have paid *pro tanto* the original debt (such as the affiliate's debt to LBIE for the acquisition price of the security from the street) has been the subject of keen debate, to which I shall return.

19.   Manual Rascals, as its name implies, was triggered only by human intervention, and was a process (or the label for a process) mainly applied to equities.   An equity purchase by LBIE for an affiliate from the street selected for Manual Rascals processing would be made the subject of a stock loan by the affiliate back to LBIE. By contrast with the daily repos, the stock loans (also on standard industry terms) were open-ended.   They provided for transfer by the affiliate of its title to the security back to LBIE in exchange for monetary collateral, with a right in the affiliate to reacquire title to an equivalent security upon payment of the collateral back to LBIE, with small adjustments for a stock loan fee and/or an interest charge in relation to the collateral and provision for margining adjustments to the collateral during the life of the stock loan, to reflect changes in the marked to market value of the security. Manual Rascals therefore required no daily repetition of transactions between acquisition and resale of the security from and to the street.   Furthermore, the evidence does not enable it to be said with confidence that Manual Rascals was

invariably or even usually applied to a security on the day of the settlement of its acquisition from the street.

20.   As with Automatic Rascals, it was not envisaged by the designers of the process that cash collateral would actually be delivered by LBIE on the making of the stock loan, or physically redelivered by the affiliate upon its termination. Rather, payment was, again, to be recorded in book entries, but achieved by offset. LBIE's obligation to lodge collateral was intended to be achieved by an offset against the affiliate's debt for the price of the acquisition from the street. Similarly, the affiliate's obligation to repay collateral at the end of the stock loan was to be offset against LBIE's obligation to account for the proceeds of the sale of the security to the street. Again, these offsets were not precise, due to movements in the value of the underlying security by reference to which the collateral was calculated, between the original trade date for the acquisition and the settlement of the sale, in each case with the street.

21.   I have throughout this summary described the subject matter of the Rascals repos and stock loans as if it were the very securities that LBIE purchased from the street. In fact it was in each case the beneficial interest (if any) of the affiliate in the securities, of which LBIE remained the owner as against the street throughout the process. LBIE remained the account holder recognised by the depositary from start to finish, and the Rascals process was therefore entirely internal, within the Group, and invisible to the rest of the world, although its perceived consequences were reflected in the Group companies' regulatory reporting, and in their published accounts.

22.   This litigation is, as I have said, concerned only with securities still within LBIE's depots which were, when it went into administration, the subject of one or other of the Rascals processes which I have summarised. In relation to Automatic Rascals, the computers which generated the stream of daily repos did not cease to do so by virtue of the Administration Order, nor is it suggested that the Order itself deprived the subsequent automated electronic workings of that computer programme of contractual efficacy. The automatic process continued until 23rd September 2008, when a manual intervention by an employee of LBIE (which I shall describe in detail in due course) prevented any new repos being made thereafter, with the consequence as a matter of form that all existing repos ended with their off-legs scheduled for that day.

23.   As for Manual Rascals, the stock loans by which that process was applied simply remained open when LBIE went into administration, there being no provision in them, or in the parties' computer systems, for automatic off-legs.

24.   It is by no means the case that all Rascalled securities which LBIE had acquired for affiliates but not re-sold for the affiliates to the street prior to LBIE going into administration remain in LBIE's depots now. Large numbers of them had been lent to the street by LBIE, and its insolvency meant that LBIE was unable to reacquire equivalent securities from its street lending counterparties due to its inability to pay the repurchase prices under repos or return the collateral under stock loans. Those which remain in LBIE's depots, and which are the subject matter of this application, therefore constitute a small and unrepresentative subset of those which were subject to Rascals processing when the Group collapsed.

**THE ISSUES**

25. The trial of this application for directions has taken the form of a straight adversarial fight between LBIE by the Administrators on the one hand and five of its affiliates on the other. By contrast with some earlier applications for directions, the Administrators have not at any stage in this application assumed a neutral role. On the contrary, they claim that LBIE is beneficially entitled to all the Rascalled securities remaining in its depots, to the exclusion of any of its affiliates.

26. For their part, the respondent affiliates each claim beneficial title to all those securities remaining in LBIE's depots acquired by LBIE for their separate accounts, to a large extent on overlapping legal arguments, but based upon the detailed separate facts about LBIE's relationship with each of them.

27. The first main area of dispute concerns the beneficial ownership of securities acquired by LBIE for the affiliates' account before the Rascals processes were applied to them. The first plank in the Administrators' case is that the global settlements practice by which LBIE acquired from the street securities for the account of affiliates was neither capable as a matter of law, nor intended, to confer beneficial title upon affiliates in relation to any of the securities acquired, entirely regardless of the Rascals processes. It being common ground that a beneficial interest in an affiliate necessitates a trustee beneficiary relationship between LBIE and the affiliate, the Administrators say that the supposed trust necessarily fails in every case due to uncertainty of subject matter or uncertainty of terms. They say that the objective common intention of both LBIE and its affiliates was that the affiliates should obtain the economic risks and benefits of an owner of the underlying securities not by the transfer of ownership (in the sense of a proprietary interest) but by the creation of purely contractual rights and liabilities between LBIE and the affiliates having the same economic effect, as it were, synthetically.

28. This is roundly challenged by the affiliates, each of which claims (albeit by reference to slightly different facts) that LBIE acquired or settled the acquisition of securities for each of them as broker or settlement agent on terms which ordinarily imply the holding of the underlying securities on trust for the affiliate principal, and that there are no facts which suggest any different outcome. On the contrary, they each say that the essential predicate of the Rascals process was that, but for it, the beneficial interest in the underlying securities was intended and assumed, as between LBIE and the affiliate, to lie with the affiliate.

29. Save for that last point, all the parties to this application have invited me to address this first issue by a close legal and factual analysis of the global settlement practice upon the counter-factual assumption that, for this purpose, the Rascals process can temporarily be ignored. They appear to have done so mainly for their own tactical reasons. There were numerous securities acquired by LBIE for affiliates (and held in its depots when the Group collapsed) to which Rascals processes were not applied, but they are, by definition, not the subject matter of this application. As will appear, I have considerable reservations as to the utility of addressing the effect of the Group's global settlement practice upon the beneficial ownership of Rascalled securities on the counter-factual hypothesis that Rascals processes were not intended to be, and were not, applied to them.

30.     The second main area of dispute concerns the effect upon beneficial entitlement to Rascalled securities on the assumption, contrary to the Administrators' primary case, that but for Rascals processing, the beneficial interest in the securities would have vested in the affiliates. The Administrators' case is that the Rascals process did what it said on the tin, that is, transfer any beneficial interest of the affiliates in the Rascalled securities to LBIE, that this is where the beneficial interests lay when the Group collapsed, and that the aftermath, including the switching off of the Automatic Rascals process, brought about no subsequent re-transfer of beneficial interests back to the affiliates.

31.     The bones of the Administrators' case in this respect are that:

i)      LBIE paid by offset for the transfer of title from the affiliates by each repo on-leg and stock loan, and that the beneficial interests resided in LBIE continuously thereafter.

ii)     On 15th September 2008 those beneficial interests were therefore with LBIE.

iii)    That none of the affiliates (all of which were also insolvent) paid LBIE for the repurchase of securities under the final repo off-legs under Automatic Rascals which occurred on 23rd September 2008, with the consequence that title remained with LBIE.

iv)     Alternatively that the manual intervention into the computerised Automatic Rascals process was invalid because it was not authorised by the Administrators.

v)      That all Manual Rascals stock loans have remained open since the onset of LBIE's administration.

vi)     That in any event no affiliate has been able to repay the collateral provided by LBIE under the stock loans, with the consequence that, pursuant to their terms, title has not passed back to the affiliates.

32.     The affiliates' case in relation to the Rascals part of the dispute may be broadly summarised as follows, although the factual basis for each affiliate's case is divergent.

i)      That LBIE never paid for any of the repo on-legs or lodged collateral for any of the stock loans, there being no available off-set in the form of a debt due from the affiliate for the acquisition price from the street, as a result of the Group's inter-company finance arrangements, with the consequence that beneficial title never passed to LBIE under the Rascals processes, Automatic or Manual.

ii)     That even if title did pass, it reverted under Automatic Rascals to the relevant affiliates on the final off-leg on 23rd September 2008 or, in the case of certain affiliates, slightly earlier.

iii)    That in relation to Manual Rascals, there arose a resulting trust in favour of the relevant affiliate once the alleged purpose of Manual Rascals (namely to

enable LBIE to use the underlying securities to raise trade finance in the street) became incapable of fulfilment by virtue of LBIE's going into administration.

33.     In addition to those general arguments, the second and third respondents (being members of the Group's Far Eastern enterprise) have additional arguments, peculiar to them, as to why the Rascals processes failed to achieve their intended purpose, arising from complicated inter-company novation and netting arrangements applicable to the Group's Far Eastern operations.

34.     It is no small irony that the primary cases of all the protagonists involve treating the Rascals processes as, in effect, a complete waste of time and effort. On the Administrators' primary case the Rascals processes were entirely unnecessary, because beneficial title in the underlying securities never passed to the affiliates in the first place. On the primary cases of all the respondents the Rascals processes simply failed to achieve their intended purpose, because for a variety of reasons the assumptions upon which they were based were incompatible with the pattern of financial dealings between the parties, established either by agreement or by invariable practice reflected in book entries.

35.     It is, at least at first sight, counter-intuitive to think that one of the largest and most sophisticated investment banking institutions in the world, staffed by some of the foremost experts in the business and advised by the most eminent law firms, should have spent more than a decade solemnly entering into countless thousands of mutual transactions which were either completely unnecessary, completely ineffective or both. The suspension of disbelief called for by the parties' primary cases has not been easy.

36.     The question whether the Rascals processes were necessary has called both for a close analysis of the operation of the Group's global settlement practice, and also a study of the legal question whether the recognition in English law in Hunter v. Moss [1994] 1 WLR 452 that there can be a trust of part of an un-segregated mass of fungibles is sufficiently flexible to be capable of being applied to the constantly fluctuating mass of security interests appearing in LBIE's un-segregated house depot accounts with its depositories.

37.     The question whether, if the Rascals processes were necessary to confer upon LBIE beneficial title to the underlying securities, they were effective for that purpose has called for a minute examination both of the contractual structures put in place between LBIE and each of the respondents (together with other affiliates) and the accounting records employed by the Group for the purpose of recording their financial dealings, including but not limited to those constituted by the Rascals transactions.

## THE FACTS

38.     By contrast with most other applications by the Administrators to date, the present case has not proceeded upon the basis of assumed facts. Rather, the parties have helpfully agreed some of the relevant facts, albeit only for the purposes of this application. Others have been the subject of dispute, to the extent that there has been a limited amount of cross-examination. Nonetheless the parties have sensibly deferred to a later stage in the administration all detailed questions as to whether, and if so precisely how, the Rascals processes were applied to specific securities. The

purpose of this application has been to obtain directions as to the legal consequences, in terms of the beneficial ownership of securities, of their having been processed in accordance with certain recognisable patterns, both in terms of security transactions and the parties' accounting for their financial consequences.

39.    Since there has been no precise correspondence between the manner in which LBIE dealt with each of the five respondent affiliates which have claimed beneficial interests in the relevant securities, either in terms of contract or accounting records, it has been necessary to consider the relationship between LBIE and each affiliate separately, both in terms of the deployment and testing of evidence, and in this judgment.

40.    The documentary evidence has fallen into three main classes:

    i)     A small number of memoranda and communications generated in connection with the carrying out of the Rascals project in the early to mid-1990s;

    ii)    The written agreements made from time to time between LBIE and the relevant affiliates (including but not limited to the respondents) relevant to the Rascals processes and the parties' funding arrangements;

    iii)   The parties' accounting records.  These were for the most part computerised, and presented in court in the form of helpfully selective screenshots with appended (and usually un-contentious) interpretative notes.

41.    The oral evidence has consisted of two main strands.  First, some of those employees within the Group involved in the planning, implementation and subsequent operation of the Rascals processes have given evidence.  Since the processes were originally planned and put in place more than ten years ago the first hand recollection of most of them has been understandably limited.

42.    The second main strand has consisted of the essentially interpretative evidence both of members of the teams of professionals now engaged in the insolvency processes affecting each of the parties and in addition some former Group employees experienced in operating or studying the Group's accounting records and therefore qualified to assist the court in their interpretation.  There has finally been evidence about the circumstances in which the Automatic Rascals processes were, in effect, switched off on 23rd September 2008, directed to the question whether the switching off was authorised by the Administrators.

43.    As might be expected of mainly professional persons with no particular axe to grind, all the witnesses did their considerable best to assist the court both with their recollection and their interpretation of technical accounting records.   Both individually and collectively they provided very considerable assistance to the court, not least because of the readiness of most of them, when challenged, to acknowledge instances where, mainly due to continuing research, conclusions or assumptions in their earlier written evidence called for qualification or amendment.

44.    This has not been to any significant extent a case in which the outcome of issues of fact has turned upon the relative skill, competence, demeanour or integrity of different witnesses.  Nonetheless I should briefly mention the evidence of Mrs Lisa Greenway

who, in no less than eight successive witness statements, undertook on behalf of the Administrators the main burden of providing a detailed explanation of the Rascals processes and the interpretation of the Group's accounting records. She augmented that evidence in chief and was cross-examined at some length by counsel for each of the respondents.

45.   Mrs Greenway joined the Lehman Group in 1992 and worked continuously for it until its collapse, in a wide variety of different roles of increasing seniority in London, mainly but not exclusively for LBIE. Following LBIE's entry into administration she was appointed by the Administrators as an Executive Director in LBIE's Administration Intercompany Team. Her presentation of the Rascals processes and her interpretation of the Group's accounting records was mainly the product of the work carried out by herself and her team during LBIE's administration. Her work for the Group prior to the collapse had not brought her into close contact with the Rascals processes, or with the Group's financial recording of Rascals and its effect. Nonetheless her long familiarity with the Group's accounting systems over many years well qualified her to present and interpret them to the court, her experience in what cross-examining counsel described as "the university of life" more than making up for her lack of any specific accountancy qualifications beyond A level maths and economics.

46.   Generally, Mrs Greenway's presentation and interpretation of the Rascals processes and the Group's accounting records was reliable, subject only to certain occasions when she and her team drew conclusions from their research which, after cross-examination, turned out not to be supported by the underlying documents, or any other evidence, or which were undermined by subsequent more detailed research carried out by others. Those specific instances did not undermine the generality of her evidence as a careful, unbiased, honest and intelligent presentation of an extremely complex subject, fully deserving of the court's gratitude.

## THE PARTIES

47.   The following brief description of the parties, and of the Group of which they formed part, relates to the period immediately prior to the Group's collapse in September 2008. It is not suggested that any differences from that description at any earlier date are relevant to the issues which I have to decide although, of course, the securities with which this application is concerned were acquired from the street during a period of some years prior to the collapse.

48.   The Lehman Group was in 2008 one of the four biggest investment banks in the United States, the core of its business being global investment banking, including the provision of financial services to corporations, governments and municipalities, institutional clients and high net worth individuals. It organised its business activities in three segments, namely capital markets, investment banking and investment management. Those segments included equity and fixed income sales, trading and research, capital markets and advisory financing, asset management, principal investing and private equity.

49.   The Group sought to present itself to the world, and to organise itself internally, as a single integrated business enterprise, rather than as a collection of separate legal entities all pursuing their own affairs in isolation from each other. Nor were its

separate legal entities confined to trading only in their countries of incorporation. Many of them, including all but one of the parties to this application, carried on business activities on a global rather than merely national or regional basis.

50.     Nonetheless, the tendency of financial services regulation to operate on national lines, the differences in national fiscal systems and the requirements of those dealing with the Group as clients, customers or trading counterparties meant that, for numerous purposes, the identity of Group companies as separate legal entities with principal places of business in particular jurisdictions was of unavoidable importance, both as a matter of internal organisation and external dealings.

51.     The ultimate parent company within the Group was Lehman Brothers Holdings Inc. ("LBHI"), a Delaware corporation with its headquarters in New York.  For present purposes, its importance is that it provided a treasury function, including day to day cash-flow management, throughout the Group either directly or (due to regional netting arrangements) indirectly.  The contractual regime for the provision of that treasury function, and its (not always consistent) application over time forms an important plank in the respondents' case that the Rascals processes were ineffective.

52.     One consequence of the Group's endeavours, within limits, to conduct an integrated business was that its staff were not invariably, or even usually, employed exclusively to conduct the business affairs of individual affiliates.  Thus for example, the manager of a trading desk in a particular geographical location would be likely to deal in securities or particular types for a number of different Lehman entities, commonly in pursuit of a Group business strategy rather than on a strictly entity by entity basis. Thus while a particular entity might appear from its financial statements to conduct business on an enormous scale, it might have a very small number of the Group's staff devoted solely to its affairs, relying on the non-exclusive services of a very large number of others for the conduct of its trading activities.  This is, as I shall describe, particularly true of one of the respondents, LBF.

**LBIE**

53.     LBIE was the Group's principal trading company in Europe.  It provided a wide range of financial services to clients including trading and broking, equity and fixed income securities and dealing in financial derivatives.  It traded in securities for its own account, for the account of Lehman affiliates, including the respondents, and for its own clients.  It maintained depot accounts with the main European securities depositories including, in particular, Euroclear.  LBIE maintained both house accounts and segregated accounts with its securities depositories. Pursuant to the global settlement practice which I have described, LBIE settled all securities trades for its affiliates into house accounts rather than segregated accounts.

54.     LBIE went into administration on 15th September 2008.  LBIE's case has been presented, through the Administrators, by Mr Iain Milligan QC, Mr Guy Morpuss QC, Mr Daniel Bayfield and Mr Socrates Papadopoulos.

**Lehman Brothers Finance SA ("LBF")**

55.     LBF is a Swiss company with a core business consisting of the entry into OTC equity derivatives transactions, either directly with the street or via other Group companies

on a back to back basis. By 2008 LBF carried on approximately 50% of the Group's total business of that type. Despite the enormous size of its business, LBF's board consisted only of three non-executive directors, and it enjoyed the exclusive services of only about a dozen staff. Its day to day business activities were transacted on its behalf by Group staff employed by other entities, working mainly outside Switzerland, and in particular at LBIE's premises in London, on a non-exclusive basis.

56.    LBF's business model was constructed in such a way as to maximise its efficiency and profitability from a regulatory and fiscal perspective. It was not subject to regulation by the Swiss Financial Market Supervisory Authority ("FINMA"), nor did it hold a banking licence. Its customers included other Lehman affiliates and professional market participants from the street worldwide. Its non-regulated status meant that it did not incur regulatory capital charges when entering into OTC derivatives transactions and it also enjoyed a valuable commercial stock exemption from Swiss stamp tax in relation to its dealings in securities for hedging purposes.

57.    LBF's hedging activities required it to establish both long and short positions in securities. Subject to certain minor exceptions, it did not hold securities or security positions through depot accounts of its own with depositories. Rather it used the depots established by LBIE (for European securities), LBI (for USA securities) and other affiliates elsewhere. It also used employees of (or located at the premises of) the Group hub companies for the implementation of its trading strategies, including its hedging activities.

58.    On 22nd December 2008 LBF was placed into a Swiss bankruptcy process on the application of FINMA, PricewaterhouseCoopers AG being appointed as its bankruptcy liquidator. It has appeared on this application by Mr Gabriel Moss QC and Mr William Willson.

**Lehman Brothers Commercial Corporation Asia Limited ("LBCCA") and Lehman Brothers Asia Holdings Limited ("LBAH")**

59.    LBCCA and LBAH are two of the Lehman Group entities based in the Far East. LBCCA's business was proprietary trading and investment, and LBAH was the primary provider of inter-company funding for Lehman Group entities in the Asia Pacific region, standing for that purpose between the Far Eastern trading entities and the Group treasury function provided by LBHI. Both companies were based and incorporated in Hong Kong. European securities acquired for the account of LBCCA were routinely settled by LBIE and held in its house depot accounts. For reasons which I shall explain in detail later, LBAH came to be used as LBIE's counterparty for the Automatic Rascals processing of such securities.

60.    LBCCA and LBAH were both placed into provisional liquidation by the High Court of Hong Kong Special Administrative Region on 19th September 2008 and the same three partners in KPMG China were appointed as provisional liquidators of each of them. They have both appeared by the same team of solicitors and counsel in these proceedings led by Mr Robin Dicker QC and Mr Tom Smith. If otherwise successful in claiming beneficial ownership of relevant securities as against LBIE, they do not require any issue as to title as between them to be resolved on this application.

**Lehman Brothers Inc. ("LBI")**

61.   LBI was a registered broker dealer in the USA trading in a variety of financial instruments including equity and fixed income securities. It was the Group's hub company for the USA and the rest of North and South America, and therefore performed a similar function within that geographical area in terms of the settlement and holding of securities that LBIE performed for the Group within Europe. For present purposes LBI is joined as a respondent not because of its activities as a hub company but because LBIE settled and held European securities for its account.

62.   There is an issue whether transactions which may properly be described as Rascals processes were applied to any of the relevant securities, as between LBIE and LBI. Nonetheless it is clear that a very small number of surviving relevant securities (that is, still held in LBIE depots) were the subject of open stock loans by LBI to LBIE when the Group collapsed. It is common ground that, as between LBIE and LBI, this application is about those securities, whether or not the stock loans were strictly part of the Rascals process.

63.   On 19th September 2008 the United States District Court for the Southern District of New York appointed James Giddens as the trustee for the liquidation of LBI under the United States Securities Investor Protection Act of 1970. Mr Giddens was, pursuant to that order, authorised to litigate claims for the recovery of property on LBI's behalf. LBI appeared on this application by Mr Michael Brindle QC and Mr Nik Yeo.

**Lehman Brothers Special Financing Inc. ("LBSF")**

64.   LBSF was the principal Lehman Group company engaged in fixed income OTC derivatives business, typically interest rates swaps, credit default swaps and other derivative products based on fixed income securities such as government and corporate bonds. It was an unregulated entity and, as a result, unable to trade at all on markets which limited trading to regulated entities, and in relation to European securities used LBIE to enter into such trades for its account. Even where it could trade in its own name in securities, LBSF used LBIE for the settlement of securities trades into LBIE's house depot accounts in accordance with the global settlements practice. The securities to which LBSF claims title were acquired mainly in the pursuit of LBSF's hedging strategies.

65.   In numerous respects, LBSF's position in relation to the issues on this application matched that of LBF. Nonetheless, because LBF's hedging was mainly in equities whereas LBSF's was mainly in fixed income securities, the two companies' main economic interests in the litigation concern Manual and Automatic Rascals respectively.

66.   LBSF made a voluntary filing for bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York on 3rd October 2008. It appeared on this application by Mr Philip Jones QC and Mr Giles Richardson.

**THE GROUP BOOK-KEEPING SYSTEMS**

67.   Throughout the period relevant to Rascals, Lehman Brothers operated a Group-wide, largely automated book-keeping system to which, prior to the collapse, each of its

affiliates had access.   Three aspects of it need brief description.   The first is the International Trading System ("ITS"), which was the Group's main trade settlement system for securities settled in Europe and Asia.   It recorded both trades (i.e. contracts for the acquisition or sale of securities), and settlements (i.e. completion of those contracts by the transfer of the relevant securities and payment of the price).

68.    ITS recorded both transactions with the street and inter-company transactions within the Group.   In addition to creating trade tickets recording the essential terms of an acquisition or sale, ITS would also automatically generate appropriate accounting book entries in the books of those Group companies affected by the trade, some of which I will have to describe later in detail.

69.    ITS was used as the main book-keeping platform for Automatic Rascals, and was, subject to manual override, capable of identifying securities which LBIE had contracted to acquire for the account of an affiliate as eligible or ineligible for Automatic Rascals treatment.   Eligible securities were then subjected to daily repos by the ITS system without any human intervention, in terms both of the creation of trade tickets and of all appropriate accounting book entries.   Following the collapse, ITS has continued to be available for inspection by the Administrators and, albeit not always to the same extent, by the office-holders of the respondents.

70.    ITS was, in relation to book entries, in effect a sub-ledger of the Group's general ledger known as DBS, from which from time to time each Group company prepared its own financial statements, eventually reflected in its audited accounts.

71.    Finally, brief mention must be made of a further IT system used by the Group's financing businesses outside the USA, called Global 1.   It was the principal means of recording the stock loan activity in respect of non US issued securities between members of the Lehman group, as well as stock loans entered into by members of the Lehman group with external counterparties in the street. Since the collapse it has been only sporadically available to parties other than the Administrators.

## LBIE'S USE OF SECURITIES HELD FOR ITS AFFILIATES' ACCOUNT

72.    The Administrators' case that the affiliates never acquired any beneficial interest in securities held by LBIE for their account is mainly based upon the way in which, with the affiliates' consent, LBIE then dealt with those securities. In short, LBIE settled them into house rather than segregated accounts with its depositories, and the Administrators say that LBIE thereafter used them in all respects as part of its own business assets. I shall address this general assertion and its consequences in due course. At this stage, two aspects of the way in which LBIE used such securities deserve special mention. They are the use of securities held for affiliates to settle short positions, and the use of securities for lending to the street.

## Short Positions

73.    Securities were typically acquired by LBIE for the account of affiliates' trading books for hedging purposes or otherwise pursuant to the affiliates' trading strategies.   The hedging and other strategies of those businesses would also, from time to time, require the affiliates to establish short positions.

74.    In order to establish a short position for the trading book of an affiliate LBIE would sell (for the account of that affiliate's trading book) to a street counterparty securities which were not in the inventory of that trading book.  It was of course necessary for LBIE to ensure that securities were available to it in order to settle the trade.  LBIE could acquire the securities by borrowing stock from the street.  Alternatively it could use securities that it held in its house depots either for its own account, or for the trading books of other affiliates.  I infer, but this was not specifically spelt out in evidence, that LBIE could also establish short positions of its own, and meet its settlement obligations in the same way.

75.    The establishment of short positions could therefore lead to LBIE having a nil position in a particular stock line in its house depot account, even though it had acquired securities of that type for an affiliate, which had yet to be re-sold to the street.  To take a very simple example, a nil position might arise if LBIE acquired a hundred shares in (say) ICI for affiliate A, and then used those shares to settle a one hundred share ICI short position created for affiliate B.  LBIE's books would show matching long and short positions with each affiliate, but its house depot account with the depository for ICI shares would, (assuming no other relevant transactions in that stock) be zero.

76.    In real life LBIE's dealings with any particular stock in its house depot accounts were generally much more complicated than that, and nil positions may have been quite rare in practice.  Nonetheless the point of the example is that, to the extent that house accounts were used to settle short positions, this inevitably generated deficiencies in LBIE's holdings of relevant stock at any given time below the simple gross aggregate of the securities held both for itself and for all relevant affiliates for the books of which it had acquired or settled that stock.

## Lending To The Street

77.    For the purposes of this explanation, I shall refer to securities the subject matter of this lending activity as "stock" in order to distinguish it from security in the sense of property held as security for the repayment of a debt.  I have already referred to what was or became Group policy for the hub companies to make stock earn its keep while held between acquisition and resale (whether for the hub company itself or for affiliates) by using it for the purpose of obtaining finance.

78.    Just as with Rascals processes, the two main vehicles for this purpose were repos and stock loans.  The essential features of a repo are that it consists of a single combined sale and repurchase contract, for the sale of specified securities settling on day one, and for the re-purchase on a fixed later date ("day two") of equivalent securities at substantially the same price, adjusted by a repo fee and/or interest charge.  The sale on day one and the re-purchase on day two are generally known as the on-leg and the off-leg of the repo respectively.  I shall refer to the seller under the on-leg as A and the other party to the repo as B.  Although Rascals repos are invariably for one day's duration, this is not an invariable feature of a repo generally.

79.    The following are standard features of repos:

i)      On neither leg is the person obliged to make payment given credit.  A may refuse to transfer the stock on settlement of the on-leg without simultaneous

payment by B.   Similarly B may refuse to transfer equivalent stock on settlement of the off-leg without simultaneous payment by A.

ii)     The on-leg requires A to transfer unencumbered title to the stock to B, and B has the same obligation on the off-leg.

iii)    B's obligation is only to transfer equivalent stock.  B is under no obligation to hold the stock received under the on-leg on trust for A, nor even under the obligation of a mortgagee in relation to it.  B can use the stock for any purpose in connection with its business, including the settlement of a short sale to a third party.

iv)     A repo leaves the market risk in the stock with A throughout.  This is because the off-leg repurchase price is the same as the on-leg price, subject only to adjustment by an interest charge and/or fee.  A also obtains any intermediate income on the stock between day one and day two.  Although A retains no beneficial interest in the stock during that period, it may nonetheless continue to record that amount of the stock as an asset on its balance sheet, because it retains the economic risks and benefits of ownership through the performance of purely personal obligations by B.

v)      For those reasons a repo is capable of being regarded in economic (but not legal) terms as a form of secured lending by B to A in the amount of the purchase price, for the period between days one and two, the security for B being constituted by receiving the stock on the on-leg while being under no obligation to transfer equivalent stock to A otherwise than against the receipt of the re-purchase price under the off-leg.

