# EXHIBIT 11

<u>Neutral Citation Number: [2014] EWHC 2378 (Ch)</u>

<u>Case No: 8276 of 2013</u>

**<u>IN THE HIGH COURT OF JUSTICE</u>**
**<u>CHANCERY DIVISION</u>**
**<u>BIRMINGHAM DISTRICT REGISTRY</u>**
**<u>IN THE MATTER OF TARLOCHAN SINGH</u>**
**<u>AND IN THE MATTER OF THE INSOLVENCY ACT 1986</u>**

<u>Birmingham Civil Justice Centre</u>
<u>Bull Street, Birmingham B4 6DS</u>

<u>Date: 14/07/2014</u>

Before :

**<u>HHJ DAVID COOKE</u>**

- - - - - - - - - - - - - - - - - - - - -

Between :

Chanan Singh Thandi                                    <u>Applicant</u>
- and -
**Mark Sands (1) and Andrew Appleyard (2) (Trustees**          <u>Defendants</u>
**in Bankruptcy of Tarlochan Singh)**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr Joseph Curl** (instructed by **Dent Abrams**) for the **Applicant**
**Ms Andy Creer** (instructed by **Wright Hassall**) for the **Respondents**

Hearing dates: 28 April- 1 May 2014
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

HHJ DAVID COOKE

**HHJ David Cooke:**

**Introduction**

1.    Tarlochan Singh (also known as Tarlochan Singh Thandi) was made bankrupt by order of the Coventry County Court on 28 September 2011, on the petition of GW Deeley Ltd, a building company, in respect of monies due for building work at Tarlochan Singh's home, which is a substantial property called Prior's Croft, Gibbets Hill, Coventry. At the date of the bankruptcy Tarlochan Singh was also the registered proprietor of 16 other properties (comprised in 13 registered titles) in the Coventry area. These consisted mostly of small houses let to students, but included a site with three larger properties on the corner of Fletchamstead Highway and Kenilworth Road Coventry ("the Fletchamstead Properties").

2.    By this application Mr Thandi, Tarlochan Singh's father, claims that he is the sole beneficial owner of all 16 properties, which he says are held on a bare trust for him. By his Points of Claim he relies on a Deed of Trust dated 8 August 2003, at the time of acquisition of the Fletchamstead Properties, which was the last of the properties to be acquired by Tarlochan Singh. In his Reply however he asserts that the properties have been his sole beneficial property "since they were purchased by him at various times between the 1980s and 2003". On that basis, Mr Curl submits the Deed of Trust did not create any new trust but merely regularised and evidenced the existing position.

3.    Accordingly it is Mr Thandi's case that the properties never formed part of the bankruptcy estate. He seeks an order that they be transferred to him, an account of the trustees' stewardship of the properties and damages or equitable compensation arising from the trustees having

 i)    caused the legal title in the properties to be vested in themselves at a time when it is said they knew they were held on trust for Mr Thandi,

 ii)   failed to transfer the titles to Mr Thandi on request,

 iii)  intervened in possession proceedings taken by Nationwide Building Society as mortgagee of certain of the properties, causing Nationwide to obtain possession and/or appoint receivers over and/or sell the properties,

 iv)   by these actions prevented Mr Thandi and his daughter from refinancing mortgages over some of the properties, which would have avoided possession or sale of them, and caused them to have to refinance others on unfavourable terms, and

 v)    similarly caused loss of rental income because the relevant universities and/or their student unions recommended students not to rent the properties and/or to withhold payment of rent.

4.    The Reply in making the new claim that Mr Thandi's interest predated 2003 does not give any detail as to how it is said to have arisen, beyond the allegation that the properties were "purchased by him", ie by Mr Thandi. Some of them were originally purchased by Mr Thandi and later transferred to Tarlochan Singh. Others were bought in Tarlochan Singh's name. Mr Thandi's evidence was that he had provided some or all of the purchase price in such cases, either directly in cash or because it was raised

by remortaging properties already owned on trust for him. Mr Curl however said that he did not put the case on the basis of a resulting trust, which would be based on an inference of intention arising from the circumstances of transfer or purchase, but of the actual express common intention of Tarlochan Singh and Mr Thandi that all the properties belonged to Mr Thandi at all times. Insofar as the trust is said to be an express trust, however, as Ms Creer submitted the applicant has never made clear when or how it is said to have been expressed, if not by the Deed of Trust. I think it would be best to regard this therefore as an allegation of a common intention constructive trust, which if proved may in principle be effective despite the lack of any instrument or evidence in writing as otherwise required by s 53 Law of Property Act 1925. Whatever the precise analysis, the indispensible foundation is the existence of the relevant common intention, as to which Mr Thandi has the onus of proof.

5.      In their Defence (responding of course to the claim as originally pleaded) the trustees put Mr Thandi to proof that the Deed of trust is valid and created with the genuine intent of divesting Tarlochan Singh of the beneficial interest in the properties. They deny that they have acted in breach of trust, deny that the alleged losses have been suffered or that if so they were caused by the actions of the trustees, rather than the mortgagees or universities concerned. There is a counterclaim that if the Deed of Trust is found to be valid and effective, it should be set aside as a transaction at an undervalue.

6.      There has been no opportunity for a pleaded response to the claim that Mr Thandi's beneficial interest pre-dates the Deed of Trust. The trustees would have been entitled to complain that this new claim should have been advanced by amendment, rather than in the Reply, but have not done so. Nor have they objected, as they could have done, that the common intention now relied on is not pleaded, even in the Reply. I proceed on the basis that Mr Thandi is also put to proof of the new claim. The trustees of course come to the matter with no separate knowledge of the facts, and cannot advance a positive case as to events at the time of acquisition of the various properties. In general terms their position is that there is good reason to doubt that the Deed of Trust was executed on the date it bears and good reason to think that there was no genuine intention either in 2003 or at any other time that Tarlochan Singh would hold the properties on trust. Accordingly Ms Creer submits that any beneficial interest Mr Thandi is said to have by reason of express or actual common intention does not exist and it is open to the court to infer that the Deed of Trust is a sham in the sense that it does not truly reflect the intentions of the parties to it.

**Acquisition of the properties**

7.      Mr Thandi dealt with the circumstances in which the properties were acquired in his witness statement of 7 January 2013 (p144). By way of general introduction he said this:

> "4. … Each of the Properties belongs to me. In terms of title, [Tarlochan Singh] was never anything more than my nominee and held simply as bare trustee for me. At no time has [Tarlochan Singh] ever had any beneficial interest in the Properties. Some of the Properties were outright cash purchases or were purchased with the support of a mortgage. Where cash was advanced (either the full purchase price or a deposit), it came from one of two sources; either my own savings or from a remortgage of one of the existing Properties. Whether funding

> came from a remortgage, then such funding was derived from
> an asset that had originally been funded by means of my
> money. "

8.     Tarlochan Singh also made a brief witness statement on the same day. All that he said
       in relation to the ownership of the properties was this:

> "3. The properties that are set out in the Applicant's statement
> were held by me on trust for the applicant. I have no beneficial
> interest in them. At no time have I ever made out they were my
> own properties to anyone. I have said that I run a student letting
> business but I have never stated to anyone I own the business. "

9.     At the highest, the first two sentences are evidence only of a general mutual
       understanding. They do not refer to any specific agreement or arrangement made at
       any particular time, or to any particular words spoken setting out that agreement or
       actions taken in consequence of it. The second two sentences are presumably intended
       to add credence to what precedes them, but are plainly untrue, as appears below.

