# EXHIBIT 12

**[2000 CILR 452]**

## GRUPO TORRAS S.A. and TORRAS HOSTENCH LONDON LIMITED

*v.*

## BANK OF BUTTERFIELD INTERNATIONAL (CAYMAN) LIMITED and FIVE OTHERS

*Grand Court*

(Smellie, C.J.)

### 6 October 2000

*Trusts—tracing actions—discovery—use in related foreign proceedings—permitted only exceptionally, e.g if otherwise risk of deception of foreign court—relevance of information primary consideration—permission justified if foreign proceedings based on same cause of action and assistance given previously—not if foreign proceedings merely contemplated and to be based on new cause of action*

*Trusts—tracing actions—discovery—use permitted to support new cause of action if commenced with same objective as existing proceedings in which discovery given and arguable in law*

*Trusts—tracing actions—discovery—use in related foreign proceedings—applicant to specify relevant documents—leave refused if merely "fishing"—not to use Cayman proceedings to generate discovery to support foreign proceedings*

The plaintiffs brought proceedings against a trust to recover, by way of proprietary tracing claims, moneys stolen by the trust settlor.

The plaintiffs were companies owned by the Kuwaiti Government's overseas investment office, which was run from England by the settlor, a member of the Kuwaiti Royal Family. They alleged that the settlor had engaged in fraud on an international scale and had placed large sums of money stolen from them in nine separate trust funds around the world, including in the Cayman Islands, Jersey and The Bahamas. The plaintiffs brought proprietary tracing claims against the first defendant trustee here and obtained discovery and an injunction restraining the settlor from dealing with the Cayman trust assets. Judgment was entered against the settlor in England, and the plaintiffs sought to enforce the English judgment against the Cayman trust. They now applied for leave to use the discovered material in existing proceedings seeking non-proprietary remedies in Jersey and proprietary tracing claims in The Bahamas. They also sought leave to use the information to bring new claims for non-proprietary relief here and in The Bahamas. The Jersey claims relied on the equitable concepts of remedial constructive trust and lifting the veil on the express trusts, and on local statute.

They submitted that (a) the material was valuable as similar fact evidence of the settlor's use of various trusts to retain *de facto* control of

the assets of which he had defrauded them and to render himself judgment-proof; (b) the information was particularly relevant to the non-proprietary claims, which relied on the argument that it would be unconscionable for the settlor to retain the benefit of the assets rather than on proof that the assets were the direct proceeds of fraud; (c) the court should recognize the equitable concepts relied on in those claims as giving rise to viable causes of action.

The fifth and sixth defendants submitted in reply that (a) the court could only give leave to use the information disclosed in support of an existing cause of action, not to assist in initiating proceedings which were merely contemplated; (b) the material should not be used in aid of tracing actions or non-proprietary claims elsewhere, since they were reliant on particular factual circumstances in each jurisdiction, to which the events in the Cayman Islands were irrelevant; (c) the settlor had no legal interest in the assets in question, and the courts could not "lift the veil" of the trusts as they might with companies; and (d) only a small proportion of the assets in the Cayman trust were proved to be the proceeds of fraud.

**Held,** ordering disclosure as follows:

(1) The plaintiffs were required to show exceptional circumstances why the court should release them from their implied undertaking not to use the discovered material for purposes other than the conduct of the action in which it was obtained. Such circumstances included a party to the proceedings taking advantage of the undertaking, to deceive another court. Leave would be given to use the information in aid of the existing proprietary tracing claims in The Bahamas, since the court had already assisted the plaintiffs in obtaining *Mareva* relief in those proceedings. The court would not give leave to use the material to initiate non-proprietary claims there. Those claims would be based on factual circumstances in The Bahamas and since the relevance of the evidence could not be established until they had been commenced and pleaded, the application in respect of them was premature (page 461, lines 7–28; page 470, lines 7–27; page 471, lines 11–15).

(2) However, leave would be granted to use the material discovered to amend the Cayman pleadings to add non-proprietary claims similar to those already commenced in Jersey. The court regarded those claims as arguable for the present purposes and using the information in this way was within the original purpose of the discovery—to recover the plaintiffs' money in the Cayman Islands. Granting leave now would save the plaintiffs the expense of making a further application. Whether the non-proprietary claims were sustainable as a matter of Cayman law would be determined once they had been pleaded (page 461, line 31 – page 462, line 6).

(3) Leave would not be given to use the information in the Jersey proceedings to support non-proprietary claims. The non-proprietary claims relying on the equitable concepts of "lifting the veil" on the

settlor's trusts and the creation of remedial constructive trusts were not based on established legal principles, but in the light of recent findings by the Jersey courts and *dicta* in the English and Bahamian courts, they were certainly to be regarded as arguable. However, the court had not relied on non-proprietary concepts in ordering the relevant discovery and its primary consideration on this application was the relevance of the information to the foreign proceedings. Even if the discovered information demonstrated the settlor's control over the Cayman trust, that would not assist the investigation into the workings of a separate foreign trust. The information related to a specific sum of money which had been traced to the Cayman trust as the proceeds of four fraudulent transactions by the settlor (page 463, lines 4–19; page 464, line 1 – page 466, line 45).

(4) The plaintiffs had not identified any specific documents that would assist them, even though they had received the discovered material three years ago. Since the "fishing" nature of an application was a sufficient reason to refuse discovery, it also justified refusal to allow use of discovery overseas. If, when the pleadings on the Jersey non-proprietary claims had been settled, the plaintiffs were able to specify relevant documents, the Jersey court could seek discovery of them by letter of request directed to the Grand Court (page 467, line 39 – page 468, line 7; page 472, lines 1–23).

(5) Furthermore, since only the Grand Court had jurisdiction to enquire into the nature of a Cayman trust, the plaintiffs would not be permitted to use the information to instigate an examination by the Jersey court of the validity of the Cayman trust and whether non-proprietary claims were sustainable against it, and so also against the Jersey trusts. To accede to the plaintiffs' application would allow them to use the proceedings here as a means of generating discovery for use elsewhere in non-proprietary claims which in turn they would then be able to cite as a precedent for similar claims here. Weighing these and other factors against the proved fact that the settlor had perpetrated a massive fraud against the plaintiffs, the court concluded that as regards the Jersey actions, the plaintiffs had shown no exceptional circumstances to justify releasing them from the undertaking (page 467, lines 20–38; page 468, lines 8–35; page 471, lines 29–38).

