# EXHIBIT 14 PART 2

*"where there wasn't a barter deal"*, would have been, according to Mr Szukalski's evidence, a:

*"Good deal. We would have taken that deal for sure, yes."*

(4) In stating, in his witness statement, that the *"contract pricing was not inflated: it was set at a level that FileTek considered to be appropriate"* he had intended to convey no more than that the sale was at a discount on the list price in the *"standard price book"*.

(5) He told me that he *"reverse-engineered to get in Mr Egan's range of the differential [the range that Mr Egan had given in their first call] but I still used the standard price list to come up with the pricing how it was. So I didn't pull it out of thin air. I came up with the pricing based on something that had already been around for a while."*

(6) He could not opine on *"fair value"*, which he regarded as an accounting concept and *"a Bill Loomis issue."*

2810. Furthermore, Mr Szukalski's evidence was that in the absence of the IDOL licence, he would have been prepared to offer Autonomy a discount as high as 74% on its StorHouse licence, if that meant transacting the business. Mr Szukalski, who was responsible for sales of StorHouse, said he would still have regarded a much lower price of only $2 million for a StorHouse licence of this size as a "*Good deal. We would have taken that deal for sure.*"

2811. Further, Mr Egan's evidence in cross-examination was more equivocal than its description in Dr Lynch's written closing submissions. When it was put to Mr Egan that the price paid to FileTek by Autonomy was a "*fair and proper price*". Mr Egan answered as follows:

*"I didn't care too much about that, I was more going through what Sushovan's objectives were for the financials of the deal. It could have been significantly smaller, it could have been significantly larger; it was the three factors I mentioned."*

2812. The "*three factors*" were identified by Mr Egan in a previous answer as, "*the absolute dollar amounts, fair value, and that the volumes going in each direction were acceptable and relevant to each party*".

2813. Mr Egan expanded in re-examination on what he meant by "*Sushovan's objectives*":

*"Pretty much exactly what I was just referring to, in other words he had a set of objectives and a bit of a puzzle to solve. He had to consider wanting the deal to be as large as it could be properly rationalised to be on fair value; it had to have enough delta to incentivise FileTek for doing this very rushed transaction; it had to involve software that both parties valued and got in the volumes that were meaningful."*

2814. The Claimants contended that Mr Egan's reference to the price being "*rationalised to be on fair value*" echoed Mr Szukalski's evidence about "*reverse-engineering*", i.e. starting with the price for StorHouse that he and Mr Egan had discussed and then creating a proposal that would be said to justify that price. Mr Egan also explained that his understanding was that:

> "*Fair value provides for a very large range. It was my understanding at the time that both prices from each company to the other met fair value criteria.*"

2815. In my view, what both Mr Egan and Mr Szukalski were trying to do was explain that they had not consciously broken any rules or adopted a pricing structure which, having regard to both transactions in the round, they felt could not be rationalised by reference to some objective criteria; but the objective was for both FileTek and Autonomy to achieve as high a price as could plausibly be presented as being within the "very large range" of fair value and not wholly disconnected in terms of percentage variation from FileTek's list price.

*Price FileTek agreed to pay Autonomy for Autonomy software*

2816. Turning to 2) in paragraph 2805 above, Mr Chamberlain's question *"why does FileTek need Autonomy and how will the technology be used?"* reflected his concern about the dramatic increase in the price to be paid by FileTek for its IDOL licence, which he would have anticipated would have to be explained to Deloitte. The figures were startling: in 2008, FileTek was required to make a $150,000 license prepayment and had paid nothing else since then. Now it was going to pay a licence fee of $8 million. On 30 December 2009, Mr Chamberlain followed up his initial query with a further email to Mr Egan and Dr Menell, again copying Mr Hussain (who recognised the issue as *"vv important"*):

> "*The technical paper should also address the different economics of their previous deal compared to this one. In Q1 2008 they signed an OEM agreement with term until 30 June 2010. They got similar software for the Trusted Edge Application. The cost was $150,000 plus 10% S&M, giving a total of $165,000. This agreement adds SPE but otherwise looks same from software perspective and allows them to also use on their Storhouse application. Now the fee is $8,000,000.*
>
> *Pete- need a compelling technical argument to support the pricing differential.*
>
> *Stouff- need to add a compelling commercial argument as to why pricing is like this. Needs significant additional revenues to justify their expense.*" 2817. Again, I prefer the insight provided by Mr Loomis's accounting memorandum to the self-justifying and ultimately circular evidence provided by Mr Egan and Mr Szukalski. The memorandum explained what truly was the proposed use of the Autonomy software envisaged by FileTek and what its anticipated value to FileTek would be. It attributed a fair value to FileTek of the Autonomy IDOL licence of $455,000. That was about 5% of the price

actually agreed to be paid. The reason for that very low value to FileTek in comparison to the price being paid was that FileTek only had plans to sell the software with Trusted Edge licences and Trusted Edge's sales projections were very low (40 sales a year).

2818.  In this context:

(1) Although an amendment to the agreement for the purchase of Autonomy software gave FileTek the right to incorporate IDOL into StorHouse (whereas the 2008 OEM agreement was limited to Trusted Edge), the truth was that FileTek's intention at the time, as Mr Szukalski confirmed, was to bundle IDOL only with Trusted Edge software licences.

(2) The accounting memorandum recorded that FileTek "*does not have on its development road map to incorporate Autonomy licences into StorHouse software*", a fact which Mr Szukalski confirmed was correct.

(3) The estimate of 40 Trusted Edge sales incorporating IDOL yearly was Mr Loomis's estimate taking into account that (as the memorandum recorded) FileTek had a "*poor track record*" of hitting its projected figures for sales of Trusted Edge, as Mr Szukalski confirmed. Mr Loomis therefore did not feel comfortable relying on FileTek's sales projections for Trusted Edge when calculating the value to FileTek of the extension of its IDOL licence. The assumption which Mr Loomis regarded as reasonable was a sale of an average of 40 units of Trusted Edge per year over 5 years. Mr Szukalski did not regard the estimate of just 40 unit sales per year as an unrealistic estimate at the time. Indeed, even that estimate turned out to be optimistic, since in the event "*Trusted Edge failed as a business*".

2819.  In the circumstances it is clear that the price for one transaction was dictated by the other, and it was calculated not by reference to the value of what was being sold but by reference to the generation of as much recognised revenue for Autonomy as it was thought possible to present to Deloitte, with a large reward for FileTek for its assistance. I accept the Claimants' submission and find that the reason why FileTek was willing to pay such a vastly higher price for IDOL was because Autonomy was going to give FileTek the funds to pay for it.

*Autonomy's technical analyses of StorHouse*

2820.  Mr Chamberlain's email of 30 December 2009 referred to in paragraph 2805 above had also asked for some assessment of *"why…Autonomy need[ed] the Filetek solution and what benefits will that bring."* When it was put to Dr Lynch that this looked as if Dr Menell was being asked by Mr Chamberlain to come up with an *ex post facto* technical argument to support a price that Mr Egan had already agreed, he acknowledged this, and queried also how a technical argument would support the price agreed. But, as the Claimants submitted and I accept, Mr Chamberlain would have understood, as I consider Dr Lynch did also, that

Autonomy needed something to give credence to the case for there being a genuine commercial rationale for acquiring StorHouse.

2821.   The requests from Mr Hussain and Mr Chamberlain prompted a cursory and superficial technical assessment by Autonomy of the StorHouse software. Mr Egan acknowledged in his witness statement that, as the chronology also demonstrates, the purpose of this technical analysis was not to decide whether Autonomy should purchase the software or what it should pay, but *"to justify the value of the deal to Deloitte"*.

2822.   Dr Blanchflower's unchallenged evidence was that, on 30 December 2009, Dr Menell, without explaining the reason for his request, asked Dr Blanchflower and Mr Gallagher (neither of whom were part of the Digital Safe team) to provide a description of FileTek's software, along with examples of how it could be used in conjunction with Autonomy's products. Dr Blanchflower gave the following unchallenged evidence:

> *"To the best of my recollection, the only thing we had to go on when conducting our analysis was the name "FileTek". Our starting point, therefore, was to conduct an internet search to find information on the company and its software. We looked at FileTek's own website, and may also have run additional Google searches to look for relevant news stories or other information about FileTek and its technology. We did not have a copy of FileTek's software or any detailed installation guides or user manuals. Our report took us no more than a few hours to produce."*

2823.   Based on those internet searches, Dr Blanchflower and Mr Gallagher prepared an email which Mr Gallagher sent to Dr Menell later on 30 December 2009. The first half of the email, which was drafted by Dr Blanchflower, set out *"Initial thoughts"* on how FileTek's software might overlap with or complement Autonomy's software. At a high level, Dr Blanchflower could see that FileTek's software could be valuable to Autonomy, but he said that he had to *"fish for possible uses"* and included anything that was potentially plausible: he made clear that he was *"stretching some of the use cases, but I was asked to think of as many as I could"*. The second half of the email, which was drafted by Mr Gallagher, was evidently based on a review of FileTek's own website, as the links to the website made clear.

2824.   It was the unchallenged evidence of Dr Blanchflower that Dr Menell did not follow up with Dr Blanchflower and Mr Gallagher in relation to the email. All that Dr Menell did was to send a hyperbolic summary in praise of StorHouse stating that its capabilities *"represent a game changing play when combined with Autonomy's SPE powered DigitalSafe"*. This was untrue and there was no basis for it: no prior work had been done to explore the possible integration of StorHouse with SPE, nor had any work been done to determine the feasibility of combining StorHouse with Digital Safe.

2825.   I accept the Claimants' submission, supported also by the evidence of Mr Wang and Mr Goodfellow, that this is hardly the sort of technical evaluation one would

expect Autonomy to conduct if it was seriously considering licensing StorHouse for in excess

of $10 million in order to integrate it with Autonomy's products[306]; and that the technical analysis was just an *ex post facto* justification in order to provide a paper trail for Deloitte.

*Execution of the two agreements*

2826. Less than half an hour after receiving Dr Menell's paper, Dr Lynch replied "*ok*", signifying his approval for the StorHouse purchase. Shortly thereafter, Mr Hussain also replied, "*This is good – I am fine*".

2827. On the evening of 31 December 2009, Mr Loomis wrote to Mr Thompson, subject "*autonomy agreements have been mutually signed*". Mr Szukalski accepted that, on that day, FileTek would not have signed the IDOL licence, unless Autonomy had mutually signed the agreement for a StorHouse licence. Mr Loomis' email again recorded that "*CEO [Mr Egan] said that we should be paid 4-5 days early via wire*", a reference to Mr Egan's assurance on the call earlier that afternoon. Also that evening, Mr Szukalski sent a note to his FileTek colleagues expressing appreciation for their help and hard work. He said, "*I would have never guessed one week ago that we would be closing a financial transaction of this size to close out 2009. It has been quite a challenging and remarkable 48+ hours ...*". Mr Szukalski accepted that his email reflects the fact that the transaction only came onto the horizon at all when Mr Szukalski heard from Mr Egan on 28 December 2009. Mr Seamans' one-word reply to Mr Szukalski's email, "*Unbelievable*", was a fair reflection of Mr Szukalski's own reaction to getting the deal done within only three days and to the scale of the deal.

2828. The two agreements mutually executed on 31 December 2009 were:

(1) A software licensing and maintenance services agreement under which FileTek granted Autonomy Inc a licence to install, implement, access, use and copy StorHouse for a period of five years for its internal business purposes and/or for the benefit of its hosted customers. The total fee for the software licence and maintenance support was $10,367,280, based on 60 users and specific data limits (including 1 petabyte of primary relational data, i.e. <u>structured</u> data), which was payable by Autonomy Inc within 30 days from receipt of invoice.

(2) An amendment of the 2008 OEM agreement under which Autonomy Inc licensed certain software, including Autonomy IDOL with SPE Basic,

---

[306] Mr Wang's evidence was that a proper product evaluation would have involved speaking to the technical team (including himself) and having engineers run a proof of concept to ensure there were no significant integration issues, which in this case would have involved trying to integrate StorHouse with Digital Safe. This never happened. Indeed, on the evidence, no attempt was made to check, for example, whether StorHouse was capable of searching structured data on the scale required by large customers, such as banks. Mr Wang's evidence was that repeated stress tests using large volumes of structured data should have been run, and that this would have taken weeks.

to FileTek for use with FileTek's StorHouse application. The agreement provided for the payment by FileTek of a licence fee of $8,000,000 and a fee of $480,000 for the first year of support. The licence fee and support fee were to be invoiced immediately and payable in two equal instalments of $4,240,000 within 30 and 90 days, respectively, from the date of invoice.

2829.   Autonomy recognised the $8,000,000 licence fee under the first FileTek sale as revenue as at 31 December 2009 and the support fee as revenue over the following year.

*How the first StorHouse purchase was presented to Deloitte*

2830.   The Defendants placed reliance in this context also, as in almost all others, on Deloitte's approval of the transactions. They emphasised that Deloitte's review involved a demonstration of the StorHouse product attended by Deloitte's technical expert Mr Johnstone.  Mr Gallagher presented the demonstration and Mr Goodfellow had worked on it. Deloitte were seeking to *"ensure from an audit perspective that the two transactions are appropriately valued and can be separated and that they make commercial sense."*

2831.   Deloitte focused on the two key questions of whether there was a commercial rationale, and whether the transactions were at fair value. With regard to the technical evaluation Mr Welham confirmed in cross-examination that Mr Johnstone was able to ask all the questions he wanted about the software.  Mr Johnstone produced his own technical evaluation.

2832.   Then, on 11 January 2010, Deloitte produced their working paper with a view to assessing whether the two deals could be recognised separately. This involved ascertaining whether there was a linkage such as to impact the accounting treatment.  Deloitte's view was that these were dissimilar goods, and the transactions could be recognised independently.  Deloitte concluded that:

(1) There was a clear commercial rationale behind the purchase; and

(2) The purchase was at fair value.  In this context Deloitte took into account that competitive quotations had been obtained by management from a number of companies with regard to potential software applications for use with SPE for structured data analysis, including HP, Informatica and CommVault. Mr Welham confirmed that Deloitte had no problem with a quotation being obtained after the year end.

2833.   Mr Welham agreed that reaching these conclusions involved the process previously described of confirming the transactions did not relate to similar goods, and then identifying both commercial rationale and fair value for the transactions:

> *"Q.  So you decide they're not similar, then you ask yourself the question, is there a commercial rationale for both limbs?  A.  Yes.*
>
> *Q.   Then you ask yourself, has fair value of the two transactions been established?*
>
> *A.  Yes, correct."*

2834.  In addition to the demonstration and a management paper provided to them by Autonomy on 12 January 2010, Deloitte was also provided with: (i) a management representation letter dated 22 February 2010, signed by Mr Hussain, confirming that Autonomy's purchase of StorHouse was on an arm's length basis, (ii) a confirmation

letter signed by Mr Loomis in respect of the first FileTek sale confirming the outstanding debt owed to Autonomy and that there were no side agreements, (iii) evidence of Dr Lynch's approval of the first FileTek purchase and internal correspondence between Autonomy management outlining the supposed commercial rationale for the purchase, and (iv) a copy of an email from Mr Szukalski to Mr Egan on 21 January 2010, in which Mr Szukalski purported to set out FileTek's commercial rationale for licensing additional Autonomy software as follows:

> *"...the FileTek Trusted Edge platform utilizes the Autonomy Keyview filters and IDOL platform. Our current contract with Autonomy was set to expire in June 2010...we projected that a royalty arrangement with the same terms would have cost us an annual average of approximately $3-5 million in royalties due to Autonomy and possibly even more. Further, the prior royalty formula caused less than optimal pricing structures for FileTek in order to minimize the per copy royalty. These conditions drove the commercial desire to negotiate a license with a fixed up front cost (and no royalties.) Otherwise, we would have been forced to find alternatives to the Autonomy products. This new arrangement not only allows us to renew our commitment to Autonomy but allows us to further expand our use of Keyview and IDOL within Trusted Edge and allows us to integrate the Autonomy IDOL SPE software in support of our STH storage virtualization platform offering."*

2835.  Deloitte concluded, on the basis of this material, that the first FileTek sale and purchase were separate transactions conducted at arm's length. This process appeared to be careful and comprehensive and reliable accordingly.

2836.  However, the Claimants' case was that Deloitte was misled. The Claimants relied particularly on the evidence of Mr Welham. According to his evidence in his witness statement, Deloitte were unaware that:

(1) Autonomy had not undertaken any detailed technical analysis or due diligence in relation to the StorHouse software but, the day before the first FileTek purchase, had only briefly reviewed FileTek's website and the information about its software on the internet.

(2) FileTek would not have bought the IDOL licence at the price it did had it not been for Autonomy's purchase of StorHouse, and FileTek was dependent on receipt of funds from Autonomy under the StorHouse purchase to make payments under the IDOL licence.

(3) The negotiations had been conducted by reference to the "*spread*", i.e. the delta or net payment that would fall to be made after setting the two payments off against each other.

(4) FileTek had been assured by Autonomy that it would not be "*burned*" on the transaction.

(5) Had Deloitte been aware of these matters, they would have been of "*concern*" as they would have called into question whether the transactions were independent, arm's length and commercially reasonable transactions, all of which were essential planks of Deloitte's analysis of the appropriate accounting treatment.

2837. According to the Claimants, the true position was also withheld from the Audit Committee. On 28 January 2010, Mr Hussain sent Dr Lynch and Mr Kanter the final version of his management note for the Audit Committee. Mr Hussain's covering email noted that he had included "*More on filetek*" and requested "*Any final comments before we send?*". Dr Lynch accepted that he had at least reviewed the draft "*at the level of the non-financial stuff*". The version of the note sent to the Audit Committee, which included what was described in Dr Lynch's written closing submissions as having *"added positioning",* was seriously misleading:

(1) The note described the purchase of the StorHouse licence as a "*completely separate transaction*" from the IDOL sale to FileTek. This was an untenable description in light of the chronology set out above. In fact, as already noted, the two transactions had been conceived by Mr Egan, and approved by Mr Hussain, as a package, and negotiated with FileTek by reference to the spread between the two prices.

(2) The note also misrepresented the commercial rationale and background to the purchase of StorHouse:

> *"We carried out a detailed evaluation process over several months to identify technology that would allow us to do this "out-of-the box" and evaluated products from HP, Informatica and CommVault. The evaluation process was carried out independently by our CTO and technical team. We eventually selected the Filetek product because the technology was judged to be the most appropriate and best of breed …"*

(3) But there had been no "*detailed evaluation process over several months*" nor is the adverb "*eventually*" apt to describe the decision to buy StorHouse; and there was no evaluation at any time of HP's or CommVault's products as an alternative to purchasing StorHouse. As explained previously, Autonomy's technical department spent a few hours browsing material about FileTek on the internet, only a couple of days before the StorHouse licence was purchased.

(4) The suggestion that the evaluation of StorHouse was carried out "*independently*" by Dr Menell, was also false: Dr Menell was only asked to consider the StorHouse purchase <u>after</u> Mr Egan had already approached Mr Szukalski about a round-trip transaction.

2838. The note also went on, as part of supporting the existence of a genuine commercial rationale, to assert that StorHouse had been "*fully integrated and is available for commercial sale*". Dr Lynch asserted in cross-examination that this was "*a perfectly reasonable statement*" on the basis that because FileTek "*was an NAS,[307] once it was set up in a network environment, then it was integrated and available for sale*". Dr Lynch's position therefore appeared to be that the statement was true if StorHouse had merely been installed in a network environment. However:

(1) Although there was a dispute about what *"fully integrated"* meant, the Claimants submitted, and I accept, that the phrase *"fully integrated"* of itself was intended to convey more than the installation of the software on the network. That is reinforced by the claim that it was *"available for commercial sale"*.

(2) The Claimants also submitted that in any event, there was no evidence that StorHouse had even been installed in a network environment within Autonomy as at late January 2010. Against this, the Defendants relied on (a) exchanges with Mr Gallagher which appeared to demonstrate that the StorHouse software had been downloaded in January 2010 and (b) the fact that there had been a demonstration in January to explain to Deloitte the purpose of the StorHouse software and a use case for combining it with IDOL, which suggested that the StorHouse software would have been installed for that purpose and to show off its functionalities. However, when cross-examined about this, Mr Goodfellow explained that the demonstration material had been compiled by him and two others in his team, and he was adamant that they had not installed StorHouse by then or for that purpose. There was nothing to contradict this.

2839. Despite Mr Goodfellow's adamant insistence, I remained puzzled by why or how a use case would have been sought to be presented without installation of the software concerned. Nevertheless, even if a prototype was installed by then (12

---

[307] This appears to stand for Network Attached Storage.

January 2010) I consider and find that the note, especially with the additions made by Dr Lynch, was materially misleading: I accept that the depiction of a fully integrated "oven-ready" product was greatly exaggerated with a view to justifying to Deloitte (and, in turn, the Audit Committee) the purchase of StorHouse as a self-standing transaction which was justified on its own merits notwithstanding its very considerable purchase price.

2840. In short, I am satisfied that the way the transaction was presented to Deloitte was distorted to the point of falsity. In my judgment, Deloitte's conclusion that the first FileTek sale and purchase were separate transactions conducted at arm's length was based on a false presentation to them.

*Mutual payments in respect of the first FileTek transaction*

2841. The inter-dependence of the transactions, and the side arrangements to ensure that FileTek would be put in funds before ever being required to pay was again illustrated by the payment process:

> (1) On 26 January 2010, a number of days before Autonomy's payment for the StorHouse licence fell due, Mr Egan wrote to Mr Scott asking him to "*raise the payment*" to FileTek that day. Mr Egan explained that, "*Sushovan is aware and is expecting a request for approval as early as this evening or at latest tomorrow AM. He will then approve and can you be sure we either wire or send check overnight?*"

> (2) The same day, Cynthia Watkins, in Autonomy's finance department, sought Mr Hussain's approval for the payment, noting that payment was due on 30 January 2010. In the early hours of 27 January 2010, Mr Hussain gave his "*ok*", and so did Dr Lynch.

> (3) Autonomy paid FileTek $10.367 million on 27 January 2010, in advance of the contractual due date for payment, in accordance with the assurance given by Mr Egan to Mr Szukalski.

> (4) Two days later, on 29 January 2010, FileTek paid the first instalment of $4.24 million to Autonomy. Mr Szukalski confirmed that FileTek used the cash it had received from Autonomy to pay Autonomy.

2842. In cross-examination,  Dr Lynch did not seek to argue that the timing of these payments was a mere coincidence; but he sought to explain and justify the sequence on the basis that, before the payment was made by Autonomy, he would have expected someone to have had a phone call with FileTek saying, "*If I send you what I owe you, you'd better send it back straightaway*". Dr Lynch said that getting prompt cash payment from FileTek was helpful for Autonomy's Days Sales Outstanding ("DSO") metrics, which he explained in re-examination was a measure of how quickly debts owed to Autonomy were paid. This did not, however, address the real issue: as the Claimants put it,

> *"the issue here is not one of the timing of cash flow: the Claimants' case does not involve a complaint that Autonomy made a legitimate purchase but paid for it sooner than it could have done; the Claimants' case is*

> *that Autonomy's reason for purchasing the StorHouse licence and paying in advance of the due date was to put FileTek in funds first to enable it to purchase Autonomy software at a high price and then to pay down its debt to Autonomy."*

2843.  On 31 March 2010, FileTek paid the remaining instalment of $4.24 million to Autonomy. Again, Mr Szukalski's evidence was that FileTek used the money it had received from Autonomy to pay Autonomy.

2844.  I accept the Claimants' case in relation to the first of the transactions comprising RT 3.

*Defendants' knowledge*

2845.  The knowledge of both Defendants of the reciprocal nature of the first of the RT 3 transactions, and the consequent impropriety of accounting for them as if they were independent, seems to me to be apparent from the description above. I give further reasons for this conclusion after my consideration of the second of the RT 3 transactions which follows.

*The second of the FileTek transactions comprised in RT 3: Q1 to Q2 2010*

2846.  Whereas the Claimants described the second FileTek purchase transaction as once again driven by Autonomy's need for more recognised revenue, the Defendants described it as being for proper commercial purposes and to meet a genuine desire on Autonomy's part to extend the data limits of the first purchase (including a 1 PB limit for relational data) so as to enhance its capacity to deploy StorHouse and enable it to meet identified customer demand. Both sides relied on the evidence of Mr Egan in this context; and there was a dispute as to whether a number of emails were genuine or pre-textual.

2847.  The Claimants relied on the following description in Mr Egan's witness statement of what promoted the transaction, and its salient features:

> *"In Q1 2010 Mr Hussain told me that we were short on revenue again. I therefore looked to do another quid pro quo deal. Mr Hussain and I agreed that I would present a second round trip deal to FileTek. The rationale for the deal, which I laid out in an email to Mr Hussain dated March 30, 2010, was that Autonomy expected an increase in its data hosting business because of its recent (separate) agreement to host Merrill Lynch data, and that as a result, Autonomy could license additional rights relating to the volume of data that could be hosted by Autonomy using FileTek's StorHouse software. The rationale was a pretext, as both Mr Hussain and I knew. Autonomy did not "need" the right to use StorHouse.*

> *On March 29, 2010, I spoke with FileTek's Mr Szukalski, with whom I had made the quid pro quo deal at the end of 2009. I proposed that FileTek licence additional Autonomy software before March 31. In*

> *return, I said that Autonomy would purchase additional rights to use FileTek's StorHouse software in the following quarter for a purchase price that would substantially exceed the amount of FileTek's purchase from Autonomy. The separation in time was a requirement established by Mr Hussain. Its purpose was to introduce two separate time periods as another fact establishing the deals as independent transactions. Most of my discussion with Mr Szukalski and FileTek's CEO, Bill Loomis, was about the spread - the dollar amount by which Autonomy's purchase from FileTek would exceed the amount of FileTek's purchase from Autonomy. The spread was a principal incentive to FileTek to do this quid pro quo deal.*

> *I agreed with Mr Szukalski and Mr Loomis that FileTek would license software from Autonomy in Q1 2010 for $8.5 million, plus one year of maintenance for $510,000, a total obligation of $9,010,000. In return, I agreed that Autonomy would purchase additional rights to use FileTek's StorHouse software and related support for about $11.5 million in Q2 2010. We agreed that the spread would be approximately $2.5 million. Mr Hussain established the amount of the licence fee for the Autonomy software and directed the negotiation of the amount of the spread; I conducted that negotiation. Both halves of the agreement were reached orally at the end of March 2010. FileTek's purchase from Autonomy was documented on March 31, 2010. Autonomy's agreement to purchase additional rights to use StorHouse remained entirely oral at that point. Mr Hussain told me that it should not be in writing."*

2848.  The Claimants relied also on internal Autonomy email exchanges with Dr Lynch which appeared to support the presentation of the transaction as a device to raise recognised revenue to cover shortfalls, and thereby also Dr Lynch's involvement and knowledge;

>  (1) On 29 March 2010, Dr Lynch sent an email to Mr Hussain and Mr Egan, attaching a revenue route map which included $12 million of revenue referable to "*gary/clutch/bluearc/safenet/cronin*". Dr Lynch accepted that "*gary*" might have been a reference to Gary Szukalski.

>  (2) The next day, 30 March 2010, Dr Lynch sent Mr Hussain an update, which now included $10 million of revenue referable to "*gary*". Again, Dr Lynch accepted

>  it was possible that this was a reference to Mr Szukalski. No alternative explanation has been advanced.

>  (3) Later on 30 March 2010, Dr Lynch sent an email to Mr Hussain, attaching what Dr Lynch called "*my list*". The list again included $10 million of revenue in relation to "*Gary*", which Dr Lynch accepted might, at the very least, be a reference to a deal with Mr Szukalski.

>  (4) On 31 March 2010, Dr Lynch sent Mr Hussain a further revenue routemap, which now included $8 million of revenue for "FILETEK".

Dr Lynch confirmed in cross-examination that it was he who had added the reference to FileTek. This strongly supports the conclusion that the references to "*Gary*" in Dr Lynch's earlier route maps had also been to FileTek.

2849. The Claimants contended that it is perfectly clear, therefore, that late in Q1 2010, Dr Lynch knew that a revenue transaction with FileTek was part of Autonomy's plan to achieve its revenue target for Q1 2010; and further, that it is very unlikely that whoever told Dr Lynch about this (either Mr Hussain or, since Dr Lynch was on the west coast of the United States at the time, Mr Egan) failed to tell Dr Lynch about the intended quid-pro-quo purchase of StorHouse.

2850. On 30 March 2010, Mr Egan sent Mr Hussain an email, subject "*filetek*", in which he said, "*BofA has granted us the Merrill business. We will have to buy more FileTek to satisfy that contract at lower HW costs. We may wish to pitch a deal at FileTek on last day of Q to get best pricing*". Mr Hussain responded enthusiastically, copying Mr Kanter and Dr Menell.

2851. Mr Egan's evidence was that both he (Mr Egan) and Mr Hussain knew that the commercial rationale set out in this email was a pretext. Although it was suggested to Mr Egan in cross-examination that his email was an "*honest email*", Mr Egan maintained that it was:

> "*a bit misleading because I wanted to buy more FileTek to enable another quid pro quo deal. It also happened to be that we had great increases in volume and therefore had perfect rationale and business case for buying more.*"

2852. The Claimants contended also that the pretextual nature of the rationale is apparent from the fact that, as at 30 March 2010, Autonomy had not yet installed, let alone used StorHouse and, therefore, had not used any of the data capacity made available under the first StorHouse licence. They added that until an email from Mr Chamberlain to Mr Hussain dated 30 March 2010 referred in a single phrase to a limit on what Autonomy had acquired under the first transaction there was no document in which anyone in Autonomy's senior management had ever referred to the capacity limitation in the first transaction, or to any need to revise it.

2853. The Defendants, on the other hand, relied on Mr Egan's evidence to support their case that the need for extra capacity was not contrived but real, and that the rationale for the purchase was genuine. They instanced especially the following:

(1) On 30 April 2010 Mr Egan emailed Mr Goodfellow and Dr Menell stating:

> "*This is FileTek's first proposal for the additional volume we asked about as a result of our winning the Merrill Lynch, Met Life and Newedge deals. They don't know about Lily volume, BNPP, The new larger JPMC volumes and the rate at which volumes are growing.*"

(2) Mr Egan confirmed that the rationale for this purchase was genuine:[308]

> *"Q.  Right.   The business about needing extra capacity, that was true, wasn't it, as you saw it at the time?  A.  I believe so, yes.*
>
> *...*
>
> *Q.  But in relation to the rationale for this further deal, what you say there represents what you honestly believed at the time?*
>
> *A.  Yes, I believed that the additional -- I knew that we had one capacity and that we had growing volumes and additional customers that rationalised making additional purchases."*

2854.  They relied also on Mr Szukalski's evidence in cross-examination that there was a genuine negotiation for something that Autonomy genuinely wanted in the course of which he wanted to "fence" the deal to limit the amount of software that Autonomy received for the $10 million that Autonomy had proposed, but that Dr Menell had negotiated *"very cleverly"* by introducing the idea that Autonomy would require in return that the StorHouse licence should be extended to grant unlimited capacity. This was Mr Szukalski's answer also to the fact that it was Mr Egan's evidence in his witness statement that the price had in fact been agreed in March 2010 at $11.5 million (see above), and indeed to his own evidence that Mr Egan had "coached" FileTek to put forward a price that could be beaten down by procurement. The following exchange in the course of Mr Szukalski's cross-examination illustrates the point:

> *"Q.  So this negotiation was a bit of a show really, wasn't it?*
>
> *A.  No, continue on, there should be more negotiation that happens –*
>
> *Q.  Yes.  There are a number of further emails between you and Mr Scott.  Those are emails you've seen recently, are they?*
>
> *A.  No, not at all.  But there's further, I think, negotiation as well relative to the capacity licences of the software that we sold.*

---

[308] In this passage of his cross-examination Mr Egan did say that he had more of a "symbiotic agreement" with Mr Szukalski than the email reflected.  Although the Defendants submitted that this went only to the negotiation process and did not affect the substance, which was that Autonomy did want the extra capacity (and paid fair value for it), I consider that Mr Egan was making the broader point about his business relationship and understandings with Mr Szukalski

> *Q. Insofar as the price is concerned, where you land up is that the figure precisely of $11.5 million that you had agreed with Mr Egan at the end of March?*
>
> *A. Correct, but the value that we provide to Autonomy becomes significantly higher based on a negotiation of the software that we're licensing to them which changes dramatically during this negotiation phase."*

2855.  Mr Szukalski presented the licence for unlimited capacity as a *"big deal"*:

> *"Q. And Autonomy didn't seek to negotiate you to a lower price than that?*
>
> *A. No, but higher value.*
>
> *Q. Removing the constraints on capacity?*
>
> *A. Big deal. It's a big deal in terms of what we're offering here in terms of unlimited capacity. The technology was completely based on per terabyte pricing. When you remove that, you've removed all limitations. So in essence what we were offering to Autonomy was -- a Zantaz Digital Safe was a complete enterprise licence for the technology. It's a big deal. It's high value."*

2856.  Mr Szukalski expanded on this in the course of his re-examination as follows:

> *"Q. ... again, can you just expand a little on that answer when you talk   about the negotiation of the software that you were licencing to him, what are you talking about there?*
>
> *A. Again, there is two components here. There is the price negotiation and then the software negotiation. In this case it was very interesting. So the price negotiation ended up about $11.5 million which was kind of the target value that we, in terms of price or budget that Autonomy was willing to spend. But what Autonomy negotiated very cleverly, and this is the involvement of Dr Pete Menell, the CTO of Autonomy at the time, was, you know, the original proposal included our standard structure of so many terabytes of licensed storage for storing this and Dr Pete came back and basically said, "We'd like to negotiate a little harder and get an unlimited capacity for Digital Safe" which was pretty*

> *clever and that's the improved value that Autonomy got as a*
> *result of that negotiation. They got an unlimited capacity."*

2857. However, although it does seem likely that there was growing demand for archiving and searching database records, and in that context there was a theoretical or potential use case for StorHouse which (in Mr Wang's words) Autonomy *"definitely tried to push and offer"*, the fact which was never contradicted was that at the time of the second StorHouse purchase, (a) Autonomy had not yet started using StorHouse for any customers (b) in the case of neither BofA/Merill Lynch nor Kraft, nor any other Autonomy customer was StorHouse ever actually used, as Mr Wang confirmed in his re-examination. There was no evidence to support the Defendants' line of argument that Autonomy needed to extend the first StorHouse licence because it had exceeded its 1 PB limit.

2858. So far as concerns FileTek's purchase from Autonomy, Mr Szukalski told me (again in re-examination) that FileTek came to the negotiation with its own "wants list" of software that it wanted to acquire in the purchase – a list a Mr Seamans of FileTek was said to have compiled as a *"running list"* before Mr Egan made an approach to FileTek. However, as the Claimants emphasised, Mr Szukalski had earlier accepted in crossexamination that FileTek had not approached Autonomy about wanting to licence any new IDOL functionality before Mr Egan's approach to him.

2859. Further, Mr Loomis' evidence in the US criminal trial was that FileTek would not have paid anywhere close to $9,010,000 if Autonomy had not agreed to license additional StorHouse software for the same amount or more:

> *"Q. ...Now, would you, on behalf of FileTek, have bought the $8.5*
> *million license from Autonomy in March 2010 if Autonomy had not*
> *agreed to a barter transaction in which it bought even more StorHouse*
> *from FileTek, you know, eventually in the period that was discussed --*
> *would you have bought that license from Autonomy if there had not been*
> *the other side of the equation?*
>
> *A. We would have bought the license, but not at that dollar amount. We*
> *needed the extra capability. And we would have bought the license if the*
> *StorHouse sale was the same exact dollar amount [as FileTek's*
> *purchase from Autonomy] also. We didn't need that extra dollar amount*
> *to do it, but it was, of course, attractive.*
>
> *...*
>
> *Q. What amount of money do you think you would have been*
> *comfortable with if there had been no reciprocal barter transaction?*
> *How much are we talking about?*
>
> *A. I don't know. It would be significantly less.*
>
> *Q. How much significantly less?*

> *A. Well, it would be less than a million, put it that way, and could be substantially less than that. I don't -- I would have to review all my sales forecasts back in those days."*

2860. That was, of course, less than one-tenth of the price FileTek in fact agreed to pay. For his part, Mr Szukalski sought to quibble about what FileTek would have agreed to pay; but he said he "*absolutely*" agreed that, if Autonomy had not been offering to buy more StorHouse licences, FileTek would not have been prepared to pay anything like $8 or

$9 million for this further IDOL licence. He later confirmed that he had no reason to disagree with Mr Loomis' testimony about what FileTek might have been prepared to pay, as set out above.

*My conclusion in relation to the second set of RT 3 transactions*

2861. In my judgment, the second FileTek purchase and sale transactions comprised in RT 3, like the first, were plainly "reciprocal" or "barter" transactions; they should have been accounted for accordingly. That is so whether or not Autonomy found some use for the StorHouse software and customer demand for the structured data analyses it facilitated. 2862. In particular:

(1) The evidence that Mr Egan's overture to Mr Szukalski was driven by a need to generate recognised revenue was clear; and the suggestion that the impetus really came from a need for greater capacity was very thin and undermined by the fact that even if later demand increased, at the time Autonomy had done little to use up the initial capacity it had purchased under the first agreement.

(2) Mr Szukalski's evidence of a real negotiation was unpersuasive; and the notion of Dr Menell having *"very cleverly"* pulled off an unexpectedly *"big deal"* of *"high value"* was not in the least bit credible. Even Dr Lynch had to accept that the whole negotiation appeared to be, as it was, a charade.

(3) The division of the two transactions across two quarters was artificial, as confirmed by Mr Egan's evidence that Mr Hussain directed that Autonomy's commitment in March 2010 to purchase additional rights to use StorHouse in the following quarter *"should not be in writing"*, which was not challenged.

(4) The purchase price for Autonomy's software was out of all proportion to its real value to Filetek.

*Deloitte's approval was given on a false basis*

2863. As usual, the Defendants sought to rely on the fact that Deloitte approved the accounting treatment of both sides of the second RT 3 transaction, after a review of the purchase transaction to ascertain whether it had any impact on the revenue

recognition for the licence deal in the previous quarter. Mr Welham confirmed that essentially the same tests were applied as if both transactions had taken place in the same quarter.

2864. It appears that Deloitte discussed the commercial rationale for the transaction with Mr Gallagher and Dr Menell. There was a further demonstration attended by Mr Johnstone, Mr Welham and Mr Murray and Deloitte were able to test the rationale and make any enquiries they wanted to. Deloitte's conclusion was:

> *"Given the above demonstration (and the input from Ben Johnstone) and the discussion with Pete Menell, there appears to be a clear commercial rationale behind this purchase."*

2865. Deloitte also concluded that the transaction was at fair value. Their memorandum on the "Purchase of additional StorHouse tech from FileTek Q2" (prepared by Mr Murray) dated 18 July 2010 noted that the:

> *"extension to make this an unlimited licence would add significant value. Note that Mike Lynch talks about the potential for a £35m licence deal alone that could come out of this purchase…*
>
> *Per Pete Menell we note that management considers this to be a worthwhile purchase and the fact that it was approved by the CEO, CTO and CFO adds weight behind it being an arms length transaction made at fair value."*

2866. It is apparent that Deloitte were unaware that the 'use case' for StorHouse within DigitalSafe was purely theoretical, and that the talk about potential deals was simply that: talk.

2867. It is also clear that Dr Menell provided Deloitte with information designed to justify the licence extension which was misleading. Thus:

(1) Dr Menell told Deloitte that the second StorHouse purchase was necessary because the 1 PB limit for structured data under the existing StorHouse licence "*was reached by Kraft alone*". This was false. In fact, as at the time of the second StorHouse purchase, Autonomy's technical team had not even attempted to use StorHouse for Kraft, still less used up the 1 PB limit. Indeed, it was the unchallenged evidence of Mr Wang that the total volume of data (structured <u>and</u> unstructured) held by Kraft in its Digital Safe as late as September, October, November and December 2010 was considerably <u>less</u> than 1 PB. The position was no different in July 2010, when Deloitte came to review the second StorHouse purchase. Dr Lynch suggested in his cross-examination that Dr Menell had meant that "*Kraft had the legal right to turn on that tap and to do that we had to have capacity of 1 petabyte in order to take whatever they sent us and that had to be up and running there and then*". But, as the Claimants pointed out, this is not what Dr Menell told Deloitte, and it was not suggested to Mr Welham in cross-examination

that it was what Deloitte understood. In any event, I accept the Claimants' submission that, even if there were any basis for Dr Lynch's attempt to rationalise what Dr Menell told Deloitte, it fails to meet the point that StorHouse was not in fact being used for Kraft as at the time of the second StorHouse purchase and, indeed, was never used for Kraft.

(2) Dr Menell told Deloitte that the capacity constraint in the first StorHouse licence required Autonomy to monitor the volumes of data being archived and that "*customers had expressed concern over that fact*". This was also misleading: Autonomy had not yet started using StorHouse for any customers. No contemporaneous documentation supports the suggestion that customers had expressed concern over monitoring of their data volumes.

(3) Dr Menell told Deloitte that "*any sale of SPE contains an element of this FileTek software*". This was untrue. As Dr Blanchflower explained, SPE never contained any element of StorHouse software. Dr Menell, as CTO, must have known this.

2868. In the round, I am satisfied, and find, that Deloitte were not aware of the true nature of the transaction. Mr Welham confirmed in his witness statement that he and his team were not aware, in particular, that Autonomy had orally agreed with FileTek at the time
of the sale of Autonomy software in Q1 2010 that in the subsequent quarter (and after the Q1 2010 earnings announcement had been made), Autonomy would make a further purchase of FileTek's StorHouse software product in order to put FileTek in funds to pay the amount due to Autonomy in respect of the Q1 2010 sale. Nor were they aware of the disparity in the values paid on each side of the transaction compared to the price that would, but for the reciprocal transactions, have been a realistically achievable price. Whether more sceptical review might have led to a line of inquiry which would have put the transaction into a more realistic perspective is not in issue in these proceedings.

2869. In my judgment, Deloitte approved the transaction on a false basis, and so did the Audit Committee.

*The FRRP were also misled*

2870. As discussed in the course of my assessment more generally of Mr Hogenson's concerns and the questions which followed from the FRRP (see paragraph *2232ff* above) Mr Hogenson had questioned the purchases from FileTek, on the basis that they appeared to be barter transactions where the economic benefit on both sides of the transaction appeared to be materially overstated, and the FRRP in due course also queried the transactions.

2871. The responses provided by Autonomy in a letter to the FRRP dated 3 March 2011 included misleading statements about the transactions now under consideration:

(1) Autonomy presented the purchase/sales in the two sets of transactions as unconnected, which plainly they were not.

(2) Autonomy told the FRRP that *"FileTek was selected by Autonomy following receipt of multiple quotations as part of Autonomy's due diligence process"*: but quotations from competing suppliers were sought and obtained only after the purchase of the first StorHouse licence.

(3) The letter went on to claim that "*FileTek products are incorporated into Autonomy software, for which sales have been strong*". This was not correct: as already explained, StorHouse was not incorporated into any Autonomy software. Sales of Autonomy software incorporating StorHouse were not "*strong*"; they were non-existent.

2872. Autonomy's perceived need to mislead has further confirmed me in my conclusion that the transactions were not properly accounted for.

*Defendants' knowledge*

2873. I am satisfied that both Defendants knew and conceived the real driving purpose of the transactions comprising RT 3 to be the generation of recognised revenue by funding FileTek to make a purchase of Autonomy software that otherwise it would not have made, and that their accounting treatment was not proper having regard to their true nature as reciprocal transactions.

*Mr Hussain*

2874. Furthermore, Mr Egan's evidence in his witness statement was that it was Mr Hussain who:

(1) authorised both sets of *quid pro quo* transactions.

(2) devised the idea adopted in the second set of FileTek transactions of the purchase from Autonomy and the sale by FileTek being artificially split to take place in sequential quarters and directed Mr Egan that the sales and purchases should never be linked in any paperwork;

(3) encouraged Dr Menell and the technical departments to come up with bogus technical reasons to justify them; and

(4) acquiesced in, and may have sanctioned, the provision by Dr Menell of false information to Deloitte; and contributed to the drafting of the misleading memoranda to Deloitte.

2875. I accept that evidence: Mr Hussain had guilty knowledge of the true nature of the RT 3 transactions and that they were improperly accounted for accordingly.

*Dr Lynch*

2876. Dr Lynch had such 'guilty knowledge' also. I consider and find that:

(1) It is unlikely that Dr Lynch was asked to approve the transactions without an explanation of their true nature. That was not how Mr Hussain and the cabal operated.

(2) That is further supported by the fact that in an email dated 29 December 2009 Mr Hussain undoubtedly did raise collectability as an issue in the context of the first RT 3 transaction, and (as the Claimants submitted) it is inherently likely that Mr Hussain would have explained to Dr Lynch how the issue was resolved through the StorHouse purchase as a means of funding FileTek.

(3) The technical evaluation was an exercise in trying to find *ex post facto* justification for the purchase and some use case. Especially given that it involved the acquisition of third party software, contrary to Dr Lynch's preference and policy, for Autonomy to develop its own solutions, it is inherently unlikely that Dr Menell, Mr Hussain and the cabal would have kept back from Dr Lynch the bogus nature of the exercise.

(4) Dr Lynch was personally involved in adding *"positioning"* to the memorandum for Deloitte and also to the letter to the FRRP which was misleading, as he must have known.

(5) Dr Lynch's depiction of the StorHouse transactions being part of a broader strategy to acquire Informatica (putting *"tanks on Informatica's lawn")* lacked any supporting documentation and any real credibility, and the creation of a false story is further evidence of his knowledge of the truth.

*Overall conclusion in respect of RT 3*

2877.  In my judgment, both sets of transactions comprising RT 3 are plainly illustrative and confirmatory of Autonomy's use of reciprocal transactions as a further means of making

good shortfalls in quarterly revenue; and both Defendants knew that, and that the objective required false accounting. The linked sales and purchases were not independent, arm's length transactions, and it was not possible to understand the substance and commercial effect of one agreement without regard to the other: they should have been considered together in order to determine their substance and appropriate accounting treatment. I agree with the Claimants that Autonomy should not, therefore, have recorded revenue from the FileTek sales, but instead should have recorded the net cost, totalling $4,395,494, as an expense.

### RT 4: Vidient Systems Inc (Q4 2009/Q3 2010)

2878.  The Claimants impugned as "reciprocal" and improperly accounted for two transactions with Vidient Systems Inc ("Vidient"). Each involved a purchase by Autonomy from Vidient of a product for which it was alleged Autonomy had no

need in order to fund a purchase by Vidient of Autonomy software which enabled Autonomy purportedly to recognise revenue from its sale.

2879.   Autonomy's underlined purchases from Vidient were:

> (1)   A purchase in Q1 2010 of a 3-year software licence for video analytics software manufactured by Vidient and called *"SmartCatch"* for $3 million plus $150k in respect of support and maintenance for one year.

> (2)   A purchase in Q4 2010 of further rights under a distribution and system integration agreement in respect of SmartCatch software for a total consideration of $2.31 million.

2880.   Autonomy's underlined sales to Vidient were of:

> (1)   A licence to certain Autonomy software for use as an embedded component of SmartCatch under an OEM agreement in Q4 2009 for which the consideration was $2.5 million plus $125,000 for one year of second-line support.  Payment was due 15 days after payment was due from Autonomy under its agreement to purchase a licence for SmartCatch.

> (2)   An extension in Q3 2010 of the term of the Autonomy OEM agreement of Q4 2009 by one year, and the licensing of additional software and IDOL functionalities for a fee of $2 million, plus $100,000 for one year of second-line support.

2884.   I address each in turn. However, I do not think it necessary to do so in the same detail as my discussion of the VMS transactions, since it seems to me that the pattern is similar, and the use of 'reciprocals' as another lever to generate revenue when needed to cover shortfalls on forecast revenue was already established both by the VMS transactions and by the FileTek transactions. Instead, I highlight the points emerging which seem to me to be of greatest significance in confirming that the Vidient transactions fell into the same pattern.

*The first Vidient transaction Q4 2009/Q1 2010*

2885.   Autonomy's first transaction with Vidient was pursued by Autonomy at the same time as the FileTek transaction. The sale side (the sale by Autonomy of a licence to embed Autonomy software under an OEM agreement) was entered into at the end of Q4 2009, the purchase side (the purchase by Autonomy of the SmartCatch licence) was entered into in Q1 2010.

2886.   SmartCatch was Vidient's only substantial product. Put in simple terms, SmartCatch monitored video feeds from closed circuit television systems ("CCTV") and identified suspicious activity, such as a person loitering in a particular area or walking the wrong way at an airport. SmartCatch was

predominantly marketed and sold to transportation entities in the US, such as railways, airports and metros.

2887. Vidient was a heavily loss-making business. During the first nine months of 2009, it incurred a loss of $2.7 million. Vidient's total revenues in the same period were just $456,902, of which $228,569 was from sales of SmartCatch. As at 30 September 2009, it had cash and cash equivalents of just over $3 million. Mr Frank Pao ("Mr Pao"), who had worked at Autonomy for four years before then (including as COO) was Vidient's fourth CEO in a 12-month period, described 2009 as a "*horrible*" year and acknowledged that the numbers for the first three quarters were "*ridiculously low*". Vidient's status as a struggling restart is worth underlining, if only to set in context the statements by Dr Lynch and Mr Frank Pao (who gave evidence on behalf of Dr Lynch) regarding the supposed success of, and market demand for, SmartCatch, and to put into context the scale of the transactions, from Vidient's perspective, that Vidient entered into with Autonomy.

2888. Mr Pao agreed when cross-examined that prior to his discussions with Mr Egan, he had no firm intention to purchase Autonomy software in Q4 2009. In view of Vidient's financial position and the rapid rate of spend, he had no money to license Autonomy software on a large scale.

2889. Although Mr Pao kept in touch with a number of his colleagues after leaving Autonomy, he most commonly contacted Mr Kanter, with whom he had worked closely at Autonomy. Mr Pao therefore had no reason to approach Mr Egan at the end of Q4 2009. Mr Egan, however, was looking for ways to generate more immediately recognisable revenue for Autonomy in Q4 2009. This is plain from the first FileTek reciprocal transaction which Mr Egan was pursuing at the same time. It was thus Mr Egan who approached Mr Pao.

2890. Mr Pao undoubtedly welcomed the opportunity to sell a licence to Autonomy for Autonomy to embed SmartCatch in its own products for sale, and for Vidient to embed Autonomy in its products likewise. On the Vidient sale side, the upside was obvious and substantial from Vidient's point of view. First, the sale price was full, and profitable for Vidient as a major sale on its own. The price being paid by Autonomy was more than 13 times the total licensing revenue that Vidient had received from sales of SmartCatch in 2009 to that point, and it was the largest transaction in Vidient's history. Secondly, Vidient's own sales had been badly affected by the 2008/2009 market crash: and it had little market penetration, having for example only two salespeople in the USA. Partnership through an OEM agreement with a large company with a successful product and a large customer base was plainly an enticing prospect to Vidient. As Mr Pao put it:

> "This is for a partner to embed our software within their product and then to sell that product out to hopefully hundreds of customers because Autonomy had a tonne of customers."

Mr Pao told me in cross-examination that he was expecting to make *"maybe $30 million out of this deal"* by way of royalty payments on Autonomy's sales.

2891.   Furthermore, the sale by Vidient was to be coupled with a purchase by it of Autonomy software for Vidient to 'OEM' it (embed it in its own product) which was to be funded by the purchase price payable by Autonomy. The net effect of both transactions together would leave Vidient with a profit or 'delta' of some $525,000. The purchase by Vidient was in effect to be funded by the sale to Autonomy. Although Mr Pao equivocated (to the point of confused bluster) when asked whether Vidient could have afforded to make the purchase out of its own resources, and settled on the formulation that he *"would have found ways to still buy the software but at a much cheaper price that's in line with my cash reserves and what I'm expecting to get in Q4"*, this was either mere puff or (which seems to me more likely) demonstrative that the price to be paid to Autonomy was considerably higher than what Mr Pao would ordinarily have been expected to pay for it. It was plain that with cash reserves of $3.1 million which were being eroded by difficult trading conditions a purchase of anything like the magnitude discussed was otherwise out of the question. Mr Pao was more candid in accepting that he:

> *"fully expected to be paid by Autonomy on one transaction first and then I would pay them this amount."*

2892.   Furthermore, after further circumlocution, Mr Pao eventually had to admit in crossexamination that in fact Vidient never did 'OEM' Autonomy software into SmartCatch. He told me that he:

> *"ended up having deals that did not necessarily require Autonomy technology, so there was no need for me to dedicate engineering resources to do that over dedicating engineering resources to sell my own product which had much higher margins."*

2893.   This too was difficult to accept given Vidient's lamentable trading history[309] and the opportunities Mr Pao had earlier told me about; but I think it reveals the truth: that from Vidient's point of view the real benefit of the deal, in addition to the benefit of association with Autonomy in general terms, was the cash 'delta'.

2894.   Looking then at the matter from the point of view of Autonomy, Autonomy's management cannot realistically have expected much from the sale of Autonomy software to Vidient, except, of course, the revenue it generated, which could be and was booked in its quarterly accounts. The prospect of large OEM sales through Vidient was small. What then of Autonomy's purchase of SmartCatch?

---

[309] Though in fairness I should note that Mr Pao told me that it improved considerably in 2010 and thereafter

2895.   The Defendants maintained that Autonomy wished to partner with Vidient
because SmartCatch had (to quote Mr Hussain's written closing submissions)
*"a good*

_____

*reputation and market penetration in the critical US markets"* [310] whereas
Autonomy's own similar product in the video analytics segment of the market,
Virage, *"had failed to penetrate US markets, and its products had been poorly
received"*. They also cited positive industry press support to the effect that the
deal made sense since (in the words of one commentator) *"while there's no
doubt, Autonomy is a global leader in the broader search market, their approach
never translated to meaningful success in the video surveillance market"*
whereas *"Vidient can provide them a solid solution"*. The Defendants' case was
thus that SmartCatch was a superior product to Virage, recognised to be so in the
market, and Vidient had thereby achieved success in the US market despite its
small size which would be of considerable benefit to Autonomy if in an OEM
partnership with it.

2896.   The Claimants disputed this, and emphasised especially that:

(1) As in respect of VMS, Autonomy undertook no analysis of SmartCatch,
technical or otherwise, prior to 30 December 2009, the point when the
deal was agreed.

(2) Dr Blanchflower and Mr Gallagher (then Autonomy's Head of
Development) were asked by Dr Menell to analyse the SmartCatch
software on 30 December 2009 only after the deal had been struck, and
their analysis was constricted by the fact that Autonomy did not have a
licence to test SmartCatch and they simply had to review Vidient's
website. That of itself is noteworthy: as Mr David Humphrey ("Mr
Humphrey", who was Chief Technology Officer ("CTO") of Micro
Focus International plc at the time of his witness statement, but at the
time CTO of Virage, Inc ("Virage", the Autonomy group company that
developed and sold Autonomy's video analytics products) stated in his
witness statement on behalf of the Claimants:

> *"...it does not make any sense to me to purchase a licence to a
> third party product based only on the information available on
> the company's website"*.

(3) Dr Blanchflower provided his thoughts and comments to Mr Gallagher,
who then wrote an email to Dr Menell the same day. Mr Gallagher's
email noted that Vidient's website was *"very low on technical detail, so*

_____

[310] In particular, Vidient had won a $500,000 contract from the US Department of Homeland
Security for San Francisco Airport and had a number of high profile users in the transport sector,
including Montreal Metro. [326] Virage was an Autonomy group company that, amongst other things,
developed and sold Autonomy's video analytics products.

no detail at all on how they do it" and that Vidient seemed to have "*one product called SmartCatch which has 2 main applications: Security and Surveillance or (Video Intrusion Detection) as they call it [and] Business Intelligence*".

(4) With regard to Video Intrusion Detection, Mr Gallagher told Dr Menell that there was "*Lots of overlap with existing Virage products lines here*",[326] but that SmartCatch had two additional features which "*Virage has never claimed much in that they do*", namely, "*…Remote control of surveillance cameras – auto control and zoom – automatic following of suspect*". Mr Gallagher's email is

---

the <u>only</u> written record of any analysis of SmartCatch by Autonomy in, or prior to, December 2009.

(5) Dr Blanchflower confirmed in cross-examination that the exercise with which he and Mr Gallagher were tasked: (i) did not involve any assessment of the relative performance of SmartCatch and Autonomy's existing offerings, because that would have required access to the SmartCatch software, which they did not have, (ii) did not involve any consideration of the respective market penetration of the products, (iii) did not involve any consideration of which product was better perceived in the market, and (iv) did not involve any assessment of the value to Autonomy of purchasing a product with better market penetration and/or perception.

2897. There remained considerable disagreement as to the relative advantages of the two systems. However, I do not think it necessary to say more than that it seemed to me that the balance of the evidence, which was limited as to its substantive content as distinct from the disagreement it encouraged, was that SmartCatch probably was a superior and more complete system, and it had a more positive reputation in the relevant market segment and some track record of exploiting it, though Vidient itself was struggling to convert this into durable success.

2898. But such an exercise in comparing the two products, to my mind, misses the point. What did not come out of the evidence, in my judgment, was that this perception was the real reason that Autonomy entered into the twin arrangements. Neither the results of the limited *ex post facto* assessment undertaken, nor the way Autonomy approached the decision whether or not to enter into the arrangements, suggests that the advantages of the product were the reason for Autonomy's purchase.

2899. Moreover, not only did Vidient not deploy the Autonomy software it had licensed (see above) but there is no evidence that Autonomy made any effort to pursue a 'strategic partnership' with Vidient after it executed the OEM agreements, or that it integrated SmartCatch into its Command and Control application (a security infrastructure platform which assisted with the retrieval

of relevant intelligence in real time), despite paying $3.15 million for the right
to do so.

2900.   Mr Pao confirmed in cross-examination that he could not recollect ever being
told of any sales by Autonomy of Vidient's software; and that he never received
any royalties from sales, still less the $30 million he had hoped for.

2901.   Indeed, Mr Humphrey and his security and surveillance division did not even
download SmartCatch until some 18 months after the Vidient OEM agreement
was executed and then only because Dr Menell asked Mr Humphrey to take a
look at the software. This evidence was not challenged. Rather, it was put to Mr
Humphrey that he was not open to the supposed commercial opportunity
presented by the partnership with Vidient and took no steps to develop it. As Mr
Humphrey pointed out in his oral evidence, he "*had no clue what was going on
[with Vidient] other than what was in the press release, which didn't make
sense*" to him. Mr Humphrey's evidence was consistent with his reaction at the
time. The Claimants relied on the following in particular:

(1)   The Vidient press release referred to by Mr Humprey announced a
'strategic partnership' between Autonomy and Vidient and was issued
in January 2010. The day after it was issued, Marc Geall (then Head of
Corporate Strategy and Investor Relations at Autonomy) asked Mr
Humphrey "…*what is the story with the vidient announcement?*". Mr
Humphrey responded: "*Thought you could tell me!*". Mr Humphrey
was clearly confused by the announcement and, as he made clear in cross-
examination, "*didn't know what was going on at this point*". As Mr
Humphrey explained in his first witness statement, he only became
aware of the OEM agreements after they had been entered into.

(2)   On 2 February 2010, Mr Humphrey emailed Mr Egan, copying Mr
Murray (the CEO of Virage), asking Mr Egan to:

"*...explain…our positioning with regards to Vidient and that
press release last week? I fully understand them wanting IDOL,
having spoken a few times to Frank [Pao] about this at
shows…What I do not understand is the statement referring to
redistributing their product. They have a very similar product
set to Virage S&S so there is a direct conflict of interest. Also
even if there are potential areas of collaboration, policy has
always been to remove third party product. We have therefore
placed confusion in the market with regards to our product
capabilities and also generated conflict against our statement
that we own all our own technology?*"

(3)   A few days later, on 4 February 2010, Mr Humphrey emailed Mr Egan
and Ms Eagan, again copying Mr Murray, setting out the quote
attributed to Mr Egan in the press release and adding:

> "*Another colleague has sent links to their website ask [sic] what is going on. As I said below the following quote really makes it difficult, what should I be saying?*".

(4) Having received no reply from Mr Egan or Ms Eagan, Mr Humphrey asked Mr Murray to "*try and chase this*". Mr Murray said "*Absolutely – nothing from either party suggest [they are] not proud of this deal*".

(5) Mr Humphrey never received a response from Mr Egan or Ms Eagan. The inference suggested is that there was no coherent story to tell.

2902. Put shortly, in all the circumstances, I have concluded and find that the real reason for Autonomy's purchase of SmartCatch was to incentivise and fund Vidient's purchase of Autonomy software and enable Autonomy to recognise the revenue thus (apparently) generated.

2903. This conclusion is fortified by the fact that no coherent explanation was ever provided to me for why Autonomy suddenly needed to acquire OEM rights to SmartCatch in the dying days and hours of Q4 2009. The best that Dr Lynch could offer, apart from emphasising that he did not really know the reason since he was not involved in the negotiation at the time, was to suggest that the hypothesis that it was all done in a rush to ensure recognition of revenue was fundamentally flawed because if that had been the aim it would have been far more straightforward to sell to a VAR. A discount would be necessary, but (on his view of IFRS) the sale to the VAR would trigger the revenue recognition and

> "*that would be perfectly fine. And then you would have that revenue, they would then sell the stock later, you'd have taken a discount hit to get them to do it, but there would be nothing improper about that. You don't need to go to these elaborate levels of buying things unless you actually want the thing.*"

In my judgment, however, that does not reveal a flaw, but simply another lever; and as I have found in the context of the impugned VAR transactions a flawed lever likewise.

*Separation of the OEM agreements by quarter*

2904. The focus on the requirement to generate recognised revenue within Q4 2009 to meet Autonomy's revenue target was the context of, and I have concluded the reason for, a particular feature of the first Vidient transaction. This feature is that, although both agreements were negotiated and then signed together on the evening of 31 December 2009, and were in similar terms, it was agreed between the parties to treat the sale by Autonomy (from which revenue was needed in Q4 2009) as completed on that day, but the effective date of Vidient's sale of a licence was (on 31 December 2009) moved into the next quarter (Q1 2010).

2905.   After Mr Hussain had asked him, by email dated 30 December 2009, to spend time with him on the paperwork, the next day (31 December 2009) Mr Chamberlain emailed Mr Mooney, Mr Guiao, Mr Scott, Mr Egan, Mr Kanter, Dr Menell and Mr Hussain expressing his concerns about the agreements that were to be signed later that day with Vidient:

> "...General – don't like the fact that we have prepared both of these. They are two separate transactions and they should look and feel like that. Need to work with Frank [Pao] to get the license of their software on their paper. Also, the licensed software needs to reflect the quote we have received (attached)."

2906.   Mr Scott replied at 6.46am PT time (2.46pm UTC time):

> "We've already received comments back on both docs (attached). We can look to move to a different [sic] for Vidient's license to Autonomy but my concern is that this will extend the process with limited time left. Is it truly necessary?
>
> Separately they have asked us to commit to issuance of a press release issued through "standard" channels and would like the draft attached to both contracts. I received from MDM [Mr Mooney] a copy of UK-approved press release yesterday. OK to agree to commitment below with UK-approved press release attached?"

2907.   The second sentence of Mr Scott's email appears to have been missing a word. It is likely that it was intended to read "*We can look to move to a different [quarter] for Vidient's license to Autonomy*" or similar because: (i) that is, in fact, what happened, (ii)

that would be consistent with Mr Chamberlain's prior email referencing a need for the transactions to appear to be separate, and (iii) that would make sense in the context of Mr Scott's own email, in which he expressed concern about the shortness of time before the end of the quarter.

2908.   Mr Chamberlain then responded at 4.38pm UTC time, saying:

> "...Priority 1 – make deal recognizable [i.e. for revenue purposes] ...Priority 2 – get deal in.... To help one [i.e. Priority 1] the more different these look the better. Just spoke to Livius [Guiao] on this point".

2909.   At 11.46am PT (7.46pm UTC time), Mr Pao sent Mr Guiao an email, copied to Mr Scott, attaching a revised draft of the Vidient OEM agreement. Mr Pao's covering email said:

> "Here are David's changes, plus two that I discussed separately with you [Mr Guiao] and Joel [Scott] today, specifically for the agreement

> *where we sell to you: (a) the date changed to 1/1/10; and (b) change
> internal fee waiver to inclusion as part of second-line support fee…"*

2910.   From this email, it is clear that Mr Pao spoke with Mr Guiao and Mr Scott that
day and agreed to change the effective date of the Vidient OEM agreement to
Autonomy from 28 December 2009 to 1 January 2010 and to make a change in
relation to the secondline support fee.

2911.   When cross-examined on the point, Mr Pao said he could not recall who had
proposed the change to the effective date, and whether it was his suggestion or
whether it had been suggested by Mr Scott and Mr Guiao. He said that it was
possible, *"maybe even likely"* that the change came from him, because the other
change "*almost certainly*" came from his accountant, Katerina Jeanneau. Mr Pao
suggested that he might have wanted to roll the deal into 2010 because 2009 had
been *"a horrible year for the company"* and, as he was *"not going to hit my
number so I don't want to waste any revenue that I can recognise…I would
rather take it in 2010 and make 2010 look fantastic"*. But he acknowledged that
this was *"kind of my guess at what happened here"*. In reexamination, when he
was again asked about the point, he told me that *"…Again I don't have a specific
recollection but that's probably the case, that I would have asked for it"*. I was
not persuaded that Mr Pao could remember the sequence, and his evidence
smacked to me of him looking back and recreating what would, as he thought,
be the canny thing to have done. Given the sequence I have described, I think it
unlikely that the idea came from Vidient, even though I would accept that his
rationalisation may explain why he was prepared to go along with it. Mr Pao
struck me as commercially obliging even when he might have been unsure of
the reasons for what he was being asked to do.

2912.   For his part, Dr Lynch (who was not copied on Mr Chamberlain's email of 31
December 2009 which I consider was the catalyst of the change) attempted to
explain the change as being down to Autonomy wanting to maximise its various
financial metrics for that quarter. He disagreed with  the suggestion that the
OEM agreements were put into different quarters by Autonomy in an attempt to
make them look like separate transactions, thereby facilitating revenue
recognition on the Autonomy OEM agreement. He suggested that:

> *"…in terms of the reality of the situation, one day is not going to make
> any difference in terms of what the process was. So I suspect it's to do
> with that we wanted the cost of this to come into this quarter rather than
> the previous quarter."*

2913.   But that ignores the context, and in particular the fact that Mr Chamberlain had
in effect spelt out why the change was necessary. I accept the Claimants'
submission that I should find (as I do) that the sequence and substance of the
exchanges was as follows:

(1) Mr Chamberlain expressed concern that the agreements should look like separate transactions.

(2) Mr Scott suggested that they could move the Vidient OEM agreement to a different quarter but was worried that this might delay the process.

(3) Mr Chamberlain advised that making the transactions look more different would help make revenue from the deal recognisable, and spoke with Mr Guiao about this point.

(4) Mr Scott and Mr Guiao then spoke with Mr Pao and suggested changing the effective date of the Vidient OEM agreement to 1 January 2010.

(5) Mr Pao obliged and circulated a revised draft of the Vidient OEM agreement which changed the effective date of the agreement to 1 January 2010 and showed the other changes that they had discussed on their call.

*Deloitte's consideration of the first Vidient transaction*

2914. There was another important facet or consequence of the artificial separation of the two sides of the first Vidient transaction. This is that, despite Dr Lynch's suggestion that it would in reality make no difference (see above), Mr Welham's unchallenged evidence was that, because the Vidient OEM agreement was in a subsequent quarter, it was <u>not</u> considered as part of Deloitte's analysis of Autonomy's sale of its licence to Vidient. Deloitte therefore reviewed Autonomy's accounting treatment of the Autonomy (sale) OEM agreement without regard to the Vidient (sale) OEM agreement. They did not review the Vidient OEM Agreement until April 2010, as part of their Q1 2010 review.

2915. The Claimants described the Vidient OEM agreement as having been withheld from Deloitte and submitted that this cannot have been inadvertent. In support of this the Claimants submitted that it is inconceivable that it would have escaped Autonomy's finance department, and Mr Hussain and Mr Chamberlain in particular, to bring to Deloitte's attention an agreement that was executed by the same party on the same day. They also relied on the fact that when Deloitte reviewed the Autonomy OEM agreement in January 2010, they immediately identified an issue with Vidient's financial condition, causing Mr Murray of Deloitte to email Mr Chamberlain on 12 January 2010 to say that Deloitte needed evidence to support recoverability in the context of various revenue deals. Amongst the list of revenue deals was the transaction with Vidient, in relation to which Mr Murray noted:

> "...although we have been provided with a balance sheet – they are a lossmaking company, albeit with $3m of cash at 30 September 2009, with a net asset position that is only supported by that cash balance. Based on their cash burn I am not sure they would have enough to pay this deal as at 31/12/09. Certainly not without using all cash reserves, which I would expect they would be reluctant to do. Unless they obtain

> *further funding I cannot see how they can pay within the 45 days. Can you please provide the rationale for the recoverability of this deal."*

2916.  Mr Pao agreed that Deloitte's summary was fair. As noted previously, he also agreed that the answer to Deloitte's question regarding how Vidient was going to pay within the 45 days was that Vidient was going to use the funds it received from Autonomy under the Vidient OEM agreement and from any other sales it made (although he did not identify any such 'other sales'). Yet even then Autonomy said nothing, and the Autonomy OEM agreement was included in Deloitte's schedule of proposed misstatements, pending evidence that the revenue from Vidient was recoverable.

2917.  Mr Welham informed Mr Chamberlain that Deloitte would "*need some cash on Vidient given heavily loss making business which we have evidence is burning cash quickly in order to remove this from misstatements schedule*". By 26 January 2010, someone from Autonomy had spoken with Mr Pao about making an early payment in respect of the Autonomy software. Mr Pao could not recall with whom he spoke, but he accepted that he agreed to make an early payment as a favour to Autonomy so as to strengthen the business relationship. Mr Chamberlain relayed the message to the Deloitte team, telling them that Vidient would pay "*all or a large proportion over the next day or so,*" without mentioning that Autonomy was to pay Vidient a far larger sum within days.

2918.  The Claimants contended that had Autonomy considered that the OEM agreements were genuine arms' length transactions, the finance department would surely have disclosed the Vidient OEM agreement as an answer to Deloitte's concerns about collectability, and ensured that the transaction was removed from what was called *"the misstatement list"*. Dr Lynch could provide no answer, stressing that he thought it unlikely that he knew of the misstatement list, still less Vidient's appearance on it. Mr Hussain, Mr Kanter, Mr Chamberlain and/or Dr Menell might have dispelled the suggestion: but not one of them gave evidence before me.

2919.  Mr Rabinowitz submitted in his oral reply the obvious inference is that Autonomy withheld the information deliberately. With some hesitation, since disclosure was inevitable sooner or later (and was indeed made for the Q1 2010 review, as has been mentioned) I have concluded that that is the only explanation. The alternative that there was a complete failure within the finance department to grapple with Deloitte's enquiry seems to me to be too unlikely.

2920.  Thus, I agree with the Claimants that, far from providing comfort and endorsement from the Defendants' point of view, the evidence relating to Deloitte's consideration of the first Vidient transaction further supports the Claimants' case.

*Conclusions on first Vidient transaction*

2921.  In my judgment, the first Vidient transaction reinforces, and indeed highlights, the pattern of the reciprocal transactions by now set, with the refinement of splitting the two agreements over two quarters. In particular:

(1) The sale and purchase were reciprocal transactions for which the principal driver was revenue recognition to cover a shortfall in revenue compared to forecast.

(2) They were orchestrated by Autonomy, and in particular by Mr Hussain and Mr Egan.

(3) No assessment of SmartCatch was made before Autonomy agreed to purchase rights under the Vidient OEM Agreement. The only assessment made was after the event and was equivocal. In reality, Autonomy had no pressing need to acquire SmartCatch on the last day of Q4 2009.

(4) There was no evidence that Autonomy ever did integrate SmartCatch into its Command and Control application, despite paying $3.15 million for the right to do so. The Defendants disparaged the evidence of Mr Humphrey that he would have expected to have been aware of any sales of the SmartCatch software and was not so. They stated that *"this was an exaggeration of his role"* and (as he acknowledged) *"although he was part of the Virage business in Cambridge, there were other parts of the business in the US in which he was not involved."* But it seems to me more likely than not that had there been sales, he would, at (in effect) headquarters have come to hear at least something about it; and he did not.[311]

(5) Nor was there any evidence that Vidient ever deployed the Autonomy software it licensed under the Autonomy OEM agreement. The reality was that what was in the transaction for Vidient was the $525,000 'delta', and what was in it for Autonomy on its sale was revenue recognition.

(6) The separation of the two agreements constituting the first Vidient transaction was at the suggestion of Autonomy, and its purpose was to give the appearance of separate transactions to protect revenue recognition and Deloitte's approval.

(7) The decision not to tell Deloitte about the Vidient OEM agreement during Deloitte's review of Q4 2009 was in order to safeguard revenue recognition, even at the cost of the transaction appearing on the *"misstatements list"*. The evidence relating to the involvement of Deloitte in this regard further undermines the Defendants' case.

2922. The accounting treatment of the first Vidient transaction was improper. As in the case of the first and second VMS transactions, it follows, in my judgment,

---

[311] Mr Humphrey was obviously proud of Virage's own product, and his evidence was that SmartCatch offered no more and was no better than Virage's existing product, though in cross-examination Dr Lynch branded the latter *"useless"*. Dr Blanchflower agreed that SmartCatch was better. I have taken into account Mr Humphrey's antagonism to the purchase and to being undermined but nevertheless regard his evidence as reliable confirmation, in the absence of contrary evidence, that in the event no sales were effected.

that Autonomy should not have recorded revenue on the sales to Vidient. Autonomy should instead

---

have: recorded the net cost in relation to the first Vidient sale and purchase, totalling $525,000, as an expense in Q1 2010.

2923.   I deal with the issue as to the Defendants' knowledge of both Vidient transactions after briefly addressing the second Vidient transaction.

*The second Vidient transaction – Q3 2010/Q4 2010*

2924.   The second Vidient transaction took place in Q3 2010/Q4 2010 and was, similarly to the first, comprised of:

(1) a sale by Autonomy to Vidient of additional Autonomy software and IDOL functionalities, and also a one-year extension of the term of the existing Autonomy OEM agreement, for which the licence fee was $2 million plus $100,000 for one year of second-line support; and

(2) the purchase by Autonomy from Vidient of further rights in respect of SmartCatch under a software distributor agreement, for which Autonomy agreed to pay a non-refundable prepayment of $2.31 million.

2925.   Thus, again much as in the first Vidient transaction, Vidient was to be paid by Autonomy more than it was to pay Autonomy, the 'delta' this time being $210,000; and, again as in the first Vidient transaction, Autonomy's payment to Vidient was due before Vidient's payment to Autonomy was due.

2926.   I need not spend as long on this second Vidient agreement. Suffice it to say that I am satisfied that:

(1) The sale by Autonomy was driven by Autonomy's imperative to generate further revenue for Q3 2010 to meet targets. On the last day of the quarter, Mr Hussain directed Mr Egan and Mr Mooney to:

"*...pull out all the stops on vident and the other 2 deals we talked about. If you can hit $5m it would be great but $4m is fine*".

(2) Mr Pao was not planning to purchase further software from Autonomy until he was approached by Mr Mooney of Autonomy close to the end of Q3 2010, and as far as Mr Pao could recall, no one from Autonomy had contacted him about purchasing further rights to SmartCatch.

(3) As of mid-2010, Vidient was still a loss-making business and its cash reserves had dwindled to a little over $1 million. Mr Pao explained in re-examination that he knew he would eventually run out of money and had to try to line up potential buyers of Vidient.

(4) The fees of $2.1 million payable under the OEM amendment were twice Vidient's available cash as at June 2010. Mr Pao admitted in cross-examination that he "*really needed their [Autonomy's] money to be able to finance this*" and that he would not have entered into the amendment if he did not know that Autonomy was going to purchase further rights to SmartCatch. It goes beyond that, in my view, because such an agreement would not have been proportionate or realistic otherwise, as well as it being  inconceivable that Mr Pao would have entered into an agreement to pay more than twice Vidient's available cash reserves without a sufficient assurance – whether (in Mr Pao's words) in the nature of "*a handshake and a discussion with Mike (Mooney)*" or otherwise – that Autonomy was going to put it in funds in time to pay the instalments. Mr Pao repeatedly asserted that Autonomy did not know he was dependent on Autonomy purchasing further rights to SmartCatch to enter into the OEM amendment. I do not accept this. It is plain that the reason Mr Mooney and Mr Pao did not agree equal payment terms, as recorded in the exchanges of 30 September 2010, was to ensure that Vidient was paid first.

(5) The two sales agreements were reciprocal. As in the case of the first Vidient agreement, the coupled agreements were deliberately put into different quarters by Autonomy to give the appearance that they were independent, arm's length transactions in order to assist with revenue recognition.

(6) Save for Autonomy's desire to generate further revenue in Q3 2010, neither party therefore had any apparent reason to enter into a further deal.

(7) The second Vidient transaction was improperly accounted for. Deloitte's approval was on a false basis and in ignorance of the true reciprocal nature of the agreements and Vidient's inability to fund its purchase without the sale proceeds from Autonomy. *Accounting treatment of the Vidient transactions*

2927.  I agree with the Claimants that:

(1) The linked sale and purchase transactions ought to have been considered together in order to determine their substance and appropriate accounting treatment.

(2) From the matters set out above, it is clear that, in each case, the linked sale and purchase were not independent, arm's length transactions, and it was not possible to understand the substance and commercial effect of one agreement without regard to the other.

(3) Further, IAS 18 §14(d) was not satisfied because no economic benefits flowed to Autonomy.

2928. It follows that Autonomy should not have recognised any revenue on its sales to Vidient and should instead have recorded the net cost in relation to the second Vidient sale and purchase, a total of $237,909, as an expense in Q4 2010.

*The Defendants' knowledge of improper accounting of the Vidient transactions*

2929. In the circumstances described above, I am satisfied that Mr Hussain had "guilty knowledge" in respect of both Vidient transactions. The position in respect of Dr Lynch requires more analysis.   Dr Lynch maintained that his involvement in both Vidient transactions was peripheral, and that he was not involved in negotiating or accounting for the purchase or sales. He drew particular support from an email dated 22 October

2010 which he sent to Mr Ganesh Vaidyanathan of Autonomy in response to a request for his approval of payments to Vidient, in which he had stated:

> *"I know nothing about this and so can't comment let me find out from the relevant people. I'm sure it's fine I have just been out of the loop."*

2930. He was adamant, however, that there was nothing wrong with the transactions. His evidence in his witness statement was:

> *"To my knowledge, the purchase made good commercial sense.*
>
> *...*
>
> *At the time, I would have expected Deloitte to review the purchases and sales as part of their quarterly audit review, and to agree an appropriate accounting treatment with the Finance Department. I had no reason to suspect that there were any material issues with the accounting. I now know that Deloitte were satisfied with the accounting treatment for both purchases and sales."*

2931. Further, Mr Hill submitted in his oral closing submissions on behalf of Dr Lynch that the Claimants had not challenged Dr Lynch's evidence that this was his understanding at the time and had instead focused on what the relevance to the decision making process of his commercial understanding can have been if he had not been involved at all in that process. This point was developed into the submission on his behalf that having crossexamined Dr Lynch on the premise that since he had not been involved his commercial view was irrelevant, they could not now turn back and rest their case on an allegation that in fact he was involved. It was submitted for him that it was *"impossible to understand"* how in such circumstances a fraud case could be pursued against him in respect of these transactions.

2932. This was bold but, in my judgment, not accurate. Although sometimes perhaps too apt to ask Dr Lynch about his views on emails to which he was not party,

HC-2015-001324

Mr Rabinowitz did cross-examine Dr Lynch on his involvement, and the fact that he also asked questions on the alternative hypothesis that he was not involved does not detract from that.

2933.  Amongst the points that emerged from that cross-examination were that:

(1) The email of 22 October 2010 referred to in paragraph 2929 above can only have referred to the second Vidient transaction, and not the first.

(2) Dr Lynch accepted that he may have been aware from one of Mr Hussain's *"prospect lists"* that Autonomy was looking to recognise revenue from a sale to Vidient at the end of Q4 2009, and probably also from an email and schedule sent to him by Mr Hussain on 29 December 2009 stating *"Frank Pao's [company] said yes $1.5m"*.

(3) On 29 December 2009 Mr Pao requested assistance from Mr Mooney and Mr Egan (in the absence of the *"PR person"*) on a press release to be issued concurrently with the OEM agreement, and Mr Mooney sent a *"first stab"* to

Dr Lynch, who responded with some changes (pruning the draft considerably) on 31 December 2009 stating:

> *"something like this would be acceptable…pls do not forward directly from me".*

(4) Dr Lynch explained that the reason he did not want to have drafts forwarded directly from him was simply because he did not want Mr Pao to know that he was *"the one that's nobbling his press release".*

(5) When it was put to him that he was thus aware of the simultaneous negotiation and agreement of the sale of Autonomy software and the purchase of SmartCatch, and that he had been able to and did review the press release (twice) in the light of that and his knowledge of their basic content, he resorted to repetition that, except for the press release, he had *"very little to do with the deal".* I formed the impression that he baulked at a denial because what was put to him was true.

(6) Dr Lynch said he would not *"explicitly"* have known that Autonomy was paying Vidient a 'delta', but it may be that he could have worked it out from email exchanges he saw. Again, I formed the impression that he was aware of the broad structure, including the payment of some form of 'delta', even if not of the precise details.

(7) He felt able to tell me categorically that *"the contracts were not dependent on each other…they were independently executed contracts".* He was also content, after the usual introduction that he *"wasn't particularly involved at this level"*, that the reason for the purchase was that *"we wanted to have some technology that the market respected that worked".* He also told me that he was able to judge this because he *"had*

*significant knowledge of this market and the technology",* having himself written the original video analytics code for the system. I accept that; but his certainty as to the reasons for the separation was based on his reading of the contracts, and his conclusion that as *"there was no clause that says, "I'm buying this because you're buying that", they were independently executed contracts"* was neither within his expertise nor correct; and the evidence was plainly self-serving.

(8) When pressed to accept that he must have known, at least when he made his first witness statement, that Deloitte had not been provided with and did not consider the Autonomy purchase agreement as part of their Q4 2009 review, Dr Lynch told me that his understanding was (it was not clear when this was formed) *"that they reviewed it – anything that was within two quarters",* and that non-disclosure would have been *"a futile approach".* But he had to accept that there was nothing to suggest that they had done.

(9) He told me that it was *"highly unlikely"* that he knew that Deloitte had put the first Vidient transaction on the list of potential misstatements, and doubted he even knew what such a list was at the time; but when shown that Mr Hussain had sent an email on 28 January 2010 (attaching the Q4 2009 Audit Committee pack) to Dr Lynch and Mr Kanter expressly alerting them to the fact that Vidient was in a list of *"judgemental errors"* and that *"we can get it down to $1m or so from the current $4m – Vidient cash plus the Italian deal is being worked on to remove"* his response was to the effect that all he had been asked about was a list of misstatements not judgemental errors and that he was not very familiar with these things. (This lacked conviction and credibility. Mr Hussain would not have been emailing Dr Lynch in these terms unless Dr Lynch was familiar with, and involved in, these sorts of matters.)

(10)    A few days later, Dr Lynch approved the payment of $3.15 million to Vidient; he must have understood that the payment was going to fund Vidient's multi-million-dollar linked purchase of Autonomy software.

(11)    When it was put to him that there was no evidence that Autonomy had either used or sold SmartCatch by September 2010 he said his understanding, based on Dr Menell having (apparently) told him was that it had been used *"in some covert surveillance applications",[312]* was that it had been.

2934.  My strong impression overall was that, although he was not involved in the day to day details, Dr Lynch was well aware of the salient aspects of and true reason for both sets of Vidient transactions. Knowledge on his part of the fact and purpose of the transactions was taken as read by Mr Hussain. He knew they were

---

[312] Dr Lynch referred in his first witness statement to a sale *"as part of a classified solution for use in Afghanistan".*

proposed as part of the route to meeting revenue forecasts; that they had been negotiated and concluded together; that they had then been presented to Deloitte as separate transactions; that their presentation as separate transactions was fundamental to revenue recognition; that Deloitte had expressed concern in that regard; that the proposed solution was to ensure payment by Vidient; that Vidient was a small company and that Deloitte considered collectability an issue; that the payments by Autonomy to Vidient he approved was the means of funding repayment; that insofar as there was any evidence at all of sale or use before the second Vidient transaction it was limited to a reference by Dr Menell about a single classified sale. He had no explanation why none of this was set out in his witness statements, except to suggest that the Claimants had been critical of the length of his witness statement as it was.

2935.  The question then is whether, with that knowledge, he also knew that revenue recognition was not justified. In my judgment, he did, despite his insistence in crossexamination that if the contract did not contain express language of direct linkage they were not so in accounting terms. He knew the transactions were linked in the sense that they were not independent but inter-dependent; and that this was fatal to revenue recognition. In my judgment, he had 'guilty knowledge.'

**RT 5: EMC Corporation - Q3 2010**

2936.  Towards the middle of August 2010, Mr Hussain provided Dr Lynch with a revenue update indicating that, in order to reach its revenue targets for Q3 2010, Autonomy needed to close another large deal "*plus one at $5m and we should be ok*".

2937.  The Claimants contended that Autonomy entered into reciprocal transactions with EMC to generate the required recognised revenue. In bare outline:

  (1)  In Q3 2010, Autonomy purchased computer software and hardware from EMC under an order letter dated 29 September 2010 which provided for the shipment of hardware and software to Las Vegas, Sacramento, Boston and London. The London order was subsequently cancelled, and the claim relates only to the US hardware purchase which totalled $8,947,386 plus sales tax ($9,627,894 in total). Payment was due on 30 October 2010.

  (2)  At the same time (on 30 September 2010) there were two sales by Autonomy of software to EMC. One such sale was pursuant to a fifth amendment of an agreement dated 26 February 2004 between an Autonomy group company, Verity Inc ("Verity") and a subsidiary of EMC called RSA Security LLC. This was referred to as the RSA amendment. The RSA amendment was not impugned. The impugned

transaction comprised a sale of OEM rights made by Autonomy's subsidiary, Verity, to EMC.  The agreement was comprised in a Sixth Amendment to a Verity OEM agreement entered into on 14 February 2002[313], and was referred to as "the Sixth Amendment". The effect of the Sixth Amendment was to extend licences EMC had acquired from Autonomy from June 2012 to June 2015. The fee was $5,007,000 plus a support fee of $250,350.

(3) The net effect of the US hardware purchase and the Sixth Amendment was that Autonomy was to pay EMC $8,947,386 (before tax) and EMC was to pay Autonomy $5,257,350. Autonomy netted off the amounts due to Verity Inc (in respect of the Sixth Amendment and the separate RSA amendment) against the amounts due to Autonomy Inc for the US hardware purchase. Autonomy paid EMC the difference of $3,627,954 in November 2010.

2938.  The Claimants' case is that:

(1) As regards the sale to EMC: the only reason EMC agreed to purchase more software and extend the term of its licence at that time was because Autonomy agreed to overpay for its purchase of hardware (and related software and services) from EMC. No extension of the term of its licence was yet necessary in circumstances where (a) under the Fifth Amendment  to the OEM Agreement (in June 2009) its existing licence still had two years of the term remaining and in any event, (b) in June 2010 Mr Di Silvestro of EMC had told Autonomy that EMC had *"not used or distributed the software covered under"* the Fifth Amendment. This was confirmed in summer 2011 when Autonomy's maintenance renewal department asked EMC to renew the support services under the Sixth Amendment. Mr Di Silvestro of EMC responded by email dated 9 August 2011 that EMC had no plans to do so because the Sixth Amendment *"was a component of the swap transaction last year, and we do not use the software."* The sale pursuant to the Sixth Amendment lacked a genuine commercial rationale and therefore lacked economic substance.

(2) As regards the purchase from EMC: although RT5 differed from the other impugned reciprocal transactions in that the Claimants did not contend that Autonomy's purchase from EMC was of goods that Autonomy did not need and accepted that the hardware and related software was for use in its data centre, that purchase was at significantly

---

[313] The Verity OEM agreement granted EMC rights to use certain Verity software for the development of EMC's software application programmes and to distribute the software as an embedded component of those programmes. As implicit, the OEM agreement had been subject to a number of successive amendments.

more than fair value. The Claimants submitted that this is obvious from the contemporaneous material:

> (a) Mr Sullivan expressed concern about the price EMC was proposing to charge Autonomy in an email to Mr Hussain on 28 September 2010. He told Mr Hussain that EMC was "*trying to charge a very heavy premium to our normal prices. Still the overall price is 20% below list but much higher than what we would normally pay. Will fill you in the AM*".

> (b) Dr Lynch suggested that this was just part of a negotiation, but the price of $10 million that Mr Hussain had mentioned on 24 September 2010 to EMC's Mr Harry You was more or less the price set out in Mr Sullivan's email to Dr Menell and Mr Hussain seeking their approval to place the order.

> (c) Dr Lynch then suggested that Autonomy had still managed a "*good reduction on the list price*". That was clearly not the case in circumstances where, as Mr Sullivan noted in his email, the price was <u>much</u> higher than Autonomy would normally pay. There is no obvious explanation for why Autonomy would pay so much more than normal, other than to incentivise a reciprocal purchase by EMC.

(3) Further, in view of the fact that Autonomy received no cash (on a net basis) from the round-trip transaction with EMC, no economic benefits flowed to Autonomy, thus precluding the satisfaction of the revenue recognition criteria under IAS 18 §14(d).

(4) It follows that Autonomy should not have recognised the revenue on the Sixth Amendment.

2939. The Defendants' case is that there was a commercial rationale for both EMC's purchase from Autonomy and its sale to Autonomy, they were genuine sales at fair value, and they were not 'reciprocal' at all:

(1) As regards the sale to EMC: EMC was a sophisticated and reputable purchaser. The Claimants did not suggest any impropriety on EMC's part. The Claimants had provided no reason or evidence at all why EMC would have been prepared to be involved in doubtful and uncommercial dealings, as was the unstated but inevitable implication of the Claimants' case. As Dr Lynch put it in the course of his cross-examination:

> "*Let's just work this through. So your theory – so remember hardware isn't profitable at the same level as software. So in order – so the margin that EMC would have made on the hardware would have been perhaps $1 million of profit, so it's not – it doesn't make any sense.*

> *They would have sold us the hardware but only made $1
> million, and then they'd have to send 5 million on software. So,
> again, when you actually think about it, putting aside the fact
> that EMC is a large, perfectly respectable company, it just
> doesn't make any sense."*

(2) A demonstration that the purchase was genuine was provided by the fact that on 31 July 2012 EMC opted to renew the licence for a further 6 years until 30 September 2018. There are no proper grounds for impugning the sale of software licences by Autonomy to EMC.

(3) As regards Autonomy's purchase from EMC: the computer equipment purchased by Autonomy was for equipment it needed for use in its own data centres (and indeed the Claimants did not suggest otherwise, see below) and the price Autonomy negotiated to pay was at a 22% discount to list price, and thus (*per* Dr Lynch) at *"better than fair value because it's at a discount to the list price".*

*My assessment*

2940. I accept that the Claimants' case implicitly implicates EMC. No one who had worked for EMC gave evidence. I do not think it appropriate, and it is not necessary, to make final findings in such circumstances.

2941. Nevertheless:

(1) It is by no means easy to understand what reason EMC had to purchase an extension of a licence which it did not need for software it twice confirmed it did not use.

(2) It does seem clear that the price paid by Autonomy for hardware, even though at a discount to list price, was much higher than Autonomy, as a valued repeat customer, would normally have expected to pay.

2942. Further, it seems clear that the impetus for the transactions at the time they were made was Mr Hussain's need at the end of Q3 2010 for recognised revenue to achieve forecast, and that was the reason for the twin transactions. In that regard:

(1) On 26 September 2010, Mr Hussain circulated a revenue summary to Dr Lynch, Mr Kanter and a number of others. The spreadsheet included a tab entitled "*forecast mrl*", which was a revenue forecast spreadsheet that Mr Hussain had prepared for Dr Lynch. The spreadsheet was divided into closed deals, large deals and deals on the right. Dr Lynch explained that Mr Hussain put together a "*sort of route which is his deals on the left, and then as things come out of the left, you put things in from the right*"; in other words, the deals on the right were brought in to cover any revenue shortfall in the event that any of the deals on the left fell away. Mr Hussain had included in the list of deals on the right a $10 million deal with EMC.

(2) The next day, 27 September 2010, Mr Hussain told Mr Egan that he "*really need[ed] db, bofa, va and one other (emc)!!*". Mr Hussain then asked Mr Sullivan and Mr Mooney if they had "*sent the sales contracts to emc*", to which

Mr Sullivan replied "*Already discussed with Joel [Scott] and Mike [Mooney] separately. Contracts are being prepared but depend on what we sell etc…*".

(3) As is clear from these emails: (i) Autonomy needed a deal with EMC, among others, in order to meet its Q3 2010 revenue target, and (ii) as late as 27 September 2010, Autonomy had no clear understanding of what it was going to sell to EMC.

(4) Dr Lynch seemed reluctant to accept this in his oral evidence. He suggested that Mr Hussain was just 'overshooting' with Mr Egan and probably did not need all the deals he had listed. But Mr Hussain's email was only 4 days from the end of the quarter. By that point, it is likely that Mr Hussain would have known how much revenue was needed in order to meet Autonomy's targets; in any event, Mr Hussain reiterated to Mr Sullivan the next day, 28 September 2010, that he "*need[ed] EMC please And probably $2m more low margin*".

(5) Also on 28 September 2010, Mr Hussain emailed Mr Mooney, Mr Sullivan and Mr Scott setting out five different purchases that EMC was apparently looking at. There was no mention in the list of what became the Sixth Amendment. Mr Hussain asked Mr Mooney and Mr Scott to send Mr Sullivan the purchase orders that they had already sent to EMC and said "*…MS [Mike Sullivan] – as agreed Billy's [Bill Scannell of EMC] team picks those that make up $6m but I want to identify deals that I can take to Harry [You]. Need that information tonight please*" (emphasis added). From Mr Hussain's email, it appears that an agreement had been reached whereby EMC would pick deals totalling $6 million, and that Mr Hussain was looking to pitch further deals to Mr You. That, at least, is what happened.

(6) The email from Mr Di Silvestro in the summer of 2011 stating that the Sixth Amendment was a component of the swap transaction and that EMC did not use the software is not easy to explain away and appears to confirm the Claimants' case.

(7) The Claimants' contention that it is further confirmed by last-minute efforts made by Mr Hussain to expand the deal that had already been agreed by adding three further purchases from EMC in return for EMC purchasing something from Autonomy, and Mr You of EMC's initial response that "*At this late stage, I think the only thing we can do is expand both sides of the current, basic deal*"[314] also seemed to me at

---

[314] Though it is to be noted that later that day Mr Harry You appears to have had misgivings, saying "*I think we are fine with the current deal*" after Mr Hussain spelt out what he had in mind ("*Harry – I*

least to invite serious questions of Mr You, and probably Mr Di Silvestro.

2943. As I say, these are not questions on which I consider it is necessary, appropriate or fair to provide a final answer on less than complete evidence and in the absence of a nonparty from which no evidence has been provided. However, it does seem to me, on the evidence before me, that:

(1) The EMC transaction had attributes echoing, and followed the pattern which emerged from, the other reciprocal transactions I have addressed above.

(2) At the least, the high price paid by Autonomy, well in excess of what it would ordinarily have expected to pay, seems likely to have been what EMC required as an incentive to effect a transaction in such a rush simply to assist Autonomy to book revenue from it in Q3 2010 so as to meet its forecast. That, rather than any proper commercial rationale, is what appears to have driven the transaction.

(3) On the view expressed by Mr Di Silvestre that the Sixth Amendment was a component of a *"swap transaction"*, the Sixth Amendment and the US hardware purchase were linked and should have been assessed together to determine their substance and proper accounting treatment, with the result that no revenue would have been recognised.

2944. I do not think the fact that Deloitte approved the revenue recognition assists the Defendants. As the Claimants submitted, Autonomy did not inform Deloitte that the Sixth Amendment was a component of a reciprocal transaction and that EMC did not use the software to which it related. Nor did Autonomy tell Deloitte that the US hardware purchase was significantly overpriced in comparison to the price it would ordinarily expect to pay. Mr Welham's unchallenged evidence was that these matters would have been highly relevant to Deloitte's assessment of revenue recognition criteria in relation to the Sixth Amendment. Dr Lynch had no explanation for why "*highly relevant*" matters were withheld from Deloitte. The inference is that Mr Hussain's finance department deliberately withheld these matters because Mr Hussain appreciated that, if they were disclosed, Deloitte would not have concurred with Autonomy's accounting treatment of the Sixth Amendment.

*The Defendants' knowledge of improper accounting of the EMC reciprocal transaction*

*Mr Hussain's knowledge*

2945. Mr Hussain was at the centre of the EMC reciprocal transaction. He closely monitored Autonomy's revenues in Q3 2010. He identified the need for another

was thinking that I can find need for hardware for data centres at list price (expand the current purchase) if you were to find the need for the web content management software for your websites")

revenue-generating transaction at $5 million in the middle of August 2010 and, as the end of the quarter approached, he stressed the need for the deal with EMC in order to meet Autonomy's revenue targets.

2946. He knew that the price Autonomy was paying for the EMC hardware (and related software and services) was a *"very heavy premium to our normal prices…much higher than we would normally pay"* (see paragraph 2938(2)(a) above). He nevertheless approved the US Purchases as described in an email to him and Dr Menell of 29 September 2010. It appears from an email from Mr Chamberlain to Mr Stephan circulated to both Mr Hussain and Dr Lynch that they gave their approval orally with 13 minutes to spare before the deadline.

2947. Mr Hussain then led a further effort to encourage EMC to enter into deals to buy <u>further</u> software from Autonomy in exchange for Autonomy making an <u>additional</u> purchase of hardware that Autonomy did not then need at a price that he knew to be significantly higher than the price Autonomy ordinarily paid EMC for comparable hardware.

2948. Mr Hussain must have appreciated in those circumstances that EMC entered into the Sixth Amendment, not because it had any genuine reason for extending the Fifth Amendment, but because Autonomy had agreed to pay over the odds for the US hardware purchase, and that the Sixth Amendment could not, therefore, give rise to any recognisable revenue because it lacked economic substance. I find that he did have 'guilty knowledge'.

*Dr Lynch's knowledge*

2949. Dr Lynch veered in his evidence between his desire to put forward observations which would rehabilitate the transaction and its approval by Deloitte and his main defence that he was not involved and any comment was conjecture or the product of analysis long after the event. Also, and this is a point of more general application, the diligence of his review of the documentation and his ability to recollect its content made it even more than usually difficult to determine what he had come to know and believe from what he knew and believed at the time. Not infrequently, his observations offered a glimpse of more contemporaneous knowledge than he was prepared to admit he had.

2950. As was often, indeed almost invariably, the case in my experience, Dr Lynch delivered his evidence in a calm, unruffled and articulate way which was impressive, and when set apart from the documentary evidence, convincingly delivered. For example, in this context, he was able to dismiss the suggestion that the fact that the transaction was done at the very end of the quarter was not in the least unusual: he assured me that nearly all Autonomy purchases were at the end of the quarter, because, so he told me, *"it's a negotiating point"* and further, *"the only time you know how much fire power you've got in the quarter is when you see whether the quarter is coming in…so…you'll have your spare capacity to buy things…."*. But that was an attempt to extrapolate from a normal transaction and its timing as justification for a very different sort of transaction. It does not, in my view, explain the coincidence of the need for revenue and the urgency of the two transactions. I do not accept Dr Lynch's suggested explanation.

2951.  My overall assessment is:

> (1) I would accept that Dr Lynch was not involved in the transaction day to day.

> (2) He seemed to me reasonably clearly to be underplaying the extent of his involvement. For instance, he seemed reluctant to accept that he was aware of Autonomy's purchase from EMC, notwithstanding that Mr Hussain had forwarded him an email referring to an offer by EMC "*to sell $10m of hardware for our data centres for q3*", and that he approved the purchase by telephone on the last day of the quarter. He also questioned whether an email from Mr Hussain saying "*Need to talk to you about q3 emc deal and db*" referred to the deal with EMC in Q3 2010, suggesting that it might have been about Project Dynamo, even though Dr Lynch knew the parties were aiming for a Q4 close for Project Dynamo because that is what he had discussed with the CEO of EMC and told Mr Hussain.

> (3) The contemporaneous documents show that Dr Lynch was aware of <u>both</u> sides of the reciprocal arrangement with EMC and that he was aware Mr Hussain was trying to find ways of incentivising EMC to enter into deals from which Autonomy could recognise revenue in Q3 2010.

> (4) Moreover, it is improbable that Mr Hussain kept Dr Lynch informed of the Q3 2010 deal with EMC and his efforts to expand both sides of the existing deal, but concealed from Dr Lynch the fact that the Sixth Amendment – which formed part of the existing deal – had only come about because Mr Hussain had agreed to make overpriced purchases from EMC that Dr Lynch was going to be asked to approve, and did approve.

> (5) Overall, I had the impression that Dr Lynch knew the general shape and purpose of the transactions at the time, and when giving his approval: and that he appreciated that the reason for both and their linkage was in reality the urgent need to show revenue.

2952.  According to Dr Lynch's own evidence about the sorts of transactions he would have considered problematic, he cannot have regarded such an arrangement as in any way proper. Nor, as an intelligent CEO with more than a basic grasp of accounting, can he genuinely have believed that it was appropriate for Autonomy to recognise in full revenue on a sale of Autonomy software which was induced by, and would not otherwise have taken place but for, an overpriced purchase by Autonomy.

**Purchase and sale transactions with MicroTech comprising RT 6 in Q1 2011**

2953.  Another set of transactions which the Claimants alleged to have been reciprocal and driven by the need, late in the quarter, for recognised revenue to cover a shortfall on market forecast, took place some time later, in Q1 2011. Autonomy's

counterparty was MicroTech, which Autonomy had by then used as a 'friendly VAR' in a number of impugned VAR transactions.

2954. The allegedly reciprocal transactions with MicroTech involved:

 (1) Autonomy granting MicroTech the right to collect 98% of Autonomy's maintenance and support fees from Autonomy's end-user customer, Bank of America, in return for MicroTech purportedly providing 'backline' maintenance and support services[315] directly to, or for the benefit of, Bank of America (the "MicroTech Services Agreement"); and

 (2) Autonomy selling MicroTech a licence to use the Autonomy software that ostensibly would allow MicroTech to provide these services (the "Autonomy Software Licence Agreement").

2955. The Claimants contended that there was no genuine intention on Autonomy's part to outsource the 'backline' maintenance and support services for Bank of America to MicroTech, and that this was a reciprocal transaction conceived by Mr Hussain, and implemented with the knowledge and approval of Dr Lynch, as a means of improperly generating revenue to ensure that Autonomy met its Q1 2011 revenue targets.

2956. As it was, Autonomy recognised the licence fee of $3,860,468 as revenue in Q1 2011.

MicroTech was rewarded with a 'delta' of $450,389, representing the difference

_____

between what MicroTech was to receive under the MicroTech Services Agreement ($4,503,880) and what, in aggregate, MicroTech was to pay for the licence under the Autonomy Software Licence Agreement ($4,053,491, comprising the licence fee of $3,860,468 and an annual support fee of $193,023).

2957. The Claimants identified and relied on the following features in support of their claim:

 (1) the absence of any contemporaneous documents demonstrating a bona fide reason for, or plan by, Autonomy to outsource 'backline' maintenance and support services to MicroTech;

 (2) the absence of any explanation as to why, if Autonomy genuinely intended to outsource these services to MicroTech, the relevant paperwork was only produced and sent to MicroTech within the last 24 hours of Q1 2011;

_____

[315] 'Backline support services' were defined in the *"Maintenance & Support Services Agreement"* between Autonomy Inc and MicroTech as including *"troubleshooting in conjunction with Bank of America in order to assist Bank of America with its support requests, coordinating with Autonomy to respond thereto, and timely responding to Bank of America's requests for telephone, email, or web-based support Services."*

(3) the fact that Autonomy never asked MicroTech to provide, and MicroTech never provided, any 'backline' maintenance and support services for Bank of America; and

(4) the fact that the reciprocal transaction was unwound shortly after the announcement of HP's acquisition of Autonomy.

2958. Dr Lynch claimed to have had *"no material involvement in this transaction."* His written closing submissions noted that the Claimants' pleadings and Further Information did not include any specific allegation of knowledge or involvement on the part of Dr Lynch; and that no basis for the allegation of knowledge was identified in his crossexamination either.

2959. However, Dr Lynch also asserted that he could see nothing in the arrangements on their face which would have alerted him to any impropriety: he would have considered it to be a straightforward commercial transaction in line with Autonomy's practice of delegating services work to its partners. In his view, the sale to MicroTech of the licence was to enable it to perform the support services; and there was nothing wrong in assigning to MicroTech the right to invoice customers directly for such services. He relied also on the evidence of Mr Steve Truitt adduced as hearsay evidence by the Claimants themselves as confirming that both the assignment agreement and the purchase of software from Autonomy were genuine commercial transactions.

2960. Dr Lynch dismissed the pattern of events after the transaction as simply showing that *"the arrangements did not operate as they were intended. Dr Lynch was not involved in this aspect."* Likewise, he depicted the arrangements made in September 2011, under which Autonomy and MicroTech executed agreements effectively cancelling the parties' obligations to each other, as *"not surprising where the arrangements had not worked out as originally intended, and BoA were continuing to pay Autonomy directly."* He noted that the Claimants made no claim for any transactional loss in respect of the transaction: it is relevant only to the FSMA and misrepresentation claims.

2961. Mr Hussain adopted Dr Lynch's position, noting in addition only that *"RT 6 is a peripheral claim, being modest in amount and it was unwound with no material impact on [Autonomy's] financial position."*

2962. In the circumstances, I consider it is sufficient for me to state my conclusions on the first limb (the allegedly reciprocal nature of the transactions) in summary form.

2963. As to the genesis and main driver of the transactions:

(1) I am satisfied that the sequence of schedules provided by Mr Hussain to Dr Lynch from 26 March 2011 demonstrated that (a) the revenue-generating side of the overall transaction was first referenced in a spreadsheet dated 25 March 2011 sent to Dr Lynch on 26 March 2011; (b) the deal was initially posted on the right of the schedule, signifying it was held in reserve and was not immediately envisaged for completion

if deals on the left hand-side of the schedule proceeded as hoped; (c) the deal was only moved to the left of the schedule when deals on the left failed to eventuate; (d) only when moved to the left of the spreadsheet did the deal move (quoting the Claimants) *"from being a contingency plan to a necessity for Autonomy to satisfy its Q1 2011 revenue goals";* (e) the deal was conceived a few days before the end of the quarter.

(2) On 30 March 2011, Mr Hussain emailed Mr Scott, copying Mr Chamberlain, with the subject "*bofa*" saying "*MT [MicroTech] assignment. Let's chat when you're up, need to get the MT obligation to support sorted*".

(3) Mr Scott testified at Mr Hussain's criminal trial that either Mr Hussain or Mr Chamberlain had asked him to prepare two agreements with MicroTech: (i) an agreement appointing MicroTech to provide 'backline' maintenance and support services for the benefit of Bank of America (the MicroTech Services Agreement), and (ii) an agreement licensing to MicroTech the software that was ostensibly needed to provide those services (the Autonomy Software Licence Agreement).[316] Although I have reservations about Mr Scott's evidence generally, I see no reason not to accept this part of it.

(4) Not until 30 March 2011 did Autonomy propose the arrangements to MicroTech: it seems that Mr Scott talked to Mr Steve Truitt sometime on the same day before sending him a draft of the proposed MicroTech Services Agreement as an attachment to an email timed at 20:44 on 30 March 2011. Even allowing for timing differences (it was some 8 hours earlier in California, which is where I take it that Mr Steve Truitt received the email) that gave MicroTech only hours to consider the agreement and the proposed purchase of the licence.

(5) The circumstances in which and the haste with which the agreement was concluded casts real doubt on its substance. Further, the MicroTech Services Agreement obliged MicroTech to have sufficient personnel trained in the features and functions of the relevant Autonomy software and to have procured office space and facilities for such personnel, ostensibly to allow MicroTech to be in a position to provide 'backline' maintenance and support services from the moment it entered into the agreement. I agree with the Claimants that it is difficult to see how MicroTech could have been in such a position in circumstances where it received the agreement stating these obligations a matter

of hours before the agreement was due to be signed and MicroTech's supposed service obligation was theoretically to be fully functioning.

---

[316] From Mr Hussain's email to Mr Scott on 30 March 2011, copied to Mr Chamberlain, in which Mr Hussain asked to speak with Mr Scott, the Claimants submitted, and I accept and find, that it is more likely that the direction came from Mr Hussain.

MicroTech did not even have access to the relevant Autonomy software until 31 March 2011.

2964. I also agree with the Claimants that the conclusion that the real rationale for the transactions was not for Autonomy to outsource 'backline' maintenance and support services, but to enable an apparent purchase by MicroTech of Autonomy software in respect of which Autonomy could (as it did) recognise revenue on Q1 2011, is reinforced by events after the agreements were concluded. In particular:

(1) Autonomy did not disclose the MicroTech Services Agreement to Deloitte. Mr Welham's unchallenged evidence, which I accept, was that Deloitte were not aware of the MicroTech Services Agreement when they reviewed Autonomy's revenue recognition of the Autonomy Software Licence Agreement.

(2) MicroTech never provided any 'backline' maintenance and support services for the benefit of, or directly to, Bank of America. There is also no evidence that Autonomy ever asked MicroTech to provide such services; and no evidence that MicroTech even set up the infrastructure needed to provide those services. Even so, Autonomy paid MicroTech $714,082 on 10 June 2011, notwithstanding that MicroTech had provided no 'backline' maintenance and support services to that point, and never provided such services thereafter.

(3) Shortly after HP's acquisition of Autonomy was announced on 18 August 2011, Autonomy and MicroTech unwound the reciprocal transaction. Thus:

(a)   On 1 September 2011, MicroTech paid Autonomy, not the amount due under the Autonomy Software Licence Agreement ($642,674.59), the amount it had received from Autonomy in June 2011 ($714,082) in a circular flow of funds.

(b)   Then, on 7 September 2011, Mr Scott sent letter agreements to Mr Steve Truitt terminating the entire arrangement and relieving MicroTech of any obligation to pay the outstanding fees under the Autonomy Software Licence Agreement. MicroTech was also relieved of any obligation to provide 'backline' maintenance and support services under the MicroTech Services Agreement and its right thereunder to invoice and/or collect fees was revoked.

(c)   Autonomy then raised credit notes to MicroTech totalling $3,339,410, the amount of the fees MicroTech was due to collect from Bank of America pursuant to the MicroTech Services Agreement ($4,053,492) less the amount paid by MicroTech in September 2011 ($714,082).

2965. I have concluded that the MicroTech Services Agreement was the means of funding the Autonomy Software Licence Agreement: the two transactions comprising RT 6 were reciprocal and the objective of both was in the last hours of Q1 2011 to enable Autonomy to recognise revenue to cover a shortfall on forecast revenues that had become apparent at the end of 25 March 2011.

2966. It follows that Autonomy should not have recognised any revenue from the Autonomy Software Licence Agreement.

*Defendants' knowledge*

2967. As to the second limb, and the knowledge of the Defendants:

*Mr Hussain*

2968. Mr Hussain maintained the revenue spreadsheets I have referred to above. I am satisfied that he conceived and managed the process by which the MicroTech reciprocal transaction was put in place and directed Mr Scott to draft the two agreements.

2969. I accept the Claimants' submission that as an accountant, Mr Hussain cannot have been in any doubt that these agreements should have been considered together to understand their substance and to determine their appropriate accounting treatment. The fact that nevertheless, he signed a representation letter to Deloitte confirming Autonomy's accounting treatment of the Autonomy Software Licence Agreement without making any mention of the MicroTech Services Agreement supports my conclusion that he knew the two, if properly considered together, would be revealed to be linked in such a way as to cause Deloitte to characterise them as reciprocal. That would have undermined their real purpose.

*Dr Lynch*

2970. Dr Lynch, for his part, attempted to distance himself from the MicroTech reciprocal transaction in his witness statement and his oral evidence. However:

(1) Although initially during cross-examination he appeared reluctant to acknowledge that he was aware of a possible deal in Q1 2011 with MicroTech involving Bank of America, Dr Lynch eventually accepted that he was "*aware that something with Bank of America was happening with MicroTech*" and that Autonomy was proposing to sell something to MicroTech for around $3 million and to recognise revenue on that sale.

(2) It must have been obvious to Dr Lynch from the sequence of spreadsheets he received from Mr Hussain as briefly described above that the transactions were conceived and came to be relied on by Mr Hussain as the means of making good a shortfall on revenue forecasts.

(3) The Autonomy Software Licence Agreement and the MicroTech Services Agreement were, in Dr Lynch's words, "*obviously linked*" even

if (as he maintained) *"not in the accounting sense".* Dr Lynch offered no credible explanation for why Mr Hussain would have informed him about only one side of the arrangement with MicroTech and concealed the other.

(4) I accept the Claimants' submission that it is also unlikely that Mr Hussain would have agreed to Autonomy relinquishing some $4.5 million in fees from Bank of America without alerting Dr Lynch. Dr Lynch cannot maintain he was unaware of the MicroTech Services Agreement without insinuating that he was misled by Mr Hussain, but it is no part of Dr Lynch's case that Mr Hussain actually did mislead him.

2971. I have concluded on a balance of probabilities that Dr Lynch would have been informed by Mr Hussain or by Mr Chamberlain of the linked agreement with MicroTech, and its objective of funding MicroTech so that it could pay for the Autonomy software and earn a profit.

2972. I am satisfied that Dr Lynch would have appreciated that it was improper to recognise revenue on such an artificial reciprocal arrangement.

2972A. Accordingly, I have concluded that Dr Lynch, like Mr Hussain, had "guilty knowledge" of the improper accounting treatment of RT 6.

### Overall Conclusion on Reciprocal transactions

2972B. My overall conclusion is that the Claimants have established their claims in respect of each of the impugned Reciprocal Transactions.


## IDOL OEM

### Summary of the Claimants' claims in relation to OEM

2973. The Claimants have brought claims against both Defendants under FSMA, under the Misrepresentation Act 1967 and in deceit, in relation to allegedly untrue or misleading statements in Autonomy's published information and representations made to HP in respect of a line of Autonomy's business called its *"Original Equipment Manufacturer"* or *"OEM"* business. Revenues from that business were variously described in Autonomy's published information, and it is the meaning perceived by the market and intended by Autonomy to be conveyed by the various descriptions which is at the nub of this aspect of the dispute.

2974. The classic characteristics of this line of business were that Autonomy sold licenses to Original Equipment Manufacturers or "OEMs", who then on-sold their products with Autonomy software embedded to third-party customers. Under the licences sold, OEMs were obliged to make payments to Autonomy in the nature of commission or royalty payments on each sale of equipment embedded with licensed Autonomy software. This generated a growing, reliable and recurrent revenue stream, which was in addition an especially high margin

business because after the sale of the licence it required no further input from Autonomy.

2975. During the Relevant Period, Autonomy reported revenue arising from its OEM business using various terms: "*IDOL OEM*", "*OEM derived revenues*" and "*IDOL OEM derived revenues*" (collectively "IDOL OEM revenue"). In total, reported IDOL OEM revenue in this period amounted to $316.5 million.

2976. In cross-examination, Mr Apotheker told me that he:

> "*really liked this notion of the OEMs because much more than the resellers themselves, this was a highly scalable model. In particular, the way it was explained to me and the way I think it worked was that it was a multi-year, layered effort where you could generate more and more income from a given OEM over time with hardly any additional cost of sale. So I thought it was a very, very important part of the business model and a very smart one.*"

2977. The Claimants submitted that:

(1) A reasonable reader of Autonomy's published information would have understood an OEM to be a software company, which then embedded IDOL into its own software products, and licensed those combined products to the OEMs' third party customers. A reader would not have supposed that a hardware supplier would be considered to be an OEM.

(2) Autonomy's presentation of OEM derived revenue in its published information gave the impression that it comprised (a) upfront development fees paid by OEMs for the right to embed Autonomy's IDOL technology into their own software products for subsequent licensing of those combined products to third parties or (b) ongoing royalty or other recurring payments from OEM partners to Autonomy in respect of the OEM's sales of their own software products, with IDOL embedded under licence, to their own customers[317].

(3) Accordingly, the understanding conveyed by the OEM metric was of (a) a (normally) recurring and predictable high-margin revenue stream which would grow over time as other software companies licensed their own software containing IDOL; and (b) broad acceptance of IDOL across the software industry.

(4) Dr Lynch's own comments about IDOL OEM revenue in Autonomy's published information reinforced the impression that IDOL OEM sales were sales of IDOL to be embedded in other software companies' products.

---

[317] The usual royalty rate was presented as amounting to about 3% of the revenue from OEM partners' sales of their own product with embedded IDOL.

2978.  According to the Claimants, the truth was very different, in that:

> (1) a large proportion of revenues represented as OEM revenues arose from sales to *"companies which could not embed Autonomy software in their own software products"* and were thus generated from sales to persons not properly characterised as OEMs[318].

> (2) The constituents of what was reported within what I shall refer to as "the OEM Metric" comprising IDOL OEM revenue as variously described[319] comprised, in addition to royalties (i) revenue from one-off sales of Autonomy software licences to customers that did not sell software and were not OEMs, (ii) revenue from one-off license sales for the purchaser's internal use only; and/or (iii)

> revenue from VAR sales, none of which therefore had any of the classic characteristics of OEM business.

> (3) Such sales did not generate royalties or produce a reliable and recurring revenue stream, and they did not signify broad acceptance of IDOL across the software industry.

> (4) Of the total of $316.5 million included within the OEM metric over the Relevant Period, around 80% of it (over $250 million) did not conform to Autonomy's description of it as OEM business because it lacked an essential quality of that business. The revenue was not generated by commission or royalty payment and thus lacked its reliable recurring nature, generated without any further effort required of Autonomy, which made it especially attractive to investors in assessing Autonomy's business. Furthermore, the amount of revenues truly of that nature and properly classifiable as *"OEM"* business were in decline.

2979.  The Claimants accepted, and it is common ground, that neither *"OEM"* nor *"OEM derived revenues"* (or cognate expressions) is a term of art; each is an expression that, in isolation, is capable of bearing different meanings. It was also common ground that Autonomy's reporting of the OEM metric was not covered by IFRS. However, the Claimants contended that by the same token, the market's understanding of the precise nature and scope of a given company's "OEM" business and revenue derived from it must be gained, not from a dictionary or

---

[318] The Claimants pleaded that *"In theory, OEMs were software companies (i.e. companies that licence software to third parties) that embedded Autonomy's IDOL software in their own software products"* and thus sales to "non-software companies" could not fall within the OEM metric

[319] As explained above, I use this expression to cover the various expressions used over time to denote the same revenue stream (*"OEM derived revenues"*, *"IDOL OEM derived revenues"* and later simply (and revealingly) *"IDOL OEM"*).

financial lexicon, but from the way that the company chose to describe this aspect of its business in its published information.

2980. The Claimants relied in this regard on various express statements in Autonomy's published information which, contrary to the Defendants' case now, appeared invariably to describe OEMs as software companies. Thus, in its 2010 Annual Report, and Quarterly Reports for Q4 2010, Q1 2011 and Q2 2011 Autonomy described IDOL OEM as follows:

> *"IDOL OEM. IDOL OEM is where Autonomy's IDOL is embedded inside other software companies' products. IDOL is now embedded in most major software companies' products addressing most software vertical markets. This is a particularly important revenue stream as it generates ongoing business across the broadest product set possible, in addition to up-front development licences."*

2981. In Schedule 8 to the RRAPoC, the Claimants provided details relating to 68 transactions which they contended generated revenues wrongly included within the OEM metric. They did not ultimately pursue their case in respect of one of these[320]; and in an Appendix (Appendix 3) to their written closing submissions they provided short summaries of the 67 such transactions in respect of which they maintained their claims. They had provided a broadly similar appendix as part of their written opening submissions.

2982. They identified three broad categories or aspects of revenue which did not conform to the understanding (as described above) of the OEM metric which the Claimants

contended was conveyed by Autonomy's published information, and which accounted for some $250 million out of total revenues of some $316.5 million described as "*IDOL OEM", "OEM derived revenues"* or "*IDOL OEM derived revenues*":

(1) Sales to non-software companies, including (a) a sale to Tottenham Hotspur of a solution to provide own-use functionality, and in particular *"functions at the level found in a Premiership football club's ordinary operations: CRM, ticketing, player analysis, retail, internet and web design"* and (b) government agencies who *"by definition"* would *"not sell anything to anyone"*;

(2) Sales that limited the purchaser's right to use Autonomy's software to internal use by the purchaser only, so that the purchaser would have neither the apparent intention nor the capability of embedding IDOL software for resale in their own products;

---

[320] A transaction in Q2 2011 with Bloomberg.

(3) Sales which could not properly be classified as giving rise to IDOL OEM revenue, because (a) the licence sale was associated with hosting transactions; or constituted (b) VAR sales where neither the VAR nor the end-user was a software company intending and licensed to embed IDOL technology into its own for onward sale, or (c) reciprocal transactions (for the same reasons) or (d) hardware sales, in each case being instances where (on the Claimants' case) the purchaser was not a software company with the ability and intention of embedding IDOL technology into its own technology for onward licensing to third parties.

2983. The Claimants contended that the Defendants were well aware of what the Claimants described as the *"striking mismatch between Autonomy's presentation and the truth".* They contended that it must have been obvious to them both that the inclusion in the *"OEM metric"* of revenue which did not conform to the description, and did not have the valuable characteristics of 'true' OEM revenue, resulted in the metric being untrue and misleading and made this aspect of Autonomy's business (and since it was a significant business line, Autonomy as a whole) seem more valuable than it was.

2984. Further, although their FSMA claim in this context was based on untrue or misleading statements, rather than omissions and deliberate concealment, the Claimants relied on what they presented as Autonomy's repeated concealment from HP of details relating to the largest transactions allocated to the OEM business as confirming the Defendants' guilty knowledge of the misleading or untrue presentation of IDOL OEM revenue.

2985. According to the Claimants, Autonomy's Quarterly Reports throughout the Relevant Period would cite only transactions with software companies as giving rise to OEM derived revenues, and (conversely) did not identify any transactions as giving rise to such revenue which did not conform to the Claimants' narrow definitions of the disputed expressions, even where such transactions were of substantially greater value or prestige

than the transactions that Autonomy did choose to highlight.[321] The Claimants provided the following illustrative examples:[322]

(1) In Q1 2009, Autonomy allocated to IDOL OEM revenue $3,251,000 from a deal with the Ministry of Defence (OEM2). This was a much larger deal than two of the three named deals: Symantec (no revenue allocated to IDOL OEM revenue) and Proof Point ($230,000).

(2) In Q1 2010, Autonomy allocated to IDOL OEM revenue $8,915,000 from a deal with Bank of America (OEM21). This was a far larger deal

---

[321] The Claimants also contended that the Defendants were involved directly in the choices: and see as to their involvement and knowledge paragraphs 3208 to 3219 below.

[322] Revenue figures are taken from Mr Hussain's spreadsheets. The size of the transactions was not reported in the Quarterly Reports – just the customer names.

than all of the named deals combined: Adobe ($750,000), McAfee ($500,000 and $248,000) and Siemens ($72,000).

(3) In Q1 2011, Autonomy allocated to IDOL OEM revenue $6,448,000 from a deal with Tottenham Hotspur Football Club (OEM48). This deal was almost four times larger than one of the named deals: Symantec[323] ($1,400,000).

2986. The Claimants acknowledged that Deloitte had reviewed these passages and indeed the constitution of the OEM metric in every quarter (though, as elaborated in paragraphs 3168 to 3170 below, the Claimants did not accept that Deloitte's advice on the classification of that revenue as IDOL OEM revenue was sought or given). However, they were keen to stress that in both their FSMA and their misrepresentations claims the *"fraud that has been alleged is not at its heart an accounting fraud".* They presented each as a claim *"where the fraud involved was straightforward",* and not one which involved the assessment of accounting standards or matters of accounting judgement. The Claimants submitted that the Defendants could not, therefore, *"hide behind anything said or done by Deloitte."*

### Summary of the Defendants' defence in relation to OEM

2987. The Defendants disputed the Claimants' claims root and branch. They submitted that there was no basis for the Claimants' *"artificially narrow definition"* of what constituted an OEM, nor for their *"unsustainably restrictive"* limitation of the scope of revenues which could properly be included within the description in Autonomy's published information of the *"OEM Metric".*

2988. In particular their position was that:

(1) The Claimants had adopted an unduly restrictive approach to what constituted an *"OEM".* According to the Defendants, there was no basis for confining the expression *'OEM'* to a company whose business included licensing software to third parties and which has the intention and capability of embedding IDOL

software into its own software products for licensing to those third parties, as the Claimants have sought to do.

(2) Nor was there any basis for restricting the revenues properly included within the OEM metric to upfront fees and royalties paid to Autonomy by the OEM itself, as the Claimants have also sought to do.

---

[323] This is an impugned OEM transaction (OEM55). The Claimants contended that its mention in the relevant

Quarterly Report, along with the mentions of the Q2 2009 deal with VMS (OEM4) and the Q2 2011 deals with Rand (OEM60), McAfee (OEM58) and OpenText (OEM59) in the relevant Quarterly Reports, would not have given rise to suspicion in the same way as mention of the concealed transactions mentioned in the main text above as the relevant named customers were very obviously software companies.

2989. According to the Defendants, such restrictions were not justified by anything said in published information by Autonomy, and the market to which such published information was addressed would not have perceived the OEM metric to be so restricted. In particular:

> (1) Dr Lynch's view was that any organisation that develops a software solution for its industry and then sells it on to others in the industry could reasonably be considered an OEM, and the Claimants' attempts to restrict OEMs to software companies was *"an artificial exercise"*. Dr Lynch accepted that *"obviously the vast majority of software in the world is done by software companies"*, and agreed that OEMs in the sector of interest to Autonomy would predominantly be software companies: but the Defendants' position[324] was thus that the category was not exclusive. The essential quality as he presented it, was the "*right to reprint*": the OEM is being given the right to produce or sell multiple copies of the software it acquires from Autonomy. In the context of Autonomy's business, Dr Lynch described an OEM as being:

>> "*one that takes Autonomy's technology and builds it into something that it sells or gives to its customers, as opposed to a one-off sale*".

> (2) As to the requisite quality required for revenues to be included within the OEM metric, Dr Lynch contended that commission/royalty payments from an OEM, albeit the paradigm, were not the only qualifying revenues: revenues from direct sales[325] to customers of Autonomy's OEMs for which the opportunity arose in consequence of the initial licence sales to the OEMs concerned (or to put it another way, for which the original OEM transaction was the springboard) were also properly classified as indirectly derived from the OEM relationship and could be and was properly described as *"OEM derived"* revenue within the 'OEM metric'.

2990. Dr Lynch, whose submissions were (as ever) adopted by Mr Hussain, did not shy away from the consequence that (as he put it in his first witness statement):

> *"Working out whether a sale was OEM-derived or not involved a qualitative judgment."*

---

[324] In his closing submissions, Mr Hussain fully endorsed Dr Lynch's position and did not address the matter further, save for summarising his overall case in consequence as being that: *"'OEM' is not an accounting term and the approach taken by AU to categorising revenue as 'OEM' revenue was reasonable. Deloitte vetted the revenue that AU categorised as OEM to ensure that it was not presented misleadingly, and there is no basis for alleging fraud against Mr Hussain."*

[325] Especially *"upsells"* and *"PODS"* as to which see footnote 343 below.

2991.  Further, the Defendants stressed that just as the meaning accorded to "OEM" was not unnatural and indeed fell within the ordinary usage of the term[326], so too the more extensive scope of their interpretation of *"OEM derived revenues"* was not contrary to any accountancy rule, and gave content and their ordinary meaning to the words used: and there was no basis for restricting the meaning of *"OEM derived revenue"* so as, in effect, to give no meaningful content to the word *"derived"*.

2992.  They contended that the very purpose of the introduction of the word was to ensure inclusion of revenue *"derived"* from OEM business (including sales to a third-party customer of an OEM)  as well as revenue from a direct sale to an OEM: the inclusion of the word "derived", which remained in the published information until Q3 2010, and (according to the Defendants) continued to inform market understanding after that date, necessarily connoted a wider category of revenues than merely those received from the OEM itself as an upfront licence payment or ongoing royalty stream and captured further sales made possible (*"driven"*) by the initial OEM sale. Dr Lynch explained this in cross-examination as follows:

> "*The metric that we give as a management metric which is OEM-derived includes that revenue but also includes revenue which has been made possible by our OEM programme, but that may – well, it does include sales where the purchaser is not an OEM.  So, for example, an upsell.*"[327]

2993.  The Defendants also drew attention to the fact that types of OEM described by Dr Lynch were similar to the types of OEM included in HP's own OEM business, and suggested that this reflected the ordinary usage of the expression. Thus HP's "*OEM Partnership*" brochure from March 2014 identified:

> "*...three types of OEM branding options to align with your go-to-market (GTM) requirements:*
> •      ***Embedded*** *– Encapsulate HP-branded hardware components within your own branded product.*
> •      ***Integrated*** *– Use HP hardware systems as the platform for an appliance or a vertically integrated solution loaded with your*

---

[326] The OED defines OEM as an *"organisation that makes devices from component parts bought from other organisations"*. By contrast, Investopedia states that an OEM is *"traditionally defined as a company whose goods are used as components in the products of another company which then sells the finished item to users"*.  In their Re-Amended Reply, the Claimants accepted the OED definition to be the usual one; but then also conceded that *"as a matter of general usage, the expression "OEM" is capable of referring to a transaction where a company makes a component or part-system that is used in another's product"*.

[327] In this context, an *"upsell"* is a sale of additional functionality or capacity, either to the OEM itself to sell on to its customers or a direct sale of additional functionality or capacity to the OEM's customers (an "end-user" in the Claimants' terminology, which I shall adopt). Another type of sale direct to the OEM's customers were *"PODS"* (short for product oriented drop-in solutions): these were sales of additional software direct to an OEM's customer.

> *intellectual property, and you can brand the turnkey solution with*
> *your brand or ours.*
> • **Private label** – *Simply rebrand and sell an HP component*
> *"asis" to your own customers."*

---

2994. Thus, in the Defendants' terminology at trial (though it is to be noted it was not deployed in the published information itself)  *"Core"* or *"straight"* OEM business involved sales to an OEM with the "*right to reprint*": the OEM is being given the right to produce or sell multiple copies of the software it acquires from Autonomy. *"Derived"* OEM business extended to sales of Autonomy software generated or which were judged to have been made possible by that original OEM sale. The latter, so the Defendants contended, included both *"upsells"* and *"PODS"*. These comprised most of the socalled *"derived"* business.

2995. In Dr Lynch's Re-Amended Defence (at paragraph 160.3) it was pleaded that:

> *"Autonomy provided information as to its OEM derived revenues in its*
> *quarterly accounts. The relevant revenues included both transactions*
> *directly with OEMs, sales of additional functionality to the end- user*
> *("upsell") either directly or through the OEM as a reseller, and (in*
> *particular where BEA, IBM or SAP[328] were the relevant OEM) sales of*
> *drop in solutions ("PODS") which end-users would buy to function*
> *with the Autonomy /OEM product."*

2996. In practical and numerical terms, the dispute between the parties in respect of all the various claims brought by the Claimants in respect of the presentation of Autonomy's OEM business focused on whether those categories could or could not properly be classified as falling within the OEM metric as generating OEM derived revenues; and then on whether the Defendants believed in the accuracy of the published information about the OEM revenues.

2997. As to the latter point, Dr Lynch emphasised that, in any event, he had not personally been involved in the classification or calculation of OEM revenues and had relied on the finance department and Deloitte. His avowed understanding was that the OEM metrics were fair and accurate and the revenues included within them were understood by the market; and he was reassured in that belief and in his approach by Deloitte's careful review, and the fact that at no time had they ever suggested that the descriptions or figures were wrong or misleading. Dr Lynch submitted that Deloitte's close involvement and their approval of the categorisation of the transactions confirmed him in his belief that the OEM metric and the figures given in Autonomy's published information were not misleading in any way.

2998. Further as to this:

---

[328] BEA Systems, SAP and IBM were/are all large software companies.

(1) Deloitte were familiar with the transactions themselves, having tested all of Autonomy's large revenue deals as part of their quarterly audit review. This involved testing all transactions over $1m, and a sample of smaller ones. According to the Claimants, most of the impugned OEM transactions (51 out of 67) fell into the $1m plus category; thus, the vast majority were tested by Deloitte.[329]

(2) Deloitte reviewed and approved each quarterly press release and Annual Report. Similarly, Mr Welham explained that somebody from Deloitte (usually Mr Welham himself) listened in to each of the earnings calls in the Relevant Period. Thus, Deloitte was aware of all of the material from which the Claimants contended their restrictive definition of OEM derived revenues had been taken.

(3) There was a quarterly testing process to agree the metrics used in the earnings release. Deloitte took the spreadsheets classifying revenue prepared by Autonomy's finance department, and incorporated them into one of its own working papers.[330] Illustrating Deloitte's approval of the classifications, in one such paper, a Deloitte tick-mark appears against the heading for the column "OEM upsell", directing the reader to a note drafted by Deloitte stating that:

> "*The OEM Upsell category includes hosted license deals that are hosted on OEM customer data-centers. This is considered reasonable for including as OEM driven revenues.*"

(4) Deloitte understood that the IDOL OEM category published by Autonomy included upsells and PODS, as Mr Welham confirmed. Mr Welham gave the following evidence on this point:

> "*Q.   ... So someone within Deloitte has specifically considered this particular category, the "OEM upsell" category in relation to hosted licence deals, hosted on OEM customer data centres and concluded that this is considered reasonable, correct?*
>
> *A.     Well, the preparer of this spreadsheet has, yes.*"

He went on to explain that the preparer of the spreadsheet, including the tickmarks, was Deloitte.

---

[329] An example of a working paper testing one of the impugned OEM transactions, with Tottenham Hotspur Plc, though it does not address the classification as OEM (that was the subject of a separate exercise), was relied on to demonstrate Deloitte's awareness of the terms of the relevant transaction.
[330] Mr Welham confirmed that the whole of the document was a Deloitte working paper.

(5) On a related note, Mr Welham said that if he had heard anything he thought was misleading on an earnings call, he would have raised the matter, in the first instance with the audit partner. Mr Welham did not raise any such issue for any of the calls he listened to; nor, as far as he was aware, did anyone else at Deloitte.

2999. In any event, the Defendants concluded, the Claimants' case *"has the whiff of hindsight"*. Although now keen to stress the importance of the OEM metric, the Claimants had not attached such importance at the time:

(1) It was not an IFRS figure, and did not form part of the financial statements. As Autonomy's published information made clear, it was a voluntary supplemental metric provided for background information, to assist in understanding the company's business. Autonomy explicitly stated that the categorisation involved qualitative estimates.

(2) The effect of any misclassification, if established, would be hard to gauge, since any reduction in the OEM metric would be offset by an increase in some other metric that might be equally attractive for investors. As Dr Lynch put it,

> *"there's no dispute that these are actual sales. So if you take them out of OEM revenues and you put them into cloud, then investors would get excited that cloud was growing even faster."*

(3) It was attractive to HP to know that Autonomy's technology had been adopted in some large OEMs, but Mr Apotheker agreed that *"the absolute number wasn't of big interest."*

3000. In further support of their position that the Claimants' approach was manufactured, the Defendants also pointed out that the transactions the Claimants now complain were misdescribed as "OEM" include contracts that were in the data room during due diligence. They contended that HP's advisers analysed these contracts, knew that they were categorised as OEM, but raised no complaint about misclassification. Further, this gave rise to the question whether the Claimants could show that they had reasonably relied on the OEM business having a narrow scope such as to exclude from it transactions of the sort that were actually made available to them as being within it.

3001. The Defendants dismissed the misrepresentation claims as similarly contrived, and in answer to the Claimants' central claim stressed especially that Autonomy's OEM derived revenues were indeed *"highly likely"* to be recurring and no false depiction had been given at any stage.

**The Claimants' various causes of action in respect of OEM business**

*Summary of FSMA claim in relation to statements made about the OEM business*

3002. The Claimants' FSMA claim is based necessarily on statements made in Autonomy's published information. In its published information, Autonomy described revenues from this line of business initially as *"OEM derived revenues"[331]*, later as *"IDOL OEM derived revenues"[332]* and lastly as *"IDOL OEM"*. (I shall refer to them uniformly as *"OEM derived revenues"*).

3003. The Claimants' FSMA case in this regard is that HP (and through it, Bidco) (a) reasonably relied on the presentation of OEM derived revenues in its published information when purchasing Autonomy[333] (b) was thereby misled and (c) has suffered loss as a result.

3004. Mr Rabinowitz summarised the essential elements of the OEM claim under FSMA in his oral closing submissions as follows:

> *"So what matters is to identify what it was that Autonomy told the market about its IDOL OEM revenue, to consider whether that reflected the reality about what was being included by Autonomy in that category and to consider also, if this is the case, whether the Defendants knew that what was being said by Autonomy in its published information did not reflect the reality of what Autonomy was in fact including in this category."*

3005. I address these FSMA claims in respect of Autonomy's presentation of its OEM business in more detail in paragraphs 3030 to 3247 below.

*Summary of the Claimants' direct misrepresentation claims in relation to OEM*

3006. In addition to their FSMA claim, the Claimants also brought claims in deceit and/or under s. 2(1) of the Misrepresentation Act 1967. However, the Claimants only claimed losses under these claims in respect of the shares and share options which each of the Defendants sold to Bidco. In connection with Autonomy's OEM business, the Claimants alleged that direct misrepresentations about the OEM derived revenue category had been made by Dr Lynch and Mr Hussain to HP in the run up to the acquisition, on which HP and through it, Bidco, had also relied.

---

[331] In four Quarterly Reports from Q3 2009 to Q2 2010.

[332] In the Q3 2010 Quarterly Report.

[333] This claim has, as in the case of all the FSMA claims, a dog-leg nature: to establish liability the Claimants must first show that Autonomy was liable to Bidco and was right to accept liability in full, and then secondly, that the Defendants are liable to Autonomy for their respective breaches of duty in thus exposing Autonomy. See also paragraphs 17 to 18 and 432 to 434 above.

3007. The Claimants grouped eight sets of misrepresentations they alleged in respect of Autonomy's OEM business and divided them chronologically according to certain presentations made during the course of the acquisition process:

(1) The initial approach to HP by Qatalyst and introductory meetings in January to March 2011, at which HP was shown two slide decks ("the January and February Slides") depicting Autonomy's *"Attractive Revenue Mix"* of which some 15% was shown in a pie-chart to be comprised of *"OEM Ongoing"* (some 13%) and *"OEM Dev"* (some 2%), and later, in March 2011 some further slides ("the March Slides") to the same effect;

(2) The more detailed discussions in London in June and July 2011, in the course of which (according to the Claimants) Dr Lynch (in addition to describing Autonomy as a *"pure software"* company) stated that (i) the costs of Autonomy's IDOL OEM revenues were very low, being royalty based, with gross margins approaching 100% and (ii) the sales channel to OEMs gave rise to a *"network effect"*; and

(3) The due diligence process in August 2011, in the course of which HP asked specific questions of Autonomy and also asked for Autonomy's *"Top 10 OEM customers by revenue for FY 2010"*, and received (allegedly) misleading responses.

3008. I address these claims in deceit and/or misrepresentation claims, which are direct claims by HP against the Defendants, in paragraphs 3248 to 3252 below.

*Two points of clarification with respect to the ambit of the dispute in respect of OEM claim*

3009. Before addressing the issues in respect of the OEM claim at greater length, it is convenient to address two points which serve to define and confine the ambit of the dispute.

3010. The first, raised by the Defendants, has two facets. One is as to the sufficiency and status of the details provided by the Claimants in respect of the 67 transactions they relied on as generating revenue which could not properly have been classified as "OEM derived revenue".

3011. The other is as to the consequences of the fact that the Claimants sought to advance their OEM case on the general basis that none fell within what the Defendants described as the Claimants' own *"self-chosen, inaccurate definition"*, and apparently on that basis did not go through the details of the transactions referred to in Schedule 8 of their RRAPoC with Dr Lynch or any other witness or ask about their classification as giving rise to OEM revenues.

3012. Dr Lynch contended that the Claimants' approach, and especially their suggested conclusion that the three categories they had identified (see paragraph 2982 above) comprised some 80% of the OEM derived category, was so insufficient

and unsatisfactory that the claim should simply be regarded as not open to them to pursue as against him. Mr Hussain could not complain that the case had not been put to him; but he could and did complain that the case was inadequately supported by the evidence that the Claimants had chosen to put forward.

3013. The Defendants relied especially on the following:

(1) The Claimants did not go through the 67 transactions (otherwise than in submissions) even on a sample basis; they did not ask Dr Lynch (or any other witness) about any specific positive features which on their case had apparently justified a judgement that revenue from it qualified for inclusion within the OEM metric. Instead, the case on misclassification was put to Dr Lynch "*at a very high level of generality*". Dr Lynch was simply asked about the Claimants' general theory, and then confronted with certain conclusions based on that theory with which he inevitably disagreed.

(2) The cross-examination of him thus proceeded on the basis of the Claimants' narrow definition, which he considered wrong, but did not condescend to the detail of why each impugned OEM transaction was, on the basis of that narrow definition, said to be lacking qualifying characteristics. The complaint was that he was never given the chance to explain how, by reference to the characteristics of each transaction, the broader definition he advanced would have justified the classification of revenue within the OEM metric in each particular case or why the characterisation suggested by the Claimants was wrong in the context of each specific transaction.

(3) Having not been given the opportunity to justify the classification of each individual transaction by reference to his own understanding of the scope of the metric, Dr Lynch was also not given the opportunity to explain the (avowedly very limited) extent of his knowledge in respect of each of them, nor what part (if any) he played in assigning them to the OEM metric as being OEM-derived.

(4) Further, the summary descriptions of the nature of the transactions provided by the Claimants were (according to the Defendants) not adequate for the purpose of testing the Claimants' complaints as to classification. In a number of cases, the Claimants' reasons for saying that transactions were wrongly classified as OEM was that the same transactions were challenged in some other part of the Claimants' case, whether as alleged 'reciprocal transactions', or impugned VAR or Hosting transactions[334]. The Defendants' more general point was that this was not a proper or sufficient basis on which to challenge the classification: a separate analysis was needed to sustain a case that the revenues were wrongly categorised as OEM.

---

[334] The examples given by Dr Lynch were OEM13, 15, 16, 23, 34 and 35.

(5) In particular, the Defendants submitted that the 80% figure asserted by the Claimants to represent the proportion of revenue included in the OEM metric which (according to their 'narrow' definition) did not match Autonomy's own description of OEM derived revenue was *"not anchored to anything, not even kinds of deals, never mind actual deals"*.

3014. Mr Rabinowitz submitted in his oral closing that, having set out in his pleading and in his written opening what characteristics of the 67 impugned transactions the Claimants relied on as disqualifying them from inclusion within the OEM metric, (a) it would have been disproportionate and would have *"got very short shrift"* from me had Dr Lynch been cross-examined on such features in each or even a sample of those transactions; (b) Dr Lynch had had every opportunity to raise, and should have raised, any points he had if he disagreed; and (c) the suggestion that the impugned transactions were properly included within the OEM metric because the market understood a broader category to be indicated by the introduction of the prefix "derived" in Q1, Q2 and Q3 2010 was the case relied on by the Defendants and for them to demonstrate.[335]

3015. The Claimants' decision is forensically understandable, especially given constraints of time, but raises a difficult issue. As to whether a trawl through the 67 impugned OEM transactions with Dr Lynch (who denied any detailed involvement but was the only person giving evidence for the Defendants who was suggested to have been involved) might have got short shrift from me, there was no need for such reticence, even if mercifully meant. But I agree that it is unlikely that I would have been persuaded that a trawl in cross-examination through 67 listed transactions, with a witness who professed not to know anything about the details of them and could only, if anything, offer a commentary which he might have provided more efficiently in submissions would have been necessary or proportionate. Some process of illustration by example might have been fashioned, but none was suggested.

3016. In any event, the question is whether having made the choice and taken that course, it was sufficient for the Claimants to base their OEM case on their general theory, and an explanation in submissions (but not evidence) why none of the features of the 67 transactions identified (but not proved) conformed with it.

3017. It is obviously important to consider what the Defendants pleaded. Neither of them admitted the contents of Schedule 8. However, the point that each made was that they were not knowingly improperly accounted for because they were considered to be "OEM-derived revenues". Dr Lynch also pleaded that if their inclusion as such was in

---

[335] As Mr Rabinowitz put it: *"It's the defendants who say – it's not us who say this – it's the defendants who say the expression "OEM derived"…everyone knew….meant something wider than development fee and ongoing royalty…They're relying on OEM derived as producing some wider category but that's their case, not our case."*

error it was not an error of which he was aware of or involved in. I set out Dr Lynch's pleading in this regard below:

> *"It is further denied that the transactions identified in Schedule 8 were incorrectly characterised. The characterization of those transactions involved a qualitative assessment by members of the Finance Department (and not by Dr Lynch), which was reviewed and concurred in by Deloitte and was fair. If, which is denied, any of those transactions could not fairly have been characterised as OEM-derived revenues, this was not an error that Dr Lynch was aware of or involved in."*

3018.   In that latter context, and as recorded in his written closing submissions, Dr Lynch's evidence on the general point was that he knew and regarded it as entirely appropriate, and consistent with the broad scope of OEM revenues that he understood was conveyed (especially by the use of the prefix *"derived"*), that during the Relevant Period, the revenues classified as *OEM-derived* revenues were not limited to those generated by sales to customers who purchased the right to embed IDOL software into their own software for onward licensing to third parties; and that he knew that Autonomy was including within the OEM metric other revenues, including one-off upsells and PODS directly to service providers which had purchased the IDOL software content from an OEM, and sales to a VAR merely for resale. The justification he avowed for the inclusion of revenue from the 67 impugned transactions in the "OEM metric" was that OEM business was not limited to sales to an OEM and sales such as upsells and PODS to service providers to update and upgrade Autonomy software on equipment supplied to them by an OEM was "OEM derived".

3019.   At times during the dispute it seemed to me that the issues were being obscured, and their determination made more difficult, by treating the disagreement as being whether the semantic description "OEM derived" offered a safe haven (as Dr Lynch insisted it did). As it seems to me, the issue cannot be determined by labels.

3020.   The issue is whether the Defendants genuinely thought that transactions with the characteristics of the 67 transactions impugned (and described as OEM derived) would have been considered in the market to be such as to justify regarding them as having special value by reference to the nature of the revenue they generated such as to justify their special description.

3021.   I am not persuaded that anything more was needed than to determine (a) why special value was generally accorded in the market to OEM business (b) what were the salient characteristics of the 67 transactions relied on by the Defendants as justifying their implicit invitation to the market (by their special description in Autonomy's published information) to treat them as having special value; and (c) whether the Defendants had any honest belief in that justification or were simply deploying the special description as a false excuse for according special treatment and value to a cohort of transactions having in fact (and to their knowledge) no special qualities or characteristics.

3022. The Claimants' case was set out clearly in their Opening Submissions, identifying the characteristics of the 67 impugned OEM transactions which they submitted were not such as would be perceived to have the especially valuable characteristics associated

with OEM business. If Dr Lynch wanted to argue that they contained other characteristics or that the characteristics had been misdescribed he had the opportunity to do so. I am not persuaded that this required him to be cross-examined to elicit his comments in that respect.

3023. As to the honesty of his belief in the characteristics it seems to me that enough was put forward and Dr Lynch was, in all the circumstances, sufficiently cross-examined.

3024. I return later to consider the Claimants' submissions on the *"general theory"* and the basis on which they submitted it excluded each of the 67 impugned OEM transactions.

3025. A second point of detail concerns whether the Claimants' "general theory" dictates that only a recurring revenue stream was properly included within the OEM metric: if so, that would have excluded single licence or upfront payments and revenue from the sale of PODS.

3026. There was some confusion in this regard, introduced by the contention in Dr Lynch's Re-Amended Defence that the Claimants' clarification (in paragraph 185.1 of their Reply) that they were not contending that revenue was "*precluded from being classified as IDOL OEM revenue merely on the ground that it did not, in a given case, result in an ongoing revenue stream*" carried with it acceptance that such single licence or upfront payments were not improperly included within the metric.

3027. I do not think that the Claimants' clarification went further than to accept that it was not a necessary quality of all revenue allocated to the OEM metric that it should be recurring in nature provided it was generated by further sales to the OEM made almost inevitable by the original sale to that OEM. The Claimants maintained their position that revenue from a sale to an end-user and PODS would not be perceived as either sufficiently certain or as having the other qualities associated with OEM business.

3028. The upshot is that it remained the Claimants' case that (a) it was misleading of Autonomy to have included within the OEM metric in its published information sales to an end-user simply on the basis that the end-user had originally acquired the IDOL software to which it wished to add functionality from an OEM; and (b) it was misleading to include in the OEM metric revenue a type of revenue might be expected to be but was not a sale to an OEM and was not an incidental but almost inevitable product of and within the original OEM relationship. I consider later whether the admitted extension to incremental sales nevertheless introduces an element of subjective judgement in any event.

3029.  I turn to identify and then address the issues to which the disputes concerning Autonomy's OEM business give rise by reference to the Claimants' pleaded causes of action.

### *FSMA claim in more detail*

3030.  The following issues arise in the context of the FSMA claim in respect of the OEM metric:

> (1)  What did the Claimants have to prove to establish their FSMA claim in relation to the OEM metric?

> (2)  What was the "published information" on which the Claimants claim to have been entitled to rely in this context? Are they right that it included transcripts of earnings calls at least from Q4 2010 onwards?

> (3)  What were the statements made of OEM derived revenue in that published information, and what, in the round, was the depiction of the scope of IDOL OEM revenue in that published information?

> (4)  Should the depiction of the scope of IDOL OEM revenues in the published information be taken as exhaustive and exclusive? Or is that depiction to be read subject to an established market understanding that revenues described as IDOL OEM would include also revenues which did not arise directly from, but could be said to have been made possible by, sales to OEMs?

> (5)  Did revenue streams in fact included in the OEM metric fall outside a reader's likely understanding of the OEM metric so as to make the published information false and misleading?

> (6)  What involvement did the Defendants each have in the presentation of that published information? If the statements were false and misleading, did they know that?

> (7)  How did HP/Bidco understand the published information? What is the test of reliance in a FSMA claim and can HP demonstrate such reliance?

### *The legal ingredients of the FSMA Claim in relation to OEM*

3031.  In the Introduction to this judgment, I have sought to explain the requisite conditions of liability applicable in any FSMA claim, whether under s. 90A or its replacement, Schedule 10A (as and from 1 October 2010): see paragraphs 432 to 544 above. Certain particular legal issues arise in the context of the OEM claim which require further elaboration. These relate to:

> (1)  Whether the statements made in earnings calls and transcripts of earnings calls after 1 October 2010, on which the Claimants placed

reliance, fell within the scope of the definition of *"published information"* in Schedule 10A, paragraph 2(1) FSMA (which came into force on 1 October 2010);

(2)   The test for determining whether a statement is *"untrue or misleading"*; and

(3)   The test of whether a PDMR within the Issuer knew it to be so, or was *"reckless whether it was untrue or misleading"* (what I have termed "guilty knowledge" in paragraph 448 above).

*The statements on which the Claimants claim to have been entitled to rely in this context*

3032.   In the context of the OEM claim, the Claimants referred to and contended they relied on Autonomy's Annual and Quarterly Reports for the Relevant Period (that is to say, the Quarterly Reports for Q1 2009 to Q2 2011 and the Annual Reports for FY 2009 and

2010). It is common ground that these constituted *"publications"* or *"published information"* within the meaning of those expressions in s. 90A and its replacement (with effect from 1 October 2010) in Schedule 10A of FSMA respectively.

3033.   However, the Claimants also referred extensively to calls and transcriptions of earnings calls in the same period, including the Q4 2010 earnings call, the Q1 2011 earnings call and the Q2 2011 earnings call, and appeared to rely on statements made in that context as also constituting *"published information"* to which Schedule 10A FSMA applied.

3034.   I have explained, in the Introduction, my reasons for concluding that the calls and the transcripts of them did not constitute published information. It follows that, in my judgment, statements made in the earnings calls cannot found a claim under Schedule 10A of FSMA. However, as also noted in the Introduction, that does not mean that they are inadmissible or irrelevant: they may well be relevant to other conditions of liability, such as the state of mind of relevant PDMRs in making the statements now impugned, and the actual state of market knowledge.

3035.   In the context of the OEM claim in particular, they may be of direct relevance to the fundamental questions of (a) whether the scope of OEM-derived revenues was explained to the market so as to become, in effect, market knowledge and (b) the Defendants' own understanding of the meaning of IDOL OEM and their perception of what the market would take the category to comprise and understand from the metrics given. Some may also be relevant to the question of what analysts and the investment community actually knew, or were told, though of course individual conversations should not be taken to import knowledge across a broader constituency.

*Determining whether a statement is (a) untrue or misleading and (b) known to be so*

3036. Obviously, whether a statement is knowingly false or recklessly made depends upon what its maker understood it to state about the matters to which it refers, and whether according to that understanding, what was stated was in fact true. In a case based on alleged deceit, the test is whether the statement was untrue, tested according to what the defendant considered to be, or envisaged would be understood to be, its meaning, though it will suffice also if the defendant was reckless in the sense of knowing that a statement might well be understood in a way which would render it (on that understanding of it) untrue or misleading.

3037. In many cases, there is no dispute as to the meaning of a given statement, and the questions then are whether it was untrue or misleading in its description of the matters to which it refers, and if so, whether the PDMR deemed responsible for the published information in which it appears knew it to be untrue or misleading, or was reckless as to whether it was or not.

3038. In such a case, the clear objective meaning of the statement, though not determinative, may itself be a relevant factor in determining whether the maker had any real belief in the meaning he now asserts. Thus:

(1) If the objective meaning of a statement is clear, and by reference to that meaning would be false, a defendant's claim to having thought and intended it to have some other meaning may be difficult to sustain. In such circumstances, the defendant will be forced to resort to some personal definition, or some eccentric meaning, which may strain credulity. As the Privy Council said in *Akerhielm v de Mare* [1959] AC 789:

> "*For instance, the meaning placed by the defendant on the representation made may be so far removed from the sense in which it would be understood by any reasonable person as to make it impossible to hold that the defendant honestly understood the representation to bear the meaning claimed by him and honestly believed it in that sense to be true.*"

(2) By contrast, as Males J (as he then was) noted in *Leni Gas & Oil Investments Limited and another v Malta Oil Pty and another* [2014] EHC 893 (Comm) at [7] to [9]:

> "*if a reasonable person in the claimant's position would not have understood that the statement in question was being made, that may make it unlikely that the defendant intended his words to be understood as making such a statement. As Mr Kitchener acknowledged, if the court is of the view that no reasonable representee could have inferred the representation contended for, it is highly unlikely that it will find either that this is what Dr Higgs intended or that this is what Mr Ritson in fact understood.*"

3039. In other cases, however, what a reasonable person would have taken the statement to mean is not clear, and is disputed. The potential for such dispute is obviously far greater in a case such as the present, in the context of statements which (a) have no standardised or defined meaning, (b) have been given none by the maker, (c) have been the subject of a variety of explanations to different audiences at different times, and (d) in the case of the voluntarily provided OEM metrics, were expressly stated to be subject to *"qualitative"* assessment. Any search for what the posited reasonable person would have understood the statement to mean is further complicated in a case such as this (and possibly in any case where information is published generally), where the audience is disparate and comprised of persons in very different circumstances, with varying degrees of background knowledge and expertise, a few of whom may also be aware of other published information issued by the same issuer at about the same time though most others may not.

3040. The search for a single objective meaning in such circumstances is in reality something of a conceit; and it may be unnecessary and even unwise. Unnecessary, because, as Mr Miles submitted, the search in the context of a deceit claim is not for the single 'best' objective interpretation, as it would be in the context of disputed contractual interpretation: for the PDMR cannot be guilty of deceit simply because the court considers that on its interpretation of it, the statement was untrue: his knowledge of its falsity is ultimately the only test of dishonesty. Unwise, because the selected preferred meaning may skew the assessment of subjectively intended meaning, at least unless it is kept firmly in mind that at most it is relevant as a test of the credibility of the defendant's own interpretation or of the likelihood that the defendant fell upon the phrase precisely because of its ambiguity (and see paragraph 3047 below).

3041. Mr Miles went on to submit that if the court is persuaded that a statement alleged to be false or misleading is genuinely open to various meanings, and that asserted by the defendant is one of them (even if not the most likely or obvious one), the determination of the matter is, in effect, removed to the second stage of enquiry, and to an assessment of the defendant's actual state of mind. As Mr Miles put it:

> *"If there is a range of possible meanings, then in order to say someone has acted fraudulently, it is necessary to show that they either understood the term in the narrow sense contended for by the claimants or deliberately used the ambiguity for the purpose of deception."*

3042. That accords with the following extract from *Clerk & Lindsell on Torts* (22nd ed) at 1825:

> *"Where a statement is capable of being understood in more than one sense, it is essential to liability in deceit that the party making the statement should have intended it to be understood in its untrue sense, or at the very least that he should have deliberately used the ambiguity for the purpose of deceiving the claimant."*

3043. Thus, for example, in the *Akerhielm* case itself, a buyer of shares who had relied on an ambiguous statement in a company prospectus (that shares had been "subscribed", begging a question whether the shares were paid up in cash or in some other way, or unpaid) failed in his action in deceit once it was shown that the defendants had honestly believed the statement to be true in the sense in which they had intended it to be read.

3044. Mr Miles submitted that there was just such ambiguity in the present case. The meaning the Defendants maintain they had intended was an available one, and (so they said) shared by many in the market, so that at worst the statements were unintentionally ambiguous: and according to that intended meaning, or one of two or more legitimate meanings resulting in ambiguity, the statement was neither untrue nor misleading.

3045. However, that submission, and Mr Miles's invitation to move straight to limb two, is premised on an initial conclusion that true ambiguity has been revealed by the dispute. The Claimants did not accept that. They contended that on proper analysis, the meaning conveyed by the OEM metric and the disputed expressions (OEM and OEM derived revenues) was clear, and as conveyed, was untrue. Although the expressions might, shorn of context, be open to different interpretations, the description of the OEM metric and the meaning attributed to the disputed expressions in the published information, resolved any ambiguity otherwise inherent in the expressions 'OEM' and 'OEM derived revenue' and left no room for any alternative interpretation. The Defendants had, in effect, supplied their own definition of the expressions in the published information.

3046. On this view, the Defendants were seeking to rely, not on ambiguity in the statements made, but on a private dictionary which the Defendants claimed to have built up in the market, in which the impugned expressions had or had acquired, on the basis of a special dictionary thus created, a broader meaning than the meaning apparently ascribed to them in the document taken as a whole. In other words, any ambiguity was introduced by some special meaning vouchsafed to the market, or more likely, a section of the market, which was not apparent from a process of interpreting the published information itself.

3047. It followed, on the Claimants' argument, that Mr Miles's approach of going straight to the question of what the Defendant intended assumed ambiguity where in fact there was none, and could result in an important factor being left out of consideration. Resort to an eccentric 'private dictionary' meaning would be difficult to sustain and itself cast dispositive doubt on the defendant's honesty in making statements in a form which relied on it; and indeed the question of guilty knowledge might also be determined by plain inconsistency between an arguable interpretation asserted by the defendant, and the other words the defendant has used in the presentation taken as a whole.

3048. I have concluded that, in this case, I am required to adopt the two-stage approach by the Claimants' assertion that any ambiguity in the meaning of the expressions used has been resolved by definitive language in the published information taken

as a whole. In any event, I have concluded that the ambiguity is not so evident that I can safely take the shortcut to the question of the Defendants' subjective intention.

3049.  In the circumstances it seems to me that there is no available shortcut such as Mr Miles in effect suggested; and to determine the OEM claim, I must assess:

(1)  whether the market would have understood the expression *"OEM Derived"* materially to extend the nature of the business included in the OEM metric.

(2)  What, at that time, the Defendants honestly intended readers of Autonomy's published information to understand to be conveyed by the OEM metrics they provided, the expressions *OEM* and *OEM derived revenue* they deployed, and the statements they made as to the scope and nature of Autonomy's OEM business;

(3)  Whether, in the light of the answers to (1) and (2) above, the statements made and the metrics provided were true or untrue, or misleading, to the knowledge of the Defendants.[336]

3050.  Incidental to these principal questions are the following further sub-issues:

(a)  What, if any, account should be taken of the evidence of Analysts relied on by the Defendants in support of their position that there was an established market understanding that Autonomy's OEM business was broader in scope than the Claimants have depicted it to be and extended, for example, to upsells and PODS;

(b)  Whether the Defendants were aware that those expressions would be likely to be interpreted by many as the Claimants maintain they did interpret them and deployed them (i) knowing that, so interpreted,  they were untrue or misleading, or (ii) lacking any honest belief in their truth (so as to be reckless according to the meaning of recklessness laid down in *Derry v Peek* (1889) 14 App. Cas 337)) if so interpreted; and/or (iii) because they knew the expressions were ambiguous and consciously deployed the ambiguity to deceive the Claimants.

3051.  I turn first to the way the OEM metric was put forward in Autonomy's published information.

*What was stated in Autonomy's published information about the OEM metric?*

---

[336] It would suffice for the Claimants if, although the Defendants did not actually know the statements to be untrue or misleading, they were reckless as to whether they were untrue or misleading.

3052.  What was said about the OEM metric and OEM derived revenues in Autonomy's Quarterly Reports and Annual Reports can be summarised as follows:

(1)  Initially, in the Q1 2009 and Q2 2009 Quarterly Reports, little more was conveyed about this category of business than that Autonomy was developing an *"OEM Program"* which involved sales of Autonomy software to key companies which would each *"OEM Autonomy technology"*, that is to say, embed Autonomy software in their own products for onward sale.

The OEM Program was said to be growing, but little more information was provided, and nothing was said about the content or form of the OEM agreements.

(2)  The Q3 2009 Quarterly Report was the first to provide *"Supplemental Metrics"* which referred to and measured *"OEM derived revenues"*. It cautioned that these metrics were *"provided for background information"* and *"may include qualitative estimates"*.

It was stated that *"More than 400 companies OEM Autonomy technology, including Symantec, Citrix, HP, Novell, Oracle, Sybase and TIBCO"*; but no definition was provided of OEM derived business, nor was the form or content of the deals described.

(3)  The 2009 Annual Report described OEM relationships (as well as cloud computing) as one of *"the new models of the software industry"* and as the vehicle to enable Autonomy's technology (especially in unstructured data analysis) to be applied to every area of IT, even areas in which Autonomy did not itself compete.

There was no discrete definition of OEM business; and the rubric *"OEM derived"* was not used.

However, it was stated that Autonomy had over 400 *"OEM relationships with other major software vendors that build our technology into their products"*; and that Autonomy was relied on by OEMs *"from virtually every major software sector"* to *"address the problem of unstructured information, provide unique next-generation functionality and deliver unparalleled performance"* by *"[embedding] Autonomy's award-winning technology into their software solutions"*.

It was stated also that:

*"Autonomy's OEM customers bring Autonomy technology to vertical markets by embedding it in their own solutions. Autonomy benefits from the expertise of a community of systems integrators and consultants who engage with customers to expand and sustain use of Autonomy products in a wide variety of industries"*.

For the first time, there was mention of the fee structure, which was said *"typically"* to provide for royalty fees based on the amount of sales by the OEM: it was stated that *"OEM and reseller arrangements…typically provide for fees payable to the group based on licensing of the group's software to third party customers".* These royalties or royalty-type payments were said to be around three percent of the value of product sales.

Supplemental Metrics were provided, with a warning about qualitative estimates; but though these gave figures for key parameters, and in particular organic growth and cash conversion rates, they did not identify or distinguish OEM or any other business lines.

(4)  The Q1 2010 Quarterly Report referred to and quantified *"OEM derived revenues"* and introduced more detailed *"supplemental metrics"* which separated out two constituent parts of OEM derived revenue, *"OEM Dev"* and *"OEM Ongoing"* and portrayed the OEM Program as growing strongly.

Still there was no overall definition of the types of revenue comprising OEM derived business nor any description of the form or content of OEM deals. The Supplemental Metrics were given as before, with the same warning about qualitative estimates.

(5)  The Q2 2010 Quarterly Report expressly stated the OEM business to be Autonomy's *"fastest growing revenue stream"*, with a quote from Dr Lynch referring to *"a powerful networking effect underway as IDOL further penetrates the entire spectrum of enterprise software applications"*.

Supplemental Metrics were provided in a form which distinguished various business lines, including *"OEM derived revenues"* (which was sub-divided into *"OEM Dev"* and *"OEM Ongoing"*). There was no further definition of OEM derived business or the form or content of OEM deals. Again a warning was given about the supplemental metrics only being provided *"for background information and may include qualitative estimates."*

(6)  The Q3 2010 Quarterly Report described strong (30% year on year) growth in "IDOL OEM revenues" as *"both a further endorsement of the unique capabilities of IDOL and reflects a growing network effect as more software companies choose to design their products with Autonomy inside."*

Supplemental Metrics were again provided, substantially in the same (revised) format, but prefacing the word "*IDOL*" before *"OEM derived revenues"* and quantifying each of the sub-components identified

(*"IDOL OEM Dev"* and *"IDOL OEM Ongoing"*). As before, there was no definition of IDOL OEM or IDOL OEM derived, and no description of the form or content of OEM deals. The same warning about qualitative estimates was given.

(7) The Q4 2010 Quarterly Report described IDOL OEM as *"where Autonomy's IDOL is embedded inside other software companies' products…addressing most software vertical markets."* It added that:

*"This is a particularly important revenue stream as it generates ongoing business across the broadest product set possible, in addition to up-front development licences."*

Autonomy continued to depict IDOL OEM, with IDOL Cloud, as fast growing, high margin, highly attractive *"as they turn one-off sales into multi-year committed annuity streams"*, replacing *"one off sales"*, and one of the *"key drivers of our business"*.

The Report drew attention to there being a short-term effect of this as appearing to depress growth, since one-off sales were recognised in full and immediately, but emphasised the advantage over the longer term of *"more valuable annuity streams"*. The impression conveyed was of the OEM business promoting the wide use and acceptance of Autonomy's software within the software industry.

Supplemental Metrics were provided in a slightly altered and truncated format but to the same effect: these indicated that in Q4 2010 IDOL OEM revenues totalled some 14% of all revenues. The previously invariable warning of "qualitative estimates" was no longer expressly stated.

(8) The 2010 Annual Report elaborated on the presentation in the Q4 2010 Quarterly Report, adopting the same description of IDOL OEM. Again, OEMs were described as software companies wishing to embed IDOL, and a warning was included in Dr Lynch's report as CEO of *"some seasonality in IDOL OEM sales as they are predicated on the rest of the software industry sales, and the period over which those vendors report their sales to us"*.

IDOL OEM growth was stated to have been 32%, and broadly similar statements as in the immediately preceding Quarterly Reports were deployed to expand on the value of turning *"one-off sales into multi-year committed annuity streams"*, and to emphasise that *"numerous world-leading software companies embed Autonomy's award-winning technology into their software solutions"*.

The fee structure was described as generating royalties, giving rise to higher margins than IDOL Cloud business. However, no breakdown

between *"OEM Dev"* and *"OEM Ongoing"* was provided, and no mention was made of *"OEM derived"*: those terms appear to have dropped out of the description of the metric.

(9) The Q1 2011 Quarterly Report conveyed basically the same message, emphasising again IDOL OEM's importance as a revenue stream *"as it generates ongoing business across the broadest product set possible, in addition to up-front development licences"*.

However, this report did not include the information provided in the Q4 2010 Quarterly Report and the 2010 Annual Report which expressly depicted the IDOL OEM category as comprising, in addition to up-front licence payments (which were mentioned), ongoing royalty payments paid by software companies which had chosen to embed IDOL in their own software for onward sale. No split between *"Dev"* and *"Ongoing"* was provided.

(10)    The Q2 2011 Quarterly Report was in similar form to the Q1 2011 Quarterly Report, again emphasising the importance of IDOL OEM as a driver of Autonomy's business, providing strong growth and (like Cloud) a recurring and particularly important revenue stream *"as it generates ongoing business across the broadest product set possible"*.

The description of IDOL OEM as being *"where Autonomy's IDOL is embedded inside other software companies' products"* was repeated.

Again, no split between "*Dev"* and *"Ongoing"* was provided: again, those sub-categories were not mentioned, though reference was made to revenue from sales by OEM *"in addition to up-front development licences"*. OEM business was (like Cloud business) presented as a *"recurring model"*, deriving *"recurring revenues with long-term contracts."*

3053.   In none of these Reports was there any express mention of either *"upsell"* or *"PODS"* revenue. Nor was there any other express reference to sales of functionality to end-users (as distinct from to the OEMs). The Defendants' contention was, as it had to be, that the reference to *"ongoing business across the broadest product set possible in addition to up-front development licences"* was easily broad enough to extend to such sales, and certainly did not exclude them.

3054.   The Claimants relied strongly on breakdowns of OEM derived revenue provided in certain quarters (Q1 2010, Q2 2010 and Q3 2010). These divided *"OEM derived revenues"* into two sub-categories (*"OEM Dev"* and *"OEM Ongoing"*). The Claimants pointed out that according to those breakdowns, the lion's share of IDOL OEM revenue consisted of ongoing royalty revenue (see paragraph 3056(4) to (5) below). Thus, in each of the three quarters (Q1 2010,

Q2 2010 and Q3 2010) in which this breakdown was provided, the sum of *"OEM Dev"* and *"OEM Ongoing"* was equal to total reported *"OEM derived revenues"*, with the vast majority (at least 90%) being attributed to *"OEM Ongoing"* revenue.

3055.   The Claimants' latter point was simple but important: in addition to emphasising the preponderance of royalty revenues, the two stated categories left no arithmetical or other room for any other sources of OEM revenue. Thus, if, as the Defendants contended, the expression "*OEM derived revenues*" communicated the inclusion of upsell and PODS revenue within IDOL OEM revenue, this could only be because upsell and PODS revenue could properly be regarded as coming within one or both of the sub-categories: "*OEM Dev*" and "*OEM Ongoing*".

3056.   The Claimants' case is, as I would summarise it, that taken together, a reasonable reader of all these various Reports would have understood them to be demonstrating the rapid growth of what in early 2009 was a relatively new line of business and as representing that:

(1) Autonomy's OEM business was based on sales to (or at least predominantly to) some 400 of the largest software companies, each with a very large customer base and considerable market presence and penetration: this was a means of introducing IDOL software to a very broad market.

(2) Those software companies (a) produced their own software (b) embedded IDOL software into their own software products under a licence purchased from Autonomy and (c) licenced or sold their products with IDOL embedded on to their own customers.

(3) Sales of software embedded with IDOL through the OEM channel (a) endorsed the unique capabilities of IDOL and reflected its penetration of the software market, and its wide acceptance and use in the software industry, and (b) promoted wider acceptance and use of Autonomy's software in the software industry, furthering the objective of IDOL OEM becoming the software of choice for anyone with unstructured data analysis needs.

(4) Revenue from IDOL OEM business (whether described as *"IDOL OEM"*, *"IDOL OEM derived revenues"* or *"OEM derived revenue"*) came from two sources, that is (a) upfront fees for the purchase of a development licence (subcategorised in the Reports for Q1 2010, Q2 2010 and Q3 2010 as *"OEM Dev"*) giving the right to embed the software into an OEM's own products and (b) royalties which normally became payable on the licensing by the OEM's own customer of the combined product (sub-categorised by way of further information in the Reports for Q1 2010, Q2 2010 and Q3 2010 as *"OEM Ongoing"* and referred to as *"OEM royalties"* in Q4 2010, the 2010 Annual Report and as *"ongoing business"* in Q1 2010 and Q2 2010 ).

(5) The predominant component of OEM derived revenue in every quarter was the ongoing element. Breakdowns of these revenues, provided in Q1 2010, Q2 2010 and Q3 2010, allocating total OEM Derived revenues between each of those two categories, appeared to show that (a) some 90% or more of the total revenue came from *"OEM Ongoing"* payments and (b) the two categories accounted for all revenues, and there was no room for any other source of revenue.

(6) *"OEM Ongoing"* revenues were presented (in Q1, Q2 and Q3 2010) as derived from payments by OEMs to Autonomy calculated as a percentage (usually about 3%) of revenues received by the OEM from the sale of its own products with embedded IDOL, and as likely to expand over time as OEM partners embedded more IDOL software functionality in product releases.

(7) Such payments represented a rapidly growing, committed (by contractual obligation imposed on the OEM) and multi-year, recurring revenue stream of greater value than one-off payments, notwithstanding some adverse impact on short-term growth because revenues classified as "royalties" for accounting purposes could only be recognised in the accounts over time.

(8) Another hallmark of the ongoing revenue stream was that it was generated without any ongoing effort by and at no additional cost to Autonomy, resulting in nearly 100% gross margin.

(9) The strong organic growth of IDOL OEM revenue had by 2010 (when such growth was stated to be 32%) become a driving force, with IDOL Cloud, of Autonomy's business and could be regarded as an important measure both of Autonomy's current success and its future prospects.

3057.  HP did not read all the published information. Mr Sarin read the most: but he considered only the 2010 Annual Report and the quarterly reports for Q1 2011 and Q2 2011. The Defendants pointed out that most of the OEM transactions sought to be impugned were from Q3 2010 or earlier. I accept the Defendants' point that it was not until Q4 2010 that anything was given resembling a definitive description of IDOL OEM in terms of being *"where Autonomy's IDOL is embedded inside other software companies' products…addressing most software vertical markets"*. However, it being common ground that the scope of IDOL OEM was intended to be constant over the entire Relevant Period, it seems to me that the Claimants were entitled to rely on the description as applicable across the Relevant Period; and, in any event, HP was entitled to rely on the way IDOL OEM was described in Autonomy's published information in the Annual Report for 2010.

3058.  In summary, the Claimants' case was that the reasonable reader of Autonomy's published information (including the reasonable reader who had only read the

annual report for 2010 and the quarterly reports for Q1 2011 and Q2 2011) would have expected and the market would have understood:

(1) Most, if not all, of Autonomy's OEM business to be generated through transactions with large software companies.

(2) The revenues of that OEM business to come exclusively from development licences sold to such OEM partners and recurring payments due from those OEM partners to Autonomy by way of royalties in respect of their onward sales to third parties of software products with IDOL embedded under licence.

They would not have expected any material part of the revenue included in the OEM metric to be derived from sales to third parties, and would not have regarded the prospect of multiple sales to third parties involving sales effort and cost on the part of Autonomy as being the same as recurring revenue from an OEM partnership at no further cost to Autonomy and thus near 100% margin.

*The Defendants' response on the scope of IDOL OEM conveyed by the published information*

3059. As indicated in my summary of their case, the Defendants contended that (a) in standard parlance and in the market, it was not only companies in the business of developing their own software which could properly be regarded as OEMs: the category was not generally understood to be so limited and hardware companies could be OEMs as well; (b) the Claimants' approach rendered redundant the word "derived" and had given no or no sufficient content to the description of the OEM metric as expressly including all revenue derived from the OEM relationships, as well as revenues generated from an OEM directly.

3060. As to (a), the Defendants drew support from the evidence of Mr Daud Khan ("Mr Khan"): when cross-examined, he accepted that OEMs are not limited to software companies. They contended that there was no reason why OEM relationships with customers in hardware or other sectors would have been less attractive than software OEMs, and that the same rationale which commended OEM partnerships with other software companies would also apply to a partnership with large hardware companies. They reasoned that the important issue was the market penetration and low costs upsells that an initial sale of a licence to an OEM could achieve; and it mattered not in terms of that objective whether the OEM developed its own software, or was a manufacturer of hardware which embedded IDOL onto its hardware.

3061. Dr Lynch suggested that market penetration across a broad range of industries is in itself desirable. Dr Lynch said that he would be keen to publicise an OEM where "*someone was OEM-ing our software on to a piece of hardware*", or an OEM in the healthcare sector, since it would be a very positive thing to show Autonomy's involvement in broader sectors.

3062. The breadth of the expression "OEM" contended for by Dr Lynch is well illustrated by the example of the transaction with Tottenham Hotspur Football Club in March 2011 (OEM48). Tottenham Hotspur is obviously neither a software nor a hardware company. In cross-examination, it was put to Dr Lynch (in effect) that a football club could surely not reasonably be considered to be an OEM, with an expectation of embedding the Autonomy software it acquired and then onward licencing the product to its own customers. Dr Lynch responded that, on the contrary, Tottenham Hotspur might well decide to sell its website solution on to another football club and it would thereby be an OEM, and the revenues would be OEM derived revenue (see below).

3063. As to (b), the Defendants maintained that they had themselves coined the description of the revenues from the OEM business as *"OEM derived"* to make clear that the category was not confined to a transaction with an OEM yielding revenue from the OEM itself by way of upfront licence fee or royalty payments. This was a lynch-pin of their case. Accepting (as the Defendants did accept) that none of the phrases in contention was or is a term of art or has any established accountancy definition, in ordinary English usage the word *"derived"* connotes something received or obtained from a source or origin and it was apt to cover a wider category of revenues than merely those received from the OEM itself as an upfront payment or royalty: it could include revenue arising from sales of IDOL transactions made possible by, or for which the need arose in consequence of, the embedding and licensing of IDOL software further to the original OEM sale.

3064. According to the Defendants, that would obviously include sales of enhanced functionality (an *"upsell"*) to the OEM itself (which the Claimants accepted to be the case only if the OEM would embed that additional functionality into its software product for on-sale to its own customers); but it would include also the sale of enhanced functionality to an end-user which had come to use IDOL software and need or want that functionality as a result of purchasing from an OEM software with IDOL embedded in it (which the Claimants did not accept).

3065. Both the Defendants positively asserted this. Mr Hussain's pleaded case was to that effect. Dr Lynch's Re-Amended Defence and Counterclaim pleaded as follows in this regard:

> *"160.1. Given the nature of Autonomy's core IDOL software, third party OEMs frequently sought to embed Autonomy's technology in their own products through a variety of contractual arrangements. OEM customers would typically license a small subset of the many functions in IDOL – perhaps four or five of the 500 available – which could be further restricted by the permissible amount of data that could be used with the software.*
>
> *160.2. Following these sales, Autonomy would have the opportunity to "upsell" additional functionality or capacity either to the original OEM purchaser or directly to an entity that had purchased the product from an Autonomy OEM customer.*

> *Autonomy considered and accounted for any follow-on license-sale – whether to the original OEM customer or to an OEM customer's customer – as OEM-derived revenue, because the follow-on sale occurred as a consequence of the initial OEM sale.*
>
> …
>
> *161.4 When referring to transaction types falling within OEM-derived revenues, Autonomy's published information also made it clear that contracts and situations varied and did not purport to describe all transactions as holding identical characteristics. The OEM model and its characteristic of having derived revenues from follow-on licence sales or upsell transactions had been discussed extensively in analysts' reports since the earliest days of the OEM business and it was clear that the market knew and understood Autonomy's OEM model."*

3066.    Dr Lynch himself described it in cross-examination as follows:

> "*The metric that we give as a management metric which is OEM-derived includes that revenue but also includes revenue which has been made possible by our OEM programme, but that may – well, it does include sales where the purchaser is not an OEM.  So, for example, an upsell.*"

3067.    Thus, sales to OEMs with a view to IDOL software being embedded into and re-sold by that OEM as part of its own software of that type could, he suggested, conveniently be described as *"core"* OEM transactions, and the revenue derived from them as *"core OEM revenue"* to distinguish it from the wider category of OEM derived revenues discussed above. The wider category would extend to sales of further functionality to persons which had acquired the original IDOL software embedded in a bundle of software sold by an OEM: though not "core" sales generating core revenue in that sense, these were nevertheless sales parasitic on, made possible and in that sense "derived" from, the original core sale, and generated OEM-derived revenue accordingly.

3068.    To my mind the clearest explanation of the distinction between OEM and OEM-derived, and what the Defendants said they intended to be the considerably wider scope of the latter, was provided by Dr Lynch in the course of his cross-examination about a list of the ten largest OEMs which Autonomy provided to HP at Mr Sarin's request in the late stages of HP's due diligence exercise in August 2011. I must return later to the dispute about the *Top 10 list*, but I quote now and at some length from that cross-examination for the illumination it offers of Dr Lynch's case on OEM and OEM derived:

> "*Q.    We've been through this before. Mr Sarin asked you for total – the ten largest OEM.*
>
> *A.       OEMs, yes.*

> *Q.      No, I think what he asked you for was the top ten OEM customers by revenue?*
>
> *A.      That's right. So an OEM-derived contributor might not be an OEM customer.*
>
> *Q.       Well, with respect, it's still an OEM customer –*
>
> *A.      No, it's not. An OEM customer is someone who takes our software and builds it into their product, and there is – and then they sell that to other people, and that is an OEM. Okay? And our OEM business is about those OEMs. The metric that we give as a management metric which is OEM-derived includes that revenue but also includes revenue which has been made possible by our OEM programme, but that may – well, it does include sales where the purchaser is not an OEM. So, for example, an upsell. So, just to go through this, for the sake of argument, Oracle sells something to Ford, we'll get revenue from Oracle because they are an OEM, and then, if Ford buys something to clip on to that piece of Oracle which uses…the connection to Oracle [quaere Autonomy], then that is a sale that has been enabled and driven by that network effect that we were talking about and that is an OEM-derived sale. But the sale to Oracle is a core OEM deal, the sale to Ford contributed to derived, but Ford is not an OEM.*
> *…*
> *I don't think there's any dispute between us that, if you sell an upsell to Ford, then Ford is not an OEM, yet that still goes into OEM-derived."*

3069.   The Defendants contended that there was nothing in the published information sufficient to displace the broader meaning which they said was intended by the word *"derived"*. They submitted that the Claimants had based their narrow definition of the term from a selective reading of certain parts of the published information, whereas in fact no such definition could fairly be spelt out of the metric as described in the published information.

3070.   They added that the express warning that the figures were provided as background information and might include *"qualitative estimates"* reflected the fact and connoted that the category was descriptive and not definitive, and that the inclusion of particular amounts within the category was a matter of judgment and estimation, rather than a rigid rule. Thus, for example, a judgement might be required and made as to whether the link between source and sale was sufficient to warrant the sale being categorised as derived from (and made possible or driven by) the original sale to an OEM.

3071.   The Defendants relied especially on the following:

(1) Throughout the Relevant Period up to and including Q3 2010, there was nothing in Autonomy's published information that stated in terms either (a) that Autonomy's OEMs were all software companies or (b) that the revenues within the OEM metric were restricted to payments direct from the OEM.

(2) The Business Review section in the 2009 Annual Report stated that "*As part of our comprehensive OEM Program, numerous world-leading software companies embed Autonomy's award-winning technology into their software solutions*" (emphasis added).  It did not purport to give an exclusive definition and nor did it say that the programme was restricted to such arrangements: on the contrary, it indicated that was only a part of the programme.

(3) The Claimants' suggestion that a comment in the Q2 2010 press release that "*IDOL further penetrates the entire spectrum of enterprise software applications*", and in the Q3 2010 press release that the growth in IDOL OEM revenues "*reflects a growing network effect as more software companies choose to design their products with Autonomy inside*" demonstrated that it was made clear that the idea that all the OEMs were software companies was an incorrect gloss. While these comments (correctly) highlighted the success of the OEM programme in the software sector, there was no suggestion that the only OEMs were software companies.

(4) The 2010 Annual Report retained the statement from the 2009 Annual Report that "*As part of our comprehensive OEM Program, numerous world-leading software companies embed Autonomy's award-winning technology into their software solutions.*" It also contained the following words, on which the Claimants placed particular reliance:

> "*IDOL OEM. IDOL OEM is where Autonomy's IDOL is embedded inside other software companies' products. IDOL is now embedded in most major software companies' products addressing most software vertical markets. This is a particularly important revenue stream as it generates ongoing business across the broadest product set possible, in addition to up-front development licences. In 2010 IDOL OEM revenue totalled $132 million, up 32% from 2009. 42 new agreements were signed during 2010 with 10 new agreements signed during Q4 2010,*
> *including deals with Nuance, HP and Vericept.*"

(5) But there was no suggestion in that extract that OEM revenues were limited to revenues received directly from the OEM.  On the contrary, this passage stressed the breadth of the business generated by the OEM programme: "*it generates ongoing business <u>across the broadest product</u>*

*set possible*". Nor did it purport to give a comprehensive definition of what is categorised as IDOL OEM revenue; at most, it is a general description, qualified by the words appearing above the passage quoted, that "*the trends are provided for background information and may include qualitative estimates.*" In any event, these words should not be read in isolation: given what was said five pages earlier ("*As part of our comprehensive OEM program*…"), the reader would understand that the embedding of IDOL in software companies' products did not represent the totality of Autonomy's OEM business.

(6) The Q1 and Q2 2011 press releases contained the passage saying that "*IDOL OEM is where Autonomy's IDOL is embedded inside other software companies' products*", but without the indication given in the Annual Reports that this was only a part of Autonomy's OEM business. However, readers interested in Autonomy would not have read the quarterly press releases alone: they would read them together with the fuller account in the Annual Reports.  In this case, HP read the 2010 Annual Report, and it would not have been led by the Q1 and Q2 2011 press releases into thinking that IDOL OEM revenues were more narrowly drawn than in the Annual Report.

3072. The Defendants contended also that the warnings about *"qualitative estimates"* would not have been necessary if the category was confined to "straight" OEM transactions: whereas there was obviously some measure of qualitative assessment or estimate in determining whether to include a later transaction as derived from the original transaction.

3073. The Defendants brought their points on the scope of OEM derived revenues and OEM Ongoing together in the submission that once it is understood that OEM derived revenues included sales direct to customers of OEMs, it is unsurprising that they included revenues from companies other than software companies: even if the OEM itself was in the software sector, its customers could well be operating in different fields.

3074. The Defendants relied on the same point in relation to sales where there was a restriction requiring the customer to use Autonomy software for internal purposes only: where a sale is made direct to an OEM's customer, that customer would be using the software for its own purposes, rather than acting as an OEM itself, so an "internal use" restriction would cause no problems.

3075. As to the Claimants' point that (a) the further breakdown of *OEM derived revenues* into the two sub-categories of *"OEM dev"* and *"OEM Ongoing"* which Autonomy provided in  Q1 2010, Q2 2010 and Q3 2010 appeared to allow no room for the inclusion of revenue from any other source (see paragraphs 3054 to 3055 above) and (b) Mr Hussain had adopted the same sub-categories as representing all such revenues, the Defendants' answer was to the effect that this depended on rigidly confining the description *"OEM Ongoing"* to royalties, and (for example) altogether excluding upsells and PODS, for which there was no warrant.  Again in the context of questions related to the *Top 10 List*, Dr Lynch

put the Defendants' position forcefully and clearly in cross-examination (the underlining is mine):

> "...what we did with our OEM business was we <u>created a definition which was well communicated to the market over a very long period</u>, at least ten years, on multiple occasions, and our numbers were done on that basis. Yes, there are some judgements in those numbers, and it was made clear that situations varied and that there were qualitative estimates. That was actually the wording in the annual report. You [the Claimants] have come up with a different definition of these terms and you've recalculated things on your own basis which bears no relation to our terms, and also, I would venture, bears no relation to the commercial reality of what was going on."

3076. The Defendants also submitted that the words *"OEM Ongoing"*, according to their definition, included not only royalties, but also revenues (a) made possible by the original OEM sale and (b) which could be expected to be ongoing from reliable repeat business. Their rationale was that OEM customers, having embedded Autonomy's software in their own products, were in practical terms tied in: they would be almost bound to renew their contracts and purchase updates and add-ons from Autonomy on a regular basis. Phrases such as *"multi-year committed annuity streams"* (as used in Autonomy's published information, see paragraph 3052(7) above) and Mr Hussain's references to *"ongoing royalties"* should be interpreted similarly, as extending to what Dr Lynch described in his first witness statement as *"follow-on sales…made possible by the initial OEM sale"*. Dr Lynch explained in cross-examination that even if not legally committed to renew, an OEM would in practical terms have to do so if its product had succeeded, because:

> "people don't make and launch software products that are going to be sold for a year. They're generally the lifetime of a software product, probably 10/15 years. So once an OEM puts our technology in, remember you have to reengineer the thing to take technology out usually, so it's a big job. So once you're in, you're in a situation that you're going to make money out of that situation for multiple years."

3077. Dr Lynch went on:

> "Autonomy's OEM business generated substantial ongoing revenue. Once the technology was incorporated in a product, the product was likely to continue being shipped and a renewal was likely to be generated at the end of the original licence. It was not uncommon for an OEM customer to enter into six renewal contracts with Autonomy. For example, EMC entered into a sixth amendment to its OEM Agreement with Autonomy in 2010."

3078.   The Defendants concluding in their written closing submissions that:

> *"Far from limiting the scope of the revenues derived from the OEM
> set, this phrase emphasised the breadth of those revenues. The OEM
> business model was a way of generating on-going revenues as it tied in
> OEMs and required them to continue doing business with Autonomy.
> Ongoing business need not necessarily be recurrent royalties. As well
> as royalties, periodic renewals and ad hoc upsells derived from the
> original OEM relationship provide a revenue stream from ongoing
> business."*

3079.   In summary, the Defendants' case was that:

(1)   There was nothing in the wording of the published information denoting
that Autonomy's OEM business and its OEM partnerships were
exclusively with software companies.

(2)   Nor was there anything in that wording sufficient to displace the
meaning of "OEM derived": on the contrary, the introduction of the
prefix "derived" was intended to denote the inclusion of any revenue
judged to have been made possible by an initial OEM sale: they had
cultivated that meaning in the market, and by Q4 2010 it had become
notorious that OEM business included "OEM derived".

(3)   The rationale of OEM derived revenue applied whether the OEM was a
software or a hardware company.

(4)   Repeat sales to third parties who had been sold a product embedded with
IDOL and thus became not only aware of Autonomy and its software
offering but often dependent on Autonomy for any enhancements or
functionality needs were both referable to the original sale of a licence
to the OEM in question and likely to lead to repeat or recurring sales;

(5)   The revenue stream from upsells and PODS to end-users could be
expected to endure and increase, as could repeat purchases by OEMs
who, having embedded IDOL would almost inevitably require upgrades,
add-ons and renewal or extension of licences; and prospective revenue
from all that business was properly regarded as offering similar added
commercial value as repeat revenue even if it was not automatically
recurring like a royalty.

3080.   Dr Lynch had to accept, however, that in not a single one of the Quarterly
Reports, Annual Reports or even Earnings Calls in the Relevant Period was there
anything expressed which either (a) distinguished between "straight" or "core"
OEM (or just OEM) and "OEM-derived" sales or (b) referred to the word
*"upsell"* or the expression *"PODS"*. Although Dr Lynch insisted nevertheless
that by that time the extended scope of the transactions and revenues categorised
as  OEM sales and revenues had become common knowledge in the investment

community and the market, he had to resort to the evidence from analysts reports and explanations said to have been given to a section of the market[337] which I have determined do not establish any market understanding to be taken into account in determining the meaning which reasonable readers would have attributed to the published information.

3081. I turn to my assessment of the competing arguments as to that meaning.

*My assessment of what was conveyed by the published information itself*

3082. I have already noted that the Claimants acknowledged (and I think this was accepted by the Defendants) that neither *"OEM"* nor *"OEM derived revenue"* were expressions with any settled or standard meaning: both were capable of different meanings, and the latter was, of course, self-coined. Subject to the issue as to some cultivated general understanding in the market (which I address further later), an understanding as to the

scope of Autonomy's OEM business and the nature of the revenues it generated had to be formed from what Autonomy said about them in its published information.

3083. The Defendants' contention that the introduction of the prefix *"derived"* clearly signalled a widening of the scope of business allocated to the OEM metric beyond the ordinary scope of OEM business, and that transactions and revenues which might not have constituted "core" OEM business and revenue nevertheless were counted as being part of that OEM metric, supposed that the market would have recognised some extension from a usual meaning: but there was no usual meaning, and readers were left to cull the meaning from Autonomy's published information read carefully in context. Put another way, the notion of an "expanded" meaning going beyond the ordinary assumes an established ordinary meaning; here there was none and a reader would not have been alerted to a broader than usual scope of business, because there was no "usual" scope of business.

3084. I consider that what must be assessed at this first stage is what impression was given in the published information of the nature and scope of Autonomy's OEM business and revenues in the relevant statements, taking into account that the statements usually included warnings about qualitative estimates. It is in a sense in the nature of a jury question rather than one of legal definition.[338]

---

[337] *"Upsells and PODS were discussed frequently between 2002 and 2009, multiple times, and not only was it done on earnings calls, but it was in analysts reports, communications with fund managers and analysts and their writings as well."*

[338] However, it would be permissible to answer that the impression given is equivocal, or to use the more familiar word, ambiguous: so that if the statement were true by reference to any of the meanings,

3085. In my view, the reasonable reader would have read the published information starting from the premise (expressly stated in the annual and each quarterly report in 2010 and in Q1 and Q2 2011) that OEM business generated *"a particularly important revenue stream"* and had special characteristics which materially distinguished it from other lines of Autonomy's business. In identifying those special characteristics, the careful reader would have particularly noted:

(1) The references to the OEMs as *"other major software vendors"* or as being within *"the software sector"*, the emphasis placed on the number and standing of the 400 software companies with whom Autonomy had established software partnerships, and the references to OEM partners *"leveraging Autonomy's award-winning technology into their software solutions"* and to IDOL being embedded in *"other software companies' products"*;

(2) Dr Lynch's own special commendation of the OEM business in his review in the 2010 Annual Report as being based on partnerships with *"numerous worldleading software companies [which] embed Autonomy's award-winning technology into their software solutions"* which were *"highly attractive to us as they turn one-off sales into multi-year committed annuity streams"*;

(3) There was no mention of revenue from OEM business other than from development licence fees and royalty payments, no room allowed in the Supplemental metrics for any different source of revenue, and no mention either

of what the Defendants now present as having been a major source of revenue, namely upsells and PODS.

3086. I cannot accept the Defendants' submissions that the published information, without reference to what they insisted was general market understanding, depicted OEM business in terms which allowed for a broader category of revenues than from development licence fees and royalty payments by OEMs to Autonomy. I do not accept that what the Defendants referred to as *"the narrow categories"* put forward by the Claimants were simply pulled together from *"various snippets from the Annual Reports and the quarterly press releases and earnings calls to come up with an unsustainably restrictive definition"* (as the Defendants suggested they were).

3087. I do not accept the Defendants' alternative submission that the presentation was ambiguous. The attraction offered was clearly depicted: a growing line of

that would conclude the matter against the Claimants, unless in fact the Defendants intended a meaning which would make the statement untrue.

business generating, at little or no expense to Autonomy and thus a near 100% margin, recurring royalties from large 'captive' partners using their size, reputation and market presence to sell products with IDOL embedded under licence, as the Claimants submitted.

3088. In any event, I cannot accept that a reasonable reader would have understood from Autonomy's published information that a substantial proportion of revenue categorised as OEM derived revenue included (a) revenues from one-off licences sales for the purchaser's internal use only or (b) revenue from VAR sales.

3089. In my judgment, taking the published information as a whole, but without regard to anything said at Earnings Calls or any views expressed by Analysts, the impression conveyed by Autonomy's published information was that:

> (1) Substantially all Autonomy's OEM relationships were with software companies, and in value terms most were with the 400 or so software companies expressly referred to.

> (2) Substantially all revenue was derived from OEMs in the form of (a) development licence sales proceeds and (b) royalties paid by the OEM to Autonomy.

3090. Further, in my judgment, the same impression would have been given to a reader who read only the 2010 quarterly reports and the 2010 annual report and the quarterly reports for Q1 2011 and Q2 2011.

*Should regard be had to evidence that various Analysts considered the market understood OEM Metric to be broad in scope?*

3091. In further or alternative support of their submission that the expression was known to have extended the scope of OEM business, however, the Defendants contended that the OEM metric and the disputed expressions ("*OEM*" and "*OEM derived revenues*") were (as the Defendants submitted) to be understood by reference to what the Defendants described as *"the understandings that had built up in the market over time as a result of explanations given by Autonomy".* They sought to rely in this regard on evidence of the views of various Analysts who covered Autonomy and wrote advisory notes on its business and prospects for the benefit of their clients.

3092. This evidence was disputed, both as to its relevance and as to its message. The principal focus was on (a) the evidence of two analysts, Mr Khan (two of whose analyst notes, one in 2002 and the other in 2004 were relied on also), and Mr Morland; (b) the evidence of one of Autonomy's corporate brokers, Mr Shelley, and the evidence of the manager of a hedge fund that invested in Autonomy, Mr Pearson; and on (c) what the Defendants sought to dismiss as *"a small selection of analyst notes"* especially identified by the Claimants.

3093. The Claimants also objected to Dr Lynch's attempt to rely upon what he argued was the market understanding concerning IDOL OEM on the broader basis that

(a) it resembled expert evidence of some general market approach and understanding; but it was not adduced and could not be relied on as such; (b) such evidence could in any event lead nowhere, since *"the possibility that an analyst or investor might have been privy to additional information, not found in the published information, is neither here nor there"*. On that basis, the Claimants dismissed Dr Lynch's recourse to what he argued was the market understanding as a *"red herring"*.

3094.  I accept the Claimants' broader objection in substantial part. I would add by way of both explanation and gloss that in my view:

(1) As emphasised previously, the question in this case is not one of contractual interpretation: nevertheless, at this first stage of identifying what the disputed statements would have been taken to mean by the reasonable reader, the principles established in the context of contractual interpretation provide a guide more generally in any context of linguistic analysis. The fact that the statement is unilateral does not alter that: see *Kyle Bay Limited t/a Astons Nightclub v Underwriters subscribing under Policy No. [019057/08/01]* [2007] EWCA Civ 57 at [31] citing *Mannai Investment Co Ltd v Eagle Star Assurance Ltd* [1997] AC 749 as putting to rest any doubt in that regard.

(2) It is well established that (even in the absence of apparent ambiguity) words must always be read in context to ascertain their intended meaning, and their context includes (in the oft-quoted words of Lord Hoffmann in *Investors Compensation Scheme v West Bromwich Building Society* [1998] 1 WLR 896):

> *"absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man"*

However, this is subject to the requirement that it should have been *"reasonably available to the parties"* and to the exclusion for the purpose of establishing objective intention of evidence of negotiations and declarations or other evidence of subjective intentions.

(3) That said, the concept of what is *"reasonably available to the parties"* must be kept within sensible limits, especially where the words spoken are addressed not as between the parties, but are published generally to a mixed audience, as in the context of published information. In such a context, if words are to be given a special "private dictionary" meaning the special private dictionary must be shown to have been available to all those to whom the words were addressed.

(4) In the context of words published generally, as by (inexact) analogy with words in a standard form contract, resort to background information or knowledge should be sparing, and probably only used where it is clearly

established that it was shared generally within the market or audience to which it was addressed. At this first stage, the search is for a meaning that would have been generally ascribed to the disputed statement(s), if one can be identified.

(5) Proof of a generally accepted market dictionary or understanding is difficult. It will ordinarily require expert evidence. Such proof is not supplied by evidence that the Defendants vouchsafed to particular persons a key to understanding not provided to the market as a whole: for example, in Earnings Calls which I have determined do not constitute published information.

(6) Similarly, evidence (such as was relied on by the Defendants in this case, as elaborated later) from particular analysts of what they themselves understood, or considered to be understood in the market more generally, will only carry weight if it is accepted as a reliable proxy for the market as a whole. I agree with the Claimants that the evidence of what analysts thought is not expert evidence and was not adduced as such. Unless I were to accept the evidence of what the analysts told me as a reliable proxy for the views of the market, I do not think it would rise above evidence of a particular point of view, possibly informed by essentially non-public information. Analysts' notes and views may inform, but they do not demonstrate or represent, a general investor outlook.

(7) Proof that a significant body of analysts or others in the market or audience held a different view of the meaning of the statements made will obviously tell against any assertion of general market understanding; and especially strongly so where (as arguably again in this case) market understanding is being used to establish a private dictionary meaning inconsistent with what the words otherwise appear to connote.

3095. I do not accept that the evidence of the views of various analysts relied on by the Defendants provides a reliable proxy, not least because of the contrary evidence (analyst notes) which the Claimants also sought to rely on. I am not persuaded that there was reliable evidence on which the Defendants could rely to establish an understanding shared by those to whom the published information was addressed of a different or modified meaning of the disputed expressions in that published information relating to the OEM metric.

3096. It follows from this conclusion that, in my view, I should assess what the published information conveyed to its audience about the OEM business and the OEM metric without regard, at the first 'objective' stage, to evidence of the market understanding alleged by the Defendants (though that does not exclude the possibility of a mixed or ambiguous message and does not mean that the evidence of market analysts is irrelevant, since it may be relevant at the second

stage of assessing what, subjectively, the Defendants themselves intended to convey).

3097. However, lest I am wrong in my conclusion that there was no reliable evidence of a general accepted market understanding,  I turn to address in more detail the Analyst evidence and any further evidence in relation to the Defendants' case that (a) the Claimants had adopted an excessively restricted and self-serving approach and had failed to take into account that (b) Autonomy had cultivated over the course of time an appreciation and understanding in the market of the phrase "OEM derived" (and cognate expressions) and that (c) it had become accepted and notorious that the OEM metric extended to business generated by reference to an original OEM sale.

*Analyst/other evidence and market understanding*

3098. The Defendants' case that the Claimants' restrictive definition  of IDOL OEM revenues (limiting them to revenues from sales of software to companies (i) whose businesses included licensing that software to third parties and (ii) who had the intention and capability of embedding IDOL software into their own software products for onward licensing to those third parties) was inconsistent with the evidence of two of the Claimants' own witnesses, Mr Daud Khan ("Mr Khan") and Mr Paul Morland ("Mr Morland"), who had covered the company on-and-off for many years, and with *"the understanding that had built up in the market over time as a result of explanations given by Autonomy."* The Defendants relied also on the evidence of their own witnesses, Mr Pearson and Mr Shelley.

3099. The Claimants' submissions engaged at some length with the content of analyst reports, including in a detailed Appendix devoted to "*Evidence concerning market understanding",* in support of their case that, if relevant, what in fact the analyst notes showed was a widespread understanding that the analyst community in general understood the OEMs involved to be software companies embedding IDOL technology in their own software products and IDOL OEM revenues to consist entirely of development fees and ongoing royalties.

3100. To determine this aspect of the dispute I address the evidence of Messrs Khan, Morland, Pearson and Shelley in turn, before turning to the evidence of other analysts relied on by the Claimants.

*Mr Khan*

3101. Mr Khan said that he understood the term "OEM" as used by Autonomy in its published information by reference to:

> *"the standard use of the word and the commentary they provided around their use of the word."*

3102. Mr Khan had covered Autonomy intermittently since 2001 (first for Merrill Lynch and then, after 2006, for Cazenove) and had become a "negative analyst"

in the sense that (a) as he accepted, from January 2008 onwards, he consistently recommended selling Autonomy stock and (b) many, if not most, of his clients had short positions in Autonomy stock.

3103. In his witness statement, he stated that it was not his *"understanding of the substance of IDOL OEM revenue"* that it included revenues derived from direct sales to customers of OEM customers. However, he accepted that he recollected having been told:

> *"by someone from Autonomy management mentioning, I believe off-line, after an earnings call, that OEM revenues included direct sales to customers that had purchased software from an Autonomy customer"* and

> *"assumed that such a sale would be related to the original OEM purchase, allowing the customer to increase the functionality of the embedded software."*

3104. He reconciled what otherwise might appear to be inconsistent positions by explaining that:

(a) *"given the focus of the published disclosure on sales to software companies, a royalty model and recurring revenue, making no mention of the inclusion of sales to the customers of OEM customers, I assumed that this was a minor part of Autonomy's overall revenues"*; and further that he

(b) *"did not believe that the inclusion of such revenues was common knowledge amongst analysts. It was not a standard interpretation of OEM"*; and he added that

(c) *"If such sales had been material, this would have been significant from a valuation perspective as they would have involved costs that would not arise in a royalty model, and hence would not command as high a valuation in the same way as OEM revenue…"*[339]

3105. When cross-examined, he largely reiterated this evidence but introduced the refinement that he thought there were *"probably two definitions of upsell"*, one an upsell to the OEM customer and the other an upsell directly from Autonomy to the OEM customer's customer to add functionality to IDOL acquired as part of software purchased from an OEM. He explained that the latter was the species of upsell he had not understood before the "off-line" conversation and had considered not to be a material part of the OEM business. The former was the sense he may have had in mind when describing upsell fees as one of three types of revenue from OEMs in a note dated 26 April 2002 which he had written on

---

[339] Mr Khan and Mr Morland agreed that IDOL OEM revenue commanded a higher market valuation than other revenue streams by virtue of its predominantly recurring nature. Mr Shelley and Mr Pearson concurred.

Autonomy when at Merrill Lynch (though he did not mention it in his witness statement).

3106.   It was not clear whether he had this in mind also in a second analyst note he had written for Clear Capital Markets [340] in January 2004, which he had not mentioned in his witness statement either, and which included the following passage suggestive that whatever upsells were:

> "What we have seen is that up-sell OEM revenues have started to be a significant contributor albeit as volatile as royalties or up-front payments."

3107.   This was, again, a little at odds with his witness statement, in which he stated that he had:

> "... assumed that this was a minor part of Autonomy's overall OEM revenues...If such sales had been material, this would have been significant from a valuation perspective as they would have involved costs which would not arise in a royalty model, and hence would not command as high a valuation in the same way as OEM revenue..."

3108.   He also stated that he did not believe that "the inclusion of such revenues was common knowledge amongst analysts. It was not a standard interpretation of OEM." Mr Khan agreed, however, that deciding whether or not a particular contract should be categorised as upsell would be a matter of judgment.

3109.   When cross-examined, Mr Khan sought to explain inconsistencies between what he had written in his notes for Merrill Lynch and Clear Capital (and also a note for Cazenove) and his evidence in his witness statement as lapses in memory; but in a passage of his cross-examination which seemed to me to cast some doubt on the status of his evidence in his witness statement, and some concern as to the way it had been assembled, he also accepted that:

> "My witness statement was drafted by the claimants' lawyers using my testimony from the US and then we had dialogue around the various paragraphs which I then authored and asked for changes."

3110.   Mr Khan could not recall whether he knew that PODS were also included in OEM revenue ("I honestly can't remember. Maybe they were"). He was referred to an earnings call in Q4 2002 in the course of which, in response to a question about the contribution of the "PODS technology" to sales, Dr Lynch had estimated that it was then running at around $2 million a quarter, noting also that it was a "different route to market" and a useful way of getting IDOL into the relevant organisation, and Mr Hussain had added that "...in terms of the POD sales in Q4, it's included within the $1.5m of up sells for the OEMs". These

---

[340] A UK based stockbroker and wealth manager

references did not trigger any recollection: and Mr Khan made the point that this was more than 17 years ago.

*Mr Morland*

3111. Mr Morland's evidence in cross-examination was that the market understood that both PODS and upsells were included in Autonomy's OEM revenues:

> "Q.  *Let's quickly deal with OEM. Autonomy reported its OEM revenues using a number of different terms over the years: OEM, OEM-derived, IDOL OEM-derived, IDOL OEM. You understood them to mean the same thing, didn't you?  A.  Yes.*
>
> Q.  *And the market understood that OEM-derived included pods and upsells didn't it?*
>
> A.      *Yes."*

3112. However, in re-examination, Mr Morland qualified this by saying that:

> *"at the time I was unfamiliar with the term 'pod' but I understood it was to do with connectors and so I understood an upsell to be a sale of an additional connector to the OEM partner at the time. I never really understood it…I wasn't familiar with the term 'pod' at the time."*

3113. The Claimants pointed out that the difficulty with the question to Mr Morland in crossexamination was that the expression "upsell" is ambiguous: some take it to include only sales of additional licence or functionality to an OEM, some take it to extend to sales to an end-user. I agree with the Claimants that Mr Morland appears to have assumed the limited meaning; and he was simply unclear what PODS were.

3114. More generally, Mr Morland's evidence was rather unclear. The impression I formed overall was that he regarded the OEM metric in much the same way as Mr Khan, and would have expected it to be substantially comprised of revenue derived from sales to OEMs for embedding and onward sale.

*Mr Pearson*

3115. Mr Pearson was one of the witnesses called by Dr Lynch. His evidence was that the category was understood differently by different investors. In his witness statement he stated that:

> *"To my knowledge, there was no 'standard interpretation' of OEM-derived revenue at the time…The definition varied company to company. Therefore, I knew that a company's OEM-derived revenue figure could have a range of revenue streams included in it, such as licences, royalties, and upsells. Quite clearly, Autonomy's OEM revenue included*

> *both recurring and non-recurring revenue streams, as was stated by*
> *Autonomy in multiple conference calls from 2002 – 2004…"*

3116.  The results presentation for Q1 2008 similarly noted that *"OEM breakdown*
*includes some licence and is almost all IDOL".* The Defendants appeared to latch
on to this as denoting that the scope and nature of OEM derived revenues was as
they had suggested, and thus included non-recurring revenue; and they
emphasised Mr Pearson's evidence in cross-examination that this was a point
that had been well understood in the market for some time. But this was, to my
mind, a misunderstanding or mistaken assertion: all that the presentation seems
to me to have signified was that OEM business generated revenue from the sale
of development licences to OEMs (*"OEM Dev"*) as well as recurring payments
from OEMs for onward sales of products with IDOL embedded (*"OEM*
*Ongoing"*). That was of course well known and plainly stated to the market: but
that is of no assistance in the present context of considering how *"OEM*
*Ongoing"* and thus *"OEM derived"* were constituted.

3117.  Mr Pearson's own assertion that he *"knew"* from the fact that the term was not
defined and had different meanings *"company to company"* that therefore the
*"OEM-derived revenue figure"* could include upsells was either a *non-sequitur,*
or simply a general statement as to the potential, but not necessarily the actual,
meaning of the term. Either way, it was of little assistance; and Mr Pearson also
had difficulty in pointing to any support for including upsells in any published
information or recorded commentary after 2004.

3118.  The only post-2004 analyst research note which Mr Pearson was able to pray in
aid (when drawn to his attention in re-examination) was one dated 6 January
2010 and written by Mr Briest at UBS. That note did, in a table highlighting that
implied growth in *"royalty/upsell sales" "might be more like 50-60%"* and a
chart tracking the acceleration in sign-up rates against an acceleration in what
were described as *"OEM upsell/royalties",* thus contain a reference to *"upsell"*
in the context of IDOL OEM revenue.  The same Note, in its analysis of *"The*
*OEM opportunity"*, also spoke of *"a high pedigree of software relationships*
*within its OEM list"* and identified the significance and value of OEM
relationships as being *"perhaps the best visible evidence of IDOL's*
*differentiation and competitive advantage"* and the high operating margin on all
such sales "*given the related R&D costs are absorbed in the core business and*
*the costs of sales will be relatively modest for incremental royalty streams."*

3119.  However, nothing in the Note, as I read it, demonstrated an understanding that
upsells to customers of the OEM partner were also included and I agree with the
Claimants that the references to upsells were to sales of additional software or
functionality to the OEM partner itself: the presentation being of upsell revenues
having a similar nature and the same source as royalties. On that reading, Mr
Briest's Note does not take the matter further for the Defendants, and tended
rather to support the Claimants' case both as to OEMs typically, perhaps
invariably, being software companies and as to there not being included in OEM
derived revenues revenue from dealings with a third-party customer.

3120. The Claimants also noted that the 6 January Note was the last report written by Mr Briest that mentioned upsells. In subsequent notes, Mr Briest only mentioned development fees and ongoing royalties.

3121. In any event, I accept the Claimants' contention that the value of Mr Pearson's evidence was diminished by (a) his claim, which he had to draw back from in cross-examination, that by 2009 the OEM category had become relatively less valuable because IDOL was by then so well known to and well regarded in the market that the market penetration offered by OEM sales was no longer of the value it had previously had; (b) his difficulty in pointing to any specific examples of explanations by Autonomy, after 2004, that justified the conclusion that the category included revenue from direct sales to endusers; as well as (c) his continuing close connection with Mr Hussain and his continuing investment in Dr Lynch's business interests, which may explain a somewhat partisan approach considered that the market also understood that OEM included some licence revenues.

*Mr Shelley*

3122. Mr Shelley (who, like Mr Pearson, was called as a witness by Dr Lynch, but who is not relied on or even referred to at all in the Defendants' closing submissions, as the Claimants noted with some glee) gave evidence in his witness statement that he did:

> *"not recall there being a discussion between Autonomy and the analyst community regarding the composition of reported OEM sales. If this had been an area of interest for analysts and investors, I would have raised the issue with Autonomy."*

3123. This was difficult to square with his own requests, of which he was reminded in crossexamination, for a breakdown of the composition of reported IDOL OEM, and in particular, what the split was between new deals and royalties from previous deals. Autonomy's response further indicated a perception that it was understood that those were indeed (substantially at least) the constituent revenue sources. Mr Kanter responded to Mr Shelley as follows:

> *"A very small proportion of OEM revenue relates to upfront development fees for new transactions, typically $200k per transaction. Royalties for OEM contracts vary, depending on what IDOL functionality is being used by the OEM. Four percent is an example of a typical OEM, and are reported on gross sales of the OEM's product. Royalties are normally paid quarterly in arrears."*

3124. The same emerged from further exploration with Mr Shelley in the course of his crossexamination, of various documents, including a variety of analysts' notes with a view to showing that in fact analysts were clear as to the substantial composition of OEM revenue, and there was no sign in any of them of it being contemplated that it might include a substantial proportion of non-royalty one-off sales to end-users.

3125. He was taken to a draft of the Q4 2010 Quarterly Report containing his comments as well as those of  a colleague of his at Goldman Sachs (just after Mr Shelley had moved there in late 2010). The draft Report noted that IDOL OEM revenues:

> *"comprise two elements: up-front development licences as third party software vendors develop new products built on IDOL; royalty payments earned from sales of those products when they come to market…".*

3126. He was then also taken to a note published by Credit Suisse on 18 March 2010 entitled *"The Autonomy OEM Opportunity".*  In addition to describing the OEM partnerships as being with *"software vendors"*, the Credit Suisse Note explained OEM derived revenues as being comprised of development licence fees and *"royalties paid to Autonomy for ongoing sales made by OEMs once they are up and running"* as Mr Shelley had to accept (and see further as to this note, paragraph 3129(1) below).

3127. The following exchange during Mr Shelley's cross-examination seemed to me to confirm his acceptance that, more generally, the high margins attributed to OEM revenues, were characteristic of, and only really explained if OEM ongoing was largely, even if not exclusively, comprised of, royalty payments rather than one-off direct sales:

> *"Q. So when Credit Suisse is talking about gross margins of over 95% and operating margins of around 75%, they're talking about margins on royalty payments, not direct sales by Autonomy, aren't they?*
>
> *A. It would appear so, yes.*
>
> *Q. So the understanding that Autonomy's reported ongoing OEM payments are royalty payments, which we've seen is an understanding they had, rather than revenues on direct sales, that is critical to Credit Suisse's valuation of the OEM business in this note isn't it? A. It would appear so, yes.*
> *…*
>
> *Q. The exercise here is based on the understanding that the OEM ongoing revenues are royalty revenues, isn't it?*
>
> *A. Yes, that's right."*

*Assessment of that evidence and comparison with analysts notes relied on by the Claimants*

3128. Looked at in the round, I consider that this evidence suggests that it was recognised by some analysts that Autonomy might have some leeway in terms of including revenue generated by sales to an end-user even if (as would be usual) they were one-off sales for which the opportunity was provided by the

embedding of IDOL in software licensed to that end-user by an OEM: but it does not signify any appreciation in the market that revenue of that sort would represent any material part of the total IDOL OEM revenue. Nor, to my mind, does it establish any general market understanding that the prefix 'derived' materially increased the scope of the OEM classification.

3129.   The impression that the market continued to regard the OEM metric as substantially confined to licence and royalty-type payments is confirmed by evidence of the understanding of other analysts relied on by the Claimants. The Claimants relied on the following:

(1)   A detailed 17-page note about Autonomy's OEM business issued by Credit Suisse on 18 March 2010, entitled "*The Autonomy OEM Opportunity*", and authored by Mr Frederick Grieb ("Mr Grieb")[341]. The note recorded Mr Grieb's understanding of the meaning of "*OEM Dev*" and "*OEM Ongoing*":

"**OEM Development**: *OEM Development fees are the upfront fees of $200k that are paid to Autonomy, upfront, upon the signing of an OEM agreement.*

**OEM Ongoing**: *These are the royalties paid to Autonomy for ongoing sales made by OEMs once they are up and running.*"

There was no mention of upsell or PODS sales anywhere in this note. The entirety of Autonomy's "*OEM derived revenues*" appears to have been understood by Credit Suisse, a sophisticated evaluator of Autonomy's published information, to be made up of development fees and ongoing royalties from licence sales by an OEM of products in which Autonomy software was embedded under licence from Autonomy.[342]

(2)   A Morgan Stanley analyst note dated 30 June 2008 describing Autonomy's OEM business as essentially comprising "*an upfront fee and then a 3% royalty on its product sales that embed IDOL on a going forward basis*";

(3)   A Nataxis analyst note dated 11 March 2011 describing OEM revenues as comprised of (a) a non-refundable upfront fee and (b) royalties on the sale of the software;

---

[341] As well as Chandramouli Sriraman.

[342] Indeed, when analysing why IDOL OEM revenues were a "*high-growth, high margin opportunity*", Credit Suisse referred only to the "*initial $200,000 fee to begin work with Autonomy*", and the "*~3% of OEM license revenues as a royalty payment on average*". Credit Suisse's analysis of Autonomy's historic IDOL OEM revenues, and its projection of Autonomy's future OEM revenues, was broken down entirely into these "*OEM Development*" and "*OEM Ongoing*" categories.

(4) A Nomura analyst note dated 22 April 2010 (by an analyst also regarded by Autonomy as "sound" according to the assessment referred to in paragraph
3130(1) below) breaking down all reported IDOL OEM revenue into *"OEM Dev"* and *"OEM Ongoing"* and describing the latter as *"royalties"*;

(5) An initiating note[343] by Standard & Poor's ("S&P") dated 27 August 2010 to the same effect;

(6) A Societe Generale ("Soc Gen") initiating note dated 23 March 2010 (by an analyst described by Autonomy as a "drifter") stating that *"OEM sales are extremely profitable as they carry a 100% gross margin"* which Mr Shelley accepted suggests that Soc Gen shared Credit Suisse's understanding since such high gross margins are consistent with royalty payments, and not direct sales by Autonomy.

3130. In short, these analyst notes suggest that a number of influential market analysts understood from what they were being told that Autonomy's OEM business was confined to what Dr Lynch described later as "Core" OEM. Dr Lynch was notably discomfited by the Credit Suisse note[344], and offered uncharacteristic bluster when confronted with it:

(1) It was first suggested to Dr Lynch that Credit Suisse did not understand that upsells were included in reported OEM revenue, and he responded that he would be "*very surprised*" if Credit Suisse had got this wrong. Having then been shown that Credit Suisse's understanding did not support his case, Dr Lynch then said that he did not know who Mr Grieb was: "*obviously Credit*
*Suisse didn't understand it, whoever this person is*" and queried whether he (Mr Grieb) had actually been *"present in the calls where this was all explained"*. Yet Mr Grieb was an analyst who was both known to, and well regarded by, Autonomy's executive management and investor relations team. Indeed, Mr Grieb was an analyst considered by Autonomy or its advisers to be "*Sound*" (as opposed to "*Corrupt*", or "*Feeble-minded*" or a "*Drifter*").[345]

(2) Dr Lynch then sought to paint Credit Suisse as an exception in not knowing about the inclusion of upsell and PODS revenue. He went so far as to tell me

---

[343] That is to say, that firm's first note on Autonomy.

[344] In which it may be noted that Mr Grieb described OEM business as being where *"Autonomy allows software vendors to use the company's IDOL technology via OEM agreements"*

[345] This was the view expressed in the slide-deck sent by Mr Brown to Dr Lynch and Mr Hussain on 3 December 2010. Furthermore, the Claimants contended that contrary to the impression given by Dr Lynch in cross-examination, Dr Lynch knew *"perfectly well"* who Mr Grieb was, having met him in September 2010 at a meeting in Autonomy's Piccadilly offices.

that *"everyone knew, with the possible exception of the one analyst"* (Mr Grieb).

3131. The Defendants broadened this to submit that this evidence of other views suggested only that the primary focus of a *"a small number of analysts"* was on core OEM revenue: it did not establish that those analysts perceived the OEM metric to include no other revenues at all; and if they did, and if they took to be excluded from the OEM metric any revenue which was not recurring, and all upsells (even of additional functionality to an OEM customer) it was altogether more restrictive than even the Claimants had put forward. As mentioned above, even the Claimants came to accept that "upsells" did at least include sales of:

> *"additional functionality to the original OEM purchaser…provided the revenues arose from licences that permitted the licensee to embed additional IDOL software in the OEM's own software product for onward licensing to the OEM's customers."*

3132. However, I do not think it ultimately assists the Defendants on this aspect of the case. What these notes suggest to me is that the focus of a not insignificant number of analysts from well-regarded firms, and (I take it) of their readership and addressees as a whole, was on the particular value to be ascribed to (a) the typically recurring nature of IDOL OEM revenues (b) the especially low cost and high margins of sales effected through an OEM and (c) the prospect of ever greater penetration into the unstructured data market, bringing the potential for IDOL increasingly to become the solution of choice embedded within a broader software package sold by large OEMs with a corresponding presence and reputation in the market. Revenue which did not have any of those characteristics or qualities, and could only be distinguished from IDOL Product revenue by reference to some antecedent sale to an OEM, would not have been anticipated to form any substantial part of the revenues included in the OEM metric.

3133. It seems to me to be clear from the analyst notes collated by the Claimants that many analysts, and it is to be inferred, many addressees, would not have expected revenues from one-off sales, or sales direct to an end-user rather than an OEM, which generated no ongoing and recurring revenue stream, to represent any material proportion of the revenue comprised in the OEM metric. If they expected any such revenues at all, they would not have expected the amounts to be such as to upset the description of the OEM metric as predominantly, even if not exclusively, made up of a recurring royalty revenue stream derived from OEMs producing software themselves which embedded IDOL in that software and licensed the combined product to end-users.

3134. Indeed, on that basis, I am not persuaded that there was such a division of understanding between the analysts relied on by the Defendants and those relied on by the Claimants.

3135. In any event, I consider that it is possible to identify revenue which, having none of the qualities associated with OEM revenue, addressees of Autonomy's

published information and market analysts would <u>not</u> have expected to form any material part of the amounts included in the OEM metric. As to that:

(1) It seems to me that the touchstone for analysts and investors was that the revenue included in the (straight or core) OEM metric was derived from either development licences sold to an OEM (whether or not a software company) for the OEM to embed IDOL into its products for sale to an end-user, in which case they fell within the description *"OEM Dev"* or from royalty payments on revenues earned by the OEM on onward sale to an end-user, in which case they fell within the description *"OEM Ongoing"*.

(2) Revenue from sales which, but for an antecedent transaction between the purchaser and an OEM, was not in any other sense "OEM-derived", and which had none of the characteristics that made OEM revenues particularly valuable (their recurring nature, especially low costs and high margins and the market penetration amongst (to use a phrase which will place this judgment in its historical context in the time of Covid-19) "super-spreaders" of the software (as were the large OEMs)), would not have been considered by addressees to be any material part of the OEM/OEM-derived metric.

(3) In my view, these included upsells and PODS directly to end-users which cannot comfortably be described as "upsells" because (a) they were not sales to the same person as had originally purchased the goods for which additional functionality was required; (b) they were not sales of OEM products; (c) they did not give the purchaser any right to embed IDOL into products for onward sale; (d) they did not enhance the royalty rate or generate any new multi-year royalty stream (or in some cases an upfront payment in lieu of it); and (e) the costs of the sales were not absorbed by an OEM, so that the marginal profit was unlikely to be either recurring or different from ordinary IDOL Product sales.

(4) Likewise, revenue from sales of IDOL to OEMs which were not calculated to result in IDOL being embedded because the OEM was not a software company and/or because the license granted was restricted to the internal use of the IDOL software, and sales which were not structured and/or intended to generate a recurring royalty revenue stream (or in some cases, a lump sum in advance in lieu of it), also fell outside what I have found Autonomy presented in its published information and addressees understood the scope of the OEM metric to be.

(5) Sales of hardware, and other sales which were not of IDOL software, would not have been understood to be included in the IDOL OEM metric either: the fact that the purchaser had in some anterior transaction acquired an Autonomy product from an OEM, or was purchasing non-IDOL goods to supplement or add to the functionality of a previous

purchase of IDOL software embedded in an OEM product, would not, in my view, have been understood to fall within that metric.

(6) Another debated category was revenue from repeat renewals of development licenses. Dr Lynch insisted (quoting from his second witness statement) that *"Even OEMs that did not include ongoing royalties provided ongoing revenue streams, as it was extremely common for OEMs to be renewed."* He gave as an example that EMC renewed its OEM six times prior to HP's acquisition, and again even thereafter. I accept the commercial sense of this, which Dr Lynch explained clearly when cross-examined as follows:

> *"... people don't make and launch software products that are going to be sold for a year. They're generally the lifetime of a software product, probably 10/15 years. So once an OEM puts our technology in, remember you have to re-engineer the thing to take technology out usually, so it's a big job. So once you're in, you're in a situation that you're going to make money out of that situation for multiple years."*

(7) But whilst I accept the commercial logic, I am not persuaded that it is of much assistance to Dr Lynch. The renewal posited is with an OEM for continued embedding of Autonomy software yielding a royalty-like payment (or sometimes a payment in advance to cover the term, which Dr Lynch explained would be called an *"upfront royalty"*). In that event, the revenue upon renewal would either be recurrent or its equivalent upfront; but whilst any renewal might be likely it could not be said to be recurrent. Dr Lynch sought to rely in this context on the evidence of Mr Collet when it was put to him that the renewal would *"lead to recurrent revenues"*, to which Mr Collet replied *"It might lead to renewal upon the end of the agreement. If that is what you call recurring revenues."* But I did not understand Mr Collet to be indicating that that is what <u>he</u> would have called recurrent revenues; and I have concluded that there is nothing to support the suggestion that either analysts or the market more generally would have considered revenue from repeat business to be like or analogous to a *"multi-year committed annuity stream"* (as Dr Lynch described the characteristic which made the OEM business so *"highly attractive to us"* in his statement in the 2010 Annual Report).

3136. In the result, I have concluded (and see paragraphs 3086 to 3089 above) that the narrow "objective" view of the meaning of the metrics provided was that which probably prevailed amongst both the analysts and in the market, with some leeway for the occasional borderline case permitted by the warnings Autonomy expressly stated (to the effect that the metric was for background information and that the decision to include revenues within it would involve some

*"qualitative estimates"*) which I consider would have been taken to connote some flexibility and room for subjective judgement.[346]

3137.  In any event, I consider that a more detailed review of the views expressed by analysts at the time confirms me in my view that there is not any sufficient evidence of there having been any general market understanding that the OEM metric extended to business judged by Autonomy to have been made possible (IDOL OEM *"derived"*) by some earlier sale to an OEM as well as the OEM sale itself.

*(e) Was the published information false and misleading?*

3138.  In the RRAPoC, the Claimants identified a total number of (initially) 68 (but subsequently amended to 67) transactions of over $1 million in the period Q1 2009 to Q2 2011 which they alleged were incorrectly characterised as giving rise to IDOL OEM revenue during the Relevant Period. Their total value was $254,964,000. This compared

to a total value of all such deals worth $1million or more during the Relevant Period of $293,500,000.

3139.  Thus, the Claimants pleaded that approximately 87% by value of the OEM transactions they had analysed had characteristics which did not match the description of IDOL OEM revenue in the published information so as to render the statements in it false.[347]

3140.  As previously explained, the Claimants did not at trial pursue a case in relation to a transaction with Bloomberg in Q2 2011 (the last one listed in the above Schedule 8), so that the Claimants ultimately identified and relied on 67 OEM transactions not having characteristics which were necessary for revenue from the transaction to be allocated to the IDOL OEM metric. The Claimants calculated that these transactions in total accounted for some 80% of the revenue included in the OEM metric, though the Defendants disputed this figure and did not accept that there was any demonstrated basis for it.

---

[346] Even though that express warning was not included in the reports for Q1 2011 and Q2 2011 (where the figures appeared in the *"Financial Review"* section which was described as representing a *"a commentary on key trends in the quarter"*) I am prepared to assume that a reader of the run of financial statements would have had the warning in mind.

[347] See the Notes at Schedule 8 to the RRAPoC, which explained that *"The analysed transactions represent approximately $293.5 million (93%) of the $315.9 million of revenue categorised as IDOL OEM in the Relevant Period. Of the transactions analysed, approximately 87% were found not to be IDOL OEM ($255.0 million of $293.5 million)...If all of the non-analysed transactions are assumed to have been properly characterized as IDOL OEM, approximately 81% of the value categorised as IDOL OEM...(or 86% in the period from Q3 2009 to Q2 2011) did not arise from IDOL OEM transactions."*

3141. The Claimants divided the revenues (allegedly comprising about 80% of the whole) which they submitted were wrongly included in the metric into three principal (but sometimes overlapping) categories:

(1) Revenues from sales of IDOL to non-software companies, which did not license software to their own customers, and so had neither the intention nor the capability to embed Autonomy's software into their own software products. In most, if not all, cases of this type, the reality was that the purchaser simply intended to deploy the software acquired from Autonomy for its own internal use. The principal examples given by the Claimants were:

(a) various sales to government agencies[348], which by definition are not in the business of selling anything to anyone, let alone their own software products with embedded IDOL software;

(b) a sale to Tottenham Hotspur football club of a solution *"intended to enable a system to provide the following functions at the level found in a Premiership football club's ordinary operations: CRM, ticketing, player analysis, retail, internet and web design"*.

This category included sales to companies which plainly intended to deploy the software on hardware supplied to them for internal use: these companies included Bloomberg (OEM10), MetLife (OEM27), JP Morgan (OEM28), as well as revenue from non-software companies who could not embed the software in their own product;

(2) Revenues from sales of software licences that expressly limited the purchaser's right to use the Autonomy software, and prevented the purchaser from

embedding the software into its own products for onward sale or licensing to third parties.

(3) Revenues from transactions that by virtue of the nature of the contract, or because the revenue was not properly recognisable under IAS, could not properly be classified as a sale giving rise to IDOL OEM revenue. These included:[349]

---

[348] As end-user, whether through a direct purchase or purchase from a VAR.

[349] It may be noted that the Claimants contended that *"Where an impugned OEM transaction…is also impugned elsewhere in the case, such that the revenue should not have been recognised at all, the fact that this revenue was classified as IDOL OEM revenue served to exacerbate the misleading nature of reported IDOL OEM revenue. That follows from the fact that IDOL OEM revenue, a particularly valuable revenue stream, was also fraudulently inflated. Further, VAR, hosting or hardware transactions are, by definition, incompatible with Autonomy's description or definition of IDOL OEM revenue."*

(a) Licence sales associated with hosting contracts which enabled those customers to archive digital information in an environment hosted by Autonomy but were not sales to software companies which embedded IDOL technology into their own software products for onward licensing to third parties, and where in any event restrictions on the use of the licenced software for such purposes was prohibited (including six impugned hosting transactions, worth a total of $31.1 million, where the Claimants alleged that the data continued to be hosted by Autonomy on Autonomy's facilities using Autonomy software and (according to the Claimants) the revenue should not have been recognised at all);

(b) Hardware sales, including (i) a transaction under which Autonomy agreed to sell  to Bloomberg *"hardware, software and services"* for a total sum (all classified as OEM revenue) of $7,129,000 of which the hardware element was $5,718,010 and (ii) a transaction with Rand covering hardware which involved a sale of Arcpliance and a licence to use DS Mail (but not IDOL software), under a contract which limited use of the licensed software, prohibited the making of any copies, sublicensing and distribution, and made clear that its use was to be to provide a hosted email archiving service to end-users;

(c) Ten impugned VAR transactions, totalling $59.9 million of revenue,  under which neither the VAR nor the end-user was permitted or intended to embed IDOL into its own products, and where the revenue should not have been recognised, and seven of which (involving $40.1 million of revenue) were not followed by any sale to an end-user during the Relevant Period;

(d) Ten components of impugned reciprocal transactions involving $55.9 million of revenue; and

(e) Five transactions totalling $11.6 million of revenue from the sale of consultancy services by MicroLink, a subsidiary of Autonomy.

3142. The Claimants' analysis was that from Q3 2009 to Q2 2011 inclusive, that estimate of 80% of the revenue included in the OEM metric had one or more characteristics of (a)(e) below:[350]

> (a) Revenue from licences sold by Autonomy where the terms of the licence restricted the licensee to internal use of the software only;

> (b) Revenue derived from hardware;

> (c) Revenue derived from contrived VAR, reciprocal or hosting transactions;

> (d) Revenue derived from transactions generating only a single up-front payment and no royalties (the Claimants' case being that none of the 67 in fact gave rise to royalties, even if provision was made in the contract for them)[351];

> (e) Revenue derived from sales which were not IDOL sales by Autonomy.

3143. The Claimants submitted that in none of the 67 transactions above described, which they estimated to represent 80% of the revenues classified as OEM derived, were any of the revenues derived from royalty or other payments of a recurring nature.

3144. Furthermore, the Claimants contended that even in relation to the remaining 20% or so of revenues allocated to the IDOL OEM metric which they accepted was such as to generate high margin royalty income from OEMs, most were restructured in favour of accelerated upfront one-off payments, which (because discounted for early payment) yielded in aggregate less in total revenue over the course of the transaction. Many OEMs accepted this since the lump sum was smaller and relatively good value for them (the only advantage to Autonomy being immediate receipt of revenue which could immediately be recognised in its accounts).

3145. The effect of the one-off prepayments, according to the Claimants, was to reduce still further the amount of revenue in the IDOL OEM metric which consisted of ongoing royalties, and still more to reduce the amount representing royalty

---

[350] The OEMs are numbered according to their position in the table provided at Schedule 8 to the RRAPoC. The same name and value are ascribed to them as in Mr Hussain's quarterly revenue spreadsheets that were provided to Deloitte, with footnotes provided in the Claimants' further tables in their written submissions suggesting explanations of any discrepancies.

[351] In respect of some there was a royalty clause [OEM1,6,11,15,18,31,34,35,44,52,60] but either none resulted (sometimes because of a commutation to a single up-front payment) or none should have been recognised because it was a reciprocal or other impugned transaction [OEM1,11,13,15,18,23,31,34,35,44,52] or there is no sufficient evidence to warrant treating revenue as royalty [OEM20,29,30,39,47,57,67]

payments at a level of 3%, thus aggravating the untrue and misleading nature of the statements made by Autonomy in its published information.

*The Defendants' response*

3146.  The Defendants' response on this aspect of the dispute concerning these analyses and numbers had four primary limbs:

(1)  The Defendants rejected as being artificially and incorrectly restrictive the basis on which the Claimants alleged the 67 OEM transactions in question to have been wrongly classified. They denied that the characterisation of the impugned transactions was untrue or misleading. In accordance with the Defendants' more flexible and broader interpretation, their case was that revenues classified as IDOL OEM reflected a qualitative estimate of all IDOL business in the period in question generated through the OEM channel/network which Autonomy would not otherwise have been able to generate. In his Defence, Dr Lynch had pleaded, for example, that a non-software company could be an OEM and revenue from sales to an OEM would be classed as OEM derived[352], as also should sales to end-users of added functionality or PODs. According to the Defendants, these transactions had not been shown to be incorrectly classified.

(2)  The numbers had been compiled by Autonomy's Finance Department in close consultation with Deloitte and listed on spreadsheets provided to and carefully ticked-off by Deloitte: Deloitte had thereby reviewed and verified Autonomy's classification of transactions as OEM transactions for the purpose of testing the OEM revenue figures.

(3)  The summary reasons given in the Claimants' written closing were not adequate for the purpose of testing the Claimants' complaints as to classification, and these had not been put to Dr Lynch.

(4)  The Claimants' assertion that 80% of the revenue characterised as IDOL OEM was misallocated was just that, an assertion, and it had not been supported by evidence.

(5)  Further, in a number of cases, the Claimants' reasons for saying that revenues were wrongly classified within OEM was that the transaction from which the revenue was generated was challenged in some other part of the case, as an alleged reciprocal transaction, or impugned VAR transaction or (in at least one case) a hardware transaction, and that was

---

[352] In his Defence, and in his witness statement, the example given was that *"a delivery company may develop a smartphone application for tracking parcels which they sell to other parcel delivery companies. If, in developing that app, they use Autonomy and then they sell the app to others, they will be acting as an OEM."*

not a proper basis of challenge without a separate analysis as to why they were not properly characterised as OEM-derived.

3147. As to (1) in the preceding paragraph, it follows that on the Defendants' own case, considerable amounts of revenue were allocated as OEM-derived which did not have what I have concluded would have been taken by addressees of the published information to be the special characteristics of that metric. It further follows from that conclusion that whilst I consider that such addressees would have expected there to be scope for *"qualitative estimate"* or subjective judgement as to whether in particular instances the link between the transaction to which revenue was referable and a prior OEM transaction was sufficient to warrant differentiating it from, for example, income referable to IDOL Product transactions, they would not have expected the inclusion of substantial amounts of revenue from categories of transaction which had not the special characteristics associated with the metric to be within that scope. Both Defendants knew

that, on the contrary, there were substantial amounts included in the OEM metric which were neither licence fees paid by an OEM nor ongoing payments payable by an OEM in respect of onward sales under licence of products embedded with IDOL. (That does not necessarily mean that the Defendants were dishonest: it is a matter for consideration at the next stage of the analysis whether at the time (a) they honestly intended the broader meaning they now assert and (b) whether they honestly considered the revenue to have been entirely properly allocated in accordance with their own understanding of the metric; but it does mean (if the amounts of revenue in question were substantial) that the published information was misleading.)

3148. Similarly as to (2) in paragraph 3146 above, although the involvement of Deloitte is a matter to which I must return (see paragraphs 3166 to 3185 below), the fact (if shown) that Deloitte did accept Autonomy's finance department's categorisation of revenue as IDOL OEM which had not the characteristics which I have concluded an addressee of the published information would have associated with the metric, can only go ultimately to the issue whether the Defendants were acting dishonestly. Any comfort or confirmation they may have obtained from Deloitte's approval would not alter the fact that the published information was, on the basis of my conclusions, misleading.

3149. The question raised by (3) in paragraph 3146 above relates back to the first of the two issues that I addressed in the introduction to this chapter as to whether what the Claimants had done was sufficient for the purpose of identifying the characteristics of the 67 impugned transactions without further evidence of their own or crossexamination of Dr Lynch. My judgment is that it was: see paragraphs 3010 to 3023 above.

3150. More specifically as to (4) above, in his oral reply, Mr Rabinowitz relied on (i) the *"underlying contracts"* alleged to have generated revenues which could not properly be classified as OEM derived revenue (which were in the trial bundles and were identified in the Schedules provided as part of the Claimants' Opening

Submissions, and, as slightly modified, as part of the Claimants' Closing Submissions also) , and (ii) Mr Bezant's Fourth Report, which Mr Rabinowitz submitted verified the content of Schedules 8 and 9 of the RRAPoC and the 80% figure as having been *"correctly quantified from Mr Hussain's revenue spreadsheets."* Mr Bezant (who was not, of course, a witness of fact but an expert) only checked and confirmed the consistency between the Schedules and what was stated in Mr Hussain's spreadsheets: he expressly stated that he was not instructed to consider *"the Claimants' assessment of whether transactions were or were not IDOL OEM…"* But he could calculate the sum assuming that none of the transactions went beyond the scope of the market view of OEM business.

3151. I have taken into account in that context, and with regard to (5) in paragraph 3146 above,  the Defendants' argument that some of the 67 transactions revenues were alleged to have been wrongly classified as OEM derived on the ground that the transactions in question were impugned on some other basis (VARs and reciprocal arrangements in particular), and that this did not suffice to establish a case that the revenues had been wrongly categorised as OEM derived. Of course, I accept that there could arise an obvious element of double-counting; and, for example, the mere fact that revenues have been recognised too early would not of itself entail that they had been wrongly categorised as OEM derived.

3152. However, in the case of almost every one of the VAR transactions and Reciprocal transactions, there was at least one further material basis alleged for the Claimants' case that the revenues generated were not properly classified as OEM, rather than (as in fact they were classified by Autonomy) 'OEM-derived'. Thus:

   (1) Of the 10 VAR transactions identified as giving rise to revenue which was not properly categorised:

       (a) OEM7 (with a VAR for end-user IBM/Ameriprise) involved the licencing of software for use of 20,000 Mailboxes only with Ameriprise and was part of a hosting services arrangement, so that no OEM was involved and no ongoing royalty arrangement could or did result;

       (b) OEM12 (with MicroTech for end-user DiscoverTech) did not involve an OEM embedding IDOL into its own software and no ongoing royalty payment could or did result;

       (c) OEM16 (with MicroLink for end-user DiscoverTech) did not involve an OEM embedding IDOL into its own software and no ongoing royalty payment could or did result;

       (d) OEM36 (with Capax Discovery for end-user Amgen) was a licence sale for internal use (hosting), and that use was restricted accordingly;

    (e) OEM45 (with DiscoverTech as VAR for end-user BofA) was a licence sale for use only for internal purposes, and no ongoing royalty payment could or did result;

    (f) OEM50 (with Capax Discovery for end-user McAfee Inc) was a licence sale for McAfee's sole internal use, no OEM which wished to embed IDOL software in its own products was involved, and no ongoing royalty payment could or did result;

    (g) OEM53 (with DiscoverTech for end-user Prisa) was a licence sale for use only for internal purposes, no OEM which wished to embed IDOL software in its own products was involved, and no ongoing royalty payment could or did result;

    (h) OEM62 (with DiscoverTech on-licensing to Dell for end-user Hyatt) was a licence solely for the purpose of a sub-licence to Hyatt for its internal use, and no ongoing royalty payment could or did result;

    (i) OEM64 (for JP Morgan) was a licence for its internal use only, no OEM was involved and no ongoing royalty payment could or did result;

    (j) OEM65 (with Capax Discovery for end-user UBS) was a licence for UBS's internal use only, no OEM was involved and no ongoing royalty payment could or did result.

(2) Of the 10 reciprocal transactions identified as giving rise to revenue which was not properly categorised:

    (a) OEM1 (with Capax Discovery) was a licence which did not permit Capax Discovery (which was not an OEM) to embed Autonomy software in its own software for onward licensing to third parties and even though the contract contained a royalty clause this related only to the provision of services;

    (b) OEM4 (with VMS) was a sale of a licence which prohibited VMS embedding Autonomy software into its own, and resulted in no ongoing royalties;

    (c) OEM11 (with Capax Discovery for Eli Lilly) gave rise to no royalty payments or obligations;

    (d) OEM13 (with FileTek) gave rise to no royalty payments or obligations;

(e) OEM15 (with Vidient) was one of three exceptions in that the contract did contain a royalty clause and Vidient might be classified as an OEM;

(f) OEM23 (with Filetek) gave rise to no royalty payments or obligations;

(g) OEM34 (with Vidient) was another of three exceptions in that the contract did contain a royalty clause and Vidient might be classified as an OEM;

(h) OEM35 (EMC) was the third such exception;

(i) OEM46 (with VMS) the transaction was not with an OEM nor did it give rise to any royalty payments;

(j) OEM52 (with Capax Discovery) was a licence for restricted internal use and though the contract contained a royalty clause it was never triggered.

3153. As to the substance of those complaints, I find that (with the possible exception of OEM15, 34 and 35, where the Claimants specified no reason other than that the transactions were "impugned reciprocal transactions" and which involved an aggregate of some $9,507,000) revenues from the 67 transactions identified were misclassified, amounting to nearly 80% of the revenues in the OEM metric. This misclassification of what I accept was regarded in the market as an important metric rendered untrue or misleading (i) Autonomy's definition or description of IDOL OEM/OEM derived revenue in its published information, (ii) each amount of IDOL OEM/OEM derived revenue stated during the Relevant Period, and thereby (iii) Autonomy's published information, including its Quarterly, Half-Yearly and Yearly Reports in 2010 and 2011.

*Did the Defendants know of the inclusion within the OEM metric of revenue outside what investors were likely to understand to be within its scope?*

3154. Nevertheless, and as the Claimants appreciated, it is not enough for them to establish (as in my judgment they have established) that Autonomy included within the OEM metric revenues that reasonable readers would not have expected to be categorised as such (in the sense that readers would not have expected the OEM metric to comprise such revenues). They must also prove that the Defendants (to quote the test in FSMA, but interpolating my own words to make clear its application in the present case) each *"knew the statement* [of OEM and OEM-derived revenues] *to be untrue or misleading or was reckless as to whether it was untrue or misleading".*

3155. Put another way it is not sufficient to show that the Defendants knew that the metric included revenue which falls outside what I have determined, looking

after the event at the language in the published information, its context and evidence of the way it was in fact understood in the market, readers would have expected to be included within the metric. What they had to show was that the Defendants knew at the time that revenue was being misclassified, and thus of a mismatch between reality and expectation, so as to displace the Defendants' case that they knew no such thing.

3156. It is the Defendants' subjective understandings and intentions which are in issue at this second stage, and which are not revealed as fraudulent simply because of a mismatch between what they thought at the time was proper to include and what, years later, the court has determined the readership expected to be included.

3157. As earlier foreshadowed, Dr Lynch submitted that (a) so far as he was aware, all revenues allocated to the OEM metric fell within its scope as he understood and intended the scope of the OEM metric to be; and (b) he was not involved in the process of characterisation of revenues nor in the allocation of revenues to the OEM metric, and he relied on the finance department and Deloitte in that regard. The first point (that is, (a) above) was available to and adopted by Mr Hussain as applicable to him also, *mutatis mutandis*. The second point was not available to him.

3158. Before turning to the facts especially relevant to this second stage, however, I must return (see also paragraph 3013 above) to Mr Miles's objection on behalf of Dr Lynch that this part of the Claimants' case was never properly put to him (despite indications that it would be in his long cross-examination), nor was he ever challenged on material parts of his witness statement in this regard. Mr Miles submitted that Dr Lynch was "*not given the opportunity either to justify the classification of the individual transactions, or to explain the extent of his knowledge in respect of each of them*" and that in combination the result should be to preclude the Claimants from pursuing the allegation of fraudulent knowledge against Dr Lynch. (Of course, although in all other respects Mr Hussain adopted all that Dr Lynch said, no such objection was open to or pursued by Mr Hussain.)

3159. I cannot accept this submission. In my judgment, Dr Lynch made clear his understanding at the time that Autonomy was including revenues within the OEM metric on the basis of an alleged market understanding that its scope extended not only to revenue from the OEM transaction but to revenue generated from transactions with end-users *"made possible by the initial OEM sale"* (as he put it in his first witness statement). He knew that included within the OEM metric was licence revenue from sales to service providers who were using IDOL to provide services; licence revenue from sales to a reseller for resale; sales to non-software companies; direct sales to customers of OEM partners; sales involving licences limited to internal use; and revenues from upsells and PODS. It was his case that he believed that the scope was understood to be so

extended[353]; the Claimants challenged him on that case and put their opposing and primary contention that it was not, and he did not have any honest belief that it was. If Dr Lynch considered that any of the 67 impugned transactions individually fell within the narrower scope, he could and should have said so. In short, I consider that the Claimants did sufficiently challenge Dr Lynch on the salient points in his evidence, and in particular on his fundamental point that it was made plain to the market, and should have been obvious from the use in 2010 of the phrase "OEM-derived", that the IDOL OEM/OEM derived metric extended to all sales of IDOL software generated or facilitated by what he called the *"OEM route to market"* (including direct sales to the end-user).

3160.  I cannot accept either that any different understanding would have resulted from a more detailed exegesis of the contracts nor that any material unfairness was caused to Dr Lynch by the course adopted by the Claimants of challenging Dr Lynch on his understanding of the phrase, its use in the relevant published material, and how he understood it would be interpreted by the market, rather than on the details of the 67 individual transactions impugned as falling outside the metric.

3161.  In summary, what was necessary was for the Claimants to challenge and undermine Dr Lynch's evidence as to his own understanding and put to him their case that he was aware of and involved in the mischaracterisation of revenue which resulted in a mismatch between the description of OEM-derived revenue and what in fact was included under that category or metric. In my judgment, they did put to Dr Lynch their case, and the basis on which they sought to challenge his.

3162.  The Claimants focused especially in this context on what Mr Hussain and Dr Lynch had said at the time, especially in the course of Earnings Calls and in the Q3 2010 Investor Bulletin. Although I have determined that the transcripts of these Earnings Calls did not constitute "published information" within the FSMA test, and (as the Defendants emphasised) there is no evidence that anyone at HP looked at or listened to any of them at the time, they are nevertheless relevant at this second stage to an assessment of the Defendants' true understanding and intentions.

3163.  The Claimants relied, for example, on the fact that:

(1)  On the Q3 2009 earnings call, when asked to comment on the *"slight deceleration"* that had occurred in that quarter in the *"OEM situation"*, Dr

Lynch had replied that *"The simple reason is that we get the returns from what*

*400 of the world's software companies have sold, and there's very little ability to work out exactly where that number's going"*. The Claimants

---

[353] For example, he told me in cross-examination that although not involved in the transactional detail, *"…everyone understood that the definition of "OEM-derived" included business that was being generated by our OEM programme even if it was not revenue directly from the OEMs."*

contended that this suggested that OEM derived revenue was, in the main at least, revenue *"from what…software companies have sold"* and that this equated to royalty revenue.

(2) On the Q1 2010 earnings call, Dr Lynch explicitly stated :

> *"On the OEM side of the business, <u>we sell to virtually all of the</u> <u>major</u> <u>names in the software industry through a royalty based</u> <u>model</u>. As we've mentioned before, that business acts like a tracker fund of the software industry. So as wider software sales increase and the number of products coming to market increase, so you would expect OEM revenues to increase."* [Emphasis supplied]

(3) In the course of the earnings call for Q1 2010,[354] Mr Hussain explained the breakdown of that quarter's reported $29 million of "*OEM derived revenues*" in terms which characterised "*OEM derived revenues*" as being comprised entirely of development licence fees, and ongoing royalties received in that quarter, leaving no scope for the inclusion of upsell or PODS revenue. He said this:
> *"OEM development licenses of $3m give us some visibility about future royalty streams into the OEM business. OEM ongoing royalties in the quarter amounted to some $26m."*

3164. When, in cross-examination, Dr Lynch was confronted with this apparently exclusive characterisation of "*OEM Ongoing*" as "OEM *ongoing royalties*" both in statements he himself made, and in statements made by Mr Hussain, he offered the following explanations, which the Claimants answered, and which I assess, as summarised below:

(1) First, as to his own statements, Dr Lynch contended that the phrase *"royalty based model"* does not necessarily mean, and he did not intend it to mean, that the only OEM business conducted by Autonomy was done on such a model, nor that each relevant transaction had an ongoing royalty stream. He gave as an example a buyout deal or bulk royalty deal that could fairly be described as *"royalty based"* where the amount the customer was required to pay was calculated by reference to a notional royalty rate. Mr Pearson (who, it will be remembered, was called by the Defendants) also sought to emphasise in re-examination that *"there were generalisations about description…generalisations were commonly used by analysts and investors throughout this period to describe the general trend of what's going on"* by which I took him to mean that words would often be deployed in a generic but not exclusive sense to signify a broad general

---

[354] The first of the three quarters in which this breakdown was reported.

category but not to denote an exclusive meaning. However, even Mr Pearson volunteered (in the same

_____

passage of his re-examination) that *"People understood that in general they were royalty driven in some form or another…"*

This did not carry the Defendants very far. The typical characteristic of OEM revenue (after payment of the original licence fee) was a payment by the OEM to Autonomy calculated by reference to the value of its onward sales of product including Autonomy software: in other words, a royalty-type basis of calculation.

(2)   Secondly, Dr Lynch told the Court that Mr Hussain simply made a mistake in his choice of words – *"there's an occasion when talking in realtime on a call, he has used a word he shouldn't"*.

However, Mr Hussain was reading from a script. He said exactly what he was scripted to say:

•   *"OEM development licenses of $3m give us some visibility about future royalty streams from the OEM business.*

•   *OEM ongoing royalties in the quarter amounted to some $26m."*

Further, the script: (i) contained edits by Dr Lynch to the management presentation part of the script; and (ii) contained no edits to the 'question and answer' section. While Dr Lynch made changes to other parts of the management scripts, he made no changes to Mr Hussain's description of *"OEM Ongoing"* as *"OEM ongoing royalties"*.

In any event, even if Dr Lynch's review had been limited to the questions as he suggested it was, the same representation of the contents of IDOL OEM revenue was contained in the 'question and answer' section. Question 59 was *"New revenues classification"* and the answer, so far as it concerned IDOL OEM revenue, said *"OEM Dev 3.0"* and *"OEM Royalty 26"* – entirely in accordance with Mr Hussain's representation that $26 million of OEM Ongoing comprised only royalty revenue. Dr Lynch could not identify any steps taken by anyone at Autonomy, including Dr Lynch himself, to correct Mr Hussain's characterisation of *"OEM Ongoing"* as *"OEM ongoing royalties"*, whether on this call or at all.

(3)   Thirdly, Dr Lynch asserted during cross-examination that an explanation of the sub-categories *"OEM Dev"* and *"OEM Ongoing"* had been given to the market two quarters before the Q1 2010 earnings call,

in the context of the Q3 2009 results, and that the actual definition of these metrics would be found there.

However, there appeared to be nothing to support this, either in the transcript of the Q3 2009 Earnings Call, or in the Results presentation for that quarter: on the contrary, both appeared to convey that Autonomy's IDOL OEM revenue comprised (i) a development fee and, (ii) payments when <u>OEMs' products</u> are sold i.e. ongoing royalties, and there was no mention of upsells or PODS in the Q3 2009 earnings call materials, let alone a description or explanation of such revenue sources.

Indeed, the way Dr Lynch explained to the market what OEM business Autonomy was doing is perhaps the most striking demonstration that he (and Mr Hussain) knew what the market perceived OEM business to comprise. Thus, for example:

(a)  On Autonomy's Q1 2008 earnings call Dr Lynch said:

"*we license our technology to other software players who then use the technology to enable their own products to understand structured information ... They do this on a model where they will sign up a deal with us. There may be an upfront payment which would typically be around $200,000, and then they ... write ... their product ... The back period is now, on average, two years between for them to write whatever their product is ... Then that product ships and we would receive a royalty stream ... What we see in Q1 is 12 OEM deals signed, so we would expect to see revenue from them on average in two years' time.*"

(b)  Autonomy's 2009 Annual Report stated:

"*An OEM pays an upfront non-refundable fee and then writes its new product which can take up to two years depending on its product roadmap and release cycle. Once the product is launched they make license payments of around three percent of product sales to Autonomy*".

(c)  Autonomy's 2010 Annual Report stated:

"*Contracts and situations vary, but by way of example an OEM could pay an upfront non-refundable fee and then take two years to launch its product. Once that product is launched they may make license payments of around three percent of product sales to Autonomy.*"

(d) An "Introduction to Autonomy" prepared for investors in 2010 read:

> "*An OEM pays an upfront development fee and then writes its new product which can take up to two years depending on its product roadmap and release cycle. Once the product is launched OEMs pay a royalty stream of around 3 per cent of product sales to Autonomy.*"

(4) Fourthly, Dr Lynch referred to what he presented as being the universal understanding in the market (except for an errant Credit Suisse or *"unless they had arrived from another planet"*). But as explained previously, (see paragraphs 3098 to 3137 above) I do not accept that that was so; and certainly no general market understanding such as the Defendants asserted was proven: the evidence showed that many analysts had the same or a similar understanding as Mr Grieb and Credit Suisse.

(5) Fifthly, Dr Lynch also relied on his understanding that both Deloitte and Autonomy's Audit Committee, as well as its finance department, were closely involved, had reviewed Autonomy's policies for disclosure of and accounting for the OEM revenues, and had satisfied themselves that they were appropriate.  He assumed that Deloitte understood the nature of the transactions and the identity of the counterparty in each case. He knew that Deloitte checked Autonomy's earnings releases and ensured that the figures reported were accurate. As Mr Miles put it in his oral closing argument, *"they understood more about the detail than Dr Lynch"* and appeared content with both *"the numbers and the way the language was used"*. Dr Lynch's case was that he felt entitled to and did assume that if Deloitte had had any concerns that the information provided about OEMs was misleading, they would have made that clear: but nothing of that kind ever happened.

3165. The last of these points, and the dispute which resulted as to the significance of the fact that Deloitte never objected to either the enumeration and presentation of the OEM metric, was a principal focus of the defence and needs elaboration.

*Deloitte and OEM revenues*

3166. I turn to consider, therefore, (1) the nature and extent of Deloitte's involvement and of its responsibilities in respect of the OEM metrics, and (2) what relevance Deloitte's involvement has to the assessment of whether the Defendants believed the OEM metric to be properly described and constituted (or whether, instead, they knew it be untrue or misleading, or took a reckless risk of it being misunderstood).

*Nature and extent of Deloitte's involvement*

3167. The Defendants' case was that although the initial preparation and presentation was for the finance department of Autonomy, Deloitte (a) reviewed the way in which the OEM metric was presented in the Quarterly and Annual Reports and in what was termed *"the front end of the accounts",* (b) checked the constituent elements of the deals going into the OEM metric, and (c) "ticked off" the numbers. Deloitte was thus closely involved in considering the categorisation of the transactions and the amount of revenue which could be included in the metric as OEM derived revenue. Dr Lynch had no role in the process.

3168. The Claimants, on the other hand, submitted that *"the misclassification of transactions within the IDOL OEM revenue was not an accounting matter"* and Deloitte's involvement was *"of very limited relevance indeed"* to the determination of the OEM issue. Deloitte's advice, they stated, *"was neither sought nor given".* They added that *"in circumstances where the Defendants knew that the definition or description of IDOL*

 *OEM revenue in the published information was misleading, it is simply irrelevant that Deloitte failed to detect the Defendants' wrongdoing."* They submitted that the Defendants could not *"hide behind Deloitte in relation to their fraud."*

3169. The Claimants accepted that, as appeared from their working papers, Deloitte had undertaken a process of going through the final draft of the relevant Reports and had ticked off every number, next to the relevant label or description of the metric. However, they contended that it was no part of Deloitte's remit to check the composition and presentation of the IDOL OEM metrics and figures in the "front-end" or narrative part of the reports, which the Defendants themselves accepted were not IFRS figures subject to audit and were provided voluntarily by Autonomy. The Claimants cited in this regard Accounting Standard *ISA 720A (2004)*, which states that *"...the auditor has no specific responsibility for determining whether or not other information is properly stated"*, and "*ISA 720B (2009)"*, which requires the auditor only to *"read the other information to identify material inconsistencies with the audited financial statements".*

3170. As to the actual process in this case, they relied on Mr Welham's evidence as confirming that this ticking off process simply involved checking the totals presented in the *"front end"* against the audited figures in the *"back end"* (as put to Dr Lynch) and that Deloitte never had to consider, and did not consider, the reasonableness of the categorisation of revenue within IDOL OEM revenue. It was, as it were, a merely mechanical process of ensuring consistency of numerical quantification between the two parts of the Reports.

3171. They relied particularly on the following passage of Mr Welham's evidence when he was cross-examined by Mr Miles on a spreadsheet which Deloitte had marked up with tickmarks, the objective of which was stated to be *"To agree the metrics used in the quarterly press release to supporting schedules and to test the validity of these schedules"*:

> *"So the tickmarks will just be what the person who prepares the spreadsheet writes. So just to clarify what we're doing here, because this relates to what we call front end information, then we have no - - our responsibilities around that are to read it and ensure consistency with the financial statements... So when the team have gone through this, they're essentially looking at what's included to make sure we can tie back - - so that the totals tie back to the financial statements and what makes up those totals ties back to what we have audited or reviewed. So while someone may have written "Appears reasonable", we're not really considering the reasonableness of where things are categorised because that's not within our remit.[355]"*

3172.  In addition, and although not stressed by the Claimants, the following further passage seemed to me to illuminate that evidence:

> *"So we're not opining on the categorisation here, we're essentially making sure that revenue deals included here are ones that we've tested and therefore that essentially there aren't incorrect deals or bogus deals included in these metrics which are not part of the reviewed revenue or the audited revenue."*

---

3173.  However, that is difficult to reconcile with what the evidence demonstrates as to what Deloitte actually did, as revealed by extracts from one of Deloitte's working papers showing their comments on spreadsheets provided by Autonomy's finance department classifying revenue. The example relied on by the Defendants was a spreadsheet with various schedules, of which the stated objective was *"To agree the metrics used in the quarterly press release to supporting schedules and to test the validity of these schedules".* Its conclusion was *"Satisfactory."*

3174.  It does seem from the paper itself that as part of the audit testing process, Deloitte would have reviewed at least some of the underlying contracts, if their value was over $1 million, as part of the sampling process.  Mr Welham was taken to the Q2 2011 tab within the document. It was clear that he could not remember much about it. His answers were really simply acknowledgements of what was stated: thus,  he agreed that columns AB to AE were headed "OEM Royalty", "OEM upsell", "OEM POD", and "OEM Prepay", and that it looked as if the "IDOL OEM" category which was published by Autonomy had included upsells and PODS.

3175.  He was then taken to columns S and Y headed "Deloitte Added Columns" with column S containing deals over 1 million which had a reference to a testing sheet

---

[355] Mr Welham made a similar point in relation to IDOL Cloud revenue, which, like IDOL OEM revenue, was not an IFRS metric.

and on to column AC row 4, which contained a reference to "tick mark e", and then on again to the "Tickmarks tab" where a note stated:

> *"The OEM upsell category includes hosted licence deals that are hosted on*
> *OEM customer data-centres. This is considered reasonable for including as OEM driven revenues."*

3176. It was put to Mr Welham that someone within Deloitte had specifically considered the OEM upsell category in respect of hosted licence deals hosted on OEM customer data centres and concluded it was reasonable: he agreed that the preparer of the spreadsheet had, and confirmed that this was someone in Deloitte.

3177. Further, in cross-examination, Mr Welham was taken to guidance issued by the Auditing Practices Board (the predecessor in this context of the FRC) as to an auditor's responsibility in respect of *"Other information in documents containing audited financial statements"* (which essentially covered the 'front-end' or narrative part of the Annual Report). That guidance provided, for example, that:

> *"The auditor should read the other information to identify material inconsistencies with the audited financial statements. If as a result of reading the other information, the auditor becomes aware of any apparent misstatements therein, or identifies any material inconsistencies with the audited financial statements, the auditor should seek to resolve them."*

3178. Mr Welham acknowledged[356] that, in the light of this guidance, Deloitte did check for material inconsistencies and misleading statements in the 'front-end', as the Schedule exemplified, and they had identified none.

*What reliance can the Defendants place on Deloitte in this context?*

3179. In his written closing submissions, Dr Lynch placed considerable emphasis and reliance on Deloitte's review and apparent acceptance of the accuracy of the schedule in this context, as in effect, endorsing and even justifying both his avowed belief in the accuracy of the published information about the OEM derived revenues and the reasonableness of that belief. Mr Miles added in his oral closing that:

> *"Deloitte read the description…in the front end of the accounts and they read the descriptions in the quarterly reports, did the same thing every quarter and never identified anything misleading. As I say, they had a fuller and closer understanding than Dr Lynch did of the deals that actually went into the numbers given for the metric. We say that's*

---

[356] As he had also agreed in his evidence in the US criminal proceedings.

> *very important because, if they didn't think there was a problem, it*
> *makes it very improbable to suggest that Dr Lynch should have done."*

3180.   The Claimants, on the other hand, dismissed any reliance on Deloitte's checks
        as unfounded: even if Deloitte's remit extended to opining on the reasonableness
        and consistency of the information provided in the front-end of the various
        Reports (whether as a matter of obligation or simply as a matter of what in fact
        they chose to do), which the Claimants did not accept, they submitted that:

> *"In circumstances where <u>the Defendants knew</u> that the definition or*
> *description of IDOL OEM revenue in the published information was*
> *misleading, it is simply irrelevant that Deloitte failed to detect the*
> *Defendants' wrongdoing."* [Claimants' emphasis]

3181.   That submission is premised on knowledge (or at least recklessness) on the part
        of the Defendants. Ultimately, as will be seen, I agree with its conclusion, but
        there is a prior question, as it seems to me, whether the Defendants' case that
        they relied on Deloitte as support for treating OEM business as being broad
        enough in scope to cover the scheduled transactions. That requires brief analysis
        of what Deloitte's role was and what their approval signified.

3182.   As to that, in my view, all that really Deloitte's process of checking and approval
        signified was that they were satisfied that the transactions were accurately
        described and that transactions as so described fell within what the Defendants
        told Deloitte was a broader category of OEM business. In other words, Deloitte
        saw no basis to contradict what they were given to understand by Autonomy was
        the scope of the OEM metric as extending to any revenue which, according to a
        subjective judgment, could be said to have been driven or made possible by an
        original licence sale to an OEM. They read the metric and interpreted the
        disputed phrases using the criteria that the Defendants

---

supplied them. Deloitte did no more than check that the transactions conformed
to the description of the metric that Autonomy had supplied.

3183.   Deloitte might have probed further; but they were not required, as regards this
        narrative description voluntarily provided, to assess separately or second-guess
        the directors whether a transaction fell fairly within the scope of what the market
        understood to be OEM business. They had to do little more than satisfy
        themselves that the approach and figures were consistent. Having, for whatever
        reason, accepted management's interpretation, approval followed, but that
        provides little or no validation of the Defendants' avowed belief. Autonomy and
        its management were in a far better position to assess what the market considered
        to be comprised in OEM business.

3184. I have concluded that the fact that Deloitte accepted, or at least did not raise any objection to, the inclusion of the 67 impugned transactions within the OEM metric is of little, if indeed any, relevance or assistance in determining whether the Defendants knew that the inclusion of revenues from *"follow-on sales"* gave an untrue or misleading depiction of the extent and success of the OEM line of business. I do not accept that Deloitte were or can be regarded as  a litmus test either of market perception of the scope of the OEM metric or of the Defendants' honesty.

3185. In my judgment, Deloitte did not know what the Defendants, in my judgment, did know, or at least knew to be a real risk: that the category they had devised extended to transactions which the market would not have regarded as having the characteristics associated with OEM business.

3186. As to the Defendants' individual positions, I do not accept that Dr Lynch was ignorant of this. As previously noted, Dr Lynch emphasised that he personally had no involvement in or knowledge of individual OEM transactions, and was not involved in determining how deals should be classified. He could not recall ever reviewing the spreadsheets in any detail, if he saw them at all. But he did know, as he has acknowledged, that there were many transactions that did not constitute "core" OEM transactions: and I have concluded that the metric was misleading, and he knew it. Mr Hussain was in no better position. He offered nothing to absolve himself except the "definitional issue".

3187. On the basis of the matters referred to above, (and I should acknowledge, fortified also by my findings summarised in paragraphs 3207 and 3235 below),[357] it is reasonably clear, and I find, that:

(1) Both Defendants knew or recklessly took the risk that readers in the market of Autonomy's published information were not aware that such a preponderance of the revenues included in the OEM metric were not "core" OEM revenues;

(2) Both Defendants well understood the enhanced value attributed to OEM business and wanted to take advantage of it, including (if necessary) by 'pumping up' the OEM metric and including within it revenues which had only a vestigial subjective basis (if any) for classifying as especially valuable.

(3) The fact that Deloitte undertook the checking exercise described above does not affect the conclusion.

---

[357] Relating to my findings in respect of the *"Lone Pine episode"* and the *"Top 10 List"* provided to HP in the course of the due diligence process

3188. The evidence has satisfied me, and I find, that a substantial (likely to be almost 80%, though I shall confirm the figure in my judgment on quantum) of the revenues allocated to the OEM metric was outside what the market perceived to be its scope, as the Defendants knew or understood to be a real risk.

*A further issue as to upfront prepaid licensing deals or "buy-outs"*

3189. A further aspect of the dispute concerns the evidence of Mr Harald Collet ("Mr Collet")[358], Autonomy's head of OEM sales in North America from Q3 2008 to Q1 2010 and as such the *"real head of OEM"*, to the effect that even in the case of "core" OEM transactions which might have generated ongoing royalty revenue, in the *"great majority"* Autonomy had agreed instead to smaller, accelerated, upfront non-royalty payments. This, the Claimants submitted, made matters even worse.

3190. Mr Collet's evidence made two principal points:

(1) the upfront prepaid licensing deals or "buy outs" were presented as giving rise to recurring revenue in the form of royalty, and that was untrue or misleading;

(2) the discount for prepayment or buyout reduced the likely aggregate payment obligation: contrary to the impression given by Autonomy's published information, Autonomy was sacrificing ongoing royalty income in order to accelerate future revenue into current reporting periods to be recognised immediately.

3191. The Claimants invited me to find that:

> *"...even as regards OEM deals with OEM partners that were legitimately included within IDOL OEM revenue and might otherwise have generated royalty payments...this in the main did not happen"*, and that this

> *"...further reinforces the untrue and misleading nature of the statements made by Autonomy in its published information to the effect that IDOL OEM revenue consisted mainly of ongoing royalties, still less that royalty payments at a level of 3% of the OEM's sales to end-users were typical. Few, if any, IDOL OEM transactions generated, or could reasonably be expected to generate, a recurring royalty stream of around 3% of license sales."*

---

[358] Mr Collet also co-authored the "Joe Bloggs" communications: see paragraphs 312 to 313 in the Introduction and 3235A and 3235C below.

3192.  Dr Lynch accepted in the course of his cross-examination that *"there would be a significant number of upfront royalties on that sort of structure, yes"*, and that he knew at the time that this was happening.

3193.  I have not been persuaded that this materially would have affected the market, or that it was wrongful, even if it was (as the Claimants contended) with a view to accelerating recognition of revenue, and despite a loss thereby to Autonomy in terms of total ultimate revenue. It seems to me that a prepaid royalty is a capitalised payment in lieu of a recurring royalty. I decline to make the finding sought.

3194.  However, Mr Collet's evidence also referred to an incident in relation to upfront royalties which I should mention since it was relied on as revealing Dr Lynch's *"willingness to lie to the Court, in order to cover up lies he had told to investors during the Relevant Period"*, and in this case to maintain the depiction of the OEM business he wished to present. This was referred to at trial as *"The Lone Pine episode"*.

*The Lone Pine episode*

3195.  Lone Pine Capital (HK) Limited ("Lone Pine") was a hedge fund (based in Hong Kong) at which a Ms Leonie Foong ("Ms Foong") worked. According to Dr Lynch's evidence in cross-examination, Lone Pine, through Ms Foong, had been probing for material in support of a negative story in the market that Autonomy had a balance of pre-paid royalties that had been improperly recognised up-front, although the royalties would need to be paid back if the sales on which they were based did not occur. When Ms Foong approached Autonomy with regard to the story, Dr Lynch sent an email dated 21 July 2009 referring her to Mr Collet whom he described to her as *"the real head of OEM for Autonomy"*.

3196.  A call was set up with Mr Collet on 21 July 2009. Mr Collet was not trained in investor relations, and was not permitted, save in limited circumstances, to speak to analysts or investors, but Autonomy was happy for him to have a one-off, general conversation about the market. In an email Dr Lynch encouraged him to keep the call short.

3197.  Mr Collet claimed that in advance of the call, "*Dr Lynch emailed me a script setting out what I should say to Lone Pine*." He said that the script contained a number of assertions that he was uncomfortable with, because (he said) they mischaracterised Autonomy's OEM business *"as principally involving deals for ongoing royalty revenue streams when, in my experience… the great majority of my team's OEM sales were being structured as up-front, pre-paid licensing deals"*; however, because of the "*culture of fear*" at Autonomy, he followed the script as best he could.

3198.  The Defendants objected that none of this was true, and the Court should find that the notion of a script – and the instruction to say anything misleading – was an invention by Mr Collet. Dr Lynch was adamant that there had been no script. His written closing submissions elaborated on this as follows:

(1) The script was, according to Mr Collet, sent by email (as it must have been since Mr Collet was located in the US and Dr Lynch in the UK). No trace or copy of any such script has been found, despite extensive searches.

(2) When this was pointed out to him in cross-examination, he said – for the first time – that he had deleted it, claiming that he did so as "*it felt like it was best for [him] not to have a copy of that*", because he "*was concerned that [he] got direct instructions on how to speak to the investor and what to say to the investor and it was emailed direct from Mike Lynch to [him]*." This was inconsistent with his witness statement, which simply stated that he did not have a copy of the script and that he understood from the Claimants' lawyers that they had been unable to locate it on Autonomy's systems. In any event, the Defendants contended that a copy would have existed in Dr Lynch's email account and no such email exists.

(3) Mr Collet maintained that the script was a narrative document, setting out in some detail what he was meant to say.  However, the call took 45 minutes, and he remembered the "script" to be only half a page long.

(4) Mr Collet said that he was uncomfortable with what he had to say on the call, but he did not raise that either with his boss, Mr Mooney, or with Dr Lynch.

(5) The suggestion that there was a script was inconsistent with the other emails that were sent at around the time of the conversation, for the reasons explored in cross-examination with Mr Collet.

3199. Following the call, on 23 July 2009 Ms Foong sent some follow up questions to Mr Collet, focussing on prepaid royalty fees, and Mr Collet passed them on to Dr Lynch.  Dr Lynch replied with a proposed response for him, copying Mr Mooney and Mr Bettencourt.  Dr Lynch then provided Mr Collet with a Word document containing the text of proposed responses to each of Ms Foong's questions, which focused especially on whether there was any "*hosted component to some OEM deals which requires either pre-payment of licences or ongoing licence fees*".  Dr Lynch instructed Mr Collet (who it will be remembered was head of OEM in North America) to "*Pls take attached doc, read it and CUT AND PASTE JUST the text into a text email reply to them.*" In crossexamination, Dr Lynch sought to explain this peremptory instruction on the basis that (a) Mr Collet was not trained in investor relations and (b) "*under the DTR regulations[359], only certain people…are allowed…to have correspondence in anything other than general terms with investment managers.*" In any event, Mr Collet followed the instruction to the letter.

3200. Lone Pine's questions and Dr Lynch's answers were as follows:

---

[359] The FCA's "*Disclosure Guidance and Transparency Rules sourcebook*" issued in compliance with the FCA's obligations under the *Market Abuse Regulation*.

(1) *"Is there any "hosted" component to some OEM deals which requires either pre-payment of licences or ongoing licence fees?*

*No this would not be normal (can't think of one), there may be deals like this in the EDD and hosted archiving group but not the OEM business…..but I guess we would consider it if it arose.*

(2) *What are pre-paid royalty fees if such a thing exists?*

*The 200k upfront payment that customers make covers the first quarter of royalties when they start shipping (typically 2 years later). It is not normal for customers to pay upfront royalties. I believe Verity did this kind of thing before the acquisition by Autonomy but it is not our model. (I think insistence on this old verity model was one of the reasons Chad was let go) We aim to maximize the royalty stream not the upfront.* [My emphasis]

(3) *Using an example, could a customer choose to prepay upfront a portion of his future expected royalty payments, and subsequently pay less royalty payments in the future (when his products get shipped). You mentioned some royalty rates go as high as 30%; I'm wondering whether there is any structuring a customer might do to lower that royalty rate, but pre pay a portion upfront*

*Prepaying would not reduce the royalty rate even if we did it, although I guess we are always open to considering any deal (not my call that would be the CEO) this is not how we work, as I said our goal is maximum ongoing royalty not upfront.*

*There is one area that might cause confusion. An OEM customer enters a deal with us for specific of the 500 functions we sell (typically 4 or 5 of them) ships them inside each time their software is sold and pays the royalty on each one sold. Sometimes although their product has these 4 or 5 functions one specific of their end customers might need another function not in the OEM agreement in which case for this one end-user the OEM can resell the extra function as a one off licence solely for that enduser (i.e. for this one sale the OEM is acting as a reseller as well as an OEM). There can also be deals where the OEM is only licensed to a certain amount of data/speed per end-user and in the event of them selling to an end-user with bigger needs they can pay a one off royalty kicker for that end-user.*

*Remember a company like Sybase may be an:*

*1 OEM paying a royalty to us on their shipping product;*

> 2 may also be a reseller of licences for other functions to augment the OEM product in specific end customers;
>
> 3 resell Autonomy non OEM licences, and
>
> 4 may also be doing systems integration work using Autonomy software.
>
> *The OEM group would only see the first 2 cases, the rest is non OEM but to the same company."*

3201. There is a dispute between the parties both as to what question Ms Foong was really asking in question 2, and whether the answers proposed by Dr Lynch were accurate and reasonable:

    (1) Dr Lynch maintained in cross-examination that the question was "*about whether we have a balance of pre-paid royalties that have to be given back if the sales don't occur, which was the hedge fund story at the time*". He submitted that his answer on that basis was correct: particularly in the context of the questions regarding returnable up-front royalties that Lone Pine had been asking, and bearing in mind the need to avoid making improper selective disclosures to a hedge fund. Autonomy did not engage in transactions involving the pre-payment of royalties which were returnable, and which could only properly be recognised on sell-through.

    (2) The Claimants dismissed this as a tactical gloss on a straightforward question about what prepaid royalties were, and whether Autonomy used them, and that Dr Lynch had to gloss the question because he knew that, if the question bore its obvious meaning, then his draft answer to that question was a lie.

3202. There was also a dispute in relation to Dr Lynch's scripted response to Ms Foong's third question. The Claimants submitted it to be obvious that the statement that "*Prepaying would not reduce the royalty rate, even if we did it*" was intended to reinforce the answer to question 2, and to reiterate the false assertion that Autonomy had not received (or bargained to receive) pre-paid royalties, that being no part of its model. Dr Lynch suggested in cross-examination that all the response meant was that the royalty rate would not be lowered, and that this was true: "*We did take pre-paid royalties, yes, but we didn't reduce the royalty rate.*"

3203. On the basis of their interpretation of the questions and answers, the Claimants submitted that:

    (1) Dr Lynch's "*lies to Lone Pine were glaring*". He had instructed Mr Collet to tell Lone Pine that prepaying royalties did not take place, when he knew it was entirely ordinary for Autonomy to receive prepaid royalty payments from OEM partners.

(2)   To cover these lies *"Dr Lynch gave blatantly dishonest evidence to the Court."* The Claimants elaborated this as follows:

> *"His tactics included: (i) attributing a false meaning to what Lone Pine had asked and the answers he drafted; (ii) inventing a justification – the risk of inside information- that was irreconcilable with is written evidence about the market's understanding; and (iii) providing evasive answers when faced with these difficulties".*

3204.   Against this, the Defendants insisted that:

(1)   Mr Collet was an unreliable witness who had concocted a story about a script which never existed to cover up his own misdescription of the OEM business to Ms Foong at their first meeting which led to the further questions.

(2)   Restrictions under the DTR regulations made it imperative for Dr Lynch to dictate the response to Ms Foong to avoid inadvertent release of inside information by Mr Collet who had no relevant training in investor relations, and especially so since Ms Foong had (according to Dr Lynch) been fishing before, and he was concerned that Lone Pine was attempting to solicit inside information. His concerns are apparent from an email he felt he had to write to Ms Foong on 23 July 2009 (after her discussion with Mr Collet) warning her off such soliciting.

(3)   Both the questions and the prescribed responses had to be interpreted in the context of earlier questions regarding returnable up-front royalties that Lone Pine had been asking, and bearing in mind the need to avoid making improper selective disclosures to a hedge fund. The questions were properly regarded as attempts to establish whether market gossip that Autonomy was engaged in transactions for prepaid royalties which would be recognised as revenue immediately but then returned was true: and the answers were intended to provide a firm refutation of that, and make clear (as was the fact) that Autonomy did not engage in transactions involving the pre-payment of royalties which were returnable, and which could only properly be recognised on sell-through.

(4)   Thus, the interactions with Lone Pine give no grounds to criticise Dr Lynch, and provide no support for the allegation that he was involved in or knew of any false reporting of OEM revenues.  Mr Collet's evidence should be rejected as unreliable.

3205.   Although in a sense something of a side-show, the Lone Pine episode does cast light on a central issue of Dr Lynch's reliability and in particular his true intentions in relation to the depiction to the market of Autonomy's OEM business.

3206.  In my judgment:

(1) Mr Collet's antipathy to the Defendants was obvious. His reliability was also shaken by:

(a) The discrepancies between his witness evidence and his evidence when cross-examined, especially those arising from his sudden mention in cross-examination of matters entirely absent from his written evidence (for example, that he had destroyed the script he said Dr Lynch had sent him);

(b) The lack of any documentary support for certain of his factual assertions (in addition to the obvious example of the lack of any trace of the script he said had been provided by Dr Lynch);

(c) His apparent willingness to fling accusations without a shred of support (so that the Claimants had to withdraw a paragraph of his witness statement containing a serious accusation that the Defendants had manipulated the number of OEM deals reported)[360];

(d) His acceptance in cross-examination, contrary to the impression given in his written evidence, that (i) he had never been specifically directed to do a buy-out (ii) there was no policy on the part of the Defendants that buy-outs should be preferred[361] and (iii) the point of the exercise was to try to do the best deal possible for Autonomy;

(e) The overall impression I had was that he was no longer able to distinguish between the case theory and his actual recollection.

(2) However, Dr Lynch's evidence on the Lone Pine episode did not appear to me to be reliable either. In particular:

(a) His effort to recharacterize the questions put by Ms Foong in order to explain his answers was ingenious but unconvincing;

(b) His answer to the second of Lone Pine's questions (quoted in paragraph 3200(2) above) was almost the reverse of the truth and was in any event misleading; and

---

[360] Mr Collet himself sought to persist with this allegation even after accepting he could not substantiate it

[361] Though Autonomy's sales commission system did provide salesmen (including Mr Collet) with a financial incentive to strike deals with a larger 'headline' figure, as Mr Collet himself explained in his first witness statement.

(c) His evidence in relation to his answer to Lone Pine's third question was not convincing either. Dr Lynch is prone to careless spelling but seldom to careless language. I find that in stating *"Prepaying would not reduce the royalty rate, even if we did it"* (and see paragraph 3202 above) he was stating and intended to confirm that Autonomy did not "do" prepayment deals.

3207. Overall, the Lone Pine episode does seem to me to provide an example, and confirm my more general impression, of Dr Lynch using language by which he intended to convey or support the depiction of a business line generating a reliable recurring revenue stream (or, to use a phrase from Dr Lynch's statement in the 2010 Annual Report, *"multi-year committed annuity streams"*), knowing that the depiction given was at best inaccurate.

*Allegation of concealment of transactions in published information*

3208. The Claimants submitted that further support for the conclusion that the Defendants were aware that an untrue or misleading presentation was being given of IDOL OEM revenues was also to be derived from what they described in their written closing submissions as *"the manner in which Autonomy repeatedly concealed the identities of the counterparties to the largest transactions that had been allocated to IDOL OEM revenue."*

3209. In particular, they submitted that it cannot have been a coincidence, especially given the prolonged period over which the contrast is apparent, that:

(1) Throughout the Relevant Period, Autonomy's Quarterly Reports would cite only a handful of deals giving rise to IDOL OEM revenue, all with counterparties who were software companies fulfilling the restrictive view of a standard OEM; whereas

----

(2) By contrast, Autonomy never identified counterparties to transactions included within the OEM metric which were not software companies even where (as they put it) *"such transactions were of substantially greater value or prestige than the transactions that Autonomy did choose to highlight."*

3210. The Claimants offered the following suggested examples:

(1) In Q1 2009, Autonomy allocated to IDOL OEM revenue $3,251,000 from a deal with the UK Ministry of Defence ("the MoD") (OEM2). This deal (which was not mentioned in the Q1 2009 Quarterly Report) was a much larger deal than two of the three named deals: Symantec (a software company) which raised no allocated OEM revenue, and ProofPoint (another software company) from which the revenues were just $230,000.

(2) In Q1 2010, Autonomy allocated to IDOL OEM revenue $8,915,000 from a deal with BofA (OEM21). This was a far larger deal than all of the named deals combined: Adobe ($750,000), McAfee ($500,000 and $248,000) and Siemens ($72,000).

(3) In Q1 2011, Autonomy allocated to IDOL OEM revenue $6,448,000 from a deal with Tottenham Hotspur Football Club (OEM48), which was almost four times larger than one of the named deals (with Symantec, from which the revenues were $1,400,000).

3211. The Claimants' point was if the Defendants honestly believed that there was nothing wrong with the inclusion in IDOL OEM revenue of revenue from large-value deals with such well-known counterparties as, for example, the Ministry of Defence, Bank of America, and Tottenham Hotspur, then it is difficult to understand why they were omitted from the published information. The Claimants suggested that the reason was that had such counterparties been mentioned, this would have invited questions as to how some of the counterparties could possibly have been embedding IDOL into their software products for on-sale to end-users.

3212. They went on to submit that had Mr Hussain attended for cross-examination he would have been asked about his involvement in the process and what led to some transactions being selected for inclusion in the published information when other much larger transactions with high profile counterparties were omitted. He would not, answering truthfully, have disputed that he and Dr Lynch were both involved in the selection process and, further, that it was no coincidence that transactions which would have alerted the market to an inconsistency between what Autonomy's published information represented as IDOL OEM revenue and what was in fact included were deliberately omitted.

3213. In the same context, Dr Lynch was taken in cross-examination to the passage in his first witness statement where he had stated that Autonomy "*commonly reported <u>selected</u> new OEM relationships to the market*" (emphasis added). The Claimants portrayed that as an acknowledgement that a deliberate choice was made as to which deals were references in Autonomy's published information. Dr Lynch did not dispute this, but he said that he, personally, "*would not have been involved in that level*".

3214. Against this, the Defendants contended that it is wrong to say that the transactions that were highlighted systematically referred only to customers operating in the software sector. Dr Lynch made four principal points in this regard:

(1) First, that the whole argument was predicated upon an artificially narrow view of what could properly be categorised as an OEM and OEM revenue. On the broader interpretation which the Defendants say they intended there was no reason to select only software companies: the choice of which deals to mention was not informed or influenced by the narrow view at all.

(2) Secondly, unless perhaps it was something *"strategically important"*, the selection would have been done by the Investor Relations or Marketing department, and Dr Lynch would only be minimally and exceptionally involved.

(3) Thirdly, there was no suggestion in Autonomy's quarterly reports that it was the largest examples that were chosen. He explained that the selection was not based on size, and the selected deals were not described as the largest OEMrelated transactions. He stated in his witness statement that:

> *"Autonomy highlighted those transactions that were innovative, to show the calibre and breadth of OEMs, to reference up-and-coming companies or those whose reputation would enhance Autonomy's reputation."*

(4) Fourthly, it is wrong to say that the transactions that were highlighted systematically referred only to customers operating in the software sector. He also specifically disagreed that there was any intention to present only software companies. Dr Lynch told me in cross-examination that he had *"gone through the press releases of Autonomy"* and in fact, Autonomy's published information in the Relevant Period included companies that would fairly be regarded as operating both outside and inside the software sector; he named companies such as GE, Siemens, Xerox and HP. He added that the boundary between a software company and a non-software company is a vague one. Dr Lynch explained in cross-examination that *"every so often companies whose primary business is something else still do something with software."*
Although he accepted that since Autonomy dealt most with software companies those highlighted would *"obviously...more likely...be software companies"* he did not understand that they were selected for that reason. He added that, on the contrary:

> *"If we'd had the chance to announce that someone was OEM-ing our software onto a piece of hardware, we would have been extremely keen to publicise that. You know, being able to show, for example, that Autonomy is being used in health care was a very positive thing, given that we didn't do a lot of health care business ourselves..."*

3215. The first of the points raises in a modified form the question at the heart of this aspect of the case as to the meaning of the disputed phrases in fact intended by the Defendants. My determination that the Defendants knew that they were allocating to the OEM Metric transactions which would not have fallen within

the market perception of OEM business (with permissible but small exceptions as I have explained above) largely disposes of the point, though of course my determination would further be supported if the Claimants establish that the selection of OEM deals was for the reasons they suggested.

3216. As to the second point, Dr Lynch's position as regards his knowledge of the process of selection was somewhat inconsistent. As the Claimants pointed out, in his first witness statement, Dr Lynch gave detailed evidence explaining the thought process behind the selection of which OEM deals to highlight and the basis on which Autonomy *"commonly reported selected new OEM relationships to the market."* There was no suggestion or acknowledgment in that witness statement that this was not a matter within Dr Lynch's direct knowledge. The Claimants submitted that if it were true that Dr Lynch had no involvement in, or direct knowledge of, the selection process, one might have expected him to have said precisely that, not least because Autonomy's reporting of selected OEM partners to the market is specifically pleaded by the Claimants as a basis for inferring Dr Lynch's knowledge of Autonomy's wrongdoing. No such statement appears in either of Dr Lynch's witness statements either. I consider that Dr Lynch and Mr Hussain would have been involved: I hold that they were so.

3217. As to the third point, I accept that the selection was not by reference to the size of the transaction, though I should have thought it might also have some bearing. But that is not, as I see it, a point entirely in Dr Lynch's favour. For example, if selection was made (as Dr Lynch contended) to enhance Autonomy's reputation, I accept that it is striking that no mention was made of the Ministry of Defence or the SFO or Tottenham Hotspur.

3218. As to the fourth point, the fact is that the selections made were of entities unlikely to cause surprise or excite enquiry as to the basis of their inclusion does support the Claimants' position. Again, the 'dual' status of some companies as both hardware and software companies is a point which is in some ways against Dr Lynch: the choice of such an ambivalent entity is consistent with the Claimants' position.

3219. In light of my earlier conclusions effectively accepting the Claimants' case that Autonomy's published information contained untrue or misleading statements in respect of its OEM line of business, I do not think I need make a determination whether in addition the selection of OEM counterparties in the published information actually concealed the identities of the counterparties to the largest transactions that had been allocated to the OEM metric. I make no finding of deliberate concealment, which in any event would only be a basis of claim under FSMA if the concealment resulted in *"the omission from…published information of any matter required to be included in it"* within the meaning of FSMA. However, I consider that the selection of OEM transactions for presentation in the Quarterly Reports is consistent with and supportive of the findings I have earlier made.

*Alleged pre-announcement concealment: Top 10 List*

3220. I am further fortified in my conclusions by the efforts made in the course of HP's preacquisition due diligence to avoid disclosing the existence of transactions included within the IDOL OEM category when providing a list of 'top 10' OEM customers by revenue which Mr Sarin requested. The Claimants relied on this in the context of the FSMA claim as providing a further demonstration of what they presented as the Defendants' willingness to mislead HP regarding the true nature of its IDOL OEM revenue and business. In brief, the facts relating to the *Top 10 List* were as follows.

3221. On 9 August 2011, Mr Sarin sent Mr Kanter a list of information requests, which sought amongst other things "*Top 10 OEM customers by revenue for FY10 (and IBM, Oracle, EMC, [Computer Associates] and [Symantec] if not in top 10 list)*". A list was provided by Mr Kanter in an email on 10 August 2011.  The email described what was being provided:  "*The top ten core OEM licence customers in FY 2010 break down as follows*".  Mr Kanter then proceeded to list three companies "*[b]etween $3m and $12m*" and seven companies "*[b]etween $1m and $3m*".

3222. Mr Kanter thus did not describe what was being provided as a list of the top contributors to Autonomy's OEM metric: it simply listed the largest "core" OEMs. The Defendants contended, in essence, that Mr Sarin got what they understood him to have asked for, and that Mr Kanter had made clear what they were providing by describing the list as being of the top 10 *"core customers"*. Dr Lynch's Defence clearly summarised their position:

> "*The customers listed were Autonomy's top 10 customers who were OEMs, which corresponded to HP's request for the top 10 OEM customers. HP's request also made it clear from the reference to IBM, Oracle, EMC, CA and SYMC that HP were looking for information as to actual OEMs, rather than transaction counterparties to other OEM derived revenue…*"

3223. Mr Sarin stated in his witness statement, however, that he *"understood this to mean that the 10 customers listed were the 10 largest sources of IDOL OEM revenue in the year ended 31 December 2010."* Dr Lynch, who was involved with Mr Hussain in the process of compiling the list, and had been consulted by Mr Hussain in drawing up the list sent by Mr Kanter, explained the difference:[362]

> "*A…. the simple fact is you can go through our contracts, you can find the top OEM customers and that will give you a list, but that's not the same as the top contributors to OEM-derived, because those are not OEMs and we're being asked for OEMs.*"

---

[362] It was also Dr Lynch who had suggested that it was better to give bands of values, rather than the exact revenue from each OEM.

3224.   Dr Lynch's evidence in his witness statement was that at no stage did he believe that HP was being provided with anything different from what Mr Sarin had requested; he was adamant when cross-examined that what he took Mr Sarin to be asking for was a list of the largest OEMs, and not the largest OEM-derived customers. His rationale was explained in an exchange in cross-examination which I have already quoted at length in paragraph 3068 above. I would refer again to that passage and add the following further extract:

> "Q.   What I suggest has happened, Dr Lynch, is you get a request from Mr Sarin for top ten customers. You and Mr Hussain work through a list of OEM customers that…Mr Hussain has put together on a schedule, and what you send him includes only those customers, only the OEM customers or transactions which fall within a narrow ambit of the definition of OEM, rather than you identifying –
>
> A.      Because they're OEMs
>
> Q.      Well –
>
> A.      The others aren't OEMs. I don't think there's any dispute between us that, if you sell an upsell to Ford, then Ford is not an OEM, yet that still goes to OEM-derived.
>
> Q.      I suggest that what you did was to exclude transactions from the list that you knew didn't accord with Autonomy's description to the market of OEM revenue?
>
> A.      I completely disagree. What they're wanting is to see the contracts – it's not even a list they want, it's the contracts – relating to OEM customers so they can see the terms of those contracts…"

3225.   In the result, the list that Mr Kanter provided omitted many of the entities that were the counterparties to the 10 largest transactions by revenue that had been included in IDOL OEM revenue in FY 2010. For example, there was no reference to the deals with JP Morgan (worth $8,700,000 (OEM28)), MetLife (worth $7,025,000  (OEM27)), Bank of America (worth $8,915,000, $2,726,000 and $7,000,000 - OEM21, OEM37 and OEM45[363] respectively) or Amgen (worth $4,467,000 and $9,000,000 - OEM24 and OEM36[380] respectively). Each of these transactions was included within the

---

[363] As end-user in an impugned VAR transaction. [380] As end-user in an impugned VAR transaction.

$132 million of IDOL OEM revenue stated in Autonomy's published information for FY 2010. Taken together, they accounted for 36.2% of reported IDOL OEM revenue in that year.

3226. The Claimants contended that it is no coincidence that none of the excluded entities is a software company; and that, furthermore, the spreadsheet prepared by Mr Hussain which formed the basis of the list ultimately provided to Mr Sarin did not identify customers to HP where the relevant contract (a) was restricted to the purchaser's internal use; (b) constituted an upsell transaction or (c) was a hosting transaction. The Claimants submitted that it was plain that, before sending the list to Mr Sarin, the Defendants had carefully selected only those customer names where they believed that the related transactions accorded by nature with the narrower interpretation of the OEM metric, inviting or supporting the inference that the Defendants knew that the market would perceive the metric to have that narrower scope.

3227. They added that Dr Lynch's responses in cross-examination were *"not at all to his credit. He made a series of assertions that lacked any credibility."* They instanced his

---

suggestion, quoted in paragraph 3224 above, that Mr Sarin was really asking for the relevant contracts not the names of customers, which was plainly not the case. More generally, they dismissed Dr Lynch's main point that there was a distinction between *"core"* and *"derived"* as a *"tactic"*, and his claim to the effect that this distinction had previously been explained to HP as *"completely untrue".* They added that the explanation of the distinction to HP was not mentioned in his Defence, nor in his written evidence (including in his response in his second witness statement to Mr Sarin's witness statement): nor was it to be found in any quarterly report, earnings call or annual report during the Relevant Period. They stated that *"There was no such mention because Dr Lynch's live evidence was simply made up."*

3228. Dr Lynch sought to rely on a Power Point display at a meeting in which (he said) the distinction was made and asserted that in any event it was also *"well understood in the market and covered in many analysts reports and market conference calls before that period"*. There was little or no evidence for either.

3229. However, the Defendants referred me to a document which was provided to Mr Sarin by Autonomy a little later in the due diligence process. This was a further list of top OEM customers, headed *"OEM analysis. Top customers by name and revenue category 2006-2010"*, which Mr Sarin accepted when cross-examined, that he had probably seen. Immediately below that description there appeared a note in the following form:

> *"Note: Excludes…upsells, maintenance, pros serve etc, and excludes companies which were formerly OEMs but subsequently acquired by Arsenal (eg IWOV, Meridio, etc). Estimates of contributions below."*

3230.  The further list then set out the customers in question under two categories (Over $10m and Under $10m) as follows:

> *"Over $10m category*
> - *EMC*
> - *HP*
> - *IBM*
> - *Iron Mountain*
> - *Video Monitoring Services*
>
> *Under $10m category*
> - *Adobe*
> - *Bloomberg*
> - *Computer Associates*
> - *Dassault Systems*
> - *Deloitte*
> - *Energy Solutions*
> - *Huron*
> - *Hyland*
> - *KPMG*
> - *Rand*
> - *Opentext*
> - *Oracle*
> - *Symantec*
>
> - *Verdasys*
> - *Xerox"*

3231.  The Defendants submitted that this list made clear to HP both that Autonomy's OEM business included upsells, and also that upsell revenue was being excluded in drawing up the list. If still uncertain, for example about the scope of the expression "upsells" (which when cross-examined he told me he had understood to be restricted to *"selling more functionality to the OEM itself"*) Mr Sarin had the opportunity to ask further questions, but had chosen not to do so.

3232.  Further, on 10 August 2011, various OEM contracts were uploaded to the data room.  Mr Gersh confirmed that he read all of them.  Those contracts include contracts which HP now impugn, saying that they cannot properly be classified as OEM.   But the Defendants contended that HP would have known that Autonomy was treating those contracts as OEM contracts from their inclusion amongst the OEM contracts in the data room; and as explained below, those reviewing the contracts for HP during the due diligence process identified the very clauses about which the Claimants now complain in a document headed "*Project Tesla OEM Contract Reviews*" prepared on 11 August 2011. However, that is a matter going, as I see it, to inducement and reliance rather than the intentions behind the provision of the *Top 10 List.*

3233. Despite some equivocation on the part of Dr Lynch when he was cross-examined on the matter, there was no real dispute about the Defendants' involvement in the preparation of the *Top 10 List*. Dr Lynch accepted that he had been consulted by Mr Hussain in drawing up the list sent by Mr Kanter, and had, for example, suggested that it was better to give bands of value rather than the exact revenue from each OEM. He accepted also (and there are emails demonstrating) that he had thereafter been kept up-to-date by Messrs Hussain and Kanter as the response to Mr Sarin was finalised. Mr Hussain was aware and involved likewise.

3234. The question whether the *Top 10 List* was contrived to perpetuate a false impression is a facet of the more general question as to whether the IDOL metric was intentionally misleading. My conclusion that it was accordingly not only informs but to some extent dictates my assessment.

3235. I have concluded on a balance of probabilities that:

(1) Although it may well be that, over time, Dr Lynch has convinced himself, such that he now does believe, that the distinction between OEM and OEM derived on which his position is based was current in the market's understanding at the time, it was not.

(2) At the time, the Defendants did wish and intend to ensure that the fact that they had included in the OEM metric a very substantial amount of revenue from sources other than what the market understood to be comprised in it was not exposed.

(3) The Defendants (and Mr Kanter) well appreciated that Mr Sarin's request for a list of *"Top 10 OEM customers"* required an answer which did not expose that fact.

(4) Like the self-coined expression "OEM derived", the notion of "core" OEM customers was the means they devised of providing a list which was apparently responsive, but which confined the listed customers to software companies engaged in business which plainly did properly fall within the metric, and did not expose the "derived" element which by now comprised by far the greater part.

(5) There was no evidence that the expression "core OEM" had been used before, or that the Defendants had some substantial basis for thinking that it would be understood by Mr Sarin as differentiating "derived" business. I have seen no evidence that either he or the market understood, or had even been introduced to, the notion of "core" OEM as denoting a small sub-set of business included in the OEM metric.

(6) The notable absence of any attempt at an explanation, and the deletion of words in an early draft list which did at least explain that upsells and maintenance had been excluded, further support the impression I have formed that the *Top 10 List* was carefully contrived to continue the

pretence that the OEM metric was substantially comprised of revenue from (a) development licences and (b) royalty-type payments by the OEM concerned on its onward sales of product embedded with Autonomy software.

(7) In this, as in general, the due diligence undertaken was feeble: its aim in reality was to find support for Mr Apotheker's project and the sale price, rather than to ferret out inconsistencies: but that is matter going to the issue of inducement and reliance, to which I turn in paragraph 3236 below, after brief consideration of one further episode which the Claimants submitted, and I agree, reinforces the conclusion that Dr Lynch was at the time intent on concealing from HP the true variety of revenues included in what Autonomy presented as its OEM business. The episode in question relates to the *"Joe Bloggs"* correspondence, which I mentioned in paragraphs 312 to 313 of the Introduction to this judgment.

*The "Joe Bloggs" correspondence and post-announcement concealment*

3235A. It may be recalled that in late August 2011, and some 14 months after he had left Autonomy, Mr Collet co-authored (with a former Autonomy colleague of his called Mr Marshall) an anonymous communication (of which there were several iterations) to industry and financial analysts suggesting a number of questions that HP should be asking about Autonomy's OEM business. The Defendants portrayed this (in Dr Lynch's written closing submissions) as *"[r]ather than being a disinterested attempt by him to pass on his concerns, this was a sustained campaign to generate negative market sentiment, apparently for the benefit of investors holding short positions in Autonomy stock…"* More pertinent in this context than Mr Collet's motives, however, is the insight that Dr Lynch's responses provides into how he intended HP to understand Autonomy's OEM business.

3235B. Of particular relevance in that context is a document dated 13 September 2011 entitled *"Autonomy – examining the intentional misinformation"* sent by Dr Lynch to Mr Robison under cover of an email of the same date, and described by Dr Lynch as *"a simple rebuttal to the 4 main attacks from the short hedgies over the years"* which had been prepared by *"Our IR people"*. One of the four areas addressed was *"IDOL OEM, how it works and the revenue profile"*. What stands out from the description given of the *"IDOL OEM"* business is that no inkling was given of any revenue source other than development fees and (predominantly) recurring royalty revenue: thus there was no mention or suggestion at all of other sources of revenue, such as upsells and PODS revenue, and no mention of some subset of *"OEM- derived revenue"* though the totals given in the document were the same in the document as in Autonomy's published information.

3235C. Dr Lynch sought, especially in his second witness statement, to distance himself from the preparation of the 13 September 2011 document. But it is clear from background documentation, and I find, that he was personally involved in its preparation and aware of its contents before it was sent to HP. He must have been aware, and I find that he intended, to perpetuate the impression given in the published information of the *"IDOL OEM"* business being entirely comprised of upfront development fees and (predominantly) recurring royalty revenues because of the special value given in the market to revenues of that sort. I would not base my conclusion as to what the category was intended to convey on this document: but it does seem to me to be supportive of the conclusion that I have reached.

*The issue of reasonable reliance: did Bidco acquire Autonomy in reasonable reliance on the information given about Autonomy's OEM business in the published information?*

3236. The Claimants' case that HP's understanding of the IDOL OEM revenue stream as particularly valuable was based on Autonomy's published information (and in the context of its deceit and Misrepresentation Act claims, on the pre-acquisition representations made to it) and their case that HP reasonably relied on what was said in that published information accordingly was based on the evidence of Mr Sarin and Mr Apotheker, little of which was challenged on the point, and also of Mr Robison and Mr

  Gersh (whose description of OEM revenues as comprising *"an upfront licensing fee, PCS [post contract support] and royalties that are paid on a quarterly basis…"* in KPMG's due diligence report was plainly based on that information).

3237. Mr Sarin's evidence was that:

   (1) He reviewed the 2010 Annual Report, and "*relied on the accuracy of the 2010 Annual Report when forming a view as to whether Autonomy could be a good acquisition target for HP*".

   (2) He also reviewed Autonomy's Q1 2011 Quarterly Report, which "*indicated that all of [Autonomy's] product lines were achieving double digit growth*", and that "*Autonomy's OEM business was said to be growing at 28% annually*".

   (3) He read Autonomy's Q2 2011 Quarterly Report "*and was impressed by Autonomy's apparent performance*", which included 27% growth in the IDOL OEM business.

   (4) When building the Deal Model, HP used the five categories of reported revenue identified in Autonomy's published information. One of these was IDOL OEM, which Mr Sarin understood to be "*licensing Autonomy software to other software companies who embedded it in their own products*".

(5) In the Deal Model, a high gross margin (98%) was projected for OEM:

> "*because we understood OEM revenue to consist of royalties paid to Autonomy by other software companies, with very little attendant cost to Autonomy, and it seemed that Autonomy had few competitors in the space*".

(6) At the time of the Q2 2011 results, the published information appeared to convey, and HP understood it to convey, that:

> "*Cloud and OEM now represented more than half of Autonomy's core software business was significant from HP's perspective. We <u>considered the Cloud and OEM revenue streams to be particularly</u> valuable because of their (apparent) recurring nature... once an OEM customer embedded Autonomy software in its own software product, that product would usually (we understood) be sold for a period of years. We viewed the OEM business as very valuable</u> because we believed the revenues were recurring in nature, increasing rapidly, and highly profitable to Autonomy because all selling was done by the third party software companies*".[364]

(7) The following excerpt, from a document headed "*Autonomy – calculating organic growth*" sent to Mr Sarin by Derek Brown (Autonomy Investor Relations), copied to Dr Lynch and Mr Hussain[365], on 23 August 2011, shortly after the offer was announced, accorded with Mr Sarin's understanding of the attractiveness of Autonomy's IDOL OEM business:[383]

> "*Autonomy has consistently signed 10 to 15 OEM agreements per quarter for many years. These lead to royalty revenues which begin to flow around 2 years later as 3rd party products with IDOL embedded come to market. Thus there is a **layering effect** as more and more products begin paying royalties each quarter.*
>
> *Another key driver for OEM is the **royalty rate**, which averages around 4% but is ticking up as more functionality is licensed. IDOL OEM revenues grew by 27% in Q2'11 which is pure organic expansion. IDOL OEM is currently 26% of core IDOL sales.*"

---

[364] Emphasis added.

[365] The Defendants saw the document in draft form before it was sent to Mr Sarin. [383] Emphasis in the original.

3238.  The Claimants also relied on the following unchallenged parts of Mr Apotheker's evidence:

> (1) His statement in his witness statement that he reviewed the 2010 Annual Report "*very carefully*" in May 2011. (He confirmed this when cross-examined.)

> (2) His understanding that the manner in which IDOL OEM revenue was described or defined in that report:

>> "*indicated that Autonomy's IDOL software had been widely accepted by other software companies and was becoming the industry standard for managing and analyzing unstructured data. This aspect of Autonomy's business also appeared to be very profitable because other software companies were selling Autonomy's software in the course of selling their own software (at no cost to Autonomy). OEM revenues were attractive for the further reason that they are typically recurring in nature. Once software is embedded in another software company's product, sales of that company's product tend to be made over a period of several years*". [366]

> (3) Dr Lynch's remark in the 2010 Annual Report that the "*IDOL OEM and IDOL Cloud routes*" were "*highly attractive*" as they "*turn one-off sales into multiyear committed annuity streams*" was consistent with Mr Apotheker's understanding of the value of the IDOL OEM revenue stream.

> (4) Mr Apotheker stated that:
>> "*Similarly, if Autonomy had fully disclosed that its IDOL OEM revenues were far lower than had been shown in the Annual Report I reviewed... it would have made a significant difference to my thinking about the company. Lower IDOL OEM growth would have meant that Autonomy's software was not as successful in the marketplace as I had otherwise thought...lower IDOL OEM revenues and slower growth would have made Autonomy, as a whole, less attractive to HP, because Autonomy would not have as readily helped HP to achieve its strategic goals of becoming a higher margin, higher growth company.*"

3239.  When cross-examined, Mr Apotheker told me that he:

> "*really liked this notion of OEMs because much more than the resellers themselves this was a highly scalable model. In particular, the way it was explained to me and the way I think it worked was that it*

---

[366] Emphasis added.

> *was a multi-year, layered effort where you would generate more and more income from a given OEM over time with hardly any additional cost of sales. So I thought that was a very, very important part of the business model and a very smart one."*

3240. He confirmed that it was this which made the OEM line such an attractive part of Autonomy's business model: *"the absolute number wasn't of big interest".*

3241. Mr Robison, who did not attend to give evidence (citing medical reasons) also stated in his witness statement that his understanding was that:

> *"Strong IDOL OEM revenues and revenue growth were important to HP. The stated growth of Autonomy's IDOL OEM sales was an indicator that other companies valued Autonomy's technology. We therefore considered IDOL OEM to be a highly profitable, growing revenue stream that was recurring in nature and an indicator of the quality of the business."*

3242. I agree with the Claimants' summary in their closing submissions that:

(a) HP based its understanding of Autonomy's IDOL OEM business, in substantial part, on the 2010 Annual Report, and the Q1 and Q2 2011 Quarterly Reports.[367]

(b) HP's understanding of IDOL OEM revenue accorded with Autonomy's description or definition of this revenue as arising where Autonomy licensed its software to other software companies who embedded it in their own products.

(c) HP understood the business to be fast-growing.

(d) HP forecast future IDOL OEM revenue by reference to the size and growth of the IDOL OEM revenue amounts reported by Autonomy.

(e) HP understood this business to be particularly valuable, because it consisted of a stream of recurring, high-margin, royalty income, paid by OEM partners over many years.

3243. Further to my analysis of the instances given by the Defendants where reliance might not be reasonable (see the Introduction to this judgment at paragraph 521) I have considered the following in the particular context of the question whether HP's reliance on the above was reasonable:

---

[367] As noted above, its understanding was also formed by the misrepresentations made to HP directly, upon which HP also relied. These misrepresentations are addressed more fully below.

(1) Whether the fact that there was a general warning in the 2010 Annual Report that *"delivery of Autonomy's core technology is via a number of methods, depending on the demands of the customers, trends within these delivery methods are not segments and are provided for background information and may include qualitative estimates"* was a sufficient warning to make any reliance without further investigation and verification unreasonable;

(2) Whether the fact that Mr Apotheker accepted when cross-examined that he did not read any more up to date quarterly reports and the 2010 Annual Report which he did read was by then some seven months' out of date (though he told me he was told by others within HP that the quarterly reports *"were in line with*

—————————————

*expectations more or less"*) made any reliance unreasonable in the context of such a large transaction;

(3) Whether in the course of due diligence HP reviewed documents which made plain the true position, and if so whether (as was submitted in Dr Lynch's written closing) the Claimants *"cannot say that they were misled about the content of Autonomy's OEM business, when these things were clear from documents provided to them and reviewed at the time."*

3244. Suffice it to say that none of the matters in (1) and (2) above persuaded me that reliance was not reasonable.

3245. As to (3), the Defendants relied on the following as demonstrating that the Claimants' claim is artificial and *"founded on matters that they (or their advisers) knew about at the time, and were not concerned about"*:

(1) that a number of the OEM contracts that the Claimants sought to complain about were included in the data room during due diligence and HP's advisers (Freshfields), working with an HP in-house lawyer (Ms Walton) had analysed these contracts, and collated a document headed *"OEM Contracts Reviews"*;

(2) the *"OEM Contracts Reviews"* document identified key features of contracts in the data room inconsistent with what the Claimants have alleged to be their understanding of the scope of the metric; yet

(3) neither HP nor its advisers raised any complaint or suggested that any contracts had been improperly categorised as OEM;

(4) one example given by the Defendants was the transaction OEM 61 in the list of OEM transactions impugned by the Claimants. This covered two contracts with Iron Mountain, both of which  were uploaded to the

data room on 10 August 2011.  Although the documents were redacted, the redactions did not cover the text which the Claimants relied on as showing these contracts could not properly be classified as OEM.  The basis which the Claimants give for the complaint that the agreements were wrongly classified is that "*The transaction related to a reseller agreement and a second agreement restricted to internal use*".  Dealing with the two contracts in turn:

> (a)     The contract the Claimants challenged as a reseller agreement was the very first contract described in the "*OEM Contract Reviews*" document.[368]  In the "*Type of Document/Contract*" box the reviewer wrote "*Value added reseller agreement*"; so there was no secret about that.  The Claimants' written opening quotes one clause to allege that the contract was wrongly classified.  The

---

> same clause is quoted in the "*OEM Contract Reviews*" document.[369]

> (b)     The Claimants alleged that the second contract described in "*OEM Contract Reviews*" contained an internal use restriction such that its categorisation as OEM was improper.  But the Defendants suggested that the reviewers must have read it, since it is the first clause on the first page, and they have quoted from other parts of the contract.

> (5)   It was also clear from those contracts in the data room that Autonomy's OEM business covered some VAR agreements: the example of OEM 61 (relating to two contracts with Iron Mountain) appears above; and OEM 55 covered a contract with Symantec also relied on by the Claimants as wrongly classified on two bases clear from the wording of the contract itself, both noted in the *OEM Contract Reviews.*".

> (6)   The contracts in the data room also included contracts which would not generate royalties (such as an agreement with Verity for lump sum payments and no royalty, OEM54).

3246.  However, although the Defendants contended in their closing submissions (both written and oral) that the Claimants *"cannot say that they were misled about the*

---

[368] The Defendants identified the document being discussed as "*Iron Mountain - IM partnership (redacted)*", a redacted version of the VAR Agreement dated May 2011.
[369] In the box headed "*Product*": "*Tesla, Inc. grants Iron Mountain, during the term of this agreement, a limited non-exclusive, non-transferable right and license to distribute copies of the Products to Iron Mountain's customers, and to resell the Service Products and Support to End-users.*"

*content of Autonomy's OEM business, when these things were clear from documents provided to them and reviewed at the time"*, I do not accept this apparent assertion of actual knowledge and understanding. It may be that the Claimants should have appreciated that the OEM business was broader in scope, and/or their advisers should have so advised them; but I am far from convinced that they did so. As discussed previously, it was not open to the Defendants to contend that HP should somehow have worked out the truth for itself. Further, none of this was put to Mr Sarin or Mr Apotheker (or Mr Gersh); it was not suggested to any of them that HP had in fact ascertained the true composition of IDOL OEM revenue from its due diligence exercise.

3247. In short, I consider that HP (and thus Bidco) reasonably relied on and was induced by what was stated in the published information as to the particularly valuable nature of the OEM revenue stream.

### The misrepresentation of Autonomy's OEM business in other materials

3248. I address in a separate chapter of this judgment the various claims made by the Claimants in respect of pre-acquisition representations, which the Claimants allege they relied on as having induced them to purchase the Defendants' own shares in Autonomy at the price they agreed to pay: see the chapter headed Deceit and Misrepresentation Claims. Although I also address various representations made about Autonomy's OEM business in that chapter, it is convenient to deal here with a sub-set of those representations now, because in my view they cast further light on the dispute as to what the Defendants intended to convey about that business, and in my view reinforce my conclusion as to

---

what the Defendants intended the published information to convey about Autonomy's OEM business.

3249. The material I have in mind, all of which I return to later, can for present purposes be summarised as follows:

(1) In initial meetings in January and February 2011, Mr Quattrone of Qatalyst took HP through two slide decks. There is an issue whether he did so as agent of Autonomy, but for the present that is not of importance since the focus presently is on what HP were told. The Slides included representations concerning (i) the level of IDOL OEM revenue; (ii) the growth of IDOL OEM revenue; and (iii) the nature of the business as *"Royalty-based ~3%"*.

(2) On 4 March 2011, a further slide deck ("the March Slides") was used which included what the Claimants alleged were misrepresentations as to (i) the level of IDOL OEM revenue; (ii) the growth of IDOL OEM revenue; (iii) the royaltybased nature of IDOL OEM revenue; (iv) that IDOL OEM revenue was revenue from transactions with software companies; and (v) that reported IDOL OEM revenue related to deals signed two years ago.

(3) The Defendants contended that the slides shown in March should not be considered in isolation; and Dr Lynch told me in cross-examination that although not mentioned in the Slides themselves, the inclusion of revenues from upsells and PODs was expressly mentioned; but there was no other evidence of this, and Dr Lynch made no mention of any such broader discussion in his witness statements, nor in his pleadings.

(4) On 29 June 2011, Dr Lynch made misrepresentations at a meeting held between HP and Autonomy representatives in London. These included that Autonomy's OEM business was fast-growing and involved many other software companies incorporating IDOL into their own software products.

(5) Further representations about IDOL OEM revenue were made to HP on due diligence calls in August 2011, including on calls held on 1, 2 and 4 August 2011. These reinforced the depiction of Autonomy's OEM business as being rapidly and exponentially growing, very high margin and generating recurring revenue, as in Autonomy's published information.

3250. The Defendants addressed the statements made in the March slides in relation to OEM as follows:

(1) First, they said that the Claimants' argument that the Slides represented that IDOL OEM revenue constituted 15% of Autonomy's reported revenue in 2010, when the true figure was only 3.2%, was founded on the Claimants' narrow and erroneous definition of the relevant revenues. The Defendants' case was that Autonomy's IDOL OEM revenues for 2010 were not, and were never represented to be, confined to core OEM revenue received directly from OEMs, rather than the broader OEM derived revenues described above.

(2) Secondly, they rejected the Claimants' allegation that by selection of companies whose logos were shown on slide 19, Dr Lynch represented that Autonomy's OEM revenue "*was exclusively derived from transactions with companies operating in the software industry or with a large software business*." They contended that no such representation was made: the relevant slide, which appeared in a section describing Autonomy's business models rather than defining the scope of its different revenue categories, merely identified a selection of Autonomy's core OEM customers.[370] The Defendants contended, therefore, that the selection was not misleading: as already discussed, Autonomy's core OEM customers are primarily software companies,

---

[370] Not all of the companies whose logos were shown were "software companies", though Dr Lynch accepted that they had software businesses.

even if its OEM derived revenues come from a wider range of counterparties.

(3) Thirdly, as to Dr Lynch's alleged representation through the Slides that the business operated mainly or typically on a royalty model, with annual royalties of 3 or 4%, the Defendants' case was that no such representation was made, and that, at most, an example was given with an indication of a 4% royalty, which HP would have known from reading Autonomy's 2010 Annual Report was only an example, and that "*contracts and situations vary.*"[371]  Further, they submitted that HP was aware from its own OEM arrangements with Autonomy that some of Autonomy's contracts provided for prepaid fees.

(4) Fourthly, the Defendants insisted that they had not given a false impression of OEM revenues in respect of recurrent revenues and that there was no misrepresentation, since Autonomy's core OEM revenues were highly likely to recur since, even where the OEM paid a bulk or prepaid royalty, there was a strong incentive to renew at the expiry of the contracts with Autonomy.  In any event, the Defendants contended that many of Autonomy's OEM contracts were royalty bearing and that the Claimants had not established otherwise.

(5) Finally, they maintained that the Claimants' argument that the growth rate for Autonomy's OEM revenues were misstated, showing that the business was growing at the rate of 35% from 2009 to 2010, rather than (as the Claimants argued) shrinking at 28.5%, was again predicated on the Claimants' misconception about the true scope of the OEM metric: see above.

3251. Given that I have found in favour of the Claimants on their case that a significant proportion of the revenues included in the OEM metric were not structured to generate recurring revenue and on their case that only revenue from development licences and royalty revenues should have been included in the OEM metric.  I accept the Claimants' case that the March Slides were misleading in relation to Autonomy's OEM business.

3252. I consider the extent of the Defendants' involvement in and responsibility for them in paragraphs 3866 to 3867 below in a separate chapter in which I address the Claimants' deceit and misrepresentation claims.  Suffice it to say for the present that I think both must accept responsibility for the representations made from March 2011 onwards.

***Conclusion on OEM***

3253. In my judgment:

---

[371] See paragraph 3164(3)(c) above.

(1) the Defendants gave a false and misleading picture of Autonomy's OEM business.

(2) They knew they were doing so. They did so because they also knew that it would be, and had been, regarded as generating a particularly valuable revenue stream.

(3) HP relied on that picture, and it was reasonable for it to have done so.

(4) The direct representations made to HP confirmed the depiction given in Autonomy's published information.

(5) HP was the controlling mind of Bidco; and its reliance is to be attributed to Bidco.

(6) The Claimants' case in respect of the OEM business has been established.

## HOSTING
## General overview of the Claimants' hosting case

3254.   An important part of the Autonomy group's business was the provision of data
hosting services to customers which enabled them to archive and preserve, access
and navigate their data and digital information in an environment that was hosted
and managed by the Autonomy group at its own data centres using Autonomy
software.

3255.   Hosting business customers tended to be 'sticky' in the sense that once having
settled on a provider, they rarely switched to another, because of the effort and
substantial expense of doing so. Further, since the standard model was that
customers would pay a subscription for the services provided, hosting businesses
tended to generate recurring and predictable revenue. This made its hosting
business (sometimes called *"IDOL Cloud"*), which Autonomy primarily carried
on through Zantaz, a part of the group's business which analysts and other
investors valued especially highly. Dr Lynch was well aware of this: he noted in
the Q2 2011 earnings call that:

> *"Obviously we'd be very happy if everything went to the Cloud because
> it's a much nicer model in terms of valuation."*

3256.   The particular importance ascribed by analysts and investors to Autonomy's
hosting business as an important source of reliable and growing revenue seems
to have encouraged Autonomy to provide metrics to show its success. From 2010
onwards, Autonomy's published information referred to the hosting business as
*"IDOL Cloud"* and included an IDOL Cloud metric in the "front-end" of its
quarterly and annual accounts. Revenue included within that IDOL Cloud metric
was an indicator of the growth and success of the hosting business. It was an
especially valued revenue stream.

3257.   The Claimants' case in relation to Autonomy's hosting business ("the hosting
case") is, in a nutshell, that Autonomy resorted to stratagems intended artificially
to accelerate the rate at which Autonomy recognised revenue from hosting
customers to boost the appearance of substantial growth of this revenue stream
whilst at the same time failing to disclose the true nature of the arrangements and
the fact that this inevitably reduced future recurring revenues.

3258.   The alleged stratagem was Autonomy's introduction of what was called a
"hybrid model" for its two main hosted offerings in the Relevant Period, which
were Digital Safe and e-Discovery. The Claimants' complaints relate both to the
model and to its presentation.

### Autonomy's hosting business and the introduction of the Hybrid Model in more detail

3259.   Both these products (Digital Safe and e-Discovery) had originally been
developed by Zantaz, a specialist in cloud archiving. Zantaz also had another
archiving solution called Enterprise Archive Solution ("EAS"), which was

typically the solution sold to smaller customers who wanted to manage their own archive on-premises (that is to say in their own office or site).[372]

3260. Autonomy had acquired Zantaz in July 2007, and Zantaz continued to be the operating company for Autonomy's hosting business thereafter[373]. Both before and after the acquisition the CEO of Zantaz was Mr Sullivan. He remained as CEO of Zantaz throughout the Relevant Period.

3261. Prior to its acquisition, Zantaz had generally charged its customers fees for hosting services (priced as an agreed sum per megabyte of storage) usually on a pay-as-you-go basis. This was an industry standard way of charging and was known as "Software-asa-Service" ("the SaaS model"). In its own financial statements prior to its acquisition, Zantaz recognised revenue from its SaaS business over the course of the hosting contract as and when the services were provided. That was the accounting treatment prescribed by US GAAP.

3262. Following its acquisition, and at Autonomy's instigation, Zantaz began to promote, both to new and existing customers, an alternative contract model, known as the *"hybrid model"* or *"hybrid structure"*. This involved structuring or restructuring its hosting arrangements so that customers paid (i) a significant upfront sum for a licence to use Autonomy's software, (ii) fees for standard maintenance and support services of the kind typically provided with software licences, and (iii) considerably reduced fees for hosting and related ongoing services. Typically, around one-third of the overall revenue from a hybrid deal was recognised upfront[374]. References in this part of this judgment to "licence fee" or "licence fee element" are to that proportion of the revenue from a hybrid deal which was recognised upfront.

3263. In cases where the hybrid model was agreed, Autonomy treated the sale of such a licence like the sale of goods and would recognise the sizeable licence fee element as revenue immediately upon delivery of the software. The remaining revenue was recognised over the period of the arrangement.

3264. The Claimants' overall "Hosting case" is that the licence issued in the hybrid model had no real substance and was not in any real sense a separate and

---

[372] After acquiring Zantaz, Autonomy made the decision not to continue to develop EAS, though it still had to provide support services for EAS customers which Autonomy largely outsourced to Capax Global.

Autonomy/Zantaz focused development efforts on e-Discovery and Digital Safe.

[373] However, and in line with my general impression that little heed was taken to separate corporate identity within the Autonomy group and all group business was in reality directed by Autonomy's management, Dr Lynch, when asked in cross-examination to confirm that hosting business was *"mostly carried on by or through Zantaz",* said *"We didn't really operate as companies in that way…so, for example, the employees in Zantaz would have been Autonomy employees…"*.

[374] As Dr Lynch explained, in the hybrid model, there was a licence element or component, for which a fee was charged, as well as hosting and service elements. The licence fee element would typically comprise about onethird of the whole. After carving out somewhere between 5% and 15% for the invariable maintenance part of the licence fee the remaining part of the licence fee would be recognised 'upfront' (i.e. immediately), provided that the auditors (Deloitte) were satisfied that the split between licence fee and maintenance fee was at *"fair value"*.

severable component of the overall transaction for the provision of hosting, monitoring and maintenance services, so that it was wrong to account for it as if its sale was analogous to the sale of goods. The rights apparently conferred on a grantee under the licence had no practical utility and were of no material benefit to the grantee except as the means of obtaining discounted hosting fees. It was a device used to justify accounting for part of the hosting

fees as realised revenue at the point of the licence sale, whereas in reality the issue of a licence did not alter the fact that all that was to be provided was hosting and related services [375]. Further, the Claimants argued that such were the discounts offered in return for payment of the upfront licence fee that the hybrid model resulted in Autonomy receiving a considerably diminished overall return.

3265.  In the particular context of eDiscovery, the Claimants also advanced an alternative case, that it was not possible to ascribe a "fair value" to the licence component of the hybrid deal and therefore recognise the licence revenue upfront.

3266.  The Claimants' hosting case had five strands:

(1) Their principal claim was a FSMA Claim which related to 51 of the hosting transactions identified in Schedule 6 of the RRAPoC each involving the sale by Autonomy of a licence to use Digital Safe and/or related software as part of a hosted Digital Safe arrangement which in many cases could only be used with Digital Safe ("Related Software"). These Digital Safe transactions were referred to as "Schedule 6DS (D(igital) S(afe)) transactions". The Claimants' complaint in relation to the Schedule 6DS transactions is that Autonomy ought to have recognised the licence fee as revenue over the term of the contract and not upfront, and that the recognition in its accounts of all revenue from the licence fee at the time of the sale caused Autonomy's published information to be misleading.

(2) The Claimants also claimed under FSMA in respect of seven more of the transactions listed in Schedule 6, which related to Hybrid Model e-Discovery arrangements ("the Schedule 6 e-Discovery transactions"). As with the Schedule 6DS transactions, the Claimants contended that Autonomy ought to have recognised the revenue rateably over the term of the contracts, rather than upfront, and the recognition in its accounts of all revenue from the licence fee at the time of the sale caused Autonomy's published information to be misleading.

(3) A further complaint raised by the Claimants related to the inclusion of the licence fee revenue within the IDOL Cloud metric in Autonomy's

---

[375] For Digital Safe, this comprised (a) hosting the software and the data on Autonomy's own hardware or the Autonomy cloud, and (b) monitoring and managing the performance of the system. For e-Discovery, this comprised the same plus related e-Discovery services, and the use of the term 'hosting' or 'storage' in a context where it applies to e-Discovery should be understood to include both.

published information[376]. The principal issue is whether Autonomy's descriptions of the IDOL Cloud category of revenue were untrue and/or misleading to the knowledge of the Defendants. According to the Claimants, Autonomy represented the IDOL Cloud metric as comprising revenue which was recurring in nature, and the allocation of licence fee revenue (which was a one-off fee and thus not recurring) was never disclosed, and (the Claimants noted) the Defendants did not contend that they were ignorant of the allocation of licence fees to IDOL Cloud. The Claimants contended that the purpose and effect of this was to give the market the false impression that Autonomy's recurring revenue from its hosting business was higher and of a different quality than actually it was. However, Mr Rabinowitz clarified that the Claimants did not assert any free-standing claim in this regard, but relied on it as evidence of (a) general dishonesty on the part of both Defendants and (b) their willingness to present Autonomy's hosting business to the market (and HP) in a misleading manner.

(4) The fourth strand of the Claimants' hosting case was a direct personal claim for breach of duty against both Defendants to recover transactional losses in relation to a numerically small, but in money terms substantial, subgroup of the 51 Schedule 6DS transactions. Originally, the Claimants sought to claim damages against the Defendants in respect of all the Schedule 6DS transactions. However, by the time of trial (and further to amendments at a contested hearing in 2017 and at the PTR in February 2019) the Claimants confined their claim for damages against the Defendants to just four of the 51 DS transactions ("Schedule 12D transactions"). Though residually maintaining that all 51 identified DS transactions were improperly accounted for, the Claimants adduced no evidence relating to any specific hosting transactions other than in respect of those four Schedule 12D transactions. The four Schedule 12D transactions all involved what were claimed to have been contrived restructuring (and in one case, re-re-structuring) of hosting contracts which had already been restructured, which were of no benefit to either of the parties to them, except in enabling Autonomy to claim further revenue recognition and the customer to achieve cost savings. The four Schedule 12D transactions accounted collectively for almost 25% of the total licence fees from the Schedule 6DS transactions. They were made between Zantaz and Morgan Stanley (two transactions, one in Q4 2009 and the other in Q1 2011), Zantaz and Deutsche Bank (in Q1 2011), and Autonomy Inc (though Zantaz continued to be the entity recording

---

[376] From 2010 onwards, Autonomy's accounts (at their "front-end") and published information referred to the hosting business as *"IDOL Cloud"* and all or nearly all hosted transactions and the revenue arising were allocated to IDOL Cloud. IDOL Cloud revenues grew considerably during the Relevant Period, increasing from $45 million in Q1 2010 to $64.3 million in Q2 2011. The Schedule 6 transactions comprised some 10% in Q1 2010, 44.4% in Q2 2010, 10% in Q3 2010, 13% in Q4 2010, 29.2% in Q1 2011 and 24.7% in Q2 2011.

revenue)[377] and MetLife (in Q2 2011). The issue is whether the Schedule 12D transactions were entered into for the improper purpose of artificially accelerating revenue, without regard for and contrary to the commercial interests of Zantaz and/or ASL.

(5) The fifth strand of the Claimants' case was defensive: they refuted any suggestion that HP was aware that the upfront recognition of licence revenue from Autonomy's hybrid hosting deals contravened the applicable accounting principles, or that the hybrid model was implemented in such a way as to result in the reduction of overall hosting revenues and profits, or that licence revenue was included in IDOL Cloud, or (more generally) any suggestion that HP was not deceived.

3267. Part A of this chapter of this judgment addresses both limbs of the FSMA/Schedule 6 claims and also the Claimants' contentions in respect of the IDOL Cloud metric. Part B addresses the Schedule 12D personal claims for transactional losses.

**PART A: FSMA Claims**

3268. The crux of the Claimants' Hosting claim under FSMA is a dispute whether it was proper for Autonomy to recognise revenue from the sale of the licence as at the date of that sale as if the licence was separate from the hosting services element for which customers continued to be obliged to pay, or whether the licence fee was properly to be treated as a prepayment of the hosting services to be provided by Autonomy and thus recognised over the period during which those services were provided.

3269. The characterisation of the sale of the licence as a separate component of a composite sale giving rise immediately to recognised revenue depended on the licence being treated and regarded as conferring a real and realisable right in respect of the software to which it related and thus as having a real and independent value to the grantee separate from the services also to be provided.

3270. At heart, the issue is as to the application of accounting principles; but the dispute as to the substance of the licence engendered a detailed analysis of what in practice the grant of a licence meant in terms of the use the grantee could in practice make of the licenced software. The Claimants argued that in all of the Schedule 6 hosting transactions the licence lacked any practical utility. The Defendants argued that, on the contrary, its utility was to enable the customer to use the software separately from any hosting services, and in its own premises if it so wished; and that whilst not all customers who subscribed into the restructured package would use the right, the right was nonetheless in the nature of a separate asset available for use and good against its issuer.

---

[377] According to Schedule 12D.

3271.   In that regard, the analysis of utility was slightly different according to whether the licence related to the 51 Schedule 6DS transactions or to the seven e-Discovery transactions. In both cases the Claimants contended that (a) the customer continued to receive substantially the same service regardless of whether it had acquired a licence (that is, the same service as a customer who contracted on a SaaS basis) and (b) only the legal/payment structure changed, which did not justify the accounting treatment accorded. However, whereas the e-Discovery software was capable of being used independently of an Autonomy hosted arrangement, the Claimants contended that Digital Safe was too big and too complex for it to be used by the customer independently from the hosting and related service components of a Digital Safe arrangement.

3272.   In the context of the e-Discovery claims, the Claimants argued that even though a customer could take e-Discovery in-house and operate it itself, it would not have been practicable for customers to do so. The argument was primarily based on the difficulty and expense of seeking to use e-Discovery "on-premises".

3273.   Subject to those differences, however, it can be seen that the broader issues as to the practical effect of the purchase and grant of a licence, and as to viability and utility of the options said to be available to the licenced customer, were common to both.[378]

3274.   Although the competing cases can thus fairly shortly be summarised, their elaboration by the parties both in submission and in the evidence was considerable. The Claimants' written submissions devoted over 320 pages and some 650 footnotes to their Hosting
Case, after days of evidence. The Defendants also dealt with the matter at length though

they managed to confine themselves to less than 200 pages in their written closing submissions, with only 400 footnotes.

3275.   I turn to address the following matters:

(1)      Brief description of Digital Safe;
(2)      Brief description of Autonomy's e-Discovery offering;
(3)      A detailed analysis of the Digital Safe claim;
(4)      A detailed analysis of the e-Discovery claim; (5) Defendants' knowledge; and (6) IDOL Cloud metric.

*(1)      Brief description of Digital Safe*

3276.   Digital Safe was Autonomy's leading archiving product. It performed a "capture and index" function, which enabled customers to store, search and retrieve their

---

[378] Mr Holgate put the essential point differently as being whether the services (of capturing, indexing and archiving) were, as he was asked to assume they were, unaffected by the sale of a licence to the customer, and *"the sale of a licence to Digital Safe had no commercial effect in practice and therefore no substance"*.

data. The software, together with the hardware (servers) onto which it was loaded, formed the Digital Safe system or (as a combined software and hardware offering was often referred to in the parlance of the sector) "solution".

3277. Mr Samuel Yan ("Mr Yan") who had been Systems Architect and Director of Development for Digital Safe at Zantaz, and continued in a similar role at Autonomy after its acquisition of Zantaz[379] described its *"most recognisable attribute"* as being *"its ability to scale"* which (in broad terms) meant that it could keep accommodating increasing demand for data for archiving with the addition of more storage cells.[380]

3278. Digital Safe was originally developed by Zantaz, which Autonomy acquired in July 2007. Zantaz had a number of archiving and related offerings, increasingly cloud-based, which it had either developed itself internally or acquired from other entities. These included, as well as Digital Safe and e-Discovery, Enterprise Archive Solution ("EAS") which was typically sold to customers who wanted to manage their own archive at their own customer site ("on-premise"), and Digital Supervisor, a surveillance product.

3279. Reflecting its Zantaz history and its acquisition by Autonomy, there were two types of Digital Safe: the original type was a Lucene-powered Digital Safe (sometimes referred to as a "Lucene Safe") developed by Zantaz and an IDOL-powered Digital Safe (sometimes referred to as an "IDOL Safe").

3280. Broadly speaking, the IDOL Safe consumed more storage and memory than a Lucene Safe, but it had other compensating advantages. Autonomy's drive was to get IDOL, its proprietary product, into everything. Nevertheless, whilst new Digital Safe customers would be provided with IDOL safes, large legacy customers of Zantaz generally remained on Lucene Safes because, though possible, there were difficulties in moving between the variants.

3281. To bridge the gap, in a few cases an additional, smaller IDOL index, known as *"IDOL Cache"*, was added to a Lucene Safe, which enabled new IDOL-based applications (such as DS Mail, which is like Gmail for DS users, and Supervisor S6) to be used on a Lucene safe. (It may be noted that even IDOL Safes needed an IDOL Cache to use DS Mail.)

3282. As Mr Sullivan explained in his witness statement, in the case of both variants, multiple services were wrapped around a Digital Safe ("DS") archive, including data migration into the archive, data returns and destruction, monitoring, technical support, systems administration and security. The solution could store,

[379] On its acquisition of Zantaz, Autonomy appointed Mr Yan Chief Architect in the Product Development team for Digital Safe. After the spin-off of Hewlett Packard Enterprise's software business, he became a senior member of the Digital Safe Product Development team at MicroFocus, the buyer.
[380] Digital Safe operated by having identical storage cells. Additional storage could be obtained with additional identical cells.

search and retrieve from multiple petabytes of data to accommodate the vast exponential growth in data in recent history. In a hosted environment it was often used in conjunction with other pieces of related Autonomy software, including Supervisor S6 and DS Mail.

3283. Of particular utility, Digital Safe offered regulated entities (such as banks) the ability to store their data in accordance with Rule 17a-4 issued by the US Securities and Exchange Commission ("SEC") regarding electronic data storage, which has specific requirements relating to length, format, quality, accessibility etc. of record retention. As mentioned before, a particular characteristic and strength was its scalability.

3284. Digital Safe was, however, a complex and sophisticated product, with what Mr Sullivan described as *"a huge footprint."* The indexing and archiving functions were performed automatically by the software, but the complexity of the solution was such that it needed close monitoring, and problems frequently arose, which (especially given the nature of the customer base and their reliance on the solution) had to be fixed very quickly.

3285. Autonomy needed teams of specialized technicians (who, according to Mr Yan, typically received around 6 months of intensive training to even understand its operation) to monitor its hosted customers' DS archives on a 24/7 basis. Mr Sullivan's evidence was that at any one time, there would be at least five network and software operations people on duty simply monitoring the software.

3286. Digital Safe was thus not designed for use by an unassisted customer: it was designed to be (primarily at least) a hosted solution to be run at scale by Autonomy from its own or third-party data centres. Its designers did not expect it to be used "on-premises" except perhaps by very large entities with their own data centres and trained personnel.

3287. Accordingly, the vast majority of Digital Safe customers (Mr Yan estimated 90%) were hosted by Autonomy, storing their data in a Digital Safe at an Autonomy data centre. Mr Yan said (and he was not contradicted) that only a handful of customers had an onpremises Digital Safe solution. Even the small number of "on-premises" customers almost invariably needed a remote management system so that their Digital Safe and data could be monitored and managed by personnel with the requisite Autonomy expertise.

3288. Mr Yan could remember only two attempts by companies (CDC and Rand) to use Digital Safe and make its capabilities available to their own customers without Autonomy's assistance; and in those two situations, CDC was supplied with a more selfsufficient variant which did enable it to carry on, but Rand was forced to stop.

3289. Mr Sullivan's evidence in his witness statement was that even with a good remote management link, on-premises Digital Safe was more burdensome for Autonomy than hosted Digital Safe since it was dependent on the customer for a number of things in an on-premise context. It was better and easier for Autonomy

to have the control of everything in its own data centres. Because of this, Mr Sullivan said, Autonomy *"always tried to sell DS on the hosted basis…"*.

*(2)     Brief description of Autonomy's e-Discovery offering*

3290.   Often as part of its hosted business Autonomy also offered e-Discovery services to assist customers with the review and disclosure of material in litigation. The software at the heart of this process was called 'Introspect' and 'Early Case Assessment' ("ECA").

3291.   Like Digital Safe, Introspect had been developed by Zantaz before its acquisition by Autonomy. ECA was developed by Autonomy before that acquisition. Introspect was used in connection with the processing of data; ECA was effectively a data-culling tool, allowing customers to reduce the population of material to be loaded into Introspect for review by identifying a subset of data falling within specified parameters.

3292.   As indicated earlier, e-Discovery software could form part of a hosted arrangement or an on-premises solution. In a hosted arrangement, the software was used in connection with the ingestion, processing, storage, analysis and production of data by Autonomy in Autonomy-run data centres. In an on-premises arrangement, the software was sold on a standalone basis to the customer to be used in-house (or at a third-party centre), where the required services would be performed by the customer (or a third party).

*(3)     A detailed analysis of the Digital Safe claim*

3293.   Under the SaaS model, Zantaz/Autonomy stored the customer's data on the Digital Safe system as a service to the customer. The Digital Safe system and the customer data loaded onto it were hosted and managed by Zantaz in data centres controlled by Zantaz or, in some cases, by third parties such as IBM.[381] The hardware and software that made up the Digital Safe system were owned by Zantaz/Autonomy and maintained by its employees, according to the unchallenged evidence of Mr Egan and Mr Yan, and the evidence of Mr Sullivan.

3294.   Before its acquisition and the introduction by Autonomy of the hybrid model, Zantaz usually provided its data hosting service under a multi-year contract, with customers paying for the service on a per megabyte basis and uploading data to

---

[381] Some of the so-called "on-premise" Digital Safe customers used a third party's data centre. The distinction between these customers and the hosted customers who nevertheless used an IBM data centre was as follows. In the hosted scenario, the customer would contract with a third party, for example IBM, for the provision of a hosted archiving solution. The third party would then subcontract Zantaz to provide the solution; there would be no contractual relationship between Zantaz and the customer, and the customer was fundamentally purchasing a hosted service provided through an intermediary. It would not own the hardware or the software on which it was installed. By contrast, in the on-premise scenario, the customer would purchase Digital Safe in the form of an appliance from Zantaz, and then Zantaz would be engaged to run and monitor the appliance, which would be located at the third party's data centre. In this scenario, there was a contractual relationship between Zantaz and the customer, and the customer was fundamentally purchasing an appliance, such that it would own the hardware and the software installed on it.

the Digital Safe system over the duration of the contract. Zantaz was paid by customers either in

---

advance[382] or, increasingly from 2008, on a 'pay-as-you-go' basis. In both cases, Zantaz recognised revenue in the quarter in which the service was provided.

3295.  Regardless of whether the customer was on a pre-paid or a pay-as-you-go contract, neither the Defendants nor Mr MacGregor, Dr Lynch's accounting expert, dispute that the substance of the SaaS arrangements was a <u>data hosting service</u>, or that Zantaz appropriately accounted for those arrangements by recognising the revenue derived from them over the term of the arrangements as the service was provided.

3296.  Under the hybrid Digital Safe arrangements, Autonomy provided the same data hosting service, but the customer also purchased a licence to use either Digital Safe software or Related Software.

3297.  The way that Autonomy structured the hybrid arrangement involved the customer paying: (i) a substantial fee in respect of the software licence, which was usually paid upfront; (ii) a fee in respect of software maintenance and support services; and (iii) significantly reduced hosting / storage fees on a per megabyte basis. The key differences between these arrangements and the SaaS arrangements were thus: (i) the change in payment structure, and (ii) the introduction of a software licence.

3298.  The Claimants emphasised, however, that the payment structure does not determine the pattern, or timing, of revenue recognition. IAS 18 §24 provides that "*[p]rogress payments and advances received from customers often do not reflect the services performed*". The fact that the customer pays in full upfront, in full in arrears, or in instalments on a monthly basis, does not alter the fact that if or to the extent that the contract is, in substance, for the provision of services, then, whatever the <u>cash</u> position the <u>revenue</u> should, in accordance with IAS 18 §20, be recognised over the period as the services are provided.

3299.  For so long as the hosting arrangement continued, the introduction into the structure of a licence enabling the customer to move on-premises did not materially alter the nature of the services provided by Autonomy, which continued to provide the same data hosting service under the hybrid arrangement as it would have done or, in the case of existing customers, did under a SaaS arrangement. In particular, regardless of the fact that the customer had purchased a software licence:

(1)  Autonomy still hosted the customer's data and the Digital Safe system – including the Digital Safe software licensed to the customer – on hardware owned by Autonomy and located in Autonomy's data centres.

---

[382] Dr Lynch disputed the extent to which this took place.

(2) Autonomy still used the Digital Safe software to perform the capture and index processes mentioned above on the customer's data, which the customer provided to Autonomy over the duration of the arrangement and which Autonomy uploaded to the system.

(3) Autonomy still monitored the customer's Digital Safe system round the clock, detecting and fixing problems as they arose.

---

3300. From the customer's perspective, the position was also the same. In particular, the customer was contracting for a hosted Digital Safe arrangement; it intended for Autonomy to host its data, it paid Autonomy to host its data, and that is what Autonomy did. The customer received substantially the same service as it would have received had it contracted, or re-contracted, on a SaaS basis with Autonomy.

3301. The Claimants emphasised that Autonomy repeatedly assured customers – particularly those who found the concept of a licence in a hosted arrangement confusing – that everything would remain exactly the same and that the licence was just a formality. Thus, for example, in an email dated 23 December 2009 to Mr Christian Lucas of Morgan Stanley (which had apparently thought the new structure *"problematic"* and queried *"what would be the upfront payment that you're looking for before y/end in order for the savings programme to kick in?"*) Mr Hussain wrote:

> *"Hi Christian – to clarify, we require no payment at all. The savings start the moment MS signs an amendment to the existing agreement that simply puts lower rates into effect coupled with a software licence fee. In this sense it is not even an offer that requires a legal review as it is purely financial and causes savings. It's quite simply "sign and save"…"* [My emphasis]

*Outline of the dispute as to the purpose and effect of the restructurings*

3302. In those circumstances, according to the Claimants, it is clear that the reason, and the vice, of Autonomy's introduction of a hybrid model for hosted business, and the sale of a licence to the hosted software in exchange for an upfront payment, was to enable Autonomy successfully to avoid the usual revenue recognition treatment of a prepayment for services and to accelerate the recognition of revenue in respect of the licence element improperly, and to present a false impression of its business. They described it as little more than a *"naked attempt to find a way to produce an accounting effect…namely the acceleration of recognised revenue"*.

3303. The Claimants' case was that the net effect of the introduction and adoption of the hybrid model was substantially to reduce the total contract value to Autonomy and to accelerate the rate at which Autonomy recognised revenue

from hosting customers at the expense of recurring revenue. They claimed that over $125m of revenue was "accelerated" in this manner.

3304. The Claimants depicted the adoption of the 'hybrid' model as part of Autonomy's relentless search for ways of giving the impression of meeting ambitious revenue targets and market expectations. According to this depiction, though in the case of the impugned hardware, VAR and reciprocal transactions Autonomy in effect purchased its own revenue, whereas hybrid hosting deals involved Autonomy foregoing some part of its future revenue stream in favour of an upfront payment which they treated as immediately recognisable revenue, the same objective of meeting and beating market revenue forecasts was common to all.

3305. The Defendants, on the other hand, insisted there was nothing intrinsically wrong, let alone improper, about the hybrid hosting model, or the issue of licences in order to secure for Autonomy immediate revenue and tie in its customer at a time of sharply declining storage rates and considerable customer volatility. That being the case, accounting for the sale of a licence was a matter of fine judgement, and the decision to treat the sale of the bundle of legal rights which a licence comprised as analogous to sale of goods revenue stream was well within the ambit of propriety. Enquiry about what use of the rights was made thereafter by individual licensees was (since it was the application of hindsight) illegitimate on ordinary accounting principles.

3306. The Defendants pointed out that after the Acquisition, HP itself had accepted the propriety, and explored how it could continue the practice, of the hybrid hosting model and the sale of licences linked to lower storage and service charges even though the requirement under US GAAP to undertake a VSOE assessment[383] was expensive. They suggested that HP had only abandoned the model because of a strong market movement back towards the SaaS model and a concern that establishing VSOE under US GAAP would constrain Autonomy's ability to be flexible with pricing. Those were matters of business judgement, not indicative of any doubt as to propriety.

3307. In that regard, the Defendants contended that the 'hybrid' model was beneficial both to Autonomy (in ensuring longer term customer commitment) and the customer (which acquired a legal right to software it could deploy outside the hosted environment and a beneficial aggregate subscription rate). They defended it as a commercially driven business decision well within the range of the proper exercise of directors' business discretion. They stressed especially that hosting was a profitable and valuable business line but highly competitive. The commercial effect of selling a licence deal was to lock in the customer which had made an upfront investment that it would not wish to lose.

3308. Ultimately, the Claimants did not go as far as to suggest that the restructurings had no commercial benefits for Autonomy. Zantaz's CEO, Mr Sullivan, who was in charge of its hosting business, and who gave evidence for the Claimants both in the US and in these proceedings, did subscribe to the Claimants' line that the

---

[383] Vendor-specific objective evidence, a requirement under US GAAP for the recognition of revenue.

*"main commercial reason for the restructurings, from Autonomy's perspective, was to generate large upfront licence fee revenues".* But he did not suggest that he considered the sales or restructurings to have been improper. In his witness statement, he explained the advantages as follows:

> *"There were, however, other incidental commercial benefits flowing from the license model, principally enhanced customer lock-in and upsell opportunities.*
>
> *...*
>
> *30.     Customers did, though, sometimes threaten to switch to a new provider for new data, often by issuing RFPs in an effort to get lower prices from Zantaz/Autonomy. Although we occasionally lost customers, these customers were generally smaller customers. We could afford to lose smaller customers because they did not significantly affect our revenues. We had to be careful with larger customers and, where data center costs had fallen, we passed some of our cost savings to them to make sure we did not lose them. The relationship was sticky, but retention was not guaranteed and concessions on rates were often offered.*

---

> *31.     One effect of restructuring to a license model was to remove this tension dynamic from the relationship with customers. They paid a great deal upfront and, in exchange, secured very low ongoing storage rates. This meant that there were, for the term of the service arrangement, no discussions around reductions in storage rates (save where instigated by Autonomy) or threats from customers to go elsewhere. Customer retention was virtually guaranteed.*
>
> *32.     The license model also had the theoretical benefit for the customer that it now owned a license to the DS software. A few customers did express some interest in having the ability to bring their DS archives inhouse in the future, if, for example, Autonomy were to go bankrupt – and may have believed that the purchase of a license gave them that ability."*

3309.  Mr Sullivan also made clear that Autonomy had to remain competitive in light of the falling rates in the market. Customers did threaten to leave. Autonomy did have to pass on some of the costs savings of falling storage costs to customers, to ensure they did not lose them. Customer retention was not guaranteed. (This was said by the Defendants to undermine the Claimants' counterfactual

assumption that in the absence of the restructured deals Autonomy could have continued to store the same amount of data at higher historical rates.[384])

3310. Mr Egan also thought there was nothing wrong with the restructuring of the hosted deals. He considered that the hybrid arrangements incentivised customers both to stay and to store additional amounts of data:

> *"My view was that it gave them incentive to stay longer and it gave them incentive to give us more of their overall volumes and change their policies to retain and collect more."*

3311. Other witnesses called by the Claimants, including Mr Goodfellow, also confirmed the business common sense in the hybrid deals when they were cross-examined about them, especially at a time (which it was not disputed it was) of precipitously falling storage prices.

3312. It should also be noted that the practice of selling the hybrid model continued after the acquisition, until at least the end of May 2012.  HP had a project to establish VSOE under US GAAP for the hybrid deals. In May 2012 the model was abandoned for

---

business reasons (including the fact that the market was moving away from a licence model to a SaaS model).

3313. However, the Defendants' answers on the issue as to the commercial rationale of a licence and the financial advantages it offered (which I shall come on to assess later) must be distinguished from the accountancy issue to be addressed in respect of the 51 Schedule 6DS transactions in the context of the FSMA claims. This is whether the accounting treatment of the sale of a licence separately from the provision of services for an upfront fee was justified (in the sense of being a not unreasonable application of the relevant accounting standards).[385]

---

[384] In a nutshell: the Defendants submitted that the Claimants' arguments as to the financial implications of the hybrid model were unrealistic.  They assumed that, absent a restructuring, customers would have continued to pay historic rates for the duration of the restructured contract, when in reality customers would have responded to the changing commercial environment by demanding competitive rates.  The Claimants also ignore the fact that, by offering competitive storage rates, Autonomy was encouraging customers to store more data.  The Defendants contended that the assumption that, in a counterfactual world, the same amount of data would have been stored under uncompetitive rates as was stored under lower, competitive rates, is a false one. However, that might be a reason  for offering a discount for the "bird in the hand"; but not for artificial devices to enable accounting for it as recognised revenue.

[385] The Claimants confirmed, with emphasis, in their closing submissions that their complaints in their Hosting case were ranged exclusively at Autonomy's sales of a licence to Digital Safe and/or related software in a hosted Digital Safe arrangement and not an on-premise arrangement so that none of their Schedule 6DS transactions involved an on-premise Digital Safe.

3314. That question, which is the principal focus of this section of this judgment, is whether or not the sale of a licence to an Autonomy customer, as part of a hybrid contract under which it was also entitled to receive and bound to pay for hosting and related services, could properly be treated and accounted for as a separate component of the hybrid transaction, and the licence fee booked as recognised revenue at the point of sale.

*Applicable accounting principles*

3315. There is no dispute that in accruals accounting, unlike cash accounting, a prepayment for goods or services falls to be recognised over the period in which the goods and services are provided, and not upfront.

3316. The dispute, in a nutshell, is whether the licence fee was merely a disguise for, and in substance no different from, the prepayment for hosting services; or whether the licence conferred rights of substance and real practical utility to the customer in respect of the use of Digital Safe, such as to justify the licence and the fee for it being treated as a separate component of the hybrid contract analogous to an immediate payment on the sale of goods.

3317. As foreshadowed above, the Claimants, though not alleging that the licence was a sham, nor disputing that it comprised and conferred a bundle of legal rights, contended that it had no real utility to the customer or effect on the hosting services and its substance and value were illusory: the hybrid model (as they put their case to Dr Lynch) *"made no difference to the substance of the arrangement and the service the customer received"* and was *"simply a pretext devised by Autonomy to accelerate revenue".*  In other words, the Claimants sought to depict the licence simply as a construct, the only value of which was that it provided a passport to discounted service costs, at the expense to Autonomy of a reduced aggregate revenue stream.

3318. The Defendants submitted that it was sufficient that the licence granted under the hybrid model conferred enforceable legal rights which gave the customer the option to continue using Autonomy's hosting services, or to use the hosting services of a third-party for the licensed Autonomy software, or to operate the software themselves by moving Digital Safe and their data on premise.

_____

3319. They contended also that the Claimants' case that the rights were illusory was false, and that it was entirely possible to deploy Digital Safe on premise and quite practicable to move from a hosted solution to an on-premise solution, lifting and shifting Digital Safe and the Customer's data from Autonomy's data centre to its own (or another) data centre.  According to the Defendants, that was a real and separate right of practical utility, justifying treating the sale of the licence as analogous to a sale of goods and to be accounted for accordingly.

3320. Except as noted below, the two experts (Mr Holgate for the Claimants, and Mr MacGregor for the Defendants[386]) agreed on the relevant accounting principles, which can be summarised as follows:

> (1) The IASB[387] *'Conceptual Framework for Financial Reporting'* makes clear that a transaction must be accounted for in accordance with its substance and economic reality and not merely its legal form.
>
> (2) The revenue recognition criteria in IAS 18 are usually applied to each transaction as a whole. However, as IAS 18 §13 provides, where a single transaction consists of multiple components, consideration should be given as to whether they are separately identifiable components to which it is necessary to apply the revenue recognition criteria separately <u>in order to reflect the substance of the transaction</u>, or, alternatively, whether the revenue recognition criteria should be applied to the transaction as a whole in accordance with its overall substance.
>
> (3) Where the substance of the transaction, or a separately identifiable component thereof, is the <u>rendering of services</u>, the criteria governing both if and when revenue can be recognised are set out in IAS 18 §§20 and 25. These provide, inter alia, that:
>
>> *"When the outcome of a transaction involving the rendering of services can be estimated reliably, revenue associated with the transaction shall be recognised by reference to the stage of completion of the transaction at the end of the reporting period… [IAS 18 §20]*[388]
>>
>> *For practical purposes, when services are performed by an indeterminate number of acts over a specified period of time, revenue is recognised on a straight-line basis over the specified period unless there is evidence that some other method better represents the stage of completion…" [IAS 18 §25]*
>
> (4) Where the substance of the transaction, or a separately identifiable component thereof, is the <u>sale of a good</u>, the relevant revenue

---

[386] Mr MacGregor was instructed by Dr Lynch; but Mr Hussain "*fully endorsed*" Dr Lynch's position and adopted that evidence.
[387] The International Accounting Standards Board.
[388] The rest of IAS 18 §20 provides that the outcome of a transaction can be estimated reliably when all the following conditions are satisfied: (a) the amount of revenue can be measured reliably; (b) it is probable that the economic benefits associated with the transaction will flow to the entity; (c) the stage of completion of the transaction at the end of the reporting period can be measured reliably; and (d) the costs incurred for the transaction and the costs to complete the transaction can be measured reliably.

recognition criteria are those set out in IAS 18 §14. These criteria include that the amount of revenue can be measured reliably.

(5) Mr Holgate accepted that it was *"entirely possible"* for there to be a hybrid contract with a licence element and then a service element *"if the facts point to that"* and in particular, if on the facts the licence was *"validly a separate good or service"* separable from the service provision as a whole; and that a software licence is in general treated as a sale of goods.

(6) However, Mr Holgate did not consider this was or could be answered by reference to what legal rights the licence conferred; he considered that in order to establish the correct accounting treatment for the hybrid transaction, it is necessary to identify the genuine economic substance of the transaction and to consider whether the components of the transaction should be accounted for separately, so as to reflect the substance of the transaction.

3321. In cross-examination Mr Holgate put the test as follows:

> *"...we have to ask if the licence is indeed validly a separate good or service...If it is separate from the provision of subsequent services, then fine, you recognise the licence upfront on day one as revenue and the services gradually over the period.*
>
> *On the other hand, if it's not separable from the service provision as a whole, then the whole thing falls to be accounted for as service provision over a period."*

3322. I did not understand Mr MacGregor to dispute the test. As he expressed his position in this regard in his and Mr Holgate's Joint Statement:

> *"If there were separately identifiable components, providing the criteria of IAS 18.14 and/or IAS 18.20 were applicable, Autonomy was entitled to recognise the IAS 18.14 revenue generated on the licence component of the hosting arrangements at the date of the sale agreement, and the separate IAS 18.20 storage services revenue over the term of the agreement (by reference further to IAS 18.25)."*

3323. The differences in approach between him and Mr Holgate were as to (a) the relevance of the definition of the attributes of the licence in the contract defining it and (b) if the contract was not conclusive, whether in fact the licence did confer rights of substance and utility.

*The differences between the experts in their approach to applying these Standards*

3324. The differences between the experts as to their ultimate conclusions were in consequence of:

(1) Mr Holgate's more expansive view of the principle that accountants look to the substance and not the form (which Mr MacGregor readily accepted as a principle but considered was not to be stretched as far as Mr Holgate suggested); and

(2) Eight assumptions which the Claimants instructed Mr Holgate to make. One of these assumptions foreclosed the issue, in that Mr Holgate was instructed to assume that the licence had *"no independent value"*. Others were conclusory and it was suggested that they "*dragooned*" the answer. Subject to that, which was objected to and on any view objectionable, the assumptions were factual matters, which were in every case disputed.

3325. As to (1) in the preceding paragraph, Mr Holgate gave the accountancy principle (which I have discussed earlier when addressing the VAR transactions) that a transaction must be accounted for in accordance with its substance rather than in accordance with its form such pre-eminence that he did not see or call for the licence agreements themselves and consequently did not consider the terms of the licences.

3326. When cross-examined on the legal differences between a SaaS contract and a hybrid contract, and challenged as to whether he was *"unduly dismissive of the legal differences between a SaaS contract and a hybrid one"*, Mr Holgate (who had not read any of the underlying contracts) answered:

> *"No. My Lord, it's inevitable that accountants and lawyers see this issue of substance over form differently. Substance over form is very much an accounting principle that essentially overrides contractual and legal form of arrangements. It's not surprising that lawyers have difficulty with that…"*

3327. Consistently with this approach, Mr Holgate seemed to consider that he was entitled to ignore the fact that the licence agreements conferred legal rights, which would (by way of illustration) be enforceable in bankruptcy; and then, having dismissed their form, to assess their substance according to whether there was any difference between the services a customer received (a) before and (b) after the sale and purchase of the licence.

3328. His conclusion, without regard to any of the licence agreements, that because the service provided was essentially the same, the rights provided to the customer had no practical substance (or, as he put it, were *"trumped by the fact that the service continues as before"*), was the main plank of his case that recognition of revenue was wrong.

3329. Mr MacGregor agreed, of course, that the accounting principles require accountants to identify and assess the commercial, or *"genuine economic"* substance of the transaction over the form. However, he ascribed importance to

the contractual option and rights conferred by the licence to *"take the storage system in-house to archive data itself at any time during the licence term."*

3330. Like Mr Holgate, Mr MacGregor wished to be satisfied, in light of the Claimants' claims to the contrary, that the legal option and rights conferred were not illusory. In that context, he recognised the need to be satisfied that the rights were capable of being exercised by the customer, and that from the customer's perspective, there was an independent value to owning a Digital Safe licence separate to the value of the data storage service provide by Autonomy: or, in other words, that the licence agreement was not all form and no substance. Mr MacGregor appeared to accept that if a customer had

in fact no intention of moving Digital Safe on premise or otherwise away from Autonomy then in that particular case the licence could not be considered to have separate value; but he appeared to suggest that then revenue recognition would be denied by reference to the individual case, and he became convoluted and indeed confused when pressed on whether that provided the basis of extrapolating any more generic test, sometimes suggesting that each individual case had to be assessed but then at other times suggesting that the matter had to be looked at generically. I think the following exchange is illustrative:

> *"Q.      …You say in a number of places in your report that, when considering whether the licence to Digital Safe or eDiscovery software should be treated separately from the service and indeed whether it has value, what is most important to consider is the view of the customer, correct?*
>
> *A. Well, one looks at it from the perspective of the customer, ie what is the customer getting?*
>
> *Q. So what is most important is to consider it from the point of view of the customer, yes?*
>
> *A. In this respect, yes.*
>
> *Q. And it would follow…in relation to customers that did not consider the licence to be important or of value, indeed customers who didn't even want to download the licence, that you would not consider any revenue from those licences could be recognised…?*
>
> *A. Well, I think where – I don't think that's correct. Because if you have a whole series of licences being sold, you're looking at the position of customers generically in terms of what it is they're getting.*
>
> *Q. What if more customers take the view that they don't really want the software and they're only doing this for reducing the costs, in other words you say you're looking at it generically, what if the bulk of customers do not consider the licence to be*

> *important or of value? Do you extrapolate from that and say I shouldn't therefore recognise it for anyone?*
>
> *A. I suppose it depends on the negotiations and what the customers think they're getting when they're going through the negotiations and what their future intentions are…*
>
> *…*
>
> *If the situation is – and we clearly have the situation where some customers are taking this stuff on premise, other customers are having it at the Autonomy data centre, if there is a position between those customers and some of those customers are in the position I just said and others are not like that, then you probably do two different things.*
>
> *Q. Two different things, what in relation to customers who are like that you don't recognise the revenue?*
>
> *A. Possibly but I think you've got to – you know, looking at the generic, what is it that the customer is getting? Well, it's getting a licence and then it's getting some services afterwards. If when you actually drill down to that you're going to a particular customer who says, well, no, I was never interested in any of that, what I wanted was just – I was offered something cheaper, then that would be a different situation…*
>
> *…*
>
> *You've got to look at these things on a detailed [contract] by contract basis…"*

3331.  Ultimately, it seemed to me that Mr MacGregor built in an implicit assumption that the bulk of customers did genuinely want to have at least the possibility of moving on premise, but accepted that a different accounting treatment might be necessary in the case of what he took to be, or persuaded himself was, the exception.  He assumed, in other words, that the exemplar was a customer which had in mind the possibility of making use of the legal right.

3332.  On that basis, and unlike Mr Holgate, Mr MacGregor's view that "*the Digital Safe licences were capable of being separated from the hosting services provided by Autonomy*" was based on his review of the evidence as to the nature of the legal rights and obligations conferred and imposed, and the use that was or could be made of the licence by exemplar customers, and on Deloitte's working papers.  Mr MacGregor especially stressed that (a) the licence conferred ownership of the software; (b) even if none of the hosted customers had brought Digital Safe and their data on premise, their entitlement to do so was valuable and sufficient, and not illusory since it appeared that there was a number of customers which had started off and run Digital Safe on premise (albeit with the assistance of Autonomy).

3333.  Neither expert provided me with what I regard as a settled and satisfactory test:

(1) In my judgment, Mr Holgate went too far in suggesting that the "*accounting principle essentially overrides contractual and legal form of arrangements.*"  The accounting principle reflects that what must be determined is what in substance is the effect of the transaction; but that will be informed by its legal form.  A valid legal contract confers enforceable legal rights and imposes enforceable obligations. As Mr MacGregor pointed out, Mr Holgate's arguments missed the point that under the licencing agreement part of the hybrid arrangements, the customer became (for the term of the licence) the owner of the software, which it could 'mine' using another hosting provider or at home, and had an option as to its use enforceable against Autonomy, including in the event of its bankruptcy.

(2) But whilst I agree with Mr MacGregor that those contractual rights and obligations cannot be ignored, or said to be "*trumped*", the assessment of them for accounting purposes required is of their intended commercial effect on the relationship between the parties. The rights and obligations may be commercially illusory (as I have held them to have been in the impugned VAR transactions); or the rights and obligations, even if given full effect, do not conform with their overall description: the classic example is a lease dressed as

a licence. Here, if in reality the customer either had no intention or no practical prospect or capability of utilising and enjoying any benefit from the licence and the reality was that it entered the arrangement to secure the discount, that may determine what the true commercial effect was to be.  The problem of the question of revenue recognition being so fact-specific and requiring individual assessment of the intentions and capabilities of the specific customer is a difficult one to deal with, and is liable to pose immense problems for any auditor.

3334. As to the factual assessment, and as regards (2) in paragraph 3324 above, Mr Holgate was required by his instructions to make eight far-reaching Assumptions of fact. His conclusions were necessarily entirely and exclusively by reference to the constructed universe to which he was confined by his instructions.

3335. The eight Assumptions which thus defined and confined Mr Holgate's task require more detailed assessment. They were stated as follows:

(1) Once a customer had purchased a licence to Digital Safe software, it received substantively the same service that it would have done had it contracted on a SaaS basis. The Digital Safe system (comprising the Digital Safe software- which performed the capture and index function- and the hardware) was at all times installed only at Autonomy's data centres.

(2) A Digital Safe licence was of no independent value to a hosted customer because a hosted customer could not customise, configure or implement the Digital Safe system (including the software) for use in its own

premises as it could only be performed by Autonomy using Autonomy's proprietary knowledge and resources. The implementation process for use on a customer's own premises was complex and took several weeks minimum to complete. Unless and until that process was undertaken, it was incapable of operation. Provision of the necessary Autonomy customisation, configuration and implementation services for Digital Safe on a customer's premises did not generally form part of the contracts with hosted customers.[389]

(3) Digital Safe required ongoing managed services without which it would malfunction and ultimately stop working. In practice, only Autonomy could provide such services and the provision of them for use of Digital Safe on a customer's premises did not form part of the contracts with hosted customers.

(4) There were no user-manuals regarding either the implementation or ongoing support and management of Digital Safe, and no third parties (let alone customers) who could provide such services.

(5) Where hosted Digital Safe involved the sale of software other than Digital Safe software then such software could only be used, or was sold for use, with Digital Safe.

(6) Negotiations between Autonomy and existing hosted customers were largely instigated by Autonomy and not the customer. For both new and existing customers the hybrid model was proposed by Autonomy and negotiations largely centred on the customer's savings over the lifetime of the contract. Autonomy's primary purpose in hybrid deals was so as to generate upfront recognition of revenue through the licence.

(7) The intention and understanding of both Autonomy and the customer was that after the sale of the licence, the Digital Safe system and the customers' data would remain hosted, and all associated services would be performed by Autonomy at its data centres.

(8) None of the hosted customers brought the Digital Safe system (comprising the Digital Safe software and accompanying hardware) in house.

3336. Mr Holgate opined that these eight factors relating to the hybrid Digital Safe contracts compelled the conclusion that (to quote his report) *"the substance of the arrangement was…the services of capturing, indexing and archiving data"*

---

[389] RRAPoC §110.1 additional support did not form part of the licensing or hosting arrangements that Autonomy provided to the customer.

and that the *"sale of a licence to Digital Safe had no commercial effect in practice and therefore no substance"*.

3337. In other words, Mr Holgate considered that, taking the assumptions together, there was, in substance, no sale of a good since on the basis of the assumptions collectively, the licence had no independent value separate from the data storage services: the sale was of services and had to be accounted for as such. On that basis, the approach taken of recognising revenue from the licence sale immediately at the point of sale was improper.

3338. On Mr Holgate's approach, there was no room for the application of the criteria prescribed by IAS18.14: that had no application to, what on that approach, was simply in what he termed *"overall substance"* a structured sale of services over time for which the relevant IAS 18 paragraphs are IAS18.20 (and 18.25 in the case of storage or other services).

3339. Furthermore, Mr Holgate did not look at the work Deloitte undertook concerning the hybrid licences. All he knew about the licences was what was said about them in the Assumptions he was given, all of which (in accordance with his instructions) he took to be the basis on which he was required to report.

3340. Mr Holgate had not been invited, and had not attempted, to try to assess what the effect of stripping out one or more of the assumptions might be: indeed, perhaps a little too easily, he accepted when cross-examined that it was *"all or nothing."* Nor did he assess other possibilities which might ensure the value to the customer of the licence (such as the possibility of purchasing implementation and monitoring services, or the possibility of the customer favouring a hybrid structure because it might enable it to allocate the cost against its capital budget, or obtain some tax advantage). He accepted that this was an important point; when asked to explain why, then, it was not mentioned in his reports he explained that this was because he had proceeded *"on the basis of the assumptions in front of us."*

3341. In his first report, Mr Holgate placed special reliance on Assumptions (2), (3) and (4) as numbered in paragraph 3335 above. All these related to the implementation and management of Digital Safe on premise, which he assumed, and the Claimants insisted, could not be achieved successfully without Autonomy's assistance on premise.

3342. He agreed when cross-examined in that connection that the fact (as it was put to him to be) that customers could buy implementation and monitoring services from Autonomy for a separate fee was important. He was a little evasive as to the effect of that in terms of Assumptions (2), (3) and (4). Instead, he moved swiftly on to say that even more important was the first part of the first Assumption (see paragraph 3335(1) above), that a hybrid customer received substantially the same service that it would have done had it continued to contract on a SaaS basis. He confirmed that he considered that point, and its elaboration in Assumptions (6), (7) and (8), to be the most important: in effect, a trump card (and see paragraph 3328 above). In his first report he explained why:

> *"The substance of the arrangements was (for new customers) and continued to be (for existing customers) the service of capturing, indexing and archiving data throughout the contract period. These services were unaffected by the sale of a licence to the customer. The licence fee, when properly considered, was therefore payment towards these services."*

3343. Consistently with that, Mr Holgate confirmed that the Claimants:

> *"do not take issue for the purpose of these proceedings with the accounting treatment for 'on premise' deals, i.e. where Digital Safe was implemented at the customer's own site."*

3344. Mr MacGregor rehearsed these assumptions in his supplemental report. In his conclusions, Mr MacGregor summarised in his own words in more compressed form his understanding of the assumptions that Mr Holgate had been instructed to make as being that (a) a Digital Safe licence was of no independent value to a customer (b) the software could not work on a customer's premises without Autonomy (and no one else's) ongoing support, (c) there were no user manuals, (d) the intention and understanding was that the customer data would be hosted by Autonomy and (e) all associated services would be performed by Autonomy at Autonomy's own data centres. He dealt, however, with all eight.

3345. Mr MacGregor accepted that the eight assumptions taken collectively, including the conclusory introductory sentence to the (second) "assumption" that the licence had *"no independent value to a hosted customer"*, led inexorably to the accounting treatment outcome or conclusion reached by Mr Holgate. However, noting that all the assumptions were matters of fact disputed by the Defendants, he made clear that, as regards Digital Safe, only the *"no independent value"* assumption was of itself conclusive.[390] "

3346. In Mr MacGregor's opinion, unless it was factually impossible (as distinct from expensive or difficult) to use the rights whether at that time or in the future, the licence would be a thing having some value independently and separately from the supply of

---

services. He suggested that, at least, it would offer *"a protection element…which you get when you purchase something which isn't there when you're just renting something"*. He considered also that the eighth assumption impermissibly introduced hindsight to an accounting assessment.

---

[390] As regards e-Discovery he went further, stating in his Supplemental Report that *"if for example, it was possible for customers to perform the services themselves, contrary to just the single assumption that it was not practicable for a customer to perform the service itself, then [he] would not agree in the same way."*

3347. When questioned further whether he would accept that on the basis of the first, sixth, seventh and eighth assumptions (which in effect elaborated on the "trump" point Mr Holgate had described as of particular importance in reaching his conclusion) it would follow that the licence had no substance, he declined:

> (1) As to the first assumption (same service with or without and before or after sale and purchase of a licence) he opined that what was missed out, not even mentioned, was the fact that the licence conferred a proprietary right of significance;

> (2) He did not consider the sixth assumption (as to the licence purchase being instigated by Autonomy) *"matters one bit"*;

> (3) In his opinion, the seventh assumption (the intention and understanding that after the sale the hosting would continue) did not *"deal with the optionality that the customer has"*;

> (4) He considered the eighth assumption (none of the customers brought Digital Safe in house) to be both a *"hindsight point"* and one which missed the point that a number of customers had started with and retained Digital Safe on premise without undue difficulty.

3348. After that, Mr Rabinowitz returned to cross-examine Mr MacGregor further on the second, third and fourth assumptions, on which Mr Holgate had relied particularly in reaching the conclusion that the licence could not be used by a customer *"independently from the hosting and related service components of a Digital Safe arrangement"* nor was it *"feasible, from a commercial or technical perspective, for the licence to be sold as a separable good"*.

3349. Again, Mr MacGregor's opinion was that none of the factual assumptions compelled or even justified the conclusion that the licence had no independent value; and the conclusory first sentence in assumption (2) (which he considered, correctly) to be in reality a self-standing judgment, not a matter of fact, of itself took the matter no further for that very reason: all it signified was that *"if that's the assumption, then that's the conclusion you reach"*.

3350. In my judgment, Mr MacGregor was correct to this limited extent: the assumptions took no account of the basic legal fact that the licence gave contractual rights to the customer and imposed contractual obligations on Autonomy which introduced, potentially, a new and separate facet of the relationship between them beyond the provision of services.

3351. But none of this answered the real question in the case, on which Mr MacGregor floundered: how it was that those contractual rights could be said to have any real substance if (a) in most or many cases those rights were commercially illusory and/or never likely to be useful or used,  and/or (b) the real intention of a hybrid customer was

to continue using hosted services, without regard or recourse to the licence rights, with the sole real benefit of the licence being as a passport to lower data storage rates.

3352. Again and again, the only answer provided by Mr MacGregor and the Defendants was (to quote from a passage in Dr Lynch's written closing submissions which seems to me eloquently and neatly to summarise the nub of his argument and of Mr MacGregor's response to Mr Holgate) that Mr Holgate's and the Claimants' approach gave:

> *"negligible, if any, weight to the contractual rights and obligations of the parties. It sets at nought the option given to the customer, in law, to take the software in-house (at which point it would be in the same position as the onsite licensee) and discounts the fact that the buyer owns an asset which would, for example, be effective in any bankruptcy of Autonomy. There may also be other good commercial reasons why the buyer would wish to have those rights, such as an ability to allocate them against a capital budget in its own business.*
> …
>
> *As Mr MacGregor pointed out, Mr Holgate's emphasis on the practical position of the customer misses the point that under the hybrid agreement, it <u>owns</u> the software and that the customer has an <u>option.</u>"*

> [Emphasis as in original]

3353. Dr Lynch also submitted that Mr Holgate's approach entirely ignored the fact that the licence conferred a bundle of legal rights; and it led to the proposition, which Dr Lynch labelled *"bizarre"* in his closing submissions, that when selling the licence to one customer (the on-site customer), Autonomy could recognise the revenue, but when selling the same asset to another customer (the hosted customer) Autonomy could not.

3354. Pausing there, in a sense the Defendants' position was, by implication at least, that if the hybrid hosting agreements were valid in accordance with their terms (which was not disputed), and the rights were capable of having some economic value for example in the event of the bankruptcy of Autonomy, or in the licensee's accounts, or (as Dr Lynch also posited, simply as an option which the licensees could flourish when the time came for renegotiation of hosting terms) that was definitive. Before considering whether (or to what extent) a factual exegesis is necessary or whether there is, as it were, such an overall or generic answer, I would summarise my view as to the relevant test or tests as follows:

(1) As already indicated, I consider the fact that the licence comprised legally enforceable contractual rights to be highly important but, in the application of accounting principles, far from definitive in the determination of the substance of the transaction.

(2) I agree also with the observation in the written closing submissions on behalf of Dr Lynch that Mr Holgate tended to talk about the use of the software, rather than the acquisition of it (or a right to it) by the customer, and that this led to the flawed assumption that if *"in practice"* the customer remained on Autonomy's hosting system it necessarily followed that the licence had no separate value.

(3) I do not think it is realistic to require of the company and its auditors to enquire of and determine the motives of an individual customer in purchasing a licence[391], or whether that customer actually intends and/or has or is likely to have the capability to utilise the rights it confers.

(4) However, I do not think it unrealistic, and I do think it necessary (as indeed must follow from my conclusion at (1) above) that an overall or generic assessment be made as to (a) whether across the cohort of customers there was ever any practical likelihood that the contractual rights would be utilised, (b) whether in reality the use of the licence ever played any substantial part in the promotion and negotiation of a hybrid deal or a further re-restructuring of its terms, and (c) whether there was ever any real expectation on the part of Autonomy or intention on the part of the customer, in any but the most exceptional case, to move the customer's software and data away from Autonomy's data centres onto its own premises (or even a third party provider's) during the currency of its hybrid hosting arrangement.

(5) If that assessment reveals no such practical likelihood; or no such usual intention; or that the difficulties and expense of moving and/or running Digital Safe on premise would in all but an exceptional case or cases be prohibitive or at least disproportionate to the likely benefit and/or that the process of promotion and negotiation of a licence or a restructuring placed no real focus on the benefit of moving on premise (as distinct from the financial benefit of reduced ongoing data storage charges or, a less obvious but potentially equally important financial advantage such as amortisation of the costs over the licence term) then the licence should be accounted for as in effect a prepayment, rather than a sale of goods.

3355. I turn therefore to that factual question whether the licence for which the licence fee was charged had any real substance and utility (whether actual or prospective) to the customer separate and apart from the hosting services which the customer also contracted to have and pay for as part of the 'hybrid' transaction looked at as a whole, and which in fact all customers continued with after acquiring a hybrid hosting licence.

---

[391] Which Ms Gustafsson emphasised she did not in any event regard as relevant. In cross-examination she told me: *"…their motivation for undertaking that transaction is irrelevant to me as an accountant when looking at that deal…Their motivation was not part of an accounting standard that would have changed the accounting treatment".*

*The practicalities of (a) installation and (b) monitoring*

3356. The evidence in this regard was very detailed. In my judgment, it established that:

> (1) Digital Safe was designed to be primarily a hosted solution, and the majority of Autonomy's Digital Safe customers were hosted (as Mr Yan put it, *"located at an Autonomy data center and managed by Autonomy personnel")*.

> (2) On-premise installation and implementation was not impossible. Digital Safe was available and actively offered as an on-premise solution. However, it involved considerable infrastructure costs. There were *"not many"* (to quote Mr

---

> Yan) existing hosted customers who moved Digital Safe on-premise. The Claimants acknowledged that some 17 customers were said to have had Digital Safe on-premise.

> (3) Most Digital Safe customers were banks and large financial institutions with considerable resources, often running (and having employees with suitable training and experience to run) complex IT systems.  Smaller entities would be unlikely to want or need to run the full Digital Safe solution; Arcpliance, a simpler product with a more limited capacity known among Autonomy's software developers as "Safe in a Box", could possibly provide a more suitable solution as it was simpler and much more easily installed, implemented and managed, though for smaller customers other simpler alternatives were available such as CAMM.

> (4) Installation, configuration and customisation or implementation of Digital Safe on-premise were complex tasks, almost inevitably requiring Autonomy's assistance. The evidence (which I accept) was that no customer ever carried out this process by itself successfully (or at all).

> (5) The complexity and duration of the implementation process for an on premise Digital Safe established from inception (and thus not involving the further complexities of data segregation and "lift and shift" involved in a move from an existing hosted service) depended on the size and resources of the customer, its data requirements and its particular needs. A minimum of at least three weeks would have been required: and Dr Lynch accepted in cross-examination that in many cases it would have taken *"at least months."*

> (6) Autonomy never encouraged on-premise deployment of Digital Safe without Autonomy managed services. The Defendants' reliance on the fact that Autonomy produced instruction manuals as signifying encouragement to move on-premise was mistaken: and I accept that such

manuals as were produced were far from being sufficiently detailed to enable a customer to do without managed services.

(7) Some customers that moved Digital Safe on-premise initially did not want ongoing services (which were usually provided by remote access through a VPN link) because they did not want anyone to have access to or visibility of their data (Apple, Axa and BNP Paribas were examples). Not all customers initially opted for full management services. However, after initial difficulties all Digital Safe customers who were sold a system without managed services (except Apple which never completed implementation) resorted to Autonomy to provide management services, or moved into another less complex solution (such as Arcpliance, and latterly, a new umbrella product called Autonomy Consolidated Archive or ACA, as in the case of Rand and a company called Air Liquide). Autonomy encouraged this. Dr Lynch's suggestion that Digital Safe could be managed without assistance was not borne out by their experience; it was (as described by Mr Young in an email to Dr Lynch dated 16 April 2010) *"a complicated beast with a lot of delicate moving parts"*.

(8) In some cases, customers chose to instal Digital Safe from inception in a third party data centre. For example, ManuLife had its Digital Safe on-premise in an IBM or IBM-controlled data centre in Canada because Canadian law required data to be hosted within its jurisdiction and Autonomy had no data centre there at the time.

(9) A customer with a licence also had the option to keep its existing data in a data centre hosted by Autonomy, whilst using that licence to have any new data onsite or at a third-party data centre: and that was a feasible and practicable alternative to full migration (which, for example, was adopted by Morgan Stanley which used hosted services for most of its Digital Safe data but had an on-premise Digital Safe in Switzerland for Swiss secrecy law reasons).

(10)   Migration of hosted data on premise was not completely impossible, at least if the migration was to another Digital Safe (or as Mr Yan put it more technically, *"if the solution source and the solution destination were Digital Safe"*). However, the process was, as described by Mr Yan, *"laborious"*, timeconsuming and expensive.  The only example in the evidence of a company which initially had its data stored under a hosting contract with Autonomy but which, after purchasing a licence, successfully migrated its data and *"lifted and shifted"* its hardware from Autonomy's data centres on to its own premises was Citibank.[392] (In fact, there is no evidence that Citibank ever purchased a

---

[392] Mr Yan explained  that *"lift and shift"* involved powering down the hosted Safe, loading it up onto trucks for transportation, reassembling it at the customer site, and re-powering it up.  As Digital Safe was compatible with most hardware, installing new hardware and programming Digital Safe onto it was likely to be the easier option.

hybrid deal: it appears that Citibank's transition was agreed in December 2007, predating the adoption of the hybrid model in mid-2008).  That was, it seems, the exception that proved the rule. Citigroup's move on-premise was very complex (involving over 2 petabytes), and took about a year, even with Autonomy's help. The actual costs of the migration of data and any *"lift and shift"* were not explored in detail. It seems likely they were a very considerable disincentive for others contemplating the same thing. Mr Yan was cross-examined as to the practical difficulties of data migration. He told me that some 30 people were involved and that though he did not have the exact figures, it was:

> *"safe to say that it would have costed them a lot of money, a lot of materials and lot of staff and certainly a lot more time…"*

(11)     During the period of a transition from hosted to on-premise a customer would still need to adhere to any applicable regulations on data storage: this was put forward by the Claimants as another reason why a move was impractical. But Dr Lynch explained, and I accept, that during the transition period the obvious solution would have been (at least in theory) for the customer to carry on its hosted service arrangements until its on-premise Digital Safe was built.

(12)     Schedule 6DS licence contracts did not include any provision for Autonomy to provide managed services if a customer decided to move its archive on premise. The Claimants initially suggested that the requirement for Autonomy's assistance rendered the process unviable in the absence of any contractual

---

provision for such assistance in the licence. That was an exaggeration. There was no impediment to Autonomy pricing and charging separately for its assistance and managed services, and that is indeed how customers (such as Merck) which did not initially contract for managed service but did subsequently require it, were charged. Autonomy's charges for such services, whether as part of the original purchase price or as a separate and subsequent addition, were modest. Thus, for example, BNP Paribas paid $80,000 per annum for remote monitoring and administration services (though this was in addition to $160,000 per annum for support and maintenance); Manulife paid $123,500 for implementation at its third-party on-premise centre and $14,583.33 per month for the entire suite of managed services; and AXA paid $60,000 for implementation.

(13)     There was nothing to suggest that the same options would not have been available where Digital Safe had been moved on-premise from a hosted environment. However, Mr Goodfellow felt sure, when cross-examined, that *"Autonomy would have been willing to sell them those services as an additional service from Autonomy"*. Citibank's

purchase of maintenance and monitoring services when it bought a licence demonstrates, as I find, that they were available. It appears from the lack of any evidence to the contrary, Mr Yan's evidence in cross-examination, and the inherent likelihood, that such services would have been provided by Autonomy at fair value and without differentiation according to whether the customer had always had Digital Safe on-premise or had moved on-premise.  In all cases, according to Mr Goodfellow, monitoring and management charges, like implementation charges, were historically comparatively small.

(14)      In all cases, however, the customer was dependent on Autonomy. No VAR or third party provider was in a position, either legally (since only Autonomy had the requisite proprietary rights) or practically (since none was trained or had experience on Digital Safe) to provide the assistance that any on-site Digital Safe customer would inevitably and routinely require.

3357.  As it seems to me this evidence also confirms, and I find, that:

(1) Although (as was not disputed) Digital Safe was capable of being and was operated on premise, it realistically only ever was so by large institutions, multinational companies or large organisations with quasi-governmental roles such as the SFO and VA Vaco with commensurate resources.[393]

(2) Even the largest institutions with considerable resources either never attempted, or having attempted, found it impossible[394], to instal and/or manage Digital Safe without Autonomy's assistance and for example, all on-premise customers found they needed to establish VPN access for Autonomy to monitor and

manage the system and provide the near constant support required for Digital Safe.

(3) In short, it was not a practical proposition to implement or keep Digital Safe going without considerable and consistent support from Autonomy. I accept the Claimants' submission and find that a customer who had bought a licence had no real chance of implementing and thereafter using the Digital Safe on a standalone basis, because of its intrinsic complexity, the lack of customer-facing manuals, and the lack of third parties in a position to assist them.

---

[393] Thus, only one of the 17 on-premise Digital Safe users identified by the Defendants was not either a financial institution (BNP Paribas, AXA, Manufacturers Life, Morgan Stanley, UBS) or a large multinational

[394] For example, Air Liquide (a large French multinational corporation) had to be moved to EAS/CAMM which were designed for on premise use because it was as a practical matter impossible to run Digital Safe unmanaged or by "self-service".

*The manner in which hybrid deals were sold*

3358. The Claimants also relied on the pattern of Autonomy's approaches to existing hosted customers and the subsequent negotiations if and when they ensued as demonstrating that (a) Autonomy presented the hybrid model licence simply as a means to obtain the data storage savings it offered, and never expected any hybrid customer actually to exercise its contractual rights or "option" and (b) very rarely, if ever, did any customer manifest any intention of using the licence independently of its hosting arrangements with Autonomy.

3359. The Claimants took as an exemplar Autonomy's approach (through Mr Krakoski, a Digital Safe sales executive at Zantaz) [395] to Charles Schwab Corporation (a US multinational financial services company, "Charles Schwab"), and the latter's reaction and the ensuing course of negotiations. They illustrated these matters by reference to contemporaneous emails as follows:

(1) On 19 October 2009, Mr Krakoski emailed Mr Andy Uffelman (of Charles Schwab) encouraging a restructure:

> *"Great thing about the license structure for Schwab is long term it reduces storage [i.e. storage rates] dramatically... It will absolutely be imperative that we are both on the same page for making this happen in the quarter. Autonomy exec's are hyper-focused on quarterly results..."*

(2) The focus of Mr Krakoski's sales pitch was thus on the potential savings that Charles Schwab stood to make, not on the licence.

(3) Although at one point, Charles Schwab's legal group expressed "*...concerns with the licensing language*", the subsequent exchanges make clear that the real focus was not on the extent of the licence rights (in which there was no apparent interest) but on the balance of the real underlying deal as between (a) what Charles Schwab would be prepared to pay for the licence and (b) what level of reduction or discount Autonomy would be prepared to accept in return on (i) storage rates (ii) maintenance and service charges.

(4) The true focus of the negotiation and Charles Schwab's lack of interest in the licence is plain from the contemporaneous documents. For example:

---

[395] Mr Krakoski had been slated as a witness for the Claimants, but he was withdrawn

(1) On 18 November 2009 Mr Krakoski proposed revised terms for a licence fee of $3.8 million, in return for a very low management and services charge of *"M/S: 5% annually!"* with *"all services currently being provided"* and in addition a licence of both ControlPoint and a Digital Safe Connector, as well as an option to increase ControlPoint capacity *"in the form of a perpetual licence".* Mr Krakoski calculated this resulted in 26% savings over the current method of charging, $2.8 million in savings over the term, reduced maintenance and services fees, as well as allowing Charles Schwab *"to leverage ControlPoint",* which he summarised as *"Overall increases savings and allows for more upside archival".*

(2) On 7 December 2009, Mr Uffelman emailed Mr Krakoski saying that (a) Charles Schwab had *"no appetite"* for so large a licence fee; (b) but they would be prepared to pay $2.25 million; provided that (c) since they *"did not intend to take the software",* Autonomy agreed to the 5% maintenance fee and the same reduced storage rates continued as part of the arrangement.

(3) After the deal closed on 28 December 2009, Autonomy sent Charles Schwab a software delivery email letting it know that the licensed software was ready for download.

(4) When Charles Schwab received this email, Mr Uffelman contacted Mr Krakoski saying:

> "*Jim, let's talk about what this means. <u>We don't want to download the software</u>, nor do we want the risk of any of our technical partners doing so in error. What controls can we have in place to ensure this doesn't happen?*" [396]

(5) Eventually, Charles Schwab agreed to restructure its arrangement and to contract on the hybrid model. But, as the Claimants contended, it appears clear from the email exchanges that the reason Charles Schwab agreed to the new model was simply because it made considerable savings; it had no interest at all in owning the licence or moving on-premise.[397]

3360. More generally, it does not appear that any of the hybrid Digital Safe customers were expected by Autonomy or themselves intended even to download the licensed software. The Claimants relied in support of this on the evidence of Mr

---

[396] Emphasis added.

[397] In his first witness statement, Dr Lynch suggested that Charles Schwab ran Digital Safe on premise. This was not so: Charles Schwab was always a hosted Digital Safe customer, as Mr Avila confirmed in crossexamination, and as also appeared from an internal Autonomy email from Mr Rizwan Khan of 15 September 2011

Avila who had noted in an email to Autonomy's Mr Mohit Mutreja in relation to a hybrid e-Discovery deal (subject headed *"Papering JPMC"*):

> *"since we are selling a license, we will have to deliver [it to the customer] – even if we host it. Similar in concept to deals where we sell the DS software but host it in any case. The customer is never expected to install it themselves."*

3361.   When Mr Avila was shown this document in cross-examination, he initially tried to pass it off as an "*exaggeration*", but ultimately he accepted that it was fundamentally correct:

> *"Q. ... That was true, in cases where Autonomy sold Digital Safe licences to customers, it was true that the customer was never expected to install the software themselves, yes?*
>
> *A. That was perhaps an exaggeration on my part, but I think we all assumed that in any hosted deal where there was a licence component, it was unlikely that the customer would go off and try to install it themselves while they had the service being hosted for them.*
>
> *Q. You didn't expect them to do that?*
>
> *A. Right.*
>
> *Q. And so far as you know, no customer did go and install Digital Safe software themselves?*
>
> *A. Or any hosted licence software as far as I know."*

3362.   The Claimants gave other examples from which this appears to have been a widespread understanding amongst Autonomy staff at the time. Thus:

> (1)   In the context of a Schedule 6 transaction in Q2 2009 during which Morgan Stanley purchased a licence to Digital Safe Universal Access, Mr Goodfellow sent an email to Mr Wang and Mr Loren Wheale (an Autonomy technician) asking them to "*build ... a package we can put on Automater for delivery to MS*". Mr Wheale asked Mr Wang what the point of the exercise was, with Mr Wang explaining in reply: "*Revenue recognition, we need to ship something to Morgan. We shipped them Digital Safe software before even though they probably won't do anything with it*".[398] The Claimants noted that Mr Wang was not challenged on this evidence.
>
> (2)   In the context of another Schedule 6 transaction with Energy Solutions LLC in Q1 2010, Ms Cynthia Watkins noted that the deal was "*hosted*

---

[398] As Mr Wang explained, he was referring to a Schedule 6 transaction with Morgan Stanley in Q2 2008.

*but we still need to ship the software in order to recognize the license*". The Claimants' point was that this suggested that shipment was irrelevant to the customer, and only needed for Autonomy's own purpose of revenue recognition.

3363. Of course, these are simply examples; but the fact that, in the Relevant Period, not one hosted customer successfully used the hybrid licence to move on premise strongly supports the suggestion that the licence element was simply regarded on both sides of

---

the transaction as something that would never be used by the licensee, except as the required fee to access the lowest data storage charges.

*Defendants' reliance on Deloitte and Audit Committee*

3364. A principal plank of the Defendants' defence, in this context as similarly (as has been seen) in others was that, whatever may now be the case, years later and with the potentially insidious overlay of hindsight, at the time they drew comfort from the approval of the accounting treatment of the hybrid hosting transactions throughout the Relevant Period by a well-trained and experienced finance department, and by respected auditors Deloitte, and also the Audit Committee headed (from 2010) by Mr Bloomer, himself a respected Chartered Accountant with a wealth of financial and commercial experience.

3365. The Defendants pointed out that Deloitte had access to a wide group of personnel at Autonomy and Zantaz to assist in their understanding of Digital Safe, and hosting and hybrid deals.[399] Deloitte also had access to their own technical expert, Mr Johnstone. The Audit Committee had its own fund of expertise.

3366. In summary, the Defendants' case was (in respect of both Digital Safe and also eDiscovery which I shall deal with later) that:

(1) Deloitte audited and the Audit Committee approved a considerable number of these deals over the course of the Relevant Period. They carefully scrutinised the hybrid model and its accounting treatment proposed by the finance department; and they considered it sound and approved it. In every audit, Deloitte concluded that the licence revenue was correctly recognised.

---

[399] Both Zantaz and Autonomy made available a number of people, including from its technical staff, to assist Deloitte in its process of review and auditing. They included Mr Lucini, Mr Goodfellow and Mr Smolek (who were not suggested to have been in any way dishonest), as well as Ms Gustafsson (whom the Claimants depicted as having *"personal interests…closely aligned with the Defendants"* and as occasionally unreliable or implausible in her evidence but not dishonest) and Dr Menell and Mr Chamberlain (both of whom the Claimants did allege were implicated).

(2) More specifically, Deloitte understood the salient features of the hybrid deals and approved Autonomy's approach in:

(1) treating the sale of the software licence and the provision of hosting and related services as separately identifiable components of a single transaction;

(2) accounting for the licence revenue upon sale to the customer and recognising revenue on that date and thus upfront; whilst

(3) accounting for hosting, support and maintenance and other services rateably over the period in which they were provided;

(4) following a "residual method" of valuing other services in order to determine the appropriate amount of revenue for the licence (which Mr Holgate also accepted was reasonable and normal).

(3) Deloitte reviewed the accounting to ensure it complied with the provisions of IAS 18. Mr Welham confirmed in his oral evidence that on the basis of the information provided to them Deloitte considered that the sale of a licence was a sale of goods, that IAS 18.14 fell therefore to be applied to that element, and that its criteria were satisfied.

3367. The Defendants submitted that they were entitled to and did rely on this as corroboration of the appropriateness of their approach; and Mr Rabinowitz accepted that if Deloitte understood the factual position and were not misled then:

*"…it's very hard to say that Dr Lynch and Mr Hussain should not have thought it was okay."*

3368. The question on that basis is whether the finance department were compromised, or Deloitte and the Audit Committee were misled, as to their assessment of the true nature of the hybrid arrangements and the expectations of the parties in respect of them. In particular, it is necessary to consider what they knew or were told as to the viability of installing and running Digital Safe and its software on premise without specialist assistance from Autonomy; and as to the practicality of a hosted customer moving on premise its data and software to which it was entitled under the terms of the licence.

3369. The Claimants' case  was that the finance department was headed by, and ultimately its assessments reflected the views and requirements of, Mr Hussain and Mr Chamberlain; and that Deloitte, and in consequence the Audit

Committee, were fundamentally misled. According to Mr Welham's witness statement, they were given to understand by Autonomy's core management that:

(1) There was no reason why hybrid model customers should not exercise their contractual right under the licence, just as Citigroup had done, to bring the Digital Safe system, including the software, onto their own premises, that this was a developing market trend[400], and that, at least in some cases, customers intended to do so in short order.

(2) There was no reason why customers could not (a) instal the Digital Safe system, their data and the software, onto their own servers, either themselves or with the assistance of third party service providers and then (b) implement and use the Digital Safe system and software themselves or with the support of third parties, without the need for material input from Autonomy.

3370. According to Mr Welham's witness statement, Deloitte were not told, and did not understand, that customers were motivated by the substantial savings offered by Autonomy, rather than by a desire to own a licence to the Digital Safe software. Nor, according to Mr Welham, did Deloitte understand that the hybrid model was generally proposed by Autonomy to the customer, and that the negotiations with hybrid customers were mainly about price.

3371. In an echo of the assumptions which Mr Holgate was instructed to make, the Claimants also asked Mr Welham to make six assumptions of fact, which he confirmed were directly contrary to Deloitte's understanding at the time. This served to (a) emphasise how different Deloitte's understanding was from what was said by the Claimants to be the reality and (b) to enable Mr Welham to state his view as to Deloitte's likely approach had they been aware of that reality. Those six assumptions were in substance[401]:

(1) Hybrid customers received substantially the same service as SaaS customers, the only substantive difference being the payment structure.

(2) A Digital Safe system could only be customised, configured and implemented for use on premises by Autonomy as part of a complex and lengthy process using Autonomy's proprietary knowledge and resources unavailable to third parties: a Digital Safe licence was thus of no independent value to a hosted customer.

---

[400] According to Mr Welham, Deloitte was told in 2008 that there was a *"current trend in the market place"* of customers *"bringing services in house"*. There was no relevant evidence of such a trend: whilst Deutsche Bank and Morgan Stanley did express an interest in (and Morgan Stanley did implement in Switzerland) on premise solutions in jurisdictions that imposed restrictions on data exports (such as Switzerland and Japan) that was a specific response to a specific difficulty and was exceptional. The real trend was towards the cloud, and in particular cloud-based hosting, which was a particular Autonomy strength and which made hosting cheaper and even more attractive.
[401] I have slightly altered their expression, but not materially so.

(3) The Digital Safe system required continuously available managed services, which only Autonomy (and no third party) could provide, to keep it going.

(4) Negotiations to restructure a hosting contract were largely instigated by Autonomy, and not the customer, and such negotiations largely centred on price and the amount that the customer would save over the lifetime of the contract.

(5) The intention and understanding of both Autonomy and the customers was that, after the licence sale, the customer's data would be hosted, and all associated services would be performed, by Autonomy at its data centres.

(6) None of the hosted customers referred to in Schedule 6 to the RRAPoC ever did bring a Digital Safe system (including the software) on premise.

3372. Mr Welham's expressed view was that:

(1) Each of these assumptions was contrary to Deloitte's understanding at the time, and would have been relevant to Deloitte's overall consideration of the issue whether the licence was analogous to a product sale or should be treated as a prepayment, which was the nub of the decision about revenue recognition.

(2) The matters he was asked to assume suggested that there was no standalone value in the Digital Safe licence.

(3) The likely conclusion would have been against revenue recognition; further,
Deloitte (and presumably also the Audit Committee whose understandings were

based on Deloitte's reports to them) would have drawn serious adverse conclusions from management's provision of what, on that basis, would have been false or misleading information.

3373. Neither this forensic approach nor the responses it elicited was accepted by the Defendants. They depicted the Claimants as having *"used hindsight to construct an argument against revenue recognition which is contentious and highly technical (and indeed wrong)",* and stressed that *"the people who were operating diligently and in good faith at the time thought that the licences could be recognised as separate components and that the accounting was correct."* The Defendants sought to challenge the six assumptions and Mr Welham's evidence as to how Deloitte would have accounted for the hybrid deals on the basis of them.

3374. The Defendants were adamant that Deloitte had not been misled, and that the Claimants had overlooked the fact that Deloitte were involved in a detailed consideration of the hosting arrangements such that they cannot have approached the matter in such a simplistic way. They were supported in this by the following aspects of Mr Welham's evidence in cross-examination:

(1) Mr Welham accepted when cross-examined that Deloitte were aware that the expectation for many customers who had purchased a licence as part of a hybrid deal was that they *"might well"* not migrate but continue to remain with Autonomy and continue to enjoy essentially the same services as any hosted customer.

(2) Mr Welham also accepted that what mattered for accounting purposes was that the customer <u>could</u> take their licence elsewhere and not whether they <u>did</u> take their licence elsewhere (which did not quite address whether they ever <u>would</u> do so).

(3) Although the Claimants presented his evidence as having been that Deloitte were misled into thinking that there was a customer trend towards an on-premise solution, Mr Welham was more circumspect in his witness statement, claiming no more than he had *"derived"* an understanding from Autonomy management that *"consistent with the then current trend in the market, customers wanted to be able to archive their data in-house and to reduce the cost of storage"*. He also clarified when cross-examined that their understanding was that there was a move amongst customers to *"cloud services or hosted services in-house"* (which was not inaccurate).

(4) Mr Welham accepted that Deloitte had understood that running a data centre on the customer's own premises *"required specialist expertise"*, though he reiterated that he did not think they had understood it would require *"very specialist implementation"*. He also accepted that a customer would always be able to buy separate implementation and support services from Autonomy: but he emphasised that Deloitte had understood that these might be purchased also from "*another provider"*.

(5) Further, he accepted that Deloitte knew that when Citi had taken Digital Safe in-house the *"lift and shift"* of its servers from Autonomy's data centres to its own had proved a serious undertaking, but had been achieved; and they took from this also that other customers would have the ability to do the same if they chose.

(6) Mr Welham confirmed also that if it was assumed that customers could migrate their data to their own data centre or a third-party data centre with specialist assistance separately charged, that could impact on the question whether the licence had standalone value and possibly lead to a conclusion *"the other way"* (that is, that it did have standalone value).

(7) Similarly, Mr Welham confirmed that Deloitte understood that Digital Safe would be likely to need monitoring and management by specialists, and as long as the services were provided to the customer at fair value that would not tell against revenue recognition and indeed would tend to support the licence having separate value.

(8) He accepted that it really did not matter whether it was Autonomy which approached the customer to initiate negotiations about restructuring, or *viceversa*. What mattered was the final contract which they agreed. However, Mr Welham suggested that he considered the issue as to who had initiated the contract had influenced Deloitte's *"slightly different"* understanding as to whether there was *"a move to move cloud services or hosted services in-house"* though he again confirmed that in isolation the point did not impact revenue recognition.

(9) When asked about the fifth assumption he had been told to make (which mirrored Mr Holgate's seventh assumption), that the intention of both Autonomy and the customers was in fact that notwithstanding their acquisition of a licence entitling them to *"lift and shift"* they would stay put as hosted customers, he agreed that this was really a repeat of the first assumption; and it was likewise answered by the point, which Mr Welham had accepted (albeit with a barely audible but potentially important reservation *"to an extent, yes"*), that what mattered for accountancy revenue recognition purposes was the rights and obligations of the parties, and not whether they were in fact exercised (unless practically incapable of being so): he made clear, however, that what he meant by this was that what mattered was having *"the ability to do it."*

(10)    Similarly, when asked whether, if it were assumed that a customer which chose to move Digital Safe on-premise could only obtain the maintenance and other services required in order to run the system from Autonomy, but also that Autonomy would have been willing to provide such services at fair value, he intimated that then that too *"might well"* militate in favour of the accounting treatment adopted.[402]

3375. Mr Welham correctly cautioned, however, that he was not, in giving this evidence, intending either to verify or disprove these assumptions: they were prescribed assumptions, not verified assertions. Before turning to assess whether Deloitte were

misled it is necessary to address the underlying questions of fact as to the viability of on premise Digital Safe and as to what truly were the objectives of

---

[402] Mr Welham was notably reluctant to concede this, and prevaricated what effect this would have before ultimately all but conceding that it would support and not undermine the accounting treatment which Autonomy had adopted and Deloitte had approved.

the contracting parties in respectively agreeing to sell and purchase hybrid licences.

3376. As detailed in paragraph 3356 above, with one notable outlier, the witness evidence broadly confirmed that:

(1) Digital Safe was a highly sophisticated product (it may be remembered that Mr Young had described it in an email to Dr Lynch dated 16 April 2010 as *"a complicated beast with a lot of delicate moving parts"*), and it could not be moved on premise or managed and kept in working order there without continuous expert assistance. All efforts to make do without such assistance, and without a VPN connection, failed. That was so even in such cases as Merck (one the world's largest pharmaceutical companies), Citibank and AXA (both amongst the world's largest financial institutions): as the Claimants noted in their written closing submissions if those three companies did not have the technical expertise and resources to operate Digital Safe without Autonomy's managed services, it is difficult to imagine that any could. According to Mr Yan's unchallenged evidence, Autonomy even had to second an employee to Citibank's New Jersey offices to supervise the system.

(2) Mr Wang, Mr Yan and Mr Goodfellow all confirmed in their witness statement evidence that Digital Safe required near constant support, for which a VPN link on a dedicated network line was essential. Mr Avila was constrained to accept that he could not disagree.

(3) That was no criticism of the product: it was simply not designed or suitable for on premise deployment without such assistance. Mr Sullivan, as the CEO of Zantaz which had devised it, described it (see also paragraph 3284 above) as *"a massive product with a huge footprint"*, and the systems required to run it as being *"complex and proprietary"*. His evidence was that it *"was not designed to operate at a customers' premises, or without the Autonomy services necessary, first to implement it and thereafter to maintain it."* There was a raft of contemporaneous documentation to that effect, in which Dr Lynch's witness, Mr Avila, repeatedly expressed his agreement. Mr Young agreed entirely with Mr Robert Desroches[403] that it should not be put onsite at all except perhaps in *"extraordinary circumstances"*, and then only with full monitoring and maintenance. Indeed, Mr Desroches considered it should not be offered at all:

EAS or CAMM[404], or sometimes perhaps Arcpliance, should be offered instead.

(4) The option offered by a hybrid licence to move and run Digital Safe on premise was more theoretical than real: the logistical support required,

---

[403] Who, according to Mr Yan, was in charge of Digital Safe operations at the time.

[404] Enterprise Archive Solution and CA Message Manager ("CAMM") were software solutions which could *readily* be installed onto a computer and easily managed.

even if put in place, was a clear disincentive against any move from a hosted solution.

(5) Further, assistance was only available from Autonomy. Mr Sullivan's evidence was that the relevant information to enable assistance was not provided to non-

Autonomy personnel, and he was not aware of any VAR that could or did

implement or maintain Digital Safe in the Relevant Period. Even Mr Martin, a witness for Dr Lynch who tended to be an enthusiastic advocate for him (though, to my mind, too enthusiastic to be a reliable one), appeared to accept that Autonomy had not trained partners like Capax Discovery and MicroTech to assist, and no other third party providers, who would not in any event be given the requisite proprietary evidence, were in a position to provide assistance either.

3377. The notable outlier was Dr Lynch. He was to some extent committed to confirming its viability because he accepted that he was involved in the decision to offer the hybrid hosting model and thought it a *"sensible business decision"*, thought he emphasised he was *"not…involved in the execution of this strategy"*. If anything, he went further in seeking to support its viability and deny impracticability when cross-examined (after the evidence of Mr Wang and Mr Yan to the contrary). He told me:

(1) When asked to agree that Digital Safe was designed to be a hosted system, not an on-premise system, he replied *"not at all"*. He sought to recharacterize Mr Yan's evidence to the contrary as limited to the case of a *"very large Digital Safe"* with thousands of cells. That was more difficult but would only be likely to be required by large institutions with the resource to handle the most complex IT systems.

(2) In that context, he asserted that in fact *"Digital Safe was not particularly advanced"*. It was written in industry-standard language and protocol. There was *"no problem using Digital Safe unhosted."* He reasoned that it shared a code with Arcpliance and, he said, *"they both ran on premise".*

(3) He accepted that there were no specific manuals to assist migration or management of Digital Safe. He did not agree this posed any problem; again he referred to Arcpliance as if it were much the same thing: *"Arcpliance is Digital Safe in a box and that had its manuals."*

(4) He contradicted the evidence of Mr Yan and Mr Goodfellow that only the most skilled staff at Autonomy dealt with Digital Safe pre-configuration and other similarly complex tasks: he told me that they *"just dealt with their little area"* and *"actually the Digital Safe group were actually not particularly highly skilled".*

(5) He sought also to contradict the evidence of his own witness, Mr Martin, that Autonomy did not train partners to assist with Digital Safe; he told me that

Capax Discovery and MicroTech *"did for ACA[405] and may have done for Arcpliance as well"* and that since *"ACA is Digital Safe but under a different brand"* he *"would totally have believed Capax was capable of implementing Digital Safe for a customer."*

3378. Dr Lynch's expertise in the software field is undoubted; for a man who had devised IDOL, its adaptation for and incorporation into Digital Safe (which was a Zantaz product) no doubt appeared relatively simple. But the balance of the contemporaneous evidence seems to me to be very firmly against his rear guard attempt, alone, to depict

_____

Digital Safe as a common or garden variety bit of software which could be implemented and managed with ease. His efforts to confuse and equate Digital Safe with other products which could more easily be deployed on premise were fairly obvious, and discreditable. His suggestion that Digital Safe could be managed without assistance was not borne out by the experience of anyone involved. I have no real hesitation in rejecting his evidence in this regard.

3379. Furthermore, the regrettable inference which I make is that Dr Lynch devised this line to try to bolster both (a) the semblance of the licence offering a viable option and (b) Deloitte's approach and acceptance of that. That obviously is of relevance more generally, and more specifically see also paragraphs 3383 and 3384 below as to what he supposed Deloitte to understand. I next deal with my assessment whether Deloitte were misled.

3380. In my judgment:

(1) As his cross-examination confirmed, Mr Welham's witness statement overegged the extent of Deloitte's misunderstanding;

(2) I do not accept that Deloitte understood Digital Safe to be *"standard software that customers were capable of installing onto their own servers themselves or with the assistance of third party service providers";* nor that Deloitte ever had any basis for an understanding that Digital Safe could be supported *"without the need for material input from Autonomy"* (as Mr Welham had rather extraordinarily claimed in his witness statement, from which he had to retreat in cross-examination).

(3) Similarly, I do not accept either that Deloitte, which also audited Citibank, did not appreciate that the process of bringing Digital Safe and related software and its data on premise had been complex and expensive for Citibank. By the same token, Deloitte knew that a move on premise, though expensive and difficult, was an option and could be

_____

[405] Autonomy Consolidated Archive.

achieved: and that therefore the licence did appear to grant some optionality.

(4) Deloitte also understood that notwithstanding that optionality, many customers might not exercise their rights under the licence, and would continue with Autonomy so as to benefit from the cheap hosting services for which they had also contracted.

(5) Nevertheless, cross-examination also confirmed that there were fundamental gaps in Deloitte's understanding. They were not provided with and did not have anything like a full understanding of what a move in-house would involve. Perhaps the most important was that they do not appear to have understood quite how much continuing and constant support was needed for Digital Safe, or quite how highly specialist was the support required, or that an on premise customer would in consequence be wholly dependent on Autonomy. In that regard, Mr Welham emphasised that Deloitte understood, and indeed Mr Miles in questioning him confirmed that he should assume, that implementation and support services could be provided by *"another provider"* (see also paragraph 3374(4) above). But the evidence was that no third party provider could assist: it was a proprietary product as well as being hugely complex and only Autonomy could assist. The fact that the evidence also was that Autonomy charged fair value did not undo the point that Deloitte had not understood that the optionality depended on continued and extensive co-operation from Autonomy.

(6) Further, and in consequence, Deloitte had not understood the degree of even the most sophisticated on-site customer's likely dependence on Autonomy, and the almost inevitable disincentive to any move on premise that this presented.

(7) In addition to the gaps in their understanding of the product and its viability in practical and commercial terms of its on premise use, Deloitte did not have a full or accurate understanding of the market. Mr Welham repeated (see paragraph 3374(8) above) that Deloitte had what he described as a *"slightly different"* understanding as to whether there was *"a move to move cloud services or hosted services in-house"*: Deloitte do seem to have been under the impression that the optionality which the licence was said to provide was a response to a perceived market desire for flexibility, rather than simply a restructuring of pricing. This clouded their view as to the true objectives of the contracting parties and whether any had any real expectation (on the part of Autonomy) or intention (on the part of the customer) that the optionality apparently granted should ever be exercised. That in turn encouraged a flawed perspective as to the separate utility and purpose of the licence.

(8) It was a noticeable feature of the cross-examination that, despite its thoroughness otherwise, Mr Welham was never asked whether Deloitte

had any, and if so what, understanding of the negotiations leading to the transactions and/or of the objectives of the customers concerned. Although Mr Welham was cross-examined about whether the assumption he was asked to make that Autonomy had instigated the negotiations was significant (see above) he was not asked about the evidence linked to it which Mr Welham had given in his witness statement: he was not questioned about the linked assumption that the ensuing negotiations *"largely centred on price."* I infer that this was not explored because, as the Claimants illustrated by reference to the transaction with Charles Schwab described in paragraph 3359 above, that was indeed (often, perhaps usually) the only focus of negotiations.

(9) In short, Deloitte did not have a proper understanding of the product, or the viability of on premise deployment of Digital Safe, or the true objectives of the contracting parties, or, therefore, of the real purpose of the licence.

(10)    With a fuller understanding, it is more likely than not that Deloitte would not have been persuaded that the licence had substantive stand-alone value, and would not have approved revenue recognition; and neither would the Audit Committee.

*The Defendants' knowledge in relation to Digital Safe*

3381. The question then is whether Autonomy's management, and more particularly, the Defendants, actively misled Deloitte, or alternatively knew that there were those fundamental gaps in Deloitte's understanding so that their audit opinion could not properly be relied on.

3382. Dr Lynch emphasised that the task of accounting for the hybrid deals was in the province of the finance department and Deloitte and he had not been involved in the audit process; but he insisted he had no reason to believe that they had been misled or had misunderstood the circumstances to which their accounting judgments were to be applied. He made clear that his understanding was that *"this is all seen completely transparently by Deloitte who go through it in great detail";*  and that he had assumed that they had the information they required, that they were doing their job properly and that he could rely on their view and approval, and that of the Audit Committee.

3383. However, I take it from his own evidence that the understanding he asserted he had, and must be taken to have assumed that Deloitte would form or share, was that Digital Safe was easily implemented, managed and maintained. He would have assumed that that was the basis on which Deloitte provided their audit opinion; and on which the Audit Committee gave their approval. However, I have found that he knew that this presentation of Digital Safe as a straightforward, easily managed product was contrived: in fact, he knew it to be false. In such circumstances, he knew likewise that Deloitte were proceeding on a false basis; and in any event, he cannot have relied on their approval.

3384. Furthermore, he would have known, as an experienced CEO that the judgement as to the viability of the optionality said to be conferred by the hybrid licence depended on matters unlikely to be, and in fact not, in their experience or knowledge. The judgement was ultimately dependent on facts, not fine assessment of audit principles. It may be that Deloitte were naive; or led by the nose; it is unnecessary and inappropriate for me to say more than that Dr Lynch cannot legitimately maintain that he relied on their approval.

3385. Mr Hussain, a trained accountant, CFO and head of the finance department, had direct involvement in a number of the deals, including in reviewing the savings models [406]. Quite how many is uncertain. In her witness statement, Ms Gustafsson suggested that she could *"only remember [Mr Hussain] looking at the models once or twice."* In crossexamination she was taken to four such examples, and referred to three more; and she revised her evidence to say that he would only have seen a *"single digit [percentage]"* of the *"hundreds of models"* she produced. But it was not the numbers that mattered: he saw quite enough for him to know what the purpose was and that the licences were sold simply on the basis of the savings they would yield to the customer and the revenue they would realise for Autonomy.

3386. This is clear also from one of his own contemporaneous emails (dated 23 December 2009) recording that he himself sold the hybrid model by reference to the savings that it would yield for customers, noting in relation to a deal with Morgan Stanley that the deal was "*purely financial and causes savings. It's quite simply sign and save*".

3387. Both his involvement and the objective was confirmed by other email exchanges urging Autonomy staff to complete hybrid deals and emphasising how important they were. The extent to which he expected to be involved is apparent from an email he sent when it emerged, in relation to a restructuring of a Digital Safe hosting deal with Pioneer

---

Investments in Q3 2010 that there would be a lower licence fee than he had been expecting or been told about:

> "*on Pioneer <u>we gave away licence value</u> without my knowledge or approval. I was expecting $1.2m but now it's a lot lot less. Do not let that happen again*"[407]

In point of fact, this seems to have been rather unfair on the part of Mr Hussain, betraying perhaps a desperation for revenue in the quarter. Again illustrating Mr

---

[406] These were detailed spreadsheets produced by Autonomy's sales representatives/Finance team which were designed to illustrate to the customer the savings that could be achieved if they chose to contract on a hybrid, rather than a SaaS, basis.
[407] Emphasis added.

Hussain's close involvement, Mr Stephan and Mr Sullivan had kept him well informed and warned him of the particular difficulties in the transaction which Mr Stephan described to Mr Sullivan made *"recognising licence revenue upfront very problematic."*

3388.   There can be no real doubt, in my judgment, that Mr Hussain was well aware that a Digital Safe hybrid hosting licence was a device to provide a basis for recognising revenue at the point of sale. In my judgment, he cannot legitimately assert that he relied on Deloitte in this respect either.

*Conclusion as to accountancy treatment of hybrid hosting licence as separable*

3389.   In my judgment, the accounting treatment of revenue from the sale of hybrid hosting licences was improper.

3390.   Customers agreed to purchase such licences and pay the considerable fee in exchange for deep discounted storage rates and service charges, and without any or any real intention of downloading software, moving their data, or otherwise exercising the rights conferred by such licences.

3391.   Autonomy expected and customers who purchased such a licence (in every instance save one (Citi, whose transaction pre-dated the hybrid model) intended to continue as hosted customers. The economic and factual reality was that the licence fee was not paid as the purchase price for the acquisition of valuable rights but as the negotiated prepayment for future services to be provided at discounted rates. It was not analogous to a sale of goods.

3392.   The suggestion of its utility in giving customers an option to move their data and software was a pretence. The option was legally defined and no doubt enforceable: but what it enabled was, in all but theory or in such an exceptional case as to be unrepresentative, in practical terms unusable. The licence was a device to obtain accelerated recognition of revenue, for which the customer paid a fee but for which it was Autonomy which ultimately paid the price by so heavily discounting future revenue streams.

3393.   Both Dr Lynch and Mr Hussain were aware that the licence was an accounting contrivance: both were aware of its purpose.

3394.   The finance department were not independent; and Deloitte and the Audit Committee were misled.

3395.   The Claimants have established their case.

*IAS 18.14 (a) and (b)*

3396.   In light of that conclusion, and for two further reasons, I do not think it is necessary or appropriate for me to consider in this context the Claimants' argument, put forward in their written closing submissions (as they had in their

written opening) that in relation to software licences sold as part of hybrid contracts, the condition of neither IAS 18.14(a) nor IAS 18.14(b) were met.

3397.   One of the further reasons is that the Defendants correctly pointed out that this had not been pleaded: in the context of their case in respect of the Digital Safe licences (Schedule 6DS) the Claimants' pleaded case in the RRAPoC relied only on IAS 18.13 as the basis for their claim that recognition of revenue was improper. Especially in a case alleging fraud, it is imperative that the case sought to be advanced should properly be pleaded. In the context of the Digital Safe hybrid hosting arrangements, the Claimants should not be permitted to rely on IAS18.14 to upset revenue recognition.

3398.   The second reason is that in the context of e-Discovery the Claimants did plead reliance on IAS 18.14 as a further basis for their contention that revenue recognition was improper in the context of the e-Discovery hosting arrangements. It is pleaded there as an alternative case. It seems to me that it only arises in that context, as in this, if it is necessary to deal with the alternative case. I return to that when addressing the eDiscovery position.

3399.   It is to the e-Discovery aspect of the Claimants' hosting claim that I next turn.

## (4)   A detailed analysis of the e-Discovery claim

3400.   Autonomy's e-Discovery offering provided customers with the software, and usually the services, necessary to collate, review and disclose material in the context of litigation.

3401.   Autonomy's e-Discovery software included: (i) Introspect, which was used in connection with the processing and hosting of data, and enabled data to be searched and reviewed before being disclosed, and (ii) ECA[408], which allowed customers to limit the material to be uploaded to the review platform by identifying data falling within specific parameters.

3402.   This e-Discovery software usually formed part of a hosted arrangement, where Autonomy used the software in its data centres in connection with its performance of ongoing e-Discovery services. These services were multiple and varied, ranging far beyond simply storing customer data to, amongst other things, ingestion, processing (and resolving data processing issues), data culling, analysis and producing reports, performing quality control checks, and production of documents in disclosure.[409]

3403.   According to the unchallenged evidence of Mr Kalbag, Autonomy personnel were heavily involved in providing these services, which were not automatically performed by the software, but required action or intervention at each stage of

---

[408] Early Case Assessment: see paragraph 3290 above.

[409] In the *context* of e-Discovery, the term "hosting" should be understood to include not just storage services, but also related e-Discovery services.

the e-Discovery process. The combination and extent of these services was difficult to predict in advance, and differed from customer to customer.

3404. As with the hosted Digital Safe arrangements, prior to its acquisition by Autonomy Zantaz sold e-Discovery to hosted customers on a SaaS basis. Zantaz offered customers a menu of different services, including data ingestion, processing, storage and production, and charged customers a unit price for each of the various services provided. Zantaz accounted for these hosted arrangements as a service, recognising the revenue as the service was provided.

3405. Following Autonomy's acquisition of Zantaz, Autonomy structured and, occasionally, restructured, hosted e-Discovery arrangements so that customers purchased a licence to use the e-Discovery software as well as storage and other e-Discovery services.  These hybrid arrangements were offered as an alternative to a SaaS basis, and offered the customer lower overall cost: the upfront fee for the licence being less than the saving achieved by reduced ongoing charges for related e-Discovery services.

3406. As in relation to the Schedule 6 Digital Safe transactions, the Claimants' overall case in relation to the seven Schedule 6 e-Discovery transactions was that the only real benefit from the customer's point of view was the heavy discount on storage and service charges thus obtained, and the only real purpose of the e-Discovery licences from Autonomy's point of view was the acceleration of revenue recognition to assist or enable it to meet revenue targets. The Claimants cited an email dated 20 June 2011 from Mr Mark Daoust (VP e-Discovery) to Mr David Wilner (who had just joined after the Iron Mountain acquisition) explaining the purpose of the licence:

> *"I would be sure to look at existing revenue for existing clients. If we are getting great rates, then I wouldn't try to convert to licence. I would only use on net new clients or new cases with existing clients.*
>
> *For instance, we had a J&J case that was going approaching contract expiration so we converted them to license. However, if they had a long time before contract expiration we would have left them as is.*
>
> *Of course, if we need revenue for the quarter we may chose [sic] to sacrifice some recurring revenue for a license deal to hit our numbers."*

3407. The Claimants pointed out also that the conclusion that Autonomy was motivated by a desire to accelerate revenue recognition is reinforced by a consideration of the targets and generous commissions that Autonomy set for its sales representatives for concluding hybrid deals. Whereas SaaS deals attracted commission of around 2% to 6% of the revenue recognised during the first 12 months of the arrangement, hybrid deals, at least to begin with, attracted commission ranging from 5% to as much as 18% of the upfront licence fee. Unsurprisingly, this had a substantial effect on the behaviour of Autonomy's sales representatives. As Mr Bock explained in an email to Mr Hussain in March 2009 (which in point of fact related to a DS transaction, to which the same

applied), he had "*negotiated with [Deutsche Bank] for months to structure [a] deal in a way that allowed us to front-load the revenue*", and therefore expected to

be paid commission on the licence immediately, at the higher rate applicable to licence fee revenue.

3408.   The seven e-Discovery transactions impugned by the Claimants were entered into with five customers and can briefly be summarised as follows:

(1)   two of the transactions were with Johnson & Johnson (one in Q2 2009 granting for a fee of $1,446,104 a two-year licence for Introspect software, with user limitations, and (for a further $695,000) storage and eDiscovery services or a term of two years, the other in Q1 2011 granting for a single fee of $2,659,176 a two-year licence, again with user limitations, for Introspect software and storage and other eDiscovery services, together with support and maintenance);

(2)   two were with BP (one in Q2 2010 granting for a fee of $13,534,000 a perpetual licence, with user limitations, to Introspect and ECA software together with a three-year application services term with a separate charge , the other in Q2 2010 granting for a fee of $1,350,000  a perpetual licence, limited to 200 named users and 10TB of customer data, for Introspect software including EDD (but with only limited functionality) together with separately charged application and support and maintenance services for a three-year service term);

(3)   one was with Philip Morris International AG ("PMI") in Q4 2010 granting for a fee of $964,176 a three-year licence , with use and user limitations,for Introspect EDD, I6 and ECA software, together with separately charged hosting and support and maintenance services);

(4)   one was with United States Postal Service ("USPS") in Q2 2011 granting for an upfront fee of $5,531,553 a two-year licence, with use and user limitations, for Introspect and ECA software and for a further spread fee, storage (hosted) eDiscovery services and support and maintenance;

(5)   one was with JPMC in Q2 2011 granting for a fee of $3,237,600 a two and a half-year licence, with use and user limitations, for SLD software and (for a further deferred and spread fee) hosting services and support and maintenance.

3409.   The Claimants' case on the Schedule 6 e-Discovery deals has two aspects:

(1) First, as with Digital Safe, they complained that the transactions in question were hosted deals structured as hybrid arrangements comprising (a) the sale of a licence to use the e-Discovery software and (b) the sale of storage and other e-Discovery services simply so that

Autonomy could present the licence sale as a sale of goods justifying the application of IAS 18.14 and the recognition of revenue at the time of that sale, whilst recognising revenue from the sale of services rateably over the term of the arrangement. The purpose of this, according to the Claimants was to accelerate revenue recognition improperly. The claim was that the licence was not a separately identifiable component of the impugned transactions, and that it should have been treated as a prepayment for services, with the revenue being deferred and recognised rateably over the terms of the arrangements as in the case of other payments for services.

(2) Secondly, the Claimants claimed that no reliable fair value could be attributed to the e-Discovery software licence, and thus even if IAS 18.14 applied to the licence element separately, its criteria for revenue recognition (and subparagraphs 14(a) to (c) in particular) could not be satisfied. The Claimants contended that in approving Autonomy's determination that fair value could be attributed to the software licence, Deloitte were misled about and/or failed to understand certain facts about the provision of e-Discovery services.

*Accounting principles*

3410. As to (1) in the preceding paragraph, the relevant accounting principles were agreed to be broadly the same as applied in the context of the Digital Safe claim. In both contexts, the question is whether the value attributed to the licence should have been recognised upfront as revenue generated by the sale of goods, or whether it should have been treated as a prepayment for services and spread rateably over the term of the relevant contract.

3411. In determining the propriety of their accounting treatment, the most important difference between Digital Safe and e-Discovery transactions is that in the case of e-Discovery, it was not in dispute, and indeed one of six bespoke Assumptions[410] numbered (4) which Mr Holgate was instructed to make in relation to the substance of e-Discovery licences was, that the software was capable of operating independently of Autonomy.

3412. However, the Claimants maintained, and Mr Holgate was (as part of the same Assumption (4) referred to in the preceding sentence) instructed that:

> *"Generally, it would not have been practicable for the hosted customers to take the software and the data in-house to perform the services themselves."*

---

[410] The Claimants instructed him to make 12 Assumptions in all in respect of the Claimants' case on eDiscovery. The first six (referred to above) related to the issue as to the substance of the licence and whether it was a separately identifiable component of the hosting arrangement (which they contended it was not); the other six (see later) related to the Claimants' argument that even if it was, the licence fee should still not have been recognised upfront, because none of IAS 18.14(a), (b) or (c) was satisfied.

3413. The other Assumptions Mr Holgate was instructed to make in respect of the question whether the e-Discovery licences had any real substance mirrored those in respect of the same question in respect of the Digital Safe transactions. Adopting the same numbering as in Mr Holgate's report, they were as follows:

(1) *"Autonomy performed a variety of services as part of its hosted e-Discovery offering, many of which (e.g. performing quality control checks, resolution of data imaging/ processing issues, e.g. from password protected, encrypted or corrupted documents, data culling, batching, report production, format conversion and load file creation) were not performed automatically by the software, but rather required action or intervention by Autonomy personnel. This process was akin to a production line requiring a significant level of involvement from Autonomy staff at each stage of the e-Discovery process."*

(2) *"With the exception of the deals with BP, the term of each of the hosted eDiscovery licences was relatively short (two to three years) and Autonomy was contracted to provide services for the duration of the term. BP had a perpetual licence with a limited capacity and Autonomy was contracted to provide*

_____

*services for an initial term of three years. During the initial three year period BP was to pay a monthly Application Service Fee of $4/ GB/ month, following which the Application Service Fee increased to $10/ GB/ month."*

(3) *"Each hosted e-Discovery customer received substantially the same service regardless of whether it had acquired a licence, i.e. the same service as a customer who contracted on a SaaS basis; only the legal/payment structure varied. Existing hosted customers who had originally contracted on a SaaS basis received substantially the same service as they had previously."*

(4) As summarised or quoted in paragraphs 3411 and 3412 above, but also adding:

*"Unlike the Digital Safe software, the e-Discovery software was capable of being used independently of an Autonomy hosted arrangement, but was either sold as standalone software (which the customer would use itself, without Autonomy providing e-Discovery services) or as part of a hosted arrangement. If a hosted customer decided to take the e-Discovery software on premise during the term of the licence, Autonomy would not have provided the services that the customer expected to receive and for which it had effectively prepaid through payment of the upfront licence fee."*

(5) *"The intention and understanding of both Autonomy and the customers was that the software and data would be hosted and maintained by Autonomy in its data centres, and the associated e-Discovery services*

> *would be performed by Autonomy, for at least the contractually agreed period. This is what happened in practice."*

> (6) *"The negotiations between Autonomy and the customers were focused on price. Autonomy typically introduced the option of an upfront licence fee and highlighted the significant discounts it offered the customer as compared to the price on a SaaS basis. From the perspective of the customers, the transactions involved the purchase of hosted e-Discovery services with an upfront prepayment in the form of a licence fee. Autonomy's primary purpose in structuring the deals to include a licence was the upfront recognition of revenue."*

3414. On the basis of this set of six Assumptions, Mr Holgate considered that (a) *"it was not generally practicable for customers to take the software and their data in-house to perform the e-Discovery services themselves"*; (b) in any event, *"it did not happen in practice in the transactions under consideration"*; and so (c) *"there was no substance to the grant of the licence"*.

3415. He concluded that:

> *"the revenue recognition criteria should therefore be applied to the transaction as a whole in order to reflect the combined substance of the two elements of the transaction taken together, which was….the provision of eDiscovery services over a period of time."*

3416. Mr Holgate considered Assumptions (3) and (5) as set out in paragraph 3413 above to be the most important in reaching his conclusion that the e-Discovery hybrid hosting licences had no real substance.

3417. As to the second aspect of the Claimants e-Discovery case (see (2) in paragraph 3409 above), Mr Holgate considered that even if he was wrong about the e-Discovery licences lacking substance, on the basis of the same Assumptions, none of the first three criteria in IAS 18.14 was met.

3418. This was because (a) it was impracticable for hosted customers to take the software and data in-house and so in substance they never had transferred to them the risks and rewards of ownership, (b) for the same reason, Autonomy and not the customers retained managerial involvement and control usually associated with ownership, and (c) the prices charged for the e-Discovery software and related services were so variable, and there was such a lack of what he called *"sufficiently disaggregated and relevant management information relating to costs",* that it was not possible to measure reliably the revenue attributable to the software licence, whether by the "residual method" (explained later) or at all.

3419. Mr MacGregor considered, as to the first aspect of the Claimants' e-Discovery case (see (1) in paragraph 3409 above), that on the basis of the specific Assumptions dictated to Mr Holgate, the conclusions he reached dictated the

result (as had his assumptions in respect of the Claimants' Digital Safe case). He stated: *"there is again not another credible way to analyse the Schedule 6 transactions for the sale of e-Discovery licences."* In other words, as with the Digital Safe case, Mr MacGregor accepted that if all the Assumptions which Mr Holgate was instructed to make were established on the evidence as matters of fact, the e-Discovery licences lacked substance and the accounting treatment adopted was incorrect and improper.

3420. However, he did not accept that it sufficed for the Claimants to establish in fact the Assumptions that Mr Holgate identified as appearing to him to be the most important. He declined to accept Mr Holgate's view that Assumptions (3) and (5) were the most important to the analysis and might of themselves invalidate the accounting treatment adopted by Autonomy. He maintained that in his view *"all of them together are part of his overall picture"* and that they all stood or fell together; he said that if even just one of the Assumptions was incorrect (he instanced Assumption (4) in particular: if it was practicable for a customer to perform the service itself, contrary to Assumption (4)) then he *"would not agree in the same way."* When cross-examined he clarified that by this he meant that *"I think if you just vary that one, then you will be taking into account revenue at the point of sale."*

3421. Overall, his refrain was that the licence did have separate substance because:

> *"...there is a right there, you own the software, it's your data on it and that of itself has value."*

3422. As to the second aspect of this part of the case (see  (2) in paragraph 3409 above), Mr MacGregor's view, contrary to that of Mr Holgate, was that the rights conferred by the licence were plainly transferred to, and enjoyed, managed and controlled by the customer (so that (a) and (b) of IAS 18.14 were satisfied); and that as to IAS 18.14(c), it appeared to be confirmed by Deloitte's review that it had been possible and practicable to capture the costs of the hosting portion of the transaction (often using standard rates for data storage) and on that basis there was no reason for not establishing the fair value of the licence calculated based on the residual value of the complete contract. Mr MacGregor also emphasised that *"the assessment of fair value does not require precision and IFRS confirms this".* He found it:

> *"difficult to believe that the range of possible costs for these services was so wide that a reasonable estimate of the cost, and therefore of the value (on a cost plus margin basis), could not be determined or that Autonomy had no idea of the costs associated with the various parts of the business."*

*Did the EDD licences have or lack substance?*

3423. Although the experts appeared at first blush to be divided by this battery of assumptions, there was no real dispute as to the factual position as regards Assumptions (1), (2), (3) and (5). It seems to me that Mr MacGregor's focus on

Assumption (4) reflected this; and that the real question to be decided in relation to the Claimants' e-Discovery claim is whether the Claimants showed, on the evidence, and as a matter of fact, that even accepting that, unlike the Digital Safe software, the e-Discovery software was capable of being used independently of an Autonomy hosted arrangement, that was not something any hosted e-Discovery customer would ever in fact have intended to do. The Claimants maintained that this was so because once a customer had elected for a hosted solution, if subsequently during the term of the licence a hosted customer decided to take the e-Discovery software on premise, Autonomy would not have provided the services that the customer expected to receive and for which it had effectively prepaid through payment of the upfront licence fee.

3424. The Claimants insisted that in such circumstances, the admitted right given to a hybrid e-Discovery customer to move on premise during the currency of a hosted e-Discovery arrangement was no more than theoretical and it was highly unlikely that any customer would ever actually exercise it. In reality, they contended, the licences simply offered financial advantages to both parties to the arrangement but otherwise were never expected or intended to alter in any way the hosting arrangements between the parties to such licences, or the use made of them. The Claimants especially noted in that regard that the term of the licence was usually coterminous with the term of the services, and/or the relevant agreement provided for Autonomy to host the licence, supporting their case that the customer had no desire to host the e-Discovery software and its data, or to perform the e-Discovery itself, and intended to rely on hosted services throughout the term.

3425. Furthermore, the Claimants contended that in each of those transactions:

(1) The hybrid e-Discovery deal was sold on the basis of the savings that the customer would make, and not on the basis of the rights a licence would confer. This was perhaps most clearly illustrated in Autonomy's detailed licence proposal for JPMC stating:

> *"Licence Deal: JPMC gets significant discount in exchange for revenue commitment and immediate payment"*

The discounts proposed were between 20% and 30% depending on the projected volumes of data, and were set out in a table of *"Proposed Discounts in exchange for License Commitments"*.

(2) What each of the customers was interested in purchasing and retaining was a hosted arrangement; and some of them demonstrated confusion (and in one case concern) as to why a software licence was being introduced into the arrangements. Thus, for example, PMI could not really understand, and therefore queried, the purpose of a licence when all it wanted was *"pure hosting"*; and USPS's comments on a draft hybrid e-Discovery arrangement circulated to it included that *"it is strongly suggested that [USPS] removes/deletes any license for which it has no interests/needs"*.

3426. As proof of the real expectations and intentions of the contracting parties, the Claimants relied also on the fact that in the case of the seven impugned e-Discovery transactions, none of the five hybrid e-Discovery customers involved did in fact operate the software independently of Autonomy.

3427. The Defendants, on the other hand, rejected the Claimants' suggestion that the licence was merely a mechanism for Autonomy to offer savings, and contended that the Claimants' case is flawed as a matter of accounting principle and baseless in fact. Autonomy marketed its e-Discovery offering on the basis that it was able to "*seamlessly provide both hosted/licensed products*" and this set it apart from its competitors. It was accepted by Mr Kalbag that Autonomy faced competition from other e-Discovery offerings, some of which offered licences that permitted a customer to use the software on-site. Not only was on premise deployment of e-Discovery entirely possible: but offering the option of it was a commercially motivated response to other products in the market, attract new customers and keep existing hosted customers happy.

3428. The Defendants emphasised both the advertised and actual commercial practicability of on premise deployment, and of a move from a hosted to an on premise environment:

(1) Autonomy made e-Discovery software available to licensees because they legally owned the software, and it did so by putting it on Automater, as Mr Lucini accepted. It was available for customers to download it if they wished to bring it on site. Customers who did not own the licence did not have access to the software.

(2) Downloading of the material was straightforward and no different than for other licenced software products. The software was made available on Automater to customers in the usual way.

(3) The evidence also was that the cost of transitioning to on-premise was close to being, by comparison to the other costs, insignificant: for example, Mr Kalbag accepted that in the case of USPS the estimate was $30,000.

3429. The Defendants also contended that, contrary to the Claimants' case, the evidence demonstrated that customers were interested in having the option of bringing the software on-site:

(1) The example the Defendants most relied on was BP which (as Dr Lynch correctly recalled) had been especially concerned about owning a licence, one of Autonomy's in-house lawyers (Ms Dolan) having noted following a meeting with BP, that:

> "*One commercial issue came up on Friday regarding their longer term plans. They will use the hosted software for their immediate need but they want to bring it in house. They do not want any limitations on the software.*

> *They want an unlimited BP license key and then they*
> *wanted to true up (number of instances, users, data*
> *amount, etc) after an agreed period."*

(2) Another client, USPS, far from indicating a wish not to have a licence, confirmed that they too were interested in the option of bringing e-Discovery on-site (which was not their immediate intention but which gave them flexibility to do so in due course). Thus, USPS requested pricing for four different eDiscovery options as part of its RFP[411] in September 2010, three of which involved USPS taking the software in-house. Two of the four options involved USPS starting out as a hosted customer, and then bringing the software in-house at a later date; and the option of bringing the software in-house continued to feature in discussions with USPS throughout much of the negotiations. Mr Kalbag confirmed that the option of taking the software in-house was never "*taken off the table*".

*My assessment and conclusion*

3430. It does seem clear, and I accept, that e-Discovery could be deployed on premise with considerably greater ease and far less expense than could Digital Safe, though (as I have found) it was not impossible to run Digital Safe on premise either. Although the evidence as to the particular point was sparse, it did not appear that e-Discovery needed the constant availability of Autonomy back-up and expertise that I have accepted Digital Safe did. Furthermore, it was not suggested by the Claimants that there were no third party providers with the ability to assist a customer to use and maintain e-Discovery inhouse. Dr Lynch was adamant that use of e-Discovery in-house was common place (he told me in cross-examination that his "*understanding was that there were more onpremise e-Discovery implementations than those that were hosted*").

3431. The real issue is whether a customer which had selected and entered into a hosted eDiscovery arrangement with Autonomy would ever have seriously wanted the option of moving on premise.

3432. Dr Lynch also maintained, though with less conviction, that moving e-Discovery software and data from a hosted Autonomy data centre on premise/in-house was not at all difficult or expensive:

> "*Q....I suggest to you not a lot of the customers who were using*
> *eDiscovery hosted services could or wanted to take on the burden*
> *of performing the eDiscovery services themselves?*
>
> *A. I disagree. I don't know about people moving but, you know,*
> *without looking it up, my understand was there were more on-*

---

[411] Request for Proposal.

> *premise eDiscovery implementations than there were those that were hosted.*

> Q. *But the point I'm trying to make to you, Dr Lynch, is that where you have a hosted customer, they are unlikely to want to move to do themselves?*

> A. *I disagree. Unlike Digital Safe, where you could have very large amounts of data to be moved, it was relatively, then all these things are relative – relatively easy to set up an eDiscovery system, and so if a customer wanted to move, it actually wasn't very difficult at all. In fact you even had – it was even easier than you might think because you often had hybrid situations, and I don't mean that in terms of the deal, but the customer is processing their own eDiscovery system, and then they have overflow and they send it to a hosted eDiscovery system or vice-versa, so there really wasn't very much  - it's a very different situation to Digital Safe.*

> Q. *The reality is that customers were interested in relation to eDiscovery as well in the savings offered on the hybrid deals, not on moving on premise, correct?*

> A. *No, I disagree with that completely. EDiscovery was a slightly different business model in that it was generally to deal with litigations. So if someone is getting sued and processed, so what would happen, for example, if they had a high volume of processing, so I think Morgan Stanley used to do this, so if they're in the middle of a big case, then they would like hosted stuff, but for the general run of the mill , they would be happy to have it run on premise, so it was basically about load balancing."*

3433. As I have outlined above, Dr Lynch offered two examples of customers who did want that flexibility and the legal rights conferred by the licence which secured it for them: BP and USPS. However, the evidence is far less clear than the Defendants suggested.

3434. As to USPS, although the Defendants relied on Mr Kalbag's evidence, it does not seem to me that it supported the proposition that USPS wanted to have and for that reason contracted for flexibility to move on premise during the currency of their hosting contract. Mr Kalbag, though tenaciously cross-examined, doggedly maintained the general thrust of his evidence that in the case of USPS (at least) their real requirement was for hosted services: although they had started off by exploring all options including on-premise software deployment (as was clear from the RFP), by the end they regarded the licence as something that Autonomy wanted more than they did, and they regarded the licence in reality simply as a sort of *"insurance policy"* affording them some *"price protections."*

3435. Mr Kalbag, who enhanced his credibility by acknowledging that his objective was to get as much commission as soon as possible[412] summarised his position as continuing to be, notwithstanding 40 pages of cross-examination on the point, that all USPS really wanted was to continue the hosting arrangements with some protection against price increases but never intended to move on premise. The protections could have been (and it seems in fact were) obtained by provisions within the hosting arrangement; and as Mr Kalbag continued to insist notwithstanding 40 pages of cross-examination on the point:

> "...Yes, I think I've said this several times: ... The licence was a mechanism to protect them from cost overruns and predictability of price. Once we gave them options that didn't require it, it was clear that bringing it in-house was not their preference or what they desired, it was just their way of protecting themselves from cost overruns. And if you look at the final licence that they signed, we inserted the licensing not because that was the best way to give them the licences [sic, but must have meant to say protections], it was because it would allow us to recognise the revenue upfront. So it was definitely an insertion from our part, it wasn't something they specifically said, that "Hey, while you're hosting it, give me licences at the same time.""

3436. BP was an exceptional case at least in one particular and important respect: BP was the only one of the five customers identified above which negotiated for and agreed a perpetual licence[413], suggesting that it did want to reserve some ability and right to move on premise after the end of the hosting services term.  But as in the case of USPS there is nothing to suggest that BP ever intended to move on premise during the currency of the agreed hosting term. Mr Sullivan recorded in a contemporaneous email (dated 16 May 2010) to Mr Hussain and Dr Lynch (and others) that, in looking for a platform for the vast documentation in the well-known Horizon well oil-spill litigation, BP explained that they would "*not even think about trying to do this themselves*". It is clear from the context, in my view, that this signified that for the term of the hosting deal (three years) they wanted a hosted and not an on premise arrangement, and the issue for them at the time was to choose a suitable hosting provider (being concerned about their then provider's *"weaknesses including throughput rates, and ability to reuse content in multi matter cases"*).

3437. More generally, Dr Lynch's own witness, Mr Avila, confirmed that Autonomy did not expect customers to install the e-Discovery software whilst it was being hosted for them. As he had explained in an email to Mr Mutreja in June 2011 in response to a query whether in hosted e-Discovery contracts the software had to be uploaded on Automater:

---

[412] Due to the terms of their compensation plans, sales representatives could make significantly more in commission by structuring new or restructuring existing hosting arrangements to include an upfront licence fee than they could from SaaS deals.

[413] The others negotiated licences coterminous with their hosting arrangements, usually 2 or 3 years.

> "*since we are selling a license, we will have to deliver [it to the customer] – even if we host it. Similar in concept to deals where we sell the DS software but host it in any case. The customer is never expected to install it themselves.*"

3438.   None of the five e-Discovery customers in Schedule 6 did in fact ever bring the eDiscovery solution in-house during the term of the hosting transaction (or at all, so far as disclosed in the evidence before me).

3439.   In my judgment:

(1)   It is clear from the evidence that in the context of e-Discovery the licence was perceived by customers as something that Autonomy were keen, indeed anxious, to persuade them to agree, and which put them in a good position to negotiate sharply reduced storage and service rates.

(2)   Some may have perceived the licence as also conferring protection against price rises; but there is no evidence that any placed any real value or practical utility on the option conferred under the licence to move on premise, at least during the hosting term which in all cases except BP was coterminous with the licence granted.

(3)   Hybrid hosting was devised and deployed by Autonomy as the means of introducing a thing (technically, and in legal terminology, a chose in action) which could be sold apparently as something separate and apart from the storage and services which the customer really wanted and intended to use.

(4)   The reality of the matter was that in most cases the licence had no real commercial purpose otherwise.

(5)   Certainly in those cases, the licence was thus not a separable part of the hosted arrangements. The sale of a licence was not analogous to a sale of goods. It should have been accounted for as a prepayment for services.

(6)   I must admit to more uncertainty in the case of the perpetual licence granted to BP. When Deloitte themselves expressed some concern about the licence being in the nature of a prepayment, the fact of the licence being perpetual was certainly emphasised by Mr Hussain to Deloitte, as recorded in Deloitte's working paper. But even in that case, Mr Hussain was clear, in contemporaneous emails not apparently shown to Deloitte, that BP had no intention of moving on premise: when a question from Mr Tim Young of Autonomy asking whether that might be BP's aim was forwarded to him, he responded unequivocally *"Nope – this is all hosted"*. Further, it seems clear from that contemporaneous record that

> BP's objective was the usual one of securing the price reductions Autonomy was offering for licensed customers.

3440. In reaching my overall assessment I have been mindful, of course, that Deloitte took a different view: they accepted that the licence component was separate, and approved the way Autonomy did account for licence sales. I accept that Deloitte considered the arrangements in considerable detail and in doing so had access to Autonomy's finance department and its own internal technical expertise.

3441. However, it is clear to me that, whether because they were misled or because they overlooked the realities, Deloitte swallowed the line they were given that the *"key feature"* in every transaction was that the customer wanted to own, and by the licence acquired ownership, of the licence. I have concluded that, save possibly in the case of BP, the evidence simply does not bear out that this was any real part of the customer's objective; and even in the case of BP, it seems that Deloitte's doubts were assuaged by Mr Hussain telling them (as recorded in Deloitte's working papers) that:

> *"if BP thought that the licence fee was in any way paying for future services to be performed by Autonomy, then they would have requested deferred payment terms over the life of the agreement. Instead, they have paid the full amount upfront within several days of signing the agreement."*

3442. That disguised the point that what the payment obtained was the deeply discounted storage and service rates. It is not for me to determine whether Deloitte should have seen through this: the fact appears to be that they did not.

3443. In any event, I do not accept that Deloitte's approval was in fact relied on by the Defendants. For reasons that I elaborate later in addressing the issue of the Defendants' 'guilty knowledge' (see paragraphs 3449 and 3475 below) I have concluded that both the Defendants knew that the licence was a contrivance and that it was not properly accounted for, negating their pleas of reliance on Deloitte.

3444. I consider briefly later their approach to the more detailed tests prescribed by IAS 18 in assessing the e-Discovery hybrid hosting transactions and the question whether, even if the licence could be regarded as a separate component or element, it was possible to ascribe that component *"fair value"* (which was another precondition for revenue recognition).

3445. As foreshadowed in the context of my discussion of the Digital Safe hybrid transactions in paragraphs 3396 to 3398 above, the Claimants submitted that even if the Schedule 6 e-Discovery transactions were in substance transactions with separable components, such that it was *prima facie* necessary to recognise the revenue from the licence fee upfront, the criteria in IAS 18.14 also needed to be satisfied before Autonomy could do so: and that IAS 18.14(a) to (c) were not met. As I have accepted their primary argument, this alternative is (on the view

I have formed) redundant in this context as I found it to be in the context of the Digital Safe transactions.

3446.   In paragraph 3398 above I indicated that in this context, in which it was expressly pleaded (it was not in the context of Digital Safe), I would consider further the basis for the Claimants' alternative reliance on IAS 18.14 as an alternative if it was appropriate.

3447.   In the event, having concluded in both contexts that, in line with the principle that a transaction must be accounted for in accordance with its true substance, a conclusion that in commercial reality the licence had none except as a ticket to cheaper storage rates appears to mandate its treatment in that same way for the purpose of the specific accountancy standards. In that event it would be very odd if some different conclusion were reached by applying the specific provisions of IAS 18.14.

3448.   On the other hand, if the hypothesis to be adopted is that the licence was genuinely a valuable thing apart and conferred real rights the problem remains, albeit in a slightly different form: the problem being how the tests prescribed by IAS 18.14 are to be applied where the rights, even if real, cannot as a practical matter be exercised and there is in

truth no wish or intention to exercise them. In short, I have concluded that ultimately this leads to a *cul de sac* because whatever the analysis, the question always has to be asked what the substance of the "real rights" was: and in substantive terms there was none. Accordingly I do not think it useful to consider further the alternative case.

*(5)      Defendants' knowledge*

3449.   Lastly in this section, I return to the case on accountancy impropriety, and the second limb of the case, as to whether the Defendants had "guilty knowledge". I do so in relation to both the Digital Safe and the e-Discovery Schedule 6 claims.

*Mr Hussain's knowledge of true purpose of the licences and accounting impropriety*

3450.   In my judgment, the evidence confirmed, as was inherently probable, that Mr Hussain, Autonomy's CFO and a chartered accountant, was involved in a number of hybrid hosting arrangements (both Digital Safe and e-Discovery) and aware of the true purpose and objective of the licence as a device to enable the acceleration of revenue and its improper early recognition.

3451.   With Dr Lynch (as to whose involvement and knowledge see below), he was responsible for developing and overseeing the implementation of the strategy of selling software licences as part of hosted arrangements, knowing that the licence was a pretext for accelerating revenue recognition. (That is particularly clear from their involvement in the Schedule 12D re-restructuring transactions as to which see further below.)

3452.   The evidence showed that Mr Hussain was often the most senior direct point of contact between Autonomy and Deloitte during the process of explaining to

Deloitte the nature of the individual hosting transactions. There was never any question that he had direct engagement in and knowledge of the basis of the hybrid hosting programme.

3453. I have concluded that Mr Hussain was aware of:

(1) Autonomy's true motivations for selling hybrid deals;

(2) The nature of the negotiations with hybrid customers;

(3) The fact that there was no change in the substance of the services provided to customers before and after the relevant transactions;

(4) The fact that Digital Safe was as a practical matter incapable of being used onpremise without Autonomy's assistance in implementation and the ongoing operation of the system;

(5) The fact that (save the transactions with BP) each of the Schedule 6 e-Discovery transactions involved the sale of a licence that was coterminous with the provision of e-Discovery services, and that there was no real likelihood of a customer which had elected to acquire a hosting licence and paid a large sum in advance for the benefit of obtaining reduced hosting rates and services moving on premise within the term.

3454. The Claimants drew my attention to a particular example of Mr Hussain's direct involvement in misrepresenting the true nature of the hybrid hosting transactions. In relation to one of the two BP e-Discovery transactions, he stated in an email dated 14 July 2010 to Mr Welham (copied to Mr Mercer of Deloitte and also Mr Chamberlain) that he would prefer with him *"clear"* with him *"the technical person you speak to since otherwise you will get incomplete information"* and (b) in the particular BP transaction at least that the *"future obligation is covered by the fee per gb per month."* As Mr Hussain knew, that presentation of the (future) hosting data storage fees and services as wholly separate and funded by the charges was materially misleading: the licence fee secured the reduced rates and was in reality a prepayment.

3455. In my judgment, Mr Hussain had "guilty knowledge" that the accountancy treatment of the hybrid hosting transactions was (as to the immediate recognition of revenue from licence sales) improper and Autonomy's published information contained untrue and misleading statements in this respect accordingly.

*Dr Lynch's knowledge of Autonomy's improper accounting*

3456. As regards Dr Lynch, it is inherently improbable, given the nature of the relationship between him and Mr Hussain, that Mr Hussain would have been aware of the impropriety of Autonomy's accounting, but not Dr Lynch. It is difficult to see what motivation Mr Hussain would have had to keep these matters from Dr Lynch, given that relationship. Notably, it was no part of Dr Lynch's case that he was misled by Mr Hussain.

3457. In any event, Dr Lynch acknowledged that he was *"involved with Autonomy management about developing creative solutions to offer our hosted customers, including the hybrid hosting model."* He implicitly acknowledged also that, as CEO, he was required to assess the commercial sense of the hybrid hosting arrangements, his evidence in that context being that they *"provided numerous benefits to Autonomy"*. He identified the following in particular:

    (1) allowing Autonomy to remain competitive in the hosting market and to avoid a feared *"exodus of clients"*;

    (2) committing the customer "*to longer terms for hosting services and greater data volumes than they had under prior agreements"* because customers *"were incurring a large "sunk cost" upfront in the form of the licence payment, with much lower costs occurring over the term of the licence"*;

    (3) increasing the prospect of upsells of a *"whole host of IDOL-compatible products, which generated new business"* to customers (who would then own hosting software integrated with IDOL and (he said) thus be "*far more likely to buy other licences from Autonomy, rather than competitors, to perform related tasks"* than would SaaS customers);

    (4) providing cash immediately, which was in itself beneficial to Autonomy and lastly;

    (5) encouraging customers to move to newer versions of the hosting software, enabling Autonomy *"to free up space and power in its data centre, which saved on internal costs"*.

3458. I return to his commercial assessment later when discussing the Claimants' claims to recover transactional losses in respect of Schedule 12D transactions (see paragraphs 3482 to 3723 below). It is relevant for present purposes in (a) demonstrating that, even if not at the implementation level, Dr Lynch was closely involved in the development, assessment and justification of the model; and in (b) revealing inconsistencies which in my view support the conclusion that Dr Lynch was quite aware that the licence rights were never intended or expected to be exercised.

3459. As to (b) above, it seems to me that the premise of Dr Lynch's assessment was not that customers would be likely to exercise their apparent legal right to move on premise, but that they would be tied closer to remaining as hosted customers and using more data storage, because of low hosting rates in consequence of, and as a reward for, upfront subscription and because, in his own words, of the large upfront "sunk cost" in the form of the licence payment. In my judgment, it is obvious from the basic premise that he assumed that the licence rights were never in fact to be exercised: and the commerciality of the model from the point of view of both Autonomy and the customer was premised on them not being exercised. That, in my view, undermined, to the point of substantially disposing of, his central theme that the licence was valuable in itself. He was well aware that it was not.

3460. Dr Lynch submitted that the Claimants' cross-examination on the issue of IAS 18.13 and e-Discovery "*fell far short of what was necessary to maintain an allegation of fraud against him*". He emphasised that very few documents relating to e-Discovery were put to him, none directly involving him, and that his cross-examination was limited to two main points:

(1) First, a suggestion that customers were told by Autonomy they would get the "*same thing*", whether it was a licence or SaaS. Dr Lynch stated this was based on a single document, which, as Dr Lynch explained it, was making the point that customers who bought a licence but still paid for hosting services received the same service from Autonomy as a SaaS customer. Dr Lynch accepted that this is what it stated; but he submitted that this did not upset his case: the fact that customers also paid for and received hosted services simply reflected the nature of the hybrid model and did not alter the fact that they paid for and received an asset – a valuable software licence.

(2) Secondly, a suggestion that customers were "*unlikely*" to want to move from a hosted service to on-premise. He rejected this and maintained that the suggestion was undermined by documents which he maintained demonstrated that customers were interested in the option of bringing the software on site.

3461. He added to this that the Claimants accepted that there were on-premise customers and that it followed (he maintained) that however "*complex*" the process of implementation, the licence in those cases had independent value; there is no justification for why a different approach should be adopted for hosted customers.

3462. However, as it seems to me, the cross-examination focused sufficiently and put to Dr Lynch the fundamental points in issue; and it also seems to me that it demonstrated that he had no satisfactory answer on either. His resort to the twin assertion that the legal rights conferred by the software licence were valuable was (I agree with the Claimants) trite; and his claim that customers were interested in the options it conferred was undone

by the premise described above, and by the fact that it was implicit in his approach that he knew that:

(1) a customer with a hosted arrangement had no need for a software licence, particularly where: (i) the customer had no intention of using the licence onpremise independently of Autonomy's hosting services, (ii) the term of the licence was coterminous with the term of the hosting services, as was almost invariably the case in the Schedule 6 e-Discovery transactions, or (iii) the licence was to software that did not exist or was not asked for nor needed by the customer, as was often the case in the Schedule 12D transactions, or could not be used without Autonomy's assistance, as was the case for all the Schedule 6 Digital Safe transactions; and that

(2) there was no material difference between the SaaS offering and the hybrid offering; both were, in essence, service offerings under which customers received substantially the same services, regardless of whether they owned a licence to the software or not.

3463. I have concluded, and find, that Dr Lynch can only have understood and intended that the purpose of introducing a licence sale in a hosted arrangement was to provide a pretext for the improper acceleration of revenue, and that there was, in truth, no justification for adopting a wholly different revenue recognition approach to the hybrid deals than the approach that had been adopted in relation to the SaaS arrangements.

3464. My conclusion is also reinforced by Dr Lynch's explanation of the hybrid model in exchanges with analysts. Two examples of such exchanges were explored with Dr Lynch in cross-examination.

3465. At the end of May 2009, Ed Meier of Schroder Investment Management emailed Mr Hussain saying "*It's come to my attention from a couple of your customers recently that there may have been some change to contract structures (both in Zantaz). We have been told that on some occasions rather than pro-rating a 5-year contract equally over quarters as used to be done, a large proportion of it has been paid up front with the remainder (maybe 20-25%) pro-rated*". Mr Meier asked if this was prevalent in more than a few contracts. Mr Hussain forwarded Mr Meier's email to Dr Lynch. Dr Lynch responded to Mr Hussain with a draft email (replete with typographical errors) to be sent to Mr Meier saying:[414]

> "*the number amount and sources exploded so this model no longer worked, so it was necessary to terminate the old approaches and move to the new hybrid model with software on site to do the gathering and apply meaning based policies for what to then send tot he [sic] digital safe…*
>
> *…on once [sic] sense what you write is true, ratably recognized solutions for 3 suppliers were rolled into one with a 1/3 upfront. However the points to bear in mind is that the new contracts were much larger (~10 times) and for different functionality that subsumed the need for the old ones. Only a 1/3 of the new larger contracts moved up front. So in fact the effect of the change was still a massive increase eint he [sic] ongoing…ie the argument Autonomy some how swapped up front licence for ratably when the whole thing is viewed is the*
>
> *opposite of the total outcome…THe [sic] outcome is actually much more longeterm [sic] revenue, not a short term boost at the expense of the future (unless you only consider a small fraction of the roll up rather than the total size).*"

3466. The Claimants branded Dr Lynch's response as a complete fiction: and I must agree, for the reason they gave, which was simply that the position he was

---

[414] Emphasis added.

attempting to disavow was precisely what had happened and what the Defendants had intended from restructuring the hosted arrangements. I agree also with the Claimants that Dr Lynch's defence of this email in cross-examination was unimpressive. He stood by his suggestion that hybrid customers would pay "*a lot, lot more*" as a result of the restructuring, a suggestion that was patently incorrect, as explained in more detail in the context of the Schedule 12D transactions below. For present purposes, it suffices to note that the evidence of Mr Sullivan, Zantaz's CEO, is that the hybrid model led "*to reductions in longer term revenue and, thus, to a reduction in the total revenue which would be earned on those customers' accounts over the lifetime of the relationship*".

3467. Moreover, the Claimants observed (again to my mind, correctly) that having accepted that he was intending thereby to give Mr Meier the impression that the licensed software was used by the customer onsite to ingest and index the data that needed to be archived, Dr Lynch steadfastly refused to accept that this was false, maintaining that "*the licence is also used on site for part of the system as well*", even when it was pointed out to him that Mr Yan had given contrary evidence. The Claimants' witnesses, Mr Goodfellow and Mr Yan, gave unchallenged evidence that, when Digital Safe was hosted, regardless of whether the customer had a licence or not, the entirety of the Digital Safe system resided on Autonomy's systems, and not the customer's. None of Dr Lynch's witnesses gave evidence to the contrary. Dr Lynch sought to defend the accuracy of his statements to Mr Meier in May 2009 by suggesting that Autonomy did not start selling licences to the Digital Safe software itself until the <u>end</u> of 2009. But that was belied by the documentary record, as set out in Annex C of the Claimants' written closing submissions and Schedule 6 of the Particulars of Claim, that Autonomy had entered five hybrid deals <u>before May 2009</u> that involved the sale of a Digital Safe licence (numbered in Annex C as 1, 2, 3, 4, 9).[415]

3468. The second example put to Dr Lynch related to similar suggestions in an email that he sent to Mr Goodman on 20 September 2009 for passing on to Mr Michael Briest, an analyst at UBS. The email appears to have been intended as a response to a note written by Mr Morland.[416] Dr Lynch wrote:

> "2/ [Mr Morland's] statement that: Autonomy has changed the revenue recognition policy at Zantaz and now recognizes a third of hosted deals up front … The statement that Autonomy recognizes a 1/3 of hosted deals up front is completely untrue, all hosted operations are recognized ratably as the service is delivered. A typical mega deal is made up of 2 parts, <u>a set of software that is bought by the banks and installed inside it and on this</u>

---

[415] There were many more Schedule 6 transactions in this period, which either concerned Related Software or eDiscovery.

[416] Two days earlier, Mr Morland had published a note in which he wrote: "*Autonomy has changed the revenue recognition policy at Zantaz which used to recognise its hosted revenues evenly over the period of the contract. Autonomy has changed this such that one third of hosted revenues are now taken up front (as if they were a license) with the rest spread as before*". This statement was addressed by Dr Lynch in the quoted text above.

> *hardware to sort data by policy (ie it is not hosted), this is in the example case given as a third of the total size. This is recognized as a normal software licence sale. 2/3 is the service of hosting a different set of software on our servers, eg archiving and discovery. [This] is recognized ratably as the service is delivered. ON NO account is a third of hosted sales recognized up front. This has been covered in earnings calls ... This error is key to the note as it is the central tenant of the hypothesis by which revenues were aggressively recognized ..... [it's] just not correct and arises solely from forgetting that <u>mega deals are only part hosted and part licence software the customer runs un hosted by us</u>…"[417]*

3469. When it was suggested to Dr Lynch that he was proposing to tell Mr Briest that the software licensed in hybrid deals was not hosted and was run on the customer's system, he echoed his remarks regarding his draft email to Mr Meier: "*Again, we're early in this process, in September 20 2009. More of the licences -- the licences tend to move -- become hosted by us more for the larger deals later*". The Claimants submitted, and again I agree, that when it was pointed out to Dr Lynch that there were sales of Digital Safe <u>in 2008</u>, he was unable to offer any meaningful explanation of his remarks:

> "*Q. Wasn't Morgan Stanley first licensed Digital Safe in 2008? A. Yes.*
>
> *Q. Well, I suggest to you from the very beginning, the way in which your hybrid system worked, was intended to work, was that Autonomy continued to host both the software and the customer's data and that what you were saying here was false?*
>
> *A. No, I think this is a reasonable explanation of what is going on. <u>And by the way, it has to be taken in the context of everything else that's been said at the time</u>.*
>
> *Q. You say everything else that's being said at the time, Dr Lynch, but if what you were saying here was untrue, then it was untrue?*
>
> *A. It's not untrue. It's absolutely correct, what it's saying.*"

It was not clear what the relevant "*context*" to which Dr Lynch referred was. The point was not explored in re-examination.

3470. Dr Lynch then sought to rely on the fact that customers were occasionally licensed some software that ran onsite in hybrid deals:

> "*A. Just on the last point, just to be clear, there's a series of things that can be licensed that are part of this cloud system which run on*

---

[417] Emphasis added.

> *premise as well as the licence itself being hosted off premise. Just so we've got that clear. My apologies for interrupting you.*
>
> *Q. Well, let's just be very clear. I understand there are a series of things that can be licensed and hosted, and there's no dispute, for example, that a*

---

> *connector could have been put in the customer's premises, but what we're talking about here is that for which you're being paid one-third of the fee, which is the whole Digital Safe licence –*
>
> *A. No, the one-third would include those licence elements because those are going in -- all of that is going into the cloud part of the business.*
>
> *...*
>
> *Q. ... that's the scenario you paint: that the customer is using the software that you've licensed, let's say Digital Safe on premise.*
>
> *A. It is using some of the software it's licensed on premise –*
>
> *Q. Some of the software?*
>
> *A. -- and some of the software, <u>its licence is hosted by us at their discretion</u> <u>rather than being on premise or somewhere else.</u>"*

3471.  But Dr Lynch's draft email to Mr Briest did not make this clear at all. In stating that a hybrid deal was "*part hosted and part licence software the customer runs un hosted by us*", it suggested that <u>all</u> the software that was sold by way of a licence would be run by the customer onsite. It did not suggest that Autonomy was licensing software that was <u>not</u> installed on the customer's systems and was instead hosted by Autonomy; but this is precisely what Autonomy did when it licensed Digital Safe and e-Discovery software (and indeed much of the Related Software that was sold as part of Schedule 6DS transactions).

3472.  When later pressed on this, Dr Lynch returned to the suggestion that hybrid customers ran Digital Safe on-premise:

> *"Q. What parts of the software do you say that they were hosting themselves?*
>
> *A. Things like parts of the Supervisor software, parts of the ControlPointtype software, parts of the gathering software so things that were actually getting the data, sucking it up. IDOL caches would be run on site, so where there were IDOL caches being run, those would be run on site. There would quite often be quite a small satellite Digital Safe system on site depending on what the bank needed as well, where that was a short-term archive. So under the regulatory requirements, some data had to be kept for seven years, some data*

> *had to be kept for three years, but some of it had to be kept for seven days, and that was better done on site."*

3473. This gave the misleading impression of some usage of licence rights by hosted customers; and it was inconsistent with the unchallenged evidence of Mr Yan that in a hosted Digital Safe arrangement, the Supervisor software would sit with the Digital Safe software in Autonomy's data centres. The Claimants submitted and I agree that it is also difficult to square Dr Lynch's comments about a "*small satellite Digital Safe system on site*" for short-term archiving with the fact that there was no evidence to suggest that any of the hybrid Digital Safe customers with existing hosting agreements ever ran Digital Safe on-premise (save for Morgan Stanley which ran an on-premise Digital Safe in Switzerland, which appears to have been for regulatory reasons and not for short-term archiving)[418].

3474. The Claimants concluded that the obvious inference from Dr Lynch's recourse to misleading statements, or at best partial truths, as to the nature and use of the hybrid hosting model is that he was aware that, if the market realised the true nature of these transactions, Autonomy's improper revenue acceleration scheme would be discovered. I accept that.

3475. I have concluded that Dr Lynch was well aware that:

(1) The hybrid hosting structure was a response, not to customer interest, but to his and Mr Hussain's obsession with ensuring that Autonomy achieved, or came as close as possible to meeting, revenue forecast;

(2) The licence was a device calculated to justify revenue recognition which conferred legal rights which neither side intended or expected would ever be deployed and which in the context of Digital Safe were in reality of no practical utility, and in the context of e-Discovery would have nullified the original choice made by the customer in favour of hosting and caused the upfront payment to be wasted;

(3) The introduction of a formal legal right of no intended commercial consequence would not in any material way alter the hosting arrangements between the contracting parties, which both parties intended and expected to carry on as before.

*(6)    IDOL Cloud metric*

3476. I should mention, but not dwell long, on the Claimants' contentions in respect of the use of the IDOL Cloud metric in Autonomy's published quarterly and annual accounts from 2010 onwards.

3477. The gist of these complaints was that in what were described as *"supplemental metrics"* provided in the narrative or *"front end"* of Autonomy's accounts from 2010 onwards a false impression was given by the inclusion of revenue from the sale of licences that Autonomy's recurring revenue from its hosting business was

---

[418] See Annex D of the Claimants' written closing submissions for further detail.

higher than it was. In particular, it was said, the market was given to understand that the metric was comprised (or at least largely comprised) of recurring revenues and thus a reliable and valuable revenue stream whereas in fact it included a substantial proportion (of around 20%) of revenue from one-off licence sales which was not recurring in nature (and see paragraph 3266(3) above).

3478.  The Claimants made clear in their closing submissions that these allegedly misleading presentations did not give rise to any standalone claim. The Claimants relied on them as constituting *"powerful evidence"* of the Defendants' (i) *"general dishonesty"* and (ii) *"willingness to present Autonomy's hosting business to the market (and HP) in a misleading manner."* In his oral submissions, Mr Rabinowitz confirmed that the Claimants' complaint in relation to the IDOL Cloud metric was *"not part of the reason why we say the published information was wrong"* and did not *"feed into the loss*

_____

*claim".* After I had queried this, Mr Rabinowitz explained that this was because *"of the way the model works, the DCF model worked here".*

3479.  The length of the Claimants' submissions on this issue of credit suggests to me that at one point this was intended as a substantive plea but was never in the event advanced. The Defendants objected to the deployment of such matters at such length on an issue of credit.  In objecting to its elaboration, Dr Lynch summarised this objection as follows in his written closing submissions:

> *"In summary, the complaint appeared to have morphed from one in the pleading where it was said that it was false accounting to allocate cloud licence revenue to IDOL Cloud to one where it was said to have been a fraudulent misrepresentation on the market to include any licences in IDOL Cloud because the latter was a category of "recurring revenue".  The morphed complaint is contingent on an unstated (and unpleaded) but implied assumption that IDOL Cloud was exclusively a category of "recurring revenue".*

3480.  I consider that the matter was pleaded. In their RRAPoC, the Claimants had alleged that an untrue and/or misleading impression had been given that:

> *"IDOL Cloud revenue was increasing rapidly and was a source of recurring revenue at the level suggested by the then-current reported IDOL Cloud revenue when, in fact, a significant component of IDOL Cloud revenue was attributable to purported licence fees which were non-recurring in nature. The aforementioned practice meant that the revenues were not representative of the actual performance of IDOL Cloud or its future prospects."*

3481.  But it was not pursued as a claim. I do not propose to delve further into it; and I have not taken account of it in my assessment of the Defendants accordingly.

## PART B
## The Schedule 12D Transactions

*The nature of the claims and how they differ from the Schedule 6 claims*

3482. In addition to their claims pursuant to FSMA that the transactions listed in Schedule 6 of the RRAPoC were falsely accounted for, the Claimants identified a sub-set of those transactions as commercially entirely unjustifiable, and as having been entered into only for the improper purpose of accelerating revenue, at considerable cost, and thereby loss, to the Autonomy group company concerned[419].

3483. The Claimants referred to this sub-set of Schedule 6 transactions as Schedule 12D transactions, the latter being the Schedule to the RRAPoC where the relevant transactions were listed. The Schedule 12D claims made were direct claims against the Defendants for breach of duty.

3484. Although both sets of claims related to Autonomy's hybrid hosting business, it is important to distinguish the different ingredients of the two types of claim:

(1) As previously explained, but as I repeat to accentuate the differences, the Schedule 6 claims pursuant to FSMA required proof that it was wrong to treat the licence sold in a hybrid hosting transaction as a separate component of real substance justifying an accounting treatment analogous to a sale of goods, and that the Defendants knew it was wrong and that Autonomy's published information was false accordingly.

(2) The Schedule 12D claims were not dependent on proof of accounting impropriety; nor was proof required of knowledge of the impropriety of the recognition of revenue.   The proof required was that, viewed as a whole, the impugned transaction lacked any commercial rationale, and that no reasonable director could have approved and/or directed it, so as to be in breach of duty as a director and/or employee or by virtue of exercise of fiduciary discretion and power.

3485. Accordingly, the Claimants' position was that their Schedule 12D claims could be made good even if their larger Schedule 6 accounting claims failed. Conversely, and as was implicit in the limitation of their direct claims to only a small sub-set of the Schedule 6 transactions, the Claimants appeared to accept that to make good their Schedule 12D claims it was not sufficient to establish their case that the accounting for these transactions was improper; they had also to establish that the transactions themselves were not commercially justifiable. I have some doubt about that implicit concession. The basis of their Schedule 6

---

[419] As I elaborate below, the Schedule 12D claims also give rise to difficult, but (in the case of the claims against Dr Lynch) potentially dispositive, issues as to which Autonomy entity was the legal person to which the duty alleged was broken and which such entity had suffered the alleged loss and damage.

claims was the contrived nature of the licence; and it is difficult to justify the sale of a contrivance, and the impropriety of the objective and intended accounting treatment may infect the whole and outweigh any other claimed commercial benefit. I return to that below.

*Overview of the Schedule 12D transactions and claims*

3486. Originally, the Claimants had asserted that all the hosting transactions which are the subject of the false accounting claims (that is all the Schedule 6 transactions) were improper and caused transactional losses which they sought to recover as damages in personal claims against each of the Defendants.

3487. However, by amendments made in early 2017, the Claimants confined their claims to losses resulting to ASL and Zantaz from only four such transactions. Those four transactions (all of which are also the subject of Schedule 6 claims) were entered into with three leading financial institutions, namely, Morgan Stanley, Deutsche Bank and MetLife by Zantaz (in the case of the Morgan Stanley and Deutsche Bank transactions) and Autonomy Inc (in the case of the MetLife transaction).

3488. The distinguishing feature of these transactions ("the Schedule 12D transactions"), and the basis of their selection, was that they were restructurings of hosting contracts which had already been restructured from the SaaS model into hybrid contracts with a licence fee; except that in the case of Morgan Stanley, the impugned transaction was a re-rerestructuring which included a further licence fee (by then the third such payment).

3489. The Claimants contended that, therefore, if there were any benefits to be gained from bringing a customer onto the hybrid model, they had already been realised.

3490. Further, the Claimants contended that the customers concerned were offered substantial reductions to their ongoing data storage rates in circumstances where they had not approached Autonomy seeking any price reductions, and where there was no discernible risk of them leaving Autonomy in favour of another archiving provider.

3491. The Claimants also maintained that in each case, Autonomy licensed software that did not exist, was of no use to the customer, had been added into the description of software to be licenced under the agreement at the last minute without any request for it by the customer and/or had already previously been promised to the customer separately from the re-restructuring. The Claimants contended that the addition in the description of the software to be licensed was contrived to give the impression (especially to Deloitte who would be scrutinising the transactions) of some further commercial basis for the transaction which was in truth illusory.

3492. The Claimants' case in such circumstances was that it was not only the accounting for these transactions which was improper: the transactions

themselves were not commercially justifiable and they resulted in overall loss. Their purpose was to establish a further licence sale from which Autonomy could immediately recognise all the revenue except for the fair value of the maintenance element. Their price was the discount which had to be offered to customers, and the resulting loss was the reduction in the overall fees paid over the course of the relevant transaction.

3493.  The total losses allegedly sustained were stated in the Claimants' written closing submissions to amount to $24,835,156. The entity which actually booked the reduced revenue was Zantaz. Of this the Claimants claimed $6,912,011 had been suffered by Zantaz and the remainder, $17,923,145 was loss claimed by ASL as transferee of losses under intra-group transfer pricing arrangements (see further below)[420].

*Problems of standing and loss outlined*

3494.  The cause of action indicated would be a claim by the corporate entity alleged to have suffered loss against the directors responsible for that alleged loss for breach of a duty owed to that company in causing it to enter the loss-making transaction(s) and/or compensation for the abuse of their powers. I make that statement of what may seem obvious because it gives rise to two fundamental difficulties for the Claimants. Both difficulties emanate from the fact that the only Autonomy entities which were parties to the four impugned transactions were Zantaz and Autonomy Inc, and Zantaz was the only entity which booked revenue from those transactions.

3495.  The first difficulty is that though Zantaz was the party which booked the allegedly reduced revenue within the Autonomy group[421] and is thus the entity which the Claimants contend "*forewent revenue as a result of the improper restructuring of four hosting arrangements*", the claim is primarily advanced by ASL. ASL claims losses of some $17,923,145 compared to a claim advanced by Zantaz of $6,912,011 (the total losses claimed in respect of the Schedule 12D transactions being just under $25 million[422]).

3496.  The Claimants have put forward this as their primary case on the basis that most of Zantaz's profits and losses were, transferred to ASL under transfer pricing agreements between (inter alios) ASL and Zantaz which provided for the allocation of profits and losses from group companies to ASL.[423] However, in

---

[420] The Claimants advanced an alternative case, reflecting the position before the transfer pricing arrangements, under which all loss is allocated to Zantaz as the entity that recorded the revenues.
[421] More precisely, the entity which contracted with the customer, raised the invoice and originally recorded the licence revenue in its general ledger, except in the case of the MetLife transaction where the contracting and invoicing party was Autonomy Inc but the revenue was recorded in Zantaz's books.
[422] More exactly (as calculated by Mr Bezant) $24,835,156.
[423] The transfer pricing arrangements and the transfer pricing calculations carried out for the year ended 31 December 2010, and which in summary amongst other things involved amounts equal to 96.5% of revenues recorded in Autonomy Inc and Zantaz, with arrangements for a percentage to be paid back to Zantaz in respect of profit-sharing arrangements between Zantaz and ASL, were of some complexity. However, Mr Bezant checked the allocation of the Schedule 12 losses by reference to

recognition of the potential difficulty in relying on the transfer pricing agreements as the basis of loss claims and also given the complex calculations necessary in that context, the Claimants put forward an alternative case which they presented as reflecting the position before the transfer pricing arrangements are taken into account. On that alternative case the entirety of the alleged loss is claimed by Zantaz.

3497. That, however, accentuates the second difficulty. Dr Lynch was never *de jure* a director of Zantaz. Nor was he a *de jure* director of ASL, though Mr Hussain was a *de jure* director of both.

3498. The Claimants sought to overcome this impediment by establishing that though not *de jure*, Dr Lynch was a *de facto* or (by virtue of being President of Autonomy Inc and/or what the Claimants described in their RRAPoC as *"the chief decision-maker within the Autonomy group"*) a shadow director of ASL, and that ASL was entitled to recover from

---

him by way of damages or equitable compensation losses passed to it in consequence of the transfer pricing arrangements referred to in paragraph 3496 above.

3499. These are, as against Dr Lynch at least, convoluted claims. For the present, suffice it to say that:

(1) The Claimants abandoned their original allegation that Dr Lynch was a *de facto* director of Zantaz when it became clear that since Zantaz was incorporated in California the question whether he would be treated as a *de facto* director of it would be governed by the laws of California;

(2) The Claimants have ultimately not pursued any claims on behalf of Zantaz against Dr Lynch and thus, Zantaz's claims are now brought only against Mr Hussain;

(3) It follows that, on the basis of the Claimants' alternative case, reflecting a mathematical model of the position before the transfer pricing arrangements, no monetary claim is left against Dr Lynch;

(4) The Claimants' claims against Dr Lynch on behalf of ASL depend on establishing either (a) that Dr Lynch was a *de facto* or alternatively a shadow director of ASL or (b) that the transfer pricing arrangements somehow gave rise (now quoting from the RRAPoC) *"to a relationship of trust and confidence such that Lynch assumed the obligations of a fiduciary towards ASL…"* and that (c) he acted in breach of duty to ASL even though the impugned transactions were entered into, not by ASL, but by Zantaz and Autonomy Inc; and

---

these arrangements and calculations and did not identify any inaccuracies. Mr Bezant was not challenged on this in cross-examination.

(5) There is also an issue as to whether ASL suffered any loss, given that it was not the party that entered into the allegedly loss-making transactions, and that any losses were allocated to it pursuant to the transfer pricing arrangements.

I shall return to deal at greater length later with (4) and (5) above: they are, of course, fundamental to the Hosting 'improper transactions' claims against Dr Lynch, as they are to the other claims for transactional losses.

*The Defences in outline*

3500.   In addition to these 'gateway' issues, the Defendants also accused the Claimants of having in effect presented a new case in closing which (as Mr Hill who dealt with this aspect of the case on behalf of the Defendants submitted) was *"not visible in their pleading".* Put shortly, the Defendants' point was that in opening the Claimants had presented the claim as based on alleged false accounting and its adverse effects, whereas in closing they impugned the Schedule 12D claims as commercially improper irrespective of the accounting because a re-restructuring (and *a fortiori*) a re-rerestructuring, could not be proper because the customer was already locked in: the bird was already in the hand.

3501.   Dr Lynch, in particular, submitted that this change of tack, albeit relating to a more restricted cohort of transactions, went back on a concession made by the Claimants in opening as to the scope of the improper transactions claim, was not pleaded, and was unfair. Mr Hill submitted that the Defendants would have wanted to know, and were entitled to know, that the Claimants were seeking to run this new case before cross-examination; and that had they known, they might well have *"wanted to put more focus in our cross-examination specifically on the issue of whether, from a commercial perspective, a re-restructuring was distinct from a restructuring and whether a rerestructuring was considered to be commercially sound."* He submitted that the Claimants should be held to the position they set out in opening and be restricted to the accounting issues they had raised.

3502.   I accept that the Claimants did refine and recast their case, as is obvious from the whittling down of the Schedule 12D transactions to re-restructuring transactions; but I do not accept that they ever made the concession asserted that they would restrict their complaints to the accountancy issues, nor do I accept that the Defendants were truly taken by surprise or caught unprepared. Seeking to strait-jacket the Claimants' claims in this way was always part of the Defendants' strategy; and I agree with Mr Rabinowitz's observation in his oral reply that this was a forensic point on their part. I do not consider that the Defendants' cross-examination of the Claimants' witnesses was unfairly affected or would have been substantially different. In my judgment, the Claimants were entitled to pursue the claim, and there is no unfairness to the Defendants thereby.

3503.   Turning to the Defendants' substantive positions, in addition to those 'gateway' matters, their case was that the transactions impugned all had a sound business rationale. They promoted customer loyalty. They encouraged increased use of hosting facilities. They locked in new revenue streams which were otherwise

uncertain in a falling market. They also secured an immediate payment of cash. Mr Hill referred to this in his oral closing submissions as *"the bird in the hand approach".* The greater customer retention they secured increased the prospect of upsales, and by demonstrating customer loyalty, enhanced Autonomy's profile and credibility in the market-place.

3504. Furthermore, the Defendants presented the transactions as profitable and not lossmaking. According to the Defendants, the rates payable under the re-restructured deals remained competitive without excessively squeezing margin. There was no basis on which any of this fell outside the proper exercise by the directors of their business judgement or constituted any improper exercise of their powers.

3505. The Defendants also relied on the fact that a number of people at Autonomy were involved in selling hybrid deals, including restructured hybrid deals, and none had apparently thought any of the transactions to involve impropriety: these included Mr Sullivan, Mr Collet, Mr Yan, Mr Wang and Mr Goodfellow (none of whom is suspected of dishonesty) as well as Mr Egan.

3506. The Defendants rejected the suggestion that in the case of each of the Schedule 12D transactions, Autonomy inserted into the description of the software licensed items which did not exist, which the customer had not asked for and did not need in order to mislead Deloitte into treating the newly licensed software package as different and more extensive than that previously licenced. They insisted that additional software was included in every case; and in every case it existed, was capable of being used, and was of practical use and value to the customer.

3507. The Defendants made the further point that it was not disputed that the software was put onto the delivery mechanism by Autonomy's technical team, none of whom was implicated in any wrongdoing, and none of whom considered that he/she was doing anything improper. They dismissed as unsubstantiated, unsupported and implausible the Claimants' case that (as Mr Hussain portrayed it) *"AU's technical team decided to upload fake software".*

*Structure of this Part*

3508. Once again, these allegations and their rebuttal led to considerable cross-examination and occupied the parties in a very substantial exegesis: in their respective written closing submissions, the Claimants devoted some 110 pages, the First Defendant, just over 100 pages and the Second Defendant added a further 50 pages, all with copious footnotes with references to passages in the transcript.[424]

3509. Although my treatment must be more condensed, bearing in mind that the losses claimed are, in the circumstances of this case relatively small (totalling a maximum of some $25 million spread in each case over several years), it is nevertheless necessary to travel into some of the details of each of the four

---

[424] Some 261 footnotes in the case of the Claimants in this part alone.

transactions to do justice to the parties' rival contentions. That is especially so since the Claimants relied on the details as further illustration of their case that all the Schedule 6 transactions were accounted for improperly.

3510. I address first the question whether, and if so on what basis and to what extent, Dr Lynch owed duties to ASL in respect of the Schedule 12D claims.

3511. I then turn to consider each of the four transactions in turn, and especially in each case

(1) Whether the Schedule 12D transactions had any proper commercial rationale;

(2) Whether Autonomy included as part of the transactions (and purported to supply) software which did not in fact exist but which gave (false) support to Autonomy's justification of the transactions to Deloitte.

*Did Dr Lynch owe any duties to ASL?*

3512. The primary basis on which the Claimants sought to establish that, though not *de jure* a director of ASL, Dr Lynch owed fiduciary and statutory duties to ASL, was their contention that he was a *de facto*, alternatively a shadow, director of ASL.

3513. The Claimants relied in this context on the recent decision of Morgan J in *Instant Access Properties Ltd v Rosser & others* [2018] BCC 751, especially at paragraphs 213 to 228. Morgan J explained in that case that:

> (1) *"...the question whether a person is a de facto director or a shadow director depends upon the specific facts of each case"* (see para. 217)

> (2) *"There does not appear to be a clear legal test to help one decide whether a person is or is not a de facto or shadow director. For the purpose of deciding that question, it is necessary to focus on what the person actually did in relation to the company."* (ibid.)

3514. Morgan J also drew on and quoted extensively from the decision of the Supreme Court in *Revenue and Customs Comrs v Holland* [2010] 1 WLR 2793, where the earlier authorities were reviewed and by a majority (3-2) it was decided (dismissing the appeal) that the director of a corporate director of a company was not a *de facto* director of that company, even though he was the guiding mind behind the sole corporate director and was the natural person who decided that the underlying company should pay the dividends which were impugned. That was because (according to the majority) he never assumed the duties of a director, and all that he did was *"in the course of directing the corporate director, not by acting or purporting to act as a director of the [underlying company]"*.

3515. As confirmed by Lord Hope JSC in *Holland* (at [26]):

> *"if it is unclear whether the acts of the person in question are referable to an assumed directorship or to some other capacity such as shareholder or, as here, consultant, the person in question must be entitled to the benefit of the doubt".*

3516. Further, as Lord Collins (also, with Lord Hope and Lord Saville, one of the majority) made clear:

>   (1) It is not sufficient, if it is sought to establish that a person was a *de facto* director for the purpose of making that person liable for some act or omission of the company, to show that that person was *"the guiding mind"* in making that company's decision.

>   (2) In such a context, it must be shown that the person assumed the responsibility for a directorial decision; and that decision must be one reserved under the company's governance structure (that is, the system by which companies are directed and controlled) to a director or board of directors, and not one capable of being performed by a manager or other employee, or actually being performed by the person in question by virtue of some other role or authority.

>   (3) Thus, the question is whether the person in question (a) was as a fact *"part of the governing structure"* [93] and (b) had been demonstrated to have *"assumed a role in the company sufficient to impose on him a fiduciary duty to the company and to make him responsible for the misuse of its assets".*

>   (4) Now that the concept of a *de facto* director has been extended to cover not only (as originally) a person whose appointment was defective or who without lawful authority claimed to hold office, there can be no hard and fast distinction between the concept of a *de facto* director and that of a shadow director (see [91]) though, as noted by Morgan J in *Instant Access* [at 216]:

>>      *"If they were de facto directors, they owed the same duties to the company as would a de jure director. If they were shadow directors, there is a separate question as to whether they owed fiduciary duties to the company, and, if so, which duties."*

3517. Morgan J also referred to cases on *de facto* directors after the *Holland* case, and especially *Smithton Ltd v Naggar* [2015] 1 WLR 189 in the Court of Appeal, where

Arden LJ said that *"The question is whether he has assumed responsibility to act as a director"* and added (*inter alia*) that:

>   (1) That *"is to be determined objectively and irrespective of the defendant's motivation or belief"*;

(2) *"The court is required to look at what the [defendant] actually did and not any job title actually given to him"*;

(3) *"The court must look at the cumulative effect of the activities relied on"* and all the circumstances in the round; but

(4) *"It is also important to look at the acts in their context. A single act might lead to liability in an exceptional case"*;

(5) *"Relevant factors include*: (*i*) *whether the company considered him to be a director and held him out as such; (ii) whether third parties considered that he was a director"*;

(6) *"The fact that a person is consulted about directorial decisions or his approval does not in general make him a director because he is not making the decision*."

3518. Lastly in his analysis of the law in *Instant Access*, on the question of what makes a person a shadow director Morgan J referred to *Secretary of State for Trade v Deverell* [2001] Ch 340 and *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch) where it was clarified that:

(1) *per* Morritt LJ (as he then was) in *Deverell*, *"Whether any particular communication from the alleged shadow director, whether by words or conduct, is to be classified as a direction or instruction must be objectively ascertained by the court in the light of all the evidence"*;

(2) again *per* Morritt LJ in *Deverell*, *"such directions or instructions do not have to extend over all or most of the corporate activities of the company; nor is it necessary to demonstrate a degree of compulsion in excess of that implicit in the fact that the board are accustomed to act in accordance with them"*, and nor furthermore is it *"necessary to the recognition of a shadow director that he should lurk in the shadows"*;

(3) *per* Lewison J in *Ultraframe*, *" a position of influence (even a position of strong influence) is not necessarily a fiduciary position"*: the test is effective control since *"the policy underlying the definition is that a person who effectively controls the activities of a company is to be subject to the same statutory liabilities and disabilities as a person who is a de jure director"*; and

(4) also *per* Lewison J in *Ultraframe*, and by the same logic, it is not necessary that the person in question should be able to influence every member of a board: *"a person at whose direction a governing majority of the board is accustomed to act is capable of being a shadow director"*.

3519. In the present case, the Claimants relied on the following facts as demonstrating that Dr Lynch was a *de facto* director of ASL (ASL being a company incorporated in England, the *de jure* directors of which were Mr Hussain and Mr Kanter):

(1) The Claimants' general case about Dr Lynch's role in relation to the Autonomy group companies, including (a) Deloitte's conclusion in its memo of January 2011 that Dr Lynch exercised *"a very unusual level of control for a FTSE 100 CEO"*; (b) the evidence of corporate decisions in all operating companies being made by a "core management team" comprising Dr Lynch (at its head), Mr Hussain, Mr Chamberlain and Mr Kanter, and also (though less consistently) Dr Menell and Ms Eagan; (c) Deloitte's further conclusion that all *"purchases over $30,000 must be approved by the CEO"* such that *"very few transactions are processed within the group without direct authorisation from Mike Lynch being required"*;

(2) The lack of any evidence that ASL acted on the basis of resolutions passed by its board of directors, and the appearance that instead, important decisions regarding its affairs were taken by executives at the Autonomy group level, including Dr Lynch. The Claimants gave as an example ASL's $9.6 million purchase of a three-year licence of the ATIC in Q4 2010 in connection with the MicroTech/Vatican VAR transaction (VT13) which Dr Lynch approved, as he accepted. The invoice was initially issued to Autonomy Inc, following which it had to be re-issued to ASL. Nevertheless, Dr Lynch refused to accept in crossexamination that he had given his approval on behalf of ASL. He said that he was "*able to do the approval as part of my role, but I don't know how that relates to the legal entities*". The Claimants contended that it is obvious that, in point of fact, Dr Lynch was acting as though he were a director of ASL. Dr Lynch had no knowledge of an ASL board resolution approving the purchase, and there is no evidence that one exists.

(3) Dr Lynch's approval was required for purchases made by ASL. Thus, for example, in the allegedly reciprocal transaction with Vidient Systems in Q3 2010 (being the second Vidient transaction in RT4), which included ASL making purchases from Vidient totalling $2.31 million, Mr Chamberlain sought Dr Lynch's approval for this "*given size of amount*". In cross-examination, Dr Lynch accepted he gave the required approvals. When it was put to Dr Lynch that these approvals were given on behalf of ASL, Dr Lynch said "*I wouldn't necessarily have known who it was getting contracted through*". This reflected Dr Lynch's earlier evidence that: "*I wouldn't know which contracting company was being used, unless I went and looked at the paperwork, which I didn't usually*".[425] The practice was clearly for Dr Lynch to provide purchase approvals where ASL was the Autonomy company that entered into substantial transactions.

---

[425] In the context of his cross-examination concerning RT3, where the relevant Autonomy subsidiary was Autonomy Inc.

(4) Dr Lynch also approved MAF payments on behalf of ASL. He accepted that he approved the payment of a $1.1 million MAF by ASL to DiscoverTech in Q1 2011.

3520. Alternatively, the Claimants asserted that Dr Lynch was a shadow director of ASL, on the alleged basis that Mr Hussain and Mr Kanter, ASL's directors, were accustomed to act in relation to the transactions entered into by ASL in accordance with Dr Lynch's instructions. Very little additional evidence in support was provided by the Claimants, save as relevant to their contention that he was a *de facto* director. I think the reality is

that if they fail to establish that he was a *de facto* director, they cannot succeed in the alternative plea that he was a shadow director.

3521. In the further alternative, the Claimants contended that Dr Lynch owed a fiduciary duty of loyalty to ASL on the basis that he undertook to act for it or on its behalf in relation to the transactions which had a financial impact on it by virtue of the transfer pricing arrangements discussed above. The Claimants relied on *Bristol and West Building Society v Mothew* [1998] Ch 1, 18 and submitted that that undertaking is implicit in the fact that:

> *"all significant transactions and decisions, including those affecting ASL, took place at his direction or with his knowledge, consent and/or involvement. These circumstances gave rise to a legitimate expectation on the part of ASL, which equity will recognise, that Dr Lynch would not utilise his position in a manner adverse to the interests of ASL and, accordingly, gave rise to the relationship of trust and confidence between him and ASL."*

3522. On the issue whether he was a *de facto* or shadow director of ASL, Dr Lynch raised little dispute on the law, not least because (as explained above) the law is clear that ultimately the issue in every case is one of fact. The facts, however, were much disputed.

3523. Dr Lynch's position on the facts was:

(1) He was adamant in his oral evidence that he was never a *de facto* director of ASL;

(2) The Claimants did not identify any instance of him being held out as a director of ASL;

(3) The main focus of his cross-examination in relation to this issue was on the fact that it was thought necessary for transactions by ASL to be approved by him, and he did, on various occasions, approve transactions that were, in the event, entered into by ASL. However, although he did not deny the fact that he was asked for and gave approval, Dr Lynch contended that (a) he would not *"have known which subsidiary the purchase was going through at the time"* and (b) his approval of

transactions undertaken by subsidiaries of Autonomy Corporation Plc does not mean that he was acting on behalf of, let alone acting as a director of, those subsidiaries: he was acting as CEO of Autonomy, or as "Group CEO" (as he was described, for example, in Autonomy's Trading Update for Q1 2011).

3524. Dr Lynch contended that the Claimants' further alternative contention that if he was not a *de facto* or shadow director of ASL, then he owed a fiduciary duty to ASL because he implicitly undertook, under or by virtue of the transfer pricing arrangements, that he would consider its interests and not utilise any power or position (whether as CEO or otherwise) in a manner adverse to ASL (in accordance with the *Mothew* case cited above), failed on the facts. Dr Lynch contended that the fundamental premise of this basis of claim was that he knew that ASL would end up bearing the consequences of the transactions he approved because of the transfer pricing arrangements: but there was no evidence, and he denied, that he knew of those arrangements and that losses would be transferred to ASL.

3525. In my judgment, Dr Lynch plainly did act as a *de facto* or shadow director of ASL and owed duties in acting as such:

(1) His own denials in that regard are not legally dispositive: the question is to be *"determined objectively and irrespective of the defendant's motivation or belief"*: see paragraph 3517(1) above;

(2) The governance structure of the Autonomy Group as a whole was such that (a) decisions at subsidiary level were taken without the perceived need for formal board consideration by the senior management group comprised of Dr Lynch,  Mr Hussain, Mr Chamberlain and/or Mr Kanter, (b) Dr Lynch was in a position to and did influence the others to the extent that his was the decisive decision on all material matters referred to him. As explained in paragraph 3518(2) above,

> *"such directions or instructions do not have to extend over all or most of the corporate activities of the company; nor is it necessary to demonstrate a degree of compulsion in excess of that implicit in the fact that the board are accustomed to act in accordance with them".*

(3) Dr Lynch's answer in the course of his cross-examination that *"I wouldn't know which contracting company was being used, unless I went and looked at the paperwork which I didn't normally"* illustrates how subsidiaries within the Autonomy Group were "used" as contracting parties without regard to their separate interests and at the direction of senior management with Dr Lynch at its apex.

(4) Although the mere fact that his approval was sought for large transactions by subsidiary companies would not of itself support the conclusion that he was a *de facto* or shadow director of the transacting subsidiary, the reality was that (a) the absence of any evidence that any of the subsidiaries had a functioning board of directors which actually

made any decision confirms that the power of management in fact resided elsewhere than the board; (b) Dr Lynch was at least on a par with the *de jure* directors, and (c) the need for his final approval connoted that Dr Lynch had the ultimate decision-making power and was in fact first among them.

3526. That makes it unnecessary to consider the alternative case based on *Mothew*, though I should say that I was not convinced by it, and would accept the arguments against its application which Dr Lynch put forward.

*The extent of Dr Lynch's duties acting as a de facto or shadow director of ASL*

3527. However, establishing that Dr Lynch acted as a *de facto* director of ASL does not entail that he owed a duty to take steps in other capacities to protect it from harm: and in this case, the sources of alleged harm to ASL were (a) transactions entered into, not by ASL but by Zantaz/Autonomy Inc and (b) the transfer pricing arrangements.

3528. Dr Lynch submitted that even if he was a *de facto* director of ASL (as I have found he was) and if he did owe such a duty, there was no basis in law for any claim for its breach in the context of the four Schedule 12D transactions, because:

(1) ASL was not a party to any of them and nothing Dr Lynch did in relation to them was done on its behalf;

(2) If ASL suffered any loss, that loss was caused, not by the transactions or their effect, but by the transfer pricing arrangements: Dr Lynch was not aware of or involved in those arrangements and had not exercised *de facto* or shadow directorial power in respect of them; and in any event

(3) The Claimants have not alleged that the decision by ASL to enter into those arrangements involved any breach of duty.

3529. The Claimants accepted that if only Zantaz (as the contracting party, or in the case of the MetLife transaction, the entity which recorded the revenues) was the proper claimant in respect of all the relevant losses, then only Mr Hussain could be liable, and not Dr Lynch. The basis on which the Claimants asserted that Dr Lynch as a *de facto* or shadow director of ASL could be liable for transactions entered into not by ASL was never made clear or even broadly explained:

(1) In the RRAPoC, the Claimants pleaded the duties that Dr Lynch owed to ASL, but there was no satisfactory explanation as to how those duties were engaged or breached in the case of a transaction entered into by another entity. The pleaded duties were alleged to include *"to act for and on behalf of ASL in relation to transactions which had a financial impact on ASL pursuant to the transfer pricing and profit sharing arrangements…".* But the basis of this broad (and, in my view, novel) duty was not explained.

(2) In their written closing submissions, the Claimants variously asserted that Dr Lynch and Mr Hussain owed duties either as a director of ASL or in equity *"not to utilise his position in a manner adverse to the interests of ASL"* and were in breach of duty:

> (a) *"in procuring Zantaz's entry into them [the Schedule 12D transactions]"*
>
> (b) *"in causing the relevant subsidiary to act to its detriment…"*

in circumstances where (the Claimant submitted) *"all significant transactions and decisions, including those affecting ASL, took place at his direction or with his knowledge, consent and/or involvement."* But again there was no explanation of the basis of these broad formulations which cut across ordinary principles of separate corporate personality.

3530. In Dr Lynch's closing submissions the Defendants took it to be the Claimants' case in this regard that Dr Lynch owed a duty to ASL in respect of transactions carried out by other companies likely to cause it loss and was in breach of that duty by causing Zantaz/Autonomy Inc to enter into the Schedule 12D transactions knowing that they would cause loss which ASL would eventually bear because of the transfer pricing arrangements. It was not for Dr Lynch to postulate the basis of such a duty and he did not do so; but he submitted that even if such a duty was assumed for the sake of argument, the claim failed on the facts anyway, since Dr Lynch had not known the details of the transfer pricing arrangements and he was not aware losses would be transferred from Zantaz to ASL.

3531. Addressing first the legal basis of the claims, in my judgment:

(1) The Schedule 12D transactions involved no decision by ASL at the time they were made: they were entered into by Zantaz (or, in the case of the MetLife transaction, by Autonomy Inc), not by ASL: no duties were owed to ASL in respect of transactions undertaken (as they were) by different entities, namely, Autonomy Inc and Zantaz;

(2) The decision of ASL which has allegedly been causative of ASL's own loss (the decision to enter into the transfer pricing arrangements) has not been impugned and cannot be the basis of loss;

(3) No basis of claim against Dr Lynch for ASL's loss has been explained, still less established;

(4) If as public filings suggested but Dr Lynch denied, he was President of Autonomy Inc, he might have been liable for loss in respect of the MetLife transaction to which
Autonomy Inc was a party: but the Claimants' case is that *"Autonomy Inc…typically transferred 100% of the costs it incurred and 96.5% of the revenues, to ASL",* leaving Autonomy Inc no worse off for having entered into the transactions and thus having sustained no loss.

3532. My findings set out in the previous paragraph address the primary case advanced by the Claimants, as I understand it (and there were convolutions in it), in respect of the four hosting contracts.

3533. As my fourth finding indicates I consider that whilst any claim for breach of duty arising from transfer pricing arrangements must fail for the reasons given, it does

not follow that the company suffering the original loss which it might have sustained from a breach of duty cannot bring a claim.  Thus, the claim which Zantaz has brought against Mr Hussain (brought in the name of the 4th claimant to whom it has been validly assigned) can be validly brought because it involves a breach of duty by him owed to Zantaz. Whether it succeeds depends on the facts which I discuss below.

3534. No question arises in respect of Zantaz of the losses having been transferred to ASL. But in principle I do not consider that the transfer pricing arrangements with ASL affect the potential claims which a subsidiary which in fact has suffered the original loss could make.  Those transfer pricing arrangements, as explained in the Claimants' submissions, do not purport to assign the claims.

3535. In my view, the fact that the subsidiary has chosen to transfer its loss to another company in the group does not mean that subsidiary has not suffered the loss.  It does not put the Defendants at risk of double recovery because there has been no assignment and therefore no claim can be brought by ASL (unless as is the case in other direct claims  under different heads (in particular, in respect of (a) reciprocal transactions (both VAR and non-VAR) on which it incurred losses as set out in Schedule 12B and (b) MAF and similar payments or foregone receipts on improper transactions identified in Schedule 12C) ASL has suffered the original loss).   The company which suffered the loss can enter into an arrangement to transfer the loss to someone else.  As long as it does not assign the claim it does not lose the right to sue, and the fact it has by an inter-company arrangement agreed the loss shall sit on another subsidiary's books does not mean it has suffered no loss.   The Claimants have put their claim in the alternative on the basis of

claims by the subsidiaries (or their assignee) for the loss they sustained as a result of a relevant breach of duty. Those are the companies which appear to me to have the claim.

3536. However, in my view, what has to be established is that the company which has the claim for the breach of duty has in fact suffered a loss as a result of that breach of duty.  The original hosting arrangements of the Schedule 12D customers, prior to any restructurings, were with Zantaz. Further, Zantaz was the contracting party in three out of four of the amending  contracts which reduced the amount of payments it received  in the future.  Autonomy Inc was the party to the fourth amending contract (the MetLife contract) which reduced the amounts to be received by Zantaz.

3537. Autonomy Inc suffered no loss as a result of this fourth contract, because it was never going to receive the income stream which has now been reduced.  It was Zantaz which suffered the loss, and Dr Lynch, for the reasons advanced, owed Zantaz no duty. It follows, in my judgment, that, not because of the transfer pricing arrangements but because it has suffered no loss, Autonomy Inc has no claim.

3538. Thus, though there is nothing sufficient to displace the public filings showing him to have been President of Autonomy Inc, and I find that he was,  for the

reason given above Autonomy Inc suffered no loss. No claim lies by Autonomy Inc, the 4th claimant, against Dr Lynch in respect of the MetLife contract.

3539.  As to what Dr Lynch knew of the transfer pricing arrangements and their effect, when the Claimants put to him in cross-examination that he was aware of the transfer pricing arrangements, his initial answer was *"Not really. I wouldn't be surprised to hear there were…but, no, I wouldn't have had any detailed* knowledge *of it".* Later he clarified that he *"understood they existed"* but he did not *"know the details".* However, I do not understand the transfer pricing arrangements themselves to have been impugned. Accordingly, I am not persuaded that Dr Lynch's knowledge or the lack of it affects the position in respect of the Schedule 12D hosting direct claims, or in respect of the other Schedule 12 direct claims (in respect of hardware, VAR, and reciprocal transactions).

3540.  In my judgment, as to the Schedule 12D hosting contracts:

(1) Notwithstanding his overall strategic control of the Autonomy group and the broad remit of his role and activities in that respect, as a matter of law Dr Lynch, though a *de facto* director of ASL, did not breach any duty to ASL.

(2) The only claim there might be for breach of duty owed to ASL would be if ASL suffered the original loss in respect of the breach of duty arising out of making the four impugned hosting contracts; and that is not alleged. No claim, therefore, lies by ASL against Dr Lynch for breach of duty in respect of these four hosting contracts.

3541.  In relation to direct claims made in Schedule 12 by ASL in respect of the payment of commission to friendly VARs and entering into unfavourable reciprocal arrangements to boost revenue, a claim does lie by ASL against Dr Lynch because ASL was the original contracting or paying party who sustained some of those losses claimed, not because of the transfer pricing arrangements. I deal with this in the section of my judgment dealing with the other direct loss claims.

3542.  However, I must turn to consider the substance of the Schedule 12D transactions, both in case I am wrong, and also because in any event, although he did not admit this in his pleading, it is clear from public filings and I find that Mr Hussain was a director of all three implicated companies (Zantaz, ASL and Autonomy Inc) and thus claims do theoretically lie against him in respect of the Schedule 12D transactions.

*General observations on the factual circumstances of the Schedule 12D Transactions*

3543.  Turning to the facts relating to the Schedule 12D transactions, the following points of general application were stressed, particularly by Mr Hussain, and do seem to me to be either common ground or to have been established:

(1) According to Dr Lynch's undisputed evidence, the cost to the hosting industry of storing data fell from $1 million for 1 GB in the 1980s to around $10 in the early 2000s and to $0.10 by 2010; the amount that a

hosting provider could charge per unit of data consequentially dropped substantially over the Relevant Period, inevitably prompting customers to expect and often demand savings.

(2) Zantaz SaaS contracts were typically terminable at short notice and prescribed no commitment by the customer to store a minimum level of data.

(3) The hybrid model gave Autonomy an immediate injection of cash.

(4) From the customer's perspective, the hybrid model delivered a more competitive rate, greater certainty as to future rates, and any benefits of owning the software licence (albeit the Claimants disputed there were any at all).

3544. Both Defendants also stressed that none of the number of people at Autonomy who was involved in selling hybrid deals, including the restructured deals in Schedule 12D, thought there was any impropriety involved in them. The Claimants' own witnesses such as Mr Sullivan, Mr Goodfellow and Mr Egan considered that there was a commercial rationale for them, in particular in enhanced customer retention and upsell opportunities.

3545. In addition, and as Mr Hussain again stressed, the hybrid model was known to the market, and known to HP from the diligence process. Further, HP studied the hybrid model in detail as part of the "re-basing" project to restate Autonomy's accounting applying US GAAP. There is nothing in the evidence to suggest that HP's decision to discontinue the model was anything other than a business and/or US GAAP accounting judgement, nor that the internal HP accountants involved in the project considered the model or its accounting treatment was inappropriate.

3546. The problem with these general points is that although they do appear to provide commercial justification for hybrid deals sold to existing SaaS customers, that justification is much more thin and tenuous in the context of the Schedule 12D transactions themselves which involved a re-restructuring or in one case, re-rerestructuring of existing hybrid arrangements.

3547. That focuses attention on the commercial justification of the individual Schedule 12D transactions, to which I now turn in chronological sequence.

*The Q4 2009 Morgan Stanley Schedule 12D transaction*

3548. Morgan Stanley had originally contracted with Zantaz on a SaaS basis pursuant to an agreement dated 21 June 2001 ("the Original MS Agreement"). Zantaz first sold a hybrid deal (using the Claimants' terminology, "the First MS Amendment Agreement") to Morgan Stanley in Q2 2008. The First MS Amendment Agreement moved Morgan Stanley off the SaaS model and secured substantial savings for Morgan Stanley. The
Claimants' complaints relate to two subsequent re-restructurings of that hybrid deal in Q4 2009 (in the Claimants' terminology "the Second MS Amendment Agreement" but which I shall call "the Q4 2009 MS Agreement") and then again in Q1 2011 ("the Q1 2011 MS Agreement").

3549. To understand the purpose and effect of the Q4 2009 MS Agreement, which the Claimants preferred to regard as a re-restructuring, it is necessary to set it in the context of the First MS Amendment Agreement in Q2 2008.

3550. Under the First MS Amendment Agreement in Q2 2008:

(1) Morgan Stanley agreed to pay a fee of US$18.5 million for a licence of a package of software including Digital Safe version 7.1 (a Lucene version) and Digital Safe version 8 (an IDOL version);[426]

(2) The agreement was for a term of two years from 1 July 2008 subject to Morgan Stanley having an option to extend for up to six consecutive one-year term;

(3) The storage rate for year one was $0.00798 per MB, reducing to $0.00312 per MB for year five.

3551. The Claimants contended that the First MS Amendment Agreement was an example of the use of the hybrid hosting model improperly to accelerate revenue recognition, at a substantial cost in terms of the deep discount that had to be provided to the customer to persuade it to pay an upfront licence fee.

3552. The Q4 2009 MS Agreement followed less than two years later. By the time it was concluded on 31 December 2009, there were still at least[427] six months left to run before the initial term of the First MS Amendment Agreement expired.

3553. The revisions introduced by the Q4 2009 MS Agreement included the following:

(1) Morgan Stanley agreed to pay a fee of $12 million to licence the same software (albeit with updates), but with the addition of a product called *"SPE Basic"*;

(2) The storage rate was amended so that Morgan Stanley would pay $0.00312 per MB from year two rather than year five, with a view to projected savings for Morgan Stanley of some $13 million over seven years.

---

[426] In an argument which presaged a more substantial dispute as to the existence of IDOL Digital Safe version 9 when purportedly supplied as part of the Q1 2011 MS Agreement (see paragraph 3618 below), Mr Yan and others of the Claimants' witnesses suggested that Digital Safe version 8 did not exist at the time it was sold to Morgan Stanley. It was asserted in the RRAPoC that it was not released until December 2010. Mr Yan also suggested that version 8 could not have been used by Morgan Stanley, which had a Lucene safe and not an IDOL safe. However, it became clear that there was confusion about the appellation/designation "version 8": it sometimes being referred to internally as *"DS Onsite"*. I did not understand the Claimants to have sought ultimately to pursue the point. In any event, I was persuaded that it was not well-founded. I was persuaded, and find, that Autonomy was in a position to sell IDOL Digital Safe version 8 to Morgan Stanley as at the date of the First MS Amendment Agreement.

[427] Although the term commenced on 1 July 2008 (*"the SOW Effective Date"*) the initial term was to continue for 24 months from the *"Livestream Activation Date"* which appears to be uncertain but to have occurred at some point between 1 July 2008 and 3 March 2009.

3554.  The Defendants presented the immediate commercial context of the Q4 2009 MS Agreement as follows:

(1) Morgan Stanley had pointedly made clear to Dr Lynch, at a meeting between him and the bank's head of enterprise infrastructure in November 2009 and in a presentation the bank thereafter provided to Dr Lynch that the bank was looking to cut costs across the board.

(2) The same presentation stated another of Morgan Stanley's objectives to be to manage its costs by working with strategic suppliers: Autonomy/Zantaz had ambitions to fulfil that role, and Morgan Stanley seemed eager to explore possibilities to broaden its use of Autonomy/Zantaz products.

(3) Thus, whereas until 2009 Morgan Stanley had very largely used its Digital Safe simply to store emails, in an email to Mr Lepore of Autonomy dated 16 October 2009, Mr David Bhola of Morgan Stanley stated that the bank was interested in both SharePoint and a document-tracking dashboard proposal, and, more generally, *"would be interested in hearing from Autonomy what is going on in the search space, new product offerings, new functionality etc. Areas of interest include rich media, spe, new functionality to be introduced into the IDOL product set."*

(4) Another, separate, deal concluded in November 2009, under which Zantaz was to supply, and Morgan Stanley's Digital Safe system would be accepting, data from MS Office, SharePoint and Documentum, seemed to offer the prospect of likely increased demand on the part of Morgan Stanley for additional data archiving in Digital Safe from 2010 onwards.

(5) Autonomy had in the circumstances seen encouraging signs of there being a substantial opportunity to increase Morgan Stanley's data needs and usage, but with the implicit costs that Morgan Stanley would be looking for lower data storage costs.

(6) Further, Autonomy/Zantaz was promoting the use of newly developed *"Ironman cells"* which allowed more data to be stored per cell than traditional IDOL cells. This new development was also thought likely to facilitate the conversion of a Lucene Digital Safe to an IDOL Digital Safe. This was a further factor suggesting enhanced prospects of Morgan Stanley increasing its data storage requirement. As Mr Egan stated in a briefing note to Mr Hussain dated 23 December 2009 if Morgan Stanley could be persuaded to upgrade to Ironman cells *"Autonomy gets a showcase account on the latest safe cells and that is good for Autonomy"*. Moreover, as Mr Egan also noted:

> *"The economics work out better for Morgan Stanley over time and in the case where MS wishes to send any additional volumes to the safe.*

> *The last point is important in that Autonomy wishes to constantly provide MS with incentive to store more volume in the safe. By capping software expense and lowering the rates MS is incentivized to migrate other types of data to the safe. An example would be the legacy migration project that is going on right now. Or for instance, Autonomy can take retired application data into the safe etc.*
>
> *Overall, this license proposition and rate reduction commercially underpins constant innovation to lower costs to Morgan Stanley on a per unit basis so that the Autonomy Digital Safe becomes an increasingly attractive and cost efficient archive platform for greater volumes and breadth of data."*

(7) Mr Egan added to this, when cross-examined about the reference to *"retired application data"*, that this would be likely to include data from financial applications, which would in turn include relational structured data which would be a use case for SPE.

(8) In the meantime, Autonomy's costs of storage had fallen since the First MS Amendment Agreement, and Autonomy could afford to offer a reduced hosting rate whilst still making the same margin.

(9) Thus, Autonomy saw its opportunity to obtain more data and data storage fees from Morgan Stanley, as well as a potential shopfront for both Ironman cells and SPE, and at the same time to lock the bank in for a new upfront commitment. In return, it was offering a package which it could present as attractive to Morgan Stanley whilst not eroding its previous margins.

(10)   When it was suggested to Mr Goodfellow in cross-examination that the end of 2009 was a good time to lock Morgan Stanley in with a new upfront commitment, the gist of Mr Goodfellow's answer was:

(a) first, that it was <u>always</u> a good idea to try to renegotiate and secure a further upfront commitment and revenue; any time was a good time to improve lock-in with customers; and

(b) secondly, that all customers would be seeking to get the best deal they could. This was true also in the case of Morgan Stanley.

3555. Against that commercial background, the Defendants submitted that the Q4 2009 MS Agreement achieved a number of objectives for both parties, made obvious business sense, and was a good commercial deal. Not least, as the Defendants emphasised, it locked in $12 million of licence revenue, which, whether or not relied on to meet quarterly targets was a valuable accretion to funds.

3556. The Claimants presented the position very differently. Their case is that the deal entirely lacked *"any legitimate rationale…"* and was driven (with the active

involvement and encouragement, it was contended, of both Mr Hussain and Dr Lynch) by the need on Autonomy's side for any deal that provided apparently recognisable revenue in a large amount.

3557. The Claimants contended that this was demonstrated by the negotiations leading up to the deal. According to the Claimants:

(1) Autonomy's opening pitch for this restructure was made by reference to the savings that Morgan Stanley stood to gain from it; only later was anyone concerned to identify what software might be licensed to Morgan Stanley to give the transaction some semblance of a rationale. Had the purpose of this transaction been to license Morgan Stanley new software that it genuinely wanted or needed, one would have expected the discussions about the software to precede negotiations over price. That was not the case.

(2) According to Mr Egan's unchallenged evidence, the deal was a point of "*focus of Dr Lynch and Mr. Hussain's attention*". In cross-examination, Dr Lynch appeared to accept it was an important deal for the quarter. Mr Egan informed both of them on 21 December 2009 that the numbers supported "*doing a large deal*", and Mr Hussain responded saying "*good luck!  Need it!*".

(3) When on 22 December 2009, Mr Egan opened the negotiations over the deal, he sent Mr Frank Cooke and Mr Troy Huber of Morgan Stanley a spreadsheet demonstrating the potential savings, noting:

> "*-Proposed lowering of overall cost structure for Digital Safe to Morgan Stanley to create savings of $6.3M over next 5 years or $13m over 7 years…*
>
> *-This deal can be accomplished with no changes to contracts other than to amend existing agreements with new software table and new rate table…*
>
> *Mike [Lynch] and Sushovan [Hussain] asked that I keep the offer very simple and show Morgan Stanley <u>a pure savings option based upon a restructure that yields license revenue for savings.</u> I know they described this in broad strokes to people like Christian in the UK which you and I discussed.*"[428]

(4) That encapsulated the deal in the eyes of Mr Egan: it was to make a further licence sale to serve as a pretext for upfront revenue recognition, in return for which Morgan Stanley would receive further substantial savings. Mr Egan forwarded this email to Mr Hussain, saying "*FYI in case you talk to [Christian Lucas of Morgan Stanley] in am*".

---

[428] Emphasis added.

(a) When Mr Hussain chased Mr Lucas again the next day, 23 December 2009, Mr Lucas replied, asking:

"*what would be the upfront payment that you're looking for before y/end in order for the savings programme to kick in?*".

(b) In response Mr Hussain clarified that:

"*The savings start the moment MS signs an amendment to the existing agreement that simply puts lower rates into effect coupled with a software licence fee. In this sense it is not even*

*an offer that requires a legal review as it is purely financial and causes savings. It's quite simply "sign and save"."*

3558. The Claimants contended that whilst it is clear that the purpose of the deal from Morgan Stanley's perspective was to achieve savings, it is equally clear that the real driver for Autonomy was revenue that it could (albeit improperly) recognise immediately. They referred in this regard both (a) to Mr Hussain's determined efforts to get a deal before the end of the quarter, and (b) also to his re-jigging of the transaction to maximise recognised revenue return.

3559. As to (a) in paragraph 3558 above:

(1) Mr Hussain pushed for the deal to be completed before the end of the quarter, emailing Morgan Stanley on 23 December 2009 to say: "*Realize this is a big ask but anything you can do would be highly appreciated*".

(2) Likewise, Dr Lynch was keen to ensure that the Morgan Stanley deal closed in Q4 2009 given its importance to Autonomy's revenue targets. On 26 December 2009, he told Mr Hussain and Mr Egan, among others, that:

"*Given the criticality to the quarter and the short amount of time left should: [Mr Egan] and [Mr Joel Scott] be in NY for 9am Monday for MS? what do we think?*"

(3) To push the matter forward, Mr Hussain approached an employee of Morgan Stanley called Mr Lucas (an investment banker who advised Autonomy from time to time but who was not part of Morgan Stanley's IT procurement function) in an attempt, as Dr Lynch acknowledged, (in his words) "*to leverage the relationship with the investment bank*". Mr Hussain suggested to Mr Lucas in an email dated 22 December 2009 that, "*if we have a deal with MS that gets us there on the q[uarter]*" it

was *"very likely"* that he would be minded to pursue a convertible bond issue with Morgan Stanley acting as Autonomy's advisors.[429]

3560.  As to (b) (in paragraph 3558 above):

(1) The problem arose because the rates Autonomy had offered and contracted for with Morgan Stanley in the First MS Amendment Agreement were already so low that under VSOE rules[448] if any lower rates were offered Autonomy would have had to carve out an amount from the licence fee and attribute it to storage, so as not to undervalue the storage component of the transaction.

(2) The consequence of carving out an amount from the licence fee would, of course, have been a reduction in the immediately recognised licence fee revenue.

(3) To avoid this, Mr Hussain was content to reduce Autonomy's fair value for Digital Safe storage to the new, lower rate proposed in the further amendment, as recorded in Mr Philip Smolek's email of 23 December 2009:

> *"I did discuss w/ Stouffer [i.e. Mr Egan] – this Morgan restructure if successful will likely [mean] we'd need to establish a new VSOE rate on storage in order to not require a carve on this license… Stouffer indicated to me that Sushovan is 100% in support of this deal & assured him that he'd handle any Accounting/VSOE adjustment that need to happen to make this Q4 license deal stick. Quick background (in case your minds are getting old like mine)… We re-pegged Dig Safe Storage VSOE to $0.00672/MB/yr (equiv) in Q2'09 [which equated to Morgan Stanley's then current second contract year contracted rate] (the lowest client rates in existence). Stouffer's proposal today proposes to peg Morgan's new storage rate effective with this deal to become
> $0.00312/MB/yr (equiv)…"*

3561.  The Claimants rejected any suggestion that Autonomy's motive for entering the deal related to any real concerns about customer retention. As Mr Hussain noted

---

[429] This is apparent from: Mr Hussain's earlier requests for advice about the effect of a convertible bond issue; his later reference to organising a call with "*John and Mark… re converts*"; a later email from Mr Lucas referring to a "*convertible financing*"; and the fact that Autonomy issued convertible bonds worth around £497 million in early 2010, with Morgan Stanley acting as "*Global Coordinator and Sole Bookrunner*". [448] VSOE is technically a US GAAP concept, but the term was also used by Autonomy during the Relevant Period to refer to its IFRS estimates of fair value for software and services. In essence, VSOE refers to the evidence required in order to attribute a reliable fair value to individual components of a transaction.

in an email to Dr Lynch in November 2009, Morgan Stanley were Autonomy's "*best client, v happy*"; which is perhaps unsurprising, since they were on the "*the lowest client rates in existence*".

3562. Likewise, the Claimants dismissed Dr Lynch's suggestion that Morgan Stanley were exerting pressure for a new deal. They accepted that it was true that Morgan Stanley had issued a generic document that showed they were attempting to cut the costs of their enterprise infrastructure software in 2009. However, this document was a nonspecific strategy presentation, which did not even mention Autonomy. The Claimants submitted that it:

> "*would be a stretch to conclude, on the basis of that presentation, that Morgan Stanley would have moved to a competitor if Autonomy was unwilling to cut prices.*"

*The dispute whether the inclusion of SPE was a contrivance*

3563. Last but not least, the Claimants contended that the last-minute[430] addition of SPE Basic to the definition of the software to be provided to Morgan Stanley under the Q4 2009 MS Agreement was a fiction devised to persuade Deloitte that there was substance in the sale of a new licence as well as a broader commercial justification for the transaction as a whole.

3564. The position with respect to SPE, which the Claimants emphasised was (apart from updates) the only new or additional software included in the Q4 2009 MS Agreement, is factually convoluted and disputed. The dispute engendered a considerable amount of evidence as to the nature of SPE, its utility generally and in particular to a Lucene safe operator such as Morgan Stanley, what Deloitte had been told and whether they were misled, and the veracity of Dr Lynch's claim during the Q4 earnings call on 3 February 2010, that "*although the deal was many other things, [SPE] was one of the key differentiators*" and his evidence to me when cross-examined that the addition of SPE was "*the basis on which Morgan Stanley were happy to commit to us for a long time*". These issues are relevant not only to the matters under discussion in this section of this judgment, but also as a test of my conclusions about the accounting treatment accorded to the hybrid hosting model which I addressed in the preceding section.

3565. In broad summary, the Claimants contended that SPE Basic[431]:

> (1) was in its infancy at that time, and in the event was never integrated with Digital Safe;

---

[430] According to Mr Egan's evidence in his witness statement,  a draft version of what became the Q4 2009 MS Agreement which was sent to Mr Crumbacher by Morgan Stanley's external lawyers on 30 December 2009, just one day before the transaction was concluded, contained no reference to SPE; SPE was only added to the draft in the early hours of 31 December 2009.
[431] Structured Probabilistic Engine.

(2) according to Dr Blanchflower, would need to have changed considerably to enable it to be harnessed with Digital Safe to access and search structured data;

(3) in any event would not have been capable of use on a Lucene safe without further work by Autonomy which, according to the Claimants, was never done; and in any event;

(4) was not asked for, discussed or required by Morgan Stanley: its inclusion in the Q4 2009 MS Agreement was in consequence of a directive from Mr Hussain at the end of December 2009 that it should be included (whether or not requested, and for free) in all IDOL deals worth more than $250,000;

(5) Morgan Stanley itself did not focus on, or even appreciate, the addition: thus, for example, Morgan Stanley's Mr Furman, who was head of archiving at Morgan Stanley at the time, sent two chasing emails in January 2010, after the Q4 2009 MS Agreement had been concluded, asking for information about SPE after reading about it in the Financial Times, and apparently unaware that it had been supplied to Morgan Stanley already.

3566. The Claimants submitted in the round that in the particular context of the Q4 2009 MS Agreement, SPE was included to give the semblance of a more extensive licence and as the means of persuading Deloitte that the new licence had independent value.

3567. The Claimants relied especially on the evidence in the witness statement of Mr Egan, who was directly involved in the negotiations with Morgan Stanley. He stated:

> "SPE was included in the deal at a very late stage. The reason for this was that, for the revenue to be recognized, it was necessary to distinguish the software package under the restructured deal from that under the prior arrangement. I discussed this issue with Mr. Hussain, including what would satisfy the appropriate level of distinction in order to enable revenue recognition. I understood that we either had to add software or include a different version of the software to that previously provided. Therefore, I understood that if we had not included SPE in the deal, and the deal had been restructured as it had
>
> originally been negotiated (without SPE), it would have threatened revenue recognition. To my knowledge, based on my involvement in the negotiation with Morgan Stanley, SPE was not part of the commercial justification for Morgan Stanley's decision to restructure their existing arrangement. Indeed, I believe that Morgan Stanley would have done the deal without SPE."

3568. The Claimants observed, and I accept, that much of this evidence was not challenged in cross-examination:

(1) Mr Egan's evidence that he and Mr Hussain discussed the need to differentiate the software licensed to Morgan Stanley from that which had already been licensed to them under the First MS Amendment Agreement, and that Mr Egan was left with the understanding that some software needed to be added to the agreement in order to enable revenue recognition was not challenged.

(2) Nor was there any challenge to Mr Egan's evidence that he did not discuss SPE with Morgan Stanley and that he believed that Morgan Stanley would have done the deal without SPE.

3569. The Claimants also pointed out, and I also accept, that Mr Egan's explanation was supported by the contemporaneous documents:

(1) When Autonomy pitched the restructuring to Morgan Stanley, it never made any mention of SPE. This was true of the pitches made by Mr Hussain and Mr Egan to Mr Lucas, Mr Cooke, and Mr Huber.

(2) Dr Lynch attempted to explain away Mr Hussain and Mr Egan's exchanges with Morgan Stanley on the basis that Mr Lucas was an investment banker with little understanding of the bank's IT functions, and that Mr Cooke and Mr Huber were "*just interested in getting a good deal*" and "*making sure the system runs*", respectively. They were later dismissed as "*low-level operational people*". However, Mr Cooke was head of procurement at Morgan Stanley, and Mr Huber was an executive Director who appears to have been Mr Furman's boss, in charge there of Archiving and Digital Safe, and of sufficient corporate weight to have been suggested as a contact for Dr Lynch. In other words, Mr Huber and Mr Cooke were senior and important individuals within Morgan Stanley's IT function; and the contemporaneous documents show that they knew nothing at all of SPE.

(3) It is also consistent with Mr Egan's evidence that the draft restructuring agreement sent to Mr Crumbacher by Morgan Stanley's external lawyers, Sidley Austin, on 30 December 2009, just one day before the transaction was concluded, contained no reference to SPE and that SPE was only added to the draft agreement in the early hours of 31 December 2009, after Mr Hussain and Dr Menell had issued their directive to include it (for no charge) in all IDOL deals worth more than $250,000.

3570. Further in relation to paragraph 3566 above and the suggestion that the inclusion of SPE was a means of persuading Deloitte to accept that the new licence was materially different, the Claimants supported their case by reference to Deloitte's working paper, which stated that:

> "*SPE is a new Autonomy product, launched in Q3 2009. SPE gives additional functionality to IDOL, which allows it to search structured information, such as databases. Combining this software with DS allows customers to sort and archive data directly from their third party databases.*

> *In order to understand the commercial rationale for this purchase by MS and to establish how significant the addition of SPE is (in order to justify the $12m price tag) we have held discussions with Pete Menell (CTO). Pete noted that under the original DS deal, MS was only able to sort and archive its undstructured [sic] data, such as e-mails and other documents produced by standard desktop applications (Microsoft Office etc.). What the addition of SPE allows MS to do is to sort and archive all of their structured data from their transactional databases i.e. the databases that the bank uses to manage its customer accounts, value its numerous financial products and manage its finances. Given the volume of structured data held by MS globally, by purchasing DS with SPE, MS has significantly increased the amount of its data that can be archived in accordance with regulatory requirements. In Pete's opinion, from MS's point of view, when compared to other options for archiving all of their global structured data, a price of $12m is tiny.*

> *…*

> *Now that we have identified the commercial rationale and the technical reasons for the transaction, we must consider whether the licence fee of $12.0m represents fair value or whether an element of the upfront fee relates to the provision of future services. To do this, we must consider the exact nature of the additional software provided to MS and the other elements in the deal, such as the future support and maintenance fees and the ongoing storage rates. These are considered in turn below…*

> *…*

> *Note from the above that the storage rates have now been reduced significantly, so that the ongoing storage charge from year two onwards is at the rate previously reserved for year five onwards under the original agreement. Per discussion with the CFO we noted that the reason why the storage rates have now been reduced is due to the commercial pressure to keep MS as a customer."*

3571.   The Claimants contended that the information provided to Deloitte by Dr Menell was misleading, because (a) SPE could not be used with Digital Safe because it was never successfully integrated into it; (b) even if it had been integrated, Morgan Stanley would not have been able to use it unless Autonomy created a new IDOL cache specifically to enable SPE to work with a Lucene Digital Safe, or Morgan Stanley converted to an IDOL Digital Safe, neither of which happened. Indeed, the Claimants suggested that even on the Defendants' evidence, further configuration of Morgan Stanley's Safe would have been needed before it could use SPE, and there is no credible evidence that this ever occurred. Dr Menell's explanation was also, according to the Claimants, misleading by omission. He neglected to mention that he and Mr Hussain had issued a directive that SPE should be included in all IDOL deals with a licence fee greater than $250,000 "*at no additional cost*". In those circumstances, they suggested that it is *"surprising"* that he was willing to tell Deloitte that the $12 million that Morgan Stanley paid for its licence to SPE was "*tiny*".

3572. The Defendants sought to rebut each of these contentions, insisting that SPE was:

(1) Compatible with Morgan Stanley's Lucene safe and usable through an IDOL 'cache': according to the Defendants, the Claimants' submissions failed to take into account that by at latest November 2009[432], Morgan Stanley had commenced (and were some way in the process of) *"IDOL-ising"* its safe by (in Morgan Stanley's case, given its huge structured data archive) installing extensive parallel IDOL architecture in the form of an IDOL cache;

(2) From, at latest, November 2009, part of what Dr Lynch called the *"roadmap"* for the development of Morgan Stanley's use of IDOL for both unstructured and structured data: the Defendants maintained that structured databases of customers such as Morgan Stanley could be searched using a combination of IDOL, Digital Safe and SPE. Indeed, as both Dr Blanchflower and Mr Wang (though with some caveats) accepted when cross-examined, such a use of SPE was being considered for another institution, BofA, at around this time;

(3) Of considerable value to Morgan Stanley, given its vast structured data archives: the Defendants emphasised that Morgan Stanley certainly had a use for SPE, as Mr Goodfellow eventually conceded, and Dr Lynch referenced in that context both correspondence in October 2009 mentioning Morgan Stanley's interest in SPE (amongst other products and functionalities) and also meetings which he told me he had personally had with senior executives of Morgan Stanley (including Mr David Riley, Morgan Stanley's CIO of enterprise infrastructure) in Q4 2009, as well as a breakfast and town hall meeting at the Morgan Stanley Investor Conference on 10 November 2009[433]. Dr Lynch also told me in the course of his cross examination that he recalled discussing SPE further with Mr Rosenthal, Morgan Stanley's CTO and Mr Traverso, and that these discussions had concerned Morgan Stanley's interest in Autonomy's roadmap of its technology and the extent to which Autonomy would be able to handle other types of data (which would increasingly become available for archiving following the November 2009 deal).

3573. In the latter context, Dr Lynch insisted, when pressed to explain why SPE was only included at the last minute, that this was a misunderstanding: according to his evidence, in fact SPE capability was already included in IDOL 7.5, and the decision to *"break out"* SPE was *"so that we could actually use that from a marketing point of view"*, that is to say, *"for branding purposes"*.

---

[432] In paragraph 8 of his third witness statement, Mr Yan suggested that Morgan Stanley *"only had an IDOL cache installed in its production safe in the first half of 2011"*. However, that was contradicted by the documentation, from which it is clear that (as the Defendants submitted) the process was well underway by November 2009.

[433] The evidence of his diary extracts also supports Dr Lynch's recollection of meetings with Morgan Stanley's CTO and other senior IT employees on 28 September 2009, and his attendance at a breakfast and town hall meeting at the Morgan Stanley Investor Conference on 10 November 2009.

3574. He insisted also that, contrary to the Claimants' suggestion, SPE was an important factor in persuading Morgan Stanley at the highest approval level to commit to a five-year engagement: Dr Lynch told me that he had met with Mr David Riley, Morgan Stanley's CIO of enterprise infrastructure, amongst others. It seems clear from the documents (and

---

especially an email from Mr Scott Coleman of Morgan Stanley to Dr Lynch dated 2 November 2009) that this discussion included email archiving.

3575. The Defendants denied that Deloitte had been misled by them or Dr Menell or anyone else. Dr Lynch repeated once again that *"No one was trying to mislead Deloitte and Deloitte could easily check anything they needed to know."* When it was put to him that he would surely have appreciated that "*the acceleration of revenue was improper given that the so-called licence contained in this agreement was artificial"* he added further:

> *"I disagree that it was improper to do that structure and it's one that Deloitte and the market knew and understood. The market was well aware that we were doing that and it's one that HP well understood and there was nothing improper about it. The commercial strategy here was actually a highly successful one for the business which led to us being one of the largest cloud providers, if not the largest, at the time."*

3576. As to Dr Menell's failure to mention that no separate charge was made for SPE, Dr Lynch gave the following answer in cross-examination:

> *"Q. Do you see that Dr Menell told Deloitte that from Morgan Stanley's perspective $12 million would be a tiny price for SPE? A. Yes.*
>
> *Q. He doesn't mention that he had instructed Mr Crumbacher to include it in all licence deals over $250,000 for free, does he?*
>
> *A. Yes, but this is tied into the archiving pricing of the per megabyte. So what's happening is they take in SPE, they take in unstructured data -- sorry, structured data, they then still have to pay on the per megabyte basis, so we're going to make a lot of money out of it.*
>
> *Q. Dr Lynch, Dr Menell tells Deloitte that, from Morgan Stanley's perspective, $12 million would be a tiny price for SPE in circumstances where, as he knew and you knew, an instruction had been given to include it in all licence deals over $250,000 for free?*
>
> *A. On the basis of the licence deal. So, remember, it's part of IDOL so that IDOL transaction that's being added to will have a limit on it. So here the limit is very large because this is a large deal. So the equate you're making is not apples to apples. So if I license IDOL to a customer they then get SPE Basic, you're calling it for free, but the point is they're only getting that for what they've licensed IDOL for. So if they've*

*licensed IDOL for a certain amount of data or a certain amount of users -- remember we talked about instances and users and things like that -- that's all they're getting SPE for.  The reason why this is so much more expensive is this is a massive system.  Q.  They already had a licence for IDOL, correct?*

*A.  They already had a licence for one level of IDOL, yes.*

*Q.  And they were restructuring in a way where the only additional software was SPE, correct?*

*A.  SPE for a large amount of data, yes.*

*Q.  I suggest Dr Menell was misleading Deloitte, correct?*

*A.  Completely disagree."*

3577. In the round, Dr Lynch remained adamant that (a) for the reasons explained above, the size of the fee was justified by the size of Morgan Stanley's structured data and the value to it of using the software in such circumstances, adding *"what you are buying is the rights for the size of what you are doing. Morgan Stanley here is buying a very big version of IDOL, if you like to think of it that way"*; (b) there was no reason why Morgan Stanley couldn't use SPE to process new structured data; and (c) there was nothing misleading about telling Deloitte that there was a risk that Morgan Stanley would leave: as Dr Lynch put it, *"obviously, if something is 10 times more expensive than the competition, you're going to move."*

*My assessment of the commerciality of the transaction and Deloitte's apparent approval*

3578. There is no doubt that Mr Hussain came to place reliance on the deal as a source of revenue to enable Autonomy to meet its quarterly target. That was the obvious driver for Autonomy's need to strike the deal before the end of the quarter. The rush betrayed the purpose. In assessing the commerciality of the transaction, the question is whether there was any other purpose; and, if so, whether that is sufficient to justify the transaction as the product of a reasonable commercial decision, rather than a costly expedient to ramp up revenue in a hurry in respect of which any side benefit was just that and not the driver.

3579. The Defendants asserted that the deal was commercially a good one for Autonomy. Dr Lynch's written closing submissions emphasised that:

(1) Autonomy locked in $12m of licence revenue.

(2) From a commercial perspective this was a good moment to renegotiate with Morgan Stanley and lock in a new commitment. They were coming towards the end of the contractual period anyway, and had the right to terminate at will.  There were also very substantial amounts of new data in prospect.

(3) Locking in Morgan Stanley was a justified objective; they were known to be cost-sensitive and an internal document showed that their "*top priority*" was in controlling and reducing costs, including by strategic sourcing.

3580. Mr Egan's briefing note to Mr Hussain explained the commercial proposition (in the second paragraph, starting "*Regarding the Digital Safe rate reduction deal*"):

(1) It referred to the value proposition of the migration to Ironman IDOL cells offered by the new arrangements. It also made the following point:

> "*Autonomy wishes to constantly provide MS with incentive to store more volume in the safe. By capping software expense and lowering the rates MS is incentivized to migrate other types of data to the safe. An example would be the legacy migration project that is going on right now. Or for instance, Autonomy can take retired application data into the safe etc.*"

(2) This showed that Autonomy was envisaging Morgan Stanley migrating other types of data into the Digital Safe. This included "*retired application data*", which would be structured data: a use case for SPE. Mr Goodfellow accepted this:

> "*Q.  And this is dealing with incentivising them to deal with other types of data including a legacy migration project, yes?*
>
> *A.     That's correct, yes.*
>
> *Q.  There's also a reference to Autonomy taking retired application data into the safe, do you see that?*
>
> *A.     There is there, yes, correct.*
>
> *Q.   And retired application data is likely to include data from financial applications, isn't it?*
>
> *A.     That is correct.*
>
> *Q.   Which is likely to include relational structured data, yes?*
>
> *A.     That is correct.*
>
> *Q.     And that is a use case for SPE, isn't it?*

> *A.      It's a potential use case for SPE as we've already covered."*

(3) The final paragraph of Mr Egan's email stated:

> *"Overall, this license proposition and rate reduction commercially underpins constant innovation to lower costs to Morgan Stanley on a per unit basis so that the Autonomy Digital Safe becomes an increasingly attractive and cost efficient archive platform for greater volumes and breadth of data."*

(4) The Claimants' witness, Mr Goodfellow, who had stated in his witness statement that he could not see *"any commercial justification beyond revenue recognition for re-restructuring",* was unable to adhere to that when crossexamined, as the following extract shows:

> *"Q.    ... So overall the message to Morgan Stanley is it's being offered incentives to put greater amounts of data into archiving, yes?*
>
> *A.      That's correct, yes.*
>
> *Q.     And that fits with Morgan Stanley's commercial programme which it's told Autonomy about of trying to lower its costs and achieve economies of scale, yes?*
>
> *A.      That seems a perfectly -- reducing costs seems a perfectly reasonable goal for Morgan Stanley.*
>
> *Q.     And at the same time Autonomy stands to benefit from getting more data?*
>
> *A.      Potentially, yes."*

3581.  When cross-examined, Dr Lynch, with characteristic fluency, elaborated his case as to the commercial rationale of the transaction as follows:

> *"Q.   ...You appreciated that this transaction was not in the commercial interests of Zantaz, correct?*
>
> *A.   I think it was an extremely commercial deal for Zantaz in that you managed to tie in one of the marked customers for another five years, you managed to set rates in a market*

> *where they were falling, you managed to get them to become a reference for your new technology, you got the possibility of opening up much more data than you already had because you now had the argument of going into Morgan Stanley and saying, "You've already got the SPE licence, turn on structured archiving for us".  So, no, I think it was a very, very good deal. And of course because we lowered the rates, they sent us more data.*

> Q.   *I suggest that substantial savings were being offered to Morgan Stanley in circumstances where there was in fact no risk of them leaving and as a result of that, Zantaz actually received substantially less revenue as a result of the restructuring; correct?*

> A.   *That's wrong on so many levels.  So, first of all, your assumption is that although their contract ended in six months' time, they would continue for the next five years at the rate at that point despite the fact that storage costs were falling and had continued to fall very, very aggressively.  So that's the assumption that you've made there. Secondly, you haven't included any concept of pricing having an effect on demand so the fact that the rate was lower meant that they put more data in. And, in terms of moving, Morgan Stanley could have decided to completely change their archive over, I agree that*

> *that would have been a very large amount of work and probably not necessary, but all they had to do to switch to a competitor was take the pipe that was bringing new data and switch it over to their competitor. And in fact the other possibility was when there were banking transactions.  So one of the things that happens here; because of this deal, we win a deal for a joint venture that Morgan Stanley does and we wouldn't have been able to win that if we hadn't got this new basis for doing the business. So the reality is it was an extremely good commercial situation where we got more data and we got more types of data, we got a long-term commitment, we fixed a price in a falling market, we kept out competition who couldn't match us and we became Morgan Stanley's choice where they did have completely green field situations such as their joint venture with Citigroup."*

3582.   The additional commercial factors referred to by Dr Lynch illustrate that commercial decisions may have many strands. Where there are competing commercial arguments, the Court is most reluctant to second-guess the balance between them struck by directors; nor even, in most cases, which was the predominant consideration; that is a matter for their business judgment. The question is whether that is the situation in this case.

3583. In my judgment, this is not really a case of competing commercial arguments as to how best to serve and advance the interests of the company: it is a case where the operative reason for what was done could not be relied on as being in the interests of the company at all.

3584. Even accepting that the transaction offered the various benefits identified and emphasised by Dr Lynch, what drove the transaction was Mr Hussain's requirement for recognised revenue to try to achieve the target for Q4 2009. Whilst I suspect that Morgan Stanley would have proceeded with the transaction even had it not been supplied with the structured data functionality, and on balance could in any event have made use of that functionality on its Lucene safe with further work by Autonomy, in my judgment (and I find) Autonomy would not have proceeded but for its management's need for, and perception that the transaction could be structured so as to generate, revenue which could immediately be recognised in its quarterly accounts and presented to auditors (and by them to the Audit Committee) in such a way as to secure their approval.

3585. It seems to me likely, and I find, that part of the reason for Autonomy's adoption of this strategy was that the hosted hybrid transactions, and in particular the issue of a licence, could be presented as having commercial benefits for both contracting parties. The fact that the licence could reasonably plausibly be presented as the means of securing continuing loyalty and the "bird in the hand", and the appearance of there being commercial benefits for both contracting parties from the transaction, were essential if the payment for the licence was not to appear too obviously to be what it really was: a prepayment of hosting costs and charges.

3586. That is not to say that those other benefits were all illusory; but I do not consider that any was the real reason for Autonomy's adoption and espousal of the model. In particular (but without elevating it into some sort of litmus test, since I have considered all the alleged benefits both individually and cumulatively) I cannot accept that the late addition of SPE (in the early hours of 31 December 2009) was anything more than cosmetic: it was made for the reasons given by Mr Egan as recorded in paragraph 3567 above. I cannot accept Dr Lynch's evidence in this regard. His claim in crossexamination that the reason that SPE was added was *"because that was the basis on which Morgan Stanley were happy to commit to us for a long time"* (and see paragraph 3564 above) was not credible; and his attempt to justify what he had said in the earnings call for Q4 2009 that SPE was *"the key winning differentiator"* in securing that commitment was likewise unconvincing: what he had said in the earnings call was false, and its falsity has confirmed in my view that the addition of SPE was a device. The other benefits were potentially real; but they were ancillary.

3587. In such circumstances, in my judgment, what ultimately drove the transaction was not a commercial assessment of the interests of the company, but the perceived imperative of generating revenue which could be presented as recognised revenue in its accounts to seek to meet revenue targets. That may have sustained the share price; but it is well established that the proper business of the company does not extend to pursuing such an objective.

3588. I consider that the Q4 2009 Morgan Stanley transaction provides a further illustration and confirmation that treating the sale of a licence as a separate component of a hybrid hosting restructuring was without foundation and led to improper accounting and misstatement of recognised revenue. There was barely more than a residual recourse to the licence as making any real difference, let alone an identified and separate difference. The arguments highlighted that even on the Defendants' case, save only for the extension of the licence to SPE which I have determined was contrived at the last minute and was provided to others free of charge, the real commercial rationale was the *quid pro quo* offer of reduced data storage rates and service and maintenance charges in return for an upfront prepayment. As briefly mentioned in paragraph 3583 above, I doubt whether in such circumstances the pursuit of that objective could ever be justified as a proper exercise of business judgment or management powers.

3589. I have concluded that the driver for the transaction was the need for recognised revenue, that this was not a commercial decision weighing the interests of the company but one borne of the Defendants' objective of maintaining Autonomy's reputation of meeting revenue forecasts which underpinned its share price, and that it was a breach of duty giving rise to loss.

3590. I confirm that I do not consider that the fact that Deloitte considered and approved the transaction provides any defence. On the contrary, it seems to me that Deloitte were materially misled, that what they were told to address concerns they expressed about SPE was false and that the perceived need to dress the transaction up for them is further proof of its impropriety. The position is particularly stark because Deloitte were misled so directly in response to a concern they had specifically raised.

3591. Deloitte were plainly concerned about the transaction, and in particular that SPE was the only additional software to that which had been licensed to Morgan Stanley under the First MS Amendment Agreement. In January 2010, Mr Welham had asked Mr Chamberlain whether Autonomy was *"saying that Morgan Stanley have paid $12 million for SPE Basic?"*

3592. More generally, Deloitte was dubious as to *"what caused the agreement to be renegotiated"*, noting that, *"from Autonomy's point of view, they had MS tied in to a lucrative S&M and storage contract…"* prior to the restructuring. Unsurprisingly, given that the storage rates under the agreement were lower than Autonomy's previous estimates of fair value,[434] Deloitte wanted to consider the *"substance of the [Q4 2009 MS Agreement] to establish if the relevant elements have been determined at fair value"*.

3593. In paragraph 3570 above, I have already quoted Deloitte's working paper recording Autonomy's explanation of the transaction, and the inclusion of SPE. I have previously also addressed the dispute whether SPE could be used on

---

[434] Mr Smolek had remarked that if the transaction went ahead, Autonomy would *"need to establish a new VSOE rate* on *storage in order to not require a carve on this license"* but that *"Sushovan is 100% in support of this deal & assured [Mr Egan] that he'd handle any Accounting/VSOE adjustment that need to happen to make this Q4 license deal stick"*.

Morgan Stanley's Lucene safe (and concluded that it could, but only with further work by Autonomy). Even leaving those aside, the reply recorded in the working paper as having been given by Dr Menell to Deloitte on the specific concern and resulting question they had raised is, in my view, sufficient to undermine any purported reliance on their approval. Deloitte were not in a position to know what SPE comprised or what its true value was. Dr Menell's statement, as recorded in the working paper, that the price of $12 million *"when compared to other options for archiving all of their global structured data"* was *"tiny"* was thoroughly misleading without being in the context of the undisputed fact that (as previously mentioned in paragraph 3571 above) he and Mr Hussain had issued a directive that SPE should be included for free. In my judgment, this was more than *"surprising"* (again see paragraph 3571 above): it was false. I do not consider that Dr Lynch's attempt to explain it away in the passage of his cross-examination I have quoted in paragraphs 3576 and 3577 above, though characteristically ingenious, was credible.

3594. Further, it appears from the final paragraph of the quoted text from Deloitte's working paper above, that Mr Hussain himself misled Mr Welham into believing that Morgan Stanley had applied commercial pressure to reduce storage rates, and that Autonomy had been concerned that, if it did not reduce the storage rates, Morgan Stanley might terminate the First MS Amendment Agreement. There is nothing to suggest that this was in fact true. This depiction of Morgan Stanley as a flighty customer contemplating a move was at odds with Mr Hussain's own evidence earlier that Morgan Stanley were Autonomy's *"best client, v happy"* (see paragraph 3561 above) and with Dr Lynch's description of them as *"reasonably happy"* (see paragraph 3600 above). Further, the Claimants pointed out that:

(1) Mr Hussain did not merely suggest that Morgan Stanley might use a new provider for new data; he suggested to Mr Welham that Morgan Stanley might terminate the existing arrangement, which would require it to move its existing data to a new provider. Dr Lynch himself accepted that a customer would be very unlikely to do that.

(2) In fact, as explained above, Autonomy could not have had any cause for concern regarding Morgan Stanley's continuing use of Digital Safe, given the extremely low rates that Morgan Stanley was already benefiting from, and the difficulties, mentioned above, with any customer switching hosting provider.

3595. In the round, therefore, in my judgment, the Claimants' factual case in relation to the Q4 2009 MS Agreement is well-founded and a breach of duty and improper use of power has been established. I shall consider later what loss was thereby caused.

*The second Morgan Stanley Schedule 12D transaction: Q1 2011*

*Outline of the Claimants' case*

3596.   The Claimants' case with respect to the third amendment to the original
        agreement in Q1 2011 (which I shall refer to as "the Q1 2011 MS Agreement",
        and which was a rere-restructuring in the Claimants' parlance), echoed their case
        in respect of the rerestructuring in Q4 2009 discussed above.

3597.   At the time of the Q1 2011 MS Agreement, Morgan Stanley's existing
        arrangements entitled them to renew for up to six years on consecutive one-year
        terms. Morgan Stanley had already exercised its option to extend its existing
        arrangements.

3598.   The licence fee under the Q1 2011 MS Agreement was $5 million. The new
        licence covered (a) the software already licenced under the hosting agreement,
        with the addition of (amongst other things) Digital Safe version 9,
        StorHouse/RFS and StorHouse/RM, Autonomy Investigator and Early Case
        Assessment, and (b) a separate package of software to be supplied by Autonomy
        pursuant to an 11th Amendment to the Software License Agreement dated 31
        March 2011.

3599.   Under the Q1 2011 MS Agreement, which was concluded on the last day of the
        quarter, 31 March 2011:

        (1) Morgan Stanley agreed to pay a licence fee of $5 million;

        (2) Autonomy agreed to reduce the data storage charge from an already
            extremely low rate of $0.00312 MB per annum to a rate of $0.0023 per
            MB per annum for the year beginning April 2011, and then to reduce yet
            further at various intervals thereafter to $0.0016767 per MB per
            annum;[435]

        (3) Otherwise, the terms of the agreement and the options to extend
            remained substantially unchanged.

3600.   The Claimants sought to impugn the Q1 2011 MS Agreement as a contrived and
        commercially indefensible deal. They dismissed as unsustainable the
        Defendants' presentation of the rationale of the deal, on the basis that (put
        shortly):

        (1) Dr Lynch's claim that *"the old hosting rates were no longer
            competitive"* and that a further reduction was needed to ensure Morgan
            Stanley's continued loyalty ignored (a) the fact that by virtue of the Q4
            2009 MS Agreement, Morgan Stanley already enjoyed extremely (and
            artificially) low storage rates, (b) his own evidence in cross-examination
            that Morgan Stanley was already
            *"reasonably happy"* and also (c) the fact that at the time that what
            became the Q1 2011 MS Agreement was being negotiated, Morgan

---

[435] The Agreement itself reads "*$0016767/MB*". This appears to be a typographical error.

Stanley had already shown its satisfaction in exercising its option to extend the existing agreement;

(2) Dr Lynch's argument that under the Q1 2011 MS Agreement Autonomy supplied additional software which was both a benefit to Morgan Stanley and a

_____

prospective source of further profit for Autonomy from its use and maintenance was contrived: Morgan Stanley had not requested the additional software and the principal addition as put forward by Dr Lynch (Digital Safe version 9) did not even exist.

3601. The Claimants invited me to reach the conclusion that the only real purpose of the transaction from Autonomy's point of view was revealed to be accelerated revenue recognition, for which it paid the price of having to agree even more deeply discounted storage rates. Once more, according to the Claimants, Autonomy was, in effect, purchasing its own revenue and swallowing the cost.

3602. The Claimants sought to elaborate and fortify these points by reference, in particular, to:

(1) the difficulties which Autonomy apparently had in finding any plausible justification for a re-re-restructuring;

(2) what on the Claimants' case was Autonomy's contrived resort to the inclusion of what was described as Digital Safe version 9 (which the Claimants claimed simply and starkly, did not exist) and the reference to structured data load capabilities as provided by FileTek Storhouse RFS and StorHouse RM software simply as expedients to differentiate the Q1 2011 deal from the Q4 2009 deal;

(3) Mr Welham's evidence that Deloitte was not made aware of fundamental aspects of the transaction and would not have considered revenue recognition appropriate had they known about them.

3603. I address these points in turn, with some additional elaboration of the convoluted and confused issue relating to whether or not Digital Safe version 9 was in existence, which is relevant also to another transaction which the Claimants impugned as improper and loss-making between Zantaz and Deutsche Bank.

*Instigation of the transaction*

3604. Dealing first with the instigation of the transaction by Mr Hussain and his team, it seems that in around the middle of February 2011, Mr Hussain identified Morgan Stanley as one of a number of *"deals possible this [quarter]"* and encouraged his team to set about trying to identify what else they could offer to Morgan Stanley to justify another transaction and another upfront licence fee which would generate recognised revenue.

3605. The twin problems which emerged were that (a) Mr Crumbacher's hurried review of the existing contractual arrangements did not suggest any restrictions or deficiencies in Morgan Stanley's existing contractual entitlements which

might have offered an easy opening for a further sale, and (b) when Mr Hussain tasked Ms Gustafsson with checking *"the model, [updating] it and [sending] it to [Mr Egan] and me with any possibility of restructure. Urgent"* Ms Gustafsson replied the same day, highlighting that Morgan Stanley storage rates were already at what Autonomy had set as "fair value": *"we are already at VSOE…"*.

3606. Notwithstanding these difficulties, on 15 March 2011, Ms Gustafsson sent a draft proposal to Mr Egan, copying Mr Hussain, presenting Morgan Stanley with *"an opportunity to save your company in excess of $9m in five years"* in return for an upfront licence fee of $5m for software that was yet to be identified. The suggested savings were later revised down to approximately $5.9 million over five years assuming a flat storage

rate of $0.00312 per MB per annum, thus not taking into account further decreases in the storage rate at various intervals that featured in the final version of the contract.

3607. On 16 March 2011, Mr Egan explained to Mr Furman and Mr Cooke of Morgan Stanley that *"through a restructure of your license the Digital Safe we can reduce for storage cost per MB by 26.2%, saving Morgan Stanley a total of $5.9m (37%) over a five-year period… In exchange for a $5m Digital Safe license, we would be able to reduce the storage rate…"*. Again, there was no mention of the software that Autonomy was proposing to licence to Morgan Stanley. The Claimants contended that this demonstrated that:

> *"the approach appears to have been to identify how much of the ongoing storage fees could be moved into the upfront licence fee in order to create substantial revenue for Autonomy for the quarter, and the savings that Autonomy would need to offer to Morgan Stanley to persuade it to pay the license fee, and then to work out what software Autonomy could licence to Morgan Stanley to justify the licence fee."*

3608. The Claimants referred to two emails from Mr Hussain to Mr Egan as illustrating the pressures he felt he was under and the pressures he put on those below him in the hierarchy: on 16 March 2011, he emailed Mr Egan saying *"2 weeks for MS is an eternity!! We definitely need the deal"* and on 21 March 2011 his email subject line read *"no pressure but need MS!"*.

3609. Meanwhile, the software to be licensed to Morgan Stanley had still not been identified. Mr Egan emailed Dr Menell, Mr Hussain, Mr Crumbacher and Mr Scott on 24 March 2011, saying:

> *"As discussed with Sush, I need a list of new software that would be additive to Morgan Contract but related to IDOL, DS, audit center and S6 that can be added to the contract to support their accounting position for keeping old and new package amortizing simultaneously. Need urgently."*

3610. Mr Hussain forwarded this email to Mr Chamberlain, who responded: *"Just met with Pete [Menell] and Poppy [Gustafsson]. She is drafting an email. Plenty of extra we can give them".* Around 15 minutes later, Ms Gustafsson sent Mr Egan a *"PROPOSED SOFTWARE OFFERING"* which included *"Digital Safe v9.0 Digital Archive System with FileTek structured data-load capabilities".* Mr Egan then asked her to "*line item the idol functions*". Ms Gustafsson duly did so by lifting a list from another customer's Digital Safe contract. Mr Chamberlain forwarded this list to Mr Crumbacher, copying Mr Egan, saying:

> *"THIS NEEDS TO BE VERIFIED BY THE TECHNICAL TEAM AS BEING RELEVANT AND DELIVERABLE".*

3611. When cross-examined, Ms Gustafsson acknowledged that she had little idea of what the software set out in her emails actually was. She told me:

> *"...I was very rarely, if ever, involved in what was actually licensing, I was agnostic to it, It certainly didn't change the metrics that I was putting in... What I can see here is that there's a long list of technical things that then I would have had no idea what any of those are, now I have no idea what any of them is - - what's a kick-start metadata? I have literally no idea. What this looks like to me is a copy and paste from a similar or equivalent agreement..."*

3612. The Claimants submitted that this demonstrated that she had simply put together a description of varieties of software offering, culled from previous agreements without discrimination in terms of customer suitability, from which others could select what would be appropriate, not for the customer's needs, but to ensure that the revenue from the licence fee could be recognised upfront.

3613. When it was put to her that it was clear that she had been called upon to put together the software offering to ensure that the revenue from the licence fee could be recognised upfront she told me:

> *"Q.  You would have been concerned from a revenue recognition perspective to ensure that the software that was licensed was something new from that which had previously been licensed, correct?*
>
> *A.  It would have been important, yes, to be able to demonstrate it was separable.*
>
> *Q.  That's why you're involved in the discussion as to what software is going to be licensed, to make sure there's something new in there which can justify recognising the revenue, correct?*
>
> *A.  I don't think that's correct."*

3614. Ms Gustafsson's explanation for the fact that she was tasked with putting together the first formulation of the software licence was that she had:

"*a lot of visibility of the other contracts readily at my disposal and [she could] copy and paste them from another legal agreement, if that's possibly helpful*" and she was "*bringing up things that could be used as a frame of reference ... to sort of start drafting the legal agreements*".

3615. The Claimants submitted that this was not credible evidence: it was improbable that Mr Crumbacher, one of Autonomy's lawyers, would have needed Ms Gustafsson's help in sourcing a suitable precedent for a Digital Safe licence. Moreover, if the software licence were being put together with Morgan Stanley's commercial and technical needs in mind, one would expect to see the person negotiating with Morgan Stanley passing information back to Autonomy's technical department, which would identify the products that met the customer's technical needs, and would in turn pass the list of products to Autonomy's Legal and Finance departments to ensure that the proposal was documented correctly. But Ms Gustafsson, on her own admission, was "*not involved in conversations that are happening there with the customer*". The Claimants invited me to conclude that the only rational explanation for Ms Gustafsson being tasked with putting together the software offering was that it was primarily driven by accounting considerations.

3616. I have concluded that this is indeed the most rational explanation. Ms Gustafsson struck me as uncomfortable in telling me "*I don't think that's correct*" and her attempt to explain her role was not convincing. Her evidence revealed clearly that though she had little, if any, idea what the software comprised, she knew what she was tasked to do and the target she was required to hit:

> "*...from my perspective, and I stand by my statement, that what we are licensing is not really relevant. What's important here is that the licence is a separable element to that bundle of contracts that we are doing. Whether it's IDOL licence 7.0 or 6.0, whatever it is, it could be anything. What matters to me is that this is a separable component of the bundled agreement.*"

3617. The second limb of the Claimants' contentions was the claim that some of the software included in order to appear to differentiate the Q1 2011 MS Agreement from the previous agreements did not even exist in March 2011, and was only made available to customers some three and a half years later, in November 2014.

3618. A considerable body of evidence was put forward on the dispute as to the existence or not at the time of version 9 of Digital Safe (an issue which, as will be seen is relevant also to another of the impugned Schedule 12D transactions, that between Zantaz and Deutsche Bank). By way of overall summary:

(1) The Claimants relied primarily on (i) Mr Langford's searches of the records of Autonomy software releases, (ii) Mr Langford's evidence that the listing of

Digital Safe software on Automater with a suffix "*WIN*" demonstrated that Automater was not an accurate guide, still less proof of 'version 9', because Digital Safe was a 'Linux' system which was not compatible

with Windows,  and (iii) the recollections of Messrs Yan, Wang, Langford and Goodfellow as to when Digital Safe version 9 was released.

(2) Dr Lynch's position was that this was no more than a "*dispute over semantics*": and that there was a version of Digital Safe called 'version 9' prior to 2014 and "*it is irrelevant that a 2016 version of Digital Safe may also been called Digital Safe version 9*". Further, Mr Langford's evidence as to the incompatibility of Digital Safe and Windows was wrong: Digital Safe could be adapted to be compatible with Windows, as shown by a number of documentary references to Windows compatible versions of Digital Safe and, for example, the supply of a Windows compatible version to Manulife.

(3) Mr Hussain's case was that he understood that version 9 was placed on Automater in March 2011.

3619. It is clear that there was some uncertainty within Autonomy at the time as to the availability of version 9, and considerable confusion as to what was in the event placed on Automater for downloading. After receiving Ms Gustafsson's list on 24 March 2011, Mr Crumbacher asked Dr Menell and Mr Avila to confirm that the additional software could be delivered by the end of Q1 2011:

(1) Dr Menell and Mr Avila replied in the affirmative the following day, but Mr Crumbacher was clearly not satisfied with their answers, because he asked Mr McCarthy to confirm that the products were deliverable a few days later.

(2) Mr McCarthy explained in an email to Mr Crumbacher dated 28 March 2011 that he did not have a version 9 of Digital Safe as a "deliverable": but he noted that he had *"heard rumours that Roger may have a copy but it isn't on Automater"*.

(3) Mr Crumbacher relayed to Mr Goodfellow and Mr Lucini:

> *"Chris, Fer, is there a version 9 of the Safe? Need it for Morgan Stanley (8.0 won't work), and Michael's telling me there's no v.9 on Automater. If Ver 9.0 exists, can we get it up on Automater for delivery?"*

(4) Mr Lucini responded saying "*...we will put [version 9] up there*" but he stated in his witness statement that he could not recall what was uploaded; "*It may have been a copy of an earlier version of Digital Safe, or possibly just an empty zip file*". Indeed, Mr Lucini's evidence, which he confirmed in crossexamination, was that somebody – he thought possibly Dr Menell – told him that it didn't matter what software was uploaded.

(5) The software that was eventually uploaded was sent by Mr Wang to Mr Goodfellow, who passed it to Mr Booth for uploading onto Automater.

Mr Wang could not be sure what he sent to Mr Goodfellow, but suggested that it was most likely to have been Digital Safe version 8.

(6) Mr Goodfellow too believed that it was most likely to have been a predecessor to Digital Safe version 9, albeit he thought it was more likely to have been Digital Safe 7.4.

3620.   This evidence on the part of the Claimants' witnesses was at best confused. But the Defendants' evidence, largely provided by Dr Lynch himself despite his position that he was barely involved, did not clarify the matter either. It was less than convincing, partly because it was based on supposition, but also because it turned on the assertion that the evidence of Mr Wang, Mr Yan, Mr Goodfellow and Mr Langford could be disregarded on the simple basis that *"It's not for the engineers to name the products"* and that "engineers" would not be either involved in or (apparently) even aware of the name allocated by marketing.

3621.   In greater detail, what Dr Lynch asserted in his evidence was that the marketing department had taken the decision to brand the combination of Digital Safe version 8, StorHouse, and dense cells as "Digital safe version 9" sometime around the time of the conclusion of the First MS Amendment Agreement. Dr Lynch went on to suggest that the software engineers would have continued to refer to this combination as a *"dot release"* on version 8 (viz. as Digital Safe version 8.1 or version 8.2 or similar), while the rest of the company, particularly customer-facing departments and the lawyers, referred to it as Digital Safe version 9.

3622.   The Claimants neatly pointed out a number of difficulties with this explanation, and in particular, that:

(1) Mr Goodfellow did interact occasionally with customers, as also (less often) did Mr Wang and Mr Yan; and it is hard to imagine how they were meant to talk to customers about the products for which they were responsible without the naming conventions that the sales and marketing departments, and therefore the customers, were using;

(2) It is hard to see how Autonomy could have run an effective business if its legal and sales departments were using different naming conventions from the engineers, with neither of them aware of the different terminology being used by the other;

(3) There is no evidence beyond the fact of the entries on Automater of any decision to rebrand Digital Safe version 8 with StorHouse and dense cells as Digital Safe version 9;

(4) Dr Lynch's suggestion that Autonomy's marketing function would have renamed the relevant iteration of Digital Safe as version 9 *"some time…around the Morgan Stanley first deal"* cannot be right: the First MS Amendment Agreement was signed in June 2008, some 18 months before Autonomy purchased the StorHouse software that Dr Lynch claimed was a critical feature of version 9.

3623.   Dr Lynch's explanation, though characteristically ingenious and delivered with assurance, is not credible. The Defendants' other witness on the issue was Mr Martin. His evidence on version 9 was speculative and no more persuasive than Dr Lynch's.

3624.   The Defendants' stronger point was that the records in evidence showed that by May 2011 at least Automater did list a product called version 9 as a shippable/deliverable. Furthermore:

(1) On 31 March 2011 Mr Adam Booth (who oversaw the Automater system) wrote to Ms Dolan (an in-house lawyer) and Mr Martin in relation to the version of Digital Safe software to be provided to Philip Morris, which had just signed a Digital Safe software purchase contract. Mr Booth wrote: "*We put "Zantaz Digital Safe v9" on Automater earlier this week. I can't see a list of products as such, shall I just ship that?*"

(2) In May 2011, Mr McCarthy was providing Mr Young with a list of "*Automater shippable*". This included Digital Safe version 9.

(3) On 16 June 2011, Mr Booth provided Mr Goodfellow with a list of Digital Safe software potentially shippable to a customer (Compliant Phones), asking which software was to be shipped. The list included Digital Safe version 9.

(4) An email from Mr Nick Ng to Mr Avila dated 7 December 2011 attached a list of "*shippables from michael*". The document lists all the products which were put up on Automater and shippable to customers as at 28 October 2011. Digital Safe version 9 was included on the list.

3625.   However, to my mind, this shows nothing more than that software named Digital Safe version 9 appeared on Automater, in line with what Morgan Stanley were told they were being provided with.

3626.   I have concluded that in a sense Digital Safe version 9 did exist, and the issue was a semantic one, as Dr Lynch insisted: but it was a new name for an old lamp, or more accurately a collection of old products, bestowed in order to give the impression of something new and novel because that was what was needed to distinguish the new licence from the old one. It was obviously necessary to ensure that the software as described should appear as a deliverable on Automater; but as Mr Langford explained, that presented no real difficulty, at least in part because Automater was simply a delivery platform. I accept:

(1) Mr Wang's evidence in cross-examination that:

"*...we sometimes put up just a binary and name it something that matches the name of the contract. That's why when we went through the list that you had pulled up for Automater, the files may be there by name but essentially you could put any file and*

> *name it, which we have done for previous contract fulfilments of software delivery.*"[436]

> (2) Mr Langford's similar evidence in cross-examination that: one "*could put something in Automater that purported to be a version of the software*" even though "*it wouldn't be the version you could actually deploy*" and that "*there was never any check or balance on Automater to ensure that actually what was being uploaded would have resulted in something that actually worked*" the effect of which was that "*you could list anything you want in Automater and it wouldn't matter*". He added that all the emails that he was shown by the Defendants could prove was that:

>> "*... there was an entry in Automater that said Digital Safe version 9. That doesn't mean there was an actual functioning installation media under that.*"[437]

3627. My conclusion that "Digital Safe version 9" was simply a name chosen to convey novelty does not mean, however, that the new licence contained no more software than the old. Although the Claimants did also challenge the inclusion of 'StorHouse' in the definition of software to be provided, the Defendants pointed out also that none of the other new or additional or upgraded software to be supplied   pursuant to the Q1 2011 MS Agreement (which included Autonomy Investigator and Early Case Assessment,
Autonomy Consolidated Archive ("ACA") Server, Autonomy Social Media Connect   DS Mail and Supervisor S6) was alleged to be superfluous, unusable or otherwise not of value and benefit to Morgan Stanley, and in terms of charges for additional ongoing support and maintenance fees and prospective add-ons to Autonomy as well.

3628. The dispute about the value of StorHouse[438] centred on whether it could be successfully integrated with Digital Safe. The Claimants contended that it never had been: certainly,

---

[436] Indeed Mr Wang suggested that this happened once in relation to Digital Safe version 8.

[437] Mr Langford also said that he had conducted his own checks through SIDCAP, which according to his evidence was a significantly more robust record of when software was released than Automater, to establish when various versions of the Digital Safe software were released. Those searches apparently showed that Digital Safe version 9 was not certified as being fit for installation in customer safes until November 2014.

[438] StorHouse, it may be recalled from the section of this judgment in which I addressed the transaction between Autonomy and FileTek in Q4 2009 which was impugned as reciprocal (RT 3), was one of FileTek's two main products (the other being "Trusted Edge"). StorHouse was a database archiving product that allowed customers to archive databases and conduct searches across them. It had two main components: (i) StorHouse Relational File System ("RFS"), which essentially was a file system hosted in the cloud and (ii) StorHouse Relational

they said, not at the level of code-integration. The Defendants contended that, on the contrary, StorHouse was substantial and valuable software even if not properly integrated at the code-level, as Mr Goodfellow explained. Ultimately, the Claimants' other witnesses did not gainsay this:

(1) Mr Yan, whose evidence in his witness statement was that StorHouse had never been successfully integrated into Digital Safe because *"it did not make sense to integrate"* the two (since Digital Safe *"does not interrogate structured data"*), conceded in cross-examination that he *"would not know"* whether nevertheless it would have been useful to Morgan Stanley in non-integrated form and that Mr Wang would know more.

(2) Mr Wang had suggested in his witness statement that Morgan Stanley *"would not have been able to make any use of StorHouse's capabilities in a Digital Safe context"*. However, when cross-examined, he eventually accepted that StorHouse was a useful product for customers without a deep code integration; and when asked more specifically about its utility to Morgan Stanley he stated:

> *"If Morgan Stanley's requirement was directly what StorHouse provided for nearline database offloading, then that would have been useful. I just don't know what Morgan Stanley's requirements were."*

3629. The issue whether what was provided did justify both the further substantial fee and its treatment as a separate component for the purpose of revenue recognition ultimately became reduced, as regards these other software additions, to whether the addition was to meet the customer's requirement or need, or simply contrived to achieve that purpose.

3630. When it was suggested to Dr Lynch that this software was not being included at the request of the customer and was added for revenue recognition purposes, he demurred, insisting that Morgan Stanley's needs would have played a role in the selection of the software, and that *"the customer won't be requesting a carburettor, but they will expect a system that actually works like a car"*.

3631. The Claimants contended that the reality was that Morgan Stanley had not requested version 9 of Digital Safe, or StorHouse; nor had they requested the functionality provided by either piece of software.[439] Dr Lynch's analogy with a carburettor provided no answer: on the Defendants' case, the addition was not simply of a part necessary to make the car already provided work: it was a new piece of equipment. I have concluded that the inclusion was directed without regard to the customer's need: it was included to support the accountancy case.

---

[439] Not only is there no evidence of this in the contemporaneous documents, it is also unlikely to have been true given the *nature* of Morgan Stanley's archived data. Mr Yan's unchallenged evidence was that Morgan Stanley never put meaningful amounts of structured data (the type of data that StorHouse was designed to handle) into its Safe.

*Were Deloitte misled?*

3632.   As in the case of the Q4 2009 MS Agreement, the Defendants relied on Deloitte's approval of the Q1 2011 MS Agreement, although it is fair to note that in both contexts

_____

Manager ("RM"), which was a means by which a customer could offload its database to the cloud and conduct searches across the database.

Deloitte's focus was on revenue recognition, rather than on testing commercial purpose and propriety (which in the ordinary course would be matters for management). Neither Deloitte (according to Mr Welham) nor the Audit Committee (according to Mr Bloomer) were provided with detailed material which would have enabled them to test how the transaction had arisen and its objectives and purposes.

3633.   The Claimants elaborated on what they presented as deficiencies in what Deloitte and the Audit Committee were told and the information provided to them, relying especially on Mr Welham's evidence (which was not directly challenged and was confirmed by Mr Bloomer from the point of view of the Audit Committee) premised on the assumptions he was asked to make that:

(1) Deloitte was not told that Morgan Stanley had not requested Digital Safe version 9 or StorHouse. Similarly, the Audit Committee did not know whether Morgan Stanley had requested this software or could use it.

(2) Nor was Deloitte told that version 9 of Digital Safe did not exist at the time and that StorHouse had not been successfully integrated with Digital Safe.

(3) Further, neither was provided with Autonomy's internal exchanges, or its communications with Morgan Stanley.

3634.   Subject to the modified approach I have taken, and the qualified answer I have given on the question whether or not Digital Safe version 9 existed at the time, and whether the inclusion of StorHouse differentiated the new licence from the old, I accept that the approval of Deloitte and the Audit Committee was based on a misappreciation of the facts.  That in turn was based on what Deloitte was told by Autonomy.  I think it unlikely that the Defendants were unaware of what Deloitte were being told. Mr Welham confirmed in cross-examination that obviously any audit view would depend on the actual facts. The fact that it is surprising that Deloitte, who must have appreciated that it was a re-re-restructuring inviting especially sceptical review, asked no more questions does not avail the Defendants.

*Conclusions*

3635.   In my judgment:

(1) Autonomy did conceive and press for the Q1 2011 MS Agreement as a means of generating recognised revenue to enable it to achieve revenue forecasts. It is more likely than not that it was that perceived advantage which prompted Mr Hussain to suggest the re-re-restructuring to

Morgan Stanley; and it is clear that it was the need to achieve forecast for the quarter which explained its urgency. Revenue recognition was the objective which drove the transaction.

(2) There were ancillary benefits, including the value Mr Hill repeatedly emphasised of the *"bird in the hand"* especially at a time (and it was accepted that this was a time) of swiftly softening rates. But that did not alter the reality that the transaction was promoted, structured and eventually concluded for the overriding purpose of securing immediately recognised revenue from the sale of a licence which in reality conferred no new rights or benefits of any utility.

(3) The real essence of the transaction was that Autonomy had to offer and agree a deep discount on future storage charges as the price of an immediate licence fee of $5 million.

(4) In my judgment, therefore, the Claimants have established the factual premises of their case in respect of both of the two MS Amendment Agreements and a breach of duty and improper use of power has thereby been established.

*Deutsche Bank Q1 2011 re-restructuring*

3636.  The third of the four Schedule 12D transactions impugned by the Claimants took place in the same quarter as the Q1 2011 MS Agreement and was made between Zantaz and Deutsche Bank.

3637.  Deutsche Bank was a long-standing customer of Zantaz. On 4 October 2005, the New York branch of Deutsche Bank had entered into a three-year contract with Zantaz for email restoration services ("the Original DB Agreement"). Pursuant to the Original DB Agreement, Zantaz had agreed to provide digital archiving services on an SaaS basis for an initial storage rate of $0.105 to $0.10 per MB per annum subject to a clause which obliged Zantaz to share with Deutsche Bank the benefit of any savings resulting from a decrease in the cost of providing the services.

3638.  In May 2008, shortly before the Original DB Agreement was due for renewal, the parties entered into a 17th amendment, which restructured the arrangements into a hybrid hosting contract. The Claimants referred to this as "the First DB Amendment Agreement".

3639.  The core terms of the First DB Amendment Agreement, which was dated 21 May 2008, were as follows:

    (1)  Deutsche Bank agreed to purchase a Digital Safe licence with certain functionalities for a fee of $5.227 million;

    (2)  The term of the amended contract and the software license was from 1 June 2008 to 31 May 2013, subject to Deutsche Bank's rights (a) to terminate the agreement on six months' notice; and (b) to extend the arrangements for a maximum of three years from 31 May 2013, a fee of $1,045,000 being payable for each consecutive annual extension;

    (3)  Deutsche Bank agreed to pay storage fees of $0.0092 per MB per annum.

3640.  The Claimants impugned the First DB Amendment Agreement as a Schedule 6 transaction, alleging that the immediate recognition of revenue from the sale of the Digital Safe licence was improper on the basis that the licence had no separable substance or value, did not confer any usable right or benefit on Deutsche Bank which had no intention of taking its data on-premise and its treatment as a separate component of the overall transaction was a pretence: their case was that it was merely a device to seek to justify accelerated revenue recognition.

3641.  The Claimants emphasised in their written closing submissions that Dr Lynch and Mr Hussain were aware of the restructuring from the outset and appear from the contemporaneous documents to have been in no doubt as to its importance to Autonomy's quarterly revenue targets. The Claimants pointed out that:

(1) On 7 February 2008, Mr Hussain told Mr Egan, among others, that "*DB are "hot" right now – so which ones are Q1 opps (and which can be made into licence)?*".

(2) The same day, Mr Jim Still, VP for North American Field Sales, informed Mr Hussain and Dr Lynch that Zantaz was looking to see if the arrangement with Deutsche Bank could "*be turned into a licence*".

(3) At the beginning of April 2008, Mr Hussain emailed Dr Lynch letting him know that Autonomy should hit its revenue target of $117m by the end of Q2 2008 if three "*large deals*" were concluded, including the deal with Deutsche Bank.

(4) In an email copied to Dr Lynch, Mr Hussain later stressed the importance of doing the "*Digital Safe restructuring*" for Deutsche Bank "*asap*"; he explained that "*they want to buy and I am telling them they have to buy now*".

3642. The Claimants also brought to my attention documentation which they submitted appeared to suggest that, in the Defendants' own perception and from Deutsche Bank's perspective, the purpose of the deal was to achieve cost savings. Thus:

(1) In an email to Mr Hussain on 7 April 2008, an Autonomy sales representative categorised the restructure as "*cost savings / license revenue*".

(2) Later in April 2008, Mr Egan emailed Mr Hussain, copying in Dr Lynch, saying that they could now "*push Dan Marovitz much more directly on the cost savings proposition*".

(3) A few weeks later, on 8 May 2008, Mr Egan provided Deutsche Bank with an overview of the proposed restructure, referring to "*$8.2M nominal savings figure over 5 years*" and "*$5.3M real savings over 5 years or an 18% savings as compared to the current structure*" without any mention of the licence element at all.

(4) Mr Egan also attached an illustrative table of the savings that could be achieved, saying that this helped to "*communicate the kind of savings that can be realised through restructure*".

(5) Mr Hussain forwarded Mr Egan's email to Dr Lynch the same day. Mr Egan sent another email the same day to Deutsche Bank, copying in Mr Hussain, telling them that "*in the case of the Digital Safe restructure the software is currently live and yielding significant value. The restructure would create savings vs expense for Deutsche Bank*", which Mr Hussain forwarded to Dr Lynch shortly after. This, the Claimants contended, demonstrated, and was evidently Autonomy's attempt to reassure Deutsche Bank, that the restructure was only about finances and that, in substance, everything would stay the same.

(6) As with the Morgan Stanley restructures above, the software appears to have been an afterthought. On 14 May 2008, only a week before the restructure, and many weeks after negotiations began, Mr Scott emailed Dr Menell, copying in Mr Egan, asking for "*...a clear list of software to be licensed to DB as part of the current deal which contemplates a licensed Digital Safe. Please give me a call asap as we are trying to get an amendment out to DB very quickly...*".

(7) The effect of the First DB Amendment Agreement was that Deutsche Bank obtained a significant reduction in storage rates in return for paying an upfront

fee to license Digital Safe, a result which was described by Mr Egan to Deutsche Bank as a "*win/win*".

3643.   In addition, the Claimants identified features, said to be indicative of Deutsche Bank having no intention to take Digital Safe on-premise, so that the licence was of no utility to it. These included the fact that the term of the Digital Safe licence was coterminous with the term of the First DB Amendment Agreement, so that if it had wished to move on-premise, Deutsche Bank would have had to terminate the First DB Amendment Agreement and forfeit the sums it had paid thereunder.

3644.   For reasons I have sought to set out in the preceding section of this judgment, I have accepted the Claimants' case that Autonomy, to the knowledge of the Defendants, improperly accounted for the Schedule 6 transactions. For comprehensiveness, I confirm that the features of the First DB Amendment Agreement which the Claimants brought to my attention to indicate particular grounds for considering immediate revenue recognition in respect of the licence sale to have been improper, appear to me to be consistent with, and to confirm, the general conclusion I reached in that part of this judgment.

3645.   In particular, I consider of particular significance that (a)  the terms of the licence and the hosting agreement were coterminous, (b) Autonomy's clear objective was immediate revenue recognition, and (c) the evidence indicated that Deutsche Bank had no intention of moving on-premise and would have forfeited sums it had paid under the First DB Amendment Agreement if it did so.  These facts support the conclusion that the licence was a contrivance, and could not realistically be characterised as a separate component of the hybrid model so as to justify immediate recognition of the sale revenue in Autonomy's accounts.

3646.   The Claimants did not, however, seek to impugn or claim any loss in respect of the First DB Amendment Agreement as an improper loss-making Schedule 12D transaction, though they noted that it secured for Deutsche Bank savings (and thus in a sense a concomitant reduction in overall revenue for Autonomy) of some $8.1 million (representing a saving compared to what it had to pay under the Original DB Agreement of approximately 37%). The Claimants did not claim any direct loss in respect of the First DB Amendment Agreement: it was not one of the Schedule 12D transactions. I need say no more about it and now revert to the further restructuring in respect of Autonomy's hosting agreement

with Deutsche Bank which was the subject matter of the Schedule 12D claim. I refer to this as the Second DB Amendment Agreement which as mentioned in paragraph 3636 above, was, after long negotiation, finally executed in Q1 2011.

*The Second DB Amendment Agreement: the restructuring negotiations*

3647.   The re-restructuring negotiations commenced some time earlier, in April 2010. The Claimants spent some time in chronicling what they presented as Autonomy's *"multiple (failed) attempts to push the deal through each quarter, until it was finally executed in Q1 2011"*.

3648.   Much time was spent in the parties' respective closing submissions on the exchanges of correspondence, both internal within Autonomy and between Autonomy and Deutsche Bank:

(1)   The Claimants' aim was to show that the process was initiated by Autonomy and that substantially the whole focus was on Autonomy trying to get Deutsche Bank to enter into a new licence and pay a fee in return for offering Deutsche Bank considerable data storage savings, and on Autonomy trying to find ways of justifying a new licence as conferring substantive rights different from those that Deutsche Bank already had under the First DB Amendment Agreement.

(2)   The Defendants' aim, on the other hand, was to show that (a) it was Deutsche Bank which approached Autonomy to try to negotiate downward its storage charges on the basis (as it stated in an email from Mr Dan Manners of Deutsche Bank to Mr Sullivan of 12 April 2010) that it was *"looking to dramatically increase [its] data volumes in the UK as [it was] moving to a capture all scenario"* and wished to discuss how pricing might be *"extrapolate[d] to the larger scope"*; (b) Deutsche Bank needed and wanted further software and software rights and that there was real substance therefore in its corresponding need for a new and more extensive licence, and (c) what Autonomy might theoretically stand to lose in consequence of reducing its data storage charges it would in reality gain from retaining Deutsche Bank as a customer and storing considerably increased amounts of data for it.

3649.   In my view, all these strands are evident from the documentary evidence. I can summarise the position as having been that Deutsche Bank, appreciating that Autonomy was certainly keen, and indeed in something of a hurry, to strike a further agreement, deployed both carrot and stick. Deutsche Bank made clear that its corporate plans included a substantial migration of its data, but (hinting at moving to a competitor) that it was not going to increase the usage of its UK Digital Safe unless it negotiated a substantial overall fee reduction, and obtained also a discount on an IDOL-isation project for its Lucene Safe which it considered it required to enable full migration into Digital Safe. It pressed, in particular, for free installation of an IDOL index and full IDOL functionality.

3650.   When the Second DB Amendment Agreement was eventually concluded on 31 March 2011 its provisions included the following:

(1) Deutsche Bank agreed a fee of $7.1 million to license a package as before, but now including Digital Safe version 9 together with IDOL dense-cell
(sometimes known as "Ironman") implementation;

(2) The term of the agreement was extended to 31 March 2016, (and thus a threeyear extension on the First DB Amendment Agreement);

(3) Storage rates were reduced to $0.00445 per MB per annum;

(4) Deutsche Bank would be given a credit if it increased the data in its UK Digital Safe from 0.34 TB to 2.37 TB.

3651.   It should be noted that Deutsche Bank was previously a Lucene user and had not licensed an IDOL version of Digital Safe (e.g. version 8).

*Claimants' case*

3652.   The Claimants alleged that:

(1) Deutsche Bank had no need or use for and had not requested IDOL dense-cell implementation, because it operated a Lucene–powered safe which used only Lucene dense-cells; and

(2) Digital Safe version 9 did not exist as of 31 March 2011, and Deutsche Bank had never requested a licence for it. This was substantially the same allegation (*mutatis mutandis*) as was made in respect of the Q1 2011 MS Agreement (see above).

3653.   In paragraph 106Y of its RRAPoC, the Claimants invited the conclusion that:

*"It is to be inferred… that Autonomy included these licences in the software definition in the Second DB Amendment Agreement in order, in part, to deliberately mislead Deloitte into believing that the licence fee of US$7.1 million had been paid in return for new software that DB had requested, and intended to use, and thus to support the case for recognising the revenue from the licence fee upfront, when in reality no new software had been requested by, or was (in the case of Digital Safe version 9) to be made available, or (in the case of IDOL dense cell capability) of any use, to DB."*

3654.   As to (1) in paragraph 3652 above, according to the Claimants:

(1) IDOL dense cells were not a licensable piece of software at all; they were part of the architecture for the Digital Safe system, and it therefore made no sense at all to include them in a software license that was apparently to be delivered electronically;[440] and

---

[440] Mr Goodfellow stated in his witness statement that *"[b]uying and implementing dense cells was an Autonomy overhead – the benefits derived from dense cells were only felt by Autonomy (through a reduction of its internal costs). It was not a piece of software that was licensed to clients."*  Mr Yan said a dense cell was a piece of *"storage architecture".*  Mr Sullivan stated in an internal Autonomy

(2)  In any event, IDOL dense-cells were of no use to Deutsche Bank since Deutsche Bank had a Lucene Safe and such dense cells were incompatible with Lucenepowered safes, for which there were Lucene-dedicated dense cells.

3655.  Further, and in anticipation of the argument that it was a substantive thing of value provided under the agreement which would also facilitate the conversion of Deutsche Bank to an IDOL safe with greater data usage, the Claimants also ran an argument in their closing oral submissions that the provision in the agreement for dense cell installation and implementation (described as  merely *"included within the software"*) simply confirmed a commitment made by Autonomy (through Mr Egan) for a free upgrade under the First DB Amendment Agreement. They argued that this could not itself substantiate the licence arrangements under the Second DB Amendment Agreement.

3656.  On the basis of those propositions, the Claimants contended that the only real substance of the Second DB Amendment Agreement, and the true *quid pro quo* for the licence fee, lay in its provisions for data storage fee reductions, resulting in losses to Zantaz/Autonomy. They accordingly denounced the licence element as a dishonest contrivance, which purported to give rights which were illusory to software which DB

---

did not want and could not use, and in the case of Digital Safe version 9 did not exist, simply in order to enable Autonomy to present it as sale of goods generating revenue which could be recognised "upfront" but which should have been spread over the term of the Second DB Amendment Agreement.

3657.  That argument primarily goes to the accountancy issue of revenue recognition. But the Claimants relied on it to show that the transaction lacked any proper commercial purpose, and caused loss. As to loss, they submitted that the savings to Deutsche Bank from lower data storage fees (estimated internally at $8.6 million over five years) were considerably in excess of the licence fee ($7.1 million); and that any suggestion that the lower rate would be balanced or exceeded by greater ingested volume (as Dr Lynch did quite strenuously suggest in cross-examination) was false. They submitted that in fact, modelling at the time suggested that ingested volumes were expected to decrease, not increase, following the transaction.

3658.  The Claimants concluded that not only was the licence a contrivance, and the transaction was simply an example of Autonomy resorting to the purchase of its own revenue at considerable cost. They submitted that the Defendants cannot have believed that the Second DB Amendment Agreement, which resulted in reduced revenues and profits, was in the commercial interests of ASL, nor can Mr Hussain have believed that it was in the commercial interests of Zantaz. On that basis, the transaction was improper, and the Defendants were in breach of their duties to ASL and, in the case of Mr Hussain, to Zantaz, in bringing about

---

email in August 2012 that *"Cells can be considered appliances because they are hardware with software pre-installed."*

the transaction. The company which had suffered the loss should be compensated accordingly.

3659.   The Claimants calculated that the loss arising from the Second DB Amendment Agreement was $6,368,357.[441] The loss has been calculated in the same way as the Q4 2009 and Q1 2011 MS Agreements. This was set out at length by Mr Bezant in his Supplemental Report.

*Defendants' answers to Claimants' case*

3660.   The Defendants refuted this case in its entirety. They mounted a sustained attack on the evidence of each of the Claimants' witnesses, both as to its apparent but suspicious consistency and as to its revealed and revealing inconsistency. As indicated above, the witnesses marshalled a great deal of detail, but it can fairly be summarised by reference to the principal propositions in the Claimants' case as I have summarised those above.

3661.   The nub of the Defendants' answer to the Claimants' proposition that Deutsche Bank had no need for IDOL dense cell implementation, supposedly because it operated a Lucene–powered safe which used only Lucene dense cells, was that the documentary evidence contradicts this. The Defendants contended that it shows that, on the contrary, Deutsche Bank (a) had, for some time before the re-restructure, wanted to IDOL-ise its

Lucene Safe, and to utilise IDOL functionality and search on its archived data; (b)

initially sought to brow-beat Autonomy into providing it for free (which Mr Sullivan dismissed in an internal email dated 9 December 2009 as *"an absurd position"* for them to take *"without a deal"*) but (c) eventually negotiated the provision of IDOL Digital Safe and IDOL dense cell implementation as part of the Second DB Amendment Agreement, as the final wording of that agreement confirmed.

3662.   The Defendants pointed to a number of what they depicted as unsatisfactory features of the evidence given by the Claimants' witnesses, and in particular:

(1) Mr Yan had said in his witness statement that he did not even understand what was meant by *"IDOL dense cell implementation"*; but he was reminded in the course of his cross-examination that he was personally involved from 2011 in the project to convert Deutsche Bank's Lucene-powered Digital Safe into an IDOL-powered safe. Once taken through some contemporaneous email exchanges (and especially an email dated 31 May 2011 from Mr Goodfellow) he accepted that this phrase

---

[441] In the RRAPoC, Schedule 12D, the loss is stated to be $6,724,420. This difference is the result of three errors, which are summarised in Table A13-12-2 of Mr Bezant's Fourth Report. The first is explained in Mr Bezant's instructions, and arose from an error in calculating the application of various volume-based archiving credits, which results in an adjustment of $381,816 in the Defendants' favour. Mr Bezant has confirmed that this adjustment is correct. The second arises from a failure to include certain actual data volumes, and results in an adjustment of $14,363 in the Claimants' favour. The third arises from a formula inconsistency, and results in an adjustment of $11,390 in the Claimants' favour.

probably referred to the use of ironman/dense cells for the project to IDOL-ise Deutsche Bank's safe.

(2) Mr Wang said in his witness statement that he had not heard of *"IDOL dense cell implementation"* before. He too omitted to mention the project to IDOL-ise Deutsche Bank's Digital Safe, notwithstanding his own involvement in it. With some initial reluctance, he eventually conceded in cross-examination that active steps were indeed taken to move all of Deutsche Bank's data to an IDOLpowered Digital Safe and that he *"would not disagree with Mr Yan…if that is what Mr Yan had attested to"* that the phrase from the contract most likely referred to the use of ironman/dense cells for this purpose.

(3) Mr Goodfellow did remember the project to IDOL-ise the Deutsche Bank safes but he could offer no explanation to explain the omission from his witness statement of any mention of it other than to say that he did not intend to give a misleading impression.

3663.   The Defendants relied on the above also to counter what Mr Hussain described in his written closing submissions as the Claimants' *"fall-back position"*, which was advanced via the evidence of Mr Goodfellow. This was to the effect that even if Deutsche Bank did require the ironman/dense cells, that could only be to enable the IDOL-isation of its Digital Safe, and Mr Egan had already given Deutsche Bank a separate undertaking, outside the contract, to IDOL-ise the Digital Safes for free. That was suggested by the Claimants to provide another reason for doubting the commerciality of the Second DB Amendment Agreement and for presenting it as in substance simply an agreement to pre-pay data storage charges as the means of obtaining an unusually deep discount.

3664.   The Defendants objected to this *"fall-back position"* on the basis that it was a new line of argument that had not been pleaded[442]. They also dismissed it as *"another bad point"* They stressed that it was quite plain that the discussions for IDOL-isation took place within the context of the discussions for the restructuring, and the obligation to provide Deutsche Bank with IDOL dense cell implementation was contained in the Second DB

---

Amendment Agreement itself and not elsewhere, and was in terms stipulated by Deutsche Bank by amendment to the travelling draft.

3665.   The Defendants further emphasised that:

(1) Although (as Mr Hussain put it) *"Cs may not like it, the legal position is that [Autonomy] and Deutsche Bank contractually agreed that the licence would include Digital safe version 9 with IDOL dense cell implementation."*

---

[442] As succinctly summarised by Mr Hill QC in his oral closing, *"… It's a new case. It is contrary to the pleadings and their own witness statement. The pleaded case is that Deutsche Bank couldn't use this software, not that it could."*

(2) There was no suggestion that the contract was some sort of a sham; and furthermore, Deutsche Bank took the trouble of amending the draft of the Second DB Amendment Agreement (by email dated 11 March 2011) to tighten Autonomy's obligations from the provision of *"IDOL dense cell capability"* to *"IDOL dense cell implementation"*.

(3) The contract is the only place where the agreement to provide the dense cell implementation is formally recorded;

(4) Mr Goodfellow ultimately accepted in cross-examination that Deutsche Bank did need to establish a contractual entitlement to the IDOL Digital Safe software, and that could only be found in the Second DB Amendment Agreement.

(5) He also eventually agreed that, contrary to the message given in his witness statement, Deutsche Bank did have a use for IDOL dense cell implementation, specifically wanted it and had contracted for it.

3666. As regards the Claimants' second proposition (that Digital Safe version 9 simply did not exist as of 31 March 2011, see paragraph 3656 above), the Defendants' case was that (a) version 9 was put up on Automater, (b) it was an IDOL version of Digital Safe; (c) it was put up with the active involvement of Mr Wang, Mr Lucini and Mr Goodfellow, (d) it was available for delivery, and was delivered, to Deutsche Bank, and (e) none of the witnesses suggested that he thought he was involved in anything improper. Furthermore, and as I return to below, Dr Lynch contends that he was not involved in any way.

3667. I have addressed this issue as to whether Digital Safe version 9 was in existence at the time in the context of the Q1 2011 MS Agreement. I add only that in the context of the Second DB Amendment Agreement the Defendants submitted that the Claimants' witness statements were once again seriously misleading and unaccountably failed to disclose the witnesses' role in providing version 9 of Digital Safe to Deutsche Bank via Automater. In particular:

(1) Although Mr Wang had stated in his witness statement that *"a customer bought version 9 of Digital Safe at a time it did not exist"*, he neglected to mention that he had been the person responsible for providing Mr Goodfellow, and indirectly Mr Booth, with the version of Digital Safe that was put on Automater as version 9 for delivery to customers. Under cross-examination, Mr Wang (a little equivocally) accepted that the file that he provided to Mr Goodfellow to put on Automater was *"eventually put on Automater as version 9"*. He accepted that the file that he provided would have been likely to be Digital Safe software. He also accepted that, if it was going to satisfy Deutsche Bank's requirements, it needed to be an IDOL version of the software. Mr Wang could give no reason why his own involvement in getting version 9 onto Automater was not dealt with in his witness statement.

(2) Similarly, Mr Lucini had stated in his witness statement that he could not recall what was uploaded: *"it may have been a copy of an earlier version of Digital Safe, or possibly just an empty zip file."* Mr Lucini

had added in the same paragraph of his witness statement that he recalled *"someone, possibly Dr Menell, telling me that it did not matter"* what was uploaded. As also mentioned in the context of the Q1 2011 MS Agreement, the Defendants submitted that both were fabrications. They dismissed Mr Lucini's evidence as an incoherent invention, falsified by Mr Wang's evidence, and demonstrating that he was an untruthful witness. It was, they said, obviously inconsistent with the sequence of events apparent from the documents which do not suggest any involvement on the part of Dr Menell or anyone other than Mr Lucini, Mr Goodfellow, Mr Wang and Mr Booth;

(3) Mr Goodfellow's witness statement also grossly understated his role in the event, referring only to an email from Mr Lucini stating *"okay, we will put it up there"* and not to his own actions in implementing that. Under cross examination, Mr Goodfellow had to accept that he was the person who actually uploaded version 9 onto Automater, that although he was now trying to suggest that he thought version 9 and version 7.4 were the same, he did not say so or suggest that at the time, that that would have been unlikely since version 7.4 was a Lucene version,  and that he knew that the fact that version 9 was for IDOL-isation purposes and was being supplied was important for revenue recognition purposes. The Defendants characterised Mr Goodfellow's evidence as contrived and dishonest with a constant but irrelevant refrain, which appeared to be a peddled script and was little more than a distraction, that IDOL-isation was not provided under the Second DB Amendment Agreement but by a prior commitment made by Mr Egan (see above).

3668.    The Defendants also relied on the further evidence showing the inclusion of Digital Safe version 9 in the Automater record of shippables/deliverables, and its compatibility with Windows, which I have previously addressed in the context of the Claimants' like contentions in respect of the Q1 2011 MS Agreement: see paragraphs 3624 to 3631 above.

3669.    More generally, the Defendants stressed the overall commerciality of the transaction:

(1) Contrary to some parts of the Claimants' submission, Deutsche Bank did need a licence: as noted above, it had not previously had any licence to operate IDOLbased software[443] on its Lucene Safe.

---

[443] The Claimants were inconsistent in this regard. They appeared in parts of their written closing submission to persist with an argument that Deutsche Bank did not need a licence because none was needed for initial installation of an IDOL Digital Safe. However, on page 1956 of their written closing submissions, the Claimants did concede that *"Admittedly, if Deutsche Bank's hosted Safe was being converted to IDOL, and it wanted a licence to the Digital Safe software deployed on that Safe, it would need a licence to the IDOL version of the Digital Safe software, as Mr Wang accepted in cross-examination…"*  That is what was provided for: what Deutsche Bank wanted and was getting was (a) Ironman/dense cells and implementation and (b) version 8 or 9 of IDOL Digital Safe software to use IDOL functionality paired with its Lucene safe.

(2) It is true that both parties had an agenda in wishing to include software in the new licence which would clearly differentiate the new licence from the old: it was important to Deutsche Bank that the new licence should be in addition to, and not terminate, the old licence, because it wished to amortise the old licence in its accounts, which required its continuation; and it was important to Autonomy that the new licence should be a substantive sale of goods, for all the reasons discussed previously.

(3) It is true also that both parties recognised that the differentiation was in part driven by accountancy objectives. But what was eventually agreed to be licenced was materially different, and was useful to Deutsche Bank, as well as to Autonomy (not least in terms of the value of market penetration).

(4) Further, the Defendants contended that from Autonomy's point of view, the Second DB Amendment Agreement:

(a) turned the speculative prospect of Deutsche Bank extending (at its option) the remaining term of the First DB Amendment Agreement beyond 2013 into a contractually certain term until 2016, in circumstances where rapidly falling data storage rates (and costs) meant that customers were naturally looking to improve their 'deal' rather than simply roll over;

(b) locked in revenue and greatly increased the likelihood of retaining Deutsche Bank as a customer both in this context and in other business contexts then being pursued: that was a positive in itself, and was the means of avoiding the very considerable negative in the market place of a large multinational bank leaving Autonomy;

(c) brought Deutsche Bank into the IDOL ecosystem and that would have provided perceived upsell opportunities, as envisaged in Mr Egan's email of 20 December 2010 where he explicitly stated (in respect of the IDOL-isation) that:

"*this would ready the safe for additional use of Autonomy software that uses advanced IDOL function like DSMail or ECA or other but those products would still need to be licensed by DB for usage and hardware expense can scale depending upon the scale of the DB usage*"

(d) generated an incentive for Deutsche Bank to store more data in due course with Autonomy in circumstances where the migration of its data was on the cards; and

> (e) strengthened the ties between Autonomy and Deutsche
> Bank and the prospect of future collaboration, it being
> recorded in an email from Mr Hussain to Dr Lynch dated
> 30 November 2011 written to brief Dr Lynch before a lunch
> engagement with Mr Dan Marovitz of Deutsche Bank that,
> in addition to Digital Safe UK and US there were existing
> relationships between the Bank and Autonomy in
> Supervision US and UK, ECA in the UK, Search Global
> Internet and an "Electronic commerce project in London";
> and Mr Hussain wrote that Deutsche *"want to use us in*
> *more areas: IDOLise the DS, Supervision in Asia and DS in*
> *Japan".*

*My assessment*

3670.  I turn first in my assessment to the dispute as to whether Deutsche Bank had any
use for ironman/dense cells, and whether the inclusion of ironman/dense cells in
the software covered by the licence granted as part of the Second DB
Amendment Agreement was (as the Claimants in effect seemed to me to be
contending) window-dressing to give credence to the presentation of the new
licence as more extensive than the first.

3671.  It seems to me that the key to the dispute in this regard is to determine quite
what ironman/dense cells actually were, and what their use actually was.

3672.  A premise of the Defendants' case was that ironman/dense cells comprised
software, properly included as such in the Second DB Amendment Agreement
and appropriately treated as valuable software items. This, on that case,
demonstrated that the licence relating to the Second DB Amendment Agreement
was materially more extensive than that relating to the first.

3673.  As mentioned previously (see paragraph 3654 above)[444], the Claimants depicted
the dense cells differently, as hardware, and not a licensable piece of software
at all so that the licence to *"IDOL dense cell implementation"* was a *"mirage"*.
As Mr Goodfellow explained in his witness statement:

> *"Over time, as technology improved, Autonomy updated its hardware*
> *and storage cells. When this happened, cells usually became "denser"*
> *and this reduced the cost to Autonomy of storing data. Buying and*
> *implementing dense cells was an Autonomy overhead – the benefits*
> *derived from dense cells were only felt by Autonomy (through a*
> *reduction of its internal costs). It was not a piece of software that was*
> *licensed to clients…"*

---

[444] And the footnote to the paragraph which I repeat here for convenience: Mr Goodfellow stated in his
witness statement that *"[b]uying and implementing dense cells was an Autonomy overhead – the*
*benefits derived from dense cells were only felt by Autonomy (through a reduction of its internal*
*costs). It was not a piece of software that was licensed to clients."* Mr Yan said a dense cell was a
piece of *"storage architecture".* Mr Sullivan stated in an internal Autonomy email in August 2012
that *"Cells can be considered appliances because they are hardware with software pre-installed."*

3674.   This explanation, and its designation of dense cells as part of the hardware architecture, was echoed and supported by both Mr Yan and by Mr Sullivan. Although the Defendants criticised Mr Goodfellow sharply for not acknowledging, and as they saw it, seeking to obscure, both (a) his knowledge of and involvement in the project for IDOL-isation of Deutsche Bank's Lucene safe in his witness statement, and (b) that ironman/dense cells were proposed to be deployed to enable it, neither his evidence nor that of Mr Yan and Mr Sullivan that such dense cells were hardware and not a piece of software that was licenced to clients was challenged. I accept that evidence: ironman/dense cells were hardware and not software and were not licensable as software.

3675.   Two points made by Mr Goodfellow then fall into place. First, the omission from his witness statement of any reference to the fact that dense cells were proposed to be

———————————

deployed in the project to IDOL-ise Deutsche Bank's Lucene safe was by no means as open to criticism as the Defendants suggested it was. Once it is understood that the dense cells were only to be deployed by Autonomy, the Defendants' contention that Mr Goodfellow, Mr Yan and Mr Sullivan were all disguising their utility to Deutsche Bank carries little force. Secondly, his point that another reason why the inclusion of the dense cells in the licence was window dressing, was that Autonomy had already agreed to provide them as part of its project to IDOL-ise Deutsche Bank's safe also is clarified and compelling. It was his evidence, elicited in cross-examination, that Autonomy had indeed committed to the project and more particularly, had agreed to do it, and thus incidentally provided the means of doing so including the ironman cells, for free.

3676.   The pleading point then seems to me to fall away also. None of this was new. It was not a *"fall back position"* as it was described in Mr Hussain's written closing submissions, nor a *"rear guard response"* as described in Dr Lynch's. It was all part of the Claimants' original case that the extension of the licence purportedly to cover dense cells was window dressing, as indeed I find it to have been.

3677.   The only other respect in which the licence granted in the context of the Second DB Amendment Agreement was said to give more extensive rights to software than did the earlier licence was the purported provision of "Version 9".

3678.   I have set out in my discussion of the same point in the context of the Morgan Stanley Q1 2011 transaction the reasons for my conclusion that this too was window dressing, and I need not repeat them.

3679.   In my judgment, and in agreement with the submission to that effect made by the Claimants, the Defendants' reliance on the "software" that was licensed to Deutsche Bank as the mainstay of their argument that the licence had true substance is misconceived. I endorse and adopt the Claimants' conclusion that the true position is that Deutsche Bank paid the $7.1 million licence fee in exchange for savings; the addition of what purported to be software was an afterthought. In the case of what was described as "version 9" it was not new; in

the case of the dense cells it was not software at all; and in neither case did the licence provide anything of utility which Deutsche Bank had not been provided with or already promised or available for free.

3680.  As in the case of the Morgan Stanley transactions I would accept that the transaction did offer some benefits. Dr Lynch described the deal as *"a very elegant solution to protect the value in Zantaz's future relationship with Deutsche Bank"*. I would not discount the value in customer retention, especially since (as I have already noted in paragraph 3649 above) Deutsche Bank's wont was to strike a hard bargain using carrot and stick, and it had (for example) already expressly threatened *"to move our email platform…to a hosted Microsoft solution"*.

3681.  But none of this was what drove the transaction. The essential characteristic of the deal was (as described in the Claimants' written closing submissions) *"savings for Deutsche Bank in return for upfront revenue for Autonomy"*. What drove the transaction, and its timing, was Mr Hussain's desperate need for more revenue: in the words of an email dated 3 December 2010 from Mr Hussain to Mr Sullivan subject- headed *"what i need"*, the transaction was an *"absolute must"*.

3682.  That imperative, and the objective of the transaction, were well known to Dr Lynch, and I infer from all the circumstances, shared and approved by him. He could have been in
no doubt about the driver. On 10 December 2010, Mr Hussain had sent him an email containing the following:

> "*Really don't know what to do mike. As I guessed revenue fell away completely yet SMS report shows massive activity. But I speak with the vp's who are far more accurate. Also stouff, Joel and mike I think keep separate sheets and unless I am v wrong don't discuss the sheets hence plane crashes and they don't know. We've covered up with bofa and hopefully db and Doi but if latter 2 don't happen it's totally bad.*"[445]

3683.  I can deal much more briefly with the Claimants' allegation that Deloitte were misled.

*The Claimants' allegations that Deloitte and the Audit Committee were misled*

3684.  I accept the Claimants' case that Deloitte were misled about the true nature of the transaction with Deutsche Bank, and in particular, were not told that the new software licensed to Deutsche Bank was inserted only at the last minute or that version 9 only existed in the sense explained in paragraphs 3626 and 3627 above.

3685.  I see no reason to doubt Mr Welham's evidence in his witness statement that if:

> "*the inclusion of additional software in the contractual documentation was made only at the last minute…simply to support an argument that the licence was of new software, then that would undermine the supposed commercial rationale for the deal and call*

---

[445] Emphasis added.

> *into question the recognition of the revenue, as well as suggesting that the documentation had been drafted in a manner to mislead Deloitte. It would also be a matter of real concern if, as I am asked to assume, the additional software that was purportedly being sold included software that did not in fact exist or which could not have been used by Deutsche Bank."*

3686. The Claimants supplemented this with an allegation that Autonomy's Audit Committee had not been provided with Autonomy's internal exchanges, or its communications with Deutsche Bank, and did not know whether Deutsche Bank had requested the licensed software, whether they could use it, or whether it had already been promised to Deutsche Bank separately to the restructure. More particularly, it was said, the Audit Committee did not know that Deutsche Bank was motivated to enter the transaction on the basis of the savings that it was offered, rather than any interest in the software that was ultimately licensed; nor that Autonomy entered into the transaction so as to accelerate revenue recognition.

3687. The fact that, as it was, both Deloitte and the Audit Committee approved the transaction is, in my judgment, of no assistance to the Defendants. In my judgment, the Claimants' allegation that the Q1 2011 Deutsche Bank re-restructuring was commercially unjustified and a breach of duty and improper use of power has been established. I shall consider later what loss was thereby caused.

*Metropolitan Life*

3688. Chronologically the last of the impugned Schedule 12D transactions was a further restructuring in Q2 2011 of a hybrid hosting contract between Autonomy Inc and Metropolitan Life Insurance Company ("MetLife") which had been concluded in June 2010.

3689. Like Deutsche Bank, MetLife had been a long-standing customer of Zantaz. Until the end of Q2 2010 it had contracted with Zantaz on a SaaS basis, on the terms of an agreement dated as of 15 March 2002. At the end of Q2 2010, MetLife and Autonomy Inc agreed an amendment and restructuring of their existing SaaS arrangement to a hybrid arrangement ("the First MLIC Amendment Agreement"), made as of 30 June 2010.

3690. Under the First MLIC Amendment Agreement:

   (1) MetLife agreed to license Digital Safe and Related Software for a licence fee of $7.025 million; and

   (2) MetLife agreed to pay storage rates starting at $0.001313 per MB per month ($0.015756 per MB per annum) and reducing to $0.001125 per MB per month
   ($0.0135 per MB per annum) in the fourth year of the contract;

(3) The agreement was for a five-year term ending on 30 June 2015, and MetLife had options to extend for additional one-year periods.

3691. In conformity with the usual pattern, (a) Mr Hussain had needed and pressed for the deal to achieve quarterly forecasts (he described it in an email to Mr Chamberlain and Ms Gustafsson as *"a key deal for the quarter")* and (b) in its negotiations, Autonomy's sales pitch focused on the potential savings from the restructure over time, while ensuring that Autonomy secured an upfront licence fee on which it could rely for revenue recognition. Autonomy made no secret of this: and in an email to Mr Hussain, Mr Sass said "*I shared that rev rec will guide what we can do".*

3692. According to a spreadsheet prepared by Autonomy for MetLife, MetLife stood to save $10.6 million over five years from entering into the First MLIC Amendment Agreement. Even so, MetLife initially balked at the licence fee, and Autonomy eventually agreed slightly extended payment terms, which became terms of the deal.

3693. Barely a year later, in May 2011, Autonomy approached MetLife about the possibility of a further restructuring with the inducement that it would lower storage rates again. Dr Lynch did not dispute that it was Autonomy that made the first approach.

3694. The initial term of the First MLIC Amendment Agreement then still had around four years left to run. Mr Hussain's written closing submissions noted, however, that under the First MLIC Amendment Agreement MetLife was paying more ($0.015756 per MB per annum) than Morgan Stanley had paid in 2008 ($0.0092 per MB per annum) and that MetLife's rates were plainly uncompetitive in light of the rapid fall in the costs of hosting.

3695. Nevertheless, Autonomy initially proposed only a reduction in maintenance and support fees. On 2 June 2011, Mr Sass sent Mr Egan a draft of his proposal to MetLife, setting out three different options, each involving the abolition of the maintenance fee. Mr Sass noted that Autonomy was "*proposing a licence "refresh" of the Digital Safe/Audit Center/Supervisor/Investigator Software (aka 2010 License software). This refreshed licence grant will include all the software licensed under the June 2010 agreement*"; in respect of two options, it would also extend the expiration date of the licence.

3696. The Claimants drew my attention to Mr Egan's response and its aftermath: "*I would change word "refresh" to "increase" for both reve rec purposes and so that they can continue to amortize the license they have".* Mr Sass proposed "*update*" instead of "*refresh*" or "*increase*", noting a concern, at least with one scenario, "*that we are not adding anything per se*". Mr Egan agreed, indicating that Mr Sass would have to "*figure out how to [add] something*" to the agreement. Mr Sass sent the proposal to Mr Kelly the same day (2 June 2011).

3697. MetLife were not interested in paying upfront simply for a reduction in maintenance. When that became clear, Mr Sass proposed a generous reduction of 60% in storage rates in return for an upfront licence fee of $5.8 million.

Having made the offer, Mr Sass reported to Ms Gustafsson that he had what he called *"sellers remorse"* that it was too generous to MetLife. Ms Gustafsson reassured him:

> "*Don't worry! It is a five year deal, and they are only getting 25% discount on NPV – I have seen many higher than that! We are close to Q end so if we want a deal then we have to get them focussed straight away*".

3698.   MetLife again balked at the licence fee, prolonging the negotiation. Mr Sass sent an email to Ms Gustafsson on 16 June 2011 requesting *"immediate help"* and reporting that though MetLife *"like the deal"* they were *"fishing for a better deal"* and were asking (a) to extend by a further year from five to six year to enable them to amortise the cost of the licence over that longer period, (b) to reduce the licence fee and (c) to reduce the storage cost. He asked Ms Gustafsson to *"do some analysis (and magic)."* The upshot was a re-engineering of the proposal to (i) reduce the licence fee to $5.5 million, (ii) increase the term to 63 months and (iii) further reduce storage charges to $0.0004888 per MB per month.

3699.   As that summary of the exchanges demonstrates, there was no focus or even mention in the negotiating process on what software was to be licensed to MetLife to attempt to justify the sizeable upfront licence fee.  As at 13 June 2011, nothing had been *"figure[d] out"* (see paragraph 3696 above). Mr Crumbacher reminded Mr Sass on that date that he needed to identify some software to license: "*you didn't state what software your licensing [sic]. Is this a termination of the old license (Digital Safe) and then a relicense of the same/most recent version of the Digital Safe software with a lower maintenance rate?*". Mr Sass told him that it was a "*relicense with lower maintenance and lower reduced storage*". Not until 17 June 2011 was any alteration made to the software to be provided; even then, according to the Claimants, it was only because Mr Hussain decided that a DiscoverEngine SharePoint connector should be included. There is nothing in the evidence to suggest that the addition was requested by MetLife, or that the additional functionality was actually required. I elaborate on this in paragraph 3711 to 3714 below.

3700.   A deal was agreed just before the end of the quarter. Mr Hussain was plainly involved in the negotiations and the ultimate transaction; and he was, for example, fully aware of and involved in the unilateral addition of software to the solution provided.

3701.   Dr Lynch denied having had anything more than an awareness *"at a high level, very high level"* that a deal was being negotiated. However, he acknowledged in crossexamination that he had been informed that Autonomy was negotiating a further deal with MetLife, and he did not dispute that he would have known from one of Mr Hussain's many revenue target lists that the deal would be important in terms of meeting Autonomy's quarterly revenue targets. Further, he implied that he knew enough about it to try to justify the transaction (in fact, incorrectly) on the basis that MetLife was *"an unhappy customer"* (as further elaborated in paragraph 3704 below). This evidence was typical of Dr Lynch's

attempts to offer explanations of a transaction which were to his advantage whilst protesting he had next to no knowledge of the transactions themselves. The Claimants submitted that *"it is to be inferred"* that Mr Hussain *"kept [Dr Lynch] informed"* of the matters complained of. In all the circumstances and in light of the instances and pattern of Dr Lynch's involvement and the way Dr Lynch and Mr Hussain worked together as chronicled in this judgment, the inference is justified. I have been left in little doubt that he knew what was going on, at least sufficiently to know what was Autonomy's true objective (revenue acceleration to help plug gaps in achieving forecast).

3702.   Under the Q2 2011 deal ("the Q2 2011 MetLife restructuring"):

(1)   MetLife agreed to licence Digital Safe and Related Software, and the five year term under the Q2 2010 hybrid hosting agreement was extended for 15 months to September 2016, for an aggregate fee of $5.5 million;

(2)   DiscoverEngine was added to MetLife's licensed software package;

(3)   MetLife's monthly storage fees were substantially reduced.

*Claimants' case*

3703.   The essential factual elements of the Claimants' claim in respect of the Q2 2011 MetLife restructuring were the Claimants' propositions that:

(1)   The Q2 2011 MetLife restructuring was conceived and instigated by Autonomy as a pretext to enable Autonomy to generate immediately recognised revenue from a licence sale at the cost to Autonomy of discounted data storage rates and thus a reduced future revenue stream;

(2)   Its true substance was simply a payment by MetLife of the licence fee in return for a considerable reduction in data storage charges (under which MetLife stood to save in excess of $10 million over the term, almost double the licence fee);

(3)   The only difference in terms of the software licensed to MetLife under the Q2 2011 restructure compared to its previous agreement was a licence to a connector called DiscoverEngine that enabled the extraction of data from a Microsoft Office document management and storage system, known as SharePoint;

(4)   DiscoverEngine was introduced into the Q2 2011 MetLife restructuring by Autonomy at the very last minute, without any demonstration to, or discussion with, MetLife or any assessment of its suitability for MetLife;

(5)   Initially, Autonomy proposed to provide DiscoverEngine for free; the true reasons why DiscoverEngine was included in the Q2 2011 MetLife restructuring had nothing to do with any requirement of MetLife and everything to do with (a) seeking to mislead Deloitte into believing that MetLife wanted and intended to use DiscoverEngine and the licence fee had been paid for this new software, and so as to justify to Deloitte another licence and another upfront licence fee and (b) assisting

Autonomy in persuading Deloitte that there was a genuine demand for DiscoverEngine from Autonomy's customers;

(6) In terms of the interests of Autonomy as a corporate entity, there was no justification or commercial rationale for the Q2 2011 MetLife restructuring, especially during the currency of the earlier hybrid deal and so soon after it: there was no basis for any suggestion that the restructuring was prompted by any real concern about customer retention; and

(7) Both the Defendants knew all this.

I address these points, and the Defendants' responses to them, in greater detail below.

3704.  Dr Lynch suggested when he was cross-examined about this deal that his memory of the background of the Q2 2011 restructuring was that MetLife were *"an unhappy customer...it had been a bit of a bumpy relationship with MetLife."* He suggested this was another matter that could be clarified from the *"corpus"* of documents. He also said that he did not think they were thinking of leaving, but *"had had issues with us"*; and that he did not know who had approached whom. He accepted that he had not mentioned this in either of his witness statements.

3705.  No documents were found by the Claimants in the *"corpus"* supporting Dr Lynch's memory; and none was suggested to Dr Lynch when he was re-examined. The Claimants instead relied on and put to Dr Lynch an email dated 16 June 2011 from Mr Sass to Ms Prentis (now Ms Gustafsson) stating (as they put to Dr Lynch) *"We are in good shape...they like working with us"*; but that was after the proposal for restructuring had been floated: the missing words after *"We are in good shape"* were *"(meaning they like the deal)…"*; so the email does not support either side.

3706.  Points of general application in the context of hosted restructurings made in Mr Casey's oral closing submissions on behalf of Mr Hussain were that (a) hosted customers were well aware that storage rates were going down fast, could transfer or reduce data storage needs at any time, were *"hard-nosed"* and could be expected to be on constant watch for a better deal; (b) although the Claimants had emphasised that once committed to data storage with one host, there were difficulties in moving and customers tended to "stick", that was *"overstated"* and there were at least two documented examples of very large movements of data during the Relevant Period and a number of threats by other customers to do the same; (c) it was *"far-fetched to suggest that what Zantaz/Autonomy should have done was to sit back and expect customers to pay whatever happened to be the current rate for hosting"*; and (d) a post-acquisition email referred to MetLife as being *"very sensitive to pricing"*.

3707.  I would, of course, accept that pro-active engagement with a customer to retain its goodwill would be understandable and indeed expected in what Mr Casey described as a business *"which was far more dynamic than the Claimants acknowledge, the customers were more hard-nosed"* and *"it's far-fetched to suggest that what Zantaz should have done was to sit back and expect customers to pay whatever happened to be the current rate for hosting"*. He added that the

Claimants' suggestion of customer reluctance to move was overstated: *"We know that there were two very large movements*

*of data during the relevant period: Citi's from hosted archive to on-premises and JPMC's move to IBM. Other customers…threatened to do the same."*

3708.   However, it was in this case a very short time since the previous substantial restructuring. There was no real evidence, beyond the say-so of Dr Lynch for which he claimed support which never materialised, of customer dissatisfaction or restlessness. It seems reasonably clear, and I find, that the impetus for the transaction came from Autonomy, and that but for Mr Hussain's need to find more revenue, no restructuring would have been proposed.

3709.   The Claimants' characterisation of the true substance of the restructuring as being the payment of an upfront licence fee in return for deeply discounted data storage rates seems to me to be accurate. That does not exclude the likelihood that as in other contexts, such as the Deutsche Bank restructurings, there were other potential commercial benefits; but it encourages sceptical review of them.

3710.   The real issue, to my mind, is whether, notwithstanding the rational commercial justifications advanced for the Q2 2011 MetLife restructuring, the imperative of somehow finding revenue which could be recognised in its accounts to *"cover up"* what Mr Hussain had described in his email to Dr Lynch of 10 December 2010 as the complete falling away of US IDOL revenue at the end of 2010 (see also paragraph 3682 above) was in reality the only, or at least plainly the predominant, driving force, and if so whether that invalidates the decision or renders it or Mr Hussain's conduct improper. The adventitious addition of DiscoverEngine as the sole extra software licensed is of particular interest in this context.

3711.   As to the commercial features of the transaction, the extension of the term was always part of the package. It is clear, however, that the addition of DiscoverEngine software came late in the day, after the contours of the deal for Autonomy to reduce data storage charges in return for MetLife committing to a licence fee for an extended term: although there is email correspondence suggesting that Autonomy had identified in May 2011 a sales opportunity for *"Connectors for the capture and archive of documents (SharePoint, JIVE collaboration)"* the addition of DiscoverEngine was made on the initiative of Autonomy, rather than of MetLife.

3712.   As submitted by the Claimants, the process leading up to that decision is revealing:

(1)   When on 13 June 2011, Mr Crumbacher pointed out to Mr Sass that he needed to identify some software to license: *"you didn't state what software your licensing [sic]. Is this a termination of the old license (Digital Safe) and then a relicense of the same/most recent version of the Digital Safe software with a lower maintenance rate?"*, Mr Sass told him that it was a *"relicense with lower maintenance and lower reduced storage"*. There was no suggestion of including a SharePoint connector.

(2) A few days later, on 15 June 2011, Mr Scott emailed Mr Hussain identifying "*several customer opportunities where we may want to offer the Sharepoint connector as part of our overall solution*", including MetLife. Mr Scott had been asked to compile the list by Mr Hussain.

(3) The message about offering DiscoverEngine to customers including MetLife had reached Mr Rothman, an Autonomy lawyer, who was involved in documenting the MetLife deal. On 17 June 2011, Mr Rothman emailed Mr Sass to say that he understood "*we now need to add Share Point Connector to ... this document ... correct?*".

(4) But the message had not reached Mr Sass, who had been leading the negotiations with MetLife. He was entirely unaware of a reason for adding a SharePoint connector to MetLife's contract. He replied: "*sorry. no clue what you are talking about*". Mr Rothman explained: "*My understanding is that Sush has decided we should give this connector to MetLife ... (for free) as a way to promote this product. Hence, I was asked by [Mr Crumbacher] to include a reference in both documents. Do you have any objection ...?*"[446]. Mr Sass responded "*Let me call Sush*". A few hours later, Mr Sass reverted to Mr Rothman indicating that he was content to include DiscoverEngine in the agreement.

(5) When on the evening of 17 June 2011, Mr Sass forwarded the draft produced by Mr Rothman to Mr Kelly, he made no mention of the fact that DiscoverEngine had been newly inserted into the agreement,[447] as shown by the "*redline*" he attached. Mr Sass's failure to mention the new software belies any suggestion that MetLife had requested it or the functionality it provided.

(6) The reality, to my mind, and I find, was that DiscoverEngine, though intended to be a promotional offer to others for free, was added in this case as if it justified a considerable fee as the available means of satisfying what Mr Egan had described as the need to *"figure out how to [add] something".*

(7) MetLife itself barely noticed the addition. The Claimants drew my attention to an email dated 1 September 2011 from MetLife to Ms Beth Ladd at Autonomy expressing interest in *"the strategy for SharePoint and capturing data that is traditionally maintained in an application or structured environment as opposed to just documents and emails"*, suggesting (so they contended) that MetLife was not even aware that it had purchased a SharePoint connector as part of that agreement.

3713. Even though it is worth remembering that (as I have determined in the chapter of this judgment dealing with "VARs") Autonomy had purchased

---

[446] Emphasis added.
[447] A previous draft of the agreement that was sent to MetLife did not include DiscoverEngine.

DiscoverEngine to put DiscoverTech in funds, I am prepared to accept in this context Dr Lynch's evidence that DiscoverEngine was superior to Autonomy's own product and did offer real benefits to MetLife; and that this was in turn of benefit to Autonomy. I accept also that it was in Autonomy's interests to improve its relationship with MetLife, address its complaints (which especially concerned cumbersome processes and service deficiencies), and pave the way for more business (including building an IDOL Index on its entire safe with 120 TB data requirements). This is apparent from the notes of a QBR (Quarterly Business Review) meeting between Autonomy and MetLife at operational level in May 2011. There were commercial considerations which also supported the transaction.

3714. But that was not the rationale of its addition of DiscoverEngine or more generally of the sale of a new licence. I accept the Claimants' contention that the operative reason for

---

the late addition of DiscoverEngine, reminiscently of the late addition of IDOL dense cells in the Deutsche Bank deal, was to support the misleading impression that MetLife was getting something for its $5.5 million which could be seen to be separate and apart from the benefit of reduced storage charges.

3715. Reverting to the transaction itself, the negotiations around the upfront licence fee for Autonomy and the overall savings for MetLife continued. After some last minute renegotiation which resulted in a reduction in the licence fee to $5.5 million, coupled with reduced storage rates, which created an additional saving to MetLife of over $1 million, on 29 June 2011, Mr Sass informed Mr Hussain that the deal with MetLife should complete that quarter, which it did. The following day, 30 June 2011, Mr Sass told Mr Hussain "*MetLife ($5.5M) IN*". Mr Hussain's response again reveals Autonomy's true motivation for entering into the transaction: "*Any possibility of recognising $5.8m?*". First and last, that was, in my view, Autonomy's and the Defendants' real focus.

*Relevance of Deloitte's review and approval?*

3716. In this context, as in all others where an accounting treatment was questioned, the Defendants sought to draw support from the approval of Deloitte. But in this context, as in all others, Deloitte saw only what was presented to them. Whether those involved in Deloitte should have adopted and pursued a more sceptical approach is not for me to determine: Deloitte's conduct is not on trial, and they are not parties. What is relevant for present purposes is whether their approval was given on a basis which reflected reality.

3717. The basis of their decision is evident from their internal working papers detailing their approach to the accounting treatment of the Q2 2011 MetLife restructuring. In particular:

    (1) Although the overall description of the deal is stated as involving *"an extension of term, a renegotiation of fees for both storage and go-forward maintenance, and the addition of the 'DiscoverEngine' connector for Digital Safe"* that is the only mention of DiscoverEngine in the assessment;

(2) The key terms are described as follows: –

> *"The licence term is extended out to 30/09/16*
>
> *Monthly storage fee reduced to $0.00048888 per MB per month for remainder of terms (reduced from $0.001313) -62.8%*
>
> *Annual S&M fee reduced to $275,000 for remainder of term (reduced from $351,250)"*

(3) Immediately after that, Deloitte recorded:

> *"we note that such deals are reasonably common with large customers – as the cost of storage for Autonomy falls, large customers are able to renegotiate their storage fees lower in exchange for a non-refundable upfront licence payment…*
> *We have reviewed the original agreement and the amendment and noted no terms that would restrict the upfront recognition of revenue. As such recognition of revenue upfront is deemed appropriate."*

(4) Having reviewed the maintenance element, and Autonomy's management assessment concluding that it complied with the VSOE, Deloitte concurred that the established rates were reasonable.

(5) After noting that MetLife were one of the largest listed insurers in the US so that collectability should not be an issue, in formally approving revenue recognition, Deloitte recorded that:

> *"(a) The risks and rewards of ownership passed to the customer when the items were delivered. As all of Autonomy's obligations have been fulfilled the risks and rewards have been transferred.*
>
> (1) *Autonomy has not retained any managerial control.*
>
> (2) *The revenue can be measured effectively as it is stated on both invoice and in the contract*
>
> (3) *it is probable that economic benefits will flow to autonomy*
>
> (4) *there are no costs incurred in this transaction."*

3718. There was no consideration given to what any broader objectives of the transaction might be; there was no focus or sceptical review of the by now fairly evident pattern of transactions of many varieties late in the quarter which as a fact bolstered revenue otherwise than by what might be termed plain vanilla sales.

3719. I do not see any sufficient reason not to accept:

(1) Mr Welham's evidence that, had Deloitte known that DiscoverEngine had not been requested by MetLife, and was included in the deal to give the impression that MetLife was getting something for its \$5.5 million licence fee, Deloitte would not have considered it appropriate for Autonomy to have recognised the licence fee as revenue in Q2 2011; and

(2) Mr Bloomer's evidence that, if it were the case that DiscoverEngine had been inserted into the agreement without any suggestion that the customer wanted it, it would have been "*contrary to [his] understanding at the time*" and he would have wanted to understand the "*conflict between*" what Deloitte was told and the true state of affairs.

### *Defendants' knowledge of impropriety*

3720. I have already found that both Defendants knew what was the driving purpose of the transaction. For comprehensiveness I confirm that, in my judgment, they appreciated that all the other claimed benefits were peripheral, even if necessary in presentational terms, and that the transaction would not have been pursued but for the objective of accelerated revenue recognition, which would come at a substantial net cost and loss.

3721. In my judgment, the decision made was not one simply of commercial judgement in which the Court should not usually intervene. Its driver was a transaction based on a contrivance. That infected the decision and rendered it, to their knowledge (since they were aware of the contrivance), improper.

### *Overall conclusion*

3722. In my judgment, the Claimants' allegation that the Q2 2011 MetLife restructuring was commercially unjustified and a breach of duty and improper use of power has been established.

3723. I shall consider later what loss was thereby caused.

## OTHER TRANSACTIONS

3724. The Claimants sought to impugn a sixth (and final) category of transactions, described in both the RRAPoC Schedule 7 ("Schedule 7") and in its closing submissions as *"Other Transactions"*[448]. This amorphous collection related to another set or sets of transactions that allegedly had, and were designed to have, the effect of enabling Autonomy to recognise or accelerate the recognition of revenue for the purpose of achieving revenue forecasts in a given quarter.

3725. The four individual sets of transactions which were the subject of Schedule 7 are:

(1) A series of agreements with Tottenham Hotspur plc ("Tottenham Hotspur"): (a) a software licence agreement between ASL and Tottenham Hotspur pursuant to a purchase order dated 30 June 2010 ("the 2010 Tottenham Sale") but not actually signed until 5 July 2010, (b) a Shirt Sponsorship Agreement dated 5 July 2010 ("the 2010 Tottenham Purchase") between the same parties and also Tottenham Hotspur Football & Athletic Co Limited (together with Tottenham Hotspur "the Club") under which Autonomy committed to pay shirt sponsorship fees of an aggregate of £63 million payable over five seasons, and also a MAF calculated as 30% of "Total Net Qualifying Revenues" being revenues from customers referred by the Club to ASL as sponsor; (c) a further agreement between ASL and Tottenham Hotspur dated 31 March 2011 for the sale to Tottenham Hotspur of additional software licences and "managed services"; and (d) an amendment to the Short Sponsorship Agreement also dated 31 March 2011 altering the amounts payable in the subsequent seasons and also changing the definition of "Qualifying Revenues" with the effect of a further MAF being payable to the Club;

(2) An amendment dated 10 December 2010 ("the Prisa First Amendment") to a software licence agreement dated 31 March 2010 between ASL and a Spanish company in the Prisa group called Ediciones El Pais SL ("EEP"), (Q4 2010);

(3) A Hosting Services and Licence Addendum ("the Hosting Addendum") entered into between Autonomy Inc and Amgen Inc ("Amgen") on 21 December 2010, which was part of a wider project for the provision by Autonomy of hosting and related e-Discovery services (Q4 2010); and

(4) An agreement dated 3 June 2011 under which Autonomy Inc sold Iron Mountain Information Management Inc ("Iron Mountain") a perpetual licence and associated maintenance and support services, which was concluded on the same day that Autonomy Inc acquired the Iron Mountain digital business from Iron Mountain Inc (Q2 2011).

---

[448] Each described in Schedule 7 of the RRAPoC.

3726. The Claimants did not, apparently *"due to time constraints",* cross-examine Dr Lynch in relation to any of these four transactions. Therefore, the Claimants accepted that they cannot allege that Dr Lynch had knowledge of their false accounting.

3727. However, they submitted that the Other Transactions remain relevant given that:

(1) the Claimants maintained that there was false accounting in relation to each of the transactions and they continued to allege that Mr Hussain knew of that false accounting; and

(2) if (as the Claimants alleged) there was false reporting in relation to the Other Transactions, they fell to be taken into account when assessing loss.

3728. The Claimants addressed the Other Transactions at considerable length in their written opening, and again in their closing submissions. They impugned the Other Transactions on various grounds, including the apparent linkage between ASL's sales to and purchases from Tottenham Hotspur, and the alleged failure in the case of all the transactions to satisfy the revenue recognition criteria in IAS 18.14.  However, the focus of this aspect of the Claimants' case as regards the first three transactions (Tottenham Hotspur, Prisa and Amgen) was their allegation that the sale of licences in each case involved (as a substantial part of the overall sale) the provision of services after the sale to initiate and enable the use of the software supplied.

3729. The Claimants' case in respect of those three transactions is that what was sold was not simply a piece of software purchased together with separately charged additional services, but a composite 'solution' of which the provision of services was an integral part[449]. Since nothing of immediate value was transferred until the integral services were provided, it was wrong to recognise revenue at the point of sale (as Autonomy had done) and revenue recognition was required to be deferred until the delivery of a fully functioning product had been concluded, or at least until some subsequent stage in the installation of the software for the customer had occurred enabling its use as a working solution.

3730. The Claimants' case in respect of the fourth 'other' transaction (Iron Mountain) was of a different nature. It raised a separate and different issue about whether the revenue from an IDOL licence sold to Iron Mountain after its acquisition by Autonomy was booked at fair value; and in particular, whether there was any proper basis for  Autonomy having increased the revenue recognised in respect of a software licence sold to Iron Mountain in Q2 2011 by way of what purported to be a 'fair value adjustment' of $5.5 million.

---

[449] "Solution" is not a term of art, nor even a well-defined accountancy or business term. It was used by the Claimants to connote an agreement for the provision of both software (in this case invariably under licence) and implementation services where the provision of both is, as a matter of substance, so intertwined that it would be unrealistic and inappropriate to recognise separately the two elements of the sale.

3731. The Claimants also contended that in the case of all four Other Transactions, the true position in respect of the relevant transaction was concealed from Deloitte.

3732. The Defendants rejected all these claims. Dr Lynch, in addition to the point agreed that having not been examined, it could not be suggested that he had dishonest knowledge of false accounting, dealt with the claims in relation to Other Transactions inside three pages. He dismissed each, at least as against him, as never having made any sense at all, and more generally, as based on *"nuanced matters of detailed accounting, and accounting judgement"* in respect of which Autonomy had taken, and Deloitte had approved, a perfectly permissible view.

3733. Mr Hussain's closing submissions dealt with the Other Transactions in more detail than in his opening submissions; but he too sought to dismiss the claims as turning on matters

of nuance and accountancy judgement, maintaining that the approach taken by Autonomy when accounting for them had been entirely legitimate, and Deloitte had concurred with it.

3734. The competing accounting views were argued out by the parties' respective experts. Each adopted the approach typical of his report. Mr Holgate relied on a series of assumptions of fact ("the Assumptions") given to him in his instructions. The Defendants criticised the Assumptions as framed in a way which funnelled him to a conclusion favourable to the Claimants. As noted in all other contexts in which he provided his expert opinion, Mr Holgate did not see, or call for, the relevant contracts. Nor did he consider Deloitte's working papers or any of the work Deloitte had undertaken in reaching their views about the accounting for these transactions. Mr Holgate agreed (as did Mr MacGregor) that in the real world an accountant would have had to be familiar with the contractual terms and all other available evidence about each individual transaction and reach a decision on revenue recognition case by case.

3735. On the basis of the Assumptions he was instructed to make, Mr Holgate's conclusions in respect of the first three transactions, put summarily, were that (a) Autonomy was in each case providing not simply a piece of software but also services as an integral part of the whole 'solution' sold, so that (b) revenue from the whole 'solution' could not be recognised unless and until it had been provided in full and (c) on the basis of the second of the Assumptions (in respect of Tottenham Hotspur and Prisa), as there was no clear statement of work for the project, nor were the deliverables or acceptance criteria defined, it was not possible to measure the costs reliably, as was required by IAS 18.20 before revenue from services could be recognised.

3736. Mr MacGregor's report was more open-textured. He concurred with the applicable tests but took a different view of the shape of the overall transaction in each case. In his first report, he identified as the main claim, and thus the main area of disagreement, in respect of the first three transactions as being whether the economic substance of the transactions was the provision of a "solution" to which the provision of services was integral, or (in the words of his report) *"whether or not the transaction could be split into separately identifiable*

*components by reference to IAS 18.13, and whether the costs to complete the project or the outcome of the transaction could be estimated reliably by reference to IAS 18.26."*

3737. With reference to the relevant agreements, and to Autonomy's general policy as set out in Autonomy's Consolidated Financial Statements for revenue associated with professional services, Mr MacGregor concluded that it was a legitimate approach, and in line with that general policy, to regard each of the first three transactions as comprised of separate components in accordance with IAS 18.13, and the costs of completing the project or the outcome of the project as susceptible to reliable estimation by reference to IAS 18.26.

3738. Although they reached different conclusions, Mr Holgate agreed in cross-examination that:

(1) the essential question for these deals was whether the sales in question were to be regarded as a sale of a licence or an agreement to provide a solution;

(2) that is a matter of judgement to be determined on the basis of the facts known to the accountant;

(3) it is possible for one agreement to include a licence and other services as long as they are separately identifiable;

(4) the question whether the costs of any service element can be measured is a matter of accounting judgement to be assessed against the factual evidence available at the time.

3739. A brief factual analysis of the first three transactions is necessary to understand the application of these questions to the facts.

**Tottenham Hotspur: the two sets of transactions**

*First set: Q2 2010*

3740. The transaction with Tottenham Hotspur was one of the "*big deals*" of Q2 2010, as described by Mr Hussain in the revenue summary spreadsheet he provided to Dr Lynch on 30 June 2010.

3741. Autonomy's sale of a software licence to Tottenham Hotspur ("the 2010 Tottenham Sale") was established pursuant to a purchase order dated 30 June 2010 ("the 2010 Tottenham Purchase Order"). The licence fee under the 2010 Tottenham Sale was a total of £3.9 million plus VAT, and professional services were contracted to be provided in order to provide Tottenham Hotspur with "*a fully implemented system*" with a view to the football club becoming "*the most technically advanced club amongst its peers*".  The 2010 Purchase Order was signed by Mr Kanter on behalf of ASL following its approval by Mr Hussain.

3742. Although the 2010 Tottenham Purchase Order was dated 30 June 2010, i.e. right at the end of Q2 2010, the contemporaneous documents show that the 2010 Purchase Order was backdated; it was not signed by the parties until 5 July 2010. Given it appears that Mr Hussain gave his approval for the 2010 Purchase Order

on 1 July 2010 (the final draft only having been produced that day), he must have been aware that it was going to be executed after the quarter end, even though it was dated 30 June 2010.

3743.   The Shirt Sponsorship Agreement was established at the same time as the 2010 Tottenham Sale following discussions between Dr Lynch and Mr Daniel Levy (the

Chairman of Tottenham Hotspur). The Shirt Sponsorship Agreement between ASL and Autonomy and Tottenham Hotspur was correctly dated 5 July 2010. The Shirt Sponsorship Agreement, which was signed by Mr Hussain on behalf of each of ASL and Autonomy, was for five seasons with fees totalling £63 million. The sponsorship fee payable to Tottenham Hotspur for the first season (2010/11) was £9 million, which rose to £12 million for the 2011/12 season (save that the fee would be reduced to £9 million if Tottenham Hotspur failed to generate 'Qualifying Revenues' of £4 million). Qualifying Revenues were revenues from sales by Autonomy to third party customers introduced by Tottenham Hotspur, with Tottenham Hotspur being entitled to a marketing assistance fee (MAF) equal to 30% of the Qualifying Revenues.

3744.   The following points are to be noted in relation to this first Tottenham transaction:

(1)   The 2010 Tottenham Purchase Order and Sale and the Shirt Sponsorship Agreement were negotiated alongside each other and (though dated differently) were entered into at or around the same time. The 2010 Purchase Order recorded – in language expressly approved by Mr Hussain – that there would be no annual support fee payable by Tottenham Hotspur provided that it continued "*to maintain a strategic relationship with Autonomy*", which was plainly a reference to the Shirt Sponsorship Agreement.

(2)   It was recited in the 2010 Tottenham Purchase Order, at the request of Mr Levy that the goal be identified, that the licence was intended *"to enable a system to provide the following functions at the level found in a Premiership football club's ordinary operations: CRM, ticketing, player analysis, retail, internet and web design. It is the goal of the parties for Licensee to represent the most technically advanced club amongst its peers".* The Claimants submitted that thereby Tottenham Hotspur contracted to receive a 'solution' to which the provision of services was integral: it required a bespoke solution to its website needs, a project involving not just the provision of software and support, but also services to conclude the delivery of a fully functioning website that would meet Tottenham Hotspur's requirements. They added that the software purchased under the 2010 Tottenham Sale was not of any use to Tottenham Hotspur until that solution had been delivered. The only witness who gave evidence in relation to the deal was Alastair Martin, but he accepted that he was not involved in its negotiation and, thus, had no knowledge of the discussions that had taken place between the parties prior to them entering into the 2010 Purchase Order.

(3) The 2010 Purchase Order provided no defined scope of work for the project; it did not define the deliverables or key milestones against which delivery could be measured, nor did it contain any defined acceptance criteria.

(4) The documents show that the project stalled and delays resulted, as Mr Martin accepted. As at 18 October 2010, nothing had happened on the project. At the end of October 2010, the parties had another "*Project Kick Off*" meeting, at which a further presentation was given by Autonomy, from which the embryonic nature of the project is clear: see, for example, the "*Work package summary*", including the "*Solution design*" workstream. Matters continued to stall thereafter and no professional services were provided following that meeting. Thus;

  (a) By late April 2011, i.e., more than six months later, the solution design had still not been agreed between Autonomy and Tottenham Hotspur.

  (b) Indeed, as late as early June 2011, Mr Martin raised with Dr Lynch and Mr Kanter the fact that Tottenham Hotspur was "*not overly happy with our responsiveness and attention*" to their website "*refresh project*", due to Autonomy's failure to apply adequate resources to it. Mr Martin acknowledged that the "*project is still in the design phases*". Dr Lynch replied on 6 June 2011 that the account was "*another one for a remedial plan*" and should be fixed, and asked that Mr Martin report back in a week.

*The second transaction*

3745. On 31 March 2011, ASL entered into a further agreement with Tottenham Hotspur to provide additional software licences and "*managed services*" for a period of three years. The agreement was recorded in a purchase order dated 31 March 2011, which was signed by Mr Kanter on behalf of ASL ("the 2011 Tottenham Purchase Order"). The licence fee was £4 million (plus VAT), with a 5% support fee for the first year (£200,000 plus VAT). On the same date, the Shirt Sponsorship Agreement was also amended, (i) increasing the sponsorship fee payable for the 2011/12 season from £9 million to £11 million, and (ii) altering the definition of 'Qualifying Revenues' so as to include licence revenues paid not just by third party customers, but also by Tottenham Hotspur to ASL, such that the £3.9 million payable under the 2010 Purchase Order and the £4 million due under the 2011 Purchase Order qualified ("the Amendment Agreement"). Mr Hussain signed the Amendment Agreement on behalf of ASL and Autonomy.

3746. A number of points should be noted in relation to this set of transactions:

(1) The 2011 Purchase Order and the Amendment Agreement were plainly linked transactions: they were negotiated together and the parties

operated on the basis that the two agreements would "*complete*" at the same time.

(2) Indeed, it is notable that the 2011 Purchase Order and the Amendment Agreement were broadly for the same value: £4.2 million was payable by Tottenham Hotspur under the former; with £4.37 million payable to it under the latter, being the total of (i) the £2 million increase in the sponsorship fee for the 2011/12 season, and (ii) a MAF of £2.37 million, resulting from the combined total of £7.9 million payable under the 2010 Purchase Order and the 2011 Purchase Order now constituting 'Qualifying Revenues' (the MAF amounting to 30% thereof).

(3) The 2011 Purchase Order did not deliver any significant incremental value to Tottenham Hotspur. It stated that the licensed software was for use in relation to Tottenham Hotspur's web services and social media, indicating that it formed part of the overall project to provide the club with its website requirements under the 2010 Purchase Order. In other words, this sale formed part of the wider commitment by ASL to deliver to Tottenham Hotspur a functioning website. Thus, the software licensed under the 2011 Purchase Order was of no use to Tottenham Hotspur until the solution contemplated by the 2010 Purchase Order had been delivered.

(4) Again, as with the 2010 Purchase Order, the 2011 Purchase Order contained no defined statement of work for the project, key delivery milestones, defined deliverables, or defined acceptance criteria.

3747. Autonomy accounted for the Autonomy licence sale side of the first two transactions as follows:

(1) Licence revenue of £3.9 million less £30,000 under the 2010 Purchase Order was recognised immediately by Autonomy on 30 June 2010, that £30,000 representing a total of 6 months' services at £5,000 per month which Autonomy carved out of the upfront licence fee as the value of future services to be provided over time[450];

(2) Licence revenue of £4 million under the 2011 Purchase Order was recognised immediately by Autonomy on 31 March 2011.

3748. As I explain below, the focus of the submissions on all sides was on the first set of transactions, which Deloitte considered were not reciprocal and so the 2010 sale and the 2010 purchase should be accounted for separately. I did not understand that to be challenged. In particular my focus is on Autonomy's accounting treatment of the 2010 sale, in which Deloitte concurred, as comprising separately identifiable components. The Claimants submitted that this accounting was wrong.

---

[450] Deloitte's working papers show that Deloitte considered that the carve-out should have been $90,000 but that no adjustment was proposed because the difference was *"clearly trivial"*

3749. Addressing the fundamental question and applying the criteria agreed between the experts as adumbrated in paragraph 3738 above, what is to be determined is whether the sales were of a licence, with separate arrangements at a separate price for servicing, or whether in reality the agreement should be characterised as providing for the sale of a 'solution'.

3750. There is no dispute of principle between the experts on this point. The issue that requires resolution is one of fact, not accounting principle, and turns on whether the substance of the deliverable to be provided to Tottenham Hotspur was a working solution.

3751. The Claimants submitted that plainly, it was. The terms of the 2010 Tottenham Purchase Order itself, which provided that the software licences that were the subject of the contract were "*intended to enable a system to provide the following functions at the level found in a Premiership football club's ordinary operations: CRM, ticketing, player analysis, retail, internet and web design*" (see paragraph 3744(2) above) reflected that Tottenham Hotspur were contracting to receive "*a fully implemented system*". According to the Claimants' characterisation:

   (1) The objective that Tottenham Hotspur sought to achieve by entering into the 2010 Tottenham Purchase Order is plain on its face: they wanted a "*system*" which would provide the various specified "*functions at the level found in a Premiership football club's ordinary operations*", but the detail of what that involved was left to be discussed and agreed between the parties subsequently;

   (2) The software licences the subject of the 2010 Tottenham Purchase Order were of no use to Tottenham Hotspur in and of themselves: they required Autonomy to provide the professional services in order to put in place the yet to be defined "*fully implemented system*" and the 2010 Tottenham Purchase Order simply included an exhaustive list of the software "*required in relation to management of a typical peer website*".

3752. Accordingly, the Claimants' case is that the substance of the deliverable to be provided to Tottenham Hotspur was a working solution (i.e. "*a fully implemented system*"), not simply a piece of software, and the provision of services was integral to that solution. Thus, nothing of immediate value was transferred to Tottenham Hotspur at the time of entry into the 2010 Purchase Order and, therefore, no revenue should have been

---

recognised by Autonomy in relation to the 2010 Purchase Order at 30 June 2010. It was not suggested to Mr Holgate in cross-examination that his conclusion was wrong if the substance of the deliverable was a working solution.

3753. For the Defendants, Mr MacGregor agrees that, if the contract – when assessed from the perspective of the customer – was for the provision of a working solution, then revenue should not have been recognised when it was. He put it as follows:

   "*A. ... Look, at the end of the day, on each of these things, again this is going to come down to a reading of what the contract*

> *information says about whether there was a sale of a licence or whether it's not as simple as that and what was being provided was the sale of a licence only in the context of something which was then had to have substantial amounts of work done on it so that it could be operated by the purchaser –*

Q.   *Again –*

A.   *– in the manner it wanted.*

> ...
>
> *...as I say, it's at paragraph 20, goods and services were integral to the delivery of the project and that that project was for Autonomy to deliver.  If that's not the case, then you're going to recognise the revenue upfront.  If it is the case, you're not.  That is the – I think in many respects there's probably not a disagreement between Mr Holgate and myself.  It's more a disagreement as far as the facts are concerned which, as I've said, is not for me to opine on."*

3754.   However, subject to that caveat, Mr MacGregor expressed the view in his first written report that:

(1)   He had seen nothing on the 2010 Tottenham Purchase Order to suggest that the goods were sold subject to installation, or (whether expressly or implicitly) that payment was subject to the services being provided.

(2)   Based on the email confirmation of delivery and the revenue confirmation letter he had seen, he agreed with the view taken by Deloitte that the contemporaneous evidence supported the conclusion that revenue could be recognised from the sale of the licence before the services were delivered.

(3)   He agreed with Deloitte that the 2010 Tottenham Sale could fairly be regarded as comprising separately identifiable components of a single sale to which the revenue recognition criteria could properly be applied separately.

*Were Deloitte misled?*

3755.   The Claimants submitted that, as between the experts, the view of Mr Holgate on the characterisation of the 2010 Tottenham Sale as a 'solution' was to be preferred, and that the Defendants' reliance on Deloitte was misplaced because the true position in relation to the Tottenham Hotspur transactions was concealed from Deloitte.

3756. They relied in this respect on Mr Welham's evidence in his witness statement that:

> (1) Contrary to the assumptions the Claimants asked him to make, he had not understood that (a) *"the parties understood at the date of the agreement that what was required was the delivery of a solution, namely a fully-functioning and much enhanced website"*, (b) *"delivery of the solution required the provision of significant services, but in the absence of a defined scope of work or key delivery milestones, there was no means reliably to measure the outcome of the transaction or the costs to complete the project"*.

> (2) While he could not determine now how precisely the revenue would have been recognised over the lifetime of the contract, had Deloitte appreciated that *"the agreement was intended to deliver a solution"*, then *"it is likely that it would not have been appropriate to recognise software licence revenue at the outset of the transaction."*

3757. They relied also on the fact that Mr Bloomer confirmed in cross-examination that the Audit Committee was not told the full picture. The Audit Committee was informed of the 2011 Tottenham Purchase Order, but not the (linked) Amendment Agreement. He stated that if the two transactions were linked, that would have been an important point for him to consider in relation to revenue recognition. The Audit Committee understood that the deal was the sale of a software licence, rather than the sale of a solution which required the provision of significant but unquantifiable services.

3758. Dr Lynch did not address these further points, but Mr Hussain's written closing submissions did, and the allegation that Deloitte were misled was there described as *"utterly spurious"*. Those submissions emphasised that *"the parties made the contract they made, Deloitte reviewed a copy of it, and came to the view that AU's approach was acceptable."*

*My assessment whether Tottenham 2010 Sale should have been accounted for as a 'solution'*

3759. I accept and would agree with the view of the experts that the essential question can be characterised as whether the sale should be characterised as a sale of a licence or an agreement to provide a 'solution'.

3760. I do not, however, agree with the Claimants that the factual position was clear and necessarily demanded characterisation of the 2010 Tottenham Sale as a 'solution' and could not be treated as comprised of two elements (the sale of a licence and the provision of services at a price). I do not consider that in reaching their view Deloitte were misled. Deloitte's working papers confirm that Deloitte were well aware of the recital on which the Claimants placed such reliance and the provisions of the contract in relation to the provision of future services. They concluded that the provision of future services was a separate element for which an appropriate deduction could and should be made. In fact they considered to be inadequate the amount that Autonomy carved out of the upfront licence fee and had agreed should be deferred over the period: they would have required a

carve-out of $90,000 equalling almost double the amount of £5,000 per month adopted

by Autonomy. However, they concluded the difference to be *"clearly trivial and as such, no adjustment has been proposed."* Mr Welham was simply stating what Deloitte's view might have been on the basis of Assumptions he was required to make. Likewise, Mr Holgate's opinion was the product of Assumptions which did mandate an answer, and he had never considered the contract.

3761.   I do not therefore accept the Claimants' conclusion that the 2010 Tottenham Sale was on the face of the 2010 Tottenham Purchase Order and in fact a contract under which the deliverable was a 'solution', namely a fully implemented system for which Autonomy had contracted to provide 200 hours of service, and from which it was wrong to recognise revenue before the implementation process had been completed. It seems to me that it is an available and respectable view that in form and substance the 2010 Tottenham Purchase Order established a contract for a licence and the separate provision of services, with the licence and the services to be paid for separately. It does not seem to me that Tottenham Hotspur's obligation to pay was contingent on either the provision of the services or the outcome of implementation. I do not accept that Deloitte were relevantly misled in this context; and I do not consider the facts clear enough to overturn the contemporaneous judgement call made of the contract and the facts.

*The second Tottenham Hotspur transaction*

3762.   As mentioned briefly above, there was no dispute between the experts that in the case of the second set of purchases and sales, the Tottenham Hotspur 2011 Purchase Order and the Amendment Agreement were linked transactions which needed to be considered together to understand their substance and to determine the appropriate revenue recognition under IAS 18.13. Nor was there any dispute between the experts that looking at the two agreements together, revenue under the 2011 Purchase Order should have been net accounted with the cost of the Amendment Agreement. As Mr MacGregor put it, the *"net effect of [the sale] is nil, when considered with the MAF and additional sponsorship payment that became due as a result of [the Amendment Agreement]"*.

3762A.  The second Tottenham Hotspur transaction was largely subsumed in point of analysis into the first by all parties. Noting that the experts had agreed that the 2011 Tottenham Hotspur transaction had been incorrectly accounted for, Mr Hussain did not address the position any further in his written closing submissions, and nor did Mr Casey in his closing speech (although he did address the first of the Tottenham transactions). Mr Hussain's pleaded defence was to the effect that the accounting judgment made at the time was not unreasonable, and had been approved by Deloitte. Mr Welham acknowledged this in his witness statement, but made clear that this was on the basis that *"Autonomy management told us that the new software included in the second deal provided significantly enhanced functionality for Tottenham Hotspur."* Any defence to the claim relating to the second transactions on the part of Mr Hussain amounted to piggy-backing on the defence to the first of the transactions. With some considerable hesitation, I have concluded that though the defence in the context

of the 2011 transaction is (at best) stretched, I have not the degree of conviction, even on a balance of probabilities, required to make a finding of "guilty knowledge" and fraud. In any event, I doubt that the single transaction will make any material difference to the computation of damages.

*Prisa (Q4 2010)*

3763.  The second transaction gives rise to broadly the same issues as the Tottenham Hotspur transactions.

3764.  On 31 March 2010, ASL entered into an End-User Software Licence Agreement with a Spanish company called Ediciones El Pais SL ("EEP"). EEP was part of the Prisa group of companies, which, at the time ASL entered into the agreement, was "*a global media conglomerate that had four main business units: newspaper and editorial content (El Páis was its largest newspaper); television and satellite (the largest pay TV operation in Spain); an education-based unit (the largest publisher of textbooks in Spanish and Portuguese-speaking markets); and radio (with between 13,000 and 14,000 radio stations globally)*".

3765.  Following negotiations involving Mr Hussain, a First Amendment to that Agreement ("the Prisa First Amendment") was entered into on 10 December 2010 between Autonomy Spain SL ("Autonomy SL") and EEP acting for itself and on behalf of its subsidiary company, Prisa Digital SL ("Prisa"). The Prisa First Amendment involved the provision by Autonomy SL of software licences, three years support and maintenance, 2,640 days of professional services and training for use on EEP and Prisa's website, audio, video and other digital products. The Claimants relied on the 2,640 days of services and training as demonstrating the importance of the services aspect of the contract, suggesting that the licensed software was of no use without these services and the two were indivisible.

3766.  The agreement provided for fees totalling about €9.6 million (plus VAT), including €6.8 million in respect of software licences. It is clear from an email dated 15 October 2010 from Mr Hussain to Dr Lynch subject *"getting to 236"* that the entry into the Prisa First Amendment was recognised by the Defendants as forming a critical part of Autonomy meeting the market consensus for Q4 2010. The documentary evidence shows that Mr Hussain provided regular updates to Dr Lynch in relation to its progress.

3767.  The background to the Prisa First Amendment was described in the Claimants' closing submissions as follows:

(1)  At the time it was concluded, Mr Rahul Puri ("Mr Puri") was Managing Director of Innovation and Chief Software Architect at Prisa. Mr Puri joined Prisa in May 2010 with the remit to transform the company's technology, moving it from a traditional analogue media organisation to a digital centric organisation. In his witness statement, Mr Puri elaborated as follows:

> "*To do that, we had to change Prisa's entire technology platform. As part of the exercise, we wanted to build Prisa's*

> *online brand and maximize the revenue streams from our website. We therefore needed to implement web content management systems, data management systems and recommendation systems to enable the use of our apps that we also were building. It was a full top-down technology transformation."*

(2) In its pitch in the tender process that took place, Autonomy made clear that it could provide all the technology, tools and services that Prisa needed to transition into a digital media organisation within a three-year transformation process.  Autonomy made a number of presentations to Prisa prior to contracting:

> (a) The first was in Madrid in August 2010.  The presentation given by Autonomy on that occasion recorded Prisa's objectives, and the "*solution*" that Autonomy was able to provide.  Mr Puri was challenged during his cross-examination that Prisa "*hadn't defined your objectives and goals*", but this presentation shows that is wrong. As Mr Puri noted, Autonomy's solution, as referenced in the presentation, was "*its organisation bringing their technology, their people to bear to help us realise our strategy and our vision*".

> (b) There was a follow up presentation in October 2010, which again reflected the custom built "*solution*" that Autonomy could provide to meet Prisa's objectives.

(3) As a result, Prisa decided to retain Autonomy. It is clear that the ability of Autonomy to tailor its core products to Prisa's needs was the key reason why Prisa elected to contract with Autonomy.

(4) That resulted in the parties entering into the Prisa First Amendment, pursuant to which Prisa purchased the software which was required in order for the digitalization project to be implemented.

(5) However, as Mr Puri explained, (i) successful implementation of the project required Autonomy's software to be tailored in order for the solution sought by Prisa to be delivered, and (ii) Prisa had no use for the software it had purchased beyond the scope of the project, and it could not use any of the software for the project without the involvement and support of Autonomy personnel. As Mr Puri explained in cross-examination:

> (a) "*the intent was to have a comprehensive solution.  So we could not execute on the technology without executing on the professional services, so they went hand in hand rather than just splitting up into two different components*"; and

(b) as a standalone product, the Autonomy software was of no use to Prisa: "*As a stand-alone we would not have been able to use that software; we required Autonomy's expertise to implement that software*".

(6) It can be seen from the contemporaneous documentation that Prisa made clear to Autonomy that the contract would need to include "*every product and functionality for the project*" as Autonomy understood the requirements at that time.[451]  As Mr Puri put it in cross-examination, "*We were looking for an entire solution that we could implement to realise our strategy and vision for Grupo Prisa. ... when we looked at the contract, we looked at it as a full comprehensive*

*solution to meet our objectives and goals as an organisation*".[452]  He noted that "*the reason we had Autonomy do the services, they knew their technology best and would be able to provide an integrated solution for us to meet our overall objectives and goals from a strategy and vision perspective*".

(7) In his witness statement, Mr Avant suggested that "*the license component of the deal was more significant than the services component*" and that "*the agreement was primarily for the purchase of software*".  However, Mr Avant accepted in cross-examination that he was not involved in the negotiation of the deal (which took place before he joined Autonomy), and as he accepted, the statements in his witness statement were based simply upon a review of the agreement after the event. In any event, he is wrong: the agreement was for Autonomy's software licences and services together because the two elements were indivisible. Similarly, Mr Martin purported to give evidence about the nature of the deal with Prisa, but he was not present at the pre-contract presentations, nor was he involved in negotiating the contract with Prisa.

(8) Although the Prisa First Amendment was entered into on 10 December 2010, no statement of work had been agreed by that time; indeed, it could not be agreed until further discussions about Prisa's requirements and testing on its systems had taken place. As a result, as is not disputed by Dr Lynch's witnesses, the scope of the project was not agreed as at 31 December 2010 and work on the project had not begun by that date. Indeed, on 31 December 2010, Dr Lynch and Mr Hussain received a

---

[451] See also Alvaro Etcheverry of Autonomy's email to Mr Hussain dated 18 August 2010, in which he referred to the fact that "*we had a very successful POC meeting with the some of the top directors of Prisa in Madrid. Not only did we fully cover all their expectations and objectives we also demonstrated the added value of the Autonomy solution*".

[452] "*The reason we had Autonomy do the services, they knew their technology best and would be able to provide an integrated solution for us to meet our overall objectives and goals from a strategy and vision perspective*".

status update which indicated that there was no project plan in place at that time.

(9) In fact, the scope of the project in relation to the flagship phase (Prisa Radio), which required the bulk of Autonomy's services and software, was not agreed until about a year later, in a statement of work dated 19 December 2011,[453] which was signed by Autonomy on 26 December 2011 and Prisa on 27 December 2011. It outlined a project schedule that indicated the project initiation had started in February 2011 and set a "*target go live date*" for the new website of February 2012. In the event, however, the project was never completed, according to the Claimants because Autonomy could not get its technology to work, and was cancelled.

3768. Thus, as with the Tottenham Hotspur transactions, the Prisa First Amendment did not provide any defined scope of work for the project, nor did it define the deliverables or key milestones against which delivery could be measured, nor did it contain any defined acceptance criteria. The Claimants made the point that this is unsurprising in

_____

circumstances where the parties recognised at the time of contracting that a statement of work addressing these issues would need to be agreed subsequently.

*Appropriate accounting treatment*

3769. On 31 December 2010, licence revenue totalling about €6.8 million[454] (out of a total consideration of €9.6 million) was recognised in full in respect of Prisa in Autonomy's accounts.

3770. For the same reasons as in relation to the Tottenham Hotspur transactions, the Claimants submitted that this accounting was wrong. In particular, they contended that:

(1) The substance of the deliverable to be provided to Prisa – when assessed from their perspective, which Mr MacGregor accepted is the correct

_____

[453] In his witness statement, Mr Martin said that the 19 December 2011 statement of work only concerned Prisa Radio, which was one of many projects with Prisa. It is right that statements of work for other parts of the overall project were envisaged and negotiated, but only one other was signed by Prisa. However, that was dated 12 July 2011, so it cannot account for revenue having been recognised by Autonomy on 31 December 2010; indeed, it expressly related to services to be performed between 18 July and 30 September 2011. In any event, due to the problems that arose in relation to the flagship phase (Prisa Radio), all other initiatives were put on hold.
[454] The licence revenue recognised was €6,820,208, being (i) the €6,745,000 licence fee appearing in the Prisa First Amendment, and (ii) a further amount of €75,208 carved out from the "*One Off Fee*" in the Prisa First Amendment (of €243,208) for a one month extension and support.

approach[455] – was a solution, to which the provision of services by Autonomy was integral.

(2) Nothing of immediate value was transferred to Prisa at the time of entry into the Prisa First Amendment (31 December 2010), and therefore, no revenue should have been recognised by Autonomy in relation to the Prisa First Amendment at 31 December 2010.

(3) The deliverable under the Prisa First Amendment was not well defined, and in the absence of an agreed statement of work it was not possible to measure with any reliability important measures such as the stage of completion or costs to complete the transaction as was required in order to recognise revenue from services under IAS 18 §20.[456]

(4) In any event, as at 31 December 2010, no services had been provided to Prisa, and thus no costs had been incurred, so there was no revenue and no costs to account for in the FY 2010 accounts.

3771. In his expert reports, Mr MacGregor asserted that the Prisa First Amendment was not a 'solution'. The Claimants objected that it is unclear how he is able to opine on that issue as he accepted it is a question of fact. They noted that in cross-examination, Mr

MacGregor accepted that, as with the Tottenham Hotspur transaction, if the transaction is properly characterised as the provision of a solution, the revenue should not have been recognised in full as at 31 December 2010.

3772. However, what I consider Mr MacGregor meant was that the determination of the substance of the transaction depends on the facts and is ultimately a matter of accountancy judgement. In any event, the matters he put forward to explain his conclusion that on the basis of his understanding of the position are of relevance, though the Claimants did not trouble to address them.

3773. In particular, he drew attention to Mr Puri's own description in his witness statement of the scope and nature of the Prisa transactions, as suggesting that the customer perceived it was purchasing the underlying technology and, separately,

---

[455] PwC's guidance stated in this regard as follows: "*The substance will not only be based on the transactions' visible effect; it will also have to be analysed based on all the transactions' contractual terms, or the combination of the contractual terms of linked transactions….in assessing the transactions' substance, the transaction should be viewed from the perspective of the customer and not the seller; that is, what does the customer believe they are purchasing? If the customer views the purchase as one product, then it is likely that the recognition criteria should be applied to the transaction as a whole. Conversely, if the customer perceives there to be a number of elements to the transaction, then the revenue recognition should be applied to each element separately.*"

[456] Indeed, this appears to have been recognised within Autonomy. On 19 May 2011, Mr Lucini sent an email to Mr Hussain in which he stated: "*As I get the facts it becomes clear that we are about to embark on a complicated project without the appropriate measures to actually positively deliver and get acceptance from the customer. what's more I think that in the present conditions we can never succeed as the customers perception and reality of what they are going to receive is simple that…a perception …There is no objective acceptance criteria…we are hoping the client likes it at this point*".

additionally priced services for the implementation of the software products. The passage read as follows (emphasis as supplied by Mr MacGregor):

> "[PRISA] entered into an agreement with [Autonomy] involving the purchase by Prisa of certain <u>Autonomy software licences, three year's support and</u> <u>maintenance and 2,640 days of professional services and training</u>, for use on El Pais and Prisa's website, audio, video and other digital products. The agreement provided for fess totalling approximately €9.6m, <u>including €6.8m in</u> <u>respect of software licences.</u> <u>Autonomy was to provide the underlying</u> <u>technology for many of the components required for the project, as well as</u> <u>provide services for the implementation of those products for Prisa."</u>

3774. Mr MacGregor also emphasised that the contract itself expressly stipulated a separate and defined rate for the services to be provided, and provided as well for further incremental increases in the service rates after the exhaustion of the contractual number of man day services contractually agreed.

3775. Furthermore, he made the point that the Claimants had *"not explained how they believe the professional services revenue should be accounted for if the components of the transaction were not considered separable, given that these services were invoiced as and when such services were performed, and are therefore (it must be assumed) matched to the cost of the service being performed."*

3776. Mr MacGregor's conclusion was that on the facts as he understood them, as reflected in the above discussion, it was within a range of proper accounting judgement to account for the Prisa transactions as Autonomy had accounted for them; and if his understanding of the facts was wrong, he did not believe that the professional services under the contract should have been accounted for other than in line with the called for provision of those services, leading in effect to the same conclusion that the accounting treatment in fact according to the transactions was probably correct and at least was proper.

*Were Deloitte misled?*

3777. As in the case of the Tottenham Hotspur transactions, Deloitte's working papers confirm that Deloitte were well aware of the terms of the agreement, and thus of the provisions for a licence fee, a support fee and professional services and managed services thereafter. They were satisfied with the "carve-out rate" of 7% and concluded that the accounting treatment proposed was satisfactory.

3778. As in the context of the Tottenham Hotspur transactions, the Claimants relied on the evidence of Mr Welham in his witness statement that the true position was withheld from Deloitte, in respect of the Prisa First Amendment. But his evidence was premised upon the conclusory assumption he was instructed to make that the *"parties understood at the date of the contract that what was required was the delivery of a solution (to transform Prisa from a traditional media group to a predominantly digital media group…)"* and that there was *"no way to reliably measure the outcome of the transaction or the costs to complete*

*the project"*. The assumptions commanded the conclusion sought by the Claimants.

*My assessment whether the Prisa Sale should have been accounted for as a 'solution'*

3779. Again (as in the context of the Tottenham Hotspur transactions) I accept and would agree with the view of the experts that the essential question can be characterised as whether the sale should be characterised as a sale of a licence or an agreement to provide a 'solution'.

3780. I do not, however, agree with the Claimants that the factual position was clear and necessarily demanded characterisation of the Prisa First Amendment as a 'solution' and could not be treated as comprised of two elements (the sale of a licence and the provision of services at a price).

3781. I accept the points made by Mr MacGregor as described above. I particularly agree with his analysis, as articulated also on behalf of Mr Hussain, that at least in its form, the Prisa First Amendment was, unequivocally, an agreement for the licencing of software and separately for the provision of services. Mr Puri agreed in cross-examination that this was indeed *"the way the contract is structured"*. The question then is whether what Mr Puri told me, in a following passage of his cross-examination, that *"the intent was to have a comprehensive solution"* and *"we could not execute on the technology without executing on the professional services, so they went hand in hand rather than just splitting up into two different components"* is sufficient to require a different reading of its effect as a matter of substance.

3782. In my view, it is not. Although in other contexts (especially in the context of the numerous impugned VAR transactions) I have accepted that it is substance rather than form which controls the accounting treatment of transaction, I have also made clear that the contractual form is usually the best guide to intention. The position is no different in this context. The following summary of the effect of the contractual provisions was put forward in the closing submissions on behalf of Mr Hussain, and I adopt it:

  (1) It was for Prisa to determine on an as needed basis whether and in what quantity to deploy the (defined) Software (by putting it into operational use for access by its users) during the defined Deployment Period (Clause 4).

  (2) Even if Prisa decided not to deploy the Software during the Deployment Period, it was nonetheless liable to pay the annual Support Service Fee (as defined) in full.

  (3) At the end of the Deployment Period, it was for Prisa to provide an inventory of its use of the Software during the deployment Period. At that stage, the parties would consider the quantities of licences that Prisa would need in the future.

  (4) The licence fee for the Software was payable up front and was non-refundable. The parties could have agreed, but did not agree, that the fee

would be staggered or that Prisa's obligation to pay would be contingent upon the deployment/implementation of the Software or upon the Software achieving a particular outcome.

(5) If the parties mutually agreed a statement of works ("SOW"), Prisa would be entitled to call upon Autonomy to provide 2,640 man days professional services at the agreed bulk rate and thereafter at a rate of €900 per day.

3783. Mr Puri did agree that the arrangement was (as it was put to him in cross-examination):

*"to have the software which gives you the building blocks and to have professional services and for you mutually to agree on the statement of works."*

3784. I also agree that the totality of what the parties agreed and promised each other can be understood from the written agreement itself. Unlike the position as I have found it to be in the case of the impugned VAR transactions, no assurances were given that the contractual agreement would in practice not be enforced.  It was not suggested that there was any side understanding. What Prisa apparently hoped might be the benefits of collaboration and their confidence that Autonomy shared and would help it achieve its rather vaguely expressed objectives cannot subvert their stated and agreed understanding. In short, and again adopting Mr Casey's closing submissions on behalf of Mr Hussain:

(1) Prisa's obligation to pay the licence fee and software support services in full was unconditional and the fees were non-refundable. Its liability was not contingent upon its use of the Software for its intended or any other purpose.

(2) At the date of the Prisa Agreement, Prisa had no concrete ideas of what it wanted to do with the Software, other than a generalised aspiration to achieve the digital transformation of its business. Furthermore, the professional services work could only begin once the SOW had been mutually agreed with Autonomy.

(3) At its highest, Autonomy had agreed that Prisa could call upon it to provide professional services (subject to the terms of the agreement) but it had not agreed to perform any specific services (that being a matter for consensus in the SOW) nor had it agreed that it would achieve any specific outcome or result. It is common in business for contractors to be paid in phased stages of time or on the achievement of performance milestones. Autonomy and Prisa could have agreed that the licence fee would be paid in either of these ways, but did not do so.

(4) Thus, Prisa assumed the risks, among others, that on analysis the project would be far smaller in scale than anticipated in December 2010; that in the event it would choose not to pursue the project at all; that the SOW

that it wanted could not be agreed with Autonomy in full; and that some or even the majority of the Software would prove to be superfluous to the project once Prisa properly defined it. Even if these circumstances materialised, Prisa had no right to, or expectation of, a refund of any part of the Software licence fee.

(5) In short, there is no warrant for the suggestion that the economic substance of the Prisa First Amendment was any different to its form.

3785. In all the circumstances, I do not accept that Deloitte were relevantly misled in this context; and I do not consider the facts clear enough to overturn the contemporaneous judgement call made of the contract and the facts they made.

*Amgen (Q4 2010)*

3786. Autonomy Inc entered into a Hosting Services and License Addendum (the "Hosting Addendum") with Amgen Inc ("Amgen") on 21 December 2010. This enabled Amgen to archive and access electronic communications in a hosted online electronic communications archiving and management system. It formed part of a wider project for the provision by Autonomy of hosting and related e-Discovery services, in relation to which there had been three prior agreements. The software and services to be provided under the Hosting Addendum related to Digital Safe technology[457].

3787. The Claimants made three points in respect of the Hosting Addendum in support of their case of improper accounting.

3788. First, they submitted that what, in substance, Amgen purchased was a 'solution', namely the "*Digital Safe System*". This comprised: (i) Digital Safe and related software (namely, DS Mail and Anywhere Archive), which was to be "*hosted and used for archiving*"; and (ii) hardware. The Digital Safe System was to be implemented for the provision of "*Hosted Services*", which consisted of "*DS Mail and Digital Safe Archiving services, which are a hosted online electronic communications archiving and management solution that enables [Amgen] to archive its electronic communications and enables Users to access such communications*". The services also included the purchase of a "*Dedicated Digital Safe*", which meant that all required servers (i.e. hardware) and software components were isolated for exclusive use by Amgen.

3789. Secondly, the Claimants invited me to note that the fees charged to Amgen by Autonomy, which were in two categories, were for a license and services (including infrastructure) which were not separately identifiable components of the overall 'solution' but rather were an integral part of the provision of the Digital Safe hosting services that Amgen had purchased. The Service fees of $11,382,076 which were charged comprised (i) an "*Infrastructure and Support Fee*" of $6,379,363 and (ii) an "*Archiving Fee*" of $5,002,713 (for volumes of data to be "*ingested into the Digital*

---

[457] By way of brief reminder, Digital Safe was an archiving solution that allowed customers to store, search and retrieve their data.

*Safe"*). The Claimants submitted that these elements, along with the license to Anywhere Archive Software, were an integral part of the hosting product and neither was a separately identifiable component of the overall solution.

3790. Thirdly, the Claimants submitted that the licence element was artificially structured into the Hosting Addendum so that Autonomy could recognise as much revenue upfront as possible. It will be recalled (and see my consideration of the "Hosting claim") that such was the complexity of Digital Safe that generally (as here) it was provided as part of a hosted arrangement, whereby the Digital Safe system (on which the customer's data was stored) was: (i) located in Autonomy's data centres; and (ii) run by Autonomy on the customer's behalf. Part of the Claimants' complaint relating to the Amgen Hosting

Addendum was that it provided for the restructuring of Amgen's hosting arrangements so that as the *quid pro quo* of greatly reduced hosting fees in the future, Amgen would pay a licence fee for an "Anywhere Archive" software licence entitling it (it was said merely notionally) to bring Digital Safe in-house.

3791. The Claimants' case impugning the Hosting Addendum appears to have two aspects.

3792. One aspect of the Claimants' case, which may not be advanced separately from the second (see below), is the Claimants' contention that the restructuring and the "Anywhere Archive" licence comprised a device. The burden of the complaint in this respect was it is clear that Amgen did not desire an "Anywhere Archive" software licence: it had no commercial effect in practice since as a practical matter, moving inhouse was not feasible, Amgen had no wish to attempt it, and the services provided to Amgen were wholly unaffected by the sale of the licence. The purpose of the "Anywhere Archive" licence, it was said, was simply to enable Autonomy to accelerate and recognise revenue from its sale. This part of the Claimants' case reflects or expounds the same arguments as its "Hosting Case", though the Claimants had by trial limited their Schedule 12D "Hosting Case" (asserting direct claims for transactional losses for breaches of duty) to re-restructurings of existing hosting arrangements. However, although not confirmed by the Claimants in their submissions, my understanding of their case as pleaded in their RRAPoC, is that the alleged artificiality of the licence is not separately relied on to establish the claim. The claim as pleaded is that no revenue should have been recognised, not because of any alleged artificiality, but because the 'solution' had not yet been provided. The pleading was:

> *"The Digital Safe system had not been successfully implemented as at 31 December 2010 or by the end of the Relevant Period (30 June 2011), and no hosting services had been provided to Amgen prior to this date. Accordingly, no revenue should have been recognised in relation to this transaction at 30 June 2011."*

3793. In the circumstances, I have assumed that the Hosting Addendum was not intended to be an unexplained and unpleaded extension of the Claimants'

Hosting Case; and in accordance with the pleadings, I take it that the claim must stand or fall according to the second part of it.[458]

3794.   The second, and on the basis of that approach the gist, of the Claimants' case impugning the Hosting Addendum is that the Claimants' contention that the licence to "Anywhere Archive" software was not a separately identifiable component of the overall arrangement (under IAS 18 §13) and that the artificiality of the licence serves to underline that the intention and understanding of Autonomy and Amgen was that both the Digital Safe System and Amgen's data would be hosted, and all associated services would be performed, by Autonomy at its data centres. That was the substance of the transaction. Nothing was transferred to Amgen that was of independent value as the

Anywhere Archive software could not be used separately from the Digital Safe System,

which itself could not be used independently of Autonomy's support services. As events transpired, the purchased Digital Safe System was not implemented by the conclusion of the Relevant Period. The Hosting Addendum contained agreed milestones for the completion of the project with an expected completion date of 30 June 2011. This expected completion date was not met and formed part of a complaint by Amgen against Autonomy on 5 November 2012.  In short, until all the constituent elements of the 'solution' were provided no revenue should have been recognised.

*How Hosting Addendum (a) was and (b) should have been accounted for on pleaded case*

3795.   Before the agreement of the Hosting Addendum on 21 December 2010, there was internal discussion within Autonomy about the amount of revenue that could be recognised. On 10 December 2010, in an email from Mr Mooney to Mr Chamberlain, copying in Mr Hussain, the view was expressed that Autonomy would be able to recognise the licence element (of $3.5 million) and the first two years of fees. When the deal eventually closed, Mr Mooney sent Mr Hussain an email stating "*Should be able to recognize very close to what's been committed. ($7.4M)*".

3796.   Ultimately, Autonomy recognised revenue for Q4 2010 of: (i) $3.5 million in respect of the "Anywhere Archive" licence on 29 December 2010; and (ii) $2,201,745 in respect of accrued infrastructure fees on 31 December 2010.[459]

3797.   The Claimants' case is that this was improper:  by reference to all these considerations, no revenue should have been recognised in relation to the

---

[458] That is so even though I note that in Mr Hussain's written closing submissions it was accepted that the first part would *"clearly follow"* the outcome of the "Hosting Case" and (as will be seen) the Claimants' expert dealt with what I shall call the 'artificiality point' substantively.

[459] Mr Hussain was involved in discussions about the appropriate accounting treatment of this transaction.

Hosting Addendum when it was or indeed at any time before the end of the Relevant Period (30 June 2011).

(1) Nothing was transferred to Amgen that was of independent value as the Anywhere Archive software could not be used separately from the Digital Safe System, which itself could not be used independently of Autonomy's support services. Thus, the software licence should not have been accounted for separately from the overall Digital Safe hosting arrangement.

(2) In the case of the infrastructure fees, again, the lack of separability of the infrastructure element from the overall Digital Safe hosting arrangement (see above) meant that it was not appropriate to account for it separately.

(3) Accordingly, in both cases, the revenue recognition criteria should have been applied to the transaction as a whole in accordance with its overall substance, namely the provision of a service over time. Revenue should, therefore, have been recognised over the period that any hosting services were actually provided, in accordance with the recognition criteria for the provision of services under IAS 18 §20. These include the requirement that "*the stage of completion of the transaction at the end of the reporting period can be measured reliably*".

(4) The Digital Safe System was not implemented, and the provision of hosting services did not commence, by the end of the Relevant Period, as explained above. Therefore, no infrastructure or licence revenue should have been recognised (even rateably) at all. Indeed, it was inherently unlikely that the

Digital Safe project would even have commenced, let alone completed, at the

time revenue was recognised within just 10 days of the Hosting Addendum being signed.[460] It was, therefore, inappropriate to recognise any revenue by the end of Q4 2010.[461]

3798. Mr MacGregor cautioned that the evidential record was sparse. But on the available evidence, and especially having regard to the terms and provisions of the Hosting Addendum, (which Mr Holgate had not read) he took a different view from Mr Holgate. In particular:

(1) He did not agree that it was necessarily the case that the "infrastructure" and support fees could not be separately identified. He did not accept Mr Holgate's conclusion, based on the Assumptions he was told to make,

---

[460] The milestones for the project envisaged a draft of the project plan being produced at a later point in time, namely 10 January 2011. Thus, revenue was recognised before the project had been planned, let alone implemented.

[461] Mr Holgate also expressed the view that, even if the criteria for sale of goods applied to the transaction (which they do not), the fact that the Digital Safe System had not been implemented shows that criteria (a) and (b) of IAS §14 had not been met.

that the "infrastructure" could not be regarded as in any way independent or operate independently from the Digital Safe services.

(2) Whilst accepting that it would not have been possible for Autonomy to provide the archiving services prior to Amgen putting any data into the Digital Safe, it appeared to him, based on his review of Deloitte's working papers (which Mr Holgate did not consider) that it was possible for Autonomy to set up the systems and infrastructure to hold such data at the outset of the contract. Also, it made sense to him that, if (as appeared) Autonomy was designating servers for Autonomy's use of a term of five years, Autonomy should be entitled to charge Amgen for these dedicated servers from the beginning of the contractual use term (of five years) regardless of whether Amgen made use of the servers or not.

(3) Further, in the absence of any evidence from Amgen as to its expectation and intentions, those could only be ascertained from the contractual documentation. The Hosting Addendum itself undoubtedly treated them separately, and provided for payment in any event on or before 12 February 2011. Mr MacGregor made the point that if, as suggested by Mr Holgate, the licence was in substance part of the provision of an overall service and was considered to be so, it was open to Amgen, and he would have expected it, to have protected its interests by specifying that it would only be obliged to pay once the services had been provided, or would be entitled to a refund if in the event they were not. As it was, Autonomy contracted for and received payment from Amgen of the licence fee and the infrastructure and support fee on 11 February 2011.

(4) Generally, he concluded that there was *"insufficient information to impugn the accounting treatment as recorded by Autonomy and detailed on Deloitte's files."*

*Were Deloitte misled?*

3799.  The Claimants contended that had Deloitte been aware of the true facts in relation to the Amgen transaction, it would not have considered it appropriate to recognise revenue upfront.

3800.  As to this, according to the Claimants:

(1) The Deloitte report for Q4 2010 shows that Deloitte considered the transaction based on a false understanding. It stated that the deal "*had been structured to split the licence fee into a licence fee payable upfront and an infrastructure fee payable over the term of the licence*" and that "*Both elements have been recognised in revenue as there are no further obligations on Autonomy's part now that the software has been delivered*". However, as shown above, in substance the transaction was

for the delivery of a solution and that solution was, in fact, not delivered at all during the Relevant Period. Autonomy had many further obligations at the time the software was delivered.

(2) In cross-examination, Mr Welham explained that Deloitte's view of the Amgen transaction was "*based on what we knew at the time*", in response to which the cross-examiner said, "*I'm not going to debate the assumptions you've been asked to make*". It was not suggested to Mr Welham that Deloitte would still have considered it appropriate to recognise revenue if those assumptions were, in fact, true - as indeed they are.

3801. The Claimants also relied on Mr Bloomer's confirmation in cross-examination that the Audit Committee was not told the full picture. As to this, it was led to understand that: (i) the Amgen sale was the sale of a Digital Safe software licence and storage – rather than, according to the Claimants, the sale of a solution absent the implementation of which the software could not be used; and (ii) there were no further obligations on Autonomy's part as the software had been delivered – even though the solution had not been implemented at the time revenue was recognised. The Claimants contended that the Audit Committee were thus deprived of relevant considerations. As Mr Bloomer confirmed, it would "*certainly have been relevant for Deloitte at the time to ensure that the revenue split was right between whatever had been delivered by the end of this quarter and whatever remained to be delivered as ongoing services*" (emphasis added).

3802. However, and although the Claimants in their oral closing argument submitted that there had been no challenge to this evidence (Mr Miles having stated he did not intend to "*debate the assumptions*" and Mr Casey not having cross-examined on the issue at all) as I read the evidence of Mr Welham he was simply expressing the conclusions already implicit (and even sometimes explicit) in the Assumptions he was required to make. As in other contexts, the evidence did not seem to me to carry the analysis any further.

*My assessment*

3803. On the basis that the Claimants have not pleaded or advanced this claim as an extension of their "Hosting Case" (see above), the gist and basis of the claim is the recognition of revenue before delivery of the 'solution'. Although there appear to me to be a number of unanswered questions as to the basis for splitting off part of what in the round appears may well have been acquired as an indivisible whole, the evidence in this context was relatively sparse.

3804. Against that, the terms and provisions of the Hosting Addendum did separate out the various elements of what Autonomy engaged to provide and the amounts payable at each contractually agreed stage.

3805. I have concluded that in the particular context, and taking into account the nature of the claim as part of a fraud case where, as to this part of it, I have heard from neither of the two Defendants, there is insufficient factual basis to overturn the

express provisions of the contract and the contemporaneous judgement call made of the contract and the facts made by Autonomy and approved by Deloitte.

*Iron Mountain (Q2 2011)*

3806.   The fourth and last of the "Other Transactions" impugned by the Claimants was a sale of a perpetual licence to IDOL and associated maintenance and support services by Autonomy to Iron Mountain Information Management Inc ("Iron Mountain") for a licence fee of $1.5 million, with an additional $75,000 support and maintenance fee. As mentioned earlier, the transaction was concluded on the same day that Autonomy acquired the Iron Mountain Digital business from Iron Mountain Inc (a related group company). It is also worth noting that this is one of the impugned OEM transactions (OEM61).

3807.   In the written closing submissions on behalf of Mr Hussain, the Iron Mountain transaction is described as *"a one-off in the case"*; and it is correct that the transaction is unlike any of the three "Other Transactions" addressed above, and the basis of impugning the transaction is specific and particular.

3808.   The Claimants' essential complaint can be summarised as follows:

(1)   As was common ground between the parties' respective experts was the correct approach, Deloitte determined that the perpetual licence sale to Iron Mountain and Autonomy's acquisition of the Iron Mountain Digital business were linked transactions and that in consequence it was necessary, in determining how much revenue from the sale could be recognised, to establish the *"fair value"* of the licence sold under IAS 18. That was more difficult than might appear since (as previously noted) IDOL had no standard price or value, with much turning on the particularities of different customers.

(2)   Autonomy calculated the fair value of the licence by identifying what it considered to be eleven comparable sales with seven different customers. Details of these were set out in a table which Autonomy sent to Deloitte. Autonomy then calculated the average price (adjusting to the same 5-year term as the Iron Mountain licence [462] if the allegedly comparable licence term was

---

[462] Management took a 5-year term to be what in reality is equivalent to a 'perpetual' licence in the software industry as after that point it is likely that the technology will be outdated. Deloitte's working paper noted this as follows: *"As the Iron Mountain licence is a perpetual licence, management has assumed that in reality perpetual in the software industry only means around 5 years, as after that point the technology is largely redundant and a new licence would need to be purchased – on that basis, management has extrapolated the value of any licence with a term <5 years up to 5 years, to represent the value of the licence if it had been sold as a perpetual licence".*

different) before excluding three of the comparables on grounds of a material difference undermining comparability[463].

(3) The comparables left gave rise to an average value of just over $11 million. In an email dated 20 July 2011 to Messrs Murray and Welham and copied to Mr Hussain, Mr Chamberlain stated that:

> *"This supports a fair value of $10-11m. Given the subjectivity we have gone for a slightly lower value - $7m – as we believe this to be a prudent and strongly supportable position."*

3809. The Claimants contended that the way that Autonomy assessed and determined the *"fair value"* was unjustifiable for two main reasons:

(1) First, the notion of determining "*fair value*" by comparison to other deals was misconceived because there was no standard pricing for Autonomy software, including IDOL:

(a) On 12 April 2011, Mr Welham sent an email to Mr Mercer (copying in Mr Hussain) expressing concern with the revenue treatment for two deals signed with Discover Tech. One was for end-user FINRA, and the other was for end-user Prisa. Both concerned e-Discovery software, into which IDOL was incorporated.[464] Mr Welham said: "*These are identical, i.e. products sold, number of users etc but the purchase price is $1.1m vs. $3.8m. We need help understanding how this works from a fair value and arms' length perspective*".

(b) The next day, Mr Chamberlain sent the following explanation to Mr Welham (again, copying in Mr Hussain): "*it is not uncommon for the same software to be sold to different customers for very different prices. The buying decision is all around ROI and different organisations can achieve different returns with the same software. The negotiations are complex and lead to very different answers from time to time*".[465]

---

[463] Three were excluded on the ground that *"Autonomy is a fundamental part of the customer offering"* which, based on Deloitte's working paper, the Claimants took to mean that it was not possible *"to split out the IDOL search related value"*

[464] Mr Welham's email concerns impugned VT30. As is apparent from the relevant letter agreement dated 31 March 2011, the software licensed to Prisa was e-Discovery software. IDOL was incorporated into such software by the time of this deal. Given that the deal with FINRA was "*identical*", the same must have been true for the software licensed to FINRA too.

[465] Dr Lynch confirmed in cross-examination that what Mr Chamberlain told Mr Welham was true. When it was put to him that there was no standard market price for Autonomy software, Dr Lynch said this would depend on the software – but he did not specify particular software that did have a standard market price. Nor was Dr Lynch's qualification expanded upon in re-examination.

(c) Accordingly, the same piece of Autonomy software could be sold on identical terms to two different customers at two very different prices from a fair value perspective. Prices were determined by the

---

idiosyncrasies of the particular customer and the complex process of contractual negotiation.

(2) Secondly, even if it were possible to compare prices, the particular transactions selected for comparison in Autonomy's spreadsheet were inappropriate. In their written closing submissions, the Claimants included a detailed table explaining their contentions in this regard by reference to each "comparable", concluding that none of the selected transactions was an appropriate comparable, for reasons which included variously (a) the licence covered different software and/or a different number of functionalities covered by the licence (b) the licence restricted the number or type of permitted users or the nature of permitted use (whereas the Iron Mountain licence was for an unlimited number and type of users and did not restrict use) (c) the licence was restricted to English, whereas the Iron Mountain licence included all languages supported by Autonomy (d) in four cases (a licence sold to Capax Discovery (RT 1), a licence sold to VMS (RT 2), a licence sold to Filetek (RT 3) and a licence sold to EMC (RT 5)) the sale was part of a transaction alleged (and which I have found) to be reciprocal.

3810. These criticisms were well put together and persuasive in demonstrating that the exercise was imperfect. But the difficulty is in fashioning any less imperfect alternatives.

3811. Mr Holgate suggested none, and acknowledged that it was not possible to be definitive about an alternative figure. In plumping (as he did) for the transaction price of $1.5 million, on the residual approach that he considered that *"no other number suggests itself as being preferable to $1.5 million"* Mr Holgate undermined the whole rationale for requiring (as IAS 18 did and does) the assessment of fair value in the first place (that is, that in a linked transaction the purchase price paid might well not be the 'right' price).

3812. Mr MacGregor made the point that *"Simply because arriving at a fair value is difficult does not mean that it should not be done; in fact international accounting standards require it must be done in certain circumstances."* Even accepting that *"views may (and...often do) differ as to what constitutes a "comparable" transaction, as there are so many different characteristics to be considered as well as the relative weight given to each"* there may be little alternative. Mr MacGregor considered that:

(1) Absent any indication of "standard price" or price list, such an approach, i.e. by reference to comparable transactions, was reasonable.

(2) Deloitte had carefully considered Autonomy management's fair value exercise (as recorded in its working paper, which show that Deloitte undertook a full review) and reached the conclusion that *"management has used a representative sample of deals and that the average used (excluding the one outlier) provides a prudent estimate of fair value"*. He noted that Deloitte had also brought the matter to the attention of the Audit Committee (though it is to be noted that Mr Bloomer confirmed that they were not provided with details of the 'comparable' transactions). Overall, Mr MacGregor saw no reason to second-guess that assessment.

3813. The Claimants were critical of Mr MacGregor's answers about these matters in crossexamination. In particular, and although more circuitously expressed, I took the effect of their criticism to be that he had (a) appeared to downplay the extent to which transactions even needed to be comparable and (b) done nothing to defend the management's assessment of fair value and appeared to accept that the comparators relied on by Autonomy did not establish anything more than that the default figure of $1.5 million might not be correct and (at most) that a higher figure might be justified. There was some substance in this: and I was left wondering whether he had himself lost confidence in the comparability of the transactions identified, though he refrained from any such admission.

3814. The Claimants submitted that the description of the fair value adjustment exercise to the Audit Committee was highly misleading. The Deloitte report dated 30 June 2011 stated that management had "*determined fair value with reference to seven similar sized licence deals*" although that sample did include "*one significant outlier*".[466] Mr Bloomer confirmed that the Audit Committee was not provided with any details of the comparator deals. Thus, the Audit Committee's understanding was that the fair value exercise was undertaken by reference to seven other deals, and that the deals used were "*relatively similar*". The Claimants submitted that neither of these factors was true:  the sample of transactions actually utilised in the calculation consisted of just four transactions from three customers, and the deals used were not similar at all.

3815. They suggested further that the comparables had been specially selected by Autonomy to justify a figure Autonomy already had in mind and needed to achieve. They relied in that respect both on what they described as the inappropriateness of the transactions they considered and on an email exchange between Mr Chamberlain and Mr Hussain on 15 July 2011 (and thus before the analysis was undertaken) in which Mr Chamberlain first requested from Mr Hussain "*a summary of comparable transactions so we can justify the fair value adjustment*".

*My assessment*

---

[466] The outlier referred to is Eli Lilly. As recorded by Deloitte, this transaction was excluded because: (i) of the different sizes of Eli Lilly and Iron Mountain; and (ii) because the value of IDOL had declined since 2008 (see Deloitte workbook tickmark (a)).

3816. I was left with a feeling of unease about the exercise adopted and the choice of comparables. Nevertheless, the fact remains that, as emphasised in Mr Hussain's closing submissions, the exercise was fully examined by Deloitte and Mr Welham did not suggest in his witness statement that Deloitte was in any way misled about this transaction: and they could assess the comparables for themselves.

3817. The Claimants made much of Mr Bloomer's evidence that the Audit Committee was not provided with any details of the "comparator deals" (see paragraph 3814 above). But it was for Deloitte to determine what detail to provide in their report and the balance of Mr Bloomer's evidence was that the approach which had been taken *"seemed a reasonable approach"*, and he and the Audit Committee well understood that "similarity" was a relative concept. The following exchange in his cross-examination seems to me to illustrate this:

> *Q. And you would have understood that the comparator deals used for the fair value exercise were similar to the Iron Mountain transaction, yes?*
>
> *A. As I say, <u>relatively similar</u> given the variability in the licence and the deals that Autonomy did, it – you know, there's an element of art rather than*
>
> _____
>
> *science in trying to do this exercise <u>but they would have been similar enough</u> <u>to do it in this way."</u>* [My emphasis]

3818. In the round, and again having heard from neither of the Defendants, I have concluded that I was not shown a sufficient evidential basis for disturbing the assessment made by Autonomy and approved by Deloitte.

*Overall conclusion on the "Other Transactions"*

3819. Accordingly, I do not consider that the Claimants' case for impugning the Other Transactions was made good in any of them. I consider them, for a number of reasons, to be distinguishable from the other claims in this case, which may explain their bundling together, and possibly even why Dr Lynch was not cross-examined on them.

3820. As a general observation, the question, which I would have found difficult, as to the effect on the calculation of loss when a claim has been made good against one Defendant but not the other, does not arise in the context of the Other Transactions, or in relation to any of the claims in this case.

## DECEIT AND MISREPRESENTATION CLAIMS

### The pre-acquisition misrepresentations alleged

3821.   The Claimants have also pleaded claims against the Defendants in common law deceit and/or under the Misrepresentation Act 1967 ("the 1967 Act" or "s.2(1)"). The Claimants' case is that in the course of the acquisition process the Defendants made a series of misrepresentations to HP on which HP/Bidco[467] relied in deciding to purchase Autonomy, and the price it was willing to pay. Subject to the 'wrinkle' that the claims are brought by Bidco, these claims are 'direct' claims: that is to say, they rely on what was allegedly represented to HP itself by Dr Lynch and/or Mr Hussain, rather than on what Autonomy represented to the market in its published information.

3822.   In paragraph 207 of its RRAPoC, Bidco limited its direct claims against the Defendants in deceit and/or misrepresentation to loss attributable to the acquisition from them of the shares and share options that they each sold to Bidco in aggregate amounting to some US$420 million (being the dollar equivalent on the date these claims were issued (30 March 2015) of £284 million, the shares having been denominated in sterling)[468].

3823.   Its claim (through Bidco) in deceit required HP to establish that:

(a)   the Defendants made representations of fact that were untrue;

(b)   they made those representations, directly or indirectly, to HP;

(c)   they did so knowingly, without belief in their truth, or reckless as to their truth;

(d)   they intended HP to rely on those representations; and

(e)   HP did so rely, and thereby suffered loss.

3824.   Bidco's alternative claims in misrepresentation under s.2(1) do not require proof of the third element (that the false representations were made fraudulently, that is, without belief in their truth or reckless as to their truth). Rather, if the other elements adumbrated above are established, the claims are made out unless the Defendants prove that they had reasonable grounds to believe, and did believe

---

[467] Again, the *Bidco point* arises: see paragraphs 484 to 500 above. References in this part of this judgment to HP should be taken to it as the controlling mind of Bidco and/or on the basis that representations to HP were intended to be relied on by HP and any acquisition vehicle that HP might use to acquire Autonomy.

[468] Bidco's case is that HP generally operated in US dollars at all relevant times, that it had to purchase sterling to effect the acquisition, and that Bidco, as the corporate vehicle that HP used to purchase Autonomy, foreseeably bore loss in US dollars: see paragraph 196C of the RRAPoC. I will address further in a judgment on quantum issues as to the currency of account and the currency of calculation of loss.

up to the time they sold their shares and share options to Bidco, that the facts represented were true.

*Summary of the representations and the claims made in respect of them*

3825.   The eight sets of pre-acquisition representations which the Claimants alleged were made to HP were grouped by the Claimants into three stages of the acquisition process:

_____

(1)  the initial approach to HP by Qatalyst and introductory meetings in January to March 2011;

(2)  the more detailed discussions in London in June and July 2011; and

(3)  the due diligence process in August 2011.

3826.   In summary, the Claimants based their claims on:

(a)  Representations made in January and February 2011 in slide decks ("the January and February Slides") sent by Mr Quattrone of Qatalyst ;

(b)  A further slide deck presented at a meeting in March 2011 ("the March Slides");

(c)  Representations allegedly made by Dr Lynch at a meeting attended by representatives of HP and Autonomy in London on 29 June 2011 ("the June meeting");

(d)  Further representations allegedly made at another meeting on 29 July 2011 ("the July meeting");

(e)  Representations allegedly made in the course of due diligence calls in August 2011, on 1, 2 and 4 August 2011.

3827.   The representations on which HP based its case in general reflected Autonomy's published information. The Claimants acknowledged that their case on the falsity of the representations, and on the Defendants' knowledge of (or recklessness as to) that falsity, generally followed from their case on the alleged false accounting. If the Defendants succeeded in defending the allegations about false accounting, many of the misrepresentation claims would have fallen away: but they have not done so.

3828.   The Defendants denied fraud and deceit. Their over-arching defences were that:

(1) Qatalyst was not acting as their or even as Autonomy's agent, and the Defendants cannot be liable for any misrepresentation made by Qatalyst, but not by them or on their behalf.

(2) The Claimants relied on some representations made by Dr Lynch and on others allegedly made by Mr Hussain, and, (for example) in their counterfactual submissions as to loss, they did not distinguish in respect of each alleged misrepresentation which, if either, was responsible; but each Defendant had to be considered separately, and in considering a claim against one, only those misrepresentations found to have been made by him, or on his behalf, can be taken into account. Neither was alleged to have nor had any liability in respect of statements made by the other (save insofar as the Claimants allege that Dr Lynch, by his silence, acquiesced in a misrepresentation made by Mr Hussain; I deal with this below in the context of the 29 July 2011 meeting).

(3) Neither had conscious knowledge at the time that they had made any representation which was false.

(4) The Claimants had not proved inducement/reliance.

(5) The Claimants had not proved loss.

3829. In addition, Mr Hussain contended in his Defence that even if, contrary to his primary case, he knew that statements made in Autonomy's reported financial results and its other public statements were false (or had no honest belief that they were true):

(a) Mr Hussain always made it clear to HP, and it was understood by all parties to the negotiations, that it was for HP to carry out its own due diligence in relation to the Autonomy acquisition.

(b) In repeating those statements to HP, or referring HP to Autonomy's published information, he was "*at its highest*" representing that those sources underlined contained the statements in issue, and was neither making such statements himself, nor representing that they were accurate, or even that he reasonably believed them to be accurate.

3830. In his closing submissions this contention, which was not advanced by Dr Lynch and which the Claimants dismissed as unrealistic, was not repeated in the context of the January and February Slides[469] but it was in relation to the 1 August 2011

---

[469] *"At its highest, any representation by Mr Hussain would have been to the effect that he believed that AU's financial information was accurate and not misleading. Any such representation would have been true"* [489] In that context, Mr Hussain's pleaded defence was that *"Mr Hussain was simply repeating information from the Q2 2011 Quarterly Financial Report and investor presentation…As a matter of English law, Mr Hussain's repetition of such information amounted, at most, to a representation that those sources contained the relevant figures, but not that those figures were accurate."*

due diligence call, and I take it to have remained part of his case in both contexts.[489]

*The January and February Slides*

3831. The first two sets of misrepresentations relied on by the Claimants were made in the January and February Slides.

3832. The Defendants' position was that:

(1) Neither of these slide stacks or presentations was prepared by either Dr Lynch nor Mr Hussain, nor were they sent by them to HP, or used by either of them on a call or meeting. According to the Defendants, these were not representations by either Dr Lynch or Mr Hussain, nor were they made to Bidco. Instead:

(a) The January Slides were emailed by Mr Quattrone to Mr Lane of HP on 26 January 2011.

(b) The February Slides were emailed by Mr Quattrone to Mr Robison on 3 February 2011.

(c) Both sets of Slides were prepared by Qatalyst on its own accord, as an investment bank's tool to drum up a transaction from which it could profit: neither set was prepared by either of the Defendants.

(d) Like the Slides sent by Qatalyst to Oracle at around the same time, they were sent "*for the purpose of our* [i.e. Qatalyst's] <u>*independently*</u> *pitching Autonomy as an idea*".[470]

(e) Neither of the Defendants was even aware that the slide stacks were being prepared.

(2) The January and February Slides preceded the acquisition by more than six months, at a time when no transaction was in prospect, and when HP and Autonomy were at an early stage of getting to know each other.[471]  They played no part in HP's decision in August to proceed with the acquisition of Autonomy.

---

[470] Email from Mr Quattrone of Qatalyst to Dr Lynch, 29 September 2011.
[471] See Mr Johnson's evidence in the US criminal proceedings that the video-conference on 3 February was a "*typical first meeting with the company to learn a little bit more about what they do, a little bit about their products, but fairly high level, from what I remember*", and that "*you start at a very high level because we're talking to a lot of companies all the time*".

(3)   The January and February Slides were prepared on the basis of and reflected Autonomy's published information, which was accurate.

(4)   Even if (contrary to the Defendants' case) the published information was in some respect not accurate, Dr Lynch's case in particular was that he believed it was, and reasonably so: accordingly, even if these documents are treated as containing misrepresentations by Dr Lynch, there would be no fraud, and Dr Lynch would have a defence to a claim under s.2(1).

(5)   In any case, at that stage, neither of the Defendants was intending to promote or bring about a sale. At that stage, according to the Defendants, Qatalyst was simply (quoting Dr Lynch's written closing), *"arranging meetings with several companies on a low-key basis, preparing for the possibility of an unsolicited bid defence."*

3833.   The Claimants did not accept any of this. Their position was that Dr Lynch and/or Mr Hussain made these representations, or caused them to be made, as part of the strategy of enticing a bidder and inducing a sale:

(1)   Mr Quattrone was shopping Autonomy to a set of potential purchasers that he had discussed with Dr Lynch. This "*potential acquiror universe*" included HP. Qatalyst produced and provided the January and February Slides to HP as part of that process and on behalf of Autonomy.

(2)   The January and February Slides included information taken from a slide deck with the file name "*corpoverview2010*" sent by Dr Lynch to Mr Quattrone by two emails in advance of their video conference on 6 December 2010, and shortly before Mr Quattrone began approaching potential purchasers. The

Claimants contended (and put to Dr Lynch) that the material was provided to

---

Qatalyst with the intention that Qatalyst should use the material to pitch Autonomy to potential buyers. As to this:

(a)   I was told that the attachments to these two emails have been lost; and the Claimants had therefore referred to the slides sent by Dr Lynch to Mr Quattrone as the *"Lost Slides"*.

(b)   However, two other Autonomy presentations from around this time – one with the file name "*Corporate overview November 2010*" (the "November 2010 Slides"); and another with the file name "*Company Overview – December 2010*" (the "December 2010 Slides") have been located. Dr Lynch accepted that Autonomy used standard slides, which it updated as needed, and that he along with others would work on them: "*one deck is used as the starting point for another*".

(c) A comparison of the November 2010 and December 2010 Slides with the January and February Slides (and indeed the March Slides, discussed below) shows significant overlaps, as was shown in detail in cross-examination. Materially:

(i) The representations as to <u>overall</u> <u>revenue, gross margin and</u> <u>net profit</u> in the January and February Slides were contained in the "*Autonomy Overview*" slide in each deck. Those Slides extensively reproduced material (including but not limited to materially identical representations) contained in four separate slides in the November 2010 Slides: "*Introduction to Autonomy*"; "*Autonomy's Power of Three*"; "*Financial Overview*"; and a slide containing bar charts. Those slides from the November 2010 Slides were later reproduced and updated in the March Slides.

(ii) The representations as to <u>organic IDOL growth</u> in the January and February Slides were contained in bar charts in the "*Key Financial Metrics*" slide in each deck, which reproduced and updated an otherwise substantively identical bar chart labelled "*Quarterly Organic Growth*" in the November 2010 Slides.

(iii) The representations as to <u>revenues by category</u> in the January and February Slides were contained in the pie charts reproduced at paragraph 3842(4) below, which substantively reproduced and updated a table of the same data in the November 2010 Slides. The same table was itself reproduced and updated in the March Slides.

(iv) The representations as to <u>IDOL OEM</u> in the January and February Slides were contained in the "*IDOL Software Business Model*" slide in the January and February Slides. Those slides extensively reproduced material (including but not limited to materially identical representations) from the December 2010 Slides.

(d) The Claimants submitted that it is clear that the January and February Slides were heavily based on the Lost Slides (updated appropriately), including the representations in issue.

3834. In cross-examination, Dr Lynch (in answers that struck me as having been thought about in anticipation of this line of questioning) admitted that the January and February Slides "*may*" have been based on the Lost Slides, but (i) initially claimed that the Lost Slides were publicly available on Autonomy's

website; and (ii) pointed out that many of the representations concerned publicly reported figures. He also insisted that none of this was done, nor was Qatalyst's involvement with a view, to pitch Autonomy to potential purchasers. He told me:

> *"We were interested in the idea of having the ability to, if we got an irresistible bid, to have more than one bidder and the possibility of having a better home for the company that we could carry on with our vision and also we were very happy to take up these introductions to the most senior people in the technology sector in the world".*

3835.   I am not persuaded that the derivation of the content of the January and February Slides has as much significance in determining whether the Slides amounted to representations by the Defendants as the Claimants suggested it did. It seems to me to be obvious that Qatalyst would have asked for information, and that Autonomy would have wished to, and in the event did, supply it. As the Claimants pointed out, if the compilation in the Lost Slides was available on and easily mined from Autonomy's website, there would have been no need to go to the effort of dividing the deck up into two parts and sending them to Mr Quattrone by email, as Dr Lynch did; he could simply have sent a link for Mr Quattrone to download. The coincidence of timing between the sending of the January and February Slides, and Mr Quattrone's approaches also suggests some connection between the two.

3836.   All in all, it seems to me plain that the derivation or source of the information was the slides prepared by Autonomy: and there would have been no point in Qatalyst reinventing the wheel from publicly available information. However, in my view, the form and content of the January and February Slides, and the fact that both were presented on their face as being Qatalyst documents, suggests (and I find) that, whatever their derivation, they were put forward by Qatalyst as its own documents.

3837.   The more pertinent and difficult question is whether the documents were put forward at the meeting with HP on 3 February 2011 in the presence of the Defendants and without objection or correction from either of them. The Claimants contended that the February Slides were indeed shared with HP <u>during</u> the 3 February 2011 video-conference with HP that both Defendants attended (and there is no suggestion that they demurred from the representations made in them). They relied in this regard on Dr Lynch's own evidence in his first witness statement, where he said (<u>emphasis added</u>):

> *"HP claims that there were misrepresentations about the amount of revenue recognisable from OEM relationships, the growth of Autonomy's OEM business and the existence of royalties from OEMs in three PowerPoint slides shared or shown to HP in January, February and March 2011. <u>The February and March slides were shared with HP during video-conferences that I attended</u>.*
>
> *The January and February slides were prepared by Mr Frank Quattrone and Qatalyst…"*

3838. However, in the course of cross-examination, Dr Lynch claimed for the first time that the February Slides had <u>not</u> been shared during the video-conference, and rather that some <u>other</u>, previously unidentified and (he seemed to suggest) no longer extant, presentation deck was shared instead. The Claimants urged that this evidence should be rejected, given that:

    (1) The passage cited from Dr Lynch's first witness statement is unambiguous and cannot sensibly be construed in the context of what immediately precedes and follows it as referring to some slide deck other than the February Slides.

    (2) No correction was made to that paragraph between 14 September 2018, when that evidence was served, and the moment when Dr Lynch made his new claim in the course of cross-examination.

    (3) Dr Lynch has not identified an alternative set of slides, nor have the Claimants been able to locate one.

3839. In the circumstances, I do not feel able to accept Dr Lynch's evidence in crossexamination contradicting what he had said in his witness statement. He himself retreated to saying that *"Yes, there's been a lot of confusion about these slides"* and he oscillated between denial that the slides had been put forward at all and general assertion that *"...these would not be slides that I would do for a presentation because they're all about things that I don't know about".* In short, the best that can be said about his evidence in this regard was that it was confused.

3840. I find that the February Slides were based on material provided for the purpose of such a presentation and were put forward under the name of Qatalyst at the 3 February 2011 meeting in the presence of Dr Lynch and Mr Hussain, neither of whom dissociated himself in any way from their content.

3841. Furthermore, even if Dr Lynch's claim that the February Slides were not shared with HP during the video-conference were correct, there is no dispute that they were provided to HP around the same time. I agree with the Claimants that the points made above in respect of both the January and February Slides would still apply, and that Dr Lynch and Mr Hussain both in effect adopted their presentation, and implicitly vouched for their accuracy.

*Substance of representations in the January and February Slides and their alleged falsity*

3842. The Claimants' case (the elaboration of which I have taken very largely from their written closing submissions) is that the January and February Slides included the following false representations (set out here following the order of the slide decks, which is identical in each case)[472]:

---

[472] The analysis which follows reflects an exercise undertaken by the Claimants and their valuation expert to contrast certain financial metrics reported to the market by Autonomy with what, on the Claimants' case, it should have reported. In accordance with the shorthand used by the Claimants'

(1) The Autonomy group's total revenues were said to be $740 million in 2009. The Claimants' case is that True total revenues were $646.8 million; or $593.8 million excluding the undisclosed pure hardware sales; and $870 million in 2010, when True total revenues were $722.3 million; or $623.3 million excluding the undisclosed pure hardware sales.[473]

(2) The Autonomy group's adjusted gross margin was said to be 88% in 2009, when in fact the True adjusted gross margin (correcting only for the treatment of hardware costs) was 83.3%. Its adjusted gross margin was held out as 87% in 2010; the True adjusted gross margin (on the same basis) was 83.6%.[474]

(3) The Autonomy group's net income (corresponding to "net profit (adjusted)" in the Quarterly Reports) was said to be $233 million in 2009, when in fact the True net income of the software business (excluding hardware costs and revenues) was $179.2 million; and $292 million in 2010, when in fact the True net income (on the same basis) was $199.8 million. As the hardware sales were loss-making, True figures including the hardware business were lower still.[475]

(4) Autonomy's purportedly "*Attractive Revenue Mix*" was represented as follows:

advanced by the Claimants as "corrected" (only) for the effects of the false accounting of which they complain. Mr Bezant and the Claimants accepted that, given the disconnect between Autonomy's

valuation expert, Mr Bezant: "**Represented**" denotes figures actually reported by Autonomy, while "**True**" refers to the restated figures

[473] 2009 figures in January Slides, 2009 and 2010 figures in February Slides.

[474] 2009 figures in January Slides. 2009 and 2010 figures in February Slides. True figures *per* Schedule 2 PoC were confirmed by Mr Bezant, which was not challenged.

[475] 2009 figures in January Slides, 2009 and 2010 figures in February Slides. True figures calculated as follows: (i) Effective tax rate on adjusted basis calculated by dividing reported provision for tax by reported profit before tax (adj), in each case as set out in the 2010 Annual Report. Thus 2009 effective tax rate = $90,268 \div 323,066 = 27.9\%$; 2010 effective tax rate = $86,705 \div 378,921 = 22.9\%$. (ii) Tax at calculated effective tax rate deducted from True cash pre-tax income, as set out in Adjusted Deal Model: "Target IS" tab (cells S31:T31), with scenarios set to "Original" ("MB assumptions" tab) and "True Position" ("Accounting assumptions" tab). Thus 2009 True adjusted net income = $248.6 million $\times (1 - 27.9\%) = $179.2 million; 2010 True adjusted net income = $259.1 million $\times (1 - 22.9\%) = $199.8 million.

underlying accounting records on the one hand, and Autonomy's reported revenues by product category on the other, there is no perfect way of correcting the latter to reflect the Claimants' case. The Claimants used two approaches: (a) they prepared what they called the **Restated Revenue Schedule** (which was built up from the underlying accounting records); and (b) they also undertook what they called the **Cross-check** (based on manually identifying transactions in the Hussain Revenue Spreadsheets from which the reported revenue figures by category were taken). In the former, "True total revenues" denoted what the Claimants contended were Autonomy's actual revenues excluding "pure" hardware sales, and "True adjusted gross margin" similarly was a calculation of gross margin with a "correction" for hardware costs. Mr Giles criticised the Restated Revenue Schedule but agreed with the Cross-check, and accepted that "*the two methodologies come up with something quite close*". In this part of this judgment, for ease of reference, True figures are taken from the Restated Revenue Schedule, in line with Mr Bezant's main analysis (in the slightly updated form exhibited to Mr Bezant's 4th Report to accurately reflect the Claimants' case). Figures based on the Cross-check are provided in footnotes for completeness.



*January Slides*          *February Slides*

(5) The slides did not specify the periods to which these pie charts were said to relate, but the January Slides appear to correspond to the reported figures for the 12 months ending in Q3 2010, and the February Slides appear to correspond to the reported figures for FY 2010. The Claimants contended that these pie charts made the following false representations:

(a) They portrayed Autonomy's revenues as being made up entirely of the categories shown: software licensing, and related services (including software as a service).[476] In fact, for the 12 months ending in Q3 2010, True hardware revenues were $83.6 million (12% of the True total), while for 2010 that figure was $100.7 million (13.9% of the True total).[477]

(b) As the total revenues shown in the pie charts included substantial hardware revenues, it follows that the revenue figures shown for one or more of the categories were significantly overstated.

---

[476] Autonomy said that the "deferred revenue release" category "*[stemmed] principally from support and maintenance contracts recognized in arrears*".

[477] True figures: see footnote 499 above. Cross-check hardware revenues – 12 months to Q3 2010: $82.1 million, representing 11.7% of the total. FY 2010: $99.8 million, representing 13.8% of the total.

(c) IDOL OEM revenues were substantially overstated. In the 12 months ending in Q3 2010, True IDOL OEM revenues were only $21.7 million (3.1% of the True total), rather than the $126 million or 15% as stated.[478] In FY 2010, True IDOL OEM revenues were only $22.8 million (3.2% of the True total), rather than the $132 million or 15% stated.[479]

(d) IDOL Cloud revenues were also significantly overstated. In the 12 months ending in Q3 2010, True IDOL Cloud revenues (i.e., in particular, absent the wrongful acceleration of revenue recognition) were $119.3 million (17.1% of the True total), rather than $184 million or 22%. In FY 2010, True IDOL Cloud revenues were

---

$119.2 million (16.5% of the True total), rather than $190 million or 22%.[480]

(6) The slides also included charts that purported to show year-on-year organic IDOL revenue growth consistently between 10% and 20% per quarter for 2009 and 2010.[481] In fact, True organic IDOL revenue (as defined, excluding lossmaking pure hardware sales and improperly recognised revenue) declined by
5% from 2008 to 2009, and was flat from 2009 to 2010.[502]

(7) IDOL OEM revenue was said to be:

(a) growing significantly year-on-year (35% in the January Slides and 32% in the February Slides) when in fact True IDOL OEM revenue declined year-on-year at comparable rates (between 20.9% and 59.3% for each of the first three quarters of 2010, and 29.5% for FY 2010);[482] and

(b) "*Royalty-based ~3%*", when in fact, few if any true IDOL OEM transactions generated, or could reasonably be expected to generate, a recurring royalty stream of around 3% of licence sales.

---

[478] These numbers are arrived at by adding "OEM Ongoing" and "OEM Dev" together. The same applies to the stated IDOL OEM revenues for FY 2010 in the February Slides.

[479] True figures: see footnote 499 above. Cross-check IDOL OEM revenues – 12 months to Q3 2010: $22.7 million, representing 3.2% of the total. FY 2010: $23.8 million, representing 3.3% of the total.

[480] True figures: see §0. Cross-check IDOL Cloud revenues – 12 months to Q3 2010: $126.9 million, representing 18.1% of the total. FY 2010: $129.1 million, representing 17.9% of the total.

[481] February Slides; the January Slides included an identical graph, save that it did not include Q4 2010 [502] True figures *per* the Claimants' Restated Organic Growth Schedule.

[482] True figures: see footnote 499 above.

3843. Dr Lynch accepted in cross-examination that he knew that Autonomy's reported revenue figures included hardware revenues, revenues from VAR transactions and revenues from what on the Claimants' case were improper reciprocal transactions.[483] Dr Lynch also accepted in cross examination that he knew that the IDOL OEM revenue figures included revenue from transactions that, on the Claimants' case, did not come within Autonomy's own description or definition of its IDOL OEM revenue. Further, he accepted that he was aware that the IDOL Cloud revenue figures included some nonrecurring licence fee revenue (which, on the Claimants' case, did not come within Autonomy's own description of its IDOL Cloud business or revenue). Mr Hussain accepted that he knew all this too. What the Defendants did not accept was that the representations were false, or that they knew they were false.

3844. In my judgment:

(1) The Defendants were content for Qatalyst to make the representations conveyed by the January and February Slides as detailed in the preceding paragraphs. I accept and find that Qatalyst was, as the Claimants put it in their written closing submissions:

*"shopping Autonomy to a set of potential purchasers that he [Mr Quattrone] had discussed with Dr Lynch. This 'potential acquiror universe' included HP. Qatalyst produced and provided the January and February Slides to HP as part of that process."*

(2) Strictly, the company (Autonomy) as a legal entity had no corporate interest in any auction which might be in contemplation or developing for its shares. The persons interested are the company's shareholders (the shares being their personal property), and the directors act in respect of inviting, promoting and developing any bid in effect as (a) potential and then actual auctioneers and (b) communicators of matters relevant for the shareholders to know in making their decision on any eventuating bid. It seems to me that representations made by Qatalyst on the basis of what they were told, or information supplied by the Defendants, were in effect made on their behalf.

(3) Although the Defendants maintained that they did not know that any of those representations was false, in light of my conclusions and findings in relation to the Claimants' cases on Hardware, VARs, Reciprocal Transactions, Hosting and OEM, that is not sustainable.

(4) It follows that the representations were in material ways false; and

---

[483] Dr Lynch also accepted that the (adjusted) gross margin figures stated in the slides would have been lower if all of the hardware costs had been accounted for in COGS.

     (5)  both Defendants knew the representations were false, or were at least, reckless as to their truth or falsity.

3845.  For the avoidance of doubt, in the light of my previous findings, I do not accept that it avails the Defendants that Autonomy's published information had been prepared by Autonomy's finance department and scrutinised and approved by Deloitte. The finance department was controlled by the clique; and Deloitte were repeatedly misled. Neither Defendant can rely on assumptions as to the accuracy of their work or avoid liability by reference to what Deloitte did or did not know or do.

*Did HP rely on the January and February Slides? What effect had the Disclaimer?*

3846.  The Defendants' final answer was to deny reliance.

3847.  As to reliance, HP maintained that the January and February Slides prompted HP's interest and led to the March meeting (see below) so that there was a continuum of reliance which concluded with HP deciding to offer, and offering, £25.50 per share for Autonomy, including the shares owned by the Defendants. They presented the misrepresentations in issue as *"fundamental parts of"* (i) the initial approach to HP concerning the possible sale of Autonomy (of which the January and February Slides were part); (ii) the Defendants pitching Autonomy to HP directly (including by the February Slides); and (iii) the Defendants' responses to HP's due diligence requests.

3848.  With particular reference to the January and February Slides they contended that:

    (1)  The January Slides, sent as part of Mr Quattrone's initial approach to HP, led to the 3 February 2011 video conference, which with the related February Slides, led in turn to the 4 March 2011 meeting at which the March Slides were presented; and

    (2)  The representations in the February Slides were of "*particular interest*" to Mr Robison (who was HP's Chief Strategy Officer and Head of SCD) and his colleagues in the SCD group, and they relied on them when considering whether Autonomy would be a suitable fit for HP.

3849.  The Defendants, on the other hand, contended that the January and February Slides had no material impact on HP in deciding to make the bid:

    (1)  They were not the cause of HP's interest, since HP was already aware of Autonomy as a potential target from late 2010.

    (2)  In January and February 2010, HP was not thinking of acquiring Autonomy: its focus was instead on Tibco.

    (3)  Mr Apotheker did not remember reading and/or looking at the Slides, still less focusing on them; and though Mr Robison's witness statement made claims about features in the slides that were interesting to him, and posited questions he would have wished to ask if gross margins had been presented as lower, he did not attend at trial, and since it was not

possible to test his evidence they submitted that little weight should be placed on his account.

(4) There was no evidence provided that any of these Slides were shown to HP's board. The documents did not feature at all in the subsequent documentation showing HP's consideration of the acquisition (for which HP relied on analysis by its own corporate analysts, and third party advice from Perella Weinberg and BarCap).

(5) In any case, it was unrealistic to suppose that these Slides had any operative effect at all at the time of the bid many months later.

3850. The Defendants also relied in their defence on a boilerplate disclaimer at the end of the two slide decks in support of an argument that HP did not rely on the representations contained in them, or that any such reliance was unreasonable. They suggested that the disclaimer estops Bidco from contending that it relied on the representations. These contentions were not, however, elaborated or even put forward in their submissions, and I have not been persuaded that, of themselves, the warnings in small print provide a defence or found an estoppel.

3851. As to reliance, the Defendants concluded that it was not realistic to think (and the Claimants had not sought to argue) that either set of slides had any impact on their thinking by the time Bidco came to make an offer for Autonomy. They contended, in effect, that it is unrealistic to think that the January and February Slides still operated on the minds of those concerned on behalf of the Claimants months later and after so much other information had been provided.

*Summary of my assessment re the alleged falsity January and February Slides*

3852. I agree with the Defendants that it is unlikely that HP called to mind the January and February slides when it came to determining to bid, nor were the slides any real influence by then in their determination of the price.

3853. Further, in my view, even if retained in the mind, the facts and impression so retained would be subject to further information provided and especially the due diligence exercise. The representations made would not independently be actionable as such.

3854. However, I accept HP's argument that the January and February Slides whetted HP's appetite. In a vacuum, I would not accept that this, nor the fact that the slides encouraged their further interest, would be sufficient. But the slides do need to be seen as part of a continuum, over the course of which the information provided and the representations made by Autonomy gave HP a picture of a company capable of enabling HP to achieve Mr Apotheker's target of moving HP into the mainstream of the advanced software sector, and thereby transformational change.

3855. In particular they need to be taken into account in conjunction with the March slides, to which I now turn.

*The March Slides*

3856. On 3 March 2011, HP and Autonomy entered into a Mutual Non-Disclosure Agreement. On 4 March 2011, Autonomy and HP spoke again via video conference. HP participants included Mr Robison, Mr Johnson, Mr Levadoux and Ms Marge Breya. The meeting took place in HP's offices in Palo Alto, California. Mr Hussain attended in person, with Mr Quattrone; and Dr Lynch joined by videolink. The third set of misrepresentations as alleged by the Claimants was made in a further stack of slides presented at that meeting ("the March Slides").

3857. Dr Lynch maintained that the March Slides were prepared by Autonomy using publicly available information. Dr Lynch said that he believed that he had delegated the preparation of the slides to various team members, and that he instructed Mr Kanter to include some additional background information about Autonomy to respond to particular questions that HP had raised (via Mr Quattrone) in advance of that meeting; but that otherwise he had little involvement.

3858. In cross-examination, Dr Lynch claimed that he had, in fact, refused to address many of HP's requested topics:

> "All I'm prepared to do is give them an introduction to the company which is a public document and then some slides on other information that's already public, which is functions, geographies, head count and org explanation. What that doesn't say is: please prepare slides with the P&L for the next three years, with cloud Saas business model, with balance sheet overview, with market share over time, with historical revenue growth. So there's lots and lots of things here which are not going to be given in this meeting but you can't blame them for asking."

3859. This was not entirely accurate. It is right to say the final deck did not include P&L projections for the next three years. Mr Quattrone had recognised that Autonomy would not want to "*give them precise forecasts at this stage*", and suggested instead "*giv[ing] them orally some directional input*"; and in any event, Autonomy always maintained it did not <u>have</u> such projections, hence the 4 August 2011 due diligence call (addressed below) to discuss the reasonableness of the assumptions and projections contained in parts of HP's Deal Model. But all of the other items referred to by Dr Lynch were covered in the final version of the March Slides: the IDOL Cloud business model; an overview of the balance sheet; market share over time (OEM market share was said to be "*almost total*" in any event); and historical revenue growth.

3860. The Claimants submitted that Dr Lynch's claim that he had not been prepared to give HP such information, when in fact the slides included it, was a misguided attempt to obfuscate his evident enthusiasm for interesting HP in a potential purchase of Autonomy. When pressed, Dr Lynch accepted that he saw HP as a potential purchaser but insisted that a purchase by HP

> "would not be a probability at this stage. This is a first meeting. There has been no discussion of anything to do with financials or price or anything like that. Remember, this is one of the largest technology

> *businesses in the world. It's a big customer of Autonomy's and we're getting to meet the CTO and we' re getting to explain the way our business is wonderful. Yes, that could end up in an acquisition, yes, they're probably interested in learning as much as they can; but from our point of view it would be a very gentle process, and…you'll see in the emails that's very much how we view it. "*

3861. I accept that although these were early days, nevertheless by this time, Dr Lynch did have in mind HP as a potential suitor, and the information provided, which was impressively packaged, was no doubt designed further to whet the appetite. But the Claimants' suggestion to the effect that Dr Lynch's efforts to downplay its content was an effort to camouflage an established determination to achieve a sale is, to my mind, exaggerated.

3862. Three hours were allocated to the video presentation; but according to Dr Lynch's account, at the meeting on 4 March 2011, he presented the technology and positioning slides; other people dealt with the other slides. Dr Lynch attended throughout. Mr Johnson explained in his evidence in the US criminal proceedings that the meeting was primarily about the technology, but with a "*little bit of financial information"* at the very end of the meeting, presented by Mr Hussain rather than Dr Lynch. I accept that Dr Lynch may largely have left matters of general presentation to others, though that would have been atypical of him, judging from his contributions in Earnings Calls. But that does not serve to disassociate him from the content: see further in paragraphs 3866 to 3867 below.

*Representations in the March Slides*

3863. The Claimants' case was that the March Slides contained material misrepresentations which they sought both to summarise and quantify as follows:

(1) The slides made a series of claims about financial metrics, which were untrue because they reflected the false accounting addressed in earlier parts of this judgment. They included those set out, with what the Claimants presented to be the corresponding True metrics, in the following table (which with the underlying derivations I have taken from the Claimants' written closing submissions with very little alteration, but which it should be remembered will require amendment in assessing loss and damage since it includes adjustments which I do not consider to be justified in respect of amounts reflecting (a) the Claimants' claims in respect of the  Realise/Credit Suisse VAR transaction (VT15) and the Schedule 7 "Other Transactions" which, in the event, I have rejected, and (b) overstatements of Autonomy's revenues for Q2 2011 in consequence of what the Claimants asserted (but never pleaded) was misaccounting for a Q2 2011 Schedule 6 Iron Mountain transaction[505]):

| Metric | Stated figure | True figure |
|---|---|---|
| 2010 total revenue | $870 million *slides 4, 58, 59* | $722 million ($623 million excl pure hardware) |
| 2009 total revenue | $740 million *slide 58* | $646.8 million ($593.8 million excl pure hardware) |
| 2010 IDOL Product revenue | $251 million *slide 59* | $222.7 million[506] |
| 2010 IDOL Cloud revenue | $190 million *slide 59* | $119.2 million[507] |
| 2010 IDOL OEM revenue | $132 million *slide 59* | $22.8 million[508] |
| 2010 IDOL OEM revenue as % of total | 15% *slides 18, 20* | 3.2%[509] |
| IDOL OEM growth year-on-year | 30–35% *slides 17, 18, 19* | (56.1%) (i.e. decline) in 2009[510] <br> (29.5%) (i.e. decline) in 2010[511] |
| 2010 operating profit (adjusted) | $377 million *slide 58* | $246.3 million[512] |

---

[505] For the avoidance of doubt, I confirm that I have accepted the Defendants' submission that this allegation, which the Claimants did not assert to be based on fraud, and which was not mentioned in their RRAPoC except as a footnote to Annex 6, nor ever properly pleaded nor put to Dr Lynch, should be ignored.

[506] FY 2010 Cross-check IDOL Product revenue of $204.4 million.

[507] FY 2010 Cross-check IDOL Cloud revenue of $129.1 million.

[508] FY 2010 Cross-check IDOL OEM revenue of $23.8 million.

[509] FY 2010 Cross-check IDOL OEM revenue represents 3.3% of the total.

[510] This represents the decline in IDOL OEM revenue between 2008 Represented revenue and 2009 True revenue. [511] Cross-check IDOL OEM growth – 2010: (26.4%) i.e. decline. 2009 not calculated because the 2008 revenues are not adjusted.

[512] Restated Profit Schedule: "Restated profit measures" tab (cell R39). Includes hardware.

| Metric | Stated figure | True figure |
|---|---|---|
| 2009 operating profit (adjusted) | $329 million *slide 58* | $239.2 million[484] |

(2) Slide 17 described Autonomy as having a "*Pure Software Model*". The same slide repeated the representations made in each of the January and February Slides as to the alleged "*Royalty-based ~ 3%*" nature of Autonomy's IDOL OEM revenue. On the Claimants' case and interpretation of the phrase, that was false, for the reasons previously discussed.

(3) Slide 18 repeated the misrepresentation made in each of the January and February Slides as to the alleged "royalty"-based nature of Autonomy's IDOL OEM revenue, save that the percentage "royalty" was now said to be "*~4%*". That was, again, false for the reasons previously discussed.

(4) Slide 19, headed "*IDOL OEM*":

(a) included the logos of 17 purported OEM customers. All of those companies were in the business of licensing software.[514] The obvious implication was that Autonomy's IDOL OEM revenue was obtained from those (and similar) companies. In fact, much of the revenue reported as "IDOL OEM" arose from transactions with companies or entities that did not license software, and so could not embed Autonomy software in any software product of their own; and

(b) claimed that "*Revenues today relate to deals signed two years ago*". This was a reference to (and so impliedly repeated) the Defendants' regular claim that IDOL OEM revenues consisted substantially of royalty payments on OEM partners' products, with such products typically released around two years after the OEMs' contracts with Autonomy were signed. The Claimants alleged that this was false, on the basis that much reported IDOL OEM revenue

---

[484] Restated Profit Schedule: "Restated profit measures" tab (cell M39). Includes hardware. [514] This does not appear to be in dispute.

(around 80%) was neither (i) an upfront fee paid to an OEM partner; nor (ii) an ongoing royalty payment.

(5) Slide 20 purported to show that Autonomy's OEM business had a "*[p]owerful cumulative effect*" on revenues "*as multiple new products reach market each quarter*", via the following graph, which compared, on a quarterly basis, the number of new OEM customers (blue bars) and "*OEM Revenue*" (red line).



(6) This slide was said to merit attention in light of and by way of rebuttal of the Defendants' case that, in Dr Lynch's words, the reference to "*~4% royalties*" (like that to "*~3% royalties*" in the February slides) was "*an example*", and "*did not represent that all of Autonomy's OEM sales generated annual royalties of 4%*":

    (a) The red line showed the total quarterly IDOL OEM revenue reported by Autonomy, which had risen to $38 million in Q2 2010, the last quarter shown.

(b) The dotted yellow line was said to illustrate a "*two year lag between sign up and first royalties*" (emphasis added). It drew a link from the number of new OEM customers (shown by a blue bar) in Q2 2008 to the red line in Q2 2010. The Claimants contended that the reasonable reader would thereby understand that the red line – and hence Autonomy's total reported IDOL OEM revenue – consisted materially of royalty revenues.

(c) Further, the slide claimed that "*Quarterly royalty run rate implies end-user sales of IDOL powered software > $1bn.*" This was alleged by the Claimants to be false given that: (i) the only revenue figures shown on the slide were those plotted by the red line; and (ii) if the 3–4% figures cited by Autonomy and Dr Lynch were remotely accurate indications of the level of IDOL OEM royalty payments, then $38 million of IDOL OEM revenue could only imply more than

$1 billion in quarterly end-user sales by Autonomy's OEM customers if the great majority of the former indeed consisted of royalty payments, the clear implication was thus that the "*quarterly royalty run rate*" approximated total reported IDOL OEM revenue.[485]

(d) The slide thus represented that IDOL had been widely adopted by other software companies in their own products (as Dr Lynch accepted it did), and that ongoing, recurring revenues from those companies' sales would be substantial. However, on the Claimants' case, those representations were false: ongoing royalty payments from OEM customers in fact made up only a small part of reported IDOL OEM revenue.

(e) In cross-examination, Dr Lynch claimed for the first time that when the slides were presented to HP, Autonomy would have explained that IDOL OEM revenue in fact included revenue from upsells and PODs. However, there was never

---

[485] In cross-examination Dr Lynch disputed this interpretation, claiming: "*there's a bit more information given away here than really should be because, if you take 3% – if you take 1 billion and you apply 3% and you gross down, it's in effect giving you the non-derived part of the OEM. Because if it was – if what you were saying was true, that number would be about 6 billion*". However, $1 billion of quarterly IDOL OEM sales, at a 3–4% royalty rate, would imply $30–40 million ($1 billion × 3–4%) in royalty revenues per quarter – so the claim of "*>$1 billion*" in IDOL OEM sales is exactly in line with the most recent quarterly IDOL OEM revenues ($38 million in Q2 2010) shown on the slide. By contrast, $6 billion of quarterly IDOL OEM sales at the same royalty rate would imply $180–240 million in royalty payments per quarter – several times the IDOL OEM revenue that Autonomy reported. It may be that Dr Lynch was trying to suggest that "*end-user sales ... of >$1 billion*" should be construed as referring to annual sales, but: (i) that is not what the slide says on its face; (ii) the reasonable reader would not read a sentence that refers in terms to a quarterly metric and understand that the other metric cited is intended to apply to a quite different time period; and (iii) even the highest quarterly IDOL OEM revenue shown ($38 million in Q2 2010), using the 3% rate cited by Dr Lynch, does not imply $6 billion in IDOL OEM sales annually in any event.

any public explanation of that point by Autonomy in the Relevant Period.[486]

(f) Dr Lynch also claimed that the slide was "*not discussing revenues*", on the basis that it was in a section of the deck entitled "*Business Models*". That appeared to be contradicted by a slide entitled "*Cumulative Revenue Effect*", which includes a graph of "*OEM Revenue*".

(7) Slides 55 and 58 repeated what the Claimants contended were the false claims about Autonomy's gross margin made in the January and February Slides, described earlier.

(8) Slide 59 set out a table of 2010 reported revenues by category, with year-on-year growth rates for Q4 revenues. This table:

(a) made no reference to hardware sales, but included revenue from such sales in some or all of the five categories of revenue listed, so

_____

making the same misrepresentation described in paragraph 3842(5)(a) above; and

(b) claimed that these figures "*implied*" IDOL OEM revenue for 2011 of $167 million, which claim the Claimants contended was neither honest nor reasonable as it would have represented more than 600% growth over the True 2010 IDOL OEM revenue of $22.8 million.

(9) The slide also claimed that Autonomy had the "*advantage of growth in annuity streams*". This too was said by the Claimants to be false: True IDOL OEM revenue was declining (see paragraph 3842(7)(a) above).

3864.  The Defendants' answer to these claims was in summary as follows:

(1) Overall, the claims that the various statements as to Autonomy's revenues (overall and by category), profit and revenue growth, which according to the Claimants were "*untrue because they reflected the false accounting*" were groundless because there was no false accounting, for reasons already given.

(2) The slide headed "*Pure Software Model*" was not a representation that Autonomy sold only software: indeed, the same slide made reference to Autonomy's appliance sales.  More generally, these slides would not have been considered in isolation from Autonomy's accounts, and those accounts made clear that the reference to "*Pure Software Model*" was

_____

[486] The Claimants suggested that the  implausibility of the suggestion is reinforced by the fact that the "intentional misinformation" document that Dr Lynch sent to HP's Mr Robison on 13 September 2011 (addressed in more detail in the OEM section of the judgment), which purported to provide (among other things) an explanation of the "revenue profile" of IDOL OEM, made no mention of the fact that IDOL OEM revenue included revenue from upsells and PODs.

intended to distinguish Autonomy from companies deriving significant revenues from services (and see paragraphs 654 to 657 in the part of this judgment dealing with the Claimants' "hardware" claims).

(3) The slide setting out revenue and growth by category, together with implied figures for 2011, accurately stated revenue and growth rates. As discussed in the "OEM" part of this judgment, the Defendants contended that the reference to "*advantage of growth in annuity streams*" was a fair comment.

(4) The remainder of the alleged misrepresentations related to Autonomy's OEM business. These representations have already been dealt with in the OEM section above.

(5) Further, Dr Lynch claimed for the first time in cross-examination that Autonomy's hardware sales were discussed at the 4 March 2011 meeting, relying on a slide in the March Slides that described "*Drag Along Third Party Revenues*". Although, as Mr Rabinowitz put to him in cross-examination, it had been part of the Claimants' case since April 2015 that the March presentation contained misrepresentations because nothing was said to HP about or to explain the hardware sales, this suggestion that there had been discussion about hardware sales as an example of *"drag along revenues"* was not pleaded in Dr Lynch's defence and was not mentioned in his witness statements. Dr Lynch suggested that it had been mentioned before, but without going through all the documents he could not be more specific; and when challenged again, he responded with studied calm and said he *"would have to disagree"* with the suggestion made to him that this was *"just another one of your opportunistic inventions"*. No mention was made of the point in Dr Lynch's closing submissions. I have attached no weight to it.

*Summary of my assessment re alleged falsity of the March Slides*

3865.  My assessment of the Claimants' allegations in respect of the falsity of the March Slides and the Defendants' answers to those claims can be summarised as follows:

(1) In light of my conclusions and findings in relation to the Claimants' cases on Hardware, VARs, Reciprocal Transactions, Hosting and OEM, I have concluded that it follows, and I find accordingly, that (a) the March Slides reflected false accounting in respect of those important aspects of Autonomy's business, so that (b) the representations in the March Slides based on that false accounting were in material ways false.

(2) I also consider that the representation made that Autonomy was a *"pure software company"* or *"pure software model"* was intended to convey a special selling point, the success and self-sufficiency of its software

business without the need for other revenue streams, whilst in fact disguising volume third-party hardware sales.

*The Defendants' involvement in and responsibility for the representations in the March Slides*

3866. There is no real dispute that the representations in the March Slides were made by the Defendants to HP:

(1) Dr Lynch and Mr Hussain were both involved in preparing the slides. Mr Hussain admitted as much and Dr Lynch did not deny it. The evidence of his involvement is summarised above.

(2) Dr Lynch's name appears on the front of the deck.

(3) The Defendants admit that they presented the slides to HP.

(4) In cross-examination, Dr Lynch admitted to presenting the "*technology and positioning slides*". He claimed that "*other people did the other slides*", which was not consistent with his pleaded admission that there were two presenters - himself and Mr Hussain. In any event, he admitted that he listened to the whole presentation, and there is no suggestion that he disavowed any of the representations made in the deck under his name.

(5) Likewise, through presenting part of the deck, and his acquiescence during the rest, Mr Hussain adopted those representations he did not directly make.

3867. In my judgment, both Defendants had "guilty knowledge" of the false accounting and therefore knew the representations were false, especially in giving no inkling of substantial sales of *"pure hardware"*; or they were, at least, reckless as to their truth or falsity.

*Did the Claimants rely on the March Slides?*

3868. The Claimants dismissed as *"fanciful"* the Defendants' argument that these representations did not induce Bidco to acquire their share and share options in Autonomy.

3869. They contended that:

(1) Mr Robison "*relied on*" the March Slides, which gave an "*impressive picture of Autonomy's financial performance and business*".

(2) The "*pure software model*" they described was, according to Mr Robison:

"*a very attractive model for HP, a predominantly hardware company that was looking to acquire an asset that would enable it to expand in the software market. The fact that Autonomy's*

> *business model was focused almost exclusively on software, with only a small amount of services as disclosed in its public filings and presentations to HP, was important to HP and affected the price that HP was ultimately willing to pay, and did pay, for Autonomy."*

(3) According to Mr Robison's witness statement, the size and growth of IDOL Cloud as described in the March Slides was "*important to HP because of the relative predictability and recurring nature of the revenue stream*".

(4) The presentation of "*strong*" IDOL OEM revenues and revenue growth was also "*important to HP*", indicating "*that other companies valued Autonomy's technology*". HP therefore considered IDOL OEM to be "*a highly profitable, growing revenue stream that was recurring in nature and an indicator of the quality of the technology*".

(5) Mr Robison described the overall "*message conveyed during the March 4 meeting was that Autonomy was a high-growth, pure software company*". Mr Robison described the presentation Dr Lynch gave of the March Slides as "*pretty compelling stuff*".

(6) Mr Sarin, who did not attend the 4 March meeting but who reviewed the March Slides shortly thereafter, also thought that the March Slides described "*a very compelling business*", given its apparent scale and growth.

3870. However, the Claimants did not mention Mr Apotheker in this connection. The Defendants presented him as the lynch-pin, and as the only one of the witnesses relied on by the Claimants in this context who could be cross-examined. Their argument was that:

(1) In March 2011, Mr Apotheker was not yet focussed on Autonomy as a possible acquisition target and the March Slides (which he did not refer to either in his witness statement or in cross-examination) played no part in his decisionmaking.

(2) On 19 March 2011 Mr Robison sent Mr Apotheker some slides showing a comparison between Tibco and Autonomy. Even by this stage Mr Apotheker was not personally considering Autonomy as a possible acquisition target. In his witness statement Mr Apotheker said that the first time he recalled Autonomy appearing on the list of companies that were part of HP's Finance and Investment Committee's "M&A Pipeline" was at a meeting some time later, on 25 May 2011.

(3) Mr Robison's account of his reliance on the slides was general and could not be tested in cross-examination. The Defendants acknowledged that Mr Robison's witness statement made various very specific claims about what he thought in relation to particular slides, and how he relied on

them; but it is hard to believe that these were genuine recollections when his witness statement said that "*I do not recall now whether I received a copy of the presentation at the time.*"   The Defendants submitted that this has all the hallmarks of forensic reconstruction; a concern heightened by the fact that so many of the witness statements for the Claimants were palpably over-lawyered.   This is a matter that Dr Lynch would have wished to test in cross-examination; and given that Mr Robison did not attend to give evidence, they submitted that no weight should be placed on what he says on this topic.

(4) In any event, none of the Claimants' witnesses suggested that the March Slides continued to have any impact on their, or HP's thinking by the time that HP's board decided to proceed with the acquisition in August. It is implausible that the March Slides played any real part in that decision, so long later, and after further investigation and negotiations must in all likelihood have relegated the March Slides far to the background, if ever they had any real prominence at all.

3871. As in the context of the January and February Slides (see paragraphs 3852 and 3853 above), I have concluded on the issue of reliance that:

(1) Subject to (3) below and to paragraph 3872, it is unlikely that HP specifically focused on or called to mind any of the January and February and March Slides when it came to determining to bid;

(2) The representations made would not independently be actionable as such;

(3) The March Slides, and what Mr Robison described as the *"impressive picture of Autonomy's financial performance and business"* conveyed by them and Dr Lynch's *"compelling"* presentation of them, were nevertheless intended to influence and were in fact influential in reinforcing HP's overall impression of Autonomy as (a) a *"pure software model"* which, as such, was particularly attractive to HP and ultimately (to quote Mr Robison's evidence, which I accept in this regard) *"was important to HP and affected the price that HP was ultimately willing to pay, and did pay, for Autonomy"*; and (b) having two sizeable and growing revenue streams, IDOL Cloud and IDOL OEM, which were relatively predictable and recurring in nature and (especially in the case of IDOL OEM, a good indicator of the quality of Autonomy's technology).

3872. I accept HP's argument that the March Slides, like the January and February Slides, whetted HP's appetite and informed its approach (including the development of its Deal Model): they need to be seen as part of a continuum, over the course of which the information provided and the representations made by Autonomy gave HP a picture of a company and business with strong revenue streams and quality technology capable of enabling HP to achieve Mr

Apotheker's target of moving HP into the mainstream of the advanced software sector, and thereby transformational change.

*29 June 2011 meeting: the fourth set of alleged misrepresentations*

3873.   A meeting on 29 June 2011 between HP and Autonomy representatives was held in London. This followed two earlier meetings, one between Dr Lynch and Mr Robison at the beginning of June and another a lunch meeting between Dr Lynch and Mr Apotheker in Paris in mid-June.

3874.   At the earlier meeting on 2 June 2011, the focus had been largely on HP and in particular Mr Apotheker's and Mr Robison's vision of making what Dr Lynch stated in his first witness statement he was given to understand was *"a key strategic shift away from its existing low-margin, commoditised hardware business, towards high-margin software"*. Dr Lynch described that he left the 2 June meeting *"excited about* [Mr Robison's] *ideas"* and went on that this was:

> *"the first meeting where I believed it was possible that HP would make an offer for Autonomy. After the meeting, I reported to Mr Quattrone that the meeting had been productive, but I expected it would be a slow partnership."*

3875.   Dr Lynch described his lunch meeting with Mr Apotheker in Paris on 16 June 2011 notably briefly in his first witness statement:

> *"We discussed at a high level whether there might be any possibility of combining the two companies. While it was a serious discussion, it was brief."*

3876.   According to Dr Lynch in his first witness statement, the purpose of the meeting on 29 June 2011 was to meet with HP's corporate development, software and cloud services team to discuss how HP and Autonomy might be able to work together. HP's participants included Mr Robison, Mr Sarin, Mr Levadoux and Ms Breya, while Autonomy was represented by Dr Lynch, Mr Hussain, Mr Kanter and Dr Menell.

3877.   Mr Robison sent lists of discussion topics and detailed questions to Dr Lynch in advance of the meeting. Mr Sarin and Mr Levadoux both made notes of the meeting, which Mr Sarin stated in his witness statement was characterised as a "partnership discussion" to minimise the chances of rumour or speculation about a purchase transaction.

3878.   The Claimants contended that Dr Lynch made the following misrepresentations at the 29 June 2011 meeting:

> (1)   According to Mr Sarin's evidence in his witness statement, Dr Lynch again described Autonomy as a "*pure software*" company. This was challenged in cross-examination, but Mr Sarin maintained that he distinctly recalled the phrase being used multiple times. It does not

appear to have struck him at the time that this was of significance though: his notes made no mention of the phrase; and although in their written closing the Claimants suggested that Dr Lynch *"ultimately accepted that he had used the term"*, I understood his evidence rather to be that he explained Autonomy's model as a software business which was unusual in doing no material services.

(2) Dr Lynch said that Autonomy's OEM business was growing, and that it involved many other software companies incorporating IDOL into their own products, which made the IDOL platform ubiquitous. Mr Sarin's evidence to this end was not challenged, and Dr Lynch accepted that it was possible that he might have made the statements that Mr Sarin says he made. The Claimants reiterated their contention that what was stated about Autonomy's OEM business was false, because True IDOL OEM revenue was a fraction of that reported, and in decline.

(3) According to Mr Sarin's witness statement evidence, Dr Lynch also represented that:

(a) Being royalty-based, the costs of Autonomy's IDOL OEM revenues were very low, so that the gross margins of Autonomy's IDOL OEM business were close to 100%; and

(b) IDOL OEM produced a *"reliable income stream"*, because the use of IDOL in other companies' software gave rise to a *"network effect"*, which Mr Sarin explained in his witness statement:

> *"refers to the increased value that a good or service has as its user base increases – the telephone, for example (like, say, PayPal or Facebook) became much more valuable to its users as the number of those users increased."*

(c) Mr Sarin added:

> *"Autonomy described their OEM business as the glue in many companies' products; it was very 'sticky', in the sense that once a company started to use IDOL as a component of its own products, it became very difficult for the company to cease doing so."*

3879.  Mr Levadoux's notes (which he summarised in an email dated 1 July 2011 to Mr Robison and others, copying (amongst others) Mr Andy Johnson) echoed this:

(1) They suggested that Dr Lynch had represented that Autonomy's technology was

> *"very sticky, and even if many competitors OEM their technology, it would be very difficult for them (i.e. IBM/Lotus/Oracle, Adobe) to switch vendor"*; and

(2) They noted that the impression given was that:

> "*A core element of [Autonomy's] strategy is to scale by allowing others to build vertical apps on this platform (i.e. through OEMs). Focusing on being a platform business is also what allows them to be so profitable*".

3880. The Defendants suggested that Mr Sarin's witness statement *"was affected by the forensic process, rather than reliable recall"*, that Mr Sarin's reference to Dr Lynch having described Autonomy as a *"pure software company"* looked like a *"forensic afterthought"* and that he was especially *"muddled"* as to what truly had been discussed about the OEM line of business, and had perhaps forgotten that in reality there had only been discussions about the broad pattern of OEM business and not about gross margins or other detailed facets of it.

3881. It was put to Mr Sarin that his contemporaneous notes of the meeting showed that the discussion at the meeting was "*all in the context of barriers to entry. It wasn't a general discussion about OEM or the OEM business model*" and "*when you suggest there was specific discussion about OEMs, gross margins and that sort of thing*", it was "*a muddle on your part.*" This part of the cross-examination of Mr Sarin was uncharacteristically convoluted; and I was not persuaded that it achieved what I took to be its purpose of suggesting and showing that nothing of any materiality or specificity had been said about the OEM business. I agree with the Claimants that the Defendants' suggestion that the discussion centred only on *"barriers to entry"* was a distraction, because the (alleged) fact that competitors could not easily enter the market was precisely one of the things that was said to make IDOL OEM a "*reliable income stream*".

3882. Further, the suggestion that a discussion about barriers to entry was not also a discussion about the reliability or profitability of IDOL OEM revenue is belied by the way Dr Lynch explained the concept in other contexts. For example, Dr Lynch explained on the Q1 2008 earnings call that:

> "*The OEMs market is very important for us because it allows penetration of the IDOL technology into many different areas without us having to write those applications, and it produces a very strong network effect*";  and in the Q3 2010 Quarterly Report, Dr Lynch said:

> "*The continued strong growth in our IDOL OEM revenues is both a further endorsement of the unique capabilities of IDOL and reflects a growing network effect as more software companies choose to design their products with Autonomy inside*".

3883. Moreover, the specific point about high gross margins recalled by Mr Sarin is also echoed in Mr Levadoux's notes:

"*A core element of [Autonomy's] strategy is to scale <u>by allowing others to build</u> vertical apps on this platform (i.e. through OEMs). <u>Focusing on being a</u> <u>platform business is also what allows them to be so profitable</u>*" (emphasis added).

3884. In any event, as Mr Sarin pointed out in cross-examination, what he described Dr Lynch as saying about Autonomy's OEM business during the 29 June meeting was consistent with how Autonomy described its OEM business in the Q1 Quarterly Report, "*which we had read by this time*", and later in the Q2 2011 Quarterly Report. Indeed, the claim about near-100% gross margins on royalties was in the March Slides.

3885. Bringing this together:

   (1) I consider it more likely than not, and therefore find, that Dr Lynch did refer to Autonomy as a *"pure software company"*, that the meaning that Mr Apotheker and others at HP (including Mr Robison) took from the phrase was the meaning adumbrated in paragraph 3865(2) above, and that this did encourage HP because it was through acquisition of a strong specialised *"pure software company"* having no need for or dependence on other revenue streams  that Mr Apotheker planned to effect "transformational change" for HP.

   (2) The main focus of the meeting appears to have been on the special value and attraction of Autonomy's (a) IDOL technology and (b) OEM business as a reliable income stream with incremental prospects because of a *"network effect"*.

   (3) The overall effect was to reinforce the message that Autonomy was a strong software-focused business with ground-breaking technology, as indeed Mr Sarin stated in his witness statement. There is no dispute about the enthusiasm it engendered in HP: Mr Robison wrote that evening to Mr Apotheker referring to a *"REALLY good meeting today"* and Mr Apotheker confirmed his and Mr Robison's considerable enthusiasm for the potential deal by that stage.

3886. The Claimants did not allege that the ground-breaking potential of Autonomy's IDOL technology was exaggerated; however, I have concluded in the context of the OEM Claim that the nature  of Autonomy's OEM business was misrepresented and its success and growth was inflated in its accounts, to the knowledge of both Defendants.

3887. Once again, I doubt that anything said at the 29 June 2011 meeting can plausibly be said to have induced the acquisition, other than in the general sense of encouraging HP's continuing interest and enthusiasm. The influence the meeting had was more general than specific: a purchase was not by then yet a real prospect and I doubt that the representations made were specifically called to the mind of those who eventually directed HP/Bidco to make a bid. However, (and

like the January, February and (most especially) the March Slides), they were intended to and did encourage and inform HP as it worked towards the decision to bid, and in its work in developing and refining the Deal Model which eventually provided the parameters for agreement of a bid price.

3888.   In other words, like the earlier slides, the representations made at the 29 June 2011 meeting were an important element of the continuum which eventually informed the bid and ultimately induced HP to purchase Autonomy at a considerable premium.

3889.   I return to the issue of reliance in the context of these deceit/misrepresentation claims in paragraphs 3979 to 3988 below.

*29 July 2011 meeting and its background: the fifth set of alleged misrepresentations*

3890.   On Friday, 29 July 2011, what HP described as the second set-piece meeting between HP and Autonomy took place at the Berkeley Hotel in London. No NDA was yet in place. HP was represented by Mr Robison, Mr Sarin, Ms Breya and Mr Levadoux. Autonomy was again represented by Dr Lynch, Mr Hussain, Mr Kanter and Dr Menell.
The primary purpose of the meeting was to discuss the approach to and intended process of due diligence. In cross-examination Mr Sarin accepted that it was agreed at the meeting that Autonomy would not be providing substantive information: it would be about process, the process by which information would be provided.

3891.   The immediate background to the 29 July 2011 meeting was a meeting the previous day between Mr Apotheker, Mr Robison and Dr Lynch in Deauville. It was at that meeting on 28 July 2011 that a bid price was discussed for the first time although the Claimants had begun developing an early version of a discounted cash flow ("DCF") model (which became "the Deal Model") to try to determine the standalone value of Autonomy some time earlier (in early February 2011).

3892.   Dr Lynch told me in cross-examination that until then he had thought a bid possible but not probable; but as from 29 July 2011 Autonomy was clearly *"in play"*. HP had even pencilled in and was targeting an announcement of acquisition on 18 August 2011 (leaving a short time for due diligence)[487].

3893.   Dr Lynch had been pressing for £27 per share. He, Mr Apotheker and Mr Robison had agreed that if HP was to acquire Autonomy, HP would need to offer a price in an agreed range. Dr Lynch's initial recollection was that this range was between £25.50 and £26.50 per share, but it now appears to be common ground that the range in fact agreed was between £24.94 (which was precisely a 45% premium over the previous end-day closing price of £17.20) and £26.94 per share (representing a premium of 57% over the previous evening's closing price).

---

[487] Dr Lynch told me in cross-examination that he did not think *"anyone in their right mind expected to do the deal on 18 August."* He added: *"I now know why they had to do it on the 18th, but I didn't at the time…I've never seen a deal done at this speed."*

Those latter figures were as stated in a draft indicative offer letter sent by HP to Autonomy the next day (29 July 2011). Having reached agreement on range of price, HP and Autonomy agreed to proceed to due diligence.

3894. The 29 July 2011 meeting was thus a new stage: a bid was by then on the cards, and it is plausible to assume (and intend) that the final decision and negotiations to fix on a final bid price would be influenced by subsequent details provided, and the due diligence process which had been agreed.

3895. The Claimants alleged that two representations were made at or arose from the 29 July 2011 meeting: one in the course of the meeting itself, and the other in a table that the Defendants agreed at the meeting to provide:

(1) Mr Sarin's evidence was that at the meeting, Mr Hussain *"told us that HP should rely on Autonomy's publicly available financial information"*. Both what was actually said and what was intended to be and understood to be conveyed by this was disputed.

(2) Second, it is common ground that following discussions at the meeting, Mr Hussain, with the assistance of Mr Kanter, prepared a table in response to item III(A)(3) on the Tesla Question List, which was uploaded to the Data Room.
The table set out quarterly revenue figures by product category for the period Q1 2009 to Q2 2011. Those figures matched, and were expressly said to derive from, Autonomy's quarterly earnings releases.

3896. As to (1) above, the Claimants alleged that what Mr Hussain said *"constituted an implied representation by Lynch and Hussain that Autonomy's published information was accurate and not misleading."*

3897. The Claimants' case is that by telling HP to rely on Autonomy's publicly available financial information, and by uploading the table to the data room in response to HP's due diligence question, Mr Hussain – and Dr Lynch, through his acquiescence – represented that in each case that information was complete, accurate, and not misleading.

3898. The Defendants did not accept this, and contended that this was not what was said or intended:

(1) Mr Sarin had a list of due diligence questions, and there was a discussion about how the answers would be provided, or where they could be found. In relation to some of those questions, he wrote "Doc" on his list. He explained what that meant in cross-examination:

*"Q. It was being explained to you, wasn't it, by -- it was Mr Hussain who was talking at that point and he was explaining to you, wasn't he, that much of the*

> *information about these things was in the published material?*
>
> *A. Much of the basic financial information was in the published material, yes."*

The Defendants submitted that in this passage, "*these things*" is a reference to the points where he had written "Doc" on his list and that it was not some general statement by Mr Hussain that HP should rely on Autonomy's published information, nor would it have been taken as such by any reasonable person hearing what Mr Hussain said.[488]

(2) Secondly, Mr Hussain submitted that all that he had said, and was understood to have said, and certainly all he had meant, was that much of the information that HP had requested was available from the published material. In other words, he was not doing, or not intending to do, more than directing HP to where information would be available, without confirming its accuracy, still less warranting it. In any event, if (contrary to this) any representation was to be implied, his alternative position was that it would have been limited to Mr Hussain's belief that Autonomy's published information was accurate and not misleading: and, he maintained, any such representation would have been true.

(3) Thirdly, for his part, Dr Lynch emphasised that he made no such statement, nor should such a statement be attributed to him., and that Mr Hussain was not acting as his agent. HP argued that Dr Lynch through his silence demonstrated acquiescence and adopted Mr Hussain's statement. But Dr Lynch countered that

silence does not ordinarily give rise to liability in deceit or misrepresentation;[489] that HP did not identify any legal obligation on Dr Lynch to correct or qualify anything said by Mr Hussain; and that  Dr Lynch was not subject to any duty of disclosure.

(4) Fourthly, Dr Lynch contended that the Claimants did not in fact rely on the fact that he said nothing at this point. If they had wanted any assurance from Dr Lynch about the content of Autonomy's published information, they could have asked him directly: indeed, they could have requested a warranty from him as to the accuracy of Autonomy's

---

[488] See *Property Alliance Group Ltd v Royal Bank of Scotland plc* [2018] 1 WLR 329 (CA) citing Toulson J (as he then was) in  *IFE Fund SA v Goldman Sachs International* [2007] 1 Lloyd's Rep 264 , para 50, (quoted in paragraph 3907 below).
[489] Clerk & Lindsell on Torts (22nd Ed, 2017), §18-06.  And bearing in mind that this is alleged to have been an *implied* representation, see *Marme Inversiones v NatWest* at §123: "*a number of principles can be distilled from these authorities: (1) First, it is possible for a representation to be made expressly or impliedly through words or conduct. For a representation to be implied, silence or mere assumption is not usually enough as there is no general duty of disclosure.*"

accounts (something they never did). While Mr Sarin stated in his witness statement that Dr Lynch did not disagree with Mr Hussain's comment about the published information, he did not say that he paid any attention to – let alone relied on – Dr Lynch's silence. And as already noted, Mr Sarin played no part in the decision making process.

(5) Fifthly, Dr Lynch submitted that there was no actionable representation by him (and there was certainly no representation made to Bidco or its agent), but that even if there had been, the representation could have been no more than that he believed the published information to be accurate, which he did. He also had reasonable grounds to do so. Accordingly, the alleged representation would not give rise to liability, either in deceit or under s. 2(1).

3899. Although an issue of law may arise, which I discuss below, the primary question is one of fact, as to what was actually said and what was meant. Neither HP nor the Defendants were very clear on important details: for example, although Mr Sarin's evidence was that *"Dr Lynch did not disagree"* with Mr Hussain's statement, he did not actually state that Dr Lynch was there, or what the context was from which it was said to be apparent that Dr Lynch *"did not disagree".* Further, the statement which Mr Sarin attributed to Mr Hussain that *"HP should rely on Autonomy's publicly available information"* was imprecise, as the present dispute as to its meaning shows: a direct quotation might have given more of an insight as to whether Mr Hussain was simply informing HP about a useful source, or indicating that what was stated was true and correct and need not further be assessed. Mr Sarin did not even in his witness statement confirm exactly what he understood Mr Hussain to mean, nor did he give any explanation as to why he had concluded that Dr Lynch understood what was said to have meant that Mr Hussain was verifying the published information (rather than identifying a source of information to be verified by HP).

3900. Indeed, although the Claimants' written closing submissions stated that Mr Hussain had made the relevant statement to HP *"in Dr Lynch's presence"* and cited Mr Sarin's witness statement in support, Mr Sarin did not actually say that, although there is some basis for an inference that Dr Lynch was present from Mr Sarin's evidence that the statement was made when going through with Dr Lynch and Messrs Hussain and Kanter and Dr Menell for that purpose what was called the *"Tesla Question List".*

---

3901. As so often in this hugely detailed case, the finer details are nevertheless lacking or elusive. Once again, the difficulty in determining what was said, and more especially its nuances, is made very difficult by the absence of Mr Hussain, who therefore could not be tested on either. Mr Kanter might have assisted me: but he withdrew and was not cross-examined: and the same applies in respect of Dr Menell.

3902. Dr Lynch himself did not expressly deny that the statement had been made. He did not assert that he did not hear it being made. He was, as it struck me,

uncharacteristically wary when he was cross-examined. The following passages serves to illustrate this:

> "Q.  So where information could be found in publicly available documents, you wanted HP to rely on that information, correct?
>
> A.   As I recall, Mr Robison was the person who first decided that a lot of the work could be done off of public documents, but we were happy for that to be a starting point.
>
> ...
>
> Q. Now, Mr Sarin's evidence is that in the meeting Mr Hussain said that HP should rely on Autonomy's published information. You don't deny that in your pleadings. Is that because you don't remember it or you have no recollection of it?
>
> A.  I think it was a generally accepted term, but, as I say, I remember Mr Robison bringing it up and I wasn't in all the meetings anyway.
>
> Q. You didn't disagree with what Mr Hussain said when he said that HP should rely on Autonomy's published information?
>
> A. I don't know about the technicalities of "rely" from a legal sense but obviously I would expect HP to read all the public information.
>
> Q.     But you didn't disagree with what Mr Hussain said when he said to you…
>
> A. I wouldn't disagree that it was a good idea to go and read all the public information, along with all the analyst reports, everything you could get your hands on.
>
> Q. It would have been obvious to you, Dr Lynch, that when HP was told to rely on that information, HP would understand that it was being told that that information was accurate and not misleading?
>
> A. A couple of things here. So first of all, I do believe that information was accurate, not misleading, but secondly, it's not for us to tell HP how to do its due diligence. Under the UK system they can request whatever information they want to request. We then decide whether to give that information. We can't tell HP how it needs to arrive at its decision or what process it needs to do, it must make those decisions itself.

> Q. When you tell them or when Mr Hussain says to them *"You should rely on Autonomy's published information"*, you would have understood that HP would have understood from that that they were also being told that the published information was accurate and not misleading?

> A. *I believe that the public information was accurate."*

3903. In addition to the questions of fact raised, it is necessary to consider certain authorities referred to by the Claimants as to the effect of a person making reference in this way to public information as the answer to enquiries. These can conveniently be dealt with now.

3904. The Claimants cited *Webster v Liddington* [2015] 1 All ER (Comm) 427 in the Court of Appeal at [46][490], where Jackson LJ (with whom Briggs LJ and Christopher Clarke LJ both agreed) gave examples of possible "scenarios" in which, absent a contractual warranty, a person had passed on information produced by someone else, and how these might variously be regarded as him having (i) adopted the information as his own; (ii) represented that he has reasonable grounds to believe the information; or (iii) simply passed on information about which he has no personal knowledge or belief. The Claimants submitted that this is not a case that can plausibly fall into the third category: Dr Lynch and Mr Hussain were, respectively, the CEO and CFO of Autonomy, and had personally approved Autonomy's published financial results. Indeed, this was not information produced by someone else at all: it was their information and in passing it on they endorsed its truth and accuracy.

3905. The Claimants argued further that implicit in any representations Mr Hussain made about figures or statements made in the accounts was that so far as he was aware those figures and statements could be relied on as giving a true and fair view: and see *MAN v Freightliner* [2005] EWHC 2347 (Comm).

3906. Mr Hussain's case was that all he said, and was understood to have said, was that much of the information that HP had requested was available from the published material; in his RRAD he pleaded that he merely "passed on" information and that his references to information being in Autonomy's financial reports *"amounted, at most, to a representation that those sources contained the relevant figures* [or statement]*, but not that those figures* [or statement] *were accurate"*. His statement was in the nature of giving directions as to whereabouts, and not any warranty of the accuracy of what was then found. In any event, Mr Hussain contended that any representation would have been

---

[490] In *Webster v Liddington* [2015] 1 All ER (Comm) 427 the defendants/appellants were qualified clinicians who handed a lay patient a brochure prepared by another which described the treatment which the clinician was offering to carry out. It was held at trial and confirmed by the Court of Appeal that the defendant clinicians, in handing over the brochure, adopted its contents and impliedly represented them to be accurate, even though the brochure was not, as it were, his document.

limited to his belief that Autonomy's published financial information was accurate and not misleading: and that each was true.

3907.  As Jackson LJ acknowledged in *Webster v Liddington*, those scenarios are not a complete statement of the range of possibilities and there are other intermediate positions. They are simply illustrations of the more general proposition explained by Toulson J (as he then was) in *IFE Fund SA v Goldman Sachs International* [2006] EWHC 2887 (Comm), [2007] 1 Lloyd's Rep 264[491] at [50] and approved by Jackson LJ in *Webster v Liddington* that:

> "*In determining whether there has been an express representation, and to what effect, the court has to consider what a reasonable person would have understood from the words used in the context in which they were used. In determining what, if any, implied representation has been made, the court has to perform a similar task, except that it has to consider what a reasonable person would have inferred was being implicitly represented by the representor's words and conduct in their context.*"[492]

3908.  What is required, therefore, at the first stage is not an assessment of which of the scenarios identified in *Webster v Liddington* most nearly equates to the position (as the Claimants appeared to suggest) but what in all the circumstances a reasonable person would have been likely to infer from Mr Hussain's references to the information sought by HP being available in Autonomy's published information, which it may be added, so far as it concerned financial information about Autonomy, was prepared by or under the aegis of Mr Hussain himself. I say "the first stage" because it seems to me that, having determined what the statement was taken to mean by the addressee, it is then necessary to determine whether that is the meaning which was intended by the addressor (and see *Arkwright v Newbold* and paragraph 466 of the Introduction).

3909.  I turn to my assessment of the factual issue as to the received and intended meaning and effect of Mr Hussain's disputed statement referring HP to Autonomy's published information.

---

[491] An appeal from that decision was dismissed by the Court of Appeal [2007] EWCA Civ 811, [2007] 2 Lloyd's Rep 449

[492] In *IFE Fund SA v Goldman Sachs International*, Goldman Sachs had sent on a Syndicate Information Memorandum ("SIM") to IFE which IFE stated it had relied on in proceeding with an acquisition and which turned out to be false. The SIM was not prepared by Goldman Sachs but by a third party, and it contained express written disclaimers including that Goldman Sachs had not independently verified the information in the SIM. Toulson J did not accept IFE's case that Goldman Sachs was making an implied representation that it was unaware of any facts showing that the information was or might be materially incorrect (even though in fact Goldman Sachs had been advised by Arthur Andersen of some inaccuracies).

3910.  I accept that a major part of the meeting was simply an exercise in assisting HP to understand where information might be found; and I note that Mr Sarin himself accepted in cross-examination that:

> (1) As mentioned in paragraph 3890 above, the 29 July meeting was about the process by which information would be provided, and Autonomy would not be providing any substantive information (not least because no Non-Disclosure Agreement was yet in place).

> (2) At the meeting, those concerned simply went through the *"Tesla Question List"*[493] together and annotated the list to identify where the information requested might be found and/or its source.

> (3) The answer in many cases was "the published information"; but all that was expressly said was to the effect that *"much of the information about these things was in the published information."*

3911.  It is unsatisfactory to have to determine the first factual question, as to what Mr Hussain actually said, without having the benefit of any evidence from him. I take it that he would have denied having said, or having intended to be understood as saying, anything more than that for many of the questions which would arise in the course of the due diligence process HP should look first for the answer in the published information. I shall proceed on the factual premise that this was all that he did say or intended to say. I doubt that Mr Hussain would have intentionally expressed himself in such a way as to appear to be confirming, still less warranting, the accuracy of what was set out in the material. After all, the published information carried its own warranty of truth and accuracy, to the best of the issuer's knowledge and belief.

3912.  The next question is what was conveyed by what I have determined he said. I consider that HP would have assumed that he was not aware at that time of anything material that he knew was not in that material and undermined its reliability.

3913.  Then the question is whether Mr Hussain would have intended that to be what was conveyed. In my judgment, Mr Hussain, with what he knew of the  quick time table and the constraints it imposed on the due diligence process, must have expected and intended that in referring HP to the published information as its first source (see above) he was conveying to them that he did not himself know of financial and other information which was material and undermined the reliability of that primary source.

3914.  I have concluded, despite the lack of direct evidence, that Dr Lynch was present and aware of whatever it was that Mr Hussain said. He did not say he was not, despite being given every opportunity to do so when cross-examined: it seemed

---

[493] Tesla being the code name for Autonomy at that time

to me that in his crossexamination he deliberately stepped away from suggesting that he was not. Having the same appreciation as Mr Hussain of the constraints on the due diligence process, and with the knowledge he had, Dr Lynch would have expected HP to take what was being conveyed as being that Mr Hussain was not aware at that time of anything material that he knew was not in that material and undermined its reliability; and that he would have shared Mr Hussain's intention that HP should do so (as I find he did).

3915.   On the basis of my previous conclusions that Mr Hussain and Dr Lynch had "guilty knowledge"  that (a) the accounting treatment of important aspects of Autonomy's business was improper and gave a false impression of the true position and performance of Autonomy and (b) the nature and amount of an important part of the revenue attributed to the software sales had been generated over the course of the Relevant Period by hardware reselling, and that this and a significant proportion of the costs of it had been concealed or disguised, both would have known that HP were being directed to an unreliable source.

---

3916.   Whilst of course I accept that ordinarily there is no duty to speak, in the particular circumstances, Dr Lynch was there to represent Autonomy as its CEO in assisting HP in proceeding with the process of due diligence, and Mr Hussain was there as CFO to assist HP; Dr Lynch shares responsibility with Mr Hussain for the latter  having led them to what I have determined he knew was a misleading source and implicitly encouraged them to rely on it.

3917.   At least in the case of Mr Hussain, I consider that I am reinforced in this assessment by the table which, after the discussions at the 29 July 2011 meeting, Mr Hussain prepared with the assistance of Mr Kanter (and see paragraph 3895(2) above).  This table, which was in response to part of the *"Tesla Question List"*, set out quarterly revenue figures by product category for the period Q1 2009 to Q2 2011 (and was uploaded to the Data Room). Those figures matched, and were expressly stated to derive from, Autonomy's quarterly earnings releases. Of particular note is that no mention was made of hardware sales. Neither of the Defendants addressed this point.

3918.   In my view, and I find, Mr Hussain, in presenting this material and causing it to be uploaded to the Data Room for the purpose of the due diligence exercise, would have been taken to and did represent that he believed, as CFO, that the information given was complete, accurate and not misleading; and the table gave a misleading impression by omitting any reference to hardware sales.

3919.   I have also concluded that Mr Hussain knew that he was representing that the information to which he directed HP, and that which he provided in the table he produced after the meeting with the assistance of Mr Kanter, was true and accurate to the best of his belief.

3920.   However, no evidence was provided sufficient to establish that Dr Lynch was involved in either the compilation or presentation of the table: and I find that he was not involved in either. That does not, however,  cause me to change my

overall conclusion that he knew and intended that what was represented by Mr Hussain was done so with his endorsement.

## Alleged misrepresentations in the course of due diligence 1 August 2011 to 18 August 2011

*Overview*

3921. I have described in the Introduction to this judgment the process of due diligence which took place between 1 August 2011 and 18 August 2011. It may be recalled that Dr Lynch, for his part, sought to impugn HP's conduct of due diligence as rushed, and suggested that HP cut corners, failing to obtain information – most strikingly, Deloitte's work papers – that would have been provided had HP not gone ahead and announced the acquisition on 18 August 2011, and revealed some of the matters that the Claimants complain about. By contrast, the Claimants submitted that those claims were not only factually wrong but also irrelevant as a matter of law, since it is trite law that it is no defence to a fraud claim that the victim should have discovered the truth, or even that he was careless in not doing so.

3922. I return to the process of due diligence now to address the Claimants' separate contention that Mr Hussain made a number of misrepresentations in the course of certain due diligence calls on which HP also relied in proceeding with the Acquisition, in particular, in the course of telephone calls as part of the process on 1, 2 and 4 August 2011.

3923. In addressing the three sets of misrepresentations (the sixth, seventh and eighth sets) alleged to have been made in the course of due diligence calls on 1, 2 and 4 August 2011, I focus first on whether there was any misrepresentation in each case. I address the issue of reliance compositely at the end of this section since it seems to me to be artificial not to look at them together and in the round.

*1 August 2011 due diligence call: the sixth set of alleged misrepresentations*

3924. On a "finance overview" due diligence call held on 1 August 2011, Mr Hussain gave an overview of the business and presented Autonomy's Q2 2011 results. The Claimants alleged that in doing so he made a series of misrepresentations, all of which were recorded in a contemporaneous note of the meeting made by Rob Binns ("Mr Binns") of HP, and were also described by Mr Sarin to the same effect in his witness statement (which was not challenged in this regard).

3925. Mr Binns noted that Mr Hussain made the following representations in his overview of Autonomy's business:

    (1) Autonomy's gross margin range was 87%–90%, and its operating margin range was 42%-50%.

    (2) Although Autonomy's accounts were drawn up in compliance with *"IFRS not US GAAP"*, revenue-recognition policy was *"closely aligned*

*to US GAAP"* (though I note that this may refer only to Interwoven since it was explained as being *"due to prior US listing"*).

(3) Autonomy's COGS included support costs, managed service data centre hosting costs, and *"very little 3P [third-party] royalty costs"*.

(4) The market consensus forecast for Autonomy's 2011 revenue was $1.06 billion.

3926. The Claimants alleged that each of these representations was false. According to the Claimants:

(1) If all hardware costs were allocated to COGS as the Claimants contended they should have been, and none to sales and marketing, Autonomy's reported gross margin (on the adjusted basis reported by Autonomy) would have been 83.3% in 2009, 83.6% in 2010 and 86.7% in H1 2011. (The unadjusted IFRS measures were substantially lower.)

(2) According to the Claimants, Autonomy's revenue recognition policy and practice did not meet even the less prescriptive IFRS standards.

(3) Mr Hussain's statement as to COGS made no mention of hardware costs, which even after Autonomy's wrongful inclusion of large parts of those costs in sales and marketing expenses still represented very large proportions of Autonomy's reported COGS: 37.7% of COGS in 2009 ($33.1 million of $87.7 million reported); 73.2% in 2010 ($81.7 million of $111.5 million reported); and 69% in H1 2011 ($40.4 million out of $58.6 million reported).

(4) Mr Hussain's statement as to the market consensus forecast for 2011 of revenues of $1.06 billion amounted to an implied representation that there were reasonable grounds for that consensus, which was false because that consensus was based on false and misleading historical financial statements.

3927. The Claimants also alleged that in presenting Autonomy's Q2 2011 results, Mr Hussain further impliedly represented that they were complete, accurate and not misleading, but that he well knew that they were not. According to the Claimants:

(1) As a result of false accounting, the Q2 2011 Quarterly Report included numerous incorrect and misleading metrics. They included those set out, with what the Claimants presented as the corresponding True metrics, in the following table (though it is to be noted that when I assess quantum the figures will have to be further adjusted to strip out claims in which the Claimants have not succeeded as identified for like purposes in paragraph 3863(1) above).

| Metric [494] | Stated figure | True figure |
| --- | --- | --- |

[494] Cross-check Q2 2011 revenue is the same as the True Position revenue to the nearest $0.1 million.

| Q2 2011 total revenue | $256.3 million *pages 1, 3, 9, 16* | $211.3 million ($190.5 million excl. pure hardware) [524] |
|---|---|---|
| Q2 2011 IDOL Cloud revenue | $64.3 million *page 3* | $49.1 million[495] |
| Q2 2011 IDOL OEM revenue | $47.2 million *page 3* | $3.8 million[496] |
| Q2 2011 IDOL OEM year-on-year growth | 26% *page 3* | (60%) from $9.6 million to $3.8 million[497] |
| H1 2011 total revenue | $476 million *pages 2, 3, 9, 16* | $388.9 million ($348 million excl pure hardware)[498] |
| H1 2011 IDOL Cloud revenue | $117 million *page 3* | $78.2 million[499] |
| H1 2011 IDOL OEM revenue | $84.3 million *page 3* | $7.5 million[500] |

| Metric | Stated figure | True figure |
|---|---|---|
| H1 2011 IDOL OEM year-on-year growth | 27% *page 3* | (44%) from $13.5 million to $7.5 million[501] |

---

[495] Cross-check Q2 2011 IDOL Cloud revenue is $43.6 million.

[496] Cross-check Q2 2011 IDOL OEM revenue is the same as the True Position revenue.

[497] Cross-check Q2 2011 IDOL OEM year-on-year growth of (64%) i.e. a 64% decline ($10.6 million to $3.8 million).

[498] Cross-check H1 2011 total revenue of the same.

[499] Cross-check H1 2011 IDOL Cloud revenue of $75.6 million.

[500] Cross-check H1 2011 IDOL Cloud revenue of $75.6 million.

[501] Cross-check H1 2011 IDOL OEM year-on-year growth of (48%) i.e. a 48% decline ($14.5 million to $7.5 million).

(2) The Autonomy group's adjusted gross margin was said to be 88% in H1 2011 and 87% in Q2 2011. The True figures (correcting only for the treatment of hardware costs) were 86.7% and 86.2% respectively.

(3) The Q2 2011 Quarterly Report also repeated, on pages 3 and 4, the claim that Autonomy operated a "*pure software*" model, which the Claimants alleged was false as previously explained and addressed above.

3928. As previously mentioned, Mr Hussain pleaded and contended as a general matter that all that he was doing in "presenting" the Q2 2011 Quarterly Report and results was telling HP that there was information available in the public domain, on which HP could take its own view: his presentation added nothing, and no-one on the call could have thought that he was making any kind of personal representation. I have not accepted that general defence in the context of the 29 July 2011 meeting, and the position is in my view clearer in the present context, after due diligence had started, and matters had progressed from the preparatory stage to the substantive stage.

3929. In my view, and I find, when making statements in the course of the due diligence exercise about Autonomy's financial information, or in repeating or paraphrasing what was said about Autonomy's financial position and performance in published information for which he had, or shared, responsibility, he was not only passing on information: I consider it would have been naturally supposed by his audience, as he must have been aware and intended, that, as CFO with responsibility in that context, he believed and was satisfied that the information thus conveyed was accurate, and not untrue or misleading.

3930. I also agree with the Claimants that implicit in any representations he made about figures or statements made in the accounts was that he believed that those figures and statements could be relied on as giving a true and fair view: and see *MAN v Freightliner*.

3931. As to the particular misrepresentations alleged, Mr Hussain responded:

(1) The gross margin percentage range he had referred to accurately reflected Autonomy's published information, which he believed had been prepared in accordance with IFRS and vetted by Deloitte (including in relation to the allocation of part of the costs of hardware reselling to sales and marketing rather than COGS). Furthermore, it was the evidence of Mr Bloomer, as the chairman of the Audit Committee, that fluctuations in Autonomy's margins within a handful of percentage points would not have had a significant effect on

investors' perception of Autonomy or its market valuation.[502] In the quarter in question (Q2 2011), even on the Claimants' case the

---

[502] Mr Bloomer explained: "*If you compare Autonomy to a company that operates on very tight margins, such as a supermarket, the impact of reported margins is very different. A*

adjustment required to correct the alleged misallocation of hardware costs in the quarter was immaterial (Autonomy reported adjusted gross margin of 88% in H1 2011 and 87% in Q2 2011, whereas the Claimants' 'correction' resulted in figures of 87.6% and 86.2% respectively).

(2) Anything that Mr Hussain had said about Autonomy's revenue recognition being closely aligned to US GAAP was (at most) a comment on Autonomy's accounting policies. It was not on its face any kind of representation about the accounting treatment of individual transactions.

(3) As to the impression alleged to have been created by the omission from the description of COGS of any significant hardware costs that there were none, Mr Hussain contended that:

(a) The description given was not, on its face, concerned with the proportionate monetary contribution of the various types of costs included in COGS;

(b) HP knew of at least Autonomy's sales of appliances and therefore that its COGS did include some hardware costs;

(c) It was open to Mr Sarin to ask questions to explore the costs of appliance sales or other sales but he did not do so because he had not taken what was said as a representation as alleged.

(4) Mr Hussain's reference to the market consensus forecast for Autonomy's 2011 revenue of $1.06 billion was not a representation that there were reasonable grounds for such consensus, nor any additional warranty of the accuracy of the published information: he was simply pointing out the availability of the public information and he believed that Autonomy's published information was accurate.

(5) In any event, no reliance had been demonstrated, in particular because:

(a) No evidence had been led to show that Mr Sarin, who was not a decisionmaker, had reported this alleged representation to anyone who was; and

(b) Mr Sarin accepted without equivocation in his cross-examination that no buyer would ever rely on the target's evaluations.

3932. As to (1) above, even if (as I would accept is likely) the gross margin percentage range Mr Hussain gave did accurately reflect Autonomy's published information, and even if (as I would accept) Mr Hussain was aware that Deloitte had vetted the accounts, Mr Hussain knew there to be material information which falsified the figures given and nullified the fact of apparent approval by Deloitte.

---

*supermarket…might have margins of 23%. In a business like that, a 1-2% fall is very significant. For a company with margins around 80% or 90% that fluctuated by a few percentage points up and down every quarter, movements in margin are less relevant"*

3933. As to (2), Mr Hussain's reference to Autonomy's revenue recognition being closely aligned to US GAAP, even if ostensibly only a comment on Autonomy's accounting policies, would have been known by him to be untrue, in that the way Autonomy accounted for VAR sales was radically different than that required under US GAAP: and indeed it was only the difference which enabled the use of VAR sales as an improper means of accelerated revenue recognition. That strategy would have been impossible under US GAAP.

3934. As to (3) in paragraph 3931 above, I consider and find, that Mr Hussain's continued adoption by reference of Autonomy's treatment of COGS in its financial statements and published information, was or amounted to a misrepresentation as to there being no material hardware sales, which was false.

3935. I cannot accept Mr Hussain's point in 3931(4) above either. On the basis of my previous findings, Mr Hussain knew that market consensus figures were derived from incorrect figures in Autonomy's financial statements.

3936. As explained above, I address paragraph 3931(5) above later, taking together all the allegations in respect of alleged misrepresentations in the course of due diligence. I also address later the dispute as to the extent of any involvement by and knowledge of Dr Lynch in the due diligence process as a whole, after considering the seventh and eight set of alleged misrepresentations and the due diligence calls on 2 August 2011 and 4 August 2011 during the course of which the Claimants contended they were made.

3937. Thus, in my judgment, Mr Hussain misled HP during the 1 August 2011 due diligence call in each of the respects alleged.

*2 August 2011 due diligence call*

3938. The seventh set of alleged misrepresentations was made during the second financial due diligence call, held on 2 August 2011. This call addressed Autonomy's business model, revenue streams, revenue recognition practices and tax policies.

3939. HP had sent questions to Autonomy in advance. Mr Johnson, Mr Sarin and others attended for HP, together with representatives of BarCap, Perella and KPMG (including Mr Gersh). Notes were taken by Mr Sarin (on his copy of HP's questions) and by Mr Murali of BarCap. Mr Sarin's unchallenged evidence was that it was Mr Hussain who addressed most of HP's questions. The Claimants alleged that Mr Hussain made two misrepresentations in the course of the call.

3940. The first alleged misrepresentation arose from Mr Hussain's response to the first of the questions provided in advance by HP:

> "1. Describe your sales model by product or vertical (i.e., hosted vs. SaaS vs. on-premise license vs. OEM vs. appliance). For each, describe the standard elements in each arrangement by sales model and how revenue is recognized with each.
>
> a. Do all or only certain arrangements include license, maintenance, professional services or hosting/subscription?
>
> b. Include discussion of how each element in the agreement is priced (i.e., % of license, users, cost per seat/node etc.)"

3941.  Mr Sarin explained his thinking and objective in asking this question as follows:

> "In short, we were asking Mr Hussain to describe Autonomy's business by product, so that we could understand the revenue streams associated with each of these products. The request was intended to be broad. We were looking to elicit information from Autonomy, and Mr Hussain in particular, about everything that Autonomy sold (whether referred to in Autonomy's public filings or not) and wanted to know how revenue was recognized in relation to each revenue stream. We wanted to understand the full picture around Autonomy's revenues."

3942.  Mr Gersh (who had been involved with KPMG in putting the question list together) explained his thinking behind the questions as follows:

> "The question [list] was intentionally broad ... [It] did not exclude (and was not intended to exclude) any particular product or type of sale or any element of Autonomy's business. We wanted to gain a broad understanding of Autonomy's sales model and how different types of revenue were recognized because revenue recognition differences between IFRS (which Autonomy used) and US GAAP (which HP used) might impact the business after an acquisition."

3943.  Both Mr Sarin and Mr Gersh gave evidence that Mr Hussain's answer to HP's question made no reference to the pure hardware sales that had made up more than 10% of all Autonomy's reported revenues (and a larger percentage of what the Claimants recalculated and presented as being its "True revenues") over the preceding eight quarters. Thus:

(1)  Mr Sarin stated:

> "We knew about Autonomy's appliance sales, which Autonomy described as a small part of its business, where customers had an urgent need to deploy IDOL, involving a pre-installed license on appropriate hardware, and which was said to be conducted at a margin not widely dissimilar to Autonomy's license business. However, we knew, and were told, nothing about any sales by Autonomy of third-party hardware without any Autonomy software ..."

(2)  Mr Gersh's evidence on this aspect was as follows:

"*I recall that Question 1 was asked on the August 2 call. As I explained to the jury in Mr. Hussain's criminal trial, if Autonomy was reselling any significant amount of hardware as an element of its contracts (with pre-loaded software or as standalone hardware), I would have expected Mr. Hussain or others in Autonomy management on the call to disclose and discuss any such arrangements in response to Question 1. They did not.*"

3944.  During the US criminal trial Mr Gersh was asked whether he recalled that "*as a part of the response to Question 1 … Mr Hussain said that Autonomy sold hardware as a matter of convenience <u>when Autonomy software was needed to work with hardware</u>*" (emphasis added). Mr Gersh said that he did recall this, later making clear (as the original question put to him by Mr Hussain's US attorney did) that he thought Mr Hussain was talking about appliances. Mr Gersh then further emphasised this in his witness statement in these proceedings by way of response (and in rebuttal) to Dr Lynch's suggestion that Mr Hussain had in fact described Autonomy's pure hardware sales on the call.

3945.  Both Mr Sarin and Mr Gersh were cross-examined on behalf of Dr Lynch about Mr Hussain's comments; but their evidence that Mr Hussain made no reference to Autonomy's pure hardware sales on the 2 August call was not itself challenged. Indeed, in his pleading, Mr Hussain did not deny that his answer to Question 1 omitted any reference to Autonomy's pure hardware sales.

3946.  The Claimants contended that by omitting any reference to Autonomy's pure hardware sales from his answer to Question 1, Mr Hussain gave the false impression on the 2 August call that Autonomy's revenues were derived entirely from software, and related services (including software as a service), except only for the "*very small*" appliance business conducted at returns comparable to the rest of its pure software business that Autonomy had disclosed and represented as effectively software sales.

3947.  Mr Hussain denied making any misrepresentation, and counter-attacked that Mr Gersh, in particular, was well aware that Autonomy sold hardware otherwise than as an appliance. More specifically, Mr Hussain contended that although the notes taken by Mr Sarin and Mr Murali both seem to make clear that all of those other revenue streams were discussed in terms on the call and only hardware went unmentioned, his defence pleaded that no false impression was given by Mr Hussain's answer because:

"*Mr Hussain's notes exclude references to a number of revenue streams, including support and maintenance, professional services and eDiscovery services … HP would have been aware that any response by*

> *Mr Hussain based on such notes would not have been an exhaustive description of Autonomy's revenue."*[503]

3948. In addition to his contention that he expressly mentioned hardware sales for the convenience of customers, Mr Hussain contended in his written closing submissions that Mr Gersh's knowledge of substantial hardware sales should be inferred from:

> (1) Mr Gersh's evidence in cross-examination that he had read all the contracts that Autonomy placed in the due diligence data room: these included at least two contracts for the sale of hardware;

> (2) The lack of any apparent foundation for Mr Gersh's explanation, which appeared to confirm that he had read the contracts, but assumed that they were all part of a *"solution involving Autonomy's product"* or an appliance;

> (3) An internal KPMG email from Mr Gersh dated 7 August 2011 which expressly stated that he was not sure that the 40 contracts in the data room *"captured everything…since as far as I can tell they have not captured free software or hardware pass-through"*;

> (4) The (alleged) falsity of Mr Gersh's suggestion in cross-examination that *"that's a reference to the hardware component of appliances and where they're selling a solution"*, it being submitted that such falsity was shown by Mr Gersh's use of the expression pass-through sales to denote hardware and distinguish hardware sales from appliance sales: the context being Mr Gersh's discovery (post-acquisition) of a $41 million purchase from Dell which he considered too large to relate to an appliance sale and Mr Gersh's approach then in distinguishing appliance sales from pass-through hardware sales; and

> (5) The frailty (as Mr Hussain presented it) of Mr Gersh's explanation that:

>> *"We use the term generally, sort of "pass-through hardware" in a software sense because software companies aren't making hardware, they're purchasing it from somebody, they're putting their software on it and they're selling the product with the hardware delivery mechanism, so as it's described as an appliance…"*

> (6) Other evidence suggesting that (contrary to what Mr Gersh maintained he had understood) "pass-through hardware" was not used in "a software sense" included both (i) KPMG in their post-acquisition report and (ii) E&Y in their memorandum of December 2012 (addressing HP's

---

[503] This point was not pursued in Mr Hussain's Closing Submissions.

write-down of $8.8 billion) used the term *"hardware pass-through"* to denote what they described as *"standalone hardware sales"*.

3949.  It is necessary to separate out three strands in these competing presentations:

    (1)  Whether what Mr Hussain said on the 2 August 2011 telephone call gave the false impression that Autonomy's revenues were derived entirely from software;

    (2)  Whether Mr Sarin and/or Mr Gersh became aware that Autonomy sold hardware, and more particularly, hardware otherwise than as an appliance ('standalone' hardware);

    (3)  Whether the issue of hardware sales was, or if properly understood, would have been, a matter of importance to KPMG, Messrs Sarin and/or Gersh, and HP.

3950.  I have addressed the last two points, which, as it seems to me, go to the issue of reliance, rather than whether or not there was any misrepresentation, in the context of the Hardware claim. I have concluded that neither Mr Gersh (or KPMG) nor Mr Sarin appreciated, prior to the Acquisition, that Autonomy had been reselling, in substantial quantities, hardware other than with Autonomy software built into or embedded in it, or as part and parcel of an identified software sale.

3951.  Focusing for present purposes on point (1) above:

    (a)  Whether or not evident from other sources read or available to HP that Autonomy had engaged in substantial "pure" or "standalone" hardware sales, the fact remains that Autonomy's published information did not contain any reference to such sales;

    (b)  In those circumstances, in my judgment, in directing HP to that published information without any warning, Mr Hussain perpetuated and reinforced the impression that Autonomy did not sell material amounts of non-appliance (i.e. standalone) hardware;

    (c)  Further, in my judgment, this was intentional in that Mr Hussain did not wish HP to know that Autonomy had (a) undertaken hardware sales as an expedient to make good any shortfall in software sales and to ensure that Autonomy either did meet or came close to meeting quarterly revenue forecasts, and (b) disguised its use of that expedient by accounting for costs and losses of sales as sales and marketing expenses: and see my assessment of and conclusion on the Hardware claims.

3952.  The <u>second</u> misrepresentation concerned Autonomy's IDOL OEM revenue. As Mr Sarin's notes recorded, HP was told that such revenue generally consisted of

an upfront payment by the OEM partner followed by royalty payments based on the OEM partner's sales, as the following excerpt from Mr Sarin's notes showed:



3953. Mr Murali (of BarCap) also made notes which recorded in relevant part:

> "Rev rec around OEMs – Upfront fee + royalty (from a licence perspective),"

though he did also note after that: "did not understand 100% Need to clarify".

3954. The Claimants alleged that this representation was false, because as discussed in the part of this judgment dealing with the OEM claims, only a small fraction of the IDOL OEM revenue reported by Autonomy was derived from ongoing royalties.

3955. For reasons set out in some detail in the part of this judgment in which I consider the OEM claims, I have concluded that the depiction of Autonomy's OEM business as generating from OEMs an especially valuable royalty revenue stream was incomplete, inaccurate and false, to the knowledge of both Defendants; and that Mr Hussain's representation was likewise false, and known by him to be so.

*4 August 2011 due diligence call*

3956. The eighth set of alleged misrepresentations were made on a due diligence call held on 4 August 2011. The call was attended for HP by Mr Johnson, Mr Sarin, Ms Hsiao and others, as well as representatives of BarCap. Mr Hussain, Mr Kanter and Mr Chamberlain participated for Autonomy, as (it appears) did Brian Cayne of Qatalyst: none of them gave evidence.

3957. During the 29 July 2011 meeting, HP had asked (not for the first time) for internal threeyear financial projections. Dr Lynch and Mr Hussain had said that no such projections existed. It had therefore been agreed that HP would show Mr Hussain parts of its Deal Model, and that Mr Hussain would comment on the reasonableness of the assumptions and projections it contained. The Claimants relied on the fact that this agreement was recorded in Mr Sarin's notes of the 29 July 2011 meeting, where against HP's questions concerning Autonomy's three year projections Mr Sarin noted: "*walk thru HP model*"; and on Mr Sarin's email to his team following the meeting:

> "*They do not have a 3 year financial plan ... As such, I have offered to Sushovan (CFO) that we can walk him through our stand-alone model*

*(just the income statement and associated assumptions) to get his perspective*".

3958.   In cross-examination Mr Sarin told me:

> "*The purpose of the August 4 call was really because we didn't have access to management's own long-term forecast. The idea was for us to really run at a high level some of the assumptions that were driving our projections for the valuation of Autonomy and so, as we have discussed before, looking at growth rates and margins was particularly important. So we were showing a subset of the model that was only looking at Autonomy, to Autonomy CFO and we were walking through that just to make sure we got comfort that some of those numbers were indeed correct, and we weren't really missing anything in the process …*
>
> *So the idea of talking to executive management really is they are more involved in running the business, they have more insight on their own business than anybody sitting from the outside would glean over a two to three-week period. So the idea was to elicit from management: here is how we're looking at the business, here is how we're evaluating the business, here is how we're looking at the projections of the business; looking at your historical numbers, do you believe this makes sense?*"

3959.   Mr Sarin made contemporaneous handwritten notes of the call and gave evidence by reference to them. The notes were a few lines long; but Mr Sarin told me that the meeting lasted about an hour.

3960.   During the call, Ms Hsiao (a member of Mr Sarin's team) shared her computer screen with the other attendees and Mr Sarin *"walked them through"* parts of the Deal Model. As Mr Sarin explained, "*it was limited to inputs*[504] *that would be needed to figure out top line and other elements of P&L until 2016, but no assumptions that would be relevant for a valuation*", because "*I wouldn't want to share with the target if the valuation that I'm coming up with is higher than the market value, because at this time the deal hasn't really been, you know, signed and so you don't want to tip your hand in terms of value.*" Mr Chamberlain took screenshots, which he emailed to Mr Hussain. There was a dispute, which I need not decide, whether those screenshots provide a complete or partial record of what was shown. Revenue projections were shown by product line, but only up until 2016.

3961.   According to the Claimants, Mr Hussain *"largely confirmed the assumptions and projections that he was shown, but suggested some tweaks, which HP largely adopted."* The *"tweaks"* which the Claimants suggested were made at Mr Hussain's suggestion related to two aspects of the Deal Model which the Claimants said were adjusted in the course of the conversation: (a) the forecast growth of IDOL Product revenues (as to which, according to Mr Sarin's contemporaneous notes, Mr Hussain stated that the original 5% annual growth

---

[504] The transcript says "imports", which is an obvious error.

projection was "*very low*" and his suggestion was to use 10% instead), and (b) the formula used to project maintenance fees (which according to the same notes suggest that Mr Hussain placed the renewal rate at 90%). The result, as can be seen by comparing the first and second of Mr Chamberlain's screenshots, was slightly to reduce total projected revenue for 2011 (from $1.08 billion to $1.06 billion) and 2012 (from $1.27 billion to $1.25 billion).

3962. The Defendants gave a rather different depiction, and in particular, submitted that any changes that were made to HP's model following the call were not made in reliance on any comment of Mr Hussain, but rather on HP's own assumptions, and that in any case, Mr Hussain was not seeking to push up the numbers: on the contrary, he suggested that some of HP's proposed figures be reduced. Further, substantial changes were made to the model at a later stage between 4 and 18 August 2011, as Mr Sarin accepted. The Defendants relied on Mr Sarin's own evidence in cross-examination:

> "Q  ... Now, you, of course, understood that you were here looking at your own projections, and that projections like this are always a matter of opinion, aren't they?
>
> A.    Yes, there is an element of subjectivity involved.
>
> Q.  No buyer would ever rely on the target's own evaluation of these things; these were your own projections, correct?
>
> A.    Correct."

3963. The dispute in this regard is relevant to, and in assessing, the Claimants' allegation that,
Mr Hussain made the following misrepresentations in the course of the call:[505]

----

(1) That the consensus analyst estimate for Autonomy's 2011 revenues was $1.05 billion, but that UBS's forecast of $1.06 billion was more accurate. The Claimants cited Mr Sarin's notes recording a statement there attributed to Mr Hussain that the consensus was "*a little behind*", so that actual revenue "*could be a little higher*", before he cited the UBS figure. The Claimants contended that this statement was false because, like the consensus figure, UBS's forecast reflected the false accounting underpinning Autonomy's published financial results.

(2) That the projections in the Deal Model for licence (i.e., IDOL Product), IDOL Cloud and IDOL OEM revenue were "*reasonable*". Again, the Claimants contended that this was false because Autonomy's 'True' revenues in those categories were inconsistent with such projections.

----

[505] Mr Sarin also explained that during the call Mr Hussain said that HP's assumptions about the various gross margins that applied to Autonomy's different product categories were "*right*". It was suggested to Mr Sarin in cross-examination that he had only asked about Autonomy's overall gross margin, rather than the margins on individual components; however, he explained later in his oral evidence that that was, and indeed he told Ms

(3) That the consensus forecast for Autonomy's 2012 revenues was $1.25 billion. As described above, this corresponded to the revised projection in the Deal Model that resulted from the adjustments which the Claimants contended were made during the call. The Claimants submitted that this amounted to an implied representation that there were reasonable grounds for the market consensus, but that in fact the consensus simply reflected the false accounting. Mr Sarin told me:

> *"when somebody is looking at the revenue elements that comprise the full Autonomy revenue, he's looking at the disaggregated gross margins by those five elements. To the extent there is a significant piece of information that is missing, which would have a material impact on the valuation and our understanding of the business, that would have been an appropriate time to flag it."*

3964.   Mr Hussain dismissed the call as *"wholly insignificant".* He submitted:

(1) In fact, he had pointed Mr Sarin to lower projected revenue figures (of $1.05 billion) and the effect of his suggestions, as Mr Sarin had accepted in his evidence and confirmed in cross-examination, was to reduce projected revenues compared to those in HP's suggested model (which had projected revenues for 2011 of $1.076 billion).

(2) All that he was doing was referring to analyst estimates which were publicly and easily available to HP. He denied having said that HP's figures were "reasonable" and although the Claimants again cited Mr Sarin's contemporaneous notes as recording just such a comment, he said that all he was doing was explaining the assumptions and the comment was Mr Sarin's own gloss.

---

Harvey of HP in an email dated 10 November 2011 that "*The gross margin split was not officially provided by Autonomy. We had made assumptions based on our understanding, public comparables etc. During one of the diligence sessions we vetted the assumptions, at a high level, with their CFO*". The suggestion put to Mr Sarin is inconsistent with the comment recorded in Mr Sarin's contemporaneous note: "*gross margins right*" (emphasis added). Further, if all HP were asking were whether the weighted average of its individual gross margin assumptions was in line with Autonomy's reported overall gross margins, it could have done the necessary, simple sums itself.

(3) In any event, as Mr Sarin confirmed in cross-examination the further and substantial changes later made to the model between 4 and 18 August 2011 were made unilaterally by HP without any reliance on any statement made or allegedly made by him.

3965.   Insofar as the Claimants were seeking to rely on the exchanges during the 4 August 2011 call as amounting to Mr Hussain confirming the validity of HP's Deal Model and its assumptions, and as going beyond or providing a basis for a claim independent of their allegations as to the falsity of Autonomy's accounting information I do not accept that. Nor do I accept that HP would have been entitled

to or did treat what was said as validating their Deal Model, or as the basis on which they made alterations to it. At most, in my judgment, Mr Hussain was refining representations already made, and by inferential repetition, reinforcing them. If relevant at all, that is really relevant principally to reliance. Whilst the call was not wholly insignificant, what happened was not such as to found any separate claim for misrepresentation.

3966. That leaves for consideration two matters that I reserved until after dealing with the representations made during the process of due diligence: (a) the involvement of Dr Lynch in the due diligence process and (b) the issue of reliance.

*Dr Lynch's involvement in the due diligence process*

3967. Dr Lynch has sought to portray himself as having played very little part in the due diligence process. He says that he did not attend any of the calls between the senior leaders on both sides to which he was invited. But Mr Sarin's evidence was that he did, noting that Mr Robison for HP "*sat through every call*", and would not have joined if "*his counterpart*" (Dr Lynch) did not. Indeed, Dr Lynch claimed not to remember speaking to Mr Sarin <u>at all</u> after 1 August 2011, but the evidence shows that he did.

3968. More generally, although it is true that Dr Lynch's name is on very few due diligence emails or documents, that does not mean he was not involved in drafting them. Rather, consistently with his general practice, Dr Lynch repeatedly commented on other people's emails in draft, and indeed himself drafted or redrafted emails for other people to send.

3969. Dr Lynch claimed in cross-examination that he did so because "*there was an explicit request from Andy [Kanter] that all emails should go through him for purposes of the recording for the UK takeover process*", but plainly Dr Lynch could simply have copied Mr Kanter on any emails sent by him. Indeed, Dr Lynch was happy to email HP directly about due diligence issues when it suited him. (Dr Lynch's claim is certainly not supported by Mr Kanter's email of 1 August 2011 asking him and others to avoid emailing <u>documents</u> on the basis that they had to go through the data room.)

3970. What is more, his involvement went beyond drafting or commenting on emails. He had conversations with Mr Hussain about how best to respond to HP requests. As described in the OEM section of the judgment, Dr Lynch was involved in putting together a list for HP of Autonomy's "*Top 10 OEM customers by revenue for FY 2010*". Despite attempting in his first witness statement to distance himself from this episode, it is clear

from the contemporaneous materials that he discussed the list with Mr Hussain on at least two calls.

3971. Dr Lynch continued to deny these allegations generally. He claimed that he did not participate in any of the financial or legal due diligence calls, though he did

join a few technical calls to discuss Autonomy's products. He sought to maintain this in crossexamination:

> "So if you look at the calls I'm on, they're all about product, technology and positioning. I don't attend the finance and legal calls."

3972. His written closing submissions suggested also that this was broadly confirmed by Mr Sarin when he was cross-examined, relying on the following passage:

> "Q.... if we just consider the due diligence process from 1 August onwards, okay, and just define it as that for a moment, during the period after 1 August, you can't recall Dr Lynch providing any information to you, can you?
>
> A. So just to make sure I understand the question, when confirmatory diligence begins with the first call on August 1, your question is do I recall Dr Lynch providing me specifically any information?
>
> Q. Yes. During any call that you were involved with or any email that you received?
>
> A. My calls were largely with Mr Hussain, Mr Kanter. I probably did speak with Dr Lynch occasionally about some things, for example the call with Deloitte that happened in -- later on down the road. I don't believe he and I were spending time going through diligence materials.
>
> Q. Right. Just on that call involving Deloitte, you're not suggesting that he was actually part of the Deloitte call? Are you talking about process again?
>
> A. Process again.
>
> Q. Right, and he again says that he wasn't actually part of that conversation and that's something you've just misremembered?
>
> A. I think there is an email to that effect, which says, "This is what Dr Lynch and I have agreed in a prior conversation and therefore we will -- instead of getting the auditor work papers, we will go ahead and have a call with Deloitte".
>
> Q. We can look at that in due course –
>
> A. Sure.

> *Q. -- but he cannot recall any discussion with you during the period after 1 August?*
>
> *A. I don't recall any substantive diligence-related call. There might have been process-related calls."*

3973. Dr Lynch's closing submissions acknowledged that later in his cross-examination, Mr Sarin suggested that he had a conversation with Dr Lynch in relation to OEMs, sometime between 16 and 18 August 2011; but it was pointed out that this was not something which Mr Sarin dealt with in his witness statement, and when cross-examined he sought to justify the omission on the basis that this was because "*it wasn't really any diligencerelated item per se*", and that "*There wasn't anything material that I ought to have then written out in the witness statement*". In the circumstances, Dr Lynch submitted that no weight should be placed on this supposed incident.

3974. Dr Lynch also said that he did not attend any of the calls between the senior leaders on both sides that he was invited to; and he pointed out that his name is on very few financial due diligence emails.

3975. However, with reference to that last point, the Claimants marshalled examples which they submitted demonstrated that, although not apparently involved, Dr Lynch was actually (as Mr Rabinowitz put it to him in cross-examination) "*directing what HP is and is not told in the background…".* In particular:

    (1) They referred to a response, apparently from Mr Kanter, to an email from Mr Levadoux listing certain key things which HP wanted to be dealt with as due diligence entered its second week (including *"Top Tesla OEM arrangements")*, and relied on an email chain to show that in fact it was Dr Lynch who had drafted the response and simply told Mr Kanter to send it to Mr Levadoux.

    (2) They put forward another example, of an email from Dr Lynch directly instructing the addressee, Mr Kanter, as to the content of a response to an email from Mr Sarin.

    (3) Another email, dated 12 August 2011, from Mr Kanter to Dr Lynch concerning information sought by Mr Sarin, including relating to OEM business, received the response "*Could you draft answers for us to review*", suggesting a supervisory role on the part of Dr Lynch.

    (4) A fourth example was an email dated 10 August 2011 from Dr Lynch to Mr Kanter with Dr Lynch's editorial changes of a draft email to Mr Sarin which Mr Kanter had prepared or caused to be prepared and obviously sent to Dr Lynch for comments. Dr Lynch stated that he had *"edited a lot".* Mr Sarin had asked various questions, focusing especially on Autonomy's hosting business, and had requested *"…off the shelf/regularly produced management reports*

*(monthly/quarterly) that you use to manage the $300 million business…"*

3976. Dr Lynch sought to dismiss the suggestion that he was directing what HP was told and not told *"in the background"* as a *"bit of kite-flying"* forming no part of the Claimants' pleaded case and which, in any event, was not true. However, as it seemed to me:

(1) His explanation of the examples above of his involvement behind the scenes in responses to Mr Sarin, which was that "*there was an explicit request from Andy [Kanter] that all emails should go through him for purposes of the recording for the UK takeover process*", and *"emails are supposed to go through Mr Kanter…"*, seemed to confirm rather than disprove the fact of his involvement.[506]

(2) There were also instances suggesting that Dr Lynch was happy to email HP directly about due diligence issues when it suited him.

(3) There are indications also that his involvement went beyond drafting or commenting on emails. He had conversations with Mr Hussain about how best to respond to HP requests. For example, he was involved in putting together a list for HP of Autonomy's "*Top 10 OEM customers by revenue for FY 2010*", and it is clear from the contemporaneous materials that he discussed the list with Mr Hussain on at least two calls.

3977. The impression which I formed generally was that Dr Lynch was simply indisposed towards permitting an important part of Autonomy's business being run by others, indeed perhaps personally incapable of doing that. As in other contexts, which I have addressed, even if he was not involved routinely, or in day-to-day details, Dr Lynch never relinquished a general supervisory role in any sphere of importance to Autonomy's business. Where not ostensibly involved, he was in any matter of importance involved behind the scenes. He would almost invariably involve himself at a more micro-level, sometimes sporadically but often more routinely, according to his concern and interest. In my view, this is illustrated in the present context of the due diligence.

3978. In my judgment, Dr Lynch shared with Mr Hussain knowledge of the impropriety of the way aspects of Autonomy's actual business activities had been accounted for and disclosed (or rather disguised, concealed, or misleadingly presented). For the proposed Acquisition to proceed at the price agreed, both knew that the false presentation had to be maintained. I consider it much more likely than not that Mr Hussain would have kept him informed of the progress of the process on a regular basis. Dr Lynch was involved in this, as in all other important matters relating to the company. He did not need to know and I doubt he did know the details of every stage; but I am satisfied that in the due diligence process overall he was, as I have described him elsewhere, the éminence grise and well aware of what the message to HP had to be, and intended that it should be, and knew that

---

[506] Dr Lynch's claim is also difficult to reconcile with Mr Kanter's email of 1 August 2011 asking him and others to avoid emailing documents on the basis that they had to go through the data room.

it was being, delivered in the form of the information provided in answer to HP's questions and in the representations made. He knew that thereby HP were being deceived. In my judgment, Dr Lynch was responsible accordingly and liable with Mr Hussain as if he also had been the actual representor.

*Whether HP relied on the Defendants' misrepresentations*

3979. It is common ground that in order to make good their claims in deceit HP had to show not only that the Defendants made representations of fact to HP which they knew to be untrue, and did so knowingly, without belief in, or reckless as to, their truth[507], but also that they intended HP (or, where the representations were made indirectly, recipients in a class including HP) to rely on those representations and HP did so rely.

3980. The Defendants contended that even if found to be such, none of the misrepresentations set out above were intended to or did induce Bidco to buy the Autonomy shares and share options they agreed to sell.

3981. The Claimants dismissed this as *"fanciful"*. They submitted that the misrepresentations in issue were fundamental parts of: (i) the initial approach to HP concerning the possible sale of Autonomy; (ii) the Defendants pitching Autonomy to HP directly; and (iii) the Defendants' responses to HP's due diligence requests. That process concluded with HP deciding to offer, and offering, £25.50 per share for Autonomy, including the shares owned by the Defendants. They contended *"non-exhaustively"* that the evidence shows that HP was induced by the representations in the following ways.

3982. The Claimants' case as to the January, February and March Slides is as follows:

   (1) The January Slides, sent as part of Mr Quattrone's initial approach to HP, led to the 3 February 2011 video conference which, with the related February Slides, led in turn to the 4 March 2011 meeting at which the March Slides were presented.

   (2) The representations in the February Slides were of "*particular interest*" to Mr Robison and his colleagues in the SCD group. Mr Robison, who was HP's Chief Strategy Officer and Head of SCD, relied on them when considering whether Autonomy would be a suitable fit for HP.

---

[507] Bidco's alternative claims under s.2(1) Misrepresentation Act 1967 do not require proof of the third element – that the false representations were made fraudulently, i.e. without belief in their truth or reckless as to their truth. If the other elements are established, the claims will be made out unless the Defendants prove that they had reasonable grounds to believe, and did believe up to the time they sold their shares and share options to Bidco, that the facts represented were true.

(3) Mr Robison "*relied on*" the March Slides, which gave an "*impressive picture of Autonomy's financial performance and business*". The "*pure software model*" they described was, as Mr Robison explained in his witness statement:

> "*a very attractive model for HP, a predominantly hardware company that was looking to acquire an asset that would enable it to expand in the software market. The fact that Autonomy's business model was focused almost exclusively on software, with only a small amount of services as disclosed in its public filings and presentations to HP, was important to HP and affected the price that HP was ultimately willing to pay, and did pay, for Autonomy.*"

———————————————

(4) The size and growth of IDOL Cloud as described in the March Slides was "*important to HP because of the relative predictability and recurring nature of the revenue stream*".

(5) The presentation of "*strong*" IDOL OEM revenues and revenue growth was also "*important to HP*", indicating "*that other companies valued Autonomy's technology*". HP therefore considered IDOL OEM to be "*a highly profitable, growing revenue stream that was recurring in nature and an indicator of the quality of the technology*".

(6) The overall "*message conveyed during the March 4 meeting was that Autonomy was a high-growth, pure software company*". The presentation Dr Lynch gave of the March Slides was "*pretty compelling stuff*".

(7) Mr Sarin, who did not attend the 4 March meeting but who reviewed the March Slides shortly thereafter, also thought that the March Slides described "*a very compelling business*", given its apparent scale and growth.

3983. As to the representations made in June and July 2011 the Claimants submitted that:

(1) The representations made at the 29 June 2011 meeting, including in respect of IDOL OEM, led Mr Sarin to conclude that Autonomy was "*a strong business*".

(2) HP also relied on the Defendants' repeated representations that Autonomy was a "*pure software*" business. Had HP known about Autonomy's hardware sales, and their contribution to Autonomy's reported rate of revenue growth, it would have viewed them as a significant negative, which would have affected how much (if anything) HP was willing to pay for Autonomy. Likewise, had Mr Sarin's team

been aware of the hardware sales it would have asked detailed questions for the purpose of valuing Autonomy.

(3) HP relied, as the Defendants told it to rely at the 29 July 2011 meeting, on Autonomy's publicly available financial information, including the H1/Q2 2011 results presented to them directly by Mr Hussain.

(4) Most importantly, HP relied on that information also when building the Deal Model, the bedrock of which was Autonomy's reported historic revenues and costs.

(5) BarCap, acting for HP, also checked the historic revenue numbers in the model against the table provided by Mr Hussain described in paragraph 3895(2) above. Had the table been accurate, there would have been major discrepancies, and the falsity of the published numbers would have been discovered.

3984.  As to the representations made during due diligence:

(1) Mr Sarin's evidence was that he and his team relied, in developing the Deal Model, on the information provided in due diligence. That included the comments on the Deal Model provided by Mr Hussain on 4 August 2011. According to Mr Sarin's witness statement:

> *"Confirmation from Autonomy's CFO that the key assumptions and projections in our valuation analysis were consistent with his knowledge of Autonomy's business was very important to us. I recall after that call feeling very comfortable that the projections in the model were reasonable. Of course, I recognized that Mr Hussain would probably be motivated to be upbeat about the projections so as [to] get a good price, and I weighed his feedback to reflect this potential bias, as well as the fact that people's views can differ. Thus, when he said that he thought our 5% year-on-year IDOL Product growth rates were too low and could be doubled to 10%, I took account of his views but did not fully adopt them. Ultimately, however, I believed that as the CFO of a large, publicly-listed company, Mr Hussain would be truthful in his statements to me and the public market."*

(2) Likewise, on 8 August 2011, Mr Johnson told Mr Robison that there were three areas in which HP hoped to "dig deeper" on due diligence: Deloitte's work papers, an open-source code scan, and:

(3) "*One click deeper on financial projections – While they do not have a 3-year plan, they probably have a financial model that they will use with Qatalyst for fairness purposes. Our financial diligence to date has been predominantly Q&A with Sushovan*" (emphasis added). HP never obtained Qatalyst's model, and Mr Hussain's answers on the 4 August 2011 call were what it principally relied on for confidence that its key forecasts and assumptions for Autonomy were in line with Autonomy management's views.

(4) Mr Apotheker and the SCD group in turn focused on the analysis in the Deal Model when considering the value that Autonomy presented to HP, which, in turn, informed the price that HP was willing to pay for it.

(5) It was suggested to Mr Sarin that HP did not rely on what Mr Hussain said in the 4 August 2011 meeting; Mr Sarin strongly disagreed. The Claimants dismissed this suggestion as *"hopeless"* and submitted that the whole purpose of the call was for Mr Hussain, the CFO of Autonomy, to provide HP with guidance on its forecasts and assumptions in the absence of any internal projections by Autonomy (which HP had repeatedly sought). They emphasised their point that there would have been no point in HP asking Mr Hussain to comment on its forecasts and assumptions if HP did not intend to rely on what he said.

3985. More generally, as set out above, the Claimants insisted that most of the representations in issue were responding to specific questions from HP. Thus:

(1) in the case of the March Slides, HP's questions covered topics including Autonomy's historical revenue growth and the size of the OEM and Cloud businesses;

(2) in the case of the 29 June 2011 meeting, HP asked about Autonomy's product categories and historical and projected sales; in the case of the 29 July meeting,  HP's detailed questions gave rise to both the representation that it should rely on Autonomy's published information for many answers, and the specific table of revenues by product category complained of; and

(3) in all of the due diligence calls (1 August 2011: overview of Autonomy's financials requested by Mr Sarin; 2 August 2011: HP sent detailed lists of questions; 4 August 2011: Mr Hussain was asked to comment on specific forecasts and assumptions in the Deal Model), Mr Hussain was likewise responding to specific questions.

3986. The Claimants suggested that if, rather than either misrepresenting the truth or staying silent, the Defendants had told the truth, then the discrepancy between that truth, and the claims in Autonomy's published financial information, would have become apparent. In such circumstances, as Mr Apotheker described:[508]

> *"I would have been highly suspicious and demanded answers … The facts that I have been asked to assume would have raised material and serious questions about the accuracy of Autonomy's public description of its business and its success, and perhaps more importantly, raise[d] significant doubts about the integrity of Autonomy's management, whose names and signatures appeared in descriptions of the business contained in the Annual Report. Matters such as substantial sales of*

---

[508] Mr Apotheker was asked in various ways whether he would have been reassured to learn that Deloitte knew some of the underlying facts and had approved the accounts. He made clear that he would still have asked questions. But those questions, as premised, are not relevant here. If the Defendants had told Mr Apotheker that Deloitte was satisfied, that would obviously have amounted to an implied representation that Deloitte was correctly satisfied – and if the alleged fraud took place at all, that implied representation would have been equally false.

> *third-party hardware by a software company, round-trip transactions, overstatement of IDOL OEM revenues, inflated revenue growth figures, and other inaccuracies or misstatements would have suggested that Autonomy's management was engaged in a systematic effort to portray Autonomy's business as stronger, better-managed, more vibrant and more successful than was truly the case ...*

> *If such information had come to my attention prior to announcing the deal, I nevertheless think it possible that I would have given Autonomy and its leadership an opportunity to explain the discrepancies. If, as seems most likely, the explanation I heard was not satisfactory, I have no doubt that I would have recommended to HP's Board that it should abandon the deal, because I would have had no interest in bringing into HP a team that I could not trust and whose judgement I doubted, and a company significantly less relevant to HP's strategy and successful than initially thought. I am confident the Board would have shared my concerns."*

*My overall assessment of the due diligence process and its relevance*

3987. In summary, in my judgment, the cumulative effect of the Slides and the representations made were to depict Autonomy as having a special selling point as a pure software company with especially valuable and dependable revenue streams (especially from its IDOL Cloud and IDOL OEM) accurately and reliably described and quantified in its published information. Due diligence on a tight timetable was undertaken on that premise, and the answers to the questions raised by HP in the course of the due diligence process reinforced the representations made and further encouraged and induced HP to rely on Autonomy's financial reports and the public statements therein of its business,

---

the sources and nature of its revenue streams, its software revenue growth, and its overall financial position and performance.

3988. HP/Bidco relied on these representations in the round, together with the published information they appeared to refresh and validate, in pursuing a potential bid, negotiating the price and ultimately entering into the Acquisition (including the purchase of the Defendants' respective shares and share options) at the price finally agreed. The suggestion that HP/Bidco did not rely on the representations as well as the published information is incorrect: they were complementary and reliance was placed on both in that all these matters impacted the mind and affected the judgement of HP/Bidco in determining to proceed and eventually conclude the Acquisition, including the purchase of the Defendants' respective shares and share options, at the agreed bid price.

*The Non-Disclosure Agreement*

3989. Finally, Dr Lynch (but not Mr Hussain, despite a passing mention in his Defence) sought in his RADC to invoke the provisions of the Non-Disclosure Agreement

("the NDA") entered into by HP and Autonomy on 3 March 2011 in an attempt to defeat the Claimants' misrepresentation claims. The plea relied on the effect of the NDA as a matter of Delaware law: but no evidence of Delaware law was provided. Dr Lynch did not mention the NDA in his closing submissions, and I take him to have abandoned the point.

3990.   Further, if I am wrong and the point is sought to be maintained, I do not consider that, taking Delaware law to be the same as English law, as I must in default of any evidence of Delaware law, the NDA would avail Dr Lynch as a defence to a claim for fraud. Dr Lynch cannot rely on a contractual term to exclude his own liability for fraud, as a matter of public policy: *HIH Casualty and General Insurance Ltd and others v Chase Manhattan Bank* [2003] 1 All ER (Comm) 349, *per* Lord Bingham at §16 and Lord Hoffmann at §76.

3991.   As to Bidco's claims under s.2(1) Misrepresentation Act 1967, pursuant to s.3 of that Act, contractual terms cannot exclude or restrict liability save insofar as they satisfy the requirement of reasonableness under s.11(1) Unfair Contract Terms Act 1977. That was for Dr Lynch to prove, and he has not even alleged that the terms of the NDA satisfy the statutory requirement. It is in any event doubtful that a contractual term that purports to exclude or restrict liability for fraud can be regarded as reasonable, especially in the circumstances of the present dispute.

3992.   Further, and in any event, I agree with HP that the provisions invoked by Dr Lynch have no such effect even on their own terms:

(1) First, Dr Lynch sought to rely on clause 5 of the NDA as estopping Bidco from "*advancing any claim by reference to confidential information defined therein*". As to this:

(a) "*Confidential Information*" was defined in clause 1. The definition excluded, among other things, information that "*prior to or after the time of disclosure becomes part of the public knowledge or literature*", save by the fault of the receiving party.

(b) It was unclear which, if any, of the misrepresentations set out above were being said by Dr Lynch to relate to "*Confidential Information*" within the meaning of the NDA – particularly given his case that the representations in issue "*generally reflected Autonomy's [public] financial statements*". The burden was on Dr Lynch to plead and prove those matters: and he did not do either.

(2) Second, Dr Lynch relied in his pleading on clause 13, which provided:

*"This Agreement constitutes the entire agreement among the parties hereto and supersedes all other prior agreements and understandings, both written and oral, among or between any of the parties with respect to the subject matter hereof and thereof. All modifications of, waivers of and amendments to this letter agreement [sic] must be in writing and signed by both parties hereto."*

(3) However,

(a) That is, in terms, an entire-agreement clause, providing that the NonDisclosure Agreement supersedes "*prior agreements and understandings*". Entire-agreement clauses do not ordinarily exclude liability for (non-negligent) misrepresentations; if that is what is intended, then it must be expressly stated: *Mears Ltd v Shoreline Housing Partnership Ltd* [2013] CP Rep 39 §16.

(b) The clause is only concerned with agreements and understandings "*with respect to the subject matter*" of the NDA– that is to say, the use of Confidential Information. Even if "*understandings*" did mean "*representations*", the clause would have no effect on representations that did not concern the use of Confidential Information.

(c) Clause 13 defines the agreement "*among the parties hereto*", i.e., HP and Autonomy. Neither Bidco nor Dr Lynch is a party to the NonDisclosure Agreement, and neither is mentioned in clause 13 (whether directly or by any reference to "*Associates*"). Dr Lynch had no right to enforce clause 13 against Bidco, nor is Bidco bound by it.

(4) In any event, even on Dr Lynch's case, he could only have invoked clause 13 in respect of representations made before the date of the Non-Disclosure Agreement, i.e. 3 March 2011: i.e., those in the January and February Slides.

*Conclusion on the claims in deceit and misrepresentation*

3993. In my judgment, the Claimants have established their claims in deceit and misrepresentation against each of the Defendants in respect of each of the misrepresentations addressed above.

## RELIANCE AND LOSS REVISITED
### Ambit of this Chapter

3994. Before turning to the Direct Loss claimed, I return to address in more fact-related detail, and as regards all the various FSMA claims, the issues of "reasonable reliance" and loss. I also address some associated issues in respect of the Deceit and Misrepresentation Claims.

3995. I have dealt in the Introduction with the law applicable in this context as I perceive it. I have also identified the persons within HP/Bidco primarily engaged in the process which ultimately led to the Acquisition (see paragraphs 158 to 178); and I have chronicled (a) how HP came to identify Autonomy as a target (see paragraphs 153 to 157); (b) the development of HP's interest and the preparation and refinement of HP's detailed analysis; (c) the exploratory and then more detailed negotiations about price (see paragraphs 222 to 233); (d) the process of due diligence (see paragraphs 234 to 278); and (e) the negotiations

and their final conclusion with agreement on price, the approval and announcement of the bid on 18 August 2011 and the declaration of it becoming unconditional as to acceptances on 3 October 2011 (see paragraphs 279 to 304 and 321).

3996.   Further, in paragraphs 3236 to 3247 I have addressed in some detail the question as to whether Autonomy's published information induced a false understanding of Autonomy's OEM business (and concluded that it did, and that HP/Bidco reasonably relied on a depiction of the extent and nature of that business which was false). I have focused especially on the presentation of OEM in Autonomy's published information for a number of reasons. First, in that context (OEM) there was a more pronounced issue in light of the dispute as to the meaning and extent of the OEM metrics voluntarily provided. Secondly, there was especially focused dispute between the parties as to whether any reliance had been placed by HP/Bidco on any particular understanding of what Autonomy's OEM business comprised. Thirdly, it is clear that HP/Bidco regarded the OEM business as (quoting from Mr Apotheker's cross-examination) a *"very, very important part of the business model, and a very smart one"* for which in its DCF analysis (see below) it projected gross margins of 98%: it is clear, and I find, that HP/Bidco placed particular reliance on their understanding derived from Autonomy's published information about the nature of IDOL OEM revenue, its rapid growth (for example, 27% growth was recorded in Autonomy's Q2 2011 Quarterly Report) and its high gross margins on what appeared to be recurring revenue.

3997.   However, the matters I referred to in paragraph 3242 in reaching my conclusion that HP/Bidco reasonably relied on the depiction of the nature and scope of OEM's business in proceeding with the Acquisition at the bid price also exemplify the false and misleading exaggeration of key elements of Autonomy's business which led HP/Bidco to conclude that its revenue streams were more reliable and valuable than was in truth the case.

3998.   My purpose now is to gather together strands already apparent as regards Autonomy's other business lines, and to confirm and clarify my conclusions as to the fact, extent and reasonableness of HP/Bidco's reliance on Autonomy's published information. This is necessary both for comprehensiveness and so as to enable determination of the related but separate issue of compensable loss in respect of the FSMA claims and the relevant counterfactual by reference to which to assess it. In doing so, I also consider the interplay between the FSMA claims and the personal claims in deceit and misrepresentation.

*Summary of Claimants' case on reasonable reliance*

3999.   The Claimants submitted that in the context of their FSMA claims, as in the context of deceit, they had established that the Defendants were each responsible for untrue and misleading statements or omissions made dishonestly, and that the "presumption of inducement" applied and had not been rebutted. However, they also described at some length the process leading up to the negotiations which

eventually culminated in the agreed bid, the construction of a DCF analysis[509] ("the Deal Model"), the formulation and agreement of a bid price, and the eventual Acquisition.

4000. The Claimants' overall factual case on reliance was that HP/Bidco's decision to proceed with and conclude the Acquisition at the bid price was materially informed and influenced by the untrue and misleading depiction of Autonomy as a *"pure software"* model achieving high margin sales with consistent organic software revenue growth based on the sale of IDOL (what Autonomy regularly referred to as *"IDOL organic growth"*) and an attractive mix of business in the amounts and having the characteristics described in Autonomy's accounts, including "annuity-like" flows of business and profits from rapidly growing OEM business.

4001. According to the Claimants, HP's approach and its Deal Model used to establish standalone and 'with synergies' valuations of Autonomy were falsified by the undisclosed reality that in what the Claimants' valuation expert, Mr Bezant, took to be the 'True Position',[510] Autonomy was (a) a much smaller business (at both revenue and profit levels); (b) not a pure software business but one that had a material and increasing proportion of sales of third-party hardware; (c) growing less rapidly than represented; and (d) based on a less attractive mix of business.

4002. As to the requirement of showing that their reliance was reasonable, the Claimants' position was that:

*"there is no sensible basis on which it could be argued that it was unreasonable of HP and Bidco to rely on the accuracy of Autonomy's published information."*

*Summary of the Defendants' contrary case*

4003. The Defendants, in addition to denying reliance on the basis of their *"Bidco point"*, also did not accept that the "presumption of inducement" has any application in the context of a claim under s. 90A/Schedule 10A of FSMA, and submitted further that even where the presumption is applicable the burden lies on the investor (here, HP/Bidco) to identify precisely what misrepresentations they relied on, to establish that but for those misrepresentations they would have acted differently (it being insufficient to show that they might have acted differently) and that in all the circumstances any such reliance was reasonable.

---

[509] As described by Mr Apotheker in his witness statement, *"A DCF model estimates the future performance of a business, and assesses the present value of the cashflows that it is expected to generate."*

[510] The 'True Position' represented the position had accurate information been published historically. Mr Bezant recorded in this regard that the basis on which he had been instructed was that, in assessing the FSMA Loss, he was instructed *"to assume that, but for the breaches of duty alleged by the Claimants: (1) Autonomy's published financial information would not have been subject to the false accounting of which the Claimants complain; but (2) the impugned transactions would still have been entered into."*

4004. The Defendants appeared to accept that the misrepresentation need not be the sole inducement, and that it is sufficient in a claim under FSMA to show that the claimant's *"mind was disturbed by the misstatement of the Defendants, and such disturbance was in part the cause of what he did"*; but they emphasised that the misrepresentation must play a *"real and substantial part in inducing the representee to act"* and that it must be shown to have been *"actively present to* [the claimant's] *mind"*. In this regard, on the facts, they contended that HP/Bidco (a) had relied on a variety of sources, and especially its own corporate analysts and third party advice from Perella Weinberg (on broad strategy issues) and Barclays Capital ("BarCap"), (on the specifics of the Acquisition) in determining whether to bid for Autonomy and at what price; (b) did not have in mind the published information or the Slides when it made the formal bid, even if those matters had encouraged and influenced its initial approaches; and (c) would have proceeded with the Acquisition on the same terms even in the absence of the alleged fraud, and so could not prove either the relevant degree of reliance or loss.

4005. In the latter context, the Defendants contended that in reality, Mr Apotheker drove the bid forward and his focus was at all times not on the published information or the financial state of Autonomy as there portrayed, but rather on the synergies that could be created by the Acquisition. They relied especially on an email from Mr Apotheker to Mr Lane dated 5 September 2011, in which, in seeking to defend the bid, he emphasised the importance of the envisaged synergies that the combined companies could generate, more than the stand-alone value of Autonomy (and see the footnote to paragraph 201 and paragraph 311).

*The issues requiring analysis*

4006. It seems to me that, in the light of those competing contentions, the following principal issues require analysis:

(1) What were the principal metrics and factors by reference to which HP/Bidco pitched its bid price and eventually concluded the Acquisition?

(2) More particularly, what were the principal metrics and factors underpinning the Deal Model?

(3) How ultimately did HP/Bidco make its decision at board level?

(4) Does the fact that HP/Bidco took into account the views of analysts and specialist advisers, especially in assessing Autonomy's likely future performance, suggest that it did not rely sufficiently on Autonomy's published information to establish its claims and substantial loss?

(5) Was anyone whose knowledge is to be attributed to HP/Bidco aware, before the Acquisition, of any material matters which falsified the depiction of Autonomy in its published information?

(1) *What were the principal factors and metrics by reference to which HP/Bidco pitched its bid price and eventually concluded the Acquisition?*

4007. With Mr Apotheker (as CEO) the persons primarily charged with the identification of suitable targets to enable HP to realise Mr Apotheker's vision of *"evolve[ing] the Enterprise Business from low-margin products and services to become a full services*

and solutions partner for businesses, providing the essential/strategic parts of the technology 'stack'[511]" were the members of the SCD Group and its Corporate Development sub-team particularly aligned with software business.[542] In the case of

Autonomy, they were, principally, Mr Apotheker, Mr Robison (head of the SCD Group), Mr Sarin, and (though less engaged because diverted by a serious family illness) Mr Johnson. It was ultimately their assessments, together with the Deal Model and the assessments of HP/Bidco's advisers (Perella Weinberg and BarCap) that went to the Board of HP and informed the final decision.

*Mr Apotheker*

4008. Mr Apotheker accepted that the only financial report he personally read relating to Autonomy was its 2010 Annual Report and Accounts. He did not read anything earlier, nor the Q1 or Q2 2011 Quarterly Reports. But he told me, and I accept and find, that he read the 2010 Report and Accounts *"very carefully"*. As well as the formal status, Responsibility Statement and the fact that the accounts were audited by Deloitte, Mr Apotheker's evidence (which I accept) was that he noted in particular that the Annual Report stated that:

 (1) Autonomy's revenues in 2010 were $870 million, and that this was an increase of 18% from 2009;

 (2) IDOL organic growth (revenue growth not attributable to acquisitions) was 17%;

 (3) Autonomy's IDOL OEM business generated $132 million in 2010, up 32% from 2009; and

 (4) IDOL Cloud growth was *"strong"*, with 2010 Cloud revenues of $190 million.

4009. Mr Apotheker noticed also that the Annual Report referred in various places to Autonomy as being a rare example of a *"pure software model"*. Subject to the caveat that he accepted in cross-examination (as I have noted in paragraph 1626(1) above) that he took this to mean also that Autonomy *"was in the business of providing excellent software with as little services as possible"*, his evidence was that he *"understood this to mean that Autonomy made virtually all of its revenues and profits from the development, use, marketing and sales of software"* and that this was very important to him.

---

[511] See paragraph 144 above as to what this meant and comprised. [542] See footnote 24 in paragraph 141 above.

4010. In my judgment, the more general impressions he formed, on the basis of his reading, that Autonomy appeared to be "*a very successful, high-growth, high margin*" enterprise encouraged his interest in pursuing negotiations, and encouraged him also to anticipate having to pay a significant premium over its then share trading price, which he took into account during the negotiations which followed, but such generalised impressions were not such as Mr Apotheker did rely or could reasonably have relied on without much more detailed analysis and support. However, I am satisfied, and find, that the untrue representation that Autonomy was a *"pure software model"* generating substantially all its revenue and growth from high margin software sales, and the concealment

accordingly of the substantial pure hardware sales undertaken to disguise shortfalls in software revenues and the true performance of Autonomy's software business, impacted on his mind and informed his judgement (and that of the SCD Group) at every stage of the process, including the final decision to make a bid at the price eventually agreed, and ultimately to conclude the Acquisition.

4011. Further, Mr Apotheker and the SCD Group also placed reliance on the fact that the 2010 Annual Report (as in fact did subsequent Reports) (a) segmented Autonomy's revenues into five categories of (i) IDOL Product, (ii) IDOL Cloud, (iii) IDOL OEM, (iv) Deferred Revenue Release (broadly signifying maintenance) and (v) Services, (b) did not suggest that there was any other revenue category and (c) stated that Services accounted for only about 5% of total revenues. That apparently exclusive description of the sources of Autonomy's revenues made no mention of sales of third-party hardware. Mr Apotheker took all of this to be consistent with and confirmatory of Autonomy's representation as a *"pure software model"*, with the exception he noted of a small amount of "appliance" sales, which was presented and he read as a sensible strategy, being (as he understood it) confined to sales of hardware with Autonomy software preloaded into it, and thus to what he called *"a delivery channel for software sales"* generating (as the Annual Report expressly stated) a *"margin profile…not widely dissimilar to our traditional licence business."*

4012. In the mind of Mr Apotheker (as also in the minds of others in the SCD group, see below) that (false) depiction of Autonomy as a company deriving substantially all its revenues and meeting its forecasts from software sales in the apparently exclusive five categories of revenues listed in paragraph 4011 above was an important distinguishing characteristic of Autonomy; and it provided a litmus test of the success of its signature product (IDOL). That depiction was an important factor in assessing Autonomy and in the construction of the Deal Model (especially in projecting likely revenue forward) and reliance on it was, in my judgment, plainly reasonable.

4013. Mr Apotheker also focused on, and was especially attracted by, Autonomy's Cloud business, which was presented as largely comprised of delivery of IDOL on a 'Softwareas-a-Service' (SaaS) model. As this business line was represented, he considered it would be of particular value in meeting HP's *"specific need to develop and grow its cloud business"*, as well as providing immediately, and apparently into the future, a source of recurring revenue, complementing

Autonomy's fast growing IDOL OEM business (which was especially attractive for all the reasons previously explained). As with the representation of Autonomy as a *"pure software model"*, these were characteristics and qualities of Autonomy's business as depicted which I have been persuaded impacted on his mind and influenced his judgement, and that of the SCD Group, throughout the process, including the eventual Acquisition.

4014. However, Mr Apotheker made clear, both in his witness statement and when crossexamined, that HP obviously did not rely simply on his reading of the 2010 Annual Report, and more generally, would not have made a formal bid or proceeded with the Acquisition without having undertaken a full and careful financial analysis of its own, nor without a process of due diligence. The centrepiece of HP's assessment was its DCF analysis and Deal Model.

4015. The following evidence in Mr Apotheker's witness statement was not substantially or effectively challenged:

> *"When considering the value that Autonomy actually presented to HP, however, the SCD Group and I focused on HP's DCF analysis. That analysis, based on Autonomy's public financial statements, analyst reports, etc., sought to estimate Autonomy's standalone value by estimating the cash it could produce in the future, and also to take account of the synergies we hoped that HP could achieve from the deal. In considering a price that would be appropriate to pay for Autonomy and to recommend to the HP Board, I focused on ensuring that the price paid by HP was justified by the value we believed it would receive (including Autonomy's cash), that HP would pay as little as possible above Autonomy's share price, and on retaining for HP's shareholders as much as possible of the value of the synergies that we hoped to achieve from the transaction. I also recognized that Dr. Lynch would seek to obtain as much value as possible for his shareholders."*

4016. As to the suggestion that Mr Apotheker and HP had in reality proceeded on the basis of the synergies and *"transformational opportunity"* to be realised by the Acquisition, rather than on the basis of Autonomy's stand-alone value, I accept the explanation and answers provided by Mr Apotheker himself in his second witness statement and then in the course of his cross-examination as to the relative importance of stand-alone value and prospective synergy values:

(1) As he explained in cross-examination:

> *"there is a sequence here that is very important. It had to be a sound asset...The acquisition was based on the intrinsic value, stand-alone value of Autonomy plus the synergies...the actual value of the company was the foundation".*

(2) When asked to confirm that nevertheless he was *"looking at the time at the longterm benefits of owning Autonomy"*, he said:

> *"A.    Well, I'm looking at two things essentially to form an idea. I'm first of all  looking at the present value of Autonomy as a stand-alone*

> *business, because that's where you start, that's what you pay for*
> *essentially. Anything else, the synergies, if you take an objective look,*
> *objective view of this, clearly the risk on the synergies is on the HP*
> *shareholders, not on the Autonomy shareholders. So when you*
> *negotiate these things you want to be in a position where it's the HP*
> *shareholders who get the maximum benefit out of these synergies, so*
> *the price point has to take that into account."*[512]

(3) This corresponded with his evidence in his second witness statement:

> *"in evaluating whether a software company's product is effective and*
> *successful, it is essential also to evaluate its financial performance,*
> *because that performance reflects whether customers who use the*
> *technology perceive it as valuable and worth the associated costs. The*
> *fact that Autonomy's reported financial results gave the impression*
> *that it had achieved significant*
>
> *and fast-growing shares of the markets in which it operated was an*
> *important part of our assessment that its technology would be valuable*
> *to those markets in the future. It would have made no sense to look*
> *only at the technology without also putting significant focus on*
> *Autonomy's financial information."*

4017. When cross-examined, Mr Apotheker reiterated the importance of the underlying finances of a target company, and just as much so where the proposed acquisition was a *"strategic"* one with anticipated synergies: as he put it, *"the actual value of the company was the foundation."* It was put to him that (a) he *"[wasn't] particularly interested in the metrics* [because he was really] *interested in buying a transformative business"* ; (b) he *"never looked in any detail at the DCF valuation produced by HP…"*; and (c) what really prompted him was that Autonomy offered *"essentially a unique opportunity"* hinging on the synergies anticipated. His answers in summary were:

(1) He wanted a transformative business; but *"good financials"* were essential:

> *"I wanted both…I wanted to buy a good company with good financials*
> *and for me the financials were actually a proof point of the success of*
> *the business."*

(2) He did not study the spreadsheet nor did he look at every number, but he was adamant that he looked at the DCF valuations in detail, and *"of course"* he considered the assumptions used to satisfy himself of their reliability.

(3) Although he accepted both that Autonomy was unique in offering IDOL and the route into the unstructured data space and that the anticipated synergies

---

[512] On HP's analysis, at the price it paid for Autonomy, it retained 90% of the synergy value that it hoped to create through the Acquisition, and yielded 10% to Autonomy's shareholders, which Mr Apotheker thought *"a fair compromise".*

were also very important in differentiating Autonomy and justifying a substantial premium on the then market price of its shares, he insisted that the underlying financial position of the company as it appeared in its Reports was the bedrock, as was apparent from the following exchanges:

> *"Q. What you say is that you presented to the board your business case hinging more on the synergies than on the stand-alone capabilities and that's what actually happened, isn't it?*
>
> *...*
>
> *A. It is impossible to achieve the synergies without the actual company and therefore one needs to pay for the company and then add to it the synergies. The price of the company was determined by the actual value of the business and some of the synergies. We came to the conclusion in the conversation of this trial that it was about 10/11% of the synergies. That's how the maths works.*
>
> *Q. You never did that maths, the board never said, "I'll tell you what, you can go up to 10% of the synergies", that's just where you ended up, isn't it?*
>
> *A. But the board had all the information. These are smart people, they can do a simple arithmetic calculation.*
>
> *Q. The truth is that what this deal was driven by was your vision about the synergies that HP could make out of acquiring the software, wasn't it?*
>
> *A. But it is clear that HP wasn't going to buy the company and not integrate it and therefore not extract synergies. The whole idea of this deal was to extract these synergies. That is absolutely right and that's the only reason that they really wanted to do any acquisition, be it Software AG or any other company. So in this case as well, the real reason of course that any company would want to acquire another company, we are not - as we said yesterday, we are not a private equity investor or a stand-alone investor, this is an industrial IT company who wants to buy a company in order to extract the value and the synergies out of it, obviously. But the price calculation and therefore what it is that you end up paying for this business is based on the value of the business first of all."* [My emphasis]

4018. Mr Apotheker was unequivocal in his evidence in his witness statement not only that he had no knowledge or awareness prior to the Acquisition of third party hardware sales except appliances sold as *"a delivery channel for software sales"*, but also that he had no knowledge or awareness of *"the round-trip transactions that created the false appearance of revenue and profit"*; or that *"Autonomy converted a significant portion of its Cloud revenue into license revenues...enhancing current reported revenue and reported revenue growth*

*and reducing the long-term value of this part of the business"*; or that *"Autonomy greatly overstated the amount of its IDOL OEM revenues, and revenue growth"*; or (though he did *"of course"* understand the widespread use of resellers by software companies) that in this case, VARs were being *"used to enable Autonomy to recognize revenue or to accelerate the recognition of revenue in a manner inconsistent with relevant standards."* These matters resulted in a difference between what was reported and what properly should have been recorded of some $145 million: a roughly 17% reduction. He considered that these inaccuracies and misstatements suggested to him *"a systematic effort to portray Autonomy's business as stronger, better-managed, more vibrant and more successful than was truly the case"* and he found it *"hard for me to conceive of an innocent explanation for the fact that no such information was apparent from my careful study of the Annual Report."* The discrepancy between the represented position and what was *"truly the case"* was plainly such as in his view to alter materially and substantially the attractions and value of Autonomy to HP.

4019. I accept Mr Apotheker's evidence as above summarised.

*Mr Robison*

4020. Although in places over-lawyered, and also untested since he did not attend at Trial (see paragraph 166 above), Mr Robison's witness statement appeared to me to be credible and convincing as regards:

> (1) his specific consideration of both Autonomy's IDOL OEM revenues (which he understood to be derived from sales *"when Autonomy software was embedded in other companies' products"* and which he especially identified as *"important to HP"* because their stated growth *"was an indicator that other companies valued Autonomy's technology"*) and its IDOL Cloud revenues as reported in Autonomy's published information and confirmed in the Slides (showing nearly 20% growth year-on-year and representing some 22% of total revenue recognised), and the perception encouraged that these were particularly attractive and high-margin sources of recurring revenue;

> (2) his perception that the emphasis in both Autonomy's published information and in its management's repeated presentations that Autonomy was a *"pure software model/company"* with *"a compelling software product in IDOL"* demonstrated that its reported revenue growth was based almost exclusively on high-margin software sales (with a very small amount of appliance sales which were also high-margin); and that this powerfully endorsed the market success of Autonomy's software and its signature product, IDOL;

> (3) his perception also that Autonomy's pure software model (as it was represented to be) was highly complementary to HP's plan to develop its business in high-growth, high-margin software markets

and not in lowermargin hardware sales (HP already being one of the world's largest hardware manufacturers);

(4) his focus on the particular attraction and value of Autonomy's IDOL OEM business as represented in Autonomy's published information and purportedly confirmed in other presentations;

(5) his emphasis on the importance of the historic performance as presented in Autonomy's published information in assembling the DCF/Deal Model and in particular in forecasting future cashflows and growth, and his confirmation that both would have been markedly lower but for the material overstatement and false depictions of Autonomy's historic revenue streams; and

(6) the continuation of his understanding of and reliance on those matters up to and including the Acquisition.

4021. In my judgment, that evidence further supports the Claimants' case that Autonomy's published information, and in particular the statements of its revenues and their growth and its assertions that Autonomy was a *"pure software company",* continued to have an impact on the mind and influence on the judgement of those within HP involved in the analysis of the merits of the proposed Acquisition and its eventual conclusion.

*Mr Sarin*

4022. As previously explained, Mr Sarin was a key member of the Corporate Development sub-team of the SCD Group, and reported to Mr Johnson (HP's Head of Corporate Development, who in turn reported to Mr Robison who reported to Mr Apotheker). He and his team had line responsibility both for the preparation of HP's Deal Model and (with KPMG) for the due diligence undertaken by HP. In the process leading up to the Acquisition, Mr Johnson relied unusually heavily on Mr Sarin especially in relation to the due diligence exercise since he himself was having to deal with serious illness in his close family and (as he told the US court in the criminal proceedings there) he was unable to travel.

4023. Mr Sarin stated in his witness statement that:

> *"We were heavily reliant on Autonomy's published information and on analysts' projections for Autonomy, which were, in turn, reliant on Autonomy's published information."*

4024. It was common ground that Mr Sarin carefully read Autonomy's 2010 Annual Report and its Q1 and Q2 2011 Quarterly Reports (but not the 2009 Annual Report nor the 2009 Quarterly Reports). He also appears to have read some (unspecified parts) of the 2010 Quarterly Reports, and the transcripts of the Q1 and Q2 2011 Earnings Calls.

4025. Amongst the matters which according to his evidence (which I accept in this regard) Mr Sarin derived from those reports and documents were:

(1) The accounting information, and in particular, Autonomy's historic revenue figures split amongst the five categories (see paragraph [] above) which (as

I elaborate later) were fed into and provided the bedrock of the Deal Model;

(2) The statements and explanations in the 2010 Annual Report as to Autonomy's strategy, products and the size and performance of its five revenue streams;

(3) The statements in the Q1 2011 Quarterly Report, in particular those indicating that (a) all of Autonomy's product lines were achieving doubledigit growth, (b) organic growth of Autonomy's IDOL Product and IDOL Cloud businesses purportedly at an annual rate of 17%, (c) 28% annual growth in Autonomy's OEM business, and (d) gross margins (which in its 2010 Annual Report Autonomy identified as a *"key performance measure"* and an *"[i]ndicator of success of the company's business model"*)[513] of 88% and operating margins of 43%;

(4) The results reported in Autonomy's Q2 2011 Report, in particular showing (a) consistency with Autonomy's previously-reported financial performance, (b) consistency with HP's own estimates (reported revenues of $256.3 million compared to HP's estimate of $245.7 million), (c) continuing strong organic growth of IDOL business year on year in H1 2011, with represented organic growth figures for H1 2011 in IDOL OEM, IDOL Cloud and IDOL Product of 27%, 17% and 13% respectively leading to the summary that (d) *"Cloud and OEM, both recurring models, account for 62% of IDOL software sales, reaching an inflection point"* (all such figures in fact being materially false for all the reasons addressed in this judgment)[514].

4026. Mr Sarin made clear that neither he nor (so far as he was aware anyone else at) HP was aware pre-Acquisition that Autonomy was improperly accelerating hosting revenues and profit and including non-recurring revenue in IDOL Cloud and IDOL OEM. This was not substantively or successfully challenged in cross-examination. He was likewise

---

[513] Autonomy reported gross margin on an *"adjusted basis"* which excluded certain specific, non-recurring and non-cash charges, thereby enabling investors, and Autonomy management, to assess the performance of Autonomy's operations.

[514] The 'True Position' (being the financial position which would have been presented to the market on the assumptions which the Claimants' valuation expert, Mr Bezant, was instructed to make and in effect were intended to enable the correction of the false accounting and descriptions of Autonomy's business as alleged by the Claimants), will be re-examined and tested as part of my quantum judgment: but, according to Mr Bezant's analysis, *"In the True Position, Autonomy's historical revenue growth over the period 2009 to H1 2011 was less than half that in the Represented Position"* with true organic growth even worse, and a materially less attractive product mix (with True IDOL Cloud effectively flat from Q2 2009 through Q1 2011, but with an uptick in Q2 2011) and True IDOL OEM revenues having in truth diminished over the Relevant Period, so as to represent only 2.5% of 'True software revenues' in the final twelve months.

adamant that he was not aware that a significant part of Autonomy's reported revenues in the period before the Acquisition resulted from the sale of hardware that included no Autonomy software; and he added that he *"would certainly have expected any such hardware resales to be described"* when, in the course of the due diligence exercise and in order *"to better understand each of Autonomy's existing and foreseeable revenue streams"*, he asked Autonomy's management to describe all of the products sold by Autonomy and *"major product categories and new products under development"*.

4027. Mr Sarin's evidence was for the most part supported by contemporaneous evidence. His cross-examination focused on an attempt to get him to accept that HP's forecasts of Autonomy's financial results had little to do with its reported financial results, and that HP did not rely on those results, or on what it was told in the process of due diligence. Mr Sarin rejected this and I consider that this attempt failed. I accept his evidence in his witness statement quoted above as to their reliance on Autonomy's published information and on analysts' projections for Autonomy *"which were, in turn, reliant on Autonomy's published information."*

*Mr Johnson*

4028. Mr Johnson, to whom Mr Sarin reported, was principally engaged in planning and overseeing the process of due diligence. Although not a member, he also attended (with Mr Apotheker, Ms Lesjak and Mr Robison) some meetings of HP's Finance and
Investment Committee of HP's Board (including those on 25 May 2011 and 18 August 2011), which was also involved in the continued financial assessment of potential acquisitions.  However, and as previously mentioned, because of a family illness he arranged for Mr Sarin to take a larger role in that. Mr Johnson did not provide a witness statement in these proceedings; but he did give evidence in the US criminal trial against Mr Hussain, which was admitted into these proceedings by a hearsay notice on behalf of the Claimants.

4029. Mr Johnson's evidence in the US criminal proceedings very largely related to the process of due diligence, the public announcement of the bid, and the post-Acquisition denouement and especially a dispute as to whether Mr Johnson had told Ms Lesjak that more than $5 billion of the eventual write-down was attributable to accounting improprieties.  When asked in re-examination in those proceedings whether he had relied on Autonomy's financial statements, he answered *"very much so."* But he was not invited to condescend to more detail and did not do so.

4030. Mr Johnson confirmed, however, that the warranties as to the truth and accuracy of Autonomy's financial reports given by the Defendants to Bidco when irrevocably undertaking to assent their respective shares in Autonomy into HP/Bidco's offer had further encouraged and resulted in such reliance on Autonomy's public statements as to its financial position.

4031. As I elaborate later, the decisions at board level were predominantly based on the reports made by Mr Apotheker and Mr Robison, the reports of the SCD and

of the Finance and Investment Committee, and the Deal Model (as to which see below), as well as the perceived absence of any "red flags".

4032.   In my judgment, the statements and figures in the published information identified above undoubtedly influenced, through Mr Apotheker, Mr Robison, Mr Johnson and Mr Sarin not only HP's initial approach, but also its Board's decision to proceed with a bid for Autonomy in preference to any other, and more particularly, in preference to a bid it had contemplated for another software company, Software AG (code-named "Singapore" within HP). Most important of all, however, was that the historical revenue figures underpinned the DCF analysis and Deal Model, to which I next turn.

(2) *The Deal Model and its bases*

4033.   There is no real doubt, and I also find, that HP's Deal Model that produced HP's standalone valuation of Autonomy, which was revised and updated throughout the acquisition process, was predominantly based on Autonomy's published information.

4034.   That is so notwithstanding the Defendants' energetically pursued point that Mr Apotheker only read the 2010 Annual Report, and Mr Sarin read the 2010 Annual Report and the Q1 and Q2 2011 Quarterly Reports but not the 2008 or 2009 Annual Reports, nor the Q1 and Q2 2009 Quarterly Reports. The main 2009 results were reproduced in the 2010 Annual Report, and the main Q1 and Q2 2010 results were reproduced in the Q1 and Q2 2011 Quarterly Reports; and in any event, the fact remains that (subject to caveats mentioned by Mr Sarin and addressed below) the historical results in the Deal Model were taken from the published information.

4035.   It is apparent from the various iterations of the Deal Model, and Mr Sarin's evidence was, that he and his team used the historic revenue and costs figures for 2008, 2009, 2010 and the first half of 2011 in Autonomy's published information in constructing their DCF analysis and Deal Model. Even in exercising judgements about other inputs, including assumptions underpinning future revenue growth and margins, those historic revenue and costs continued to provide the bedrock. Mr Sarin's evidence in his witness statement, which I accept in this respect, unequivocally supported this. Thus:

(1)   The Deal Model was based on a DCF analysis, using an analysis of the historic performance of the target to estimate its future performance and the present value of the cashflows that it could be expected to generate as the means of establishing standalone value (that is, value of the target in its own right without regard to potential synergies to be obtained from the combination of businesses and resources pursuant to the acquisition). That analysis was necessarily based on historic figures provided by Autonomy in published information.

(2)   The DCF analysis set out within the Deal Model focused on (a) *"Rev Buildup"*, which set out historical and forecast revenues and gross profits; (b) *"Target IS"*, which set out historical and forecast operating costs, profits and cash flows; and (c) *"Stdaln DCF"* which set out the

calculation of the net present value ("NPV") of forecast cash flows during the explicit forecast period of H2 2011 to 2021, and the terminal value of Autonomy (being the value of Autonomy into perpetuity as at the end of a forecast period of ten years, assuming continuation forever having reached a steady state).

(3) The calculations set out in the *"Rev Buildup"* tab of the Deal Model were based on HP's analysis and forecasts of future revenues in five revenue categories, being (a) *"IDOL Product Licence"*, corresponding to the IDOL Product revenue category in Autonomy's financial reports; (b) *"IDOL Cloud"*, corresponding to the IDOL Cloud revenue category in Autonomy's financial reports; (c) *"OEM"*, corresponding to the IDOL OEM revenue category in Autonomy's financial reports; (d) *"Maintenance"*, corresponding to the

Deferred Revenue Release revenue category in Autonomy's financial reports (which was said to stem *"principally from support and maintenance contracts recognized in arrears"*); and (e) *"Services"*, corresponding to the Services revenue category in Autonomy's financial reports.

(4) The *"Rev Buildup"* tab set out historical revenues between 2008 and H1 2011 adjacent to HP's projections of Autonomy's future revenues over the explicit forecast period (H2 2011 to 2021). Mr Sarin explained in his witness statement that *"the historic revenue and costs were derived from Autonomy's annual audited accounts, its quarterly reports, and quarterly earnings calls that Autonomy had with analysts."* He added that *"we considered, and relied on, Autonomy's historic revenue figures for 2008, 2009, 2010 and the first half of
2011, as Autonomy had provided them to the market."*

(5) I accept that evidence, though with two caveats that Mr Sarin accepted in cross-examination. One caveat was that Autonomy did not report IDOL Cloud separately until Q4 2009, but rather provided one combined figure for what was later split into IDOL Product and IDOL Cloud, so the split between Product and Cloud revenues applied in the Deal Model for 2008 and 2009 reflected estimates provided by Goldman Sachs. The second caveat was that the historic revenue figures could only provide a starting point and future growth could not simply be extrapolated from past growth[515], though Mr Sarin also made clear that *"Where we used our own projections (in particular for later years), we paid particular regard to Autonomy's publicly reported organic growth to date…"*

(6) Mr Sarin's evidence, which I also accept, was that while HP obviously did not unthinkingly "carry forward" prior years' growth, historical revenue growth, and particularly historical organic growth, played a central part in HP's forecasts for the period through 2021: it was put to

---

[515] Mr Sarin explained in cross-examination that he thought a simple extrapolation would be inaccurate because *"…given a business like Autonomy with various revenue segments, there are different growth rates, different capital investment assumptions, all of that factors into a much more thoughtful free cash flow number than just trying to take history and grow it at a certain rate."*

Mr Sarin in crossexamination, and he was asked to agree, that HP did not base its 2014-2021 revenue growth forecasts on historical organic growth rates up to 2011, and had in reality relied more on market growth projections than on Autonomy's reported results; but he did not agree and reiterated that whilst the projection of growth rates naturally took account of various sources and market projections, it remained *"based on what was prior growth and prior revenue."* He emphasised: *"Where we used our own projections (in particular for later years), we paid particular regard to Autonomy's publicly reported organic growth to date…"* When asked in re-examination whether reported historic revenues had any effect on the DCF analysis, he answered:

> *"They do…the model is very sensitive to margins, growth rates and a whole host of other factors. If the reported numbers are different or historic numbers are different, then the model would be very different."*

(7) Similarly, the three categories of operating expenses (research and development, sales and marketing, and general administrative costs) which were also reflected in the Deal Model to build up a projection of gross margins

---

were also grounded in the historical reported numbers. The three categories were projected as a percentage of revenue, based on their reported historical relationships, though for the purpose of the Deal Model HP held the relevant percentages constant from 2013 to the end of the forecast period because (as Mr Sarin explained) that was a conservative assumption to make given the significant revenue growth projected. Forecast costs were then deducted from the forecast revenues to produce forecast operating profits.

(8) In turn, and demonstrating once again the continuing bedrock influence of Autonomy's published historical figures, (a) HP's forecast of free cash flows through 2021 in the *"Target IS"* tab of the Deal Model was based on adjustments to those forecast operating profits to account for taxes, capital expenditures and working capital needs[547] and (b) the calculation of standalone value was based on the sum of (i) the free cash flow forecast through 2021, and (ii) the *"terminal value"* of Autonomy, that is to say, the value of its free cash flows after 2021 calculated on the assumption that the free cash flows projected for 2021 would grow at a *"terminal growth rate"* for which HP's central estimate was 4% *per annum.*

(9) Then, to establish enterprise value[548], each of the above components was discounted to present value by reference to HP's estimate of Autonomy's weighted average cost of capital ("WACC"), which was 10%. This resulted in an estimate of Autonomy's enterprise value of some $9.5 billion. Adding Autonomy's net cash reserve of $705 million produced an equity value of $10.207 billion.

(10)     The Deal Model then also included an estimate of the synergies that HP hoped to realise by combining its resources with those of Autonomy, which (after deducting certain "dis-synergies" in respect of the likely discontinuance of some of Autonomy's OEM relationships where the OEM was a competitor with HP), amounted to $7.6 billion, leading to a combined standalone and synergistic value of $17.1 billion. Mr Sarin explained that the quantification of likely synergies was a rather different exercise, which relied principally on a *"thorough understanding of HP's own business"* and was undertaken principally by Ms Breya and Mr Levadoux (leaving Mr Sarin and his team to focus on constructing the financial model). Mr Sarin explained, and I accept and find, that *"Standalone value is given more weight in pricing decisions than any estimated synergy value because standalone value is based on an existing*

---

[547] As Mr Bezant explained in his expert's report, HP calculated future free cash flows as it forecasts: (1) Operating profits (as above derived), plus
   (2) Amortisation expenses (assumed to be nil from 2011 onwards), less
   (3) Tax (assumed at a rate of 28%), plus
   (4) Depreciation (calculated as the product of forecast revenues and its expectations of depreciation as a percentage of total revenue), less
   (5) Increase in working capital (calculated as trade receivables less trade payables informed by their historical values) plus
   (6) Increase in deferred revenue (on assumptions informed by the historical relationship between deferred revenue and revenues in 2008, 2009 and 2010) less
   (7) Capital expenditures (calculated as a percentage of forecast revenues).

[548] *"Enterprise value"* represents the standalone value of Autonomy as calculated in accordance with the discounted cash flow analysis in the Deal Model; Mr Sarin explained in his witness statement that *"Enterprise value ignores cash and debt, and adjusting for these items produces the equity value of Autonomy. The focus of our valuation exercise was on enterprise value."*

*performance history"*; once more underlining the importance and impact of the historic figures derived from Autonomy's published information.

4036. In short, although (inevitably) HP had regard to other sources of information and other analyses in building the Deal Model, the fundamental importance and influence in the building of the Deal Model of the historical figures in Autonomy's published information is obvious. For the avoidance of any doubt, it was in my judgment clearly established.

### (3) *How ultimately did HP's Board make its decision?*

4037. The Deal Model could not and did not dictate the price: that was inevitably the product of negotiation and then consideration and approval (or not) by HP's Board. However, the Deal Model did provide, in effect, the lower and upper boundaries of a suitable bid price, in the form (respectively) of its figures for the standalone value of Autonomy and the valuation incorporating synergies. It was ultimately common ground, and in any event it seems to me to be clear, that the standalone value generally formed a lower bound to the price, above which the buyer will seek to pay over as little as possible of what it might obtain from potential synergies. A bid price within that range then had to be fixed by

reference (principally) to (a) the standalone value (b) Autonomy's then current share price and (c) what premium HP was persuaded would be necessary (and thus what proportion of the synergy value which HP hoped would result would have to be surrendered to Autonomy's shareholders) to achieve the objective of an agreed bid.

4038.   The Deal Model was not, of course, the only analysis put before the HP Board. Before finally agreeing the bid price and approving the Acquisition, HP's board was also presented with what the SCD Group called the *"IRB Shell"* in the form of a deck of slides and information built up over the course of the bid process. An important function of the *IRB Shell* was to show and explain the SCD's working valuation of the target. Mr Sarin explained that the *"...purpose of the IRB Shell was to deliver all the key information in relation to an acquisition to HP's senior executives and the relevant Board committees in a format that was familiar to, and could easily be followed by, those executives and committees."* Perella Weinberg and BarCap supplemented this with presentations of their own (including valuation analyses).

4039.   The *IRB Shell* produced to HP's Board on 5 August 2011 incorporated a valuation section that included most of the key types of analysis that would typically inform a board's deliberations in determining whether to proceed with a large acquisition, most importantly, DCF valuations on both standalone and synergistic bases, but also trading and transaction multiples, together with analyses of earnings accretion/dilution and a range of potential bid premia. In this case, the deck included a chart summarising the key analyses graphically in a format referred to as a *"football field"* chart.

4040.   In parallel with the continuing process of due diligence in the following two weeks after 5 August 2011, HP's board and relevant committees continued detailed assessment of the proposed deal. The Deal Model continued to be fine-tuned. Negotiations also continued to agree finally the bid price, taking into account a more than 10% decline in Autonomy's share price since the original range (of £24.94 to £26.94 per share) had been agreed between Dr Lynch and Mr Apotheker and Mr Robison in Deauville on 28 July 2011. The bid price of £25.50 per share (which was thus further toward the bottom of the range agreed at Deauville) was finally agreed (subject to Board approval by both

HP and Autonomy) on 15 August 2011. That was then considered by the SCD, Perella Weinberg and BarCap, and then also the Finance and Investment Committee, and the matter then went forward to the Board of HP with their recommendations and supporting material.

4041.   When the question whether finally to approve the Acquisition at the bid price agreed came before HP's board for the final time on 18 August 2011, the deck and the presentations by the SCD and by Perella Weinberg and BarCap also included investment appraisal metrics, by way in effect of cross-checking the DCF-based valuations, and comprising:

(1) historical bid premia: the range of premia over the share price paid in comparable transactions can be used both to sense-check a proposed bid and

to gauge the likelihood that it will be accepted by shareholders. These were provided by Perella Weinberg and BarCap;

(2) internal rate of return ("IRR"): the discount rate that, when applied to forecast cash flows, results in a net present value of zero. This can be compared to a predetermined "hurdle rate" that defines the minimum rate of return required by the investor. BarCap calculated the internal rate of return implied by SCD's DCF estimate of total synergistic value at the offer price; and

(3) earnings accretion/dilution: analysis of whether, and when, a proposed transaction will increase the return to shareholders of the acquiring company. Such analysis was provided by SCD, Perella Weinberg and BarCap.

4042. Perella Weinberg and BarCap's presentations included materially similar standalone
DCF valuations to those presented by SCD, both of which were based on HP's forecasts.

4043. All the various presentations and the *"football fields"* showed that HP's board considered and approved the bid price by reference to (a) a standalone valuation of Autonomy and (b) a valuation including both standalone value and synergies. All the assessments were underpinned by the historical figures and metrics in Autonomy's published information. The bid price was at a premium to the standalone valuation, but significantly less than the valuation combining standalone value and synergy value: the bid price did not require HP to cede more than about 10% of its anticipated synergy benefits, which the Board was satisfied was reasonable, and by reference to analyses of historical acquisition premia paid for UK listed technology companies was so. The Board unanimously resolved to authorise HP to proceed with the transaction, and the bid proceeded through its subsidiary, Bidco.

(4) *What is the relevance of HP/Bidco's reliance on other sources of information and advice?*

4044. It will already be apparent and it was not in dispute that HP/Bidco took into account the views of analysts and specialist advisers, especially in assessing Autonomy's likely future performance (including, for example and as already noted above, relying on Goldman Sachs estimates in splitting annual IDOL Product and IDOL Cloud revenue figures for 2008 and 2009 which Autonomy had not provided).

4045. Also, HP used other valuation techniques, including trading and transactions multiples analyses, historical bid premia comparisons, calculations of Internal Rate of Return and earnings accretion/dilution analyses produced by BarCap and Perella Weinberg, as well

as Perella Weinberg and BarCap's own materially similar standalone valuations, to inform its deliberations.

4046. It seems to me unlikely that in any large transaction of this nature a bidder would proceed exclusively by reference to the target's published information even if tested by rigorous due diligence.

4047. However, in my judgment, none of this undermines my conclusion that the foundation of HP's assessment and ultimate decision was the description of historical revenue performance, organic software revenue growth, gross margins and the description of its business and five revenue streams put forward in Autonomy's published information and providing the bedrock for the Deal Model.

4048. Autonomy's published information also, of course, influenced the market, the share price, the anticipation of a bid premium and the expectations of shareholders in gauging the sufficiency of any bid offer price. That in turn had to be taken into account by HP in determining what bid price to agree and offer; and as already mentioned, one of HP's cross-checks was an analysis of bid premia in similar acquisitions. However, in my judgment, that does not militate against HP/Bidco having relied on the published information: on the contrary, it is a further manifestation of the fact that Autonomy's published information inevitably informed not only its analysis but its eventual decision. (5) *Was HP/Bidco actually aware of any matters falsifying the published information?*

4049. I have concluded in earlier parts of this judgment that no one involved in due diligence on the part of HP, or in the negotiation and ultimately approval of the bid and Acquisition, whose knowledge would be attributed to HP/Bidco, was aware, before the Acquisition, of any material matters which falsified the depiction of Autonomy in its published information.

4050. As also previously explained, a defendant found guilty of deceit cannot establish a defence based on contributory negligence or the principle of *"caveat emptor"* (and see paragraph 519 above).

**Conclusion on reliance (FSMA Claims)**

4051. I am entirely satisfied that the Claimants have established reliance on Autonomy's published information and that such reliance was reasonable.

4052. If, as I consider to be the case, the presumption of inducement applies, it has not been rebutted; but even if I am wrong and it does not apply in the context of FSMA claims, as Mr Miles rather tentatively argued, inducement is established in any event in the case of each one of the claims that HP/Bidco based their assessment, constructed their Deal Model and proceeded on the basis of representations and statements in Autonomy's published information which have been demonstrated by the Claimants to have been untrue and/or misleading.

4053. As summarised in paragraph 522 above:

(1) HP/Bidco have established reasonable reliance on what was stated in the published information in respect of all the aspects of Autonomy's business now said to have been misrepresented; and more particularly,

HP/Bidco reasonably relied on that published information as having conveyed that:

(a) Autonomy was a *"pure software company"* having no need to rely on any sources of revenue other than those from its software licence sales;

(b) All revenue recognized in its accounts was generated by substantive transactions which had been properly accounted for;

(c) Autonomy's OEM business revenue was a particularly valuable source of recurring revenue derived at least predominantly from development licence sales and recurring revenue from royalties;

(d) Autonomy's hosting business, which was accounted for as part of its IDOL Cloud business, was growing as a result of increased hosting revenue streams which by their nature were recurrent;

(e) Sales by Autonomy from which revenue was recognized were genuine transactions of commercial substance, and properly accounted for accordingly.

4054. In the circumstances it was reasonable for HP/Bidco to rely on Autonomy's published information and they did so; but in the respects I have sought to set out, that published information was untrue or misleading to the knowledge of both of the Defendants; and there were matters omitted from Autonomy's published information which were required to be included in it, both Defendants knowing that the omissions constituted dishonest concealment of material facts.

4055. In reality, Autonomy was a smaller company with a materially less attractive revenue mix, with lower growth and less success in the market and (overall) lower profit margins than it was represented and appeared from its published information to be.

*Introduction to issues of quantum*

4056. In my judgment, absent the fraud, HP would not have proceeded with the transaction at the bid price. The question then is whether HP would have proceeded with the transaction at all, and if so, at what price. However, I have reached the provisional view, in the context of the FSMA Claims, that even if accurate information had been given and Autonomy's financial position and performance had been properly and accurately disclosed, HP/Bidco would nevertheless have wished to proceed to a bid and to conclude the Acquisition, but at a significantly reduced bid price.

4057. Although serious, in my judgment the misrepresentations did not negate the value of the core product IDOL nor the potential for the Acquisition of Autonomy's software business to provide the platform and catalyst for the transformational change in HP's focus away from its low-margin hardware

business towards enterprise software, and the better use of its vast resources and market presence in that area and in the developing field of unstructured data analysis.

4058.  The question then is whether Autonomy's shareholders would have accepted a lower bid price. The Claimants pleaded that they would have done so (or at least would have been likely to do so): see the quotation from the RRAPoC in paragraph 530 above.

4059.  The premise of this is that Autonomy's published information should be assumed to have been corrected and that the shareholders would have been properly informed by accurate information, but would not have known of the fraud. As noted in paragraph
529, and expressly stated in Dr Lynch's closing submissions, it was common ground that in assessing the FSMA Loss, the relevant counterfactual is that accurate information would have been published historically, since loss falls to be calculated on the assumption that Defendants did not cause Autonomy to breach its obligations under FSMA, so that Autonomy's published information would have reflected the correct accounting in respect of the impugned transactions. I have taken it also thereby to be common ground that this accurate information would have informed the market, and thus Autonomy's share price and its shareholders' expectations. Accordingly, my understanding is that, on the case as argued I need not be troubled by a question that had at one time concerned me about whether the transaction would inevitably have been abandoned because whilst the position would have been corrected as between HP and Autonomy, the shareholders (whose agreement to sell was necessary) would still have had the perception of value and expectations of premium informed by the (inaccurate) published information.

4060.  On the assumptions explained above, my provisional view is that it is more likely than not that shareholders would have accepted a lower bid price, even a considerably lower bid price.

4061.  The assessment of what bid price, on that basis, would have been recommended and agreeable is a difficult one. As Mr Bezant acknowledged, it is not possible to provide a scientific determination and there is inevitably subjective judgement involved. The reality, as it seems to me, is that though valuation techniques provide a floor and ceiling, ultimately the price to be paid depends upon what is to be taken to be the then current share price and what premium is necessary to win the likely support of a strong majority (probably 90% of the shareholders). Autonomy's share price would have been lower, and shareholders' expectation of premium moderated; and HP's DCF modelling and other valuation cross-checks would only have justified a lower price and lesser premium to ensure an agreed bid. As Dr Lynch himself recognised, a bid becomes irresistible if at a premium which most shareholders are likely to find irresistible; and the Defendants could not have resisted or vetoed such a bid.

4062.  What that price would have been remains to be assessed in a later judgment on quantum, which will need to take into account the recalibration of the Deal Model and other crosschecks in light of my findings as part of an overall enquiry

to assess what in Autonomy's 'True Position' its share price would be likely to have been, what premium would reasonably have been required to be paid, and whether a bid at the resulting price would have been within acceptable parameters having regard to HP's (properly recalibrated) Deal Model (including its revised assessment of synergy value) and other cross-checks.

4063. In doing so I shall also wish to consider further the Defendants' expert, Mr Giles's, central themes that Mr Bezant had adopted a flawed approach both to the assessment of remaining synergy value and to the effect of the required adjustments on a DCF valuation, it being Mr Giles's view that *"Overall the Accounting Adjustments [would] very likely have no impact or very little impact on cash"* and that in consequence a DCF valuation would *"not be materially affected by the Allegations"*.

4064. I am also likely to need further guidance on (if it becomes relevant) the *"No-Transaction scenario"* (the quantification of which would depend, amongst other things on whether synergy value of Autonomy in the hands of HP is to be included) and the differences in the *"FSMA Counterfactual"* and the *"Misrepresentation Counterfactual"* (as to which see further below).

4065. For the present, I do not feel it appropriate or possible to express any final view; but I presently and provisionally consider that the Claimants' FSMA loss will be established to be, though substantial, substantially less than the amounts claimed.

*Issues relating to the Deceit/Misrepresentation Claims*

4066. As previously explained, the FSMA claims did not seek to recover loss relating to the acquisition of shares and share options held by Dr Lynch and Mr Hussain. Conversely, the claims for common law deceit and under the Misrepresentation Act 1967 against the Defendants were confined to loss attributable to the purchase of their shares and share options (the amount claimed being approximately $420 million). A further complexity relates to the different considerations which the parties agreed were applicable in relation to the counterfactual to be assumed for the Deceit and Misrepresentation Act claims.

4067. Whilst I have taken the claims to be complementary, and to have been established in both cases, it is of course important to keep in mind that whereas the basis of the FSMA claims against the Defendants is the recovery from the Defendants (by way of breach of duty claims) of Autonomy's loss in consequence of it having accepted liability to HP/Bidco for the untrue or misleading statements and omissions dishonestly concealing material facts in published information for which the Defendants were responsible as PDMRs, what the Claimants described as the *"conceptually simpler"* claims in deceit/misrepresentation were direct claims against the Defendants, based on their personal deceit/misrepresentation. I have had to be (and have been) satisfied in the one (the FSMA claims) that HP/Bidco reasonably relied on Autonomy's  published information in proceeding with  the Acquisition at the bid price; and in the other (deceit and misrepresentation) that HP relied on the representations in purchasing the Defendants' respective shares and share options.

4068. The Claimants also stressed an important difference between the two sets of claims in respect of the measure and calculation of loss they asserted. As explained above, in the FSMA claim, and for the purpose of assessing the FSMA Loss, the counterfactual (*"the FSMA Counterfactual"*) presented is one in which the Defendants did not cause Autonomy to breach its obligations under FSMA, so that Autonomy's published information would have been compliant with FSMA and reflected the correct accounting in respect of the impugned transactions throughout. In the FSMA Counterfactual, therefore, HP would never have been aware that the published information was inaccurate or misleading, still less that the misrepresentations were the product of dishonesty. In the deceit/misrepresentation claims, however, the counterfactual is different. Unlike the FSMA Counterfactual, the *"Misrepresentation Counterfactual"* which the Claimants presented does not assume any correction to Autonomy's published information until the negotiation stage, and so HP would have at some stage become aware that the published information had been materially inaccurate or misleading, although it would after that disclosure or discovery then have proceeded on the corrected information.

4069. Quite when and in what terms it is to be assumed that the disclosure or discovery would have been made is likely materially, perhaps determinatively, to affect whether, in the context of the direct misrepresentation claims, the transaction would have proceeded at all.

4070. Thus, the Claimants contended (though Mr Bezant was not entirely consistent in this regard) that the correction would have revealed or required the revelation of dishonesty; and that in those circumstances it may then seem implausible that HP would have pursued an acquisition of Autonomy at all. In that context, Mr Bezant was instructed by HP to assume, in constructing the Misrepresentation Counterfactual that:

(1) but for the breaches of duty alleged by the Claimants, the misrepresentations alleged to have been made by the Defendants directly to HP would not have been made; but the impugned transactions would still have been entered into, and Autonomy's published financial information would have been the same as it was in fact; and

(2) insofar as HP continued to pursue an acquisition at all, price negotiations on both sides, and the decisions of the selling shareholders, would have been informed by the same information about Autonomy's "True" historical performance that would have been available to the market in the FSMA Counterfactual.

4071. Mr Bezant stated in his first report that he read this as in effect requiring him to

> *"assume that, during the course of negotiations, Autonomy would have informed HP of the True Position and thereby that its published information was false and misleading. In that scenario, I anticipate that, HP may well have terminated negotiations. If HP did not do so, I would not expect HP to have proceeded with negotiations until Autonomy had fulfilled its obligation to disclose the True Position to the market. In any*

> *event, consistent with my instructions, disclosure by Autonomy would be required in order for negotiations to proceed with the selling shareholders and Convertible Bond holders aware of the True Position."*

4072.   The Defendants, on the other hand, contended that no such revelation of dishonesty would have been necessary and in the construction of the Misrepresentation Counterfactual none should be assumed. According to the Defendants, it would have been (as it was stated in their written closing submissions) sufficient for Autonomy to *"say that it had learned that the accounting ought to be different and then provided HP with the correct accounting treatment"* and accordingly the Misrepresentation Counterfactual should simply be based on the assumption that *"HP would have had a full view of the transactions in question."* In short, and as Dr Lynch's valuation expert Mr Giles approached the matter, neither the issue whether the transaction would have proceeded nor the counterfactual value of Autonomy should be discounted by reference to the *"stain"* of accounting issues.

4073.   Further, if it is assumed for the purpose of the Misrepresentation Counterfactual that the transaction would have proceeded, the question arises as to what information revealing the need for correction would have been known when, and by whom, and what, even if no disclosure of dishonesty is to be assumed, what (if any) other repercussions of revelation should be assumed.

4074.   In that context, Mr Bezant's approach was that:

> *"... disclosure of the True Position would cause the market to reassess the value of Autonomy for:*
>
> (1)   *the business' prospects in the True Position; and*
>
> (2)   *additional uncertainty arising from knowledge that Autonomy had misrepresented its operations and results in public filings and its communications with the market.*
>
> *...*
>
> *This uncertainty a buyer would have faced would adversely affect both the Actual Value of Autonomy and the Revised Price. I am unable to quantify with certainty the discount to value that would result from taking such matters into account."*

4075.   The Defendants again disagreed. Consistently with their position that the Misrepresentation Counterfactual should not involve any assumption that Autonomy's historical conduct was in any way improper (but also they contended, in any event), they and Mr Giles rejected any suggestion that any correction required would have any lasting effect on *"the long-term expectations for revenues, profits and cash flow that determine value"*. They contended further that *"by the time that HP was provided with the information about the*

*transactions, it would also know that the matter had been looked into and this is what had been identified. Any further discount for the stain would be double-counting."*

4076. I consider that these points, which I have only sought briefly to introduce, raise challenging difficulties both in terms of legal principle and in their effect on the ultimate decision whether the transaction would have proceeded, and according to that, the construction of the appropriate Counterfactual and the quantification of loss. For these reasons, and also because the figures so far produced seem likely to be affected by my findings, I have considered it appropriate both to express only a provisional view as to whether (a) in the FSMA context and (b) in the deceit/misrepresentation context HP would have proceeded with the transaction, and more generally to defer my determination of quantum to enable further submissions.  I shall need particular assistance in seeking to resolve, and if possible, reconcile the two different approaches:   I would find it difficult to accept that it would be a satisfactory result for there to be a material difference in the quantification of loss according to whether the context and counterfactual relates to (a) the acquisition of shares and share options from Dr Lynch and Mr Hussain and (b) the acquisition of shares from all other shareholders.

## **DIRECT LOSSES**

4077. This Chapter addresses the Claimants' claims against each of the Defendants for breaching their duties as directors and/or employees of three companies within the Autonomy Group, namely, Zantaz, Autonomy Inc (the 4th Claimant), and ASL (the 3rd Claimant) (and/or in the case of ASL, for breach of Dr Lynch's fiduciary duty of loyalty, see paragraph 3521 above).

4078. The claims are for direct losses[516] suffered by particular Autonomy subsidiaries (including the 3rd Claimant and 4th Claimant, which bring the claims) as a result of the Defendants' breach of duty in causing the relevant subsidiary to act to its detriment, essentially by spending, or foregoing, money which it was not in the subsidiary's best interests to spend or forego, and which the Defendants did not believe to be in the subsidiary's best interests.

4079. In these further claims, the 4th Claimant (Autonomy Inc) sues (a) in its own right, but also (b) as the legal assignee of Zantaz's direct claims under this head, there having been a valid assignment to it of all of Zantaz's claims.

4080. I have already addressed such of the direct loss claims as relate to Autonomy's "Hosting" business. In relation to the direct claims made in respect of the four hosting transactions, I have set out in detail in the hosting section, my conclusion

---

[516] Described in the RRAPoC as "transaction-based losses".

is that all four of the impugned contracts were not commercially in the relevant company's best interests, and the Defendants both knew that, because the contracts were entered for the purpose of falsely inflating Autonomy's apparent revenue.

4081. In the course of my analysis in that context, I have reached a number of conclusions of relevance to the matters addressed in this Chapter, which for convenience I summarise below.

4082. As to the dispute whether Dr Lynch had any directorial role in the three companies concerned, I have found that:

(1) both Defendants owed duties as *de jure* directors to Autonomy Inc;

(2) Mr Hussain was *de jure* a director of ASL and Zantaz;

(3) Dr Lynch was not *de jure* or *de facto* a director of Zantaz, but he was a *de facto* or shadow director of ASL.

4083. I have concluded that the only proper claimant for any of these direct claims is (a) the company to which either of the Defendants owed and breached a duty as director or employee (or, in the case of ASL, fiduciary in the sense described in (paragraph 3521 above) or (b) a valid legal assignee of such a claim. More particularly, I have determined that the existence of the transfer pricing arrangements where losses are transferred from one subsidiary to another within the group does not give a right to the transferee to sue for those losses.

---

4084. I have also found (again when dealing with the direct claims in respect of the hosting transactions) that no relevant duties were broken by either of the Defendants in their roles as directors of ASL in relation to the transfer pricing arrangements whereby losses incurred by Autonomy Inc, Verity Inc and Zantaz were transferred (but not assigned) to ASL. In my view, on the evidence put forward, those transfer pricing arrangements did not affect the right of the Autonomy company to which a duty was owed and broken by one or both of the Defendants in respect of the impugned transactions to make a claim. An agreement to transfer losses (as distinct from an assignment of the underlying rights) does not carry with it the conclusion that no loss has been sustained by the original claimant, nor that the right to claim has been lost or transferred. How the claimant which has suffered the loss has sought in the past or in the future seeks to deal with the loss which has been sustained has no bearing on its right to sue, or the quantum it may claim.

4085. I concluded in respect of the Hosting claims that because Dr Lynch was not a director of any sort or employee of Zantaz, he owed no duty in respect of the three Zantaz contracts impugned in these direct claims under hosting, and the claim against him in respect of those contracts fails accordingly.  It succeeds against Mr Hussain.  In relation to the fourth contract, namely between

Autonomy Inc and MetLife, the loser was Zantaz, because it was Zantaz which was the original contracting party with MetLife, whose payments were reduced by the later contract with Autonomy Inc. Although Dr Lynch was a director of Autonomy Inc, because Autonomy Inc suffered no loss there is no valid claim against Dr Lynch in respect of this fourth impugned hosting contract. I emphasise that the reason the claim fails against Dr Lynch in relation to this fourth contract is not because of the transfer pricing arrangements, but because Autonomy Inc suffered no loss in the first place.

4086. In my judgment, the same approach as regards the status of Dr Lynch and the identification of the proper claimant and what if any loss was sustained applies to the remaining transaction-based/direct loss claims under the three remaining heads (Hardware, MAF payments to VARs, and reciprocal transactions (VAR and nonVAR)). The breach of a duty owed by the Defendants to the company which sustains the loss, must be established. Such a claim is not affected by loss transfers which fall short of assignment, nor do such matters result in the company suffering no loss. Further, the transfer pricing arrangements made by ASL cannot form the basis of a claim because the entering into of the transfer pricing arrangements cannot successfully be impugned as a breach of duty.

4087. Turning to the factual basis of the claims under these remaining heads, the parties dealt with these three heads of claim relatively shortly in their submissions. So will I.

*Hardware*

4088. The only difference on the threshold issues in respect of the hardware transactions is that unlike the hosting contracts Autonomy Inc did suffer the losses because they were the buyer and seller of the relevant hardware.

4089. The Third and Fourth Claimants put their case as follows:

(1) The relevant purchases and sales were made for the improper purpose of inflating Autonomy's reported revenue rather than for any genuine commercial purpose.

(2) Both Defendants (a) were directors of Autonomy Inc and (b) actively, albeit in different ways, promoted these hardware sales.

(3) The losses on the hardware sales related to and resulted from a breach by the Defendants of their duties to Autonomy Inc as the relevant company that sustained them.

4090. The Defendants' principal defence of course was that the hardware transactions were legitimate. Otherwise, they were left with arguments as to the effect of the transfer pricing arrangements and questions as to the extent of Dr Lynch's duty and knowledge. I have already dealt with these, as explained above.

4091. I have concluded that the Claimants must succeed on this aspect of their claims. That includes their claim for recovery of $250,000 paid as bonuses in respect of the hardware transactions.

4092. The Defendants have points on the quantum of these claims, which I will deal with in my quantum judgment.

*MAF Payments to VARs*

4093. The Claimants put their claim under this head as follows:

(1) All three subsidiaries paid so-called marketing assistance fees (MAFs) to VARs. The VARs did not assist in any marketing efforts, notwithstanding the paper trail in relation to various of the MAFs suggesting the contrary.

(2) These were inducements for the relevant VAR to participate, and a reward for having participated, in a transaction that would enable Autonomy to report revenue improperly, and were thus paid in breach of the Defendants' duty to the relevant subsidiary. That would in principle include foregone receipts on certain transactions, including in respect of Verity Inc, where amounts were paid to a VAR by an end user, as a designated payee on a transaction between Autonomy and the end user, which exceeded the amounts paid by Autonomy to the VAR, being in effect another mechanism for payment of a MAF.

4094. Again in principle, I have found the factual basis alleged by the Claimants made out in my detailed consideration of the VAR claims. I also find that procuring the companies to make MAF payments or forego receipts was a breach of duty as a director.

4095. It was not altogether easy or even possible to unravel from the schedules the extent to which ASL or Autonomy Inc was the original payer (and not simply a party to which a cost was subsequently transferred under transfer pricing arrangements). If either was the original payer, a claim lies against both Defendants. To the extent the original MAF payer was Zantaz the claim will only be against Mr Hussain.

4096. The schedules of MAF payments identify all three companies as payers depending on the relevant MAF payment. In principle I find both Defendants are liable for the Autonomy Inc payments or foregone receipts. I find only Mr Hussain is liable for the Zantaz payments (or foregone receipts).

4097. In relation to the ASL payments, although the evidence is unclear, it appears in respect of a limited number of the MAF payments that ASL was the original payer. Both Defendants were responsible for those payments being made, and in those circumstances both Defendants are liable for the ASL MAF payments.

4098. Again, I will consider precise quantum in my quantum judgement. However, I note that the Defendants did not raise any positive points against the

quantification of this head of loss advanced by the Claimants (and amounting to $8,883,221), and did not challenge at trial Mr Bezant's verification work in respect of those figures as set out in Schedule 12C of the RRAPoC.

*Reciprocal Transactions*

4099.  The Claimants put their claim under this head as follows:

(1) All three subsidiaries were involved in either: (i) the impugned reciprocal transactions; and/or (ii) improper reciprocal transactions used to unravel VAR transactions (i.e. where the relevant subsidiary bought something it did not need in order to put the VAR in funds to settle its proposed debt).

(2) The losses incurred similarly represent damages for the Defendants breaches of duty.

4100.  For the reasons I have set out at length in my consideration of the VAR Claims, and Reciprocal Claims made under FSMA I find the premise of this head of claim made out, namely there was no commercial justification for these reciprocal transactions and this was known to both Defendants because their purpose was falsely to inflate Autonomy's apparent income.   In my judgment, both Defendants authorised these transactions.

4101.  As with each of the four separate claims for breach of duty owed by the Defendants to Autonomy companies, against which Defendant the claim can be made depends on which subsidiary entered the impugned transaction.  In their closing submissions the Claimants identify which entity has suffered the loss in respect of the reciprocal transactions as follows:

> *"Of this total amount, [around $20m] $739,450 was suffered by Zantaz and the remainder resulted in a loss to ASL by virtue of the aforementioned transfer pricing arrangements."*

4102.  They added in a footnote:

> *"The Claimants advance an alternative case, which reflects the position before the transfer pricing arrangements. Under this case, the net loss is recorded in the entity that recorded the purchase transaction. This approach results in losses of
> $2,980,444 to ASL, losses of $14,469,910 to Autonomy Inc and losses of $3,215,000 to Zantaz: PoC Schedule 12, Table 12B."*

4103.  They also asserted that Mr Bezant had confirmed that he had not identified any inaccuracies in PoC Schedule 12, Table 12B.  Mr Bezant's evidence on this point was not challenged in cross-examination.

4104.  I did not understand the Defendants to take any points on quantum on this head of claim if liability were to be established. However, although no points were raised, I will leave the assessment of these losses to my quantum judgment.

4105.  In those circumstances I find that the subsidiary which suffered the losses   were
as identified in the alternative claim, set out in the footnote. The amounts of that
claim have not been challenged but will finally be determined in my separate
judgment on quantum.

## COUNTERCLAIM

4106. Lastly, I should briefly address Dr Lynch's Counterclaim against the First Claimant (Autonomy), though ultimately only to confirm that it seems to me to follow from my findings in the main claim that it falls to be dismissed.

4107. In summary, the gist of the Counterclaim was that HP's public announcement on 20 November 2012 of the $8.8 billion write-down of Autonomy, and the various briefings on that day, contained statements seriously impugning the conduct and damaging the reputation of Dr Lynch which (according to the Counterclaim) were untrue, that Autonomy authorised the false statements made, and that in doing so it was in breach of a duty of trust and confidence, alternatively duties in tort and under the Data Protection Act 1998 ("the DPA"), which it owed to Dr Lynch.

4108. The Counterclaim identified a series of eleven specific statements made in the course of the announcements and calls referred to above, including serious allegations against *"former members of Autonomy's management team"* accusing them of a *"wilful effort to mislead investors and potential buyers"*, and alleged each to be false. Most of the eleven statements impugned the way the business of Autonomy had been conducted and accounted for on broadly the same grounds as have been put forward by the Claimants in the main proceedings and alleged that those *"former members of Autonomy's management team"* had *"used accounting improprieties, misrepresentations and disclosure failures to inflate the underlying financial metrics of the company, prior to Autonomy's acquisition by HP"*. Three of the statements referred, misleadingly it was claimed, to the circumstances in which the alleged improprieties came to light, one to the impact of the alleged improprieties and misrepresentations in causing HP to pay too much for the acquisition of Autonomy. A further statement related to the role of Deloitte and HP's alleged reliance on them.

4109. The claims were not brought in defamation: it does not seem to have been disputed that any defamation claims were statute-barred. Nor did Dr Lynch seek to recover damages for reputational damage. Rather, the claims asserted that the allegedly false statements caused such reputational damage to him that it caused two very substantial prospective investors in his company, Invoke Capital, to withdraw. The sums claimed in the Counterclaim were considerable: Dr Lynch claimed that if the investments had been made, he would have earned considerable equity gains and fees through Invoke Capital of at least $160 million.

4110. The claims depended upon Dr Lynch demonstrating (on the usual balance of probabilities) that (a) the identified statements were false, (b) Autonomy authorised the making of the statements and thereby assumed responsibility for them, and (c) Autonomy owed Dr Lynch duties of which it was in breach. There was also a dispute about causation, and about quantum.

4111. As may be apparent from my description in the Introduction to this judgment, and especially in paragraphs 384 to 414, I have never been convinced that at the

time of the Announcement of Impairment in November 2012 HP had yet established the facts necessary to justify the very serious allegations which the Announcement contained. The references in the Announcement to *"intense internal investigation"*, which were relied on as underpinning and justifying the representations and allegations made, had

not been completed and, so far as the evidence went, were largely undocumented (though the Claimants suggested that a claim made to privilege might in part at least explain that).

4112. Still less had there been any exercise to correlate the irregularities alleged to the amount of the write-down sought to be explained and justified, as internal emails make clear (see paragraph 396(2) above). Indeed (as may also be relevant to the question of quantum), any correlation between the amount of the write-down and the improprieties alleged to have justified it is difficult to discern, and appears to be belied by the way it was calculated at the time. Of the total write-down of $8.8 billion, $3.6 billion was the result of increasing the discount rate from the 9.5% used in August 2012 (when no impairment was thought necessary) to 16% (an extra percentage point having been added at the very last minute). According to an HP infographic circulated on 19 November 2012, the remaining $5.2 billion was attributable to (a) $2.9 billion for lower margins, (b) £1.8 billion for lower growth rates and (c) $1.3 billion for the effect of rebaselining revenue to reconcile the accounts. No mention was made of the alleged accounting improprieties (though they may be compendiously taken into account in those calculations without express identification).

4113. There are grounds for supposing (and see paragraphs 409 to 413 above) that HP had hurried to inform the market before it had completed the necessary investigations because it urgently needed to revalue the component parts of its business following a reduction in its market capitalisation in 2012 and to satisfy the requirement of US accounting rules that the sum of the parts of a business plus 30% control premium could not exceed its market capitalisation. The huge write-off neatly resolved this problem. Writing down the value of Autonomy ensured that no write-down was required of HP's own Software division (which, as explained in paragraph 411) HP wanted to avoid. The signs are that HP proceeded before it was really ready in light of market and accounting exigencies, and the write-down was in an amount which satisfied both. That may also explain why the allegations were not even put to Dr Lynch before they were vigorously publicised.

4114. However, whilst these matters did encourage in me original scepticism about the claims and their quantum, I do not consider it necessary to consider them in any greater detail. Nor do I need to explore and determine the various and considerable difficulties in Dr Lynch's way (including the difficulty of demonstrating that Autonomy assumed an obligation in respect of HP's Announcement), which would have confronted him even had he succeeded in the main claim. For the fact is, as pleaded by the Claimants, and whether or not sufficiently underpinned and documented at the time that they were made, the statements as to the conduct of the business and its accounts which Dr Lynch

identified were, in my judgment, true. The fundamental premise of the Counterclaim was that the statements were untrue, and the premise having been falsified, the claim must fall away. That is so even if the representations as to the basis of the statements were untrue, incomplete or inaccurate: there would be no realistic prospect of establishing loss.

4115. Accordingly, as I indicated would be the result in my Summary of Conclusions (in Appendix 6), I dismiss the Counterclaim.

## CONCLUSION

4116. I approached the Claimants' case with considerable scepticism. This was not a case like Theranos, which raised more than $700 million to develop and support a product which never had any substance. Autonomy was a successful cash-generating enterprise, audited by Deloitte, with substantial cash reserves at the close of 2010, and a worldbeating software product, which had opened up for analysis the then uncharted but vast area of unstructured data (IDOL) and which Ms Whitman herself had apparently described as *"almost magical technology"*.

4117. However, I have been satisfied and concluded that the evidence reveals a clear pattern of Autonomy's central management resorting, under the direction of the Defendants, to a variety of what the Claimants had termed *"levers"*, which (quoting from the Claimants' written closing submissions) *"the Defendants could pull, as and when desired, to achieve their overall goal of misrepresenting Autonomy's financial condition so as to make it appear that the business was operating in line with market expectations"*.

4118. Although the Defendants advanced the semblance of commercial justification for hardware sales, VAR transactions, reciprocal sales, "hybrid hosting" and the inclusion within the "OEM" category of subsequent sales said to have been generated by OEM transactions, those justifications lacked substance.

4119. Further, the extent to which the Defendants had consistently and successfully sought to conceal the true substance and purpose of material parts of Autonomy's business and to disguise their adverse effect has become clear. No good or sufficient reason was ever provided, for example, for the failure properly to disclose the hardware sales and the treatment of their associated costs which made them loss-making.

4120. Both individually and together the effect of the deployment of these "levers" was to portray Autonomy as a much larger and more successful company than it really was, with a history of meeting and beating market expectations which was sustained only by resort to undisclosed or incorrectly described sources other than proper software licence sales.

4121. I have determined that the Defendants were responsible for a strategy of sales of third- party hardware which were not appliances or in any meaningful way a *"delivery channel for software sales"*, and the purpose of which was to plug shortfalls in software licence sales and thus to disguise the true performance of Autonomy's software business.

4122. I have accepted the Claimants' case that the series of VAR sales which I have described lacked any real substance and the apparent revenue they purportedly generated should not have been recognised: in every case (with one exception where the allegation was not established) the sale to the VAR was put in place to make good revenue lost when a sale to a genuine end-user failed: the reseller was never intended to, nor ever did, play any part in the resale of the software purportedly sold to it; nor was it intended to pay Autonomy from its own resources if an end-user sale eventuated; nor did it have any part to play in any sale to the proposed or a substitute end-user, which Autonomy alone would seek to negotiate and conclude, without regard to or any participation by the reseller.

4123. I have accepted also the Claimants' case that by a variety of reciprocal transactions Autonomy put its customers in funds to buy Autonomy products, by buying products from the customer despite having no or no real commercial rationale for doing so.

4124. Both the pure hardware sales (which Autonomy subsidised by buying the hardware and then reselling it at a loss) and the reciprocal transactions (where in effect Autonomy was paying a customer to buy Autonomy products) amounted to Autonomy buying its own revenue.

4125. Moreover, I have accepted that the Defendants well knew that Autonomy had repeatedly misrepresented the nature and scale of its IDOL OEM revenues, which they knew would be and were especially highly regarded by HP, and had materially exaggerated its hosting revenues.

4126. In reaching these conclusions, I have borne in mind throughout that Autonomy had well known and reputable auditors, and through much of the Relevant Period, an Audit Committee chaired by a well-regarded and very experienced accountant, and an equally well regarded and experienced non-executive Chairman, all of whom had access to the accounting records without restraint. For reasons I have sought to explain, the Defendants' reliance on them as denoting that the accounting treatment of the impugned transactions may sometimes have 'pushed the envelope', but was within the parameters of reasonable judgements and propriety, justifies or provides a conclusive litmus test. The fact is, as I have concluded, that the evidence (including, especially, emails of which Deloitte, Mr Bloomer and Mr Webb QC were not aware) shows that the Defendants knew that the true purpose of the various 'levers' they deployed was dishonest, as further demonstrated by the efforts the Defendants made to conceal or misdescribe the true nature and scope of the business undertaken.

4127. In the result, I have determined that the Claimants have succeeded in substantially all their claims, except in respect of one impugned VAR transaction and in their claims relating to the *"Other Transactions."* They have established, on the civil standard of the balance of probabilities, that the Defendants dishonestly misrepresented the financial position and performance of Autonomy during the Relevant Period. I consider that HP/Bidco bought a smaller and less

successful company than it was represented to be and that HP was led to and did believe that it was acquiring.

4128.   One of the tragedies of the case is clear: an innovative and ground-breaking product, its architect and the company will probably always be associated with fraud.

4129.   The length of this judgment may well be unparalleled. I have sought to set out the detail I have thought appropriate having regard to the gravity of the claims and the enormity of the consequences for the parties (and especially the Defendants). If there is excuse for its length it is that this has been a most unusual case.

4130.   Ordinarily, even the most complex cases tend to be resolved ultimately by reference to a small collection of documents which become dog-eared with repeated citation during the course of the trial, and discrete passages of oral evidence likewise cited so often as to verge upon becoming leitmotifs. In this case, however, the allegations travelled over all the major aspects of the way Autonomy generated revenue, over (in all) more than 100 transactions each with supporting documents. The pattern which I have concluded emerges in the round had to be tested against each one, not least in case some differences emerged which falsified the general description. The number and variety of transactions, documents and extracts from witness evidence referred to in this judgment may demonstrate the unusual nature of the case, as may also the volume of transcripts which exceed some 18,000 pages and the hundreds of pages of evidence from the US criminal proceedings admitted into evidence in these proceedings as hearsay.

4131.   Another unusual facet of the case which necessitated particularly detailed focus on the extensive documentary record has been, conversely, the absence of not only, and most obviously, one of the only two Defendants (Mr Hussain) but also (as already recorded) of a number of key individuals who might have assisted me, and in particular, Mr Knights and Mr Mercer (the lead partners for Deloitte over the course of the Relevant Period), Mr Sullivan, Mr Johnson and Mr Scott (who gave evidence in the US criminal proceedings but not before me) and (on the Defendants' side) Mr Chamberlain, Ms Eagan, Mr Kanter, Dr Menell (all of whom I have concluded were part of a clique responsible with the Defendants for the operation of the impugned 'levers').

4132.   The length and complexity of the judgment, my delay in completing my assessment, the need for an extended period to enable the parties' legal representatives to consider, correct and comment upon the draft and my concern about the difficulty of maintaining strict confidentiality pending final formal handing down of the finalised version, caused me to follow an unorthodox course in delivering my conclusions and reasoning. First, I took the unusual step of setting out a Summary of my conclusions and their basis at a public hearing on

28 January 2022[517] (see Appendix 6). Shortly thereafter I provided my draft judgment (first circulated on 31 January 2022, and supplemented in stages thereafter) to nominated individuals for correction and appropriate comment under conditions of the strictest confidence.

4133. As it transpired, rather longer was required for the process of correction and comments, and their consideration, than originally estimated; but the corrections and comments provided by all parties have been extremely useful, and I am grateful to all concerned. I am grateful too for the confirmation provided by all to whom any previous drafts were provided to enable the process of correction and comment, which remain embargoed that any such drafts, will (to ensure confidentiality) be delivered up and destroyed.

4134. More generally, I reiterate my thanks to the parties and their representatives for their patience and unstinting assistance throughout the long process of pre-trial hearings, the Trial itself and the regrettably long period of this judgment's gestation. The advocacy on all sides was of the highest quality, and the support on which it rested was equally exemplary.

4135. I shall need the same assistance in respect of the issues of quantum, which (as I have indicated) will be the subject of a separate judgment in due course after further submissions (in respect of which I shall give directions at a subsequent hearing which is to be arranged).

**Postscript**

4136. This postscript addresses three points which have arisen in the process of providing corrections of and comments on the embargoed original draft of this judgment.

*The position of Mr Chamberlain*

4137. First, on 6 April 2022, Clifford Chance sought my permission "*to notify Mr Chamberlain's US and UK counsel that the judgment includes findings of wrongdoing against Mr Chamberlain, so that he can (if so advised) apply to come inside the embargo or take whatever other steps he is advised to take.*" In that regard, they noted that "*the draft judgment contains a number of findings against Mr Chamberlain, who is facing prosecution in the United States alongside our client. The judgment makes findings against a number of other individuals, but Mr Chamberlain is the only one of these individuals facing prosecution. Mr Chamberlain is, of course, not aware of the fact that the judgment will include findings against him and will not have any opportunity to take legal advice on the implications of the civil judgment before it becomes public.*"

---

[517] The Summary I provided on 28 January 2022 is, for convenience, attached as Appendix 6 to this judgment. Where there is any inconsistency with this judgment, this judgment prevails.

4138. When I declined to give permission, but invited further explanation of the basis of the request, Clifford Chance by further email dated 20 April 2022 helpfully referred me to the decision in *MRH Solicitors v Manchester County Court* [2015] EWHC 1795 at [24], [32] to [39] as being what they had in mind, though they stated also that it was *"not an issue that affects our client directly."*

4139. *MRH Solicitors v Manchester County Court* concerned findings made in an *ex tempore* judgment by a Recorder, after a four-day trial, dismissing a claim for personal injury and consequential losses on the basis that the underlying motor accident was staged and the claims were fraudulent. In the course of his judgment, the Recorder found that the solicitors for the claimant driver in that action (MRH Solicitors) were party to the fraud, as also (he held) were two companies which had provided and charged for hire cars provided to the claimant. A passenger was separately represented: but neither the solicitors nor either of the two car hire companies were party to the proceedings. The Recorder subsequently approved a transcript of his judgment which included those findings. MRH Solicitors and the two car hire companies brought proceedings for judicial review to seek to undo what they submitted was a breach of natural justice which had resulted in their integrity being impugned unfairly. They sought and obtained interim relief to prevent the circulation of the approved judgment and as their substantive relief they sought an order quashing parts of the approved judgment.

4140. It was submitted on the applicants' behalf in the judicial review proceedings in the Administrative Court that:

(1) The Recorder had behaved unfairly in expressing final conclusions that the Solicitors and car hire firms had behaved fraudulently, especially since (i) none of the three had been heard or had an opportunity to be heard; (i) no claim of fraud had been pleaded, (iii) there was no evidence for the findings of fraud made.

(2) Judicial review was the appropriate route and remedy since there was no route of appeal by non-parties.

4141. The Divisional Court declined to grant the order sought, since *"no more than on appeal can we re-write the judgment of [the] Recorder…"* They also declined to make declaratory relief; but that was because they considered that it was unnecessary in light of the unequivocal determination in their judgment, where they stated that:

> *"…the Recorder was not entitled to make a conclusive finding of dishonesty or fraud against MRH [or the two hire companies] and they should be treated as not having such a finding made against them."*

4142. The Divisional Court also provided general guidance, stating that in

> *"the unlikely event that something similar to this should happen in the future, in our view the right course would be for the third party who believes they have been unfairly criticised in a judgment to apply to be joined as a party."*

The person concerned could then appeal (or seek permission to do so). At the same time, however, the Court stressed that the decision was a discretionary one, and emphasised that:

> "... we are not saying that a third party who is criticised will necessarily be entitled to be joined as a party. There are many cases heard in the civil courts (and also family and criminal courts) where the conduct of an absent person falls to be considered. For example, in a conspiracy case not all the alleged conspirators may be before the court as parties or witnesses. In complex commercial frauds it may well be part of the case there's an absent personal institution was party to dishonest conduct somewhere in the chain. Everything will depend on the facts of the individual case."

4143. It seems to me that two questions thus need to be considered: (a) whether, prior to public circulation of the judgment, the court should pre-circulate any person(s) in respect of whom it has made serious findings to enable them to make representations for the judgment in some way to be anonymised or even altered; and (b) whether at that stage or thereafter the court should, on application by the person concerned (or indeed on its own motion), order their joinder as a party to enable an appeal.

4144. In determining not to give the permission requested by Clifford Chance to make available this judgment to Mr Chamberlain and his advisers before its final handingdown, I have had in mind particularly the following considerations:

(1) Although Mr Chamberlain's decision not to provide evidence or attend is understandable in light of his indictment in the US, and his right of silence in the criminal proceedings there, that was his decision: he nevertheless had the opportunity to give evidence in these proceedings and declined it.

(2) As mentioned previously, he was not alone in declining that opportunity; and even if his reasons may be stronger than theirs, there would be a variety of persons in the same position as he, the common denominator being that in each case I considered it essential to consider his or her role in what was done as part of the process of determining the claims against the two Defendants. Mr Chamberlain must have appreciated, as must all the others, that their conduct would be reviewed; and it was on the cards that it might be criticised.

(3) This is, in my judgment, just the sort of case which the Divisional Court had in mind in emphasising that such findings might be necessary.

Furthermore, I do not consider that there was any means of successfully anonymising some part(s) of the judgment; nor that any good would come of any process which enabled Mr Chamberlain or others in a similar position to, as it were, offer their commentary and evidence on the findings I have made, without being bound by evidence or exposed to the scrutiny of cross-examination. I have been acutely aware throughout of the obvious imperative that judges should be extremely cautious before impugning the honesty of persons who have not had an opportunity to defend themselves, and I have

taken every care accordingly, even though in this case, they did have an opportunity but declined it.

(4) I emphasise nevertheless that nothing in this judgment constitutes a finding of liability or formal finding of guilt against anyone other than the two Defendants. My findings against others are ancillary to my findings against the Defendants.

4145.  In those circumstances, and given that (as the Court noted in *MRH Solicitors v Manchester County Court*) *"it is axiomatic that appeals are brought against orders, not the reasons for orders"*, I would not of my own motion consider it appropriate to join Mr Chamberlain or any other of the persons I have found to have been involved in the frauds on the basis of which I have held both Defendants to be liable.

4146.  I very much doubt that an application to be joined would be appropriate or serve any purpose, since I have not been asked, do not intend to and could not properly make any order against Mr Chamberlain or any non-party I have criticised. However, since no application has been made, and theoretically, I suppose, could be so, I do not finally decide that now, but certainly do not encourage any such step.

*Extant copies of embargoed draft judgment and related documents*

4147.  The content and copies of all drafts of my judgment circulated to the parties after I had delivered a summary of my conclusions on 28 January 2022 in open court were strictly embargoed. In the unusual circumstances of this case, I attached express conditions, including that all copies should be returned and destroyed once the process of finalising and handing down final judgment had been completed. The purpose of the embargo and of these conditions was to assist, safeguard the confidentiality of, the necessary process of enlisting the assistance of the parties in identifying and correcting suggested errors and omissions (including any parts of the draft(s) which might require clarification or amplification) before finalising the judgment and (by hand-down) putting it in the public domain. I had understood that the conditions I stipulated in relation to drafts of earlier and superseded versions of this judgment and associated documents proposing corrections were accepted, and certainly nothing to the contrary was intimated until 10 May 2022.

4148.  However, Clifford Chance on behalf of Dr Lynch have now asked to be permitted to retain copies and the parties' proposed corrections for the purposes of pursuing any application for permission to appeal, and if permission is granted, any appeal itself. After I had indicated that I was not persuaded that this was appropriate, and very shortly before this judgment was finalised for publication, they have indicated that they may wish to put forward further arguments in support of this. I shall consider this further and make directions to the parties accordingly. In the meantime, I should explain briefly why (subject to consideration of any further arguments and (possibly) interim arrangements for safe custody) I consider that earlier drafts should remain strictly embargoed and be returned or destroyed.

4149. I fully recognise that the process has been more extended and complex than usual, and the corrections proposed considerably more numerous. The parties have all assisted me greatly in identifying typographical errors and in reconstructing paragraph references. They have also, especially in the case of the Claimants, identified other errors both of expression or detailed fact, including some where I had overlooked documents or submissions which I was invited to (and did) revisit with a view to their correction. Dr Lynch, in particular, objected to various of the corrections suggested by the Claimants on the basis that the *"Claimants' comments cross[ed] the line from corrections to submissions on findings in the draft judgment"*.

4150. I have considered every such objection carefully by reference to any source material or submissions cited or repeated. Where I have made corrections, I have done so because it seemed to me necessary either to clarify the language I had used or to reflect my own review of some particular aspect of the record or submissions to which I had been directed and which I felt, with the perspective offered by a little distance from the original drafting process, I had not sufficiently accurately recorded or taken into account. In light of the same process of review, I have also included additional sections to address matters which I considered required further explanation of my conclusions. (These include, in particular, an additional chapter on Reliance which I considered both clarificatory and a necessary introduction to the issue of quantum, on which I shall require further submissions.)

4151. In no case were any corrections suggested or made by reference to evidence or submissions which had not been before me. In no case was any correction suggested or made which altered my overall approach or substantive conclusions as summarised in my Summary (subject only to the caveat below). I am satisfied that the corrections made were appropriate and necessary to ensure both clarity of expression and detailed accuracy in explaining those conclusions in this my final judgment .

4152. As should perhaps go without saying, this version of my judgment, as handed down, is the only version and record to be made public of my final conclusions and reasoning in this case.

*Differences between the Summary of Conclusions and this judgment*

4153. As to the caveat mentioned above, Simmons & Simmons have suggested to me that in certain instances there are differences between the wording in this judgment and the wording of my Summary of Conclusions. Of the differences to which they drew attention the following remain:

(1) Paragraph 42 of the Summary should be taken to be replaced by paragraph 524 of this judgment which is more nuanced.

(2) Paragraph 48 of the Summary does not reflect that ASL as well as Autonomy Inc have claimed for direct losses.

(3) Paragraph 50.1 of the Summary states that the quantity of pure hardware sales was $100 million whereas in this judgment the total aggregate over the Relevant Period has been corrected to $200 million.

(4) Paragraph 50.4 of the Summary describes the Claimants' case as the foregoing of future recurring revenue in exchange for a "one off and heavily discounted capital sum for a licence", which has been amended to remove the words "and heavily discounted" in paragraph 16(4) of this judgment, though in fact the capital sum provided a discount compared to licence fees otherwise payable over time.

(5) Paragraphs 50.5 and 80 of the Summary describe OEM as Autonomy software being embedded in an OEM's hardware: the judgment has corrected this to an

OEM's software at paragraph 16(5), consistently with other parts of the judgment.

4154. Simmons & Simmons have accepted that these corrections are minor. But they have suggested that in light of them, the Summary should now be removed from the Courts and Tribunals website, and not included as an Appendix to this judgment. I do not consider that either course is required. It seems to me that such minor differences are inevitable and had been anticipated in my Summary, where I expressly anticipated differences and stated that in the event of any conflict my judgment would prevail.

4155. Nevertheless, I shall give instructions for the version of the Summary publicised at the end of January to be re-issued with an endorsement in bold, referring readers to this judgment (which will by then have been handed down) and reiterating that in the event of any differences between the Summary of Conclusions and this judgment, this judgment prevails. It may also be possible to include in the Summary an electronic link to this judgment.

## APPENDIX 1

## DRAMATIS PERSONAE

[Names in **BOLD CAPITALS** are parties. Names in CAPITALS were principal witnesses who gave oral evidence; names in *italics* were other witnesses, including in parenthesis those whose evidence in the US was admitted into these proceedings under hearsay notice; names in capitalised *ITALICS* were individuals of principal importance who did not give evidence]

| Name | Description of role |
|---|---|
| | **Description of role** |
| | ***The roles of Autonomy individuals (and associated third parties) relate to the Relevant Period (Q1 2009 to Q2 2011) unless otherwise specified*** ***The roles of HP individuals relate to the date of HP's acquisition of Autonomy unless otherwise specified*** |
| Anderson, Antonia | Autonomy Group Financial Accountant and Revenue Director (from 2011; previously Manager at Deloitte). |
| APOTHEKER, LÉO | HP President and CEO (November 2010 to September 2011). *Witness for the Claimants*. |
| Araujo, Neil | CEO Protect, Professional Markets at Autonomy (from August 2009). |
| Ariko, Barry | Member of Autonomy's Audit Committee. |
| *Avant, Donald "Don"* | Group Head of Operations at Autonomy (from July 2011). At the time of trial, VP, Customer Experience at Darktrace, an investee company of Invoke Capital (founded by Dr Lynch and Mr Hussain). *Witness for Dr Lynch.* |
| *Avila, Eloy* | Held various technical roles at Autonomy, including Chief Technology Officer (from November 2010). At the time of trial, Chief Technology Officer, Americas at Darktrace. *Witness for Dr Lynch.* |

| | |
|---|---|
| BAIOCCO, JOHN | Managing Partner at Capax Discovery. *Witness for the Claimants.* |
| Barris, Bob | Vice President of Sales, Dell. |

| | |
|---|---|
| *Bettencourt, Michele (formerly Anthony)* | CEO of Verity Inc (acquired by Autonomy in December 2005). Thereafter headed up Autonomy's integration of Zantaz and Interwoven (left Autonomy in December 2009). *Witness for Dr Lynch (but not cross-examined).* |
| Bhagat, Varoon | Member of the Corporate Development sub-team within HP's Strategy and Corporate Development group (**"SCD"**). |
| Binns, Robert | Member of the worldwide Field Operations team, who worked within HP's Software & Solutions team. |
| Black, Ian | Autonomy Head of Global Operations. |
| BLANCHFLOWER, SEAN | Autonomy Head of R&D. *Witness for the Claimants.* |
| Blank, John | Member of HP's Enterprise Financial Reporting (**"EFR"**) group, focused on M&A Technical Accounting. |
| BLOOMER, JONATHAN | Chairman of Autonomy's Audit Committee (from 2010). *Witness for Dr Lynch.* |
| Bordeaux, Dean | Account Executive, Dell. |
| Broli, Corrado | Autonomy sales executive (covering Italy). At the time of trial, Country Manager, Italy at Darktrace. |
| Brossard, Gerard | Vice President for Planning, Strategy and Operations (HP Software); led the Project Management office focused on the Autonomy integration. |

| | |
|---|---|
| Brown, Derek | Investor Relations, Autonomy. |

| | |
|---|---|
| Breya, Marge | Senior member of HP's software marketing team. |
| Brunnick, Michael | Autonomy Vice President of Federal Sales. |
| *(Camden, Dominic)* | Responsible for sales at Zones Inc, an IT solutions provider and hardware reseller. *Evidence in the US admitted as hearsay (Claimants and Defendants).* |
| *CHAMBERLAIN, STEPHEN* | VP, Finance at Autonomy (until March 2012). Chief Operations Officer at Darktrace (until 2018). Part of the 'Clique' or 'Cabal'. |
| Chan, Otto | Managing Director, Global Technology Operations, Citibank. |
| Chang, Hung | Lawyer at Autonomy. |
| *(Channing, Roger)* | Chief Technology Officer and Senior Vice President at MicroTech. *Evidence in US admitted as hearsay (Claimants and Defendants).* |
| COLLET, HARALD | Autonomy Vice President of Business Development (October 2007 to May 2008); Autonomy Head of OEM Sales in North America (May 2008 to June 2010). Co-author of Joe Bloggs correspondence. *Witness for the Claimants.* |
| *Colomar, Vanessa* | Autonomy Head of Communications (August 2011 to September 2012). At the time of trial, Head of Communications and Investor Relations at Invoke Capital. *Witness for Dr Lynch.* |
| *Cooke, Stephen* | Partner at Slaughter and May (Mergers and Acquisitions practice). *Witness for Dr Lynch (but not cross-examined).* |
| Corado, Ray | Financial Analyst, Autonomy. |

| | |
|---|---|
| Corley, Tom | Sales Account Manager, Zones Inc. |
| Crumbacher, James "Jim" | Associate General Counsel of Autonomy Inc. |
| Daoust, Mark | Vice-President of e-Discovery, Autonomy. |
| Debban, Vince | Senior Vice President, End User Computing / Desktop and Electronic Communications, Bank of America. |
| Desroches, Robert | Vice-President of Digital Safe Operations, Autonomy. |
| Dolan, Julie | Autonomy Senior Corporate Counsel. At the time of trial, Senior Legal Counsel at Darktrace. |
| *Duckworth, David* | HP's Mergers, Acquisitions, Divestitures and Outsourcing Finance Integration Project Manager (until March 2012). *Witness for the Claimants.* |
| Eads, Richard | Global Procurement Officer and Director of Credit and Collections, Autonomy. |
| *EAGAN, NICOLE* | Autonomy Chief Marketing Officer. At the time of trial, co-CEO of Darktrace. *Withdrawn as witness for Dr Lynch.* |
| EGAN, CHRISTOPHER "STOUFFER" | CEO of Autonomy Inc. *Witness for the Claimants.* |
| *(Esterrich, Tomas)* | CFO at MicroTech. *Evidence in the US admitted as hearsay (Claimants and Defendants).* |
| Faughnan, Michael | Global Account Manager, Dell. |

| Fitzgerald, Lisanne | Senior Manager and Professional Standards Reviewer, audit, Deloitte. |

| | |
|---|---|
| Flanagan, Tom | Chief Information Officer, Amgen. |
| Frischknecht, Dominic | Member of the Supply Management team, Credit Suisse. |
| Furman, Al | Chief Technology Officer, Morgan Stanley. |
| Gallagher, Darren | Autonomy Head of Development. |
| Geall, Marc | Autonomy Head of Corporate Strategy and Investor Relations (until May 2010). |
| *Gersh, Andrew* | Managing Director at KPMG. Led the KPMG financial due diligence team retained by HP in respect of the Autonomy acquisition and the KPMG team engaged by HP in October 2011 to assist HP in understanding Autonomy's closing balance sheet. *Witness for the Claimants.* |
| Goldfarb, Neil | Latin America Sales, Autonomy. |
| GOODFELLOW, CHRISTOPHER | Chief Technology Officer of Infrastructure at Autonomy. *Witness for the Claimants.* |
| Goodman, Peter | Investor Relations, Autonomy. |
| GREENWOOD, PHILIP | Autonomy Head of Connectors. *Witness for the Claimants.* |
| Guiao, Livius | Autonomy Associate General Counsel. |

| GUSTAFSSON (NÉE PRENTIS), POPPY | Autonomy European Financial Controller (from June 2009) and later Autonomy Corporate Controller. At the time of trial, coCEO of Darktrace. *Witness for Dr Lynch.* |
| --- | --- |
| *Harris, Elizabeth "Lisa"* | Autonomy's Financial Controller. Joined an Invoke Capital company as a Finance Manager in 2013. At the time of trial, a Director of Darktrace. *Witness for Dr Lynch.* |

| Haverfield, Rachel | Senior legal counsel at Autonomy. Joined Invoke Capital as General Counsel in December 2013. |
| --- | --- |
| *HOGENSON, BRENT* | CFO for Autonomy in the Americas (whistleblower whose employment was terminated in late July 2010). |
| *Humphrey, David* | Chief Technology Officer of Virage Inc. *Witness for the Claimants.* |
| Humphries, Brian | Head of HP's Corporate Development sub-team within the SCD group (until March 2011). |
| **HUSSAIN, SUSHOVAN** | Second Defendant and Autonomy's CFO (who did not give evidence). |
| Hyson, Malcolm | Chief Technology Officer, DiscoverTech. |
| Hsiao, Emily | Member of HP's Corporate Development sub-team within the SCD group. |
| Jackson, Alex | Member of the Deloitte audit team. |
| Jimenez, Antony | CEO of MicroTech. |

| *(Johnson, Andrew)* | Head of HP's Corporate Development sub-team within the SCD group. *Evidence in the US admitted as hearsay (Claimants and First Defendant).* |
| --- | --- |
| Johnstone, Ben | IT specialist, Deloitte. |
| KALBAG, SAMEER | Chief Technology Officer of Autonomy's Federal group. *Witness for the Claimants.* |
| *KANTER, ANDREW* | Autonomy Chief Operating Officer and General Counsel. At the time of trial, non-executive Partner at Invoke Capital. Part of the |

| | 'Clique' or 'Cabal'. *Withdrawn as witness for Dr Lynch.* |
| --- | --- |
| Kelly, Brian | Director, Global Procurement, MetLife. |
| Kelly, Frank | Member of Autonomy's Audit Committee. |
| *Khan, Hafeez "Daud"* | Financial analyst who covered Autonomy for Merrill Lynch (2001 to 2003) and for Cazenove (2006 onwards). *Witness for the Claimants.* |
| *King, Martina* | Head of Aurasma UK (May 2011 to May 2012). At the time of trial, was working at Featurespace, an Invoke Capital investee company. *Witness for Dr Lynch.* |
| *KNIGHT, ROB* | Member of the Deloitte audit team. |
| *KNIGHTS, RICHARD* | Deloitte audit engagement partner for Autonomy (2005 to 2010). |
| Krakoski, James (or Jim) | Autonomy sales executive selling Digital Safe. |

| Ku, Helen | Autonomy Revenue Manager. |
|---|---|
| Ladd, Beth | VP, Customer Marketing at Autonomy. |
| Lafreniere, Joanne | Planning & Strategy Manager, Bank of Montreal. |
| Lamond, Andy | Director, Realise. |
| Lane, Raymond | HP's Chairman. |
| LANGFORD, JONATHAN | Autonomy Development Support Engineer (from July 2010). At the time of trial, Service Management Director at Micro Focus. *Witness for the Claimants*. |
| Lee, Mickie | Autonomy Senior Counsel. |

| Lenschow, Raimo | Analyst, Merrill Lynch. |
|---|---|
| LESJAK, CATHERINE "CATHIE" | Executive Vice President and CFO of HP. *Witness for the Claimants*. |
| Letelier, Sergio | Director of HP's Corporate, Securities and M&A Operations team and in-house lawyer. |
| Levadoux, Jerome | Vice President in HP's Products, Information Management and Analytics group; involved in the Autonomy integration. |
| Levine, Marc | HP's Corporate Controller (from May 2012). |
| Livermore, Ann | Member of HP's Board of Directors. |

| *(Loomis, William "Bill")* | CEO and CFO of FileTek. *Evidence in the US admitted as hearsay (Claimants and Defendants).* |
|---|---|
| Louw, Gerry | Chief Information Officer, VMS. |
| Lucas, Christian | Managing Director, Morgan Stanley. |
| LUCINI, FERNANDO | Autonomy Head of Pre-sales and Chief Architect. *Witness for the Claimants.* |
| Lynch, Christopher | CEO of Vertica. |
| **LYNCH, MICHAEL** | First Defendant and CEO and Managing Director of Autonomy. |
| Lytle, Charles | Managing Director, Citibank. |
| Mackenzie-Smith, Simon | Chairman of Bank of America Merrill Lynch, UK. |
| Manners, Daniel | Director, Global PMO Manager, Deutsche Bank. |

| Mark, Robert | Autonomy Global Accounts Director. |
|---|---|
| Marovitz, Daniel | Managing Director, Deutsche Bank. |
| *Martin, Alastair "Al"* | Group Head of Autonomy's Technical and Customer Operations, EMEA & APAC. At the time of trial, VP, Technical Operations at Darktrace. *Witness for Dr Lynch.* |
| McCarthy, Michael | Autonomy Contracts Manager. |

| | |
|---|---|
| McMonigall, John | Senior member of Autonomy's Audit Committee. |
| Meier, Ed | Equity Analyst, Schroder Investment Management. |
| *Meiers, John* | Sourcing Leader in H&R Block's procurement department. *Witness for the Claimants (but not cross-examined).* |
| *MENELL, PETER* | Autonomy Chief Technology Officer. Currently head of R&D Technology at Invoke Capital. Member of the 'Clique' or 'Cabal'. |
| *MERCER, NIGEL* | Deloitte audit engagement partner for Autonomy (from May 2010). |
| Mohammadi, Rafiq | Chief Technology Officer of Interwoven; Group Chief Technology Officer of Autonomy following its acquisition of Interwoven. |
| Mooney, Michael | Senior Vice President, Field Sales Operations at Autonomy. |
| *Morland, Paul* | Financial analyst at brokerage firm Astaire Securities (July 2008 to June 2010) and at Peel Hunt (from June 2010). *Witness for the Claimants.* |
| Murali, Shailesh | Vice President, Technology Mergers & Acquisitions, Barclays Capital. |

| | |
|---|---|
| Murphy, Tony | CEO, Realise. |
| Murray, Tom | Assistant Manager, audit, Deloitte. |
| Niemier, John | Business Development Manager, Zones Inc. |

| | |
|---|---|
| *Orton, Emily* | Member of Autonomy's marketing department (2009 to 2010); Assistant to Dr Lynch (2010 to 2011). At the time of trial, Chief Marketing Officer at Darktrace. *Witness for Dr Lynch.* |
| *Pao, Frank* | CEO & President of Vidient Systems, Inc (and previously an Autonomy employee). *Witness for Dr Lynch.* |
| Pasini, Cesare | Prefect of the Vatican Library. |
| Patel, Dipan | Autonomy sales executive. |
| *Pearson, Philip* | Fund Manager at GLG Partners who invested in and traded Autonomy stock. At the time of trial, a Partner at Invoke Capital. *Witness for Dr Lynch.* |
| Perachio, Glenn | Senior Vice President of Protect, EMEA Autonomy. |
| *Pereira, Mariana* | Held roles in the marketing, R&D and sales teams at Autonomy; Director of Rich Media at Autonomy (until August 2011). At the time of trial, in the marketing department at Darktrace. *Witness for Dr Lynch.* |
| Perle, Richard | Member of Autonomy's Audit Committee. |
| Prasad, Reena | Autonomy Director, Americas Credit & Collections. |
| *Puri, Rahul* | Managing Director of Innovation and Chief Software Architect, Prisa. *Witness for the Claimants.* |

| | |
|---|---|
| Quattrone, Frank | CEO of Qatalyst Partners. |

| Robertson, Chris | Deloitte audit partner who oversaw the Autonomy Q1 2010 review. |
|---|---|
| *Robins, Harry* | Partner at Morgan, Lewis & Bockius LLP who advised Autonomy on merger control filing requirements in relation to its acquisition by HP. *Witness for the Claimants (but not cross-examined).* |
| *Robison, Shane* | Chief Strategy & Technology Officer of HP and Head of HP's SCD group. *Witness statement on behalf of the Claimants admitted as hearsay.* |
| Rothman, Ivan | Autonomy Senior Corporate Counsel. |
| Ryan, Patrick | Autonomy AVP Sales. |
| SARIN, MANISH | Senior Director in the Corporate Development sub-team of HP's SCD group. *Witness for the Claimants.* |
| Sass, Robert | Senior Vice President, North America Sales at Autonomy. At the time of trial, Managing Director, North America at Darktrace. |
| Sayad, Laila | CFO, VMS. |
| Scannell, Bill | Global Sales and Customer Operations, EMC. |
| Schultz, John | HP General Counsel (from 2012). |
| *(Scott, Joel)* | Chief Operating Officer and General Counsel, Autonomy US. *Evidence in US admitted as hearsay (Claimants and Defendants).* |

| | |
|---|---|
| *Shelley, Philip* | Co-head of Corporate Broking and UK ECM team at Goldman Sachs. *Witness for Dr Lynch.* |

| | |
|---|---|
| *(Smith, Reagan)* | Head of Bank of America's procurement team for software purchases. *Evidence in the US admitted as hearsay (Claimants).* |
| Smolek, Phil | Autonomy Senior Financial Analyst (until December 2009). |
| *(Stephan, Matthew)* | Autonomy Senior Finance Manager (2009 until early 2011). *Evidence in the US admitted as hearsay (Claimants and Defendants).* |
| Sullivan, Michael | CEO of Zantaz (July 2007 to 2009); CEO of Autonomy Protect (the archiving and litigation discovery division of Autonomy) (from 2009). *Witness Statement on behalf of the Claimants and evidence in the US admitted as hearsay (Claimants and Defendants). He gave oral evidence in the US criminal trial but not in these proceedings.* |
| Sunderwala, Meeta | Senior Director, Accounting Policies and M&A Reporting, in HP's EFR team. |
| SZUKALSKI, GARY | COO and Chief Marketing Officer of FileTek. At the time of trial, Chief Channel Management Officer at Darktrace. *Witness for Dr Lynch.* |
| Tejeda, Percy | Autonomy Director of Revenue in the Americas. |
| Truitt, Dan (brother of David and Steve Truitt) | Federal District Sales Manager, Autonomy. |

| | |
|---|---|
| *(Truitt, David)* (brother of Dan and Steve Truitt) | Founder and CEO of Microlink. Co-founder of MicroTech. Co-founder of DiscoverTech. *Evidence in the US admitted as hearsay (Claimants and First Defendant).* |
| *(Truitt, Steve)* (brother of Dan and David Truitt) | Chief Operating Officer of MicroTech. *Evidence in US admitted as hearsay (Claimants and Defendants).* |

| | |
|---|---|
| Uffelman, Andy | Managing Director, Operational Services Control, Charles Schwab. |
| Veghte, Bill | Executive Vice President, HP Software; temporarily oversaw the management of Autonomy from May to September 2012. |
| Walton, Charles "Woody" | Vice President of Technology, Federal at Autonomy. |
| WANG, ROGER | Vice President of Product Development for Digital Safe at Autonomy. *Witness for the Claimants.* |
| Watkins, Cynthia | Autonomy's Corporate Controller. |
| *Webb QC, Robert* | Non-Executive Chairman of Autonomy. At the time of trial, Chair of Luminance (another Invoke Capital investee company) and Darktrace. *Witness for Dr Lynch (but not cross-examined).* |
| WELHAM, LEE | Member of the Deloitte audit team for Autonomy (2005 to 2008); Deloitte Senior Manager on the Autonomy audit team (2008 to August 2011). *Witness for the Claimants: the only one from Deloitte.* |
| Wengryn, Peter | CEO, VMS. |

| | |
|---|---|
| Wharton, Tim | Co-founder of MicroTech.<br>Co-founder of DiscoverTech (and owned a 20% stake in Microlink, out of which DiscoverTech was spun). |
| WHITMAN, MARGARET "MEG" | Member of HP's Board of Directors (January 2011 to September 2011); President and CEO of HP (September 2011 to November 2015); CEO of Hewlett Packard Enterprise (November 2015 to January 2018). *Witness for the Claimants.* |
| YELLAND, CHRISTOPHER | Autonomy CFO (April 2012 to February 2013).<br>Autonomy Financial Controller (February 2013 to September 2017). *Witness for the Claimants.* |
| YAN, SAMUEL | Chief Architect in the Product Development team for Digital Safe at Autonomy. *Witness for the Claimants.* |
| You, Harry | EMC Executive. |
| *Youngjohns, Robert* | Senior Vice President and General Manager of HP's Autonomy / Information Management business unit (from September 2012). *Witness for the Claimants.* |
| Zanchini, Marco | Systems engineer in Autonomy's Milan office. At the time of trial, Cyber Defence Education Specialist at Darktrace. |

# APPENDIX 2

## SCHEDULE OF BRIEF BIOGRAPHICAL DETAILS OF FACTUAL WITNESSES (OTHER THAN PARTIES) AND OF VARIOUS OTHER KEY PERSONS WHO DID NOT GIVE EVIDENCE

**The Claimants' witnesses (listed alphabetically)**

*Mr Léo Apotheker*

1. Mr Apotheker started working in the software business not long after he graduated from university in 1976. In 1988 he joined SAP, which has become one of the largest software companies in the world. He started as the managing director of a small SAP subsidiary, and worked his way up, eventually becoming sole CEO of SAP in May 2009.

2. Mr Apotheker was approached by HP in August 2010. At that stage HP had recently fired its CEO, Mr Hurd, in connection with allegations about expenses. Ms Lesjak, a longstanding HP executive, had been appointed as interim CEO.

3. After he was head-hunted, Mr Apotheker wrote a paper for the Search Committee (an HP committee charged with selecting the next HP CEO) to support the hypothesis that HP needed to transform its business towards enterprise software; and it was not disputed that he was selected with that in mind. He was not a Silicon Valley insider, but SAP had a substantial presence in Silicon Valley and so he was not a stranger to it.

4. He was appointed President and CEO of HP on 30 September 2010 (to take effect from 1 November 2010). He had initially been offered the position of Chairman as well as CEO, but turned down the chairmanship. In conformity with European norms and best practice, he considered it was preferable to segregate the positions.

5. At the time of Mr Apotheker's appointment, HP was a low margin traditional hardware company employing some 300,000 people with an annual turnover of about $125 billion. His view was that it needed to evolve to provide a full technology "stack" which he described as comprising *"the hardware, software and network layers that stand between the basic infrastructure of data creation, storage and distribution and the end user of information."*

6. Mr Apotheker perceived there to be special potential value in the integration of structured and unstructured data. He recognised Autonomy as one of the market leaders in unstructured data analysis. He led HP's acquisition of Autonomy.

7. His appointment was terminated by the Board on 22 September 2011, just over a month after the acquisition had been announced.

8. Mr Apotheker was the first witness called by HP and he was cross-examined for two days. His evidence primarily concerned his perception and perspective in relation to the acquisition of Autonomy.

*Mr John Francis Baiocco*

9. Mr Baiocco was during the Relevant Period, and remains, the Managing Partner of Capax Discovery LLC, perhaps Autonomy's most favoured of its stable of 'friendly' VARs. Capax Discovery was a subsidiary of Capax Global LLC, of which Mr Baiocco was (and remains) also effective CEO.

10. Mr Baiocco gave evidence to the Grand Jury and in the US criminal proceedings against Mr Hussain. He had his own lawyer, paid for by HP.

11. Mr Baiocco retained close links with HP after the Acquisition: for example, he was appointed to the partner advisory board of HP in 2013 and Capax Discovery became a "preferred partner" of HP at about the same time. When Mr Baiocco was first interviewed by HP's lawyers in 2013 Capax Discovery was making about $15 million a year from contracts with HP.

12. He was cross-examined in these proceedings for one day. His evidence addressed the impugned VAR and reciprocal transactions to which Capax Discovery was a counterparty, including VT2, VT3, VT4, VT10, VT16, VT20, VT21, VT27, VT28 and VT34.

*Dr Sean Mark Blanchflower*

13. Dr Blanchflower joined Autonomy in 2000 as a Research and Development Engineer in Cambridge after a PhD in applied mathematics and then a year of research at Trinity College, Cambridge. From the end of 2004, his job title was Head of Research and Development. He was the leader of IDOL development, though not everyone in R&D reported to him (for example, the R&D teams in the US and in the web content management division did not report to him). He reported to Dr Menell.

14. After the Acquisition he continued working first for Autonomy and then for HP. At the time of giving evidence, he was Vice President of Engineering for IDOL at Micro Focus (which had acquired the software business of Hewlett Packard Enterprise ("HPE") in 2017).

15. Dr Blanchflower attended the trial pursuant to a witness summons. His evidence predominantly addressed technical issues, and especially (a) the development of SPE; (b) Autonomy's approach to purchasing third-party software; (c) the purchase of SAT from MicroLink (though he was not aware of the purchase at the time); (d) the purchase of StorHouse from FileTek and its use thereafter; (e) the VMS transaction; and (f) the Vidient transaction. He was cross-examined for one and a half days.

*Mr Harald Peter Ferdinand Collet*

16.     After a brief interlude at a marketing and media services company, Mr Collet
        (who graduated from Yale University in 2000) joined Oracle. He was there for
        seven years, holding the positions of Director of Global Sales Support from
        October 2005 to July 2006, and Senior Director of Governance Risk and
        Compliance from July 2006 to October 2007.

17.     In October 2007, he joined Autonomy in its New York office, as Vice
        President of Business Development. In around May 2008, he became Head of
        OEM Sales in North America.

18.     In June 2010, Mr Collett left Autonomy and joined Bloomberg LP and held
        the position of Global Business Manager for Governance and Compliance
        Products from July 2010 to August 2016 at which point he left Bloomberg and
        began a consulting practice. In January 2017, he founded a start-up company
        in the financial tech sector called Alkymi of which he was CEO at the time of
        giving evidence.

19.     Mr Collet was the author of the 'Joe Bloggs' communications (see paragraphs
        312 to 313 and 3235A to 3235C in the main body of my judgment) sent to
        various industry and financial analysts at the end of August 2011 in which he
        (and a colleague when at Autonomy, an engineer called Mr Alex Marshall
        who left Autonomy shortly after Mr
        Collet to join him at Bloomberg) sought to express concerns about the way in
        which Autonomy's OEM business was reported to the market, raising a
        number of questions that they felt HP should ask about its OEM revenues.

20.     Mr Collet was cross-examined for a full day. His evidence primarily
        concerned (a) his assessment of the true nature of Autonomy's "OEM"
        business; (b) the basis of his concerns as communicated in the 'Joe Bloggs'
        communications; and (c) his account of Dr Lynch's involvement in providing
        misleading information to a company called Lone Pine (see paragraphs 3195
        to 3207 in the main body of my judgment).


*Mr David John Duckworth*

21.     Mr Duckworth worked for HP for more than 22 years. His job title in 2011
        was Mergers, Acquisitions, Divestitures and Outsourcing ("MADO") Finance
        Integration Project Manager.

22.     He had responsibility for the integration of Autonomy's financial systems and
        processes into HP's financial accounting structure following the Acquisition.
        That involved the "mapping" of Autonomy's financial information on a
        spreadsheet showing key parameters such as (a) Autonomy's various legal
        entities to HP's company codes, (b) Autonomy's organisational structure
        compared to HP's, (c) Autonomy's product lines to HP's business areas and
        (d) Autonomy's various general ledger accounts to HP's general ledger
        accounts.

23.     His evidence addressed whether in that process he came to know of Autonomy's *"pure hardware"* sales, and he was cross-examined on that for about two hours: he denied any such knowledge.

*Mr Christopher "Stouffer" Bradley Egan*

24.     After graduating with a BA in Economics from Trinity College in Hartford Connecticut in 1991, Mr Egan worked in a sales capacity for Glaxo Pharmaceuticals. In 1995 he joined Dataware Technologies, again in a sales capacity, before moving to Autonomy.

25.     Mr Egan initially joined Autonomy Inc in March 2001 as a salesperson based in Boston and was given responsibility for managing sales on the U.S. east coast within approximately six months. He was promoted to the position of Head of Sales for the entire USA within a year.

26.     In 2003, he moved to San Francisco in California and from 2004 until 2012, Mr Egan was the CEO of Autonomy Inc responsible for Autonomy's sales activities in North and South America.

27.     Mr Egan was principally involved in almost all of the impugned VAR transactions. Towards the end of November 2017, Mr Egan entered into a Deferred Prosecution Agreement ("DPA") with the US DoJ, in which he admitted that he was part of a fraudulent scheme to deceive purchasers and sellers of Autonomy's securities about the true performance of Autonomy's business, and that this scheme involved artificially inflating Autonomy's revenues using many of the means complained about by the Claimants. The DPA obliged Mr Egan to pay $923,391 in disgorgement and interest to resolve an action brought against him by the Securities and Exchange Commission. Under the DPA Mr Egan also admitted all facts as set out in a Statement of Facts attached to it, and promised full co-operation with the US DoJ. Any departure from the Statement of Facts or other breach of the DPA would expose him to being charged for all the conduct the subject of the DPA and any other conduct. Mr Egan testified in Mr Hussain's criminal trial as part of his agreement in the DPA to cooperate with the DoJ.

28.     Mr Egan gave evidence in these proceedings via video-link from New York pursuant to a 28 U.S.C. §1782 order directing him to do so. His evidence addressed the general sales management process at Autonomy, as well as four categories of impugned transactions, namely, the VAR transactions, the reciprocal transactions, the pure hardware sales and the hybrid hosting arrangements. Mr Egan spoke to these transactions in general terms; he also spoke to a number of the specific transactions in which he had direct involvement. He was cross-examined over a video-link for three shortened days.

*Mr Andrew Keir Markham Gersh*

29.    At the time of the Acquisition, Mr Gersh was a Managing Director at KPMG LLP, the US member firm of the KPMG network. He had been working for KPMG since 1992, first in the UK and, since 1999, in the United States. He is a qualified Scottish chartered accountant, a US Certified Public Accountant, and a licensed accountant in Massachusetts and California. As already stated, at the time of the Autonomy acquisition he was a Managing Director in KPMG; he became a Partner in October 2012. Between 2004 and 2011, Mr Gersh worked on at least 50 financial due diligence engagements for HP, all of them associated with HP's M&A activity, as well as dozens for other clients. He was familiar with both US GAAP (which was his primary expertise) and IFRS.

30.    He was cross-examined for about three-quarters of a day in these proceedings. His evidence primarily related to the allegation that HP knew of Autonomy's pure hardware sales before the Acquisition, which he denied.

*Mr Christopher James Robin Goodfellow*

31.    Mr Goodfellow joined Autonomy in October 2004 as a sales engineer and became the Europe Middle East and Africa pre-sales manager. He subsequently was in the Global Accounts department: he claimed to be its Director, but this was disputed and unclear. He worked in Global Accounts until 2008.

32.    Between 2009 and 2013, he was Chief Technology Officer of Infrastructure at Autonomy. During the Relevant Period, he worked with the Digital Safe Sales Team, Digital Safe Product Development Team, the Digital Safe Operations Team and the post-sales support team for Digital Safe customers. Organisational diagrams showed him as reporting to Mr Alastair Martin (then Group Head of Technical and Customer Operations); but he insisted that in practice he reported to Dr Menell. He was senior on the technical side, but not one of Autonomy's leaders.

33.    Following the Acquisition, Mr Goodfellow became the Chief Technology Officer of HP HAVEn OnDemand and moved to Micro Focus when it acquired HPE's software business. He subsequently left Micro Focus on 28 February 2018.

34.    A witness summons was issued on behalf of the Claimants to ensure his attendance at trial. He was cross-examined for two days. His evidence related primarily to
Autonomy's hosting business, some of the reciprocal transactions and one of the VAR transactions.

*Mr Phillip Howard Greenwood*

35.    Mr Greenwood graduated from the University of St Andrews in 2000 with a degree in physics and joined Autonomy as a software developer in Autonomy's Research and

Development team based in Cambridge. While in that team, he initially worked on "fetches" also referred to as connectors which extract data from one system to another.

36.     In 2002 he moved to another software development team within Autonomy before returning in 2005 to the connectors team to become the Head of Connectors. His main report was Mr Gallagher, who in turn reported to Dr Menell. At the time of the trial, Mr Greenwood was the Connector Team Lead at Micro Focus.

37.     Mr Greenwood attended the trial pursuant to a witness summons and he was crossexamined for part of a morning. His evidence related to (a) the development of Autonomy's own *"SharePoint connector"* which enabled the extraction of data from 'SharePoint' (which is a Microsoft Office document management and storage system) and its input into another system such as IDOL, and (b) the acquisition of another 'SharePoint' connector from MicroLink. He also addressed the merits of DiscoverEngine (another SharePoint connector) which Autonomy acquired from DiscoverTech.

*Mr David Humphrey*

38.     At the time of the trial, Mr Humphrey was CTO of Rich Media at Micro Focus. From 2005 until September 2017 (when HPE sold its software division to Micro Focus) he had been CTO of Virage, Inc ("Virage"), an Autonomy group company. Virage developed and sold Autonomy group video analytics products. Until Dr Lynch left Autonomy, Mr Humphrey in theory reported to him; but in practice he reported to Dr Menell and Mr Hussain.

39.     His witness statement addressed a series of allegedly reciprocal transactions in Q4 2009-Q1 2010 (RT4 and OEM15) and Q3 2010-Q4 2010 (RT 4 and OEM 34) which are discussed in my main judgment and which related to the purchase by Vidient from Autonomy of IDOL and Virage software with funds provided by a purchase from Vidient by Autonomy of Vidient's SmartCatch software.

40.     He was compelled to attend trial by witness summons and was cross-examined for about one and a half hours.

*Mr Sameer Sadanand Kalbag*

41.     After graduating from Cornell University with a degree in Computer Science, Mr Kalbag worked at Intel Corporation, followed by Convera Corporation, the primary focus of which was on search technology.

42.     Mr Kalbag joined Autonomy in August 2007 as the Vice President of Technology of the Federal Group. Towards the end of 2009, he was appointed as Account Executive of the Federal Sales Team within Autonomy, which was responsible for sales to government agencies.

43.     In mid-2010, he became Director of Federal Sales, responsible for managing a small team in Federal Sales and then in around January 2011 he became interim Vice President of Federal Sales. In around June 2011, he was appointed Chief Technology Officer within Federal responsible for providing assistance to Federal Sales team members.

44.     Following the Acquisition, he continued to work for Autonomy and then for Micro Focus following its acquisition of HPE's software business in September 2017. He left Micro Focus in April 2018 and at the time of giving evidence worked as the President and Chief Executive Officer of Trenzai LLC, a data analytics company.

45.     Mr Kalbag was cross-examined in one day. His evidence primarily related to the Claimants' case on hosting (and in particular the aspect of it relating to e-Discovery, see paragraphs 3400 to 3448 in the main body of my judgment) and impugned VAR transactions.


*Mr Hafeez Bux Daud Khan*

46.     Mr Khan graduated from the University of Cambridge and qualified as a chartered accountant with PwC, becoming a technology analyst, initially for Merrill Lynch and then, from 2006 to 2011, Cazenove, which was acquired by JP Morgan in 2010. From September 2011 to December 2015 he worked at Berenberg, and from 2016 to early
2018, Cannacord Genuity. At the time of this trial, Mr Khan was a Vice President of Corporate Development at WANdisco, a technology company specialising in distributed computing.

47.     Having initially been bullish about Autonomy he became progressively bearish, having concluded that Autonomy was not able to sustain organic growth and was increasingly dependent on growth by acquisition. He cast doubt on the way
Autonomy presented and accounted for its organic growth. His relationship with Dr
   Lynch and Mr Hussain, originally cordial, deteriorated and he was accused of

regulatory breaches and excluded from Autonomy Earnings Calls. Autonomy sought to portray him as ill-informed and even (when he changed his Autonomy share recommendation to "sell") "corrupt".

48.     He was cross-examined about this and related matters for nearly a day. It was suggested that he had used *"non-public information"* and had tried to drive Autonomy's share price down in order to please unspecified clients with short positions by seeking to manipulate consensus, because according to one set of forecasts for Q1 2011 he had the highest revenue forecast and one of the lowest target prices. He denied this.

*Mr Jonathan Paul Langford*

49. After graduating from the University of Cambridge with an M.A. and an MSci in Biochemistry in 2007, Mr Langford joined Autonomy as a Development Support Engineer in July 2010.

50. After the Acquisition, between November 2011 to June 2013, he became a Technical Support Team Lead and then between June 2013 to September 2015 was Applications Support Manager. From September 2015 to the date of his evidence he held the position of Service Management Director, with a focus on the Digital Safe product set.

51. Mr Langford was cross-examined for part of one day. His evidence related to the Claimants' case on hosting.


*Ms Catherine Anne Lesjak*

52. Ms Lesjak worked at HP for over thirty years and at the time of the Acquisition she was Executive Vice President and Chief Financial Officer. Pending Mr Apotheker's appointment, between August and November 2010 she had served as Interim CEO. She was, as it were, HP born and bred and was very much committed to the company.

53. In November 2015, she became CFO of HP Inc. (when HP split into HPE and HP Inc) and at the time of giving evidence had stepped down from that role to become Interim COO.

54. Ms Lesjak was cross-examined over two days. The primary focus of her evidence was the impairment charge that HP announced in November 2012 after the Acquisition, and when she came to know of Autonomy's sales of hardware.


*Mr Fernando Lucini Gonzalez-Pardo*

55. After graduating with a degree in electrical engineering from the University of Kent in 1998, Mr Lucini joined an IT consultancy firm called Dataware Technologies where he held the position of Solutions Center Manager. Dataware changed its name to Leading Side and Mr Lucini remained at Leading Side until around 1999.

56. In 2000, Mr Lucini joined Autonomy working in pre-sales, Autonomy's technology selling arm whose members were known as Systems/Sales Engineers. His precise title and position within the organisation in the Relevant Period was a point of contention between the parties; but it is not disputed that during the Relevant Period, he worked

in pre-sales at Autonomy and on the technical side. It was common ground that he was of relatively high seniority amongst the technical individuals, though in describing himself as "Chief Architect" the Defendants contended that he inflated his position;  he was not one of the leaders of the organisation.

57.    Mr Lucini remained with Autonomy following the Acquisition and left HPE in 2016. At the time of his evidence he was the Managing Director of Artificial Intelligence at Accenture, a global professional services company.

58.    He was compelled to attend trial by a witness summons and was cross-examined for two and a half days. His evidence covered principally (apart from extended questioning of his own role): (a) SPE, (b) Autonomy's approach to purchasing third party software, (c) the purchase of StorHouse from FileTek and subsequent integration work, (d) the VMS transaction, (e) the DiscoverEngine purchases from DiscoverTech, (f) the MicroTech/Vatican Library VAR transaction, (g) the Prisa "*other*" transaction and the DiscoverTech/Prisa VAR transaction and (h) the Morgan Stanley Q1 2011 hosting transaction.

### Mr John Meiers

59.    Mr Meiers was employed by H&R Block, a tax preparation services company, between August 2007 and January 2015. He had previously worked for DST Output, a subsidiary of DST Systems, Inc, where his role included managing complex IT and manufacturing systems.

60.    When he joined H&R Block he was employed as an IT Contracts Project Manager. In March 2008, he became Sourcing Leader in  H&R Block's procurement department, and in that role he was responsible for negotiating all of H&R Block's in-bound software licensing agreements.

61.    Mr Meiers provided a witness statement on behalf of the Claimants, but the Defendants decided not to cross-examine him. His evidence was thus unchallenged, principally concerned his negotiation of a $2 million software deal with Autonomy, and in particular the fact that when negotiating that deal, he was not told and was unaware that just three months earlier, Autonomy had been involved in the resale of hardware by Zones Inc to H&R Block. This (unchallenged) evidence was relied on by the Claimants as further support for their case that there was no real linkage between Autonomy's hardware reselling and its software sales: see paragraphs 1159 to 1182 in the main body of this judgment.

### Mr Paul Gilmer Morland

62.    Mr Morland started working as an analyst in 1994, and began focusing on technology stocks when technology emerged as an independent sector from 1998 onwards. He started covering Autonomy in 2005 when working at Société Générale. He covered Autonomy throughout the Relevant Period as an analyst first at Astaire Securities, and then (from June 2010) at Peel Hunt. Thereafter, he was self- employed, before moving to Arden Partners in October 2014. He joined Canaccord Genuity in February 2016 where he remained at the time of the trial.

63.     Like Mr Khan he was initially bullish about Autonomy but after mid-2009 he increasingly began to question Autonomy's results and accounts, resulting in Autonomy accusing him of making a *"knowingly false accusation"* that Autonomy was *"misaccounting"*, and (falsely) suggesting he was in possession of inside information. Mr Kanter escalated this into a complaint to the FSA.

64.     Mr Morland's evidence in his witness statement was directed to explaining why he came to doubt Autonomy's accounting and especially (a) its *"organic growth"* figures, (b) its change to the way it structured its hosting contracts which *"flattered"* its true performance and accelerated receipts at the expense of longer term revenue and (c) its overly aggressive revenue recognition and its poor cash conversion rate. Mr Morland was fiercely attacked in his cross-examination over the course of a full day and it was alleged (for example) that, in bad faith, he tailored his reports to assist clients holding short positions.

## Mr Rahul Puri

65.     Between May 2010 and September 2013, Mr Puri was the Managing Director of
Innovation and Chief Software Architect at Promotora de Informaciones S.A., a Spanish media conglomerate known in these proceedings as Prisa, which was presented as the proposed end-user in the context of a VAR sale by Autonomy to DiscoverTech (see VT30 and paragraphs 591 to 707 of the Schedule of Impugned VAR Transactions).

66.     Mr Puri gave evidence about one of the "other transactions" impugned by the Claimants, a transaction between Prisa and Autonomy in Q4 2010. He also gave evidence in respect of impugned VAR transaction VT30, to the effect that (a) he had not even heard of DiscoverTech and DiscoverTech had not at any time contacted Prisa, until 2018 when he was testifying in the US criminal proceedings and (b) the software which was the subject of the VAR sale (e-Discovery software) would not have been of any interest to Prisa. Mr Puri was cross-examined in these proceedings for about one hour.

## Mr Harry T. Robins

67.     Mr Robins was at the time of the trial (and I assume still is) a partner in the New York office of Morgan, Lewis & Bockius LLP ("Morgan Lewis"), which has acted in the US for HP in connection with HP's investigation into Autonomy and the subsequent US criminal proceedings, but also advised Autonomy on US merger control filing requirements relating to its acquisition by HP/Bidco.

68.     Mr Robins provided a witness statement in which he addressed a suggestion made by Dr Lynch that on 16 and 17 August 2011 (very shortly before the acquisition was announced) Mr Kanter and Mr Chamberlain sent Morgan Lewis spreadsheets detailing Autonomy's revenue breakdown for 2009 and

2010, including hardware revenue, and that the information thus provided to Morgan Lewis is attributable to HP. Mr Robins made clear that Morgan Lewis was at that time and for that purpose acting for Autonomy and not HP, and that the spreadsheets were not forwarded to HP's antitrust advisers, Freshfields. The Defendants did not require Mr Robins to attend to be cross-examined and his evidence was not challenged.

### *Mr Shane V Robison*

69.    Mr Apotheker was assisted by Mr Robison, the Chief Strategy & Technology Officer and Head of HP's Strategy and Corporate Development Group ("SCD"). Mr Robison was in favour of the strategy to move further into enterprise software.

70.    Mr Robison had worked as a staff engineer at Evans & Sutherland, a computer graphics company before moving to Schlumberger to work on artificial intelligence in 1984. He later worked at the Advanced Technology Group at Apple, where he became the Vice President and General Manager of the Personal Interactive Electronics Division. In 1995 he joined Cadence Design Systems which produces software to design integrated circuits and chips before joining AT&T Labs as President of Internet Technology and Development.

71.    In 2000, he joined Compaq as the Chief Technology Officer and Head of Corporate Strategy. In May 2002, Compaq was acquired by Hewlett-Packard Company and he became the Chief Strategy & Technology Officer of Hewlett-Packard Company and Head of HP's SCD from mid 2002 until 20 October 2011.

72.    Mr Robison made a witness statement which was adduced into evidence under a hearsay notice. He did not attend at trial for medical reasons.

### *Mr Manish Sarin*

73.    Before joining HP, Mr Sarin had been a Director in Merrill Lynch & Co's Technology Investment Banking Group. He has an MBA from Columbia Business School.

74.    He joined HP in the SCD team and became a Senior Director in February 2010. He reported to Mr Andy Johnson (HP's Head of Corporate Development) who in turn reported to Mr Robison. (Mr Robison reported to Mr Apotheker.)

75.    At the time of giving his evidence, Mr Sarin had left HP and was Vice President of Proofpoint Inc, an enterprise security company in California.

76.    Mr Sarin was cross-examined over two days. His evidence principally concerned his role in the due diligence process and in the SCD's assessment of

Autonomy's results and in assessing and valuing Autonomy for the purpose of assisting HP's leadership.

## Mr Michael Sullivan

77.　Mr Sullivan co-founded SteelPoint Technologies Inc ("SteelPoint") which specialised in the management of unstructured information and litigation support services. SteelPoint was founded in 1993 and was acquired by Zantaz Inc in 2004. Mr Sullivan was made Senior Vice President of Operations and Services of Zantaz, responsible for the delivery of all software and services to customers. In 2009, following the acquisition of Zantaz by Autonomy in 2007, he became and remained CEO of
Autonomy Protect, the archiving and litigation discovery division of Autonomy.

78.　After the acquisition of Autonomy by HP in October 2011, he held the position of Senior Vice President of Information Management and Governance, responsible for Autonomy's SaaS business.

79.　From 1 September 2017, upon HPE's software business being spun out and merged with Micro Focus, he oversaw the information management and governance product portfolio at Micro Focus, reporting directly to the CEO. In November 2017, he left Micro Focus to become CEO of a different company.

80.　Mr Sullivan gave evidence in the US criminal proceedings but (being resident outside the jurisdiction) he was not willing to, and did not, appear before me. His witness statement was adduced as hearsay evidence. No order was sought for video-link evidence.

## Mr Roger Wang

81.　Mr Wang began working as a program manager for Verity Inc, a search technology development company, in 2002. In 2008, following the acquisition of Verity Inc by Autonomy in 2005, he was promoted to Vice President of Product Development for Digital Safe, reporting to Dr Menell.

82.　He left Autonomy in or around January 2013. At the time of this trial Mr Wang worked as a Senior Product Manager at BitGo Inc.

83.　Mr Wang was cross-examined for two days. His evidence related principally to the Claimants' case in relation to hosting and the impugned reciprocal transactions with FileTek.

## Mr Lee Peter Welham

84.　Mr Welham joined Deloitte in 2002 and qualified as a chartered accountant in 2005. From late 2005 to 2011, he was a member of the Deloitte audit team for Autonomy. Through the period of 2008 to August 2011, he was a Senior Manager on the Autonomy audit team. He was made a Partner at Deloitte in 2016.

85.     Mr Welham was the only person from Deloitte who gave evidence in these
        proceedings. He was cross-examined for a full three days in relation to all
        Deloitte's audit work in the Relevant Period.


*Ms Margaret ('Meg') Cushing Whitman*

86.     Ms Whitman is a graduate of Princeton and Harvard Business School. She had
        held executive roles at a number of large companies including Walt Disney
        and Proctor & Gamble. She also served as CEO of eBay from 1998 to 2008.
        Between 2009 and 2010 she ran unsuccessfully for Governor of California.

87.     In January 2011, she joined the Board of Directors of Hewlett-Packard
        Company before succeeding Mr Apotheker as President and CEO in
        September 2011.

88.     Following Hewlett-Packard dividing into Hewlett-Packard Enterprise
        Company and
        HP Inc in November 2015, she became CEO of HPE, stepping down on 31
        January
        2018. She also served as Chair of the Board for HP Inc from November 2015 to
        July 2017.

89.     Ms Whitman was cross-examined over two days. Her evidence was directed
        towards
        Dr Lynch's criticisms of the way HP handled the integration of Autonomy
        after the Acquisition and the Defendants' case that when the write-down was
        announced HP had no basis for its amount, and the exercise was one of the
        new board abdicating its responsibility and seeking to shift any blame on HP's
        side to Messrs Apotheker and Robison.


*Mr Samuel Hald Yan*

90.     Mr Yan joined Zantaz Inc in October 1998 as a Systems Architect and
        Director of Development for Digital Safe. Following Autonomy's acquisition
        of Zantaz in July
        2007, he was appointed Chief Architect of the Product Development Team for
        Digital Safe. In the Relevant Period, Mr Yan was one of the lead engineers in
        the Digital Safe Product Development team, reporting to Mr Wang.

91.     Following the spin-off of HPE's software business to Micro Focus in
        September 2017, he remained in the Product Development team.

92.     Mr Yan was cross-examined over two days, principally in respect of the
        Claimants' allegations relating to Autonomy's hosting business, and the
        theoretical and practical viability of moving Digital Safe on-premise.

*Mr Christopher Henry Yelland*

93.     Mr Yelland was Autonomy's CFO from April 2012 until February 2013. After
        graduating from the University of Warwick he joined Arthur Andersen and

qualified as a Chartered Accountant. He worked there for three and a half years before becoming a tutor at the Financial Training Company training people to become accountants. In 1995, he joined the Rover Group. He moved to Compaq in January 2000.  In April 2004, after Compaq's merger with HP, he was appointed Finance Manager of HP's UK software and enterprise[518] storage and servers business. In 2007 he became the Finance Director of HP's Personal Systems group in the UK and Ireland. In September 2010, he was promoted to Finance Director of HP's EMEA

Software business, and in April 2012, after the Acquisition, he was promoted to be

CFO in Autonomy. From February 2013 to September 2017, he was Autonomy's

Financial Controller. After Micro Focus had acquired HPE's software business (effective on 1 September 2017), he became Vice-President of Finance at Micro Focus, with responsibility for group Financial Planning and Analysis.

94.     Mr Yelland's witness statement primarily related to his experience as CFO of Autonomy from April 2012, including the "rebasing" exercise conducted in June- July 2012 and its enquiry into Autonomy's historical financial performance, preparing various revised business forecasts, and preparing ASL's 2011 statutory accounts and restated 2010 financial results.

95.     Mr Yelland was cross-examined for more than a day. His cross-examination focused principally on his perceptions of the "rebasing" exercise.

*Mr Robert Harold Youngjohns*

96.     After graduating from the University of Oxford, Mr Youngjohns worked for IBM for

17 years before working at Sun Microsystems Inc as Executive Vice-President of Global Sales and later Executive Vice-President of Strategy. Mr Youngjohns then held the position of President and CEO of Callidus Software before joining Microsoft Corporation in 2007 as President of Microsoft North America.

97.     On 17 September 2012, he joined Autonomy as Senior Vice President and General Manager of HP's Autonomy/ Information Management business unit. In May 2014, he was promoted to Executive Vice President and General Manager of HP Software.

98.     In December 2016, Mr Youngjohns left HP Software and has since founded his own investment and advisory firm with a focus on software and services industries.

---

[518] HP's "enterprise" business focused on the provision of hardware (such as servers, network infrastructures and storage devices), software, and services to large commercial businesses.

99.     Mr Youngjohns' evidence was directed towards Dr Lynch's allegations that HP mismanaged the integration of Autonomy. He was cross-examined for about half a day.

**The First Defendant's witnesses (listed alphabetically)[519]**

*Mr Donald Leonard Avant, Jr*

100.    Mr Avant only joined Autonomy in mid-July 2011, less than a month before the Acquisition was announced. His title when he joined was Group Head of Operations and his evidence was that, as such, he oversaw a group of 400 to 450 people which had *"responsibility for all Autonomy functions in the post-sales space, including professional services, training, and technical support services."* He continued to work for Autonomy for five years thereafter. Since November 2017, he has been employed by Darktrace, in which he is a shareholder.

101.    His witness statement discussed (a) Autonomy's provision of services using third party partners; (b) the utility of a licence to use and run Digital Safe on-premise; (c) what he called *"HP Autonomy Culture",* and what he perceived to be the
        *"dysfunction [which] grew during the time of HP's ownership"*; and (d) his *"observations"* on Autonomy's agreement with Prisa. However, and unsurprisingly given that he had not been working for Autonomy at the time and had had no active role, his 'evidence' was largely interpretation and surmise.

102.    Mr Avant was cross-examined for just over an hour. There was no reference to or reliance placed on Mr Avant's evidence in the Defendants' closing submissions.

*Mr Eloy Avila*

103.    Mr Avila joined Autonomy in January 2004 as a sales engineer. He became Chief
        Corporate Architect in September 2009, before being promoted to Chief Technology
        Officer (Americas) in May 2010, and subsequently became the worldwide CTO in
        November 2010, a position he held until June 2013, when he became the Vice President of Worldwide Pre-Sales for Big Data, a division within HP software.

---

[519] Of these, none provided a witness statement in the first round of evidence.

He held this role until he left HP in September 2015. He is currently employed by

Darktrace as its CTO for the Americas, a position he has held since April 2018.

104.   After being promoted to worldwide CTO, Mr Avila reported directly (and regularly) to Dr Lynch. Before then he reported to Mr Lucini and Dr Menell (more often, the latter). His witness statement covered (a) Autonomy's general rule or philosophy of preferring to develop its own software rather than buying in third party software; (b)

SharePoint connectors; (c) the practical feasibility of moving Digital Safe on-premise; (d) SPE; (e) Filetek Storhouse; (f) VMS; and (g) post-acquisition and corporate culture.

105.   Mr Avila was cross-examined on all these issues and gave evidence over the course of two days.

*Ms Michele (previously Anthony) Bettencourt*

106.   Ms Bettencourt (who before and when working for Autonomy was known as Anthony) joined Verity Inc in 1995 as a Vice President in its sales department, was promoted to the position of President and ultimately served as its CEO from 2003 to December 2005 (when Verity Inc was acquired by Autonomy). Ms Bettencourt worked within the Autonomy group from January 2006 until October 2009, focusing first on the integration of Verity Inc and thereafter on various acquisitions and potential acquisitions. Ms Bettencourt headed up the integration process of (a) Zantaz Inc when Autonomy bought Zantaz Inc in July 2007, and (b) Interwoven Inc after its purchase by Autonomy in March 2009, before leaving Autonomy in December 2009.

107.   Ms Bettencourt provided a witness statement on behalf of Dr Lynch. Its main object was to address the doubts raised in the witness statements for the Claimants casting doubt on the development costs and substance of SPE: her evidence set out her awareness of and involvement in Autonomy's plans to grow its structured data capability, SPE having been developed for that purpose. However, Ms Bettencourt accepted that she was not personally involved in the development of SPE or the acquisition of other technology to develop Autonomy's move into structured data.

108.   Ms Bettencourt also explained that she had been involved in preliminary approaches to two potential targets for Autonomy, namely TIBCO and Informatica, and before she left Autonomy had been *"working to improve relations between the companies with a view towards a possible merger or acquisition."* The Claimants chose not to cross-examine her.

*Mr Jonathan William Bloomer*

109.   Mr Bloomer was formerly CEO and CFO at Prudential Plc, having trained and qualified as an accountant and auditor at Arthur Andersen where he became a partner

in 1987 and remained for 20 years. Whilst at Prudential Plc, he was appointed the Chairman of the Practitioner Panel at the Financial Services Authority. He then became a partner at Cerberus European Capital Advisors and founder and CEO of Lucida Plc from 2006 to 2012. He had served on the audit committee at both RT Group plc and Hargreaves Lansdown plc. He became a non-executive director of Autonomy in August 2010.

110.    In September 2010, Mr Bloomer became the first permanent chair of Autonomy's Audit Committee.  Prior to Mr Bloomer's appointment: (i) there had not been a permanent chair of the Committee, but its members had instead served as chair on an *ad hoc* basis; and (ii) none of the members of the Committee was an accountant or had any formal accountancy training,[520] which was unusual: Mr Bloomer said that the majority of Audit Committee chairs in listed companies would be qualified chartered accountants.

111.    Between his appointment and the acquisition of Autonomy by HP, Mr Bloomer chaired four meetings of the Committee held on the following dates: (i) 18 October 2010, in relation to Q3 2010; (ii) 28 January 2011, in relation to FY/Q4 2010; (iii) 19 April 2011, in relation to Q1 2011; and (iv) 25 July 2011, in relation to Q2 2011.  The other members of the Audit Committee over this period were Mr Frank Kelly and Mr John McMonigall.

112.    During his tenure as chair, meetings of the Audit Committee were also attended by Mr Hussain, Mr Kanter, Mr Chamberlain, Deloitte and occasionally Mr Webb QC.  In his witness statement, Mr Bloomer stated that Mr Mercer "*and occasionally more junior members of the Deloitte team*" attended the Audit Committee meetings but, in fact, the minutes show that Mr Welham attended three of the four meetings chaired by Mr Bloomer.

113.    In his evidence about the Audit Committee meetings, Mr Bloomer addressed hardware sales and revenue recognition, VARs, Reciprocals, COGs, account receivables and provisioning. He was cross-examined for three-quarters of a day.

*Ms Vanessa E. Colomar*

114.    Ms Colomar joined Autonomy as Head of Communications in August 2011. She thus had no relevant evidence to give in respect of the pre-Acquisition period. The focus of her evidence was thus on HP's statements to the market in November 2012.

115.    Ms Colomar resigned from Autonomy in late May 2012 and shortly thereafter joined Invoke Capital as a Partner and its Head of Communications and Investor Relations.  Invoke Capital's website described her as a "founding partner" but she denied that she was, insisting that she *"joined Invoke in September when it was fully formed"* and was not involved in setting it up. She

---

[520]  In addition to Mr McMonigall, the previous members of the Committee were Mr Barry Ariko and Mr Richard Perle.  Mr Ariko was a former executive of several computer and software companies. Mr Perle was former US Assistant Secretary of Defense.

also sits on the boards of Darktrace and Luminance. Throughout the course of the trial, she was responsible, along with the Brunswick Group, for Dr Lynch's PR in relation to these proceedings.

116.    Ms Colomar was cross-examined for one hour. Her evidence concerned Dr Lynch's Counterclaim, and is of very limited relevance since in light of my conclusions on the main claim the Counterclaim has fallen away.

117.    Of suggested relevance to the main claim, she was taken to documents to show that, in the lead up to the 20 November 2012 announcement by HP, Dr Lynch was making preparations "*in case we really get blamed*", and he requested that Ms Colomar prepare a "*red secret list*" for that eventuality.  Ms Colomar told me that she had no idea what Dr Lynch had meant by "*red secret list*", but nor could she recall whether she had sought clarification from Dr Lynch as to what he was referring.  The Claimants submitted that this is implausible: Dr Lynch had instructed her to produce the list and she would have acted on that instruction, either producing the list or, if she had been under any uncertainty, seeking his clarification.  That seems to me to be credible: but I need make no finding. Ms Colomar was almost invariably in court during the trial; but she was a peripheral witness.

*Mr Stephen John Cooke*

118.    Mr Cooke joined Slaughter and May in 1982, became a partner in 1991, headed its

 Merger & Acquisitions practice from 2001 to 2016 and at the time of the Trial was its Senior Partner. Slaughter and May was approached by Autonomy in October 2010 (on the introduction of Mr Webb QC) and Autonomy confirmed its intention to appoint the firm as defence counsel in the event of a potential takeover. Autonomy engaged Slaughter and May to advise on the HP acquisition in July 2011. Mr Cooke led the team.

119.    In his witness statement on behalf of Dr Lynch, Mr Cooke confirmed that (a) if Autonomy was seeking a buyer for the company in late 2010 and early 2011, he was not aware of that; (b)  he was not aware of Autonomy seeking to prevent specific information going to HP; (c) he was not personally involved in the drafting of either a non-disclosure agreement (dated 3 March 2011) or a draft exclusivity agreement (signed by HP on 29 July 2011), but he was aware that Slaughter and May advised the removal of terms sought by HP to impose a requirement for Autonomy to provide all information requested by HP, so that in the result Autonomy never agreed to grant such unrestricted access (which he confirmed also would *"as well as being completely unacceptable to nearly all sellers, be highly unusual in a UK takeover bid")*. He also confirmed that he was not directly involved in the due diligence process.

120.    The Claimants did not require Mr Cooke to attend for cross-examination, and so his witness statement was not challenged.

*Ms Poppy Gustafsson (whose maiden name was Prentis)*

121.   Ms Gustafsson began working at Deloitte in September 2004 and was assigned to the
       Autonomy audit soon after she joined. She left Deloitte in April 2008. She joined Autonomy's finance department in June 2009, working on the costs side of the business, before transitioning to work on the revenue side at the end of 2009. She left Autonomy shortly after its acquisition by HP in 2011, and co-founded Darktrace in
June 2013. At the time of her evidence she was co-CEO of Darktrace with Ms Eagan.
       She was also a substantial shareholder in Invoke, with shares worth around $15 million.

122.   Ms Gustafsson accepted that she remains a "*good friend*" of Mr Hussain's, whom she regards as a "*mentor*". She suggested that she had "*no personal loyalty*" to Dr Lynch; but she accepted that he was "*the founding money behind*" Darktrace, a company she set up and of which she was, at the time of her evidence, co-CEO. Indeed, she maintained that she was motivated to "*come and tell [her] side of the story*" because she did not think that Dr Lynch's "*perspective has always been fairly represented*". She was sometimes too obviously an advocate for the Defendants.

123.   She gave evidence in relation to (a) the conduct of Deloitte's audits and relationship with Autonomy; (b) her perception of the purpose and strategic rationale of hardware sales, and the reasons why no separate disclosure was considered necessary;  (c) her understanding of Autonomy's transactions with VARs, and the issues raised about revenue recognition; (d) her understanding of SPE (she was not involved in its technical development, but her evidence was that she recalled it being talked about and celebrated) and its shipment to VMS; (e)  her involvement in accounting for Autonomy's hosting transactions, Autonomy's purpose in adopting the so-called "hybrid model" and her emails, on which she was cross-examined, suggesting that her view was that Autonomy should *"steer clear of upfront payment"*  unless it achieved accelerated revenue recognition; and (f) her experience of processes within Autonomy for the collation and monitoring of time sheets and labour costs.

124.   Ms Gustafsson was cross-examined for a little less than one and a half days.

*Ms Elizabeth "Lisa" Jane  Harris*

125.   Ms Harris qualified as a chartered accountant with KPMG in 1987. She commenced employment with Autonomy on 1 April 2005, working on costs accounting in the finance team. From August 2005, when Mr Steve Chamberlain joined Autonomy, she reported to him. She was made Group Financial Controller in 2009. She worked for Autonomy in the same role after the Acquisition but left in February 2013. After three months gardening leave she left to work for an Invoke Capital company.

126.    Her evidence covered (a) Autonomy's finance department functions and structure; (b) Deloitte's role and the audit process as she perceived it, and her impression of their work; (c) her awareness of Deloitte's investigation of the allocation to 'Sales and Marketing' of the costs of loss-making hardware sales (in which she was not herself involved); (d) her awareness of but separation from VAR sales notwithstanding having to approve payments of MAF; (e) her involvement with the sales team in paying staff expenses, commissions and salaries; (f) her perception of work postAcquisition and on the various exercises to integrate Autonomy's accounting systems and processes into HP's and (in the case of the *"rebasing exercise"*) to find any errors and (as Ms Harris put it) *"prove things were incorrect"* and (driven by Mr Yelland) *"to look for any, and every, little mistake";* and (g) her view that a number of people within HP (including Mr Yelland and Mr Duckworth) were aware of hardware sales from the ledger codes.

127.    She was cross-examined for (in all) about one day. Her cross-examination also covered an allegation against her that after she had determined to leave, but whilst still employed by Autonomy, she copied on to a USB drive/ pen drive copies of Autonomy's and HP's confidential documents.  She shared this with Mr Hussain because she considered that the documents held on the pen drive showed that HP knew of the hardware sales. She was also cross-examined on an attendance note of an interview of her by HP's lawyers which she claimed was inaccurate (which she addressed in a second witness statement also).

*Ms Martina Ann King*

128.    Ms Martina King had worked at Yahoo and then pursued a *"plural career"* until she joined Aurasma UK (an Autonomy group company) in May 2011 as its Head. She resigned in May 2012 and subsequently joined Invoke Capital.

129.    Her witness statement addressed: (a) her experience of working with Dr Lynch (about whom she spoke very highly) and in the work environment he cultivated and (b) HP's interaction with Aurasma  (which she maintained HP did not understand or seek to foster and support, and with which HP struggled).

130.    Ms King was cross-examined for a little less than one hour.

*Mr Alastair James Martin*

131.    Mr Martin joined Autonomy in September 2004 as a sales engineer, having graduated from the University of Sheffield with a 1st class degree in Computer Science. His role became increasingly managerial, and by the time of Autonomy's acquisition by
HP/Bidco his title was Group Head of Technical and Customer Operations, EMEA & APAC which in practice meant that he oversaw Autonomy's sales engineers in EMEA and Asia. He described this role as *"technical customer facing"*, which

he intended to mean that he *"worked a lot on the support side, helping customers with their technical issues."* He was not in product development but asserted familiarity with *"the technical language"* such that he *"could liaise between Autonomy's developers and our customers."* After leaving his role at HP in 2015, he joined Darktrace. He gave evidence for Dr Lynch.

132.   Mr Martin's witness statement addressed a broad variety of the claims against Autonomy. His evidence was in summary that, contrary to the Claimants' case (a) it was not accurate to say that Autonomy never bought software from third parties (and he provided examples of such purchases to the contrary) (see paragraph 2417(3) of the main body of my judgment); (b) there were good reasons why there was customer demand for a connector made by MicroLink which Autonomy acquired from it, and for a product called DiscoverPoint Engine which Autonomy acquired from DiscoverTech; (c) it was not the case that software sold by Autonomy to Tottenham Hotspur plc was of no use to it until Autonomy provided a full 'solution' (cf paragraph 3744 in the main body of my judgment); (d) Prisa made full and substantive use of software it acquired from Autonomy (see paragraph 3767(7) and footnote 473 in the main body of my judgment); (e) SPE was a real and valuable product for which there was real customer demand and which was incorporated  as a module of the IDOL platform (see paragraphs 3623 to 3624 of the main body of my judgment); and (f) Digital Safe was capable of being used by a customer on-premise and there was no difficulty in training Sales Engineers to assist customers to do so (though see paragraph 3377(5) in the main body of my judgment). He also described the differences in the working ethos of Autonomy compared to that of HP.

133.   There was considerable overlap and some repetition between Mr Martin's evidence and that of Mr Avila (to the point that certain passages were identical).  The Claimants submitted that in cross-examination (over the course of just over an hour) Mr Martin *"was frequently willing to speculate on matters beyond his ken, but was unwilling to accept the obvious (for example, that either he or Mr Avila had copied the other's witness statement)."*

*Ms Emily Orton*

134.   After graduating from Cambridge University in 2009, Ms Orton started working at Autonomy in September 2009 as a graduate European Marketing Executive in the marketing department in London. From early 2010, for around 18 months, she worked as Dr Lynch's assistant, before returning to the marketing department in various roles.  By the time she left Autonomy in the summer of 2012, she had become the European Marketing Manager. She then joined Invoke Capital as a Senior Associate. She later became Head of Marketing at Darktrace, and then Darktrace's Chief Marketing Officer. She has been rewarded by around 1.5% of the equity in Invoke Capital, and shares and options in Darktrace in *"life changing"* amounts.

135.   Ms Orton's witness statement addressed (a) her perception of Autonomy's workplace culture and contradicted Mr Youngjohns' witness statement

disparaging it; (b) her experience of working for Dr Lynch, and her perception of Mr Hussain (though she did not work directly for him); (c) her understanding more generally of Dr Lynch's role and activities, which she described as involving him spending some 50% on *"public facing matters"*, leaving little time to deal with internal operational matters, and his relationship with line managers such as Mr Lucini. She mentioned that *"Operationally, while in the office, Dr Lynch was more inclined to be involved with marketing strategy...particularly ensuring the messaging was correct."* She also offered her evidence that *"After the acquisition, to my knowledge there were no tangible steps to integrate the companies."*

136. She was cross-examined for part of an afternoon predominantly on (a) the extent of
Dr Lynch's control of expenses and day to day matters and his way of working, and (b) her perception that HP's senior management barely involved themselves in Autonomy after the Acquisition.

*Mr Frank Pao*

137. Mr Pao, who had formerly been employed by Autonomy, joined Virage as its CEO (see also the short description of Virage's CTO, Mr Humphrey, above) before it was purchased by Autonomy in 2003, remained there for a little over four years, and then left to become Chief Executive Officer and President of Vidient Systems, Inc ("Vidient"). He held that role for approximately three years. Vidient (which designed and developed search and surveillance products) went out of business in November 2010.

138. Mr Pao's evidence was in response to Mr Humphrey's evidence and addressed a series of transactions which the Claimants impugned as reciprocal and which Mr Pao had made on behalf of Vidient.

139. Mr Pao was cross-examined over the course of one morning. The Claimants accepted his evidence on the negotiations that led to the allegedly reciprocal transactions (where consistent with the contemporaneous documents), whilst rejecting and inviting the Court to disregard what they described as his *"speculation and attempts to insulate the Defendants."*

*Mr Philip Michael Pearson*

140. Mr Pearson, a good personal friend of Mr Hussain, initially worked at UBS and then managed a technology hedge fund at GLG Partners ("GLG") (one of the largest hedge funds in Europe at the time), where he worked from late 2001 to the summer of 2015. He began following Autonomy in 1999 (while still at UBS) and continued to do so at GLG. GLG invested in Autonomy and made at least £20 million from HP's acquisition. He became a partner at Invoke in May 2017, and at the time of giving evidence sat on the board of

two of its investments: Darktrace (a company in which he also has a personal shareholding) and Featurespace.

141.    His witness statement addressed: (a) how Autonomy was perceived by analysts and the market; (b) methods of valuation (and EPS v DCF models); (c) the relevance of organic growth and the valuation of Autonomy; (d) how disclosure of hardware sales would have affected the perception and valuation of Autonomy; (e) his understanding of "OEM derived revenues" and the value placed on them (his thesis being, contrary to the rest of the evidence, that OEM revenue was a less valuable stream, though when cross-examined he conceded this was his personal and not a market view); and (f) market perception of the constitution of Autonomy's IDOL Cloud revenue. Some of his evidence appeared to be in the nature of opinion evidence, often without reference to supporting evidence or documents.

142.    He was cross-examined over the course of a morning.


*Ms Mariana Mato Machado de Paiva Pereira*

143.    Ms Pereira joined Autonomy in September 2008 as a Marketing Executive, an entry level role in the marketing department. In her short (4-page) witness statement she described her primary role as having been product marketing, including supporting the demo team by producing short marketing videos. She worked with the research and development team and the sales team during the period 2008 to October 2009. She then moved to San Francisco as the director of 'Rich Media'.

144.    She resigned from Autonomy in September 2011 and moved to Brazil, freelancing for a time until she was hired by HP Brazil in 2012 for a few months, before she left to study for an MBA. After obtaining her MBA degree she worked at Heinz and then started her own company. She then joined Darktrace's marketing department in September 2017 at the request of Ms Eagan (Autonomy's Chief Marketing Officer), with whom she had worked when at Autonomy.


145.    The purpose of her evidence was to respond to the evidence of Dr Blanchflower and Mr Lucini concerning the development of SPE and to explain her role in that respect. This came down to having produced a video to demonstrate the product's capabilities and also having worked (indirectly) on its launch. She felt able to say that IDOL SPE *"was a genuine product which followed the normal path of development…"*. She was cross-examined for less than 30 minutes. The cross-examination confirmed that she had little direct involvement (even, for example, in the press releases) in SPE, and none at all before September 2009. She was a peripheral witness; the Claimants submitted that the decision to call her simply highlighted the failure to call Ms Eagan.


*Mr Philip John Shelley*

146.   Mr Shelley was the co-head of Corporate Broking at UBS for several years
prior to September 2010, and then joined Goldman Sachs in December 2010
as co-head of their combined Corporate Broking and UK ECM[521] team. Whilst
at UBS he covered a range of clients as corporate broker, including Autonomy.
UBS continued in its role as Autonomy's corporate broker (sharing that role
with Citibank) after Mr Shelley left; but in around May/June 2011, Goldman
Sachs was appointed as Autonomy's third corporate broker. Mr Shelley left
Goldman Sachs in May 2015 and joined Barclays in June 2015 as Vice
Chairman of European Banking. He left Barclays in
February 2018 and founded his own company, Arlington Capital Markets,
Ltd., which (he explained) *"advises companies on how best to communicate
their strategy and proposition to potential investors."* Mr Shelley has no
ongoing business connections with Dr Lynch.

147.   Mr Shelley's witness statement contained a useful analysis of Autonomy's
shareholding constituency (and he noted especially that some 60% of its shares
were held by its top 20 shareholders) and addressed (a) his view of how the
market regarded Autonomy (largely positive with a belief in the potential of
IDOL for sustained market penetration, but with a particularly vocal negative
constituency too); (b) his perception of Autonomy's approach to reporting
(which he regarded as generally transparent); (c) his views on the 'negative
analysts' (especially Mr Morland and Mr Khan); (d) his reaction on learning
subsequently of the extent of Autonomy's hardware sales (he said he was not
*"shocked or astonished"*); (e) his view that the constitution of Autonomy's
OEM sales was not a particular area of interest for analysts and investors; and
(f) his lack of any recollection of any market questions or discussions
regarding the composition of revenues from hosting deals included in IDOL
Cloud.

148.   He was cross-examined for just over half a day. I have dealt with points
emerging in my judgment. The Claimants pointed out that the Defendants did
not refer to Mr Shelley's evidence at all in their closing submissions.

*Mr Gary Gerard Szukalski*

149.   Mr Szukalski worked for FileTek from January 1986 until August 2000, then
for Verity (where he continued after its acquisition by Autonomy at the end of
2005) until 1 January 2009 when he re-joined FileTek as its President.

150.   His witness statement addressed allegedly reciprocal transactions with
Autonomy whereby FileTek purchased Autonomy software and Autonomy
purchased FileTek's StorHouse software. He also addressed a reciprocal VAR
transaction with Autonomy for end-user USDVA.

---

[521] European Capital Markets.

151.  The Claimants made a number of points in support of their contention that *"Mr Szukalski's witness statement was not entirely satisfactory."* Although Mr Szukalski stated in his witness statement that he had *"read the witness statement of Stouffer Egan"* and purported to comment on certain paragraphs in Mr Egan's statement, it emerged in cross-examination, however, that Mr Szukalski had not been provided with a copy of Mr Egan's witness statement prior to signing his own witness statement, and therefore had not read it. Although Mr Szukalski initially appeared to say that he was given excerpts from Mr Egan's witness statement to comment on, he later clarified that he had not read the witness statement *"until fairly recently"* and so *"didn't read these witness statements prior to putting together my witness statement"*. Rather, someone from Dr Lynch's legal team had sought to give Mr Szukalski the gist of what was stated in Mr Egan's witness statement. Mr Szukalski also was not shown the transcript of the testimony of Mr Loomis (FileTek's CEO and CFO) in the US criminal proceedings before signing his witness statement, even though Mr Szukalski's statement was presented as part of Dr Lynch's reply evidence (served in the supplemental round), by which time the Claimants had already put in a hearsay notice in respect of Mr Loomis' testimony. Furthermore, it emerged during cross-examination that, prior to signing his witness statement, Mr Szukalski was not shown any contemporaneous documents to refresh his memory, apart from the single email cited in the statement itself. The Claimants submitted that the unsurprising result was a witness statement that was inaccurate in material respects, and needed to be corrected during examination-in-chief. It failed faithfully to convey the reality of Mr Szukalski's recollection of events, as it emerged during his oral evidence.

152.  Mr Szukalski was cross-examined for just short of a day and a half. His depiction in the course of cross-examination of FileTek's role as being that of a *"fulfilment partner"* with no real role or intended participation in any onward sale to an end-user was relied on by the Claimants. Indeed, although Mr Szukalski was called by Dr Lynch, the Claimants invited me to attach *"very significant weight to the oral evidence of Mr Szukalski."*

*Mr Robert Stopford Webb QC*

153.  After a successful career as a barrister, Mr Robert Webb QC was General Counsel at British Airways Plc (1998 to 2009) and Rolls Royce Plc (2012 to 2015). He also held non-executive directorships and chairman positions with various British companies, including The London Stock Exchange (2001 to 2015), the BBC (2007 to 2012) and Argent Ltd (2009 to 2012). He became non-executive Chairman of Autonomy in mid2009 and continued in that position until the Acquisition. At the time of the trial he was Chairman of Darktrace and Luminance (amongst other roles).

154.  Mr Webb's witness statement responded to (and contradicted) Mr Robison's evidence that in 2011 Autonomy's management was trying to find a buyer for

the company, and also provided (a) his perception of the culture at Autonomy; (b) his impression of the way Mr Hogenson's concerns were addressed (his impression being that *"Mr Hogenson was being given the opportunity to say everything he had to say…"*); (c) his understanding of the extent and purpose of Autonomy's sales of hardware; and (d) his assessment of the views of analysts and how Autonomy addressed their questions.

155.    The Claimants chose not to cross-examine Mr Webb.


**The following individuals did not provide any evidence but played key roles**


*Mr Stephen Chamberlain*

156.    Mr Chamberlain was an ex-Deloitte Chartered Accountant. He joined Autonomy as the Vice President of Finance in August 2005. He was based in Cambridge, where the main group finance function was based. Ms Anderson (ex-Deloitte), Ms Gustafsson (ex-Deloitte), Ms Harris (ex-KPMG) and Mr Stephan (ex-Deloitte) all worked in the finance department and reported to Mr Chamberlain. All finance teams in group companies elsewhere also reported to him. He reported to Mr Hussain.

157.    Mr Chamberlain was described by Mr Welham in his witness statement as his *"main point of contact throughout the audit and review processes"* and the *"first point of contact for many requests from the Deloitte audit team for information."* In his first witness statement, Dr Lynch described the Finance Department as being *"headed by Stephen Chamberlain"*, though when cross-examined Dr Lynch suggested that Mr Hussain (as CFO) headed the department and Mr Chamberlain *"would be the number two."* It seemed to me that Mr Chamberlain had day to day control of the department, whilst Mr Hussain oversaw Autonomy's operations, with Dr Lynch: Mr Chamberlain was the energetic *aide de camp* to the general staff. He was (with Mr Hussain and Mr Kanter) directly and closely involved in the due diligence process.

158.    He left Autonomy in March 2012. Following his departure, he was appointed as the COO of Darktrace. Dr Lynch has maintained personal contact with him and is paying his legal fees in the ongoing US criminal proceedings.

159.    The Claimants described Mr Chamberlain as being *"all over the documents"*. He was part of the core management team and what I have called the "clique" or "cabal". I would have been interested in and greatly assisted by his evidence. He did not provide any.

160.    The explanation offered was that he had been indicted by the US DoJ and also charged by the FRC in this country with acting dishonestly and/or recklessly (as well as failing to act with competence and due care). Neither had happened in September 2018 when the first round of witness evidence was served. Dr Lynch told me he did not know whether there was any reason why Mr Chamberlain could not have given a statement.

*Ms Nicole Eagan*

161.   Ms Eagan was Chief Marketing Officer at Autonomy and (as Dr Lynch acknowledged) a member of Autonomy's core management team. She was one of the individuals from Autonomy who helped Dr Lynch set up Invoke Capital. She was, at the time of her witness statement, co-CEO (with Ms Gustafsson) of Darktrace and on its board.

162.   She had direct knowledge concerning the sales and marketing of SPE whereas the individual called to speak to that (Ms Pereira) did not.

163.   I would have expected her to be called as a witness; and, as in the case of Mr Kanter, she provided a witness statement and was included as a witness in every version of the trial timetable prior to late August 2019, slated to be cross-examined for one day. Not until a letter from Clifford Chance dated 22 August 2019 was it indicated that Ms Eagan (again like Mr Kanter) would not be giving evidence at trial. Dr Lynch suggested that (like Mr Kanter) Ms Eagan declined to appear in light of the continuing investigations being made of them by the US DoJ.

*Mr Brent Hogenson*

164.   At the time of Autonomy's acquisition of a company called Interwoven in 2009, Mr Hogenson was its Vice-President of Finance.  Following that acquisition, Mr
Hogenson became CFO for Autonomy in the Americas and was based in Autonomy's office in San Jose.

165.   Mr Hogenson did not give evidence in these proceedings. However, his contemporaneous expressions of concern especially about the way Autonomy accounted for its sales to VARs (and in particular, Capax Discovery) were well documented, as was how Dr Lynch dealt with them. The *'Hogenson Episode'*, as the Claimants referred to this aspect of the matter (see paragraphs 2232 to 2289 in the main body of this judgment, also led to revealing exchanges with the FRRP/FSA (see paragraphs 2290 to 2336 *ibid.*).

166.   Autonomy and Mr Hogenson concluded a settlement agreement (executed on 19 November 2010) pursuant to which Mr Hogenson was paid $750,000. One of the terms of the settlement required Mr Hogenson to deliver an affidavit, which he did. The affidavit was calculated to give the impression that Mr Hogenson had recanted.

167.   Read closely, however, Mr Hogenson preserved his position: the most he stated was that he did not consider himself an "*expert*" in IFRS, as distinct from US GAAP, that he "*would not have had access to the complete books and records of the company*" and that, as a result, he "*would not have been in a position to reach conclusions on all of the matters that I raised*" and understood that "*some of the matters I raised may have been wrong or immaterial*" (emphasis added).

*Mr Andrew Kanter*

168.   Mr Kanter is admitted to practice law in California and in his early career was an associate at US law firms in California and London.

169.   He was employed by Autonomy Systems Limited a wholly owned subsidiary of
       Autonomy Corporation Plc from July 2000 to May 2012. From 2001, he served as
       Autonomy's Chief Operating Officer and General Counsel and in 2012 as Chief Operating Officer only. He was closely involved in many of the impugned transactions. I have described him as one of the members of the 'clique' or 'cabal' through whom Dr Lynch and Mr Hussain effectively ran the Autonomy group.

170.   Mr Kanter formally resigned from Autonomy in May 2012 and helped to form Invoke Capital as a founding partner in July 2012. He remains employed by Invoke Capital.

171.   Mr Kanter provided a witness statement on behalf of Dr Lynch and it was envisaged that his cross-examination might take four days. I would have been assisted by his evidence. As it was, following Dr Lynch's evidence, Dr Lynch's solicitors gave notice that Mr Kanter's lawyers had informed them that he would not be testifying and they had decided not to seek to compel his attendance (though his address was given as being a residential address in London in his witness statement).

172.   Reports in the press suggested that Dr Lynch's team had made the decision not to call Mr Kanter (or Ms Eagan). On the other hand, Dr Lynch suggested that Mr Kanter (like Ms Eagan) declined to appear in light of the continuing investigations being made of them by the US DoJ.  In any event, he was not called and his witness statement was withdrawn without further explanation.

*Mr Richard Knights*

173.   Mr Richard Knights was the Deloitte audit engagement partner in respect of the 2008 and 2009 financial statements for Autonomy as well as for the quarterly review work during that period. He shared partner responsibility for the first quarter 2010 work with Chris Robertson. He was involved in all the auditing decisions and discussions in that period.

174.   However, Mr Knights gave no evidence in these proceedings, even though a Settlement Agreement the Claimants entered with Deloitte in April 2016 gave the
       Claimants unusual control over him as a potential witness: cl.6 gave them the right (inter alia) to require Mr Knights to prepare for and attend interviews, sign statements and attend voluntarily as a witness at this trial. I would have been assisted by his evidence. The Claimants' explanation for not calling him

is that he was involved in the disciplinary proceedings brought against him by the FRC, which included allegations that Mr Knights breached the fundamental principle of integrity.

## Dr Peter Menell

175.   Dr Menell worked as Autonomy's Chief Technology Officer from 2004 to 2010. He became Autonomy's Chief Research Officer ("CRO") in November 2010. He was based in Cambridge.

176.   Dr Menell was one of the members of what I have called "the clique" or "the cabal". He signed off technological justifications for a number of Autonomy's reciprocal purchases (which I have determined were largely spurious).

177.   At the time of trial Dr Menell worked for Invoke Capital. He was one of those involved in the setting up of Invoke Capital.

178.   Dr Menell did not give evidence during the trial. I would have been assisted by his evidence. When Dr Lynch was asked if there was a good reason for the failure to call Dr Menell as a witness, he alluded to a "*personal*" matter which should not be referred to in open Court and then said, "*I guess you would call it a medical issue*". This was never further explained or substantiated.

## Mr Nigel Mercer

179.   Mr Mercer worked for Deloitte and took over responsibility as audit engagement partner on the Autonomy account in around May 2010 and was responsible for Q2 2010 through to Q2 2011.

180.   Mr Mercer was as such involved in the audit decisions in that period. His name again appeared on many documents and he was referred to repeatedly in the course of the evidence; and he was involved in all the important accounting decisions at the time. Mr Bloomer gave evidence about his discussions with Mr Mercer before and at Audit Committee meetings. Mr Mercer too was required by the Settlement Agreement to cooperate with the Claimants and, if they wished, to provide them with a statement and appear voluntarily at the trial.

181.   However, he gave no evidence in these proceedings: the Claimants cited the same reason that the FRC had brought disciplinary proceedings against him, though the allegations against him did not include any breach of the fundamental principle of integrity.

## **APPENDIX 3**



**APPENDIX 4**

*Chart 1: Reported Revenue in each Quarter of the Relevant Period*



**Chart 2: Impact of undisclosed pure hardware revenue and revenue claimed to have been recognised improperly**



## *Chart 3: Revenue performance relative to market expectations*



## *Chart 4: Overview of yearly revenues in the Relevant Period*



**APPENDIX 5**



**APPENDIX 6**

**THE APPROVED FINAL JUDGMENT [2022] EWHC 1178 (Ch) WAS HANDED DOWN ON 17 MAY 2022 . IN THE CASE OF ANY CONFLICT BETWEEN THAT APPROVED JUDGMENT AND THE SUMMARY OF CONCLUSIONS SET OUT BELOW AND PROVIDED ON 28 JANUARY 2022, THE APPROVED JUDGMENT PREVAILS.**

    (1) ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY CORPORATION LIMITED)

    (2) HEWLETT-PACKARD THE HAGUE BV (AS SUCCESSOR TO HEWLETT-

### PACKARD VISION BV)

### (3)  AUTONOMY SYSTEMS LIMITED

### (4)  HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC

-v-

### MICHAEL RICHARD LYNCH AND SUSHOVAN TAREQUE HUSSAIN

### SUMMARY OF CONCLUSIONS OF MR JUSTICE HILDYARD - 28TH JANUARY 2022

*This summary*

1.  I will summarise my key findings in the statement I am about to make.  This is a public statement.  However, I will also deliver by 8pm today to the parties' legal representatives, but only to them, a copy of my draft judgment setting out much more fully the reasons
    for my conclusions.  **That draft will remain at all times strictly embargoed.**

2.  Neither that draft, nor any part of its contents, is to be made available to persons other than those on the lists notified by the parties' legal representatives to me, and agreed by me.  **Any breach of the embargo would be a contempt of court**.  My final judgment will be handed down after the usual process of checking and correction is completed.  As the judgment is of considerable length, that will take longer than usual.  That is the principal reason for this summary of my conclusions today.  As with any summary, it

    may not entirely capture what the much longer document is intended to convey.  If there is any conflict between this summary and my judgment as finally delivered, my judgment will prevail.

3.  Even this summary of the draft is not short. Copies can be made available.  But I do not wish to cause unnecessary suspense.  I will start by saying that the Claimants have substantially succeeded in their claims in these proceedings.

Quantum will be determined in a later judgment, but I would anticipate that, although substantial, it will be considerably less than claimed.

## *The proceedings*

4.      These proceedings relate to acquisition ("the Acquisition") for approximately $11.1 billion in cash of the entire issued share capital of Autonomy Corporation Limited ("Autonomy") by a special purpose vehicle called Hewlett Packard Vision BV, which was incorporated in the Netherlands for the purpose of the Acquisition . I will refer to the acquisition vehicle as "Bidco". By a merger in 2018, all of the assets and liabilities of Bidco were transferred to the Second Claimant.

5.      The Acquisition was declared wholly unconditional on 3 October 2011, and completed on 5 January 2012.

6.      The fallout from the Acquisition has spawned not only these proceedings, but also at least two sets of criminal proceedings in the Northern District of California, USA. One has led to the conviction of the Second Defendant (hereafter "Mr Hussain"), for wire fraud under US legislation, and he has been imprisoned. He could not attend this trial. The First Defendant, (hereafter, "Dr Lynch") has been indicted in a further set of criminal proceedings in Northern California, in respect of which the US authorities now seek to extradite him to face trial there.

7.      All of the assets and liabilities of Autonomy, including all claims it has against the Defendants, were transferred to the First Claimant in 2017.

8.      The real bidder and acquirer, through Bidco, was Hewlett Packard Company ("HP"). HP was the ultimate holding company in the Hewlett Packard group, one of the first companies to set up in Silicon Valley and since then a household name.

9.      Autonomy was and is an English company. Autonomy acted as a holding company for a group of companies, all in the business of infrastructure software ("the Autonomy group").

10.     Autonomy was founded in 1996.  It was spun out of a company called Cambridge
        Neurodynamics, which was an early venture into using "machine learning" to
        develop software techniques which Dr Lynch had explored in his PhD thesis at
        Cambridge University and his subsequent research fellowship in "adaptive pattern
        recognition".

11.     Autonomy, and in particular its core product called IDOL, was the creation of Dr
        Lynch.  IDOL is an acronym for Intelligent Data Operating Layer.  IDOL was the
        core technology at the heart of nearly all of Autonomy's software.  IDOL
        technology was focused on the analysis of unstructured data.

12.     Put shortly, using IDOL technology, computers could make sense of unstructured
        data.  There are two types of data: structured and unstructured.  Structured data is
        found in spreadsheets or in prescribed fields in a database.  When data is entered
        into a database it is easily searchable.  Unstructured data is data that is not
        contained in the prescribed fields.  Most data is unstructured.  Books, newspaper
        articles, websites, voice recordings, videos and indeed, most forms of
        communication comprise unstructured data.  Unstructured data is obviously much
        more difficult for computers to interpret and analyse.  In 2009, the vast majority
        of computer software could only process structured information.   It was
        Autonomy's ability, using IDOL technology, to handle unstructured information
        that set it apart.  HP chose barely to acknowledge this in the course of the
        proceedings, but IDOL was, in words attributed to Meg Whitman, who became
        CEO of HP, "almost magical"

13.     In consequence, by the beginning of the period to which the contested accounting
        information related, Autonomy had grown from a small start-up into a market
        leader in enterprise technology, especially in the field of unstructured data
        analysis.  It went public in 1998, with an initial listing on the EASDAQ.  It was
        admitted to the official list of the LSE in November 2000.  It joined the FTSE 100
        in 2008.

14. The Autonomy group was highly profitable.  It generated annual revenue of about $900 million, collected all the cash it reported, and (as an illustration) held cash reserves of $1.1 billion at the close of 2010.  Its customers included blue-chip companies in every sector.  In 2011, based on market capitalisation, it was the largest British software company.

15. On the other side of the Atlantic, HP was a giant company, with an annual turnover of $130 billion, but it was in the doldrums.  Its focus and reputation had remained in hardware, where margins are very tight.  A new CEO, Mr Apotheker, wished to change this.  He was wanting to effect what he called "transformational change" by the acquisition of a software company to drive a reorientation of HP towards high margin software.  Software margins can be well over 60%.

16. However, when, together with other changes in HP's business, the Acquisition was announced, the markets reacted badly.  Just over a month later Mr Apotheker was removed.  The Defendants' case is that the claim was "manufactured" to cover and justify a change of corporate mind, and to cast the Defendants as scapegoats for what in reality is buyer's remorse coupled with management failings.  The Claimants' case is that they were fundamentally misled.

### *Brief summary of the basis of each Claimant's claim*

17. Before giving a brief summary of the various claims, I would note some matters of terminology:

  17.1. Throughout this summary, unless stated to the contrary, I use the term "the
  Claimants" as a shorthand to denote the Claimant making the particular claim.  The Claimants do not in reality make any claims jointly.  I should also clarify that in terms of describing the acquirer, I use the descriptions HP and Bidco interchangeably.  I shall explain why later by reference to an issue in the case which was called the '*Bidco point*'.

  17.2. My references to "Autonomy" in the context of the various impugned

transactions are by way of short-hand.  In the context of an impugned transaction the reference is intended to denote (unless otherwise stated) whichever of the Autonomy group companies was the contracting party.

17.3.  References to the "Defendants" are to whichever of the two of them is alleged to have been implicated in wrongdoing.  I have sought to identify them individually when issues arise as to that individual's knowledge or involvement.

On almost all other matters, Mr Hussain adopted Dr Lynch's arguments.

18.  I shall now very briefly summarise the claims.  The Claimants' essential complaint in respect of the Acquisition is that they were induced into making the Acquisition by dishonest statements and omissions in Autonomy's published information, and other representations made personally by the Defendants.  The Claimants have in these proceedings accused both Defendants of fraud.

19.  There are also other claims which do not relate to the Acquisition, but to alleged breaches of duty on the part of the Defendants whilst directors or shadow directors of Autonomy group companies.

### *The First Claimant's claim*

20.  By far the largest of the claims is brought under Schedule 10A of the Financial Services and Markets Act 2000 ("the FSMA claim").  The gist of the FSMA claim is fraud on the part of the issuer (Autonomy) in respect of statements or omissions in its published information on which the Claimant relied in making an investment decision.  It is claimed that "*persons discharging managerial responsibilities within the issuers*" ("PDMRs") knew those statements or omissions to be untrue or misleading, or to amount to the dishonest concealment of a material facts.  (An issuer's "published information" is specially defined but for present purposes the ordinary meaning it conveys will suffice.)

21.  The FSMA claim depends on establishing first that Autonomy was liable (as issuer) to Bidco, and second, accordingly (as explained below) that the Defendants were liable to Autonomy.

22.    It is not disputed that both Defendants were, for the purposes of the FSMA claim, PDMRs within the meaning of Schedule 10 A of FSMA (and previously section 90 A (4) before it's amendment).  The basis for the issuer's liability is fraud on the part of at least one

PDMR.

23.    It may at first blush seem surprising that the claimant in the FSMA claim is the First Claimant, ACL Netherlands BV, which is the successor to Autonomy. Autonomy might appear to be suing in respect of its own fraud. The explanation is that its claim is in the nature of what is sometimes called a "dog leg claim". It is to recover from the Defendants the loss that Autonomy suffered by having (voluntarily) accepted liability for a claim brought by Bidco against it to recover its losses in having been induced to enter into the Acquisition.

24.    The amount of accepted liability by Autonomy to Bidco is the sum of $4.55 Billion USD.

That is therefore the principal sum which the First Claimant claims from the Defendants.

25.    The reason for the "dog leg" structure of the claim is that under Schedule 10A of FSMA, only the issuer of published information is liable to persons induced to make investment decisions in reliance on  dishonest statements or omissions in that published information.  The position was the same under the equivalent provision of FSMA, section 90 A (3) which applied until 30 September 2010 and which Schedule 10A replaced.  But a claim by HP against Autonomy would be of no benefit to HP since HP owned Autonomy. What HP/Bidco needed was recourse against the Defendants.  Crucially under FSMA, an issuer can seek to lay off its own liability by suing key management persons called PDMRs on the basis that they were responsible for, or at least had knowledge of, the falsities.

26.    To enable HP/Bidco to sue the Defendants, the following steps were taken.

   **26.1.**    HP/Bidco notified its claim to Autonomy.

26.2.    Controlled by HP, Autonomy (whose assets and liabilities are now held by the First Claimant) has admitted liability to Bidco (whose assets and liabilities are now held by the Second Claimant).  The Claimants have accepted that this admission does not bind the Court.  That liability has to be determined.

26.3.    Autonomy then blamed and sued the two Defendants, who are both admitted to

be PDMRs, for the loss.

27.    No objection in principle was made by the Defendants to the 'dog-leg' nature of the claim, although every part of its substance is contested.  The Defendants 'case is that Autonomy had no liability to Bidco and should not have submitted to its claims.

28.    Bidco's FSMA claim was thus founded upon allegations that, when proceeding with the Acquisition, HP and therefore Bidco reasonably relied on Autonomy's published information, which contained untrue and/or misleading statements and/or dishonestly concealed material facts which were wrongly omitted from the published information.

### The Second Claimant's claim

29.    The Second Claimant claims an aggregate principal amount of  $420 million against Dr Lynch and Mr Hussain for false representations which it claims were made by them to HP/Bidco knowingly and/or recklessly and/or without reasonable belief in the truth thereof, and which they claim induced the Second Claimant to purchase shares in Autonomy from the First and Second Defendants.  Those false representations include reaffirmations of the false statements within the published information.

30.    The damages are claimed pursuant section 2(1) of the Misrepresentation Act 1967 and/or the tort of deceit.

### The Third and Fourth Claimants' claim

31.     The Third and Fourth Claimants claim against the Defendants for direct losses suffered by them in loss-making transactions which they claim Dr Lynch and Mr Hussain caused them to enter into in breach of their fiduciary duties or employment contracts.

32.     These claims do not arise out of the Acquisition, but out of the Defendants' management conduct. The losses occasioned by those transactions are estimated by the Third and Fourth Claimant to amount to $76.1 million:

33.     In the case of Dr Lynch, the claim is pursued against him as shadow director or assumed fiduciary of Autonomy Systems Limited (hereafter "ASL") and as an officer of Autonomy Inc, pursuant to the Companies Act 2006.

34.     In the case of Mr Hussain, the claim is pursued against him as director of ASL under the

Companies Act 2006 and under his contractual and fiduciary duties as an employee of ASL in respect of the Fourth Claimant. Those losses include those of another group subsidiary Zantaz Inc ("Zantaz"), the cause of action to which was assigned to Autonomy Inc on 31 October 2014. This is pursued against Mr Hussain on the basis of breach of his fiduciary duties as a director and officer of Zantaz.

### The Defendants

35.     Dr Lynch was the Director of Autonomy from the time of its incorporation in 1996 up until 30 November 2011. Throughout the period with which this litigation is concerned, he was the driving force and leading figure within Autonomy.

36.     Mr Hussain was the Autonomy Group's Chief Financial Officer from June 2001 until

30 November 2011 and was a director of Autonomy from 1 June 2003 until 30 November 2011.

### *The fraud alleged*

37. The fraud alleged, which underlies the legal heads of claim arising out of the Acquisition (the FSMA claim, the direct fraud and/or Misrepresentation Act claims, as distinct from the breach of duty claims for transactional losses) consisted of the publication of information to the market which was known by the Defendants to be false.

38. The allegation was based on (a) the allegedly dishonest description of Autonomy as being a "*pure software company*" when in fact it undertook and had become accustomed to inflating what appeared to be the revenues of its software business by undertaking substantial hardware sales and (b) the allegedly dishonest presentation of its financial performance, which did not disclose (and instead disguised) improper practices which Autonomy adopted to boost and accelerate revenue.

39. The Claimants contended that all this resulted in Autonomy being in fact a considerably less valuable enterprise than it appeared on the basis of its published information.

40. These alleged improper practices included:

    **40.1.** artificially inflating and accelerating Autonomy's revenues;

    **40.2.** understating Autonomy's costs of goods sold by characterizing such costs as

    sales and marketing expenses so as to protect gross margins;

    **40.3.** misrepresenting Autonomy's rate of organic growth; and

    **40.4.** misrepresenting the nature and quality of Autonomy's revenues as well as

    overstating its gross and net profits.

Approved Judgment                                                                    HC-2015-001324
Mr Justice Hildyard

*Financial Services and Markets Act claims*

41.   In the FSMA claims, it is common ground that the Claimants need to make good
      their case at each stage, ie the liability of Autonomy, and the fraud by the PDMRs
      .

42.   They have accepted also that each of Dr Lynch and Mr Hussain will not be liable
      except in respect of misstatements or omissions by the issuer about which he
      himself knew. It is not sufficient for the Claimants to demonstrate that the
      transactions or the way that they were accounted for was improper (the first limb).
      They need also to prove personal knowledge and dishonesty in respect of the false
      accounting on the part of the Defendants as PDMRs (the second limb).

43.   As far as Bidco is concerned, the Defendants contended that no liability was owed
      to it because no representations were made to it, and it placed no reliance on any
      statements made.  This is the *Bidco point* to which I have referred earlier.  I have
      found that, if the necessary elements are made out, Bidco (and therefore the
      Second Claimant) have a valid claim (both under FSMA and in respect of direct
      fraud and Misrepresentation Act 1967 claims against the Defendants).

44.   I have accepted the Claimants' argument that the fact that it was HP which claims
      to have been influenced by Autonomy's published information (and specific
      representations) and that it was HP which undertook due diligence, does not mean
      that Bidco cannot satisfy this part of the reliance test.  For the purpose of the
      acquisition, HP can be treated as the controlling mind of Bidco, and HP's reliance
      can be treated as Bidco's reliance.

*Direct Fraud and/or Misrepresentation Act 1967 claims against the Defendants*

45.   The claims for fraudulent misrepresentation and/or under section 2(1) of the
      Misrepresentation Act 1967 are direct claims against the Defendants: they are
      based on personal liability, not on the liability of the issuer.

46.    Specific representations are averred against the Defendants which in many cases traverse the same territory as the FSMA claims.  The quantum of those claims is much lower than the FSMA claims: the damages sought relate only to loss attributable to the shares and share options which the Defendants themselves each held and sold to Bidco.  The pleaded quantum of this loss is $420 million.  Any sum recovered under this head of claim will be in the alternative to the FSMA claim.  There cannot be double recovery.

47.    A point which may be of general interest is that it is no defence to a FSMA or a fraud claim that the claimants had the means of discovering the truth.  No defence of contributory negligence is available.  Thus, even if (though I have made no finding that it was) HP's due diligence were considered to be rushed and deficient, and HP might have been expected to unearth and probe further into matters about which complaint is now made, that would not be a defence.  It would be beguiling but wrong to think that the answer could be "caveat emptor". Of course, had I found that HP was in fact aware, before the Acquisition, of the matters of which complaint is now made, that would be different, for in those circumstances it could not say that it had reasonably relied on what
it saw and read.  But I have found that it was not actually aware and that its reliance was reasonable.

### *Breach of Duty Claims brought By Autonomy Companies Against the Defendants*

48.    The claims for transactional losses based on breaches of fiduciary and employee duties stand on a different footing.  They do not arise in consequence of the Acquisition (except in the sense that they would almost certainly not have been brought if the Defendants still directed Autonomy).  They are claims for direct losses suffered by Autonomy Inc, Autonomy's main operating company in the US, incorporated in 1996 (now the Fourth Claimant) and another group subsidiary called Zantaz as a result of the Defendants' breaches of duty in causing the relevant subsidiary to enter into the impugned transactions without regard to the interests of that subsidiary.

49.   The Claimants accept that in the ultimate quantification of loss, they must give credit for a recovery of $45 million made in a settlement of related claims (against Autonomy's auditors), after deducting the cost of such claims and any tax payable in respect of the settlement sum.

### Factual basis: the FSMA and direct fraud and / or Misrepresentation Act claims

50.   In relation to the first two of the three legal heads of claim that I refer to above (that is to say, in relation to the FSMA and direct fraud and Misrepresentation Act claims), the factual basis of the claims relate to six areas of Autonomy's business and accounting. These claims, each of which is substantial, are very briefly described below.

**50.1.**   The "**hardware case**" relates to the purchase and resale by Autonomy (usually
at a loss) of "pure" hardware (in broad terms, hardware unaccompanied by any Autonomy software) in quantities (of over $100 million). The Claimants allege that these transactions were never disclosed to the market that by boosting apparent revenue, they gave a false impression of the performance of Autonomy's business. The Claimants say that they belied its presentation in its published information as a *pure software company.* The hardware case also raises issues as to (a) whether a proportion of the cost of the sales were improperly accounted for as marketing expenses so as artificially to increase gross margins, and (b) whether Deloitte, who approved Autonomy's accounting treatment of the sales, were misled as to the true purpose of the hardware sales.

**50.2.**   The "**reseller case**" or "**VAR case**" relates to 37 transactions between Autonomy (or in some cases, Autonomy Inc or Zantaz) and a small group of value-added resellers. The Defendant treated these transactions as sales giving rise to revenue which could be and was recognised immediately in Autonomy's accounts. The Claimants contended that this simply interposed a reseller between Autonomy and a true customer, and that these were not in substance true sales at all. The only true sale was

to an end-user, if one eventuated.  In many instances no end-user sale did eventuate, giving rise to a difficulty which I explain later.  The Claimants' case is that in each VAR sale, the VAR was only a passive placeholder with no further participation expected or permitted of it after the VAR sale.  Thus, the VAR sales were, in effect, devices to accelerate recognition of revenue in Autonomy's accounts, with the intended effect of misrepresenting its performance.

50.3.   The "**reciprocal transactions case**" relates to certain transactions with the VARs which are described below, and what the Claimants alleged were backto-back transactions with friendly counterparties.  It is claimed that Autonomy purchased from the counterparty software or other goods or services that Autonomy did not need, in order to fund the purchase by that counter party of high margin software from Autonomy.   The Claimants contend that these reciprocal, or round-trip transactions, also were contrived with the dishonest purpose of artificially boosting apparent high margin software sales.  It is said that this had the effect of giving an exaggerated depiction of the success of Autonomy's core business.

50.4.   The "**hosted case**" relates to transactions between Autonomy (or Zantaz) and existing customers.  Under these transactions, Autonomy agreed to forego future recurring revenue from the provision of hosted archiving services (which was a substantial and lucrative part of Autonomy's business) for monthly (or other periodic) fees in return for the customer paying a one-off and heavily discounted capital sum for a licence to use Autonomy software outside the hosted environment.  The licence was alleged to be illusory, and its issue and sale was said to be for the dishonest purpose of treating it as akin to sale of goods so as to justify the immediate (that is at the transaction date) recognition of the sale proceeds as revenue.  Again, it was alleged that the intended effect was artificially to boost apparent revenue in the period in question.

50.5.   The **"OEM case"** relates to the presentation in the narrative part of Autonomy's accounts of information about the revenue from its OEM

business, variously described as "*OEM*", "*OEM derived*" and latterly "*IDOL OEM*".  The Claimants' case is that revenue so presented would be taken in the market to have been generated by a transaction with an Original Equipment Manufacturer ("OEM") for Autonomy software to be embedded in the OEM's hardware. Autonomy would in return receive royalty payments on all their sales of such hardware (and thus a recurring revenue stream). The Claimants say that in fact Autonomy included in what was compendiously described as the *"OEM Metric",* revenues from one-off sales of software licences to customers which were not OEMs under contracts which did not provide for royalties or any other recurring revenue.  The Claimants did not impugn the transactions themselves but contended that it was misleading and dishonest to include the latter revenues within the OEM metric.  The Claimants claim that this gave the false impression of a valuable recurring category of revenues, and thereby dishonestly misrepresented the quality and reliability of Autonomy's revenue and earnings.

50.6.    The "**Other Transactions case**" relates to an amorphous collection of four sets of transactions entered into in late 2010 and early 2011 by ASL, Autonomy

Spain SL and Autonomy Inc (and which I refer to as the "Other Transactions").  The Claimants' case in respect of three of those transactions is that what was sold was not simply a piece of software purchased together with separately charged additional services.  They say that it was in fact a composite 'solution' of which the provision of services was an integral part. The Claimants alleged that it was wrong to recognise revenue at the point of sale (as Autonomy had done) and that revenue recognition was required to be deferred until the delivery of a fully functioning product had been concluded, or at least until some subsequent stage in the installation of the software for the customer had occurred, enabling its use as a working solution. The fourth transaction raised an entirely separate and singular issue about whether the calculation of the *"fair value"* of the licence sold (to a company called Iron Mountain) was correct, which also determined whether revenue

from the transaction had been correctly stated or overstated by Autonomy.

***Factual basis: the breach of duty claim for transactional losses***

51.   The third legal head of claim was the breach of duty claim for transactional losses. This relates to four categories of transaction: (i) loss-making "pure hardware" sales; (ii) VAR transactions where a marketing assistance fee ("MAF") was paid to the VAR; (iii) alleged reciprocal; transactions and VAR transactions involving a reciprocal element and (iv) Schedule D hosting transactions.

52.   In Schedule 12 of the Re-Re-Amended Points of Claim ("Schedule 12"), the Claimants identified a number of the hosting lump sum transactions (set out specifically in Schedule 12D).  Autonomy Inc, the Fourth Claimant, was the contracting party for most of these transactions.  Zantaz was the contracting party on three out of four of the Schedule 12D hosting transactions, and also for some of the MAF payments, and reciprocal transactions.   ASL, as well as being the company within the group to which losses arising from these transactions were transferred (but not assigned),  was also the original contracting or paying party in respect of some of the MAF payments and reciprocal transactions. Zantaz assigned to Autonomy Inc all of its rights, title to and interest in, amongst other matters, any claims, rights and causes of action that Zantaz had against third parties, and notice of such assignment was given to the Defendants on 27 March 2015.

***Findings***

53.   In summary, my findings in relation to each of the heads of claim are as follows:

***Findings: the FSMA and direct fraud and / or Misrepresentation Act claims***

**The hardware case**

54.   The purpose of the hardware selling strategy was to meet market expectations of revenue maintenance and growth, by misleading the market as to the true market

position of Autonomy.  These loss-making transactions were not commercially justified on any basis.  The justifications advanced by the Defendants were no more than pretexts to increase stated revenue in the accounts.  The strategy was not for the purpose of raising software revenue sales.  That justification was a pretence, fashioned principally for the audit committee and Deloitte, who would not have approved the accounting treatment without the pretence.

55.   Both concealment of the hardware sales and their true cost in Autonomy's accounts and other published information were necessary because revelation of the Autonomy's use of hardware sales, and the erosion of gross margin would have nullified their true purpose.  This would have exposed that Autonomy's software business was not generating the accelerating revenue and profits which the market thought it was, and which heavily influenced its price.

56.   In my judgment:

56.1.   The hardware reselling programme was conceived, expanded and implemented

in order to enable Autonomy to cover shortfalls in software revenue by selling hardware and including the revenue without differentiation in revenue shown in the accounts as generated by Autonomy's software business.

56.2.   To succeed, the hardware reselling had to be concealed from the market, but

sufficiently revealed to Autonomy's auditors and audit committee to secure their apparently fully informed approval of the company's accounts.

56.3.   The imperative that the reselling should be concealed from the market required

a variety of accounting devices which had to be presented in such a way as to secure the approval of the auditors and the audit committee.  In

particular, their approval had to be secured to treat the costs of the hardware reselling programme, not as Costs of Goods Sold ("COGS"), which would have eroded gross margin and encouraged both analyst and market inquiry and concern, but instead as Sales and Marketing expenses which had no such adverse effect on key investment parameters.

56.4.   The means by which this difficult balancing act was achieved are set out in my

judgment. Suffice it to say that the auditors and audit committee were persuaded to regard the purpose of all hardware sales as being to generate revenue and new orders for the software business, and to account for hardware costs accordingly.

56.5.   The strategy also required that the contribution of hardware reselling revenues

to overall revenues should be disguised or concealed, and that again the auditors and audit committee nevertheless being satisfied that such disclosure as was given was sufficient. That balancing act also was successfully achieved.

56.6.   The purpose of the hardware reselling strategy/programme was dishonest, and

the way it was accounted for depended on its dishonest presentation.

56.7.   The Defendants were well aware of this.

56.8.   Although I doubt that this justifies the quantum of loss in the amount claimed in respect of it, in terms of liability the Claimants' hardware case has been established.

57.   The Claimants reasonably relied on the truth of what was said about the revenue in the accounting material and were induced to buy Autonomy for $11.1b.

58.   These facts satisfy both limbs of the FSMA claim and also give rise to liability on the part of both Defendants to the Claimants in respect of the direct fraud and/or Misrepresentation Act claims, and for breach of duty as employee and/or directors owed to the Autonomy companies in embarking on the hardware selling strategy.

**The reseller or VAR case**

59.   Sales to VARs enabled Autonomy to recognize income before any sale to an end
       user. This enabled Autonomy to make good shortfalls in software business
       revenues relative to market forecasts.  Dr Lynch and Mr Hussain kept a very
       careful watch over revenues, especially towards the end of a quarter when
       Autonomy would have to post its results.

       If such a shortfall became apparent, a VAR sale would be arranged, usually on
       the same day, to cover it, with no questions asked.  Almost all the impugned
       VAR sales were to a small group of "friendly" VARs.

60.   Although the "VAR buyers" accepted they were legally bound by the terms of the
       contracts, the impugned VAR transactions had no commercial substance.  They
       were a means by which Autonomy could maintain the appearance of meeting
       revenue targets at the end of a quarter.

61.   In truth there was a pattern which emerged very clearly from all of the impugned
       VAR transactions.  They were all large, entered into at the very end of the quarter,
       after no investigation by the VAR of the liability they were legally undertaking.
       The VAR would often not have the  financial ability to meet the stated payment
       obligation out of its own resource, and in reality there was never any expectation
       or intention that it should do so, there never being any expectation on the part of
       either Autonomy or the VAR that the contractual terms would ever be enforced.
       There was a clear understanding, and it was invariably the fact,  that the VAR
       would play no part in seeking to procure any contract with the end-user.  If
       payment were ever required from a VAR, it would come either from the end-user,
       or if no contract were made with the end-user, payment would be waived or
       another transaction would be generated.  This would involve Autonomy providing
       the VAR with the means to meet any obligation it owed under the VAR
       transaction.  No VAR was ever to be left "on the hook" or "carrying the bag".

62.    The purpose of the strategy was to ensure that Autonomy continued to appear to be a company which met its forecasts out of the sales of IDOL and related software and thereby maintained its share price.  The VAR strategy became of additional importance and increased in volume when the hardware selling strategy underwent difficulties when Autonomy's main hardware supplier suddenly drew back from its association with Autonomy.  VAR sales and hardware sales were turned on and off by Autonomy at the end of each quarter depending on the levels of revenue required to be shown in the accounts.

63.    The VAR strategy was directed by Mr Hussain and encouraged and presided over by Dr Lynch.  Both knew that the VAR transactions were not being accounted for according to

       their true substance. Both knew that the recognition of revenue on the sale to the VAR was improper, and that the accounts were thus false.

64.    Deloitte did not see the full picture, or alternatively preferred to accept reassurance that ostensibly negated the true purpose of the VAR transactions.  In any event neither the approval of Deloitte nor that of the audit committee was fully and properly informed, and the fact of it does not avail the Defendants, who knew that.

65.    The Claimants reasonably relied on the truth of the financial information provided by Autonomy (both numerical and narrative), including what was said about the revenue in the accounting material, and were induced to buy Autonomy for $11.1billion.

66.    These facts satisfy both limbs of the FSMA claim and also give rise to liability on the part of both Defendants to the Claimants in respect of the direct fraud and/or Misrepresentation Act claims, and for breach of duty as employees and/or directors owed to Autonomy companies in embarking  on the VAR strategy.

       **The reciprocal transactions case**

67.    There were two types of, so called, "reciprocals".

68.     In the case of the VAR reciprocals (related to the VAR case above), which involved the purchase by Autonomy of a product from a VAR, I am satisfied that in each case Autonomy purchased from the VAR a product for which it had little or no identified need or use.  It was done in order to funnel funds to the VAR to enable it to appear to discharge its indebtedness to Autonomy under a VAR agreement.  The purchase by Autonomy was the means of getting the VAR "off the hook" of the legal obligation to pay, which it was never expected or intended it would in fact be required to meet out of its own resources.  No revenue should have been recognized.  The Defendants were in each case aware of the contrived nature of Autonomy's purchase and its true purpose.  They had guilty knowledge accordingly.

69.     In the case of reciprocal transactions, Autonomy would identify a counterparty with an interest in purchasing Autonomy software, but which would in all probability not make
        any purchase at the price set by Autonomy unless it could sell Autonomy its own products and use the sale proceeds to fund its own purchase.  The strategy was assisted by the fact that Autonomy had no list price for IDOL and could in effect choose its price.  This would be a matter of indifference to the reciprocal purchaser, since it would be receiving funds from Autonomy under its reciprocal sale to Autonomy. By increasing the price, Autonomy could maximise its apparent revenue.

70.     I am satisfied that in the case of each of the transactions impugned on this ground, the reason for Autonomy's purchase was to enable the counterparty to purchase a licence for Autonomy software. This would generate recognized revenue which Autonomy could show in its accounts to cover shortfalls in revenue for the relevant quarter. Thus, Autonomy's purchase was another means of Autonomy buying recognised and reportable revenue at substantial cost. The purchase and sale should have been accounted for on a net basis.  I am satisfied that both Defendants knew that these reciprocal or round-trip transactions also were contrived with the dishonest purpose of artificially boosting apparent high margin

software sales, with the effect of giving an exaggerated depiction of the success of Autonomy's core business.

71.    As with the VAR, and Hardware cases, I find reasonable reliance on the part of the Claimants, and liability established on the FSMA claim.

72.    There are also direct fraud and Misrepresentation Act claims made out in respect of these reciprocal claims.  I also find the case made out in respect of those direct claims.

**The hosted case**

73.    The impugned hosted transactions all involved a lump sum payment being made by the existing Autonomy customer who was already making periodic payments for Autonomy hosting its archive, for what on the face of it appeared to be a software licence. An example would be the right to transfer Autonomy software from Autonomy's hardware to the customer's in-house hardware, or to a third-party's directed hardware.   These transactions inevitably also involved substantially reduced periodic payments going forward.  All of the lump sum would be recognised immediately as income by Autonomy.  This was a true way of accounting for that income, if it was truly a payment for software rights.  If it was no more than the price paid for the reduction in the later periodic payments for hosting services, then it was misleading to treat what was compensation for a later reduction in revenue as an immediately realized sum.

74.    The lump sum arrangements I have just described were in reality almost invariably a response not to customer interest, but to the Defendants' obsession with ensuring Autonomy achieved or came as close as possible to meeting revenue forecasts.   The licence was a device calculated to justify revenue recognition which conferred legal rights which neither side intended or expected would ever be deployed.

75. The introduction of a formal legal right of no intended commercial consequence would not in any material way alter the hosting arrangements between the contracting parties, which both parties intended to carry on as before.

76. Both Defendants were aware of the true nature of these lump sum arrangements and that they were driven by income recognition. Any software rights bestowed were never expected to be exercised. They knew it gave a false impression to recognise the income immediately.

77. The Claimants relied on the figures given as to revenue including the lump sum payments and it was reasonable for them to do so.

78. I have concluded that both limbs of the FSMA claim are established.

79. In Schedule 12, the Claimants identified a number of the hosting lump sum transactions (set out specifically in Schedule 12D) which involved significant reductions in periodic payments. The Claimants contended these contracts were commercially unjustifiable. Because they were only motivated by the desire for income recognition, the deals were commercially unfavourable to Autonomy and they had no purpose beyond income recognition, I find the breach of duty established in respect of each of the Schedule 12D transactions.

**The OEM case**

80. I have concluded that the perception and attraction of the OEM Metric as presented to the market was that it comprised a distinctive revenue stream, which was recurring and reliable because it derived from royalty payments made by or through the OEMs in whose hardware the Autonomy software was embedded. That revenue stream also included incremental revenue from sales to the OEM of updates and upgrades for that software. It was a stream of income which involved little or no further cost of sales. OEMs also usually had established market reputations; and the embedding of Autonomy software in their hardware assisted Autonomy in terms of market penetration. There was evidence that the market placed special value on OEM business for all these reasons.

81.     However, a substantial proportion of the sales categorized as OEM sales in the accounting documents, and in the representations made by the Defendants from March 2011 onwards, did not have this recurring nature, nor were they to OEMs. Instead, they were one-off sales to buyers. They would not offer the same advantages, did not yield a recurring royalty or royalty type payment, and they would not ensure the same certainty of incremental purchases of updates and upgrades to protect and enhance the OEM's own product and reputation.

82.     I have found that both Defendants knew that the accounts and the representations they made in this regard gave a misleading picture of Autonomy's OEM business. They did so because they knew revenues were included from transactions lacking the characteristics associated with OEM business. They knew that such revenues were considered in the market to generate a particularly dependable and valuable revenue stream.

83.     The direct representations which the Defendants made confirmed the depiction of Autonomy's OEM business and the revenue it generated which was given in Autonomy's published information.

84.     This was another matter on which HP reasonably relied on in proceeding with its Acquisition for $11.1 billion.

85.     Both the FSMA claim and the direct fraud and/or Misrepresentation Act claims are made out against the Defendants.

86.     There are no breach of duty claims under this head

**The Other Transactions case**

87.     The Other Transactions allegedly had, and were designed to have, the effect of enabling Autonomy to recognise or accelerate the recognition of revenue for the purpose of achieving revenue forecasts in a given quarter.

88.    The Claimants did not, apparently *"due to time constraints",* cross-examine Dr
       Lynch in relation to any these four transactions.   Therefore, the Claimants
       accepted that they could not pursue an allegation that Dr Lynch had knowledge
       of their false accounting.

89.    However, they submitted that the Other Transactions remain relevant given that:

   **89.1.**    the Claimants maintained that there was false accounting in relation to
                each of
                the transactions and they continued to allege that Mr Hussain knew of
                that false accounting; and

   **89.2.**    if (as the Claimants alleged) there was false reporting in relation to the
                Other Transactions, it fell to be taken into account when assessing loss.

90.    In my draft judgment I have considered each of these four Other Transactions in
       detail.   I have concluded in respect of each of them, that the Claimants have failed
       to establish that the accounting treatment adopted with the approval of Deloitte
       was wrong rather than a matter of accountancy judgement on which views might
       properly differ.   In those circumstances, the question of Mr Hussain's guilty
       knowledge does not arise, and this head of claim makes no contribution to any
       loss calculation.

### *Findings: the breach of duty claim for transactional losses*

91.    In relation to the claim for transactional losses, Dr Lynch was the President of
       Autonomy Inc, and he owed legal duties to that company as a director.   He was a
       de facto director of ASL and owed duties to it.   I find that Mr Hussain was a de
       jure director of all three relevant subsidiaries, Autonomy Inc, Zantaz and ASL,-
       and owed duties to all three.

92.    I find that the transfer pricing arrangements which gave rise to the losses from
       transactions being transferred to ASL do not allow ASL to sue for those losses,
       and nor is there any legal basis for impugning the conduct of the Defendants in

entering into those arrangements.  But nor do they cause  the subsidiaries who suffered the original losses to be treated as though they had suffered no loss, nor deprive them of the right to claim in respect of the losses.  How they deal with the losses subsequently for example by price shifting arrangements does not effect the claims.

93.   In respect of each of the transactions impugned under the four heads identified in this claim, as being of no commercial benefit to Autonomy Inc, ASL and Zantaz I find that case made out.  I find that both Defendants breached their duties   in causing or allowing these transactions to take place in respect of ASL and Autonomy Inc.

94.   I emphasise that the breach of duty in respect of ASL is not the transfer pricing arrangements, but the original involvement in the Schedule 12 identified MAF payments, and reciprocal transactions.

95.   I find Mr Hussain liable in respect of each one of the Zantaz impugned transactions in Schedule 12, and their claim may validly be made as assignee by ASL. Dr Lynch was neither a de jure nor de facto director of Zantaz, and no direct claim succeeds against him in respect of any of Zantaz transactions.

96.   The pleaded quantum of the loss for the direct claims is $76.1 million.  Whether that is the correct figure, I will determine in the quantum judgment.

97.   That concludes a summary of my findings.  I now deal with a number of other matters.

### *Quantum*

98.   I have not included in my embargoed draft judgment to be delivered to the parties today detailed findings or conclusions on quantum.  The parties have called evidence and addressed full argument on quantum.  I considered it inappropriate to delay my judgment on liability when it could have an effect on other

proceedings, in particular the extradition proceedings, to allow completion of the quantum section. I have however provisionally determined that even if adjusted to take account of the fraud, HP would still have considered Autonomy, with its signature product, IDOL, a suitable acquisition whereby to effect transformational change. I would expect the quantum to be substantially less than is claimed.

99. The evidence on the quantum part of the case was dense and voluminous. There was extended cross-examination. I will now proceed to consider that aspect of the case. That section will take some time to complete and further submissions may be necessary.

## Counterclaim

100. Dr Lynch also brought a Counterclaim. Dr Lynch contended that HP's public and much- publicised announcement of a claim against the Defendants of $5 billion was precipitate and had no properly formulated basis. I need say nothing about this. My findings in the main claim undermine his counterclaim. I have not therefore addressed it in my draft judgment. If there remains anything of substance, I am sure I will be told of it.

## Final matters

101. This has been an unusually complex trial, 93 days long. Dr Lynch was cross-examined for 20 days. There was a database of many millions of documents from which there was extracted a trial bundle containing more than 28,000 documents. These documents have been the most reliable source of evidence. But there were also hundreds of pages of hearsay evidence, largely comprised of transcripts from previous proceedings in the United States, both civil and criminal. The determination of this matter in its plainly natural forum has been made the more difficult by the concerns I have had about the reliability of some of the Claimants' witness and hearsay evidence, which bore signs of having been fashioned, rehearsed and repeated in the course of multiple previous proceedings in the US and the preparatory stages for them, and in some cases, of the constraints (such as the terms of promised immunity) under which it had been given.

102.  Nevertheless, I have reached clear conclusions in these proceedings on the civil liability of Dr Lynch and Mr Hussain for fraud under FSMA, common law, and the Misrepresentation Act 1967, applying, of course, the civil standard of proof of the balance of probabilities.

### The Parties' representatives

103.  Finally, the legal representation and assistance provided to me in this case have been of the very highest standard.  The longer my labours have continued the more I have understood and appreciated theirs and quite how much work has been put into these proceedings.  I have been shown patience and understanding throughout.  I wish to express my profound and genuine appreciation to them all for the quality of their work, and in particular the enormous help they have provided to me in what has been for everyone involved an exceptionally onerous case.

End.

| SCHEDULE OF IMPUGNED VAR TRANSACTIONS | |
| --- | --- |
| *Headings* | *Paragraphs* |
| Structure of this Schedule | 1-5 |
| **PART I OF SCHEDULE OF IMPUGNED VAR TRANSACTIONS** | |
| Various exemplars of the impugned VAR transactions with 'friendly' VARs | 6 |
| VT1: comprising the 11 impugned MicroLink VAR deals | 7-17 |
| Did Defendants know that MicroLink transactions were improperly accounted for? | 18-23 |
| Autonomy's purchases from MicroLink | 24 |
| The SAT purchase | 25-29 |
| The AIS purchase | 30-35 |
| Acquisition of MicroLink by Autonomy | 36-44 |
| Summary of conclusions in respect of VT1 and associated purchases | 45-46 |
| The Capax Discovery VAR deals in Part I: VT2, VT3, VT4 and VT10 | 47 |

| Various antecedent points | 48 |
|---|---|
| A relevant antecedent arrangement? | 49-59 |
| Standard terms of the Capax Discovery VAR sales | 60-61 |
| Audit Confirmation Letters in every case | 62-63 |
| VT2: Capax/TXU in Q2 2009 and Q3 2009 | 64-70 |
| My assessment of VT2 | 71-77 |
| Particular points on the Defendants' involvement and knowledge of VT2 | 78 |
| Mr Hussain's knowledge | 79-82 |
| Dr Lynch's knowledge | 83-89 |
| VT3: Capax/Kraft | 90-105 |
| Approval by Deloitte | 106-121 |
| My assessment of VT3 | 122 |
| Particular points on the Defendants' involvement and knowledge of VT3 | 123 |
| Mr Hussain | 124-125 |
| Dr Lynch | 126-132 |
| VT4: Capax/Eli Lilly (Q4 2009) | 133-150 |
| Defendants' alleged knowledge of false accounting in respect of VT4 | 151-152 |
| Particular matters highlighted by VT4 | 153-167 |
| VT10: Capax/FSA (Q1 2010) | 168-183 |
| Four particular matters relating to VT10 emphasised by the Claimants | 184-204 |
| Summary as to propriety of recognition of revenue in respect of VT10 | 205 |
| Defendants' alleged knowledge of false accounting in respect of VT10 | 206 |

| Mr Hussain | 207 |
|---|---|
| Dr Lynch | 208 |
| Summary as to whether the Defendants had "guilty knowledge" | 209 |
| Conclusions on Capax Discovery transactions VT2, VT3, VT4 and VT10 | 210 |
| MicroTech impugned VAR deals: VT5, VT6, VT7, VT8, VT13, VT25, VT32, VT33 and VT37 | 211 |
| MicroTech itself and the MicroTech VAR agreement | 212-221 |
| VT6, VT7 and VT8: MicroTech/Honeywell, Morgan Stanley, ManuLife, all Q4 2009 | 222-247 |

| | |
|---|---|
| Defendants' knowledge of and participation in VT6, VT7 and VT8 | 248-254 |
| VT5: Autonomy/MicroTech sale of 'Control Point' licence in Q4 2009 | 255-269 |
| Knowledge and involvement of the Defendants in VT5 | 270-279 |
| VT13: MicroTech/Vatican Q1 2010 | 280-298 |
| Claimants' case on VT13 | 299-329 |
| ATIC | 330-357 |
| My assessment of the dispute re the ATIC | 358-369 |
| Defendants' knowledge of VT13 and the ATIC transaction | |
| Mr Hussain | 370-377 |
| Dr Lynch | 378-395 |
| Summary | 396-397 |
| VT25: MicroTech/DoI Q4 2010 | 398-412 |
| Did the Defendants have "guilty knowledge" about VT25? | 413 |
| Mr Hussain | 414-417 |
| Dr Lynch | 418-424 |
| VT32 and VT33: MicroTech/Bank of Montreal and Xerox: Q1 2011 | 425-429 |
| VT32: MicroTech/Bank of Montreal | 430-438 |
| Summary assessment | 439-440 |
| VT33: MicroTech/Xerox | 441-449 |
| Defendants' knowledge of and participation in VT32 and VT33 and direct deals | 450 |
| Mr Hussain | 451-454 |
| Dr Lynch | 455-459 |
| VT37: MicroTech/HP Q2 2011 | 460-481 |
| Federal cloud purchase and the payment by MicroTech it enabled | 482-491 |
| Knowledge and participation of Defendants in VT37 and Federal Cloud transaction | |
| Mr Hussain | 492-495 |
| Dr Lynch | 496-501 |
| DiscoverTech reseller deals | 502-515 |
| VT11: DiscoverTech/Citi Q1 2010 | 516-567 |

| | |
|---|---|
| Defendants' knowledge of and participation in VT11 | 568-574 |
| VT12: DiscoverTech/PMI Q1 2010 | 575-590 |
| VT30: DiscoverTech/Prisa Q1 2011 | 591-595 |
| Alleged backdating | 596-614 |
| Calibration with hardware sales: two levers to manipulate revenue? | 615-630 |
| Never any intention that DiscoverTech would negotiate or conclude an enduser sale | 631-640 |
| Was DiscoverTech let off the hook by funds from purchases by Autonomy? | 641-645 |
| First DiscoverEngine purchase: Q2 2011 | 646-671 |
| Second DiscoverTech purchase (Q3 2011): source code | 672-688 |
| My assessment re VT30 and the Discover Engine purchases in the round | 689-692 |
| Defendants' knowledge of and participation in VT30 and backdating | 693-698 |
| Defendants' knowledge of backdating | 699-707 |
| VT31: DiscoverTech/ThinkTech Q1 2011 | 708-720 |
| My assessment re VT31 | 721-723 |
| Were the Defendants aware and involved? | 724-725 |
| VT35: DiscoverTech/Abbott Labs Q2 2011 | 726-735 |
| My Assessment of VT35 | 736-743 |
| VT36: DiscoverTech/Dell/Hyatt Q2 2011 | 744-753 |
| VT18: FileTek and USDVA Q3 2010 | 754-776 |
| Particular points on VT18 | 777-796 |
| Collapse of the USDVA deal and its aftermath | 797-803 |
| Q1 2011 StorHouse purchases | 804-806 |
| Q2 2011 StorHouse purchase | 807-811 |
| Q3 2011 StorHouse purchase | 812-822 |
| My assessment of VT18 and the 2011 StorHouse transactions | 823-833 |
| Defendants' knowledge of and participation in VT18 | 834-839 |
| **PART II OF SCHEDULE OF IMPUGNED VAR TRANSACTIONS** | 840-841 |
| Four further impugned transactions with Capax Discovery | |
| VT20: Capax Discovery/DKO Q4 2010 | 842-857 |
| Defendants' knowledge of false accounting in respect of VT20 | |

| Mr Hussain | 858-861 |
|---|---|
| Dr Lynch | 862-866 |
| VT27: Capax Discovery/McAfee Q1 2011 | 867-879 |
| The 'staging tools' transaction | 880-907 |
| Defendants' knowledge | |
| Mr Hussain | 908 |

| Dr Lynch | 909-915 |
|---|---|
| VT28: Capax Discovery/UBS Q1 2011 and VT34: Capax Discovery/UBS Q2 2011 | |
| The first Capax Discovery/UBS purchase order | 916-919 |
| The second Capax Discovery/UBS purchase order | 920-938 |
| Knowledge of the Defendants | |
| Mr Hussain | 939 |
| Dr Lynch | 940-948 |
| **PART III OF SCHEDULE OF IMPUGNED VAR TRANSACTIONS** | 949 |
| The Bank of America ("BofA") transactions: VT16, VT21, VT23 and VT24 | 950-964 |
| Splitting up of the BofA deal into smaller pieces sold to VARs | 965-974 |
| VT16: the original Capax Discovery/Amgen deal in more detail | 975-980 |
| Whether the VAR's role in respect of VT16 in its first incarnation was misrepresented to Deloitte and the Audit Committee | 981-989 |
| The "re-purposing" of VT16 and its second incarnation | 990-1012 |
| MAF | 1013-1022 |
| Backdating? | 1023-1026 |
| Deloitte's understanding of the transaction | 1027-1041 |
| VT21: Capax Discovery/Merrill Lynch: Q4 2010 | 1042-1053 |
| VT23 and VT24: DiscoverTech/Bank of America Q4 2010 | 1054-1082 |
| Defendants' alleged knowledge of false accounting in respect of the BofA deals | |
| Mr Hussain | 1083-1087 |
| Dr Lynch | 1088-1094 |
| **PART IV OF SCHEDULE OF IMPUGNED VAR TRANSACTIONS** | |
| Other impugned VAR transactions where side-agreements are alleged | 1095-1099 |

| | |
|---|---|
| VT15: The Realise/Credit Suisse deal Q2 2010 | 1100-1116 |
| My assessment of VT15 | 1117-1124 |
| Defendants' knowledge of and participation in VT15 and the Release acquisition | 1125-1130 |
| VT26: Tikit/KPMG Q4 2010 | 1131-1153 |
| My assessment of VT26 | 1154-1164 |
| Defendants' knowledge of and participation in VT26 and subsequent arrangements | |
| Mr Hussain | 1165-1168 |
| Dr Lynch | 1169-1175 |
| VT14: Auxilium/Vatican Library (Q1/2010) | 1176-1190 |
| Defendants' knowledge that revenue should not have been recognised from VT14 | 1191-1193 |
| **PART V OF SCHEDULE OF IMPUGNED VAR TRANSACTIONS** | |
| The "Collectability VARs": VAR deals impugned but no side agreement is alleged | 1194-1198 |
| VT9: Sales Consulting SRL / Poste Italiane (Q4 2009) | 1199-1221 |
| Defendants' knowledge of wrongful revenue recognition in respect of VT9 | 1222-1226 |
| VT17: Comercializadora/TV Azteca Q3 2010 | 1227-1242 |
| Defendants' knowledge of improper revenue recognition in respect of VT17 | 1243-1245 |
| VT22: Comercializadora/CISEN Q4 2010 | 1246-1252 |
| Defendants' knowledge of improper revenue recognition in respect of VT22 | 1253-1256 |
| VT19: Red Ventures/Poste Italiane Q3 2010 | 1257-1268 |
| Defendants' knowledge of improper revenue recognition in respect of VT19 | 1269-1271 |
| VT29: Computer Trading/Poste Italiane Q1 2011 | 1272-1279 |
| Defendants' knowledge of improper revenue recognition in respect of VT29 | 1280-1282 |
| Overall conclusions as to the Collectability VAR claims | 1283-1284 |

## SCHEDULE OF IMPUGNED VAR TRANSACTIONS

### Structure of this Schedule

1.  In this five-part Schedule to the main body of this judgment I address each of the impugned VAR transactions. Although more conveniently set out in a Schedule, the findings I make should be treated as if in the main body of the judgment. The discussion is intended to complement the more general analysis in the main body of the judgment and my conclusions there, and to provide detailed exemplars of the 'pattern' which the Claimants alleged and which I have concluded was demonstrated.

2.  Although some repetition of the more general points made in my general analysis of the impugned VAR transactions in the main body of this judgment is inevitable, my intended focus is on any significant evidence or features which have not emerged from, or which provide a particularly significant illustration of some feature identified in, my overview of the impugned VAR transactions in the main body of the judgment.

3.  There is a general point on the issue of knowledge, and in particular, Dr Lynch's knowledge of improper accounting of the individual impugned VAR transactions, which I should clarify. Although I do address this issue in respect of the individual impugned VAR transactions, the Claimants' position was that, in particular as regards the bulk of the impugned transactions which were with 'friendly' VARs, they did not need to establish that Dr Lynch knew about every one of them; and that it was sufficient that he knew of and authorised the practice of calling upon a friendly VAR, as and when required by a shortfall in aggregate revenue, to recognise revenue improperly. Accordingly, in some cases, they did not put forward transaction-specific evidence of his "guilty knowledge". I confirm that I have concluded, in line with this submission, that Dr Lynch knew of and authorised the practice, which became a pattern of which all the impugned VAR transactions were exemplars, of improperly recognising revenue from sales to VARs which lacked any real substance in order to make good (to the extent possible) shortfalls in properly recognised revenue from software sales. Subject to the proviso that if in any instance there was positive evidence to show that the relevant Defendant (in effect, Dr Lynch) did <u>not</u> have any knowledge the burden would be on the Claimants to provide additional positive evidence the other way, I have broadly (and except as otherwise appears in the context) accepted the Claimants' approach.

4.  Most of the VAR transactions addressed were impugned by reference to some form of side agreement or understanding; but

some (the *"pure collectability VARs"*) were impugned only on the basis that none satisfied the requirements of IAS 18.14(d). This Schedule is structured as follows:

> (1) Part I addresses VT1 (with MicroLink), VT2, VT3, VT4 and VT10 (all with Capax Discovery), VT5, VT6, VT7, VT8, VT13, VT25, VT32, VT33 and VT37 (all with MicroTech), VT11, VT12, VT30, VT31, VT35 and VT36 (all with DiscoverTech) and VT18 (with FileTek).

> (2) Part II addresses four further impugned VAR sales to Capax Discovery which followed VT10. These were VT20 (in Q4 2010, for end-user DKO), VT27 (in Q1 2011, for end-user McAfee), VT28 (in Q1 2011, for end-user UBS), and VT34 (in Q2 2011 also for end-user UBS).

> (3) Part III addresses VAR transactions comprising the parts into which a very large composite deal with BofA (or subsidiaries of BofA) was split in circumstances described below. Two (VT16 and VT21) were with Capax Discovery and two (VT23/24) were with DiscoverTech.

> (4) Part IV addresses three impugned VAR transactions (VT14, 15 and 26) with counterparties other than those I have called "the friendly VARs" (that is to say, Capax Discovery, FileTek and the Truitt companies).

> (5) Part V addresses the remaining five impugned VAR transactions (VT9, 17, 19, 22 and 29), all with counterparties which were not "friendly VARs, and in respect of which no side-agreement or the like was alleged (the *"pure Collectability VAR transactions"*).

5.   I adopt the same definitions in this Schedule as in the main body of the judgment.

## PART I OF SCHEDULE OF IMPUGNED VAR TRANSACTIONS

## Various exemplars of the impugned VAR transactions with 'friendly' VARs

6. In this Part of this Schedule, I have grouped various exemplars of the impugned VAR transactions with 'friendly' VARs. They are grouped   according to the identity of the VAR involved, rather than chronologically: this reflects the way they were addressed in the written closing submissions.

## VT1: comprising the 11 impugned MicroLink VAR deals

7. I have already noted some basic details about MicroLink in paragraph 1963 of the judgment. As there stated, MicroLink was the VAR in a series of reseller transactions in 2008 and 2009, of which the Claimants have impugned 11, all entered into in 2009. The Claimants referred to this series of transactions as "VT1".

8. MicroLink was one of a growing stable of 'friendly' VARs. It was headed by Mr David Truitt (who subsequently headed DiscoverTech, another 'friendly' VAR, and who cofounded MicroTech, a third 'friendly' VAR of which Mr David Truitt's brother, Mr Steve Truitt, was made Chief Operating Officer at Mr David Truitt's instigation). Without thereby pre-judging their activities with Autonomy, it is to be noted that Mr Stephan gave the following evidence at the US criminal trial:

> "From my - what I saw at MicroLink, I was concerned that was the modus operandi of all these resellers, that the head of the company would sign whatever we wanted them to sign for the auditors but they had no intention of paying."

9. The MicroLink transactions were the first of the *"at risk deals"* or *"acceleration deals"* [522] which Autonomy embarked on using 'friendly' VARs as vehicles through which Autonomy could recognise revenue in the quarter in which the transactions occurred to cover shortfalls identified in revenue from other sources identified by Mr Hussain. Impetus was given to the use of this expedient when EMC withdrew from its close association with Autonomy and the use of the favoured alternative programme of hardware sales for the same purpose became more difficult.

10. Autonomy had undertaken various transactions with MicroLink before the impugned VT1. None of the transactions with MicroLink prior to the Relevant Period was impugned, though (as explained above) no details were provided of their number or

---

[522] See footnote 283 in the main body of the judgment.

nature, except for a brief reference by Mr Egan, when he was cross-examined, to some of them being *"at risk deals"* (see footnote 283 in the main body of the judgment). The Defendants also referred to deals with MicroLink in 2009 which were not impugned: but again, no details were supplied.

11.  The prospective end-users in the 11 impugned VAR sales referred to under the rubric 'VT1' were Allstate, JICPAC, United States Postal Service, United States Federal

Government, Public Works & Government Services Canada, CIPM, VA VACO, IBMameriprise, Navy Commander Sub Forces and DiscoverTech (though in respect of the last no side agreement was alleged to have been made and the transaction is impugned by

---

reference to the alleged use of funds from Autonomy's later acquisition of MicroLink). The Claimants did not suggest that anything turns on the individual details of the various VT1 transactions: their claims apply across them all.

12.  All of the purchase orders in respect of the VT1 transactions were made under the *'Autonomy Government Reseller Agreement'* made between Autonomy and MicroLink on 20 November 2003 ("the Q4 2003 MicroLink VAR agreement"). Under the terms of that agreement:

(1) MicroLink was obliged to pay Autonomy irrespective of whether it closed a deal with an end-user.  Clause 5.5 provided:

> *"Government Reseller shall not be relieved of its obligations to pay fees owed to Autonomy hereunder by the nonpayment of such fees by an End-User."*

(2) Clause 5.1 provided that once Autonomy's products on a purchase order had been shipped (which happened electronically), MicroLink could not cancel or amend the purchase order without prior written consent from Autonomy. Clause 5.1 also provided that the agreement superseded any pre-printed terms and conditions that could appear on any purchase order.

(3) Clause 14.4 provided that no amendment to, change, waiver or discharge of any provision of the agreement was valid unless in writing and signed by an authorised representative of each party.

(4) Clause 14.10 was an entire agreement clause which confirmed there were no other representations, understandings or agreements.

13. In aggregate, the total licence fees invoiced by Autonomy for the VT1 transactions amounted to $15,317,488 (all of which Autonomy recognised as revenue at the date of the transactions). It is not disputed that only $2,098,772 of this was ever paid by MicroLink to Autonomy; but it is alleged by the Claimants that even this payment was only generated as a result of a purchase by Autonomy from MicroLink of software produced by MicroLink known as Search Analysis Tool ("SAT") for $4,100,000.

14. Mr Egan provided a general review of Autonomy's transactions with MicroLink as follows:

> "*In around 2008 and 2009, Autonomy did a series of what I called "at risk" VAR deals with Microlink.[523] They followed the pattern I have described in the section above headed "Value Added Resellers". In my discussions with Mr. Truitt I followed the guidance that Mr. Hussain gave me as described in paragraphs 28 and 29 above. In many instances, Microlink was not involved in the pursuit of the sale with the end-users[524]. In some situations, where the enduser deal could not be completed by the end of a particular quarter, Autonomy asked Microlink to submit a purchase order to Autonomy. The purchase order identified the software that we were attempting to license to the end-user*

> *customer and stated that the software was to be licensed to Microlink for sublicense to the end-user. Autonomy would invoice Microlink for the software, deliver the identified software to Microlink, and recognize revenue on this paper transaction in the quarter that was ending.*

> *I then continued to attempt to sell a license to use the same software to the true customer. On many occasions, either Autonomy or Microlink succeeded in making the sale to the end-user; on others, the end-user sale was delayed for a long period of time, but eventually was made. In yet other situations, no sale to the end-user was ever made. I believe that in one way or another, including, ultimately, Autonomy's purchase of Microlink, we made sure that Microlink never suffered a loss on these deals, in accordance with the*

---

[523] See footnote 283 in the main body of the judgment.
[524] And it was not involved in any of the impugned VAR transactions.

> *understanding between Mr. Truitt and me in respect of these deals."*

15.  The basis on which the Claimants impugned the 11 VT1 sales can be summarised as follows:

> (1) In each, Autonomy's sole purpose of resorting to a VAR was to enable it to recognise revenue in the quarter of the sale to the VAR notwithstanding delay or difficulties in closing a transaction with what Mr Egan described as its *"true customer"*, that is a prospective end-user.

> (2) In none of the VT1 transactions was there any evidence of MicroLink making any effort to sell to the end-user: rather, the evidence available is that Autonomy continued its efforts to sell a licence for the same software to the *"true customer"*.

> (3) In none of the VT1 transactions did MicroLink contract with an end-user. The end-user deals were between Autonomy and the end-user.

> (4) Even though in various cases no end-user deal eventuated, there is no evidence that MicroLink was ever required to post a loss, and Mr Egan's unchallenged and uncontradicted evidence was that he believed that:

>> *"in one way or another, including, ultimately, Autonomy's purchase of Microlink, we made sure that Microlink never suffered a loss on these deals, in accordance with the understanding between Mr Truitt and me in respect of these deals."*

> (5) Furthermore, there was no evidence that the VT1 transactions were ever accounted for in MicroLink's accounts. The only money ever paid by MicroLink to Autonomy in respect of the 11 transactions was money that Autonomy had channelled to MicroLink for that purpose.

> (6) I address in greater detail below (see paragraphs 25*ff*) the basis on which the Claimants contended that the SAT purchase and a further purchase of Autonomy / SharePoint Integration Suite for MOSS ("AIS") software (in Q3 2009) were contrived to fund MicroLink to enable it to appear to discharge its indebtedness to Autonomy, and that the purpose of Autonomy's subsequent acquisition in Q1 2010 of the entire issued share capital of MicroLink was to enable Autonomy to

release MicroLink's very substantial remaining deficit in its deals with Autonomy on an intra-group basis.

16.  Against this, the Defendants' case was based on the following:

(1) Both Mr Egan and Mr David Truitt were clear that they understood MicroLink to be *"on risk"*; they meant this in the sense that the legal liability to pay was clear, unequivocal and unconditional, as is apparent from the account of their evidence already given in my overview above.

(2) When cross-examined in the US criminal proceedings, Mr David Truitt confirmed (albeit in the context of DiscoverTech transactions) that the VAR acquired the licensed software, and full ownership and control of it, which it would be left with and have to realise value from if an end-user contract did not eventuate:

> *"Q. And is what you meant is that once you made the agreement, you, be it Discover Tech, MicroTech, whoever made the agreement, owned the software? It was your software? A. Yes.*
>
> *Q. And was -- if it didn't close, it's still your software and you owed money; right?  A. Yes.*
>
> *Q. If you sold it to the end-user, the terms were already set. It was there in the agreement; right? A. Correct.*
>
> *Q. So you had control of the software, you owed the money, and you were fully the owner; right?*
>
> *A.      Yes."*

(3) In the same proceedings, Mr David Truitt also said that there was never an understanding that he could cancel the deals with no further obligation if the end-user did not purchase the software.

(4) In addition to the plain contractual terms, MicroLink signed the usual confirmation letter acknowledging the indebtedness and confirming that:

> *"...there are no side letters or other agreements in respect of the subject matter of this request…"*

(5) According to Deloitte's working notes, and contrary to the Claimants' case, at least one of the impugned

transactions was originated not by Autonomy but by the VAR: thus, Mr Egan had given information to Deloitte in respect of one of the impugned deals (for end-user US Federal Government[525] in Q2 2009). This was a deal for the National Security Agency ("NSA"). Mr Egan had informed Deloitte as follows:

> *"We discussed this deal with Stouffer Egan (CEO of Autonomy US) and noted that MicroLink won this contract with the NSA off the back of another project with a major US*

> *intelligence agency. The NSA are upgrading their entire national network with IDOL search. In the past, it used to take about 1 day to search the entire network to gather the information they required. MicroLink has the relevant security clearance to go and integrate this software into the NSA network. It will be a year- long project for MicroLink to do this, and they charge the NSA based on a day rate. None of the professional services work comes back to Autonomy, it is only the perpetual licence that they contribute."*

(6) Deloitte's conclusion as regards this transaction was that the risk and rewards of ownership had passed to MicroLink, and that the other revenue recognition criteria were satisfied. In cross-examination, Mr Egan was asked whether he had any reason to disagree with Deloitte's conclusion; he said he did not, though he did also make clear that this was really because he did not *"have much memory of this deal"*.

(7) Dr Lynch accepted that Mr Stephan's evidence that MicroLink had made no provision for any liability to Autonomy in its accounts was *"the literal truth"*, but suggested (contrary to the Claimants' contention) that this did not reveal anything untoward. According to Dr Lynch he had discovered no more than that *"MicroLink did its accounting net, not gross, so it accounts on a basis where it doesn't take the licences through its*

---

[525] National Security Agency.

*books. That doesn't mean to say that in any way those liabilities are not there."*

(8) As to Mr Stephan's failure to clarify this, Dr Lynch emphasised that Mr Stephan had not attended trial and he characterised his evidence admitted under a hearsay notice as not only vague and untested (since the Defendants had no opportunity to cross-examine him), but also as given under significant pressure from the US DoJ.   According to Dr Lynch, Mr Stephan was intercepted by them when on holiday in the USA and told that he would be prosecuted if he did not cooperate. Dr Lynch submitted that no reliance should be placed on the evidence thus procured (though I note that Dr Lynch himself relied on other parts of Mr Stephan's testimony in the context of the hardware allegations in the US criminal trial, where he said that he saw nothing wrong in a software company selling hardware *"to bring in revenue, to meet a target"* as it was put to him in his cross-examination).

17.   As to these arguments:

(1) The Defendants' reliance on the contractual terms and the audit confirmation letters as confirming contractual indebtedness and legal control is a reflection of their main general point, which they maintained in respect of all the VAR claims, that even if the contractual position is not conclusive, it is of preponderant weight. I have concluded, however, that whether the purchase price should be regarded as recognised revenue for the purposes of the seller's accounts depends on the real economic substance of the transaction; that the substance of the transaction is to be determined according to the true intentions of the parties, as opposed to their strict legal rights and obligations, and according to the economic intent and substance of the transaction as thus revealed.

(2) The Defendants never satisfactorily addressed any of the matters referred to in paragraph 15 above.

(3) I was not persuaded by Mr David Truitt's evidence, admitted as hearsay, that there was never an understanding that he could cancel the deals with no further obligation if the end-user did not purchase the software. His evidence in this regard was given to try to overcome contemporaneous documentary evidence in the form of an email headed *"Cancellation of VAR agreements"* sent by him to Mr Joel Scott and dated 23

September 2011. That email, though it in fact refers to DiscoverTech transactions [526], provides a revealing insight which certainly does not assist the Defendants' case:

> "Hello Mr. Scott, I am writing to formally request that VAR agreements signed on June 30th, 2011 between Discover Technologies and Autonomy, regarding Abbott Laboratories and Dell/Hyatt be cancelled. Per my discussions with Stouffer Egan, <u>under the condition that the end customer did not ultimately license the proposed Autonomy software, the agreements would be cancelled with no further obligation on the part of Discover Technologies</u>. Thank you for your attention and prompt response." [Emphasis as supplied by the Claimants]

(4) Indeed, it seems to me that this rather let the proverbial cat out of the bag, requiring the explanation offered by Mr David Truitt that it was a mistake. Mr Scott's reply on 26 September 2011 corrected the "mistake" but not the actual economic result of DiscoverTech being *"let off the hook"* by the 'liability' being erased:

> "*Having checked internally and spoken with Stouffer, I think you misunderstood; however, given that you haven't closed the deals and there is no prospect of us getting paid, we are prepared to write these off.*"[527]

(5) The Claimants' closing submissions did not address Dr Lynch's main point in relation to Mr Stephan's evidence that his inspection of MicroLink's accounts, after Autonomy's acquisition of MicroLink, when Autonomy's finance team were provided with MicroLink's books and accounting records, showed that the VT1 transactions were never accounted for in MicroLink's accounts, which was that MicroLink

---

[526] Mr MacGregor, who referred to Mr David Truitt's denial of any understanding that if an end-user deal did not occur, the deals would be cancelled, suggested that this was referrable to MicroLink transactions just as much as DiscoverTech transactions because Mr Truitt referred to *"deals going back to 2006"* (when DiscoverTech did not exist).

[527] The upshot was that on 29 December 2011, Autonomy Inc issued DiscoverTech with credit notes covering the entire ostensible indebtedness. The Claimants submitted that *"There could hardly be a clearer indication that these transactions lacked economic substance in the first place."*

accounted on a net rather than gross basis. I was not shown accounts which would have (presumably) revealed the basis of MicroLink's accounting. In the circumstances, I do not feel able to make a finding on this intriguing point. However, it remained the case that notwithstanding the shortfall between the amounts charged by Autonomy and the payments apparently generated by MicroLink, there was no accounting evidence which

reflected the fact that MicroLink had suffered a loss. (Dr Lynch told me in crossexamination on Day 50 that he suspected that there must be some such evidence but none was ever identified.) Further, I would accept Mr Stephan's evidence in the US criminal proceedings of his own impression, which seems to me to be consistent with the other oral evidence, that:

> *"From my – what I saw at MicroLink, I was concerned that the modus operandi of all these resellers, that the head of the company would sign whatever we wanted them to sign for the auditors, but they had no intention of paying."*

(6) In all the circumstances I accept the Claimants' arguments that the intention of the parties was in truth that (a) MicroLink would never be required to pay, that any legal obligation to do so would be cancelled, forgiven, or somehow funded by some other apparently but not actually separate transaction with Autonomy to put money in the hands of MicroLink which would then be 'paid' to Autonomy; and (b) Autonomy retained managerial involvement and effective control in the sense that only Autonomy would negotiate its sale, and any enduser contract which eventuated would be a sale by Autonomy to the end-user. In Mr Egan's words, the *"true customer"* would throughout be the end-user, and it was only from the *"true customer"* that Autonomy had any real expectation of receiving revenue at the end of the day.

(7) That undermines the accounting treatment of VT1. Revenue recognition in respect of the VAR sale was wrong. That is so notwithstanding the approval of that accounting by Deloitte and the Audit Committee. Their view could only have been based on what they saw (and in particular, the signed documentation). Deloitte were not, of course, told of what I have held to have been the

true intentions and expectations of the parties; and the Audit Committee were substantially reliant on Deloitte's reports. Whether or not Deloitte or the Audit Committee should have detected signs of the untoward is beside the point in a claim to which they are not a party. In my judgment, on this simple basis, the Defendants' reliance on the approval of Deloitte and the Audit Committee for the VT1 transactions must fail.[528]

*Did the Defendants know that the MicroLink transactions were improperly accounted for?*

18. The Claimants did not rely on any evidence specific or particular to the VT1 transactions themselves in respect of their allegation that the Defendants knew that their accounting treatment was improper. As the Defendants pointed out, neither the RRAPoC nor the Claimants' Further Information of 30 January 2018 identified any material facts specific to VT1 in that regard. The basis of the Claimants' claim that both Defendants had "guilty knowledge" was the evidence given, especially by Mr Egan, of the way the *"at-risk*

deals"* were implemented. The Claimants also relied on the Defendants' knowledge of the subsequent transactions to put MicroLink in funds (and ultimately Autonomy's acquisition of MicroLink) to ensure that it was not left *"holding the bag"*: see below.

19. Dr Lynch, in particular, denied any involvement in or knowledge of the MicroLink transactions comprising VT1. His written closing made the point that there was no crossexamination of him with regard to his involvement and/or knowledge of those transactions. This culminated in the submission that the Claimants had *"not even put any case to Dr Lynch"*.

20. However, the Claimants did cross-examine Dr Lynch about the subsequent purchases made by Autonomy which put MicroLink in funds to pay amounts outstanding under VT1, and also about MicroLink's subsequent acquisition by Autonomy. Further, as

---

[528] Deloitte's working papers for the VT1 transactions, so far as made available, demonstrate a careful and methodical, but essentially process-driven, approach based on the apparent contractual arrangements. The criteria stipulated by IAS 18.14 were ticked off against the contractual provisions and buttressed by the audit confirmation letters: but the economic reality was not sceptically examined. (As Mr MacGregor noted, Deloitte's working papers for 7 of the 11 VT1 transactions were available but not for the remaining four.)

recorded in paragraph 3 above, I have accepted the Claimants' position that they did not need to prove knowledge of every individual transaction and that proof that Dr Lynch knew of and authorised the practice of calling upon a 'friendly' VAR as and when required to generate revenue to cover a shortfall sufficed. If and insofar as Dr Lynch sought the dismissal of this part of the claim against him on the basis of the case not having been put, I do not think that was warranted: there is no proper basis for dismissing the claim on that ground.

21.   Notwithstanding the absence of transaction-specific evidence of knowledge in relation to VT1, I have concluded (as always, on the balance of probabilities) that both Defendants knew that its accounting treatment was improper.

22.   I have been especially influenced in reaching that conclusion by:

> (1) The fact that the VT1 transactions were the first of the *"at-risk deals"* marking the commencement of what became, in effect, a programme of vital importance to the Defendants and key to Autonomy meeting its revenue and earnings per share targets in every quarter. Having concluded that Mr Hussain conceived and directed the strategy and that Dr Lynch (though not usually involved in implementation) presided over and encouraged it, it seems to me that both would have known and kept themselves well informed about the fact and progress of the first of the impugned VAR transactions.

> (2) The amounts involved in the licence sales were such as would undoubtedly have come to the attention of Mr Hussain, who would have closely monitored their implementation and progress, and would in all likelihood have kept Dr Lynch informed in any event, even if he had not been involved in the overall strategy. The total fees invoiced by Autonomy for the 11 transactions comprised in VT1 amounted to $15,317,488, of which only $2,098,772 was ever paid by MicroLink to Autonomy, and even then, the payment was funded by a reciprocal purchase by Autonomy.

> (3) In those circumstances, it is more likely than not that Mr Hussain would also have known about, and kept himself well informed about, Mr Egan's continuing attempts to conclude a deal with the end-user, and that Mr Hussain would have reported those attempts to Dr Lynch.

(4) More generally, it seems to me clear that Mr Hussain was well aware of the transactions and that they were contrived; Mr Hussain habitually reported to Dr Lynch on any matters of significance, value or importance; and I cannot accept that Mr Hussain was on a frolic of his own. In general terms it seems to me more likely than not that Dr Lynch knew what Mr Hussain knew.

(5) Both Defendants were involved in the subsequent purchases from MicroLink by Autonomy, and I have concluded (for reasons I have set out below) that each was aware that their true or driving purpose was to put MicroLink in funds to pay down some of its debt to Autonomy to fulfil the assurances given to MicroLink that it would not be left *"holding the bag".*

23. It is to those purchases and then the acquisition by Autonomy of MicroLink that I next turn.

*Autonomy's purchases from MicroLink*

24. As mentioned above, the only money ever paid by MicroLink in respect of the transactions comprising VT1 was money that Autonomy had channelled to MicroLink for that purpose. The way Autonomy did this was to contrive purchases of software though it had no need or use for it, and in the end, to acquire MicroLink itself (which eliminated the debt on consolidation).

*The SAT purchase*

25. In Q1 2009, Autonomy purchased a one-year licence to use MicroLink's SAT software (defined in paragraph 13). The agreed purchase price for the one-year licence was $4.1 million. Mr Kalbag explained in his witness statement that his understanding was that the SAT was:

> *"a tool to monitor and visualise statistics such as search performance and search behaviour of users to allow administrators to better tune the search results."*

26. The Claimants described the SAT purchase in considerable detail; but I think the purchase and the basis on which the Claimants portrayed it as contrived to fund MicroLink rather, or more, than to benefit Autonomy can briefly be summarised as follows:

(1) At the time of the purchase, Autonomy already had a comparable product called Statistical Server ("Stat Server"). This was a feature of IDOL which Mr Kalbag

believed was included for free as part of the IDOL package rather than being sold to customers as a separate product. According to Mr Kalbag, the SAT and Stat Server had very similar functionality and could achieve predominantly the same results.

(2) It was Autonomy's stated policy to develop and grow its own software products rather than buying in, if at all possible: it would only usually buy in if the functionality of its own product proved deficient in some material way or its performance proved unsatisfactory. The purchase of a licence was an aberration from that policy; and yet there was no evidence to suggest that prompting the purchase was any perception of deficiency in Stat Server or some specific need to buy in a product which seems so similar to one of Autonomy's own.

(3) There is no evidence that before the SAT purchase any technical evaluation was made by anyone within Autonomy of the SAT software. The purchase was driven by Mr Hussain, Mr Kanter and Mr Egan, none of whom could or would have been involved in such an evaluation. The only technical input was comprised of an urgent review by Dr Menell three days before completion of the purchase, and two days after Mr Hussain had asked for his approval urgently. Dr Menell's report was *"ok – tech pieces look fine"*. No document has been produced recording any prior interest in buying SAT before the purchase was driven forward.

(4) No-one on the technical side, other than, at the last minute, Dr Menell, was consulted or involved. Dr Blanchflower would have expected to be so; but his unchallenged evidence was that he was *"not aware of this transaction at the time"*. He added that had there been a perceived need to extend the functionality of Autonomy's own product (Stat Server) to include a user interface like the SAT's, that could easily have been done, but no one had ever suggested it was needed.

(5) The purchase was ascribed considerable urgency within Autonomy. No reason was suggested in evidence. Dr Lynch speculated that perhaps the product was needed urgently for a customer: but he accepted this was no more than speculation.

(6) The rationale developed thereafter, with the assistance of Dr Menell, was that (according to Deloitte's working note after discussions with him) the SAT allowed

Autonomy *"access to the portals to surface IDOL functions directly into a federally certified SharePoint Environment. This creates IDOL function capabilities in SP Portals within the Fed."* SharePoint was presented as *"a product which is actively used by US Federal Government departments".*

(7) However, according to the Claimants, the reason thus recorded in Deloitte's working paper would not have been a good reason for purchasing the SAT, because SAT had nothing to do with SharePoint.

(8) Dr Lynch's attempt to explain this in cross-examination tended to confirm the impression that those explaining the matter to Deloitte (and, in particular, Dr Menell) did not really know what the rationale was, and reinforced the conclusion that no one within Autonomy conducted any technical evaluation of the SAT in advance of the purchase. Dr Lynch told me that he thought there had been *"confusion between two different products"* namely SAT and AIS, and explained that whilst SAT was a *"tool that analyses the searches done on IDOL…AIS is a web part for SharePoint".* He added that he did not know how the confusion had happened. But the metadata showed that Deloitte's working paper was dated 29 April 2009, some four months prior to Autonomy's purchase of AIS on 2 September 2009. The Claimants suggested that it was *"hard to see how on 29 April 2009 Deloitte could have confused SAT with a different product that Autonomy only decided to buy four months later"* and that the inaccurate description was likely to have come from Dr Menell. They supported the suggestion by pointing out that when later on, in October 2009, Deloitte prepared a further interim review summary memorandum to consider both the purchase of the SAT and AIS, they recorded that Dr Menell had *"noted that both items of software related to the Microsoft Sharepoint software".* The Claimants summarised the position as being that:

> *"there is no contemporaneous document which records a commercial rationale for the purchase of SAT which reflects SAT's true functionality."*

(9) There is no evidence either of anyone within Autonomy making any use of the SAT after the SAT purchase. Dr Lynch said that Dr Blanchflower's evidence that it was never used either internally within Autonomy or by customers was wrong, but when pressed for examples

could provide none. No witnesses were called by Dr Lynch to assert that they had used SAT at any time or sold it to customers.

(10)    The payment flows of the purchase moneys show, and Mr David Truitt in his deposition in the MicroTech litigation confirmed, that MicroLink did indeed immediately use all the money it received from the SAT purchase to pay down some of its debt to Autonomy. At that time, MicroLink had no available resources of its own from which to do so.

27.    Against this, the Defendants submitted that the transaction had in fact a sound commercial rationale: the SAT was useful software developed by MicroLink on the basis of their specialist expertise in working with customers on Autonomy products. They relied on the following:

(1) SAT was said to enable *"clients to capture and analyse metrics regarding their utilisation of IDOL server and IDOL-based applications."*

(2) Dr Blanchflower accepted in cross-examination that the SAT had more differences from Autonomy's own Stat Server software than he had identified in his witness statement. He had suggested that the only real difference was that Stat Server did not have an interface to display results diagrammatically, and that this did not justify paying anywhere close to $4.1 million. His evidence was based on a review of the SAT licence and a proposal document by MicroLink *"to determine what it was trying to do"*: he had not analysed the actual SAT software, because he did not have a copy of it.

(3) The SAT had core features and additional and useful capabilities and functionality of real utility which IDOL's Stat Server did not have, as email exchanges in August 2009 revealed had been noted within Autonomy.

(4) Further, and as Dr Lynch emphasised particularly in cross-examination, SAT could export to systems like 'Cognos' providing business intelligence reporting capabilities, which again Stat Server could not, as then configured.

(5) Although Dr Blanchflower talked of writing additional functionality within an hour, that was likely to have been greatly exaggerated.

    (6) Even where there was an overlap in functionality between Stat Server and SAT, there was evidence that the Stat Server was poorly regarded within Autonomy.

    (7) Further, the Defendants submitted that SAT was acquired at fair value, and indeed that the Claimants did not suggest otherwise at trial.

28.    The Defendants did not, however, have evidence to contradict the other two points relied on by the Claimants in relation to the SAT: they acknowledged that the evidence of the use after its purchase was *"not clear"*, and they did not dispute the flow of funds, instead submitting that it was irrelevant if the transaction (which was endorsed by Autonomy's board of directors) was a sound one for fair value.

29.    In my judgment, the preponderance of the evidence is such as to cast real doubt on the reasons relied on by the Defendants for the purchase of the SAT at such a price. As so often, the Defendants could muster ostensibly coherent points of justification (as, for example, for the 'pure' hardware sales); but the weight of evidence against those points having really driven the decision is considerable and, in my assessment, clearly preponderant. I cannot accept that the Claimants did not suggest that the price paid was excessive: that was the inevitable consequence of their arguments, and Dr Blanchflower expressly stated that the SAT was not worth nearly as much.

*The AIS purchase*

30.    The second transaction which the Claimants relied on in this context was Autonomy's purchase in Q3 2009 of resale and distribution rights in respect of AIS software from MicroLink at a cost of $5.2 million.

31.    MicroLink's presentational material explained that AIS, which had two principal components (AIS webparts and AIS Fetch) had been developed by MicroLink, leveraging its long experience of both Autonomy's products and Microsoft SharePoint, to enable its customers to enhance their use of Autonomy's products by allowing them to utilise IDOL 7 and Microsoft SharePoint in a unified platform. It was designed to have encryption levels up to US federal standards so that it could successfully be deployed to the US Government and Fortune 500 companies.

32.    The Claimants made very similar points in relation to the AIS purchase as in relation to the SAT purchase, contending that:

    (1) No proper evaluation was undertaken by Autonomy prior to purchase;

(2) Autonomy already had its own SharePoint connector prior to the purchase;

(3) The creation of such a connector is not particularly complex, and Mr Greenwood (who was Autonomy's Head of Connectors) was not challenged on his evidence that it would probably not have taken more than 3-4 weeks of a developer's time; but Mr Greenwood was not consulted or even told about the AIS purchase;

(4) There was sparse, if any, evidence of its use within Autonomy after its purchase; and

(5) The payment flows between Autonomy and MicroLink, showing the moneys received by MicroLink being paid on to Autonomy almost at the same time, constituted further strong evidence that the true reason for the purchase was to

put MicroLink in funds with which to pay its debt in respect of its VAR transactions with Autonomy.

33. Likewise, the Defendants rejected the Claimants' contentions in relation to AIS on much the same basis as they had sought to reject the SAT allegations, contending that:

(1) Contrary to the Claimants' case (and evidence on their behalf from Mr Greenwood) there had been a proper evaluation including by Mr Lucini, which had also satisfied Deloitte which reviewed it with the assistance of its in-house technical expert, Mr Ben Johnstone, who consulted both Mr Lucini and Dr Menell;

(2) The AIS product did not overlap with Autonomy's connector product. The Claimants' suggestion to the contrary was based on a narrow review of only one element of the product, known as the AIS Fetch (as the connector was called), whereas the product's other element, the "webparts" constituted the real *"heart of the product"* which was both different and of great utility to customers (offering, for example, enhanced search and encryption levels), as illustrated by its deployment in Government and Fortune 500 companies (including the US Joint Forces Command and NASA) for use with their IDOL and SharePoint products;

(3) There was no suggestion that the purchase was not at fair value: and Deloitte had been satisfied in that regard also.

34. Again, as in relation to the SAT, the evidence of subsequent use within Autonomy was sparse; but the Defendants pointed to the fact that there is no reason to suppose that the product was not used,

given the evidence of its use in the market, and also to the fact that although the Claimants had originally pleaded that Autonomy never used the product, they had amended to delete and abandon that plea. As to the money flows, the Defendants made the same point as in the context of SAT: that if the transaction was a commercially fair one, what was done with the proceeds was irrelevant.

35. I consider the assessment whether the AIS purchase was predominantly an expedient to rescue MicroLink from the *"hook"* to be more finely balanced than the similar question relating to the SAT. On balance, however, even if there was a coincidence of benefit to Autonomy and an imperative to release MicroLink, the episode is consistent with, and mildly supportive of, it having always been the intention and shared understanding that MicroLink should not be left *"on the hook"*.

*Acquisition of MicroLink by Autonomy*

36. The third of the transactions relied on by the Claimants as further evidence of the side agreement or understanding they alleged in the context of VT1 was the MicroLink acquisition, which closed in January 2010 for $55,000,000.

37. The Defendants contended that the MicroLink acquisition was made for solid and sound commercial reasons: being to ensure that Autonomy could continue sales to the US Federal Government after the US regulatory clearance which it had through a US subsidiary called Verity Inc expired. This happened when the US Federal Government changed the rules and prohibited foreign companies (such as Autonomy) conducting such business through a US subsidiary unless that subsidiary was ring-fenced or segregated in management terms from its foreign parent. Dr Lynch gave the following explanation in his witness statement:

> *"285. MicroLink was a longstanding partner of Autonomy based in the US. It had federal security clearances and thus could sell to and work with the US Federal Government, like the National Reconnaissance Office, which typically only purchased through companies with security clearances. MicroLink were very familiar with Autonomy technology and its marketability in the federal space. They had been a partner of Autonomy's since 2004.*
>
> *286. As a UK company, it was difficult for Autonomy to get federal security clearance. Prior to the MicroLink acquisition, as a workaround*

*solution, Autonomy's US federal business was run by Verity, a US subsidiary that did have these clearances. In Autumn 2009, the US Federal Government changed the rules on how foreign companies could conduct US federal business. Using a US subsidiary was no longer sufficient; the subsidiary had to be ring-fenced from the parent. This was not practical with Verity because the majority of its business was commercial, and its commercial and federal businesses were integrated. Autonomy therefore needed to acquire a company that would be solely federal, that could be ring-fenced from the commercial business. MicroLink was a good choice for Autonomy—it had contacts in the federal space, had the requisite security clearances and was already a strong Autonomy partner. We thought the acquisition would keep our federal business alive and strengthen it. Autonomy approached Mr Dave Truitt, then CEO of MicroLink, about the idea. He was receptive and saw that it was a good business opportunity.*

*287. The negotiations were led by Messrs Kanter and Hussain. I agreed with the strategy to acquire MicroLink and was kept abreast of developments by other members of management. Autonomy valued MicroLink at $55M and that was the price ultimately agreed. It was also agreed that Mr Dave Truitt could spin out certain business from MicroLink to form DiscoverTech. Mr Dave Truitt negotiated a deal whereby DiscoverTech would own the IP to certain MicroLink products that were in their infancy, including DiscoverEngine, which DiscoverTech could then further develop and sell.*

*288. It was further agreed that Mr Dave Truitt would stay at MicroLink for one year after the acquisition, to facilitate the transition, and then be allowed to move to DiscoverTech full-time as the CEO. I understand HP has suggested that something nefarious can be inferred from the fact that Mr Dave Truitt was involved with a number of the resellers implicated in their claims. As explained, Mr Dave Truitt was the prior CEO of MicroLink who then became the CEO of DiscoverTech, a business he spun out of MicroLink. I now know that he was also a silent investor in MicroTech, where his brother Mr Steve Truitt worked, but had no role in the management*

> *of the MicroTech business. I do not recall being aware of this at the time. However, from my perspective, nothing improper can be inferred from the above and Mr Dave Truitt's role in both MicroLink and DiscoverTech did not raise any concerns for me at the time.*
>
> *289. From my perspective, $55M was a fair price for the acquisition of MicroLink. The federal business was a reasonable slice of Autonomy's business but we felt we were underrepresented. In acquiring MicroLink we acquired the necessary clearances and cleared personnel to be able to operate in the US federal sphere. Security clearances can take years to come through, making MicroLink much more valuable than an ordinary services company. It turned out to be a very successful acquisition and led to considerable business for Autonomy.*
>
> *290. Autonomy's Board of Directors approved the acquisition after reviewing information regarding the strategy behind the deal and the valuation. I also understand that Deloitte handled the acquisition accounting and assessed the value of MicroLink, how it should be valued on our books and what to do with the inter-company debt. To my knowledge, Deloitte did not raise any concerns about our accounting for the acquisition."*

38.   In those circumstances, the Defendants contended that Autonomy had limited options, which Dr Lynch presented as having been as follows:

> (1)   It could seek to restore Verity's clearance by imposing the strict segregation required.   However, this was considered to be commercially unrealistic given the substantial size of Verity and the level of integration of Verity's business, products and staff with the wider group.
>
> (2)   It could exit the federally cleared business, transacting only such deals as it could achieve with cleared resellers who dealt with those federal customers.   This would be to cede a substantial potential business stream to middlemen, leaving Autonomy with far less control of the business and forced to pay margin to the reseller on any sale. Dr Lynch explained (in fact, in connection with the ATIC transaction) that Autonomy had striven over the years to get itself out of the position of being

beholden to the margins extracted by large resellers such as Lockheed Martin. The prospect of operating in this arena without a federally cleared subsidiary was not attractive.

(3) Autonomy could alternatively acquire a federally cleared reseller which was able to maintain as a sufficiently segregated entity that it complied with the clearance requirements, but without impeding the integration of important members of the group (as would happen if Autonomy attempted to restore Verity's clearance). This, according to Dr Lynch, was precisely what the MicroLink acquisition offered.

39. The evidence of full board of directors' approval of the acquisition after careful explanation was clear. Deloitte, which was fully aware of MicroLink's indebtedness, also prepared a detailed analysis paper, addressing primarily whether after acquisition MicroLink would have to be treated as a separate segment for accounting purposes but dealing also with the structure and rationale of the acquisition including the prior spin-off of the DiscoverPoint business which formed a prong of the Claimants' attack as described below.

40. The Defendants pointed out that the Claimants' own witnesses, and in particular Mr Egan and Mr Kalbag, supported the rationale and the decision. Mr Egan said he was *"100% for this, absolutely, yes"* though he also made clear that his memory of the transaction was very limited. He added that his belief at the time was that it *"was a nice benefit of it"* that the debt *"would be effectively forgiven because MicroLink would be a part of Autonomy"*. When cross-examined on the broader statement in his witness statement that he believed that to have been also the perspective of Dr Lynch, Mr Hussain and Mr Kanter, he accepted that he did not have evidence of their belief or outlook: *"It was just a belief that I had…"*

41. Against this, the Claimants' case was that it was that benefit which was an operative, and probably the primary, rationale of the acquisition. They accepted that the rationale offered by the Defendants was also part of it, but they asserted that it was not the whole or even the largest part of it. They relied in summary on the following matters:

(1) By September 2009, MicroLink owed Autonomy some $22.7 million, which would cause problems also for any future deals when Deloitte assessed collectability, as Dr Lynch accepted in cross-examination he knew.

(2) Although Dr Lynch added that it *"wasn't due…"*[529] and there was an email from Mr Hussain supporting that, the Claimants suggested that the effort to downplay the position was *"carefully-crafted"* and that there was real concern about the debt and MicroLink's deteriorated position, including the concern that Deloitte would be against further sales to MicroLink on collectability grounds.

(3) Mr Egan's evidence in his witness statement was that from his perspective and (again as he perceived it) also that of both Defendants and Mr Kanter forgiveness of debt which it would enable was *"one reason for Autonomy to purchase Microlink"*.

(4) Even though there was a likely benefit to Autonomy in acquiring a federallycleared reseller such as MicroLink, that was not an imperative. The acquisition was not necessary in order for Autonomy to continue selling to US government customers: they pointed out that Autonomy could instead have sold through federally-cleared resellers, and they cited in that context an email to Dr Lynch dated 14 September 2009 where Mr Kanter had said just that.

(5) The process (between Mr Hussain and Mr David Truitt) which then started to negotiate terms was far from arms' length. Various proposals were discussed; but a hallmark of each was the focus of both parties on ways of structuring the deal so that (a) Mr Truitt would pay for certain proprietary products/rights from MicroLink to enable him to carry on business using them in a new vehicle of his own (which was the basis of DiscoverTech) (b) the acquisition price for MicroLink would be calibrated to cover the purchases and (c) in that way Autonomy would be able to recognise revenue from the sales of assets taken out.

(6) MicroLink's financial position by December 2009 was difficult (if its indebtedness to Autonomy was real). It had paper assets of just under $24.5 million; only some $362,069.17 of these assets were in cash, and by far the largest asset, in the sum of $13,711,426.50, which was

---

[529] An email dated 14 September 2009 from Mr Hussain to Mr Egan cc Dr Lynch stated that the indebtedness was not such a concern because *"June 09 deals not owed is $10.9m leaving $11.8m; $9.6m is owed from the EDD deal in December 08 which had long payment terms; so as long as we receive about $1.5m we should be up to date"*.

classified as *"Inventory Asset"*, was stated to be *"Licences purchased from Autonomy not yet resold"*. Its total liabilities were stated at $26.9 million, of which the vast majority, $23,961,729.22, consisted of *"Accounts Payable"* explained as being sums *"Due to Autonomy"*. There was little or no prospect of MicroLink paying Autonomy out of its own resources. If some or all of the Autonomy software held in in MicroLink's inventory could not be onsold then MicroLink's liabilities would very substantially exceed its assets.

(7) In the event, MicroLink's outstanding indebtedness was duly forgiven or written off after the acquisition in October 2011.

42.  The Claimants added to this that the purchase price of the acquisition was, in effect, enhanced by $10,000,000 so that, in return, Mr David Truitt's new company, DiscoverTech, would have the funds to purchase a software licence of the same sum from Autonomy so that Autonomy could recognise $10,000,000 of revenue in respect of the impugned VAR transaction between Autonomy and MicroTech for end-user DiscoverTech referred to as VT5. I shall deal later with that last point relating to VT5: see paragraphs *255ff.*

43.  In concluding my assessment of the issue as to the rationale of the MicroLink acquisition it is fair to acknowledge the following points of importance:

(1) There was considerable dispute as to the exact net position in MicroLink given that (a) Dr Lynch was correct in saying that not all the indebtedness to Autonomy was yet due and (b) some of the *"inventory"* of Autonomy software licences that MicroLink had not yet onsold was capable of being realised, though it does appear that its value was written down shortly after the acquisition by $10.66 million;

(2) Dr Lynch was adamant in cross-examination that *"the company was not struggling, it was very successful and growing rapidly and had blue chip customers"*;

(3) Autonomy's board of directors unanimously approved the acquisition on the express basis that it was *"critical to accelerate the adoption of Autonomy solutions in the Federal space, where our growth prospects are limited by the lack of direct selling ability due to security requirements"*;

(4) The Claimants acknowledged that this was an important factor in the decision to acquire MicroLink;

(5) Mr Egan's evidence was that he did think at the time that the acquisition proved successful and there was evidence suggesting, for example, that some six or seven months after the acquisition, MicroLink was awarded a very large contract (the largest, it was said, in its history) by a major US Federal agency.

44. Nevertheless, the coincidence and urgency of the timing, the nature of the negotiations between Mr Hussain and Mr David Truitt, and the basic fact that the effect was to enable MicroLink's indebtedness to Autonomy to be dissolved, have persuaded me that the latter was a substantial part of the rationale for the acquisition, and that it is supportive of the Claimants' case that one way or another, Autonomy did what was necessary to ensure that its 'friendly' VARs were not left *"on the hook"*.

*Summary of conclusions in respect of VT1 and associated purchases*

45. In summary, the three purchase transactions addressed above reinforce my conclusion that the VAR transactions comprising VT1 were not true sales, and the obligations assumed in law were never intended or expected to be enforced.

46. I accept the Claimants' case in relation to the VT1 transactions that:

(1) Notwithstanding the legal enforceability of the provisions of the contracts governing them, in reality it was never intended or expected that the VAR would have any role in respect of the negotiation and sale to an end-user of the software licenced to it: that was intended to be and in the event was exclusively a matter for Autonomy. The VAR was in terms of what was actually intended or expected of it, no more than a placeholder.

(2) It was not expected or intended that the VAR should ever be required to pay, or in fact pay, any sums due under the VAR sale out of its own resources. The three purchase transactions provide confirmatory evidence of this.

(3) The Defendants knew this; and that recognition of revenue from the VAR sale was improper.

## The Capax Discovery VAR deals in Part I: VT2, VT3, VT4 and VT10

47. I turn to address the following impugned VAR transactions with Capax Discovery: VT2 (for proposed end-user TXU), VT3 (for

proposed end-user Kraft), VT4 (for proposed enduser Eli Lilly) and VT10 (for proposed end-user the UK FSA). I have selected those four transactions with Capax Discovery as providing examples from the formative stages of Autonomy's engagement with Capax Discovery and thereafter a reasonable chronological spread, and also because they appear to me to illustrate particularly clearly, but representatively, certain important aspects of that engagement.

*Various antecedent points*

48.   Before turning to the specific transactions, however, it is convenient to record certain details of the antecedents to the VAR sales to Capax Discovery, which provide some insight into the pattern of those sales, and a few key points relevant or common to all the impugned VAR sales to Capax Discovery.

*A relevant antecedent arrangement?*

49.   The first of these key points relates to the background to Autonomy's use of Capax Discovery as a VAR. Autonomy's first engagement with Capax Discovery was not a VAR sale. It was a licence and distribution agreement made between Autonomy Inc and Capax Discovery on 31 March 2009 (the last day of Q1 2009), signed by Mr Egan on behalf of Autonomy Inc and Mr Baiocco on behalf of Capax Discovery ("the first Capax Discovery/EDD sale"), which forms part of the Capax reciprocal transaction, which I address in detail in the chapter of this judgment that deals with the "Reciprocal" transactions. The term of the agreement was five years from the effective date of 31 March 2009.

50.   The licence and distribution agreement provided for Autonomy Inc to grant Capax Discovery a licence to use software whilst providing services or installing Autonomy software (which included Autonomy's e-Discovery software, Introspect and EAS) for the benefit of Autonomy customers. The consideration for the licence grant was (i) an initial licence fee of $7,500,000, (ii) a royalty fee equal to 20% of the net revenues earned by Capax Discovery, which was payable once Capax Discovery's net revenues from distributing Autonomy's services and/or providing its own Software-as-a-Service ("SaaS") offering exceeded $25 million, and (iii) an annual support fee equal to 5% of the licence fee, i.e. $375,000, the first two years of which was payable with the initial licence fee. The initial licence fee and the support fee for the first two years of support services, totalling $8,250,000, were payable in accordance with a schedule set out in the first Capax Discovery/EDD sale. The first instalment of $500,000 was due on 30 April 2009. There were then eight instalments of $968,750, which were due at three-month intervals thereafter until 31 March

2011. Autonomy recognised the $7,500,000 licence fee as revenue in Q1 2009.

51. The first Capax Discovery/EDD sale was clearly important to Autonomy's quarterly revenue targets, as the emails demonstrate. On 31 March 2009, Mr Robert Sass ("Mr Sass") sent Mr Hussain and Mr Egan (among others) an email marked with 'high importance' saying: "*CAPAX IS IN (SIGNED COPY IN HAND)*". A few hours later, Mr Hussain replied, copying Dr Lynch, saying "*Very well done to the both of you – I like $7.5m deals!*".

52. The problem was that, at the time, Capax Discovery was a newly-formed entity, established by Mr Baiocco to set up an e-Discovery business. It had no substantial assets, no revenue stream and no trading record, as documentary evidence makes clear Mr Hussain and Autonomy's finance department were well aware. According to the Claimants, this was no real impediment from the point of view of Mr Baiocco and Mr Egan because they had reached an agreement that Autonomy would channel sufficient funds to Capax Discovery to allow it to pay instalments due under the first Capax Discovery/EDD sale, and to provide what Mr Baiocco referred to as a *"champagne smacking"* profit. But it was a problem from the point of view of establishing a paper trail of financial information sufficient to justify a deal of such magnitude with such a fledgling counterparty.

53. When Mr Chamberlain outlined the financial information he would want to see from the new entity, including "*at least the first years['] worth of payments as funding*" and a budget to demonstrate that it was expected to be a profitable business that would be able to generate cash to meet the longer term obligations, on 31 March 2009, Mr Baiocco provided Mr Sass with financial statements for Capax Global. But this was accompanied by a letter stating that:

> "*Capax Discovery LLC is looking forward to a successful business relationship with Autonomy. The specific contract terms are being finalized and the contract should be ready for signature shortly.*
>
> *In the meantime, Autonomy has requested financial information for Capax Global LLC. We are here providing that information but with the express understanding that Capax Global LLC is a separate and distinct entity from Capax Discovery LLC. All contractual obligations will be between Capax Discovery LLC and Autonomy only.*"

54.  The message was clear: it should <u>not</u> be assumed that Capax Global
     would stand behind the financial obligations of Capax Discovery.
     As Dr Lynch was keen to point out in his first witness statement
     and in his oral evidence, in the real world, parent companies will
     often be expected to stand behind their subsidiaries, for
     reputational and other reasons. Mr Baiocco's letter negated any
     such expectation. If it was not already apparent to Autonomy that
     a reason for Mr Baiocco forming the new entity was to insulate
     Capax Global, that point was driven home by this letter.

55.  According to Mr Welham, that clear message was not, however,
     shared with Deloitte: it was Mr Welham's unchallenged evidence
     that Deloitte was <u>not</u> provided with a copy of this letter, either
     during its review or at any time thereafter. As the Claimants
     submitted, it is not easy to think of an innocent explanation for why
     Autonomy withheld the letter from Deloitte; even Dr Lynch was
     stumped: he resorted to a generality about a parent always wanting
     to avoid reputational risk, not able to come up with an explanation.
     Mr Hussain could not be asked: but the Claimants submitted, as
     must be right and I accept, that with the finance department so
     exercised about the issue it is most unlikely he did not know about
     the difficulty or that any of this happened without his knowledge.

56.  If a paper trail to justify the position could not be developed, the
     importance of showing that Capax Discovery was in fact paying its
     debts became all the more important. Consistently with what
     according to the Claimants' case had been agreed between Mr
     Egan and Mr Baiocco (as they each confirmed it had been), the
     process adopted to give the appearance of a fast-developing
     revenue stream from which Capax Discovery could (and in the
     event, did) pay the instalments due under the first Capax
     Discovery/EDD sale was for Autonomy to invoice and pay Capax
     Discovery for "*outsourcing*" what were described as 'specialised
     EDD services' to Capax Discovery.

57.  According to the Claimants, the supposed *"outsourcing"* was a
     fiction. It was Mr Egan's clear evidence that, just a week or so after
     the licence, Capax Discovery was not then in a position to perform
     e-Discovery services for Autonomy's customers; in other words,
     Autonomy could not outsource its own e-Discovery work to Capax
     Discovery. Mr Egan accepted in cross-examination that he did not
     *"proactively tell"* anyone in Autonomy's finance department; but
     he was firm in his belief that Mr Hussain and Dr Menell would
     certainly have known this from the fact that the work could not
     possibly have been done so little time after the licence.

58.  To return to the 'handshake' agreement between Mr Egan and Mr
     Baiocco, it is to be noted that the existence of an arrangement
     between Mr Baiocco and Mr Egan was not challenged. Rather, the

challenges came in the form of: (i) the timing of the arrangement, (ii) its terms, and (iii) who else knew about it. There was considerable dispute about all three issues, and especially the question of the terms of the agreement in light of conflicting evidence that a note of an interview with Morgan Lewis in February 2013 suggested Mr Baiocco had given, to the effect that the only agreement was that Autonomy was going to send Capax Discovery enough business to cover the instalments due under

the first Capax Discovery/EDD sale, rather than that Autonomy would initially fund such instalments.

59. For reasons more elaborately explained elsewhere (see paragraphs 2497 to 2502 in the main body of the judgment) I have concluded that the 'handshake' agreement was before the written agreement, as Mr Baiocco told me it was; and that the agreement was a means of getting the funds to Capax Discovery to enable it to pay instalments due under the first Capax Discovery/EDD sale. But for present purposes, the more immediately relevant points are, as it seems to me, that these arrangements (a) do suggest a previous track record of arrangements between Mr Baiocco and Mr Egan that sat outside a contract, and quite radically altered its economic substance from that apparent from the legal terms and (b) provide a foretaste of the arrangements which on the Claimants' case underpinned all the impugned VAR sales.

*Standard terms of the Capax Discovery VAR sales*

60. The second of the 'key points' is that each of the Autonomy/Capax Discovery VAR sales transactions took place under a VAR agreement between Autonomy and Capax Discovery dated 30 June 2009 ("the June 2009 Capax Discovery VAR Agreement"). This provided for the following, amongst other things:

(1) Clause 5.1 stipulated that there was required to be a purchase order for each sale transaction, and in the event of any conflict between the terms of a purchase order and the agreement, the terms of the VAR agreement would prevail.

(2) Clause 23 stated:

"***ENTIRE                    AGREEMENT: AMENDMENT****. This Agreement sets forth the complete and exclusive agreement between the parties with respect to its subject matter and supersedes any and all other written or oral agreements previously existing between the parties with respect to such*

> *subject matter. No alterations, modifications or additions to this Agreement shall be valid unless made in writing and signed by a Director or Officer of each party. The terms of any purchase orders or the like submitted by the VAR which conflict with any terms in this Agreement whether or not countersigned as accepted by Autonomy shall not be binding on Autonomy, regardless of Autonomy's failure to object to such terms."*

This provision was drawn so as to invalidate the legal effect of even written variations drawn up in purchase orders between Capax Discovery and Autonomy. Any variation necessarily needed to be in writing and signed by a director or officer of Autonomy. The clause similarly negated any prior arrangement reached between Capax Discovery and Autonomy (or more pertinently, any Autonomy salesman).

(3) Clause 7(c) made it clear that Capax Discovery was unequivocally on risk for any purchase, irrespective of whether or not Capax Discovery could obtain payment from an on-sale to an end-user:

> *"VAR shall not be relieved of its obligations to pay fees owed to*
> *Autonomy hereunder by the non payment of fees by an end-user."*

61.   These provisions made crystal clear the legal position that no side or collateral agreements would be effective in law to modify in any way the legal obligations assumed, and that the VAR's obligation to pay was not in any way conditional on itself receiving funds from an end-user.

*Audit confirmation letters in every case*

62.   The third of the 'key points' is that this position in law was further buttressed by the requirement of the auditors that the VAR (here, Capax Discovery) must sign 'debtor confirmation letters' in respect of the debt arising under the impugned VAR deals. The debtor confirmations are identified further below by reference to the individual transactions. For example, in VT16 (which *inter alia* related to the Amgen deal) the debtor confirmation stated:

> *"The items listed above were properly charged to our account and were unpaid as of 30th September 2010 and there are no side letters or other agreements in respect of the subject matter of this request, except as noted below:*
> *[Nothing was noted.]*
>
> *We acknowledge that Autonomy Corporation plc retains no continuing managerial involvement in the delivery of this product or service, other than stipulated in the licence agreement."*

63. Fourth of the 'key points' was that Mr Baiocco, who invariably represented Capax Discovery in each of the sales, confirmed in his evidence that he *"absolutely believed"* the debtor confirmations he signed to be true. Mr Egan also believed them to be true. In Mr Baiocco's witness statement, in language smacking of considerable lawyering, Mr Baiocco set out his view of the nature of the Capax Discovery transactions in general terms as follows:

> *"A value-added reseller ("VAR"), as that term is usually used, is a company that purchases a product from a manufacturer or supplier to which it adds features or services and then resells the package (usually to an end-user) as an integrated or completed solution. However, that was not the nature of the relationship we had with Autonomy. Instead, Mr Egan told me that Autonomy often faced the situation where it was very close to completing a sale to an enduser, which it was not able to conclude by the end of the quarter. Rather than Autonomy lowering the price to get the end-user to sign a contract before quarter end, Autonomy wished instead (a) to enter into an agreement with us at quarter end supposedly for on-sale by us of the software in question to the enduser, and then (b) to continue to negotiate with the end-user and to close the deal with the end-user in the following quarter. In return, Capax Discovery would receive a 10% fee."*

## VT2: Capax/TXU in Q2 2009 and Q3 2009

64. The Capax Discovery/TXU VAR transaction (VT2) was the first VAR sale by Autonomy to Capax Discovery. Mr Baiocco's evidence was that he was approached in around May or June 2009 by Mr Egan, asking whether Capax Discovery would become a reseller for Autonomy.

65. VT2 was in two parts. Both sales were on the terms of purchase orders issued under the June 2009 Capax Discovery VAR Agreement (see paragraph 60 above) for prospective end-user TXU. The first purchase order was dated 30 June 2009 and was in an amount of $783,086 for the licence fee plus $78,309 for support and maintenance to be paid in three instalments within 90, 180 and 270 days respectively of 30 June 2009. The second purchase order was dated 30 September 2009 and was in an amount of $462,840 for license ($61,652), support and maintenance ($6,165) and hardware ($395,023).

66. The Claimants relied especially on the following features of VT2:

   (1) At the time, Capax Discovery had only very recently been incorporated. At least if looked at as an entity legally separate from its parent (Capax Global), the risk in taking on a liability of $1.3 million was very considerable.

   (2) Although Mr Baiocco accepted in cross-examination that part of the incentive for doing the TXU deal was that Capax could try to build a relationship with TXU, and Capax did then obtain some business from TXU, the Claimants contended that the risk was so disproportionate to the reward for a recently incorporated entity that it lacked any *"sensible business justification"* absent some other explanation of its acceptability to Capax.

   (3) The Claimants submitted that the obvious explanation of this basic mismatch between legal exposure and the rationality of taking the risk was that there was a side agreement or understanding that Autonomy would relieve it of the risk.

   (4) They contended further that that explanation is supported by the fact that there is no evidence of any price negotiation between Capax Discovery and either Autonomy or TXU, nor of any assessment by Capax Discovery of the inherent risk by reference to the then state of negotiations for an end-user deal and the reliability of the end-user and its covenant.

   (5) There is no evidence that Capax Discovery was ever intended to, or did in fact, have any involvement in Autonomy's ongoing attempts before and after the purchase orders to negotiate an end-user deal with TXU. Only Autonomy negotiated with TXU.

   (6) After its exclusive negotiations with TXU, Autonomy entered into a direct Master Services Agreement with

TXU and a Product Purchase Agreement exhibited to it on 18 September 2009 for the sale and purchase of both software and hardware for a total fee of $1,693,404 with an additional fee for consulting and training of $112,500.

(7)     The 'direct' sale differed in substance from the VAR sale: and the fees payable were more than double those payable under the first Capax Discovery purchase order. In an email dated 15 September 2009 from Mr Livius Guiao ("Mr Guiao") to Mr Hussain, Dr Menell, Mr Kanter, Mr Chamberlain and others Mr Guiao expressed the need to check that given that *"the terms of this deal were not contemplated at the outset, and largely defined in response to customer demands in the context of the negotiation"* and *"Given the one-off nature of where we ended up"*, all concerned were *"Ok with moving forward"*. Of course, Autonomy had it in its power to deliver software whether or not the subject of the VAR sale, and to make an agreement without regard to any restrictions that might apply to a VAR.

(8)     Although the contract was "direct" between Autonomy and TXU, the direct sale agreements provided that TXU was to pay Autonomy or Autonomy's designated payee. On 30 September 2009 Autonomy notified TXU that all fees due under the Product Purchase Agreement were to be paid to Capax Discovery.

(9)     The sums thus to be paid to Capax Discovery exceeded the sums payable under the first purchase order by almost double; it was (so the Claimants alleged) because of this that Autonomy arranged for Capax Discovery to issue the second purchase order for the purchase of software and hardware.

(10)    Mr Baiocco gave unchallenged evidence that:

> *"TXU paid Capax Discovery $47,000 per month over the next 36 months. Between December 31,2009 and September 6, 2011, Capax Discovery paid Autonomy the full amount of the two TXU purchase orders and retained the balance of $370,000."*

(11)    Although Capax Discovery thus pocketed some $370,000 despite having no role in bringing about any sale of the software licence to TXU, unusually the payments from TXU came in 36 relatively modest tranches: and, significantly according to the Claimants,

this coincided with (or the Claimants would say, resulted in) an exactly corresponding delay in Capax Discovery paying on to Autonomy what was owed. That, the Claimants suggested, evidenced a side agreement or understanding that Capax Discovery would only pay if and when paid.

67.   The Claimants' case was that the vice of the arrangements was further demonstrated by the fact that Autonomy never told Deloitte about the direct Autonomy/TXU agreement; and in (allegedly) unchallenged evidence Mr Welham stated in his witness statement that this was would have been relevant for Deloitte:

> *"...because evidence of revenue reversals on sales to Capax Discovery would have been relevant to our assessment of the timing of revenue recognition in relation to further Capax Discovery sales. As I will explain further below, Deloitte became aware in the first two quarters of 2010 of a handful of VAR transactions being replaced by direct deals between Autonomy and the enduser, and these caused Deloitte concern."*

68.   Mr Welham added that he would have expected any direct deal with TXU in Q3 2009 to have been included in a list of all revenue deals of $100,000 or more provided by Autonomy to Deloitte for the purpose of its Q3 2009 review: but it was not. The Claimants contended that by not including the direct TXU deal in Autonomy's list of Q3 2009 transactions with revenues exceeding $100,000 Autonomy deliberately concealed from Deloitte the fact of the direct dealing because (it was stated in the Claimants' closing submissions):

> *"the existence of the direct sale would have given rise to a concern that the agreement with Capax Discovery had, in effect, been reversed and would later be seen by Deloitte as part of a pattern of such reversals."* [530]

69.   The Defendants disputed all these contentions, and submitted that:

(1)   The terms of the June 2009 Capax Discovery VAR Agreement made it clear that the VAR was obliged to pay (and was not relieved by any non-payment by the end-user) and that the agreement comprised the entire agreement between the parties. The terms of the contractual arrangement also made it clear that the risk

---

[530] Being precisely the concern later expressed by Deloitte in 2010.

of ownership had passed, and that managerial control was not retained.

(2) None of this was said to be a sham. The June 2009 Capax Discovery VAR Agreement represented the intentions of the parties, and they had promised they had no other.

(3) Further, there was no 'direct' evidence of any side agreement or understanding. On the contrary, Mr Baiocco had accepted that on all the Capax Discovery VAR deals, including this one, Capax Discovery was well aware of the terms of the arrangement and the nature and legal fact of the risk; he accepted the risk because he was confident that an end-user deal would be closed and in the hope and expectation of immediate profit and then longer term reward by way of a direct and valuable relationship with the end-user. Mr Egan did not specifically address the TXU deal in his witness statement, and did not suggest there was anything unusual or improper about it.

(4) The second purchase order was not occasioned to *"remedy the disparity between Capax Discovery's 30 June 2009 purchase order and the Autonomy/TXU agreement"* (as the Claimants alleged) but to cover additional licences, newly agreed managed services and support and hardware, as recorded in an internal Autonomy email dated 15 September 2009 from Mr Livius Guiao to Mr Hussain, Dr Menell, Mr Kanter, Mr Chamberlain and others requesting confirmation of the deal, which stated (*inter alia*) as follows:

> *"Background: We sold licence and support through our reseller CapAx last Q, and they submitted a PO for $783k licence + 10% maintenance. It has since evolved into a managed services engagement for which TXU will pay CapAx $47k per month for 36 months. This fee is payment for Qfiniti licences, hardware and managed services (including support). It's my understanding that we are waiting for a second PO for CapAx to cover the managed services and hardware."*

(5) As mentioned above, Capax Discovery did indeed subsequently enter into a subcontracted service

agreement with TXU; and Mr Baiocco confirmed in his testimony in the US criminal proceedings that the deal worked *"in the way we hoped it was going to work"* (though it is fair to add that he said this to contrast the position with later deals).

(6)  The statements in the Goldberg Segalla letter (see paragraph 2024 in the main body of the judgment) were true: and see paragraphs 2020 to 2028 in the main body of the judgment. The most that was said between Mr Egan and Mr Baiocco was that Autonomy would try to assist Capax Discovery if the end-user did not close by slotting Capax Discovery into another deal (*"backfilling"*, which did not deprive the original VAR deal of substance and did not undermine revenue recognition in respect of it). Mr Baiocco did not regard this as a side agreement at the time, or consider that he was involved in anything fraudulent.

(7)  Capax Discovery had the ability to pay, if it had to. Deloitte expressly noted in their Q2 2009 review that it had a profitable business model, and drew comfort from the fact that the prospective end-user (TXU) was a Texas power company serving around 2 million homes, with latest accounts showing revenue of some $15 billion.   Further, Capax Discovery's parent company, Capax Global, had adequate resources; business with Autonomy was potentially very profitable and a source also of valuable service work, all of which default would have squandered.

(8)  Criticism of the second purchase order was misplaced: there was nothing improper in completing the overall transaction via the reseller, the reseller having already assumed the risk in relation to the first (major) portion.

(9)  Likewise, criticism that Capax Discovery made a *"tidy profit"* was misplaced and did not suggest any side agreement or impropriety: risk deserved reward.

(10)  The provision for Capax Discovery to be paid by TXU as designated payee was unobjectionable likewise: the fact that Capax Discovery paid Autonomy only as and when paid by TXU might show reluctance or forbearance in the exercise of contractual obligations, but not that there was no real sale, nor that risk or reward or managerial control had been retained.

(11)  Deloitte had reviewed the revenue recognition on the deal as part of their Q2 2009 review (in July 2009) and, with an expressly recorded recognition in their

"method statement" that particular care was required since *"given the nature of Autonomy's business…revenue is seen as a driver for market assessment of the performance of the business",* were satisfied that revenue was correctly recognised.

70.  As to the allegations that Deloitte was misled, the Defendants submitted that:

(1)  It was only later, in 2010, that Deloitte became interested in being told about deals that had gone direct and where the VAR was relieved of liability as a result. After Deloitte had expressed that concern, Autonomy's finance department made a point of informing Deloitte of any such deals where the reseller was relieved of its liability as a result. The TXU deal occurred at an earlier stage.

(2)  In any event this was not a deal where the VAR was relieved from liability (rather, it was paid by TXU as its designated payee). Dr Lynch was asked about this in cross-examination. He told me he was not involved and did not know whether Deloitte was told of the direct deal; but he added that (a) in the case of a *"designated payee deal"*, *"the original deal isn't cancelled, it stays"* (b) Deloitte *"were given free run of all deals"* and (c) it was quite *"incorrect"* to suggest that Deloitte were intentionally not informed lest it might cause Deloitte to question the propriety of recognising revenue on VT2.

(3)  There was no reason to include the direct deal in the list of Q3 2009 deals in excess of $100,000 provided to Deloitte because that list was for revenue deals, whereas the direct deal raised no revenue additional to the Q2 2009 and Q3 2009 sales to Capax Discovery which had already been included in the revenue sheets, and it would have been wrong to double-count.

(4)  In reality, such complaint as the Claimants might have does not impact on the recognition of revenue from VT2: the most Mr Welham was prepared to say was that its disclosure *"would have been relevant to our assessment of the timing of revenue recognition in relation to further Capax Discovery sales."* It did not, in other words, affect their assessment of VT2.

*My assessment of VT2*

71.   In my judgment, VT2 is not sensibly explicable except on the basis that the shared intention and expectations of the parties to it were that Autonomy's *"real customer"* (to use Mr Egan's phrase) was the end-user, and Capax Discovery was in substance what the Claimants labelled a *"placeholder"* for the real transaction, expected to do nothing and pay nothing out of its funds.

72.   It is not realistically conceivable that a newly incorporated VAR which was genuinely at risk would have played such a minimal role after no due diligence and left Autonomy to carry on negotiations without participation of any kind or any process of keeping it updated and informed.

73.   Nor is it really conceivable that Autonomy would have expected to be paid by the newly incorporated entity set up (according to Mr Baiocco) to provide a further layer of insulation from any risk, or accepted payment in dribs and drabs from the VAR once the end-user sale was closed, unless the real deal was of a different nature and substance than the contractual one, and ascribed to the VAR in effect a nominal role.

74.   Any notion, sometimes suggested by the Defendants, that Autonomy was acting as agent for Capax Discovery and not on its own behalf is, in my view, almost impossible to square with the 15 September 2009 email from Mr Guiao referred to in paragraph 66(7) above, which demonstrates the extent to which Autonomy was negotiating for itself and without regard for the VAR, and the substantive economic irrelevance of the VAR sale save to trigger revenue recognition. It is a vivid illustration, to my mind, that Autonomy's customer was the end-user.

75.   I cannot regard the contractual terms as precluding an accountancy treatment consistent with the true substance of the transaction. The legal position would have held sway in any legal proceedings; but the accounts were intended to reflect its economic substance, and

    to include as recognised revenue only the revenue from a true sale where any onward sale to the end-user would truly be the adventure and responsibility of the VAR.

76.   I do not accept the argument that such a conclusion is based on hindsight, which is impermissible. The events which occurred did not alter the substance of the transaction: they reveal its true substance and what it always was intended to be. In my judgment, these considerations, which of course do relate in part to facts occurring after the date of the VAR sale, are relevant in determining the real intentions of the parties and the economic substance of the transaction.

77. My conclusions as above summarised are fortified by the failure to notify Deloitte of the fact of the "direct deal". I do not accept the distinction sought to be made by Dr Lynch for these purposes between a "cancelled" deal and a "designated payee" deal: the effect that the VAR was provided with the funds whereby to pay off the amounts due under the VAR sale and that the VAR sale otherwise became an irrelevance (so that the VAR apparently retained no rights under the licence notionally granted) appears to have been the same in both. I do not think any good reason was provided or suggested for the failure to disclose. In my judgment, the most likely explanation is, and I find, that Deloitte were not told because it would have upset Deloitte's understanding of the nature of the transaction and led to questions about the role of Capax Discovery.

*Particular points on the Defendants' involvement and knowledge of VT2*

78. The Claimants contended that both Defendants were aware of facts demonstrating the impropriety of the decision to recognise revenue from VT2 and that both are culpable accordingly.

*Mr Hussain's knowledge*

79. As regards Mr Hussain in particular, the Claimants contended in summary that:

   (1) The idea of involving Capax Discovery was, at least in part, his; and he took the credit for it: when Mr Egan reported to Mr Hussain and Dr Lynch by email dated 1 July 2009 that some large deals (*"Big ones"* with VMS, JPMC, Morgan and Intel) had successfully closed and also that *"...MM [Mr Mooney] got a $700k+ in from CAPAX that was not in Sush's planning"* Mr Hussain quickly responded that *"Unfortunately TXU (Capax) was in my planning but it came in a bit bigger!"*

   (2) Mr Hussain (as well as Dr Menell, Mr Kanter, Mr Chamberlain and others) was responsible for the allegedly inappropriate issue by Capax Discovery of a second purchase order to cover the unanticipated difference between the licence fees payable under the Autonomy/TXU direct agreement and those payable by Capax Discovery under the first purchase order (and see paragraph 66(7) above);

   (3) Mr Hussain was well aware, and kept a careful track, of the correlation between the staggered (36 in all) (i) receipts by Capax Discovery from TXU and (ii) payments by Capax Discovery to Autonomy, and was

thus aware of the matters alleged by the Claimants to reflect and demonstrate the "pay only if and when paid" side agreement or understanding;

(4) Mr Hussain was also aware of the direct deal between Autonomy and TXU: the Claimants appear to imply (there is no direct allegation) that Mr Hussain would have known that this should have been reported to Deloitte and that he should have ensured that it was so; likewise, they contended, he should have ensured the inclusion of the TXU direct deal in the list of revenue deals for the purposes of Deloitte's Q3 2009 review (see paragraph 68 above). The Claimants went on to assert that Mr Hussain probably authorised both omissions with a view to ensuring that the direct deal did not prompt a concern on the part of Deloitte about deal "reversals".

80. Except for emphasising his position as regards (4) in the preceding paragraph that *"it was right not to include the TXU deal in the revenue list and indeed it would have been wrong at that point to recognise revenue from the direct deal"* Mr Hussain did not respond in detail to these allegations, but he denied that there was any impropriety in anything that was done in respect of VT2.

81. In my judgment, Mr Hussain was closely involved in the salient elements of VT2 and knew that the VAR sale was simply intended to provide the basis for revenue recognition prior to the "real deal" with TXU. He was aware and indeed party to the fact that there was never any intention of requiring Capax Discovery to do or pay anything; and he knew and was involved in the arrangements which resulted in the "designated payee" way of enabling Capax Discovery to discharge its obligations under and make a profit on the VAR transaction which then became in law the irrelevance which in substance it had always been.

82. I also find that Mr Hussain knew and approved of the decision not to include the Q3 2009 direct deal between Autonomy and TXU in the list of revenue deals over $100,000 compiled for the purposes of Deloitte's Q3 2009 review, because to attribute revenue to direct deals which followed impugned VAR transactions (in respect of which revenue had already been recognised) would have been double-counting. I do not consider that decision to have been improper in the case of VT2, given that both the Q2 2009 and the Q3 2009 sales to Capax were included in the revenue sheets.

*Dr Lynch's knowledge*

83. As regards Dr Lynch, the Claimants did not in their pleadings identify any involvement or participation in VT2 on his part; and

the Claimants' Further Information in respect of the allegations of knowledge against Dr Lynch did not identify any particulars in relation to VT2. The only specifically transaction-related evidence of his involvement that the Claimants advanced was his receipt of the email exchange on 1 July 2009 between Mr Egan and Mr Hussain which I have quoted above (of which he was an addressee).

84.    Nevertheless, he was cross-examined as if he must have known about the transaction and understood that Capax Discovery was to be a "placeholder", required to do nothing and required to pay nothing in return for a large fee for (in effect) facilitating the improper recognition of revenue by Autonomy.

85.    Dr Lynch rejected every aspect of this, emphasising that:

(1)    He had no knowledge of or involvement in the TXU deal beyond what he had been told in the email exchange of 1 July 2009 referred to above;

(2)    He had no reason to think that either the direct deal or the payment of a MAF was in the least improper (and nor was it ever suggested to him on what basis he should have known there was anything improper about the transaction);

(3)    He was not involved in determining how the deal should be reported to Deloitte, but he had no reason to believe that Deloitte had not been told of the direct deal because of a concern that it might cause Deloitte to question its propriety;

(4)    In any case, Deloitte had been *"given free run of all deals"*, with open access to Autonomy's books and accounting records, to see whatever they wanted to see about any of them;

(5)    Furthermore, this was not, in his view, an example of a cancelled deal: it was *"a designated payee deal…in which case the original deal isn't cancelled; it stays"*;

(6)    He also rejected the description used by the Claimants of Capax Discovery being a mere *"placeholder to facilitate the improper recognition of revenue"* as being a self-minted term or tag which, notwithstanding the VAR's unquestioned liability, assumes some inherent impropriety in a VAR deal where there was none.

86.    I cannot accept this, or its implicit suggestion that Mr Hussain was on a frolic of his own or prepared to proceed in such a matter and in such a way without keeping Dr Lynch informed. Furthermore,

this was the first VAR deal with a new 'friendly' VAR, Capax Discovery. It seems to me very unlikely that Dr Lynch would neither himself have kept an eye nor been informed as to its features and progress.

87.   Further:

(1)   Autonomy was a tight-run company, managed in effect by a small 'gang' of which Dr Lynch and Mr Hussain were at the apex, and who corresponded regularly with each other;

(2)   Dr Lynch and Mr Hussain often shared an office, and always worked closely together;

(3)   I had not the opportunity to observe Mr Hussain; but the documentary record, especially of his emails to Dr Lynch before Earnings Calls and other pressure points, suggests to me that Mr Hussain is a highly strung and anxious person, who was apt to share his concerns with, and seek assistance and reassurance from, Dr Lynch;

(4)   There was no reason for Mr Hussain to bear alone the burden of what I have held he knew about the impugned VAR deals: a natural inclination, stronger for someone in need of reassurance, would have been to discuss what was on any view an area of some risk and sensitivity (and exposure);

(5)   Dr Lynch was, or at least after 2008 had become, fixated on meeting revenue forecasts, and followed revenue targets and shortfalls closely and continuously in close conjunction with Mr Hussain: it is not disputed the VAR deals were an obvious integral part of this, being (it was common ground) resorted to frequently for revenue recognition purposes;

(6)   It is, to my mind, much more likely than not that Mr Hussain kept Dr Lynch informed, and Dr Lynch (who was controlling and interventionist) would have wished to and did discuss the position with him in some detail.

88.   I have concluded, on a balance of probabilities, that Dr Lynch would have been kept informed by Mr Hussain and made well aware of the importance of the  deal in the context of Mr Hussain's need to cover a revenue shortfall, and would have recognised the transaction as fitting the format that Mr Hussain had conceived and which he and Mr Hussain needed and encouraged as I have previously described. In short, I consider it more likely than not (and I find) that in accordance with the strategy the sale to Capax

Discovery VT2 was in commercial terms illusory, despite its ornate legal clothing.

89. In other words, in my judgment, the only real sale was the direct one by Autonomy to TXU; no revenue should have been recognised from the VAR sale; and both Defendants knew that.

### VT3: Capax/Kraft

90. VT3 was a VAR transaction between Autonomy Inc (referred to in the agreement and below as Autonomy) and Capax Discovery in Q3 2009. It was established by a purchase order in September 2009 for a licence fee of $4,000,000 and a maintenance fee of $200,000 in which the prospective end-user was Kraft (a well-known American grocery manufacturing and processing conglomerate and, by Q3 2009, already a long-standing customer of Autonomy).

91. The Kraft deal, which was to convert Kraft's then-existing data hosting relationship from a pure fee-for-service arrangement into a licence plus hosting arrangement, was a large (originally some $4,300,000) and important one for Autonomy, and negotiations to close it were a matter of keen interest to both Mr Hussain and Dr Lynch.

92. Although as early as 31 August 2009 Mr Hussain reported by email to Dr Lynch that *"Kraft is won at $4.3m"*, that proved over-optimistic, and negotiations continued in September, so that by 23 September 2009 Mr Patrick Ryan, one of the Autonomy salespeople involved, was *"not sure they can pull it off"*. When Mr Hussain forwarded this gloomy report to Dr Lynch, he replied in his blunt and dictatorial style, *"Ryan is as always useless someone else must close"*.

93. When cross-examined on whether he could recall that deal at around this time, Dr Lynch described the Kraft deal as "key to the quarter" he replied:

> *"I don't, but it's a $4.3 million deal a week off the end of the quarter, so, yes, it's going to be an important one."*

Its importance, and the pattern of Mr Hussain keeping Dr Lynch closely and regularly informed, was emphasised again in an email from Mr Hussain to Dr Lynch and others on the next day (24 September 2009) noting:    *"...Key are eli, ameriprise, kraft"*

94.    On 25 September 2009, Mr Hussain sent a series of emails including one in the morning to Mr Egan starting *"so the wild card is kraft (stouff – good luck!) – we really need this deal"*, and one a little later to Dr Lynch reporting on an *"Overall miserable day"* because expected deals had not materialised (including Kraft). Later that day, however, Mr Hussain emailed Dr Lynch saying,

*"I have an idea on kraft"*.

95.    There is no written evidence as to the nature of that idea, so the Claimants contend it must have been elaborated and discussed orally between Mr Hussain and Dr Lynch. Again, there is no record of that discussion, but Dr Lynch (though he explained he had no specific recollection) said in cross-examination that he *"suspect[ed]"* that it was to use a VAR to take over the Kraft deal and to enable revenue to be recognised in Q3 2009 notwithstanding delays in concluding the end-user deal. Plainly that was the reason and purpose: Dr Lynch's equivocation on this, and also his refusal to concede that by then Autonomy no longer expected to conclude a deal with Kraft in that quarter (though he accepted that it was *"certainly looking less likely"*) seemed to me to be designed to suggest detachment and was unconvincing.

96.    Mr Hussain, in an email shortly before midnight on 25 September 2009 sent to Mr Egan (which was not sent to Dr Lynch), stated that *"we may have to use capax for the K[raft] deal??"*. The Claimants suggested that the implicit hesitation in using Capax Discovery was caused by Mr Hussain's concern that there were still outstanding amounts due from Capax Discovery in respect of the prior Capax Discovery EDD (RT1) and TXU transactions (VT2), which could prevent Deloitte from agreeing to the recognition of revenue on a further Capax Discovery transaction in view of IAS 18 §14(d) (lack of collectability). Mr Hussain therefore told Mr Egan he needed "*paperwork for capax - suggest $750k or so?*"

97.    The Claimants alleged that what this signified was that Autonomy was to channel further funds to Capax Discovery (in the event, $1 million rather than $750,000) to enable Capax Discovery to pay down its outstanding debt: the *"paperwork"* required was for this purpose. Such a payment would enable Autonomy to present Capax Discovery to Deloitte as a counterparty that was complying with the payment schedule in its prior deal.

98.    Mr Egan then approached Capax Discovery with a proposal that Capax Discovery should submit a purchase order to Autonomy for a Digital Safe licence for onward licencing to Kraft for $4,000,000. In his witness statement he said:

> *"At Mr. Hussain's direction, I approached Mr. Baiocco (Capax Discovery) with a proposal. I told him about the status of the Kraft deal, including the fact that I expected it to close shortly after the end of the quarter. I asked Capax Discovery to act as a VAR, to submit a purchase order for a Digital Safe license for onward licensing to Kraft, and to agree to pay $4 million for that software -- the same price I had been discussing with Kraft. I followed the guidance that Mr Hussain gave me as described in paragraphs 28 and 29 above. I told Mr Baiocco that Autonomy would continue its efforts to close a deal with Kraft and, when we were successful, we would get Kraft to pay its license fee to Capax so that Capax, in turn, could pay Autonomy. I also told him that, if for some reason we could not get Kraft to pay Capax, we would find another way to make sure that Capax did not have to reach into its own pocket to make a payment to Autonomy. I agreed that Autonomy would pay Capax 10% of the purchase price for assisting us by submitting a purchase order that said that Capax Discovery was obligated to pay for the software under the terms of its VAR agreement with Autonomy. I told Mr. Baiocco that the 10% fee arrangement was the normal margin for resold deals."*

99. On 30 September 2009, the last day of the quarter, Capax Discovery issued a purchase order for a licence of Digital Safe archiving software for on-sale to end-user Kraft. Dr Lynch accepted in cross-examination that he would *"probably have known shortly after quarter end"*. Mr Baiocco's evidence, which Dr Lynch said he had no basis to dispute, was that *"Capax's purchase order was drafted for us by Autonomy"*. The inference (which I accept) is that Autonomy had to draft the purchase order because it was only Autonomy (rather than Capax Discovery) that knew what software was being offered to Kraft and at what price.

100. The Claimants relied on the following features of the purchase order itself:

> (1) The amount was almost the same as the original proposed deal between Autonomy and Kraft.

> (2) Kraft was the only authorised end-user under the terms of the purchase order: Capax Discovery could not sell to anyone else. Thus, if a deal with Kraft could not be closed, then, according to the contract, Capax Discovery would still have to pay Autonomy, but be unable to recoup its payment by a sale to another third party.

   (3) The licenced software was Digital Safe and related products, and a hosted arrangement was envisaged: the Claimants submitted that Capax Discovery *"could have no conceivable role to play in that commercial context"*.

101. The Claimants submitted that, having regard to these features, the VT3 deal made no commercial sense at all, unless accepted to be an expedient to enable Autonomy to accelerate into Q3 2009, revenue that would be likely to be earned in Q4 2009 by the mechanism of introducing Capax Discovery as a placeholder, which would sign up to an agreement on the basis of an assurance that it would not have to do anything for its reward and, whatever the agreement might provide in law, would in reality not have to pay Autonomy if the end-user deal failed.

102. The Claimants further submitted that the conclusion that this indeed was the key to what they presented as the otherwise commercially incoherent, was supported by the further evidence that:

   (1) When, on 30 November 2009, the $3.8 million balance payable by Capax Discovery in respect of the Kraft purchase order fell due, it was not paid. This non-payment was entirely consistent with the handshake agreement between Mr Egan and Mr Baiocco: as at 30 November 2009, no end-user deal with Kraft had been concluded, and so Capax Discovery was not expected to pay Autonomy.

   (2) The end-user deal eventually struck was another direct deal between Autonomy and its established customer Kraft for the identical software as was detailed in

     the purchase order from Capax Discovery: just as, according to the Claimants, had always been expected by the "placeholder" (Capax Discovery).

   (3) Although Autonomy requested Kraft to pay Capax Discovery, which would have enabled Capax Discovery to pay Autonomy, Kraft declined and insisted on its arrangements being exclusively with Autonomy; again consistently with the alleged assurances, Autonomy took steps to relieve Capax Discovery, and on 29 December 2009, they entered between them a letter agreement cancelling the licence fees due from Capax Discovery in recognition of the direct receipts by Autonomy from Kraft.

   (4) The same letter agreement also provided for Capax Discovery to be paid a *"onetime fee"* of $400,000, which the Claimants contended was:

> *"to reward Capax Discovery for having acted as a placeholder in order to enable Autonomy to recognise revenue improperly and as an incentive to do additional, similar deals with Autonomy."*

103. Finally, the Claimants contended that both the fact of the impropriety of these arrangements and the knowledge that they were so on the part of the Defendants is shown by the steps that the Claimants claimed were taken to mislead both Deloitte and Autonomy's regulators.

104. Before addressing that latter question whether Autonomy misled its auditors and regulators about VT3, it is convenient to record the basis on which the Defendants sought to rebut the Claimants' contentions as to its features and their alleged conformity with the Claimants' case that, in accordance with the side agreement or understanding they alleged, Capax Discovery was only ever a *"placeholder"*.

105. As to the Defendants' rebuttal:

   (1) They again stressed (a) the unequivocal nature of the June 2009 Capax Discovery VAR Agreement's provisions as to (i) the unconditional transfer of risk and reward (ii) the unconditional obligation to pay (iii) the absence of any provision for Autonomy to retain any managerial control and (iv) the entire and exclusive nature of the contractual agreement, and (v) the stipulation that to be valid any modifications would have to be in writing signed by a director or officer; and (b) Mr Baiocco's evidence, written and oral, that (i) Capax Discovery was genuinely on risk (ii) Capax Discovery perceived there to be a good commercial rationale sufficient to warrant the risk; and (iii) there was no side arrangement or understanding such as might impact on revenue recognition. In this context, the Defendants again pointed out that Mr Baiocco has expressly vouched on oath for the accuracy of the Goldberg Segalla letter which confirmed the above, and for the confirmation letters to Deloitte.

   (2) They rejected the Claimants' contention that there was anything wrong or improper in the admitted circumstance that the Kraft VAR transaction (VT3) was (a) entered into right at the end of the quarter, because (b) delays with Kraft meant that the deal with Kraft could not be signed until October 2009 and (c)

the VAR deal enabled Autonomy, by securing the deal with Capax Discovery, to recognise revenue in Q3 2009.

(3) They referred to and adopted Mr Baiocco's evidence in the US criminal trial, which he reiterated in cross-examination in these proceedings, that Capax Discovery had its own line of credit, and that even if that *"would have been painful",* it could have drawn down on it and would have been able to pay what it owed.

(4) They rejected any suggestion that the software was not delivered to Capax Discovery, citing Mr Baiocco's express confirmation that it had been delivered in the usual way, on execution, through Autonomy's electronic portal (Automater).

(5) They made the point that the fact that Capax Discovery could legally only sell on to Kraft only impacted against it if the end-user sale was in doubt: but the Kraft deal, though delayed, was secure.

(6) Further, they stated that the Claimants' suggestion that because (a) Kraft was Autonomy's customer and Autonomy would probably handle negotiations for closing the end-user deal to it and (b) the Digital Safe element was to be hosted there was no realistic prospect of Capax Discovery forging a relationship with Kraft (so that a primary perceived commercial benefit to Capax Discovery would never in fact eventuate) was factually incorrect. Digital Safe was the biggest but not the only element of the software package sold. The package included also Autonomy Legal Hold. In the event, Capax Discovery did in fact provide services to Kraft, including in connection with Autonomy Legal Hold.

(7) They also emphasised that the original intention was that the end-user (Kraft) should purchase from the reseller (Capax Discovery). There was nothing abnormal, still less improper, for a reseller to be interposed to complete a deal even where the manufacturer had been involved in the negotiations. Nor, in any logic, so they argued, would revenue recognition be affected by who was at meetings and carried on negotiations with Kraft, the end goal being a shared one, to achieve an end-user sale.

(8) They denied that the provisions for cancellation of Capax Discovery's obligations when Kraft insisted on a direct deal with and direct payment to Autonomy demonstrate any impropriety. There was no anterior agreement; and the cancellation was a proper way of dealing with the events that happened. It also ensured

that revenue would not be recognised twice in respect of a sale of the identical software. Dr Lynch explained in cross-examination:

> *"...the problem is that we've now got a reseller who has gone on risk in good faith that when the Kraft opportunity, if it appears, they will be the one that's in the queue to supply it. Kraft, for whatever reason, have decided that they don't want to work with these people. We don't want Kraft to be unhappy because they're an important, big customer, and we don't want one of our resellers to get turned over by events which are beyond their control and so we have come up with a solution and the solution here...looks like a sensible outcome to us in that there's $4 million worth of real deal*
> *– remember, the software goes on and is used by Kraft and*
>
> *thousands of employees so it's a perfectly real thing – and there's $4 million of cash coming in and we end up with Kraft being happy and we end up with Capax being happy.*
>
> *Another way of looking at this is, what would be the situation if we supplied Kraft and then we left Capax unable to sell to Kraft, then we'd be looking like we were behaving with our partners in very bad faith in that situation. And that would be very damaging to the business and the ecosystem with partners. Why would anyone work with us? Why would anyone trust us in that situation?*
>
> *It's a commercial decision ultimately about how you handle a difficult situation..."*

(9) Likewise, they contended that the payment of a fee to Capax Discovery did not connote that anything improper had happened, or that Capax Discovery had not been on risk, or that the revenue was not properly recognised. It was (as Dr Lynch said in cross-examination) *"eminently reasonable"* to pay Capax Discovery a fee in circumstances where Capax Discovery had gone on risk, but Autonomy had taken

the Kraft sale opportunity (and any upside from it) for itself.

(10)     They relied on Deloitte's assessment of VT3 and their conclusion that each of the criteria of IAS 18.14 was satisfied.

(11)     They rejected the allegation that they had misled Deloitte, and also the FRRP, about VT3 and in doing so further demonstrated its lack of commercial sense and real substance.

*Approval by Deloitte*

106.   As the Defendants emphasised, Deloitte reviewed VT3 and were satisfied with the revenue recognition. It is clear from Deloitte's working papers for the transaction that their approval was in the full knowledge that (a) Autonomy had been negotiating directly with Kraft throughout Q3 2009 but the deal could not be struck directly before quarterend due to time constraints; (b) Autonomy continued to be in negotiation with Kraft after the date of the VAR transaction (as recorded in the working papers); (c) during Q4 2009, Kraft made clear that it wished to deal directly with Autonomy, rather than through Capax Discovery, and ultimately, the deal went direct with Kraft; (d) the VAR deal was cancelled to make sure (as Mr Welham explained in his cross-examination) that *"revenue wasn't, as it were, recognised twice"*; and (e) a MAF was paid to Capax Discovery so that (to quote from Deloitte's working paper)*"the VAR retained the margin they would have got, had the end-user actually signed with them"*.

107.   Deloitte did not apparently consider that any of these features were an issue for revenue recognition, whether as regards the *"genuine commerciality"* of the VAR agreement or otherwise. (They have more recently confirmed that this remains their position in their own defence in the Formal Complaint against them brought by the Financial Reporting Council ("the FRC")).

108.   The Claimants sought to answer this on the basis that Deloitte was fundamentally misled as to vital aspects of the true transaction. In particular, the Claimants claimed that:

(1) Deloitte was misled into treating Capax Discovery as a creditworthy counterparty because it was able to and did pay a deposit of $400,000 for the VT3 transaction: Deloitte was not told, and did not know, that the funds used by Capax Discovery to pay the deposit were principally derived from payments by Autonomy for allegedly non-existent EDD services;

(2) Deloitte was misled into believing that behind Capax Discovery stood the resources of Capax Global and the group, and that it had always kept up to date on payments for previous large deals: Deloitte was not told, and did not know, that Mr Baiocco had set up Capax Discovery as a separate entity in part to bolster the alleged assurance that it would not be at real risk by making it unprofitable to sue, and had written (on 31 March 2009) to Autonomy expressly disavowing any suggestion that Capax Global could be expected to stand behind Capax Discovery's obligations;

(3) Deloitte was misled by Autonomy's management into an understanding that it was intended that Capax Discovery would on-sell to Kraft and that Capax Discovery would at least participate with Autonomy in negotiations with Kraft: whereas in truth (so they contended) Autonomy never expected Capax Discovery to have any dealings at all with Kraft, still less to complete a deal with Kraft;

(4) Deloitte was misled into concluding that Capax Discovery was genuinely taking the risk that no end-user deal might eventuate: they were not told and knew nothing of assurances given by Mr Egan which (so the Claimants alleged):

> "meant that, in commercial reality, Capax Discovery was not intended to be left out of pocket if no end-user deal eventuated".

(5) Deloitte was misled into concluding that the cancellation of the VAR transaction was simply a necessary way out of a most unusual eventuality, and that the payment of a MAF was a suitable recompense for depriving Capax Discovery of its expectation of an end-user deal and future service fees, for which it had taken on substantial risk: whereas in truth, some method of reversing or cancelling the VAR transaction was always going to be required, Capax Discovery had never in truth had any such expectation and the MAF was a gratuitous  payment for its role as a *"placeholder"*.

109. As to (1) in the preceding paragraph 108, it does appear that Messrs Hussain, Chamberlain and Egan did have concerns that Deloitte might have an issue about Capax Discovery taking on such a large debt whilst there remained outstanding amounts due from Capax Discovery on the TXU (VT2) deal, and did press for

this to be resolved. E-mails exchanged between Messrs Chamberlain, Hussain and Egan in October 2009 demonstrated their concern in this regard:

(1) On 1 October 2009 at 12.06 a.m., Mr Chamberlain sent an email to Messrs Hussain and Egan saying:

"*It would be a big help on rev rec if Capax pay the amount due on TXU. 1/3rd ($287,131,66) of the Q2 deal was due on 28 Sept 2009. Taking such a large deal through someone not up to date on payment presents issues. Can you get the cash?*"

(2) Mr Hussain then wrote to Mr Egan:

"*Important that we try to get something – auditors will be an issue, I didn't know this one was o/s*" (i.e. that the Capax Discovery/TXU debt was outstanding)

(3) Mr Egan replied:

"*me neither, does it have to be today or can we get it asap. Remember they have sent 400k against the 4M Fedex today*"

(4) Mr Hussain replied:

"*Find out if they got the cash on the first txu deal – I assume they did*"

110. This concern regarding collectability continued into October 2009 as Deloitte considered revenue recognition on the Capax Discovery/Kraft deal:

(1) On 9 October 2009, Mr Stephan sent an email to Mr Hussain (copied to Messrs Egan and Chamberlain) saying:

"*On the Capax/Kraft deal, the auditors want to understand the status of the deal between the reseller and the end-user (is the deal closed and if not, when is it expected?). This is necessary because Capax is not a big company and it would probably be difficult for Capax to prove*

> *that they could pay us if they did not get paid by Kraft*".

    (2) Mr Hussain replied:

> "*I'll let stouff handle but obviously capax have given us an unconditional PO and are upto [sic] date with all payments. PLUS and most importantly they have paid 10% on signing so the risk is lower than most other deals!*"

111. Mr Miles took Mr Welham, in the course of his cross-examination, to invoices and confirmation letters in relation to the TXU deal, which were sent to Deloitte in October 2009, and also to a "Debtor testing spreadsheet" e-mailed to Mr Tom Murray of Deloitte on 15 December 2009 making clear to Deloitte that Capax Discovery's debt remained outstanding. Furthermore, Deloitte's working paper schedule recorded that indebtedness as outstanding. Thus, it seems clear that Deloitte actually knew that the VT2 amounts remained outstanding, as Mr Welham had eventually agreed. Mr Welham also agreed that

(a) he had in effect been misled by it being framed as an assumption in his instructions that there were amounts outstanding and that Deloitte did not know this (when in fact it did) and (b) as a matter of fact, this was not an issue which impacted their assessment of revenue recognition anyway.

112. As to (2) in paragraph 108 above, it is true that Deloitte were not specifically shown the letter from Mr Baiocco (dated 31 March 2009) making clear, when providing financial information for Capax Global at the request of Autonomy in the general context of discussions about VAR deals with Capax Discovery, that Capax Discovery was a separate and distinct entity from Capax Global. However, when cross-examined as to his evidence in his witness statement that the letter *"may have been of some relevance to the exercise we undertook of assessing the collectability of revenue from Capax Discovery"* he accepted that Deloitte were well aware that Capax Discovery was a new company, legally separate from Capax Global, and emphasised the next following phrase in his witness statement that:

> "*...it is fair to say that we were not proceeding on the basis that other companies within the group would be guaranteeing Capax Discovery's payment obligations.*"

113.   As to (3) in paragraph 108 above, and as stated previously, it seems that Deloitte were aware that Autonomy had handled all the negotiations with Kraft prior to the VAR transaction and were also well aware that it would continue such negotiations directly with Kraft after it. In the course of his cross-examination, Mr Welham confirmed as accurate the following paragraph in Deloitte's Defence to the FRC's Formal Complaint:

> "...it is admitted that Deloitte and Mr Knights were aware (a) that Capax's principal role was to allow Autonomy to complete a sale and for revenue to be recognised in the quarter in which the Kraft deal was negotiated because it could not be formally completed with Kraft in that quarter, and (b) that Autonomy were negotiating directly with Kraft."

114.   It was clear also from Deloitte's working papers that Deloitte did not consider that either the fact that Autonomy had brought Capax Discovery in when the direct deal could not be closed, or the fact that Autonomy was negotiating with Kraft after the sale, affected the genuine commerciality of the agreement, or whether revenue should be recognised. Indeed, it appears that Deloitte took some comfort from Autonomy's continuing involvement in the negotiations with the end-user, in that it reassured them on the collectability issue; the Deloitte spreadsheet records:

> "Note that we have also seen an email from Joel Scott ... that contained draft professional service contracts between Autonomy and Kraft, thus evidencing that the two parties continue [to] negotiate in good faith and that the deal is progressing.
> Given that we have seen evidence that directly links Autonomy and Kraft, both pre and post the deal with Capax, we conclude that there is satisfactory evidence to support the fact that Kraft are the end-user.  As such, we conclude that this amount is recoverable, on the basis that Kraft are a multi-national blue chip company, who will be able to pay
> Capax for the purchased licence."

115.   Mr Welham's reservation appears to have been that if Autonomy were under what he called a "performance obligation" to close the deal, that might suggest that perhaps risk had not passed. This was a matter taken up in my own questions after his crossexamination, and Mr Welham explained that if the VAR:

> *"...habitually had an agreement, albeit not written down but verbally, where Autonomy would sell to the VAR but the VAR would be under the understanding that Autonomy close the deal, that would be different to our understanding at the time and that would suggest to me that perhaps risk hadn't passed"*

But he then continued:

> *"But the trouble with accounting is that, perhaps unlike law, it's never really black and white. There's a lot of judgment involved."*

116. In supplemental questions after mine, Mr Miles asked Mr Welham to elaborate as to what he meant, in the context, by the notion of a *"performance obligation"*. After some rather vague answers appearing to suggest that it would depend on the level of involvement required of the VAR and the seller, he reiterated that ultimately it was a matter of accounting judgement, and would depend on the extent and nature of the seller's involvement. As to that, he said that although *"some involvement may well be OK"*,

> *"...I think extensive would be more problematic."*

117. Mr Miles pressed him on this, given that Deloitte had actually seen evidence of extensive continuing involvement but had not expressed concern. Mr Welham answered:

> *"You can have isolated cases. Clearly, <u>if you take Kraft as an example, the deal</u> with the end-user was very, very <u>close to completion, so I'm not sure you would need extensive involvement because it's so close.</u> I can't remember the specifics of the Eli Lilly deal[531], but <u>I think if it were always the case that there was extensive involvement in closing a deal, then that would be a problem, yes."*</u> [My underlining]

118. Mr Miles pressed again:

> *"Q. Going back to my point about whether Autonomy was* [under] *some sort of obligation, leave aside for a minute the question whether that's a legal obligation or not, so I'm not assuming that it's a legal obligation. But as between the parties, the VAR is, as it were, saying that it's for Autonomy to do, to close a deal.*

---

[531] See paragraphs 133ff below.

*That's one case, but take a case where it's something Autonomy may well choose to do because it's got a good relationship with the end-user, the enduser wants to speak to Autonomy about the technology and so on, so there are*

*good commercial reasons, if you like, for Autonomy continuing to deal with the end-user, again, in that case, it's all a matter of judgment, isn't it, on the particular facts and a matter of nuance?*

*A. Yes, so I think what you've described there is a little bit different to what we were talking about before. If there's continuation of involvement because of commercial reasons, and it's more assisting the sales process and the close process that the VAR is doing, then I think that's where it's more nuanced and there's judgement involved, but that's a little bit different to what we're suggesting where it's the obligation or sole responsibility of Autonomy to close. That's quite different.*

*Q. Yes, and that's a different case?*

*A*

*,*

*Y*

*e*

*s*

*,*

*a*

*g*

*r*

*e*

*e*

*d*

*.*

*."*

119. I have dwelt on these answers because they seem to me to demonstrate that the Defendants' point – well made, as far as it goes – that Deloitte knew of Autonomy's involvement in discussions with Kraft after the VAR sale does not, on analysis, go very far. In particular:

> (1) It seems clear from Mr Welham's approach that Deloitte did not know that the negotiations were proceeding solely between Autonomy and Kraft, to the exclusion of the VAR: and there was no evidence to suggest that they did;

(2) Nor is there anything to suggest that they were aware that Autonomy was negotiating in reality on its own account with a view to a direct contract; and

(3) The points above have additional power given Mr Welham's singling out of Kraft as a deal where the deal was so close that extensive further involvement would be difficult to justify.

(4) Furthermore, Deloitte assumed that the object of Autonomy's involvement was to conclude a sale by the VAR: but (as I find) the objective throughout was a direct deal, and the fiction that at the last moment Autonomy's old customer suddenly determined it wished to deal with Autonomy rather than the VAR is just that – fictional. Although in an email dated 28 December 2009 to Mr Scott and Mr Egan, Mr Hussain (in response to a question whether Mr Hussain was aware of repayment arrangements with Capax Discovery in respect of the Kraft deal after conclusion of the contract between Autonomy and Kraft) wrote that *"Kraft decided to reissue the order direct to us for the same amount as Capax – strange but I guess they decided it was too strategic a project for them to buy the software from a partner"* it was not in the circumstances *"strange"* at all.

120. As to (4) in paragraph 108 above, the issue as to whether Deloitte knew of the side agreement or understanding pleaded by the Claimants is of course premised on there having been one in the first place; but I have concluded that there was, whether described as understanding, agreement or shared intentions and expectations. Plainly, Deloitte knew nothing of that and was never told of any such thing.

121. As to (5) in paragraph 108 above, it appears that Deloitte reviewed the VT3 deal and were in fact aware of, and saw no problem in, the cancellation of the VAR sale, repayment to Capax Discovery of its deposit, and the payment to it of a MAF. Various internal Deloitte documents confirm this, including a Memorandum dated 22 January 2010, the stated objective of which was *"To summarise the facts surrounding the sale to Kraft (using Capax Discovery) in Q3 2009 and the subsequent deal signed directly between Autonomy and Kraft in Q4 2009"*. An extract from the Memorandum, which also records as being Deloitte's main concern the need to ensure *"that only one amount of revenue has been recognised over this deal in the year…",* reads:

> *"This was a deal where Autonomy had been negotiating directly with Kraft throughout Q3*

> *2009 but due to time constraints the deal could not be signed directly before quarter end..... During Q4 2009 Kraft expressed a willingness to sign the deal directly with Autonomy rather than through Capax. As such, Autonomy negotiated a fee with Capax to purchase the contract off them so that a deal could be signed directly between Autonomy and Kraft. In exchange for this right, Autonomy agreed to pay Capax $0.4M and waive Capax's contractual obligations to Autonomy under the original contract.*
>
> *. . .*
>
> *We conclude that as no additional revenue has been recognised in Q4 2009, the year-end debtor position has been corrected and the full year revenue position is correct that this accounting treatment is satisfactory."*

*My assessment of VT3*

122. Some of my conclusions with respect to VT3 will by now be apparent. However, in summary:

   (1) The Kraft deal/VT3 provides, in my judgment, a very clear example of the use of a VAR as a placeholder, the VAR being intended and expected to do nothing and pay nothing from its own resources (as is the most arresting characteristic of all the impugned VAR deals).

   (2) That use is clear from the oral evidence, from the way VT3 proceeded (with the VAR entirely excluded from the process and eventually entirely by-passed except when it came to arrangements to compensate it for its nominal role), and from what Deloitte were not told.

   (3) Although the Defendants emphasised and relied on the apparently informed approval given by Deloitte after obviously careful and fully documented consideration of the transaction, Deloitte were not told and did not know any of the matters referred to in (1), which, in my judgment, cast a fundamentally different light on the nature and substance of the transaction.

   (4) Had Deloitte appreciated those matters, I have no real doubt that they would have determined (a) that in economic substance there was no sale, (b) that notwithstanding the position in law, in reality Autonomy was in full control of the software to be sold to Kraft,

that if no sale eventuated Autonomy would have somehow to reverse the VAR transaction or in some other way rescue the VAR from the legal *"hook"*, and that the risk of a sale not eventuating was its risk, so that (c) the criteria of IAS 18.14 might apparently be, but were not actually, satisfied so that no revenue should be recognised from VT3 at the stage of the impugned VAR sale. Mr Welham was clear in his oral evidence that:

> *"....the standard requires you to consider the substance of what the transaction is. So although you might have a legal document, if there is persuasive evidence that any arrangement exists then that would be relevant."*

In my judgment, on the facts, it was both relevant and determinative.

(5) Even taking into account a generous margin of appreciation, it does not seem to me that revenue recognition of the VAR sale in VT3 can be justified.

### Particular points on the Defendants' involvement and knowledge of VT3

123. The question then, as ever, is whether the Defendants or either of them had "guilty knowledge". For the present, I note only the following factual matters specific to the VT3 transaction which may be of relevance in my assessment of the allegation that the Defendants knew the VAR sale was not in reality a sale at all and/or that its accounting treatment was improper.

### Mr Hussain

124. As regards Mr Hussain, the Claimants relied especially on the following:

(1) As may be seen from paragraph 95 above, the introduction of a VAR to enable revenue recognition in Q3 2009 notwithstanding the delay in closing the end-user deal with Kraft was Mr Hussain's *"idea"*.

(2) It was Mr Egan's evidence that:

> "*At Mr Hussain's direction I approached Mr Baiocco...with a proposal..[for] Capax Discovery to act as a VAR, to submit a purchase order for a Digital Safe licence for onward licencing to Kraft, and to agree to pay $4 million for that software...I followed the guidance that Mr Hussain gave me..."*

(3) Mr Hussain was clearly conscious of the need to persuade Deloitte that the $4.2 million debt was collectable from Capax Discovery in light of Capax Discovery's other payment obligations to Autonomy, including its outstanding indebtedness under the TXU sale, and its continuing commitments in respect of the first Capax Discovery/EDD sale; and he was closely involved in the process of persuading them. That involved very selective disclosure: for example, Mr Hussain was aware that Capax Discovery was up to date on the Capax Discovery/EDD transaction only because Autonomy had sent it cash for non-existent EDD services; and that Autonomy had in effect funded Capax Discovery to pay the deposit on the Kraft sale which was intended to present a picture of independent credit-worthiness.

(4) Indeed, the Claimants contended that it was again Mr Hussain who masterminded and oversaw the alleged channelling of funds (amounting in all to $1,000,000) to Capax Discovery to enable it to pay down its existing debt before undertaking VT3 and (to quote from the Claimants' closing submissions) to: *"enable Autonomy to present Capax Discovery to Deloitte as a counterparty that was complying with the payment schedule in its prior deal."*

(5) Mr Hussain was well aware that Autonomy was negotiating with Kraft, to the exclusion of Capax Discovery and with the objective of completing the sale which had been nearing completion before the end of the quarter. Mr Egan also said in an unchallenged part of his witness statement that it was only <u>after</u> Autonomy's deal with Kraft was complete that he asked Kraft's representatives if Kraft would be willing to take its licence from Capax Discovery or to pay Capax Discovery as Autonomy's designated payee. His evidence was that *"Kraft was unwilling to involve Capax Discovery in any capacity"* so that *"...we had to find another way to make Capax Discovery whole, consistent with the intent of the deal we had agreed with Mr Baiocco."* Mr Egan added that (a) Mr Hussain approved all the ensuing arrangements to return Capax Discovery its $400,000 deposit and to pay it its 10% ($400,000) "profit"; and (b) though Mr Hussain stated in an email of 28 December 2009 that *"the referral fee should be paid to capax...as it was contracted"* the truth was that Capax Discovery did not refer Kraft to Autonomy and the $400,000 was not a referral fee: as

Mr Hussain well knew, it was a fee for signing a purchase order "at risk" to enable Autonomy to recognise $4 million revenue in Q3 2009 in accordance with Mr Hussain's *"idea"*.

125. I have concluded that Mr Hussain must have been aware of the true nature of VT3, that Capax Discovery was a compliant placeholder, that Autonomy's true customer was Kraft, and that the only true sale ever envisaged was a sale direct to Kraft. He was a trained accountant. He must have known this was wrong. I find that he did.

*Dr Lynch*

126. As regards Dr Lynch's knowledge in relation to Kraft:

(1) Overall, his position was that he *"didn't know anything about what happened on the ground in Kraft."*

(2) His position emerged more elaborately from a sequence of answers to questions in cross-examination, as follows:

> *"Q. You knew that Capax Discovery had been given the assurance described by Mr Egan in order to get it to agree to enter into a contract to buy from Autonomy the software for Kraft, didn't you?*
>
> *A. I did not know that. Mr Baiocco confirmed that he thought he was on risk, so he obviously didn't consider that to be the case. And thirdly, he was capable of reading the contract.*
>
> *Q. And you knew in particular that Capax Discovery had been told that Autonomy would do everything it could to avoid Capax having to dip into its own pocket to pay for the software if an end-user deal failed to eventuate? A. No, I didn't.*
>
> *Q. You also knew that Capax Discovery had been told that*
>
> *Autonomy would continue its efforts to close the deal with the end-user?*
>
> *A. I didn't know that, no.*
>
> *Q. And you knew that Capax Discovery would not be making any efforts to close*

> *a deal with the end-user?   A.   No, I*
> *didn't know that.*
>
> *Q.   You knew that the VAR was not in reality*
> *taking the significant risk of ownership of the*
> *goods?*
>
> *A. No.  The VAR -- you know, I wouldn't*
> *have gone away and looked at the*
> *purchase order, but all our purchase*
> *orders were the same and they were*
> *absolutely clear: they owned the goods*
> *and they were on risk.*
>
> *Q.   You also knew, following the VAR*
> *deal,      that    Autonomy    retained*
> *continuing managerial involvement or*
> *control of the goods?*
>
> *A.  No, I didn't.*
>
> *Q.  And you knew it wasn't probable that*
> *Capax Discovery, a new company,*
> *would pay from its own resources for*
> *those goods?*
>
> *A.   No, I would have expected and I*
> *understand my finance department did*
> *do that test and that was checked by*
> *Deloitte and the judgment was correct.*
>
> *Q.  You well understood that it was*
> *wrong for Autonomy to recognise the*
> *revenue   on   this   Capax   Discovery*
> *transaction, correct?  A.  No.*
>
> *Q.  And you knew that the same was true*
> *of all the subsequent VAR deals with*
> *Capax Discovery that are at issue in*
> *these proceedings?*
>
> *A.  No."*

(3)     He was made aware by Mr Hussain by email dated
25 September 2009 that the Kraft deal was unlikely to
close that quarter, and he understood that this *"increased
[the] risk"* of Autonomy having a shortfall on its revenue
target for Q3 2009. He did not recall seeing Mr Hussain's
email about his *"idea on Kraft"* but accepted that *"there
would have been some communication, I assume, yes"*. He
said that he would have regarded it as perfectly normal to
use a VAR in such circumstances. He would have
expected Capax Discovery to be getting involved because
*"by getting a reseller involved in a deal, it gave them the
ability (a) to introduce themselves to the end-user, if they
weren't already, and (b) it meant that they could then do*

*services"*. He referred in that context to "Capax Discovery" as *"our largest services partner in terms of number of engagements"*.

(4)     He had no basis for disputing Mr Baiocco's evidence that the purchase order was drafted entirely by Autonomy.  He did not see the Capax Discovery purchase order at the time, nor any of the other paperwork, and so it was unlikely he would have known of the restriction on any onward sale by Capax Discovery except to Kraft: but he expressed his view that if despite Autonomy dealing directly with Kraft, Capax Discovery had been required to fulfil its payment obligations under the purchase order, Autonomy would no doubt have taken a commercial decision to allow Capax Discovery to sell to other end-users.

(5)     He would *"probably have known shortly after quarter end"* of the VAR deal (VT3) and *"quite possibly"* proceeded on the basis that the VAR deal was for essentially the same amount as the Kraft deal.

(6)     When questioned as to the ability of Capax Discovery, as a newly-formed entity, to have any means of paying, and how Deloitte were to be persuaded of collectability, he stated that he thought *"the reason they would have been reassured was the 400,000 that was paid on signing"* but when asked whether he knew that was using Autonomy's money, he said he did not know where the money would have come from.

(7)     He told me he did not know whether Mr Egan had said to Mr Baiocco that Autonomy would deal with and close a direct deal with Kraft and would then get Kraft to pay Capax Discovery so that in turn Capax Discovery could pay Autonomy; but in any event, that did not strike him as *"problematic"*.

(8)     He said he had no *"first-hand knowledge"* that Autonomy was negotiating directly with Kraft to conclude a deal after the VAR sale and was not able to say whether Capax Discovery had been involved at all in those negotiations; but he seemed to me to accept (albeit remonstrating that he could not police every meeting, and it was the reseller's choice if it did not participate) that the impression he gave in his witness statement, and which was given to Deloitte, was that Autonomy was only seeking to help Capax Discovery to close a deal. He saw no difficulty either way: *"...if I'm wrong, then fine"*.

(9)     He said he did not know that Kraft had refused to agree to pay Capax Discovery and was not consulted about the cancellation of VT3 after Autonomy's direct deal with Kraft: he said that he assumed *"it would have gone to the level of Mr Hussain and perhaps Mr Kanter."*

(10)     He defended the payment of a MAF for going on risk, even if in the event the reseller did no more and was never called upon, saying *"You've got to at least give them some compensation for that situation"*; but he did not recall whether he had been specifically consulted about the $400,000 payment to Capax Discovery.

127.  Dr Lynch also made the following, for the most part more general, observations in the course of cross-examination:

(1) He told me he did not know what Mr Egan and Mr Baiocco had discussed before striking the deal, nor what guidance Mr Hussain had given Mr Egan, but said:

> *"I think Mr Hussain would have been happy with the normal industry general warm comments that are given. I don't think Mr Hussain would have said anything more than that."*

(2) He added:

> *"...as the CEO of the company sitting in London, what I rely on is the fact that no matter what the sales guy says that I can't control in a meeting on the other side of the world in a closed room with someone, the paperwork is absolutely clear, which is: you're on risk, you're going to have to pay us, and this piece of paper contains all the terms of the deal. If ever there was a dispute, they would lose, they would have to pay us.*
>
> *If Mr Egan said more than warm words, then he wasn't authorised to do that. But also Mr Baiocco is not an idiot. He knows perfectly well that that's worthless."*

(3) Equally memorably, he observed:

> *"I think you can't legislate against hope. For good commercial reasons the reseller would hope that in the case of something going wrong, that the vendor would try and help them, but the vendor is under no obligation to do that, other*

> *than the reputational damage of being seen to leave a reseller in the lurch."*

128.  These two passages seem to me to encapsulate Dr Lynch's position in these proceedings as to how he perceived this transaction and, more generally, Autonomy's use of VARs and what he would have understood the understandings of the parties to be. Dr Lynch consistently maintained that whilst Mr Egan may have given assurances that fostered and encouraged the hope and belief in the VAR that the risk was worth taking and that if the worst eventuated, Autonomy would do all it could as a business partner to assist, he knew of nothing that had been said to indicate, and would have regarded it as unauthorised to indicate or invite the understanding, that the VAR would be taking anything less than the significant risks and responsibilities of ownership and managerial control over the goods. He was clear that he would have expected Mr Baiocco, and all VARs, to have understood they were bound, and whilst they might hope for assistance, they could not depend on release: none of them was *"an idiot"*.

129.  Dr Lynch expressed himself with cogency and conviction. He seemed to me to have persuaded himself by the time of trial of the truth of what he said, and in particular, that VT3 was in the general run of VAR deals not impugned in these proceedings which Autonomy had been undertaking for many years. His reference to not legislating against hope carried real force in general terms; I do not, however, accept his evidence.

130.  VT3, like the other impugned VAR sales, was not in the general run of deals. The impugned sales were marked out by features which inexorably and fundamentally distinguished them, as the Claimants' case identified. Capax Discovery was not proceeding on the basis of hope; it was proceeding on the basis of a settled understanding which was a basic feature of all the impugned VAR transactions, which would have been far too rich a commercial risk without it. Dr Lynch had no real answer to these special features and the sales' lack of substance which they revealed: the probability is, and I find, that he did know of them, as I have found Mr Hussain plainly did.

131.  I accept that in the context of VT3 and more generally, there is little direct evidence of any direct and express conversations between Mr Hussain and Dr Lynch relating to the terms of the sales or how matters proceeded after an impugned VAR sale. Again, however, it seems to me much more likely than not that they shared the same understanding of a strategy which was becoming so essential to them. The same considerations and factors as I have set out in relation to VT2 apply in the context of VT3 (and indeed all the impugned VAR transactions).

132.  Put shortly, I have concluded that Mr Hussain knew, and that it is more likely than not that from him, Dr Lynch would have known if he could not see for himself (which I suspect he could), that in VT3 and those other sales the VAR was (a) a 'best friend' (b) resorted to (as it well knew) as an urgent expedient (c) to whom a considerable *"champagne smacking"* fee would be paid (d) to take on a legal obligation on paper which each was assured would not be enforced but which (e) could not have sensibly taken on such an existential risk without more than usually warm comfort and in any event, (f) had not the resources itself to pay and which (g) where necessary to persuade Deloitte of collectability, had been put in funds by Autonomy through purchases with that as at least part of their aim, and which (h) was never expected, or intended, or itself expected or intended to, or ever did, pay (out of its own resources) or do anything.

## VT4: Capax/Eli Lilly (Q4 2009)

133.  I turn to the next impugned VAR transaction to which Autonomy Inc and Capax Discovery were the parties, in respect of which the prospective end-user was the pharmaceutical company Eli Lilly, another large existing customer of Autonomy. The VAR transaction was entered into on the last day of Q4 2009.

134.  VT4 was another big transaction: the licence fee for the purchase order was $5,986,827, plus a support and maintenance fee of $299,342. The software sold was a *Licensor Archiving Solution*, which included Digital Safe, Digital Safe Retention-Deletion and Digital Safe Audit Center Software, as well as Aungate Legal Hold and Aungate RealTime Policy Management.

135.  As in the case of VT2 and VT3, the sale was under the June 2009 Capax Discovery VAR Agreement. I have set out the most relevant terms of that agreement in paragraph 60 above; but in summary the agreement made clear that the reseller was obliged to pay (and was not relieved by any non-payment by the end-user), that the agreement comprised the entire agreement between the parties and that there could be no valid modifications without following the stipulated formalities. According to the terms of the contractual arrangements, therefore, the legal risk of ownership had passed, and managerial control was not retained.

136.  In terms set out in Exhibit "B" to the purchase order, the *"End-User"* was defined as Eli Lilly. As in VT3 (Kraft), the *"Authorised Use"* was restricted (to use by that end-user; so Capax Discovery had no contractual right to sell the software to any other end-user if no deal with Eli Lilly eventuated. The purchase order stated that payment in full was to be made within 90 days (so, by 31 March 2010). Capax Discovery did pay a deposit of $400,000; but it did not make any other payment by 31 March 2010.

137. This was another impugned VAR transaction which was not followed by an onward sale by the VAR. Ultimately, on 15 June 2010, Autonomy entered into a direct deal with the end-user, under the terms of an agreement which provided for Eli Lilly to pay Capax Discovery as Autonomy's designated payee.  The direct sale to Eli Lilly was for the same software, but at the lower licence fee of $5,303,431 plus support and maintenance fee of $265,172.

138. Again, the Claimants alleged non-compliance with IAS 18.14(a) (they submitted that there was in substance no transfer of risk of ownership); with IAS 18.14(b) (they contended that Autonomy in substance retained managerial control of the goods); and IAS 18.14(d) (they alleged there were grounds for doubting collectability).

139. The Claimants submitted that:

> (1) Capax Discovery was introduced as a VAR on the very last day of the quarter as a response to Autonomy's urgent financial response to a delay in closing a direct deal between itself and Eli Lilly, and with no time for Capax Discovery to assess the prospect of an end-user deal eventuating, or to negotiate on price or other terms.

> (2) The large amounts involved made it especially important for Autonomy to establish a transaction from which revenue could be recognised. Failure to secure the revenue from it in Q4 2009 would have materially reduced quarterly earnings and imperilled the achievement of the market expectations for that quarter.

> (3) The evidence of Mr Baiocco that the purchase order *"was drafted for us by Autonomy"* and that Capax Discovery *"had no dealings with Eli Lilly before it issued its purchase order and did nothing to try to sell software to Eli Lilly after it issued its purchase order"* was not contradicted, except to the extent of a bare (though four-times repeated) assertion by Dr Lynch that he had *"seen information"* that *"Capax were actually working inside Eli Lilly at this point anyway"*. Nor was the evidence of both Mr Egan and Mr Baiocco that Capax Discovery would not be required to participate in the continuing negotiations for a sale to Eli Lilly and played no role in discussing the terms of the direct sale eventually agreed, contradicted either.

> (4) Capax Discovery acted simply as a *"placeholder"* for a fee (10% of the total contract price, and so in excess of $600,000), having been assured (so it was alleged) that Autonomy would require nothing from it, and (apart

from a \$400,000 deposit for which Autonomy would indirectly provide the funding) would require payment only if and when the end-user deal was closed, again consistently with the assurance alleged.

(5) The Claimants referred also to email exchanges when Autonomy's accounts department pressed for payment. Mr Baiocco is reported as having said that Capax Discovery was *"waiting for payment from Eli Lilly and once they get the payment Capax will issue a payment to Autonomy"*. When Mr Baiocco complained to Mr Egan about being chased Mr Egan responded *"Got your message. The calling will stop."* Mr Baiocco forwarded that response to one of his business partners, with the comment, *"Fyi this is autonomy CEO telling me not to worry about the collection calls!!!",* which the Claimants also relied on as signifying that Mr Baiocco relied on Mr Egan having the authority of a CEO.

(6) As it was, Capax Discovery did not pay until after the direct deal was closed; but it did pay as soon as it received Eli Lilly's payment to it as Autonomy's *"expressly designated payee"*.

140. Against all this the Defendants again relied on (a) the evidence of Mr Egan and Mr Baiocco, both generally as regards the Capax Discovery VAR transactions and with particular reference to VT4, that they well appreciated that Capax Discovery was genuinely at risk, and nothing that Mr Egan did could alter this, and that there was no side agreement or understanding that impacted on revenue recognition; (b) the contractual terms including the entire agreement clauses, as well as the strict instructions to sales employees prohibiting side agreements and understandings; (c) Mr Baiocco's evidence specifically confirming that he saw the reseller deal with Autonomy as a way of becoming an approved vendor of professional services to Eli Lilly, even though in the event his objective was not achieved; (d) the fact that Deloitte carefully reviewed the accounting for the transaction at the time and were satisfied with the revenue recognition; and (e) the fact that Deloitte reviewed the accounting treatment afresh in the light of Mr Hogenson's allegations (as to which see paragraphs 2232 to 2289 in the main body of the judgment) and continued to be satisfied that the revenue was correctly recognised.

141. Further as to (d) and (e) in paragraph 140 above, the Defendants emphasised that:

(1) Deloitte had considered shortly after the reseller deal had been entered into that there was a real prospect that

this deal would end up going direct. They concluded that this did not bar the revenue recognition. Mr Welham told me in cross-examination that his perception was that a direct deal was a risk but not his expectation: and went on to suggest that had it been his expectation then that might have precluded revenue recognition. However, in his almost contemporaneous email (dated 16 January 2010) to Mr Knights he stated that he *"would expect that both Eli Lilly and Morgan Stanley will go direct to Autonomy during the course of Q1 2010"* and in the next paragraph recorded that he understood from Mr Chamberlain that *"what I have described above may well happen"*.

(2) Mr Welham confirmed that Deloitte knew that the Autonomy/Eli Lilly agreement allowed Autonomy to designate a payee to which Eli Lilly should submit a purchase order and pay fees. They knew that Autonomy had directed that Eli Lilly should submit its POs and pay its fees to Capax Discovery, and that Capax Discovery would in turn pay Autonomy in fulfilment of its obligations under the June 2009 Capax Discovery VAR Agreement.

(3) Mr Welham also (in cross-examination) confirmed as correct the following extract from Deloitte's Defence to the FRC Formal Complaint:

> *"…Mr Hogenson raised queries in respect of transactions, including Eli Lilly, and these were treated with appropriate scepticism by the audit team. It was because of Deloitte's earlier work which had already been carried out with heightened scepticism and enhanced procedures that Mr Hogenson's queries were not alarming: these issues had already been the subject of careful consideration."*

(4) This was one of the transactions specifically queried by Mr Hogenson (see paragraph 2264(1) in the main body of the judgment). His queries in relation to the Eli Lilly transaction were not seen by Deloitte as alarming, because the issues raised had already been the subject of careful consideration by Deloitte.

(5) Deloitte's summary of their views on this transaction after seeing and investigating Mr Hogenson's complaints about it included the following:[532]

> "We have discussed and reviewed management's views on the matter as summarised above and concur with the accounting policy in place. The determination of the revenue recognition of the Capax sale as at 31 December 2009 is consistent with our understanding of this transaction at that time."

142. As they did in the context of VT3, the Claimants contended that Deloitte were knowingly misled by the Defendants about the true nature of VT4. They relied especially on draft responses to Deloitte's request to Autonomy management to justify the recognition of revenue on VT4, which Deloitte sent after receiving Mr Hogenson's letter dated 26 June 2010 raising concerns about possible false accounting in respect of the Eli Lilly transaction (see paragraphs 2232 to 2289 in the main body of the judgment). These draft responses were prepared by Mr Hussain, and sent in draft to Dr Lynch, Mr Kanter and Mr Chamberlain, before Mr Hussain sent them on (in substantially the same form) to Deloitte attached to an email dated 5 July 2010.

143. I set out below the assertions in the draft response to Deloitte on which the Claimants particularly relied, the Claimants' submission in respect of them, followed in each case by the Defendants' response:

(1) The Claimants first criticised the assertion that:

> "Additionally management were aware that an ultimate end-user was identified - Eli Lily ["Eli"] who are a major multi-national business that had a track record of purchasing Autonomy software ($22m). Indeed Autonomy had spent some time seeking to sell this product direct to Eli before ultimately selling it to Capax. The key feature that Capax was able to offer to Eli was an ongoing partner/servicing arrangement."

As to this:

(a) The Claimants submitted that this assertion was false for two reasons: (i) that it gave the

---

[532] Mr Welham suggested in his witness statement that he did not see Mr Hogenson's complaint as amounting to an allegation of improper conduct by management.

impression that it was the introduction of Capax Discovery that assisted the end-user sale, whereas there is no evidence that Capax Discovery's willingness to offer services to Eli Lilly had anything to do with the matter; and (ii) that in fact, since the licensed software was Digital Safe which was to be hosted, along with Eli Lilly's data, in Autonomy's data centre, Capax was not in any position to offer any services.

(b)  The Defendants sought to counter this submission on the basis that the assertion was fair: Capax Discovery was able to offer Eli Lilly an ongoing partner/service arrangement, especially in respect of the elements of the package sold other than Digital Safe; and Mr Baiocco himself confirmed in cross-examination that he had entered into the reseller deal with the aim of providing professional services to Eli Lilly and becoming one of its approved vendors. Although this objective was not realised, Mr Baiocco firmly believed in the opportunity, certainly did not believe that Capax Discovery had nothing to offer, and continued to pursue it even after the direct deal, as shown by his email to Eli Lilly dated 23 August 2010 (which I interpolate should be noted to be some time after the direct sale) asking for a meeting and stating:

> *"The biggest reason I have been calling you, is to get connected as a vendor to Lilly. I can promise you, that if you get us in front of your folks, we will blow them away with our capabilities in both the MS [Microsoft] and Discovery/Autonomy lines."*

(2)  The Claimants criticised also the assertion that:

> *"There were ongoing conversations between Eli and Autonomy as Eli remains a significant customer although it was expected that Capax and Eli would be in contract as at 31 December*

> *2009. These conversations resulted in a revised agreement with Eli and Autonomy in June 2010, though the agreement provides for Capax to invoice Eli directly and, importantly, Capax remain fully liable to Autonomy for the obligation established under the original PO."*

As to this:

(a) This too, the Claimants submitted, *"included lies"*, in that Autonomy management had no expectation that Capax Discovery and Eli Lilly "*would enter into a contract*" by 31 December 2009. They had entered into the Capax Discovery transaction precisely because Autonomy could not reach agreement with its long-time customer, Eli Lilly by the end of Q4 2009. Capax Discovery was not even approached by Autonomy until 31 December 2009; and Capax Discovery never even tried to sell a licence to Eli Lilly. The transaction with Capax Discovery had been concluded solely as a means of enabling Autonomy to meet its revenue target for Q4 2009.

(b) The Defendants accepted that this assertion (which was made some time later in similar form in a letter to the FRRP)[533] was *"not precisely phrased"* but submitted that *"Everyone knew that the deal between Capax and Eli Lilly had not been done by that stage"*, and the assertion should be interpreted sensibly as signifying an

expectation that there would in the future be a contract between Capax Discovery and Eli Lilly, not that one had already been made.

(3) Thirdly, the Claimants criticised the assertion that:

> *"We have discussed and reviewed management's views on the matter as summarised above. Their determination of the revenue recognition on the Capax sale as at 31*

---

[533] See Autonomy's letter to the FRRP dated 3 March 2011 in relation to investigations made by the FRRP after Mr Hogenson had raised concerns: and see paragraph 2304 in the main body of the judgment.

> *December 2009 is consistent with our understanding of the original transaction at that time.*
>
> *As a result of unforeseen circumstances arising in Q2 2010 we understand that additional work was involved on this transaction as summarised in the information from Brent [Hogenson] and as explained above. As these events took place in 2010 this information was not known as at the time of completing the 2009 group accounts and accordingly adjustments, if any, would fall to be treated in 2010."*

As to this:

    (a) The Claimants submitted that this too was false: it proceeded on the basis that something unforeseen had happened in 2010 that was not known about as at 31 December 2009, whereas in fact, what happened was always foreseen (including especially that Autonomy would continue negotiating directly with Eli Lilly, regardless of the VAR transaction).

    (b) The Defendants did not address this specifically in their written closing submissions; but they asserted generally, and both experts accepted, the need to assess revenue recognition as at the date of the VAR agreement, and not by reference to events afterwards; and they rejected the notion of there being anything improper in Autonomy continuing to negotiate with the end-user.

144. The Claimants also relied on Autonomy's responses to the FRRP in March and June 2011, when it too asked Autonomy's management for their response to Mr Hogenson's allegations about VT4. I set out below the assertions relied on by the Claimants as being false, and again I summarise, in respect of each of the Claimants' arguments, the Defendants' counter-arguments:

    (1) The Claimants referred to Autonomy's response dated 3 March 2011 to the FRRP's letter dated 2 February 2011 as follows:

> *"It was expected that the VAR and end-user would be in contract as at 31 December 2009. However due to evolving regulatory requirements, conversations between Eli Lilly*

*and Autonomy resumed in 2010, resulting in an agreement between Eli Lilly and Autonomy in June 2010. This was accommodated because of the relationship between the companies with Autonomy as a key supplier."*

As to this:

(a) The Claimants submitted that these *"were further, deliberate falsehoods"* on the basis that, in reality, the Defendants never expected Capax Discovery to contract with Eli Lilly, whether by 31 December 2009 or at all. They invited me to reject Dr Lynch's evidence in cross-examination in this regard as unconvincing. Further, they submitted that it was not some unforeseen *"regulatory"* issue which resulted in direct contact being *"resumed"*: rather, it had been the intention all along that Autonomy would deal directly with Eli Lilly.

(b) The Defendants offered the same explanation for the *"not precisely phrased"* language as they had in relation to the draft response to Deloitte; and although they accepted that Autonomy had always intended to carry on negotiating with Eli Lilly (as they considered, as did Deloitte, to be both proper and commercially of obvious sense and advantage), they again rejected the suggestion that a direct deal had been intended all along.

(2) The Claimants then also criticised Autonomy's response (by letter dated 8 June 2011) to the FRRP's follow-up letter dated 5 April 2011 asking for an explanation as to *"why Eli Lilly decided to contract direct with Autonomy rather than seeking to revise its contract with Capax."*

In that regard:

(a) The Claimants criticised Autonomy's reply that it was *"unable to comment further on the reasons that Eli Lilly decided to ultimately contract with Autonomy"* on the basis that *"No attempt was made to correct the FRRP's evident misapprehension."* Further, the Claimants criticised what Autonomy went on to say, which was:

> *"Under the terms of the subsequent direct agreement between Autonomy and Eli Lilly, Capax are a party to the contract and are invoicing Eli Lilly for the software."*

> The Claimants submitted that this was untrue, since Capax Discovery was not a party to the direct agreement but was *"merely Autonomy's designated payee."*

(b) The Defendants rejected both criticisms, denying any need to say anything further about Eli Lilly's preference to deal direct (since they regarded that as ultimately Eli Lilly's choice even if it was always on the cards), and depicting that and (given that in effect the arrangement was tri-partite in that Capax Discovery became a *"designated payee"*) the following criticism as *"nit-picking"* and *"unfair"*.

(3) In conclusion, the Defendants rejected the Claimants' final salvo in this context that:

> *"the Defendants displayed no compunction about dissembling to the regulatory authorities".*

145. The Claimants further relied on two other explanations or arrangements that they alleged were *"demonstrably untrue",* or fraudulent pretexts advanced by the Defendants to mislead Deloitte and the regulator. Both relate to the arrangements made after the direct deal for reimbursement of Capax Discovery and payment of a MAF:

(1) The first was a letter dated 30 September 2010 which Mr Kanter sent to Capax Discovery which described Capax Discovery as a *"Referral Partner"* and set out terms and conditions that purported to *"formalize our prior discussions."* These included:

> *"Referral Partner will: (1) introduce Autonomy into the deals with Eli Lily [sic] ("<u>End-User</u>"); (2) obtain quotes from Autonomy on behalf of the End-User; and (3) work with the End-User to assist in executing purchase orders and contracts with Autonomy.*

> *Autonomy will (1) pay Referral Partner commissions in the amount of $629,000 as a result of Referral Partner's direct and proximate participation in the account ...".*

(a) The Claimants submitted that this was *"another work of fiction".* Capax Discovery had not, and was not expected to, introduce Autonomy into deals with Eli Lilly, or to obtain quotes from Autonomy on Eli Lilly's behalf, or to work with Eli Lilly to assist in executing contracts. Capax Discovery had nothing to do with the transaction between Autonomy and Eli Lilly. The natural interpretation, the Claimants submitted, was that this was a contrivance made necessary by the perceived need to avoid putting in to writing or in any way leading to the supposition that the real reason for the payment was that:

> *"Capax Discovery was being paid for providing documentation that enabled Autonomy to recognise revenue prematurely."*

(b) The Claimants also made the point that in opening they had made clear that Mr Kanter would have to explain what they regarded as this fabrication: but he had been subsequently withdrawn as a witness. They contended that the subterfuge was further compounded when, on 30 September 2010, Mr Hussain approved payment *"on the basis that we have a signed MAF".*

(c) Dr Lynch, under cross-examination, said he did not know whether he had approved this letter. He appeared to me to be somewhat flummoxed, stressing when asked what it was referring to that he was not a lawyer and was *"just reading this cold here".* He suggested that the letter (and the payment for which it provided) appeared to him to be dealing, at least in part, with the future and the need to ensure that Capax Discovery did not use their introduction to Eli Lilly to compete with Autonomy; but although the

letter did also contain what was in effect a non-compete stipulation, that explanation was not convincing in relation to the express wording that:

> *"Autonomy will pay Referral Partner commissions in the amount of $629,000* [equating to 10% of the deal already done] *as a result of Referral Partner's direct and proximate participation in the account…"*

(d) When it was put to him that *"Mr Kanter's letter is simply laying a false paper trail",* he disagreed and said that *"all that he's done is taken a standard MAF agreement"* and the letter appeared to him to look *"like a perfectly standard MAF paperwork…the normal paperwork we would use, something like that"*; but that did not explain its reference to Capax Discovery's *"direct and proximate participation".* Dr Lynch appeared discomfited; and his responses were not convincing.

(e) As it seems to me, Mr Kanter's perception of the need for such a letter does support the Claimants' case that at least he felt uncomfortable paying a MAF without (a) some written agreement and (b) the reseller having actively participated in the transaction in some way.

(2) Secondly, the Claimants relied on the steps taken to reimburse or protect Capax Discovery from liability to pay for the shortfall of some $700,000 between the VAR transaction licence fee (for which Capax Discovery remained legally liable) and the lower amount eventually charged by Autonomy to Eli Lilly in the direct deal. Again, the Claimants contended, it was Mr Kanter who devised a solution, which I have already dealt with in some detail above (see the section in the main body of the judgment where I deal with the Capax Discovery/EDD reciprocal transaction (RT1)), and again it involved pretence.

In summary:

(a) By email to Mr Hussain and Mr Egan dated 6 October 2010 Mr Kanter referred to

*"experiencing bandwidth constraints on EDD processing"* as the basis for recommending (so as to *"ensure availability of service for customers"*) an *"increase in European EDD processing availability for Capax of 500GB per month for the next seven months"* at a price of approximately $100k per month.

(b) There is thus an exact coincidence with the amount of shortfall; and the coincidence in timing is notable also.

(c) Mr Egan stated in his witness statement that Mr Kanter had *"generated emails that created the appearance that Capax was actually providing overflow EDD services for Autonomy"* though he (Mr Kanter) knew that was not the case, and the emails were pretextual. Mr Egan also referred to the fact that he *"knew that Mr Kanter and Mr Hussain had made similar pre-textual statements."*

(d) Mr Baiocco's evidence in his witness statement was that these payments were made following a proposal from Mr Egan and Mr Kanter that the shortfall be covered by Autonomy, though in crossexamination he clarified that he did not discuss the matter with Mr Kanter, at least until much later. Mr Baiocco further confirmed that:

> *"...Capax Discovery did not work on any 'European projects'. I believe that this documentation was simply designed to paper the payments by Autonomy to Capax Discovery to cover the shortfall on the Eli Lilly transaction."*

(e) This evidence was not really contradicted. Indeed, it will be recalled that at the commencement of his cross-examination when asked whether there were any matters that on reflection he felt were untoward, Dr Lynch singled out the issue as to the purchase orders and payments made to Capax Discovery for EDD services as his one area of concern that there might have been wrongdoing, although he insisted that

he had no knowledge of this at the time, and did not accept that Mr Kanter and Mr Hussain had either. Dr Lynch told me that he did not think that Mr Kanter knew, or had any reason to know, that money was being sent to Capax Discovery for doing nothing because he sat:

> *"in a legal office in Cambridge, he doesn't go to the US, he doesn't stand in data centres and he's getting approvals from Mr Egan saying that the work has been done."*

(f) However, there is no doubt that Mr Kanter was involved in the process under which Autonomy contracted for Capax Discovery to provide the EDD services; and, for example, there was a statement on the face of the purchase order in question, *"REQUESTED BY: Andrew Kanter"*.

(g) When it was suggested to Dr Lynch that surely Mr Baiocco would not have failed to tell Mr Kanter that Capax Discovery was not doing any work, he denied this tersely, reasoning that if Mr Baiocco had told Mr Kanter that (in effect) he was defrauding Autonomy, Mr Baiocco would have been sued. When the riposte from Mr Rabinowitz was that this might be so unless, of course, there was agreement on a contrivance, including by Dr Lynch, Dr Lynch dismissed that completely.

(h) It would certainly have been helpful to hear from Mr Kanter on these points; but I did not, in circumstances I have previously explained. In his absence, and for reasons I have already given, I have concluded that the likelihood is that these arrangements were a contrivance orchestrated by Mr Kanter, and implemented by Mr Egan and Mr Baiocco, each of whom knew that at the time Capax Discovery was not able to provide the overflow EDD services it was purportedly issuing a purchase order in respect of, and being paid for.

(i) The Claimants submitted that whether or not Mr Baiocco, Mr Egan or Mr Kanter actually told Dr Lynch about the specifics (as to which see below) the contrivance was:

> *"entirely in keeping with the arrangement – which the Court should find Dr Lynch had authorised (or at the very least knew about and supported) – of ensuring that Capax Discovery was not left out of pocket, thus enabling Autonomy to call upon Capax Discovery as and when required to enable revenue to be recognised improperly."*

(j) I address the issue as to what the Defendants knew of this below.

146. The final episode of VT4 relates to the process by which, in the end, the $299,342 support and maintenance fee was dealt with, which the Claimants also relied on as the final implementation in the context of the transaction of the side agreement or understanding they allege, and improper accordingly. As to this:

(1) Capax Discovery never paid that sum, and Autonomy never threatened any recovery process.

(2) Rather, on 28 July 2011, Ms Helen Ku of Autonomy's finance department informed Mr Baiocco, copying Mr Chamberlain, that the outstanding balance on the Eli Lilly purchase order was $299,680. Mr Chamberlain forwarded this to Mr Hussain the same day, and said, "*Down to $300k which is the maintenance credit that I need to sort*". Mr Hussain responded, and did not dissent from, the notion that a credit should be given.

(3) Accordingly, on 8 August 2011, Autonomy issued a credit note to Capax Discovery in the amount of $299,342, effectively cancelling Capax Discovery's remaining payment obligation relating to the Eli Lilly deal. Mr Chamberlain approved the issue of the credit note.

(4) The Defendants dismissed the suggestion that this was improper as *"unreal"*. As with the Kraft transaction, after Autonomy had closed a direct deal with Eli Lilly, it was commercially sensible, and avoided counting the

same revenue[534] twice, to issue a credit note in respect of the outstanding support and maintenance component, which Autonomy had instead committed to undertake for a commensurate fee.

(5) In the circumstances as they then were, plainly, the Defendants are correct that the revenue could not be counted twice, and the loose end of the VAR sale had to be tied up. But the Defendants' dismissal of any complaint about this last part of the process as *"unreal"* does not answer the overall picture painted by the Claimants, and which I accept as encapsulating the economic result, which was

that as regards Capax Discovery's total debt of $6,286,169 under the Eli Lilly purchase order:

(a) Capax Discovery paid about $5.3 million using money which <u>Autonomy</u> was entitled to receive from Eli Lilly, but which Autonomy directed Eli Lilly to pay to Capax Discovery, so that Capax Discovery could, in turn, hand it over to Autonomy;

(b) Capax Discovery paid $700,000 using money which Autonomy channelled to Capax Discovery for fictitious services, so that Capax Discovery could then pay it back to Autonomy; and

(c) Autonomy cancelled Capax Discovery's obligation to pay the remaining $299,342.

147. In effect, the difference between the Claimants and the Defendants as to this was that the Claimants contended that outcome further justifies the inference that, at the time of the purchase order, Capax Discovery did not genuinely take the risk of having to pay $6,286,169 (or any amount) to Autonomy from its own resources; whereas the Defendants presented it as illustrating how far Mr Egan, Mr Baiocco, and Mr Kanter were prepared to go to preserve the goodwill of Capax Discovery and the VARs, and what Dr Lynch was fond of referring to as the *"ecosystem of resellers"* on

---

[534] Is it the same revenue or is (1) revenue for software delivered via Automater to VAR, the other is revenue from sale of software presumably delivered by Autonomy directly to Lilly.

which *"a company like Autonomy stands or falls..."* Dr Lynch put up an energetic case for the latter:

> *"So one of the crucial things is to make this ecosystem of resellers strong because not only do they bring you business, not only do they keep the competitors out, not only do they do the marketing for you, but they're also the ones that are there supporting the customers and doing the installations, so – and of course if they don't get the revenue through their books, they have to go and do it with competitors.*
>
> *...*
>
> *And you know, yes, I guess theoretically Autonomy could turn round and say, well, even though we sold it to you, we're going to sell it again, but in that case, as soon as the ecosystem heard about that, no one would trust you anymore, so there's a sort of mutually assured destruction in that situation."*

148. This was energetically put and well thought out: but I am not persuaded that it has anything much to do with the present case. Of course, a company in the position of Autonomy would not wish to let a reseller down; of course, it would not seek to extract a double revenue; of course, if a direct sale resulted, Autonomy would need to pay the VAR what, or substantially what, it would legitimately have expected had it re-sold, Autonomy having destroyed the prospect of an onward sale. But the result was the real purpose of the arrangements, and not an unexpected one, and I am persuaded that it conformed with the intentions of Autonomy and Capax Discovery all along.

149. In my judgment, therefore, the explanation offered by the Claimants is plainly the most likely.

150. In the round, I have concluded that VT4 lacked economic substance; the only real substantive sale was direct by Autonomy to Eli Lilly. In my judgment, no revenue should have been recognised from impugned VAR sale VT4; and the repetition of its features in subsequent sales is of general relevance and requires the like conclusion in respect of subsequent Capax Discovery sales accordingly.

*Defendants' alleged knowledge of false accounting in respect of VT4*

151. As to the second limb of their case, that the Defendants both knew that the inclusion in Autonomy's accounts and published

information of recognised revenue from VT4 was misleading, the Claimants relied on the following:

(1) Their general or overriding case to the effect that the introduction of a VAR so late in the day, and only because of a delay in closing the intended end-user deal with Eli Lilly, and the fact that after the VAR transaction, Autonomy continued to conduct the negotiations which led to a direct sale by it to Eli Lilly (rather than an onward sale by Capax Discovery as the VAR to Eli Lilly as end-user) were ultimately directed by Mr Hussain and must have been known by Dr Lynch;

(2) The specific arrangements made for (a) Eli Lilly to make a payment, at Autonomy's direction, to Capax Discovery (rather than) Autonomy to enable Capax Discovery to discharge its indebtedness to Autonomy under its VAR transaction and (b) the payment of a MAF to Capax Discovery, though (as the Claimants saw it) it was not expected or intended to participate at all (so that it was merely a *"placeholder"*) were similarly known to, and known to be improper by, Mr Hussain, and it is to be inferred, also by Dr Lynch;

(3) The further arrangements to ensure that Capax Discovery was either held harmless in respect of, or given funds to discharge, any remaining indebtedness under the VAR transaction to which legally Capax Discovery remained subject by reason of the lower sums achieved in the direct sale were known by Mr Egan, Mr Baiocco, Mr Kanter, Mr Hussain, and by inference, Dr Lynch to be contrivances or (as the Claimants put it) *"works of fiction"*;

(4) The guilty knowledge of both Defendants being confirmed by the fact that they did, and perceived the necessity to, (a) neutralise Mr Hogenson and (b) mislead both (i) Deloitte and (ii) the FRRP and the FRC about the true nature of the VAR transaction and the ultimate direct deal.

152. The points in (1) and (2) above substantially relate to the same 'pattern' and reflect points already addressed in relation to VT3. I do not propose to repeat my assessment of them. I turn to address, however, (a) various matters that the dispute in relation to VT4 highlighted, and which have a more general significance to this and the other Capax Discovery impugned VAR sales; then (b) the question whether either of the Defendants knew that the arrangements made to pay Capax Discovery for EDD processing were a contrivance (see in paragraph 145(2) above); and then (c)

whether the way that Mr Hogenson was dealt with and/or the way VT4 was presented to Deloitte and the FRRP demonstrates "guilty knowledge".

*Particular matters highlighted by VT4*

153.   The Claimants focused especially in the context of VT4 on a spreadsheet prepared by Mr Hussain, which he sent to Dr Lynch on 29 December 2009:

> (1) The spreadsheet contained, between columns W and AB of the "*revenue*" worksheet, a table setting out the daily progress of the large deals on 15, 16, 17 and 18 December 2009 (cells X16 to AA16):

| | 15th dec | 16th dec | 17th dec | 18th dec | | | |
|---|---|---|---|---|---|---|---|
| HOME OF | 3 | 3 | 0 | 1 | | | |
| MOD #1 | 2.5 | 2.5 | 2.5 | 2.4 | | | |
| MOD #2 | 2 | 2 | 2 | | out | | |
| MT | 10 | 10 | 10 | 10 | 24th dec | | |
| Dell oem | 2 | 2 | 2 | | risk | | |
| Dell MS | 5 | 5 | 10 | 5 | MS + BofA closed for $1m | | |
| BNP | 3.3 | 3.3 | 3.3 | | signed | | |
| Eli | 6.6 | 0 | 0 | | out | | |
| D&T | 2 | 0 | 0 | | out | | |
| JPMC | 5 | 10 | 10 | | disappeared | | |
| Vat | 19 | 19 | 19 | | | | |
| capax | | | | | | | |
| microtech | | | | 6.5 5 | | | |
| Verdasys | | | | | collections | | |
| integracion | | | | 2.5 | collections | | |
| HP OEM | | | | | | | |
| Filetech | | | | 8 | recognition | | |
| frank pao | | | | 1.5 | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Imperva | | | | 1 | | | |
| MS | | | | 12 | risky | | |
| Schwab | 3.5 | 3.5 | 3.5 | | signed | | |
| VT | | 2 | 2 | 1.9 | | | |
| | 63.9 | 62.3 | 64.3 | 56.8 | | 0 | 0 |

(2) Row 24 (marked with the first red arrow above) showed "*Eli*" (cell W24) with a value of $6.6 million on 15 December 2009 (cell X24), reduced to zero as at 16 and 17 December 2009 (cells Y24 and Z24) together with the comment "*out*" (cell AB24).

(3) Row 28 (marked with the second red arrow above) now had a new entry for "*capax*" (cell W28). This row was blank for 15, 16 and 17 December 2009 (cells X28 to Z28) but had a value of $6.5 million as at 18 December 2009 (cell AA28).

(4) It is easy to see that, as at 18 December 2009, the $6.6 million potential deal with Eli Lilly was to be replaced with a deal for approximately the same amount ($6.5 million) with Capax Discovery.

154. Dr Lynch said in cross-examination it was "*possible*" but "*unlikely*" he looked at this spreadsheet. But he was the primary addressee of Mr Hussain's email attaching it (Mr Stephan and Mr Chamberlain were copied, no doubt because they were working with Mr Hussain in the finance department). The Claimants submitted that Mr Hussain would not have sent it unless he expected that Dr Lynch would look at it. It is true that Dr Lynch (who said he disliked spreadsheets) considered that Mr Hussain was over-fond of them. But although Dr Lynch sought to portray his "*multi-page, multi-column, multieverything*" spreadsheet as "*pretty incomprehensible*", that struck me as rather exaggerated in the particular instance: it contained a user-friendly table charting the day-by-day position on the major deals. Given his focus on revenue, and on the large deals which would make the difference between achieving forecast and falling short of it, I agree with the Claimants that that would have been of considerable interest to Dr Lynch, and the likelihood is that he read it.

155. The Claimants urged me to find that Dr Lynch knew that Mr Hussain's plan was to try to recognise revenue on the potential Eli

Lilly deal in Q4 2009 by using Capax Discovery as a placeholder, on the basis of the same assurances as had been made in respect of the Kraft transaction. Although taken as a whole, I would have agreed with Dr Lynch that this rolled up set of assertions was *"going a bit further than the data on this spreadsheet"*. I accept that he would have gleaned from it quickly that Mr Hussain planned to use Capax Discovery if Eli Lilly did not complete in time or fell out. Furthermore, whether he read it properly or not, the fact that it was sent to him demonstrates both Mr Hussain's perception that Dr Lynch was not aloof from everyday detail or concerned only with strategy as a CEO of a listed public company but rather wished and expected to be involved in such detail, and also Mr Hussain's wish and propensity to share information with Dr Lynch and seek his support or guidance. I find it inherently unlikely that Mr Hussain would have wished to share this sort of detail whilst keeping to himself the matters of which he was aware as to how in truth the impugned VAR deals were intended to operate.

156.    A second point of detailed evidence relates to the fact that VT4 was only proposed to Capax Discovery on the very last day of Q4 2009, and had to be (as it was) completed by midnight. Capax Discovery (a fledgling entity which its parent had indicated it would not support in this regard) had no time, and made no attempt, to assess the potential for an end-user sale and thus the $6 million risk which on the Defendants' case it was undertaking for an upside fee of 10% and the possibility of future servicing work for Eli Lilly if that proposed end-user deal eventuated. Dr Lynch sought to address the obvious point that such an indifference to risk might suggest that it was not a real one (or that some other reliable comfort was available to cover it) with a suggestion to the effect that Capax Discovery already had available the information:

> *"Q. Mr Baiocco's evidence is that Capax Discovery had not had any dealings with Eli Lilly about this potential transaction before Capax Discovery issued its purchase order. Again, that wasn't challenged. I don't understand you to dispute that either, do you?*
>
> *A. Well, other than I think I've seen information that says that <u>Capax were actually working inside Eli Lilly at this point anyway</u>."* [My emphasis]

157.    Dr Lynch repeated this "understanding" three more times in the course of his crossexamination, but never gave any indication of its source or any other support for it. No evidence was provided to support it; and it was not suggested or put to Mr Baiocco that Capax Discovery was already working for Eli Lilly prior to 31 December 2009. It was suggested to Mr Baiocco that Capax

Discovery subsequently became an approved vendor of professional services to Eli Lilly: but Mr Baiocco's evidence was that this did not end up happening.

158. A third point of focus in relation to VT4 was the arrangements made to pay Capax Discovery for the provision of EDD services, which as I have explained above the Claimants alleged were contrived to make good a liability to which Capax Discovery was contractually exposed because of a shortfall of some $700,000 representing the difference between the licence fee under the direct agreement between Autonomy and Eli Lilly (about $5.3 million) and the licence fee that had been agreed with Capax Discovery (about $6 million). I have described above how this was done and the Claimants' case that it was all a contrivance (which I have accepted): the question now is as to what the Defendants knew.

159. There are three facets to this question: (a) whether purchase orders issued by Autonomy supposedly in respect of *"EDD Services"* related to any actual EDD work done or to be done by Capax Discovery; (b) whether, if not, the Defendants knew that and (c) whether the Defendants were aware of the arrangements in the particular context of VT4 for which Capax Discovery's shortfall was to be paid off and their alleged contrivance.

160. As to (a), I have summarised in paragraphs 2507 to 2510 in the main body of the judgment and elaborated in the part of this judgment dealing with the allegations about 'Reciprocal Transactions', the question whether Capax Discovery had that capability at the time of the first Capax Discovery/EDD sale at the end of March 2009. I have concluded that it did not. The Claimants' case was that it did not develop a capability to provide EDD overflow services until late 2011. By way of summary:

(1) The device of using purchase orders for *"Specialist EDD processing"* on the purported basis that Autonomy had such a volume of EDD processing work that it could not do it itself and thus needed to secure from Capax Discovery *"overflow capacity"* had been devised in April 2009 to provide funds to Capax Discovery to enable it to make instalment payments under the first Capax Discovery/EDD sale and had become well-established: and see paragraphs 2507 to 2524 in the main body of the judgment.

(2) Use of such purchase orders was extended in May 2009 to cover hardware purchases from Autonomy to enable Capax Discovery to start an EDD processing facility and build capacity itself to do EDD processing work.

(3) It was then extended again to cover instalments due to Autonomy by Capax Discovery under a second Capax Discovery/EDD sale in early 2010.

(4) As at April 2009, and for a considerable time after that, probably until early 2011, Capax Discovery had not in fact the ability to do specialist EDD processing.

(5) The truth that Capax Discovery had no ability to deliver specialised EDD processing throughout this period was established by the evidence of Mr Baiocco, Mr Egan and Mr Sullivan, and by the absence of any proof of it ever being provided. Further, Mr Sullivan, who as CEO of Zantaz, had detailed insight of its e-Discovery business, stated in his witness statement that he

> *"knew of no instance of EDD work being outsourced to Capax or any other third party. Further, I do not believe that Autonomy needed standby EDD support services. When capacity constraints did arise, as in the case of our extremely large EDD contract with BP, Autonomy scaled up its operations by adding hardware and hiring additional staff to handle the additional workload."*

(6) The fact that the purchase orders, which were never followed by any contract to establish terms for the provision of services, were simply a means of generating funds for Capax Discovery was also discernible from the clear pattern which developed: Capax Discovery would never pay instalments unless and until it had received payment under the purchase orders. Indeed it was that pattern which Mr Hogenson discerned and expressed concern about in late June 2010 (see paragraphs 2239 to 2242 in the main body of the judgment), as (in July 2010) did Mr Tejeda as Autonomy Inc Director of Revenue in the Americas.

(7) Documentary evidence such as a spreadsheet sent by Mr Baiocco to Mr Kanter on 4 March 2010 under cover of an email explaining that it *"reflected the deal from q1 09"* and also drew attention to the fact that as regards the *"q4 deal"* it had not yet been populated *"because there has been no payments related to that deal as of yet"*, confirmed the expectation that funds would be provided for Capax Discovery to enable it to pay down its debt. Thus, the spreadsheet had a column for the *"Total Owed to Capax"*, which listed the instalments due

to Capax Discovery in order to fund Capax Discovery's payments under the first
Capax Discovery/EDD sale, and then various columns showing when Capax Discovery paid Autonomy following receipt of funds from Autonomy pursuant to various e-Discovery purchase orders. The spreadsheet indicated that Capax Discovery was expecting Autonomy to pay it amounts equivalent to the instalments due under the first Capax Discovery/EDD sale and was using the funds it received from Autonomy under the guise of e-Discovery services to pay those instalments. The difference between the amounts in the Total Owed to Capax Discovery column and the amounts recorded in the column headed "Check Breakdown" was Capax Discovery's profit.

(8) If this was not clear enough from Mr Baiocco's spreadsheet, Mr Baiocco then sent Mr Kanter a follow up email, saying:

> *"...sorry to hit you again here. Just wanted to reiterate that we were promised more than a dollar for dollar on this. We were promised a profit as well. Trying not to sound ungrateful in any way, just that we were nowhere near ready to do a deal like this."*

(9) Dr Lynch himself acknowledged, when asked early in his cross-examination, whether having seen the material adduced and listened to the evidence up until then, he was still adamant that there was no wrongdoing, that he was concerned about impropriety in relation to the payments to Capax Discovery for EDD, in that he had seen evidence that:

> *"...we were paying for the provision of EDD outflow services and that Mr Baiocco was not in a position to actually provide that if that had been required and Mr Egan knew that."*

(10) As earlier noted, the invoices referred to *"Outsourced Specialist EDD Services...for European projects"*, but Mr Baiocco's evidence, which was on this point not challenged or contradicted, was that Capax Discovery never did work on any *"European projects."*

(11) Not only was the use of purchase orders purportedly for *"Specialist EDD processing"* an established device and pretence, but the propensity of those directly

engaged in the deployment of the device, including especially Mr Egan, Mr Kanter and Mr Hussain, to co-operate in the creation of pre-textual correspondence with an eye to the auditors, which might otherwise not be likely, is apparent from an earlier email in the same email chain as culminated in Mr Kanter's *"bandwidth"* email of 6 October 2010 to Mr Hussain and Mr Egan dated 6 October 2010 (see paragraph 145(2) above). In that earlier email, Mr Kanter pretended to have been *"impressed with Capax's contribution to the FSA transaction"* so as to justify a MAF. He knew, and they all knew, that Capax Discovery had in fact done nothing.

161.  As to who knew of the pretence:

(1) Mr Egan, Mr Kanter and Mr Hussain worked together in this area as a tight, close-knit team. They were all also part of what Dr Lynch considered to be his core management team. Of course, Mr Egan was on the ground in the US, whereas for the most part Mr Hussain and Mr Kanter were in the UK, sharing an open plan office when in London with Dr Lynch, and being in close proximity to each other when working in Cambridge; and they were able to and did keep in close contact with each other, both in writing, as the email chain itself illustrates, and in undocumented discussions. It seems to me much more probable than not that Mr Hussain would have come to know what Mr Egan and Mr Kanter knew.

(2) I consider it unlikely that Mr Kanter or Mr Egan would have contrived all this without the knowledge and approval of Mr Hussain; and all the more unlikely that either would have dared to do so alone and implicated the others by including them in emails seeking their approval. They were a tight team, all aware of the assurances given to Mr Baiocco, and the need to find a solution to fulfil them. It seems to me reasonably clear that Mr Kanter and both recipients of his "bandwidth" email were well aware of the device and its development and purpose.

(3) The documentary evidence lends further support by revealing a sharp difference in the way Mr Baiocco's frequent and increasingly urgent enquiries as to payment as instalment dates under the various EDD contracts became imminent were treated within Autonomy's finance department according to whether they did or did not know that no EDD work was in fact being done by Capax Discovery. By way of illustration of this:

(a) When Mr Crumbacher (who was not in the know) tried to find out in February 2010 who was dealing with Capax Discovery EDD purchase orders after Mr Phil Smolek had left (in December 2009), Mr Sullivan (who was not in the know either) responded that he did not know but assumed that Mr Chamberlain would be able to say, prompting Mr Crumbacher to ask:

> *"Doesn't your team have to tell finance how much processing work was done, and for what fee? Who are they giving that information to now? Or has no EDD work been done by Capax since Phil left?"*

(b) Those in the know, such as Mr Kanter (who had become by then responsible for the e-Discovery purchase process, which of itself is of interest), simply dealt with the enquiries for what they were: enquiries as to when Mr Baiocco would get the funds he needed. Thus, for example, after Mr Crumbacher had once more sought information about EDD sales after urgent enquiries from Mr Baiocco, Mr Kanter appears to have enquired of Mr Egan how much was required, and when told that an increased amount was outstanding, simply increased the payment by a total of some $350,000 without requiring or providing any explanation.

(c) Mr Egan, Mr Kanter and Mr Baiocco were in constant contact, and email evidence suggests that increasingly Mr Kanter kept a close eye on any purchase order from Capax Discovery relating to EDD Processing, without involvement on the part of others in the finance department.

(d) They kept a close eye on purchase orders with respect to EDD.

162. The third question, and the one of most specific relevance to VT4, is whether the Defendants knew that the purchase order which

generated the funds used to cover Capax Discovery's shortfall of $700,000 was likewise a pretence. As to that:

(1) It seems to me clear that the purchase order was a pretence, just as the preceding purchase orders for *"Outsourced specialist EDD Services"* were pretences, to justify the payments that in effect Mr Baiocco had been promised would be made to enable Capax Discovery to make the instalment payments due by it, and in the case of VT4 the shortfall that had arisen;

(2) In the circumstances detailed above, I have concluded that Mr Hussain, Mr Kanter and Mr Egan were all aware of this and indeed involved in it;

(3) That leaves only the question of what Dr Lynch himself knew.

163.  Dr Lynch was aware of the direct Autonomy/ Eli Lilly contract (not least, from Mr Hogenson's expressed concerns). However, he denied in cross-examination that either Mr Egan or Mr Kanter told him about this arrangement to cover Capax Discovery's shortfall. Dr Lynch's position was that, as far as he was concerned, the payments were for services which Autonomy needed to sub-contract; nothing suggested to him that the payments were for fictitious services.

164.  The Claimants rejected this and submitted that "*given that the arrangement involved paying $700,000 to Capax Discovery in exchange for nothing, that is highly implausible."* But that assumes against the Defendants the very point in issue, which is whether the payment was in fact for services. Nevertheless, having concluded that Mr Hussain was involved (see paragraph 161 above), in addition to Mr Egan and Mr Kanter, I do not think it likely that they would all have kept from Dr Lynch the arrangement which lay behind the exchanges, which I have concluded they devised to fulfil the assurances given by Mr Egan and to ensure that Capax Discovery was not left out of pocket.

165.  I consider that I am fortified in that conclusion by the following:

(1) On 9 December 2010 Dr Lynch was asked to approve the $700,000 purchase order by an Accounts Assistant, obviously on the instructions of Mr Hussain and/or Mr Kanter and/or Mr Egan (all of whom had previously given their approval), with a careful, but unusual, explanation that his (Dr Lynch's) approval was needed *"as the total exceed 30,000USD".* Dr Lynch wrote *"ok"* from his iPhone.  He asked no questions at all.

(2) This needs to be set in the context of the fact that in July 2010 Mr Percy Tejeda ("Mr Tejeda"), Director of Revenue at Autonomy Interwoven, had raised specific queries about various issues relating to VT4 and the Eli Lilly contract, including whether Autonomy were genuinely sub-contracting EDD services to Capax Discovery. He had also referred to the shortfall in question. Mr Tejeda's email had been forwarded by Mr Hogenson to Autonomy's Audit Committee on 8 July 2010, copying Mr Knights and Mr Knight of Deloitte and Mr Kanter. It was put to Dr Lynch in cross-examination that in light of these concerns, he would surely not *"have just said "okay" without asking any questions about these purchase orders?"*

(3) I accept this "dog that did not bark" point. In his oral evidence, Dr Lynch told me that he also sought to dismiss the concerns of Mr Tejeda and Mr Hogenson as *"nothing new"* and he had in fact drawn additional comfort that there was nothing amiss about the EDD purchase orders[535] from Deloitte's investigation finding nothing untoward. However, I cannot accept this justification for Dr Lynch having raised no questions in respect of an issue that had become such a focus of concern:

(a) It seems to me most unlikely that this request for approval came out of the blue: it is much more likely, in all the circumstances, that Dr Lynch had been told by Mr Hussain or Mr Kanter what to expect and why.

(b) That is especially so because it appears that the requirement for his approval of anything over $30,000 was new, and thus the request fairly new too. In that context, Dr Lynch disputed that there was any such rule at all: but in that case the request would surely have appeared all the more questionable unless pre-explained.

(c) Furthermore, in relation to EDD payments to Capax Discovery, he had no basis for supposing, let alone getting comfort as he suggested, from

---

[535] He told me in cross-examination: *"The irony, which may be a slightly sad one, is that after Deloitte had looked at all this, I actually felt confident in these things."* The fact is, however, that Deloitte were not aware that Capax Discovery had no ability to provide the relevant EDD processing, and had never done so, as I have found to be the position; and if Dr Lynch knew this, the point rebounds on him.

Deloitte's review: Deloitte never did consider EDD payments.

_____

166. In summary, therefore, I have concluded that all of the core management team of Dr Lynch, Mr Hussain, Mr Kanter and (for these purposes) Mr Egan were aware that the purchase order for $700,000 was a pretence, and was the mechanism whereby to appear to justify covering Capax Discovery's exposure in the VT4 transaction. That further substantially supports the Claimants' case for impugning VT4 and for liability on the part of the Defendants under FSMA.

167. In my judgment, the Claimants have established both limbs of their case in relation to VT4.

## VT10: Capax/FSA (Q1 2010)

168. By mid-March 2010, Autonomy was close to concluding a substantial sale of software to the UK Financial Services Authority ("the FSA"). The sale was being negotiated by Mr Chris Hartley (a senior sales executive with ASL, based in Cambridge) directed and assisted by Mr Hussain. The FSA deal was one of the main targets for the quarter.

169. Mr Hussain told Dr Lynch by an email dated 15 March 2010, Autonomy at that stage needed *"5-8 more"* and though Mr Hussain still hoped to close the proposed FSA deal of about $4,500,000, which would have greatly assisted it to meet its revenue target for Q1 2010 of $195,500,000, by then the prospects were fading of doing so before the end of the quarter.

170. As at 29 March 2010, it was clear that no deal could be concluded with the FSA within Q1 2010. Dr Lynch sent Mr Hussain a document setting out the transactions that he understood needed to be concluded in order for Autonomy to achieve its total revenue target for Q1 2010. The attachment identified $4 million in revenue as coming from *"FSA PARTNER MT"*. The use of the suffix "*PARTNER*" denoted the use of a VAR in order to recognise the revenue in Q1 2010, as Dr Lynch accepted.

171. Dr Lynch denied that he was thereby instructing, or at least, authorising Mr Hussain to enter into a VAR transaction to enable revenue to be recognised, but he accepted that he was content with Mr Hussain doing so. He went on to accept the following:

> *"Q. And so what Mr Hussain was proposing and you were going along with was for Autonomy to get this VAR to submit a purchase order that would enable Autonomy to recognise the revenue in Q1, correct?*

*A. I assume that's what it would want to do, yes."*

172.  On 30 March 2010, Dr Lynch sent Mr Hussain an attachment entitled "*115Done.docx*" and said in his covering email, "*Ok heres [sic] my list*". The attachment attributed $4 million of revenue to "*FSA PARTNER MT*". Dr Lynch accepted in cross-examination that MT "*could be*" MicroTech. No other meaning has been suggested.

173.  The plan became to use as the VAR a company called Centennial, an affiliate of FileTek, which Mr Szukalski described to me, in the context of the FileTek/USDVA deal, as being *"very comfortable and familiar with these types of transactions"*:

> (1) On 30 March 2010, Mr Egan asked Mr Kanter to create a purchase order for Centennial "*to agree with the parameters you finalize on for FSA deal*".

> (2) The same day, Mr Egan, Mr Kanter and Mr Hussain discussed what terms should be included in the purchase order.  Mr Hussain said, "*the problem is rev rec on the reseller – are they financially strong?*"

> (3) On 31 March 2010, Mr Crumbacher, at Mr Egan's request, set out in an email a list of "*big issues*" in the proposed FSA contract "*for your communication with Centennial tomorrow*". The list made apparent that the FSA deal was complex and there were a large number of potential issues for consideration by Centennial.

> (4) That day (31 March 2010), Mr Hussain emailed Mr Egan saying, "*this doesn't look good to me*". Mr Egan agreed, "*I know I think I need to either do straight on the FS deal as financing or do FT deal*". Mr Hussain replied, "*With these guys I think you can only do a FT deal. PMI and citi thru DT. FSA?*". The Claimants submitted, and I accept, that this signified that they considered that a different VAR needed to be found.

174.  Also on 31 March 2010, at 12:38 pm, Mr Hussain sent Dr Lynch (and Mr Egan) another revenue route-map document.  The overall target was revenue of $200 million, equating to earnings per share of $0.25. A list of transactions was given to reach that target, including "*FSA 4.5*". No VAR was identified on this list.

175.  Later that day (31 March 2010), at 7.19pm, Mr Hussain sent Dr Lynch a further version of the same document which stated at the foot of the page, under the heading "*ISSUES*", "*FSA??*".  The VAR was still not identified on the list.

176. At 11.31pm on 31 March 2010, Dr Lynch sent Mr Hussain a further version of the document. He stated in the subject field of his covering email "*Important sheet ring if awake ... midnight italy*". Next to the reference to the $4.5 million FSA transaction, Dr Lynch wrote the letters "*cx*". Dr Lynch accepted in cross-examination that this was a reference to Capax Discovery. He explained how Capax Discovery had come to be chosen as the VAR for the FSA deal as follows:

> "*Q. On 31 March, you are identifying Capax as the VAR to use to recognise revenue on the potential transaction with the FSA?*
>
> *A. No, someone will have told me that that is who we are talking to about doing it.*
>
> *Q. Who?*
>
> *A. It could have been Mr Egan. It could have been Mr Hussain.*"

177. There was still time to do a deal with Capax Discovery, because Capax Discovery was located on the US East Coast (five hours behind London time). Dr Lynch accepted in cross-examination that he had no reason to think that Capax Discovery (a New Jersey company) had had any dealings with the UK financial services regulator. It was the unchallenged evidence of Mr Baiocco that the first he heard of a possible transaction for end-user FSA was "*when Mr Egan called me right at the end of the quarter*".

178. On 31 March 2010, at 10.14pm, Mr Crumbacher emailed Mr Baiocco a draft purchase order for him to execute and return, which he did. The purchase order, drafted by Autonomy, stated a licence fee of $4,285,714 plus $214,286 for one year of support. Payment was required as follows: $450,000 by 30 April 2010, $1.05 million by 31 March 2011, $1.5 million by 31 March 2012 and $1.5 million by 31 March 2013. The software included Introspect (i.e. e-Discovery), Aungate Investigator and ECA. The payment order was issued under the June 2009 Capax Discovery VAR Agreement, summarised at paragraph 60 above, and which made clear that the reseller was unconditionally obliged to pay (and was not relieved by any non-payment by the end-user) and the agreement comprised the entire agreement between the parties. As the Defendants also emphasised, the terms of the contractual arrangements (which are not said to be a sham and must thus be given full effect in law) made it clear that the risk of ownership had passed, and that managerial control was not retained by the seller (Autonomy).

179. Notwithstanding the extreme hurry (necessitating the choice of a VAR in a different time zone) to enable recognition of revenue by the use of a VAR in anticipation of an end-user sale to the FSA, it appears that in the immediate aftermath there was some shilly-shallying as to whether or not to take the revenue in that quarter, or defer it. In particular:

> (1) In the early hours of 1 April 2010, Dr Lynch (who was in California) emailed Mr Hussain to say, "*everything expected in IDOL US closed*" and attached an update. The update continued to show $4.5 million of revenue on an FSA deal, through Capax Discovery.

> (2) Also on the morning of 1 April 2010, Mr Hussain emailed Mr Egan, subject "*update pls*". The body of his email identified the following transactions:

>> (a) *"Filetek 8m"*
>> (b) *"Discovertech – pmi & citi"*
>> (c) <u>*"Capax – fsa"*</u>

> (3) But on 8 April 2010, Mr Chamberlain emailed Cynthia Watkins and Matt Stephan to say that "*Powers greater than me*" were making decisions which required adjustments to revenue, including "*Defer Capax (FSA) - $4,285k*".

> (4) Then, on 12 April 2010, Mr Chamberlain emailed again, saying, "*We have had to make further changes to your numbers*", and identified "*Capax (FSA) back in*". The same day (12 April 2010), Mr Hussain sent Dr Lynch an "*audit update*" which stated, "*MT is ok (subject to some evidence) Capax ditto*".

180. In the event, Autonomy recognised the licence fee revenue immediately as at 31 March 2010, with the support and maintenance recognised over the course of the following year.

181. Subsequently, in August 2010 Autonomy entered into a direct agreement with the FSA which provided for three years of hosting and archiving services, together with software licences, for a total amount of $6,676,102 payable in stages subject to acceptance criteria not finally satisfied until August 2011. The last stage payment was not due or paid by the FSA until September 2011. In June 2011 Capax Discovery paid $1.5m due in respect of

its obligations. [536] After Autonomy had invoiced the FSA in respect of the sale, Autonomy credited Capax Discovery in respect of the balance of the debt due.

182.  Some of the Claimants' submissions in respect of VT10 broadly mirrored those in respect of the other impugned VAR transactions between Autonomy and Capax Discovery (other than those relating to EDD). Thus:

(1)  The VAR deal was offered to Mr Baiocco at literally the eleventh hour and Capax Discovery had no time or opportunity to assess the prospect of the proposed end-user deal, nor to negotiate price. Mr Baiocco said that he was told that *"the deal with the FSA was very close to closing, and that we would get a 10% commission once Autonomy had closed it"*; but Capax Discovery could and did make no enquiry of its own, and simply settled in to passively awaiting whatever Autonomy negotiated. It had not the time or the means, nor (if in reality it was taking none) any reason, to measure the risk.

(2)  The Claimants relied on the unchallenged evidence of Mr Baiocco that Capax Discovery had no involvement in the negotiations, which continued after the VAR deal much as before, to conclude and close a deal with the FSA, so that Capax Discovery was entirely dependent on Autonomy for information about the progress of the negotiations;

(3)  When on 30 April 2010 the first instalment (of $450,000) became due and payable by Capax Discovery under VT10, Capax did not pay, and yet Autonomy did nothing to enforce the debt pending a deal with the FSA;

(4)  Although it had done nothing to assist the ultimate deal with the end-user, Capax Discovery was paid a MAF as if they had made a substantial contribution;

(5)  After the direct deal had closed, Autonomy agreed with Mr Baiocco, in wording confirmed by Mr Kanter in a letter, that it would apply the payments it received (this time directly) from the FSA against Capax Discovery's account with Autonomy which, the Claimants submitted:

> *"in effect, involved waiving Autonomy's right to be paid $4.5 million by Capax Discovery, if that*

---

[536] The Claimants allege that this payment resulted from Autonomy's ramp up payment in respect of Capax Discovery's NearPoint services, dealt with at paragraphs 198 to 202 below.

> *amount was paid to Autonomy by the FSA
> pursuant to a separate contract to which Capax
> Discovery was a stranger."*

183.   The Claimants submitted that all this fitted the 'pattern' and was
consistent with and confirmatory of the Claimants' overall case
that Mr Egan had assured Mr Baiocco that Capax Discovery would
not be required to pay for VAR deals like the FSA deal from its
own resources. The Claimants submitted further that:

> *"Indeed, absent the handshake agreement, Mr Kanter's
> confirmation makes no sense: there is no other reason
> why Autonomy should be giving credit to Capax
> Discovery for a sale to the FSA which Capax Discovery
> had done nothing to bring about."*

*Four particular matters relating to VT10 emphasised by the Claimants*

184.   Even though not with direct reference to VT10, I have addressed
these matters in the context of my general analysis, and further in
relation to VT3 and VT4. My comments there should be read in
here *mutatis mutandis.* However, there were four matters
particular to VT10 on which the Claimants placed considerable
emphasis:

(1)   One was the oddness and lateness of the sudden change
to engaging Capax Discovery as a VAR, having
originally contemplated engaging Centennial.

(2)   The second was the Claimants' complaint that Deloitte
was simply not informed of the direct FSA deal at all
during their Q3 2010 review; and in crossexamination,
Mr Bloomer told me that he did not recollect it being
mentioned to the Audit Committee either.

(3)   The third arose out of the provisions for deferment of
payment under the direct deal, which meant that Capax
Discovery remained legally *"on the hook".* The
Claimants highlighted two aspects of this: the first was
that Autonomy never pressured Capax Discovery to pay
out of its own resources until after the direct deal was
closed in August 2010; and the second was that, when
the position of Capax Discovery's outstanding
indebtedness became a source of pressure and
embarrassment for Capax Discovery, Autonomy
allegedly contrived a transaction, the *"NearPoint"*

transaction, as a means of passing funds to Capax Discovery to enable it to discharge part of that indebtedness. Capax Discovery was not pressed to pay for so long as the instalment payments due from FSA were deferred.

(4) The fourth matter related to the payment of a MAF, and more particularly, the rationale advanced for its payment, which (as previously noted) suggested some concern as to its true justification.

185. As regards the first of these particular matters, the hurried resort to Capax Discovery was certainly even more rushed than usual (such that Capax Discovery's time zone was of itself a necessary resort); and the Claimants' point that Capax Discovery was based in San Francisco and had had no contact with the FSA in the UK, so there was nothing to suggest that it had any ability to negotiate, or even materially assist in the negotiation of a transaction, seemed to me to be fairly made, even if of limited significance in the round (in light of my previous conclusions). The further suggestion floated by the Claimants, however, was that Capax Discovery had shown itself ready in the Kraft and Eli Lilly transactions to act *"obligingly"* (as the Claimants perceived and described it) in a *"placeholder role"* without any real interest in the end-user sale save if it brought a useful contact and a MAF.

186. Dr Lynch's response in cross-examination to these suggestions seems to me fairly to encapsulate his own outlook (even though he stressed he had very little involvement in either the VAR transaction or the direct deal):

> *"Q.   I would suggest, just going back to this transaction with the FSA, that in proposing Capax you had very much in mind the placeholder role which I've suggested Capax performed on the*
>
> *Kraft and Eli Lily transactions.*
>
> *A.   Well, first of all -- and it's getting repetitive, but I wasn't proposing anything. I'm just keeping a track of what's going on. Secondly, FSA, I now know, was a deal that required a very large amount of services. And, thirdly, we wanted one of our good partners to do those services. And then the outcome was that Capax actually did do services at FSA. So, to me, this is all a perfectly fine*

> *commercial decision which looks like a*
> *good one, getting a services partner in*
> *there. Secondly, I understand that the*
> *VARs all consider that they were on*
> *risk."*

187.  Especially since it was not until much later that Capax Discovery did secure a service agreement with the FSA, there was obviously the use of hindsight in that response. But to my mind the greater objection is that it obscures the fact that Autonomy inserted a reseller minutes before midnight because it wished urgently to plug a shortfall in recognised revenue and trusted and paid Capax Discovery to take the legal risk but do no more. When Mr Baiocco agreed to Capax Discovery's use in this way, he would have known nothing about the potential for it to provide future services; and the emails he sent shout the message that he was in it first and foremost, for *"champagne-smacking"* commission. That may not of itself be improper; but the effort to disguise it tells against the Defendants' comfort with its propriety, and the fact of it fits the pattern relied on by the Claimants.

188.  The second point of particular note is the FSA direct deal was not disclosed to Deloitte during Deloitte's Q3 2010 review, nor until long afterwards. The Claimants highlighted that (a) the direct deal was of a value many multiples of the $100,000 threshold for deals that were to be disclosed to Deloitte and (b) as Autonomy's finance department acknowledged and thus knew, Deloitte were expressing concern as to whether the reversal and replacement of VAR deals in two previous quarters (involving end-users Kraft (VT3), Morgan Stanley (VT8) and ManuLife (VT7)) called into question whether Autonomy had in fact retained managerial control and thus whether it had been appropriate to recognise revenue at the point of the original VAR transactions.

189.  This was of some significance; for, as Mr Hussain knew, Deloitte was, at just this time, expressing concerns about the fact that some earlier VAR sales[537] had been replaced by direct end-user deals; and the importance attached by Deloitte to the issue was reflected in a note in that review:

> *"that no value added reseller deals have been reversed*
> *this quarter and resigned directly with the end-user and*
> *this supports management's policy of revenue*

---

[537] Deloitte expressly noted in their H1 2010 report that they had raised the concern, reminding that it would not be appropriate to recognise revenue if Autonomy was required to maintain ongoing managerial duties in respect of the product sold to the reseller or if the reseller could not show it could pay, and Autonomy's management had acknowledged it.

> *recognition at the point of sale to the value added reseller".*

190. However, the Defendants pointed out (as to (a) in paragraph 188 above) that the disclosure required was of revenue-earning deals: and since Autonomy had already recognised the

   revenue from the VAR deal, it would have been wrong to include revenue from the direct deal in the list. That was especially so because (as Dr Lynch, with notable attention to detail) pointed out under cross-examination, there were acceptance criteria in the FSA direct deal which would not have permitted revenue recognition at that point.

191. Dr Lynch also made the point (especially with reference to (b) in paragraph 188 above) that Deloitte's concern related to reversals of previously booked revenue with resellers: and (until much later) there was no reversal of revenue, because Capax Discovery remained on the hook for the debt, as Mr Baiocco acknowledged[538]. There was a reversal only in September 2011, after the FSA had paid. The Defendants submitted that Deloitte were only interested to know about actual reversals of previously booked revenue and that in this case, there was no reversal of revenue as such until much later, in September 2011 when (it was common ground) the last instalment due was paid by the FSA and Capax Discovery's obligations were formally cancelled. Then, according to Mr Welham, when Deloitte subsequently learned, in Q1 2011, of a deal between Autonomy and the FSA, they did not associate it with the Capax Discovery/FSA VAR transaction.

192. Dr Lynch submitted that, for the same reason, the passage in the Q3 2010 report to the Audit Committee was accurate, and not misleading.

193. In my judgment, Dr Lynch's explanation did not grapple with the basic point underlying Deloitte's concern, which was whether there was developing a pattern of direct deals suggesting an

---

[538] 17 Dr Lynch stated:

> *"I think you're conflating two situations…The situation with Capax at this point is that Capax has not been lef off the hook, it's just that the payments from FSA are being allocated against their requirement, so no credit note is issued to Capax at this point. So it's a different situation to the one…where…the deals that have been sold to the VAR being undone and a credit note issued."*

intention that Autonomy should retain managerial control, and the signs that it in fact did so. Further, the suggestion that the note in the Q3 2010 report was accurate is a blinkered and self-serving one. It seems to me obvious that Deloitte would have wanted to know about a direct deal contemporaneous with their warning, especially such a large and important deal.

194.  In relation to the third and double-faceted point summarised in paragraph 184(3) above, there is no doubt that Autonomy did not chase Capax Discovery to pay the instalment of $450,000 due under VT10 in April 2010, and made clear efforts to cover its indebtedness. Then, on 27 September 2010, Mr Hussain emailed Mr Egan, Mr Scott and Mr Kanter, subject "*capax*", noting that Capax Discovery currently owed $18 million and, having received the Eli Lilly cash, should pay $5.5 million: "*That leaves $12.5m of which $5m is for FSA which is being sorted out as we went direct*". In a further email in the same chain, Mr Hussain said, "*Steve will sort out FSA*". The entirety of the chain was then copied to Dr Lynch.

195.  The Claimants submitted that Dr Lynch must, therefore, have known that Autonomy had contracted directly with the FSA, and that Capax Discovery was not going to be made to

pay from its own resources, and would instead be "*sorted out as we went direct*". Then on 30 September 2010, Mr Chamberlain sent Mr Hussain an email, subject "*FSA*", stating:

> "*Don't think we need to resolve this today but will keep going on this if you want me to. My recommendation would be that we enter into a one pager with Capax saying that they remain liable for this but that we will provide a credit as we receive amounts from FSA. To the extent we have a shortfall they have to make that good since they entered into an irrevocable PO.*"

I consider this was a recitation of the legal position, but in reality all concerned knew that the direct deal released Capax Discovery.

196.  The Claimants relied also on a transaction referred to as the "*NearPoint ramp-up fee*" as further illustrating (especially by reference to its context and timing) how arrangements were always made to ensure that any legal obligations undertaken by the VAR should be covered by Autonomy in one way or another.

197.  As regards the context, as the end of Q2 2011 approached, Capax Discovery's debt in respect of the FSA purchase order totalling $1.5 million was overdue. Mr Baiocco's evidence in his witness statement was that by then he had "*rising concern about the paper debt relating to [the FSA transaction], which was causing me*

*issues with my fellow partners at Capax, all of whom wanted to know what was going on".* He had expressed this concern in an email to Mr Kanter dated 7 March 2011. He sent a number of chasing emails, all expressing rising concern and in effect calling upon Autonomy to do something to release Capax Discovery. After months of prevarication in response, by the end of Q2 2011 it was clear to Autonomy that something had to be done.

198.  The *"NearPoint ramp-up fee"* was what Mr Hussain finally proposed (by email of 13 June 2011) as an answer. This was a fee Mr Hussain suggested might be paid to Capax Discovery, ostensibly at least to assist it to develop (*"ramp up"*) infrastructure to support legacy customers using the *"Nearpoint"* archiving product which Autonomy acquired as part of its acquisition of Iron Mountain software assets. Mr Hussain explained his proposal to Mr Baiocco in carefully orchestrated terms:

> *"Further to our meetings last week I would be grateful for a proposal from you to help us with our integration of the recently completed Iron Mountain Digital acquisition. As we discussed there are several areas which we believe you could immediately assist us:*
>
> - *The NearPoint asset is a direct competitor to EAS and we would want Capax to take over servicing the support and maintenance base*
>
> - *The Stratify asset and the DRCCM asset is a direct competitor to Introspect and Digital Safe. We would like to upgrade the data centres with additional products to enhance the offering.*
>
> *Can you come back to me with a quick high level proposal and we can then discuss further. Please feel free to call me. As i said at the meetings we are looking at a relatively small budget initially of between $5m and $6m and we are looking to engage quickly."*

199.  When Mr Baiocco responded affirmatively, Mr Hussain wrote again on 24 June 2011 (copying Mr Kanter):

> *"John- further to our numerous discussions on Capax starting to engage on Nearpoint maintenance i'd like to propose the following: capax starts to build up the team and infrastructure and for that we pay you a fee of $2m to $2.5m. As we get all the information on Nearpoint customers consolidated from Iron Mountain we will provide the information to you and gradually get you to takeover the provision of maintenance. This should then follow the EAS structure whereby you take over the*

> *smaller contracts initially, leaving the very large strategic customers with us and then gradually we shift those customers to you.*
>
> *If this is ok with you then Andy can start the paperwork process."*

200.  Unsurprisingly, Mr Baiocco, who had not in fact asked for $2-2.5 million, responded within hours, "*This sounds perfect*". This was not surprising in that it appears that Mr Hussain was volunteering the payment of an upfront fee of $2-2.5 million to Capax Discovery for taking on new business that would be profitable to Capax Discovery in any event. Mr Baiocco told me in cross-examination that:

> *"I would have done it for free with no ramp-up charge. It was good business for us, I would have done it for free."*

201.  The Claimants claimed that in truth the fee was simply part of a circular funding process to enable Capax Discovery to appear to pay off its outstanding indebtedness to Autonomy in respect of instalment payments due under VT10, both for audit presentation purposes and to honour the side agreement/understandings they alleged. It is enough for present purposes to note that it is not disputed that:

> (1) Autonomy paid Capax the entirety of the $2,000,000 ramp-up fee, even before expiry of a 60-day grace period, and
>
> (2) The same day Capax made a payment of $1,500,000 in respect of VT10 as requested by Mr Hussain.
>
> (3) Mr Baiocco's concerns about outstandings under the FSA deal were not repeated, until a final instalment became due.

202.  My impression that Mr Baiocco is something of a braggart, suggests to me that he may have exaggerated in saying he would have gone ahead with Mr Hussain's original proposal even without any ramp-up fee[539], even if he would in fact have been prepared to accept less, very possibly much less and thought he had done a good deal for his company. I also accept Dr Lynch's evidence under cross-examination that the immediate payment by Capax Discovery upon receipt was of advantage to both because of its positive effect on the "days sales outstanding" ("DSO")

---

[539] Especially given that his original view, expressed in 2013, was that some level of ramp-up fee was warranted.

calculation in the books of account of each. Thirdly, I have taken into account that Deloitte reviewed the transaction, and noted that Autonomy had purchased support services from Capax Discovery, and the ramp-up fee was considered in substance to be prepaid support.  Deloitte considered there to be nothing

to indicate that this was not a commercial arm's length transaction.[540] Nevertheless, it seems to me more likely than not that the NearPoint ramp up fee was at least in substantial part a means of funding Capax Discovery. Both its amount and timing seem to me to point strongly to that conclusion: and it fits a pattern. Furthermore, that Mr Baiocco saw a link between the NearPoint fee paid by Autonomy and Capax Discovery's payment of the debt under the FSA purchase order is apparent from his version of the Capax Discovery Aging Report, to which he referred during his examination-in-chief and to which he was taken again in re-examination, which included the $2 million NearPoint fee within the "*FSA*" worksheet (red arrows added for ease of reference):

| Customer Name | Invoice # | Invoice Date | Due Date | Invoice Total | Received From AU | Paid to AU | Capax Commission | Commission Received | Notes |
|---|---|---|---|---|---|---|---|---|---|
| FSA | 6815-ANA | 03/31/09 | 04/30/10 | $ 450,000.00 | | | | | |
| | | | 03/30/11 | $ 1,050,000.00 | | | | | |
| | | | 03/30/12 | $ 1,500,000.00 | | | | | |
| | | | 03/30/13 | $ 1,500,000.00 | | | | | |
| | | | | | | | $ 450,000.00 | 07/10/2010 | |
| | | | | | | | | | |
| FSA 2 | | | | $ 4,500,000.00 | | | | | |
| | | 30/06/2011 | | | | $ 1,050,000.00 | | | |
| | | 30/06/2011 | | | | $ 450,000.00 | | | |
| | | 30/06/2011 | | $ 2,000,000.00 | | | | | NearPoint rampup |

203.   The fourth and last matter of special relevance relates to the payment of a MAF. In that regard:

> (1) On 6 October 2010, Mr Kanter emailed Mr Hussain and Mr Egan, subject "*Capax*", to say:
>
>> "*Having been impressed with Capax's contribution to the FSA transaction, I am comfortable that they have earned a marketing assistance fee in line with our standard terms. I have prepared the attached to document properly the transaction. Please can I have your views.*"

---

[540] 19 [Deleted].

(2) Mr Egan responded "*Agreed*" and Mr Hussain responded "*ok*".

(3) There was no challenge to Mr Baiocco's evidence that Capax Discovery "*did not make any attempt to license Autonomy software to the FSA or participate in setting the terms of the license that I understand Autonomy sold to the FSA*".

(4) The Claimants' written opening specifically noted that this email would be explored with Mr Kanter in cross-examination. In particular, the Claimants would have challenged Mr Kanter to identify precisely what "*contribution*" to the FSA transaction on the part of Capax Discovery had so "*impressed*" him. The Claimants contended that the only truthful answer Mr Kanter could have given is that Capax Discovery made no contribution to the FSA transaction, and that Mr Kanter's email was, therefore, pretextual.

(5) Dr Lynch in cross-examination sought to justify Mr Kanter's email on the basis that Capax Discovery "*were doing a lot of the work to actually show the technology and use it for FSA*". However, it was not put to Mr Baiocco in crossexamination that Capax Discovery had started doing any work for the FSA by 6 October 2010, and there is no evidence to that effect.

(6) The same day, 6 October 2010, Mr Kanter sent a letter to Mr Baiocco, which was in essentially the same terms as the MAF letter for the Eli Lilly transaction. The letter again described Capax Discovery as Autonomy's "*Referral Partner*" and purported to record that Capax Discovery was to introduce Autonomy into deals with the FSA, obtain quotes from Autonomy on behalf of the FSA and assist in executing purchase orders and contracts.

(7) It was the unchallenged evidence of Mr Baiocco that Capax Discovery "*did none of these things; and I never discussed any of this with Autonomy*".

(8) After the necessary internal approvals, on 7 October 2010, Autonomy paid the $450,000 fee to Capax Discovery.

204. As in the Eli Lilly transaction, it is not the payment of a MAF which is objectionable; it is the confected basis for paying it which invites the conclusion that Mr Kanter, Mr Egan and also Mr Hussain were aware that Capax Discovery had done little or nothing to merit such a payment. I am not persuaded by the argument that Mr Kanter's letter of 6 October 2010 was simply an

inapt deployment of a standard form: I consider its wording was chosen to present a justification to Deloitte because the truth that Capax Discovery had in substance done nothing would have invited a potentially difficult line of enquiry.

*Summary as to propriety of recognition of revenue in respect of VT10*

205.   In my judgment, for all these reasons, some common to VT2 and VT3, others particular to VT10 itself, the recognition of revenue from the sale to the VAR in the context of VT10 was not proper.

*Defendants' alleged knowledge of false accounting in respect of VT10*

206.   As to the necessary second limb of their case, that the Defendants both knew that the accounting treatment of VT10 was false, the Claimants relied on the following.

*Mr Hussain*

207.   As regards Mr Hussain, and in addition to his alleged role in encouraging and giving guidance to Mr Egan in the use of VAR transactions to accelerate revenue when required to meet revenue targets or forecasts (which I have discussed above):

   (1) Dr Lynch thought it was either Mr Egan or Mr Hussain who had identified Capax Discovery as the appropriate VAR to use in the emergency that developed.

   (2) Mr Hussain knew at the time of the direct deal that Deloitte were concerned about the fact that some earlier VAR transactions had been replaced by direct deals: he was sent (and sent on to Dr Lynch) Deloitte's report to the Audit Committee for Q3 2010 noting that *"no value added reseller deals have been reversed this quarter and re-signed directly with the end-user"*.

   (3) It was also Mr Hussain who, with Mr Chamberlain, devised and put in place the process for Capax Discovery to remain legally liable unless and until the FSA paid Autonomy, whereupon the receipts from the FSA would be taken as a credit against Capax Discovery's indebtedness.

   (4) Mr Hussain concurred in Mr Kanter's recommendation of payment of a MAF to Capax Discovery for its *"contribution to the FSA transaction"* though he must have known that Capax Discovery had made none in terms of assisting the end-user transaction.

(5) It was Mr Hussain who made the initial proposal for the NearPoint ramp-up fee, and it was Mr Hussain also who coordinated the payment of the fee to Capax Discovery and Capax Discovery's same day payment of the two VT10 outstanding instalments to Autonomy.

*Dr Lynch*

208.  As regards Dr Lynch:

(1) It was he who, two days before the quarter end, sent Mr Hussain a document listing transactions that needed to be concluded in order for Autonomy to achieve its total revenue target for Q1 2020. The list identified [$]4 [million] as coming from *"FSA Partner"*, which Dr Lynch accepted referred to the use of a VAR.

(2) Dr Lynch denied thereby instructing Mr Hussain to do so, but he accepted that he was at least content that Mr Hussain should, introduce a VAR whereby to enable Autonomy to recognise revenue on the sale to that VAR: he told me that he did not *"have any issues about partners being involved in deals"*.

(3) On 30 March 2010, Dr Lynch sent the list referred to in sub-paragraph (1) above, apparently envisaging that MicroTech would be the VAR of choice.

(4) Mr Hussain kept Dr Lynch closely informed by email of the transactions needed to reach the target, sending a sequence of updated versions of a *"revenue routemap"* document.

(5) It was Dr Lynch who appears from one of such exchanges to have suggested the use of *"cx"* which he accepted was a reference to Capax Discovery, referring in the subject line of one email to *"midnight Italy"*, signifying close involvement going well beyond the overall strategic role which Dr Lynch sought to depict, and at least an awareness in the context of the importance of different time zones.

(6) Mr Chamberlain and Mr Hussain kept Dr Lynch closely involved as to what deals were ultimately included on the revenue recognition tally.

(7) Dr Lynch confirmed that an agreement with the UK financial regulator was an important win for Autonomy and that he would probably have been told about

it. However, he did not think he would have known anything about how the deal was negotiated.

(8) Although he told me that he was not normally sent Deloitte's reports to the Audit Committee that does not appear to have been wholly accurate. In any event, even if he was not on Deloitte's circulation list for these purposes there is documentary evidence of covering emails from Mr Hussain sending him such material fairly routinely; certainly, it appears that Mr Hussain sent him the report for Q3 2010 which included the note on page 6 that no VAR deals had been reversed in the quarter. I think it likely that the issue was topical: I think it likely that, having been sent it, Dr Lynch would have read it.

(9) Dr Lynch told me that he was not involved in and knew very little about the direct deal, and that included the payment of a MAF: although, in the latter context, he suggested reasons why the payment of a MAF could be justified.  He emphasised the point that he was not on any of the emails relating to the agreement to pay a MAF for Capax Discovery's *"contribution"* nor was it suggested that he was responsible for approving it.

(10)     Dr Lynch does not appear to have been sent any of the various emails relating to Mr Baiocco's concerns about his aging debt (see above) but he did approve the agreement for the NearPoint ramp-up fee and the early payment of that fee.

*Summary as to whether the Defendants had "guilty knowledge"*

209. I have concluded that both the Defendants knew that, in accordance with the 'pattern', Capax Discovery's role in the FSA VAR deal was nominal and that Capax Discovery was not intended to pay or do anything. I think it more likely than not, and I find, that they each knew that the VAR sale should not have triggered revenue recognition.

*Conclusions on Capax Discovery transactions VT2, VT3, VT4 and VT10*

210. The examples I have addressed at some length earlier seem to me to provide a representative sample, in the sense of illustrating features relied on by the Claimants as demonstrative of the 'pattern' on which they relied and the Defendants' answer.

## MicroTech impugned VAR deals: VT5, VT6, VT7, VT8, VT13, VT25, VT32, VT33 and VT37

211. I turn next to identify particular features of the nine VAR deals between Autonomy and MicroTech which were impugned by the Claimants.

*MicroTech itself and the MicroTech VAR agreement*

212. MicroTech was described by the Claimants as *"a friendly VAR of choice"*. As will be recalled, it was one of the *"Truitt companies"*. Mr Steve Truitt was its COO, Mr Jimenez its owner (who had decision making power). I have described MicroTech itself and Mr Steve Truitt's perception of the various transactions in my overview of his evidence in paragraphs 2036 to 2048 in the main body of the judgment.

213. Autonomy's VAR transactions with MicroTech during the Relevant Period accounted for over $43 million of Autonomy's reported revenue. Each was for a sum exceeding $1,000,000.[20]

214. All the purchase orders for the impugned MicroTech VAR transactions were governed by the June 2006 MicroTech VAR agreement, entitled *"Autonomy Government Reseller Agreement"* ("the June 2006 MicroTech VAR agreement").

215. Like the agreement between Autonomy and Capax Discovery, the June 2006 MicroTech agreement, which was governed by the law of the State of California, made it clear that MicroTech was legally on risk and that the written contractual terms constituted the entire agreement between the parties and could not be modified except in writing signed by an authorised representative of each party.

216. More particularly:

(1) MicroTech was obliged to pay Autonomy unconditionally, irrespective of whether it closed a deal with an end-user. Clause 5.5 provided:

> *"Government Reseller shall not be relieved of its obligations to pay fees owed to Autonomy hereunder by the nonpayment of such fees by an End-User."*

(2) No amendment to, change, waiver or discharge of any provision of the agreement was valid unless in writing and signed by an authorised representative of each party (clause 14.4). The agreement also superseded any pre-printed terms and conditions that could appear on any purchase order (clause 5.1).

(3) Once Autonomy's products on a purchase order had been shipped, MicroTech could not cancel or amend the purchase order without prior written consent from Autonomy (clause 5.1).

(4) There was a comprehensive entire agreement clause which confirmed there were no other representations, understandings or agreements.  Clause 14.10 provided:

> *"This Agreement and the Exhibits to this Agreement represent the entire agreement between the parties with respect to its subject matter, and there are no other representations, understandings or agreements between the parties relative to such subject matter."*

---

[20] 1. VT5 MicroTech/DiscoverTech is licence fee of $9,532,810 plus $476,190 support and maintenance.

2. VT8 MicroTech/Morgan Stanley is $4,656,000 licence fee plus $232,800 support maintenance.

3. VT6 MicroTech /Honeywell is licence fee of $1.8m and $90k support and maintenance.

4. VT7 MicroTech / ManuLife is licence fee of $1.08m and $104k support and maintenance.

5. VT13 MicroTech /Vatican Library is $11m licence and $550,000 support and maintenance.

6. VT25 MicroTech /US DoI is licence fee of $4m and support and maintenance of $200k.

7. VT32 MicroTech /Bank of Montreal is licence fee of $2,880,000 with maintenance and support of $144,000.

8. VT33 MicroTech / Xerox is license fee of $1,170,000 and maintenance and support of $58,500.

9. VT37 MicroTech /HP is licence fee of $7m with support and maintenance of $350,000.

217.   In each of the impugned MicroTech VAR transactions MicroTech provided debtor confirmations directly to Deloitte, stating amongst other things that there were no side agreements or understandings with regard to the purchase orders and/or invoices referable to the transactions impugned. Mr Steve Truitt regarded them as accurate at the time, though it will be recalled that he came to be persuaded by the US prosecutors that the assurances he understood he had been given that somehow MicroTech would have the means to pay its debts effectively amounted to a side agreement.

218.   The Defendants' case was that MicroTech was on risk in respect of each of the reseller transactions; and MicroTech acquired on transfer of the relevant software management control of it such as to comply with the accounting rules.

219.   They relied on the contractual documentation which specifically stipulated the passing of risk and management control, and furthermore precluded any side-agreements which might affect those legal criteria. They added that there were no relevant discussions between Mr Egan and Mr Steve Truitt and that Mr Steve Truitt was clear about that in the evidence that he gave the

US criminal court. Mr Steve Truitt also stated that he had never spoken to or met Mr Hussain, marked by Claimants as intended to be relied on.

220. The Defendants' case in summary was that given the documentation, there was nothing that could have been said which would have altered the fact that MicroTech was on risk, but nothing material was said in any event.

221. As in the context of the Capax Discovery sales, I turn to deal with examples of the impugned MicroTech VAR sales, starting with VT6, VT7 and VT8. (I address VT5 later, since it was an exception in that no side agreement was alleged).

**VT6, VT7 and VT8: MicroTech/Honeywell, Morgan Stanley, ManuLife, all Q4 2009**

222. Autonomy had tried to make sales to each of Honeywell, Morgan Stanley and ManuLife in Q4 2009, but was unable to close any of them prior to the end of the quarter. The failure to close the three deals left, in the Claimants' words, *"an unwanted gap in the revenue"* for Q4 2009.

223. The prospective deal with Morgan Stanley was substantially the largest of the three, and was described by Dr Lynch in an email of 26 December 2009 to Mr Hussain, Mr Egan, Mr Scott and Mr Mooney as being of *"criticality to the quarter"* .

224. Mr Hussain was personally involved in the proposed transaction, and according to an email dated 31 December 2009[541] from him to Mr Christian Lucas, Managing Director of Morgan Stanley Investment Banking who advised Autonomy from time to time, seeking urgent help on the last day of the quarter/year in trying to conclude it, it had *"suddenly been stopped by someone in [Morgan Stanley] legal".* In the event, no part of the transaction, including the sale of hardware, was concluded by quarter end, leaving a considerable shortfall on revenue expectations.

225. The other two deals failed to close also:

---

[541] The legal difficulty was not explained. The email was relied on by the Defendants in support of an argument that hardware sales at a loss fertilised (as it were) software deals, and in the email Mr Hussain stressed that *"the fact that we show value for the software and are selling hardware at a loss in our proposal is a commercial decision for us."* This might suggest that this may have been the origin of the legal query: but this was not explored and I can take it no further.

(1) On 24 December 2009, an internal Autonomy email sent to Mr Avila (among others) recorded that no deal had closed with Honeywell Aerospace.

(2) On 28 December 2009, an internal Autonomy email stated, as regards a proposed sale to ManuLife, that "*Unfortunately – this does not look like it will make the Dec 31 timeframe we all hope for*".

226. Mr Egan's evidence in his witness statement, which was not challenged in this respect, was that on 30 and 31 December 2009 he asked Mr David Truitt if MicroTech would agree to purchase a number of "at risk" deals, including these three deals. Mr Egan stated further that the purpose of these deals:

> "*...was to get the revenue associated with the corresponding prospective enduser deals into the fourth quarter of 2009.*"

227. Following Mr Egan's conversation with Mr David Truitt, MicroTech submitted purchase orders to Autonomy:

(1) A purchase order for end-user Honeywell, with a licence fee of $1.8 million and $90,000 support and maintenance (VT6);

(2) A purchase order for end-user ManuLife, with a Digital Safe licence fee of $1.08 million and $104,000 support and maintenance (VT7); and

(3) A purchase order for end-user Morgan Stanley, with a licence fee for identified software of $4,656,000 plus $232,800 support and maintenance (VT8).

228. Autonomy recognised the licence fees on all three purchase orders as revenue as at 31 December 2009.

229. As with the other MicroTech reseller transactions, these deals were governed by the terms of the June 2006 MicroTech VAR agreement (see paragraph 214 above) which provided expressly that MicroTech was obliged to pay Autonomy for its orders unconditionally, irrespective of any sale to an end-user, that there was no other understanding or arrangement between the parties, and that modifications must be in writing.

230. Mr Steve Truitt gave evidence in respect of these deals that MicroTech knew it was on risk but wanted to do the deal because of the prospect of establishing a new customer relationship and providing services. His evidence was that MicroTech entered into

three other at risk transactions at around the same time.  The Claimants have not sought to impugn those transactions.[542]

231. MicroTech signed debtor confirmations in respect of these deals, each of which both Mr Steve Truitt and Mr Egan later confirmed was true and accurate. Thus:

(1) <u>Honeywell:</u>  MicroTech provided written confirmation to Deloitte on 13 January, 8 July and 15 October 2010 that the invoices listed in the confirmations were proper and due, and that there were no "*side letters or other agreements*".[543]

(2) <u>ManuLife:</u>  MicroTech provided written confirmation to Deloitte on 13 January 2010 that the invoices listed in that confirmation were proper and due, that there were no "*side letters or other agreements*", and that Autonomy retained no continuing managerial involvement.[544]

(3) <u>Morgan Stanley:</u>   MicroTech provided written confirmation to Deloitte on 13 January 2010 that the invoices listed in that confirmation were proper and due, that there were no "*side letters or other agreements*", and that Autonomy retained no continuing managerial involvement.[25]

232. However, no-one at MicroTech had any relationship with any of the three proposed endusers, nor any knowledge of the state of negotiations thus far. Mr Steve Truitt confirmed in his deposition evidence in the MicroTech proceedings in the US (which was admitted in these proceeding as hearsay evidence) that he did not speak to any of them before (as it were, blindly) submitting MicroTech's purchase orders.

233. It was thus not intended by anyone that MicroTech should, following the submission of the purchase orders, make any effort to negotiate, or conclude, an onward sale to any of the three end-users; and MicroTech did not do so. At the US criminal trial, Mr

---

[542] The transactions were for end-users KPMG, Assurion and CenturyLink.  Steve Truitt referred to them in his testimony in the US trial against Mr Hussain.

[543] The signature on the first of these is dated '1/13/2009' – presumably a typographical error.

[544] See the footnote above in relation to the signature.

[25] *Ibid.*

Steve Truitt testified (and this testimony was likewise admitted as hearsay evidence) that:

> *"We didn't know anybody at these end-users, first of all. Secondly, the circumstances about why these opportunities were available was ostensibly that these were very late in the sales cycle with the Autonomy sales team. They were going to close imminently so there would be no need for our involvement to attempt to sell it. We would just, if all worked out well, service these accounts after they closed."*

234.  In the event, MicroTech made no approach to any of the end-users to try to get follow-on business either, even though Mr Steve Truitt had given the prospect of doing so as a central part of the rationale for doing each VAR deal.

235.  I cannot accept that the above is compatible with any genuine sale. I cannot accept either that it is consistent with any real expectation on Mr Steve Truitt's part that MicroTech could be left "on the hook" if the end-user deals did not eventuate. That would go a long way beyond commercial insouciance, especially given Mr Steve Truitt's acknowledgement (at the US criminal trial, in evidence also admitted in these proceedings as hearsay) that if MicroTech had really been left "on the hook" that *"would have been disastrous for MicroTech".* Nor can I accept that Autonomy ever relinquished managerial control or involvement: it was always to be the supplier of the software to the end-user if a contract eventuated, and MicroTech had no say or input at any stage or in any way.

_____

236.  That conclusion is fortified by what actually occurred:

(1) No deal was concluded with Honeywell by either MicroTech or Autonomy: MicroTech purported to pay Autonomy what it owed under the purchase order, but it is said by the Claimants that it was enabled to do so only by Autonomy's payment to MicroTech in respect of a transaction in Q4 2010 called "the ATIC transaction" which is discussed below.

(2) In March 2010, Autonomy entered into a larger, direct, deal with ManuLife. Shortly afterwards, Autonomy issued a credit note to MicroTech for

$1,184,000. Later, in April 2010, Autonomy paid MicroTech a MAF of $118,400, followed by a further MAF of $101,908 in August 2010.

(3) In February 2010, Autonomy entered into a direct deal with Morgan Stanley for $5,288,800: however, this was for the sale of hardware, and not (nor anything like) the software (including DS Mail, Introspect and Autonomy Sharepoint Connector) which had been sold to MicroTech with a view to onward sale to Morgan Stanley. Nevertheless, in March 2010, a credit note was issued to MicroTech in the amount of $4,888,800. Autonomy thereafter (in April 2010) paid MicroTech a MAF of $488,880 (10% of the value of the original VAR deal).

237.  In summary, therefore, in all three cases, Autonomy saw to it that one way or another MicroTech's ostensible liability was addressed, and MicroTech was rewarded by MAFs totalling $709,188.

238.  In addition to the usual 'pattern' which these transactions further demonstrated, the Claimants relied on three specific matters in respect of them as showing that revenue ought not to have been recognised at the point of the VAR deals in respect of any of them:

(1) The automatic acceptance that a later direct deal of whatever nature would be treated as negating the VAR deal invoice and releasing MicroTech from continuing liability: the Claimants referred me in particular to an email dated 4 February 2010 from Mr John Cronin (an ex-employee of Autonomy who, though an independent contractor, effectively acted first as MicroLink's and then MicroTech's sales manager) to Mr David Truitt which seems to suggest an automatic assumption that a direct deal would be treated as negating the VAR deal invoice:

> "The large trans, Morgan Stanley, is happening any moment. However, it will probably be going directly to Autonomy per customer request. A credit of some type will be issued to negate that invoice. MicroTech will still get the fee.
>
> Will have updates on the other trans shortly".

(2) The fact that the reversals of the ManuLife and Morgan Stanley VAR deals (VT7 and VT8) troubled Deloitte and prompted them to give a warning in their report to the Audit Committee for Q1 2010 that:

> *"Management alerted us to the fact that two deals sold to Microtech in Q4 2009 have been credited in this quarter and resold directly to the two endusers. This was as a result of the end-users wanting to transact directly with Autonomy. This reduced the profit in the period by approximately $4 million. As there is no significant history of deals being reversed in this way, management has recognised the revenue at the point of sale to the reseller. Management has confirmed that these were isolated incidents which are not expected to be repeated in future periods.*
>
> *...*
>
> *...With regards to the reversal of revenue on two sales to the reseller Microtech in the quarter, we highlight to the Audit Committee that any further evidence of revenue reversals may jeopardise management's ability to recognise revenue at the point of sale to the reseller".*

(3) The fact that MicroTech was first released from its obligations under the Morgan Stanley VAR purchase order and was then paid a MAF, even though the ultimate end-user transaction between Autonomy and Morgan Stanley for the supply of hardware had nothing really to do with the VAR deal for the purchase of software, and the 10% fee paid cannot have represented compensation to Micro Tech for lost margin (a sale of hardware never being in its contemplation).

239. The Defendants emphasised that Deloitte carefully reviewed the deals and approved the revenue recognition; and it is necessary to consider how or on what basis it is that they came to a conclusion so different than seems to me to emerge from a consideration of the matters addressed above.

240. The starting point is to clarify Deloitte's basic approach. In summary, this was based on the only relevant sale being the sale to the VAR, and on the characteristics of that sale being determinative of the issue of compliance with IAS 18.14 for revenue recognition purposes. Deloitte then took from this that, provided that the VAR sale fulfilled the criteria in IAS 18.14, the VAR's arrangements with the specified or any other end-user were not of concern. In consequence, as Mr Welham put it in his witness statement, Deloitte

"*did not therefore seek to interrogate either Autonomy or third parties as to the subsequent negotiations of the VAR's sale to the proposed end-users*".

241.  This approach reflected, indeed implemented, Autonomy's insistence (which Deloitte well understood) that the position with the end-user was an irrelevance. When, for example, a senior associate at Deloitte queried with Mr Stephan the status of discussions with the end-user (called Sprint/Century Link) in the context of a VAR deal in January 2010 with MicroTech which has not been impugned, he received a dusty response. The associate had asked for supporting documentation in respect of the proposed end-user sale and *"…assuming this* [the sale to the VAR] *was put through Microtech late on, if we could see support of Autonomy's negotiation during the quarter direct with end-user that would be useful; or any discussion/agreement with Autonomy and end-user to go through a VAR."* Under cover of an email to the associate stating *"Steve sums it up pretty neatly I think"*, Mr Stephan forwarded in response a reply dated 12 January 2010 from Mr Chamberlain (to whom Mr Stephan had referred the query), which read as follows:

> *"I don't care if Microtech have closed their deal with Century Link. I have an order from Microtech not Century Link. I am providing maintenance to Microtech not Century Link.*
>
> *Microtech have an obligation to pay us irrespective of whether they get paid by Century Link or indeed close an order with Century Link. The issue is whether or not MT have capacity to pay. Nothing else."*

242.  Mr Welham was asked in cross-examination whether he agreed also that the issue of credit notes, in effect releasing the VAR from liability under the purchase order where a direct deal had taken place, was a commercial decision which raised no issues of principle or caused any difficulty with the decision to recognise revenue from the VAR deal, so long as they remained exceptional items. Mr Welham (somewhat ruefully, it seemed to me) replied *"That was what was explained to us, yes"*, though he did stress the caveat that it had to be exceptional and *"not something which happens regularly"*.

243.  He was also asked to confirm that, in light of Mr Hogenson's concerns, Deloitte had rereviewed the three transactions presently under consideration. That prompted a more guarded response:

> "Q...Again, Deloitte re-reviewed these and were
> content with the accounting treatment, weren't they?
>
> A. Yes. Albeit, as we've said before, we did then
> raise the point with regard to the fact that, if this
> was a pattern of events, then it would impact
> revenue recognition going forward.
>
> Q. Well, that's the point that we've discussed a
> number of times today. That's the point about
> probabilities and whether, as you explained it
> earlier on, there might need to be some sort of
> reduction to reflect the probability?
>
> A. Yes, or change the whole policy if it's happening
> across all VAR transactions, yes." [My
> emphasis]

244. That caveat (as underlined) was an important one; but even that
was later glossed by Deloitte to accord with their client. Deloitte's
later memorandum dated 13 January 2011 on proposed changes to
the VAR agreement to provide (in effect) for the VAR to be
entitled to be paid out of any direct deal an amount to hold it
harmless against its obligations under its purchase order also
noted, in relation to the four deals from 2009 that had gone direct
(including the above three deals), that:

> "When compared to the number of deals done through
> VARs (c60 per annum) historical occurrences that
> would trigger this clause (hereafter "Direct Sales")
> have been rare.
>
> Four deals from 2009 were noted that subsequently
> became Direct Sales, three of which eventually being
> signed with Autonomy in 2010. Whilst large in the
> context of the average deal size, they were not material
> (total value c60% of materiality).
>
> Since the Phillip Morris and Citigroup deals that were
> signed as Direct Sales in Q2 2010 there have been no
> further Direct Sales.
>
> Based on this, management's assessment that the
> probability of current VAR deals becoming Direct Sales
> in the future is remote is considered reasonable.
>
> Total license revenue recognised in the quarter on VAR
> PO's with the above clause present is $14.6m, over four

*deals. The largest of these deals accounted for $7m of the total figure.*

*Given the total value of these deals and the low number of VAR deals that actually became Direct Sales (based on a historical average for 2009/2010 of <1 deal per quarter, we would not expect there to be any Direct Sales in Q4), the likelihood of material misstatement of revenue based on the above is deemed low."*

245. In all this, what, having in effect been warned off, Deloitte did not apparently know, and certainly what they did not factor in, was that the VAR sale was not intended or expected to result in the VAR doing anything at all, or paying anything out of its own resources. Even Mr Chamberlain's terse and vigorous response quoted above seems to me to be premised on there being an expectation of some real activity and exposure on the part of the VAR to signify a real change in the position of the parties to the VAR sale with respect to the control of the product and who would bear the risk of an end-user sale not eventuating. That is so even if, on Mr Chamberlain's approach, the nature of that activity was considered not relevant for accounting purposes. Put another way, Mr Chamberlain's approach assumes that the VAR sale has real economic substance; the question it overlooks is whether that is so, or whether the substantive reality is that the "true sale" was the envisaged sale to the end-user, and Autonomy's "true customer" was that enduser, and the VAR sale was all form and no substance. The assumption of legal risk is not determinative if it is never in reality intended or expected to be visited on the purchaser; and the delivery of the product is of no real consequence if it is never intended to be or in fact used or dealt with by the purchaser before its cancellation once the "true sale" has been either accomplished or abandoned.

246. The Defendants sought to downplay the caveats rather tamely introduced by Mr Welham, predominantly on the footing that in comparison to the universe of VAR deals done by Autonomy (though neither their number nor any detail was ever provided) the number of cancelled VAR deals was very small. But that is not, in my judgment, the right comparator to assist in the detection of a pattern. A proper comparator was the universe of VAR deals over $1 million with a 'friendly' VAR which had either been replaced by 'direct' deals or cancelled. The ratio revealed a pattern. The fact that the impugned VAR deals were egregious, in the sense of being different from the standard, does not alter this.

247. In my judgment, therefore, the fact that Deloitte went along with their client does not absolve the latter: the accounting treatment was wrong. This is not a case against Deloitte,

who settled the claim against them by HP. So I need not decide whether this was primarily because Deloitte were misled (as they were) or beholden to and leant on by their client (as also they were) or simply mistaken (as they were): the point is, as I have concluded, that their approval provides no escape from the conclusions I have expressed above, nor ultimately assistance to the Defendants.

*Defendants' knowledge of and participation in VT6, VT7 and VT8*

248. Mr Hussain was plainly involved in all three VAR deals and the subsequent direct sales.

249. Dr Lynch did not mention any of the three transactions in either of his two witness statements. In cross-examination, he maintained his position that he had had very little dealing or involvement in these deals; but he accepted that he probably knew that they were entered into at around the quarter-end:

> *"Q. Do you accept that you knew either at the time they were entered into or at any rate early in 2010 that Autonomy had entered into these transactions with MicroTech?*
>
> *A. I doubt if I knew when they were being entered into, but I would probably have seen a sheet listing deals for the quarter at the end."*

250. Mr Hussain sent a spreadsheet to Dr Lynch on 1 March 2010 (i.e. a couple of months later) which recorded that the "*Honeywell*" and "*ManuLife*" (VT6 and VT7 respectively) transactions had been entered into with MicroTech. It seems to me surprising that he was not aware of the three MicroTech deals before then. Certainly in the case of VT8 (Morgan Stanley), Dr Lynch's email dated 26 December 2009 emphasising the deal's "*criticality to the quarter*", shows that he was aware of and abreast with the Morgan Stanley deal from its earliest stage. Further, Mr Hussain forwarded to Dr Lynch his 31 December 2009 email seeking to enlist the help of Morgan Stanley's Mr Lucas; on 5 January 2010 he sent Dr Lynch a reconciliation spreadsheet showing (in the "*IDOL summary worksheet*" and next to an entry "*dell – morgan stanley*") a figure of $4,656,000 of revenue; and on 12 April 2010, he sent Dr Lynch an email subject-headed "*audit update*" stating that "*MT is okay (subject to some evidence)*".

251. It was suggested to Dr Lynch in cross-examination that he *"knew that MicroTech was serving the same role as we've seen Capax Discovery serve in the Kraft and Eli Lily transaction, namely to act as a placeholder by submitting a purchase order which Autonomy could use to recognise revenue improperly"*. In closing submissions, Dr Lynch objected to this question, on the basis that it invited him to subscribe to the Claimants' own dictionary, *"placeholder"* being their description of the role played by the VAR in the impugned VAR transactions. At the time, Dr Lynch simply reiterated that he had had very little involvement, but emphasised that what he did understand was MicroTech considered that *"it was on risk in all of these deals"*. That was the case as far as the legal position went, and:

> (1) Mr Steve Truitt's evidence was that he was genuinely purchasing the software and wanted to establish a relationship with the end-user and to *"service these accounts after they closed"* (in relation to the Kraft and Eli Lilly transactions Mr Baiocco's evidence was to the same effect).

> (2) Neither Mr Egan nor Mr Steve Truitt (or Mr Baiocco in relation to the Kraft and Eli Lilly transactions) thought that there was anything improper, and Mr Egan thought that revenue was being properly recognised.

252. The Claimants did not cross-examine Dr Lynch on any specific documents. The Defendants dismissed the cross-examination of Dr Lynch as *"perfunctory"*. It was submitted for Dr Lynch that:

> (1) There was no explanation or exploration in the cross-examination as to the basis on which Dr Lynch is supposed to have thought that these deals had been entered into in order to enable improper revenue recognition;

> (2) The Claimants did not identify any information Dr Lynch had that was not also known to Deloitte whose job they said it was to check revenue recognition;

> (3) The Claimants put to Dr Lynch that he *"knew it was improper to pay a fee to MicroTech for its involvement in the transactions"* but did not indicate or put to Dr Lynch any basis on which Dr Lynch was supposed to know that the payment of a MAF was improper.

253. As to these points:

(1) It is true that the Claimants did not put any specific documents to Dr Lynch to demonstrate knowledge of impropriety in the three transactions. They relied on Mr Hussain's knowledge of the facts, what the facts revealed as to the transaction's lack of real substance and what was kept from Deloitte.

(2) I have described what Deloitte were not told and did not know: they were warned off any enquiry as to the VAR's engagement with the end-user which might have revealed the facts that demonstrated that the VAR was to do nothing and pay nothing, which would have disqualified the transactions for revenue recognition purposes.

(3) I would accept that no specific additional reasons were put to Dr Lynch as to the impropriety of the payment of MAFs to compensate the VAR for going on risk in respect of an adventure ultimately not pursued: but that in my view comes back again to whether any real risk was assumed.

254. In summary: I have concluded that these three transactions demonstrate, and illustrate, the pattern which the Claimants identified and relied upon; they add little to the issue of knowledge; but for more general reasons explained above, I consider that both Defendants knew that the VAR sale lacked substance and was indeed a *"placeholder"* for the *"real sale"* to the *"true customer"*.

### VT5: Autonomy/MicroTech sale of 'Control Point' licence in Q4 2009

255. VT5 was a transaction between Autonomy and MicroTech for the sale of a perpetual licence for the 'Control Point' module (which included some IDOL server software called "Retrieval Lite", though not full-blown IDOL capability). The licence fee was $9,523,810 and there was a first-year support fee of $476,190. The prospective end-user was DiscoverTech. The sale to MicroTech was on the terms of the June 2006 MicroTech VAR agreement, summarised in paragraph 216 above.

256. The Claimants' claims in respect of this transaction, which arose in connection with the acquisition by Autonomy of MicroLink, (see paragraphs 36 to 44 above) were different from those made in relation to other impugned VAR transactions. It was, on the Claimants' case, another example of revenue generation through a series of transactions in a circle: it was not in reality a VAR transaction, as explained below. In particular, the Claimants did not allege that there was any side agreement or understanding in

the context of VT5 such as to (on their case) alter the true substance of the arrangements; and there was no direct sale. However, the transaction throws light on the relationship between the Truitts and Mr Hussain and Mr Egan, and their willingness to devise or structure transactions for the sole substantial purpose of showing revenue in Autonomy's accounts.

257.  According to the Claimants, the essence of VT5 was that when Autonomy acquired MicroLink for $55,000,000 it designedly overpaid Mr David Truitt and Mr Tim Wharton (Mr David Truitt's minority partner in both MicroLink and DiscoverTech) by $10,000,000 (see paragraph 42 above) with a view to their new company, DiscoverTech, then having the funds to pay MicroTech for DiscoverPoint and Control Point software, enabling MicroTech then to pay Autonomy under VT5.

258.  The Claimants relied on Mr David Truitt's evidence in his deposition in the MicroTech trial, which was verified by reference to documents evidencing each of the payments and was adduced as hearsay evidence in these proceedings, as follows:

> "Q. And the way the transaction worked was that Autonomy paid $55 million in the aggregate for the purchase of MicroLink; is that right?  A. Yes.
>
> Q. Okay. 80 percent to you, 20 percent to Mr. Wharton; is that right?
>
> A. Yes.
>
> Q. Okay. And some of that money was put in an escrow for a period of time; is that right?
>
> A. Yes. That's correct.
>
> Q. And then you and Mr. Wharton deposited funds into Discover Tech's bank account, which together amounted to $10 million; is that right?  A. Yes.
>
> ...
>
> The way the software side of the equation worked was that Autonomy licensed the software to MicroTech as the reseller and MicroTech resold that software to Discover Tech?  A. Yes, sir.
>
> Q. Okay. And then Discover Tech paid MicroTech $10 million for the software and MicroTech paid $10 million to Autonomy all on substantially the same day?
>
> A. Yes, sir.

> *Q. So you got paid on January 4th, 2010; is that right?*
>
> *A. Yes.*
>
> *Q. And you and Mr. Wharton put the money in Discover Tech on January 4th or 5th; is that right?  A. Yes.*
>
> *Q. And then on January 4th or January 5th that money then was flowed by Discover Tech to MicroTech; is that right?  A. Yes.*
>
> *Q. And on January 6th, MicroTech paid Autonomy the same $10 million?*
>
> *A. I believe that's correct, yes."*

259.   In addition, the Claimants relied on the following as demonstrating the contrived and circular nature of the arrangements:

(1) An email dated 18 November 2009 from Mr David Truitt to Mr Hussain, in which Mr David Truitt suggested the transaction be structured so as to generate revenue:

> *"What I was thinking was that we would include the purchase of DiscoverPoint in with the Control Point OEM, <u>so Autonomy would show revenue on both products in the 10 million dollar order</u>. So total at closing for the MicroLink purchase would be 55 million with an immediate purchase of DP and Control Point OEM for 10 million from the New Company. I would take about 6 people from the development staff and one or two commercial sales reps (probably would not be needed by Autonomy anyway) and I would eventually transition out to run the new company when everything is running smoothly with MicroLink/Autonomy group. Autonomy would retain their rights to all of our other SW IP, including our AIS (Autonomy Integration Suite) and fetch framework. We can go through specifically what I would want to take with DP IP but that is the general concept…."* [My emphasis]

(2) The fact that the price of $10,000,000 originally proposed by Mr David Truitt for two pieces of software (DiscoverPoint and Control Point) remained the same even though, at Mr Hussain's suggestion according to

Mr David Truitt[545], DiscoverPoint was spun out to DiscoverTech before the acquisition and Autonomy ended up selling only Control Point to DiscoverTech (through

MicroTech) but for the same $10,000,000 price, suggesting arbitrary pricing and/or contrived attribution of value;

(3) The fact that (as Mr David Truitt confirmed in his deposition in the MicroTech proceedings) DiscoverTech never managed to sell Control Point to anyone, suggesting that it was worth little and certainly less than the price attributed to it;

(4) The fact that DiscoverTech paid MicroTech on 5 January 2010 and MicroTech paid Autonomy on 6 January 2010, even though MicroTech had 30 days (i.e. until 29 January 2010) to pay, a suggested indication of a circular and contrived transaction;

(5) The fact that Mr Scott and Mr Kanter knew (and stated in an email) that the money would need to *"go through 3 wires"*, signifying transfers from Mr David Truitt (as part of the proceeds of the sale to MicroLink) to DiscoverTech, then to MicroTech and finally to Autonomy is again suggestive of contrivance and circularity;

(6) The fact that the original proposal from Autonomy was that 10% of the purchase price for the MicroLink acquisition should be placed in escrow, yet the escrow amount was only $4,500,000, suggesting a real purchase price of $45,000,000, and the contrivance of additional circular payments of $10,000,000 to give the appearance of revenue generation. This was confirmed by Mr David Truitt in his deposition evidence in the MicroTech civil proceedings:

> *"Q. ...And so it is correct that the escrow amount was $4.4 million, which was 10 percent of the $55 million that you got paid minus the $10 million that you paid back to Autonomy?*

[545] In his deposition evidence in the MicroTech proceedings in the US Mr David Truitt said: *"I thought it was going to work a bit differently where they were going to sell me the software, our software, that MicroLink had built. But in further conversations, it – you know, [Mr Hussain] preferred me to do the larger Control Point deal and allow me to take the software for free."*

*A. Yes, that's true."*

260. The Defendants' answers were that:

(1) Mr David Truitt originally wanted $60,000,000 for MicroLink; Autonomy originally offered $45,000,000; after negotiation the agreed price was $55,000,000 but DiscoverPoint was spun out before the acquisition (to the newly-formed DiscoverTech).

(2) The MicroLink transaction for $55,000,000 was at a fair value, and reflected the value placed by Autonomy more on the services side than the product side of MicroLink's business: there is no basis (nor was there any evidence) for regarding the value of either the MicroLink shareholding or the Control Point software as inflated.

(3) There was no evidence that the amount of Control Point software ultimately licenced was not fairly valued at $10,000,000; further, the Claimants' submissions overlooked the fact that (a) as part of the arrangements MicroTech received from MicroLink the DiscoverPoint IP (b) the Control Point deal included "lite" IDOL technology (though not the full IDOL suite), permitted MicroTech to use that technology in its own products, and thereby enabled Mr David Truitt to start a new company with new technology.

(4) Mr David Truitt was adamant that, contrary to the Claimants' contentions, the $55,000,000 price for the acquisition was not related to the price of the software, and that the $10,000,000 order and purchase had no relationship with the $55,000,000 acquisition amount, other than that the acquisition gave Mr David Truitt (and through him, his new company DiscoverTech) the resources and commercial reasons to make the purchase.

(5) Mr David Truitt's reference in his email dated 18 November 2009 to including the purchase of DiscoverPoint in with the Control Point OEM *"so Autonomy could show revenue on both products in the 10 million dollar order"* could not in such circumstances bear the weight sought to be placed on it by the Claimants: the suggestion was in any event odd and misplaced since (as Dr Lynch pointed out in cross-examination) it was MicroLink, not Autonomy, which owned and could sell DiscoverPoint.

(6) The escrow arrangements did not suggest a true purchase price of $45,000,000: the $4,500,000 escrow amount was what Autonomy had offered as part of its original proposal to pay $45,000,000 and the simple explanation was that it was not changed when the price agreed eventually was higher.

(7) The Claimants' theory that the purchase price for the MicroLink shares was inflated by $10,000,000 so as to fund the $10,000,000 purchase of software was commercially unrealistic, not least because it failed to take into account tax payable on the acquisition consideration.

(8) DiscoverTech's success or otherwise with its business is immaterial given that it genuinely wanted the software at the time that it bought it, as Mr David Truitt confirmed. He explained that the reason why the product integrated with Control Point faced obstacles in penetrating the market was because of Microsoft's integration of FAST search which took over SharePoint search following Microsoft's acquisition of FAST:

> "A.  We immediately integrated that software into our platform. We demonstrated that software many times. In March of 2010, Microsoft integrated their billion dollar acquisition of FAST Search that took over for SharePoint Search. So when we would go and intro our DiscoverPoint product with Autonomy Control Point and IDOL on the back, we would get, Why would I put another search engine in here if FAST was their biggest competitor? It had lots of the same capabilities. Nobody wanted to introduce complexity into their Microsoft SharePoint environment. So over time, we phased out our investment of Autonomy software and went and integrated FAST into our product and continued on with a different search engine. So the answer to the question is, no. We weren't successful, but we tried really hard."

(9) The overall deal was approved by Autonomy's Board of Directors and by Deloitte. Deloitte noted as regards the $10,000,000 Control Point acquisition:

> "We understand the commercial rationale for the acquisition. We have reviewed the purchase agreement and have not noted any unusual terms…"

261. The Claimants accepted none of this. They contended that both the Board and Deloitte were misled; and that, in particular, (a) they were not told of the links through the Truitt brothers (David, Steve and Dan) between MicroLink, MicroTech, and DiscoverTech (which would have been relevant as a factor in the consideration of whether the acquisition was at a fair and proper value) (b) they were not told that addressing MicroLink's mounting debt to Autonomy under VAR transactions was part of the rationale for the acquisition and were led to believe that only a relatively small amount of the acquisition price for MicroLink represented bad debts that would need to be written off, (c) they were misled as to how MicroTech was able to finance the payment of $10,000,000 and (d) they were given a misleading impression as to the arrangements between MicroTech and DiscoverTech.

262. As to (a) in the preceding paragraph, I do not accept the Claimants' contention that Deloitte was not told of the links between the Truitts and their companies; although he had given the impression in his witness statement that Deloitte was uncertain of these links, in cross-examination Mr Welham accepted that Deloitte did know about them[546] and Deloitte's working paper on the acquisition expressly noted this. As to (b) in the preceding paragraph, there was no dispute.

263. The last two matters ((c) and (d) in paragraph 261) related more specifically to VT5 and the payment of $10,000,000, and concern certain of the answers given by Mr Chamberlain in a draft document dated 11 January 2010 entitled *"ML auditor queries"* to queries raised by Deloitte about the transaction. Thus:

> (1) Question 2(2) asked what insight Autonomy had into how MicroTech had *"financed this $10m"*. The answer given was, *"The $10m was financed from their operating cash."* The Claimants submitted that this was untrue, since the only expected source was the

---

[546] It appears from an entry in a documented response to various questions that Deloitte had about the MicroLink acquisition, someone had written against the question about the nature of such links *"Not sure. These are independent companies with different groups of shareholders"*. That may be the origin of the misunderstanding clarified by Mr Welham in cross-examination.

exceptional receipt of sale proceeds remitted through DiscoverTech.

(2) Question 3 sought information about Autonomy's trading history with DiscoverTech and DiscoverTech's ability to finance the $10 million payment. The answer was, "*No trading history with Autonomy. We have not done a deal with them, the deal is via a reseller*". The point about DiscoverTech having had no trading history with Autonomy was factually correct, but only because DiscoverTech had only recently been incorporated. Given the close nexus between the companies and the funding arrangements, these answers were plainly misleading. The Claimants submitted that this was an attempt to create the appearance of distance between the $10 million purchase, on the one hand, and the acquisition of MicroLink, on the other.

---

264. In Dr Lynch's written closing submissions, it was suggested that:

> "*This was not Dr Lynch's document and the Claimants did not challenge his confirmation that he did not see the document at the time. The author (Mr Chamberlain) was unlikely to have known how MicroTech financed the purchase, and it was reasonable to suppose that he was addressing the issue from a collectability perspective.*"

265. Although the collectability point was probably fair, the rest of this explanation was weak, especially since the draft responses that Mr Chamberlain prepared were circulated to Mr Hussain and Mr Kanter. The Claimants understandably made the point that if Autonomy senior management felt they lacked sufficient knowledge of the arrangement between MicroTech and DiscoverTech to give an accurate answer to Deloitte's question, they should have said precisely that, rather than provide a misleading answer.

266. The last point to note in respect of VT5 is that MicroTech was paid $100,000 for its role, and in particular, for acquiring $10 million worth of Autonomy software for immediate resale to DiscoverTech. In his 'direct' evidence (evidence in chief) in the MicroTech proceedings in the US, Mr Steve Truitt acknowledged that this was for "*doing practically nothing*". He added that he had entered into the purchase arrangements at the direction of and to assist his brother (Mr David Truitt) who wanted to do the deal quickly. Put shortly, on the Claimants' case, this was an improper

payment to recognise MicroTech's help in portraying a false impression; on the Defendants' case it was the price of, in effect, a guarantee to ensure satisfaction of collectability tests. In my judgment, both are probably true; but the first point demonstrates impropriety whether alone or in combination with the second.

267. In summary, I agree with the Claimants' depiction of the essence of VT5 as being a contrived and circular transaction involving:

(1) An artificial and unwarranted increase in the agreed purchase price for MicroLink from $45 million (which was correctly reflected in there having been a 10% deposit of $4.5 million) to $55 million: Autonomy designedly overpaid Mr David Truitt and Mr Tim Wharton (Mr David Truitt's minority partner in both MicroLink and DiscoverTech) by $10,000,000 (see paragraph 42 above) with a view to their new company, DiscoverTech, then having the funds to pay MicroTech for Control Point software, enabling MicroTech then to pay
Autonomy under VT5;

(2) Incorrect responses to Deloitte's queries about (a) the rationale of the MicroLink acquisition (b) the financial position of MicroTech (c) various disguised efforts by Autonomy to create the appearance of distance between the $10 million purchase, on the one hand, and the acquisition of MicroLink, on the other, including (d) the true arrangements between MicroTech and DiscoverTech resulting in the purchase of software in order to provide recognised revenue for Autonomy before the end of the relevant quarter and (e) the source of the $10 million eventually paid by DiscoverTech;

(3) The payment of a MAF to MicroTech as a reward not for any properly rewardable contribution but for its participation in the contrivance.

268. Apart from the payment of a MAF, the contrivance is, to my mind, laid bare in the email dated 18 November 2009 from Mr David Truitt to Mr Hussain (which I refer to at paragraph 259(1) and 260(5) above). That email included the following:

*"What I was thinking was that we would include the purchase of DiscoverPoint in with the Control Point OEM, so Autonomy could show revenue on both products in the 10 million dollar order. So total at closing for the MicroLink purchase would be 55 million*

> *with an immediate purchase of DP and Control Point OEM for 10 million from the new company…"*

269. In my judgment, the recognition of revenue of $10 million by Autonomy in its quarterly accounts which was enabled by the contrived and circular transactions comprising VT5 was improper.

*Knowledge and involvement of the Defendants in VT5*

270. Mr Hussain plainly knew about VT5; he was the recipient of Mr David Truitt's email of 18 November 2009; and there is nothing to contradict Mr David Truitt's evidence (see paragraph 259(1) and footnote 26 above) that it was Mr Hussain who suggested that DiscoverPoint should be spun out to DiscoverTech in advance of Autonomy's acquisition of MicroLink and it was he who also negotiated the $10 million price for DiscoverTech's purchase of software;  he was (with Mr Kanter) copied into Mr Chamberlain's draft responses to Deloitte's questions (see paragraph 263 above); and he knew of the arrangements for the sequence of payments to *"go through 3 wires"*. I accept the Claimants' submission that Mr Hussain was involved first-hand in this transaction and knew the relevant facts.

271. There is no dispute that Mr Hussain kept Dr Lynch informed about the MicroLink acquisition. On 18 November 2009, Mr Hussain wrote to Dr Lynch regarding "*project DC*", which was the code word for the acquisition of MicroLink, as follows:

> *"I believe agreement in principle is possible on the following basis:*
>
> - *Valuation $55m*
>
> - *We would buy ML without the as yet not in production product "DiscoverPoint", 6 developers plus 2 sales reps*
>
> - *Dave would stay on for integration but eventually transition out*
>
> *Let me know if you are ok with this and I'll write up the Board Paper."*

272. The next day (19 November 2009), Dr Lynch replied "*ok*". Then, on 15 December 2009, Mr Chamberlain provided a memorandum entitled "*Financial Due Diligence*" to the board of directors of Autonomy regarding the MicroLink acquisition. Dr Lynch confirmed in cross-examination that he would have read this memorandum with care.  It showed that MicroLink had total assets of just under $24.5 million. Only $362,069.17 of these assets were

in cash. By far the largest asset, $13,711,426.50, classified as "*Inventory Asset*", was stated to be "*Licences purchased from Autonomy not yet resold*". For good measure, the memorandum went on to explain, "*The inventory assets relate to licences purchased from Autonomy that have not yet been resold to the end-users*". Accordingly, there was little prospect that MicroLink could pay any substantial part of what it owed to Autonomy. The fact that this did not apparently cause him consternation suggests that it did not come as a surprise and that Dr Lynch, like Mr Hussain and the others involved, well understood that MicroTech was not expected to find the means of paying out of its own resources. But the memorandum did not explain either (a) how a valuation of $55 million for MicroLink could be justified or (b) the arrangements for DiscoverTech to purchase Control Point and acquire DiscoverPoint for (in aggregate) $10 million.

273. On 17 December 2009, Mr Kanter sent Autonomy's directors, including Dr Lynch, a number of documents, and in particular, a Memorandum about the acquisition of MicroLink prepared by himself and Mr Hussain, which (given its importance) I accept Dr Lynch must have read. That Memorandum referred to and discussed the proposed spinning-out of DiscoverPoint and expressed the view that they did *"not believe there is a material business in DiscoverPoint, and not materially different from technology Autonomy already has, and thus are happy for it not to be part of the transaction."* Again, little detail was given.

274. Dr Lynch accepted in cross-examination that he would have known about the $10,000,000 transaction before it was concluded. He was asked whether Mr Hussain had told him about it: he supposed that he would have seen it from the board papers when it went for board approval. In cross-examination he also accepted that he knew that $10 million of the purchase price for MicroLink was "coming back":

> *"Q.        You knew about this transaction, both about the amount that was going to be paid out, the 55 million, and the 10 million that was coming back?*
>
> *A. I think I did, yes."*

275. Dr Lynch said in cross-examination that, at the time, he regarded VT5 as separate from the MicroLink acquisition and that Autonomy would have gone ahead with the acquisition whether or not DiscoverTech had proceeded with the acquisition of Control Point. When pressed he said:

> *"Well, they're linked in the normal sense that you wouldn't need to buy the software if you*

> *weren't spinning out the company. So if he*
> *wasn't selling his company, he doesn't need to*
> *buy the software, because he's buying the*
> *software for his new company which is spun out*
> *from the old one. So in that sense they're*
> *linked, but, as I said, Autonomy's board were*
> *happy to continue with the acquisition even if*
> *Mr Truitt had not decided he wanted to buy*
> *software. We viewed it round the other way,*
> *which is he was making it a condition of the*
> *deal that he would sell provided he could have*
> *a business to carry on with and that was the*
> *DiscoverPoint business. And in fact the*
> *software sale is heavily negotiated and he*
> *doesn't get what he wants."*

276.  In arguing that there was no basis, nor had the Claimants put to Dr Lynch any basis apart from conclusory assertion with which he disagreed, on which Dr Lynch was supposed to have known that the purchase price was (allegedly) inflated, Dr Lynch relied on the following:

>    (1)    Although he knew that $55 million was being paid to the shareholders, and $10 million would be being paid by DiscoverTech (ultimately) for the software, it was submitted that this did not suggest that the MicroLink acquisition price was inflated.

>    (2)    David Truitt confirmed in his hearsay evidence that there was no relationship between the acquisition price and DiscoverTech's purchase of the software, and the material passing to Dr Lynch also showed that $55,000,000 was the negotiated price for MicroLink.

277.  The Claimants referred Dr Lynch to Mr David Truitt's email of 18 November 2009 which I have also quoted from in paragraph 259 above. This email was not sent to him but to Mr Hussain. Dr Lynch's evidence was to the effect that his understanding was that the reason that the escrow was at that level was because that was the original proposal from Autonomy for the escrow amount (when their opening offer was at $45m), and that while the headline figure had been negotiated upwards no one bothered to move the escrow amount. In this regard he was later taken to an email from the lawyer for MicroLink to Mr Kanter on 30 December 2009 attaching a revised version of the draft escrow agreement (stated to be nearly ready for execution) changing the escrow amount from $5,500,000 to $4,500,000; but the email was not sent to Dr Lynch. When asked to agree that the email and its attachment showed that his supposition that the $4,500,000 was

simply a hangover from a previous draft must be incorrect he answered:

> *"My understanding, and as I say I wasn't involved in this, was that the original price and escrow number that was agreed was 4.5 million, there was then a negotiation and it came to 55 and then this email seems to be a discussion about whether it should be 10% or it should still be the 4.5."*

278. What emerges from all this is that Dr Lynch was well aware of the overall picture, including (as well as the $55 million acquisition) of the broad detail of the arrangements for DiscoverTech to acquire DiscoverPoint and purchase Control Point for $10 million. I think it more probable than not, and I find, that he knew that the real purchase price for MicroLink was $45 million, that the escrow arrangements reflected this and that the additional $10 million was to enable MicroTech to pay back Autonomy. He may not have known how the $45 million was calculated: but that is of little moment.

279. In my judgment, both Defendants thus had "guilty knowledge" of accounting impropriety, which was part of the false presentation of Autonomy's financial position and performance in its published information.

## VT13: MicroTech/Vatican Library Q1 2010

280. VT13, which was referred to at trial as "the Vatican Library deal", was prospectively by far the largest of the impugned VAR sales: and it illustrated in a variety of ways what the Claimants called "the pattern".

281. From early 2009, Autonomy had hoped to be involved in a project, which was initially secret, for the digitisation and saving in Digital Safe of the Vatican Library's collection of over 80,000 manuscripts and over 40,000,000 documents so as to make it widely available for scholars and the public for the first time. The overall project was huge (in

value terms in the region of Euro 75,000,000); it was likely to take years, and involve a programme of installation and sustained servicing; it was also prestigious, with huge potential marketing benefits for Autonomy. Dr Lynch perceived this as a flagship project for Autonomy, which Dr Lynch accepted in cross-examination, would *"certainly have been a contender for"* Autonomy's biggest ever single deal. Dr Lynch was clearly excited by the whole idea which he described as *"a wonderful thing for humanity"*.

282. It appears from email exchanges between Mr Goodfellow and Mr Lucini in October 2009 that Autonomy envisaged and proposed that Autonomy would provide *"the whole solution – hardware, software & services"* in conjunction with an Italian implementation partner. It also appears that the Vatican Library wanted, if possible, to fund the project through a foundation which would be funded, in whole or part, by public and corporate donations.

283. In February 2010, after the replacement of its original Italian partner, Selex (part of Finmeccanica), because of its involvement in an Italian corruption scandal (the replacement partner being Poste Italiane, the Italian postal service), Autonomy was sent confirmation by the Vatican Library that Autonomy could begin what was called a "*TestBED*" of the digitisation project. An email from Mr Luciano Ammenti ("Mr Ammenti") on behalf of the Vatican Library stressed that Autonomy would have to pay for the hardware and labour and "*AUTONOMY won't have anything to claim to the Vatican Library in case the project of manuscripts digitalization won't take off*".  In other words, Autonomy would be proceeding with the test bed entirely at its own economic risk.

284. This was followed by discussion of a Memorandum of Understanding to regulate the partnership between Autonomy and Poste Italiane and the Vatican Library in respect of the project. A draft of this was in circulation on 18 March 2010, although the terms were fairly broad, and did not constitute a contractual agreement. Some 8 days later, on 26 March 2010, a Letter of Intent was signed between the Vatican Library and Postecom SpA, providing for a 60-day period of negotiations with a view to the parties then discussing *"in good faith the terms of their possible collaboration."* However, Autonomy was not a party; the letter of intent was no more than that; and it was expressly agreed that its terms did *"not bind the parties in signing any collaboration contract."* This Letter of Intent was forwarded to Autonomy on 28 March 2010.

285. Although there is some suggestion that there was talk of a deal before the end of March, that was entirely unrealistic.

286. By 29 March 2010, it was clear that there could be no realistic expectation that the Vatican Library's proposed charitable foundation would be in a position to issue a purchase order to Autonomy by the end of the quarter; and indeed, that final closing of a deal was some way off.

287. It seems from the content of an email dated 29 March 2010 entitled *"BAV – the route to closing the deal tomorrow"* sent by Mr Hussain to Mr Broli (Autonomy's sales executive covering Italy),

which Mr Hussain sent also to Dr Lynch, that Mr Broli suggested the involvement of an Italian partner. Mr Hussain appears to have welcomed that, on the basis of the partner acting as a VAR (in return for a suggested margin of 5%). Mr Hussain expressed his approach to Mr Broli, stating that *"having an Italian partner would be very useful to us"* but that:

> *"the partner that we would use would have to be sufficiently strong financially for us to be able to recognise the revenue and only if the [Purchase Order] and contract is signed this quarter."*

288. On 31 March 2010, the last day of the quarter, Monsignor Cesare Pasini (the Prefect of the Vatican Library) sent Mr Broli a new Letter of Intent between the Vatican Library and Postecom. Mr Hussain requested a translation from Mr Zanchini. This changed the exclusivity period to 50 days, extendable by a further 40 days subject to the agreement of the Vatican Library, but otherwise was essentially the same. Recital (f) to this Letter of Intent stated:

> *"It is understood that if by the terms as in d) of this preamble BAV finds the financial contributions to destine to the BAV Project and that the amount will be sufficient to cover at least the First Phase of the BAV Project, these contributions will be entirely used by BAV to pay Postecom the amounts due for such first Phase as defined at point a) of the Preamble."*

289. Evidently, therefore, the question of funding the digitisation project remained unresolved as at 31 March 2010. In the circumstances, it was plain that there was no prospect of the Vatican Library itself – or any newly established foundation – signing a contract in Q1 2010.

290. However, Autonomy needed recognised revenue from a sale prior to the end of the quarter. Without a Vatican Library transaction, Autonomy was at risk of missing the market consensus figures for revenue and earnings per share in Q1 2010: this was in the region of $193 million (revenue) and $0.25 (adjusted earnings per share). Accordingly:

> (1) On 28 March 2010, Mr Hussain sent Dr Lynch an email which made it clear that to achieve $195 million in revenue for the quarter *"we will need Vat and Stouffer's deal"*.
>
> (2) On 29 March 2010, Dr Lynch sent Mr Hussain and Mr Egan a document setting out his suggestions or 'route-map' on which transactions were needed to achieve

revenue of $196 million in the quarter. He identified $15 million of revenue from a "*VAT*" deal: this signified the Vatican Library transaction and what became VT13. This was larger than any of the other listed deals. Dr Lynch continued to work at ways of delivering results commensurate with revenue forecasts.

(3) At 23:30 on 31 March 2010, Dr Lynch sent Mr Hussain a new iteration of his route-map document. This noted that: $22.5 million of revenue needed to be recognised from "*VAT*", the Vatican Library, in order to achieve revenue of $205 million in Q1 2010: a "*VAT contribution*" of $10 million was needed to achieve $193 million of revenue, which would involve Autonomy announcing earnings per share of less than $0.25; and a "*VAT contribution*" of $17 million was needed to achieve $195 million of revenue, which would enable Autonomy to announce earnings per share of $0.25. This document therefore picked up on the $193 million consensus revenue figure and the $0.25 market consensus earnings per share figure that had been identified in an email on the same day

(31 March 2010) from Mr Peter Goodman (who worked in Autonomy's Investor Relations team).

291. Only at the last moment did Autonomy resort to MicroTech. There is an issue whether in fact it was by then too late. It seems that it may be that the purchase order was not signed until 1 April (see paragraphs 323 to 327 below); but even on the basis of the Defendants' account, VT13 was not agreed until the dying hours of Q1 2010 (indeed, only then by the use of a VAR in a western time-zone). Mr Egan gave this evidence in his witness statement:

> "*Mr Hussain asked me to see if MicroTech would agree to take a part of the deal that Autonomy was trying to sell to the Vatican Library. He ultimately gave me the amount: $11.5m. I contacted David Truitt and asked him whether MicroTech would take an $11.55m Vatican Library deal on the usual terms. David Truitt said he would check with Steve Truitt, the MicroTech COO. At David Truitt's request, we then prepared a description of the deal terms for John Cronin who, in this context, was acting for MicroTech. MicroTech agreed to take the deal.*"

292. Dr Lynch was asked about his "route-map" document referred to at paragraph 290(2) above which the Claimants relied on as showing calculations of the size of any VAR sales according to Autonomy's fluctuating requirement for recognised revenue. Dr

Lynch dismissed this: he was adamant that the amounts were not calibrated by reference to revenue forecasts, but according to *"political"* considerations.  His explanation, as I understood it, was that this signified simply consideration of the possibility of parts of the deal being sold off to different prime or sub-prime resellers, given the very considerable size of the deal, and given the likely political imperative of including an Italian partner[547], one of which might *"end up being the prime"*. This initially struck me as plausible: but an email dated 2 April 2010 from Dr Lynch to Mr Hussain stating *"I saw that MT is 11 so if we can get data more than that would be good"*, though not altogether clear (the reference to data appearing extraneous), suggested that Dr Lynch would have wanted to "sell" more to MicroTech (and see also paragraph 311(5) below). This seems to me to show that (a) Dr Lynch remained personally and directly involved and that (b) he knew full well that the size of the VAR deal was calibrated not by reference to any prospective and realistically anticipated end-user deal (there was none) but by reference to Autonomy's requirement for recognised revenue.

293. The VT13 purchase order for Autonomy software (IDOL Server and Autonomy Archive Solution with Digital Safe Core Appliance) for end-user Vatican Library was issued under the June 2006 MicroTech VAR agreement (see paragraph 214 above). This provided expressly that MicroTech was obliged to pay Autonomy for its orders irrespective of its sales to an end-user, and confirmed that there was no other understanding or arrangement between the parties.[548]

294. The licence fee for VT13 was $11,000,000, plus $550,000 for support and maintenance and was payable within 90 days (i.e. by 29 June 2010). The authorised use of the software was confined to use for the Vatican Library digitisation project and within the territory of

the Vatican Library. VT13 related only to a part of what had always been envisaged as a larger Vatican Library deal.

295. In the event, no deal was concluded with the end-user (Vatican Library), either by MicroTech or by Autonomy. It appears from a letter dated 15 May 2014 from the Vatican Library to HP Autonomy, that some considerable time later, in March 2014, the Vatican Library selected and contracted with a

---

[547] A large Italian integrator called Selex (part of Finmeccanica) was originally identified, but the Vatican Library removed Selex because of a corruption scandal. Poste Italiane was then considered. See paragraph 283 above.
[548] And see paragraph 216(4) above.

different supplier of software, NTT Data, to undertake the digitalisation of its archives.

296. However, MicroTech remained under its legal liability pursuant to the terms of the agreement. The question which arose, in accordance with the usual pattern where no enduser deal had eventuated, was how it could be let *"off the hook"*.

297. The Claimants' case is that MicroTech was only rescued by a transaction between itself and Autonomy for the purchase by the latter of goods that Autonomy did not in fact need (the "ATIC" transaction, of which more later), which (exemplifying the 'pattern' asserted by the Claimants to be typical) got MicroTech *"off the hook"*.

298. More generally, the Vatican Library transaction was not only prospectively the largest of the VAR transactions: it was also a transaction which demonstrates many of the principal features of the Claimants' case on impugned VAR sales, and the Defendants' answers to their allegations. It also illustrated especially clearly the role expected of the VAR, in this case, MicroTech. It was dealt with at considerable length at the hearing, no doubt for that reason; and I deal with it at some length below.

*Claimants' case on VT13*

299. The Claimants highlighted the following particular features of VT13 and its context in support of their case that it made no commercial sense whatsoever to suppose that MicroTech perceived itself to be taking any more than a nominal risk for which it was to be handsomely rewarded for doing absolutely nothing. It was, in their language, no more than a *"placeholder"*.

300. First, the Claimants emphasised that MicroTech had no prior relationship with the Vatican Library, nor any knowledge of the Vatican Library project before agreeing to act as a VAR and signing up to the VT13 purchase order. MicroTech was based in Northern Virginia, USA. There is no evidence that it had Italian speakers working for it or any experience working for any customer located in Italy, let alone the Vatican Library. On the contrary, Mr David Truitt testified in the MicroTech proceedings in the US that MicroTech had not done any work outside the US, and had no employees located outside the US. The obvious choice of a VAR would have been one based in Italy, and indeed an "Italian partner" had been suggested (see above): but it seems likely, not least in light of the unlikelihood of any imminent end-user sale, that Autonomy needed a 'friendly' VAR and there was none there.

301.   The Claimants submitted that Dr Lynch's justification under cross-examination that MicroTech *"had a couple of hundred people doing services and that's actually very difficult if that's done by people that are speaking Italian rather than English and it's much better done co-located nearer our own technical resources"* made no sense; and that Dr Lynch *"gave no evidence…to explain how a US reseller, with no insight into the Vatican Library, could ever hope to achieve such a sale"*. They quoted Mr Stephan's statement in the US criminal trial that he was *"incredulous"* when he learned that the VAR for the Vatican Library deal would be in the Washington D.C. area. They noted and adopted his view that:

> *"It suggested that – to me it indicated that they were just a conduit for giving us paperwork to close – to book deals in the quarter end because there was no linkage in my mind between a U.S. federal government reseller and, you know, the Vatican in Italy."*

302.   The Claimants also noted Mr Stephan's further evidence that he had telephoned Mr Chamberlain, who had shared Mr Stephan's surprise about the Vatican Library deal going to MicroTech; and that he had made clear to Mr Chamberlain that, as he considered:

> *"...these deals were, you know, garbage. They were not worth the paper they were written on, and I wasn't happy to front them up as good deals to our auditors"*.

His recollection was that Mr Chamberlain's response was that it was not his call: it was Mr Hussain's call, and that *"we just need to do our job and put it to the auditors"* but was resigned to the fact that it was *"Mr Hussain's call"*. Mr Stephan added the more general observation about Mr Chamberlain that:

> *"That was always his – his stance was like, troops in an Army. The general says what to do and we have to follow our orders."*

303.   Dr Lynch submitted that Mr Stephan's hearsay evidence should be given no weight. His team had had no chance to cross-examine him and as previously noted, Dr Lynch gave evidence that Mr Stephan had, in effect been coerced (see paragraph 16(8) above). Plainly, it would be wrong to accept Mr Stephan's surprise and characterisation of the transaction as of itself demonstrative of the true nature of the transaction: but his recitation of his surprise and characterisation, though highly coloured, had the ring of truth, and was at least consistent with the inherent unsuitability of MicroTech for any more than a nominal role in the matter.

304. The Defendants' defence of the choice of MicroTech was that (a) *"much of the services work would not have required attendance in Italy",* (b) it was *"common for software and service providers to provide services to international customers"* and (c) for example, according to the Defendants Capax Discovery had itself worked for Prisa, a Spanish company. This was not, to my mind, persuasive. In particular (a) Mr David Truitt's evidence was that MicroTech had no international experience nor even the service capability; (b) in any event, MicroTech's last ditch retention by Autonomy was notionally for the purpose of selling on the software: and its total lack of experience, lack of Italian speakers, lack of contacts, and unfamiliarity with the Vatican Library made it entirely unsuitable in that regard[549]; and (c) no details were provided of what "Capax Discovery"

did for Prisa[550], nor even of which "Capax Discovery" company it was or why it was chosen, and the example offered carried the matter no further.

305. The second feature highlighted by the Claimants was the clear and complete absence of any engagement on the part of MicroTech in any part of the negotiations with the Vatican Library: they were carried on exclusively by Autonomy. Mr Steve Truitt confirmed this in his deposition in the MicroTech proceedings as follows:

> *"Q. Did MicroTech at any time contact the Vatican Library in an effort to sell the identified software, the software identified in [the MicroTech purchase order], to the Vatican or to assist Autonomy in Autonomy's efforts to sell that software?*
>
> *A.     No.*
>
> *Q. Did – did MicroTech, to your knowledge, have any involvement in the negotiation with the Vatican Library of the terms of a proposed transaction involving the software identified in [the purchase order]? [objection omitted]*

---

[549] The Defendants made the point that Mr Steve Truitt had expressed enthusiasm for MicroTech providing services to the Vatican Library: but enthusiasm is obviously not enough.

[550] As will be seen, one of the impugned VAR sales involved Prisa: but the VAR selected was DiscoverTech, and so cannot have been the same deal as in the example offered.

> *A.      No."*

306.  This was confirmed by a letter written considerably later (15 May 2014) by the Vatican Library to HP:

> *"As you well know, BAV [the Vatican Library] has never dealt with the company MicroTech and was not even aware of its involvement with Autonomy at the time of the latter's contacts with BAV to analyze the possibility of a possible collaboration on the digitisation project."*

307.  MicroTech made no effort to even approach the end-user with a view to service work after any end-user sale, as Mr Steve Truitt confirmed in his deposition evidence in the MicroTech civil proceedings in the US:

> *"Q. Did you – did MicroTech at any time, to your knowledge, approach the Vatican Library in an effort to obtain service business from the Vatican Library?*
>
> *A.      No."*

308.  Indeed, in the same deposition evidence, Mr Steve Truitt made it clear that in his view, MicroTech did not have the capability of providing such services:

> *"Q. Mr. Truitt, in 2010/2011, did MicroTech have people on its staff who were familiar with Autonomy software?*
>
> *A. I'm going to say no. It's possible we had one or two, but also there -- there were people out working on contracts that knew stuff. I mean, you know,*
>
> *we didn't have on the -- we didn't have anybody on the bench, I don't think."*

309.  A third feature pointed out by the Claimants was that, as Mr Lucini described it in his witness statement, Autonomy's proposal was for an "*end to end solution*". Although the Defendants contended in their written closing submissions that Mr Lucini's evidence had not stood up to cross-examination and he had accepted that numerous aspects of the overall project would naturally have had to be undertaken by professional services partners, the fact

remained that Autonomy had stressed the advantage of a single point of supply in its own proposal to the Vatican Library:

> *"In order to minimise TCO Autonomy can provide a fully managed solution as part of its Digital Safe offering including Software, hardware, Support, Installation, Monitoring & Administration…A full Autonomy solution also provides the traditional advantages of single supplier sourcing."*

310. The Claimants acknowledged that, of course, Autonomy might have decided to subcontract some of its work or, as Mr Lucini said in cross-examination, it might have used a professional services firm for particular parts of the project. However, the Claimants made the point that the notion that Autonomy would outsource the <u>licensing of the Autonomy software itself</u>, i.e. that the Vatican Library would contract with Autonomy for the whole of the project, but with the specific exception of the Autonomy software, which the Vatican Library would instead purchase from a third party, made no sense. There is no evidence that anyone at Autonomy understood this to have been the plan at the time.

311. Fourthly, the Claimants pointed out that VT13 was even riskier than other deals from the point of view of a VAR, had it really been substantively on risk:

    (1) The progress of the project depended on attracting funding for the foundation which the Vatican Library wished to use for the digitisation project: see paragraphs 280*ff* above. By 31 March 2010 the funding issue remained unresolved, was (given the size of the project) an enormous undertaking, and was plainly some considerable way from being addressed.

    (2) It was thus apparent by then that delay in any end-user deal was almost inevitable: Dr Lynch's evidence in cross-examination that *"the feeling at the time was that it was very close to being signed"* and that *"it was considered to be a project that was very close to happening"* was based on emails containing vague expectations, and the terms of the Letter of Intent between the Vatican Library and Postecom (to which Autonomy was not even a party) confirm that any such expectations were entirely unrealistic, as was Dr Lynch's evidence accordingly.

    (3) Any onward sale was confined to the Vatican Library as end-user and was dependent, not only on the end-user wanting to purchase the goods purchased by the VAR, but also, since the software was only part of what was

needed for the project, on the end-user proceeding with the larger project in a manner that made it still require the software.

(4) It made no sense to commit in March/April 2010 to pay $11,500,000 on the footing that the VAR would be able to on-sell the software licence to the Vatican Library within a reasonable time and at a profit, especially in circumstances where the VAR knew nothing of the end-user and was intended and expecting to have no participation in negotiations to bring about a resale.

(5) Dr Lynch's evidence in cross-examination when asked to explain what commercial benefit there could have been for MicroTech was to the effect that the advantages were (a) it would get *"an introduction into commercial business"*; (b) *"the services of doing all the gluing work"*; (c) *"the marketing effect of being able to say that they were part of this incredibly prestigious project"*; and (d) *"the revenue on the deal"*. Dr Lynch added that he would have signed off on a cost of $10 million *"just from a marketing point of view, just to be involved in it."* I did not find any of this persuasive. The *"introduction to commercial business"* struck me as somewhat condescending and unfocused generality; the *"services…gluing work"* was neither offered nor expected, or even within its capabilities; and though Mr Steve Truitt gave evidence in the US criminal trial (relied on by the Claimants themselves) that he was very excited by the project and *"the services add on here would be tremendous"* that was undermined by the fact that it was dependent on the risk in question (there never being an end-user deal) not eventuating, and upon MicroTech having a capability which (see above) Mr Steve Truitt had denied; and the marketing opportunity for MicroTech was very restricted in comparison to what Dr Lynch claimed for it, given MicroTech's low profile and minimal involvement. That leaves only the revenue on the deal.

312. The reality this confirms is that MicroTech could proceed only because it was never going to be *"left holding the bag"*. The VAR sale was a commercial proposition for it only because it was not required to take any real risk; it was required, as always, to do *"next to nothing"* in return for a substantial MAF.

313. Fifthly, the Claimants relied on Dr Lynch's replies to a question testing the aim of Autonomy's negotiations with Vatican Library

and in particular, how the prospect of an onward sale by MicroTech would have been impacted, as follows:

> *"Q. Can you just explain this: what does Autonomy's considerable effort have to do with the fact that MicroTech was not able to close a deal with the Vatican?*
>
> *A. Because if Autonomy had closed a deal with the Vatican then that would have closed MicroTech's deal.*
>
> *Q. How so?*
>
> *A. Because it was a consortium deal. So if we'd closed the thing and the consortium had got going, then the software that MicroTech had would have been used as part of that consortium."*

314.  The Claimants took this to mean that if Autonomy had closed a deal with the Vatican Library, that would have ensured that the software sold to MicroTech would be used. On that basis, they submitted that it could not be clearer that, in Dr Lynch's understanding, Autonomy was going to retain managerial involvement and control over that software; and MicroTech had not assumed the significant risks or rewards of ownership, precluding revenue recognition.

315.  Sixthly, the Claimants alleged that Deloitte were misled (as also they submitted, were the Audit Committee) about the true nature of VT13, and especially as to the role intended to be played by MicroTech. The Claimants contended that Deloitte were misled into thinking that MicroTech was intended to and did participate in the transaction, whereas in fact, it was not involved at all (other than on paper and in a passive, in reality nominal role) and the Vatican Library did not even know of its existence.

316.  Deloitte's understanding of the position is shortly stated in a working paper dated 16 April 2010 which recorded the following:

> *"Per discussions with Sushovan Hussain, Microtech is still considered to be a key reseller of Autonomy licence and as a result has entered into one deal with Autonomy in Q 1 2010 with the end-user of the Vatican for $11.5 million. The end-user has been informed of the fact that the licence will be supplied through Microtech, therefore Autonomy management is confident that it is appropriate to recognise the revenue on the transfer of the risks and rewards to Microtech."*

317. The Claimants maintained that it was untrue that the Vatican Library had been "*informed of the fact that the licence will be supplied through MicroTech*"; and they relied on the Vatican Library's letter of 15 May 2014 to HP (see paragraph 306 above) making clear that the Vatican Library had never dealt with MicroTech and was not aware of its involvement with Autonomy at the time. This led on to the submission that if the Defendants had really thought that there was nothing wrong about their plan in relation to MicroTech and the Vatican Library transaction (that plan being that MicroTech would do nothing and that Autonomy would continue negotiating as before), they could and would have been open and honest with Deloitte about it. But they were not.

318. The Claimants submitted further that it was clearly an important point from Deloitte's point of view that (as was recorded in Deloitte's working paper dated 16 April 2010) the end-user had been "*informed of the fact that the licence will be supplied through MicroTech*". But the Vatican Library's letter of 15 May 2014 (referred to above) made clear that the Vatican Library had never dealt with MicroTech and was not aware of its involvement with Autonomy at the time.

319. Moreover, and as also noted in the background section of the same working paper, Deloitte had recently found out that the Q4 2009 MicroTech deals for end-users Morgan Stanley and ManuLife (which have been addressed above) had gone direct. This had raised a question as to the recognition of revenue on deals with MicroTech. Deloitte had been told (it is to be inferred, by Mr Hussain) that the reason that these two deals went direct was because the end-users in question had not wanted to deal with a reseller; rather, they wanted to contract directly with Autonomy.

320. Accordingly, the fact (at least according to Mr Hussain) that the end-user had been informed of MicroTech's involvement was said ("*therefore*", see paragraph 316 above) to explain why Autonomy management was confident that it was appropriate to recognise the revenue on the transfer of the risks and rewards to MicroTech. That reflected Deloitte's expectation that, from April 2010 onwards, it would be MicroTech, rather than Autonomy, that would be negotiating to supply the software licence to the Vatican Library.

321. Dr Lynch's efforts to answer this point by suggesting that he thought the Vatican Library's "*agents were*" informed were far from convincing. He mentioned what he thought might be the name of one of the "*agents*" (he named Mr Ammenti) but in a way which struck me as some possibility plucked out to provide some sort of footing which did not exist, and he could not name anyone who might have told Mr Ammenti beyond saying he thought that

it would have been *"the technical people"*. When it was put to him that he was *"literally making this up"* he resorted (as became something of a pattern as his crossexamination drew out) to unidentified documents in the 'corpus'; which he assured me would back him up [551], but which were never identified or produced. He was more credible in saying later that he simply *"didn't know about many of the things you ask me about and I'm telling you the background of how these things work."*

322. In my view, Dr Lynch had no basis for supposing that the Vatican Library had been informed of MicroTech's involvement, and his evidence amounted to an acknowledgement that they should have been, in accordance with ordinary procedure. I find that as they later told HP (see their letter referred to in paragraph 306 above) they were not told, and that Deloitte were misled in being given to understand otherwise. (The Claimants claimed that one of the reasons why one of Dr Lynch's notified intended witnesses, Mr Marco Zanchini, a systems engineer in Autonomy's Milan office, who had been engaged in the transaction and would have been in a position to say whether anyone had been told about MicroTech's involvement, was withdrawn as a witness is that his evidence would have confirmed this.)

323. A more egregious element relied on by the Claimants (but not one which was unique, as will appear later) was that to achieve its only true purpose of enabling Autonomy to book the sale price as recognised revenue the VT13 purchase order had to be and was backdated.

324. As to this:

   (1) Both documentary evidence and the evidence of Mr David Truitt appear to establish that the VT13 purchase order was not signed by Mr Steve Truitt until 1 April 2010 even though it bears the date 31 March 2010;

   (2) Mr David Truitt's evidence was that prior to 1 April 2010 he had not even heard of any potential transaction with the Vatican Library; according to his deposition in the MicroTech proceedings he was telephoned that day by Mr Egan who asked him whether MicroTech would take a deal dated 31 March 2010, involving the Vatican Library end-user: and this appeared to be confirmed by an email chain dated 1 April 2010 between Mr Cronin and Mr Steve Truitt and in particular an email from Mr Cronin stating *"I just talked w/Dave re the most recent AU conversations. I'm available to help w/this…am*

---

[551] Dr Lynch made a vague reference to documents and getting "*the names off of those documents I'm sure*".

*awaiting details from AU....”* which was followed up when Mr Cronin sent Mr Steve Truitt the purchase order, stating *“It needs to be signed and emailed back to me, assuming it meets your expectations”.* (It was signed and returned that day.)

(3)   Mr Steve Truitt confirmed in his deposition in those proceedings that he had not signed until some time after 6pm on 1 April 2010.

325.   Dr Lynch's response to all of this (in addition to emphasising that he was not sent any version of the purchase order and knew nothing of any backdating) was that the deal was agreed prior to the quarter end, even if it was only memorialised in writing the next day.  He acknowledged that, if the document was intended to be effective from the date of the earlier oral agreement, that should have been stated; but that omission may have complicated matters and was not critical for revenue recognition. Mr Welham confirmed with regard to this transaction that there was no specific requirement under IAS 18.14 for a written contract, so long as there was a binding agreement on the relevant date. Dr Lynch relied also on the following:

(1)   In cross-examination, Mr Egan said that his *“memory of this deal was that it was done inside of the quarter in which it was submitted”*, and seemed to think also that Autonomy and MicroTech had discussed the proposed deal at the end of March 2010; but Mr Egan cautioned that he didn't have *“specific knowledge of the dates”.*

(2)   Mr Steve Truitt stated in his evidence to the Grand Jury which indicted Mr Hussain that his *“understanding”* was that he had actually agreed a deal before the end of the quarter; but his later evidence was to the contrary.

(3)   A delivery confirmation appeared to show that the software was made available to MicroTech on 31 March 2010, signifying a transfer of risk on that date; but that did not necessarily assist Dr Lynch because (a) there was nothing to stop Autonomy sending MicroTech a delivery confirmation, even though MicroTech had yet to commit to buy and in any event (b) Mr Steve Truitt testified at the US criminal trial that this confirmation was *“false”*, both as to the delivery of the software and as to the date of delivery.

326.   I consider it clear that the purchase order was not signed prior to the quarter-end. Accordingly, it was backdated. But I think it

likely that a deal was struck in broad principle on or about 31st March. Whether the terms were sufficiently set out is debatable; the price was made clear and arguably the inference may be, and it might be sufficient that, there was already a definition of the terms in the draft agreement which had governed previous deals. However, I do not propose to make a finding in this regard, for (a) the relevance of VT13 in the broader context is primarily that it exemplifies the use of a VAR, whether at the very last minute or beyond it, to book recognised revenue without there being any intention or expectation of the VAR ever doing anything else, apart from assuming a liability from which it fully expected to be relieved, and on that basis (b) the transaction should not have been accounted for as having generated revenue to be recognised; so that (c) such a finding would be superfluous.

327. In addition, I do not think that there is sufficient evidence that Dr Lynch was, at the time, aware of the details to infer knowledge of the facts alleged to amount to backdating and thus forgery. I accept that:

> (1) There is no evidence that Dr Lynch was sent any version of the purchase order.
>
> (2) In the absence of specific proof of involvement it is unlikely that Dr Lynch would have been involved in this level of detail.
>
> (3) Dr Lynch's denial of knowledge struck me as credible.

328. The last of the points particularly relied on by the Claimants was a familiar one in the pattern. The Claimants contended that the illusory nature of the transaction and their case that all the impugned VAR transactions were subject to side agreements or understandings intended to ensure that the VAR was not substantively at risk were confirmed in the context of VT13 by the extraordinary steps taken by Autonomy to ensure that MicroTech was, in effect, provided by Autonomy with the funds to meet its obligations.

329. The Claimants relied in this regard on (a) a contrived transaction involving the purchase by Autonomy of an exclusive three-year licence to use what was described as MicroTech's *"Advanced Technology Innovation Center"* ("ATIC") for $9,600,000; (b) the routing to MicroTech of further funds for the same purpose of enabling MicroTech to discharge its obligations to Autonomy under the VT13 purchase orders; and (c) the writeoff of the remaining VT13 indebtedness in the "Dark Period" immediately after the announcement of the acquisition of Autonomy by HP.

*ATIC*

330.  The ATIC was a facility built by MicroTech. It was often referred to in contemporaneous documents as the "I2C". It was essentially to be a mobile demonstration centre and a display facility which MicroTech was constructing to demonstrate MicroTech's own capabilities. The facts relating to Autonomy's purchase of a three-year non-exclusive licence to use ATIC for a fee of $9.6 million are complex and, in most instances, disputed.

331.  Put in a nutshell, whereas the Defendants sought to justify the transaction and the ATIC facility as of great utility to Autonomy, especially in the context of its cleared federal contracts and projects, the Claimants' case is that ATIC was a facility which Autonomy did not in fact need, of which large parts were never even built. According to the Claimants, the purchase of a licence to use it was a transaction contrived to fund MicroTech when it was apparent by the end of Q4 2010 that Autonomy was no closer to securing an end-user deal with the Vatican Library: it was another example of Autonomy using its own funds to purchase or reimburse the costs of a purchase of its own revenue.

332.  The Claimants contended that the purchase was also driven by the need urgently to assuage Deloitte's developing concerns and deflect further questions about the collection of the VT13 debt (which had become due in full on 29 June 2010). Deloitte noted these concerns in its Audit Committee report for Q3 2010, dated 17 October 2010, in which they warned that:

> "We understand that Microtech has yet to receive the amounts due from its enduser and as such is delaying payment to Autonomy. As a result, this amount remains unprovided at this time. We highlight this as a significant balance which management will need to re-assess for the purposes of the 2010 year-end financial statements. Should a substantial proportion of this balance not be recovered by year end, provisioning will need to be considered."

333.  Mr Bloomer confirmed in cross-examination that the importance of getting some form of payment from MicroTech would have been apparent to those present at the related Audit Committee meeting (on 18 October 2010), when (he said) there had been considerable "*discussion about this topic and the deal with the Vatican*".   He was also asked about the reference to the presentation that MicroTech was awaiting "*amounts due from its enduser*" (see quotation above):

> "Q. So you were told that the reason why MicroTech had not paid Autonomy was that MicroTech had not been paid by its end-user, the Vatican, yes?

> *A. Yes.*
>
> *Q. And that's what you understood at the time, yes?*
>
> *A. Yes.*
>
> *Q. So you would have understood that MicroTech was looking to get paid by the Vatican in relation to the deal, yes? A. Yes.*
>
> *Q. If MicroTech had never had any dealings with the Vatican of any kind, that would have been contrary to your understanding at the time, yes?*
>
> *A. It would have been surprising."*

334. In fact, the Defendants well knew that MicroTech had not had, and it was never intended that it should have had, any dealings with the Vatican Library.

335. The Claimants also relied on the following as demonstrating the contrived nature of the ATIC transaction, and its true objective (being to fund MicroTech and enable it to pay back its liability under VT13):

    (1) Autonomy showed no interest in ATIC when MicroTech first (and then repeatedly) pitched for business in November and December 2010. Dr Lynch acknowledged this in cross-examination. The Claimants suggested that the interest came first from Mr Hussain as a response to the need to find a way of paying down MicroTech's indebtedness.

    (2) There is no evidence that Autonomy's technical department conducted any analysis of the ATIC beyond reading MicroTech's proposal.

    (3) Email exchanges between Mr Hussain, Mr Scott and Mr Chamberlain appear to demonstrate that it became important to Autonomy to reach a deal on ATIC to justify a payment by Autonomy to MicroTech *"in 2010"*. An email from Mr Chamberlain to Mr Hussain and Mr Scott dated 17 December 2010 (subject "MT") illustrated the link and Autonomy's real concern:

    *"How close are we to agreeing? Need to collect their overdue balances"*

    (4) The deal originally proposed was for a one-year licence for $3,747,500: Mr Scott testified at the US criminal trial that the impetus behind the increase in the size of the deal came from Mr Hussain. The development of the

proposals was haphazard, and the Claimants suggested that it appeared to be driven by some purpose other than by reference to what Autonomy needed of the ATIC. For example, the cost breakdown had little logic, and the price went within a fortnight from $3.4 million for a one-year deal to $9.6 million for a three-year deal, and it included an advance payment of the full salaries of five MicroTech employees to staff the ATIC for three years after its completion which Mr Kalbag told me was neither necessary nor justified. In other words, the size of the deal appeared to be calibrated according to the level of MicroTech's indebtedness.

(5) No written contract was ever drawn up to detail the respective rights of the parties in relation to the construction and operation of the ATIC: Mr Scott identified this as very unusual for such a large deal of such a type.

(6) Mr Steve Truitt gave evidence at the US criminal trial that a purpose of the ATIC was indeed to obtain funds with which to pay MicroTech's debt to Autonomy, and testified to the same effect in his deposition in the MicroTech proceedings. He added that the price for the ATIC was reverse-engineered: the price was arrived at by starting with a *"final number, and we would work backwards to provide goods and services that were worth about that much"*.

(7) The price paid by Autonomy exceeded the total construction costs for the display facility launched in July 2011: this made no sense where all Autonomy was getting was a three-year, non-exclusive licence to have its software displayed in the facility, potentially in competition with other companies.

(8) According to Mr Steve Truitt's deposition in the MicroTech proceedings, he was not aware of any other company paying MicroTech more than a million dollars to display their hardware or software at the ATIC. Yet when ATIC – the basic display facility -  (by then renamed as the *"I2C"*) was launched in July 2011, (a) no mention was made of Autonomy in promotional videos and (b) none of the other companies show-cased had paid anything close to what Autonomy had paid; (c) the launch was labelled "Product Agnostic", and Mr Jimenez (CEO of MicroTech) sent an internal

MicroTech email explaining the approach to be taken, which suggests no prominence was given to Autonomy:

> "*The intend [sic: intent] of doing a Grand Opening is to increase awareness (about our technical dominance) and to not only show our customers that we are ready for prime time but to show our partners that we are levels above the other partners they are leaning on.*
>
> ...
>
> *Please be very sensitive to the "Product Agnostic" title we carry, but at the same time be sensitive to the fact that Microsoft, EMC, Dell, HP, VMware, Autonomy and Cisco account for more than half of our revenue and more than 90% of Product revenue and that even though we have received great support from Hitachi, Fujitsu, SGI, Christie Lucus, T-Mobile and others for our I2C they are not providing us with the Millions in revenue the big "7" provide and if they (Microsoft, EMC, Dell, HP, VMware, Autonomy, and Cisco) decide to take their ball and go home we will take a very hard hit!!!!*
>
> *The bottom line is - We will try, even though we know we can't show love to everybody, but let's make sure we remember where MicroTech's bread is buttered and let's be respectful of that and show homage to the companies that have paid the dues over the years and have a seat at the BIGGER table!!!!"*

(9) The manner in which payment was made and the way the funds were used was also relied on as reinforcing the conclusion that the true purpose of the ATIC was to route money to MicroTech so that it could pay down a significant part of its debt to Autonomy. As to this:

> (a) As set out above, Autonomy paid the entire contract sum in full on 31 December 2010 and one day after it submitted its two-sentence purchase order. It paid in full, before the ATIC was constructed. There were no progress payments as the facility was constructed. Autonomy paid the salaries of the five most senior persons who were to work at the ATIC months before the need for

the MicroTech employees to begin their work could have arisen, not as those salaries were incurred. The Claimants argued that, had this been a genuine commercial transaction, it is difficult to see why, commercially, this is something to which Autonomy would possibly have agreed. No credible explanation for this structure has been offered by the Defendants.

(b) An internal MicroTech email dated 30 December 2010 refers in its subject line to an "*Expected Incoming Payment and Associated OutGoing Wire Payment*". The body of the email notes that there was to be an "*incoming payment*" of $9.6 million from Autonomy Inc. and that there would then be a "*request for a wire transfer back to Autonomy as payee*" in the amount of $6.3 million.  Mr Steve Truitt testified at the US criminal trial that this was "*Absolutely*" part of the purpose of the ATIC purchase.

(c) At his deposition in the MicroTech proceedings, Mr David Truitt agreed that it was his understanding that MicroTech was to use part of the $9.6 million paid by Autonomy for the ATIC in order to pay down MicroTech's debt to Autonomy. In fact, on the <u>same</u> day that ASL paid $9.6 million to MicroTech, MicroTech paid $6,305,140 to
Autonomy Inc. Of that $6.3 million, $1.89 million was used to settle MicroTech's debt on VT6 (Honeywell) and $4.321 million was used as a partial payment on VT13 (Vatican Library).

(10)   Lastly, the Claimants contended that *"large swathes of what were set out in MicroTech's $9.6 million proposal were never built"* including the following (i) the mobile data centre featured in the proposal (ii) the *"medical scientific research solution"* promised in the proposal (iii) the Department of Defence record management and archiving solution described in the proposal (iv) the intelligence investigation solution set forth in the proposal and (v) a test evaluation laboratory using Autonomy applications. The Claimants noted

further that Autonomy made no complaint (suggesting indifference); and that in respect of the part of what was described in the MicroTech proposal that the Claimants accepted MicroTech <u>did</u> build – the basic ATIC display facility – Mr Kalbag's evidence was that, so far as he was aware, the ATIC facility was not used by Autonomy or any of its customers (whether for demonstration purposes or otherwise).  Autonomy's salesforce were not even told of the purchase: thus, for example, Mr Kalbag (Director of Federal Sales) was not aware of the purchase until he attended the *"I2C"* launch in July 2011.

336. Having paid Autonomy $4,321,000 after receipt of the ATIC monies, MicroTech still owed some $6,700,000 in respect of the VT13 purchase order. During Q2 and Q3 2011, MicroTech paid a further $4.4 million to Autonomy Inc:

    (1)   Of this, $2 million was paid on 21 April 2011.

    (2)   A further payment of $2.4 million was paid by cheque dated 1 July 2011 though it is recorded in Autonomy's accounting data as having been made on 30 June 2011. The $2.4 million was paid after receipt of funds received by MicroTech on 1 July 2011 from DiscoverTech, which, in turn, had been received from Autonomy. This is explained further in the context of VT30 below.

337. That still left $2.3 million of the original $11.55 million outstanding. That amount was never paid. Instead, Autonomy Inc wrote off this balance as at 30 September 2011 (three days before the HP acquisition completed). On 12 October 2011, Ms Lisa Harris sent an email stating, "*We need to write-off the attached list of debts on the AR modules as at 30th Sept*". The email was sent to Mr David Mobley and two others (all of whom I assume worked in Autonomy's finance department) and circulated to five others on Autonomy email addresses (who appear from the body of the email to have been working in the "collection teams"). Its attachment included the remaining debt of some $2.3 million due from MicroTech under VT13 as one of those to be written off as of 30 September 2011.

338. Ms Harris confirmed in her oral evidence that the write-offs included $2.3 million owed by MicroTech in respect of the Vatican Library transaction though she insisted that the write-offs were simply an accounting exercise to reflect accounting provisions already made. Dr Lynch, however, was adamant that the write-off *"was done by HP Finance after the acquisition"*. I return to this dispute later.

339. The Defendants rejected the suggestion that the ATIC transaction was contrived purely or predominantly to provide the means for Autonomy to fund MicroTech and enable it to discharge enough of its indebtedness under the VT13 purchase order to assuage Deloitte and the Audit Committee and give the appearance of substance to the transaction.  On the contrary, Dr Lynch defended the transaction as having a sound commercial rationale, which was entered into at fair value, and which was approved by Deloitte. Mr Hussain endorsed and adopted his case. Further, the Defendants contended that when MicroTech did build the ATIC, it incorporated most of the features in MicroTech's initial proposal to Autonomy, and did employ the highly experienced staff who had been recruited for it.

340. Dr Lynch's answer to the Claimants' allegations, as adopted by Mr Hussain, can conveniently be dealt with under five headings: (a) what the ATIC comprised; (b) its commercial rationale; (c) the Defendants' case on fair value; (d) Deloitte's review; and (e) construction and use of the ATIC.

341. As to (a) above, the ATIC was designed and subsequently run by Dr Roger Channing, then Chief Technology Officer and senior Vice President at MicroTech ("Dr Channing").  He was highly qualified and had current US secret clearance.

342. The ATIC was proposed to have a number of components.  There were three main components which were costed.  First, a "MicroData Center", a demonstration of private cloud technology solutions.   Secondly, an "Emerging Technology Center", for MicroTech to highlight Autonomy software in a virtual store front. These were subsequently built. Although its footprint was not large (it was described by Mr Steve Truitt as something you could have (and MicroTech did in fact have) in a *"trailer in the garage"*[552]), Dr Channing explained in the US MicroTech trial that the ATIC was usually in a building, and that "*that impressive room that you saw in the video* [553] *is where the Emerging*

---

[552]  There was a dispute as to what he meant. The Claimants' presentation gave the impression that he was describing the whole ATIC facility. What he said (in his depiction in the MicroTech proceedings in the US)  was that a part of the facility, the MicroData Center (MDC) which was to feature Autonomy-based MicroTech "Private Cloud Solutions", was *"not big. Like you could have it in a trailer in the garage like we did at MicroTech for a while"*. The Defendants argued that he was not saying that the whole ATIC consisted of a large facility in a building. In the MicroTech proceedings, Dr Channing estimated its size as 3,000 sq feet. No evidence was provided to me otherwise.

[553] A video of the facility was shown to the Court in the MicroTech trial in the US, but neither that video nor any other, or any other photographs were provided to me in these proceedings. The Claimants' closing submissions mentioned that Dr Channing conceded when cross-examined that no video had been disclosed in the Microtech proceedings in which any mention was made of Autonomy.

*Technology Center was*," and that that was where he demonstrated Autonomy software.  Mr Kalbag explained that that was also demonstrated to him. Thirdly, a "Test, Evaluation and Integration Laboratory". (Dr Channing explained in the US that that was also built, and Autonomy software had been used there).

343.   As to (b) in paragraph 340 above and the commercial rationale for the ATIC transaction, Dr Lynch told me that, after initial lack of interest, Autonomy then had a change of heart after Autonomy had installed a system for GCPD (which he explained referred to *"a number of UK intelligence community systems"* generating or storing classified items which Dr Lynch referred to as *"secret squirrel"*). The reason for this change of heart was that Autonomy had no cleared facility to demonstrate its capabilities to these customers. ATIC was identified within Autonomy (principally by the Defendants) as a vehicle which might assist in boosting Autonomy's federal business by showcasing functionalities of multiple products to a wide range of government and intelligence agencies in a purpose-designed security-cleared demonstration centre, staffed by cleared personnel with extensive experience with cleared customers.[554]

344.   The federal business within Autonomy was an area that Autonomy was struggling to grow. Mr Kalbag,[36] a salesman in the federal business, accepted this. Mr Kalbag also accepted that this was an area of potential growth. He considered (which the Defendants' closing submissions did not mention) that what Autonomy really needed was wider exposure to more federal customers through *"a wider pool of integrators who are able to*

*sell your product rather than having to go through MicroLink"*[555].[556]  Mr Kalbag accepted that in theory having the ATIC was one route to giving Autonomy this increased exposure to federal customers.

---

[554] Dr Lynch was plainly intrigued by business with US and other Intelligence agencies and spoke almost conspiratorially of *"the Five Eyes"* services.  [36] Called by the Claimants.

[555] It will be recalled that MicroLink was a small integrator favoured by Autonomy as a VAR, which had what was known as a "GSA Schedule" which meant that it was pre-approved for conducting business with US Federal Government departments and agencies.

[556] Mr Kalbag's theory was that Autonomy should have been making more use of the larger resellers and integrators such as Lockheed Martin.  Dr Lynch explained the problem with this approach at paragraph 38(2) above, it would have made Autonomy beholden to the large Government suppliers, stripping out Autonomy's margin.  Mr Kalbag accepted that his approach would have meant paying over margin.

345. Dr Menell described this (in an email dated 16 December 2010 to Mr Scott and Mr Hussain) as potentially providing *"a massive advantage if we can offer in the US a fully accredited storage capability for protectively marked content"*. Mr Hussain (so he wrote to Dr Lynch on 14 December 2010) considered *"the income potential could be huge but would require some investment from us…"*.

346. Mr Kalbag accepted that all the technology described above was likely to be a useful way of showing technology to customers. Mr Kalbag accepted further that the proposed staff were suitable for the work, the staffing structure was appropriate, and the costs were reasonable in terms of running the facility.

347. The personnel costs were a large proportion of the proposed cost to Autonomy of the ATIC: but Mr Kalbag confirmed that the staffing levels in terms of numbers and relevant accumulated expertise were reasonable. The other main cost of the ATIC was equipment related. Mr Kalbag accepted that this was reasonable also.

348. The Defendants relied on a combination of Dr Lynch's description (which omitted (2) and (3) below) and email evidence as demonstrating an orderly approval process for the project, as follows:

   (1) On 5 November 2010 MicroTech had provided Mr Scott with an initial proposal. This costed the facility for only one year, at a cost of $3.745m.

   (2) In the thread of emails is one from Mr David Truitt to Mr Scott dated 5 November 2010 explaining that he had been provided with the Proposal by MicroTech to pass along, and commending the proposal as offering Autonomy *"a unique and strategic advantage that will ultimately result in growing market share within the Federal Sector."*

   (3) Mr Scott forwarded the email to Mr Hussain that same day (5 November), but nothing was done until 13 December 2010 after Mr Scott sent Mr Hussain a reminder, having himself *"Got another ping from MT"*.

   (4) On 14 December 2010 Mr Hussain forwarded the proposal to Dr Lynch, stating:

      *"Given the success of GCPD and MicroLink in providing services in the federal space I think it may be a good idea to begin considering the need for a data centre and test bed for cleared federal data and projects. I believe the income*

> *potential could be huge but would require some investment from us. This is a proposal for Microtech who now owns our*

> *GSA schedule I believe. If you think it appropriate, I can review with Pete and get some prices.*"

(5) Dr Lynch, who understood at the time that the opportunity had an intelligence focus, responded the next day: "*ok I assume this is secret squirrel so pls be careful who you talk to*". Mr Hussain responded that he would run it past Dr Menell (who was cleared) and that only cleared people would be involved. Dr Menell, when asked by Mr Scott whether he supported the purchase, replied:

> *"Yes, it's a massive advantage if we can offer in the US a fully accredited storage capability through protectively marked content"*

(6) Mr Scott negotiated with MicroTech over the price. On 22 December 2010 Mr Scott emailed Mr Hussain, Dr Menell and Mr Chamberlain with regard to negotiations that he had conducted on the one-year proposal, which he thought was "*the best we will do*". On 24 December 2010 Mr Scott explained to Mr Hussain, Dr Menell and Mr Chamberlain about the disadvantages of the oneyear limitation in the proposal, and that he had negotiated pricing under which the best achievable discount involved a 3-year commitment for $9.6m. Again, there has been no suggestion that Mr Scott was acting improperly in this regard. Dr Menell confirmed that the pricing looked "*in the right ball park if not relatively reasonable*". He recommended some due diligence on comparative staff compensation to see if there was any "*wiggle room for further negotiation*". Mr Scott had done the negotiation and did not think there was.

Mr Hussain approved the purchase. Mr Scott then forwarded the approvals, with a deal summary, to Dr Lynch, and followed that up later in the day with a further email *"just to clarify this has already been run by Andy, and Sushovan and Pete have both signed off."*

(7)  Dr Lynch approved it in terms which suggested that he had not read the deal summary but referring to an intelligence focus:

> "Ok i assume this is the spooky stuff...
> God bless America"

349.  Dr Lynch emphasised the point that in the round this was all a matter of business judgement.

350.  Turning to (c) in paragraph 340 above, Dr Lynch's position in his written closing submissions was that (i) the ATIC was purchased at fair value and (ii) the Claimants had not contended otherwise. As to (ii), however, the Claimants attacked the issue of fair value in their own written closing submissions, as has been referred to above. Further, Mr Welham had been instructed to assume for the purpose of his witness statement that *"what Autonomy paid for the right to use the ATIC licence substantially exceeded the value (if any) of the ATIC transaction to Autonomy"*.

351.  According to Dr Lynch:

(1)  Contrary to the Claimants' case, the increase in the lifespan of the ATIC deal from one year to three years at an almost three-fold increase in the price was not motivated by a wish *"to put MicroTech in funds to pay more of its outstanding debt"*; rather, Autonomy was interested in the arrangement continuing for more than one year because "*most government projects span more than 1 year from inception to award, with larger projects spanning 2 and 3+ years in many cases*". MicroTech offered terms for a multi-year arrangement including up to 5 years for $15.5m. In the event, Autonomy chose the option with the highest discount (16.77%), not the largest payment. This was $9.6m for 3 years.

(2)  Mr Kalbag accepted in evidence that the component parts of the cost summary were reasonable.

(3)  Dr Menell also thought at the time that the costs were reasonable given what was provided, but pushed Mr Scott to negotiate the best discount.  Mr Scott, who had been handling the negotiation, considered the price offered to be "very compelling".

352.  The Defendants placed reliance also on the review and approval of Deloitte (see (d) in paragraph 340 above). This was, in a sense, adventitious. In his witness statement, Mr Welham had stated that the ATIC purchase was not brought to Deloitte's attention by

Autonomy, and it only became apparent to Deloitte when a member of the Deloitte team came across it when reviewing Autonomy's general ledgers as part of their 2010 audit work.[557]

353.  Deloitte reviewed the ATIC purchase to satisfy themselves that it made commercial sense, was at fair value, and was not a reciprocal/barter transaction. In their workpaper  they were content with the rationale and price (though they caveated this with the statement that given the uniqueness of the purchase they had no "conclusive evidence"), and were satisfied that it was not a *"barter transaction"*.

354.  In relation to the construction and use of the ATIC (see (e) in paragraph 340 above) the Defendants contended that the facility was built, that whilst some features were not yet included it was capable of being and was used successfully for the purposes for which it was of utility to Autonomy, and that there was nothing in the Claimants' case that the purchase was a contrivance to put MicroTech in funds.

355.  The ATIC was under construction by MicroTech in the first half of 2011. Dr Channing, who was the main designer, developer and operator of the ATIC and was highly experienced with Autonomy software and an enthusiast about it, also gave evidence in the MicroTech case in the US in relation to the building and subsequent operation of the ATIC.  The Defendants referred to the following points, which they maintained were not disputed by Mr Kalbag, who (they said) had *"positively endorsed"* some of them:

    (1)  The costs of designing, developing, building and operating the ATIC between 2011 and 2014 were in excess of $8m. Mr Kalbag confirmed: "*Well I saw it, so I can imagine that may be a fair price.*"

    (2)  As regards Autonomy being showcased without its competitors, Dr Channing's evidence was:

> "Q.    Were any of Autonomy's competitors ever a part of ATIC?
>
> A. No. The many competitors for Autonomy were other discovery engines, like FAST that Microsoft had and some others, but we never -- no, we never had a competitor for Autonomy.

---

[557] Dr Lynch was keen to emphasise that the transaction was visible on Autonomy's ledgers, to which Deloitte had open access, and was not concealed in any way; and that Deloitte always had full access to Autonomy personnel.

> *That was always our number one
> search and discovery engine."*

(3)   The centre first opened in July 2011. Demos were run
for customers and the ATIC had around 1800 customers
from 300 organisations.   Contrary to the Claimants'
assertion that the ATIC was not used, Dr Channing's
evidence was:

> *"During the time that the facility was
> open, our best estimate from people
> signing in, we had about 1,800
> visitors they were from about 300
> different organizations and 21
> different countries.   And I did
> almost all those briefings."*

(4)   Dr Channing confirmed that he got the basic form of
IDOL to do live demonstrations, though (and it is of
some note) he added (a) *"we didn't get any of the
peripheral – we would keep asking…"* and (b)
demonstrations were further restricted because *"…there
was a portal that had numerous applications of
Autonomy and they would not give us – we couldn't get
access to that portal"* (unless an Autonomy rep. was
present who could provide a login and password key).
He added that Autonomy was in every briefing that he
gave.

(5)   Dr Channing pitched to commercial clients as well as
Government clients, but the Government clients were
the majority.  The Government institutions to which Dr
Channing gave demonstrations included all the "three
letter organisations", by which he meant intelligence
organisations.  They also included health organisations,
the Army and Department of Defence.

(6)   Mr Kalbag accepted that the ATIC was built and he saw
it. He thought it a *"great showcase"* (though see below).

(7)   The ATIC was also visited and used by HP. There is also
documentary evidence that HP and MicroTech were also
planning various demonstrations of Autonomy software
in the I2C (i.e. ATIC).

356.   The Defendants accepted the Claimants' contention that some
features or proposed functionalities of the ATIC were not built;
but they submitted that the Claimants had exaggerated this and
that in any event they had missed the point, which was that the

main features of the ATIC were built. Thus, according to the Defendants:

(1) The Claimants referred to the fact that MicroTech did not construct the "mobile data center" for Autonomy, and sought to make some play of the events relating to this aspect of the facility: but the Defendants depicted this as immaterial on the ground that that part of the proposal was not even costed in the proposal. The Claimants dismissed this as misconceived.

(2) Certain *"more subordinate features of the facility"* were not built; but according to the evidence of Dr Channing in the MicroTech proceedings, the *"medical scientific research solution"* was not provided because MicroTech did not have the requisite licences; the Department of Defence record management and archiving solution was not installed because it was decided that the facility already had *"the ability, with resources, to implement most of the listed capabilities"*; and the Intelligence/Investigative Solution was not provided because, in the event, Autonomy did not want or support it. As to the test evaluation laboratory, Dr Channing's evidence was that this was built, and had IDOL software running on it (points which were glossed over by the Claimants), albeit that it did not have other Autonomy application software. The Defendants submitted that none of this impacted on the commercial rationale or fair value of the ATIC investment at the time that it was made.

357. In conclusion, the Defendants rejected the Claimants' criticisms of the merits and purpose of the ATIC purchase as *"misguided in any event"*. They depicted the Claimants' presentation as having *"ignored the fact that MicroTech did build the ATIC, and did employ the highly experienced staff who had been recruited for it"*. That is what the funds provided by Autonomy paid for; they did not fund repayment under VT13: the money could not be spent twice. In the round, they accused the Claimants of building a *"distorted case though their witness statements, in particular from Mr Kalbag"* and submitted that when it came to his cross-examination, *"he in fact accepted most of the propositions which undermined [sic] the Claimants' case."*

*My assessment of the dispute re the ATIC*

358. There was exaggeration on both sides of the record in their respective cases concerning the ATIC.

359. The Claimants' alleged that the ATIC was little if anything more than a room and a vehicle trailer, largely uncompleted, the only purpose of which was to demonstrate MicroTech's own capabilities and which was of no utility to Autonomy because all its demonstrations could be done more easily on a computer screen were overblown.

360. On the other hand, I do not consider that the Defendants' accusation against the Claimants of presenting a highly *"distorted case"* was appropriate or made good; and they never satisfactorily provided any realistic and reasonable explanation of why it was and how it was justified that alone among all the companies whose software was demonstrated in the ATIC, only Autonomy paid for the privilege, still less how the privilege of a three-year non-exclusive licence justified a price in excess of the entire build and most of the manpower bill. I address both sides of the argument in more detail below.

361. It seems clear, for example, that the Claimants' suggestion, based on Mr Kalbag's evidence in his witness statement, that the ATIC facility was not used by Autonomy or any of its customers,  was exaggerated. The Defendants could point to a number of emails suggesting some use; and to the evidence of Dr Channing[558] that he demonstrated Autonomy software in the part of the facility referred to as the *"Emerging Technology Center"*,  that there were many customers visiting the ATIC including all the *"three letter"* organisations [559],   and that he mentioned Autonomy software in every briefing that he gave to visitors to the facility, which he numbered at about 1,800. However, the Claimants' broader point was that, in circumstances where Autonomy had spent $9.6 million on the ATIC licence of just three years, one might have expected an urgent and major effort to use it and deploy all Autonomy's range there: but there is no evidence of any such effort at all.

362. To take another example: the Defendants submitted that the Claimants had miscast Mr Steve Truitt's evidence given at the US criminal trial that a purpose of the ATIC was to obtain funds with which to pay down MicroTech's debt to Autonomy. They submitted that the Claimants should have made clear that the idea had come from Mr David Truitt and was not that Autonomy

---

[558] Dr Channing stated in his US evidence in the MicroTech proceedings that *"People call me an Autonomy zealot because I super-believed in the software and capability and things that it can do for society and government"*.
[559] Signifying (as explained by Dr Channing in his evidence in the MicroTech proceedings in the US) intelligence services, health organisations,  the Army and Department of Defense.

should simply fund MicroTech but that MicroTech should come up with a genuine business transaction that would create value. However, Mr Steve Truitt's evidence (admitted as hearsay) gave the strong impression, to my mind, that the transaction was taken up by Autonomy as a useful funding mechanism, even if it may have had other potential advantages (for MicroTech itself especially):

> "Q.  Okay. And -- and is it correct that David Truitt said to you in substance that getting Autonomy involved in some way relating to the ATIC would be a way to get money -- would be a way to get Autonomy to pay money to MicroTech that could be used to pay down what was owed on paper with respect to the Vatican deal?
>
> ...
>
> THE WITNESS: Yeah, in a nutshell.
>
> Q.   Okay. And --
>
> A.   The thought being that we could create value in excess of the cost, ideally, and that would be a way that we could do business with them directly that would allow us to earn the money to pay out from under these debts for the ones that weren't closing that we had taken on."

363.  It is dangerous to parse or read too much into hearsay evidence of this kind: but the impression I was left with, having regard to the context, was that funding was at least a major driver, and utility to Autonomy a subsidiary consideration. ATIC was a useful vehicle. That impression is in part informed also by the notably limp way in which Autonomy pursued any opportunity offered by the ATIC facility (see paragraph 361 above).

364.  It is also informed by the clear coincidence between the payment made by Autonomy for the ATIC and the use of the funds by MicroTech to discharge MicroTech's debt. The Defendants characterised this as *"an insubstantial point"*. They contended that it was *"unsurprising that Autonomy would want to pay its debts promptly, and even more unsurprising that Autonomy would expect a debtor customer to pay Autonomy when*

---

*Autonomy made its payment."* I have not found this convincing: it smacked to me of special pleading and overlooks

and seeks to deflect attention away from the manner and circumstances in which the price was agreed and then agreed to be revised, and the way the payment to MicroTech was made. In particular:

(1) As Dr Lynch accepted in cross-examination, in mid-December 2010 Deloitte were pressing to know when MicroTech would pay down its debt.

(2) I agree with the Claimants that the link between agreeing a purchase of an ATIC licence from MicroTech, and the collection of MicroTech's overdue Vatican Library balance, all before imminent year-end, is clear.

(3) The only evidence advanced in support of the price agreed for a one-year deal (of $3.3 million), and then $9.6 million for a three-year deal with a commitment to pay in 2010, was Mr Scott's evidence that this was the product of negotiation; but Mr Scott's evidence indicated that Mr Hussain was involved throughout and he stated at the criminal trial that the impetus behind the increase in the size of the deal came from Mr Hussain, who *"said to me he would like to do a larger deal with MicroTech in the 9 to 10 million-dollar range and asked me to take that back to Dave Truitt, at which point I did, and this reflects the larger deal that Sushovan had asked for"*. That is not a negotiation at all. I see no reason not to accept that evidence, which I consider to be inherently plausible, especially given the pressure to ensure repayment. There was no real evidence of fair value.

(4) The only documentary basis for the ATIC transaction was a one-page purchase order referring to the ATIC as described in MicroTech's Proposal and providing for payment of $9,600,000 on 31 December 2010, without further terms. The Proposal was written in marketing language and made no attempt to define the parties' legal rights and obligations. Mr Scott made the point which I also accept, that typically an investment of almost $10 million would be the subject of detailed terms and conditions.

(5) The obvious inference is that none was needed because the product was not the principal purpose: it was the payment by the end of the year, and not the ATIC or the parties' plans in respect of it, which was the essence of the arrangement. Likewise, there was no specified requirement for, and no evidence was provided of, build progress or the like. MicroTech's "Proposal" for the

ATIC was in the form and style of a marketing document, proposing an idea, not a business plan: but that is all Autonomy ever got.

(6) The purchase price covered (a) payment of the full salaries for three years after construction of five MicroTech employees who were to staff the ATIC and (b) the entirety of the construction costs of the ATIC facility, in circumstances where Autonomy got only a three-year non-exclusive licence to have its software displayed in that facility.

(7) Furthermore, the entirety was payable in advance, and was in fact paid in full in advance on 31 December 2010. I agree with the Claimants that none of this made commercial sense.

(8) The acceleration of payment, together with the immediate payment down of MicroTech's debt that same day, is also consistent with, and in my judgment in the context supports, the Claimants' case. So too does the fact that there was apparently no record of the five MicroTech employees (for whose services Autonomy supposedly paid $2,874,000) ever performing any material services for the Autonomy group. The Claimants suggested that the evidence of Dr Channing was that the principal person who was to undertake work was Dr Mayall, who had not spent anything like the 1500 hours per year on Autonomyrelated projects that had been budgeted (and paid) for; and neither Mr Guzman nor Mr Kirsch had spent appreciable time on Autonomy-related projects either; and that in fact only some $200,000 had been spent on the salaries of two engineers who, with Dr Channing himself, did some Autonomy-related work. Yet Autonomy had made no complaint.

(9) In addition, and to my mind of particular importance, there was no evidence that any other company was prepared to or did pay anything in return for the usage of the ATIC.  In his deposition in the MicroTech trial, Mr Steve Truitt professed not to know whether that was the case or not. Dr Channing was closely questioned about the issue in the MicroTech trial. It is fair to note that he made clear that he had nothing to do with cash receipts: but he did not make clear, and it was never mentioned, who did. In any event, it seems to me to be most unlikely that he would not have had any awareness at all about cash support for the project, even if he was

not involved in accounting for it. He was not able to point to a single contribution from any of the various entities that had their products featured in the ATIC. These included HP: and if HP had contributed any money, it would have been easy for it to have provided evidence accordingly. I infer that it made no payment; and if it did not, the further inference is that others did not either.  In other words, Autonomy paid \$9.6 million for something for which the others in the non-exclusive group using ATIC paid nothing. That seems to me strongly supportive of the Claimants' case.

(10)     Dr Lynch's perceived "trump card" was the notion that since MicroTech built and paid for the facility, the money paid cannot have been intended to be, and could not be, used to discharge indebtedness: as Dr Lynch put it: *"It's a real thing. It's really built"*: *"I don't understand how you spend money twice".* This is not the answer Dr Lynch appears to have convinced himself it offers. To my mind, it presents another point against his case. There is nothing to suggest that the build costs of the ATIC had to be met immediately. It was a valuable asset in MicroTech's ownership. There is no reason to suppose it had no other means or facility to fund it. Even more obviously, the undisputed fact is that a substantial proportion (amounting to \$6.3 million)[560] of the money paid by

---

Autonomy came back to Autonomy in discharge of MicroTech's debt that same day: it is certain that most of Autonomy's money did not fund the ATIC.

(11)     Large parts of the ATIC as originally proposed were never built. Dr Channing testified in the MicroTech trial in the US that MicroTech did not construct (i) the mobile data centre featured in its original proposal; or (ii) the *"medical scientific research solution"* promised in that proposal; or (iii) the Department of Defence record

---

[560] Of that \$6.3 million, \$1.89 million was used to settle MicroTech's debt on VT6 (end-user Honeywell) and \$4.321 million was used as a part payment on VT13 (end-user Vatican Library). MicroTech made further payments in respect of the remaining debt by payments of \$2 million in April 2011 and \$2.4 million in early July 2011 (which the Claimants contended was paid using funds received by MicroTech from DiscoverTech, which, in turn, had been received from Autonomy in the context of VT30). The remaining \$2.3 million of the total of \$11.55 million was never repaid. Instead, it was written off as at 30 September 2011 (three days before the HP Acquisition completed).

management and archiving solution described in the proposal; or (iv) the intelligence investigation solution promised in the solution or (v) a test evaluation laboratory using Autonomy applications. Mr Kalbag confirmed that he was not aware of MicroTech having built any of this. Yet noone from Autonomy ever pressed MicroTech to deliver any of these things, as Dr Channing confirmed in his evidence in the MicroTech trial in the US. Dr Lynch also told me in cross-examination in these proceedings that he took no steps to find out whether MicroTech had built what it had promised. That too is consistent with, and in my judgment supportive of, the Claimants' case that Autonomy did not need the ATIC and was largely indifferent to it: and that it was a funding operation not a commercial investment.

365. As in other contexts, I do not consider the fact that *"Deloitte analysed the transaction and were content with the rationale and price"* is the trump card that the Defendants suggested it was. Had Deloitte known, as I have found to be the case, that (a) Autonomy had no real need or intended use for the ATIC and/or (b) its real objective was to ensure that funds were available to MicroTech to enable it to pay down the majority of its liabilities to Autonomy, they would not have agreed to the accounting treatment accorded to it, as Mr Welham expressly confirmed.

366. The context tells against the depiction of the correlation between payment and repayment being an insubstantial point. The circumstances as a whole, as well as the back-history, tell against the ATIC deal being simply a self-standing arrangement born of a coincidence of interest and the payments and repayments made being in the ordinary course of trade; MicroTech plainly needed to find some way of funding its debt; it had always expected that Autonomy would find or accede to some means of achieving that; the correlation between payment and repayment was legitimately relied on by the Claimants as a further indication that the ATIC deal was the way that was found.

367. In my view, the Defendants' depiction of Mr Kalbag's evidence as in effect helping them more than it hindered them was based on an unfortunately selective reliance on evidence which in the round gave a very different picture. I can take a few examples to illustrate this:

(1) The Defendants submitted that Mr Kalbag *"ultimately agreed with most of the commercial rationale that Autonomy had at the time"*. But in fact, what Mr Kalbag told me was that *"it didn't make sense"*. He elaborated:

> *"I think in general there are many big integrators who have these showcases, so there's nothing wrong with having that. I think the issue is that for most of our software we would do the sales and even MicroLink would do the sales by going to the customer and being at the customer's site. Also Autonomy software was pretty much back end software, it wasn't something that was very exciting graphically.*
>
> *Autonomy specifically decided not to focus on user interfaces as much as possible, so the idea that putting in a very expensive demo centre where, you know, what you're trying to show is archiving or some other thing that you can show on a laptop, it just – to me, it didn't make sense, and at the time I wasn't even aware that we had paid for it so my impressions were based on what I saw when I went to see a demo of it, it didn't even seem applicable to what our sales people were trying to do."*

(2) The Defendants cited Mr Kalbag's evidence that the ATIC was a *"great showcase"*; but they omitted to mention that he went on in the next phrase to say:

> *"The problem was that the majority of that…centre was focused on hardware and not our software. I mean, when I left that demo, I was like this is a great showcase for Microtech possibly - I didn't even know what their business was – but I did not feel that this was, you know – like I would have been super surprised that we had actually paid for it at that time…"*

(3) Later in his cross-examination, though accepting that MicroTech would be *"leveraging its own ability to sell into the federal space and to provide services in the federal space"*, which might assist Autonomy when using MicroTech as a VAR, Mr Kalbag elaborated as follows:

> *"It might help them sell more hardware for Microtech and that was the impression that I left…it was that this is a demo centre for Microtech…this was a Microtech demo centre, and yes, there was a room with our technology in it, but I never brought a customer to it afterwards…I can tell you for sure that the*

> *impression that was left on me after seeing the demonstration…was that this was primarily around selling Microtech's capabilities…than the primary purpose being for Autonomy…"*

(4) He responded to the arguments put to him that nevertheless Autonomy might be assisted as follows:

> *"So I mean, you know, I think all of your arguments and what you're asking me is in theory and I would argue, yes; <u>just when you add it all up it doesn't make sense to me."</u>* [My emphasis]

368. Even if Mr Kalbag tended to overlook that though primarily a showcase for MicroTech the ATIC could be and was a useful and successful display centre for others, there was no logic in Autonomy paying nearly $10 million for 3-years of rights and benefits other companies got for free without limit of time: that did not make sense. Although the Defendants sought to wrap this in the clothing of a business decision, it is still necessary to be satisfied what business rationale lay behind it: and I have not been persuaded that there was a business rationale for paying so much for what others paid nothing. Some other rationale must have driven that decision.

369. In short, I have concluded and find that the real point of the payment (for the ATIC), and its calibration, was to get as much by way of funding as possible to MicroTech to enable it to make payments in part payment of its obligations and in satisfaction of Deloitte's expectations and concerns.

*Defendants' knowledge of VT13 and the ATIC transaction*

*Mr Hussain*

370. The Claimants' principal submission with particular reference to Mr Hussain's role in VT13 was that he knowingly misled Deloitte (a) first, by giving them to understand that the Vatican Library had been informed that the licence was to be supplied through MicroTech: they alleged that he must have known that what he was telling Deloitte was untrue, and in any event, there was certainly no factual basis on which he could have believed it to be true; and (b) secondly, by representing to them during the FY 2010 audit that MicroTech had concluded a sale to the Vatican Library and that the only reason why Autonomy had yet to be paid was that the Vatican Library had yet to pay MicroTech.

371. As to (a) in the preceding paragraph 370, Mr Hussain relied on Dr Lynch's evidence that the fact of MicroTech's involvement was well known to the Vatican Library's agents (see paragraph 321 above). As to (b) in that paragraph 370, Mr Hussain made the point that it was quite apparent from, for example, the notes for the audit planning meeting and Dr Lynch's evidence that Deloitte were well aware that there was no deal between MicroTech and the Vatican Library.

372. I have determined (see paragraph 322 above) that Dr Lynch had no basis for supposing that the Vatican Library had been informed of MicroTech's involvement, and his evidence amounted to an acknowledgement that they should have been, in accordance with ordinary procedure. I find that as the Vatican Library later told HP (see their letter referred to in paragraph 306 above) they were not told, and that Deloitte were misled in being given to understand otherwise.

373. I have also determined that Deloitte were told that MicroTech had made a deal with the Vatican Library as end-user, that the Vatican Library had been informed that MicroTech was to be the supplier of the software sold, and that MicroTech would thus receive payment from the Vatican Library. Deloitte's working paper makes the above clear.

374. In my judgment, Mr Hussain knew the true nature of VT13 and did mislead Deloitte.

375. As to the ATIC, the Claimants contended that it was Mr Hussain who fastened on MicroTech's proposal (in an email from Mr David Truitt dated 5 November 2010, which Mr Scott forwarded to Mr Hussain that day) for Autonomy to purchase a licence to use the ATIC as a means of funding MicroTech under cover of a transaction which could be presented as having a separate commercial purpose; and that Mr Hussain's true objective was demonstrated by (a) his emails chasing for closing of the deal to enable MicroTech to make a payment which would assuage Deloitte's concerns about its outstanding obligations and (b) the impetus he gave to increasing the licence fee payable by Autonomy.

376. Against this, Mr Hussain adopted Dr Lynch's case that the ATIC transaction had a rational commercial purpose at the time it was made, and that no complaint could legitimately be

based on his part in representing the transaction accordingly to Deloitte. In his written closing submissions, Mr Hussain summarised the position as follows:

> *"it would be fair to say that Cs' case that Mr Hussain misrepresented that there was a commercial rationale for the transaction collapsed at trial. Sameer Kalbag conceded that AU was struggling to grow its federal business; that it had insufficient exposure to US government agencies; that the use of a demonstration unit was a recognised way to increase exposure and to showcase the functionalities of software; and that ATIC was a means of achieving these ends. When he was shown MicroTech's proposal document for the ATIC he agreed that it was a useful way of showing technology to customers. The furthest his evidence ultimately went was that it was a matter of business judgement whether the ATIC was the best route for addressing Autonomy's admitted need to improve its federal business, or whether there was an alternative or lower cost route. Indeed, it emerged during his evidence that his alternative proposal of demonstrating AU's software to US intelligence agencies on a laptop would not have worked: Mr Kalbag did not have any clearance level to do such a thing."*

377.   For the reasons I have stated at some length above, I disagree with this assessment. Mr Hussain was, I consider, the principal proponent of the ATIC deal as the means of enabling a substantial payment down of MicroTech's debt before the year-end as Deloitte had emphasised was important and they expected. In my judgment, he knew that the ATIC deal was primarily a means of enabling MicroTech to pay and Autonomy to honour MicroTech's expectation that it would not be "left on the hook"; and Mr Hussain had "guilty knowledge" of the impropriety of the accounting treatment both of the ATIC deal and of VT13 accordingly.

*Dr Lynch*

378.   Dr Lynch, who was cross-examined at some length about his knowledge and involvement in VT13, accepted that the project was certainly a contender for the *"biggest ever single deal done by Autonomy"* and that he was well aware of it at the time. He was also *"kept appraised of how it was going"*. He emphasised, however, that he *"wasn't at the level of actually negotiating it or doing the technical details…"*. He denied being aware of any impropriety in the transaction or the accounting treatment of it, and he submitted that the Claimants had not shown *"even the vestige of a case"* to show that he was.

379.   I do not agree. In my judgment, it is more likely than not, and I find, that Dr Lynch was well aware that MicroTech's introduction

into the Vatican Library deal as a VAR (of which he accepted he was aware at the time) was solely to enable Autonomy to book revenue from a transaction to which MicroTech was (except for the purposes of remuneration) in substance a placeman. Although Dr Lynch told me he thought that "agents" for the Vatican Library knew of MicroTech's involvement this did not carry conviction (and I have determined against it above).

380. I think it more likely than not, and I find that at the time (a) Autonomy had had to resort to a VAR precisely because funding for the Vatican Library project (from the unnamed *"Mexican billionaire"* from whom Dr Lynch told me a large donation had been on the brink) had fallen through, and the deal was bound to be substantially delayed since the Vatican Library was unwilling to fund the project itself; (b) Autonomy had no intention of stepping back from the negotiations and no intention or expectation of MicroTech becoming involved from the US in any way in such negotiations (for which MicroTech was singularly badly placed and ill-equipped in any event); (c) MicroTech had limited reserves and could not realistically have taken on an $11 million risk without assurances that it regarded as water-tight (Dr Lynch's suggestion to me that he would have been happy on behalf of cash-rich Autonomy to pay such a sum for the opportunity of being involved in such an important project being entirely inappropriate in the case of cashstrapped MicroTech).

381. I also consider it more likely than not, from the available evidence and my own impression when Dr Lynch was cross-examined and sought to dispute what was put to him along these lines and to blame Deloitte that (i) Dr Lynch was aware that Mr Hussain had told Deloitte that the Vatican Library had been informed of the sale to MicroTech, and knew this was not correct; and (ii) he was also aware that Deloitte was consistently given the impression, which was reflected in their reports which were sent to Dr Lynch, that MicroTech was dealing with and expecting payment from the Vatican Library as enduser, and that this was untrue.

382. In summary, I have concluded and find that Dr Lynch knew that the sale to MicroTech was not intended or expected to result in any substantive change in the way Autonomy dealt with the Vatican Library in respect of the goods "sold", or in the way the goods would be made available to the Vatican Library if the sale still hoped for by Autonomy to the Vatican Library did eventuate. He knew further that Deloitte had been given to understand otherwise, because it was necessary for the purpose of their approval of revenue recognition that the "sale" to MicroTech should be regarded as having real substance. This was typical of a pattern of which he was more generally aware, and a further

demonstration of his "guilty knowledge" in respect of all the impugned VAR sales.

383.   The Claimants also cross-examined Dr Lynch in respect of the ATIC transaction, again at some length. I have set out the process by which the proposal was assessed and the sequence of steps leading up to approval of the proposal in paragraph 348 above.  Dr Lynch's position was that:

>   (1) (as he put it in cross-examination):
>
>   *"The decision by Autonomy to buy it had nothing to do with the collateral effect of creating cash flow for MicroTech, Of course MicroTech still has to spend all the money to build this thing, so it's not getting free money here. It can't use the money twice."*
>
>   (2) He was not involved in the detail; for example, he maintained in crossexamination that he did not even know that the proposal was originally for a oneyear deal.

384.   Dr Lynch's more general involvement is clear. Also clear to me, from my observation of him when giving his evidence, was the particular pride and interest he had in the application and use of IDOL in the intelligence community and its usage in the *"secret squirrel"* sphere[561]. I feel sure that had the purpose of the ATIC deal been, or predominantly been, to provide the means of marketing to the *"Five Eyes"*, Dr Lynch would have made sure that he was closely involved in it. He liked what he called *"the spooky stuff"*.

385.   As it was, however, Dr Lynch told me he *"wasn't particularly involved in the details"*.  He told me that he had no memory of the original one-year proposal because *"it wouldn't have been very useful for just one year"*, and said that would not really have been of interest. He rejected as inaccurate the suggestion put to him that *"it went from a one-year deal to a larger deal because Mr Hussain wanted to do a deal in the 9 to $10 million range"*; and he denied that Mr Hussain had explained to him that Autonomy needed to make a large purchase to put MicroTech in funds to pay down its outstanding debt, repeating once more (as he did again and again) that he could not see *"how you could use the money twice in that hypothesis"*. He added that although payment of the debt by MicroTech was important *"you know, at the end of the day they can just have a provision."*

---

[561] Dr Lynch explained in cross-examination: *"GCPD…represents a number of UK intelligence community systems and the reference to "secret squirrel" is a reference to classified items."*

386.  Dr Lynch thought he was more likely to have discussed the transaction with Dr Menell than any of Mr Hussain, Mr Chamberlain and Mr Kanter, since Dr Menell was cleared to a high level and had been identified by Mr Hussain as the person to make the recommendation on the transaction.  He shrugged off Mr Kalbag's evidence as *"the sort of idle musings of a mid-level sales person…"* and Mr Kalbag's suggestion that Autonomy did presentations off a laptop as *"just crazy"*.

387.  Although he understood that the licence that Autonomy obtained was stated to be nonexclusive, so that there was nothing in it to stop a competitor company's software being showcased in the facility, he told me in cross-examination that there was *"an arrangement that they wouldn't put competitive software in there…"*  He had not mentioned this before, and when challenged as to whether that was documented he explained that this was his *"understanding of the arrangement"* and saying that he was *"pretty sure that it was agreed at some point"*. He added that in any event there was:

> *"also the de facto reality on the ground which is, if they had put a competitor in there, then they were reliant on us for their livelihood, it would have been the dog that bit the hand that fed it."*

388.  There was, to my mind, something in this, notwithstanding that (as the Claimants remonstrated) it had not been a point made by Dr Lynch before, and it was advanced in a somewhat smuggled way. There was some support for this in the original Proposal and in the evidence of Dr Channing in the US MicroTech proceedings. In the Proposal, it was stated that *"MicroTech envisions the ATIC as the primary Autonomy solutions demonstration center on the U.S. East Coast"*. Dr Channing's evidence (admitted in these proceedings as hearsay) was that (a) the reason why the licence was non-exclusive was because Autonomy's software needed hardware infrastructure (some of it supplied by EMC, but with other makes, according to Dr Channing, *"that our Government partners might be using"*); but that (b) none of Autonomy's direct competitors in unstructured data (such as Microsoft FAST) were showcased: MicroTech *"never had a competitor for*

---

*Autonomy. That was always our number one search and discovery engine"*. In addition to the fact that Autonomy had few competitors in that particular niche anyway (Microsoft's FAST being the only one mentioned), I accept that showcasing them would have been most unwise for MicroTech if it valued its connection with Autonomy (as of course it did).

389.   However, even if accepted, it does not dispose of the point that the ATIC was the showcase for a variety of hardware and hardware/software companies who made no payment at all. Nor does it address the point raised by Dr Lynch's own justification: if, because it valued its relationship with Autonomy, MicroTech would not have hosted and showcased a direct competitor, the payment did not secure Autonomy any more compliance than would have been afforded to it as a matter of MicroTech's commercial interest in any event. In my assessment, it is not likely that Dr Lynch did not appreciate these fairly self-evident points at the time.

390.   On the question of fair value, Mr Kalbag had already given evidence to the effect that the price for all the component parts of the ATIC was reasonable (see paragraphs 346 and 347 above); the Claimants put to Dr Lynch that nevertheless the amount paid for a three-year licence was so disproportionate to the overall cost of the ATIC itself as to be commercially irrational.   Dr Lynch did not accept this:

> "No, I don't agree.  What we had was access to the facility and that had a set of costs.  Those costs actually pretty much line up with what we paid, plus a small amount of profit for MicroTech.  And let's just remember, this thing was built.  The leases were taken on, the equipment was put in, the systems were set up.  People with stella-cleared CVs were employed and the whole thing existed.  That cost the money and you can go through the costing and it would pretty soon come out to what we paid plus a bit of profit for the poor people that are doing the work and it was all done.  You cannot spend the money twice, it's that simple."

391.   Dr Lynch was asked about Mr Kalbag's idea that a better solution for growing federal sales was to give a licence to an integrator which had its own demonstration centre.  This was a question of business judgment, and Mr Kalbag's idea was in any event flawed. Dr Lynch explained this:

> "Q.   Do you recall that Mr Kalbag said it would have been much cheaper to have given Autonomy software licence to an integrator which already had its own demonstration centre?
>
> A.   Yes, again, what we're doing here is getting the sort of idle musings of a mid-level

> *salesperson on what you might or might not
> do.  Let me take you through why that's a bad
> idea.*

Q.  *No, let me ask my question.  Do you accept that
> that is true, that it would have been much
> cheaper to give an Autonomy software
> licence to an integrator which already had
> its own demonstration centre?*

A.  *No, because that integrator would then control
> the customer and would take margin off of us
> which would cost us a lot of money and they
> may well bid our competitors against us
> which would also cost us a lot of money, so
> it would turn out to be a lot more expensive
> in the end. So the problem with these
> integrators is they have power with the
> customer, they control the customer and then
> they make their suppliers bid to supply them.
> So the reason why we have to have an
> independent channel is that we don't get
> squeezed like that.  The point being that
> MicroTech was sufficiently dependent on its
> Autonomy business that if, for example, we'd
> seen them bid our competitor into a
> situation, we would have had them under
> control, whereas if, for example, it was
> Lockheed Martin, then all Lockheed Martin
> would do is it would go around four or five
> to get the lowest price from the suppliers and
> it would keep the margin for itself. So a
> wholly unrealistic understanding of the
> reality of how these things work.*

Q.  *There's no evidence that anyone even thought about that
> alternative before deciding to pay $9.6 million to
> MicroTech?*

A.  *I spent about a decade working with that
> alternative and continually them doing
> exactly what I've just described of using their
> power in the marketplace to cram down their
> suppliers. What was really important in
> these areas was to have an independent route
> that you controlled to the end customer.  You
> needed to have people that could talk to the*

> *DIA or the CIA or the NSA or the NRO. As soon as you were going through Lockheed Martin, they would get you and the way they made money was to give a fixed price to the customer and then get the suppliers to bid against each other and you would lose all your margin because you didn't control the customer."*

392.  Dr Lynch was equally dismissive when asked about Mr Kalbag's evidence that he could demonstrate software on his laptop:

> *"Okay, I don't want to use the word "absurd" but in a first meeting  in a normal commercial environment you might turn up and show something to someone on a laptop, but in terms of any normal part of the sales process for multi-million dollar software sales, you can't show it on a laptop. Actually in this market you can't even show it on a laptop because you're not allowed to take laptops into the customers. Because the customers are sensitive customers, you're not allowed to take in electronic equipment. So, for example, if you go and visit the DIA, or over here their equivalents, you have to leave your phones and your laptops and everything in a special building away from the main building because you can't take it in. When Meg Whitman -- when I took Meg Whitman in to meet these customers, even she had to leave everything and her bodyguard outside. So the idea that you do this business off of a laptop is just crazy. The*
>
> *process for selling software like this is you may well have a first meeting and if it's not a cleared customer and you can show a laptop, you might put something on a screen. But then the normal procedure is to do a POC, which is a proof of concept, and a proof of concept is set up to show what the software can do, but also how it scales, how reliable it is, and that requires setting up a big server, and quite often you'll have to take data and show the customer what you can do with the data. That whole process of a POC can take three to four months. In the cleared case, what they will often do is give you analogous*

> *data, so data that's like their problem but it isn't actually their problem and then they want to do things like test scaling, so they want to test what it does under very large volumes, which of course you can't possibly put near a laptop."*

393. But in my assessment, Dr Lynch's aggressive attempts to dismiss Mr Kalbag's evidence was intended to deflect attention away from the unanswerable points mentioned previously: that no-one else paid to be showcased, that the primary beneficiary of the showcasing was MicroTech, and that the money it paid did not get Autonomy anything more than it had or had the means of obtaining already.

394. I accept that Deloitte approved the ATIC license deal. However, (a) there is no evidence that Deloitte were told or aware of the matters summarised in the preceding paragraphs, and they appear to have assumed that any entity which wanted to have the right to use the facility would have to pay a licence fee; and (b) Deloitte did not feel they had sufficient evidence[562] of fair value to opine, and left it instead to be dealt with by a representation letter confirming that the transaction "*was conducted on an arms' length basis and at fair value."*

395. In the round, I cannot accept Dr Lynch's case that he simply relied on others' assessment of the ATIC; and on what he knew he thought that it was a proper business transaction, and was entitled to do so. In my judgment, it is more likely than not that he was aware that the need and size of the payment was dictated by the necessity of providing funds to MicroTech to enable it to pay a substantial proportion of its outstanding debt at a time when Deloitte had expressed concerns. His suggestion that it was not a requirement, and that it was always an option simply to make a provision in the accounts, was disingenuous: the use of VARs to accelerate revenue when needed, which had become an essential part of the strategy to sustain the share price, would have been imperilled and probably fatally undermined.

*Summary*

396. I have spent some time on VT13 and the ATIC transaction, not only because of their size, and the extended analysis undertaken

---

[562] Deloitte stated that *"given the uniqueness of this purchase and the customer relationship being offered, we have no conclusive evidence, other than the signed contract and our knowledge of the sales potential of future deals into the US federal space to support this value further."* Since *"conclusive"* evidence in its literal sense must be rare in such a context, I take this to mean sufficient evidence on which to justify a conclusion. It is to be noted that there was no *"signed contract"* other than the purchase order.

by both sides, but also because these transactions, and their inter-play, seem to me to illustrate in highly coloured terms features or characteristics of the VAR transactions more generally. The transactions were not typical; but they are illustrative.

_____

397.  In my judgment,

(1) VT13 was contrived to generate recognised revenue in a substantial sum to cover a shortfall in circumstances where, to the knowledge of the Defendants, there was no real prospect of an end-user deal in the near or medium term.

(2) MicroTech was retained as a VAR as a matter of urgency because it was a friendly VAR which could be relied on to take on an enormous payment obligation such as to pose an existential risk because it knew the payment obligation would never be enforced unless and until Autonomy found the means of either funding or dissolving it.

(3) The ATIC was the means found to fund the obligation, and the Defendants knew that that was its true primary purpose.

(4) No revenue should have been recognised from the VAR sale to MicroTech. Both Defendants knew that too.

### VT25: MicroTech/DoI Q4 2010

398.  By comparison with VT13, VT25 was a simple transaction, but it also exhibits many of the characteristics of that and other impugned VAR transactions. It is chiefly remarkable for (a) the desperation about the prospects for software sales that appears from email exchanges to have been the context for Mr Hussain's resort to a VAR transaction at the end of Q4 2010, and (b) the issue of credit notes to MicroTech when no end-user deal materialised.

399.  In November and early December 2010, Autonomy had been negotiating with an existing client, the US Department of Interior ("DoI"), a potential deal for the restructuring of DoI's Digital Safe hosting arrangements for an upfront fee (which Autonomy could and intended to recognise as revenue). The prospect of a deal closing within Q4 2010 had seemed positive until (as recorded in an email dated 13 December 2010 from Mr Sullivan to Mr Hussain and others in Autonomy, but not Dr Lynch) DoI decided, for *"strategic"* rather than financial reasons, to *"pass"* on

Autonomy's offer and instead undertake a full procurement exercise and then *"evaluate all options"*.

400. A deal with DoI had been one of three (the others being BofA and Deutsche Bank) on which Mr Hussain had been pinning his hopes of (in his own words) *"covering up"* a shortfall on revenue forecasts for the quarter in what he described in an email to Dr Lynch dated 10 December 2010 as bad trading conditions with revenue falling away *"completely"*, calling for *"radical action, really radical…"*.

401. There was a longer lead time than usual before a VAR transaction was arranged: but the evidence does not reveal what happened prior to the issue of a purchase order. The purchase order for the transaction ("the VT25 purchase order") was issued on 31 December 2010 and was (as usual in the case of MicroTech deals) governed by the terms of the June 2006 MicroTech VAR agreement which expressly provided that MicroTech was obliged to pay Autonomy for its orders irrespective of its sale to an end-user. The licence fee was $4,000,000, plus a first-year support fee of $200,000.

402. The VT25 purchase order contained a provision also found in substantially the same form in VT20 (with Capax Discovery, see paragraph 846 below), as follows:

> *"Although End-User and VAR currently anticipate entering into such a license transaction, in the unlikely event End-User, instead, enters into a direct agreement with Autonomy or its affiliate to licence the Software, then VAR shall distribute the Software to End-User upon receipt of written notice (which may be via email) from Autonomy ('Distribution Notice') of such direct license transaction. In the event distribution is accomplished by reason of a Distribution Notice, upon such time as Autonomy has received payment in full for such license fee and support fee, Autonomy shall pay to VAR an amount equal to the license fee paid by End-User to Autonomy less the Licence fee described above…, but in no event more than US$400,000, as full compensation in connection with VAR's efforts in securing End-User's procurement of a license of Autonomy software."*

403. The Claimants submitted that this language was misleading in that (a) (according to them) the DoI had no intention of contracting with anyone to buy the Autonomy software licence and had made (according to the email of 13 December 2010 referred to in paragraph 399 above) a *"final"* and *"strategic"* decision to *"pass"* on the deal; (b) if (hypothetically) the DoI had been going

to buy Autonomy software, it would have done so directly from Autonomy and not from MicroTech; and (c) the software included Digital Safe: only Autonomy could implement, manage and service a Digital Safe Archive, and so MicroTech could not offer or provide any value to the transaction.

404. The Claimants further claimed that the language actually misled Deloitte. They relied on Mr Welham's evidence in his witness statement that the true facts would have been relevant to Deloitte's assessment of revenue recognition. The Claimants further claimed that Deloitte was also misled by untrue audit confirmation letters, signed by Mr Steve Truitt, confirming the absence of any side agreement or any continuing managerial involvement. They relied on Mr Steve Truitt's evidence in the US criminal trial (adduced as hearsay in these proceedings) as follows:

> "Q. All right. With respect to where it says no side letters or other agreements, was that true?
>
> A. No, because of, again, the fact that I was no longer worried about somehow getting the money to pay them.
>
> Q. And in the bottom here they've added (reading): "We acknowledge that Autonomy Corporation PLC retains no continuing managerial involvement in the delivery of this product or service other than stipulated in the license agreement." Was that true?
>
> A. It was not true and to my discredit, I didn't even notice the language at the time. But, no, it was not true. ..."

405. The Claimants also stressed Mr Steve Truitt's further evidence at the same trial as follows:

> "Q. After you signed this purchase order –
>
> A. Yeah.
>
> Q. -- did you or, to your knowledge, anyone else associated with MicroTech attempt to sell this software to the Department of the Interior? A. No.
>
> Q. Did you help Autonomy in its efforts to attempt to sell this software?
>
> A. No.

> *Q. Did you discuss with Autonomy what would be the terms of sale to the Department of the Interior? A. We didn't.*
>
> *Q. I'm sorry?*
>
> *A. No.*
>
> *Q. Okay. Did you – did Autonomy run by you terms that it was considering offering to the Department of the Interior or that it had offered to the Department of the Interior?*
>
> *A. No."*

406. As explained below, little was said of VT25 in Dr Lynch's submissions and there was little if any specific evidence suggestive of any participation in or knowledge of it after Mr Hussain's anxious email (see paragraph 400 above); but those submissions advanced the following correctives of what were described as the Claimants' *"tendentious"* criticisms of the transaction:

   (1) It was contended that the Claimants were wrong to suggest that DoI had made a final decision such that a licence could not have been sold to them and that in fact the DoI were still considering purchasing a licence. I am not persuaded by the email provided in support of this since it appears from the email that the license concerned was not for restructuring of the DoI's Digital Safe hosting arrangement, but for a smaller deal (still in excess of $2,000,000 though) for an email archiving system. In my view, even if the DoI had not finally closed the door on any deal when writing in December 2010, they had made clear that it was uncertain that they would.

   (2) The Defendants contended that the Claimants were also wrong to suggest that Mr Steve Truitt accepted in his evidence in the US criminal trial that the DoI would only ever have bought from Autonomy and not from MicroTech. Dr Lynch contended that the *"whole thrust"* of his evidence was that he was going on risk and intended to make the sales to the end-users with whom he would be establishing relationships. However, I cannot accept that either, at least in the general terms in which it was put. Later in the same transcript of Mr Steve Truitt's evidence, he was asked again about the DoI transaction; and he expressly accepted that that deal

> *"was Autonomy's to take care of"*. He never envisaged
> negotiating with or concluding an end-user sale to DoI.

407.  As it happened, and as was common ground between Dr Lynch
and the Claimants[563], Autonomy failed to conclude any deal with
DoI. Tellingly, the upshot of there being no end-user deal was not
that Autonomy required payment from MicroTech. Rather, it was
that on the last business day before the HP Acquisition closed, Mr
Chamberlain emailed Ms Helen Ku (an Autonomy revenue
manager) stating *"DOI – we need to credit the $4.2m
(4 invoices) and invoice direct. Have we not invoiced the DOI
directly."* The next day Ms Ku notified Ms Gustafsson and Ms
Anderson: *"We will reverse this revenue tmr."* Four credit notes,
each dated 30 September 2011, were then issued to MicroTech,
writing off the entire amount of MicroTech's debt. The obvious
explanation in the circumstances is that this honoured the
assurance that had been provided, that one way or another
MicroTech would not be left on the hook.

408.  As usual, the Defendants relied on the approval of VT25 by
Deloitte both as confirming its propriety and as an answer in any
event (that is, whether Deloitte were right or wrong) to any
suggestion that the Defendants knew that the accounting treatment
of the transaction was improper.

409.  Deloitte certainly reviewed VT25, including the provision referred
to in paragraph 402 above (which they noted in their report was
*"common to almost all VAR purchase orders"*). They were
satisfied that revenue recognition was satisfactory. They do not,
however, appear to have been told or aware that the end-user deal
with DoI as originally contemplated was no longer on the cards,
and that any surviving prospect of an end-user deal depended on
the inherently uncertain outcome of a full procurement exercise.

410.  The Claimants relied on Mr Welham's evidence in his witness
statement that this *"would have been relevant to Deloitte's
assessment of the revenue recognition criteria"* and that *"if it was
aware of this, I would have expected Autonomy management to
have told us this information".* His evidence did not, and could
not, anticipate what the result would have been; and I take it that
in this context he accepted, as in other similar contexts, that the
actual response would have depended on a *"whole series of
conjectures about what might or might not have happened"* (to
adopt the way Mr Miles put a similar issue to Mr Welham, and Mr
Welham accepted). Deloitte were also unaware that MicroTech

---

[563] There was a footnote in Mr Hussain's submissions which appeared to suggest
otherwise; but it seems clear that Dr Lynch and the Claimants were right.

neither intended nor was it expected to negotiate with DoI, and it was not in its contemplation to on-sell to DoI.

411.  In those circumstances, the fact of Deloitte's approval cannot assist the Defendants; on the contrary, the fact that they were misled in the ways indicated tells against them, particularly as regards the state of mind of anyone responsible for their instruction as to the characteristics of VT25.

412.  I have concluded in the circumstances described above that it was wrong for the sale to MicroTech in VT25 to be treated as generating recognised revenue.

*Did the Defendants have "guilty knowledge" about VT25?*

413.  I turn to the second issue, as to whether the Defendants had "guilty knowledge".

*Mr Hussain*

414.  The Claimants asserted that Mr Hussain must have been aware of VT25 and its accounting treatment *"since it is he who had to approve the recognition of the revenue."* No further evidence was suggested that he knew that its accounting treatment was wrong than is summarised above.

415.  I consider that by this time, late December 2010, the Defendants' obsession with meeting and beating revenue forecasts had become so ingrained that it displaced rational analysis of individual cases on the part of Mr Hussain and those concerned within Autonomy. The expedient of resorting to a friendly VAR if an anticipated end-user deal was delayed or likely to be delayed was now tried, tested, and virtually automatic. Mr Hussain had devised the template and would have expected it to be followed with such alteration as ensured revenue recognition in the quarter for which it had been anticipated, with any appropriate arrangements to be made to rescue and recompense the VAR if the deal went direct or did not eventuate.

416.  The credit notes were issued on 30 September 2011. The Claimants contended that the scale on which Autonomy *"cleaned up unpaid debts"* during the *"Dark Period"* was so extraordinary that:

> *"it is inconceivable that Mr Hussain was not involved (as Ms Harris agreed she would have expected, and as*

> *Mr Scott's evidence of Mr Hussain's desire to make the VARs whole also implies)".*

417.   I would accept the likelihood that Mr Hussain was involved, and that the person in direct control of the operation, Mr Chamberlain, was directed by Mr Hussain. I consider later, in the context of an analysis of write-offs in the *"Dark Period",* whether that in turn is further evidence of *"guilty knowledge".*

*Dr Lynch*

418.   Dr Lynch denied any involvement in the transaction. The Claimants did not allege that Dr Lynch had any specific knowledge of or involvement in VT25 (beyond the email from Mr Hussain mentioned above before any VAR deal, when a direct deal seemed on the cards). However, they invited me to infer that:

> *"Mr Hussain was acting within the scope of a broad authorisation from Dr Lynch to call upon friendly VARs as and when required to plug gaps in revenue."*

419.   Further, and with reference to the release of MicroTech's liability after no end-user deal could be secured, they added that it was not:

> *"...plausible that write-offs and credit notes on such scale could have taken place without the agreement of Dr Lynch – whose authority, it will be recalled, was required for all purchases over $30,000."*

420.   There was nothing else in the Claimants' Closing Submissions about this, and there was a dispute as to whether Dr Lynch had been cross-examined relevantly about the transaction.  If by this it is meant that he was not asked questions about the transaction prior to the issue of credit notes, I think that the Defendants are right that any challenge to him about the specifics of VT25 was perfunctory. But the Claimants' real points, as summarised above, went to (a) the general issue as to whether Dr Lynch was aware of the overall use of VARs and his approval of it and (b) the more particular issue as to the issue of credit notes in the *"Dark Period"* to extract MicroTech from any exposure.

421.   The Defendants dealt brusquely with the latter (the issue of credit notes), submitting that *"this was a post-transaction event, which could not have affected the original recognition of revenue."* They submitted further that:

> *"In circumstances where the end-user had chosen to deal directly with Autonomy so that Autonomy received payment for the software from the enduser it was a sensible business decision to cancel the reseller deal. The alternative would have been to leave the reseller on the hook despite Autonomy having taken the customer opportunity. That would have been damaging to the relationship."*

422. Those submissions are readily understandable but (at least in the context of VT25) ignore three important points. First, I agree with the Claimants that events post-transaction may (though they may not) reflect and expose the anterior intentions of Autonomy at the time of the VAR transaction. Secondly, in the case of VT25, there was no end-user deal, so the logic offered for cancellation of its exposure is inapplicable. Thirdly, the inapplicability of the logic offered is further confirmed by the fact that in VT25, there was never any question of the end-user electing as between MicroTech and Autonomy: MicroTech was, from its point of view, never involved at all.

423. In summary, I consider that even if Dr Lynch had no or little specific knowledge of VT25 at the time of the VAR transaction, the fact remains that he was well aware of and had approved the strategy of which VT25 was an example. I do not consider that it is likely, or even conceivable, that such a transaction would have been implemented without Dr Lynch's approval.

424. Further, even if (as I think is likely) Dr Lynch was not aware of the specific event of the issue of a credit note, the issue of credit notes and other means of extinguishing VAR liability of which again VT25 provides an example must have been approved by him. I consider later, in the context of an analysis of write-offs in the *"Dark Period",* whether that in turn shows awareness of some impropriety.

## **VT32 and VT33: MicroTech/Bank of Montreal and Xerox: Q1 2011**

425. In March and April 2011, Autonomy had been negotiating with Bank of Montreal and Xerox Corporation ("Xerox") an Autonomy software sale, in the latter case with a view to Xerox on-licensing the software to General Motors Corporation ("GM").

426. In the case of the Bank of Montreal, the deal appeared to have been given the *"Green light"* (as Mr Sass informed Mr Hussain by email dated 23 March 2011, circulated to Mr Egan, to which Mr Hussain immediately replied *"yeehah").* However, on 30 March 2011,

as the end of the quarter fast approached, the Bank of Montreal's representative (Ms Joanne Lafreniere) informed Mr Patrick Ryan (in Sales) at Autonomy that she had *"found out that the size of this contract with [sic] require the signature of our Group Head. We will not be able to get this done by eod tomorrow."* Although Mr Ryan sought to press by threatening in his email in reply that the *"deal dies tomorrow – and will cost BMO millions. No questions asked"*, Bank of Montreal was not to be moved away from its prescribed processes. When, on the evening of 31 March 2011, Mr Sass sent Mr Egan, Ms Eagan and Mr Hussain a status update on the transactions he was trying to close, he stated as regards Bank of Montreal *"not today"*. That same day, Mr Hussain sent Dr Lynch a blank email headed *"flagging a problem at Bank of Montreal – 3m – sass on his way there now."*

427. Similarly, Autonomy was not able to conclude a transaction with Xerox by the end of the quarter (Q1 2011). The reason given by Xerox, according to an email from Mr Sass to Mr Hussain and Mr Egan dated 28 March 2011 recounting a telephone conversation with Xerox, was that it could not approve the deal at that time, because of a spending freeze imposed in consequence of an earthquake in Japan, but that the freeze would not stop the deal and Xerox remained eager and expected closing to happen in early Q2.

428. On 31 March 2011, Mr Scott sent the following purchase orders to Steve Truitt, who duly (and it seems automatically) issued them on MicroTech's behalf:

> (1) One for end-user Bank of Montreal, with a licence fee of $2.88 million plus $144,000 for annual maintenance and $50,000 for annual premium support (VT32); and

> (2) One for end-user Xerox, with a licence fee of $1.17 million, plus $58,500 support and maintenance (VT33).

429. Both purchase orders were issued under the June 2006 MicroTech VAR agreement, summarised at paragraph 214 above.

## VT32: MicroTech/Bank of Montreal

430. Mr Steve Truitt's evidence in his MicroTech deposition (admitted as hearsay in these proceedings) was that (a) prior to issuing the purchase order he did not contact Bank of Montreal to establish the prospects of a deal being concluded; (b) MicroTech did not refer Bank of Montreal to Autonomy; (c) MicroTech did nothing after submitting the purchase order to try to sell the software to Bank of Montreal and (d) MicroTech did not control pricing or any of the terms of the Bank of Montreal deal.

431. MicroTech provided written confirmations to Deloitte on 19 April, 12 July and 14 July 2011 that the invoices listed in the confirmations relating to the Bank of Montreal deal were proper and due, that there were no "*side letters or other agreements*", and that Autonomy retained no continuing managerial involvement.

432. A direct deal was concluded between Autonomy and Bank of Montreal in June 2011 for a licence fee of $2.8 million.

433. In August 2011, Autonomy issued credit notes to MicroTech in respect of the amounts owing under the March 2011 purchase order. The Claimants drew particular attention to

the fact that on 16 August 2011, Mr Steve Truitt emailed Mr Scott, subject "*Bank of Montreal*", stating, "*Just got three credit memos from Chris Chu for Bank of Montreal Invoices. What is the back story on those? Thanks*". The Claimants submitted that it was surely remarkable that Mr Steve Truitt should receive a credit from Autonomy worth $3 million and not even know why this had happened. Mr Scott asked Mr Chamberlain, who explained, "*We had to bill direct as the BMO deal closed directly. Deal credited from MT's books*". Mr Scott forwarded Mr Chamberlain's explanation to Mr Steve Truitt.

434. The Claimants further submitted that Mr Chamberlain would not have credited these sums back to MicroTech without, at least, the authorisation of Mr Hussain; and that the decision to credit these amounts demonstrates that MicroTech's role was to act as a placeholder, and remain entirely disengaged while Autonomy proceeded to negotiate an end-user deal.

435. As always, the Defendants sought to rely on Deloitte's approval. Deloitte had reviewed VT32 and approved the decision to recognise revenue in respect of it in the amount of the purchase price. However, the Claimants' case, based on Mr Welham's evidence at the US criminal trial, was that he did not see the direct agreement between Autonomy and Bank of Montreal until he gave his evidence in chief, and that when they undertook their review Deloitte were not aware of the direct deal. He said in his witness statement in these proceedings that Deloitte:

> "*routinely requested that Autonomy provide us with all copies of licence agreements over $100,000 and…we had made clear to Autonomy management our concerns about VAR transactions being replaced by direct agreements with the end-user*".

436. The Claimants submitted that in those circumstances Autonomy's management were required but failed to bring these matters to Deloitte's attention during their Q2 2011 review, and that this can only have been a

> *"deliberate attempt to circumvent Deloitte's earlier warnings about the serious consequences for Autonomy's revenue recognition practices if further VAR agreements were replaced by direct deals."*

437. However, according to the Defendants:

(1) The direct deal was not a revenue deal because no additional revenue was being booked (it had been booked in respect of the VAR deal).

(2) Although Deloitte had separately expressed an interest in knowing about earlier VAR deals being "cancelled" or credited following a deal going direct, Autonomy would not normally do this unless and until it had been paid for the direct deal.

(3) Deloitte were in fact made aware of the deal later in 2011, as Mr Welham had to accept under cross-examination when confronted with documentary evidence to that effect.

438. I consider the Defendants' attempts to justify not having disclosed the full relevant facts to Deloitte at the proper time to be far from satisfactory:

(1) Deloitte had made clear its concerns about VAR transactions being replaced by direct agreements with the end-user after observing the Kraft (VT3), ManuLife (VT7) and Morgan Stanley (VT8) deals discussed earlier in this judgment (see paragraph 2180 in the main body of the judgment). They had explained on the basis that such direct deals called into question whether it had been appropriate to recognise revenue at the point of the original VAR transaction.

(2) Deloitte had given express warning to the same effect in their report to the Audit Committee for the H1 2010 review. Autonomy had acknowledged this and assured Deloitte that those deals were exceptional.

(3) Deloitte had made clear how important this was in their Q3 2010 report to the Audit Committee noting that (so

they understood) there had been no further reversals of transactions with VARs in the form of direct deals.

(4) The Defendants knew full well that Deloitte would have expected to be informed of any direct deals. The submission that the direct deal following VT32 was not reported because it was not a revenue deal since no additional revenue was being booked as it had been booked in respect of the VAR deal is nonsense.

(5) For the same reason the second point made by the Defendants is likewise nonsense.

(6) According to Mr Welham, whose evidence I accept, Deloitte were not made aware of the direct deal until October 2011, long after Deloitte's Q2 2011 review, and far too late.

(7) The Defendants' resort to reliance on Deloitte was misplaced: their conduct in failing to keep them properly informed is further confirmation of their awareness that if they had been so they would not have approved the recognition of revenue in respect of VT32.

*Summary assessment*

439. In summary, in my judgment, the 'sale' to MicroTech in VT32 had no substance, the only real sale being the direct sale to the end-users which Autonomy failed to advise Deloitte until far too late to make a difference to the way it was shown in Autonomy's accounts.

440. Mr Hussain's involvement and knowledge is clear. Dr Lynch's knowledge is, in my judgment, to be inferred from the 'pattern', from the unlikelihood that such a transaction would have been implemented without his knowledge and approval, and from the various factors I have identified in paragraphs 98 to 103 in the main body of the judgment as characteristic of the way he and Mr Hussain interacted and the business was run.

**VT33: MicroTech/Xerox**

441. After the issue by MicroTech of purchase order VT33, Autonomy continued to negotiate with Xerox, without any involvement by MicroTech. Thus, on 12 April 2011, in an email to Mr Hussain and Dr Lynch (among others), Mr Sass said that, as well as expecting closure on Bank of Montreal that month, he (Mr Sass) was also "*pushing for GM as well*". Mr Steve Truitt confirmed during his deposition that MicroTech made no effort to achieve a sale to Xerox. It is plain that it was not expecting and not intending

to do so: negotiations with, and any sale to, an end-user were left entirely to Autonomy

442. Nevertheless, MicroTech provided written confirmations to Deloitte on 19 April, 12 July and 14 July 2011 that the invoices listed in the confirmations were proper and due, that there were no "*side letters or other agreements*", and that Autonomy retained no continuing managerial involvement.

443. The negotiations were not concluded as rapidly as had been hoped. In the process, there was an episode during June 2011 when, in the course of Autonomy's ongoing negotiations with Xerox, Autonomy gratuitously inserted a reference to DiscoverEngine into the draft Xerox/GM contract, resulting in the need for Mr Avila to devise an explanation as to how that software would benefit GM. Although Autonomy had been hopeful of concluding a deal in Q2 2011, Mr Sass informed Ms Eagan and Mr Egan on 28 June 2011 that "*GM is a concern*".

444. In the event, it was not until 29 July 2011 that an Autonomy group company, Verity Inc, entered into a direct sale agreement with Xerox, for an amount of $1.3 million in respect of the licence fee plus support and maintenance, as well as a $14,175 fee for a Spanish module.

445. The direct agreement provided for Xerox to make payment, at Autonomy's express direction, to Autonomy's designated payee. On 1 August 2011, Ms Mickie Lee (an Autonomy lawyer) informed Xerox that MicroTech would be invoicing Xerox for the amount due. She explained that "*MicroTech is a minority and small business vendor*" (which suggests that Xerox had never heard of MicroTech). On 4 August 2011, Ms Lee sent a formal letter to Xerox in which Autonomy designated MicroTech as its payee. Ms Lee's covering email was copied to Mr Chamberlain.

446. On 26 October 2011, MicroTech paid Autonomy $475,572 and, on 23 May 2012, MicroTech paid $752,928, for a total of $1,228,500.

447. These payments were less than the sum payable by Xerox to MicroTech at Autonomy's direction. The difference was $85,675, which MicroTech retained. In addition to their reliance on VT33 in the context of their FSMA claims, the Claimants seek recovery of that amount as damages due to ASL or alternatively Verity Inc for the Defendants' breach of duty.

448. Deloitte again approved the accounting treatment of VT33, permitting revenue from it to be recognised as at the date of the VAR deal, and thus within the relevant quarter. Once more the Defendants placed reliance on this for the reasons explained

above, and also on the fact that Deloitte had expressly considered and approved the provision for payment to a "*designated payee*" of which use was made in this context. However, Deloitte's approval of revenue recognition in respect of VT33 was based on the same misrepresentation as in the case of VT32 (see above). The only substantive difference was the utilisation of the "*designated payee*" mechanism.

449. My conclusion that the sale to MicroTech in VT33 had no substance and that the only real sale was that eventually negotiated and contracted with the end-user, Xerox, is based on substantially the same considerations as my conclusion in respect of VT32. The same conclusion also follows that the recognition of revenue from the sale to the VAR was wrong, and would have been recognised as wrong by Deloitte had they been kept fully and timeously informed. The "*designated payee*" provisions, reminiscent of the early VAR deals in 2009, do not affect the substance of the VAR sale (or rather, the lack of it) and make no difference to my assessment.

*Defendants' knowledge of and participation in VT32 and VT33 and direct deals*

450. My conclusions about the Defendants' "guilty knowledge" likewise mirror my previous conclusions in the context of VT32.

*Mr Hussain*

451. It seems plain from email exchanges that Mr Hussain knew and approved the resort to a VAR transaction and the subsequent direct transaction in each case. It also seems more likely than not that he was aware that in neither case was the VAR expecting or intended to be involved in the negotiations that resulted in the respective direct deals.

452. It was not expressly alleged, but I take it to be implicitly suggested, that as part of the Autonomy management Mr Hussain was responsible for the alleged deliberate attempt to "*circumvent*" Deloitte's warnings in respect of direct deals by not revealing the fact of the direct deal between Autonomy and Bank of Montreal.

453. Further, the Claimants alleged that the arrangements for and the direction to Xerox to pay MicroTech as Autonomy's designated payee "*had no doubt been approved by Mr Hussain as well.*"

454. In my judgment, Mr Hussain plainly had "guilty knowledge" that the accounting treatment of VT33 was improper.

*Dr Lynch*

455. The Claimants also submitted that the court should infer that these transactions *"fell within the broad approval granted by Dr Lynch to Mr Hussain to call upon a friendly VAR as and when required to plug gaps in revenue."*

456. Beyond that, however, the Claimants made no further particularised allegation of knowledge against Dr Lynch in respect of either VT32 or VT33, and they did not crossexamine him about them (or the direct deals) either.

457. Nevertheless, and once again for substantially the same reasons as I have given and referred to in the context of VT32, I have concluded that the sale to the VAR (MicroTech) and its accounting treatment would not have been proposed and implemented but for Dr Lynch's approval of the strategy pursuant to which they were so and the need to book revenue of which he was aware.

458. If he had no specific knowledge of the actual transaction and its accounting treatment, that would only have been because by now the pattern was well established and the implementation of VAR sales pursuant to it as and when Mr Hussain identified the urgent need to cover a shortfall had become all but automatic.

459. I am satisfied therefore that Dr Lynch too had "guilty knowledge" of the improper accounting treatment of VT33.

### VT37: MicroTech/HP Q2 2011

460. In chronological terms, this June 2011 sale was the last of the impugned VAR transactions. It was a large sale for a fee of $7 million with an additional $350,000 for a single year's maintenance, and by June 2011 Mr Hussain was relying on it to achieve revenue forecasts. This can be seen, for example, from an email from Mr Hussain to Mr Egan on 7 June 2011:

> *"Stouffer – assume you are on your way to St Louis but where is the HP proposal?...If we don't close HP then we are *****d…"*

461. VT37 is complicated by the fact that the ultimate end-user was one of HP's existing clients, which Autonomy was seeking to persuade to adopt Digital Safe for its archiving needs instead of HP's own product (with which it was not happy). Autonomy pursued a dual-track strategy to this end, seeking either (i) to sell Digital Safe to HP for it to use to provide archiving services to its client, the United States Postal Service ("USPS") or (ii) to sell Digital Safe direct to USPS itself. In the end, no end-user deal involving either MicroTech or Autonomy eventuated before HP's acquisition of

Autonomy, and it appears that after that acquisition, HP, which by then owned and/or controlled the Autonomy software, stepped in to do a direct deal itself.

462. The transaction is further complicated by the Claimants' associated allegations relating to Autonomy's purchase from MicroTech of the Federal Cloud platform for $8.2 million in Q3 2011: those allegations being to the effect that there was no commercial rationale for the Federal Cloud purchase and that it was executed solely to put MicroTech in funds to meet existing liabilities to Autonomy, including its liability (according to contract) under VT37. It is necessary for an understanding of its evolution and the ultimate failure to close an end-user deal to describe the background of the transaction.

463. Prior to Q2 2011, HP was the appointed technology provider to USPS which also used HP's software (an archiving offering called RISS) for archiving. Dr Lynch explained in his witness statement (and this was not challenged) that:

> "HP's archiving offering was called RISS [which] was an earlier version of Digital Safe and was extremely outdated. In early 2011, USPS was involved in a number of lawsuits and needed a functional archive system and EDD system to preserve and review relevant data. Due to its track record, USPS was not convinced HP's offerings would be up to the task of helping USPS prepare for litigation. In Q2 2011, USPS abandoned its existing EDD solution and moved to Autonomy's software. Autonomy closed a multi-million-pound EDD deal with USPS in the quarter. It was my understanding that USPS also considered moving away from HP's archiving offering and considered Autonomy a frontrunner for the replacement. There were two possible ways that Autonomy could structure the deal. Either Autonomy could have sold archiving software to USPS directly or to HP who would use Autonomy software to improve its offering to USPS. Autonomy pursued both possible deals."[564]

---

[564] Dr Lynch explained in cross-examination that USPS were unhappy with HP because the HP product for archiving *"had failed and was losing things. And so there was a big legal liability because the archive wasn't archiving. So USPS had basically told us that they were going to switch over to Autonomy which made sense because they'd just switched over the eDiscovery, and then they wanted us to work through HP who were their technology provider just like Dell was for Hyatt."*

464.  Dr Lynch's evidence in cross-examination was that (a) Autonomy had already recently done a good deal with USPS for e-Discovery which was working well (b) Autonomy were being told by USPS that *"they'd said yes already"* (c) USPS were exasperated with HP's archiving product *"that had failed and was losing things. And so there was big legal liability because the archive wasn't archiving"*; so that (d) according to him, a deal with USPS looked like a good prospect, the only problem being that HP (Mr Veghte) was *"giving us a bit of a run-around"*.

465.  Mr Egan, on whose witness statement the Claimants principally relied in this context, explained the position as follows:

> *"As the end of the quarter approached, we were making good progress on the direct Postal Service deal, but not much progress on the HP side. Mr. Hussain asked me to take an HP deal to a reseller. I spoke to either David or Steve Truitt and asked that MicroTech take an HP deal. I explained the greater risk that MicroTech would be taking with respect to this deal because of the uncertainty of the end-user deals. I identified the paths that were available to get MicroTech paid. I said that we might be able to complete a sale to HP (but the prospects of such a sale were not in good shape at that time but that we would keep trying that route). Alternatively, we might be able to license the same software directly to HP's end customers like the Postal Service who had shown they were interested and needed the software as an alternative. In all events, I said we would use all efforts and means available to protect MicroTech from holding the bag."*

466.  Apart from Dr Lynch's Counsel suggesting to Mr Egan (as he accepted) that it was more likely he spoke to Mr David Truitt (who the Defendants emphasised was not a MicroTech decision-maker) than Mr Steve Truitt, Mr Egan's evidence in this respect was not challenged in cross-examination.

467.  Accordingly, I accept that (a) it was Mr Hussain who suggested to Mr Egan that a sale to a VAR should be arranged in light of difficulties or delays in closing a deal within the quarter with either USPS or HP; (b) Mr Egan made clear to MicroTech that there was more than usual risk that an end-user deal would not be achieved; and (c) Autonomy would *"use all efforts and means available to protect MicroTech from holding the bag"* (though Dr Lynch reminded me when he was cross-examined on the paragraph that *"the*

*contracts that they signed made it clear that they could only rely on what was in the contract and that did not put an obligation on Autonomy to do any such thing"*).

468. Nevertheless, MicroTech agreed to take the VAR deal without any prior assessment of the prospect of an end-user deal or of the risks to MicroTech. On 30 June 2011, Autonomy prepared, and Mr Steve Truitt signed, a purchase order that included a licence fee of $7 million, plus $350,000 for one year's maintenance. Autonomy recognised licence revenue of $7 million that same day.

469. The VT37 purchase order was governed, as usual in the case of MicroTech VAR deals, by the terms of the June 2006 MicroTech VAR agreement (see paragraph 216 above for a summary of its terms) which provided expressly that MicroTech was obliged to pay Autonomy for its orders irrespective of its sale to an end-user, and which confirmed that there was no other understanding or arrangement between the parties. The VT37 purchase order also incorporated the provision, noticed previously in other later MicroTech transactions, permitting a direct deal, but stating that the parties *"currently anticipate"* an onward licence transaction between MicroTech and HP.

470. This was not true: an onward sale by MicroTech was never in the contemplation of either MicroTech or Autonomy. In Dr Lynch's written closing submissions, it was argued that a sale of Autonomy software was still a good prospect because *"[t]he main question was not whether Autonomy software would be used but whether the deal would be done through HP as the continuing archive provider"*. The thrust of the Claimants' case was that the only real prospect was of a direct deal between Autonomy and USPS, but that was uncertain given HP's interest and Mr Veghte's obvious wish to retain USPS for HP.

471. In any event, MicroTech was not in the frame at all. There was no real reason to suppose that HP would have entertained a sale from them. Mr Steve Truitt accepted in his deposition in the MicroTech proceedings in the US that it was *"a weak expectation at best"*. The Claimants described that as *"if anything, an overstatement"*, especially since the licence was for the use of Digital Safe software and MicroTech had never installed[565], nor could it have installed, Digital Safe. It seems to me that the reality was, and I find, that the prospect of an end-user deal between MicroTech and USPS was vanishingly small.

---

[565] As Mr Steve Truitt acknowledged in his deposition in the MicroTech proceedings in the US.

472.  In an effort to explain how MicroTech could rationally have signed the purchase order and taken on the risk unless assured that Autonomy would see to it that the risk would, one way or another, be covered by Autonomy, Dr Lynch asserted that:

> *"the one thing we haven't mentioned is that they had the right to sell that software to any other party as well. So it wasn't – although we're talking about this as though it's an HP/USPS deal, they had the right to sell that software to anyone."*

473.  But he was mistaken. The purchase order named HP as the "*End-user*" (item 1) and stated (item 3) that HP was licensed to deploy three separate instances of Digital Safe, with each instance to be used "*solely for the purposes of hosting and archiving data from a single Client's Internal environment for access solely by such Client. A "Client" is an end-user customer of End-User*". Thus, HP could use the software for up to three of HP's own customers. However, MicroTech was not free to sublicense the software to anyone other

_____

than HP. When confronted with the terms of the purchase order, Dr Lynch said he was "*surprised*" and said he would "*have to go away and find out more as to why I have a different understanding*". No further explanation was subsequently provided.

474.  The Claimants added to this what I can compendiously describe (meaning no underestimation of them) as the usual points in respect of these later impugned VAR transactions with MicroTech, to the effect that MicroTech never had or even attempted any contact with either HP or USPS, and it was never envisaged by either party to VT37 that they should.

475.  I need note only in this regard that on this occasion, Dr Lynch sought to contradict this, in that in the course of his cross-examination he stated his understanding to be that MicroTech, as a federal reseller, had *"their own federal relationship"* and did know *"some people in HP Federal and they had communications with them"*. When further pressed, he named a Ms Amy Santucci and a Mr Tom Hempfield (both of whom worked at HP) as being those *"people"*. He also referred very generally to *"quite a few emails"* with Ms Santucci (which so far as referred to related to a contact between HP and Autonomy but not with MicroTech).

476.  Dr Lynch's evidence in cross-examination on the point was uncharacteristically vague and meandering, and he named no person at MicroTech involved in, nor any instance of involvement on the part of MicroTech in, negotiations of any kind with either

HP or USPS.  Eventually, after a particularly long and discursive answer by Dr Lynch, Mr Rabinowitz pressed him to identify who at MicroTech he said had been involved; he could not do so, and simply repeated the names of persons working for HP whom he thought might be known to MicroTech, before trying to deflect the question away by saying *"But the whole thing was just a disaster."* Even when confronted with the suggestion that his evidence was *"completely made up"* Dr Lynch could do little more than fall back on naming again Ms Santucci, and then revert to another discursive explanation of the complications at the time.

477. I cannot accept Dr Lynch's evidence that MicroTech was involved in any dealings or negotiations in the matter. It was unpersuasive in itself, and there was no other basis for it. I accept Mr Steve Truitt's own evidence in his deposition in the MicroTech proceedings that MicroTech made no approach or seek to sell the software to either HP or USPS. Accordingly, I take VT37 to provide another illustration that the VAR sale did not interrupt or impact Autonomy's negotiations with the end-user, nor the likelihood (or not) of a sale by Autonomy to the end-user eventuating.  MicroTech simply signed the purchase order and then stepped back, as was the intention and expectation of both Autonomy and MicroTech.

478. Autonomy resumed its efforts in pursuit of its dual track strategy, with Dr Lynch's personal involvement. But these did not result in Autonomy reaching a deal with either HP or USPS. In his witness statement, Dr Lynch stated that MicroTech *"was not able to sell the software on to HP or USPS"* . When cross-examined on this, he tried to defend this as simply a statement of fact; but I consider that it was plainly intended to give the impression that MicroTech was involved and was intended to pursue and become the contracting party to any ultimate deal, which it was not, and (at least by the time of his witness statement) he knew it. (His contemporaneous knowledge is addressed later.)

479. As it was, email exchanges between Dr Lynch and Mr Veghte at the end of June 2011 seem to me to suggest that, though they also suggest that the process was complicated by the fact that HP felt restricted in its dealings with USPS in light of the danger of any breach of confidentiality about the proposal for HP to acquire Autonomy then under discussion, HP quite deliberately used this as the reason for (in effect) cutting Autonomy out of discussions with USPS.  Thus, on 30 June 2011 Mr Veghte stated in an email to Dr Lynch:

> *"Circled with the HP team on the ground and we received instructions from USPS Procurement not to discuss the USPS environment with you directly and*

> *while this may be inconsistent with other communications from USPS, we do need to honour that request. In addition, USPS is raising awkward questions to our account team as to whether and what relationship HP and Autonomy may have or be developing and I think it is in our collective best interests to limit that speculation as I am sure you would agree.*
>
> *In consideration of this and other factors, HP believes it best if we proceed separately with respect to USPS…"[566]*

480.  The question which then arose, however, was as to how, given that there was no end-user sale to generate funds, MicroTech was to be saved from its contractual payment obligations. The problem was both more pressing and more difficult because, as at 5 July 2011, MicroTech owed Autonomy in excess of $25,000,000, of which $10,300,000 was already overdue at 30 June 2011, as set out in a spreadsheet attached to an email of that date from Mr Chamberlain to Mr Egan, copying Mr Hussain and Mr Scott.

481.  As Mr Steve Truitt put it in his deposition in the MicroTech proceedings, *"We needed a fix for all of it"*. He went on to confirm that Mr David Truitt asked him to develop a proposal as the path to resolving at least part of their outstanding obligations. In that deposition, he was asked whether Mr David Truitt had suggested a proposal relating to a Federal Cloud platform as part of a fix. He said:

> *"… don't recall it being a cloud solution, but, yes, he asked me to put together a proposal. I don't think it's important, though, that it's  - whether it's cloud or not, but, yes, he did."*

### *Federal cloud purchase and the payment by MicroTech it enabled*

482.  The Claimants' case is that the proposal developed as the means of getting funds to MicroTech was the purchase by Autonomy from MicroTech in Q3 2011 of the *Federal Cloud* platform briefly mentioned above for a purchase price of $8,200,000. The

---

[566] It is difficult not to sympathise with Dr Lynch's complaint that Mr Veghte *"was giving us a bit of a runaround"*, with HP trying to keep its client to itself, whilst improving its product by incorporating instead Autonomy software, in which HP ultimately succeeded (see above at paragraph 464).

> Claimants alleged that there was no commercial rationale for this transaction, and it was

---

executed solely to put MicroTech in funds to meet existing liabilities to Autonomy: it was the *"fix"* which MicroTech needed.

483.  The Federal Cloud purchase is one of the six Reciprocal VAR transactions listed (as *MicroTech/HP*) in Schedule 12B to the RRAPoC. It is relied on by the Claimants as having undertaken solely to put MicroTech in funds to meet contractual liabilities to Autonomy under impugned VAR sales. The Claimants relied on the Federal Cloud purchase both as exemplifying the variety of ways in which Autonomy contrived to ensure that VARs party to impugned VAR transactions were not *"left on the hook"*, and also as giving rise to transactional loss (which the Claimants seek to recover).

484.  I have set out in greater detail in another part of this judgment the factual history and the respective positions of the parties in respect of transactions said by the Claimants to have been devised in order to fund on a 'friendly' VAR to enable it to appear to meet its contractual obligations under VAR contracts with Autonomy. That includes the six Reciprocal VAR transactions listed in Schedule 12B in respect of which the Claimants seek recovery of transactional losses, including the Federal Cloud transaction.

485.  The following matters stand out, in my view, from the Claimants' submissions in respect of the Federal Cloud transaction in relation to the question now in issue:

> (1)  The impetus for the transaction initially came from Mr David Truitt and Mr Hussain.  An email dated 28 July 2011 from Mr Hussain to Dr Menell and Mr Egan headed *"SSA contract"* introduced the matter by stating *"...as you both know we have a very large $24m plus deal with SSA via Microlink"* and went on to relate a conversation between Mr Hussain and Mr David Truitt about a proposal for Autonomy to purchase from MicroTech certain *"software and data facilities"* which Mr Hussain stated he believed would *"help us deliver our very large project"*. The project was in fact a contract between MicroLink and the US Social Security

Administration ("SSA") for the provision of on-site (not cloud) information and e-Discovery solution.[567]

(2) No evidence was adduced suggesting that anyone in Autonomy's technical department had suggested a need for further software for the purpose of the project. The timing, the genesis of the proposal through Mr Hussain, and the lack of anything supporting technical need support the suggestion that the focus was not on the product but on a "fix".

(3) It is apparent from email evidence and the evidence of Mr Steve Truitt in his deposition in the US MicroTech proceedings that there was considerable but unexplained urgency attached to the preparation of the proposal.

(4) On 31 July 2011, Mr Steve Truitt sent Mr David Truitt and Mr Jimenez a draft "*Autonomy proposal*". On 1 August 2011, Steve Truitt sent the proposal to Mr Hussain, describing it in his covering email as a "*proposal from MicroTech to*

---

*develop FISMA compliant hardware stacks and operational approaches to deliver Autonomy software solutions to US Federal clients from a cloud computing model*". The attached proposal, which ran to 7 pages, was for Autonomy's software to be configured to support the requirements of the SSA for email archiving and, given the potential growth of archived data, "*the SSA could very easily decide that it makes sense to move both its email infrastructure and its email archiving to the cloud. Should that occur, MicroTech stands ready to assist Autonomy with the move to help maintain and enhance its relationship with a key Federal customer*".[568]

---

[567] The "*SSA*" is a US government agency. The "*SSA contract*" was a contract between MicroLink (by then an Autonomy subsidiary) and SSA for the provision of an email archiving/e-Discovery/email records management system, pursuant to a Blanket Purchase Agreement dated May 2011. As stated in an internal Autonomy email dated 20 May 2011, the scope of the project was that "*SSA plans to deploy an onsite end-to-end Information Governance and eDiscovery solution ...*".

[568] The proposal was for MicroTech (i) to deliver an Autonomy Solution Stack comprising IDOL Server, Zantaz Fetch Module and "other software" to meet the SSA's business requirements for a payment of $8.2 million and (ii) if Autonomy wanted to deploy an Autonomy Solution Stack for a second client, MicroTech would do so for a further payment of $7 million and (iii) an Autonomy Solution Stack for any subsequent Autonomy clients would be $6.2 million for each one. Mr Steve Truitt testified that Mr David Truitt had

(5) However, and as the wording reflected on close reading, there was no reason to think that SSA was going to move this particular project to the cloud: Autonomy's brief was to create an onsite solution, not one based in the cloud. Further, Mr Kalbag's evidence was that a federal cloud platform was never discussed or even mentioned in his discussions with SSA, that SSA was an "*on premise*" customer with its own data centre, due to security concerns, and that so far as he was aware a federal cloud platform would have been of no interest to SSA. Apart from putting to him the general Cloud First policy of the US federal government, none of that evidence from Mr Kalbag was challenged in cross-examination. No document has been identified prior to August 2011 in which SSA expressed any interest in changing its archiving system from an onpremise arrangement to a cloud-based one.

(6) $8.2 million was what Mr David Truitt had told Mr Steve Truitt should be the purchase price: Mr Steve Truitt confirmed this and testified that he started with the end price and then worked backwards to identify the amounts of equipment and labour that would support such a price.

(7) The contractual terms were vague and unspecific, lacking any technical detail, and more in the style of a proposal than a serious commitment. Further:

> (a) There was no defined deadline for the provision of the end-product. Indeed, Mr Steve Truitt's evidence was that Autonomy never asked MicroTech when delivery would take place; and there is no evidence to the contrary.

> (b) Although the contractual documentation provided for services to be provided according to a "*schedule as mutually agreed by the parties*", no such schedule was ever proposed or agreed.

> (c) The contract did require MicroTech to "*periodically document its efforts by furnishing written progress reports as request by Autonomy*". However, as Mr

---

stipulated that the price should be $8.2 million, and so he had started with the end price and then worked backwards to identify the amounts of equipment and labour that would support such a price.

Steve Truitt testified, MicroTech never submitted any written progress reports, and was never asked for

them. As it was, MicroTech never delivered anything to Autonomy, and Autonomy never requested delivery of anything from MicroTech.

(8) Moreover, although the contract specified that Autonomy had 30 days to pay, Autonomy paid the stipulated purchase price of $8.2 million immediately on the first day. Mr Steve Truitt testified that this was *"so that we could then retire some of the debt that we had with them"*.

(9) On 17 August 2011, one day after that payment by Autonomy, and also of course the day before the HP acquisition of Autonomy was announced, MicroTech paid the entire amount of $7.35 million payable under its VAR contract (in respect of VT37), in advance of the actual payment date.

486. The Defendants' answers to this can be summarised as being that:

(1) Autonomy expected SSA soon to need and require cloud-based storage and eDiscovery capability: in December 2010, the US Government had adopted a *"Cloud First"* policy under which Government agencies were obliged to identify three services to move to the cloud within three months, and then to move one within 12 months and two within 18 months.

(2) Under the SSA's blanket purchase agreement with Autonomy (through its MicroLink subsidiary) the contract spend was at the discretion of the SSA and it was structured as a "*call-off*" contract. As a result, MicroLink had to be able to provide the services at all times. The first stage of the project was a pilot which did not require a cloud solution, but given the Government's "cloud first" policy, Autonomy's management anticipated that a cloud solution would offer benefits to the SSA in the future.

(3) MicroTech, a company with which Autonomy had a good relationship, also thought that the SSA might be interested in a federal cloud solution because "*the SSA [were] doing lots of things that would make it hungry for storage*" and "*if we could figure out a way to make it convenient and cheap for them, they might bite at it*".

Over the years, Autonomy had received Requests for Proposals from federal bodies requiring FISMA compliance.

(4) MicroTech's proposal "*to deliver Autonomy software solutions to US Federal clients from a cloud computing model*" (sent on 31 July/1 August 2011 – see paragraph 485(4) above) drew on the input of Roger Channing of MicroTech. MicroTech proposed that they would build a security-compliant data centre that could be used by one of Autonomy's customers with unlimited data storage for five years. The solution could be deployed at the customer's facility (where their data would be hosted by either the customer, Autonomy or MicroTech) or a security-compliant facility built by MicroTech (where the customer's data would be hosted by MicroTech). The proposal specifically noted Autonomy's contract with the SSA and highlighted that the business case for a federal cloud platform was supported by the fact that "*the SSA could very easily decide that it makes sense to move both its email infrastructure and its email archiving solution to the cloud*".

(5) There was support for the commercial rationale of a federal cloud solution in  testimony at trial: (a) Mr Baiocco explained the interest that Capax also had in the federal cloud business; and (b) Mr Kalbag viewed this as a strong growth area and had generally confirmed that Autonomy did not have FISMA certification and that Autonomy needed to engage with a FISMA-certified third party in order to host data for federal customers. Indeed, Mr Kalbag agreed that it was becoming a must for Autonomy to have the ability to host its software on a FISMA-certified Cloud, and that it was going to be difficult for Autonomy to acquire federal clearance and run a federal cloud platform.[569]

(6) Although Mr Kalbag considered that it would have been more logical and economic for Autonomy to have partnered any of a number of businesses providing cloud storage, rather than to develop its own cloud, that was a commercial judgement: and Mr Kalbag "*was a middle-ranking salesman with no involvement in these kind of judgements*".

---

[569] Any idea of using MicroLink would have been hampered by the strict rules in place governing how Autonomy communicated with MicroLink (which were necessary to maintain MicroLink's security clearance).

487. The Defendants' case that a Federal Cloud solution was becoming essential was, to my mind, persuasive; and I agree that the choice of how to achieve that was a commercial judgment. Even so, I have not been persuaded that this disposed of the Claimants' case that the Federal Cloud purchase itself, at the time and on the terms it was made, was devised in order to place MicroTech in funds. In particular, in my judgment, the Defendants did not address satisfactorily:

(1) The fact (as for the avoidance of doubt I accept it to be) that the SSA contract itself provided for an on-site and not a cloud solution, and it was a matter of speculation whether the SSA would want a cloud solution in the immediate future;

(2) Mr Kalbag's further evidence in cross-examination that the SSA had expressly been asked whether they would be interested in a cloud offering but

> *"it was made clear to me at that time this had to be an on-site solution because of the sensitivity of the SSA data and they were very protective and were concerned with hosting that data outside of their own data centres…"*

(3) The fact that (a) whereas the Defendants focused on whether a federal cloud platform would be useful generally, under the terms of the proposal the solution offered at the price of $8.2 million was available only for the SSA, with cloud solutions for any other customers to be provided separately and at a significant additional cost; (b) Mr Hussain's suggestion in email correspondence that the proposed cloud solution was needed for the SSA contract was demonstrably wrong; and (c) having regard to Mr Kalbag's evidence described above, the prospect of SSA wanting a federal cloud platform was not illogical or misguided but it was speculative and it was not immediate;

(4) The urgency attached to generating a proposal, establishing a contract of purchase, and accelerating payment to enable MicroTech to pay down its debt

is difficult to square with an anticipated but so far unexpressed and speculative generalised future need;

(5) Most important of all perhaps, not only was the product so insufficiently specified as to cast doubt on whether it

was anything more than a proposal fashioned to give descriptive but not real substance to an idea, the fact is that it was never delivered at all.

488.   Taken in the round, I accept the Claimants' contention that the Federal Cloud contract was primarily devised and implemented in order to put MicroTech in a position to pay down indebtedness to Autonomy. There is no evidence that Autonomy needed the goods for the contract with SSA, no evidence that the goods were ever provided, and no evidence that any complaint was ever made in that regard.

489.   In my judgment, the context, the urgent genesis and the way the price was calibrated according to what Mr Dave Truitt thought was needed all smack, to my mind, of the "fix" which the Truitt brothers had conceived was necessary; and MicroTech's anticipation of Autonomy's collaboration in such a "fix", together with Autonomy's ready engagement, are, in my judgment, strongly supportive of the Claimants' case that it was well understood and intended that MicroTech would never really be at risk at all in respect of its contractual commitment under VT37.

490.   I have concluded that the VAR sale in VT37 exemplified the pattern by then well established, and despite the usual legal trappings, it was not a sale in commercial substance at all. The only distinguishing feature of VT37 tended to embolden the pattern: whilst there was no intention to negotiate or conclude a sale by MicroTech, in this case there was also real doubt whether any end-user transaction would be concluded by Autonomy either, in which case (since MicroTech's legal obligation was either to be funded or forgiven) Autonomy stood to receive no 'new' money at all.

491.   In my judgment, the VT37 VAR sale lacked substance and did not satisfy IAS 18.14: its accounting treatment as giving rise to recognised revenue was improper.

*Knowledge and participation of Defendants in VT37 and Federal Cloud transaction*

*Mr Hussain*

492.   There is no doubt about Mr Hussain's detailed involvement in and knowledge of VT37: Mr Egan's evidence (which was not challenged in this regard and which I accept) was that it was Mr Hussain who asked him to take the deal to a reseller once it became clear that the envisaged deal with HP would not eventuate and HP were showing every sign of wishing to edge Autonomy out of any direct deal with USPS. It is plain from emails that Mr Hussain knew that the *"8a"* VAR chosen was MicroTech.

493. The 'pattern' for Autonomy and not the VAR to negotiate and contract with the end-user was devised by Mr Hussain, and I have seen nothing to suggest any reason for supposing otherwise in this instance. In any event, the overall likelihood is that he was well aware of it; Mr Egan's evidence was that the plain intention was that Autonomy would continue alone its efforts in that regard. The only evidence was of direct engagement between Autonomy and USPS, with no suggestion of any involvement on the part of MicroTech.

I find that Mr Hussain did not intend or expect MicroTech to play any active role in any onward sale.

494. I infer from this, from the pattern and from what actually transpired, that Mr Hussain knew that the introduction of MicroTech was as a placeholder and there was no real substance in the VAR sale. I also infer and hold from this and all the circumstances that Mr Hussain was aware that the prospect of any direct sale was weak, given the demonstration of HP's desire to keep the USPS relationship to itself.

495. Mr Hussain was a trained, experienced and commercially sophisticated accountant. He knew the rules relating to revenue recognition, and that they were required to be satisfied not just on paper but in reality. He knew that the 'sale' to MicroTech was not intended to have any substantive effect as regards Autonomy's efforts to sell the goods or as to the ultimate direct contract which was the objective. He had 'guilty knowledge'.

*Dr Lynch*

496. Dr Lynch said that he *"had limited involvement in the deal"* (VT37). In Dr Lynch's closing submissions it was stated that *"the Claimants had no basis for suggesting that Dr Lynch was aware of any impropriety or any false account with regard to the MicroTech/HP transaction."*

497. Dr Lynch's evidence was that although the end-user archiving deal did not close with either HP or USPS in Q2 2011 as had been hoped, he and those concerned at Autonomy all thought that (I quote from his first witness statement):

> *"...HP was still interested in Autonomy's archiving software because they had a very angry customer and they needed to provide USPS with a workable software solution. Thus, we were confident USPS would need Autonomy software."*

498. Dr Lynch accepted in cross-examination that he had been emailed by Mr Hussain on 2 July 2011 saying *"We got the edd processing*

*deal and we got the hp digital safe deal via 8a"* and that he knew that a VAR had been used. The subject line of the email was simply *"usps"* which suggests that Mr Hussain thought it safe to assume that Dr Lynch understood the underlying end-user deal sufficiently to be aware of the connection with USPS. His evidence was that he was not involved in negotiating the terms.

499.  The Claimants did not suggest to Dr Lynch in cross-examination that he knew the VAR was not at risk, or that the VAR sale was not genuine or improper; or that the revenue was improperly recognised. They did however cross-examine him on his understanding that MicroTech was not to be involved in the sale other than in a nominal capacity. It was put to him that Mr Steve Truitt had made clear that MicroTech had not made any approach to USPS nor any effort to onward sell to either USPS or HP: understandably, he said that he could not comment on what Mr Steve Truitt did or didn't do. But when it was put to him that he would not have expected MicroTech to make any such approach or effort I found his answer that he thought MicroTech had *"their own federal relationship"* (see paragraph 475) above unconvincing. No support for this was provided, nor any evidence found to support any contact between them at all. More generally, in my view, Dr Lynch's answers on the issue of whether MicroTech was intended to play any role did not carry conviction.

500.  I have already addressed the uncharacteristically vague and meandering nature of the evidence that Dr Lynch gave in an attempt to support this. Suffice it to say that my impression was that Dr Lynch knew that MicroTech were to do nothing, and Autonomy were to continue negotiating and dealing with the software which USPS wanted and for which Autonomy had notionally sold MicroTech a licence as if that sale had never taken place. Although not a trained accountant, Dr Lynch was an experienced CEO intimately engaged in the direction and presentation to the market of Autonomy's business and well aware of the requirement that to qualify for revenue recognition it was essential that the sale be unconditional and effect a substantive transfer of risk and control. I find that he either knew that the VT37 'sale' to MicroTech in substance and commercial reality effected neither, or was reckless in that regard.

501.  In light of my conclusions in paragraph 489 above, I find also that both Defendants were aware that the Federal Cloud purchase was pursued, and pursued with such urgency, because of the need to get MicroTech "off the hook".

## DiscoverTech reseller deals

502. I turn to Autonomy's VAR sales to DiscoverTech in the Relevant Period (starting at the end of Q1 2010), other than VT5 (because I have already dealt with that transaction).

503. I have briefly described DiscoverTech in paragraph 1963(4) in the main body of the judgment. It will be recalled that it was established in December 2009 by Mr David Truitt (together with Mr Wharton) initially as a vehicle for the DiscoverPoint business spun out of MicroLink at the time of the MicroLink acquisition.

504. As with the other reseller deals, there was testimony from the main protagonists on both sides of the transactions between Autonomy and DiscoverTech, confirming that DiscoverTech was on risk.

505. Mr Egan's evidence (as described in paragraphs 1976 to 1998 in the main body of the judgment) related to the deals with DiscoverTech as it did to the deals with the other resellers. Mr Egan's evidence confirmed that the reseller was on risk, knew that it was on risk, knew that the reseller agreements were binding, and knew that any words of comfort that Mr Egan could offer were not intended to have any effect on the reseller's obligations to Autonomy.

506. Mr Egan's testimony on these points was corroborated by Mr David Truitt's hearsay testimony given in the US trial against Mr Hussain and in the MicroTech proceedings in the US (as described in paragraph 1999 in the main body of the judgment). In that evidence, he confirmed:

    (1) That DiscoverTech was at risk, and would have to pay for the purchase whether or not it sold onto the end-user. DiscoverTech would be stuck with the purchase and the debt; and

    (2) That there was never an understanding that DiscoverTech could cancel or otherwise walk away from the deals with no further obligation if the end customer did not purchase the software.

507. With regard to collectability, MicroLink had substantial debts when DiscoverTech was spun off; but MicroLink's debts were not assumed by DiscoverTech. In evidence introduced by hearsay notice by the Claimants, Mr David Truitt confirmed that he had been paid $39,000,000 when the acquisition of MicroLink happened, and that he could fund the DiscoverTech business to the extent that he wanted to; and Mr Wharton as 20% shareholder could help him.

508. DiscoverTech's reseller transactions were governed by an individual reseller agreement for each deal. The agreements were all in materially the same terms, which included the following:[570]

    (1) A provision binding the reseller irrevocably to the purchase, once executed:

> "*this Agreement including all Product Schedules attached hereto, constitutes a non-cancellable purchase commitment, all fees and expenses specified herein are non-refundable*".

    (2) A wide entire agreement clause. Clause 6 provided:

> "*Any waiver, amendment, supplementation or other modification or supplementation of any provision of this Agreement shall be effective only if in writing and signed by both parties. If for any reason a court of competent jurisdiction finds any provision or portion of this Agreement to be unenforceable, that provision of this Agreement shall be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of this Agreement shall continue unmodified except as necessary to avoid unfairness. This Agreement, including the pricing set forth in Section 2, represents the entire Agreement between the parties hereto concerning the subject matter hereof and supersedes any and all prior correspondence, quotations and negotiations. VAR expressly agrees that this Agreement shall have priority over any contrary terms or additional terms contained in any purchase order or other form hereafter delivered by VAR to Autonomy and any such inconsistent or additional terms shall have no effect.*"

509. DiscoverTech also executed debtor confirmations in respect of its debts under the various purchase orders issued in respect of its impugned VAR transactions with Autonomy. These confirmed

---

[570] See, for example, the agreement in respect of the DiscoverTech/Citi deal.

that the debts under the deals were owing, and that there were no sideagreements or side understandings.

510. The Defendants contended that there is no realistic basis for the Claimants' arguments that DiscoverTech was not fully on risk in respect of its purchases, or that the revenue was not properly booked; still less that the Defendants had "guilty knowledge" such as to found a claim under FSMA.

511. As to knowledge, the evidence of Mr Egan and Mr David Truitt was that Dr Lynch was not involved in any of the negotiations between Autonomy and DiscoverTech. Dr Lynch's case is that he was not aware of any of the detail of the underlying transactions between

Autonomy and the reseller, nor was he involved in the accounting. He approved a MAF

payment to DiscoverTech in respect of just one of the eight deals, but even in respect of that he made clear at the time that he did not know the detail of the situation and needed to ask Mr Hussain about the proposal.

512. Mr Hussain submitted that in relation to the large majority of the VAR deals, the written contract was all that he ever saw, and he was entitled to rely on those contracts. He further submitted that he was never involved in the negotiations and had virtually no other contact with the principals of the VARs, emphasising that Mr Egan gave evidence that he had no recollection and no knowledge of Mr Hussain involving himself in negotiations or speaking to the VARs before deals were closed.

513. The Claimants maintained that both Defendants were well aware of the pattern and the particulars. I return to these issues in the discussion which follows of individual impugned VAR transactions, to which I turn.

514. Of the impugned VAR sales, 8 paired transactions were with DiscoverTech: VT11 (enduser Citigroup Technologies), VT12 (end-user Philip Morris International ("PMI"); VT23 and VT24 (end-user BofA); VT30 (end-user Prisa, a Spanish and Portuguese language media group), VT31 (end-user ThinkTech, Inc as contracting party for the brokerage firm TD Ameritrade), VT35 (end-user Abbott Laboratories, a healthcare company) and VT36 (end-user the Hyatt hotel chain via Dell as reseller).

515. I address below three pairs of transactions: VT11/12, VT30/31 and VT35/36. I have addressed the remaining pair of DiscoverTech impugned VAR transactions (VT23/24) in Part III of this Schedule. The reason for dealing with VT23/24 separately is because they formed part of a complex composite deal with BofA

(or its subsidiaries of BofA) and it is convenient to deal with them together with the other transactions (VT16 and VT21, for which the VAR was Capax Discovery) in that composite deal (also in the same Schedule).

## VT11: DiscoverTech/Citi Q1 2010

516.   Citi was an existing Zantaz/Autonomy client which (according to Mr Goodfellow) had, by 2010, become one of Autonomy's largest accounts. During 2010 Autonomy was seeking to conclude a sale to Citi of archive storage cells (hardware with software embedded). The aim was to increase the capacity in Citi's archive which was at risk of running out of storage capacity.

517.   Email exchanges in March 2010 show that Mr Hussain was personally involved, and that negotiations resulted in him putting forward what he described in an email to Mr Otto Chan of Citibank dated 18 March 2010 as *"a really special quarter end offer…of an additional 10% discount…in the spirit of partnership"* which (when that offer was not taken up) Mr Hussain then (by email of 25 March) further offered to improve if the deal was closed before the quarter end.

518.   However, Citi did not accept the revised offer on that basis and on 27 March 2010, Mr Robert Mark (a director in Autonomy's Global Accounts department) notified Mr Crumbacher by email, that the deal was *"Dead for the quarter."*

519.   In these circumstances, Mr Egan approached Mr David Truitt with a view to a VAR transaction for the end-user deal. According to Mr David Truitt (who it always must be borne in mind was also the CEO of MicroLink, by then a subsidiary of Autonomy) he perceived the deal to be exciting and advantageous to DiscoverTech in that (a) Citi was an existing client of Autonomy and it was hoped that it would lead to sales by DiscoverTech of software and services to Citi and (b) DiscoverTech stood to earn a substantial margin or fee.

520.   On 31 March 2010, DiscoverTech issued the VT11 purchase order for end-user Citi with a licence fee of $5,500,000 plus $275,000 for support and maintenance. The VT11 purchase order was for 62 "instances" of the smart cell software; it was thus confined to software and made no mention of storage cells, which constituted the hardware element of the package that Citi required. In light of DiscoverTech's recent incorporation, its limited assets and the history of MicroLink's indebtedness, Mr Egan asked for and DiscoverTech agreed to pay 20% of the licence fee upfront, funded by way of capital contribution from Mr David Truitt (as to $1,627,000) and Mr and Mrs Wharton (as to $406,000).

521. It is convenient briefly to peer ahead to set the context for the issues of primary focus in relation to VT11, after it became apparent that Citi needed not only the software the subject of VT11 but also storage cells (which DiscoverTech had not purchased and could not provide). Autonomy negotiated a special tripartite agreement, entitled a *"One-Time Reseller Processing Agreement"*, entered as of 9 August 2010, to which (through Zantaz) Autonomy was a party, together with Citi and DiscoverTech, for the supply to Citi of the software and hardware which Citi required. This provided:

> (1) By clause 1, that Autonomy would deliver Citi's purchase order to DiscoverTech, and that DiscoverTech would process it and facilitate delivery of the applicable products to Citi.

> (2) By clause 2, that Citi would pay the applicable fees to Autonomy, but that Autonomy "*shall receive such payment on behalf of Reseller and ... Autonomy shall be responsible for payment to Reseller of fees due to Reseller for the processing of the Order of Products as contemplated hereunder*".

> (3) Clause 5 nevertheless confirmed that Autonomy "*shall remain responsible for its obligations*" under its Master Services and Software License Agreement with Citi.

522. Autonomy paid DiscoverTech a MAF (in this instance described as a *"Referral Partner commission"*) in the amount of $497,000, which was said in a letter from Mr Kanter to be *"as a result of Referral partner's direct and proximate participation in the account."*

523. Deloitte were aware of VT11 and the VT11 purchase order, and of the subsequent tripartite agreement. They were also aware of the payment of the "*Referral Partner commission*". They did not consider, at the time, that any of this raised any concerns about revenue recognition or other audit concerns, as Mr Welham confirmed in the course of his cross-examination (though he attached the gloss, *"Not for this isolated case, no"*).

524. Three particular issues arise in connection with VT11 which seem to me to merit special focus:

> (1) What was the reason for, and significance of, the VT11 purchase order being confined to software when (it is common ground) the end-user also always needed the storage cells constituting the hardware component of what Citi had negotiated to purchase;

(2) What role DiscoverTech played after the VAR transaction was agreed, what the significance was of the special tripartite agreement, and whether Deloitte were misled into thinking that DiscoverTech had tried to make a direct sale to Citi and were only prevented from doing so for administrative reasons;

(3) Whether the payment of a MAF (in this instance described as a *"Referral Partner commission"*) was purportedly justified on a false basis suggesting impropriety.

525.    As to (1) in paragraph 524 above, it is common ground that (a) the VT11 purchase order as issued by DiscoverTech on 31 March 2010 was for software only (the software component of the archive storage cells but without the cells themselves) whereas (as previously explained) the deal discussed with Citi included an element of hardware (the storage cells with software embedded).

526.    The Claimants' argument was that the ostensible restriction of the purchase order to software was an expedient to enable revenue recognition in Q1 2010: it was necessary because by the time of the purchase order, the hardware element was no longer capable of being delivered within the quarter, whereas software could instantly be delivered electronically; and Autonomy wanted to recognise at least the lion's share of the revenue from a sale to Citi in the quarterly results for Q1 2010.

527.    Mr Goodfellow explained this as follows (and his account was not challenged):

> *"I do not recall the events leading up to this conversation specifically but I believe that I received a phone call from Mr Crumbacher that day (31 March 2010) where he asked for the storage cells to be shipped immediately (to DiscoverTech). I would have explained that this was impossible as it required physical delivery of both hardware and software and we did not have the required hardware available to deliver. I confirmed that we could, though, deliver the software almost instantly. I recall that it was Autonomy's focus to deliver a product, whether hardware or software, by the end of the quarter to enable it to recognise revenue. Delivering software was the only means of achieving that."*

528.    Following this telephone conversation, Mr Crumbacher sent Mr Egan and Mr Scott a further email, also dated 31 March 2010, in which he stated:

> *"Stouffer, Following up on my voicemail, I just talked to Chris G and understand this is no longer a hardware resale deal but, instead, a software resale. We'll be licensing Discover Tech 62 instances of Zantaz Digital Safe Smart Cell software. ..."*

529. The Claimants contended that all that had changed was the discovery by Mr Crumbacher that Autonomy would be unable to effect delivery of hardware to DiscoverTech that day, precluding revenue recognition for the entire purchase, and that this was what led to the DiscoverTech purchase order being confined to software, delivery of which could be effected instantaneously.

530. Thus, they submitted, the confinement of the DiscoverTech deal to software alone had nothing to do with any commercial reality, nor any specification or preference on the part of the VAR, and everything to do with Autonomy's desire to recognise revenue in Q1 2010.

531. This was put to Dr Lynch in cross-examination. He offered a simpler explanation:

> *"No, it's because DiscoverTech wanted to buy software, it didn't want to buy the hardware.*
>
> *...*
>
> *They had no interest in buying the hardware, from what I understand."*

532. When pressed as to the basis for this understanding, Dr Lynch's response was equally simple:

> *"I've never seen any – anything that leads me to believe that they wanted to buy the hardware.*
>
> *Q. So you have no basis one way or another?*
>
> *A. Well, I do, otherwise I would expect to see something saying that they want to buy hardware. I've never seen that, I think it's a very simple case of a reseller knows that there is software that has to go into a solution for a third party that can be sold to many third parties and does a deal to buy the software part of it. They're not buying the hardware part of it, they don't have to."*
>
> *...*
>
> *Q. Were you aware of this transaction at the time?*

> *A. I may have had it on a list, but I wouldn't have had any more involvement than that.*

533.  It was then put to Dr Lynch that despite the change in the identity of the product being sold to DiscoverTech, as compared to the combined product offered to Citi, the price in the VT11 purchase order was essentially the same as the price Autonomy proposed to charge Citi for both the software and the hardware. Dr Lynch was taken to the following extract from Mr Goodfellow's second witness statement:

> *"However, I did not appreciate at the time, that the software was licensed under the DiscoverTech VAR Agreement for substantially the same price as the storage cell deal that was being discussed between Autonomy and Citi (which included hardware and software). This struck me as odd when I learned about it as I would have expected the price paid by DiscoverTech for the software alone to be materially less than the price which we had been discussing with Citi for delivery of the storage cells (which included the hardware on which the software was to be loaded)."*

534.  Dr Lynch answered as follows:

> *"Q. So the point Mr Goodfellow makes is that, despite confining the DiscoverTech purchase order to software alone, the price remained substantially the same as the price Autonomy had been trying to get from Citi for the hardware/software combination and that was not challenged evidence. Do you dispute it?*
>
> *A. They bought more software than they would have done if they had bought the hardware and the software together.*
>
> *Q. Mr Goodfellow says he would have expected the price for the software alone to be materially less than the price of the combination --*
>
> *A. Not unless they're buying more software, which is what they did."*

535.  As noted previously, one of the difficulties in assessing Dr Lynch's evidence is that he was routinely invited to comment or speculate on the reasons or motivation for things in which he had said he had not had any substantive part, and he took to answering from his research and understanding years after the event without

invariably reminding the questioner that he was really providing not evidence of facts, but a subsequently informed gloss or *ex post facto rationalisation*. Dr Lynch's sometimes insouciant style tended to exacerbate the difficulty. In this particular context, a subsequent exchange in crossexamination clarified that Dr Lynch was simply offering an alternative explanation based on subsequent review:

> *"A. My understanding is that, yes, they were buying a higher amount of software.*
>
> *Q. What's the basis for your understanding?*
>
> *A. Because all the value is software. There's no hardware in that value*
>
> *Q. So you're simply looking at the value of the contracts and saying, well, they must have bought something different to what was being sold to Citi?*
>
> *A. I had a look at - - you know, as I say, with many of these things you're asking me about I wasn't involved at the time. I had a look at it as part of these proceedings and that was my understanding, so I could go back and have another look."*

536.   In any event, and as the Claimants pointed out, Dr Lynch's *ex post facto* rationalisation was flawed. The unchallenged evidence of Mr Goodfellow was that Autonomy had been seeking a price of $5,488,538 from Citi for 64 storage cells. That would have required 64 instances of the software. However, DiscoverTech's purchase order was for only 62 instances of the software. The Claimants are plainly right, in my judgment, that DiscoverTech were not involved in the negotiations as to either price or quantity, whether before or after the VT11 purchase order; and the VT11 purchase order did not represent DiscoverTech's carefully refined view of what it wanted to buy and sell on: it was in all probability, as it seems to me, substantially dictated by Autonomy.

537.   The Claimants depicted this as *"another attempt by Dr Lynch to mislead the Court."* I think it is more complicated and less stark than that. Dr Lynch has convinced himself of the righteousness of his position. From the premise that all was correctly done, he glossed events with a mixture of insouciance and plausible conviction. I doubt he told me many things he had not come to believe (though I am afraid that he did tell some). In this instance, he offered an explanation which evidence disproved. I would not, in this instance, say more than that.

538. In the circumstances, the Claimants submitted that their explanation that the hardware element had been stripped out of the VT11 purchase order because if it extended to hardware delivery it could not be effected before the end of the quarter, and thus revenue recognition would not have been defensible or accepted by Deloitte, was left beyond real challenge.

539. Their further implicit submission was that DiscoverTech's indifference to whether what it had purchased and had to sell met the requirements of the proposed end-user was a further illustration of the lack of any real substance in VT11: it was simply paperwork to justify revenue recognition: DiscoverTech did not care because once it had completed the purchase order its part was over, there never being any intention or expectation that any effort be made to achieve an onward sale by the VAR (as distinct from a direct sale by Autonomy).

540. I accept these submissions (express and implicit). The stripping out of any hardware content from the VAR transaction did reflect the need for immediate electronic delivery, in order to achieve a sale before the end of the quarter and justify revenue recognition in that quarter. That was impossible in the case of hardware. I also suspect that a VAR such as DiscoverTech would not have wished to hold (and thus have the burden of storing and then delivering) physical inventory. The purchase order was confined to software simply in order to enable revenue recognition which would otherwise have been denied in respect of the whole transaction. The Claimants are plainly right, in my judgment, that DiscoverTech were not involved in the negotiations as to either price or quantity, whether before or after the VT11 purchase order; and the VT11 purchase order did not represent DiscoverTech's carefully refined view of what it wanted to buy and sell on: it was in all probability, as it seems to me, substantially dictated by Autonomy. I do not accept Dr Lynch's *ex post facto* rationalisation.

541. As important, to my mind, as this further illustration of the use of friendly VARs to trigger revenue recognition is the apparent indifference of the VAR in question to what it ordered or the price: it had no interest in either since in reality the goods remained in Autonomy's control and the VAR would never be called to pay the price.

542. Turning to (2) in paragraph 524 above, the Claimants contended that DiscoverTech played no substantive role in any negotiations with Citi after the VAR deal was made, nor (though party to the tripartite arrangements recorded) in the transaction eventually concluded between Autonomy and Citi. They placed reliance in this regard on the evidence of Mr Goodfellow. This was to the

effect that he would have expected to have known about it if DiscoverTech had played any role in the transaction between Autonomy and Citi, and as far as he was aware it did not. The Claimants relied also on the hearsay evidence of Mr David Truitt that DiscoverTech did not have any relevant contacts at Citi (nor at PMI) nor did it *"participate in any sales efforts"* on this account. By the time DiscoverTech became involved the issue of what was to be sold to Citi and at what price had already been determined between Autonomy and Citi, and in that sense it was fair to say that Autonomy "*were in control*".

543. As a corollary of this, the Claimants submitted that from Citi's point of view, the tripartite document was meaningless, and the joinder of DiscoverTech as a third party an irrelevance. Citi was to deliver its purchase order to Autonomy, it was to make payment to Autonomy and it was to look to Autonomy for performance of all obligations owed to Citi. The mismatch between writing and fact is illustrated by the simple fact that DiscoverTech had no hardware to sell, and it was the unchallenged evidence of Mr Goodfellow that Autonomy delivered the storage cells directly to Citi.

544. The Claimants further submitted that the purpose of executing the agreement had:

> *"nothing to do with Citi's actual requirements and everything to do with Autonomy's revenue recognition manoeuvres. This piece of paper was designed to allow Autonomy to persuade Deloitte that the sale to Citi was made by DiscoverTech. However, as the chronology… makes clear, this was pure illusion. It was the unchallenged evidence of Mr Goodfellow that DiscoverTech played no substantive role in the transaction between Autonomy and Citi…That is consistent with David Truitt's testimony…that DiscoverTech did not "participate in any…sales efforts on either of these accounts." There is no evidence to the contrary."*

545. The Claimants coupled to this a further contention that Deloitte were indeed misled into thinking that DiscoverTech did try to engage with Citi and make an onward/end-user sale but were stymied simply by administrative impediments. The Claimants cited in support the history recorded in Deloitte's working paper (suggesting that what was stated there must surely reflect what Deloitte had themselves been told by their audit client), as follows (typographical errors are in the original):

> "*This debtor relates to a Q2 2010 Digital Safe licence deal sold to the end-user Citigroup, through the VAR Discover Technologies LLC.*
>
> *These balances have not been paid directly by Discover Technologies, but have been settled by Citigroup for the following reasons.*
>
> *Discovery Tech had not traded with CitiGroup before, and CitiGroup are very strict about only trading with approved suppliers. The processes to become an approved supplier takes a long time, and so it would not have been possible to make Discovery Tech an approved supplier before the due date on the invoice owed to Autonomy.*
>
> *Autonomy is however an approved supplier of CitiGroup, and so a 3 party agreement was created whereby CitiGroup would transact directly with Autonomy and settle the gross debt between them, bypassing Discover Tech. In the process, the debtor from DiscoverTech, which is aged here, would be forgiven.*"

546. The Defendants disputed this, and they too relied principally on the evidence of Mr David Truitt. The Defendants particularly cited the following extract from his cross-examination in the US criminal proceedings:

> "*Q. In the…Citi deal, did Mr Cronin make a lot of effort to get involved with Citi?*
>
> *A. He definitely reached out to - to procurement folks that we were referred to. He – you know, there was a vendor list that we were attempting to try and get on. So there were conversations that he was having with some folk within Citi.*
>
> *Q. One of the reasons that DiscoverTech wanted to be the reseller on this Citi deal was that you hoped that it would lead to sales of software and services with Citi? A. Yes. That's correct.*
>
> *Q. And a small company getting a relationship with a big company like Citibank would be an advantage, as far as you were concerned? A. Absolutely.*
>
> *Q. And that's why you wanted to be a reseller in the deal?*
>
> *A. Yes. That was very enticing to us.*"

547.  The Defendants also relied on the following further extract, this time from Mr David Truitt's evidence in chief, which had been side-lined by the Claimants:

> "Q. ...Mr Cronin is writing (reading):
>
> > "It appears that a method is being worked where DT would be the reseller, Autonomy would be acting as a DT agent and executing an agreement with Citi directly."
>
> Can you help us understand what that means?
>
> A. Not – not specifically but, you know, they were -- we were looking to --Discover was having conversations with procurement at Citi. We were trying to figure out what it would take for them to deal with us directly, and what we found was that they had concerns about that. It was a very long process…to get put on their approved vendor list…"

548.  The Defendants submitted on the basis of this evidence that:

(1) DiscoverTech did make efforts to be involved with Citi on the deal and both DiscoverTech and Autonomy were seeking to have Citi issue any purchase order to DiscoverTech; Autonomy was not seeking a direct sale to Citi. In the event, Citi's internal processes did not permit DiscoverTech to accede to approved purchaser status, and the best that could be done was the tripartite arrangement.

(2) Accordingly, the impression given to Deloitte that DiscoverTech had been trying to make a direct sale to Citi but had been prevented from doing so for administrative reasons was not false: it was true. Mr David Truitt had explained these attempts in his testimony, marked up as hearsay by the Claimants themselves.

549.  As it seems to me, a substantial part of what Deloitte appear to have been told as recorded in their working paper was true: DiscoverTech had not traded with Citi before, and Citi were strict about only trading with approved suppliers. The processes to become an approved supplier did probably take a long time, and so it would not have been possible to make DiscoverTech an approved supplier before the due date on the invoice owed to Autonomy. (See especially the third paragraph of the Deloitte note quoted at paragraph 545 above.)

550. What was not true, however, was that there was ever any real intention for DiscoverTech to negotiate with or sell to Citi: DiscoverTech never became part of the negotiations, and it was always intended to be a direct deal with Autonomy (or nothing). Mr David Truitt's evidence (see paragraph 547 above) was evasive and fell short of saying that it did.  An email from Mr Mark of Autonomy to Mr Goodfellow dated 14 May 2010 starts with the words *"Citi won't do a reseller deal…",* Citi maintained the position through until August 2010.

551. Indeed, it seems clear that Citi were only persuaded to become party to the tripartite agreement on the basis that (a) it imposed no obligations upon them, made clear that, although delivery would be via DiscoverTech, Autonomy remained *"responsible for its obligations"* and provided for payment by Citi to Autonomy leaving the joinder of DiscoverTech as a matter essentially between Autonomy and DiscoverTech relating to invoicing and payment; and (b) Citi received a 40% discount (which Mr Hussain agreed expressly in an email to Mr Mark of Autonomy dated 5 August 2010, stating *"Alright if thru discovertech and close this week"*). The Claimants' closing submissions noted that Mr Hussain was willing to countenance a 40% discount in order to have DiscoverTech however notionally, in the loop.[571]

552. In my judgment, the tripartite agreement was put in place, not because Autonomy had to be brought in as an intermediary, but because Autonomy was the true seller, as principal, in a direct sale, which if apparent would have concerned Deloitte. The first sentence of the Deloitte note (see again paragraph 545 above) was simply false: there had been no sale through DiscoverTech to Citi, and given Citi's clear insistence that it would not entertain such a deal, none had ever been intended.

553. Further, in my judgment, the false impression given was intentional. It was supplemented by an equally false email (after the transaction and as part of the audit process) from Mr Chamberlain to Mr Welham and Mr Murray of Deloitte dated 13 October 2010, in which Mr Chamberlain stated *"Citi could not get DiscoverTech entered into their systems in time for a 30th sept close and so we had a three way agreement with us accepting*

---

[571] It should be noted that Citi were very tough in the negotiation, and it would not be accurate to regard the 40% discount as entirely referable to Autonomy's need for the deal to be routed through DiscoverTech. At one point, Citi indicated that it was regarding Autonomy's efforts to maintain its price as *"a relationship issue",* and in an email dated 5 August 2010 even relayed a message from "Otto" who was in charge of the negotiation for them that *"He says he will spend every working minute to ensure that we get off the digital safe if we cannot get the discount he is asking for".*  But the fact that Autonomy needed this special arrangement left them in a weak bargaining position.

*payment on behalf of DT."* It achieved the result intended of heading off Deloitte's concern that, if

a further VAR agreement were to be replaced by a direct end-user agreement, this would call into question whether the VAR had genuinely assumed the risks of ownership. What Deloitte understood, in the words of Mr Welham's witness statement, was that:

> *"it was for purely logistical reasons that DiscoverTech did not itself make the sale to Citi, i.e. because DiscoverTech, having negotiated with Citi, could not be added to Citi's supplier account listing in good time, thus resulting in Autonomy stepping in instead…This explanation distinguished the position from our understanding of the other direct deals that we had identified in our Q1 and Q2 Audit committee reports[572] (where we were concerned whether the VAR had in fact assumed the risks of ownership)."*

554. VT11 also illustrates how mechanical the role of a friendly VAR had become; and the friendlier the VAR, and the firmer its trust based on its experience that Autonomy would not leave it in the lurch, the less the need for any protracted or focused consideration of anything more than the potential upside from its point of view which I consider to have been very largely, and sometimes exclusively, the payment of a MAF (by whatever name called). The VAR contract was a necessary step. It had legal effect. The VAR was bound on the terms of its purchase order and the underlying VAR agreement. In his evidence in the US criminal proceedings, introduced in relevant part by the Claimants as hearsay evidence in support of their case, Mr David Truitt expressly agreed that he understood and accepted that DiscoverTech (a) owned the software (b) had full control of the software and (c) owed the money whether or not an end-user deal eventuated. But that did not represent the full understanding of the parties. Only in the technical sense of there being no formal agreement binding on Autonomy was there no side agreement. In substance, the parties knew that (a) DiscoverTech would never interfere or be allowed any say in the negotiations for onward sale and no onward sale by the VAR was ever intended (b) all the parties were subscribed to the assurance that Autonomy would

---

[572] It will be recalled that Deloitte were not told about the direct deal with the FSA in Q3 2010 (in which the VAR was Capax Discovery) either, and so in their Q3 2010 report to the Audit Committee Deloitte had noted that there had been no further reversals of transactions with VARs in the form of direct deals. Deloitte had expressly warned about its concerns if another deal went direct.

never leave DiscoverTech on the hook, and (c) accordingly neither risk nor control ever in reality passed from Autonomy.

555. The third issue which I have identified in sub-paragraph (3) of paragraph 524 above is the issue as to the basis and propriety of the payment of what in the context of this transaction was labelled a *"Referral Partner commission",* similar to a MAF. In particular, my focus is on the way the payment was presented and sought to be justified.

556. An email dated 15 October 2010 from Mr Egan to Mr Kanter, copying Mr Hussain, recorded the agreement of Mr Hussain and Mr Egan that *"DiscoverTech is due 10% on the Citi deal"* and requested Mr Kanter to *"create the letter today and approve wiring funds for today."* Mr Kanter's letter to DiscoverTech of the same date (and dated accordingly) purported to formalise a *"prior discussion"* and evidence an agreement to pay DiscoverTech $497,000 as a "*Referral Partner commission*". The letter provided in relevant part as follows:

*"Referral partner will: (1) introduce Autonomy into the deals with Citi Group*

*("End-User"); (2) obtain quotes from Autonomy on behalf of the End-User;*

*and (3) work with the End-User to assist in executing purchase orders and contracts with Autonomy.*

*Autonomy will: (1) pay Referral Partner commissions in the amount of $497,000, as a result of Referral Partner's direct and proximate participation in the account; (2) deliver products directly to the End-User; and (3) use reasonable efforts to provide mutually agreed upon sales assistance. With respect to any Lead (as defined below), including the End-User obtained by Referral Partner through Autonomy, Referral Partner agrees not to market or sell any products competitive with the Autonomy software to such Lead for the specific Lead opportunity identified and will promptly notify Autonomy is such Lead is considering a competitive product…".*

557. The Claimants submitted that DiscoverTech had not performed any of these roles. As Mr David Truitt testified in the US criminal trial:

> *"Q. Did Discover introduce Autonomy into the deals with Citigroup? A. We did not.*
>
> *Q. (reading) "(2) Obtain quotes from Autonomy on behalf of the end-user." Did Discover Technologies do that? A. We did not.*
>
> *...*
>
> *Q. Beyond signing the purchase order in March of 2010 and taking the risk as you described, did Discover Tech provide any marketing assistance to Autonomy?*
>
> *A. No. Again, these existing customer deals, there really wasn't much to do. We did not."*

558. Dr Lynch confirmed in cross-examination that he had no basis on which to dispute Mr David Truitt's evidence though (as elaborated below) he explained his different understanding of the letter, and he did not accept that, in the round, a false impression was given of DiscoverTech's role.

559. The Claimants also made the point that there is no evidence before the Court from Mr Kanter. They submitted that therefore there is no basis on which the Court could find that he (Mr Kanter) honestly believed the description in this agreement of DiscoverTech's role to be true, or that he had any basis for holding such a belief.

560. Accordingly, the Claimants submitted that the payment of a nearly $0.5 million fee was for doing *"nothing other than facilitating an improper acceleration of income."*

561. Against this, the Defendants contended that, even if the presentation was not entirely accurate, there was a clear rationale for the payment, as Deloitte accepted in their review. The letter from Mr Kanter contained standard form language and was capable of being

used, in that (a) the first obligation of Autonomy was to pay DiscoverTech for its *"direct and proximate participation in the account"* which covered DiscoverTech's planned and eventual role and (b) the agreement also had forward-looking obligations, including a restriction on competition from the VAR which Dr Lynch stated in cross-examination was of importance because:

> *"...in return what we want is the ability to have the relationship through them with the customer and them*

> *not to go along and do things like, for example, bring in our competitors and that sort of thing."*

562.  When pressed by Mr Rabinowitz to accept that *"it's obvious that the letter from Mr Kanter gives a false impression of what role DiscoverTech was actually playing here"* Dr Lynch reiterated that this was not his understanding. The suggestion was then put to him that:

> *"the problem for Autonomy was that if it documented the real reason for paying a fee to the VAR, that would involve stating that the VAR was being rewarded for enabling Autonomy to recognise revenue improperly, correct?"*

563.  Dr Lynch responded:

> *"I disagree. If the VAR letter had just said, "We're going to pay a marketing assistance fee" or, you know, "a fee", there would be nothing wrong with that. There doesn't have to be a specific reason given. Especially if the commercial reality is obviously the VAR wants to make a turn on its deal. Again, this is industry standard stuff, everyone does it, including HP."*

564.  The Defendants thus dismissed the Claimants' point as a *"forensic rather than a real one".*

565.  The question, as it seems to me, is whether Mr Kanter's letter was really just a handy template, some broadly applicable to the facts, some not but adopted out of convenience and not to misrepresent; or whether the description of the services purportedly provided by DiscoverTech was intentionally crafted to secure approval from Deloitte and/or the Audit Committee. Did Mr Kanter intentionally exaggerate and misstate DiscoverTech's role? Dr Lynch said it did not.

566.  In my judgment, the letter was all of a piece with the misrepresentation of the whole nature of the transaction. It was false because the whole notion that the VAR was doing anything at all was false. The letter was intentionally in terms which sought to bolster the appearance of, in the words of the letter itself, a commission being paid for *"direct and proximate participation in the account",* direct contact with and delivery to the end-user and *"reasonable efforts to provide mutually agreed upon sales*

*assistance"*. A fee would probably not of itself have been objectionable; nor do I think it has been established that it was known to be a reward for impropriety. It seems to me likely that Mr David Truitt's simple explanation that *"we took the risk by issuing the order, and…expected to be paid*

*a margin when the deal closed"* was the reality in this context, as in many similar VAR deals. But the letter was part of the entire presentation: and, in my judgment, whether template or made to measure, it was misleading, and known by Mr Kanter to be so.

567. Finally, I would note one further typical feature:  Dr Lynch accepted that the deal did not ultimately result in follow-on work for DiscoverTech either. In seeking to justify a fee by reference to the need to secure loyalty in the context of that future work, Dr Lynch was once again speaking more theoretically than accurately. Moreover, the 'friendly' VARs tended to present the opportunity for future service work as both (a) the main commercial reason for the VAR undertaking the risk and also (b) a valuable prospective contribution or *"added value"* from Autonomy's point of view, since its objectives included minimising its own service business (and relying on sub-contractors or partners instead) and maximising its software licence sales.

*Defendants' knowledge of and participation in VT11*

568. There is no issue as to Mr Hussain's knowledge of and participation in VT11 and in offering a discount in exchange for agreement to the subsequent tripartite agreement and payment of a *"Referral Partner commission"* or MAF (which Mr Hussain approved). He appears to have been sent a copy of Mr Kanter's letter of 15 October 2010.

569. Dr Lynch's case was that he (Dr Lynch) knew of but was not involved in the negotiation of this reseller deal, nor in the accounting for it.   Nor was he involved in the later tripartite arrangement, or in the MAF payment. Dr Lynch was cross-examined on this transaction:

> (1) Dr Lynch understandably said that he would not know whether DiscoverTech had a relationship with Citi.
>
> (2) He was asked why he had not mentioned either this transaction or the one with PMI in his evidence; he replied by saying *"I don't think there's anything wrong with a willing buyer buying software off you in the hope of selling it on."*

(3) It was put to Dr Lynch that he was aware that "*Autonomy was proposing to get DiscoverTech to submit a purchase order for end-user Citi to enable Autonomy to recognise revenue of $5.5 million in the quarter*".  Dr Lynch answered: "*I think that's the goal, yes*".

(4) The Claimants put to Dr Lynch their argument about the Citi deal ultimately including hardware and software as well.  Dr Lynch made clear that he was not involved in or aware of any of this detail at the time.  He said: "*I may have had it on a list, but I wouldn't have had any more involvement than that.*" He was not challenged on this evidence.

(5) Dr Lynch was asked about the wording of Mr Kanter's MAF letter.  It was not suggested that Dr Lynch had played any role in preparing this letter, or that he had even seen it at the time.  When asked questions about it, however, Dr Lynch did not accept that the letter was misleading: he explained that these were standard terms which contained a forward-looking element.  He also made the point that this was a standard way of compensating a reseller in the industry, and that resellers did in fact assist in marketing continually.

570. Dr Lynch submitted in the round that none of the points raised by the Claimants in cross-examining came near to justifying the contention that he was aware of any impropriety or false accounting with respect to this transaction.

571. In my judgment, Dr Lynch plainly knew of the use of DiscoverTech as a VAR for the transaction. On 31 March 2010 Mr Hussain had notified him of this by an emailed note which summarised the "*Route to 25c requires $200m*" and had an entry "*Citi – Disc tech 5.5*".  But there is little transaction-specific evidence to tie him to the various subsequent events described above.

572. Nevertheless, and given the usual course of monitoring of deals identified as necessary to enable forecasts to be met, I think it more likely than not that Mr Hussain did keep him informed of the progress towards a deal; and in light of their usual practices, and Mr Hussain's personal need and tendency to share such matters with Dr Lynch, I also think it likely that Mr Hussain told Dr Lynch of (a) Citi's threat to walk away from the relationship if not given a discount (see above), (b) Mr Hussain's agreement to 40% and (c) the accommodation agreed in the form of the tripartite agreement (which Dr Lynch would have known would be presented to Deloitte). More generally, in my judgment, Dr Lynch knew that the VAR was expected to do nothing in every case.

Once again I would in addition refer to and read in paragraph 2192 to 2195 in the main body of the judgment *mutatis mutandis*. Given the $30,000 approval policy, I consider also that Mr Hussain would have referred to Dr Lynch before approving a payment out as a MAF of some $0.5 million.

573. All in all, therefore, I have concluded that both Mr Hussain and Dr Lynch knew that VT11 had no real substance, and the recognition of revenue from it in Q1 2010 was wrong and that Deloitte were giving approval in ignorance of the true nature of the transaction (and in particular, its lack of any real substance).

574. VT11 (in Q1 2010) seems to me to illustrate well the strategy of using 'friendly' VARs to make good revenue shortfalls and the pattern adopted (with variations to suit particular exigencies) to implement it, which involved the VAR in doing nothing beyond accepting a legal risk and thereby enabling Autonomy to present the 'sale' as mandating revenue recognition whereas in truth the only real sale was any which Autonomy could negotiate and agree with an end-user.

## VT12: DiscoverTech/PMI Q1 2010

575. VT11 was transacted in tandem with another impugned VAR transaction (VT12) between Autonomy and DiscoverTech for prospective end-user Philip Morris International ("PMI"), the tobacco company.

576. The VT12 purchase order was issued subject to a reseller agreement on substantially the same terms as that used for VT11, which I have summarised at paragraph 508 above. It was set out in a letter dated 31 March 2010 from Autonomy to DiscoverTech, signed by Mr Kanter and counter-signed by Mr Malcolm A. Hyson (as Vice President) for DiscoverTech. The agreement expressly provided that it constituted the parties' entire agreement and put DiscoverTech fully on risk. The licence fee was $4,185,000 (with $878,850 payable immediately upon execution) plus a first-year support fee of $209,250.

577. Mr David Truitt's evidence was that the PMI deal presented an opportunity he wanted to participate in. He wanted to provide services to the end-user, and assumed the risk of the transaction in order to do so. He also funded the first instalment payment from his own resources. Mr David Truitt's evidence corroborated Mr Egan's evidence that DiscoverTech was on risk.

578. The only issue on which I need to focus in respect of VT12 seems to me to concern the circumstances in which PMI entered into a direct deal with Autonomy, rather than a deal with DiscoverTech.

579.  The Claimants focused in this regard on an email dated 4 August 2010 from Mr Hussain to Mr Kanter (copying Mr Egan) seeking approval for a payment of a MAF to DiscoverTech, in which Mr Hussain explained the history and sought to justify the payment of a MAF on the basis of:

> *"the history being that because PMI were so concerned about compliance that they placed the order direct so the DiscoverTech PO was replaced."*

580.  The Claimants contended that this explanation was contrived and untrue, *"as all those involved in the exchange would have known"*. In truth, they contended, PMI had:

> *"placed its order with Autonomy because it had been negotiating with*
> *Autonomy all along and had no relationship with DiscoverTech."*

581.  The Claimants relied on a sequence of emails demonstrating that it was Autonomy which pushed for the deal it eventually struck with PMI to be *"pushed through DiscoverTech"*. At one point, in early June 2010, this appeared to be nearly agreed since PMI at that time contemplated itself dealing through its "partner", SHI. But PMI changed its mind because that idea was causing internal problems for it. At that point, Autonomy continued to press for the deal with PMI to be "pushed through" via DiscoverTech, and put this forward in what the emails described as a *"higher level approach"*; but in the same email it was recognised within Autonomy that if that higher level approach failed, they would *"need SH to approve the direct route"*. That effort did fail: PMI declined to place an order with DiscoverTech and insisted that any deal be direct with Autonomy; and a direct deal was then concluded. The Claimants submitted that this transaction thus followed the standard 'pattern', with the irrelevant exception that at one point, and at Autonomy's urging, the end-user did toy with the idea of dealing via DiscoverTech. None of this signified that there was any real intention for DiscoverTech to take any active part in the negotiation or execution of a transaction with PMI; it was always to be entirely passive, in accordance with the 'pattern'.

582.  The Defendants, on the other hand, presented the background to be, in summary, as follows. After the VAR deal had closed, PMI wanted to use its own partner for the deal, SHI. Autonomy was content with this provided that PMI's partner dealt through Autonomy's partner, DiscoverTech.  As at 4 June 2010, DiscoverTech were waiting for a purchase order from SHI, and

would be shipping them the software that had been shipped to DiscoverTech by Autonomy (using Automater) in the previous quarter.

583.   In the event, PMI changed its mind with regard to having any partners on the deal and the purchase was implemented as a direct deal.   In circumstances where Autonomy had taken the opportunity and the purchase order directly, leaving DiscoverTech without the enduser prospect envisaged, a credit note was issued to DiscoverTech and a MAF was paid.  The amount of the MAF reflected the margin between the sale to DiscoverTech and the subsequent end-user sale.

584.   In effect, the Defendants sought to contend that the direct deal between Autonomy and PMI was an unexpected substitute for an expected end-user sale by DiscoverTech to PMI, necessitating and justifying the credit note as the means of making good DiscoverTech for the direct deal having caused DiscoverTech to miss out on the end-user sale for which it had purchased the software. The sub-text was that the sale to the VAR was a substantive sale in the expectation of an onward sale by the VAR to PMI.

585.   I cannot accept that an end-user sale was ever the expectation; and even if PMI had agreed to sell to DiscoverTech (which, as has been seen, it did not) the reality would have been that this would simply have been a convenient means of settling Autonomy's direct sale. Vis-a-vis PMI the seller was always Autonomy. The objective of the negotiations was always a direct sale. Autonomy's urgent recourse to a VAR in order to trigger revenue recognition in the desired quarter did not alter either the negotiations or their objective. The Defendants' depiction of VT12 as having been entered into with a view to DiscoverTech entering into an onward end-user sale to PMI is inconsistent with the chronology and the emails I have referred to above.

586.   I agree with the Claimants, therefore, that VT12 was another exemplar of the usual pattern. It follows, and I find, that Mr Hussain's email of 4 August 2010, in giving the impression that only concerns about compliance issues had led to the direct sale, was false.

587.   There is no dispute as to Mr Hussain's knowledge of VT12, and he was kept informed at every stage after it which ultimately resulted in the proposed onward sale by DiscoverTech to PMI's partner, SHI, being replaced by a direct sale by Autonomy to PMI and the issue of a credit note by Autonomy to DiscoverTech. Mr Hussain also approved the payment of a MAF.

588. Dr Lynch did not address VT12 in his witness statements. He explained in crossexamination that he had *"almost no involvement"* in either PMI or Citi, or in their accounting treatment. He accepted that he knew that a VAR was to be involved, and he made clear that he was content with that:

> *"As I've said, I would have had no issue about a deal that we were working with an end-user, a VAR becoming involved in that and that sale happening to the VAR if the end-user deal was delayed or the VAR gave us other advantages."*

589. I would repeat *mutatis mutandis* what I have said in paragraphs 568 to 574 above in relation to VT11 and the Citi deal, and the Defendants' "guilty knowledge" and express the same conclusion.

590. The only further point I need note in respect of the transaction is the Claimants' assertion that:

> *"Thereafter, the Defendants were more careful to ensure that Deloitte was kept in the dark about the phenomenon of VARs being reversed and replaced by a direct end-user deal. Until Q3 2011 – a quarter that was not reviewed by Deloitte – Autonomy developed other ways to protect the relevant VARS."*

**VT30: DiscoverTech/Prisa Q1 2011**

591. Promotora de Informaciones SA ("Prisa") was (and is) an IT service management and media company operating in Spain, Portugal and (so Dr Lynch thought) Latin America. It was an existing Autonomy customer with which Autonomy was in discussions during 2011 with a view to a hosting transaction under which Autonomy would *"swipe the hosting business away from IBM",* as Mr James Murray at Autonomy described it in an email dated 15 March 2011 to Mr Hussain and Mr Wyse, which was copied to Dr Blanchflower. In the same email Mr Murray noted that Prisa understood that Autonomy *"would try to squeeze it into this quarter."*

592. The possibility of such a transaction was initially described by Mr Hussain in an email to Dr Lynch dated 17 March 2011 as a *"real long shot"*. However, after a meeting in Madrid, Mr Hussain emailed Dr Lynch on 24 March 2011 saying *"Prisa going well. Need bbc"*, and again on 28 March 2011 to say the prospects were 50/50. However, when Dr Lynch requested a further update from Mr Hussain on 30 March 2011 (which is demonstrative of the frequent contact and process of updating that apparently was the

norm between Dr Lynch and Mr Hussain), Mr Hussain's spreadsheet sent in reply no longer mentioned Prisa; and in the event, however, no deal had transpired before the end of the quarter.

593.  The collapse of the prospect of the Prisa deal in Q1 2011 gave rise to the risk of a shortfall of quarterly revenue (compared to forecast). Prisa became one of several deals in respect of which Autonomy resorted to a VAR transaction with DiscoverTech, the terms of which were set out in a letter agreement bearing the date 31 March 2011. Those terms were substantially the same as the terms set out in earlier letter agreements between Autonomy and DiscoverTech, and included the provisions referred to in paragraph 508 above (including the provisions for the passing of risk and control, and an entire agreement clause).

594.  Looking ahead, no deal in relation to this software was eventually concluded with Prisa, by either DiscoverTech or Autonomy. The Claimants' position is that although DiscoverTech satisfied its obligations in respect of this deal[573] it was only enabled to do so by a 'reciprocal' transaction which they sought also to impugn.

595.  To return to the VAR transaction itself, the Claimants' complaints in relation to this transaction, VT30, had four principal strands (though one related to the hardware case rather than the VAR claims):

(1) First, there was an allegation of backdating. It was said that Mr Hussain only asked Mr David Truitt (via Mr Egan) to take a deal for Prisa as prospective enduser some time in the week <u>after</u> the end of Q1 2011, that the Prisa deal was in

fact not entered into until 4 April 2011, and the letter agreement was backdated to the quarter end so that revenue could be booked as earned in the quarter (Q1 2011), which in truth it had not been;

(2) Secondly, the deal was also said to illustrate the use of hardware sales as a discretionary fund, use of which could be calibrated with VAR sales;

(3) Thirdly, the Claimants contended that there was never any real prospect of a sale to Prisa because Prisa had no need for the software offered;

---

[573] The Claimants complain about the purchases by Autonomy of DiscoverEngine software. See section C.5.12 below.

(4) Fourthly, the Claimants contended that although DiscoverTech did pay its debts to Autonomy on the deal (despite there being no end-user sale), DiscoverTech was enabled to do so by Autonomy purchasing DiscoverTech's

*"DiscoverEngine"* software.

*Alleged backdating*

596. The Claimants' case that the Prisa VAR deal was dishonestly backdated to 31 March 2011 (see paragraph 595(1) above) was principally based on the evidence of Mr Egan in these proceedings and on Mr David Truitt's testimony when cross-examined in the US criminal proceedings. They also relied on more limited evidence from Mr Scott also given in the course of the US criminal proceedings.

597. Mr Egan described the circumstances of the VAR deal (VT30) in his witness statement as follows:

> *"In early April 2011, Mr Hussain told me that he needed a deal to make up for a revenue shortfall in Q1 2011. He asked me to get DiscoverTech to take a deal for PRISA as end-user. He told me that the deal documents had to be dated March 31, 2011. I called David Truitt. I asked him, as a favor and as a one-time request, to do a deal that would be backdated to March 31. On April 4, 2011, I sent Mr. Truitt a letter agreement dated March 31 that gave DiscoverTech a license to sublicense to PRISA certain identified eDiscovery and archiving software. The license fee was $3.6 million, plus $200,000 for support and maintenance. I asked that a signed purchase order be sent to my personal email, rather than my Autonomy email address, so that I could separate the signed license agreement (dated March 31) from the electronically dated covering email (which would be dated April 4 or 5) and could then provide a copy of the license agreement only to Autonomy for its records.*
>
> *Mr. Truitt said that he was uncomfortable with this request. I said I was equally uncomfortable with it. Nevertheless, Mr. Truitt agreed to have his CTO Malcolm Hyson sign the letter agreement. The signed agreement was sent to my personal email address. I countersigned the agreement and dated my signature March 31, 2011. …"*

598. The Claimants contended that Mr Egan's account was also borne out by an instant messaging chat on 4 April 2011 between Mr David Truitt and Mr Hyson. Mr David Truitt was confused by Mr

Egan's request to "*pdf me an email*" and sought Mr Hyson's advice on what it meant. He explained that "*Autonomy wants me to PDF an order, said that it will not change the date on the document if it is PDF?*". The Claimants contended that the reason for a PDF was to conceal the fraudulent backdating.

599.   When he was asked by Counsel for Mr Hussain in these proceedings why he had not revealed the backdating earlier to HP's lawyers (and only then when trying to get an immunity deal), and why he had made no mention of it in his letter to the US Air Force in relation to the Prisa deal, Mr Egan's evidence was that he felt "*uncomfortable*" about the backdating, that he *"buried it"* as a "*very unpleasant memory*". He accepted that *"in the truest sense of the word"* he had not forgotten it and would "*never forget about it*". He said, "*I felt at the time when I was doing it that it was the wrong thing to do*".

600.   His explanation for not having mentioned the backdating earlier to HP's lawyers was that he was not asked about the DiscoverTech/Prisa transaction and was not volunteering information on transactions he was not asked about:

> "*I really wasn't volunteering any information in general. I was asked to and really advised to answer everything and anything asked of me truthfully.*"

601.   When asked whether he accepted that it was possible that his recollection "*might have been affected by the threat that you might be prosecuted and imprisoned*" he said he did not accept that, adding that he "*never felt as though there was any prospect that [he] was in that kind of jeopardy*". He did accept, however, that it was possible ("*a truism in the world*") that his recollection might have been affected by the process of talking to lawyers.

602.   Mr David Truitt's evidence in the US criminal proceedings was that the backdating was for him too "*very concerning because it was out of the norm of what I knew business to be*". Mr David Truitt also said that he "*reached out to both Mr Egan and Mr Scott and let them know that I was concerned about what I had been asked to do;*" he "*wanted to make sure that I wasn't doing anything improper. I did not want to put myself in a situation where I could be in trouble.*"

603.   Mr David Truitt's evidence was that it was in light of his concerns that a meeting took place between Mr Egan, Mr Hussain and himself on 14 April 2011, in respect of which he sought reassurance. The Claimants and the Defendants presented the nature and effect of the discussions very differently.

604. In summary, the Claimants painted a picture of Mr Hussain reassuring Mr David Truitt that since Autonomy traded out of the UK, it was not within the purview of the US Securities and Exchange Commission and that international accounting principles allowed "*some flexibility*", but that in light of Mr David Truitt's misgivings, it would not happen again. The forensic impression the Claimants sought to create was that the reassurance was in effect that the backdating was unlikely to be discovered by the regulators, and Autonomy would not run the risk again.

605. The Claimants dismissed the suggestion made on behalf of the Defendants that Mr David Truitt's discomfort was alleviated by the reassurance given that the documenting of a previously reached agreement was permissible under IFRS; they submitted that the suggestion was "*inherently implausible, uncorroborated by any contemporaneous documents, unsupported by any evidence from Mr Hussain, and Mr Egan did not have any memory of it*". The Claimants made the point that if the purpose of the purchase order was merely to record a previously concluded oral agreement, it is hard to see why the documentation could not simply have said so: it would have been easy for the document

to have borne the genuine signature date but stating that it was memorialising an oral agreement reached in March 2011.

606. The Defendants, on the other hand, depicted Mr David Truitt's concern as having been that for accounting purposes the relevant date was not when the transaction was agreed but when it was formalized in writing, and that therefore his signature on a backdated document had resulted in substantively improper accounting, (which, he said, "*is why I was concerned*"). The Defendants contended that this concern was misplaced. It was based on a misunderstanding as to the effect under IFRS of papering a deal agreed within a given quarter, but not reduced to writing until after the end of the relevant quarter. It was their case that the relevant date for IFRS purposes was the date of agreement, and not the date of the paper recording or evidencing agreement. On that basis, the backdating of the document had no substantive effect in terms of revenue recognition in Q1 2011 if the date on the document reflected the date of an earlier oral agreement.

607. The factual premise of the Defendants' presentation was thus that the relevant Prisa deal had in fact been agreed before the end of the quarter, as one of many in a "*slate of deals*" agreed orally. However, neither Mr David Truitt nor Mr Egan could be sure of this. In a sense it offered Mr David Truitt a graceful exit; for Mr Egan it was more dangerous, first, because if there was a prior agreement, it could be said that it was his own failure to get the paperwork done which had caused the problems, and secondly,

because his approach to the US prosecuting authorities was to confess and avoid, and hope they would pursue bigger fish; and, further, his deal with the US authorities required him to maintain consistency with the version of events he agreed with them.

608. Mr David Truitt's evidence was that Autonomy had approached him within the last days of the quarter. They had offered a *"slate of deals"* which Mr Truitt agreed to do; he thought that the Prisa deal *"very well could have been"* in that slate of deals, but he could not say for certain one way or the other. He thought that he and Mr Egan were talking about the slate of deals on the Thursday (the last day of the quarter); the paperwork for the Prisa deal was not completed until the Monday.

609. Mr Egan accepted that he could not be sure, or anywhere near sure, that David Truitt's recollection was wrong. He accepted that his own memory of the meeting and what specifically was said was vague; but whilst accepting that it was possible that Mr David Truitt's recollection was right, he did say *"It's not my memory"*; and he subsequently added:

> *"…My feeling was I did not feel as though we had done the deal, so I had bad feelings about papering it after the end of the quarter."*

610. That encapsulates the factual difference: the dispute is not as to whether the document was backdated but whether before the document was executed the parties were already in fact in agreement on the terms of the deal.

611. The evidence given by Mr Scott in the US criminal proceedings is of some relevance in this context. He confirmed that Mr Hussain had asked late on 31 March 2011 for a list of *"8a deals"* which he had taken to be a request for a list of the VAR deals that Autonomy had executed on 31 March 2011. When Mr Scott responded (on 1 April 2011) listing the deals for which purchase orders had been issued, he identified two DiscoverTech deals, neither of which was a Prisa deal. No explanation was offered by the Defendants as to

why, if done by then, the Prisa deal was not included in the list. There was no documentary evidence to support the theory that Prisa was proposed to and agreed by DiscoverTech on or before 31 March 2011.

612. I have reached the conclusion, on the balance of probabilities, that the Prisa deal was presented to DiscoverTech after the end of the quarter. It seems to me probable that it had been omitted in error from the "slate of deals" presented to DiscoverTech, and that when the error was discovered (perhaps after the list obtained from Mr

Scott did not mention it) the error was sought to be cured by the wrongly dated letter agreement: given that Mr Hussain had earlier pressed hard for a direct deal with Prisa before quarter-end that seems to me more likely than the alternative explanation of it being an after-thought. In my judgment, therefore, VT30 was backdated, and the backdated document did not evidence any prior finalised oral agreement.

613.   It would follow that revenue was prematurely recognised in an earlier quarter than was justified.

614.   Ironically, in fact the revenue from VT30 was not required to achieve the quarterly revenue forecast. That leads on to another facet of the Claimants' contention that the Prisa deal shows *"that, for the Defendants, the revenue recognition decision was to be reverseengineered from the target figure for total revenue, regardless of the underlying facts."*

*Calibration with hardware sales: two levers to manipulate revenue?*

615.   This aspect of the case ties in with parallel allegations in the context of the Claimants' claims in relation to hardware sales to the effect that Autonomy was treating the revenue from hardware sales as a discretionary fund that could be recognised as and when it was needed to meet quarterly targets, and that the figures were manipulated by Autonomy after the quarter-end.

616.   In the context of the Prisa deal, the Claimants focused on two emails in particular. The first was an email from Mr Hussain to Dr Lynch dated 11 April 2011, with the subject *"Q/e"*, stating:

> *"If we defer prisa then we are at 218.1m but 24c and 85% [gross margin]. If we don't defer prisa but defer equiv low margin we are at same revs but now at 25c and 88%. To discuss when I land or you can discuss with steve [Chamberlain]."*

617.   The reference to *"equiv low margin"* was to low margin hardware revenue, which the Claimants contended was turned on and off according to whether it was needed to meet revenue forecasts. In short, the Claimants contended that in this email Mr Hussain was identifying various options that he considered might be adopted in relation to revenue recognition at this time, and in particular was questioning whether to recognise revenue in Q1 2011 on the DiscoverTech/Prisa transaction (which was, in fact, not entered into until early April 2011, but was backdated to 31 March 2011), or instead to recognise hardware revenue – the benefit of the former course being the advantageous effect it would have on

gross margin and earnings per share (given the comparatively low margin or loss on hardware sales).

618. In cross-examination, Dr Lynch stated that he did not accept that Mr Hussain was "*saying that there's necessarily a choice in all of this*". However, the Claimants submitted that it is plain from Mr Hussain's email that Mr Hussain was doing precisely that: he was making clear to Dr Lynch that they could do one thing ("*defer prisa*") or the other ("*defer equiv low margin*"). Moreover, if Mr Hussain was not presenting a choice, there would be nothing for Dr Lynch to discuss with Mr Hussain or Mr Chamberlain on the back of the email ("*To discuss when I land or you can discuss with steve*"). That is plainly correct: I accept it[574].

619. The second email exchange relied on was on the following day. Mr Chamberlain's email to Mr Hussain the following day, 12 April 2011, with the subject "*Numbers*" read as follows:

> "*Three options*:
>
> 1) *recognize Prisa, defer $3.6m Hardware - $218.1m, 88%, 24.8c*
>
> 2) *Defer Prisa, recognize $3.6m HW - $218.1m, 86%, 23.7c*
>
> 3) *recognise BBC $1.6m, defer Prisa, recognize $2.0m HW - $218.1m, 87%, 24.2c*
>
> *Need to speak asap to lock this down. We announce in 9 days and if we don't stop moving I cannot deliver timetable.*"

620. Thus, according to the Claimants' reading of the email, Mr Chamberlain presented "*Three options*":

(1) The first option was to recognise the Prisa VAR transaction and to defer the equivalent amount of hardware revenue ($3.6 million), which would result in total revenue for the quarter of $218.1 million, a gross margin of 88%, with earnings per share of 24.8 cents.

(2) The second option was to defer Prisa and instead recognise hardware revenue of $3.6 million, which would result in the same overall revenue ($218.1 million), but a lower gross margin (86%) and earnings

---

[574] This is also relevant to the hardware claim, as it shows hardware was seen as a flexible mechanism to meet revenue targets.

per share (23.7 cents) due to the hardware deals being loss-making.

(3) The third option was to recognise a transaction with the BBC with revenue of $1.6 million, again defer Prisa, but recognise hardware revenue of $2 million, which would generate the same overall revenue, but mean that gross margin and earnings per share were at 87% and 24.2 cents respectively.

621.  The Claimants submitted that the fact that these were intended to form options is reinforced by Mr Chamberlain's concluding paragraph, in which he said that he needed to speak to Mr Hussain as soon as possible so as "*to lock this down*".

622.  Dr Lynch told me that this was not how he interpreted the email. Dr Lynch did not accept that Mr Chamberlain was really presenting a choice between options: rather, he suggested

that the email identified the various ways in which revenue would be affected according to whether it was possible to recognise revenue from the various transactions identified, which would depend on a review of whether or not the accountancy criteria were satisfied.

623.  Dr Lynch also sought to distinguish between on the one hand, picking and choosing what revenue to recognise (which he had accepted was not permissible under IAS 18.14) and, on the other hand, determining by reference to criteria whether it was permissible to recognise the revenue by reference to accountancy criteria such as collectability, or whether delivery had successfully been completed. Thus, Dr Lynch rejected the suggestion put to him that the email demonstrated "*a willingness to pick and choose what revenue to recognise which you knew was improper*". He maintained that his understanding was that this was explicable as one of the legitimate judgements that have to happen after the quarter end and before the finalisation of the quarterly report: in particular:

> "*A. ...After the end of the quarter, my understanding is there are a series of judgments that have to be made. One of them is to do, for example, with creditworthiness, and in this quarter DiscoverTech had submitted three orders and there was a judgment to be made about whether DiscoverTech's credit was worthy of having three*

> *or two or one, or which of the two,
> and that decision had to be made.*
>
> *At the same time there was also
> issues about whether all of the
> necessary proof to meet all of the
> acceptance criteria about hardware
> had been met. And this is part of the
> normal process that happens past
> the quarter end where all of the
> paperwork and the terms and the
> evidence is reviewed."*

624. Dr Lynch further elaborated this as follows (in a passage which I
also consider reinforces my conclusion that the backdating was to
cover an oversight) when pressed as to whether he understood the
process at the time:

> *"I would definitely have understood at the time the
> general principle I just outlined to you because what
> happened at the quarter end was there would be
> complete chaos in the last couple of days of the quarter
> as the deals are done, then the deals start to come in, the
> paperwork, over the next few days. Then they go through
> legal and finance, so legal will check that there's no
> amendments that make it not recognisable or
> acceptance criteria, whatever. Then finance will look at
> it. As we've seen, Mr Chamberlain then has to get
> together evidence for whatever –"*

625. This has, in general terms as opposed to particular application, the
ring of truth and practical reality. In the parallel context of the
recognition or deferral of hardware revenue, both Mr Bloomer
(Audit Committee Chairman from September 2010) and Ms Harris
(Autonomy's Financial Controller) confirmed that there is nothing
improper in reviewing, after the quarter end, whether to recognise
revenue in the previous or subsequent quarter according to a
judgment as to the satisfaction or not of revenue recognition
criteria. As Mr Bloomer said:

> *"…it's normal in any company, when you finish a
> quarter or a half-year or year, annual accounts, to have
> a -- there are always things that need sorting out after
> the end of the period…[such as] …did things actually get
> delivered in the quarter or the next quarter, the bad debt
> provision always gets sorted out after the quarter-
> end…I'd want and would expect the auditors to look at
> that as part of their review of cut-off and be comfortable
> that whatever decisions were made were appropriate for*

> *the end of the period and what should fall into the next period."*

626.  Ms Harris also stressed that any late post-quarter or other accounting period changes, and especially revenue recognition changes, would be scrutinised with special care by auditors, who typically remained on site in the weeks after the quarter-end.

627.  I accept the evidence of Dr Lynch, Mr Bloomer and Ms Harris that post-accounting period review and alterations were plainly normal, appropriate and indeed necessary, especially as regards revenue recognition (whether in respect of sales of hardware or software). But the real question is whether that was the process recorded or invited by the emails to which I have referred. The Claimants contended that it was not, and they dismissed Dr Lynch's further justifications as not credible.

628.  I have concluded that the email exchanges referred to above cannot satisfactorily be explained away as showing merely the usual and proper process of checking that revenue recognition criteria (such as completed delivery or achievement of designated 'milestones') have been satisfied prior to the end of the quarter. The impression I have formed is, and I find, that by early 2011 Mr Chamberlain and Mr Hussain had begun to think of the revenue recognition criteria, especially in their application to hardware revenue, as being malleable. Further, the 'options' adumbrated by Mr Chamberlain demonstrated that, by then, the two of them (at least) were prepared occasionally to stretch the normal process of revenue recognition review after quarter-end to extend to some fluid self-serving review, which could be described as manipulation, of the timing of revenue recognition, perhaps taking advantage of a certain fluidity and chaos, to suit the objectives of (a) meeting and beating revenue forecasts, (b) achieving healthy gross margins and (c) maximising earnings per share.

629.  Given that (as was common ground) IAS 18.14 not only permits but requires revenue recognition if the criteria it identifies are satisfied, so that, as Mr Welham put it in his witness statement, *"[e]ither the revenue was earned in Q1 2011, or it was not"*, a determination of the timing of revenue recognition after the end of a quarter in which it was apparently earned which is influenced and even driven by such objectives is a departure from the approach stipulated, as well as being obviously improper. It is not consistent with IAS 18.14, as all concerned must have known.

630.  In the event, revenue from the DiscoverTech/Prisa VAR transaction was allocated to and recognised in Q1 2011. A comparison between the hardware revenue that Mr Sullivan achieved in Q1 2011 ($22.1 million) and the amount recognised in

that quarter ($20.1 million) indicates that some $2 million out of $3.6 million of hardware revenue was deferred. The upshot was that Autonomy was able to report total revenue for the quarter of $220 million, gross margins of 88% and adjusted earnings per share[575] of 26 cents.

*Never any intention that DiscoverTech would negotiate or conclude an end-user sale*

631. The third strand of the Claimants' case on the Prisa deal (see paragraph 595(3) above) was their assertion that there was never any real prospect of any onward sale to Prisa, and that there was never any real intention either that DiscoverTech should even attempt to effect such a sale.

632. The Claimants relied in this context on the evidence of Mr Rahul Puri ("Mr Puri"), who was between May 2010 and September 2013 Managing Director of Innovation and Chief Software Architect at Prisa (based in Madrid). Mr Puri, who also gave evidence at the US criminal trial, stated that he only learned of Autonomy's agreement with DiscoverTech (VT30) in the context of that criminal trial, and had never heard of DiscoverTech before then. He stated that:

> *"DiscoverTech did not at any time contact Prisa and, in particular, did not attempt to license any Autonomy software or to sell any Autonomy services to Prisa. All of my interactions were with Mr Murray and his colleagues from Autonomy."*

633. Furthermore, Mr Puri added that the software licence which was the subject matter of VT30 would not have been of interest to Prisa. His evidence was:

> *"I have been shown a copy of the agreement between Autonomy and DiscoverTech. The software in question, including e-Discovery software, was of no interest to me or Prisa. I am confident that, if Prisa had made an acquisition of Autonomy software for a sum as large as $3.6 million, or had a need for such software, I would have known about it. Furthermore, I note that the only language listed in the agreement was English. However,*

---

[575] 57
Adjusted for conversion of loan notes.

> *this would have been of little use to Prisa. As I have
> already explained, the key languages from Prisa's
> perspective were Spanish and Portuguese."*

634.   It was suggested to Mr Puri in cross-examination that Prisa would
       have been interested in a hosting platform that "*could handle
       litigation if it arose*". However, Mr Puri said that the initial
       purpose of the hosting platform was for Prisa's media assets and
       media content, not the back office. It was also suggested to him,
       giving as an illustrative example of standard needs of a large media
       group, an agreement between Zantaz and Sony Pictures
       Entertainment, which included a licence of Introspect (e-
       Discovery software). Mr Puri answered "*Depends on the company
       and depends on the need*" and rebuffed any suggestion that Prisa
       would need such software. There was no challenge to Mr Puri's
       evidence that Prisa's interest would, in any event, have been in
       Spanish- and Portuguese- language versions of the software.

635.   As well as stressing their general point that the likely level of
       Prisa's interest was something for which, having purchased the
       software, DiscoverTech was bearing the risk,

       the Defendants contended that the Claimants' argument (a)
       inaccurately and unfairly characterised the deal with
       DiscoverTech which was not just for electronic discovery
       software and (b) was dependent on evidence from Mr Puri which
       overstated his involvement with the hosting part of Prisa's plans
       and should be treated with considerable caution.

636.   As to (a) in the preceding paragraph 635, the software purchased
       under VT30 included not only e-Discovery software but also a
       complete "Archive Solution", which included Autonomy
       Consolidated Archive ("ACA"), Software for Microsoft
       Exchange, ACA Mail, Autonomy Legal Hold and Autonomy
       Investigator for use with ACA software. Mr Puri accepted that this
       package would, for example, have permitted archiving of emails:
       and it was not disputed that Autonomy was in discussion with
       Prisa about selling it archiving software (and indeed Mr Puri
       himself had been "supportive" of a deal which he knew Autonomy
       wanted to squeeze into Q1 2011). Further, Prisa's needs were
       broadbased: it was looking to consolidate all management and
       infrastructure across the group and had put out an RFP for a
       hosting platform for content. As Mr Puri accepted in
       crossexamination, this amounted to a *"platform migration for the
       whole of the Prisa infrastructure"*. Mr Puri also accepted in cross-
       examination that Autonomy continued to discuss a possible
       hosting deal with Prisa after the end of the quarter.

637. The Defendants added that even as regards the electronic discovery component of the sale to DiscoverTech, the Claimants' arguments were exaggerated. Prisa was (and is) a vast Spanish media conglomerate with, amongst other things, its own in-house legal counsel (included in the shortlist for The Lawyer's Global In-house Lawyer of the Year in 2018). Contrary to the evidence given by Mr Lucini in his witness statement, electronic discovery software was in principle a suitable product for a large media company (as exemplified by the sale of EAS Discovery to Sony Pictures Entertainment in 2007).[576] Prisa was always likely to be a good prospect for purchasing EDD software. In cross-examination, the furthest Mr Puri could go was to say only that litigation software was not the primary technology purchased by media groups (which is unsurprising), and he admitted that EDD software could be a normal thing to include, depending on the company and the need.

638. As to (b) in paragraph 635 above, the Defendants submitted that Mr Puri's evidence as to the scope of Prisa's hosting and archiving requirements must be treated with considerable caution: although when cross-examined in these proceedings he repeatedly sought to emphasise the importance of his role and his oversight of all aspects of what he called *"the transformation"*, it became clear that he was neither the decision maker nor an attendee at the key meetings relating to the transformation of Prisa's managed services infrastructure (the key decision maker, who controlled a separate budget, being a Mr Luis Garcia). Indeed, in the US criminal proceedings Mr Puri said he *"wasn't really interested in the hosting project"*; and he accepted that he knew at the time that Prisa *"was going through a process of looking at their managed services infrastructure, but I was not directly involved in the process…"*.

639. My impression of Mr Puri was of an eager witness who tended to overstate his involvement in areas of the "transformation" for which he did not have immediate responsibility. I do not accept his evidence that Prisa had no need for the software which was included within VT30; and I do not accept the implicit suggestion that Autonomy

---

foisted on DiscoverTech software which it had no basis for thinking Prisa had any need, and thus built a reseller deal around a fabricated prospect. As Deloitte noted in their own review, the purchase of a suite of software including an archiving and e-Discovery solution is commonplace for a large firm operating globally with the ever-present threat of litigation. The commercial

[576] See also the sale of EAS Discovery to Fox Entertainment Group in 2008. EAS Discovery was another legal ediscovery product: see Goodfellow.

need for such software is all the more understandable in the case of a company with a traditional but global media business which was undertaking a transformation from analogue to digital and introducing new systems across its entire infrastructure.

640. However, even if there might have been some prospect of a sale to Prisa, the prospect would not have been realised by DiscoverTech but by Autonomy. As usual, and in accordance with the pattern, the VAR was not expected or intended to have any say or participation in the negotiations for a sale to the end-user, and all that was in contemplation was a direct sale by Autonomy. As to this:

> (1) Mr David Truitt testified in his deposition in the MicroTech proceedings in the US that, at the time, he had never heard of Prisa, thus had no contacts with it, and (wrongly) believed it to be a New Jersey rather than a Spanish media company. Dr Lynch said he suspected that he (i.e. Mr David Truitt) *"knew very little about them."*

> (2) Mr Puri's evidence in these proceedings that DiscoverTech *"did not at any time contact Prisa, and, in particular, did not attempt to license any Autonomy software or to sell any Autonomy services to Prisa"* was not challenged, and Dr Lynch told me he did not dispute it.

*Was DiscoverTech let off the hook by funds from purchases by Autonomy?*

641. The fourth strand of the Claimants' case on VT30 (see paragraph 595 above) was their allegation that although DiscoverTech did appear to satisfy its contractual payment obligation to Autonomy under the VT30 purchase order (despite there being no end-user sale), DiscoverTech was only enabled to do so by Autonomy making two purchases, first of a licence for and then further instances of software source code in respect of DiscoverTech's *"DiscoverEngine"* software[577]. (Those purchases also provided the funding to enable DiscoverTech to pay what it contractually owed under VT31 (see below), a VAR deal for end-user ThinkTech.) This strand of the Claimants' case requires something of a detour before I return to the main issue as to the overall propriety of VT30.

642. It may be recalled that the DiscoverPoint business, of which DiscoverEngine was a product, had been spun out of MicroLink

---

[577] Sometimes referred to as *'DiscoverPoint Engine'*

before the acquisition of MicroLink by Autonomy. DiscoverEngine was a certified Microsoft SharePoint connector (SharePoint being a content management system produced by Microsoft). At the time of the spin-off, Mr Hussain and Mr Kanter advised the board of Autonomy in a memorandum dated 16 December 2009 that Autonomy's management did not believe there was *"a material business in DiscoverPoint"*, or at any rate that it was *"materially different from technology Autonomy already has."*

643.  Autonomy's first purchase in respect of DiscoverEngine, of a licence, took place on 30 June 2011. The price for the DiscoverEngine licence, which Autonomy paid the very same day, was $4,400,000 ("the Q2 2011 DiscoverEngine purchase"). The subsequent purchase of additional software and also the source code at a cost of $3,200,000 was in September 2011 ("the Q3 2011 DiscoverEngine source code purchase").

644.  The Claimants' case was that Autonomy had no need for a licence to use DiscoverEngine, and certainly had no need to purchase the source code, since it already had its own offering of three different SharePoint connectors, including 'AIS Fetch' (which it owned through MicroLink), and that the purchases were in each case simply the solution arrived at as a means of channelling funds to DiscoverTech to enable it to settle its debt to Autonomy. Further, in light of the advice at the time of the spin-off, the amounts paid appeared over the odds.

645.  It is necessary in this context to distinguish between (a) whether DiscoverEngine, as a product, had any utility (b) whether there was any real need for Autonomy to purchase it and (c) whether need for the product or the objective of putting the VAR in funds was the determinant of the price and the purchases at the times they were made.

*First DiscoverEngine purchase: Q2 2011*

646.  The main thrust of the Claimants' case in relation to the Q2 2011 purchase can be summarised as follows:

(1) Especially given the assessment at the time of the spin-off of the DiscoverPoint business, to the effect that there was nothing in it *"materially different from technology Autonomy already has"* (see paragraph 273 and 642 above) some evaluation of the functionality of DiscoverEngine as compared to Autonomy's own products would be expected before making such a

purchase and paying such a price. But it appeared to be accepted by the Defendants that none was conducted within Autonomy: there was no assessment made as to (a) how another third-party SharePoint connector differed from Autonomy's existing SharePoint connectors or (b) whether any such differences could readily be matched by making adjustments to one or other of those existing Autonomy connectors.

(2) The impetus for the purchase came, not from Dr Menell or anyone within Autonomy with knowledge of any potential advantages of DiscoverEngine compared with Autonomy's own similar products or of any technical shortcomings in the latter, but from Mr Hussain.

(3) The suggestion repeatedly made by Dr Lynch that the DiscoverEngine licence was specifically needed for specified Autonomy customers, namely, Bloomberg, National Bank of Canada and MetLife to solve a problem which needed to be solved, so that the purchase would be a prelude to a "sell-through" to them for commercial advantage, was untrue.

647. As to paragraph 646(1), the Claimants relied particularly on the evidence of Mr Greenwood[578], who, at the time of trial, worked for MicroFocus International plc as

"Connector Team Lead" and who started his working life as a software developer at Autonomy focusing on the development of what were then referred to as "fetches" and are now more commonly known as connectors.[579] There was no challenge to Mr Greenwood's evidence that (a) the Autonomy Connector was capable of evolution and did evolve in line with succeeding versions of SharePoint without difficulty (he estimated it would have taken only a week for his team to re-configure the 2007 version to be compatible with the 2010 version of SharePoint); (b) he conducted no evaluation of DiscoverEngine prior to its purchase from DiscoverTech and he was "*not involved in or aware of*" the purchase of a DiscoverEngine licence, had no contemporaneous familiarity with the product, and no knowledge of his own of it being used at any time during or after the Relevant Period; and (c) he was not aware of Autonomy having had any

---

[578] Mr Greenwood became "Head of Connectors" at Autonomy in 2005 and in the period 2005 to 2011 he had oversight of two connector teams, one in Cambridge (where he was based) and the other in Calgary, Canada. He reported to Mr Darren Gallagher, the Head of Development at Autonomy. The only member of Autonomy's senior management with whom he had occasional contact was Dr Menell.

[579] A "fetch" or "connector" is a tool which extracts data from one system and transfers it to another.

particular problem with Microsoft during the Relevant Period which might have affected his team's ability to develop connectors to SharePoint or any other Microsoft product, and they had the access they needed through a MSDN subscription. There was no evidence that DiscoverEngine was the subject of any evaluation by anyone else in Autonomy's technical department in June 2011 either. When Deloitte approached Dr Menell in July 2011 for an explanation as to the technical/commercial rationale for the DiscoverEngine purchase, he (Dr Menell) did not know what it was. Mr Welham stated in his email dated 19 July 2011 to Mr Hussain and Mr Chamberlain:

> *"Purchase of DT software – we talked to Pete M about this today but he was not aware of the technical/commercial rationale for the purchase. We need to understand this so that we can be sure that it makes commercial and technical sense and is at fair value."*

648. The Claimants also relied on that email, together with Mr Chamberlain's reply, as evidence that the impetus came from Mr Hussain (see paragraph 646(2) above). Mr Chamberlain responded on 20 July 2011 with the following explanation:

> *"Pete may not be the best person to talk to this. This related to the DiscoverPoint engine which was included in sales to Bloomberg, National Bank of Canada and Metlife. Sushovan can provide more background on the call."*

649. As to paragraph 646(3) above, Dr Lynch said in his first witness statement that Autonomy bought the DiscoverEngine licence "*for customers Bloomberg, National Bank of Canada, and MetLife*". That was also the understanding given to Deloitte. Deloitte were told that DiscoverEngine was needed for Autonomy customers; and when they reviewed the DiscoverEngine transaction, they noted that it was being sold through to customers and expensed to costs of sales (COGS).

650. According to the Claimants, the presentation that customers needed the specific functionality offered by DiscoverTech and Autonomy acquired that software to meet customer need was untrue. They contended that at the direction of Mr Hussain, Autonomy simply foisted the product onto customers by inserting references to DiscoverEngine into deals that Autonomy was negotiating in June 2011 in circumstances where the customer

had no need for the product, or even any understanding of what the product offered or why it was being supplied. They gave an example as the MetLife contract.

651.   Thus, on 17 June 2011, Mr Ivan Rothman, an Autonomy lawyer, said that he understood that SharePoint Connector (a mistaken reference to DiscoverEngine) needed to be added to the draft MetLife contract. Mr Sass, the salesman for the MetLife deal, said he had "*no clue what you are talking about*", prompting Mr Rothman to explain that it was his understanding that the connector should be given to MetLife (and Bloomberg) for free:

> "*My understanding is that Sush has decided we should give this connector to MetLife and Bloomberg (for free) as a way to promote this product. Hence, I was asked by [Mr Crumbacher] to include a reference in both documents. Do you have any objection to that?*"

652.   Mr Sass replied saying that he would "*call Sush*". Later that day, Mr Sass confirmed that Mr Rothman could add DiscoverEngine to the MetLife contract (see paragraph 3712(4) in the main body of the judgment). Mr Rothman said he had "*added the language Sush requested re the connector (actually called "DiscoverEngine", not "SharePoint")*".

653.   The Claimants relied additionally on an email dated 17 June 2011 from Mr Crumbacher to Mr Scott regarding DiscoverEngine, which added a new name to those to be provided with DiscoverEngine (Tracfone) and read as follows:

> "*FYI, information on the product to be inserted into MetLife, Tracfone, National Bank of Canada, and Bloomberg. Dave Truitt describes it as multi-tenant Sharepoint connector, and it's called "DiscoverEngine." Dave said he provided Sushovan with a proposal for reselling the product and wanted to send to me ... I told him that I wasn't told I'd be managing or even involved in that transaction, so he should hold off sending me anything with $$ in it.*
>
> *McCarthy has been made aware of its existence, so hopefully we'll minimize all the stress and wasted time his sky-is-falling response to third party software products would cause. Michael [McCarthy] did say that, when third party software is included, he has to [sic] the billing team know what the cost to us is, for commission*

> *purposes. Alex and Ivan are putting this into Bank of Canada, Bloomberg, and MetLife, and I'll put it in Hung's Tracfone schedule.*
>
> *Again, you might want to reconsider including Tracfone as one of the customers to get this connector. I don't see anything that has [sic] says "sharepoint'' to me in the call center and Explore software they licensed. In its place, we could consider Morgan Lewis (draft attached is Internal ediscovery software and already has a Sharepoint connector, LF $1.1M), and if Morgan's a no-go, I can do some research to come up with others. But, since Sushovan asked you, personally, to come up with the customers and since I don't know what criteria were given in choosing them, I'll follow your lead."*

654.   The Claimants submitted that Mr Crumbacher's email makes clear that he, a lawyer, had been tasked with plucking customers out of the air on whom DiscoverEngine could be foisted, as distinct from responding to any customer demand or need for that software. Dr Lynch maintained in cross-examination that Mr Crumbacher's email "*may be the understanding of the lawyers sitting in San Francisco but it's not the basis on which this is being done*". The Claimants dismissed this too as inherently implausible.

655.   The pattern continued with an email dated 24 June 2011 from Mr Hussain to Mr Scott reminding him to ensure DiscoverEngine was included in a number of deals "*particularly MetLife and BB [Bloomberg]*". Mr Hussain asserted also that "*UBS definitely need it*"; but the need was not explained and there is no document that indicates that Mr Hussain had been prompted to say this by some input from the technical department, the sales team or from UBS. In an email the same day (24 June 2011), Mr Crumbacher instructed Ms Julie Dolan (an Autonomy lawyer) to include DiscoverEngine in the UBS deal because "*Sushovan has asked*".

656.   To this the Claimants added a number of other examples (including a potential contract with Xerox which the Claimants put forward as particularly striking) showing, as they contended, that DiscoverEngine was being inserted into draft contracts, willy-nilly, at the dictation of Mr Hussain, without any request from the customer, or even any understanding, whether on the part of the customer or the salesman, of its use and still less need.

657.   The Claimants' punchline in this context was that it could not be clearer that, in and after June 2011, Autonomy was, on Mr Hussain's instruction, including DiscoverEngine in draft contracts

with customers, regardless of customer demand or technical need; and that this strongly suggests that Autonomy's reasons for purchasing the DiscoverEngine licence were <u>not</u> based on a genuine customer need. Mr Hussain was insisting that DiscoverEngine be included in customer contracts, despite the absence of demand for its functionality, in order to justify the purchase (on a false basis) to Deloitte.

658. The Claimants further submitted that it also follows that Deloitte were misled. Deloitte's understanding was that DiscoverEngine was needed for the three Autonomy customers (Bloomberg, National Bank of America and MetLife). Deloitte was not aware that DiscoverEngine was inserted gratuitously into IDOL licence sales to customers who had no interest in it.

659. Likewise, the Claimants submitted that the Audit Committee was also misled in the same way. Mr Bloomer's evidence was as follows:

> *"Q. So you were told that Autonomy paid this $4.4 million because it needed DiscoverPoint to complete IDOL licence sales to Bloomberg, National Bank of America and MetLife, yes? Sorry, National Bank of Canada and MetLife, yes? A. Yes.*
>
> *Q. And that was your understanding at the time?*
>
> *A. Yes.*
>
> *Q. You were told that those three customers required DiscoverPoint, yes?*
>
> *A. As part of the product, yes.*
>
> *Q. And that's what you understood?*
>
> *A. Yes.*
>
> *Q. If it was the case that those three customers did not need DiscoverPoint, that would have been contrary to your understanding at the time, yes?*
>
> *A. If that was the case, yes.*
>
> *Q. If, for example, DiscoverPoint had simply been inserted into the contracts with those three customers, without any suggestion that the customers needed or wanted it, you would have wanted to understand why Autonomy was paying $4.4 million for DiscoverPoint, yes?*

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

> *A. Yes, and given again Deloitte's commentary down below that they specifically looked at the rationale and the linkage with the sales above and discussions with the group's chief research officer, et cetera, given your presumption or assumption, the conflict between those."*

660. The Defendants painted a very different picture, though (to carry on with the metaphor) Dr Lynch retouched the painting markedly in the course of cross-examination. Initially, they presented DiscoverEngine as a substantially superior product in terms of functionality and efficiency to anything Autonomy could offer or was likely to be able to offer without considerable further diversion of resource and delay. They emphasised also the importance of the fact that it was a Microsoft-certified connector, with a materially higher level of encryption.

661. They dismissed the notion that it was comparable to Autonomy's own connectors, and explained the views expressed at the time of the spin-off as in effect overtaken by subsequent events and developments. They pointed out that in June 2010, before either of the impugned transactions, Autonomy had in fact entered into a *"Software Distributor Agreement"* giving it a 3-year renewable licence to copy, install and integrate
DiscoverPoint, including DiscoverEngine, within a *"Bundled Module"* (defined as *"Autonomy's software products which incorporate some or all of the Licensor's Software Products"*) and it should be assumed to have been considered useful. They asserted (it was not clear to me what the evidential basis was, and none of this appeared in Dr Lynch's witness statements)  that *"...the DiscoverTech business and DiscoverEngine product had obviously developed significantly since its early stage status in Q4 2009. It had acquired other customers by 2011"*.

662. When taken to the Rothman/Sass exchange (see paragraphs 651 to 652 above) in crossexamination, Dr Lynch asserted that this *"is another example of looking to the wrong area for understanding things"* and that this email was between people who "*really have no idea what is going on*" (though, as the Claimants pointed out, Mr Sass was the salesperson who was dealing directly with MetLife[580] and the exchange was between a salesperson and a

---

[580] The Claimants pointed out also that Mr Sass is a current Darktrace employee, and that he was not called as a witness by Dr Lynch so as to offer a different explanation for what they submitted was the plain meaning of this email exchange.

lawyer, suggesting little reason to doubt that these individuals understood what was going on).

663. In cross-examination, Dr Lynch shifted the explanation towards the need being driven, not by customer demand, but by Autonomy's appreciation of inadequacies and frailties in its own offering and the resulting need to make available a more satisfactory replacement. On this revised version, the Defendants contended that:

(1) The decision was largely based on the perception of an urgent need to catch up with the huge growth in popularity and use of SharePoint and to provide Autonomy customers with a certified, encrypted, and working connector in place of a product which was not certified, had deficient encryption, and which Autonomy recognised had quite serious deficiencies and problems which Autonomy had tried, and over some time failed, to resolve (as above described). For example, and as the Claimants did not dispute, if a customer wanted to index its cloud-based SharePoint system (then called BPOS), it needed a Microsoft certified connector. Certification was a long process and Autonomy had never achieved it. Autonomy needed a quick fix to provide functionality and certified and encrypted connection to SharePoint that customers needed, without the risk of customer complaint and dissatisfaction: DiscoverEngine offered it.

(2) Further, according to Dr Lynch, a confidential fact, which was not appreciated by the salesmen or the lawyers at Autonomy, and which Dr Lynch had never mentioned before, was that Autonomy's own offering had been hacked. This concern was compounded by the fact that (a) it had not been certified for connection to Microsoft; (b) any damage caused to a customer's software or equipment would not be covered and (c) MicroLink's security clearance could be put at risk.

(3) Dr Lynch accepted that prior to the licence purchase there was no formal "buy versus build analysis"; but the reality was that Autonomy had problems with its own connector which over a considerable period it had tried and failed to fix. Further, the aged architecture of that connector would have had to be replaced, with substantial consequential delay. Dr Lynch stressed that DiscoverEngine was a very different product, with (for example) *"efficiency ratios of the fetching of the two products which [were] phenomenally different"*; but he summarised the real problem as being that:

> *"We can keep going on for a very long time down into the weeds and the minutiae on this one, but the simple – to bring it back to the simple level, Autonomy's SharePoint connector was not fit for purpose and was likely to have Autonomy put in a position of significant liability due to data loss or missing regulatory information."*

(4) According to Dr Lynch's evidence, Autonomy wished to overcome this problem by moving its customers off its own product and onto DiscoverEngine, analogous to repairing a faulty part:

> *"What we were trying to do was quietly move over to something that was quality and worked and was tested and would deal with that problem…"*

(5) Dr Lynch accepted that he did not, when approving the first purchase on the basis that Autonomy was selling DiscoverEngine through to Autonomy customers, mean that he understood there to be purchase orders for the product; he understood Autonomy to be meeting known customer requirements for a working connector and did not expect that customers would have been asking for DiscoverEngine specifically. His understanding was (and he stressed that he was not involved in the negotiations nor in any technical assessment of DiscoverEngine) that there were existing customers of Autonomy which wanted a SharePoint connector with full access, and that DiscoverEngine would be supplied to them as (a) the best functioning product that Autonomy could supply and (b) as a substitute for an Autonomy product which had potential flaws as explained above. He did not regard it as either surprising or problematic if (as he suspected) Mr Hussain had gone down the list of everyone who had been supplied with Autonomy's own connector with a view to providing DiscoverEngine instead. He rejected the Claimants' allegation that DiscoverEngine was, at the instance of Mr Hussain, provided *"willy-nilly"* to customers for nothing to give a false appearance of its profitable deployment at the customer's request.

(6) The Defendants relied on the evidence of Mr David Truitt in the US criminal trial to the effect that DiscoverTech was offering the licence at what Autonomy's management perceived to be a substantial discount representing a very good price. Mr David Truitt also explained that Autonomy purchased the instances of DiscoverEngine at a much lower price than other purchasers, and as the manufacturer of the software that DiscoverEngine supported, Autonomy could sell to all its customers:

> "So to give you some perspective, though, we sold to Glaxo and to Lockheed Martin -- an instance cost $25,000. The deal that we ended up cutting with Autonomy averaged $5,000 per instance.
>
> …
>
> Not only did they get a good deal, but they were not any other customer. They were the manufacturer of the software that we were trying to support. So they had all of the Autonomy customers that they could go and give this solution to."

664.   In relation to (1) and (2) in the preceding paragraph, it is, I think, worth quoting Dr Lynch's explanation in full during the course of his cross-examination:

> "If I could explain what this is all about. So Autonomy had a connector basis, which connected to a thing called SharePoint. SharePoint was a Microsoft product and, unlike most corporate IT where the system is set up by IT centrally and run by them SharePoint was a product that ordinary people could set up in a department without having to go near IT.
>
> So at this time there was an absolute explosion in SharePoint because people in companies were tired of waiting for IT to do things and it didn't work, so SharePoint became a major movement in the industry and appears everywhere. And suddenly our customers have a big problem in that when they get a legal investigation, they have an obligation to bring all the documents that are relevant to the court or the Senate, or whatever. And that's relatively

*easy when you have a system that's run by IT and that you know where everything is and you go there and you get it.*

*But with SharePoint the problem was that there were vast numbers of these things. So you may recall Mr Lucini when he was talking about it talked about a SharePoint forest. Some people talk about weeds or a forest, but the idea is vast numbers of these things everywhere. And in order to meet legal requirements you've got to go and look at all of them.*

*So it was a big problem. The difficulty we had was our own SharePoint connector, which was what was going into this arrangement, had some difficulties in that it had been hacked and we'd had a little scandal that we'd managed to keep under control of it being a security risk. It was also not certified, which meant that if it did any damage to the customers' systems, then – well, technically it wasn't allowed to be used by the customers and it also wasn't encrypted.*

*Then it also had another problem, which it was highly inefficient. So that the SharePoint connector that we had could only do – go to a place, get everything and bring it all back. And whilst that's okay when you've got a centralised system, with SharePoint it means that you've got to go everywhere and bring everything back. So even though you might only want documents about this particular employee who was fired, say, for a legal matter, you have to bring back every document in the company centrally and it meant that it took a horrendous amount of time and slowed the network down.*

*So we had a whole series of issues that we were quietly trying to clear up here, and the idea was that we were going to drop in our – take our faulty product and supply these customers with the new one and was certified and thus avoids the problems.*

*The product was much better and didn't have the problems which we had which were pretty fatal, actually."*

665.  To this he added later in his cross-examination, when asked whether Autonomy could not have completed IDOL-based sales without this product, the following:

> *"I don't think so. I think taking into account the efficiency issue, I think we'd have had very, very unhappy customers if they were trying to backhaul SharePoint on the size that these people were thinking of doing it, using our technology. And that's before you take into account the liability we'd have had if we'd put in the insecure product and then they'd been hacked. Imagine MetLife, an insurance company, if all its customer data had been extracted through our leaky SharePoint connector. We'd have had a major issue on our hands.*
>
> *So we were very happy to quietly shift everything over to something that was reliable and secure."*

666.  As to the price paid, Mr David Truitt's evidence explained that he considered that Autonomy made a good deal on the software and purchased it for much lower than the price that was offered to other customers. The Claimants did suggest that the number of instances sold by DiscoverTech was not enough to establish a market price. That would not be sufficient to justify an allegation that the transaction was not at fair value.  Nor did the Claimants suggest that Dr Lynch knew that there was (allegedly) no market price.  Dr Lynch rejected the suggestion in any event. Mr David Truitt expressed the view that there was an established price and that Autonomy had received a good deal.[581]

667.  In my judgment, however, and even though I accept that DiscoverEngine was a potentially useful connector, what had driven the purchase was the need to fund DiscoverTech so that it could pay down its debt to Autonomy.

668.  No documentary evidence was put forward to support the new suggestion of flaws, inadequate security and hacking issues; and very little, if any, of this was in Dr Lynch's witness statement. It was put to him that as he could so easily have explained that his case was that Autonomy's SharePoint connector was not fit for

---

[581] See paragraph 4504(6) above.  See also David Truitt's evidence: "*A: We could certainly sell and did sell to other customers. We had sold prior to that to customers, and that software was more valuable to Autonomy because they had the customers. It was built for Autonomy technology. So they could distribute that software to thousands of customers. So it was very valuable, in my opinion, to them.*"

purpose and was likely to expose Autonomy to complaint and liability, his failure to do so suggested that it was an afterthought (with an implication, though the cross-examiner's challenge faltered, of unreliability at best). Dr Lynch retorted that the claim against him was not particularised in this aspect, and in any event, he had since collated other views and been able to set out in more detail why the decision was made. He added that he had sometimes had difficulties in understanding the true extent of the claim *"because it diverges from the reality that I know…"* and was unsure what detail to put in to answer it. He suggested, a little sardonically, that the next time he did a witness statement he would *"try harder to put more and more detail in".* This was not convincing.

669.  The notion that there was an appreciation within Autonomy of flaws and a history of hacking of a particular product without there having been generated any customer complaints, nor any report by Autonomy or any other documentary evidence of a cyber security breach, is not an easy one to accept. That is especially so given the delegation of

---

the task of identifying customers which might need or be interested to Mr Crumbacher and Mr Scott, who were not in a position to know (see paragraph 653 above).

670.  Further, examples given by the Claimants of the reaction of a customer and/or a salesman to being told that DiscoverEngine was to be included in the deal struck me as telling. I have referred in paragraphs 655 to 656 above to certain customers; another related to the Tracfone contract mentioned in paragraph 653 above. When on 20 June 2011, another Autonomy lawyer, Mr Hung Chang, was negotiating the contract with Tracfone (see paragraph 653) he mentioned to the relevant sales executive (Mr Dipan Patel) that he understood that *"we are adding some kind of Discovery Engine to the PQ".* Mr Patel answered that this was news to him, and that he had no idea what it comprised or why it would be included.  Mr Chang responded that he too would be interested to know *"as it was a directive from Sushovan."* When Mr Patel enquired more widely about DiscoverEngine, none of his sales colleagues knew what it was either and thought it must be a mistake.

671.  It is also interesting to compare the price agreed by Autonomy in June 2010 under the Software Distributorship Agreement (see paragraph 661 above) which was $224,000 for up to 5,000 users with that to which it committed under the Q2 2011 purchase of $5,500 per instance up to 800 instances.

*Second DiscoverTech purchase (Q3 2011): source code*

672. In Q3 2011, Autonomy purchased additional *"instances"* of the DiscoverTech software[582] and also what Dr Lynch described as a *"pared-down version"* of the source code for $3.2 million. These purchases coincided with an urgent need for Autonomy to tidy up its books and obtain payment or other discharge of any debts owed to it prior to completion of its imminent acquisition by HP.

673. In the US criminal trial, Mr David Truitt testified that these further purchases arose out of a discussion he had with Mr Hussain following the announcement of HP's acquisition. The discussion related to DiscoverTech's various outstanding contractual commitments (including in respect of VT30 and VT31). Mr David Truitt's evidence placed the second purchase firmly in the context of the need to find a way to discharge those commitments. He said:

> *"...we had a discussion regarding potentially more instances of our product, which would enable me to then pay down some of that obligation.*
>
> *They did go back, and over a period of a week or two, they determined, you know, how much more they could buy, and we did a few more of those purchases over the next month or so."*

674. The original proposal from DiscoverTech for this further transaction had been for a purchase of the product itself, with unlimited distribution rights, for $10.35m.   The document explained the commercial basis for this:

> *"Autonomy is currently authorized to distribute one copy of DiscoverEngine for each copy of IDOL server shipped to Autonomy customers as well as existing IDOL customers under Autonomy annual support. Autonomy's current purchase price for DiscoverEngine is at an average price of $2,700,000 per 500 hundred instances plus an annual maintenance fee of $270,000 dollars for each bundle of 500 DiscoverEngine instances.   Discover Technologies is offering to sell to Autonomy the DiscoverEngine product and allow unlimited distribution as an Autonomy owned product for $10,350,000. Autonomy's IDOL software exists in hundreds of thousands of environments throughout the world. The purchase of the*

---

[582] An *"instance"* means the number of servers on which the software could be run.

> *DiscoverEngine product under the proposed*
> *terms will allow Autonomy to significantly*
> *reduce its costs to distribute the DiscoverEngine*
> *while providing value to a larger segment of*
> *Autonomy's customer base."*

675. A review of the software was undertaken by Mr Lucini and Mr Chen (an Autonomy systems engineer). Dr Menell summarised and forwarded their findings to management. Their assessment was fairly low-key:

> *"Basically if we wanted to [purchase] it could be used*
> *within the Control Point suite as part of data triage and*
> *set up. Its [sic] workmanlike and utilitarian so difficult*
> *to get enthusiastic about…Does what it says on the tin*
> *even if it's a dull tin. We could obviously do this but*
> *would need to drop other more important pushes."*

676. The assessment did not mention the existence of Autonomy's own SharePoint connector and contained no analysis of any similarities or differences between that and DiscoverTech's product, even though on Dr Lynch's argument that was the main task. As in the context of the first purchase, there was no mention of any problems such as hacking, or customer dissatisfaction with Autonomy's own product. Nor was there any mention of any experience that Autonomy might have garnered from its first licence purchase.

677. Mr Lucini accepted that when first instructed he was asked to identify what overlap there was with Autonomy's own products, but that this was soon cut down by Dr Menell simply to assessing its utility. No assessment of the comparative time and cost to develop Autonomy's own product appears to have been undertaken either. The Claimants submitted that this was because Dr Menell had warned Mr Lucini off a comparative approach knowing that it would undermine the rationale for any purchase. Mr Lucini's line was that (a) he had not been asked to assess and comment on any overlap with Autonomy products and did not do so, and (b) in fact in a conversation after an initial brief, Dr Menell had given express instructions, which he felt he had to accept, that the assessment should not make any *"head-to-head"* comparison with Autonomy's own products. The fact that such a comparison seems obviously necessary and yet there is nothing to suggest that Dr Menell or Mr Hussain thought that the report was deficient, or that Mr Lucini had not done what was required of him, gives credence to Mr Lucini's version of events in this respect.

678.  However, the Defendants submitted that there was nothing to support this subsequent alleged instruction, and that Mr Lucini had invented it. The Defendants argued that, on the contrary, it was because it was clear that DiscoverTech did offer advantages over Autonomy's product, and certainly did not duplicate it: they suggested that if the field engineering team and Mr Lucini had thought the product simply replicated Autonomy's own product they would surely have said so. The Defendants' case is that Autonomy's technical engineers gave independent and objective consideration to the second purchase and confirmed to Autonomy that DiscoverEngine was a useful and valuable source code to buy.

679.  In an email on 15 September 2011 to Dr Lynch and the rest of the core management team in response to Dr Menell's confirmation of the product's utility, Mr Hussain suggested that he was thinking of a price of between $8m and $10m for the source code (i.e. a discount from DiscoverTech's proposal), or a purchase of more limited software for $6m.  Dr Lynch responded, "*that is too much*".   Mr Hussain replied, thanking Dr Lynch *"for the direction"* and stating that he would negotiate, he believed Autonomy were in a strong position, and would aim for below $2 million.  This extreme and off the cuff reduction in the price to be offered, and especially (a) Mr Hussain's alacrity in moving from his initial estimate to one which was one-fifth of it, and (b) Dr Lynch's suggestion of the lower price without any explanation, suggests to me that the price they determined to offer was calibrated according to some more general considerations than its list price or true value. It also suggests a certain confidence that Autonomy would not be rebuffed.

680.  Emails ensued as follows:

    (1) On 21 September 2011 Mr Hussain emailed David Truitt, stating:

        "*Hi Dave – technical have evaluated and we want to buy but we can only pay $1.6m".*

    (2) On 23 September 2011 Mr David Truitt provided a revised proposal.   The new proposal stated that: "*We have reduced our price significantly down to 3 million dollars and have reduced the components of the DiscoverEngine solution accordingly*".

    (3) Mr Truitt went on to explain what was now included and not included in the new proposal.  His email made clear that key points from the earlier proposal were still present (including all the points highlighted by the field

engineering team and Dr Menell), concluding: "*The value proposition is still compelling in that the ability to distribute to SharePoint 2010 customers as well as leverage our Microsoft certification is still included*".

(4)  On 26 September 2011 Mr Hussain forwarded the revised proposal to Dr Menell and Mr Scott, saying "*we are prepared to pay $1.7m max*".  Dr Menell said in response to this that "*price is a commercial call I can't really advise*", but did not dissent from Mr Hussain's approach, and gave a positive indication of the potential market for the product.

> "*It's very dull but Rafiqs point about Open Deploy, bank of America and the utility space is the market for something simple, done well and with a compliant slant is large especially if coupled with an umbilical cloud distribution channel as large as ours (which by the way and needless to say I imagine is only going to get dramatically bigger with HP!)*".

(5)  On 27 September 2011 Mr Scott requested approval from Mr Hussain, Mr Kanter and Mr Chamberlain for the purchase of 285 additional instances of DiscoverEngine for $1.5m.  Mr Scott explained that most of the prepay had been used up and that Autonomy needed to purchase additional volumes for the customer deals it was tracking.

(6)  On 27 September 2011 David Truitt gave Mr Scott DiscoverTech's "*best and final proposal*" for the source code sale.  This stated:

"*Our price has been reduced to 1,700,000 dollars contingent on Autonomy purchasing an additional 285 instances of the DiscoverEngine for resale distribution under our current Software Distributor Agreement prior to 9/30/11.*"

(7)  On 27 September 2011 Mr Scott forwarded DiscoverTech's updated proposal to Dr Lynch, Mr Hussain and Dr Menell.  The email made clear that DiscoverTech had reduced its price for the source code from the $3m proposal, in consideration of the fact that Autonomy was purchasing the additional instances of the software.  The email also indicated that Autonomy had customers for the additional purchases.  It should be noted that the additional instances would be of the full

DiscoverEngine product in a form ready to be shipped to customers. The source code that Autonomy was purchasing was more limited or *"pared-down"*, following the reduction of the scope of the sale explained in David Truitt's email of 23 September 2011.

(8) Dr Lynch approved the purchase in response to Mr Scott's email, saying "*ok this is much better*".

681. Mr David Truitt's evidence with regard to the sale of the source code was that this was something he "*wasn't a big fan of doing*" because his company was selling its know-how; but he felt he had no alternative. He said:

> "*So effectively I had to give up a product that we had built and that, you know, had high hopes for, but, you know, I was willing to do it because we were able to clear our debt.*"

682. Dr Lynch summarised the position as he understood it at the time in his first witness statement:

> "*296. Autonomy bought a pared-down version of the source code, which did not include all DiscoverEngine functionality, for a competitive price. The price was further discounted because Autonomy agreed to purchase additional instances of DiscoverEngine around the same time. It made commercial sense to purchase the additional instances because Autonomy had used up most of its prepaid instances, but still had customers interested in the functionality offered by the product. The additional instances included all DiscoverEngine functionality (unlike the source code Autonomy had purchased) and it could be shipped to customers immediately.*
>
> *297. The UK management team approved these purchases. I gave the final approval. I approved the purchases because I understood that we needed the product and was informed that we had customers lined up to which we could sell it. In my opinion, these purchases were in Autonomy's interest and we exercised sound commercial judgment in buying the*

> *DiscoverEngine software. We were able to sell the products on to customers."*

683.    A considerable time was spent on the competing submissions as to the utility of DiscoverPoint and its source code, and as to whether Autonomy might itself have developed its own enhanced and improved product. The Defendants also criticised the Claimants for muddling the two purchases, and also for failing to be clear as to what part of the purchase price of the Q3 2011 purchase related to instances and how much to the source code.

684.    I do not think either criticism alters the analysis; and I do not consider it necessary to go through this evidence: as it seems to me, what the Defendants' justification came down to was the simple but substantial point made by Dr Lynch in cross-examination that, irrespective of specific request or individually identified need, Autonomy naturally wished to provide customers who asked for a SharePoint connector with the best functioning connector that Autonomy could supply, and that was not its own connectors but DiscoverEngine. No specific customer request or need was on that basis necessary, and nor was any sale of the connector since it would simply be included as "best of breed" in the overall solution sold; as Dr Lynch put it in one of his many analogies in the course of his cross-examination:

> *"They didn't request it. DiscoverEngine is a very technical piece of software that solved a particular problem. Those customers needed that problem solved but they didn't – it's a bit like you buying a car. You don't request a carburettor, but you have to have a carburettor in order for the car to go. So it was a necessary piece of technology for what these people wanted to do."*

685.    The problem from the Defendants' point of view was the lack of evidential underpinning for this explanation. Furthermore:

> (1)    This explanation was not the same as or even consistent with that given by Dr Lynch in his witness statement, which was very much based on sales of the connector to satisfy individual customer specific requirements. As Dr Lynch put it in his first witness statement:
>
> > *"I approved the purchases because I understood that we needed the product and was informed that we had customers lined up to which we could sell it"*;

(2) Whilst the explanation might have covered the first purchase of a three-year renewable licence, it was difficult to fit with the second purchase of further 'instances' for customers which were never identified;

(3) Although Dr Lynch advanced theoretical justifications for preferring a buy-in (diversion of valuable talent and delay) these seemed to me insufficient to explain why Autonomy did not develop its own enhanced connector, especially given Autonomy's avowed policy of supplying its own products if at all possible;

(4) No coherent explanation was offered as to the basis on which Autonomy sought to include (for free) the DiscoverEngine connector rather than any of its own in solutions for customers: Dr Lynch suggested that this was primarily driven by Dr Menell who had the expertise, but there is no support in the evidence for that suggestion, and the signs are that it was driven by Mr Hussain, who had no such expertise and whose eyes were on the financial objective of clearing outstanding indebtedness; and

(5) The lack of any paper record of (i) complaints or concerns about Autonomy's connectors and (ii) why it would be better to buy in, added to the impression that the second purchase, like the first, was driven primarily by some other consideration.

686.  In summary, my conclusions on both DiscoverEngine purchases are as follows:

(1) DiscoverEngine was a serviceable product, probably superior to Autonomy's and advantageous to customers because of its certification.

(2) But Autonomy did not need it: I do not accept Dr Lynch's evidence that the frailties of its own product were such that Autonomy had to substitute DiscoverTech in its place irrespective of customer demand or identification to them of any issue.

(3) The price was excessive, in comparison to (a) the likely costs had it needed to develop its own product (including any costs of diverted software expertise), (b) what Autonomy paid for its June 2010 licence and (c) the value placed at the time of the spin-off; and it seems clear that it never did sell on to customers who had a genuine need / had requested it.

687. As in the case of the first purchase (see paragraph 645), it is necessary in this context to distinguish between (a) whether DiscoverEngine, as a product, had any utility (b) whether there was any real need for Autonomy to purchase it and (c) whether need for the product or the objective of putting the VAR in funds was the determinant of the price and the purchases at the time it was made.

688. In short, I have concluded that the predominant driver for both purchases was the need to assist DiscoverTech; it was the method selected to achieve the objective in a way which could be presented in such a way as to pass muster with Deloitte and the Audit Committee, and albeit contrived (in the sense that but for its true primary purpose it is unlikely that Autonomy would have entered into it) it was not fanciful (in that DiscoverEngine was useful and could be presented as being so).

*My assessment re VT30 and the DiscoverEngine purchases in the round*

689. Having come to the end of that detour, I turn to my assessment of the Prisa (VT30) VAR transaction as a whole.

690. In my view, VT30 was typical of Autonomy's deals with DiscoverTech, demonstrating what was by early 2011 Autonomy's almost automatic recourse to a 'friendly' VAR to cover revenue shortfalls in a quarter:

> (1) There was no other purpose in the introduction of a VAR, and DiscoverTech in this case, than to book recognised revenue; and it was never expected or intended that the VAR should have any active part to play at all, nor even that it would be a contracting party to any ultimate sale to the prospective end-user.
>
> (2) The VAR (in this instance, DiscoverTech) never acquired any autonomous control of the software notionally licenced to it. Any onward sale would be negotiated and (if the negotiations were successful) closed by Autonomy. The VAR was dependent on Autonomy for both reimbursement and reward.
>
> (3) The DiscoverEngine purchases, despite their factual complications, had the simple predominant objective of making good Autonomy's commitment to DiscoverTech (as to all its 'friendly' VARs) to see it that they were not left 'on the hook'. The fact that the purchases may well have had other legitimate purposes demonstrates no more than that the 'rescue' transactions were well chosen to obtain approval from Deloitte and the Audit Committee.

(4) In consequence, the role of the VAR (DiscoverTech in this case) was nominal:
there was no real transfer of risk or control, which was in reality retained by Autonomy.

691.   In my judgment, recognition of revenue from VT30 was improper.

692.   The backdating of the VT30 VAR agreement was an additional but egregious (though not unique) impropriety. The email exchanges between Mr Hussain and Mr Chamberlain relating to the possible deferral of revenue (see paragraphs 619 to 621 above) demonstrate also that by that time, Mr Hussain and Mr Chamberlain (at least) were prepared to allocate revenue flexibly in the week or so following quarter-end. This echoed similarly improper manipulation of revenue as in certain of the hardware sales, and further demonstrates what in my judgment is the impropriety of VT30 as a whole.

*Defendants' knowledge of and participation in VT30 and backdating*

693.   In my judgment, the use of 'friendly' VARs, and in the Prisa case, DiscoverTech, for this purpose was well known to the core management group in Autonomy and in particular not only to Mr Hussain but also to Dr Lynch. They also knew that if no end-user sale eventuated, Autonomy would need somehow to finance or absolve the friendly VAR.

694.   I have also concluded that both Defendants knew that the DiscoverEngine purchases were devised as the means of financing DiscoverTech.

695.   The position against Mr Hussain is reasonably clear; he was directly involved.

696.   Dr Lynch was at one remove. However, he did approve both purchases. I have concluded that (a) this is something on which Mr Hussain would have forewarned and consulted with him about and (b) his one-line approvals without feeling the need for any further enquiry, coupled with the quite extraordinary grasp of the detail of which he manifestly was capable, and his exceptionally close control of the company, suggest that he was aware of the true drivers of the purchases. I think it is more likely than not that he knew enough to know that the purpose of the purchases was predominantly to fund DiscoverTech to enable it immediately to pay down its debt and enable Autonomy to take DiscoverTech's outstanding indebtedness off its books.

697.   Neither Mr Hussain nor Dr Lynch can have thought this use of VARs to be a proper basis for recognising revenue from delayed and inherently uncertain deals.

698.   In my judgment, both Defendants knew that the sale in VT30 lacked substance and in reality transferred no risk or control of the software. Both Defendants had "guilty knowledge" of the accounting impropriety accordingly.

*Defendants' knowledge of backdating*

699.   Mr Hussain's defence to the allegation of backdating of VT30 was not that he did not know but that the Prisa deal was amongst the 'slate of deals' approved on 31 March 2011, and that the documentation properly memorialised the earlier agreement.

700.   However, I have held that the Prisa deal was not on the 'slate': see paragraph 612 above, and the question therefore is whether, on a balance of probabilities, Mr Hussain knew that. I consider it more likely than not that he did.

701.   I consider also that Mr Hussain's email to Dr Lynch of 11 April 2011 presenting a choice whether to *"defer Prisa"* (see also paragraph 616 above) some two weeks after the end of the quarter demonstrates that Mr Hussain was willing to adjust the record to reflect whichever option was agreed, and it would have fallen to him to arrange whatever needed to be done, even if the doing of it was delegated.

702.   In the round, I have concluded on the balance of probabilities, that Mr Hussain was aware of and probably directed the backdating of VT30.

703.   In considering the position of Dr Lynch it is necessary to take full account of the fact that he was involved in the mechanics of the deals much less than Mr Hussain was, even though (as I have found) he was aware of the strategy and its impropriety.

704.   In his closing submissions Dr Lynch dismissed the claim that he was knowingly involved as *"more forensic froth"* and contended that the exchanges between Mr Hussain and Dr Lynch did not identify any knowledge or involvement on Dr Lynch's part in the terms of the deal, and certainly did not identify any knowledge of backdating or involvement in it. Insofar as they sought to rely on the email (see paragraphs 619 to 621 above) from Mr Chamberlain to Mr Hussain of 12 April 2011 (as they had in opening, but seemed only elliptically to do so in closing) Dr Lynch made the point that none of it had anything to do with backdating and he was not in any event a party to it. He suggested further that neither he nor Mr Hussain had any motivation to backdate the Prisa deal,

because *"the contemporaneous documents show that there was no shortfall in revenue"*. By contrast Mr Egan had a plain motive because he had:

> *"missed his target…So I think this is more likely the case that Mr Egan, for whatever reason, didn't get the paperwork done when he should have done and then realised he was going to miss his personal number and did the number."*

705. That does not seem to me adequately (or at all) to explain Mr Hussain's email to Dr Lynch of 11 April 2011 (which I have quoted in paragraph 616 above)[583] nor why, almost two weeks after the end of Q1 2011, Mr Hussain was discussing with Dr Lynch whether revenue should be reported for Q1 2011, as though this was discretionary, and in circumstances where there was no documented deal between Autonomy and the end-user at that time. That presupposes that according to the option elected there may be a need to demonstrate earlier revenue recognition. The later emails of 12 April and thereafter, which I have also referred to earlier, seem to me also to reinforce the likelihood that Mr Hussain and Dr Lynch were not troubled by the actual factual sequence in determining whether or not to "defer" Prisa. Dr Lynch's evidence that Mr Hussain would not have *"operated in that manner"* (that is backdated documents) needs to be considered in that light.

706. Dr Lynch's justification for his own acceptance that the question whether to recognise revenue in Q1 2011 from VT30 was even in April 2011 still elective or optional was that these were typical matters of judgement that had to be made (for example, if doubts had emerged about the VAR's credit-worthiness, or as to whether all acceptance criteria had been met) in the immediate aftermath of every quarter. But although I have accepted the necessity and commonplace nature of the process in general terms I have not felt able to accept that it explains the emails. I consider that Dr Lynch was aware that Mr Hussain would take steps necessary to ensure recognition of revenue or not according to the election made, and that this would depend on whether the revenue was needed in the previous quarter to make up a shortfall, or was better reserved for the subsequent quarter.

---

[583] *"If we defer prisa then we are at 218.1m but 24c and 85% [gross margin]. If we don't defer prisa but defer equiv low margin we are at same revs but now at 25c and 88%. To discuss when I land or you can discuss with steve [Chamberlain]."*

707. In such circumstances, although it may well be that Dr Lynch did not know how the election would be documented, and it is possible that Mr Hussain did not refer back to Dr Lynch before finalising that (the die having already been cast), I cannot accept that Dr Lynch was not aware that the decision was going to be made on the basis not of chronological truth but revenue need, and that if the latter prevailed, any documentation of the decision would be false.

## VT31: DiscoverTech/ThinkTech Q1 2011

708. In March 2011, Autonomy was seeking to conclude a transaction with the brokerage firm TD Ameritrade ("Ameritrade"), for which the contracting end-user would be its subsidiary, ThinkTech, Inc ("ThinkTech"). The desired transaction was an amendment to ThinkTech's existing Digital Safe hosting arrangement so as to add a licence for Zantaz Supervisor (S6).

709. However, the transaction could not be concluded within the targeted quarter. On 23 March 2011, Robert Sass notified Mr Hussain that the deal was "*highly unlikely for March*", though Mr Hussain encouraged him to "*keep pushing*". Then, on 29 March 2011, it emerged that Ameritrade had "*said 'no' – not why, not later, just 'no'*". The Claimants contended that this bad news was doubtless relayed to the Defendants, given Mr Hussain's recent involvement in pushing for the deal to be concluded.

710. As had become habitual (or what I have called the pattern) when a targeted deal which Autonomy needed to satisfy revenue forecasts was delayed, Autonomy sought to set up a sale to a friendly VAR. On 31 March 2011, DiscoverTech signed an agreement with Autonomy Inc for a licence of the same software, for the same end-user, ThinkTech. The licence fee was $1.8 million plus $180,000 support and maintenance. Autonomy recognised the licence fee as revenue immediately, that is to say, in Q1 2011.

711. The VAR letter Agreement dated 31 March 2011 was on the usual terms which stipulated that DiscoverTech was on risk irrespective of whether an end-user sale was concluded, and that the agreement represented the entire agreement between the parties. Mr David Truitt confirmed in his evidence in the US criminal proceedings that he understood that DiscoverTech was on risk.

712. The Claimants' central point relates to the fact that on 29 March 2011 there was an email from the indirect end-user which the Claimants referred to as the "just no" email. In that email, which

was part of an internal Autonomy exchange reporting on the status of certain deals that Mr Hussain was pressing should be closed before the quarter-end, an Autonomy sales manager reported as follows:

> "TD Ameritrade said "no" – not why, not later just "no"
>
> We are working to get more info"

713. The Claimants (who did not quote the second sentence of the email) construed this as denoting Ameriprise/ThinkTech's categorical withdrawal; and they relied on the fact that, in the end, no licence was sold to ThinkTech as further support for that construction. On that basis they advanced the argument following:

> "The question that immediately arises is this: why would DiscoverTech take on a liability to pay $1.8 million, in the hope of selling a licence to ThinkTech, in circumstances in which, as noted above, ThinkTech had already said it did not want one….
>
> ...
>
> In fact, the only sensible explanation for this otherwise irrational behaviour on the part of DiscoverTech is the existing of the intention described in Chapter 6 [the side agreement] as well as the promise of a MAF."

714. The Claimants also sought to rely on evidence given by Mr David Truitt in the US criminal trial which they portrayed as having been as follows:

(1) DiscoverTech probably would not have had the ability to pay for the order, in the absence of an end-user sale.

(2) Autonomy exercised control over what to sell to ThinkTech, when, and at what price.

(3) It was Autonomy that would be responsible for consummating any sale with ThinkTech: Mr David Truitt observed during his testimony, "*That is the way it worked.*"

715. The Claimants emphasised that Mr Welham was unaware of the "*just no*" email at the time and that there was nothing to suggest that either Mr Hussain, or anyone else, drew it to Mr Welham's attention. In Mr Welham's witness statement he said that had he known about this email, he would have wanted to understand the

commercial rationale for the sale to DiscoverTech, given such remote prospects of an end-user sale.

716. To all this, the Defendants submitted that the real answer to the Claimants' rhetorical question was the one actually given by Mr David Truitt in a passage the Claimants themselves had marked up as hearsay evidence that they wished to adduce and rely on: his recollection was that Mr Egan had given him an *"indication that they were very close to closing".*

717. The Defendants contended also that the Claimants' portrayal of Mr David Truitt's evidence was unfair and out of context:

> (1) Mr David Truitt's evidence was in fact that DiscoverTech <u>could</u> have been put in funds to meet all its sales obligations.
>
> (2) As to the contention that Autonomy had control over the goods, the quoted passage of Mr David Truitt's deposition evidence in the US criminal proceedings was only making an observation about what he understood from the restrictions in the <u>reseller agreement</u>. Their line was that those provisions did not suggest that Autonomy exercised managerial control for the purposes of IAS 18.14.
>
> (3) They asserted (though Mr David Truitt did not say this) that the idea of the relationship with Autonomy was that DiscoverTech would be the contracting party with the end-user, enabling it to commence a relationship under which it would provide services.

718. The Defendants also contended that, to the extent relevant, the *"just no"* email did not mean at all that there was no prospect of a deal being done with the end-user, contrary to the Claimants' case. Less than a month later on 26 April 2011, there is documentation showing that negotiations continued, and that Autonomy's salesmen were forecasting a "50% plus probability" for a deal with Ameritrade (though what deal and at what price is not disclosed).

719. The Defendants did not deal specifically with the fact that Deloitte were not told of the "just no" email. It is not clear when Deloitte undertook their review of the revenue deals for Q1 2011; and, more particularly, whether negotiations for a deal had re-started or were on-going (such that the "just no" email was no longer of any material relevance). As usual, Deloitte focused on the VAR agreement and concluded that all the relevant criteria were satisfied to enable and require revenue recognition. As to the end-user all they noted was as follows:

> *"The end-user, ThinkTech Inc is a subsidiary of TD Ameritrade, a large listed stockbroking firm. The purchase of a compliance archiving product with Bloomberg integration appears to be a rational purchase for such an entity."*

720. The Claimants also relied in the context of VT31 on the DiscoverEngine software purchases for the same reasons and on the same basis as they had in the context of VT30: they contended that the purchases were simply a means of passing money to DiscoverTech to make good on the agreement or understanding they alleged.

*My assessment re VT31*

721. In my view (and I find that) at the time that the VAR deal with DiscoverTech was entered into:

(1) Autonomy's sales department had been told, and Mr Hussain (who had been keeping an eye on and had been pushing for the deal to be concluded) would have been informed and appreciated, that the prospect of a sale to Ameritrade/ThinkTech was very slim. It is more likely than not that Mr Hussain would have informed Dr Lynch, who also monitored closely the likelihood of deals which were part of the means of achieving the quarterly revenue target eventuating.

(2) Deloitte should have been told of the *"just no"* email; and it is more likely than not that it was withheld deliberately, lest it prejudice revenue recognition in the targeted quarter, at the instance of Mr Hussain.

(3) DiscoverTech would have had great difficulty in meeting its contractual obligations under VT31 out of its own resources, and it was never in reality expected or intended by either Autonomy or Mr David Truitt that it would be required to do so.

(4) DiscoverTech was not intended or expected to participate or be involved in any way in any future effort to conclude a deal with ThinkTech, the objective of which would continue to be a direct deal between Autonomy and ThinkTech. DiscoverTech was never intended or expected to deal with or use the software notionally 'sold' to it in any way.

(5) The 'sale' was a device with no economic substance to enable revenue recognition, regardless of whether or not any sale to ThinkTech ever eventuated.

722. In my view, VT31 is a further demonstration of the by now habitual and routine way or pattern in which Autonomy resorted to friendly VARs, and especially DiscoverTech, to bolster quarterly revenue. Further, it shows that by now at least, Autonomy was prepared to exaggerate the prospects of an end-user deal, and trust in some other mutually beneficial commercial solution to preserve the loyalty of the VAR and reward it for taking on risk if no end-user sale eventuated. A further aspect of the pattern appears to be emerging: recognition of revenue even in circumstances which at the time of such recognition there appeared to be little likelihood of the putative end-user deal eventuating at all.

723. In my judgment, this is the pattern well established by now. It is inconsistent with proper revenue recognition.

*Were the Defendants aware and involved?*

724. Mr Hussain's involvement and 'guilty knowledge' is plain.

725. I accept that Dr Lynch was not involved in the detail of this deal. But I consider that it is more likely than not that he was informed that it was, as at the end of Q1 2011, most unlikely to result in a deal with Ameritrade/ThinkTech, and that there was at least real doubt whether it would ever eventuate in the then proposed form and price. Accordingly, it is more likely than not that Dr Lynch was aware that a VAR was being introduced solely for the purpose of triggering revenue recognition, without any intention of the VAR being involved in any way or dealing with the software notionally sold, and (in the particular case of VT31) regardless of whether in the end any revenue in fact was generated. He was aware also, since with Mr Hussain he was an architect of the practice of resorting to 'friendly' VARs  in order to recognise revenue in a targeted quarter where there was a delay in closing the prospective end-user deal, of the tacit understanding shared with all the 'friendly' VARs, that though legally at risk, they would never be expected or required to pay out of their own resources. That, in my judgment, constituted "guilty knowledge".

## **VT35: DiscoverTech/Abbott Labs Q2 2011**

726. In an email to Dr Lynch dated 11 June 2011 (subject: update) Mr Hussain referred, as one of three new potential deals, to the *"chance of a $15m software deal"* with Abbott Laboratories ("Abbott"), a healthcare company which was an existing customer of Autonomy. Though this was, as Dr Lynch accepted, a large deal (he cavilled at *"very large"*), he had not mentioned it in his witness statements; and his position was that he did not think he

had had any involvement in it (apart from being updated occasionally as to its status by Mr Hussain).

727.   It is clear that the prospective Abbott deal was large enough to become of increasing concern as the end of June approached without its successful agreement. When Mr Sullivan informed him on 27 June that Abbott *"say they need till tomorrow"*, Mr Hussain almost immediately responded *"Fingers and toes crossed we need it"*.

728.   In the event, Abbott would only agree to a substantially reduced deal, and demanded very extended payment terms, which Mr Hussain agreed. Mr Wilner of Autonomy reported to Mr Sullivan by email dated 30 June 2011 as follows:

> *"Sr. Atty* [negotiator for Abbott] *veto'd by GC* [General Counsel] *who says (and has said in the past) that they will 'never authorise forward-looking commitment levels.' Nothing left to be done.*
>
> *Utterly ridiculous conclusion to a ridiculous process. Wish the news were better. Sorry we couldn't get this one done."*

729.   Later that day, Mr Hussain updated Dr Lynch by email as to the "state of play", reporting in relation to the Abbott deal as follows:

> *"Abbott – 2 deals being worked – a $2.5m deal direct (we negotiated this last night, not on good terms though) and one thru partner"*.

730.   It appears, therefore, that when the larger deal with Abbott that it had hoped to close by the end of the month failed to materialise, Autonomy decided to resort to a VAR in accordance with its usual practice in such circumstances. On 30 June 2011, DiscoverTech issued a purchase order for the licence that Autonomy had been trying to sell Abbott. The licence fee was the very precise sum of $8,611,011.07, which Autonomy recognised as revenue immediately. The total amount payable under the purchase order, taking account of additional sums for hosting and support and maintenance, was $9.45 million.

731.   As in other DiscoverTech VAR deals, the reseller agreement placed DiscoverTech on risk irrespective of whether an end-user sale was concluded, and contained a clause stipulating that the contract represented the entire agreement between the parties. This was a further transaction on which DiscoverTech understood that

it assumed the legal risk, and the evidence from Mr David Truitt and Mr Egan confirmed that.

732. Mr David Truitt gave further evidence about this transaction specifically in the US criminal trial. He said that Mr Egan convinced him to do the deal and that he accepted the risk and DiscoverTech owed the money on the deal:

> "Q.   Let's talk a little bit about the Dell Hyatt and Abbot Labs deals in the third quarter of 2011.
>
>    Again, this is all Mr. Egan. Mr. Egan came in and convinced you to do it; right?
>
> A.   Yes.
>
> Q.   Told you that these deals were about to close?
>
> A.   Yes.
>
> Q.   Told you that these were long-term customers of Autonomy who were going to have to buy eventually -- A. Yes.
>
> Q.   -- right? And persuaded you that this was something that you wanted to do? A. Yes.
>
> Q.   And to the extent that -- you didn't talk to Mr. Hussain about the Abbott deal, did you?
>
> A.   No.
>
> Q.   Mr. Egan didn't tell you that the -- they were having problems getting the general counsel to agree to a license?
>
> A.   No.
>
> Q.   Okay. Did you know that eventually they did get Abbott to agree to a license?
>
> A.   No.
>
> Q.   But, again, these were deals that you accepted the risk on and you owed the money on?
>
> A.   Yes, sir."

733. Earlier in his testimony David Truitt had also made the same points. His evidence was that Mr Egan told him that "*the deal was going to happen sometime soon*". There was consensus between the parties that if Mr David Truitt had been told that Abbott had vetoed a forward-looking commitment, he would not have done the deal. The Defendants indeed relied on this evidence, which

had been marked up by the Claimants as hearsay evidence upon which they relied, as confirmation that Mr David Truitt regarded DiscoverTech as on risk, and as thus being inconsistent with the Claimants' case.

734. However, the real thrust of the Claimants' case in respect of the Abbott deal (VT35) was that it was *"devoid of economic substance"* and even *"absurd"*. The Claimants contended that:

(1) DiscoverTech had no ability to pay, absent an end-user transaction, and there was no real prospect of an end-user transaction with Abbott in light of it having been vetoed by its General Counsel.

(2) Mr David Truitt was not told about the General Counsel's veto.

(3) DiscoverTech was to have no involvement in any negotiations with the end-user and made no effort and was not expected or intended to effect a sale itself: after the VAR 'sale' as before, any sale to Abbott was intended to be a direct sale by Autonomy. That demonstrated Autonomy's *de facto* continuing managerial control of the software sold which would disqualify revenue recognition. Mr David Truitt was asked in his cross-examination in the US criminal proceedings whether he would say Autonomy exercised control over what to sell to Abbott and on what terms; his answer was unequivocally "yes".

(4) Mr Hussain then misled Deloitte about the rationale of the proposed end-user deal (DiscoverTech/Abbott) in (a) telling Deloitte that it was using DiscoverTech because it had 8A status, knowing that it did not; and (b) keeping back from Deloitte the fact that Abbott's General Counsel had vetoed any deal involving a *"forward-looking commitment"*.

(5) When no onward sale to the end-user eventuated, Autonomy, at Mr David Truitt's request, simply "cancelled" and wrote off the obligations under VT35. The Claimants placed great reliance in this context on an email dated 30 September 2011 from Mr David Truitt to Mr Scott under the subject heading *"Cancellation of VAR agreements"* in support of the allegation that according to Mr David Truitt, this is what Mr Egan had at the outset agreed should be done if no end-user deal eventuated. That email read as follows:

> *"Hello Mr. Scott, I am writing to formally request that VAR agreements signed on June*

> *30th, 2011 between Discover Technologies and Autonomy, regarding Abbott Laboratories and Dell/Hyatt be cancelled. Per my discussions with Stouffer Egan, under the condition that the end customer did not ultimately license the proposed Autonomy software, the agreements would be cancelled with no further obligation on the part of Discover Technologies. Thank you for your attention and prompt response".*

(6) Such a cancellation and write-off in the aggregate sum of $15 million would not have been made without the approval of both Defendants.

735. The Defendants' responses were:

(1) Whether or not DiscoverTech was good for the amounts for which it assumed an obligation to pay was an issue of collectability. Collectability was a judgmental area, was assessed by Deloitte, and was considered satisfactory. In any event, this would not render the transaction *"devoid of economic substance"*. Mr David Truitt's answer to the question whether DiscoverTech had sufficient money to pay for the purchase order if the end-user sale failed was *"No, not within the company"*. But Mr David Truitt and his partners had funds; and he confirmed that they could put DiscoverTech in funds to pay the DiscoverTech reseller deals.

(2) It was common ground that Mr David Truitt was not told of the alleged veto by Abbott's General Counsel. That may explain why he proceeded, and the Defendants argued that, if anything, the point tends to undermine rather than support the Claimants' contention that Mr David Truitt was to be held harmless in any event.

(3) Further, (and this is relevant also to (1) above), Dr Lynch did not accept that the General Counsel's "veto" was really such as to preclude a further deal. He explained that while this was not good news he had seen deals in this position come back, and that he had experienced this kind of thing before as a negotiating tactic. Dr Lynch also observed correctly that Abbott did in fact come back subsequently. With regard to the Abbott deal and the reseller deal generally, Dr Lynch also explained that this was a very sizeable opportunity with a very large demand from Abbott for e-Discovery. Dr Lynch's analogy was that rather than selling Abbott the multiple deliveries of milk they would need, Autonomy was offering the cow, and was likewise

offering the cow to the reseller (who could itself supply either the cow or the milk to the end-user).

(4) The criterion in IAS 18.14(b) is about whether the seller retains managerial involvement or control over the goods.[584] Under the reseller deals Autonomy had no continuing contractual obligations in respect of the software and no rights to control what happened to it. The fact that the reseller may have left it to Autonomy to carry on negotiations, with a view to a sale of the goods by the reseller to the end-user does not mean that the criterion was not fulfilled. Mr David Truitt's evidence in fact confirmed repeatedly that DiscoverTech did have managerial control: there was a true sale under which managerial control of the goods passed without qualification. When asked in more detail about managerial control, Mr David Truitt's understanding was that the preservation of managerial control by Autonomy arose out of the terms of the reseller agreement (which in fact provided the opposite).

(5) DiscoverTech does not appear to have been a section 8A business; and the Defendants accepted that it was recorded as being so on a Deloitte workpaper after a discussion between Mr Hussain and Mr Welham relating to the Abbott

---

deal, but erroneously so. However, the Defendants contended that there was no evidence to explain why this was so, still less that Deloitte had been deliberately misled whether by Mr Hussain (whom the Claimants implicated) or anyone else. Mr Welham had no recollection himself; and though he was not challenged on his evidence that he *"would be surprised if we wrote it down incorrectly"* there was nothing to gainsay the suggestion that *"the person who gave you the information may have been muddled"*. The Defendants referred in that connection to an email from Mr Scott to Mr Hussain in April 2011 which referred to two DiscoverTech deals on a list of "8A deals", which might have given rise to a misunderstanding on Mr Hussain's part.

(6) Although the Claimants took Dr Lynch to Mr David Truitt's email dated 30 September 2011, they did not take him to Mr David Truitt's evidence about it. Mr

---

[584] The experts on accounting matters were agreed that this criterion generally goes hand-in-hand with the transfer of the risks and rewards of ownership of the goods.

Truitt had in fact confirmed in his testimony in the US criminal proceedings, which the Claimants themselves put forward as their evidence, that there was *"never an understanding that if an end customer didn't buy, that I could cancel the deals with no further obligation"*. Dr Lynch also confirmed that that was not the arrangement with the resellers: the contracts were clear and the resellers were on risk. It was not as Mr Chamberlain understood matters either: his immediate response to Mr Truitt's email was *"must be a mistake"*.[585]

(7)   As to the writing off of the debt, although Dr Lynch was not involved in it, and would like to have been consulted about it, he did not see it as remarkable in circumstances where Autonomy was being acquired. He thought the decision would have been a commercial one. Further, in his perception, everything was transparent and Autonomy's books were always going to be open to HP.

*My Assessment of VT35*

736.   In assessing the Claimants' case that the transaction was *"devoid of economic substance"* the essential questions, as it seems to me, are (a) whether it was ever expected or intended that DiscoverTech would negotiate and itself conclude a deal with Abbott and (b) whether Autonomy's agreement to cancel the deal (VT35) was to honour a pre-existing arrangement between Mr Egan and Mr David Truitt to cancel the deal if no end-user sale eventuated in order to persuade DiscoverTech to undertake a more than usually large and uncertain VAR transaction; or whether alternatively, it was an *ad hoc* response agreed subsequently to deal with an (until then uniquely) unusual situation.

737.   As to (a), and as noted above, Mr David Truitt accepted unequivocally that Autonomy not DiscoverTech had and was expected to exercise control over what to sell to Abbott and on what terms; his answer was unequivocally "yes". He also confirmed that DiscoverTech never did make any efforts to negotiate with Abbott. That is an illustration of the usual pattern that the VARs in impugned VAR sales were not expected or intended to negotiate or themselves be party to a sale to the prospective end-user. Although the Defendants sought to ascribe this to Mr David Truitt's understanding of the terms of the VAR

---

[585] As Dr Lynch put it in his testimony "*A. So Mr Chamberlain knows there's a contract but makes it absolutely clear that, even if Mr Egan has given some strange assurance, that it's worthless.*"

agreement, I am satisfied that his evidence shows what he understood to be the position in reality.

---

738. As to (b), I do not accept, in light of the subsequent negotiations culminating in a deal (albeit a smaller one) and the undisputed evidence as to Abbott's real need for substantial software to organise its material and data to respond to a huge investigation into it by the US Department of Justice, that Abbott's General Counsel's "veto" entirely put an end to any prospect of an end-user deal apparently envisaged in the VT35 purchase order.

739. However, I accept that (i) even if a deal could be struck, there was a real risk that only a lesser price would be achieved, (ii) the prospect of such a deal was very uncertain, and (iii) since the amounts at stake were notably large, DiscoverTech was more than usually exposed, especially given its other outstanding commitments. The size of the deal meant that the risk undertaken by DiscoverTech, if real, was an existential one. Both that and the easy agreement of Autonomy to write off such a sizeable debt does suggest a previous arrangement that Autonomy would make sure the legal obligation was satisfied or released in some other way.

740. I have taken into account that, as the Defendants much emphasised, in a passage of his testimony in the US criminal proceedings in part relied on and adduced in evidence by the Claimants themselves, Mr David Truitt disavowed any pre-existing arrangement and sought to explain his email referring to his discussions with Mr Egan as connoting that there was one (see paragraph 735(6) above) as simply his misunderstanding of what Autonomy had wanted him to write. However, all I have read Mr David Truitt as saying was that there was no pre-agreement as to the manner in which Autonomy would ensure that DiscoverTech would be released from legal risk, and no formal writing such as to constitute in his eyes a side agreement. He was not saying that he had been given no assurance that DiscoverTech would not be required to pay out of its own resources.

741. I am also satisfied that Mr Hussain had no reason to think that DiscoverTech had 8A status; and in representing to Deloitte (as I am also satisfied he did) that DiscoverTech did have such status, Mr Hussain was seeking to encourage Deloitte to approve revenue recognition by depicting the VAR as contributing to the transaction and as the company likely to enter into the contract with Abbott, knowing all of that to be false.

742. All in all, I accept the Claimants' case that VT35 lacked any real substance. To my mind, it once again exemplifies Autonomy's use

of VAR deals predicated on an end-user deal even if those responsible knew the prospects of an end-user deal to be weak simply to plug gaps in revenue. It is a further illustration of a well-established pattern and its latter stage development of taking revenue even when the prospect of any real receipt was uncertain.

743. I am also satisfied that both Defendants (a) knew that the VAR sale was not intended to effect any real change in the way that Autonomy dealt with Abbott nor was it ever to result in a sale by DiscoverTech to Abbott; and (b) approved the arrangements by credit notes to dissolve DiscoverTech's substantial legal obligations. In the latter context ((b)), I accept that Dr Lynch may not have been consulted about the specific write-off and credit notes; but I do not accept that it would have been done without his overall approval for the process.

## VT36: DiscoverTech/Dell/Hyatt Q2 2011

744. At the same time as the negotiations with Abbott, Autonomy was also negotiating a separate transaction with the Hyatt hotel chain in which it was envisaged that Autonomy would licence to Dell, which would in turn sublicence to Hyatt. The price which Autonomy hoped for was some $5,000,000.

745. After encouraging signs in early June 2011, by 11 June 2011 Mr Hussain was telling Dr Lynch that he was *"nervous"* about the prospect; and by 18 June 2011 Mr Hussain was reporting to Dr Lynch that the transaction was *"OUT"*. On 30 June 2011, Mr Hussain advised Dr Lynch in another *"state of play"* email, that in relation to Dell, he had *"received draft order from partner"* (signifying a VAR).

746. The purchase order for VT36 (stating a licence fee of $5,333,914 plus $266,696 for support and maintenance) was issued pursuant to a letter agreement dated 30 June 2011 which included the usual terms which placed DiscoverTech on risk irrespective of whether an end-user sale was concluded, and stipulated that the agreement represented the entire agreement between the parties. Mr David Truitt gave further evidence about this transaction specifically when dealing with this deal together with the Abbott deal. He said that Mr Egan convinced him to do the deal and that on that basis he accepted the risk and DiscoverTech had a legal obligation to pay Autonomy.

747. The Claimants' case with respect to VT36 was substantially the same as their case with respect to VT35: that (a) the VAR transaction lacked any economic substance (there being, it was said, no real prospect when it was made of any sale to Dell/Hyatt, and none of DiscoverTech itself entering into a sale since in the unlikely event of any sale at all it would be direct by Autonomy);

that (b) arrangements were made for the deal to be cancelled when no end-user deal eventuated, and that (c) Mr Hussain lied to Deloitte about the rationale for transacting with DiscoverTech (its supposed 8A status).

748.   Likewise, the Defendants' response mirrored that in relation to VT35.

749.   In such circumstances, I do not think it is necessary to rehearse the detailed facts and competing contentions. I have concluded for like reasons as in the context of VT35 that VT36 followed the same pattern and the VAR sale lacked any real substance. The following passage from Mr David Truitt's evidence in cross-examination in the US criminal proceedings illustrates that the essential requirement in IAS 18.14 that risk and management control should pass to the purchaser and not be retained by the seller were not fulfilled:

> "Q.   Did Discovertech have any relevant contacts at Dell or Hyatt?
>
>  A.   No, sir.
>
> Q.   Did it make any efforts to resell them software?
>
> A.   No.
>
> Q. Would you say that Autonomy exercised control over what to sell to Dell or Hyatt and on what terms and at what price?
>
> A.   Yes."

750.   The Defendants submitted that the questions were *"broad and imprecise"* and posed without any reference to the accounting concepts under IFRS, and that the answers did not undermine or detract from the legal position that risk and control had passed. I do not agree: the substance of the position was that the VAR was not intended to have anything more to do with the software, or its sale, and that it would be dealt with by Autonomy as if there had been no such sale.

751.   As the Claimants submitted any confirmation required that VT36 lacked substance just as VT35 had lacked substance was provided by the arrangements made to release the VAR's ostensible indebtedness when in both cases (and as was by now becoming predictable) no end-user deal eventuated.[586]

---

[586] On 29 September 2011, Autonomy Inc issued DiscoverTech with credit notes for $9.45 million and $5.6 million, representing the entirety of what was

752. Once again I am satisfied that both Defendants (a) knew that the VAR sale was not intended to effect any real change in the way that Autonomy dealt with Dell/Hyatt nor was it ever to result in a sale by DiscoverTech to Dell/Hyatt; and (b) approved the arrangements by credit note to dissolve DiscoverTech's substantial legal obligations.

753. In the latter context ((b)), I accept that Dr Lynch may not have been consulted about the specific write-off and credit notes in either VT35 or VT36; but I do not accept that it would have been done without his overall approval for the process.

## VT18: FileTek and USDVA Q3 2010

754. FileTek, it may be recalled from paragraph 1963(5) in the main body of the judgment, specialized in the archiving of structured data, and was (amongst other activities) the developer of the StorHouse and Trusted Edge software.

755. Autonomy had learned in May 2010 that USDVA[69] were going to issue a Request for Proposal ("RFP") for a large deal including archiving. Autonomy wanted to secure the archiving component. It could only do so by bidding and partnering with a US Government pre-approved vendor. USDVA was a repeat customer of Autonomy which had been working with Autonomy on an email archiving system, but Autonomy was not a pre-approved vendor and under US regulations could not supply it directly. It could only do so in conjunction with or through a pre-approved vendor.

756. According to Dr Lynch's evidence in his witness statement, a number of pre-approved vendors were planning to bid on the RFP, and of those the majority were willing to partner with Autonomy and include its software. Autonomy decided on that course.

757. Mr Hussain had hoped that the process would proceed fairly quickly, and that it would be possible to include revenue from a sale in the Q3 2010 figures. On 7 August 2010, Mr Hussain had sent Dr Lynch an email entitled *"latest revenue"* stating that projected revenue for Q3 2010 was $215 million and projected earnings per share were $0.30, and that he would *"need VA and most probably one other"*.

758. The size of the deal, its importance in terms of Autonomy's revenue figures, and Dr Lynch's management style and active supervision are all demonstrated by a vigorous email response from Dr Lynch that same day (7 August 2010) to Mr Hussain and a number of other Autonomy personnel (Mr Still, Mr Egan, Dr

---

ostensibly payable under VT35 and VT36 respectively [69] United States Department of Veteran Affairs

Menell, Mr Mooney, Mr Sullivan and Mr Bryan Rellinger) as follows:

> *"...this is the biggest deal in the quarter and the idea that some no-name proserv guy is allowed to potential f this up and we are even having debates about charging them is a MAJOR MANAGEMENT FAILURE. THIS CANNOT BE DELEGATED. ALL of you own this.*
> *Jim, stoff,mikem,mikes,bryan,pete you need to be minute to minute experts on this deal, nothing is said to the customer with out it being cleared by someone senior, no meetings occur with out someone with a brain present, NO F-ing abdications of responsibility or delegation. If there is any problem I WANT TO KNOW ABOUT IT IN A F***ING MILLISECOND from all of you.*
>
> *We cannot act like muppets on a deal of this size ... break the rules and do it right.*
>
> *AND we will bid with anyone the customer wants us to, none of this Autonomy favoured nation shit anymore".*

759. Nevertheless, this vigour expressed to Autonomy employees could not of itself galvanise USDVA, and by mid-August 2010 it was becoming clear that, unless government agency financial rules compelled USDVA to hurry to issue a RFP (which would trigger the tender process) and move forward with speed, there was little prospect of any deal before Q4 2010. When Dr Lynch asked Mr Hussain in an email dated 13 August 2010 (a) *"how sure are we will win?"* and (b) *"how sure are we it will be q3"* Mr Hussain's replies were (a) as there were what he termed *"EAS issues"* and he had not yet seen an RFP he was not able to assess the prospect, but his overall feeling was that *"it's a low probability"*, and (b) on timing and whether the deal could be done in Q3 2010, he said: *"I can't see it unless they have to spend the funds".*

760. By 25 August 2010, no RFP had yet been issued. Through late August and September, the prospect of a deal in Q3 2010 further receded. On 8 September 2010 Mr Hussain reported to Dr Lynch by email that the deal was *"AT RISK – Need RFP to come out to have a hope".* On 15 September 2010 Mr Hussain reported again to Dr Lynch, this time removing USDVA from the list of expected revenue for Q3 2010.

761. It was nonetheless a large deal, and an important prospective revenue source. Mr Egan's unchallenged evidence was that he and

*"Mr Hussain…discussed the need to be able to take the deal to a VAR in order to be able to recognise revenue in the quarter."* At that stage, Mr Hussain and Mr Egan were discussing using MicroTech and MicroLink as a *"partner".* It is not clear why, on 28 September 2010, they turned to FileTek.

762. Autonomy had established a close relationship with FileTek through a number of deals, including two which the Claimants impugned as *"reciprocal"* or *"round trip"* transactions (and which are addressed later in the main body of the judgment in the chapter on alleged 'Reciprocal Transactions')[587]. None of those deals, however, was a

_____

VAR deal. FileTek was not a VAR[588]; as Mr Szukalski confirmed in cross-examination, being a reseller was not part of FileTek's business and it had never resold Autonomy software. VT18 was the only VAR transaction FileTek ever entered into with Autonomy.

763. Indeed, when Autonomy contacted FileTek almost at the end of Q3 2010 with a view to its participation as a *"partner"* in VT18, Mr Szukalski had not initially been keen on the idea because he did not consider it was FileTek's business model to resell other companies' software. He had suggested to Mr Egan that Autonomy might instead use a company called Centennial, a VAR that FileTek had a relationship with and that was accustomed to handling these types of deals. However, Autonomy was not familiar with Centennial and *"Mr Egan or others at Autonomy wanted FileTek to be involved, because Autonomy knew FileTek and had dealt with it over several years".* Mr Egan also suggested that Centennial *"did not pass the eligibility criteria for our resellers"*, and Autonomy reverted to FileTek: but this was not further explained.

764. Following a call with Mr Hussain and Mr Egan on 30 September 2010, Mr Loomis of FileTek recorded in an email that *"We will be licensing through a prime contractor. Autonomy will coordinate*

_____

[587] The two transactions with FileTek impugned as reciprocal transactions (both referred to in the RRAPoC, in

Schedule 5, as "RT 3") were (1) a purchase in Q4 2009 by Autonomy from FileTek of a licence for FileTek's StorHouse software for integration with Digital Safe at the same time as (and alleged to have been made in order to enable) a purchase by FileTek of a license for IDOL and (2) a purchase in Q1 2010 by Autonomy from FileTek of a further licence for StorHouse and a purchase at the same time by FileTek from Autonomy of a further licence for IDOL in Q2 2010.

[588] As elaborated in the chapter of this judgment on Reciprocal transactions, FileTek's specialisation was in the archiving of structured data and its development and sale of its two principal products (*"StorHouse"* and "*Trusted Edge"* software)

*for us*".  In his witness statement, Dr Lynch described the purpose as being *"to de-risk the deal."* But the need for revenue in the quarter was plainly the driving reason.

765.   VT18 was, in legal terms, governed by a letter agreement dated 30 September 2010, which granted FileTek the right to sublicence the specified Autonomy products either directly or through an agreed prime contractor to the USDVA or an Alternate Licensee (subject to the terms of clause 3). The licence fee was $10,000,000 and there was a first-year support fee of $500,000.

766.   The VT18 agreement was in the form of a counter-signed letter dated 30 September 2010. As was part of the pattern, it provided:

>  (1) (by clause 1) that once executed by FileTek the agreement constituted a non-cancellable purchase commitment on the part of FileTek;

>  (2) (by clause 7) that the agreement represented the entire agreement between the parties concerning its subject matter and any discussions outside the four corners of the agreement would not have any legal effect.

767.   Only clause 3 of the letter agreement was more unusual in expressly providing for FileTek to have the ability to sell to other end-users within a prescribed time (90 days from 30 October 2010).  That right was, however, subject to the proviso that the VAR agreed:

>  *"not to sublicence and distribute the Autonomy Software Products and Maintenance Services hereunder to any party or entity that sells, licenses, or distributed [sic] products, services, software, or offerings competitive with the products, services, software and/or offerings of Autonomy or its affiliates."*

768.   As was also required and invariable, FileTek countersigned audit confirmation letters verifying its indebtedness, confirming that there were no *"side letters or other agreements in respect of the subject matter of this request, except as noted…"* and acknowledging that Autonomy retained:

>  *"no continuing managerial involvement in the delivery of this product or service, other than stipulated in the licence agreement."*

769. It was common ground that Mr Egan had given FileTek (through Mr Loomis) assurances of assistance if no deal with USDVA eventuated. Mr Egan's evidence in his witness statement, with specific reference to VT18, was that the gist of what he said at the time that the VAR transaction was entered into was:

> *"Autonomy would be responsible for arranging a licensing transaction with the winning contractor; FileTek would not engage in the actual sales efforts. If, for some reason, the VA deal was not completed, Autonomy would use all efforts to find another end-user for the same software or some other way to make sure that FileTek would get paid and could then pay Autonomy."*

770. As may also be recalled (and see paragraphs 1991 and 1993 in the main body of the judgment), Mr Egan elaborated some of this by reference to VT18 as follows:

> (1) All he meant by *"backfilling"* was that he was going to *"take other deals from Autonomy's forward-looking pipeline and then give them to the reseller to backfill…in other words, basically substitute another deal for it…"*; and in the meantime

> (2) Unless and until a substitute deal was arranged *"they had to make their payments in line with payment terms"*, not least because

> (3) Any assurance given by him was not legally binding on Autonomy and was not intended to affect the legal obligation to pay (*"No, 100% not"*).

771. There was something in these explanations for both sides, resulting in considerable dispute as to the extent and status of these assurances. The Claimants relied on VT18 as a further exemplar of the 'pattern'; but the Defendants themselves also placed emphasis on VT18 as a good test of the furthest extent of the assurances given in the context of the impugned VAR transactions. Indeed, this appears to have emboldened Dr Lynch to state in his written closing submissions that:

> *"Of all the reseller transactions the evidence in respect of the FileTek transaction in fact takes the Claimants' case the furthest. But even if the conversation had run as Mr Egan suggested (and…this is a very big if), what he said would not have undermined revenue recognition."*

772. Aunt Sally or litmus test? I turn to the details of the transaction. In this section I focus primarily on (a) the evidence given by Mr Loomis in the US criminal proceedings (which was admitted into these proceedings under a hearsay notice) (b) the evidence of Mr Szukalski in these proceedings (c) particular distinguishing features of the transaction and

(d) Autonomy's purchase of StorHouse software from FileTek, which the Claimants alleged was contrived to save FileTek from *"holding the bag"* when, in the event, no enduser deal with the USDVA was ever concluded.

773. Mr Loomis's evidence in the US criminal proceedings in relation to FileTek's role in VT18 was in outline as follows:

> (1) He said that he understood that FileTek was at *"full risk"* in that *"FileTek owed the money once they agreed to it"* and was aware that FileTek provided signed audit confirmation letters to Deloitte confirming its indebtedness. He also understood that there was an entire agreement clause applicable;

> (2) The risk was considered proportionate and acceptable because (a) USDVA was already a current customer of Autonomy (b) Mr Loomis's understanding was that Autonomy would have closed the deal itself without any recourse to a VAR but for delays *"because of government procurement issues"* (c) Autonomy *"were very confident that it was going to be concluded shortly"* and (d) FileTek on completion of the deal would get a mark-up or margin on the licence sale to the USDVA of 10% equating to about $1,000,000;

> (3) Thus, FileTek was *"an investor"* (as he put it) in the proposed end-user sale because FileTek *"would be dependent on the closure of that sale to the Veteran's Administration for us to receive a revenue"*;

> (4) When asked whether it would have been a problem for FileTek if the sale to the proposed end-user *"dragged on and didn't close for months at a time"*, Mr Loomis replied *'yes'*, and some form of reassurance was sought from Autonomy in this respect. In an email dated 30 September 2010 from Mr Loomis to Mr Bill Thompson summarising the proposed transaction, reference was made to three scenarios having been considered, which were (i) completion of the end-user sale as planned in

Q4 2010, or (ii) deferral of the end-user sale to Q1 2011 or (iii) *"Disaster: something fully unexpected either further delays or eliminates the opportunity"* in which case *"Our plans for each are as per our telephone conversation"*, it being noted also that *"We have ability to reassign the license"*;

(5) Mr Loomis was not asked about his conversation with Mr Thompson but confirmed that he had a telephone conversation with Mr Hussain and others at Autonomy at the very end of September 2010. He professed that his recollection was *"vague"* but that the purpose of the conversation with Mr Hussain was to hear from someone at Autonomy with the stature of Mr Hussain *"the same story that we were hearing from Stouffer Egan"*;

(6) Beyond a statement that the conversation was reflected in the email referred to above, the content of that *"story"* was not explored in either examination or cross-examination in the US criminal proceedings. However, whatever was discussed appears to have satisfied Mr Loomis; and the concern he expressed about what would happen if the end-user sale collapsed focused on the loss of the margin of $1 million, not the exposure to risk in respect of the VAR purchase;

(7) Mr Loomis became concerned when after 45 days or so the end-user deal had not completed, and became frustrated by Autonomy's lack of communication about its progress and prospects: it was clear that FileTek played no part in the process or the negotiations;

(8) After a small initial deposit, Mr Loomis determined not to make and did not in fact make any payments to Autonomy because (a) *"it was a lot of money"*; (b) *"we did not have status updates"*; and (c) *"it was a way to help leverage the status update…"*;

(9) His evidence was that when by June 2011 the end-user deal had not eventuated, it was agreed that Autonomy would buy StorHouse software from File Tek and

> *"the arrangement was that we would take the proceeds from the sales and utilize those proceeds or a substantial portion of those proceeds to pay down the liability we had to Autonomy for the VA transaction".*

774. In summary, and it is obviously an assessment made on a transcript, rather than on the basis of 'live' cross-examined evidence, the impression given in the transcript is that, however this was conveyed to him, Mr Loomis had no intention of paying Autonomy unless and until the end-user deal closed, and if it did not eventuate, he never envisaged FileTek being left to pay down its indebtedness out of its own resources: some arrangement would be made.

775. Mr Szukalski's evidence in these proceedings in relation to VT18 may be summarised as follows:

(1) His understanding from Mr Loomis was that FileTek was on risk, but that Mr Loomis was comfortable proceeding because (a) the end-user deal was likely to proceed and take place well within 45 days and before any further payments would be due from FileTek; (b) under the terms of the transaction, FileTek was able to sell the software to any customer, and Mr Egan had told Mr Loomis, and Mr Szukalski and Mr Loomis believed, that *"Autonomy would help us out by putting us in contact with another buyer in the unlikely event that the USDVA deal fell through for some reason"*;

(2) He did not expect FileTek to play any active part in the sale of the software on to the end-user, and his understanding was that Autonomy was going to coordinate the licencing of the software through a prime contractor acting merely as a *"fulfilment partner"*:

> *"Q. And the reason why Autonomy would help prepare the purchase schedules is that FileTek didn't know what Autonomy software the USDVA might be interested in buying?*
>
> *A. This was just a fulfilment transaction quite frankly in the sense that we were told that there was a deal at the USDVA, Department of Veteran Affairs, that was going to close in approximately 45 days, was the number that we were given, and that would we mind holding the paperwork for those 45 days and in exchange we'd earn a certain margin on the deal. I think the number turned out to be around $1 million worth of - - to do that.*
>
> *So that's what we were asked to do. Again, I would have rather this gone through Centennial but it went through FileTek.*
>
> *Q. And apart from holding the paperwork, FileTek wasn't going to be expected to do anything else?*

> *A. That was it. We really were told there were several bidders on this particular transaction and it was just a matter of awarding the deal to one of those bidders and all of them was bidding Autonomy software so it would be a, you know, no brainer/slam-dunk kind of transaction."*

(3) Mr Szukalski repeatedly emphasised that FileTek:

> *"had no contact with the [USD]VA and…no contact with the six primes that were bidding on the deal.*
>
> *Autonomy gave us the assurance that this particular transaction was going to happen through one of those bidders, it was going to include IDOL, and it would happen in the next 45 days. That's the summary of basically what we had. So we didn't have any contact with those systems integrators."*

(4) He told me later in the course of his cross-examination that in his experience it was not unusual in the industry for there to be a reseller partner which had no expertise in selling the technology, which would do no more than *"just push paper"* and which took a margin for their role without adding value beyond acting as a "fulfilment partner": but see further paragraph 785 below.

(5) In his witness statement, Mr Szukalski had given the impression that all that FileTek could expect from Autonomy if the USDVA sale failed was that Autonomy would help by finding an alternative buyer, but that in the meantime Autonomy would be entitled to enforce its rights. However, when crossexamined, he made clearer that he did not expect that FileTek would ever have to find a replacement end-user itself: Autonomy would find a replacement enduser, failing which the intention and expectation was that Autonomy would find some other way of enabling FileTek to discharge its legal obligation (and would not press for payment in the meantime):

> *"Q. So Mr Loomis' expectation was that Autonomy would find a way to ensure that FileTek got paid so that FileTek could pay Autonomy?*

> *A. That is correct also.*
>
> *Q. And Mr Loomis trusted Autonomy to honour that assurance?*
>
> *A. He did but this particular transaction didn't come without*
>
> *risk, obviously, in that disaster scenario. It was different than the other transactions.*
>
> *Q. And the risk was that Autonomy doesn't honour the assurance that had been given to Mr Loomis?*
>
> *A. That is correct."*

(6) In response to the Claimants' suggestion that FileTek wanted to use the audit confirmation letters, which were marked for Mr Szukalski's attention but signed on behalf of FileTek by one of three others (namely, Ms Leslie Levy, FileTek's "Controller", Mr Howard Patrick, FileTek's General Counsel and contracts negotiator, and Mr Bill Loomis), as leverage over Autonomy, the gist of Mr Szukalski's evidence was again that FileTek's was a real debt, that they wanted the USDVA deal and were prepared to accept the risk for that and the reward by way of margin:

> *"A.   So as I said before, we used certain milestones, whether it was a payment date or an auditor letter in this case, to kind of trigger or get Autonomy to respond to our request for where are we in this process, because we feel very, very uncomfortable signing this auditor letter or moving forward without, you know, continued update or assurances that the [USD]VA deal is real and coming through.*
>
> *Q. Or that Autonomy would find you someone else who would buy the software for more than $10 million –*
>
> *A. Yes, at this time we really didn't focus our efforts on that. We really wanted that [USD]VA deal and that is a continuing theme throughout the next several months that I'm sure we'll get to, but that*

*was -- that there was a VA deal and it
was real."*

776. Mr Szukalski had not been shown the transcript of Mr Loomis's
testimony or Mr Egan's witness statement (although he told me
that someone had given him the gist of the latter) before signing
his witness statement evidence and so did not address either. Nor
(save for one email) was he shown any contemporaneous
documentation at that time. The result was that Mr Szukalski's
evidence in crossexamination differed from some parts of his
witness statement. I agree with the Claimants that his oral
evidence was more reliable. However, the inconsistencies were
not such that the essential message of his evidence was unclear.

*Particular points on VT18*

777. Five points about VT18 were particularly emphasised by the
Claimants, as indicating its lack of substance and the fundamental
ways in which it failed to satisfy the criteria for revenue
recognition.

778. The first such point related to the true nature of the assurances
given by Mr Egan as to how the legal risk which the VT18
agreement undoubtedly imposed on FileTek would be covered in
the event of no sale to USDVA, or a long delay before such a sale
could be concluded; the central question in this, as in all the other
impugned VAR sales, being whether the reseller would be called
upon to pay out of its own resources.

779. According to the Claimants, the basis of the VAR transaction was
that from its inception, and with the consensus of both parties,
FileTek had received an assurance that in reality Autonomy would
cover its risk and FileTek had entirely abdicated from any
continuing managerial involvement to the degree usually
associated with ownership of the goods sold: accordingly, it was
Autonomy, and not FileTek, which had the significant risks of
ownership and effective control of the goods sold, thus
disqualifying revenue recognition because of IAS 18.14(a) and
(b), as well as because the 'sale' lacked any real substance.

780. The Claimants further supported this conclusion on the basis that,
in any event, FileTek had none of the information or expertise to
negotiate and effect an end-user sale: it had never previously sold
Autonomy software to anyone; the software purchased included
Digital Safe, which FileTek had no experience in implementing,
nor any ability to maintain. For the same reason, clause 3 of the
VAR Agreement governing VT18, which appeared to give
FileTek some latitude to sell to another end-user if the USDVA
deal failed, was largely illusory: the prospects of FileTek being

able to find a third party buyer for this software at a price of $10 million were very remote.

781. The following passage from Mr Szukalski's evidence in cross-examination (which I have quoted in part in paragraph 775(1) above) elaborates these points:

> "Q. ....In the disaster scenario, the plan was that Autonomy would help you to reassign the software licences to another potential customer?
>
> A. That is correct.
>
> Q. Yes. So Autonomy would find a different customer who was willing to pay at least $10 million for the software?
>
> A. That is correct.
>
> Q. And then Autonomy would put FileTek in touch with that customer?
>
> A. Or Autonomy would act on our behalf and we would be just the fulfilment partner, again, not adding a lot of value in terms of selling but the paperwork would go through FileTek. So again very common practice. We don't have to necessarily have the expertise in IDOL or Autonomy software, we would leverage the expertise of Autonomy but the paperwork, the contractual paperwork would have gone through FileTek.
>
> Q. So Autonomy would draw up a contract with this other customer but it would then insert FileTek as either the contracting party or the party who would receive the payment?
>
> A. That is correct.
>
> Q. And then after that was done, this other customer would pay FileTek and then FileTek would use that money to pay Autonomy?

> *A. That is the reassignment, yes.*
>
> *Q. And that's what you understood Mr Loomis expected to happen here on the basis of his discussions with Mr Egan and Mr Hussain?*
>
> *A. That is correct.*
>
> *Q. So Mr Loomis' expectation was that Autonomy would find a way to ensure that FileTek got paid so that FileTek could pay Autonomy?*
>
> *A. That is correct also.*
>
> *Q. And Mr Loomis trusted Autonomy to honour that assurance?*
>
> *A. He did but this particular transaction didn't come without risk, obviously, in that disaster scenario. It was different than the other transactions.*
>
> *Q. And the risk was that Autonomy doesn't honour the assurance that had been given to Mr Loomis?*
>
> *A. That is correct."*

782.  Furthermore, in the event of a deal in the conclusion of an end-user delay extending beyond instalment payment dates, it was not intended or expected that Autonomy would call upon FileTek to pay.   In cross-examination, Mr Szukalski told me that he understood that Mr Loomis's plan was to pay Autonomy only after FileTek received the money. He told me:

> *"...that kind of a structure in terms of payment after we get paid from a transaction where we are the fulfilment partner is a standard kind of reseller transaction. That's not something unusual to this transaction. That is something that, if you're a reseller fulfilment partner that often is the case."*

783.  Indeed, and the second point emphasised, his understanding was that FileTek did not have the financial resources to meet its

obligations under VT18 unless the end-user deal was closed and paid within the 120-day payment terms applicable to the VAR deal (i.e. VT18). Mr Chamberlain shared that understanding (as is apparent from an email from him to Mr Egan copying Mr Hussain in October 2010). The Claimants contended that the deal was inordinately risky for FileTek unless it was given the assurances they alleged, and it could be reasonably sure that in the meantime it would not be called upon to pay (which it never was and never did).

784.   The Claimants further supported this point by referring to an email dated 1 February 2011 from Mr Szukalski to Mr Loomis, reporting on a discussion with Mr Egan after it became clear that the end-user deal with USDVA was in trouble. This included a paragraph stating: *"He wanted to ensure [sic, presumably assure] us that there is no risk to us"*. As regards that statement, Mr Szukalski's evidence was as follows:

> *"Q. So that reflects the assurance that Mr Egan gave you that there was no risk to FileTek?*
>
> *A. That's correct.*
>
> *Q. What that means is that there is no risk to FileTek that Autonomy will fail to honour the assurances that had been given to you at the time of signing the purchase order?*
>
> *A. That is correct.*
>
> *Q. And you trusted that assurance?*
>
> *A. We did. We had trust but it didn't come without a little bit of agita and concern that we were still on the hook for $10 million. Q. If Autonomy fails to honour the assurance?*
>
> *A. That is correct."*

785.   The third point emphasised by the Claimants was that FileTek was to have no further involvement in the sales effort to close the prospective deal with the USDVA. Mr Szukalski told me in cross-examination:

> *"A. ...One thing I do want to say again is that is not an unusual -- there are reseller partners that act as pure fulfilment partners.  What I mean by that is it's just a contractual vehicle by which to sell -- resell software through.  So there are partners who have no expertise in the*

*technology or selling technology but they're just used as a simple contractual vehicle and they get a certain percentage of margin like we did. So to some extent I hear your questioning and it sounds a little bit like this is an unusual thing where we had no expertise in selling IDOL and in the world of -- the reseller world, there are partners called fulfilment partners that do just -- just push paper, that's all they do. They have no expertise, they don't add value and in this case, for this transaction, FileTek was acting as a fulfilment partner on behalf of Autonomy."* 786. The fourth point was that, according to Mr Welham, the arrangements for FileTek to have no further involvement in the sales effort to close the prospective deal with the USDVA were not disclosed to Deloitte. Deloitte were invited to and did approve VT18 on the basis of a misapprehension, which the Audit Committee (on the basis of what they were told) also shared, that FileTek would be attempting to conclude a deal with the USDVA, when in truth that was not the agreed plan. The Claimants relied in this regard on the evidence of Mr Welham in answer to a question put to him in re-examination whether:

*"[i]f Autonomy retained sole charge of commercial negotiations with the enduser without any involvement by the VAR, that would have been relevant to Deloitte's audit judgement on whether to recognise that revenue on the sale to the VAR?";*

787. The relevance of this was basic:

*"Because then it would suggest that the risk hadn't passed, if the VAR has to do nothing and Autonomy has to do everything".*

788. The fifth point emphasised by the Claimants relates to the same email (referred to at paragraph 784 above): the Claimants contended that Deloitte were never told that Mr Egan had given an assurance that there was *"no risk"* to FileTek. They suggested that Mr Welham's evidence to that effect was not challenged, and nor was his further evidence that, had Deloitte been aware of this, Deloitte would have wanted to understand whether there was some form of side agreement or understanding which meant that the

risks and rewards of the USDVA transaction remained with Autonomy, which in turn would have prevented the recognition of revenue.

789. The Defendants countered each of these points as follows. With reference to the first (see paragraph 778 above), although the Claimants seized on Mr Szukalski's acknowledgement that he had been given *"assurances",* the Defendants maintained that the *"assurances"* to which Mr Szukalski was referring were limited to Mr Egan making every effort to "backfill" (as described above). They contended that there was no support for the vague reference in Mr Egan's witness statement to Autonomy promising that it would find *"some other way to make sure that FileTek would get paid and could then pay Autonomy"* (see paragraph 769 above).

790. Further, the Defendants insisted that there was never any understanding that FileTek would not be required to pay unless itself paid. Although the Claimants also sought to rely on Mr Szukalski's answers when cross-examined on this, which were to the effect that a "pay only when paid" structure was *"a standard kind of reseller arrangement"*, the Defendants pointed out that Mr Szukalski never suggested any actual agreement or assurance of that kind, simply an intention on the part of FileTek and an expectation that this would not be out of the ordinary. Likewise, in asserting that FileTek would not pay until paid the Defendants stressed that Mr Loomis was referring to *"my plan"*, rather than any bilateral agreement or shared understanding; and, since (they submitted) that would not suffice, that this undermined rather than supported, the Claimants' case.

791. The Defendants sought to deflect the Claimants' second point, that FileTek could not have paid $10 million out if its own resources if no end-user sale eventuated (see paragraph 783 above) by pointing out that (unusually) FileTek paid Autonomy $500,000 on the day the VT18 agreement was concluded and thereafter did in fact make payments in discharge of its contractual debt of $1.5 million in March 2011, $1 million in April 2011, $1.5 million in June 2011 and the remaining $6 million in August 2011, which in an Autonomy Accounting Update Memo on *"September 2010 to August 2011 Transactions"* were described as *"funded over time as cash flow became available"*. How that cash flow was generated, however, was the subject of dispute: the Claimants' case being that it was generated only because Autonomy bought software from FileTek for which it had no real need (the StorHouse purchases): see below.

792. As to the third point (see paragraph 785 above), the Defendants broadly accepted that FileTek was not to participate in negotiations with USDVA to close the proposed transaction: the

points they emphasised were that (a) the role of 'fulfilment partner' (which was how Mr Szukalski openly and straightforwardly described FileTek's role) was standard in the industry (b) it was common practice that nothing was necessarily expected of such a fulfilment partner, except that the paperwork would go through it (c) similarly, it was entirely normal that the supplier (here, Autonomy) would negotiate and draw up the end-sale contract and then simply insert the fulfilment partner as either the contracting party or the party who would receive payment, as Mr Szukalski confirmed, see paragraph 781 above.

793.  As regards the (admitted) intention that Autonomy was to carry on the negotiations with the USDVA, and even assuming (as Mr Welham and the expert witnesses were invited by the Claimants to assume) that it was to have "sole charge" of such negotiations, the Defendants stressed the difference between a situation where that was done because the VAR (here, FileTek) recognised that the prospect of closing the end-user deal was more likely if Autonomy, with its experience of and previous contact with the end-user, continued the negotiations it had started and was simply content to leave it to Autonomy, and on the other hand, a position where Autonomy retained the right and/or the responsibility under the VAR deal to close the end-user deal. Mr Miles took me in his oral closing to detailed cross-examination where, contrary to the Claimants' suggestion that Mr Welham had not been cross-examined on this, that point was put to Mr Welham, who accepted that what he had in mind was a *"further performance obligation…to close the deal with the end-user"*, whether expressly stipulated or to be inferred from the circumstances. The Defendants submitted that neither an express stipulation nor any inference of a commitment to the same effect had been demonstrated.

794.  That also was the Defendants' answer to the Claimants' fourth point (see paragraph 786 above), which was to the effect that the Audit Committee was invited to consider and Deloitte were invited to and did approve VT18 on the basis of a misapprehension that FileTek would be attempting to conclude a deal with the USDVA, when in truth that was not the agreed plan. The Defendants distinguished between who was negotiating the final deal and who was intended to be the contracting party to it when closed, which the Claimants had elided. They contended that the Claimants' assumption that FileTek was not to be a contracting party was contrived and incorrect:

(1)  Although Autonomy wished to pursue the negotiations with the USDVA itself, the Defendants insisted that FileTek <u>was</u> intended to be the contracting party in any deal ultimately concluded with the USDVA;

(2) That deal was considered to be *"on the cards"* (to use the Claimants' expression) and indeed that was the basis on which FileTek had agreed the VAR transaction (as Mr Szukalski repeatedly made clear).

795. On the Defendants' case, this also answered the fifth point emphasised by the Claimants (see paragraph 788 above), based on Mr Welham's evidence in his witness statement that Deloitte were never told that Mr Egan had given an assurance that there was *"no risk"* to FileTek. No disclosure was necessary: the risk passed in the usual way.

796. The Defendants also sought to turn against the Claimants their reliance on Mr Szukalski's 1 February 2011 email and Mr Szukalski's agreement in cross-examination that the email was saying that there was *"no risk to FileTek that Autonomy will fail to honour the assurances that had been given to you at the time of signing the purchase order"* (in further support of their third point, see paragraph 792 above). The Defendants' argument was that that answer, which was much relied on by the Claimants as being supportive of their basic case that the legal transfer of risk under the VAR agreement was illusory and that the deal lacked substance, had to be understood by reference to what Mr Szukalski meant by the *"assurances".* If all the reference to FileTek not being at risk connoted was that Autonomy would do what it could to put FileTek in contact with another end-user, they submitted that it is extremely difficult to accept the Claimants' argument that it had a bearing on risk and reward.

*Collapse of the USDVA deal and its aftermath*

797. Before assessing these competing contentions, it is convenient to address what the Claimants described in their written closing submissions as the *"Unravelling of the FileTek VAR transaction".*

798. In his email of 30 September 2010 (see above) explaining the VAR deal to Mr Thompson, Mr Loomis stated that:

> *"Three scenarios have been considered: (a) VA orders as planned, i.e. in Q4, (b) VA order is deferred to Q1, (c) Disaster: something fully unexpected either further delays or eliminates the opportunity. Our plans for each are as per our telephone conversation. We have ability to reassign the license."*

799. In the event, "disaster" occurred (though it was perhaps not *"something fully unexpected"*): no deal was concluded with USDVA by either FileTek or Autonomy. As foreshadowed above, the Claimants alleged that FileTek was only enabled eventually to

discharge by instalments its debt under the VAR agreement to Autonomy because of an allegedly contrived transaction pursuant to which Autonomy acquired from FileTek the StorHouse and Trusted Edge software for which it had no real use at an overvalue.

800.   As explained in paragraph 2735 and footnote 317 of the main body of the judgment, the purchases of software by Autonomy from FileTek in March, June and August 2011 ("the 2011 StorHouse transactions") were the last in a series of such purchases. The earlier purchases (in Q4 2009 and Q1 to Q2 2020) were impugned as improper "circular", "round trip" or "reciprocal" transactions (labelled together as "RT 3"). The 2011 StorHouse transactions were not labelled and impugned by the Claimants as "reciprocals", in that their alleged vice was not that they were a purchase by Autonomy to fund a sale by Autonomy (as in the case of the "reciprocals"  in RT 3, which did not involve a VAR) but the means of funding VT18 (labelled by the Claimants as "Reciprocal VARs"). The 2011 StorHouse transactions were also alleged to give rise to transaction-based losses which were identified at Schedule 12B and sought to be recovered from Defendants as part of the Claimants' breach of duty claims against the Defendants.

801.   The purchases comprised:

> (1)   Two Q1 2011 purchases of software for on-sale to HP and to Morgan Stanley, for $1.76m and $739.8k respectively.

> (2)   A Q2 2011 purchase for $1.596m for three specific customers in respect of the Iron Mountain data centre migration.

> (3)   A Q3 2011 purchase for $7.5m of an unlimited licence for use in the Iron Mountain data centres.

802.   It is not disputed that in cashflow terms FileTek was assisted in making payments due under VT18 by its receipt of the sale proceeds; nor that FileTek thereafter paid $1.5 million in March 2011, $1 million in April 2011, $1.5 million in June 2011, and the remaining $6 million in August 2011.

803.   The Claimants addressed each of these StorHouse transactions in considerable detail in their written closing submissions in seeking to make good their over-arching allegation that it was obvious that these payments were:

> *"the means by which Autonomy honoured Mr Egan's assurance, given at the time of the VAR transaction, that FileTek would not be left holding the bag."*

*Q1 2011 StorHouse purchases*

804.   The Claimants contended that Autonomy's justification for the two Q1 2011 StorHouse purchases, which was that they were made with a view to on-sale to Morgan Stanley and HP, was false. As to that:

(1)   They submitted that there was no supporting documentation or any evidence from Morgan Stanley itself to show that Morgan Stanley needed and wanted to acquire FileTek software as part of a package also comprising licences for other Autonomy hosted software. They suggested that StorHouse software had been added onto an existing order from Morgan Stanley without any specific request for it; and they rejected Dr Lynch's explanation (when cross-examined):

> "Q.   *You are not aware of any suggestion that Morgan Stanley wanted to be supplied with any StorHouse–based capability, are you?*
>
> A.   *Well, they wanted the functionality it brought. I doubt if they would have known, without looking into it, the name of the product, but they certainly wanted the ability to load structured data.*
>
> Q.   *It very much looks as if StorHouse is being given new software, even though it's not something Morgan Stanley had asked for, would you agree?*
>
> A.   *No. Morgan Stanley is a sophisticated purchaser. It would check everything, it had a whole series of tests it would have to do, for example to do with whether there was restricted encryption and things like that, so they wouldn't accept something they didn't have some basis for understanding why it was there."*

(2)   They contended that Autonomy already had existing StorHouse licences to use StorHouse for its hosted customers, and so Morgan Stanley, being a hosted Digital Safe customer, had no need for any further licence for itself. They again rejected Dr Lynch's evidence, when cross-examined, that this analysis was:

> *"incorrect, because Morgan Stanley liked to own its own licences so it had done a deal where it owned its own software licences and so it wanted the full set of licences so that it had the option if it wanted not to be hosted. So it owned its licences which it in effect lent back to us to host. We could not allow Morgan Stanley, even if we were running it in a hosted environment, to own their licence."*

(3)  The Claimants contended that the suggestion that HP wanted StorHouse was even less credible. HP had a competitor product to StorHouse. In January 2010, Dr Lynch had asked HP for a quote for that product, which presupposed that the HP product could be substituted in place of StorHouse; and (the Claimants submitted) it is implausible to suggest that HP decided to pay Autonomy to purchase from FileTek a licence of software that competed with HP's own software.

(4)  The Claimants relied also on the correlation between the payments Autonomy made to FileTek and the payments then made by FileTek to Autonomy as demonstrative of their primary purpose as alleged. Thus:

   (a)  On 31 March 2011, Autonomy paid the $1.769 million in respect of the HP invoice but did not pay the approximately $740,000 in respect of the Morgan Stanley invoice.

   (b)  Then, also on 31 March 2011, instead of paying $2.5 million to Autonomy, as Ms Leslie Levy's (who worked in FileTek's accounts department) email a day before had foreshadowed, FileTek paid Autonomy the lesser sum of $1.5 million, in respect of FileTek's debt under the VAR agreement. FileTek's payment was just less than the $1.769 million that FileTek received from Autonomy that day.

   (c)  What FileTek did, as regards the balance of $1 million that Autonomy was expecting to receive, was to write a cheque for $1 million, which FileTek then held pending receipt of further funds from Autonomy.

   (d)  On 6 April 2011, FileTek received an auditor debtor confirmation letter from Mr

Chamberlain. Mr Szukalski's evidence was that he used Autonomy's need for the auditor confirmation letter as leverage in order to obtain information from Autonomy about the progress of the USDVA deal or any alternate deal that could be used to put FileTek in funds.

(e) The next day, 7 April 2011, Autonomy paid FileTek the sum of about $740,000 in respect of the Morgan Stanley invoice. Once this money had arrived, FileTek had received an aggregate of $2.508 million and Mr Loomis therefore authorised the $1 million cheque to be sent to Mr Scott.

805. In relation to the Claimants' case on the Q1 2011 StorHouse purchases, the Defendants countered the Claimants' assertion that neither of those companies (Morgan Stanley nor HP) had any use for or had ever wanted the software and that Autonomy had simply added it on to the Autonomy software supplied to each as a way of showing its actual deployment on the following basis:

(1) The suggestion that Autonomy had simply insinuated StorHouse as part of the package of licences acquired by each of them was unrealistic. Both Morgan Stanley and HP would have had a use for FileTek. Moreover, both were sophisticated purchasers who would have known what they were purchasing and scrutinised their contracts. They would not have acquired software unless they wanted to.

(2) The documents supported this, showing that:

(a) numerous individuals were involved in the inclusion of this software, including Mr Avila and Mr Guiao, as well as Mr Crumbacher, Mr Chamberlain, Mr Scott, Mr Egan and Dr Menell;

(b) in the case of HP, there were specific communications highlighting the FileTek software, and its appropriate location in the contractual software list.[589]

(3) Mr Scott's suggestion in his evidence in the US criminal proceedings that Autonomy did not need a licence in order to resell to Morgan Stanley, because of the existing Autonomy licence for use in the hosted environment was simply incorrect. Although the

---

[589] HP also appear to have understood that there was a structured data focus.

Claimants put to Dr Lynch that this was correct, the Defendants submitted that it was in fact wrong, and obviously so: the existing licence for Autonomy to use StorHouse in its hosted environment could never have permitted Autonomy to sell a licence to Morgan Stanley, which Morgan Stanley could then take and use onsite and/or in a third party data centre.

(4) Although the Defendants suggested that this was another example of the dangers inherent in the Claimants' selective reliance on hearsay evidence that Dr Lynch has never been able to test, they also noted that in this instance, Mr

Scott did in fact qualify his evidence significantly in cross-examination, which

_____

the Claimants did not go to with Dr Lynch (even though they marked up the passage as being their own hearsay evidence).

> "A.  My one hesitation is without looking at and reading through all of the agreements and trying to understand exactly how they fit together, I can't be certain; but based on the way that you've presented the facts, if Autonomy has a license where only Autonomy can use it internally and we want to give a customer the right to use this software on their own outside of the Autonomy environment, I believe that wouldn't be covered by the first license.
>
> Q.  All right. And so you'd be wrong when you said it was gratuitous?
>
> A.  I would be wrong in that case."

(5) The Claimants had at one time also suggested that the purpose of the email from Mr Chamberlain to Ganesh Vaidyanathan (who worked within the Autonomy finance team), copying Mr Scott and Mr Hussain, on 31 March 2011 was to create a "false paper trail", but the documents do not support that, and it would not have appeared that way to anyone at the time.

806. As to the inference that the Claimants had submitted should be drawn from the correlation between the payments made by

Autonomy and the payments made by FileTek to reduce its outstanding debt, the Defendants submitted that it was only to be expected that Autonomy's payment to FileTek was followed by a payment to FileTek to reduce its existing indebtedness. This was a normal business practice.

*Q2 2011 StorHouse purchase*

807. Similarly, in relation to the June 2011 StorHouse purchase, the Defendants' averred justification was that Autonomy had been asked to obtain such software for three customers, namely, Barclays Capital, BofA and Morgan Stanley. The Claimants rejected this also; they pointed out that in an internal email dated 18 July 2011 Deloitte had confirmed that no licence sales to those customers had in fact taken place and derided Dr Lynch's response that he did not mean that such sales were to be completed immediately as *"another example of Dr Lynch being prepared to say anything that he thought might suit his case."*

808. Further, the Claimants alleged that none of the three customers ever needed the product, all being hosted customers; and they pointed also to Mr Wang's reaction to the news of the further purchase, being:

> *"What's the deal, we're buying more FileTek licenses".*

809. The Claimants also noted that, though it had negotiated a discount, Autonomy in fact paid, without any suggested reason, the full undiscounted amount of $1.596 million, and that on the same day FileTek used the money it received to pay $1.5 million on that same day.

810. In the case of the Q2 2011 StorHouse deal, Dr Lynch's understanding, as he explained in his witness statement, was that the expected use of StorHouse for which licences were required was to try to make Iron Mountain data centres more efficient and profitable and bring them into line with Autonomy's profitable data centres: Iron Mountain data centres, which had come under Autonomy's control when it acquired Iron Mountain's digital archiving business in Q2 2011, and which had a considerable amount of stored data, had been operating at 0% operating profit, compared to the 40% operating profit expected in Autonomy's own data centres. The Defendants noted that it was not suggested to Mr Szukalski that the sale was not at fair value (or that he did not understand there to be a genuine requirement for StorHouse for these Iron Mountain customers).

811. As to the further points made in relation to the Q2 2011 StorHouse deal, the Defendants argued that:

(1) The Claimants' suggestion that, after Autonomy's acquisition of Iron Mountain Autonomy may not have needed the licence because its existing 2010 licence to use StorHouse in its data centres could have included using StorHouse in Iron Mountain data centres was not how Dr Lynch perceived the position at the time. He told me that his belief was that this was not permitted and had been so advised (though he could not say who by). Mr Loomis likewise assumed that Autonomy needed a further licence. The Defendants suggested also that it was also noticeable that the Claimants did not put this point squarely to Mr Szukalski.

(2) Secondly, the Claimants' suggestion that Dr Lynch would have discussed this transaction with Mr Hussain and would have been told that this transaction was channelling funds to FileTek was misplaced. Dr Lynch rejected this, and indeed explained that it was unlikely that he would have discussed the transaction at all with Mr Hussain.

(3) Thirdly, in answer to the suggestion that no onward sale had taken place at the time of the purchase, there was no requirement that it should have done so.

*Q3 2011 StorHouse purchase*

812. As to the third and last of the 2011 StorHouse purchases (in August 2011), the Claimants portrayed as coming *"apparently out of the blue"* an email dated 1 August 2011 from Mr Hussain to Mr Egan, copying Dr Menell, which was blank except for a subject line which read *"also please on FileTek for expansion to IRM* [Iron Mountain] *data centres"*.

813. The Claimants submitted that:

(1) The fact that the email was otherwise blank suggested that this was:

> *"a reminder for Dr Menell to say something about the need for FileTek in an Iron Mountain Digital context that Mr Hussain had already discussed with Dr Menell."*

(2) The exchange which followed was confected. The email duly prompted Dr Menell to send an email asking whether the existing StorHouse licences covered the Iron Mountain Digital data centres. Mr Hussain replied, "*Can we get a proposal please*".

(3) The purchase price was calibrated to ensure that FileTek would have enough to discharge the outstanding debt. Thus, Mr Egan approached FileTek for another quote for more StorHouse software for Iron Mountain Digital customers. Mr Egan gave Mr Szukalski a range of $6.9 to $7.1 million for the amount that Autonomy was willing to pay. These figures exceeded, by approximately $1 million (the amount of the margin promised to FileTek), the outstanding debt owed by FileTek to Autonomy in respect of the USDVA VAR transaction ($6 million). The Claimants submitted that this was surely not a coincidence.

814. The Claimants also relied on the urgency demonstrated by Autonomy to effect the purchase. Mr Szukalski said that Mr Egan indicated that he needed a quote for the StorHouse licence the next day, as a matter of some urgency. Mr Szukalski sensed that urgency, though not any particular reason for it; and whilst FileTek needed a solution to its indebtedness urgently too, resolved to use it as leverage to obtain a better deal for FileTek in relation to its sale of StorHouse and the maximisation of its revenue whereby to pay down its indebtedness under VT18 (it being the shared expectation of the parties that the sale proceeds would be so applied). Thus:

(1) On 15 August 2011, Mr Hussain wrote to Dr Menell and Mr Egan, copying Mr Kanter and Dr Lynch, stating:

> *"Gents – we have I believe completed the negotiations on the Filetek software for the Digital data centres. Based on Digital run rate revenues of around $150m a year the final number which is approximately $7m is fine. Remember that we have paid larger amounts for our data centres. Again I am asking for Pete's final tech sign off and either Andy or MRL for counter sign off to my sign off."*

(2) Dr Lynch gave his approval by email dated 16 August 2011. Dr Lynch said in cross-examination that, before doing so, he would have discussed it with Dr Menell.

(3) The next day, Mr Scott asked Mr Szukalski for an invoice and said that, if it could be provided shortly, "*we may be able to pay today*". Mr Szukalski obliged and Mr Chamberlain asked Ms Harris to "*process payment asap*" .

(4) Evidently, Mr Chamberlain was very concerned to ensure that the money was sent to FileTek that day: and there are email exchanges within the finance department showing his irritation when there were some minor delays. The only plausible explanation for this sense of urgency was that Autonomy needed to channel money to FileTek on 17 August 2011, so that FileTek could pay off its VAR debt, prior to HP's announcement of the Autonomy acquisition on 18 August 2011.

(5) Autonomy did indeed pay FileTek $7.569 million that day (17 August 2011), and the next day, (18 August 2011), FileTek paid Autonomy the entirety of its outstanding debt of $6 million under the VAR agreement in accordance with what Mr Szukalski had agreed with Mr Egan.

(6) The same day (18 August 2011), Mr Loomis sent Mr Thompson the news that HP was to acquire Autonomy. Mr Thompson responded, "*Now you have the explanation*". Similarly, Ms Levy (of FileTek) remarked in an email dated 22 August 2011 that the HP acquisition was "*why we probably got the deal mid quarter … Just to close it out before new mgmt*".

815. The Defendants, however, rejected the Claimants' allegations that the funding of FileTek was the true rationale of the sequence of purchases of StorHouse licences by Autonomy.

816. They contended that all the StorHouse deals were genuine independent sales, and that StorHouse was a good and cost-effective database storage product for customers with large commercial databases which Autonomy needed to be able to offer as part of its objective of becoming a force in the market for hosting and searching structured data.

817. The features of StorHouse which made it valuable to Autonomy are elaborated in the chapter on Reciprocal Transactions in the main body of this judgment, where I also set out the facts relating to a further dispute as to whether there was ever any proper assessment made by Autonomy of the product prior to the various licence purchases. For the present it suffices to say that the Defendants maintained strongly that StorHouse was a product of great potential value and use to Autonomy, which Autonomy could not readily have built it itself, and which it did in fact deploy, and that each of the various purchases had a strong commercial rationale.

818. As to the last in the sequence of StorHouse transactions, the Q3 2011 StorHouse purchase, which was of an unlimited licence use in Iron Mountain data centres and which extended Autonomy's ability to use StorHouse to all customers operating in the Iron Mountain hosted environment (as well as the DRC-CM product, Iron Mountain's hosted products, included LiveVault, which was a cloud-based back-up and disaster recovery product). As to this, the Defendants' position was:

(1) Dr Lynch explained in his witness statement that Autonomy had initially purchased the licence for a few customers but subsequently decided it made sense for there to be a full overhaul of the data centres.

(2) Dr Lynch approved the Q3 2011 StorHouse purchase by email on 16 August 2011. This email chain showed Dr Menell's prior request for the licence for to cover the expected use of FileTek in the Iron Mountain data centres, as well as Mr Hussain's prior confirmation that the price was "*fine*". Dr Lynch was asked to confirm Mr Hussain's sign off and told that Mr Scott and Mr Egan had "*done the negotiations and the legals*". Dr Lynch wrote: "*yep if this gets their zero op margin stuff to our architecture*". As stated above, Dr Lynch's witness statement explained his understanding that Iron Mountain were operating their data centres at a 0% operating profit, while Autonomy's data centres operated at a 40% operating profit.

819. Dr Lynch rejected the suggestion that this transaction was done solely to put FileTek in funds, and that his own approval was a "false paper trail". The Defendants contended that it is impossible to square the allegation with (a) the acceptance by the Claimants' witnesses that the StorHouse product was in fact used to migrate customers on the DRCCM product, and (b) the fact that Mr Lucini was enthusiastically promoting the use of StorHouse in LiveVault both to customers and to analysts in the market.

820. The Defendants also relied especially on:

(1) Mr Szukalski's evidence to the effect that Mr Egan had approached FileTek with the transaction, and the expectation was that the funds would be used to pay down the USDVA debt. It was not suggested to Mr Szukalski that the StorHouse licence was at anything other than fair value. Nor was it suggested that he understood the desire to have StorHouse for Iron Mountain to be anything other than a genuine business desire on Autonomy's part. Mr Szukalski's testimony had in fact been that FileTek was excited about the

opportunities for adding StorHouse to Autonomy's product offerings. Mr Szukalski was not prepared to agree with the conclusion that was put to him, that it was unlikely that FileTek would have received the extent of StorHouse orders from Autonomy that it did in 2011 if it had not entered into the USDVA contract (though he did accept that it was Mr Bill Thompson's conclusion).

(2) Mr Scott, who had negotiated the Q2 and Q3 2011 purchase transactions, and whose evidence in the US criminal trial suggesting that Autonomy did not need any further licence in order to resell to Morgan Stanley because of the existing Autonomy licence for use in the hosted environment the Claimants much relied on in the context of VT18, did not consider he was doing anything illegal in making the purchases: and that was the Claimants' own hearsay evidence.

821. In their cross-examination of Dr Lynch in relation to StorHouse the Claimants questioned the extent to which StorHouse was ever eventually used. I have already addressed this issue when dealing with the other StorHouse purchases discussed in the chapter on Reciprocal Transactions in the main body of the judgment. For the present I need only mention that amongst the questions put particularly relevant to the 2011 StorHouse transactions were (a) whether there were in fact any sales, including to Morgan Stanley and HP, in addition to the inclusion of StorHouse in the database connector and (b) whether StorHouse was ever in fact set up in Autonomy's data centres.

822. In addition to their overall submission that this involved a high level retrospective view on subsequent events which had little bearing on the merits of the earlier purchase decisions at the time they were made, the Defendants contended as follows:

(1) There were in fact sales of StorHouse, including to HP and Morgan Stanley, in addition to the inclusion of StorHouse in the database connector. Moreover, StorHouse was used for the DRC-CM migration, actively offered to a number of other archiving customers, and discussions progressed to an advanced stage with Kraft before Kraft's priorities changed.

(2) In addition to installation in Pleasanton, the evidence shows that Mr Lucini was purchasing hardware in order to install StorHouse in all the Iron Mountain data centres. It is unclear how far the installation in the individual data centres progressed. However, Mr Lucini felt able to include a reference to the

StorHouse/LiveVault integration in the literature for LiveVault customers, as well as to promote it to customers as part of the LiveVault structured data offering.

(3) Again, in each case, what matters is what people thought at the time, not hindsight. StorHouse was incorporated into Autonomy's product line and made available to customers. It was seen as a valuable product for that purpose at that time.

*My assessment of VT18 and the 2011 StorHouse transactions*

823. The FileTek/USDVA transaction (VT18) was a particularly stark one in the sense that FileTek was not a VAR and there was never any suggestion that FileTek would do anything more than be a "fulfilment partner"; all it was to do was to *"hold the paper"*. Further, it was not disputed that Mr Egan did give Mr Szukalski certain assurances, both at the time of and after the VAR transaction.

824. There were inconsistencies between them, and between Mr Szukalski's evidence in his witness statement and in cross-examination, as emphasised by the Defendants. But it seemed to me that Mr Loomis and Mr Szukalski largely agreed on what they understood to be the fundamentals of the deal. I consider that, notwithstanding certain other inconsistencies, the fundamental message of both witnesses (Mr Loomis and Mr Szukalski) was clear:

(1) FileTek, though it had assumed legal risk, both expected to receive the proceeds of the end-user sale before its payment obligation arose, and was assured that if there was some delay, or no end-user sale eventuated, Autonomy would (a) not press for nor expect payment by FileTek out of its own resources and (b) find another end-user without FileTek having itself to make any effort to do so, to enable FileTek to pay Autonomy out of the proceeds in due course or if the worst came to the worst, Autonomy would find some other way to ensure that FileTek got paid so that FileTek could then pay Autonomy.

(2) FileTek would have no contact with either the pre-approved systems integrators or the ultimate end-user in any event: it was simply a *'fulfilment partner'*.

825. By this I consider they meant that, all FileTek conceived it had to and in the event did do, was to act as intermediary between the

supplier (here, Autonomy) and rival pre-approved suppliers of a Federal agency (here USDVA). Its assumption of legal liability was a risk, but one covered by the assurances given; and it was not intended to interrupt or affect in any way Autonomy's ability to negotiate and contract with the ultimate end-user with whom it had a long-standing relationship and which it hoped to persuade to accept a bid from one of the pre-approved systems integrators bidding for the large deal which was using IDOL software.

826.    It probably does not ultimately matter whether there is a difference in the market between a fulfilment partner and a VAR. I suspect there is in the market: but in this case, there was not: however classified, none of the 'purchasers' from Autonomy under VAR sales was intended to play any active role. Further, there is danger in looking at such questions though the lens of IFRS accounting standards: any market distinction may have been agnostic in that regard. Nor without more do I accept, though it was neatly expressed, Mr Rabinowitz's submission in his oral closing that *"the clue is on the tin. Value added resellers. They add value…""* and that *"If the VAR just sits there and does nothing, then you cannot recognise revenue".* Revenue recognition under IAS 18.14 does not depend

upon the characterisation of the parties, but on the substance of the transaction, and its substantive effect (if any) in terms of the transfer of risk and management control in respect of the goods the subject of the transaction from which revenue is said to have been generated.

827.    That said, to satisfy the revenue recognition criteria it seems to me to be clear that there must be some change in the substantive economic relationship of the seller in relation to the goods apparently 'sold'; and concomitantly, the purchaser must in substance and in reality take over, not only custody, but control of the goods apparently 'sold', and either use them or have effective control of their disposition or retention.

828.    In the case of VT18, it is clear, in my judgment, that FileTek never had control of the goods sold in any substantive sense. Autonomy retained managerial control, and the shape of the arrangements was such that (reflecting the words of IAS18.14(b)) it remained managerially involved to a degree usually associated with ownership. Whatever FileTek was to do, it was to do at Autonomy's direction: it was (and the words on this tin are instructive) a fulfilment partner, its task being to fulfil according to Autonomy's direction the contract which Autonomy would negotiate and conclude. The relevance of the fact that FileTek was intended and expected to do, and did, nothing except *"push paper"* is that it demonstrates that effective control and management involvement was never passed to FileTek.

829. The question as to the passing of risk in this context (as in the context of all the impugned VAR transactions) is not as straightforward. The passing of risk is primarily a legal concept, and (as noted previously) the various examples given in IAS18.16 and 18.17 lead the eye to legal tests. Even so, there was ultimately no disagreement to the proposition that accountants must determine accounting treatment according to the substance of a transaction; and the question is whether in substance FileTek took on the risks and rewards of ownership of the goods. A unilateral expectation on the part of the purchaser, or even an assurance given to it, that the vendor will "see him right" does not necessarily negate the passing of the risk of ownership or remove its rewards.

830. The real question is whether in economic reality it was Autonomy or FileTek which was expected and intended to suffer the consequences or enjoy the benefit if the proposed sale to USDVA failed. In my judgment, the assurances given to FileTek reflected the reality that one way or another it would be Autonomy which would have to sort out the mess. That is undoubtedly the understanding given to FileTek and equally undoubtedly what FileTek expected, albeit with a *"little bit of agita"* (see paragraph 784 above) about the residual risk of legal liability. I accept the Claimants' case that without that assurance and expectation, FileTek's risk would have been obviously disproportionate.

831. More generally, it seems to me to be clear that VT18 was not intended to transfer to FileTek any of the incidents of ownership: it was intended to be simply the means of booking revenue in advance of a sale by Autonomy, rather than in substance a sale to FileTek. The 'sale' was a legal fact but a nominal arrangement: the real sale from which Autonomy sought to be rewarded was the direct sale by Autonomy to the USDVA. Further, or perhaps another way of expressing the same basic point, Autonomy had no grounds to suppose, nor any intention or expectation, that FileTek had the means to pay out of its own resources or any real ability to fund its obligations by a sale of the product it had nominally acquired.

832. Also in accordance with a different aspect of the pattern, the Defendants emphasised that Deloitte had approved the accounting treatment of VT18. However, as in other contexts, I do not consider this reliance was justified. I agree with the Claimants that Deloitte were not given a fair and proper description and understanding of VT18, or, in particular, of Autonomy's continued exclusive control of the negotiations with USDVA and FileTek's essentially nominal role. Their approval of revenue recognition does not, in such circumstances, assist.

833. Given the conclusion that follows that VT18 did not satisfy the requirements of IAS18.14 or even the basic test that there should be in substance a true 'sale', so that it was not proper to recognise the 'sale' price as revenue, it is not strictly necessary for me to determine in this context whether the only real or at least the driving purpose of the 2011 StorHouse transactions was to fund FileTek in order to clear its indebtedness (a matter of particular and growing importance to Autonomy in preparation for completion of the HP acquisition). However, I can for present purposes summarise my views as follows:

    (1)  The evidence has not persuaded me that Autonomy had no need or use for StorHouse, but

    (2)  A powerful driver of the purchases was the objective of providing funds to FileTek.

    (3)  The 2011 StorHouse transactions provide further supportive evidence of my conclusion that VT18 was not a true 'sale' and no revenue should have been recognised from it.

*Defendants' knowledge of and participation in VT18*

834. Mr Hussain's direct involvement in VT18 is clear. Mr Egan's evidence was that it was he and Mr Hussain who told Mr Loomis and Mr Szukalski in their discussion on 30 September 2010 that Autonomy would be responsible for arranging the end-user deal and FileTek would not engage in the actual sales effort, in terms quoted in paragraph 769 above. That evidence was not challenged; and having regard also to the general matters previously referred to (including his part in the genesis of the strategy and the development of the pattern) I consider and find that Mr Hussain knew about and was responsible for Autonomy then handling the continuing negotiations with the USDVA itself and knew that FileTek had no real part to play except to *"push paper"* and act in accordance with Autonomy's directions.

835. In my judgment, Mr Hussain cannot have thought that the criteria for revenue recognition were satisfied; and his failure to see to it that Deloitte had a fair picture of what truly was FileTek's role reinforces my view that he knew it was difficult to square with any true sale: he had "guilty knowledge" that the recognition of revenue from VT18 was improper.

836. As was usually the case, Dr Lynch appears to have been kept or kept himself at one place removed. Dr Lynch accepted in cross-examination that he "*may well have been*" aware of the reseller deal before the deal was signed. He thought that this information *"would come normally from Mr Hussain"*.  But though interested and kept informed at a high level there was no transaction-specific

evidence that he was involved in the actual selection of FileTek, or in any conversation with FileTek (and it is not suggested, for example, that he was aware of the discussion between Mr Egan, Mr Hussain and FileTek on 30 September 2010). Nor was there any transaction-specific evidence of his involvement in or knowledge of any arrangement that FileTek should not participate in any of the ongoing negotiations between Autonomy and the end-user nor of the fact that it did not.

837. I do not therefore consider that the evidence specific to VT18 advances materially the Claimants' case that Dr Lynch had "guilty knowledge". However, the evidence is consistent with my more general conclusion that the programme of which the impugned VAR sales, including VT18, were examples, was devised by Dr Lynch and Mr Hussain together for the purpose of making good shortfalls in revenue.

838. It is clear from email exchanges that Dr Lynch did continue to take an interest in the USDVA deal; and Mr Hussain was in *"nearly daily"* contact with those concerned pressing for a deal in Q3 2010. The USDVA deal was, as Dr Lynch accepted in crossexamination, *"Definitely a big deal for Autonomy".* Dr Lynch's anger when it appeared that the deal had been imperilled or delayed because someone at Autonomy had irritated the USDVA by charging them for minor expenses to fix a fault on Autonomy's software is evident from the email dated 7 August 2010 from Dr Lynch to Mr Hussain, Mr Still, Mr Egan, Dr Menell, Mr Mooney, Mr Sullivan and a Mr Bryan Rellinger which I have quoted in paragraph 758 above. The email betrays his supervision and interest, as well as his hands-on management style, exemplified by his demand that if there was a problem with the potential USDVA deal, "*I want to know about it and, you know, at a high level I'd expect to be kept informed*".

839. In all the circumstances of the transaction itself, and taking into account also his approval and encouragement of the strategy and knowledge of the pattern, in my judgment, Dr Lynch knew that the sale to FileTek was in a commercial sense illusory, that Autonomy retained risk and control and that it was improper to recognise revenue from it; and that constituted "guilty knowledge" on his part.

## PART II OF SCHEDULE OF IMPUGNED VAR TRANSACTIONS

840. In this Part II of the Schedule, I consider four further impugned VAR transactions with Capax Discovery which followed VT10 (see paragraph 47 in the first part of this Schedule). These were VT20 (in Q4 2010, for end-user DKO), VT27 (in Q1 2011, for

end-user McAfee), VT28 (in Q1 2011, for end-user UBS), and VT34 (in Q2 2011 also for end-user UBS).

841.   In my judgment, these further impugned VAR transactions with Capax Discovery:

> (1) further illustrate the pattern of using a VAR as a *"placeholder"* evident from VT2, 3, 4 and 10 and the complicity of the 'friendly' VAR, Capax Discovery;

> (2) provide further examples (in each case) of the basic objections to revenue recognition, being (in summary) that the sale to the VAR was illusory and the VAR, despite the legal trappings, was (a) not to be involved in any onward sale negotiations nor in any end-user sale that eventuated (save in certain cases as the passive recipient of the proceeds of a direct sale between Autonomy and the relevant end-user to enable it (the VAR) to make good its outstanding payment obligation to Autonomy) and (b) never to be required to meet any payment obligation until put in funds by Autonomy (or an end-user sale contracted directly between Autonomy and the end-user);

> (3) also provide further examples of involvement and in any event knowledge of impropriety on the part of both Defendants in respect of (a) the payment of large MAFs and (b) most importantly improper revenue recognition and false presentation of the performance and position of Autonomy in its published information.

**Four further impugned transactions with Capax Discovery**

*VT20: Capax Discovery/DKO Q4 2010*

842.   VT20 was a VAR transaction between (or originally between) Capax Discovery and the US Department of the Army, acting through a portal known as Defence Knowledge Online ("DKO").

843.   Once again, Capax Discovery was introduced as a VAR at the very end of a quarter, in this case Q4 2010, when the prospect of finally concluding a prospective deal, in this case between Autonomy and DKO, before the end of the quarter collapsed. This was the other VAR transaction on New Year's Eve which Mr Baiocco described as *"particularly memorable"*: see paragraph 1044 below.

844.   As with previous Capax Discovery VAR deals with Autonomy, VT20 was entered into on the terms of the June 2009 Capax Discovery VAR Agreement (the principal provisions of which are

summarised above). The relevant purchase order was prepared for Capax Discovery by Autonomy, and was for a licence fee of $1,950,197 plus $292,530 for support and maintenance. Such sums were payable in instalments as follows: $747,575.66 on 31 March 2011, $747,575.67 on 29 June 2011 and $747,575.67 on 27 September 2011.

845. The features of VT20 relied on by the Claimants, in addition to their general points, as demonstrating particular adaptations of the 'pattern', and that there was not really a sale to the VAR at all, were:

> (1) A special provision in the purchase order contemplating and making provision for, but describing as *"unlikely"*, a direct deal with Autonomy: the Claimants described the provision, and another provision in the same purchase order for the payment of a MAF *"as full compensation in connection with VAR's efforts in securing End-User's procurement of a licence of Autonomy software"*, as *"a work of fiction"*;

> (2) After the negotiation of a direct sale between Autonomy and DKO, its implementation by a series or convolution of sales of the relevant software licence, first by Capax Discovery to MicroTech, followed by a sale from MicroTech to DKO, necessitating also certain amendments to the terms of the Capax Discovery purchase order; and

> (3) The family connection between the Autonomy salesperson (Mr Dan Truitt) and his brother Mr Steve Truitt (COO of MicroTech).

846. As to (1) in paragraph 845 above, the purchase order contained, just before the signature block, a provision like that in VT23 (discussed below) as follows:

> *"Although End-User and VAR currently anticipate entering into such a license transaction [i.e. with one another], in the unlikely event End-User, instead, enters into a direct agreement with Autonomy or its affiliate to license the Software, then VAR shall distribute the Software to End-User upon receipt of written notice (which may be via email) from Autonomy ('<u>Distribution Notice</u>') of such direct license transaction. In the event distribution is accomplished by reason of a Distribution Notice, upon such time as Autonomy has received payment in full for such license fee and th[r]ee years of support fees, Autonomy shall pay to VAR an amounts [sic] equal to the license fee and three years of support fee paid by End-User to Autonomy less the Licence Fee*

> *and Annual Support Fee (for three years) described above, but in no event more than US$224,272.00, as full compensation in connection with VAR's efforts in securing End-User's procurement of a license of Autonomy software."*

847. The Claimants depicted this provision as *"a work of fiction"*, on the grounds that in fact:

> (a) Capax Discovery and DKO did not anticipate entering into a licence agreement with one another. They had had no contact with one another. They never did have contact in respect of the licence. It was Mr Baiocco's unchallenged evidence that *"we did not expect Capax Discovery to have any dealings with DKO"*. The Claimants submitted that there is no reason to suppose that DKO even knew of Capax Discovery's existence, still less of its involvement in respect of what Autonomy was negotiating to sell it.

> (b) A direct agreement between Autonomy and DKO, though by no means assured, was much less *"unlikely"* than an agreement negotiated between Capax Discovery and DKO, which was never going to happen.

> (c) Capax Discovery was not intended to expend, and did not expend, any *"efforts in securing End-User's procurement of a license of Autonomy software"* and there was no basis for it being compensated as if it had. Capax Discovery had only learned of the potential DKO transaction earlier the same day (31 December 2010).

848. The Defendants did not accept any of the above criticisms of the provisions. Dr Lynch submitted that:

> (a) The new provision was a clause inserted into other reseller deals in the quarter.

> (b) Deloitte reviewed the clause and were satisfied that it did not undermine revenue recognition. Deloitte's Defence to the FRC's Formal Complaint, which it still stands by, reads as follows:

>> *"The clause therefore envisaged that on occasion Autonomy might enter into a transaction with a VAR, but subsequently deal directly with the end-user. In those circumstances, once Autonomy had received payment from*

> *the end-user, it would pay a fee to the VAR.*
>
> *The audit team concluded that this new clause did not affect revenue recognition. Upon the VAR entering into the agreement, it had accepted the risks and rewards of ownership. It had possession of the licence, and the ability to sell it to the end-user without requiring the involvement of Autonomy. It was legally required to pay Autonomy. The existence of the new clause did not change the analysis is respect of IAS 18 paragraphs 14(a) and (b) as the risk remained with the VAR, unless a direct deal was concluded with the end-user, a risk the VAR could not control."*

(c) The Claimants' criticisms of the clause were overblown. As regards the wording in the purchase order to the effect that Capax Discovery and DKO *"anticipate entering"* into a licence agreement they were misplaced. The words were standard rubric but in any event the clause reflected the expected arrangement at the time of the deal, namely that Capax Discovery would enter into the deal with the end-user, as Mr Baiocco confirmed. Dr Lynch contended that there was no basis for asserting that an agreement between Capax Discovery and DKO was *"never going to happen"*. Capax Discovery entered into the deal with the aim that it would happen, and it was assuming the risk on the faith of it.

(d) The Claimants' criticism of the reference to *"efforts"* was also misplaced. The clause was prospective, and it was clear from Deloitte's memo that Deloitte well understood the commercial rationale for the proposed compensation of the reseller.

(e) As to the provision for the payment of compensation *"in connection with VAR's efforts in securing End-User's procurement of Autonomy software"*, Mr Chamberlain had expressly made clear to Deloitte that in previous cases where Autonomy had signed directly with the end-user as a matter of goodwill Autonomy had paid the resellers their lost margin: Deloitte were thus fully aware of that and had made no objection. Deloitte also

made the point that the previous direct deals, before the introduction of the provision,

> "highlighted the issue of risk for the VARs – relying only on the goodwill of Autonomy towards its resellers rather than formal legal recourse was deemed to be too high, and hence the clause was agreed."

849.  As to (2) in paragraph 845 above, the arrangements made in the aftermath of Autonomy's ultimately successful negotiations with DKO, and in particular, the interposition of MicroTech in place of Capax Discovery so that MicroTech could deliver to DKO the software which Autonomy had agreed to sell it, certainly invited enquiry:

(1)  After hearing what was proposed, Mr Crumbacher sent an email dated 7 June 2011 to Joel Scott in response to a request that he (Mr Crumbacher) should ask Mr Dan Truitt *"to address paperwork"*:

> "I'll call him. I think I know it already. Something about we took through one reseller and now we're replacing it with another. Brilliant."

(2)  Whether that email was intended to be admiring (or much more likely) ironic, the unusual nature of the insertion of MicroTech seems to have struck Mr Crumbacher. It was also not straightforward. Mr Crumbacher had become concerned about a mismatch between Capax Discovery's payment terms to Autonomy, under its DKO purchase order, and MicroTech's entitlement to payment from DKO under the direct deal. Mr Crumbacher explained this issue to Mr Scott in an email dated 8 June 2011:

> "MicroTech is going to be told to pay in full net 75 days (otherwise Dan [Truitt, the Autonomy salesperson for the DKO transaction] doesn't get paid, and we all know that's the driving factor here). Capax doesn't have to pay in full for two years. It seems to me Capax should be paying as soon as they get paid by MicroTech, but their order doesn't state that, and now there's absolutely no incentive (other than good will) for Capax to revise their payment terms."

(3) The solution arrived at was to amend the terms of the Capax Discovery/DKO purchase order. On 13 June 2011, Mr Crumbacher wrote to Mr Baiocco, stating:

> "*John, per Joel (who spoke with Sushovan), I'll be revising the amendment to the DKO PO's I sent Friday such that Capax will be paying for the DKO PO in full by the end of June. Can you please confirm? If this is not your understanding, can you please contact Sushovan to come to agreement on these payment terms? Thanks.*"

(4) An evidently puzzled Mr Baiocco forwarded the exchange to Mr Hussain, adding the comment "*???*" and requesting a call. Mr Hussain responded, "*No worries I was hoping you could pay early*". Mr Baiocco asked when MicroTech would be paying Capax Discovery (he understood in 75 days' time). The Claimants submitted that this was a further demonstration that Mr Baiocco's understanding remained that Capax Discovery would not pay until it had been put in funds by Autonomy.

(5) That day (13 June 2011), Mr Kanter and Mr Baiocco executed an amendment to the Autonomy/Capax Discovery purchase order. It retrospectively expanded the classes of products that had been licensed to Capax Discovery, stipulating that certain further types of software were "*deemed to be included*" in the earlier purchase order, but there was no change in price. The change in the description was necessary, however, to bring the Capax Discovery purchase order into line with the terms of the direct agreement that had been made between MicroTech and DKO.

(6) The amendment also provided (by clause 1):

> "*Notwithstanding anything in the Purchase Order to the contrary, in the event CAPAX receives payment in full for the Software and Services from End-User or from an agent or reseller procuring the Software and Support on behalf of or for distribution to End-User, CAPAX agrees to remit payment in full to Autonomy of the total amount due under the Purchase Order not less [sic: more] than one (1) business day after the date it receives such full payment, regardless of any payment terms otherwise set forth in the Purchase Order.*"

(7) Thus, it appears to be clear that the intention was that Capax Discovery should use the funds it received from MicroTech to make immediate payment to Autonomy. The intention was duly fulfilled. In July 2011, MicroTech paid Capax Discovery, and Capax Discovery paid Autonomy, $2,242,727.

(8) On the same day, 13 June 2011, Mr Crumbacher sent Mr Dan Truitt a "*draft purchase order from MicroTech to Capax for the DKO order*". This was another demonstration of the lack of any semblance of independence between the contracting parties: one Autonomy employee was sending another Autonomy employee the paperwork for a deal that was purportedly to be concluded between two independent third parties; furthermore, the relevant Autonomy salesperson, Mr Dan Truitt, was the brother of MicroTech COO, Mr Steve
Truitt.

850. The Defendants again rejected this summary as *"a highly selective and unfair presentation"* which *"ignore[d] a number of background documents in this context."*  As to the interposition of MicroTech, the Defendants contended that:

(1) The Claimants had ignored the fact that this was a federal contract, and the involvement of MicroTech as an approved 8A reseller was a normal commercial event.

(2) It was not sudden or unplanned. As from February 2011 it had looked likely that MicroTech would play a material role in the DKO deal. As early as March 2011, Autonomy's federal sales team were expecting that MicroTech would be contracting directly with DKO, but that MicroTech would purchase from Capax Discovery:

> "*DKO will be bought by DITCO (the govt contracts shop) via MicroTech, but then needs to go through Cap X.*"

(3) MicroTech were proposing to deal directly with DKO on terms that offered them financing.  This meant that they would be interposed as reseller, and could expect reseller fees. According to the Defendants' theme, Autonomy found it commercially normal that it should be paying two reseller fees in these circumstances; for

example Mr Crumbacher stated in an email dated 8 June 2011:

> *"The government is actually paying Microtech somewhere north of 2.9M, but it's paid over three years and includes both the margin they make on our software as well as finance charges for MicroTech financing the government's purchase (as an aside, I'm a little concerned, being a US citizen, that the Truitt brothers are now in the business lending money to my federal government).  Because its lumped in with their three-year pay out, I don't see how we can get around a double-dip on reseller fees here.  And…frankly…we're using two resellers, so we shouldn't be surprised at paying two reseller fees."*

(4) None of the adjustments to the Capax Discovery purchase order made necessary in consequence was sinister or surprising, or altered the fact that Capax Discovery was on risk.

(5) Capax Discovery's payment terms to Autonomy under the deal were brought forward by mutual consent.  The commercial background to this was set out in an email to Mr Scott from Mr Crumbacher.  In short, MicroTech was going to be paying Capax Discovery in a shorter period than Capax Discovery was due to pay Autonomy, so Autonomy wanted to bring Capax Discovery's payment terms forward if Capax Discovery would agree (which they did). (In other words, according to the Defendants' analysis, the Claimants had wrongly asserted that this evidenced that Capax Discovery would only pay when paid:  on the contrary, Capax Discovery was being invited to pay <u>early</u>).

(6) The Capax Discovery purchase order was also subject to an adjustment to the wording as to the software included.

851. As to (1) in paragraph 845 above and the payment of compensation to Capax Discovery for its *"efforts in securing End-User's procurement of a license of Autonomy software"* (in effect, a MAF of 10% of the Capax Discovery purchase order amount), the Defendants submitted that:

(1) This was to be expected in circumstances were there was the interposition of another reseller: the usual reseller margin was effectively taken by MicroTech, meaning

that Capax Discovery would not obtain any margin on the deal absent a MAF payment (see Mr Crumbacher's email referred to above);

(2) The Claimants' criticism of the wording of the MAF letter as being "entirely false" in its description of Capax Discovery's contribution (on the basis that it wrongly suggested that Capax Discovery was to introduce Autonomy into deals with DKO) was *"an overblown forensic point"*: the MAF letter was drafted by a lawyer, Mr Crumbacher, was in standard form and in any event stated:

> "*Autonomy will: (1) pay Referral Partner commissions in the amount of US$224,275, as a result of Referral Partner's direct and proximate participation in the account*".

(3) Moreover, Deloitte well understood and accepted that a MAF could be paid in situations like these where a reseller could not otherwise obtain its margin.

852. The Defendants also sought to draw support from the fact that VT20 and DKO's transaction with MicroTech was dealt with in the Goldberg Segalla letter (which, it will be recalled, Mr Baiocco confirmed was accurate). That letter had stated that Capax Discovery was on risk, and that both the reseller sale and the subsequent sale to MicroTech were normal commercial transactions:

> "*Paragraph 14.c. of the memorandum accompanying the show cause letter ("Memorandum") indicates that Capax was involved in a transaction involving a Government end-user. The Government enduser business opportunity was brought to Capax in late December 2010. Although this opportunity was brought to Capax near the end of a fiscal quarter, the timing was not uncommon because Autonomy would have been working diligently to close the deal prior to the end of the quarter, just like many companies tend to do.*
>
> *Capax decided to pursue this opportunity and agreed, on December 31, 2010, to buy the software for $1,950,197, in addition to product support of $95,510 per year, for a total of $2,242,727. As originally contemplated, this transaction involved the sale of certain software by Autonomy to Capax, as the VAR, with the*

*Government end-user ultimately receiving the software and related product support services. The purchase order reflecting this transaction is at CAPAX000015- CAPAX000017. When the purchase order was signed, the financial risk of the deal was transferred to Capax. Paragraph 14.c of the Memorandum states that "the Autonomy sales representative, nor his supervisor, nor the Government agency were made aware that Autonomy had 'closed' the deal in Q4 2010." Capax does not have any knowledge of the Autonomy sales representative's and supervisor's or the Government end-user's knowledge regarding when the deal closed. Capax was dealing with Autonomy's U.S. CEO and executive level counsel to close the deal on December 31, 2010.*

*Under this agreement, Capax, as the VAR, would receive a commission from Autonomy upon the closing of the deal between Autonomy and the Government end-user. In the event the deal with the Government end- user did not close, Capax would own the software licenses and ultimately have to pay Autonomy for them. Capax was aware of this consequence from the advice of counsel, Frank T. Gaglione, Esq. In the event that the transaction did not materialize, Capax's only option would be to resell the software licenses to another customer. Capax evaluated this risk and decided the upside was worth the inherent risk.*

*Autonomy later informed Capax in June 2011 that the Government enduser preferred to purchase the software through MicroTech, instead of Capax, because it had previously worked with MicroTech, which has significant sales to the Government. The transaction ultimately closed on June 3, 2011. On June 15, 2011, MicroTech sent Capax a purchase order for the amount at which the deal closed, $2,315,959.40, which was slightly higher than the original purchase order between Autonomy and Capax. The purchase order reflecting this transaction is at CAPAX000018-CAPAX000019. Capax subsequently invoiced MicroTech, received payment in full from it, and then paid Autonomy in full.*

> *Capax's invoice to MicroTech is at CAPAX000020. On June 30, 2011, Capax invoiced Autonomy for its commission of $231,595.94 under the terms of the VAR agreement. Capax's invoice to Autonomy is at CAPAX000021-CAPAX000022. Capax received $224,275 in July 2011, an amount less than it invoiced, which corresponded with the value of the purchase order between Capax and Autonomy.*
> *Communications regarding this amount and payment are at CAPAX000023-CAPAX000027.*
>
> *Paragraph 14.c. of the Memorandum states "there was no indication that Capax participated in this deal." This is inaccurate. Capax was the original VAR in this transaction and took on the risk inherent in. it. As described in greater detail above, this risk included the possibility that the deal with the Government end-user would not materialize, leaving Capax responsible for ultimately paying Autonomy for the software without a definite end-user."*

853.  The Defendants offered no explanation as to why, if MicroTech was a more suitable onseller because of its approved status and ability to offer flexibility of finance, they originally selected Capax Discovery to act as the VAR. The reason for the choice is all the more interesting in light of the fact that Mr Mooney had originally asked Mr Hussain whether he wanted to go through MicroTech, Mr Hussain had said no, on the ground that he did not believe MicroTech would be bidders on DKO's Request for Quotation ("RFQ") and wanted to consider companies who would be bidding: but when Mr Mooney replied MicroTech was expected to bid, Mr Hussain steered him away to *"other bidders"*; yet when it came to the last minute, Capax Discovery, though not a bidder, was selected.

854.  In my view, it is difficult to escape the conclusion that Capax Discovery was the most compliant of Autonomy's usual VARs, and the most flexible and least likely to ask any questions about the proposed end-user transactions when time was really short, and revenue was urgently required.

855.  Perhaps more importantly, however, the Defendants' vigorous defence of the interposition of MicroTech tended to distract attention from what seem to me to be the real points, neither of which they answered:

(1) The event which was relied on for the purpose of revenue recognition was the sale to Capax Discovery. That sale lacked substance and did not satisfy IAS 18.14. The interposition of MicroTech at the direction of Autonomy in order to effect delivery from an 8A vendor after Autonomy had alone conducted the negotiations with DKO confirmed that it was Autonomy, and not Capax Discovery or indeed MicroTech, which had control and retained risk, and showed how little substance there was in the original VAR sale.

(2) The requirement for Capax Discovery to pay early was not a sign of it being on the hook: quite the reverse because part of the arrangement was that Autonomy had to arrange for Capax Discovery to be put in funds for that purpose. That once more conformed to the pattern, and demonstrated that the payment obligation in the contract was all show and no substance.

856. The Goldberg Segalla letter was an unreliable reed to grasp. I have already explained that it too was contrived and misleading.

857. In my judgment, VT20 was part of the pattern. Recognition of revenue from the VAR sale to Capax Discovery was improper.

*Defendants' knowledge of false accounting in respect of VT20*

*Mr Hussain*

858. Mr Hussain was involved throughout. It was he who expressed himself to be *"dumfounded" [sic]* when the DKO deal faltered and clearly could not be completed in the quarter, and who emailed Mr Mooney and Mr Egan on 23 December 2010, stating *"Obviously we should consider partners"*, meaning the use of a VAR. It is fairly clear to me that this was in order to recognise revenue.

859. It is less clear whether Mr Hussain actually chose Capax Discovery: it was Mr Egan who contacted Capax Discovery so late in the day; but it seems to me to be more likely than not that Mr Hussain and Mr Egan were aware of each other's preference.

860. Mr Hussain was kept informed of the negotiations. He knew that Capax Discovery was the VAR.  Mr Hussain was involved in the amendments to the Capax Discovery/DKO purchase order, as apparent from an email on 13 June 2011 from Mr Crumbacher to Mr Baiocco recording the fact of a conversation on the matter between Mr Hussain and Mr Scott. He must have been aware from that process of the interposition of MicroTech. He was also aware

of and involved in the payment to Capax Discovery of a MAF after Autonomy had received from Capax Discovery what in an email to Mr Crumbacher dated 8 July 2011 he described as *"the dko cash",* which Mr Hussain had stipulated to be a condition a week earlier. At Mr Hussain's request, the final payment had to be, and was, sanctioned by Mr Kanter. When the deal was done: Mr Mooney so informed Mr Hussain by email on 3 June 2011. The email contained no message except the subject heading: *"DKO done".* The deal needed no introduction or explanation, reinforcing my view that Mr Hussain knew all about it.

861. Mr Hussain cannot have thought that the recognition of revenue from the 'sale' to Capax Discovery as a 'placeholder' was proper in this context. In my judgment, he had "guilty knowledge".

*Dr Lynch*

862. Dr Lynch appears to have had very little personal involvement in VT20, except that he was emailed by Mr Hussain on 23 December 2010 indicating that the deal with DKO was unlikely to happen that quarter and complaining that *"This is just unbelievable. I bet you no one in the US actually visited DKO".*

863. No transaction-specific evidence of substance was put to Dr Lynch in cross-examination; he was asked to comment on aspects of the transaction as it developed, but he was insistent he had no direct involvement. Thus:

(1) Dr Lynch was asked in cross-examination whether he knew of the VAR deal at the end of December 2010: he said he did not know, but would not have been surprised to hear of it.

(2) He denied seeing the Capax Discovery purchase order; and when it was put to him that the statement in it that *"...end-user and VAR currently anticipate entering into such a license transaction"* was not true, he said he was not involved and could not comment or speculate as to what was anticipated.

(3) As to the provision for payment of a MAF for *"VAR's efforts in securing End User's procurement of a license of Autonomy software",* when it was put to him that this *"deliberately gives a wrong impression of what Capax's role was to be"* he stated:

> *"As I've said, first of all, this was a relatively small deal in a subsidiary, in the US, being run by other people at a level that I have no knowledge other than having seen the name on a list. So I can't comment on this for you."*

(4) Later, when pressed whether he would have expected Capax Discovery *"to have exactly the same role as I suggested that it had in other deals we've looked at"* he responded:

> *"Again, you're asking me to comment on things. I have no idea whether Capax did or did not have involvement with the end-user or, indeed, whether or not that is a relevant question to ask under IFRS. My understanding is it isn't."*

(5) Dr Lynch was not involved in the MicroTech deal, or how the opportunity arrived, and was not challenged on this. He was nonetheless shown the email of 13 June 2011 from Mr Crumbacher to Mr Dan Truitt explaining that he had drafted a purchase order from MicroTech to Capax for the DKO order by reference to the directions of Mr Hussain (see paragraphs 849(8) and 860 above) and it was suggested that Mr Hussain was *"pulling the strings here and is causing MicroTech to buy something from Capax Discovery so that MicroTech*

> *can make the sale to DKO which has been negotiated between Autonomy and DKO"*.   It was not explained what relevance this would have to the original revenue recognition, but Dr Lynch did not accept it.   His speculation as to what was happening was fair:

> *"A. I think what's going on here is that we have one of our resellers who has the stock and has been given the opportunity to sell to DKO. We have another one who, my understanding, had a very close relationship with DKO and knew them well, and what we're doing is putting the two parties together so that the transaction happened, which is obviously in our commercial interests and in the commercial interest of the two parties and presumably in DKO's commercial interests."*

(6) Dr Lynch was asked about the amendment in respect of the software component to the Autonomy/ Capax Discovery purchase order, but Dr Lynch was not involved in that, and (beyond speculating) he said that he could not answer the question without looking at the amendment, which was not shown to him.

(7) He was also asked about the amendment to the payment terms, but was not involved in that, and thought it

extremely unlikely that he would have been told of the amendment to the purchase order.

(8) Though he was not involved at the time, Dr Lynch observed when asked about the deal that there was nothing unusual in the commercial situation represented by this deal:

> "... my understanding is it's a straightforward situation of Autonomy sold to Capax, so Capax is Autonomy's customer, and Autonomy recognises that revenue.  Then Capax sells to MicroTech, and then MicroTech sells to an end-user, DKO.    And, again, there's nothing remarkable in that.
>
> ... Again, this to me is perfectly normal commercial trading.  Party sells something to one party, who then sells it to another party who sells it to an end-user and the money flows back up the chain.  Almost not worthy of comment but very obvious."

(9) It was not put to Dr Lynch that he was involved in the payment of the MAF or aware of it at the time, or involved in or aware of the letter documenting the MAF. However, Dr Lynch rejected the idea put to him that this was a false paper trail:

> "A.   First of all, I don't think it's a false paper trail. The MAF document is a standard form document that's been used for years and years and years, and I'm sure it was just picked off the shelf and used and I don't believe there's any attempt here to create a false paper trail."

864.   In summary, Dr Lynch submitted that in any event there is no basis for the allegation that he knew of or participated in any improper accounting for the VT20 revenue.

865.   In my judgment, Dr Lynch was correct to focus on the 'sale' to Capax Discovery (see paragraph 863 above). He accepted that, even if he did not know about it (and he emphasised this was a relatively small deal) he would not have been surprised to hear about it. In my judgment, that is because all these impugned VAR sales were taking place as part of the strategy to cover shortfalls in revenue; and the pattern which implemented the strategy usually involved a 'sale' to a "friendly VAR". I have little doubt that Mr Hussain would have

told him the constituent elements of the revenue achieved: Mr Hussain reported that to Dr Lynch almost as obsessively as he pursued revenue.

866. In my judgment, it is more likely than not that Dr Lynch knew that VT20 fell into the pattern and I find that he had "guilty knowledge" accordingly.

## VT27: Capax Discovery/McAfee Q1 2011

867. In Q1 2011, Autonomy was seeking to conclude a $5,000,000 licence sale to McAfee, a software company well known for its computer virus protection products. Dr Lynch told me in cross-examination, and I accept, that McAfee was an established customer of Autonomy.

868. On 25 February 2011, Mr Hussain emailed Dr Lynch saying: "*So overall $200m needs 1 big deal in Europe (it'll come from the middle east probably), DB from Stouff and McAfee and Rand from Mooney plus a deal from Axicom*". On 3 and 6 March 2011, Mr Hussain sent further updates to Dr Lynch by email.

869. On 10 March 2011, Mr Hussain updated Dr Lynch that "*Mooney is running mcafee (for the deal to happen either you or i may need to meet with Dewalt) ...*". As the Claimants submitted, this suggests that the Defendants (or at least Mr Hussain, without apparent objection from Dr Lynch) considered that this proposed transaction merited their personal attention. The stream of updates confirms this.

870. On 15 March 2011, Mr Hussain sent an email update to Dr Lynch, noting that McAfee was "*progressing*". On 16 March 2011, Mr Hussain emailed Dr Lynch to say that the McAfee transaction was progressing well and that he (i.e. Mr Hussain) was "*all over every deal right now*".

871. However, on 17 March 2011, Mr Hussain told Dr Lynch that there had been "*no material progress today*" on the McAfee transaction. On 30 March 2011, Mr Mooney emailed Mr Hussain to say that the McAfee transaction was "*dead for the quarter*".

872. The same day (30 March 2011), in response to a request from Dr Lynch for "*Update pls*", Mr Hussain sent Dr Lynch his summary revenue spreadsheet. This stated, "*Took out McAfee 5*". Dr Lynch accepted that he "*would have had a look*" at this spreadsheet. Dr Lynch said that this "*doesn't mean that it's necessarily gone as a total chance. It's just that it's not what he's [Mr Hussain is] putting his route in*".

873. Just after midnight at the start of 1 April 2011, Mr Hussain sent Dr Lynch a further version of the summary revenue spreadsheet, subject "*update before I turn in*". This now included a new transaction "*8A (stouffer) 5.0*". The Claimants produced a table (as below) to illustrate the juggling that went on (red arrows added for ease of reference):

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| closed | 183.4 | | | | | | | |
| 8A (stouffer) | 5.0 | | | | | | | |
| MS (Stouff) | 5.0 | | | | 25th mar activity | | | |
| Bank of Montre: | 3.2 | | | | EMEA weaker - 3 deals o | | | 1 |
| HMRC | 0.9 | | | | Management - d&t out | | | 1 |
| Ameritrade | 2.0 | | | | | | | |
| 8A (stouffer) | 6.0 | | | | 28th mar activity | | | |
| Herbalife | 1.1 | | | | Took out Goldmans | | | 0.5 |
| | | | | | Took out DB EU | | | 1.6 |
| Rafiq | 0.1 | | | | Took out GM | | | 1.3 |
| Neal | 2.6 | | | | | | | |
| Sass | 1.0 | | | | 29th mar activity | | | |
| EMEA | 0.4 | | | | Took out McAfee | | | 5 |
| Mikes | 0.1 | | | | Took out QVC | | | 2.5 |
| SE | 3.0 | | | | Rafiq small deals | | | 1 |
| Sanjay | 0.1 | | | | | | | |
| MGMT IB | 0.0 | | | | | | | |
| FX upside | 0.5 | | | | | | | |
| TOTAL | 214.2 | | | | | | | 13.9 |

874. Dr Lynch accepted in cross-examination that he looked at this update. He would have understood the reference to "8A (Stouffer) 5.0" to refer to a reseller deal to be obtained by Mr Egan. Dr Lynch said he did not know if this was related to McAfee or not, but in my judgment, it is likely he did understand this given that the amount of revenue ($5 million) was identical to the amount stated next to "*McAfee*" in Mr Hussain's 30 March 2011 spreadsheet which he (Dr Lynch) had reviewed.

875. Although especially well illustrated, the pattern is familiar. VT27 was yet another impugned VAR transaction done on the last day of a quarter in hurried circumstances when an expected direct deal could not be closed in time before the end of the quarter. Again, Autonomy resorted through the ever-co-operative Mr Baiocco to a (particularly) "friendly" VAR, Capax Discovery.

876. On 31 March 2011, Capax Discovery issued a purchase order under the June 2009 Capax Discovery VAR Agreement summarised in paragraph 60 above for intended end-user McAfee for a licence fee

of $5,000,000 plus a first-year support fee of $250,000. The licence fee was payable in two tranches in July 2011 and September 2011.

877.   The Claimants alleged non-compliance with IAS 18.14(a) (no transfer of risk of ownership), (b) (retention by Autonomy of managerial control) and (d) (collectability). For the most part, the argument proceeded on familiar lines and was answered in the familiar way, though Mr Baiocco and Dr Lynch both told me that Capax Discovery also had a previous relationship with McAfee, and that Mr Baiocco was therefore pleased that this new VAR transaction could further assist his relationship. The Claimants relied on the transaction as further illustration of the 'pattern' they claimed was characteristic of the impugned VAR transactions.

878.   However, VT27 was another example where no end-user deal was ever closed, either by Capax Discovery or Autonomy, leaving Capax Discovery notionally exposed and in need

of the assistance which it was the basis of its participation Autonomy would somehow arrange to be provided.

879.   It was the way this exposure was dealt with which was the focus of the Claimants' attack on the overall transaction and which the Claimants relied on as specific evidence that Autonomy and Capax Discovery had agreed that whatever happened, Autonomy would always see to it that its VAR was never left *"holding the bag"*.

*The 'staging tools' transaction*

880.   The Claimants' case was that to enable Capax Discovery to pay the $5,250,000 debt under the McAfee purchase order, Autonomy contrived a purchase by ASL from Capax Global of a licence to use what Mr Baiocco described in his witness statement as *"a tool set that improved or facilitated the e-Discovery process"* which Capax Global had developed and which it called "Staging Tools".

881.   The licence fee was $6,000,000, which Autonomy paid on 12 August 2011 the day after receiving an invoice from Capax Discovery (11 August 2011). It was this receipt, according to Mr Baiocco, which enabled Capax Discovery to pay the sums due under VT27; and it is clear that Capax Discovery did then make two payments of $2,625,000 to Autonomy, one on 15 August 2011, and the second on 1 September 2011 (though the latter payment was not due until 27 September 2011).

882.   The Claimants contended that Autonomy had no genuine commercial rationale for purchasing the Staging Tools, and that its real purpose was to put Capax Discovery in funds.

883. The Claimants also referred in this context to Mr Baiocco's evidence in his witness statement that he was concerned lest the staging tools purchase was a scam and not a real deal; and that he had raised this with Mr Egan on the telephone who (he said) *"reacted angrily to my statement that there was something suspicious about the deal"*. Mr Baiocco's witness statement also stated that it seemed to him *"as if Autonomy was urgently seeking to clean up its books"*, causing him to call Mr Hussain on 17 August to ask him if Autonomy was about to be acquired, but Mr Hussain *"did not give anything away"*.

884. The Defendants submitted that Autonomy's urgent need for the staging tools, far from being a contrivance to assist Capax Discovery, was real and urgent, and that there was no basis for Mr Baiocco's purported suspicion or for the Claimants' complaint in relation to Autonomy's purchase.

885. Although highly critical of Mr Baiocco's evidence in his witness statement, they adopted in this context with some enthusiasm his evidence in cross-examination. They offered the following context and explanation, based on evidence given by Mr Baiocco of his understanding (and was subject to his warning that he was *"not a tech – not even a little"*):

   (1) The staging tools were tools developed by "Capax Discovery" (in fact, according to the licence agreement between it and Autonomy (see below), by Capax Global) to improve the user operability of Autonomy's Introspect 6 software. According to Mr Baiocco's understanding, "Capax Discovery" had created a set of 9 modules designed to improve the performance of the platform. The tools improved the EDD process, speeded it up and made Autonomy's Introspect software more efficient. The "Capax Discovery" engineering team who had developed the software were experienced IDOL and Introspect experts,

   as was evident from their biographies (provided on an email from Capax Global). "Capax Discovery" engineers were demonstrating the tools to Autonomy by March 2011.

   (2) Autonomy had itself experienced difficulties with the Introspect platform and delays in meeting performance

and quality control requirements which were causing backlogs[590] and customer dissatisfaction.

(3) Further, in Q1, Q2 and Q3 2011 Autonomy was engaged in the Deepwater Horizon discovery project for BP. This was one of the largest e-Discovery projects (if not the largest) to date. Autonomy had been encountering difficulties in meeting quality control requirements under the contract, which were similarly causing performance and quality control issues.

(4) Autonomy shared some of its difficulties with Mr Baiocco and invited Capax's assistance. The solution offered involved the configuration and implementation of the nine modules for Autonomy's specific use, as described in a letter to Autonomy from Capax Global dated 27 July 2011 which Mr Baiocco told me was written for him by his technical team.

(5) Mr Baiocco recalled that high importance was being put on the staging tools for the BP e-Discovery work at the time.

(6) A Commercial Software License Agreement agreed between Autonomy and Capax Global in respect of the staging tools (dated 11 August 2011) granted not only a licence but also *"EDD workflow management and reporting – "Chain of custody" and "job" tool extension"* to assist Autonomy and its customer, BP, further in e-Discovery work for the BP project.

(7) The urgency for Autonomy was illustrated by Autonomy's request that Capax Discovery get people out to Chicago to get on with the process as quickly as possible. Mr Baiocco was *"pretty sure"* that his people did go out to Chicago.

(8) In short, Autonomy badly and urgently needed the staging tools to recover ground and perform properly its enormous e-Discovery project in relation to the BP case: and the Staging Tools met that need.

886. As to "fair value", Mr Baiocco's technical team told him that the "Capax Discovery" tools could be worth more than the $6 million being paid by Autonomy:

---

[590] This was Mr Baiocco's understanding from what he was told at the time. Mr Sullivan also confirmed that Autonomy was encountering difficulties keeping up with what was a *"very challenging case"*.

> "*Q.   And they said that the Capax tools
> resulted in much faster results and
> could be worth 6 million because of the
> amount of data Autonomy was
> processing, do you remember that?*
>
> *A.  That's what they said to me, yes.*
>
> *Q.  And did they say to you that they could have been
> worth more than the 6 million paid by
> Autonomy?*
>
> _____
>
> *A.  They did.*
>
> *Q.  Who did you ask that?  Were those people like
> Mr Tucker, Mr Balam, Mr Ferbert, those
> characters we've seen?*
>
> *A. It would have been more Mr Gurney and Mr Williams"*[591] .

887.  Further, the task of configuring and implementing the nine modules
was a complex and substantial one, some requiring more than 15
man-days each and the use of highly qualified software engineers:
having initially queried what Mr Miles meant when he suggested
this, Mr Baiocco accepted this. Mr Miles emphasised that the only
evidence that the Court has on fair value was that given by Mr
Baiocco: the tools could have been worth <u>more</u> than Autonomy was
paying,[592] and there was no evidence to suggest that they were
worth less.

888.  Cross-examination also revealed errors or inaccuracies in the
witness statement evidence of Mr Baiocco in relation to this
transaction.  In particular:

   (1) Mr Baiocco's witness statement suggested that an email
   of 13 June 2011 comprised a request for a proposal from
   Capax Global to license Autonomy staging tools, and
   pitch the licence fee at around $5 million or $6 million.
   Mr Baiocco's evidence was that he had been surprised
   that *"Mr Hussain suggested these arbitrary numbers
   without any prior discussion or negotiation"*; and that

---

[591] Mr Baiocco told me that Mr Stephen Williams was an EDD expert and Mr Gurney was trained by
him.
[592] See paragraph 886 above.

although Mr Hussain did not explicitly make the link to Capax Discovery's debt to Autonomy under the McAfee transaction, it seemed to him that this was a way of paying down the McAfee debt. Mr Baiocco referred also to having had a heated telephone discussion with Mr Egan *"around this time"* after Mr Baiocco had asked *"whether the staging tools purchase was a real deal or a scam."*

(2) However, as Mr Miles brought out, the email of 13 June 2011 did not relate to staging tools: the references there were to Stratify and DRCCM assets which were part of Iron Mountain Digital, whereas staging tools were for Introspect eDiscovery.

(3) When faced with this point in cross-examination Mr Baiocco's evidence was described by the Defendants as *"incoherent and evasive"*. Mr Miles portrayed it to him as a *"serious error"* and Mr Baiocco was patently uncomfortable.

(4) The muddle in the witness statement replicated his examination in chief in Mr Hussain's US criminal trial, where Mr Baiocco had made the same bad points: the Defendants suggested that this was *"no doubt following his preparation sessions with the DoJ"*.[593] When it was put to him that this *"was something that someone put into your witness statement and you just signed up to without thinking"*, Mr Baiocco offered no coherent response except to reiterate that he

stood by the fact that Autonomy had indeed purchased the staging tools for $6,000,000.

889. The Defendants submitted that the upshot was that such evidence as Mr Baiocco gave in his witness statement on the staging tools purchase was wholly unreliable and shown to be so by his own answers in cross-examination. In that context, and contrary to what he had said and intimated in his witness statement, Mr Baiocco had confirmed both that the staging tools were seen as useful and important at the time and that his team considered that they could be worth more than Autonomy was paying.

---

[593] In his cross-examination in this trial Mr Baiocco suggested that this was his mistake, but it was obvious from Mr Baiocco's evidence in Mr Hussain's US criminal trial that this was a prepared question from the examiner in chief. Mr Baiocco was expressly asked, "*Q. Can you tell us what happened in terms of the proposal on NearPoint and on the staging tools that you had the email communication with him about?*"

890. This was all enthusiastically supported by Dr Lynch (who had not mentioned VT27 in his witness statement) when he explained in his cross-examination his understanding of the reason for the purchase. He confirmed that he considered it to have been done for good commercial purposes and dismissed the suggestion that the reason for the transaction was *"quick payment…simply to put Capax in funds to pay down what it owed Autonomy on end of quarter VAR deals"* as follows:

> *"No, the purpose of the money being sent was to pay Capax for something that we needed very urgently because of our BP crisis that was going on. If they used that money to pay down their VAR debt, then great. They've managed to produce something that's useful to us. Just one thing to keep context here, these resellers, their business is about taking our software and adding things which they then sell to customers. Every so often they actually make something useful and we have the ability to buy that from them. So it's not -- you know, they are actually in effect almost an extension of our R&D operation in that they're doing these things. They continually pitch the work they've done to see if we'll buy it because they've already written it for their own customers. Often the reason they've written it is it's something that's missing from our product, otherwise they could just sell our product. So we get pitched with these and we buy them and this one, the reason I know more about this one is that this was central to a very large crisis that we had at the time where we were doing British Petroleum's Deep Horizon well litigation, which at the time was the largest litigation in the world, and we were failing to the point where we'd been called into the headquarters of BP and told that they were switching to a competitor because we kept making silly quality control mistakes. So, for example, we didn't actually provide some of the documents for a deposition until after the deposition. I sent out an edict in the March to Mr Sullivan to do whatever it took to fix it and he started creating something called a new fire engine, as he called it. Then we had another showdown with BP and they threatened to pull the plug on a 10 million deal that we did, so we bought these tools and these tools were specifically designed -- they'd been around a*

> *while -- to stop these quality control problems*
> *of losing documents and things like that."*

891.  Dr Lynch's understanding also reflected the information given to
      him in the emails going to him in connection with his approval of
      the purchase:

> (1)  On 5 August 2011 Mr Egan notified Mr Kanter and Mr
>       Hussain that he had finalised negotiations with Capax
>       Discovery, describing the tools purchased.
>
>       Mr Hussain included Dr Lynch, Dr Menell and Mr
>       Chamberlain on the thread, stating:
>
>> *"Thanks Stouffer. There has been a lot of emails*
>> *on this and i am glad we can get to a close now.*
>>
>> *I need approval from Pete on the technology⋯⋯*
>> *please provide via email*
>>
>> *I approve the cost side but need one of*
>> *Andy and Mike to counter approve given*
>> *its size. For your information these*
>> *products are being used against the*
>> *delivery for BP so will be expensed. We*
>> *have so far received $22m from BP, are*
>> *charging them nearly $1m a month, the*
>> *project is getting bigger as I am*
>> *negotiating a $4m backup deal and a $6m*
>> *disaster recovery plus 99.9% uptime deal.*
>>
>> *Steve- could i please ask you to put this into a PO*
>> *form, and append the approvals by printing the*
>> *relevant emails.*
>>
>> *Stouffer ⋯⋯ I am keen to get the software today so*
>> *lets get this wrapped."*
>
> (2)  Dr Menell stated in the same thread (copying Dr Lynch):
>
>> *"These tools will need to be customised*
>> *and configured to our environment so not*
>> *only do Chicago and Camb need the sw*
>> *asap we will need bodies from Capax to*
>> *work alongside dev to get this done.*
>> *Presumably we can get Capax crew in*
>> *without being hit by another bill! Given*
>> *dev is now into double figures on the*
>> *versions of Dashboard we have built*

> *without success we cannot be left without*
> *help as this type of tool needs a great deal*
> *of background to manipulate and operate*
> *effectively- background self evidently we*
> *don't have. I see this as key if it's to have*
> *any impact on BP in a time frame that*
> *makes a difference. Stouffer will need your*
> *help to press Capax to fly troops asap or*
> *at least point us to who can help."*

(Mr Baiocco confirmed that the "Capax crew" did fly into Chicago.)

(3) Mr Hussain subsequently asked Dr Lynch for approval, replying on the same email thread.  Dr Lynch wrote *"yes"*.

892. Turning to my assessment, the evidence was obviously rather inconsistent, and sometimes confused. My impression when Mr Baiocco was cross-examined on this transaction was that he was struggling with the evidence in respect of it attributed to him in his witness statement. I would accept that the picture that emerged from cross-examination was rather different from the neat presentation in his witness statement pointing inexorably at the staging tools transaction being suspect as to purpose and inflated as to price.

893. I do not think that Mr Baiocco was being dishonest. I regard this part of Mr Baiocco's evidence as illustrating the dangers that evidence may be polluted by rehearsal and repetition at the instance of lawyers with a forensic objective, just as much as its accuracy may be eroded by lapse of time, and the gradual replacement of real memory by nurtured assumptions and the desire for consistency with what the witness comes to believe he or she has said before. This was a salutary reminder to me, and I have at all times borne in mind, that I need to consider disputed witness statement evidence from the Claimants' VAR and other witnesses on impugned transactions with particular care and a degree of scepticism.

894. That does not of itself, however, resolve the question as to the operative purpose of the staging tools transaction, or the issue as to fair value.

895. As to the purpose of the staging tools transaction, it seems to me to be reasonably clear that the proceeds were used, and were probably always intended to be used, by Capax Discovery to pay down instalments due under the McAfee transaction. That was the consequence of the transaction, and as I find, an important part of its intended effect.

896.  However, I consider that the email evidence did suggest also that Autonomy urgently needed staging tools (or some similar product), especially in the context of its e-Discovery work for BP and the difficulties it was experiencing in that context. The email exchanges were all within the cabal of Dr Lynch, Mr Hussain, Dr Menell, though usually involving also Mr Egan. To my mind, there is a whiff of artifice in some of the points in favour of the purchase which were made in those exchanges and the possibility that they were pre-textual has lingered in my mind. But I do not consider the evidence goes so far as to show that they were, and I therefore proceed on the basis that Autonomy's need for the staging tools was real and not contrived.

897.  It is not easy to determine which was the predominant purpose. I have in mind also that, whilst Autonomy needed the tools, it may not have needed so many: and though there is some evidence that the order exceeded the need, it was sketchy. In the end, however, I have concluded that I need not assess the comparative weight of the two purposes: for, in my view, the vice in the transaction was that the price was contrived to enable Capax Discovery to make payment under VT27 which was part of the purpose of the purchase, with enough surplus to fund also a MAF. In a sense, Mr Baiocco was right, even if for the wrong reason.

898.  I have had very much in mind, in reaching this conclusion, Dr Lynch's point that the only evidence on the issue of fair value was provided by Mr Baiocco in cross-examination, and that evidence was that Mr Baiocco had been told by experienced e-Discovery personnel within Capax Global that the staging tools could be worth $6 million, or perhaps even more.

899.  However, what on analysis stands out from that evidence is that Mr Baiocco made clear that he had not asked those he had consulted (it may be noted, quite informally) *"how much they were worth upfront"*. The question he thought he had asked was *"are they worth the price they're paying"*, and the answer he was given (according to the cross-examination evidence on which Dr Lynch relied) was *"yes"* and that this was *"because of the amount of data Autonomy was processing."* In other words, the only evidence was as to what the experts thought the staging tools would be worth to Autonomy, which in light of the use Autonomy could make of them in the context of an enormous job for which it was being or stood to be paid (literally) millions, could even exceed that. That was the distinction implicit in Mr Baiocco's distinction between "worth upfront" and whether the tools would be worth to Autonomy the amount they were prepared to pay; and that was why the amount

of data which Autonomy was processing would feed into what Autonomy would be prepared to pay.

900. It is important to have regard both to the nature and limits of the evidence, and the actual question asked. There was no list or recommended price, nor any other mechanism to establish price. The evidence, such as it was, of "fair value" was not a formal assessment, nor was it made by those with commercial or market experience of making an assessment of "fair value". The question asked was, in effect, whether the price could be justified according to the value to be extracted from the staging tools by the particular customer. I infer and find that at some point Mr Hussain suggested the convenient figure of $6 million; and that being the price Autonomy was prepared to pay, and in the view of those with experience of e-Discovery products in general and the staging tools in particular, not being excessive according to its benefit, Mr Baiocco adopted it.

901. Put shortly, the price paid was defensible because the staging tools would be worth that to the user; but its amount was calculated by reference to Autonomy's other purpose.

902. I have concluded that the staging tool transaction was a further example of Autonomy making good on the fundamental understanding which underpinned all the impugned VAR transactions that one way or another the VAR would not be "left on the hook" or "holding the bag".

903. The Claimants also complained about the payment of a MAF (in the sum of $525,000) to Capax Discovery in respect of VT27, focusing again on the way the payment was presented, as appears from the letter dated 1 September 2011 that Mr Baiocco was asked to sign, which referred to Capax Discovery having purchased from Autonomy certain products and services for resale to McAfee, and continued:

> "Such contemplated resale is referred to herein as the "Transaction."
>
> Capax has submitted to Autonomy invoice no. 1282, in the amount of $525,000.00, due from Autonomy as payment to Capax for marketing assistance services related to the Transaction. Such payment from Autonomy shall be deemed full and final payment of any and all fees due to Capax from Autonomy as a result of the Transaction, or otherwise in connection with Capax' resale of products and/or services to McAfee."

904. The Claimants submitted that this *"was another work of fiction"*. There had been no sale by either Autonomy or Capax Discovery to McAfee. Capax Discovery had never contemplated itself making a "*resale*" of the Autonomy products to McAfee. Nor had Capax Discovery provided any "*marketing assistance services*" to

Autonomy in relation to such a resale. In reality, the only service provided by Capax Discovery was the submission of a purchase order, which Autonomy used to recognise revenue improperly in Q1 2011.

905. Again, the Defendants' answer was that the payment of a MAF was unobjectionable for the reasons previously given above.

906. I do not accept that. In my judgment, payment of the MAF was part of the pattern: it was the price levied for signing up to nominal legal liability, and keeping out of the way thereafter.

907. Taking all the features of these transactions together, in my judgment, VT27 was another exemplar of the pattern. The sale to the VAR was illusory and effected no change in control or transfer of risk; no revenue should have been recognised in respect of it.

### Defendants' knowledge

### Mr Hussain

908. As always, Mr Hussain was directly involved. His usual obsession with plugging shortfalls to enable him to meet forecast prompted the transaction. He knew it was contrived. Likewise, he knew that the staging tools transaction was at the price necessary to rescue Capax Discovery and was in the know throughout. The transactions were, to his knowledge, exemplars of the strategy he devised. In my judgment, he had "guilty knowledge".

### Dr Lynch

909. Dr Lynch submitted that there was no basis for the allegation that he knew of or participated in any improper accounting of the transactions. His evidence was that:

(1) He was aware of efforts being made to close a deal with McAfee in Q1 2011, but he was not involved in the reseller deal, and certainly had no information to suggest that there was a deal with a reseller where revenue was being improperly recognised. When cross-examined he was shown documents which the Claimants suggested could have led him to infer that Capax Discovery was coming in for McAfee, but he did not accept that such a link was obvious and confirmed that he had certainly not made it.

(2) He was made "*distantly aware*" of continuing discussions between Autonomy and McAfee after Q1 2011; but he told me that he did not know whether or not Autonomy was negotiating with McAfee without Capax Discovery's involvement;

(3) He did approve the later purchase of staging tools from Capax Discovery, but he understood that he was approving a transaction put together and recommended by others and had no reason to think other than this was a sound purchase at fair value (which it was) for good commercial reasons.

(4) In any event, he did not accept the causality and linkage between the staging tools purchase and the McAfee repayment suggested by the Claimants' simplified slide and maintained that no one at Autonomy had suggested a link to Mr Baiocco at the time.

(5) He was not involved in the discussions between Autonomy and Capax Discovery regarding prompt payment (which amounted to early payment by Capax Discovery). But, asked about it in cross-examination, he saw it as unproblematic:

> "If we had agreed to pay early in return for being paid early, then that would be a reasonable commercial action."

(6) Further, he told me that Autonomy would naturally expect prompt payment by Capax Discovery in return, and this reduced Autonomy's days sales outstanding. Other companies took a netting approach but Autonomy did not:

> "No, because, as we've discussed before, when someone owes you money and you owe them money, what you normally can do is just net it instantaneously, which is in both parties' interests because their day sales are outstanding, are reduced by that and it also helps their credit rating if they require credit. In our case we did actually send the money back and forth because we practise something called cash transparency, but we would only send the money on the understanding that the money would come straight back. It was equivalent to it being netted."

(7) He was not involved in the MAF payment or letter. He told me he did not accept that the MAF was paid on his authority unless that was documented on the emails (which it was not).   Although Dr Lynch was not

involved in this payment, he rejected the idea that it connoted anything improper.

910.  In his written closing, it was also submitted that it was not squarely put to him that he knew about the revenue recognition or knew that the revenue recognition was improper.

911.  However, in my judgment:

(1) The McAfee deal was carefully monitored by Mr Hussain, and Dr Lynch was continuously updated by Mr Hussain about its status.

(2) The emails sent by Mr Hussain to Dr Lynch included information which I consider and find Dr Lynch would have appreciated meant that (a) the prospective deal with McAfee would not be closed within the quarter, (b) a sale to a VAR would be made instead, (c) the VAR would in all likelihood be a "friendly" VAR, (d) the sale would not involve real risk for the VAR nor any real change to Autonomy's dealings with McAfee thereafter and (e) the way the matter thereafter proceeded would conform to the pattern implementing the strategy over which he had from its inception presided and encouraged (and would not involve the VAR in any dealings with McAfee at all).

(3) Dr Lynch knew also of and approved the staging tools transaction. I reject the notion that he simply signed because others had, which would have been entirely contrary to (a) the requirement for his approval which his own rules stipulated, (b) the way he ran Autonomy and (c) his nature as I came to assess it.

912.  The Claimants' case was adequately put to Dr Lynch: he knew that what was being put against him was the case summarised in the preceding paragraph.

913.  In summary, in my judgment, Dr Lynch knew that the sale to the VAR was, as usual in the case of these large VAR transactions in the Relevant Period, illusory; and that the staging tools transaction was in substantial part required to relieve Capax Discovery from the hook.

914.  The payment of a MAF would have been part of the usual pattern; but I accept that the decision to pay and the implementation of it appears to have been carried out by others (all others in fact) in the cabal, and Dr Lynch was not ostensibly involved.

915. However, I need make no determination of that: I am satisfied without a finding about the MAF, and find, that Dr Lynch had "guilty knowledge".

## VT28: Capax Discovery/UBS Q1 2011 and VT34: Capax Discovery/UBS Q2 2011

*The first Capax Discovery/UBS purchase order*

916. In January 2011, Autonomy was seeking to negotiate a deal with UBS, the well-known bank. On 13 January 2011, Mr Hussain emailed Mr Egan and Dr Menell, copying in Dr Lynch that the negotiations were going "*v well*". Even at that time, however, there was a note of caution: the email forwarded one from Mr Glenn Perachio, another Autonomy employee, headed *"Need to speak about UBS and rumours there re Deloitte"* and Mr Hussain advised that *"…UBS legal got negative feedback from Deloitte US and it's causing concern…"*

917. In March 2011, Mr Hussain learned from an internal email (circulated to the legal department as well as Mr Hussain) that the *"quick hits"* had *"turned into an ongoing saga…and constant growth in what UBS wants us to show"*; and that UBS's demands for proofs of concept (evidence that the performance of a desired task was feasible) meant that it would "*take us several quarters to even get all of this up, running, and POC'd, let alone get them to buy anything*". There was no hope of concluding a deal in time for the end of Q1 2011.

918. On 31 March 2011, the last day of the quarter, at Mr Egan's request, Capax Discovery sent to Autonomy a purchase order for UBS as end-user. The licence fee payable was $8 million, with an annual support and maintenance fee of $400,000. The money was to be paid in two equal instalments, on 4 July 2011 and 29 July 2011 respectively.

919. Mr Scott included "*Capax – UBS*" within a list of "*8A deals*" he sent to Mr Hussain, at Mr Hussain's request, on 1 April 2011.

*The second Capax Discovery/UBS purchase order*

920. Despite these difficulties, negotiations between Autonomy and UBS continued in Q2 2011. On 9 June 2011, Mr Hussain sent Dr Lynch an email, subject, "*I need 2 out of the top 3 or 8 out of the top 10*". Third in his list of deals, with an expected fee of $8 million was UBS.

921. On 27 June 2011, Mr Hussain sent UBS a proposal with revised payment terms. That day, Ms Sarah Wilkinson of UBS sent an email to Mr Hussain, querying "*the offer you made associated with the*

*leverage of an 8A payment agent*" and (since she had *"never heard of this construct previously"*) requesting "*a little more colour and background on this proposal*". Mr Hussain immediately forwarded the emailed to Mr Egan (copying in Mr Kanter) stating only *"Please help"*. In the meantime, Ms Julie Dolan (an Autonomy lawyer) contacted her UBS counterpart with some information. When UBS asked whether Autonomy was proposing that UBS contract directly with the 8A entity, Ms Dolan said,

"*No, not at all. All agreements will be between Autonomy and UBS. We are asking that the third party entity acts as a paying agent only. All invoice and payments are pass through the third party*".

922.  On 28 June 2011, Mr Hussain sent a further proposal to UBS. That day, Mr Hussain sent Dr Lynch an email entitled "*quick updates*", which stated, "*Ubs – no further news, we got everything over to Sarah, we have a final legal call tomorrow*". On 30 June 2011, Mr Hussain informed Dr Lynch, "*UBS – paperwork all done (I am last night), michelle trogni for final signing this am*".

923.  However, on 30 June 2011, Ms Wilkinson wrote to Mr Hussain to say that, "*Regrettably, despite huge efforts, it has just not been possible to complete the internal consultation and approval processes in time*". Mr Hussain forwarded the message to Dr Lynch and Mr Kanter without comment.

924.  It would therefore have been clear to Dr Lynch and Mr Kanter that any VAR agreement in respect of a UBS deal would have to be implemented on the very last day of the quarter. Plans to do that were already on foot.

925.  On 30 June 2011, Mr Scott sent Mr Hussain, Mr Egan and Mr Chamberlain a draft purchase order to be submitted by Capax Discovery, for UBS as end-user, and requested approval. Approval must have been given, because Mr Scott then sent the draft purchase order to Mr Baiocco. At this point, the licence fee was stated to be $5.5 million. However, less than an hour later, Mr Scott sent a revised draft purchase order with a higher licence fee of $6.5 million. On 1 July 2011, a yet further draft was sent, with a yet higher licence fee of $7,644,132 (plus an annual maintenance fee of $383,206.60).

926.  No changes were made to the software ordered. There is no evidence of any objection, or indeed any response at all by Capax Discovery to these sudden substantial increases (of over $2 million) in the ostensible payment obligation for the same products. Nor is there any evidence of Capax Discovery ever speaking to UBS or doing anything else to determine that on-sales, much less on-sales totalling more than $16 million, could actually be achieved.

927.  Mr Baiocco signed this last version, which was dated 30 June 2011 despite the fact that it was not signed until 1 July, the first day of the next quarter. Mr Baiocco gave the following unchallenged evidence about the two Capax Discovery/UBS purchase orders:

> *"As with the other VAR transactions, the terms of the purchase orders were given to us by Autonomy. Capax Discovery was not involved in the efforts to license the software to the end-user (UBS). Autonomy handled all of the negotiations with UBS."*

928.  In accordance with that and the established pattern, these further negotiations with UBS were carried out by Autonomy alone (and overseen by Mr Hussain).

929.  Autonomy's proposal to UBS was that UBS should contract directly with Autonomy but make payment via an 8A entity (Autonomic Resources LLC, an affiliate of Capax Discovery) as paying agent. Autonomy suggested that participation in this way in a US Federal Government-promoted scheme offered a number of benefits, especially in terms of goodwill. Autonomy also offered UBS a 3% discount for participation.

930.  UBS did not favour this. It expressed concerns about the proposal that UBS should make payment under a direct deal with Autonomy to an 8A payment agent. It appears from an email dated 19 July 2011 from Ms Wilkinson of UBS to Mr Hussain (copying three individuals working for UBS) that these primarily concerned any credit risk in payment to an intermediary; but there appeared also to be an undercurrent of concern as to the basis of interposing a paying agent at all and Ms Wilkinson noted that UBS could not *"see that the use of one of these entities purely as paying agent would support the aims of the SBA [Small Business Administration] program".*[594] Ms Wilkinson's email concluded: *"On this basis, I have asked Sharon to ensure that the clause on the use of payment agents is removed from the contract."*

931.  That proved to be the sticking point. As his annotations which he made on the email from Ms Wilkinson when forwarding it to Mr Kanter show Mr Hussain regarded all the other concerns as resolvable (for example, by Autonomy agreeing to hold UBS harmless); but he would not accept the deletion of the paying agent provision and told Mr Kanter to tell UBS *"Sorry it stays in"*. The Claimants asked me to infer from this obduracy on a point which

---

[594] In an earlier email, dated 27 June 2011, Ms Dolan of Autonomy legal had explained to UBS that the SBA was a program supported by the US Federal Government in which a number of authorised Autonomy resellers were involved. Autonomy had offered UBS a 3% discount if it participated though an authorized reseller.

would not otherwise have benefitted Autonomy that Mr Hussain had to have the provision for payment to a Capax Discovery affiliate so that monies could then flow to Capax Discovery to be used by it to pay its debt under the purchase orders for end-user UBS to which Capax Discovery had committed.

932.  That same day (19 July 2011) Mr Kanter advised Ms Wilkinson by email accordingly. By email sent only two minutes later, Ms Wilkinson responded:

> *"Having submitted this three times to our internal legal team, and had it rejected three times, I think we're done on this.*

> *Sorry that we couldn't oblige, but the decision is now final."*

933.  That was that: there was to be no end-user deal to generate receipt from which Capax Discovery could have paid Autonomy and discharged its indebtedness. Something else had to be done to get Capax Discovery off the hook.

934.  The solution Autonomy found was a re-packaged deal with UBS. Autonomy entered into a direct agreement with UBS on 20 July 2011, with a total contract value of approximately $24,000,000, of which $13,489,860 related to the provision of Autonomy software. Under that direct deal, UBS paid Autonomy directly. There was no paying agent involved. However, Mr Chamberlain instructed Ms Ku (cc Ms Poppy Gustafsson) to issue credit notes to Capax Discovery for the two UBS purchase orders, explaining that since UBS had required their purchase to be invoiced directly Autonomy needed *"to remove these as they are no longer payable by Capax."* The Claimants contended that this made no sense, especially since if Capax Discovery was genuinely at risk, its liability would not in law be affected by any subsequent agreement to which it was not a party.

935.  The Claimants submitted that this series of transactions fell into the well-established pattern:

> (1) A sale to a friendly VAR at the last possible moment (or in this case, it appears, beyond it) to make good the revenue which had been expected from a 'real' sale.

> (2) Complete indifference on the part of the VAR as to the purchase price from Autonomy, or the sale price which might be expected from an end-user.

(3) No contact by the VAR with the proposed end-user either before or after the VAR sale to determine the prospect and likely price range of an end-user sale;

(4) Legal documentation emphasising the absolute and unconditional nature of the VAR sale and the obligations imposed.

(5) The continuation after the VAR sale of negotiations for an end-user sale as if the VAR sale had never taken place: in this case, only Autonomy was negotiating with UBS, and the only contract in contemplation was one between Autonomy and UBS.

(6) The absence of any suggestion of the VAR being asked still less required to pay.

(7) Efforts by Autonomy to ensure an apparently legitimate route to pay the VAR the proceeds of any end-user sale successfully negotiated.

(8) If the negotiations failed and no end-user sale eventuated, the negotiation and implementation by Autonomy of other means of ensuring that the VAR was not left on the hook.

936. In the case of VT28 and VT34 the colours on the pattern were in some ways particularly vibrant:

(1) The remarkable indifference of Capax Discovery to a sequence of unexplained and substantial increases in the purchase price for the second Capax Discovery/UBS purchase order (VT34);

(2) Mr Baiocco's casual signature on 1 July 2011 of a purchase order prepared and provided to him by Autonomy unseen which had to be completed before the end of the quarter (30 June 2011);

(3) Autonomy's insistence on interposing an 8A payment agent in the Capax Discovery group (Autonomic Resources LLC) to be used as a channel for the purchase price under the end-user sale to be recycled and repaid to discharge Capax Discovery's own indebtedness;

(4) When that eventually drove UBS away from the original deals, Autonomy's immediate engagement in selling the same software to an end-user (in this case, the

same end-user, UBS) whilst the VAR (which notionally owned the software) did nothing.

(5)     The payment of a MAF to the VAR (in this case of $1,644,733) for doing nothing except lending its name to notional legal liability.

937.   The Defendants responded that:

(1) The fact that the VAR transactions were each made at the end of a quarter does not signify anything improper if (as was the case, and Mr Baiocco confirmed) Capax Discovery was unconditionally on risk: the question was not whether the risk was wise but whether it was assumed;

(2) Mr Baiocco was keen to establish a relationship with UBS and saw the reseller deals as the way into that;

(3) Mr Baiocco confirmed the truth and accuracy of the parts of the Goldberg Segalla letter which specifically dealt with these transactions, including statements that (i) Capax Discovery took on risk and if the end-user transaction did not materialise Capax Discovery's only option would have been to resell to another customer (ii) this particular transaction also promised to be of significant benefit to Capax Discovery in that it represented a large professional services opportunity for Capax Discovery to install, integrate and implement Autonomy's software, (iii) such service opportunities and ongoing management being the basis for the strong partnership maintained between Capax Discovery and Autonomy (and subsequently HP);

(4) The arrangements for Capax Discovery to be credited with the value of the direct deal ultimately made between Autonomy and UBS up to the amount of the VAR deals (and paid a MAF) were commercially similar to those in the Kraft deal (VT3) and equally unobjectionable.

938.   In my judgment, the Defendants' responses fell well short of a satisfactory answer; for the reasons identified by the Claimants and apparent from the facts as described above, VT28 and 34 fell within, and to my mind provide further striking examples of, the pattern; the 'sales' were illusory, neither risk nor control passed, and no revenue should have been recognised from them.

*Knowledge of the Defendants*

*Mr Hussain*

939. There is no dispute that Mr Hussain was involved in the UBS transactions and oversaw VT28 and VT34. He knew all the facts and matters set out above, and that revenue recognition could not be justified. He had "guilty knowledge."

*Dr Lynch*

940. The position was, as usual, not as clear in relation to Dr Lynch. Further, not only was no transaction-specific evidence shown or put to Dr Lynch, but the Claimants did not crossexamine him on VT28 and VT34 at all.

941. The Claimants sought to answer the fact that they did not cross-examine Dr Lynch for lack of time; and they (a) pointed out that Dr Lynch said nothing about either transaction in his witness statement, and (b) submitted that given the usual roll call of senior individuals involved – Mr Hussain, Mr Kanter, Mr Chamberlain, Mr Egan and Mr Scott – the Court should infer that the two Capax Discovery/UBS purchase orders fell within the general authorisation given by Dr Lynch for VARs to be used as placeholders, to enable the improper recognition of revenue, as and when required.

942. It was for the Claimants to use their time as they saw fit: whilst not endless it was sufficient. It is understandable why they should have decided not to devote any part of it to crossexamining Dr Lynch on a subject on which he had given no evidence. But the result was that Dr Lynch had no opportunity to traverse or set in a kinder context, the particular features of VT28 and VT34 and either to explain them or contradict the Claimants' case that he was aware of them.

943. The question is whether, because the Claimants did not cross-examine Dr Lynch on the particular transactions, they are precluded from reliance on evidence put to him and his answers on their general case as to the overall strategy of using VARs as placeholders to enable the improper recognition of revenue and its implementation by way of the pattern; and if not, whether they were able to show in a way which did not call for a fresh response from Dr Lynch that these particular transactions fell into that pattern.

944. It seems to me that the Claimants cannot rely on transaction-specific matters which they did not put to Dr Lynch as evidence of his knowledge. But I do not accept they cannot rely in relation to these transactions, on general matters common, or alleged to be common, to all the impugned VAR transactions and his responses when confronted with them, simply because they were not once again rehearsed by reference to the same basic pattern in these transactions.

945. The Claimants had plainly and repeatedly put their general case to Dr Lynch on his "guilty knowledge"; that he presided over and encouraged the strategy and encouraged its implementation in the way disclosed by the pattern. He had ample opportunity, which he took, to seek to explain why if there was any pattern, none of the features said to reveal and comprise it were such as to make revenue recognition improper, and that in any event he was well removed and was not told and did not see anything such as to fix him with knowledge of impropriety.

946. In my judgment, it is clear that Dr Lynch did preside over and encourage the implementation of the general strategy; it was not disputed that he had been told and kept informed by Mr Hussain of the fact of these transactions, and the fact that no end -user deal within the relevant quarter had proved possible and that Autonomy had resorted to a VAR. The more difficult question is whether Dr Lynch might have had some basis in fact to dispute that he had knowledge that the particular transactions were "pattern" transactions.

947. In my judgment, the general case fairly put to Dr Lynch included that transactions which (a) were of a size that Mr Hussain was depending on them to meet revenue targets (b) had failed to complete within the quarter (c) were being remitted to a VAR and (d) handled by the 'team' of Mr Hussain, Mr Kanter, Mr Chamberlain, Mr Egan and Mr Scott, were transactions within the strategy, and would follow the pattern. By now, in 2011, he had seen it all so often before. I have concluded that Dr Lynch had "guilty knowledge" of the improper recognition of revenue from VT28 and VT34.

948. I would add, however, in case I am wrong in that approach or conclusion, that:

  (1) Whether or not Dr Lynch had "guilty knowledge" of VT28 and VT34 has not affected at all my analysis of his knowledge in respect of the other impugned VAR transactions.

  (2) Although individually large, the sums involved are not such as would affect my ultimate decision as to the value of Autonomy at the date of the Acquisition or the price that HP would have paid.

## PART III OF SCHEDULE OF IMPUGNED VAR TRANSACTIONS

949. In this Part III of this Schedule, I address the VAR transactions comprising the parts into which a very large composite deal with BofA (or subsidiaries of BofA) was split in circumstances described below. Two (VT16 and VT21) were with Capax Discovery and two (VT23 and VT24) were with DiscoverTech.

### The Bank of America ("BofA") transactions: VT16, VT21, VT23 and VT24

950. In Q3 2010, Autonomy began working on a very large deal with BofA, described by Mr Hussain in emails to Dr Lynch as *"the big one"*, with an aggregate value of some $20 million. This was not concluded in Q3 2010: but it became a vital part of Mr Hussain's planned route to achieving the forecast of US revenues of $45 million in Q4 2010. In comments on an email dated 31 October 2010 from Mr Egan (which was sent to him and Mr Mooney but also circulated to Mr Scott and Dr Lynch) he stressed its importance (together with another large deal with an entity called Acxiom) as one of *"2 deals that could swing the quarter massively for us"*.

951. The importance of the large BofA deal became a consistent theme of Mr Hussain's communications with Dr Lynch during the quarter. I have taken the following factual summary very largely from the detailed account in the Claimants' written closing submissions:

(1) On 4 November 2010, Mr Hussain sent Dr Lynch and Dr Menell an update on the *"big deals"*. As regards BofA, he said, *"want to do a deal by end of q. will be big"* and that he will *"be chasing"*.

(2) On 7 November 2010, Mr Hussain sent a group revenue update to Dr Lynch and others. His update identified the *"key deal"* as being BofA at circa $10 million to $20 million.

(3) On 8 November 2010, Mr Hussain emphasised to Mr Mooney (copying Dr Lynch) that getting the pricing proposal to BofA as soon as possible was the *"most important thing we should be doing"*.

(4) Mr Hussain provided further updates to Dr Lynch (and others) on 10 November 2010, 11 November 2010, and 14 November 2010. In an update on 17 November 2010 sent to Dr Lynch and Dr Menell, Mr Hussain expressed concern about Mr Egan's management of the deal and said that he (Mr Hussain) personally would focus on it *"as this is key for q"*.

(5) By 19 November 2010, Mr Hussain told Dr Lynch that the figure for the licence fee was currently between $24-26 million and that BofA "*seem to be very engaged*".

(6) In an email dated 20 November 2010 (circulated to Dr Menell, Mr Kanter and Mr Chamberlain), Mr Hussain reiterated that "*BofA and VMS are the key to the quarter*".

(7) On 2 December 2010, under the subject heading *"More positive update",* Mr Hussain told Dr Lynch: "*BofA – accountants and lawyers to sit in a room on Tuesday. Deal is definitely on*".

(8) By 7 December 2010, Mr Hussain informed Dr Lynch that he was including $17 million in revenue from BofA during the quarter, and that three days of discussions with BofA had been scheduled.

(9) On 9 December 2010, Mr Scott asked Dr Lynch to approve a memorandum setting out the contemplated terms. Dr Lynch gave his approval in principle that day (stating *"This looks fine to me in principle if people have done their homework on the details*"), adding a comment on the cost structure.

(10)    On 17 December 2010, however, expectations of a Q4 2010 deal were pegged back after Mr Egan was told by Mr Vince Debban of BofA that the agreement would not receive the requisite internal approvals in time for it to be concluded in 2010. Mr Egan's email to Mr Hussain stated, "*I don't know what to say*". Mr Hussain raised the matter with Dr Lynch and replied to Mr Egan suggesting a form of messaging that Mr Egan should adopt with BofA, describing the deal as a "*massive opportunity for the bank*" which could not be repeated in 2011. Mr Egan's response was despondent, stating *"...but you do realize that that's it. It is not really a matter of finance being unwilling. We have watched exceptional process unfold for 10 days. You saw it first hand."* Mr Hussain's reply to that was:
            *"We have to beg and beg again.*
      *We can't have the same deal next quarter."*

952. The urgency and importance ascribed to trying even at this stage to get revenue which could be recognised within the quarter was reflected in Mr Hussain's request on 18 December 2010 that Dr

Lynch and others join an "*All hands call today*", and in the activity afterwards to try to reinstate the deal:

(1) Mr Hussain again proposed messaging to BofA to the effect that there could be no deal in 2011 in the same form as the deal then under consideration, because Autonomy's auditors would require such a deal in 2011 to be disclosed and explained. Notably, Mr Hussain asked Dr Lynch whether this accounting point passed Dr Lynch's "*smell test*".

(2) Dr Lynch replied the same day, "*I would avoid using words auditor and audit*" and instead suggested different messaging:

> "*More: as previously disclosed to the market we are increasing and restructuring disclosure and this will set an unworkable comp under this new model, so this Is [sic] a unique point in time to do this deal*".

(3) Mr Hussain prepared a draft email for Autonomy's BofA deal team (which he copied to Dr Lynch), outlining the proposed message to BofA, and invited comment. The draft email, which stated in the subject heading "*Possible email that can be forwarded to the BofA team…*" and was obviously drafted for BofA's consumption, commenced in terms loyally reflecting (with a little bit of translation) the high-pressure "now or never" message that Dr Lynch had suggested:

> "*I realize that the BofA team is having some difficulty in getting all approvals in time for 2010, but I have to stress to you that this deal is not possible for us to sign in Q1 2011. As Autonomy has previously disclosed to the equity market we are increasing and restructuring our accounting disclosure in 2011, and doing the deal in 2011 will set an unworkable comparative under this new model. So this is a unique point in time to do the deal. Our additional disclosure of a "commitment" figure in 2011 will show major movements in a 2011 BofA deal which we will need to disclose and explain – and we won't do this.*"

It then set out various figures to try to persuade BofA that, on analysis, it would not actually be committing (net) more than $10.5 million, and asked for one last effort to "*get the deal over the line*". Mr Hussain

continued to keep Dr Lynch apprised of his efforts with BofA on 19 December 2010 and 20 December 2010.

953.   These efforts were unsuccessful. On 21 December 2010, Mr Ronald Johnson of BofA emailed Mr Hussain:

> *"Thank you for the note. Andy* [595] *and I both spent several hours on this late into the day yesterday. We met with Tom Korzik and decided collectively that because the entire deal structure was being re-written, the approval is actually against the full $48MM transaction. Even from a "complete transparency" perspective, we all felt like we would want the full leadership team to be aware of our activities.*
>
> *...*
>
> *We aren't able to give you an official response this morning but to be very honest, this is a long shot given the holidays and the number of educational conversations that would need to occur. The leaders at the top of our house frown on these last minute transactions. The perception they have of us is one of unorganized and no process rigor. Accordingly, this might be the right thing to do for BAC, just the wrong timing"*.

954.   Mr Hussain forwarded the news to Dr Lynch, stating only *"Oh s\*\*t"*.

955.   Even then, the Defendants were not yet ready to give up. On 21 December 2010, Mr Hussain emailed Mr Egan (copying Dr Lynch) telling him *"I spoke to ron [of BofA] – he was just out of the shower, not really happy to hear from me"* and suggesting that *"Stouffer reaches out to Carol [of BofA] for one last try even if we get a smaller deal it might be worthwhile"*. That same day, Dr Lynch prepared a draft email intended for BofA which stressed that the transaction *"has to be done this quarter as it requires us to take an option on some excess capacity which is not possible next year"* and stated that, *"at the last minute we have unexpectedly hit a bureaucratic hurdle"* because the relevant finance person at BofA was on holiday. The draft email requested advice on how to overcome the issue. Later

---

[595] Possibly Mr Andrew McGowan of BofA. Mr Korzik, I assume, was part of BofA.

that day Dr Lynch sent the email to Mr Simon Mackenzie-Smith. Mr Mackenzie-Smith was Head of BofA in London.

956.   Later still, in the evening of the same day, Mr Egan forwarded to the Defendants an email he had sent to BofA recording that Mr Hussain had authorised "*a further $2M reduction in the license fee currently on offer for execution in 2010*". Mr Egan observed,

> "*I'm on the roof but will stay away from edge until we hear back.*"

957.   Dr Lynch accepted in cross-examination that Mr Hussain, for his part, was also in a state of high anxiety as to whether the potential BofA transaction would be concluded.

958.   On 22 December 2010, Dr Lynch continued his correspondence with Mr Mackenzie-Smith, saying that he "*would great[ly] appreciate any subtle help*" that Mr Mackenzie-Smith could give to the matter.

959.   It seems, however, that BofA had concerns "*over the value of the licenses and does this deal pass the smell test*". Mr Egan sought to address this by sending BofA an email (dated 23 December 2010) with a note emphasising that "*the answer is yes absolutely*" but pointing out that the deal "*must be thought of as a Program not just a 'Client Access License' purchased*" and explaining (interestingly[596] in the context of the Claimants' 'Hosting case', as to which see the Hosting section in the main body of this judgment) that the benefits of the purchase of the licence which the deal entailed included (primarily) the following:

> "*1.    $73m without the deal; $48m with the deal*
>
> *2.    $19m license fee is offset against the volume and delivery credits, so its **$10m net new** investment to **access** the savings. For this BAML gets unlimited software plus lower fees.*

---

[596] By way of very brief explanation, this is interesting in the context of the 'Hosting Case' because the essential claim in that part of the case is that the licence sold as part of what was termed a "*hybrid hosting solution*" (which had two elements, (i) a licence to software and (ii) hosting services) was presented and accounted for as conferring a right separate from the advantage it also brought in terms of reduced data storage fees. That accounting treatment enabled immediate recognition of the revenue from the licence fee whereas if the licence could not properly be regarded as separable, the revenue from its sale would be lumped together with the revenue from hosting services, and would be required to be spread over the length of the hosting contract. The interest of the explanation given to BofA is that the licence is described simply in terms of offering access to savings, and there is not a whisper in the headline description of its separable value. That would support the Claimants' case that the licence was an accounting artifice and the revenue recognition of fees from its sale was improper.

> 3. *A 50% reduction in archiving costs which come from massive lowering of archiving fees and supervision services for free + no expense on the 900tb legacy data…"*

(Emphasis as in original)

960. On 28 December 2010, Mr Hussain forwarded to Dr Lynch an email which suggested the odds of getting the deal approved by 31 December 2010 were 50/50.

961. On 29 December 2010, with the quarter end fast approaching, Mr Krakoski emailed Mr Hussain stating that he had put calls and emails into BofA but that it was all quiet: "*Will advise on activity as soon as they [BofA] surface*". Mr Hussain forwarded this email to Dr Lynch, adding only the observation "*Almost unbearable!!*".

962. On 30 December 2010, Dr Lynch continued to make direct contact with senior individuals at BofA in the hope of concluding a deal. On 31 December 2010, Mr Mackenzie-Smith responded, "*I have emailed my colleagues in the US plus UK to give this one last push. Fingers crossed*". Dr Lynch forwarded this response to Mr Hussain.

963. However, on 31 December 2010, Mr Debban of BofA stated that an agreement would not be executed that day. Mr Hussain thanked the BofA team for their efforts and asked whether even part of the deal could be approved as a favour. Nothing eventuated.

964. As a result, there was a significant gap in revenue that needed to be filled.

*Splitting up of the BofA deal into smaller pieces sold to VARs*

965. It was the unchallenged evidence of Mr Egan that, when it became apparent at the very end of the year (2010) that no BofA deal would be signed during Q4 2010, Mr Hussain instructed Mr Egan to break down the deal into smaller pieces and sell the pieces to different VARs. That was necessary because of the size of the overall deal: it was too large for any single VAR (including MicroTech) to take on alone. The splitting up of the deal and the resort to VARs were plainly expedients to generate recognised revenue in Q4 2010 to cover the shortfall left by the failure to close the BofA transaction. Dr Lynch accepted in crossexamination that he knew that, prior to 31 December 2010, no VAR had been involved in Autonomy's negotiations with BofA, though he sought to distinguish this from

other VAR deals, stating that *"Obviously we did other things with them…"*.

966. VT16 and VT21, together with VT23 and VT24, comprised these "smaller pieces" which were parcelled out amongst the selected VARs, namely Capax Discovery and DiscoverTech:

> (1) VT16 was originally a VAR transaction in September 2010 between Autonomy and Capax Discovery in respect of which the named prospective end-user was Amgen. Ultimately, Amgen dropped out [597] and was substituted by BofA.

> (2) VT21 was a VAR transaction in December 2010 between Autonomy and Capax Discovery in respect of which the named prospective end-user was Merrill Lynch, which had become a subsidiary of BofA in January 2009 (in the wake of the financial crisis precipitated by the collapse of Lehman Brothers).

> (3) VT23 and VT24 were sales by Autonomy to DiscoverTech for end-user BofA. Much as in VT16 and VT21, the software sold to DiscoverTech in VT23 and VT24 was ultimately sold by Autonomy to BofA as part of the overall BofA transaction.

967. These constituent elements of the BofA transaction were, in a sense, corralled together by the introduction of a "lead reseller" namely, MicroTech (see further below). MicroTech acted, in effect, as the conduit for Capax Discovery and DiscoverTech to be paid their respective shares from Autonomy's direct sale to BofA.

968. Looking forward in the story, when (as had always been intended) Autonomy eventually concluded a direct deal with BofA in February 2011 (which included the software that it had parcelled out to the selected VARs) arrangements were made to ensure that the selected VARs received what they would have received had they themselves on-sold to BofA (though in fact it was never intended that there should be, and there never was, any enduser sale by any of the selected VARs).

---

[597] VT16 was originally a separate transaction concluded before Autonomy entered into initial discussions for the deal with BofA. It originally had nothing to do with the BofA transaction. It only became part of it when Amgen dropped out and was substituted by BofA in respect of the purchase of software specified in VT16. Autonomy then concluded a direct deal with Amgen in Q4 2010 for different software, rubric *"OT 3"*, *"Repurposed"* (see below) as a BofA deal, VT16 then became a constituent element of the overall composite BofA arrangements.

969. Thus, under the direct agreement between Autonomy and BofA, it was provided that payment was to be made to Autonomy or its designated payee. Autonomy designated MicroTech as its payee, and BofA then paid the total $19,500,000 licence fee (minus an early payment discount agreed of $500,000) to MicroTech rather than Autonomy. MicroTech then paid out $10,000,000 to DiscoverTech and $9,000,000 to Capax Discovery.

970. As a result, Capax Discovery received (via MicroTech) in the case of each of VT16 and VT21 a share of the aggregate amounts paid by BofA, much as if it had on-sold the software it had acquired under its VAR transactions to BofA. Likewise, DiscoverTech received its share (via MicroTech) as if it too had on-sold to BofA.

971. The reconstituted, large composite direct deal which Autonomy eventually completed with BofA in February 2011, and which included a further restructuring of BofA's Digital Safe hosting arrangements, was of an aggregate value of some 8.9% of reported revenue in Q1 2011.

972. Although all four VAR deals came together as summarised above, I shall adopt the same basic approach as the Claimants, and focus first on the Claimants' allegations in respect of VT16 and VT21, which I deal with in tandem, albeit that those two transactions took place in different quarters of 2010, whereas VT21 was contemporaneous with VT20 (as to which see paragraphs 842 to 866 above).

973. Accordingly, I first address the Claimants' basis for impugning VT16 and the Amgen deal as it was originally conceived. I then explain the Claimants' allegations relating to how that deal was *"re-purposed"* and became part of the complex arrangements for the ultimate sale to BofA (which brought in VT21) and for the parcelling out of the BofA sale proceeds to all the three VARs concerned in VT16 and VT21. I then discuss the Claimants' allegations in respect of the cancellation of any further payment obligation on the part of Capax Discovery under VT16 and VT21, and also the controversy concerning the payment of two sets of MAFs to Capax Discovery (and also to DiscoverTech). After that, it will then be necessary for me to deal with certain features of the DiscoverTech transactions, VT23 and VT24.

974. It will also be necessary to consider the issue of 'guilty knowledge'. The Claimants contended that the size and importance of these deals, and especially of the composite BofA deal for which (on the Claimants' case) they were the interim arrangements, is evident from and commanded the particularly close personal involvement of the Defendants.

### VT16: the original Capax Discovery/Amgen deal in more detail

975.   VT16 and the background to its *"repurposing"* can be summarised as follows. In Q3 2010, Autonomy was hoping to sell a software licence to Amgen (see paragraph 966(1) and footnote 80 above). The deal was a large one, and important to Autonomy in terms of revenue requirements for the quarter. However, despite offering Amgen a discount to close the deal within the quarter, on 30 September 2010 Amgen's Chief Information Officer, Mr Tom Flanagan ("Mr Flanagan") emailed Mr Egan (who was handling the matter, though Mr Hussain was also closely involved) to say that they could not do the deal in that quarter but could in the next. That email was forwarded by Mr Egan to Mr Hussain, and also to Dr Lynch (who had been sent an earlier email also, and who accepted in cross-examination that he *"may have known something"* about the deal, though he denied any involvement in the negotiations or other details).

976.   In order to recognise revenue in Q3 2010, Autonomy, with the usual urgency, engaged Capax Discovery (through Mr Baiocco) to act as a VAR right at the end of the quarter. On the same day as Mr Flanagan's email and at Mr Egan's request, on 30 September 2010 (the last day of Q3 2010), Capax Discovery issued a purchase order with a licence fee of $9,000,000 plus one year's support of $450,000, for on-sale to end-user Amgen. Dr Lynch accepted in cross-examination that he knew that Autonomy resorted to Capax Discovery in order to obtain recognised revenue on a purchase order issued before the end of the quarter (though as usual he intimated he became aware only after the event, which I do not accept).

977.   The purchase order stated that Capax Discovery was to pay 10% of the purchase order price ($945,000) within 30 days, i.e. by 30 October 2010, with the balance to be paid in two tranches of $4,252,500 within 90 and 120 days respectively, i.e. by 29 December 2010 and 28 January 2011 respectively. Unusually, the purchase order expressly gave Capax Discovery qualified permission (expiring after 12 months) to sell to another end-user if a sale to Amgen could not be completed. Otherwise, the purchase order was on the terms of the June 2009 Capax Discovery VAR Agreement summarised in paragraph 60 above.

978.   After issuing the purchase order, Autonomy continued its negotiations with Amgen. Capax Discovery was not involved at all. The Claimants contended that, consistently with the 'pattern' common to the impugned VAR transactions, there was never any intention that Capax Discovery should participate in negotiations with the (then) prospective end-user in any way, and certainly it never did so.

979. VT16 then took an atypical turn. Revenue having been recognised in respect of it, it was, in effect, moth-balled (or as it was put *"repurposed"*) to be brought out of the cupboard as part of the composite BofA deal. In the meantime, Autonomy entered into a direct but different deal with Amgen in December 2010 for a total of $14,882,076: but this was made up largely (as to $11,382,076) of hosting and servicing fees; the licence fee was much less: $3,500,000. The Claimants called this the *"other Amgen transaction"* with the rubric "OT 3", and they alleged that "OT 3" was also accounted for wrongly, not by reference to any VAR involvement but because it was (so they alleged) wrong to recognise revenue up-front in respect of the deal in Q4 2010: I address this separate and differently based allegation in the section in the main body of the judgment that deals with the "Other Transactions". Thus, VT16 had in a sense two incarnations: and both are illustrative of Autonomy's use of 'friendly' VARs.

980. In the present context, the following aspects of VT16 and its *"repurposing"* are of particular interest in terms of the 'pattern' asserted by the Claimants:

   (1) What Deloitte and the Audit Committee were told about the circumstances of VT16 and the subsequent negotiations with Amgen: it being the Claimants' case that both Deloitte and the Audit Committee were given a very different impression as to what the respective roles of Capax Discovery and Autonomy were to be in the transaction than was in fact the case, and were thus misled.

   (2) The substitution of BofA in place of Amgen as the intended end-user, and its presentation as the *"re-purposing"* of VT16, which provided a mechanism to ensure that Capax Discovery was not left "holding the bag" in respect of its payment obligation under the VT16 purchase order.

   (3) The justification advanced for payment of a MAF of nearly $1 million.

   (4) The backdating of the documents recording and providing for the substitution of BofA *vis-á-vis* Capax Discovery.

   (5) Deloitte's understanding of the transaction (including the *"repurposing"*).

*Whether the VAR's role in respect of VT16 in its first incarnation was misrepresented to Deloitte and the Audit Committee*

981. As regards the first of those contentions (see (1) in paragraph 980 above), Mr Baiocco's unchallenged evidence [598] in his witness statement was that Capax Discovery *"had no involvement in the negotiations with Amgen, which were conducted by Autonomy both before and after Capax Discovery issued its purchase order."* There is no evidence that Capax Discovery participated at any time, or in any way, in Autonomy's efforts to reach an agreement with Amgen.

982. The Claimants relied on Deloitte's report to the Audit Committee for Q3 2010 to support their case that this was not the impression given to Autonomy's Audit Committee. That report included the following statement (which I infer was based on information supplied by Autonomy):

> *"This is a $9.0 million Digital Safe licence deal sold to this end-user via the value added reseller Capax Discovery LLC ("Capax"). Autonomy have introduced this customer to the value added reseller in order for them to carry out the professional services implementation work required to migrate Amgen from EAS mail to DS mail. On the basis that Capax are up-to-date with their payments on the majority of the Eli Lilly sale discussed in Q2 2010, management has concluded there are no concerns over recoverability that would impact revenue recognition."*

983. The Claimants relied also on Mr Bloomer's responses as to his understanding of this statement (and in particular, its second sentence):

> *"Q. So you were told that Autonomy had introduced Amgen to Capax Discovery, yes?*
>
> *A. Yes.*
>
> *Q. And that is what you understood at the time?*
>
> *A. Yes.*
>
> *Q. You were told that Capax Discovery had agreed with Amgen that Capax Discovery would carry out professional services implementation work for Amgen, yes?*
>
> *A. That was the implication of this, yes.*

---

[598] Dr Lynch was asked in cross-examination whether he had any basis to dispute this evidence: he confirmed he had not, adding *"I'm not involved at that level"*.

> *Q. It would have been your understanding that Capax Discovery would be the entity selling to Amgen, yes?*
>
> *A. Well, based on the introduction from Autonomy, there was clearly an implication that Autonomy may have done the sale or agreed with Amgen [what] they wanted a reseller to do – my understanding was that the resellers did the professional services which Autonomy didn't do and hence this one where Autonomy have agreed a sale but there's a reseller needed so they've introduced Capax to do that role. That was my understanding of this one.*
>
> *Q. Yes, the first sentence says that the licence has been sold via Capax, so your understanding would have been that Capax was the entity in the relationship with Amgen, yes?*
>
> *A. Certainly that the bill was going to go to Capax, the invoice, and then the invoice from Capax on to Amgen, but the fact of the introduction, my recollection at the time was that Autonomy had the relationship with Amgen but that there was a reseller needed to do professional services and Autonomy introduced Capax to fill that role, and therefore the sale went through Capax. That was my recollection at the time.*
>
> *Q. And if Capax never had any dealings with Amgen in relation to this transaction at any time, that would have been contrary to your understanding, yes?*
>
> *A. If Capax never had –*
>
> *Q. Any dealings at all with Amgen?*
>
> *A. That would have been surprising given this commentary here.*
>
> *Q. Yes. And it would have been something that it would have been relevant for you to know, yes?*
>
> *A. I'd have wanted to know that to have the discussion both with management and the auditors about the transaction as a whole."*

984. Even taking into account Mr Bloomer's suggestion that Autonomy's introduction of the VAR might have been with a view to the VAR providing services to the end-user in due course (which I do not think he can have taken to be a sufficient contribution of itself), he plainly took the statement to mean that Capax Discovery was always the party at interest and that the objective was always an end-user sale by Capax Discovery to Amgen.

985.   The Claimants' case, which I accept, was that neither was the reality. The truth which was not told was that the sale to Capax Discovery was not intended to, and did not, make any difference to the negotiations carrying on between Autonomy and Amgen with a view to a sale by Autonomy directly to Amgen. In this first incarnation of the deal (as indeed in its second, after it had been *"repurposed"*) Capax Discovery was always intended to be entirely passive, with the assurance of some mechanism at the end of the day to release it from liability or give it the means of its discharge, and (as its rationale from Capax Discovery's viewpoint) the expectation of a handsome reward for its passivity. The perceived necessity to obscure (at best) the truth tells its own story against those responsible within Autonomy for misleading Deloitte, and through Deloitte, Autonomy's Audit Committee.

986.   The Defendants sought to blunt the effect of this by presenting the intent and fact of a VAR's engagement (or not) in negotiations with the end-user as immaterial in determining whether the sale to the VAR qualified for revenue recognition. They relied especially on Mr Bloomer's evidence in the course of his re-examination, as follows:

> *"Q. Did you understand from your discussions with Deloitte whether there was any requirement that Autonomy itself must not negotiate with the end-user after the VAR deal had been entered into? A. No, not at all.*
>
> *Q. Did you understand from your discussions with Deloitte that there was any requirement that the VAR itself must conduct negotiations with the end-user?*
>
> *A. No, not necessary."*

987.   However, that evidence did not answer why an accurate presentation had not been made to the Audit Committee; and nor did it properly address, let alone neutralise, the real point. Even if non-participation by the VAR in negotiations for an onward sale might not of itself demonstrate lack of substance, or no passing of risk or control for the purposes of IAS 18.14, the position is very different if the truth is that the VAR was to have not only no role but no interest, because the negotiations were not for a sale by it but for a direct sale by Autonomy. That would be a strong, usually determinative, manifestation of the reality that the VAR had not assumed any risk nor acquired any control of the goods, and its contractual obligations to Autonomy would be covered, not by onward sale proceeds, but by or via Autonomy itself (whether out of the proceeds of a direct sale by it or otherwise). Further, any remaining argument that even this might not be fatal if Autonomy

could be said to be acting as the VAR's agent or quasi-agent would be disposed of if, as was also the case, the negotiation was not for an onward sale by the VAR, but the direct sale as principal by Autonomy for which Autonomy had always negotiated.

988.   I have concluded that the role of Capax Discovery in VT16 (in its first incarnation) was not properly represented to the Audit Committee (or to Deloitte), and the fact that it was not gives rise to the inference that those responsible in Autonomy knew that the reality had to be disguised in order to obtain approval for the revenue recognition that was required.

989.   That conclusion is fortified by at least one email: the one I have in mind was sent by Mr Hussain to Mr Egan and Mr Mooney dated 8 October 2010 stating that Capax Discovery were *"obviously... heavily involved"* which seems simply to be contrary to the facts. Such pretence invites enquiry as to why it was thought necessary. Of course, Mr Hussain might have offered a different interpretation had he given evidence: but he did not.

*The "re-purposing" of VT16 and its second incarnation*

990.   The second aspect of VT16 of particular note concerns the steps taken by Autonomy, after Autonomy had made a different deal with Amgen and Autonomy wanted to set up a separate deal with BofA for the purchase of the same software as was covered by Capax Discovery's original VT16 purchase order, to ensure that Capax was not left "holding the bag" in respect of the payment obligation under the VT16 purchase order.

991.   The need for such steps was particularly acute because (despite its overall value) Autonomy's direct sale to Amgen for a licence fee of $3.5 million left a considerable shortfall of some $5.5 million on the original VT16 deal (in which the licence fee was $9 million). Something had to be done if Capax Discovery was not to be "left on the hook" or "left holding the bag" for at least the shortfall, even if Autonomy accounted to it for the full amount of the revised Amgen deal: and in fact, under the direct deal between Autonomy and Amgen, Amgen was to pay the fees to Autonomy, not Capax Discovery. As the Claimants put it the question was:

> *"How, then, to provide for the payment of the $9.45 million Capax Discovery order?"*

992.   Mr Baiocco's unchallenged evidence was that Autonomy decided to do what it first called a "swap":

> *"Mr Egan told me that Autonomy had decided that this transaction would be replaced with one relating to*

> *[BofA], in what I recall Mr Egan described as a "swap" deal involving the cancellation of our Amgen deal and its replacement with a BofA deal."*

993. This swap was dictated by Autonomy. The introduction of BofA was entirely at the instance of Autonomy. BofA was Autonomy's customer. Capax Discovery had not had any dealings with BofA regarding any potential sale of Autonomy software. Mr Baiocco's evidence to this effect was not challenged.

994. Mr Egan explained the *"re-purposing"* or "swap" in his witness statement in these terms:

> *"In January 2011, Mr. Hussain asked me to determine how payments that were to be made by Bank of America under our then-anticipated deal with Bank of America could be used to fund payments by the VARs to Autonomy on their "at risk" deals with Autonomy. This gave me an opportunity to solve the problem of getting money to Capax Discovery to allow it to satisfy its payment obligation under an "at risk" deal for Amgen (in the total sum of $9.45 million) as enduser done in Q3 2010. Autonomy drafted a letter for Capax in which Capax requested that its license to sell software to Amgen be converted to a license to sell software to Bank of America. The price remained the same. Capax then signed, and Autonomy approved, that request."*

995. It seems clear that within Autonomy there was some uncertainty as to what this required and entailed. Mr J. Livius Guiao ("Mr Guiao"), an Autonomy lawyer who was tasked with preparing a draft of the letter that Mr Egan had in mind, sent the letter to Mr Chamberlain, under cover of an email dated 18 January 2011 copied to Mr Scott which stated:

> *"Attached is a draft letter from Capax to AUTN, requesting that we approve 'replacement' of the Amgen PO with a PO for BofA. Note, I left the amount blank, as I am not quite sure as to the overall structure of what we are doing."*

996. Evidently, Mr Baiocco did not know quite what was happening either. On 25 January 2011, Mr Egan asked Mr Baiocco to sign and return the letter. The letter was dated 31 December 2010. Mr Egan said: *"Please sign, as is, and importantly scan vs fax[599] (i'm on a*

---

[599] The Claimants ascribed this stipulation to an intention to backdate: *"The problem with a fax, of course, is that it would immediately have revealed the fact that the letter was backdated."*

*plane) and email return*". Mr Baiocco wrote back to Mr Egan seeking clarification as to the effect of the letter:

> *"So once I sign this.*
>
> *I no longer owe Autonomy for Amgen/*
>
> *I will still get the 950k sales referral fee?*
>
> *I will then owe Autonomy 9.5 for B of A? This is on top of the deal we sold/did 12/31/10 for around 2 mil."*

997. Thus, Mr Baiocco (who seems from the email hardly have been able to believe it) wanted assurances that Capax Discovery would no longer owe Autonomy and yet be paid the 10% MAF (i.e., "950K") for his Amgen purchase order. His reference to the $2 million 31 December deal was a reference to Capax Discovery's Merrill Lynch purchase order (VT21) described later. His understanding at that time was that his obligation to Autonomy would then be in respect of the BofA transaction, rather than the Amgen transaction: not that it appears that he minded, so long as any risk was removed and his commission payments were safe.

998. Mr Egan responded, "*No you will not owe au for bofa. I will call you when I land. Wait till then.*" Later that day, Mr Chamberlain clarified the position in an email to Mr Egan and Mr Guiao:

> "*Livius is correct, They are repurposing. They will absolutely owe the cash for the $9.45m. They are selling to BofA instead of Amgen but the $9.45m must be paid.*"

999. On 26 January 2011, Mr Baiocco sent Mr Egan some questions about the proposed swap which also demonstrate both his focus on his commission and confusion as to the nature of the legal position as regards Capax Discovery's obligations:

---

> "*Upon signature Autonomy will provide me the letter of release on Amgen (ala Kraft) immediately? We will get the PO for the commission/payable in 2 weeks or whatever you stated.*
>
> *We will get a PO from Microtek for the full amount of both deals for B of A. We will get commission for B of A signed on 12/31. Po?*
>
> *Why the 30 days payment guarantee?*"

1000. Mr Baiocco then signed and returned the letter that Autonomy had drafted for him. On 26 January 2011, Mr Egan forwarded a copy of the signed version to Mr Scott and Mr Chamberlain. The signed version, as noted above, bears a date of 31 December 2010, even though it was only drafted in mid-January 2011 and signed on 26 January 2011. It stated:

> *"As you know, Capax Discovery LLC ("Capax") and Autonomy, Inc. ("Autonomy") are parties to that certain Value added Reseller Agreement dated as of May, 2009 (the "Agreement"). Pursuant to such Agreement, Capax submitted to Autonomy a purchase order dated September 30, 2010, relating to Capax' resell of certain Autonomy products to Amgen, Inc. (the "Amgen Purchase Order").*
>
> *Capax hereby requests that Autonomy agree to cancellation of the Amgen Purchase Order, subject to Autonomy's acceptance of this letter, which shall serve as a purchase order from Capax for Autonomy products to be provided to Capax by Autonomy and resold by Capax to Bank of America, N.A. The amount payable for such Autonomy products shall be US $9,450,000.00, invoiced immediately and due and payable from Capax within thirty (30) days from the date of such invoice. For avoidance of doubt, this letter shall serve as a purchase order from Capax in the aforementioned amount, which shall be governed by the terms of the Agreement.*
>
> *Please sign below and return an executed version of this letter to Capax, to acknowledge agreement by Autonomy to the terms set forth above."*

1001. It was put to Mr Egan in cross-examination that the substitution of BofA as end-user in place of Amgen "*took place in accordance with that contractual term*", namely the term of the Capax Discovery/Amgen purchase order that permitted Capax Discovery to sell the licence to an alternate licensee if no end-user deal eventuated within 90 days. In my view, this letter cannot be regarded as involving an exercise by Capax Discovery of its contractual right under its Amgen purchase order dated 30 September 2010.

1002. The provision in the Amgen purchase order which gave Capax Discovery a qualified right to sell the software licence to a different end-user was in the following terms:

> *"Notwithstanding anything herein to the contrary, in the event the [sic] Amgen fails to issue a contract, award, or order within ninety (90) days of the Effective Date by*

> *which it licenses the Autonomy Software Products and procures the Maintenance Services otherwise described hereunder, VAR shall have the right, upon written notice to Autonomy, to sublicense the Autonomy Software Products and distribute the Maintenance Services to an alternative end-user ("Alternate Licensee"), subject to the terms hereof ... Notwithstanding the foregoing, VAR's right to sublicense and distribute the Autonomy Software Products and Maintenance Services to an Alternate Licensee shall expire twelve (12) months from the Effective Date hereof, and VAR's failure to sublicense the*
> *Autonomy Software Products and distribute the Maintenance Services to an Alternate Licensee during said period shall not relieve VAR of its obligations hereunder."*

1003. The purchase order thus posited a situation where Capax Discovery, having failed to persuade Amgen to buy, might, after 90 days, find someone else willing to buy the licensed software. What happened here was very different. In summary:

   (1) During the initial 90-day period, Capax Discovery made no attempt to sell to Amgen. Instead, during that period, Autonomy sought to sell to Amgen.

   (2) Indeed, Autonomy was successful in achieving a sale of the licensed software to Amgen during the initial 90-day period, resulting in the direct Autonomy/Amgen deal dated 21 December 2010, albeit for a much lower licence fee;

   (3) Autonomy then found an alternative buyer of Autonomy software, namely BofA.

   (4) Autonomy drafted a request (backdated to 31 December 2010) from Capax Discovery to cancel the Amgen purchase order and treat the letter as a new purchase order for end-user BofA at the same price and for the same products.

   (5) Though Mr Baiocco was not sure what it all meant, Capax Discovery followed Autonomy's directions and signed and sent that request.

1004. The Defendants did not fully explain their attempts to present the "swap" or "repurposing" of VT16 as effected pursuant to the provision mentioned. It was not clear to me what point Dr Lynch thereby sought to make. I have deduced that it was in order to

present the substitution of BofA to Deloitte and the Audit Committee as being at the instance and pursuant to a legal entitlement on the part of Capax Discovery, rather than as an *ad hoc* means of funnelling funds to Capax Discovery to enable it to pay Autonomy. It appears to have been of importance to Deloitte that it should so appear, and it seems that Deloitte accepted the presentation: see further below. In my judgment, the fact that such disguise was perceived necessary tells against the Defendants. The reality was that far from involving the exercise by Capax Discovery of its contractual rights, this episode involved Mr Egan honouring the assurance he had given to Mr Baiocco at the outset: namely, that in the absence of an end-user deal that made Capax Discovery whole, then Autonomy would find a different buyer of the software and slot Capax Discovery into that different deal. BofA was, in Mr Egan's language, the "*backfill*" to ensure that Capax Discovery was not left "*holding the bag*" in relation to its Amgen purchase order.

1005. The mechanism thus adopted met its objective of covering Capax Discovery's exposure and safeguarding the recognition of revenue from VT16 in its first incarnation. The broad effect was that Autonomy proceeded with its smaller sale to Amgen, repackaged the software sold under VT16 and sold it to BofA as part of the composite deal, and thereby held Capax Discovery harmless.

1006. Thus, in the event:

(1) As explained below, Autonomy ultimately concluded the larger composite deal with BofA on 9 February 2011 and designated MicroTech as the payee under that deal. On 11 February 2011, Mr Guiao then drew up the invoice for MicroTech to send BofA, as well as (among other things) a purchase order for MicroTech to submit to Capax Discovery.

(2) BofA paid $19 million to MicroTech, which then paid $9 million to Capax Discovery (the remainder going to DiscoverTech).

(3) On 4 March 2011, Mr Baiocco wrote to Mr Guiao stating:

> "WE have received the monies into our account from the B of A deal. Can we please get all the necessary paperwork in place to close this out?
>
> 1    Executed letter we sent requesting replacement of Amgen purchase with BOFA.
>
> 2    relief letter for 450k you have received direct.
>
> 3    our sales referral commission letter for 945k."

(4) The reference to a "*450k*" was to the support and maintenance component of the original Amgen purchase order, as to which Capax Discovery was to receive "*relief*", i.e. release of indebtedness. Mr Baiocco also wanted Capax Discovery's $945K "*referral commission*" in respect of the deal even though Capax Discovery had made no referral.

(5) On 7 March 2011, Autonomy Inc issued a credit note to Capax Discovery, dated 28 February 2011, for $450,000. Mr Baiocco queried whether the credit note should refer to BofA rather than Amgen. Upon being reassured by Mr Scott, Mr Baiocco asked whether he would get a copy of the "*executed amgen BOFA swap letter back*". Mr Scott raised that issue with Mr Kanter, asking whether it was "*OK to send back to him?*" Mr Kanter's reply was, "*If Sushovan is happy with the transaction and the accounting treatment, the language of the letter is fine*". The signed swap letter was then sent to Mr Baiocco. Evidently, therefore, both Mr Kanter and Mr Hussain – as well as Mr Scott, Mr Chamberlain and Mr Egan – were kept informed of what was happening *vis-à-vis* Capax Discovery.

(6) On 15 March 2011, Mr Scott informed Mr Chamberlain and Mr Hussain that Capax Discovery had not yet paid the $9 million due on the backfilled-BofA purchase order and said "*I think that they may be holding it up because they want a MAF associated with the Amgen/BofA transaction*".

(7) On 18 March 2011, Mr Chamberlain emailed Mr Egan, Mr Hussain and Mr Scott, subject "*Capax*", to say, "*Need to resolve today. They owe $9m on BofA deal which is stalled. Joel – did MT pay Capax or do MT still hold the BofA funds?*". Mr Scott replied that MicroTech had paid Capax Discovery, and Mr Egan added that "*Capax wants to pay us*". Mr Egan then suggested that the reason for non-payment was that Mr Baiocco "*does not have clear instructions on whether to deduct MAF or expect separately*". Mr Chamberlain replied by email which Mr Egan then forwarded to Mr Hussain:

> "*Stouffer – let's be very clear here. I have no wish other than getting my $9m, I have not agreed any MAF.*

> *Any MAF will only have been discussed with John by you and it will need SH to be onboard. From my perspective he owes me the $9m."*

(8) In his email dated 24 March 2011 to Mr Chamberlain, Mr Baiocco stated "*We have received the monies from the BofA deal. I will work on getting them to you.*" Mr Egan responded the same day, "*Please send us invoice for the 10% of the original invoice amount and please wire the gross BofA amount to us. We will turn around your invoice immediately*".

(9) Mr Chamberlain drew the issue to Mr Hussain's attention: "*need you to approve the $945k commission to Capax for BofA/Amgen. As I indicated earlier he is holding our $9 million payment pending resolution of this issue*". The Claimants submitted that the oddity of Capax Discovery, which had effectively been relieved of a very substantial obligation and did nothing whatever to effectuate either the Amgen or the BofA transaction, nonetheless holding out for a near $1million marketing assistance fee would be glaring, if one were not aware of the "*handshake agreement*". However, Mr Baiocco was doing nothing more than insisting that the handshake agreement be honoured; and it was.

(10) Capax Discovery then paid the $9 million – which Capax Discovery had received from MicroTech – to Autonomy in discharge of its obligations to pay licence fees of $9 million under what had originally been the Amgen purchase order.   It was not left "*holding the bag*".

1007. On the Claimants' case, that was a principal [600] point of the manoeuvring. They submitted that, far from involving an exercise by Capax Discovery of its contractual rights, the episode demonstrates the extent to which Mr Egan and those concerned within Autonomy's management would go to honour the assurance that underlay all the impugned VAR sales that the VAR would not be left "holding the bag".

1008. The Defendants accepted that the wording of the *"re-purposing"* letter was *"clumsy, in the way that it described a cancellation of the original purchase, and the treatment of the letter as a fresh purchase order"*: but, they countered that the fact remained that

---

[600] See below for the other main objective served which was to support the appearance of the software covered by the VT16 purchase order being sold by Capax Discovery to BofA, whereas in fact Autonomy sold the same software directly to BofA.

Capax Discovery was entitled to redeploy to a different end-user under the original purchase order, and the letter should be treated as recording the implementation of that right, and not the cancellation of the purchase order itself (which was never intended).

1009. Dr Lynch explained this further in the course of his cross-examination, emphasising that nothing that was done affected the recognition of revenue at the point of sale to the VAR:

"*My understanding…is that the original deal wasn't cancelled and the revenue was left in the original area.*

*What happens in this deal is that the American office doesn't understand this process under IFRS, and so it produces this form of letter. But actually the auditors completely understand the process that's gone on here and it's mentioned in the audit committee pack and explained to the audit committee.*

*The basic principle – I don't know what the technicalities are about whether you consider a PO cancelled or not, but the basic principle is the deal is not cancelled. So the deal – the transaction which was done at the time with Capax, that revenue stays in the books. What actually happens is that the software – and this was an explicit term of the deal – is actually dealt somewhere else, but there's no new revenue recognised or put in the books. So there's no actual transaction as far as Autonomy is concerned.*

*The transaction as far as Autonomy is concerned was with the sale to Capax originally and all that is happening is that Capax stock is being given to MicroTech/Bank of America. As I say, it's covered in quite a lot of detail, I understand in the audit committee pack from Deloitte.*

*Q. Capax became involved in the Bank of America deal because Mr Egan had used Bank of America as backfill to ensure Capax got paid for its Amgen purchase order?*

*A. I wouldn't use the word "backfill". What it is is that Capax had stock and Mr Egan introduced the Bank of America opportunity and they could sell that stock to Bank of America, which was written explicitly in their deal.*

> ...
>
> *Q. In fact 9 million gets paid to Capax as the proceeds of the Bank of America deal and that 9 million is then used to discharge Capax's debt under the purchase order for a different customer, Amgen, correct?*
>
> *A. Correct, but as Deloitte make absolutely clear, Autonomy's deal is with the reseller, the reseller is the customer. What then happens to that software, especially if there's a clause that explicitly allows it to be sold to anyone, is really not Autonomy's business."*

1010. I address Deloitte's involvement later. In the meantime, it seems to me that Dr Lynch put forward a well-worked summary of the theoretical mechanics, premised on the notion that the true intention which was lost in the inaccurate drafting by the American office of the *"re-purposing"* letter was that Capax Discovery should continue, after the *"re-purposing"* as before, to be liable to Autonomy under the original Amgen purchase order, and not under the substituted BofA deal. However, the practical realities undid the theoretical analysis.

1011. As I have explained above, the reality is that Capax Discovery never had anything to do with BofA, either before or after the "repurposing". The deal was simply fed to it: Mr Baiocco simply had to sign and willingly did so once satisfied that Capax Discovery's obligations had been dealt with and it was going to receive the nearly $1 million as a MAF.

There is nothing to support Dr Lynch's apparent belief that BofA's requirements were satisfied out of stock held by Capax Discovery, and there is no evidence of delivery by Capax Discovery to BofA. As noted previously, software is easily and infinitely capable of being reproduced; and Autonomy simply had to press a button on Automater to deliver what BofA required. Dr Lynch's analysis did not address the reality or the true intention, which was that Capax Discovery should be and was released from liability because it was (albeit indirectly) relieved of it by Autonomy.

1012. In summary as to this aspect, in my judgment:

> (1) The idea and impetus for the *"re-purposing"* came from Autonomy, and it was Autonomy which provided a ready-made end-user deal into which Capax Discovery was insinuated.
>
> (2) This achieved two objectives. One was to hold Capax Discovery harmless from exposure in the Amgen deal.

The other was that in its second incarnation, VT16 could be (as it was) used to present the sale on to BofA of the software described in the VT16 purchase order as a sale by Capax Discovery, whereas in truth it was a direct sale by Autonomy (see further below).

(3) The suggestion that the "re-purposing" was effected pursuant to the exercise by Capax Discovery of a right under the original purchase order was made for presentational reasons but lacked any basis in fact or law.

(4) The fact that a false presentation was perceived to be necessary, even though in the particular circumstances there was, to my mind, a more basic justification for taking steps to release Capax Discovery in respect of a purchase order (in that by its direct sale to Amgen, Autonomy had cut out Capax Discovery and destroyed the prospect of the intended end-user by reference to which Capax Discovery had issued its purchase order), is a measure of the concern of those involved within Autonomy about Deloitte's warnings that any pattern of direct deals would be likely to upset revenue recognition of VAR deals, and the determination to adopt a mechanism which did not fit and reveal that pattern.

(5) Mr Baiocco's acceptance of a solution which also appeared to secure the MAF which was the real focus of his interest is an illustration of the passive and subservient role played by Capax Discovery and the other 'friendly' VARs in all the impugned VAR transactions.

*MAF*

1013. As regards the MAF, on 25 March 2011, Mr Chamberlain informed Mr Hussain: "*Good news. The $9m is in. Need to get approval on the MAF now. Please advise*". Mr Hussain replied, copying Mr Kanter, "*Approved. Per our agreement 10% on the invoiced amount after cash is received. I spoke to stouffer*".

1014. An internal discussion then followed between Mr Hussain, Mr Chamberlain and Mr Egan as to whether the correct amount of the MAF was $900,000 (10% of the $9 million licence fee) or $945,000 (10% of the total amount originally payable under the $9.45 million Amgen purchase order, albeit that Autonomy subsequently credited Capax Discovery for the $450,000). On 29 March 2011, Mr Hussain informed Mr Chamberlain (copying Mr Egan and Mr Kanter), "*Stouffer will be sending an email for confirmation which andy and i will need to approve but it is $900k*".

1015. On 29 March 2011, Mr Egan wrote to Mr Kanter and Mr Hussain regarding "*Final MAF for Capax*", stating:

> "*I wanted to submit for approval the MAF to Capax for their involvement in the BofA deal. It is a standard 10% fee identical to the terms an [sic: as] past MAFs paid for similar channel involvement and value add for a deal in which they added considerable value.*
>
> *We received payment in full early as well.*"

1016. This was, at best, formulaic. The "*channel involvement*" was a euphemism for signing a contract and awaiting release from it, with no active participation by the VAR in the enduser deal. Nevertheless, Mr Hussain gave his approval for the MAF the same day (29 March 2011), stating, "*Ok We have received the cash from capax*". Mr Chamberlain forwarded Mr Hussain's approval to Ms Harris, noting "*Need approval from Andy*". Mr Kanter must have given approval because, on 1 April 2011, ASL paid the $900,000 fee.

1017. Some months later, on 14 July 2011, Alex Jackson of Deloitte asked Mr Chamberlain about the invoice for the $900,000 fee: "*Do you have a bit more info on this, exactly what Capax did/will do in respect of marketing etc ... and where this is living on the balance sheet/P&L*". Mr Chamberlain's response was, "*Believe this is included in marketing fees. Relates to their assistance on managing the BofA relationship*". This was untrue. Capax Discovery had done nothing to manage Autonomy's BofA relationship.

1018. The Audit Committee was informed simply that "*VARs from time to time provide goods and services to Autonomy in areas such as marketing assistance...During the quarter Autonomy has paid Capax....$0.9 million for marketing assistance services in managing the Bank of America relationship...*". Mr Bloomer told me that he would have assumed that Capax Discovery did provide some form of services and was being paid this fee in accordance with the master agreement between Capax Discovery and Autonomy. The assumption was natural; but false.

1019. Although he maintained that he was not asked to approve these payments, and would not have known about them, Dr Lynch nevertheless rejected any suggestion that the MAF payments were improper:

> "*Q.   I suggest you knew it was improper to pay Capax a fee here which was being paid to enable Autonomy to recognise revenue prematurely.*

> *A. No. And the other thing that we mustn't lose sight of in all of this is these are real deals. So this software is sold, it's sold through a reseller. Ultimately it ends up with an end-user who install it and thousands and thousands of people across the world use it, and we get paid against the revenue. And so there's absolutely nothing improper here. The fact that the structure of these deals is that the onsale is done at the same price as the purchase means that the MAF model is used to give the reseller in effect the margin that keeps them part of the ecosystem and gives them a reason to do business with Autonomy. Every software company I know in the world runs that model just as they run the mark-up model as well."*

1020. This defence of MAFs in general was stated with apparent conviction; but it focused on general practice in contexts where VARs were actually performing a service, not on the particular case, where they had performed none. It did not explain why it was thought necessary to pretend that Capax Discovery had played a part in the BofA deal which it had not played, added *"considerable value"* when it added none, provided marketing services which it had not provided, secured a deal which it had done nothing at all to negotiate or secure, and arranged payment to Autonomy *"early"* which had nothing to do with it.

1021. Mr Egan's justification for paying a MAF on the basis that Capax Discovery had *"added considerable value"* was plainly contrived. As Mr Kanter and Mr Hussain would have known, Capax Discovery had not been involved in the BofA deal. It had added no value, let alone "*considerable value*", to the BofA deal. The fact that Autonomy received payment "*early*" had nothing to do with Capax Discovery: the timing of payment was the result of Autonomy's direct deal with BofA, which (via MicroTech) put Capax Discovery in funds to pay Autonomy.

1022. Dr Lynch sought to sweep this aside, much as he had swept aside a similar pretence in the context of VT10 (Capax Discovery/FSA) as having *"made too much of the language of the emails"*, but he offered no answers and ultimately relied on his assertion that he was not personally involved anyway. I would tend to accept that 'gilding the lily' in justifying large commission payments is a commonplace of commercial life, but in the context, and all the circumstances here, it is a further illustration of a disturbing culture within the management of Autonomy and an unsettling and unsatisfactory approach to disclosure on the part of Dr Lynch himself.

*Backdating?*

1023. I have considered whether the backdating of the *"re-purposing"* letter may be another illustration of this culture. The Defendants did not seek to contradict the fact that the *"repurposing"* letter stated on its face an incorrect date (31 December 2010); and it is not disputed that the letter was not drafted until 18 January 2011.

1024. The Claimants submitted that the backdating was intentional, and in a somewhat obscure passage of their closing submissions, appeared to suggest that when asking Mr Baiocco to sign and return the letter on 25 January 2011 Mr Egan's covering email, in stating *"Please sign, as is, and importantly scan vs fax (i'm on plane) and email return",* sought to disguise the fact, suggesting that the *"problem with a fax, of course, is that it would immediately have revealed the fact that the letter was backdated."*

1025. The Defendants did not accept the suggestion that this was dishonest backdating (as distinct from an error). They pointed out (*inter alia*) that (a) the letter was drafted by Mr Guiao, an Autonomy lawyer in the US and when Mr Guiao sent the draft to Mr Egan it already bore the date of 31 December 2010, (b) the reason why Mr Egan asked Mr Baiocco to scan rather than fax the signed version was the reason stated in Mr Egan's email: he was on a plane (and presumably could not receive a fax), and (c) the dating of the letter was irrelevant to revenue recognition: the revenue in respect of this sale had already been recognised on the Q3 2010 sale to Amgen and was not going to be recognised again. Further, backdating would have implicated both Mr Guiao (a lawyer against whom no suggestion of impropriety was made) and Mr Baiocco: and Mr Baiocco was clear in his testimony that he never thought he was engaged in anything fraudulent (or criminal). Further, no reason for backdating was suggested.

1026. I am not satisfied that there is sufficient evidence of intentional backdating of the *"repurposing letter".* That is so even though it is also a relevant consideration that in other contexts (and in particular, the Vatican Library deal and the Prisa deal) I have concluded that management did backdate documents dishonestly, Mr Egan admitting to remorse and anxiety in that regard.

*Deloitte's understanding of the transaction*

1027. As is apparent also from his evidence as quoted in paragraph 1009 above, Dr Lynch placed some considerable reliance on the fact that Deloitte were well aware of the salient features both of the original VAR sale and its *"re-purposing"* and were content that it did not affect revenue recognition at the point of the original sale to the VAR for the purposes (then) of the anticipated Amgen deal.

1028. The Defendants' case in more detail was that:

(1) Deloitte reviewed the original sale to Capax Discovery for end-user Amgen, took notice of the clause permitting a change of end-user, and were satisfied with the revenue recognition, treating Capax Discovery as the customer.[601]

(2) They were aware of the switch to enable Capax Discovery to sell to BofA instead of Amgen, as apparent from Deloitte's Q1 2011 report to the Audit Committee:

> *"We note that a licence previously sold to Capax Global in Q3 2010 for onsale to Amgen ($9.5 million), has been re-assigned in the quarter to enable a sale by Capax Global to Bank of America, as part of the large Q4 2010 revenue deal previously reported to the Audit Committee. No revenue has been recognised on the reassignment of this licence and the outstanding receivable has been received during the quarter."*

(3) Deloitte were given a breakdown so that they understood how the Amgen-BofA repurposing fitted in with the other amounts in the large BofA deal, in which Capax Discovery was not the only reseller involved.

(4) As explained at greater length below, Deloitte also specifically understood and represented in the Q4 2010 Audit Committee report, (a) that the BofA deal was going through MicroTech as the lead reseller which would be the direct seller to BofA, (b) that as of Q4 2010 there was not yet a BofA purchase order, and (c) that the same software that would ultimately be purchased by BofA had been sold to both Capax Discovery and DiscoverTech.

(5) Deloitte were also aware of payment of the MAF to Capax Discovery, following the repurposing of VT16. Deloitte understood the commercial

---

[601] It should be noted that the Claimants appeared to be advancing a separate complaint that the software in the Q3 2010 Amgen transaction was the same as in an earlier Q2 2010 Amgen transaction. This was the subject of an assumption that Mr Welham was asked to make. This proposition was factually incorrect. The correct position was explored with Mr Welham. He accepted that the assumption was wrong and that the conclusion that he had reached on the basis of the false assumption needed to be revised. This point was not taken up with Dr Lynch in his cross-examination.

position, and the revenue remained as recognised under the Q3 2010 agreement. Deloitte were satisfied that the revenue was properly booked.

1029. In short, the Defendants sought to stress that Deloitte knew all the material features of the transaction: and (they added) more than Dr Lynch could ever have known. Yet, contrary to the Claimants' case, Deloitte had no problem with the transaction, or the recognition of revenue. On the Defendants' case, if Deloitte were the Defendants' conscience, it would be clear.

1030. The approval of Deloitte, if given on a properly informed basis, is obviously, in this context as in all other contexts calling for accountancy assessment and judgment, a powerful point in the Defendants' favour.

1031. However, the Claimants sought to turn the point against the Defendants by demonstrating critical areas in which Deloitte (and the Audit Committee) were misinformed or misled, arguing that the impropriety (as they saw it) of the transactions was easily illustrated by what was kept back or misrepresented, and at the same time undermined reliance on Deloitte's approval. I have concluded that there is force in the Claimants' point both in theory and in application.

1032. As to sub-paragraph (1) of paragraph 1028 above and the initial VAR sale (VT16 itself), I have already referred in paragraphs 981 to 989 above to the way that the Audit Committee were misled by Deloitte's report to the Audit Committee for Q3 2010, and in that context inferred that the report was based on misleading information provided to Deloitte by Autonomy. In my judgment, that is sufficient to undermine the Defendants' position that they did, and were entitled to, rely on Deloitte's approval of the transaction.

1033. In the particular context of the *"re-purposing"* or reincarnation of VT16, the Claimants contended that both Deloitte and the Audit Committee were materially misled. Although told of the money flows for the omnibus or composite BofA deal, the Claimants contended that neither Deloitte nor the Audit Committee were told that all of the VAR deals, including the Amgen deal, had been replaced by direct deals between Autonomy and BofA without any participation on the part of the VARs (except, in the case of Capax Discovery, signature on a pre-prepared letter). They drew my attention to Mr Hussain's memorandum to the Audit Committee for Q1 2011 (copied to Dr Lynch) which made no mention of the direct deal that had been concluded during that quarter. It simply stated:

> *"In q4 the Bank of America deal ($21m) went through two 8A partners and £19.3m cash has been received."*

1034. Mr Welham's evidence was that Deloitte did not appreciate that VT16 (and also the other component parts of the overall BofA deal, VT21, VT23 and VT24) *"had been replaced by a direct deal between Autonomy and BofA"*.[85] Mr Hussain's email as quoted above certainly did not reveal that.

---

[85] In Deloitte's Defence in the FRC proceedings, Deloitte's understanding was stated to be that *"DiscoverTech and Capax were to sell these licences to Microtech, which would sell them to Bank of America. In this way,
Bank of America would be able to contract with a s8A accredited business (MicroTech). In addition, in Q1
2011, Capax sold to Bank of America the $9m licence it had acquired from Autonomy on 30 September 2010 (at*

1035. The picture is less clear in respect of the overall BofA deal. An email dated 15 April 2011 from Mr Chamberlain to Mr Welham had attached a copy of the direct agreement between Autonomy and BofA of 8 February 2011, which Mr Chamberlain had provided in response to a request from Mr Welham asking for *"the final agreement for the Bank of America deal…"* to assist in his efforts to *"work back to cash receipts, what we recorded in Q4 as revs and taking account of the old Amgen deal with Capax"*. Further, in the same email thread, Mr Chamberlain set out the amounts to be paid to the VARs concerned in respect of the BofA deal (including $9m to Capax Discovery).

1036. The Defendants contended, and Mr Miles put to Mr Welham in cross-examination, that having been provided with the BofA agreement, and the relevant numbers, Mr Welham had the information disclosing the fact of a direct deal, even if he had not appreciated its full import at the time. The Defendants took from all this that Mr Chamberlain and Autonomy would legitimately have considered they had properly disclosed the arrangements and were entitled to rely on Deloitte's approval: it was not their fault if Deloitte misunderstood the position.

1037. Mr Welham agreed that he had been provided with this, but nevertheless maintained that the information did not, to his mind at the time or now, disclose a direct deal in its true sense. By this I took him to mean that it did not disclose that in reality the VARs were entirely by-passed by Autonomy, and received payment to make good the deal they had lost, rather than for a contract by them for onward sale. Mr Welham acknowledged that the agreement between Autonomy and BofA included a *"designated payee"* provision, which provided an explanation of the payments to the VARs (as he also acknowledged); but at the time he had taken the payments to connote that the VARs were actually involved in

negotiating and concluding the sales and would supply the software to Bank of America via MicroTech, so as to distinguish the position from true direct deals (an example of which, he suggested, was the Capax Discovery/Kraft deal).

1038. A further factor to be taken into account is the evidence of Mr Bloomer as to the Audit Committee's understanding. He too assumed that it was the VARs who would supply the software and that their deals with Autonomy remained in place.[602] He did not understand that Autonomy was negotiating and contracting directly with BofA to the exclusion of the VARs. He made the further point that in any event a direct sale did not:

> *"rule out the revenue recognition at the original point as long as you meet the relevant accounting tests at that point and have the right to the goods passed, its collectability and so on…"*

1039. That is a useful reminder, as it seems to me, that the ultimate question is whether risk and control passed under the original sale by Autonomy to the VAR: a subsequent direct sale

---

*that time, for onward sale to Amgen). No additional revenue was of course recognised by Autonomy in respect of Capax's sale to Bank of America. An agreement was signed between Autonomy and Bank of America on 8 February 2011, which contained a provision that enabled Bank of America to submit a purchase order to*
*Microtech, as intended. In due course, Autonomy received the due payment from the relevant VARs (Capax and DiscoverTech)."*

does not alter revenue recognition unless the fact and circumstances of it demonstrate that the original sale had no substance and/or that the sale to the VAR did not result in any substantive change in the way Autonomy conducted itself with respect to the software it had 'sold'. Looked at in that way, it seems to me that what Mr Welham and Deloitte really meant was that they did not understand the agreement between Autonomy and BofA to signify that the original sales to the VARs were a dead letter, because they continued to assume that the VARs would be the suppliers of the software to BofA (under what was, in effect, an umbrella agreement reached by Autonomy).

1040. In my judgment, the question is not whether Deloitte and the Audit Committee should have understood from the material with which

---

[602] Unlike the usual position, it seems likely that because of the need for an 8A supplier (which was the reason for MicroTech's introduction as *"the lead reseller who has the overall contract with Bank of America"*) Deloitte thought that MicroTech would actually be supplying the software as an approved 8A supplier to BofA. (There is no doubt that BofA accepted MicroTech as an 8A supplier.)

they were provided that Autonomy had dealt with BofA as if its original sales to the VARs could be ignored. It is whether they understood that, contrary to what would be the natural assumptions, (a) Autonomy, in making the various agreements, never had any intention that the VARs should have any say in dealings thereafter with the software licences apparently sold to them; (b) that in reality, the onward sale to the end-user of the software nominally sold to the VARs was exclusively negotiated and contracted by Autonomy with full effective control, and not the VARs, and (c) that the VARs received not the proceeds of onward sale, but compensation from Autonomy in lieu of it; in other words, that software was parked with VARs and dealt with and disposed of by Autonomy.

1041. In my judgment, Deloitte and the Audit Committee were likely to and did make the assumption that the VARs were in control of the sale process and were in a real sense the sellers and suppliers of the licences required first by Amgen and then by BofA in its place, and were misled accordingly.

**VT21: Capax Discovery/Merrill Lynch: Q4 2010**

1042. VT21 was, notionally at least, a VAR transaction with Capax Discovery for end-user Merrill Lynch, an affiliated company of BofA, for a licence fee of $1,830,600 (which included a two-year support and maintenance fee). It too was a constituent part of the big overall BofA deal: that was the real deal. The purchase order was, as usual, issued under the June 2009 Capax Discovery VAR Agreement, summarised in paragraph 60 above.

1043. The Claimants' criticisms of VT21 and their contention that it lacked any real substance focused principally on the following:

> (1) The extreme haste of the transaction, showing that Capax Discovery had no input into, or time to measure the risk of, the transaction before signing, and was simply given a purchase order prepared by Autonomy to sign;

> (2) The fact that Capax Discovery was not intended or expected to, and did not, have any involvement at the time, or make any contribution thereafter;

> (3) The fact that Capax Discovery did not meet any of the instalment dates for payment, was never pressed to pay on the relevant dates, and in the end, made no payment to Autonomy at all, before ultimately being released from its payment obligation altogether;

(4) The fact that the software apparently sold to Capax Discovery for onward sale was always intended to be sold directly by Autonomy to BofA when the BofA sale which had been broken into smaller pieces was reconstituted;

(5) The fact that Capax Discovery's liability under the original Merrill Lynch purchase order was released, and that such release was effected as part of what the Claimants depicted as a concerted *"clean-up exercise"* that occurred after the HP acquisition was announced and whilst *"crucially"* (they said) Autonomy remained in control of its finance function in Q3 2011 (which during HP's later investigations became known, and which the Claimants labelled, as the *"Dark Period"*)[603];

(6) The payment of a MAF of $183,060 for "assistance" which Capax Discovery had never in fact provided, and which the Claimants submitted could only have been for Capax Discovery's willingness to act as a placeholder so as to enable Autonomy, wrongfully, to recognise revenue on what, in this instance, was a revenue acceleration transaction.

1044. As to (1) in the preceding paragraph, VT21 was one of the two transactions (the other being VT20, as described above) which Mr Baiocco said he found *"particularly memorable"* (see paragraph 843 above) because he first learned of a potential BofA/Merrill Lynch transaction on the afternoon on New Year's Eve when staying at a hotel in Pittsburgh to watch a professional hockey game. He recalled that he had signed purchase orders prepared by Autonomy for each of the two transactions shortly before midnight that very last day of the quarter (Q4 2010), New Year's Eve. As regards VT21, there can have been no time for Capax Discovery to assess the prospective end-user sale, what the software comprised (which was Zantaz Supervisor S6) and what opportunities for servicing it might offer, or whether, and if so how, it could assist or add any value at all as a VAR. The Claimants submitted that this, together with Autonomy's own frantic resort to Capax Discovery, demonstrated clearly the pattern they asserted, and the true character of the entire transaction as a 'placeholder' arrangement involving no real sale, no substantive transfer of risk, and the substantive retention by Autonomy of the managerial control of the goods sold.

---

[603] Mr Baiocco's unchallenged evidence was that in the period from August to September 2011 Autonomy issued credit notes to Capax Discovery totalling $21.6 million.

1045. As to (3) in paragraph 1043 above, Mr Baiocco's evidence, which was not challenged, was that though Autonomy did invoice Capax Discovery, Capax Discovery did not pay any of the fees stated in the Merrill Lynch purchase order on the instalment dates, or at all. The Claimants submitted that this further demonstrated the lack of substance and the real attributes of a substantive sale.

1046. As to (4) in paragraph 1043 above, I have already explained that, with the *"repurposed"* VT16, and also VT23 and VT24 (which I describe later), the quartet of VAR deals and the superimposition of MicroTech, were all pre-packaged *"smaller pieces"* of the overall BofA deal (see paragraphs 965 to 974 above). In each case, the software notionally sold was parked with the VAR awaiting onward sale to BofA by Autonomy under a direct deal. That left each VAR with no autonomy, no control, and nothing to do.

1047. As to (5) in paragraph 1043 above, the Claimants contended that it was not until 26 August 2011 that Mr Chamberlain informed Ms Ku that "*we need to credit the below invoices as we have now invoiced directly*" and referred to the two invoices issued under the Capax Discovery/Merrill Lynch purchase order. The same day, Autonomy issued two credit notes for $915,300 each to Capax Discovery, thereby cancelling the entirety of the amount stated

to be due under the Merrill Lynch purchase order. Mr Scott sent copies of the credit memos to Mr Baiocco that day. The Claimants depicted all this as plainly improper, done to "clean up" Autonomy's accounts in the period of time following the announcement of the HP acquisition on 18 August 2011 during which Autonomy retained control of its accounting function and was safe from scrutiny because it was not subject to quarterly review in Q3 2011 either by Deloitte or by the Audit Committee.

1048. The Defendants sought to meet these criticisms of VT21 on the same grounds as in other impugned VAR transactions and rejected as irrelevant and misplaced the dark interpretation of its aftermath urged by the Claimants. They contended that:

> (1) The introduction of a VAR at a late stage when an end-user sale stalled at a late stage was not objectionable, provided the VAR went on risk and that risk was not qualified or negated by side agreement or understanding. The Defendants' position in this, as in every one of the impugned VAR transactions, was that the VAR (in this case, Capax Discovery) was indeed on risk: the VAR agreement unequivocally stated so, and Mr Baiocco accepted that Capax Discovery was on risk and signed audit confirmations which he provided to Deloitte on 15 January, 6 April and 12 July 2011 expressly confirming

Capax Discovery's liability, that the invoices were proper and due, and that there were no *"side letters or other agreements"*.

(2) Mr Baiocco also confirmed in cross-examination a statement in the Goldberg Segalla letter (see paragraphs 2020 to 2029 in the main body of the judgment) making clear that he regarded the risk as attenuated by the consideration that Autonomy would not want Capax Discovery to go to the wall because Capax was a *"major service and support provider to Autonomy's clients."*

(3) Non-payment did not signify or evidence a side agreement or understanding: simply commercial forbearance on the part of Autonomy. In any event, such post-transaction events did not alter the quality of the VAR transaction or undermine the decision made at the time to recognise revenue, which furthermore, Deloitte approved.

(4) The credit notes issued in August 2011 were justified: they reflected the reality that the Zantaz S6 software purchased by Capax Discovery under the purchase order for resale to Merrill Lynch/BofA had in the event been sold by Autonomy to BofA directly under the arrangements described above and which had been reviewed and approved by Deloitte. The Defendants clarified that it had originally been contemplated that BofA would pay for that software immediately and that its payment would flow through to Capax Discovery via MicroTech. In the event, however, BofA were not willing to pay immediately since they regarded the S6 software as an extension to a licence, which should not be invoiced until a later date. BofA was then not invoiced until August 2011, whereupon soon after the decision was taken to issue the credit notes, resulting in a commercial outcome substantially the same as in the Kraft deal, and equally unobjectionable. Any subterfuge was denied.

(5) The Defendants repeated their general line that no adverse inference that the payment was a reward for enabling improper revenue recognition should be drawn from the payment of a MAF. Such payments were common in the software industry, and something HP itself employed; and Deloitte were aware that Autonomy paid MAFs where the deal went direct and the reseller was being compensated for loss of margin.

1049. Once again, the fundamental problem with the Defendants'
contentions is that they brush over the particular characteristics in
this and (to a greater or lesser extent) all the impugned VAR sales
which mark them out: the Defendants did not face up to the 'pattern'
identified by the Claimants and, in particular, the inconsistency of
this pattern with there being any real substance in the VAR sale or
any substantive transfer of risk and management control of the
licensed software.

1050. Looked at in the round, VT21, like VT16 and the other constituent
packages brought together in the BofA transaction, provided a
striking example of the use of a VAR without any intention or
expectation of any involvement in the negotiation or contract for the
onward sale, which was already pre-packaged, controlled and
intended to be implemented as a direct deal by Autonomy with the
end-user, with the VAR sale having no substance or economic
effect save as a trigger for revenue recognition and as the origin of
a counterobligation in effect imposed on Autonomy to hold
harmless the VAR in the event of some failure of the pre-packaged
deal.

1051. The Defendants' contentions miss their mark because they are
based on a premise of (i) a risk which was in substance illusory and
(ii) intended and actual involvement by the VAR in the control of
the licenced software for the purpose of an onward sale which is
belied by the facts.

1052. Further, VT21 provides another example to negate the suggestion
in the Goldberg Segalla letter that the prospect of future servicing
business was a factor of benefit to Capax Discovery which might
have justified the enormous risk: in only two deals (the TXU and
FSA deals) did Capax Discovery's involvement lead to any
servicing work.

1053. More generally, in my judgment, the Defendants were never able
satisfactorily to answer the two fundamental points, which infected
every aspect of Autonomy's business with its 'friendly' VARs, that
(a) the risk assumed by the VAR (in this case, Capax Discovery, on
New Year's Eve) without any assessment of the prospects of an
end-user sale and no previous relationship with that end-user was
entirely disproportionate unless an assurance which Mr Baiocco
considered reliable had been given that Autonomy would always
find a means of holding Capax Discovery harmless against it; and
(b) at no stage did Capax Discovery ever do anything consistent
with it having more than nominal ownership: it never had or
asserted any control over any onward sell; and it ceded to
Autonomy the exclusive right to negotiate and conclude a deal with
the end-user, not as agent for Capax Discovery or otherwise on its
behalf, but as principal, and it was never involved actively in that

context from the moment of the purchase order until the moment of completion of whatever stratagem the Claimants had adopted to ensure that it was not left on the hook. VT21 was a particularly clear illustration of a VAR acting as placeholder: the real deal was the direct deal between Autonomy and BofA when the constituent elements parcelled out to the VARs were brought together.

### VT23 and VT24: DiscoverTech/Bank of America Q4 2010

1054.  As explained above, the other "smaller pieces" into which the BofA deal was temporarily parcelled up were VT23 and VT24, which were VAR transactions with DiscoverTech (for end-user BofA), both in December 2010.

1055.  Both VT23 and VT24 were, though "smaller pieces" of an even larger overall deal, relatively large deals. VT23 was for a licence fee of $3,675,000 (including support for the first year); and VT24 was for a licence fee of $7,000,000, plus a first-year support fee of $350,000. Although numbered in that way, in fact VT24 preceded VT23, as will be seen.

1056.  In addition to the complex arrangements whereby all the "smaller pieces" were brought together in, or perhaps more accurately, unravelled and replaced by the large direct deal, the following claims by the Claimants in seeking to impugn these VAR transactions require analysis in relation to VT23 and VT24:

> (1) That the VT23 purchase order was backdated by nearly one month in order to capture recognised revenue for the Q4 2010 account;

> (2) That DiscoverTech did not have the ability to pay the purchase price for these large VAR deals if it could not resell the software, and it made no sense for DiscoverTech to have taken such a risk if Autonomy genuinely intended to require DiscoverTech to pay (which the Claimants maintain it never did intend);

> (3) That the DiscoverTech purchase orders for VT23 and VT24 contained misleading language which gave a false impression of DiscoverTech's role in order to justify both its involvement and the substantial payments to it;

> (4) That Autonomy then failed to disclose the direct deal to the Audit Committee and Deloitte and instead misled them into believing that the VARs had achieved their own onward sale to BofA;

> (5) That Autonomy contrived arrangements for the sums payable by BofA under the direct deal to be routed and used to fund payments to Autonomy by the VARs in respect of their obligations under VT23 and VT24 (as

well as VT16 and VT21) so that (according to the Claimants) *"Autonomy's own money was used to pay off debts ostensibly owed to Autonomy by DiscoverTech (and Capax Discovery)"*;

(6) That Autonomy made a payment, purportedly as a MAF, which was improper because DiscoverTech never provided any marketing assistance of any kind.

1057. The allegation of backdating (see paragraph 1056(1) above) concerned the VT23 purchase order, which the Claimants alleged was in fact issued on 25 January 2011 and then dishonestly backdated to show a date of 31 December 2010.

1058. It was not disputed that the VT23 purchase order for an additional $3.5 million (plus maintenance and support of $175,000) was not issued until 25 January 2011, and that until the last moment it was not clear whether the order should come from DiscoverTech or MicroTech. Thus:

(1) According to Mr Egan's witness statement, on 25 January 2011, Mr Egan asked Mr David Truitt (at Mr Hussain's request) whether DiscoverTech would *"take an additional $3.5 million licence…"* (additional, in other words, to the $7 million covered by VT24).

(2) An email from Mr Egan to Mr Hussain and Mr Scott on 24 September 2011 was in terms that suggested that right up to that moment it had not been decided whether to use MicroTech or DiscoverTech for this:

> *"I'll get the signatures. Don't you want the $3.6m from micro tech? Or do you want it through DT as well?"*

(3) By e-mail dated 25 January 2011 Mr Livius Guiao (an Autonomy lawyer) sent Mr Egan *"an additional one-time reseller agreement to be signed by DiscoverTech"* which Mr Egan sent on to Mr David Truitt under cover of a message which stated that:

> *"It will be important that it be signed as is with no additions or modifications late today and scanned and emailed back. This covers the excess amount of the order…"*

(4) Mr Egan's message appears not to have got through because Mr Hyson, DiscoverTech's CTO, sent back a signed version on which he had dated his signature *"25 Jan 2011"*.

(5) Autonomy reacted to this by supplying DiscoverTech with a fresh draft which had the date of 31 December 2010 physically typed into the signature line, which Mr Hyson then signed and returned.

1059. Dr Lynch stated that he was not at all involved in this episode. Mr Hussain gave no evidence; but he was directly and closely involved, as is apparent from the fact that he was  a recipient of Mr Egan's email on 24 January 2011 (see paragraph 1058(2) above) and an email which he sent to Mr Egan, copied to Mr Scott, on 26 January 2011 in which he berated them for delay:

> *"Thought I had made it clear multiple times that I had asked for the amendment and the revenue confirm last night. Nothing received."*

1060. Mr Hussain relied on evidence given in the US criminal proceedings as follows:

(1) Mr Egan gave evidence there to the effect that he thought what was done was unexceptional and *"perfectly legal"* because he believed (and believed that Mr Hussain believed) that it involved in reality only an amendment to an existing purchase order which he considered to be common-place and unexceptionable, and the replacement of the document showing a later date was necessary *"just so there wouldn't be conflicting dates"*.

(2) Mr David Truitt gave evidence that he *"honestly wasn't"* concerned by this because *"it was simply adding to the original deal"*; but it is of some note that Mr David Truitt then continued far more equivocally, suggesting that it did not occur to him that *"this could be a – you know, we're trying to squeeze it in the later quarter scenario"*.

(3) Mr Scott, who was also directly (and he sought to convey, uncomfortably) involved, also gave evidence that he had had concerns, but had been to some extent (but, he made clear, not wholly) reassured by Mr Hussain's assurances that he would be entirely transparent with Deloitte and abide by their view whether the amount in the VT23 purchase order could be allocated as revenue to Q4 2010 or would have to be postponed to Q1 2011.

(4) Mr Welham's uncontradicted evidence, however, was that this was not something of which he was even aware

or had any inkling at the time. Nor was the Audit Committee told anything about it.

1061. In my judgment, the VT23 purchase order plainly was backdated, and those concerned (including Mr Hussain, Mr Chamberlain, Mr Egan, Mr David Truitt and Mr Scott) were aware that it was so. No persuasive justification for what was done was ever put forward. There is no evidence that the VT23 purchase order was intended to correct an error in the VT24 purchase order and/or agreement (which perhaps might have justified what was done). Mr Egan and Mr David Truitt appear to have to some extent persuaded themselves that all that was being done was an expansion of an earlier order and that such a thing was commonplace: but whilst that may be permissible if the amendment is within the same accounting period, I am by no means persuaded that it could be permissible where the amendment is in a subsequent accounting period. Mr Scott was to some extent comforted by the promise of full disclosure to Deloitte: but he had serious misgivings. In the event, Mr Hussain entirely neglected and failed to make good his promise of disclosure to Deloitte.

1062. I cannot accept Mr Hussain's position in his closing submissions that *"there is no indication that Mr Hussain asked anyone to do anything that should be regarded as wrong."* It plainly was wrong: which is no doubt why Mr Hussain did not disclose it to Deloitte or the Audit Committee. In my judgment, Mr Hussain was, by this late stage, so driven by his obsession with meeting revenue forecasts, that he was prone and indeed eager to persuade himself of any justification that seemed arguable, and on this occasion that all that was being done was a correction or amendment to a previous order, which was simply not the case.

1063. I accept that there is no separate or transaction-specific evidence that Dr Lynch was personally involved. When cross-examined on the point, he denied firmly that he was involved. He told me he thought now that Mr Hussain believed it was *"a correction and an amendment to a purchase order for a different quarter"*. But this was speculation uninformed by the evidence. In these circumstances, the Claimants could not do more than to rely on the evidence of Mr Hussain's pattern of consistently reporting to Dr Lynch on revenue targets and how they were to be accomplished, and to invite me to infer from that and from the evidence of Dr Lynch's insistence on overall control that *"Mr Hussain would not have taken this extreme step without authorisation from Dr Lynch".*

1064. The BofA deal of which this was a constituent but individually large element was of prime importance in the quarter; and the BofA deal was a subject of regular report (as noted above). Especially in light

of the size and importance of the BofA deal, the amount involved in the backdated transaction itself ($3,675,000) and the evidence that Mr Hussain kept Dr Lynch continuously updated about it, I consider that the inference the Claimants invite me to draw is justified. I accept that it is considerably more likely than not that Mr Hussain explained the position (and the prescription) to Dr Lynch. Further, if Mr Hussain had truly thought that the additional purchase was a correction to regularise an initial error he would have wished to report its successful resolution to Dr Lynch; if he knew that it was simply a ploy to boost recognised revenue for Q4 2010 which had succeeded he would have wished to share the coup with Dr Lynch. In any event, it was not in Mr Hussain's character as it appears from the evidence available to keep such things from Dr Lynch. I cannot accept Dr Lynch's denial.

1065.   The second point relating to VT23 and VT24 is that Mr David Truitt testified in the US criminal proceedings that, at least without recapitalising the company, DiscoverTech did not have the ability to pay some $7 million if it was unable to resell the software. In other words, it was taking an existential risk. The Claimants contended, and put to Dr Lynch in cross-examination, that it cannot reasonably be supposed that it would have taken the risk if it had not been assured that it would never be called upon to pay.

1066.   Dr Lynch refused to accept this. In rejecting it, he explained why a reseller could well conclude that this was a good risk to buy into. This included that the VAR would know that BofA's regulatory archive was running on Autonomy software, that this would lead to the prospective benefit of repeat purchases (and, he might have added, service opportunities) from a huge bank and could be

> *"actually pretty certain that there would be a purchase from Bank of America [in the] not too distant future…It's actually a pretty good bet for a VAR, this one.".*

1067.   This answer, delivered with Dr Lynch's usual appearance of calm assurance and initial plausibility, is, in my judgment, falsified by the artificiality of the whole arrangement:

(1)  DiscoverTech had no previous dealings with BofA, and it was not intended that it should deal with BofA in any way, certainly prior to the conclusion of the prospective BofA deal (and see further as to this below).

(2)  The deal in prospect was not one to which DiscoverTech would be a party: it was always intended to be, and in the event resulted in, a direct deal between Autonomy and BofA.

(3) The VAR's purchase did nothing to assist it establish or deepen a relationship with BofA which would lead to any further purchases or work: the $10.65 million or more bought it nothing which it could not legitimately hope to benefit from without any such payment.

1068. The notion that the newly incorporated DiscoverTech, or any of the 'friendly' VARs, would have incurred a potentially existential risk in such circumstances without assurances that the risk would be covered by Autonomy, is very difficult to accept, and I do not accept it.

1069. In reaching that conclusion in this as in other contexts concerning impugned VAR transactions, I have taken careful account of the arguments always advanced on behalf of the Defendants that it was plausible for the VARs to subscribe the risk simply relying on Autonomy having proved itself reliable in the past, and on the commercial calculation that Autonomy would never wish or perceive it to be in its interests to *"burn a partner and leave them in the dust"*, as Mr Egan had put it. But I have concluded that this was not the basis on which the VARs proceeded. In my judgment, the understandings between Autonomy and its VARs in these and other impugned VAR transactions went well beyond an expectation on the part of the VAR of loyalty and self-interest on the part of Autonomy. The patterns revealed the real deal: the VAR would co-operate by doing nothing, Autonomy would retain entire control, rescue the VAR if it became necessary, and would never demand payment out of the VAR's own resources.

1070. As to (3) in paragraph 1056 above, the DiscoverTech purchase orders ended with the following language (which had also newly been introduced into Capax Discovery purchase orders prepared by Autonomy in and after December 2010):

> *"Although End-User and VAR currently anticipate entering into such a license transaction, in the unlikely event End-User, instead, enters into a direct agreement with Autonomy or its affiliate to license the Software, then VAR shall distribute the Software to End-User upon receipt of written notice (which may be via email) from Autonomy ("Distribution Notice") of such direct license transaction. In the event distribution is accomplished by reason of a Distribution Notice, upon such time as Autonomy has received payment in full for such license fee and support fee, Autonomy shall pay to VAR an amounts [sic] equal to the license fee paid by End-User to Autonomy less the license fee described in Item 2 above, but in no event more than $816,000.00, as full compensation in connection with VAR's efforts in*

> securing End-User's procurement of a license of
> Autonomy software."

1071. This language was misleading. DiscoverTech did not "*currently anticipate*" entering into a licence transaction with BofA nor was the possibility of a *"direct agreement"* with Autonomy *"an unlikely event"*; Autonomy was the entity negotiating with BofA, and which was to continue negotiating with BofA, without any involvement by DiscoverTech, and with the objective, not of an end-user deal, but of a direct deal, as in due course eventuated. The provision for Autonomy to cover DiscoverTech's costs, together with an uplift, was the essence of the deal: there was never any intention or realistic prospect of DiscoverTech itself generating revenue from an onward sale (since there was never to be one).

1072. This language (also adopted in Capax Discovery purchase orders) was also the first time that a purchase order made any reference to the possibility of Autonomy rewarding the VAR for its involvement. However, it will be noted that what Autonomy was to pay DiscoverTech was the difference (if any) between the end-user's licence fee and DiscoverTech's licence fee, subject to a cap (here $816,000); this was not an agreement that Autonomy should pay $816,000, nor was it an agreement to pay 10% of the end-user licence fee. Furthermore, the purchase order stated that any such amount was to be paid as compensation "*in connection with VAR's efforts*" to secure an end-user sale. In reality, neither Autonomy nor DiscoverTech intended that DiscoverTech should make any such efforts.

1073. In addition to the pretence in the wording of the purchase orders, I have already explained in the context of the *"repurposing"* of VT16, that:

> (1) Mr Hussain's memorandum to the Audit Committee for Q1 2011 (a copy of which was sent to Dr Lynch) made no mention of the direct deal that had been concluded during that quarter. Instead, it stated, "*In q4 the Bank of America deal ($21m) went through two 8A partners and $19.3m cash has been received*".
>
> (2) Mr Welham did not appreciate that the VAR deals had been replaced by a direct deal between Autonomy and BofA. Although it is clear from their working papers that Deloitte were told of the overall structure, including the use of MicroTech and *"other regularly used VARs"* as *"middle men"* in the overall deal, it is also clear that the understanding that Deloitte were given and had was that

the VARs would be expected to be parties to end-users sales.

(3) The Audit Committee was misled into believing that the VARs had achieved their own onward sale to BofA. Mr Bloomer's evidence was as follows:

> "Q. So you would have understood that to mean that the 19.3 million cash had been received from the two resellers with whom the deal had been done in Q4, yes? A. Yes.
>
> Q. Either from their own resources or because they did a deal with Bank of America, yes? A. Yes.
>
> Q. And there's no mention here that in Q1 2011, Autonomy concluded a direct deal with Bank of America?
>
> A. Not on this, and I don't recall that being mentioned at the time
>
> Q. And presumably you were also unaware that under that direct deal, Autonomy designated a third reseller, MicroTech, as its payee? A. No.
>
> Q. Were you ever told that, pursuant to that agreement between Autonomy and Bank of America, Bank of America then paid MicroTech which in turn paid the two VARs: Capax and DiscoverTech?
>
> A. No. That was a level of detail we wouldn't have gone into.
>
> Q. And if that is what had happened, it's not something you would have understood at the time, no?
>
> A. No, as I say, it's a level of detail we wouldn't have gone into at the time.
>
> Q. And you would have remained of the understanding in Q1 2011 that no deals between Autonomy and a VAR had been resigned directly between Autonomy and the end-user, yes? A. Yes.
>
> Q. And no instances of that occurring were drawn to your attention, were they?

> *A. Not that I recall.*
>
> *Q. If that had in fact happened in Q1 2011, that would have been contrary to your understanding at the time?*
>
> *A. Yes."*

1074. The Claimants also contended (see (5) in paragraph 1056 above) that Autonomy contrived arrangements for the sums payable by BofA under the direct deal to be routed and used to fund payments to Autonomy by the VARs in respect of their obligations under VT23 and VT24 (as well as VT16 and VT21) so that (according to the Claimants) *"Autonomy's own money was used to pay off debts ostensibly owed to Autonomy by DiscoverTech (and Capax Discovery)".*

1075. It was Mr Egan's unchallenged evidence that, in January 2011, in anticipation of the direct BofA deal, Mr Hussain asked Mr Egan to determine how the payments from BofA could be used to fund payments to Autonomy by the VARs in respect of their BofA deal-related payment obligations. On 25 January 2011, Mr Egan asked Mr Hussain and Mr Chamberlain, "*Assume you want cash flows to be bofa/mt/dt/au not add another route?*". Mr Hussain did not dissent. The Claimants also contended that "*It is inconceivable, given the size of the amounts involved, that Dr Lynch would have been unaware of the overall plan, whether or not he knew the details."*

1076. Under the direct agreement between Autonomy Inc and BofA, payment was to be made to Autonomy or its designated payee. Autonomy designated MicroTech as its payee, ostensibly because of MicroTech's 8A status. BofA therefore paid the $19.5 million licence fee (minus the early payment discount of $500,000) to MicroTech rather than Autonomy.

1077. The impetus for involving MicroTech plainly came from Autonomy, not BofA. Indeed, on 25 January 2011, Reagan Smith of BofA asked Mr Egan to explain, "*What service, specifically, will they [MicroTech] offer as part of this?*". Mr Egan responded that MicroTech "*are not truly providing a service in the classic sense other than reselling the software*".

1078. As explained by Mr Egan, what happened next is that:

> (1) MicroTech paid $10 million to DiscoverTech.
>
> (2) DiscoverTech paid $9 million to Autonomy (having already paid Autonomy $1 million in January 2011), in substantial discharge of its "*obligation*" to pay licence

Mr Justice Hildyard

HC-2015-001324

fees of $7 million and $3.5 million under VT23 and VT24 respectively.

(3) The remaining $9 million was paid to Capax Discovery and used by it to pay $9 million to Autonomy.

1079. This demonstrates the circularity relied on by the Claimants; but, given the express provisions of the purchase orders, I am not persuaded that these money flows do more than give effect to the provisions ostensibly agreed for the VARs to be compensated in the event of a direct sale. To my mind, a more telling point than the contention that *"Autonomy's own money was used to pay off debts ostensibly owed to Autonomy by DiscoverTech (and Capax Discovery)"* is that the presentation of the composite arrangements, by apparently treating the VAR's obligations to repay as substantive, bolstered (artificially) the notion that the VARs were actually transacting substantive business and undertaking substantial risk. The money flow was a further means of giving substance to the illusion.

1080. In the same context, the Claimants also contended that Autonomy's justification for the introduction of MicroTech was false. Deloitte's working paper records that Deloitte were told that Autonomy had *"chosen to use Microtech, albeit through two separate VARs, to lead and integrate this produce [sic] on behalf of the end-user"* and to avail itself of MicroTech's 8A status. The Defendants queried what Deloitte had been told but accepted that the summary was *"broadly correct"* and that *"BofA were enthusiastic about paying MicroTech as an 8A. MicroTech were also going to provide services and did indeed do so."* The evidence relied on by the Defendants demonstrated acceptance not enthusiasm; and as the Claimants submitted there was no evidence that BofA had suggested the need for an 8A entity to be involved (nor was there), and neither was there evidence that BofA had requested the involvement of the VARs. No reason for this falsity as to the introduction of MicroTech was suggested to me; but, as it seems to me, it justified the payment flows, and assisted their presentation as connoting VAR end-user sales; and that may have been its purpose.

1081. The sixth and last specific criticism of VT23 and VT24 concerned the payment of MAFs to DiscoverTech. As to this, the Claimants' case was that:

(1) Autonomy paid a $1.1 million MAF to DiscoverTech. On 8 March 2011, Mr Egan said (in an email copied to Mr Hussain) that DiscoverTech should be paid a 10% MAF on the $7 million licence fee, a $400,000 fee for *"distribution"*, but no margin on the $3.5 million licence fee.

(2) Mr Hussain was asked for and gave his approval to the $1.1 million MAF, as did Dr Lynch. Dr Lynch said in cross-examination that he approved the payment of this fee "*because it would have been agreed at the time that the deal was done with DiscoverTech*". However, there is nothing in any written contract at the time of these VAR transactions which entitled DiscoverTech to such a fee.

(3) The fee was invoiced as a MAF on 8 March 2011, even though, as both Defendants knew, DiscoverTech had not provided any marketing assistance of any kind.

1082. In all the circumstances, I find it difficult to accept that a payment of a MAF, let alone a payment of some $1.1 million, was justified. When his first answer about a prior contractual commitment failed, Dr Lynch talked once more in cross-examination about encouraging *"our ecosystem of partners"* and of the need to provide them with an *"incentive for doing the business"*. This was unimpressively general; but it is also necessary to consider what the ecosystem and the business being done in it really was. It was not the usual ecosystem: and Dr Lynch's evidence that such fees were common was an exercise in extrapolating a justification from a very different context. Usually, VARs make some sort of contribution. Here, the *"ecosystem"* was comprised of a small coterie of VARs whose contribution was limited to signing paperwork prepared by Autonomy to provide a ticket for revenue recognition. The BofA arrangements provided a particularly glaring example of the inactivity required of them. The incentive was for them to act as placeholders, as they did: that did not, in my judgment, justify payment of a MAF. The basis for payment of a margin or MAF was as set out in the purchase order: it depended on *"VAR's efforts in securing End-User's procurement of a license of Autonomy software."* None of the criteria was met.

*Defendants' alleged knowledge of false accounting in respect of the BofA deals*

*Mr Hussain*

1083. It is clear from the documentary evidence that it was at Mr Hussain's suggestion that the big BofA deal was parcelled into smaller pieces and 'sold' to VARs to be warehoused until the real (BofA) deal could be completed. It was inherent in the objective of the arrangements that the VARs selected should do nothing, and Mr Hussain must have known that. As previously noted, the VARs were never intended to exercise, and never did exercise, any independent right of disposition in respect of the software notionally 'sold' to them. The only real sale of the software took place when the direct BofA sale was concluded. Especially as a

trained accountant and experienced CFO, Mr Hussain cannot have thought that the sales to the VARs had any real or economic substance such as to legitimately warrant revenue recognition.

1084.   Mr Hussain cannot have taken any real comfort from Deloitte's approval. He knew that they did not know that the BofA sale was the only real sale, and that the VARs were not intended or expected to do anything, and never did anything, except wait for payment in due course.

1085.   I find that Mr Hussain had "guilty knowledge" that the recognition of revenue from VT16, VT21, VT23 and VT24 was (in each case) improper.

1086.   Further, I find that in the circumstances set out in paragraphs 1056 to 1061 above, Mr Hussain was aware of and complicit in the backdating of the VT23 purchase order, and that therefore on that ground also the recognition of revenue in respect of VT23 in Q4 2010 was improper.

1087.   Mr Hussain also must have known that in such circumstances the justification put forward for the payment of large sums purportedly by way of MAFs (i.e. that the VARs' assistance had made a valuable contribution), which he personally approved, was without foundation and indeed false.

*Dr Lynch*

1088.   Dr Lynch accepted that he was aware of and involved in the efforts to close the deal with BofA in Q4 2010[604]; but he maintained that he was not involved in or aware of the "smaller pieces" VAR deals, the implementation of the BofA deal after its closing, the payment flows to the VARs, or the MAF payments.

1089.   The Claimants offered very little transaction-specific evidence of his involvement at the operational level and his knowledge, though in cross-examination he did ultimately accept that (a) he *"may have known something"* about Autonomy's efforts to do a deal with Amgen in Q3 2010 and did know that when it could not be closed, Autonomy ended up involving a VAR and recognising revenue on a purchase order from Capax Discovery in respect of VT16; (b) it was *"quite possible"* that he did discuss with Mr Hussain the latter's wish to bring in VARs, and would have had *"no issue"* with that; and (c) no sale to BofA had been closed in Q4 2010 and that instead Autonomy had made sales to VARs. He also explained his understanding to be that *"the stock from the resellers was sold to Microtech as part of this deal."* He explained this further when it was suggested to him that "*Mr Egan had used Bank of America as*

---

[604] including intervening with the head of BofA in London to try and get the deal done.

*backfill to ensure Capax got paid for its Amgen purchase order*".
He answered:

> "A.   I wouldn't use the word "backfill".  What it is
> is that Capax had stock and Mr Egan
> introduced the Bank of America
> opportunity and they could sell that stock to
> Bank of America, which was

> *written explicitly in their deal.*"

1090. He also had to accept that he had approved the payment of the MAF
to DiscoverTech, his position being (at least initially) that he would
have approved it because *"it would have been agreed at the time
the deal was done with DiscoverTech"* and because he was happy
to encourage *"our ecosystem of partners"*.

1091. Apart from this, he repeated that he was not involved at any level
of detail. In particular, when it was suggested to him that Autonomy
negotiated with BofA without any involvement by the VARs, and
that he would have known that they were not involved, he answered
that he would have expected Autonomy to continue to be involved
with BofA, which was a very large repeat customer of Autonomy's;
that he did not know whether or not the VARs were involved in
negotiations with BofA; but that in any event, he would not *"be at
that level of knowledge in any case"*, given that this was taking
place well below his level and in the US with a US subsidiary.

1092. Notwithstanding Dr Lynch's unusual degree of control and
tendency to descend suddenly to micro-manage matters of
particular interest or concern to him, I would be inclined to accept
that the details of who participated in negotiations and when were
not within his knowledge. However, the decision to involve VARs
in the context of an especially large deal like the BofA deal seems
to me to be of a different order, about which I consider he is more
likely than not to have been consulted. Mr Hussain would not have
wished to fragment such a deal and commit to substantial payments
without first consulting Dr Lynch. Similarly, it seems to me likely
that both Mr Hussain and Dr Lynch would have been careful and
vigilant to ensure that nothing upset the balance with BofA. In my
judgment, it is more likely than not that the strategy of involving
VARs to obtain revenue recognition but keeping them altogether
removed from the negotiation and closing of the ultimate
prospective deal would have been discussed and developed by the
Defendants. Put another way, Dr Lynch with Mr Hussain set the
pattern, adapting it as necessary to the particular circumstances.

1093. I have concluded, on the balance of probabilities, that Dr Lynch did know that the sales to the VARs were expedients to trigger revenue recognition which were intended to result in no substantive change so far as Autonomy's negotiations with BofA were concerned, nor any independent control of or dealing by the VAR with the software sold. I have concluded further that Dr Lynch knew that only on paper could what occurred be termed a sale; that what mattered was ultimately substance not form; and that the VARs' involvement was underpinned by their knowledge that though to fulfil the objective of the dealings their legal obligations had to be recorded, Autonomy would, one way or another, see to it that they were covered or extinguished.

1094. In my judgment, Dr Lynch had "guilty knowledge" that the only real deal was Autonomy's direct BofA deal and that recognition of revenue from the VAR deals which preceded it was improper.

## PART IV OF SCHEDULE OF IMPUGNED VAR TRANSACTIONS

### Other impugned VAR transactions where side-agreements are alleged

1095. Eight of the impugned VAR transactions were between Autonomy and counterparties other than Capax Discovery, FileTek and the Truitt companies. Of these, five were *"pure collectability VAR transactions"* (VT9, VT17, VT19, VT22 and VT29) where no sideagreement or the like was alleged and the issue is only whether the requirements of IAS 18.14(d) were satisfied.

1096. I deal later, in Part V of this Schedule, with those *"Collectability VARs"*, pausing to note here only that for two of the five (VT9 in Q4 2009 and VT22 in Q4 2010) it was common ground between the accounting experts that the requirements of IAS 18.14(d) were not satisfied and that therefore no revenue should have been recognised.

1097. Two of the transactions I discuss in this Part IV (VT15 in Q2 2010 and VT26 in Q4 2010) were alleged to have displayed the same 'pattern' as in the case of the other impugned VAR transactions, even though the VARs concerned appeared independent, were not in the small group of 'friendly' VARs, and the agreements were not transacted through Mr Egan. The VARs concerned were (a) in the case of VT15 in Q2 2010 for proposed enduser Credit Suisse, a company called Realise Limited ("Realise"), and (b) in the case of VT26 in Q4 2010, a company called Tikit Limited ("Tikit") for proposed end-user KPMG.

1098. The Claimants' case was that the Court should infer in the case of VT15 and VT26 that, as in the case of the other impugned VAR

transactions with 'friendly' VARs, the 'pattern' was consistent only with there having been a side agreement that the VAR should not either make any efforts to on-sell nor ever be required to pay Autonomy from its own resources, and that the recognition of revenue was thus improper.

1099. A third transaction with an apparently "independent" VAR was part of the larger projected transaction with the Vatican Library (VT14 in Q1 2010), which Deloitte refused to approve for revenue recognition and was impugned on the narrow basis that though no side agreement was alleged, it was never intended that the relevant VAR (called Auxilium) should make, and it never did make, any efforts to on-sell the licence. I deal with VT14 last in this Part IV before addressing the *"pure Collectability VARs"* in Part V.

### VT15: The Realise/Credit Suisse deal Q2 2010

1100. On 18 June 2010, with the end of Q2 2010 approaching, Mr Hussain sent Dr Lynch (only) a revenue summary spreadsheet identifying the key transactions for Q2 2010. These included a transaction for $2.7 million with Credit Suisse, subject to the observation that "*sign off 29th so tight*".

1101. On 29 June 2010, Mr Hussain sent Dr Lynch an updated revenue summary spreadsheet. The proposed Credit Suisse transaction was now stated to be worth $2.4 million and Mr Hussain included the comment "*Steering committee signed off on Friday, now race to get paperwork*".

1102. On 29 June 2010, Mr James Murray asked Credit Suisse to confirm its agreement to a letter of intent, which it did on 30 June 2010, though Mr Dominic Frischknecht of Credit Suisse emphasised in his covering email that, "*we are only confirming that we are interested to close a contract in future but at this point not able to confirm any terms of the deal*". The letter of intent stated that Credit Suisse:

> "*plans to enter into a software license purchasing agreement under which – and provided that Credit Suisse gives approval to [sic], Autonomy's chosen partner shall provide software licenses to Credit Suisse AG no later than July 31st 2010.*"

1103. That same day (30 June 2010), Mr Murray wrote to Mr Andy Lamond of Realise, forwarding a copy of the Credit Suisse letter of intent, saying "*Thanks for your time today at very short notice. The attached letter specifies the amount that Credit Suisse are prepared to pay*". That evening, Mr Murray informed Mr Hussain and Mr Chamberlain, "*Realise will sign the deal tonight. Please liaise with Andy Lomond*". Realise appears to have been a

substantial UK technology company: *'The Scotsman'* reported its sale for £40,000,000 in 2014. It was a significant UK partner of Interwoven.   The evidence did not reveal quite why or when Realise was selected. None of Mr Hussain, Mr Chamberlain or Mr Kanter gave evidence in these proceedings (or at all). There was no witness evidence as to what was said to induce Realise to act as a VAR, or why Realise was chosen.

1104.   Also on 30 June 2010, Mr Rafiq Mohammadi of Autonomy emailed Dr Lynch, reporting that "*we did not get Credit Suisse but James [Murray] was able to find one large and one medium that added up. CS is his next quarter – so we have not lost anything*". Dr Lynch forwarded the email to Mr Kanter and Mr Hussain. Dr Lynch accepted in cross-examination that he did learn before the end of the quarter that no Credit Suisse deal could be concluded in the quarter ("*Yes, I guess so*"); but he emphasised more than once that he was not really involved in it or in the VAR deal that followed. The frequency with which he was updated in the last days of the quarter suggests that even if not involved directly, he was kept very closely informed.

1105.   On 30 June 2010, ASL entered into a One-Time Reseller Agreement with Realise, for end-user Credit Suisse Securities (USA) LLC, for a licence fee of €1,463,000 (USD equivalent $1,987,096) plus €365,750 (USD equivalent $496,774) for support and maintenance and €102,500 in consulting fees. Mr Kanter signed the agreement on behalf of ASL. The amount of the proposed deal to Credit Suisse exceeded the amount of the VAR deal and thus gave the VAR (Realise) margin on the deal.

1106.   The One-Time Reseller Agreement placed Realise unequivocally on risk as a matter of law:

(1) Clause 1 provided:

> *"Products Licensed and Services Provided. Upon VAR's execution of this Agreement, Autonomy shall license to VAR for sublicense to the End-User the Autonomy Software. Once executed. This Agreement including any Product Schedules attached hereto, constitutes a non-cancellable purchase commitment. All fees and expenses specified herein are nonrefundable.  …"*

(2) Clause 9 provided:

> *"Any waiver, amendment, supplementation or other modification or supplementation of any provision of this Agreement shall be effective only if in writing and signed by both parties.*
>
> *...*
>
> *This Agreement, including the Exhibits, represent the entire Agreement between the parties hereto concerning the subject matter hereof and supersedes any and all prior correspondence, quotations and negotiations. VAR expressly agrees that this Agreement and the Exhibits hereto shall have priority over any contrary terms or conditions contained in any purchase order or other form hereafter delivered by VAR to Autonomy... VAR expressly agrees that this Agreement and the Exhibits hereto shall have priority over any additional or inconsistent terms contained on such purchase orders or other forms hereafter delivered by VAR to Autonomy."*

1107.  Realise provided written confirmation to Deloitte on 30 June 2010 that the invoice listed in the confirmation they had requested was proper and due (although part-paid) and that there were no *"side letters or other agreements".*

1108.  In the event, no deal was ever concluded with Credit Suisse, by either Realise or Autonomy. In December 2010, Realise paid Autonomy in total £626,990 (representing £533,609 plus VAT) in respect of the June 2010 deal, but no further amounts.[605] A bad debt provision was made for the full amount of the remaining outstanding receivables (some £1,299,342 inclusive of VAT). That amount (£1,299,342) was finally written off long after the acquisition, in September 2012.[90]

1109.  The Claimants suggested that, in the absence of any evidence from Mr Hussain, Mr Chamberlain or Mr Kanter, and *"no witness evidence, therefore, as to what Autonomy said to induce Realise to act as a VAR",* the Court should:

> *"infer, however, that the same assurances were given to Realise as were given to Autonomy's preferred VARs –*

---

[605] It is evident that this payment was directly related to the Credit Suisse deal because the invoice number on the cash receipt – 5006 – matches that on the invoice issued to Realise in on 30 June 2010. [90] As the Claimants have accepted at Schedule 3 to their Particulars of Claim.

> *in particular, that Realise was not expected to make efforts to sell the software to Credit Suisse and that Autonomy did not intend Realise to pay for the software from its own resources."*

1110. In their written closing submissions, the Claimants relied on the following in support of that inference:

(1) When on 15 October 2010, after Realise had not paid the first instalment (of €200,000) which fell due on 28 September 2010, ASL's credit control department sent an email to Mr Chamberlain and Mr Stephan asking whether they could *"chase them for payment yet???"*, Mr Chamberlain immediately forwarded it to Mr Hussain with the message (marked High importance ) simply stating *"Need guidance"*. There is no record of a response; but Realise was not

chased for payment. When the remaining sum of €1,628,750 plus the consulting fee fell due on 28 October 2010 that was not paid by Realise either.

(2) When no end-user deal eventuated, Autonomy agreed (by an agreement dated 20 December 2010) to purchase a stake in Realise Holdings Limited (for £2,607,208) and to *"pre-purchase professional services"* from Realise (for the sum of £570,000 plus VAT), conditional on receiving from Realise payment of £533,609 plus VAT in partial satisfaction of its debt; and all this was arranged, not because Autonomy needed or it was in its commercial interests to acquire either Realise or professional services, but to put Realise in funds to pay down part of its outstanding debt to Autonomy.

(3) Realise never paid any sums to Autonomy except as and when it received payments made by Autonomy on the understanding that Realise would use the receipts to pay down instalments. By 9 August 2011, no further payments had been made by Realise except those for which it was put in funds to make as briefly described in (2) above. When on 9 August 2011, after Realise had sought to re-activate its CSS (Customer Support Site) support account, Autonomy's credit control department asked what should be done about their overdue invoice of 300+ days, Mr Chamberlain referred the matter to Mr Kanter, stating:

> *"Need guidance here. When I spoke to them (Andy Lamond) he directed me to you and stated that they "did not need to pay". I can't give them access to a support account when they have not paid."*

(4) Mr Kanter replied (copying Mr Hussain) *"Bs. Haven't spoken to him in six months"*, whereupon Mr Chamberlain informed them both that he would stop access to their accounts and send the outstanding account to legal absent objections. Yet on the last business day (30 September 2011) before HP's acquisition of Autonomy became final, and after negotiations in which Realise made clear its understanding that it *"did not need to pay"* unless and until funded, a bad debt provision was made for the full amount of the shortfall between the funds thus far provided by Autonomy and then remitted to Autonomy by Realise and the total amounts due from Realise under the OneTime Reseller Agreement, which then was $2,030,611 (equivalent to £1,299,342 inclusive of VAT). This was (considerably) later written off in full.

(5) All the while, Realise never made any attempt to negotiate or conclude an enduser sale; it was instead Autonomy which continued to seek a deal with Credit Suisse.

1111. As to (2) in the preceding paragraph, the Claimants focused especially on Autonomy's agreement to pay Realise in advance for professional services (at a stated rate of £950 per man day for 600 days) in support of their case that the deal was contrived simply to fund Realise to enable it to repay Autonomy, and that Autonomy's moneys *"went round in a circle"*. The Claimants contended that:

(a) Autonomy had never provided any evidence as to why it had any need to purchase two years of professional services paid for in advance, except for Mr Kanter's description of the arrangement in an email to Dr Lynch and Mr Hussain dated 19 December 2010 as being *"part of the process of bringing the two companies closer"* and *"to bring [Realise] into key customers"* and an assertion by Dr Lynch when cross-examined that Autonomy *"had continual need for services"*. Mr Kanter might have elaborated; but he was not called.

(b) When in September 2011, during the period between HP's offer and the completion of the HP acquisition of

Autonomy, a question was raised as to whether a credit was applicable to Autonomy in respect of the service days promised, Mr Murphy of Realise sent an email to Mr Hussain dated 19 September 2011 stating:

> *"We rebated £533,609 + VAT (£626,990) against the service days in Dec and it was our understanding that this concluded the deal…"*

(c) No professional services were ever in fact provided.

1112. The Defendants, noting also that the Claimants had withdrawn their claims in October 2018 only to reinstate them in December 2018, but without any pleading, evidence or particulars of the side-agreement they purported to allege, dismissed any suggestion that the VAR deal with Realise lacked economic substance and could only be explained by reference to some sort of side-agreement.

1113. They referred at some length to the exchanges between Credit Suisse, Realise and Autonomy in support of their contention that Realise intentionally assumed the risk on the purchase unconditionally under its reseller agreement because it was confident of the prospects of the Credit Suisse deal closing, especially given Credit Suisse's letter of intent (see above), and there was a generous reseller margin. They relied also on:

(1) Mr Murray was engaged in speaking to Mr Lamond of Realise. The Claimants did not suggest that Mr Murray was engaged in wrongdoing.

(2) Ms Haverfield sent Mr Lamond of Realise a draft of the One-Time Reseller Agreement 27 minutes after that, copying Mr Murray and Mr Chamberlain. The Claimants have not suggested that she was engaged in wrongdoing.

(3) At 20:03, 39 minutes later, Mr Lamond said he was happy with the draft and that Mr Murphy (the CEO) would be signing it on behalf of Realise that night. Mr Lamond had evidently read and approved the terms of the document. He was the Finance Director, so was well-placed to understand what it was that Realise were signing up to.[606] Ms Haverfield sent Mr Murphy the execution copy 20 minutes later. Mr Murphy signed and returned the agreement at 22:00, saying:

---

[606] Mr Lamond's role as Finance Director can be seen from his email.

> *"Please find enclosed the signed pages of the Autonomy One Time Reseller Agreement as per your email.*
> *I also enclose a combined whole signed document in one pdf for your records."*

(4) The signed agreement sent back by Mr Murphy placed Realise unequivocally on risk.

---

1114. As to the matters relied on by the Claimants as summarised above, the Defendants contended that:

(1) First, the email of 15 October 2010 in which Mr Chamberlain said to Mr Hussain "*need guidance*" on the question of whether to chase Realise for payment was neither sinister nor suggestive of a side-agreement. Autonomy had sold this deal to Realise on the parties' mutual expectation that the Credit Suisse deal would go through. As at October 2010 it had not yet gone through. It was not until later, in April 2011 on the Claimants' case, that Credit Suisse decided to look at a competitor product. In these circumstances, the Defendants contended that it was hardly surprising from a commercial perspective that Autonomy was not automatically hounding Realise for payment in Q3 2010.

(2) Secondly, the email exchanges in August 2011 occurred after the transaction in which Autonomy had taken a stake in Realise, and after the Credit Suisse opportunity had not come to fruition. The email from Mr Chamberlain telling Mr Kanter and Mr Hussain that "*Mr Lamond directed me to you and stated that they [Realise] "did not need to pay*"" did not show that there was a side-agreement in Q2 2010. If anything, it appeared to show Realise seeking to avoid payment to their minority shareholder in circumstances where the commercial opportunity had been lost. Further Mr Kanter had rejected the suggestion that Realise need not pay as *"Bs"*.

(3) Thirdly, the fact that Autonomy continued to negotiate with Credit Suisse was immaterial. Even assuming that Realise was simply acting as fulfilment partner on the transaction, providing it was genuinely assuming the risk the revenue was correctly recognised. In this regard, the Credit Suisse approved letter of intent made it clear that the plan was for the software to be provided by Autonomy's partner.

(4) More generally, the Defendants submitted that the Claimants' arguments involve a fallacy which (as previously observed) is repeated elsewhere in their submissions: the fact that Autonomy may have continued in negotiations does not mean that the reseller was never intended to be a party to the end-user deal.  On the contrary, the aim was that the end-user <u>would</u> execute the deal with the reseller, as per the Credit Suisse letter of intent.

(5) Fifthly, the fact that a deal with Credit Suisse could not ultimately be concluded (referring to events in April 2011) was not an "indicium" of a side-agreement.  At the time of the reseller transaction the Credit Suisse deal was seen as a good prospect and the letter of intent approved by Credit Suisse confirmed that.

1115. The Defendants contended further that the Claimants' depiction of Autonomy's transactions with Realise after the transaction, under which Autonomy (i) sold a minority stake in a company named Okana to Realise (which was pursuing an acquisition of Okana), (ii) took a minority stake in Realise and (iii) purchased 600 man days of professional services from Realise for a total of £570,000 whereupon Autonomy agreed with Realise that Realise would make a payment of £488,000 against their existing debt, as artificial was illegitimate, distorted and misplaced.

1116. The Defendants relied on the following:

(1) The approach from Realise to Okana and Autonomy's decision to invest in Realise were patently genuine.  On 25 October 2010 Mr Hampson of Okana wrote to Dr Lynch as follows.  (This email also shows the substance of Realise as a reseller):

> "I've developed an excellent relationship with Interwoven
> Partner, Realise, and in particular their ChiefExec, Tony Murphy, over the last 18 months. This came about as part of our strategy to open up new channels for our core IDOL capability as chaining has become the norm. Realise look after the likes of Fidelity, Standard Life, Nikon and Channel4.
>
> Our joined-up thinking and exact-same view of the phenomenal market opportunity you've created for Autonomy Partners has now reached critical mass

> *and Realise have taken a natural next step to look to acquire Okana. A cash and shares offer for 80% of the company has been tabled, this being at a valuation which Bob and I are comfortable with and would like to accept. Not only do we believe this represents the best possible outcome for Okana at this point, we are also extremely excited by the power and growth potential of a joined-up Okana/Realise organisation. We firmly believe that this is the right thing for us to do.*
>
> *Ultimately, this is all small beer to Autonomy but following the support you've given to Okana, and to me personally, I'd be delighted if we can work to have all shareholders accept the same deal, this keeping Autonomy in as a minority shareholder. Okana would become part of the Realise Group, which as you probably know, also now includes Realise Capital Markets headed up by Nick Hough-Robbins. Coverage of the combined unit would grow to span a great many facets of the Power, Protect and Promote sectors."*

(2) Mr Hussain wrote to Dr Lynch in relation to this. Mr Hussain was clearly interested in acceding to Mr Hampson's request, provided Autonomy retained shares in Realise, and was interested in a minority investment in Realise. Mr Hussain did mention the outstanding debt, but the Defendants contended that this plainly was not driving his thinking, and Dr Lynch would not have seen it that way:

> *"We need to know the valuation. Gut feel (although I could be well out) says it's being valued at £1.5m or so ex cash and £2m inc. cash. We own 18% or so of Okana so our stake would be worth c. £400k on this valuation. I'll have to check but I think we invested around £80k.*
>
> *The last 3 years has seen the following:*
> *- Revenues Mar '1 0 (£808k), Mar '09 (£795k), Mar '08 (£1 ,028k)*

> - *Operating profit £101 k, £146k, £164k*
> - *PAT £80k, £123k, £144k*
> *Cash at hand is £465k*
>
> *Since Realise is proposing to pay in cash and shares I would be happy to accept shares only to keep my ownership level meaningful.*
>
> *I would be prepared to invest in a minority stake in Realise and like Okana continue to put more services through them. Please note that Realise owes us £1.2m which is slightly overdue so this would work as long as the current debt was paid off.*
> *I need to know the valuation for Okana and the valuation established for the Realise shares."*

(3) The transaction was completed in December 2010. Although Autonomy secured a repayment of part of its debt out of the overall transaction there is nothing sinister in that, nor in the notion that money "went around in a circle". The Claimants did not suggest (and had not adduced any evidence) that either the stake in Realise or the professional services which were purchased were overvalued.

(4) As regards the professional services, as Mr Hampson's email made clear, Realise were a major professional service provider in connection with Autonomy's Interwoven business. Realise were a UK partner for Autonomy and there is no basis for suggesting that these were other than at fair value. The Defendants contended that the Claimants were seeking to read too much into Mr Murphy's later email in September 2011 which referred to an amount being *"rebated"*, and that amount concluding the professional services aspect of the deal: this was simply part of Mr Murphy's attempt to minimise his obligations in September 2011: Mr Kanter's response (not referred to by the Claimants) was that he was *"a little distressed"* about what he had read in Mr Murphy's email, and plainly did not agree with him.

(5) The Claimants' apparent complaint about the admitted fact that the debt was *"later written off"* was misconceived: that happened in late 2012, and was a

decision of HP.  In any event, the Defendants argued, these post-transaction events could have had no bearing on the earlier revenue recognition.

*My assessment of VT15*

1117. Realise was a longstanding service partner of Autonomy in connection with Autonomy's Interwoven business; but it was not a "friendly VAR". That, and the fact that (unlike the position in, for example, VT18 and the 'fulfilment' transaction with FileTek) Mr Egan was not in any way involved are obvious departures from the pattern.

1118. There are serious gaps in the evidence. As noted previously, the selection of Realise was unexplained; and I was provided with no details of its business, still less whether it included reselling or being a 'fulfilment partner'. In contrast with the position relating to all the other VAR transactions discussed above, where evidence had been given on behalf of the VAR in the US even if not in these proceedings,  I had not the merest glimpse into the intentions or expectations of Mr Lamond or anyone else at Realise, save what was revealed by the factual sequences and coincidences I have described, and the documentation.

1119. In my view, those factual sequences and (for the most part) the documentation do give rise to an inference that Realise never expected to pay instalments under the One-Time Reseller Agreement out of its own pocket, and was obdurate in refusing to do so when the end-user deal it had expected to be completed virtually immediately did not eventuate. Those sequences and that documentation also demonstrate that Autonomy contrived a number of transactions to rescue Realise. Furthermore, it is the undisputed fact that Realise did nothing after the sale to it to negotiate with Credit Suisse or otherwise assist in establishing an end-user sale: it was wholly passive and dependent on Autonomy in that regard.

1120. The transaction did exhibit certain features characteristic or at least reminiscent of the pattern. However, it departed from the pattern in important respects additional to those already identified above. In particular, it seems plain that it was intended and expected to be the contracting party to the end-user deal; and it was from a margin on resale (which had been carefully quantified by reference to the price expressly confirmed in Credit Suisse's letter of intent) that it was to be rewarded and not by a MAF. Further, the documentation is not all one way: although the references in the exchanges in 2010 to Mr Chamberlain needing guidance could suggest some high-level understanding, the exchanges between Mr Kanter and Mr Chamberlain in 2011 appear genuine and indicate that neither understood any

assurances to have been given by Autonomy that Realise did not need to pay.

1121. In my judgment, there is an alternative explanation for the fact pattern. This is that on the one hand, Realise (a) was content to accept uncovered risk on the deal because it was assured, and Credit Suisse's letter of intent confirmed, that the end-user deal with Credit Suisse was virtually certain and imminent and (b) regarded the minimal risk as it perceived it to be at the time, of Credit Suisse in effect going back on its statement of intent to be commercially justified in light of the margin it was to obtain, and (c) felt let down, justified in declining to pay, and in any event determined not to do so; whereas on the other hand, Autonomy (i) felt it in its own interests to try to remove the signs of a failed VAR deal and (ii) as time moved on, had an extra incentive in that regard in not wishing anything to unsettle the presentation necessary for the sale to HP.

1122. At the front of my mind, and the question I have consistently returned to and do again now is: what distinguished VT15 from the other successfully impugned VARs?  I would summarise the differences as follows:

(1) The evidence on the transaction was sparse (there was no mention of it in the witness statements at all), and (as previously noted) did not explain why Realise was selected. However, Realise was a substantial UK technology company with well-established credentials in servicing and looking after major companies including Fidelity, Standard Life, Nikon and Channel 4 with no special relationship with Autonomy. Its choice as a VAR, even if only as a 'fulfilment partner' was not, on the evidence put before me, impugned in any way.

(2) There was never any suggestion of any impropriety whether on the part of anyone in Realise or on the part of those who negotiated the transaction at Autonomy.

(3) Even though Realise was not intended to negotiate with Credit Suisse, it is clear that Credit Suisse expected to contract with Realise, and there is nothing to suggest that Realise did not intend to contract with the end-user: its MAF was dependent on the margin between what it paid Autonomy and what it would charge the end-user. I see no sufficient basis for concluding that risk and control was retained by Autonomy.

(4) It was not plausibly suggested that Mr Kanter's email response (*"Bs. Haven't spoken to him in six months"*) to Mr Lamond's suggestion that Realise *"did not need to*

*pay"* was contrived, and the exchange is inconsistent with any known side agreement of the sort alleged.

1123. Even then, it has been a close run thing, especially given the track record prior to this deal of confected VAR arrangements; but I have not in the end been persuaded that the very limited available evidence necessarily demonstrates on a balance of probabilities that Realise entered into VT15 on the basis of a side-agreement or similar arrangement which in effect negated, or promised its release from, its contractual obligations.

1124. In case, however, I am wrong, and the inference asserted by the Claimants is on review held to have been warranted and established, I should state my conclusions on the Defendants' knowledge.

*Defendants' knowledge of and participation in VT15 and the Realise acquisition*

1125. Mr Hussain was directly involved. If, contrary to my assessment, revenue was improperly recognised from VT15, Mr Hussain would have been aware of the facts giving rise to the impropriety and their consequences in terms of the substance of the transaction and the criteria in IAS 18.14. He would thus have had "guilty knowledge".

1126. Dr Lynch did not say anything about VT15 in either of his witness statements. He told me in cross-examination that he had very little involvement in this transaction. He accepted that he was given some, but he stressed very limited, information in relation to the progress of the Credit Suisse deal, but the information given to him in an email update on 30 June 2010 indicated that it was a good prospect for a subsequent quarter. He told me he did not recall that Autonomy had taken the deal to a VAR and had no recollection of being involved in the sale to Realise, the sale terms, or in the accounting for it.

1127. Later in 2010, he was aware of and involved at a high level in considering taking a stake in Realise, which Autonomy subsequently did. It was suggested to Dr Lynch that he and Mr Hussain "*saw this as an opportunity to address Realise's debt on its VAR transaction*". The Defendants contended that this would not be improper even if correct, but Dr Lynch rejected the proposition. Dr Lynch also explained about his understanding of the transaction as follows:

(a) The transaction involved the acquisition by Autonomy of an approximately 20% interest in Realise conditional on Realise paying £533,609 to Autonomy, and a payment by Autonomy to Realise upfront of a fee for professional services for a specified number of days in the sum of

£570,000. It was an opportunity to combine two of his services partners, Realise and Okana (which Realise was about to acquire or had acquired). Autonomy would have wanted to see the debt paid off in the process.

(b) The purchase of professional services was at market rates. The Claimants did not challenge Dr Lynch's evidence on that, except to question whether Autonomy had any actual need for professional services from Realise, and to suggest that in fact Autonomy never intended to call on Realise to provide them.

(c) Dr Lynch's answer was that Autonomy had a continual need for services. Further, he did not accept the proposition that Realise was not in fact expected to provide professional services: he did not know, after such a long time, *"whether they had services days already on the books or not"*. It will be recalled that in September 2011 Mr Kanter also did not agree with the summary of Realise's obligations given by Mr Murphy in the email relied on by the Claimants.[607]

1128. Whether or not when giving his evidence he could recall having been aware of it at the time, I have little doubt that Dr Lynch was kept informed of the Credit Suisse deal, the need to close it before the end of the quarter to bring in revenue to meet forecasts, the race to close it, the ultimate delay, and the usual last-minute resort to a VAR or 'fulfilment partner'. By the same token, it seems to me likely, however, that he would have known also that (a) Realise was not a 'friendly' VAR (b) Mr Egan was not involved (c) Credit Suisse had signed a letter of intent, the only glitch had been tightness of time, and the deal could confidently be expected to close in the next quarter.

1129. However, it seems to me that it is to be borne in mind that although it is an abiding curiosity of this case, and I suspect an omission for which each side may have a conflicting forensic explanation, that I was told next to nothing about other "innocent" VAR deals, it does seem that there was a large number of them both before and during the Relevant Period. The necessary inference is that some were entirely innocent.

1130. On balance, I do not think the evidence is sufficiently clear in this particular context to establish that Dr Lynch considered this deal to be a 'pattern' deal; and I would therefore have declined to conclude that he had "guilty knowledge".

---

[607] See paragraph 1116(4) above.

## VT26: Tikit/KPMG Q4 2010

1131. As was pointed out at the outset of the section in Dr Lynch's written closing submissions addressing this transaction (VT26), VT26 differed from all the other VAR transactions which the Claimants sought to impugn in this case, since it is common ground that it was in writing: there was a collateral letter agreement.

1132. The Claimants' principal complaint is that the side-letter should have been disclosed to Deloitte and was not, and that if it had been disclosed as and when it should have been, revenue recognition would not have been approved by Deloitte. The Claimants also alleged that revenue recognition was improper because Tikit was never intended to onsell to the named prospective end-user, KPMG. The factual background can be summarised as follows.

1133. Autonomy's forecast revenues for Q4 2010 were $236,000,000. A potential deal with KPMG was listed in an email dated 15 October 2010 from Mr Hussain to Dr Lynch under the stated subject *"getting to 236"* as one of seven "big deals" which Autonomy hoped to close before the end of the quarter. The deal related to an Interwoven product called "iManage". KPMG were an important iManage customer, and the proposed transaction in Q4 2010 was a renewal deal.

1134. Mr Hussain kept Dr Lynch regularly updated on progress, including by emails dated 4 November 2010 and 10 November 2010. Dr Lynch accepted in cross-examination that he

knew that Autonomy was trying to conclude this direct deal, and that he knew it was a "*big deal*".

1135. Autonomy was very open about the fact that it needed the transaction to close within Q4 2010. On 10 November 2010, Mr Robert Sass, Autonomy's Senior Vice President, North America Sales, made plain to KPMG that "*In terms of timing, the opportunity to reach contracts by end of year is very key to us*", expressing the hope that the paperwork could be executed in December 2010. His KPMG counterparty, however, said he would be "*surprised if KPMG will move to purchase the solution before the end of the year*".

1136. This was prescient: on 13 December 2010, Mr Mooney informed Mr Hussain that "*KPMG said no*" and that a direct deal with KPMG would not be possible by the end of the year but would be considered in Q1 2011. He added: *"Can pay maintenance. May consider "search" but probably Q1".* Mr Hussain relayed the bad news to Dr Lynch the same day. On 15 December 2010, Mr

Hussain told Dr Lynch that the transaction was "*at risk in my opinion*", though he prefaced this by saying that *"feedback is that they are still working it – getting sign offs".* He sent a further update on 17 December 2010.

1137. On 23 December 2010, Mr Hussain suggested involving Tikit to Mr Neil Araujo (CEO Protect, Professional Markets at Autonomy). Mr Hussain explained that KPMG were "*squeezing us hard*" and that the decision had therefore been made to wait until Q1 2011 to do a deal. Tikit was (and is) a substantial, publicly listed, technology services company. Dr Lynch's evidence in his witness statement was that it was a long-standing reseller of iManage, an Interwoven product, with a large team of professionals who sold, implemented and supported the product.

1138. On 27 December 2010, Mr Hussain asked Autonomy's in-house lawyers to draw up a contract with Tikit and specified the terms of the contract. The same day (27 December 2010), Mr Hussain wrote to Dr Lynch and Mr Araujo, subject "*tikit deal*", suggesting that it would be a good idea for Mr Araujo to be in the UK to close the transaction and asked "*Agree?*". Mr Hussain plainly expected Dr Lynch to understand what was meant by the "*tikit deal*", i.e. a VAR agreement in circumstances where KPMG had said 'no' to concluding a deal within the quarter. When this obvious point was put to him in crossexamination, Dr Lynch gave what the Claimants said were *"cagey answers"* and claimed, "*I don't know what I knew at that time*" (which the Claimants invited me to find was not so).

1139. On 29 December 2010, Mr Hussain was overseeing the drawing up of contractual documentation with Tikit. He said he needed "*a side letter (which will be disclosed)*", providing that, in the "*highly unlikely event that KPMG do not extend then tikit can resell similar software, part of partnership etc. start with the fact that tikit has been an autonomy partner for many years, many customers...*" . Dr Lynch agreed in cross-examination that the reference to disclosure is likely to have meant disclosure to the auditors.

1140. On 31 December 2010, Tikit issued a purchase order to ASL, for resale to KPMG, with a lower licence fee of £3,847,500 (plus £202,500 support and maintenance). Autonomy recognised the licence fee revenue immediately. The same day, ASL entered into a side letter with Tikit. Illustrating his direct personal involvement, Mr Hussain signed for ASL. After an introduction reciting that Tikit's purchase of Autonomy WorkSite technology was for resale to KPMG, it provided:

> *"In the event that Tikit does not consummate the original transaction to at least the value set forth in the PO by 30 March 2011 then such PO shall be deemed a binding pre-purchase obligation, and Tikit shall be permitted to utilize prepurchased software under the PO and offset amounts due to Autonomy (to a maximum of £3.1 million) under other orders placed by Tikit related to such software and maintenance under the Agreement for the period between 1 January 2011 and 30 June 2012."*

1141. The Claimants contended that the notion of Tikit consummating a deal with KPMG was a fiction. Tikit was never going to be involved. Rather, it was Autonomy, with the close involvement of Mr Hussain, which continued to negotiate with KPMG in an effort to conclude a direct deal. This provision served to insulate Tikit against the risk that Autonomy failed to conclude an end-user deal with KPMG.

1142. The side letter went on to provide:

> *"Further in the event that Tikit does not consummate the original transaction to at least the value set forth in the PO by 30 March 2011 then Autonomy and Tikit shall enter into an arrangement whereby Tikit shall be appointed as the second line support and maintenance provider to KPMG under the existing maintenance arrangement between KPMG and Interwoven for three quarters from 1 January 2011 for a fee of up to £320,000 per quarter."*

1143. The Claimants invited me to find that this provision for Autonomy to transfer to Tikit support and maintenance fees of up to £960,000 (three quarters @ £320,000), which would otherwise have been payable by KPMG to Autonomy, was simply a mechanism introduced for the sole purpose of putting Tikit in funds to pay its debt to Autonomy, so that *"Once again, Autonomy was going to get (part) paid using its own money."*

1144. Despite Mr Hussain's indication in his email of 29 December 2010 that the side letter would be *"disclosed"*, Mr Welham's evidence was that Deloitte did not see it during its 2010 annual audit. The Claimants sought to suggest deliberate concealment by reference to the alleged falsity of a representation letter dated 22 February 2011 signed by Mr Hussain, in which the directors of Autonomy represented to Deloitte that there were no side letters. The Claimants contended that it followed that the representation in the representation letter was false, must have been known by

Mr Hussain to be false, but was relied on as being accurate by Deloitte.

1145. They submitted further that given that the representation was made on behalf of all of the Autonomy directors, the Court should infer that Mr Hussain would have told the relevant facts to Dr Lynch before signing it. They sought also to rely, as further demonstrating concealment, on the fact that it was only much later that the Tikit side letter came to light, not because of any action taken by the Defendants to disclose it, but because Tikit, quite properly, qualified their audit confirmation letter dated 6 July 2011 (which contained a representation that there were no side letters) by attaching a copy.

1146. Mr Welham's evidence in his witness statement was that Deloitte relied upon that representation. Mr Bloomer also said that the Audit Committee was not aware of the letter at the time, and that it would have been relevant to consider its revenue *"implications"*.

1147. The Claimants' case was that the reason for concealing the side letter from Deloitte was that the side letter transformed the nature of the risk being undertaken by Tikit by virtue of its purchase order: on the Claimants' interpretation, instead of making an outright purchase of the software specified in the purchase order and assuming the risk of its resale, Tikit was being insulated by Autonomy against the risk that a resale would not eventuate. The Claimants submitted that the consequence was that risk never passed and that the recognition of revenue was improper accordingly.

1148. The Claimants contended further that the steps proposed and then abandoned, revised and then taken, after the VAR sale to relieve Tikit from having to satisfy in cash its obligations under the VT26 purchase order further demonstrated Autonomy's *"general practice…that [the VAR] should not be left holding the bag"*. They painted a picture of ever-changing but (as they characterised them) invariably improper efforts to unravel VT26:

(1) When in due course Autonomy was approaching the conclusion of a direct deal with KPMG, Autonomy needed to solve the problem of Tikit's outstanding debt. Autonomy therefore proposed to KPMG that contractual language be included whereby Tikit was Autonomy's designated payee. However, KPMG refused to agree. On 10 February 2011, it emerged that the KPMG board was refusing to have a third party such as Tikit introduced into the contract, regarding this as a "*red flag*" and a major problem. The problem was escalated to Mr Hussain. Dr Lynch's evidence that KPMG did not

wish to purchase from Tikit because it audited Tikit's accounts was not challenged.

(2) In light of the deal going direct to KPMG without (at KPMG's insistence) Tikit's involvement, Mr Hussain appears to have been willing at one stage simply to cancel Tikit's obligations. On 7 March 2011, Mr Scott emailed Mr Kanter and Mr Chamberlain stating that "*Sushovan asked me to prepare a cancellation notice for Tikit in connection with its KPMG order... Sushovan also asked me to have a look at what we did with Capax/Kraft an [sic] Capax/Eli and to use that as a model*", and attaching a draft termination letter. As the Defendants observed in their written closing submissions, this would have resulted in a similar outcome, and for similar reasons, as the Capax Discovery/Kraft deal in Q3 2009 (VT3), which Deloitte had reviewed and understood. But in the event this route was not adopted.

(3) Instead, and after an Autonomy entity, Verity Benelux BV, had entered into a direct agreement with KPMG for $10,796,860 on 21 March 2011, the arrangements envisaged in the side letter were restored. On 28 April 2011, Mr Chamberlain (copying Mr Hussain) asked Ms Julie Dolan, Autonomy Senior Corporate Counsel, to draft a letter to be signed by Tikit and Autonomy. He explained the rationale as follows:

> "*When they issued the PO in Dec we also signed a letter effectively allowing them to repurpose if the KPMG deal did not close via them. They have received a bunch of orders for circa £1.5m. They want to offset those against the o/s debt which we are happy to do. Effectively the £4m will act like a prepay and they will allocate orders to burn through it. Need a document that captures this.*"

(4) The Claimants submitted that this explanation makes little sense. They submitted that to say that the £4 million would act as a "*prepay*" overlooks the obvious problem that Tikit had, to date, paid nothing (disregarding the offset of Autonomy's own entitlement to maintenance fees from KPMG). It had not prepaid but rather incurred a debt: far from Tikit discharging that debt by placing further orders from third parties for Autonomy software, on its face, such orders would create additional debts on the part of Tikit, rather than discharging a pre-existing debt.

1149. What in the event happened is that a series of letter agreements were entered into between ASL and Tikit, which recited the provision of the side letter and then set out various lower value deals which Tikit had concluded for sales of Autonomy software to many different end-users. The letter agreement then recorded that the value of those lower value deals would be offset against Tikit's obligations under VT26. There are two such letter agreements dated 27 May 2011, and subsequent letter agreements dated 7 June 2011 and 20 June 2011. The offsetting process seems to have continued until 28 November 2011 until the figure of £3,089,825 (i.e. the total amount due under the purchase order less £960,000 treated as already paid, as explained below) had been reached.

1150. As part of its direct deal with KPMG, Autonomy agreed to pass to Tikit the benefit of £960,000 in maintenance and support fees that would otherwise have been received by Autonomy from KPMG. Rather than have the money going round in a circle, Tikit was not paid the £960,000; rather, Autonomy simply offset the £960,000 against the monies due under VT26. The Claimants maintained that there is no evidence that Tikit actually provided maintenance and support to KPMG; and that indeed, the provision of such services would fly in the face of KPMG's opposition to the interposition of a third party. The Defendants reminded me that Tikit's business was as a service provider for iManage, and that KPMG's opposition was simply to acquiring software from Tikit, not services, but did not provide further evidence. It seems to me more likely than not, and I find, that this was a means devised by Autonomy in order to ensure that Tikit was not exposed.

1151. The Defendants, on the other hand, submitted that the Claimants had misunderstood: the commercial intent was in line with the side letter; Tikit was able to repurpose the software purchased under the Tikit/KPMG agreement towards other orders, up to the agreed value.

1152. The essential points stressed by the Defendants, and which they suggested had been overlooked or mis-appreciated by the Claimants, were that (a) Deloitte were in fact aware of the side letter in April 2011, but even if they were not (b) the side letter did not make any difference to the revenue recognition, and (c) when in 2012 Deloitte re-reviewed it, they expressly confirmed that it did not. The Defendants contended that (d) Tikit remained

liable for the debt under VT26, though it would have the repurposed sales to fund the debt partially.[608]

1153. These points were supported by submissions on the part of the Defendants that:

(1) The Claimants' suggestion with regard to the side-agreement that "*the notion of Tikit consummating a deal with KPMG was a fiction*" is misplaced. The overwhelmingly likely view on the evidence is that both Tikit and Autonomy

did envisage that Tikit would receive a purchase order from KPMG. The Claimants' fallacy (here and elsewhere) was to assume that the fact that Autonomy may have continued in negotiation with the end-user meant that it was not contemplated that the reseller would be involved in the end-user deal.

(2) Neither the side letter, nor the subsequent arrangements made further to the side letter after a direct deal was reached between Autonomy and KPMG, affected the initial recognition of revenue in respect of VT26. None affected the initial incidence of risk: Tikit as the VAR was on risk until released by the offsetting arrangements *pro tanto.* None of the arrangements affected Tikit's control of the goods; and it is to be noted that Tikit recorded the Autonomy software in its audited accounts as inventory, reflecting its understanding that it was on risk and the owner of the software.

(3) When Autonomy made a direct deal with KPMG in respect of substantially the same software as was the subject of VT26, from which Titkit was excluded at KPMG's insistence, it was only right that Titkit, having been deprived of its prospective end-user deal, should in some way be made good. A solution might have been simply to forgive the debt due under the VT26 purchase order, on the lines of what happened in VT3 (the Kraft deal), which Deloitte had approved. However, given the specific terms agreed at the outset in VT26 in the side letter, that was the route eventually taken.

(4) Contrary to the Claimants' efforts to present what was done as making no sense, the arrangement contemplated

---

[608] D1 closings suggests still liable and could repurpose up to agreed value, but not that it was to fund the debt.

in the side letter and implemented broadly in accordance with it was an entirely proper and rational arrangement which, in effect, enabled Tikit to sell on software that it had acquired, and thereby with the proceeds of sale reduce its indebtedness to Autonomy (up to a pre-specified limit).

(5) The offsetting arrangements were proper and practical; and they were carefully documented. Mr Chamberlain provided Deloitte with the running state of the offsetting arrangements between Autonomy and Tikit, showing Autonomy invoices to iManage customers which had obtained software from Tikit.

(6) The subsequent sales were correctly and properly treated by Autonomy as prepaid: having already received and recognised revenue under the original VAR sale in VT26, it would have been double-counting to recognise revenue in respect of the subsequent sales of the same software albeit that Autonomy invoiced for them.

(7) Although the Claimants had omitted altogether to mention it, when in 2012 HP asked Deloitte to reconsider the revenue recognition of VT26 in the light of the side letter which Mr Welham stated they had not seen at the time, Deloitte specifically endorsed the revenue recognition decision and confirmed that the side letter did not make any difference to revenue recognition. Mr Welham also confirmed in cross-examination that his conclusion was that the revenue should not be adjusted as at 31 December 2010 because the criteria under IAS 18.14 had been met. Although Mr Welham suggested in his witness statement that the side letter "*cast doubt on whether all of the revenue on the transaction with Tikit could be recognised*", he confirmed in his testimony that the side letter would not in fact have made any difference to the revenue recognition. That was

his view both in 2012 and now.[609] He explained this in cross-examination as follows:

> "*That's correct, because ultimately we saw this as a pre-payment, but they could only on-sell the*

---

[609] Mr Welham was also asked to assume that Autonomy had cancelled its purchase order with Tikit in March 2011. In fact, Autonomy did not do so, so the assumption was misplaced. In any event, however, Mr Welham thought that it was hard to say what difference it might have made if this had happened.

> *software they had, which is an important point,
> so yes, in that case it doesn't affect it."*

(8) If, as Mr Welham stated in evidence, Deloitte were not provided with the side letter to review during the 2010 annual audit, that was not deliberate concealment: it was a regrettable oversight on the part of Autonomy's finance department. All Autonomy's files were open for inspection for Deloitte, and the Defendants submitted that there was no evidence of any deliberate attempt to conceal the side letter. As explained below, Autonomy were open with Deloitte about the side letter in subsequent months. Mr Welham accepted that Deloitte would in any event have known about the side letter in Q1 2011 if they had required earlier audit confirmation.[610] Tikit, entirely properly, identified the side letter in its audit confirmation letter to Deloitte dated 6 July 2011.

(9) Furthermore, the evidence suggests that Deloitte understood about the side letter and its terms by or before July 2011. When Deloitte were considering whether revenue could be recognised on Autonomy's direct deal with KPMG their review stated:

> *"It was noted that in Q4 2010, a £4
> million license (c. $6 million) was signed
> with KPMG via the VAR Tikit Limited
> (documented in PY Q4-8130c). Deloitte
> has compared the software purchased in
> Q4 with the current deal and noted that
> the majority of the Q4 software
> purchased, including the maximum
> number of named users (WorkSite, AES,
> IUS Enterprise) has also been included
> in the current deal, which is a direct sale
> with KPMG. This direct sale by
> Autonomy therefore replaces the sale
> previously being made by Tikit to
> KPMG. PDW Steven Chamberlain (VP
> Finance), as stated in the December
> 2010 VAR agreement, the VAR may
> resell the software to another end-user
> and it has the legal obligation to pay for
> the license fee and therefore it is up to
> the VAR to reassign the software if*

---

[610] *"Q. Now, if you had required a confirmation in Q1, no doubt you would have found out about this letter at that point? A. That's likely, yes."*

> *required. Given that under the current deal, Autonomy has delivered the software to KPMG and we have assessed the recoverability of this Q1 deal as being satisfactory (see below), the current contract meets the requirements of IAS18 and therefore the revenue recognition is considered satisfactory."*

The point in this context is that the right to "resell the software to another end-user" that Deloitte were referring to was contained in the side letter (and

only there), strongly suggesting that Deloitte must have seen the side letter before July 2011.

(10)    In summary, the initial revenue recognition was proper at the time; it was considered proper when later reviewed; and nothing in the subsequent arrangements affected that or, more generally, was itself improper or lacking in commercial rationality.

*My assessment of VT26*

1154.    In my view, the propriety of revenue recognition in this VAR transaction primarily hinges on whether the Claimants' allegation that the notion of Tikit consummating a deal with KPMG was a fiction and that Autonomy, directed by Mr Hussain in this regard, always intended that Autonomy itself would conclude a direct deal with KPMG. If so, it seems that what Autonomy intended was that Tikit's introduction was simply to enable Autonomy to book revenue, without any expectation of an end-user sale by Tikit, rendering Tikit's ownership economically nominal. Further, on that basis, the side letter contained a plain and intentional misrepresentation, casting a darker shadow over Autonomy's failure, if proved, to disclose it to Deloitte and the Audit Committee.

1155.    If, in addition, Deloitte were also subsequently misled as to the effect of the side letter that would, of course, further exacerbate the position, and remove a plank of the defence.

1156.    As in the case of VT15, the evidence was sparse: Mr Welham did address VT26 (he had not addressed VT15); Dr Lynch mentioned it too, and so did Mr Bloomer; but no-one gave evidence in these proceedings or elsewhere on behalf of Tikit, nor for KPMG, in respect of the transaction.  The documentary record was more revealing generally; but it too was sparse as to the nature and objectives of the discussions between Autonomy and

KPMG.

1157. I do not consider that the available evidence demonstrates that Tikit understood that it was not to be involved in any resale, though I think read as a whole it suggests that it is more likely than not that it had no intention or expectation of being so. However, more importantly, it does seem to me more likely than not, having regard to the documentary evidence as a whole, that Mr Hussain always envisaged and intended a direct deal between Autonomy and KPMG: a resale by Tikit to KPMG was never seriously in his contemplation. The side letter he caused to be prepared, which gave the clear impression that a direct sale was perceived and understood by both parties to be the less likely result, was misleading: I would indeed accept that, as far as Mr Hussain was concerned it was a fiction.

1158. Whether or not Deloitte somehow came to know of the side letter in 2011, it should have been but was not disclosed to them. There is no plausible satisfactory explanation, to my mind, why Mr Hussain did not cause the side letter to be disclosed to Deloitte, having given an express assurance that it would be. Of course, in a busy life, oversights are possible, even frequent; but on the Defendants' own case, a side letter was highly unusual and ordinarily proscribed, and a representation letter is a serious matter, and it is to be inferred, in my judgment, that in signing the representation letter he would surely have been aware or reminded of the assurance he had given. I accept in its favour that Autonomy did have an "open files" policy; but that did not negate or satisfy the assurance Mr Hussain had given that the side letter would be disclosed to Deloitte or justify the terms of the representation letter given by Autonomy's Directors to Deloitte.

1159. Having (as I have) rejected oversight as the explanation, I consider it more likely than not that it was considered by Mr Hussain to be easier to present the VAR deal without the side letter, even if he might have been reasonably confident that if revealed, it was sufficiently equivocal that it could be presented as not affecting the result, as indeed Deloitte concluded when eventually it was disclosed by Tikit.

1160. Quite how Deloitte interpreted the letter and came to its view that it made no difference to revenue recognition is not easy to understand. It was certainly acted upon by Tikit as effectively permitting them to set against the amounts owed in respect of VT26 any sales of Autonomy software they thereafter negotiated. What in the event happened is that a series of letter agreements were entered into between ASL and Tikit, which recited the provisions of the side letter and then set out various lower value deals which Tikit had concluded for sales of Autonomy software to many different end-users. The letter agreement then recorded

that the value of those lower value deals would be offset against Tikit's obligations under VT26. In other words, the original deal was, in the language of
Mr Chamberlain "repurposed". The "offsetting" process seems to have continued until 28 November 2011 until the figure of £3,089,825 (representing the total amount due under the purchase order less the £960,000) had been reached. But it is not clear whether (a) the software sold by Tikit came from its own 'inventory' or from Autonomy or (b) whether any receipts were actually paid over by Tikit to Autonomy.

1161. Certainly when the position was reviewed in October 2012 Ms Antonia Anderson (formerly of Deloitte but by then employed by HP) assumed no such payment, her understanding being that:

> *"...as Tikit submitted additional orders, Autonomy delivered software for these orders but did not charge Tikit and created zero value orders and invoices as these orders were fulfilled. The attached excel shows which orders were set against the prepay. As you can see there was a large number of small orders."*

1162. However, this made no sense: there had been no "prepayment" by Tikit under VT26. When consulted by Ms Anderson in October 2012, Mr Welham gave a different explanation of the side letter. He said that, in his view, the side letter as written permitted Tikit to resell the same software to users other than KPMG. Even allowing for confirmation bias and the considerable pressures on Deloitte (and Mr Welham personally) by that time to confirm the decisions on revenue recognition which had by then been made and acted upon, I do not consider that the evidence gainsays this assertion of Deloitte's own understanding. Right or wrong, the point is that Deloitte's understanding of what was permitted was not what occurred; and on that basis its approval of revenue recognition was based on a mistaken understanding.

1163. I have concluded, though not without hesitation, that the reality known to Mr Hussain was that the economic risks of ownership and management of the software were retained by Autonomy, and in the event that happened, Tikit was (not unnaturally) content that this was so.

1164. In my judgment, revenue should not have been recognised from VT26.

*Defendants' knowledge of and participation in VT26 and subsequent arrangements*

*Mr Hussain*

1165.  The Claimants submitted that Mr Hussain, again, knew all the relevant facts. Moreover, they submitted that *"he must have taken the decision not to disclose the side letter to Deloitte, as he unquestionably should have done."*

1166.  Mr Hussain could not dispute his knowledge of the facts, but he did dispute the allegation of deliberate concealment. He submitted that there was no reasonable basis on which to draw an inference that there was any concealment by Autonomy. Dr Lynch sought to assist him in the course of his own cross-examination:

> *"...by the way, it wouldn't have been Mr Hussain that was responsible for handing over that file. That would have been the legal department."*

1167.  I do not accept that Mr Hussain did not himself hold the letter back. He had promised its disclosure. It was for him to see that this was done. In my judgment, Mr Hussain was personally and directly involved at all relevant stages. I have already found (see paragraph 1157 above) that as far as Mr Hussain was concerned the side letter was to an important extent a fiction. I think it more likely than not that he chose to keep it back from Deloitte for fear that it would prejudice revenue recognition: and I so find.

1168.  In my judgment, it follows also that Mr Hussain knew that revenue should not have been recognised from the transaction and he had "guilty knowledge".

*Dr Lynch*

1169.  As regards Dr Lynch, the Claimants submitted baldly that:

> *"the likelihood is that Mr Hussain kept Dr Lynch informed or, at the very least, was acting within the scope of what Dr Lynch had authorised him to do, namely to recognise revenue improperly, as and when required."*

1170.  Dr Lynch accepted that he received occasional updates on the status of the KPMG renewal deal.  He may also have been aware that Mr Araujo of Autonomy was meeting with Mr Lumsden of Tikit.  However, he told me that he was not involved in the sale to Tikit, did not participate in the negotiations and neither reviewed nor approved the terms of the transaction.

1171.  Dr Lynch said that he did not recall knowing about the side letter at the time but on reviewing it for his witness statement he did not regard it as untoward. His position was that he was not involved in the revenue recognition, and had no reason to think there were any material issues with the accounting.

1172. Dr Lynch was cross-examined about this transaction:

(1) He did not accept the proposition that Mr Hussain's email dated 13 December 2010 forwarding Mr Mooney's email of that same date headed *"KPMG said no"* (see paragraph 1136 above) meant that KPMG would not do the deal. He pointed out that KPMG were still a prospect later in December (as emails later in December confirmed).

(2) It was not suggested that Dr Lynch had seen or reviewed the side letter.

(3) Dr Lynch was referred to Mr Hussain's representation letter at paragraph 1144 above. As to this:

(a) Dr Lynch did not think he would have reviewed this letter at the time. The Claimants did not identify or put to him any document demonstrating that he did do so.

(b) Although he was not involved in this aspect, when asked about it, Dr Lynch did not accept that the side letter had not in fact been disclosed to Deloitte. As explained at paragraph 1153(9) above, Deloitte did seem to know of the terms of the side letter, at least by April 2011. In any event, he suggested that this was in substance a representation about there being no undisclosed side letters and that disclosure would have been a matter for the legal department.

(c) Dr Lynch was asked *"Would Mr Hussain have discussed with you whether you should sign this representation letter despite the existence of a side letter from Tikit?"* Dr Lynch rejected this; and no evidential basis was advanced for it.

(4) It was suggested that Dr Lynch knew that "*no revenue should have been recognised on the Tikit transaction*". The Defendants submitted that it was unclear how Dr Lynch could have known this, given that:

(a) it was not suggested to him that he knew of the side letter, and

(b) when Deloitte (who were the experts) did consider the side letter they did not think that

the revenue should not have been recognised.

(5) When it was put to him that he *"knew, just as with those earlier transactions, no revenue should have been recognised on the Tikit transaction either"*, Dr Lynch summarised his position as follows:

> *"A. That's incorrect, and of course when Deloitte -- when it's not in dispute that Deloitte do see the amendment which is a quarter later, they consider it has no effect on the revenue recognition and the revenue stands in any case. And then, when HP takes over Autonomy, it puts a lot of pressure on Deloitte to reverse this revenue and move it into the future, into their future books, and Deloitte resist that and they say that the revenue was fine. So everything I've seen about this transaction leads me to believe that actually whether or not Deloitte saw the paperwork, all of it, at the time -- and I believe they did -- that it made no difference anyway."*

1173. In my assessment:

(1) It is unlikely that Mr Hussain did not inform Dr Lynch of the side letter, though he may not have detailed its terms. It was an important feature of the transaction, in which he was keeping Dr Lynch otherwise informed, and which was a large one. It would have been both risky for him and unnecessary, given their shared objectives and strategy, to keep this from Dr Lynch.

(2) I do not accept that it was not sufficiently put to Dr Lynch that he knew of the letter. The thrust of the questioning was to demonstrate that he did know of it and (for example) should have made reference to it in the Directors' representation letter to Deloitte.

(3) I do not accept either that Dr Lynch was unaware of the relevant part of the representation letter. The way matters were presented to Deloitte was an important part of the VAR strategy, and I think it more likely than not that Mr Hussain would have alerted him to it. But even

if he did not read it and was unaware of its content, my view that he was aware of the thrust of the side letter would still stand.

(4) Both Dr Lynch's quick intelligence and his opportunism were displayed by the debate he had with Mr Rabinowitz as to whether the representation contained a typographical error of some significance. The relevant representation, as it appeared, read as follows:

> "No revenue deals containing side letters of ongoing Autonomy performance requirements…"

It was suggested to him that the word *"of"* was an obvious typographical error and should have been *"or"* and that was how Mr Welham had understood it also. After the smallest pause to read, Dr Lynch said *"No, I think it's 'of'"*. He added that:

> "Again, I'm reading this now but I think it's a clause to make sure that Autonomy doesn't have ongoing performance requirements that it hasn't disclosed."

This was ingenious, but not, in my view sustainable: there was an obvious error. Corrected, it was an obvious misrepresentation, all of a piece with the desire that the letter not be disclosed.

1174. In my judgment, though there is, not unusually, little transaction-specific evidence of Dr Lynch's involvement or of what he was told or saw, the Tikit transaction (VT26) fell within the pattern which implemented the strategy instigated and encouraged by Mr Hussain and Dr Lynch, in the context of which Mr Hussain habitually reported regularly to Dr Lynch. In my judgment, it would be contrary to their usual *modus operandi* for Mr Hussain to have kept from Dr Lynch the fact of the side letter arrangements; and even had he done so, it would be more likely than not, in all the circumstances, that Dr Lynch would have assumed something similar to have been put in place in accordance with the usual pattern.

1175. Having regard to the standard of proof, I have concluded that Dr Lynch also had guilty knowledge that VT26 should not have been accounted for as giving rise to recognised revenue at the point of the VAR sale.

## VT14: Auxilium/Vatican Library (Q1 2010)

1176. In addition to the MicroTech VAR deal for end-user Vatican Library in Q1 2010 (VT13), ASL entered into a VAR deal dated 31 March 2010 with Auxilium Tech SrL ("Auxilium", another Italian reseller). The VAR Agreement was signed on behalf of ASL by Mr Kanter.

1177. A Product Schedule was signed by Mr Kanter bearing a Commencement Date of 31 March 2010 (clause 20). That stated a licence fee of €2.5 million plus €125,000 for support and maintenance (clause 17), both payable within 120 days. The authorised use of the software in the Auxilium purchase order was limited to the Vatican Library digitisation project (clause 8), permitted 10 concurrent users (clause 10) and the territory of software installation was the Vatican Territory (clause 11).

1178. It appears that, as at 31 March 2010, the total licence revenue recognised by Autonomy on this purchase was only €1,300,000 ($1,858,024), and that no further revenue ultimately ended up being recognised as at the end of Q2 2010.

1179. As noted in their Report to the Audit Committee on the Q1 2010 Review dated 20 April 2010, Deloitte considered that any revenue recognition at all on this transaction and a transaction with another Italian reseller should be deferred until *"management has more clarity on recoverability".* Autonomy management, and in particular Mr Chamberlain rejected this, but failed to persuade Deloitte otherwise.

1180. In the event, Auxilium never did pay any amount to Autonomy, and the whole invoice value was written off in ASL's general ledger on 30 September 2011 (bad debt provisions having previously been recorded).

1181. Although falling within the description of a *"Collectability VAR"*, in that the Claimants did not aver any side-agreement and relied principally on Auxilium's doubtful ability to pay and thus an alleged failure to satisfy IAS 18.14(d) in respect of VT14 as the ground for impugning it, the Claimants also argued that neither IAS18.14(a) nor IAS18.14(b) was satisfied either. Their position was that, contrary to the way in which Mr Chamberlain presented the transaction to Deloitte (he asserted that Auxilium would be receiving payment from the end-user before it became liable to pay Autonomy), there is no evidence that Auxilium ever had any involvement with the Vatican Library, let alone any basis for expecting to be paid by it.

1182. The Claimants invited me to conclude that it was never intended that Auxilium should make any attempt to achieve a sale to the Vatican Library and, in any event, that Auxilium did not in fact

make such an attempt. That fed into the Claimants' primary allegation that the debt was not collectible contrary to IAS 18.14(d) (since on that basis, Auxilium could not expect to receive any imminent payment from an end-user) but also was contended to show that in fact Autonomy retained risk and control, contrary to IAS18.14 (a) and (b). Thus, collectability and the other provisions of IAS 18.14 are inextricably linked, as Mr MacGregor acknowledged.

1183. This is illustrated by the way that Autonomy sought to persuade Deloitte of the creditworthiness of Auxilium. Mr Chamberlain described Auxilium to Deloitte (in an email dated 16 April 2010) as *"a reasonably sized VAR with significant revenues and assets"*. This, together with the knowledge he asserted from being *"very close to the negotiations of the end-user deal with BAV"* that *"they are expecting to receive payment from BAV on May 15th"*, which he stated *"provides us with the comfort to recognise the deal."*

1184. In fact, and contrary to what he told Deloitte, the financial information about Auxilium available to Autonomy was slim: and Mr Chamberlain had that same day (16 April 2010) described its 2008 financial statements to Mr Corrado Broli ("Mr Broli"), the Autonomy sales executive covering Italy, as *"not strong enough to support revenue recognition on their own"*.

1185. Even so, that same day (16 April 2010), Deloitte's refusal to approve revenue recognition and their production of an updated misstatements schedule, which included the revenue on the Auxilium purchase order provoked an immediate and aggressive response from Mr Hussain. Despite Mr Chamberlain's acknowledgement in his email to Mr Broli that revenue recognition could not be supported on the basis of the 2008 financial statements on their own, Mr Hussain wrote to Deloitte the very same day (16 April 2010) pressing for full recognition:

> *"Auxilium- No way am I accepting this as a judgmental item, you have the financials, you have the confirmations. These companies have quite sizeable revenues ($15m) and are profitable. They can resell $2m of software and we can't simply assume that a properly signed contract is not recognizable when there is good evidence. Many private companies keep small amounts of cash but are profitable and cash generating."*

1186. This was bluster. The truth is that Auxilium had never produced, and in the event never did produce, robust financial information. The impression of frailty was reinforced by Auxilium's failure to

provide more up-to-date accounts, which even Mr Hussain described as *"very disappointing"*.

1187. Further, Mr Chamberlain's assertion that Auxilium was expecting to receive payment from the Vatican Library on 15 May was also not true. As I have found in relation to VT13 (the MicroTech/Vatican Library VAR transaction), all efforts to conclude a contract for the Vatican Library digitisation project were being undertaken by Autonomy with a view to a co-ordinated direct deal between Autonomy and the Vatican Library. I consider and find that there was never any real intention or expectation of Auxilium reselling to the Vatican Library, and thus no real prospect of receipts from such a sale.

1188. Although I accept that this would not ordinarily affect a decision on grounds considered sufficient at the time to recognise revenue, the fact is that Auxilium did not meet its payment obligation under VT14 due on 29 July 2010. Even so, Mr Hussain continued over that time to seek to persuade Deloitte to reverse their decision to refuse recognition. In the event, Auxilium never made any payments to Autonomy at all. The whole invoice value was written off in ASL's general ledger on 30 September 2011 (bad debt provisions having previously been recorded). The correctness of Deloitte's contemporaneous view was thereby reinforced; and Mr Hussain and Mr Chamberlain's efforts to overturn it appear reckless.

1189. Mr Holgate arrived at the same conclusion as Deloitte that no revenue should have been recognised. Mr MacGregor did not go further in his expert report than to say that *"there was insufficient information to reach the conclusion that Autonomy's accounting treatment in respect of the licences was inappropriate"*: allowing for the benefit of hindsight, I do not agree. There was at the time no sufficient basis for revenue recognition, as the misrepresentation of the actual position to Deloitte suggested.

1190. This conclusion is also supported by the curiosity identified by the Claimants in their written closing submissions that all of the software identified in clause 1 of Auxilium's Product Schedule – LiquidOffice, FITS PlugIn, SPE, Mediabin and Archive Solution – was already included in the MicroTech for end-user Vatican Library purchase order (VT13) signed on the same day and for exactly the same authorised use. The MicroTech purchase order permitted 200 concurrent users (clause 9), which reflected the number of users in the draft licence agreement that Autonomy hoped to conclude with Postecom. The Claimants' (readily understandable) point is that it is difficult to understand, therefore, what the point would have been of selling Auxilium a licence to use a subset of identical software, but for an additional 10 users,

and that they would have wished to explore this with Mr Zanchini in cross-examination, given Mr Zanchini's personal involvement in the Vatican Library project, but for Dr Lynch's decision not to call him. All of this appears to me to confirm the artificiality of VT14.

*Defendants' knowledge that revenue should not have been recognised from VT14*

1191. In my judgment, Mr Hussain knew that in reality Auxilium was not expected to enter into an end-user deal which was its only realistic prospect of being able to pay Autonomy under the VAR agreement. He had "guilty knowledge".

1192. The Claimants' case that Dr Lynch also had such knowledge is once again based on the submission that Mr Hussain was *"acting within the authorisation he had received from Dr Lynch to use non-creditworthy VARs to recognise revenue improperly"*. I would not accept that Dr Lynch gave such authority in such unlikely terms. No evidence was ever produced showing or even suggesting his involvement in the collectability judgement made. However, that does not conclude the matter.

1193. I have found that Dr Lynch did know that the VARs were used as placeholders. Given his close interest and involvement in the Vatican Library deal, it seems to me more likely than not that he appreciated that Auxilium would not be entering into any end-user deal and more generally had nothing to offer and no role to play except as a placeholder. He had no reason to believe that Auxilium could pay out of its own resources; and I consider it very unlikely that he was not told of Deloitte's decision to refuse revenue recognition, and Mr Hussain's reckless and unsuccessful efforts to make them change their mind. In my judgment, this amounts to "guilty knowledge", and I find accordingly.

## PART V OF SCHEDULE OF IMPUGNED VAR TRANSACTIONS

## The "Collectability VARs": VAR deals impugned but no side agreement is alleged

1194. As regards five of the impugned VAR transactions the criticism the Claimants made of the revenue recognition is on collectability grounds. No side agreement is alleged to have been made. The Claimants based their claims on the basis that the requirement of IAS 18.14(d), being that *"it is probable that the economic benefits associated with the transaction will flow to the entity"* was not

satisfied.[611]  The Claimants referred to these as the *"Collectability VARs"*.

1195. The Defendants sought generically and quickly to dismiss these claims as misplaced on the basis that collectability was a judgemental issue;  and that, as they put it, if there were any errors in the judgements made, it is not easy to see how this is the territory of a fraud claim.

1196. Further, Dr Lynch submitted that in any event there was no evidence to show that he was involved in the collectability judgement and in point of fact he was not. Collectability judgements were being made by the finance department and scrutinised by Deloitte. In such circumstances, there could be no basis for a claim of dishonest participation against Dr Lynch.

1197. The "Collectability VARs" as described in Schedule 3 of the RRAPoC were:

> (1) Sales Consulting SRL / Poste Italiane (Q4 2009) (VT9);
>
> (2) Comercializadora/ TV Azteca (Q3 2010) (VT17);
>
> (3) Red Ventures / Poste Italiane (Q3 2010) (VT19);
>
> (4) Comercializadora/CISEN (Q4/2010) (VT22); and
>
> (5) Computer Trading / Poste Italiane (Q1 2011) (VT29).

1198. Although I address these individually below, certain introductory remarks in relation to this category of impugned transactions may assist to set the scene:

> (1) In none of these cases did an end-user deal eventuate; whilst that could not be known in advance, the fact is that in each of them, the prospect of any such enduser deal appeared problematic and unlikely. Revenue from an ultimate enduser sale was thus uncertain at best; and last-minute recourse to the VAR was not in real anticipation of an end-user sale but simply to book revenue regardless.  The onus was on collectability from the VAR.
>
> (2) Whereas Dr Lynch characterised collectability as a judgmental issue for the finance department, in the context of which a difference of view, and even a plain error of judgement, would not of itself begin to constitute fraud, the Claimants contended that the real

---

[611] Though in the case of VT29, a support and maintenance contract, the relevant equivalent provision is IAS 18.20(b).

vice was that those directing the transactions at Autonomy knew that the VARs in question obviously had not the means to pay, never did pay, and in one case at least may not even have existed.

(3) The essence of the Claimants' case is thus that in fact all Autonomy was doing was "parking" deals with companies for which there was no or no sufficient evidence of creditworthiness or substance simply because of an urgent need to book more revenue: the focus is really on whether the deals were contrived rather than on collectability as such.

(4) The Defendants also stressed that the issue of collectability and the judgements made at Autonomy which were questioned were not concealed or misrepresented, but discussed openly with both the Audit Committee and Deloitte. The Defendants contended that such openness destroyed the Claimants' case of dishonesty, and also emphasised the immaterial amounts (in an accounting sense) which were involved ($10,716,796 in aggregate). The Claimants answered this by contending that misrepresentations were made to both the Audit Committee and Deloitte, and in any event, Autonomy repeatedly went against Deloitte's advice, demonstrating determination to take revenue from these VAR deals notwithstanding clearly expressed doubts. According to the Claimants, the figures might be immaterial but the light cast on the practices allegedly directed and sanctioned by the Defendants respectively was not.

(5) There was also a dispute as to the burden of proof, on which the parties' respective experts also appeared to differ. In essence, the Claimants contended that since under IAS 18.14(d) the burden lies on the party seeking to recognise revenue, if there was no evidence put forward now to support collectability, the burden should not be treated as discharged, and recognition should be regarded as improper. On the other hand, the Defendants and Dr Lynch's expert, Mr MacGregor, contended (in effect) that the presumption should be that there was sufficient evidence at the time, and the burden should be on the Claimants to dislodge the judgement made at the time.

(6) The Claimants cross-examined Dr Lynch relatively briefly on the Collectability VARs, and the documentation they put forward did not overtly show or suggest any involvement on his part. In answer to the

Defendants' submission that there was no evidence of Dr Lynch's involvement or knowledge, the Claimants contended that though questions of collectability were primarily considered by Mr Hussain and Mr Chamberlain, often alongside Mr Kanter, rather than by Dr

Lynch, it is not credible to suggest that Mr Hussain, Mr Chamberlain and Mr Kanter would have acted in the way that they did in relation to these transactions, unless they believed that Dr Lynch had authorised them to do so. Accordingly, the court should infer that Dr Lynch authorised Mr Hussain to call upon non-creditworthy VARs as and when required to deal with shortfalls in Autonomy's revenue targets, and to recognise revenue improperly on the basis of transactions with such VARs notwithstanding failure to comply with the requirements of IAS 18.14(d). Put shortly, the Claimants' case against Dr Lynch relied on the proposition that:

> *"It is not credible to suggest that Mr Hussain, Mr Chamberlain and Mr Kanter would have acted in the way that they did in relation to these transactions, unless they believed that Dr Lynch had authorised them to do so."*

## VT9: Sales Consulting SRL / Poste Italiane (Q4 2009)

1199. In October 2009, Mr Corrado Broli ("Mr Broli"), the Autonomy sales executive covering Italy, reported by email to Mr Hussain that he was pursuing two potential deals involving Poste Italiane, the Italian postal service. Mr Hussain observed in an admonishing response that only one had any prospect of coming to fruition:

> *"Corrado - you have not sold a deal with standard cash collection for the last few years - this is very bad. The only deal that is worth forecasting is the Interwoven deal which I am uncomfortable allowing any commission share. All the other deals have been forecast for many many quarters and I do not believe any of them. This is a serious issue which I want you and Nigel to address and come back to me as to the solution."*

1200. The evidence is sketchy: but it seems likely that Mr Broli's response was to engage a reseller to establish a sale with a view to on-sale to Poste Italiane. On 4 January 2010, Mr Broli sent the purchase order dated as of 31 December 2009 in the sum of €1,725,000 (including €225,000 for maintenance) to an

Autonomy lawyer and asked her to "*convert*" it into what he called a "*one shot*" agreement.

1201. This resulted in the execution of an "*Autonomy One-Off Reseller Agreement*" between ASL and Sales Consulting for end-user Poste Italiane. The letter agreement stated at the top, "*effective 31 December 2009*". However, it must have been executed on or after 4 January 2010 (since it was not until then that an Autonomy lawyer was asked to draft it).

1202. In both their opening and closing submissions, the Claimants appeared to be suggesting that the letter agreement was improperly backdated. But this was not pleaded, and no such allegation was put to Dr Lynch. Further, the letter agreement is not otherwise dated and there is no pretence that it might have actually been executed on the effective date. As was emphasised in Mr Hussain's written closing submissions, and as Mr Welham accepted in cross-examination, an agreement in writing is not required for the purposes of revenue recognition pursuant to IAS 18.14, and there is nothing in itself wrong in documenting a transaction after the quarter end if the substance was agreed in the previous quarter. I do not consider that a suggestion of improper backdating is available to the Claimants, and I draw no inference of impropriety in respect of this aspect of the matter.

1203. Nevertheless, the VT9 transaction was somewhat haphazard from the start. The One-Off Reseller Agreement stated that "*Reseller should only place an order with Autonomy when Reseller has received an order from an End-User*". The Agreement also required proof of "*sell through*" by Sales Consulting to Poste Italiane on all orders in excess of $100,000. Shipment was to be made "*upon receipt of a valid purchase order*". No proof of "*sell through*" to Poste Italiane was provided to Autonomy. Thus, the purchase order did not meet the contractual requirements established by Autonomy for a valid order in the first place. There was no evidence of any effort to put in place a *"sell through"*. There is no substantial evidence that there was ever any settled prospect of a sale to Poste Italiane (and none eventuated).

1204. The somewhat haphazard documenting of the transaction was matched by the makeshift and unsatisfactory correspondence with Sales Consulting after the sale. It seems clear that there were difficulties in pinning Sales Consulting down from the start. In January 2010, Autonomy made several attempts to obtain an email address for, and financial information regarding, Sales Consulting:

(1) On 11 January 2010, Mr Chamberlain asked Mr Broli to provide an email address for it. Mr Broli provided a

gmail address. On 12 January 2010, Mr Chamberlain responded, "*I cannot use a gmail address. If this is a proper organization they will have a proper e-mail address. I need that please*".

(2) On 13 January 2010, Mr Chamberlain emailed Mr Broli (copying Mr Hussain) to say, "*desperately need financials and evidence of how good they* [Sales Consulting] *are for the money. Also, still need a proper email address*". Mr Hussain followed up on the 18 January 2010 in similar vein: "*We have no information on this company ...*"

(3) On 21 January 2010, Mr Broli reported that Sales Consulting had been founded on 30 July 2009 (five months before the Sales Consulting deal) and had revenues in 2009 of €1.8 million and €6.4 million projected for 2010. No information about profitability was provided.

(4) Mr Chamberlain responded, "*sorry, this does not help*" and requested further information.

(5) On 21 January 2010, Mr Chamberlain requested that Mr Broli provide evidence of "*sell through*" to the end-user. None was provided.

1205. The evidence about the likelihood of payment by Sales Consulting further deteriorated thereafter. On 19 April 2010, Mr Hussain emailed Mr Broli, copying Mr Chamberlain, complaining that no debtor's confirmation for Sales Consulting had been received, nor any up-to-date financials, and that this was "*very disappointing*".

1206. Dr Lynch, in the course of his very light cross-examination on the transaction, put this all down to business practices in Italy. But the difficulties do seem strange given that Sales Consulting was a subsidiary of BNP Paribas, a large bank.

1207. The Claimants submitted that the reality is that it is plain from this evidence that Sales Consulting was not a creditworthy counterparty for a €1.75 million transaction. That was also Deloitte's conclusion: in its Q4 2009 report to the Audit Committee, Deloitte proposed that the revenue should not be recognised "*as we have not seen persuasive evidence that this amount is recoverable*". However, Deloitte recorded that "*Management are comfortable that the customer has a sound financial position based on its knowledge of the customer's reputation and position in the industry*" which was said to include Sales Consulting's status as a subsidiary of BNP Paribas but

added that *"...the absence of further persuasive evidence means that we are unable to reach the same position at this time."*

1208. In the event, Sales Consulting did not pay and went into liquidation. By a letter dated 24 May 2010, Sales Consulting stated (emphasis in original):

> *"Dear Steven Chamberlein, [sic]*
>
> *as anticipated through Mr Corrado Broli, on May 6th 2010 the company Sales Consulting Srl, in Via Nicolò Tartaglia 11, Rome, **was placed in liquidation** in accordance with the legislation in force in Italy.*
>
> *The reasons that led the propriety [sic] to that decision are:*
>
> *Budget losses recorded in fiscal and financial management 2009;*
>
> *Very strong market restrictions and competition from large corporations due to the global financial crisis;*
>
> *Massive cuts in spending budget of the public administration and as a consequence of private too;*
>
> *Moreover the customer named Poste Italiane SpA, who had already expressed some difficulties with its delays (which we communicated to you in the email dated in April), is not in the right condition to acquire software applications and related services throughout 2010.*
>
> *It is therefore with great regret that our company cannot maintain the conditions for the acquisition of the rights to the software registered by you on December 31st, 2009. ..."*

1209. On 5 July 2010, a representative of Sales Consulting emailed a copy of the letter direct to Mr Chamberlain and Mr Broli. Mr Chamberlain forwarded a copy to Mr Hussain and Mr Kanter, stating "*Not seen this before*". The same day, Mr Kanter contacted Rachel Haverfield, an Autonomy lawyer, to ask whether Autonomy could terminate its contract with Sales Consulting "*under the bankruptcy clause*".

1210. Autonomy did not provide a copy of Sales Consulting's letter to Deloitte. It was the unchallenged evidence of Mr Welham that Deloitte "*certainly should have been told about it*", because it would have meant that what Deloitte had hitherto been content to regard as a "*judgemental adjustment*" had now become a "*known adjustment*".

1211. The Claimants pointed out that no explanation has been advanced by the Defendants as to why the letter was not forwarded to Deloitte. However, it is also to be noted that by that stage Autonomy's management had determined that the individual effect of this transaction, and the aggregate effect of the adjustments necessary to reverse the revenue recognition in respect of all prior transactions impugned on collectability grounds, was not material in the context of the financial statements as a whole.

1212. On 21 July 2010, Ms Anderson (then of Deloitte) asked Mr Chamberlain about the status of Sales Consulting. Mr Chamberlain did not tell Deloitte of Sales Consulting's bankruptcy.

1213. In an email dated 26 July 2010, Ms Rachel Haverfield, an Autonomy in-house lawyer, summarized the situation with Sales Consulting: "*In Dec 2009, one of our smaller resellers (Sales Consulting) purchased a licence on behalf of an Italian company, Poste. It appears that Poste did not go ahead with the project, so the reseller did not get paid.*" She mentioned that Mr Kanter was exploring whether Autonomy could terminate the contract on the basis of the liquidation.

1214. When, in October 2010, Deloitte raised, as an outstanding audit issue, the need for evidence of the recoverability of the Sales Consulting debt, Mr Chamberlain told Mr Hussain to "*Ignore Sales Consulting, this is not valid*". However, that position was never relayed to Deloitte either.

1215. In Q3 2011, after the HP acquisition was announced, but before it became effective, Autonomy wrote off the then-outstanding balance.

1216. As previously mentioned, the experts agreed that (in retrospect at least) revenue should not have been recognised on this transaction: so little was known or ascertainable about Sales Consulting in terms of its financial information and trading history that it could not be said that there was a sufficient basis for a conclusion that the debt was collectible and IAS 18.14(d) was not satisfied.

1217. The immateriality of the transaction in accounting and financial terms, whether looked at singly or in aggregate with other "Collectability VARs" (as confirmed by Deloitte), means, to my mind, that any significance to be attributed to it depends upon whether the circumstances I have described support the Claimants' case that the Collectability VARs, in common with all the impugned VAR transactions, were in effect contrived simply

to recognise revenue regardless of their true viability and substance, and improperly.

1218. The principal question in that regard, in my view, is whether either of the Defendants were aware, at the time of revenue recognition in respect of VT9, that Sales Consulting was not creditworthy.

1219. It seems clear from the email exchanges between Mr Chamberlain and Mr Broli that (a) Mr Chamberlain was concerned to obtain proper details (as was Mr Hussain) but (b) nothing useful was received from Mr Broli (who seems to have been unable or unwilling to understand what was required, but whenever prompted painted a picture of a company quickly expanding in terms of revenue and gave repeatedly unfulfilled assurances of the provision of imminent further financial information) leaving Mr Chamberlain (and Mr Hussain) very disappointed and having (c) to hold on to the fact that Sales Consulting was a subsidiary of BNP Paribas.

1220. The Claimants submitted that in such circumstances there was no basis on which Mr Hussain could genuinely have been satisfied, as at the date of publication of the Q4 2009 results (2 February 2010) or the 2009 Annual Report (22 February 2010), that Sales Consulting was more likely than not to pay the amount specified in the purchase order, which was the effect of the condition stipulated by IAS 18.14(d).

1221. I have concluded as follows:

> (1) In light of the expert evidence and the clear view of Deloitte, it was wrong to recognise revenue in respect of VT9, as later events confirmed.

> (2) The likelihood is that Mr Hussain's criticism of Mr Broli that he so seldom brought forward any realistic prospective transactions caused Mr Broli to resort to a quick VAR deal and to overlook, and then prevaricate and in effect cover up, the VAR's inadequacies.

> (3) The broken promises of financial information, and the frailties revealed by the little information that was provided, must have increasingly concerned Mr Chamberlain and Mr Hussain (who, the evidence would suggest, were not gullible by nature). But the VAR deal having been done, and the revenue recognised, they were plainly averse to any write-off until the apparent became the blindingly obvious;  and when added to a corporate or institutional mind-set of maximising the amount of recognised revenue this caused them to

subordinate their real concerns, and place erroneous reliance on Sales Consulting's apparent financial umbrella (BNP Paribas).

(4) That was wrong; the question then is whether it was dishonest. It is important to bear in mind the time line. Deloitte's Final Report on the 2009 Audit, in which they proposed an adjustment of $2.2 million since they had *"not seen persuasive evidence that this amount is recoverable"* but noted that *"Management are comfortable that the customer has a sound financial position based on its knowledge of the customer's reputation and position in the industry"*, was dated

1 February 2010. By that stage, Mr Chamberlain plainly had real concern and was voicing it to Mr Broli (and sharing it with Mr Hussain); and such concern was exacerbated after there was no satisfactory response to his email to Mr Broli of 21 January 2010 (copied to Mr Hussain) asking him to get hold of evidence of sell through arrangements that the one-off reseller agreement stated had to be provided. Although even in April, the expression on the part of Mr Hussain that no debtor's confirmation or up-to-date financials had been provided was one of disappointment (see paragraph 1205 above). But by then it seems to me plain that neither Mr Chamberlain nor Mr Hussain would have been able to say that they had confidence in Sales Consulting's ability to pay. They were, at the least, reckless.

(5) In short, I accept the Claimants' case that as at 1 February 2010 (when Deloitte recorded the difference in view between it and Autonomy's management) and/or as at 22 February 2010 (the date of the 2009 Annual Report) Mr Chamberlain and Mr Hussain had no honest belief that Sales Consulting would be able to pay.

*Defendants' knowledge of wrongful revenue recognition in respect of VT9*

1222. Mr Hussain was directly and personally involved. He knew the salient facts. In my judgment, he must have known it was wrong to press for revenue recognition. This conclusion is reinforced by his failure (which the Claimants said was otherwise inexplicable) to ensure that news of Sales Consulting's insolvency was promptly relayed to Deloitte. He had "guilty knowledge".

1223. As so often, the case against Dr Lynch was less clear. The Claimants accepted that there is no documentary evidence of Dr

Lynch's direct personal involvement in relation to this transaction. However, they submitted that it is not credible to suggest that Mr Hussain, Mr Chamberlain and Mr Kanter participated in this transaction, without Dr Lynch's authorisation. As stated above, they urged the court to infer that Dr Lynch authorised them to recognise revenue on non-creditworthy VARs, as and when required.

1224. I do not accept that the evidence supports that inference in that form. I do accept, however, that the general policy condoned by Dr Lynch was that, if necessary to meet forecast for revenue, VARs should be used as placeholders without proper regard for their ability to pay out of their own resources and in the knowledge that they would not receive anything from resale.

1225. Further, I think it more likely than not that Mr Hussain would have kept him regularly informed; and I think it likely that Mr Hussain would have warned Dr Lynch of Deloitte's conclusions, and of the proof that they were justified when Sales Consulting's bankruptcy became known to him.

1226. In my judgment, the likelihood is that Dr Lynch was told of the serious doubts and was prepared to turn a blind eye. In any event, he had condoned the policy: that amounts to recklessness as to whether or not the accounting might be untrue and misleading; and that is sufficient for FSMA purposes.

## VT17: Comercializadora/TV Azteca Q3 2010

1227. In September 2010, Autonomy was hoping to conclude a sale to TV Azteca, a Mexican multimedia conglomerate. However, on 30 September 2010, at the end of Q3 2010, Mr Hussain sent Dr Lynch an email stating that the deal was in trouble. Almost immediately thereafter, Mr Neil Goldfarb, an Autonomy representative for Latin America Sales, sent an email marked urgent to Mr Crumbacher stating that he needed a *"one-off reseller agreement for my TV Azteca order"* and asking whether it would be possible to get this *"in template form"* for him simply *"to fill in the contact and address etc."*

1228. Email exchanges show that such an agreement was completed within the day with an entity named as Comercializadora Cobal SA de CV ("Comercializadora"). Thus, on 30 September 2010, Autonomy entered into a VAR agreement with Comercializadora for a licence fee of $1,500,000 plus $150,000 support and maintenance on the terms of a letter agreement containing the usual provisions previously noted. Payment was due on 29 December 2010.

1229. Comercializadora never paid. In Q2 2011, a bad debt provision of $549,945 was made; and in Q3 2011 Autonomy wrote off the entire debt.

1230. The Claimants' case is that at least by the time of publishing Autonomy's 2010 Annual Report, Autonomy had such doubts as to the substance of Comercializadora that provision should have been made against the debts; that Autonomy did not inform Deloitte about such doubts; and that VT17 (like VT22, another VAR deal with Comercializadora which I deal with below) is a further demonstration of serious impropriety of which the Defendants were well aware.

1231. It is not apparent who selected Comercializadora to be a VAR: Autonomy had not engaged with it previously. Deloitte (which initially pronounced the recognition of revenue in respect of VT17 to be satisfactory) noted the following about Comercializadora in its working papers:

> "Comercializadora Cobal's is a new customer and therefore there is no payment history available. Financial statements as at 31 Dec. 2009 shows that it has cash of $5.3m in hand and its net assets amount to around $16m. Total sales of 2009 is around $24m and net profit around $8.2m…"

1232. However, the Claimants contended that by the time of the 2010 Annual Report, evidence had come to light which cast considerable doubt on the financial substance (and even existence) of Comercializadora and on the collectability of the debt, but which (according to Mr Welham, who was not cross-examined on the point, avowedly because the point was not pleaded) was not shared with Deloitte. In particular, on 5 November 2010, Mr Richard Eads (Global Procurement officer and Director of Credit and Collections) of Autonomy notified Mr Chamberlain of "*some issues*" with the Comercializadora account:

> "We may have some issues with this account as follows:
>
> 1) the phone number provided on the order is no longer working.
>
> 2) the email address provided on the order is no longer working.
>
> 3) the domain name www.cobalsco.com.mx is not active.
>
> 4) the email at the bottom of this thread was send from a hotmail account.

> *5) we have reason to believe that Gilberto Alvarez used to work for Itegrar.*
>
> *Would you like us to continue researching here in Dallas? Or should we bring legal into the mix?"*

1233. That was a formidable list. On 10 November 2010, Mr Chamberlain wrote to Ivan Rothman, Autonomy's Senior Corporate Counsel, noting that there were "*early indicators that the reseller did not exist or has gone underground*".

1234. On 19 January 2011, Mr Gilberto Alvarez (signing as Comercializadora's Legal representative) sent an email to Mr Goldfarb attaching Accounts for 2010 which showed Comercializadora as having $4.2 million in cash, but (except for the email referred to in paragraph 1249 below) any attempts to contact Mr Alvarez and Comercializadora further were unsuccessful, and in an email to (amongst others) Mr Eads, Mr Rothman and Mr Goldfarb dated 20 January 2011, Mr Stephan wrote:

> *"Neil – I don't understand. They can't pay us even half the cash from their Q3 deal without raising bank financing yet they have $4.2m in cash? Excuse my cynicism but either these financial statements have been falsified or they should be paying us the full balance from Q3 immediately. What's the true story here?"*

1235. The evidence is at best patchy as to how the issue of revenue recognition and any appropriate provision was thereafter dealt with, except that Deloitte's Report to the Audit Committee for the year ended 31 December 2010 (dated 26 January 2011) proposed a judgmental adjustment (and bad debt provision accordingly) of $2.7 million to cover both VT17 and VT22 "*given the long overdue nature of the balance and lack of recent correspondence*".  The same report noted additionally, however, that this was not material in the context of the financial statements as a whole.

1236. Although Mr Welham was not cross-examined on the point (on the apparently erroneous basis that it was not pleaded) it was suggested in Mr Hussain's closing submissions that it was untrue that Autonomy had kept Deloitte in the dark about the difficulties it was having in contacting Comercializadora, as Mr Welham appeared to suggest, since Deloitte's 2010 year-end Report to the Audit Committee (see paragraph 1235 above) commented on management having to chase overdue balances and the "*lack of recent correspondence*".

1237. Further, and as was pointed out in the written closing submissions on behalf of Mr Hussain, Deloitte's *"Evaluation of Misstatements"* document records a discussion with Mr Chamberlain, Mr Hussain and the Audit Committee on 26 January 2011 about Deloitte's proposed judgmental misstatements and the reasons for them (including, I think I should assume, the doubts that Mr Eads had expressed to Mr Chamberlain in his email of 5 November 2010).

1238. Nevertheless, the depth of the difficulties and Autonomy's concerns were still not shared with Deloitte, and were entirely inconsistent with any attempt to contradict Deloitte's own doubts.

1239. To complete the picture, no sale to TV Azteca was achieved: the evidence was sparse in this regard but there was little or nothing to suggest that it was ever likely. The result of

the recourse to the VAR was thus not to accelerate but to fabricate revenue which was never in fact received from any source.

1240. In my judgment, VT17 was another illustration of what by the end of 2010 had become a propensity on the part of Autonomy to resort to a VAR as a means of booking revenue  with very little analysis on its part either of the VAR's ability to pay or the prospect of the direct sale by Autonomy to an end-user from which alone there was any prospect of actual revenue receipt.

1241. It is also an illustration of the mismatch between Autonomy's speed to recognise revenue and its reluctance to (in effect) reverse any part of it even in the face of widespread doubt as to collectability.

1242. The truth is that in these cases, revenue was recognised when in reality the expectation of any receipt was uncertain (and in the event, none eventuated). In my judgment, the recognition of revenue was unjustified and indeed reckless.

*Defendants' knowledge of improper revenue recognition in respect of VT17*

1243. Mr Chamberlain plainly knew the relevant details. The Claimants' case that Mr Hussain  knew the relevant facts is based on the proposition that *"Given his* [Mr Chamberlain's] *close working relationship with Mr Hussain, it is likely that he kept Mr Hussain informed of them."*  The Claimants also relied on the fact that neither Mr Chamberlain nor Mr Hussain had attended trial to offer evidence to the contrary. I accept this: it is unlikely that Mr Chamberlain proceeded without keeping Mr Hussain informed.

1244. Dr Lynch was not cross-examined on the transaction, and no transaction-specific evidence of his involvement was provided.

The only basis on which Dr Lynch was said to be implicated was that he had (it was alleged) given general authorisation for transactions with non-creditworthy VARs. As in the context of VT9, I do not think he knew of the particular transaction; but he condoned the policy.

1245. In my judgment, as I have held to be likely, Mr Hussain would have kept Dr Lynch informed. But even if that were not so, Dr Lynch had condoned the policy: that amounts to recklessness as to whether or not the accounting might be untrue and misleading; and that is sufficient for FSMA purposes.

## VT22: Comercializadora/CISEN Q4 2010

1246. Although slightly out of chronological sequence (since another Collectability VAR, VT19, preceded it) I next discuss the second transaction with Comercializadora, which was entered into in Q4 2010. The transaction comprised a VAR sale in the sum of $1,000,000 (plus $100,000 support and maintenance) for end-user Centro de Investigacion y Seguridad Nacional ("CISEN", the Mexican intelligence agency).

1247. This second Comercializadora deal revealed the same pattern and traits as the first (including the very late introduction of the VAR right at the end of the relevant quarter, and the complete failure to pay followed by a $366,630 bad debt provision in Q2 2011, followed by a 100% write-off in Q3 2011). Its principal interest is in the fact that by the time that it was made Autonomy was well aware of serious doubts about Comercializadora's financial position (and even, existence), and, although Deloitte declined to approve revenue recognition, Autonomy recognised the revenue regardless.

1248. Again, the difficulty in this transaction is the sparseness of the evidence: indeed, the evidential position is materially less clear than in the case of VT17. The Claimants relied on the experts: but the experts relied on assumptions as to the facts and do not assist in assessing how it was that Autonomy came to resort to this doubtful VAR and persuade itself that revenue could properly be recognised.

1249. In my judgment, what emerges from the very limited documentary evidence, and especially an email from Mr Gilberto Alvarez (breaking his previous silence) to Mr Ray Corado (an Autonomy Financial Analyst) and Mr Goldfarb, dated 26 January 2011, is that Comercializadora was not in a position or intending to pay unless and until its end-user paid. The Claimants never suggested any side agreement to that effect: it was simply the position Comercializadora (or, if it was not an existent entity, those speaking for it) took. Thus, when the Mexican Treasury

suspended resourcing of open projects, Mr Alvarez appears to have taken it as read that Comercializadora would not pay Autonomy notwithstanding the terms of the VAR Agreement (again in a letter with the usual terms).

1250. Deloitte's working papers record satisfaction that the requirements of IAS 18.14 as to the transfer of risk and reward, managerial control and economic benefits had been satisfied, except that they proposed that an adjustment be made to defer revenue recognition, stating as follows under the heading "Collectability":

> *"Based on Comercializadora's historic dealings with Autonomy and the fact that the most recent available financial information (as at 31 December 2009) on Comercializadora shows that it has insufficient means by which to pay this current deal and the Q3 2010 deal of $1.65m. As such, we conclude that there is sufficient doubt over the recoverability of this deal such that revenue should be deferred."*

1251. The Claimants alleged further that *"Autonomy recognised the revenue regardless"*. Although Deloitte advised an adjustment to defer recognition of revenue, Autonomy stuck to its view. Deloitte were less than robust despite the obvious red flags, and ultimately the resolution appears to have been that the effect of the difference in view was immaterial to the accounts. However, for present purposes what is important is that once again recourse had been made to a VAR, and the 'sale' proceeds booked in full as recognised revenue, without any sufficient prospect of revenue ever being received.

1252. As it was, Comercializadora never did make any payment to Autonomy on this transaction. By Q2 2011, a bad debt provision of $366,630 had been recorded.  In Q3 2011, the invoice was written off in full. No sale to CISEN ever eventuated.

*Defendants' knowledge of improper revenue recognition in respect of VT22*

1253. Again, the Claimants' case is that Mr Chamberlain knew all the facts. He was expressly warned by Mr Eads that the deal was *"complete nonsense…We have no reason to believe that this [is] a good order…"* I think it more likely than not he would not have withheld any of this from Mr Hussain. He did not, of course give any evidence to gainsay that.  Mr Hussain himself knew about the contemplated transaction with CISEN: it is documented that he pressed for updates on its progress, and that he also knew that it had proved, before year-end *"a heroic failure"* and that a VAR was to be involved to book revenue, the transaction being (as

described by Mr Scott *"a big one that we are counting on"*).  In my judgment, Mr Hussain had "guilty knowledge".

1254. Dr Lynch maintained that he was not involved[612] and that the revenue recognition decisions were made by Autonomy's finance department. He was not cross-examined at all on either VT17 or VT22; but since his position was that he could give no evidence that is more understandable.

1255. As in the case of the other impugned Collectability VAR transactions, I accept that there is no transaction-specific evidence of Dr Lynch's personal involvement.  I doubt he knew the details: but he had condoned the policy, even in its extreme form where revenue was booked without any real prospect of receipt. That was not honest. Again, the question is whether Mr Hussain would inevitably have informed him, despite the relatively immaterial amount involved, or whether if not it suffices that Dr Lynch had condoned this sort of transaction.

1256. In my judgment, Mr Hussain would have kept Dr Lynch informed. But even if that were not so, he had condoned the policy: it amounts to recklessness as to whether or not the accounting might be untrue and misleading; and that is sufficient for FSMA purposes.

**VT19: Red Ventures/Poste Italiane Q3 2010**

1257. On 30 September 2010, Mr Kanter, on behalf of ASL, signed a VAR agreement with Red Ventures srl ("Red Ventures"). The agreement appointed Red Ventures to act as a VAR on behalf of four end-users in Italy, namely Poste Italiane, the Italian Ministry of Justice, the Italian Ministry of Health and Terna (the operator of the Italian transmission grid).

1258. The agreement provided, by clause 2, for a sale of software licences, with licence fees of €2 million and one year's support fees of €100,000.  The payment terms were 90 days from invoice.

1259. Autonomy recognised the licence fee revenue at the time of the VAR Agreement. The Claimants contended that it was clear even at that time that Red Ventures was not good for the money and that *"the recovery of this licence fee was never probable".*

1260. It appears from email exchanges that Autonomy had some difficulty in obtaining any financial statements from Red Ventures, despite repeated efforts by Mr Hussain and Mr

---

[612] In closing submissions it was submitted Dr Lynch was not involved in the collectability judgments being made by the finance department and Deloitte. Dr Lynch said he had no role in the post-quarter collectability judgments that were made.

Chamberlain to obtain them. There is no indication that adequate financial statements were ever produced.

1261. Deloitte's working paper said it had "*not seen any persuasive evidence that this deal is recoverable*", with the consequence that it had been recorded as a "*likely misstatement*". Similarly, Deloitte's Q3 2010 report to the Audit Committee stated Deloitte's belief:

> "*that there is currently insufficient evidence of recoverability and therefore that it is not appropriate to recognise revenue at this stage*".

1262. In the event, Red Ventures never did make any payment to Autonomy on this transaction. On 13 April 2011, Mr Kanter was sent an update on non-payment, which noted that,

"*There is a telephone number [i.e. for Red Ventures], but it doesn't answer*". By Q2 2011,

a bad debt provision of $965,213 had been recorded and, on 30 September 2011, the total invoice was classified as a bad debt and written off.

1263. The Claimants submitted that the court should accept Mr Holgate's evidence that, on the facts assumed by him, this transaction did not satisfy the requirements of IAS 18.14(d). Mr MacGregor did not agree. He concluded that he did "*not have enough information to conclude whether IAS 18.14(d) was met*" and that on that basis, there was "*insufficient information to reach the conclusion that Autonomy's accounting treatment in respect of the licences was inappropriate*". However, the Claimants submitted that on that basis he should have reached the opposite conclusion that the absence of sufficient information to satisfy IAS 18.14(d) should prevent a finding that Red Ventures was more likely than not to pay Autonomy. The Claimants contended that this was therefore "*another transaction where Deloitte never approved the recognition of revenue, despite which Autonomy nonetheless went ahead and recognised it anyway*".

1264. This latter contention is not quite accurate. It conflates three separate accounting events: (a) the recognition of revenue at the time of the VAR sale in September 2010; (b) the subsequent Q3 2010 review of and Audit Committee report on that decision by Deloitte proposing reversal of revenue as a "judgemental adjustment"[613]; (c) the determination of materiality and whether

---

[613] Which Mr MacGregor explained as being "*the difference in judgment between Deloitte and Autonomy's management at the time*".

and how to reflect the results of the review in the Q3 2010 reported results.

1265. As to (a) in the preceding paragraph 1264 above, there appears to have been little or no evidence available to Autonomy as to the standing and financial position of Red Ventures. It remains unclear why Red Ventures' was chosen as a VAR. Insofar as Red Venture's ability to pay depended on a successful re-sale to end-users, it appears that the contracting party was proposed to be Poste Italiane, although other Italian governmental or quasigovernmental departments or entities were intended users. As in previous contexts, the one-off VAR agreement (dated 30 September 2010) expressly provided that *"VAR should only place an order with Autonomy when VAR has received an order from End-User or its authorized agent."* No such order from End-User was received at the time or thereafter. The evidence was sparse: there was none that an end-user deal was a probability, or even on the cards; and Poste Italiane had proved unreliable in the past.

1266. As to (b) in paragraph 1264 above, the Defendants stressed that Deloitte's proposal subsequently that an accounting adjustment should be made to reverse the value of Autonomy's sale to Red Ventures (and the corresponding debtor balance) does not of itself impact on the original decision to recognise revenue: it reflects the different view they took, presumably once the difficulty in obtaining information emerged and also (it would appear) in light of some specific (but unexplained) concern about one of the enduser's (Poste Italiane's) ability to pay.

1267. As to (c) in paragraph 1264 above, it appears that the decision not to include the adjustment in the Q3 2010 reported results was because (a) Autonomy's management still hoped that payment could be made and (b) Autonomy's management considered, and Deloitte concurred, that the adjustment would not have had any material effect on the financial statements taken as a whole.

1268. In my judgment, VT19 is another example of Autonomy tending to take advantage of any leeway available and to stick by its judgement to recognise revenue unless and until unequivocally required to reverse it. Autonomy was prepared to take a clear risk of never receiving revenue for the immediate advantage of booking revenue to meet target. That was not honest. The transaction was flawed and no revenue should have been recognised from it.

*Defendants' knowledge of improper revenue recognition in respect of VT19*

1269.   The Red Ventures VAR deal was signed by Mr Kanter. Although there is no evidence of his involvement before then, it was Mr Hussain who pursued (entirely unsuccessfully) financial information about Red Ventures after the event. It is more likely than not that he knew (from Mr Kanter) about the deal and its frailty. He was responsible for its revenue recognition and the lack of any substantial basis for it. I consider that this amounted to "guilty knowledge".

1270.   The Claimants did not put any transaction-specific evidence nor indeed any case of specific dishonest knowledge to Dr Lynch in relation to this transaction. Again, however, it is more likely than not that Mr Hussain kept him abreast; and in any event, even if he did not know the details, he had condoned the policy, even in its extreme form where revenue was booked without any real prospect of receipt.

1271.   In my judgment that amounts to recklessness as to whether or not the accounting might be untrue and misleading; and that is sufficient for FSMA purposes.

### VT29: Computer Trading/Poste Italiane Q1 2011

1272.   The last, and in value terms least, of the Collectability VAR transactions was a purchase order from an Auxilium group company called Computer Trading dated 10 February 2011 for support and maintenance services and support on IDOL products for a period of 15 months (1 January 2010 to 31 March 2011) for end-user Poste Italiane. The price was €340,000. There would probably have been a governing agreement, but it was not shown to me and I note that Mr MacGregor had not seen a copy either.

1273.   A notable feature of VT29 for present purposes is that Autonomy recognised the sum of €340,000 as licence revenue in its income statement on 31 March 2011, despite this transaction relating to the sale of maintenance and support services. It appears from ledger extracts referred to in Mr MacGregor's Supplemental Report that Autonomy originally recorded the transaction in full as support revenue, but that this was reversed the same day and transferred to licence revenue in the income statement: but the reason for this was not explained. Mr MacGregor postulated that perhaps the reason was that the services were to be and perhaps had in fact been provided over the prescribed period, and on that basis he considered that:

> "...it is reasonable that the revenue was recognised in full by that date, although ordinarily I would expect for this revenue to have been spread over the period in which services were provided…".

1274. It appears from Mr Broli's email to Mr Hussain dated 10 February 2011 that Computer Trading (Auxilium) had been required and had promised to pay €340,000 upon receipt of Autonomy's invoice. Mr Hussain had insisted they pay *"since they already owe us for BAV we can only recognise on cash received."* In the event, Computer Trading paid nothing until it paid the lesser sum of €70,000 on 19 October 2011. No further payments were received and the remaining balance was written off in September 2012. The Claimants focused on the alleged lack of financial evidence of Computer Trading's ability to pay as the basis for impugning VT29.

1275. The Claimants alleged, supported by the evidence of Mr Holgate, that the recognition of revenue in respect of VT29 was not compliant with IAS 18.20(b), which applies to the supply of services. IAS 18.20(b) requires that *"it is probable that the economic benefits associated with the transaction will flow to the entity"* in order that revenue shall be recognised. Mr MacGregor did not accept this because he was *"not able to reach a conclusion as to the appropriateness (or otherwise) of Autonomy's accounting treatment for this transaction".*

1276. As in the case of VT19 (Red Ventures), the Claimants submitted that "*the absence of evidence means that the requirement of a 51% likelihood of payment was not satisfied."* In my judgment, the question is broader than that: it is whether at the time when the decision to recognise revenue was made there was a sufficient basis in the contemporaneous information available to Autonomy for concluding reasonably, even if ultimately wrongly, that the VAR would pay within a reasonable time.

1277. As Mr MacGregor noted, there is no witness statement evidence, nor any Deloitte working papers, specific to this transaction. The transaction was not mentioned in Deloitte's Report to the Audit Committee for Q1 2011, presumably because it was immaterial. The sparseness of the evidence available in this context makes an assessment now of the judgment then very difficult.

1278. The Defendants' position was that as the Claimants bear the burden of proof in the proceedings, the lack of evidence is fatal to their claims. I do not agree. In my judgment, having regard to all the circumstances including the demonstrated unreliability of Poste Italiane and the 'pattern' evident of recourse to a VAR without prospect of payment, the lack of evidence of a likelihood of payment suggests that IAS 18.14(d) was not fulfilled. Further, and more specifically, the VAR deal itself required payment immediately upon receipt of Autonomy's invoice; and none was made. In such circumstances, in my judgment, the evidence that revenue should not have been recognised is clear.

1279. I would regard this transaction as being all of a piece with the other Collectability VARs:

there was no evidence of any proper basis for recognising revenue from it.

*Defendants' knowledge of improper revenue recognition in respect of VT29*

1280. Although it was a relatively small transaction, Mr Broli kept Mr Hussain updated about it.  Mr Hussain had stipulated payment against invoice; and it must be likely that he knew this had not been fulfilled. He had "guilty knowledge" accordingly.

1281. I accept that there is no transaction-specific evidence of Dr Lynch's personal involvement. Again, the question is whether Mr Hussain would inevitably have informed him, despite the relatively immaterial amount involved, or whether if not it suffices that Dr Lynch had condoned this sort of transaction.

1282. In my judgment it does: it amounts to recklessness as to whether or not the accounting might be untrue and misleading; and that is sufficient for FSMA purposes.

*Overall conclusions as to the Collectability VAR claims*

1283. In summary, in my judgment, the Collectability VARs demonstrate a pattern of knowing improper recognition of revenue simply to book revenue to meet targets without any sufficient regard to whether any revenues would in due course be received.

1284. Both Defendants were implicated and had "guilty knowledge" of the wrongful accounting and consequent false depiction in Autonomy's published information.

<span style="color:red">**THE APPROVED FINAL JUDGMENT [2022] EWHC 1178 (Ch)  WAS HANDED DOWN ON**

**17 MAY 2022 . IN THE CASE OF ANY CONFLICT BETWEEN THAT APPROVED**

**JUDGMENT AND THE SUMMARY OF CONCLUSIONS SET OUT BELOW AND PROVIDED ON 28 JANUARY 2022, THE APPROVED JUDGMENT PREVAILS.**</span>

**(1) ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY CORPORATION**

**LIMITED)**

**(2) HEWLETT-PACKARD THE HAGUE BV (AS SUCCESSOR TO HEWLETT-**

**PACKARD VISION BV)**

**(3) AUTONOMY SYSTEMS LIMITED**

**(4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC**
-v-
**MICHAEL RICHARD LYNCH AND SUSHOVAN TAREQUE HUSSAIN**

**SUMMARY OF CONCLUSIONS OF MR JUSTICE HILDYARD - 28TH JANUARY 2022**

**This summary**

1.   I will summarise my key findings in the statement I am about to make.  This is a public statement.  However, I will also deliver by 8pm today to the parties' legal representatives, but only to them, a copy of my draft judgment setting out much more fully the reasons for my conclusions.  **That draft will remain at all times strictly embargoed.**

2.   Neither that draft, nor any part of its contents, is to be made available to persons other than those on the lists notified by the parties' legal representatives to me, and agreed by me.  **Any breach of the embargo would be a contempt of court**. My final judgment will be handed down after the usual process of checking and

correction is completed.  As the judgment is of considerable length, that will take longer than usual.  That is the principal reason for this summary of my conclusions today.  As with any summary, it may not entirely capture what the much longer document is intended to convey.  If there is any conflict between this summary and my judgment as finally delivered, my judgment will prevail.

3.      Even this summary of the draft is not short. Copies can be made available.  But I do not wish to cause unnecessary suspense.  I will start by saying that the Claimants have substantially succeeded in their claims in these proceedings.  Quantum will be determined in a later judgment, but I would anticipate that, although substantial, it will be considerably less than claimed.

**The proceedings**

4.      These proceedings relate to acquisition ("the Acquisition") for approximately $11.1 billion in cash of the entire issued share capital of Autonomy Corporation Limited ("Autonomy") by a special purpose vehicle called Hewlett Packard Vision BV, which was incorporated in the

 Netherlands for the purpose of the Acquisition .  I will refer to the acquisition vehicle as "Bidco".  By a merger in 2018, all of the assets and liabilities of Bidco were transferred to the Second Claimant.

5.      The Acquisition was declared wholly unconditional on 3 October 2011, and completed on 5 January 2012.

6.      The fallout from the Acquisition has spawned not only these proceedings, but also at least two sets of criminal proceedings in the Northern District of California, USA.  One has led to the conviction of the Second Defendant (hereafter "Mr Hussain"), for wire fraud under US legislation, and he has been imprisoned.  He could not attend this trial.  The First Defendant, (hereafter, "Dr Lynch") has been indicted in a further set of criminal proceedings in Northern California, in respect of which the US authorities now seek to extradite him to face trial there.

7.    All of the assets and liabilities of Autonomy, including all claims it has against the
      Defendants, were transferred to the First Claimant in 2017.

8.    The real bidder and acquirer, through Bidco, was Hewlett Packard Company
      ("HP").  HP was the ultimate holding company in the Hewlett Packard group, one
      of the first companies to set up in Silicon Valley and since then a household name.

9.    Autonomy was and is an English company.  Autonomy acted as a holding company
      for a group of companies, all in the business of infrastructure software ("the
      Autonomy group").

10.   Autonomy was founded in 1996.  It was spun out of a company called Cambridge
      Neurodynamics, which was an early venture into using "machine learning" to
      develop software techniques which Dr Lynch had explored in his PhD thesis at
      Cambridge University and his subsequent research fellowship in "adaptive pattern
      recognition".

11.   Autonomy, and in particular its core product called IDOL, was the creation of Dr
      Lynch.  IDOL is an acronym for Intelligent Data Operating Layer.  IDOL was the
      core technology at the heart of nearly all of Autonomy's software.   IDOL
      technology was focused on the analysis of unstructured data.

12.   Put shortly, using IDOL technology, computers could make sense of unstructured
      data.  There are two types of data: structured and unstructured.  Structured data is
      found in spreadsheets or in prescribed fields in a database.  When data is entered
      into a database it is easily searchable.  Unstructured data is data that is not contained
      in the prescribed fields.  Most data is unstructured.  Books, newspaper articles,
      websites, voice recordings, videos and indeed, most forms of communication
      comprise unstructured data.  Unstructured data is obviously much more difficult for
      computers to interpret and analyse.  In 2009, the vast majority of computer software
      could only process structured information.  It was Autonomy's ability, using IDOL
      technology, to handle unstructured information that set it apart.  HP chose barely to
      acknowledge this in the course of the proceedings, but IDOL was, in words
      attributed to Meg Whitman, who became CEO of HP, "almost magical"

13.   In consequence, by the beginning of the period to which the contested accounting information related, Autonomy had grown from a small start-up into a market leader in enterprise technology, especially in the field of unstructured data analysis. It went public in 1998, with an initial listing on the EASDAQ. It was admitted to the official list of the LSE in November 2000. It joined the FTSE 100 in 2008.

14.   The Autonomy group was highly profitable. It generated annual revenue of about $900 million, collected all the cash it reported, and (as an illustration) held cash reserves of $1.1 billion at the close of 2010. Its customers included blue-chip companies in every sector. In 2011, based on market capitalisation, it was the largest British software company.

15.   On the other side of the Atlantic, HP was a giant company, with an annual turnover of $130 billion, but it was in the doldrums. Its focus and reputation had remained in hardware, where margins are very tight. A new CEO, Mr Apotheker, wished to change this. He was wanting to effect what he called "transformational change" by the acquisition of a software company to drive a reorientation of HP towards high margin software. Software margins can be well over 60%.

16.   However, when, together with other changes in HP's business, the Acquisition was announced, the markets reacted badly. Just over a month later Mr Apotheker was removed. The Defendants' case is that the claim was "manufactured" to cover and justify a change of corporate mind, and to cast the Defendants as scapegoats for what in reality is buyer's remorse coupled with management failings. The Claimants' case is that they were fundamentally misled.

**Brief summary of the basis of each Claimant's claim**

17.   Before giving a brief summary of the various claims, I would note some matters of terminology:

   **17.1.**   Throughout this summary, unless stated to the contrary, I use the term "the Claimants"

as a shorthand to denote the Claimant making the particular claim.  The Claimants do not in reality make any claims jointly.  I should also clarify that in terms of describing the acquirer, I use the descriptions HP and Bidco interchangeably.  I shall explain why later by reference to an issue in the case which was called the '*Bidco point*'.

17.2.   My references to "Autonomy" in the context of the various impugned transactions are

by way of short-hand.  In the context of an impugned transaction the reference is intended to denote (unless otherwise stated) whichever of the Autonomy group companies was the contracting party.

17.3.   References to the "Defendants" are to whichever of the two of them is alleged to have

been implicated in wrongdoing.  I have sought to identify them individually when issues arise as to that individual's knowledge or involvement.  On almost all other matters, Mr Hussain adopted Dr Lynch's arguments.

18.   I shall now very briefly summarise the claims.  The Claimants' essential complaint in respect of the Acquisition is that they were induced into making the Acquisition by dishonest statements and omissions in Autonomy's published information, and other representations made personally by the Defendants.  The Claimants have in these proceedings accused both Defendants of fraud.

19.   There are also other claims which do not relate to the Acquisition, but to alleged breaches of duty on the part of the Defendants whilst directors or shadow directors of Autonomy group companies.

**The First Claimant's claim**

20.   By far the largest of the claims is brought under Schedule 10A of the Financial Services and Markets Act 2000 ("the FSMA claim").  The gist of the FSMA claim is fraud on the part of the issuer (Autonomy) in respect of statements or omissions in its published information on which the Claimant relied in making an investment decision.  It is claimed that "*persons discharging managerial responsibilities within the issuers"* ("PDMRs") knew those statements or omissions to be untrue or misleading, or to amount to the dishonest concealment of a material facts.  (An

issuer's "published information" is specially defined but for present purposes the ordinary meaning it conveys will suffice.)

21.     The FSMA claim depends on establishing first that Autonomy was liable (as issuer) to Bidco, and second, accordingly (as explained below) that the Defendants were liable to Autonomy.

22.     It is not disputed that both Defendants were, for the purposes of the FSMA claim, PDMRs within the meaning of Schedule 10 A of FSMA (and previously section 90 A (4) before it's amendment).  The basis for the issuer's liability is fraud on the part of at least one PDMR.

23.     It may at first blush seem surprising that the claimant in the FSMA claim is the First Claimant, ACL Netherlands BV, which is the successor to Autonomy. Autonomy might appear to be suing in respect of its own fraud. The explanation is that its claim is in the nature of what is sometimes called a "dog leg claim".  It is to recover from the Defendants the loss that Autonomy suffered by having (voluntarily) accepted liability for a claim brought by Bidco against it to recover its losses in having been induced to enter into the Acquisition.

24.     The amount of accepted liability by Autonomy to Bidco is the sum of $4.55 Billion USD.  That is therefore the principal sum which the First Claimant claims from the Defendants.

25.     The reason for the "dog leg" structure of the claim is that under Schedule 10A of FSMA, only the issuer of published information is liable to persons induced to make investment decisions in reliance on  dishonest statements or omissions in that published information.   The position was the same under the equivalent provision of FSMA, section 90 A (3) which applied until

30 September 2010 and which Schedule 10A replaced.  But a claim by HP against Autonomy would be of no benefit to HP since HP owned Autonomy. What HP/Bidco needed was recourse against the Defendants.  Crucially under FSMA, an issuer can seek to lay off its own liability by suing key management persons called PDMRs on the basis that they were responsible for, or at least had knowledge of, the falsities.

26.     To enable HP/Bidco to sue the Defendants, the following steps were taken.

    **26.1.**     HP/Bidco notified its claim to Autonomy.

    **26.2.**     Controlled by HP, Autonomy (whose assets and liabilities are now held by the First Claimant) has admitted liability to Bidco (whose assets and liabilities are now held by the Second Claimant).  The Claimants have accepted that this admission does not bind the Court.  That liability has to be determined.

    **26.3.**     Autonomy then blamed and sued the two Defendants, who are both admitted to be PDMRs, for the loss.

27.     No objection in principle was made by the Defendants to the 'dog-leg 'nature of the claim, although every part of its substance is contested.  The Defendants 'case is that Autonomy had no liability to Bidco and should not have submitted to its claims.

28.     Bidco's FSMA claim was thus founded upon allegations that, when proceeding with the Acquisition, HP and therefore Bidco reasonably relied on Autonomy's published information, which contained untrue and/or misleading statements and/or dishonestly concealed material facts which were wrongly omitted from the published information.

**The Second Claimant's claim**

29.     The Second Claimant claims an aggregate principal amount of $420 million against Dr Lynch and Mr Hussain for false representations which it claims were made by them to HP/Bidco knowingly and/or recklessly and/or without reasonable belief in the truth thereof, and which they claim induced the Second Claimant to purchase shares in Autonomy from the First and Second Defendants. Those false representations include reaffirmations of the false statements within the published information.

30.     The damages are claimed pursuant section 2(1) of the Misrepresentation Act 1967 and/or the tort of deceit.

**The Third and Fourth Claimants' claim**

31.   The Third and Fourth Claimants claim against the Defendants for direct losses suffered by them in loss-making transactions which they claim Dr Lynch and Mr Hussain caused them to enter into in breach of their fiduciary duties or employment contracts.

32.   These claims do not arise out of the Acquisition, but out of the Defendants' management conduct. The losses occasioned by those transactions are estimated by the Third and Fourth Claimant to amount to $76.1 million:

33.   In the case of Dr Lynch, the claim is pursued against him as shadow director or assumed fiduciary of Autonomy Systems Limited (hereafter "ASL") and as an officer of Autonomy Inc, pursuant to the Companies Act 2006.

34.   In the case of Mr Hussain, the claim is pursued against him as director of ASL under the Companies Act 2006 and under his contractual and fiduciary duties as an employee of ASL in respect of the Fourth Claimant.  Those losses include those of another group subsidiary Zantaz

Inc ("Zantaz"), the cause of action to which was assigned to Autonomy Inc on 31 October 2014.  This is pursued against Mr Hussain on the basis of breach of his fiduciary duties as a director and officer of Zantaz.

**The Defendants**

35.   Dr Lynch was the Director of Autonomy from the time of its incorporation in 1996 up until 30 November 2011.   Throughout the period with which this litigation is concerned, he was the driving force and leading figure within Autonomy.

36.   Mr Hussain was the Autonomy Group's Chief Financial Officer from June 2001 until 30 November 2011 and was a director of Autonomy from 1 June 2003 until 30 November 2011.

**The fraud alleged**

37.    The fraud alleged, which underlies the legal heads of claim arising out of the Acquisition (the

FSMA claim, the direct fraud and/or Misrepresentation Act claims, as distinct from the breach

of duty claims for transactional losses) consisted of the publication of information to the market which was known by the Defendants to be false.

38.    The allegation was based on (a) the allegedly dishonest description of Autonomy as being a "*pure software company*" when in fact it undertook and had  become accustomed to inflating what appeared to be the revenues of its software business by undertaking substantial hardware sales and (b) the allegedly dishonest presentation of its financial performance, which did not disclose (and instead disguised) improper practices which Autonomy adopted to boost and accelerate revenue.

39.    The Claimants contended that all this resulted in Autonomy being in fact a considerably less valuable enterprise than it appeared on the basis of its published information.

40.    These alleged improper practices included:

       **40.1.**    artificially inflating and accelerating Autonomy's revenues;

       **40.2.**    understating Autonomy's costs of goods sold by characterizing such costs as sales and

       marketing expenses so as to protect gross margins;

       **40.3.**    misrepresenting Autonomy's rate of organic growth; and

       **40.4.**    misrepresenting the nature and quality of Autonomy's revenues as well as overstating

       its gross and net profits.

**Financial Services and Markets Act claims**

41.   In the FSMA claims, it is common ground that the Claimants need to make good their case at each stage, ie the liability of Autonomy, and the fraud by the PDMRs .

42.   They have accepted also that each of Dr Lynch and Mr Hussain will not be liable except in respect of misstatements or omissions by the issuer about which he himself knew. It is not sufficient for the Claimants to demonstrate that the transactions or the way that they were accounted for was improper (the first limb).  They need also to prove personal knowledge and dishonesty in respect of the false accounting on the part of the Defendants as PDMRs (the second limb).

43.   As far as Bidco is concerned, the Defendants contended that no liability was owed to it because no representations were made to it, and it placed no reliance on any statements made.  This is the *Bidco point* to which I have referred earlier.  I have found that, if the necessary elements are made out, Bidco (and therefore the Second Claimant) have a valid claim (both under FSMA and in respect of direct fraud and Misrepresentation Act 1967 claims against the Defendants).

44.   I have accepted the Claimants' argument that the fact that it was HP which claims to have been influenced by Autonomy's published information (and specific representations) and that it was HP which undertook due diligence, does not mean that Bidco cannot satisfy this part of the reliance test.  For the purpose of the acquisition, HP can be treated as the controlling mind of Bidco, and HP's reliance can be treated as Bidco's reliance.

**Direct Fraud and/or Misrepresentation Act 1967 claims against the Defendants**

45.   The claims for fraudulent misrepresentation and/or under section 2(1) of the Misrepresentation Act 1967 are direct claims against the Defendants: they are based on personal liability, not on the liability of the issuer.

46.   Specific representations are averred against the Defendants which in many cases traverse the same territory as the FSMA claims.  The quantum of those claims is

much lower than the FSMA claims: the damages sought relate only to loss attributable to the shares and share options which the Defendants themselves each held and sold to Bidco.  The pleaded quantum of this loss is $420 million.  Any sum recovered under this head of claim will be in the alternative to the FSMA claim.  There cannot be double recovery.

47.   A point which may be of general interest is that it is no defence to a FSMA or a fraud claim that the claimants had the means of discovering the truth.  No defence of contributory negligence is available.  Thus, even if (though I have made no finding that it was) HP's due diligence were considered to be rushed and deficient, and HP might have been expected to unearth and probe further into matters about which complaint is now made, that would not be a defence.  It would be beguiling but wrong to think that the answer could be "caveat emptor". Of course, had I found that HP was in fact aware, before the Acquisition, of the matters of which complaint is now made, that would be different, for in those circumstances it could not say that it had reasonably relied on what it saw and read.  But I have found that it was not actually aware and that its reliance was reasonable.

**Breach of Duty Claims brought By Autonomy Companies Against the Defendants**

48.   The claims for transactional losses based on breaches of fiduciary and employee duties stand on a different footing.  They do not arise in consequence of the Acquisition (except in the sense that they would almost certainly not have been brought if the Defendants still directed Autonomy).  They are claims for direct losses suffered by Autonomy Inc, Autonomy's main operating company in the US, incorporated in 1996 (now the Fourth Claimant) and another group subsidiary called Zantaz as a result of the Defendants' breaches of duty in causing the relevant subsidiary to enter into the impugned transactions without regard to the interests of that subsidiary.

49.   The Claimants accept that in the ultimate quantification of loss, they must give credit for a recovery of $45 million made in a settlement of related claims (against

Autonomy's auditors), after deducting the cost of such claims and any tax payable in respect of the settlement sum.

## Factual basis: the FSMA and direct fraud and / or Misrepresentation Act claims

50.   In relation to the first two of the three legal heads of claim that I refer to above (that is to say, in relation to the FSMA and direct fraud and Misrepresentation Act claims), the factual basis of the claims relate to six areas of Autonomy's business and accounting. These claims, each of which is substantial, are very briefly described below.

50.1.   The "**hardware case**" relates to the purchase and resale by Autonomy (usually at a

loss) of "pure" hardware (in broad terms, hardware unaccompanied by any Autonomy software) in quantities (of over $100 million). The Claimants allege that these transactions were never disclosed to the market that by boosting apparent revenue, they gave a false impression of the performance of Autonomy's business. The Claimants say that they belied its presentation in its published information as a *pure software company.* The hardware case also raises issues as to (a) whether a proportion of the cost of the sales were improperly accounted for as marketing expenses so as artificially to increase gross margins, and (b) whether Deloitte, who approved Autonomy's accounting treatment of the sales, were misled as to the true purpose of the hardware sales.

50.2.   The "**reseller case**" or "**VAR case**" relates to 37 transactions between Autonomy (or

in some cases, Autonomy Inc or Zantaz) and a small group of value-added resellers. The Defendant treated these transactions as sales giving rise to revenue which could be and was recognised immediately in Autonomy's accounts. The Claimants contended that this simply interposed a reseller between Autonomy and a true customer, and that these were not in substance true sales at all. The only true sale was to an end-user, if one eventuated. In many instances no end-user sale did eventuate, giving rise to a difficulty which I explain later. The Claimants' case is that in each VAR sale, the VAR was only a passive placeholder with no further participation expected or permitted of it after the VAR sale. Thus, the VAR sales were, in effect, devices to accelerate recognition of revenue in Autonomy's accounts, with the intended effect of misrepresenting its performance.

50.3.     The "**reciprocal transactions case**" relates to certain transactions with the VARs which are described below, and what the Claimants alleged were back-to-back transactions with friendly counterparties.  It is claimed that Autonomy purchased from the counterparty software or other goods or services that Autonomy did not need, in order to fund the purchase by that counter party of high margin software from Autonomy.  The Claimants contend that these reciprocal, or round-trip transactions, also were contrived with the dishonest purpose of artificially boosting apparent high margin software sales.  It is said that this had the effect of giving an exaggerated depiction of the success of Autonomy's core business.

50.4.     The "**hosted case**" relates to transactions between Autonomy (or Zantaz) and existing customers.  Under these transactions, Autonomy agreed to forego future recurring revenue from the provision of hosted archiving services (which was a substantial and lucrative part of Autonomy's business) for monthly (or other periodic) fees in return for the customer paying a one-off and heavily discounted capital sum for a licence to use Autonomy software outside the hosted environment.  The licence was alleged to be illusory, and its issue and sale was said to be for the dishonest purpose of treating it as akin to sale of goods so as to justify the immediate (that is at the transaction date) recognition of the sale proceeds as revenue.  Again, it was alleged that the intended effect was artificially to boost apparent revenue in the period in question.

50.5.     The **"OEM case"** relates to the presentation in the narrative part of Autonomy's

accounts of information about the revenue from its OEM business, variously described

as "*OEM*", "*OEM derived*" and latterly "*IDOL OEM*".  The Claimants' case is that revenue so presented would be taken in the market to have been generated by a transaction with an Original Equipment Manufacturer ("OEM") for Autonomy software to be embedded in the OEM's hardware. Autonomy would in return receive royalty payments on all their sales of such hardware (and thus a recurring revenue stream). The Claimants say that in fact Autonomy included in what was compendiously described as the *"OEM Metric",* revenues from one-off sales of software licences to customers which were not OEMs under contracts which did not provide for royalties or any other recurring revenue.  The Claimants did not impugn the transactions themselves but contended that it was misleading and

dishonest to include the latter revenues within the OEM metric. The Claimants claim that this gave the false impression of a valuable recurring category of revenues, and thereby dishonestly misrepresented the quality and reliability of Autonomy's revenue and earnings.

50.6. The "**Other Transactions case**" relates to an amorphous collection of four sets of

transactions entered into in late 2010 and early 2011 by ASL, Autonomy Spain SL and Autonomy Inc (and which I refer to as the "Other Transactions"). The Claimants' case in respect of three of those transactions is that what was sold was not simply a piece of software purchased together with separately charged additional services. They say that it was in fact a composite 'solution' of which the provision of services was an integral part. The Claimants alleged that it was wrong to recognise revenue at the point of sale (as Autonomy had done) and that revenue recognition was required to be deferred until the delivery of a fully functioning product had been concluded, or at least until some subsequent stage in the installation of the software for the customer had occurred, enabling its use as a working solution. The fourth transaction raised an entirely separate and singular issue about whether the calculation of the *"fair value"* of the licence sold (to a company called Iron Mountain) was correct, which also determined whether revenue from the transaction had been correctly stated or overstated by Autonomy.

**Factual basis: the breach of duty claim for transactional losses**

51. The third legal head of claim was the breach of duty claim for transactional losses. This relates to four categories of transaction: (i) loss-making "pure hardware" sales; (ii) VAR transactions where a marketing assistance fee ("MAF") was paid to the VAR; (iii) alleged reciprocal; transactions and VAR transactions involving a reciprocal element and (iv) Schedule D hosting transactions.

52. In Schedule 12 of the Re-Re-Amended Points of Claim ("Schedule 12"), the Claimants identified a number of the hosting lump sum transactions (set out specifically in Schedule 12D). Autonomy Inc, the Fourth Claimant, was the contracting party for most of these transactions. Zantaz was the contracting party on three out of four of the Schedule 12D hosting transactions, and also for some of the MAF payments, and reciprocal transactions. ASL, as well as being the company within the group to which losses arising from these transactions were transferred (but not assigned), was also the original contracting or paying party in respect of some of the MAF payments and reciprocal transactions. Zantaz assigned to

Autonomy Inc all of its rights, title to and interest in, amongst other matters, any claims, rights and causes of action that Zantaz had against third parties, and notice of such assignment was given to the Defendants on 27 March 2015.

## Findings

53.  In summary, my findings in relation to each of the heads of claim are as follows:

### Findings: the FSMA and direct fraud and / or Misrepresentation Act claims

#### The hardware case

54.  The purpose of the hardware selling strategy was to meet market expectations of revenue maintenance and growth, by misleading the market as to the true market position of Autonomy.  These loss-making transactions were not commercially justified on any basis.  The justifications advanced by the Defendants were no more than pretexts to increase stated revenue in the accounts.  The strategy was not for the purpose of raising software revenue sales.  That justification was a pretence, fashioned principally for the audit committee and Deloitte, who would not have approved the accounting treatment without the pretence.

55.  Both concealment of the hardware sales and their true cost in Autonomy's accounts and other published information were necessary because revelation of the Autonomy's use of hardware sales, and the erosion of gross margin would have nullified their true purpose.  This would have exposed that Autonomy's software business was not generating the accelerating revenue and profits which the market thought it was, and which heavily influenced its price.

56.  In my judgment:

56.1.   The hardware reselling programme was conceived, expanded and implemented in

order to enable Autonomy to cover shortfalls in software revenue by selling hardware and including the revenue without differentiation in revenue shown in the accounts as generated by Autonomy's software business.

56.2.    To succeed, the hardware reselling had to be concealed from the market, but

sufficiently revealed to Autonomy's auditors and audit committee to secure their apparently fully informed approval of the company's accounts.

56.3.    The imperative that the reselling should be concealed from the market required a

variety of accounting devices which had to be presented in such a way as to secure the approval of the auditors and the audit committee.  In particular, their approval had to be secured to treat the costs of the hardware reselling programme, not as Costs of Goods Sold ("COGS"), which would have eroded gross margin and encouraged both analyst and market inquiry and concern, but instead as Sales and Marketing expenses which had no such adverse effect on key investment parameters.

56.4.    The means by which this difficult balancing act was achieved are set out in my

judgment. Suffice it to say that the auditors and audit committee were persuaded to regard the purpose of all hardware sales as being to generate revenue and new orders for the software business, and to account for hardware costs accordingly.

56.5.    The strategy also required that the contribution of hardware reselling revenues to

overall revenues should be disguised or concealed, and that again the auditors and audit committee nevertheless being satisfied that such disclosure as was given was sufficient. That balancing act also was successfully achieved.

56.6.    The purpose of the hardware reselling strategy/programme was dishonest, and the

way it was accounted for depended on its dishonest presentation.

56.7.    The Defendants were well aware of this.

56.8.    Although I doubt that this justifies the quantum of loss in the amount claimed in respect

of it, in terms of liability the Claimants' hardware case has been established.

57.   The Claimants reasonably relied on the truth of what was said about the revenue in the accounting material and were induced to buy Autonomy for $11.1b.

58.   These facts satisfy both limbs of the FSMA claim and also give rise to liability on the part of both Defendants to the Claimants in respect of the direct fraud and/or Misrepresentation Act claims, and for breach of duty as employee and/or directors owed to the Autonomy companies in embarking on the hardware selling strategy.

### The reseller or VAR case

59.   Sales to VARs enabled Autonomy to recognize income before any sale to an end user. This enabled Autonomy to make good shortfalls in software business revenues relative to market forecasts.  Dr Lynch and Mr Hussain kept a very careful watch over revenues, especially towards the end of a quarter when Autonomy would have to post its results.  If such a shortfall became apparent, a VAR sale would be arranged, usually on the same day, to cover it, with no questions asked.  Almost all the impugned VAR sales were to a small group of "friendly" VARs.

60.   Although the "VAR buyers" accepted they were legally bound by the terms of the contracts, the impugned VAR transactions had no commercial substance.  They were a means by which Autonomy could maintain the appearance of meeting revenue targets at the end of a quarter.

61.   In truth there was a pattern which emerged very clearly from all of the impugned VAR transactions.  They were all large, entered into at the very end of the quarter, after no investigation by the VAR of the liability they were legally undertaking.  The VAR would often not have the   financial ability to meet the stated payment obligation out of its own resource, and in reality there was never any expectation or intention that it should do so, there never being any expectation on the part of either Autonomy or the VAR that the contractual terms would ever be enforced.  There was a clear understanding, and it was invariably the fact,  that the VAR would play no part in seeking to procure any contract with the end-user.  If payment were ever required from a VAR, it would come either from the end-user, or if no contract were made with the end-user, payment would be waived or another transaction would be

generated.  This would involve Autonomy providing the VAR with the means to meet any obligation it owed under the VAR transaction.  No VAR was ever to be left "on the hook" or "carrying the bag".

62.  The purpose of the strategy was to ensure that Autonomy continued to appear to be a company which met its forecasts out of the sales of IDOL and related software and thereby maintained its share price.  The VAR strategy became of additional importance and increased in volume when the hardware selling strategy underwent difficulties when Autonomy's main hardware supplier suddenly drew back from its association with Autonomy.  VAR sales and hardware sales were turned on and off by Autonomy at the end of each quarter depending on the levels of revenue required to be shown in the accounts.

63.  The VAR strategy was directed by Mr Hussain and encouraged and presided over by Dr Lynch.  Both knew that the VAR transactions were not being accounted for according to their true substance. Both knew that the recognition of revenue on the sale to the VAR was improper, and that the accounts were thus false.

64.  Deloitte did not see the full picture, or alternatively preferred to accept reassurance that ostensibly negated the true purpose of the VAR transactions.  In any event neither the approval of Deloitte nor that of the audit committee was fully and properly informed, and the fact of it does not avail the Defendants, who knew that.

65.  The Claimants reasonably relied on the truth of the financial information provided by Autonomy (both numerical and narrative), including what was said about the revenue in the accounting material, and were induced to buy Autonomy for $11.1 billion.

66.  These facts satisfy both limbs of the FSMA claim and also give rise to liability on the part of both Defendants to the Claimants in respect of the direct fraud and/or Misrepresentation Act claims, and for breach of duty as employees and/or directors owed to Autonomy companies in embarking  on the VAR strategy.

**The reciprocal transactions case**

67.    There were two types of, so called, "reciprocals".

68.    In the case of the VAR reciprocals (related to the VAR case above), which involved
       the purchase by Autonomy of a product from a VAR, I am satisfied that in each case
       Autonomy purchased from the VAR a product for which it had little or no identified
       need or use.  It was done in order to funnel funds to the VAR to enable it to appear
       to discharge its indebtedness to Autonomy under a VAR agreement.  The purchase
       by Autonomy was the means of getting the VAR "off the hook" of the legal
       obligation to pay, which it was never expected or intended it would in fact be
       required to meet out of its own resources.  No revenue should have been recognized.
       The Defendants were in each case aware of the contrived nature of Autonomy's
       purchase and its true purpose.  They had guilty knowledge accordingly.

69.    In the case of reciprocal transactions, Autonomy would identify a counterparty with
       an interest in purchasing Autonomy software, but which would in all probability not
       make any purchase at the price set by Autonomy unless it could sell Autonomy its
       own products and use the sale proceeds to fund its own purchase.  The strategy was
       assisted by the fact that Autonomy had no list price for IDOL and could in effect
       choose its price.  This would be a matter of indifference to the reciprocal purchaser,
       since it would be receiving funds from Autonomy under its reciprocal sale to
       Autonomy. By increasing the price, Autonomy could maximise its apparent
       revenue.

70.    I am satisfied that in the case of each of the transactions impugned on this ground,
       the reason for Autonomy's purchase was to enable the counterparty to purchase a
       licence for Autonomy software. This would generate recognized revenue which
       Autonomy could show in its accounts to cover shortfalls in revenue for the relevant
       quarter. Thus, Autonomy's purchase was another means of Autonomy buying
       recognised and reportable revenue at substantial cost. The purchase and sale should
       have been accounted for on a net basis.  I am satisfied that both Defendants knew
       that these reciprocal or round-trip transactions also were contrived with the
       dishonest purpose of artificially boosting apparent high margin software sales, with

the effect of giving an exaggerated depiction of the success of Autonomy's core business.

71. As with the VAR, and Hardware cases, I find reasonable reliance on the part of the Claimants, and liability established on the FSMA claim.

72. There are also direct fraud and Misrepresentation Act claims made out in respect of these reciprocal claims. I also find the case made out in respect of those direct claims.

## The hosted case

73. The impugned hosted transactions all involved a lump sum payment being made by the existing Autonomy customer who was already making periodic payments for Autonomy hosting its archive, for what on the face of it appeared to be a software licence. An example would be the right to transfer Autonomy software from Autonomy's hardware to the customer's in-house hardware, or to a third-party's directed hardware. These transactions inevitably also involved substantially reduced periodic payments going forward. All of the lump sum would be recognised immediately as income by Autonomy. This was a true way of accounting for that income, if it was truly a payment for software rights. If it was no more than the price paid for the reduction in the later periodic payments for hosting services, then it was misleading to treat what was compensation for a later reduction in revenue as an immediately realized sum.

74. The lump sum arrangements I have just described were in reality almost invariably a response not to customer interest, but to the Defendants' obsession with ensuring Autonomy achieved or came as close as possible to meeting revenue forecasts. The licence was a device calculated to justify revenue recognition which conferred legal rights which neither side intended or expected would ever be deployed.

75. The introduction of a formal legal right of no intended commercial consequence would not in any material way alter the hosting arrangements between the contracting parties, which both parties intended to carry on as before.

76. Both Defendants were aware of the true nature of these lump sum arrangements and that they were driven by income recognition. Any software rights bestowed were never expected to be exercised. They knew it gave a false impression to recognise the income immediately.

77. The Claimants relied on the figures given as to revenue including the lump sum payments and it was reasonable for them to do so.

78. I have concluded that both limbs of the FSMA claim are established.

79. In Schedule 12, the Claimants identified a number of the hosting lump sum transactions (set out specifically in Schedule 12D) which involved significant reductions in periodic payments.

    The Claimants contended these contracts were commercially unjustifiable. Because they were only motivated by the desire for income recognition, the deals were commercially unfavourable to Autonomy and they had no purpose beyond income recognition, I find the breach of duty established in respect of each of the Schedule 12D transactions.

## The OEM case

80. I have concluded that the perception and attraction of the OEM Metric as presented to the market was that it comprised a distinctive revenue stream, which was recurring and reliable because it derived from royalty payments made by or through the OEMs in whose hardware the Autonomy software was embedded. That revenue stream also included incremental revenue from sales to the OEM of updates and upgrades for that software. It was a stream of income which involved little or no further cost of sales. OEMs also usually had established market reputations; and the embedding of Autonomy software in their hardware assisted Autonomy in terms of market penetration. There was evidence that the market placed special value on OEM business for all these reasons.

81.   However, a substantial proportion of the sales categorized as OEM sales in the accounting documents, and in the representations made by the Defendants from March 2011 onwards, did not have this recurring nature, nor were they to OEMs. Instead, they were one-off sales to buyers. They would not offer the same advantages, did not yield a recurring royalty or royalty type payment, and they would not ensure the same certainty of incremental purchases of updates and upgrades to protect and enhance the OEM's own product and reputation.

82.   I have found that both Defendants knew that the accounts and the representations they made in this regard gave a misleading picture of Autonomy's OEM business. They did so because they knew revenues were included from transactions lacking the characteristics associated with OEM business. They knew that such revenues were considered in the market to generate a particularly dependable and valuable revenue stream.

83.   The direct representations which the Defendants made confirmed the depiction of Autonomy's OEM business and the revenue it generated which was given in Autonomy's published information.

84.   This was another matter on which HP reasonably relied on in proceeding with its Acquisition for $11.1 billion.

85.   Both the FSMA claim and the direct fraud and/or Misrepresentation Act claims are made out against the Defendants.

86.   There are no breach of duty claims under this head

### The Other Transactions case

87.   The Other Transactions allegedly had, and were designed to have, the effect of enabling Autonomy to recognise or accelerate the recognition of revenue for the purpose of achieving revenue forecasts in a given quarter.

88.  The Claimants did not, apparently *"due to time constraints",* cross-examine Dr Lynch in relation to any these four transactions.  Therefore, the Claimants accepted that they could not pursue an allegation that Dr Lynch had knowledge of their false accounting.

89.  However, they submitted that the Other Transactions remain relevant given that:

**89.1.**  the Claimants maintained that there was false accounting in relation to each of the

transactions and they continued to allege that Mr Hussain knew of that false accounting; and

**89.2.**  if (as the Claimants alleged) there was false reporting in relation to the Other Transactions, it fell to be taken into account when assessing loss.

90.  In my draft judgment I have considered each of these four Other Transactions in detail.  I have concluded in respect of each of them, that the Claimants have failed to establish that the accounting treatment adopted with the approval of Deloitte was wrong rather than a matter of accountancy judgement on which views might properly differ.  In those circumstances, the question of Mr Hussain's guilty knowledge does not arise, and this head of claim makes no contribution to any loss calculation.

**Findings: the breach of duty claim for transactional losses**

91.  In relation to the claim for transactional losses, Dr Lynch was the President of Autonomy Inc, and he owed legal duties to that company as a director.  He was a de facto director of ASL and owed duties to it.  I find that Mr Hussain was a de jure director of all three relevant subsidiaries, Autonomy Inc, Zantaz and ASL,- and owed duties to all three.

92.  I find that the transfer pricing arrangements which gave rise to the losses from transactions being transferred to ASL do not allow ASL to sue for those losses, and nor is there any legal basis for impugning the conduct of the Defendants in entering into those arrangements.  But nor do they cause  the subsidiaries who suffered the

original losses to be treated as though they had suffered no loss, nor deprive them of the right to claim in respect of the losses.  How they deal with the losses subsequently for example by price shifting arrangements does not effect the claims.

93.   In respect of each of the transactions impugned under the four heads identified in this claim, as being of no commercial benefit to Autonomy Inc, ASL and Zantaz   I find that case made out.  I find that both Defendants breached their duties  in causing or allowing these transactions to take place in respect of ASL and Autonomy Inc.

94.   I emphasise that the breach of duty in respect of ASL is not the transfer pricing arrangements, but the original involvement in the Schedule 12 identified MAF payments, and reciprocal transactions.

95.   I find Mr Hussain liable in respect of each one of the Zantaz impugned transactions in Schedule 12, and their claim may validly be made as assignee by ASL. Dr Lynch was neither a de jure nor de facto director of Zantaz, and no direct claim succeeds against him in respect of any of Zantaz transactions.

96.   The pleaded quantum of the loss for the direct claims is $76.1 million.  Whether that is the correct figure, I will determine in the quantum judgment.

97.   That concludes a summary of my findings.  I now deal with a number of other matters.

**Quantum**

98.   I have not included in my embargoed draft judgment to be delivered to the parties today detailed findings or conclusions on quantum.  The parties have called evidence and addressed full argument on quantum.  I considered it inappropriate to delay my judgment on liability when it could have an effect on other proceedings, in particular the extradition proceedings, to allow completion of the quantum section. I have however provisionally determined that even if adjusted to take account of the fraud, HP would still have considered Autonomy, with its signature

product, IDOL, a suitable acquisition whereby to effect transformational change.  I would expect the quantum to be substantially less than is claimed.

99.    The evidence on the quantum part of the case was dense and voluminous.  There was extended cross-examination.  I will now proceed to consider that aspect of the case.  That section will take some time to complete and further submissions may be necessary.

## Counterclaim

100.  Dr Lynch also brought a Counterclaim.  Dr Lynch contended that HP's public and much- publicised announcement of a claim against the Defendants of $5 billion was precipitate and had no properly formulated basis.  I need say nothing about this.  My findings in the main claim undermine his counterclaim.  I have not therefore addressed it in my draft judgment.  If there remains anything of substance, I am sure I will be told of it.

## Final matters

101.  This has been an unusually complex trial, 93 days long. Dr Lynch was cross-examined for 20 days. There was a database of many millions of documents from which there was extracted a trial bundle containing more than 28,000 documents. These documents have been the most reliable source of evidence. But there were also hundreds of pages of hearsay evidence, largely comprised of transcripts from previous proceedings in the United States, both civil and criminal. The determination of this matter in its plainly natural forum has been made the more difficult by the concerns I have had about the reliability of some of the Claimants' witness and hearsay evidence, which bore signs of having been fashioned, rehearsed and repeated in the course of  multiple previous proceedings in the US and the preparatory stages for them, and in some cases, of the constraints (such as the terms of promised immunity) under which it had been given.

102.  Nevertheless, I have reached clear conclusions in these proceedings on the civil liability of Dr Lynch and Mr Hussain for fraud under FSMA, common law, and the

Misrepresentation Act 1967, applying, of course, the civil standard of proof of the balance of probabilities.

## The Parties' representatives

103. Finally, the legal representation and assistance provided to me in this case have been of the very highest standard.  The longer my labours have continued the more I have understood and appreciated theirs and quite how much work has been put into these proceedings.  I have been shown patience and understanding throughout.  I wish to express my profound and genuine appreciation to them all for the quality of their work, and in particular the enormous help they have provided to me in what has been for everyone involved an exceptionally onerous case.

End.