# EXHIBIT 15 PART 1

## [2015 (2) CILR 278]

## IN THE MATTER OF WEAVERING MACRO FIXED INCOME FUND LIMITED (in liquidation)

### CONWAY and WALKER (as joint official liquidators) v. SKANDINAVISKA ENSKILDA BANKEN AB (PUBL)

GRAND COURT, FINANCIAL SERVICES DIVISION (Clifford, J.) December 4th, 2015

*Companies—compulsory winding up—creditors—redeeming shareholders become "creditors" for purposes of Companies Law (2013 Revision), s.145 on date redemption request submitted to company and immediate debt then created—grace period for payment in articles of association irrelevant—unclear whether shareholders intending to redeem in future "creditors" for purposes of s.145*

*Companies—compulsory winding up—creditors—voidable preference—party alleging voidable preference contrary to Companies Law (2013 Revision), s.145 to establish, by direct evidence or inference, that company appreciated "unable to pay its debts" and dominant intention had been to make preferential payment (rather than payment due to another motivation, e.g. duress)—no need to demonstrate fraud or dishonesty*

*Companies—grounds for winding up—inability to pay debts—company "unable to pay its debts" for purposes of Companies Law (2013 Revision), s.145 if unable to pay redemption proceeds to redeeming shareholders on date of alleged preferential payment—grace period for payment in articles of association irrelevant as merely facilitates payment of debts*

278

The joint official liquidators of a company sought a declaration that a number of redemption payments made to the defendant by the company were invalid as they constituted preferential payments contrary to s.145 of the Companies Law (2013 Revision).

The company was an investment fund incorporated in the Islands. It was administered by PNC, and its trading activities were managed by WCUK, whose director and chief executive officer was Magnus Peterson. His stepfather and brother were the company's directors, though previous proceedings (reported at 2015 (1) CILR 45) had established that they played a negligible role in managing the company and merely approved decisions made by Mr. Peterson concerning the company's affairs. WCUK was also investment manager to WCF, the counterparty to a number of interest rate swaps with the company.

The defendant subscribed for a number of shares in the company as a nominee for Catella and HQ Solid. It subsequently became evident that the swaps between the company and WCF were worthless, and had merely been intended by Magnus Peterson to give the false impression that the company was profitable; it was in reality suffering large losses, and became cash-flow insolvent following a number of share redemption requests amounting to approximately US$213m. in late 2008 and early 2009. The company was liquidated in March 2009.

The defendant had made a number of redemption requests amounting to approximately US$8.2m. Following an email sent to PNC by Mr. Peterson in December 2008, a redemption payment of US$1.1m. was paid to the defendant and a number of payments were made to other redeemers, but nothing was paid to any other redeemers as the company had insufficient funds to do so. In January 2009, a second redemption payment of US$1.8m. was made to the defendant, together with *ad hoc* payments to a number of other redeemers, and further redemption obligations were incurred by the company; in February 2009, a third redemption payment of US$5.3m. was made to the defendant while the company continued to owe significant sums to other redeeming shareholders. The defendant therefore received all of the sums due to it while the company had US$134m. of outstanding debt.

The plaintiffs submitted that these payments constituted voidable preferences contrary to the Companies Law (2013 Revision), s.145 and that the sums paid to the defendant should therefore be repaid to the company. They submitted that (a) direct evidence of intention to prefer the defendant over the other redeemers was not necessary, and as the company had made payments to the defendant when it was clear that it was unable to pay its debts an intention to prefer the defendant could be inferred; (b) in any event, there was a clear intention to prefer as Magnus Peterson had emailed PNC indicating that the defendant should be paid in preference to other creditors so that they could reinvest in another fund; (c) Mr. Peterson was the "controlling mind" of the company, as the directors played no effective role in supervising its affairs, as had been established in the previous proceedings questioning the directors' conduct, and therefore it

was his state of mind that was relevant when establishing whether a preferential payment had been made; (d) the company was "unable to pay its debts" at the time of the payments to the defendant, as immediate debts were created when the other redeeming shareholders applied to redeem their shares, and the company clearly had insufficient funds to pay those redemptions; (e) the defendant could not rely on Mr. Peterson's fraudulent conduct in order to assert that the NAVs at the time of redemption were invalid, and therefore that the redemptions were not binding, as his fraud was an "external" fraud on the company itself, and, further, contracts were not necessarily vitiated by fraud, and as the redemption contracts were not for an illegal purpose they should be upheld; (f) as the redeeming shareholders became creditors on the day they redeemed their shares, they were "other creditors" for the purposes of s.145; and (g) the defendant was unable to rely on defences such as illegality as s.145 did not indicate that the court was to exercise its discretion once s.145 was engaged, and therefore once it was established that the payments were preferential it followed that the sums paid should be repaid.

The defendant submitted that (a) an intention to prefer could not be inferred from payments made to creditors in the knowledge that a company was insolvent, and instead it had to be positively demonstrated that the company had intended to prefer one creditor over another, which the plaintiffs had failed to do; (b) Mr. Peterson was not the controlling mind of the company, as the articles of association stated that the directors were responsible for managing the company, and it had not been established that they had played no effective role in supervising the company's affairs—the evidence indicated that they were involved in decision-making, and in any event it was PNC, as administrator, that was responsible for making redemption payments; (c) it had not been demonstrated that the company was unable to pay its debts at the time the redemption payments were made, as it was only required to make the payments within a reasonable time following the redemption requests, particularly as the company's offering memorandum and articles of association stated that redemption payments were to be made within 30 days, indicating that no debt arose until the conclusion of that period; at the time of the payments to the defendant there were therefore no immediate debts due; (d) as the stated NAV for the shares at the time of redemption was based on Mr. Peterson's fraudulent attempts to create an impression that the company was profitable, it was not binding, and the required redemption procedure had therefore not been adhered to, as there had been no valid valuation of the shares and the shareholders neither became creditors nor did the company become insolvent; (e) the redeeming shareholders did not become "creditors" until the end of the 30-day payment period stipulated in the offering memorandum, and there had therefore been no payment in preference to "other creditors" contrary to s.145; (f) in any event, s.145 did not state that payments must be repaid if they were preferential, and therefore repayment could only be made according to the principles of unjust enrichment and, as the redemption payments had been paid by the

defendant to Catella and HQ Solid, it had not been unjustly enriched; (g) it had also changed its position in good faith by paying the redemption proceeds to Catella and HQ Solid, which it was now unable to reclaim, and it was therefore not liable to repay the sums to the plaintiffs; and (h) the plaintiffs' claim was barred by illegality as it effectively required the other creditors to be paid according to the company's fraudulent NAV.

**Held,** granting the application:

(1) A declaration would be made requiring the defendant to repay the sums paid to it by the company as the redemption payments were made in preference to the company's other creditors, contrary to s.145 of the Companies Law (2013 Revision). This was the case since Magnus Peterson's principal intention throughout the period in which the redemption payments were made had been to pay the defendant in order to allow it to subscribe to another fund, as demonstrated by the emails to PNC; throughout this period he also appreciated that the company was unable to pay its debts. It was irrelevant that other redeemers also received payments as those payments may also have constituted voidable preferences. It was for the party alleging a preference to establish, by direct evidence or inference, that the company appreciated that it was unable to pay its debts and that its dominant intention had been to make a preferential payment (rather than the payment being the result of some other motivation, *e.g.* duress or avoidance of criminal liability), though there was no need to demonstrate fraud or dishonesty on the part of the paying party. As there was a clear intention to prefer the defendant, however, it was not necessary in the present case to decide whether an intention to prefer could be inferred merely from the fact that payments had been made by the company whilst it was aware that it was unable to pay its debts (para. 88; para. 147; paras. 154–155; para. 158; para. 160; para. 174; para. 180; paras. 183–187; paras. 189–190; paras. 192–193; para. 252).

