# EXHIBIT 15
# PART 2

second SEB redemption), although the December redeemers' debts had fallen due, the January redeemers' debts had not and so are not relevant to an assessment of the company's insolvency on a commercial basis on that date. And carrying through the analysis to February 11th, 2009 (the date of the third SEB redemption payment), although any December 2008 redeemers and January 2009 redeemers who remained unpaid were creditors whose debts were due, the February 2009 redeemers were only prospective creditors whose debts are not relevant to the determination of solvency on that date.

110   In response, Mr. Lord, on behalf of the JOLs, relies on *Strategic Turnaround* (31) as establishing the effect of art. 36 in this case to be that, on December 1st, 2008, the amounts due to those investors who had redeemed on that day became debts of the company, such that those investors became creditors of the company on that date who, for example, could petition to wind it up. He referred me to the decision of the Privy Council in that case. Mr. Chivers has pointed out that the Privy Council held that it was not open to the company, after the redemption day had passed, to suspend redemptions, but that they did not need to consider, and did not consider, the time at which the debt owed became due and payable. Nevertheless, there was an observation by Lord Mance, to which my attention was drawn by Mr. Lord, which is relevant to the issue raised here. In *Strategic Turnaround*, the relevant article provided that "the price to be paid for shares which are to be redeemed shall be deemed to be a liability of the company from the close of business on the redemption day until the price is paid."

111   Lord Mance said this about it (2010 (2) CILR 364, at para. 20):

"The focus of these provisions is on the redemption date, by reference to which the redemption price payable is crystallized and from which the price is deemed to be a liability of the [company]. The remittance of the 'redemption proceeds' is treated as a matter of supplementary procedure . . . Both stages may be said to be part of a continuing process, but it does not follow that 'redemption' within the meaning of [the articles] only occurs at the conclusion of that whole process."

112   In my view, much the same can be said here. The allowance of a grace period of 30 days for redemption payments was a purely practical measure to allow for orderly payment of sums which had become due on the redemption date. It had no legal bearing on the liability which arose at that date. Subsequent payment in accordance with the grace period was, mirroring the words of Lord Mance, no more than a matter of supplementary procedure. Nor is there any need, as suggested by Mr. Chivers, to consider implying terms as to payment.

113   Mr. Lord also submits that, on the face of it, the contention of SEB as to the 30-day period is plainly wrong. It would only apply to the first SEB redemption and then only because, if anything, on this analysis, the payment had been made early.

114   However, the point is made that the analysis must be wrong because it could lead to absurd results: for example, if a company owes a main contractor a substantial sum of money that it has no prospect of meeting, but that contractor agrees not to enforce it for a period (*e.g.* grants a 7-day period of grace for payment) and, during that period the company pays off its bank overdraft in order to relieve its directors of any obligations pursuant to personal guarantees before going into liquidation shortly after, on SEB's argument that payment could not be a preference within s.145.

115   The test in s.93(c) of the Law, as Mr. Lord points out, is whether "it is proved to the satisfaction of the Court that the company is unable to pay its debts." Since it is accepted by SEB that, on December 1st, 2008, all December 1st, 2008 redemption payments were "debts" of the company, the test, he submits, is whether or not the court is satisfied (in relation to the first SEB redemption payment) that on December 19th, 2008 the company was unable to pay all December 1st, 2008 redemption payments.[3] In point of fact, however, he contends that it does not matter whether or not those debts are regarded as payable on December 31st, 2008 or on December 1st, 2008, as long as the court is satisfied that on December 19th, 2008, on the balance of probabilities, the company would not have been able to pay all of December 1st, 2008 redemptions on December 31st, 2008. It is submitted that the evidence amply demonstrates that the company on December 19th, 2008 had no prospect of being able to pay all December 1st, 2008 redemption payments on December 31st, 2008. I have no hesitation in accepting this to be the position.

116   Accordingly, I am of the view that the 30-day grace period has no bearing on the material position on solvency for the purpose of the claims in these proceedings.

### *Fraudulent NAV*

117   SEB contends that as the published NAVs were wrong on account of Magnus Peterson's fraud, this fraud had the following consequences:

---

3   The JOLs actually go further and submit that the correct test is whether or not the company is able to pay not only all of its incurred debts but also any future debts which it knows will arise (which include the further redemption payments that were incurred on January 2nd, 2009).

(a) The published NAVs, being based on Magnus Peterson's fraud, were not "valuations" of the company's net assets at all within the meaning of the company's articles. The company therefore did not determine NAVs and the redemption process provided for in the articles and the OM was never completed. Redeeming shareholders accordingly never became creditors of the company.

(b) Alternatively, the published NAVs, even if they constituted "valuations" within the meaning of the company's articles, were not binding as between the company and redeeming shareholders. The company does not therefore owe legal liabilities to such shareholders.

(c) In the further alternative, the published NAVs were not binding as between the company and redeeming shareholders to the extent of Magnus Peterson's fraud. The company only owes legal liabilities to redeeming shareholders based on the real (lower) NAVs.

118   It is thus submitted that the redeemers in this case never became creditors; that there was no liability to pay them anything and so the company was not insolvent. So, on this footing, none of them (including, it has to be accepted, SEB) should have been paid anything.

119   Article 34 provides as follows: "The assets of the Company shall be valued in accordance with such policies as the Directors may determine. Any valuations made pursuant to these Articles shall be binding on all persons."

120   SEB submits that a valuation of the company's assets based on fraud would not be in accordance with any policy which the directors of the company (or Magnus Peterson) could lawfully have adopted. Further, it is said, that a valuation of the company's assets based on fraud would not be pursuant to the articles as required under art. 34 because it would be absurd to suggest that the statutory contract of membership constituted by the articles, or the general law, permitted fraud. Reference is also made to art. 32, whereby the directors are required, in calculating the NAV, to "apply such generally accepted accounting principles as they may determine," which it is contended cannot be said to have happened because of the fraud in relation to the NAV.

121   In support of these contentions, Mr. Chivers submitted that it is implicit that a valuation to be carried out by a contracting party must be carried out rationally and in good faith. He cited *Socimer Intl. Bank Ltd.* v. *Standard Bank London Ltd.* (30), where Rix, L.J. said as follows ([2008] 1 Lloyd's Rep. 558, at para. 66):

"It is plain from these authorities that a decision maker's discretion will be limited, as a matter of necessary implication, by concepts of honesty, good faith, and genuineness, and the need for the absence of arbitrariness, capriciousness, perversity and irrationality."

122 Other English authorities to the same effect were also cited.[4] In this jurisdiction, in *In re FIA Leveraged Fund* (9), Chadwick, P. adopted the same approach, using very much the same words as those of Rix, L.J. referred to above (2013 (1) CILR 152, at para. 25).

123 Mr. Chivers also referred to the very recent Cayman case of *In re Herald Fund SPC* (13). The ruling was on an application to determine certain issues in the Herald liquidation in relation to redemption requests, and there was also a rectification issue. The latter required a consideration of O.12, r.2 of the Companies Winding Up Rules, which requires an official liquidator to rectify the company's register of members in certain circumstances in accordance with s.112 of the Law. Mr. Chivers points out that Jones, J. (2015 (1) CILR 482, at para. 33) was of the view that for a NAV not to be binding between the company and its members there had to be "some conduct on the part of the company itself or conduct on the part of an agent which can properly be imputed to the company, and which has the effect of vitiating the contract with its members."

124 It is observed also that Jones, J. drew (*ibid.*, at para. 48) a distinction between "internal" and "external" fraud, the former, it is suggested, being one to vitiate the contract with members, whereas the latter would not. This was a case of external fraud, though in the event the judge left over the question of whether the power of rectification should be exercised until a further hearing.

125 As it is the JOLs' case that Magnus Peterson was the controlling mind and will of the company, so it is submitted by Mr. Chivers that Magnus Peterson's fraud must be attributed to the company as an internal fraud. The result, it is contended, is that the published NAVs are not binding, or alternatively are only binding in so far as they are based on the company's real net assets.

126 Accordingly, on SEB's case, there was no determination of NAV in accordance with the contract for the December redemptions and no lawful December redeemers. So, those redeemers did not become creditors and the company was not insolvent.

