# EXHIBIT 16
# PART 1



**Michaelmas Term**
**[2010] UKSC 51**
*On appeal from: 2009 EWCA Civ 625*

# JUDGMENT

# Holland (Respondent) *v* The Commissioners for Her Majesty's Revenue and Customs (Appellant) and another

before

**Lord Hope, Deputy President**
**Lord Walker**
**Lord Collins**
**Lord Clarke**
**Lord Saville**

## JUDGMENT GIVEN ON

## 24 November 2010

**Heard on 21 and 22 July 2010**

*Appellant*
Michael Green QC
Adam Sher

(Instructed by Her
Majesty's Revenue and
Customs)

*Respondent*
Peter Knox QC
Aidan Casey
Helen Pugh
(Instructed by Neil
Myerson Solicitors)

**LORD HOPE**

1.      This is an appeal by HM Revenue and Customs ("HMRC") against a decision of the Court of Appeal (Ward, Rimer and Elias LJJ) dated 2 July 2009: [2009] EWCA Civ 625, [2009] 2 BCLC 309, [2009] STC 1639. The Court allowed an appeal by Mr Michael Holland ("Mr Holland") against an order dated 4 July 2008 by Mr Mark Cawson QC sitting as a Deputy High Court Judge of the Chancery Division, following a judgment which he issued on 24 June 2008: [2008] EWHC 2200 (Ch), [2008] 2 BCLC 613, [2008] STC 3142. The trial over which the deputy judge presided arose out of 42 originating applications issued by HMRC on 27 July 2006 against Mr Holland and his wife Linda. The applications were made under section 212 of the Insolvency Act 1986 ("IA 1986"). It was alleged that Mr and Mrs Holland were de facto directors of 42 insolvent companies of which HMRC is the only creditor, and that they had been guilty of misfeasance and breach of duty in causing the payment of dividends to the companies' shareholders between 24 April 2002 and 19 October 2004 when the companies had insufficient distributable reserves to pay their creditors. Orders were sought requiring them to contribute sums to the assets of the insolvent companies by way of compensation in respect of their misfeasance and breach of duty of amounts totalling in excess of £3.5m.

2.      The background to the litigation was the setting up by Mr and Mrs Holland in 1999 of a complicated structure of companies, including the 42 companies of which they were alleged to be de facto directors. Their business was the administering of the business and tax affairs of contractors working in various sectors, but mainly that of information technology. Each contractor was taken on as an employee of one of the 42 companies and allotted a non-voting share. This enabled him to be rewarded on a weekly or monthly basis by way of both salary and dividends. The contractors' services were provided to clients through an agency which paid the parent company. The intention was to provide the same tax advantages to the non-voting shareholders/employees as they would have enjoyed had they each set up and run their own individual service companies, while relieving them of the administrative burden of doing so. It was of the essence of this scheme that each of the 42 companies would be liable to pay corporation tax at the small companies' rate under section 13 of the Income and Corporation Taxes Act 1988 ("ICTA 1988"). So long as they were not regarded as "associated" for the purposes of section 416 ICTA 1988, they could achieve this aim provided that each company kept its profits below the £300,000 threshold, which it did. As it turned out, however, the scheme was doomed to fail. By the operation of section 417(3) ICTA 1988 Mr Holland, as the settlor of the one share in each company which had voting rights, fell to be treated as being in control of them. The result was that the 42 companies were treated as associated for tax purposes. Because

their collective turnover exceeded the £300,000 threshold, each company was liable for higher rate corporation tax ("HRCT"). Dividends had been paid after making provision only for corporation tax at the lower rate. So there was a substantial deficiency in the liquidation of each company in respect of its HRCT liability.

3.     The deputy judge dismissed the claims against Mrs Holland, and there has been no appeal against that decision. He took a different view of the position of Mr Holland. He found that he was a de facto director of each of the 42 companies and so was answerable to HMRC's claims under section 212. He divided the allegations against Mr Holland into three different periods. First, in respect of the period from 24 April 2002 to 18 August 2004, the deputy judge held that Mr Holland was at no stage liable or, if he was, that he ought to be relieved from liability pursuant to section 727 of the Companies Act 1985 ("CA 1985"). Second, he held that Mr Holland was entitled to a short period of grace from 19 to 22 August 2004 as, although he was liable for the payment of dividends during this period, the circumstances were such that he was entitled to be relieved under section 727 from that liability. Third, in respect of the remaining period from 23 August to 19 October 2004, he held that Mr Holland had been guilty of misfeasance and breach of duty in relation to each company in causing the payment to its shareholders of the unlawful dividends, and that it would not be a proper exercise of the power under section 727 to relieve him of that liability: [2008] EWHC 2200 (Ch), paras 236-237. He ordered an assessment of the amount that Mr Holland was liable to contribute to the companies' assets, but he limited this amount to the HRCT that the companies had failed to provide for to meet the claims of HMRC in respect of their trading during that period.

4.     The Court of Appeal allowed Mr Holland's appeal against the orders which the deputy judge made against him, dismissed the originating applications and dismissed a cross-appeal by HMRC as the points that it sought to raise were no longer in issue. Had it been necessary to decide them it would, by a majority (Rimer LJ dissenting), have dismissed HMRC's appeal against the deputy judge's decisions to allow Mr Holland a period of grace from 19 to 22 August 2004 and as to the amount that he was liable to contribute to the assets of the companies, its contention being that he should have been ordered to repay the full amount of the unlawful dividends. In the appeal by HMRC to this court all of these points are in issue, although if Mr Holland succeeds on the question whether he was a de facto director the other issues will become academic.

*The corporate structure*

5.     From about June 1997 to February 1999 Mr and Mrs Holland ran a company called Paycheck Services Ltd ("Paycheck"), whose function, in return for

a fee, was to administer the business and tax affairs of contractors who did not want to go to the trouble of setting up and running their own companies. Each contractor who joined the scheme became an employee of Paycheck and was allotted a non-voting share in the company. This entitled him to dividends as well as a salary. Paycheck's income was derived from charging the contractor's clients for his services. Most contractors did not pay higher rate income tax, and the bulk of their income from Paycheck was by way of a dividend. It soon became apparent, however, that the income of Paycheck was likely to exceed the limit for the small companies' rate of corporation tax of £300,000, which was between 19% and 21% during the relevant period. So Mr and Mrs Holland, with the help of a number of professional advisers, set about devising a new structure which would enable them to expand their business while avoiding corporation tax at the higher rate, which during the relevant period was between 30% and 33%.

6.     The new structure was established in February 1999. It operated until 13 October 2004, when all the companies went into administration and later into liquidation. Under this structure Mr and Mrs Holland each held 50% of the issued shares in, and were directors of, a new company called Paycheck Services Ltd ("Paycheck Services"). Paycheck Services held 100% of the issued shares in, and Mr and Mrs Holland were appointed as directors of, two further new companies called Paycheck (Directors Services) Ltd ("Paycheck Directors") and Paycheck (Secretarial Services) Ltd ("Paycheck Secretarial"). Paycheck Directors and Paycheck Secretarial were incorporated to act respectively as the sole director and secretary of 42 trading companies ("the composite companies"), each of which had similar names distinguished only by a number. Their names were Paycheck Services 3 Ltd, Paycheck Services 4 Ltd, and so on.

7.     Each of the composite companies had a single voting "A" share and 50 non-voting shares, each of a separate class (B1, B2, C1, C2, etc). The A share was held by yet another new company called Paycheck Services Trustee Limited ("Paycheck Trustee"), of which Mr and Mrs Holland were each directors and in which they each held 50% of the issued share capital. The A share was held by Paycheck Trustee pursuant to a Trust Deed of which Mr Holland was the settlor, which provided that each A share was be held for the benefit of the members of the composite companies. The non-voting shares were, in the case of each composite company, held by about 50 shareholders/employees, each of whom held one each of the separate classes of shares in the company.

