# EXHIBIT 16
# PART 2

seems to me, therefore, my Lords, that we have here the case of three individuals being de facto directors, and one being de facto secretary."

65.     Slade J, in *Rama Corpn Ltd v Proved Tin and General Investments Ltd* [1952] 2 QB 147, considered that the point in *Mahony* was whether the bank was entitled to treat the persons who were described in the mandate as directors. They were directors de facto, and whether they were directors de jure depended on whether the provisions in the articles relating to the appointment of directors had been complied with. This was a matter of internal management into which the bank was not bound to inquire: *Royal British Bank v Turquand* (1856) 6 E & B 327. In *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* [1964] 2 QB 480, 507, Diplock LJ said that the basis of the decision in *Mahony* was that the conduct of those who were entitled to appoint the directors was relied on as a representation that they had been appointed.

66.     The issue in *John Morley Building Co v Barras* [1891] 2 Ch 386 was whether an action was properly brought by de facto directors on behalf of the company to restrain the defendants from holding themselves out as directors. The persons who had brought the action were persons who had been appointed directors by a document which had been signed by only seven of the subscribers instead of all of them. It claimed that because they were de facto directors under the articles at the first ordinary meeting after the registration of the company they retired from office after that as "vacating" directors, they continued in office until the ordinary meeting in the next year. It was held that the provision did not apply to persons who were only de facto directors. It applied only to those directors who had been validly appointed in pursuance of the articles. De facto directors did not derive any authority from that clause as against directors duly appointed. The defendants were validly appointed and the action was not properly brought.

67.     In *Channel Collieries Trust Ltd v Dover, St Margaret's and Martin Mill Light Railway Co* [1914] 2 Ch 506 the sole remaining director purported to fill vacancies on the board, even though there was no quorum. It was held that "their acts as de facto directors" were validated by the Companies Clauses Consolidation Act 1845, section 99. Swinfen Eady LJ approved (at pp 514-515) the way in which it was put in the then current edition of *Buckley on the Companies Acts* (9th ed) p 169 in relation to the equivalent provision in the Companies (Consolidation) Act 1908, section 74: "Endangering accuracy for the sake of brevity, it may be said that the effect of this section is that, as between the company and persons having no notice to the contrary, directors etc de facto are as good as directors etc de jure."

68.     The third decision of the House of Lords on de facto directors, *Morris v Kanssen* [1946] AC 459, was concerned with the validation provision in section 143 of the Companies Act 1929. It was held that the appointment of X as a director at a board meeting attended by A and B, and the allotment of shares to X, were not validated by the section in a case where A and B had falsely claimed that B had been duly appointed a director, and where A had ceased to be a director in accordance with the company's articles because no general meeting had been held in the relevant year. Lord Simonds said (at p 475) that there was no authority for the proposition that a director or de facto director could invoke the rule so as to validate a transaction which was in fact irregular and unauthorised. The decision raises difficulties which are not relevant on this appeal: see *Gower and Davies, Principles of Modern Company Law* (8th ed) (2008), para 7-15), and the Companies Act 2006, section 161.

69.     All of the cases discussed thus far concerned persons who actually acted as directors, and all are about the authority of de facto directors or the validity of their acts. There was an invalid appointment in all of them, except *Foss v Harbottle* (where there had been a valid appointment, but the directors had ceased to hold office), and in *Morris v Kanssen*, where two de facto directors were involved, one of whom had ceased to hold office and the other had been invalidly appointed.

### The liability of de facto directors

70.     The only cases touching on the liability of de facto directors before the modern developments in the law are *Gibson v Barton* (1875) LR 10 QB 329, *Re Canadian Land Reclaiming and Colonising Co, Coventry and Dixon's case* (1880) 14 Ch D 660, *Re New Par Consols Ltd* [1898] 1 QB 573, and *R v Lawson* [1905] 1 KB 541.

71.     Like the cases on the validity of directors' acts, both *Re Canadian Land Reclaiming and Colonising Co, Coventry and Dixon's case* and *Re New Par Consols Ltd* were about individuals who had been appointed directors: in the former case, the appointment of the two directors was defective, and in the latter case the defendant had ceased to be a director through an act of bankruptcy. Neither *Gibson v Barton* nor *R v Lawson* directly involved de facto directors. In each of those cases the question was whether a person who had acted as a manager of a company could be treated as a manager for the purposes, in the former case, of a predecessor of the Insolvency Act 1986, section 212 and in the latter case, of the Larceny Act 1861, even though he had not been appointed as such. *Gibson v Barton* deals obiter with the position of directors.

72.    *Gibson v Barton* (1875) LR 10 QB 329 is the first case in which the liability
of a de facto director is considered (but again in the context of a director whose
appointment is invalid), and the first case in which the analogy of executor de son
tort is employed. The issue was whether a penalty under the Companies Act 1862
for failure to file an annual return could be imposed under a section which imposed
the penalty on the company and on "every director and manager of the company
who shall knowingly and wilfully authorise or permit such default". The appellant
was held to have been rightly convicted because he had been permitted by the
board to manage the company generally, just as if he had been legally appointed to
act as manager. Blackburn J also dealt with the position of directors, but he also
was plainly thinking of a director whose appointment was defective, or, as he put
it, "illegally elected." He said (at pp 338-339):

"There are many instances in which a person who de facto exercises
an office cannot defend himself by saying, when he is called upon to
bear liability in consequence of his wrong, 'I am not rightfully in the
office, there is another man who may turn me out.' An executor de
son tort is an instance in which a man incurs all the liabilities of an
executor as to third persons, and he is not permitted to say, 'I am not
executor; there is another man who may take out probate.' The
answer is, 'Your liability as to a third person rests upon your being
executor de son tort; you have usurped the office and must bear the
liabilities.' … So, if a director were to set up in answer to a penalty
under section 27, that he was not a director, that he was illegally
elected, the answer would be, 'You have acted as director, and were
a director in your own wrong.' I think there was evidence to justify
the Lord Mayor in drawing the conclusion that the appellant was de
facto manager. No doubt the appellant is called secretary, but was he
a person to whom the whole management had been delegated,
probably improperly delegated, by the board of directors, and who
had taken upon himself to act as sole manager? He himself says in
the minutes, 'The secretary,' that is himself, 'reported that, in order
to comply with the requirement of the Joint Stock Companies Acts
he had called a general meeting of the shareholders,' &c. … That is
evidence upon which the Lord Mayor might find that he had taken
on himself the management of the company; he has of his own
authority done an act which was to be done only by the directors. So,
again, in the letter he tells the directors he will call a meeting. I do
not say he had power to call a meeting. I think he had not, but I think
that is evidence that he had assumed to act for the directors, and had
taken the management of the company on himself. The Lord Mayor
rightly drew the inference that the appellant was, by his own wrong,
manager of company."

