# EXHIBIT 17



Trinity Term
[2017] UKPC 19
Privy Council Appeal No 0092 of 2016

# JUDGMENT

# Pearson (Appellant) *v* Primeo Fund (Respondent) (Cayman Islands)

## From the Court of Appeal of the Cayman Islands

before

**Lord Neuberger**
**Lord Mance**
**Lord Clarke**
**Lord Sumption**
**Lord Carnwath**

## JUDGMENT GIVEN ON

## 6 July 2017

**Heard on 24 and 25 May 2017**

<table>
<tr>
<td>

*Appellant*
Lord Goldsmith QC
Francis Tregear QC
(Instructed by Debevoise
& Plimpton LLP)

</td>
<td>

*Respondent*
Tom Smith QC

(Instructed by Enyo Law
LLP)

</td>
</tr>
</table>

*Ist Intervener*
Lawrence Rabinowitz QC
Maximilian Schlote
(Instructed by Proskauer
Rose (UK) LLP)

*2nd Intervener*
Stephen Atherton QC
Jonathan Allcock
(Instructed by Stephenson
Harwood LLP)

Appellant
Michael Pearson (additional liquidator of Herald Fund SPC) (in official liquidation)

Respondent
Primeo Fund (in official liquidation)

Interveners
(1)     Reichmuth & Co (the Late Redeemer)
(2)     Natixis SA (the Later Redeemer)

**LORD MANCE:**

*Introduction*

1.     The path to redemption is not always smooth. Herald Fund SPC ("Herald") issued quantities of participating non-voting shares, redeemable on terms set out in its articles, and placed the funds so raised with Bernard L Madoff Investment Securities LLC ("BLMIS"). On 11 December 2008, Mr Bernard Madoff confessed that BLMIS was a giant Ponzi scheme. At 5.00 pm (Luxembourg time) on 12 December 2008, Herald suspended the calculation of its NAV and, *inter alia*, all further payments to those who had invested in its redeemable shares. On 16 July 2013, the Grand Court made a winding up Order in respect of Herald pursuant to a petition presented on 14 February 2013 by the respondent, Primeo Fund (in official liquidation) ("Primeo"), with the consequence that Herald's liquidation was deemed to commence on 14 February 2013. On 8 January 2015, Herald received some USD259m by way of a first realisation of sums payable under a settlement with the Trustee for the liquidation estate of BLMIS ("Trustee"). Herald subsequently received further substantive distributions from the Trustee of several hundred million USD. These amounts and any future realisations would be sufficient to pay in full the sums claimed by the December Redeemers and the KYC Redeemers (defined below) - but would fall short of the total sums claimed in the liquidation by investors in Herald's redeemable shares.

2.     In these circumstances, various interests are represented before the Board:

    i)     Herald, represented by its additional liquidator, advances the case that all investors who were unpaid at 5.00 pm on 12 December 2008 (and so, by reason of the suspension, also unpaid at the commencement of the liquidation on 14 February 2013) rank as ordinary members.

    ii)     Primeo represents investors who, under Herald's articles, either gave the necessary 35 days' notice, or had such notice period waived by Herald's directors, and had their shares redeemed either on 1 December 2008 ("the December Redeemers") or at some earlier redemption date ("the KYC Redeemers"), but were not paid the redemption proceeds before Herald suspended further payments. The KYC ("Know Your Client") Redeemers were redeemers who were owed the redemption proceeds, but to whom no payment was made, because Herald was awaiting proof of entitlement. No distinction has been drawn by any parties between the positions for present purposes of the December and KYC Redeemers. Primeo's primary case is that they are all the beneficiaries of simple debts owed by Herald and so rank as (although

immediately below other) ordinary creditors. The bracketed qualification is agreed to arise under section 49(g) of the Companies Law, because the debt owed to the December and KYC Redeemers by Herald originated in a shareholding interest as members. Alternatively, if contrary to its primary case, section 37(7) of the Companies Law has any relevance to the December and KYC Redeemers, Primeo submits that they satisfy the pre-conditions for the priority provided by that subsection.

iii)      Reichmuth & Co appears, by leave of the Board, as first intervener representing the interests of investors ("the Late Redeemers") who, prior to 5.00 pm on 12 December 2008, gave notice under the articles of at least 35 days to redeem on a subsequent date (being, in Reichmuth's case, 2 February 2009). Reichmuth relies on section 37(7) of the Companies Law to give them a priority at least equivalent, if not superior, to any enjoyed by Primeo by virtue of its primary case.

iv)      Natixis SA appears as second intervener representing the interests of investors ("the Later Redeemers"), who made requests to redeem after 5.00 pm on 12 December 2008. It joins with the additional liquidator for Herald in submitting that neither Primeo nor, at any rate, Reichmuth enjoys any special priority, and that both rank alongside Natixis as ordinary members.

3.      The appeal is by Herald's additional liquidator, Mr Michael Pearson, against a judgment given on 12 June 2015 by Jones J in favour of Primeo. Reichmuth and Natixis did not intervene, and their interests were not separately represented, below. Jones J and the Court of Appeal both accepted Primeo's primary case, holding that Primeo's shareholding had been redeemed, for the purposes of the Companies Law as well as Herald's articles, on 1 December 2008, and that the fact that payment remained suspended and outstanding until the commencement of the winding up on 14 February 2013 was irrelevant. In the light of the interventions, the issues before the Board, outlined above, now also embrace the positions of those whose redemptions under the articles were not completed before the suspension took effect on 5.00 pm on 12 December 2008, either because (as in the case of those represented by Reichmuth) they only gave notices for a redemption date falling after that time or because (as in the case of those represented by Natixis) they only made requests for redemption after that time.

