# EXHIBIT 19

Court of Appeal                                       *A*

# Secretary of State for Trade and Industry *v* Deverell and another

1999  Nov 9, 10, 11;                    Morritt and Potter LJJ and Morison J
      Dec 21

*Company — Director — Disqualification — Shadow director — Person "in*   *B*
*accordance with" whose directions or instructions directors of company*
*"accustomed to act" — Whether definition to be construed strictly because of*
*quasi-penal consequences — Whether person taking no steps to hide part played*
*in company's affairs shadow director — Company Directors Disqualification Act*
*1986 (c 46), ss 6, 22(4)(5)*

A company went into creditors' voluntary liquidation with an estimated   *C*
deficiency with regard to creditors of £4·46m. In due course the Secretary of State
applied under section 6 of the Company Directors Disqualification Act 1986[1] for
disqualification orders to be made against three of the company's duly appointed
directors. He also sought disqualification orders against D and H on the ground that
they were shadow directors, i e persons in accordance with whose directions or
instructions the directors were accustomed to act, to whom section 6 applied by
virtue of section 22(4). The judge held that the mere giving of advice on its own was   *D*
insufficient and it was only relevant if given and accepted so as to amount to a
direction or instruction, coupled with a pattern of the board being accustomed to act
on it, and that what the court had to find was whether the board did what the shadow
director told it to do and exercised no, or no substantial, independent judgment. On
that basis, he refused to make the orders sought against the alleged shadow directors.

On appeal by the Secretary of State—

*Held*, allowing the appeal, that "shadow director" was to be construed in the   *E*
normal way to give effect to the parliamentary intention ascertainable from the
mischief to be dealt with and the words used; that, since the purpose of the Act was
the protection of the public, and given that the definition was used in other legislative
contexts, it was not to be strictly construed, notwithstanding its quasi-penal
consequences in the context of the Act; that the purpose of the legislation was to
identify those, other than professional advisers, with real influence in the corporate
affairs of the company, although it was not necessary that such influence was   *F*
exercised over the whole of its corporate activities; that the court had to ascertain
objectively in the light of all the evidence whether any particular communication
from an alleged shadow director, whether by words or conduct, was to be classified
as a direction or instruction; that, while it would be sufficient to show that in the face
of directions or instructions from the alleged shadow director the properly appointed
directors or some of them cast themselves in a subservient role or surrendered their
respective discretions, it was not necessary to do so; that the judge, in looking for the   *G*
additional ingredient of a subservient role or the surrender of discretion by the board,
had imposed a qualification beyond that justified by the statutory language; and that,
on the facts found by the judge, D and H were both shadow directors of the company
and were each unfit to be a director of a company, and disqualification orders would
be made against them ( post, pp 354A–D, F–G, 360B–C, 362F, 363D–F).

*In re Lo-Line Electric Motors Ltd* [1988] Ch 477 considered.

*H*

[1] Company Directors Disqualification Act 1986, s 22: "(4) 'Director' includes any person
occupying the position of director, by whatever name called, and in sections 6 to 9 includes a
shadow director. (5) 'Shadow director,' in relation to a company, means a person in accordance
with whose directions or instructions the directors of the company are accustomed to act (but so
that a person is not deemed a shadow director by reason only that the directors act on advice
given by him in a professional capacity)."

A   *Per curiam.* It is not necessary to the recognition of a shadow director that he should lurk in the shadows, though frequently he may. For example, a person resident abroad who owns all the shares in a company but chooses to operate it through a local board of directors may from time to time, to the knowledge of all to whom it may be of concern, give directions to the local board what to do but take no part in the management of the company himself. Such an owner may be a shadow director notwithstanding that he takes no steps to hide the part he plays in the affairs of the company ( *post*, pp 355B–D, 363E–F).

B       Decision of Judge Roger Cooke sitting as a judge of the Chancery Division reversed.

The following cases are referred to in the judgment of Morritt LJ:

*Australian Securities Commission v AS Nominees Ltd* (1995) 133 ALR 1
*Hydrodam (Corby) Ltd, In re* [1994] 2 BCLC 180
C   *Kaytech International plc, In re; Potier v Secretary of State for Trade and Industry; Secretary of State for Trade and Industry v Solly* [1999] BCC 390, CA
*Lo-Line Electric Motors Ltd, In re* [1988] Ch 477; [1988] 3 WLR 26; [1988] 2 All ER 692
*Secretary of State for Trade and Industry v Laing* [1996] 2 BCLC 324
*Unisoft Group Ltd (No 3), In re* [1994] 1 BCLC 609

D   The following additional cases were cited in argument:

*Blackspur Group plc, In re* [1998] 1 WLR 422, CA
*Company (No 005009 of 1987), In re A, Ex p Copp* [1989] BCLC 13
*Fine v Secretary of State for Trade and Industry* (unreported), 5 June 1997, Neuberger J
*Firth, Ex p; In re Cowburn* (1882) 19 Ch D 419, CA
*Grayan Building Services Ltd, In re* [1995] Ch 241; [1995] 3 WLR 1, CA
E   *Hickman v Kent or Romney Marsh Sheepbreeders' Association* (1920) 37 TLR 163, CA
*Hitco 2000 Ltd, In re;* [1995] 2 BCLC 63
*Living Images Ltd, In re* [1996] BCC 112
*PFTZM Ltd, In re* [1995] 2 BCLC 354
*Park House Properties Ltd, In re* [1997] 2 BCLC 530
*Pinemoor Ltd, In re* [1997] BCC 708
F   *Reddish, Ex p; In re Walton* (1877) 5 Ch D 882, CA
*R v Secretary of State for Trade and Industry, Ex p McCormick* [1998] BCC 379
*Richborough Furniture Ltd, In re* [1996] 1 BCLC 507
*Secretary of State for Trade and Industry v Tjolle* [1998] BCC 282
*Sevenoaks Stationers (Retail) Ltd, In re* [1991] Ch 164; [1990] 3 WLR 1165; [1991] 3 All ER 578, CA
*Tasbian Ltd (No 3), In re; Official Receiver v Nixon* [1993] BCLC 297, CA
*Tasmania (Owners of) v City of Corinth (Owners of)* (1890) 15 App Cas 223, HL(E)

G

**APPEAL** from Judge Roger Cooke sitting as a judge of the Chancery Division

The Secretary of State applied under section 6 of the Company Directors Disqualification Act 1986 for disqualification orders to be made against three directors of Euro Express Ltd. He also sought orders against the respondents, John Deverell and Peter Hopkins, on the ground that they were shadow directors. Judge Roger Cooke, sitting as a judge of the Chancery Division, applied a strict test to the definition of shadow director and refused to make the orders sought.

By a notice of appeal dated 11 June 1998 the Secretary of State appealed. The grounds of appeal were that the judge erred in holding that (1) to

A   establish a person as a shadow director it was necessary to prove that the board of directors made itself subservient to the shadow director and exercised no independent judgment of its own; (2) "directions or instructions" within section 22(5) of the 1986 Act were mandatory; and (3) a shadow director remained always in the shadows and took no part in the management of a company.

The facts are stated in the judgment of Morritt LJ.

B

*Michael Green* for the Secretary of State. The purpose of the Company Directors Disqualification Act 1986 is to protect the public and to improve the standard of conduct of company directors: see *In re Blackspur Group plc* [1998] 1 WLR 422. The intention of Parliament was to establish a minimum standard of probity and competence for directors and to punish them by C   disqualification for failure to reach that standard: see *In re Grayan Building Services Ltd* [1995] Ch 241, 257–258 and section 6 of the 1986 Act.

The definition of "shadow director" in section 22(5) of the 1986 Act says nothing about subservience to the shadow director or surrender of discretion. The judge's approach would make it virtually impossible for the Secretary of State ever to prove a shadow directorship. By contrast, de facto directorship can be established merely by showing that a person acted on an D   equal footing with duly appointed directors: see *In re Richborough Furniture Ltd* [1996] 1 BCLC 507; *Secretary of State for Trade and Industry v Tjolle* [1998] BCC 282 and *In re Kaytech International plc; Potier v Secretary of State for Trade and Industry; Secretary of State for Trade and Industry v Solly* [1999] BCC 390. In considering a similar provision the Federal Court of Australia held that it was not a necessary condition of being a shadow director that the board surrendered discretion on all matters or that E   instructions embraced all areas: see *Australian Securities Commission v AS Nominees Ltd* (1995) 133 ALR 1. There is an exception for professional advice, since otherwise it might constitute a direction or instruction to the board: see *In re Tasbian Ltd (No 3)* [1993] BCLC 297 and *In re A Company (No 005009) of 1987) Ex p Copp* [1989] BCLC 13; cf *In re PFTZM Ltd* [1995] 2 BCLC 354. The judge wrongly concluded that "directions or F   instructions" must be shown to be mandatory. Because of the proviso, "advice" can be included and should be understood in the sense of "guidance". The issue is whether the individuals exercised "real influence" otherwise than as professional advisers.

