# EXHIBIT 20

IN THE COURT OF THE APPEAL OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CICA (Civil) Appeal 11 of 2021
(On Appeal from FSD 93 of 2019 (NSJ))

BETWEEN:

**CHINA SHANSHUI CEMENT GROUP LIMITED**

Appellant/Defendant

-and-

**TIANRUI (INTERNATIONAL) HOLDING COMPANY LIMITED**

Respondent/Plaintiff

BEFORE:

The Rt Hon. Sir John Goldring, President
The Hon. Sir Richard Field, Justice of Appeal
The Hon. C. Dennis Morrison JA

Appearances    Tom Smith QC instructed by James Eldridge and Adrian Davey of Maples and Calder (Cayman) LLP for the Appellent
Thomas Lowe QC instructed by Gemma Lardner and Joey Cheung of Ogier for the Respondent

Date of hearing:    10 November 2021

Date draft judgment circulated:    2 June 2022

Judgment delivered:    1 July 2022

**JUDGMENT**

**Field, JA**

*Introduction*

1.   This is an appeal from the order made by Justice Segal ("the judge") dismissing an application by the Appellant ("CSCG") to strike out an action brought against it by the Respondent ("Tianrui"), a shareholder in CSCG, in which Tianrui advances a personal claim challenging the validity of the issuance by CSCG of two sets of convertible bonds and 1,067,830,759 new shares. The claim is founded on a plea that issue of the convertible bonds and new shares was made for the improper purpose of diluting Tianrui's shareholding in CSCG to enable two other shareholders, Asia Cement Corporation ("ACC") and China National Building Material Co.

      Ltd ("CNBM"), with the participation of another shareholder, China Shanshui Investment Company Ltd ("CSI"), to gain control of CSCG.

2. CSCG's strike out was based on the contention that Tianrui had no standing to advance its individual claim on the grounds that: (a) the pleaded breaches of fiduciary duty by CSCG's directors on which the claim was based was a duty owed to CSCG and not Tianrui; (b) the damage resulting from the alleged breaches of duty was damage suffered by CSCG and not Tianrui; and (c) the issues of the convertible bonds and new shares were ratifiable in general meeting by a majority of CSCG's shareholders. Heavy reliance was placed (as it is in this appeal) on *Argentine Holdings (Cayman) Limited v Buenos Aires Hotel Corporation SA et al* [1997] CILR 90 (Smellie J) *("Argentine Holdings"); Gao v China Biologic Products Holdings Inc* [2018] (2) CILR 591 (Kawaley J) ("Gao"); *Hogg v Cramphorn Ltd* [1967] Ch 254; and *Bamford v Bamford* [1970] Ch 212).

3. As at December 2017, prior to the issue of the convertible bonds and new shares, the then issued and outstanding shares held by Tianrui and ACC, CSI and CNBM were as follows: Tianrui – 951,462,000 shares (28.16% of shares in issue); CSI – 847,908,316 shares (25.09%); ACC – 902,914,315 (26.72%); CNBM – 563,190,040 shares (16.67%).

4. As at 31 December 2018, after the issue of the convertible bonds and the new shares, the then issued and outstanding shares were held by the aforesaid shareholders as follows: Tianrui – 951,462,000 shares (21.85%); CSI – 847,908,316 (19.47%); ACC – 902,914,315 (17.46%); CNBM – 563,190,040 (12.94%).

5. Paragraphs 58 and 59 of the Statement of Claim plead:

> *58. The Convertible Bonds were issued by the board of China Shansui to persons connected with and/or acting in concert with ACC and/or CNBM for the improper purpose of enabling ACC and CNBM by themselves or with others to control China Shansui as set out below.*
>
> *59. ACC and CNBM entered into a secret or undisclosed voting agreement about how to exercise between ACC and CNBM and the Bond Subscribers and/or New Shareholders and/or each of them and/or reached an understanding with them and/or with each of them.*

6. Clause 4 of CSCG's Memorandum of Association provides that "[e]*xcept as prohibited by the Companies Law (2013 Revision) the Company shall have the power and to carry out any object not prohibited by any law ... and shall have and be capable of ... exercising any and all powers*

*at any time ... exercisable by a natural person or body corporate, ... to do any of the following acts or things, viz: ... to issue ... debenture stock, loans, loan stock, loan notes, bonds, convertible bonds, bills of exchange ... and other negotiable or transferable instruments ..."*

7. Articles 3.13 and 11.2 of CSCG's Amended and Restated Articles of Association that were operative at all material times provided that: "the unissued shares in the Company shall be at the disposal of the Board, which may offer, allot, grant options over or otherwise dispose of them to such persons, at such times, and for such consideration, and upon such terms, as the Board may determine" (3.13); and (b) "the Board may raise or secure the payment or repayment of such sum or sums in such manner and upon such terms and conditions in all respects as it thinks fit, and in particular, by the issue of … bonds or other securities of the Company, whether outright or as collateral security …" (11.2)

8. Paragraph 13 of the Statement of Claim pleads that it is implied in the Articles to provide business efficacy that no exercise of the powers to issue convertible bonds and new shares could result in a valid issue of securities if the exercise of the power was affected by any improper motive or purpose and/or if the power would not have been exercised but for such improper motive or purpose.

