# EXHIBIT 21

**[2018 (2) CILR 591]**

## GAO v. CHINA BIOLOGIC PRODUCTS HOLDINGS INCORPORATED

GRAND CT. (Kawaley, J.) December 10th, 2018

*Companies — minority shareholders — right to bring action — no standing to bring personal claim for breach of fiduciary duty against company for improperly motivated allotment of shares, which diluted voting rights — directors owe duty to company not shareholders, unless special factual circumstances give rise to individual right of action (e.g. contractual right to receive dividends or redemption proceeds) — dilution of voting rights not freestanding exception to rule in Foss v. Harbottle*

*Companies — shares — beneficial owner — no standing to bring personal claim to set aside improperly motivated allotment of shares approved by directors which diluted voting rights, except in special circumstances*

The plaintiff challenged a decision to allot and issue shares.

On August 24th, 2018, the defendant allotted and issued shares to four groups of investors pursuant to share purchase agreements ("the SPAs"). The plaintiff had been a director of the defendant, chairman of the board and CEO until his removal from office in July 2018. The plaintiff claimed that the share issue was for the improper purpose of seeking to alter the

balance of power in the company and to thwart a take-over bid by a consortium of which the plaintiff was a member.

Until September 4th, 2018, the plaintiff had been beneficial owner of 417,143 ordinary shares in the company (Cede & Co. was the registered owner of the shares). From September 4th, 2018, after transferring beneficial ownership of 200,000 shares to a family trust, the plaintiff retained beneficial ownership of 217,143 shares. From September 14th, he was the registered owner of 50,000 shares. On October 22nd, 2018, Cede & Co. (as registered owner of the 417,143 shares as at August 24th, 2018) assigned all rights and remedies of the shares to the plaintiff pursuant to s.5 of the Property (Miscellaneous Provisions) Law (2017 Revision).

The plaintiff sought a declaration that the decision of August 24th, 2018 and the SPAs were invalid and unenforceable, together with an order requiring the defendant to rescind the SPAs and rectify the register.

The plaintiff sued (a) as a beneficial owner of shares in the company, with sole voting control; (b) as a registered member of the company; and/or (c) as assignee of a cause of action from a registered member. The plaintiff contended inter alia that the directors' duty to exercise their powers for a proper purpose was a legal and/or equitable duty owed to individual shareholders and in respect of which individual shareholders had a right of action.

The defendant applied pursuant to GCR O.14A, r.1 for the determination of the following: (a) that the defendant did not owe any fiduciary, equitable, contractual or other duty to the plaintiff in respect of the directors' power to allot/issue the shares in circumstances where the plaintiff was not a registered shareholder at the relevant date; (b) the plaintiff had not taken any valid assignment from Cede & Co. of a right of action against the defendant and could not proceed in that capacity; and (c) in the circumstances, the plaintiff had no cause of action against the defendant and no standing to bring these proceedings.

The court considered the following questions: (a) Did a registered shareholder possess legal standing to assert a personal claim for breach of fiduciary duty in respect of a board decision to allot and issue shares for an improper purpose? (b) Did the beneficial owner of shares possess legal standing to assert a personal claim for breach of fiduciary duty in respect of a board decision to allot and issue shares for an improper purpose? (c) Did a shareholder who acquired legal title to his shares after the impugned board approval of a share allotment have standing to assert a personal claim to set it aside? (d) Did the plaintiff have standing to pursue a personal claim based on the Cede & Co. assignment?

The defendant submitted that (a) directors owed their fiduciary duties to the company, not ordinarily to particular shareholders; (b) a special factual relationship would have to be established to create a right of action by an individual shareholder against a company for breach of fiduciary duty; (c) the plaintiff, as beneficial owner of the shares, had no right to sue the company for breach of fiduciary duty; (d) a personal claim in the form brought by the plaintiff required an actionable wrong to have been

committed against the plaintiff personally, and the plaintiff needed to have been a registered shareholder when the wrong was allegedly committed; and (e) Cede & Co. had not effectively assigned any right to pursue the present proceedings, and any such alleged personal right for an individual registered shareholder to sue the defendant was not an assignable right.

The plaintiff submitted that (a) there was clear authority to support the proposition that shareholders could pursue personal claims for breach of fiduciary duty to invalidate an improperly motivated allotment of new shares which diluted the voting power of existing shareholders; (b) an equitable claim could be asserted by the equitable owner of shares; (c) to the extent that there was any impediment to the commencement of proceedings by a beneficial owner, that impediment was removed when the beneficial owner had shares transferred into his name; alternatively, when the 50,000 shares were transferred from the bare trustee into the plaintiff's name, the wrong was continuing; and (d) it was clear that the purpose of the Cede & Co. letter was to enable the plaintiff to enforce the rights which attached to his shares and in which Cede & Co. had no interest.

**Held,** ruling as follows:

(1) The plaintiff lacked standing to bring a personal claim as registered shareholder. Individual minority shareholders ordinarily had no standing to sue for breach of fiduciary duty in relation to a complaint that their voting power had been diluted by a share allotment approved by the directors for an improper purpose. Ordinarily, directors only owed a duty to the company in the exercise of their powers, and the company in general meeting could validate any defects in such exercise. Shareholders ordinarily acquired their shares on the explicit basis that their only means of controlling the management of the company was by way of successfully passing resolutions in general meetings. It would be inconsistent with this fundamental rule and potentially expose companies to limitless litigation if individual shareholders were permitted to enforce duties that were not owed to them. It would amount to permitting individual shareholders to participate in the management of the company by intruding into the company's proper sphere of supervising the conduct of directors. The position was different with regard to ultra vires acts because the company itself was not competent to ratify ultra vires acts. Section 28 of the Companies Law, for example, expressly permitted shareholders to set aside ultra vires acts. The position was also different when special circumstances gave rise to an individual right of action by a particular shareholder against the company in respect of a transaction which affected that shareholder in its own right, *e.g.* where the shareholder asserted a personal contractual right to receive dividends or redemption proceeds. Share allotments usually affected all shareholders of the affected class in the same way and there was therefore no identifiable principled basis upon which to treat this category of breach of an equitable duty as a sui generis one giving rise to concurrent duties owed to the company and individual

shareholders. The dilution of share voting rights did not constitute a freestanding exception to the rule in *Foss* v. *Harbottle* that claims for damage caused to a company must ordinarily be brought by or on behalf of the company. Minority shareholders could challenge intra vires share allotments which they considered to improperly dilute their voting rights by means of a derivative action or a general meeting (majority shareholders could express the will of the company in general meeting and ratify or set aside any share allotment which would dilute a majority shareholding) (paras. 29–48).

(2) The plaintiff had no standing as a beneficial owner of shares to pursue a personal claim to set aside an improperly motivated share allotment. The preponderance of relevant authority clearly pointed to the conclusion that a beneficial owner of shares ordinarily lacked standing to pursue legal or equitable claims in relation to the relevant shares. Section 38 of the Companies Law provided that a "member" of a company was, by statutory definition, a registered member, though the Law did not state that the company was not required to take notice of any trusts. Article 12 of the company's amended articles stated, however, that the company was not bound by or compelled to recognize in any way any equitable, contingent, future or partial interest in any share. Companies were, in general, both entitled and obliged to deal only with those who were registered as having legal ownership of shares. The suggestion that an equitable shareholder should in principle be permitted to advance an equitable claim must therefore be rejected. The standing rule was not an absolute one and did admit the possibility that exceptions might be made in special circumstances, though the plaintiff in the present case had not advanced a case based on special circumstances (paras. 53–60).

(3) A shareholder would have standing to pursue a personal equitable claim to impugn an allotment of shares authorized by the directors prior to his becoming a registered shareholder, assuming that he had standing to pursue such a personal claim at all. It would be surprising if the rights which indubitably did pass with shares (essentially the statutory contract embodied in the articles) were not also accompanied on a transfer of legal ownership by legal and/or equitable rights of action which had not been exhausted by the transferor prior to a share transfer of title. Equitable claims could be attached to and assignable with shares. There was no general prohibition on a new shareholder complaining about a continuing wrong which first occurred before he became a shareholder. This finding most accorded with justice, broadly conceived, because it ought in principle to be possible for a new shareholder (especially a former beneficial owner) to seek to put matters right. To put it another way, if a shareholder had a personal equitable claim against the company in his capacity as such which had not been finally settled before legal title was transferred, it was difficult to see why as a matter of principle that claim would not be attached to the relevant shares. The right to challenge a continuing dilution of the voting power attached to the shares seemed

quite clearly to be a right which should be viewed as attaching to the shares rather than to the legal owner. The court repeated, however, that a personal right of action would only exist at all if there were special circumstances giving rise to a personal shareholder right of action in relation to a breach of fiduciary duty, which would ordinarily only be actionable by the company (paras. 73–78).

(4) The plaintiff did not have standing to pursue a personal claim based on the Cede & Co. assignment. The assignment was not effective to transfer the right to pursue a claim of equitable breach of fiduciary duty in respect of the 200,000 shares still registered in the nominee's name. Cede & Co. was not the registered owner on the date it was purportedly executed of the shares described therein. More fundamentally, an equitable claim which personally belonged to a shareholder arising out of rights attached to shares was not an independent assignable chose in action. The traditional common law rule was that the "bare right to litigate" was not assignable. The Property (Miscellaneous Provisions) Law (2017 Revision), s.5 did not change that position in relation to a "mere equity" such as the personal equitable claim in the present case. Section 5(1) expressly contemplated that an assignment would pass the legal right to a debt or thing in action and all legal and other remedies for the same. The wording of s.5 was a clear indicator that the statute did not contemplate the assignment of remedies designed to enforce property rights separately from an assignment of the relevant legal right or chose in action. Accordingly, the assignment was not effective to pass to the plaintiff, while the purported assignor retained title to the shares, any personal equitable right of action in relation to an improper dilution of the voting power of the shares (paras. 87–95).

**Cases cited:**

(1) *A Company, Re*, [1987] BCLC 82, considered.

(2) *Antow Holdings Ltd.* v. *Best Nations Invs. Ltd.*, Eastern Caribbean Supreme Ct. (C.A.), Case No. BVI HCMAP 2017/0010, September 21st, 2018, unreported, considered.

(3) *Argentine Holdings (Cayman) Ltd.* v. *Buenos Aires Hotel Corp. S.A.*, 1997 CILR 90, followed.

(4) *Artan Invs. Ltd.* v. *Bank of East Asia Ltd.*, Hong Kong Ct. of First Instance, HCMP 125/2015, June 5th, 2015, unreported, distinguished.

(5) *Ashburton Oil N.L.* v. *Alpha Minerals N.L.*, [1971] HCA 5; (1971), 123 CLR 614, considered.

(6) *Bamford* v. *Bamford*, [1970] Ch. 212; [1969] 2 W.L.R. 1107; [1969] 1 All E.R. 969, applied.

(7) *Bermuda Cablevision Ltd.* v. *Colica Trust Co.*, [1998] A.C. 198; [1998] 2 W.L.R. 82; [1998] 1 BCLC 1; [1997] BCC 982, distinguished.

(8) *Binney* v. *Ince Hall Coal & Channel Co.* (1866), 35 L.J. Ch. 363; 14 L.T. 392, considered.

(9) *Eclairs Group Ltd.* v. *JKX Oil & Gas plc*, [2014] EWCA Civ 640; [2014] 4 All E.R. 463; [2014] 2 All E.R. (Comm) 1018; [2014] 2 BCLC 164; [2015] BCC 821; [2014] Bus. L.R. 835; on appeal, [2015] UKSC 71; [2015] W.L.R. (D.) 497; [2016] 3 All E.R. 641; [2016] 2 All E.R. (Comm) 413; [2015] Bus. L.R. 1395, distinguished.

