# EXHIBIT 24

# DIRECTORS' DUTIES, CREDITORS' RIGHTS AND SHAREHOLDER INTERVENTION

By Sarah Worthington*

[This article puts the view that directors' duties to act for proper purposes are fundamentally different from their fiduciary duties of loyalty to the company. The consequences of recognizing this difference are far-reaching: different remedies, different possibilities for shareholder intervention and different classes of possible complainants are appropriate for breaches of the different duties. These consequences suggest that the existing law adequately meets the current demands for greater accountability of company directors, and that legislative change is unwarranted.]

## 1. INTRODUCTION

The time is ripe for a critical analysis of the scope of directors' duties, the ability of company creditors to obtain remedies and the role of shareholder intervention. Company directors are now the object of intense public scrutiny. Popular sentiment, law reform bodies and the judiciary all appear to favour expanding the duties owed by directors and increasing the ability of minority shareholders and company creditors to complain of breaches. Before any reforms are introduced, the existing law needs to be reassessed: it may, as this article suggests, already be capable of meeting the proposed demands.

The emphasis in this article on situations where creditors' interests are affected is a reflection of one stream of problem cases in the area of directors' duties. The traditional formulation that directors owe fiduciary duties to the company, and not to the company's shareholders, creditors or other outsiders, is increasingly being strained in attempts to protect the interests of outside parties. The route most frequently used to achieve this end is manipulation of the concept of 'interests of the company' when determining whether directors have exercised their powers *bona fide* in the interests of the company and for proper purposes. Courts have held that in certain circumstances the interests of the company include the interests of the company's creditors. This has prompted assertions that directors therefore owe duties to the company's creditors. These assertions in judicial decisions are criticized as being conceptually flawed, and an alternative analysis is proposed.

This article re-examines the traditional equitable rules regulating the conduct of directors; it analyses the leading decisions of the past decade which elevate 'the interests of creditors' to the role of an independent control mechanism regulating directors' conduct; finally, it considers the ability of shareholders to ratify conduct in breach of directors' equitable duties.

The view is put that a clear distinction should be drawn between the various mechanisms for control of directors' conduct. In particular, it is argued that the

---

* B.Sc. (Hons) (A.N.U.), Dip. Ed. (Qld), LL.B. (Hons) (Qld), L.L.M. (Melb.), Lecturer in Law, University of Melbourne.

duty to act *bona fide* and in the interests of the company should be treated as conceptually independent of the duty to act for proper purposes. The former is a fiduciary duty, controlling the exercise of discretionary powers by all fiduciaries. The latter is an equitable restriction, not a fiduciary one, controlling the exercise of power by all donees of limited powers.

Such a distinction has critical consequences. The former duty is owed to the company. The latter, it is argued, is owed to a far wider range of people, namely all those affected by use of the power for improper purposes. It follows that different classes of complainants may sue for breach of the two duties.

The ability of shareholders to ratify directors' conduct in breach of their duties is also affected by the distinction. Prior authorization or subsequent ratification will not always be possible. Sometimes the desired outcome will only be achieved if the shareholders in general meeting can properly exercise their own limited power to achieve what the directors were unable to achieve.

Where creditors' interests are concerned, the level of protection given by the courts could have been achieved using the conceptual analysis suggested in this article. Existing remedies thus appear sufficient to protect creditors without the need to manipulate traditional concepts to give creditors the benefit of an express duty.

If the analysis in this article is accepted, creditors may avoid transactions which have been entered into for improper purposes by either the board of directors or the general meeting. This has several advantages when compared with available statutory remedies: first, avoidance is not dependent upon proof of the company's financial instability; second, it benefits all the creditors, not just those litigating, by increasing the general pool of assets held by the company; third, it permits intervention in the affairs of the company before cumulative breaches lead to insolvency and remove the chance of a remedy for anyone; finally, it may operate as a threat and indirectly improve the standards of conduct in company decision-making.

## 2. DIRECTORS' DUTIES: A RE-EXAMINATION [1]

### 2.1 Directors as donees of limited powers: the duty to act for proper purposes

#### 2.1.1 The duty of directors to act for proper purposes

The board of directors and the general meeting, as the two decision-making organs of the company, are donees of limited powers. This grant entails a number of restrictions on exercise of the power.[2] These operate in a manner

---

[1] This article concentrates on the equitable restrictions affecting the exercise of power by directors. It ignores for the most part restrictions imposed by the Corporations Law or the company's memorandum and articles.

[2] *E.g. Re Horsley & Weight Ltd* [1982] Ch. 442; *Re Halt Garage (1964) Ltd* [1982] 3 All E.R. 1016; *International Sales and Agencies Ltd v. Marcus* [1982] 3 All E.R. 551; *Rolled Steel Products (Holdings) Ltd v. British Steel Corporation* [1982] 3 All E.R. 1057 *per* Vinelott J. and [1985] 3 All E.R. 52 *per* Court of Appeal; *Advance Bank Australia Ltd v. F.A.I. Insurances Ltd* (1987) 9 N.S.W.L.R. 464, 473-5 *per* Kirby P., 493-4 *per* Mahoney J.A. See also Wedderburn, K. W., 'Ultra Vires in Modern Company Law' (1983) 46 *Modern Law Review* 204.

which is familiar and well recognized in administrative law. Thus, decisions may be challenged as irregular and held to be voidable[3] where there are 'improper motives', 'abuses of power', '*ultra vires*', 'unreasonableness', 'failure to take account of relevant considerations' and so forth. These expressions admit of different shades of meaning and different interpretations, and thus allow for unpredictable degrees of intervention by the courts into the decision-making process. Nevertheless, the expressions have never been regarded as so vague and indeterminate that the courts are unclear as to the decision required of them. For example, Dixon J. in *Mills v. Mills*[4] stated that if

> the substantial object the accomplishment of which formed the real ground of the board's action . . . is within the scope of the power, then the power has been validly exercised. But if, except for some ulterior and illegitimate object, the power would not have been exercised, that which has been attempted as an ostensible exercise of the power will be void, notwithstanding that the directors may incidentally bring about a result which is within the purpose of the power . . .[5]

Similiar restrictions have been specified for shareholders voting in general meeting: this point has recently been made most emphatically by McPherson J. in *ANZ Executors & Trustee Co. Ltd v. Qintex Australia Ltd (Recs and Mgrs apptd)*.[6]

These formulations emphasize the fact that the courts must look at the cause of the decision, not its effect, to determine whether the decision has been taken for improper purposes.

> Impropriety depends upon proof that the directors were actuated by a collateral purpose, it does not depend on the nature of any shareholders' rights that may be affected by the exercise of the directors' powers.[7]

### 2.1.2 *Distinction between the duty to act* bona fide *in the interests of the company and the duty to act for proper purposes*

The duty to act for proper purposes and the duty to act in the interests of the company have frequently been cited in the same breath, leaving it open to doubt whether they are distinct or are merely different formulations of the same restriction.[8]

This tendency to synthesize the law requiring decisions to be made for proper purposes with that requiring directors to act *bona fide* in the interests of the company may not be wholly legitimate:[9] it ignores the fact that the two sets of

---

[3] Despite some earlier views that an improper exercise of power by the directors was 'void', *e.g. Mills v. Mills* (1938) 60 C.L.R. 150, 186 *per* Dixon J., it now seems clear that such an issue is only 'voidable': *e.g. Whitehouse v. Carlton Hotel Pty Ltd* (1987) 162 C.L.R. 285, 295 *per* Mason, Deane and Dawson JJ., 310 *per* Brennan J.

[4] (1938) 60 C.L.R. 150.

[5] *Ibid*. 186; *cf.* Franzi, N. C. A., 'The Subjective and Objective Elements of a Company Board's Power to Issue Shares' (1976) 10 *M.U.L.R.* 392, 405.

[6] (1990) 2 A.C.S.R. 676; see also *Allen v. Gold Reefs of West Africa Ltd* [1900] 1 Ch. 656, 671; *Ngurli v. McCann Ltd* (1953) 90 C.L.R. 425, 438.

[7] *Teck Corporation Ltd v. Millar* (1972) 33 D.L.R. (3d) 288, 312 *per* Berger J. See also *McGuire v. Ralph McKay Ltd* (1987) 12 A.C.L.R. 107.

[8] *Australian Metropolitan Life Assurance Co. Ltd v. Ure* (1923) 33 C.L.R. 199, 217 *per* Isaacs J.; *Provident International Corporation v. International Leasing Corporation* [1969] 1 N.S.W.R. 424, 436 *per* Helsham J. See also Birds, J. R., 'Proper Purposes as a Head of Directors' Duties' (1974) 37 *Modern Law Review* 580; Finn, P. D., *Fiduciary Obligations* (1977) 38-9.

[9] Sealy, L. S., '"Bona Fides" and "Proper Purposes" in Corporate Decisions' (1989) 15 *Monash University Law Review* 265, 267.

rules may be traced to different sources.[10] Still less acceptable is the imposition on shareholders of restrictions co-extensive with those of directors, when clearly directors owe fiduciary duties to the company while shareholders do not.[11]

The uncertainty has, to some extent, been resolved in Australia in favour of the existence of two separate directors' duties. In *Whitehouse v. Carlton Hotel Pty Ltd*,[12] a majority of the High Court held that an exercise of power for an improper purpose was bad, notwithstanding that the *bona fides* of the directors were not in question.[13] This division accords with the approach taken in this article. The consequences of the Court's finding, however, were not, and have never been, properly appreciated.

The restrictions requiring both directors and shareholders to exercise their powers for proper purposes, while equitable, are not necessarily fiduciary; they ought, therefore, to be regarded separately from fiduciary obligations when considering questions of standing to sue and appropriateness of remedies. To do so might resolve some of the inconsistencies in this area of the law.

### 2.1.3 *Determination of proper purposes*

The determination of legitimate or proper purposes is a question of law. It requires an examination by the court of the facts and surrounding circumstances of each case to determine the ends or objects which were within the contemplation of the parties granting or defining the powers. Although there are obvious analogies with administrative law's regulation of public officials, the task here is more difficult. This is because the limits of the powers of directors and shareholders are often expressed with less precision than is usually the case with public officials.

The powers of the directors are given to them directly by the incorporators and indirectly by the legislature, which permits companies to exist. The incorporators may clearly indicate in the company's objects the purposes for which company powers may be used: this will be so, for example, with a real estate development company, a charitable company or a sporting club; other types of companies may allow the court to apply broad commercial criteria as a matter of inference.[14] In this context, the fact that a company was incorporated as a quasi-partnership or to run a family business may modify the view taken by the court of various actions which would otherwise seem unjustified.[15] Where a company has no objects clause the task of determining proper purposes will be more difficult and the outcome less predictable. Nevertheless, even in this case the court may still be able to strike down as invalid those decisions which are gratuitous and self-serving rather than directed towards the company's ends.

The legislature, too, may indicate the purposes for which the directors' powers

---

[10] Finn, P. D., *op. cit.* para. 139.
[11] *Allen v. Gold Reefs of West Africa Ltd* [1900] 1 Ch. 656, 671; *Ngurli v. McCann Ltd* (1953) 90 C.L.R. 425, 438.
[12] (1987) 162 C.L.R. 285.
[13] *Ibid.* 293.
[14] *Cf. Brady v. Brady* [1988] B.C.L.C. 20, 38 *per* Nourse L.J. (decision reversed on other grounds: [1988] 2 W.L.R. 1308).
[15] *E.g.* salary and pension determinations.

may be used. If a purposive construction is adopted, the Corporations Law may be seen as permitting only those objects which are not contrary to public interest. On this basis, conduct intended to defeat the interests of creditors is contrary to permitted purposes.

