# EXHIBIT 25 PART 1

Neutral Citation Number: [2012] EWHC 2343 (Ch)

Case No: 8690 of 2011

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

Royal Courts of Justice
The Rolls Building
7 Rolls Building
Fetter Lane
London EC4A 1NL

Date: 10 August 2012

Before :

**THE HONOURABLE MR JUSTICE DAVID RICHARDS**

**IN THE MATTER OF COROIN LIMITED**
**AND IN THE MATTER OF THE COMPANIES ACT 2006**

-
Between :

**PATRICK McKILLEN**                                                           **Petitioner**
**- and -**
**(1) MISLAND (CYPRUS) INVESTMENTS LIMITED**
**(A company registered in Cyprus)**
**(2) DEREK QUINLAN**
**(3) ELLERMAN CORPORATION LIMITED**
**(a company registered in Jersey)**
**(4) B OVERSEAS LIMITED**
**(a company registered in the British Virgin Islands)**
**(5) RICHARD FABER**
**(6) MICHAEL SEAL**
**(7) RIGEL MOWATT**
**(8) COROIN LIMITED**                                                          **Respondents**

AND

IN THE HIGH COURT OF JUSTICE          **Claim No. HC 11 C03437**
CHANCERY DIVISION

**BETWEEN**

PATRICK GERARD MCKILLEN      <u>Claimant</u>
- and -
**(1) SIR DAVID ROWAT BARCLAY**
**(2) SIR FREDERICK HUGH BARCLAY**
**(3) MISLAND (CYPRUS) INVESTMENTS LIMITED**
**(4) ELLERMAN CORPORATION LIMITED**
**(5) B OVERSEAS LIMITED**
**(6) MAYBOURNE FINANCE LIMITED**
**(7) THE TRUSTEES OF THE SIR DAVID AND SIR**
**FREDERICK BARCLAY FAMILY SETTLEMENTS**
**(8) RICHARD FABER**
**(9) MICHAEL SEAL**
**(10) RIGEL MOWATT**
**(11) NATIONAL ASSET LOAN MANAGEMENT LIMITED**    <u>Defendants</u>

- - - - - - - - - - - - - - - - - - - -

**MR PHILIP MARSHALL QC, MR RICHARD HILL QC, MR GREGORY DENTON-COX**
and **MS RUTH DEN BESTEN** (instructed by **Herbert Smith LLP**) appeared for the
**Petitioner/Claimant**.

**MR KENNETH MACLEAN QC, MR EDMUND NOURSE, MR SA'AD HOSSAIN** and
**MISS EMMA JONES** (instructed by **Weil, Gotshal & Manges**) appeared for **Misland
(Cyprus) Investments Limited, Ellerman Corporation Limited,  B. Overseas Limited
and Maybourne Finance Limited**.

**MR STEPHEN AULD QC, MR MICHAEL FEALY** and **MR MICHAEL d'ARCY** (instructed
by **Quinn Emanuel Urquhart & Sullivan LLP**)
appeared for **Derek Quinlan**.

**MR JOE SMOUHA QC** and **MR EDWARD DAVIES** (instructed by **Ashurst LLP**)
appeared for **Richard Faber, Michael Seal and Rigel Mowatt**.

**LORD GRABINER QC** and **MR. EDMUND NOURSE** (instructed by **Weil, Gotshal &
Manges**) appeared for **Sir David Barclay and Sir Frederick Barclay**.

**MR ROBIN DICKER QC and MR WILLIAM WILLSON** (instructed by  **Hogan Lovells
International LLP**) appeared for **National Asset Loan Management Limited**.

**MR NIGEL DOUGHERTY** (instructed by **DLA Piper UK LLP**) appeared for **Coroin Limited**

Hearing dates: 19-23, 26-30 March, 2-4, 18,20, 23-27,30 April and 1,10,11,14,21-25 and 29 May 2012

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................................

THE HONOURABLE MR JUSTICE DAVID RICHARDS

**Mr Justice David Richards :**

**Introduction**

1.    At the heart of this case lies a battle for control of three of London's leading hotels – Claridge's, The Connaught and The Berkeley.

2.    The contenders for control are Patrick McKillen and Sir David and Sir Frederick Barclay.  Mr McKillen is the last man standing of a consortium of investors who purchased the hotels in 2004.  He has a 36.2 % shareholding in Coroin Limited (the company) which heads the group of companies owning the hotels.  The Barclay brothers have extensive and diversified business interests, including hotels and in particular the Ritz Hotel in London.  In January 2011, a company controlled by them acquired indirectly a 24.78% interest in the company, which has since increased to 28.36%.

3.    The remaining shares are owned by Derek Quinlan, also a member of the original consortium but now in severe financial difficulties. His shares are fully charged to secure debts now held by companies controlled by the Barclay brothers.

4.    The Barclay brothers have made no secret of their aim to obtain control of the company.  There is nothing wrong in this aim, provided that unlawful means or means which are unfairly prejudicial to the interests of other shareholders are not used to achieve it.

5.    Mr McKillen alleges that the Barclay brothers or companies controlled by them have used unlawful or unfairly prejudicial means, comprising principally breaches of contract by shareholders and breaches of duty by directors of the company appointed by them.

6.    These allegations form the basis of two sets of proceedings brought by Mr McKillen, which are the subject of this judgment.  The first is a petition under section 994 of the Companies Act 2006, alleging that the affairs of the company have been conducted in a manner unfairly prejudicial to Mr McKillen's interests as a member of the company.  The principal remedy which he seeks is an order that the shares held by companies associated with the Barclay brothers be sold to him.  This would give him control of the company.  The second is a claim for damages in tort for conspiracy to cause him loss by the same unlawful means as are alleged in the petition and for inducing breaches of contract.

7.    The allegations made by Mr McKillen fall into two broad categories, although they are all said to form part of a scheme to obtain control of the company.  First, he alleges that there have been breaches of pre-emption provisions contained in a shareholder agreement and the articles of association of the company.  Shares or interests in shares have been sold or disposed of to the Barclay brothers or their interests without first being offered to the other shareholders.  This allegation relates principally to arrangements and agreements made by the Barclay interests with Derek Quinlan.  It was initially also part of Mr McKillen's case that the purchase by the Barclay interests of the company holding the 24.78 % interest triggered the pre-emption provisions.  However, this claim, which turned on the proper meaning of the pre-emption provisions, was decided against Mr McKillen as a preliminary issue, the Court of Appeal at [2012] EWCA Civ 179 affirming my decision at first instance at [2011] EWHC 3466 (Ch).  Mr McKillen has amended his petition to plead an alternative case that an express contractual duty of good faith in the

shareholders agreement nonetheless required the shares in question to be offered to the other shareholders.

8.  There is a further element to Mr McKillen's case on the pre-emption provisions. He says that charges given by Mr Quinlan on his shares to secure personal borrowings have become enforceable, thus triggering a power vested in the directors to require them to be offered for sale to the other shareholders, but the directors have failed to exercise the power.

9.  The second broad category of allegations comprises allegations of breach of duty against the directors appointed by the Barclay interests. There are a number of such alleged breaches, all said to be motivated by a desire to advance the interests of the Barclay brothers and their associated companies rather than the company itself. In particular, they relate to the company's dealings with the National Asset Management Agency ("NAMA"), an Irish state-owned entity to which I refer below.

10. Mr McKillen had also raised a case that the assignment in September 2011 of the company's bank debts by NAMA to a company owned by the Barclay brothers was invalidated by breaches of the relevant facilities agreement, specifically an obligation of prior notice to and consultation with the company and a restriction on permitted assignees. NAMA was joined as a respondent to the petition and submitted to the jurisdiction of this court for the purpose of determining these allegations. It denied any breach of the relevant provisions but in any event it asserted that those provisions did not apply to an assignment of the debts by NAMA. This too was tried as a preliminary issue. The Court of Appeal at [2012] EWCA Civ 864, reversing my decision at [2012] EWHC 129 (Ch), held in NAMA's favour. The Court of Appeal refused permission to appeal but Mr McKillen has applied to the Supreme Court for permission. The position is therefore that Mr McKillen cannot rely on his case that the assignment of the debts to NAMA involved a breach of the facilities agreement, unless the Supreme Court gives permission to appeal and allows his appeal.

11. The principal issues which therefore arise may be summarised under these headings:

    i)   Were the pre-emption provisions triggered by the agreements made between Mr Quinlan and the Barclay brothers and their interests?

    ii)  Allied to issue (i), did Mr Quinlan and Sir David Barclay make on 15 January 2011 the oral agreement alleged by Mr McKillen?

    iii) Were the pre-emption provisions triggered by charges over Mr Quinlan's shares becoming enforceable?

    iv)  If shares had been offered to Mr McKillen under the pre-emption provisions, would he have been able to finance their purchase?

    v)   Did the directors of the company appointed by the Barclay interests commit the breaches of duty alleged against them?

vi)   Was Sir David Barclay a shadow director of the company?

vii)  Has Mr McKillen established a case of unfairly prejudicial conduct under section 994 of the Companies Act 2006?

viii) The tort claim.

12.   The structure which I have adopted for this judgment is first to set out the background and some general points. The facts are complex and often crowded into relatively short periods. I do not think there is any alternative to a chronological account of the facts.  While it is long and detailed, a large volume of the more peripheral facts are omitted. The picture was a good deal more hectic for the main participants than appears from the chronology, because there were dealings with many other parties which in the end got nowhere and did not contribute to the story relevant to this case.

13.   In the chronological section I make findings on many of the disputes of fact, but I deal with the principal factual issues in the sections which follow.  Those sections, which are addressed to the main issues set out above, deal also with relevant legal principles.

14.   For convenience, the following is a summary table of contents.

| Content | Paragraphs |
| --- | --- |
| Introduction | 1-14 |
| Background | 15-22 |
| Financial position of the company | 23-27 |
| Main Parties | 28-46 |
| Other Participants | 47-50 |
| Proceedings | 51-58 |
| Unpleaded issues | 59-61 |
| Outline chronology | 62-70 |
| Shareholders agreement | 71-81 |

| | |
|---|---|
| The facts: chronological account | 82-257 |
| Should adverse inference be drawn from the absence of witnesses | 258-275 |
| Pre-emption | 276-298 |
| Alleged 15 January agreement | 299-397 |
| Mr McKillen's ability to finance the purchase of shares | 398-440 |
| National Asset Management Authority | 441-486 |
| Alleged breaches of duty by directors | 487-591 |
| Was Sir David Barclay a shadow director | 592-602 |
| Contractual obligations of good faith | 603-623 |
| Unfair prejudice: the law | 624-633 |
| Conclusions on Mr McKillen's case on unfair prejudice | 634-653 |
| Tort claim | 654-655 |
| Conclusion | 656-657 |

**Background**

15.    In order to give some context to the detail which follows there are some broad points to mention at this stage.  The consortium which was formed in 2004 to acquire the hotels comprised five Irish investors or groups of investors, of whom the principal three were property developers and investors.  Both the investors and the company were financed by Irish banks.  Although the hotels themselves have remained profitable, the international financial crisis which began in 2008, and specifically the Irish banking crisis, led to serious problems both for the company and for at least some of the investors.

16.    The position by 2010 was that the company was over-indebted to the extent of some £150-200 million. Its bank facilities totalling some £650 million had been transferred to NAMA and they were due to mature on 31 December 2010.  While

the company could support commercial bank facilities of up to about £450 million, it could not raise the full amount of £660 million in that way. The principal shareholders in 2010 were unable to provide capital to bridge the gap. Their attempts to agree terms with outside investors failed.

17.   Mr Quinlan was and remains in severe financial difficulties.  From 2009 and throughout 2010 he was very active in trying to find buyers for his shares. Following the collapse of negotiations for new investment at the end of 2010, the third major investor, the Green family, also decided to sell their stake.  Only Mr McKillen wished to retain an interest, although he was prepared to contemplate a reduction to 25% or even 20% on terms acceptable to him.

18.   The problem remained that the bank facilities, now with NAMA, fell due for payment at the end of 2010.  In December 2010, NAMA agreed in principle to an extension of two years to the facilities so as to give the shareholders time to find a long term solution.  Nonetheless, NAMA's statutory purpose and express policy required it to recover the value of the loan by repayment or sale as soon as practicable.

19.   In January 2011 the Green family sold Misland (Cyprus) Investments Limited (Misland) to a company controlled by the Barclay brothers.  Misland owned the Green family's 24.78% stake in the company. This changed the landscape.  There was now a shareholder owned by a group which not only wanted to obtain control of the company but had the means to do so.  Unlike the other shareholders, it could raise the funds required to repay the NAMA debt and to acquire the remaining shares.

20.   Mr McKillen had opened discussions in January 2011 with Al Mirqab Holding LLC (Al Mirqab), an investment company owned and controlled by the Prime Minister of Qatar, Sheikh Hamad bin Khalifa Al Thani (Sheikh Hamad), and his son Sheikh Jassim bin Hamad Al Thani (Sheikh Jassim).  In February 2011 an agreement was reached between Mr McKillen, the Barclay interests and Al Mirqab for the company to be owned in the proportions 41:41:18, with Mr McKillen holding the 18 % interest, and on the basis that the Barclay interests and Al Mirqab would raise the finance required to re-pay the debt to NAMA.  Although it was expressed to be a legally binding agreement, Mr McKillen thought better of it and it did not proceed. This failed agreement had, as I find, a profound effect on NAMA's attitude to the company.  It demonstrated that with shareholder agreement NAMA could be re-paid the full amount due to it within a short timescale.

21.   Despite attempts to do so, Mr McKillen and the Barclay interests were unable to reach agreement.  The problem of re-financing the NAMA debt remained.  The Barclay interests were willing to provide the finance necessary to re-pay the NAMA debt, but would do so only if they had control of the company.  This was particularly so given that raising the initial finance would require the personal guarantees of the Barclay brothers for very substantial sums.  Mr McKillen was not prepared to agree to the Barclay brothers or their interests having control of the company, nor would he agree to a rights issue to raise capital to bridge the company's funding gap.  He clung to the hope that NAMA could be persuaded to revive its agreement in principle of some months earlier to extend its debt by up to

two years.  As I find when I come to consider the detail of this, I am satisfied that there was no possibility of NAMA agreeing to this.

22.    Towards the end of September 2011 NAMA sold its debt at par with accrued interest to a company owned by the Barclay brothers.  The Barclay brothers took this step both to advance their aim of obtaining control of the company and to avoid the debt being sold by NAMA to other possible competitors for control.  In particular, serious interest was being shown by Malaysian and Abu Dhabi investors who had purchased debts secured on some of the shares in the company.  The debt fell due for payment on 30 September 2011 and, following its acquisition, the Barclay interests proposed a rights issue to fund repayment of part of the debt.  Mr McKillen objected to the proposal for a rights issue and to its terms and these proceedings were commenced shortly thereafter.  No rights issue has proceeded and the debt acquired from NAMA remains outstanding.

**The financial position of the company**

23.    The financial position of the company in 2010-2011 is of central importance. The underlying hotel businesses are successful and profitable. The enterprise value of the businesses and assets in that period (excluding the company's own borrowings) has been variously put at £900 million – £1 billion.

24.    The problem is that the company has substantial loan liabilities of some £660 million, incurred to purchase the hotels, refurbish The Connaught and purchase properties adjacent to Claridge's and The Berkeley. All the evidence in the case, and there is a good deal of it, shows that the indebtedness is too high in relation to the businesses. The evidence consistently suggests that the debt should be reduced to no more than £450-500 million.

25.    Both the company and the Barclay interests have been able to negotiate bank facilities at about that level, but no more, except in the case of the Barclay interests with the benefit of personal guarantees by Sir David and Sir Fredrick Barclay for £200 million or more. The proposals negotiated by the company in 2010 envisaged new capital of £200 million, with new bank facilities of about £450 million.

