# EXHIBIT 25
# PART 2

*completed. We need to re-engage with each other we complete our arrangement. If you do not want to deal with me personally, that is fine with me. But you need to stay engaged with my principals directly*".

196.    Discussions were resumed between the parties or their lawyers, but by 24 February 2011 Mr McKillen had decided, and made clear, that he would not proceed with the agreement.

197.    In explaining his decision to pull out of the agreement, Mr McKillen has said in this case that it was caused by a change in the proposed structure for the deal. He says that his understanding on 12 February 2011 was that there would be three shareholdings, the Qataris and the Barclay interests with 41% each and himself with 18%. In those circumstances, by siding with either the Qataris or the Barclay interests in the event of dispute between them, he would hold the balance of power, which he saw as a distinct advantage. He says that he subsequently learned that it was intended by the Qataris and the Barclay interests to form a single holding company for their combined interests of 82% and he would not be in a position to exercise a casting vote. I am not satisfied that this is the true explanation or indeed that it played any significant part in Mr McKillen's thinking. The deal reached in Doha was not in terms on the basis that there would be three shareholders in a single company but rather that their interests would be held ultimately in the agreed proportions. More significantly when Mr McKillen's solicitors on 17 February 2011 wrote a long letter to him, raising concerns in relation to the agreement this point was not raised. If it had the central significance which Mr McKillen attaches to it, one would expect that to be clear from his solicitor's letter. Moreover, Mr Cunningham emailed Anglo Irish Bank on 15 February 2011 in relation to this deal and said specifically that "[n]*ewco will be established which will hold 82% of Coroin, this newco will be jointly owned 50/50 by the Barclay Brothers and the Qatari's..... This will result in the net position of 41%, 41% and 18%"*.

198.    The letter dated 17 February 2011 from Arthur Cox, Mr McKillen's solicitors, gives a good picture of Mr McKillen's concerns. The letter was written following a meeting between them. The letter points out the inherent risks for Mr McKillen entering into a joint venture in the shareholdings envisaged *"with parties having a significantly stronger financial position, regardless of the level of legal protection put in place"*. They expressed the view that these risks would be exacerbated "*where a potential party to the joint venture [the Barclay interests] applies a very different management style and business strategy to the running of a hotel business compare to that which you have employed in the group to date*". Reference is made to the need for mutual trust and co-operation between the parties and the letter notes *"your heightened concerns  following your meeting in London on Tuesday"*, that being the meeting with Mr Bakhos. They then refer to two specific risks "*which present a serious threat to your position in the short to medium term*". First, the proposed refinancing for a period of only one year raised questions as to how the funding would be provided thereafter: "*An equity refinancing in these circumstances would carry the risk that you would suffer a serious dilution of your holding*". Secondly,

> "*We had understood that a five-year management agreement would be put in place between you and Bidco, whereas the structure currently proposed only envisages a one-year deal. Such an arrangement would not provide you*

> *with a firm basis from which to direct the implementation of the proposed strategy of the Group for the duration of the time period expected to be needed to deliver that strategy. A one-year management deal therefore deprives the transaction of what we had understood to be a key attraction for you concluding any potential deal with the other parties."*

They strongly advised that a new shareholders agreement be agreed in order to provide Mr McKillen with "*appropriate legal protection*".

199.   In his evidence, Mr McKillen described  the meeting with Mr Bakhos as "heated" and said that Mr Bakhos had made clear that there would not be provisions in the shareholders agreement protecting Mr McKillen against dilution in the event that further funding was required. Mr McKillen realised that he would not be in position to keep pace financially with the Qataris or indeed with the Barclay interests. I conclude that it was general concern as to the future of the relationship which caused Mr McKillen to withdraw. Although the 12 February 2011 agreement was stated to be legally binding, the Qataris, who took legal advice on this, and the Barclay interests decided not to seek to enforce the agreement.

200.   It did not become absolutely clear that Mr McKillen would not proceed with the agreement for some days. In the meantime steps continued to be taken with a view to implementation of the agreement. NAMA formally extended the term of existing facilities by 14 days and entered into a letter agreement dated 16 February 2011 with the Barclay interests setting out the terms on which NAMA would be repaid and on which NAMA would release its charge on Mr Quinlan's 13.52% shareholding. Criticisms were made in the course of cross-examination of Mr Faber and others that this letter included a provision whereby the company would pay what is described as "exit fee" of £13.5 million on 28 February 2011. In my judgment, no criticism can be made of this term. It was part of the price exacted by NAMA to enable the new deal to proceed, which at that time all parties including McKillen had agreed and thought was in the best interest of the company.

*Discussions between Mr McKillen and the Barclay interests:  March 2011*

201.   Following the breakdown in late February 2011 of negotiations involving the Qataris, there were discussions in March 2011 between the Barclay interests and Mr McKillen. The Barclay interests proposed that Mr McKillen should waive his pre-emption rights over Mr Quinlan's shares which would be bought by the Barclay interests, giving them a majority shareholding in the company, while Mr McKillen would retain his shareholding. The NAMA debt would either be extended for two years, which would of course be dependent on NAMA's agreement, or refinanced by a bridge loan with a commercial bank. The Barclay interests would arrange long term debt finance, likely to be £475-520 million, with the balance being "facilitated by the Barclay family on market terms for mezzanine debts". There would be a new shareholders agreement, with pre-emption rights, equal board representations, a management fee payable to each shareholder of £2.5 million in the first year (to be reviewed annually, with an assumption that it would rise to £5 million each per annum and intended to be "whatever the company can financially support" without affecting essential capital expenditure or the ability to finance the company), and an option for Mr McKillen after seven years to sell his shares to the Barclay interests.

202.    Mr McKillen turned down this proposal unless he received a substantial payment for not exercising his pre-emption rights. On his behalf, Mr Cunningham put forward a figure of £35 million. The Barclay interests were not willing to agree this and these discussions came to nothing.

*NAMA:  March 2011*

203.    There were discussions with NAMA as regards an extension to the loan facilities. I give some detail of these discussions and NAMA's position in the section dealing with NAMA. The outline, for present purposes, is that the facilities were due to expire on 28 February 2011, following the extension granted on 16 February 2011. On 8 March 2011, NAMA notified the company that it had extended the facilities to 21 March 2011. On 22 March 2011 the credit committee of NAMA agreed an extension for three months, and so rejected the company's request for a two-year extension. The new facilities agreement was made on 1 April 2011, with an expiry date of 30 June 2011.

*Purchase of security over Mr Quinlan's shares from NAMA:  March – April 2011*

204.    There were also negotiations during March 2011 for the purchase of Mr Quinlan's indebtedness to Anglo Irish Bank which had been acquired by NAMA. It was secured over part of Mr Quinlan's shareholding representing 13.5% of the company's shares. The Barclay interests were anxious to buy it to prevent any other party purchasing the debt and thereby being entitled to be registered as the holder of the shares or taking steps to enforce the charge. There was competition to purchase the debt. NAMA was approached by those acting for Wynton early in March 2011 and an offer to purchase the debt for £49.1 million was made by Wynton on 21 March 2011. The Barclay interests were not prepared to offer as much, so NAMA accepted Wynton's offer and on 4 April 2011 executed an assignment in favour of JQ2 Limited, a company associated with Wynton and used as the vehicle for the purchase.

*Wynton:  April – May 2011*

205.    This purchase demonstrated that Wynton retained a serious interest in the company. Sir Frederick Barclay met representatives of Wynton on or about 21 April 2011 and discussed possible co-operation. He also had discussions with Sunil Mittal and approached Sheikh Mansour. Negotiations with Wynton with a view to joint ownership of the company continued in May 2011, including meetings with Jho Low attended by Sir Frederick Barclay and Aidan Barclay on 16 May 2011 and by Mr Faber on 17 May 2011. These negotiations effectively came to an end on 23 May 2011 when Mr Low insisted on a three-way split involving the Abu Dhabi interests behind Aabar as well as Wynton and the Barclay interests. The latter were not interested in only a one-third interest.

*16 May 2011*

206.    On 16 May 2011, Mr Quinlan resigned as a director of the company, at the request of the Barclay interests and was replaced by Mr Mowatt. On the same day, Mr Quinlan executed the power of attorney in favour of Mr Faber or any director of Ellerman, to which I refer in more detail in the section dealing with pre-emption.

*Discussions between Mr McKillen and the Barclay interests: June 2011*

207.    Negotiations between the Barclay interests and Mr McKillen were resumed at the beginning of June 2011 when Mr Cunningham and Mr Faber had a series of meetings. Mr McKillen was prepared to accede to the Barclay interests' key requirement of control, but on terms which included the payment of a pre-emption fee of £25 million and a project management fee for 4 to 7 years at £5 million per annum. These terms were again not acceptable to the Barclay interests. Mr McKillen also sought a soft loan of £21-30 million to purchase a sufficient number of Mr Quinlan's shares to take his holding up to 45%. On 8 June 2011, the Barclay interests put a proposal to Mr McKillen, which included a pre-emption fee of £5 million, no management fee other than remuneration on a non-executive basis, and a loan to enable Mr McKillen to purchase some of Mr Quinlan's shares. This was not acceptable to Mr McKillen and further discussions between Mr Faber and Mr Cunningham failed to bridge the gap.

*Negotiations between the Barclay interests and banks: June-July 2011*

208.    From the start of June 2011, the Barclay interests were negotiating with Barclays Bank with a view to agreeing a facility to provide funding either to purchase the company's debt to NAMA or to provide the company with the finance necessary to repay the debt. Such financing would be necessary if a deal were struck with Mr McKillen, but equally the Barclay interests saw this as a means by which they might both resolve the problem faced by the company and also increase their prospects of obtaining control of the company.

209.    Mr Peters was primarily responsible for these negotiations on behalf of the Barclay interests. In an email dated 31 May 2011 to Mr Stoneley at Barclays Bank he explained the purpose and benefit of the acquisition of the NAMA debt as follows:

> *"The benefit to us is that it prevents any other party from 'agitating' our plans to acquire the entire share capital of Coroin Limited. The NAMA facility expires at the end of June 2011, unless otherwise agreed by NAMA".*

At the conclusion of the letter he wrote:

> *"By effecting an early refinancing, we ensure another third party does not gain access to assets by similarly refinancing and making demand at the 30 June maturity. This enables the Barclay family to go forward from a position of strength and tackle the remaining equity acquisitions".*

210.    Following the collapse of the negotiations between the Barclay interests and Mr McKillen, which inevitably created an uncertain position from a lender's point of view, Barclays Bank required the personal guarantees of Sir David and Sir Frederick Barclay in the sum of £260 million.

211.    The negotiations with Barclays Bank were difficult. This led the Barclay interests to open discussions also with HSBC. Again the personal guarantee of Sir David and Sir Frederick Barclay was a requirement. In an email on 28 June 2011, Mr Peters

offered a personal guarantee from them in the sum of £135 million. Discussions with HSBC reached the point of draft term sheets which were provided on 13 July 2011, subject to credit committee approval but the proposals involved the loan being split between HSBC and one other, undetermined, institution. It was at that time in the prevailing conditions very difficult to obtain a Bank loan for as much as £660 million from one institution. Nonetheless, the Barclay interests preferred to have a single lender and, as Barclays Bank were prepared to negotiate on the basis that it would be the only lender, they decided to proceed with negotiations with Barclays Bank, not HSBC.

212.    With the sole exception of a valuation obtained from Jones Lang LaSalle ("JLL") to which I will later refer, no allegation of unfairly prejudicial conduct, acts or omissions is made in the petition as regards the conduct of any of the respondents in relation to the negotiations with Barclays Bank or HSBC. In his closing submissions, Mr McKillen seeks to criticise Mr Faber in a number of respects. First, it is said that he provided, in breach of duty, confidential information concerning the performance of the company to Mr Peters to be passed on to the banks. Secondly, Mr Faber helped Mr Peters in the drafting of some of the proposals to the banks and was generally aware of Mr Peters' negotiations with the banks. He did not disclose these negotiations to the company and it is suggested that, in acting as he did, he was acting for a purpose which was not only collateral but hostile to the company's interests. Thirdly, it is said that Mr Faber could and should have pursued these negotiations on behalf of the company rather than on behalf of the Barclay interests.

213.    I do not propose to address these submissions in detail. First, they are not pleaded as grounds for the relief sought in the petition and indeed are not pleaded at all. Secondly, they are themselves contentious issues which would require careful analysis of the relevant evidence before deciding. Since they are not pleaded, they could be relied on only for the purposes of credit but the contentious nature of the issues prevents them being relied on for that purpose. I comment elsewhere on the submissions which have been made concerning the disclosure of confidential information, and the fact that all shareholders seem to have been engaged in this conduct. I should say that the suggestion that Mr Faber could and should have sought to obtain this finance from Barclays Bank or HSBC on behalf of the company appears to me to be entirely unrealistic. The availability of such finance, certainly following the breakdown of negotiations with Mr McKillen which would have put the shareholder structure of the company on an agreed basis, was dependent on the provision of very substantial personal guarantees by Sir David and Sir Frederick Barclay. It is inconceivable that they would have been willing to give such guarantees in respect of a loan to the company where they did not control the company and where there had been no agreement as to the shareholder structure with Mr McKillen.

214.    Mr Peters continued to negotiate with Barclays Bank through July 2011. A draft term sheet was provided by Barclays Bank on 20 July 2011 on which there was broad agreement in principle. It provided for a facility of £660 million (or a lesser amount depending on the price paid for the NAMA debt). It was to be a term loan but the final maturity date is not specified in the draft term sheet. The borrower was to be a newly formed single purpose vehicle ultimately owned and controlled by the Barclay brothers. Two alternative purposes of the facility were specified:

> "1.    purchase the existing indebtedness of Coroin owed to NAMA
>        ('Plan A');
> 2.     on lend to Coroin for the purpose of refinancing the existing
>        indebtedness which Coroin has from NAMA ('Plan B')."

215.    In a section headed alternative scenarios, the current scenario is described as one
        whereby the Barclay brothers have the ability to control both decisions of the Board
        and decisions of over 50% of the voting shares of the company. In that scenario and
        also if the Barclay Brothers were to lose such control, they were required as a term
        of a facility to provide personal guarantees for all interest shortfalls and repayment
        to an amount of £260 million.

216.    When the draft term sheet was sent out on 20 July 2011, the intention of Barclays
        Bank and the Barclay interests was to sign the finalised facility agreement by the
        end of July. In fact this timetable was not achieved and the proposal was not put to
        the Barclays Bank credit committee for approval as had been initially expected.
        While there was substantial commercial agreement on the terms of the facility, the
        detailed terms remained to be agreed and were the subject of negotiations between
        lawyers during August and the first half of September 2011.  Barclays Bank credit
        committee approval was formally given on 15 September 2011. The requirement for
        personal guarantees from the Barclay brothers for £260 million was maintained
        because Barclays Bank considered that the company could support only £400
        million of senior debt.

*Mr Faber's memorandum 1 August 2011*

217.    With substantial agreement on the terms of a facility agreement with Barclays Bank,
        the Barclay interests turned their attention from the end of July 2011 to a
        consideration of how best to deal with the NAMA debt. On 28 July 2011 Sir David
        Barclay, Mr Faber and Mr Peters had a long telephone call in which they debated
        the benefits of buying the NAMA debt as against offering the company refinance on
        30 September 2011 when the debt would mature. There were at the same time
        communications with Sheikh Mansour with a view to a partnership in relation to the
        company, but in the end nothing came of this. On 1 August 2011, Mr Faber
        prepared a memorandum for Sir David Barclay to summarise the discussion which
        they had had and setting out Sir David's view of the ideal outcome.

218.    Under the heading "Control of Coroin", the memorandum set out three means by
        which this could be achieved.