80.     A stock loan has substantially the same effect as a repo, albeit by means which are at least terminologically slightly different.  A transfers absolute and unencumbered title in stock to B against (i) an undertaking to transfer back equivalent stock in the future at either a fixed date or a floating date triggered by notice, and (ii) the immediate receipt of monetary collateral, which A is obliged to transfer back to B on the future date against the simultaneous receipt of equivalent stock.  Where, in particular, the stock loan's off-leg is floating rather than fixed, margining provision is generally made for adjustment, upwards or downwards, in the collateral to reflect increases or falls in the value of the stock.

81.     The stock loan shares all the same essential features of a repo.  In particular, B is under no trust obligation in relation to the stock received under the on-leg, its obligation being a merely personal one to transfer equivalent stock to A against simultaneous return of the collateral.

82.     Both under a repo and a stock loan, A is, for the whole of the period between the on-leg and the off-leg, at B's credit risk so far as concerns obtaining back stock equivalent to that transferred under the on-leg. If B has neither the necessary stock nor the means to pay for its acquisition in time for the settlement of the off-leg, A may have to whistle for the stock.   Nonetheless A has the security of B's money, transferred under the on-leg. By the same token, B is equally at A's credit risk so far as concerns return of its money, since A is under no obligation to keep the money (whether purchase price under a repo or collateral under a stock loan) in a segregated

trust account.  On the contrary, the commercial purpose of repos and stock loans is that A should have free use of the money, and B free use of the stock, in each case for deployment in, and the benefit of, their respective businesses. Nonetheless B has the security of having received A's stock, and cannot be compelled to transfer equivalent stock to A without simultaneous repayment.

83.   As with shorts, the Group policy whereby LBIE as a hub company put securities held in its house depot accounts to work for the raising of finance by lending to the street in the form of repos and stock loans meant that, on any particular day, the amount of securities within any particular stock line held in its depot accounts could, and indeed usually would, fall well short of the aggregate amounts recorded in inter-company accounts as held by LBIE for affiliates and for itself.  In fact, it became settled policy, in particular after about 1997, to keep the amount of securities lying idle in LBIE's house depot accounts as low as possible.  On each trading day the account would be reviewed to identify all securities suitable for lending to the street, and such securities would be transferred from a house account to a designated stock lending sub-account, in respect of which unencumbered title would be transferred to street counterparties under repos and stock loans, in exchange for cash which, far from being credited to any account held on a fiduciary basis for affiliates, LBIE simply deployed in and about its own business, any spare cash being passed up to LBHI pursuant to group treasury arrangements.

84.   An inevitable consequence of this practice was that LBIE's ability at any particular time to transfer securities held for affiliates at the affiliate's direction (whether upon re-sale to the street or for any other purpose) was critically dependent upon LBIE's own solvency, to the full extent that, at any moment in time, securities held in LBIE's house accounts had been lent to the street or used to make good short positions.  As will appear, when LBIE went into administration a very substantial proportion of the securities originally settled into LBIE's house accounts on behalf of its affiliates were out on loan to the street and were, therefore, lost to the affiliates because of LBIE's inability to pay the re-purchase price under repo off-legs or to return the collateral received under stock loans. It is possible that LBIE's use of securities held for affiliates with long positions for settling its own or other affiliates' short positions contributed to this very large shortfall.

85.   Another consequence of the global settlement practice is that it is at least potentially misleading to speak of LBIE acquiring, holding and then reselling stock for the account of affiliates, if that phraseology conjures up a picture of particular shares or bonds being bought, held and then resold. LBIE's own interest in a particular stock vis-à-vis its depository was not in specific securities, but rather a co-ownership right to a stated (but unappropriated) number within the whole of the depository's holding. More importantly, between the acquisition and resale of securities for a particular affiliate, LBIE's house depot account in that particular stock was likely to have a constantly fluctuating balance, depleted and refreshed on a daily basis by street lending, street borrowing, sales and purchases for LBIE itself and for other affiliates. Even ignoring the nature of LBIE's rights against its depository, it would be the merest fluke if the 100 ICI ordinary shares acquired for an affiliate on a Monday were the same as the 100 ICI ordinary shares sold for its account on the following Friday. I shall nonetheless continue to speak of LBIE's acquisition, holding and resale of securities for its affiliates, because that is the jargon of the trade, or at least of the

hearing of this application. It must however be understood subject to this health warning.

86.   I have described LBIE's practice of settling short positions and of lending to the street as a general aspect of LBIE's use of securities held in its house depot accounts, without reference to any particular period or point in time and, after 1995, without reference to the question whether, in relation to affiliates' securities, it was limited to those which had been Rascalled. Mr Dicker sought to dissuade me from any over-readiness to assume that these practices were widespread before the Rascals processes were introduced, or that they were applied thereafter indiscriminately to Rascalled and non-Rascalled securities. Since the very limited evidence about these aspects of the Group's global settlements practice before 1996 consists mainly of documents generated during the Rascals project, I shall for convenience defer my findings about those matters to the next section of this judgment.

## THE RASCALS PROJECT 1993-1996

87.   I have already described the perceived problems arising from the adoption of the global settlement practice which led to the constitution of the Rascals project team. Its leader and the principal architect of the Rascals processes was a Mr Oliver Backhouse, who was at the time head of the Lehman European Regulatory Capital Group based in London, but who has since died. His supervisor between 1993 and 1995 was Thomas Bolland, then the Lehman European Financial Controller, and thereafter Chief Financial Officer for Europe from 1995 until 2001. Mr Bolland gave evidence and was cross-examined. The Rascals project and its implementation was only one of an increasing number of matters for which Mr Bolland was responsible at the time. Although he identified useful contemporaneous documents, his own unaided recollection of the development and implementation of Rascals was inevitably less than precise.

88.   The impression given by Mr Bolland, to some extent backed up by the contemporaneous documents, was that the Rascals project, although initiated within LBIE, was perceived to address problems arising from the global settlement practice of a type likely to affect not merely LBIE but also other hub companies settling securities trades for affiliates. The evidence of Mr William Burke, employed from 1991 onwards in LBI's regulatory reporting department in the USA was, by contrast, to the effect that Rascals was very much LBIE's solution to its own problems and that, for example, LBI dealt with problems arising from the global settlement practice in a different way. Mr Burke was an occasional addressee of memoranda emanating from the Rascals project, which Mr Bolland said was discussed extensively with LBIE's affiliates.

89.   It is unnecessary for me to resolve this difference of emphasis, since I am concerned only with the effect of Rascals upon LBIE's activities as hub company when settling trades in securities for affiliates. The relevance of the contemporaneous material is twofold. First, it demonstrates, at least from LBIE's perspective, the problems which the Rascals processes were designed to address and at least LBIE's purposive intention in constructing and then operating the Rascals processes. Secondly, those documents demonstrate that LBIE's thinking in this regard was sufficiently ventilated within the Group for it to be improbable that any affiliate which subsequently participated with LBIE in Rascals processing could have been unaware of LBIE's

purposive intention, or of the problems which the Rascals processes were designed to address. Thus, the purpose or intent behind the Rascals processes may properly be described as having been mutual, even if they were processes aimed at dealing with LBIE's particular problems as a hub company.

90.   The following matters, relevant to the issues which I have to decide, sufficiently appear from those contemporaneous documents. First, they display a clear underlying assumption that one effect of LBIE's settling the acquisition of a security from the street for the account of one of its affiliates was to confer upon the affiliate beneficial title to the security, even though LBIE invariably settled it into one of its un-segregated house depot accounts. In cross-examination Mr Bolland confirmed that this was indeed his understanding at the time, although he recalled an opinion of some of his then colleagues that title would not pass to an affiliate in relation to a security cash-settled by LBIE with the street until the affiliate paid the purchase price to LBIE.

91.   Secondly, the evidence makes it clear that a primary purpose of the Rascals processes (whether by way of daily repos or stock loans) was indeed that the affiliate should thereby confer absolute title to the underlying security upon LBIE, to the exclusion of any continuing beneficial interest of the affiliate. Without doing so, the perception was that none of the problems thrown up by the global settlement practice would be satisfactorily addressed. Without full title to the underlying securities, LBIE would have no effective security as against its affiliate to remedy the capital charge problem. For as long as the affiliate remained the beneficial owner of the security, the segregation problem would not be addressed. Equally, the financing problem was perceived to require LBIE actually to have absolute title to the security in order to be able to lend it to the street, not least since the standard terms of repos and stock loans required the transfer of absolute title to the street counterparty, against cash plus a merely personal obligation to transfer back equivalent securities.

92.   In fact, as is hinted at by the contemporaneous documents, none of those problems were necessarily immediate in 1993, when the Rascals project was established, or insoluble otherwise than by a transfer of absolute title. The capital charge problem was, prior to the coming into force of the EU Capital Adequacy Directive at the beginning of 1996, capable of being addressed by reference to an exception in favour of unsecured loans between affiliates. A requirement to segregate securities held for the account of third parties was subject to an exception for regulated affiliates until after 2005. The financing problem had not proved insoluble from the adoption of the global settlement practice in 1993, even though LBIE had regularly lent to the street securities acquired for the account of affiliates prior to the introduction of the Rascals processes. This worked in practice, since stock borrowers in the street customarily took title to securities from LBIE under repos and stock loans for value and without notice of the affiliates' beneficial interests.

93.   Mr Bolland was pressed in cross-examination by Mr Moss with the suggestion that, in any event, the off-leg of the daily repos which eventually became the principal mechanism under Automatic Rascals necessarily involved a transfer of beneficial title back to the affiliate at the beginning of every day, where it rested until the coming into effect of the next on-leg later on the same day. Mr Bolland's response was that it had been his understanding that the purpose and effect of the daily repos was to confer continuous rather than intermittent beneficial title on LBIE, and in this he was corroborated by a memo of Mr Backhouse created in 1997 to the effect that "I have

always taken the view that the RASCALS repo lasts 23 hrs 59 mins & 59.999 secs and that if a dividend arises that happens in the 0.001 sec the stock is back in 'custody'." Whether the process of daily repos had that effect as a matter of law is something to which I shall return but, to the extent that the answer depends upon the parties' mutual intention, I accept Mr Bolland's evidence that the objective behind Rascals was to bring about a continuous beneficial interest of LBIE in the underlying security, to the exclusion of the affiliate, for as long as the security was the subject matter of a Rascals process, whether by a stream of daily repos or by an open-ended stock loan.

94.    Thirdly, it is evident that, as a matter of purpose and intent, the Rascals processes were conceived of as effecting a transfer of beneficial title from the affiliate to LBIE despite payment for the first repo (or collateral for the stock loan) not being effected by cash settlement as between LBIE and the affiliate. Payment was to be effected by book entries, coupled with offset against the affiliate's unsecured debt to LBIE for the original acquisition price of the security from the street. That this was to be the method of payment is spelled out in the contemporaneous documents. It is not, as some of the respondents suggested, simply an after-the-event interpretation of the Rascals structure dreamed up by the Administrators and their legal team.

95.    Finally, the contemporaneous material provides no guidance as to subjective intent in relation to beneficial ownership in the event that the Rascals process should be terminated, not by the eventual resale of the security to the street, but by events triggered by the insolvency of one or both of the parties to the Rascals transactions. This is hardly surprising, since the Rascals processes were devised in order to meet regulatory and other problems associated with the active carrying on of LBIE's business, rather than in the context of an apprehension that the Group might collapse. Nonetheless it is inherent in the capital charge problem, and in the solution that LBIE should become in effect a secured creditor of the affiliate, that a purpose of the Rascals process was to confer security upon LBIE in the form of beneficial title to the underlying stock in the event of the affiliate's insolvency.

96.    The contemporaneous documents also shed light on the question raised by Mr Dicker as to the extent to which LBIE's use of affiliates' securities held in its house depot accounts for settling short positions and for lending to the street was widespread before 1996. In a paper headed "Rascals Project" in March 1995, Mr Brian Nicholson, a member of the Rascals Project team wrote this, under the heading "Title":

> "As well as not segregating the stock belonging to other group companies, the stock is often used to secure financing, e.g. a trader in LBI takes a position in a Bund, the trade clearing through LBIE's Euroclear account. Since Bunds are a European product, they would normally be funded by the London repo desk. The repo desk will repo the bond out and pass the benefit back to the LBI traders book. The repo is booked out of LBIE, not LBI (the repo trader sees only the bonds sitting at Euroclear, he has no indication of ownership). Clearly, LBIE has no title to the bonds and should not do the repo."

97.   In an email dated 21st April 1995, in relation to the same issue, Mr Backhouse said this:

> "The problem is that the settling company ends up with a big debt from the trading company and with the trading company's securities in its depot which it then uses (e.g. for its own funding needs via repo) as if they belong to it."

98.   Those two extracts, taken together, suggest that the raising of finance by lending securities to the street was a general feature of LBIE's dealings with securities held in its un-segregated depot accounts, including securities held for affiliates, before the implementation of Rascals.  In his examination in chief Mr Bolland confirmed that this was the practice before Rascals was implemented, and that it was well known to LBIE's affiliates, being part of the way in which the Group operated, rather than a practice peculiar to LBIE.  He recalled that this practice was discussed with representatives of LBIE's affiliates during the Rascals Project in which he participated.

99.   The two extracts quoted above do not (at least at first sight) speak with one voice as to the question whether LBIE used the funding obtained by lending securities on its house depot accounts to the street specifically for funding the acquisition of securities for the affiliates whose securities were used in that way, or simply for the purposes of its own business, including the raising of funding for the acquisition of securities generally.  The first extract suggests the former whereas the second suggests the latter.  Evidence from Mrs Greenway (in her sixth witness statement and in cross-examination) suggested that the reference in the first extract to the benefit being passed "back to the LBI Traders Book" did not mean that LBIE accounted for the benefit of any street funding to the affiliate whose securities had been lent to the street, but rather that LBIE's traders were expected as far as possible to fund the cost of the acquisition of securities generally from the proceeds of street lending.  As already described, LBIE rather than the affiliates bore the cash-flow burden of the acquisition of securities settled into a LBIE depot.  Prior to the implementation of Rascals, LBIE merely had an unsecured receivable from the affiliate for which the securities were acquired.

100.  In my judgment the reference to passing the benefit back to the LBI Traders Book in the first quoted extract does not displace the clear impression given by the evidence as a whole that, both before and after the implementation of Rascals, the financing benefit obtained by LBIE from lending securities in its un-segregated depot accounts to the street was applied generally by LBIE to fund its activities, including but not limited to funding the settlement of its affiliates' acquisitions, and that at no time did LBIE account on a specific basis to the affiliate whose securities were lent to the street, or recognise any obligation to do so.

101.  The quoted passage from Mr Nicholson's note is relevant also to the question whether, after the introduction of Rascals, LBIE confined its street lending of affiliates' securities to those which had been Rascalled.  The passage "the repo trader sees only the bonds sitting at Euroclear; he has no indication of ownership" suggests that, at least in 1995, it would have been impossible for any of LBIE's repo traders (i.e. those conducting the street lending) to have known whether any particular

security was held either for LBIE, or for the book of any particular affiliate. Evidence relating to the period after 1995 suggests otherwise.

102. It is clear from the evidence that, by the time of the Group's collapse, a very large part of the affiliates' securities which had been Rascalled were out on loan to the street. That is the primary reason why LBIE's depots contain only a minority of the securities by then acquired for affiliates' books and not resold outright to the street. Nonetheless, since the present application has only been concerned with Rascalled securities, the evidence does not permit any findings as to the extent to which non-Rascalled securities were, after 1995, habitually (rather than merely accidentally) lent by LBIE to the street.

103. I consider that the evidence shows with reasonable clarity that the basis upon which Rascals was implemented was that it would be extended, automatically or manually, to all those securities at all likely to be suitable for lending to the street so that, whether or not a repo trader could actually check on his own computer screen whether a security which he wished to lend to the street had been Rascalled, he could proceed on the working assumption that, if it was held for the book of an affiliate rather than for LBIE itself, it had been.

## IMPLEMENTATION OF RASCALS

104. Implementation of Rascals manifested itself in two distinct forms. The first consisted of a series of written master agreements entered into between LBIE and each of its relevant affiliates, designed to provide a structure (uniform for each affiliate, but not always across the Group) for the subsequent entry into repo and stock lending contracts. The second consisted of the making of the repos and stock loans thereafter, now evidenced by the Group's electronic books and records, and reflected in each relevant entity's accounts and financial statements.

## THE INTER-COMPANY AGREEMENTS

105. The analysis of the implementation of the Rascals processes is greatly complicated by the need to address the terms and subsequent implementation of the master agreements in the context of other agreements made between LBIE and the relevant affiliates, including financing agreements, custody agreements, brokerage agreements and agency agreements. Most of them appeared to have been in, or modelled on, forms in standard use within the Group from time to time.

106. None of these agreements were negotiated at arm's length between their various parties, all of which were wholly owned subsidiaries of sub-subsidiaries of LBHI. Far from being the product of any bargaining process, they appear to have been put in place mainly as a convenient means of recording in contractual form the basis upon which, from time to time, inter-company transactions and arrangements were being conducted, and for purposes having more to do with being able to demonstrate fact-patterns about inter-company dealings relevant to regulators, auditors and fiscal authorities, rather than to serve as binding and rigidly enforceable contracts between the entities concerned.

107. I do not mean by that description that these agreements are to be regarded as shams. Nonetheless the absence of arm's length bargaining, and of any conflict of

commercial interests calling for their rigorous scrutiny or enforcement, coupled with serious and sometimes insoluble divergences between the terms of the agreements and the inter-company dealings revealed by the Group's book-keeping, means that this patchwork of agreements between LBIE and the relevant affiliates forms a by no means wholly reliable guide as to the basis upon which the Rascals transactions were conducted and, in particular, paid for.

108.   Furthermore, the absence of arm's length bargaining, coupled with the use, for convenience, of internal standard forms within the Group means that it is often difficult to ascertain precisely in relation to any particular agreement to what business between its parties it was intended to apply, or to which it was, thereafter, actually applied.  Some of the agreements are, to a modern eye, in extraordinarily short and generalised form.  While that has mercifully eased the task of their assimilation, it has led to real difficulties of interpretation, either separately, or as part of the wider patchwork of agreements in force between the relevant parties from time to time.

109.   A further general complicating factor is that whereas the agreements apparently regulating the dealings between LBIE and the affiliates appear to have been made on a wide range of dates between 1996 and 2003, the accounting records evidencing specific Rascals transactions (and in particular the Automatic Rascals process) which have been focused on for the purposes of analysis mainly concern the period after 2005, during which the overwhelming majority of the relevant surviving securities were acquired from the street.  The evidence did not show whether those responsible during that period for processing the relevant transactions were concerned to comply with, or were even cognizant of, the terms of the relevant agreements, all of which were by then several years old, leaving open a real possibility that even if the agreements constituted an accurate reflection of the basis of inter-company dealings to which they related at the time when they were made, inter-company practices thereafter diverged from that pattern without anyone taking the trouble to amend the framework of agreements accordingly.

110.   The result of these general features of the parties' mutual dealings is that, as Mr Milligan put it in opening, the court is being invited on this application "to make the best sense of what is in some respects a mess".

111.   There is, unfortunately, no escape from a separate review of the apparent contractual relationship between LBIE and each of the respondent affiliates, save only that for this and most other purposes, LBCCA and LBAH can be taken together.

112.   Save where I state otherwise, the agreements were all governed by English law.  Even where they were not, in respect of all but one of them, the parties have invited me to assume that the application of a foreign law interpretation would produce the same result as under English law.  The exception is an agreement between LBIE and LBI, governed by New York law, about the interpretation of which substantial expert evidence has been deployed but, happily, cross-examination avoided.

**LBF**

113.   Reliance was placed by LBIE and/or LBF on the following types of agreement between them: an Inter-Company Repurchase Agreement ("ICRA"), a Master Custody Agreement ("MCA"), an Inter-Company Funding Agreement ("ICFA") an

Agency Agreement and a Brokerage Agreement, together with a supplement.  I shall describe the relevant provisions of each, in turn.

114.   The ICRA, dated 15th March 1996 and made between LBIE and LBF was clearly the result of the Rascals project, and was specifically concerned with regulating the routine making of repos and stock loans between its parties.  It includes the following recitals:

> "WHEREAS each Party may settle securities transactions at the request of the other Party and, as a consequence of these transactions, may hold securities on behalf of the other Party;
>
> WHEREAS all parties wish to ensure that security and monetary balances arising between them from such settlement are properly secured;
>
> WHEREAS the parties are or may become subject to capital adequacy and other regulations under the various jurisdictions in which they operate;
>
> WHEREAS the parties wish to ensure both that there can be no doubt about adherence to regulations relating to the custody of assets and that there is no doubt about their treatment for regulatory capital purposes of the inter-company balances arising from these settlements;
>
> WHEREAS the parties consider that the most appropriate way in which to resolve this is to enter into repurchase, sell/buy-back or stock loan transactions in respect of securities held by one party but owned by another."

115.   Clause 1 made general provision for the parties to enter into repos and stock loans between each other.  In the case of repos, the current version of the industry standard PSA/ISMA in force from time to time was to apply.  In relation to stock loans the current version of the industry standard Overseas Securities Loan Agreement ("OSLA") was to apply.

116.   Clause 1 then continued:

> "Where a Party is holding securities (the "Holding Party") on behalf of the other Party (the "Owning Party"), the Holding Party may, in its discretion and by notice to the Owning Party buy or borrow the Securities, in which case the Owning Party shall pass full legal and beneficial ownership in the securities to the Holding Party against receipt by the Owning Party of purchase monies (in the case of repurchase or sell/buy-back transactions) or collateral (in the case of stock loan transactions).  Both Holding Party and Owning Party agree that the Owning Party shall be obligated to repurchase or accept return of the Equivalent Securities, at a price to be agreed by the Holding Party and the Owning Party…."

117.    Clause 1 concluded with notice provisions whereby either side could call back or put back the equivalent securities at any time, and conferred on the Holding Party the right to sell the securities upon default by the Owning Party in repurchasing or accepting return.

118.    Clause 2(a) enabled transactions to be entered into orally or in writing at the initiation of either party, and then provided for evidence of transactions in the form of Confirmations, a process which research post-collapse suggests was routinely ignored, reliance being placed instead on deal and trade tickets together with book entries, all in the ITS system.  Clause 2 concluded as follows:

> "In the event of a default in relation to more than one transaction a net aggregate sum of the amounts owed by one party to the other under this agreement shall become due and payable."

119.    Clause 3 made provision for daily marking to market of both securities and collateral, with consequential margin obligations.  Since, under Automatic Rascals, the daily repos were each transacted at the marked to market price of the underlying security on that day, margining was unnecessary.  Margining was necessary in relation to Manual Rascals.

120.    Clause 4 provided that, wherever a security generated intermediate income (by coupon or dividend or otherwise) while the subject of a repo or stock loan, that income would be paid or credited by the Holding Party to the Owning Party.

121.    Clause 5, headed Netting, provided as follows:

> "All parties hereto agree on an ongoing basis that all obligations of the Owning Party to Holding Party and vice versa shall be calculated on a net aggregate basis.  It is agreed that all securities and cash owed by Holding Party to Owning Party shall be set off against the obligations of Owning Party to Holding Party.   For the purposes of calculating the net aggregate exposure pursuant to this section the value of any securities purchased, lent or provided as collateral shall be the value determined by the Lehman Brothers ITS system.  The claims of the Owning Party to the Securities is to be set off against the claim of the Holding Party to the payment of money for the Securities."

122.    Clause 8 provided for the agreement to remain in force until terminated by seven days written notice from either side.

123.    The incorporation by reference in clause 1 of the ICRA of the industry standard repo and stock loan forms of agreement (namely the PSA/ISMA and OSLA) meant that, in relation to the detailed terms of any particular repo or stock loan, the master agreement was automatically updated in line with changes in the industry standard. Nothing turns on those standard terms.

124.   LBIE and LBF made an Agency Agreement on 29th November 1996.  It was replaced by a Brokerage Agreement dated 27th March 1998, which was in turn amended by a Supplement dated 23rd October 2000.  The importance of these agreements is not their operative terms, which simply regulated the remuneration payable by LBF to LBIE for services therein specified, but rather in their recitals.  Recitals (c) and (d) to the Agency Agreement were as follows:

> "(c)     The Company, as agent for LBF, negotiates the terms of individually tailored derivative product transactions entered into by LBF and in connection therewith markets and sells such derivative products, as well as executes for LBF transactions intended to hedge related balance sheet exposures.
>
> (d)     The Parties intend to organise their financial relationship relating to the Company's agency activities for LBF's derivatives business."

Recitals (c) and (d) to the Brokerage Agreement which (by clause 7) superseded the Agency Agreement were as follows:

> "(c)     The Company is responsible for designing, marketing and selling derivative products as agent for LBF, as well as for hedging related balance sheet exposures.
>
> (d)     The Parties intend to organise their financial relationship and in particular the compensation of the Company's activities such as described above."

125.   Clause 1 of the Brokerage Agreement (which was governed by Swiss law) provided for brokerage commission at a stated rate to be payable "for each transaction entered into by the Company (*i.e. LBIE*) as agent for LBF".  The Supplement merely altered the rate of remuneration, so as to bring it into conformity with the OECD Transfer Pricing Guidelines for Multi-Nationals and Tax Administrations.

126.   Mr Moss placed reliance on the Agency and Brokerage agreements as determinative of the relationship between LBIE and LBF in connection with LBIE's settlement of securities for LBF's account.  Mr Antony Rush, a Managing Director and head of the LBIE Administration Tax Team, gave evidence that these agreements (in particular the Brokerage Agreement and its Supplement) were an unreliable guide to the legal nature (as broker, agent or otherwise) of LBIE's securities settlement service for LBF's account, being concerned merely to ensure conformity in terms of inter-company remuneration with the transfer pricing guidelines in force from time to time.  He nonetheless confirmed that brokerage was routinely paid by LBF to LBIE in relation to LBIE's purchases of securities from the street for LBF's account, at least until 2001, in answer to a question from the court during cross-examination.  He declined Mr Moss's invitation to treat his evidence in chief, that those agreements "were not intended to define the nature of the legal relationship between LBIE and LBF or the capacity in which LBIE was acting described therein" as meaning that those agreements were shams.

127.  In my judgment the fact that brokerage under these agreements was in fact paid by LBF to LBIE in connection with LBIE's settlement of securities for LBF's account demonstrates that both parties assumed when those agreements were made that LBIE provided those services to LBF as an agent or broker.

128.  Considerable reliance was placed by Mr Moss on the terms of a Master Custody Agreement made between LBIE and LBF on 22nd August 2003.  It is in standard Lehman Group form, and evidently designed, at least primarily, for use between a Lehman company and an external client, for the purpose of regulating the terms upon which the Lehman company was to hold securities, precious metals or other forms of property as custodian for the client in custody accounts.

129.  The MCA described LBIE as the Custodian and LBF as the Client.  Its terms are, *prima facie*, wholly incompatible with the global settlement practice, pursuant to which, far from keeping LBF's securities in a separate custody account, subject only to pooling with the securities of other clients, as required by the MCA, the settled practice was for all securities held for the account of an affiliate to be aggregated with LBIE's own securities in a house depot account, and used for financing purposes by LBIE for its own account.

130.  It seemed to me, initially, that the reconciliation of this incompatibility might lie in the fact that, without depots of its own, LBF might need from time to time to arrange for LBIE to hold LBF's own clients' securities on a custodial basis.  Mr Moss submitted, in opening, that this could not be so, since LBF had no external clients.  It emerged in evidence however that external counterparties in derivatives transactions with LBF would commonly lodge non-monetary collateral or margin with LBF in the form of securities which, lacking its own depots, LBF did indeed then arrange for LBIE to hold.  The evidence was ambivalent as to whether in those circumstances LBIE invariably ensured that such securities were held in custody accounts, but it seems to me probable that it was in connection with the holding of such securities, deposited by LBF's counterparties as collateral or margin, that it was considered appropriate for LBIE to enter into an MCA with LBF.  The MCA had in my judgment nothing whatsoever to do with securities acquired by LBIE for LBF's account in connection with LBF's hedging strategies.

131.  I must finally describe the Inter-Company Funding Agreement ("ICFA") made between LBF, LBIE and LBHI on 5th June 2000.  Its recitals were as follows:

> "WHEREAS LBF is a Swiss Limited company trading in equity and other derivatives and investing in securities to hedge exposures arising from derivative transactions.
>
> WHEREAS LBIE is a member of the Securities and Futures Authority and is authorized to carry on investment business in the United Kingdom under the Financial Services Act 1986.
>
> WHEREAS LBIE acts as settlement agent for LBF in certain of the derivatives and securities transactions noted above.
>
> WHEREAS LBHI can provide treasury services to any Lehman Brothers group company."

132.   Under the heading Funding and Settlement, clause 1 was as follows:

> "1.      Funding and Settlement
>
> LBIE agrees to settle such securities transactions as LBF
> requests it to: and LBHI agrees to provide funding to LBF to
> permit LBF to provide funds to LBIE to effect settlement
> transactions on behalf of LBF.  LBIE will hold funds provided
> by LBF on deposit for LBF as requested by LBF from time to
> time.
>
> For the avoidance of doubt, any loans under this agreement are
> provided directly from LBHI to LBF and at no time will LBIE
> be regarded as lending to LBF."

The agreement was by clause 6 to remain in full force until terminated by any party
giving written notice to the others.  No such notice of termination appears ever to
have been given.  Nor does it appear thereafter to have been amended in writing as
prescribed by clause 7.