10.    Mr Thandi's witness statement went on to refer to each of the properties in the order
       they were acquired, making comments in respect of some of them as to the
       circumstances of their acquisition or transfer to Tarlochan Singh. He also attached
       schedules setting out information in relation to the property, and there has been
       disclosure of documents including Land Registry entries and some mortgage
       documentation.

11.    The first property acquired was 25 Britannia Street, Coventry. In his witness
       statement, Mr Thandi said that he bought it and had it registered in his sole name on
       30 March, 1987, using money he had saved and without a mortgage. There are no
       Land Registry or other documents to confirm this. He said nothing about how it had
       come to be vested in Tarlochan Singh, though the schedule states that the property
       had been mortgaged to Barclays bank on 17 January, 1999 and transferred to
       Tarlochan Singh on 15 October, 2002. However the Land Registry entries showed
       that Tarlochan Singh had purchased the property for a stated price of £40,000 on 17
       December, 1999, and obtained a mortgage from Barclays bank (trading as the
       Woolwich) on that date, although for some reason the transfer was not registered until
       nearly three years later. Asked about this in cross-examination, Mr Thandi said that
       Tarlochan Singh had raised the money by way of mortgage so that they could buy
       another property, he (Mr Thandi) had paid the deposit (which I take to mean the
       balance of £5000) and the solicitors fees and had then given the money back to
       Tarlochan Singh "some time afterwards" to buy a house. He said that Tarlochan Singh
       had obtained a mortgage because he, Mr Thandi, would not have been able to borrow
       as much. Elsewhere, Mr Thandi said that lenders were not willing to lend to him, or
       not willing to lend so much, because of his age.

12.    For some reason (neither Mr Thandi nor Tarlochan Singh were asked about it) the
       solicitors instructed on the transaction by Tarlochan Singh were based in Anglesey.
       Included in the bundle are their invoice and completion statement, both dated 14
       December, 1999, showing that by that date the balance required to complete of just
       over £5000 had not been received by them. Their client is stated to be Tarlochan
       Singh. There is no evidence, either from the entries on the Register or from any other
       document, that the solicitors or mortgagee were told anything about any trust
       arrangement. Mr Thandi's evidence was that the whole £40,000 proceeds of sale were

used towards the purchase of 3 Northumberland Road, Coventry, as to which see below.

13.    The second the property acquired was 80 Nicholls Street Coventry, which was said to have been purchased and registered in the name of Tarlochan Singh on 13 April, 1994. According to Mr Thandi's witness statement, the purchase price was £25,000, paid from his own savings. He points to bank books showing cheque withdrawals totalling £24,900 on 19 January 1994, though there is no documentary evidence linking these with any purchase of this property. Curiously, the Land Registry entries do not show any record of the price stated to have been paid, as they normally would on a disposition for value. Tarlochan Singh was only 16 at this time, but Mr Thandi said he was not aware that he should not been registered as the proprietor of the property. He said that his son had just left school at that time and was unemployed, and he wanted to show that he trusted him, give him some adult responsibility and introduce him to business, the intention being that he would deal with the day-to-day management of the properties as Mr Thandi was "getting on in years" (he was 51) and his health was beginning to deteriorate. It was absurd, he said, to suggest that he was making a gift to his son. He accepted however that it would have been perfectly possible to involve his son in managing the properties without being the registered owner of them. It was pointed out to him that Tarlochan Singh's witness statement said that he had been involved in the family business renting property from the year 2000, not 1994. His response was that Tarlochan Singh had responsibility before that date. There is no other evidence, by way of documents or otherwise, as to the role that Tarlochan Singh played in the letting business before 2000.

14.    Very similar evidence was given in respect of 39 Britannia St Coventry, said to have been bought in the name of Tarlochan Singh for £22,000 on 17 February 1995. Tarlochan Singh was still just under 18 at that date. He is recorded as proprietor from 21 March 1995, again without reference to any purchase price, but in this case there is a solicitor's completion statement, undated, recording the client as "Mr T Singh". It shows receipt of two amounts of £2,000 and £20,265 which were paid by cheque from an account in the name of Mr Thandi on 9 and 17 February 1995.

15.    These two properties then, on the evidence, were purchased in Tarlochan Singh's name using funds provided by Mr Thandi, on his account with the intention that they would be beneficially owned by him. His stated reasons are not however very convincing, and there is no documentary evidence to support this intention.

16.    The next acquisition was 14 Wren St Coventry, said to have been bought for £31,500 on 8 March 1996. The price was again paid from funds drawn from accounts in Mr Thandi's name. In this case however the proprietor on the Register was Charan Singh, Mr Thandi's father in law. It was transferred from Charan Singh to Tarlochan Singh in September 2000. Mr Thandi said that he had "intended to register this property in my own name" on its original acquisition but it instead "I registered it in his name and a power of attorney was signed by him giving me control over the property". The power of attorney (p3136) was however dated 14 March 1994, some two years before the purchase, so that it would seem unlikely it had any specific connection with the purchase. At that date Charan Singh's address was stated already to be 14 Wren St. In cross examination Mr Thandi said Charan Singh was living at the property in 1994, and had bought it then. Apparently inconsistently, he said that he (Mr Thandi) had bought the property in 1996 from a Mr Bains, who lived next door. It was suggested that Charan Singh was a tenant entitled to a right to buy, so that the purchase had to

be in his name. Mr Thandi said he "did not know anything about that". The reason it had been transferred to Tarlochan Singh's name in 2000 was "so that in future if he wants to buy a house he can raise money on it".

17.     Mr Thandi said the power of attorney had been prepared by solicitors, though he did not say which firm. Correspondence was disclosed showing that Sarginsons (who also acted for Mr Thandi both before and after 1996) acted for Charan Singh in the purchase; their letters to him (eg at p 2632) show no indication that they were aware he was buying as nominee for Mr Thandi. For some reason they wrote a letter several months after the purchase in January 1997 (p2632) addressed "To whom it may concern" stating that they had acted in the purchase for "Mr C Singh" in the purchase, and that he had paid £31,500. Mr Cox was asked about other documents from his firm referring to the Applicant, and said he always called him "Mr Thandi", so it must be assumed that this letter was prepared because there was a need for some purpose to show third parties that Charan Singh was the owner of 14 Wren St and had paid for it. This also suggests that Sarginsons were not aware that he had bought on behalf of Mr Thandi, since if they had been so aware, the letter must have been produced to support a position they knew to be untrue.