**Cases cited:**

(1) *Abacus (C.I.) Ltd., In re*, 2000 JLR 165.

(2) *Bankers Trust Co. v. Shapira*, [1980] 1 W.L.R. 1274; [1980] 3 All E.R. 353.

(3) *Cobra Golf Inc. v. Rata*, [1996] F.S.R. 819.

(4) *Crest Homes PLC v. Marks*, [1987] A.C. 829; [1987] 2 All E.R. 1074.

(5) *Esteem Settlement, In re*, 2000 JLR 119; on appeal, 2000 JLR *N*–41, considered.

(6) *Fortex Group Ltd. v. MacIntosh*, [1998] 3 NZLR 171, con-sidered.

(7) *Grupo Torras S.A. v. Al-Sabah*, Queen's Bench Division, July 29th, 1994, unreported; further proceedings, [1999] CLC 1,469, considered.

(8) *Home Office v. Harman*, [1983] 1 A.C. 280; [1982] 1 All E.R. 532.

(9) *Hoyes v. Gas Monitoring Inc.*, 1994–95 CILR 504.

(10) *Metall & Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc.*, [1990] 1 Q.B. 391; [1989] 3 All E.R. 14, considered.

(11) *Private Trust Corp. v. Grupo Torras S.A.*, (1997–98) 1 O.F.L.R. 443, considered.

(12) *Riddick v. Thames Board Mills Ltd.*, [1977] Q.B. 881; [1977] 3 All E.R. 677, applied.

(13) *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council*, [1996] A.C. 669; [1996] 2 All E.R. 961, considered.

**Legislation construed:**

Trusts Law (1998 Revision) (Law 6 of 1967, revised 1998), s.90:

"All questions arising in regard to a trust which is for the time being governed by the laws of the Islands or in regard to any disposition of property upon the trusts thereof … are to be determined according to the laws of the Islands, without reference to the laws of any other jurisdictions with which the trust or disposition may be connected…"

Trusts (Jersey) Law 1984, art. 10(2):

"A trust shall be invalid—

…

(b) to the extent that the court declares that—

…

(ii) the trust is immoral or contrary to public policy."

art. 47(2): "The court may, if it thinks fit—

(a) make an order concerning—

(i) the execution or the administration of any trust …

(b) make a declaration as to the validity or the enforceability of a trust …"

*G.F. Ritchie* and *Mrs. R.C. Whittaker-Myles* for the plaintiffs;

*H. St.J. Moses* and *N. Joseph* for the first to fourth defendants;

*D. MacF. Murray* for the fifth and sixth defendants.

**SMELLIE, C.J.:** This is the plaintiffs' application for leave to use in other proceedings material obtained by orders for discovery in these proceedings. Other proceedings have already been instituted by the
45   plaintiffs before the Royal Court of Jersey and in the Supreme Court of

The Bahamas. The plaintiffs also seek leave to use the discovery material
in future proceedings intended to be brought in this court and in The
Bahamas.

5       The discovery material relates to the Comfort Trust, which is
established under and governed by the laws of the Cayman Islands. It
consists of information and documents which were disclosed by the first
defendant in its capacity as trustee of the Comfort Trust pursuant to
orders for discovery made in this action. The second, third and fourth
defendants are the trust companies holding its assets, and the contingent
10      beneficiaries of the Comfort Trust—Sheikh Fahad's wife and son—are
the fifth and sixth defendants.

In this action the plaintiffs have brought proprietary tracing claims
against the Comfort Trust seeking to trace and recover funds alleged to
have been stolen from them and settled into the trust by its settlor Sheikh
15      Fahad Mohammed Al-Sabah ("Sheikh Fahad"). Sheikh Fahad, although
himself the sole primary beneficiary of the Comfort Trust, has not been
joined as a defendant in this action and has not applied to be joined.

Although this action was begun in 1995 when the injunctive orders and
orders for early discovery were made, the plaintiffs have not taken the
20      final steps to bring it to trial. Written reasons for the making of the earlier
orders in support of the plaintiffs' proprietary tracing claim against the
Comfort Trust in this action have been delivered on August 7th, 1995,
September 7th, 1995 and November 23rd, 1995.

The plaintiffs explain the delay on the basis that they have been
25      engaged on several fronts in other actions in other jurisdictions in seeking
to preserve and protect assets which have been placed at Sheikh Fahad's
disposal through various trusts he has settled in those jurisdictions. They
have succeeded in the trial of the "main" action in England, and now have
in their favour against Sheikh Fahad a judgment there of US$800m.,
30      which has not been appealed. Only now, therefore, they say, are they able
to advance the action here.


*Background*

Sheikh Fahad is described as a central figure in a massive fraud,
35      perpetrated on an international scale against the plaintiffs. The plaintiffs
are entities owned and operated by the Kuwaiti Investment Office ("the
KIO") for its investment purposes overseas. Sheikh Fahad, a member of
the Kuwaiti Royal Family, was the Executive Chairman of the KIO,
which has its base of operations in London, England. The KIO was
40      established against the background of the then looming threat of Iraqi
invasion for the purpose of expanding and diversifying Kuwaiti invest-
ments overseas.

In the action brought before it, the English High Court found that
Sheikh Fahad was indeed a central party to the fraud in which some
45      US$450m. was stolen from the plaintiffs. That court found that Sheikh

Fahad personally received at least US$125m. Judgment was entered against him for more than US$800m., including accumulated interest and reflecting his central role in the defalcation of all the funds.

5      The plaintiffs have discovered that Sheikh Fahad is the settlor and a primary beneficiary of several trusts established in a number of jurisdictions. Among these are the Comfort Trust and at least one other Cayman trust (the Eaglet Trust, only recently brought to light). His interest in several other trusts in the Channel Islands and The Bahamas has also been established. In all, nine separate trusts have been identified.

10     The plaintiffs seek to enforce the English judgment against the assets of the various trusts and, to that end, the actions already mentioned are either under way or contemplated in Jersey, The Bahamas, in this jurisdiction and perhaps elsewhere. As a central theme of their various recovery actions, the plaintiffs will seek to show that Sheikh Fahad's use
15     of the various trusts involved a *modus operandi* by which he sought to transfer into them substantially all his assets—including the proceeds of fraud—even while he remained the primary beneficiary of the trusts, retained *de facto* control of them and used them as vehicles for seeking to judgment-proof himself against the plaintiffs' claims.