(2) It was clear that Magnus Peterson was the controlling mind of the company as he exercised significant control over its activities, and it was therefore his state of mind that was relevant when considering whether a preferential payment had been intended. The directors had clearly delegated authority to him to direct the payment of redemptions requests, as they failed to conduct board meetings in order to oversee the company's affairs or supervise its trading, as was evident from the previous proceedings challenging their conduct (evidence from which was admissible as hearsay evidence). He therefore had actual authority to indicate which creditors would receive redemption payments and was the company's controlling mind. PNC's role was irrelevant, though it exercised significant discretion in deciding who would receive redemption payments, as ultimately WCUK and Magnus Peterson managed the affairs of the company, including the making of redemption payments, and PNC merely administered the fund (paras. 40–42; para. 45; para. 53; paras. 56–59; paras. 61–62).

(3) The company was unable to pay its debts on December 19th, 2008 (the date of the first redemption payment to the defendant) as on that date it was clearly unable to pay all of the redemptions processed in early December. The 30-day period for payment referred to in the company's offering memorandum and articles of association was irrelevant and did not suggest that there were no immediate debts at the time of the first redemption payment; instead the period was a purely practical measure facilitating orderly payment to redeemers. The company was therefore "unable to pay its debts" at the time of the redemption payments, as required by s.145 for a payment to be declared to be preferential. Those shareholders who had submitted redemption requests became "creditors" on the day they redeemed their shares, and were thus "other creditors" for the purposes of s.145, though there was some doubt whether those who had yet to redeem their shares could be considered "creditors" (paras. 99–100; para. 112; paras. 115–116; para. 141; para. 202).

(4) Magnus Peterson's fraudulent conduct did not enable the company to avoid being bound by the NAV at the time of redemption so that the redeeming shareholders did not become creditors, as it had not been established that his fraud could be attributed to the company; though he was the company's controlling mind for the purposes of the redemption payments made to the defendant, it did not necessarily follow that he controlled the making of other redemption payments. In addition, the redemption contracts were not in any event vitiated by fraud as they had not been entered into for an illegal purpose, and the NAV therefore remained binding for the limited purpose of determining the value of the shares on redemption, and the shareholders did become creditors whom the company was unable to pay on December 1st, 2008. Further, a claim for a declaration that a redemption payment was invalid was to be determined according to the NAV which applied at the time of the payment (paras. 131–134; paras. 136–137).

(5) The principles of unjust enrichment and the defence of change of position were not applicable as they were irrelevant once s.145 was engaged, and the court had no discretion other than to order a payee to repay any preferential payments. The recipient of a preferential payment was therefore obliged to repay to the payer any moneys received, and the defendant would be ordered to repay to the company the sums received. In any event, the defence of change of position had not been established by the defendant on the facts, as the defendant had been obliged to pay the redemption payments to Catella and HQ Solid as their nominee, and therefore its payments to them could not be construed as a change of position; the defendant's alleged inability to reclaim the sums paid also did not indicate a change of position as its claims had always been "worthless" (paras. 216–217; para. 220; para. 222; paras. 224–226; paras. 228–235).

(6) The defence of illegality also did not apply so as to allow the defendant to avoid liability to repay the sums as the redemption contracts

had not been entered into for an illegal purpose and were therefore not necessarily vitiated by Magnus Peterson's fraudulent manipulation of the company's NAV. As the fraudulent NAV applied at the time of the preferential payments to the defendant, it was also binding for the purpose of the recovery of those payments, and the defendant could not therefore argue that the plaintiffs' cause of action was based upon an incorrect NAV (paras. 246–247; para. 250).

**Cases cited:**
- (1) *4Eng Ltd.* v. *Harper*, [2010] BCC 746; [2010] 1 BCLC 176; [2010] Bus. L.R. D58; [2009] EWHC 2633 (Ch), referred to.
- (2) *21st Century Logistic Solutions Ltd.* v. *Madysen Ltd.*, [2004] 2 Lloyd's Rep. 92; [2004] S.T.C. 1535; [2004] EWHC 231, referred to.
- (3) *Astea (UK) Ltd.* v. *Time Group Ltd.*, [2003] EWHC 725 (TCC), referred to.
- (4) *Bilta (UK) Ltd.* v. *Nazir*, [2016] A.C. 1; [2015] 2 W.L.R. 1168; [2015] 2 All E.R. 1083; [2015] 2 All E.R. (Comm) 281; [2015] 2 Lloyd's Rep. 61; [2015] BCC 343; [2015] 1 BCLC 443; [2015] UKSC 23, *dicta* of Lord Mance considered.
- (5) *Brac Construction Ltd.* v. *Broome*, 2006 CILR 185, applied.
- (6) *Charles Terence Estates Ltd.* v. *Cornwall Council*, [2012] P.T.S.R. 790; [2012] 1 P. & C.R. 2; [2011] EWHC 2542 (QB), referred to.
- (7) *Cohen, In re*, [1924] 2 Ch. 515, followed.
- (8) *Cutts (a bankrupt), In re, ex p. Bognor Mut. Bldg. Socy.* v. *Trustees of T.W. Cutts*, [1956] 1 W.L.R. 728; [1956] 2 All E.R. 537, applied.
- (9) *FIA Leveraged Fund, In re*, 2012 (1) CILR 248; on appeal, 2013 (1) CILR 152, considered.
- (10) *FP & CH Matthews Ltd., In re*, [1982] Ch. 257; [1982] 2 W.L.R. 495; [1982] 1 All E.R. 338, considered.
- (11) *Fairfield Sentry Ltd.* v. *Migani*, [2014] 1 CLC 611; [2014] UKPC 9, applied.
- (12) *Hampshire Land Co.*, *In re*, [1896] 2 Ch. 743, referred to.
- (13) *Herald Fund SPC, In re*, 2015 (1) CILR 482, considered.
- (14) *Hick* v. *Raymond & Reid*, [1893] A.C. 22; [1892] All E.R. Rep. 491, considered.
- (15) *Hollington* v. *F. Hewthorn & Co. Ltd.*, [1943] K.B. 587; [1943] 2 All E.R. 35, applied.
- (16) *Holman* v. *Johnson (alias Newland)* (1775), 1 Cowp. 341; 98 E.R. 1120, referred to.
- (17) *Jones* v. *Sherwood Computer Servs. plc*, [1992] 1 W.L.R. 277; [1992] 2 All E.R. 170, referred to.
- (18) *Lipkin Gorman* v. *Karpnale Ltd.*, [1991] 2 A.C. 548; [1991] 3 W.L.R. 10; [1992] 4 All E.R. 512, referred to.
- (19) *M. Kushler Ltd., In re*, [1943] Ch. 248, followed.
- (20) *MC Bacon Ltd. (No. 1), Re*, [1990] BCC 78; [1990] BCLC 324, considered.