127 The JOLs, in response, begin by observing that this is not an attractive argument by SEB: it results, it is said, in SEB benefiting from Magnus Peterson's fraud to the detriment of other redeemers and is contrary to the purpose of the insolvency legislation, and s.145 in

---

4 *WestLB AG* v. *Nomura Bank Intl. plc* (34) (affirmed by the Court of Appeal), where the court held that a valuation of shares carried out honestly but irrationally was not a valuation at all; and *Jones* v. *Sherwood Computer Servs. plc* (17), where a fraudulent (as opposed to a merely mistaken) valuation was not binding as between contracting parties.

particular. SEB's argument, it is submitted, is inconsistent with the wording of art. 34 and also runs contrary to its pleaded case. In para. 17(1) of the re-amended defence it is stated:

"It is admitted that upon [the] December 1st, 2008 Redemption Day, the Company became obliged to redeem Participating Shares in respect of which Redemption Notices had been duly given prior to that date. The Redemption Price payable on that date constituted a debt of the Company."

128  Mr. Lord also submits that the case as then put at trial on behalf of SEB runs contrary to authority. It ignores, he says, the decision of the Privy Council in *Fairfield Sentry Ltd.* v. *Migani* (11),[5] to the effect that the determination of the NAV was binding. Mr. Chivers submitted that *Fairfield Sentry* can be distinguished on the facts because in that case the redemption liabilities based upon the reported NAV were honestly, if mistakenly, determined. However, the question of "honesty" does not appear to form any part of the Privy Council's judgment. The whole thrust of the argument in that case was that the NAV had not been correctly determined ([2014] 1 CLC 611, at paras. 22–24), and Lord Sumption (*ibid.*, at para. 24) had this to say about it:

"If, as the articles clearly envisage, the subscription price and the redemption price are to be definitively ascertained at the time of the subscription or redemption, then the NAV per share on which those prices are based must be the one determined by the directors at the time, whether or not the determination was correctly carried out in accordance with [the articles]. That means either (i) that the directors' determination at the time must be treated as conclusive whether or not there is a certificate [under the articles]; or else (ii) that [the article] must be read as referring to the ordinary transaction documents recording the NAV per share or the subscription or redemption price which will necessarily be generated and communicated to the member at the time, and not to some special document issued at the discretion of the directors."

129  Mr. Lord submits that this reasoning of the Privy Council applies whether or not the NAV had been correctly determined and whether or not the fund itself knew it had been.

130  Mr. Lord also drew attention to a decision of the Chief Justice in this jurisdiction, *RMF Market Neutral Strategies (Master) Ltd.* v. *DD*

---

5  A case arising out of the Madoff Ponzi scheme fraud; the reasoning was followed by Jones, J. in *In re Herald Fund SPC* (12) in saying that the mere fact that the NAV was affected by fraud was not by itself sufficient to vitiate the contract (2015 (1) CILR 482, at para. 33).

*Growth Premium 2X Fund* (25). That case included a clawback claim by liquidators on the basis of undue or fraudulent preference, and further reference will be made to it on the issue of preference here. However, for present purposes, it is to be observed that the Chief Justice accepted that the fund was insolvent on the basis of its liability to pay redeemers money which it did not have the ability to pay. The NAV was grossly overstated as a result of a fraud in purchasing bonds which were then overvalued for the purposes of the NAV (in the same way as the swaps were in the present case). Nevertheless, it was not suggested that the redeemers, whose redemption entitlement was calculated on the basis of the overstated NAV, were not creditors for that sum, or that the fund was not insolvent for that reason, or that the liquidators' claim fell foul of public policy due to illegality.

131  SEB's argument, it is submitted, also faces other hurdles. It must prove that Magnus Peterson's relevant knowledge is to be imputed to the company for the purposes of the redemption contracts that arose in respect of those investors who redeemed on December 1st, 2008. It has not addressed this point (other than to not admit it). Whilst it is the company's case that Magnus Peterson's intention is the relevant intention for the purpose of the SEB redemption payments (because he was the person who directed them to be made) it does not follow that his knowledge of the fraudulent nature of the swaps is to be imputed to the company for the purpose of the redemption contracts.

132  As explained by the Supreme Court in *Bilta (UK) Ltd.* v. *Nazir* (4), it is perfectly possible for a company to rely on attribution of a person's knowledge for one purpose[6] (for example, as in *Bilta*, causing the company to make payments) whilst disclaiming attribution of that same person's knowledge for another purpose (for example, again as in *Bilta*, when that person is defrauding the company). In the words of Lord Mance ([2016] A.C. 1, at para. 43), a company "can rely on attribution for one purpose, but disclaim attribution for another."

133  In the present case, submits Mr. Lord, there is no reason to impute Magnus Peterson's knowledge of his fraud (which was a fraud on the company and its shareholders) to the company for the purpose of the redemption contracts. The fraud, it is observed, was not in the calculation of the NAV, which was carried out by PNC, but in the fraudulent valuation of the swaps that Magnus Peterson provided to PNC to calculate the NAV. So, rather than being characterized as a fraud of the company, it should be regarded as a fraud on the company by Magnus Peterson, a director of

---

6   In fact, the JOLs do not rely on attribution of knowledge, but rather
    that it was Magnus Peterson who directed the SEB redemption
    payments to be made and therefore it is his intention that is relevant.

WCUK, one of the service providers, and hence an external fraud. In reliance on the basic principle set out in *In re Hampshire Land Co.* (12), it is submitted that a fraud on the company should not be imputed to it by Magnus Peterson's knowledge.

134  But the matter does not rest there. It is also submitted on behalf of the JOLs that even if (contrary to the above) Magnus Peterson's knowledge is to be imputed to the company for the purpose of the redemption contracts, it does not necessarily follow that those contracts are necessarily vitiated by that fraud. The correct legal analysis is said to be that if a contract is entered into for an illegal purpose or for the purpose of committing an illegal act, then it is unenforceable by the party who entered into the contract for that illegal purpose: *21st Century Logistic Solutions Ltd.* v. *Madysen Ltd.* (2) ([2004] 2 Lloyd's Rep. 92, at para. 11). Mr. Chivers contends that this case does not assist because it concerns a contract entered into for an illegal purpose, whereas his case is that the NAV is not binding because of fraud. The counterpoint, it seems, is that if the redemption contracts were not entered into for an illegal purpose (which Mr. Chivers appears to accept) then the claim to make recovery of sums paid pursuant to those redemption contracts does not depend on any illegality.

135  There may, of course, be other circumstances in which the fraud affecting the NAV will have to be addressed. One such circumstance may be if, as a result of recoveries, the company becomes solvent and the JOLs are required by s.112 of the Law and O.12, r.2 of the Companies Winding Up Rules to rectify the register of members of the company, for which purpose there may be an application to the court, as in *In re Herald Fund SPC* (13). Mr. Stokoe accepted in cross-examination that this is a possibility at least. However, this is for the future. It is also to be noted that although in *In re Herald Fund SPC* Jones, J. held (2015 (1) CILR 482, at para. 48) that s.112 "contemplates the possibility of rectifying the register, if necessary, to eliminate or ameliorate the consequences of both 'internal' and 'external' fraud," he also went on (*ibid.*) to say that a rectification of the register would not have any effect upon the unpaid redeemers in that case who would remain entitled to prove in the liquidation as creditors.

136  Having considered in detail all the submissions referred to, I have come to the conclusion that not only is SEB's case contrary to its pleaded defence, but it also produces an unattractive result which must be rejected. I prefer the JOLs' case and the analysis put forward on their behalf. However, I think that it is necessary to guard against the issue in relation to the NAV being weighed down by too much analysis. What it all comes down to in the end can be summarized quite simply.

137  In my view, certainly for the purpose of this case, the NAV is binding in accordance with art. 34 of the articles of association. The fact that it has emerged that the NAV is affected by fraud is not by itself sufficient to vitiate the NAV for the reasons explained by Lord Sumption in *Fairfield Sentry* (11) and referred to by Jones, J. in *In re Herald Fund* (*ibid.*, para. 33). It seems to me that the claims in relation to the redemptions in this case have to be resolved by reference to the NAV which gave rise to their payment. The NAV remains binding (in accordance with art. 34) for this specific, and perhaps limited, purpose, even though it has subsequently, after payment of the redemptions, proved to be affected by fraud. This, I believe, is the sensible and rational approach which avoids an unacceptable outcome.

138  It is consistent also with what happened in *RMF Market Neutral Strategies (Master) Ltd.* v. *DD Growth Premium 2X Fund* (25). The fraud there which affected the NAV gave rise to no issue of solvency to prevent the clawback claim. Nor should it do so in the present case.