8.     Article 8(b)(i) of the Articles of Association of the composite companies provided:

> "each class of Non-Voting Shares shall carry the right to the receipt of such dividends payable on each such class of Shares, in such

amounts, at such frequency, at such times as, on the recommendation of the Directors, the holder of the 'A' share shall, in General Meeting, resolve in accordance with the following:

(aa) subject to the provisions of the Act and to the following provisions of this Article, the Company may, by Ordinary Resolution passed at a General Meeting upon the recommendation of the Directors, declare a dividend for any class of the Non-Voting Shares;
…

(ee) when paying interim dividends, the Directors may make payments of interim dividends to one or more classes of Non-Voting Shares to the exclusion of one or more other classes of Non-Voting Shares on the same basis that final dividends may be paid by the Company to each class of Non-Voting Shares in accordance with the foregoing;

(ff) Regulations 102 and 103 of Table A shall be read and construed accordingly with the foregoing provisions of this Article."

9.    As had been the case under the previous structure, the services of the shareholders/employees were contracted out, typically through employment agencies. Under the new structure this was done by the composite companies which, out of the income they received, made the following payments: (i) a fee to Paycheck Services for its administrative services; (ii) a salary to each shareholder/employee, typically limited to the national minimum wage and the associated PAYE tax and National Insurance contributions; and (iii) after making provision for the payment of corporation tax at the small companies' rate, a dividend to each shareholder/employee.

10.    The dividends were paid on a regular basis. The shareholders/employees put in timesheets for the work that they had done. The relevant figures were entered into Paycheck Services' computer, and the accountancy software thereon then calculated the dividend payable after making provision for the items listed in the previous paragraph. The computer programme then generated a document purporting to be a minute of a directors' meeting of the relevant composite company. It recorded as present "M Holland Paycheck (Director Services) Ltd, LM Holland Paycheck (Secretarial Services) Ltd" and that it had been resolved that a dividend of a specified amount be distributed to the specified shareholder/employee. The computer generated on the minute a copy of Mr Holland's signature, beneath which appeared the words "for and on behalf of Paycheck (Director Services) Ltd." This was the only authority for payment by the composite company of the relevant dividend.

*The corporation tax problem*

11.    As already noted, it was crucial to the commercial viability of the scheme that the composite companies should have annual taxable profits of no more than £300,000, so as to get the benefit of the small companies' rate of corporation tax. There was, however, a flaw in the structure which, as Rimer LJ said in para 16, was not spotted when the structure was established. Section 13(3) ICTA 1988 limited the benefit of the small companies' rate by providing that where a company had two or more associated companies during an accounting period they would have to share a single £300,000 limit. Mr Holland was the settlor of the trust under which Paycheck Trustee held the A shares in each of the composite companies. The effect of section 417(3) ICTA 1988 was that Mr Holland was regarded as in control of all the composite companies, so they were "associated" within the meaning of section 13 of that Act. Their collective profits all had to be aggregated, and they had to be treated for the purposes of the small companies' rate of corporation tax as a single company.

12.    It had been thought by Mr and Mrs Holland and their advisers that an escape from this consequence was provided by Extra Statutory Concession C9 ("ESC C9"). Its effect was believed to be that the composite companies would not be regarded as "associated". It was not appreciated when the new structure was established that the fact that Mr Holland was the common settlor of the A shares in each company meant that he fell to be regarded as being in control of each of the companies, with the result that ESC C9 did not apply. But, as Rimer LJ observed in the Court of Appeal, para 18, the advice that Mr and Mrs Holland received that the companies would not be regarded as "associated" was not unqualified.

13.    The risk of HMRC attacking the scheme was recognised in written advice given by tax counsel on 22 January 1999. The deputy judge commented that the advice contained a number of apparent contradictions: para 44. Mr Holland's solicitor advised in February 1999 that the two trading companies then in existence should restrict their profits to £150,000 each. In March 2001 the composite companies' accountants received an informal telephone enquiry about the arrangements from an official at the Wrexham 1 Tax Office. This was followed by a letter in relation to three of the composite companies in which a detailed profit and loss account, with notes to indicate whether the companies were grouped or associated, was requested. The accountants and the solicitor repeated their advice to Mr Holland about restricting profits of each of the two companies to £150,000.

14.    Subsequent contacts with HMRC are described in detailed findings made by the deputy judge: paras 55 and following. He found that the accountants, and through them Mr Holland, were led to believe in March 2001 that HMRC would treat the matter as covered by ESC C9 and that it was content, in the light of an

explanation common to all the composite companies, that there was no association between them: para 66. But he added that it would have been open to HMRC at any time to take the point on the effect of section 417(3) of the 1988 Act and of Mr Holland's position as the settlor of the A shares that was not, in fact, taken until over three years later: para 67. On 24 April 2002 Mr Williams of HMRC wrote to say that in his view the companies were associated. Throughout the rest of 2002 and most of 2003 there was what Rimer LJ called "sporadic and inconclusive" correspondence between HMRC and the composite companies' advisers: para 25. Mr Williams was dissatisfied with the arrangements but he failed to identify its crucial flaw. It was not at this stage suggested to Mr Holland by his advisers that he should cease trading or consider not continuing to cause the composite companies to pay dividends without making provision for HRCT.

15.     On 4 December 2003 HMRC opened a formal inquiry into the claims for the small companies' rate made for all the composite companies for the year ended 31 July 2002. On 8 December 2003 it issued closure notices for the years ended 31 July 2000 and 2002 and assessments in relation to the year ended 31 July 2001 on the basis that the composite companies were liable to HRCT. At a meeting of professional advisers on 24 February 2004 the corporation tax deficit, if HMRC were to succeed, was estimated at £2m. Nevertheless it was decided that the composite companies should continue to trade and continue to pay dividends without making any reservation for HRCT.

16.     There was a meeting with HMRC on 21 June 2004 at which officials raised the issue of the composite companies' solvency. On 25 June 2004 Mr Russell (who had taken over HMRC's file from Mr Williams) wrote expressing the view that the structure was an avoidance scheme and identifying the common settlor point under section 417(3) of the 1988 Act. This was the first time that HMRC had taken this point.  Mr Holland's solicitor sought advice from counsel whose advice had been taken when the scheme was set up. Neither of them identified the importance of the common settlor point raised by HMRC, but on 6 August 2004 another tax counsel advised on the telephone that it "blows our scheme out of the water." In written advice he recommended that the composite companies should cease trading or that the structure should be substantially revised as soon as practicable. He also proposed an alternative structure that would avoid the "association" problem and suggested that it might be possible to persuade HMRC not to pursue a claim for periods up to 31 July 2004 if it was adopted. It was decided to take a second opinion from leading counsel, and a conference with Mr John Tallon QC in London was arranged for 18 August 2004. He advised that, although HMRC had dealt with the issue badly and that leave for judicial review might well be granted, the composite companies would ultimately lose if such an application were made. He agreed that the new corporate structure that had been suggested was basically sound and that a letter should be sent requesting a meeting with HMRC in the hope that it might be possible to achieve a favourable settlement.

17.     A discussion took place between Mr Holland and his advisers on the train
back from London to Colwyn Bay after the conference. In the light of Mr Tallon's
advice Mr Holland's solicitor advised him that he and Mrs Holland might be
unlawfully trading and that trading should not continue if there was no reasonable
prospect of avoiding insolvent liquidation. But Mr Holland was not, for reasons
that the deputy judge regarded as understandable, in any mood to engage properly
in this discussion: para 160. His solicitor did not repeat the advice that he gave on
the train, nor was there any evidence that Mr Holland sought, or was given, advice
as to the propriety of continuing to pay dividends.