73.     An executor de son tort is a person who has not been lawfully appointed executor or administrator who by reason of his intrusion upon the affairs of the deceased is treated for some purposes as having assumed the executorship: *Williams, Mortimer and Sunnucks, Executors, Administrators and Probate* (19th ed) (2008), para 8-16.

74.     The analogy with an executor de son tort was taken up in *Re Canadian Land Reclaiming and Colonising Co, Coventry and Dixon's case* (1880) 14 Ch D 660, which is the authority for the proposition that de facto directors are directors for the purposes of what is now the Insolvency Act 1986, section 212, but it too (like all of the older cases) is a case about persons who were appointed as, and acted as, directors, but whose appointment was defective. Coventry and Dixon were appointed, and for some time acted, as directors of a company in which the qualification for a director was the holding of a hundred shares. Neither of them was the holder of any shares. In the course of the winding up the liquidator applied under section 165 of the Companies Act 1862 (a predecessor of the Insolvency Act 1986, section 212) to charge them for misfeasance in acting as directors without qualification.

75.     In the Court of Appeal it was held, reversing the judgment of Sir George Jessel MR, that section 165 created no right and merely provided a summary mode of calling directors to account for acts of impropriety, and that to make a person liable under it he must be shown to have been guilty of some misconduct by which the company had suffered loss. But there was no disagreement on the concept of de facto directors.

76.     Sir George Jessel MR, in a passage which was not affected by the reversal of his decision, said (at pp 664-665):

"No doubt they were not properly elected, and were, therefore, not de jure directors of the company; but that they were de facto directors of the company is equally beyond all question. The point I have to consider is whether the person who acts as de facto director is a director within the meaning of this section, or whether he can afterwards be allowed to deny that he was a director within the meaning of this section. I think he cannot. We are familiar in the law with a great number of cases in which a man who assumes a position cannot be allowed to deny in a court of justice that he really was entitled to occupy that position. The most familiar instance is that of executor de son tort. In like manner, it seems to me, in an application under this section, the de facto director is a director for the purposes of this section."

77.    James LJ said (at p 670):

"It was admitted by the appellants that these persons, as de facto directors, would be liable for any act of commission or any omission on their part in the same manner and to the same extent as if they had been de jure as well as de facto directors. They were, so to say, directors de son tort, and liable in that character, but not otherwise, and you must shew something that they did which resulted in loss to the company, and for which, if they had been duly appointed directors of the company, the company would have been entitled to a remedy against them."

78.    Bramwell LJ said (at p 673):

"If he has done anything wrong as a de facto director, no doubt he can be got at under the clause."

79.    In *Re Western Counties Steam Bakeries and Milling Co* [1897] 1 Ch 617, 630, AL Smith LJ said in a phrase which is the only one in the older cases to foreshadow the modern development of the law: "When examined, *Coventry and Dixon's case* is only the case of *Gibson v Barton* over again. I agree that doing the work of a director may make a person a de facto director …"

80.    In *Re New Par Consols Ltd* [1898] 1 QB 573 Mr Gregory was a director of the company, and continued to act as such until it was wound up on 14 August 1897. He was adjudicated bankrupt in October 1896, having committed an act of bankruptcy on 3 August 1896. The articles provided that the office of director be vacated if he became a bankrupt. The bankruptcy dated back to the act of bankruptcy in August 1896 and he took the point that he was not bound to submit a statement of affairs because he had ceased to be a director of the company more than one year before the winding up. It is hardly surprising that the argument was rejected. Lord Russell of Killowen CJ said (at p 576) that the object of the legislation (the Companies (Winding-up) Act 1890, section 7) was to get at the persons who had the information which the court required, and accordingly

"even if he had properly and legally ceased to be a director, but was de facto acting as a director within the prescribed period of a year, he was a director within the meaning of the section, and subject to the obligation to prepare and sign the accounts which are required by that section."

81.   *Gibson v Barton* was applied in *R v Lawson* [1905] 1 KB 541. The Larceny Act 1861, section 84, made it a misdemeanour for "any director, manager, or public officer of any body corporate or public company" to publish false statements with intent to deceive or defraud. It was held that it applied to a person who, without having been appointed an officer of the company, had in fact acted throughout as the manager of the affairs of the company.

## The modern law

82.   It seems that there is not a single case prior to the 1980s in which the term de facto director was applied to anyone other than one who had been appointed a director, but whose appointment was defective, or one who had been, but had ceased to be, a director. Consequently the extension of statutory provisions relating to disqualification of directors and wrongful trading by directors to persons who had not been appointed as directors but who took part in management was a judicial innovation, first fully articulated in *Re Lo-Line Electric Motors Ltd* [1988] Ch 477 by Sir Nicolas Browne-Wilkinson V-C.

83.   Prior to that decision, in *Re Eurostem Maritime Ltd* [1987] PCC 190, there was a disqualification application under the Companies Act 1985, section 300 (now the Company Directors Disqualification Act 1986, section 6). The application related to the respondent's association with seven companies. He was a director of four of them. Mervyn Davies J held that the respondent was actively concerned in the administration of all seven companies and that section 300 applied to de facto directors.

84.   The relevant facts in *Re Lo-Line Electric Motors Ltd* [1988] Ch 477 were that the respondent had been a director of company A; he resigned as a director but continued as production manager; after the sole remaining director had absconded to the United States, the respondent took over the running of the company, but was not appointed as a director; the respondent also acted as a director of company B, although he was never appointed as such. Sir Nicolas Browne-Wilkinson V-C held that for the purposes of a disqualification order under the 1985 Act, in considering whether a person was unfit to be a director, only his conduct "as director" was relevant, and that, as a matter of construction, "director" in section 300 included a person de facto acting as a director, though not appointed as such. It is apparent from the report of the argument that the respondent did not dispute that he had run the companies. The only argument relevant to the present case is that, relying on *Morris v Kanssen* [1946] AC 459, it was suggested that a de facto director was a director whose purported appointment was invalid, and not a person who had never been appointed. Sir Nicolas Browne-Wilkinson V-C rejected this argument:

"[Counsel for the respondent] sought to draw a distinction between two types of de facto director, viz (a) a person who has been appointed director, but invalidly and (b) a person who has never been appointed director at all. He submitted that if, contrary to his primary submission, section 300 of the Act of 1985 permitted regard to be paid to the conduct of a director who was invalidly appointed, the section did not extend to the conduct of a person who had never been appointed a director at all. He relied on *Morris v Kanssen* [1946] AC 459, 471, in which the House of Lords drew exactly that distinction in holding that the statutory predecessor of section 285 of the Act of 1985 (validation of acts of directors) did not validate the acts of a person who had never been appointed a director at all. I do not accept this submission. For the reasons I have given the plain intention of Parliament in section 300 was to have regard to the conduct of a person acting as a director, whether validly appointed, invalidly appointed, or just assuming to act as director without any appointment at all. In this context, there is no logic in drawing the distinction put forward by [counsel]. *Morris v Kanssen* was dealing with quite a different section which validated the acts of a director 'notwithstanding any defect that may afterwards be discovered in his appointment or qualification.' In that case, both the words of the section and the common sense of the matter pointed to the section being concerned only with the acts of a person who had been invalidly appointed a director." (At 490)