*The Companies Law*

4.      The Companies Law (2007 revision) contained provisions permitting companies to issue redeemable shares as follows:

> "Redemption and purchase of shares

37.(1) Subject to this section, a company limited by shares or limited by guarantee and having a share capital may, if authorised to do so by its articles of association, issue shares which are to be redeemed or are liable to be redeemed at the option of the company or the shareholder.

(2)    Subject to this section, a company limited by shares or limited by guarantee and having a share capital may, if authorised to do so by its articles of association, purchase its own shares, including any redeemable shares.

(3)(a) No share may be redeemed or purchased unless it is fully paid.

> (b)    A company may not redeem or purchase any of its shares if, as a result of the redemption or purchase, there would no longer be any issued shares of the company other than shares held as treasury shares.

> (c)    Redemption or purchase of shares may be effected in such manner and upon such terms as may be authorised by or pursuant to the company's articles of association.

> (d)    If the articles of association do not authorise the manner and terms of the purchase, a company shall not purchase any of its own shares unless the manner and terms of purchase have first been authorised by a resolution of the company.

> (e)    The premium, if any, payable on redemption or purchase must have been provided for out of the profits of the company or out of the company's share premium account, before or at the time the shares are redeemed or purchased or in the manner provided for in subsection (5).

> (f)    Shares may only be redeemed or purchased out of profits of the company, out of the share premium account or out of the proceeds of a fresh issue of shares made for the purposes of the redemption or purchase or in the manner provided for in subsection (5).

(g)     Shares redeemed or purchased under this section shall be treated as cancelled on redemption or purchase, and the amount of the company's issued share capital shall be diminished by the nominal value of those shares accordingly; but the redemption or purchase of shares by a company is not to be taken as reducing the amount of the company's authorised share capital.

(h)     Without prejudice to paragraph (g), where a company is about to redeem or purchase shares, it has power to issue shares up to the nominal value of the shares to be redeemed or purchased as if those shares had never been issued:

Provided that where new shares are issued before the redemption or purchase of the old shares the new shares shall not, so far as relates to fees payable on or accompanying the filing of any return or list, be deemed to have been issued in pursuance of this subsection if the old shares are redeemed or purchased within one month after the issue of the new shares.

(4)(a) Where, under this section, shares of a company are redeemed or purchased wholly out of either or both of the company's profits or share premium account, the amount by which the company's issued share capital is diminished in accordance with paragraph (g) of subsection (3) on cancellation of the shares redeemed or purchased shall be transferred to a reserve called the "capital redemption reserve" and the share premium account or company's profits, as the case may be, shall be adjusted accordingly.

…

(5)(a)  Subject to this section, a company limited by shares … may, if so authorised by its articles of association, make a payment in respect of the redemption or purchase of its own shares otherwise than out of its profits or the proceeds of a fresh issue of shares.

…

(6)(a)  A payment out of capital by a company for the redemption or purchase of its own shares is not lawful unless immediately following the date on which the payment out of capital is proposed to be made the company shall be able to pay its debts as they fall due in the ordinary course of business.

…

(7)(a) Where a company is being wound up and, at the commencement of the winding up, any of its shares which are or are liable to be redeemed have not been redeemed or which the company has agreed to purchase have not been purchased, the terms of redemption or purchase may be enforced against the company, and when shares are redeemed or purchased under this subsection they shall be treated as cancelled:

Provided that this paragraph shall not apply if -

> (i)     the terms of redemption or purchase provided for the redemption or purchase to take place at a date later than the date of the commencement of the winding up; or

> (ii)    during the period beginning with the date on which the redemption or purchase was to have taken place and ending with the commencement of the winding up the company could not, at any time, have lawfully made a distribution equal in value to the price at which the shares were to have been redeemed or purchased.

(b)     There shall be paid in priority to any amount which the company is liable by virtue of paragraph (a) to pay in respect of any shares -

> (i)     all other debts and liabilities of the company (other than any due to members in their character as such); and

(ii)     if other shares carry rights whether as to capital or as to income which are preferred to the rights as to capital attaching to the first mentioned shares, any amount due in satisfaction of those preferred rights,

but subject to that, any such amount shall be paid in priority to any amounts due to members in satisfaction of their rights (whether as to capital or income) as members.

…

Definition of member

38.     The subscribers of the memorandum of association of any company shall be deemed to have agreed to become members of the company whose memorandum they have subscribed, and upon the registration of the company shall be entered as members on the register of members hereinafter mentioned, and every other person who has agreed to become a member of a company and whose name is entered on the register of members, shall be deemed to be a member of the company.