The judge appears to have decided D's case on the basis that shadow directorship and de facto directorship were mutually exclusive following *In re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180 and *Secretary of State for G   Trade and Industry v Laing* [1996] 2 BCLC 324. The Court of Appeal, therefore, has to consider afresh whether the respondent was a director: see *In re Hitco 2000* [1995] 2 BCLC 63 and *In re Grayan Building Services Ltd* [1995] Ch 241, 255.

*Ian Alexander QC* and *Simon Airey* for Mr Deverell. The issue in the trial was whether D was a shadow director which is an issue of fact. The judge H   correctly applied the classic definition of shadow director: see *In re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180. Proceedings under the 1986 Act are not criminal proceedings within the meaning of article 6 of the European Convention for the Protection of Human Rights and Fundamental Freedoms

Case 1:21-cv-11059-GHW  Document 150-22  Filed 06/28/23  Page 5 of 25
343
[2001] Ch                    Sec of State for Trade v Deverell (CA)

A  (Cmd 8969): see *Reg v Secretary of State for Trade and Industry, Ex p McCormick* [1998] BCC 379. However, they are not ordinary civil proceedings: see *Ex p McCormick*. The case was never pleaded that D was a de facto director. Proceedings under the 1986 Act involve a substantial interference with the freedom of the individual. They involve penal consequences and natural justice requires that a person facing such

B  proceedings knows what case he has to answer: see *In re Lo-Line Electric Motors Ltd* [1988] Ch 477, 486; *In re Living Images Ltd* [1996] BCC 112, 116 and *Secretary of State for Trade and Industry v Laing* [1996] 2 BCLC 324, 339.

If the secretary of state intends to allege that a person is a de facto director, either as an alternative or in addition to being a shadow director, he must make a clear distinction between the facts relied upon in support of each allegation. The respondent must know what case he has to answer and

C  prepare his case accordingly: see *In re Pinemoor Ltd* [1997] BCC 708, 710; *In re Park House Properties Ltd* [1997] 2 BCLC 530, 535 and *In re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180.

*Clare Hoffmann* for Mr Hopkins. Before the judge the Secretary of State relied upon the definition of shadow director set out in *In re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180, but he now contends that the judge was

D  wrong to adopt that definition.

There is no justification for the law making a person liable to misfeasance or disqualification proceedings unless they were truly in a position to exercise the powers of and discharge the functions of a director: see *Secretary of State for Trade and Industry v Tjolle* [1998] BCC 282. The purpose of the disqualification proceedings is the protection of the public

E  from those who are unfit to be concerned in the management of a company. The person who is to be subject to the jurisdiction must be a person who had the executive power within the company to make decisions that put creditors at risk. It is an essential element of an allegation that a person acted as a director, whether de facto or shadow, that the person exercised or had the capacity to control the company's financial decisions.

In all cases in which it is alleged that a person is a de facto director it must

F  be shown that (1) the person was involved in the company's major financial decisions or was expected by the other directors to contribute to such decisions and (2) that the person performed functions that were consistent only with acting as a director and could not have been performed by a person in a managerial or some other role below board level.

The judge was not entitled to find matters proved which had not been

G  alleged: see *In re Sevenoaks Stationers (Retail) Ltd* [1991] Ch 164, 179. Furthermore, at the outset of the trial the Secretary of State expressly disavowed any intention to rely upon an allegation of de facto directorship. The judge cannot be criticised for failing to make a finding of fact which the secretary of state had expressly invited him to refrain from making. A party may be barred from raising a point which was deliberately omitted from argument in the court below (see *Hickman v Kent or Romney Marsh*

H  *Sheepbreeders' Association* (1920) 37 TLR 163), or from arguing a case totally inconsistent with and contradictory to the case previously argued (see *Ex p Reddish; In re Walton* (1877) 5 Ch D 882).

A point not taken at trial and presented for the first time in the Court of Appeal will be scrutinised carefully. The court has to be satisfied that (1) it

has before it all the facts bearing on the new controversy as completely as would have been the case had the controversy arisen at trial, and (2) no satisfactory explanation could have been offered by those whose conduct is impugned if an opportunity for explanation had been afforded them in the witness box (see *Owners of Tasmania v Owners of City Corinth* (1890) 15 App Cas 223). If a point was not taken in the tribunal of fact and evidence could have been adduced which could have prevent the point from succeeding, it cannot be taken afterwards: see *Ex p Firth; In re Cowburn* (1882) 19 Ch D 419.

The judge correctly found that the appropriate test was the balance of probabilities but that disqualification proceedings were of a type which required the allegations to be established clearly and with conviction: see *In re Living Images Ltd* [1996] BCC 112 and *Fine v Secretary of State for Trade and Industry* (unreported) 5 June 1997.

21 December. The following judgments were handed down.

## MORRITT LJ

*Introduction*

1 Euro Express Ltd ("the company") carried on the business of tour operators. On 10 March 1993 it went into creditors voluntary liquidation with an estimated deficiency with regard to creditors of £4·46m. In due course the Secretary of State for Trade and Industry applied under section 6 of the Company Directors Disqualification Act 1986 for disqualification orders to be made against three of the company's duly appointed directors, namely Mr William Besant, Mr Colin Blyth and Mr John Stevens. He also sought such orders against Mr John Deverell and Mr Peter Hopkins on the ground that each of them was a "shadow director" of the company to whom by virtue of section 22(4) the provisions of section 6 applied. Such a director is defined by section 22(5) as:

> "a person in accordance with whose directions or instructions the directors of the company are accustomed to act (but so that a person is not deemed a shadow director by reason only that the directors act on advice given by him in a professional capacity)."

2 After a hearing extending over 17 working days, by his order dated 11 May 1998, Judge Roger Cooke, sitting as a judge of the Chancery Division, made disqualification orders against Mr Blyth for 11 years, Mr Besant for six years and Mr Stevens for two years. With regard to both Mr Deverell and Mr Hopkins he considered that their respective conduct warranted such an order but he dismissed the application against each of them because, as he concluded, neither of them had been shown to be a shadow director.

3 This is the appeal of the Secretary of State. He contends that if the judge had properly construed and applied the statutory definition to the facts as found by him or, in the alternative, to the facts he should have found then he would have decided that each of Mr Deverell and Mr Hopkins was a shadow director. Mr Deverell and Mr Hopkins submit that the judge was right for the reasons he gave and that no sufficient grounds are shown to entitle this court to interfere with the judge's findings of fact.

A  *The facts*

   4   The company was incorporated on 17 February 1986. Its issued capital was 20,000 shares of £1. All but one such shares were registered in the name of Mr Besant. According to the file maintained at Companies House Mr Besant was a director of the company from the time of its incorporation down to his resignation in circumstances I shall describe in
B  more detail later on 5 November 1991. For a short period after incorporation there an another director appointed to protect the interests of Mr Deverell's father as a loan creditor. Otherwise Mr Besant was the only apparent director from the time of incorporation down to 18 October 1990.

   5   As I have indicated the business of the company was that of a tour operator. For that purpose it required an Air Traffic Organiser's Licence ("ATOL") from the Civil Aviation Authority. As a practical matter it also
C  needed to be a member of the Association of British Travel Agents ("ABTA") and to obtain an ABTA bond. The rules of ABTA provided that to be eligible to become or remain a member

   "Every director, principal shareholder, proprietor or partner and every person employed or concerned in the management of a member's business
D  must be 'a respectable and honest businessman' and in particular must not: (a) be an undischarged bankrupt . . . (c) have been an owner or a controlling director of or partner in a business which has failed to meet its liabilities . . ."

In due course the company obtained an ATOL, membership of ABTA and an ABTA bond.
E  6   Mr Deverell had been concerned with two companies which had previously failed. Giro Travel Service Ltd of which he had been controlling director went out of business in August 1971. Century Tours Ltd of which he was also the owner or controlling director had gone into insolvent liquidation as recently as 13 September 1985. Mr Deverell was concerned in the management of the company from the time of its incorporation; he was
F  one of the signatories to the company's bank account. In a sales document drawn up in 1992 for which he was responsible he was described as an effective founder. He claimed that his participation was as a consultant. The judge concluded that "in reality he was throughout the whole story senior management and a key executive".

   7   The particular business of the company was that of a flight seat sales operator on the Gatwick/Nice route. For the purpose of promoting the sales
G  of flight seats on the return journey and acting as its broker in France it formed an associated or subsidiary company in France called Euro Express SARL Mr Deverell was the gérant or managing director of that company.

   8   Mr Colin Blyth joined the company as a manager shortly after its incorporation. He was appointed company secretary on 12 July 1987. He became a director of the company on 23 August 1991 shortly before the resignation of Mr Besant. He remained a director until the liquidation of the
H  company in March 1993.