9. All general meetings of CSCG other than annual general meetings are "extraordinary meetings" for the purposes of the Articles (Art 12.2). The difference between the two types of meetings lies in the different rules governing the requisition of such meetings. The granting of a mandate or authority to the Board to offer, allot, … or otherwise dispose of the unissued shares of CSCG representing not more than 20% in nominal value of its then existing share capital is deemed to be ordinary business at general meetings (Art 13.1 (f)). At any general meeting a resolution put to the vote of the meeting shall be decided on a poll taken in such manner as the Chairman directs (Art 13.6).

10. Tianrui informed the judge that it proposed to amend its Statement of Claim to plead that the relief sought is a series of declarations declaring that the issue of the convertible bonds and the new shares and the conversion of the bonds into shares were not a valid exercise of the power under which these actions were taken. Tianrui's action against CSCG is hereinafter referred to as "the second writ action".

*The background to the litigation*[1]

11. CSCG is a Cayman Islands exempted company. It is the holding company of a corporate group engaged in the production, supply and distribution of cement and related construction products in the People's Republic of China ("the PRC"). Its principal subsidiary is Shandong Shanshui Cement Group Co. ("SSCG"), a wholly foreign-owned enterprise established in the PRC. Measured by annual production capacity, CSCG (through SSCG) is the sixth largest cement company in the PRC. It is listed on the Hong Kong stock exchange, although trading in its shares was suspended between 16 April 2015 and 31 October 2018 because it had insufficient public investors to comply with the listing requirements.

12. CNBM is reputed to be the largest cement producer in the world; it is also the largest cement producer in China, and the PRC has a significant shareholding in it. ACC is a Taiwanese company, and in 2016 was the tenth largest cement company in the PRC. Tianrui is a BVI company that in 2016 was the ninth largest cement company in the PRC. These three companies are competitors of the company and of each other in the Chinese cement market. CSI is an informal benefit trust holding its shares in CSCG for employees of the company.

13. In November 2014, the PRC prohibited any expansion of capacity or development of new projects in the cement industry. This meant that cement producers could not expand through the development of new projects; they could only do so by acquiring or merging with other existing producers. This has caused CNBM, ACC and Tianrui to acquire or expand their shareholdings in CSCG, and to have been the genesis of a battle for control of CSCG's board of directors of CSCG between Tianrui on the one hand and CNBM and ACC on the other. This battle for control has given rise to shareholder disputes and takeover battles. The ability to pass ordinary resolutions to appoint and remove directors, and thus control the board, has depended on obtaining the voting support of CSI. Prior to 1 December 2015, CNBM and ACC had nominees on the board; thereafter, until 23 May 2018, Tianrui had nominees on the board; and since then, CNBM and ACC have again had nominees on the board.

14. It was in August and September 2018, when nominees of CNBM and ACC were on the board, that CSCG made the two issues of convertible bonds and the issue of new shares.

---

[1] This account is largely drawn from the judgment of this Court in Tianrui (International) Holding Co Ltd v China Shanshui Cement Group Ltd [2019] (1) CILR 481

15. On 4 September 2018, Tianrui presented a petition to wind up CSCG on the just and equitable ground ("the Petition"). The complaints pleaded in the Petition were identified under three headings: control of CSCG, improper share issue and loss of listing. In respect of the first heading, Tianrui alleged that while it had been in control of CSCG's board of directors, ACC and CNBM had conspired to prevent it having control of SSCG. Tianrui stated that ACC and CNBM had acted unfairly and/or oppressively towards it and/or the affairs of the company had been conducted with a lack of probity and Tianrui had justifiably lost confidence in the management of CSCG. The petition was struck out by Madam Justice Mangatal on the ground that there was an alternative cause of action available to Tianrui, namely a writ action. This decision was overturned by this Court[2] and the Privy Council refused leave to appeal the Court's decision.

16. There have been two sets of proceedings in Hong Kong. In the first action CSCG sued CNBM, ACC and eight individuals who had been directors of CSCG. In the second action CSCG and various of its subsidiaries sued, inter alios, Tianrui and its shareholders and a number of individuals who had at various times been directors of CSCG.