(10) *Ellis* v. *Torrington*, [1920] 1 K.B. 399, referred to.

(11) *Emlen Pty. Ltd.* v. *St. Barbara Mines Ltd.* (1997), 24 ACSR 303, considered.

(12) *Fitzroy* v. *Cave*, [1905] 2 K.B. 364, considered.

(13) *Foss* v. *Harbottle* (1843), 2 Hare 461; 67 E.R. 189, referred to.

(14) *Gross* v. *Lewis Hillman Ltd.*, [1970] Ch. 445; [1969] 3 W.L.R. 787; [1969] 3 All E.R. 1476, distinguished.

(15) *Hannoun* v. *R Ltd.*, 2009 CILR 124, referred to.

(16) *Hogg* v. *Cramphorn Ltd.*, [1967] Ch. 254; [1966] 3 W.L.R. 995; [1966] 3 All E.R. 420, *dicta* of Buckley, J. considered.

(17) *Hooker Invs. Pty. Ltd.* v. *Email Ltd.* (1986), 10 ACLR 443, considered.

(18) *Howard Smith Ltd.* v. *Ampol Petroleum Ltd.*, [1974] A.C. 821; [1974] 2 W.L.R. 689; [1974] 1 All E.R. 1126, considered.

(19) *Independent Asset Management Co. Ltd.* v. *Swiss Forfaiting Ltd.*, Eastern Caribbean Supreme Ct. (C.A.), Case No. BVI HCMAP 2016/0045, November 24th, 2017, unreported, considered.

(20) *Investors' Compensation Scheme Ltd.* v. *West Bromwich Bldg. Socy.*, [1998] 1 W.L.R. 896; [1998] 1 All E.R. 98; [1998] 1 BCLC 531; [1997] C.L.C. 1243, applied.

(21) *JN2 Ltd.*, *Re*, [1978] 1 W.L.R. 183; [1977] 3 All E.R. 1104, considered.

(22) *Lancelot Investors Fund Ltd.*, *In re*, 2015 (1) CILR 328, *dicta* of Martin, J.A. considered.

(23) *Lloyd* v. *Casey*, [2002] 1 BCLC 454, considered.

(24) *McGrattan* v. *McGrattan*, [1985] N.I. 28, considered.

(25) *North-West Transp. Co.* v. *Beatty* (1887), 12 App. Cas. 589; 56 L.J.P.C. 102; 3 T.L.R. 789, referred to.

(26) *Peskin* v. *Anderson*, [2000] EWCA Civ 326; [2001] 1 BCLC 372; [2001] BCC 874, *dicta* of Mummery, L.J. considered.

(27) *Piercy* v. *S. Mills & Co. Ltd.*, [1920] 1 Ch. 77, considered.

(28) *Punt* v. *Symons*, [1903] 2 Ch. 506, considered.

(29) *Rayfield* v. *Hands*, [1960] Ch. 1; [1958] 2 W.L.R. 851; [1958] 2 All E.R. 194, referred to.

(30) *Residues Treatment & Trading Co. Ltd.* v. *Southern Res. Ltd. (No. 4)* (1988), 51 SASR 177; on appeal (1988), 51 SASR 196; 48 ACLR 599, not followed.

(31) *Schultz* v. *Reynolds*, 1992–93 CILR 59, *dicta* of Zacca, P. considered.

(32) *Simpson* v. *Molsons Bank*, [1895] A.C. 270, referred to.

(33) *Svanstrom* v. *Jonasson*, 1997 CILR 192, considered.

(34) *Tolhurst* v. *Associated Portland Cement Manufacturers (1900) Ltd.*, [1902] 2
    K.B. 660, *dictum* of Cozens-Hardy, L.J. considered.

**Legislation construed:**

Companies Law (2018 Revision), s.38: The relevant terms of this section are set
    out at para. 54.

Property (Miscellaneous Provisions) Law (2017 Revision), s.5: The relevant terms
    of this section are set out at para. 89.

*M. Green*, *Q.C.*, *C. Moran* and *L. Schroeter* for the applicant/defendant;
*N. Meeson*, *Q.C.* and *E. Bodden* for the respondent/plaintiff.

1   **KAWALEY, J.:**

**Introductory**

The propriety of the issuance of new shares in circumstances where the voting
power of existing shareholders is materially diluted has been the subject of legal
challenges for over 100 years. The legal basis for asserting such challenges has
been largely consistent and clear: an alleged breach of the directors' equitable duty
to use their powers only for proper purposes. On the other hand, in what capacity a
shareholder may seek relief, personally or derivatively on behalf of the company,
is a question on which different views have been expressed by judges and text
writers over the years. This is the first main legal controversy raised by the
defendant's present application.

2   The second main question which falls for determination is the extent to which
it is possible for a beneficial owner of shares to enforce rights attaching to the
shares. Although this issue has been generating case law for over 150 years, it is
raised in the modern context of a listed company where the legal title to all shares
is ordinarily registered in the name of a depositary. Two further ancillary and
somewhat narrower questions also fall for determination. First, can a registered
shareholder assert an equitable claim in respect of impropriety which occurred
before he became a registered shareholder? Secondly, is the right to pursue such a
claim itself assignable independently of the shares themselves?

3   These questions came before this court for determination in the following way.
On August 24th, 2018, the defendant allotted and issued shares to four groups of
investors under share purchase agreements ("the SPAs") and a board resolution
("the August 24th decision") of the same date. With remarkable speed, the plaintiff
filed a writ of summons on August 27th, 2018 followed by a statement of claim on
September 10th, 2018. As a result of the plaintiff taking various somewhat hurried
steps to respond to the standing challenges raised by the defendant, an amended
statement of claim was filed on September 20th, 2018 and a re-amended

statement of claim was filed pursuant to a consent order dated October 31st, 2018 ("RASC"). However, before leave was granted for the plaintiff to advance the third iteration of his statement of claim, the defendant by a summons dated October 4th, 2018 (an amended version of which was filed on October 31st, 2018) applied for the following relief:

"1. Pursuant to GCR O.14A r.1 that the Court do determine the following questions of law, namely that:

    1.1 The Defendant did not owe any (i) fiduciary duty; and/or (ii) equitable duty; and/or (iii) contractual duty and/or (iv) any other duty, to the Plaintiff in respect of its' [*sic*] directors power to allot/issue shares pursuant to the Share Purchase Agreements dated 24 August 2018 ('Relevant Date') in circumstances where the Plaintiff was not a registered shareholder of the Defendant at the Relevant Date; and

    1.2 The Plaintiff has not taken any valid assignment from Cede and Co. of a right of action against the Defendant and cannot proceed in that capacity; and

    1.3 In the circumstances, the Plaintiff has no cause of action against the Defendant and therefore no standing to bring these proceedings.

2. Further or in the alternative the Re-Amended Writ of Summons be struck out pursuant to GCR O.18 r.19(1) and/or the inherent jurisdiction of the Court on grounds that it does not disclose a reasonable cause of action and/or is an abuse of process . . ."

**The re-amended statement of claim**

4   The RASC alleges non-controversially that the plaintiff was a director from October 6th, 2011, Chairman of the Board of Directors of the defendant from March 30th, 2012 and Chief Executive Officer ("CEO") from May 10th, 2012. He was removed as Chairman and CEO on July 1st, 2018 and as a director on July 12th, 2018. The description of the circumstances of the plaintiff's removal from office, under the heading "Board Coup," are said to be that the plaintiff was removed in an unceremonious manner without being told the reasons for his removal. Although the legality of the removal is not challenged, the August 24th decision is said to be the final stage of a "Board Coup" which removed the plaintiff from the board and changed control of the board. Wilting flowers do not ordinarily rise to the top of the corporate tree. This "coup" quite likely would have been experienced by the plaintiff as humiliating, and so it is perhaps unsurprising that he was keen to seek urgent legal recourse, as he would elect to do.

5   Other background facts are also uncontroversial. On June 11th, 2018, the defendant received an acquisition proposal from CITIC Capital Holdings Ltd. ("CITIC") to acquire all of the defendant's shares (not already owned by CITIC) for $110 per share ("the CITIC proposal"). The defendant publicized this offer on June 19th, 2018.

6   On August 17th, 2018, a consortium of which the plaintiff was part submitted a preliminary non-binding offer to acquire all of the other shares in the defendant for $118 per share ("the GL proposal"). On August 24th, 2018, the board announced that the CITIC proposal had been withdrawn and the GL proposal rejected. Instead, it had been decided to allot and issue 5,850,000 shares.

7   The RASC (para. 23) next alleged that this share issue represented "14.9% of the Company's Ordinary shares post issuance . . . at a purchase price per Ordinary Share of US$100.90 for gross proceeds of approximately US$590 million to a handpicked group of investors." The central averments made are the following:

"29.   The Share Purchase Agreements and the allotment of shares pursuant thereto, which occurred both before and after the issue of the writ herein, were manifestly for an improper purpose, namely to seek to alter the balance of power between the Incumbent Management consortium and the Plaintiff's Consortium and to seek to thwart any take-over offer by the Plaintiff's Consortium (including the 17 August GL proposal) or others unconnected with the Incumbent Management Consortium or the Board) . . .

32.   Further or alternatively, the conduct of the Board in entering into the Share Purchase Agreements and allotting shares to the Incumbent Management consortium pursuant thereto was in breach of their fiduciary duty to exercise their powers for a proper purpose being the purpose for which such powers were granted."

8   The relief sought included, inter alia, a declaration that the August 24th board decision and the SPAs are invalid and unenforceable, together with an order requiring the defendant to rescind the SPAs and rectify the register.

9   As regards the plaintiff's shareholder standing, the key sequence of events is pleaded as follows:

- *at all material times to September 4th, 2018*: the plaintiff was the beneficial owner of 417,143 ordinary shares, and was disclosed as such in SEC filings;

- *September 4th to date*: after transferring beneficial ownership of 200,000 shares to a family trust, the plaintiff retains beneficial ownership of 217,143 of those shares;

- *September 14th to date*: the plaintiff is registered owner of 50,000 shares;
- *October 22nd, 2018*: Cede & Co. as registered owner of the 417,143 shares as at August 24th, 2018 assigned all rights and remedies of the shares to the plaintiff;
- *October 24th, 2018*: notice of the assignment is given to the defendant pursuant to s.5 of the Property (Miscellaneous Provisions) Law.

10   By letter dated November 1st, 2018, the plaintiff's attorneys clarified the capacities in which the plaintiff sued:

(a) as a beneficial owner of shares in the company, with sole voting control;

(b) as a registered member of the company; and/or

(c) as assignee from a registered member of a cause of action.

11   Conyers Dill & Pearman also clarified the breaches of duty relied upon:

(a) the duty to exercise directors' powers for a proper purpose "is a legal and/or equitable duty owed to an individual shareholder and in respect of which an individual shareholder has a right of action";

(b) a shareholder has a "corresponding legal and/or equitable right not [to] have its voting rights diminished except as a consequence of shares being issued for a proper purpose";

(c) where a public company and its directors know that the registered shareholder is a nominee and the identity of the controlling beneficial owner is a matter of public record (through SEC filings), the company and its directors owe a legal and/or equitable duty to such persons only to issue new shares for a proper purpose.