Permitted proper purposes are thus judged by reference to both the express and implied objects within the contemplation of the donor of the power. In practice, however, the stated prescriptive approach to determination of proper purposes has been replaced by a proscriptive exercise. A power is generally granted for more than one proper purpose and the courts, being reluctant to specify limits to proper purposes, prefer to specify those purposes considered unquestionably improper. The danger in this is apparent: those purposes which are most demonstrably improper always involve lack of *bona fides*, even if they are arguably in the interests of the company. This overlap of proper purposes and *bona fides* is not a problem if the decision is regarded as in breach of two distinct duties, with the possibility of distinct avenues for complaint. The likelihood, though, is that the duty to act for proper purposes will become subsumed in the duty to act *bona fide* in the interests of the company. It is not true that those decisions taken without the necessary *bona fides* are the only ones taken for improper purposes.[16]

### 2.1.4 *Class of complainants*

The class of people allowed to complain of a breach of the duty to act for proper purposes is not clearly defined in any of the cases in this area. In some instances the company itself has complained, either directly or by the shareholders pursuing a derivative action, but the conclusions which might be drawn from this are unclear. Assertions of improper purpose are almost invariably made in conjunction with allegations of failure to act in the interests of the company: often the facts support an assertion of breach of both duties; sometimes the two duties are treated as identical.[17] Consequently, the cases do not distinguish the class permitted to complain of a failure to act for proper purposes from the class permitted to complain of a breach of fiduciary obligation, even though such a distinction might be appropriate. In other instances minority shareholders have been allowed to sue, but the question of their standing has often not been argued[18] nor its basis explained. So far no case has turned on the rights of outsiders to seek remedies.

Since the cases are not determinative, the class of complainants must be found

[16] Cf. *Advance Bank Australia Ltd v. F.A.I. Insurances Ltd* (1987) 9 N.S.W.L.R. 464, 484-5 *per* Kirby P.

[17] *Australian Metropolitan Life Assurance Co. Ltd v. Ure* (1923) 33 C.L.R. 199, 217 *per* Isaacs J.; *Provident International Corporation v. International Leasing Corporation* [1969] 1 N.S.W.R. 424, 436 *per* Helsham J.

[18] The majority of cases dealing with improper purposes are control motivated share issue cases. Stapledon, in an analysis of some of the main Australian cases, concludes that the courts have not been overly concerned with procedural *locus standi* issues. Most cases seem to embrace some notion of a personal right in the shareholder to have standing before the court, although the point was not directly argued: Stapledon, G. P., 'Locus Standi of Shareholders to Enforce the Duty of Company Directors to Exercise the Share Issue Power for Proper Purposes' (1990) 8 *Company and Securities Law Journal* 213, and the cases cited therein.

by deduction and analogy, looking at other donees of limited powers. Both public officers and donees of powers of appointment have powers which can only be used for proper purposes. The former derive their powers from Parliament; Parliament's purpose in granting the power is expressly and impliedly stipulated in the empowering legislation. Complaint may be made by anyone both adversely affected by an exercise of the power for improper purposes and within the Parliament's contemplation as a prospective person affected by the exercise. Donees of powers of appointment, on the other hand, derive their powers from a private grant. Nevertheless, the purposes contemplated by the donor are similarly stipulated in the grant. Again, complaint may be made by anyone adversely affected by an exercise of the power for improper purposes and within the contemplation of the donor; the complainants in this case, therefore, are restricted to the class of possible appointees. In both cases the remedy available to the complainant is a declaration that the exercise of power is invalid, not that the defaulter is personally liable.[19]

To generalize, the class of possible complainants may be seen as either the group for whose *benefit* the donor intended the power to be exercised or, alternatively, the group who might *suffer detriment* solely because the power has been exercised for a purpose not contemplated by the donor. The latter emphasis is preferable: it indicates that persons can complain even where a new and proper exercise of the power will not benefit them. For example, a possible appointee under a power of appointment may complain if the power is exercised for an improper purpose: this is not because the donor of the power intended the complainant to benefit from an exercise of the power, nor intended that the power be exercised in the interests of the complainant; nor is it because a proper exercise of the power will necessarily benefit the complainant. It is because the complainant might suffer detriment solely because the power has been exercised for a purpose not contemplated in the grant.

Applying this analysis to the power of the board of directors,[20] power is granted to the board by the original shareholders and perhaps modified by later shareholders; thus the purposes contemplated by these shareholders determine the ambit of the powers and the class of possible complainants. In addition, because companies are incorporated under statute, the power of the board also ultimately derives from Parliament in allowing such a legal entity to be established. This places limitations on the powers which would not exist if the agreement were solely between the shareholders and the directors.[21] The purposes contemplated by Parliament, either expressly or by inference from a purposive interpretation of the statute, impose overriding limits on the powers of the board.

For example, the directors cannot act for the purpose achieving illegal ends, or for the purpose of defeating the interests of creditors, even if the original shareholders were to specify this as an object of the company. This is because,

---

[19] In some circumstances the relationship will be such that other duties are also breached and personal remedies are consequently available.

[20] The same analysis can be applied to the powers of the general meeting.

[21] Consequently these limitations do not exist, for example, in partnerships.

by inference, Parliament did not intend in its grant of power to directors that the powers would be used for these purposes. This does not mean the duty to exercise powers for proper purposes requires that creditors' claims are always met, or that illegal ends are never reached; it simply means that decisions cannot be taken *for the purpose of* defeating the creditors' interests or achieving the illegal ends.

Once the power is viewed as having its source in both Parliament and the shareholders, the class of possible complainants becomes very wide: all those within the contemplation of either Parliament or the shareholders who might suffer detriment because the power has been exercised for an improper purpose have a personal right to complain. This includes the company itself; it includes individual shareholders, unimpeded by the rule in *Foss v. Harbottle*;[22] it would also have the dramatic effect of including creditors, employees and consumers.

Expanding the class of complainants in the way argued for, allowing creditors, employees, consumers and perhaps other individuals to take this type of action, does not make directors personally liable to these groups. It simply allows avoidance[23] of those transactions taken, for example, to defeat the interests of creditors, while leaving unaffected any genuine risk-taking on the part of the company.

This analysis provides a means of rationalizing many cases brought by shareholders against directors. Fiduciary duties are owed to the company, not to the shareholders individually, so shareholders should not be able to pursue *personal* actions to remedy a breach.[24] It should only be possible to sue, and obtain injunctive relief and damages, in the company name or by a derivative action on behalf of the company.[25] Shareholders may, however, take personal actions against directors who have acted for improper purposes; their remedy is solely to have the exercise declared invalid. Thus the situation noted as confusing by certain commentators,[26] that the only remedy available to the shareholders in such circumstances is injunctive or declaratory relief but not damages,[27] is more readily explained.

In addition, where the directors' *bona fides* are not in question, it is stretching principles to find that shareholders have standing under the 'fraud on the

---

[22] (1843) 2 Hare 461; 67 E.R. 189, since this rule relates only to shareholders taking actions for wrongs done to the company.

[23] The exercise of power for an improper purpose is voidable. Avoidance in the particular circumstances depends upon considerations well known in equity: intervention of *bona fide* third party rights, laches, acquiescence.

[24] As the courts allowed in *Bamford v. Bamford* [1970] Ch. 212; *Ashburton Oil N.L. v. Alpha Minerals N.L.* (1971) 123 C.L.R. 614; *Harlowe's Nominees Pty Ltd v. Woodside (Lakes Entrance) Oil Co. N.L.* (1968) 121 C.L.R. 483 and probably also in *Ngurli Ltd v. McCann* (1953) 90 C.L.R. 425 and *Howard Smith Ltd v. Ampol Petroleum Ltd* [1974] A.C. 821. See detailed discussion in Stapledon, *op. cit.*

[25] Pennington, R.R., *The Investor and the Law* (1968) 488; Slutsky, B.V., 'Shareholders' Personal Actions — New Horizons' (1976) 39 *Modern Law Review* 331, 334. This restriction cannot be avoided by postulating that the shareholders are suing personally to uphold rights based on the Corporations Law s. 180 statutory contract: in such actions the company is, and must be, the real defendant, not the directors.

[26] Stapledon, *op. cit.* 218, and the commentators noted therein.

[27] *Ibid.*; Gower, L.C.B., *Principles of Modern Company Law* (4th ed. 1979) 656; Slutsky, *op. cit.* 334.

minority' exception to the rule in *Foss v. Harbottle*.[28] This exception requires the wrong to be an act of such fraudulent character that it is non-ratifiable, and the alleged wrongdoers to be in control of the company to the extent that the company is prevented from taking legal action in respect of the alleged wrong.[29] Where directors act honestly in what they consider to be the best interests of the company, but nevertheless for an improper purpose, their actions should not be regarded as involving the necessary 'fraud'. As a consequence, in these circumstances it is highly unlikely that a derivative action can be pursued,[30] and the wrong may go unremedied. Recognition of improper purposes as an independent breach of duty with independent standing requirements would allow shareholders, and others, to sue personally.

Some of the more recent cases lend weight to this analysis. They do not consider the possibility of outsiders complaining where directors have failed to act for proper purposes. Nevertheless, they do indicate that the rights of shareholders to complain are personal rights, based on equitable limitations on the powers of directors, rather than company rights based on directors' fiduciary obligations.

The decision of the Full Court of the South Australian Supreme Court in *Residues Treatment & Trading Co. Ltd v. Southern Resources Ltd (No. 4)*[31] is one such case.[32] The Court recognized

> the existence of a personal right in a shareholder, grounded upon equitable principles, to have the voting power of his shares undiminished by improper actions on the part of the directors and of his *locus standi* to institute and prosecute proceedings to protect that right.[33]

The right was expressly stated to be founded upon general equitable considerations[34] rather than in contract,[35] although it was fortified by the Companies Code s. 78 statutory contract[36] and by the existence in the Code of a number of sections which conferred standing on shareholders to seek similar remedies.[37]

This is consistent with the analysis proposed in this article. King C.J. emphasized that an improper exercise of power by the directors is

> not merely a breach of duty by the directors to the company, it is also a wrong done to the shareholders by the company acting through its agents.[38]

He added that shareholders do not have personal rights to remedy every impropriety in the directors' management of the company, even where the impropriety causes detriment to the shareholder.[39] In defining when shareholders will and will not be able to obtain remedies, however, his approach is narrower than that proposed here.