26.    The consistent view of outsiders is that the company needs to reduce its bank debt to a level of £500 million or less. NAMA's view in January 2011 was that the appropriate level was £400-450 million, having regard to cash flow. Goldman Sachs in September 2011 considered that the company could support up to about £495 million of senior term loan, assuming a return to 'normalised' market conditions. The view of Alvarez & Marsal, following their appointment as the company's independent financial advisers in October 2011, was that a capital injection of £150 - 200 million was required.

27.    The need for the company to fill this gap in its financing, as NAMA put increasing pressure on the company, is the single most significant factor in this case.

**Main parties**

28.    For the purposes of this case, there are four parties whose actions and aims are central to the events and to the issues: the Barclay brothers, Mr McKillen, Mr Quinlan and NAMA. It is convenient to say something about each at this stage.

*The Barclay brothers and their business organisation*

29.    The clear and open aim of the Barclay brothers is to secure control of the company. Mr Quinlan spoke admiringly of their skills as deal-makers. In the case of the company, they have moved quickly and decisively as opportunities have arisen. Their case is that they act within the law, certainly within what they understand from the advice they take to be the law.  Within that constraint, they act with determination to achieve their aim.

30.    As owners of the Ritz Hotel, they have naturally taken a keen interest in the company's hotels for a number of years and have from time to time considered offering to buy one or more of them.  They made their move when the Green family decided to sell and the opportunity arose to buy Misland with its 24.78% shareholding.  It was a particular advantage that they could buy Misland without triggering the pre-emption provisions, entitling them to appoint one out of the six directors.  The means by which they have tried to secure control are summarised in the outline chronology, and set out more fully in the chronological section.  In addition to those steps, they tried but failed to purchase debts secured on Mr McKillen's shares, including the use of banks to act as fronts for them in approaching the lenders.  These steps are set out by Mr McKillen in his petition, seemingly as among the grounds for relief.  They cannot assist Mr McKillen, not only because they failed but also because they do not involve the conduct of the affairs of the company or any act or omission of the company.

31.    Sir David and Sir Frederick Barclay have over many years built up significant business interests in a number of different sectors.  They are now in their late seventies and are resident in Monaco, where they maintain an office.  One of the pleaded issues in this case is whether Sir David Barclay is or was a shadow director of the company.  There has therefore been exploration of the extent to which the Barclay brothers exercise actual control over the affairs of the companies carrying on what may loosely be called their business interests.  The overall conclusion which I draw from the evidence in this case is that all the companies comprising the "Barclay interests" are within their control, in the sense that they are able if they choose to control their decisions and activities.  Those acting on their behalf frequently refer to them as controlling the companies and they are content to be seen as controlling the companies.

32.    The evidence I have heard also shows that they are content to leave a good deal of the business to the executives whom they have appointed but that they take an interest, and sometimes a very keen interest, in particular aspects of the businesses.  In particular, they will be directly involved in decisions to make significant acquisitions or disposals of assets, in this case shares in the company or debts due from the company or from individual shareholders. I have heard evidence from four senior executives in the Barclays organisation and they are all highly professional, strong-minded individuals.  They are certainly not ciphers, simply rubber stamping

decisions taken by the Barclay brothers.  They are prepared to argue their corner but they would, I think, be reluctant ultimately to take a decision of which the Barclay brothers did not approve.  In many cases, however, the Barclay brothers are content to leave matters to their senior executives and the evidence of one executive, Philip Peters, that they often say *"do what you think is best"* rings true.

33.   The precise structure of ownership of the Barclay business interests is not relevant to the issues in this case and I have not had evidence on it.  Most of the Barclay companies involved in the case are ultimately owned by the trustees of the Sir David and Sir Frederick Barclay family settlements.  But the trustees have played no part at all in the relevant events and indeed were ignorant of many of them.  Whatever the precise ownership structure and whatever, if any, beneficial interests the Barclay brothers have in these companies and whatever, if any, legal rights of control they have, I am satisfied, as I have said, that they could in practice control all the "Barclay companies" involved in this case.

34.   The companies principally involved are B Overseas Limited ("B Overseas"), Ellerman Corporation Limited ("Ellerman"), Ellerman Hotels Group Limited (EHGL) and Maybourne Finance Limited ("MFL").  B Overseas, EHGL and Ellerman are owned ultimately by the trustees of the family settlements, while MFL is indirectly owned by the Barclay brothers themselves.  I will refer to these companies and any other companies under the practical control of the Barclay brothers as the Barclay interests without usually distinguishing between the individual companies.  B Overseas was the company that acquired Misland from the Green family in January 2011 and also acquired in September 2011 debts due from Mr Quinlan and secured over his shares in the company.  Ellerman acquired other debts due from Mr Quinlan, secured over part of his shareholding.  EHGL made a written conditional agreement with Mr Quinlan on 17 February 2011 to purchase his shares.  MFL was the company which acquired at the end of September 2011 the debts due from the company to NAMA (the NAMA debt).

35.   The affairs of these companies, and many other business interests of the Barclay brothers, are managed from an office in St James's Street in London where a number of senior executives are based.  The four executives who gave evidence before me have offices there, and each has his own area of responsibility.  Richard Faber's background is in corporate finance and he is one of the principal investment managers within the group dealing in particular with investment opportunities and transactions.  Michael Seal is a chartered accountant whose principal responsibility lies in the areas of tax, corporate structure and pensions.  He is not generally involved in operational or banking matters.  Mr Peters' background is in commercial banking and his primary responsibility is to manage the banking and finance requirements and relationships of the companies.  Rigel Mowatt is also a chartered accountant.  His primary responsibilities are the management and financing of various businesses, although he is also involved in the acquisition and disposal of businesses.  He is particularly involved in the Telegraph Media Group which occupies a substantial part of his time, with the result that he spends only a minority of his time at the St James's Street offices.

36.   Also based at the St James's Street office is Aidan Barclay, son of Sir David Barclay.  He is chairman of the Ellerman group of companies which includes B Overseas, EHGL and Ellerman.  Mr Faber would in the normal course of events

look to Aidan Barclay for decisions on what might be called shareholder matters, although he was in direct and frequent contact with Sir David and Sir Frederick Barclay as well.  From July 2011 Aidan Barclay was ill which meant that he was unable to play an active role in the companies.  Mr Faber looked instead to Sir David Barclay for decisions on "shareholder matters".  Although these executives work in the same offices in St James's Street, it does not automatically follow that they each know exactly what the others are doing.  While they will of course have informal discussions together and may communicate more formally, the evidence indicates that they each get on with their own particular projects and, moreover, they may often be absent from the office, travelling on business.  In particular, Mr Mowatt, based for the most part elsewhere, does not involve himself in what the others are doing.

37.    Overall the evidence supports what Mr Faber said in his witness statement about the degree of involvement of the Barclay brothers in the businesses.  After referring to the fact that they spend most of the year abroad, while the business is based in London, Mr Faber continues:

> "that is not to say that Sir David and Sir Frederick play no part in the business anymore, they do.  They built the business up and still take a keen interest in how it is doing, what is happening, and what deals there are to be done or being done.  ...they remain public faces of the business.  However, they have no desire to know everything that goes on, only the important or interesting issues and deals.  Routine deals and details are no part of their lives and the business has teams of professionals to do that.  Moreover, they no longer deal with the lawyers or look at the transaction documents:  others are employed to do this including internal and external lawyers."

Mr Faber adds that his experience is that "major issues or transactions are discussed round the family and consensus is usually reached before major steps are taken....".

38.    Dealing specifically with the company, Mr Faber says:

> "The Coroin deal has not been a run of the mill transaction for the group.  First, there is its size and complexity.  Next, Sir David and Sir Frederick have had more involvement than they would in most business matters of the group.  The transaction is substantial and of interest to them personally, given their long experience in the hotel industry.  Also, Aidan was ill during the second half of 2011, giving Sir David, in particular, greater involvement than he would otherwise have had."

*Mr McKillen*

39.    Mr McKillen has been a property investor and developer for many years.  A leading member of the group of Irish developers who became very prominent in international property development from the 1990s to the financial crisis in 2008, he built a large portfolio of property investments in Ireland, the United Kingdom, western Europe, Japan, Vietnam, Argentina and the US.  Like the other members of the consortium which bought the hotels in 2004, he had very little experience of hotels.  Mr McKillen has survived better than some other developers, no doubt because of a more prudent approach.  But there is no doubting the financial pressure on him following the international financial crisis.  Like other Irish developers and investors, he was badly affected by the Irish banking crisis, as most of his finance came from the major Irish banks.  Facilities for very substantial amounts matured in 2010.  While they have not been called in or enforced, Mr McKillen has not been able to re-finance them.

40.    Mr McKillen's financial position in 2011 has been the subject of extensive disclosure and evidence, because the respondents deny his claim that, if the shares held by Mr Quinlan had been offered to other shareholders under the pre-emption provisions, he could have raised the funds to purchase his pro rata share.  I deal with this issue later.

41.    Mr McKillen's aims in 2010-2011 as regards his participation in the company were threefold.

42.    First, unlike the Green family and Mr Quinlan, he did not want to sell his shares.  In negotiations with US equity funds in 2010 and Al Mirqab in 2011 he was prepared to see a reduction in his equity stake to 20% or less, but he nonetheless wished to retain an equity interest of, at the very least, 15%.  Secondly, he was anxious to play a significant role in both the management of the business and the redevelopment of Claridge's and The Berkeley, and to receive substantial remuneration for it.  He had in mind a figure of £5 million for at least three years, preferably longer.  This was agreed in principle with Al Mirqab in early January 2011 and it was "*a key attraction*" as his solicitor described it in a letter of advice to him dated 17 February 2011.  It was put to Mr McKillen that this was just disguised consideration and there was no intention to perform a management role.  I accept Mr McKillen's denials, although by the time he was negotiating with the Barclay interests later in the year he was demanding a "pre-emption fee" of £25 million as well as a management fee of £5 million per annum for 5 to 7 years.  I do not however accept Mr McKillen's evidence that a significant part of the management fee would go in paying necessary staff.  This was a late addition to his evidence and not one which I found convincing.  I am satisfied that it was a major aim of Mr McKillen to earn substantial remuneration of the order of £5 million per annum from the company.  His third aim was to avoid a rights issue.  I will later deal with this in more detail.

*Derek Quinlan*

43.    Mr Quinlan was a high profile figure in the group of prominent Irish property investors.  He operated principally by assembling consortia to invest in projects, taking an enhanced equity position as his reward.  It was he who in 2004 put together the consortium to purchase the Savoy group of hotels, which included the

hotels still owned by the company.  He became the public face of the group.  He has not been able to weather the storm and his massive borrowings were transferred to NAMA.  NAMA and the banks have not taken action to enforce the security over his property interests, seeing it as likely to achieve better returns if he is closely involved in the disposal process.  He disposed of assets with a value of some €2 billion in 2010-2011.

44.  Mr Quinlan's interest in the relevant period has been in selling his shares.  But the picture is a little more complex.  He and his close financial adviser Gerard Murphy tried throughout 2010 to act as the introducer of a deal for the acquisition of the company or at least a controlling interest, in return for substantial fees of up to £50 million.  This involved discussions with various parties, principally with Sheikh Hamad and Sheikh Jassim and with Sheikh Mansour bin Zayed Al Nahyan (Sheikh Mansour) of the Abu Dhabi ruling family, but with others also, such as the Oberoi group in India and Raj Kumar in Singapore.  Nothing came of it.

45.  Sir David and Sir Frederick Barclay have provided financial support to Mr Quinlan and his family, starting with a loan of €500,000 in November 2010 and continuing with sums totalling some £1.86 million and €500,000 during 2011.  Mr McKillen alleges that these payments were made under an oral contract made on 15 January 2011 for the sale of Mr Quinlan's shares to NAMA, which triggered the pre-emption provisions and was for that reason kept secret.  This is a significant issue which I later address.

*NAMA*

46.   NAMA plays a pivotal role.  I later describe its purpose and powers, but as the state-owned repository of many of the loans and other financial assets of Irish banks, its main function is to recover the maximum value of those assets as quickly as practicable.  Its importance in this case, as transferee of the company's senior bank facilities, lies in whether it would be prepared to agree an extension of two years or so to those facilities.  Mr McKillen's case is that it would have done if the Barclay brothers through MFL had not bought the debt.  In that way, the company would have been given time to find a satisfactory long-term solution to the acknowledged problem that it was over-indebted with senior debts of about £660 million.

**Other participants**

47.  In addition to the parties above, there is a large cast of characters who have played roles in the unfolding events.  The hotels in question are widely regarded and described as "trophy assets" and as such they attract a great deal of interest, and have done for many years.  They have been fought over before.  When part of the Savoy group, they attracted the attention of Lord Samuel and Land Securities and of Sir Charles Clore in the 1950s and of Trusthouse Forte plc in the 1980s.  In the period relevant to this case, interest has been shown from a number of quarters, some of it serious, some of it transient and opportunistic.   Those involved have included ruling families, foreign governments, property investors and investment funds, with their attendant intermediaries.

48.     It may be helpful to identify a few of the participants who played a significant role. Foremost are Sheikh Hamad and Sheikh Jassim and their entity Al Mirqab. In this judgment, as in the evidence and during the trial, they are collectively referred to, without disrespect, as the Qataris. They played a significant part at different times. In mid-2010 they were negotiating with Mr Quinlan with a view to a purchase of his shares leading to an acquisition of the entire share capital. These discussions ultimately failed in August 2010. In early January 2011, Mr McKillen visited Doha in Qatar for discussions with Sheikh Hamad and Sheikh Jassim with a view to an agreement with them, whereby the Qataris would make an offer for all the shares in the company other than about 25 % to be held by Mr McKillen. These negotiations were interrupted by the acquisition of Misland by the Barclay interests. Further negotiations led to the written binding agreement on 12 February 2011 between Al Mirqab, the Barclay interests and Mr McKillen. Al Mirqab's lawyer, Fady Bakhos, was closely involved in this agreement. The Qataris had no further involvement until early this year when, with the assistance of Tony Blair Associates and a personal intervention by Tony Blair with Sheikh Hamad, the Qataris agreed to finance the acquisition of shares by Mr McKillen if he were to succeed in obtaining an order to purchase the Barclay interests' shares in these proceedings.

49.     Sheikh Mansour and those acting for him held discussions with Mr Quinlan in the course of 2010. The Barclay interests had discussions with him in the course of 2011 with a view to a possible joint venture in relation to the company. His principal representative was Aasim Mahmood. The interest from Abu Dhabi was serious, as shown in December 2010 when Aabar Investments, an Abu Dhabi sovereign wealth fund, acting together with Robert Tchenguiz, a property developer, acquired debts of Mr Quinlan secured by a second charge over his shares in the company. This clearly signalled a significant interest in taking a position in the company and perhaps seeking control. From about May 2011 they were acting in collaboration with a Malaysian based investor and, together, they approached NAMA with a view to buying the debt due from the company.

50.     The Malaysian based investor was Jho Low, a businessman with some backing from a Malaysian sovereign wealth fund. Through an entity called The Wynton Group, offers were made to the company and its shareholders in January and February 2011. As will later appear these were not at the time taken seriously by most of the shareholders. Mr Low persisted in his interest and in April 2011 he acquired a debt due from Mr Quinlan to NAMA which was secured on part of Mr Quinlan's shareholding in the company, bidding more for the debt than the Barclay interests were prepared to pay. The debt was acquired through an associate company called JQ2. This too was a clear demonstration of serious interest in the company.