219.    The first was a purchase of Mr Quinlan's shares. It recites the obstacles to such a
        purchase which, as the memorandum states, had been blocking Misland for the
        previous six months. Those obstacles were:  first, the need for the permission of Mr
        Quinlan's debt holders including JQ2 and Aabar; secondly, the need for a waiver by
        Mr McKillen of his pre-emption rights; thirdly, if JQ2 were registered as the holder
        of the shares charged to secure Mr Quinlan's debt purchased from NAMA, it could
        also participate in a pre-emption round; and, fourth, the possibility that if Mr
        Quinlan became bankrupt any sale could subsequently be challenged.

220.  The second means is described as *"Rights Issue/Private Placements"*. The memorandum states as follows:

> *"Faced with a potential foreclosure of the senior loan, the Board of Coroin could decide to hold a private placement to raise satisfactory funds (£160m minimum) to refinance the Senior Debt Holder.*
> *While this may allow McKillen to participate, his backers will have to ask themselves what he has achieved by participating. He will not have control of the company because other shareholders (Misland/Ellerman/Malaysians) will also participate, thus it is a significant equity contribution McKillen would need to source, without it achieving very much.*
>
> *There may also be ways in which Maybourne Finance, as the new debt holder on September 30 could force the company into lowering its debt from £660m to £500m by Christmas, thus forcing Coroin's board to accept equity from an outside party which may include Maybourne Finance or its fellow group companies.*
>
> *The debate will be around which structure creates the best landscape to lower the price of the equity. Presumably it is better to be in default to Maybourne Finance, Maybourne Finance demands an equity injection to avoid foreclosing, and the equity injection comes either from Maybourne Finance or its fellow group companies".*

221.  The third means identified is "*Appropriation of the assets via foreclosure*". Under that heading the memorandum states as follows:

> *"If Maybourne Finance decides to acquire to Coroin's debt from NAMA, or become the lender to Coroin on September 30, it can choose to foreclose on the borrower following a default by Coroin on the facility (including on a repayment at maturity)."*

The memorandum continues by discussing different timelines which might apply to such a step. The memorandum also identifies certain problems in relation to this possibility, including "some form of litigation by McKillen".

222.  A further issue is identified:

> *"The Coroin directors have a difficult position in that their director's duties require them to seek the best terms available to Coroin on a refinancing of the NAMA debt – i.e. that the market and any hostile entity could offer to refinance on lower/better/longer terms than Maybourne Finance can offer (and which Barclays as lender to Maybourne may need to approve). Failing to go with those better third party terms would mean that a disappointed minority shareholder (McKillen, JQ2 if they are on the register) could sue and may even be able to injunct the refinancing. This is a greater risk on a refinancing. On a foreclosure the directors would still have to show that they tried to refinance on positive terms ahead of that foreclosure".*

223.   The memorandum goes on to discuss various possible ways forward. The first is *"Foreclosure or Rights Issue with an Equity Partner"*.  The costs could be shared with the partner who could either be a shareholder in the business or a buyer of one of the hotels. In the former case, the memorandum states that:

> *"...the partners have a choice – either hold a rights issue at the end of September and dilute Paddy McKillen's interests or simply foreclose. The issue of new shares would need consent under the current shareholders agreement of Coroin, but as Misland and Ellerman (through its holding of DQ's 22%) hold more than 50% of the shares, they could give that consent".*

224.   The second possible way forward is "Foreclose or Rights Issue in an Agreement with Abu Dhabi (Aarbar)/Malaysians". Under this heading the memorandum states:

> *"If we had an agreement with DQ's debt holders to split the assets in due course it would enable the partnership to have a negotiation with Paddy McKillen in advance of a foreclosure or a rights issue. If McKillen allows the partners to purchase DQ's 35% we will not foreclose and not hold a dilutive rights issue. This allows McKillen to keep his equity position, and has enabled the partnership to acquire 63.4% of the equity and control, potentially for a £900m purchase price. If McKillen refuses the partnership could foreclose (subject to the higher risk of litigation from him)".*

225.   The third way forward is headed *"Wait until late September"* and the memorandum states as follows:

> *"We could continue to hold to our current position, and see what events unfold and determine how we respond. However by waiting we will eventually have to put the Malaysians on the share holder register – probably by the end of August which will give them a seat at the main table and the ability to frustrate us, and we will give time to the Abu Dhabi and Malaysians to acquire the NAMA £660m Coroin debt, which may well change the perceived negotiations which then take place. For instance I believe the Malaysians and Abu Dhabi will target a £200m rights issue at the end of September but offer cheap ongoing debt to the company once they have taken control. NAMA has also stated they are expecting an offer for the debt from them in September".*

226.   The document ends with a  *"Summary"*, which reads as follows:

> *"Although it is financially less attractive to consider buying the debt from NAMA, it will position us favourably for any negotiation with H.H. Sheikh Mansour or indeed the debt holders (Abu Dhabi/Malaysians) and Paddy McKillen in due course as we will hold as strong a position as possible.*

*In order to mitigate the costs of buying the debt we could propose to send an offer letter to NAMA, or visit them this week and seek a discount to the debt purchase. By owning the NAMA debt we would anyway be entitled to a 1% termination fee, which gives us £6.6m refund should a third party remove Maybourne Finance on September 30th. If we could extract even a further 1% haircut this will save us £13.2m in total and go some way to offsetting the Barclays Bank fees.*

*The choice NAMA currently has is to wait until September 30th and see Coroin pay back £660m plus the 1% fee – a total £666.6m. The closer we get to September the more commercially appealing it will be for NAMA to wait for the redemption.*

*Once Maybourne Finance owns the debt it can write to Coroin and put it on notice that it will not extend the loan beyond the end of September, which would mean the directors would need to go out and find alternative arrangements which may include, potentially, a rights issue, thus teeing up a negotiation with McKillen to allow us to buy DQ shares, or with the debt holders to reach an agreement on the foreclosure plan, or Mansour as a partner for the 100% purchase. The only risk is that the company refinances itself anyway, for example through JQ2".*

227.   Mr Faber and Sir David Barclay met on 4 August 2011 to discuss Mr Faber's memorandum. What emerged either from that meeting or over the next few days was essentially a two-pronged strategy on the part of the Barclay interests. First, they were already in discussions with Sheikh Mansour as I earlier mentioned and they regarded it as important to continue those discussions, with a view either to forming a partnership with Sheikh Mansour or at least to removing both him and Wynton and its associates as possible rivals for control of the company. To that end Mr Faber went to Abu Dhabi for meetings on 16 and 17 August 2011. Negotiations for a partnership did not come to a conclusion, but agreement in principle was reached in respect of the charges held by Aabar and JQ2 over Mr Quinlan's shares. Aabar would release its second charge and the Barclay interests would purchase from JQ2 the debt secured over Mr Quinlan's 13.32% shareholding. This was part of a larger transaction under which the Barclay interests would relinquish claims in respect of an unrelated matter.   The negotiations were not completed during Mr Faber's visit to Abu Dhabi and there were protracted negotiations through the rest of August and during much of September to finalise the details. Ultimately agreement was reached on all aspects.   A contract was signed on 14 September 2011 and the transaction was completed on 23 September 2011. The Barclay interests had thereby achieved one of their objects, removing Sheikh Mansour and Wynton as rivals for control of the company.

228.   The other part of the strategy was to open discussions with NAMA with a view to the purchase of the NAMA debt. Although Mr Faber texted Mr Hennigan on 5 August 2011 to suggest a meeting, no meeting in fact took place.  On Monday 8 August 2011 Mr Peters met Sir David and Sir Frederick Barclay and they discussed opening negotiations with NAMA. On the following day Mr Peters spoke to Mr Hennigan and put forward a proposal to purchase the NAMA debt. The proposal

was to pay £660 million to NAMA for the debt but on the basis that NAMA would pay the net arrangement fee of £12.4 million. Mr Hennigan told Mr Peters that it was NAMA's expectation to recover the par value of the NAMA plus accrued interests. Mr Hennigan sought instructions from his superior in NAMA who informed him that NAMA's position was that it required a par recovery and would not agree to paying the arrangement fee. Mr Hennigan reported this to Mr Peters and told him that NAMA would be pursuing some other options. NAMA was at this time in discussion with Wynton with a view to a sale of the debt.

229.  There was no further contact between the Barclay interests and NAMA during August.  Mr Peters was away on holiday and Mr Faber was largely taken up with dealing with Sheikh Mansour and Wynton.

230.  On 8 July 2011, NAMA had agreed to extend the loan facility to 30 September 2011. Mr Hennebry on behalf of the company was doing what he could to identify possible sources of refinance and also dealing with NAMA. He arranged lunch on 26 July 2011 with representatives of Bank of China who had been introduced to the company by KPMG. This did not lead anywhere and in Mr Faber's view it never had any prospect of doing so.

231.   On 5 August 2011, Mr Hennebry wrote to NAMA to put forward a proposal under which the company would repay £500 million of the NAMA debt and the remaining £160 million would be restructured as a junior loan, ranking after a new senior loan from a third party lender for the £500 million. The term of the junior loan would be 5 years but Mr Hennebry wrote, "*Coroin would then be well placed to work through solutions to refinance the junior loan away from NAMA over the course of the next two to three years*". NAMA's internal documents show that its immediate decision was to reject this proposal and to re-iterate that its only interest was in receiving repayment in full of its existing senior debt. NAMA's formal response was contained in a letter dated 10 August 2011 to the company which stated:

> "*While we appreciate your effort to seek a solution to the refinance of Coroin, please take this letter as confirmation that NAMA will not consider a partial repayment proposal, as such any proposal should be for the full amount of the £660m debt plus accrued interest.*
> *I also wish to take this opportunity to state that I can give no guarantee or expectation that NAMA will agree to extend the facilities beyond the 30 September 2011 maturity date*".

232.  On the evening of 4 August 2011 Mr Hennebry had shown a draft of his letter to NAMA to Mr Faber. Mr Faber said in evidence that he was worried that NAMA would see this as a ridiculous proposal. He contacted NAMA to warn them that this letter was coming. He knew that NAMA's only concern was to be repaid the full amount of the debt as soon as possible and he also knew that NAMA was seriously considering the sale of the debt to a third party, be it the Barclay interests, Wynton or someone else. When asked in cross examination to explain why he went behind Mr Hennebry's back in this way, he said, after referring to NAMA's position which had been made clear to the company:

> "*So when Mr Hennebry, God bless him, puts together a proposal which, if you go to 11284, suggests that NAMA should take a junior position*

> with a three and three-quarter per cent margin, it is just not a flyer. It is
> not commercial. It is an effort and I am not going to stop Mr Hennebry
> making an effort because, as Mr Marshall has pointed out, that is his
> job, but it is not what NAMA have asked for or indicated that they want.
> I am entirely clear what their request was and, therefore, I am trying to
> warn NAMA that, do not worry I have not forgotten what you want or
> what you have told us".

Mr Faber regarded it as being in the company's best interests to warn NAMA
that it understood what NAMA required.

233.   NAMA's response to Mr Hennebry's proposal was discussed in a conference call on
15 August 2011, attended by Mr Cunningham, Mr Faber, Mr Seal, Mr Mowatt, Mr
Hennebry, Mr Alden and representatives of DLA Piper, the company's solicitors.
Mr Hennebry described the present state of play with regard to his discussions with
Bank of China and others and asked the other directors for an update. Mr
Cunningham referred to the possibility of a French bank but Mr Faber and Mr Seal
did not mention the Barclay interests' negotiations with Barclays Bank or the
approach to NAMA. It was agreed that a response would be sent to NAMA. An
email sent by Mr Alden immediately after the telephone call records that a note to
NAMA would be drafted "*asking about whether they are attempting to sell debt as
there is a provision in the facilities agreement for them to consult with the company
if they are*". Mr Hennebry drafted a letter which contained the following paragraph:

> "*In reference to the possibility that NAMA may be considering selling
> the company's loan to another Bank, financial institution etc, the
> company expects that notification and consultation as required under
> the facilities agreement would commence at least four weeks prior to
> any such transfer or assignment in order for the company to have
> adequate time to consider it. In addition, please can you confirm if
> NAMA is currently in discussion with any party at this time regarding its
> loan to the company*".

234.   Mr Hennebry circulated the draft letter among the directors. Mr Seal promptly wrote
to Mr Faber and Mr Mowatt saying that he could not believe that there was a
requirement for NAMA to give this confirmation.  Mr Mowatt responded promptly
saying "*I agree. Where does the four weeks come from?*". Mr Seal replied saying
that they should wait for Mr Faber to respond but "*It seems nonsense to write to
NAMA in terms as suggested*".

235.   Weil, Gotshal & Manges, the Barclay interests' solicitors, advised that there was an
obligation to notify and consult on a proposed transfer in the facilities agreement but
that it was "*absurd*" to suggest the company be given four weeks' notice. Mr Seal
emailed Mr Hennebry on 17 August 2011 to say that he was "*not actually sure why
we are asking NAMA anything about the possibility of selling their loan. If they
have obligations under the facilities agreement then I am sure they will be only be
too well aware of them. I would therefore be inclined to exclude any reference to
this*". In a telephone conversation the following morning Mr Seal told Mr Hennebry
that his view was that there was little point in telling NAMA their duties under the
facilities agreement. Mr Hennebry, after a number of calls with Mr Seal, told him
that he did not think there was any point in sending a letter to NAMA that contained

nothing more than an expression of disappointment at the rejection of the company's offer of a junior loan.

236. Mr Cunningham was concerned to find that, contrary to his understanding of the decision taken in the board telephone call, a letter was not being sent to NAMA and he accordingly emailed the directors on this point. In an email to Mr Faber, Mr Seal said that he thought it was "*futile to raise the issue of debt sale and their obligations*" in a letter to NAMA. Mr Seal expanded on this in an email to Mr Hennebry on 21 August 2011:

> "*It was indeed only after seeing the draft letter prepared by DLA that I thought it inadvisable to include reference to the sale of the NAMA debt. Agreeing to review a draft is not of itself agreement to send the letter. Being cognisant of the fact that a letter was to be sent I thought it best just to include the reference to the our* [sic] *disappointment in their decision not to consider an extension beyond the end of September and to reject the mezzanine proposal. If you recall it was you who told me that if that was all that was to be said it was best not to send the letter at all. That was your decision and not mine*".

237. On 22 August 2011 Mr Cunningham emailed the other directors of the company:

> "*It seems to me that we are all attempting to refinance the company on an individual basis and not approaching this with a united front, which in its own right is unhelpful.*
>
> *Shouldn't the company appoint someone like Goldman Sachs who might have a broader knowledge of what is happening throughout the market place to see what they can raise in terms of senior debt finance.*
>
> *Then as a company and as a board we can present a cohesive refinance plan*".

238. There followed email exchanges between Mr Faber, Mr Seal and Mr Mowatt. Mr Mowatt asked who should be recommended as the financial adviser or whether they go with the suggestion of Goldman Sachs and who would manage the process. Mr Seal expressed the view that it was best to go with the suggestion of Goldman Sachs and that there should be a committee of the board comprising Mr Hennebry, one of the Barclay interests' directors and Mr Cunningham. But he added that they should await Mr Faber's view once he had spoken to Sir David Barclay. Mr Faber agreed with the approach of appointing Goldman Sachs and Mr Seal's suggestion of a board committee but he was due to have a discussion with Sir David Barclay and Mr Compagnoni, a partner in Weil, Gotshal & Manges who regularly acts for the Barclay interests. Mr Faber reported back to Mr Seal and Mr Mowatt that Sir David Barclay was against the idea, stating that it created unnecessary work for a result guaranteed to fail. Mr Faber gave evidence that he agreed with Sir David's view that attempts by Goldman Sachs to obtain replacement financing for the company were bound to fail and that in that sense the appointment of Goldman Sachs would serve no purpose. Mr Mowatt emailed to say that he respected Sir David's view but

*"should we not have a meeting with Goldman's?"* Mr Faber evidently discussed it with Mr Compagnoni whose advice was to agree to the appointment of Goldman Sachs. However, Sir David Barclay strongly disagreed. Mr Mowatt responded *"difficult one!"* He explained in evidence that he meant that it was difficult if they had to go against Sir David's wishes, because they would not want to go against him unless it was unavoidable. Mr Seal agreed that it was *"v difficult"*.