133.   The ICFA formed the bedrock of LBF's case as to the ineffectiveness of the Rascals
processes for the purposes of transferring beneficial ownership in the underlying
securities.  As will appear, similar cases were advanced both by LBSF and, in a more
complicated form, by LBCCA/LBAH.  I will defer addressing the issues as to the
interpretation and implementation of the IFCA to a later stage in this judgment.
Regardless of the effect of clause 1, its recitals plainly identify LBIE as settlement
agent for LBF in at least some of LBF's security investments for hedging purposes.
To that extent it is supportive of Mr Moss's submissions based upon the Agency and
Brokerage agreements.

## LBCCA/LBAH

134.   The relationship of these respondents with LBIE gives rise to the most complicated
contractual analysis.  It will be recalled that LBCCA was a Hong Kong securities
trader which used LBIE for the settlement of European securities.  LBAH was, so far
as is relevant for present purposes, a funding company, interposed in the funding
arrangements between LBHI and Group entities in the Asia/Pacific region including
LBCCA.

135.   The Rascals project was intended to be implemented in relation to securities acquired
by LBIE for the account of LBCCA by the combined effect of two agreements, both
made on 28th November 1997, entitled respectively the Multi-Party Repurchase
Agreement ("MPRA") and the Inter-Company Novation and Netting Agreement ("the
NNA").  On its face, the NNA appears to have had a substantially wider purpose and
effect than merely the implementation of Rascals, and it is convenient to describe it
first.

136.   The NNA was made between LBAH, LBIE and seven other Lehman entities in the
Far East, one of which was LBCCA.  Its recitals are as follows:

> "WHEREAS:

(1)    each of the Parties is an Affiliate of Lehman Brothers Holdings Inc; and

(2)    the Parties wish to enter into this Agreement in order to achieve the netting of all payment and delivery obligations under certain inter-group company payables, receivables and deliverables so as to reduce inter-company exposures; and

(3)    the Parties have agreed that rights and obligations under certain inter-company cash payables, receivables and deliverables will be transferred to and assumed by LBAH and netting arrangements are to be put in place on the terms set out below;"

137.    Clause 1 contained a number of definitions including the following:

"Balance Ledger" means the ledger of certain balances and debts owing between two Parties and prepared and maintained by LBAH for the purposes, inter alia, of this Agreement;

"Inter-Company Balance" means (subject always to clause 4 (Cessation)) a balance, debt or deliverable owed between two Parties and as, or to be, recorded or shown in the Balance Ledger from time to time, but not including, (i) Excluded Balances; (ii) Novated Balances; and (iii) Unnovated Balances (unless otherwise agreed between the Parties to the relevant balance and LBAH);

"Excluded Balance" means a balance debt or deliverable as recorded or shown from time to time in the Balance Ledger of a type as set out in, and between those parties referred to, in Schedule 1 hereto;

"Novated Balance" bears the meaning set out in Clause 6;

"Unnovated Balance" means (subject always to Clause 4 (Cessation)) a balance or deliverable owed between LBAH and a Party and as recorded or shown in the Balance Ledger from time to time, but not including (i) excluded balances; and (ii) novated balances, unless otherwise agreed between LBAH and such Party.

"Balances" means Inter-Company Balances, Novated Balances and Unnovated Balances;"

138.    Clause 3 made provision for additional parties to be added to the agreement.  With effect from 5th June 2000 LBHI (or, literally, its London branch) was added as a party. Clause 4 made provision for cessation of the arrangements contemplated by the NNA in relation to particular balances, by the issue of a Cessation Notice by LBAH, but the evidence does not suggest that any Cessation Notices have ever been served.

139. For present purposes the important provisions of the NNA are to be found in clauses 6 and 7, headed respectively Novation and Netting.  Clause 6 is worth quoting in full:

> "6.1     Novation Time
>
> An Inter-Company Balance shall be deemed to be novated in accordance with Clause 6.2 as of the time immediately after that Inter-Company Balance becomes due and payable, notwithstanding that it may not be shown or recorded in the Balance Ledger at that time.
>
> 6.2     Novation
>
>> (a)    Upon the occurrence of an Inter-Company Balance arising between the Parties hereto the relevant Inter-Company Balances shall be novated, whereby the outstanding rights and obligations under such Inter-Company Balances shall be cancelled and terminated and there shall be deemed to arise two separate debts:
>>
>>> (i)    one of them subsisting between (x) the creditor Party ("the Creditor Party"); and (y) LBAH in lieu of the debtor Party ("the Debtor Party");
>>>
>>> and
>>>
>>> (ii)   the other of them subsisting between (x) the Debtor Party; and (y) LBAH in lieu of the Creditor Party;
>>
>> Each of these two separate debts (each a "Novated Balance") being on the same terms mutatis mutandis as the relevant Inter-Company Balance.
>>
>> The obligations and rights of the Parties to the Novated Balances shall entirely supersede and replace the obligations and rights of the parties to the relevant Inter-Company Balance."

140. Clause 7.1, headed Settlement Netting provides as follows:

> "7.1     If, with respect to two Parties on any Business Day more than one payment is payable or more than one security is deliverable under two or more Balances owed between such Parties then the amounts of such payments or deliverables shall be aggregated and only the difference between the aggregate amounts shall be payable or deliverable, by the Party owing the larger sum or amount deliverable to the other Party, and, if the aggregate amounts are equal, no payment of the relevant amounts or delivery of the relevant securities shall be made."

141.   Clause 7.2 makes similar provision under the heading Novation Netting, in relation to Novated Balances (as explained in clause 6.2), as is made in relation to Balances prior to novation in clause 7.1.

142.   Clause 7.3(a) brings the operation of settlement and novation netting to an end upon the happening of an Early Termination Date (which is triggered, *inter alia*, by an insolvency event affecting a party), and it is replaced by close-out netting under clause 7.4.  Clause 7.3(b) provides that settlement and novation netting should apply notwithstanding that LBAH and/or any Party may fail to record the new obligations referred to in those clauses in its books or records.

143.   Clause 8 obliges all parties to any Inter-Company Balance to enter into Novated Balances in accordance with the terms of the agreement.  By clause 15, the agreement is governed by Hong Kong law.

144.   The provisions as to novation and netting in the NNA are reasonably comprehensible in the context of Balances consisting of inter-company debts.  Thus for example a debt owed by LBCCA to LBIE in connection with LBIE's cash settlement of a security acquired for LBCCA's account would, from the moment it became due and payable (see clause 6.2) be replaced by equivalent debts owed by LBCCA to LBAH and by LBAH to LBIE, subject to any settlement netting applicable to that debt prior to novation because of any debt due at the same time by LBIE to LBCCA.  Equally, the novated balance due from LBAH to LBIE would itself be subject to novation netting by reference to any other novated balances owed either way, as between LBIE and LBAH.

145.   By contract, the effect of the NNA in relation to balances consisting of what are described (without any further definition) as "deliverables" is extraordinarily opaque.  It is tolerably clear from the phrase "more than one security is deliverable" in clause 7.1 that a deliverable is some form of obligation in relation to a security and probably, since otherwise it would simply be a debt, a non-monetary obligation.  For present purposes, the critical question is whether and if so how the provisions of the NNA as to deliverables apply to the relationship of trustee and beneficiary (rather than debtor and creditor) which the respondents allege arose between LBIE and an affiliate by reason of LBIE's settlement of the acquisition of a security for the affiliate's account.  Critically, is the effect of the NNA to substitute LBAH as LBIE's beneficiary under that trust and if so, what is the relationship then created by clause 6.2 between LBAH and LBCCA in connection with the same security?

146.   No surviving document or evidence suggests that anyone within the Group gave this conundrum any rational thought.  Nonetheless it is clear from the terms of the MPRA, made on the same date as the NNA, that the assumption of the draftsman at least was that LBAH did become LBIE's beneficiary.  This is because the MPRA, which was the primary vehicle for the application of Rascals processes to securities acquired by LBIE for LBCCA's account, was made not between LBIE and LBCCA, but between LBIE and LBAH.  Save for the slight difference in its title, it is otherwise, and for all practical purposes, in the same terms as the ICRA between LBIE and LBF, which I have already described.

147.   Another baffling aspect of the NNA concerns the effect of the addition of LBHI as a party in June 2000. Literally, it would appear to have the effect that any inter-company debts or deliverables arising even between LBIE and LBHI would be subject to novation, so as to interpose LBAH, regardless whether the debt or deliverable had anything to do with the affairs of the Group in the Far East. Plainly the inclusion of LBHI was intended to have some more limited purpose, but the nature of that purpose, or of the relevant limitations, is almost unfathomable.

148.   A Master Custody Agreement ("MCA") was also entered into between LBCCA and LBIE on 17th November 2000. For the reasons which I have already given in relation to the agreement in similar form between LBIE and LBF, I consider that it has no relevance or application to Rascalled securities. Its reasonably obvious purpose was to regulate LBIE's custody of European securities deposited with LBCCA by its clients, for which LBCCA had no suitable depot of its own.

## LBI

149.   The relevant contractual structure as between LBIE and LBI consisted of four agreements, the first of which in time was an Undisclosed Clearing Custody and Brokerage Services Agreement ("UCCBSA") dated 15th November 1996, which replaced an earlier agreement of the same type dated 13th July 1994. Both agreements contained the following provisions:

>    "Relationship of LBIE and LBI. It is understood and agreed that LBIE is acting as a clearing broker for LBI, and not for any customer of LBI or for any other person, in respect of transactions performed hereunder…" (Clause 3.2)

>    "Except as otherwise provided in this Agreement, LBIE shall be responsible for the safekeeping as custodian for LBI of all money and securities received by it pursuant to this Agreement." (Clause 8.1)

>    "In the event that LBIE effects a short sale in a given security, and it is holding in custody for any customer of LBI a long position in the same security, LBIE shall ensure that such long position shall remain segregated for the benefit of such customer and shall not be offset against LBIE's short position" (Clause 8.5 (1994 version) Clause 8.8 (1996 version))

150.   Apart from the specific provision about long positions of LBI's customers, neither agreement contained any general requirement for LBIE to segregate LBI's securities and money while held in safekeeping as custodian.

151.   There is a sharp dispute as to the interpretation of the UCCBSA, backed up by competing expert evidence as to the applicable principles of New York law, to which I shall have briefly to return. For present purposes it is sufficient for me to note that the agreement made in 1996 (at about the time of the conclusion of the Rascals project) contained the following three provisions which were absent from the July 1994 agreement:

"8.4     LBIE may use its own funds to settle any non custody customer and proprietary transaction on behalf of LBI. To the extent that LBIE does so then LBIE shall be deemed to have stepped in as principal at point of settlement and, until such time as LBI shall pay LBIE, LBIE shall have the unfettered right to use the securities it has paid for as it sees fit. LBIE shall maintain a separate account of these transactions ('the related loan account').

8.5     The securities held by LBIE relating to transactions arising under paragraph 8.4 above shall be marked to market at close of business each day and the difference between their total value and the balance on the related loan account shall be settled on demand and the balance on the related loan account adjusted to the extent such settlement occurs.

8.6     In the event of a default by LBI then LBIE shall have the right to realise all securities it holds relating to the transactions arising under paragraph 8.4 and to apply the proceeds to reduce or extinguish the balance on the related loan account. In such event only the net remaining balance on the related loan account shall be accountable between the parties."

152.   LBIE and LBI made a Global Master Repurchase Agreement on 1st November 1996, replacing an earlier agreement of the same type dated 14th February 1996. Since it does not appear that any surviving security held in LBIE's depots for LBI was the subject of a repo, I need say no more about it.

153.   LBIE and LBI also made an Overseas Securities Lender Agreement ("OSLA") on 27th February 1997. There is no issue as to its interpretation or effect. It regulated stock lending between the two companies on terms which (*inter alia*) made the obtaining of beneficial title to equivalent securities by the stock lender at the end of a stock loan conditional on repayment of the collateral.

154.   It is likely that there existed a Master Custody Agreement between LBIE and LBI since, although it cannot be found, there are references to it in schedules dated respectively 20th June 2000 and 9th January 2002 from which its existence, probably on standard Group MCA terms, can readily be inferred. Again, I consider it to have no more relevance to the issues arising from Rascals than any of the MCAs to which I have already referred.

## **LBSF**

155.   There existed a suite of agreements between LBIE and LBSF broadly similar to those which I have already described as between LBIE and LBF. They included a Multi Party Repurchase Agreement ("MPRA") dated 15th November 1996 to which LBIE and LBSF were two of the five parties. Its terms differed in no significant respect from the ICRA between LBIE and LBF. There was also an MCA, although (as with LBI) a copy has not survived. I infer that it was on the same terms as those which I have already described, and equally irrelevant for the same reasons as concern LBF.

156. LBSF, LBIE and LBHI made an inter-company funding agreement ("ICFA") on 2nd February 2001.  Again, it is in identical terms to that made between LBIE and LBF. Nonetheless, Mr Jones QC for LBSF placed reliance for the purposes of interpreting the ICFA between LBIE and LBSF upon two earlier funding agreements, the first of which was a Non-Discretionary Agency Agreement made between LBSF, LBIE and Lehman Brothers Holdings plc ("LBH plc") in January 1994.  While broadly in the same terms as the 2001 ICFA it contained the following additional material.  First, there was an additional final recital in the following terms:

> "WHEREAS plc wishes LBIE to act as its agent in making advances to LBSF in regard to those same securities transactions."

In clause 1 the second sentence reads as follows:

> "Notwithstanding that the accounting records of the parties to this agreement may show PLC lending to LBIE which then lends to LBSF IT IS HEREBY AGREED that any loans under this agreement are provided directly from plc to LBSF and that at no time will LBIE be regarded as lending to LBSF."

157. The second predecessor to the 2001 ICFA was dated 5th June 2000 and also entitled a Non-Discretionary Agency Agreement.  By contrast with the 2001 ICFA it contained the same additional recital as I have quoted from the 1994 agreement, but its clause 1 was in the same terms as the 2001 agreement.

158. Finally, LBIE and LBSF entered into a pair of successive Discretionary Agency Agreements dated respectively 27th March 1995 and 16th August 2002.  It took from 1995 until October 2000 before LBSF got round to signing the earlier agreement. It is sufficient to quote briefly from the second of those agreements. It included the following recitals:

> "WHEREAS LBSF enters into transactions in interest rate swaps, currency swaps, interest rate caps, equity swaps, equity options, equity securities and other related transactions intended to hedge interest rate, equity and currency risk and providing capital markets advice and services (the "Transactions").
>
> WHEREAS LSBF wishes LBIE to use its best efforts to find customers willing to enter into with, and effect Transactions through LBSF as agreed from time to time. "

Clause 1 headed Services was as follows:

> "Subject to the terms and conditions of this Agreement, LBIE agrees to act as an introducing agent to LBSF for the purposes of the Transactions.  All documentation relating to the Transactions will be arranged by LBIE as introducing agent for and on behalf of LBSF, subject to LBSF's confirmation."

By clause 6 the agreement was stated to remain in full force and effect until terminated by seven days written notice.  There is no evidence that it was terminated before the collapse. Conversely there is no evidence that any payments were ever made under it to LBIE.  Payments were made to LBIE under the earlier agreement until about 2001, after which they were made by LBSF to LBEL pursuant to a similar form of agreement between those parties.

## IMPLEMENTATION – THE BOOK ENTRIES

159.  This is, potentially at least, an enormous subject, and the interpretation of the book entries lies at or close to the heart of a number of the issues which I have to decide. Nonetheless, at least by the end of the hearing, the scope of factual dispute about the entries themselves, as opposed to their interpretation, had become very limited, albeit that serious limitations on the extent of the respondents' access to the Group's electronic book-keeping systems after the collapse means that there are areas of incomplete research where it is necessary to draw inferences based on probabilities, and some areas where the available material precludes any safe conclusions at all.

160.  The account which follows is therefore very much a brief summary of an enormous mass of primary material.  In describing what the book entries show I have avoided as far as possible the use of the words debit and credit because of the differences in the ways in which those words are used, both as between lawyers and accountants, and by different accounting conventions.  Generally, where I describe the book entries as showing payables and receivables between Group entities, it may be assumed that the books of both the creditor and the debtor show substantially the same position.  This is because, for present purposes, most of the relevant entries in the books and records of the relevant entities within the Group are derived, directly or indirectly, from the ITS system in common use by all of them, and their consequences passed automatically to the individual entities' separate books via DBS.

161.  Although many of the book entries generated by the Rascals processes take a common form as between LBIE and each of the respondent affiliates, there are nonetheless important differences which make it impossible to provide a general description applicable to all of them.  I shall therefore begin with describing the book entries reflecting the implementation of Rascals as between LBIE and LBF.  Thereafter I shall focus in relation to the other respondents upon the departures from the LBIE/LBF model thus described.

## LBF

## Acquisition From The Street

## The Trade Date

162.  Whenever LBIE acquired a security from the street for the account of LBF, two trade tickets were generated by ITS on the trade date (that is, in legal parlance, the date of the contract).  The first was a trade ticket recording the essential terms of LBIE's contract with the street counterparty (invariably described in the ticket as the "client").  The second ticket recorded a back to back sale of the same amount of the same security by LBIE to LBF with the same settlement date and the same price.

Each ticket would then lead to the automatic generation by ITS of consequential entries in LBIE's and LBF's books.

163. First, LBIE's stock inventory account would, as a result of the first ticket, momentarily show a long position by reference to that type of security and, until the settlement date, a debt due to the street counterparty for the purchase. The second ticket would generate a long position in LBF's stock inventory account with a corresponding unsecured debt due (but not yet payable) to LBIE in its pending transactions inter-company account, for the same amount.

**The Settlement Date**

164. Completion of the purchase of the securities by LBIE from the street almost invariably required LBIE to pay cash to the street counterparty, and this was recorded in LBIE's books, which from then on showed LBIE as the holder of the relevant rights to the security as against its depository. By contrast, the LBIE and LBF accounting records showed LBF as owing LBIE an unsecured debt for the acquisition price as both due and payable, reflected in the transfer of that debt from the pending transactions inter-company account to the unsecured inter-company account. LBF continued to be recorded in its stock inventory as having a long position in respect of that type of security, as it had been since the trade date. LBIE's stock records showed that its long position in that security as against its depository was allocated to its inter-company account with LBF.

**Rascals Processing**

165. As might be expected from the nature of LBF's equity-based derivatives business, most of LBIE's security acquisitions for its account related to equities, with the consequence that most of the Rascals transactions between LBIE and LBF were of the manual type. It is nonetheless convenient to deal with the processing of Automatic Rascals transactions first.

**Automatic Rascals**

166. The ITS system was programmed automatically to recognise securities eligible for Automatic Rascals processing. It is unnecessary to describe the eligibility criteria (save to note that it excluded, among others, securities issued by a Lehman Group company and securities which were so illiquid as to be generally unsuitable for stock lending to the street). The computer programme identified securities of a particular type as eligible or ineligible by what the evidence describes as a "tag" which could be manually switched between those two classes.

167. A security tagged as eligible for Automatic Rascals was thus identified automatically by the ITS system which, on the settlement date for the acquisition of the security from the street, generated both a deal ticket setting out the essential terms of the one day repo, and separate trade tickets for each of the on and off legs of that repo. The deal ticket and both trade tickets were generated on the settlement date, i.e. day one of the first repo.

168. Both tickets caused automatic accounting entries to be made in ITS. The on-leg was reflected in an unsecured debt owed to the affiliate by LBIE, in the amount of the

marked to market value of the security that day. This was booked to the same unsecured inter-company account as showed LBF's debt to LBIE for the acquisition price from the street. The off-leg generated a secured debt owed by the affiliate to LBIE (payable the following day) as the repurchase price, into which was built the one day interest charge payable by the affiliate.

169.   Thus, at midnight on the settlement date (the end of day one of the first repo) the combined effect of the acquisition of the security from the street for LBF's account and the making of the first repo may, in terms of accounting entries, be summarised as follows. First, LBF continued to record the security acquired as a long position in its inventory account. Secondly, the unsecured inter-company account between LBIE and LBF would show largely off-setting debts each way, owed to LBIE for the acquisition price and to LBF for the repo on-leg price. If the security was marked to market at its original trade price, the debts would precisely off-set. If not, there would be an amount owing unsecured, to LBIE if the security had declined in value, and to LBF if it had increased in value. Finally, the secured inter-company account between LBIE and LBF would show a debt to LBIE in respect of the off-leg repurchase price, payable on day two.

170.   On the day after the settlement date for the acquisition from the street (day two of the first repo) accounting entries were made to reflect the settlement of the off-leg of the first repo, the settlement of the on-leg of the second repo, together with the secured liability of LBF to pay LBIE for the settlement (on the following day) of the off-leg of the second repo. Any change in the marked to market value of the security would be reflected in the prices payable and repayable under the second repo and, again, the off-leg purchase price would have added to it a one day interest or financing charge payable by LBF.

171.   Thus, LBF's obligation to pay for the settlement of the off-leg of the first repo was transferred from secured to unsecured inter-company account, where it would be largely offset by LBIE's obligation to pay for the on-leg of the second repo, differences in marked to market values being reflected in a corresponding change in the unsecured inter-company balance between LBIE and LBF. LBF's secured liability to pay for the off-leg of the second repo would be recorded in the secured inter-company account. Viewed as at midnight at the end of the second day, LBF's secured liability to LBIE (in respect of the off-leg of the second repo) would therefore have changed from the amount shown as a secured liability at the end of day one, in line with any change in the marked to market value of the security.

172.   Accounting entries reflecting daily repos of the type which I have described continued to be made throughout the period between the acquisition of the security from the street and its ultimate re-sale to the street. It is unnecessary to describe them in any detail. Their overall effect was to show LBIE as the secured creditor of LBF, albeit in constantly changing amounts, in respect of the continuous succession of off legs.

173.   On the trade date for the re-sale to the street, a short position would be recorded in LBF's inventory account, off-setting the original long position recorded on the trade for the acquisition. Daily repos would continue between the trade date and the settlement date for the re-sale to the street. No new repo would be entered into between LBIE and LBF on the settlement date. Thus, on that day, LBF's secured liability to pay for the last off-leg would be transferred to unsecured inter-company

account and largely off-set by LBIE's obligation to account for the proceeds of sale received from the street counterparty, subject to movements in the marked to market value of the security between trade date and settlement date.

174.   Mrs Greenway's evidence (as the principal interpreter of the accounting entries) was that each off-leg appeared to settle prior to the succeeding on-leg, and that the final off-leg settled prior to LBIE's settlement of the re-sale to the street, so that there were, at least in theory, moments on every day when LBF's secured liability to pay the off-leg purchase price was recorded as replaced by an unsecured liability in the same amount, before being largely off-set by LBIE's unsecured obligation to pay for the next on-leg, or, on the final day, to account for the proceeds of the re-sale to the street.

175.   Furthermore, some of the evidence about the ITS accounting entries, in particular an example given by Mr Stacey of a particular Automatic Rascals process which occurred at the time of the collapse (Friday 12th September – Monday 15th September 2008) suggests that some hours may have elapsed between the making of the accounting entries for the settlement of the off-leg and the making of the entries recording the settlement of the following on-leg. Much debate has been focused on whether these apparent intra-day time lags are of any greater legal significance than is, these days, usually attributed to a *scintilla temporis* or, in modern parlance, a nanosecond.

### Manual Rascals

176.   The open-ended nature of the stock loans used for the purposes of Manual Rascals makes it much easier to describe their accounting treatment. Technically, the full description would be more complicated because the entries involve both the Global 1 and ITS systems, but their interpretation is uncontentious.

177.   The accounting entries reflecting the acquisition by LBIE from the street of a security which is then Manually Rascalled are the same as those for a security subjected to Automatic Rascals. Thus, on the settlement date of that acquisition, LBF is shown as owing the acquisition price to LBIE on unsecured inter-company account.

178.   The first point of difference between Automatic and Manual Rascals is however that the evidence does not permit any conclusion safely to be drawn as to whether Manual Rascals was generally, or even usually, applied on the settlement date of the acquisition of the security, or upon some later date. After increasingly inconclusive debate, the parties eventually accepted that, if that timing issue mattered in terms of beneficial ownership now, I should express my conclusions on the alternative assumptions that Manual Rascals was, or was not, applied on the settlement date for the acquisition.

179.   The result of that is that at the end of the day of the settlement with the street, in relation to a security which had yet to be Manually Rascalled, the book entries will show merely an unsecured debt due and payable by LBF to LBIE for the whole of the acquisition price.

180.   The stock loan invariably used for Manual Rascals processing involved first, the creation of a trade ticket which, by contrast with the repo deal tickets and on-leg trade

tickets, makes no reference to the consideration for the stock loan. Nor is there generated on day one of the stock loan any trade ticket for the off-leg.

181. The financial accounting entries arising from the stock loans were dealt with on an aggregate basis for the relevant day, rather than on an individual basis, as with repos. Nonetheless, their effect, in relation to an individual stock loan, is to treat the monetary collateral invariably to be provided by LBF as an offset against LBF's debt to LBIE for the acquisition price, on the unsecured inter-company account, and to treat LBF's future liability to repay collateral to LBIE as, in effect, a secured loan of the same amount by LBIE to LBF, in substantially the same way as the entries recording a repo.

182. The open-ended stock loans between LBIE and its affiliates (including LBF) included provision for margining the collateral, that is increasing or reducing it in accordance with rises or falls in the value of the underlying security. The amounts required to be paid by way of margin adjustment each way were reflected in the unsecured inter-company account between LBIE and LBF, and the consequential increase or decrease in the monetary collateral reflected in adjustments of the amount by which, in the secured inter-company account, LBIE was shown to be a secured creditor of LBF.

183. Finally, on the settlement date for the re-sale of the security to the street, the off-leg of the stock loan is reflected in a trade ticket, together with accounting entries which show off-setting entries in unsecured inter-company accounts between, on the one hand, LBF's liability to repay the collateral to LBIE, and LBIE's liability to account for the proceeds of the sale to the street. In that respect, the entries broadly correspond with the off-leg of the final repo in a series of Automatic Rascals transactions. Some stock loans were closed earlier than upon the resale of the security to the street, for example when an underlying loan of that security to the street ended, or if an intended loan to the street did not proceed. It is unnecessary to describe the accounting entries made in that event.

**Month End Netting, Novation And Pay Down**

184. LBF had no bank account of its own, and was therefore unable directly to settle unsecured inter-company balances with LBIE by cash payment. Unsecured balances were, instead, dealt with as follows. At the end of each month, temporary journal entries were made reflecting a netting, as between LBIE and LBF, of all unsecured inter-company balances, and the novation of the resulting net balance to LBHI. By that I mean that LBHI was interposed between LBF and LBIE, so that any net debt on the unsecured inter-company account owed by LBF to LBIE was replaced by a debt from LBF to LBHI, and a debt from LBHI to LBIE. If the net balance was owed the other way, LBIE would owe LBHI, and LBHI would owe LBF. Similar arrangements existed as between LBIE and certain other affiliates, including LBSF, LBCCA and LBAH, but not LBI.

185. Pay down of the net inter-company balance thus created, for example between LBIE and LBHI, was subject to the obtaining of various Group internal approvals, and did not occur every month. For months where there was no pay down, the temporary month end journal entries to which I have referred were then reversed at the beginning of the next month. For months where there was pay down, the journal entries became permanent.

186.   What matters for present purposes is that the secured balances owed by LBF to LBIE at the end of the month in respect of Rascalled securities, whether there was a pending stream of one day repos or an open stock loan, were not included within the month end netting, novation and pay down processes between LBIE, LBF and LBHI.  That much is common ground.  The consequences, in terms of an understanding of how the Rascals processes worked (if they did) and were paid for (if they were) has nonetheless been a matter for protracted argument.

**LBSF**

187.   It is convenient to take the reflection in the accounting entries of the implementation of Rascals between LBIE and LBSF out of turn, mainly because, subject to one significant exception, the accounting treatment was in all respects the same as between LBIE and LBF.  The only significant difference relates to the manner in which LBIE's purchases of securities from the street for LBSF were recorded in terms of trade tickets.

188.   I have already described above how, as between LBIE and LBF, two trade tickets were generated on the trade date of any securities acquisition from the street for LBF's book.  In the case of LBSF, and for reasons which remain largely a matter of conjecture, such acquisitions from the street were recorded sometimes by two trade tickets and sometimes by a single trade ticket.  Furthermore, acquisitions from other affiliates were on occasion recorded by three trade tickets, but they can be ignored for present purposes.

189.   Cases where acquisitions led to the generation of two trade tickets were dealt with in all relevant respects in the same way as between LBIE and LBF.  Single trade tickets consisted of the electronic record of a direct trade (i.e. contract) between LBSF and the street counterparty.  The only reference in the ticket to LBIE was the identification of a LBIE account number for settlement of the trade.  All the other accounting entries generated both by the trade and its settlement were the same as between LBIE and LBF, save only that, in relation to single ticket trades, no entry was made in LBIE's stock inventory.

190.   The natural inference from the use of a single ticket is that LBSF rather than LBIE was in fact the contracting Lehman party with the street counterparty.  By the end of the hearing that had become, more or less, common ground.  In any event, I find that to be the probable explanation.  What remains entirely unclear is why, on any particular occasion, LBSF rather than LBIE contracted with the street.  It may have been merely a consequence of the rules of the particular exchange or clearing house on or across which the relevant securities had to be traded or settled.  For present purposes the reason does not matter and, to the extent that the use of one or two tickets to record a relevant trade has any consequence upon beneficial ownership now, I am invited to deal with them alternatively.  As will appear, I have concluded that it makes no difference.