18.     I do not believe Mr Thandi gave me a full and frank account in relation to this property. If it had been beneficially his all along, he appears to have concealed that, for no apparent reason, from the solicitors acting. Alternatively, he must have secured their cooperation in a scheme to conceal his ownership by pretending they were acting for Charan Singh and allowing Charan Singh to represent himself as the owner. The stated reason for transferring the property to Tarlochan Singh, so that Tarlochan Singh could use it to raise money to buy another house (there was no indication that he would be doing so on behalf of Mr Thandi) would be consistent with Tarlochan Singh being entitled to the mortgage proceeds himself, and not receiving them as trustee for Mr Thandi.

19.     I accept that on the evidence Mr Thandi has shown that the funds for the original purchase of these 4 properties came from accounts in his name. I am not satisfied however that he gave me a full account of the source of these funds. The bank books and statements he produced showed frequent deposits in cash, more than were apparently consistent with either rents received on the properties already owned, or his own stated employment as a private hire driver. He said that his wife was working as well and giving him her money, but I do not believe these entries were satisfactorily explained by that either. It seems more likely that he had other undisclosed sources of cash, though nothing turns on that for these proceedings.

20.     It also appears that there was at least one other property purchased at about this time that has not been referred to in the statements. The trustees have not been provided with full copies of the statements for the various accounts referred to, but on one of the pages provided (p221) there is an entry showing a withdrawal of £11,500 by cheque on 19 December 1998 from an account in Tarlochan Singh's name. Against this, someone has written "33 Greenfields". Mr Thandi and Tarlochan Singh both told me, in a way I thought wholly unconvincing, that they had no idea what this referred to. I formed the view they were lying, that the note refers to another property, and that the most likely explanation was that this was a cheque to acquire that property. For some reason, the witnesses do not wish to admit to that transaction.

21.     From 2000 onwards the property portfolio was increasingly used to raise further funds for additional purchases, all of which were made in the name of Tarlochan Singh. The

first of these was 3 Northumberland Avenue, Coventry, bought on 14 January 2000 for £50,000. Tarlochan Singh sent that amount to the solicitors acting, shortly before completion. It had been paid into Tarlochan Singh's account from various sources. £40,000 came from an account in the name of "Chaman Singh Thandi", which Mr Thandi said was an incorrect typing of his own name. It came from the sale proceeds of 25 Britannia St (of which £5,000 had been recycled from his own funds and £35,000 came from the mortgage raised by Tarlochan Singh). £8780 came from an account in the name of Tarlochan Singh's sister, Susan Thandi. £6,000 was paid in cash, according to Mr Thandi, by him. Assuming this to be so, the amount provided directly by Mr Thandi was thus £11,000. His claim to have provided the whole price depends on attributing to Mr Thandi both the mortgage proceeds from 25 Britannia St and the money paid by Susan.

22.   The mortgage proceeds would of course have belonged to Mr Thandi if the sale of 25 Britannia St had been intended to be a genuine sale, resulting in a transfer of legal and beneficial ownership to Tarlochan Singh. But that was not Mr Thandi's case; he relies on the sale having been a collusion between himself and Tarlochan Singh. I have no doubt that it was such a collusion, but the question then is whether it was entered into with a view to benefitting Mr Thandi or Tarlochan Singh. As for the money paid by Susan, although she gave evidence and provided a witness statement, she did not say that she had paid this amount on behalf of her father, or indeed why she had paid it at all.

23.   The next purchase was 61 Bramble St Coventry, bought in the name of Tarlochan Singh on 19 June 2000. The purchase price came from a National Savings Account in the name "Mr T S Thandi" (p174). Mr Thandi said in his witness statement that this was an incorrect reference to him, but I am satisfied this is not so, because he has his own National Savings account in the name "C Singh". He then said that it was his son's account, but the money in it belonged to him because it came from rent paid by the students "in his [ie Tarlochan Singh's] name". Mr Thandi's claim to have provided this money thus depends on the rent money paid by student tenants having been received by Tarlochan Singh on trust for Mr Thandi.

24.   According to Mr Thandi's witness statement, there was "something of a turning point" when he made an application through a broker (in his own name) for what he described as a remortgage of 3 Northumberland Rd. That was refused, by letter dated 4 September 2000. He said the broker had told him "it was probably my age that was to blame". "From this point on" he said "there was no point in keeping any of the properties registered in my name if I was going to be unable to remortgage them."

25.   It does appear that at about this time Mr Thandi and Tarlochan Singh had identified that finance could potentially be raised on the existing portfolio to buy further properties. From that point onwards (with the possible exception of 35 King Richard St, as to which see below) all further purchases were, according to Mr Thandi's witness statement, funded by mortgages or remortgages of properties already owned and registered in the name of Tarlochan Singh. However, I do not believe that Mr Thandi has given a true account of the reasons for this application and its refusal, or that it provides any explanation for the fact that later acquisitions were made in Tarlochan Singh's name.

26.   Firstly, there was no "turning point" in the registered ownership of properties. Three properties, 3 Northumberland Rd, 80 Nicholls St and 39 Britannia St had already been bought in Tarlochan Singh's name, according to Mr Thandi using his funds, so the

strategy of making such purchases was well established. I have said above that I do not accept that the explanation given of wanting to show trust in his young son was the true reason for it.

27.     Second, the refusal letter produced (p172) does not support what Mr Thandi says. It is incomplete; only the first page being in the bundle. It is from Mortgage Express, addressed to the broker and headed "Customer name: Mr C Thandi. Property: 3 Northumberland Rd". It explains that the application "has failed our 'credit score' " and that Mortgage Express compiles a credit score and uses it "together with information provided by a credit reference agency" to make a decision. It goes on to say that the information received from the credit reference agency was acceptable, so it must have been something else that caused the application to be declined. At the foot of the page, apparently unconnected to the text above, and with curious blank spaces above and below it, is a single bullet point paragraph:

        " -  We have received an unsatisfactory credit history."

This odd layout might suggest that part of the text has been hidden, but no such suggestion was put to Mr Thandi. There is no further explanation, and no reference to Mr Thandi's age. It appears that some information amounting to an "unsatisfactory credit history" must have been received, but from a source other than the credit reference agency.

28.     When asked in cross examination, Mr Thandi said that it was the broker who had surmised that his age may be a factor, and would have known what was meant by the unsatisfactory credit history. He said "that's why I put it in my son's name", which I took to be a reference to the eventual mortgage of 3 Northumberland Rd by Tarlochan Singh in October 2001. Asked why he was applying for the mortgage on 3 Northumberland Rd when Tarlochan Singh was already the owner of that property, Mr Thandi said Tarlochan Singh already had a mortgage on 25 Britannia St and "with the same way I could have a higher mortgage on this property. If [Tarlochan Singh] had taken it in his own name he would not have got as much… We did it on this property the same as we did for 25 Britannia St, to raise a larger amount."

29.     This I think reveals the truth. The application made was not for a remortgage by Mr Thandi on the basis that he was the beneficial owner of 3 Northumberland Rd (which would have been highly unusual and required a joint application with Tarlochan Singh as the registered owner). It was on the basis that a sale would take place from Tarlochan Singh to Mr Thandi, as had been done the other way round with 25 Britannia St. One may surmise that the mortgagee would not have been told that there was any connection between "Mr Tarlochan Singh" and "Mr C Thandi", in order to present it as an arms length sale and raise a greater advance than if Tarlochan Singh had mortgaged as existing owner. If so, and if the connection had been discovered, that might explain the rejection. Whatever the reason was, so far as can be seen from the evidence this approach to obtaining mortgage funds was not pursued again.