20     In seeking to support the present application, the plaintiffs argue that information about any of the trusts obtained in any jurisdiction will be relevant in any action in other jurisdictions as similar fact evidence of Sheikh Fahad's propensity to use his trusts to defraud them. It is submitted that evidence of that propensity will be directly relevant in
25     particular to certain claims already brought in Jersey.

The plaintiffs will argue that the veil of the various trusts should be lifted and their assets treated, for the purposes of enforcement of the English judgment, as Sheikh Fahad's assets.

Although joined as a defendant to the Jersey actions, Sheikh Fahad has
30     chosen not to respond but Barbara, his wife, and Mishal, his son, who were also joined, have responded.

The nature of the plaintiffs' causes of actions brought against the trusts in the various jurisdictions may generally be described either as proprietary or non-proprietary. In the proprietary context, it is that assets
35     of the trusts belong to the plaintiffs as representing and as being traceable to the proceeds of the fraud. In the non-proprietary context, it is that the assets are available none the less by dint of different statutory or equitable remedies, to satisfy the massive judgment debt obtained against Sheikh Fahad.

40

*The Jersey actions*

The following factual and unrefuted narrative of events is gleaned from the affidavits filed in this action. At present there are two separate actions in Jersey in which the plaintiffs seek to use the Comfort Trust discovery
45     material obtained in this court. Both actions were commenced at the

instance of Abacus Ltd., the Channel Islands entity which is the trustee of the Jersey trusts established by Sheikh Fahad.

In the first action commenced in August 1999, *In re Abacus (C.I.) Ltd.* (1), Abacus seeks the direction of the Royal Court of Jersey as to what to
5   do in light of the plaintiffs' allegations in the English proceedings—as to the invalidity of the Jersey trusts—claiming the ownership of some or all of the trust assets. Abacus has asked the court to make declarations as to (a) whether the Jersey trusts are valid; (b) whether Abacus holds the assets upon and subject to the terms of the trusts; and (c) whether Grupo
10  Torras ("GT") had or has any valid claim to any of the assets. GT, which is the first plaintiff in this action, has also been joined as a respondent in the Jersey actions upon Abacus's application.

The Royal Court of Jersey has also joined the contingent beneficiaries of the Jersey Trust—Barbara Al-Sabah and Mishal Al-Sabah and the
15  remoter classes of beneficiaries—as respondents to the Jersey proceedings. Like the stance taken in Cayman, Sheikh Fahad has not acknowledged or responded to the proceedings but his wife and son have.

GT has served particulars of claim and a counterclaim for non-proprietary relief in these Jersey proceedings. GT's claim to non-proprietary relief is
20  made on the following bases:

(a) Under art. 10(2)(b)(ii) of the Trusts (Jersey) Law 1984, as amended, on the ground that the Jersey trusts are contrary to public policy as being used as the instruments of fraud.

(b) By the application of equitable principles, the courts will lift or
25  look behind the veil or legal structure of the trusts if they are designed to be and appear to be under the effective control of the perpetrator of fraud, to provide a remedy to the victims of his fraud.

(c) The assets of the Jersey trusts are or should be the subject of a remedial constructive trust for GT.

30  (d) Abacus, as trustee, is obliged to apply the assets of the Jersey trusts (even if they are validly constituted) to satisfy (albeit potentially only partially) Sheikh Fahad's judgment debt and the Jersey court has an obligation to direct Abacus as trustee to do so pursuant to art. 47 of the Trusts (Jersey) Law 1984, as amended ("the art. 47 claim"). The art. 47
35  claim was separated out into a second set of proceedings on the order of the Royal Court but that order has been reversed by the Jersey Court of Appeal.

Abacus seeks to have the determination by the Jersey court of the art. 47 claim as to whether it should exercise its discretion to apply the trust
40  assets for Sheikh Fahad's "benefit" by way of reduction of the judgment debt owed by him to GT, in partial satisfaction of the English judgment. Abacus has further indicated that before arriving at a conclusion as to whether such a distribution would be appropriate, it would "wish to hear from the second and third beneficiaries (Barbara and Mishal Al-Sabah) as
45  to their current circumstances."

Attempts by the respondents to strike out GT's non-proprietary claims in the Jersey actions on the basis that they assert no sustainable causes of action have so far proved to be unsuccessful. The Jersey Court of Appeal has so held in a robust and unanimous judgment delivered on July 27th,
5    2000 (*In re Esteem Settlement* (5)). Of significance to the present application, in so doing, the Jersey Court of Appeal also allowed GT's cross-appeal from an aspect of the judgment of the Royal Court of Jersey that disallowed references in GT's claim to various non-Jersey trusts (2000 JLR at 144–145). These included the Comfort Trust. In relation to
10   this point ("the non-Jersey trusts point") the Court of Appeal (Southwell, J.A.) explained the reasons for its decision at para. 33 of the judgment:

"The first question is whether GT is to be permitted to include in its pleadings references to trusts settled by Fahad other than the two Jersey trusts the immediate subject of this action. GT seeks to rely
15   on what Fahad did and what has happened in relation to such other trusts in order to show that he has acted systematically in using trusts and other offshore vehicles as means of hiding from GT the fruits of his defalcations. For my part, I consider it plain that GT must be permitted to include in its particulars of claim references to
20   such other trusts for this purpose."

The Court of Appeal also itself granted leave to GT to re-amend its particulars of claim to reconsolidate the art. 47 claim (as indicated above) and to include the non-Jersey trusts point. Those amendments have been effected by GT.

25   It is of note that in support of the non-Jersey trust points, particulars of pleadings have been included which make reference to the Bahamian Blatant, Lake and River Trusts following orders of the Bahamian court permitting GT to use for those purposes information discovered in the Bahamian proceedings. The Bahamian court made those orders notwith
30   standing the opposition of Mishal Al-Sabah.

### The Bahamian proceedings

These fall into two categories: proceedings already instituted, as described below, and "any further proceedings in any way connected
35   with" Sheikh Fahad's Bahamian trusts. It is only necessary for present purposes that I give a brief description of the existing Bahamian proceedings against which to test the relevance of the Comfort Trust discovery and the other legal criteria for the grant or refusal of the plaintiffs' present application to use that discovery information in them.