(21) *New, Prance & Garrard (Trustee)* v. *Hunting* [1897] 2 Q.B. 19, referred to.
(22) *Niru Battery Mfg. Co.* v. *Milestone Trading Ltd.*, [2002] EWHC 1425; [2002] 2 All E.R. (Comm) 705; on appeal, [2004] Q.B. 985; [2004] 2 W.L.R. 1415; [2004] 1 All E.R. (Comm) 193; [2004] 1 Lloyd's Rep. 344; [2004] 1 C.L.C. 647; [2003] EWCA Civ 1446, considered.
(23) *Peat* v. *Gresham Trust Ltd.*, [1934] A.C. 252, referred to.
(24) *Peregrine Sys. Ltd.* v. *Steria Ltd.*, [2005] EWCA Civ 239, referred to.
(25) *RMF Market Neutral Strategies (Master) Ltd.* v. *DD Growth Premium 2X Fund*, 2014 (2) CILR 316, applied.
(26) *Rennie* v. *Westbury Homes (Holdings) Ltd.*, [2007] 2 P. & C.R. 12; [2007] 2 E.G.L.R. 95; [2007] 20 E.G. 296; [2007] EWHC 164 (Ch), referred to.
(27) *Rose* v. *AIB Group (UK) plc*, [2003] 1 W.L.R. 2791; [2004] BCC 11; [2003] 2 BCLC 374; [2003] EWHC 1737 (Ch), considered.
(28) *Sarflax Ltd., In re*, [1979] Ch. 592; [1979] 2 W.L.R. 202; [1979] 1 All E.R. 529, considered.
(29) *Segoes Servs. Ltd.* v. *Ueoka*, 2006 CILR N [1], considered.
(30) *Socimer Intl. Bank Ltd.* v. *Standard Bank London Ltd.*, [2008] 1 Lloyd's Rep 558, referred to.
(31) *Strategic Turnaround Partnership Ltd., In re*, 2008 CILR 447; on appeal, *sub nom. Culross Global SPC Ltd.* v. *Strategic Turnaround Master Partnership Ltd.*, 2010 (2) CILR 364, applied.
(32) *Tinsley* v. *Milligan*, [1994] 1 A.C. 340; [1993] 3 W.L.R. 126; [1993] 3 All E.R. 65; [1993] 2 FLR 963; (1994), 68 P. & C.R. 412, referred to.
(33) *Titan Invs. Ltd. Partnership, Re* (2005), ABQB 637, considered.
(34) *WestLB AG* v. *Nomura Bank Intl. plc*, [2010] EWHC 2863 (Comm); on appeal, [2012] EWCA Civ 495, referred to.

## Legislation construed:

Bankruptcy Law (1997 Revision), s.111(1): The relevant terms of this sub-section are set out at para. 146.

Companies Law (2007 Revision), s.168(1): The relevant terms of this sub-section are set out at para. 145.

Companies Law (2013 Revision), s.93:

"A company shall be deemed to be unable to pay its debts if—

. . .

(c) it is proved to the satisfaction of the Court that the company is unable to pay its debts."

s.145(1): The relevant terms of this sub-section are set out at para. 10.

*D. Lord, Q.C.* and *S. Folpp* for the plaintiffs;
*D. Chivers, Q.C.*, *S. Dawson* and *K. McGriele* for the defendant.

1    **CLIFFORD, J.:** The plaintiffs are the joint official liquidators ("the JOLs") of a Cayman fund, Weavering Macro Fixed Income Fund Ltd. ("the company"). They were appointed as voluntary liquidators on March 19th, 2009. By order dated April 3rd, 2009, the liquidation was ordered to continue subject to the supervision of the court, whereupon the plaintiffs became joint official liquidators. It is in that capacity that they have brought these proceedings.[1]

2    The defendant, Skandinaviska Enskilda Banken AB (Publ) ("SEB"), is a Swedish financial institution and was an investor in the company. SEB acted as a depositary and custodian for, among others, two Swedish mutual funds, namely (a) HQ Solid, a fund managed by HQ Fonder Sverige AB ("HQ Fonder"); and (b) Catella Stiftelsefond ("Catella"), a fund managed by Catella Fondforvaltning AB ("Catella Fonder").

3    In the period between April 2006 and November 2007, SEB subscribed for US$8.5m. of "participating shares" (as defined in the company's articles of association) on behalf of HQ Solid. The company issued 56,836.96 participating shares to "SEB Merchant Banking as nominee for HQ Solid."

4    In March 2008, SEB subscribed for US$1m. of participating shares in the company on behalf of Catella and was issued 5,926.98 of such shares. Subsequently, the company issued equalization shares to SEB, taking its total holding on behalf of Catella to 5,953.99 participating shares. In each case, the company issued such participating shares to "SEB Merchant Banking as nominee for Catella Stiftelsefond."

5    Despite acting in a nominee capacity, SEB was nevertheless the legal owner of these participating shares on the company's register of members.

6    In the months prior to its liquidation, the company made three redemption payments to SEB which are material to these proceedings.

7    On October 9th, 2008, SEB gave the required instructions to redeem all shares it held for Catella. This resulted in the company paying US$1,096,903.58 to SEB on December 19th, 2008 ("the first SEB redemption payment").

8    Having previously redeemed some of the shares held for HQ Solid on October 28th, 2008, SEB gave the required instructions to redeem the remaining shares. On January 2nd, 2009, the company paid to SEB 25% of this redemption in the sum of US$1,780,214.29 ("the second SEB redemption payment"). On February 11th, 2009, the remaining 75% of the

---

1    One of the original JOLs, Mr. Stokoe, who gave evidence in these proceedings, has retired and was replaced by Mr. Simon Conway on July 13th, 2015.

redemption proceeds were paid by the company to SEB in the sum of US$5,340,643.47 ("the third SEB redemption payment").

9 In these proceedings, the JOLs seek a declaration that those three payments are invalid pursuant to s.145(1) of the Companies Law (2013 Revision) ("the Law") and an order that SEB pay to the company the total of the payments in the amount of US$8,217,761.54, plus interest.

10 Section 145(1) of the Law provides:

"Every conveyance or transfer of property, or charge thereon, and every payment obligation and judicial proceeding, made, incurred, taken or suffered by any company in favour of any creditor at a time when the company is unable to pay its debts within the meaning of section 93 with a view to giving such creditor a preference over the other creditors shall be invalid if made, incurred, taken or suffered within six months immediately preceding the commencement of a liquidation."

11 SEB admits receiving the redemption payments, but denies that they constituted preferences within the meaning of s.145 of the Law and denies any liability to make repayment.

12 During the course of the proceedings the issues to be determined have become defined as follows:

(a) As to the company's controlling mind.

(b) Whether the company was unable to pay its debts at the time of each of the SEB redemption payments.

(c) Whether the SEB redemption payments were made with a view to preferring SEB.

(d) Whether the SEB redemption payments were made with a view to preferring SEB over the other creditors.

(e) As to the availability of a defence arising out of consequences of a voidable preference, including change of position, and, if so, whether it is made out on the facts.

(f) Whether there are illegality and public policy reasons why this claim should not be allowed.

**The company**

*Introduction*

13 The company was incorporated in April 2003 as an open-ended investment company, established as an exempted company with limited liability pursuant to the laws of the Cayman Islands. The share capital was

US$50,000, divided into 100 management shares of US$1 par value each and US$4,990,000 of participating shares of US$0.01 par value each.

14   There were two directors of the company. These were Stefan Peterson and Hans Ekstrom.

15   During the life of the company, a number of offering memoranda were published by which information about the company was made available to investors who wished to invest in the company by way of subscription for its shares. The last version of the offering memorandum to be published prior to the commencement of the company's liquidation is dated September 24th, 2008 ("the OM").

16   Weavering Capital (UK) Ltd. ("WCUK") was the company's investment manager and undertook its trading activities. WCUK was also the investment manager of Weavering Capital Fund ("WCF"), a BVI company that was counterparty to interest rate swaps ("the swaps") entered into by the company.

17   WCUK maintained offices in London. It was placed into administration on March 19th, 2009 and, subsequently, liquidation in October 2009.

18   Magnus Peterson was a director of WCUK, and was employed as WCUK's chief executive officer and principal investment manager. He is the brother of the company's director, Stefan Peterson, and the stepson of the other director, Hans Ekstrom.

19   Magnus Peterson's wife, Mrs. Amanda Peterson, was also a director of WCUK. In addition, Mr. Charanpreet Dabhia ("Mr. Dabhia") was a director of WCUK and was employed, initially, as its head of business development, and, later, as its chief operating officer. Others involved with the management of WCUK included Mr. Edward Platt, who was employed as an investment manager, and Mr. James Stewart, an investment commentator who was also a director of WCUK during its final period.

20   The company's administrator was PNC Global Investment Servicing (Europe) Ltd. ("PNC"), pursuant to an administration and accounting services agreement dated July 30th, 2003. Its auditors were Ernst & Young ("EY").