139  Maybe, in the future, the NAV will be revisited if the liquidation ends up going down the *Herald Fund* route, perhaps before there is any final distribution. But that has no bearing on the present case.

140  So, far from being left out of account on solvency, I find that the NAV must be at the very heart of a claim to recover sums paid pursuant to it.

141  In conclusion, drawing all this together, I am of the view that neither the 30-day grace period nor the fraudulent NAV has any bearing on the material position on solvency for the purpose of these proceedings. As previously indicated, I am satisfied on the evidence that the JOLs have discharged the burden of proving that on each of the dates of payment of the SEB redemptions the company was unable to pay its debts. Indeed it also seems probable on the evidence that the company was commercially insolvent all the time from December 1st, 2008 until it went into liquidation.

142  So now it is necessary to move on to consider the question of preference.

### With a view to giving a preference

143  The effect of the SEB redemption payments was, it appears, to prefer SEB, subject to the issue addressed below about whether it amounted to a "preference over the other creditors." However, whether the payments were "with a view to" giving a preference within the meaning of s.145(1) requires analysis of the relevant legal principles.

### Legal principles

144  In order to understand the relevance of the authorities to which reference will be made, it is necessary to begin by tracking the evolution of the statutory provision.

145  The statutory precursor to s.145 of the Law was s.168, which applied until its repeal by the Companies (Amendment) Law 2007. Section 168 of the Companies Law (2007 Revision) imported into corporate insolvency the law of preferences applying in individual bankruptcy:

"(1) Any such conveyance, mortgage, delivery of goods, payment, execution or other act relating to property as would, if made or done by or against any individual trader, be deemed in the event of his bankruptcy to have been made or done by way of undue or fraudulent preference of the creditors of such trader, shall, if made or done by or against any company, be deemed in the event of such company being wound up under this Law to have been made or done by way of undue or fraudulent preference of the creditors of such company, and shall be invalid accordingly."

146  That cross-reference to preferences applying in individual bankruptcy brought in the test in s.111(1) of the Bankruptcy Law (1997 Revision):

"Every conveyance or transfer of property, or charge thereon, and every payment, obligation and judicial proceeding, made, incurred, taken or suffered by any person unable to pay his debts as they become due from his own moneys, in favour of any creditor or any person in trust for any creditor, with a view to giving such creditor a preference over the other creditors, shall, if a provisional order takes effect against the person making, taking, paying or suffering the same within six months after the date of making, taking, paying or suffering the same, be deemed fraudulent and void as against the Trustee."

147  Section 168 of the Law was modelled on the former preference regime which applied in England: s.168 was in substantially the same form as s.320 of the UK Companies Act 1948, which applied the law of fraudulent preferences in individual bankruptcy to corporate insolvency. As recognized in this jurisdiction in *RMF Market Neutral Strategies (Master) Ltd.* v. *DD Growth Premium 2X Fund* (25), authorities on the former English preference regime were relevant to the interpretation of s.168 of the Law.

148 The former preference regime applying in England was repealed.[7] As explained in the note in 1 *Sealy & Milman: Annotated Guide to the Insolvency Legislation 2015*, at 258 (2015), the object of the current preference regime (now contained in s.239 of the UK Insolvency Act 1986) is to make preference claims easier to prove, by avoiding the need for a liquidator to establish impropriety and that the company's "dominant intention" was to prefer one creditor over others. Under s.239(5) all that must be proved is that the company "was influenced . . . by a desire" to bring about a preference.

149 So, in England authorities on the former preference regime are not relevant to the interpretation of the current regime.[8]

150 However, the Cayman legislature did not follow the UK in replacing its voidable preference regime. To an extent, s.145 of the Law replicates the substance of the former s.168. Accordingly, the English authorities on the former regime there continue to be relevant here.[9] Such authorities have been cited to me by both Mr. Lord and Mr. Chivers.

151 Prior to *DD Growth*, there was limited Cayman authority on the relevant test to be applied to determine the question of preference. In *Segoes Servs. Ltd.* v. *Ueoka* (29), in applying English case law, it was held in the circumstances there presented that it was difficult to resist the inference of fraudulent preference where the director of the insolvent company, being aware of the company's insolvency and the demands of other creditors not yet satisfied, preferred his wife as a creditor of the company. The decision was reached on the basis of the onus being on the liquidator to satisfy the court that the dominant intention of the debtor (*e.g.* the directors of the company) in allowing a particular creditor to be paid ahead of other creditors was to prefer that creditor. The English case law was helpfully reviewed by the Chief Justice in *DD Growth*, from which he set out what appear to be the relevant principles to be applied.

152 He began by distilling from the authorities the proposition that the mere fact of preference, that is the consequence that one creditor gets paid ahead of others, is not on its own enough. On this point he referred to *In re M. Kushler Ltd.* (19), a decision of the Court of Appeal, where Lord Greene, M.R. and Goddard, L.J., in their respective judgments, explained

7 Following publication of the report of the Cork Committee: *Report of the Review Committee on Insolvency Law & Practice*, Cmnd 8558 (1982).

8 As held by Millett, J. in *Re MC Bacon Ltd (No. 1)* (20) ([1990] BCLC at 335), cited in *RMF Market Neutral Strategies (Master) Ltd.* v. *DD Growth Premium 2X Fund* (25) (2014 (2) CILR 316, at para. 181).

9 In *Brac Construction Ltd.* v. *Broome* (5) (2006 CILR 185, at para. 12), the Cayman Court of Appeal recognized the relevance of English authority on English legislation which was *in pari materia* to Cayman statutory provisions.

that the statute is directing the court to ascertain the state of mind of the payer in relation to the particular transaction or transactions. Lord Greene, M.R. said this ([1943] Ch. at 252):

"The statute is directing the court to ascertain the state of mind of the payer in relation to a particular transaction. A state of mind is as much a fact as a state of digestion and the method of ascertaining it is by evidence and inference, and I can see nothing in the language of the section which justifies the view that the problem which the legislature sets the court is to be dealt with on any principles different from those commonly employed in drawing inferences of fact. It must, however, be remembered that the inference to be drawn is of something which has about it, at the least, a taint of dishonesty, and, in extreme cases, much more than a mere taint of dishonesty. The court is not in the habit of drawing inferences which involve dishonesty or something approaching dishonesty unless there are solid grounds for drawing them."

153   Goddard, L.J. put it as follows (*ibid.*, at 255):

"The authorities establish that the mere fact that a preference is shown is not sufficient to enable the court to draw the inference that that preference was fraudulent. Before that inference can be drawn the court must be satisfied that the dominant motive of the debtor was to prefer the particular creditor."

154   So the court can infer an intention to prefer from the circumstances of the case; there is no requirement that the intention can only be established by direct evidence. Nor is it necessary to show an intention to disturb the operation of the bankruptcy laws in the sense of intending to avoid an equal distribution of the company's assets to the company's creditors. So, considerations as to whether the payer contemplated whether he would be able to pay his debts at some future time were irrelevant (in the analysis of the Chief Justice in *DD Growth*) once the payer was aware that the company could not pay its debts as they fell due at the moment when he made the particular payment. Reference was made in this regard to *In re FP & CH Matthews Ltd.* (10), another decision of the Court of Appeal. In that case, Lawton, L.J. said as follows ([1982] Ch. at 263):

"What the court has to do is to construe the statute and it does not seem to us that the statute directs any inquiry whether the debtor's purpose was to disturb the operation of the bankruptcy law. The question under the statute is whether the payment was made 'with a view of' giving the creditor a preference over other creditors."

155   Having then referred to the facts of that case and considered *Kushler* (19), as well as another case, *In re Sarflax Ltd.* (28) ([1979] Ch. at 602), Lawton, L.J. concluded as follows ([1982] Ch. at 264):

"The result, in our view, is that if the debtor, at the time when he makes the payment, genuinely believes that he can then pay his debts as . . . they fall due there can be no intention on his part to prefer; there is then no knowledge on his part of insufficiency of assets which could indicate any intention to prefer. But that is not the present case. Mr. Matthews was aware that the company could not pay its debts as they arose. The preference that he gave to the bank was that he deliberately paid it ahead of the other creditors and put on them the whole risk of insufficiency of assets . . . the payments were fraudulent preferences . . ."

156   There is no basis, in the view of the Chief Justice, for reading this judgment in *Matthews* as saying that the very fact of making payment being aware of the state of insolvency was sufficient to make it a fraudulent preference, although on the particular facts it was found to be sufficient.