18.     The letter which Mr Tallon had settled was sent to HMRC, and a meeting
took place on 4 October 2004 with a view to attempting a settlement. HMRC were
told for the first time of the intention to transfer the business to a new structure. Mr
Holland's advisers proposed to HMRC that they should accept that ESC C9 did
apply to the existing companies to the end of October on the basis that they would
cease to trade then, pay all outstanding corporation tax at the small companies' rate
and then be dissolved. It was suggested that the pot available to HMRC would be
less if the composite companies were forced to cease trading and go into
insolvency. HMRC rejected this proposal. By a letter dated 5 October 2004, which
was received on 13 October 2004 and forwarded at once to Mr Holland, Mr
Russell made it clear that HRCT was still being sought from 2002. Mr Holland
was advised that there was now no prospect of a deal with HMRC and that no
further dividends should be declared. No dividends were declared after 13 October
2004. On 19 October 2004 administrators were appointed to the composite
companies and the various service contracts were transferred to the new
companies. The composite companies were left with a total deficiency of about
£3.5m in respect of unpaid corporation tax.

*The issues*

19.     The first issue, which lies at the heart of this appeal, is whether Mr Holland
was a de facto director of the composite companies. If he was, a number of further
issues arise concerning the nature and scope of the remedy. As set out in the
agreed Statement of Facts and Issues, they are as follows:

      "(2) Whether Mr Holland's liability for payment of unlawful
      dividends is strict or whether it is necessary to show that he was
      negligent (in breach of his common law duty of care).

      (3) Whether the correct remedy for any breach of Mr Holland's
      duties as a director not to cause the companies to make unlawful
      payments of dividends is damages or equitable compensation for the
      net loss sustained by the company as a result of the breach, or

restitution or restoration of the amount of the unlawful dividends without an inquiry into the loss sustained.

(4) The scope of the discretion under section 212 of the IA 1986. In particular:

(a) whether the discretion is wide enough to allow the court to reduce the award to nil or some other sum (as Mr Holland contends) …; or

(b) whether it is more circumscribed as HMRC contends … so that the judge did not have power to limit Mr Holland's liability to the amount of HRCT that fell due during the relevant period (approximately £144,000).

(5) Whether, in the light of the judge's findings as to whether Mr Holland acted reasonably from 18 August 2004 onwards, there was jurisdiction under section 727 CA 1985 to allow Mr Holland a 'few days grace' between 18 and 23 August 2004.

(6) Whether the judge should have relieved Mr Holland of liability under section 727 CA 1985 in respect of the period from 23 August 2004 onwards."

*The first issue: was Mr Holland a de facto director?*

*(a) background*

20.     An examination of this issue must start with some of the basic elements of company law. A company is, of course, an artificial entity, a creature of statute. So it can act only through human beings. Inevitably it is human beings who must take the decisions, and give effect to them by actions, if the company is to do anything at all: Palmer's *Company Law* (25th ed) para 8.101; Gower and Davies *Principles of Modern Company Law* (8th ed), para 7-1. A company is formed by one or more persons subscribing their names to a memorandum of association and complying with the requirements of the Act as to registration: Companies Act 1985, section 1; see now Companies Act 2006, section 7. Among the requirements for registration is a statement of the company's proposed officers, including the required particulars of the person or persons who are to be the first director or directors of the company: CA 1985, section 10(2); see now CA 2006, section 12(1). The expression "director" is not defined in the Companies Acts. All section 741(1) of CA 1985 says is: "In this Act, 'director' includes any person occupying the position of director, by whatever name called": see now CA 2006, section 250. In *Re Lo-Line Electric Motors Ltd* [1988] Ch 477, 489 Sir Nicolas Browne-Wilkinson

V-C, noting that this definition was inclusive and not exhaustive, said that its meaning had to be derived from the words of the Act as whole.

21.     The definition extends, of course, to persons who are validly appointed as directors. Persons who are not directors de jure may nevertheless be treated as directors de facto. Sir Nicolas Browne-Wilkinson said that in his judgment it was not possible to treat a de facto director as a "director" for all the purposes of CA 1985. But it is not in dispute that de facto directors are within section 212 IA 1986. That section, as amended by para 18 of Schedule 17 to the Enterprise Act 2002, provides so far as relevant as follows:

"(1) This section applies if in the course of the winding up of a company it appears that a person who –

(a) is or has been an officer of the company,

(b) has acted as liquidator or administrative receiver of the company, or

(c) not being a person falling within paragraph (a) or (b), is or has been concerned, or has taken part, in the promotion, formation or management of the company,

has misapplied or retained, or become accountable for, any money or other property of the company, or been guilty of any misfeasance or breach of any fiduciary or other duty in relation to the company.

. . .

(3) The Court may, on the application of the official receiver or the liquidator, or of any creditor or contributory examine into the conduct of the person falling within subsection (1) and compel him –

(a) to repay, restore or account for the money or property or any part of it, with interest at such rate as the Court thinks just, or

(b) to contribute such sum to the company's assets by way of compensation in respect of the misfeasance or breach of fiduciary or other duty as the Court thinks just."

Section 251 IA 1986, as amended, provides that "officer", in relation to a body corporate, includes a director, manager or secretary. Mr Knox QC for Mr Holland accepted that, as section 212 IA 1986 was concerned with the conduct of directors and their liability for actions or decisions in relation to the company, de facto directors must be assumed to be covered by this expression and treated as directors. As he put in his written case, this is to ensure that the persons with real directorial control but who, for whatever reason, lack a formal appointment are held responsible in law for their conduct of the affairs of the company.

22.     There is a third type of director, known as a "shadow director". Section
741(2) CA 1985 (see now sections 251(1) and (2) CA 2006) provided:

> "In relation to a company, 'shadow director' means a person in
> accordance with whose directions or instructions the directors of the
> company are accustomed to act.
>
> However, a person is not deemed a shadow director by reason only
> that the directors act on advice given by him in a professional
> capacity."

But, as Rimer LJ observed in para 57, it has not been asserted in this case that Mr
Holland was a shadow director of the composite companies. Section 214 IA 1986,
which provides a remedy in relation to a person who is or has been a director of a
company for wrongful trading, is extended to shadow directors expressly by
subsection (7). But HMRC do not rely on that section. Section 212 IA 1986, under
which a summary remedy is sought in this case, applies to a person who is or has
been an "officer" of the company. It does not apply to shadow directors because,
unlike section 214, the statute does not provide for this.

23.     There is another feature of company law that must be taken into account in
the examination of the question whether Mr Holland was a de facto director of the
composite companies. As has already been noted, Paycheck Directors and
Paycheck Secretarial were incorporated to act respectively as the sole director and
secretary of 42 trading companies. The nineteenth century company law statutes
made no provision for corporate directors. The question whether a company could
act as the director of another company does not appear to have been raised in any
reported case until *In re Bulawayo Market and Offices Co Ltd* [1907] 2 Ch 458.
Objection was taken by a minority of the shareholders to the appointment of a
limited company as the company's sole manager. Warrington J dismissed the
application without calling on the respondents. He said, at p 463, that there was
nothing in the Companies Act 1862 which made it incumbent on a company to
have directors who were individual persons and responsible as individuals to the
shareholders.

24.     The Companies Act 1929 was the first statute to recognise in terms that a
company could be a director: sections 144, 145; see also sections 176, 178 and 201
of the Companies Act 1948. Section 282(3) CA 1985, which was the Act in force
in February 1999 when the new corporate structure was established, provided that
every private company shall have at least one director. Section 283(4)(b) CA 1985
provided that no company shall have as sole director of the company "a
corporation the sole director of which is secretary to the company". Section 305(1)
CA 1985 provided that a company which stated the name of any of its directors on

any business letter had to state the name of every director who was an individual "and the corporate name of every corporate director." Section 155(1) CA 2006 now provides that a company must have at least one director who is a natural person. But no such requirement was in force during the events that gave rise to the claim in this case. The position then was that CA 1985 allowed a company to have a corporation as its sole director, so long as its sole director was not the secretary to the company.