85.    The most discussed modern authority is *Re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180. Hydrodam had two corporate directors, which were companies incorporated in the Channel Islands. It was a subsidiary of Eagle Trust plc. The liquidator commenced proceedings against Eagle Trust plc (the ultimate parent company of Hydrodam through two other subsidiaries) and all of Eagle Trust's directors, alleging that they were liable as de facto or shadow directors of Hydrodam under the Insolvency Act 1986, section 214, for wrongful trading. The decision concerned an application by two of the directors to strike out the proceedings. It was alleged that as directors of Eagle Trust they were, with the other directors, collectively responsible for the conduct of Eagle Trust in relation to Hydrodam. The proceedings were struck out because the liquidator had neither pleaded nor adduced evidence to support any allegation that either of the respondents was a director of Hydrodam.

86.    Millett J accepted that the liability for wrongful trading imposed by section 214 extended to de facto directors as well as to de jure and shadow directors. Millett J said (at p 183):

"A de facto director is a person who assumes to act as a director. He is held out as a director by the company, and claims and purports to be a director, although never actually or validly appointed as such. To establish that a person was a de facto director of a company it is necessary to plead and prove that he undertook functions in relation to the company which could properly be discharged only by a director. It is not sufficient to show that he was concerned in the management of the company's affairs or undertook tasks in relation to its business which can properly be performed by a manager below board level.

A de facto director, I repeat, is one who claims to act and purports to act as a director, although not validly appointed as such."

87.     Millett J, in a much debated passage, dealt with the question whether the directors of a corporate director of a company must ipso facto be what he described as shadow directors (by which he probably also meant to include de facto directors) of the company. His answer was (at p 184):

"Attendance of board meetings and voting, with others, may in certain limited circumstances expose a director to personal liability to the company of which he is a director or its creditors. But it does not, without more, constitute him a director of any company of which his company is a director."

88.     On the facts Millett J held that the liquidator had neither pleaded nor adduced evidence that either of the directors was a director of Hydrodam. As regards one of them, Dr Hardwick, he had never acted as a director, and as regards the other, Mr Thomas, it was not alleged that he acted in any way in relation to the company's affairs.

89.     Since the decision in *Re Hydrodam* there have been many decisions on de facto directors, most of which have been in disqualification cases at first instance. Many of the cases have involved a textual analysis of Millett J's judgment (which was, according to the report, a reserved judgment delivered on the day following the oral hearing). The most notable developments have been in *Re Richborough Furniture Ltd* [1996] 1 BCLC 507 (Timothy Lloyd QC), and *Secretary of State for Trade and Industry v Tjolle* [1998] 1 BCLC 333 (Jacob J), and in the decision of the Court of Appeal in *Re Kaytech International plc* [1999] 2 BCLC 351, which contains a valuable analysis by Robert Walker LJ.

90.     The decisions have treated *Re Hydrodam* as a starting point. But although in *Re Hydrodam* Millett J used expressions such as "held out as a director" and "claims and purports to be a director", it has been held that although these were relevant factors, they were not necessary factors, and he could not have meant that the label "director" had to have been attached to the person or that he be held out as a director: *Re Moorgate Metals Ltd* [1995] BCC 143 (Warner J); *Re Richborough Furniture Ltd* [1996] 1 BCLC 507 (Timothy Lloyd QC); cf *Secretary of State for Trade and Industry v Tjolle* [1998] 1 BCLC 333, 343.

91.     Once the concept of de facto director was divorced from the unlawful holding of office, there were two consequences. The first consequence was that the distinction between de facto directors and shadow directors was eroded. A shadow director is "a person in accordance with whose directions or instructions the directors of the company are accustomed to act": Companies Act 1985, section 741(2); Companies Act 2006, section 251(1). In *Re Hydrodam* [1994] 2 BCLC 180, 183, Millett J said that de facto and shadow directorship "do not overlap. They are alternatives and in most and perhaps all cases are mutually exclusive." But the distinction was impossible to maintain with the extension of the concept of de facto directorship and the consideration of such matters as the taking of major decisions by the individual, which might be through instructions to the de jure directors, and the evaluation of his real influence in the affairs of the company: see *Re Kaytech International plc* [1999] 2 BCLC 351, 424, per Robert Walker LJ. The second consequence is that the courts were confronted with the very difficult problem of identifying what functions were in essence the sole responsibility of a director or board of directors. A number of tests have been suggested of which the following are the most relevant. First, whether the person was the sole person directing the affairs of the company (or acting with others equally lacking in a valid appointment), or if there were others who were true directors, whether he was acting on an equal footing with the others in directing its affairs: *Re Richborough Furniture Ltd.* Second, whether there was a holding out by the company of the individual as a director, and whether the individual used the title: *Secretary of State for Trade and Industry v Tjolle.* Third, taking all the circumstances into account, whether the individual was part of "the corporate governing structure": *Secretary of State for Trade and Industry v Tjolle*, at pp 343-344, approved in *Re Kaytech International plc* [1999] 2 BCLC 351, 423, where Robert Walker LJ also approved the way in which Jacob J in *Tjolle* had declined to formulate a single test. He also said that the concepts of shadow director and de facto director had in common "that an individual who was not a de jure director is alleged to have exercised real influence (otherwise than as a professional adviser) in the corporate governance of a company" (at p 424). See also especially *Re Mea Corpn Ltd* [2006] EWHC 1846 (Ch), [2007] 1 BCLC 618 (Lewison J); *Ultraframe (UK) Ltd v Fielding (No 2)* [2005] EWHC 1638 (Ch) (Lewison J); *Secretary of State for Trade and Industry v Hollier* [2006] EWHC 1804 (Ch), [2007] BCC 11 (Etherton J). In fact it is just as difficult to define "corporate governance" as it is to identify those activities which are essentially the sole responsibility of a director or

board of directors, although perhaps the most quoted definition is that of the Cadbury Report: "Corporate governance is the system by which businesses are directed and controlled" (Report of the Committee on the Financial Aspects of Corporate Governance, 1992, para.2.5).