…

Liability of present and past members of company

49.     In the event of a company being wound up every present and past member of such company shall be liable to contribute to the assets of the company to an amount sufficient for payment of the debts and liabilities of the company, and the costs, charges and expenses of the winding up and for the payment of such sums as may be required for the adjustment of the rights of the contributories amongst themselves:

Provided that -

(a)     a past member shall not be liable to contribute to the assets of the company if he has ceased to be a member for

a period of one year or upwards prior to the commencement of the winding up;

(b)      a past member shall not be liable to contribute in respect of any debt or liability of the company contracted after the time at which he ceased to be a member;

(c)      a past member shall not be liable to contribute to the assets of the company unless it appears to the Court that the existing members are unable to satisfy the contributions required to be made by them under this Law;

(d)      in case of a company limited by shares, no contribution shall be required from any member exceeding the amount, if any, unpaid on the shares in respect of which he is liable as a present or past member except where such member or past member holds or held shares of a class which are expressly stated in the memorandum of association to carry unlimited liability, as provided in section 8(2);

(e)      in the case of a company limited by guarantee, no contribution shall be required from any member exceeding the amount of the undertaking entered into on his behalf by the memorandum of association, except where the amount of the undertaking of such member is unlimited, as provided in section 9(2);

(f)      nothing in this Law shall invalidate any provisions contained in any policy of insurance or other contract whereby the liability of individual members upon any such policy or contract is restricted, or whereby the funds of the company are alone made liable in respect of such policy or contract; and

(g)      no sum due to any member of a company in his character of a member by way of dividends, profits or otherwise, shall be deemed to be a debt of the company, payable to such member in a case of competition between himself and any other creditor not being a member of the company; but any such sum may be taken into account for

the purposes of the final adjustment of the rights of the contributions amongst themselves.

…

Avoidance of share transfers

125.   Any transfer of shares, not being a transfer with the sanction of the liquidator, and any alteration in the status of the company's members made after the commencement of a voluntary winding up is void.

Provable debts

139.(1)  All debts payable on a contingency and all claims against the company whether present or future, certain or contingent, ascertained or sounding only in damages, shall be admissible to proof against the company and the official liquidator shall make a just estimate so far as is possible of the value of all such debts or claims as may be subject to any contingency or sound only in damages or which for some other reason do not bear a certain value.

…

Distribution of the company's property

140.(1)  Subject to subsection (2), the property of the company shall be applied in satisfaction of its liabilities pari passu and subject thereto shall be distributed amongst the members according to their rights and interests in the company."

5.   Herald's articles dated 24 March 2004 provided as follows:

"INTERPRETATION

… (24) 'Offering Memorandum' means any offering memorandum relating to the issue of Participating Non-voting Shares.

…

(29) 'Redemption Day' means such day or days as may be specified by the Directors from time to time, either generally or in relation to a Separate Class.

…

(49) 'Valuation Point' means such time or times as may be specified by the Directors from time to time, either generally or in relation to a Separate Class.

## DETERMINATION OF NET ASSET VALUE

18. The Net Asset Value of each Separate-Class shall be determined by the Directors, except when determination of prices (relevant to such Separate Class) has been suspended under the provisions of article 19, separately by reference to the Segregated Portfolio designated by reference to that Separate Class and to each such determination the following provisions shall apply:

…

(h) for the purpose of this article 18 and paragraph (2) of article 20:

…

(ii) Participating Non-Voting Shares to be redeemed under article 20 shall be deemed to be outstanding until and including the Valuation Point as at which the Net Asset Value per Share is determined and after that time until paid the price thereof shall be deemed to be liabilities of the Company.

## SUSPENSION OF DETERMINATION OF NET ASSET VALUE PER PARTICIPATING NON-VOTING SHARE

19.     The Directors may declare a temporary suspension of the determination of the prices of Participating Non-Voting Shares of any Separate Class and may do so in the circumstances set out in the relevant Offering Memorandum. ... Whenever the Directors shall declare a suspension of the determination of the prices of Participating Non-Voting Shares under the provisions of this article 19, then as soon as may be practicable after any such declaration the Directors shall cause a notice to be given to the holders of the Participating Non-Voting Shares tendering their Shares for redemption stating that such declaration has been made, and at the end of any period of suspension the Directors shall cause another notice to be given to the same stating that the period of suspension has ended. ...

## REDEMPTION OF PARTICIPATING NON-VOTING SHARES

20(1)  Subject to the provisions of the Statute and as hereinafter provided and except as otherwise agreed or determined by the Directors, the Company shall on receipt ... of a written request or requests from a Shareholder for the redemption of all or any Participating Non-Voting Shares held by him accompanied by the share certificate or share certificates, if any, to which such request relates ... redeem or repurchase such Participating Non-Voting Shares for an amount equal to Net Asset Value per Participating Non-Voting Share of the relevant Separate Class as may be determined in accordance with articles 14, 15 and 18 ...

(2)     Subject to the following provisions of this article 20 and unless otherwise agreed by the Directors the redemption or purchase of Participating Non-Voting Shares pursuant hereto shall take effect at the Net Asset Value per Share of the relevant Separate Class as may be determined calculated as at the relevant Valuation Point relating to that Redemption Day less any applicable Redemption Fee bank charges and other duties and charges referable to the redemption as the Directors determine appropriate provided such request (or requests) is received by such time as the Directors may determine) *[sic]* and the redemption or repurchase shall take effect on such Redemption Day. The time by which redemption requests must be received may be subject to such qualifications and contingencies as the Directors may

determine (including, without limitation qualifications or contingencies based on the size or proportion of a holding of shares of a Separate Class or Separate Classes redeemed). The Directors may apply a redemption fee on a 'first in first out' basis.