   9   The company was acquired by Pilgrim Air, a subsidiary of Granada Plc, in June 1988. Though the shares in the company were acquired by Pilgrim Air Mr Besant remained a director. The judge found that "the internal management [of the company] proceeded as before with Mr Besant

and Mr Deverell taking an important and active role in management". In *A* October 1989 Pilgrim Air closed down the company's operations but agreed, in January 1990, to what was colloquially known as a management buyout. The apparent purchaser was Mr Besant. He paid £1 for all 20,000 issued shares. The shares were registered in his sole name and, according to the file maintained at Companies House, he remained the sole director of the company.

10 Mr Hopkins had been chief executive of Granada Travel, the *B* holding company of Pilgrim Air. He had been involved in the travel business since 1961. In 1988 he left Granada Travel on grounds of ill-health and went to live in France. Shortly after the management buyout in January 1990 he was approached initially by Mr Besant alone and later by both Mr Besant and Mr Deverell to help expand the company's business on the return leg of its route, i e from Nice to London. Mr Hopkins told the judge *C* that he agreed to do so on a consultancy basis. He bought one-third of the issued shares (6,666) from Mr Besant for £3,333 which, at his request, were registered in the name of Checkout Ltd, an offshore company controlled by Mr Hopkins. He was provided by the company with free air travel between Nice and Gatwick as well as substantial cash benefits.

11 By July 1990, as the judge accepted, the shares in Checkout Ltd, *D* which by then had acquired all Mr Hopkins's other assets, had been transferred to Languedoc, a Channel Island trust company, and were held by that company on the trusts of an offshore settlement for the benefit of Mr Hopkins and his family. In October 1990 Checkout transferred the shares in the company to another Channel Island company, Chalfont Enterprises Ltd. At some time in late 1991 or 1992 Chalfont Enterprises Ltd charged the shares in the company in favour of Allied Irish Bank (Channel *E* Islands) Ltd. The initial steps were no doubt taken in anticipation of the presentation on 17 August 1990 by the Inland Revenue of a petition for a bankruptcy order against Mr Hopkins. Ultimately a bankruptcy order was made against him on 27 November 1991.

12 Mr Stevens joined the company in October 1990. He was appointed a director on 18 October 1990 and he acquired from Mr Besant 6,666 shares *F* in the company. This represented one-third of Mr Besant's original holding and half of what he had left after having transferred 6,666 shares to Checkout Ltd at the direction of Mr Hopkins. Mr Stevens did not give evidence before the judge. The judge described him as a distinctly shadowy figure. Initially he was brought in as a non-executive director and was not paid. He dealt with matters concerning the Civil Aviation Authority and ATOL. The judge considered that it would be consistent with what *G* happened to describe Mr Stevens as Mr Deverell's stooge and that he was the most obvious candidate for casting in the role of a puppet.

13 In April 1991 the business of the company expanded in a new direction, namely the schools ski market. The judge found that this market had been in the hands of two giants who had both gone out of business. The company diversified into this area under the name of Kaleidoscope. In *H* relation to schools ski holidays in Austria there was a profit-sharing arrangement with the company's agent, Mr Walter Mayer, and his wholly owned company W M Ferienhotels. The judge referred to the evidence of Mr Hopkins that he had advised that Mr David Lyne and Mrs Pamela Smith should be brought in to look after the operation (as they were), that he,

Case 1:21-cv-11059-GHW   Document 150-22   Filed 06/28/23   Page 9 of 25
347
[2001] Ch                Sec of State for Trade v Deverell (CA)
                                                    Morritt LJ

A   Mr Hopkins, would not be available in the United Kingdom and that, in anticipation of his bankruptcy, he could not be involved in the management of the business. He said that his own duties would have to be restricted to advice, the production of brochures, the business plan and contracting duties. The judge concluded that: "There can be no doubt of course that [Mr Hopkins] was heavily involved with [Kaleidoscope]. It gave him a major opening in a field which he knew to perfection." The judge accepted

B   that in connection with the bankruptcy order Mr Hopkins was advised to avoid involvement on the financial side of the company's business.

   **14**  In view of its increased business the company needed to increase its ATOL bond from £121,923 to £472,041. As part of its financial structure the Civil Aviation Authority required the company to have subordinated loans. A company called Linberg Designs Ltd, an offshore company

C   registered in Alderney on 6 June 1991, agreed to provide such loans and entered into two subordinated loan agreements in respect of £40,000 and £60,000 respectively. The Civil Aviation Authority was so informed. But the researches of the liquidator showed and the judge accepted that there was no loan of new money whether or not subordinated. The sums of £40,000 and £60,000 were ostensibly paid by Linberg to the company on

D   10 June and 18 September 1991. But at its year end Linberg was shown as a debtor for £98,237 represented by £60,000 paid by the company to Mr Deverell in December 1990 and £34,237 paid by the company to Linberg on 13 September 1991. The judge concluded that "certainly £34,000 and in all probability virtually the whole loan went round in a circle. This was a most serious deception of the Civil Aviation Authority." He considered that Mr Deverell was "at the heart of it" but, though

E   Mr Hopkins might have been instrumental in setting up Linberg Design, there was no evidence that Mr Hopkins was involved in such deception.

   **15**  In the summer 1991 there was a major policy disagreement between Mr Besant and Mr Deverell. As I have recorded Mr Blyth was appointed a director of the company on 23 August 1991. Shortly thereafter the disagreements between Mr Besant and Mr Deverell came to a head. At a board meeting consisting of Mr Besant, Mr Blyth and Mr Stevens the latter

F   two sided with Mr Deverell and against Mr Besant. Mr Besant refused to resign and steps were taken to convene a meeting of members to consider a resolution for his removal. In the event it was unnecessary to hold it for, on 5 November 1991, Mr Besant accepted quite a generous resignation package and resigned. The judge described this episode as the oddest of all. He said:

G   "It is of course an odd enough feature that the 'consultant' should stay and the director should go—though [Mr Deverell's] consultancy was really no more than a label. He was senior management on any view. But it is even odder that the others were prepared to force the issue. On the register the shareholdings were equal thirds with [Mr Besant] holding the odd share. With [Mr Stevens] against him . . . he would narrowly outvote Mr Stevens unless the Chalfont holding cast its vote against him . . .

H   [Mr Deverell] said in evidence that he spoke to the directors and also to [Mr Hopkins] . . . Mr Hopkins himself says that he was not consulted."

The judge concluded that the episode clearly showed that Mr Deverell was regarded by others as important and powerful, that Mr Hopkins appeared to have been spoken to rather than to have taken the initiative and that

although the Chalfont holding was in baulk some at least thought that the    A
threat of the use of its voting power was real.  After the resignation of
Mr Besant Mr Stevens and Mr Blyth were the only directors of the company
until the appointment on 20 January 1992 of Mr Lyne and Mrs Smith.

16   In addition to the subordinated loan capital it was necessary, in
order to satisfy the Civil Aviation Authority, to increase the issued capital of
the company.  At an extraordinary general meeting held on 12 December
1991 the authorised capital was increased to £250,000 divided into 250,000    B
£1 shares.  The minute records that the meeting was attended by Mr Besant,
Mr Blyth representing Chalfont Enterprises and Mr Deverell representing
Mr Stevens and that Mr Besant abstained.  Pursuant to the articles of
association such shares should be offered to the existing shareholders in
proportion to their existing holdings.  165,000 shares were issued payable in
full in cash on 17 February 1992.  No shares were taken up by either    C
Mr Besant or Chalfont.  The shares were taken up by Mr Stevens as to
79,160, which was 24,160 more than his entitlement to one-third, 30,833 to
Mr Blyth and 55,000 to a Mr Mays, neither of whom had previously held
any shares at all.  According to the judge Mr Mays was an English travel
operator with an office at Salzburg Airport.  The judge concluded that it was
"in all probability a window-dressing exercise for the benefit of the Civil
Aviation Authority."    D

17   In March 1992, notwithstanding the apparent increase in the issued
share capital, the company issued £460,000 loan stock to lenders found by
their auditors.  A Mr Norris was appointed a director to protect the interests
of the loan stock holders.  He took no part in the management of the
company and no complaint is made against him.  At this time both
Mr Deverell and Mr Stevens were expressing their concerns at the absence of    E
any proper procedure to monitor expenditure and the lack of management
accounts and cash flow forecasts.  Indeed Mr Stevens expressed the fear that
the company might be trading whilst insolvent.  Mr Hopkins persuaded him
and others that that was not the case.  One consequence was that on the
suggestion of Mr Standen of the company's auditors, Tuffin & Co, Mr Alan
Charlwood was recruited from a specialist agency and appointed a financial
controller.  He reported to Mr Deverell.  Originally he was engaged for six    F
months only but in September he was taken on as part of the permanent
staff.  The judge regarded Mr Charlwood as thoroughly dishonest both as
the financial controller and as a witness.