*The judgment below*

17. Briefly put, the judge chose not to follow the decision in *Gao* and concluded that the reasoning expressed by Hoffmann J in *Re Sherborne Park Residents Co Ltd, Re A Company* (Case No. 005136 of 1986) [1987] BCLC 82 *("Sherborne Park")* and that developed by King CJ (with the concurrence of Matheson J and the approval of Bollen J) in *Residues Treatment Company Limited & Anor v Southern Australia* [1988] 6 ACLC 1160 *("Residues"),* a decision of the Court of Appeal Division of the Supreme Court of South Australia, affords a sound basis for finding that Tianrui was entitled to bring its personal claim challenging the validity of the issue of the convertible bonds and the issue of the new shares. In so concluding, the judge also drew support from a number of authorities including in particular *Fraser v Whalley* (1864) 2 H & M 10, 71 ER 361 and the decision of the Privy Council in *Howard Smith Ltd v Ampol Petroleum* [1974] AC 821 *("Howard Smith").* He also expressed the view that whilst *Hogg v Cramphorn* and *Bamford v Bamford* held that the issues of shares in those cases could be ratified in general meeting, those decisions did not compel the conclusion that a shareholder is unable to sue in his personal capacity.

---

[2] Tianrui (International) Holding Co Ltd v China Shansui Cement Group Ltd [2019 (1) CILR 481]

*CICA (Civil) Appeal 11 of 2021 –China Shanshui Cement Group v Tianrui(International) Holding Co Ltd.- Judgment*
-5-

18. In addition, the judge was of the opinion that it followed from the characterisation of Tianrui's claim as being based on a personal right that, as a matter of principle, ratification of the issue of the convertible bonds and the issue of the new shares was not available, since ratification only relates to causes of action vested in and prevents claims being brought by the company. And even if ratification were available in some circumstances, it was strongly arguable that it is not in cases of the fraud on the minority exception to the rule in *Foss v Harbottle*. Tianrui's case in the Court of Appeal when the Petition was allowed to go forward was based on serious allegations of wrongdoing by and involving a conspiracy between ACC and CNBM and their representatives on the board who were in control of board decision making.

19. *Argentine Holdings* was cited by the judge but was not addressed in his judgment. There, one of the claims on which summary judgment was sought was for breaches of fiduciary duty committed by the directors of the plaintiff in improperly transferring assets of the company to third parties. In lines 15 to 29 on page 106 of his judgment, Smellie J (as he then was) said:

    > "*By virtue of their fiduciary positions, directors owe duties to act bona fide in the interest of their company and to act only for a proper purpose: see Hogg v Cramphorn Ltd. (9). As custodians of the company's assets under their control, their fiduciary duties are owed not to a particular shareholder but, in the usual context, to the company. The fiduciary relationship imposes upon directors duties of loyalty and good faith which are akin to those imposed upon trustees properly so called. If the purpose of the directors is improper, as the admitted purposes in this case certainly were, then their decisions will be ineffective: see Howard Smith Ltd. v Ampol Petroleum Ltd. (19)*"

20. In *Gao*, the defendant company ("CBPH") moved to strike out the plaintiff's claim that the issue of shares by CBPH for the improper purpose of diluting the voting power of the shares in the company of which he was the beneficial owner and to thwart a take-over bid by a consortium of which he was not a member. The authorities relied on by CBPH in making its strike out action included *Argentine Holdings* and *Bamford v Bamford*. The plaintiff placed particular reliance on *Residues*, in which, as we shall see, it was held that a minority shareholder had personal standing to challenge an issue of shares for the improper purpose of diluting the voting power of his shareholding in the company.

21. Kawaley J struck out the plaintiff's claim. In the course of his judgment he held, citing *Argentine Holdings* and *Bamford v Bamford,* that there was a general rule that individual shareholders have no legal standing to sue for breach of fiduciary duty in relation to a complaint that their voting power has been diluted by a share allotment approved by the directors for an improper purpose (para 29). In his view "*both the general rule and the exception are*

*fundamental principles of company law which are central to the way in which companies limited by shares operate. Directors are only answerable to the company for intra vires breaches of fiduciary duty because they are agents of the company appointed on the explicit basis that they owe duties of loyalty to the company. Shareholders ordinarily acquire their shares on the explicit basis that their only means of controlling the management of the company is by way of successfully passing resolutions in general meetings. It would be inconsistent with what is essentially a functional rule, and potentially expose companies to limitless litigation, if individual shareholders were permitted to enforce duties which are not owed to them. This would amount to permitting individual shareholders to participate in the management of the company by intruding into the company's proper sphere of supervising the conduct of the directors".* (para 30).

*The appeal*

22. The crucial issue in this appeal is whether, as held by the judge, it can be deduced from the judgments he relied on that a shareholder has a personal claim for the diminution of the voting power of his shares consequent on an issue of shares where the pleaded cause of action is that the power under which the shares were issued was a fiduciary power exercised for a purpose for which the power was not granted.

23. The major problem that stands in the way of reaching the conclusion made by the judge is that it is trite law that directors owe their fiduciary duties not to the shareholders but to the company which appoints them, which means that a plaintiff shareholder is not the beneficiary of the fiduciary duty owed by directors not to exercise the powers vested in them for an improper purpose and therefore cannot sue to enforce that duty. Another potential problem is the view held by some that, if the cause of action is founded on a breach of fiduciary duty owed to the company, the damage thereby resulting is damage to the company and not to the shareholder whose voting power attached to his shares is diminished by the issue of new shares. I consider below whether this latter concern really is a reason that supports the view that a minority shareholder lacks standing to bring the postulated personal action.