12   Next it was explained that in the alternative, the plaintiff's case was that the relevant duties were owed to Cede & Co. and that their breach created a cause of action which Cede & Co. held as a bare trustee for the plaintiff which it was able to legally assign to him. Finally, as regards the 50,000 shares legally transferred to the plaintiff by Cede & Co., the right of action attached to those shares and was transferred to the plaintiff.

13   For the purposes of deciding the standing issues, it was common ground that I should assume that the plaintiff was able to prove the various averments upon which he based his breach of fiduciary duty case.

**Does a registered shareholder possess legal standing to assert a personal claim for breach of fiduciary duty in respect of a board decision to allot and issue shares for an improper purpose?**

*The defendant's submissions*

14    The legal position contended for by the defendant is best captured by the passage quoted from the first authority cited in its skeleton argument, *Argentine Holdings (Cayman) Ltd.* v. *Buenos Aires Hotel Corp. S.A.* (3). In that case, Smellie, J. (as he then was) opined as follows (1997 CILR at 104):

"By virtue of their fiduciary positions, directors owe strict duties to act *bona fide* in the best interests of the company and to act only for a proper purpose: see *Hogg* v. *Cramphorn Ltd.* . . . As custodians of the company's assets under their control, their fiduciary duties are owed not to a particular shareholder but, in the usual context, to the company. The fiduciary relationship imposes upon directors duties of loyalty and good faith which are akin to those imposed upon trustees properly so called. If the purpose of the directors is improper, as the admitted purposes in this case certainly were, then their decisions will be ineffective . . ."

15    That statement was made in the context of a claim by the company against directors in relation to actions taken by them after receivers had been appointed to take over the management of the company. But it unequivocally asserted that directors' duties are ordinarily owed to the company. And, as will be seen below, in an area of law which has not always received the benefit of legal lucidity, Smellie, J.'s *obiter* remarks summarized the relevant principles with admirable clarity.

16    The defendant accordingly further submitted that a "special factual relationship" would have to be established to create a right of action by an individual shareholder against a company for breach of fiduciary duty. It also bears noting that Smellie, J. cited as authority for his quoted statement a case where a shareholder sued for breach of fiduciary duty, *Howard Smith Ltd.* v. *Ampol Petroleum Ltd.* (18), an appeal emanating from the Supreme Court of New South Wales. However, as Mr. Green, Q.C. pointed out, that was a case where the aggrieved shareholder had not only sued the allottee or new shareholder but also the company (in seeking to set aside the allotment and rectify the register), and Lord Wilberforce noted ([1974] A.C. at 838): "It was not disputed that an action to set aside the allotment and for rectification of the register was properly brought by Ampol as plaintiff."

17    Further authorities were relied upon as supporting the proposition that the company was the proper plaintiff for the breach of fiduciary duty claim which confronted this issue head-on. Reference was made to

*Hooker Invs. Pty. Ltd.* v. *Email Ltd.* (17), a first instance decision of the Supreme Court of New South Wales. This was a case where the beneficial owner of shares sought to establish that an issue of shares was invalid because the directors had been improperly motivated. The standing of a legal shareholder to sue for breach of fiduciary duty did not directly arise, but nonetheless Young, J. (as a precursor to determining whether an equitable shareholder had standing) analysed the position as follows (10 ACLR at 444–445):

> "The basic rule is that normally the company itself is the only proper plaintiff for a wrong done to it, a shareholder is himself a proper plaintiff for a wrong done to him, but that in certain cases a shareholder may sue even though the duty is owed only or primarily to the company.

> Getting down to specifics, so far as a duty with respect to an issue of shares is concerned, the case comes within Buckley's fourth rule, that is, that the act is not ultra vires, but is of a fraudulent character in equity so that the corporation alone can sue but if the alleged wrongdoers are in control the corporation then the minority may sue by one shareholder on behalf of himself and others . . .

> Thus it seems that the better view is that the duty is a duty owed to the company, the company is normally the proper plaintiff, but in suitable circumstances the court will listen to proceedings brought in the name of a shareholder."

18   These were very clear and coherent statements of principle indeed. On the other hand, they were only provisional views. Mr. Meeson, Q.C. relied on the following *dicta* of Young, J. in *Hooker Invs. Pty. Ltd.* v. *Email Ltd.* (*ibid.*, at 446):

> "In view of the way in which the law of fiduciary duty is moving . . . I can not say that it is so unarguably clear that a shareholder himself has no personal cause of action in respect of a breach of duty by a director, that I should not allow that matter to go to trial."

19   Mr. Green, Q.C. also referred to two earlier important cases which were cited in *Hooker.* In *Hogg* v. *Cramphorn Ltd.* (16), it was established that a proposed issue of new shares was liable to be set aside on the application of the plaintiff shareholder suing in a representative capacity. Buckley, J. held ([1967] Ch. at 262–263): "It follows that a majority in general meeting of the company at which no votes were cast in respect of the 5,707 shares could ratify the issue of these shares."

20   It was submitted that if the misuse of power could be waived by the majority of the shareholders, that demonstrated that the duty was owed to the company and its shareholders as a whole, and not to any individual shareholder(s). The principal authority the defendant's counsel invited the

court to follow was the English Court of Appeal decision in *Bamford* v. *Bamford* (6). Counsel pointed out the broadly similar factual matrix in *Bamford.* The company was a public company and the plaintiffs, two minority shareholders, sought a declaration that an allotment had been made to block a takeover bid. The directors convened a special general meeting to seek shareholder approval for the allotment and the plaintiffs additionally sought a declaration that any resolution passed at the general meeting would be a nullity. The issue of whether the shareholders could ratify the allotment was tried as a preliminary issue on the assumption that the allotment had been approved by the directors for an improper purpose. Plowman, J. held that the shareholders could ratify the directors' invalid decision. The Court of Appeal dismissed the appeal against this decision. Harman, L.J. crucially stated ([1970] Ch. at 237–238):

"It is trite law, I had thought, that if directors do acts, as they do every day, especially in private companies, which, perhaps because there is no quorum, or because their appointment was defective, or because sometimes there are no directors properly appointed at all, or because they are actuated by improper motives . . . such directors can, by making a full and frank disclosure and calling together the general body of shareholders, obtain absolution and forgiveness of their sins; and provided the acts are not ultra vires the company as a whole everything will go on as if it had been done all right from the beginning . . .

The only question is whether the allotment, having been made, as one must assume, in bad faith, is voidable and can be avoided at the instance of the company—at their instance only and of no one else, because the wrong, if wrong it be, is a wrong done to the company."

21   Russell, L.J. also stated (*ibid.*, at 242):

"It is true that the point before us is not an objection to the proceedings on *Foss* v. *Harbottle* (1843) 2 Hare 461 grounds. But it seems to me to march in step with the principles that underlie the rule in that case. None of the factors that admit exceptions to that rule appear to exist here. The harm done by the assumed improperly-motivated allotment is a harm done to the company, of which only the company can complain."

22   Mr. Green, Q.C. invited the court to follow *Bamford* v. *Bamford* (6) instead of the authorities relied upon by the plaintiff which admittedly suggested that shareholders could assert a personal claim to challenge an improperly motivated board decision to allot shares.

*The plaintiff's submissions*

23   The plaintiff's counsel submitted that there was clear authority in support of the proposition that shareholders could pursue personal claims for breach of fiduciary duty with a view to invalidating an improperly motivated allotment of new shares which diluted the voting power of existing shareholders. Mr. Meeson, Q.C.'s submission was justified to the extent that he relied on two text authorities and, primarily, one Australian appellate decision.

24   First, *Gore-Browne on Companies*, Issue 142, July 2018, para. 44 states as follows:

"There are certain (limited) circumstances in which a shareholder will have a claim against the company directly: where the company's articles have been amended otherwise than bona fide for the benefit of the company as a whole, where there has been a breach of a member's individual rights (arising, eg, under the articles), or where the directors of the company have exercised their powers for an improper purpose. These claims are not derivative claims, as the shareholder himself has a personal cause of action (although there may be parallel claims that might be advanced by the company and that, theoretically, could be pursued as derivative claims."

25   Secondly, in Chivers, Shaw, Bryant, & Staynings, *The Law of Majority Shareholder Power: Use & Abuse*, 2nd ed., para. 5.20, at 120 (2017) states as follows:

"The authorities also establish that a minority shareholder may bring a personal action if directors allot shares for an improper purpose. Again, the minority shareholder could seek injunctive relief to restrain the allotment, if he discovered the majority's plans to allot the shares for an improper purpose. The minority shareholder could in these circumstances seek a declaration that the allotment was invalid and a consequential rectification of the company's register of members."

26   The plaintiff's counsel was bound to accept that neither text cited case law which supported the crucial opinions clearly or at all. The only authority which clearly supported the crucial proposition in circumstances where the issue was directly engaged and on the basis of reasoned analysis was *Residues Treatment & Trading Co. Ltd.* v. *Southern Resources Ltd. (No. 4)* (30) (South Australia Supreme Ct. (*in banco*)).[1] The plaintiffs were minority shareholders who sought, inter alia, to invalidate an

-----

1   The Supreme Court first instance judgment is reported at 51 SASR 177. The case is also apparently reported at 48 ACLR 599.

allotment of shares on the grounds that the directors improperly wished to dilute their shares' voting power in the context of a takeover bid. At first instance, Perry, J. held that the plaintiffs lacked standing to bring a personal claim because they did not fall within any of the exceptions to the rule in *Foss* v. *Harbottle* (13). The Court of Appeal unanimously reversed this finding with King, C.J. delivering the leading judgment. Reliance was placed in particular on the following statements (51 SASR at 202):

"The rule in *Foss v Harbottle* clearly operates to preclude a shareholder from sueing [*sic*] in his personal capacity in respect of a detriment which he suffers in common with other shareholders in consequence of a wrong done to the company. There is a clear distinction, however, between such a detriment and the diminution of a shareholder's effective voting power by an improper allotment of shares by directors acting on behalf of the company. The latter is not merely a breach of duty by the directors of the company, it is also a wrong done to the shareholder by the company acting through its agents ... Diminution of voting power stands on a fundamentally different footing from other detriments resulting from abuse of power by directors. A member's voting rights and the rights of participation which they provide in the decision-making of the company are a fundamental attribute of membership and are rights which the member should be able to protect by legal action against improper diminution. The rule in *Foss v Harbottle* has no application where individual membership rights as opposed to corporate rights are involved . . ."

27   Mr. Meeson, Q.C. confirmed, consistently with King, C.J.'s quoted *dicta*, that the proposition the plaintiff relied upon was not that all breaches of fiduciary duty based on an improper purpose gave rise to a personal shareholder claim. The right of personal action only arose in relation to improperly motivated allotments of shares which diluted the voting power of existing shareholders, which was a special category of breach of fiduciary duty which was a wrong to the company and minority shareholders. King, C.J.'s interesting thesis was not clearly supported by any of the other prior or subsequent authorities referred to by the plaintiff's counsel.

28   Mr. Green, Q.C. rightly submitted that this decision had not exactly received a "ringing endorsement." The correctness of the decision had been academically doubted.[2] The Supreme Court of Western Australia (Wheeler, J.) in *Emlen Pty. Ltd.* v. *St. Barbara Mines Ltd.* (11) cited *Residues Treatment & Trading Co. Ltd.* v. *Southern Res. Ltd. (No. 4)* (30),

---

2   Diethlem, "*Impugned Share Allotments and the Rule in Foss v Harbottle*," 5 *Australian Bar Review* 262 (1989).

but merely described its central holding (24 ACSR at 306) as "arguable." However, Mr. Meeson, Q.C. further submitted that the voting power dilution scenario was simply another example of the recognized category of exceptions to the rule in *Foss* v. *Harbottle* (13) where "special circumstances" justified an individual right of action: *Peskin* v. *Anderson* (26).