---

[28] (1843) 2 Hare 461; 67 E.R. 189.
[29] *Burland v. Earle* [1902] A.C. 83, 93 *per* Lord Davey.
[30] Unless another exception to the rule in *Foss v. Harbottle* is satisfied.
[31] (1988) 14 A.C.L.R. 569.
[32] Some commentators have gone so far as to say the case stands for the proposition that directors owe *fiduciary* duties to individual shareholders, that duty being not to dilute shareholder voting power by allotting shares for unauthorized purposes: Stapledon, *op. cit.* 237-9.
[33] (1988) 14 A.C.L.R. 569, 575 *per* King C.J., Matheson and Bollen JJ. concurring.
[34] *Ibid.*
[35] *Ibid.* 574.
[36] *Ibid.*; see Corporations Law s. 180.
[37] (1988) 14 A.C.L.R. 569, 574; see Corporations Law ss 212, 260, 1324.
[38] *Ibid.*
[39] *Ibid.*

King C.J. held that personal actions by shareholders were possible only where an improper allotment of shares by directors caused a diminution in the shareholder's effective voting power, stating that

> [d]iminution of voting power stands on a fundamentally different footing from other detriments resulting from an abuse of power by the directors. A member's voting rights and the rights of participation which they provide in the decision-making of the company are a fundamental attribute of membership . . .[40]

Although such rights are fundamental, they provide a logically inelegant basis of distinction. The consequence of the analysis proposed here is that *all* breaches consisting of directors exercising their powers for an improper purpose would give shareholders, and others, a personal right of action; breaches of the duty to act *bona fide* in the interests of the company, on the other hand, would give only the company a right of action.[41]

This analysis also receives qualified support from Helsham J. in *Provident International Corporation v. International Leasing Corporation*[42] where he said:

> I think that the rule in *Foss v. Harbottle* does not apply in the case of fraud on the powers of directors, at any rate where the abuse of power concerns a purported issue of shares, and I am of the opinion that this is so where the fraud consists of no dishonesty but a mere attempt to use the power for purposes other than that for which it was given. . . . The reason why the rule in *Foss v. Harbottle* does not apply in a case of fraud on a power such as the present no doubt resides in the fiduciary nature of the duty owed and the fact that it is owed to all the corporators of the company.[43]

Further support may be drawn from cases dealing with the relevance of the rule in *Foss v. Harbottle*[44] in preventing shareholders seeking remedies for directors' breaches. In Australia this rule has never appeared to impose much of an impediment in practice.[45] This has perhaps reduced the need for detailed analysis of those actions which are permitted to be taken by an individual shareholder. In *Nankivell v. Benjamin*,[46] however, a distinction was drawn between (i) an action for injunctive relief to which a claim to recover money of the company improperly paid away to third parties is incidental, where it was held that a suit may be brought at the instance of a shareholder, and (ii) an action brought solely to recover such moneys, where a plea of *Foss v. Harbottle* will succeed unless some special circumstances are shown, such as wrongdoer control.[47] This distinction rests on the different remedies available for actions where a power is improperly used and actions taken in breach of fiduciary duties owed to the company, and the different classes of complainant to which each action is open. The former type of action is available to shareholders affected by the wrongful decision, unimpeded by the rule in *Foss v. Harbottle*, and is, by analogy, also open to creditors who are affected by the wrongful decision. The latter type of

---

[40] *Ibid.* 575, with the other members of the Court concurring.
[41] Unless the shareholders could pursue a derivative action.
[42] (1969) 89 W.N. (Pt 1) (N.S.W.) 370.
[43] *Ibid.* 381, although the analysis in this article suggests the duty is equitable but not fiduciary.
[44] (1843) 2 Hare 461; 67 E.R. 189.
[45] Sealy, L. S., 'The Rule in *Foss v. Harbottle*: the Australian Experience' (1989) 10 *The Company Lawyer* 52.
[46] (1892) 18 V.L.R. 543, dealing with *ultra vires* acts.
[47] See Sealy, L. S., 'The Rule in *Foss v. Harbottle*: the Australian Experience' (1989) 10 *The Company Lawyer* 52, n. 44.

action is only available to the party to whom the fiduciary duty is owed, which is the company or a shareholder with standing to pursue a derivative action.

### 2.1.5 *Proof of breach*

Having examined the objects which were intended should, or could, be achieved by the grant of the power, any use of the power aimed at achieving other objects will be regarded as an exercise of the power for improper purposes. The nature of the task that the court must undertake is described in the much cited passage from the judgment of Viscount Finlay in *Hindle v. John Cotton Ltd*:[48]

> Where the question is one of abuse of powers, the state of mind of those who acted, and the motive on which they acted, are all important, and you may go into the question of what their intention was, collecting from the surrounding circumstances all the materials which genuinely throw light upon that question of the state of mind of the directors so as to show whether they were honestly acting in the discharge of their powers in the interests of the company or were acting from some bye-motive, possibly of personal advantage, or for any other reason.[49]

This task raises three particular issues: first, proving directors' purposes in coming to a decision; second, dealing with mixed motives; and, third, combining the individual and perhaps mixed motives of each director to determine the overall purpose for which the decision was taken by the board of directors.[50] In decisions taken by the general meeting, these same problems arise, but are magnified because of the larger numbers of participants in the decision-making process. These issues are vital to any successful action; however, the treatment they merit is beyond the scope of this article.

### 2.2 *Directors as fiduciaries*

This area may be dealt with briefly, since it is not proposed to enter into any debate on central precepts. Broadly speaking, the duties of directors as fiduciaries may be divided into two categories. First, directors must act *bona fide* in what they consider to be the interests of the company;[51] this duty regulates directors in the exercise of their powers on behalf of the company and is concerned with the validity of any decision taken. Second, directors must act in good faith and with loyalty. The common expression of this requires directors to avoid conflicts of duty and interest and duty and duty and not to misuse their position for personal benefit. This duty regulates the general conduct of directors and is concerned with their personal liability. The distinctions between the two categories have important consequences where ratification and remedies are concerned.

---

[48] (1919) 56 Sc.L.R. 625.
[49] *Ibid*. 630-1.
[50] Note especially *Southern Resources Ltd v. Residues Treatment & Trading Co. Ltd* (1991) 3 A.C.S.R. 207, 217, 221, 223.
[51] *Re Smith & Fawcett Ltd* [1942] Ch. 304, 306 *per* Lord Greene M.R.

*Directors' Duties* 131

### 2.2.1 *Directors' duty to act* bona fide *in the interests of the company*

*The scope of the duty*

The obligation governs the manner in which directors hold and exercise their discretionary powers: such powers must be exercised 'in the interests of the company'.[52] Considerable attention has been devoted to the words 'in the interests of the company',[53] since they define both the scope of a director's fiduciary obligation and the class of complainants when breach occurs.

Since there is judicial support for several different interpretations of the words, it is impossible to settle on one correct meaning by looking to precedents. The arguments for various choices have been well put elsewhere,[54] and it seems nothing will convince all to subscribe to one view. Nevertheless, certainty in applying the law demands that directors' obligations be clearly defined. In these circumstances the better solution seems to be to settle upon the interpretation which is conceptually sustainable and which both provides the desired scope in defining directors' obligations and delivers preferred outcomes for remedies and standing to sue.

Without entering into the debate, it is suggested that some of the confusion and controversy might be removed if it were held that the fiduciary duty is owed to the company as a separate legal entity:[55] this has the advantage of according with the existing conceptual framework of company theory[56] and the underlying principles of fiduciary powers.[57] It is also simple.

*Class of complainants*

If the above view is accepted, then the company as a separate legal entity is the only party entitled to complain of breach of fiduciary duty. This may be achieved either by the directors deciding to litigate in the company name[58] or by the shareholders taking a derivative action to obtain a remedy for the company.[59]

Statutory modification[60] has theoretically expanded this class of complainants

---

[52] *Ibid.*

[53] *E.g.* Heydon identifies four different formulations of the duty, each finding judicial support: Heydon, J. D., 'Directors' Duties and the Company's Interests' in Finn, P. D. (ed.) *Equity and Commercial Relationships* (1987) 120.

[54] *Ibid.* ch. 5 and the commentaries referred to therein.

[55] This is also the view argued for in McPherson, B. H., 'Duties of Directors and the Power of Shareholders' (1977) 51 *Australian Law Journal* 460, 468; Santow, G. F. K., 'Defensive Measures Against Company Take-overs' (1979) 53 *Australian Law Journal* 374. See also Steel, T., 'Defensive Tactics in Company Takeovers' (1986) 4 *Company and Securities Law Journal* 30, especially n. 27; Sealy, L. S., 'Directors' "Wider" Responsibilities — Problems Conceptual, Practical and Procedural' (1987) 13 *Monash University Law Review* 164, 174.

[56] *E.g. Salomon v. Salomon & Co.* [1897] A.C. 22; *Percival v. Wright* [1902] 2 Ch. 421.

[57] *Hospital Products Ltd v. United States Surgical Corporation* (1984) 156 C.L.R. 41; Finn, P. D., *Fiduciary Obligations* (1977) 8-9, but also note 66-9.

[58] Where the directors have general powers of management of the company, which is usually the case: *e.g.* Corporations Law Schedule 1 Table A reg. 66.

[59] Subject to limitations on the availability of this procedure imposed by the rule in *Foss v. Harbottle* (1843) 2 Hare 461; 67 E.R. 189.

[60] Corporations Law ss 1324, 1325; Companies Code s. 574.

*Melbourne University Law Review* [Vol. 18, June '91]

by allowing a wide class[61] to complain of contraventions of the Corporations Law and obtain injunctions or damages, since such contraventions include breaches of fiduciary duties by the directors.[62] Perhaps surprisingly, in this area of the law there has been no reliance so far on these provisions.

### Proof of breach

In deciding whether the duty has been breached, courts must determine whether directors have acted in what the directors, not the court, believe to be the best interests of the company. This requires a determination of the subjective motivations of the directors: the court does not presume to substitute its own management opinion for that of the directors, although it may review the evidence for itself in order to decide whether the directors honestly believed that what they were doing was in the interests of the company.

While this sounds acceptable in theory, in practice intervention has frequently occurred only when the 'amiable lunatic' test[63] is satisfied. Any greater intervention has occurred on a haphazard basis, often in defiance of the original rule which clearly imposes a subjective standard.[64] Perhaps the most acceptable attempt to subject the duty to act *bona fide* and in the interests of the company to a more rigorous supervision by the court comes from the judgment of Kirby J. in *Darvall v. North Sydney Brick & Tile Co. Ltd (No. 2)*:[65] directors, he held, could not allege that their decision was in the interests of the company[66] where they had failed to inquire once they suspected or ought to have suspected some impropriety.[67]

Nevertheless, the duty to act *bona fide* in the interests of the company is still a duty requiring only loyalty of the director, not one imposing an objective standard of behaviour nor one demanding a particular commercial outcome for the company. Other duties imposed on directors contribute towards achieving these ends. Therefore, finding that a decision is in the interests of the company as a commercial entity is not conclusive of the validity of the decision.[68]

[61] *Broken Hill Proprietary Co. Ltd v. Bell Resources Ltd* (1984) 8 A.C.L.R. 609, interpreting the Companies Code s. 574.

[62] As incorporated into the statute: Corporations Law s. 232; Companies Code s. 229. There is debate as to the extent of overlap between the statutory and equitable duties: *Southern Resources Ltd v. Residues Treatment & Trading Co. Ltd* (1991) 3 A.C.S.R. 207, 225-9.

[63] From the decision of Bowen L.J. in *Hutton v. West Cork Rly Co.* (1883) 23 Ch.D. 654, 671.

[64] Frequently this stricter approach is achieved by linking a failure to act *bona fide* in the interests of the company with breach of another equitable duty, such as failure to avoid conflicts of duty and interest or failure to act for proper purposes, both of which permit a more objective determination.

[65] (1989) 7 A.C.L.C. 659.

[66] And exclusively for proper purposes.

[67] (1989) 7 A.C.L.C. 659, 680.

[68] For example, the decision may have been made for improper purposes, it may involve unreasonable discrimination against a section of the membership, it may unacceptably alter share rights and so forth.

#### 2.2.2 *Directors' other fiduciary duties*

These duties are mentioned purely for the sake of completeness. They include duties to avoid conflicts of duty and interest and duty and duty; duties preventing misuse of position; and duties relating to the purchase and sale of property the subject of a fiduciary obligation. These duties frequently overlap, and breaches may be categorized under several heads, although double recovery is not possible.

Breaches of these duties invariably involve a benefit to the defaulting director. This explains the different remedies for breach: not only is the transaction voidable, but personal and proprietary remedies are available against the director to enable the company to recover the director's gain. This difference has important consequences for shareholder ratification.