**Proceedings**

51.     As I mentioned, there are two sets of proceedings, a petition under section 994 of the Companies Act 2006 and a claim under CPR Part 7 for damages in tort for conspiracy to injure by unlawful means and inducing breaches of contract. There is a substantial, but not complete, identity between the respondents and defendants to these proceedings. Misland, Ellerman and B Overseas are parties to both sets of proceedings and in addition MFL is a defendant to the tort claim. Mr Quinlan is a respondent to the petition but not a defendant to the tort claim. Mr Faber, Mr Seal and Mr Mowatt who were all at various times directors of the company are parties

to both sets of proceedings.  Additional parties to the tort claim, but not to the petition, are Sir David and Sir Frederick Barclay.  The trustees of their family settlements were named as defendants to the tort claim but the action is not being pursued against them, in the light of evidence that they had no involvement in the relevant events.  NAMA is also named as a defendant but no claim in tort is made against it.  The purpose of joining it was to enable the issue of the validity of the assignment by NAMA of the company's debt to be determined.

52.   Six parties or groups of parties have been separately represented by leading and junior counsel at the trial: Mr McKillen, Sir David and Sir Frederick Barclay, the Barclay interests, the three directors of the company appointed by the Barclays interests, Mr Quinlan and NAMA.  The company has attended by junior counsel only when necessary.  It is of course neutral in this dispute among the shareholders.

53.   There has been disclosure of a very large volume of documents.  Complex corporate transactions involving many parties over a period in excess of a year generate a great deal of paper.  The chronological bundle for the trial comprises 54 files, with a total number of pages approaching 20,000.  Text messages played a vivid, and sometimes significant, part in the story.  Many of the principal players, including Sir David Barclay, frequently send and receive text messages.  Disclosure of text messages has been far from complete, with some extensive gaps on the respondent's side and some gaps on Mr McKillen's side.  Explanations have been given in the evidence and in correspondence.  Although Mr McKillen's closing submissions invite me to draw adverse inferences from the loss of these text messages, it does so only in the most general terms.  I do not know precisely what inferences I am invited to draw, but in any event I am not persuaded that I should reject the explanations given.

54.   I heard evidence from a number of witnesses.  Mr McKillen gave evidence, as did his financial adviser and close associate, Liam Cunningham, who was also his alternate director on the board of the company.  Likewise, Mr Quinlan and Mr Murphy gave evidence.  Mr Faber, Mr Seal, Mr Mowatt and Mr Peters gave evidence.  Sir David Barclay and Aidan Barclay did not give evidence.  Sir Frederick Barclay provided a short witness statement under the Civil Evidence Act but did not give oral evidence.  The absence of these witnesses was the subject of submissions on behalf of Mr McKillen, inviting me to draw adverse inferences.  I deal with that issue later in this judgment.  Finally two officers of NAMA, John Mulcahy and Paul Hennigan, gave evidence.  Mr Hennigan was closely involved on a day to day basis in dealing with the loans to the company and he reported to Mr Mulcahy as head of portfolio management and a member of NAMA's credit committee.

55.   I do not propose to make general comments or give thumbnail sketches of the witnesses, save only to say this.  The disclosure provided by NAMA and the evidence provided by Mr Hennigan and Mr Mulcahy, whom I regarded as wholly reliable witnesses, was invaluable in establishing the approach and attitude of NAMA at different stages of the story.

56.   The trial occupied 30 days in court of which 20 days were taken up with cross examination of witnesses.  I have been provided with many hundreds of pages of closing submissions, all of the highest standard, which were supplemented by oral

submissions.  Many issues were explored in evidence and submissions have been made on them, but the parties' cases are defined by their pleadings.  This is of particular importance to proceedings under section 994 of the Companies Act 2006. The breadth of the jurisdiction means that the petition plays, in my judgment, a vital role in defining the basis of the petitioner's case.  This is not a question of taking technical pleading points.  The petition must be read sensibly.  But it does mean that the grounds on which the petitioner says the affairs of the company have been conducted in an unfairly prejudicial manner should be fairly set out in the petition. Only in this way will the respondents be able properly to meet the case and the court be able to keep the proceedings within manageable bounds:  see *Re BSB Holdings Ltd (No2)* [1996] 1 BCLC 155 at 159-160, a case of comparable size and complexity.

57.  The petition was amended on four separate occasions.  Very extensive amendments were proposed shortly before the start of the trial.  As I had given directions for a speedy trial and all the pre-trial stages had been completed in accordance with a very tight timetable, there could be no criticism of Mr McKillen or those representing him in making the application so close to trial.  Because of the importance of the petition to the proper conduct of the trial, I looked closely at each of the amendments proposed and allowed only those which could be said to be arguable on the facts or the law.  Amongst the amendments which I rejected were those based on the legal proposition which I held to be unarguable, in the absence of partnership or express provision, that shareholders as joint venturers owed each other fiduciary duties.  I also rejected amendments, on the grounds of both law and the facts proposed to be pleaded, that Sir David and Sir Frederick Barclay were de facto directors of the company and that Sir Frederick Barclay was a shadow director of the company.  I did however allow an amendment to plead that Sir David Barclay was a shadow director.  See [2012] EWHC 521 (Ch).

58.  There were a number of applications in the course of the trial.  The most substantial was an application by Mr McKillen for that part of the trial dealing with his financial position to be heard in private and for the continuation of a confidentiality regime which restricted the documents disclosed by Mr McKillen on that issue to certain solicitors and counsel for the respondents but did not permit the respondents to have access.  This was opposed by a number of English and Irish newspapers and broadcasters, who appeared by counsel, as well as by the respondents.  I rejected the application: see [2012] EWHC 1158 (Ch).

**Unpleaded issues**

59.  Many unpleaded issues were canvassed in the course of evidence, and some have been pursued in the closing submissions, which it is unnecessary or inappropriate to address.  I will mention just a few first.

60.  I refused an application by Mr McKillen, after Mr Faber had completed his evidence, for permission to amend the petition to allege that Mr Faber acted in breach of his duties as a director of the company in his dealings with NAMA in March 2011.  Submissions to this effect are nonetheless made in Mr McKillen's closing submissions.  If an amendment had been permitted, this would have been a substantial issue on which Mr Faber would have been entitled to give evidence in chief.  Without it being pleaded and fully addressed, it would be procedurally unfair

to consider the allegation, even if only going to Mr Faber's credit.  It is in any event too large and contentious a subject to be considered for the purposes of credit only.

61.    There was a significant amount of cross examination of the respondents and their witnesses as to allegedly improper disclosure of confidential information of the company, allegations which do not feature at all in the petition.  In due course it transpired that the unauthorised disclosure of confidential information was endemic among all the shareholders, including Mr McKillen.  In closing, Mr Marshall made clear that it does not feature as a basis for the petition.

**Outline chronology**

62.    It may be helpful to set out an outline chronology of the key events before moving on to the chronological account.

63.    Much of 2010 was taken up in seeking new investment in the company.  On 26 June 2010, despite the strenuous efforts of the directors and shareholders of the company, its loan facilities with Anglo Irish Bank and Bank of Ireland were transferred to NAMA.  In December 2010, NAMA agreed in principle to extend the transferred loan facilities by two years.

64.    In August 2010, Mr Quinlan and Mr Murphy put a proposal for an acquisition of a majority stake in the company to Sir David Barclay but it was quickly rejected.  The Barclay brothers continued to keep an eye on the company and in or about early November 2010 there was an agreement or arrangement that if Mr Quinlan was considering selling his shares he would let the Barclay brothers know so that they could make a matching offer.  Mr Quinlan and the Barclay parties say that this was no more than a gentleman's agreement but Mr McKillen contends that it was a binding agreement.

65.    January and February 2011 was a particularly busy and important time in this case. In early January 2011, Mr McKillen had discussions with the Qataris with a view to a transaction under which the Qataris would take a majority interest in the company, buying out all the shareholders except Mr McKillen who would be left with an interest of about 25% of the equity and a management contract for a number of years at an annual fee of £5 million.

66.    On 15 January 2011 Mr Quinlan signed an exclusivity agreement with the Barclay interests, to last until 16 February 2011.  It is a significant part of Mr McKillen's case that on the same day a binding oral agreement was made between Sir David Barclay and Mr Quinlan for the acquisition by the Barclay interests of Mr Quinlan's shares.  This is denied by Mr Quinlan and the Barclay interests.  On 18 January 2011 B Overseas agreed to purchase Misland with its holding of a 24.78 % interest in the equity of the company.  The agreement was completed on 21 January 2011 and on the same day Misland served notice on the company exercising its right to appoint Mr Faber as a director.  On 29 January 2011 Ellerman acquired debts owed by Mr Quinlan to Bank of Scotland (Ireland) Limited which were secured on part of Mr Quinlan's shareholding representing approximately 22 % of the company.

67.    On 12 February 2011, Mr McKillen, Al Mirqab and the Barclay interests signed an agreement providing for the company to be owned in the ultimate shares of

18:41:41 respectively. This would require a sale of part of his holding by Mr McKillen and the acquisition of those shares and the other shares in the company by the Barclay interests and Al Mirqab. On 17 February 2011, Mr Quinlan and the Barclay interests entered into an agreement for the purchase of Mr Quinlan's shares, conditional on compliance with or waiver of the pre-emption provisions in the shareholders agreement and articles of the company. Towards the end of February 2011 Mr McKillen pulled out of the tripartite agreement and negotiations to implement it came to an end.

68.    Immediately after the tripartite agreement had been signed and with a view to giving effect to it, the Barclay interests conducted intensive negotiations with Barclays Bank with a view to providing a facility to repay the debt due to NAMA. Although NAMA had agreed in principle in December 2010 to extend the term of the facilities by two years, it had not committed itself to doing so and in February 2011 it allowed a short extension to the facilities to enable the tripartite agreement and its re-financing proposals to be put into effect. Following the breakdown of that agreement, there were further discussions on the company's behalf with NAMA to persuade it to revert to the proposal for a two year extension. NAMA was no longer prepared to agree to that and instead allowed three month extensions to 30 June 2011 and again to 30 September 2011. In April 2011 the Malaysian interests purchased from NAMA debts due from Mr Quinlan secured over part of his shareholding representing 13.5% of the company's equity.

69.    On 16 May 2011, Mr Quinlan gave a one year irrevocable power of attorney in relation to his shares to Mr Faber or failing him any director of Ellerman. On the same day, Mr Mowatt replaced Mr Quinlan as a director of the company. In June and July the Barclay interests conducted negotiations with two banks with a view to agreeing a facility to provide the funds required either to purchase the company's debt to NAMA or to make a loan to the company to enable it to repay those debts. Those negotiations were not completed until mid-September 2011 when agreement was reached on a facility with Barclays Bank.

70.    In early August 2011 the Barclay interests opened discussions with NAMA with a view to purchasing the company's debt. There was at that time rival interest from Malaysian and Abu Dhabi interests. NAMA rejected formal offers made by the Barclay interests in the first half of September 2011, insisting that it would accept nothing less than full repayment of the debt together with accrued interest. In mid-September 2011 the Barclay interests reached agreement with the Malaysian and Abu Dhabi interests, under which the latter sold to the Barclay interests debts of Mr Quinlan secured on shares in the company. On 23 September 2011 the Barclay interests made an offer to NAMA for the purchase of the company's debt on the terms required by NAMA. NAMA accepted the offer and the assignment was completed on 27 September 2011. On 28 September 2011 the Barclay interests sent to the company an initial proposed term sheet for the extension of the loan facility. The proposed conditions included a requirement that the facility be reduced by way of the proceeds of an equity issue for at least £200 million by 12 December 2011. Mr McKillen strongly objected to the terms. The company appointed Alvarez & Marsal as its independent financial advisors. MFL agreed the first of a series of suspensions of its security rights, to enable negotiations to proceed for a longer term

re-financing. This has continued to be the case since the issue of the present proceedings on 5 October 2011.

**Shareholders agreement**

71.  When the company was established in May 2004, the initial shareholders entered into a shareholders agreement dated 14 May 2004. There were seven subsequent amendment agreements, the last of which was dated 23 October 2009. A composite agreement incorporating the terms of all the amendments was prepared and, while it is stated not to be a legally binding document, it has for convenience been used by all the parties in the present proceedings.

72.  Recital B to the shareholders agreement records that the initial investors entered into the agreement:

> "...for the purpose of the subscription for shares and loan stock as therein set out, for regulating the future conduct of the business of the Company and its subsidiaries and for the purpose of regulating their relationship with each other."

73.  Clause 3.1.1 provides:

> "The primary objective of the Company in undertaking the Relevant Business is to manage and turnaround the Primary Assets. It is acknowledged that this is likely to be achieved by initial self management of the Primary Assets followed by entry into management contracts with international hotel operators and ultimately the sale of some or all of the Primary Assets (other than Claridge's Hotel). It is agreed that the Company shall initially seek to sell the Savoy Hotel and the Berkeley Hotel or their respective holding entities."

In fact there were two changes to the objectives so stated. First, management contracts have not been made with international hotel operators but, rather, the hotels have been managed by a wholly-owned management company. Secondly, although the Savoy Hotel was quickly sold, the decision was taken to retain The Berkeley.

74.  Clause 3.2 imposes a series of "business covenants" on the company for the benefit of the investors' interests. Clause 3.4 contains a series of "protective covenants" whereby the shareholders agreed to procure the company not to take various steps without the prior consent in writing of the holders of a majority of the voting shares. These steps include the creation or issue of share or loan capital, the appointment of additional directors and changes to the nature or scope of the relevant business.

75.  Clause 3.7 provides for allottees or transferees of shares to become parties to the shareholders agreement. Clause 4 deals with the composition of the board of directors, voting rights and other matters relating to board and general meetings. Clause 5 confers pre-emption rights on the allotment of new shares or convertible securities.

76.    Clause 6 contains detailed pre-emption provisions with regard to the transfer of existing shares.  I will refer in more detail to these provisions in the section of this judgment dealing with Mr McKillen's pre-emption claims.

77.    Clause 8.3 provides that in the event of any inconsistency between any terms in the shareholders agreement and any provision in the articles of association of the company, including the provisions of clause 6, the terms of the shareholders agreement shall prevail and the shareholders shall make such amendments as may be necessary to the articles to ensure consistency with the shareholders agreement. By reason of this clause, the focus has been on the pre-emption provisions contained in the shareholders agreement rather than the largely identical provisions in the articles of association, as was also the case on the trial and appeal of the preliminary issue relating to the sale of Misland.

78.    Clause 8.5 contains a series of provisions including in particular an obligation on the shareholders to act in good faith towards each other.  Mr McKillen relies on clause 8.5 and alleges that the respondents have been in breach of it.  I shall refer in detail to its terms when I consider that head of claim.

79.    By clause 8.13 the agreement is to be governed by and construed in accordance with Irish law, but all parties have accepted that there is no relevant difference between English and Irish law and, while clause 8.13 gives a non-exclusive jurisdiction to the Irish courts, no party has objected to the jurisdiction of this court.

80.    Articles of association were adopted in accordance with the shareholders agreement. The articles currently in force were adopted on 19 October 2009.  They incorporate Table A in the schedule to the Companies (Tables A to F) Regulations 1985 and set out certain matters, such as the rights attached to the various classes of shares in the company, the pre-emption rights on the allotment of new shares, provisions dealing with directors including their appointment and, in article 5, pre-emption provisions as regards existing shares.  It is not necessary for the purposes of these proceedings to refer in further detail to the articles of association.

81.    There are five classes of shares in the capital of the company which rank *pari-passu* in all respects and have the same voting rights, save as regards the appointment of directors.  Each of the A, B, C and D classes of shares confers the right to appoint one director.  The E shares carry no such right.  The maximum number of directors is six, of whom two may be co-opted by the board.  The directors appointed by the four classes of shareholder have different numbers of votes at board meetings:  the A director has 70, the B director 7, the C director 48 and the D director 70.  Any co-opted director has one vote.  The shares allotted to Mr McKillen, Misland and Mr Quinlan were A shares, C shares and D shares respectively.