239.    Mr Faber emailed Mr Cunningham, having discussed its contents with Mr Seal and Mr Mowatt, as follows:

> *"Whilst the idea of appointing an advisory firm is appealing to the board as we contemplate the near term requirement to refinance the business, we do face the inevitable task of explaining to the advisor the current shareholder situation and over leverage. As you, Mark and I discussed at Maybourne's offices only a short while ago, the simple truth is the current register when combined with an over indebtedness to the tune of £160-200m make the refinancing impossible, especially as the banking market moves against us by the day.*
>
> *So if the board wishes to appoint a bank/ advisor then we can agree to it, but I think the board could use the precious little time we have left to September 30th to impress upon the shareholders to agree a way forward where either of these two matters is resolved by the following manner:*
> 1)    *Sell a hotel to lower overall debt.*
> 2)    *Bring in new financing to lower debt.*
> 3)    *Allow Misland to acquire Quinlan's shares, and therefore allow banks we know well to refinance in its current state of indebtedness. As we have discussed before this will mitigate the financing requirement (via new equity or sale of assets) as we can give the banks wider comfort than they will inevitably require.*
> *We have proposed a number of solutions to this and offered you different contracts to satisfy Paddy, but as yet I have not received your acceptance except for terms which are on terms we cannot accept because the refinancing banks will not accept them.*
> *Therefore I think its time the board discuss option one or two, in conjunction with appointing an advisor because Paddy doesn't appear to want to accept our various proposals".*

240.    Mr Cunningham replied on 23 August 2011. He said that the idea of appointing an adviser was purely to widen the options open to the company by going to someone who was more familiar with the options available in the market. Whilst acknowledging that the timeframe was short, he and Mr McKillen were not as convinced as Mr Faber that the NAMA debt would not be rolled over. Mr Cunningham went on to say that he thought that they should exhaust how much senior debt could be obtained. He felt that while the Barclay interests' banking contacts might be happy to provide finance only if the Barclay interests had a majority stake, other banks might not be as restrictive and an adviser might source the financing. He made clear that Mr McKillen would not agree to the sale of a hotel

as this would be very damaging to senior staff morale and could result in serious management issues. As to bringing in new financing, this was an option they would look at but only if it meant a new equity stake from a new third party investor, as Mr Cunningham made clear in a further email on 26 August 2011. As to Mr Quinlan's shares he said that Mr McKillen would exercise his pre-emption rights if those shares became available.

241. On 26 August 2011 Mr Compagnoni advised in an email that it was sensible to go along with the suggestion for the appointment of Goldman Sachs. He advised that *"This is all about process and the directors being seen to have done the right thing by the company in covering off all options from the company's perspective as it faces its debt running out at the end of September"*. It was not, he advised, an unreasonable suggestion in the circumstances. Mr Mowatt commented in an email to Mr Seal "*we need to convince David that we need to appoint GS*" to which Mr Seal responded *"I regret that it will not be possible!"*.

242. On 26 August 2011 Mr McKillen took two steps. First, he emailed NAMA referring to the obligation of consultation on NAMA contained in the facility agreement. He asked for confirmation that there would be consultation and he also asked for confirmation that NAMA was not in negotiations with any third party. He therefore sent the letter which he had hoped the company would send. He also emailed Bob Diamond, then Chief Executive of Barclays Bank. This was a cold call. He introduced himself and then continued: *"I understand BarCap have been having discussions around refinancing the company debt structure. I have to date not been privy to the discussions but would very much like to be and play my part."* Mr McKillen received a reply on behalf of Mr Diamond in which he was told that Barclays Bank was currently conflicted and therefore could not discuss the matter with him.

243. NAMA replied to Mr McKillen's email on 29 August 2011. It confirmed that NAMA was aware of its obligations under the loan agreement. It continued:

> *"NAMA's objective is to achieve full repayment of our debt as soon as practicable. The company and shareholders are well aware of our objective and we note that the company has been in refinancing talks for close to two years now without success. As you recall no doubt we facilitated the restructuring of the Knightsbridge loan into the company earlier this year to assist and enhance the ability to achieve refinancing by the company.*
> *In our view the three months extensions is not the real issue, as we understand that refinancing by the company was very close very early this year only to be thwarted at the last minute by a disagreement amongst the shareholders over certain issues. NAMA reserves its rights to achieve its objective of achieving full par debt repayment by any means available to it. We would welcome any near term firm proposals by the company to achieve full par debt repayment as soon as possible".*

244. Agreement was reached to the appointment of Goldman Sachs on behalf of the company. On 5 September 2011, Goldman Sachs produced a draft proposal. They stated that they believed that the company could support up to about £495 million of

senior term loan at an average cost of about 7% assuming a return to "*normalised*" market conditions. The balance of about £165 million would be required either from existing shareholders or, potentially, new mezzanine/preferred equity investors. They warned that market conditions had been challenging in the previous few weeks and that no significant real estate deals had been closed during the recent market turbulence, although investors continue to evaluate new opportunities and "*the pipeline remains robust*".

245.    Mr Faber responded on 6 September 2011 to the draft paper from Goldman Sachs. He emailed Mr Hennebry and the other directors:

> "*I can't see how this proposal can work. We have until the end of the month, not Christmas to refinance the debt. This advice is not what the board needs now and only considers the refinance options. Unless the board is given strong evidence we will receive an extension we need a far more detailed short term plan.*"

246.    On 7 September 2011 Mr Peters wrote to NAMA with an offer, subject to contract, to acquire the NAMA debt. The price offered was the par value of the loan of £660 million together with accrued interest, but it also contained a term that NAMA would pay a fee of £10 million to the Barclay interests in recognition of NAMA's accelerated receipt of the debt.  This offer was rejected on 12 September 2011 on the grounds that the fee would give NAMA less than full recovery.

247.    On 8 September 2011, Mr Cunningham emailed Mr Hennebry, copied to Mr Faber, with regard to the letter from NAMA. Mr Cunningham said "*Considering we are all concerned about deadlines. We should not delay writing to NAMA at all, we can soften the language to say we have engaged with Goldman as against appointed them. It allows us know sooner rather than later what NAMA's stance will be. We wouldn't be happy with any further delay in engaging with NAMA*". In private exchanges between Mr Faber and Mr Seal they agreed that they could see no harm in such a letter being sent to NAMA. On 9 September 2011, Mr Hennebry on behalf of the company wrote to NAMA requesting an extension of the maturity date from 30 September 2011 to 31 January 2012 "*at the earliest*". The letter stated also:

> "*Refinancing the company's loan from NAMA remains the priority and every effort continues to be made to achieve this objective. With stronger trading results which underpin the property values and which provide improved interest cover, the company is confident that a refinancing can take place in the near term. We are engaging with an investment bank to assist in this process and their view is that a refinancing transaction would be viewed positively by the real estate debt of market.*
> *It has also become clearly evident over the last couple of months that the quarterly maturity deadlines are counterproductive in our efforts to refinance the debt. A longer maturity date of one year would remove this avoidable uncertainty and allow the company to focus on refinancing. I would welcome your thoughts on this matter*".

248.    On 9 September 2011, Mr Faber, Mr Seal and Mr Mowatt as directors decided to terminate Mr Hennebry's consultancy contract with the company. I will deal separately with this matter and the events leading up to it later in this judgment.

249.    On 13 September 2011, NAMA wrote to the company in response to its letter of 9 September 2011. It did not respond directly to the request for an extension of the facilities to 31 January 2012 but the letter included the following:

> "I am not clear what evidence you have that the quarterly debt maturity deadlines are counter-productive to your efforts in achieving a refinance of the existing facilities. Perhaps you would like to elaborate in concrete terms how a change in the maturity date would have the desired effect of achieving a refinance?
>
> As you know it is been our wish that this loan be repaid in full at the earliest opportunity and this continues to be our objective".

250.    On 15 September 2011, Mr Peters wrote again to Mr Hennigan at NAMA, seeking to persuade him of the merits of the offer which had been made by the Barclay interests in its letter dated 7 September 2011 and subsequently rejected by NAMA. NAMA responded on 16 September 2011, reiterating its refusal of the offer. The letter stated:

> "Coroin Limited owes NAMA principal of £660m plus accrued interest, repayable in full on 30 September 2011. NAMA would not be acting in the interests of the tax payer if it sold the debt for less than £660m given that NAMA expects Coroin will repay its debts in full as the asset value exceeds the amount of the senior debts we hold.
> Your offer was discussed amongst NAMA's Chairman, Chief Executive and Chairman of the Credit Committee. They reiterated the position that NAMA will only consider the sale of the Coroin debt at par value plus accrued interest.
>
> If you or any of the Coroin shareholders believe that Coroin will be unable to repay its debts and will default on its obligations on 30 September I will bring this to their attention to ensure we are prepared accordingly".

251.    On the same day Mr Peters replied stating that the Barclay interests would reflect on their position further and no doubt speak again after the week-end. The letter continues:

> "In the meantime, in relation to the point you make in the last paragraph of your letter, I should point out that these discussions we are having (and have had to date), concerning a possible purchase of NAMA's debt due from Coroin, are completely separate and distinct from anything to do with Coroin itself. Here at 20 St James's Street we have been rigorous in maintaining an information barrier between me, my team and the rest of my colleagues on all matters relating to

> *Coroin, so I have no idea or view on what Coroin and its
> directors/board are doing in relation to its financing arrangements, or
> as to its affairs or ability to meet its obligations to NAMA. If you
> construed anything in my letter to the contrary then it was not intended
> and is, in fact, not the case".*

252.    Following a board meeting of the company on 16 September 2011, Carole Walker
on its behalf sent a letter on the same day to NAMA in the following terms:

> *"Please be assured that refinancing the company's loans away from
> NAMA remains our priority. As previously stated, we have been in
> discussions with a leading international investment bank to assist us
> with this process. Initial indications have been very positive and we
> have another meeting with them scheduled for early next week.
> However, we remain firmly of the view that a loan of this magnitude
> will take more than 3 months to refinance.*
>
> *Further to your request to us to elaborate in concrete terms as to why
> a longer maturity date would help facilitate the refinancing process,
> we plan to provide examples from our experience to date together with
> the additional insight of the investment bank on this issue following
> our meeting with bank [sic] next week".*

253.    On 20 September 2011 Mr Peters called Mr Hennigan to ask whether NAMA had
all the approvals in place to sell the debt.  Mr Hennigan replied that they had
approval for a sale at par plus accrued interest. Mr Hennigan told Mr Peters that
NAMA would not be granting another extension to the debt.

254.    It is apparent from a letter dated 20 September 2011 from Morgan Stanley to Mr
Cunningham that he had been discussing a refinancing of the company's debt with
them. The letter states that Mr Cunningham is hopeful of securing a senior loan of
up £500 million and that Morgan Stanley would be interested in underwriting a loan
for the remaining amount. The letter states:

> *"We understand that the group's current running annualised EBITDA is
> upwards of £53 MM, which would not enable you to service on an
> ongoing basis any mezzanine financing in full. We confirm that we will
> be willing to allow you to accrue (PIK) some of the interest on a
> capitalised basis thereby increasing the notional amount due in
> refinancing of the new term loan in 2016".*

The letter further states that their cost of capital is 15% per annum upwards.

255.    A board meeting of the company was held on 21 September 2011, attended by Mr
Seal, Mr Faber, Mr Mowatt, Mr Cunningham, Mr Alden and Ms Walker. There was
a report on the recent correspondence with NAMA and a report of a meeting with
Goldman Sachs on 20 September 2011, which had been attended by Mr Faber, Mr
Mowatt, Mr Cunningham, Mr Alden and Ms Walker. The minutes of the meeting
record:

> *"On first review of the refinancing proposals submitted by* [Goldman Sachs], *it is apparent that the proposal is too expensive and will drain the company of cash"*.

256.   On 23 September 2011 Mr Peters called Mr Hennigan at NAMA and offered to buy the NAMA debt at par plus accrued interest, saying that a written offer would follow. Mr Peters said that they wished to do the deal as soon as possible and he and Mr Hennigan agreed to work towards 27 September 2011 as a target date.   Later that day Mr Peters sent the offer letter, subject to contract.  It fulfilled NAMA's requirement for a full recovery of £660 million plus accrued interests.

257.   NAMA accepted the offer and  the sale of the NAMA debt to the Barclay interests was completed on 27 September 2011.

**Should adverse inferences be drawn from the absences of witnesses?**

258.   It is submitted for Mr McKillen that the court should draw adverse inferences from the absence of four witnesses who might have been called by the respondents or some of them: Sir David Barclay, Sir Frederick Barclay, Aidan Barclay and Mrs Quinlan.

259.   It is of course well settled that in civil proceedings the court may draw adverse inferences from a party's decision not to give or call evidence as to matters within the knowledge of the party or of witnesses who, it is reasonable to conclude, would have given evidence if asked to do so. Whether or not in any particular instance it is appropriate to draw an adverse inference from the absence of a witness and, if so, the weight to be attached to such inference will always depend on the particular circumstances of the issue to which the evidence would go. In *Murray v DPP* [1994] 1 WLR 1, a case to which Mr Marshall referred me, Lord Mustill made observations at p.5 which, although said in the context of criminal proceedings, are in my view applicable also in civil proceedings:

> *"Everything depends on the nature of the issue, the weight of the evidence adduced by the prosecution on it……. and the extent to which the defendant should in the nature of things be able to give his own account of a particular matter in question. It is impossible to generalise, for dependant upon circumstances the failure of the defendant to give evidence may found no inference at all, or one which is for all practical purposes fatal."*

260.   An obvious case where an adverse inference may be drawn is where the issue is what was said in a conversation between two parties with no other witness present. The claimant gives evidence of his version of the conversation but the defendant declines to give evidence. Assuming that the claimant's evidence is capable of being accepted, the court is highly likely to draw an adverse inference from the defendant's failure to give evidence. Another case to which Mr Marshall referred me, *Crawford v FIS* [2005] UKPC 40, provides an illustration of this.   A bank in Jamaica and associated companies were the subject of a statutory intervention by the Ministry of Finance. The group of companies had been controlled by the defendant who was a director of the relevant companies. The companies brought claims against him based or consequential on mis-management or misappropriation

in the financial affairs of the group. It appears that there was substantial evidence in support of the claims but the defendant refused to give evidence. By way of example, one of the claims was in relation to payments totalling over $1.48 million which the bank had made to or for the benefit of the defendant. There were no vouchers of any kind. The defendant's service contract, which it was suggested might have permitted such payments, was not produced. The court was entitled to draw an adverse inference from the failure of the defendant to give evidence and to find that he had been helping himself to the bank's funds. Giving the decision of the Privy Council, Lord Walker stated at paragraph 12:

> "The weight to be attached to a defendant's failure to testify varies with the circumstances of the case. It is plain that in this case the Chief Justice and the Court of Appeal attached a great deal of weight to Mr Crawford's silence, and their Lordships are satisfied that they were right to do so. Mr Crawford was the chairman and chief executive of the bank, the building society and merchant bank. It is an irresistible inference that he was the directing mind behind Regardless, Holdings and the rest of the group. The consolidated proceedings raised many grave issues as to his stewardship of the whole of companies. His failure to testify was a strong indication that he had no satisfactory answer to what was alleged against him".