191.   Another consequence of LBSF's fixed income derivatives business is that most of the Rascals processing applied to security dealings by LBIE for its book were Automatic rather than Manual, the opposite being the case for LBF.  In the end, nothing turns on that difference either.

**LBCCA/LBAH**

**Acquisition From The Street**

192.   Subject to one difference, the recording in the Group's records of LBIE's acquisition of securities from the street for the book of LBCCA was in all respects the same as for LBF and LBSF.  The only difference, of no import for present purposes, is that (so far as research has revealed to date) they were all single ticket transactions, the implication being that LBCCA itself contracted with the street counterparty in every case.

**Rascals Processing**

193.   It is at this stage that the recording of transactions relating to securities acquired by LBIE for LBCCA's book diverges from the pattern so far described, and in a manner which has given rise to serious complexity and difficulty, as a matter of interpretation, albeit only one dispute as to primary fact.  There is also a baffling difference between the manner in which Automatic and Manual Rascalling of such acquisitions was dealt with, for which it is impossible to find any rational explanation.

**Automatic Rascals**

194.   It will be recalled that there existed, from November 1997, a NNA between LBIE, LBCCA, LBAH and a number of other Far Eastern Group companies, to which LBHI was added as a party with effect from June 2000, and which was expressed to apply both to debts and to deliverables.  It is obvious that those in London and Hong Kong responsible for the implementation of Automatic Rascals in relation to securities acquired for LBCCA's trading book thought that in some way the effect of the NNA was to transfer title to the underlying securities from LBCCA to LBAH, along with the inter-company unsecured debts incurred by LBCCA in connection with LBIE's acquisition of those securities.  Thus, the whole of the Automatic Rascalling applied to those securities was conducted, so far as the Group records show, entirely between LBIE and LBAH, to the complete exclusion of LBCCA.  Nonetheless, the LBCCA inventory records continue to show it rather than LBAH as having a long position in the underlying securities, and both LBCCA's and LBIE's records continue to show LBCCA as owing an unsecured debt to LBIE for the whole of the purchase price, at least from each settlement date until the end of the month in which it occurred.  This is, if for no other reason, because the entries which in the case of LBF record LBIE's on-leg obligations as offsetting the affiliate's original acquisition debt simply never arrive in the inter-company unsecured account between LBIE and LBCCA, being recorded instead in the unsecured inter-company account between LBIE and LBAH.

195.   Nothing in any of the Group's records, (leaving aside the NNA itself) shows how, if at all, LBAH was clothed with sufficient title to the underlying securities to be able to repo them up to LBIE.  Furthermore, as between LBIE and LBAH, LBIE's obligation to pay the on-leg purchase price arrives in the inter-company account between those two companies with nothing already owed the other way available for offset.  LBIE is nonetheless shown as LBAH's secured creditor in respect of the repurchase price for the off-leg.

196.   The matter becomes even more opaque (in terms of interpretation) at the end of the month.  At this point, all unsecured inter-company balances between LBIE, LBAH, LBCCA (and certain other Hong Kong entities) are novated and netted so as to give rise to a substitute single inter-company balance, not between LBAH and LBIE (as might have been supposed pursuant to the NNA) but between LBHI and LBIE.

197.   Furthermore, the effect for LBCCA of that month end process was to substitute LBHI for LBIE as LBCCA's unsecured creditor for a sum equivalent to the whole of the acquisition price for the underlying securities rather than, as between LBIE and LBF, merely for the unsecured element left behind after extracting the secured amount financed by the Rascals process.

198.   For LBIE the effect of the month end process on the unsecured inter-company account was no different from what it would have been if Automatic Rascals had been processed directly with LBCCA, or if the LBCCA acquisition price debts had been novated up to LBAH immediately, rather than straight to LBHI at the month end. This is because the offset which would then have occurred every day between the acquisition debt and the first repo on-leg purchase price debt occurred in bulk when they both arrived at LBHI at the month end, when LBAH's unsecured receivables from LBIE and LBCCA's unsecured payables to LBIE are both novated up to LBHI and netted. As Mr Milligan put it, it all comes out in the wash at the month end so far as concerns the unsecured balances, at least from LBIE's perspective.

199.   Looked at from LBCCA's viewpoint, the month end position actually recorded is not the same as would have resulted from direct participation in Automatic Rascals, or if an immediate novation of the acquisition debts had taken place with LBAH.  LBCCA was never recorded as a secured debtor of LBIE in relation to Automatic Rascals, but LBAH was.  More significantly LBCCA continued to owe LBHI the whole of the acquisition price from the street after the month end, rather than the net amounts (if any) remaining after offset between the acquisition debt and the on-leg purchase debt. Similarly LBAH remained a creditor of LBHI for the on-leg purchase debt.  The underlying securities remained reflected in long positions on LBCCA's inventory account throughout.

200.   The Administrators' case was, by the end of the hearing, that this imbalance between LBCCA and LBAH was in fact sorted out at the year end, by the belated recognition of a novation to LBAH of LBCCA's aggregate acquisition debt, thus enabling the missing offset with the on-leg purchase debt to take place after the event. There was conflicting evidence about this, between on the one hand Mrs Greenway and Mr Gibb for LBIE, and Mr Alldis for LBCCA/LBAH on the other.  Due to the production of LBCCA's 2007 accounts just before the end of the hearing, this evidence continued to arrive (with my permission) thereafter, and Mr Alldis's departure on holiday then led to a situation where a further adjournment of several weeks would have been required in order for the issue to have been subjected to full research, reply evidence and, if necessary, cross examination.  The issue whether there was such a year end adjustment, and if so as to its precise effect, was highly technical, and heavily dependent upon after-the-event interpretation of inadequate materials. I therefore directed that there should be no further procedure in relation to this issue, and that I would give judgment on the alternative bases that there had been or had not been such a year end adjustment, to the extent that it mattered.

**MANUAL RASCALS**

201. The thinking which identified LBAH rather than LBCCA as LBIE's proper counterparty for Automatic Rascals was not applied to Manual Rascals, where the stock loans were entered into directly between LBCCA and LBIE. Again, no rational explanation for this difference of treatment has emerged, or even been proffered. The accounting treatment of Manual Rascals transactions between LBIE and LBCCA was also complicated, by comparison with that which I have described as between LBIE and LBF. The complications relate to the manner in which LBIE's obligation to pay collateral to LBCCA in relation to the on-leg of the stock loan is recorded.

202. The first entry in relation to any particular stock loan consists of the recording of LBIE's collateral liability in a cash memo account, as part of the daily aggregate arising from similar transactions, not only between LBIE and LBCCA, but also between LBIE and other Hong Kong affiliates. By "similar transactions" I mean equity financing transactions relating to securities of the same type. The net aggregate balance is then posted to LBIE's account with LBHI and LBHI's account with LBAH.

203. No entry is made in LBCCA's books recording a receivable from LBIE in respect of the collateral. Nonetheless is appears that an equivalent receivable is recorded as owing to LBCCA from another Lehman Hong Kong company Lehman Brothers Asia Capital Company ("LBACC"). Mrs Greenway's evidence (unchallenged on this point) was that, by reference to complicated inter-company entries between a number of Lehman Brothers Hong Kong companies under what she described as the Global Cash and Collateral Management System ("GCCM"), it was nonetheless possible to link the LBIE obligation to pay the collateral with the receivable recorded as owing to LBCCA by LBACC, so that, taking those complicated records as a whole, it was appropriate to describe LBIE's obligation in relation to the collateral as shown as owing indirectly to LBCCA, as it were, round the houses. Nonetheless, at no time does LBIE's collateral obligation appear in the same inter-company account as LBCCA's obligation to pay the acquisition price, so that it is not obvious how they can have offset each other, at least prior to month-end novation and netting through LBHI.

204. The ITS system does nonetheless record a secured obligation of LBCCA to repay the collateral to LBIE on the off leg, in the same way as in relation to the other affiliates. This persists for as long as the stock loan remains open, and is reflected in both LBIE's and LBCCA's accounts.

**LBI**

205. By contrast with the complicated and confusing picture which I have described in relation to the Hong Kong affiliates, the accounting relationship between LBIE and LBI was straightforward. LBIE and LBI entered into no Automatic Rascals transactions at all, and there is good reason to doubt whether the stock loans by which, from time to time, LBI purported to lend its beneficial interest in particular stock to LBIE really form part of any Rascals process at all. Nonetheless, for present purposes, it is common ground that I should give directions as to the present beneficial ownership of securities which (a) were settled by LBIE into one of its

depots for LBI's account; (b) were then made the subject of a stock loan by LBI to LBIE; and (c) remain held in a LBIE depot.

206.    The accounting treatment of LBIE's acquisition of such securities from the street was no different from that applied to acquisitions for the other affiliates, which I have already described.  As between LBIE and LBI, they gave rise to single trade tickets, rather than to pairs, the implication being that LBIE merely settled trades which had been entered into directly by LBI with the street counterparty.  The starting point from an accounting perspective therefore is that the settlement of such trades created an unsecured liability of LBI to LBIE to pay the acquisition price, recorded on inter-company account.

207.    By contrast with the other affiliates, there existed between LBIE and LBI a system for regular pay down of unsecured inter-company liabilities which was operated on a frequency that varied between daily and about two or three times a week.  Thus, unless a security settled by LBIE for LBI's account was subjected to a same-day stock loan, LBI's liability to refund LBIE for the acquisition price paid to the street would simply be discharged in full by the next regular pay down.

208.    By contrast, if a stock loan intervened, either on the same day or in any event prior to the next pay down, then any net balance between LBI's liability for the purchase price and LBIE's liability for the collateral would be dealt with at the next pay down.

209.    Similarly, unsecured inter-company liabilities between LBIE and LBI arising from margin adjustments to the collateral under stock loans (as already described in relation to LBIE and LBF) would be swept into the regular pay down process in the same way.

210.    For reasons which remain unexplained, the accounting records ceased to show any entries in respect of liabilities to pay collateral in respect of some of the stock loans, as between LBIE and LBI, after the end of May 2008.

## THE GROUP'S COLLAPSE AND ITS AFTERMATH

211.    LBIE went into administration shortly before 8 a.m. on 15th September 2008.  All the respondent affiliates went into forms of insolvency process within the same week or shortly thereafter.  LBHI's insolvency process started just before that of LBIE.  On the same day the Administrators caused an instruction to be given to all LBIE's staff, to the effect that no trades or other transactions were to be entered into without the Administrators' consent.  I shall refer to it (adopting the parties' own abbreviation) as the "blanket instruction".

212.    On 16th September, under cover of an email timed just after 5 p.m., LBF notified LBIE of the termination of all inter-company agreements or arrangements between them, to the extent that they authorised LBIE to act on behalf of or as an agent for LBF, without specific approval, adding that no further transactions in cash or securities were allowed.

213.    The winding up petition in relation to LBAH was presented on 19th September 2008, thereby giving rise to an event of default under clause 10 of the GMRA between LBIE and LBAH.

214.    The Automatic Rascals process operated, as I have described, without the need of any human intervention at all.  It therefore continued, as between LBIE and the relevant respondents (i.e. LBF, LBSF and LBAH) during the whole of the week beginning 15th September 2008, continuing to generate routine book entries of the types which I have described.

215.    On 23rd September, shortly after midday (London time), and without any prior discussion with the Administrators, an employee of LBIE manually switched all the tags which governed the eligibility of securities of a particular type for Automatic Rascals processing from eligible to ineligible, with the result that the ITS system recorded all pending repos as having their off-legs settled at that date, and recorded no further repos thereafter. The effect of stopping the Automatic Rascals process in that way was that the ITS system recorded unsecured liabilities of each of the relevant affiliates arising from their obligations to pay the off-leg repurchase price in relation to each repo, with no corresponding offset constituted by a LBIE obligation to pay the on-leg purchase price of any further repo, and no continuing secured liability, the off leg having apparently settled.  One interpretation of those entries, which of course the respondents adopt, is that LBIE thereby handed back to the affiliates beneficial title to all securities subject to Automatic Rascals, leaving itself only with unsecured debts owed by its, by then, hopelessly insolvent affiliates.

216.    Consistent with one of the objectives of the Rascals process, a very large proportion of the underlying securities were out on loan by LBIE to the street at the time of the collapse.  In respect of a large proportion of those, LBIE has been unable to pay the off-leg repurchase price, or repay the collateral, necessary to get back equivalent securities from its street counterparties.  The result is a large shortfall between the securities now held by LBIE in its house depots and the amount to which the affiliates lay beneficial claim. Nonetheless the value of those which remain is extremely large. They are mixed with securities which were never Rascalled and with securities held for LBIE's own trading book.  They are subject to various other competing claims, and to the resolution of issues such as lien and the consequences of shortfall which are not for determination on this application.

## GLOBAL CLOSE

217.    The various office holders in charge of the insolvency processes of the majority of the Group's trading companies, including LBIE and the respondents, have attempted to identify their financial position at the collapse, including reconciling inter-company balances within the Group, following the collapse, by a process known as Global Close.  They chose close of business on 12th September 2008 as the accounting reference date, and used the going concern principles and policies habitually used by the Group for its regular reconciliation exercises hitherto.

218.    The relevance of Global Close to the issues arising in this application is limited.  The choice of 12th September 2008, just before the collapse, means that the effects of the switching off or other termination of the Automatic Rascals process were not captured by that exercise.  Nonetheless because of the tendency of ITS entries to be reflected upwards via DBS into the separate companies' own books, the net unsecured balances caused by the Rascals processes while up and running are generally reflected in the Global Close reconciliation.

219.   The secured balances are also captured, on the assumption that at the accounting reference point the Automatic Rascals repos were all at the stage of an on-leg: i.e. that they were not at that moment in time (if any) between the settlement of an off-leg and the settlement of the on leg for the next repo.  Similarly, all relevant stock loans under Manual Rascals were also open, thereby capturing all secured liabilities of the affiliates to repay collateral.


## ANALYSIS

### A.   DID LBIE'S ACQUISITION OF SECURITIES FOR THE ACCOUNT OF AN AFFILIATE GIVE RISE TO ANY BENEFICIAL INTEREST FOR THE AFFILIATE?

220.   This is the question which all the parties (for their separate tactical reasons) have invited me to address, as arising logically prior to the application of Rascals processing to any such securities. This application is about (and only about) Rascalled securities. My complaint during the hearing that, in relation to Rascalled securities, this seemed to me rather an unreal question, fell on deaf ears.  It is no doubt an important question in relation to securities held by LBIE for an affiliate's book at the time of the collapse which were not Rascalled. But those securities are not the subject of this application.  It is a rational historical question in relation to securities acquired by LBIE for an affiliate's book under the global settlements practice which prevailed before Rascals was implemented (i.e. before 1996), but it is not suggested that any of the securities acquired that long ago were still in a LBIE depot at the time of the collapse.

221.   In relation to Rascalled securities, it is an inescapable aspect of the relationship between LBIE and each affiliate that, upon or after acquisition, they were to be or might be Rascalled, either because they were eligible securities for Automatic Rascals, or securities sufficiently worth being lent to the street to be Manually Rascalled.  The fact that Rascals processes were to be or could be applied to eligible securities is an essential part of the terms upon which LBIE acquired them for the books of the affiliates, and cannot therefore be ignored when considering whether LBIE acquired them as trustee rather than as absolute owner.

222.   A conclusion that the Rascals processes applied to the securities were and remain effective to confer absolute title on LBIE would deprive this prior question of any relevance.  Nonetheless it matters because of the affiliates' case that, for different reasons, the Rascals processes were ineffective for that purpose, either because LBIE never paid for the on-leg, or because LBIE transferred title back to the affiliate on the final off-leg (Automatic Rascals) or because LBIE holds them on resulting trust (Manual Rascals) or, finally, because in relation to LBCCA the Automatic Rascals processing was transacted with the wrong affiliate.

223.   I have concluded that the most useful way in which (at the parties' insistence) I should address this first question is in two stages.  First I shall address it in relation to the period before 1996, that is after the institution of the global settlements practice, but before LBIE and any affiliate had decided to apply Rascals processing to securities acquired for that affiliate's book.  Secondly I shall address the question by

reference to the period after the introduction of Rascals, on the footing that LBIE and each of its affiliates (with the possible exception of LBCCA) intended that relevant securities acquired by LBIE for that affiliate's book were to be Rascalled Automatically, or were liable to be Manually Rascalled at LBIE's discretion.

224.    At each stage the question whether the acquisition gave rise to a proprietary interest for the affiliate, and therefore a trustee beneficiary relationship between LBIE and the affiliate, is governed by the same legal principles, to which I now turn.

## THE LAW

225.    I set out below what I conceive to be the principles to be applied, where A acquires title to property for the account of B, to the question whether B thereby obtains a proprietary interest in that property.   I do so initially merely by stating those principles.  Later, I shall to the extent necessary look in more detail at some of them.

## The Principles

i)    The recognition of a proprietary interest of B in property where A has the legal or superior title necessarily assumes the existence of a trust as between A and B.

ii)    There can be no such proprietary interest if the necessary trust would fail for uncertainty.

iii)    A trust of part of a fungible mass without the appropriation of any specific part of it for the beneficiary does not fail for uncertainty of subject matter, provided that the mass itself is sufficiently identified and provided also that the beneficiary's proportionate share of it is not itself uncertain.

iv)    A trust does not fail for want of certainty merely because its subject matter is at present uncertain, if the terms of the trust are sufficient to identify its subject matter in the future.

v)    Subject to the issue of certainty, the question whether B has a proprietary interest in the property acquired by A for B's account depends upon their mutual intention, to be ascertained by an objective assessment of the terms of the agreement or relationship between A and B with reference to that property.

vi)    The words used by the parties such as "trust", "custody", "belonging", "ownership", "title", may be persuasive, but they are not conclusive in favour of the recognition of B's proprietary interest in the property, if the terms of the agreement or relationship, viewed objectively, compel a different conclusion.

vii)    The identification of a relationship in which A is B's agent or broker is not conclusive of a conclusion that A is, in relation to the property, B's trustee, although it may be a pointer towards that conclusion.

viii)    A relationship which absolves A from one or more of the basic duties of trusteeship towards B is not thereby rendered incapable of being a trustee beneficiary relationship, but may be a pointer towards a conclusion that it is not.

ix)     Special care is needed in a business or commercial context.  Thus:

(a)     The law should not confine the recognition and operation of a trust to circumstances which resemble a traditional family trust, where the fulfilment of the parties' commercial objective calls for the recognition of a proprietary interest in B.

(b)     The law should not unthinkingly impose a trust where purely personal rights between A and B sufficiently achieve their commercial objective.

x)     There is, at least at the margin, an element of policy.  For example, what appears to be A's property should not lightly be made unavailable for distribution to its unsecured creditors in its insolvency, by the recognition of a proprietary interest in favour of B.  Conversely, the clients of intermediaries which acquire property for them should be appropriately protected from the intermediary's insolvency.

## Commentary

226.   Principles (i) and (ii) were not the subject of any dispute or elaboration by counsel, and may be taken as read.  It is common ground that a trust may exist not merely between legal owner and ultimate beneficial owner, but at each stage of a chain between them, so that, for example, A may hold on trust for X, X on trust for Y and Y on trust for B. The only true trust of the property itself (i.e. of the legal rights) is that of A for X. At each lower stage in the chain, the intermediate trustee holds on trust only his interest in the property held on trust for him. That is how the holding of intermediated securities works under English law, wherever a proprietary interest is to be conferred on the ultimate investor.   In practice, especially in relation to dematerialised securities, there may be several links in that chain.

## Certainty

227.   Principle (iii) is derived from Hunter v. Moss [1994] 1 WLR 452.  It formed a central plank in the respondents' submissions.  Mr Moss described it as the basis upon which securities are intermediated in the modern world, and therefore a principle to which the law should lend the broadest possible support.  For his part Mr Milligan did not challenge the basic principle, or its operation in relation to a segregated securities account.  He focused his attention on the requirement for a sufficiently certain mass of fungibles which, he submitted, could not be satisfied by an un-segregated house depot account which LBIE was free to use for lending to the street, and for meeting short positions, rather than being obliged to keep it whole.  Further, he submitted that the probability that on any given day the supposed trust fund (constituted by LBIE's un-segregated house depot account for a particular description of security) would fall well short of the aggregate of the affiliates' supposed beneficial interests raised such difficulties of apportionment between them as to render the supposed trust uncertain as to its terms, as well as to its subject matter.

228.   Hunter v. Moss was a very simple case on its facts.  The defendant was registered as the holder of 950 shares in a company with an issued share capital of 1,000 shares. He orally declared himself a trustee for the plaintiff of 5% of the company's issued share capital, which the trial judge interpreted as meaning 50 of his 950 shares.  Both

the judge and the Court of Appeal rejected the submission that such a trust must fail for want of appropriation of any specific shares out of the defendant's holding to satisfy the plaintiff's beneficial interest in 50 of them.

229.  The Court of Appeal specifically distinguished Re London Wine Co (Shippers) Limited [1986] PCC 121, in which Oliver J had found that the issue to customers by a wine dealer of certificates of title describing them as beneficial owners of specific quantities of wine of specified types and vintages failed to create a proprietary interest under a trust because the dealer had never appropriated specific quantities of matching wine to each of its customers from stocks held in bulk in its warehouses.  The reason for the distinction appears more clearly from the judgment of the trial judge (Colin Rimer QC as he then was) at [1993] 1 WLR 934, at 940 and 946, namely that the complete fungibility of the block of shares made it irrelevant which 50 of the 950 should be identified for the purpose of giving effect to the trust.

230.  The Court of Appeal also distinguished Mac-Jordan Construction Limited v. Brookmount Erostin Limited [1992] BCLC 350, in which a developer's failure to carve from its general assets a retention fund for its builder pursuant to an obligation in the building contract, before becoming insolvent, was held to preclude the identification of the necessary subject matter of an enforceable trust of the retention monies.  Again, the precise basis for the distinction is not spelt out in Hunter v. Moss, but it is reasonably clear that the Court of Appeal thought that the defendant's holding of 950 shares in a particular company was a sufficiently specific fund, separate from the defendant's general assets, to resolve any issue as to certainty of subject matter, any further appropriation to the plaintiff's specific interest being unnecessary.

231.  Hunter v. Moss has not been without its academic and judicial critics, but its conclusion that there is no objection on the grounds of uncertainty to a trust of part of a shareholding of the trustee has been generally followed, in this country in Re Harvard Securities [1997] 2 BCLC 369, in Hong Kong in Re CA Pacific Finance Limited [2000] 1 BCLC 494, and in Australia in White v. Shortall [2006] NSW SC 1379.

232.  The difficulty with applying the Court of Appeal's judgment in Hunter v. Moss to any case not on almost identical facts lies in the absence of any clearly expressed rationale as to how such a trust works in practice.  There has not been unanimity among those courts which have followed Hunter v. Moss, nor among the many academics who have commented upon it, as to the correct approach.  The analysis which I have found the most persuasive is that such a trust works by creating a beneficial co-ownership share in the identified fund, rather than in the conceptually much more difficult notion of seeking to identify a particular part of that fund which the beneficiary owns outright.  A principal academic advocate for the co-ownership approach is Professor Roy Goode: see for example "Are Intangible Assets Fungible?" [2003] LMCLQ 379.  Among the judicial commentators I have found the analysis of Campbell J in White v. Shortall (supra) at paragraph 212 to be the most persuasive.  My own preference for the co-ownership analysis may be observed in LBIE v. RAB Market Cycles [2009] EWHC 2545 (Ch), at paragraph 56.  I propose to adopt it for the purposes of the analysis which follows.

233.  Neither Hunter v. Moss nor any of the decisions of the common law courts which have followed it address the subject matter certainty issues raised in the present case

as a result of LBIE's liberty to deal with securities acquired and held for the time being for the account of affiliates, by lending them to the street or by using them to settle short positions of other affiliates or of LBIE itself.  All that the cases do is to demonstrate, by contrast with <u>Mac-Jordan Construction v. Brookmount</u> (in relation to money) or <u>Re Goldcorp Exchange Limited</u> [1995] 1 AC 74 (in relation to gold bullion) how the identification of a fund of which the beneficiary is to be a co-owner may sufficiently satisfy the requirement of subject matter certainty.  Thus it is no objection that the fund is beneficially shared with the trustee, as in <u>Hunter v. Moss</u> itself and in <u>White v. Shortall</u>.  Nor is it an objection that a segregated fund (i.e. one in which the trustee does not share) is a constantly changing fund beneficially co-owned by a constantly changing class of the clients of the trustee: as in <u>CA Pacific Finance Limited</u>.

234.   At the heart of Mr Milligan's submissions based upon subject matter uncertainty lay the undoubted fact that, at any moment in time, the supposed trust fund consisting of LBIE's house depot account in respect of a specific type of security (such as ordinary shares in ICI) might consist either of shares originally acquired, equivalent shares subsequently acquired by the exercise of rights under a repo or stock loan with the street, or simply shares subsequently acquired by LBIE to make good a shortfall caused by using shares to settle its own or other affiliates' short positions.  Furthermore, the fund could (for reasons already explained) consist at a particular moment in time of no securities at all, where all had been used to settle short positions, or all had been lent to the street, so that the only identifiable trust property consisted of LBIE's personal rights to obtain equivalent securities in the future, for example by calling in stock loans or enforcing the off-legs of repos, as against street counterparties.

235.   To meet this obvious and serious point of distinction with the <u>Hunter v. Moss</u> line of authority Mr Moss and counsel for the other respondents relied upon  Principle (iv) above, namely that a trust does not fail for want of certainty merely because its subject matter is to consist of after-acquired property.  For that principle Mr Moss relied simply on <u>Tailby v. Official Receiver</u> (1888) 13 App Cas 523.  That was a case about an equitable assignment by way of security of all the present and future book debts of the assignor, without limit as to time or type.  It shows that a trust is not vitiated by subject matter uncertainty merely because the trustee has, at the date of the creation of the trust, yet to acquire property answering the relevant description.  Since it applied to all the assignor's future book debts however obtained, no question of subject matter uncertainty arose.

236.   It is convenient at this point to break off my discussion of the legal principles applicable to this first main issue generally, and address the Administrators' uncertainty case directly, first in relation to subject matter and then in relation to terms.  In both respects I shall first address the position as it was before 1996, when Rascals processing began to be implemented.

237.   The starting point is that it is misleading to think of LBIE's house depot accounts as if they were simply one big omnibus account into which all its holdings of securities of any type were deposited, like some single bank account used for all its payments and receipts of cash.  However they were recorded, the reality is that LBIE held a great multiplicity of positions on house depot accounts, one position for each type of security, by which I mean not one for equities and one for fixed income, but one for

ICI ordinary shares, one for BP ordinary shares, separate positions for any different class of shares of the same issuer, and further separate positions for different classes of fixed income securities, again, separately for each issuer. The question of certainty must be addressed by looking, conceptually at least, at each position individually, even if they were all recorded in one account. LBIE's depot account position for ICI ordinary shares is a convenient (if now purely historical) example. It would consist at any given moment in time of a chose in action against LBIE's depository in relation to a specified number of ordinary shares, and would consist of a beneficial co-ownership interest in the depository's total holding of shares of that type.

238. At any moment in time, the amount of shares so held by LBIE would be attributable to acquisitions from the street both for its own account and for the accounts of one or more affiliates, less shares sold to the street for those same accounts, but also, reduced by shares lent to the street and shares used to settle short positions, as already described. For all shares lent to the street LBIE would have contractual rights to obtain equivalent securities, subject to paying for them. For shares used to settle affiliates' short positions, LBIE would have similar rights against the relevant affiliates. As and when, at any later date, LBIE received back shares pursuant to its repos and stock loans with the street, the shortfall in the depot account would be made good *pro tanto* by equivalent shares attributable to the exercise of those rights.

239. Although the picture created by that analysis is very much more complicated than the simple facts of Hunter v. Moss, I consider that it gives rises to no fatal uncertainty of subject matter. The subject matter of the fund is, from start to finish, LBIE's holding of ICI ordinary shares or, more precisely, LBIE's beneficial co ownership interest in its depositary's holding of ICI ordinary shares, as shown in LBIE's relevant depot account with its depository. The subject matter of the fund may also include all LBIE's rights to recover equivalent securities from street lending counterparties, and its rights as against affiliates to make good short positions. The subject matter of each affiliate's beneficial interest is its co-ownership share in the fund thus constituted, which will (in principle, whether or not in practice) be readily ascertainable from Group records, showing the amount of those securities acquired for LBIE and for each affiliate, less the amounts disposed of, expressed as a proportion of the whole.

240. The question whether the fund consists simply of LBIE's proprietary rights in relation to the securities, or includes LBIE's personal rights to recover equivalent securities from street lending counterparties or from short affiliates is a question of intention, as between LBIE and its affiliates, rather than subject matter certainty. If the former, I see no uncertainty or other objection in a conclusion that the subject matter of the fund extends to equivalent securities once acquired by LBIE's exercise of those rights. If the latter, there is in my judgment no valid objection that the rights are purely personal and contractual, and not such as would be enforced by an order for specific performance: see again Tailby v. Official Receiver (*supra*).

241. As to the latter point, no-one doubts the beneficial interest of clients in a solicitor's client account. Yet the subject matter of that fund consists entirely of the solicitor's purely personal rights as a customer of the client account bank or banks.