30.     The next purchase was of 35 King Richard St, Coventry, bought in the name of Tarlochan Singh on 25 November 2000 for £50,000. Mr Thandi said he had provided those funds. He had produced no documentary evidence of this with his witness statement, but in cross examination said he had drawn that amount from his National Savings account, paid it into his HSBC account and then sent a cheque for that amount to the solicitors acting, Heer Manak. His HSBC statement (p3192) shows a transfer, rather than a cheque, to Heer Manak of that amount on 27 July 2000.

Although this was some four months before completion, Mr Thandi maintained it was for this property, there having been a delay in completion because it was a repossession sale. He denied having purchased any other properties.

31.    If this account was true, it would show a remarkable memory for the detail of a transaction nearly 14 years ago. But I do not believe it is true. Insofar as there are documents relating to these purchases, the pattern is that funds are provided to the solicitor for completion a matter of a few days at most before completion. Little if anything is paid by way of deposit on exchange. This is all consistent with keeping control of funds until the last possible moment, not leaving them lying unused for months in a solicitor's account. Mr Thandi's account seemed designed to give the impression there had been a last minute hitch delaying completion of the purchase, but this does not appear to have been the case- such documents as there are from the solicitor's file (p 2620 ff) show an agent's sale memorandum dated 19 October (addressed to "C Singh", so Mr Thandi appears to have had some involvement in the purchase). Heer Manak were not instructed until late October 2000 (when they wrote an engagement letter addressed to Tarlochan Singh). They received the contract documents on 7 November and the matter completed on 25 November. Even if the purchase had been under negotiation since July (as to which there is no evidence) there would have been no reason for Mr Thandi to deposit funds with his solicitor before the sale had been agreed and referred to the solicitor. I conclude therefore that the money paid in July was not originally sent in connection with this purchase. It may nonetheless have been eventually so used, but there is no evidence to show that it was. This purchase took place about the time Mr Thandi was seeking to raise a mortgage by purchasing 3 Northumberland Rd from Tarlochan Singh, so it may have been that which was intended to provide the funds. In the end I cannot be sure on the evidence what happened to the money transferred in July, or whether other funds were obtained (and if so from where) to make this purchase.

32.    37 King Richard St was bought on 2 August 2001, in the name of Tarlochan Singh, for £60,000. According to Mr Thandi's witness statement the funds came from the remortgage of 35 King Richard St on 12 July 2001. It was put to Mr Thandi that there are no documents evidencing such a remortgage, but he asserted that they had been provided to the trustees, and the remortgage was for £76,000. If so, that is a remarkable figure considering the property was purchased for £50,000 just 8 months before. He may have been confusing this with a remortgage of 3 Northumberland Rd for £76,000, but that took place in October 2001 (see p 2701) and cannot therefore have funded this purchase. If there was a remortgage of no 35, whether the funds raised can be regarded as belonging to Mr Thandi depends on whether Tarlochan Singh was acting as his trustee in acquiring and then mortgaging no 35.

33.    Five further individual properties were subsequently purchased, 2 and 4 Wren St in October 2001, 15 St Georges Rd, 35 Mowbray St and 29A Swan Lane in February 2002, all in the name of Tarlochan Singh and, according to Mr Thandi, using funds obtained by Tarlochan Singh from remortgage to Mortgage Express of properties already acquired. Finally, on 8 August 2003 a major acquisition was made with the purchase, after a successful tender, of the Fletchamstead Properties, being 3 houses with adjoining potential development land on the corner of Fletchamstead Highway and Kenilworth Rd, Coventry. The price was £1,200,050 and was entirely funded from a £1.3m facility granted by Nationwide Building Society on the security of the Fletchamstead Properties and six of the previously acquired properties. The mortgage and purchase were made in Tarlochan Singh's sole name, with no reference in any

documents to any interest on Mr Thandi's part, although it was Mr Thandi's evidence that as before he was fully involved and the purchase by Tarlochan Singh was as trustee on his behalf.

**External presentation of ownership**

34.    Tarlochan Singh had said in his witness statement that he had never made out that the properties or the letting business was his. There was not a great deal of evidence as to lettings and dealings with tenants, but such as it was it appeared that the universities and students dealt with Tarlochan Singh, and to some extent his sister, at least from 2000 onwards. It was Mr Thandi's own evidence that Tarlochan Singh was involved in the business before that. I do not place great weight on such dealings themselves, since they would not normally involve any need to show to tenants or others the nature of Tarlochan Singh's interest in the property. They are consistent with, but not necessarily only consistent with, beneficial ownership.

35.    He was taken in cross examination to various documents in connection with various funding applications to Mortgage Express and Nationwide which, it was said, showed that these had been made on the footing that he was the owner of all the properties and the income they generated, and in consequence a man of wealth.

36.    At p 2129 is an application form submitted to Nationwide by a broker, Mr Green, on behalf of Tarlochan Singh seeking to remortgage 2 and 4 Wren St. That document is signed by Tarlochan Singh on 6 February 2003 and includes the following:

   i)     Details of Tarlochan Singh's business as a "developer", his status as "sole trader" (a section for details of employment being crossed out) and that he had been in that business for "3½ years". This would be inconsistent with his being an employee of his father, or having been in that business since before about mid 1999.

   ii)    A Net Worth Statement, in which Tarlochan Singh is said to have property assets worth £955,000 and mortgage liabilities of £277,000. This can only be consistent with his being the beneficial owner of the properties referred to, which include all those in issue in this case except the Fletchamstead Properties which were yet to be acquired.

37.    At p 1721 is an online application made to Mortgage Express by Mr Green on behalf of Tarlochan Singh in 2007. That document includes:

   i)     A statement that his business is as a "sole trader" owning 100% of the business and that he has owned the business since 1 January 2000. A section for details of employment is left blank.

   ii)    A statement that his income is £140,000 pa, with details of his accountants.

   This again is inconsistent with his being a mere employee of his father. The stated income must be wholly or mainly from the rents received, and can only be his income if he is beneficially entitled to those receipts.

38.    At p 2124 is a document which evidently is an internal credit proposal prepared by Nationwide in relation to the proposed facility to purchase the Fletchamstead Properties. It is undated but must therefore have been written in mid 2003. The source

of information is not stated but must be Tarlochan Singh, or someone on his behalf. It shows what Nationwide was given to understand about Tarlochan Singh and the proposition it was being asked to finance. It includes the following:

i)     "Commercial Loan Application: Tarlochan Singh. Tarlochan Singh is seeking a facility of £1,300,000 to purchase four residential investment properties in Coventry…"

ii)    "Borrower: Tarlochan Singh… Mr Singh is purchasing [the Fletchamstead Properties] for a combined price of £1,250,000. The properties are four large detached houses in the premier residential district of Coventry… all vacant and in need of refurbishment…Mr Singh has already arranged for a contractor to start the work… The Society will take a charge over another five unencumbered residential properties owned by Mr Singh."

iii)   "Tarlochan Singh… has owned a small portfolio of residential investment properties for 3½ years. Previous to this he assisted with the day to day running of his family's property interests for over five years."

iv)    "A net worth statement is enclosed. This shows Mr Singh's main assets are the property portfolio, which currently stands at c £1m in value…Overall net worth is c £990k."

v)     "Rental accounts are enclosed for the portfolio… Tarlochan Singh rental accounts as at 5th April [2000- 2002]"

vi)    "An application form was completed to [raise capital] on two properties initially. A new form will be completed prior to drawdown." [presumably this refers to the application in February 2003 noted above]

vii)   "Mr Singh manages the property portfolio with his father."

viii)  "… we can take comfort from Mr Singh's personal covenant and additional income from a largely unencumbered portfolio is available in support."