40

### Cause No. 72 of 1994 against, inter alia, Sheikh Fahad, Chemical Bank and Private Trust Corporation ("PTC")

This action was commenced by the plaintiffs in order to obtain *Mareva* injunctive relief in The Bahamas against Sheikh Fahad and the other
45   defendants in respect of the assets of one of the Bahamian trusts settled

by Sheikh Fahad. That relief was obtained after disclosure to the
Bahamian court of information obtained in England and in this jurisdiction—the latter pursuant to the leave of this court to use the early
Comfort Trust discovery for those purposes. Leave was then also given to
5   use the discovery material in the proceedings which were then pending in
England.

### Cause No. 1262 of 1998 against Pictet Bank & Trust Co. Ltd.

This action is based upon the plaintiffs' propriety tracing claim for
10   some US$97.5m. which it claims is traceable to the fraud through
Account G772 set up by Sheikh Fahad with Lombard Odier in Geneva,
Switzerland. It is averred that these moneys were transferred into the
Better Trust established in The Bahamas by Sheikh Fahad and later
transferred to and settled upon the Lake Trust, another Bahamian
15   settlement of his.

These trusts have been described by Mance, J. in the English High
Court in *Grupo Torras S.A.* v. *Al-Sabah* (7) ([1999] CLC at 1,674):

"No difficulty exists about tracing [the amount of \$97.5m.
standing to the credit of the Better Trust in The Bahamas]. Neither
20   the Better Trust nor Esteem Ltd., nor any intermediary between the
plaintiffs and the Better Trust and Esteem Ltd., can claim to have
provided value or rely on any change of position defence. Indeed,
the Better Trust and Esteem Ltd. were and are no more than vehicles
established or used by Sheikh Fahad to hold misappropriated
25   assets."

### Cause No. 971 against Allyson Gibson and partners (a law firm).

Allyson Gibson and her firm have been Sheikh Fahad's lawyers in The
Bahamas for a number of years and have acted for him in relation to GT's
30   claims against him brought in The Bahamas and elsewhere. It is claimed
that payments totalling US$8.5m. to Gibson & Co. for the benefit of
Sheikh Fahad have been made out of either the Better or Lake Trusts,
being moneys stolen from GT by Sheikh Fahad. The claim in the action is
for declaratory and mandatory injunctive orders against the defendants for
35   the tracing and restitution of these funds.

### Further claim against PTC in The Bahamas.

A fourth action has been commenced against PTC in respect of a
payment of some US$20m. traced to it as having been paid out by Pictet
40   Bank & Trust Co. from the assets of the Better or Lake Trusts. This is
therefore also a proprietary tracing action to recover moneys GT claims
Sheikh Fahad stole from it.

It is against all that factual background that I now turn to consider the
plaintiffs' arguments in this application for leave to use the Comfort Trust
45   discovery in aid of the Jersey and Bahamian actions, both extant and
contemplated.

The leave sought is for use in The Bahamas of the information in support of the existing actions and the contemplated non-proprietary claims in The Bahamas of the kind pleaded in Jersey. These contemplated actions would be against all of Sheikh Fahad's trusts.

5

*Leave for use in the Bahamian actions*

I can record here and now that I consider the application for leave in support of claims outside the jurisdiction of this court *which are merely contemplated* to be premature. This is the current position with the pro
10  posed non-proprietary claims in The Bahamas. The existing actions there are based on proprietary tracing claims and on the basis of leave granted before in respect of use in Cause No. 72 of 1994. I grant leave for use of the Comfort Trust discovery in the extant Bahamian actions.

The position is different with the non-proprietary claims. Those claims
15  there will, if brought at all, be based primarily upon factual circumstances brought to light in the Bahamian jurisdiction. The Comfort Trust discovery can at best only be relevant to support, not initiate, those claims and so they must first be required to be pleaded in a sustainable form and the relevance of the Comfort Trust discovery shown in relation to them,
20  before it might be appropriate to grant leave to further deploy that information abroad in The Bahamas.

As matters stand, the application for leave in respect of proposed Bahamian proceedings is not in order to support an existing known cause of action but in the hope of helping to create one there. On the basis of the
25  outcome in *Riddick* v. *Thames Board Mills Ltd.* (12), that is an impermissible reason (although the written reasons for judgment in that case did not emphasize this point): see also *Cobra Golf Inc.* v. *Rata* (3) ([1996] F.S.R. at 826, *per* Laddie, J.).

30  *Leave for use for further claims in this jurisdiction*

During the course of the arguments, I granted leave to use the discovery information to amend the pleadings in this action to allow equitable non-proprietary claims similar to those in Jersey to be brought in this jurisdiction; or, alternatively, for use in support of a separate action
35  if necessary for bringing such claims here. Leave was required because the information was discovered for use only in support of the action in the Cayman Islands as it stands. Leave was granted on the basis that it would be unnecessarily costly to require the plaintiff to make yet a further application for leave to support further related claims in this jurisdiction
40  which it has been advised to bring.

Whether it can sustain those non-proprietary claims is a separate issue to be dealt with beyond the stage where the pleadings will be filed. That issue will be tested by reference among other things to whether the non-proprietary claims are to be recognized as a matter of Cayman law. For
45  present purposes, for reasons which will become apparent below, I am

prepared now to regard the non-proprietary claims as being at least arguable. This further use of the discovery material is an entirely legitimate purpose coming broadly within the original purpose of the discovery—recovery of the plaintiffs' money in this jurisdiction. The fact
5    that the further use will be in this jurisdiction will ensure that this court can continue to ensure there is no abuse.

### Relevance to proceedings in Jersey

         In aid of the application for leave to disclose the information in the
10   Jersey actions as presently pleaded, Mr. Ritchie articulated persuasive reasons but which none the less left some difficult concerns.

         Of course a basic test is: What relevance can there be to the claims to the assets of the Jersey trusts (and those of the Bahamian trusts for that matter) in the fact that the Comfort Trust exists, the manner of the
15   disposition of its assets, its respective beneficial entitlements, and Sheikh Fahad's alleged *de facto* control over those assets? The Jersey Court of Appeal regarded the answer to that question as self-evident from the circumstances of the case. But the Deputy Bailiff in the Royal Court below did not see the matter that way and had ordered
20   the pleadings relating to the non-Jersey trusts to be struck out. I am also now aware of the defendants' application for leave to appeal to the Privy Council against the judgment generally of the Court of Appeal. I must therefore satisfy myself in all respects as to the appropriateness of granting leave and, in particular—as I certainly regard the matter—as to
25   the likely relevance of the Comfort Trust discovery to the Jersey actions.