21   The company retained a number of different clearing providers simultaneously, but at all times after November 2006 retained Fortis Bank Global Clearing NV as its back-office services provider, clearer and custodian. SEB also provided clearing and brokerage services to the company. However, it is clear that SEB's role in that capacity was quite distinct from its role as an investor in the company.

22   There were a number of other corporate entities within the Weavering Group. These included a Swedish arm, Rantehedge, an investment vehicle

into which investors could invest, which was managed by Weavering Fonder, and which in turn was advised by Weavering Capital AB. All three entities were Swedish domiciled entities.

## *Subscription and redemption of shares*

23   Subscription for the company's shares is provided for in arts. 20–27. Redemption of the company's shares is provided for in the articles, commencing at art. 48.

24   The OM states as follows in relation to redemption of shares:

"REDEMPTIONS

### *Redemption of company shares*

Shareholders can redeem their Shares, in whole or in part, in a minimum amount of US$50,000 (subject to the discretion of the Board of Directors to redeem lesser amounts), on one calendar month's prior written notice (subject to the discretion of the Board of Directors to waive such notice), on each Redemption Day. To effect a redemption, a Request for Redemption of Shares, obtained from the Company, must be received by the Company by 5 p.m. Dublin time one calendar month before any Redemption Day, accompanied by the share certificates, if any, duly endorsed and in a form for redemption acceptable to the Board of Directors.

Redemptions are made at a price per Share equal to the NAV per Share of the Company, as of the close of business on the relevant Valuation Date, to the nearest whole US cent (the 'Redemption Price').

### *Payment of redemptions*

Redemption payments are generally made within 30 calendar days after the Redemption Day. No interest is paid from the Redemption Day to the payment date. Payment is made by telegraphic transfer (with transfer charges to the account of the recipient) to the Remitting Bank/Financial Institution or to another account in the name of the Shareholder."

25   "Redemption day" is defined (at p.9 of the OM) as the first business day of each calendar month. "Valuation day" is defined (*ibid.*) as the business day immediately preceding each redemption day.

26   The effect of the price to be paid for redemptions was set out in art. 36 of the company's articles of association as follows: "The price to be paid for Participating Shares which are redeemed shall be deemed to be a liability of the Company from the Valuation Point on the Redemption Day until the price is paid."

### The purported change in structure in 2007

27   Prior to January 2007, WCUK was engaged directly by the company pursuant to an investment advisory agreement dated July 31st, 2003. In 2007, a proposal was put forward by Magnus Peterson whereby, for tax reasons, the formal structure pursuant to which the company was run was to be changed. It was proposed that WCUK be engaged as the company's "investment adviser," with a new entity, Weavering Capital Management Ltd. ("WCM"), being engaged as the company's "investment manager."

28   WCM is a Cayman Islands entity. Each of the directors of the company was also a director of WCM.

29   The changes were purportedly effected by entry into—

(a) a management agreement between the company and WCM dated January 30th, 2007, by which WCM was appointed the company's investment manager; and

(b) a tripartite investment advisory agreement between the company, WCM and WCUK dated January 30th, 2007, by which WCUK was appointed the company's investment adviser.

30   However, it is clear from the evidence (and there is no real issue about this) that these agreements, for whatever reason, were never carried into effect.

31   Accordingly, for all practical purposes relevant to these proceedings WCUK remained the company's investment manager and undertook its trading activities.

### The swaps

32   The swaps were entered into between the company and WCF pursuant to the terms of a standard ISDA Master Agreement dated January 20th, 2005. It was purportedly signed by Mr. Ekstrom on behalf of the company, although he has always denied that it bears his signature. Mr. Ekstrom and Stefan Peterson were also directors of WCF, but thought that by this time it had stopped trading. They do not appear even to have realized that WCF was the counterparty until March 2009.

33   The nature of the swaps and how they operated is explained in the expert report of Dr. Chudozie Okongwu, adduced in evidence by the JOLs. His report explains, *inter alia*, (a) the nature of interest rate swaps; (b) the nature of counterparty risk; (c) the swaps that were entered into by the company; (d) the dealings with those swaps and the lack of any payment to the company when positions beneficial to the company were closed out; and (e) the value of the swaps to the company. Dr. Okongwu was not required to attend the trial for cross-examination. His evidence is unchallenged and I accept it.

34  Mr. Stokoe has also investigated the swaps and their effect on the company and its NAV, as set out in his first witness statement, which he has verified in evidence. He was cross-examined, but not as to the position regarding the swaps.

35  The evidence demonstrates the very significant impact the swaps had on the trading performance of the company, in essence as follows:

(a) The swaps were worthless paper transactions entered into with WCF, which was never in a position to honour its obligations pursuant to them. WCF (as explained by its liquidator, Mr. Carter) had no realizable assets and did not trade other than as counterparty to the swaps.

(b) Magnus Peterson used the existence of the swaps to show a sustained growth over the life of the company. Large monthly adjustments were made to swaps exposures through the full or partial closing out of existing swaps and the opening of new swaps so as to avoid generating the impression of too large profits that the swaps would otherwise have shown on paper, but not in reality, and to avoid defeating the impression of the company as relatively low risk. The result was that the company was able to show the relatively modest but positive month-on-month performance expected by its investors.

(c) No gains were ever realized by the company in relation to the swaps, even when some of the swaps were closed out (as is clear from the financial statements). They were simply used to present a picture of a fund showing sustained growth, when in fact the unrealized gains represented by the swaps were fictitious.

(d) The reality was that the company was suffering large losses through its options trading (which were masked by the swaps) and expending considerable sums on management and performance fees and brokerage fees, largely to WCUK.

36  Accordingly, I find that the swaps were worthless (as Magnus Peterson knew) and they must be taken out of account when it comes to assessing the solvency of the company at the material times.

### The company's controlling mind

37  It is a key part of the JOLs' case that, at all material times, Magnus Peterson and his company, WCUK, managed and controlled the company. On their case, this management and control did not extend merely to the investments carried out by the company but to all facets of its business and, significantly for the purposes of these proceedings, all decisions about redemptions and how, when and to whom redemption payments were made. The directors, it is contended, played a purely formal role and allowed Magnus Peterson to run things such that he was permitted by them to be a *de facto* director.

38   For the purpose of making out this case, the JOLs rely (though not exclusively)
on evidence from other proceedings. There have been three previous sets of
proceedings involving some of the matters that are relevant to these proceedings:

(a) Proceedings brought by the JOLs against the directors of the company in
Cayman in Cause No. 113 of 2010 ("the directors' proceedings") (reported at 2015
(1) CILR 45).

(b) Proceedings brought by the administrators (and, in turn, liquidators) of
WCUK against Magnus Peterson and others in England ("the English
proceedings").

(c) Criminal proceedings brought against Magnus Peterson in England in which
Magnus Peterson was convicted of fraud and sentenced to 13 years' imprisonment.

39   I have previously ruled in the present action that the JOLs cannot rely on the
judgments in the directors' proceedings and the English proceedings based on the
principle set out in *Hollington* v. *F. Hewthorn & Co. Ltd.* (15). Nevertheless, all of
the witness evidence that was before the Cayman court in the directors' proceedings
(including the full transcript of the directors' cross-examination in those
proceedings) is before the court, as well as parts of the evidence that was before the
English court in the English proceedings.

40   It has been agreed that most of that evidence can be admitted in these
proceedings. The exception related to a very short extract of the evidence of
Magnus Peterson in the English proceedings which was objected to by SEB as
hearsay. Having heard submissions on this evidence during the course of leading
counsel's openings, I ruled that it should be excluded. Although arguably the
evidence in question is inherently plausible and not tainted by the fraud perpetrated
by Magnus Peterson, it was a statement plainly made for his own purposes in other
proceedings to which SEB was not a party, and I did not consider it appropriate to
admit it as hearsay as it was objected to.

41   So the position is that this key issue as to the company's controlling mind falls
to be determined to some extent on a consideration of the evidence admitted by
agreement from the previous proceedings, together with other evidence before the
court.