157   The Chief Justice was also of the opinion that it will be sometimes necessary (as it was in *DD Growth* (25)) to distinguish between the motive of the debtor being something other than an actual intention to prefer when making payment. He referred to *Cutts (a bankrupt), In re, ex p. Bognor Mut. Bldg. Socy.* v. *Trustees of T.W. Cutts* (8), where Lord Evershed, M.R. ([1956] 1 W.L.R. at 734) observed:

". . . [I]t is notorious that human beings are by no means single-minded, the intention to prefer, which must be proved, is the principal or dominant intention. There may also be a valid distinction . . . between an intention to prefer and the reason for forming and executing that intention."

158   In the view of the Chief Justice, this distinction is not a mere subtlety. A creditor who is given a payment lawfully due to him cannot be required to surrender it back to the insolvent debtor's estate simply on the basis that the intention was to pay him what was due to him. It is the requisite intention to prefer him as "the principal or dominant intention" that makes the payment an undue or fraudulent preference (*DD Growth* (2014 (2) CILR 316, at para. 139), citing from the judgment of Lord Evershed, M.R. in *In re Cutts* ([1956] 1 W.L.R. at 734)).

159   The Chief Justice (in *DD Growth*) quoted extensively from the judgment of Lord Evershed, M.R. in *In re Cutts*, including the following ([1956] 1 W.L.R. at 734):

"... [I]f a debtor deliberately selects for payment A in preference to all his other creditors, it cannot, to my mind, matter, in the absence of other relevant circumstances, whether A is the debtor's oldest friend, closest relative or best client. On the other hand, where a debtor, owing money in all directions, has also robbed his employer's till, he may, knowing himself to be insolvent, elect to reimburse the till in order that, when the crash comes, the damaging fact of his robbery may not be discovered. Or a debtor may elect to make a particular payment under pressure of some threat, or to obtain for himself some immediate and material benefit or to fulfil some particular obligation. In these cases the reason for the payment affects, essentially, the intention in making it. In the instances given the intention, that is the real or dominant intention, will no longer be to 'prefer' (that is to pay, as it were, out of turn) but will be to avoid the detection of a criminal act; to relieve the threat; to get the benefit and postpone the evil day; or to satisfy the particular obligation. Though the question of pressure in some form or another has, in the reported cases, often been the crux of the matter, it is plain that an inference of intention to prefer may be displaced in many other ways than by showing that the debtor acted under pressure ... the real question before us is whether, upon the evidence and findings of the [judge], the true inference is intention to prefer or whether an inference of some other kind similar to those in the examples given is, at the least, not equally legitimate."

160   From his review of these authorities, the Chief Justice then helpfully summarized (2014 (2) CILR 316, at para. 141) the principles as follows, quoting from *In re Cutts* (8) ([1956] 1 W.L.R. at 733):

   "(1) ... [T]he onus is on the person alleging a fraudulent preference to prove to the satisfaction of the court that the payment impugned was made by the bankrupt with the intention of preferring the payee over his other creditors; (2) that it was competent for the court to draw the inference of an intention to prefer from all the facts of the case; (3) that the intention to prefer, which must be proved, must be the principal or dominant intention; there might, however, be a valid distinction between an intention to prefer and the motive for that intention . . ."

161   The Chief Justice was there considering the old s.168 of the Law, but he went on specifically to note that the amended provision, s.145, has retained the words "with a view of giving such creditor preference over the other creditors" and with them, as he put it, the "dominant intention" test ascribed by the common law (2014 (2) CILR 316, at para. 182). It is appropriate, therefore, to regard the principles summarized by the Chief Justice as being applicable to the present case.

162   On the facts of the *DD Growth* (25) case, the Chief Justice went on to find that the payments there were made in response to "unrelenting and escalating pressure." He examined the motive for the payments being made and decided that they were in response to such pressure, rather than there being any dominant intention to prefer the payee over the other creditors.

163   Mr. Lord, on behalf of the JOLs, as well as referring to the authorities mentioned above, has also cited other cases. *In re Sarflax Ltd* (28), he submits, establishes that it is not necessary to prove that payments were made with an intent to defraud. Further, as is shown by *In re Cohen* (7), the absence of any direct evidence from the debtor of an intention to prefer is by no means fatal and, indeed, in a lot of cases there is no such evidence, so an inference is drawn. In that case, Warrington, L.J. said as follows ([1924] 2 Ch. at 538):

"The payment being purely voluntary and the circumstances attending it being what I have described, I must and do infer that, for some reason or another of which we are ignorant, or for no definite reason in fact and for no other motive, he selected the particular creditors for preferential treatment, and therefore made the payment with a view to preferring them. I can find no rule of law which prevents me from drawing what seems to me to be an obvious inference."

164   In the same case, Sargant, L.J. referred to the *prima facie* intention to be gathered from the mere fact of preference which can be displaced, but, as he put it (*ibid.*, at 544):

"No case has been cited to us nor do I think any case can be found where a debtor in imminent expectation of bankruptcy has given a preference in fact to a particular creditor, which is apparently voluntary and is wholly unexplained, and where that preference in fact has been held good. To hold otherwise in this case would, in my judgment, be inconsistent with the whole course of decision in bankruptcy in such cases and would revolutionise the settled law in this respect."

165   Mr. Lord also drew attention to *Re MC Bacon Ltd. (No. 1)* (20) in support of the proposition that intention is objective (unlike "desire" in s.239 of the English Act) and that ([1990] BCLC at 335, *per* Millett, J.) "a man is taken to intend the necessary consequences of his actions." Intention was also distinguished from motive in *In re Cutts* (8) ([1956] 1 W.L.R. at 740, *per* Jenkins, L.J.): "As to the substitution of 'intent' for 'view', which is the word actually used in section 44(1), 'object' and 'motive' have sometimes been used as other equivalents for 'view'; but I think 'intent' or 'intention' gives the meaning best . . ."

166   When considering the older authorities, it is important to bear in mind, submitted Mr. Lord, the change from the earlier sections that were dealing with "fraudulent preference" (and incorporated the word "fraudulent" in the section) and s.145, which is merely talking about "voidable preference." So, it is contended, there is no requirement to establish any element or taint of dishonesty pursuant to s.145. And, as for the references to the intention to prefer a particular creditor, there is no reason for this purpose, it is contended, why a creditor cannot be a member of a class.

167   Mr. Lord also cited a Canadian case, *Re Titan Invs. Ltd. Partnership* (33), a case, he said, bearing similarities to the present case, where the court concluded (ABQB 637, at para. 27):

"There is no evidence to indicate why Comte chose to distribute funds to certain investors in Titan and not to other investors. The doctrine of pressure is not applicable . . . While it is impossible to determine why Comte chose to pay certain investors, I find that he did intend to prefer those investors that he paid out. His deliberate decision to ignore the requests of certain investors for redemption of their funds and to instead pay full redemptions to investors who had made no such requests is evidence of his decision to prefer the Overpaid Investors."

168   In the final analysis, in the case put forward on behalf of the JOLs, there is contended to be a key principle to be derived from the authorities. This is that whilst the necessary intention to prefer cannot be inferred simply from the fact that payments made at the time had the effect of preferring the recipient, if payment is made at a time when the person orchestrating the payment knows that the company is unable to pay its debts (and *a fortiori* if he knows that liquidation is likely or even inevitable) then, in the absence of any other explanation for the payment (such as pressure), the necessary intention to prefer will be inferred objectively.

169   Mr. Chivers, on behalf of SEB, takes issue with this submission. He contends that it ignores the plain wording of s.145, which requires proof that payments were made "with a view" to giving a preference and does not embody the required dominant intention to prefer one creditor over another. As well as relying on various of the authorities already cited (which led to the principles laid down by the Chief Justice in *DD Growth*) he also cited two additional cases.

170   The first was *New, Prance & Garrard (Trustee)* v. *Hunting* (21). In that case, Lord Esher, M.R. said as follows ([1897] 2 Q.B. at 27):

"The doctrine with regard to fraudulent preference is well known. The question whether there has been a fraudulent preference depends, not upon the mere fact that there has been a preference, but

also on the state of mind of the person who made it. It must be shewn, not only that he has preferred a creditor, but that he has fraudulently done so. It depends upon what was in his mind. Whether it is called 'intention,' or 'view,' or 'object' does not appear to me to matter much. The question is whether in fact he had the intention to prefer certain creditors. It has been argued that the debtor must be taken to have intended the natural consequences of his act. I do not think that is true for this purpose. I think one must find out what he really did intend."