25.    The new corporate structure was created on the assumption that it was open to the composite companies to have, as their sole de jure director, Paycheck Directors of which Mr and Mrs Holland were the directors. Mr Holland and his advisers cannot be criticised for doing so, as this was expressly permitted by the statute. Drawing on the reasoning in *Salomon v A Salomon & Co Ltd* [1897] AC 22, Mr Knox submitted that the separate legal personality of Paycheck Directors from that of its directors had to be respected. I do not think that he needed the authority of *Salomon's* case for that proposition. *Salomon* was concerned with the different question whether, as Lord Macnaghten put it at p 51, a body corporate could lose its individuality by issuing the bulk of its capital to one person. The deputy judge acknowledged that it was not alleged by HMRC that Paycheck Directors was a pure shell or a façade. Nor was it asserted that Mr Holland acted outside his authority as a director of Paycheck Directors in directing the affairs of the composite companies: para 172; see also Rimer LJ, para 47. The question whether Mr Holland was acting as de facto director of the composite companies so as to impose on him fiduciary duties in relation to those companies when the purported directors' meetings were held on his direction at which the relevant dividends were declared must be approached on the basis that Paycheck Directors and Mr Holland were in law separate persons, each with their own separate legal personality.

*(b) de facto directors: the authorities*

26.    The expression "de facto director" has been in use for a long time, as Robert Walker LJ observed in *Re Kaytech International plc* [1999] 2 BCLC 351, 420. It was used by Sir George Jessel MR in *Re Canadian Land Reclaiming and Colonising Co, Coventry and Dixon's case* (1880) 14 Ch D 660, where the question was whether two individuals who had been appointed and acted as directors while they were ineligible were directors or other officers liable to a summons for misfeasance. The test which he applied at pp 664-665 was whether a man who had assumed a position could be allowed to deny in court that he was really entitled to occupy it. But it is not easy to identify a simple and reliable test for determining whether a person in Mr Holland's position was acting as de facto director of a company whose sole director was a company of which he was a director de jure. There are a number of first instance cases which offer some

assistance. But I do not think that they provide a clear and simple solution to the problem, as the facts which can give rise to it are so variable.

27.     In *Re Lo-Line Electric Motors Ltd* [1988] Ch 477 it was accepted that Mr Browning, against whom the disqualification proceedings were brought and who had not actually been appointed a director, de facto ran one of the companies which he allowed to trade after his retirement as a director de jure knowing it to be insolvent. Sir Nicolas Browne-Wilkinson V-C held that the court had to have regard to his conduct as director whether validly appointed or invalidly appointed or merely de facto acting as a director. At p 490 he said:

"… the plain intention of Parliament in section 300 was to have regard to the conduct of a person acting as a director, whether validly appointed, invalidly appointed, or just assuming to act as director without any appointment at all."

But he did not need to explore what was needed to determine whether an individual could properly be held to be acting de facto as a director of a company in a case such as this, where a corporate director was interposed between him and the subject company and his actions could be attributed entirely to the position which he occupied de jure as a director of the corporate director.

28.     That question was however in issue in *Re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180. That was a company which had only two directors, which were two Channel Islands companies. It went into compulsory liquidation, and its liquidator brought claims for wrongful trading under section 214 IA 1986 against 14 defendants who included two of the directors of Eagle Trust plc of which Hydrodam was, by several removes, an indirect subsidiary. It was alleged that they were responsible for the wrongful trading of Hydrodam from the date when they were appointed to be directors of Eagle Trust. But, as Millett J observed at p 183, the Channel Islands companies were Hydrodam's titular directors and there was nothing pleaded in the points of claim to suggest that there were, in addition to the titular directors, any other persons who claimed to be directors of the company at all. The case was argued on the basis that sufficient facts had been pleaded to justify the inference that Eagle Trust acted as a shadow director of the company, and that as directors of the shadow director its directors were collectively responsible for Eagle Trust's conduct in relation to the company as its de facto or shadow directors.

29.     Millett J held that the liquidator had failed to plead or adduce any evidence to support the allegation that the directors of Eagle Trust were at any material time directors of Hydrodam, and the proceedings were struck out. There are significant

differences between that case and this. It is not alleged here that Mr Holland was a shadow director and section 212 IA 1986, unlike section 214, does not extend to shadow directors. But it is of interest because of what Millett J said in the course of his judgment about what is needed to establish that a person is a de facto director. At pp 182-183 he said:

"I would interpose at this point by observing that in my judgment an allegation that a defendant acted as de facto or shadow director, without distinguishing between the two, is embarrassing. It suggests – and counsel's submissions to me support the inference – that the liquidator takes the view that de facto or shadow directors are very similar, that their roles overlap, and that it may not be possible to determine in any given case whether a particular person was a de facto or a shadow director. I do not accept that at all. The terms do not overlap. They are alternatives, and in most and perhaps all cases are mutually exclusive.

A de facto director is a person who assumes to act as a director. He is held out as a director by the company, and claims and purports to be a director, although never actually or validly appointed as such. To establish that a person was a de facto director of a company it is necessary to plead and prove that he undertook functions in relation to the company which could properly be discharged only by a director. It is not sufficient to show that he was concerned in the management of the company's affairs or undertook tasks in relation to its business which can properly be performed by a manager below board level.

A de facto director, I repeat, is one who claims to act and purports to act as director, although not validly appointed as such. A shadow director, by contrast, does not claim or purport to act as director. On the contrary, he claims not to be a director. He lurks in the shadows, sheltering behind others who, he claims, are the only directors of the company to the exclusion of himself. He is not held out as a director by the company."

Here too, as in *Re Lo-Line Electric Motors Ltd*, the test which is being suggested is whether the individual assumed office as a director. But Millett J added these words at p 184:

"The liquidator submitted that where a body corporate is a director of a company, whether it be a de jure, de facto or shadow director, its

own directors must ipso facto be shadow directors of the company. In my judgment that simply does not follow. Attendance at board meetings and voting, with others, may in certain limited circumstances expose a director to personal liability to the company of which he is a director or its creditors. But it does not, without more, constitute him a director of any company of which his company is a director."

The words "without more" are important. They indicate that the mere fact of acting as a director of a corporate director will not be enough for that individual to become a de facto director of the subject company.

30.    In *Re Richborough Furniture Ltd* [1996] 1 BCLC 507 the question was raised whether one of the three respondents, who was not a director of the company de jure, was nevertheless a director of the company de facto and as such liable under section 6 of the Company Directors Disqualification Act 1986 to be disqualified. Asking himself what is a de facto director, Timothy Lloyd QC (sitting as a Deputy High Court judge) said at p 524:

"It seems to me that for someone to be made liable to disqualification under section 6 as a de facto director, the court would have to have clear evidence that he had been either the sole person directing the affairs of the company (or acting with others all equally lacking in a valid appointment, as in *Morris v Kanssen* [1946] AC 459) or, if there were others who were true directors, that he was acting on an equal footing with the others in directing the affairs of the company. It also seems to me that, if it is unclear whether the acts of the person in question are referable to an assumed directorship, or to some other capacity such as shareholder or, as here, consultant, the person in question must be entitled to the benefit of the doubt."

He held that the individual in question, who was a business consultant providing computer and other management services to the company, was not a de facto director despite having undertaken negotiations with creditors and performed some of the functions of a finance director.