92.    Other common law jurisdictions have had to deal with similar problems, and they have also imposed liabilities not only on irregularly appointed directors or persons who, without being appointed as directors, have been held out as directors, but also on persons who perform the functions of directors with any appointment, irregular or otherwise, and without any holding out: for Australia see the Corporations Act 2001, section 9, and eg *Gebo Investments (Labuan) Ltd v Signatory Investments Pty Ltd* [2005] NSWSC 544; *Chameleon Mining NL v Murchison Metals Ltd* [2010] FCA 1129; for Canada, contrast *Wheeliker v Canada* (1999) 172 DLR (4th) 708, at [19] (Fed CA) (remedies available against persons "who act as directors or who are held out by the company as directors although they lack the required qualification or authority") with *Scavuzzo v The Queen* [2006] 2 CTC 2429, at para 32 ("a person must have some semblance of qualification as director and must hold himself … out as a director"); in the United States de facto director still connotes a person who, without being a director, claims to be one (eg *Osler Institute Inc v Forde*, 333 F 3d 832 (7th Cir 2003)), but the courts impose fiduciary duties on other persons who, without being directors, are "control persons" (eg *Re Parmalat Securities Litigation*, 684 F Supp 2d 453, 475-476 (SDNY 2010)).

93.    It does not follow that "de facto director" must be given the same meaning in all of the different contexts in which a "director" may be liable. It seems to me that in the present context of the fiduciary duty of a director not to dispose wrongfully of the company's assets, the crucial question is whether the person assumed the duties of a director. Both Sir Nicolas Browne-Wilkinson V-C in *Re Lo-Line* (at p 490) and Millett J in *Re Hydrodam* (at p 183) referred to the assumption of office as a mark of a de facto director. In *Fayers Legal Services Ltd v Day*, (unreported) 11 April 2001, a case relating to breach of fiduciary duty, Patten J, rejecting a claim that the defendant was a de facto director of the company and had been in breach of fiduciary duty, said that in order to make him liable for misfeasance as a de facto director the person must be part of the corporate governing structure, and the claimants had to prove that he assumed a role in the company sufficient to impose on him a fiduciary duty to the company and to make him responsible for the misuse of its assets. It seems to me that that is the correct formulation in a case of the present kind. See also *Primlake Ltd v Matthews Associates* [2006] EWHC 1227 (Ch), [2007] 1 BCLC 666, at para 284.

**Conclusion**

94.    It follows that I do not consider that the answer to the question on this appeal lies in considering what Millett J meant by the words "without more," and then attempting to catalogue what Mr Holland did. If the question is, as I believe, whether Mr Holland was part of the corporate governing structure of the composite companies and whether he assumed a role in those companies which imposed on him the fiduciary duties of a director, then I would answer that he was not.

95.    This is not simply a question of fact, since it raises the question of principle of the effects of acts done by a director of a corporate director in that capacity. The sole director of the composite companies was Paycheck Directors. From the time of the decision in *Re Bulawayo Market and Offices Co Ltd* [1907] 2 Ch 458 that a company could have a sole corporate director and its statutory recognition from the Companies Act 1929, sections 144 and 145, until the requirement in the Companies Act 2006, section 155(1), that a company have at least one director who is a natural person, the corporate structure of the type in this case was perfectly lawful.

96.    There is no material to suggest that Mr Holland was doing anything other than discharging his duties as the director of the corporate director of the composite companies. It does not follow from the fact that he was taking all the relevant decisions that he was part of the corporate governance of the composite companies or that he assumed fiduciary duties in respect of them. If he was a de facto director of the composite companies simply because he was the guiding mind behind their sole corporate director, then that would be so in the case of every company with a sole corporate director. The development of the law of de facto directors from *Re Lo-Line* and *Re Hydrodam* onwards was a significant judicial innovation given that for some 150 years de facto directors meant individuals who had actually been appointed, or purportedly appointed, as directors. As has been seen, in two of the three older cases which dealt with the liability of de facto directors, an analogy was drawn with executors de son tort: *Gibson v Barton* (1875) LR 10 QB 329 and *Re Canadian Land Reclaiming and Colonising Co, Coventry and Dixon's case* (1880) 14 Ch D 660. That suggests strongly that the basis of liability was the assumption of responsibility. The legislature has already intervened in the 2006 Act to ensure that there is a natural person to whom responsibility is attributed. The purpose of what became Companies Act 2006, section 155(1), was to ensure that every company would have at least one individual who could, if necessary, be held to account for the company's actions: Department of Trade and Industry, *Company Law Reform* (Cm 6456, 2005), para 3.3. For the court to hold that every significant decision of individual directors of a corporate director is to be regarded as being taken as if they were directors of the company of which it is the corporate director goes considerably beyond the law as it has been developed at first instance and by the Court of Appeal in the modern de

facto director cases, and beyond what I would regard as the function of the court. I would not wish to question the modern judicial development of the de facto director concept, and I well understand the policy reasons why in such a case as this a person in the position of Mr Holland should be liable, although those reasons may not be as powerful as they were prior to the enactment of the Companies Act 2006, section 155(1). The legislature could have intervened to require that all directors be natural persons, as under the Corporations Act 2001, section 201B (Australia), the Canada Business Corporations Act 1985, section 105(1)(c), the New York Business Corporation Law, section 701, and the Delaware General Corporate Law, section 141(b). But it did not, and in my judgment the proposed extension which is inherent in HMRC's case is a matter for the legislature and not for this court.

## LORD SAVILLE

97.     To my mind the appellant's case necessarily involves substantial inroads into the long established principle that although a company is an artificial entity and can only act through natural persons, it is to be treated as a legal personality separate and distinct from its directors and members.

98.     It is the case that Mr Holland was the guiding mind behind the sole corporate director of the composite companies. He was the natural person who decided that the composite companies should pay the dividends in question. But he did so in the course of directing the corporate director, not by acting or purporting to act as a director of the composite companies. In my judgment, it does not follow from the fact that Mr Holland caused the corporate director to make decisions in relation to the composite companies that he was accordingly a de facto director of the composite companies. To suggest that he was is to ignore or bypass the separate legal personality of the corporate director and instead to treat Mr Holland as though he, rather than the corporate director, was the legal personality running the composite companies.

99.     As Lord Collins has pointed out in paragraph 96 of his judgment, if this were the law, then in the case of every company with a sole corporate director, the natural person or persons who caused the corporate director to make decisions relating to the company would necessarily be de facto directors of that company. Such a state of affairs would lie awkwardly with the fact that in 2006 Parliament enacted that a company must have at least one director who is a natural person; hardly necessary if the natural person or persons who were the guiding minds behind the corporate director's decisions relating to the company were ipso facto to be treated as de facto directors of the company.