(3)     Subject as in this article 20 provided, the Shareholder shall not be entitled to withdraw his request unless the Directors otherwise determine.

(4)     If the determination of Net Asset Value per Share of the relevant Separate Class is suspended beyond the day on which it would normally occur by reason of a declaration of the suspension. of prices pursuant to article 19, the right of the Shareholder to have his Participating Non-Voting Shares redeemed or purchased pursuant to this article 20 shall be similarly suspended and during the period of suspension he may withdraw his request for redemption. Any withdrawal under the provisions of this paragraph shall be made in writing and shall only be effective if actually received by the Company during the period of suspension. If the request is not so withdrawn, the redemption or purchase of the shares shall be made at the Net Asset Value per Share of the relevant Separate Class as may be calculated at the. next relevant Valuation Point next following the end of the suspension less any applicable Redemption Fee bank charges and other duties and charges referable to the redemption as the Directors determine appropriate. In addition, the Directors shall have power to declare additional Valuation Points and Redemption Days for any reason, including without limitation in order to redeem shares the redemption of which has been deferred aforesaid.

…

22.(1) Any amount payable to the Shareholders in connection with the redemption or purchase of Shares pursuant to article 20 or 21 shall be paid in the currency of denomination of the relevant Separate Class which shall, at the risk of the Shareholder, as soon as reasonably practicable after the later of [sic] the date as at which the redemption or purchase takes effect, be cabled or telexed to a bank at the Shareholder's request and expense or otherwise as directed by the Shareholder and as may be agreed by the Directors. The Directors may make payments of redemption proceeds in connection with redemptions based on estimated Net Asset Value per Share calculations in circumstances where the value of any

investment of the Company is not available on a timely basis pursuant to provisions of the relevant Offering Memorandum. In all cases, the Directors may suspend the payment of redemption proceeds in circumstances where the valuation of the net assets of the Company or of a Separate Class has been suspended pursuant to article 19.

…

23.    Upon the redemption of a Participating Non-Voting Share being effected the Shareholder shall cease to be entitled to any rights in respect thereof (excepting always the right to receive a dividend which has been declared in respect thereof prior to such redemption being effected) and accordingly his name shall be removed from the Register of Shareholders with respect thereto and the Share so redeemed shall be available for re-issue and until re-issue shall form part of the unissued capital of the Company."

6.    Herald's Offering Memorandum in respect of the redeemable shares provided inter alia

"DEFINITIONS

'Redemption Day' means the first Business Day of each month, or such other Business Day as the Directors may from time to time determine and notify to Shareholders. …

'Valuation Point' means the last Business Day in each month, or such other Business Day as the Directors may from time to time determine and notify to Shareholders.

…

Redemptions and Redemption Price

Shareholders may request that Shares be redeemed on and with effect from any Redemption Day subject to the provisions relating to suspension of dealings referred to under 'Temporary Suspension of Dealings' below. The Shares shall be redeemed on a particular Redemption Day at the Net Asset Value per Share of the relevant

class as at the Valuation Point immediately preceding the Redemption Day on which the redemption is effected as calculated in accordance with the Articles of Association …

Requests for redemptions should be made on the Redemption Request Form … which must be sent so as to arrive at the Administrator's office by post or by facsimile (with original to follow immediately be post) no later than 5.00 pm (Luxembourg time) 35 calendar days prior to the relevant Redemption Day … or such later time as the Directors may from time to time permit. …

Payment of Redemption Proceeds

… Full payment shall be made generally within 20 Business Days of the relevant Redemption Day. …

Temporary Suspension of Dealings

The Fund may temporarily suspend the determination of the Net Asset Value the issue and redemption of Shares and delay the payment of redemption proceeds for Shares already redeemed during the whole or any part of any period:

> (a)    when any of the principal markets on which any significant portion of the investments from time to time are quoted, listed, traded or dealt in is closed … or during which dealings therein are restricted or suspended …"

*Primeo*

7.    The key issue is whether the December and KYC Redeemers represented by Primeo fall within section 37(7) of the Companies Law. It is common ground that their shares were, under the terms of Herald's articles, redeemed either before or on 1 December 2008, notwithstanding that payment was deferred until a date "as soon as reasonably practicable" thereafter, explained in the Offering Memorandum as meaning "generally within 20 Business Days of the relevant Redemption Date" (ie by 29 December 2008). It is also common ground that the reference in section 37(7) to "any of its shares which are or are liable to be redeemed" is a shorthand reference back to the words in section 37(1) to "shares which are to be redeemed or are liable to be redeemed at the option of the company or the shareholder". Section 37(7) expressly addresses

shares which "have not been redeemed" or "shares ... which the company has agreed to purchase" but which "have not been purchased". In these circumstances, Primeo submits, and the courts below have accepted, that section 37(7) has no application, because the December and KYC Redeemer's shares had on or by 1 December 2008, and in any event prior to any suspension, actually been redeemed; the mere fact that payment of their proceeds was, under the articles, postponed for a short period or pending confirmation of identity was irrelevant.