18   In the summer 1992 a number of relevant events occurred.  First,
Mr Deverell entered into negotiations with First European Ltd for that
company to acquire the shares in the company.  First European was seeking    G
to set up a new airline operating between London and Nice and was an
obvious commercial associate.  Later, in December 1992, the proposals
changed to a purchase of the company's assets attributable to the flight seat
sale operation with the proceeds thereof being used to expand the
Kaleidoscope business.  During the course of the negotiations, which were
carried on by Mr Deverell with the authority of the board and the
knowledge and apparent approval of Mr Hopkins he stated in terms that he    H
and Mr Hopkins had received an unsolicited offer for the company.  Second,
W M Ferienhotels had to overdraw substantial sums from their bankers in
order to pay for the company's bookings with hoteliers in Austria.
Mr Hopkins sent an urgent memorandum to Mr Blyth with a copy to

Case 1:21-cv-11059-GHW   Document 150-22   Filed 06/28/23   Page 11 of 25
[2001] Ch                                    Sec of State for Trade v Deverell (CA)
                                                                    Morritt LJ

A   Mr Deverell, amongst others, requiring urgent payments to W M Ferienhotels
    so as to restore its credit. The liquidator considered, and the judge agreed,
    that by August 1992 the company was insolvent. Third, the company
    moved to larger leasehold premises. The landlord was a company of which
    Mr Deverell was a director and shareholder. In addition he had given a
    guarantee of its debts secured on his own home. The company agreed to a
B   loan of £180,000 being made at the commencement of the lease to defray the
    cost of the considerable refurbishment works required. The loan was to be
    repaid by set-off against the rent subsequently falling due.

        19  In October 1992 Mr Charlwood went to Austria, as the judge
    thought, in part to obtain evidence to support his theory that Mr Hopkins
    was siphoning the company's money out to Austria and then pocketing it
    himself. Mr Charlwood found no such evidence but on his return produced
C   a credit note from W M Ferienhotels acknowledging that it would pay
    £200,000 to the company as its share of the profits. The allegation against
    Mr Hopkins came to his attention. As the judge described it there was a
    monumental row. Mr Charlwood grovelled and gave a humiliating apology;
    he kept his job. Mr Lyne, who had become unwittingly involved, apologised
    unreservedly and resigned as a director on 7 November 1992.

D       20  The company's year end was 31 October. The audited accounts
    were sent to the Civil Aviation Authority. In the summer of 1992 it was
    anticipated that the authority would be troubled by the company's lack of
    liquidity. The accounts to 31 October 1992 were dressed to allay that
    concern. First, the W M Ferienhotels credit note was entered at its face value
    as cash. Second Euro Express SARL, which owed the company £500,000 it
    could not pay, paid £250,000 on the eve of the balance sheet date which the
E   company paid back a few days later. The sum so paid was recorded as a cash
    balance as at the balance sheet date. The judge concluded that Mr Deverell
    was "a prime mover" in the window dressing of the accounts which was
    intended to deceive the Civil Aviation Authority.

        21  As I have already mentioned, the basis of the negotiations with First
    European changed on 17 December 1992. The proposal then discussed was
    for the sale of the flight side assets and the use of the proceeds of sale thereof
F   in the expansion or support of the Kaleidoscope business. Though a
    memorandum of understanding dated 14 February 1993 was signed by
    Mr Deverell, First European and the company, its implementation was
    conditional on loans from a Mr Adams which never materialised.
    Accordingly, on the advice of Mr Gilbert, an insolvency expert with Levy
    Gee, the company went into creditors' voluntary liquidation on 10 March
G   1993. Mr Gilbert and Mr Pallen of Ernst & Young were appointed joint
    liquidators.

        22  These proceedings were commenced shortly before the expiry of the
    two-year period prescribed by section 7(2) of the Company Directors
    Disqualification Act 1986. The allegations against Mr Deverell and
    Mr Hopkins were, in accordance with the normal practice, contained in the
    affidavit in support of the application sworn by Mr Gilbert. The allegation,
H   as clarified at the commencement of the hearing before the judge, was that
    Mr Deverell and Mr Hopkins were shadow directors as defined in
    section 22(5) of the Act, not de facto directors coming within the definition
    of director contained in section 22(4), as "any person occupying the position
    of director, by whatever name called". Thus the judge only dealt with the

Case 1:21-cv-11059-GHW   Document 150-22   Filed 06/28/23   Page 12 of 25
**1521**
Sec of State for Trade v Deverell (CA)                          [2001] Ch
Morritt LJ

allegation before him.  In his notice of appeal and in argument before us the    A
Secretary of State sought leave to take the point that if Mr Deverell and
Mr Hopkins were not shadow directors then they were de facto directors.
We rejected the application.  My reasons for doing so are, briefly, that it is
too late and that to grant leave would prejudice Mr Deverell and
Mr Hopkins.  Counsel for the Secretary of State explained why there had
been the change of approach and that he would not seek to rely on any other    B
evidence or finding of fact.  But neither point meets the objection that the
hearing below was conducted throughout on a different basis.  That the
Secretary of State will rely only on existing findings ignores the possibility
that if the case had been conducted differently at an earlier stage the
respondents might have adduced further evidence in support of different or
further findings.  Their counsel informed us that such evidence would have
been sought.  Likewise the fact that the Secretary of State might then have    C
had good reason to limit his case against Mr Deverell and Mr Hopkins is no
reason for letting him expand it now on the ground that the reason no longer
exists if to do so will cause prejudice to them.

  **23**   Accordingly, this appeal has been confined to the questions whether
either Mr Deverell or Mr Hopkins was a shadow director.  Those questions
break down into five issues, namely (1) whether the judge correctly    D
interpreted the statutory definition; (2) whether the judge made the correct
findings of fact with regard to Mr Deverell; (3) whether on the findings of
fact the judge ought to have made, alternatively did make, with regard to
Mr Deverell the application of the definition properly interpreted should
lead to a finding that Mr Deverell was a shadow director; (4) whether the
judge made the correct findings of fact with regard to Mr Hopkins;
(5) whether on the findings of fact the judge ought to have made,    E
alternatively did make, with regard to Mr Hopkins the application of the
definition properly interpreted should lead to a finding that Mr Hopkins was
a shadow director.  Before us issues (2) and (3) and (4) and (5) were argued
in reverse order.  From the advocates' point of view there were obvious
attractions in doing so.  But the logical order and, therefore, the one most
likely to arrive at the proper result is that in which I have set out the issues    F
and which I propose to follow.

*The interpretation of section 22(5)*

  **24**   The words of the definition, as opposed to the term defined, are not
new.  Thus, with the omission of the proviso it was added by section 3 of
the Companies (Particulars as to Directors) Act 1917 to the definition    G
of the word "director" in sections 26, 75 and 274 of the Companies
(Consolidation) Act 1908, it was included in the definition of "officer" in
section 73(3) and "director" in section 75(5) of the Companies Act 1928.
What is now the proviso was added by section 380(2) of the Companies Act
1929.   Since then it has been carried forward through the various
consolidations effected in 1948 and 1985.  The words "shadow director"
first appeared as the defined term in section 63 of the Companies Act 1980.    H
Currently the defined term and the definition appear not only in section 741
of the Companies Act 1985 and section 22(5) of the Company Directors
Disqualification Act 1986 but also in section 251 of the Insolvency Act 1986
and section 207(1) of the Financial Services Act 1986.

Case 1:21-cv-11059-GHW  Document 150-22  Filed 06/28/23  Page 13 of 25
[2001] Ch                           Sec of State for Trade v Deverell (CA)
                                                                Morritt LJ

A    25    The definition has been considered by the courts from time to time
but this appeal appears to be the first time its proper construction may be
crucial to the outcome of an appeal. The previously reported cases, taking
them in chronological order, are *In re Lo-Line Electric Motors Ltd* [1988]
Ch 477; *In re Unisoft Group Ltd (No 3)* [1994] 1 BCLC 609; *In re
Hydrodam (Corby) Ltd* [1994] 2 BCLC 180; *Australian Securities
Commission v AS Nominees Ltd* (1995) 133 ALR 1; *Secretary of State for
B    Trade and Industry v Laing* [1996] 2 BCLC 324 and *In re Kaytech
International plc* [1999] BCC 390.

26    In *In re Lo-Line Electric Motors Ltd* [1988] Ch 477 Sir Nicolas
Browne-Wilkinson V-C was concerned with an allegation that the person in
question was a de facto director, not a shadow director. He said of the latter
that the definition presupposes that there is a board of directors "who act in
C    accordance with instructions from someone else, the éminence grise or
shadow director": p 489. He rejected the submission that because the
section had penal consequences the word "director" should be strictly
construed. As the paramount purpose of disqualification is the protection of
the public he approached the question of construction on the normal basis.