24. I turn to consider the judgments in *Fraser v Whalley, Howard Smith*, *Sherborne Park and Residues*.

25. In *Fraser v Whalley*, the Oswestry Railway Company ("the Company") had been given power by a validly passed resolution in general meeting to issue shares to raise money for the purpose of investing in the Mid-Wales Railway Company. As it happened, the Mid-Wales Railway

Company proceeded to issue all of its shares to other parties and the conferred power became obsolete. A year and a half later, the Mid-Wales Railway Company obtained an Act of Parliament empowering it to extend its line and to raise £75,000 for that purpose. The Company decided that it would be advisable to advance money to the Mid-Wales Railway Company to assist in this undertaking. The directors of the Company were then informed by some of the Company's shareholders that at the next general meeting they were likely to be removed from office and on the verge of the next such meeting the directors resolved that shares were to be issued pursuant to the aforesaid obsolete power for the purpose of controlling the ensuing meeting. A shareholder called Savin owning ordinary and preference shares representing £140,000 of the Company's £240,000 ordinary and preference stock, the holders of which were entitled to vote at general meetings, applied to the Vice Chancellor, Sir W. Page Wood on behalf of the shareholders of the Company for an injunction restraining the issue of shares proposed to be made by the directors prior to the general meeting.

26. Giving judgment in favour of the grant of the injunction sought, the Vice-Chancellor said:

> *"I have no doubt that the Court will interfere to prevent such a gross breach of trust. I say nothing on the question whether the policy advocated by the directors, or that which I am told to be pursued by Savin (is the more for the interest of the company. This is a matter wholly for the shareholders. I fully concur in the principle laid down in Foss v Harbottle (2 Hare, 461) as to that; but if the directors can clandestinely and at the last moment use a stale resolution for the express purpose of preventing the free action of the shareholders, this Court will take care of that, when the company cannot interfere, this Court will do so.*
>
> *Moreover, the resolution in question clothed the directors with a trust to appropriate the shares. Does not that imply that they were to be appropriated fairly for the benefit of the new constituency to be created? How can this Court allow them to use that power for a purpose not connected with the new constituency at all, but either, as the plaintiff says, to keep themselves in office, or, as they say, to protect the preference shareholders, who are not, so far as I know, intended, any of them, to take a single share?"*

27. The Vice-Chancellor distinguished the case from *Foss v Harbottle* and granted the injunction sought, observing that the Court would act in circumstances where the company could not interfere. It is not clear whether the Court was vindicating a personal right vested in the shareholders to maintain the existing share capital and to prevent the directors' management of the company being carried on pursuant to the proposed resolution or was sanctioning a representative action based on a fraud on the shareholders. It is also unclear as to the extent that

the decision was based on the fact that Savin had a majority both of the ordinary stock and the preference stock, the holders of which were entitled to vote in general meeting.

28. As the judge observed, *Fraser v Whalley* was applied in *Punt v Symons* [1903] 2 Ch 506 where shares had been issued, not for the general benefit of the company, but for the purpose of controlling the holders of the greater number of shares by obtaining a majority of voting power. After citing *Fraser v Whalley*, Byrne J said, "*If I find as I do that the shares have been issued for the express purpose of acquiring an unfair majority for the purpose of altering the rights of the parties under the articles, I think I ought to interfere. I propose to grant an injunction, but to confine it to restraining the defendants from holding this confirmatory meeting*".

29. The decision of the Privy Council in *Howard Smith* is well known. The litigation arose out of a struggle for the takeover and control of R W Miller (Holdings) Ltd ("Millers") between, on the one hand, Ampol Ltd ("Ampol"), which held 29.8 % of Millers' issued share capital, together with Bulkships Ltd ("Bulkships") which held 25.1 % of Millers' issued share capital and, on the other hand, Howard Smith Ltd, a shareholder in Millers and certain persons concerned in the management of Millers. The directors of Millers authorised the allotment of 4,500,000 $1 ordinary shares at a premium of $1.30 per share to Howard Smith in order to reduce the voting power of the shares held by Ampol and Bulkships in order to thwart a rival offer to takeover Millers made by Ampol and Bulkships. It was also the case that Millers needed to raise capital for its ordinary business purposes.

30. Ampol then brought proceedings against 14 defendants which included Howard Smith and 11 directors of Millers challenging the validity of the issue of the shares to Howard Smith. The directors contended that the primary reason for the issue of shares to Howard Smith was to raise more capital. The trial judge Street J found that the primary purpose of the allotment was to reduce the proportionate shareholding of Ampol and Bulkships which was an improper exercise of the directors' powers. He ordered that the allotment of shares should be set aside and the share register rectified.