***Findings: individual (minority) registered shareholders have no standing to pursue personal claims against a company for an improperly motivated allotment of shares which dilutes their voting rights***

29   I find that individual minority shareholders ordinarily have no legal standing to sue for breach of fiduciary duty in relation to a complaint that their voting power has been diluted by a share allotment approved by the directors for an improper purpose. The correct legal principle was accurately stated, strictly *obiter*, by Smellie, J. in ). The position is most fully considered and persuasively articulated in the judgment of Harman, L.J. in *Bamford* v. *Bamford* (6). He regarded it as trite law that directors only ordinarily owe a duty to the company if they misuse their powers and that the company in general meeting can validate any such defects in the exercise of the directors' powers. The relevant analysis occurred in the context of considering an allotment of shares which it was complained was approved in order to dilute the voting power of the plaintiff shareholders. The statements in *Bamford* do not explain the exceptions to what is properly viewed as a general and perhaps almost invariable rule because these were not relevant to that case. However, Harman, L.J. ([1970] 1 Ch. at 239) cited a passage from the Privy Council decision of *North-West Transp. Co.* v. *Beatty* (25) confirming that it is not every breach of fiduciary duty which the company in general meeting can approve.

30   In my judgment both the general rule and the exception are fundamental principles of company law which are central to the way in which companies limited by shares operate. Directors are only answerable to the company for intra vires breaches of fiduciary duty because they are agents of the company appointed on the explicit basis that they owe duties of loyalty to the company. Shareholders ordinarily acquire their shares on the explicit basis that their only means of controlling the management of the company is by way of successfully passing resolutions in general meetings. It would be inconsistent with what is essentially a functional rule, and potentially expose companies to limitless litigation, if individual shareholders were permitted to enforce duties which are not owed to them. This would amount to permitting individual shareholders to participate in the management of the company by intruding into the company's proper sphere of supervising the conduct of the directors. The position is different

as regards ultra vires acts because the company itself is not competent to ratify ultra vires acts and may only validly act within its powers. Section 28 of the Companies Law, for example, expressly permits shareholders to set aside ultra vires acts.

31    The position is also obviously different when special circumstances give rise to an individual right of action by a particular shareholder against the company in respect of a transaction which affects that shareholder in its own right, *e.g.* where the shareholder is asserting a personal contractual right to receive dividends or redemption proceeds. In such cases the fact that other shareholders may be in a similar position is probably irrelevant. Some jurisdictions (but not this one) have created statutory minority shareholder oppression remedies to extend the ambit of minority shareholders' rights.

32    A further consideration which weighs against the existence of standing to assert a personal claim with a view to challenging the August 24th decision is that share allotments will usually affect all shareholders of the affected class in the same way and that there is accordingly no identifiable principled basis upon which to treat this category of breach of an *equitable* duty as a *sui generis* one giving rise to concurrent duties being owed to the company and individual shareholders. Directors' fiduciary duties are quintessentially owed to the company and their breach is actionable by or on behalf of the company. I reject the suggestion that the dilution of share voting rights constitutes a freestanding exception to the rule in *Foss* v. *Harbottle* (13), which establishes the general rule that claims for damage caused to a company must ordinarily be brought by or on behalf of the company.

33    Before dealing with the special circumstances point, I should explain why I decline to follow *Residues Treatment & Trading Co. Ltd.* v. *Southern Res. Ltd. (No. 4)* (30). In my judgment, this decision represents a departure from the mainstream of British Commonwealth company law which is not supported by any previous or subsequent authorities to which I was referred. Nor is *Residues* supported by any coherent principle. King, C.J.'s central thesis was that a shareholder's voting rights were so fundamental that they deserved special protection in the form of a personal action against the company for breach of fiduciary duty. With the greatest of respect, this reasoning fails to acknowledge that individual shareholders can sue the company to set aside ultra vires acts (Companies Law, s.28), and can challenge intra vires share allotments which they consider improperly dilute their voting rights either (a) through a derivative action, or (b) through the instrumentality of a general meeting. The contrary argument also fails to explain how as a general rule a share allotment affects some existing shareholders differently to others.

607

34   King, C.J. himself acknowledged (51 SASR at 201), after referring to various cases which he considered provided some support for his conclusion, that "[n]one of the above cases is decisive of the present point." Mr. Meeson, Q.C. suggested that various previous decisions supported the individual shareholder's right to challenge an improperly motivated share allotment, but on careful reading they provided no direct support (as King, C.J. himself accepted):

(a) in *Punt* v. *Symons* (28), an injunction was granted to restrain the holding of a general meeting at which it was proposed to allow the new shareholders to vote in circumstances where a breach of the articles was complained of and the plaintiff was asserting special share rights conferred by the articles;

(b) in *Piercy* v. *S. Mills & Co. Ltd.* (27), the plaintiff and allies were majority shareholders and the court upheld their right to "prevail" on the question of whether or not there should be an allotment;

(c) in *Howard Smith* v. *Ampol Petroleum Ltd.* (18), the issue of standing was not considered or decided;

(d) *Re A Company*[3] (1) was an unfair prejudice petition case, where the court was considering an *ex parte* application for a pre-emptive costs order. The *obiter dicta* relied upon ([1987] BCLC at 84–85) of the presumably *ex tempore* judgment of Hoffmann, J. (as he then was) are accordingly unpersuasive[4];

(e) *Ashburton Oil N.L.* v. *Alpha Minerals N.L.* (5) (High Court of Australia) does contain *dicta* suggesting that even minority shareholders have a personal right of action in respect of an improperly motivated allotment. As the plaintiff was a majority shareholder, these *dicta* were *obiter*.

35   Mr. Green, Q.C. wryly observed that *Residues* (30) had not received a "ringing endorsement." The central thesis of *Residues* may have been academically doubted, but it was tentatively supported nonetheless. Diethelm in "*Impugned Share Allotments and the Rule in Foss v Harbottle*," 5 *Australian Bar Review* 262, at 266 (1989) commented as follows:

---

3   This case is also occasionally cited under the name "*Re Sherborne Park Residents Co. Ltd.*"

4   Hoffmann, J.'s opinion that a personal claim could be asserted by shareholders was justified by reference to a shareholder's right to uphold the articles. Where a shareholder can ground a breach of fiduciary claim in personal rights contained in the articles, this would probably be an instance of "special circumstances" where an individual right of action would exist.

"Whether recognition of a personal right can be supported by precedent is a much more obscure question but, fortunately, this did not deter the court. After conceding that none of the cases cited was decisive of the present point, King CJ held that it was 'clear' that an allotment for improper purposes which had the effect of converting a majority shareholder into a minority shareholder infringed that member's personal rights (which is doubtful), that there is no reason in principle for distinguishing that case from the case of the minority shareholder whose voting power is diluted (which is true), and that consequently a minority shareholder has standing to complain (which is desirable) . . ."

36   This article in my judgment fails to appreciate that there *is* a fundamental distinction between the standing of a majority shareholder and a minority shareholder. In the former case the majority shareholder has the right to express the will of the company in general meeting and to ratify or set aside any share allotment which will dilute his majority shareholding. To the extent that King, C.J. in *Residues* held that a majority shareholder can assert a personal equitable claim to set aside an improperly motivated allotment, he was (although perhaps expressing it somewhat imperfectly) articulating a well-recognized legal principle. However according to the report of that case, the plaintiffs were in fact two minority shareholders.

37   The *Residues* case (30) has not apparently been judicially followed in so far as supporting the standing of minority shareholders to impugn an allotment at least. It was mentioned in a case where a minority shareholder was pursuing statutory remedies: *Emlen Pty. Ltd.* v. *St. Barbara Mines Ltd.* (11). Wheeler, J. merely observed (24 ACSR at 306):

". . . [I]t may also be said that there is a clear personal right to be protected against dilution of voting rights which it is also the purpose of the Corporations Law broadly to protect. This principle is discussed in the context of the standing of a minority shareholder to restrain a share allotment in *Residues Treatment and Trading Co. Ltd. v Southern Resources (No 4)* (1988) 14 ACLR 569. It is arguable that a shareholder has standing to restrain any improper action by the directors which would lead to such dilution whether the improper action be a breach of s 260 or the issue of a misleading Part A statement."

38   The plaintiff submitted that Harris, J. applied *Residues* in *Artan Invs. Ltd.* v. *Bank of East Asia Ltd.* (4). Harris, J. was dealing with a statutory application for discovery and the question of whether the information was being sought by the minority shareholders (in relation to an allotment they objected to) for a "proper purpose." The possibility that proceedings might be brought to challenge the allotment was taken into account even though

the judge expressly found that "it is not necessary to satisfy the court that the applicant has a specific or personal right that can only be protected through the inspection of records" (para. 25(5)). And so, although Harris, J. made the following statement with reference to the *Residues* case, this passing reference has minimal persuasive value as regards the equitable position (at para. 14):

"Shareholders have a personal right not to have the voting power of their shares diminished except for a proper reason, which will generally be a genuine need to raise additional capital. A shareholder has locus standi to institute and prosecute proceedings to protect that right."

39   I accept entirely that Harris, J. clearly opines that minority shareholders have the right to bring personal claims, but he was not actually deciding a standing dispute in relation to an equitable claim. On the contrary, he was resolving a standing dispute in relation to a statutory claim. And was probably accurately stating the position under Hong Kong law where, I believe, statutory protections for minority shareholders exist. For much the same reasons as I decline to be persuaded by the somewhat similar views expressed by Hoffmann, J. in *Re A Company* (1) ([1987] BCLC at 84–85) (which made reference to claims for breach of the articles), one should always accord far greater weight to judicial statements made in the context of deciding a controversial legal issue than to mere *obiter dicta*.

40   As regards other subsequent decisions said to support the *Residues* principle:

(a) in *Eclairs Group Ltd.* v. *JKX Oil & Gas plc* (9), the beneficial owners of the shares brought a derivative action on behalf of the registered owners of those shares (see para. 34 of Briggs, L.J.'s judgment in the Court of Appeal ([2014] Bus. L.R. 835, at para. 34));

(b) in *Independent Asset Management Co. Ltd.* v. *Swiss Forfaiting Ltd.* (19), the claimant was not only the previously 100% majority shareholder of the company's class A shares which carried all the voting rights in the company (who was presumably entitled to block the diluting allotment in general meeting), but also was pursuing personal statutory claims;

(c) in *Antow Holdings Ltd.* v. *Best Nations Invs. Ltd.* (2), the shareholders were pursuing personal statutory claims.

41   It remains to consider the text writers upon whom the plaintiff's counsel understandably heavily relied. *Gore-Browne on Companies*, Issue 142, para. 44, July 2018, confidently asserts that "where the directors of the company have exercised their powers for an improper purpose . . . the shareholder himself has a personal cause of action . . ." The only authority cited in support of this proposition by the learned authors is *Howard Smith*

v. *Ampol Petroleum Ltd.* (18), which, with respect, provides next to no support for the statement. The House of Lords merely noted that the standing of the shareholder to bring a personal claim was not disputed. Mr. Green, Q.C. pointed out what I consider to be a crucial factual consideration in that case. The plaintiffs were majority shareholders holding 55% of the shares. The central holding in *Howard Smith* was entirely consistent with the defendant's central thesis, which I unreservedly accept, that majority shareholders have the right (by way of expressing the will of the company) to disapprove or ratify any intra vires breach of fiduciary duty by the directors.