### 2.3 *Comment*

In summary, the duties imposed on directors regulating the exercise of their discretions should be regarded as conceptually independent. The fiduciary duty requiring directors to act *bona fide* in the interests of the company is imposed because of the special relationship between directors and the company; this duty is owed to the company and only the company may complain of a breach. On the other hand, the equitable duty requiring directors to exercise their powers for proper purposes is imposed because the grant of power to directors is not absolute. The permitted purposes are those contemplated by the donors of the power, here both the Parliament and the corporators. This equitable restriction allows all parties within the contemplation of the donor of the power to complain of a breach.

### 3. *DIRECTORS' DUTIES AND CREDITORS' INTERESTS*

The view has been put that the duty to act *bona fide* and in the interests of the company is conceptually distinct from the duty to act for proper purposes. Nevertheless, there is a long line of precedent treating these duties as merely different expressions of the same idea. Added to this is the confusion surrounding the scope of the former duty. This confusion and uncertainty has predictably led to series of cases testing the limits of directors' obligations.

One such group of cases suggests that directors owe duties of some sort to creditors. These cases merit analysis to determine how the courts perceived that duty. In most cases it seems that an unwarranted extension to the duty has been made where, arguably, traditional principles analysed as suggested in this article could have provided the same remedy on a more rational basis.[69] This is made even more apparent when creditors' rights and the possibilities for shareholder intervention are considered.

---

[69] The same could be said of the cases concerning directors' duties in the face of takeover threats.

3.1 *The duty to creditors: its development*

### 3.1.1 *The initial statement of the duty*

The notion that directors owe duties to creditors appears to have developed from the statement of Mason J. in *Walker v. Wimborne*:[70]

> the directors of a company in discharging their duty to the company must take account of the interests of its shareholders *and its creditors*[71] (emphasis added).

Predictably, this statement has been interpreted in two quite distinct ways in subsequent case law and commentary. On one hand, it has been viewed as indicating that directors owe duties to creditors independent of any duty to the company.[72] On the other hand, the statement has been viewed as no more than a comment on the necessity for directors to consider the interests of creditors in satisfying the duty owed to the company.[73]

In *Walker v. Wimborne*[74] the duty to act *bona fide* and in the interests of the company was breached. The defaulting directors had made a payment on behalf of the company to another company within the group. Mason J., with whom Barwick C.J. agreed,[75] found this to be a breach of duty because the payment offered no possible advantage to the particular company to whom the directors owed their duty.[76]

It was recognized by Jacobs J. that even if directors have acted *bona fide* in the interests of the company, they may nevertheless have acted for improper purposes.[77] To this extent the case demonstrates the two independent facets of directors' duties, the fiduciary duty and the duty to act for proper purposes. No rationale was put forward for an additional independent duty to consider the interests of creditors, much less an independent duty owed directly to creditors.

### 3.1.2 *Subsequent developments*

For several years there were no clear signals that Mason J.'s *dictum* would be interpreted as other than a restatement of traditional principles. That position has now changed dramatically. In Australia the High Court has not deliberated upon the matter, so the current position must be assessed on the basis of State decisions. In the most recent Australian case, *Jeffree v. National Companies and*

[70] (1976) 137 C.L.R. 1.
[71] *Ibid*. 7.
[72] Support for this interpretation may be found in *Nicholson v. Permakraft (N.Z.) Ltd (in liq.)* [1985] 1 N.Z.L.R. 242, 250; 3 A.C.L.C. 453, 459 *per* Cooke J.; *Jeffree v. National Companies and Securities Commission* (1989) 7 A.C.L.C. 556, 560 *per* Wallace J., Pidgeon J. concurring; *Winkworth v. Edward Baron Development Co. Ltd* [1987] 1 All E.R. 114, 118 *per* Templeman L.J. See also Corkery, J. F., *Directors' Powers and Duties* (1987) 69.
[73] See, for example, the reasoning of Street J. in *Kinsela v. Russell Kinsela Pty Ltd* (1986) 4 N.S.W.L.R. 722 and Jacobs J. in *Grove v. Flavel* (1986) 43 S.A.S.R. 410.
[74] (1976) 137 C.L.R. 1.
[75] *Ibid*. 3.
[76] *Ibid*. 8. Jacob J.'s dissent was based on his opinion that it was open on the facts to find the challenged payment was made in the interests of the company, and therefore did not constitute a breach of duty by the directors.
[77] (1976) 137 C.L.R. 1, 16.

*Securities Commission*,[78] the unanimous view, stated in expansive and forthright terms, was that a duty to creditors exists.[79]

Why such a duty was necessary to the decision is not apparent. The case was based on simple facts: Jeffree was a director of Wanup, the trustee company of the Jeffree Family Trust, which carried on a swimming pool business for the beneficiaries of the trust. Arbitration proceedings were commenced by Leighton for defects in the construction of a pool. Wanup, acting in accordance with legal advice and apparently with the unanimous consent of the shareholders,[80] paid out its creditors and sold its assets at full value to a new entity called Cassidy. Cassidy was incorporated with the same directors, shareholders and trustee establishment, and effectively took over the running of the business. When Leighton eventually obtained a judgment for the amount of the arbitration award, it found that the only asset of Wanup was a debt representing the amount outstanding on the sale of the business. In authorizing the transfer of Wanup's assets to Cassidy so as to defeat the arbitration claim sought by Leighton, Jeffree was held to have improperly used his position to gain an advantage for himself.[81]

This case provides the first successful Supreme Court prosecution of a director pursuant to s. 229(4) of the Companies Code;[82] it indicates that a director will make 'improper use' of his or her position, within the terms of that section, where the purpose of a transaction or the motive for a transaction is impermissible.[83] This indicates an acceptable overlap between the fiduciary duties of good faith, requiring directors not to misuse their position, and the separate duty to act for proper purposes. The Court unanimously held that the directors had acted for the impermissible purpose of defeating the interests of contingent creditors. This should have disposed of the case,[84] but the Court gave reasons for holding the purpose improper. It was improper, they said, because the directors owed a duty to the company's creditors, present and future,[85] to keep the company's property inviolate and available for the repayment of the company's debts.[86]

This is not to suggest that the outcome in *Jeffree v. N.C.S.C.* is unwarranted, merely that the means of arriving at it may be. The Court could have found that

---

[78] (1989) 7 A.C.L.C. 556; 15 A.C.L.R. 217.
[79] (1989) 7 A.C.L.C. 556, 560 *per* Wallace J., 565 *per* Brinsden J., 566 *per* Pidgeon J. concurring.
[80] *Ibid.* 563 *per* Brinsden J., listing the Magistrate's findings.
[81] The Court took a very broad and unanimous view of what constitutes an 'advantage': here it was the ability of Jeffree to continue working for the same business under a fresh corporate structure unimpeded by the claims of prospective creditors. This aspect of the case deserves further attention, but is not relevant to the present discussion.
[82] Corresponding to Corporations Law s. 232(6).
[83] (1989) 7 A.C.L.C. 556, 560 *per* Wallace J., 565 *per* Brinsden J., 566 *per* Pidgeon J. concurring.
[84] Query whether for the majority it did in fact dispose of the case. Although the authorities for directors owing a duty to creditors were cited with approval, both Wallace and Brinsden JJ. appear to base their decisions upon a finding that the directors had acted for an improper purpose, and had therefore made improper use of their position in breach of the Companies Code s. 229(4). Although they agreed there had been a breach of the duty owed to creditors, they did not seem to rest their decision on this. The level of analysis in the judgments leaves much to be clarified.
[85] (1989) 7 A.C.L.C. 556, 560 *per* Wallace J., 565 *per* Brinsden J., 566 *per* Pidgeon J. concurring.
[86] *Ibid.*, Brinsden J. by inference from the authorities cited.

Jeffree exercised his powers for an improper purpose,[87] or breached his fiduciary duty to the company,[88] or possibly that he acted fraudulently.[89] The Court's finding that Jeffree acted for an improper purpose[90] does not also require finding a positive duty to creditors to act in their interests. None of the judgments in *Jeffree*'s case provides a reasoned argument for the existence of such a duty, nor considers its consequences. Any attempt to define the duty more clearly thus requires recourse to the cases cited in support of the proposition.

The two cases which have had the most dramatic impact on this developing concept are from overseas jurisdictions, one from New Zealand and the other from Britain. The first is the 1985 decision of the New Zealand Court of Appeal in *Nicholson & Ors v. Permakraft (N.Z.) Ltd (in liq.)*.[91] The appellants were directors of the plaintiff, a furniture manufacturing company. At a time when the company was undercapitalized and facing liquidity problems, the directors implemented an elaborate reconstruction scheme. This resulted in a capital profit for the company, which was distributed to the shareholders as a capital dividend. A temporary improvement in the company's liquidity was followed by compulsory winding up. The liquidator unsuccessfully sought to recover the capital profit from the company's directors. He argued that payment of the dividend had been in breach of the directors' duties; that, as the company was in a state of near insolvency at the time, the money should have been retained in the interests of existing and future creditors.

The three judges hearing the appeal disagreed with this proposition. Both Richardson and Somers JJ. specifically considered both the *bona fides* and improper purpose aspects of directors' duties: they found the company was solvent at the time of restructuring, and that the directors had sufficiently considered and acted in the interests of the company;[92] in addition, they found the directors had acted honestly and that there had been no deliberate intention to remove assets from the reach of creditors.[93] Further than this, both declined to decide the question of directors' duties to creditors.[94] Not so Cooke J., who devoted a considerable part of his judgment to these duties,[95] and whose decision has been the most influential in subsequent cases.

In considering the creditors, Cooke J. commenced his analysis with the traditional principles, stating that

[t]he duties of directors are owed to the company. On the facts of particular cases this may require the directors to consider *inter alia* the interests of creditors.[96]

[87] To defeat a creditor, or to obtain a personal benefit.
[88] By not acting *bona fide* in its interests, or by misusing his position for a personal gain or allowing his personal interests to conflict with his duty.
[89] (1989) 7 A.C.L.C. 556, 561 *per* Wallace J., who appeared to agree with the Magistrate that Jeffree's actions were 'clearly dishonest'.
[90] *Ibid.* 560 *per* Wallace J., 565 *per* Brinsden J., 566 *per* Pidgeon J. concurring.
[91] (1985) 3 A.C.L.C. 453.
[92] *Ibid.* 463 *per* Richardson J. and 464 *per* Somers J.
[93] *Ibid.* 456 *per* Cooke J., 463 *per* Richardson J. In this respect the case can be distinguished from *Jeffree v. N.C.S.C.*
[94] *Ibid.*
[95] *Ibid.* 460-2.
[96] *Ibid.* 459, where it was also indicated that these interests should be considered '... if the company is insolvent or near insolvent, or of doubtful solvency, or if a contemplated payment or other course of action would jeopardize its solvency'.

His rationale for this seems to be twofold: failure to do so may result in insolvency,[97] and so presumably would not be in the interests of the company; alternatively, failure to do so would demonstrate a lack of 'business ethics'[98] and a break in the 'linking of power with obligation',[99] and so presumably would constitute a fraud on the power, or a use of the power for an improper purpose. Neither of these reasons indicates an expansion of the obligations owed by directors nor of the remedies available against them. On traditional grounds directors would be in breach of their duties if they acted in a manner which failed to consider the continued viability of the company, or which demonstrated a use of power for a purpose not contemplated in the grant of the power. The latter would occur where directors act deliberately to remove assets from the reach of creditors: such actions may equally well be described as a fraud on the power or fraud pure and simple.