**The facts:  chronological account**

*Formation of the company and initial investors: 2004*

82.    In early 2004, the Savoy Group of hotels, comprising the Savoy Hotel as well as the three hotels still owned by the company, was put up for sale by its then owners, two American private equity funds.  Mr Quinlan was approached as a possible investor who might organise a syndicate to purchase the hotels.  He negotiated an exclusivity

period commencing on 12 March 2004 and ending in early April when a deposit of £20 million would be required, with completion to follow on 7 May 2004. The agreed purchase price would be £750 million. Mr Quinlan's intention was to raise £665 million by way of loan finance and the balance from equity investors including himself.

83.   In addition to legal and financial due diligence, the period following the making of the exclusivity agreement was used by Mr Quinlan to organise and raise the debt finance and the equity investment. This was by no means straightforward. Debt finance of £665 million was provided by a syndicate comprising Anglo Irish Bank and four other banks. Mr Quinlan encountered considerable problems in organising a syndicate of equity investors. All those who initially agreed in principle to invest pulled out. Completion was delayed until 14 May 2004 by which time Mr Quinlan had obtained the commitment of four investors or groups of investors in addition to himself. They were Mr McKillen (on behalf of himself and Padraig Drayne in equal shares), Misland, three individuals who invested through Quinlan Nominees Limited, and Moya Doherty and John McColgan. Mr McKillen and Mr Drayne agreed in principle to become investors on 20 April 2004, followed by Ms Doherty and Mr McColgan on or about 1 May 2004. Misland, acting by Ian Buchanan on behalf of the Green family, agreed on 10 May 2004 and the individuals who invested through Quinlan Nominees Limited on 11 May 2004.

84.   The total amount paid by the investors was £110 million. Misland, Mr McKillen (with Mr Drayne) and the Quinlan Nominees investors as a single group each agreed to invest £25 million for interests of 20% each. As agreed with his co-investors, Mr Quinlan paid £10 million for his 20% interest, given that he had introduced the opportunity. Ms Doherty and Mr McColgan in fact provided £12.5 million, rather than £25 million, but this shortfall did not prevent the completion of the purchase. They received a 10% interest and the balance was taken up, as to 5%, by Mr McKillen (with Mr Drayne), Mr Quinlan and Misland in equal proportions and, as to the remaining 5%, by Kyran McLaughlin.

85.   Each investment of £25 million was applied in subscribing at par £24.9 million nominal of loan stock, 100,000 special redeemable preference shares of £1 each and 2,000 ordinary shares of 10p each. Mr Quinlan subscribed at par for £10 million loan stock, 1,000 redeemable preference shares of £1 each (carrying the right to a total of £15 million on a return of capital) and 2,000 ordinary shares.

*Changes in shareholdings: 2004-2010*

86.   There were subsequent changes in the investors and their respective holdings of shares. At the end of 2004 Mr Quinlan and Mr McKillen (with Mr Drayne) purchased in equal parts the shares held by the Quinlan Nominees investors. This was agreed by the other shareholders. As a result, the percentage shareholdings became: Mr Quinlan 31.66%, Mr McKillen and Mr Drayne 31.66%, Misland 21.66%, Mr McColgan and Ms Doherty 10% and Mr McLaughlin 5%.

87.   In March 2007 Mr Drayne transferred his interest to Mr McKillen. In 2011, Mr Drayne issued proceedings claiming an entitlement to ownership of a portion of these shares but in the present case all parties have proceeded on the basis that Mr

McKillen is the beneficial owner of the shares registered in his name. The transfer of Mr Drayne's interest to Mr McKillen was capable of triggering the pre-emption provisions in the shareholders agreement and in the articles of association but all parties agreed to waive their rights in that respect.

88.   In the course of 2008, Mr McColgan and Ms Doherty sold their shares to the remaining shareholders so that the equity was then held as follows: Mr Quinlan 35.185%, Mr McKillen 35.185%, Misland 24.074%, and Mr McLaughlin 5.556%.

89.   In October 2009 Mr McLaughlin negotiated to sell a 2% interest in the company to Misland but Mr Quinlan and Mr McKillen took up their rights under the pre-emption provisions, so that the 2% holding was sold in equal parts to them and to Misland with the result that the holdings were then as follows: Mr Quinlan 35.93%, Mr McKillen 35.93%, Misland 24.584% and Mr McLaughlin 3.556%.

90.   In February 2010, £3 million was raised by a rights issue which was taken up by all the shareholders except Mr Quinlan, with the result that the equity holdings became: Mr McKillen 36.2%, Mr Quinlan 35.4%, Misland 24.78% and Mr McLaughlin 3.58%. These remained the percentage holdings as at the beginning of 2011.

*Events: 2004-2008*

91.   Only a few points need be noted in respect of the period from May 2004 to September 2008. The parties intended at the start to sell the Savoy and Berkeley hotels as soon as practicable. The Savoy was sold for £230 million in January 2005 to Prince Al-Waleed bin Talal, who had made an unsuccessful bid for the entire group. At an early stage the parties decided to retain The Berkeley.

92.   In June 2005, the shareholders personally borrowed £28 million under a facility with Anglo Irish Bank to purchase a property in Knightsbridge adjoining The Berkeley hotel. The purchase was made by, and the loan was made to, Goldrange Properties Limited as nominee for the shareholders.

93.   In mid-2005 the shareholders purchased a property at 41-43 Brook Street, adjoining Claridge's. In March 2008 this property was sold to Claridge's Limited.

94.   A major refurbishment of The Connaught was carried out between March 2007 and the end of 2008. Ambitious development plans were prepared for Claridge's and The Berkeley, and planning permission was obtained in 2006, although it has not as yet been feasible to implement these plans in the very different economic and financial conditions prevailing since the latter half of 2008.

*Management of the group*

95.   The day to day management of the group was, and remains, in the hands of a chief executive officer and staff employed by Maybourne Management Limited which acts as the management company for the hotels and the group. The present CEO, Stephen Alden, was appointed in 2006.

96.   Until 2009 Mr Quinlan, through a management company owned by him, was responsible for overseeing the management of the group on behalf of the

shareholders. In January 2005 the board formally confirmed an annual fee of £300,000 which was increased to £450,000 in April 2005. Mark Hennebry, who had joined Mr Quinlan's management company in 2002, assumed a lead role. He had previously acted as the "asset manager" of investments made by Mr Quinlan and his investment syndicates in a number of hotels, with responsibility for monitoring those investments. Approximately £300,000 of the management fee covered Mr Hennebry's remuneration.

97.   Mr Hennebry explains in his evidence that the role of the asset management team was to be responsible to the investors for the management of the hotels, dealing with many aspects of the business, including ownership and real estate matters, annual budgets and capital expenditure plans. Mr Hennebry explains also that he became the shareholder representative on behalf of all the shareholders, attending most board meetings.

98.   Board meetings were held on a fairly regular basis and were generally attended by the directors appointed by the different shareholders or their alternates. Of these directors, only Mr Quinlan and Mr McKillen played an active part in the group's business outside the board meetings. This was recognised by the board when it resolved in January 2005 to meet the expenses of both of them, although Mr McKillen did not in fact charge any expenses to the company.

99.   Mr Quinlan was identified as the public face of the group, having organised the syndicate of purchasers and being actively involved in many aspects of the business. Mr McKillen was heavily involved in the process of obtaining planning permission for developments at the hotels and in the refurbishment of The Connaught in 2007-2008. He was involved also in other matters including dealings with Anglo Irish Bank.

100.  There is considerable disagreement between Mr Quinlan and Mr McKillen as to the extent of their respective activities, which it is unnecessary to resolve. It is clear, and each acknowledges, that they were both actively involved in various aspects of the group's business.

101.  There were some changes in the management structure in 2009, resulting from the financial difficulties faced by Mr Quinlan. The other shareholders and their representatives, particularly it would appear Mr Buchanan for Misland and the Green family, were concerned that the group's reputation would be damaged by the personal financial problems of Mr Quinlan as its public face. The board resolved in October 2009 to reduce the management fee to the sum of £300,000 required to meet the costs of Mr Hennebry's remuneration, and subsequently resolved to terminate the management contract with Mr Quinlan with effect from the end of 2009. Mr Hennebry was engaged as a consultant under an agreement with Cadence Advisory Limited, a service company which he set up for the purpose, and continued as asset manager and shareholder representative in that capacity.

*Loan facility changes*

102.  There were changes to the company's loan facilities. The initial advances totalling £675 million were made by a syndicate of five banks. The overall debt level was reduced on the sale of the Savoy Hotel. New loan facilities totalling £460 million

were established in September 2005 and from that time all bank finance was provided by Anglo Irish Bank and Bank of Ireland. The facilities were later increased, principally as a result of advances totalling £70 million to refinance the refurbishment of The Connaught and an advance of £35 million for the purchase of the property at 41-43 Brook Street from the shareholders in March 2008.

*Irish banking crisis and its consequences*

103.    The international financial and banking crisis, particularly following the collapse of Lehman Brothers in September 2008, had a profound effect on the position of Irish banks and hence on the company and its shareholders. So far as the shareholders were concerned, both Mr Quinlan and Mr McKillen had large facilities with Irish banks and were likely to come under pressure in respect of them. Mr Quinlan was in serious difficulty from mid-2008 and his problems worsened with time. He failed to meet interest payments due in June 2008 on loans from Anglo Irish Bank and BOSI.

104.    The company's own loan facilities were provided by Irish banks. The facilities fell due for repayment at the end of 2010 and it became increasingly apparent that those banks would not be able to provide replacement facilities on maturity. These concerns were increased when in January 2009 Anglo Irish Bank was taken into state ownership and in April 2009 the Irish Government announced proposed legislation to create NAMA as a State-owned entity to which loans and other financing arrangements provided by Irish banks would be transferred. Mr McKillen and the other shareholders were very concerned about the effect as they saw it of a transfer of the company's loan facilities to NAMA. As Mr McKillen explains in his witness statement there were two major areas of concern. First, there was a concern that NAMA might try to sell the loans to a hedge fund with a "*loan to own*" attitude by which Mr McKillen meant an aggressive lender which buys a debt package with the purpose of trying to find a default in the relevant facility agreement, calling in the loan with a view to foreclosing on the underlying assets. Secondly, there was a concern that a transfer would cause reputational damage to the hotels. Mr McKillen explains that NAMA was perceived as a "*bad bank*" set up by the Irish Government to deal with distressed property loans to failing businesses.

105.    In or about October 2009, it became clear that it was proposed that the company's loan facilities should be transferred to NAMA. Strenuous efforts were then made by the company and its shareholders to persuade the banks, NAMA and the Irish Government that the loan should not be transferred to NAMA. In the event these efforts were unsuccessful and the loan facilities were formally transferred to NAMA on 25 June 2010.

*Search for new equity:  2009 - 2010*

106.    Against this background, in the course of 2009-2010, the directors and shareholders of the company gave urgent consideration to bringing in new equity so as to improve the company's financial position and to refinance the existing facilities. On 20 October 2009, Mr Hennebry briefed the board on his discussions with a number of both large and smaller banks. He reported that all the banks without exception highlighted the fact that debt service ratios, i.e. interest payments as a proportion of

net revenue, were tight and that the company would require new capital either prior to a refinancing or as part of a refinancing. It was agreed that Mr McKillen and Mr Buchanan would work with Mr Hennebry to gauge interest from potential investors. It was further agreed that a shareholding of between 25% and 50% would be offered but it was recognised that new capital at the level of 25% would not fully recapitalise the balance sheet.

107.    Discussions were held with a number of interested parties in late 2009 and early 2010. Serious discussions were held with two US investment funds, Westbrook Partners introduced by Mr McKillen and Northwood Investors LLC introduced by Mr Buchanan on behalf of the Green family. Each made presentations to the shareholders in June 2010, following which the two funds worked together to propose a deal under which they would invest £200 million for a 42% equity interest. While Mr McKillen was content to accept the dilution of his equity interest which this would entail, it proved impossible to reach final terms when Westbrook changed its terms. Northwood came back on its own, again with a proposed equity injection of £200 million for a 42.5% interest. Terms could not however be agreed, principally because Mr Quinlan rejected the proposal. Mr Quinlan likewise rejected a further proposal made by Northwood in October 2010 for an investment of £200 million of mezzanine finance, with Deutsche Bank providing a senior debt facility of £475 million, to repay the existing senior facilities now held by NAMA. These proposals were discussed at a board meeting on 3 November 2010 when the opposition of Mr Quinlan was made clear. Mr Hennebry reported that the company had been actively pursuing an extension of the NAMA loan but no heads of terms had by that stage been received from NAMA. The only alternative to an extension was therefore the deal proposed by Northwood and the board agreed to continue negotiations with both Northwood and Deutsche Bank and with NAMA in parallel. The deal with Northwood did not proceed, on account, it appears, of both the opposition of Mr Quinlan and problems with syndicating the senior debt.

*Mr Quinlan's position: 2010*

108.     By this stage relations between Mr Quinlan and the other shareholders  were at a low ebb. There was a view amongst the other shareholders that he was not cooperating with the company and frustrating an equity injection. Some shareholders considered that Mr Quinlan's well-publicised financial difficulties were bringing adverse media attention to the group's hotels. At the board meeting on 3 November 2010 it was resolved by a majority to pursue the collection of unpaid bills amounting to £285,000 due to the hotels from Mr Quinlan, and to ratify the issue in October 2010 of proceedings against him.

109.    As a result of his financial difficulties, Mr Quinlan was engaged in trying to sell his many assets. In evidence he said that in 2010-2011 he had realised some £2 billion from the sale of assets, most of which were charged to secure borrowings.

110.    Mr Quinlan made strenuous efforts to find a purchaser for his shares in the company in the course of 2010. On 31 May 2010, he and Mr Murphy had discussions with a member of the ruling Al Nahyan family in Abu Dhabi. Twice in June 2010 he had meetings with Sheikh Jassim in Qatar concerning the possible sale of assets, including his shares in the company. Further discussions with Sheikh Jassim and his lawyer Mr Bakhos took place in July and August 2010 and there were meetings

with Sheikh Hamad in Mougins in the South of France and Cala di Volpe in Sardinia. The prospect of any deal fell through towards the end of August 2010 when it proved impossible to agree a price. Mr Murphy said that he kept the relationship "*sort of simmering*" after August because his strategy was to keep all doors open, but it had clearly gone off the boil. At the end of August 2010 Mr Quinlan met Sheikh Mansour, of the Abu Dhabi ruling family who engaged Barclays Capital on his behalf. Again, however, it proved impossible to agree terms. In September 2010 Mr Murphy and Mr Quinlan met representatives of the Oberoi group of hotels in India. But it transpired that one of the principal shareholders in the Oberoi group was not prepared to give his backing to a deal. Discussions took place in October 2010 with Raj Kumar in Singapore and in November 2010 with a Qatari entity called Mega Trade.

111. A feature of many of these discussions was an understanding that Mr Quinlan and Mr Murphy would receive "*fees*" in amounts varying, as regards Mr Quinlan, from £25 million to £50 million. Terms were not agreed for any of these deals, including terms as to the payment of a fee, but it appears to have been accepted in some cases that a fee of this order would be paid to Mr Quinlan. Such fees were not linked just to a sale of Mr Quinlan's shares, but would be payable if the purchaser acquired either 100% ownership or at least control of the company.