261.   The basic requirement is to consider the appropriate inference, if any, to be drawn and the weight to be attached to it in the particular circumstances of the case. Mr Marshall placed emphasis on a passage from the judgment of Gillard J in the Australian case of *O'Donnell v Reichard* [1975] VR 916 at 921, cited by the Court of Appeal in *Wisniewski v Central Manchester Health Authority* [1998] PIQR 324 at 339:

> "…….. it may be accepted that the effect of the party failing to call a witness who would be expected to be available to such party to give evidence for such party and who in the circumstances would have a close knowledge of the facts on a particular issue, would be to increase the weight of the proofs given on such issue by the other party and to reduce the value of the proofs on such issue given by the party failing to call the witness."

This is not, however, an absolute proposition applicable irrespective of the circumstances of the case.

262.   Mr Marshall accepted that the circumstances of the relevant issues in this case were not akin to the stark case of the conversation or event in which there are only two witnesses and only one of the witnesses gives evidence. On the contrary, there are no issues to which the evidence of any of these witnesses would go, which involves a dispute between evidence given by Mr McKillen or his witnesses on the one hand and the account which might be given by the persons not called as witnesses on the other. They are, on the contrary, issues on which evidence supporting the respondents' cases has been given by the respondents or their witnesses, with no contrary evidence called by Mr McKillen.

263.   The starkest example is the telephone conversation on 15 January 2011 between Sir David Barclay and, first, Mrs Quinlan and, then, Mr Quinlan. Mr McKillen alleges

that a binding agreement was made in the course of that conversation between Sir David Barclay and Mr Quinlan. Mr Quinlan has given evidence and has denied that any such agreement was made. Mr McKillen has not and cannot call any direct evidence of that discussion, there being no other witnesses to it and no document recording it. Instead, and I mean no criticism of this, he relies on inferences which he submits should be drawn from the subsequent course of events and from various comments made in various communications. The task of the court is to assess the totality of that evidence and to reach a conclusion on it. If the court believes Mr Quinlan's account, and does not conclude that it is displaced by the course of subsequent events and the documents, then it is hard to see why an adverse inference should be drawn by the failure of Sir David Barclay to give evidence. There is no doubt that his case is that no such agreement was made. Mr Marshall would have had to say either that Sir David Barclay would not be prepared on oath to support that case or that his evidence would not survive cross-examination. In view of the findings on the evidence, which I make later in this judgment, either of these possibilities appears somewhat fanciful. If, on the contrary, I had not been persuaded by the evidence of Mr Quinlan and other witnesses, Mr McKillen does not need to rely on the absence of Sir David Barclay as a witness.

264.   Many of the matters on which it is submitted that the court should draw an adverse inference from the absence of Sir David Barclay as a witness are of a similar category. They are all issues on which witnesses called by the respondents gave evidence supporting the respondents' cases and on which Mr McKillen and his witnesses could not give evidence.   They include Sir David's discussions with Mr Quinlan and Mr Murphy in July and August 2010, the circumstances in which the loan of €500,000 to Mr Quinlan and the pre-emption arrangement was made in October/November 2010, the meeting in Gstaad on 14 January 2011 and the circumstances in which Mr Hennebry's consultancy contract with the company was terminated in September 2011. The same is true of the financial support given by Sir David Barclay to Mr Quinlan and his family.

265.   In other cases, it is submitted that adverse inferences should be drawn in respect of documents, in particular text messages, sent by Sir David Barclay. Those communications are relied on by Mr McKillen as evidence in support of his case. I have to consider whether they are capable of bearing the significance which is attached to them by Mr McKillen. If they are capable of bearing that weight, then that is a matter which I take into account in favour of Mr McKillen's case in arriving at its overall conclusion. To that extent, Sir David Barclay is at a disadvantage because he has not put forward an explanation which detracts from the significance which I otherwise attach to the communication.

266.   There is in total a good deal of evidence and, having regard to that evidence, I do not think that it is appropriate to draw an adverse inference from the absence of Sir David Barclay as a witness. But, even if it were, I am satisfied having looked at all the evidence that it would not make any difference to the findings which I have made. In saying this, I have put to one side that Sir David Barclay's position is that he is medically unfit to give evidence. That is a point which I shall shortly consider separately.

267.   What I have said above as regards an adverse inference in relation to Sir David Barclay applies all the more strongly to Sir Frederick Barclay.  He did provide a

short witness statement which was submitted as hearsay evidence under the terms of the Civil Evidence Act. When Mr McKillen issued an application requiring Sir Frederick Barclay to attend for cross-examination, he made it clear through his solicitors that even if such an order were made he would not attend. In those circumstances, Mr McKillen did not pursue his application. Sir Frederick's involvement in the relevant transactions was a good deal less direct than that of Sir David Barclay. It may well be that Sir Frederick was kept apprised of relevant developments by Sir David, but if it is not appropriate to draw adverse inferences from the absence of evidence from Sir David Barclay on matters in which he was directly involved, it is certainly not appropriate to do so in relation to the absence of evidence from Sir Frederick whose involvement was for the most part indirect.

268.    As regards Sir Frederick Barclay's witness statement, it is a denial of allegations made against him in a form which subjects him to the contempt jurisdiction of the court under CPR 32.14. However, as can be seen from the rest of this judgment, I have not found it necessary to take account of Sir Frederick's witness statement in making my findings of fact.

269.    The role of Aidan Barclay became clearer in the course of the oral evidence of Mr Faber than perhaps it had previously been. There were quite a number of matters which Mr Faber said he would refer to Mr Barclay for decision. The closer involvement of Sir David Barclay after July 2011 resulted from Mr Barclay being ill for that period. Nonetheless, Mr Faber was more closely involved in the main than Mr Barclay and there is little on which Mr Barclay can give evidence on which there is not already a considerable body of evidence.

270.    It is noticeable that there are very few inferences which I am invited to draw from Aidan Barclay's absence.  There are five, set out in paragraph 664 of Mr McKillen's closing submissions.  The first is that the Barclay brothers were the key decision-makers because he would have given evidence if he had been a key decision-maker. Leaving aside the faulty logic, there is more than enough direct evidence as to who made which decisions.  The second is that he chose not to give evidence because his evidence would have been unhelpful to the respondents' case.  This is entirely general, with no identification of the issues on which the inferences should be drawn.  The third is that he knew that a binding agreement was made with Mr Quinlan on 15 January 2011, but there is no particular evidence suggesting that Mr Barclay knew of the alleged agreement. The fourth, that he failed to disclose to Mr McKillen the joint venture agreement made at the beginning of February 2011 with Sheikh Hamad is accepted but is of little relevance.  The fifth, that he was fully aware of the attempts to acquire the NAMA debt and facilitated it, is true to the extent shown by other evidence but his involvement was as I have mentioned above clearly curtailed by his illness. Given the amount of other evidence, and the issues on which Mr Barclay might be expected to give direct evidence, I see little or no room for any adverse inference from his absence as a witness.

271.    No adverse inference should, in my judgment, be drawn from the absence of evidence from Mrs Quinlan. The main issue to which evidence is said to be relevant is the alleged agreement made on 15 January 2011. It is however important to bear in mind that the case that such an agreement was made during Sir David Barclay's telephone conversation with Mr Quinlan on that date emerged only in the course of cross-examination of the respondents' witnesses. Ironically, it was Mr Quinlan's

evidence in his first witness statement of his wife's recollection of the conversation which played an important part in, and may have prompted, this allegation. I have in any case found that it is likely that some reference was made in that conversation to Sir David Barclay's intention to support the Quinlan family.  It is not, and cannot be, suggested that the alleged agreement was made in the course of Sir David Barclay's conversation with Mrs Quinlan. The agreement if made at all was made with Mr Quinlan. There is nothing in the point that Mrs Quinlan would have given evidence as to the detail of the payments made and benefits conferred on Mr Quinlan and his family. Before the trial, Mr McKillen applied for further information in relation to such payments and benefits but I held that the details provided were sufficient for the purposes of the trial.

272.    I earlier referred to the position taken by Sir David Barclay that he is medically unfit to give evidence. I have already concluded that in any event adverse inferences should not be drawn from his absence as a witness. Without going into the details, which are the subject of a confidentiality regime agreed between the parties, Sir David Barclay underwent heart surgery on or about 20 September 2011. Shortly after that, he complained of various symptoms which could affect his ability to give evidence. He has been under the care of distinguished consultants in cardiology and surgery. The consultant cardiologist provided a letter dated 20 February 2012, supplemented by a further letter dated 18 March 2012 and the consultant surgeon provided a letter dated 19 March 2012. The consultant cardiologist is clearly doubtful that the symptoms experienced by Sir David Barclay result from the operation but he is satisfied as to the existence of these symptoms, both as a result of his own observation of Sir David Barclay, most recently on 18 March 2012, and on the basis of a detailed report from the registered nurse who is continuously supervising Sir David. The consultant cardiologist concludes his letter of 18 March 2012 by saying that he has re-examined Sir David Barclay and that he is firmly of the opinion that Sir David Barclay would be unable to face a stressful court session with prolonged examinations. The consultant surgeon concurs in this opinion on the basis of the reports of his symptoms provided by the registered nurse and the consultant cardiologist.

273.    It is submitted for Mr McKillen that the court should not accept that Sir David Barclay is unable to give evidence for medical reasons. Objection is taken to the form in which the medical opinions have been put before the court. It is submitted that such opinions should have been contained in expert reports for which the permission of the court should be obtained. I do not accept this objection. In my experience, and I suspect the experience of most other judges, reports on the medical conditions of parties or witnesses for the purposes of a trial are not the subject of formal expert evidence such as is given on issues in the case. The medical opinions are usually provided in letters from the medical practitioners. Secondly, it is submitted that the letters do not constitute a sufficient medical explanation for Sir David Barclay's absences as a witness. Attention is drawn to a number of occasions on which Sir David Barclay appears to have been active since his operation in September 2011. A number of those occurred within a few days of the operation and the evidence is that the symptoms reported in the consultant's letters manifested themselves not immediately but a little while after the operation. Other matters such as sending and receiving emails and text messages are not inconsistent as it seems to me with the symptoms described by the consultants. Reference is made also to Sir

David Barclay's signing statements of truth on his defence on the 9 December 2011 and on his amended defence on 15 March 2012, as well as on his three-page disclosure statement on 13 January 2012. This again seems to me to be in no way comparable to giving oral evidence in court. A party can be taken slowly through a defence, enabling him properly to verify it by a statement of truth.

274.    Much reliance was placed on the fact that Mr McKillen's solicitors had suggested that Sir David Barclay should be examined by an independent consultant agreed by both parties. I have to say that this is not a course which I have ever seen used to determine whether a party or witness is medically fit to give evidence. I am aware of it occurring in the case of respondents to proceedings for disqualification orders under the Company Directors Disqualification Act where the issue was whether the proceedings should be stayed on the grounds that in view of the medical condition of the respondent a fair trial was impossible. I do not consider that any adverse conclusion should be drawn from the refusal to submit to an independent medical examination in this case. The issue for the court on the evidence put before it is whether the party, in this case Sir David Barclay, has satisfied the court that he is medically unfit to give evidence, so as to displace any adverse inference that might otherwise be drawn from his failure to give evidence. Such a party could of course agree to an independent examination but in the absence of doing so the court will reach its conclusion, on the material put before it. If that material does not pass muster, without being bolstered by an independent consultant's report, the consequence is that the court will not accept the explanation of the party or witness for his absence.

275.    It is apparent that this is not one of those cases where the condition of the witness is so obvious that the court can without difficulty conclude that he is medically unfit to give evidence. Symptoms of fatigue, stress and lack of concentration require a judgment as to whether the witness is fit to give evidence. But it is a medical judgment, albeit one which will be subject to judicial scrutiny. There is in my judgment no reason to doubt the existence of the symptoms which have been referred to and the judgment of the consultants.  In particular the consultant cardiologist is clear that Sir David Barclay is medically unfit to give evidence. The court can, of course, take various steps to mitigate the adverse effects of giving oral evidence. But there is clearly a limit to what can be done in this respect and I have no doubt that Sir David Barclay's evidence would have been the subject of vigorous and sustained challenge. The evidence before me is quite insufficient to cast serious doubt on the medical opinions expressed in the consultants' letters and I am satisfied that there are good medical reasons for the absence of evidence from Sir David Barclay.

**Pre-emption**

*Introduction*

276.    Mr McKillen alleges that the pre-emption provisions in relation to shares in the company contained in the shareholders agreement were triggered by two quite separate events or series of events. First, it is alleged that the security given by Mr Quinlan over his shares to secure his borrowings became enforceable. Secondly, it is said that the arrangements made between Mr Quinlan and the Barclay interests as regards his shares also triggered the pre-emption provisions. Those arrangements

comprised both agreements and other arrangements admittedly made and also an oral agreement which is alleged by Mr McKillen to have been made on 15 January 2011 but is denied by Mr Quinlan and the Barclay interests.

277.    The pre-emption provisions are contained both in the shareholders agreement and in the articles of association of the company. Those provisions are in largely similar but not quite identical terms. I shall deal with these issues by reference to the provisions of the shareholders agreement. Clause 8.3 of that agreement provides that in the event of any inconsistency between the terms of the agreement and the articles of association, the terms of the agreement are to prevail and the shareholders are required to make such amendments as may be necessary to the articles to conform to the terms of the agreement.

278.    Clause 6 of the shareholders agreement, containing the pre-emption provisions, is a long and elaborate clause but it is necessary to refer only to a few of its provisions.

279.    Clause 6.1 provides:

> *"Except in respect of a transfer made pursuant to clauses 6.14, 6.15 and/or 6.16, a Shareholder (the Proposing Transferor) desiring to transfer one or more Shares (or any interest therein) (the Transfer Shares) may at any time give notice in writing to the Company (Transfer Notice) of his desire to transfer the Transfer Shares and the sale price thereof and other sale terms, as fixed by him. For the purposes of this clause 6, 'Share' shall be deemed to include Loan Stock and any other debt or other instrument convertible into share capital of the Company".*

This clause differs from many standard form pre-emption clauses by not requiring a member who desires to transfer his shares to give a transfer notice, but only giving him the option of doing so. If a shareholder does give a transfer notice pursuant to clause 6.1, sub-clauses 6.2 to 6.5 make provision for the shares to be offered round to the other shareholders and what the shareholder may do if the pre-emption offer is not accepted.

280.    Clause 6.6 is directly relevant to both ways in which Mr McKillen puts his case. It provides as follows:

> *"If any Shareholder*
>
> > *6.6.1 (being a corporate Shareholder) enters into liquidation or receivership or suffers the appointment of an examiner or any Shareholder Security becomes enforceable or suffers any analogous proceeding (not being a voluntary liquidation for the purpose of and followed by a reconstruction or amalgamation while solvent upon such terms as may be approved by all of the Shareholders); or*
> >
> > *6.6.2 (being an individual Shareholder) becomes or is adjudged bankrupt in any part of the world or enters into any composition or arrangement with his creditors generally or any Shareholder Security becomes enforceable; or*

> *6.6.3 attempts to deal with or otherwise dispose of any Shares or interest in Shares in the Company otherwise than in accordance with the provisions of this Agreement;*

> *such Shareholder or as the case may be, his personal representatives, if so notified by the Company following a determination by the Directors at any time within a period of one month after the occurrence of any such event, shall be deemed to have given a Transfer Notice in respect of all Shares held by it or him on the date of such notice and the provisions of clause 6.7 shall apply."*

281.   Again this is a somewhat unusual provision. Rather than requiring a shareholder to give a transfer notice upon the occurrence of the specified events, it confers on the directors a discretion to determine whether the shareholder should be deemed to have given a transfer notice. If the directors exercise the discretion in favour of requiring a transfer notice, the transfer notice will be deemed to relate to all the shares held by the shareholders, even though the security may have become enforceable over only some of his shares or he may have sought to deal with or dispose of only some of his shares. Clause 6.7 provides for the mechanics of the offer round following a determination by the directors that a transfer notice is deemed to have been given.