242. I turn to address Mr Milligan's case based on uncertainty as to terms. By this he meant that, because of the typical shortfall in the fund constituted by LBIE's depot account, caused by lending to the street and the meeting of short positions, it was

impossible to say in relation to the depleted balance how it should be shared between LBIE and the affiliates for whose accounts the securities had been acquired.  Should the matter be resolved, Mr Milligan asked rhetorically, by a first in first out approach or by a *pari passu* approach?  It was no answer, he submitted, that the court would, in the case of a shortfall in an undoubted trust fund, resolve that issue by reference to settled equitable principles.  To avoid a fatal uncertainty as to the subject matter of each affiliate's beneficial interest, the answer had to be found in the terms upon which the supposed trust was constituted.

243.   I accept the premise for that submission, but not Mr Milligan's conclusion.  Subject matter certainty requires not only that the identity of the shared fund is certain, but also that the proportionate amount of each alleged beneficiary's share is also certain.  Thus, an uncertainty as to the terms upon which LBIE and its affiliates were to bear any shortfall would be destructive of the necessary certainty of each affiliate's beneficial share in the securities remaining in LBIE's depot account.   In truth, uncertainty as to terms in this context means, or inevitably leads to, uncertainty as to beneficial subject matter.

244.   But I see no reason why, on the assumption that LBIE and its affiliates had a common intention which authorised LBIE to operate its house depot accounts in a matter which included lending to the street and the making good of short positions, the consequential day to day shortfalls thereby created in the depot accounts should not be shared on a *pari passu* basis.  Bearing in mind that the evidence shows that LBIE's operation of its house depot accounts in that way was an aspect of the Group settlements practice rather than something done idiosyncratically by LBIE behind the backs of one or more of its affiliates, there is no basis in fact for concluding that the manner in which LBIE operated those accounts before the implementation of Rascals was other than consensual.  If all those interested in the fund consented to the arising of the shortfall inherent in the way it was managed, then I can see no reason why they should not be taken to have agreed to bear the consequences of the shortfall equally.

245.   The law does not lightly allow contracting parties' purposes and intentions to be defeated by supposed uncertainty, and there is in my judgment no reason why the law should do so any more readily than normal merely because the issue is as to the validity of an intended trust.  On the contrary, the law commonly recognises the creation of a trust as a necessary consequence of an intention that parties should share property beneficially, in circumstances where the parties themselves have given no thought at all to the terms of the consequential trust, if indeed they even recognised its existence.  In all such cases the law fills the consequential gaps by implication, and by importation of generally applicable principles.

246.   The beneficial ownership of matrimonial and other shared homes is a case in point.  The courts have for many years wrestled with the difficulties which arise in quantifying the beneficial interests of cohabitees, in circumstances where a clear mutual intention that they should share the property necessitates the existence of a trust, in particular in cases where only one of them is the legal owner.  Nonetheless, at no time during this protracted and difficult debate has the fact that the parties themselves frequently give no thought to the amount of their proportionate shares in the property led the courts to conclude that the intended trust fails for uncertainty.

247.    By parity of reasoning, and on the assumption that LBIE and its affiliates intended that the affiliates should enjoy proprietary interests in securities acquired by LBIE for their account, the fact that the mode of LBIE's operation of its house depot accounts to which they all consented may throw up difficulties of analysis as to their proportionate shares in the securities which remain after the collapse is not a basis for concluding that the trust which the law necessarily recognises so as to give effect to their intended proprietary interests should fail for want of certainty, whether as to terms, or as to the amount of those beneficial interests.

248.    I have thus far been considering the question of certainty in relation to the pre-Rascals period, and concluded that, if a trust was intended as the necessary consequence of the conferral upon affiliates of proprietary interests in securities acquired by LBIE for their account, such a trust would not fail for uncertainty.  I can envisage no reason why a different conclusion should follow from that analysis, conducted after the implementation of Rascals.  On the contrary, it seems to me that an argument of uncertainty would be weaker than in relation to the pre-Rascals period.  The Rascalling of the relevant securities (if not defective in the various ways alleged by the respondents) would for the duration of the underlying repos and stock loans confer absolute title to the underlying securities upon LBIE, and therefore, for the same period, take them out of the supposed trust fund.  The result would be that any lending of those Rascalled securities to the street would have no effect upon the constitution of the fund, thereby depriving Mr Milligan's submissions as to the uncertainties created by the consequential shortfall in the fund of most of their effect.  If the Rascals processes were ineffective to confer absolute title upon LBIE, then the certainty issues would broadly match those which I have already addressed in relation to the pre-Rascals period.  I can therefore return to the remaining legal principles listed above, all of which assist in answering the question whether a proprietary interest, and therefore a trust, was intended.

## Intention

249.    Principles (v) and (vi), which focus on the essential objectivity of the process of the ascertainment of the parties' mutual intention, were not in dispute between counsel, and therefore call for no justification.  They serve as a warning against giving excessive weight to the labels used by the parties to describe their relationship, or even to the labels chosen to describe their supposed interests in the relevant property.  Banking is fertile ground for the misuse of language in that context, as the habitual employment of phrases like "money in a bank account" or references to banks "looking after customers' money" demonstrates.

## Agency

250.    Principle (vii), namely that an agency relationship is not conclusive of, but only a pointer towards the existence of a trust relationship, was not directly challenged, but was the subject of extensive submissions.  Enormous effort was devoted by the respondents towards demonstrating that LBIE acted as the affiliates' agent or broker in the making and settlement of securities transactions for their account, and valiant effort was deployed by Mr Milligan in challenging that assertion.  It is therefore appropriate that I address the relevant agency principle in a little more detail.  For this purpose, I shall refer to the agent or broker as A and the principal as B, in conformity with the analysis thus far.

251. The starting point is that the question whether A is B's agent does not fall to be answered in the negative merely because B contracts as principal with the third party: see Teheran-Europe Co. Ltd v. ST Belton (Tractors) Ltd [1968] 2 QB 53, at 59-60 per Donaldson J. In that case the judge was concerned with the question whether the terms upon which B contracted with the third party created any privity between A and the third party. Nonetheless Donaldson J's lucid description of the three ways in which an agent can conclude a contract on behalf of his principal puts the point beyond doubt. In the present case LBIE contracted with the street counterparty as principal in many, but by no means all, of the relevant securities trades. But that is perfectly consistent with LBIE having been the affiliate's agent for all purposes connected with the terms and consequences of the transaction, as between them.

252. A conclusion that, as between them, A acts as B's agent in the acquisition of property from C by no means leads to the inevitable result that B thereby obtains a proprietary interest in the property, such that it is held by A as his trustee. Nelson v. Rye [1996] 1 WLR 1378 is a classic example of a case in which that assumption was wrongly made, as is illustrated by the devastating critique of that judgment by Millett LJ in Paragon Finance v. DB Thakerar & Co [1999] 1 All ER 400, at 415-6. Nelson was a solo musician, managed by Rye, who collected Nelson's fees and royalties as his agent, with an undoubted duty to account. Nonetheless the terms of the agency relationship permitted Rye to mix Nelson's fees and royalties with his own money, to use them for his own cash-flow, to deduct his own commission and to account for the balance to Nelson only at the year end. Those features of the relationship were inconsistent with the existence of any trust of the receipts, and therefore with any proprietary interest of Nelson in them, for as long as they remained with Rye.

253. The true principles are in my judgment admirably summarised in Bowstead & Reynolds on Agency (19th ed) in paragraph 6-041, from which I have drawn the following extracts (although the whole passage deserves reading in full):

> "The analogy with trust might be taken to suggest first, that when an agent holds title to money or other property for his principal, he always does so (in situations where the principal does not himself own it) as trustee. This would often be impractical and has never been the rule. It is perfectly possible for property so held, especially money, to be the agent's own, and mixed with his own assets subject only to a duty to transfer or account for it to his principal. Equally however he may certainly hold as trustee.
>
> Sometimes the answer turns on the contract between principal and agent. It is clear in this context and in general that the existence of a contractual relationship of debtor and creditor between the parties does not prevent the existence of a simultaneous trust relationship, or a fiduciary relationship of a less onerous nature, involving nevertheless that certain money or property is held on trust.
>
> Thus it may be provided expressly between principal and agent that money received is so held. At other times the intention to create a trust may be inferred; the matter turns on the objective

interpretation, according to general principles, of the intentions of the parties.

…the present trend seems to be to approach the matter more functionally and to ask whether the trust relationship is appropriate to the commercial relationship in which the parties find themselves; whether it was appropriate that money or property should be, and whether it was, held separately, or whether it was contemplated that the agent should use the money, property or proceeds of the property as part of his normal cash flow in such a way that the relationship of debtor and creditor is more appropriate.

A relevant consideration also is whether money or property was received in pursuance of a single transaction for which the agent was appointed, or as part of a group of transactions in respect of which a general account was to be rendered later or periodically.

Although the issue does not arise in many of the cases, a central question, really one of policy, and perhaps too often overlooked (because not in issue) is whether the rights of the principal are sufficiently strong, and differentiatable from other claims, for him to be given priority in respect of them in the agent's bankruptcy….

Sometimes the position is secured by statute or regulation providing that particular types of functionary (e.g. estate agents and solicitors) hold clients' money on trust, pay into client accounts and keep trust accounts."

## Basic Duties of Trusteeship

254.    Principle (viii), that a trustee may be excused performance of basic trust duties without rendering impossible the existence of a trust, was also the subject of extended debate.  Mr Milligan submitted that if A is permitted by B both to mix property acquired for B's account with his own property and to use it for the purpose of his own business, those incidents in the A/B relationship were necessarily, and fundamentally, incompatible with any relationship of trustee and beneficiary in relation to the property.  He brought some powerful dicta to bear in support of that submission.

255.    In Paragon v. Thakerar (*supra*) at p.416 in the passage to which I have already referred, Millett LJ said this:

"It is fundamental to the existence of a trust that the trustee is bound to keep the trust property separate from his own and apply it exclusively for the benefit of his beneficiary.  Any right on the part of the defendant to mix the money which he received with his own and use it for his own cash-flow would be inconsistent with the existence of a trust. "

256.    In <u>Ayerst v. C & K (Construction) Limited</u> [1976] AC 167, at 180 Lord Diplock said
this, in relation to the use of the expression "trust" and "trust property" in reference to
the assets of a company in liquidation:

> "All that was intended to be conveyed by the use of the
> expression "trust property" and "trust" in these and subsequent
> cases (of which the most recent is *Pritchard v. M.H. Builders
> (Wilmslow) Limited* [1969] 1 WLR 409) was that the effect of
> the statute was to give to the property of a company in
> liquidation that essential characteristic which distinguished
> trust property from other property, viz., that it could not be used
> or disposed of by the legal owner for his own benefit, but must
> be used or disposed of for the benefit of other persons."

257.    These, and other broad and general statements about the core characteristics of a trust
need to be addressed with some caution.  In <u>Brown v. Inland Revenue Commissioners</u>
[1965] AC 244 a question arose as to the income tax treatment of interest received by
a solicitor upon deposited client account money and used for his own benefit.  The
solicitor also lent client monies to other clients on interest bearing loans, and kept for
himself the difference between the interest charged and the interest paid on clients'
deposits.  The House of Lords held that, in both respects, the solicitor's receipt of
interest was an unauthorised secret profit, and a breach of trust.  But Lord Reid added
this, at page 258:

> "The appellant (*the solicitor*) supports this contention on the
> grounds of custom and implied agreement.  On the facts found
> in the case he cannot succeed on custom if only because the
> practice is by no means universal and I shall not consider what
> the position would be if there were a custom in the legal sense.
> As regards implied agreement I do not doubt that clients could
> agree, if they so chose, to their solicitor making profit out of
> their money by using it in certain ways in certain
> circumstances.  The fact that a solicitor is in a fiduciary
> position does not prevent him from making agreements with
> clients who are sui juris and are fully aware of the facts.  And
> there might be circumstances from which an agreement could
> be implied."

258.    In my judgment there is no immutable principle that an arrangement between A and B
(where A acquires property for B's account) which includes a consensual
disapplication of some fiduciary obligation generally regarded as a basic feature of a
trust, thereby prevents the existence of a trustee beneficiary relationship arising
between the parties, or the recognition of A's proprietary interest in the property.  The
Lehman Brothers litigation provides two recent examples.  In <u>LBIE v. RAB Market
Cycles</u> (*supra*) at paragraphs 60 to 63, I concluded that the prime broker's Right of
Use under clause 11 of the standard form  International Prime Brokerage Agreement
(Charge Version) used by LBIE with its customers was, although a powerful contra-
indication to the recognition of a trustee beneficiary relationship between LBIE and
its customers under that agreement,  not however inevitably fatal to it, if (as was the
case) other aspects of the relationship pointed more powerfully in favour of a trust.

259.   In LBIE (sub nom CRC Credit Fund Limited v. GLG Investments plc sub-fund) [2010] EWCA Civ 917, the Court of Appeal affirmed my decision that regulatory permission given to an investment firm to deposit clients' money in a house account before segregating it under the regime regulated by CASS 7 did not automatically mean that the statutory trust imposed by that regime was incapable of applying to client money until it had been segregated.

260.   In my judgment the true principle which emerges from these cases is that, while there are no hard and fast rules whereby the consensual disapplication of some basic trustee duty precludes the recognition of a trustee beneficiary relationship between the parties, nonetheless the greater the extent to which those duties are disapplied, the harder it will be for the court to conclude, taking all relevant matters into account, that the parties objectively intended to create such a relationship between them.

**The Business Or Commercial Context**

261.   Authority for principle (ix)(a), that the law should not, in a commercial context, be hidebound by traditional rules about trusts derived from their origin in family settlements, is to be found in Target Holdings v. Redferns [1996] AC 421, per Lord Browne-Wilkinson at p. 435-6.  Principle (ix)(b) that the law should not unthinkingly impose a trust where purely personal rights between A and B sufficiently achieve their commercial objective is in my view no more than an aspect of the need to interpret commercial agreements and arrangements purposively.

**Policy**

262.   The cited extract from Bowstead & Reynolds acknowledges the role to be played by policy considerations in the recognition or the denial of a trustee beneficiary relationship between agents and their principals.  Mr Moss forcefully illustrated how deeply the concept of the trustee beneficiary relationship is embedded in modern thinking about intermediated securities, both by reference to the Financial Markets Law Committee's July 2004 Report on "Property Interests in Investment Securities" and to the Unidroit Convention on Substantive Rules for Intermediated Securities (signed in October 2009) which, although yet to be ratified by the United Kingdom, nonetheless commands the broad support (so Mr Moss informed me) of the Law Commission.

263.   Nonetheless, both those documents (in section 8 of the FMLC Report and Articles 24 and 25 of the Unidroit Convention) assume that an effective system for the conferral and protection of proprietary interests in intermediated securities upon the clients of the intermediaries presupposes rules which require the intermediaries to maintain at all times a pool of securities sufficient to satisfy their clients' entitlement.  Mr Moss (who was himself a contributor to the FMLC Report) did not persuade me that the basis upon which LBIE was free to use securities acquired for the account of affiliates for lending to the street, and for making good short positions, came near to satisfying that type of pool maintenance obligation.

264.   As for the need to avoid the unthinking extension of proprietary claims in circumstances which infringe the *pari passu* principle in insolvency, sufficient authority is to be found in the observations of Lord Neuberger in Re B A Peters (In Administration) [2008] EWCA Civ 1604, at paragraph 21, as follows:

"In my view, the court should not be too ready to extend the circumstances in which proprietary or other equitable claims can be made in insolvent situations, bearing in mind the consequences to unsecured creditors.  To raise those in the commercial world, it must sometimes seem almost a matter of happenstance as to whether or not a particular creditor, with no formal security, has a proprietary or equitable claim.  However the fact is that every time such a claim is held to exist in the case of an insolvent debtor, the consequence is that one commercial creditor gets paid in full to the detriment of all the other commercial creditors, who also have no formal security, but are found to have no proprietary claim."

## Application To The Facts

## The Pre Rascals Period

265.   Having already disposed of the objection based on uncertainty, I now set out my conclusions on the question whether LBIE's acquisition of securities for the account of its affiliates gave rise to proprietary interests in the affiliates' favour.  I shall first address the question in relation to the pre-Rascals period, i.e. on the basis that it was not part of the common intention of the parties that a security acquired by LBIE for an affiliate's book should thereupon or thereafter be Rascalled.  The first question is whether, as the respondents all contend, LBIE was acting as the affiliates' agent or broker or whether, as the Administrators maintain, LBIE was acting as a principal in its own right.  As already noted, this issue is clouded by the fact that the agreements between LBIE and the various respondent affiliates deployed in evidence almost all post-date this period.  Nonetheless, I consider it legitimate to have regard to the recitals found in those agreements entered into by way of implementation of the Rascals project, to the extent that they describe an existing relationship, upon which the particular terms of those agreements were then to be superimposed.  This is, in particular, because the recommendations of the Rascals working party which led to the making of those agreements were necessarily based upon a review of a pre-Rascals relationship between the parties in connection with the acquisition of securities by a hub company for its affiliates' accounts.

266.   In my judgment the evidence clearly establishes that LBIE was indeed acting as the affiliates' agent or broker, rather than purely as a principal in its own right.  My reasons follow.

267.   The agreements which point that way may be summarised as follows.  First, as between LBIE and LBF, there is the ICRA made in March 1996, the Agency Agreement made in November 1996 and the Brokerage Agreement made in March 1998.  As between LBIE and LBAH there is the MPRA made in November 1997.  As between LBIE and LBSF there is the MPRA made in November 1996, and the original Non-Discretionary Agency Agreement made in January 1994.  Between LBIE and LBI there is the UCCBSA made in July 1994, the predecessor of the 1996 version described earlier in this judgment.

268.   More fundamentally, the feature common to the relationship between LBIE and all of the respondent affiliates for the books of which it acquired securities was that LBIE

acquired and settled or (as the case may be) merely settled those securities into its house depot accounts upon the basis, and with the intent, that the economic risks and benefits inherent in the ownership of those securities would be for the account of the affiliates rather than for LBIE, both as to market risk and intermediate income.

269. For the purpose of understanding the relationship between LBIE and its affiliates, it is in my judgment nothing to the point that in relation to some, although not all, of the relevant acquisitions LBIE contracted with the street counterparties as principal, for the reasons which I have already given in relation to the Teheran-Europe decision of Donaldson J.

270. On any view, and in relation to all the relevant acquisitions, it is not seriously challenged by the Administrators that LBIE was liable to account to the relevant affiliate both for the proceeds of the ultimate sale of the security to the street and for any intermediate income received from the moment of acquisition onwards. Those are quintessentially characteristic of the obligations of an agent or broker for the affiliates.

271. Against that, it is equally common ground that LBIE did not, and was not expected to, comply with the other characteristic obligation of a broker, namely to "get into his possession, and retain, an equivalent number of shares" to those delivered to him under the acquisition contract: see Solloway v. McLaughlin [1938] AC 247 at 256. All that LBIE did in practice was to manage its house depot accounts in such a way as to ensure (for as long as it remained solvent) that it could settle trades by way of disposal of shares held for its affiliates' books, whether by retaining shares, borrowing them from the street or having recourse to securities held for its own book or for other affiliates. Nonetheless I consider that this consensual departure from the ordinary obligations of a broker comes nowhere near displacing a conclusion that, for all purposes in connection with LBIE's acquisition and holding of securities for its affiliates' books, LBIE's role was that of an agent or broker. It makes no difference for present purposes which of those two technically different but overlapping labels is to be applied.

272. I also accept, as the next stage in the respondents' submissions, that proof that LBIE acted as an agent or broker for its affiliates is a *prima facie* indication that the affiliates were to have proprietary interests in the securities thus acquired. That much seems to me to be implicit in the judgment of the Privy Council in Solloway (*supra*) at pages 257-8. But it is no more than a starting point.

273. It is to be noted from the *travaux preparatoires* of the Rascals committee, and from the recollection of Mr Bolland in evidence, that the general view within the Group (at least in London where the Rascals working party appears to have been based) was indeed that a hub company's acquisition of securities from the street for the books of affiliates did give rise to proprietary interests in the affiliates' favour, although some appeared to have thought that no such proprietary interest arose until the affiliate had refunded LBIE for the acquisition price. Nonetheless the subjective assumptions of Group employees about the legal consequences of the parties' arrangements are not the same as the objective ascertainment of intention to be derived from the terms of those arrangements, viewed as a whole. For example, many if not most ordinary clearing bank customers probably think they own the money in their bank deposit accounts, whereas the standard terms of a clearing bank's contract with its customer

creates only personal rather than proprietary rights in relation to such accounts. Such depositors are merely unsecured creditors, not beneficiaries under a trust.

274. In my judgment the basis upon which LBIE acquired and dealt with securities for its affiliates' accounts prior to the implementation of Rascals, as reflected in the global settlement practice which I have described, was not such as to give the affiliates proprietary interests in the underlying securities. My reasons follow.

275. First and foremost, while those arrangements included an obligation upon LBIE to account in relation to its holding of the underlying securities, both for any proceeds of sale and for any intermediate income, they imposed upon LBIE none of the characteristic obligations of a trustee in relation to those securities. On the contrary, they clearly disapplied such obligations. Thus LBIE was free to mix the securities with its own, to dispose of them by way of street lending on terms which permitted LBIE to enjoy the consequential funding benefits of the cash received in lieu, without accounting to the affiliates, and to use the securities of one affiliate to make good short positions both for other affiliates and for LBIE itself. In short, LBIE was free to use securities held in its house depot accounts generally for the purposes of its cash flow and more generally for its business, albeit that its business included agency and brokerage activities for its affiliates. LBIE was under no obligation to maintain sufficient securities in its house depot accounts to match the aggregate of its affiliates' book entitlements. On the contrary, it simply managed its house depot accounts so as to be able to settle disposals of securities held for its affiliates' books, as and when instructed to do so. In all those respects, LBIE's permitted conduct in relation to its house depot accounts much more closely resembles that of a banker in relation to customers' deposits than a trustee in relation to its beneficiaries' property.

276. Secondly, the conferral upon the affiliates of a proprietary interest in the underlying securities was not necessary for the achievement of the commercial objectives of the parties. The affiliates' objective was to enjoy the economic fruits of ownership, namely the rises and falls in the value of the security, and its intermediate income, either as an investment in its own right, or as a hedge against the risks of derivatives transactions which formed the main business, for example, of LBF and LBSF. Those fruits could be fully enjoyed as the result of LBIE's personal obligation to account, both for the proceeds of the on-sale of the securities to the street, and for the intermediate income, at least for as long as LBIE remained solvent, and therefore able to discharge its personal obligations.

277. The affiliates had no need to obtain any form of title to the underlying securities. They were settled into LBIE's name and re-sold in LBIE's name. For all purposes connected with the street, LBIE's title was a sufficient means of enabling the affiliates to realise their economic interests in the capital and income value of the securities.

278. Nor did the affiliates, as associated companies in the same group, have cause to rely upon a proprietary interest as a protection against the risk of LBIE's insolvency, as they might have had if choosing a wholly independent broker or settlement agent for their dealings in securities. Furthermore, LBIE's liberty to use the underlying securities in connection with its own business, and in particular by lending them to the street, meant that the arrangements gave the affiliates no real protection against LBIE's insolvency in any event.

279.   A useful demonstration of the fact that the affiliates' commercial purposes in connection with the securities did not require the conferral upon them of a proprietary interest is to be found in the fact that the Rascals processes, later superimposed upon the global settlement practice, had as their main object the conferral of absolute title on LBIE, to the exclusion of the affiliates, for the whole of the period during which LBIE held the underlying securities for the affiliates' account.  No-one appears to have considered that the superimposition of Rascals processes in any way detracted from the achievement of the commercial purposes for which the affiliates used LBIE as their broker or settlement agent.

280.   In reaching my conclusion that, prior to the implementation of Rascals, the operation of the global settlement practice between LBIE and its affiliates did not confer upon the affiliates a proprietary interest in the underlying securities,  I have not ignored the factors relied upon by the respondents for the contrary argument.  I will briefly address the main factors relied in turn.

281.   First, I have already acknowledged that LBIE's status as the affiliates' agent or broker is a pointer in the opposite direction, but only a starting point.  Secondly, the respondents placed much emphasis on the routine inclusion of the underlying securities in the affiliates' stock inventories.  At first sight this is indeed another pointer towards a conclusion that the beneficial interest in the underlying securities lay with the affiliates rather than with LBIE.

282.   On closer analysis however, this factor carries no real weight as evidence of any common assumption or intention about beneficial title.  I have already described how the underlying securities came to be included in the affiliates' stock inventories upon the trade date rather than the settlement date, and how they remained in those stock inventories during the whole of the period when the underlying securities were the subject of Rascals processes, whether by repo or stock loan.  Similarly, they were removed from the affiliates' stock inventories upon the trade date of a re-sale of the underlying security, rather than upon the settlement date.  Thus, the underlying securities appeared in the affiliates' stock inventories before they (or for that matter LBIE itself) could have acquired any proprietary interest in them, since the earliest date for the passing of title from the street is the settlement date rather than the trade date.  Equally, they remained in the stock inventories at a time when it was commonly assumed that the Rascals processes conferred absolute title on LBIE.  Finally, they were removed from the stock inventories before the affiliates (on their case) lost their proprietary interest, which only occurred on the settlement of the re-sale to the street.

283.   Mr Bolland's written evidence was that the significance of the entry of a security in an affiliate's stock inventory was a recognition that, during the period when it was so recorded, the affiliate was entitled to the economic risks and returns of the securities position, rather than necessarily to a proprietary interest in the underlying security.  This was confirmed by Mr Dominic Gibb, the Lehman Brothers European Financial Controller at the time of the collapse, and he said that this approach to the accounting treatment of securities positions was consistent with his understanding of UK GAAP.  Mr Gibb was cross-examined on this evidence by Mr Brindle, by reference to paragraph 14 of FRS26, which provides that:

>    "An entity shall recognise a financial asset or a financial liability on its balance sheet when, and only when, the entity

> becomes a party to the contractual provisions of the instrument."

Mr Gibb was prepared to acknowledge in cross-examination that the phrase "party to the contractual provisions of the instrument" was generally equivalent to ownership of it, but not always.

284. Mr Brindle directed my attention to provisions of FRS26 which specifically explained why, during the currency of a repo or stock loan, the on-leg seller or stock lender continues to record the underlying security on its balance sheet, the explanation being that it continues to retain substantially all the risks and rewards of ownership.

285. In my judgment, taking this evidence as a whole, while an affiliate's inclusion of the underlying security in its stock inventory (and therefore as an asset in its balance sheet) is certainly consistent with beneficial ownership, it is equally consistent with personal rights securing to it the economic fruits, risks and rewards of ownership, in the absence of any conferral of a proprietary interest.

286. A more specific case was advanced on behalf of LBF, based upon its inclusion of the underlying securities in a stock register required to be maintained by Swiss stamp tax legislation. LBF was a Swiss securities dealer for stamp tax purposes, and stamp tax was chargeable on any transfer of ownership in taxable securities for consideration in circumstances where a Swiss securities dealer acted as a counterparty or intermediary in respect of such a transfer, and no exemption arises. In fact, LBF enjoyed the hugely valuable benefit of a stamp tax exemption in respect of securities required for hedging purposes, but it was nonetheless under a continuing obligation to record and report such acquisitions for stamp tax purposes.

287. LBF routinely recorded and reported its purported acquisition of the underlying securities acquired by LBIE for its book under the global settlement practice. As with the affiliates' stock inventories, LBF did not record a disposal of the underlying securities when title to them was purportedly transferred to LBIE under the Rascals processes. No-one suggested that LBF's leaving the underlying securities on its stock register while Rascalled arose from some perception at the time that the Rascals processes were ineffective for the purposes of passing absolute title to LBIE.

288. There was some rather inconclusive evidence (not all of which was subjected to cross-examination) about whether there was a tendency in Switzerland to over-report stock acquisitions subject to the stamp duty exemption. For present purposes, I am prepared to assume that Mr Eric Fiechter, a Swiss lawyer and non-executive director of LBF, believed that, for Swiss law and stamp tax purposes, the acquisition by LBIE of securities for LBF's books was to be treated as an acquisition by LBF. The question for decision however is whether in English law LBIE's acquisition conferred a proprietary interest on LBF. On that question it seems to me that Mr Fiechter's perception of the Swiss legal and fiscal consequences of the arrangements is of limited persuasive force.

289. Attempts were made by various of the respondents to rely upon the terms of the Master Custody Agreements in force from time to time between LBIE and the affiliates. In my judgment, for the reasons already given in relation to each respondent between which and LBIE there existed a MCA, those agreements are

simply inapplicable to LBIE's holding of securities for the affiliates' books in un-segregated house depot accounts. LBIE's making of those agreements with LBF and LBSF is, as I have already explained, probably attributable to the fact that, from time to time, derivatives counterparties in transactions with those affiliates occasionally lodged securities rather than cash by way of collateral, and those affiliates then used LBIE's segregated accounts for keeping those securities in custody. As for LBCCA, it had clients whose securities were deposited with LBIE.