All of this is consistent only with Nationwide having been given to understand that the properties and their income were beneficially owned by Tarlochan Singh, and that any involvement by Mr Thandi in managing the properties was on behalf of Tarlochan Singh, not the other way round. The information in this document is much more extensive than in the February application, so must have been imparted after that, and not by submission of some further form, since that was stated as a matter to follow.

39.    According to Tarlochan Singh's evidence in cross examination, all of this information had been provided by the broker by way of completion of forms which he had merely signed. The broker he said was fully aware that he owned the properties on trust for his father, but had told him this did not matter to the lender as long as it got a charge on the properties. He had never met anyone from Nationwide. It would however be highly surprising if such a substantial facility were granted without someone from the lender meeting the principal in person. It is much more likely in my judgment that insofar as Nationwide had information going beyond what was on the form, some or all of it was provided direct by Tarlochan Singh.

40.     Although it cannot be regarded as absolutely impossible that a mortgage broker fully aware that his client had no substantial income or assets of his own would nevertheless persuade his client that it was acceptable to inform lenders that he had substantial wealth, I did not believe Tarlochan Singh's evidence that that was what had happened on this occasion. Watching and listening to him giving that evidence (and taking into account the other matters I refer to which cast doubt on his credibility) I am satisfied that he was lying. On the contrary, it is much more likely in my judgment that Tarlochan Singh himself told the broker that the property and income were his, and the applications were made on that basis. Further, since it is evident from the accounts given by both Tarlochan Singh and Mr Thandi that the proposals to acquire the Fletchamstead Properties and the other properties were dealt with by them both acting together at all times, Mr Thandi must have known that this was the way matters were being portrayed, and approved of it.

41.     Part of the information provided to Nationwide consisted of accounts for the letting business for three periods up to April 2002. These accounts must have been prepared on the instructions of Tarlochan Singh, and in the circumstances I am satisfied also with the knowledge and approval of Mr Thandi. They showed the income from all the properties as being that of Tarlochan Singh. It follows that the statement of his income completed on the form and otherwise supplied to Nationwide was not a matter of innocent and accidental mis-presentation of information, or solely the responsibility of the broker, but deliberately adopted and maintained by Tarlochan Singh over a substantial period.

42.     Although in principle Tarlochan Singh could grant a valid charge over the Fletchamstead Properties and other properties specifically charged to Nationwide if he were a trustee and not the beneficial owner, it is clearly not the case that this was the only thing that was important to them. They asked about his personal status, income, assets and liabilities because they were also relying on his personal covenant for the borrowing. Tarlochan Singh was by this stage an experienced property investor, as was Mr Thandi, and I am satisfied that both of them and the broker would be aware of this, and that they knew and intended that it would assist Tarlochan Singh's application to be presented as the person entitled to ownership of the properties that were outside the Nationwide charge, and the income from them.

43.     That income was also presented to Her Majesty's Revenue and Customs as being the income of Tarlochan Singh rather than Mr Thandi. Tarlochan Singh's tax returns for the years 2008 and 2009 were disclosed, showing the income of all the properties as his. Although returns for earlier years were not provided, it was not suggested that they had been prepared on any other basis. In correspondence with solicitors for the Trustee, the accountants acting at the time (R Pau & Co) stated that there had been an agreement with the Revenue that Tarlochan Singh would account for tax on income from properties owned by other members of the family, but I was not taken to any document showing any such agreement, or any contemporary document referring to it. It would be surprising if the Revenue would make any such agreement, since it would necessarily result in the wrong amount of tax being claimed from all the family members involved. I reject that as an explanation for these returns.

44.     It was not until the return for the tax year 2010-11 that this presentation changed. From then on the rental income was included in the returns of Mr Thandi and Tarlochan Singh is described as a self employed taxi driver. Mr Thandi said in cross examination that prior to that tax year his son had filed tax returns and accounted for

the tax "on my behalf", but it was not suggested that this meant he had, or was expected to, file returns or pay tax in Mr Thandi's name. Neither of them had realised that this was not a proper way of dealing with things until they changed accountants to Luckmans (in February 2011, see p 1834). I do not believe this was a true explanation, and am satisfied it is much more likely that the change was because by the time these returns were prepared Tarlochan Singh was facing proceedings from the builders employed at Prior's Croft and the family were alert to the potential need to protect assets.

45.     Nor is there any evidence that the cash receipts from lettings were treated as belonging to Mr Thandi rather than Tarlochan Singh. At all times they were paid into bank accounts in the name of Tarlochan Singh. Both Tarlochan Singh and Mr Thandi said that these accounts were regarded as belonging to Mr Thandi, and that they only had money paid into them from the properties belonging to Mr Thandi. They pointed to some payments from them that were said to be to meet household expenses of Mr Thandi. As to those payments, there is no contemporary documentary evidence to support what was said. Even if some payments were made for Mr Thandi's benefit, that would not be surprising in a close family context. It is not a reliable indication that the whole of the money paid into the account is owned by Mr Thandi and has merely been paid for convenience to his son and employee, as Mr Thandi's case requires.

46.     It was not true that the only money paid into those accounts related to the properties said to belong to Mr Thandi. It is apparent from tax returns prepared by the second set of accountants, Luckmans, that they treated the accounts as including income and expenses relating to Tarlochan Singh's business as a taxi driver, so he must have told the accountants that at least some of the payments in were his income and at least some of the payments out were his liabilities. At best therefore these were mixed accounts, with no documentary evidence to show that any differentiation was made between monies of Tarlochan Singh and those said to belong to Mr Thandi.

**The Deed of Trust**

47.     I come to the Deed of Trust itself. It is a short document, prepared by Mr Cox of Sarginsons, solicitors based in Coventry who acted for the family in many, but not all, of its property dealings. The evidence as to how and when it came into existence is inconsistent and incomplete. Mr Thandi's witness statement said that during the acquisition of the Fletchamstead Properties Mr Cox had "pointed out to me that all the Properties were now registered in [Tarlochan Singh's] name holding on bare trust for me. Mr Cox said it would be strongly in my interest for the trust to be regularised to ensure that… it would be clear to anyone… that the Properties belonged to me and always had done. Mr Cox <u>subsequently</u> prepared a deed of trust for me to execute, which <u>was dated</u> 8 August 2003". The emphasis is mine, which I make to show that this wording, whether by accident or design, does not expressly state that the document was executed on 8 August 2003. It is one of a number of areas in which this central issue may be said to have been approached gingerly. It is right of course to say that that date is at least implied, and that was also Mr Thandi's oral evidence. Tarlochan Singh's witness statement said nothing about the preparation and execution of this document at all, although he must have known when it was prepared that it would be in issue (p244ff).