         The same thinking must be applied, *a fortiori*, to the Bahamian actions, where the claims are still limited to proprietary claims and where the possible wider relevance to non-proprietary claims does not yet exist.

         Mr. Ritchie put his arguments in these term: There are special circum
30   stances which make it essential for the Jersey and Bahamian courts to have all relevant information about Sheikh Fahad's trusts, wherever they may be, namely: (a) the massive nature of the fraud; (b) the apparent existence of an intention and scheme to set up trusts in various juris dictions to hide the stolen moneys or his own moneys with a view to
35   frustrating the judgment GT has obtained against him; and (c) the risk that without the full picture a court may not see the real extent to which Sheikh Fahad has created a web of trusts intended for the purpose of defrauding the plaintiff.

         Mr. Ritchie argued that the case for leave to disclose is particularly
40   compelling in respect of the non-proprietary claims now pleaded in Jersey. The court will have to determine whether, having regard to all the circumstances, it would be unconscionable for Sheikh Fahad, and those who claim through him, to retain intact their respective interests in the various trusts at the expense of GT. This is an issue to be tried even if the
45   proprietary tracing claim cannot be made out in proof that the assets are

the direct proceeds of the fraud. Secondly, such retention by those bene fiting from Sheikh Fahad's largesse would constitute unjust enrichment in all the circumstances now brought to light.

5     Two of GT's non-proprietary claims are to be based upon equitable principles which must at this stage at least be recognized not to be settled principles. They might even be described as novel in the particular context of Jersey jurisprudence. Here I make reference to the claim for the "lifting of the veil" of the Jersey trusts and for declarations of remedial constructive trusts. These are the non-proprietary claims similar
10     to those to be brought here and contemplated in The Bahamas to which I refer above.

    The two non-proprietary claims based upon Jersey statutory trust pro visions—arts. 10(2)(b) and 47 of the Trusts (Jersey) Law 1984—are also to be regarded as somewhat novel. For present purposes, however, I
15     regard myself as obliged to see all these claims as arguable or sustainable in light of the findings both of the Royal Court of Jersey and of the Jersey Court of Appeal. The outcome there may yet prove to redound in further support—by way of precedent—for the non-proprietary equitable claims to be brought in this jurisdiction.

20     Succinct descriptions of these claims can be taken from the judgment of the Royal Court in *In re Esteem Settlement* (5). The following discussion appears (2000 JLR at 130):

        "*(a) Lifting the veil*

25         GT accepts that there is no case where a court has 'lifted the veil' of a trust so as to enable the creditors of the settlor to have recourse against assets in a trust that is otherwise valid. However, it argues that this is a developing field and that where the assets are in the control and under the effective control of the settlor (because the trustee will in practice invariably do what the settlor says) and
30     where the trust was set up or used to put assets out of the purported control of the settlor, but with those assets still remaining freely available for the settlor when required, the court may be able to look through the trust structure and treat the assets as if they were the settlor's, particularly where fraud is involved."

35     The analogy with lifting the corporate veil of an incorporated entity such as a limited company is compelling but obviously legally strained by the fact that grantor discretionary trusts of the kind involved here have no legal corporate existence. They are none the less legal contractual entities which create fiduciary relationships enforceable also in equity and there
40     appears to be an emerging body of authoritative judicial *dicta* which suggests that the analogy with the lifting of the corporate veil will be applied in appropriate circumstances. Indeed some of this *dicta* would suggest an approach which would treat companies and trusts virtually interchangeably for the purpose of "lifting the veil" to get at assets
45     believed to be dishonestly hidden behind it.

I have asked myself the basic question whether those claims reveal a sustainable cause of action.

For the present purposes of considering leave to allow use of the discovery material in support of such claims, I think I need only further cite a passage from an early ruling of Mance, J. in the English action (7) when that court had to consider whether to maintain an *ex parte* injunction against Sheikh Fahad as a party before it in relation to his overseas trusts, including the Jersey trusts. In the following passage, Mance, J. reviewed the earlier English cases on the "lifting the veil" point:

"It is common ground that any discretionary trusts of which Sheikh Fahad was settlor and under which he is a potential beneficiary are *prima facie* to be regarded as quite separate in law from Sheikh Fahad, and that the assets of any such trusts fall *prima facie* to be distinguished from the assets of Sheikh Fahad. The *prima facie* position is, therefore, that it is only if and in so far as the trustees of any such trust actually exercise their powers in favour of Sheikh Fahad that his assets may be increased. The onus thus rests on the plaintiffs to justify the extension of any interlocutory relief, whether by way of injunctive or disclosure order, to the trusts or trust assets. The precise circumstances in which such an extension could be justified were in dispute. Relevant guidance is afforded by *S.C.F. Fin. Co.* v. *Masri* … and *Re a Company* … both in the Court of Appeal. A further recent instance of such an extension is provided by *TSB Private Bank Intl. S.A.* v. *Chabra* … a decision of Mummery, J. In the first case, Lloyd, L.J. with whom Sir George Waller agreed, said … that—

'where a plaintiff invites the court to include within the scope of a Mareva injunction assets which appear on their face to belong to a third party, *e.g.* a bank account in the name of a third party, the court should not accede to the invitation without good reason for supposing that the assets are in truth the assets of the defendant…'

The ultimate issue is not, therefore, the legal efficacy of the corporate, or, in this case, trust structure under consideration. It is whether it is necessary, in order to achieve justice, to lift the veil of that structure and so to treat the assets of the company or trust as the defendant's.

In a case where the structure cannot be entirely disregarded as a sham, a key question is likely to be whether it was in practice a vehicle over which the defendant exercised substantial or effective control. In both *Wallersteiner* v. *Moir* … and in *Re a Company* itself, the fact that the structure 'danced at the defendant's bidding' or 'to the defendant's tune' was central to the court's conclusion.

       In *TSB Intl.* v. *Chabra* … Mummery, J. allowed the joinder of a
company and upheld an injunction against it on the basis that there
was 'a good arguable case that some of the assets held in its name
are the beneficial assets of Mr. Chabra either on the basis that the
5    company holds them on trust for or as nominee for him, or on the
basis that the company is nothing more than a convenient repository
for Mr. Chabra's assets'."