42   It has to be borne in mind, of course, that the evidence admitted from the other
proceedings is hearsay and there is the question of what weight can be attached to
it. The same goes for transcripts of interviews of the directors carried out by the
JOLs which are before the court. Neither of the directors has given evidence in the
present proceedings, nor, of course, has Magnus Peterson, who is in prison.

43   I should add that it has also been agreed that the parties did not need to serve
hearsay notices in relation to the other documents that have been disclosed in these
proceedings (most of which were also before the courts in the directors'
proceedings and the English proceedings). However, SEB required the JOLs to
identify all statements made by Magnus Peterson on which they rely and this was
duly done.

44   In addition to the evidence in the previous proceedings and the transcripts of
the interviews, the JOLs rely on the documents disclosed in this action and the
evidence of Mr. Stokoe. As far as the latter is concerned, Mr. Stokoe has carried
out a detailed investigation of the role of the directors, which is set out in his first
witness statement. There was no challenge to his findings in cross-examination.

45   On the basis of all this detailed evidence of the role played by the directors,
the JOLs contend that in summary the position was as follows:

(a) The directors did not perform any significant role at all but did whatever was
required of them by Magnus Peterson. They simply rubber-stamped his decisions
when asked to do so.

(b) There were no effective board meetings, as explained by Mr. Stokoe. They
were not held regularly and did not involve any scrutiny of the company's business
and affairs. Further, despite the collapse of Lehman Bros. and the ensuing volatility
in the markets in late 2008, and a large number of redemption requests received by
the company, no board meeting was held between May 22nd and December 23rd,
2008. In so far as it can be described as a board meeting, the meeting on December
23rd, 2008 probably only took place because Magnus Peterson was in Sweden for
Christmas.

(c) The directors signed whatever documents they were asked to sign by Magnus
Peterson, or practically anyone else. This was true, for example, of—

(i) the minutes of the board meetings;

(ii) the financial statements and confirmation letters provided to EY;

(iii) specific confirmations given to investors;

(iv) PNC waivers;

(v) the proposed restructuring in relation to WCM, referred to above;

(vi) the letter of December 31st, 2008 (which will be referred to below in
relation to the redemptions) that Stefan Peterson signed on January 7th, 2009; and

(vii) the signing of blank documents.

(d) Further, Magnus Peterson forged Hans Ekstrom's signature on the 2005 ISDA Master Agreement (referred to above) and the swap confirmation letters from WCF.

(e) The directors were not involved at all in the trading that was carried out on behalf of the company, did not supervize Magnus Peterson and WCUK's activities, and did not even seek to ascertain whether the company's investment restrictions were being adhered to (which they were not).

(f) They were provided with limited information, consisting largely of the PNC quarterly reports. As explained by Mr. Stokoe, it was possible to track the swaps through those reports, but the directors did not do so. They did not even bother to read those reports properly and, for example, did not pick up that WCF was the counterparty to the swaps when that was expressly stated in the September and December 2008 quarterly reports. Further, they did not appreciate that, as expressly stated in the audited financial statements, the purported gains on the swaps were all "unrealized."

(g) At no time did the directors seek any further information from Magnus Peterson or anyone else at WCUK, PNC or EY, and they never spoke to PNC or EY.

(h) Their involvement in the redemption process in the last few months prior to the liquidation of the company was virtually non-existent. They were aware that a large number of redemption requests were being received and they came to realize that the company did not have the money to fund those payments, which they may for a time have thought was a temporary problem. However, even then they did not seek to become involved in any real sense or seek any clarity on the financial position of the company. Indeed, it appears that during this period Stefan Peterson's main concern was that he should be paid for his services and Hans Ekstrom simply raised a query about the company's expenses. Their role remained limited to sanctioning the redemption policies devised by Magnus Peterson.

46   In support of this analysis, the JOLs rely on the totality of the directors' evidence in the transcripts of the interviews and in the directors' proceedings. During the course of the hearing, Mr. Lord, on behalf of the JOLs, has also drawn my attention to certain passages in the transcripts and has produced an extract of the transcripts upon which he particularly relies.

47   SEB contests the analysis. Complaint is made by their counsel, Mr. Chivers, that the JOLs "rely on snippets extracted from transcripts, meetings and the cross-examination of witnesses in previous proceedings." However, Mr. Chivers has also produced his own extracts from the

interviews and previous proceedings, to demonstrate that the evidence was not all one way.

48 These particular extracts indicate that, in response to certain questions, the directors stated that there was joint decision making with Magnus Peterson and WCUK, that they did not just sign documents without reading them, and that they were aware of the redemptions and took legal advice. In answer to certain questions, they insisted that they took their directorships very seriously and denied that their role was nothing other than to be a "rubber stamp" or "puppets." In response to one particular question, when he was interviewed on April 23rd, 2009, Stefan Peterson said: "But Magnus can't instruct the board. It should be the other way round. We have instructed the investment manager or investment adviser to manage the fund."

49 So, it is submitted, on behalf of SEB, that some parts of the evidence flatly contradict the JOLs' case that Magnus Peterson was in charge. However, none of the extracts referred to suggest that the directors were in charge of deciding who redemption payments were to be made to.

50 SEB also makes a number of legal and constitutional points concerning the position under the articles of association of the company and the role of PNC as the entity which actually made the redemption payments.

51 It is submitted that the company and SEB, as a member, were bound by the terms of the company's constitution. Under art. 122 of the company's articles of association, the board of directors was responsible for managing the company and its business. Further, the articles provided that the redemption process was under the control of the directors: under art. 48, a member redeeming shares was required to submit his share certificate to the directors; under art. 49, the directors could declare a suspension; under art. 50, the directors could temporarily suspend redemptions in order to effect the orderly liquidation of assets; and under arts. 51 and 54, the directors had a discretion to refuse to redeem shares.

52 The board could, however, delegate these powers to other persons under arts. 144 and 145. But Mr. Chivers, on behalf of SEB, submits that the JOLs have produced no evidence demonstrating any delegation by the *de jure* directors of board authority to Magnus Peterson to choose which creditors would receive redemption payments. On the contrary, he points out that Mr. Stokoe, in his first witness statement, said that he is "unaware of the basis on which, constitutionally, Mr. Magnus Peterson was authorized to unilaterally direct that redemption payments be made to certain shareholders and not others . . ." Mr. Stokoe seems to have been commenting on the lack of any formal board authority, but in any event the point was not pursued with him in cross-examination.

53   The answer to this, it seems to me, is that the evidence shows that the directors, in effect, delegated authority, including authority in relation to redemption payments, to Magnus Peterson, which they were entitled to do pursuant to arts. 144 and 145. Even if there was not any formal delegation of authority for this purpose, there is a compelling weight of evidence to the effect that the board permitted Magnus Peterson to act as a *de facto* director and, in effect, delegated their powers to him as they were entitled to do pursuant to the articles referred to. It is probably not even a question of deciding whether this amounted to ostensible authority. In my view, it is clear that the board allowed Magnus Peterson to act on its behalf in performing all the functions necessary for the payment of redemptions. The necessary implication is that Magnus Peterson had the board's actual authority for this purpose. There is no requirement, in my view, that s.145 of the Law requires express actual delegated authority. Magnus Peterson was allowed to act on behalf of the board for relevant purposes and clearly had authority to do so.

54   Turning to the point that it was the administrator, PNC, which actually made the redemption payments, the question raised is whether this had any effect on the controlling mind in making such payments.

55   The administration agreement provided that PNC would disburse money on "written instructions," meaning signed by an "authorized person," which in turn meant an officer of the company or any person duly authorized. Having found that Magnus Peterson did have such authority, there is nothing further to be made from this.