171  The second additional case was *Peat* v. *Gresham Trust Ltd.* (23). Lord Tomlin had this to say ([1934] A.C. at 262):

"In my opinion in these cases the onus is on those who claim to avoid the transaction to establish what the debtor really intended, and that the real intention was to prefer. The onus is only discharged when the court upon a review of all the circumstances is satisfied that the dominant intention to prefer was present. That may be a matter of direct evidence or of inference, but where there is not direct evidence and there is room for more than one explanation it is not enough to say there being no direct evidence the intent to prefer must be inferred. In my opinion there is nothing in the decision in *In re Cohen* to justify the doctrine for which the appellant contends [that an intent to prefer must be inferred] . . ."

172  Mr. Chivers also draws support from the cases already mentioned (and referred to by the Chief Justice in *DD Growth* (25)). In *Kushler* (19) (1943 Ch. at 252), there is the reference to the court having to ascertain the state of mind of the payer (mention is also made of "a taint of dishonesty"); there is also the reference to the court having to be satisfied of the dominant motive to prefer a particular creditor (*ibid.*, at 255). In *Cutts* (8), attention was drawn to an earlier part of the judgment of Lord Evershed, M.R. where, in referring to an inference which may be drawn as to the state of mind of the payer, it was said ([1956] 1 W.L.R. at 733):

"But the inference should not be drawn, having regard to the situation of the onus of proof, unless such inference is the true and proper inference from the facts proved. Thus, it will not be drawn, if the inference from the facts is equivocal and, in particular, it will not be drawn from the mere circumstance that the creditor paid was in fact 'preferred,' in the sense that he was paid when other creditors were not paid and could not be paid."

173  It was also submitted by Mr. Chivers that although it was suggested that *Re MC Bacon* (20) indicates that intention can be determined objectively, state of mind for the purpose of dominant intention must be subjective.

174   In the end, all this analysis leads back to *DD Growth* (25). Applying those principles, it is plainly necessary, in my view, for the JOLs to prove to the satisfaction of the court that the redemption payments were made with the intention of preferring SEB over other creditors. It is competent for the court to draw the inference of an intention to prefer from all the facts of the case. However, the intention to prefer, which must be proved, must be the principal or dominant intention. There is no mention, in the final analysis by the Chief Justice, of there being a need for evidence of dishonesty, which is understandable in that the relevant statutory provision has moved away from fraudulent preference to voidable preference. But, in reaching his conclusions, the Chief Justice did appear to accept that the dominant intention must be to prefer a particular creditor, although I see no reason why that could not be a class of particular creditors.

175   The principle of preferment of a particular creditor was actually expressed in *Kushler* ([1943] Ch. at 255) in terms of the need for there to be a "dominant motive" to this end. And, indeed, in relation to principal or dominant intention, the Chief Justice acknowledged that there might be a valid distinction between an intention to prefer and the motive for that intention. This is because, as was made clear in that case, it might be necessary in particular circumstances to examine motive to determine whether a payment has been made as a result of something other than dominant intention to prefer, such as pressure being brought to bear.

176   The critical point of difference between the parties is whether payment of the redeemers in the knowledge that the company was unable to pay its debts is of itself sufficient (in the absence of any other explanation such as pressure) to infer objectively the necessary intention of preference or whether there must be proof of something more, specifically a subjective dominant intention to prefer particular creditors over others.

177   Whether this difference needs to be resolved, in this case at least, depends upon the findings to be made in relation to the SEB redemption payments.

### *The first SEB redemption payment*

178   On the basis that I find, as indeed I do, that the redemption payments were all made in the knowledge on the part of Magnus Peterson that the company was unable to pay its debts, on the JOLs' case it is to be inferred that there was the necessary intention of preference.

179   However, the matter does not rest there. The JOLs also put forward a case of specific intention to prefer. It is submitted that the first SEB redemption payment was plainly made with a view to preferring SEB as one of the specified Swedish redeemers. The Swedish redeemers were paid ahead of the others and before even the expiry of the 30-day grace

period in the OM. They were paid in full 13 days before any of the other investors who had redeemed on the same day were paid anything, and in circumstances where the first payment to those other investors represented only 25% of their entitlement.

180 The intention, it is said, appears in the words of the email from Magnus Peterson directing the payment (set out at para. 65, above). Magnus Peterson intended them to be paid ahead of anyone else because he thought that they had, or would, switch into the Swedish fund referred to above.

181 SEB disputes that there was any such intention. Reliance is placed on the evidence of Mr. Hedman of SEB to the effect that SEB never subscribed for shares in the Swedish fund, whether on behalf of Catella, HQ Solid or anyone else, and nor did SEB express an interest in a possible investment in such fund on behalf of these clients or any other clients. Mr. Hedman has also given evidence that neither Catella nor HQ Solid invested in the fund themselves.

182 I accept the evidence of Mr. Hedman. However, the fact that neither SEB nor Catella nor HQ Solid actually invested in the Swedish fund, is, in my view, irrelevant. Individual unitholders may have done so, or Magnus Peterson may simply have been mistaken in his belief that SEB was among the Swedish investors through whom redemptions could be channelled for re-investment. But any such mistake cannot affect his intention in directing the first SEB redemption payment to be made.

183 The evidence in relation to this first SEB redemption payment has already been referred to above. I see no reason to reject the email as evidence of the intention to pay the Swedish redeemers. The authenticity of it has been accepted and the instruction in it is clear and was acted upon. I acknowledge the point that Magnus Peterson has not given evidence and there has been no opportunity for SEB to cross-examine him on the email. It is also complained that there is nothing in the evidence of the JOLs to indicate that they investigated the circumstances surrounding the making of the payment. Making due allowance for these points, I nevertheless see no reason to doubt the evidence. There is nothing to suggest that it is tainted by Magnus Peterson's fraud. It must stand as the only evidence, indeed, as to the reason for the early payment of the Swedish redeemers.

184 Accordingly, I find on the evidence that there was an intention to pay the Swedish redeemers on the basis that they were investors, or potential investors, in the Swedish fund. The fact that there may have been a mistake about this matters not. What does matter is the subjective intention of Magnus Peterson in acting, as I have found, as the company's controlling mind. The intention appears to have been a principal or

dominant intention to prefer a particular class of creditors. This resulted in a preference in fact of a particular creditor (as in *In re Cohen* (7)).

185    Therefore, I am satisfied that, on an application of the legal principles referred to, the first SEB redemption payment was made with a view to giving a preference within the meaning of s.145.

### The second SEB redemption payment

186    The question which has occurred to me is whether the intention in relation to the first payment continued beyond then. There is evidence that it did because of the email of January 20th, 2009, when Magnus Peterson selected for payment three more Swedish investors who were said to have switched into the Swedish fund. This was actually after the second SEB redemption payment. It is also right to note that after the first SEB redemption payment (which resulted in payment in full to SEB as nominee for Catella) there was no specific mention of paying SEB as nominee for HQ Solid. However, nor is there anything to suggest that any distinction was made in the mind of Magnus Peterson as to the different capacities in which SEB was acting. The evidence rather indicates that there was a continuing general intention on his part to make preferential payments to the various Swedish redeemers (SEB included) as a class thought, rightly or wrongly, to be re-investors in the Swedish fund.

187    The matter does not rest there. There is also the point that the second SEB redemption payment appears to have been made with the intention of complying with the policy set out in the December 31st, 2008 letter (set out at para. 75, above). That policy arguably had the effect of reinforcing the decision which had been made to pay SEB, resulting in a preference over other creditors. Thus it appears that in the absence of any other explanation for the second SEB redemption payment (and there is none) that it was made with a view to prefer SEB.

188    So it is not right, as SEB submits, that the case in relation to the second SEB redemption payment rests only upon the effect of preference rather than a dominant intention to prefer.

### The third SEB redemption payment

189    Nor is it right that the third SEB redemption payment rests solely upon the effect of preference. It can be taken to have been paid pursuant to what I have found to be a continuing general intention to make preferential payments to the particular Swedish redeemers as a class.

190    It may well be, as pointed out by Mr. Chivers, by reference to the relevant schedule previously referred to, that in the meantime various other redeemers had in fact been paid ahead of SEB. The reasons for this are not presently apparent and may well have to be investigated in the

context of any claims pursued in relation to other preferences of these particular redeemers. But none of this detracts from the intention which there appears to have been to make the preferential payment to SEB.