31.    In *Secretary of State for Trade and Industry v Tjolle* [1998] 1 BCLC 333 Jacob J was referred to what was said in *Re Hydrodam (Corby) Ltd*, including a passage at p 182 where Millett J pointed to the purpose of any test as being to impose liability for wrongful trading on those persons who were in a position to

prevent damage to creditors by taking steps to protect their interests, and to *Re Richborough Furniture Ltd*. At pp 343-344 he said:

"For myself I think it may be difficult to postulate any one decisive test. I think what is involved is very much a question of degree. The court takes into account all the relevant factors. Those factors include at least whether or not there was a holding out by the company of the individual as a director, whether the individual used the title, whether the individual had proper information (eg management accounts) on which to base decisions, and whether the individual had to make major decisions and so on. Taking all these factors into account, one asks 'was this individual part of the corporate governing structure', answering it as a kind of jury question. In deciding this, one bears very much in mind why one is asking the question. That is why I think the passage I quoted from Millett J is important. There would be no justification for the law making a person liable to misfeasance or disqualification proceedings unless they were truly in a position to exercise the powers and discharge the functions of a director. Otherwise they would be made liable for events over which they had no real control, either in fact or law."

In that case the individual in question was given the courtesy title of deputy managing director but did not form part of the real corporate governance of the company. There was no function that she performed that could only be properly discharged by a director.

32.    In *Re Kaytech International plc* [1999] 2 BCLC 351, 423 Robert Walker LJ said that he saw much force in what Jacob J said in *Tjolle* when he declined to formulate a single test. Referring to the passage which I have just quoted, he added this observation:

"I do not understand Jacob J, in the first part of that passage, to be enumerating tests which must all be satisfied if de facto directorship is to be established. He is simply drawing attention to some (but not all) of the relevant factors, recognising that the crucial issue is whether the individual in question has assumed the status and functions of a company director so as to make himself responsible under the 1986 Act as if he were a de jure director."

Here again the word "assumed" is used. But, as Lewison J said in *Re Mea Corpn Ltd* [2006] EWHC 1846 (Ch); [2007] 1 BCLC 618, para 83, in considering whether a person "assumes to act as a director" what is important is not what he calls himself but what he did: see also *Secretary of State for Trade and Industry v Hollier* [2007] BCC 11, para 66.

33.     The question whether a director of a corporate director could, through his control of the corporate director, be held to be a de facto director of the subject company which was in issue in *Re Hydrodam (Corby) Ltd* was raised again in *Secretary of State for Trade and Industry v Hall* [2006] EWHC 1995 (Ch); [2009] BCC 190. The first respondent to those proceedings for disqualification, Mr Hall, did not respond, did not appear and was not represented. The question which the court had to consider was whether the second respondent, Mr Nuttall, was a de facto director of the subject company by reason of the fact that it owned and controlled and was the sole director of its corporate director. The case against him failed because he had not, either individually or through his control of the corporate director, taken any step which indicated that either he or his company had assumed the status and functions of a director of the subject company. It was accepted by the Secretary of State that Mr Nuttall did not fit the description of a de facto director which emerged from Millett J's judgment in the *Hydrodam* case. This was because that description required positive action by an individual which showed that he was acting as if he was a director. It was contended that it was sufficient that he was in a position to exercise the powers and discharge the functions of a director of the subject company, even if he did not actually do anything. But Evans-Lombe J said that he could not accept that argument: para 30.

34.     Among the reasons which Evans-Lombe J gave for coming to that conclusion in that paragraph were the following:

"(ii) In the *Hydrodam* case … Millett J finds that the director of a corporate director is not, without more, constituted a director, whether shadow or de facto, of a subject company. However I do not read his judgment as saying that this can never happen. I can well accept that an individual through his control of a corporate director can constitute himself a de facto director of a subject company. It seems to me that whether or not he does so will depend on what that individual procures the corporate director to do. In theory I am not bound by the judgment of Millett J in the *Hydrodam* case. Even putting on one side the authority of that judge in this and other fields of the law, I would need convincing reasons for not following it. I can find none.

(iii) It seems to me that in order to be constituted a de facto director of a subject company, a director of a corporate de jure director must cause the corporate director to take actions with relation to the subject company as would have constituted it a de facto director of that company were it not already a director de jure.

(iv) In addition the degree of control which the director of the corporate director exercises over that company will be of relevance. In the present case Mr Nuttall's control was absolute but the situation may be substantially different where the corporate director is controlled by a board with a number of members with different responsibilities. Equally the shareholder control of the corporate director may be relevant."

35.    The deputy judge was impressed by para (iii) in this list of reasons. He said that applying that test to Mr Holland's case would clearly lead to the conclusion that he was a de facto director of the composite companies in that he, in so far as he is properly to be regarded as having acted on behalf of Paycheck Directors, clearly caused it to act in such a way as would have caused the latter to be treated as a de facto director were it not already a de jure director: para 176. This left for consideration Mr Knox's argument that to make that finding would involve piercing the corporate veil which, on the authority of *Salomon v A Salomon & Co Ltd* [1897] AC 22, was contrary to principle. He was not persuaded that arguments as to separate corporate personality were of assistance or relevant to the issue. He said that as a matter of fact Mr Holland did, by what he actually did, direct the affairs of the composite companies and that it was beside the point whether he purported to do so on his own account or as agent for Paycheck Directors: para 177. As the corporate veil point was the only point taken on behalf of Mr Holland, he found that it necessarily followed that he was a de facto director of the composite companies.

36.    In the Court of Appeal Rimer LJ (with whom Ward and Elias LJJ agreed on this aspect of the case) reached the opposite conclusion. He accepted that the critical issue was, as Robert Walker LJ put it in *Re Kaytech International plc* [1999] 2 BCLC 351, 423, whether the individual assumed the status and function of a company director so as to make himself responsible as if he were a de jure director and that it mattered not what the individual called himself but what he did: para 65. He concluded, I think rightly, that the only authorities that lent any assistance on the question posed by this case were *Re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180 and *Secretary of State for Trade and Industry v Hall* [2009] BCC 190. Recalling that the essence of Millett J's reasoning in *Hydrodam* was that membership of the board of a corporate director will not, without more, make such member a shadow or de facto director of any company, he said that he did not find anything in that judgment to suggest that the "requisite more" would be satisfied

merely by the active participation of the board member in the making of board decisions by the corporate director in relation to the actions of the subject company: para 66. As for the test suggested by Evans-Lombe J in para 30(iii) of his judgment in *Hall* which had impressed the judge, he said that it appeared to him to be somewhat artificial and that it was wrong in principle. He saw no reason why a director of a corporate director who is doing no more than discharging his duties as such should thereby become a de facto director of the subject company: para 70.

37.    In para 74 Rimer LJ added these comments:

"I emphasise that nothing that I have said is intended to suggest that there can never be circumstances in which a director of a corporate director can or will so act as to cause himself to be regarded as a de facto director of the subject company. But something more will be required than the mere performance by him of his duties as a de jure director of the corporate director. On the facts accepted by the judge, there was nothing more in the present case."

*(c) Mr Holland's case*

38.    The remedy that is provided by section 212 IA 1986 may be sought only against persons to whom that section applies, as described in section 212(1). The description that applies to this case is that set out in para (a) of the subsection: "is or has been an officer of the company". The word "officer" includes a director, but it is accepted that the section does not apply to shadow directors because the statute does not provide for this. It follows that HMRC must plead and prove against Mr Holland that he was a de facto director of the composite companies.