100.   I accordingly agree that for the reasons given by Lord Hope and Lord Collins, this appeal should be dismissed.


## LORD WALKER


101.   I am unable to agree with the reasoning and conclusions of the majority on the first issue in this appeal. The Court's decision will, I fear, make it easier for risk-averse individuals to use artificial corporate structures in order to insulate themselves against responsibility to an insolvent company's unsecured creditors.


102.   I gratefully adopt Lord Hope's summary of the relevant facts. I would add only that the specimen of the standard-form computer-generated document purporting to be a minute of a meeting of the board of directors of the composite company does not specify whether the dividend to be paid is an interim dividend or a final dividend.


103.   This last point is potentially of some importance because Article 8(b)(i) of the articles of each of the composite companies, part of which is set out in para 8 of Lord Hope's judgment, makes the payment of dividends a matter for the decision of the company in general meeting acting on the recommendation of the directors.   Article 8(b)(i)(ee) and (ff) provide as follows:

"(ee) when paying interim dividends, the Directors may make payments of interim dividends to one or more classes of Non-Voting Shares to the exclusion of one or more other classes of Non-Voting Shares on the same basis that final dividends may be paid by the Company to each class of Non-Voting Shares in accordance with the foregoing;

(ff) regulations 102 and 103 of Table A shall be read and construed accordingly with the foregoing provisions of this Article."


104.   Rather surprisingly, the question whether the dividends purportedly paid by the composite companies were interim or final dividends seems not to have been considered in the courts below. Nor was it raised in argument in this Court. It may have been assumed that every single dividend paid by any of the composite companies was an interim dividend payment of which was a decision for the corporate director alone. But for a company to pay an endless stream of interim dividends, with no final dividend ever recommended by the directors and approved by the company in general meeting, could not be a proper exercise of the powers

conferred by the article. That conclusion is reinforced by the opening words of article 8(b)(i) ("…such dividends payable on each such class of Shares in such amounts, at such frequency, at such times as, on the recommendation of the Directors, the holder of the A share shall, in General Meeting, resolve …").

105.   The holder of the A share in each of the composite companies was of course Paycheck Services Trustee Limited,  the directors and shareholders of which were Mr and Mrs Holland. Paycheck Services Trustee Limited held each A share on the trusts of a settlement made by Mr Holland. The beneficiaries were the other shareholders in the composite company in questions. Clause 3.1 of the form of settlement expressly provided for how the voting control conferred by the A share was to be exercised:

"In the exercise by the Trustees of their duties hereunder and of the voting rights attached to the 'A' share the Trustees shall act at all times in the best interests of the [relevant composite company] and the Members and the Company's employees."

*The authorities*

106.   In the courts below counsel for Mr Holland relied heavily on the decision of Millett J in *Re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180. That company ("Hydrodam") had two corporate directors, both incorporated in the Channel Islands. Millett J commented (p183):

"That fact alone may be sufficient to justify an inference that they were accustomed to act in accordance with the directions of others; in which case there were shadow directors of the company. But there is nothing pleaded in the points of claim to suggest that there were, in addition to the titular directors, any other persons who claimed to be directors of the company at all."

Millett J went on to explain in detail why the pleaded case was so deficient. Hydrodam's liquidator had made claims for wrongful trading against numerous respondents including two individuals who were (with six or seven co-directors) directors of Eagle Trust plc ("Eagle") of which Hydrodam was (at two removes) an indirect subsidiary. The pleaded case against the two individuals was that they were "collectively responsible" for decisions taken by Eagle in relation to Hydrodam. In that case, the judge said, it was Eagle, not two members of its fairly large board, who should be regarded as a shadow director: (at p 184) "but if all they have done is to act in their capacity as directors of the ultimate holding

company, in passing resolutions at board meetings, then in my judgment the holding company is the shadow director of the subsidiary, and they are not". To put the point another way, in the statutory definition of "shadow director", the context in which "person" is used does not permit the singular to include the plural.

107.  In striking out the defective pleading as against the two directors of Eagle, Millett J, was, if I may respectfully say so, obviously right. But he also made some general observations which have been much quoted and discussed, and not accepted without some qualification, in later cases. The key passage (at pp 182-183) is set out in para 29 of Lord Hope's judgment and I need not repeat it.

108.  Later authority, at first instance and in the Court of Appeal, has qualified some of Millett J's propositions and developed others. It is unnecessary to embark on a lengthy discussion of all the first-instance authorities. There are three main points of qualification. First, Millett J said that a de facto director "assumes" to act as such, is "held out" as such, and "claims and purports" to be a director. That is true of some of the early cases in which an apparently de jure director had been disqualified by failing to obtain the requisite share qualification, or by bankruptcy (see for instance the cases mentioned by Sir Nicolas Browne-Wilkinson V-C in *Re Lo-Line Electric Motors Ltd* [1988] Ch 477, 489-490). But it is not required in every case. The Vice-Chancellor's view (at p 490) was that:

> "The plain intention of Parliament in section 300 [of the Companies Act 1985, the predecessor of the Company Directors Disqualification Act 1986] was to have regard to the conduct of a person acting as a director, whether validly appointed, invalidly appointed, or just assuming to act as director without any appointment at all."

Here the context shows that "assuming" was used in a neutral sense, simply drawing attention to what the individual in question actually did. To the same effect are the observations of Etherton J in *Secretary of State for Trade* and *Industry v Hollier* [2006] EWHC 1804 (Ch); [2007] BCC 11, para 66 (but compare para 81(4)). This analysis is supported by the observations of Lewison J in *Re Mea Corpn Ltd* [2007] 1 BCLC 618, paras 83 and 84, citing Jacob J in *Secretary of State for Trade and Industry v Tjolle* [1998] 1 BCLC 333, 343-344. Lewison J said,

> "In considering whether a person 'assumes to act as a director' what is important is not what he calls himself, but what he did."

109. Secondly (though not directly relevant in this appeal), it is not necessary that a shadow director should be someone who "lurks in the shadows". He may do so, especially if he has a bad commercial reputation (or has actually been disqualified from acting as a director). But he may be the chief executive of a group of companies who openly gives directions to the board of a subsidiary company on which he does not sit. This point has been made by the Court of Appeal in *Re Kaytech International plc* [1999] 2 BCLC 351, 424 (Robert Walker LJ) and in *Secretary of State for Trade and Industry v Deverell* [2001] Ch 340, para 36 (Morritt LJ). Indeed, Millett J could be said to have recognised it himself in the example that he gave in a later paragraph in *Hydrodam* (at p 184 f).