8.      At the core of the case advanced for Herald by Lord Goldsmith QC is the proposition that "redemption" in section 37 of the Companies Law bears a different meaning from its meaning in Herald's articles. It must be understood as embracing a whole process including payment of the proceeds, and this understanding must for present purposes prevail. On that basis, Lord Goldsmith submits that Proviso (i) in section 37(7)(a) applies; suspension affected the terms of redemption, so as to postpone payment of the proceeds until, ultimately, a date later than the date of the commencement of the winding up; and the December and KYC Redeemers were not therefore entitled to the priority contemplated by section 37(7)(b) and must be seen as falling back into the status of an ordinary member within the concluding words of section 140(1).

9.      The validity of Herald's suspension of payment of the proceeds of redemption is accepted on all sides. The suspension was valid under the last sentence of article 22(1) and the provision in the Offering Memorandum titled "Temporary Suspension of Dealings", even though the shares had, under the terms of the articles, been redeemed. The case in this respect contrasts with *Culross Global Spc Ltd v Strategic Turnaround Master Partnership Ltd* [2010] UKPC 33, where the Board held that, under the particular articles there in issue, no power of suspension of payment of the proceeds of a redemption existed after redemption had occurred under the articles.

10.     In response to Herald's case, Mr Tom Smith QC for Primeo submits that, if (contrary to their primary case) the December or KYC Redeemers fall within the opening part of section 37(7)(a), they escape the application of Proviso (i), because, pursuant to their notices to redeem, their terms of redemption provided for redemption to take place on 1 December 2008 and the suspension directed by Herald with effect from 5.00 pm on 12 December 2008 cannot be regarded as having affected those terms. In this submission, Primeo is, as will appear, joined by Reichmuth.

11.     In support of his submissions relating to the significance of payment in the statutory context, Lord Goldsmith is able to rely on numerous references in section 37 to the payment to be made for redemption or purchase and to the profits, premium account, proceeds of a fresh issue or capital out of which redemption or purchase can permissibly be made: see eg section 37(3)(e) and (f), (4)(a), (b) and (c), (5)(f) and (6), as well section 37(7)(a) proviso (ii). Further, as he submits, there is nothing in section

37 which expressly addresses a situation in which the actual payment by a company of the redemption value, or the price of shares purchased, is postponed, for a short period. It is common ground however that such postponement is permissible under Cayman Islands law.

12.     It is in this connection instructive to look back at provisions which appeared as sections 45 and 59 of the English Companies Act 1981, on which section 37 appears, loosely, to have been based. Section 37 was introduced into Cayman Islands law by the Companies (Amendment) Bill 1987, with the explanation, given both in the Bill's "memorandum of objects and reasons" and orally by the First Official Minister for Finance and Development, that section 37 "follows the recent changes in the United Kingdom's companies legislation". Sections 45 and 59 in the English Act appeared separately under the respective headings of "Power of company to issue redeemable shares" (section 45) and (after various intermediate sections) "Miscellaneous and supplemental - Effect of company's failure to redeem or purchase own shares" (section 59). Section 45(4) stated that "The terms of redemption must provide for payment on redemption". It is not, in these circumstances, surprising that section 37 of the Cayman Islands Companies Law does not focus directly on the possibility of delay in payment of the proceeds of redemption. But it is, as stated, common ground that, in contrast to the original English legislation, section 37 permits such a delay; and it does not follow from the English or the Cayman Islands statutory language that payment is by itself an inherent element of redemption.

13.     In the Board's opinion, payment is, as a matter of general principle, clearly not an inherent element of the redemption or purchase by the company of its own shares. The provision in the articles for its deferral for a short time was, no doubt, a convenience to the company. The essence of redemption is, however, the surrender of the status of shareholder, with all attendant rights, just as the essence of purchase is the transfer of property. If this occurs, the deferral of payment of the price is no more than a grant of a short period of credit to the company, without any reservation of property or interest.

14.     That redemption occurs on surrender of the status of shareholder, rather than on payment, is what the articles explicitly provide by articles 18(h)(ii) and 23. Article 18(h)(ii) makes clear that shares to be redeemed under article 20 continue outstanding up to and including the date of the Valuation Point, and redemption takes place, normally, on the day immediately after the date taken for the Valuation Point.

15.     The Board is unable to accept Lord Goldsmith's general proposition that redemption has an autonomous statutory meaning that prevails over any definition found in or meaning to be derived from the articles. The essence of redemption or purchase being the moment when the prior shareholding interest is extinguished or acquired by the company, that is necessarily a moment which can be defined and shaped by the articles, which constitute the relevant agreement between all the members and

the company. There is no reason to treat the Companies Law as containing prescriptive provisions in this regard, which do not appear in its text. On the contrary, section 37(3)(c) provides that "Redemption or purchase of shares may be effected in such manner and upon such terms as may be authorised by or pursuant to the company's articles of association". That is a clear indication of the freedom that shareholders and a company have to shape their relationship as regards redemption or purchase of the company's shares.