27    In *In re Unisoft Group Ltd (No 3)* [1994] 1 BCLC 609 Harman J
was concerned with an application to strike out a minority shareholder's
D    petition. One of the relevant allegations was that a particular individual was
a shadow director within the meaning of the definition contained in
section 741 of the Companies Act 1985. Of that definition Harman J said, at
p 620:

"those words can only mean . . . that the shadow director must be, in
E    effect, the puppet-master controlling the actions of the board. The
directors must be (to use a different phrase) the 'cat's paw' of the shadow
director. They must be people who act on the directions or instructions of
the shadow director as a matter of regular practice. That last requirement
follows from the reference in the subsection to the directors being
'accustomed to act'. That must refer to acts not on one individual
occasion but over a period of time and as a regular course of conduct."

F
28    In *In re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180
Millett J contrasted a de facto director with a shadow director. He
considered, at p 183, that the terms do not overlap: "They are alternatives,
and in most and perhaps all cases are mutually exclusive." Thus, he
suggested, it would be embarrassing to allege, without distinguishing
between them, that the respondent acted as a de facto or alternatively a
G    shadow director. He continued:

"A de facto director . . . is one who claims to act and purports to act as
a director, although not validly appointed as such. A shadow director, by
contrast, does not claim or purport to act as a director. On the contrary,
he claims not to be a director. He lurks in the shadows, sheltering behind
others who, he claims, are the only directors of the company to the
H    exclusion of himself. He is not held out as a director by the company. To
establish that a defendant is a shadow director of a company it is
necessary to allege and prove: (1) who are the directors of the company,
whether de facto or de jure; (2) that the defendant directed those directors
how to act in relation to the company or that he was one of the persons

who did so; (3) that those directors acted in accordance with such   A
directions; and (4) that they were accustomed so to act. What is needed
is, first, a board of directors claiming and purporting to act as such; and
secondly, a pattern of behaviour in which the board did not exercise any
discretion or judgment of its own, but acted in accordance with the
directions of others."

29   Section 60 of the Corporations Law (Australia) is in the same terms   B
as section 22(5) save that the proviso is not confined to advice given in a
professional capacity but extends to advice given in the proper performance
of the functions attaching to a business relationship with the directors. In
*Australian Securities Commission v AS Nominees Ltd*, 133 ALR 1 Finn J,
sitting in the Federal Court of Australia, was concerned with petitions to
wind up various trust companies of which Windsor was a manager.   C
Finn J held, at p 52, that:

> "The reference in the section to a person in accordance with whose
> directions or instructions the directors are 'accustomed to act' does not in
> my opinion require that there be directions or instructions embracing all
> matters involving the board. Rather it only requires that, as and when the
> directors are directed or instructed, they are accustomed to act as the   D
> section requires."

Later, he concluded that it could and should be found that Windsor was a
director. He continued, at pp 52–53:

> "This finding does not . . . require it to be shown that formal directions
> or instructions were given in those matters in which he involved himself.
> The formal command is by no means always necessary to secure as of   E
> course compliance with what is sought. There is no reason to construe
> the section to so deny this . . . The idea of the section, as Wells J noted of
> its predecessor . . . is that the third party calls the tune and the directors
> dance in their capacity as directors. This aptly describes Windsor's role.
> The question the section poses is: Where, for some or all purposes, is the
> locus of effective decision making? If it resides in a third party such as   F
> Windsor, and that third party cannot secure the 'adviser' protection . . .
> then it is open [to the court] to find that person a director for the purposes
> of the Corporations Law."

In *Secretary of State for Trade and Industry v Laing* [1996] 2 BCLC 324
Evans-Lombe J adopted the propositions enunciated by Millett J in *In re
Hydrodam (Corby) Ltd* [1994] 2 BCLC 180.   G

30   In *In re Kaytech International plc* [1999] BCC 390 the Court of
Appeal was concerned with alleged de facto directors. Robert Walker LJ,
with whom Thorpe and Stuart-Smith LJJ agreed, commented, at p 402, on
the observations of Millett J in *In re Hydrodam (Corby) Ltd* [1994]
2 BCLC 180 in relation to the two concepts of de facto and shadow director
that they   H

> "have at least this much in common that an individual who was not a
> de jure director is alleged to have exercised real influence (otherwise than
> as a professional adviser) in the corporate governance of a company.
> Sometimes that influence may be concealed and sometimes it may be

A   open.  Sometimes it may be something of a mixture, as the facts of the
    present case show."

    31   I have referred to these cases in some detail as setting the context for
    the comments of Judge Cooke and the arguments of counsel for the Secretary
    of State.  In section 4 of his judgment, described as the "Legal framework",
    the judge set out the relevant provisions of the Act.  In paragraph 4.2.A he
B   set out four categories of director which he considered the law had
    developed so as to identify.  They were (1) directors properly so-called
    because they had been validly appointed; (2) de facto directors type 1, being
    those who assume to act, claim to be and are held out by the company as
    being directors; (3) de facto directors type 2, being those who directly
    assume the functions of the directors and act on a equal footing with those
C   who are but without having any sort of label; and (4) shadow directors as
    defined by Millett J in *In re Hydrodam (Corby) Ltd* He then set out the
    passage from the judgment of Millett J which I have already quoted as
    embodying the test which the Secretary of State had to satisfy so as to
    establish his case against Mr Deverell and Mr Hopkins.

    32   In paragraph 4.2.C Judge Cooke identified various points which he
    described as problems with the shadow director test.  The relevant problems
D   so identified are (1) whether the "directions or instructions" referred to in
    section 22(5) can include "advice", and (2) the extent to which such
    directions or instructions on which the board is accustomed to act must cast
    the board in a subservient role.  In respect of the first point he held that:

        "advice on its own will not do.  Only if such advice is so given and so
        accepted as to amount to a direction or instruction (coupled with a
E       pattern of the board being accustomed to act on it) is it relevant."

    With regard to the second point the judge considered that:

        "Directions or instructions are both words with a mandatory effect.
        Coupled with the word 'accustomed' they . . . contemplate a situation
        where the board has cast itself in a subservient role to the 'shadow', i e it
        does what it is told or to borrow an expression from trust law it
F       'surrenders its discretion' to the shadow.  Being accustomed to follow
        what somebody says does not of itself make what is said a direction/
        instruction . . . what the court has to find, whether on direct evidence or
        inference, is that the board does what [the shadow] tells it and exercises
        no (or at least no substantial) independent judgment."

G   33   For the Secretary of State it is submitted that the judge adopted too
    strict a test in both the problem areas he identified.  It is suggested that the
    definition is concerned to identify those with real influence in the corporate
    affairs of the company whatever the label given to the communications from
    the shadow to the board.  Thus, it is argued, all that is required is that what is
    said by the shadow to the board is not by way of professional advice but is
    usually followed over a wide enough area and for long enough.  In other
H   words frequent non-professional advice usually acted on is sufficient.
    34   Either or both counsel for Mr Deverell and Mr Hopkins accepted
    that the instructions or directions did not have to cover the whole of the
    company's activities but must cover at least those matters essential to the
    corporate governance of a company including control of its financial affairs.

They also accepted that the label attached to the communications from the   A
shadow to the board were immaterial provided that the communication was
understood or expected by both giver and receiver to be followed by the
latter.

35   I propose to express my conclusions on these and other issues in a
number of propositions. (1) The definition of a shadow director is to be
construed in the normal way to give effect to the parliamentary intention
ascertainable from the mischief to be dealt with and the words used.  In   B
particular, as the purpose of the Act is the protection of the public and as the
definition is used in other legislative contexts, it should not be strictly
construed because it also has quasi-penal consequences in the context of the
Company Directors Disqualification Act 1986. I agree with the statement to
that effect of Sir Nicolas Browne-Wilkinson V-C in *In re Lo-Line Electric
Motors Ltd* [1988] Ch 477, 489. (2) The purpose of the legislation is to   C
identify those, other than professional advisers, with real influence in the
corporate affairs of the company. But it is not necessary that such influence
should be exercised over the whole field of its corporate activities.  I agree
with the statements to that effect of Finn J in *Australian Securities
Commission v AS Nominees Ltd*, 133 ALR 1, 52–53 and Robert Walker LJ in
*In re Kaytech International plc* [1999] BCC 390, 402. (3) Whether any   D
particular communication from the alleged shadow director, whether by
words or conduct, is to be classified as a direction or instruction must be
objectively ascertained by the court in the light of all the evidence.  In that
connection I do not accept that it is necessary to prove the understanding or
expectation of either giver or receiver.  In many, if not most, cases it will
suffice to prove the communication and its consequence.  Evidence of such
understanding or expectation may be relevant but it cannot be conclusive.   E
Certainly the label attached by either or both parties then or thereafter
cannot be more than a factor in considering whether the communication
came within the statutory description of direction or instruction. (4) Non-
professional advice may come within that statutory description.   The
proviso excepting advice given in a professional capacity appears to assume
that advice generally is or may be included.  Moreover the concepts of
"direction" and "instruction" do not exclude the concept of "advice" for all   F
three share the common feature of "guidance". (5) It will, no doubt, be
sufficient to show that in the face of "directions or instructions" from the
alleged shadow director the properly appointed directors or some of them
cast themselves in a subservient role or surrendered their respective
discretions.  But I do not consider that it is necessary to do so in all cases.
Such a requirement would be to put a gloss on the statutory requirement that   G
the board are "accustomed to act" "in accordance with" such directions or
instructions.   It appears to me that Judge Cooke, in looking for the
additional ingredient of a subservient role or the surrender of discretion by
the board, imposed a qualification beyond that justified by the statutory
language.