31. The Privy Council upheld the judgment and the order made by Street J, observing that it was not disputed that an action to set aside the allotment and for rectification of the register was properly brought by Ampol.

32. It is necessary to quote the following passages in the judgment of the Privy Council given by Lord Wilberforce.

> "*The directors, in deciding to issue shares, forming part of Millers' unissued capital, to Howard Smith, acted under clause 8 of the company's articles of association. This provides… that the shares shall be under the control of the directors, who may allot or otherwise dispose of the same to such persons on such terms and conditions and either at a premium or otherwise and at that such time as the directors may think fit. Thus, and this is not disputed, the issue was clearly intra vires the directors. But intra vires though issue may have been, the directors' power under this article is a fiduciary power: and it remains the case that an exercise of such a power though, formally valid, may be attacked on the ground that it was not exercised for the purpose for which it was granted.* [P. 834 A – C]
>
> *So far as authority goes, an issue of shares purely for the purpose of creating voting power has been repeatedly condemned: Fraser v Whalley, 2 Hem. & M. 10; Punt v Symons & Co [1903] 506; Piercy v S Mills & Co Ltd [1920] 1 Ch 177 ("merely for the purpose of defeating the wishes of the existing majority of shareholders") and Hogg v Cramphorn Ltd [1967] Ch 254. In the leading Australian case of Mills v Mills, 60 CLR 150, it was accepted in the High Court that if the purpose of issuing shares was solely to alter the voting power the issue would be invalid. And, though the reported decisions, naturally enough, are expressed in terms of their own facts, there are clear considerations of principle which support the trend they establish. The constitution of a limited company normally provides for directors, with powers of management, and shareholders, with defined voting powers having power to appoint the directors, and to take, in general meeting, by majority vote, decisions on matters not reserved for management. Just as it is established that directors within their management powers, may take decisions against the wishes of the majority of shareholders, and indeed that the majority of shareholders cannot control them in the exercise of these powers while they remain in office: (Automatic Self-Cleansing Filter Syndicate Co. Ltd v Cuninghame [1906] 2 Ch 34), so it must be unconstitutional for directors to use their fiduciary powers over shares in the company purely for the purpose of destroying an existing majority, or creating a new majority which did not previously exist. To do so is to interfere with that element of the company's constitution which is separate from and set against their powers".* [P.837 C – G] [The judge set out this passage in para 93 of his judgment.]

33.  In paragraph 105 (b) of his judgment the judge said:

> "*... even if it were right that improper allotments which did not affect control rights did not result in personal claims, such claims would arise where control was an issue. An interference with a shareholder's rights to block special resolutions (to exercise negative control) by dilution of his shareholding seems to me to affect a core entitlement granted by the corporate constitution to the shareholder and the constitutional balance of power between shareholders by affecting fundamental rules regulating corporate governance. This is why Lord Wilberforce in Howard Smith referred to the use by directors of their fiduciary powers over shares in the company for the purpose of destroying an existing majority, or creating a new majority which did not previously exist, which interfered with that*

> *element of the company's constitution which is separate from and set against their powers ..."*

34. In *Sherborne Park*, the company in question was a management company that held the freehold in a large country house divided into flats whose owners held one share each in the company. The petitioner owned one of the flats and he alleged that the directors of the company were proposing to issue new shares on a basis that would result in some of the owners having more shares than the others which would involve a breach of their fiduciary duty to use their powers to issue shares only for the purpose for which the power was granted. The management of the company was acting in a way that was unfairly prejudicial to his interests and the interests of the other shareholders. The petitioner applied to the court for an order that he be indemnified by the company of all costs and expenses pursuant to the principle in *Wallersteiner v Moir* (No 2) [1975] QB 373. In order to come within this principle, the petitioner had to show that he was bringing a derivative action.

35. Hoffmann J (as he then was) held that the petitioner was not bringing a derivative action. He said:

> *"Although the alleged breach of fiduciary duty by the board is in theory a breach of its duty to the company, the wrong to the company is not the substance of the complaint. The company is not particularly concerned with who it shareholders are. The true basis of the action is an alleged infringement of the petitioner's individual rights as a shareholder. The allotment is alleged to be an improper and unlawful exercise of the powers granted to the board by the articles of association, which constitute a contract between the company and its members. These are fiduciary powers, not to be exercised for an improper purpose and it is generally speaking improper -*
>
>> *"for the directors to use the fiduciary duties over the shares in the company purely for the purpose of destroying an existing majority, or creating a new majority which did not previously exist"*
>
> (See *Howard Smith Ltd v Ampol Petroleum Ltd* (1974) 1 All ER 1126, at 1136, [1974] AC 821 at 837.) *An abuse of these powers is an infringement of the member's contractual rights under the articles.*
>
> *Professor Gower in his Principles of Modern Company Law (4th edn, 1979) pp 647-656 distinguishes between the derivative action and the member's personal action. The former is brought when -*
>
>> *"a wrong has been done to the company and action is brought to restrain its continuance, or to recover the company's property or compensation due to it."*