42    There is a fundamental distinction between the rights of the majority and the minority in this regard. It may well be that the most formal way of proceeding would have been for the majority shareholders to have issued derivative proceedings, but it is easy to understand why no standing challenge was raised. *Howard Smith*, properly understood, is in no material way inconsistent with the notion that minority shareholders ordinarily have no standing to assert a personal claim in relation to a share allotment which is improperly motivated.

43    Chivers, Shaw, Bryant & Staynings in *The Law of Majority Power: Use & Abuse*, 2nd ed., para. 5.20, at 120 (2017) also confidently state: "The authorities also establish that a minority shareholder may bring a personal action if directors allot shares for an improper purpose." Three authorities are cited in support of this proposition:

(a) *Eclairs Group Ltd.* v. *JKX Oil & Gas plc* (9). However this did not concern an allotment of shares;

(b) *Bamford* v. *Bamford* (6). However, this case establishes the converse proposition, namely, that a minority shareholder *cannot* advance a personal equitable claim to challenge an improperly motivated allotment of shares;

(c) *Re A Company* (1). However, the petitioner was pursuing a statutory unfair prejudice claim so the issue of standing to advance an equitable claim did not arise for consideration. The decision does admittedly indirectly support the view that a personal statutory claim can be pursued to challenge an improperly motivated share allotment. But, as already noted, this was an *ex parte* application for a pre-emptive costs order so the *obiter* remarks relied upon provide only slight potential support for the principle in support of which it is cited. Moreover, to the extent that Hoffmann, J. described the personal claim as a means of enforcing the articles, this type of claim is a classic instance of special circumstances justifying a minority shareholder asserting a personal claim for breach of duties generally owed solely to the company.

611

44   Mr. Green, Q.C. submitted that the text writers were clearly "confused" about this issue. I would merely say that the passages relied upon by the plaintiff do not provide any sound basis for doubting that the general rule is that minority shareholders do not (absent special circumstances) have standing to pursue a personal action to set aside or restrain an improperly motivated allotment of shares which would dilute their voting power. Any such breach of fiduciary duty would be actionable by or derivatively on behalf of the company, because the company in general meeting has the right to decide whether or not to affirm or disapprove the improper intra vires actions the directors have taken purportedly on behalf of the company.

45   What then potentially qualifies as special circumstances ousting this general rule? Clearly not the mere fact that a minority shareholder's voting power has been diluted. *The Law of Majority Power: Use & Abuse* does provide a helpful hint. In para. 5.19, at 120, which was not referred to in the course of argument, the following opinion is expressed:

"A minority shareholder could, if he discovered the majority's plans to allot shares in breach of pre-emption provisions contained in a company's constitution, seek injunctive relief to restrain this breach."[5]

46   This statement is most consistent with one of the authorities relied upon by the plaintiff, *Punt* v. *Symons* (28), where an injunction was granted to restrain the holding of a meeting at which business said to be in breach of the articles was due to be considered. However, the special circumstances principle was perhaps most lucidly explained in another case to which Mr. Meeson, Q.C. aptly referred, *Peskin* v. *Anderson* (26). Mummery, L.J. in that case held as follows ([2001] BCC 874, at paras. 29–33):

"29   According to the headnote in *Percival v Wright* [1902] 2 Ch 421 that case decided that:

'The directors of a company are not trustees for individual shareholders, and may purchase their shares without disclosing pending negotiations for the sale of the company's undertaking.'

30 The apparently unqualified width of the ruling has, over the course of the last century, been subjected to increasing judicial, academic and professional critical comment; but few would doubt that, as a general rule, it is important for the well being of a company (and of the wider commercial community) that directors are not over-exposed to the risk of multiple legal actions by dissenting

---

5   *Rayfield* v. *Hands* (29) is cited in support of this proposition.

minority shareholders. As in the affairs of society, so in the affairs of companies, rule by litigation is not to be equated with the rule of law.

31 For his part, Lord Grabiner QC accepted that the fiduciary duties owed by the directors to the company do not necessarily preclude, in special circumstances, the co-existence of additional duties owed by the directors to the shareholders. In such cases individual shareholders may bring a direct action, as distinct from a derivative action, against the directors for breach of fiduciary duty.

32 A duality of duties may exist. In *Stein v Blake* [1998] BCC 316 at pp. 318 and 320 Millett LJ recognised that there may be special circumstances in which a fiduciary duty is owed by a director to a shareholder personally and in which breach of such a duty has caused loss to him directly (e.g. by being induced by a director to part with his shares in the company at an undervalue), as distinct from loss sustained by him by a diminution in the value of his shares (e.g. by reason of the misappropriation by a director of the company's assets), for which he (as distinct from the company) would not have a cause of action against the director personally.

33 *The fiduciary duties owed to the company arise from the legal relationship between the directors and the company directed and controlled by them. The fiduciary duties owed to the shareholders do not arise from that legal relationship. They are dependent on establishing a special factual relationship between the directors and the shareholders in the particular case.* Events may take place which bring the directors of the company into direct and close contact with the shareholders in a manner capable of generating fiduciary obligations, such as a duty of disclosure of material facts to the shareholders, or an obligation to use confidential information and valuable commercial and financial opportunities, which have been acquired by the directors in that office, for the benefit of the shareholders, and not to prefer and promote their own interests at the expense of the shareholders." [Emphasis supplied.]

47   This clear and cogent reasoning is entirely consistent with what I regard as the mainstream view of this somewhat bedevilled area of the law. The notion that some special relationship is required to result in directors owing fiduciary duties to individual shareholders as opposed to the company (*i.e.* the shareholders as a whole) has echoes for me of an analogous insolvency law rule. In the context of an insolvent company and challenges to antecedent transactions, it is well understood that the directors are generally liable to the company for breaches of duty, and it is only in special circumstances that directors are directly liable to creditors.

48   It is in my judgment impossible to extract from any of the authorities cited before me support for the plaintiff's counsel's ambitious submission,

namely, that what I regard as a generic position of a minority shareholder facing a dilution of his voting power through an improperly motivated share allotment constitutes special circumstances giving rise to a fiduciary duty being owed to the shareholder on the directors' part.

49    The first of the standing issues is accordingly resolved in favour of the defendant.

### Does the beneficial owner of shares possess legal standing to assert a personal claim for breach of fiduciary duty in respect of a board decision to allot and issue shares for an improper purpose?

50    This point can be dealt with more shortly. I regard the relevant legal principles as being more straightforward. The point only arises for direct consideration (a) if I am wrong in finding that the plaintiff lacks standing to bring a personal claim as (registered) shareholder, and in circumstances where I also (b) correctly conclude that the plaintiff lacks standing as a registered post-August 24th, 2018 shareholder to challenge the August 24th, 2018 decision. It is hard to see how a beneficial owner could rationally have standing to pursue a claim that the legal shareholder was not competent to pursue. But the beneficial shareholder claim would sidestep the objection that even a registered shareholder cannot complain of a wrong which was committed before he acquired legal title to his shares.

### *The defendants' submissions*

51    The defendant's counsel placed an array of authorities before the court in support of the at first blush incontrovertible submission that the plaintiff as beneficial owner had no right to sue the company for breach of fiduciary duty. These authorities included s.38 of the Companies Law, 7(1) *Halsbury's Laws*, 4th ed., 2004 Reissue, s.786 (as read with art. 12 of the amended articles of association[6]), *Simpson* v. *Molsons Bank* (32) ([1895] A.C. at 279), *Eclairs Group Ltd.* v. *JKX Oil & Gas plc* (9) (*per* Briggs, L.J. ([2014] Bus. L.R. 835, at para. 33)), (*per* Zacca, P.)), (*per* Georges, J.A.)), *Hannoun* v. *R Ltd.* (15), *In re Lancelot Investors Fund Ltd.* (22) (*per* Martin J.A. (2015 (1) CILR 328, at para. 17 and para. 22)).

---

6    Article 12 provides: "The Company shall not be bound by or compelled to recognise in any way (even when notified) any equitable, contingent, future or partial interest in any Share, or (except only as is otherwise provided by the Articles or the Statute) any other rights in respect of any Share other than an absolute right to the entirety thereof in the holder."

### *The plaintiff's submissions*

52    The plaintiff's counsel submitted that authority did exist for the proposition that an equitable claim could be asserted by the equitable owner of shares, arguing that the Caymanian authorities relied upon by the defendant are distinguishable. Reliance was placed on the *Eclairs* case, *Binney* v. *Ince Hall Coal & Channel Co.* (8) (35 L.J. Ch. at 368), *McGrattan* v. *McGrattan* (24). It was also argued that the depositary system used by the plaintiff ought not to diminish his capacity to enforce his equitable share rights.

### *Findings: the plaintiff has no standing as a beneficial owner of shares to pursue a personal claim to set aside an improperly motivated share allotment*

53    The preponderance of relevant authority clearly pointed to the conclusion that a beneficial owner of shares ordinarily lacks standing to pursue legal or equitable claims in relation to the relevant shares. I will therefore review the plaintiff's authorities first before summarizing the principles relied upon by the defendant which I substantially adopt as accurately stating the correct position under Cayman Islands law:

(a) *Eclairs Group Ltd.* v. *JKX Oil & Gas* (9) (Mann, J.): It is true that the claimants were beneficial owners of shares. But they were seeking to set aside a notice served by the company under s.793 of the Companies Act 2006 (UK) and the company's articles seeking disclosure in relation to their beneficial interests. The notice apparently prevented them from transferring legal title to the shares and voting at a controversial shareholders meeting. The exceptional nature of the legal matrix was explained by Briggs, L.J. in the Court of Appeal ([2014] Bus. L.R. 835, at para. 36):

"I have been no more persuaded by JKX's submissions in relation to standing than was the judge. Indeed, I would go further. Part 22 of the 2006 Act is a remarkable exception to the general principle that companies are only concerned with the legal owners of their shares."

(b) *Binney* v. *Ince Hall Coal & Channel Co.* (8) (35 L.J. Ch. at 368): This case supports the proposition that an equitable shareholder can in appropriate cases seek to restrain the company from paying dividends to the legal shareholder on the grounds that the beneficial owner's interests would be damaged, despite an article saying that the company was not required to take notice of any trust. It does not support the wider proposition that a beneficial owner can assert a general personal claim against the company.

(c) *McGrattan* v. *McGrattan* (24): This was a claim by the beneficial owner of shares against the legal owners who had wrongfully refused to transfer legal title back to the beneficial owner. This case does not support

the proposition that a beneficial owner of shares has a general right to sue the company in that capacity.

54   Section 38 of the Companies Law [2018 Revision] provides as follows:

"**DEFINITION OF MEMBER**

The subscribers of the memorandum of association of any company shall be deemed to have agreed to become members of the company whose memorandum they have subscribed, and upon the registration of the company shall be entered as members on the register of members hereinafter mentioned, and every other person who has agreed to become a member of a company and whose name is entered on the register of members, shall be deemed to be a member of the company."

55   A "member" is by statutory definition a registered member even though the Law does not actually state that the company is not required to take notice of any trusts. Article 12 of the company's amended articles however state:

"The Company shall not be bound by or compelled to recognise in any way (even when notified) any equitable, contingent, future or partial interest in any Share, or (except only as is otherwise provided by the Articles or the Statute) any other rights in respect of any Share other than an absolute right in the entirety thereof in in the holder."