Cooke J.'s judgment, however, takes the matter further than these traditional concepts. This is apparent in two particular areas: first, his explicit formulation of a duty to act *in* the interests of a defined class of creditors;[100] and, second, his analysis of the effectiveness of shareholder ratification.

In defining directors' duties, Cooke J. held that directors must consider the interests of 'current and likely continuing trade creditors',[101] apparently relying on an analogy with the duty of care owed to individuals in tort rather than on any fiduciary duties owed to the company:

> [this legal obligation] accords with the now pervasive concepts of duty to a neighbour . . . the fortunes of . . . [likely continuing trade creditors] may be so linked with those of the company as to bring them within the reasonable scope of the directors' duties.[102]

Thus a possible duty in tort has been amalgamated with traditional fiduciary duties to produce a new fiduciary duty, not a tort duty,[103] owed to an expanded class of objects. This is quite outside even the widest formulations of fiduciary obligations.[104] Nevertheless, the broad principles set out in the judgment of Cooke J. have been accepted to varying degrees in subsequent cases,[105] including the important decision of the N.S.W. Court of Appeal in *Kinsela & Anor. v. Russell Kinsela Pty Ltd (in liq.)*.[106]

The other case significantly influencing developments in this area of the law is

---

[97] *Ibid.*
[98] *Ibid.*
[99] *Ibid.*
[100] Rather than a prohibition against acting *to defeat* their interests.
[101] (1985) 3 A.C.L.C. 453, 459. Directors need not consider the interests of other future creditors, whose remedies are restricted to those available for misrepresentation or deceit if they continue to give credit in ignorance of changes damaging their prospects for repayment.
[102] *Ibid.* 459.
[103] *Ibid.* 460. The implications are that only the company may *sue* for breach of this duty owed to creditors, although only the creditors may *ratify* the breach.
[104] This is not a simple adoption of the approach of Cumming-Bruce and Templeman L.JJ. in *Re Horsley & Weight Ltd* [1982] 1 Ch. 442, which goes no further than traditional concepts would allow, despite what Cooke J. says at (1985) 3 A.C.L.C. 453, 460. Also, *cf. Hospital Products Ltd v. United States Surgical Corporation* (1984) 156 C.L.R. 41, 68-72 *per* Gibbs C.J., 96-9 *per* Mason J., 141-9 *per* Dawson J.
[105] *E.g. Grove v. Flavel* (1986) 43 S.A.S.R. 410; 4 A.C.L.C. 654; 11 A.C.L.R. 161; *Hilton International Ltd v. Hilton* [1989] 1 N.Z.L.R. 422.
[106] (1986) 4 N.S.W.L.R. 722.

the unanimous decision of the House of Lords in *Winkworth v. Edward Baron Development Co. Ltd.*[107] The appeal concerned the claim by a director that her company held residential property on resulting trust for her. It was unsuccessfully argued that such a trust arose as a consequence of her financial contributions to the property's acquisition. Lord Templeman, delivering the judgment of the House, held that she had not made any such contributions, but that in any event equity would not assist her because of breaches of her duties as director.[108] It was Lord Templeman's description of these breaches of duty which was adopted and relied upon in *Jeffree v. N.C.S.C.*[109] The breaches consisted of withdrawing money from the company to fund the purchase of her own and her husband's shares, and incurring a company overdraft at least partly for their own benefit. Such activities, one might have expected, would constitute a breach of directors' fiduciary duties as traditionally conceived: a conflict of duty and interest or a misuse of position for a personal profit. Such breaches should have been sufficient to enable the Court to determine that she had not come to equity with clean hands and thus, as against the company or persons taking title from the company, she should receive no protection. Lord Templeman did not, however, rely on such traditional analysis. His reasons are stated categorically and bear repeating:

> But a company owes a duty to its creditors, present and future . . . to keep its property inviolate and available for the repayment of its debts. The conscience of the company, as well as its management, is confided to its directors. A duty is owed by the directors to the company and to the creditors of the company to ensure that the affairs of the company are properly administered and that its property is not dissipated or exploited for the benefit of the directors themselves to the prejudice of the creditors . . . These breaches of duty would not have mattered if . . . [the directors] had been able to maintain the solvency of the company and to see that all its creditors were paid in full.[110]

This illustrates clearly the confusion in this area of the law. Traditional analysis holds that a company owes duties to its creditors either in contract, requiring the exercise of good faith in fulfilling contractual obligations, or in tort, requiring an absence of fraudulent or negligent conduct.[111] Breach of these common law duties will give rise to remedies in contract or tort according to well recognized, although changing, rules. Only the company can fulfil these duties, or breach them, through human agents, commonly the directors. This may expose both the company, as principal, and the directors, as agents, to potential liability on common law agency principles. There will be no breach, rather than that the breach does not matter, if the company remains solvent and the creditors are paid in full according to the terms of their contracts. The question of personal benefit to the directors is irrelevant in reaching this conclusion.

Where the directors' fiduciary duty to the company is concerned, the situation is quite different. The fiduciary duty requires the directors to ensure that 'the affairs of the company are properly administered and that its property is not

---

[107] [1987] 1 All E.R. 114.
[108] *Ibid.* 117-8.
[109] (1989) 7 A.C.L.C. 556, 560 *per* Wallace J., 565 *per* Brinsden J., and 566 *per* Pidgeon J. concurring with both.
[110] [1987] 1 All E.R. 114, 118.
[111] Such tort duties may also operate to regulate dealings with future creditors.

dissipated or exploited for the benefit of the directors themselves'.[112] This duty may be breached regardless of prejudice to the creditors: it is irrelevant whether the company remains solvent and the creditors are paid in full.[113]

Neither of these distinct strands of obligation introduces new developments in the law, but when rolled together by Lord Templeman to produce the rule that directors owe fiduciary duties to creditors, the potential for radical intervention is vast. Lord Templeman's statement was clearly *dicta*, and a traditional and narrow interpretation of it, keeping common law and equitable obligations separate, is sufficient to reach his conclusions. However, the necessity for such a narrow interpretation was not indicated by Lord Templeman himself, and cannot be inferred from supporting decisions as none were cited.[114] Given the possibilities thus left open, it is little wonder that subsequent cases have seized upon his words.

### 3.2  *The duty to creditors: incidents and ramifications*

The cases considering directors' duties to creditors all involve common characteristics: the companies were all proprietary companies owned and managed by director-shareholders; all were threatened with insolvency at the time of the impugned transaction; all the transactions involved placing company assets directly or indirectly into the hands of the controllers to the detriment of the unsecured creditors. These similar fact situations reduce the likelihood of extracting from the cases a comprehensive statement of the duty and its incidents. Nevertheless, some comments may usefully be made.

### 3.2.1  *To whom is the duty owed?*

In *Walker v. Wimborne*[115] Mason J. indicated that directors may need to consider the interests of existing creditors.[116] There was no suggestion, however, that this was a duty owed directly to the creditors; rather, it was a duty owed to the company allowing the company, or in this case the liquidator, to take action for breach.[117] The damages obtained were paid by the directors to the company and the judgments contain no suggestion that the creditors themselves could pursue the claim for their personal benefit. In this sense the case does not advocate a duty owed by directors to creditors.

The range of creditors who must be considered and the possible existence of a duty owed directly to them has only been taken further in two cases. In *Nicholson v. Permakraft (N.Z.) Ltd*[118] Cooke J. expanded the class to include likely

---

[112] [1987] 1 All E.R. 114, 118.
[113] *Boardman v. Phipps* [1967] 2 A.C. 46; *Regal (Hastings) Ltd v. Gulliver* [1942] 1 All E.R. 378.
[114] This makes it difficult to determine whether he was merely restating the capital maintenance doctrine as stated by Jessel M.R. in *In re Exchange Banking Company* (*Flitcroft's* case) (1882) 21 Ch.D. 519.
[115] (1976) 137 C.L.R. 1.
[116] *Ibid.* 7.
[117] The action was taken by the liquidator against the directors for breach of duty or breach of trust, under s. 542 of the Companies Code, the equivalent of the present Corporations Law s. 598.
[118] (1985) 3 A.C.L.C. 453.

continuing trade creditors,[119] apparently relying on an analogy with tortious negligence, but not future creditors.[120] *Jeffree v. N.C.S.C.*,[121] on the other hand, specifically included future creditors, or at least contingent creditors, within the ambit of the duty. These two cases also raised the possibility, in *dicta*, that the duty was owed directly to creditors.[122] If accepted, these extensions would create a vast potential liability for company directors.

### 3.2.2 *When does the duty arise?*

The duty is commonly perceived to arise when the company is insolvent or marginally insolvent. In fact, in *Walker v. Wimborne*,[123] although the company was insolvent at the time of the transaction, this appeared to be only one of a number of influential factors and not essential to the conclusions reached. To this extent the later cases requiring insolvency or marginal insolvency[124] have the effect of narrowing the duty as set out in *Walker v. Wimborne*[125] where no limits were imposed.[126] The high-water mark must, however, be the case of *Ring v. Sutton*,[127] where a duty to creditors was found even though the company was solvent.[128]

In the face of this breadth of application, the outcome in *Nicholson v. Permakraft (N.Z.) Ltd*[129] is comforting: there the directors were found not to have breached the duty, seemingly because, despite the adverse effects of their decision on the creditors, they had acted *bona fide* and for proper purposes.

### 3.2.3 *What is the rationale for the duty's existence?*

Where reasons were given for the existence of the duty, the one most favoured was that creditors may be seen as beneficially interested in the company, or at least contingently so, when the company is insolvent or marginally solvent.[130] This suggests that the directors' duty to creditors is dependent upon the creditors having a proprietary interest in the assets of the company, or being prospectively entitled to such a right in a 'practical sense'.[131] This requirement of a proprietary interest is a recurrent theme in equity jurisprudence.

---

[119] *Ibid.* 459.
[120] *Ibid.*
[121] (1989) 7 A.C.L.C. 556.
[122] (1985) 3 A.C.L.R. 453, 459 *per* Cooke J.; (1989) 7 A.C.L.C. 556, 560 *per* Wallace J., 566-7 *per* Brinsden J., 566 *per* Pidgeon J. concurring.
[123] (1976) 137 C.L.R. 1.
[124] *Nicholson v. Permakraft (N.Z.) Ltd* (1985) 3 A.C.L.C. 453; *Kinsela v. Russell Kinsela Pty Ltd* (1986) 4 N.S.W.L.R. 722; *Winkworth v. Edward Baron Development Co. Ltd* [1987] 1 All E.R. 114; *Jeffree v. N.C.S.C.* (1989) 7 A.C.L.C. 556.
[125] (1976) 137 C.L.R. 1.
[126] Hill, J., 'Recent Cases — *Kinsela v. Russell Kinsela Pty Ltd (in liq.)*' (1986) 60 *Australian Law Journal* 525, 526.
[127] (1980) 5 A.C.L.R. 546.
[128] *Ibid.* 547 *per* Hope J.A., citing Mason J. in *Walker v. Wimborne* (1976) 137 C.L.R. 1.
[129] (1985) 3 A.C.L.C. 453.
[130] *E.g. Kinsela v. Russell Kinsela Pty Ltd (in liq.)* (1986) 4 N.S.W.L.R. 722, 730 *per* Street C.J.; *Nicholson v. Permakraft (N.Z.) Ltd (in liq.)* (1985) 3 A.C.L.C. 453, 457-60 *per* Cooke J., who, at 459, also puts an alternative rationale based on an analogy with the tortious duty of care.
[131] *Kinsela v. Russell Kinsela Pty Ltd* (1986) 4 N.S.W.L.R. 722, 730 *per* Street C.J.