*The Barclay brothers' interest in the company and discussions with Mr Quinlan: 2010*

112. It is convenient at this point to turn to consider the interest shown by the Barclay interests in the company's hotels and their dealings with Mr Quinlan, in each case before the end of 2010. Given their connection with the Ritz Hotel in London, the Barclay brothers had an obvious interest in the company's hotels. Mr Faber gives evidence that those and a few other similar hotels were something that the Barclay interests naturally kept an eye on, looking for opportunities either to take control and run the hotels or to buy and make a turn on them. They had indeed given consideration to making an offer for the hotels or some of them in 2004. The Barclay interests were well aware that, with the collapse of the Irish banking system, there was a real possibility of a sale of the company or its assets. In April 2010, as a result of an introduction made by Deutsche Bank, Mr Faber had a short meeting with Mr Buchanan. Mr Buchanan suggested that the Barclay interests might be interested in joining them in refinancing the group. I accept Mr Faber's evidence that this was very much a preliminary discussion and that nothing came of it. On 20 July 2010, following a conversation with Ken Costa of Lazard, Lazard supplied to Aidan Barclay some historical financial figures in relation to the three hotels. On the same day, this information was passed on to Sir David and Sir Frederick Barclay. Lazard, it appears, was then acting for Qatar Holdings LLC, part of the Qatari investment authority.

113. In his witness statement, Mr Quinlan gives an account of how he met and got to know the Barclay brothers, which was not challenged. They and their wives first met in November 2005 when Mr and Mrs Quinlan were invited to the island of Brecqhou in the Channel Islands which is owned by the Barclay brothers. They met again in June 2006 when the Barclay brothers and their wives spent an evening with Mr Quinlan and his wife at their house in the south of France. They spoke regularly on the telephone and Sir David Barclay and his wife became good friends of Mrs Quinlan. They met a number of times in France and elsewhere over the following

years. The Barclay brothers are resident in Monaco and Mr Quinlan had a villa on Cap Ferrat. The Barclay brothers were grateful to Mr Quinlan when he and his partners donated part of a site in Old Church Street, Chelsea to one of Sir Frederick Barclay's charities so that a school for children with learning difficulties could be built on it. Sir Frederick had a family reason for his close involvement in this project. While the construction of the school also benefitted Mr Quinlan and his partners because it fulfilled one of the conditions of planning consent for the site as a whole, the transferred land was very valuable and, as described by Mr Quinlan, the Barclay brothers were "*extremely grateful and very appreciative*".

114.   In July 2010 Mr Quinlan, together with Mr Murphy, were due to meet Sheikh Hamad and Sheikh Jassim in Sardinia. While there, Mr Quinlan also met Sir David Barclay and, he says, briefly discussed the value of the company and its hotels. Mr McKillen challenges Mr Quinlan's evidence that this was a chance encounter. He says that it is too much of a coincidence, but I see no good reason to doubt Mr Quinlan's evidence in this respect. Over a six week period in the second half of July and during August 2010, Mr Quinlan met the Barclay brothers about seven times at the Café de Paris in Monte Carlo. On some of these occasions they discussed a possible purchase of Mr Quinlan's shares in the company. Mrs Quinlan was sometimes with them, as was Mr Murphy. These meetings covered a wide range of topics of conversation and were not restricted to discussions about the company.

115.   In July and early August 2010, the principal focus of the efforts of Mr Quinlan and Mr Murphy was a possible deal with the Qataris. Mr Murphy gives evidence that following a meeting with Mr McKillen on 12 August 2010, in which Mr McKillen spoke disparagingly about the Qataris, he concluded that he should seek to find a new buyer and with that in mind he developed a proposal to put to the Barclay brothers. On 27 August 2010 Mr Murphy emailed to Sir David Barclay a copy of the shareholders agreement and supplemental agreements, a review by the company's solicitors of the pre-emption provisions, the pre-emption articles and a draft document described as "Project Ben deal scenario summary" which Mr Murphy had prepared. Mr Murphy had arranged to meet Alistair Barclay on the same day and it is apparent that these documents were emailed in advance and for the purpose of that meeting. The proposal set out in the deal summary document was that Mr Quinlan should sell his shares to the Barclay interests who, with the agreement of the other shareholders, would provide £200 million for a 42% holding, thereby replacing the two US investors with whom the company was then negotiating. The main assumptions are stated to be: first, Mr Quinlan would sell his 33.44% shareholding for £95.3million, representing an enterprise value of £950 million; secondly, Mr McKillen would not sell his shares as he was happy with 42% dilution and would not participate in the cash call or would only partially participate; thirdly, "*facilitator fee to be agreed [as discussed]/ paid once DQ sell his shares*".

116.   This proposal did not get anywhere. Two days later, Sir David Barclay emailed Mr Murphy to say "*Having difficulties with shareholders over price and another shareholder remaining. I would very much like to do a deal but not easy I am afraid*". An attached letter showed that Sir David was thinking in terms of an enterprise value of £800 million and that he was not happy with outside shareholders although he would live with Mr McKillen having a shareholding of,

say, less than 10%. On 31 August 2010 Mr Murphy forwarded Sir David's email to Mr Hennigan at NAMA and commented "I have met Sir D several times on this with and without DQ. There is no future in these negotiations".

117.   Mr Quinlan and Mr Murphy were asked during cross-examination about the "*facilitator fee*" referred to in the draft Project Ben document. They said that the fee they proposed would be at a level of £1-2 million (Mr Murphy) or £1-3 million (Mr Quinlan) for the purpose of funding Mr Quinlan's private office, comprising Mr Murphy, Mr Kelly and others. Mr Murphy gave evidence that this was a suggestion that he put to Sir David Barclay when they met by chance in the Hotel de Paris in Monte Carlo shortly before 27 August 2010. His evidence was that he indicated that if a deal was done with Mr Quinlan "*I would expect that there would be a fee paid to me – basically my plan being to use that fee to run the office, to pay myself and Mr Kelly and other suppliers*".

118.   Both Mr Quinlan and Mr Murphy accepted in their oral evidence that NAMA was making payments towards continuing costs, including office costs, but they said that they did not cover all the costs and there were difficulties in dealing with NAMA. It was put to both of them that they were in fact proposing fees of the order being discussed with the Qataris. While I have no difficulty in accepting that Mr Murphy would be pitching for a fee of a million or two, which he would share with Mr Kelly and perhaps others, I am wholly unpersuaded that the Barclay brothers would begin to contemplate the payment of fees running to many millions of pounds of fees or that Mr Quinlan or Mr Murphy would think it sensible to suggest it.

119.   Mr Murphy explained that there was a basic difference between dealing with the Qataris and dealing with Barclay brothers:

> "*The Qataris proposed fees – it is cultural in the Gulf I believe. We were I suppose in some way helping in the deal. In relation to the Barclay brothers, it is a very, very different kettle of fish. The Barclay brothers were deal makers in their own right and did not need me, certainly, or Mr Quinlan to guide them through the process. They were never going to pay us a fee on the scale we are talking about. I might have got an office fee, my Lord, if I was lucky, or a fee for carrying out some of the work, but there was absolutely no question whatever of the Barclay brothers paying us a fee like one we spoke to the Qataris about, and many other people as well*".

120.   I will need to come back to the question of fees when I deal with Mr McKillen's case of an agreement made between the Barclay interests and Mr Quinlan in mid-January 2011. At this stage, it is enough for me to say that I am satisfied that the proposal to purchase Mr Quinlan's shares was in any event quickly rejected by Sir David Barclay, principally on the grounds of the price being suggested and also because he was not keen there should be any significant minority shareholdings. There is no evidence to suggest that the question of a fee was seriously considered, still less agreed. It is convenient also to say here that I consider it also to be in the highest degree unlikely that Sir David bothered to read the shareholders agreement or the solicitors' analysis of it. His principal interest would be in the price and in the question of whether there would be minority shareholders. Having decided that the

proposal was unsatisfactory so far as those issues were concerned, it is highly improbable that he would have concerned himself with matters which he would in any event have regarded as the domain of lawyers. These documents were not even sent to the Barclay interests' London office for comment.

121.    While Mr Quinlan gives evidence that he and his wife met the Barclay brothers in the weeks after August 2010, he denied discussing a deal in relation to the company with them. Mr Murphy may have made a further attempt to persuade Sir David Barclay that the enterprise value of the group was more than £800 million, but I am satisfied that there were no substantial discussions between Mr Quinlan and the Barclay brothers or their representatives during September and October 2010 as regards the company and Mr Quinlan's investment in it.

*Pre-emption arrangement between Mr Quinlan and the Barclay brothers: October-November 2010*

122.    In late October 2010, a payment of €500,000 was made by a company owned or controlled by the Barclay brothers to Mr Quinlan. Either at the time of the payment or shortly afterwards Mr Quinlan agreed with Sir David Barclay that he would tell him if he was going to sell his shares in the company.

123.    The petition pleads that "an agreement was reached to the effect (at least) that Mr Quinlan would not sell his shares without first giving the Barclay Brothers the opportunity to match the price offered, i.e. that the Barclay Brothers would be given a right of first refusal, over the shares". Although not there spelt out, I understand this to be an allegation of an enforceable agreement.

124.    In their response dated 2 February 2012 to Mr McKillen's request for further information in these proceedings, the Barclay interests stated that "*as a quid pro quo for the first payment of €500,000, Sir David asked Derek Quinlan to let him know if he intended to sell off his shares in Coroin and to allow Sir David to match any other offer received, i.e., to give him the option of offering for the shares if Derek Quinlan decided to sell them in future. This was a 'gentlemen's agreement' and was not intended to have contractual force*".

125.    The evidence on this is as follows.

126.    On 28 October 2010, Mr Quinlan faxed a handwritten letter to Sir David Barclay. It was headed "self-loan-€500,000" and the letter read: "*Many thanks for helping at this time. I will repay your loan by 12 Nov 2010 when I expect my deal to close.*" He then gave his account details. The deal to which he referred was the sale of a yacht berth in the south of France. The deal fell through and Mr Quinlan did not repay the loan. Nor has he since repaid it or been pressed to do so. It may be that Mr Quinlan's request for a loan, rather than a gift, was prompted by personal pride but there can be no doubt that at the time the payment was treated as a loan.

127.    In his first witness statement, Mr Quinlan explained that his financial position was precarious at this time and that he had a tax bill payable in Switzerland. The documents show that he was due to pay a total of 300,000 Swiss Francs in equal instalments on 1 October, 1 November and 1 December 2010 and that the first of those was in fact paid on 28 October 2010. He says that he requested Sir David

Barclay for assistance and that Sir David was willing to provide it and asked only for the bank details to which the money should be sent. He goes on to say that he met Sir David about a week later at the Ritz Hotel in London, with Mr Murphy also present. In the course of the conversation which covered a number of topics, Sir David said he would like to know if Mr Quinlan was ever selling his shares in the company. Mr Quinlan describes this as a casual comment. In his witness statement Mr Murphy, who was present at the meeting at the Ritz with the Barclay brothers in early November, supports Mr Quinlan's account of what was said at that meeting. He goes on to say that as far as he was aware at no point was a right of first refusal provided and that there was no agreement of any sort linking the loan to Mr Quinlan's shares.

128.  Some account of the loan and discussion concerning Mr Quinlan's shares was given in an email sent by Mr Murphy on behalf of Mr Quinlan to NAMA on 23 January 2011. Following the acquisition by the Barclay interests of Misland, NAMA had requested a written brief on the implications of the purchase and also an explanation of the relationship between Mr Quinlan and the Barclay brothers. Mr Murphy prepared a draft which included "*In October Sir David gave a personal loan to DQ of €500k to keep the family going financially and in return they asked DQ to ensure that BB would have an opportunity to buy his MHG interests if he was ever selling. This was a gentleman's agreement "to a friend in need" with no documentation.*" Mr Faber made some changes to the draft following a conversation with Sir David Barclay on 23 January 2011. The first sentence of the passage concerning the loan in October 2010 was changed to "*In October Sir David gave a personal loan to DQ of €500k to keep the family going financially and requested that BB would have an opportunity to match any offer DQ might receive in the future for his shares if he was ever selling*".

129.  Mr Quinlan was cross-examined about the loan. First I should say in the light of some of the questions put to Mr Quinlan that I am satisfied that it was Mr Quinlan who approached Sir David Barclay for the loan and that he did so because he lacked funds with which to pay pressing bills. It was put to Mr Quinlan that when he did not repay the loan on 12 November 2010, an arrangement was made whereby he gave the Barclay brothers the right of first refusal in relation to his shares in the company. Mr Quinlan denied this suggestion and said that when he met the Barclay brothers early in November, Sir David asked if he would be happy to tell him if he, Mr Quinlan, was selling his shares to which Mr Quinlan replied that he would be happy to do so. That, he says, is the only thing they agreed: "*I would advise him if I was selling my shares*". His comment on Mr Murphy's draft email to NAMA in January 2011, and in particular the reference to "in return" was as follows: "*it is accurate to say in return, but not on that date. It was when we met in the Ritz hotel in early November that this came up.*" His comment on the Barclay interests' response to the requests for further information which I have quoted above was as follows: "*there was a quid pro quo in November. When I made the call from the Capital Hotel at the end of October 2010, there was no question, no discussion, about the Coroin shares........... there was no discussion about quid pro quos on that date. It was when I met Sir David and Sir Frederick in the Ritz Hotel in November that this came up.*"

130.    In the light of the email drafted by Mr Murphy in January 2011 and its form following the amendments made after Mr Faber had discussed it with Sir David Barclay, and in the light of the Barclay interests' response to the request for further information, there was clearly a connection between the loan and Mr Quinlan's agreement to give the Barclay brothers advance notice of any proposal to sell his shares. The only purpose of giving such notice would be to enable the Barclay brothers to make a counter offer if they were so minded. I am satisfied in the light of Mr Quinlan's evidence and the terms of his hand written letter of the 28 October 2010 that this was not discussed in his telephone conversation with Sir David Barclay on 28 October 2010. I am also satisfied that it was discussed, albeit briefly, at the end of the meeting at the Ritz Hotel in early November 2010. I am entirely satisfied that the parties did not intend to create a legally binding agreement. Rather, because Sir David Barclay had made the loan of €500,000 and because the parties well knew Mr Quinlan might very well not be able to repay it, Mr Quinlan acceded to Sir David Barclay's request to be informed of any proposal to dispose of his shares. In the light of the agreements later made between the parties, I consider it unlikely that an enforceable agreement would have been made without it being recorded in writing, probably in a formal agreement.

*Sale of Misland:  October 2010 – January 2011*

131.    In the light of the disagreements between Mr McKillen and Mr Quinlan as to the way forward for the company, the Green family had by October 2010 decided that it would pursue a possible sale of its interest in the company without reference to the other shareholders. They instructed Lazard to act on their behalf. Lazard produced a discussion document, in effect a sales pitch for the Green family's stake. It stated that the Green family was willing to sell its 24.78% interest in the company for £75 million implying a group enterprise value of £969 million. The section of the document headed "Transaction Overview" stated that "*acquisition would be of Cyprus vehicle Misland avoiding need to offer shares pre-emptively to other shareholders*" and that the other assets held by Misland would be removed from Misland unless the purchaser wished to retain them. The document also contained suggestions as to how a purchaser of Misland could seek to obtain control of the company.

132.    On 7 October 2010, Lazard and Mr Buchanan on behalf of the Green family presented their proposals to representatives of the Barclay interests, including Aidan Barclay. Following this meeting, Aidan Barclay wrote on 8 October 2010 to Bank of Scotland Corporate, "*We have 'agreed', subject to due diligence and contract, to purchase the Green family's shareholding (24.78%) of the Maybourne Group for a consideration of £75m. We are currently working on signing and funding this acquisition in the early part of next week*". The letter goes on to state that the Barclay interests' plan would eventually be to acquire 100% of the shares of the company, which depending on how events unfolded, could be in a matter of weeks or, for example, in two years' time. In fact, there was no progress with this transaction and it does not appear from the evidence that there was any further discussion with the Green family until December 2010.