282.   Clause 6.17 provides:

> *"No Share nor any interest therein shall be transferred, sold or otherwise disposed of save as provided in this clause 6."*

*Agreements and arrangements between Mr Quinlan and the Barclay interests as regards his shares*

283.   The provisions of clause 6 of the shareholders agreement apply to the transfer, sale or other disposal not only of shares, but also of any interest in shares. *"Interest"* here means an equitable interest in the shares themselves: see the judgments at first instance and in the Court of Appeal on the preliminary issue as to whether the sale of Misland triggered the pre-emption provisions: [2011] EWHC 3466 (Ch) and [2012] EWCA Civ 179.

284.   Mr McKillen relies upon a number of agreements and arrangements as involving a sale or disposal of interests in Mr Quinlan's shares as being contrary to clause 6.17 of the shareholders agreement or coming within clause 6.6.3.

285.   He relies first on the agreement alleged to have been made on 15 January 2011 between Mr Quinlan and Sir David Barclay. I shall consider the case on this alleged agreement in detail after considering the other ways in which this part of the case is put.

286.   There are admitted transactions which, Mr McKillen asserts, involved a sale or disposal of an interest in Mr Quinlan's shares, *"especially when taken cumulatively"*. These transactions are said to be as follows:

   a.   A right of first refusal given to Sir David Barclay in October 2010;

b.  The acquisition in January 2011 by Ellerman of Mr Quinlan's debts to BOSI and its registration as the holder of his shares charged to secure those debts;

c.  The 17 February Agreement;

d.  The power of attorney granted by Mr Quinlan on 16 May 2011;

e.  The acquisition in September 2011 by B Overseas of all other debts secured on Mr Quinlan's shares.

287.  I have dealt in the chronological section with the so-called grant of a right of first refusal in October 2010. I have found that the arrangement made was not intended to have, and did not have, legal effect.  In any event, it is accepted on behalf of Mr McKillen that a mere right of first refusal, even if enforceable, does not confer a proprietary interest in an asset: *Pritchard v Briggs* [1980] 1 Ch 339. It is nonetheless submitted that in order to give clause 6 proper effect, it is necessary to construe an *"interest in shares"* as going wider than the conferring of a proprietary or equitable interest in those shares. It is submitted that the grant of a right of first refusal has a direct impact on other shareholders, because it means that they will be inhibited in obtaining a third-party offer for the entirety of the shares in the company. It is said that in these circumstances the shareholder conferring a right of pre-emption would, in practical terms, be conferring an interest in respect of his shares to the detriment of the other shareholders.

288.  I do not accept this submission for two reasons. First, for the reasons given in the judgments delivered on the preliminary issue regarding the sale of Misland, the phrase *"interest in shares",* in the context of clause 6, is to be given its usual proprietary meaning. Secondly, I do not, in any event, follow the logic of the submission being made. The suggested right of first refusal is at best no more than a right to *match* an offer. It by no means follows that third parties would be deterred from making offers for the entire issued share capital. In any case, if the holder of the right of first refusal does seek to match the offer, then the sale to him will trigger the pre-emption provisions, and the other shareholders will be able to purchase the relevant shares and then accept the third party's offer.

289.  The transfer to Ellerman of the shares charged to secure Mr Quinlan's debt to BOSI which Ellerman acquired was effected pursuant to clause 6.18 of the shareholders agreement, which provides that

> *"Nothing in this clause 6 shall prohibit or restrict the grant by a Shareholder of any Shareholder Security or the transfer of any Share to the holder for the time being of such Shareholder Security and the Directors shall approve such transfer....."*

290.  While Mr McKillen accepts that Ellerman was entitled to be registered as the holder of the charged shares without triggering any pre-emption rights if it was no more than the holder of the charge granted to secure the BOSI debt, he submits that Ellerman acquired an interest which went beyond that of a mere security holder and which constituted an interest in shares within the meaning of the pre-emption provisions. Mr McKillen's case that Ellerman acquired an interest beyond that of a mere security holder depends on establishing his case that such further interest was

acquired either as a result of the pre-emption arrangements made in October/November 2010 or of the agreement allegedly made on 15 January 2011. I have already rejected the submission that the arrangement for a right of first refusal conferred any interest in shares on Ellerman or other Barclay interests and I later consider whether there was an agreement made on 15 January 2011 which conferred any such interest. Subject to that, the transfer to Ellerman on or about 1 February 2011 did not trigger the pre-emption provisions.

291.    In their closing submissions, counsel for Mr McKillen referred to written forms of confirmation which were given by Ellerman and Mr Murphy on behalf of Mr Quinlan to the effect that there were no arrangements between Mr Quinlan and any of the Barclay interests for the acquisition of an interest in Mr Quinlan's shares including the transfer of voting or other rights in those shares. It may be observed that the directors had no power to impose this requirement on Mr Quinlan and Ellerman unless it was restricted in its ambit to the disclosure of a transfer or agreement to transfer an interest in the shares which would trigger the pre-emption provisions. Subject to the issue of the alleged 15 January 2011 agreement, there has been no transfer or agreement to transfer any interests in Mr Quinlan's shares which would have had that effect. If the use of the word "arrangement" in the form of confirmation was intended to cast a wider net, it was an illegitimate interference on the part the directors in the right of Ellerman to take a transfer pursuant to clause 6.18 of the shareholders agreement. In its context, it cannot properly have been understood to go further than such arrangements as conferred a proprietary or equitable interests in the shares.  In any event, the allegation that the representations were untrue and that Ellerman was registered as the holder of the shares on the basis of its own false representation formed no part of Mr McKillen's pleaded case.

292.    The 17 February agreement was a legally binding agreement for the sale of Mr Quinlan's shares and loan stock to EHGL for an aggregate price of £80 million. The agreement of sale is however expressed to be subject to

>       " (i) compliance with the terms of the shareholders agreement relating to the Company and the Company's articles of association; and
>       (ii)  consent to the transfer to us of the Securities on the terms of this letter first having been duly received from any person who holds any security interests over the Securities and whose consent is thereby required to the sale which is the subject of this letter…"

293.    As regards the second of these conditions, Mr McKillen relies on the fact that by September 2011 the Barclay interests had acquired all the charges over Mr Quinlan's shares and it was therefore within their power to give the relevant consent. Accepting that for the moment, there remains the first requirement, to comply with the terms of the shareholders agreement and the articles of association. This is clearly intended as a reference to the pre-emption provisions.  It follows that the 17 February agreement involves no breach of clause 6.17 of the shareholders agreement.  Until compliance with the terms of clause 6 there can be no transfer, sale or other disposal of Mr Quinlan's shares or an interest in them under the agreement. Clause 6.6 applies only to attempts to deal with or otherwise dispose of any shares or interest in shares in the company *otherwise than in accordance with the provisions of this Agreement"*. By virtue of the express condition, the 17

February agreement was not an attempt to deal with or dispose of shares or an interest in shares otherwise than in accordance with the provisions of the agreement, but rather was an agreement to do so in accordance with the provisions of the agreement.

294.   A similar issue arose in *In re Ringtower Holdings Plc (1989) 5 BCC* 82. The court was there concerned with a conditional agreement under which a shareholder irrevocably undertook to accept an offer for its shares and to vote in favour of special resolutions removing pre-emption provisions in the company's articles and re-registering the company as a private company. The issue was whether the shareholder by making the agreement had evidenced a desire to transfer or dispose of its shares or an interest therein for the purposes of the pre-emption articles. The agreement to accept the offer, when made, was legally binding but the making of the offer was conditional, amongst other things, on the removal of the pre-emption provisions in the articles. Peter Gibson J rejected the submission that the agreement triggered the pre-emption article and said at p.99 that he was *"unable to see how any present or unequivocal desire on the part of [the shareholder] to transfer or dispose of its shares or an interest therein can be discerned from the conditional agreement constituted by the letter of undertaking"*.

295.   If, as in that case, the condition requiring the removal of the pre-emption articles was sufficient to prevent the conditional agreement from amounting to a desire to transfer the shares or any interest therein, it is in my judgment all the clearer that the 17 February agreement was not an attempt to deal with or dispose of Mr Quinlan's shares or an interest in them *"otherwise than in accordance with the provisions of"* the shareholders agreement.

296.   On 16 May 2011 Mr Quinlan granted a power of attorney in favour of Mr Faber or, failing him, any director of Ellerman. It was expressed to be irrevocable and to remain in force for a period of one year. Like any power of attorney, it was the appointment of an agent to exercise powers attached to the shares on behalf of Mr Quinlan as holder of the shares but in this case at the discretion of the attorney. Apart from relying on the power of attorney to evidence the agreement said to have been made on 15 January 2011, the submission on behalf of Mr McKillen was that combined with the earlier admitted agreements this power of attorney showed that Mr Quinlan had in practice no real interest in his shares.  It was submitted that the practical effect of the arrangements made, including the power of attorney, was to enable the Barclay interests to step into the shoes of Mr Quinlan in every real sense. The commercial objective of the pre-emption process, it was submitted, was to prevent arrangements having that practical effect. The difficulty with this submission is that it remains necessary before the pre-emption provisions are triggered to demonstrate that there has been a disposal, transfer or sale of the shares or an interest in them. If the earlier agreements had not disposed of the shares or an interest in them, then the grant of the power of attorney does not by itself do so.

297.    Finally, the acquisition in September 2011 by the Barclay interests of the remaining debts of Mr Quinlan secured on his shares cannot in my judgment advance the position. It did not involve Mr Quinlan as shareholder taking any steps to transfer the shares or an interest in the shares and in any event the only interest transferred was a security interest. Once again, unless the prior agreements had involved a

transfer of an interest in shares, then the acquisition of these debts in September 2011 cannot and did not do so.

298.   It follows that, in my judgment, none of the admitted agreements made between Mr Quinlan and the Barclay interests, either singly or in combination, involved a transfer of an interest in his shares such as to trigger any of the provisions of clause 6 of the shareholders agreement. Mr McKillen's case that the pre-emption provisions were triggered must therefore depend on his allegation of an agreement reached on 15 January 2011, to which I now turn.

**Alleged 15 January Agreement**

299.   Mr McKillen alleges that on 15 January 2011 a binding oral agreement was made between Mr Quinlan and Sir David Barclay in respect of Mr Quinlan's shares, by which Mr Quinlan dealt with or disposed of his shares or an interest in his shares for the purposes of the pre-emption provisions of the shareholders agreement (either in breach of clause 6.1 or triggering clause 6.6 by reason of clause 6.6.3). It is not disputed by Mr McKillen that any agreement dealing or disposing of shares must for these purposes amount to an enforceable contract. Where, as here, there is no question of a transfer of the shares themselves, an agreement for their sale or transfer or other disposal must be specifically enforceable if it is to have the effect of transferring an interest in the shares.

300.   Mr McKillen's case is that the exclusivity agreement signed by Mr Quinlan on 15 January 2011, which was an enforceable agreement, did not reflect the real agreement between the parties at that time.

301.   The pleaded case, as it originally appeared in paragraph 34 of the petition, was that "*Mr McKillen believes that on or around 1 February 2011 the Barclay Brothers (or Barclay Interests) and Mr Quinlan entered into an agreement in respect of certain of Mr Quinlan's shares in the Company intended to achieve the transfer or effective transfer of shareholder control to the Barclay Brothers without going through the required pre-emption process*". This was amended on 13 March 2012 to widen the period in which it was alleged that the agreement was made. The words "alternatively at some other dates" were added after "on or around 1 February 2011".

302.   Paragraph 33E of the Petition, which was added by amendment, referred to payments, benefits and assistance provided by the Barclay brothers to Mr Quinlan and his family and alleged that they were provided:

> "*a.    as part of the consideration for an agreement or agreements as pleaded at paragraphs 34...... below, under which Mr Quinlan conferred beneficial ownership, alternatively some other direct interest, in the shares to the Barclay Brothers (or one of their entities) or to their order; alternatively*
>
> *b.    as part of the consideration for an agreement on the part of Mr Quinlan to sell his shares or achieve the transfer or effective transfer of his shares to the Barclay Brothers without going*

> *through the required pre-emption process (and/or at a time of the Barclay Brothers' choosing)".*

303.  Mr McKillen's written opening put the case as follows:

> *"Even before the 17 February Agreement, a deal had been reached with Mr Quinlan, as Mr Faber accepts. Mr Faber accepts that the 17 February Agreement simply reflected the fundamentals of the deal which had been agreed in January: see paragraph 69 of his witness statement. On this further basis there was an infringement or triggering of the pre-emption provisions. In addition, the deal that had been arrived at with Mr Quinlan plainly entitled the Barclay Interests to control Mr Quinlan's voting rights, both as shareholder and director. This amounted to a conferring of rights over Mr Quinlan's own rights attaching to his shares. Shares in a company are themselves a bundle of rights, of which voting rights are key components. Accordingly, by agreeing to hold those rights for the Barclays' benefit, Mr Quinlan was granting an interest in the shares".*

No further details of the alleged agreement were put forward at that stage. It should be noted that Mr Faber had not accepted that a binding agreement was made in January 2011. In paragraph 69 of Mr Faber's witness statement the word "*agreed*" was in inverted commas in the phrase "*reflected the fundamentals of the deal which had been "agreed" in January*" and in paragraph 30 he had referred to the agreement as "*a (non-binding) agreement in principle*".

304.  In the course of the cross-examination of some witnesses, particular Mr Faber, Mr Quinlan and Mr Murphy, Mr Marshall developed a case that a binding agreement had been reached in the course of Mr Quinlan's telephone conversation with Sir David Barclay early in the evening of 15 January 2011.

305.  It is important to see how the case was put to Mr Quinlan. Mr Marshall did not cross-examine on the detail of the telephone conversation. However, he put to Mr Quinlan "*You were promised payments by the Barclay brothers in return for agreeing with them to exercise all the rights associated with your shares for their benefit and at their direction*" and "*the purchase of your shares was in effect what had happened*".

306.  In the closing submissions for Mr McKillen, the case was put as follows:

> *" …….. in this call, Sir David made clear that if Mr Quinlan would agree to sell to the Barclay brothers, and (in order to avoid the pre-emption provisions) to conceal the fact of the agreement to sell until such times as it could be admitted openly, the Barclay brothers would, at the very least, agree to support his family financially and, as seems likely, provide other consideration equivalent to that offered by the Qataris. In any event, whether or not any figures were discussed the agreement was that the financial support would be provided in return for the agreement to sell".*

307. Paragraph 125 of Mr McKillen's closing submissions contains the following "overview" of his case on the alleged agreement:

> "*On a review of the whole of the evidence it is clear that Mr Quinlan reached a decision in the afternoon or early evening of 15 January 2011 that he would no longer support the Qataris' bid for the Company but instead would sell his shares to the Barclay Brothers. He agreed during (or following) a telephone call with Sir David Barclay on 15 January that the Barclay Brothers could acquire his shares at a price based on an enterprise value for the Company of £900 million. Although the true nature of the agreement could not be revealed, and the transfer could not be formally and openly completed, until the pre-emption provisions could be "dealt with" (by the Barclay Brothers acquiring the remaining shares or reaching a deal with the remaining shareholders), it was agreed that the parties would behave as though the transfer had been effected and ownership had formally passed and Mr Quinlan would exercise all the rights associated with his shares for the benefit of and at the direction of the Barclay Brothers (achieving in practice the effect of a completed sale). In return, it was agreed that the Barclay Brothers would, at the very least, support Mr Quinlan and his family financially, and they are also likely to have promised other consideration at least equivalent to the fees previously negotiated with the Qataris. As explained further below, the negotiations between Mr Quinlan and the Barclays effectively ended on 15 January 2011, because everything had been agreed".*

308. The allegation is summarised in paragraph 158: *"Mr Quinlan agreed to sell his shares, and to give effect to that agreement by exercising all the rights attaching to his shares as though the sale had already taken place".*

309. The existence of the alleged agreement is not supported by any direct evidence. Mr Quinlan repeatedly denied it in his evidence. Sir David Barclay did not give evidence but Mr Faber denied it in his evidence. Although the agreement is said to have been made in a telephone conversation between Mr Quinlan and Sir David, I regard it as highly unlikely that if such an agreement were made, Sir David did not inform Mr Faber. It is not recorded in any document. On the contrary, the written agreements made between Mr Quinlan and the Barclay interests on 15 January 2011 and 17 February 2011 are inconsistent with it.