290.   For LBI, Mr Brindle placed reliance upon the language of both the 1994 and 1996 versions of the UCCBSA which, in various places, described LBIE as holding securities for LBI "as custodian". As a matter of language this affords some support to LBI's case for a proprietary interest, but it is by no means sufficient to displace the considerations which, as much for LBI as for the other affiliates, militate the other way. While the UCCBSA is to be construed in accordance with New York law principles of interpretation, the small differences in those principles, by comparison with English law, afford no basis for attributing some more powerful consequence to the use of the word "custody" in what is, by common consent, otherwise an entirely English law analysis of the nature of the relationship between LBIE and LBI, and the consequences of that relationship in terms of the creation of a trustee beneficiary relationship between LBIE and LBI. Furthermore the UCCBSA did not in general terms require segregation of securities or money held by LBIE in custody for LBI, save in relation to long positions held indirectly for LBI's customers.

291.   LBSF advanced no particular arguments of its own on this issue, the underlying facts about its relationship with LBIE being for these purposes substantially the same as between LBIE and LBF.

292.   Mr Dicker's submissions for LBCCA in relation to the pre-Rascals period focused, as I have already described, upon the thinness of the evidence about the operation of the global settlements practice, by comparison with the much more detailed evidence in relation to the later period. It was a submission equally available to all the affiliates, rather than one based on special facts applicable to the LBIE/LBCCA relationship viewed separately. While there is force in Mr Dicker's submission that LBIE's policy to lend to the street as much of the securities in its house depot accounts as possible was intensified during rather than before the implementation of Rascals, I have not been persuaded (for the reasons already given) that LBIE's liberty to use such securities for street lending during the pre-Rascals period was subject to any significant restrictions, as between itself and either LBCCA or any other of the respondent affiliates.

293.   I am conscious that I have in relation to the pre-Rascals period reached a conclusion on the question of proprietary interest which is the opposite to that which I reached in relation to the similar question arising from the terms and operation of the IPBA(Charge) in the RAB Market Cycles case, notwithstanding that the IPBA permitted LBIE a right of use (which I described as a right to swap) in relation to the underlying securities. That right of use was the main contra-indication to the existence of a beneficial interest of LBIE's clients in the underlying securities, but there were powerful factors pointing towards a trustee beneficiary relationship in that case, which are absent from the present analysis. In particular, the language of the IPBA included not merely references to custody, but also to the securities as "belonging to the Counterparty" and that they "do not belong to the Prime Broker".

The IPBA required the client's securities to be segregated, and permitted mixing with LBIE's property only in exceptional circumstances. Furthermore, the right of use was hedged about by obligations to replace securities thus used with equivalent securities, hence my description of it as a right to swap, whereas in the present case, LBIE's consensual use of securities held in its house depot account appears to have been subject to no significant restrictions of any kind.

294. I am therefore satisfied that there is no inconsistency between my conclusion in the present case that, prior to the application of Rascals, no trustee beneficiary relationship existed between LBIE and the affiliates, and my contrary conclusion in relation to the IPBA (Charge).   At the end of the day, a line has to be drawn somewhere.  I am satisfied that it lies between those two different structures.

**The Period After The Implementation Of Rascals**

295. LBIE's use of securities held for the account of its affiliates did not become any more trustee-like after the introduction of Rascals, at least in relation to Rascalled securities.  On the contrary, as already explained, the policy by which such securities were to be put to use by lending to the street for the improvement of LBIE's cash-flow intensified after Rascals was introduced.  Furthermore, the Rascals processes were specifically designed and intended to justify that use, both in terms of avoiding any regulatory requirement to segregate, and in terms of ensuring (albeit in my judgment unnecessarily) that LBIE had good title to lend securities to the street.

296. Nonetheless, the interposition of the Rascals processes between the acquisition of securities for the account of affiliates and their use in street lending necessarily acquires a complete re-analysis of the factors for and against the recognition of a trustee beneficiary relationship during the (largely theoretical) period between acquisition and Rascalling.

297. At the heart of any repo or stock loan is a mutual assumption that, prior to its taking effect, the on-leg seller or stock lender (as the case may be) has some form of proprietary interest in the underlying security.  In short, it must have property to sell or to lend, if the repo or stock loan is not to be meaningless.  This must be all the more the case in relation to repos or stock loans which (as they invariably did as between LBIE and its affiliates) in terms preserve for the seller/lender the economic fruits, risks and benefits of the underlying security throughout the period of the repo or stock loan.  If those economic fruits, risks and benefits are not transferred, and no property interest is transferred either, the repo or stock loan is denuded of any operative effect.

298. For the purpose of the objective ascertainment of the parties' mutual intention, it must be supposed that they considered that the repos and stock loans were effective, even if, as alleged, they may in fact have been defective for one or more technical reasons.  I exclude from that analysis the Automatic Rascalling of securities acquired for the book of LBCCA, where its case is not merely that the repos were technically ineffective, but that they were made by LBIE with the wrong affiliate, leaving LBCCA entirely unaffected by them.  I will return later to the issue whether LBCCA's case in that regard is made out.

299.   It is in my judgment entirely artificial, and therefore misleading, to appraise the parties' mutual intention as at the moment of acquisition of a security for the affiliate's book without regard to the fact that, in accordance with well established procedures, the underlying security was either immediately thereafter to be Automatically Rascalled, or eligible for Manual Rascalling because of its suitability for street lending.  In relation to securities eligible for Automatic Rascals, the entirely automated procedures in place by 2006 left no room for uncertainty, as at the moment of acquisition, whether such securities would be Rascalled.  Their subjection to an immediate repo on the settlement date was an entirely automated process calling for no human intervention of any kind.

300.   The position in relation to Manual Rascals is less straightforward, both because the process was discretionary, depending upon the decision of a member of LBIE's trading team, and because the stock loan did not always immediately follow the settlement of the acquisition from the street.  Nonetheless, the understanding upon which Manual Rascals was based was, as I have already described, designed to ensure that before any specific security was lent to the street by LBIE, it would be made the subject of a stock loan from the relevant affiliate, if it had not already been Automatically Rascalled.

301.   Two important consequences flow from that analysis.  The first is that, as all the respondents submitted, the mutual understanding and intention of the parties in relation to any security eligible for Automatic or Manual Rascals must have been that, to enable the Rascals process to take effect, the basis upon which its acquisition from the street had been settled by LBIE was such as to confer some form of proprietary interest on the affiliate.  The second consequence is that the use, subsequent to Rascalling, of the underlying security by LBIE for the furtherance of its own business (whether by street lending, settling short positions or otherwise) is no longer a significant factor in the objective ascertainment of the parties' intention as to beneficial ownership on acquisition.  On the contrary, as Mr Dicker cogently submitted, LBIE's subsequent conduct in relation to the underlying Rascalled securities is entirely attributable to the mutual intention that the repos and stock loans between LBIE and the affiliate (rather than the acquisition itself) should confer upon LBIE absolute title, free from any competing proprietary interest in the affiliate.

302.   Mr Milligan's response to these two submissions was his often repeated refrain that, in reality, the Rascals processes were just a form of belt and braces, designed merely to resolve some doubt about whether LBIE acquired, and thereafter retained, absolute title on acquisition.  Mr Milligan sought to buttress that submission by reference to the recitals to the standard form ICRA and MPRA, which do indeed make some reference to the avoidance of doubt.

303.   I have not been persuaded by this submission.  The evidence shows that the prevailing assumption within the Group was that LBIE's acquisition of securities for the account of an affiliate conferred a proprietary right on the affiliate, the only uncertainty being whether that right was (in accordance with normal practice between parties at arm's length) postponed until the receipt of payment.  Secondly, none of the agreements between LBIE and the affiliates pursuant to which Rascals was implemented, still less the industry standard form repos and stock loans utilised for that purpose, disclose any uncertainty as to the existence of a proprietary interest in the affiliate.  On the contrary, the presumed existence of such an interest is the essential basis for all those

transactions.  Thirdly, the reference in the recitals to the standard form ICRA and MPRA is to the avoidance of doubt about whether LBIE and its affiliates were adhering to capital adequacy and other regulatory requirements, rather than to a doubt as to whether, apart from Rascals, the affiliates had proprietary interests in the underlying securities.

304.   Even if there may have been differing views about that question within the Group prior to 1996, the implementation of the Rascals processes by the use of repos and stock loans simply demonstrates in my judgment that those who assumed that the affiliates did acquire proprietary interests upon settlement of acquisitions from the street prevailed, and that it is their intention and understanding, rather than any different understanding of those who thought otherwise, that must be taken as governing the parties' mutual intention during the period after 1996, when Rascals was being implemented.

305.   It is nothing to the point that I have concluded that prior to the implementation of Rascals, the prevailing understanding within the Group was, as a matter of English law, wrong, so that for any purpose connected with a need to ensure that LBIE had absolute title to the underlying securities, the Rascals processes were unnecessary. The parties' decision to implement those processes has the two consequences which I have just described, and for which the respondents have contended.

306.   It follows in my judgment that the introduction of the Rascals processes as an important element in the terms governing LBIE's acquisition of eligible securities for its affiliates' accounts not only compels a re-evaluation of the question whether the affiliates thereby obtained a proprietary interest on acquisition, but also a conclusion, contrary to that which I have reached in relation to the pre-Rascals period, that they indeed did acquire such an interest.  By eligible securities I mean, of course, securities eligible either for Automatic or Manual Rascals.  It is an entirely different question, as to which I express no view one way or the other, whether the acquisition of securities which were ineligible for Rascals processing (whether because they were issued by a Lehman group company, inappropriate for lending to the street, or for any other reason) gave rise to any similar proprietary interest.  Not only were such securities not Rascalled, but they were, ex hypothesi, unlikely to be subjected to street lending or other uses essentially inconsistent with the existence of a trust in relation to them.  In any event, such securities are not the subject matter of this application and there has been no satisfactory evidence about how securities of that type were dealt with by LBIE after acquisition.

307.   I have considered whether the mutual intention (which was a pre-requisite of the Rascalling of eligible securities) that the affiliates should first acquire some proprietary interest in them ought to be regarded as a conditional intention, the condition being the effectiveness of the relevant Rascals repo or stock loan as a means of the transfer of title back to LBIE.  In my judgment I should not so conclude. Nothing in the way in which LBIE and the affiliates dealt with the Rascals processing of eligible securities after 1996 suggests any doubt in the corporate minds of the parties as to the effectiveness of the repos and stock loans for the purpose of clothing LBIE with absolute title.   The challenges to the effectiveness of the Rascals transactions with which I have to deal emerged entirely after the collapse, when the structures came to be subjected to the critical analysis of the various affiliates' office-holders and their legal advisers.

308.   To that general conclusion there are two potential exceptions.  The first is LBCCA, in relation to Automatic Rascals to which, on the face of the documents at least, it was not a party.  Mr Dicker had no cogent answer to the proposition that LBCCA could hardly, at one and the same time, rely upon the intended Rascalling of eligible securities as a critical factor in the beneficial interest analysis, while repudiating any involvement in that process.

309.   The second more complicated exception relates to LBI.  It will be recalled that the capital adequacy problem arising from LBIE's acquisition of securities for the account of affiliates had no real application as between LBIE and LBI, because of the process of regular pay-downs of inter-company indebtedness which followed within a day or two of any relevant acquisition.  LBIE was simply not for any significant period an unsecured creditor of LBI in relation to the aggregate cost of such acquisitions.   It may be for that reason that Automatic Rascals was never applied as between LBIE and LBI.

310.   There was nonetheless some stock lending between LBIE and LBI, but it is by no means clear that this took place as part of any conscious application of Rascals processing, rather than merely on a sporadic basis, as and when LBIE wished to lend to the street a security acquired for LBI's book.  As between LBIE and LBI this case is in fact concerned only with some thirteen securities still held in a LBIE depot which were the subject of stock loans at the time of the collapse.  All other issues between LBIE and LBI in relation to securities acquired for its book remain to be resolved on some future occasion.

311.   The second complication arises from the terms of clauses 8.4 and following of the UCCBSA (quoted above) which appeared for the first time in its November 1996 version.  These provided, in relation to securities not paid for on acquisition, (i) that LBIE should "be deemed to have stepped in as principal at point of settlement", (ii) that until paid for, LBIE should have the unfettered right to use the securities as it saw fit, subject to maintaining a separate account of those transactions, and (iii) that upon default LBIE should have the right to realise all securities held pursuant to clause 8.4 and to apply the proceeds of sale to exclude any balance on that separate account.

312.   Considerable time and effort both by counsel and by LBI's expert were devoted to the question whether, in relation to securities not paid for by LBI, clause 8.4 and following deprived LBI of any proprietary interest which it might otherwise have had in those securities.  That dispute included a debate about whether LBI's expert's opinion about what a New York court would conclude that clauses 8.4 and following actually meant was even admissible in this court, a debate which, had it been necessary to do so, I would have resolved against LBI.

313.   But in my judgment it is neither necessary nor appropriate for me to address the issues arising from the interpretation of clauses 8.4 and following of the UCCBSA (1996 version) on this application.  It is unnecessary because, so far as I have been able to ascertain, there is no basis for concluding that, by the time of the collapse, the acquisition of those securities which had by then been subjected to stock loans had not been paid for by LBI to LBIE under the regular pay-down process which I have described.  The only difficult issue in relation to the thirteen relevant securities is whether LBIE had ever paid the collateral in respect of ten of the thirteen, and if not, whether LBIE could rely on a passing of absolute title from LBI to it under the

relevant stock loans.  For present purposes, the necessary common assumption that, immediately prior to those stock loans, LBI had a proprietary interest thereby to confer upon LBIE is sufficient to justify an affirmative answer to the question whether LBI had such a proprietary interest, even if for reasons which have not been explained, LBIE never thereafter paid the collateral.

314.   Whatever the precise meaning of Clause 8.4 and following of the UCCBSA, Mr Brindle submitted that they showed that, if and when LBI did pay for LBIE's acquisition of securities for its book, LBI was intended to have a proprietary interest in them, regardless whether they were Rascalled, or even eligible for Rascalling.  I recognise the force of that, but if LBIE continued to use and manage all such securities in the same way as it had before the introduction of Rascals (i.e. whether or not Rascalled), I would not regard the terms of the 1996 UCCBSA as sufficient to override the considerations which have led me to conclude that no proprietary interest was intended or in fact created.  The difficulty in relation to LBI is that, since this Application has not been about non-Rascalled securities, the evidence does not show whether in fact LBIE did continue to use LBI's securities in the same non-trustee-like manner after 1995.  That evidential lacuna makes it inappropriate that I should resolve that question now.

## Conclusion

315.   I can therefore conclude the difficult analysis of the first main issue between the parties as follows.  Prior to the implementation of Rascals, the terms upon which LBIE acquired securities and thereafter held them in its un-segregated house depot accounts for the books of affiliates did not give rise to a proprietary interest in favour of the affiliate, but only to personal rights.  Secondly, following the implementation of the Rascals processes, the acquisition of securities eligible to be Rascalled, and which were then purportedly Rascalled, including therefore all the securities the subject matter of this application, did give rise to a beneficial interest in the affiliates immediately prior to being Rascalled, regardless of the effectiveness or otherwise of the Rascals transactions in conferring absolute title on LBIE.  To that second conclusion there is the exception in relation to LBCCA, to which I shall return.  Furthermore it applies to LBI only in relation to the subject matter of the 13 stock loans open as at the date of the collapse.

## B.   DOES THE RASCALS PROCESSING OF THE RELEVANT SECURITIES MEAN THAT LBIE NOW HOLDS ABSOLUTE (INCLUDING BENEFICIAL) TITLE TO THE RASCALLED SECURITIES REMAINING IN ITS DEPOTS?

316.   The number and variety of competing arguments which arise in this part of the case, together with the factual differences affecting LBIE's relationship with each of the respondents, make the presentation of my analysis and conclusions on this question a complicated task in itself.  For the most part I have no alternative but to consider the case in relation to each respondent separately (albeit treating LBCCA and LBAH as a single group) and to address Automatic Rascals separately from Manual Rascals.  It is for the most part also necessary to consider the effect of on-legs separately from the effect of off-legs, both in relation to repos and stock loans.  In addition to questions of interpretation, the parties' submissions also raise issues of performance, waiver and estoppel by convention, as well as an alleged resulting trust of the type first identified in Barclays Bank Limited v. Quistclose Investments Limited [1970] AC 567.

317.  It is convenient however to begin by mentioning certain points of common ground, and by resolving one point which was common ground save for one dissentient party.

318.  First, it was common ground that, subject to any issue as to compliance with a condition precedent, the on-leg of each repo and stock loan was effective to transfer any proprietary interest of the relevant affiliate to LBIE.  By relevant affiliate I mean the affiliate which was party to the relevant repo or stock loan.  Secondly, it became common ground during the hearing that, as a matter of contract, the passing of title under the on-leg of each repo and stock loan was conditional upon payment by LBIE of the on-leg purchase price or collateral (as the case may be).  Thirdly, it was almost common ground that, as a matter of contract, the passing of title from LBIE back to the affiliate under each off-leg was also subject to the same condition as to payment. The only dissenter from that last proposition was LBF, the point being conceded by the other respondents.

319.  In my judgment the concession was rightly made.  I need only deal with LBF's challenge, by reference to the contractual provisions between it and LBIE.  Clause 1 of the ICRA made in March 1996 provided that the re-sale and return to LBF of equivalent securities was to be:

> "Against the payment of their purchase price or return of collateral in money by Seller to Buyer."

Clause 3(c) of the standard form GMRA in force at the time of the collapse made similar provision in relation to repos, and clause 6(c) provided that:

> "Transfer of Equivalent Securities by Buyer and payment of the Repurchase Price payable by Seller against the transfer of such Equivalent Securities shall be made simultaneously."

Finally, the standard form OSLA dated 27th February 1997 (which regulated stock loans), made similar provision in clause 7(B), to the effect that repayment of the collateral was to be simultaneous with the transfer of equivalent securities to the lender.  In my judgment it is clear, as between LBIE and LBF, that as a matter of contract LBIE's obligation to re-transfer title to equivalent securities, both under repos and stock loans, was conditional upon the simultaneous payment of the repurchase price or repayment of the collateral (as the case may be) by LBF.  When it is borne in mind that LBIE's and LBF's books uniformly recorded LBIE as a secured creditor of LBF in relation to the repurchase prices payable and the collateral repayable under the off-legs of repos and stock loans, a conclusion that LBIE was contractually obliged to return to LBF its proprietary interest in the underlying securities otherwise than in exchange for payment would in my judgment be commercially absurd.

**LBF**

**Automatic Rascals**

**The on-leg**

320. It will be recalled that the Administrators' case is that LBIE paid for the on-leg of the first repo under the Automatic Rascals process by way of offset of its payment obligation against LBF's obligation to refund LBIE for its cash payment of the acquisition price of the security from the street.

321. LBF advanced the following counter-submissions, all in support of the general argument that LBIE never paid the on-leg purchase price.  First, Mr Moss submitted that the accounting records were inconsistent with any automatic set-off.  Secondly, he submitted that, on the true construction of the Inter-company Funding Agreement of June 2000 ("the ICFA") LBHI rather than LBF was LBIE's debtor in relation to the purchase price from the street.  Mr Jones for LBSF submitted that, even if those two arguments were wrong, nonetheless in every case in which the purchase price for the on-leg of the first repo exceeded the purchase price payable to the street, then nonetheless LBIE did not pay even by offset in full, so that the condition for the passing of title on the on-leg was not satisfied.  If that submission were good for LBSF, it would equally be good for LBF.

322. By way of riposte, Mr Milligan submitted that if for any of those reasons the contractual condition for the passing of title on the on-leg of the first repo was not satisfied, nonetheless LBF was estopped by convention from denying that title had passed, both on the first and every subsequent on-leg.

323. In support of his submissions both as to interpretation and estoppel, Mr Milligan submitted that I should approach those issues upon the basis of the recognition of an overriding common intention between the parties that Automatic Rascals was to bring about a vesting of absolute title to the underlying securities in LBIE for the whole of the period between the acquisition of the securities from the street and their subsequent re-sale to the street, a submission which acquired the abbreviated name of "cradle to grave".  Mr Moss submitted that I should consider each successive repo as a separate transaction, with no relevance attached to its place in a series.  It is convenient to address this difference of approach at the outset, since it coloured much of the detail of the parties' rival submissions.

324. I accept the broad thrust of Mr Milligan's cradle to grave analysis, for the following reasons.  While it is of course necessary to look separately at each repo, for example for the purpose of understanding how it was performed and paid for (if it was), and for the purpose of understanding the structure of the stream of daily repos as a whole, nonetheless a purposive approach to the interpretation of the repos as the mode of achieving the objectives of the Automatic Rascals process leads inescapably to a conclusion that the parties' purpose was indeed to bring about a continuous vesting of absolute title to the underlying securities in LBIE, rather than a vesting of title in LBIE between (say) 7 p.m. on each working evening and (say) 2 p.m. on the afternoon of the next working day, with a vesting of beneficial title in the affiliate between 2 p.m. and 7 p.m., as Mr Moss argued.

325. That conclusion follows inevitably from an analysis of the problems for which Rascals (including Automatic Rascals) was to be a solution. None of the three problems would be solved merely by arrangements which left LBIE as the absolute owner of the underlying securities for part, rather than the whole, of each day. Thus, Article 4 of the Capital Adequacy Directive (Council Directive 93/6/EEC) clearly required the prescribed level of adequacy to be maintained at all times, and it is clear from correspondence between the Security and Futures Authority and the Group in relation to the Capital Adequacy Directive in December 1995 that this was well understood within the Group. Similarly, the avoidance of a requirement to segregate, and the assurance of good title to lend the underlying securities to the street both required that LBIE be continuously, rather than intermittently, the absolute owner of the underlying securities. In particular, LBIE did not confine the street lending of securities subjected to Automatic Rascals rigidly to one day repos.

326. Finally, the reason for the use of a stream of successive one day repos in the Automatic Rascals process had nothing to do with creating intermittent title in LBIE. Its purpose was to provide a mechanism whereby the amount of the secured loan from time to time was constantly adjusted so as to be equivalent with the marked to market value of the stock held by LBIE as security. In that respect the constant repetition of daily repos under Automatic Rascals had the same margining effect as the provisions for adjustment of collateral in the open-ended stock loans used under Manual Rascals.

327. Mr Moss's best point was that the evidence did show (albeit by reference to specific examples rather than a comprehensive survey) that there could be a gap of some hours between the processing of the off-leg of one repo and the on-leg of the next repo on any particular day, and the consequential accounting entries did, if read literally, appear to substitute the secured debt owed to LBIE for an unsecured debt on settlement of the off-leg, followed by a new secured debt of the adjusted marked to market amount on the settlement, later in the day, of the next on-leg. There was on the face of it a period each day when, according to the parties' records, no repo on-leg was in place.

328. The cradle to grave submission is however concerned not with continuity of contracts but with continuity of absolute title. I have decided, contrary to Mr Moss's submission, that the passing of title back to an affiliate pursuant to the off-leg of a repo was conditional upon simultaneous payment of the repurchase price. The intention behind the Automatic Rascals structure was, as I have already described, that the off-leg repurchase price would be largely offset against the next on-leg purchase price payable by LBIE. Thus in the example of an off-leg booked as settled at 2 p.m. and a following on-leg booked as settled at 7 p.m. on the same day, title under the off-leg would pass back to the affiliate only upon settlement of the on-leg, whereupon it would pass immediately back to LBIE. In abstract theory there might, as Mr Backhouse graphically described it, be a split second while title lay with the affiliate on its way round the circle which started and finished with LBIE, but the interpretation of commercial documents is no more to be affected by such split seconds as the analysis of a mortgage transaction is to be based upon the supposed *scintilla temporis* between the purchaser's acquisition of the legal estate, and his charge to the lender: see Abbey National v. Cann [1991] 1 AC 56, at 93, per Lord Oliver.

329.  Returning to the respondents' main submissions in support of the supposed
ineffectiveness of the repo on-legs, there is in my judgment nothing of substance in
the distinction between offset and set-off for the purposes of deciding whether LBIE
paid for the first on-leg after settlement of an acquisition from the street.  It is true that
in the unsecured inter-company account between LBIE and LBF the offsetting entries
of LBF's debt to LBIE (for the street acquisition price) and LBIE's debt to LBF (for
the first on-leg) are merely recorded as successive entries, with no immediate journal
extinguishing them as against each other.  But that comes nowhere near displacing a
conclusion that the parties intended that the offsetting of those two obligations should
have the effect, *pro tanto*, of paying both debts.  Where in a single account two parties
record successive mutual credits and debits there is in reality only a net debt owing,
one way or the other between them, at any particular moment in time: see Wood on
English and International Set-Off at paragraph 3-3.  This normal conclusion may of
course be displaced by a contrary intention where for some reason the parties wished
to preserve the opposing debts, but in the present case the evidence as to intention is
all one way.  Witness after witness agreed with Mr Moss in cross-examination that
payment under the repo structure of Automatic Rascals was to be by book entry rather
than by cash.  A book entry which merely records an unpaid debt pays nothing.  But
book entries which record offsetting debits and credits sufficiently evidence payment
if, but only if, there is an offsetting credit available for that purpose.

330.  I am no more impressed by Mr Jones' submission that, in cases where the repo on-leg
price was greater than the acquisition price from the street, the condition for the
passing of title was not satisfied in full, and therefore, not at all.  The parties must be
taken to have understood when setting up the Automatic Rascals process that
increases in the value of the underlying security between the trade date of its
acquisition from the street and the date of the first repo would lead to small
deficiencies in payment of the on-leg purchase price, which would then fall to be
settled as unsecured liabilities at the next monthly netting and novation process, as
between LBIE, LBF and LBHI.  It is inconceivable that the parties can have intended
the efficacy of a repo on-leg in passing absolute title from the affiliate to LBIE to
depend upon whether the on-leg purchase price was slightly greater, equal to or
slightly less than the acquisition price from the street.  The answer that an available
but slightly smaller offset was sufficient to discharge the simultaneous payment
condition for passing of title on the on-leg may be arrived at either, as a matter of
interpretation, by a vigorous application of the principle *verba ita sunt intelligenda ut
res magis valeat quam pereat* or on the basis that any consequential non-compliance
with the strict terms as to passing of title was simply waived by the affiliate.

331.  The main plank in Mr Moss's case that title did not pass to LBIE on the first on-leg,
enthusiastically supported by both Mr Dicker and Mr Jones, was that LBIE had no
available offsetting receivable due from LBF, because of the terms of the ICFA.  By
clause 1 LBHI agreed to provide funding to LBF and to permit LBF to provide funds
to LBIE to effect settlement transactions on behalf of LBF.  LBIE was to hold funds
provided by LBF on deposit for LBF and requested by LBF from time to time.
Clause 1 concluded that, for the avoidance of doubt "any loans under this agreement
are provided directly from LBHI to LBF and at no time will LBIE be regarded as
lending to LBF".

332.   LBF's case was that whenever an acquisition by LBIE from the street for LBF's book settled (as it always did) without LBF paying cash, the acquisition was for the purposes of clause 1 of the ICFA to be treated as funded by LBHI rather than by unsecured lending by LBIE to LBF.  Mr Moss submitted that the final sentence of clause 1 (quoted above) was a deeming provision that ought to prevail over any apparent accounting entries to the contrary, and Mr Jones bolstered that argument by reference back to an earlier version of the ICFA between LBIE and LBSF (but with LBH plc rather than LBHI) which contained express words requiring a disregard of accounting entries to the contrary.  I was treated by Mr Jones and Mr Milligan to an erudite analysis of the authorities relating to the question whether words in an earlier agreement omitted from a later agreement are or are not to be implied. If it had been necessary to do so I would have concluded that it was not safe to assume that such an implication was intended by way of carry-over into the later ICFA between LBIE and LBSF, not least because of the change in parties and the introduction of Rascals between the dates of the two agreements.  Nonetheless I consider that Mr Moss is correct in his submission that the final sentence of clause 1 of the ICFA between LBIE and LBF is a deeming provision which, to the extent that it applies for present purposes, would override accounting entries to the contrary.

333.   I have not however been persuaded that clause 1 of the ICFA has any application to the acquisition from the street of securities which were then subjected to Automatic Rascals.  In my judgment, such an acquisition did not require funding from LBF at all, still less from LBHI in substitution for LBF.  The acquisition was in substance self-funded by LBIE, since it used LBF's unsecured obligation to pay for the acquisition price from the street as an offset against its obligation to pay the purchase price under the first repo on-leg.  The secured debt from LBF to LBIE which arose under the first repo did not represent funding for the acquisition of the security from the street, but LBF's off-leg purchase price obligation.

334.   All that LBF can be said to have funded in relation to an acquisition from the street was the amount (if any) by which the acquisition price exceeded the first repo on-leg price.  This was indeed retained initially as an unsecured debt to LBIE on inter-company account and, in due course, novated to LBHI at the month end so that it became thereafter funded by LBHI rather than LBF.  To that very limited extent clause 1 of the ICFA may have had some application to the acquisition from the street of Automatically Rascalled securities, as indeed the accounting entries show, albeit only at the month end. But by definition that amount, even if deemed immediately to be owing to LBIE by LBHI rather than LBF forms no part of the offset used by LBIE as the means of its payment for the on-leg.

335.   Nor is there anything in the notion that LBF funded the acquisition from the street during such brief period on the settlement date as may have elapsed between settlement of the acquisition from the street, and the taking effect of the first repo on-leg.  For the purposes of answering the question "did LBF or LBHI have to fund the acquisition?" that is no more than another *scintilla temporis*.