48.     Mr Cox met Miss Reynolds, the Trustees' solicitor, on 12 June 2013, when she asked him about the execution of the deed. She prepared a note (p2208) which was not

challenged as an accurate record of the meeting. He told Miss Reynolds that the deed had been prepared in draft and amended by him in hand, that he had witnessed the signature, and that it had probably been signed in advance of completion of the purchase of the Fletchamstead Properties and dated by his secretary at his instruction to correspond with the date of completion. He was adamant however that (contrary to what Mr Thandi had said) he had prepared it on Mr Thandi's instructions and not as his own initiative, he had not provided any advice in connection with it, had not investigated anything he was told about it or the acquisition of the properties it referred to and had simply assumed that they had been bought using Mr Thandi's money. He regarded it as a family matter and said that Mr Thandi as the head of the family was used to getting what he wanted. He left his file from the purchase of the Fletchamstead Properties with Ms Reynolds.

49. Ms Reynolds asked why the deed had not been recorded on the title, and noted that Mr Cox "seemed a bit uneasy about this but his general comment was that he hadn't been paid anything extra for preparing the Declaration of Trust and therefore just did as he was told, completed it and handed it over to the clients". The implication is that it was handed over as soon as it was executed.

50. Mr Cox produced a very brief witness statement dated 2 July 2013 in which he said he "can confirm that the Declaration of Trust was signed in 2003" and that he had witnessed it.

51. The Deed of Trust itself was originally disclosed only in copy form, the original having been said to be lost. Rather dramatically however, on the first day of trial the original was produced at court together with a letter from Mr Cox to Tarlochan Singh dated 6 February 2006 saying (in its entirety) "We enclose herewith original Trust Deed". Both documents were in an envelope postmarked 6 February 2006.

52. The documents disclosed from Sarginsons' file include only two potentially relevant to this deed. The first is what appears to be a draft of the document itself, and I will so refer to it although whether it was in fact a draft of the document as executed came to be in dispute. The second was a copy letter (p1134) addressed to Tarlochan Singh dated 15 December 2006 as follows:

> "**Re Priors Croft**…
>
> I enclose herewith copy of the Declaration of Trust dated 20th October."

Although no year is stated, it was pointed out that the purchase of Priors Croft was completed on 20 October 2006, so the obvious inference both from the heading of the letter and the date is that it is referring to a declaration of trust relating to Priors Croft, or at least one executed in connection with the completion of that purchase. Both Tarlochan Singh and Mr Thandi however deny that any deed of trust was ever executed in relation to Priors Croft, and say this letter must have been referring to the 2003 Deed. Mr Cox wrote a letter to Mr Thandi's current solicitor (p1146, after he had been told Tarlochan Singh denied any such deed had been executed for Priors Croft) saying he could not remember what document his letter had referred to, and that he "may have been referring to a deed relating to Fletchamstead Highway which was being sent out on this file…".

53.     There were no documents at all dating from 2003, or indeed any time prior to
        February 2006, relating to, or even referring to, any deed of trust. There was no copy
        of the executed deed or any other draft of it. There was no record of any instructions
        to prepare such a deed, nor of any request to the client to come and sign it, or note to
        say that he had. There was no mention of it, even in passing, in other correspondence.

54.     Mr Thandi and Tarlochan Singh were asked why the deed of trust would have been
        sent to them in 2006 if it had been prepared in 2003. They said that they had been
        looking for it in 2006 and not been able to find it, and so had asked Mr Cox if he had
        it. He had said he would try to find it in his file but if he could not he would prepare
        another one for them. He had then found it and sent it to them. They gave no reason
        why they had been looking for the original (Mr Thandi said he had always had a
        copy) in 2006. They could not explain what document would have been sent in
        December 2006, though they were adamant there had never been any declaration of
        trust relating to Priors Croft. They could not explain why Mr Cox would be sending a
        further copy of the 2003 deed when they had received the original a few months
        earlier, or why he would refer to a deed dated 20 October, which was the date of
        completion on Priors Croft but bore no relation to the date of the 2003 deed.

55.     Further it is apparent that, contrary to his evidence to me, in the past Tarlochan Singh
        has asserted that he held Priors Croft on trust for his father. In the bundle are two
        letters from Drew Jones, solicitors who acted in recovery proceedings for K&O
        Construction Ltd, the second firm of builders engaged at Priors Croft but not paid. In
        the first (p2186) they record that their clients were introduced to Tarlochan Singh as
        owner of Priors Croft, and had met Mr Thandi who was said to be his father but not
        suggested to be otherwise involved. In the second (p 2188) they relate how Tarlochan
        Singh sought to set their client's judgment aside, submitting to the judge that his father
        was the contracting party not himself, and that although Priors Croft was registered in
        Tarlochan Singh's name it was held on trust for his father. The same letter refers to a
        copy deed of trust being produced, but it is clear from the letter that this is not a deed
        relating to Priors Croft but other properties the creditor had sought to enforce against-
        presumably it was the 2003 deed. Tarlochan Singh denied he had ever said that Priors
        Croft was held on trust and said that Drew Jones must have got this wrong. I do not
        believe him, and find it more likely that he has subsequently, for whatever reason,
        abandoned the contention of a trust over Priors Croft. His present position is that his
        father has a charge over Priors Croft to secure money lent for its purchase and
        improvement. The validity of that charge is in dispute, but not directly in issue in this
        case, so I will say no more about it.

56.     Ultimately I cannot be certain what document was enclosed with the 15 December
        letter. I do not however believe it was a copy of the 2003 deed, because that simply
        does not fit with the content of the letter or the circumstances at the time. There must
        have been some other document, although Mr Cox cannot remember what it was and
        Mr Thandi and Tarlochan Singh are not prepared to say.

57.     Mr Cox was asked about the draft trust deed. He said he had asked his secretary to
        prepare an initial draft which he had then amended by hand, from which she had made
        an engrossment. The list of properties is typed as a continuous list, but the manuscript
        amendments include moving the heading "Property" so that each property appears
        under it on a separate line in a column, opposite a space for entry of its title number.
        Mr Cox must have provided his secretary with this list, probably by dictating it as I
        infer for reasons that appear below. The 2003 deed as signed corresponds very closely

with this draft. Among other things, the properties are listed in the same order, and identically set out apart from the reformatting onto separate lines, including the same errors of description (eg 80 Nicholls St was typed as 18 Nicholls St, an error likely to have come from misheard dictation) and the same punctuation, including the presence of a comma between the street name and "Coventry" in only one (and the same) case. It is not plausible that this list was independently typed on two occasions.

58.     The draft deed as typed however begins:

"This Declaration of Trust is made the        day of        2006…"

which would be an unlikely error to make if it had been typed in 2003. That date is not corrected in manuscript on the draft, though one may think it would have been shouted out to Mr Cox if he had been amending it in 2003. It does however appear as "2003" in the signed document.