    Mance, J. went on to consider the facts (then only as alleged at that
interlocutory stage) and concluded that the injunctions should be
10  maintained as there was some evidence that the Jersey trusts were
"dancing to Sheikh Fahad's bidding" and that, in relation to the Esteem
Settlement, "Sheikh Fahad is, in reality, the beneficial owner of it and its
assets and their substantial and effective controller."

    The *dicta* from the English cases considered by Mance, J. have also
15  been recognized and applied by the Bahamian Court of Appeal in one of
the actions pending there in respect of Sheikh Fahad's trusts. This was on
the occasion of an appeal against an injunctive order restraining trust
assets. The pronouncements of the Court of Appeal, although strictly
*obiter* in the context of the existing Bahamian actions, suggest the
20  readiness of the Bahamian courts to recognize the remedy of "lifting the
veil" of the trust: see *Private Trust Corp.* v. *Grupo Torras S.A.* (11).

    It is appropriate to note here that the injunctive and discovery orders
obtained by the plaintiffs in this jurisdiction have been made by reference
to the plaintiffs' proprietary tracing claim. This relates directly to some
25  US$2.4m., part of a larger sum of US$25m., the proceeds of one of the
four major fraudulent transactions involving Sheikh Fahad. This sum of
US$2.4m. is alleged to have been traced into the Comfort Trust. Early
injunctive orders backed by limited discovery orders were made. The
principles in *Bankers Trust Co.* v. *Shapira* (2) were applied in granting
30  the early orders: see my written ruling delivered on November 23rd, 1995
(*2000 CILR 441*). Later, full *inter partes* discovery was given by the
trustee in recognition of the plaintiffs' right to ascertain exactly how
much of their money had found its way into the Comfort Trust or became
admixed with its assets. All the information given in the course of
35  discovery is the subject of the present application.
The orders so far made in this jurisdiction have not been made in
recognition of the existence of relief based on any of the principles of the
lifting of the veil or remedial constructive trust.

40   *Remedial constructive trust*

    This, GT's other equitable non-proprietary claim, has not yet found
settled acceptance in English law. *Dicta* from the House of Lords in
*Westdeutsche Landesbank Girozentrale* v. *Islington London Borough
Council* (13) would suggest that the remedy none the less has a promising
45  future. Lord Browne-Wilkinson said ([1996] A.C. at 716):

"Although the resulting trust is an unsuitable basis for develop
ing proprietary restitutionary remedies, the remedial constructive
trust, if introduced into English law, may provide a more satis
factory road forward. The court by way of remedy might impose a
5    constructive trust on a defendant who knowingly retains property
of which the plaintiff has been unjustly deprived. Since the
remedy can be tailored to the circumstances of the particular case,
innocent third parties would not be prejudiced and restitutionary
defences, such as change of position, are capable of being given
10   effect. However, whether English law should follow the United
States and Canada by adopting the remedial constructive trust will
have to be decided in some future case when the point is directly
in issue."

This potential equitable remedy has been defined in perhaps clearer but
15   no more settled terms by Slade, L.J. in *Metall & Rohstoff A.G.* v.
*Donaldson Lufkin & Jenrette Inc.* (10) ([1990] 1 Q.B. at 479):

"While we have had the benefit of very full argument on almost
all other aspects of the law involved in this case, we have neither
heard nor invited comprehensive argument as to the circumstances
20   in which the court will be prepared to impose a constructive trust de
novo as a foundation for the grant of equitable remedy by way of
account or otherwise. Nevertheless, we are satisfied that there is a
good arguable case that such circumstances may arise and, for want
of a better description, will refer to a constructive trust of this nature
25   as a 'remedial constructive trust.'"

As suggested above, the remedy has also gained positive recognition in
other Commonwealth countries including New Zealand. In *Fortex Group
Ltd.* v. *MacIntosh* (6) Tipping, J. stated, *obiter* ([1998] 3 NZLR at 172)
that "a remedial constructive trust is one which is imposed by the Court
30   as a remedy in circumstances where, before the order of the Court, no
trust of any kind existed."

GT contends that the Jersey court can impose a remedial constructive
trust upon the assets of the Jersey trusts in favour of GT. The grounds for
so doing are based upon the same facts as are relied upon for lifting the
35   veil. Citing the massive fraud resulting in the judgment of the English
court for US$800m. and the use by Sheikh Fahad of various trusts which
he controls for protecting his assets, GT argues that unless the trust assets
are declared to be subject to a remedial constructive trust to satisfy the
judgment debt, it will remain largely unsatisfied.

40   Against all that background of the history of the matter—of the extant
English judgment and of the actions in Jersey, The Bahamas and in this
court—this application for leave really comes down to what, to my mind,
is a fundamental premise: It is whether the fact that Sheikh Fahad
controls the Comfort Trust will be relevant to the proper disposition of
45   the non-proprietary claims against the Jersey trusts. This is assuming that

the discovery information would so reveal. To put it again in the terms
used by Southwell, J.A. of the Jersey Court of Appeal:

5
"GT seeks to rely on what Fahad did and what has happened in
relation to such other trusts in order to show that he has acted
systematically in using trusts and other offshore vehicles as means
of hiding from GT the fruits of his defalcations."

To the extent that the Comfort Trust discovery could be helpful in that
manner in proof of GT's non-proprietary claims in Jersey, this court must
be naturally concerned that in refusing leave it might impede the proper
10   trial of the claims there in the extraordinary circumstances of this case.
And given the relative novelty of the claims and the complexity of the
issues involved, the views expressed by the Jersey Court of Appeal as to
what may be relevant are to be noted. Misgivings do, however, exist, in
the absence of any particularization by the plaintiffs of the documents or
15   other discovery information they will rely upon and without a showing of
the specific relevance to the issues to be tried in Jersey.

In this regard Mr. Murray made three main points which on an
application of this nature the case law regards as pertinent. These I found
to be very persuasive in the end.

20      1. The fifth and sixth defendants have always disputed the relevance in
Jersey of documents relating to the set up and operation of a different
trust in a different jurisdiction involving different trustees. This is
principally because the enquiry cannot be limited in any case to Sheikh
Fahad. It is as much an enquiry into the conduct of the Cayman trustee as
25   to the administration of the Comfort Trust. The conduct of the Cayman
trustee ought to be immaterial to proceedings in Jersey, unless the
intention in the Jersey proceedings is to enquire into and pronounce upon
whether the Comfort Trust has been operated so as "to dance to Sheikh
Fahad's bidding." This court should not lend itself to such an exercise, as
30   only this court has jurisdiction to determine the nature of the Comfort
Trust (s.90 of the Trusts Law (1998 Revision)).