56   It is also pointed out, however, on behalf of SEB, that, when making the redemption payments (which we shall come on to), PNC insisted, in one instance, on a waiver signed by a director of the company. Then, in January 2009, the time came when PNC was not willing to carry out Magnus Peterson's instructions to make payments without a specific board resolution. And, indeed, it appears that some redemption payments were made by PNC ahead of others selected by Magnus Peterson.

57   Nevertheless, the evidence shows that the decision making in relation to the payment of redemptions, and specifically the SEB redemption payments, was that of Magnus Peterson, as can be seen from how each payment came to be made. There is nothing surprising about the fact that it was Magnus Peterson who was the decision maker. He was the "principal investment adviser" and CEO of WCUK. Whilst it was PNC, as the administrator, who would actually make redemption payments, unless PNC could fund redemptions from subscriptions (which they plainly could not at the relevant time) it was entirely reliant on WCUK to provide it with the cash to make the payments. WCUK (and in particular Magnus Peterson) was entirely in control of the whole process.

58 When the payments came to be made by PNC, they of course had authority to make them in accordance with the provisions of the administration agreement. The services provided by PNC included arranging for the computation of the NAV (cl. 15(xiii)), controlling and authorizing all disbursements (cl. 15(viii)), maintaining the register of shareholders (cl. 16(v)), preparing and forwarding documents to shareholders (cl. 16(vii)) and notifying the adviser, the custodian and the accounting agent of all share activity (cl. 16(vii)). PNC's role is also made clear in the OM, in which it is stated that "the Administrator has been appointed to administer the day to day operations and business of the Fund, including processing subscriptions, redemptions, computing the Net Asset Value . . ."

59 WCUK, on the other hand, as the investment adviser, was appointed "to manage the affairs of the Fund."

60 PNC's role was purely administrative, as would be expected. I specifically reject the submission of Mr. Chivers that PNC was part of the decision-making process in relation to the payment of redemptions.

61 I have taken into account all the evidence referred to from the previous proceedings, from the documents disclosed, and specifically from Mr. Stokoe, whose evidence I accept. Having carefully considered such evidence as a whole, and made due allowance for some discrepancies and those parts that are hearsay, I find that nevertheless the overwhelming weight of it is to the effect that Magnus Peterson directly, and through his company, WCUK, managed and controlled the company for all purposes relevant to these proceedings. He controlled the investments and he made the material decisions about redemptions.

62 Accordingly, I find that Magnus Peterson was indeed the company's controlling mind in the payment of the relevant redemptions which I must now move on to examine.

### The redemption of SEB's shares and the liquidation of the company

63 During the month of October 2008, the company received redemption requests for shares that, at the determined NAV, totalled US$138.4m., including the redemption requests from SEB, which amounted to US$8,217,761.54. Those redemption requests were processed on the December 1st, 2008 redemption day (being the next redemption day following the requisite 30-day notice period), and calculated in accordance with the company's NAV at that time. Pursuant to the company's OM, the redemption payments would be expected generally to be made within 30 calendar days of the December 1st, 2008 redemption day.

64 Additional redemption requests were received by the company in November 2008 and December 2008, for processing in accordance with the January 2009 and February 2009 redemption days (being January 2nd,

2009 and February 2nd, 2009, respectively). The redemptions that fell due totalled approximately US$54.7m. and US$30.0m. respectively, as calculated in accordance with the relevant published NAVs.

65   On December 17th, 2008, Magnus Peterson sent an email to PNC asking that a select number of investors who had redeemed their shares in accordance with the December 1st, 2008 redemption day be paid the following day, on the basis that those investors ("the Swedish redeemers") were switching to another fund within the Weavering Group. That email was as follows:

"Hi Gillian,

We have a few Swedish investors that have switched into our SEK-based Fund as at 1st December.

We need to pay them value tomorrow please.

On the attached spreadsheet I have highlighted those investors in yellow. It is approximately US$7.6 million that needs to be paid.

SEB are sending funds today to PNC so there should be no problem executing it.

Best regards,

Magnus"

66   It can be seen from the spreadsheet attached to this email that SEB was one of the investors referred to by Magnus Peterson, and its redemption sum of US$1,096,903.58 formed part of the US$7.6m. to be paid. The redemption related to SEB's account in respect of Catella. The directors were not involved at all in that decision.

67   As can be seen from the email chain thereafter, there followed some issues regarding there being insufficient funds available for these redemption payments to be made to the Swedish redeemers (which the JOLs say demonstrates that the company was unable to pay its debts at that time). However, payment was made on December 19th, 2008, as can be seen from PNC's daily transaction report for that date, which records redemption payments in the sum of US$7,598,979.03 as having been made. The first SEB redemption payment of US$1,096,903.58 was received on that day.

68   No further sums were paid to any redeemers for the remainder of December 2008.

69   With the end of December 2008 approaching, and apparently insufficient cash to meet the December 2008 redemption debt, Magnus Peterson and WCUK sought legal advice. The advice is set out in an email dated December 30th, 2008 from Mr. Kevin Nosib, of the law firm Ogier, to Mr.

Dabhia of WCUK, referring to a conversation between the two of them the day before.

70   Mr. Nosib there sets out his understanding that the issues facing the company were cash-flow related. The JOLs make the point that if Mr. Nosib had properly understood the position (as Magnus Peterson did) his advice would have been very different.

71   The email chain shows that on December 29th, 2008 (the day of the conversation between Mr. Nosib and Mr. Dabhia), there was an email from Magnus Peterson to Mr. Dabhia in which Mr. Peterson proposed a form of wording to be sent to those investors who sought to redeem their shares in accordance with the December 1st, 2008 redemption day in relation to a decision which he had made to pay only 25% of the remaining December 2008 redemption debt and in which it was intimated that the balance of the December 2008 redemption debt would be paid by the end of January 2009. The evidence of the JOLs (in particular the analysis carried out by Mr. Stokoe) demonstrates that Magnus Peterson must have known by this time that the company would never be in a position to do all this (let alone pay the January 2009 redemption debt which was to fall due just two days later, on January 2nd, 2009).

72   There appears to have been some discomfort felt on the part of PNC about the decision by Magnus Peterson to pay only 25% of the redemption debt. On December 31st, 2008, Gillian Nugent of PNC sent to Mr. Dabhia a waiver to be signed by a director confirming that only 25% (excluding the full redemption payments already made) should be paid. This was forwarded to the directors, copied to Magnus Peterson, and was duly signed as requested, after an email from Magnus Peterson to Mr. Ekstrom.

73   The letter to investors proposed by Magnus Peterson, dated December 31st, 2008, was not in fact sent until January 7th, 2009, after it had been signed by Stefan Peterson at the request of Magnus Peterson.

74   By then, on January 2nd, 2009, the second SEB redemption payment had been made in the sum of US$1,780,214.29. This was 25% of the sum due in respect of the shares held for HQ Solid.

75   The letter sent to investors stated as follows:

"Dear Redeeming Investor,

Due to the illiquidity of the markets at present, and the fact that the Fund has received redemption requests for over 30% of its NAV, the Fund's directors have exercised their discretion to postpone a *pro rata* proportion of existing redemptions until market conditions improve.

Reducing positions in December's market conditions to create cash to effect redemptions has proved very difficult, has started to have a

detrimental effect on returns and, if continued, will in the opinion of the directors seriously prejudice existing investors.

Therefore, after consulting Weavering Capital (UK) Ltd. as the Fund's investment manager, in order to effect an orderly liquidation of the Fund's assets to meet the requested redemptions, the directors have decided to pay at the end of this month 25% of all redemptions requested at the end of November on a *pro rata* basis.

The remaining redemption amounts will be paid out in one or more instalments as market conditions improve as the directors in their absolute discretion determine, and the directors envisage this improvement will take place by the end [of] January."

76  On the same date as the second SEB redemption payment, the company incurred the further redemption obligations in the sum of US$54.7m. At the same time, in addition to making payment of the second SEB redemption, further partial payments were also made, seemingly *ad hoc*, to some of the other December redeemers, with two additional partial payments on January 5th and 13th, 2009. Later in the month, most of these other redeemers (except, it is pointed out by Mr. Chivers, SEB and three others) were paid the remaining portion of their redemptions.