191  Moreover, if an inference is to be drawn, there appears to be nothing here to displace the "inference of intention" in the analysis of Lord Evershed, M.R. in *In re Cutts* (8) ([1956] 1 W.L.R. at 734). The same can be said of the second SEB redemption payment. Additionally, it appears from the board minutes of February 22nd, 2009 (referred to at para. 85, above) that the payment may have been made pursuant to an intentional policy to prefer smaller investors over larger investors. Again this may have had the effect of reinforcing the decision which had been taken to pay SEB. The policy was one which could lead to the recipients being preferred over the other investors who had redeemed but were not paid in full or were not paid at all.

### *Summary*

192  I am satisfied that each of the SEB redemption payments was made with the principal or dominant intention of preferring SEB as a member of a particular class of creditors, the Swedish redeemers. Here there was not mere selection, but the added dimension of conscious decision making resulting in particular selection for payment. This was clearly the case, in my view, in relation to the first SEB redemption payment. It is less clear in relation to the second and third SEB redemption payments, although, on balance, I think that it is reasonable to draw the inference that these further payments were made as part of a continuing general intention to make preferential payments to the Swedish redeemers. Furthermore, the intention in this regard appears to have been reinforced by particular decision making in relation to the payments.

193  As indicated, I also find that the payments were made in the knowledge on the part of Magnus Peterson that the company was unable to pay its debts. However, having regard to my conclusion as to the specific intention to prefer SEB, it is not necessary for me to decide whether, absent such specific intention, the required intention of preference can be inferred objectively from the fact of such payments being made when the company was commercially insolvent. This may well have to be resolved if claims are pursued against other redeemers. In such cases it can be anticipated that there will have to be weighed against such inference any other particular reasons in those individual cases why payments were made, such as pressure being brought to bear (as in *DD Growth* (25)). It may also be necessary to consider whether, perhaps, the evidence is equivocal.

194  Balanced against any inference of preference, it may have to be considered whether payments were simply made at random, or perhaps to

play for time to keep the company going, in the hope of Magnus Peterson to avoid detection of his fraud for as long as possible.

195 However, in this particular case, for the reasons given, I conclude that the first, second and third SEB redemption payments were each made with a view to giving a preference within the meaning of s.145.

### A preference over the other creditors

196 This can be taken much more shortly.

197 A payment is a preference if it amounts to "a preference over the other creditors." "Creditor" is not defined for the purpose of s.145. The question has been raised whether for this purpose the other creditors have to be current creditors or whether, as the JOLs contend, there can be included all creditors (actual, future or contingent) who would be entitled in due course to prove in the insolvency.

198 Mr. Lord, on behalf of the JOLs, submits that the meaning of "other creditors" must be informed by what s.145 is intended to achieve. He contends that s.145 only arises in the event of the insolvency of a company and is intended to preserve the assets of the company for the benefit of all its creditors, to be treated equally. The "view" (in the words "with a view") must be, he says, to prefer over the other creditors who could prove in a liquidation. Section 139(1) of the Companies Law (2013 Revision) provides: "All debts payable on a contingency and all claims against the company whether present or future, certain or contingent, ascertained or sounding only in damages, shall be admissible to proof against the company."

199 It is submitted, therefore, that all those investors who had applied to redeem their shares in the company at the date of each of the SEB redemption payments (regardless of whether or not their redemption day had passed) were "other creditors" for the purposes of s.145. So too were other investors who could be anticipated to redeem in the future.

200 Mr. Chivers, on behalf of SEB, disputes the analysis. He submits that paying creditors then due cannot possibly in law be a preference over creditors not yet due. This he says is the subject of authority. It was made clear by the Court of Appeal in *In re FP & CH Matthews Ltd.* (10) when considering the English provision (s.44) and saying ([1982] Ch. at 264):

"It seems to us that, as a matter of language, the section is directed solely to the time when the payment is made. The section is contemplating that the inability to pay debts as they arise co-exists with the payment which is in question . . . We do not think that the section, in this respect, is looking to future events. In particular, when the prerequisite for the operation of the section is that, at the time of the payment, the debtor should be unable to pay his debts as

they arise, we think it unlikely that the draftsman would, without any express words, introduce considerations of whether the debtor will be able to pay his debts at some future time."

201 Later redeemers could have no complaints, observes Mr. Chivers, if SEB and other shareholders redeemed earlier and were therefore paid earlier. To paraphrase Lord Evershed, M.R. in *In re Cutts* (8), the company would not then have paid "out of turn."

202 Having considered these submissions, I have some doubt whether investors who have not yet redeemed can be included as "other creditors" for the purpose of the section. However, having regard to the determination I have already made on the question of solvency, that redeeming shareholders became creditors of the company from the valuation point on the redemption day,[10] it is not necessary for me to decide the point.

203 Restricting "other creditors" to creditors whose debts existed at the date of each payment to SEB, the position is as follows:

(a) The first SEB redemption payment was a preference over the other investors who had redeemed on December 1st, 2008, who received no payment on that date.

(b) The second SEB redemption payment was a preference over two remaining investors who had redeemed on December 1st, 2008 (but who had not been paid their 25%) and all the investors who had redeemed on January 2nd, 2009.

(c) The third SEB redemption payment was a preference over those investors who had redeemed on December 1st, 2008, but had not been paid in full, and all the investors who had redeemed on January 2nd, 2009 and February 2nd, 2009.

204 Accordingly, I am satisfied that there was a preference over the other creditors for the purposes of s.145.

205 This means that the JOLs have met the requirements of s.145 for the claims made in these proceedings, subject only to considering the particular defences raised by SEB.

## Defences of SEB

206 On the assumption that (contrary to SEB's primary case) the payments in this case were preferential, SEB relies on defences said to arise from consequences of a voidable preference as well as illegality and public policy.

---

10 In accordance with the decision in *In re Strategic Turnaround Partnership Ltd.* (31).

### Consequences of a voidable preference

207    SEB relies by way of defence on the fact that it was never enriched by receipt of the redemption payments. Alternatively, it contends that it changed its position.

208    As to these defences, the point is made that s.145 says nothing about the consequences if a payment is proved to be preferential; all it provides is that the payment is "invalid" if made within six months of the commencement of the company's liquidation. In particular, it is submitted, s.145 does not provide any statutory remedy enabling the court to reverse a preferential transaction. So, it is said, in the absence of any statutory remedy available to them, the JOLs may only recover a payment under s.145 by seeking restitution based on the principles of unjust enrichment. Various cases were cited in support of this proposition.

209    In *Rose* v. *AIB Group (UK) plc* (27), the court had to consider whether to make a validation order under s.127 of the Insolvency Act 1986, which does not spell out the appropriate remedy. It was accepted that whether a payment should be validated was separate from the issue of whether the creditor who had received the payment had changed his position. And it was accepted ([2003] 1 W.L.R. 2791, at para. 41) that in "cases where payments can be treated as void or ultra vires, it is commonplace that restitution is available subject to restitutionary defences."

210    The next case cited, *4Eng Ltd.* v. *Harper* (1), concerned claims brought under s.423 of the Insolvency Act 1986 to set aside transactions defrauding creditors. There the court was prepared to consider, by way of example, that it would be inappropriate to make an order requiring the transferee to pay back what he had received if it would be unfair to do so ([2010] BCC 746, at para. 14). This shows, submits Mr. Chivers, that the statutory discretion under the section involves balancing the interests of the unpaid creditors and the innocent recipient of the moneys and that there is no principled reason why this should not also apply to a claim under s.145.

211    In Mr. Chivers' submission, the recovery claim is governed by common law, and he went on to contend that there are no public policy grounds for ruling out common law defences. In support of this contention, he cited the recent English case *Charles Terence Estates Ltd.* v. *Cornwall Council* (6) ([2011] EWHC 2542 (QB), at paras. 95–100). In that case, leases entered into by local councils were held to be void on the grounds that councils had failed to act in accordance with their fiduciary duties to council taxpayers. The councils, therefore, had claims for repayment of rent. Notwithstanding there being public policy reasons why the rental payments were void, the court allowed the landlords' common law defence of change of position.

329

212 To allow SEB a common law defence, it is submitted, does not undermine the policy of treating unsecured creditors of the company equally because, having paid away the redemption proceeds which it received to Catella and HQ Solid, SEB is no better off than it was before it received the payment of such proceeds. And, it is observed, if SEB is required to repay redemption proceeds, it will be worse off than unpaid redeeming shareholders in the company. The claim under s.145, it is submitted, is a claim in unjust enrichment and it must fail because SEB never received any enrichment.