39.    How is this to be done? It is plain from the authorities that the circumstances vary widely from case to case. Jacob J declined to formulate a single decisive test in *Secretary of State for Trade and Industry v Tjolle* [1998] 1 BCLC 333, as he saw the question very much as one of fact and degree. He was commended by Robert Walker LJ in *Re Kaytech International plc* [1999] 2 BCLC 351, 423 for not doing so, and I respectfully agree that there is much force in Jacob J's observation. All one can say, as a generality, is that all the relevant factors must be taken into account. But it is possible to obtain some guidance by looking at the purpose of the section. As Millett J said in *Re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180, 182, the liability is imposed on those who were in a position to prevent damage to creditors by taking proper steps to protect their interests. As he put it, those who assume to act as directors and who thereby exercise the powers and discharge the functions of a director, whether validly appointed or not, must accept

the responsibilities of the office. So one must look at what the person actually did to see whether he assumed those responsibilities in relation to the subject company.

40.     The problem that is presented by this case, however, is that Mr Holland was doing no more than discharging his duties as the director of the corporate director of the composite companies. Everything that he did was done under that umbrella. Mr Green QC for HMRC was unable to point to anything that he did which could not be said to have been done by him in his capacity as a director of the corporate director. When asked what it was that lay outside his performance of that role, he said that it was simply the quality of his acts. He did everything. He was the decision maker, and he was the person who gave effect to those decisions. In *Hydrodam* at p 184 Millett J rejected the proposition that, where a body corporate is a director of a company, whether it be de jure, de facto or shadow director, its own directors must ipso facto be shadow directors of the subject company. He said that attendance at board meetings and voting with others did not, without more, constitute him a director of any company of which his company is a director. That would not be a fair description of what Mr Holland did in this case. But in a later paragraph on p 184 Millett J said this:

> "It is possible (although it is not so alleged) that the directors of Eagle Trust as a collective body gave directions to the directors of the company and that the directors of the company were accustomed to act in accordance with such directions. But if they did give such directions as directors of Eagle Trust, acting as the board of Eagle Trust, they did so as agents for Eagle Trust (or more accurately as the appropriate organ of Eagle Trust) and the result is to constitute Eagle Trust, but not themselves, shadow directors of the company."

This passage indicates that the "without more" requirement that Millett J had in mind would not be satisfied by evidence that the individual director of the body corporate was actually giving instructions in that capacity to the subject company and the subject company was accustomed to act in accordance with those directions. That would not be enough to prove that the individual director assumed a role in the management of the subject company which imposed responsibility on him for misuse of the subject company's assets.

41.     The facts of this case do not precisely match those in *Hydrodam*. But I think, with respect, that Rimer LJ put his finger on the way the question in this case should be answered. In para 67 of his judgment he referred to the "principle" that emerges from Millett J's judgment. In para 70 he said that the proposition that Evans-Lombe J set out in para 30(iii) of his judgment in *Secretary of State for*

*Trade and Industry v Hall* [2009] BCC 190 was "wrong in principle". He rejected the argument that the mere fact that an individual has been acting as a director of the corporate director can, or may, result in his also becoming a director of the subject company. In para 68 he expressed the principle that he had in mind in these words:

"The relevant act in relation to the affairs of the subject company is an act directed by the corporate director, not one directed by the latter company's individual board members. That may be regarded as a distinction of some technicality. But so long as we have a system of company law which recognises the difference between a company and its directors, it is a distinction which must be recognised and respected."

42.      This was, I think, the point that Mr Knox was seeking to make when he referred to the speeches in *Salomon v A Salomon & Co Ltd* [1897] AC 22. As Lord Davey said at p 54, the intention of the legislature must be collected from the language of its enactments. One can properly say, as Lord Macnaghten did about the company and its subscribers at p 51, that a company is at law a different person from its directors and that it is the intention of the enactment that this distinction should be recognised. I do not think that one can overcome this distinction by pointing, as Mr Green seeks to do, simply to the quality of the acts done by the director and asking whether he was the guiding spirit of the subject company or had a real influence over its affairs. As a test, that would create far too much uncertainty. Those who act as directors of a corporate director are entitled to know what it is that they can and cannot do when they are procuring acts by the corporate director. That is as true of a case such as this, where the affairs of the corporate director are effectively in the hands of one individual, as it is where there is a board comprised of several directors who always act collectively. As Lord Collins says (see paras 53 and 95, below), the question is one of law and it is a question of principle. I think that the guiding principle can be expressed in this way, unless and until Parliament provides otherwise. So long as the relevant acts are done by the individual entirely within the ambit of the discharge of his duties and responsibilities as a director of the corporate director, it is to that capacity that his acts must be attributed.

43.      It is, of course, right to bear in mind the interests of the creditors. Their protection lies in the remedies that are available for breach of the fiduciary duty that rests on the shoulder of every director. But the essential point, which Millett J was at pains to stress in *Hydrodam*, is that for a creditor of the subject company to obtain those remedies the individual must be shown to have been a director, not just of the corporate director but of the subject company too. I agree with Rimer LJ that, on the facts accepted by the deputy judge, it has not been shown that Mr

Holland was acting as de facto director of the composite companies so as to make him responsible for the misuse of their assets. I also agree with the reasons that Lord Collins gives for reaching this conclusion.

*The other issues*

44. On the view that I take on the first issue, the points raised about the extent of the liability do not require to be decided. But I would offer these brief comments on some of them, as these points were fully and carefully argued by counsel on both sides.

45. First, there is the question whether the liability for the payment of unlawful dividends is strict or depends on a degree of fault being established. There are two lines of authority on this issue. On the one hand there are cases in which it has been said without qualification that directors are under a duty not to cause an unlawful and ultra vires payment of a dividend: *Re Exchange Banking Co, Flitcroft's Case* (1882) 21 Ch D 519; *Re Lands Allotment Co* [1894] 1 Ch 616 at 638; *Selangor United Rubber Estates Ltd v Cradock (No 3)* [1968] 1 WLR 1555 at 1575; *Belmont Finance Corpn v Williams Furniture Ltd (No 2)* [1980] 1 All ER 393 at 404; *Re Loquitur Ltd* [2003] EWHC 999 (Ch); [2003] 2 BCLC 442 at 471- 472. On the other there is a line of authority to the effect that a director is only liable if he makes a misapplication of a company's assets if he knew or ought reasonably to have known that it was a misapplication: *Re County Marine Insurance Co (Rance's Case)* (1870) LR 6 Ch App 104 at 118; *Re Kingston Cotton Mill Co (No 2)* [1896] 1 Ch 331 at 345-348; *Dovey v Cory* [1901] AC 477 at 489- 490; *Re City Equitable Fire Insurance Co Ltd* [1925] Ch 407, per Romer J at 426.

46. The trend of modern authority supports the view that a director who causes a misapplication of a company's assets is in principle strictly liable to make good the misapplication, subject to his right to make good, if he can, a claim to relief under section 727 CA 1985. The authorities that favour the contrary view really come to an end with *Dovey v Cory* [1901] AC 477, as the later judgment of Romer J in *Re City Equitable Fire Insurance Co Ltd* [1925] Ch 407 can be read, at least in relation to dividends, as supporting strict liability. Furthermore, the whole point of introducing the right to claim relief under section 727 was to enable the court to mitigate the potentially harsh effect of being held strictly liable. That relief was introduced by section 32 of the Companies Act 1907, so it was not available when most of the cases in this line of authority were being decided.

47. It is not necessary to express a definite view on this issue in this case. As counsel for HMRC pointed out in their written case, there has been no challenge to the finding by the deputy judge that as from 18 August 2004 all the dividends were

unlawful, and it is accepted that the relief available by way of a defence under section 727 CA 1985 would have been available if Mr Holland could show that he acted reasonably. So the issue is academic here, and it was no doubt for this reason that it was not thought to be necessary to develop the point fully in oral argument. But the better view seems to me that in cases such as this, where it is accepted that the payment of dividends was unlawful, a director who causes their payment is strictly liable, subject of course to his right to claim relief under the statute.