110. Thirdly (following on from the first two points) it is not the case that the concepts of de facto director and shadow director are fundamentally different, and always, or nearly always, to be regarded as mutually exclusive categories. This point has been made in *Kaytech* at p 424. It was left open in *Deverell* at para 36 but in *Mea* Lewison J has taken *Deverell* as leading to the same conclusion (para 89):

"Now that Morritt LJ has explained that the role of a shadow director does not necessarily extend over the whole range of the company's activities, it seems to me that there is no conceptual difficulty in concluding that a person can be both a shadow director and a *de facto* director simultaneously … In each case, it is necessary to examine the facts, bearing in mind that, as Morritt LJ explained ([2001] Ch 340 at 354), the purpose of the legislation is to 'identify those, other than professional advisers, with real influence in the corporate affairs of the company."

111. Subject to these qualifications (which are in my opinion correct and necessary) *Hydrodam* still provides valuable guidance especially in emphasising (p 183) that

"to establish that a person was a de facto director of a company it is necessary to plead and prove that he undertook functions in relation to the company which could properly be discharged only by a director."

This essential feature has been further explained and developed in *Kaytech* at pp 423-424 (citing *Tjolle),* in *Hollier* at paras 66-81 and in *Mea* at paras 82-83.

*"Something more"*

112.   In *Hydrodam*, at p184, Millett J added some further observations to the passage already referred to:

> "Attendance of board meetings and voting, with others, may in certain limited circumstances expose a director to personal liability to the company of which he is a director or its creditors. But it does not, without more, constitute him a director of any company of which his company is a director."

The theme that "something more" is required has been repeated in later cases, including the judgment of Rimer LJ in this case, para 66. Rimer LJ did not take from Hydrodam (and I entirely agree)

> "that the requisite more would be satisfied merely by the active participation of the board member in the making of board decisions by the corporate director in relation to the actions of the subject company."

113.   In a section of his judgment headed "Mr Holland's case" (there is no parallel section considering the appellant's case) Lord Hope observes (para 41), "the facts of this case do not precisely match those of *Hydrodam*". That is, with respect, a considerable understatement. In *Hydrodam*, as already noted, each of the individuals in question was one of about eight persons who made up the board of directors of Eagle, of which Hydrodam was a sub-sub-subsidiary. The pleaded case was that the Eagle directors were "collectively responsible". Being a de facto director is a matter of what the individual himself does on his own initiative, not simply as part of a process of collective decision-making.

114.   Mr Holland was (with his professional advisers, who took their instructions from Mr Holland, and whose function was simply to give advice) the founder and guiding spirit of the whole Paycheck empire. With the concurrence of his wife (whose responsibilities were no more than secretarial) he was the only active director of both Paycheck Directors and Paycheck Secretarial; he was the original holder of all the A shares which carried voting control of the composite companies, and he was the only active director of the corporate trustee which held the A shares under settlements which he had created. He took the decision (after receiving the advice of leading counsel at the consultation on 18 August 2004) that composite companies should continue trading, and should continue to pay dividends without reserving for higher-rate corporation tax.

115. If those facts did not amount to the "something more" referred to in the authorities, it is hard to imagine circumstances that would do so. The repeated assertion that everything that Mr Holland did was done in his capacity as a director of Paycheck Directors, and was within his authority as a director of that company, is no doubt not "pure sham" but it is, in my view, the most arid formalism. In my view Mr Holland was acting both as a de jure director of Paycheck Directors and as a de facto director of the composite companies. A de facto director is not formally invested with office, but if what he actually does amounts to taking all important decisions affecting the relevant company, and seeing that they are carried out, he is acting as a director of that company. It makes no difference that he is also acting as the only active de jure director of a corporate director of the company.

116. I reach that conclusion without reference to the point, raised earlier in this judgment, about the status of the payments as interim dividends. The Court heard no argument on the point, and it would not be right to place any reliance on it. But Mr Holland's apparent disregard for the provisions of articles tailor-made for his own purposes makes his reliance on formalities even less convincing.

*The Standard Chartered case*

117. Mr Green QC, for HMRC, relied strongly on the decision of the House of Lords in *Standard Chartered Bank v Pakistan National Shipping Corpn (Nos 2 and 4)* [2002] UKHL 43; [2003] 1 AC 959. In that case Mr Mehra had made fraudulent misrepresentations on behalf of a company called Oakprime, of which he was a director. The Court of Appeal accepted the argument that he was not personally liable for deceit because he had been acting solely on behalf of Oakprime. The House of Lords trenchantly exposed the fallacy of this reasoning. The most important passages are paras 20-23 in the opinion of Lord Hoffmann and paras 35-41 in the opinion of Lord Rodger of Earlsferry.

118. These passages in their entirety call for careful study, but I will limit quotation to para 41 of Lord Rodger's opinion:

"The Court of Appeal sought support for their view that Mr Mehra should not be held personally liable in the speech of Lord Steyn in *Williams v Natural Life Health Foods Ltd* [1998] 1 WLR 830, 834-835. In truth it provides no such support. The issue in that case related to the personal liability of a director for a misleading projection, prepared in large part by him and issued by the company, as to the profits which the plaintiffs might earn by opening a health food shop under a franchise. Lord Steyn, with whom the other

members of the House concurred, said ([1998] 1 WLR 830, 835B-C):

'But in order to establish personal liability under the principle of *Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] AC 465, which requires the existence of a special relationship between plaintiff and tortfeasor, it is not sufficient that there should have been a special relationship with the principal. There must have been an assumption of responsibility such as to create a special relationship with the director or employee himself.'

Since the plaintiffs had failed to show a special relationship with the director himself, the House held that he was not liable. Lord Steyn was dealing with the tort of negligence where a claimant must establish that the defendant owed him a duty of care. There is no such requirement in the case of deceit. Liability for deceit is so self-evident that we do not consider it as resulting from a breach of duty (*Tony Weir*, *Tort Law* (2002), p 30). Mr Mehra set out by his fraudulent acts to make Standard Chartered pay under the letter of credit. He succeeded. He is accordingly personally liable for the loss which he thereby caused them."

119.   Mr Knox QC, for Mr Holland, summarily dismissed this case as irrelevant on the ground that it was a claim in deceit. So it was, and there has never been any pleading or finding of dishonesty against Mr Holland. Nevertheless there is to my mind a significant parallel between liability for deceit (which is in Lord Rodger's words "so self-evident that we do not consider it as resulting from a breach of duty") and the unqualified statutory prohibition in section 263 of the Companies Act 1985 on payment of a dividend otherwise than out of available profits. Contravention of this prohibition is a statutory wrong giving rise to strict liability, and anyone who is in a position to contravene it is likely to be in a fiduciary position (see further below). Mr Holland was the human cause of (and apart from his wife's secretarial assistance, the only human being who took any part in) the payment of unlawful dividends. They were, as Rimer LJ said (para 112) payments which should never have been made. Mr Holland is liable for the payments because he deliberately made them. His liability has nothing to do with limited liability of shareholders, or with *Salomon v A Salomon & Co Ltd* [1897] AC 22.