16.     Reference was made in the courts below to the Board's previous judgment in *Culross Global Spc Ltd v Strategic Turnaround Master Partnership Ltd* [2010] UKPC 33. Lord Goldsmith correctly points out that the issue there before the Board was different. The question was whether, under the particular articles, a power to suspend payment extended after redemption. The Board was concerned solely with the meaning of redemption under the articles. The Board did however, underline the general freedom which company law affords to shareholders and a company to frame their relationship inter se as they may think appropriate, noting:

> "16.    ... The existence and extent of any power to suspend the payment of redemption proceeds after the Redemption Date is a subject upon which the members were at liberty to make 'any contract inter se which they pleased', as the Earl of Selborne LC said in *Walton v Edge* (1884) 10 App Cas 33, 35 with regard to an issue regarding the effect of a provision allowing a member of a building society 'to withdraw (provided the funds permit) ... by giving' either seven days' or one month's notice according to the amount. The discussion of the concept of redemption in the Australian case of *In re HIH Insurance Ltd (in liquidation)* [2008] FAC 623 ... took place in a very different context to the present, and cannot obviate the need for a detailed examination of the ... articles and documentation to answer the present issue. The issue is not to be approached on the basis of any a priori view that, until payment of the redemption proceeds, a shareholder must or should necessarily remain a member of a company which is (as the respondent was) due to make such payment upon or after a certain redemption date ..."

This underlines the improbability that the Companies Law should have intended to impose, even in the context of winding up, a completely different meaning of redemption, without saying so.

17.     Lord Goldsmith also argued strongly that, unless section 37 had the effect for which Herald contends, it could have no real application at all. In particular, the terms of redemption or purchase could never provide "for the redemption or purchase to take

place at a date later than the date of the commencement of the winding up" unless what was envisaged was that they postponed payment of the redemption value or purchase price until after the date of such commencement. The Board does not accept this. Section 37(7) envisages situations in which shares are to be redeemed or are liable to be redeemed at the commencement of the winding up, but the terms of redemption or purchase may remain enforceable. Such a situation would exist if the shares had a fixed redemption date, or if notice to redeem had validly been given for a date, prior to the commencement of the winding up, but the company had for any reason wrongly failed to take steps necessary to enable redemption at that date. This would be the case if, for example, redemption was, under the articles, only to take place against payment by the company of the proceeds (in a manner similar to that formerly contemplated by the English Companies Acts 1981, section 45(4) and 1985, section 159(1)). It is also possible to contemplate formalities that a company might be obliged, and might fail, to take in order to complete redemption. It is instructive that the title to section 59 of the English Companies Act 1981 indicated that it was addressing the "effect of company's failure to redeem or purchase its own shares", ie pursuant to terms of redemption or purchase which obliged the company to effect the redemption or purchase at a date prior to the commencement of the winding up.

18.     Section 37(7) is thus addressing situations in which redemption or purchase ought to have been, but was not, effected by the company before the commencement of the winding up, and allows the relevant shareholder to enforce the terms of redemption or purchase notwithstanding the winding up. In this respect, it is elevating the shareholder to a priority it would not otherwise enjoy. The debts and liabilities of a company fall, as a matter of general principle, to be ascertained as at the date of its winding up - "the tree must lie as it falls": see eg *In re Dynamics Corp of America* [1976] 1 WLR 757, 762G-H, per Oliver J, quoting *In re Humber Ironworks and Shipbuilding Co* (1869) LR 4 Ch App 643, 646, per Selwyn LJ.

19.     In these circumstances, section 59(2) of the English Companies Act 1981 expressly excluded any liability in damages on the part of the company for failure on its part to redeem or purchase any shares. It replaced it with the right of a shareholder to enforce the terms of any such redemption or purchase, which is substantially reproduced in section 37(7) of the Cayman Islands Companies Law. It is perhaps an oddity that the Cayman Islands Companies Law does not expressly address the question whether any right to damages could subsist. But both section 59 of the English legislation and section 37(7) of the Cayman Islands Companies Law were on any view designed to elevate the status of a shareholder where redemption or purchase had not taken place at the commencement of the winding up. In so doing, section 37(7) qualified the strictness of section 125 of the Cayman Islands Companies Law. Neither was designed to lower or reverse the status of a shareholder who had by a redemption or sale already become a creditor. Indeed, it is difficult to see any basis in the Companies Law or in Herald's articles whereby such a redemption or sale could be regarded as reversed, or a former shareholder reconverted to the status of shareholder. Articles 18(h)(ii) and 23 are in particular categoric.

20.     The Board notes, finally in this connection, Lord Goldsmith's submission that Primeo's case means that the December and KYC Redeemers can prove in Herald's winding up on the basis of inflated valuations, based by Herald on a belief in the genuineness of BLMIS and its transactions, whereas BLMIS was in reality a Ponzi scheme of far less worth than appeared. In his submission, Primeo's case conflicts with the principle that the tree must lie as it falls. The Board has considered the operation of this principle in the context of another "feeder" fund to BLMIS in *Fairfield Sentry Ltd v Migani* [2014] UKPC 9. Lord Sumption, giving the judgment, said, para 3:

> "It is inherent in a Ponzi scheme that those who withdraw their funds before the scheme collapses escape without loss, and quite possibly with substantial fictitious profits. The loss falls entirely on those investors whose funds are still invested when the money runs out and the scheme fails. Members of the Fund who redeemed their shares before 18 December 2008 recovered the NAV which the Directors determined to be attributable to their shares on the basis of fictitious reports from BLMIS. The loss will in principle be borne entirely by those who were still Members of the Fund at that date."