36   In substance I would accept the submissions of counsel for the
Secretary of State and reject those of counsel for Mr Deverell and   H
Mr Hopkins.   Before leaving this part of the case I would add two
observations. The first relates to the use of epithets or descriptions in place
of the statutory definition of a shadow director. They may be very effective
in graphically conveying the effect of the definition in the light of the facts of

A   that case, as shown by their frequent use in the reported cases to which I have referred. But, it seems to me, they may be misleading when transposed to the facts of other cases. Thus to describe the board as the cat's paw, puppet or dancer to the tune of the shadow director implies a degree of control both of quality and extent over the corporate field in excess of what the statutory definition requires. What is needed is that the board is accustomed to act on
B   the directions or instructions of the shadow director. As I have already indicated such directions and instructions do not have to extend over all or most of the corporate activities of the company; nor is it necessary to demonstrate a degree of compulsion in excess of that implicit in the fact that the board are accustomed to act in accordance with them. Further, in my view, it is not necessary to the recognition of a shadow director that he should lurk in the shadows, though frequently he may, for example, in the
C   case of a person resident abroad who owns all the shares in a company but chooses to operate it through a local board of directors. From time to time the owner, tothe knowledge of all to whom it may be of concern, gives directions to the local board what to do but takes no part in the management of the company himself. In my view such an owner may be a shadow director notwithstanding that he takes no steps to hide the part he plays in
D   the affairs of the company. Lurking in the shadows may occur but is not an essential ingredient to the recognition of the shadow director. The second observation relates to the classification of directors to which Judge Cooke referred. It was not relevant to the resolution of this appeal to consider either the subdivision of de facto directors into types 1 and 2 or whether the categories of shadow director and de facto director are mutually exclusive. I express no view on either of those matters.
E

*The evidential burden*

37   It follows from my conclusions on the proper interpretation of section 22(5) that I consider that the judge directed himself by reference to too strict a test as a matter of law. Before turning to the facts it is also necessary to consider whether he properly directed himself in respect of the
F   burden of proof.

38   In paragraph 4.4(e) the judge properly directed himself that the standard of proof is the civil standard, that is the balance of probabilities. He also considered, in my view rightly, that the nature of the charge is one which requires proof of the relevant facts clearly and with conviction. But there are passages in the judge's judgment which suggest that he did not
G   follow his own precept. In paragraph 4.4(b) he observed in relation to "circumstantial evidence" that its purpose is

> "to produce a situation where the court says 'there can be no other sensible explanation'. If the respondent gives evidence that the court feels bound to accept as truthful and which provides a different explanation, the value of the circumstantial evidence is lost."

H   The judge returned to this point in paragraph 5.4.1 of his judgment in relation to the case for the Secretary of State that at all times Mr Deverell and Mr Hopkins owned or controlled the company. Having considered the various episodes in the history of the company he accepted Mr Hopkins as a witness of truth. He continued:

"The facts which I have found are in some cases consistent with the A
'ownership/control' theory most notable perhaps the [First European]
negotiations (a curious affair on any view) and the 'palace coup' "—the
removal of Mr Besant.—"But like all circumstantial evidence it is only
ultimately probative of an allegation if it leads to a conclusion to which
there is no other rational alternative. Here there are rational alternatives.
The fact that there is enough evidence to found a theory (there is such)
will not do. I will consider the rational alternative and my ultimate   B
conclusions below."

39  I would make three observations. First, the evidence to which the
judge referred was not circumstantial in the sense in which that expression is
normally used for the evidence related directly to the relevant acts and events
on which the Secretary of State's case depended. Second, the references to   C
the absence of a sensible or rational alternative are appropriate to questions
of fact to be proved beyond reasonable doubt, namely the criminal standard
of proof, not on a balance of probability. Third the credibility of a witness is
to be determined in the light of many factors; one of the more important is
the extent to which it is consistent with other evidence concerning the same
events. In other words, the credibility of a witness is to be determined in the
light of all the evidence and not independently of other evidence as to the   D
same events which is categorised as circumstantial. Accordingly, I approach
the judge's factual conclusions not only on the basis that he directed himself
by reference to too strict a test but also with concern that, though he
correctly directed himself as to the standard of proof, there are grounds for
thinking that he may not have applied that standard.

*Mr Deverell*                                                        E

40  As I have already indicated, I propose to consider first the contention
of the Secretary of State that the judge reached wrong factual conclusions in
respect of Mr Deverell, that is issue 2. The alleged errors are specified in
paragraph 6 of the notice of appeal. The Secretary of State contends that the
judge should have determined that Mr Deverell was one of the effective
owners or controllers of the company. Though raised separately from the   F
comparable allegation made in respect of Mr Hopkins, the two contentions
overlap.

41  In paragraph 5.1 of his judgment Judge Cooke described how this
allegation came to be made. Originally the case for the Secretary of State
relied on a number of disparate events demonstrating that Mr Deverell and
Mr Hopkins were much more closely connected with the management of the   G
company than their declared positions as consultants would suggest. The
Secretary of State then obtained copies of the correspondence between
Mr Deverell and First European suggesting that he and Mr Hopkins were in
a position to sell the entire company or its assets as they might choose. The
third and final stage came when the Secretary of State adduced the evidence
of Mr Charlwood, who asserted in terms that the shares ostensibly owned by
Messrs Besant, Stevens, Blyth and Mays were held by them as nominees for   H
Mr Deverell and Mr Hopkins. This is the case the judge considered at
considerable length and rejected.

42  He started by considering the various individuals involved. This was
not helped by the fact that none of Mr Besant, Mr Stevens or Mr Mays gave

A    oral evidence. He considered Mr Blyth and Mr Charlwood to be unreliable witnesses. He accepted Mr Lyne, appointed a director on 20 January 1992 having been employed in connection with the Kaleidoscope part of the business, and Mr Standen, a partner in the firm responsible for the audit of the company's accounts, as witnesses of truth.

     43    In relation to the company's history the judge concluded that there was no evidence that Mr Deverell had a beneficial interest in the issued share
B   capital at any stage before the management buyout or in consequence of it. He considered that it was consistent with the facts giving rise to the departure of Mr Besant and the negotiations with First European that Mr Stevens should be a nominee shareholder for Mr Deverell. Ultimately the judge concluded that the case was not made out because he accepted the evidence of Mr Hopkins that he, Mr Hopkins, did not own or control any
C   shares in the company.

     44    The suggestion that the judge reached the wrong conclusion rests on a number of separate matters. First, the judge did not adequately appreciate that the ABTA rules required Mr Deverell to conceal his shareholding as well as his part in the management of the company. Second, the fact that the acquisition of the shares from Pilgrim Air by means of what was described as
D   a management buyout did not justify a conclusion that the acquisition was by Mr Besant alone because, as the judge found, Mr Deverell was equally concerned in the management of the company. Third the judge failed to give adequate weight to his finding that Mr Stevens was Mr Deverell's stooge. Fourth, the judge made no reference to two letters dated August 1991 from Mr Deverell to Mr Standen in which Mr Deverell appeared to consider in relation to the appointment of Mr Blyth as a director that the composition of
E   the board of directors of the company was a matter for him and Mr Hopkins. Finally the judge appeared to reject the clear inference from the documents that Mr Deverell was negotiating the sale to First European as a substantial shareholder without giving any reasons for doing so.

     45    I do not consider that these matters or any combination of them entitles this court to reach different factual conclusions from those of the
F   judge. The first point arises in connection with the suggestion that Mr Deverell was the beneficial owner of the shares registered in the names of Mr Besant or Mr Stevens. There is no evidence at all that Mr Deverell provided any part of the purchase price or that Mr Besant or Mr Stevens entered into any assignment or declaration of trust in respect of their respective holdings of shares in the company so as to confer a beneficial
G   interest on Mr Deverell. None of the matters on which the Secretary of State relies justifies an inference of beneficial ownership. The fact that the rules of ABTA would have necessitated the concealment of any beneficial ownership of shares in the company is not a ground from which to infer such ownership. The use of the commonly used label "management buyout" cannot predicate that one of the purchasers was Mr Deverell when it is beyond doubt that Mr Besant was at least part of the management and the
H   sole director. Similarly the description of Mr Stevens as the stooge of Mr Deverell says nothing about the beneficial ownership of the shares in the company. I would accept that the fourth and fifth matters are a good indication of the views of Mr Deverell. But they are not proof of the beneficial ownership of shares registered in the names of Mr Besant and

Mr Stevens; for that purpose it is the views or admissions of Mr Besant and   A
Mr Stevens which matter.