> *In such a case, says Professor Gower, the company is the only true plaintiff. In the member's personal action the dispute is an internal one between those interested in the company. A shareholder in such an action may sue as representative of himself and other shareholders who have identical interests but he does not in substance assert a right which belongs to the company alone. It is perhaps worth observing that in cases concerning the improper allotment of shares like Howard Smith Ltd v Ampol Petroleum Ltd there is no suggestion that the plaintiff sues on behalf of the company or in any capacity other than individual shareholder.*"

36. This passage is set out in the judge's judgment at para 93. At para 105 (a) the judge observed:

    > "*I, for my part, find Hoffman J's analysis in Sherbourne Park compelling. The shareholders cause of action in the case of an improper allotment of shares is based on the statutory contract and needs to be treated as a personal right because "the wrong to the company is not the substance of the complaint. The company is not particularly concerned with who is shareholders are. The true basis of the action is an alleged infringement of the petitioner's individual rights as a shareholder." This might be classified as the real parties in interest analysis. Where the improper allotment directly affects the rights of a shareholder, and results in the increase in the shareholding of one shareholder (or group of shareholders) and the diminution of the shareholding of another shareholder (or a group of shareholders), the real dispute is between the shareholders and it is the shareholders rights, and not the company's rights, that have been interfered with.*"

37. In *Residues* the plaintiffs were minority shareholders in Southern Resources Ltd ("the company"). The first plaintiff was a wholly owned subsidiary of Emperor Mines Ltd ("EML") which owned 40% of the shares in the second plaintiff. EML took steps towards making a takeover offer to the company's shareholders. The company's directors responded by announcing that the company intended to make takeover offers to acquire 100% of the issued share capital of Square Gold and Minerals Ltd ("Square Gold") in consideration of the allotment of shares in the company. If implemented, this would have given one McDougall and his associates, by reason of their present shareholdings in Square Gold, a majority of the voting shares in the company. The directors also made allotments of shares in the company to a syndicate and a further allotment to another of the defendants.

38. The plaintiffs applied for an injunction restraining the implementation of the takeover plan contending that, in pursuing the takeover plan and making the allotments of shares, the directors were acting in breach of the fiduciary duty they owed to exercise their powers to allot shares bona fide for the benefit of the company and for the purpose for which those powers had been granted. The Statement of Claim pleaded an infringement of the plaintiffs' personal right. The judge at first instance struck out the Statement of Claim.

39. King CJ considered a number of decisions where the allotments of shares made for an improper purpose had been declared invalid which he concluded were not conclusive on the point whether a shareholder whose voting power had been diminished had a personal claim to restrain such an allotment of shares or to challenge the allotment's validity but which showed a clear trend tending to show the existence of such a personal right. In the course of this review, King CJ referred to the decision of the High Court of Australia in *Ashburton Oil N.L. & Ors v Alpha Minerals N.L.* (1971) 614 CLR 123 in which Barwick CJ recognised: (a) "*the equity of a shareholder to restrain action on the part of the directors in excess of the powers given by the articles of association of the company*"; and (b) expressed the view that the shareholder's equity did not depend on the shareholder having a majority shareholding. He also cited *Howard Smith* and referred to the following passage in the joint judgment of Mason, Deane and Dawson JJ in *Whitehouse & Anor v Carlton Hotel Pty Ltd* (1986 – 1987) 162 CLR 285:

> "*The reason why, as a general rule, it is impermissible for the directors of a company to exercise a fiduciary power to allot shares for the purpose of destroying or creating a majority voting power was identified by the Privy Council in Howard Smith v Ampol. It lies essentially in the distinction between the indirect proprietorship and ultimate control of the shareholders on the one hand and the powers of management entrusted to the directors on the other. It is simply no part of the function of the directors as such to favour one shareholder or group of shareholders by exercising a fiduciary power to allot shares for the purpose of diluting the voting power attaching to the issued shares held by some other shareholder or group of shareholders.*"

40. King CJ went on to opine that there seemed to be no reason in logic why a distinction should be made between a case where the majority of shareholders bring the claim and where the plaintiffs are minority shareholders.

> "*When the improper dilution of voting rights has the effect of converting a majority into a minority, the effect of the dilution is dramatically evident. The principle is the same, however, if the dilution does not go that far but merely reduces the aggrieved shareholder's voice in the company … If there is a personal right in a shareholder not to have a majority of which he is a member converted into a minority by an improper allotment of shares, I can see no reason in principle or logic why that right should not extend to protection against improper dilution of his voting rights the effect of which does not go so far.*
>
> *The personal right of a shareholder to which I refer is founded, in my opinion, upon general equitable considerations referred to in the cases cited above arising out of membership of a body whose management is in the hands of directors having fiduciary obligations. It is fortified by the nature of the contract between the company and the members constituted by the memorandum and articles of association and given statutory force by sec*