56   The defendant's counsel quite appropriately relied on the following statement of the relevant standing rules. In *Eclairs Group Ltd.* v. *JKX Oil & Gas* (9), Briggs, L.J. stated ([2014] Bus. L.R. 835, at para. 33):

"Companies are, in general, both entitled and obliged to deal only with those who are registered as having the legal ownership of their shares. Companies are, in general, entitled to decline to deal with mere beneficial owners."

57   This principle has been confirmed under Cayman Islands law by Court of Appeal decisions directly or indirectly addressing the issue of standing and which are accordingly either strictly binding on this court or of considerable persuasive weight indeed. In *Schultz* v. *Reynolds* (31), Zacca, P. stated (1992–93 CILR at 69):

"The Companies Law (Revised) recognizes only members who are registered. The appellant has no voting rights and as a beneficial owner of the shares has no rights under the Law . . .

In my view it is only CMS, the registered shareholder of Newport Ltd., who can institute an action against Newport Ltd. The appellant,

as beneficial owner of the shares, is not entitled to bring a derivative action against Newport Ltd."

58   However it is clear from the judgments of Georges, J.A. and Kerr, J.A. that the appeal was not actually decided on this particular standing issue. *Svanstrom* v. *Jonasson* (33) was a case where the standing of beneficial owners to pursue shareholder claims was directly considered. The Cayman Islands Court of Appeal unanimously decided that no such standing exists. Georges, J.A. (with whom Kerr, J.A. and Zacca, P. concurred), after quoting from a passage in *Gower's Principles of Modern Company Law*, 4th ed., at 652–653 (1979) affirming this standing rule stated (1997 CILR at 203):

> "This formulation rests on the principle clearly stated by the Court of Appeal in *In re Perkins, ex p. Mexican Sta. Barbara Mining Co.* . . . that no doubt should be cast on the principle that companies are under no obligation to recognize any trust which may exist in relation to its shares. The relationship between a trustee whose name appears on the register of shareholders of a company and the beneficial owner of the shares is purely a matter for contractual arrangement between them. This can be structured in such a way that the trustee or nominee can always be compelled to act on the instructions of the cestuis que trust or beneficial owner in matters concerning the filing of derivative actions to protect the company from damage inflicted by a majority in circumstances in which such an action may be filed.

> Where such arrangements do not exist it may well be the case that hardships may appear to arise because the beneficiary is unable to compel the nominee to transfer the shares to him or to induce him to file an action to remedy the alleged wrong. The temptation is strong to introduce what has been described as 'flexibility' in the application of exceptions to the rule in *Foss* v. *Harbottle* . . . by permitting a beneficiary to file when his name does not appear on the register of members. Permitting this would, in my view, weaken the fundamental principle of non-recognition by the company of trusts affecting its share."

59   This decision is binding on this court. Moreover Georges, J.A. expressly approved (*ibid.*, at 205) the application of the same standing principle to a challenge to an allotment of shares.[7] The suggestion by Mr. Meeson, Q.C. that an equitable shareholder ought in principle to be

---

7   This indirectly supports the conclusion I have reached above on the first legal issue: that an individual shareholder has no standing to complain of a breach of fiduciary duty in the form of an allegedly improperly motivated share allotment.

permitted to advance an equitable claim must accordingly be rejected. The *Svanstrom* case cannot properly be distinguished on the grounds that the claim in question was being brought as a derivative one. The principle is clearly one of general application. This is confirmed by the first instance decision of this court in *Hannoun* v. *R Ltd.* (15) (Henderson, J.); a just and equitable winding-up petition presented by a beneficial owner was struck out on standing grounds. More authoritatively still, in the context of winding-up proceedings, Martin, J.A. in ) opined as follows: "There is no doubt that in ordinary circumstances the rights attaching to shares may only be pursued by the registered shareholder."

60    The relevant standing rule is not an absolute one and does admit the possibility that exceptions may be made in special circumstances. The plaintiff did not and was unable to advance a case based on special circumstances here. He still has a derivative claim as a potentially available alternative and more appropriate remedy. For these reasons, I resolve the beneficial owner standing point in favour of the defendant.

**Does a shareholder who acquires legal title to his shares after the impugned board approval of a share allotment have standing to assert a personal claim to set it aside?**

61    This question arises for consideration on the assumption that I am wrong in my primary finding that the plaintiff has no standing to assert a shareholder claim at all but correct in my secondary finding that a beneficial owner cannot assert a personal shareholder claim. I did not initially find this to be an altogether straightforward question. Having recorded my primary finding that the plaintiff lacks standing to assert a personal equitable claim in relation to the August 24th decision at all, it is more difficult to grapple with this issue on the basis of a hypothesis that my primary findings have rejected. Even at the end of the hearing, however, I felt as though counsel had exchanged a variety of impressive forensic cuts and jabs, but that neither was able to land a knock-out punch.

*The defendant's submissions*

62    The skeleton argument for the defendant contains the following crucial submissions on this issue:

"54.    Furthermore the nature of unfair prejudice proceedings and derivative actions is that they generally concern wrongs done to a company or a complaint as to how the directors have conducted the affairs of the company. Insofar as a shareholder is claiming on behalf of the company, there can be no problem in relying on such wrongs that took place before the shareholder was registered.

618

55.   By contrast, the very premise of a personal claim in the form brought by the Plaintiff is that it requires an actionable wrong to have been done to the Plaintiff personally, hence the need for the Plaintiff to have been a registered shareholder at the time the wrong was allegedly committed. If no wrong has in fact been done to the Plaintiff, then he cannot have a cause of action (absent special statutory provision). See for example Gross v Lewis Hillman Ltd [1970] Ch 445. Indeed the Plaintiff has not sought to plead any positive basis for this alleged right to complain about conduct prior to his registration."

63   Those arguments initially appeared coherent and compelling, albeit that to my mind they assume that it is self-evident that a personal claim is not a right which would be attached to shares and automatically transmissible with the legal title to the shares. This tacit assumption is problematic. Mr. Green, Q.C. did elaborate on this question in oral argument by reference to *Gross* v. *Lewis Hillman Ltd.* (14), a case relating to land. No direct support was placed before the court for the proposition that a personal equitable claim cannot be asserted by a shareholder in relation to not just a past but also a continuing wrong.

### *The plaintiff's submissions*

64   The plaintiff's submissions were, not unlike the defendant's, noteworthy for the authorities which are not cited rather than for the cases which are relied upon. The only cases cited in the plaintiff's skeleton argument and referred to in oral argument were both statutory unfair prejudice petitions: *Lloyd* v. *Casey* (23) and *Bermuda Cablevision Ltd.* v. *Colica Trust Co.* (7). Notable by way of omission was any example of a private law claim being asserted against a company for a wrong allegedly committed at a time when the claimant was not the legal owner of the shares.

65   Nonetheless, the plaintiff's skeleton argument advanced the following attractive arguments:

"4.42   Whilst it is true that both of these cases concern the construction of statutory provisions giving unfair prejudice remedies, the underlying principle is the same whether a shareholder brings his personal claim by way of unfair prejudice petition or by way of writ . . . There is no unfair prejudice provision in the Cayman Islands Companies Law. If and to the extent that there was any technical impediment to the commencement of proceedings by a beneficial owner, that technical impediment was removed when the beneficial owner had shares transferred into his name . . .

4.43   Further or alternatively, at the time when the Plaintiff had 50,000 shares, which he beneficially owned, transferred from the

name of a bare trustee into his own name, the wrong was continuing. The voting rights attaching to those shares were no less diminished at the time of the registration in his own name than they had been at the time he was the beneficial owner. This is not a case where it could be argued that a purchaser of shares was purchasing something already 'damaged'. Here there was no fresh purchase, merely a technical change in the persons whose interests had actually been affected."

66   Each submission must ultimately be tested for consistency with the judgments in the unfair prejudice petition cases, which the defendant contended grounded the standing for a new shareholder to challenge antecedent transactions in the provisions of the statute. This ought not to have been necessary if the common law position was the same. Nevertheless I find the continuing wrong argument to be an important one because it highlights the fact that transferring legal title to shares does not without more mean that the new shareholder has nothing that he might wish to legally complain about.

### Findings: a shareholder does have standing to pursue a personal equitable claim to impugn an allotment of shares authorized by the directors prior to his becoming a registered shareholder (assuming he has standing to pursue such a personal claim at all)

67   The logical starting point in the analysis of the competing submissions is to consider how the prior wrong issue was dealt with in the cases upon which Mr. Meeson, Q.C. relied. However, in my judgment these authorities are not directly dispositive of the relevant issue.

68   *Bermuda Cablevision Ltd.* v. *Colica Trust Co. Ltd.* (7) was decided more than 20 years ago. The issue of whether or not the petitioner could complain of a prior and/or continuing wrong did not arise in precisely these terms. Rather the question addressed was whether or not the petitioner's "prior knowledge" of the alleged wrong deprived it of standing to seek relief ([1998] A.C. at 211–212):

"Counsel for Colica rightly point out that the judge did not in terms hold that there was no locus standi or jurisdiction in a case where the shareholder had prior knowledge of the matters advanced in the petition. Yet he did not embark on any examination of the countervailing arguments. On the appeal to the Privy Council counsel for the appellants made a more radical submission. They submitted that prior knowledge as a matter of law debars any remedy under section 111.

In the absence of any authority directly on the point the answer to the submission of the appellants must be sought in the application of first principles. *By its express terms section 111 covers both past and future conduct. In the present case the petition complains of unlawful*

*conduct which is continuing.* Moreover, the prejudicial effect of such conduct is increasing as the years pass and Cablevision's profits increase so that ever larger amounts are paid out of the profits of Cablevision to Atlantic. The shareholders of Cablevision, including Colica, are locked into that position without limit of time. Moreover, it is realistic to accept that Colica's prior knowledge will be shared by any incoming member. If Colica is debarred from presenting a petition, the effect will be to shut out complaints by any new members, ever, and thus to facilitate the continuation of Cablevision carrying on business unlawfully. That is a most unattractive result. That is the reality which led the Court of Appeal to reinstate the petition. The consequences of an acceptance of the absolutist argument of the appellants, based on prior knowledge, induce an initial sense of incredulity. But consequentialist arguments do not by themselves solve the present problem. *There is, however, a principled answer to the submission of counsel for the appellants. It is entirely orthodox to say that a petitioner, who bought shares with prior knowledge of all relevant matters, is entitled to proceed on the basis that the statutory contract contained in the byelaws (which in the present case incorporates the consulting agreement) must be regarded as tempered by the provisions of the Companies Act 1981, including section 114 read with Part I of Schedule 3, and indeed by the general law. To that extent such a shareholder may have a legitimate or reasonable expectation that he may be able to put matters right. Such a shareholder may have the necessary locus standi to present a petition, and the court may have jurisdiction to grant relief under section 111. Their Lordships are therefore satisfied that the generality of the wording of section 111(1) is not qualified by a bar to presentation of a petition by a member who had prior knowledge of the grounds of the petition.* Accordingly, their Lordships reject the submission of counsel for the appellants as well as the less extreme reasoning of Ground J." [Emphasis supplied.]

69    This case has very little obvious persuasive value for the present standing dispute. It did not involve a new shareholder seeking to complain of a prior wrong at all. If it had, not only would the terms of the statute have applied to expressly permit such a complaint, Lord Steyn might have made some comments about the non-statutory position. The nature of the complaint was not a private wrong, but an alleged breach of the general law governing the ownership of Bermudian companies. It is impossible to extract from this case any clear insights into what private law standing an individual shareholder has to challenge a private wrong which was allegedly committed before he was a registered shareholder.