Such an analysis, while superficially attractive, is fundamentally flawed. It is true that on winding-up the creditors acquire the right, for the first time, to participate directly in the administration of the affairs of the company.[132] In addition, the liquidator, acting as the agent of the company, owes fiduciary duties to the creditors.[133] This special position of the creditors, however, does not entail the concurrent acquisition of a proprietary interest in the assets of the company;[134] moreover, it comes at a cost to the creditors: they are deprived of all their ordinary remedies against the company.[135] For these reasons it is impossible to draw the analogies suggested: they are wrong when winding-up has commenced; they are inappropriate beforehand, even in a situation of marginal insolvency.

### 3.2.4  *Can the shareholders modify the duty or excuse the breach?*

Where the question was considered,[136] no decision allowed the shareholders to ratify the directors' actions or excuse the directors from liability.

The discussion of Cooke J.[137] is typical:[138] he considered that not even the unanimous assent of the shareholders would justify the breach of duty by the directors because

> [t]he situation is really one where those conducting the affairs of the company owe a duty to creditors. Concurrence by the shareholders prevents any complaint by them, but compounds rather than excuses the breach as against the creditors.[139]

Although the duty is specified to be owed to the creditors, and only they can ratify, Cooke J.'s judgment indicates they cannot take action for breach of the duty; only the company, via the liquidator, can do this.[140] This is not easy to reconcile with accepted concepts of the links between duty and remedy for its breach. His further statement adds to the confusion: it suggests that ratification by the shareholders results in the solvent company being unable to sue the directors, while the insolvent company, via the liquidator, may do so. This is despite the fact that the liquidator, although representing the interests of the creditors, pursues those interests on behalf of the company, and has no title or interest greater than that of the company.

Similarly, the directors in the *Kinsela* case[141] argued that there could be no question of a breach of duty by them, since the impugned lease was granted with the full knowledge and unanimous approval of all the shareholders. Street C.J.'s response to this was to distinguish directors' breaches affecting the interests of

---

[132] See Corporations Law ss 479(1), 547 (Companies Code ss 379(1), 431).
[133] As well as the company and the shareholders (members or contributories): O'Donovan, J., *McPherson's Law of Company Liquidation* (3rd ed. 1987) 214.
[134] *Ibid.* 163-4.
[135] *Ibid.* 161; Corporations Law ss 468(4), 500 (Companies Code ss 368(3), 401).
[136] And in some cases it was surprising that the question was not considered: *e.g.* in *Jeffree v. N.C.S.C.* (1989) 7 A.C.L.C. 556, 563 the issue was not considered despite the suggestion that Jeffree's actions had the unanimous and informed approval of all the shareholders.
[137] *Nicholson v. Permakraft (N.Z.) Ltd (in liq.)* (1985) 3 A.C.L.C. 453.
[138] Similarly *Ring v. Sutton* (1980) 5 A.C.L.R. 546, 548.
[139] (1985) 3 A.C.L.C. 453, 460.
[140] *Ibid.*
[141] (1986) 4 N.S.W.L.R. 722.

shareholders from those affecting the interests of creditors. The former type, he agreed, could be authorized prospectively or ratified retrospectively; the latter, however, could not be affected by a shareholders' resolution.[142] This was because the creditors had a proprietary interest in the assets of the company, or were prospectively entitled to such a right in a 'practical sense'.[143] Since he also held that this interest only arises when the company is insolvent or marginally insolvent,[144] the consequence is that the shareholders can ratify a breach while the company is solvent but not otherwise. The practical difficulties in being certain of the effect of shareholder resolutions are obvious.

### 3.3 *The duty to creditors: comment*

The foregoing analysis indicates the pitfalls when the law departs from its fundamental precepts. Here the departure seems to have created a duty owed by directors to creditors[145] with no sound rationale for its existence other than that the plight of creditors seems unfair. The result is to circumscribe directors' and shareholders' actions while providing creditors with no enforcement mechanisms.

A preferable approach is to follow the fundamental precepts, if they provide adequate solutions, or to legislate for the desired ends. The former does not deny development of the law, and is recommended here as able to meet current demands for directors' accountability. It has the advantage, too, of regulating directors' conduct by a very general statement of principle, whereas the detailed prescriptions provided by most legislation often seem simply to signpost routes for avoidance.

In all the cases concerning directors' duties to creditors, recourse to traditional fiduciary duties or to restrictions on the exercise of limited powers for proper purposes would have sufficiently and effectively limited the powers of directors. The outcome on a particular set of facts would have been identical, and the rationale for the decision would have been more easily applied in the future to different circumstances. In addition, such an analysis would provide a better, more consistent explanation for the inability of the majority to ratify certain acts of the directors. This aspect is discussed in detail in considering the rights of shareholders to intervene.

### 4. *SHAREHOLDERS' INTERVENTION*

Shareholders may wish to either adopt or complain about conduct which breaches the duties owed by directors. A great deal of confusion surrounds both possibilities. The central questions are, first, who may take the decision, second, whether it binds minority shareholders and the company liquidator and, finally, whether creditors' rights are affected by shareholders' adoption of the directors' misconduct. In answering these questions it is useful to separate situations where

---

142 *Ibid.* 730, 732.
143 *Ibid.*
144 *Ibid.* 730.
145 Or owed by directors to the company requiring them to consider, and perhaps even act in, the interests of creditors.

the directors either exceed their powers, abuse their power by acting for improper purposes, or breach their fiduciary obligations.[146]

## 4.1 *Avenues for shareholders' complaints about directors' misconduct*

If the analysis of the general law proposed in this article is accepted, then individual shareholders have a personal right to complain where directors have acted for improper purposes; the shareholders may have the decision declared invalid and an injunction ordered to restrain its implementation.

On the other hand, individual shareholders do not have a personal right to complain where an action is in breach of the directors' fiduciary obligations. Those obligations are owed to the company and only the company can take action to remedy the wrong,[147] apart from the limited exceptions permitted to the rule in *Foss v. Harbottle*.[148] Even then, the remedy is for the company, not the individual shareholder. Where the breach of fiduciary obligation is a failure to act *bona fide* in the interests of the company, the remedies available include setting aside the transaction or, where this is not possible, recovering the loss thereby caused to the company;[149] where the breach involves the directors profiting from their position, the remedies include setting aside the transaction or recovering the profit made by the defaulting director by either an account of profits or the declaration that the benefit is held on constructive trust for the company.

The obvious distinction, then, between the two breaches is not merely the difference in standing to sue, but also the fact that breach of fiduciary obligations allows the company to obtain a money or property remedy, whereas failure to act for proper purposes can only result in the transaction being set aside where equity permits this. These differences have important implications for the analysis of shareholders' rights to ratify and adopt directors' misconduct.

In addition to these general law remedies, there are statutory avenues of complaint. Standing to sue and the remedies available differ from those discussed above, and are beyond the scope of this article.[150] One statutory remedy, however, warrants special mention: it is the remedy for oppression provided to shareholders by the Corporations Law s. 260.[151] The statutory definition of oppression is wider than common law 'fraud on the minority'; a finding of oppression depends on finding that the *effect* of a resolution is oppressive

---

[146] This article does not deal specifically with situations where the directors act in breach of their common law or statutory duties: a similar analysis is nevertheless appropriate, with modifications to take account of the different duties owed and the specific rights given by statute to different parties to intervene or to seek remedies. Such an analysis, particularly of the Corporations Law s. 232, is amply warranted, but is beyond the scope of this article.

[147] *Foss v. Harbottle* (1843) 2 Hare 461; 67 E.R. 189.

[148] *Ibid.*, exceptions listed in *Burland v. Earle* [1902] A.C. 83.

[149] Recovery is on the basis of equitable compensation: *Re Dawson* [1966] 2 N.S.W.R. 211.

[150] *E.g.* Corporations Law ss 232, 1324, 260, 598, 592 (Companies Code ss 229, 574, 320, 542, 556). Some of these provisions are specific to the company, the shareholders or the liquidator. Note, however, the exceedingly general terms used in the Corporations Law s. 1324 and the wide interpretation of the equivalent Companies Code provision (s. 574) given in *Broken Hill Proprietary Co. Ltd v. Bell Resources Ltd* (1984) 8 A.C.L.R. 609; in view of this, the failure to make use of this provision is surprising.

[151] Corresponding to the Companies Code s. 320.

or unfairly discriminatory or unfairly prejudicial to the shareholders or a group of them. The remedy for oppression is not automatic avoidance of the resolution, but the court in exercising its wide-ranging powers to grant relief has this avenue open to it.

Consequently, even though a decision is taken for proper purposes and in what the directors honestly believe are the best interests of the company, it may, when viewed objectively, be unfairly prejudicial to the members.[152] Similarly, even where the shareholders validly adopt directors' breaches, minority shareholders may have standing to seek a remedy for oppression. The possibility of an otherwise valid resolution being avoided by a court order if the *effect* of the resolution is oppressive qualifies all of the analysis which follows.

### 4.2 *Avenues for shareholders' adoption of directors' misconduct*[153]

### 4.2.1 *Restrictions on the validity of a decision of the general meeting*

Much of the following discussion turns on the ability of the general meeting to act for the company in deciding to ratify and adopt the conduct of defaulting directors. The primary problem is identification of the features essential to the validity of such a decision by the general meeting. The subsidiary problems are whether such a decision binds the company in the future, preventing it from changing its mind and suing the defaulting directors,[154] and whether it binds the minority shareholders.

A decision of the general meeting will bind the company if it is, first, within the power of the general meeting and, second, taken for proper purposes.

### *The power of the general meeting*

Where shareholders wish to ratify and adopt directors' misconduct, they will need to establish that they have the necessary power to do so: for example, this may require them to have power to waive a legal right, or affirm a voidable transaction, or re-exercise a particular power. The appropriate options are discussed in detail later.

The cases defining the powers of the general meeting are not consistent:[155] there is a conflict between the doctrine of the constitutional contract and the basic underlying assumption of the rule in *Foss v. Harbottle*.[156] Although this debate is far from over, it seems that, regardless of its outcome, the general meeting will often have powers sufficiently wide to ratify and adopt the conduct of defaulting directors. This is because, first, although the doctrine of the constitutional

---

[152] *Wayde v. New South Wales Rugby League Ltd* (1985) 61 A.L.R. 225, 234 *per* Brennan J.
[153] Note also Corporations Law s. 1318 (Companies Code s. 535), allowing the court to excuse the director either wholly or partly from liability to the company.
[154] Of principal concern is determining whether the decision binds the liquidator.
[155] *E.g. John Shaw & Sons (Salford) Ltd v. Shaw* [1935] 2 K.B. 113; *Kraus v. J. G. Lloyd Pty Ltd* [1965] V.R. 232; *Alexander Ward & Co. Ltd v. Samyang Navigation Co. Ltd* [1975] 1 W.L.R. 673; *cf. Marshall's Valve Gear Co. Ltd v. Manning, Wardle & Co. Ltd* [1909] 1 Ch. 267, *per* Neville J.
[156] Wedderburn, K. W., 'Shareholders' Rights and the Rule in *Foss v. Harbottle*' (1957) 15 *Cambridge Law Journal* 194, 201 and the cases cited therein. (The article continues at (1958) 16 *Cambridge Law Journal* 93.)

contract presumes that powers given to the board are exclusive to the board, this may leave the general meeting with residual powers not granted to the board because of the limitations requiring board powers to be exercised for a proper purpose and in a fiduciary manner; secondly, it may sometimes be possible to construe the company's articles as providing for the existence of concurrent, rather than exclusive, powers in the board and the general meeting.[157] These approaches give the general meeting wide powers to ratify and adopt the conduct of defaulting directors.