133.    Discussions with the Green family were renewed in December 2010. A deal was agreed between Sir Frederick Barclay and Mr Buchanan in mid-December but it did not at that stage proceed to a contract. The Green family kept their options open. As

potential bids for the whole company emerged in early January 2011, they wanted the company and shareholders to co-operate with the bidders, but they also wanted to keep the deal agreed with Sir Frederick Barclay alive, as they were by no means certain that other offerors would "*deliver*". For their part, the Barclay interests started to work on a possible purchase of all or a majority of the shares, including discussions with Deutsche Bank to raise finance.

134.   On 18 January 2011 Mr Faber met Mr Buchanan in Ireland and agreed a deal to purchase Misland for £70 million. The deal was approved by Aidan Barclay and Sir Frederick Barclay in a telephone call and the agreement for the purchase of Misland was signed late on 18 January 2011 and completed on 21 January 2011. This move took Mr McKillen and the other shareholders by surprise.

*Offers by Wynton*

135.   Before dealing with the major events of January and February 2011, this is a convenient point at which to mention offers which were made and revised during that period by an entity called The Wynton Group (Wynton). As mentioned earlier, it appears that Wynton was controlled by a Malaysian businessman, Jho Low, and his brother. In mid-December 2010, advisers to Wynton made an indicative offer for the shares of the company. Mr McKillen met Jho Low and his advisers at Claridge's on 29 December 2010. A revised letter of intent was sent to the shareholders on 3 January 2011, proposing an acquisition of all the shares on the basis of an enterprise value of £1 billion, subject to due diligence and agreement of documentation including warranties and indemnities. An accompanying letter from a Malaysian Bank indicated that it was intended to seek to raise up to £950 million of debt and/or mezzanine finance and £50-£100 million of equity. A further letter of intent dated 10 January 2011 was sent to the shareholders.

136.   Although Mr Buchanan on behalf of the Green family was prepared to take this approach seriously, neither Mr Quinlan nor Mr McKillen did so. Mr Murphy on Mr Quinlan's behalf described it as "*pure fantasy due to their plan to raise a £900 million bond with little over £100 million equity*". In an email dated 11 January 2011, after Mr McKillen had had his meeting in Doha on 9 January 2011, he wrote that he did not have anything like the same comfort or belief that it was a reliable offer compared with interest from Qatar. He said "*my sense is that it is an offer that can't really be delivered either in time or structure. The delivery of the Malaysian government bond is not guaranteed and the deal may end up in an open ended bridging situation because it does not have the proper financing. I also sense that some Malaysian government may have a political motive and that will naturally delay execution. I am conscious that on paper the Malaysian deal is better to me personally, however, we should be looking at credibility and execution*". Mr McLaughlin was of the same view. Even Mr Buchanan was not confident that Wynton would deliver, and so had asked Sir Frederick Barclay on or about 6 January 2011 to keep the Barclay offer for Misland open.

137.   Mr McKillen said in evidence:

>    "*The Malaysians offered an unrealistic finance package with £900 million debt and no one appreciated that it was realistic – nobody.  I met the Malaysians and I did not believe they had the credibility to deliver £1 billion.*"

138.    In an email on 13 January 2011, Mr McKillen repeated his view. He wrote that *"with regard to the Malaysian offer, I feel that to labour the company with £900 million of debt is in itself unrealistic"*. The provision on 15 January 2011 of a letter from 1 Malaysian Berhad, an investment vehicle wholly owned by the Malaysian government, confirming its support for the offer, did not allay the concerns of the majority of the shareholders. A further letter from Wynton dated 24 January 2011 stated that the financing for the offer had "in principle" been fully underwritten by Malaysian government-backed investment funds.

139.    On 7 February 2011, Wynton made a revised offer, on the basis of an enterprise value of £1.028 billion. Instead of an offer for all the shares of the company, it was an offer, subject to contract, made to each shareholder to purchase that shareholder's interest and it was not expressed to be conditional upon acceptance by any other shareholder. The offer was stated to be open for acceptance until 5.00pm on 11 February 2011. A board meeting of the company was scheduled for 8 February 2011 and Wynton requested that its offer be considered at that meeting. The offer was not approved by the board. Only Mr McLaughlin supported it and on 11 February 2011 he signed a contract for the sale of his shares to Wynton, which led to his shares being offered round to the other shareholders at the price offered by Wynton under the pre-emption provisions.

*Dealings in January 2011*

140.    I will turn now to the dealings in January 2011 between Mr McKillen and the potential Qatari investors and between Mr Quinlan and the Barclay interests. The sequence of events is of importance because of Mr McKillen's case that in January 2011, and specifically, as it was put in closing, on 15 January 2011, Mr Quinlan reached a binding agreement with the Barclay interests for a disposal of his shares to them.

*Mr McKillen's dealings with Al Mirqab: January 2011*

141.    Although Mr Quinlan's discussions with the Qataris in July and August 2010 had ultimately come to nothing, Mr Murphy was anxious to maintain contact with them. To that end he had at least one meeting with Credit Suisse, advisors to the Qatari interests, in London in December 2010. In early January 2011, he suggested to Mr McKillen that he should speak to the Qataris. He suggested that the Qataris were interested in taking a 75% stake in the company, but allowing Mr McKillen to retain a 25% shareholding and to be the projects director and main promoter of the hotels with appropriate compensation. This was of interest to Mr McKillen and accordingly he and Mr Murphy met William Mansfield of Credit Suisse on 6 January 2011. At the meeting Mr Mansfield confirmed that Sheikh Hamad was interested in acquiring a 75% interest in the company, allowing Mr McKillen to retain 25%. Mr Mansfield indicated that Sheikh Hamad would refinance the NAMA loan facilities and would be likely to agree a purchase on the basis of an enterprise value of not less than £900 million. It was agreed on that basis that Mr Mansfield and Mr McKillen would go to Doha in Qatar to meet Sheikh Hamad and that Mr Murphy should go with them to provide comfort that Mr Quinlan would be in favour of a deal. As appears from an email sent on 7 January 2011 by Mr Murphy to Mr McKillen, Mr Murphy had confirmed with Mr Quinlan that he would accept a deal based on an enterprise value of £900 million subject to the other shareholders

accepting it. Mr McLaughlin confirmed his support in writing. Mr Buchanan refused to provide a letter of support but said that if the Qataris genuinely made an offer on the basis of an enterprise value of £900 million the Green family would be willing to sell.

142.   In a further email late on 7 January 2011, Mr Murphy set out the reasons for accepting an offer of £900 million from the Qataris. These included *"we don't think Q will chip the price"* and *"we know Q can write the cheque unlike so many potential purchasers who are all talk but lack financial substance in the end."* Another reason, Mr Murphy mentioned, was that *"we think the Viceroy/Wynton £1b deal is pure fantasy due to their plan to raise a £900m bond with a little over £100m equity"*.

143.   Mr Murphy explained in his oral evidence that he was enthusiastic about the possibility of a deal with the Qataris because he believed that if Mr McKillen and Mr Quinlan were *"on the same page in terms of a deal, then something could be achieved"*. He distinguished his own enthusiasm for a deal with the Qataris with the rather less enthusiastic attitude of Mr Quinlan. He agreed that he would have spoken to Mr Quinlan about the first of the two emails sent on 7 January 2011 but added that he may possibly have over-stated Mr Quinlan's enthusiasm. He said that Mr Quinlan suspected that the Qataris might try to chip the price. As regards the second email he did not agree that the views expressed as to the reasons for supporting a deal with the Qataris were shared by Mr Quinlan, notwithstanding the repeated use of the word *"we"*. He regarded the possibility of a deal with Qataris as being *"very much my own initiative"*. He further suggested that he may have misled Mr McKillen into thinking that Mr Quinlan's support was greater than in fact it was, because he thought he could bring Mr Quinlan round to the idea that the Qataris' offer was the best offer, particularly if Mr McKillen agreed to it.

144.   On 9 January 2011 the trip to Doha took place. There were meetings initially with Sheikh Jassim, which did not go well because he indicated privately to Mr Murphy that Sheikh Hamad was not prepared to pay as much for Mr Quinlan's shares as for the other shares in the company. He proposed that the purchase of Mr Quinlan's shares would be on the basis of an enterprise value of £800 million as opposed to £875-900 million for the other shareholders. Mr Murphy was very shocked by this proposal. Mr McKillen, when told about it by Mr Murphy, was also surprised and considered that Mr Quinlan was being unfairly treated. He sought in conversation with Sheikh Jassim and others to persuade them to increase the offer being made for Mr Quinlan's shares to the same level as the other shares. Subject to that point, Mr McKillen's discussions on 9 January 2011 with Sheikh Jassim and later with Sheikh Hamad were very satisfactory from his point of view. As he explains in his witness statement, he left Doha on 9 January 2011 with the understanding that they had secured a good offer in principle for the shareholders. The opportunity involved refinancing the NAMA facility and *"offered a secure personal situation for me notwithstanding the proposed reduction in the size of the shareholding, giving me a long term interest in the company and the opportunity to continue to manage the company going forward, for a fee of £5 million per annum and for a minimum three year term"*.

145.   Mr Murphy not unnaturally took a rather different view. He said in evidence that what happened on that day confirmed all of Mr Quinlan's suspicions. Mr Murphy's

reaction was to see if he could revive discussions with Sheikh Mansour of Abu Dhabi.   He was in any event travelling to Abu Dhabi on other business.   On 12 January 2011 he had a meeting with Harry Martin of Barclays Capital, representing Sheikh Mansour, and an intermediary Aasim Mahmood. In his oral evidence Mr Murphy said that his discussions in Abu Dhabi made clear that a deal involving Sheikh Mansour had no realistic prospect because of the size of fees which Mr Mahmood was looking to achieve.

146.   Mr McKillen reported on his discussions in Doha to Mr Buchanan and Mr McLaughlin in an email sent on 11 January 2011. The offer being made by the Qataris was "*the most credible offer we have had to date and one we should not miss out on. We at least know that funding and execution is not an issue with the Qataris*". He continued "*the alternative of not doing a deal is two years in NAMA and the effect of that we both know well – we risk losing control of the business along with the equity*". He expressed a lack of confidence in the credibility of the proposal from Wynton. He ended by saying "*having seen so many offers over the 18 months, I strongly believe we should pursue the most realistic offer (i.e. Qatar) which can be delivered on time and hence avoiding the catastrophic situation of ending up in NAMA*".

*13-14 January 2011*

147.   On or before 7 January 2011, Sir David Barclay called Mr Quinlan and suggested they should meet at Gstaad in Switzerland within a few days. Mr Quinlan flew to Switzerland on 12 January 2011 and was joined by Mr Murphy the following day. The arrangement was to meet Sir David on 13 January 2011 but he was unwell and it was agreed to meet the following day. Mr Quinlan and Mr Murphy had dinner with Mr Faber that evening but there was no discussion of any proposal in respect of Mr Quinlan's shares except that Sir David Barclay would present a proposal to Mr Quinlan the following day.

148.   In the days following the meeting in Qatar on 9 January 2011, Mr McKillen had numerous discussions with representatives of the Qataris. Late in the afternoon on 13 January 2011 he emailed Mr Buchanan and Mr McLaughlin to say that in the next 24 hours the Qataris would make an offer in the range of £875-900 million, which would be available for acceptance for a few days. Contact must also have been made with Mr Quinlan or Mr Murphy because at 18.23 UTC (7.23pm in Switzerland), Mr Murphy texted Mr McKillen to say that Mr Quinlan had agreed to support the Qatari deal and that they were both going to ring Mr Bakhos within the hour to tell him.

149.   During the evening of 13 January 2011 Mr Quinlan spoke to Mr Bakhos. Mr Bakhos apologised for what had occurred in Doha on 9 January and stated that his principals would make an offer which would not involve any discount on the price for Mr Quinlan's shareholding. Mr Quinlan said that he would be willing to consider a deal with the Qataris. Privately, as Mr Quinlan made clear to Mr Murphy, he was not entirely keen to proceed with the Qataris in the light of what had happened on 9 January but Mr Murphy was, as Mr Murphy put it, pushing for him to do a deal with the Qataris.

150.    Evidence of Mr Quinlan wavering in his intentions is shown by an email sent by Mr Murphy at about 10.30pm on 13 January 2011 after dinner with Mr Faber. The email was sent to Mr Mahmood and said *"DQ wants to do Twins deal and Twins are tabling their offer in writing tomorrow. I believe the Twins deal will fail but Q have their proposal. Paddy wants to do Q deal"*. Mr Murphy goes on to say that Mr McKillen would at that stage not meet Sheikh Mansour and that the Green family were promoting Wynton's bid which would in Mr Murphy's view fail. He stated that he regarded the Qatari deal as the most credible but that it could fail as the Green family might not support it.

151.    Just after midnight Mr Murphy sent an email to the other shareholders and to Mr Hennebry to say that he and Mr Quinlan had discussed the possible deals and had come to *"the following definitive conclusions"*. They were not satisfied with the deal from Wynton but *"the new deal proposed by Paddy from the Qataris has a definite air of financial credibility in it and we would support it as an exit strategy for Derek subject to: 1) our Bank's approval and 2) a majority of shareholders accepting it"*. In his second witness statement, Mr Quinlan said that he had not seen this email before and that it did not accurately reflect his thoughts at the time as he remained uncomfortable about doing a deal with the Qataris. In his oral evidence, Mr Murphy said that this email was not the result of any conversation in which Mr Quinlan expressed his support for a Qatari deal. He said that he was on a solo run when he was writing the email and that he was still trying to bring Mr Quinlan and Mr McKillen together. He overstated the position in the hope that he could get the agreement of both Mr Quinlan and Mr McKillen. He believed at that stage that he could change Mr Quinlan's mind. He did not want to blow the deal up so he sent the email just to keep the door open.

152.    The meeting with Sir David Barclay took place on the morning of 14 January 2011. Present were Sir David, Mr Faber, Alistair Barclay, Mr Quinlan and Mr Murphy. They discussed the purchase of Mr Quinlan's shares and as recorded by Mr Faber in his witness statement *" a (non-binding) agreement in principle was reached that we would buy his shares on the basis of an enterprise value of £900 million, i.e. about £80 million for Mr Quinlan's shares"*.

153.    In his second witness statement, Mr Quinlan says of this meeting that Sir David said that he was willing to offer £900 million for the whole group and that there would be no due diligence or warranties. While Mr Quinlan does not recall a specific timetable being discussed, he thought that the deal could be completed reasonably quickly. He says that he believed it was a significant improvement on the Qatari offer due to the fact there would be no due diligence or warranties and he told Sir David that he thought the offer would be acceptable to shareholders. He mentioned also that any offer would be subject to the pre-emption provisions. I accept the evidence of Mr Faber and Mr Quinlan as regards this meeting.

154.    During the morning of 14 January 2011 Credit Suisse sent a letter, on behalf of the Qataris, containing an indicative offer to the shareholders of the company. It put an enterprise value of £875-£900 million on the company. It stated that any final offer would be subject to Mr Quinlan, the Green family and Mr McLaughlin agreeing to sell all of their interests in the company but it recorded that the Qataris were willing to allow Mr McKillen to retain an equity interest reflecting his future role in the business. It was conditional also on the satisfactory completion of a reasonable

scope of financial, tax, pensions, legal, property and commercial due diligence and on the agreement of appropriate legal documentation including representations, warranties and indemnities from the selling shareholders. It stated that the indicative offer was opened for acceptance to mid-night on Saturday 15 January 2011.

155. In the car on the way to the airport after the meeting with Sir David Barclay, Mr Murphy received details of the written offer made during the morning by Credit Suisse and informed Mr Quinlan. Mr Murphy called Mr Faber and told him about the offer. Mr Faber says in his witness statement that he said something along the lines that the Qatari offer was not a problem since Mr Quinlan had a deal with the Barclay brothers but Mr Murphy gave the strong impression that Mr Quinlan might not stand by it. In his second witness statement, Mr Murphy agrees that he most likely did give this impression to Mr Faber. He was not enthusiastic about doing a deal with the Barclay brothers because he believed that any sustainable deal would have to include Mr McKillen. He thought the Qatari offer would be acceptable to Mr McKillen and that Misland could possibly be required to sell under the drag-along provisions of the shareholders agreement. He comments that he did not know that the Barclay brothers would shortly agree terms for the purchase of Misland and that, if he had known, it would have changed everything.