310. It is submitted for Mr McKillen that the existence of this agreement can be inferred from a number of different matters. These may be summarised as follows.

311. First, in his dealings with various potential purchasers in 2010, and in particular with the Qataris, Mr Quinlan discussed the payment to him of very substantial fees, payable if they obtained control of the company. The sums being talked about were very large indeed, ranging from £25 million to £50 million. It should therefore be inferred that in Mr Murphy's discussions with Sheikh Jassim on 9 January 2011 and in the telephone discussion with Mr Bakhos on 13 January 2011, similar fees were offered to Mr Quinlan. It follows, it is submitted, that in order to obtain Mr Quinlan's agreement not to sell to the Qataris but rather to agree a sale with the Barclay interests, they must have agreed to pay similar fees to Mr Quinlan.

312.   Secondly, the Barclay brothers provided substantial financial support to Mr Quinlan and his family from January 2011. The principal sums paid were four payments to Mrs Quinlan as follows: £500,000 on 31 January 2011, £500,000 on 14 April 2011, €500,000 on 7 July 2011 and £825,000 on 16 December 2011. In addition, on 16 April 2011, a little over £35,000 was paid to a firm of solicitors in respect of fees owed by Mr and Mrs Quinlan. In addition, sums were paid on behalf of Mr and Mrs Quinlan to creditors and others. Details of these payments were requested but it was said that neither the Barclay brothers nor Mr and Mrs Quinlan had records which would enable the details to be provided. However, it was said that they amounted in total to less than the cash payments. The Barclay brothers have also been paying for Mr Quinlan's legal representation in the present proceedings. Mr McKillen alleges that the reasonable explanation of these payments is that they were made pursuant to a contractual entitlement of Mr Quinlan arising under the alleged agreement on 15 January 2011.

313.   Thirdly, it is said there was a *volte-face* on the part of Mr Quinlan in the course of 13-15 January 2011. It is said, by reference to the emails sent by Mr Murphy and Mr Murphy's agreement in the telephone board meeting on 15 January 2011 to a continuation by Mr McKillen of exclusive negotiations with the Qataris, that Mr Quinlan was by that time committed in a non-binding way to a deal with the Qataris. It is said that his sudden change to backing an offer by the Barclay interests must have been the result of inducements offered by the Barclay interests.

314.   Fourthly, reliance is placed on text messages and emails sent by Sir David Barclay and others in the period following 15 January 2011.

315.   Fifthly, reliance is placed on the conduct of Mr Quinlan after 15 January 2011 as a shareholder and director, which, it is said, provided consistent support for the Barclay brothers.

316.   I think it convenient first to state my overall conclusion on this issue. I am satisfied on the totality of the evidence that no binding agreement was reached on 15 January 2011 between the Barclay brothers or any of the Barclay interests and Mr Quinlan, other than the written exclusivity agreement signed on that day. There are several grounds for this conclusion, which I shall set out before addressing the detail of Mr McKillen's submissions and before stating why I do not consider that they provide the basis for the inference sought to be drawn.

317.   First, I heard Mr Quinlan and Mr Faber cross-examined at some length in relation to this issue and having seen them give their evidence and in the light of the various factors to which I shall refer I am satisfied that they were telling the truth.

318.   Secondly, Mr McKillen's case amounts to an allegation of outright and sustained dishonesty on the part of Sir David Barclay, Mr Quinlan, Mr Murphy, Mr Faber (because, as I have mentioned, I cannot see that he would have been kept in ignorance of the agreement) and perhaps others. It involves the allegation of secretly making the suggested oral agreement while at the same time making a written agreement which was quite contrary to, and designed to conceal, the oral agreement and of thereafter misleading the other shareholders, the company, NAMA and finally the Court that the exclusivity agreement was the only binding agreement

made on 15 January 2011. I do not consider that the evidence comes anywhere near establishing so serious an allegation.

319.    Thirdly, the exclusivity agreement not only contradicted the alleged oral agreement but would in practice have made it impossible to enforce the alleged oral agreement. In the face of the exclusivity agreement signed by both sides, neither side would have had any real prospect of establishing in Court as against the other the making of the alleged oral agreement. If it could not be enforced in Court proceedings, it was clearly not worth making. Anyone, let alone experienced and sophisticated business people like Sir David Barclay and Mr Quinlan, would have been able to appreciate that.

320.    Fourthly, both sides were acutely aware of the pre-emption provisions and the need to avoid triggering them. The alleged oral agreement would, however, do precisely that. Both in the exclusivity agreement and in the 17 February agreement, great care was clearly taken to avoid triggering the pre-emption provisions. Why, therefore, should the parties act so recklessly as to make the alleged oral agreement?

321.    Fifthly, the Barclay interests were in all other cases careful to document their binding agreements. The alleged oral agreement is wholly out of character with all the undisputed dealings between the Barclay interests and Mr Quinlan.

322.    Sixthly, the exclusivity agreement was sufficient for the Barclay interests' purposes at that stage. Their concern was to prevent Mr Quinlan from throwing in his lot with the proposed Qatari deal. The exclusivity agreement achieved that and allowed the Barclay interests time to reach agreement with the other shareholders. In fact, that was achieved during the exclusivity period. First, they acquired Misland and, secondly, they reached agreement with Mr McKillen on 12 February 2011.

323.    Seventh, and allied to the last point, there is no commercial reason why the Barclay interests should commit themselves to purchase Mr Quinlan's shares at a time when they had yet to do any deal with any shareholder, particularly the deal involving the purchase of Misland which they understood, correctly, would not trigger the pre-emption provisions.

324.    Eighth, there are private communications on the Barclay side which are wholly inconsistent with the alleged agreement. In an email dated 16 March 2011 to Mr Seal, Mr Faber addressed the position if no deal was reached with Mr McKillen:

> *"....we will continue to live in a worsening board environment where decisions will be driven by board votes. In this scenario it will be good to have two Ellerman board members, even though it does not improve our voting capacity, which will continue to hinge on the fact we can ask Derek to support us (if he is so minded and until he goes bankrupt)."*

This is inexplicable if the alleged agreement had been made. Mr Faber would have no reason to mislead Mr Seal as regards any such agreement. Although the email was referred to in Mr McKillen's opening, it was not put to Mr Faber. It was put to Mr Seal but without any suggestion that it misstated the position.

325. In a private memorandum dated 1 August 2011 from Mr Faber to Sir David Barclay, on which Mr McKillen places some reliance for other purposes, Mr Faber summarises the state of affairs as regards the purchase of Mr Quinlan's shares. He refers to the 17 February agreement. There is no mention of the alleged oral agreement but, if it had in fact been made, Mr Faber would surely have referred to it in this memorandum.

326. Ninth, Mr Quinlan's decision to commit to an exclusivity agreement and to agree in principle to co-operate with the Barclay interests was, objectively, a reasonable commercial choice. They were willing to move fast to make an offer at an enterprise value of £900 million with no due diligence and no warranties. The Qataris' offer was at £875-900 million, with a requirement for due diligence and warranties. The Barclay interests' offer could reasonably be seen on all counts as the better offer even before taking account of the treatment by the Qataris of Mr Quinlan's position on 9 January 2011.

327. I reject the suggestion that the Barclay interests' position of not requiring due diligence was a sham. The request to Mr Murphy for certain documents in an email on 16 January 2011 was not due diligence of the sort or scale usually found on such transactions, and for which the Qataris required four weeks. Nor would Mr Quinlan have known of even this modest request when he signed the exclusivity agreement on 15 January 2011.

328. My findings on the agreements and understanding reached between the Barclay interests and Mr Quinlan are as follows. The only binding agreement made before the 17 February agreement was the signed exclusivity agreement. There was agreement in principle that Mr Quinlan would accept an offer made to the shareholders by the Barclay interests for the purchase of their shares at a price based on an enterprise value of £900 million and on terms which did not require due diligence or warranties. I am satisfied that both sides believed that the Barclay interests would move quickly to make such an offer. I am satisfied too that Mr Quinlan made clear that he would co-operate with the Barclay interests. They would be allies but not on a basis which conferred any enforceable rights against Mr Quinlan.

329. Either in the conversation on 15 January 2011 or at around that time, I find that Sir David Barclay indicated to Mrs Quinlan that he and his brother were prepared to provide financial support to Mr Quinlan and his family. No figures were discussed. No commitment was entered into. But the Barclay brothers made clear to Mr and Mrs Quinlan that they could rely on them for support. Quite apart from any desire to help the Quinlan family, it was, as is said in Mr McKillen's closing submissions, in the interests of the Barclay side to keep Mr Quinlan out of bankruptcy, so avoiding the pre-emption provisions being triggered on that basis. There was no contract for the provision of support in consideration for Mr Quinlan's co-operation in relation to the company. Nonetheless, common sense must have suggested that, however well-disposed the Barclay brothers were to Mr Quinlan and his family, their patience and generosity might well wear thin if he were to act contrary to their interests.

330. I turn now to deal with each of the areas of evidence on which reliance is placed by Mr McKillen.

331. As regards fees, there is no evidence that any fee was offered by the Qataris to Mr Quinlan or to Mr Murphy on his behalf in January 2011. As it appears from the evidence, the position in January 2011 was very different from the position in July and August 2010. In the earlier period it was Mr Quinlan who appeared to have the means of procuring for the Qataris a purchase of the company or control of it. It will be remembered that, on the evidence of Mr Quinlan and Mr Murphy and I see no reason to doubt it, fees would have been payable if control of the company were achieved, rather than simply a purchase of Mr Quinlan's shares. Whilst it is true that it appears to be Mr Murphy who got the parties together in early January 2011, the Qataris no longer had any need of Mr Quinlan as an intermediary. They had direct discussions and reached an agreement in principle with Mr McKillen on 9 January 2011 and they agreed to continue negotiations directly with Mr McKillen. Moreover, it was Mr McKillen's evidence that he was told by the Qataris in January 2011 that they had difficult dealings with Mr Quinlan in August 2010, finding that he reneged on deals which they understood to have been agreed.

332. The stance of Sheikh Jassim on 9 January 2011, that the Qataris would pay a significantly lower price to Mr Quinlan than to the other shareholders because he was seen to be a distressed seller, is inconsistent with any agreement to pay him fees. However, Mr Marshall suggested that the reduction in the price to be paid to Mr Quinlan of about £35 million equated to the level of fees being discussed in August 2010. It could therefore, he suggested, be inferred that this reduction was proposed to take account of a fee of about that amount still to be paid to Mr Quinlan secretly if the deal being discussed on 9 January 2011 were to proceed. There is no evidence for this. If true, it would mean presumably that when on 13 January 2011, Mr Bakhos on behalf of the Qataris told Mr Quinlan that they would pay the same price to him as to other shareholders, he would in fact be receiving not only that full price but also a substantial fee. Looking at the course of dealings with the Qataris during January 2011, it appears to me highly unlikely that they were offering Mr Quinlan any fee. It may be noted that Mr McKillen did not call Mr Bakhos or anyone else on the Qatari side to give evidence.

333. Further, the purpose of this suggestion is to lay the ground for the allegation which was put to Mr Quinlan that the Barclay interests agreed to pay him substantial fees of the order of those which Mr Quinlan discussed with the Qataris in July-August 2010. On the basis of the evidence which I have heard concerning the Barclay brothers and their operations, and their approach to the acquisition of control of the company, I regard it as fanciful that they would be willing to pay Mr Quinlan "*fees*" of any amount remotely approaching the sums being discussed in August 2010.

334. It is a possible explanation of the payments made to and benefits conferred on Mr and Mrs Quinlan by the Barclay brothers since January 2011 that they were contractually obliged to provide them. This is denied by Mr Quinlan and the Barclay brothers who say that they represented financial support to the Quinlan family at a time when they were and continued to be in serious financial difficulties. This too is a possible explanation for the payments and one which is supported by Mr Quinlan's evidence that the payments were made following requests by him and because he understood the Barclay brothers to be willing to support him as a friend. As I have earlier suggested, I think it likely that the Barclay brothers were aware of the commercial advantages to them if they did provide support to Mr Quinlan and

his family. That does not mean that they were not also motivated by a genuine desire to support the Quinlan family, and it certainly does not mean that they were providing the support in accordance with a contractual obligation to do so. There is no particular pattern to the payments and Mr Quinlan's evidence is that they were made following calls to the Barclay brothers from Mrs Quinlan. I have some difficulty in seeing how there could be an enforceable contract where the consideration consisted of an obligation to provide unspecified amounts of financial support at unspecified times. How many payments were the Barclay brothers required to make? How much in total were they required to pay? There would need to be answers to these questions before either Mr Quinlan could enforce an obligation to make payments or before the Barclay brothers could enforce the obligations of Mr Quinlan in respect of his shares. But, leaving these difficulties to one side, I approach the issue of the alleged agreement on the basis that the payments made, whilst possibly consistent with it, do not establish it.

335.   I should mention here a point made on behalf of Mr McKillen. In the course of 2011, the Barclay interests acquired all the debts secured over Mr Quinlan's shares. Mr Quinlan is not being required to meet the interest due on those debts. It is said that when this non-collection of interest is added to the payments made to or for the benefit of the Quinlan family, the result is that the total support received by Mr Quinlan from the Barclay brothers is of a similar order to the level of fee that he had been seeking from the Qataris and others. It is submitted that it is likely that an agreement to waive the payment of interest was part of the consideration offered in return for Mr Quinlan's agreement on 15 January 2011 to sell his shares. This submission rests on the false basis that it must have been contemplated at that time that the Barclay interests would acquire the debts secured over Mr Quinlan's shares. In fact, the evidence shows that the Barclay interests were initially reluctant to accede to Mr Quinlan's suggestion at the end of January 2011 that they should purchase the debt due to BOSI. Moreover, in April and May 2011, they were not prepared to pay what was needed to acquire Mr Quinlan's debt to NAMA, which sold it instead to a company associated with Wynton. Only in September 2011 did the Barclay interests acquire the remaining debts secured on Mr Quinlan's shares. I do not consider there is any basis for supposing that any question of waiving interest on Mr Quinlan's secured debts  was contemplated by the Barclay brothers or by Mr Quinlan in mid-January 2011.