336.   It well may be that clause 1 of the ICFA had a more substantial operation in relation to acquisitions of securities by LBIE for LBF's book which were not then Rascalled at all.  But such acquisitions fall outside the scope of this application and I say no more about them.

337. Mr Moss and counsel for the other respondents concerned with Automatic Rascals sought to bolster their submissions about the ICFA by pointing to the undoubted fact that, as the Group's central banker and treasury, LBHI provided cash on a daily basis to LBIE, to the extent necessary for its immediate needs.  Furthermore the inter-company position between LBIE and LBHI was as a matter of policy maintained on a basis designed to ensure that LBHI was always LBIE's creditor, rather than the other way round.  For that purpose a prudential minimum of US$1 billion of net debt owed by LBIE to LBHI was sought to be maintained.  Furthermore, at least during the period immediately prior to the collapse, surplus cash in LBIE's house accounts at the end of a business day was routinely swept up and transferred to LBHI, with a fresh cash float being transferred back to LBIE at the beginning of the following day.

338. In my judgment this aspect of the Group's treasury and cash management system says nothing about the applicability of clause 1 of the ICFA to the acquisition from the street of Automatically Rascalled securities.  The Group's accounting records uniformly show that at no time did LBHI treat as part of its inter-company position with LBIE any part of the acquisition price of securities from the street for LBF's book other than such occasional unsecured balances as arose from transactions where the acquisition price from the street exceeded the on-leg price of the first repo.  The volume of business between LBIE and LBF, *a fortiori* if aggregated with the volume of similar business between LBIE and LBSF, and between LBIE and LBAH/LBCCA, was frequently so great that, if the full acquisition prices had been included, the amounts of unsecured indebtedness of LBHI to LBIE would substantially have overtopped the US$1 billion minimum LBIE debt, so as to render LBHI from time to time a net debtor to LBIE.  It cannot have been the intention of any of the parties to the ICFA that clause 1 should by a deeming provision have that destructive effect upon a major policy objective in relation to inter-company balances between LBHI and LBIE.

339. For those reasons the challenge to the effectiveness of the first repo on-legs based upon the ICFA fails.  In my judgment the uniform effect of the first repos in relation to the Automatic Rascalling of securities acquired by LBIE for LBF's book was, as plainly intended, to transfer to LBIE any proprietary interest of LBF in the underlying securities.

**The First Off-Leg And Subsequent Repos**

340. The above analysis of the effect of the first repo on-leg shows that, at the beginning of the business day following the settlement of the acquisition from the street, LBIE was indeed a secured creditor of LBF in respect of the off-leg repurchase price falling due later that day, because LBIE had acquired absolute title to the underlying security under the first repo by paying the on-leg purchase price by offset.  The result is, as I have also described, that since LBF never paid an off-leg repurchase price in cash but only by way of offset against LBIE's next on-leg purchase price obligation, title passed back to LBF, if at all, only for a nanosecond on its way round a circle which started and finished with LBIE, when the next repo on-leg settled.

341. The same analysis holds good for every subsequent daily repo.  The "cradle to grave" objective of conferring absolute title to the underlying security to LBIE on a continuous basis between the acquisition from the street and its subsequent resale to the street was thereby achieved.

342. It is therefore strictly unnecessary for me to address Mr Milligan's alternative submissions based upon estoppel by convention.  Mindful however that this case will probably be appealed, and of the risk that a higher court may take a different view of the complicated issues of interpretation and analysis thus far, I shall briefly address the estoppel submission, on the hypothetical basis that I had concluded that the repo on-legs were ineffective to transfer LBSF's proprietary interest in the underlying securities to LBIE, as a matter of contract.

343. An estoppel by convention may arise where parties to a transaction act on an assumed state of facts or law, the assumption being either shared by them both or made by one and acquiesced in by the other.  The effect of an estoppel by convention is to preclude a party from denying the assumed facts or law if it would be unjust to go back on the assumption.  See Republic of India v. India Steamship Co Ltd (No 2) [1998] AC 878 at 913 E-G.

344. The circumstances in which a shared but mistaken assumption as to the meaning or effect of a prior agreement between the parties will give rise to an estoppel by convention are not straightforward: see Keen v. Holland [1984] 1 WLR 251, Hamed El Chiaty and Co v. The Thomas Cook Limited [1992] 2 Lloyd's Rep 399, CP Holdings Limited v. Dougdale (unrep) 22nd May 1998, Wilson v. Truelove [2003] EWHC 750 (Ch), PW & Co v. Milton Gate Investments Limited [2004] Ch 142 and Colchester v. Smith [1991] Ch 448.  I attempted a summary of the relevant principles to be derived from Keen v. Holland and the cases commenting upon it in HMRC v. Benchdollar Limited & ors [2009] EWHC 1310 Ch, at paragraphs 41 to 52, albeit in a non-contractual context.  To the extent relevant, I have applied my summary of the relevant law in paragraph 52 of that judgment to the analysis of the various alleged estoppels by convention which have arisen in the present case.  For convenience I set it out below:

> "(i)     It is not enough that the common assumption upon which the estoppel is based is merely understood by the parties in the same way.  It must be expressly shared between them.
>
> (ii)    The expression of the common assumption by the party alleged to be estopped must be such that he may properly be said to have assumed some element of responsibility for it, in the sense of conveying to the other party an understanding that he expected the other party to rely upon it.
>
> (iii)   The person alleging the estoppel must in fact have relied upon the common assumption, to a sufficient extent, rather than merely upon his own independent view of the matter.
>
> (iv)    That reliance must have occurred in connection with some subsequent mutual dealing between the parties.
>
> (v)     Some detriment must thereby have been suffered by the person alleging the estoppel, or benefit thereby have been conferred upon the person alleged to be estopped, sufficient to

> make it unjust or unconscionable for the latter to assert the true
> legal (or factual) position."

345. The convention alleged by the Administrators has been variously put in written and oral submissions and in position papers, either that LBIE paid for the repo on-legs or that, in any event, the repo on-legs were effective to confer absolute title to the underlying securities on LBIE. Since the only challenge to the effectiveness of the repos for that purpose is the alleged absence of payment by LBIE for the on-legs, the two conventions amount in substance to the same thing.

346. By the time that any of the securities the subject matter of this application were acquired from the street, LBIE and LBF had for many years been engaging in a Rascals process of daily repos in relation to eligible securities of the same type. The mutual book entries resulting from those repos uniformly describe their effect as making LBIE a secured creditor of LBF in respect of the off-leg purchase prices under every repo. To LBF's knowledge (and with its acquiescence) LBIE had constructed the Automatic Rascals process in relation to those securities as a way of legitimising, from a capital adequacy, regulatory and street lending perspective, the basis upon which it carried out its acquisition, holding, and exploitation of such securities for LBF's book, and on the express basis that this necessitated the conferral upon LBIE of absolute title to the underlying securities, to the exclusion of any proprietary interest of LBF. LBIE's status as LBF's secured creditor appeared both in LBIE's and LBF's accounts, and constituted the basis upon which LBIE considered itself able properly to satisfy compliance with the capital adequacy regime introduced pursuant to the Directive. Both LBIE and LBF benefited from the conduct of the Automatic Rascals process on that basis and, in so far as it was intended thereby to confer the requisite capital adequacy upon LBIE, so did LBIE's unsecured creditors stand to benefit in the event of its insolvency. The conduct of the Automatic Rascals process on an assumption that the on-legs thereby conferred absolute title on LBIE was part of a course of dealing which both preceded and followed the acquisition of the securities which are the subject matter of this application.

347. In those circumstances I consider that the legal requirements for the establishment of an estoppel by convention are satisfied. Having for many years obtained the benefit of LBIE's acquisition from the street for securities for its book, without paying cash up front but on the assumption that LBIE became by the Rascals process a secured creditor, I consider that it would now be unconscionable for LBF to resile from that convention as to the effect of the on-legs of the Automatic Rascals repos. The requirement that the conventional understanding was sufficiently shared between LBIE and LBF, and that LBIE assumed an element of responsibility for it seem to me fully satisfied by their adoption of a mutual system of book-keeping which recorded LBIE as a secured creditor, and by LBF's acquiescence in circumstances where, but for the effective transfer of beneficial title, LBIE would have been unable to satisfy itself that it could continue to act as LBF's agent or broker in the acquisition of securities from the street, consistent with its capital adequacy and regulatory obligations.

348. Before leaving this aspect of the case I must briefly mention an alternative fall-back submission by Mr Moss as to the basis upon which the Rascals on-legs might properly be regarded as having been effective to confer upon LBIE absolute title to the underlying securities in circumstances where, contrary to my finding, it were

concluded that LBIE had not paid for the purchase price under the on-legs.  Mr Moss's submission (devised as will appear, for the purpose of giving LBF a leg-up in the next stage of the analysis) was that LBF could be said to have waived the requirement for simultaneous payment as a condition for the transfer of title.  On a like for like basis, Mr Moss submitted that a similar waiver should be identified in relation to the passing of title back to LBF on every off-leg.  Thus the daily repos should be analysed, he said, as a series of transactions under which title passed to and fro between LBIE and LBF, but without payment ever being made one way or the other on either leg of the transaction.

349.   Mr Moss's ingenious purpose for deploying that analysis was to ground a submission that, without payment of the repurchase price under the final off-legs which occurred when the Automatic Rascals was switched off a week after the collapse, LBF could recover its proprietary interest in the underlying securities without payment to LBIE.

350.   I have not been persuaded that the mutual and comprehensive waiver of all payment obligations under the repo transactions is a viable analysis, for two related reasons. The first is that I cannot envisage how the parties could properly have recorded LBIE as a secured creditor for the off-leg purchase price in circumstances where, by conduct, they had established a course of dealing which included a commitment by LBIE to return LBF's interest in the underlying securities on the off-leg without ever demanding simultaneous payment.  To treat the repos as conferring security upon LBIE in those circumstances would be a mere sham.

351.   Secondly, that analysis would have the consequence that for part of every day during a series of automatic repos, that is the period between settlement of the off-leg and settlement of the on-leg of the next repo, beneficial title would lie in LBF rather than LBIE, so that LBIE would for that period be in breach of its capital adequacy obligations, any regulatory requirements for segregation and would (or at least as the parties feared) lack title for the lending of the underlying securities to the street.  Mr Moss, with some support from Mr Dicker, submitted this mattered not if the time for measuring compliance with LBIE's capital adequacy and regulatory obligations was, on each day, at a moment when there was an on-leg in place.  For the reasons which I have already given, I am wholly unpersuaded by that submission.

### The Final Off-Leg

352.   The primary case advanced on behalf of LBF (and the other respondents engaged in Automatic Rascals with LBIE) was that since LBIE never acquired absolute title under the on-legs, the consequences, if any, of the final off-legs which occurred upon the switching off of the Automatic Rascals process do not matter.  I have rejected that case.

353.   Nonetheless LBF advanced a number of alternative submissions as to why, even if at the moment of collapse LBIE enjoyed absolute title to Automatically Rascalled securities, it nonetheless transferred a beneficial interest back to LBF when the process was switched off.  LBF's case may be summarised as being first, that this is what the final automatic book entries showed, namely that LBIE in fact transferred back beneficial title without insisting on payment by LBF.  Alternatively LBF alleges that because of its letter to LBIE terminating its authority to transact on its behalf, sent on 16th September 2008, the Automatic Rascals process ended with the off-leg which

immediately followed LBIE's receipt of that letter, all subsequent repos being unauthorised. LBF advances the same case as to the consequences of the settlement of that off-leg as it does in relation to the final off-leg recorded as taking place on 23rd September.

354.  For their part the Administrators submit that beneficial title did not pass back to LBF on the final off-leg for any one or more of the following reasons:

i)      It was never paid for the repurchase of the securities by LBF.

ii)     Equivalent securities were not appropriated by LBIE to any trust in favour of LBF.

iii)    The repurchase contract constituted by the off-leg was not specifically enforceable.

iv)     A proprietary remedy is excluded by the GMRA.

Those submissions would all apply equally to the off-leg on 23rd September and to the off-leg following receipt of LBF's termination letter on 16th September. Finally, the Administrators submit that, to the extent that LBF's case depends upon the off-leg recorded as occurring on the 23rd September, this was the result of an unauthorised action taken by an employee of LBIE, contrary to paragraph 64 of Schedule B1 to the Insolvency Act 1986.

355.  It is convenient to begin the analysis of this final stage, as between LBIE and LBF, by a summary of the relevant facts. On 15th September 2008, when the Group collapsed, there existed on-legs in relation to all securities with which this application is now concerned, as between LBIE and LBF, for which, as I have found, LBIE had paid by offset, and pursuant to which LBIE therefore had absolute title to the underlying securities.

356.  As at that date, LBIE was a secured creditor of LBF in (at least) the aggregate amount of all the off-leg repurchase prices of those repos, together with the aggregate amount of the off-leg repurchase prices of repos relating to all other Automatically Rascalled securities, most of which are no longer in LBIE's depots. As was well known to both parties and (in due course) to their office-holders, there was no prospect that LBF would be able to pay those debts, and LBIE's only effective security for payment consisted in a refusal to re-transfer to LBF any proprietary interest in equivalent securities, and a consequential right to realise such corresponding underlying securities as it held in its depots, for the benefit of its unsecured creditors.

357.  Both on 16th and 23rd September, the parties' mutual computerised book-keeping system was still up and running, and recorded apparent settlements of all repo off-legs due to take place on those two dates. On both occasions the accounting system showed LBF's secured debt to LBIE as replaced by an unsecured debt. On 16th September this was immediately replaced by a secured debt for the off-leg of the new repo apparently contracted on that day. On 23rd September no reinstatement of LBIE as LBF's secured creditor occurred, so far as appears from the automatic book entries.

358. The electronic processes which led to that result on 23rd September resulted from a decision by an employee of LBIE, for which no specific authority had been obtained from the Administrators, to set all the eligibility tags for Automatic Rascals in relation to the relevant securities from eligible to ineligible.  But for that switching, Automatic Rascals would have continued in relation to the underlying securities between LBIE and LBF, potentially *ad infinitum* but in reality either until the relevant computers broke down, or until the process was switched off in some other manner.

359. The electronic recording of the settlement of the final off-legs on 23rd September occurred not because of the conscious decision of an individual to waive any condition of payment by LBF, but simply because the computer programme had been set up from the outset on an assumption that, immediately after any off-leg, there would either be a new on-leg or the settlement of a sale of the underlying security to the street.  It is possible to see, with the benefit of hindsight, why such accounting entries would ordinarily follow from the switching of all eligibility tags to ineligible, but I consider it most unlikely that the individual who took the decision to switch the tags either appreciated that this would be what would then occur, still less that the final automatic book entries would be used as the basis for a case that LBF rather than LBIE now has beneficial title to the surviving underlying securities.  All that the evidence shows is that the decision to switch the tags was taken in the belief that this was consistent with the blanket instructions given by the Administrators on 15th September, because it prevented LBIE from entering into any new Automatic Rascals transactions with LBF.

360. In my judgment neither on 16th nor 23rd September did the repo off-legs recorded in the parties' mutual electronic records have the effect of bringing about a transfer back to LBF of any proprietary interest in the underlying securities, save only in the sense of a momentary transfer on 16th September if, but only if, the on-leg of the next repo which is recorded as having then followed was authorised by LBF.

361. At the outset, I consider it strictly unnecessary to decide, one way or the other, whether the final authorised repo had its off-leg on 16th or 23rd September.  My reasons for concluding that in neither case did LBF thereby reacquire a proprietary interest (other than momentarily on 16th) are based upon an analysis of whichever of the two was the last authorised transaction between the parties. Should it matter to a higher court, I would have concluded that LBF's instruction to LBIE on 16th September was insufficient to terminate the process of daily repos, because (by contrast with transactions with the street) the computerised process by which the Rascals repos were transacted did not require LBIE to act as LBF's agent. Each transacted with the other as principal.

362. Whichever it was, it is clear that LBF did not pay LBIE the repurchase price.  In my judgment LBIE did not waive compliance with that repayment obligation as a condition for the passing back to LBF of a proprietary interest in the underlying securities.  On my analysis of the way in which the daily repo process operated, LBIE had on every previous occasion been paid the repurchase price by offset against its payment obligation on the next repo, and title had momentarily gone round in a circle from LBIE to LBF and then back to LBIE on settlement of that further on-leg.

363. The mere fact that a computer programme was set up on a particular assumption (namely that any off-leg would be followed by an on-leg or by a re-sale of the

underlying security to the street) does not have the consequence that, when the computer mindlessly performed the same steps in the wholly different circumstances prevailing at the moment of the settlement of the last off-leg, its mechanical recording of the book entries which I have described means that LBIE either waived its right to payment, or transferred any proprietary interest to LBF.  On my analysis, on no previous occasion had title actually passed even momentarily back to LBF until payment by offset, and on the assumption that the off-legs and on-legs on any particular day were in terms of book entries separated in time, that momentary passing of title back to LBF did not occur merely because of the book entries made by the accounting computer at the moment of apparent settlement of the off-leg.

364.   Even if my primary analysis were held by a higher court to be wrong, such that there was some kind of habitual waiver of payment on the off-leg, I consider it entirely wrong to infer that any such waiver also occurred on the final off-leg, in the wholly different circumstances (by comparison with all those that gone before) that:

   i)   there was never to be another on-leg;

   ii)   the securities were not being sold to the street; and

   iii)   LBF's insolvency meant that it was never going to pay the repurchase price in any other way.

365.   It follows that I accept, as conclusive for all present purposes, the Administrators' first submission.  Had it been necessary to consider the others, I would not have accepted them.  While I acknowledge that the obligation of the off-leg seller under a repo is ordinarily a merely personal obligation which, because it relates only to equivalent securities, involves no trust of securities pending appropriation, the relevant fact-pattern for present purposes is that on 16th and/or 23rd September LBIE either held equivalent securities in a depot account, or held rights under repos or stock loans with the street to acquire equivalent securities which have since become identifiable by the reacquisition of such securities and their lodgement in a depot. When it is borne in mind that, from start to finish, LBF's proprietary interest consists not of an exclusive interest in any particular securities, but of a co-ownership interest in a fund, it seems to me that the reacquisition of a fund of equivalent securities constitutes a sufficient appropriation for present purposes to clothe a proprietary interest of that kind with sufficient substance to enable it to be regarded as the subject matter of a trust.

366.   In my judgment <u>Tailby v. Official Receiver</u> is sufficient authority for there being no need for the repo off-leg to be specifically enforceable, and for a sufficient appropriation to take place in the future, by LBIE's subsequent acquisition of equivalent securities.

367.   It will be apparent that I have not found it necessary to determine whether the Administrators' case that the switching off of Automatic Rascals was unauthorised is well-founded.  Nonetheless I will briefly address it, against the risk that it should become material on appeal.  Conceptually, it is tempting to regard a switching-off process designed to prevent new transactions occurring as both consistent with the Administrators' blanket instruction and as falling short of the exercise of a management power within the meaning of paragraphs 64(2)(a) of Schedule B1.  But

that is I think to ignore the way in which the switching-off process actually operated if, contrary to my conclusion, it had the effect of releasing rather than enforcing LBIE's security for payment of LBF's debt, by actually transferring back to LBF a proprietary interest in the underlying equivalent securities. The Automatic Rascals process could have been switched off in a manner which did not have that effect, for example by making sure that the book entries did not record a settlement of the final off-legs. That might have required assistance from persons with considerable IT skill and experience, but it would not have been impossible. If the Administrators had even known of the Automatic Rascals processes during their first week in office, I consider that they could have exercised their management powers in a way which did not even appear to release LBIE's security for payment of LBF's debts. Since the switching off of Automatic Rascals was carried out in a way which interfered with the ability of the Administrators to take that course, I consider that, had it otherwise been effective to transfer a proprietary interest in the underlying securities back to LBF, it infringed paragraph 64.

368. At a very late stage in the hearing, the point was taken that paragraph 64 of Schedule B1 does not spell out the consequences of an infringement of it, as between the company in administration and any third party. But in my judgment a third party who or which deals with a company in administration or with an officer of that company in circumstances which involve the company or its officer committing a breach of paragraph 64, without any step being taken by the administrators to confer actual or ostensible authority for the purposes of the relevant exercise of the management power, cannot complain of the administrators' recourse to paragraph 64 on the basis that the management power was exercised without their authority. Were it necessary to do so, I would conclude that a third party would be unable to avoid the consequences, even if it was equity's darling i.e. a *bona fide* purchaser for value without notice of the infringement. In the present case, since LBF neither could nor did pay the repurchase price, it was nothing more than a volunteer, in relation to the proprietary interest which it alleges it received as a result of the switching off of Automatic Rascals.

## Conclusion

369. For the reasons thus far given, I have therefore concluded that, in relation to securities which were, at the moment of LBIE's collapse, the subject matter of Automatic Rascals, LBF has no proprietary interest in such securities.

## Manual Rascals

370. The analysis of the Manual Rascals transactions between LBIE and LBF largely follows the above analysis of the Automatic Rascals process, but is simpler because of the absence of any repeated one day repos, and the concession by LBF that Manual Rascals transactions have all remained open since the collapse.

## The On-Legs

371. Mr Moss advanced substantially the same "no payment by LBIE" submission in relation to the stock loans under Manual Rascals as he did in relation to the repos under Automatic Rascals. For the most part, those submissions also fail, for the reasons which I have already given. In relation to stock loans instituted on the same

day as the settlement of the acquisition from the street, there is in my judgment no relevant distinction between Automatic and Manual Rascals in relation to the first (and, for a stock loan, only) on-leg.

372.   In relation however to stock loans instituted on a later date, there is at first sight less force in my conclusion that the acquisition from the street required no funding from LBF or therefore from LBHI within the meaning of clause 1 of the ICFA. Pending the putting into place of a stock loan, it may be said that, for a brief period, the acquisition from the street was funded by an unsecured debt due from LBF to LBIE, rather than by LBIE's payment obligation under the on-leg. The period between the settlement of the acquisition from the street and the on-leg under the stock loan is not so obviously a mere *scintilla temporis*, without legal or commercial consequences.

373.   Nonetheless, by parity of reasoning with the purposive analysis which I have applied to the funding issue in relation to Automatic Rascals, it cannot objectively have been the parties' intention that the deeming provisions of clause 1 of the ICFA should be applied to the question whether or not LBF was a debtor for the acquisition price from the street, so as to provide the offset against LBIE's payment obligation in relation to the on-leg. To treat the effectiveness of the Manual Rascals process as depending in each case upon whether the stock loan was entered into on the day of the settlement with the street, or on some later date, seems to me commercially incomprehensible. It would in any event have no impact at all on the outcome of the alternative case based upon estoppel by convention. Furthermore the alternative analysis by way of habitual waiver of payment obligations is no more persuasive, not least because LBIE is recorded as a secured creditor of LBF in relation to stock loans in exactly the same way as it is in relation to repos. Perhaps more importantly, the waiver analysis in relation to stock loans takes LBF nowhere because it is not suggested that the relevant stock loans have ever closed.

374.   There might have been some substance in treating delayed stock loans as falling within a separate category from other Rascals processing (so far as concerns the applicability of the case based on the ICFA) if there was evidence that they had been recorded in the parties' mutual records any differently from other Rascals transactions. On the contrary, LBIE is shown as LBF's secured creditor just as much in relation to delayed stock loans as it is in relation to automatic repos and immediate stock loans, at least in the sense that there was no submission or evidence to the contrary.

**After the Collapse**

375.   Mr Moss very fairly acknowledged on behalf of LBF that if his submissions as to the absence of any passing of title on the on-leg under the stock loans did not prevail, then absolute title to the underlying securities rested with LBIE at the time of the collapse. Nonetheless he and the other respondents advanced a claim for a beneficial interest under a resulting trust, of the Barclays Bank Limited v. Quistclose variety. The argument ran as follows. The main purpose of Manual Rascals was to facilitate LBIE's lending of the underlying securities to the street, in the course of its business. Once LBIE ceased business, that purpose became impossible of fulfilment. Accordingly, but by way of resulting trust, LBIE should be regarded as holding the underlying securities upon trust to give effect to the same proprietary interest in LBF as had preceded the putting in place of the stock loans pursuant to Manual Rascals.

376.    As authority for that argument Mr Moss took me to the thorough analysis of the
        Barclays v Quistclose resulting trust in Lord Millett's dissenting speech in Twinsectra
        Limited v. Yardley [2002] 2 AC 164, at paragraphs 68-100.  The gist of Lord Millett's
        analysis (and in this respect he was the only one of their Lordships to express any
        view on the subject, rather than a dissenter) was that if A transfers money or other
        property to B to be used only for a specific purpose, then B obtains no beneficial
        interest in the property, but holds it as a fiduciary, first to use it if possible for that
        purpose, and if not, on resulting trust for A.  Such an arrangement "prevents the
        borrower from obtaining any beneficial interest in the money, at least while the
        designated purpose is still capable of being carried out" (paragraph 69). The question
        in every case "is whether the parties intended the money to be at the free disposal of
        the recipient" (paragraph 74). "The duties are fiduciary in character because a person
        who makes money available on terms that it is to be used for a particular purpose only
        and not for any other purpose thereby places his trust and confidence in the recipient
        to ensure that it is properly applied.  This is a classic situation in which a fiduciary
        relationship arises, and since it arises in respect of a specific fund it gives rise to a
        trust." (paragraph 76).

377.    Lord Millett concluded as follows, at paragraph 100:

            "As Sherlock Holmes reminded Dr Watson, when you have
            eliminated the impossible, whatever remains, however
            improbable, must be the truth.  I would reject all the alternative
            analyses, which I find unconvincing for the reasons I have
            endeavoured to explain, and hold the Quistclose trust to be an
            entirely orthodox example of the kind of default trust known as
            a resulting trust.  The lender pays the money to the borrower by
            way of loan, but he does not part with the entire beneficial
            interest in the money, and in so far as he does not it is held on a
            resulting trust for the lender from the outset.  Contrary to the
            opinion of the Court of Appeal, it is the borrower who has a
            very limited use of the money, being obliged to apply it for the
            stated purpose or return it.  He has no beneficial interest in the
            money, which remains throughout in the lender subject only to
            the borrower's power or duty to apply the money in accordance
            with the lender's instructions.  When the purpose fails, the
            money is returnable to the lender, not under some new trust in
            his favour which only comes into being on the failure of the
            purpose, but because the resulting trust in his favour is no
            longer subject to any power on the part of the borrower to make
            use of the money.  Whether the borrower is obliged to apply the
            money for the stated purpose or merely at liberty to do so, and
            whether the lender can countermand the borrower's mandate
            while it is still capable of being carried out, must depend on the
            circumstances of the particular case."

378.    Accepting as I do for present purposes the whole of that analysis, I consider that the
        assertion of a resulting trust in the present case is manifestly unsustainable, for the
        following reasons.  First and foremost the fundamental purpose and effect of the stock
        loans was precisely to confer absolute title upon LBIE in relation to the underlying

security, to the exclusion of any continuing proprietary interest in LBF.  Secondly, LBIE paid for the transfer of LBF's beneficial interest by lodging collateral of equivalent value.  As Mr Moss eventually reluctantly acknowledged, he could not suggest that LBF could enjoy a beneficial interest under a resulting trust affecting the underlying securities without repaying that collateral in full.  Thirdly, the effect of the stock loan was not to confer a limited permission (still less obligation) on LBIE to use the underlying securities for a specified purpose, but rather to give LBIE an unfettered right of use, coupled only with a personal obligation to transfer equivalent securities on closure of the stock loan, in exchange for repayment of the collateral.  Fourthly, an important purpose of the stock loan (central to its effect for capital adequacy purposes) was in commercial terms to render LBIE a secured creditor of LBF in relation to the return of the collateral.  To describe the purpose of the transaction as having become impossible of fulfilment by reason of LBIE's insolvency is completely to ignore the fact that, because of LBF's insolvency, the status of the transaction as conferring security has, for the first time, become of the utmost value to LBIE, and to its unsecured creditors.

379.   In short, I find it difficult to conceive of any transaction (other than an outright sale) less amenable to a <u>Barclays v. Quistclose</u> analysis than the stock loans with which this case is concerned.

## Conclusion

380.   For the above reasons, I have concluded that LBF is no more entitled to a beneficial interest in securities the subject of stock loans under Manual Rascals than in relation to the repos under Automatic Rascals.

## LBSF

381.   I have reached precisely the same conclusions in relation to LBSF's claims as to the ineffectiveness of the Rascals processes as I have in relation to LBF.  In certain small respects, Mr Jones for LBSF relied upon aspects of the transactional relationship between his client and LBIE which differed from the pattern in relation to LBF.  In particular, LBSF was to a significant extent a single ticket rather than a two ticket participator in acquisition from the street.  Mr Jones sought to pray in aid an antecedent to the ICFA between LBSF, LBIE and LBHI, to which Mr Moss for LBF did not have recourse.

382.   Nonetheless, for reasons already given, those small differences in the pattern of dealings between LBIE and LBSF give rise to no relevant differences in the process of analysis of LBSF's challenges to the validity of the Rascals processes in conferring absolute title on LBIE.  I have taken on board distinct submissions made by Mr Jones for LBSF when addressing the matter as between LBIE and LBF, because it seemed to me that his submissions, if well-founded, would for the most part avail LBF as well.  As will be apparent, I have not been persuaded by those submissions.  It follows that my conclusions in relation to LBSF, both in relation to Automatic and Manual Rascals, match those which I have described in relation to the claims of LBF.