59.     Mr Cox at first said he did not know why this date would have been included. He then said he had been asked in 2006 to find the original deed and could not, so he had had to do another. Before that was completed he had however found the original and so sent the client that. The draft would, he implied, thus have been prepared in 2006 and left on the file unengrossed. There are however no references in any documents from the file to any request in 2006 to find the 2003 deed, to any search for it or any decision to prepare a new deed. The letter sending it out made no reference to having found it, although on Mr Thandi's evidence the possibility that it would not have been on the file and have to be recreated was discussed. I was concerned about this document and asked for Mr Cox to be recalled, having had the opportunity to search his files for any other documents that might illuminate what had happened, in view of the potentially serious implications if I found that the deed had been prepared in 2006 and backdated to 2003. He was not able to provide any further documents because his files are in storage. Both parties agreed that I should make findings on the basis of the evidence before me rather than waiting for the files to be obtained and reinspected. They accept that in doing so I must bear in mind that those files might therefore have contained material which would have affected the conclusions I reach.

60.     On the second occasion Mr Cox said that although he had no positive recollection, it was possible that when trying to recreate the document in 2006 his secretary had found in the wordprocessing system the draft she had created in 2003, amended the date to 2006 and then given it to him to amend again. That would account for the similarities in typing of the list, but I am not satisfied that it can be the correct explanation.

61.     Firstly, this explanation only emerged when asked about the date on the draft. Until that point, Mr Cox had answered as if the draft were the document from which the 2003 deed was produced. For it to be true, the secretary would have to have located the original draft from 2003 but not any subsequent drafts or the engrossment version. While not impossible, this seems relatively unlikely. Mr Cox would have had to have told his secretary to produce a new deed to be executed in 2006, though he accepted that if a 2003 deed had been lost, the more sensible thing to do would be to prepare some form of declaration recording that it had existed and what its terms were rather than a fresh document which might have had a different legal effect.

62.     If the secretary amended the date from 2003 to 2006 in response to instructions, she cannot have been told that the beneficiary was to be Mr Thandi, since his details as

the second party and beneficiary named in the operative clause had to be filled in by Mr Cox. That also seems unlikely, if the instructions were to reproduce the document that had previously been executed.

63.    Finally, Mr Cox would have had to make in 2006 exactly the same manuscript amendments to the draft, both as to wording and formatting, as he had in 2003, since (with one exception) the 2003 deed corresponds with the putative 2006 draft and the amendments on it. He must also have failed to notice both in 2003 and 2006 that the formatting of the execution clause was faulty, since it appears identically in both versions. This cannot be ruled out, but again seems to me relatively unlikely.

64.    The exception relates to the spelling of Tarlochan Singh's name, which appears in three places in the draft, twice spelt correctly as Tarlochan Singh and once (in Recital 1) incorrectly as "Talochan" Singh. Mr Cox has underlined that for correction. In the 2003 deed as signed, the name in recital 1 appears correctly. But for some reason the name in the execution clause, correct in the draft, is incorrect in the executed deed. This might have suggested that the 2003 deed was not prepared from a typed draft in this format, although the other similarities are so many that I would have been satisfied in any event that it was, even if this change is unexplained. But in any event it does not make Mr Cox's suggested explanation of the draft any more probable, since that explanation requires that the same wordprocessed draft document, presumably therefore with the correct name in the execution clause, was the basis of both the 2003 deed and the later attempt to reproduce it in 2006.

65.    I should also say that in giving his evidence about the dates on which these documents came into existence, Mr Cox seemed to me to be curiously hesitant. When it was first put to him that the deed was not in fact executed in 2003 he said "that is not my recollection". Later it was suggested it might have been signed in 2006 and he said "possibly, I don't believe so", suggesting he had no positive recollection. It was then suggested it might have been signed in 2010 and he responded "definitely not". Asked why he was certain about that but not about 2006 he firmed up his evidence, saying "because it was done in 2003". I was reminded of Miss Reynolds' note of his unease when she asked similar questions. I note also that he told Miss Reynolds that he had sent the deed to the client, not mentioning that this was in 2006 after the document had remained in his file for 3 years, and that the whole explanation of looking for the document in 2006 had only emerged at trial when the original was produced with the letter showing it had been sent then.

66.    It is of course for Mr Thandi who puts forward the deed of trust to discharge the burden of proving that it is what it purports to be, ie a document executed in 2003. On the evidence before me, I am not satisfied that it is. The evidence of Mr Thandi and Tarlochan Singh is in my view self serving and not to be relied on unless independently supported. In important respects it was contradicted by Mr Cox- notably as to whether he had originated the idea of a trust deed. Mr Thandi invented the advice allegedly given by Mr Cox, no doubt to bolster his case that the properties had always been regarded by all concerned as held on trust for him. In fact, Mr Cox did not appear to have been under that impression previously, and merely accepted what Mr Thandi as head of the family told him.

67.    Weighing Mr Cox's evidence, which I was not wholly persuaded by for the reasons given above, against the absence of any record of the existence of this deed before February 2006 and the draft document with its 2006 date, which is not in my view

satisfactorily explained, I conclude that on the balance of probability both the draft and the signed deed were produced in 2006, when the deed was backdated.

68. That conclusion is made between the parties to this litigation. In view of the fact that they elected to have me reach my conclusion without affording Mr Cox a further opportunity to investigate his stored files, I should emphasise that it is not a finding binding against him and I cannot rule out the possibility that if any issue arises elsewhere as to his conduct, those files may shed a different light.

## Other relevant matters

69. In August 2003 Tarlochan Singh owned at least two other investment properties in addition to those listed in the schedule. One was at 44 Tarquin Close, which was sold in 2005. It was suggested that this was not listed because the list and deed were prepared in 2006, by which time this property had been sold. Mr Thandi said that the reason had been that in 2003 he had been intending to sell, so there was no point in listing it in the deed of trust. Tarlochan Singh, who by agreement had not been in court during his father's evidence, volunteered exactly the same reason before he could be asked about it, in words so similar to his father's that I considered they must have co-ordinated their evidence. As an explanation for not recording an existing trust, it is nonsense- nothing would be lost by putting it in the schedule, and if the trust existed it might be necessary to evidence it by means of the deed before a sale could be concluded. There is no evidence that any such sale was imminent. Even if it was, the deed of trust would have made no difference on sale since it was not intended to be recorded on the title. Having concluded that the deed was drafted in 2006, I consider that it is more likely that Mr Thandi failed to realise that if it was to be plausibly backdated this property should be listed in it.

70. The other property was at 45 Arran Close. In relation to that, Mr Thandi said he had told Mr Cox about it, but that Mr Cox had forgotten to include it in the schedule. Mr Thandi had not noticed this at the time, or subsequently. I had the impression he was being evasive in giving these answers, but no other plausible reason for omitting this property has been put forward so I draw no conclusion against Mr Thandi from its omission.