It would be an illegal use of discovery material obtained in this
action if the action has been maintained all along only so as to get
discovery to be able to support other actions abroad. This appears to be
35   what GT has been about and should it not be allowed the further abuse
of using the material in Jersey to bring non-proprietary claims, which
it would later cite as precedents for similar claims in the Cayman
Islands.

2. Of course, if the plaintiffs had identified any particular documents
40   or series of documents to support their case, then it might have been
possible to say that any or all of such documents might have a proper
bearing in Jersey. But the plaintiffs have not so specified and should not
be given the benefit of the doubt. They should certainly not be given a
"blank cheque" simply because they have not managed to identify the
45   documents which they say are relevant.

3. On any view, if any documents are relevant, they must be on the periphery. Allegations in Jersey will focus on the Jersey trust. If indeed there is Comfort Trust discovery relevant to the Jersey allegations it should be particularized, and this can readily be done through a letter of
5  request from the Jersey court to this court. In the absence of such particu larization the plaintiffs cannot point to any prejudice they suffer by not having the Comfort Trust discovery.

There are still further factors of concern to be addressed. It is clear to my mind that GT will seek to invite the Jersey court to draw inferences
10 and conclusions not only about the affairs of the Jersey trusts, but about those of the Comfort Trust as well. Those inferences and conclusions will of course not be determinative of any rights or obligations under the Comfort Trust because only this court is seised of jurisdiction over the Comfort Trust. As Mr. Murray submits, s.90 of the Trusts Law (1998
15 Revision) governs the position.

None the less, conclusions reached in Jersey about the Comfort Trust could be significant to the overall interests of Barbara and Mishal Al-Sabah who are contingent beneficiaries under the trusts here and in Jersey. For instance, as appears from Abacus's representations to the
20 Royal Court of Jersey, that court's deliberations upon the art. 47 claim as to the distributions of the assets of the Jersey trusts may be influenced by what it "hears from the second and third beneficiaries (Barbara Al-Sabah and Mishal Al-Sabah) as to their current circumstances." In that context the Comfort Trust discovery could yet prove to be beneficial or
25 detrimental to the fifth and sixth defendants, depending on the view taken as to how their interests under the Jersey trusts should be treated.

While I may not overlook the fact that the outcome in Jersey (or elsewhere for that matter) cannot prejudice or determine the interests of Barbara and Mishal Al-Sabah as the fifth and sixth defendants here *qua*
30 beneficiaries of the Comfort Trust, unspecified use of the Comfort Trust discovery in Jersey is a matter of proper concern to them.

The foregoing factors are all to be placed in the balance as against the proved massive fraud committed by Sheikh Fahad and the proper concern of the plaintiffs to be able to recover as much of their judgment debt as
35 they might. I have also not overlooked the fact that the action here against the Comfort Trust has been pending now for more than five years and the injunctive orders against its assets have been in place here for just as long. No claim has been brought that the Comfort Trust is a mere sham and the non-proprietary claims are only now to be brought here. The only
40 extant claim here is the proprietary tracing claim, and that is still confined to the sum of US$2.4m. mentioned above. No wider tracing claim has emerged, so far as I am aware, notwithstanding the early and later general discovery given in respect of the Comfort Trust by the trustee.

I was told that very significant assets were settled upon the Comfort
45 Trust well before Sheikh Fahad's crime was committed.

Mr. Murray cited these concerns as reasons why I should refuse leave to ensure that the action in this jurisdiction is not being maintained for the purpose only of supporting the plaintiffs' other actions overseas. I am urged to bear in mind that there can be no presumption that all the assets
5   of the Comfort Trust are tainted by the fraud and that Sheikh Fahad was an independently wealthy man before the fraud was perpetrated against the plaintiffs. As was submitted on his behalf before Mance, J. in the English proceedings: "a discretionary trust such as the Settlement (Esteem Comfort Trust) was 'standard equipment' for a wealthy foreign
10  national like Sheikh Fahad seeking to minimize potential liability to inheritance tax."

He is not before me to assert such an argument himself and such an argument on his behalf should have received the same short shrift it was given by the English court. However, given the nature of their defence, it
15  is, to my mind, still too early to say that coming from the other benefi ciaries, such an argument in support of the Comfort Trust is spurious. As an example of this concern, it is the defendants' case that at least one valuable asset, an expensive house in The Bahamas, had been indepen dently acquired by Barbara Al-Sabah before it was transferred into the
20  Comfort Trust at the instance of Sheikh Fahad.

For those reasons, the massive fraud notwithstanding, it is not to be overlooked that the Comfort Trust, until this court determines otherwise, is distinct from Sheikh Fahad, and that no accusation of impropriety or dishonesty has been levelled against either the trustees or the contingent
25  beneficiaries.

For its part the first defendant trustee, consistent with its advisedly neutral role, has not opposed the plaintiffs' application for leave. However, Mr. Moses for the trustee did emphasize a salient concern which it has, namely, that the plaintiffs appear to be seeking a determination as to the
30  validity of the Comfort Trust indirectly in the Jersey proceedings, in which the trustee is not a party and will not and cannot be heard. While such an "indirect determination" of course may not be determinative of any issue under Cayman law it may, in the way anticipated above, serve to inform the Jersey court in any general pronouncements it might make
35  adverse to the Comfort Trust and its trustee.

I have taken the trouble of setting out the competing concerns in some detail because they are concerns which this court must fairly weigh in the balance before exercising its discretion. Any court would be concerned to assist the plaintiffs in recovering the proceeds of fraud, but the case-law
40  clearly shows that it would be a facile and impermissible approach to cast aside *prima facie* legitimate interests in trust information and other principles which apply, once it appears that fraud on a large scale has been committed.

This application is not about whether the plaintiffs should have all the
45  relevant information about the trust. On the basis that there has been full

and frank discovery in this action and in the tracing actions in England and The Bahamas, they already have. The remaining issue here is whether and in what circumstances the plaintiffs should be further able to deploy that information abroad.