77  Moving into February 2009, the next redemptions, of some US$30m., became due (on the 2nd of the month). Shortly after, on February 4th, 2009, one of the December redeemers was paid the remaining portion due, followed soon after by the third SEB redemption payment (of US$5,340,643.47) and a payment of the remaining portion to one other December redeemer on February 11th, 2009. That left just one December redeemer to be paid a remaining portion and this happened on February 26th, 2009. The third SEB redemption payment was made following on from an email dated February 10th, 2009, from Magnus Peterson to PNC, requesting payment of the sum in question to "SEB Merchant Banking as nominee for HQ Solid."

78  All these payments made are summarized in a spreadsheet produced in the evidence of Mr. Stokoe. Overall they amounted to the following:

| Date | US$ Payment |
| --- | --- |
| December 2008 | $7,598,979.03 |
| January 2009 | $72,334,131.96 |
| February 2009 | $10,236,352.00 |
| US$ Total Paid | $90,169,462.99 |
| US$ Total Due | $138,361,002.62 |
| US$ Shortfall | ($48,191,539.63) |

79  There are various emails relating to payment of these sums. These emails, on the case of the JOLs, show, and I accept, that—

THE CAYMAN ISLANDS LAW REPORTS

2015 (2) CILR

(a) all decisions about redemption payments were being made by Magnus Peterson;

(b) the company did not have sufficient funds to pay all those who had redeemed on December 1st, 2008 (let alone those who had redeemed on January 2nd, 2009 and February 2nd, 2009);

(c) others (not Magnus Peterson) were looking to the swaps to fund the redemption payments and Magnus Peterson confirmed that some of the swaps would be closed out to meet the payments (something he knew could not be done); and

(d) some redeemers were putting pressure on PNC and WCUK to pay them, but there does not appear to have been any pressure or even a request for payment from SEB.

80  It should be added that, as in December 2008, again in January 2009 Magnus Peterson selected Swedish redeemers to be paid who were switching in to another fund. Thus, on January 20th, 2009, he emailed PNC as follows:

"Gillian,

Just like last month we have 3 Swedish investors who have switched into our SEK-based Fund.

We need to pay them tomorrow please.

. . .

Regards

Magnus"

81  On this occasion, SEB was not one of the redeemers, but the selection appears to have been made for the same reason as before.

82  The making of the third SEB redemption payment resulted in payment of the entirety of the sums due to SEB pursuant to its redemption requests. However, by then the company had in excess of US$134m. in outstanding redemption obligations, being the balance of the December 2008 redemption debt of about US$50m., in addition to the entirety of the January 2009 redemption debt and the February 2009 redemption debt.

83  During this period, it was not until late January 2009 that it appears that any thought was given to putting things on a formal footing and documenting the decision to pay some of the December 2008 redeemers, notwithstanding the number of redemption requests received. This is explained in Mr. Stokoe's first witness statement.

84   PNC, for their part, informed Magnus Peterson on January 20th, 2009 that they would require a directors' resolution before paying out any redemption proceeds for December 2008.

85   Finally, there was a board meeting, but not until February 22nd, 2009. The minutes of that meeting record as follows:

"During December it became apparent that due to a severe lack of liquidity in the fixed income markets, and taking into account the high level of redemptions, that redemption payments may need to be deferred in order that the Fund's assets that needed to be realised to meet the redemption payments could be sold at a fair market price and not at distressed levels. Using the powers under Article 50 the Directors determined on 30th December that redemption payments due by the end of December would be deferred to such time as liquidity returned to the fixed income markets and assets could be realised at fair value and on the basis of an orderly liquidation, and so that the interests of the remaining shareholders would not be prejudiced thereby. In making a judgment on market liquidity, it was noted that the Board will rely on the advice of the Investment Manager. In recognition of their fiduciary duty to the Fund and its Shareholders, the Directors confirmed that the Fund's redemption policy shall continue to be to secure an orderly liquidation of the Fund's assets and to pay out redemption proceeds to redeeming Shareholders on an equitable basis when funds are available, and taking into account that:

(a) the policy of the Fund has always been to make redemption payments *generally* within 30 days of the relevant Redemption Day which permits the Directors in their discretion to extend the payment period; and

(b) where one redemption request is of such a size that it can only be satisfied in a number of payments or in one deferred payment (a 'Large Redemption'), the Directors may satisfy all other contemporaneous or prior redemption requests in full before paying the redemption proceeds for the Large Redemption in order best to protect the Net Asset Value of the Fund and the interests of the remaining Shareholders."

86   Leaving aside whether this was a correct analysis (which will be considered in relation to the issue of solvency) the board's intervention was clearly limited and late. Other than Stefan Peterson signing the December 31st, 2008 letter (on January 7th, 2009), the directors had no further involvement in relation to the payment of redemption proceeds until this February 22nd, 2009 board meeting. Further, there are obvious inconsistencies between the December 31st, 2008 letter and the board

301

minutes. The minutes call for larger redemption requests to be subordinated to smaller redemption requests, while the December 31st, 2008 letter refers to the *pro rata* payment of 25% of redemption sums due, and thereafter the payment of remaining amounts in one or more instalments. There was no provision unilaterally to pay one investor over another if the unpaid investor was a "large investor" (the February 22nd board minutes appear to be a belated attempt to rectify that).

87 Furthermore, by February 22nd, 2009, SEB had received its redemption payments in full, with respect to both Catella and HQ Solid, and all the other redemption payments referred to above had also been paid, with the exception of just the one payment made a few days later on February 26th, 2009.

88 Magnus Peterson was aware of the need to treat all investors equally. He also, of course, was the person aware of the fraud in relation to the swaps. He must have realized that the company was unable to pay its debts. Accordingly, he should have suspended (or requested the directors to suspend) calculation of the company's NAV and he must have known that the company should have taken the course of suspending payment of redemptions.

89 As I have already found, it was Magnus Peterson who was the company's controlling mind in the payment of the relevant redemptions. However, if the intention of the directors matters, then the JOLs rely on the knowledge of the directors (already referred to) that a large number of redemption requests were being received and that the company did not have the money to fund those payments. Knowing that the company was unable to make these payments, nonetheless, as the evidence relating to the redemption payments shows, they became involved in sanctioning the policies set out in the December 31st, 2008 letter and the February 22nd, 2009 board meeting.

90 There is no evidence that the directors even knew about the first SEB redemption payment. But the policies they sanctioned could be said to be relevant to the payment of the second and third SEB redemption payments if their intention matters at all for this purpose.

91 At last, on about March 5th, 2009, the directors became aware of the true nature of the swaps and their likely effect on the solvency of the company. In March 2009, the directors resolved to suspend the determination of the NAV per share and the issue and redemption of shares of the company with immediate effect. Shareholders were informed of this by letter dated March 11th, 2009.

92 The company was then put into liquidation on March 19th, 2009.

### The solvency issue

93 Before moving on to consider whether the evidence of payment of redemptions establishes that payments were made with a view to giving a preference in respect of each of the payments to SEB, it is necessary first to establish whether the company was "unable to pay its debts within the meaning of s.93" of the Law when each such payment was made. This is a threshold requirement for a claim under s.145(1) of the Law.

94 Section 93 of the Law provides three grounds upon which a company may be deemed unable to pay its debts. The first two (namely (a) an unsatisfied demand for payment and (b) an unsatisfied execution of a judgment, decree or order) have no relevance in the present case. It is common ground that the JOLs must rely on s.93(c) and prove "to the satisfaction of the Court that the company [was] unable to pay its debts" at the relevant times. This test of inability to pay debts under s.93(c) is one of commercial insolvency, a so-called cash-flow test, rather than a balance-sheet test. It is based on a company's present inability to pay debts as they fall due (see *In re FIA Leveraged Fund* (9) (2012 (1) CILR 248, at para. 71) and *In re Strategic Turnaround Partnership Ltd.* (31)).