213 Mr. Chivers referred back in this context to the *Titan Invs.* case (33), mentioned above in relation to the issue of preference. He did so because the JOLs rely on this Canadian case as also establishing that a change of position defence is not available in relation to a preference claim. The point he makes is that this case did not review the English position on unjust enrichment and change of position.

214 As far as change of position is concerned, the alternative argument is that SEB changed its position in good faith, in reliance on the receipt of the redemption proceeds, which gives rise to a defence. He submits that change of position is a recognized defence to claims brought in unjust enrichment (see *Lipkin Gorman* v. *Karpnale Ltd.* (18)), and also to claims brought in insolvency proceedings, as can be seen from the *Rose* and *4Eng* cases referred to above.

215 Further, it is contended that a defence of change of position is only denied if a defendant is guilty of changing his position in bad faith. In the case of *Niru Battery Mfg. Co.* v. *Milestone Trading Ltd.* (22) it was held ([2002] 2 All E.R. (Comm) 705, at para. 135, *per* Moore-Bick, J.) that bad faith in this context means "a failure to act in a commercially acceptable way and sharp practice of a kind that falls short of outright dishonesty as well as dishonesty itself." This, however, was not an insolvency case, nor one of unjust enrichment.

216 There is no doubt that SEB paid away the redemption proceeds. Having received the first SEB redemption payment, the proceeds were credited to Catella's cash account. Similarly, having received the second and third SEB redemption payments, the sums were promptly credited to HQ Solid's cash account. However, I do not accept the submissions of Mr. Chivers that the principle of unjust enrichment or change of position gives rise to any defence to a claim under s.145 of the Law.

217 This is because these common law defences are not available, in my view, to a statutory claim under s.145 of the Law. None of the cases cited by Mr. Chivers is relevant to the particular position of a claim under s.145, nor are they of assistance by way of analogy. The specific effect of a payment falling within s.145 is that it is "invalid" and the effect of this can only sensibly mean, in my view, that the recipient has to pay back an

equivalent sum of money to that received. It is clear to me that this is what the section is intended to achieve. Furthermore, the important point to make is that there is no discretion in the court to make any other order.

218  Mr. Lord submits, and I accept, that the absence of any discretion built into the section reflects the policy behind it of restoring value to the company for the benefit of its creditors, which overrides the common law rules on unjust enrichment and change of position as between parties to a private transaction.[11] The cause of action derives from the section itself: pursuant to statute the payment is invalid, therefore, the recipient is obliged to repay what he received. There is no question of having to consider unjust enrichment, rather the recipient has received something he should not have received and is obliged to pay it back.

219  The position may arguably be different in England where the remedies available pursuant to the preference provisions are much wider, but the court is given a discretion. Section 239(3) of the Insolvency Act 1986 provides: "Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not given that preference."

220  Even where the court is granted a discretion it is doubtful whether common law defences should be entertained to bypass the remedial relief provide by statute.[12] However, the plain point here is that there is no discretion pursuant to s.145. So no balancing exercise (of the kind referred to by Mr. Chivers in relation to English cases) is required.

221  Mr. Lord submits that s.145 is not concerned with the resolution of claims between private parties but with the protection of creditors in a winding up and it has the specific policy of protecting the value of the company's assets. Change of position by a creditor who has been preferred does nothing to mitigate the loss suffered by the general body of creditors as a result of the invalid transaction. To allow the preferred creditor to rely on change of position and keep the proceeds of an invalid payment would give that creditor an unfair advantage over the general body of creditors and defeat the purpose of the section and its clearly stated effect of rendering any payment invalid.

222  It is further submitted by Mr. Lord that, to allow the defence contended for by SEB, additional words would have to be read into the

---

11  There is academic support for this from Professor Goode: *Goode on Commercial Law*, 4th ed. (2010).

12  For the reasons explained by Professor Goode in his essay: "The Avoidance of Transactions in Insolvency Proceedings and Restitutionary Defences," Burrows and Lord Rodger of Earlsferry (eds.), *Mapping the Law: Essays in Memory of Peter Birks*, at 299 (2006).

section to provide that the payment is "invalid unless the recipient has acted in reliance on the payment in such a way as to change his position so that it not considered just that the payment should be invalid," or some such words to this effect, which is clearly at odds with the section as drafted and the clear policy behind it. I accept this submission.

223    As previously referred to, reliance is also placed by Mr. Lord on the Canadian *Titan Invs.* case (33). It may not, as Mr. Chivers has observed, have reviewed the English position on unjust enrichment and change of position. However, what is relevant to note in that case is that a change of position defence was held not to be available in relation to a preference claim in respect of a payment which was thereby void.

224    In conclusion, in my view, as a matter of law, the defences founded upon the principles of unjust enrichment and change of position are not available to SEB.

225    Even if, for any reason, this were not the case, I am also of the view that SEB has not made out any defence of change of position on the facts.

226    Properly analysed, this can be seen to be because SEB was acting as a nominee. As soon as SEB received the redemption payments it was obliged to pay over the money to Catella and HQ Solid respectively. But this did not involve any change of position. It was rather the consequence of the position of being a nominee. Furthermore, SEB cannot shelter behind being a nominee. SEB was the registered legal owner of the shares and has to accept the consequences of this. SEB is the party who was entitled to redeem the shares, but is also then the party with the corresponding liability to refund the money if the payments were invalid.

227    Furthermore, the alleged change of position has not in fact been made out. The relevant pleading is in para. 22(3), (4) and (5) of the re-amended defence, the material parts of which are as follows:

"In January 2014, the Catella Stiftelsefond managed by Catella was liquidated and dissolved, all the surplus assets of that fund having been distributed to unitholders. There is accordingly no prospect of SEB recovering from that fund the redemption proceeds which SEB credited to it.

In 2009, the management of the HQ Solid mutual fund originally managed by HQ was transferred to another fund management company, Optimised Portfolio Management Stockholm AB, and the fund [was] re-named 'OPM Solid.' This fund was then merged with another fund known as 'OPM Hedge.' In 2011, the OPM Hedge fund was merged with another fund, 'OPM Omega.'

. . . SEB avers that there is no realistic prospect of it being able to bring a successful claim in the Swedish courts to recover from the

OPM Omega fund the redemption proceeds paid by SEB to the HQ Solid fund."

228   SEB adduced expert evidence on Swedish law as to these matters in a report by a Mr. Alf-Peter Svensson who attended the trial and was cross-examined. His evidence is that SEB cannot recover the proceeds and his report can be summarized as follows:

(a) As a matter of Swedish law, a mutual fund has no legal personality of its own. SEB cannot therefore sue a fund.

(b) A fund's assets are managed by a fund management company and are entrusted to a depositary, such as SEB, for safekeeping. A fund's assets are jointly owned by unitholders, who have rights of redemption on demand and rights to dividends from underlying instruments held by the fund. They are, however, not responsible for any obligations incurred on behalf of the fund.

(c) Under the terms of the depositary agreements entered into by SEB with respect to the Catella and HQ Solid funds, SEB had rights of pledge and indemnity, the effect of which gave SEB the right to withhold redemption proceeds that it received in respect of participating shares in the company in order to protect itself against claims from third parties.

(d) A fund management company is not liable to pay damages for breaches of any agreements entered into by it on behalf of a fund, including any depositary agreement entered into. Instead, in the event that a fund management company fails to perform any such agreements, the consequences are regulatory: the Swedish Financial Supervisory Authority ("SFSA") could impose fines or withdraw the fund management company's licence.

(e) In the case of Catella, SEB's rights of pledge and indemnity are of no value, given that Catella has been liquidated and dissolved. There are, therefore, no assets against which SEB could have recourse.

(f) In the case of HQ Solid, if SEB sued OPMS, the manager of the merged OPM Omega fund, under the terms of its pledge and indemnity, OPMS would deny the claim on the ground of legal uncertainty. Further, the SFSA would not intervene.

229   However, it appears that neither the liquidation and dissolution of Catella, nor the mergers that took place in relation to HQ Solid, have impacted upon SEB's ability to recover the SEB redemption payments from the Swedish funds, their management companies or the unitholders in those Swedish funds. This is because it emerged from Mr. Svensson's evidence that, in his opinion, SEB never had the ability to do so. As far as the indemnities and the pledges are concerned, he accepted in cross-examination that they were in effect "worthless."