48.    Then there is the question whether the correct remedy for any breach of the duties of a director not to make unlawful payments of dividends is damages or equitable compensation for the net loss sustained by the company, or restitution or restoration of the amount of the unlawful dividends without any inquiry into the loss sustained. The deputy judge held that the established remedy was to require the director to reinstate the amount of the payment without any inquiry as to the loss suffered by the company as a result of the breach of duty: para 218. But he declined to make an order in these terms. What he did, having refused relief under section 727 CA 1985 for this period as he held that Mr Holland had not acted reasonably in paying the dividend without taking all appropriate advice and properly informing himself, was to order him to pay the amount of HRCT that the companies had not provided for in the period of trading from 23 August 2004. He said that he was doing this in the exercise of his discretion under section 212 IA 1986: para 274.

49.    I agree with the Court of Appeal that the obligation is to restore the moneys wrongfully paid out. This, as the deputy judge accepted, is the established remedy. Where dividends have been paid unlawfully, the directors' obligation is to account to the company for the full amount of those dividends: see *Bairstow v Queens Moat Houses plc* [2001] EWCA Civ 712, [2001] 2 BCLC 531, para 54, per Robert Walker LJ. But there is a discretion under section 212 IA 1986 that it is open to the judge to exercise. This is indicated by the use of the word "may" in subsection (3). Rimer LJ said that the judge's order should have reflected the wrong that had actually been committed and the fact that he had refused relief under section 727 CA 1985 in respect of it. Elias LJ, paras 133-134, and Ward LJ, para 143, disagreed. In their view it was open to the deputy judge to limit the amount that Mr Holland should pay to what HMRC had lost from his unlawful conduct. Had it been necessary to reach a view on this point, I would have agreed with the majority. HMRC is the only creditor. There is no evidence that anyone would have been disadvantaged by limiting the liability in this way. It would have been a different matter if the deputy judge had misdirected himself as to the extent of the obligation. That plainly is not so. As he made clear in para 274 of his judgment, he proceeded on the basis that, while restoration is the established remedy, he had a discretion under section 212 IA 1986 to limit the award to what was required to make up the deficiency of a particular creditor where the claim was made by a party other than the liquidator. In my opinion it was open to him to exercise his

discretion in this way, and I do not think that he can be faulted for doing so in this case.

50.     Lastly, there are the questions about relief under section 727 CA 1985. There are two points. First, there is the decision by the deputy judge that Mr Holland was entitled to a few days grace after the events of 18 August 2004 to enable him to take stock.  Rimer LJ thought the deputy judge was in error in giving Mr Holland this grace period: para 88. He said that Mr Holland had not conducted himself so as to deserve it and that there was no factual basis for the decision. Here too Elias LJ, para 128, and Ward LJ, para 138, disagreed. Elias LJ said that there was evidence justifying the deputy judge's analysis. I respectfully agree with the majority on this point too. It seems to me that the judge provided a sufficient explanation for his decision in paras 269-270, and that his was a decision with which an appellate court could not properly interfere.

51.     The second question is whether, as Mr Knox submitted, the judge should have gone further and relieved Mr Holland from the obligation to pay anything at all. He suggested that account should have been taken of the fact that, as he put it, the course taken by Mr Holland was the least bad of all the alternatives. I do not see how, on the facts found by the deputy judge, this argument can be supported. He found that Mr Holland acted unreasonably because he did not take appropriate advice or inform himself as to the merits of what he was doing. But there is a more fundamental point. Mr Knox submitted that the discretion under section 212 was wide enough to allow the court to reduce the award to nil even if it declined relief under section 727 CA 1985. I agree with Rimer LJ that the discretion under section 212(3), which is essentially procedural in nature, is a discretion as to amount only once liability has been established. It is not so wide as to allow the judge, having determined that the section applies, to decline to make any order at all: paras 108-110. The discretion which he is given by section 212(3) is as to the order that would be appropriate once liability has been established, not to grant relief against liability. It is a discretion as to how much the director should be ordered to pay, so as to do what is just in all the circumstances: *Re Loquitur Ltd* [2003] 2 BCLC 442, per Etherton J at para 245.  The deputy judge was right to reject this argument.

*Conclusion*

52.     As I agree with the Court of Appeal that it has not been shown that when he was directing payment by the composite companies of the unlawful dividends Mr Holland was acting as their de facto director, I would dismiss the appeal.

## LORD COLLINS

### Introduction

53.    I agree with Lord Hope that the appeal should be dismissed, and write to set out my own approach on the main issue. In my judgment what divides this court is not simply a matter of appreciation of the facts, namely whether what Mr Holland did in fact was sufficient to make him a de facto director of the composite companies, but a question of law and a question of principle. The question is whether fiduciary duties can be imposed, in relation to a company whose sole director is a corporate director, on a director of that corporate director when all of his relevant acts were done as a director of the corporate director and can be attributed in law solely to the activities of the corporate director.

54.    My reasons will require some elaboration, particularly because they involve examination of older case law which was not cited in argument, but can be summarised in this way. Mr Holland is sought to be made liable for breach of fiduciary duty as a de facto director of the composite companies. For almost 150 years de facto directors in English law were persons who had been appointed as directors, but whose appointment was defective, or had come to an end, but who acted or continued to act as directors. There was a striking judicial innovation in *Re Lo-Line Electric Motors Ltd* [1988] Ch 477 and *Re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180 (endorsed by the Court of Appeal in *Re Kaytech International plc* [1999] 2 BCLC 351) by which (at the risk of over-simplification) persons who were held to be part of the corporate governance of a company, even though not directors, could be treated as directors for the purposes of statutory provisions relating to such matters as wrongful trading by, and disqualification of, directors. To extend that line of authority so as to impose fiduciary duties on Mr Holland in relation to the composite companies, when all of his acts can be attributed in law solely to the activities of Paycheck Directors would be an unjustifiable judicial extension of the concept of de facto director, and best left to the legislature, given that it was as recently as 2006 that it intervened to require that at least one director of a company be a natural person: Companies Act 2006, section 155(1).

55.    The issue is whether Mr Holland can be made liable, pursuant to the Insolvency Act 1986, section 212 (as amended), to account for the funds paid out by the insolvent composite companies on the basis that they have been misapplied by him, or he is accountable for them, or has been guilty of misfeasance or breach of any fiduciary or other duty in relation to the funds. It is common ground that (a) a de facto director is covered by section 212; (b) "shadow" directors (i.e. "a person in accordance with whose directions or instructions the directors of the company are accustomed to act": Companies Act 1985, section 741(2); Companies Act 2006, section 251(1)) are not within section 212; and (c) section 212 is a

procedural provision which does not create any substantive obligations, and consequently for a person to be made liable under section 212, that person must be guilty of breach of an independent duty: *Re Canadian Land Reclaiming and Colonising Co, Coventry and Dixon's case* (1880) 14 Ch D 660; *Re City Equitable Fire Insurance Co Ltd* [1925] Ch 407.

56.    In this case the basis of the relevant independent duty is significant. The only basis on which liability is sought to be placed on Mr Holland is that as a de facto director of the composite companies he was in breach of his fiduciary duty not to misapply their funds by paying unlawful dividends. Directors are accountable for breach of fiduciary duty to a company for unlawful distributions paid in contravention of what is now the Companies Act 2006, section 830: see eg *Bairstow v Queens Moat Houses plc* [2001] EWCA Civ 712, [2001] 2 BCLC 531. In *Re Exchange Banking Co, Flitcroft's Case* (1882) 21 Ch D 519 the liquidator of an insolvent banking company issued a summons against five former directors who had been concerned in paying dividends at a time when they knew the company had no distributable profits. The Court of Appeal held the directors jointly and severally liable for the amount of the dividends. The principle was put by Sir George Jessel MR (at p 534): "It follows then that if directors who are quasi trustees for the company improperly pay away the assets to the shareholders, they are liable to replace them." It is not suggested that (in the absence of dishonesty) persons who facilitate the payment of unlawful dividends are responsible for knowing assistance in a breach of trust.