120.   I have carefully considered the judgment of Lord Collins. It contains a very full analysis of the early cases and the development of the law relating to de facto directors. It notes that *Re Lo-Line Electric Motors Ltd* [1988] Ch 477 was a striking judicial innovation. But its innovation has been followed and developed in many decisions at first instance and in the Court of Appeal.

121. I agree with Lord Collins that section 212 is procedural in nature, and that for liability to arise under the section, a breach of some identifiable duty must be established. I also agree that assumption of responsibility is the appropriate test, so long as that expression is understood as focusing on what the individual in question did, rather than what he was called (see the authorities mentioned in para 108 above). In this case the assumption of responsibility equates with the fiduciary duty that a company director owes to his company not to make an unauthorised distribution of capital. But in the circumstances of this case I think that there would be some element of putting the cart before the horse in looking for a fiduciary duty before looking at what Mr Holland did, because it is what he did that demonstrates that he was undertaking responsibility and exposing himself to a claim for breach of fiduciary duty.

122. Lord Collins makes a modest reference to his own monumental first instance judgment in *Primlake Ltd v Matthews Associates* [2006] EWHC 1227 (Ch), [2007] 1 BCLC 666. It would be inappropriate, in a dissenting judgment, to go far into that decision, which was not cited to the court. But it is to my mind a striking example, comparable on its facts to this case, of an individual held to be a de facto director, and to be liable for breach of fiduciary duty, because of what he did (see the summary at para 311 of the judgment).

123. Lord Saville's brief judgment overlooks the important difference between a multiplicity of human directors participating in the collective governance of a single corporate director (as is common and as was the case, indirectly, in *Hydrodam*), and a single individual director who is the guiding mind of a single corporate director, as Mr Holland was in this case.

*Other issues*

124. On the other issues I agree with Rimer LJ in the Court of Appeal. The discretion conferred by section 212(3) of the Insolvency Act 1986 is not a wide discretion. It does not replicate or extend the court's power to grant relief under section 727 of the Companies Act 1985. What it does is to enable the court to adjust the remedy to the circumstances of the particular case (some examples are given by Dillon LJ in *West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250).

125. For these reasons I would for my part have allowed the appeal and restored the order of the deputy judge but without the restriction on Mr Holland's liability imposed by para 2 of the judge's order.

## LORD CLARKE

126.   I agree with Lord Walker that this appeal should be allowed for the reasons he gives.  I state the principal considerations which have led me to that conclusion because others take a different view.

127.   I entirely agree with Lord Walker's analysis of and qualifications to the decision and reasoning of Millett J in *Re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180. In particular, I agree that, as Lewison J said in *Re Mea Corpn Ltd* [2007] 1 BCLC 618 at para 89 (in the passage quoted by Lord Walker), there is no conceptual difficulty in holding that a person can be both a shadow director and a de facto director simultaneously and that the real purpose of each is to identify those, other than professional advisers, with real influence in the corporate affairs of the company.

128.   As I read the judgments in the present case, it is accepted in them all that, in order to establish that a person was a de facto director, it is necessary to plead and prove that he undertook functions in relation to a company which could properly be carried out only by a director and that he must have done "something more" than merely participate in decisions by the corporate director in relation to the actions of the subject company. This requirement was not satisfied in *Hydrodam* because each of the individuals alleged to be de facto directors was, as Lord Walker describes it, one of about eight people who made up the board of Eagle, of which Hydrodam was a sub-sub-subsidiary. The allegation was that the directors of Eagle were collectively responsible. I agree with Lord Walker that being a de facto director depends upon what the individual does on his own initiative.

129.   The question in each case is whether the individual did something more than participate in a collective decision. In this case the question is whether Mr Holland did an act which was a directorial act of each composite company. I agree with Lord Walker that it does not follow from the fact that he did the act in his capacity as a director of Paycheck Directors, which was the corporate director of each composite company, that he did not also do it as a de facto director of each composite company. There is no reason in principle why it cannot be held as a matter of fact that Mr Holland decided to pay the dividends both as a de jure director of Paycheck Directors and as a de facto director of each composite company.

130.   Section 263(1) of the Companies Act 1985 provides:

"(1)  A company shall not make a distribution except out of profits available for the purpose."

As Lord Hope observes at para 47, it was held by the deputy judge that, as from 18 August 2004, all the dividends were unlawful and it is accepted that the relief available under section 727 of that Act would have been available to Mr Holland if he could show that he acted reasonably. It is thus accepted that, if Mr Holland was a de facto director of the composite companies, his position is the same as that of the de jure director of those companies, namely Paycheck Directors. The de jure director would be liable, subject to section 727, because it procured the payment of unlawful dividends and, if Mr Holland was a de facto director, he would be liable on the same basis.

131.  It is in this regard that I agree with Lord Walker that assistance is to be found in the reasoning of the House of Lords in *Standard Chartered Bank v Pakistan National Shipping Corpn* [2002] UKHL 43, [2003] 1 AC 959. If Mr Holland was a de facto director of the composite companies, he is liable because, as a matter of fact, he procured the unlawful payment of the dividends to the shareholders and because he cannot show that he acted reasonably so as to enable him to seek relief under section 727. In *Standard Chartered Bank* Mr Mehra was liable "not because he was a director but because he committed a fraud": see per Lord Hoffmann at para 22. In the extract from para 41 of the speech of Lord Rodger quoted by Lord Walker he said:

"Mr Mehra set out by his fraudulent acts to make Standard Chartered pay under the letter of credit. He succeeded. He is accordingly personally liable for the loss that he thereby caused them."

As I see it, the position is essentially the same here. If Mr Holland is a de facto director of the composite companies, it is because he personally procured the payment of the unlawful dividends and is liable to restore them just as the de jure director is.

132.  Mr Michael Green QC submitted that if agency and therefore capacity are irrelevant to the question whether an individual has committed a tort, as was held in *Standard Chartered Bank*, then so capacity should be irrelevant to the question whether an individual is a de facto director. I would accept that submission. In both cases the answer to the question depends upon what the individual did, not upon the capacity in which he did it.

133.   Lord Collins has expressed the view that what divides the court is not simply a matter of the facts, namely whether what Mr Holland did was in fact sufficient to make him a de facto director of the composite companies, but a question of law and a question of principle. He formulates the question at para 53 as being whether fiduciary duties can be imposed, in relation to a company whose sole director is a corporate director, on a director of that corporate director when all of his relevant acts were done as a director of the corporate director and can be attributed in law solely to the activities of the corporate director. That appears to me to be a similar principle to that stated by Lord Hope at para 42 that, so long as the relevant acts are done by the individual entirely within the ambit of the discharge of a person's duties and responsibilities as a director of a corporate director, it is to that capacity that his acts must be attributed.