21.     *Fairfield Sentry* involved an attempt to recover redemption moneys which had already been paid. The present issue did not there arise, and it was not necessary to draw the precise line between "those investors whose funds are still invested" and "those who were still Members of the Fund" at the critical date, which is here the commencement of the winding up. That line falls now to be drawn, and the Board's conclusion is that the critical moment is when an investor has redeemed and so ceased to be a member of the fund, becoming instead a creditor owed the redemption proceeds. On this basis, the fact that the debt constituted by the redemption proceeds is provable together with - albeit subordinated by section 49(g) to - other debts owed by Herald is in no way incongruous. No basis has been suggested on which Herald could on this analysis disturb the valuation by reference to which such redemption proceeds were calculated. The Board only adds that, even on the case advanced by Lord Goldsmith, section 37(7) would itself have had some effect in enabling some shareholders, who were due to be but had not been redeemed and paid the proceeds before the commencement of the winding up, to enforce the company's obligation to redeem and pay such proceeds, and thereby to gain a measure of priority over the claims of ordinary members.

22.     For all these reason, the Board concludes that the courts below were correct to reject the additional liquidator of Herald's case that the first part of section 37(7)(a) applies to Primeo. Primeo and the December and KYC Redeemers have redeemed and are entitled to prove in respect of their claims to the redemption proceeds under section 139(1), though they are, as former members, subject to having their claims deferred under section 49(g) to those claims of other ordinary creditors. It is in these circumstances irrelevant, in relation to Primeo, to consider the effect of Proviso (i),

which can await consideration until addressed (below) in relation to Reichmuth. The additional liquidator's appeal should be dismissed as against Primeo.

*Reichmuth*

23.     Reichmuth's case is relatively simple. It accepts and asserts that it is within the first part of section 37(7). It accepts Primeo's construction of the concept of redemption for this purpose as well as under the articles. All that is necessary to fall within the first part of section 37(7) is, in Mr Rabinowitz QC's submission, that there should be redeemable shares. Support for this view is found in the words "shares which are or are liable to be redeemed" in section 37(7)(a). They echo the words "shares which are to be redeemed or are liable to be redeemed at the option of the company or the shareholder" in section 37(1) which refer to all redeemable shares issued by the company. An alternative view might be that the first part of section 37(7) only bites when there is either a fixed date for redemption or purchase or a notice to redeem or an agreement to sell given prior to the commencement of the winding up, although this is not a view which could claim support in the (admittedly slightly differently worded) precursor of section 37(7) to be found in section 59(1) of the English Companies Act 1981. Which view is correct does not in fact matter in relation to Reichmuth. On either basis the first part of section 37(7) applies.

24.     The critical question thus becomes whether Proviso (i) applies to take Reichmuth back out of section 37, and to leave it and the Late Redeemers who it represents with the status of ordinary contributory members. Mr Rabinowitz submits that there can be a disconnect between a Valuation and a Redemption Date. Here the Late Redeemers gave notice for a Redemption Date of 2 February 2009, meaning that payment would be expected around the end of February 2009. There is, in Mr Rabinowitz's submission, no reason why the terms of redemption should not provide and continue to provide for redemption on that date, even though the suspension announced on 12 December 2008 by Herald under article 19 and the last sentence of section 20(4) prevents any valuation or payment.

25.     The Board cannot accept Mr Rabinowitz's submissions on this point, attractively though they were presented. The whole scheme involves a close link between valuation and redemption. Under article 19, the effect of a temporary suspension of valuations is to require the Directors to cause a notice to be given as soon as reasonably practicable to the holders of redeemable shares "tendering their shares for redemption". Under article 20(4), if there is such a suspension under article 19:

> "the right of the Shareholder to have his Participating Non-Voting Shares redeemed or purchased pursuant to this article 20 shall be

> similarly suspended and during the period of suspension he may withdraw his request for redemption."

Further:

> "If the request is not so withdrawn, the redemption or purchase of the shares shall be made at the Net Asset Value per Share of the relevant Separate Class as may be calculated at the next relevant Valuation Point next following the end of the suspension",

and

> "In addition, the Directors shall have power to declare additional Valuation Points and Redemption Dates for any reason, including without limitation in order to redeem shares, the redemption of which has been deferred aforesaid."

26.    In the Board's view, the effect of the articles is that, once there is a suspension under article 19, the right to redemption is suspended and only revives if and when the suspension is lifted. The terms of redemption cannot be regarded as providing for redemption to take place on a date when the right to redeem is suspended under article 20(4). When as here the suspension continued until the commencement of the winding up, the terms of redemption must be regarded as having provided for redemption to take place at a date later than the date of the commencement of the winding up, within the language of Proviso (i) to section 37(7)(a). The reason why Proviso (i) is framed looking back to a past moment is not, as Mr Rabinowitz submitted, because the position was frozen or fell to be regarded as at the date when notice to redeem was given or when the suspension was ordered, but simply because Proviso (i) is (like Proviso (ii)) necessarily looking back, during the winding up, at a past period ending with the commencement of the winding up.

27.    For these reasons, the Board concludes that Reichmuth and the other Late Redeemers fall within Proviso (i) in section 37(7)(a), and are so taken back outside the scope of the first part of section 37(7)(a). They remain accordingly within the category of members falling within the concluding words of section 140(1).