46   I do not understand the Secretary of State to rely on any control of
the company other than that which stems from share ownership.  If he did
then it would have to rest on some contract with the shareholders.  But, as in
the case of ownership, there is no evidence at all of any such agreement.  I do
not consider that it can be inferred from all or any of the matters relied on by
the Secretary of State.                                                       B

47   I turn then to issue (3).  In paragraph 5.4.2 Judge Cooke considered
whether Mr Deverell or Mr Hopkins could be regarded as shadow directors
on some basis other than ownership or control of the company.  With regard
to Mr Deverell he found, in paragraph 5.4.2(a), that (a) Mr Deverell was
brought in by Mr Besant to be an essential part of management;
(b) Mr Deverell could not be a director because of the ABTA rules but from   C
start to finish he was a key member of management; though his involvement
in management was itself a breach of the ABTA rules, it was easier to
conceal; (c) Mr Deverell was a party to the exclusion of Mr Besant;
(d) Mr Deverell was personally involved in the share issue which occurred in
February 1992; (e) Mr Deverell undoubtedly played a prominent part in
management though finance was customarily left to Mr Blyth and
Mr Charlwood and Mr Deverell did not tell the directors what to do;          D
(f) Mr Deverell played a prominent role in the First European negotiations;
(g) Mr Deverell bossed everyone around from the directors downwards;
(h) Mr Deverell (and Mr Hopkins) stood out as far more capable than
Mr Blyth and more involved than Mr Stevens but Mr Lyne was not a puppet
and exercised clear independence.

48   In paragraph 5.4.2(c) the judge gave what he described as his final   E
conclusions.  He stated:

> "In my judgment the facts which I have found do not support the
> central thesis of shadow directorship, viz that [Mr Deverell] was
> somebody on whose directions/instructions the directors were
> accustomed to act.  He was a prominent and powerful member of
> management who took part in that management on a broad and wide   F
> ranging basis on occasion on almost an equal footing with the directors.
> 'Consultant' certainly does not describe what he did.  But this sort of open
> and equal participation is in my judgment the very antithesis of the
> 'éminence grise'/puppet-master activity (or inactivity) required of a
> shadow director."

After again referring to the judgment of Millett J in *In re Hydrodam (Corby)*   G
*Ltd* [1994] 2 BCLC 180 the judge returned again to the evidence of Mr Lyne.
He said:

> "In my judgment [Mr Lyne's] evidence even though directed to his own
> erroneous definition goes strongly to show that the board did not act in a
> way that would satisfy the correct definition."

49   The Secretary of State relies on a number of other findings of fact      H
made by the judge but which were not included in the summary in paragraph
5.4.2(a).  They are: (a) Mr Lyne and Mr Blyth were unable to think of an
example of where the board did not follow Mr Deverell; (b) Mr Deverell had
been responsible for the growth of the business of the company and had

Case 1:21-cv-11059-GHW   Document 150-22   Filed 06/28/23   Page 21 of 25
[2001] Ch                    Sec of State for Trade v Deverell (CA)
                                                  Morritt LJ

A    succeeded in recruiting excellent senior management to support him; (c) until
     1990 Mr Deverell and Mr Besant managed the business and were the only
     signatories to the bank account; (d) Mr Deverell was involved, with
     Mr Besant, in bringing Mr Hopkins into the company; (e) it was the
     disagreement of Mr Deverell with Mr Besant which led to the exclusion of
     Mr Besant; (f) the authority of Mr Deverell within the company with regard
     to expenses and the operation of the company's bank accounts was
B    equivalent to that of the directors; (g) Mr Deverell's pay and benefits in kind
     exceeded in value those of the directors; (h) Mr Deverell was involved in the
     original deception arising from the subordinated loan from Linberg and the
     continued fiction; (i) Mr Deverell caused the company to make the loan of
     £180,000 to the lessor of the premises to which the company moved in 1992;
     (j) Mr Deverell was at the heart of the deception of the Civil Aviation
C    Authority by the window-dressing of the company's accounts for the year
     ended 31 October 1992 with the repayment from Euro Express SARL.
        50   Counsel for Mr Deverell placed considerable emphasis on the judge's
     acceptance of the evidence of Mr Lyne: see paragraphs 47(h), 48, 49(a)
     above and 52 below. With regard to the finding I have summarised in
     paragraph 49(a) counsel relies on the fact that Mr Lyne was not asked for an
     example. It was also suggested that to reach a conclusion contrary to that of
D    the judge would involve not only a rejection of the evidence of Mr Lyne
     which the judge accepted but also the acceptance of the evidence of
     Mr Charlwood which the judge rejected.
        51   I can state my conclusion more shortly. First, I do not accept that to
     reach a conclusion different to that of the judge would involve accepting the
     evidence of Mr Charlwood. The Secretary of State does not now rely on it,
E    nor did the judge. If a different conclusion is to be reached it is on the basis
     of the judge's own findings not the evidence of Mr Charlwood.
        52   Second, it is necessary to bear in mind the relatively limited
     involvement of Mr Lyne. He was employed by the company from April
     1991 in flight programming in connection with the business of
     Kaleidoscope. He was described by the judge as being involved on the
     Kaleidoscope side. He became a director of the company on 20 January
F    1992 and resigned under 10 months later on 7 November 1992. His cross-
     examination by counsel for Mr Deverell, to which the judge referred with
     approval in paragraph I.2, was, in terms, directed to whether at the
     management meetings either he or any of the other directors were told what
     to do. He said that they were not. But many matters concerning the
     company were evidently dealt with outside the management meetings and
     involved persons other than Mr Lyne. Thus the exclusion of Mr Besant
G    occurred before he became a director. Mr Lyne was not in fact involved
     with the subordinated loans from Linberg in 1991, the share issue in
     February 1992, the initial negotiations with First European in June 1992, the
     loan to the lessor of the new office premises in September 1992 or the
     window dressing of the accounts for the year ended 31 October 1992 with
     the Euro Express SARL repayment. The change in the nature of the
     transaction with First European to an asset sale which occurred in December
H    1992 was after Mr Lyne had resigned.
        53   The reference in the passage from the judge's judgment which I have
     quoted in paragraph 48 to éminence grise/puppet-master suggests that the
     judge had in mind a need to lurk and the adoption by the board of a

Case 1:21-cv-11059-GHW   Document 150-22   Filed 06/28/23   Page 22 of 25
1360
Sec of State for Trade v Deverell (CA)                                    [2001] Ch
Morritt LJ

subservient role as conditions for a finding of shadow directorship. This *A*
appears to be borne out by the fact that his conclusion is inconsistent with
his own findings which I have recorded at paragraphs 47 and 49. They make
it plain that Mr Deverell was concerned at the most senior level and with
most aspects of the direction of the company's affairs. This could only be
achieved by an ostensible consultant if those who were directors acted upon
his directions or instructions conveyed by words or conduct. The judge held
in terms that Mr Deverell "bossed everyone around from the directors *B*
downwards". It is immaterial that, as the judge observed, he was the sort of
man who would boss anyone around. The facts, as found, show that he
bossed the directors around and, because what he achieved was within the
province of the directors, the directors were accustomed to submit to his
requirements.

54   For all these reasons I conclude that the judge was wrong to find that *C*
Mr Deverell was not a shadow director of the company. I will consider later,
after dealing with issues (4) and (5), the consequences of that conclusion.

*Mr Hopkins*

55   Issue (4), like issue (2) in the case of Mr Deverell, raises the question
whether the judge was wrong to conclude that Mr Hopkins did not, together
with Mr Deverell, own and control the company. In the case of Mr Hopkins *D*
the question of ownership is clear. He acquired from Mr Besant one-third of
the shares then in issue in early 1990. By July 1990 he had divested himself
of his beneficial ownership by the creation of the Languedoc Trust. It
appears that he had some entitlement as an object of the discretionary
powers conferred on the trustees of that settlement but it would be
inconsistent with the evident intention to pre-empt the consequences of his *E*
impending bankruptcy that he should retain any beneficial interest. In late
1991 or 1992 the shares were charged to the bank but by then Mr Hopkins
had been made bankrupt and his interest (if any) had vested in his trustee.