> *.78 (1) of the Companies Code. I do not mean that the relevant right of a shareholder is founded in contract or that his remedies for infringement are remedies for breach of contract. The shareholder's right is founded in equity and has a right to have the say in the company which accrues to him by virtue of the voting rights which are attached to the shares by his contract with the company, preserved against improper actions by the company or the directors who manager its affairs. It is true, as the learned judge appealed from observed, that a person taking shares in a company must be taken to have agreed to suffer such effects as may flow from the allotment of further shares made by the company, but that is not to say that he is without rights in relation to such a further allotment as may be made by the directors for improper purposes.*
>
> *The rule in Foss v Harbottle ... clearly operates to preclude a shareholder from suing in his personal capacity in respect of a detriment which he suffers in common with other shareholders in consequence of a wrong done to the company. There is a clear distinction, however, between such a detriment and the diminution of a shareholder's effective voting power by an improper allotment of shares by directors acting on behalf of the company. The latter is not only a breach of duty by the directors to the company. It is also a wrong done to the shareholder by the company acting through its agents. To make that distinction is not necessarily to subscribe to the view that a shareholder has a personal right to be affected detrimentally by any breach of what is to be an implied term in the contract between the member and the company that the affairs of the company will be managed without impropriety on the part of the directors. Diminution of voting power stands on a fundamentally different footing from other detriments resulting from abuse of power by directors. A member's voting rights and the rights of participation which they provide in the decision making of the company are a fundamental attribute of membership and are rights which the member should be able to protect by legal action against improper diminution. The rule in Foss v Harbottle has no application where individual membership rights as opposed to corporate rights are involved: Efstathis v The Greek Orthodox Community of St George & Ors (1988) 6 ACLR 706 esp. per Ryan J at ACLC p.711."*

41. Later in his judgment King CJ said that the time had come to give unequivocal recognition of the existence of a personal right in a shareholder grounded in equitable principles to have the voting power of his shares undiminished by an improper actions on the part of directors. He said that this view was reinforced by "considered dicta" in Hoffmann J's judgment in *Sherborne Park* and in *Eromanga Hydrocarbons N.L. v Australis Mining N.L. & Ors* (1988) 6 ACLC 906, where Malcolm CJ in the Supreme Court of Western Australia, in a case concerned with a challenge to an allotment of shares alleged to have been improperly made, said:

> *"While, therefore, the action is presently constituted by the plaintiff, purporting to represent all the shareholders in Australis Mining N.L. Is, in my view, improper, it would be open, with appropriate steps being taken, to put the proceedings on a proper footing, either by specifying those*

> *shareholders whom the plaintiff proposes to represent or by the plaintiff pursuing the proceedings on his own behalf as a shareholder.*"

42. King CJ also considered whether an issue of shares for an improper purpose could be ratified by majority vote in general meeting. Citing, inter alia, *Allen v Gold Reefs of West Africa Ltd* [1900] 1 Ch 656 at 671, he noted that the voting power of a majority may not be exercised in fraud of the minority of shareholders and said it was by no means clear to him that an allotment of shares for an improper purpose was capable of being ratified. In his view, if it was correct that a shareholder had a personal right to have the voting power of his share undiminished by an allotment made for an improper purpose, there was a substantial argument that an exercise of voting power of the majority to ratify such an allotment would be beyond the purpose for which that power exists. He also noted that *Bamford v Bamford* no longer had to be followed in the Supreme Courts of the Australian States.

43. Kawaley J declined to follow the decision in *Residues*. In his judgment, the decision represented a departure from the mainstream of British Commonwealth company law which was not supported by any previous or subsequent authorities to which he (Kawaley J) had been referred. Nor was the decision supported by any coherent principle. "*King CJ's central thesis was that a shareholder's voting rights were so fundamental that they deserved special protection in the form of a personal action against the company for breach of fiduciary duty. With the greatest of respect, this reasoning fails to acknowledge that individual shareholders can sue the company to set aside ultra vires acts … and can challenge intra vires share allotments which they consider improperly dilute their voting rights either (a) through a derivative action, or (b) through the instrumentality of a general meeting. The contrary argument also fails to explain how, as a general rule of share allotments, affects some existing shareholders differently to others.*"

*Discussion and decision*

44. Mr Smith QC for CSCG submitted that one of the reasons why a shareholder could not bring a personal claim where the voting power of his shares had been diminished by an improper allotment of shares was that it was the company that suffered loss from the voidable allotment shares and not the aggrieved shareholder. He cited the following passage from the judgment of Harman LJ in *Bamford v Bamford*:

> "*It is true that the point before us is not an objection to the proceedings on Foss v Harbottle grounds. But it seems to me to march in step with the principles that underlie the rule in that case. None of the factors that admit of exceptions to that rule appear to exist here. The harm done by the assumed*

> *improperly-motivated allotment is a harm done to the company, of which only the company can complain.*"

45. Mr Smith contended that the company suffered a loss when shares were issued pursuant to an improper issue because: (i) it is the company's share capital that is thereby affected; (ii) it is a wrong to the general body of shareholders; and (iii) the company is subjected to a liability. He accepted that there was an indirect effect on the value of the shares of other shareholders, since the votes on their shares were diluted by the new issue, but he insisted that that effect is only indirect and consequential on the company's own loss.