70    On the other hand, the finding that a shareholder with prior knowledge of an alleged wrong involving the breach of the statutory contract

with members in the articles and under the general law "may have a legitimate or reasonable expectation that he may be able to put matters right" has some resonance in the present context. The plaintiff's position is that as soon as he realized that he was not the registered shareholder, he took steps to transfer the 50,000 shares into his name with a view to, in effect, putting things right. Assuming for present purposes that the plaintiff's nominee had a valid personal claim, it would produce an odd and technical result for the plaintiff (or a third party purchaser) to be deprived of the ability to pursue his personal claim for a continuing wrong because he was not a member when the wrong was committed. However, Mr. Green, Q.C.'s constant refrain was that in such circumstances a derivative claim could always be pursued in the name of the company, so his client's present position does not entail driving the plaintiff from the seat of justice altogether.

71   *Lloyd* v. *Casey* (23) was a case which Mr. Meeson, Q.C. rightly argued had facts closer to those in this case. This is because the central holding was that the petitioner, who had been a beneficial owner at the time of the alleged wrongs, could complain (having become the registered owner of the shares) under s.459 of the Companies Act 1985 of prior wrongdoing. The position under the general law is not considered, which is understandable as what was relevant were the parameters of specific statutory remedy. However, the following passage in the judgment of Ferris, J. draws an analogy ([2002] 1 BCLC 454, at para. 52) with a case involving a just and equitable winding-up petition, *Re JN2 Ltd.* (21) ([1977] 3 All E.R. at 1109):

> "It is clearly implicit in the citation of this passage by Mervyn Davies J that he thought that, just as the petitioner in *Re JN2 Ltd* would, if and when he became registered as a member, be able to support a winding-up petition on just and equitable grounds by relying on matters occurring before his name was entered on the register of members, so a petitioner for relief under s 459 would, after registration as a member, be able to support the petition by relying on conduct which took place before that time."

72   That analogy is an interesting one, because it suggests that prior conduct can be complained of in yet another statutory context where the statutory jurisdiction is broadly expressed and does *not* explicitly provide a basis for complaining about conduct before the shareholder became registered as such. Section 92 of the Companies Law, which is derived from longstanding language in British company law statutes, simply provides that a company may be wound up on the grounds that "(e) the Court is of opinion that it is just and equitable that the company should be wound up." If prior wrongdoing can be complained of without express statutory language pointing in this direction, why should there be a

general bar to shareholders complaining of conduct before they became shareholders at all?

73    Mr. Green, Q.C. in my view rightly submitted that the answer lay in assessing whether or not an equitable claim passed with legal title to the shares. This legal terrain is central to the relevant analysis. Reliance was placed on *Gross* v. *Lewis Hillman Ltd.* (14) ([1970] Ch. at 460), but this case directly supports a different point, namely, that an equitable right to rescind does not run with land. Land is, for present purposes, an unhelpful analogy. All equitable claims are not the same. It would be surprising if the rights which indubitably do pass with shares, essentially the statutory contract embodied in the articles, were not also accompanied (upon a transfer of legal ownership) by legal and/or equitable rights of action which had not been exhausted by the transferor prior to a share transfer of title occurring. Indeed, the authorities relied upon by the defendant for the purposes of defeating the plaintiff's right to rely upon the Cede & Co. assignment letter, which are considered below, positively support the proposition that equitable claims may be (a) attached to, and (b) assignable with shares.

74    In Dr. Ying Khai Liew (ed.), *Guest on the Law of Assignment*, 3rd ed., para. 1–07, at 4–5 (2018) (discussed in more detail below), the learned author opines as follows:

   "A 'mere' equity, for example, a right to rescind or to rectify a contract, is probably not a chose in action. It is not assignable unless it is transferred as an incident of property conveyed or a chose in action assigned and is not sought to be assigned separately from the property or chose in action to which it is incident."

75    Resolving this question is particularly difficult because I am required to deal with it on the basis of a hypothesis which I have rejected, namely assuming that the plaintiff has standing to pursue a personal claim when in my preferred version of legal reality, this question would not arise at all. On balance, nonetheless, I prefer the view that there is no general prohibition on a new shareholder complaining about a continuing wrong which first occurred before he became a shareholder. This finding most accords with justice, broadly conceived, because it ought in principle to be possible for a new shareholder (especially a former beneficial owner) to seek to "put matters right" (to borrow Lord Steyn's phrase from *Bermuda Cablevision* (7) ([1998] A.C. at 212)), even where no breach of the bye-laws or the general law is involved. Or, to put it another way, if a shareholder has a personal equitable claim against the company in his capacity as such which has not been finally settled before legal title is transferred, it is difficult to see why as a matter of principle that claim would not be attached to the relevant shares.

623

76    Putting it another way, the only basis on which the plaintiff could have standing to impugn a transaction which preceded his acquiring legal title to the 50,000 shares is on the hypothesis that the relevant remedy was an incident of the shares themselves. The right to challenge a continuing dilution of the voting power attached to the shares seems quite clearly to be a right which should be viewed as attaching to the shares rather than to the legal owner. The sort of personal equitable claim which would probably *not* pass with shares would be a claim relating to, for instance, breach of confidence by the directors in relation to personal information received about the former shareholder. Whether the past wrong was continuing or not, the relevant question should usually be: is the equitable claim attached to the shares or not? This conclusion does not overlook the fact that in an infinite variety of circumstances it might be arguable that no equitable right passed at all because, on the facts, by the date of the transfer the equity had been "spent." Such would be the case, for example, if a registered shareholder entitled to assert a personal claim *qua* shareholder compromised that claim before transferring title to the relevant shares.

77    It bears repeating that based on my primary findings, a personal claim would only exist at all if there were special circumstances giving rise to a personal shareholder right of action in relation to a breach of fiduciary duties which would ordinarily only be actionable by or on behalf of the company. Implicit in the plaintiff's case on standing, which I assume for present purposes to be correct, is the assumption that the equitable right of action he seeks to assert passed to him with the shares, and was not personal to the former legal owner. There is accordingly more congruence between the assumed alternative basis upon which this point is being determined and my primary findings than initially appeared to be the case. It is possible to imagine many scenarios involving special circumstances relating to an individual shareholder where a pre-registration personal equitable claim ought in principle to be viewed as having passed to the new legal owner with the transfer of legal title to the shares. However, such special circumstances would probably in most cases involve equitable claims which involve vindicating rights conferred by the articles which would quite obviously be transmissible with the shares in any event.

78    In my judgment the submission that a personal claim can only be advanced by a registered shareholder who was actually injured, based on the admittedly limited arguments addressed to this point in the present case, is overly simplistic, overly restrictive and (whether as regards past or continuing wrongs) is not supported by any coherent legal principle. For

these reasons and on the above-stated assumed facts,[8] I find that the plaintiff has standing to pursue such a claim based on his post-August 24th, 2018 status as a registered shareholder.

### Does the plaintiff have standing to pursue a personal claim based on the Cede & Co. assignment?

79   Have Cede & Co. validly assigned the equitable right to sue which they held as at August 24th, 2018 to the plaintiff in respect of the shares they continue to hold as his nominee? This issue essentially falls to be determined on the following assumed basis:

(a) I ought not to have concluded that an individual shareholder lacks standing to assert a personal claim in respect of an improperly motivated share allotment;

(b) I have correctly concluded that a beneficial owner of shares lacks standing to pursue such a personal claim;

(c) I was not entitled to conclude (on the basis of assumptions (a) and (b)) that the plaintiff has standing as a registered shareholder to challenge a wrong that was committed before he became a registered shareholder.

80   This point can, despite of (or perhaps because of) its esoteric nature, conveniently be considered as a freestanding legal question about the terms and effect of a document purporting to evidence a legal assignment of an equitable cause of action. That highly unusual and confusingly drafted document dated October 22nd, 2018 ("the assignment") reads as follows:

"Cede & Co., as nominee of The Depositary Trust Company ('DTC'), is the registered holder, as of 24 August 2018, of 417,143 Ordinary shares (the 'Shares') . . . of China Biologic Product Holdings Inc. (the 'Company').

DTC is informed by its participant . . . Morgan Stanley Smith Barney (the 'Participant)', that the Shares credited to the Participant's DTC account as of 24 August 2018 are held by the Participant as custodian for David Xiaoying Gao ('David Gao') who is the beneficial owner of the Shares.

At the request of the Participant, on behalf of David Xiaoying Gao ('David Gao'), Cede & Co., as the nominee of DTC, and as registered holder of the Shares, hereby authorizes the Participant,

---

8   *I.e.*, on the assumption that I am required to find that a minority shareholder can seek to set aside a share allotment allegedly approved in breach of the directors' fiduciary duties through a personal (as opposed to a derivative) action.

solely with respect to the shares held by David Xiaoying Gao ('David Gao'), to take any and all actions and exercise any and all rights and remedies that Cede & Co. as the registered holder of the Shares is entitled to take, and hereby assigns such rights to David Gao so that he may exercise them in his own name, other than any action or any exercise of any right or remedy as against The Depositary Trust Company or its affiliates or its nominee Cede & Co. under any controlling documents.

> While Cede & Co. is furnishing this authorization as the registered holder or holder of record of the shares, it does so solely at the request of the Participant and only as nominal party for David Gao which DTC is informed by its Participant is the holder of the account in which beneficial ownership of the shares is held. Cede & Co. has no interest in this matter other than to take those steps which are necessary to ensure that David Gao is not denied his rights and remedies as the holder of the account in which beneficial ownership of the shares is held. Cede & Co. assumes no further responsibility in this matter."

81   The final paragraph of the assignment clarifies the document's commercial and intended legal purpose. The document's contents are odd for two principal reasons. First, it looks back to the shares held by Cede & Co. as at August 24th, 2018, which it no longer held by October 22nd, 2018. It therefore fails to accurately describe the shares to which the assignment relates. It can only possibly relate to the shares held by Cede & Co. on October 22nd, 2018 (or October 24th, 2018, being the date on which notice was given of the assignment). The plaintiff's pleaded case (assumed for the present application to be true) is that in September he transferred the beneficial ownership of 200,000 of those shares to a family trust and that legal title to 50,000 shares was transferred to himself (leaving Cede & Co. with the legal title to 367,143 shares of which 200,000 are beneficially owned by the family trust and the other 167,143 shares are beneficially owned by the plaintiff in addition to the 50,000 shares of which he is both the legal and beneficial owner). Secondly, the third and operative paragraph combines the language of a power of attorney conferred on the participant with that of an assignment to the plaintiff. Without a firm grasp of how the depositary system operates, which might provide a simple explanation for the way the clause is drafted, it is unclear what function the power of attorney serves.

82   Stepping back, it is impossible to avoid the distinct impression that the assignment document was a "rush job" drafted by a nominee under pressure to appease an aggrieved and impatient litigant who had already pressured his lawyers into commencing hastily crafted legal proceedings.

### The defendant's submissions

83    The defendant in its skeleton argument (at paras. 57–58) is withering in its critique of the plaintiff's case in relation to the assignment. The case is said to be "curious to say the least . . . The Cede letter . . . is oddly worded. It is impossible to tell what exactly is being assigned." Incoherence and ambiguity were sensibly not relied upon as a sufficient basis for the defendant to nullify its legal effect. Instead it was centrally argued as follows:

"57.1    The Cede Letter has not effectively assigned any right to pursue these proceedings; *and*

57.2    Any such alleged personal right for an individual registered shareholder to sue the Defendant is not an assignable right." [Emphasis supplied.]