Once it is established that the general meeting has the necessary power, the validity of any decision depends upon whether the power was exercised for proper purposes.

*The purposes of the general meeting*

As with directors, shareholders may only exercise their powers for proper purposes. There seems to be no difference in principle between the requirements imposed on directors and those imposed on shareholders to act for proper purposes: *A.N.Z. Executors & Trustee Company Ltd v. Qintex Australia Ltd (Recs and Mgrs apptd).*[158] Thus the resolution of the general meeting will be voidable if, but for the participation[159] of shareholders with improper purposes, the resolution would not have been passed. The court will not enforce such an exercise of power;[160] in fact, on the analysis proposed here, the court would allow a wide class of people to complain and have the decision declared invalid.

A significant issue in this context is the extent to which the votes of defaulting directors may be used to support the adoption of their own breach of duty.[161] The position is unclear: predictions based on an analysis from first principles do not seem to be consistently supported by the cases. Where the evidence establishes on a balance of probabilities that certain shareholders have voted[162] for improper purposes and the outcome of the resolution depends upon such votes, it seems the resolution ought to be voidable, if not void. For example, where the general meeting vote concerns the issue of shares for the purpose of retaining control in the hands of the existing board, it seems the directors could not participate in such a resolution: *prima facie* they might be presumed to be motivated by their own personal benefit in defiance of the interests of the company. Similarly, where the general meeting resolves not to sue directors for a breach of duty, it seems the directors could not participate in the resolution: they might be presumed to be motivated by the desire to avoid personal liability at the expense of the company. Both these motivations would constitute improper purposes.

---

[157] *Doncon v. Doncon* (1990) 2 A.C.S.R. 385, dealing with the power to issue shares.
[158] (1990) 2 A.C.S.R. 676, 687 *per* McPherson J., with whom Lee and Mackenzie JJ. agreed.
[159] By analogy with directors' meetings, a resolution is considered taken by all those who *participated* in the decision-making process: *Advance Bank Australia Ltd v. F.A.I. Insurances Ltd* (1987) 9 N.S.W.L.R. 464, 488-9 *per* Kirby P., with whom Glass J.A. agreed; *Southern Resources Ltd v. Residues Treatment & Trading Co. Pty Ltd* (1991) 3 A.C.S.R. 207, 221.
[160] *A.N.Z. Executors & Trustee Company Ltd v. Qintex Australia Ltd (Recs and Mgrs apptd)* (1990) 2 A.C.S.R. 676, 687.
[161] Earlier cases indicate this is possible where there is no improper dealing with the company's property: *North-West Transportation Co. Ltd v. Beatty* (1887) 12 App.Cas. 589; *Burland v. Earle* [1902] A.C. 83.
[162] Or participated.

On the other hand, even if a resolution of the board to issue shares for the purpose of defeating a take-over were held invalid, it appears that the general meeting could resolve to issue shares for such a purpose,[163] and the directors could vote as shareholders on such a resolution,[164] although the holders of newly issued shares could not.[165] In this case, *prima facie*, the directors are not motivated by prospective personal benefits at the expense of the company, so their votes will not be classified as for improper purposes.[166] The new share-holders, however, would *prima facie* be expected to vote in favour of the issue for the purpose of benefiting themselves, by giving themselves a stake in the company, at the expense of other members of the company; therefore their votes should not be permitted to influence the outcome of the resolution of the general meeting.[167]

The above analysis is equally appropriate where the interests of creditors are concerned. Resolutions of both the board of directors and the general meeting will be voidable if they have been taken for the improper *purpose* of defeating the legitimate interests of the company's creditors. This consequence does not depend upon the actual *effect* of the decision on creditors, nor on any duty owed to the creditors, nor on the company's financial stability: this seems preferable to postulating an equitable duty owed by directors to consider the interests of creditors when the company is insolvent or marginally solvent.[168]

### The binding nature of a valid resolution

If the general meeting, having the power to make a particular decision, does so for proper purposes, then the decision is a decision of the company. The company may recant only where a natural person in the same circumstances could do so.[169] In all other cases the company is bound: this means that if the company subsequently becomes insolvent, the liquidator, having no greater rights than the company, is bound by the decision.[170] It also means that minority shareholders are bound by the decision, as a direct result of the rule in *Foss v. Harbottle*.[171] The only exception[172] to this is when the effect of the decision is oppressive, allowing individual shareholders to obtain a statutory remedy.

---

[163] *Bamford v. Bamford* [1968] 3 W.L.R. 317 *per* Plowman J.; *cf.* the same case on appeal where the Court of Appeal, in an unreserved judgment, affirmed the decision on the broad ground that any impropriety by directors in the exercise of their powers may be waived by ordinary resolution: [1970] Ch. 212. This difference in reasoning (re-exercise of power *cf.* waiver) is repeated in many subsequent cases: *e.g. Winthrop Investments Ltd v. Winns Ltd* [1975] 2 N.S.W.L.R. 666.

[164] *E.g.* Hogg *v. Cramphorn Ltd* [1967] Ch. 254.

[165] *Ibid.*

[166] Unless there is some other improper purpose.

[167] *E.g.* Hogg *v. Cramphorn Ltd* [1967] Ch. 254.

[168] This analysis also provides some protection for other outsiders, such as employees: it would be improper to act for the *purpose* of defeating their legitimate interests without needing to manufacture a fiduciary duty owed to them by the directors.

[169] *E.g.* a gratuitous promise is not binding at common law, although even here equity may intervene to prevent a party going back on its promise.

[170] *E.g. Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd* [1983] 1 Ch. 258, 288: the majority of the Court of Appeal held that once the actions of the directors had been approved by the company they became the acts of the company, even though they led to its insolvency, and the liquidator could not complain. See also Parkinson, J. E., 'Non-Commercial Transactions and the Interests of Creditors' (1984) 5 *The Company Lawyer* 55.

[171] (1843) 2 Hare 461; 67 E.R. 189.

[172] Unless the 'interests of justice' exception to the rule in *Foss v. Harbottle* is allowed.

4.2.2 *Adoption where the directors have exceeded their powers*

Where directors exceed their powers in a transaction with a third party, the company may nevertheless be bound to that person under the doctrine of ostensible authority or under the Corporations Law s. 164. Problems arise where the shareholders wish the directors' conduct to bind the company, but the third party cannot or does not wish to rely on the doctrine of ostensible authority. In these circumstances the analogy with ratification in the law of agency is appropriate. Directors have acted without authority; the company, by the general meeting, may ratify the act of the directors to make it an act of the company.[173] The possibility of ratification depends upon, first, the general meeting having the power to commit the company to the transaction in question, and, second, the general meeting exercising that power for proper purposes.[174]

4.2.3 *Adoption where the directors have acted for improper purposes*

Where the directors have acted for improper purposes, the analysis in this article suggests that the transaction is voidable at the instance of a large number of possible complainants.[175] Alternatively, those complainants may affirm the transaction. A general meeting vote to affirm the action on behalf of the company cannot defeat the personal right of another to elect to either affirm or avoid the transaction.

In addition, a general meeting vote to 'ratify' the directors' conduct, in the sense of merely acquiescing in the same improper purposes, would be automatically invalid: the powers of the general meeting are not given for the purpose of condoning a fraud on the power by other organs of the company. In *Residues Treatment & Trading Co. Ltd v. Southern Resources Ltd*[176] the Court considered there was a substantial argument that the exercise of voting power by the general meeting to ratify an improper allotment of shares would be beyond the scope of the purpose for which that power exists.[177] Although explicitly restricted to share issues, the principle may be of wider significance: there seems no reason why one particular improper purpose should be singled out.

The reasoning would help rationalize the cases dealing with duties to creditors, where it has been expressly held that the directors' breach could not be ratified by the general meeting.[178] On this basis, the inability of the general meeting to ratify the directors' breach arises because any attempt to do so is automatically a fraud on the power. This was not the reasoning given by the court in any of these cases,

---

[173] *Grant v. United Kingdom Switchback Railways Co.* (1888) 40 Ch.D. 135.

[174] Where the general meeting does not have residual power, the shareholders may change the articles to give themselves this power. Alternatively, it has been suggested that a unanimous vote of the shareholders would constitute a valid ratification, because all persons who have standing to complain would have acquiesced: *Grant v. John Grant & Sons Pty Ltd* (1950) 82 C.L.R. 1 *per* Fullagar J.; *Re Australian Koyo Ltd* (1984) 8 A.C.L.R. 928.

[175] Usual equitable considerations will operate to determine the court's response to a request to avoid the decision: the decision will not be set aside if this would affect the rights of *bona fide* purchasers for value of legal interests or if restitution is not possible.

[176] (1988) 6 A.C.L.C. 1160.

[177] *Ibid.* 1165 *per* King C.J. and Matheson J.

[178] E.g. *Nicholson v. Permakraft (N.Z.) Ltd (in liq.)* (1985) 3 A.C.L.C. 453, 460; *Kinsela v. Russell Kinsela Pty Ltd* (1986) 4 N.S.W.L.R. 722, 730, 732.

but seems preferable to postulating an equitable duty owed to creditors by the directors.[179]

Strictly speaking, these decisions can only be 'ratified' by a new and proper exercise of power by the company, either through the board of directors or the general meeting. This requires the board of directors to re-make the decision, this time for proper purposes.[180] If improper purposes have been proved once, however, it may be difficult to negate their presence in any subsequent decision. Alternatively, it requires the general meeting to make the decision. The validity of this possibility depends upon, first, whether the general meeting has the power to make the decision and, second, whether the vote was taken for proper purposes.

### 4.2.4 *Adoption where the directors have breached their fiduciary duties to the company*

These actions involve situations where the directors have failed to act *bona fide* in the interests of the company or where their actions show lack of good faith. Analysis of the effect of any decision taken by the general meeting is simplified if different options are considered independently. The general meeting might adopt the directors' conduct by giving prior authorization to the directors, or by deciding not to avoid a voidable transaction, or by deciding not to sue the defaulting directors for the company's loss or for the profit made by the directors.

### *Prior Authorization*

Since the directors' fiduciary duty is owed to the company, it is open to the company to modify that duty: if the directors make full disclosure and obtain the consent of the company their actions will not be in breach. Prior authorization will be ineffective if the directors do not make adequate disclosure or if the general meeting's consent is invalid, either because it lacks the power to give the consent or because it gives it for improper purposes.

If authorization is properly given, it binds the company since the company has acquiesced in what would otherwise have been a breach of duty by the directors. The authorization also binds both the minority shareholders and the liquidator: the former are bound because the decision is an effective decision of the company not involving any personal rights of minority shareholders;[181] the latter is bound because the liquidator stands in the shoes of the company and has no greater rights than the company.

---

[179] Especially one where the creditors can ratify a breach but cannot sue for a remedy *e.g. Ring v. Sutton* (1980) 5 A.C.L.R. 546, 548.
[180] *Whitehouse v. Carlton Hotel Pty Ltd* (1987) 162 C.L.R. 285, 295 *per* Mason, Deane and Dawson JJ.
[181] Subject to the possibility of discretionary statutory remedies for oppression.

*Subsequent agreement not to avoid a voidable transaction*

If the impugned transaction is voidable by the company, then the company has the right to elect whether to avoid or adopt the transaction. Once an election is made it binds the company without the necessity for consideration.

The shareholders in general meeting can effectively elect to adopt the transaction if they have the power to do so and if they exercise their power for a proper purpose. If these conditions are satisfied then both minority shareholders and the liquidator are bound by the decision.[182]

*Subsequent agreement not to sue the directors*

This option raises two problems which are not common to the other options open to the general meeting. The first is whether the company is bound by a gratuitous decision to waive its rights to sue the directors for breach of fiduciary duty. The second is whether a decision to do this will always be considered as taken for improper purposes because a gift is being made of company assets.