156. Mr Quinlan flew back from Geneva to London and Mr Murphy to Dublin. Shortly after 4.00pm Mr Murphy sent an email from the airport to the shareholders of the company which began "*I have been asked to expand on why we are prepared to support the Q proposal*". A number of reasons are given, of which the first is that the Qataris are credible buyers with cash to complete and not someone offering a high price to get an exclusive deal and then chip. Another reason is that the shareholders have run out of time to complete a deal having held out as long as they could. The email was sent to, amongst others, Mr Quinlan. Mr Quinlan says in his second witness statement that he does not remember seeing it at the time and that he would not have had access to his emails while travelling. In any event, he says that it did not reflect his thoughts at the time since he remained unconvinced about the Qatari deal and thought that he should do a deal with the Barclay brothers.

157. Mr Faber immediately relayed the contents of his call from Mr Murphy to Sir David Barclay who told him that he should return to London and make sure that Mr Quinlan continued to support the proposal from the Barclay interests. Mr Faber returned to London that afternoon and explained the position to Aidan Barclay. Mr Faber met Mr Quinlan at the Capital Hotel in Knightsbridge, with Mrs Quinlan also present, on the evening of Friday 14 January 2011 and again at about 10.30am on Saturday 15 January 2011. At each of these meetings Mr Faber impressed on Mr Quinlan the merits of the offer which the Barclay interests were prepared to make, stressing not only the price based on an enterprise value of £900 million but also in particular that it would not be subject to due diligence or warranties. At the meeting on Saturday morning, Mr Quinlan explained to Mr Faber that there was to be a board meeting of the company and that it was all very difficult.

*15 January 2011*

158. A conference call among the shareholders or their representatives took place at noon on Saturday 15 January 2011. Those participating were Mr McKillen, Mr McLaughlin, Mr Buchanan and Mr Murphy, with Mr Hennebry in attendance. Mr

McKillen wished to have support for his negotiations with the Qataris and in particular wished the shareholders to enter into a binding exclusivity agreement for a period of three weeks. Mr Buchanan on behalf of the Green family made clear that Misland would not agree to giving the Qataris exclusivity. Mr McLaughlin was willing to do so and Mr McKillen, Mr McLaughlin and Mr Hennebry understood Mr Murphy to agree to exclusivity on behalf of Mr Quinlan. There is a difference in the evidence as to the extent to which Mr Murphy participated in the conversation. I do not consider it necessary to resolve this detail because it is clear that at the very least Mr Murphy allowed the others to understand that Mr Quinlan did agree to such exclusivity. Indeed Mr Murphy was himself in favour of the deal with Qataris and during that day had a number of calls with Mr Quinlan, seeking to persuade him to support the Qatari deal.

159.   Mr Quinlan and Mr Faber met again in the afternoon with Aidan Barclay also present. By the end of that meeting Aidan Barclay and Mr Faber believed that they had persuaded Mr Quinlan not to sign the Qatari exclusivity agreement. They called Sir David Barclay who thought that they should get something in writing from Mr Quinlan.

160.   Mr Quinlan returned home to Putney and that evening received a telephone call from Sir David Barclay. Sir David spoke first to Mrs Quinlan and then to Mr Quinlan. In his first witness statement Mr Quinlan said that Sir David told Mrs Quinlan that he would support the family and try to get Mr Quinlan back on his feet. In his second witness statement, Mr Quinlan said that he has since discussed this with his wife and she could not confirm with certainty that Sir David made those comments on that specific evening but he accepts that it is possible that Sir David made reference to the fact that he would support the family. Mrs Quinlan passed the telephone over to Mr Quinlan. Sir David wanted to know whether he had Mr Quinlan's support for his proposals. Mr Quinlan said that he did support them.   Mr Faber had arranged the preparation of a short exclusivity agreement and took it round to Mr and Mrs Quinlan's house later that evening. Mr Faber understood that an exclusivity agreement was as far as the Barclay interests could go with Mr Quinlan in view of the pre-emption provisions. Mr Quinlan signed the agreement.

161.   Mr Faber understood that Mr Quinlan had accepted the fundamentals of the deal which the Barclay interests were proposing, on the basis of an enterprise value of £900 million. He denied the suggestion put to him in cross-examination that Mr Quinlan was promised a facilitation fee. He said that he never once had a conversation with Mr Quinlan about a facilitation fee. He was not aware that there had ever been any discussion between Mr Quinlan and the Qataris about a fee and he said that he and the Barclay interests were never asked to match any fees. Mr Faber commented that the level of fees discussed with the Qataris in about August 2010 would have represented a considerable additional enterprise value and would have certainly affected the view of the Barclay interests as to whether it was an attractive transaction.

162.   Mr Faber denied also that the arrangement made on 15 January 2011 involved Mr Quinlan agreeing that he would thenceforth be using all of his rights in relation to his shares for the benefit of the Barclay interests. Equally he denied that Mr Quinlan agreed to act in accordance with instructions given to him by Barclay interests.

163.   At 1.55pm on 15 January 2011, Mr Murphy had informed Mr McKillen of the dealings between Mr Quinlan and the Barclay interests. In a text he said: "*Greens are talking to Barclay Twins who have now contacted Derek. They are proposing a role for you, more than 900. Close in a week. No due diligence. No warranties. Seems incredible. Don't blow a gasket on this news. Talk to me. It might offer a compromise. You would have the power of the telegraph behind you*". Later that evening Mr Murphy informed the other shareholders about the exclusivity agreement with the Barclay interests. In an email sent at 10.39 pm, he said Mr Quinlan believed that a better deal could be agreed with the Barclay brothers and that they would table an offer the following week at £900 million on terms that would not include any due diligence or warranties, would provide for payment in a matter of days and would give a future role to Mr McKillen (to be agreed directly with him). Given that other shareholders had understood from Mr Murphy that Mr Quinlan would support an exclusivity agreement with the Qataris, the understandable reaction from Mr McKillen, Mr McLaughlin and Mr Hennebry was a mixture of incredulity and anger.

164.   What becomes very clear from a number of texts and emails sent by Mr Murphy is that he felt personally let down by Mr Quinlan's decision and embarrassed as regards the other shareholders and the Qataris. In an email to Mr Bakhos and Mr Mansfield at 10.50pm on 15 January 2011 Mr Murphy said that he very much regretted what had happened but then went on to float the possibility of a deal involving the Barclay interests and the Qataris. In a text message to Mr McKillen sent on 16 January 2011, Mr Murphy said "*you have no idea how badly I feel about the way Derek has behaved and you have been treated. He has killed off a chance for me and Owen to get a few bob*". On the morning of 16 January 2011 Mr McKillen texted Mr Murphy to say: "*That man deserves no respect. I know you did your best Gerry*".

165.   I am satisfied that Mr Murphy and Mr Quinlan were by no means of one mind in the days leading up to 15 January 2011 about the respective merits of dealing with the Qataris or the Barclay interests. It is clear that Mr Murphy strongly favoured a deal with the Qataris. This is borne out by Mr Murphy's text messages to Mr McKillen in early January 2011 when he was encouraging Mr McKillen to enter discussions with them, for example: "*This is THE deal for us.*"   He felt that a solution to the company's difficulties could only be found if both Mr McKillen and Mr Quinlan agreed on a proposal. As Mr McKillen was keen on a deal with the Qataris and seemed to have an antipathy towards the Barclay brothers, Mr Murphy believed that the best course for all concerned, including Mr Quinlan, was to reach an agreement with them. He sought to persuade Mr Quinlan of this view and I am satisfied that it coloured the approach which he took in some of the emails supporting a Qatari deal, to which I have referred. I do not consider that Mr Murphy's emails are by any means a reliable indicator of Mr Quinlan's state of mind at any particular time. Mr Murphy was no doubt also attracted by the possibility of making, as he puts it, "*a few bob*". He explained in answer to questions from me that he had a hope that the Qataris might pay a fee for Mr Kelly and himself for their office. He said that it could have been anything from £100,000 to £1 million.

*17 January 2011*

166.    As I mentioned earlier, the Barclay interests agreed the purchase of Misland on 18 January 2011. The position at that point therefore was that the Barclay interests had acquired an interest of just under 25% in the shares of the company and, so far as any written agreement showed, had by the exclusivity agreement of 15 January 2011 prevented Mr Quinlan from selling his shares to the Qataris or anyone else before 17 February 2011. Meanwhile on 16 January 2011 Mr McKillen and Mr McLaughlin had entered into an exclusivity agreement with the Qataris, lasting until 7 February 2011. The position was accurately summarised by Mr Faber in an email sent on 18 January 2011 to a contact who had heard a rumour that the Qataris were close to agreeing a deal in relation to the company: "*we are now demonstrating negative control (we can block things) and I hope we can take a positive step forward in the coming day or two*". In the same email and with remarkable prescience Mr Faber said "*this is a soap opera and has a few chapters left to run*". I doubt whether Mr Faber then realised quite how many chapters were left to run.

*23-27 January 2011*

167.    On 23 January 2011 Mr Murphy sent to Mr Hennigan at NAMA the background brief on the implications of the sale of Misland to the Barclay brothers.   The document also refers to the arrangements between the Barclay interests and Mr Quinlan.  It refers to the exclusivity agreement signed on 15 January 2011 adding that it "*is the only agreement DQ has with BB*". It continues that on 15 January 2011 the Barclay interests did not seek to agree to buy Mr Quinlan's shares as this would merely give Mr McKillen an opportunity under the pre-emption provisions. The same document states that "[f]*or several practical reasons DQ supports BB as a shareholder and will align himself with their stake and support the sale of his shares when it is appropriate to do so. Adopting a contrary stance in the current circumstances would most likely damage DQ's equity value and reduce what DQ can repay his creditors*". The document states also that "*Sir David intends to place the professional services of Cork Gully (Stephen Cork) at the disposal of the Quinlan family in order to effect a speedy settlement with creditors*". On 24 January 2011, Mr Murphy emailed Stephen Cork at Cork Gully stating "*Derek Quinlan now has a supporter in the form of the Barclay brothers ('BB')*".

168.    In an email to a contact dated 24 January 2011, Mr Faber wrote that "*Derek is an old acquaintance so we hope to emerge with 60% shortly*".

169.    On 24 January 2011, Aidan Barclay and Mr Peters attended a meeting with Mr Hennigan and others from NAMA. Mr Peters' hand written notes of the meeting include the following: " *'Agreement' DQ to acquire and share pro rata price*". Mr Peters gave evidence that this was a reference to the agreement in principle with Mr Quinlan that he would sell his shares to the Barclay interests based on an enterprise value of £900 million. Mr Hennigan recalled that Aidan Barclay said that the Barclay brothers "*had a debt of gratitude to Derek Quinlan, they wished to see him get back on his feet and they were going to provide him support with the day-to-day expenses*".

170.    Mr Peters followed up the meeting with a letter to NAMA on 25 January 2011 to confirm points made at a meeting. He referred to the acquisition of Misland and to the intention to make an offer to the other shareholders on the basis of an enterprise value of £900 million. He stated also that "*we have signed an exclusive 'agreement'*

*with Derek Quinlan to acquire the shareholding in Coroin at the same pro-rata equity value as per Misland, as set out in (1) above. We did not specifically discuss the topic of Derek Quinlan extending his exclusive arrangement with us, if necessary for any reason, although Graham did ask the question as we were leaving your building. To be clear, if we find ourselves in such a position, it would be natural for Derek Quinlan to extend his exclusive arrangement with us for a longer period of time".*

171.    On 24 January 2011, provoked no doubt by the publicity surrounding the sale of Misland to the Barclay interests, further indicative offers from third parties were sent to shareholders. PCP Capital Partners, whose chief executive officer, Amanda Staveley, had become well known when Abu Dhabi and Qatari funds invested in Barclays Bank in 2008, sent an indicative offer, subject to contract, offering to purchase the company on the basis of an enterprise value of £960 million. There is no evidence that any of the shareholders ever took this or other approaches from PCP Capital Partners seriously.

172.    At this stage, it was the intention of the Barclay interests to proceed as swiftly as possible to a purchase of all the shares in the company, if that were possible. At the meeting with representatives of NAMA on 24 January 2011, Aidan Barclay stated their intention to purchase all the shares of the company within the following 4 to 8 weeks. He also said that, while they wished the two year extension to the NAMA debt to proceed, their intention was to refinance the whole of that debt within twelve months. They were already having detailed discussions with Deutsche Bank and with Barclays Bank with a view to raising within a short period the finance required to repay the NAMA debt. Deutsche Bank proposed terms conditional on the Barclay interests obtaining 51% control of the company. Those terms were rejected on the grounds that they were significantly more expensive than the NAMA debt. Discussions with Barclays Bank proceeded on the basis of a facility either to a Barclay interests' company or directly to the company to refinance the NAMA debt. The latter would be adopted only if the Barclay interests had majority control of the company. Barclays Bank required the personal guarantees of Sir David Barclay and Sir Frederick Barclay.

173.    On 25 January 2011, PR consultants acting for the Barclay interests emailed Mr Faber to tell him that The Times was likely to run an article the following day. They identified questions and invited any comment that Mr Faber wished to make. One of the questions was *"Will you buy Kyran McLaughlin stake imminently?"* The comment provided by Mr Faber was as follows: *"An offer has been made to all the shareholders including Kyran. We hope they will all accept in due course as it represents immediate cash – so we are buying 'as seen'. Makes our offer unique as no due diligence so 100% certainty. Due to pre-emption rights we would prefer all 3 remaining shareholders sold at same time, but we are happy to deal individually if need be. The alternative is we refinance the company to lower the debt and dilute all the shareholders to take control. This option is available to us as we control 60% of board votes".*

174.    On 25 January 2011 NAMA had written to the directors of the company and to Mr Quinlan in relation to Mr Quinlan's shareholding and to his exclusivity agreement with the Barclay interests. The letter drew attention to the rights of NAMA as the holder of a charge over part of his shareholding. Mr Murphy replied to NAMA,

having first spoken to both Mr Quinlan and Mr Faber. Mr Murphy stated in his reply "*Derek has only ONE agreement with the Barclay brother* [sic] *which is as set out in the letter Derek signed with their BVI company and which I copied to you. His agreement is as you state in your letter. Derek has NOT agreed to sell his shares and cannot do so without approval from NAMA and Bank of Scotland and the second charge party. It will be Derek's banks' prerogative to approve any sale*".

175.   Mr Faber became a director of the company on 21 January 2011 as the appointee of Misland. A board meeting of the company was held on 25 January 2011 and it was the first to be attended by Mr Faber. The minutes record that he introduced himself to the board, noting that Ellerman was the investment holding company for Sir David and Sir Frederick Barclay. As regards dealings with NAMA, Mr Faber informed the board that he had discussed the refinancing with NAMA and suggested that the Ellerman team should assist Mr Hennebry with completing the refinance. This was welcomed and accepted by the board.

176.   Between 27 January 2011 and 8 February 2011 there were email exchanges and discussions relating to the closure of company's data room which is the subject of complaint in Mr McKillen's petition. I will deal separately with the sequence of events in relation to this matter when I come to deal with allegations of breach of duty by the directors.