336.   As regards what is said to have been Mr Quinlan's *volte-face* in the course of 13-15 January 2011, I have already in large part addressed this in the chronological section. I am satisfied for the reasons there stated that Mr Murphy's emails are often not a reliable guide to Mr Quinlan's thinking. It is clear that Mr Murphy was very keen for a deal to be reached with the Qataris. It was his analysis for the reasons which he gave that this was the most promising outcome for the company and one which, as he said, might result in a "*few bob*" for himself. Mr Quinlan had every reason to distrust the Qataris following Mr Murphy's meeting with Sheikh Jassim on 9 January 2011. It was only on the evening of 13 January 2011 that the Qataris through Mr Bakhos indicated to Mr Quinlan that they would not "chip" his price. It was clear from Mr Quinlan's oral evidence that he was deeply suspicious of potential purchasers whom he thought might "chip" the price. It was a constant theme of his evidence. I find credible his evidence that the suspicions about the Qataris were by no means wholly allayed by Mr Bakhos' telephone call. Mr

Quinlan was no doubt happy to leave as many opportunities open for as long as was possible, but when on 15 January 2011 he was required to make a choice and acceded to the request from the Barclay interests that he should sign an exclusivity agreement, it was not in my judgment a *volte-face*.

337. The fourth area of evidence relied on by Mr McKillen comprises statements made after 15 January 2011 by Sir David Barclay and others on the Barclay side, many made in private communication which are said to reveal the true position.

338. A number of text messages were sent by Sir David Barclay to Mr Murphy from 19 January 2011.

339. The first read *"Gerry, deal done with Greens, O Danny Boy, H. E. SIR David your friend"*.   The second sent a few minutes later read:   *"will need your help with nama, PM nows wants to meet with richard, I will now standby derrick and family and help him in every way i can on the road back to recovery, David"*.   I fail to see how either of these text messages, taken separately or together, supports the existence of the agreement alleged to have been made on 15 January.  The most that can be drawn from them is the reference in the second that Sir David Barclay "will now stand by" Mr Quinlan.  This, however, appears to link Sir David Barclay's support for Mr Quinlan not to a contract already made with Mr Quinlan but to the agreement just made to purchase Misland.

340. Mr McKillen relies in particular on a text sent to Mr Murphy on 22 January 2011 in which Sir David states:

> *"The purchase of Derrick shares present me with the opportunity to put forward my support based on a settlement I know what has to be said I am considering whether to make a direct approach or through a my lawyer I will think about it. My son Chairman of the Telegraph is meeting NAMA on Tuesday."*

341. Mr McKillen relies on the reference to the "*purchase of Derrick shares*" as evidencing the alleged oral contract. Of course it could evidence a contract of purchase but it could equally well evidence an agreement in principle, particularly when coupled with the exclusivity agreement. If Sir David Barclay thought he had a binding agreement to purchase Mr Quinlan's shares, it is difficult to see why he should send a text on 21 January 2011 saying "*Morning Derrick my advice is not be distracted by what the gataries [sic] would have or what they are willing to pay now*". Equally, the existence of a binding agreement as regards Mr Quinlan's shares does not sit easily with Sir David Barclay's texts to Mr Murphy on 15 February 2011:

> *"Gerry i understand you were prepared to meet the Malay people why would you want to do that? David"*.

and

> *"Gerry following my text re your proposal to meet with the Malay people sounds like a very disloyal thing to do, i am lost for words, David"*.

Rather than saying it was *"a very disloyal thing to do"*, Sir David Barclay could simply have said that a sale to Wynton would be a breach of contract.

342.    The same points may be made as regards a text from Sir David Barclay to Mr Murphy sent on 24 January 2011 and relied on by Mr McKillen:

> *"NAMA have no say in the matter. The deal is done with the majority. A bird in the hand is better than a promise from the Middle east and joe lewis of this world."*

Further, the last sentence reads as an encouragement to stay with the existing agreement with the Barclay interests, which would be unnecessary if it were a binding agreement.

343.    Two further text messages from Sir David Barclay to Mr Murphy, sent on 24 and 28 January 2011, are relied on by Mr McKillen. They read:

> *"To stop this speculation we need to put out a press announcement to day that we now reached an agreement 55 pe cent of the shares. This message to all concerned. AB travelling back. Will talk when landed".*

and

> *"Yes Gerry we will think of releasing a new press announcement to today, to let our detractors [know] we have the control SD".*

344.    Both texts are concerned with what is to appear in the press, not in a technical document such as a prospectus or pleading. "Agreement" and "control" can well refer to the position in practice not law. Even on Mr McKillen's case it would be perverse if the Barclay interests wished the press to publish that they had made a contract which would trigger the pre-emption provisions. Moreover, in a commercial situation such as this, it was very much in the interests of the Barclay brothers to talk up the level of control which they had achieved. It is worth noting that when an article appeared on 29 January 2011 in the Irish Times stating that sources close to the Barclay brothers and reports in the UK media had said *"The Brothers reached agreement with Mr Quinlan to purchase his 35% stake in the Group"*, Mr Murphy was quick to correct it with a statement that Mr Quinlan had not yet agreed to sell his 35% stake in the company.

345.    Undated texts were sent by Sir David Barclay to Mr Faber. One refers to the possibility of briefing a Sunday newspaper to the effect that Mr McKillen is a *"one-third owner against Barclay 64% controlled business"*. The other refers to Mr McKillen having *"signed a contract with us and the Q people in so doing he was acknowledging we were the rightful owners of Misland and Derek's shares"*. No suggestion has been made as to the dates of these texts and it is clear that the second post-dates the agreement signed in Qatar on 12 February 2011 and may well post-date the 17 February agreement with Mr Quinlan. Neither of these texts messages were put to their recipient, Mr Faber, in cross-examination. In a third undated text also sent to Mr Faber and also not put to him, Sir David Barclay said *"We have purchased DQ's shares by way of a contract as well as holding the debt"*. This was clearly sent after 29 January 2011 and the reference to *"a contract"* is in my view most likely a reference to the 17 February agreement.

346.    Reliance is placed on two statements made by Mr Faber. First on 18 January 2011 Mr Faber said in an email "*We are demonstrating negative control (we can block things)*". Mr Faber said in evidence that he was referring to the exclusivity agreement and the email seems to me to be entirely consistent with that explanation. Secondly, on 25 January 2011 Mr Faber provided the Barclay interests' PR consultants with possible answers to questions that might be raised by the press. I have earlier quoted the suggested response provided by Mr Faber to the question "*Will you buy Kyran McLaughlin's stake imminently?*" which ended with "*We control 60% of board votes*". In circumstances where the Barclay interests owned Misland with its block of nearly 25% and had reached an agreement in principle with Mr Quinlan for the purchase of his shares, combined with the exclusivity agreement, it is credible, as Mr Faber said in evidence, that the use of the word "*control*" was "*a positive spin on where we are. I mean, it is what you would expect to want to put out as we are dealing with PR*".

347.    Mr McKillen relies on notes made by Mr Peters of the meeting with NAMA representatives on 24 January 2011, which include "*'Agreement' DQ to acquire same pro-rata price*". The use of inverted commas round the word agreement appears to me to support the Barclay interests' case rather than Mr McKillen's case. They naturally refer to an agreement in principle for the purchase of Mr Quinlan's shares, which is precisely what the Barclay interests maintain was agreed on 14/15 January 2011. It was not suggested to Mr Peters that it referred to a binding contract.

348.    In the course of negotiating bank facilities, Barclays Bank emailed Mr Peters on 21 March 2011 to say "*An unguaranteed facility where no shareholders can force a Rights issue or an alternative refinancing strategy is potentially disadvantageous to us all*". Mr Peters, seeking to reassure Mr Stoneley of Barclays Bank, replied "*We are already able to call a rights issue today – bear in mind that, with DQ's votes, we have the majority of the directors votes being 125 out of the total of 197 i.e. 63%*". The reference to Mr Quinlan's votes shows an expectation on Mr Peters' part that Mr Quinlan could be relied on to vote with the Barclay interests, but I find it hard to see that it provides significant support for the existence of a binding agreement going further than the 17 February agreement. On the contrary, it tends to suggest that legally  the Barclay interests do not control Mr Quinlan's votes.

349.    In a letter dated 21 March 2011 from Aidan Barclay to Aasim Mahmood, copied to Mr Faber, Mr Barclay requested a meeting with Sheikh Mansoor and said "*As you are aware, we are now substantial and controlling shareholders in the Maybourne Hotel Group*". By the time of this letter, the Barclay interests were registered as the holders of over half the shares in the company. If the letter refers to control by the Barclays interests, the co-operation between the Barclay interests and Mr Quinlan, together with the 17 February agreement, made it substantially true as a matter of practical reality. Mr Barclay's letter may be contrasted with Mr Faber's letter on the same day to Mr Mahmood, stating "As you know the Barclay family are positioned to become the majority owner of the Maybourne Hotel Group", a statement which is consistent with the 17 February agreement rather than the alleged agreement of 15 January 2011.

350.    Mr McKillen does not gain support from an email sent on 31 January 2011 by Mr Murphy to Peter Lukas, an intermediary trying to fix a deal for the sale of Mr

Quinlan's shares. Mr Murphy forwarded to Mr Lukas the statement issued on Mr Quinlan's behalf, correcting the article which had appeared in the Irish Times and making clear that Mr Quinlan had not yet agreed to sell his shares in the company. In the accompanying email Mr Murphy said "*Yes, Peter that is exactly the position. We will not be selling Derek Quinlan's shares unless there is a full sale. However, we are joined at the hip and will be supporting Misland (Barclays) and so one could say that there is now a very solid block of 60% plus*". It seems to me clear that Mr Murphy is saying that Mr Quinlan has not sold his shares to the Barclay interests or anyone else, but is closely allied with and supporting the Barclay interests.

351.   The final major area of evidence relied on in support of the alleged agreement made on 15 January 2011 is the conduct of Mr Quinlan after that date which, it is said, is reasonably explicable only if the agreement had been made.

352.   First, it is said that Mr Quinlan and Mr Murphy discharged their functions as a director or alternate director in a manner which mirrored or followed the actions of Mr Faber. It is to be inferred, Mr McKillen alleges, that Mr Quinlan and Mr Murphy were acting on instructions from the Barclay interests. It is said that there were no occasions on which Mr Quinlan acted otherwise than in accordance with the interests and wishes of the Barclay interests. In fact, there were only two board meetings of which complaint is made in the period between 15 January 2011 and 16 May 2011 when Mr Quinlan ceased to be a director.  They were on 25 January and 8 February 2011. There does not appear to have been any divisive issue or any question on which Mr Quinlan could demonstrate partisan support for the Barclay interests, save possibly for a division of opinion at the meeting of 8 February 2011 as to whether the data room should remain closed. With the exception of the data room issue and the release of Deutsche Bank, it was not argued, and never put to Mr Quinlan, that he took any decision in his capacity as a director other than in what he considered to be the best interests of the company.

353.   Secondly, reliance is placed on some email exchanges between Mr Faber and Mr Murphy on 23 January 2011 preparatory to the board meeting fixed for 25 January 2011. Mr Faber spoke of needing to talk about how "*we handle the board meeting given PMcK stand point re: Q*" (referring to the Qataris) and of wanting to use the board meeting "*to get some resolutions passed*". He met Mr Faber on 24 January 2011 "*to run through the board matters for tomorrow*". In fact, as I have mentioned, there was no contentious business at the board meeting and it is not clear which issues Mr Faber wished to discuss. To my mind, the tenor of these exchanges is not that of instructions being given by a person with a contractual entitlement to do so but of one shareholder/director seeking the co-operation of another shareholder/director at a forthcoming board meeting. There is no dispute that Mr Quinlan was co-operating with the Barclay interests but these emails and text messages appear to me to go no further than that.

354.   Thirdly, reliance is placed on Mr Murphy's co-operation in obtaining a release for Deutsche Bank from the company. The background is that Deutsche Bank had during 2010 been discussing with the company terms for a refinancing of the NAMA debt. In January 2011, the Barclay interests wished to negotiate with Deutsche Bank for the grant of facilities to finance the purchase of shares and to refinance the NAMA debt. Deutsche Bank required a formal release from the company. It is not suggested that there was any good reason why Deutsche Bank

should not be released for this purpose and in fact the shareholders agreed to its release, although it is said on behalf of Mr McKillen that he did not appreciate that Deutsche Bank would be working with the Barclay interests. The points principally relied on in this connection are: first, an email from Mr Faber to Deutsche Bank on 1 February 2011, saying "*we will ask Derek's advisor under power of attorney for him, to release the Bank*"; secondly, the speed with which Mr Kelly on behalf of Mr Quinlan agreed to the release once he received an email from Mr Hennebry raising the point; and thirdly, a further email from Mr Faber saying that it was he who had asked Deutsche Bank to be released from the company and adding "*please write supporting to release them*". None of this suggests that Mr Quinlan was under an obligation to support the release. It is consistent with the release being an unobjectionable step and with Mr Quinlan co-operating to achieve it.

355.   Fourthly, Mr McKillen relies on the grant by Mr Quinlan of a charge on a small number of shares which he had acquired in 2009 from Mr McLaughlin under the operation of the pre-emption provisions. This further charge was granted by a deed dated 1 February 2011, two days after the transfer by BOSI of its secured debt to Ellerman. It was Mr Quinlan who suggested to the Barclay interests that this further charge be granted. Mr Quinlan's evidence was that he believed that BOSI had been entitled to a charge on these shares, although they had overlooked that entitlement. Mr McKillen has not sought to disprove this evidence by reference to the relevant documentation. Mr Quinlan could of course have let sleeping dogs lie but I think it likely that he preferred those shares to be charged in favour of the Barclay interests rather than in favour of NAMA, which would have required a charge if it had become aware that the shares were unencumbered. Indeed, a week later, on 8 February 2011, NAMA did seek a charge on the shares but Ellerman was able to inform it that they were charged to it, with a covenant by Mr Quinlan not to grant any further security. I have difficulty in understanding how this episode can support the existence of the agreement allegedly made on 15 January 2011.

356.   Fifthly, reliance is placed on the acquisition by the Barclay interests of Mr Quinlan's debt to BOSI secured over part of his shareholding. I have earlier summarised the evidence relating to this transfer. It was Mr Quinlan who sought to persuade the Barclay interests that they should take an assignment of this debt and the Barclay interests decided to do so in order to forestall its acquisition by any other party interested in acquiring control of the company. The Barclay interests had to pay a premium for this debt over the value attributable to the charged shares on the basis of an enterprise value of £900 million. It is suggested on behalf of Mr McKillen that the Barclay interests were prepared to do this only because they had the benefit of the agreement allegedly made on 15 January 2011. In my view, this does not follow. Whether or not there was the alleged agreement, the Barclay interests had good commercial reasons for acquiring this secured debt. In particular, once the security holder was registered as the holder of the charged shares, it could exercise the right to appoint a director. On any basis, the Barclay interests would not wish this power to be exercisable by a potential competitor for control of the company.

357.   Sixthly, Mr McKillen relies on Mr Quinlan's failure to encourage and pursue alternative offers, either when he entered into the exclusivity agreement, or when he supported the closure of the data room at the end of January 2011  or when the

exclusivity period expired on 16 February 2011. This presupposes that anyone considered that there were any credible bidders available other than the Barclay interests and the Qataris. He decided to deal with the Barclay interests rather than the Qataris for the reasons already given. He and Mr Murphy did not consider a deal with Sheikh Mansour was possible for reasons already given, and it is to be noted that Mr McKillen did not pursue any negotiations with Sheikh Mansour. PCP Capital Partners was not taken seriously by any of the shareholders.

358.    The only possible candidate as another bidder was the Malaysian group, Wynton. Although the Green family showed interest when Wynton made an approach in early January 2011, neither Mr Quinlan nor, significantly, Mr McKillen considered that it had any credibility. Their proposal to fund the purchase by £900 million of debt and only £100 million of equity was regarded as unrealistic. Mr McKillen said in evidence "*The Malaysians offered an unrealistic finance package with £900 million debt and no one appreciated that it was realistic – nobody. I met the Malaysians and I did not believe they had the credibility to deliver £1 billion*". It was put to Mr Quinlan in cross-examination that if he was truly free to sell his shares and wished to protect the interests of his creditors, then at any rate after the expiry of the exclusivity agreement he would, like Mr McLaughlin, have served a transfer notice expressing the desire to sell his shares at the same price as that being offered by Wynton. But to do that, and thereby to antagonise the Barclay interests, he would have had to be confident that Wynton would make and be able to complete a firm offer. In fact, the scepticism as to Wynton's ability to raise the requisite funds persisted. As to protecting the interests of his creditors, NAMA approved the 17 February agreement and the conditional sale of Mr Quinlan's shares to the Barclay interests, notwithstanding that it had details of Wynton's offer.