**LBAH/LBCCA**

383.    No such similar equivalence applies to the analysis required of the extraordinarily complicated position as between LBIE and the two Hong Kong affiliates. The central difficulty lies in finding an interpretation of the Novation and Netting Agreement ("NNA") which makes sense of the very different way in which Automatic and Manual Rascals processes were applied to securities acquired and held by LBIE for the book of LBCCA. Whereas LBAH acted as LBIE's repo counterparty under Automatic Rascals, LBCCA acted as the stock lender under Manual Rascals. Whilst it is therefore necessary to analyse Automatic and Manual Rascals separately, an attempt to understand the meaning and operation of the NNA which is based upon an exclusive focus upon one or other of those processes may fairly attract the criticism that it involves the wearing of blinkers. I shall therefore begin by addressing the interpretation of the NNA by reference to the whole of LBIE's activity of the acquisition and Rascalling of securities for the Hong Kong affiliates, before addressing the effectiveness of each of the Automatic and Manual Rascals processes separately.

384.    While the court is of course entirely neutral as between the parties in relation to a dispute about the meaning of an agreement, where (as here) the competition is between a party which asserts that the agreement is effective to achieve its obvious purpose, and a party which asserts that it is not, then the court is in my judgment obliged to search for an interpretation which achieves rather than destroys that purpose (i.e. *ut res magis valeat quam pereat*), albeit not to re-write the parties' bargain. The court's duty is in that respect no different from that which it faces when confronted by rival interpretations of a commercial agreement, one of which makes commercial sense, and the other of which produces a commercial nonsense.

385.    Mr Dicker's primary submission, for LBCCA and LBAH, was that whatever the meaning and effect of the NNA in relation to inter-company debts between its parties, it had no effect at all in relation to proprietary interests in securities. The result was that a proprietary interest in securities acquired for LBCCA's book could not be transferred to LBIE by anyone other than LBCCA. Since LBCCA was not a party to the relevant Rascals agreement (the MPRA between LBIE and LBAH of November 1997), nor (according to the electronic book entries) the on-leg seller under any of the repos entered into under the Automatic Rascals process, that process must therefore have been wholly ineffective to transfer any proprietary interest of LBCCA in the underlying securities. The implication behind Mr Dicker's submissions was that the decision that the Automatic Rascals process should be put in place between LBIE and LBAH rather than between LBIE and LBCCA was simply a dreadful mistake, from the consequences of which LBIE is now unable to escape.

386.    Conversely, although this was not part of his primary case, Mr Dicker pointed out that if the NNA was in some way effective to confer upon LBAH the necessary title with which to effect Automatic Rascals transactions with LBIE, then it is difficult to see how it could be construed so as to leave LBCCA with the requisite title for the purposes of Manual Rascals transactions with LBIE. His point was that there was no uniform interpretation of the NNA which extended its effect to proprietary interests in securities in a way which made sense of the parties' subsequent dealings.

387.    Mr Dicker submitted, and I agree, that the starting point is to understand what the word "deliverable" means as part of the definition of "Inter-Company Balance" in clause 1 of the NNA, and as part of the phrase "or more than one security is deliverable under two or more balances" in clause 7.1, under the heading Settlement Netting.  In the latter context he took me to paragraph 1-006 of Wood on Set-off and Netting, Derivatives, Clearing Systems (2nd edition) which, he submitted, suggested that the settlement netting of deliverables normally relates to personal obligations to deliver securities due for performance on the same day.  In relation to novation netting he took me to paragraph 12.09 of Benjamin on Finance Law which, he submitted, suggests that novation netting is generally concerned with fungible personal obligations, rather than with proprietary interests.  Next, he handed up some worked examples of the insoluble problems which would occur if the NNA was sought to be applied by way of settlement or novation netting in connection with proprietary interests owned by Hong Kong companies in relation to securities held by LBIE, and proprietary interests of LBIE in relation to securities held by a Hong Kong hub company.  Finally, Mr Dicker submitted that, even though they were made on the same day, it was wrong to treat the NNA and the MPRA as two agreements forming part of a larger overall transaction, so that the interpretation of one could be assisted by reference to the other.  The NNA was, he said, entered into for reasons separate and distinct from the furtherance of the Rascals project.

388.    If Mr Dicker had been correct in his submission that recourse cannot properly be had to the MPRA for the purpose of interpreting the NNA, I would have agreed with him that, looked at purely on its own, it would be difficult to think that the references to deliverables in the NNA extended beyond their normal usage, i.e. to personal delivery obligations due for performance on the same day.  That may fairly be ascribed as the ordinary meaning of the word deliverable in the context of settlement netting and novation netting.  But in my judgment it is not merely permissible but essential to interpret the NNA as part of a package which included the MPRA.  This is not merely because they were made by overlapping (although not identical) parties on the same day, but because there is also a large subject matter overlap between the two agreements, and it is plain from the surviving communications between the parties about their drafting, that the NNA was formulated with the Rascals processes very much in mind.

389.    Although the House of Lords has in <u>Chartbrook Limited v. Persimmon Homes Limited [2009]</u> UKHL 38 very recently upheld the rule excluding the parties' negotiations as admissible guides to the interpretation of their agreement, extrinsic evidence has always been admissible for the purpose of ascertaining, as a surrounding fact, the commercial or business object of the transaction: see <u>Prenn v. Simmonds</u> [1971] 1 WLR 1381 at 1384 per Lord Wilberforce.  It would in my judgment be extraordinary if recourse could not be had to the prior discussions of parties representing associated Group companies for the purpose of understanding whether the NNA had Rascals transactions between its parties as part of its intended subject matter, or whether (which is really the same thing) the NNA and the MPRA of even date were agreements dealing simultaneously with an overlapping subject matter, and therefore each to be construed by reference to the other.

390.    The NNA was of course made between a larger number of parties than the MPRA.  The evidence did not show whether or not similar MPRAs were made between LBIE

and other Hong Kong companies (parties to the NNA) for which LBIE acquired and held securities eligible for Rascalling.   That is because no other Hong Kong companies have made claims in relation to any of the securities the subject matter of this application, so that the detail of LBIE's relationship with them has simply not been investigated.

391.   Once the NNA and the MPRA are placed on a table side by side, it becomes immediately apparent (at this stage without looking at the parties' subsequent conduct) that their mutual understanding was that the novation provisions of the NNA had the consequence that LBAH rather than LBCCA should be the on-leg seller or stock lender under Rascals transactions, since LBCCA made no similar simultaneous MPRA with LBIE, and since the MPRA between LBAH and LBIE was, on its face, designed to operate as a master Rascals agreement both in relation to repos and stock loans.

392.   As at November 1997 there did in fact exist as between LBIE and LBCCA both an OSLA (i.e. a master agreement in relation to stock lending) and a GMRA (in relation to repos), having been made between those parties in March and August 1995 respectively.   This is not therefore a case in which there existed no contractual basis for repos and stock loans between LBCCA and LBIE.   The significance of the MPRA made between LBIE and LBAH on the same day as the NNA is that because LBAH was purely a financing company with no securities trading activities of its own, the only rational explanation for its entering into an MPRA with LBIE in November 1997 is that it was assumed that it would acquire title to securities eligible for Rascals, by virtue of the NNA, by a process therein described as novation, from some other Hong Kong trading company which did use LBIE for the acquisition and holding of securities.   The question is whether any such intention can be seen to be implemented within the NNA by any legitimate process of interpretation, rather than by rewriting it.

393.   In my judgment, it both can and should.   The answer emerges by way of analogy with the novation of a debt.   Clause 6 of the NNA is about novation pure and simple, rather than either novation netting or settlement netting.   It is in that respect separate from those conventional contexts as described in the two text books to which Mr Dicker drew my attention.   Clause 6.2 applies to all Inter-Company Balances (as defined) and spells out in relation to debts that a debt originally owed, for example, by LBIE to LBCCA should be replaced by two debts, by LBIE to LBAH, and by LBAH to LBCCA.   This is described as something which occurs in relation to all "outstanding rights and obligations under such Inter-Company Balances".

394.   Clause 6 does not expressly refer anywhere to deliverables, but its application to deliverables is the result of the inclusion of deliverables in the definition of Inter-Company Balance to which I have already referred.   Furthermore, it is clear from clause 7.1 that a deliverable is a right and/or obligation in relation to a security.

395.   The existence of a trustee beneficiary relationship between LBIE and LBCCA in relation to a security held for LBCCA's account in a LBIE depot creates fiduciary obligations and proprietary rights which, in my judgment, it was intended should be subjected to a process akin to novation.   It was not intended that LBCCA should simply transfer its proprietary interest in the underlying security to LBAH for nothing in return.   That would be wholly contrary to the purposes of clause 6, in which the

rights of the creditor (here LBCCA) against one debtor (LBIE) are replaced by identical rights against another debtor (LBAH), while LBAH acquires similar rights as against LBIE.

396.    In my judgment that concept may readily be applied to fiduciary obligations and proprietary interests under a trustee beneficiary relationship by the interposition of LBAH in the chain of beneficial title between LBIE and LBCCA.  LBAH thus becomes LBIE's beneficiary, but it holds those rights upon trust for LBCCA as the ultimate beneficial owner.

397.    There is nothing unusual or surprising in the creation of a structure of trusts and sub-trusts between the legal owner and ultimate beneficial owner in relation to intermediated securities.  As Mr Moss submitted it is the very basis upon which the modern system for the intermediation of securities works.  Thus, ignoring Rascals and the NNA for the moment, where LBIE settled into its depot account a security acquired for the book of an affiliate, with the intent that the affiliate should have a proprietary interest in it, there necessarily existed a structure of trust and sub-trust, pursuant to which LBIE has a proprietary interest as against its depository (which holds the legal rights) and the affiliate has a proprietary interest as against LBIE.  Under that structure the depository recognises LBIE as its beneficiary and in turn LBIE recognises the affiliate as its beneficiary.

398.    That analysis of the operation of clause 6 of the NNA in relation to proprietary interests in securities held under a trust will not entirely satisfy a purposive interpretation of the NNA and the MPRA read together unless its effect is also to confer on LBAH as intermediate trustee a right to confer absolute title to the underlying security on LBIE so as, in effect, to overreach LBCCA's ultimate beneficial interest.  Again, I see no reason why such a power to overreach should not be treated as included.  Wherever a trustee sells trust property with the authority of the beneficiary (i.e. pursuant to a power in the relevant trust instrument) that sale necessarily overreaches the beneficiary's proprietary interest in the subject matter of the sale, so that his interest then attaches to the *quid pro quo*, i.e. to the proceeds of sale.  I see no reason why the interposition of LBAH as an intermediate trustee between LBIE and LBCCA should not confer upon LBAH the same power, in relation to the Rascalling by LBAH of the underlying securities, either by repo or stock loan, under the MPRA.

399.    Finally, there remains the apparent inconsistency arising from the fact that whereas LBAH entered into the repos under Automatic Rascals, LBCCA entered into the stock loans under Manual Rascals.  This is not strictly a matter of interpretation, but rather of reconciling an available interpretation with the subsequent conduct of the parties.  In my judgment there is no necessary inconsistency.  An interpretation of clause 6 of the NNA which leaves LBCCA as the ultimate beneficial owner of the underlying security, but with LBAH rather than LBIE as its immediate trustee, nonetheless seems to me to leave LBCCA free to deal with its ultimate beneficial interest, provided only that it has not in the meantime been overreached by a sale, repo or stock loan in relation to that same security by LBAH.  It must be borne in mind in this context that the whole of the Rascals processes involved the affiliates as repo sellers or lenders, not of the underlying securities themselves, but only of such beneficial interest in those securities as they may have enjoyed.

400.   I shall now address the effectiveness or otherwise of the Automatic and Manual Rascals transactions entered into respectively by LBAH and LBCCA upon the basis of the interpretation of clause 6 of the NNA at which I have arrived.  Because I acknowledge that my interpretation involves at least an extension of the ordinary meaning of the words used, I shall also address the remaining issues on the alternative basis that Mr Dicker's more restricted interpretation of the NNA is the correct one.

## Automatic Rascals

### The On-Legs

401.    Besides adopting the submissions of Mr Moss as to the ineffectiveness of the on-leg for the purposes of transferring any proprietary interest to LBIE, Mr Dicker advanced the following main submissions specific to LBCCA/LBAH.  First, he said that LBAH simply had no proprietary interest to transfer, because the NNA was on its true interpretation not concerned with proprietary interest in securities.  I have rejected that submission, but will return to its consequences if correct.  Secondly he submitted that in any case LBAH did not owe LBIE a debt for the acquisition price from the street, to which LBIE could have recourse by way of offset as a means of payment of the on-leg purchase price.  In this respect Mr Dicker was assisted by the inter-company records which, as I have described, continued to show LBCCA as LBIE's unsecured debtor for the acquisition price from the street, from the settlement date in relation to any particular security until the following month end.  Thereafter LBCCA was shown as owing the acquisition price to LBHI, although this may have been replaced by a novation to LBAH at the year end.

402.   I do not accept that submission either.  The debt for the acquisition price from the street owed by LBCCA to LBIE was, on any view, an Inter-Company Balance, and therefore liable to be novated pursuant to clause 6 of the NNA.  Clause 6.1 provides that:

> "Inter-Company Balance shall be deemed to be novated in accordance with clause 6.2 as of the time immediately after that Inter-Company Balance becomes due and payable, notwithstanding that it may not be shown or recorded in the Balance Ledger at that time."

The "Balance Ledger" is defined as meaning "the ledger of certain balances and debts owing between two Parties and prepared and maintained by LBAH for the purposes, *inter alia*, of this agreement".

403.   I was not shown any document or screenshot corresponding to that definition of "Balance Ledger" but it is clear that clause 6.1 was designed to provide for a deemed immediate novation, regardless whether the parties' mutual accounting systems were operated in such a way as to record it as occurring then, or thereafter.  If effect is given to that deeming provision, it follows that LBCCA's initial debt to LBIE for the purchase price of any security from the street was immediately novated so as to be deemed a debt owing to LBIE by LBAH, and therefore available by way of offset against LBIE's debt to LBAH for the on-leg purchase price under the first repo.

404.    I have already concluded that from LBIE's perspective the month end novation and netting process between LBIE, LBHI, LBCCA and LBAH had the same effect thereafter as if there had been an immediate novation of the acquisition debt between LBIE, LBAH and LBCCA at the time of the first repo. As Mr Milligan put it, at the month end it all came out in the wash.  That left only an imbalance as between LBCCA and LBAH, in relation to their separate unsecured accounts with LBHI.  For reasons already explained, I have been unable to resolve, without disproportionate further delay and expense, whether this was also resolved at the year end. Whether it was or not, I do not consider that any such enduring imbalance as between LBCCA and LBAH is of any consequence in relation to the question whether the repos between LBAH and LBIE were effective to confer on LBIE absolute title to the underlying securities.   LBIE was entitled to engage in repos with LBAH on the footing that there had been a deemed novation of LBCCA's acquisition debt to LBAH, whether or not LBAH, LBCCA and LBHI followed through the consequences of the novation in their mutual accounting.

405.    I turn to deal with the consequences in terms of the effectiveness of the repo on-legs in the event that Mr Dicker's interpretation of the limited scope of clause 6 of the NNA should prevail in a higher court.  Mr Milligan advanced an alternative case based on estoppel by convention, but he never resiled from his primary submission that LBCCA never acquired a proprietary interest in the securities in the first place.  I shall deal with that question first.

406.    I have already concluded that, prior to the implementation of Rascals, the consensual basis upon which LBIE acquired, settled and held securities for the accounts of its affiliates was not such as to confer a proprietary interest on the affiliates.  By contrast, I have concluded that, once LBIE and any particular affiliate restructured their relationship so that eligible securities would be the subject of Rascals processing, this necessarily involved the initial conferral of some proprietary interest in eligible securities upon the affiliate.

407.    Mr Dicker's primary case, based upon an interpretation of the NNA which rendered it inapplicable to proprietary interests in securities, was of course that LBCCA had no part at all in the supposed Automatic Rascalling of its eligible securities, the whole process taking place, by virtue of a ghastly mistake, between LBIE and LBAH.  If that be right, then I consider that the basis of my conclusion that, following the implementation of Rascals, a proprietary interest in securities eligible for Automatic Rascals was conferred upon affiliates is simply inapplicable to LBCCA.  Mr Dicker had no cogent answer to this conundrum when I raised it with him as a possible outcome during his closing submissions.

408.    On any view, LBIE continued to deal with securities acquired for LBCCA's book, after the implementation of Rascals, with the same liberty to use them for the purposes of its own business as it had done prior to 1996.  Since the parties used and had access to a Group-wide mutual system of book-keeping, it is in my judgment unreal to suppose that LBIE's use of those securities was unknown to LBCCA, or that, unless and until LBCCA participated in the Rascals processes it thought that, for the first time in 1996, LBIE would cease using securities held for its book as it had done since 1993.

409.   The question whether there arose an estoppel by convention between LBIE and LBCCA is by no means straightforward.   At the heart of the Administrators' similar case against LBF and LBSF was the fact that, from start to finish, those two affiliates constantly recorded LBIE as a secured creditor in respect of the off-leg repurchase prices.   So did LBAH, but of course LBCCA did not.   Nonetheless, LBCCA had full access to the ITS accounts system, which for almost ten years from 1997 constantly recorded the Automatic Rascalling by LBAH of what (on this analysis) were LBCCA's securities, without a word of protest.   Furthermore LBCCA was no less privy to the purposes for which the Rascals processes had been instituted than any other affiliate, being one of the Hong Kong sub-group of companies all of which were represented in discussion about the Rascals process by the same individuals.

410.   Issues as to whether a person alleged to be subject to an estoppel by convention has sufficiently "crossed the line" as to make itself responsible for the conventional understanding in question normally arise between persons dealing with each other at arm's length.   In the exceptional circumstances constituted by the fact that all the potential parties to the convention estoppel here relied upon are co-subsidiaries or sub-subsidiaries of the same holding company, doing business for the benefit of common shareholders, using a common accounting and book-keeping system, and sharing the services of individuals employed on a non-exclusive basis, it seems to be that the necessary sharing or acquiescence is capable of being established by those features rather than, as would be necessary in an ordinary case, by some specific "crossing of the line" between persons dealing at arm's length.   Accordingly, although with rather less confidence than in relation to LBF and LBSF, I have concluded that if it had been necessary for the Administrators to rely upon a convention estoppel for the purpose of preventing LBCCA now from denying that the Automatic Rascals on-legs were effective in relation to any proprietary interest of its own in the underlying securities (whether because of want of title or non-payment by LBIE), the Administrators' case in that regard ought to succeed.

411.   I have considered whether the possibility that LBCCA and LBAH failed ever to record in their books a novation to LBAH of LBCCA's acquisition debt means that the recognition of a convention estoppel would now work an injustice to either of them, or to any other person. It will be recalled that I have been unable to decide, without disproportionate delay, whether this was or was not done at the year end. Mr Dicker submitted that it would not be just for LBCCA to lose any proprietary interest in the underlying securities while at the same time owing LBHI the full acquisition debt from the street.

412.   I am not persuaded that there would be any relevant injustice. The fact that LBCCA, LBAH and LBHI may, as between themselves, have failed to reflect in their mutual accounting the consequences of the Automatic Rascalling of LBCCA's securities which was obviously intended strikes me as an internal matter between them. It had no consequences as between them as a group and LBIE since, as I have described, it all came out in the wash at each month end. LBHI has declined despite invitation to participate in this application.     LBCCA and LBAH have not asked the court to adjudicate on any issues as to beneficial ownership which might have arisen between them, the inference being that any such question can be resolved between them, without the assistance at least of the English court. As I see it, the imbalance which would remain if the year end adjustments were not made is an imbalance essentially

between LBCCA and LBAH, in their respective inter-company accounts with LBHI. It is not one with which this court need be concerned.

413.   Mr Dicker's last line of defence was that even if an estoppel might be established, it would not rescue LBIE from the requirement for writing imposed by s. 53(1)(c) of the Law of Property Act 1925. He relied by analogy upon the *obiter dicta* of Lord Scott in <u>Cobbe v Yeoman's Row Management Ltd</u> [2008] 1WLR 1752, at paragraph 29, to the effect that estoppel could not be relied upon as an answer to s. 2 of the Law of Property (Miscellaneous Provisions) Act 1989. If the NNA did not confer LBCCA's interest in the underlying securities upon LBAH, then there was, said Mr Dicker, no writing capable of validating any disposition of that interest, whether upon LBAH of LBIE.

414.   Mr Milligan sought to meet that ingenious point by reference to <u>Vandervell v. IRC</u> [1967] 2 AC 291.  But that case only establishes that s.53 has no application to a disposition by the trustee which, at the beneficiary's direction, carries with it the beneficial interest as well; see per Lord Donovan at pp. 317-8.  In my judgment the real answer is that the estoppel merely prevents LBCCA from denying that LBAH was, by the NNA, constituted an intermediate trustee for LBCCA of its interest in the underlying securities. That was not itself a disposition of LBCCA's equitable interest. The transfer of LBCCA's equitable interest to LBIE was itself achieved by LBAH's participation in the Automatic Rascals process with LBIE which was itself fully documented, albeit electronically, by ITS.  Accordingly the s.53 point fails.  For completeness I should say that I have reached no conclusion as to whether Lord Scott's dictum in <u>Cobbe v. Yeoman's Row</u> is applicable to s. 53.  If it is, it may be that a number of the cases which have recognised convention estoppel might need to be reconsidered.

### The Off-Legs

415.   Mr Dicker did not advance any submissions in relation to the consequences of the switching off of the Automatic Rascals process following the collapse, different from those advanced by Mr Moss and Mr Jones on behalf of LBF and LBSF.  Nonetheless, the Administrators sought to introduce a specific alternative case against LBAH arising from the provisional winding up order made against that company on 19th September 2008, and what by common consent was therefore a consequential event of default under clause 10 of the applicable GMRA.  I found it unnecessary to determine those issues, which include complicated questions of timing, as between the moment of the winding up order in Hong Kong and the question whether (contrary to my view) there was an on-leg or off-leg in relation to any particular repo during part of a business day.  The issues are all questions of law arising upon facts which are either not in dispute, or which I have determined, and can therefore be addressed without a re-trial by a higher court if necessary.

### Conclusion

416.   For the above reasons, I have concluded that in relation to securities remaining in LBIE's depots for the book of LBCCA (or LBAH) which were, actually or apparently, the subject of Automatic Rascals processing between LBIE and LBAH, neither LBCCA nor LBAH retains any proprietary interest in them.

**MANUAL RASCALS**

417.   Under this heading, the salient facts are that:

i)   LBCCA rather than LBAH was the lender under each relevant stock loan.

ii)   The parties' mutual records consistently showed LBIE as LBCCA's secured creditor in relation to its right to repayment of collateral.

iii)   LBIE's obligation to pay collateral on the on-leg of each stock loan does not specifically appear as an entry on the unsecured inter-company account between LBIE and LBCCA.  Nonetheless it is possible to identify a connection between that obligation of LBIE and a receivable shown on LBCCA's inter-company account with another Hong Kong affiliate, namely LBACC, in each case arising as a result of the funding arrangements in existence between the Hong Kong companies.

iv)   As with LBF and LBSF, all the stock loans remained open after the collapse, and it is not suggested that LBCCA has, or could, repay any of the collateral for which LBIE continues to be shown in their mutual records as a secured creditor.

418.   On the interpretation of the NNA which I consider to be correct, there is nonetheless no title impediment which would have prevented LBCCA from making a stock loan to LBIE of its ultimate beneficial interest in the underlying securities.  That is not because clause 6 of the NNA operated only in relation to securities eligible for Automatic Rascals, but because clause 6 did not prevent LBCCA from remaining the ultimate beneficial owner of them, with power to deal with its beneficial interest, subject only to any prior disposal of it by LBAH, by an authorised transaction as LBCCA's immediate trustee.

419.   There is nonetheless a real problem with LBIE's case that LBCCA owed it a debt for the acquisition price from the street, against which LBIE could offset its obligation to pay collateral on the on-leg.  If, as I have concluded, the effect of clause 6 of the NNA was to cause an immediate novation of that debt, so as to replace LBCCA with LBAH as LBIE's debtor, then there was on the face of it no immediately available offset to which LBIE could have recourse against LBCCA, by way of payment.  Of course, the parties' mutual book-keeping did not show LBCCA's debt to LBIE as being novated to LBAH, at least before the year end, but in that respect clause 6.1 of the NNA contains a deeming provision which, at least as a matter of contract, overrides the absence of contemporaneous book-keeping entries.

420.   The reality however is that LBCCA did get the benefit of LBIE's payment of collateral, not directly, but by the "around the houses" process which led in every case to LBCCA being credited with an equivalent amount in its inter-company account with another Hong Kong affiliate, LBACC.  Mr Dicker very fairly acknowledged that if these accounting entries were capable of amounting to a process of payment, then LBCCA could not assert that it had not been paid the collateral in respect of the stock loan on-legs.

421.   On any view, it seems to me that the constant recognition in LBCCA's and LBIE's mutual records that LBIE was a secured creditor of LBCCA in relation to the return of the collateral makes the alternative case for the establishment of a convention estoppel (sufficient to prevent LBCCA from denying the effectiveness of the stock loans as a means of transfer of LBCCA's beneficial interest to LBIE) just as strong as it is in relation to LBF and LBSF.

422.   As for the consequences of the collapse in relation to Manually Rascalled securities, as between LBIE and LBCCA, Mr Dicker did not advance any alternative submissions to those put forward by Mr Moss and Mr Jones on behalf of LBF and LBSF.   For the reasons already given, I consider that those submissions do not prevail.

## Conclusion

423.   It follows that for the above reasons, neither LBCCA nor LBAH retain any proprietary interest in securities which remain in LBIE's depots, to the extent that those securities were subjected to Manual Rascals processing.

## LBI

424.   The issue as to the effectiveness of Rascals processing as between LBI and LBIE for the purpose of passing title to LBIE seems to me, by comparison with the issues relating to the other respondents, very straightforward indeed.   The salient facts may be summarised as follows:

   i)      There were no Automatic Rascals transactions between LBIE and LBI.

   ii)     LBIE holds securities in its depots in respect of which, at the time of the collapse, there have been identified thirteen open stock loans by LBI to LBIE. Of those, three of them are accompanied by evidence of payment by LBIE to LBI of the collateral.   As to the remaining ten, there is, as at today, no such evidence.

   iii)    The ordinary process of pay-down on a daily or similar basis between LBIE and LBI means that, in respect of the acquisition of the underlying security from the street, LBI has paid LBIE in full and that, where (in relation only to three of the stock loans) there are book-keeping entries recording LBIE's liability in relation to collateral, that has also been paid.

425.   Those facts mean first that none of the issues about non-payment for the on-leg of the stock loan caused by inter-company funding agreements between LBIE and the other respondents affect the issue as between LBIE and LBI.   The only question arising in relation to the on-leg is a purely factual one, namely whether there is any evidence at all sufficient to show the recording and consequential pay-down of LBIE's obligation to pay collateral.

426.   Mr Milligan did not suggest, in relation to securities for which there was a stock loan but no evidence of payment of collateral, that title nevertheless passed to LBIE by way of waiver of the payment obligation, or by estoppel.   He accepted, rightly in my

view, that the Administrators' case in relation to the 13 stock loans depended upon proof of payment.

427. Mr Milligan submitted that I should answer the on-leg question in purely formulaic terms, leaving on one side the evidential question whether by further research the Administrators can show that payment of the collateral was booked.  For LBI Mr Brindle submitted in closing that the Administrators have had quite enough time to research this question in relation to the small number of relevant securities, that the Administrators have failed to demonstrate any evidence sufficient to support a conclusion that the collateral was paid, and that there should now be an end of the matter in relation to those ten stock loans.

428. While I have considerable sympathy for Mr Brindle's submission, it has from start to finish been common ground that I should not on this application delve into disputed factual questions arising in relation to individual securities or transactions.  While it may be that there is no basis other than Micawberism for Mr Milligan's suggestion that, even now, something might turn up to prove payment of the collateral, I consider that I should simply decide at this stage that, in relation to stock loans for which LBIE cannot prove payment of collateral, the beneficial interest in the underlying securities rests with LBI.

429. As for the remaining three stock loans, in which there is evidence of the booking (and therefore payment at the next pay-down) of collateral, Mr Brindle did not offer any submissions other than those already advanced in relation to Manual Rascals by the other respondents, as to why LBIE should not now be regarded as having absolute title to the underlying securities, it being common ground that LBI has neither repaid, nor is in a position to be able to repay, the collateral.  Accordingly I conclude that in relation to those three stock loans, LBI has no proprietary interest in the underlying securities to the extent that they remain in a LBIE depot.

430. I fear that Mr Brindle and Mr Milligan may feel slightly short-changed in the sense that I have declined to adjudicate upon the issues of interpretation (pursuant to New York law) and application (in the English law context) of clauses 8.4 and following of the UCCBSA, or upon the issue whether, after 1995, LBI acquired a proprietary interest in non-Rascalled securities.  The clause 8.4 issues are matters which, as it seems to me, do not arise on the facts relating to the only relevant Manually Rascalled transactions, since LBI appears to have paid LBIE the acquisition price from the street in full.  Non-Rascalled securities are on any view outside the scope of this application, and the evidence about how LBIE used them is not available. It may well be that those issues will arise in relation to such securities transactions.  If they do they can be determined as and when necessary.

*****