71. Tarlochan Singh was made bankrupt in late 2011. During 2012 Dent Abrams solicitors on his behalf put forward his position that he held the properties as trustee and they should be restored to him on the Register. It was not until January 2013 that the solicitors said they were also acting for Mr Thandi and put forward his claim to be the beneficial owner, with the demand that the trustees deal with them as he directed. Both sides sought to make play of this; Mr Curl submitted that the trustees were on notice of Mr Thandi's claim and had ignored his rights in dealing with the property and not contacting him until 2013. Mr Thandi said that Tarlochan Singh had been acting as his trustee and on his behalf in seeking the return of the properties prior to that. Ms Creer said that Mr Thandi had held back when the expectation would be that if he had a genuine interest he would have come forward to assert it.

72. I do not regard this as a strong point on either side. On balance, it seems to me that the trustees' case on it has more force. They were faced on appointment with the production of the previously unknown deed of trust rather like a rabbit out of a hat, purporting to show that all the apparent wealth of the bankrupt was illusory. They were suspicious of it, with good reason, and were justified in enquiring into it and waiting to see what evidence would be put forward to show that it was genuine. The

responses to their enquiries can in my view be properly regarded as grudging and even evasive. The general approach of Tarlochan Singh and his advisers seems to have been to say as little as possible and take the position that if the trustees could not prove that the deed was not genuine, it must be accepted as valid and effective. I have no doubt that Mr Thandi was (as he accepted) fully involved in this approach. If he had wished to provide further evidence, or state the case that was eventually made (that the properties had always been held on trust for him) he would have done so, or procured that Tarlochan Singh did so. The fact that he did not in my view shows that he was content to sit behind his son and have the case presented for him until it suited him to take it on directly. He no doubt hoped that the trustees would concede the case if they could not find any positive evidence against the validity of the deed, so that he would not have to take on the burden of proof.

**Summary and conclusions**

73. Drawing all this together, the starting point is that the beneficial interest in the properties is the same as the legal interest, in the absence of evidence to show a different interest, and the onus is on the person asserting that interest to prove it by convincing evidence. Insofar as an interest is said to arise by way of a common intention trust, the whole of the circumstances must be looked at to determine whether such an interest exists, and (if relevant) the extent of it. The relevant intention may be found from express words spoken or written, or by inference from the actions of the parties (as in the case of a resulting trust found on the basis of contribution to the purchase price). But in deciding what inferences are to be drawn from conduct, the court must look at the relevant conduct as a whole. I do not think these general propositions were in dispute between the parties; although there are many cases in the field, for my purposes I need cite none other than *Stack v Dowden* [2007] UKHL 17.

74. Mr Curl as I have said eschewed reliance on resulting trust as a separate concept, basing his case on the alleged actual intention of Tarlochan Singh and Mr Thandi, evidenced by matters such as payment of purchase price, as distinct from an intention they were only inferred to have by reason of those actions. This is not a distinction I find persuasive. The task of the court is (almost) always to find the actual intention of the parties, the first point of reference being what they had said, orally or in writing, as to that intention. There is no evidence (and no pleading) however of anything specific said or written at the time of acquisition or transfer of these properties, or in their subsequent management or dealings with them, to the effect that they were to be held on trust. If there was no expression of intention, the court may make inferences from their conduct, such as payment of or towards the purchase price. The inference is however (save in exceptional cases where an intention may be imputed even though there is no evidence that it was actually held) of actual intention.

75. Mr Curl relies on the evidence now given by Tarlochan Singh and Mr Thandi to the court as direct evidence, albeit retrospective, that they actually held that intention throughout, and that all their dealings were on that premise. But the court is entitled to be wary of such self serving evidence of subjective intention, and in this case I do not believe that evidence can be relied on without independent corroboration. I have referred to a number of instances above in which I was satisfied that both witnesses were lying to the court, and others in which their evidence was not complete or frank, or did not fit with the surrounding circumstances and contemporary documents. My conclusion overall as to their testimony was that both of them would be prepared to

give any evidence, written or oral, that they thought would assist them to keep the family assets away from creditors.

76.    The most reliable evidence of their actual intentions at all relevant times must therefore be that which can be inferred from what they actually did. I accept that on the evidence all or substantially all the finance for acquisition of the initial properties was provided by Mr Thandi. He chose however to have them all transferred to, or purchased in the name of, his son Tarlochan Singh. In doing so he might have intended that Tarlochan Singh would hold them on trust, but that is by no means the only possible intention, particularly in the context of the acquisition and management of family assets and family wealth. It is just as possible, in principle, that he intended to build up a portfolio of assets that his son would own, or that would be regarded as assets of the family to be dealt with in future as they might agree or as he might procure by exercise of informal influence as head of the household. Neither such arrangement would involve a trust in his favour.

77.    In this case, the contemporary objective evidence shows clearly that all these properties were treated from the time they were acquired by Tarlochan Singh as belonging beneficially to him. They were so presented to third parties at all points where the true beneficial ownership might be relevant. Tarlochan Singh was positively held out as the beneficial owner to the various mortgage companies to which he made applications with statements of his assets, income or status as a sole trader. In particular, the major applications to Mortgage Express and Nationwide were on this basis, for reasons given above. His tax returns are only consistent with his being the beneficial owner of the income arising from these properties, and therefore with being the beneficial owner of them.

78.    Apart from the deed of trust, there is no evidence to show dealing with the properties or their income other than on the basis that Tarlochan Singh is the beneficial owner. No trust was recorded on the title of any of the properties, nor is there any evidence that any of the solicitors were told of any trust at the time of their acquisition. The deed of trust might have been an exception, had I been satisfied that it had been executed in 2003 when the Fletchamstead Properties were acquired, but I have found that it was not. The income was paid into accounts in the name of Tarlochan Singh and it has not been shown that it was paid out or used in any way inconsistent with his beneficial ownership.

79.    Although most of this evidence derives from the period after about 2000 and some of the properties were already owned by that date, there is no evidence of any change of common intention at any time, so I infer that the intention evidenced in later years had always been the same. Mr Curl submitted that I might find Tarlochan Singh an unreliable witness, but that should not affect his father. However, I find his father was also unreliable. He said further that if Tarlochan Singh has presented himself as owner of the properties and retained the income from them, that may show he is a bad trustee but should not deprive his father of his property rights. The evidence in my view shows not that Tarlochan Singh was a bad trustee, but that he acted as he did with his father's full knowledge and approval because neither he nor his father considered him to be a trustee at all.

80.    I reject therefore the contention that there was any trust established over any of these properties by the common intention of Tarlochan Singh and Mr Thandi at any time. Insofar as the deed of trust is relied on, I am satisfied that it was created for the purpose of showing a position to third parties that was not the actual intention of the

parties to it, by way of insurance against claims against Tarlochan Singh. It is thus neither persuasive evidence of the prior existence of any trust nor legally effective to create a trust where none existed before. It was a sham, in that sense. I should say that I would have come to the same conclusion even if I had found on the balance of probabilities that it had been executed in 2003.

81.    Having made the finding that the claimant does not have a beneficial interest in properties, I do not need to consider the case in respect of alleged loss resulting from interference with that interest. Nor do I need to consider the question whether the deed of trust in creating such an interest is challengeable as a transaction at an undervalue.

82.    I invite the parties to agree an order reflecting this judgment.