5

*The legal principles*

There is no dispute about the legal principles. The starting point must be with the settled principle that documents disclosed on discovery in a court action are disclosed subject to an implied (if not expressed)
10 undertaking from the receiving party not to use them for any purpose other than the proper conduct of the action and, in particular, that the documents will not be used for any collateral or ulterior purpose. The undertaking is given not to the party disclosing but to the court, although the prevention of prejudice to the party disclosing is an important reason
15 for the undertaking.

It follows that the undertaking may be released or varied only upon an order of the court and the documents can only be used for other purposes with the leave of the court or the consent of the party giving discovery. The law is that only in exceptional circumstances are such undertakings
20 to be released or varied by the court. This is primarily for the reason that their importance lies in the preservation of the confidence of parties to litigation that the information they disclose in, and exclusively for the purpose of, litigation, will not be abused to their detriment in another context. This abuse is the "collateral or ulterior purpose" mentioned above
25 and it is anathema to the encouragement of full and frank disclosure, which is essential to the just disposition of cases before the courts.

A breach of the undertaking by a party or advocate is treated as a criminal contempt of court and can be visited with serious consequences.
30 In the leading case of *Home Office* v. *Harman* (8), a solicitor's conviction for contempt for breach of the undertaking was upheld by the House of Lords. Lord Diplock opened his speech (one of the majority) in these terms ([1983] 1 A.C. at 299–300):

"What this case *is* about is an aspect of the law of discovery of
35 documents in civil actions in the High Court. The practice of compelling litigating parties in the course of preparing for trial of a civil action to produce to one another, for inspection and copying, all documents in their possession or control which contain information that may, either directly or indirectly, enable that other
40 party either to advance his own cause or to damage the case of his adversary or which may fairly lead to a chain of enquiry which may have either of these two consequences is peculiar to countries whose systems of legal procedure are inherited from the English courts of common law and from the court of Chancery (in which discovery
45 originated). Nothing resembling this forms any part of the legal

procedure in civil actions followed in countries of the civil law, from
which are drawn the majority of states that are parties to the
European Convention on Human Rights. The use of discovery
involves an inroad, in the interests of achieving justice, upon the
5  right of the individual to keep his own documents to himself; it is an
inroad that calls for safeguards against abuse, and these the English
legal system provides, in its own distinctive fashion, through its
rules about abuse of process and contempt of court."

Whether or not exceptional circumstances exist to justify waiving or
10  varying the undertaking will depend on the circumstances of the case.

The consideration that if the discovery material was not available to it
a litigant would be allowed to stand behind the undertaking to perpetrate
a deception upon another court overseas was accepted by this court in
*Hoyes v. Gas Monitoring Inc. (9)* as being, among others, an exceptional
15  circumstance justifying the release of the undertaking. This court allowed
the discovery evidence to be put before that court in the proceedings
joined between parties—estranged spouses—who had been parties in
earlier proceedings in this court in which the discovery had been given.

In the written decision then delivered, I noted the court's concerns that
20  the undertaking should not be allowed by a court to which it is given to be
used by a litigant as a cloak for his own fraudulent conduct elsewhere
(*1994–95 CILR at 506–507*):

"I note … the irresistible inference that to the extent that the fifth
defendant [the husband] attempted to hide the true position [as to the
25  ownership of shares in the subject company] from the Wake County
court, he must have placed great store by this court's embargo on the
use of evidence discovered herein for the purposes of those or any
other proceedings."

In arriving at the decision I have made in this matter not to further release
30  the undertaking at this point in time, I am satisfied that Sheikh Fahad
would ultimately be no more likely to succeed because of this decision in
using the undertaking as a cloak on the Comfort Trust discovery to hide
the true extent of his fraud.

In this case, the several factors cited by Mr. Murray and Mr. Moses
35  persuaded me that the undertaking should not be released at this stage.

The onus is upon the plaintiffs (applicant) to demonstrate cogent and
persuasive reasons why the implied undertaking should be released: see
*Crest Homes PLC* v. *Marks* (4).

Notwithstanding the pronouncements of the Jersey Court of Appeal as
40  to the general relevance to GT's case of the pleadings on the non-Jersey
trusts point, the failure of the plaintiffs to specify any documents from the
wide discovery material they have had for some three years now is
indicative at least of uncertainty about their case on the non-proprietary
claims. The lack of specificity therefore suggests that the application may
45  be of a "fishing" nature from the point of view of the Jersey actions.

It is trite law that "fishing" is sufficient basis for refusal of discovery orders and must be, *a fortiori*, basis for refusal to release the undertaking and for holding that the applicants have failed to discharge the onus upon them to satisfy the court. There is some support in authority for the latter
5   aspect of this proposition, to the extent that it is novel and support is necessary: see *Cobra Golf Inc.* v. *Rata* (3) ([1996] F.S.R. at 830–832).

In the absence of particularization and some clear indication of how the discovery material is to be used under the supervision of the Jersey court, the potential prejudice to the Comfort Trust, the trustee and to the
10  fifth and sixth defendants is apparent. This is especially so in the light of the fact that the trustee will not be able in the Jersey action to make representations on how the discovery material should be construed. This is although that is likely mainly to be about how the Comfort Trust has been administered by the trustee.

15  For all the foregoing reasons, it strikes me that the appropriate course to adopt here is to await the settlement of the pleadings on the non-proprietary claims in Jersey. At that time the Jersey court will be well placed to support a particularized request from GT for documents from within the Comfort Trust discovery which will be relevant to those
20  claims. From all we now know about the case, it would not be premature of me to indicate that this court would stand ready to assist were an appropriate letter of request to emanate from the Jersey court in those circumstances.

25  *Summary of conclusions*

The discovery material may be used to bring the proposed non-proprietary claims in this jurisdiction, either in this action or in a separate action to be brought specifically for that purpose. The discovery material may be used for the trial of the existing proprietary claims in The
30  Bahamas but not for non-proprietary claims which at present are merely contemplated.

The discovery material may not be used in support of the non-proprietary claims in Jersey at this stage. A particularized letter of request in support of that use is likely to be favourably considered.

35  Apart from the trustee's costs (for which it is entitled to have recourse to the trust fund), the costs of this application shall be in the cause.

*Order accordingly.*

*Charles Adams, Ritchie & Duckworth* for the plaintiffs; *Hunter & Hunter* for the first to fourth defendants; *Walkers* for the fifth and sixth defendants.