95 Mr. Stokoe in his evidence carried out an analysis of the relevant position at the time of each of the three redemption days. On the figures set out by him he concluded that, as at December 1st, 2008, once the worthless swaps were disregarded, the company had insufficient other assets to fund the redemption obligations unless it received significant subscription moneys to use for such purpose, which it did not. Likewise, his analysis for the position as at January 2nd, 2009 and February 2nd, 2009 shows that, in each case, ignoring the value of the swaps, there were insufficient assets to pay the redemption debt. This evidence was not challenged in cross-examination and I accept it, subject to determining the legal issues raised by Mr. Chivers on behalf of SEB, which will be dealt with below.

96 At my request during the hearing, for convenient reference, a schedule was produced on behalf of the JOLs setting out the relevant figures with the swaps taken out of account. This schedule shows over the relevant period the reported NAV less the swaps, and the amounts of monthly subscriptions and monthly redemptions. It appears to be clear from these figures that (subject again to the legal issues) the company was unable to pay its debts on December 1st, 2008, and this continued to be the position right up to the time when the company went into liquidation and the directors declined to provide a declaration of solvency.

97 SEB has not pleaded a positive case that the company was able to pay its debts (other than raising its legal issues) but merely does not admit that the company was unable to pay its debts and has not adduced any evidence on the point. However, in his closing submissions, Mr. Chivers

disputed that the JOLs had established that the company was insolvent on a commercial basis on each of the three dates on which SEB was paid redemption proceeds. He submitted that there had been no identification of the cash and other liquid assets of the company which were available on each of the three dates on which SEB was paid redemption proceeds. He further submitted that there is no evidence as to which assets were within the company's portfolio on the three dates which could have been sold, even at a significant discount, in order to raise cash to meet the redemption obligations.

98   Mr. Lord, on behalf of the JOLs, accepted that the schedule does not expressly show what immediately realizable assets (if any) the company had (other than subscription moneys received) but submitted that it, nonetheless, demonstrated a very dire financial position for the company. He contended that there was ample evidence before the court to show that the company did not have the ability to realize assets to raise cash to meet the redemption payments that had fallen due on December 1st, 2008, January 2nd, 2009 and February 2nd, 2009, namely:

(a) The evidence of the directors.

(b) The emails between WCUK and PNC in December 2008 demonstrating that PNC did not have the necessary funds with which to meet the redemption payments that had fallen due on December 1st, 2008. For example, on December 5th, 2008, PNC asked WCUK twice for confirmation as to when redemption moneys could be requested from the prime broker and was told in response that WCUK would look to pay the redemptions "around 28th/29th Dec." Further, when it came to paying the Swedish redeemers, initially there appeared to be insufficient funds to make payment and they were only provided after some chasing.

(c) At the end of December 2008, it was apparent that there were still insufficient funds to pay all those who had redeemed on December 1st, 2008, hence the decision to pay only 25%, as belatedly recorded in the letter to redeeming investors dated December 31st, 2008, but sent on January 7th, 2009. The terms of that letter admit that the company was unable to pay its debts. Despite the terms of the letter there was one investor who did not receive 25% until January 13th, 2009, as shown on the spreadsheet.

(d) Further, the company remained unable to pay all those who had redeemed on December 1st, 2008 by March 9th, 2009, when it resolved to suspend redemption payments. And it was unable to pay any of those investors who had redeemed on January 2nd, 2009 and February 2nd, 2009.

(e) In email exchanges in January 2009, Mr. Barden of PNC sought assurances from Magnus Peterson that assets would be realized to create

cash to pay the redemptions and was met with the response that some of the swaps would be closed out to create the necessary cash (something that was, of course, impossible).

99   It is clear on the evidence that throughout this period Magnus Peterson must have known that there were insufficient funds to pay all the redemptions.

100   Taking account of all of this evidence, the vast discrepancy between subscription payments received and redemption payments that fell due from December 1st, 2008 until the liquidation of the company, and the unchallenged evidence of Mr. Stokoe, which I accept, I am satisfied that the JOLs have discharged the burden of proving that, on December 19th, 2008, January 2nd, 2009 and February 11th, 2009, the company was unable to pay its debts.

101   This, however, is subject to resolving two legal issues raised on behalf of SEB. The first is the contention that there were no redemption debts that the company was unable to pay until the 30-day grace period referred to in the OM had expired, which affects the first SEB redemption payment. The second, overarching, point made is that as the published NAVs were wrong on account of Magnus Peterson's fraud, they were not valuations at all, or at least not binding valuations, and so none of the redeeming shareholders became creditors of the company. It follows from this that SEB, on its case, should have been paid nothing, and nor should any of the other redeemers.

102   Each of these issues now needs to be addressed.

### The 30-day grace period

103   The effect of art. 36 of the company's articles of association (which has been referred to at para. 26 above) is that a redeeming shareholder becomes a creditor of the company from the valuation point on the redemption day. This is accepted by Mr. Chivers. In *In re Strategic Turnaround Partnership Ltd.* (31), the Cayman Court of Appeal held that an article containing very similar wording created a provable debt owed to the redeeming investor from the redemption day.[2]

104   So SEB has to accept that, on December 1st, 2008, the amounts due to those investors who had redeemed on that day became debts of the company, such that those investors became creditors of the company on that date and, for example, had standing to petition to wind up the company in that capacity.

---

2   The Court of Appeal's decision was overturned on other grounds by the Judicial Committee of the Privy Council.

105   However, reliance is placed by Mr. Chivers on the provision in the company's OM that redemption payments are "generally made within 30 calendar days after the Redemption Day." He submitted that while redeeming shareholders became creditors of the company on the relevant redemption day under art. 36, they did not become current creditors on that day; rather they only became prospective creditors in respect of unpaid redemption proceeds. So, it is contended, on a true construction of the company's articles and the OM, which it is said must be interpreted together, the company was obliged to pay redemption proceeds on the expiry of 30 calendar days after the relevant redemption day.

106   A forensic point is sought to be made that this interpretation has appeared to be common ground between the parties. However, it has certainly not been conceded in the final analysis in the submissions which have been made by Mr. Lord, which will be referred to below.

107   Alternatively, Mr. Chivers submits that if the court concludes that the articles must be construed in isolation and the OM is merely descriptive, the position is that art. 36 does not spell out when the company is to pay redemption proceeds. Reliance is therefore placed on the well-established principle of general application that, in the absence of any express provision as to timing in a contract, an obligation must be performed within a reasonable time: thus, in *Hick* v. *Raymond & Reid* (14) ([1893] A.C. at 32):

"When the language of a contract does not expressly, or by necessary implication, fix any time for the performance of a contractual obligation, the law implies that it shall be performed within a reasonable time. The rule is of general application . . ."

108   Mr. Chivers also cited other cases demonstrating the application of the principle and showing that any estimate given by a party as to the likely amount of time necessary for performance is relevant (see *Rennie* v. *Westbury Homes (Holdings) Ltd.* (26) and *Astea (UK) Ltd.* v. *Time Group Ltd.* (3), approved in *Peregrine Sys. Ltd.* v. *Steria Ltd.* (24)). So, it is submitted that, as in the present case, the OM provided an estimate of the time necessary for the company to pay (generally within 30 calendar days), and there would be no breach of contract by the company if it took advantage of a grace period of no more than that number of days. Thus, it is contended that no redeemer could, as a matter of contract set out in the articles, have required performance of the obligation to pay until the expiry of 30 days as the obligation would not until then have fallen due.

109   On the basis of this analysis, it is submitted on behalf of SEB that the December 2008 redeemers did not have debts which were due for payment on December 19th, 2008 (the date of the first SEB redemption payment) and so they cannot be taken into account to establish insolvency on that date. Further, it follows that, by January 2nd, 2009 (the date of the