230  Further, as far as the liquidation of Catella is concerned, that did not occur until September 2013, by which time all the assets had already been distributed. By that time, SEB was already on notice of the potential claims against it, having been informed by email of the AGM of the company that took place on May 16th, 2013, and having been sent the liquidators' fifth report.

231  Mr. Hedman of SEB, in his evidence, confirmed that SEB's depositary and custodian business had received the email. He explained that SEB had procedures in place for escalating to management level any important notices received at the particular email address, although apparently it did not happen with this email.

232  According to Mr. Hedman, SEB did not, however, receive an earlier letter from the JOLs, dated June 24th, 2011, referring to possible preference claims, which letter was emailed to SEB S.A. Luxembourg, an entirely separate legal entity. Nevertheless, there was no indication in his evidence whether SEB would have done anything had it been informed of the claims earlier. Mr. Hedman could not say what happened to the moneys for Catella or whether SEB held any assets on behalf of Catella that it might have sought to hold on to pursuant to the pledge. But this is something that Mr. Svensson, in any event, said SEB would not be entitled to do.

233  As far as the mergers are concerned, Mr. Svensson accepted that any of the "worthless" rights purportedly granted by the indemnity and pledge would still have been available to SEB following the merger. And, in any event, Mr. Hedman accepted that new depositary and custody account agreements would have been obtained by SEB. However, Mr. Svensson expressed the opinion that if any proceedings were brought against the manager of the merged funds (which, in any event, he viewed as contrary to the "main rule" and not open to SEB) they would not succeed because of the change of membership of the fund. He also accepted, though, that such position would be just as likely even absent any merger because the membership of the fund would have changed anyway as existing unitholders redeemed and new unitholders subscribed.

234  Finally, in relation to both the liquidation and merger, Mr. Svensson accepted that neither would have affected any claim that SEB could try to bring against the management companies, albeit in his opinion any such proceedings would never be successful anyway.

235  Accordingly, in my view, even if a change of position defence were available as a matter of law, I find that it has not here been established by SEB on the facts.

### *Illegality and public policy*

236 The final defence of SEB is that if the court determines that Magnus Peterson was the controlling mind of the company, such that his knowledge and intentions must be imputed to it, then, it is submitted, the JOLs' claims fail on illegality and public policy grounds. It has been found, as set out above, that Magnus Peterson was the company's controlling mind in the payment of the relevant redemptions. The question for determination is whether this gives rise to any defence.

237 For the purpose of this defence, reliance is placed on the fundamental principle that a court will not lend its aid to a litigant whose cause of action is founded on an illegal act (*Holman* v. *Johnson (alias Newland)* (16) (1 Cowp. at 343; 98 E.R. at 1120), cited in *Tinsley* v. *Milligan* (32) ([1994] 1 A.C. at 354)). In the analysis put forward by Mr. Chivers, the JOLs sue to remedy a wrong they say was done to the redeeming creditors who were not paid *pari passu* with SEB, but payment was on the basis of a fraudulent valuation.

238 This case, it is contended, turns upon an allegation that those other creditors should also have received the benefit of the fraudulent NAV and were entitled to a *pari passu* share of the pot of money which was, by fraud, removed from the members as a whole. On this basis, it is submitted to be repugnant to public policy to found an action on an allegation that the proceeds of fraud should have been divided *pari passu* between the beneficiaries of the fraud.

239 A further point made on behalf of SEB is that the JOLs cannot sue in right of other creditors whose claims are based on the fraudulent NAV. It is contended that if the proceeds of the fraud were to be divided between the victims of the fraud, rather than the would-be beneficiaries of the fraud, the public policy considerations might be different. On the footing that the NAV is not set aside by virtue of the fraud, then, it is submitted, there is no evidence that it is members, rather than the unpaid redeeming creditors, who will benefit.

240 Accordingly, it is submitted in defence that the preference claims against SEB are founded on Magnus Peterson's fraud; that the JOLs rely on the published NAV in order to establish the extent of the company's liabilities and the status of SEB and other redeeming shareholders as creditors, and so rely on Magnus Peterson's dishonesty in overstating the NAV as part of their preference claims under s.145.

241 This defence is an extra dimension or adjunct to the fraudulent NAV issue raised by SEB on the issue of solvency. To an extent, therefore, the analysis of that issue (as set out above) is also relevant to the determination which must be made as to this defence.

242   As set out in relation to the solvency issue, whilst it is the JOLs' case that Magnus Peterson's intention is the relevant intention for the purpose of the SEB redemption payments (because he was the person who directed them to be made) it does not follow that his knowledge of the fraudulent nature of the swaps is to be imputed to the company for the purpose of the redemption contracts.

243   There is the authority of the UK Supreme Court that it is perfectly possible for a company to rely on attribution of a person's knowledge for one purpose whilst disclaiming attribution of that same person's knowledge for another purpose (see the case of *Bilta* (4) and the analysis of Lord Mance referred to above at para. 132).

244   I have accepted this analysis and I have accepted that there is no reason to impute Magnus Peterson's knowledge of his fraud (which was a fraud on the company and its shareholders) to the company for the purpose of the redemption contracts. The fraud, as has been observed, on proper examination, was not in the calculation of the NAV (carried out by PNC) but in the fraudulent valuation of the swaps provided by Magnus Peterson.

245   Mr. Lord submits that the JOLs do not rely on Magnus Peterson's fraud to found their claim. They rely rather on the redemption contracts which in this case gave rise to a legal liability which is admitted by SEB.

246   There is the further point that even if (contrary to the above) Magnus Peterson's knowledge is to be imputed to the company for the purpose of the redemption contracts, it does not necessarily follow that those contracts are vitiated by fraud. There is legal analysis of this as set out above. But it seems in any event to be accepted here that the redemption contracts were not entered into for an illegal purpose. It therefore follows that the claims to make recovery of sums paid pursuant to those redemption contracts do not depend on any illegality.

247   As I have already found in relation to solvency, the claims in respect of the redemptions in this case have to be resolved by reference to the NAV which gave rise to their payment. Just as the NAV must stand for the purpose of determining who were creditors, so it must also stand for recovery from any such creditors who were paid by reference to that NAV, but whose payments were a preference over other creditors within the meaning of s.145. In other words, just as the NAV was the measure for the amount found to have been paid out of turn, so it must stand for the purpose of the recovery of such money.

248   Mr. Lord also submits that the JOLs are not, as has been suggested on behalf of SEB, seeking to divide the proceeds of a fraud equally between creditors who are beneficiaries of the fraud. The proceeds of the fraud, as such, can be regarded as having gone to Magnus Peterson,

through WCUK. He contends that what the JOLs are doing rather is seeking to ensure that all creditors should share equally on the proper basis of *pari passu* distribution.

249   He submits that the comments in the *Titan Invs.* case (33) demonstrate that the public policy points only in one direction in a case such as the present, namely that a preferred creditor should repay sums received so that all creditors can be treated equally. I accept these submissions.

250   Having regard to the findings which I have made, I reject the defence that the claims here fail on illegality or public policy grounds. There is a compelling reason why the NAV must stand to allow recovery of redemption payments made in accordance with it which are found to be invalid. The public policy, in my view, is very much in support of such recovery, rather than against it.

251   In the final analysis, in rejecting the defences, I would say this about them. If a creditor is paid out of turn, such that there is a preference within the meaning of s.145(1) of the Law, then the expected consequence will be a liability to make repayment.

## Conclusion

252   In all the circumstances, and on the basis of my findings on the issues, I have come to the conclusion that each of the SEB redemption payments is invalid as a preference over the other creditors of the company pursuant to s.145(1) of the Law. I make the declaration sought to such effect. Further I make an order that the SEB repay the following sums to the JOLs: (a) US$1,096,903.58; (b) US$1,780,214.49; and (c) US$5,340,643.47.

253   I am inclined to the view that there should be some allowance for interest on such sums pursuant to s.34 of the Judicature Law (2013 Revision). It seems to me also that costs should follow the event. I shall leave it to the parties to seek to agree these ancillary matters. If they are not able to do so, there will be liberty to apply to resolve any issues on the terms of the order.

254   The result in this case, it seems to me, achieves the objective of s.145 of the Law and also has the consequence of requiring repayment of money which on the defendant's case (because of the misstated NAV) it should never have been paid at all.

*Application granted.*

Attorneys: *Mourant Ozannes* for the plaintiffs; *Solomon Harris* for the defendant.