57.    In my judgment the decision of the House of Lords in *Standard Chartered Bank v Pakistan National Shipping Corpn* [2002] UKHL 43; [2003] 1 AC 959, is of no assistance in the solution of the problem raised on this appeal. The basis of that decision is that a director who makes fraudulent representations is liable in deceit irrespective of whether he makes the representations on behalf of a company. The decision of the Court of Appeal, which was reversed by the House of Lords and which had held that he was not liable because he had been acting on behalf of the company, was plainly wrong (although I used more diplomatic language in *Daido Asia Japan Co Ltd v Rothen* [2002] BCC 589). But in the present case there can be no suggestion that Mr Holland is not responsible because the corporate director is responsible. He will be responsible if what he did was unlawful. The question, to which it is now necessary to turn, is whether he was himself in breach of duty.

### The development of the law relating to de facto directors

### *Validity of acts of de facto directors*

58.    Most of the early cases are about the validity of the acts of de facto directors, but they are relevant to the question of principle, namely what makes a person a de facto director. The first mention in the case law of de facto directors appears to have been in *Mangles v Grand Collier Dock Co* (1840) 10 Simons 519, a case involving the formation of a dock company by private Act of Parliament. Sir Lancelot Shadwell V-C said (at p 535) that the Act assumed that persons by whom a call was made had to be directors de facto, and that all that Parliament meant was that, if the call were made by persons appearing to be directors, it should not be necessary to prove their appointment. The first full discussion of the de facto director was in the famous case of *Foss v Harbottle* (1843) 2 Hare 461, which was of course concerned with the right of shareholders in a company incorporated by Act of Parliament to sue for wrongs alleged to have been done to the company, a matter which has no relevance to the present appeal. The shareholders claimed that the extinction of the board of directors by the bankruptcy and consequent disqualification of three of them, and the want of any clerk or officer, effectually prevented the due convening of a general meeting of shareholders competent to secure the remaining property of the company, and provide for its due application. That argument was rejected on the basis that the continued existence of a board of directors de facto must be intended; and that the possibility of convening a general meeting of shareholders capable of controlling the acts of the existing board was not excluded by the allegations of the bill; that in such circumstances there was nothing to prevent the company from obtaining redress in its corporate character in respect of the matters complained of. Sir James Wigram V-C held that shareholders could serve a notice requiring an extraordinary general meeting at the place where "the board of directors de facto, whether qualified or not, carry on the business of the company at a given place…" (at p 496). He said (at p 498):

> "Whatever the bill may say of the *illegal* constitution of the board of directors, because the individual directors are not duly qualified, it does not anywhere suggest that there has not been during the whole period, and that there was not when the bill was filed, a board of directors de facto, acting in and carrying on the affairs of the corporation, and whose acting must have been acquiesced in by the body of proprietors; at least, ever since the illegal constitution of the board of directors became known, and the acts in question were discovered. But if there has been or is a board de facto, their acts may be valid, although the persons so acting may not have been duly qualified."

59.    The concept of de facto directors is used in that case to validate acts which might otherwise have been invalid, and most of the early cases are not only about persons who purported to be directors but whose appointment was defective, but they are also mainly concerned with whether the acts of those persons were legally

valid or effective. Several of the cases are also applications of the principle in the Companies Acts or in articles of association that notwithstanding that it might be afterwards discovered that there was some defect or error in the appointment of the directors, any acts of those directors were to be valid: see from the Companies Clauses Consolidation Act 1845, section 99, and the Joint Stock Companies Act 1856, Sched, Table B, reg 60, through to the Companies Act 2006, section 161, and the Companies (Tables A to F) Regulations 1985 (SI 1985/805), Table A, reg 92.

60.     The question in *Re County Life Assurance Co* (1870) LR 5 Ch App 288 was whether a claim under a policy could be admitted in the liquidation of an insurance company. The directors who were named in the articles, and signed the memorandum of association, refused to act and passed a resolution that the company should not carry on business or allot shares. Notwithstanding this resolution, Mr Preston, the promoter of the company, and one of the shareholders carried on business and allotted shares and appointed directors. A stranger effected a policy at the company's office which was signed by three of the de facto directors, and sealed with what purported to be the seal of the company. It was held to be binding because, per Sir GM Giffard LJ (at p 293)

> "The company is bound by what takes place in the usual course of business with a third party where that third party deals bona fide with persons who may be termed de facto directors, and who might, so far as he could tell, have been directors de jure."

61.     In *Murray v Bush* (1873) LR 6 HL 37, the first of three decisions of the House of Lords dealing with de facto directors, the question concerned the validity of a share transfer and whether the purported transferee was a contributory. Its articles of association required (inter alia) that the directors at a board meeting had to certify their approval of the proposed transferee. Bush was a shareholder and a director. The articles also required directors to have a share qualification. The transfer was approved at a board meeting, but it was claimed that three of the directors were not duly appointed because they had not executed a deed binding themselves to obey the regulations of the company. The Joint Stock Companies Act 1844, section 30, provided that notwithstanding that it might be afterwards discovered that there was some defect or error in the appointment of the directors, any acts of those directors were to be valid. The House of Lords was equally divided on the outcome of the appeal (which was from a decision of Lord Hatherley LC, who also sat on the appeal) and therefore the appeal was dismissed. Lord Cairns and Lord Hatherley decided that the transfer was to be treated as valid because of section 30 and because the company itself had approved the transfer. Lord Hatherley (at pp 76-77) referred to directors to whom section 30 applied as directors de facto. This case concerned persons who acted in all respects as if they were directors.

62.   In the second decision of the House of Lords, *Mahony v East Holyford Mining Co Ltd* (1875) LR 7 HL 869, it was held that bankers who held funds of a company could lawfully honour the cheques of the directors without being bound to inquire whether the persons pretending to sign as directors had been duly appointed in conformity with the provisions of the memorandum and articles of association. The persons purporting to act as directors had not been appointed, as required by the articles, by the subscribers to the memorandum. Lord Cairns LC, Lord Hatherley and Lord Penzance considered that the case was covered by the normal validating provision in the articles that acts done by the board or by a committee of directors should, notwithstanding that it be afterwards discovered that there was some defect in the appointment be as valid as if every such person had been duly appointed, and was qualified to be a director.

63.   Lord Cairns said (at p 888) that the House of Lords:

"should now hold that there having been de facto directors of the company, who were suffered and permitted by the majority of those who signed the articles of association to occupy the position of and act as directors, and the bankers having, in the full belief that these persons were directors, as they were represented to be, honoured the cheques drawn by them, the payment of these cheques is an answer to the action of the liquidator of the company…"

64.   Lord Penzance said (at pp 900-901):

"In the present case, from the time when the East Holyford Mining Company came into existence, that is after the registration of the memorandum and articles of association, three persons usurped the position of directors (I say 'usurped', because they do not seem to have been regularly appointed) and another person usurped the office of secretary. This they did in the face of the subscribers to and shareholders in the company, as well as of persons dealing with the company; and both before the company was legally formed, and after it was formed, they publicly advertised themselves in the prospectus as directors and secretary respectively. They occupied the offices designated in the prospectus and they opened an account with the bank therein named. During the six months following they assumed, to the exclusion of all others, the executive functions of the company; no subscribers, nor shareholders, nor strangers dealt with any one else, and no one questioned their authority. Therefore, during the whole of the time that this company was acting as a company, these individuals were ostensibly directors and secretary respectively, and they were the de facto directors and secretary…. It