134.   As I understand it, those propositions are advanced as propositions of law. However, no authority is cited for them and, for my part, I would not accept them. I recognise of course that, as Lord Collins points out at para 95, until section 155(1) of the Companies Act 2006 was enacted, it was perfectly lawful for a company to have a corporate director as a sole director. I also recognise that Mr Holland was a director of Paycheck Directors. However, as I see it, it does not follow as a matter of law that he cannot be a de facto director of the composite companies. Whether he was or not is a question of fact.

135.   Lord Collins says at para 93 that in the present context the crucial question is whether Mr Holland assumed the duties of a director. He then approves the test stated by Patten J in the unreported case of *Fayers Legal Services Ltd v Day*, where the question was whether the defendant was a de facto director of a company and liable for misfeasance or breach of fiduciary duty. The test stated by Patten J was whether the defendant was part of the corporate governing structure; the claimant had to prove that he assumed a role in the company sufficient to impose upon him a fiduciary duty to the company and make him responsible for the misuse of its assets.

136.   I do not think that either Patten J or Lord Collins can have intended that the question whether a person is a de facto director always depends upon whether he owed a fiduciary duty. In most cases, it is logical and, to my mind, correct in principle to ask the single question whether he is a de facto director. If he is, it follows that he owes fiduciary duties. If he is not, it equally follows that he does not. It may have been appropriate to ask a rolled up question in the *Fayers Legal Services* case because the issue there was whether what the alleged director did amounted to acting in a directorial manner on the facts. It was held by Patten J at para 73 that his acts were essentially managerial and not directorial. It may well have been relevant to the issue in that case to ask whether the acts performed by him were of a kind which might be expected to give rise to a fiduciary duty and thus to be the acts of a de facto director.

137.   The two questions posed by Lord Collins in para 94, are whether the alleged de facto director assumed the duties of a director and whether he was part of the governing structure. I agree that those are relevant questions to ask but I also agree with Lord Walker that they are questions of fact. So too are other questions identified in the authorities. Examples include those given by Lord Collins in para 91 including the following: whether the individual was taking the major decisions, which might be through instructions to the de jure directors, and what was real influence in the affairs of the company (see *Re Kaytech International plc* [1999] 2 BCLC 351, per Robert Walker LJ at p 424); whether he was the sole person directing the affairs of the company or whether there were others who were the true directors and whether he was acting on an equal footing with the others (see *Re Richborough Furniture Ltd* [1996] 1 BCLC 507); and whether he exercised real influence, otherwise than as a professional adviser, in the corporate governance of the company (see *Re Kaytech* at p 424). As Lord Collins has observed at para 91 in a quotation from the Cadbury Report, corporate governance is the system by which businesses are directed and controlled.

138.   In my opinion all those questions are questions of fact. For my part, I do not see how they can be questions of law when the question is whether someone who is not a de jure director is a de facto director. That question depends ultimately on the answer to the question what Mr Holland did.

139.   The question is thus one of fact. What did Mr Holland do? There can be no doubt that the decision to pay dividends was a directorial act and not a mere managerial act. It seems to me that, if (as the deputy judge has held), Mr Holland in fact deliberately procured the payment of the dividends by the directors of Paycheck Directors and had the de facto power to do so, he was a de facto director. As such, he owed a fiduciary duty to the company and the procuring of the payment of the dividends was a breach of fiduciary duty and, on the deputy judge's findings of fact, an unlawful act. He is accordingly liable to restore the dividends.

140.   I agree with Lord Walker that such a liability has nothing to do with the limited liability of shareholders or with *Salomon v A Salomon & Co Ltd* [1897] AC 22. The conclusion that Mr Holland was a de facto director does not involve the piercing of the corporate veil but simply the application of the principles identified in the modern cases to the facts of this case.

141.   On the detailed facts, again I agree with Lord Walker. As he explains, and is not in dispute, all the decisions were made by Mr Holland. Each decision by Mr Holland to procure Paycheck Directors to pay the dividends without reserving for the relevant composite company's liability to tax was a decision to commit an unlawful act. Each decision was, as I see it, a decision to carry out the underlying

decision previously made by Mr Holland, who was then wearing a number of hats, that none of the composite companies would reserve for higher rate tax. When each decision to pay a particular dividend was made, he was thus acting, both as a de jure director of Paycheck Directors and as a de facto director of the particular composite company. Moreover, he was not acting merely as a director of Paycheck Directors, but pursuant to a decision he had already made wearing all his hats.

142.    In these circumstances, it is in my opinion artificial and wrong to hold that he was doing no more than merely discharging his duties as a de jure director of Paycheck Directors, as Rimer LJ suggested at paras 70-72 and 74 of his judgment. There is no reason in principle why a person may not act in more than one capacity. The question is again one of fact. On the deputy judge's findings of fact, Mr Holland was not merely discharging his duties as a director of the corporate director. He was in fact acting as a director of the composite companies by deciding (after taking leading counsel's advice) that the composite companies should both continue trading and continue paying dividends without reserving for higher rate corporation tax and by procuring the directors of Paycheck Directors as a director of the composite companies to pay the unlawful dividends. The specific decision in each case was no more than an implementation of the scheme which he had devised (as described by Lord Walker) by entering the particular figures in the computer programme and authorising payments to the particular shareholders/employees.

143.    If Mr Holland had not been a director of Paycheck Directors but had simply directed other directors of Paycheck Directors to make those payments as a director of the relevant composite company, there could, as I see it, be no doubt that Mr Holland was acting as a de facto director of the composite companies, simply on the basis of what he actually did.  Suppose, for example, his wife was the sole director of Paycheck Directors and he had instructed her to pay the dividends and she had done so without giving independent thought to the matter, he would surely have been doing so as inter alia a de facto director of the composite companies.  The fact that he was a director of Paycheck Services to my mind would make no difference.

144.    On the facts the answers to the various questions posed above are clear. He was part of the governing structure because he in fact made every decision as to the payment of dividends. He thus assumed the duties of a director because paying dividends is what directors do. He was taking the major decisions through instructions to the de jure director of the composite companies. His real influence on the affairs of the companies was total. Indeed, he was the sole person directing the affairs of the company. There were no others who were taking decisions other than in accordance with his directions. In short, he exercised real influence, otherwise than as a professional adviser, in the corporate governance of the company. In so concluding I use the expression corporate governance in the sense

used in the Cadbury Report as being the system by which the composite companies businesses were directed and controlled. They were directed and controlled by Mr Holland.

145. In all the circumstances I would hold that Mr Holland was a de facto director of the composite companies on the ground that he in fact made directorial decisions with regard to them.

146. As to the other issues, like Lord Walker, I agree with the views of Rimer LJ in the Court of Appeal. For the reasons I have given I would allow the appeal and make the order proposed by Lord Walker.