*Natixis*

28.    It follows from the above that Natixis, if it is within the first part of section 37(7)(a) at all, is, a fortiori, also unable to satisfy Proviso (i). Whether Natixis is within

the first part of section 37(7)(a) at all is unnecessary to consider. Since the suspension was declared before Natixis requested redemption, it may be that Natixis's request for redemption was invalid, in circumstances where under article 20(4) the effect of the suspension was to suspend Natixis's right to have its shares redeemed. But the Board need not decide that point.

*Priorities*

29.     It is in these circumstances also strictly unnecessary for the Board to address the nice question of the relative priorities of a former shareholder in Primeo's position who has redeemed but not been paid, and a shareholder who does fall within section 37(7)(a) and is entitled to the priority accorded by section 37(7)(b). It has been, as stated, common ground before the Board that section 49(g) includes former members. The ordinary meaning of member is a current member. This is the definition given in the section 38 of the Cayman Islands Companies Law, based no doubt on the similarly worded definition in section 25 of the English Companies Act 1948.

30.     However, there is well-established English authority to the effect that the English statutory provisions (most relevantly, section 212(g) of the Companies Act 1948) from which section 49(g) of the Cayman Islands Companies Law no doubt derived, are to be read - when they refer to a "sum due to any member of a company in his character of a member by way of dividends, profits or otherwise" - as embracing any such sum due to a *former* member: *In re Anglesey Colliery Co* (1866) 1 Ch App 555; *In re Consolidated Goldfields of New Zealand* [1953] Ch 689 (Roxburgh J); *In re Compania de Electricidad* [1980] Ch 146, 170B-C per Slade J.

31.     This, as Roxburgh J accepted in the second case, is an exceptional, rather than the ordinary, meaning of "member". Indeed, Roxburgh J accepted that the ordinary meaning would apply under the English equivalents of section 49(a) and (b). In the third case cited, the conclusion reached by Roxburgh J was simply recited and assumed as correct, first by counsel, Richard Sykes QC (p 152G) and then by Slade J (p 170B-C). Mr Sykes (p 152E) and Slade J (p 170D-E) both also accepted that the reference in the equivalent English provision to section 49(g) to any sum "due … by way of dividends, profits or otherwise" encompassed a sum claimed by way of return of capital (and so, necessarily, redemption proceeds). The Board sees no reason to question now that section 49(g) should be read as governing the priority of a former member claiming a return of capital, here by way of redemption proceeds.

32.     On that basis, Primeo, as a former member, ranks after creditors who were not formerly members, but ahead of all current members. The claim of a shareholder entitled to enforce terms providing for redemption or purchase to take place before the commencement of winding up would, under section 37(7)(b), rank behind

> (1)     "all other debts and liabilities of the company (other than any due to members in their character as such)".

but, subject to that:

> (2)     "in priority to any amounts due to members in satisfaction of their rights (whether as to capital or income) as members".

33.     This language raises some questions. Are the references to (1) debts and liabilities "due to members in their character as such" and (2) "amounts due to members in satisfaction of their rights (whether as to capital or income) as members" references to the same subject matter? Are both or either of (1) and (2) references to past and current members? The phrase "members in their character as such" in (1) might be seen as paralleling the later phrase "any member of a company in his character of a member" in section 49(g). But the two are not identical, and it should be borne in mind that ordinary redeemable shares only entered English law through section 45 of the Companies Act 1981, later consolidated as section 159(1) of the Companies Act 1985. Similarities with pre-existing language of the entirely different section 212(1) of the Companies Act may not be as significant as might at first glance appear. Further, the reasoning adopted in English authority on the English equivalent of section 49 shows that the significance of any reference to "member" is highly contextual.

34.     If the answer to the questions posed in the previous paragraph is that both (1) and (2) refer to past and current members, the (on its face incongruous) result would be that section 37(7) claimants, who had not (due to the company's default) achieved redemption but were entitled to enforce it in the winding up would rank higher in priority than those like Primeo, who had achieved redemption, but had simply not been paid. The Board cannot contemplate such a result as the intended or actual effect of sections 37(7) and 49(g).

35.     There are two alternative possibilities. One is to read both (1) and (2) as referring only to current members. The effect then is that section 37(7) claimants will, pursuant to (1), rank behind claimants like Primeo falling within section 49(g). That would not be incongruous. On the other hand, the Court of Appeal took a different view, considering, without detailed explanation, that claims such as Primeo's would rank equally with those of any section 37(7) claimants (see CA judgment, para 55). This could be achieved by reading (1) as referring to former as well as current members, but (2) as referring only to current members. This would involve reading in different senses two references to "members" in the same subsection, the latter of which ("members as … members") might or might not be seen as echoing, rather than differing from, the earlier ("members in their character as such"). However, the Board itself heard no detailed submissions on this possibility, and prefers in the circumstances to say no more

on the question of priorities as between section 49(g) and section 37(7) claimants. The likelihood in practice of successful section 37(7) claimants may well also be slight.

*Conclusion*

36.    The Board will humbly advise Her Majesty that the appeal by the additional liquidator of Herald should be dismissed as against Primeo representing the December and KYC Redeemers, and that declarations should be made that Reichmuth representing the Late Redeemers and Natixis representing the Later Redeemers have no claims under section 37(7) of the Companies Law and rank as ordinary members in Herald's winding up. The parties should make any submissions as to the precise form of such declarations and as to costs, in each case if not agreed, within 14 days of the handing down of this judgment.