56   The case for the Secretary of State was that the shares issued in
February 1992, and therefore after the bankruptcy of Mr Hopkins, to
Mr Blyth and Mr Mays amounting in all to 85,833 were held by them as *F*
nominees for Mr Hopkins. It was suggested that they matched the 85,834
shares held by Mr Stevens, as alleged, as nominee for Mr Deverell. In
addition there were holdings of 6,667 shares registered in the name of
Mr Besant and 6,666 shares registered in the name of Checkout Ltd or
Chalfont Enterprises Ltd.

57   But the judge considered that this issue of shares was a sham anyway.
Even if it was genuine there is no evidence at all that the registered *G*
shareholders, Mr Blyth and Mr Mays, were trustees of their shares for
Mr Hopkins. The judge accepted the evidence of Mr Hopkins that he was
not the beneficial owner. In my view he should more correctly have
determined that there was no evidence that he was.

58   With regard to Mr Hopkins the judge's factual summary contained
in paragraph 5.4.2 is much more limited than in the case of Mr Deverell. It *H*
may be summarised as follows: (a) Mr Hopkins was brought in initially in a
limited role, which later grew substantially with the creation of
Kaleidoscope; (b) on Mr Lyne's evidence neither Mr Lyne nor the other
directors were told by Mr Hopkins what to do; (c) Mr Hopkins was more
often than not abroad. He gave a good deal of advice, some of it unsolicited.

Case 1:21-cv-11059-GHW   Document 150-22   Filed 06/28/23   Page 23 of 25
[2001] Ch                          Sec of State for Trade v Deverell (CA)
                                                                Morritt LJ

A  People accepted it and acted on it. His activities were not limited to advice, he tended to spill over into other matters and though he had a limited and sporadic involvement in some financial matters he was not concerned in finance on anything like a regular basis; (d) Mr Hopkins stood out as far more capable that Mr Blyth and far more involved than Mr Stevens.

59  In paragraph 5.4.2(c) Judge Cooke gave what he described as his final conclusion regarding Mr Hopkins. He said:

B  "If, as I have held, the ownership/control theory is untenable on the evidence then much of the case against [Mr Hopkins] really goes. The alternative ground is to say that the directors habitually acted on his advice. I would accept that when he gave advice they usually (if not always) took it. But that (as I have already explored when I considered the law) is in my judgment nowhere near saying that there was a 'pattern of behaviour in which the board did not exercise any discretion . . . of its own, but acted in accordance with the directions of others': *In re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180, 182. There is no evidence which suggests that in circumstances where [Mr Hopkins] was not giving advice that the directors did not exercise their own discretion. Nor indeed is there evidence that suggests that the acceptance of advice was mechanical as opposed to considered."

C

D  In my view this passage discloses three errors of law. First the judge substituted a "pattern of behaviour in which the board did not exercise any discretion . . . of its own" for the statutory test of being accustomed to act on the directions or instructions of the alleged shadow director. Second, if, as the judge concluded, the directors usually took the advice of Mr Hopkins, it is irrelevant that on the occasions when he did not give advice the board did exercise its own discretion. Third, if the board were accustomed to act on the directions or instructions of Mr Hopkins it is not necessary to demonstrate that their action was mechanical rather than considered. None of the parties suggested that if we disagreed with the judge's conclusions of law we should order a new trial. Accordingly it is incumbent on this court to reach a conclusion on the basis of the facts as found by the judge.

E

F  60  The Secretary of State contends that the judge failed to give any weight to further significant aspects of the case against Mr Hopkins. He contends that had the judge done so then he would not have accepted the truthfulness of Mr Hopkins's evidence. Having considered these matters, set out in paragraph 8 of the notice of appeal, I do not think that separately or together they could justify this court reaching a different conclusion on Mr Hopkins's credibility with regard to the question of share ownership. But it is plain that the judge himself did not accept the evidence of Mr Hopkins whereby he sought to characterise his role as that of a consultant and limit his participation to advice.

G

61  In that respect the Secretary of State contends that the judge's conclusion is inconsistent with his own findings. Thus, in addition to the matters I have summarised in paragraph 58 above, he relies on findings that (a) at the meeting held on 3 April 1992 it was Mr Hopkins who, in strong terms, convinced the directors that the company was not trading while insolvent; (b) Mr Hopkins was paid substantially more than the directors; (c) Mr Hopkins intervened at management meetings less than Mr Deverell

H

*A*

but both of them appeared as men of importance whose words are listened to; (d) the directors were accustomed to act on Mr Hopkins's advice.

62    Counsel for Mr Hopkins placed great reliance on the evidence of Mr Lyne to which I have already referred which the judge accepted. In the case of Mr Hopkins the judge pointed out that there was no evidence that Mr Hopkins was concerned with the exclusion of Mr Besant, the issue of shares in February 1992 or the window-dressing of the accounts in October 1992. He found that Mr Hopkins's involvement in the negotiations with First European was minimal. Moreover, Mr Lyne was concerned with the Kaleidoscope division of the company's business and so better able than in the case of Mr Deverell to assess the role Mr Hopkins played.

*B*

63    I return to the statutory test as I have explained it earlier in this judgment. Was Mr Hopkins a person in accordance with whose directions or instructions the directors of the company were accustomed to act? In my view he was. First, it is plain that his involvement went far beyond that of a consultant and was not confined to the business of Kaleidoscope. Thus, to give two examples, it was Mr Hopkins who insisted that the company put W M Ferienhotels into credit and it was Mr Hopkins who took the lead on the issue whether the company was trading while insolvent. These were two important matters directly affecting the company's financial affairs and the interventions went beyond the giving of mere advice. Second, the position of Mr Hopkins in the structure of the company, as in the case of Mr Deverell, gave to his "advice" the potency of directions or instructions. As in the case of Mr Deverell, the directors listened to him. Third, his suggestions, to use a neutral word, when given were adopted. As the judge put it, the directors were accustomed to act on them. The fact that he did not at the management meetings tell the directors what to do is not sufficient to refute the case for the Secretary of State. It is clear that he had no need to be so direct. Indeed the only difference between the cases of Mr Deverell and of Mr Hopkins is that there is more evidence of the participation of the former than of the latter. But, in my view, this is because Mr Hopkins lived abroad. On the occasions when he did participate his role and the effect of his participation were no different to that of Mr Deverell.

*C*

*D*

*E*

64    For all these reasons I conclude that Mr Hopkins was a shadow director of the company.

*F*

*The consequences*

65    In paragraph 6 of his judgment the judge reached certain conclusions as to the unfitness of both Mr Deverell and Mr Hopkins if, contrary to his conclusions, either or both of them was a shadow director. In each case he considered that his conduct in relation to the company rendered him unfit to be a director of a company. In the case of Mr Deverell this finding was based on (a) the deliberate deception of and concealment from ABTA of his involvement in the management of the company; (b) the deception of the Civil Aviation Authority involved in the Linberg subordinated loan transaction in the summer 1991; (c) the deception of the Civil Aviation Authority in relation to the window-dressing of the 1992 accounts with the repayment by Euro Express SARL; (d) trading whilst insolvent. In the case of Mr Hopkins the finding was based on (a) the deliberate deception of ABTA in his failure to disclose his bankruptcy; (b) trading whilst insolvent on the basis that it was his duty as a director to keep his finger on the

*G*

*H*

A   company's financial pulse at what was clearly a difficult time.  No party has challenged these findings.  The Secretary of State does not contend that the judge should have found other episodes to constitute unfitting conduct as well.

66   We did not hear argument during the hearing of the appeal on the penalty to be imposed.  The question was raised which tribunal should deal

B   with the matter of penalty, the choices being this court, Judge Cooke or some other judge of the Chancery Division.   Counsel for Mr Deverell and Mr Hopkins opted for a judge of the Chancery Division and Judge Cooke respectively.  Counsel for the Secretary of State submitted that this court should decide the question of penalty as well.

67   I have no doubt that this court is entitled to deal with the issue of penalty for it is a necessary ingredient in the disqualification order which the

C   court below might have made: CPR Sch 1, RSC Ord 59, r 10(1).  Moreover it would be consistent with CPR r 1.4(2)(i) to deal with this issue as well.  The only reason not to do so would be that Mr Deverell and Mr Hopkins would be denied a possible appeal against the penalty.  The latter consideration did not preclude this court from determining the length of disqualification to impose on Mr Solly in *In re Kaytech International plc* [1999] BCC 390.  In

D   my view the court should do likewise in this case.  Accordingly if this court decides that Mr Deverell and Mr Hopkins were shadow directors then, having given them an opportunity to address the court in mitigation, this court should determine the period of disqualification.

*Conclusion*

68   For all these reasons I would allow this appeal, hold that both

E   Mr Deverell and Mr Hopkins were shadow directors and, having given them the opportunity to address the court in mitigation, determine the respective periods of their disqualification.

**POTTER LJ**   I agree.

**MORISON J**   I also agree.

F
                                                    *Appeal allowed.*

    *Solicitors: Burstows, Brighton; Edwin Coe; Gordon Dadds.*

                                                         G F

G

---

H