46. Mr Smith went further. He argued that the shareholder could not sue by reason of the doctrine of reflective loss even as re-stated in *Marex Financial Ltd v Sevilleja* [2020] UKSC 31, [2021] AC 39. I cannot accept this submission. It was held by the majority in *Marex* that the doctrine of reflective loss applies where (1) a shareholder complains that he has suffered loss in the form of a diminution in share value or in distributions which is the consequence of loss sustained by the company in respect of which the company has a cause of action against the wrongdoer and (2) cases where claims are brought, whether by a shareholder or by anyone else, in respect of loss which does not fall within that description, but where the company has a right of action in respect of substantially the same loss (see para 79 of the judgment of Lord Reed). In the postulated case, however, the injury caused to a shareholder whose voting power has been diminished by an issue of shares made for an improper purpose is the reduction of the shareholder's capacity to exercise his constitutional right to cast the votes attached to his shares in general meeting founded on the contract based on the articles of association between himself and the company. This is not a loss suffered by the company. It is a loss which in my judgment undoubtedly stands to be regarded by the law as separate and distinct from any loss suffered by the company.

47. I move to consider the key question in this appeal which I identified in paragraph 23 above, namely, whether, as held by the judge, it can be deduced from the judgments he relied on that a shareholder has a personal claim for the diminution of the voting power of his shares consequent on an issue of shares where the pleaded cause of action is that the power under which the shares were issued was a fiduciary power exercised for a purpose for which the power was not granted.

48. In my judgment there is force in Mr Smith's submission that in *Sherborne House* Hoffmann J did not explain why, having regard to the substance of the petitioner's complaint, the petitioner/shareholder had a personal right of action. It also has to be remembered that

Hoffmann J was dealing with an application for a *Wallerstein v Moir* indemnity order and he had not heard any argument from the respondent.

49. There is also some force in Mr Smith's observations that in *Howard Smith* it is manifest that the claim was based on a fraud on a power committed by directors who owed fiduciary duties to the company and that there was no discussion as to Ampol's entitlement to bring an action untrammelled by the rule in *Foss v Harbottle* since "*it was not disputed that an action to set aside the allotment ... was properly brought by Ampol.*" On the other hand, the significant fact remains that Ampol's claim was indeed a personal claim.

50. In my opinion, Mr Smith made a telling point when he criticised the judgment of King CJ for its lack of a reasoned, principled basis for the conclusion that the shareholder had a personal right "*founded in equity*" that was preserved against improper actions by the company or the directors who manage its affairs. I would add that it is also the case that King CJ's reference to improper actions by the company or the directors for which the company is responsible can only be a reference to a breach of a fiduciary duty owed by the directors to the company, not the shareholders. Thus, the equitable right that a shareholder has to obtain protection of his voting power by a personal action identified by King CJ has at its heart a fiduciary duty owed not to shareholders but to the company which is the principal reason for the conventional view that the shareholder has no entitlement to bring a personal claim to protect his voting power.

51. With respect to King CJ and the judge, I have concluded that the omission in the *Residues* judgment to provide a principled basis for the conclusion that a shareholder has a personal right to complain of a diminution of his voting power caused by an issue of shares in breach of a fiduciary duty owed to the company and not to the shareholder, means that it remains the law of the Cayman Islands that the postulated aggrieved shareholder has no such personal right of action but must found his claim on a basis that is consistent with the rule in *Foss v Harbottle* or with the fraud on the minority exception to that rule.

52. In concluding, I offer the thought that there may be scope for a personal claim by our postulated aggrieved shareholder based on one of the economic torts such as the wrongful interference with contractual rights or conspiracy to injure where the breach of fiduciary duty owed to the company constitutes "*wrongful/unlawful means*" rather than the fly wheel of the cause of action. And if such a cause of action were recognised, it seems to me that ratification of the share issue would be no bar to recovery. However, no such case was advanced on behalf of Tianrui, no doubt because of the way in which Tianrui's case is pleaded. Instead, Mr Lowe QC for Tianrui skilfully submitted that the many cases he drew to the Court's attention where an aggrieved

shareholder had apparently succeeded in bringing a personal claim to impugn the issue of shares on the ground of a fraud on a power established that his client was entitled to bring the personal claim it had brought in this case.

*Conclusion*

53.　For the reasons I have given above, I would allow this appeal and order that the costs here and below be the costs of the Respondent.

54.　It remains open to the Respondent to apply to Grand Court for leave under Order 15 Rule 12A of the Grand Court Rules to bring its claim as a derivative action.

**Morrison JA**

55.　I agree.

**Goldring, President**

56.　I also agree.