84    This central thesis had the following elements to it. It was submitted that:

(a) s.5 of the Property (Miscellaneous Provisions) Law cannot be used to transfer a share, which can only be transferred by registration;

(b) personal rights of the registered owners of shares are assignable;

(c) the right to bring proceedings which can only be brought by the registered shareholder cannot be assigned: *Gore-Browne*, paras. 18[7] and 19[2];

(d) if a personal right to sue for breach of fiduciary duty by an individual shareholder exists, it is a personal equity which is not assignable: *Hooker Invs. Pty. Ltd.* v. *Email Ltd.* (17) (10 ACLR at 446–447 (*per* Young, J.)); *Fitzroy* v. *Cave* (12) ([1905] K.B. at 371 (*per* Cozens-Hardy, L.J.)); *Investors Compensation Scheme Ltd.* v. *West Bromwich Bldg. Socy.* (20) ([1998] 1 W.L.R. at 915 (*per* Lord Hoffmann)).

### The plaintiff's submissions

85    The plaintiff's counsel robustly and persuasively submitted in their client's skeleton argument that it "is abundantly clear that the purpose of Cede & Co. issuing the letter is to enable the Plaintiff to enforce the rights which attach to his shares and in which Cede & Co. have no interest themselves" (para. 4.45). The real controversy about the assignment document is not what it seeks to achieve but what its legal effect is. The brief written submissions on the efficacy of the assignment are largely bare assertions unsupported by authority. An exception was the submission that the present case was analogous to *Ellis* v. *Torrington* (10) where the purchaser of land post-conveyance obtained an assignment of the benefit of covenants under a sub-lease so he could sue on them.

627

86   This section of the plaintiff's skeleton concluded with a legal "lifeboat" submission:

"4.52   Whilst not accepting that it is necessary to do so, and solely in order to seek to have the case determined on the merits as soon as possible, the Plaintiff has issued an application to have Cede & Co joined as a co-plaintiff so as to put the matter beyond doubt."

### Findings: the assignment was not effective to transfer from Cede & Co. to the plaintiff the right to pursue an equitable breach of fiduciary duty claim in respect of the 200,000 shares still registered in the nominee's name

87   In my judgment it is clear that the assignment is not effective according to its terms strictly construed on any sensible view. Cede & Co. was not the registered owner on the date it was purportedly executed of the shares described therein. If this was fatal Cede & Co. could simply execute a fresh letter correctly describing the number of shares they currently hold for the benefit of Mr. Gao (presumably 167,143) and a fresh writ could be issued relying on these modified facts. It is in my judgment preferable to dispose of this point by deciding the more fundamental point of whether an equitable cause of action arising out of rights attached to shares is capable of assignment at all without also assigning the shares.

88   To the non-specialist lawyer, let alone the layman, certain aspects of property law often seem so abstract and arcane that one imagines they were invented for the amusement of property lawyers rather than designed to serve any practical legal purpose. Whether or not an equitable personal claim accruing to an individual shareholder for breach of fiduciary duty is capable of being assigned without also transferring the shares is for me an example of such abstract and arcane questions. Mr. Green, Q.C.'s submissions helped to clear the legal mist and let in the sun to illumine the legal picture.

89   It is common ground that the assignment was said to be a legal assignment taking effect under s.5 of the Property (Miscellaneous Provisions) Law 2017 Revision, when notice of it was given to the defendant[9] by letter dated October 24th, 2018. That provision states as follows:

"(1) Subject to subsection (2), *any absolute assignment by writing* signed by the assignor or the assignor's agent lawfully authorised in writing (not purporting to be by way of charge only) *of any debt or thing in action*, of which express notice in writing has been given to the person from whom the assignor would have been entitled to

---

9   But not, apparently, the other parties to the SPAs.

claim such debt or thing in action, *is effectual in law (subject to equities having priority over the right of the assignee) to pass and transfer from the date of such notice—*

    (a) *the legal right to such debt or thing in action*;

    (b) *all legal and other remedies for the same*; and

    (c) the power to give a good discharge for the same without the concurrence of the assignor.

    (2) If the person liable in respect of such debt or thing in action has notice—

    (a) that the assignment is disputed by the assignor or any person claiming under him; or

    (b) of any other opposing or conflicting claims to such debt or thing in action,

he may, if he thinks fit, either call upon the person making claim thereto to interplead concerning the same, or pay the debt or other thing in action into court under the Trusts Law (2017 Revision) or any statutory modification or successor thereto." [Emphasis supplied.]

90   The provision is derived from s.136 of the Law of Property Act 1925, and no doubt has its counterparts elsewhere in the common law world.[10] The critical question is not whether an equitable right can be assigned legally under s.5. The critical question is whether an equitable claim which personally belongs to a shareholder constitutes an independent assignable chose of action in its own right. In Liew (ed.), *Guest on the Law of Assignment*, 3rd ed. (2018), the learned author opines as follows (paras. 1–06 – 1–07, at 3–5):

"The category of choses in action was at first a relatively narrow one . . . At the present day it covers a wide spectrum of rights which differ widely from each other in essential characteristics, ranging from simple contract debts to shares in a company and intellectual property rights. To this long list must be added rights in equity (referred to as 'equitable choses in action') . . .

A 'mere' equity, for example, a right to rescind or to rectify a contract, is probably not a chose in action. It is not assignable unless it is transferred as an incident of property conveyed or a chose in action assigned and is not sought to be assigned separately from the property or chose in action to which it is incident."

---

10  *E.g.* Supreme Court Act 1905, s.19(d) (Bermuda).

91   These cautiously expressed academic views are in fact supported by judicial authority to which the defendant's counsel referred. First, the traditional common law rule has always been that the "bare right to litigate" is not assignable. In the pre-1925 Law of Property Act era in England, the position was illustrated by reference to *Fitzroy* v. *Cave* (12), where Cozens-Hardy, L.J. stated ([1905] 2 K.B. at 371):

> "It is desirable to consider the limits of the doctrine of maintenance as applied to choses in action. There are undoubtedly many choses in action which are not and never were assignable either at law or in equity. A right to set aside a deed on the ground of fraud is a typical instance. It is plain that no Court would allow the assignee of such a right to maintain an action. The instrument would be equally void at law and in equity."

92   The equitable right of a shareholder to set aside a board resolution because the directors approved it for an improper purpose (assuming for present purposes that such personal legal right exists) would not have been assignable in its own right at law or in equity prior to s.136 of the Law of Property Act 1925 in England (or its predecessor provision, s.25(6) of the Judicature Act 1873). The same position would appertain in the Cayman Islands before the enactment of s.5 of the Law (including, of course, any predecessor provisions). How then, if at all, have these statutory provisions changed the position? *Guest on the Law of Assignment* suggests that the position has not changed as regards a "mere equity" such as the personal equitable claim contended for by the plaintiff in the present case. In *Tolhurst* v. *Associated Portland Cement Manufacturers (1900) Ltd.* (34), Cozens-Hardy, L.J. stated ([1902] 2 K.B. at 676) in relation to s.25(6) of the Judicature Act 1873: "Now, this section relates to procedure only. It does not enlarge the class of choses in action, the assignability of which was previously recognised either at law or in equity."

93   Perhaps the clearest modern judicial exposition of the relevant legal position in the materials placed before me may be found in Lord Hoffmann's speech in *Investors Compensation Scheme Ltd.* v. *West Bromwich Bldg. Socy.* (20) upon which Mr. Green, Q.C. relied ([1998] 1 W.L.R. at 915):

> "My Lords, I agree that a chose in action is property, something capable of being turned into money. *Snell's Equity*, 29th ed. (1990), p. 71 defines choses in action as 'all personal rights of property which can only be claimed or enforced by action, and not by taking physical possession.' At common law, for reasons into which it is unnecessary to discuss, choses in action could not be assigned. In equity, they could. Assignment of a 'debt or other legal thing in action' was made possible at law by section 136 of the Law of Property Act 1925. *In each case, however, what is assignable is the*

*debt or other personal right of property. It is recoverable by action, but what is assigned is the chose, the thing, the debt or damages to which the assignor is entitled. The existence of a remedy or remedies is an essential condition for the existence of the chose in action but that does not mean that the remedies are property in themselves, capable of assignment separately from the chose.* So, for example, there may be joint and several liability; a remedy for the recovery of a debt or damages may be available against more than one person. But this does not mean that there is more than one chose in action. The assignee either acquires the right to the money (or part of the money) or he does not. If he does, he necessarily acquires whatever remedies are available to recover the money or the part which has been assigned to him." [Emphasis supplied.]

94    This was a majority House of Lords decision with Lords Goff, Hope and Clyde concurring with Lord Hoffmann. It is noteworthy that although Lord Lloyd dissented in part, he did not dissent on that part of the case to which the assignment issue relates. He did not, admittedly, fully endorse Lord Hoffmann's analysis of the law, but as he concurred in the result saw no need to fully explore the issue (*ibid.*, at 906). I find Lord Hoffmann's reasoning to be entirely persuasive read together with the above-cited passage in *Guest on the Law of Assignment.* I find further support for these cogent judicial and academic views in the terms of s.5 themselves. Section 5(1) expressly contemplates that an assignment will pass:

"(a)  the legal right to such debt or thing in action; [*and*]

(b)  all legal and other remedies for the same . . ."

95    That is a clear indicator that the statute does not contemplate the assignment of remedies designed to enforce property rights separately from an assignment of the relevant legal right or chose in action (in this case the shares are the relevant thing in action). The plaintiff's counsel was unsurprisingly unable to advance any coherent theory in opposition to these ultimately irresistible propositions. Accordingly, I find that the assignment was not effective to pass to the plaintiff, while the purported assignor retained title to the shares, any personal equitable right of action in relation to an improper dilution of the voting power of the shares.

### Findings: abuse of process

96    As I indicated in the course of the hearing, if I had concluded on any basis that the plaintiff had standing to pursue the present action I would not have found instead that it was liable to be struck out on abuse of process grounds.

97    The defendant's submissions only plausibly support a case for striking out on the hypothesis that the standing challenges have all

631

succeeded. On that basis alone has the defendant established an alternative basis to Grand Court Rule O.14A for concluding that the present claims should be struck out because for legal reasons they are abusive in that they are bound to fail.

**Conclusion**

98   The plaintiff's claim (including the application to join Cede & Co.) is liable to be dismissed because the following key issue has been resolved in favour of the defendant pursuant to GCR O.14A. The plaintiff, as a minority shareholder, lacks standing to assert a personal equitable claim for breach of fiduciary duty on the part of the defendant's directors with a view to setting aside an allotment of shares on the grounds that they were issued for improper purposes. The relevant claim belongs to the company and can only be pursued by an individual shareholder suing in a derivative capacity.

99   Two supplementary points of law were also resolved in favour of the defendant. The plaintiff has no standing to sue as a beneficial owner of the shares and the purported assignment of the right to sue separately from the shares was ineffective. A fourth point, whether (assuming the plaintiff had standing to pursue his claim personally) he lacked standing to sue in relation to a wrong committed before he acquired legal ownership of his shares, was resolved in the plaintiff's favour. In light of my primary finding, this was for him a Pyrrhic victory.

100   I will hear counsel if required on the terms of the final order and as to costs.

*Ruling accordingly.*

Attorneys: *Maples & Calder* for the plaintiff; *Conyers Dill & Pearman* for the defendant.