First, arguably the waiver binds the company. This view is reached by drawing analogies with waiver of equitable and common law rights. The company wishes to waive its equitable rights:[183] an analogy can be drawn with the position of trustees, where there has never been any requirement for consideration where a beneficiary waives rights against the trustee.[184] Further, even where legal rights are waived and the common law requires accord and satisfaction to make the waiver binding,[185] it is now true that equity will generally intervene using the doctrine of promissory estoppel to prevent enforcement of the legal obligations in defiance of the waiver.[186]

The second problem is more difficult. A decision not to sue the directors is effectively a decision to make a gift of the property which would otherwise have been recovered by the company. Whether such a decision is automatically presumed to be for improper purposes has been the subject of much debate. One view is that corporate gifts amount to the expropriation of the company's property and are therefore a 'fraud on the minority'; as such, they may only be made with the unanimous approval of the shareholders.[187] This, it is suggested, is not always the case: a corporate gift may be made for proper purposes by either

---

[182] For the reasons noted earlier.
[183] To sue for breach of a purely equitable obligation.
[184] Meagher, R. P., Gummow, W. M. C. and Lehane, J. R. F., *Equity: Doctrines and Remedies* (2nd ed. 1984) 753-4, and the cases cited therein, suggesting that gratuitous release of accrued equitable rights generally is permitted *cf.* Partridge, R. J. C., 'Ratification and the Release of Directors from Personal Liability' (1987) 46 *Cambridge Law Journal* 122, 127. If Partridge is correct, then the waiver does not bind the company: the company is entitled to change its mind and sue the defaulting directors. Such a decision would most frequently be taken by the liquidator. Even on this analysis, however, the minority shareholders remain bound by the valid (although not binding) decision of the company. This would be the position if common law rights were gratuitously waived and the doctrine of promissory estoppel did not apply.
[185] *E.g. Foakes v. Beer* (1884) 9 App.Cas. 605.
[186] *E.g. Waltons Stores (Interstate) Pty Ltd v. Maher* (1988) 164 C.L.R. 387; *Commonwealth v. Verwayen* (1990) 64 A.L.J.R. 540.
[187] Calnan, R. J., 'Corporate Gifts and Creditors' Rights' (1990) 11 *The Company Lawyer* 91, 93, citing *Parke v. Daily News Ltd* [1962] 1 Ch. 927.

the directors or the general meeting even when the gift is to an associated person, and even when the company is in financial difficulties.[188]

Situations may arise where a decision not to sue the directors can be seen to be for proper purposes: perhaps where the breach is minor or technical and the damage to the company as a likely consequence of legal action would outweigh the remedy obtained; alternatively, where legal action would leave the company without the benefit of experienced management.

On the other hand, and perhaps more frequently, a decision not to sue will clearly evidence improper purposes. For example, the decision will not be for proper purposes where the perpetrators of the breach exercise their own votes to influence the outcome of the resolution of the general meeting. To do so would be tantamount to the shareholders voting to make a present to themselves of company property, and will not be regarded as for proper purposes: *Cook v. Deeks*[189] is an example of this.

If the decision not to sue the directors is taken by the general meeting for proper purposes, then it binds both the minority shareholders and the liquidator.[190] If, however, the decision is not for proper purposes, then a large class of complainants, including the company, minority shareholders and company creditors, have standing to seek a declaration that the resolution of the general meeting is invalid. This would leave the directors open to being sued for their breach of duty.

## 4.3 *Comments on shareholders' intervention*

Although this proposed analysis of the role of shareholder intervention is not clearly reflected in the cases, equally the cases do not unequivocally support any alternative analysis. An example of the confusion surrounding the role of the general meeting is readily provided by the judgments in *Winthrop Investments Ltd v. Winns Ltd*:[191] Glass J.A. thought that the general meeting could relax the duty owed by directors;[192] Samuels J.A. thought the company could waive rights to sue which would otherwise vest in the company;[193] and Mahoney J.A. thought the general meeting could affirm or avoid a voidable allotment.[194]

This analysis puts the view that shareholder intervention is not dictated by the financial fortunes of the company at the time of the directors' breach.[195] If applied to the cases dealing with directors' duties to creditors, the same results would be reached, although arguably on a more rational basis. For example, in *Kinsela v. Russell Kinsela Pty Ltd*[196] the company leased its premises to its shareholders at an undervalue at a time when it was insolvent. The Court held that the transaction was in breach of duty to the creditors and that any consent by

---

[188] *E.g. Re Horsley & Weight Ltd* [1982] Ch. 442.
[189] [1916] 1 A.C. 554, 564 *per* Lord Buckmaster.
[190] For reasons already noted.
[191] [1975] 2 N.S.W.L.R. 666.
[192] *Ibid.* 674.
[193] *Ibid.* 684.
[194] *Ibid.* 697ff.
[195] *Cf.* Calnan, *op. cit.* n. 187.
[196] (1986) 4 N.S.W.L.R. 722.

the shareholders was ineffective to waive such a breach of duty. Street C.J. would only allow shareholders to ratify a breach which exclusively affected their interests.[197]

The analysis proposed here would find the ratification ineffective because the shareholders, having power to make the disposition or ratify the breach by the directors, can only do so for proper purposes. Where the shareholders are the recipients of the 'gift' from the company, their purposes are likely to be the acquisition of a personal benefit at the expense of the company. This is undoubtedly an improper purpose. There is no need to rely on directors' breach of a special duty to creditors, or even a duty to the company to consider the interests of creditors.

Such a conclusion does not follow simply because the shareholders are the recipients of the property. It is also appropriate where the sale is at full value to an associated company, or even to an independent third party, when the *purpose* of the transaction is improper: this would explain the result in *Jeffree v. N.C.S.C.*,[198] where the transaction was entered into to defeat or avoid the company's legal obligations to a contingent creditor, and seemingly both the board of directors and the consenting shareholders acted for this improper purpose.

In fact, many of the cases which have been said to stand for the proposition that directors are required to consider the interests of creditors[199] may be better viewed as indicating that action cannot be taken by either organ of the company for the improper purpose of defeating the interests of creditors. This limits not only the decisions taken by directors, but also any subsequent intervention by the shareholders.

## 5. *CONCLUSION*

The reasons directors owe fiduciary duties to companies are clear: while in office, directors have power to affect the rights and interests of companies, and their exercise of that power is not subject to interference from or control by the company. The same does not apply to directors in their relationship with creditors: no analysis of the director-creditor relationship provides any sound reasons for imposing fiduciary duties on directors to act in the interests of creditors. Where such a duty to creditors has been proposed, no means of effectively dealing with the problems of standing to sue and ratification have been suggested.

Creditors' interests are in fact already adequately protected by existing equitable and common law principles and statutory provisions. Equitable princi-ples, in particular, provide valuable regulation of company decision-making. On

---

[197] *Ibid.* 732.

[198] (1989) 15 A.C.L.R. 217.

[199] *E.g. Lonrho Ltd v. Shell Petroleum Co. Ltd* [1980] 1 W.L.R. 627, 634 *per* Lord Diplock; *Re Horsley & Weight Ltd* [1982] Ch. 442, 455 *per* Cumming-Bruce and Templeman L.JJ.; *Rolled Steel Products (Holdings) Ltd v. British Steel Corporation* [1986] Ch. 246, 296 *per* Slade L.J.; *Winkworth v. Edward Baron Development Co. Ltd* [1987] 1 All E.R. 114, 118 *per* Lord Templeman; *West Mercia Safety Wear v. Dodd* [1988] B.C.L.C. 250.

the analysis proposed in this article, equitable principles impose two distinct obligations:[200] the first is a fiduciary obligation, requiring actions to be taken *bona fide* in the interests of the company, and requiring the exercise of good faith; the second is an equitable obligation, requiring discretionary powers to be exercised for proper purposes. Both these equitable obligations restrict the exercise of power by directors, while only the latter restricts the shareholders in general meeting.

If these two equitable obligations are treated as conceptually distinct, then shareholders and outsiders, including company creditors, are seen to have greater rights than was previously thought. This follows from an analysis of the obligation requiring powers to be exercised for proper purposes. The powers exercised by the board of directors and the general meeting are limited powers granted by Parliament and the company's members. These powers may be used only for the purposes permitted in the grant of power.

Recognizing Parliament as one source of the powers exercised by the board of directors and the general meeting imposes limitations which would not otherwise exist: the powers may only be used for the purposes contemplated by Parliament; they may not be used for purposes contrary to the public interest. In particular, neither the board of directors nor the general meeting may exercise their powers for the purpose of defeating the legitimate interests of creditors. A corollary of this greater restriction on the exercise of powers is that a correspondingly wider class may complain when the equitable obligation is breached: the class includes all those within the contemplation of Parliament as likely to be affected by an improper exercise of the power. This includes creditors: they have a personal right to have the impugned decision declared invalid and the transaction avoided.

Using this analysis, the interests of creditors are protected without the need to strain the concept of directors' fiduciary obligations to encompass interests outside the company. There is also no need to argue for additional or expanded exceptions to the rule in *Foss v. Harbottle*:[201] where fiduciary obligations are breached, the company *is* the only proper plaintiff, and any money remedy obtained is properly the company's. Where powers are exercised for improper purposes, however, a wide class of complainants may seek a remedy.

In addition, a duty to creditors is not necessary to raise commercial morality and impose minimum standards of conduct on directors.[202] The traditional concepts of fiduciary obligations and the requirement that donees of limited powers exercise those powers for a proper purpose are more than adequate.

This proposed analysis also helps clarify the role of shareholders in adopting and ratifying directors' misconduct. Shareholders, as well as directors, are constrained by the requirement that they exercise their powers for proper purposes: they thus have only limited possibilities for adopting directors' breaches of duty. Where directors have acted for improper purposes, the

---

[200] *Cf.* Sealy, L. S., 'Directors' "Wider" Responsibilities — Problems Conceptual, Practical and Procedural' (1987) 13 *Monash University Law Review* 164, 166-7.
[201] (1843) 2 Hare 461; 67 E.R. 189.
[202] *Cf.* Dawson, F., 'Acting in the Best Interests of the Company — For Whom are Directors "Trustees"?' (1984) 11 *New Zealand Universities Law Review* 68, 71.

shareholders cannot simply acquiesce in those purposes: that would be equally improper. If they wish to avoid the possibility of the directors' conduct being declared invalid, they must validly re-exercise the power themselves. This is not always possible, either because the general meeting does not have the necessary power or because their exercise is also improper.

On the other hand, where the directors' misconduct is a breach of fiduciary obligations, the general meeting may resolve to give prior authorization to the directors, or elect to affirm a voidable transaction or determine not to sue the defaulting directors to recover a money remedy for the company. Whatever the choice, the resolution must be within the power of the general meeting and the power must be exercised for proper purposes. Beyond that, the binding nature of the resolution depends upon considerations which differ for each option open to the shareholders. It is therefore not satisfactory simply to resolve to 'ratify' directors' misconduct.

Although attention has focused on the interests of company creditors, the analysis proposed in this article is equally applicable to directors' decisions affecting the interests of other parties, be they insiders, such as shareholders or debenture holders, or outsiders, such as employees or consumers. At least in relation to creditors, no change in the law is warranted. Creditors already have adequate protection and directors and shareholders have effective interrelating roles. What is required is perhaps more vigorous enforcement of the existing rules with a better appreciation of what those rules are.