*Formation of MFL*

177.   As part of the planning, MFL was formed on 28 January 2011.   It was wholly-owned by Maybourne Holdings Limited, another newly-incorporated company with the Barclay brothers as its directors and shareholders.  There is an issue as to the purpose in establishing it.  Mr McKillen's case is that even at this early stage the intention was to purchase the NAMA debt and MFL was established to be the vehicle for the acquisition.  I do not accept either limb of this case.  First, it is clear from the purposes expressed in the draft term sheets provided by both Deutsche Bank and Barclays Bank that the purpose of the proposed loans would be to provide, either directly to the company or through a company controlled by the Barclay family, the funds needed to repay the NAMA debt.  The purchase of the debt is not mentioned.  Secondly, the evidence of Mr Peters and Mr Seal was that a purchase of the debt was not at this time being contemplated.  Mr McKillen relies on paragraph 12 of Mr Peters' first witness statement (made at an early stage in the proceedings and not his evidence at trial) to show that the purpose of the meeting with NAMA on 24 January 2011 was to explore a purchase of the NAMA debt. That paragraph must be read with Mr Peters' third witness statement, particularly paragraph 24, as well as his oral evidence.  I am satisfied that the purchase of the debt was not then in contemplation and that it was the NAMA representatives who at the meeting mentioned that they would be prepared to sell the debt as a means of recovering its value.

178.   I am satisfied that MFL was established so as to be used, as needed, in relation to financing in connection with transactions concerning the company, or its shares, without any clear plan as to precisely how it would be used.  It is perfectly possible that it would have been used as the borrower under the facilities then being discussed with the banks, but equally it might be used in any other way relevant to financing.  This is the evidence of Mr Peters and Mr Seal which I accept.  An email

from the Barclay interests' solicitors to the Jersey incorporation agents setting up Maybourne Holdings Limited said that MFL *"will be acquiring loans"*. I am satisfied that this was not its only purpose and that it was not referring specifically to an acquisition of the loans which then comprised the NAMA debt.

*Assignment of security to the Barclay interests*

179.    On 29 January 2011, Ellerman purchased from Bank of Scotland (Ireland) Limited a debt owed by Mr Quinlan and secured on part of his shareholding representing a 21.34% interest in the company. This was prompted by Mr Quinlan who was anxious that the Barclay interests should acquire it. BOSI was pressing for payment and Mr Quinlan knew that he would face severe difficulties if it remained his creditor. The Barclay interests were not at first keen to buy the debt but they were persuaded to do so, principally because they learnt that another party was making enquiries about purchasing it. This raised the possibility that a new security holder might be able to exercise the right attached to the shares to appoint a director. Mr Faber and others on the Barclay side assumed this was Aabar Investments and Robert Tchenguiz. In December 2010 they had acquired from Royal Bank of Scotland a debt secured by a second charge on Mr Quinlan's shares. Mr Quinlan consented in writing to the transfer to the Barclay interests on 28 January 2011 and the sale of the debt and associated security was completed the following day.

180.    The fact that this transaction was prompted by Mr Quinlan and that the Barclay interests needed to be persuaded to proceed with it is relevant to two points made by Mr McKillen. First, it is suggested in his closing submissions that the acquisition was the next step in the plan to acquire control of the company. If by that is meant that it was a pre-planned step, contemplated by the Barclay interests at the time of the acquisition of Misland, I reject it. Secondly, it is alleged that there was a connection between the acquisition of the debt and a payment of £500,000 made by the Barclay brothers to Mrs Quinlan on 31 January 2011. At the end of January 2011, Mr and Mrs Quinlan were in Gstaad and met the Barclay brothers at least once, on 29 January 2011. On that day, Mr Quinlan signed a form of consent to the assignment, although it is not by all means clear that his consent was required. There was discussion also as to the financial pressures on the Quinlan family. The suggestion that the payment was made in return for Mr Quinlan's co-operation in the assignment of the debt does not seem likely, in view of the fact that it was Mr Quinlan who was keen for the debt to be acquired and persuaded the Barclay interests to acquire it.

181.    On 4 February 2011, Ellerman as security holder was registered as the holder of the shares, as permitted by clause 6.18 of the shareholders agreement and as agreed by all the directors. Mr McKillen requested confirmation that there had been no transaction between Mr Quinlan and the Barclay interests. This confirmation was given in a letter dated 3 February 2011.

*Agreement between Barclay interests and Al Mirqab: 2 February 2011*

182.    The Barclay interests quickly decided that the best way forward was a joint venture with the Qataris. Accordingly, on or before 26 January 2011 Aidan Barclay spoke to Sheikh Jassim and followed up their conversation with a letter dated 26 January 2011 which enclosed draft heads of terms for a 50/50 joint venture. Sheikh Jassim

had evidently asked how they should next proceed. Aidan Barclay said that they had not had a direct conversation with Mr McKillen. He suggested that the Qataris should not release Mr McKillen and Mr McLaughlin from their exclusivity agreement. He added that the Barclay interests had exclusivity obligations from Mr Quinlan which they would maintain. He suggested that they would not make any overtures to Mr McKillen or Mr McLaughlin and Sheikh Jassim should not make any more overtures to Mr Quinlan. "*Instead we will work to acquire all of Derek Quinlan's shares whilst you work in parallel to acquire all of Paddy McKillen's and Kyran McLaughlin's shares, so that we ultimately, together, after adjustment, will hold all the shares and related assets 50/50*". The Qataris responded on 27 January 2011 with proposed amendments to the heads of terms and there were further exchanges.

183.   A joint venture agreement was signed on 2 February 2011 by Sheikh Hamad and Aidan Barclay for the "Barclay Family". As previously discussed it contemplated 100% ownership of the company held by the parties for their joint benefit on an equal 50/50 joint venture basis. It provided that the Barclay interests were to undertake the role of asset manager, involving operational responsibility and day to day management of the group. Their fee was to be at a rate of 5% of group gross operating profit, not to exceed £3 million for the financial year 2011.

*Agreement between Mr McKillen and Al Mirqab: 3 February 2011*

184.   The Barclay interests were not alone in dealing at this time with the Qataris. Their acquisition of Misland undermined the arrangements which Mr McKillen had made with the Qataris in mid-January 2011 which would have involved the company being owned as to 75% by the Qataris and as to 25% by Mr McKillen. In the light of this development Mr McKillen resumed discussions with the Qataris which resulted in heads of terms being signed between them in Doha on 3 February 2011. The heads of terms recited the acquisition by the Barclay interests of Misland and provided for alternative courses to be taken by the parties to deal with this new situation. Clause 2 gave Mr McKillen an opportunity until midnight on 10 February 2011 to obtain a firm acceptance from the Barclay interests to either of two proposals: first, a purchase of their current interests in the company for a net profit of £20 million; secondly, if that were not acceptable to the Barclay interests, Mr McKillen was to offer to split the hotels between the two parties so that Claridge's would be owned by the Barclay interests and the other properties would be owned by Al Mirqab and Mr McKillen on the terms of their proposed joint venture. Clause 3 provided that, if Mr McKillen failed to obtain a firm acceptance of either of those proposals, the parties empowered Sheikh Jassim to enter into direct discussions with the Barclay interests with the aim of offering one of the following proposals. The first proposal was that there would be a joint acquisition of the company on the basis of a 40-40-20 split between respectively Al Mirqab, the Barclay interests and Mr McKillen subject to the following terms. First, Mr McKillen would further reduce his shareholding from 20% to 15% if it was necessary to secure the firm acceptance by the Barclay interests of this proposal. Secondly, Mr McKillen would have a senior managerial role in conjunction with the Barclay interests in the management of the group or Mr McKillen would have an independent leading management role in The Berkeley hotel. Thirdly, the management would be under the supervision of a board of directors representing the interests of Al Mirqab, the

Barclay interests and Mr McKillen on a pro-rata basis. Fourthly, the terms and conditions of each party's management role would be discussed and agreed between the three parties. The alternative to that proposal would be an offer to the Barclay interests to split the hotels so that Mr McKillen would independently own The Berkeley and the Barclay interests would own the other hotels, such split being subject to the right of Al Mirqab to be a partner.

*Agreement between the Barclay interests, Mr McKillen and Al Mirqab: 12 February 2011*

185.    On 11 February 2011 Aidan Barclay, Howard Barclay and Mr Faber travelled to Qatar to have further discussions with a view to taking forward the deal with the Qataris. They knew that Mr McKillen would be there and they assumed that he would be negotiating his exit from the company. They were not aware of the agreement which Mr McKillen had made on 3 February 2011. On 12 February 2011 there were private meetings involving Mr McKillen with Mr Bakhos and the Barclay representatives with Sheikh Jassim, followed by a tripartite meeting attended also by Sheikh Hamad. The Barclay representatives were informed, in effect as a *fait accompli* as Mr Faber describes it, that Mr McKillen would not be selling out completely but would remain an 18% shareholder with the remaining 82% being split equally between the Barclay interests and the Qataris. The Barclay interests accepted this condition but there was negotiation on other terms, in particular as to the basis on which Mr McKillen would continue to have any active management role in the company. The compromise reached on that aspect was that Mr McKillen would manage the group for a term of one year for a fee of £5 million.

186.    The three parties signed a binding agreement giving effect to these terms in the course of 12 February 2011. The parties to the agreement were named as Al Mirqab and its affiliates (Al Mirqab), the Barclay family (Barclay) and Mr McKillen (PM). Clause 1 provided:

> *"The parties commit to work together on a joint venture basis divided as follows: 41% to the benefit of Al Mirqab, 41% to the benefit of Barclay and 18% to the benefit of PM (referred to as our 'partnership')".*

Clause 4 provided:

> *".......the management of the Maybourne Hotel Group will be entrusted to PM for term of one year from the date the Parties have acquired the Maybourne Hotel Group. At the end of such term, the Parties shall agree by majority on the future management arrangements of the Maybourne Hotel Group."*

Clause 5 provided that Mr McKillen would be paid a management fee amounting to £5 million for the first year of management. Clause 6 provided that the parties were to have pro-rata representation on the board. By clause 7 the parties agreed to treat the agreement as confidential, with a requirement to agree on a public announcement once they had acquired the company. Clause 8 provided that the agreement was intended to be legally binding upon the parties and clause 9 provided that it was governed by English law.

187.  As regards Mr McKillen's proposed management role, Mr Faber on behalf of the Barclay interests took the view that, as it was an appointment for only one year and was not anticipated to involve any significant change to the way in which the hotels were managed, this arrangement in effect represented an exit fee for Mr McKillen. Given that the appointment was for only one year and that the development plans for the hotels, which Mr McKillen identifies as his principal area of interest, presented a project which would take several years to fulfil, it appears to me likely that this was indeed the case. While Mr McKillen may well have hoped that he might be able to negotiate an extension, the Barclay interests clearly did not regard it as a long term role and it seems unlikely that Al Mirqab saw it differently. There was unlikely to be any obvious commercial advantage in extending his appointment beyond a year, certainly at an annual fee of £5 million.

188.  Mr Faber's evidence was that Mr McKillen appeared to be very happy to sign the agreement and delighted that the Barclay interests and the Qataris were going to work together to refinance the company. The conversations with Mr McKillen were, Mr Faber says, good natured. Mr McKillen said that refinancing the company was an absolute priority and the other parties agreed with him. While the Qataris were suggesting Credit Suisse as the source of funding, Aidan Barclay proposed Barclays Capital to whom Aidan Barclay and Mr Faber spoke after the deal was signed on 12 February 2011, with Mr Faber emailing some further details later that evening. The intention was for Barclays Capital to come back quickly with refinancing proposals.

*Steps to implement the 12 February 2011 agreement*

189.  The Barclay interests' representatives returned to London on Sunday 13 February 2011 and within a day or two Mr Bakhos travelled to London to finalise the deal.

190.  Within a day or so, Barclays Bank provided an indicative term sheet, agreeing to provide a £660 million loan facility in principle but requiring the personal guarantees of Sheikh Hamad and the Barclay brothers. It made clear that it was not prepared to provide the facility without these personal guarantees although attempts were made to persuade it otherwise.

191.  Special purpose vehicles were set up for the purposes of implementing the agreement. This was explained by Mr Faber late in the evening of 12 February following the signature of the agreement, in an email to Barclays Bank. He said that a New Co would be formed to be owned by B Overseas and Al Mirqab. New Co would form Bid Co which would acquire 82% of the shares in the company. Mr McKillen would retain an 18% holding. Shortly afterwards, Ellerman Group Holdings Limited and EHGL, both incorporated in the BVI, were established as New Co and Bid Co respectively.

192.  A draft agreement for the purchase by EHGL of the shares needed to reduce Mr McKillen's holding to 18% was sent to Mr Cunningham as Mr McKillen's representative on 15 February 2011. An agreement for the purchase by EHGL of Mr Quinlan's shares at a price of £80 million was provided to him in draft on 15 February 2011. It was signed by Mr Quinlan and EHGL on 17 February 2011 (the 17 February agreement). The agreement provided that the sale was subject to compliance with the shareholders agreement and the company's articles of association. This disposal by Mr Quinlan of his shares required the release by

NAMA of its charge and NAMA approved the sale and provided a release on 23 February 2011.

193.   Mr McLaughlin's shares were acquired. The Barclay interests had declined in early February to make an offer for his shares but within a few days found that he was proposing to sell his shares to Wynton. On that basis he initiated a pre-emption round. The Barclay interests made the only offer and purchased them. On 23 March 2011 Mr McLaughlin resigned as a director and was replaced by Mr Seal.

194.   Following the agreement there was a real urgency to finalise the financing and implement the agreement as quickly as possible. The reason for this was that the extension to the NAMA facilities expired on 14 February 2011. Until the weekend of 12-13 February 2011, all parties including Mr Faber had been working towards an extension of the NAMA facilities for two years. It was the expectation of all concerned, including Mr Faber, that the two year extension would be agreed on 14 February 2011. This created a real dilemma once the agreement had been made on 12 February 2011. On the one hand, the NAMA facilities expired on 14 February 2011. On the other hand, the re-financing which had been negotiated intensively over the week-end with Barclays Bank would be on better terms than those available from NAMA. Moreover the proposed two year extension of the NAMA facility included heavy pre-payment penalties. It was therefore in nobody's interests at that point that the two year extension with NAMA should be entered into but there was further work to do in negotiating the terms of facilities to be provided by Barclays Bank and in agreeing the necessary documentation. It became urgent therefore to negotiate with NAMA an extension of the facilities for a short period. Great efforts were made to achieve this, which included a telephone call by Sheikh Hamad to Brian Lenihan, the Irish Finance Minister. NAMA agreed a two-week extension on Tuesday 15 February 2011.

*Termination of the agreement by Mr McKillen*

195.   Although, as he confirmed in evidence, Mr McKillen had carefully read the agreement of 12 February 2011 before signing it, he was having second thoughts about it within a few days and ultimately, later in February, refused to proceed with it. The source of the difficulty appears to have been a meeting with Mr Bakhos on Tuesday 15 February 2011. Mr McKillen emailed Mr Bakhos the following day: *"After your attitude during yesterday's chat, I want to make something very clear, my present shareholding in Maybourne was earned over a 6 year period by a lot of sweat and tears. It was very clear from our chat yesterday that there is an attempt to bully me into an unacceptable deal that puts my last 6 years and my future at risk. For the record I will not be bullied by you, Barclays or anyone else for any money"*. Mr McKillen referred in his email to some critical comments made by Mr Bakhos regarding Mr Cunningham's absence in Argentina. Mr Bakhos responded to this email later on 16 February 2011. He said that it had not been his intention to offend Mr McKillen and apologised if he had done so. He continued *"but knowing that Liam [Cunningham] is at the far end of the planet with different time zones was shocking to me; since I knew we could not progress to finalise the arrangement we reached in Doha in his absence"*. He expressed the hope that they would proceed with the agreement and continued *"We are under enormous pressure to finalise before other bidders emerge. We have made good progress since our agreement on Saturday: financing is ready, NAMA on board and standing still for us, and DQ*