359.    There are further dealings as regards Wynton on which Mr McKillen relies. On 23 February 2011, Wynton's advisers sent a renewed offer for Mr Quinlan's shares to Mr Murphy. By then Mr Quinlan was bound by the 17 February agreement. On Mr Faber's advice, Mr Murphy replied that "*DQ has undertaken to sign a contract to sell his shares to a third party which is legally binding and so there is no possibility DQ can consider your offer either now or in the future*". The submission that this was not a reference to the 17 February agreement because Mr Quinlan had already signed that agreement, rather than having simply undertaken to sign it, is fanciful.

360.    There were text exchanges between Sir David Barclay and Mr Murphy on 23 February 2011 when Sir David again thought Mr Quinlan might be dealing with Wynton. Mr McKillen relies in particular on two. Sir David Barclay sent the following text to Mr Murphy:

> "*If i have misjudged you i am sorry but it is not helpfull to have discussion with others about Maybourne we are not making progress with Paddy because of Gatar backing and RT* [Robert Tchenguiz] *is relying on higher value to hold us to ransom the price of the deal has increased substantially and will reflect on our proposed arrangement*".

Mr Murphy replied:

> *"Sir David. The price we agreed for DQ shares has never changed. We have signed off on it and so have Nama with you. You can't blame us for what others do? Gerry".*

361. It was submitted that Sir David's reference to the increased price reflecting on "*our proposed arrangement*" was a reference to the side payments to Mr Quinlan and that Mr Murphy's reply referred to agreement on the price reached in January 2011. It is not in dispute that the price was agreed in January 2011. The dispute is whether it was agreed in principle or as a binding commitment. Mr Murphy's text seems to me consistent with the former. The price was agreed in January 2011, but when he says "[*w*]*e have signed off on it and so have Nama with you*" he is clearly referring to the binding 17 February agreement. Why refer to that agreement if a binding agreement had already been made in January 2011? It is not clear what Sir David meant by "*our proposed arrangement*" but a "*proposed*" arrangement is not consistent with an existing contract under which, on Mr McKillen's case, payments have already been made. Neither of these texts was put to Mr Murphy.

362. Seventh, JQ2 approached Mr Murphy in May 2011 to suggest discussions for a purchase of Mr Quinlan's shares. Mr Murphy forwarded the email to Mr Faber, asking "*What do you want us to do*", and to Sir David Barclay, saying "*We will be guided by you and RF* [Mr Faber]". Mr Murphy agreed to send a reply along the lines suggested by Mr Faber. Mr Murphy also told Mr Faber that "*[w]e are happy to take your instructions*" on whether to convert loan notes into ordinary non-voting shares. He also looked to Mr Faber for guidance on whether to challenge the sale of Mr Quinlan's loans by Anglo Irish Bank and NAMA to JQ2. Mr McKillen submits that all this is "*consistent with the reality being that all Mr Quinlan's rights and interests in "his" shares in the company were continuing to be held for the benefit of, and exercised in accordance with the wishes of, the Barclay Brothers*". In my judgment, it is simply consistent with being bound by the terms of the 17 February agreement.

363. In about early May 2011 the holder of the second charge over Mr Quinlan's 21.34% shareholding gave notice to redeem the first charge held by the Barclay interests as assignee. Mr Murphy sought to persuade Sir David Barclay to cooperate with this, in a text message sent on 6 May 2011 in which Mr Murphy also said "*Sir David. We are 100% committed to you and so who owns our debt will NEVER be an issue between us. You do NOT need our debt to tell us what to do. We will ALWAYS do that anyway.*" Mr McKillen submits that this commitment to comply with instructions was "*in accordance with*" the alleged oral agreement. In my view, it is more obviously consistent with being bound by the 17 February agreement and with a non-binding agreement to cooperate with the Barclay interests.

364. Finally, Mr Murphy said in an email dated 17 April 2011 to Mr Faber "*Derek would do nothing unilaterally without referring to yourselves in advance*". This, however, was not said in the context of exercising rights attached to Mr Quinlan's shares in the company or exercising his votes as a director. It was said in the context of the possible bankruptcy of Mr Quinlan and, in particular, whether he might apply for his own bankruptcy. This would be a concern to the Barclay interests, at least partly because it would trigger the pre-emption provisions.

365.   For the reasons given above, I reject Mr McKillen's case that a binding oral agreement was made by Mr Quinlan and Sir David Barclay on 15 January 2011, or at any other time.

*Enforceability of charges over Mr Quinlan's shares*

366.   The case that the security over Mr Quinlan's shares became enforceable so as to trigger clause 6.6 centres on two charges granted by Mr Quinlan in favour of Bank of Ireland (Scotland) Limited (BOSI). I should mention that reliance was also placed on a charge which, it appeared, had been given by Mr Quinlan in favour of Anglo Irish Bank on 2 September 2010. Such a charge was indeed pleaded by Mr Quinlan but it appears that Mr Quinlan, reluctant to grant this further charge, did not return the executed charge document to Anglo Irish Bank. It is common ground that other security in favour of Anglo Irish Bank over Mr Quinlan's shares did not become enforceable.

367.   The first charge to be granted by Mr Quinlan in favour of BOSI was dated 14 May 2004 (the 2004 charge). It secured all sums due under a facility letter dated 6 April 2004, as amended by a supplemental letter dated 21 April 2004. The charge extended to Mr Quinlan's shares and convertible loan stock in the company.

368.   Whether the security created by the 2004 charge had become enforceable depends on a combination of provisions contained in the 2004 charge, the facility letter and BOSI's general conditions. I return to these in detail later.

369.   The other charge in favour of BOSI was created by a charge document dated 20 October 2005 (the 2005 charge). The 2005 charge secured sums due under the facility letters dated 6 and 21 April 2004 and under a further facility letter dated 17 October 2004. The security is expressed to be enforceable upon the happening of an Event of Default which is defined as "*any failure by the Chargor to pay upon written demand by the Bank any sums which are due and payable to the Bank by the Chargor whether as principal, surety or in any other manner whatsoever*". It is common ground that there has been only one written demand for payment of any sum secured by the 2005 charge. While it is also common ground that payment was made in response to that demand, there is nonetheless an issue as to whether a default occurred and the charge became enforceable. This is the only occasion on which it is alleged that the 2005 charge became enforceable.

370.   Mr Quinlan submits that neither charge has become enforceable. First, the 2004 charge has not become enforceable on a proper analysis of the relevant provisions of the charge, the facility letter and the general conditions. The 2005 charge did not become enforceable because the only sum which was the subject of a written demand for payment was paid. Secondly, he submits that the terms of the 2004 charge were superseded by the 2005 charge so that the question of whether the former charge became enforceable does not arise. It is not suggested that it had become enforceable prior to the execution of the 2005 charge. While Mr Quinlan places the greater emphasis on the first of these submissions, the second logically comes first and I will address it now.

*Did the 2005 charge supersede the 2004 charge?*

371.   The sequence of events as regards the two charges is as follows. As mentioned above, the 2004 charge was created by a deed executed and dated 14 May 2004, securing sums due under the facility letters dated 6 and 21 April 2004.  Under a facility letter dated 4 November 2004, Mr Quinlan borrowed further sums from BOSI to purchase additional securities in the company. By the terms of that letter, he agreed to give BOSI security over his entire interests in the company and on 21 December 2004 executed a deed, expressed to be supplemental to the 2004 charge, which expressly included within the property charged by the 2004 charge the additional securities purchased by Mr Quinlan. Further sums were borrowed by Mr Quinlan under a facility letter dated 18 March 2005 which were also expressed to be secured by the 2004 charge. Mr Quinlan executed a deed dated 14 April 2005, stated to be supplemental to the 2004 charge and containing a clause which expressly amended the 2004 charge to define facility letter as including the letters dated 6 and 21 April 2004, 4 November 2004 and 18 March 2005.

372.   Mr Quinlan borrowed further sums under a facility letter dated 17 October 2005, which provided that the loan would be secured by, amongst other things, "*an extension of the security held by the Bank over the shares and loan stock held by or on behalf of the Borrower in Coroin….*". Instead of executing a supplemental deed, as had previously occurred, Mr Quinlan executed a new deed of charge, the 2005 deed. By the 2005 deed Mr Quinlan granted a first equitable charge and mortgage over his shares and loan stock in the company as detailed in the first schedule. It was therefore a charge over precisely the same property as charged by the 2004 charge, as supplemented by the deed of charge dated 21 December 2004.

373.   Mr Quinlan submits that the 2004 charge was superseded by the 2005 charge. He relies on a number of points for this submission. First, the 2005 charge expressly created a "*first equitable mortgage and charge in favour of*" BOSI. Secondly, the property charged is the same as that charged by the 2004 charge together with the supplemental deed executed in December 2004. Thirdly, it would be odd to have different charges with different provisions, for example as to enforceability, applying to the same security for liabilities covered by both charges.  Fourthly, by clause 7(f) of the 2005 charge, Mr Quinlan represented and warranted that "the Charged Property is free from any Security Interest of any kind other than the security created pursuant to this Charge".

374.   As an alternative to the submission that the 2005 charge superseded or replaced the 2004 charge, it was submitted for Mr Quinlan that the effect of the 2005 charge was to amend the terms of the security previously granted by the 2004 charge, such that the terms of security were set out in the 2005 charge.

375.   In further support of these submissions, Mr Quinlan relies on seven deeds executed by him in favour of BOSI following the 2005 charge. Each is expressed to be a supplemental deed and deed of confirmation and each provides that "*this Deed should be construed as one single Deed with each of the Security Documents*" and that "*provisions contained in the Security Documents which are inconsistent with the terms of this Deed shall cease to apply*". "Security Documents" is defined to include "*the Equitable Charge*" which itself was defined in the first, second, third and fourth supplemental deeds (made between 19 May 2006 and 10 December

2007) as the 2005 charge, as supplemented. They did not refer to the 2004 charge. The fifth, sixth and seventh supplemental deeds referred to the 2004 charge but in somewhat inconsistent ways.  The fifth supplemental deed dated 22 January 2008 defined "Equitable Charge" to mean the 2004 charge "as amended and supplemented" by the subsequent deeds including the 2005 charge.  However, the sixth and seventh supplemental deeds dated 2 May 2008 and 9 September 2008 respectively referred separately to the 2004 charge and the 2005 charge and did not state that the former was amended by the latter.

376.   As against this, Mr McKillen relies on express provisions of the 2005 charge. Clause 14.1(a) provides that the 2005 charge *"shall be in addition to and not in substitution for or limitation of and shall neither be prejudiced nor affected by, nor shall it prejudice or affect, any other security held by"* BOSI. Clause 17.1 provides that the 2005 charge *"shall be in addition to and shall be independent of every other security which [BOSI] may at any time hold for any of the Secured Obligations. No prior security held by [BOSI] over the whole or any part of the Charge Property shall merge in the security hereby constituted".*

377.   While it may at first sight appear odd that BOSI should have taken separate and inconsistent charges over the same property, such that there might in the absence of express provision be good argument for reading the two consistently, it seems to me that the express provisions of the 2005 charge just cited make clear the parties' intention that the 2004 charge was to continue unaffected. The powers of the court under insolvency law to set aside prior transactions made within specified periods before the start of bankruptcy provide a good reason why banks commonly seek to preserve pre-existing security, even where a new charge covering the same security is executed.   The provisions of the supplemental deeds do not in my view assist Mr Quinlan's argument.  The first four do not refer to the 2004 charge and the last two expressly distinguish between the two changes and do not treat the earlier charge as amended by the latter.  Only the fifth refers to the 2005 charge as amending the 2004 charge but in context it is a misdescription, and in any event the reference cannot be relied on as an operative provision to amend the 2004 charge.

378.   I turn to the second issue whether either of the charges has become enforceable for the purposes of clause 6.6 of the shareholders agreement.

*Has the 2005 charge become enforceable?*

379.   As detailed above, it is common ground that the 2005 charge became enforceable only upon *"any failure by the Chargor to pay, on written demand by the Bank any sums which are due and payable to the Bank by the Chargor".* On 10 September 2009 BOSI wrote to Mr Quinlan, stating that he had failed to make interest payment due under a loan agreement dated 28 August 2006 on three occasions in 2009. The letter recorded that failure to pay constituted an event of default under the loan agreement *"unless remedied within 60 days to the satisfaction of the majority lenders in the manner set out in the proviso (the "Proviso") to clause 19.1 of the Loan Agreement".* The proviso to clause 19.1 of the loan agreement provided that non-payment of amounts due or any of the other events specified in clause 19.1 would not constitute an event of default, if it arose in relation to one or more but not all of the borrowers and within 60 days of the occurrence of the event the defaulting

borrowers were replaced by other persons acceptable to the majority Lenders. It is not suggested that this occurred in this case.

380.   The letter dated 10 September 2009 continued:

> *"We hereby make formal demand for payment forthwith of all outstanding interest payment.*
>
> *In the event that the outstanding interest payments are not immediately paid or the above Event of Default is not remedied to the satisfaction of the Majority Lenders within 60 days of the date of this letter in the manner specified in the Proviso, the Lenders will be entitled to exercise all rights conferred upon them by Clause 19.2 of the Loan Agreement including the right to demand immediate repayment of the Loan together with all interest and other sums (including any applicable broken funding costs). In the event that such sums are not paid we reserve the right to exercise the power to appoint a receiver over the Secured Assets, the power of sale and all other powers conferred on us by law or by the Security Documents."*

The rights conferred by clause 19.2 are not to enforce security but to accelerate repayment of borrowings and to terminate any existing commitment to lend.

381.   It is common ground that Mr Quinlan paid the amount demanded in the letter dated 10 September 2009 on or about 4 November 2009. BOSI had not by then taken any steps to exercise the rights under clause 19.2 or to exercise any rights arising under the 2005 charge.

382.   It is submitted for Mr McKillen that the failure to pay the sums demanded *"forthwith"* or *"immediately"* meant that there was a failure by Mr Quinlan to pay on written demand the sums due. The words *"forthwith"* and *"immediately"* appear in the letter dated 10 September 2009. They do not appear in the definition of event in default in the 2005 charge.

383.   The issue is whether BOSI was entitled to enforce the 2005 charge following Mr Quinlan's failure to pay "forthwith" the sums demanded in the letter dated 19 September 2009.  In my judgment it was not entitled to do so.  Its rights of enforcement could not be determined by reference only to the terms of the 2005 charge but required account to be taken also of the loan agreement under which the unpaid sums had fallen due and the letter dated 10 September 2009.  The letter demanded payment of the outstanding interest immediately or the substitution of new borrowers within 60 days of the date of the letter.  Necessarily BOSI had to wait until the expiry of the 60 days before it could take the next step of exercising those rights.  It could not rely on the failure to meet the first alternative of immediate payment without waiting the 60 days allowed for the second alternative. Even then those rights were not to enforce security but to demand immediate repayment of the principal amount of the loan together with all other sums due and only in the event that such sums were not paid did BOSI reserve the right to exercise powers of enforcement.  In my judgment, the provisions of the 2005 charge did not allow BOSI to leapfrog over the requirements contained in the loan agreement dated 28 August 2006 and BOSI's letter of demand.  Reading these