# EXHIBIT 25
# PART 3

documents together, and bearing in mind that the relevant provision in the 2005 charge does not use the words *"immediate"* or *"forthwith"*, BOSI would not be entitled to enforce the 2005 charge at least until 60 days had passed from the letter dated 10 September 2009. That is the basis on which Mr Quinlan and, it appears, BOSI proceeded at the time and in my judgment they were right to do so.

384.   It follows that the 2005 charge did not at any time become enforceable. If it had become enforceable, it would have fallen to the directors to determine under clause 6.6 of the shareholders agreement whether to deem a transfer notice to have been given by Mr Quinlan. Given the circumstances of the demand just referred to and the draconian consequences of a deemed transfer notice, I am far from satisfied that the directors would have considered it appropriate to deem a transfer notice to be given. It appears to me much more likely that they would have waited at least until the expiry of the 60 days to see whether payment was made and whether BOSI was likely to take any enforcement action as against the shares. In any event Mr McKillen has not established, or even addressed, whether the directors would have taken action under clause 6.6 and unless he can show that they would have done, he cannot show that he has suffered any prejudice in relation to this matter.

*Has the 2004 charge become enforceable?*

385.   The relevant provisions in relation to the enforceability of the 2004 charge are as follows. The 2004 charge in clause 1.1 defines "*Events of Default*" to mean "*the events of default set out in the Facility Letter and any one an 'Event of Default'*". The facility letter is the letter dated 6 April 2004 as amended by the supplemental letter dated 21 April 2004. Clause 10.1 provides that upon "*the happening of an Event of Default*" BOSI is entitled to exercise a power of sale and clause 11.1 provides that it may, at any time after the power of sale has become exercisable, appoint a receiver. Clause 2.3 provides that the liabilities secured by the charge shall become due and payable upon written notice by BOSI and that Mr Quinlan shall pay all actual and contingent liabilities on the occurrence of any Event of Default. Clause 2.4 provides that Mr Quinlan will *"notify the Bank in writing on the occurrence of any Event of Default or of the occurrence of any event which with the lapse of time or giving of notice or both would or may constitute an Event of Default"*.

386.   Notwithstanding the definition of "*Events of Default*" in the 2004 charge, the facility letter does not set out the Events of Default but incorporates BOSI's standard loan conditions. Paragraph 9 of the facility letter provides:

> *"In addition to the terms contained in this facility letter, the Loan is subject to the conditions set out in the Bank's General Loan Conditions (Ref:01.01.04) attached. Unless expressly excluded or varied by the terms of this facility letter, the General Conditions shall apply to the loan".*

387.   Condition 9 of the General Conditions is headed "*Events of Default*". It sets out in twenty numbered sub-paragraphs various events, such as a failure by the borrower to pay sums due to BOSI on the due date. It continues "*then, and in such case and*

*at any time thereafter, the Bank may in its absolute discretion*" and there then follow four numbered paragraphs of which the fourth is:

> "*Declare that the Security Documents have become enforceable immediately in accordance with their terms whereupon the same shall be immediately enforceable*".

388.   It is submitted for Mr McKillen that the Events of Default for the purposes of the 2004 charge are each of the events listed in the twenty numbered sub-paragraphs in paragraph 9 of the General Conditions. Accordingly, where clause 10 of the 2004 charge provides that "*upon the happening of an Event of Default the Bank shall have and be entitled to exercise the power to sell or otherwise dispose of*" the charged property, that power arises when any of the listed events occurs without the need for a declaration that the security has become enforceable in accordance with the fourth numbered paragraph above.

389.   In my judgment, these documents must be read consistently with each other, unless there is provision in the 2004 charge or the facility letter which is inconsistent with the terms of the general conditions: see paragraph 9 of the facility letter. The effect of condition 9 of the General Conditions is to make the security enforceable only upon the occurrence of one of the twenty listed events together with a declaration issued by the Bank, in its absolute discretion, that the security has become enforceable. There is nothing in the terms of the 2004 charge which conflicts with condition 9 read in its totality. The definition of Events of Default in the 2004 charge does not require that the need under condition 9 for a declaration of enforceability should be ignored. Clause 2.4 expressly contemplates that an event of default may require the giving of notice following the occurrence of any event. It would require rather more than is contained in the definition of Events of Default in the 2004 charge to create a conflict with the terms of the General Conditions in circumstances where, unless expressly excluded or varied, the General Conditions are to apply to the loan.

390.   It is not in dispute that a number of events occurred in 2010 and 2011 which fell within one or more of the twenty numbered sub-paragraphs in condition 20 of the General Conditions. It is also common ground that there has been no declaration pursuant to condition 9 that the security had become enforceable. It follows, in my judgment, that the 2004 charge has never become enforceable.

*Issues under clause 6.6 of the shareholders agreement*

391.   These conclusions, that the charges over Mr Quinlan's shares have not become enforceable, mean that it is unnecessary to decide some further issues on the construction and application of clause 6.6 of the shareholders agreement but I will briefly address them. Those issues arise from the terms of clause 6.6 providing that, if the security had become enforceable, a transfer notice would be deemed to be served only if the directors made a determination to that effect within one month after the security became enforceable.

392.   Mr Quinlan and the Barclay interests rely on the fact that there was no determination by the directors that a transfer notice should be deemed to be given

within one month after the occasions on which the charges are said to have become enforceable.

393.    It is submitted for Mr McKillen that in order to make clause 6.6 workable it is necessary to imply an obligation on a shareholder to notify the company of the occurrence of any of the events which acts as a trigger under clause 6.6. It is pointed out rightly, in my view, that many of these events could occur without the company or its directors knowing about it. Bankruptcy in any part of the world is a trigger. It could well occur without coming to the attention of the company or the directors. Even more likely, he might enter into an arrangement with his creditors, or security over his shares could become enforceable, without coming to the knowledge of the company or its directors. It would then be a matter of chance whether the directors had an opportunity of making a determination under clause 6.6.

394.    Viewed objectively, it cannot sensibly have been the intention of the parties to the shareholders agreement that clause 6.6 should work as haphazardly as the respondents suggest.  There is no difficulty, in order to give commercial sense to the provision, in implying an obligation to give notice to the company of the occurrence of any of the triggering events within the knowledge of the shareholder:  see *Tett v Phoenix Property and Investment Co. Ltd.*  [1986] BCLC 149 (CA).

395.    The next issue is whether, for the purposes of clause 6.6.2, a shareholder security can become enforceable more than once, in the absence of a waiver by a chargee of an earlier breach. If, for example, the shareholder misses a series of interest payments and, in respect of each, a declaration is made by the chargee that the security is enforceable, does the security become enforceable only on the first of such occasions or does it become enforceable each time the relevant declaration is made?   It is submitted for Mr Quinlan and the Barclay interests that, as a matter of ordinary language, security can become enforceable only once, unless there is a waiver of a prior breach. If a security is already enforceable, it is submitted that it makes no sense to say that it "becomes enforceable" when a further event of default occurs.

396.    As a matter of general language, I would agree with this approach but it fails in my judgment to give full effect to the purpose and effect of clause 6.6. As Mr Quinlan and the Barclay interests have been at pains to emphasise, the occurrence of an event listed in clause 6.6 does not automatically trigger the deemed service of a transfer notice but gives the directors the discretion whether to determine that a transfer notice should be given. They have also, rightly in my view, been at pains to point out that there could be circumstances, such as a trivial event giving rise to a right of enforcement without any real prospect that enforcement would follow, where the board could quite properly determine that no transfer notice should be deemed to be given. This is all the more the case when it is remembered that the deemed transfer notice, if determined to be given, applies to all the shares held by the shareholder, not just those shares which are subject to the charge. If those submissions are accepted, which I believe they should be, their reading of "*becomes enforceable*" could deprive clause 6.6 of much of its purpose.  A decision by the directors not to determine that a transfer notice be deemed to be given on a trivial event of default would deprive the directors of the ability to do so, in the event of a subsequent, but more substantial, event of default making the security enforceable. It seems to me very unlikely that the parties to the agreement can have intended this

result. The words *"becomes enforceable"* are not incapable of applying to a succession of events of default giving rise to rights of enforcement and I would hold that they do so apply in those circumstances.

397. There is a further issue which I should mention. Mr Quinlan pleads in his defence that if, contrary to his primary case, security over his shares became enforceable, the same is true of security over Mr McKillen's shares, so that Mr McKillen cannot complain of unfair prejudice in this respect. It follows from my decision on Mr Quinlan's security that this point does not arise. Mr Quinlan applied towards the end of the trial to amend his defence to add a reference to a further security over Mr McKillen's shares which had only lately been disclosed. In the light of my decision on the issue of enforceability, I refuse the application.

**Mr McKillen's ability to finance the purchase of shares**

398. If I had concluded that the pre-emption provisions would have been triggered as regards Mr Quinlan's shares, and if those shares had been offered round to the shareholders, the issue arises as to whether Mr McKillen could have purchased the shares or a sufficient proportion to give him control. Mr McKillen's pleaded case in his petition is that he could and would have done so, and this is denied by the respondents. Mr McKillen's evidence is that he would have purchased shares equal to a 20% stake, bringing his holding up to 56%. This would cost about £48 million at an enterprise value of £900 million or £58 million at an enterprise value of £950 million.

399. Issues of law arise, such as whether a failure to comply with or operate the pre-emption provisions caused unfair prejudice to Mr McKillen only if he would have taken up the shares. There is also the prior issue whether a failure by a shareholder to give notice of a relevant event when required involves conduct of the affairs of the company or an act or omission of the company, so as to fall within section 994. In view of my conclusion that the pre-emption provisions were not triggered, these issues do not arise for decision. However, I should make the relevant findings of fact on the evidence which I heard on Mr McKillen's ability to finance a purchase of shares.

400. Mr McKillen's case, as originally pleaded in his petition, was:

> " *Mr McKillen intended to retain funds to purchase all or a proportionate share of Mr Quinlan's shares in the Company once they became available pursuant to the pre-emption rights.*"

401. Subsequently, Mr McKillen made clear that he was not saying that he could have financed a purchase of shares out of his own funds. The petition was amended to read:

> "*Mr McKillen would have raised funds to avail himself of any opportunity to purchase all or a proportionate share of Mr Quinlan's shares in the Company once they became available pursuant to the pre-emption rights.*"

402.    I will not here recite the tortuous process by which evidence and disclosure was provided on this issue.  The upshot was a substantial amount of disclosure by Mr McKillen and two witness statements by Mr Cunningham.  Both Mr McKillen and Mr Cunningham were cross-examined on this issue.

403.    Certain matters are not in dispute.  First, Mr McKillen did not himself have the funds required for any purchase.  Secondly, Mr McKillen did not have any committed facilities available to him for this purpose, until the agreement dated 16 March 2012 with Al Mirqab Capital (SPC), an entity under the same control as Al Mirqab Holdings LLC.  Thirdly, Mr McKillen does not suggest that he could have obtained a loan facility for this purpose from a bank or similar commercial lender.

404.    In support of his case, Mr McKillen relies on three principal matters.  First, there were a number of parties who were interested in the company in 2011, in particular the Qataris, Wynton, and Sheikh Mansour.  Secondly, he relies on the agreement dated 16 March 2012 with Al Mirqab.  Thirdly, he had discussions or negotiations with a number of potential funding parties in 2011, six of which reached the stage of draft term sheets.

405.    The parties, such as the Qataris and Wynton, who demonstrated a substantial level of interest in the company in 2011, were concerned to achieve an equity position in the company.  Wynton made offers, first for all the shares and then for each member's shares.  It subsequently acquired, through JQ2 Limited, debts secured on part of Mr Quinlan's shareholding and later took part in negotiations with the Barclay interests and Sheikh Mansour for a joint venture.  Sheikh Mansour and related Abu Dhabi interests had also bought debts secured on Mr Quinlan's shares and were involved in the joint venture negotiations.  The transactions these parties were considering were very different from a personal loan to Mr McKillen to enable him to purchase shares and there is no evidence to suggest that they would have had any interest in making any such loan.

406.    The negotiations and agreements with the Qataris in January-February 2011 were all concerned with the Qataris either obtaining at least 75% ownership of the company or, after the Barclay brothers became involved with the purchase of Misland, entering into a joint venture with the Barclay brothers and Mr McKillen.

407.    It is true that on 21 January 2011, immediately after the acquisition of Misland became known, Mr Bakhos emailed Mr McKillen with a suggestion that if the shares held by Misland were as a consequence offered round under the pre-emption provisions, Al Mirqab "*would be prepared to provide you with funding to acquire some or all these shares*" subject to the price reflecting an enterprise value of no more than £875-900 million and:

> "*our reaching a satisfactory arrangement under which it may be possible for my Principal in due course to obtain ownership of the shares concerned, together with sufficient additional shares to provide control of the company.*"

This condition would have to be satisfied in a way which did not itself trigger the pre-emption provisions.

408. It is said for Mr McKillen that this has been achieved in the agreement dated 16 March 2012, and could also have been achieved in January 2011. However, Mr Bakhos' letter was concerned with Misland's shares, not Mr Quinlan's. The whole thrust of the discussions and negotiations was to achieve a joint venture with the Barclay interests. At that time, unless Misland's shares were offered round and sold with the result that the Barclay brothers' involvement ceased, there is no basis for concluding that the Qataris would have been prepared to finance a purchase of Mr Quinlan's shares without reaching an agreement with the Barclay brothers.

409. I do not consider that the agreement dated 16 March 2012 with Al Mirqab provides a basis for inferring that a similar agreement could have been reached in 2011 with Al Mirqab to purchase Mr Quinlan's shares. First, the agreement is the product of the proceedings. It is driven by the prospect that Mr McKillen might obtain orders for the sale to him of the shares held and owned by Misland and/or Mr Quinlan.

410. Secondly, relations between Mr McKillen and the Qataris broke down after Mr McKillen pulled out of the tri-partite agreement dated 12 February 2011. There was mutual distrust. Mr McKillen felt badly treated by them and, as evidenced by Arthur Cox's letter dated 17 February 2011, had no confidence in them as a party to a joint venture. In evidence, he said that they had "*burned their bridges*" with him. He needed to be persuaded by close friends and family before dealing again with them in February 2012. For their part, the Qataris felt that Mr McKillen had reneged on the agreement and took advice on proceedings against him. I am satisfied that each would have been very reluctant to deal with the other and it is significant that Mr McKillen did not approach the Qataris in 2011 when he was holding funding discussions with a large number of parties. It would appear that it was only Tony Blair's personal approach to Sheikh Hamad during a meeting in Qatar in February 2012 that brought the two together. There is no evidence of Mr Blair's involvement, or any likelihood of his involvement, at any relevant time in 2011.

411. Negotiations with potential funders is the third basis for Mr McKillen's case. Mr McKillen relies in particular on the discussions with six possible funders who issued draft indicative term sheets. I will consider each of these in turn.

412. Mr McKillen was introduced to Och-Ziff Capital Investments LLC (Och-Ziff), a hedge fund, in May 2011. At the end of June 2011, it provided a proposal for a loan of £48 million, at rates of interest with a minimum of 15% pa, which represented high risk equity-type returns. Och-Ziff required security over both the shares to be acquired and Mr McKillen's existing holding, although Mr McKillen said in evidence that the latter security requirement was dropped. Mr McKillen was advised at the time that refinancing this facility would be difficult, and probably only achievable with the injection of new funds or other assets by him on an asset sale. Mr McKillen agreed that the terms were unattractive and that he would not have agreed to them. Further term sheets were prepared in July 2011 but on terms which did not significantly change from the June term sheet.

413. No terms were produced by Och-Ziff which Mr McKillen would have agreed. Mr McKillen did not call any witnesses from Och-Ziff and I am unable to find that it is likely that they would have reached agreement on terms acceptable to each side.

414. In August 2011, Mr McKillen approached Ong Beng Seng, a Singapore businessman and hotelier, for financial support to purchase Mr Quinlan's shares if offered under the pre-emption provisions. Mr McKillen had known Mr Ong for about 10 years and had been in contact with him about the company since January 2011 but had not previously sought support.

415. Mr Ong's interest was not in making loans but in acquiring an equity stake in the company. A proposal was put forward by Leisure Ventures Pty Limited, a joint venture company owned equally by Mr Ong and a company called Hotel Properties Limited. The proposal for a loan of £54 million was set out in draft heads of terms sent on 9 September 2011 by Leisure Venture's solicitors, who wrote in a covering email:

> "*As discussed between Mr B.S. Ong and Mr Patrick McKillen and subsequently between you and me, our willingness to provide the share financing is by way of a first step to acquire a shareholding within the Coroin Limited (the holding company) and therefore we have provided in the HOT that when the Loan Amount is advanced, we would have documentation executed with PMcK in place which will give us rights to become a 50:50 shareholder with you in due course.*"

416. This requirement conflicted with the pre-emption provisions because it would involve the conferral of rights to acquire shares from Mr McKillen, and hence an interest in those shares, simultaneously with his acquisition of them.

417. Mr McKillen's solicitors provided amended heads of terms on 5 October 2011, removing the requirement for rights in favour of Leisure Ventures to acquire shares and substituting a financial penalty against Mr McKillen if Leisure Ventures did not acquire the shares within a specified period.

418. This was quickly picked up by Alex Lee of Hotel Properties Limited, on behalf of Leisure Ventures, who said in an email on 7 October 2011:

> "*I am afraid that will not meet our requirement.*
>
> *We thought we have made it very clear through Evershed to Arthur Cox and from myself to you.*
>
> *If our most fundamental requirement is not met, I believe it would not be very meaningful for us to discuss other terms.*"

In cross examination, Mr McKillen dismissed this as just "*toing and froing negotiations*". It was not, he said, a deal-breaker. However, it looks as if it was regarded as fundamental and it was not followed by agreement to remove the requirement. Whether it was a deal-breaker is a matter for evidence from Leisure Ventures but Mr McKillen called none.

419. The only development was that an offer on significantly worse terms was made in February 2012. Instead of providing 100% of the funding required to purchase

some or all of Mr Quinlan's shares, it proposed 75% of the funding up to £37.5 million required to purchase a 19.86% holding, based on an enterprise value of £908 million rather than £930 million as before. This would have left a funding gap of some £18.5 million. The interest rate was 10%, not 6%. Moreover, Leisure Ventures required a period of not less than three weeks for due diligence, despite having been provided with information.

420. In the earlier draft heads, Leisure Ventures had required six weeks and Mr McKillen's solicitors suggested four weeks in response. But the offer period under clause 6.2 of the shareholders agreement was only four weeks.

421. In light of these difficulties, it was not in my judgment likely that Mr McKillen could have reached agreement in 2011 with Leisure Ventures or Mr Ong for the provision of funding to purchase shares offered under the pre-emption provisions.

422. In January 2012, Mr McKillen was contacted by Talos Capital Limited, a hedge fund or hedge fund manager. Its CEO worked for Blackstone when it owned the Savoy Group, so he was familiar with the company's hotels, and he obtained Mr McKillen's contact details from NAMA. Mr McKillen's evidence is that there were about ten meetings in January/February 2012, leading to a two-page heads of terms. This proposed a loan facility of a figure in square brackets of £48 million to purchase a 20% shareholding from Mr Quinlan under the pre-emption procedure. It envisaged a 50/50 joint venture with Mr McKillen to own the company, once Mr McKillen had an unconditional right to buy the Barclay brothers' interest in the company. The proposal was therefore clearly made in the context of these proceedings and the possibility of a successful outcome for Mr McKillen.

423. There is no evidence from Talos Capital Limited. There is no explanation why the approach to Mr McKillen was not made until January 2012. The reasonable inference is that it was the prospect of a joint venture made possible by Mr McKillen's proceedings.

424. There are no good grounds for concluding that Talos Capital Limited had any interest in 2011 for lending funds to Mr McKillen to purchase Mr Quinlan's shares or some of them. Mr McKillen made no approach to Talos Capital Limited at any time, despite seeking funds to purchase Mr Quinlan's shares.

425. On 16 September 2011, Mr McKillen had a meeting with Morgan Stanley as managers of the Morgan Stanley Real Estate Fund No. 7 (MSREF), a property investment fund. On 4 October 2011, MSREF provided an indicative term sheet. Rather than a loan to Mr McKillen, funding of £45 million would be provided through an issued of preferred redeemable shares by a special purpose vehicle to be owned by Mr McKillen. At a meeting on 6 October 2011, Morgan Stanley said that they would prefer the funding to be provided in that way because a loan to Mr McKillen would require "*tiresome and intrusive*" know-your-client procedures "*which will be slow*". They were however prepared to be flexible on this point.

426. Capped at £45 million, representing on a 20% holding an enterprise value of £850 million, the facility was insufficient. Mr McKillen said in evidence that he would supplement it with his own funds. Mr McKillen did not demur at the suggestion that the interest rate of 20% pa was "*eye-wateringly large*". He said "*That is the*

*name of the game. If you want money quick, 15 to 20%*". Mr McKillen did not pursue this proposal because of its cost.

427. On 31 October 2011, Mike Walsh, who was introducing a number of possible funders to Mr McKillen, met the CEO of Round Hill Capital, an investment management group, which led to a letter of intent dated 2 December 2011 from Global Asset Capital Europe LLP (GAC), part of a private equity firm with, according to its brochure, $1 billion under management.

428. The letter of intent proposed financing the purchase of shares held by Misland and/or Mr Quinlan if Mr McKillen succeeded in the present proceedings. The "*ultimate goal*" was to acquire 50:50 control of the company, but, pending removal or waiver of the pre-emption provisions, the funding would be provided as a loan. The interest on the loan was to be the dividends and other profit derived from the shares acquired with it. Since the company did not pay dividends and, with its borrowings, was not obviously in a position to do so, it is not clear how this would work. Mr McKillen admitted that he did not understand it.

429. Most striking is that neither the letter of intent nor any subsequent communication indicated the amount of funding which GAC was prepared to provide. It also required a four-month exclusivity period which Mr McKillen said in evidence he would definitely not agree. Negotiations with GAC extended over a period of some three months up to early March 2012. I am not satisfied that any agreement could have been reached with GAC or that the negotiations with GAC provide a reliable basis for concluding that Mr McKillen could have raised funds to purchase shares under a pre-emption offer.

430. A company called Avington Financial Limited (Avington) was introduced to Mr McKillen at the end of November 2011. Mr McKillen's evidence is that it manages investments for some wealthy Canadian families. It provided a draft term sheet in January 2012, where the objective was stated as:

> "*To become a 50% / 50% equity partner with Patrick McKillen or entities controlled by Patrick McKillen ("PM") in Coroin Limited ("Coroin" or the "Company") in the event that PM is presented with the opportunity to acquire 100% of the voting and total issued shares in the Company (the "Shares") in a single transaction or in a series of transactions leading to the ultimate acquisition of 100% of the Shares.*"

431. Avington offered to make a bridge loan of £35-48 million to Mr McKillen to finance the acquisition by him of up to 14% of the shares to bring his holding up to 50%. The term would be five years at an interest rate of 8%. It was conditional on the completion of due diligence and an exclusivity period of 120 days.

432. Avington's interest was clearly prompted by the prospect of success by Mr McKillen in these proceedings opening the way to a 50:50 joint venture. Mr Browne of Le Bruin Private Limited who introduced Avington emailed Mr Cunningham on 14 December 2011 to say that Avington had "*advised that they have the funding in place to back Paddy in the battle with the BB*". There were

problems with their draft offer which were never resolved. First, the funding offered was too small. Mr McKillen said in evidence that he would only accept funding to bring his holding up to 56%. Secondly, he would never agree to exclusivity. Thirdly, confirmation of the availability of funding was not received. On 15 February 2012, Avington emailed to say that they were waiting to hear back from one family office and then would be in touch. I was not shown any further evidence on this. Nor was there any evidence that they would have agreed Mr McKillen's points on the amount of funding or the exclusivity period.

433. Mr McKillen had discussions with a variety of other parties but none reached the point of an indicative term sheet. These included the following. There were discussions in May 2011 and again between November 2011 and February 2012 with Blackstone Advisory Partners, which is associated with the Blackstone private equity fund. Discussions were held between October 2011 and February 2012 with Walter Kwok, from Hong Kong, and with an intermediary acting for him. Mr McKillen met Mr Kwok once. Mr McKillen lost interest after a short time. Mr Cunningham continued the discussions but they never came close to an agreement. There were discussions also with John Caudwell, the Kumar family from Singapore, the Abu Dhabi Investment Authority and others but none of them got to the point of serious engagement. None of these proposals and discussions, including those which resulted in a draft term sheet, provides any solid basis for concluding that Mr McKillen could have raised funds in 2011 to buy a 20% stake from Mr Quinlan if the pre-emption provisions had been triggered and followed.

434. There were significant outstanding issues on even the most advanced of these proposals. Mr McKillen called no evidence from any of them to say that a deal could have been achieved and, if so, how. Most of the interest arose only after Mr McKillen started these proceedings. No doubt they were perceived as opening up the possibility that Mr McKillen could gain 100% control of the company. This is striking given that Mr McKillen was seriously trying to arrange the necessary finance from May 2011.

435. It is said on Mr McKillen's behalf that a bridging loan on expensive terms could be arranged, on the basis that it would be soon refinanced. But there is no adequate answer in the evidence to the obvious question of how this would be done. The evidence as to Mr McKillen's overall financial position is such, I find, that he could not raise a conventional term facility for this. Even if his net cash flow was sufficient to service a facility, he could not offer adequate security as his existing 36% holding was not available, being already charged to secure existing (and as yet un-refinanced) borrowing.

436. It might be thought that achieving a 56% controlling interest would provide a basis for refinancing a bridge loan. In the absence of a conventional facility, the only realistic source for finance would be an investor interested in a joint venture, but this would almost certainly require a much larger stake than 56%, probably 100%. Otherwise, the joint venture investor would have to face the prospect of the Barclay interests as a substantial minority shareholder and would not itself be able to have a controlling holding while allowing Mr McKillen a continuing equity stake. There is no evidence that an investor would have been willing to proceed on that basis.

437.    Without reassurance that bridging finance would be repaid, it is unrealistic to think that Mr McKillen could have obtained such finance.  Mr McKillen relies on his unencumbered ownership of a number of properties in Vietnam, Argentina, California, France, Ireland, Dubai and Kazakhstan and his equity in a number of encumbered properties in France, England and Germany.

438.    The evidence about Mr McKillen's property interests came in a very unsatisfactory form, and I disallowed a substantial part at the trial.

439.    Insofar as Mr McKillen says that he could have used any of these interests as security, I have no evidence from any potential lenders that they would have been acceptable.  So far as prospective sales are concerned, if this were seriously relied on, I would expect proper expert evidence, but there is none.  I do not regard the evidence as a satisfactory basis for concluding that Mr McKillen could probably have used property sales to raise funds for a purchase of a 20% shareholding.  It is telling that he did not seek to sell properties for this purpose in 2011, or even contemplate doing so, even though he was trying to raise finance from May 2011 and even though he thought from September 2011, if not before, that the pre-emption provisions might be triggered imminently.

440.    On the evidence before me, I conclude that Mr McKillen would not have been able in 2011 to raise the funds necessary to buy a 20% stake in an offer under the pre-emption provisions.

**National Asset Management Agency (NAMA)**

441.    The National Asset Management Agency is an Irish public body established by the National Asset Management Agency Act 2009, enacted by the Irish Parliament in December 2009. It was established as part of Ireland's response to the international economic and financial crisis and in particular to the severe problems in the Irish banking sector. Its statutory purpose, which it is permitted to fulfil through subsidiaries, is to acquire loans and related assets from banks and other credit institutions facing financial difficulties. In the transactions relevant to the case, NAMA acted through a wholly-owned subsidiary, National Asset Loan Management Limited, but I will refer to both as NAMA without distinction.

442.    NAMA aims to deal expeditiously with the loans acquired by it and to protect or otherwise enhance the value of those loans for the purpose of contributing to the achievement of its objectives. As at 1 January 2012, it had acquired loans with a nominal value of over €74 billion from five participating financial institutions, including Bank of Ireland and Anglo Irish Bank. A witness statement filed on behalf of NAMA states:

> *"The Agency's objective is to obtain the best achievable financial return for the Irish State on this portfolio, and in the case of each individual loan to achieve such a return as soon as practicable in order to reduce the value of the portfolio to zero as soon as commercially practicable."*

443.    For this purpose NAMA's statutory powers include all steps necessary or expedient to realise the value of assets acquired by it, including disposing of loans for the best achievable price: see section 11(a) of the National Asset Management Agency Act 2009. Section 12 confers on NAMA all powers necessary or expedient for or incidental to the achievement of its purposes and performance of its functions, including the power to transfer debt securities and to sell assets for such consideration and on such terms as the Board of NAMA thinks fit. John Mulcahy, the Head of Portfolio Management at NAMA, said in evidence that "*our focus is to get our money back*". The options for doing so are threefold. First, it can encourage the debtor to repay or refinance the loans. Secondly, it can seek to sell the loan to third party. Thirdly, it can enforce the security for the loan, where such power has arisen. Clearly, as Mr Mulcahy confirmed, the best outcome for NAMA is to recover the full par value of a loan together with accrued interest and costs.

444.    The establishment of NAMA caused considerable concern to the shareholders of the company at that time, both as regards the company as a substantial borrower from Bank of Ireland and Anglo Irish Bank and, in the case of Mr McKillen and Mr Quinlan, as very substantial borrowers from those banks.  Their personal facilities had expired but had not been repaid nor, as had previously been the case, rolled out into new term facilities. Instead the facilities went into default but steps to enforce the security for them were not taken.

445.    The view of the shareholders, as regards both the company and themselves, was that a transfer of their loans to NAMA would be catastrophic.  So far as the individuals were concerned the loans to Mr Quinlan were transferred to NAMA in March 2010. His financial position was so dire that there was little he could do about it. Mr McKillen successfully resisted the transfer of his loan facilities to NAMA. He brought proceedings in the Republic of Ireland against NAMA and, on appeal to the Supreme Court of Ireland, he succeeded in his claim that NAMA had not validly resolved to acquire his debts: *Dellway Investments Ltd v NAMA* [2011] IESC 4 (3 February 2011). In a later judgment the Supreme Court also held that NAMA was required to give notice of any intention to consider making a decision to acquire his debts so as to give him an opportunity of making representations: [2011] IESC 14 (12 April 2011). This left it open to NAMA to resolve afresh to take a transfer of his debts but on 6 July 2011 it resolved not to do so.

446.    The concern as regards the company was twofold. First, the shareholders were concerned that if the loan facilities were transferred to NAMA it might try to sell them to a more aggressive lender. Secondly, there was a concern that a transfer to NAMA would cause reputational damage to the hotels owned by the company. They considered that NAMA had an international reputation as Ireland's "bad bank" set up to deal with distressed properties loans which had failed, which was certainly not the case with the loans to the company.

447.    Accordingly, after the Irish Government announced in the course of 2009 that it intended to establish NAMA, but even before the statute establishing NAMA had been enacted, the company was active in seeking to discourage the transfer of the company's loans to NAMA. These efforts continued through the autumn of 2009 and into 2010 and included approaches to the European Commission. However, on 25 June 2010 the loan facilities were transferred to NAMA.

448.   At this stage there were three separate loan facilities, comprising a Facilities Agreement originally dated 21 September 2005 (the Senior Facilities Agreement), a Subordinated Facility Agreement also dated 21 September 2005 and a Facilities Agreement dated 12 March 2008 to finance the purchase of a property in Brook Street, adjacent to Claridge's. At the time of the transfer of the facilities to NAMA, some £625 million had been drawn down and, other than one tranche of the Senior Facilities Agreement, they were all due to expire on 31 December 2010. A fourth facility had been made available by Anglo Irish Bank to a number of the shareholders for the purchase of a property in Knightsbridge adjacent to The Berkeley. All four facilities were effectively consolidated into a single Facility Agreement dated 1 April 2011. At that time a total of approximately £648.4 million was outstanding.

449.   Following the transfer to NAMA, the manager at NAMA with day-to-day responsibility for the company's facilities was Paul Hennigan. Mr Hennigan's unchallenged evidence is that throughout his dealings with the company he made it clear that NAMA was keen to exit its position with the company as soon as practicable. All the shareholders and directors of the company understood that NAMA was not a normal commercial lender but aimed to achieve repayment as soon as possible and might sell the loans.

450.   NAMA's approach to dealing with the company's facilities was complicated by the fact that in March 2010 it acquired Mr Quinlan's personal loans from Anglo Irish Bank. These loans were secured over part of Mr Quinlan's shareholding in the company representing some 13.52% of the total equity of the company. Accordingly, NAMA's interests were best served not only by a repayment in full of the company's loans but also by maximising the value of the company's equity. This made NAMA reluctant to enforce the loan facilities if they were not repaid by the expiry date of 31 December 2010. Although enforcement would almost certainly result in repayment of the loans, enforcement would impair the value of Mr Quinlan's equity.

451.   As detailed in the chronological section, all attempts during 2010 to raise the finance necessary to repay the NAMA debt, by a combination of loan facilities and equity investment, had failed by early November 2010. The company and its shareholders decided to seek a two-year extension to the loan facilities from NAMA. This was raised with Mr Hennigan by Mr Buchanan at a meeting on 5 November 2010 and was followed on 19 November 2010 by a formal application from the company. Mr Hennigan viewed this request as a last resort, the company having exhausted all other forms of refinancing. At their meeting on 5 November 2010 Mr Buchanan had told Mr Hennigan that Ernst & Young had been appointed by the company to advise the directors on their legal duties and obligations given that there was a very strong likelihood that the company would be insolvent within three months if the facilities were not extended. Mr Buchanan had explained to Mr Hennigan that the advantage of an extension for a period as long as two years was that it would allow the company to seek a sale of the group without any association of a distressed asset sale. NAMA initially suggested an extension of 18 months but by the end of December 2010 an extension of two years had been agreed in principle. Certain key terms, such as the interest rate and an arrangement fee of 1% of the total size of the facilities, were agreed in principle but further terms remained

to be agreed and the proposed new facility agreement still had to be drafted. Accordingly, on 24 December 2010 NAMA agreed to extend the facilities to 31 January 2011 and, by the terms of the extension letter, confirmed that, if requested, it would give reasonable consideration to a further extension to 1 March 2011.

452.   NAMA's approach to the company at this stage may be summarised as follows. First, the company's overall indebtedness to NAMA was well secured. Secondly, the level of indebtedness was nonetheless too high because the anticipated cash flow would be only just sufficient to allow the company to service the debt. Thirdly, the company was over-leveraged by about £200 million and any new lender would require a reduction in the debt. Fourthly, the existing shareholders were unable to provide the necessary new equity or other funding, so that new equity or similar finance would have to come from external sources. Fifthly, the shareholders were in disarray and it was necessary for shareholder issues to be resolved. Sixthly, a two-year extension would provide the time and stability needed for a sale and refinancing of the company. Progress towards a resolution of the problems would be closely monitored, with a view to a sale at an earlier opportunity.

453.   The approach of NAMA was significantly affected by the events of January-February 2011: the purchase by the Barclay interests of Misland and the tripartite agreement between the Barclay interests, Mr McKillen and Al Mirqab. Although the agreement with Al Mirqab failed, these events demonstrated to NAMA that it was possible for its loan facilities to be repaid within a relatively short time scale and for Mr Quinlan's shares to be purchased, provided that the shareholders could reach agreement amongst themselves. The arrival of a wealthy investor such as the Barclay interests with ambitions to control the company, either alone or with others, indicated to NAMA that this was achievable.

454.   NAMA first heard of the purchase of Misland by the Barclay interests on 21 January 2011. It learnt also about the exclusivity agreement signed by Mr Quinlan on 15 January 2011. Mr Barclay and Mr Peters attended a meeting in Dublin on 24 January 2011 with Mr Mulcahy, Mr Hennigan and other representatives of NAMA. The note of the meeting prepared on the same day by Mr Hennigan records that Mr Barclay expressed his intention to purchase 100% of the shares of the company within the following four to eight weeks and requested NAMA to finalise the proposed two year extension to its facility but stated that he intended to refinance 100% of the debt within 12 months. NAMA regarded this as a positive development, indicating an exit for NAMA both by repayment of its loan facilities and a sale of the equity over which it held security. Mr Hennigan's memorandum sets out the return that NAMA could expect on the assumption that the debt was refinanced by the end of 2011.

455.   On 1 February 2011, NAMA agreed to extend the deadline on its facilities to 14 February 2011. Discussions on the final terms of the 2-year extension to the NAMA facilities continued. Mr Hennebry reported to a board meeting of the company on 8 February 2011 that although the loan agreement was substantially complete there were still some outstanding issues. Nonetheless, the extension was seen as imminent. The minutes record Mr Faber as saying that the company should remain focussed on the NAMA refinancing proposition "*so as to allow the Board to act from a position of strength and allow the company to stabilise before looking to a 3rd party debt provider for a longer term solution*". He reported on the same day to

Aidan Barclay that the Board remained confident that the outstanding points would be dealt with and that the extended facility would be entered into on Friday 11 February or Monday 14 February 2011.

456.   On 4 February 2011, the Barclay interests informed NAMA that it had acquired Mr Quinlan's secured debts from BOSI, and offered to purchase his debts to NAMA which were secured on part of his shareholding, representing 13.52% of the equity of the company. The price offered was £35 million, representing an enterprise value of £900 million. Mr Mulcahy regarded this as a reasonable offer but on 7 February 2011 NAMA received a competing offer from Wynton at a price equivalent to an enterprise value of £1.028 billion.

457.   On Saturday 12 February 2011, the Barclay interests, Al Mirqab and Mr McKillen made their agreement in relation to the company. Mr Hennigan was informed that this would involve the purchase of Mr Quinlan's shares and the repayment in full of the NAMA facilities through credit facilities negotiated by the Barclay interests with Barclays Bank. A further two week extension of the NAMA facilities was requested in order to finalise these arrangements. At its meeting on 15 February 2011 the credit committee of NAMA agreed the extension and agreed to the proposed repayment of its facilities and to a sale of Mr Quinlan's debt, but on terms that the company would pay an "exit fee" of £13.5 million. The fee's purpose was to compensate NAMA for not selling the loans to Wynton at a higher price.

458.   The terms agreed with NAMA were contained in two letters, one from the company to NAMA and the other from EHGL to NAMA, each dated 16 February 2011. The agreement with the company provided that NAMA would extend the present facilities until the close of business on 28 February 2011 "*so that the Group may complete a refinance of the entire current NAMA senior debt facilities, totalling £660 million, plus all accrued interest, on or before such date*". It provided also for the payment of the balance of the arrangement fee, amounting to £2.3 million, on completion of the third party refinancing. The agreement with the Barclay interests provided, first, for a period of exclusivity until the close of business on 28 February 2011 during which time NAMA would not enter into discussions with or accept any offer from any third party relating to the refinancing of its facilities or the sale or purchase or refinancing of debt owed by Mr Quinlan. Secondly, NAMA agreed to release its charge over shares in the company held by Mr Quinlan upon receipt of £35 million. Thirdly, EHGL agreed to procure that the company would pay NAMA the exit fee of £13.5 million upon the refinancing of the group. Fourthly, NAMA undertook to seek to agree with Anglo Irish Bank that the latter would consent to the sale of shares held by Mr McKillen in the company. Fifthly, EHGL agreed that it would procure that on the refinancing the company would pay NAMA's costs and legal fees incurred to date relating to the two-year extension subject to a cap of £500,000.

459.   Mr Hennigan's unchallenged evidence was that these were very positive developments for NAMA and reaffirmed their view that refinancing by an external party would only be available where there was both shareholder agreement and a financially solid shareholder with majority control.

460.   NAMA gave internal approval to a sale of Mr Quinlan's personal loan facilities on 22 February 2011. On the same day it received further evidence that the proposed

deal was proceeding when a request was sent to it by Anglo Irish Bank for approval to the sale of its security over part of Mr McKillen's shareholding representing 18.23% of the equity of the company. This request was regarded as important by NAMA, in particular because, while they had concerns as to whether Mr McKillen would in fact support the deal, the request had come via Mr Cunningham so it was believed to be fully supported by Mr McKillen.

461.    The first indication to NAMA that the deal might not proceed was on 25 February 2011 when Mr Hennigan received a call from Mr Hennebry to say that refinancing might be about to fall through. On 1 March 2011 Mr Hennigan called Mr Faber to ascertain the position. Mr Faber confirmed that the agreement would not proceed on account of Mr McKillen's rejection of it. Mr Hennigan says that NAMA viewed this action as "*bizarre*" because a credible proposal for refinancing the company's debts had been rejected by the shareholders "*for no apparently good reason*".

462.    The importance of the events of January-February 2011 for NAMA is summarised by Mr Mulcahy and Mr Hennigan in their witness statements.

463.    Mr Mulcahy states:

> "…….*the BarCap Refinance did demonstrate that, contrary to Coroin's assertions in late 2010, the company did not need a two-year term to be able to raise the necessary funds for a full refinance. In fact, it had been able to raise sufficient funds in the course of less than two months. The only reason that the deal had not gone through was due to shareholder disagreement. As such, and also to focus the shareholders on the aim for finally completing the successful refinance or sale, we decided that NAMA would only offer Coroin a three-month, rather than a two-year, extension in order to keep them focused on the refinancing or other exit for NAMA.*"

464.    In his witness statement, Mr Hennigan says:

> "*67. NAMA saw the position differently as a result of the failed BarCap Refinance. In December 2010 NAMA had agreed in principle to a two year extension because, according to Coroin, the shareholders and directors could not arrange a full refinance without a two year window in which to do so.*
>
> *68. It was now clear, after the BarCap Refinance, that Coroin did in fact have the ability to raise the full amount for a refinance, and could do so with a maturity date of just two months. The BarCap Refinance had only failed because the shareholders could not agree personal terms, not because of the short extension.*
>
> *69. Consequently NAMA adopted a new strategy moving forwards. It would not grant a two year refinance. Instead, it would only grant short extensions, keeping Coroin aware that it needed to push hard to find a way*

> *of agreeing a refinance out of NAMA. Because of the actions of the shareholders NAMA had formed the view that it was imperative to exit Coroin at the earliest opportunity.*"

465.    In early March 2011, NAMA held discussions with the Barclay interests and with representatives of Wynton with a view to agreeing a sale of Mr Quinlan's debt secured on part of his shareholding. The Barclay interests were no longer prepared, by payment of the £13.5 million fee, to match the Wynton offer but Wynton was prepared to proceed with a purchase of the debt at a price of £49.1 million which was agreed by NAMA in early April 2011. This too appeared to NAMA to be a positive sign. As Mr Mulcahy comments, *"there were clearly now two interested and well-backed parties in competition for control of Coroin.*"

466.    NAMA's position became very clear in the course of March 2011. Although Mr Hennebry seems to have understood from a conversation with Mr Hennigan on 28 February 2011 that NAMA was moving towards approving a two-year extension and permitting drawdown the following week, I am satisfied that he misunderstood the position. A telephone conversation with Mr Hennigan later that evening showed that NAMA was far from agreeing any such new facility. On 3 March 2011 Mr Hennigan told Mr Hennebry that if the company wished to renew its requests for a two-year extension then it would have to make the request in writing. Mr Hennebry on behalf of the company wrote in those terms to NAMA on the same day.

467.    There was at this time continuing discussion, or the prospect of continuing discussion, between the Barclay interests and Mr McKillen with a view to reviving in some form the deal which had been agreed in February 2011. Aidan Barclay and Mr Faber met Mr Hennigan and Mr Mulcahy at NAMA's offices on 2 March 2011. The main purpose of the meeting was to discuss the Barclay interests' offer for Mr Quinlan's debt but in the course of the meeting Mr Barclay and Mr Faber explained that they expected or hoped that the collapsed deal could still be revived and for that reason, at that stage, wished to there be a delay in the two-year extension.

468.    On 8 March 2011, NAMA informed the company that the facility would be extended only till 21 March 2011. Mr Hennigan's evidence is that the purpose of this short extension was to enable the shareholders to revive the deal agreed in February and in particular the Barclays Bank refinance. In a letter dated 9 March 2011 to the company, NAMA made clear that any agreement at the end of 2010 for an extension to the facilities had been an agreement in principle only. In the letter NAMA made clear its position:

> *"Please note that we were assured by Coroin that the Anglo facilities would be repaid in full by no later than 28 February 2011. This did not happen. NAMA is under a statutory duty to protect the interests of the Irish State and Ireland's taxpayers in respect of loans that it has acquired under the NAMA Act 2009. If NAMA considers it necessary to make facilities to Coroin in any way conditional upon, or subject to, reaching satisfactory agreements or compromises with Coroin's shareholders then this is a matter for NAMA in the discharge of its statutory objectives. Coroin's option is to obtain third*

> *party financing and repay Anglo in accordance with the contractual terms of the various facilities agreements."*

The letter ended *"NAMA will continue to discharge its statutory obligations in such manner as it considers appropriate to protect the interests of the Irish State".*

469.   On 10 March 2011, Mr Hennebry and Mr Cunningham met Mr Hennigan and Mr Mulcahy to discuss an extension to the NAMA debt. The latter made clear that NAMA would not grant a two-year extension without shareholder consensus. They would at most consider a three-month extension to permit time for the shareholders to reach agreement. As Mr Hennebry reported to the board of the company the following day, NAMA was prepared to sell the loan as it was becoming increasingly frustrated with the situation, although it would not sell it at a discount and it appreciated the potential damage to the value of the shares over which it held security.

470.   The prospect of an agreement among the shareholders led NAMA to state that it would extend the NAMA debt until 31 March 2011, as Mr Hennebry reported to the board of the company on 14 March 2011. Mr Hennebry further reported that NAMA's position *"remains unchanged in that they still seek reassurance from the shareholders on the long term solution"*.

471.   Agreement was not reached with Mr McKillen in the course of discussions in mid-March 2011. On 22 March 2011 the NAMA credit committee agreed to offer the company a three-month extension of the facilities. The minutes record that the reduced refinance period followed a change in the shareholders and was intended to encourage the shareholders to agree external refinance with a third-party. Mr Hennigan conveyed this decision to Mr Hennebry in a call on the same day during which he made clear that NAMA retained the ability to sell the NAMA debt. Mr Hennigan also made clear that a two-year refinance was firmly off the cards and that NAMA now expected the company to press hard for a sale or refinance within the following three months. Mr Hennigan followed this up with an email on 29 March 2011 in which he stated that *"if appropriate, any extension to the 3 month facility will be considered on the basis of Coroin's or the shareholders' progress in achieving a 3rd party refinance out of NAMA"*.

472.   It is in my judgment clear that by the end of March 2011 the approach of NAMA to the company's indebtedness had irrevocably changed. NAMA's primary function was to realise to the best advantage of the Irish State and taxpayer the loans which had been transferred to it. The events of February 2011 had made clear that it could realistically expect full repayment of the NAMA debt. It was clear that, if the shareholders could reach agreement, the debt could be refinanced. NAMA's assessment was that the debt could not be refinanced by a conventional senior loan facility alone. It would need a significant amount of equity injection or perhaps mezzanine finance. It considered that in order successfully to refinance the debt the company needed a financially strong equity holder and it recognised such a party in the Barclay interests. However, it was not concerned with the identity of the purchaser of the NAMA debt. It was prepared to sell to any party which could raise the funds required to purchase debt at par with accrued interest. A short extension of the debt was needed to bring pressure on what NAMA regarded as a dysfunctional

group of shareholders. It would keep the shareholders focussed on resolving matters.

473.	In his cross-examination of Mr Mulcahy and Mr Hennigan, Mr Marshall sought to make the case that NAMA's decisions with regard to an extension of the debt were influenced by what was said to them by Mr Faber and Mr Barclay in the course of meetings and communications. I am satisfied that this was not the case. NAMA had every reason to refuse a lengthy extension to the NAMA debt, acting with a view to the pursuit of its statutory purposes, and in my judgment their decisions would have been the same whatever was said to them by representatives of the Barclay interests.

474.	The new consolidated facilities agreement was executed on 1 April 2011, with a maturity date of 30 June 2011. The accompanying letter from NAMA to the company highlighted that "*nothing in this letter shall oblige or commit NAMA or the Finance Parties in any way to grant any extension to any Repayment Date or agree any roll-over of any Loans or to renew or refinance any Loans and any such decisions shall be for NAMA to make in its absolute and sole discretion*".

475.	As it appeared to NAMA, and indeed was the case, nothing was achieved during the three-month extension to 30 June 2011 which would bring closer a refinancing of the NAMA debt. Negotiations between the Barclay interests and Mr McKillen came to an end in June 2011 without acceptable terms being agreed. Although in its letter dated 16 June 2011 to NAMA, requesting a further three-month extension, the company wrote that every effort continued to be made to achieve the primary objective of refinancing the NAMA debt and that the company was confident that a refinancing could take place in the near term, there was in truth little basis for this.

476.	On 8 July 2011 NAMA agreed to grant a three-month extension, expiring on 30 September 2011. By then, there had been a further significant development in NAMA's approach to dealing with this debt. As an alternative to a repayment of the debt, NAMA now started to give serious consideration to a sale of the debt. It had previously been inhibited in this respect by its continuing interest in the equity of the company, which might be damaged by a sale of the debt. As well as its security over part of Mr Quinlan's shareholding, it had a potential interest if it sought a transfer of bank loans to Mr McKillen secured on his shareholding. However, in April 2011, NAMA had sold the Quinlan debt to Wynton and on 6 July 2011 the board of NAMA resolved not to acquire Mr McKillen's debts. Its sole interest was therefore in the speedy realisation of the debt due from the company. Mr McKillen accepted in cross-examination that he appreciated that this was the case. The NAMA board paper supporting the recommendation for board approval to the extension of the company's facility to 30 September 2011 stated as follows:

> "*Coroin is the holding company for the Maybourne Hotel Group. NAMA previously provided a 3 month facility extension to encourage the shareholders to refinance the debt. The shareholders of Coroin have requested another 3 month extension to 30th September to allow sufficient time to identify an alternative lender, noting that trading performance is satisfactory.*

> *NAMA PM is uncertain as to the ability of the shareholders to*
> *secure alternate financing in light of the current shareholding*
> *structure therefore NAMA PM will consider alternative exit*
> *strategy during the extension period."*

477.   In July 2011 NAMA took active steps to pursue a sale of the company's debt. It
       contacted Wynton's lawyers who responded that it was still interested in a purchase
       of the debt. On 28 July 2011, the board of NAMA approved a sale of the NAMA
       debt at par, without specifying any purchaser. At a meeting on 4 August 2011, Mr
       Hennigan told Mr Hennebry that NAMA had opened discussions with a view to a
       sale of debt and that NAMA might well sell the debt in the near future. In addition
       to discussions with Wynton, NAMA engaged in discussions with a view to a
       possible sale of the NAMA debt to the Barclay interests. These started with a call
       from Mr Peters on 9 August 2011.

478.   There was no room for the company or its directors and shareholders to
       misunderstand NAMA's position, nor in fact did they do so. In a letter dated   10
       August 2011, rejecting a proposal which had been put by the company to NAMA,
       Mr Hennigan made clear that the only proposal NAMA would consider was full
       repayment of the debt plus accrued interest. He added:

> *"I also wish to take this opportunity to state that I can give no*
> *guarantee or expectation that NAMA will agree to extend the*
> *facilities beyond the 30 September 2011 maturity date".*

       This letter was discussed in a conference call of the directors of the company on 15
       August 2011 and they well understood that NAMA might seek to sell the debt, so
       much so that there was a proposal for a letter to be written to NAMA asking
       whether NAMA was in discussion with any parties with a view to a sale of the debt.

479.   Mr McKillen's evidence was that he was aware of rumours that NAMA might be in
       discussions with possible purchasers of the debt. He emailed NAMA on 26 August
       2011 to say that he was alarmed by the statement in Mr Hennigan's letter of 10
       August 2011 quoted above and he sought confirmation that NAMA was not in
       negotiations with any third party with a view to a sale of the debt. Mr Mulcahy
       made NAMA's position abundantly clear in his reply to Mr McKillen sent on 29
       August 2011:

> *"NAMA's objective is to achieve full repayment of par debt*
> *as soon as is practicable. The company and shareholders are*
> *well aware of our objective and we note that the company has*
> *been in refinancing talks for close to 2 years now without*
> *success. As you recall no doubt we facilitated a restructuring*
> *of the Knightsbridge loan into the company this year to assist*
> *and enhance the ability to achieve refinancing by the*
> *company.*
>
> *In our view the 3 month extensions is not the real issue, as we*
> *understood that refinancing by the company was very close*
> *earlier this year only to be thwarted at the last minute by a*
> *disagreement amongst the shareholders over certain issues.*

> *NAMA reserves its rights to achieve its objective of achieving full par debt repayment by any means available to it. We would welcome any near term firm proposals by the company to achieve full par debt repayment as soon as possible."*

480.    The company was no more able in the period from July to September 2011 to put forward proposals which NAMA would regard as remotely satisfactory than it had been in the preceding three months. All that NAMA received in July was a letter dated 18 July 2011 stating:

> *"We remain committed to exploring all available options to enable us to refinance the existing facilities. Indeed, Coroin and its shareholders are actively engaged in discussions with several banks which it is hoped would lead to a refinance before the end of September."*

NAMA was hardly likely to be impressed by generalised statements of this sort, nor was it.

481.    On 5 August 2011 Mr Hennebry wrote to Mr Hennigan with the proposal that there should be a refinancing on the basis that 75% of the NAMA debt would be repaid out of a new senior facility and that NAMA would accept a junior position with respect to the balance of 25%. Leaving aside the fact that the company was nowhere near arranging the finance for this proposal, it was from NAMA's point of view a wholly unrealistic suggestion. NAMA's interest, as it had made clear on many occasions, was the repayment in full of the existing indebtedness as soon as possible. Not only was the suggestion of taking a deferred position in respect of 25% of its debt intrinsically unattractive, when all parties are agreed that an enforcement of the security would be likely to result in full repayment of the debt, but the interest offered on the junior debt was at a rate (3.75% over LIBOR) lower than the rate under the existing senior debt and significantly lower than market rates for comparable mezzanine finance.

482.    The company's next move was to write to NAMA on 9 September 2011, requesting an extension of the maturity date to 31 January 2012 at the earliest. The letter stated:

> *"Refinancing the company's loans away from NAMA remains the priority and every effort continues to be made to achieve this objective. With stronger trading results which underpin the property values and which provide improved interest cover, the company is confident that a refinancing can take place in the near term. We are engaging with an investment bank to assist in this process and their view is that a refinancing transaction would be viewed positively by the real estate debt market.*
>
> *It has also become clearly evident over the last couple of months that the quarterly debt maturity deadline is counterproductive in our efforts to refinance the debt. A longer maturity date of one year would remove this avoidable*

> *uncertainty and allow the company to focus on refinancing. I*
> *would welcome your thoughts on this matter."*

This letter showed that the company was in truth no further forward than it had been when it wrote, in strikingly similar terms, to NAMA on 8 July 2011. In fact, it appeared the position was worse. The letter indicated that it might take at least a year to achieve a refinancing and its reference to "*engaging with an investment bank*" indicated that company was not yet in discussions with any potential sources of finance.

483.   NAMA's reply dated 13 September 2011 made clear its scepticism at the contents of the company's letter. Mr Hennigan wrote:

> *"I am not clear what evidence you have that quarterly debt*
> *maturity deadlines are counterproductive to your efforts in*
> *achieving a refinance of existing facilities. Perhaps you*
> *would like to elaborate in concrete terms how a change in the*
> *maturity date would have the desired effect of achieving a*
> *refinance?"*

The letter ended with the now familiar statement that it was NAMA's wish that "*this loan be repaid in full at the earliest opportunity*". The inability of the company to provide the concrete evidence requested by NAMA was exposed by its reply dated 16 September 2011. Referring again to the company's discussions with a leading international investment bank, it stated *"initial indications have been very positive and we have another meeting with them scheduled for early next week"*. It goes on to state that they planned to provide examples from their own experience to date together with the additional insight of the investment bank on how a longer maturity date would facilitate the refinancing process. The company was unable to provide anything of more substance in its letter dated 26 September 2011, requesting a further extension.

484.   On 23 September 2011 Mr Hennigan, supported by NAMA's credit and risk department, recommended to the credit committee that any loan extension should be rejected "*to encourage the company or the shareholders to refinance the debt out of NAMA*". This was stated to be in line with its approved strategy. On the same day the Barclay interests had made a new offer to NAMA to purchase the NAMA debt at par plus accrued interest, thus fulfilling NAMA's requirements. Mr Hennigan's evidence, which I accept, is that even if this offer had not been received his recommendation would have been the same given the lack of any progress on the company's part with a refinancing of the debt.

485.   As detailed in the chronological section, discussions had continued in August and September between NAMA and Wynton and the Barclay interests as possible purchasers of the NAMA debt. In mid-September 2011 the Barclay interests reached agreement with Wynton and the interested Abu Dhabi parties, so that thereafter the Barclay interests appear to have been the only prospective purchasers of the debt.

486.   In my judgment, it is very clear that by August and September 2011, there was no prospect whatsoever of NAMA agreeing to an extension to the facilities by one

year, let alone two years. There was simply no way in which any party could persuade NAMA to agree to an extension to the debt without concrete evidence that a full refinancing would be forthcoming in the very near future. Mr McKillen's belief that NAMA could be persuaded to agree a further extension does not bear examination. His evidence, if accepted, on the company's dealings with NAMA in this period suggests that he did not have a grasp on the realities of the situation. His views that the proposal made in early August 2011 involving NAMA taking a junior position in respect of 25% of its debt was *"a brilliant idea"* and that NAMA's letter dated 13 September 2011 should be *"seen as positive"* were fanciful.

**Alleged breaches of duty by directors**

487.   Leaving aside the pre-emption issues, the principal basis for Mr McKillen's case of unfairly prejudicial conduct of the affairs of the company rests on allegations that the directors appointed by the Barclay interests acted in a number of respects in breach of their duties as directors.

488.   The duties of directors are now largely codified in sections 170 to 177 of the Companies Act 2006 but they reflect the fiduciary and other duties of directors long established at law and in equity.   The duties are owed to the company:   section 170(1).   The duties most relevant to the present proceedings are as follows.   Under section 172(1), a director *"must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole"* and in doing so he must have regard, amongst other matters, to the factors set out in sub paragraphs (a) to (f).   Section 173(1) requires a director to exercise independent judgment.   Section 174(1) requires a director to exercise reasonable care, skill and diligence.   Under section 175(1) a director *"must avoid a situation in which he has, or can have, a direct or indirect interest that conflicts, or possibly may conflict, with the interests of the company."*   A conflict of interest includes a conflict of duties: Section 175(7).   By section 177(1), if a director is in any way, directly or indirectly, interested in a proposed transaction or arrangement with the company, he must declare the nature and extent of that interest to the other directors.

489.   The directors in question are Mr Faber, Mr Seal and Mr Mowatt.   They were appointed as directors on the following dates:   Mr Faber on 21 January 2011, Mr Seal on 23 March 2011 and Mr Mowatt on 16 May 2011.   Mr Faber ceased to be a director on 11 October 2011, but the other two remain directors.   They were all appointed by the exercise of powers attached to shares registered in the names of companies comprising the Barclay interests.

490.   Most of the alleged breaches occurred in the period July to September 2011 although there is a breach alleged against Mr Faber at the end of January 2011.   An allegation that they had been in breach of duty by blocking redevelopment plans for Claridge's and The Berkeley was abandoned in Mr McKillen's closing submissions. I shall deal with each of the alleged breaches in their chronological order.

*Closure of the data room*

491.   This is an allegation against Mr Faber.   Mr Seal and Mr Mowatt had no involvement in it.   The events complained of occurred in late January and early February 2011.

They should be seen in the context of the other events at this time which I have set out in the chronological section of this judgment. I shall first set out the sequence of events directly relevant to this issue.

492.    In the course of 2010 the company established an electronic data room to contain confidential information relating to the company, its operations and its financial position.    The purpose was to provide information to Northwood as a proposed investor and Deutsche Bank as the lead for a new banking syndicate. When the Northwood deal fell through in November 2010, the data room was closed. With new approaches and discussions with third party purchasers and investors in early January 2011, there was renewed interest in the data room. It appears that at some point in January 2011 Credit Suisse acting on behalf of the Qataris was told that it would have access to the data room. In addition Mr Buchanan on behalf of the Green family was concerned that Wynton should also have access to it.    On 10 January 2011 Wynton executed a non-disclosure agreement as a pre-condition to access.    There is however no evidence that either Credit Suisse or the Qataris or Wynton in fact accessed the data room in January 2011.

493.    Mr Faber attended his first board meeting on 25 January 2011, when there was no reference either to any proposed sale of shares in the company or to the existence of or access to a data room. On 27 January 2011, Mr Hennebry sent an email to the directors in which he referred to the negotiations then taking place with NAMA with a view to an extension to its facilities. He continued in the email as follows:

> "Separately and in parallel to the Nama process, DLA are in the process of putting the finishing touches to a "draft" sale & purchase agreement which will be sent to the lawyers acting for the potential acquirors who continue to show an active interest in acquiring the company which it is hoped will, amongst other things, give the board opportunities to explore the terms on which potential bidders may be willing to conclude a transaction and finance any such acquisition and the impact on the group of such financing arrangements going forward (which is obviously very important from the company's standpoint).  In connection with these processes DLA are continuing to populate the data room, update their draft vendor legal dd report and respond to material due diligence enquiries to the extent they are able to do so".

494.    Mr Faber promptly called Mr Hennebry and then emailed a letter to him, stating:

> "As I mentioned, I was extremely surprised by the last paragraph of the email in which you detailed the action DLA is taking purportedly on behalf of Coroin in connection with the sale of the company and the provision of information (potentially of a confidential nature) to third parties.
>
> This is a key matter for Coroin and, given the importance of such potential steps, these actions must be viewed and discussed by the board. Further action must not be taken without the board's authority".

He confirmed their earlier conversation in which Mr Hennebry had agreed that work on any sale documentation would cease and he would not send documentation to any third parties.    He would inform all members of the board in detail of the steps taken to date in relation to any purported sale, including details of any information

which had been made available to third parties. Mr Hennebry did not in fact provide details of any information which had been made available to third parties, so it is a reasonable inference that no such information had been provided. Mr Faber continued in his letter to say that he was instructing the secretary to convene a board meeting by no later than noon on 31 January 2011 to enable the board to consider and review the position. The instruction was subject to the receipt of agreement by directors holding between them at least 100 votes, as required by the shareholders agreement for a meeting to be held on short notice.

495.   I do not doubt that Mr Faber was extremely surprised to read the last paragraph of Mr Hennebry's email. The preparation and distribution to lawyers acting for potential purchasers of a draft sale and purchase agreement relating to the shares in the company is necessarily an act on behalf of the shareholders of the company. It requires the support of the shareholders. Whatever the position of the Green family, once the Barclay interests had acquired Misland, there could be no assumption that Misland remained interested in a sale of its shares. On the contrary, there was every reason to suppose that the Barclay interests were not  interested in selling shares but in buying them.

496.   Mr Faber gave evidence that he had not been aware before Mr Hennebry's email that there was a data room. In an email sent to him on 16 January 2011 Mr Murphy had referred to getting access for the Barclay brothers to the company data room and the need for a non-disclosure agreement. Mr Faber had given Mr Murphy the following day an address for a non-disclosure agreement. Whether or not Mr Faber had that exchange in mind when he spoke to Mr Hennebry following receipt of Mr Hennebry's email on 27 January 2011, I find it entirely plausible that he may not have done, he had no reason to believe that a draft sale and purchase agreement was being prepared or that other potential purchasers were being given access to the data room.

497.   Mr Faber's request for a board meeting to be held on short notice was followed 17 minutes later by an email of support from Mr Murphy. The combination of the votes capable of being cast by Mr Faber and Mr Quinlan or by Mr Murphy as his alternate exceeded the 100 votes required for the meeting to be called on short notice. Accordingly, on 28 January 2011, Ms Walker gave notice of the meeting to be held at 11.00am on 31 January 2011.

498.   Mr McKillen emailed the other directors objecting to the meeting convened for 31 January 2011 and saying that in any case that he would not be in London on that date due to commitments which he could not change at short notice. He said that "*as a gesture of goodwill I am prepared to attend a meeting on 8 February to facilitate an early discussion of the matters raised*". He also said that the provision of information had been discussed with and approved by all of the shareholders and directors including Misland and its nominee and its appointee on the board and as such he failed to see how a further discussion could reasonably and in good faith be considered as sufficiently urgent to justify a meeting at such short notice. Mr McKillen's evidence demonstrated that he was at least in part motivated in his reply by a desire to show that he would not be pushed around by the new owners of Misland.

499.    Mr Faber responded that he would accept a delay in the meeting until 8 February 2011 as requested by Mr McKillen, conditional upon no further steps being taken by the company or its advisers in connection with any offer for the company or its assets and of no further data room access being provided to third parties pending a proper discussion at the meeting on 8 February 2011. The following day Mr McKillen agreed to the conditions specified in Mr Faber's letter.

500.    In an email dated 31 January 2011 DLA raised concerns as regards to the closure of the data room: *"that was made operational last week to which advisors to a prospective bidder currently had access"*. The advisers in question were Credit Suisse. Their concern was that closing the data room, as opposed to not posting additional information to it, could be seen as closing off a process with a party at a time when the company should, technically, be considering all options open to it in light of its refinancing position.

501.    The board meeting was held on 8 February 2011. The minutes of the meeting record;

> *"With the NAMA refinance now imminent, the meeting agreed that the company would not engage with any third parties until such time as the refinancing was complete. This would provide a solid balance sheet and remove the perception of distress that surrounds the Company…… It was agreed that the data room would remain closed".*

There was some difference in the evidence as to whether a vote was taken on this issue, with Mr McKillen voting against the continued closure of the data room. I find that no vote was taken but that Mr McKillen did register his objections to the closure of the room. Mr Faber's evidence was that Mr McKillen's concern appeared to be that he had been embarrassed in his dealings with the Qataris by this decision. I am satisfied that Mr McKillen went somewhat further than that.

502.    On the basis of these largely undisputed facts, the petition alleges that the decision to close the data room and Mr Faber's insistence on its closure before the meeting on 8 February 2011 was a breach of fiduciary duty on the part of Mr Faber and Mr Quinlan. Somewhat surprisingly, notwithstanding that Mr McKillen had known all the material facts since the time at which they occurred, this allegation did not feature in the petition as presented or as amended in early February 2012 but was brought in as one of a number of amendments made shortly before the start of the trial.

503.    It is alleged in the petition that the decision to close the data room and Mr Faber's insistence on its closure prior to the meeting:

> *"i.    was not in the interests of the Company, as it would reduce the prospects of the Company being able to obtain financing from third parties (as part of an acquisition of or investment in shares in the Company or at all) at a time when the Company's facilities with NAMA were due to expire on 31 January 2011 and an extension had not yet been agreed, and further*

ii.    *was calculated to advance the sectional interests of the Barclay Brothers, and accordingly motivated by a collateral purpose rather than being actions considered most likely to promote the success of the company for the benefit of its members as a whole."*

504.    The short answer to this allegation, as an instance of conduct which was unfairly prejudicial to Mr McKillen as a member of the company or indeed to any claim for relief for breach of fiduciary duty, is that the closure of the data room caused no loss or prejudice at all. No potential purchaser or finance provider was put off by its closure. The Qataris were content to enter into agreements with the Barclay brothers on 2 February 2011 and with Mr McKillen on 3 February 2011, without any access to the data room. Equally they were prepared to enter into the tri-partite agreement on 12 February 2011 without any such access. The closure of the data room did not prevent Wynton from making an offer to the shareholders on 7 February 2011.

505.    Nor was there any damage to the company in its dealings with NAMA. It is true that NAMA was initially concerned when it learnt that the data room had been closed: "*They've gone nuts that we closed the data room*" as Mr Faber described it in an internal email but it did not in fact prevent NAMA from agreeing a short extension of the facilities and from thereafter dealing with the company first in the light of the tri-partite agreement reached with the Qataris and then subsequently. It is quite impossible to conclude that events in relation to NAMA would have been any different at all if the data room had remained opened. Their concerns stemmed from the fact that Credit Suisse as advisers to the Qataris did not have access to the data room with the result, as they initially saw it, that it would affect the prospects of a deal of the Qataris. But, as is clear, that was not the case and NAMA had no further grounds for concern once agreement was reached with the Qataris.

506.    As regards Mr Faber's motivation for seeking the closure of the data room, it was not in my judgment improper or a breach of duty on his part to seek its closure. This must be seen in the context of, first, the circumstances in which the data room was initially established and, secondly, the change in those circumstances brought about by the purchase of Misland by the Barclay interests. The data room was originally established in circumstances where all the shareholders accepted the need for new capital in order to refinance the company but none of them was prepared to provide it. All the shareholders, with the exception of Mr McKillen, wished to sell their shares. In drafting a share purchase agreement and in making information available in a data room, the company was facilitating the injection of new capital by a third party and the sale of shares of existing shareholders. The circumstances were substantially altered by the purchase of Misland by the Barclay interests. Misland did not wish to sell its shares, and was clearly interested in buying the shares of other shareholders. Moreover, it was prepared and in a position to provide the further capital required by the company.  A third party offer for the shares of the company was no longer feasible if it did not have the support of the Barclays interests, because they would refuse it.  The data room was no longer relevant, as events showed.   In those circumstances, Mr Faber was not, in my judgment, acting wrongfully in seeking the closure of the data room. Nor can Mr McKillen complain about the closure of the data room pending the meeting held, for his convenience, on 8 February 2011 because he agreed to its closure during that period.

*JLL Valuation*

507.   It is alleged that Mr Faber acted in breach of his duties as a director by taking steps to obtain a valuation of the company's hotels from Jones Lang LaSalle (JLL) in July 2011.

508.   The relevant facts are as follows. As appears from the chronological section, from mid-June 2011 Mr Peters on behalf of the Barclay interests was negotiating with HSBC and with Barclays Bank with a view to agreeing a facility to enable the Barclay interests to purchase or refinance the NAMA debt. By 8 July 2011 the discussions with HSBC had got to the point where a draft term sheet from HSBC was imminent. It would appear that HSBC wanted to see an up-to-date valuation of the group's hotels and properties, because on that day Mr Peters emailed HSBC to ask:

> *"Assuming that HSBC want to undertake the transaction with us, and receive the necessary internal approvals, would you please confirm that if we got JLL to update their valuations from May 2010 that would suffice for your purposes?"*

509.   JLL had produced a valuation of the company's hotels in May 2010 for the purposes of discussions then taking place between the company and Deutsche Bank for a new facility. On 8 July 2011, Mr Faber emailed JLL, saying: *"We are currently keen to engage JLL to refresh the valuation of Maybourne Hotel group from last June"*. The coincidence of timing, combined with Mr Peters' evidence that obtaining the valuation is something that Mr Faber would have dealt with, makes it highly probable that Mr Faber's approach to JLL was prompted by the need to obtain a valuation for the purposes of negotiations with HSBC, and I so find. Mr Faber's email to JLL would give the impression that the valuation was being sought by the Barclay interests. In the course of their subsequent exchanges, however, it became clear that Mr Faber envisaged that the company would be the client and would pay for the valuation. JLL made clear that they would wish to re-inspect the hotels and Mr Faber arranged this with Mr Alden, with visits to The Connaught and The Berkeley taking place on 21 July 2011. Mr Hennebry was kept informed of these visits.

510.   On or about 20 July 2011 Mr McKillen discovered that Mr Faber had taken steps to instruct JLL and that they were inspecting the hotels. He called Mr Faber in the evening of 20 July 2011 and, in an email sent two days later, Mr Cunningham confirmed that Mr McKillen was *"absolutely outraged"* that these steps had been taken without consultation. The email made clear that Mr McKillen wanted to be fully involved in the valuation process. JLL met Mr McKillen on 27 July 2011 to discuss in particular any proposed changes to the development proposals for the hotels. At a board meeting on 11 October 2011 attended by Mr Cunningham as Mr McKillen's alternative, as well as by Mr Seal, Mr Mowatt and Mr Alden, it was unanimously resolved to obtain an up-to-date valuation from JLL. JLL was willing to provide the draft valuation provided their fee was paid.  Their agreed fee of £112,500 was paid, with the specific approval of Mr Cunningham.

511.   It is alleged in the petition that Mr Faber liaised with and directed the appointment of JLL purportedly on behalf of the company without authority and, *"principally or at least in part for the benefit and use of the Barclay brothers and their interests"*. The petition invites the inferences that, first, *"a purpose for instructing to JLL to*

*value the company was in order that the valuation could be provided to Barclays Bank to satisfy the condition imposed on planned provisions of funding to MFL*" and secondly "a *purpose of instructing JLL to value the Company was in order that the valuation could be used by MFL in the planned appropriation of assets*". The planned appropriation of assets alleged in the petition would occur following a purchase of the NAMA debt and a foreclosure.

512.   In my judgment, the evidence supports neither of these inferences. The evidence does suggest, and I find, that Mr Faber's initial instructions to JLL were for the purpose of providing a valuation which could be used by the Barclay interests in negotiations with HSBC. In fact, however, this is not how matters proceeded. No valuation by JLL was used by the Barclay interests in their discussions with HSBC nor is there any evidence that any such valuation was used in their discussions with Barclays Bank. Instead the company was quickly identified as the client and JLL's work for the production of the valuation was undertaken with the full co-operation of Mr Hennebry, Mr Alden and Mr McKillen. Mr McKillen was clearly angry that JLL had been instructed without consultation with him but he nonetheless co-operated with them. No fee for the valuation was paid by the company until the board unanimously resolved to do so on 11 October 2011. The valuation was then provided to the company, for its own purposes.

513.   In my judgment, these events disclose no breach of duty on the part of Mr Faber, nor, importantly, any loss to the company or any prejudice to Mr McKillen or any other shareholder in the company.

514.   It was Mr Faber's evidence, and this would seem to be plainly correct that the Barclay interests would not be in a position to use a valuation obtained by and addressed to the company. If the Barclay interests wished to rely on a valuation, they would have to obtain their own. It is true that in his memorandum dated 1 August to Sir David Barclay, Mr Faber referred to the headline figures as appearing in the draft JLL valuation. Whether those figures had been provided orally or in writing by JLL does not appear from the evidence. This, however, is the only evidence of any use being made of the JLL valuation for any purposes other than those directly of the company. As for the allegation that a purpose of the valuation was for use by the Barclay interests in the event of a foreclosure, Mr Faber makes clear in his memorandum that following a foreclosure the lender would have to select its own valuer.  It is significant that Mr Peters never saw the valuation.

515.   It cannot be denied that, objectively speaking, it was in the interests of the company to obtain an up-to-date valuation of its properties, even though it was highly unlikely that the company would be able to procure refinancing without agreement amongst its shareholders. If such agreement could be reached, then the company would need to move quickly to co-operate in obtaining funding for the purpose of refinancing the NAMA debt. It made obvious sense that any valuation should be prepared by JLL, given their previous experience.

*Draft Letter to NAMA*

516.   Mr McKillen alleges that Mr Seal was in breach of his duties as a director in interfering with the contents of a letter to be sent on behalf of the company to NAMA.

517.   On 10 August 2011 NAMA had written to the company, rejecting its proposal for refinancing the NAMA debt contained in the company's letter dated 5 August 2011. A board meeting was held by telephone on 15 August 2011 to discuss the company's response to NAMA's rejection. Mr Hennebry, Mr Cunningham, Mr Seal, Mr Mowatt and Mr Faber, who was then in Abu Dhabi, participated in the call. No note or minute was taken of the discussion but in an email sent just after the call by Mr Alden to Ms Walker, Mr Alden reported *"discussed blunt response from NAMA re our proposal to refinance with their help. Also concerning that they refer to no obligation to roll over debt. Toby will be drafting a note to NAMA asking about whether they are attempting to sell the debt as there is a provision in the facilities agreement for them to consult with the company if they are"*. It was agreed that Mr Hennebry would circulate the proposed draft letter among the directors for their comment. Mr Hennebry circulated the draft on the following day.  After expressing in the first paragraph the company's disappointment that the previously proposed refinancing route had been rejected, the draft letter continued:

> *"In reference to the possibility that NAMA may be considering selling the company's loan to another bank, financial institution etc the company expects that notification and consultation as required under the facilities agreement would commence at least four weeks prior to any such transfer or assignment in order for the company to have adequate time to consider it. In addition, please can you confirm if NAMA is currently in discussion with any party at this time regarding its loan to the company".*

518.   There were email exchanges between Mr Seal, Mr Mowatt and Mr Faber regarding the wording of this draft letter to which I shall refer in a little more detail. The upshot was that Mr Seal responded to Mr Hennebry suggesting that in effect the second paragraph should be excluded. Mr Hennebry took the view that there was little or no point in sending a letter which did no more than express the company's disappointment, although Mr Seal's view was that it was important to have a response on record. In any event Mr Hennebry did not send a response. When Mr Cunningham discovered this, he raised his concerns that a letter along the lines agreed, as he saw it, during the conference call on the 15 August 2011 had not been sent. In the end Mr McKillen wrote a letter to NAMA making the points included in Mr Hennebry's draft letter and received an abrupt response.

519.   It is alleged in the petition that it is to be inferred that Mr Seal sought to delay the company from contacting NAMA or setting out the company's entitlement as regards consultation on the sale of the NAMA debt *"as he was aware that NAMA was in discussions with"* the Barclay interests. It is further alleged that *"in this regard Mr Seal was in a position of conflict and preferred his duty to or interest in Ellerman Investments and the Barclay interests to his duty to the company, in breach of his duties to the company"*. Consistent with this allegation, it is alleged in the closing submissions for Mr McKillen that Mr Seal was seeking to ensure that NAMA did not inform the company that the Barclay interests were in discussions with NAMA for the purchase of the NAMA debt.

520.   This allegation requires a careful consideration of the emails sent in the days following the circulation of Mr Hennebry's draft. Throughout much of this period Mr Faber was in Abu Dhabi and, although he was able to participate in the

conference call on 15 August 2011, he was for the most part heavily engaged in the negotiations there. Mr Seal responded within about half an hour of receiving Mr Hennebry's draft letter to say that he had given his comments to Mr Mowatt who would call Mr Hennebry as regards to the draft letter "*which I think needs some tweaking*". Mr Hennebry and Mr Mowatt spoke by telephone, following which in the afternoon of 17 August 2011 Mr Hennebry emailed Mr Seal, referring to the conversation with Mr Mowatt and saying "*The question that I'd like to discuss with you is whether we have a specific time frame for NAMA to notify us or leave it open ended. My preference is for the former but perhaps we could speak as it may be more efficient than emails?*" Mr Seal responded half an hour later to say "*Difficult to chat right now but not actually sure why we are asking NAMA anything about the possibility of their selling their loan. If they have obligations under the facility Agreement then I am sure they will be only too well aware of them. I would therefore be inclined to exclude any reference to this.*" Mr Hennebry responded to say that the reference to the notification period was to put NAMA on notice of what the company expected. The following morning Mr Hennebry and Mr Mowatt spoke and Mr Mowatt expressed the view, as Mr Hennebry recorded in an email to Mr Faber, "*that there is little point in telling NAMA their duties under the facility agreement*". It appears from an email which Mr Seal sent to Mr Faber in the afternoon of 19 August 2011 that he had told Mr Hennebry "*that it was futile to raise the issue of debt sale and their obligations*".

521.    In the light of this Mr Hennebry saw little point in sending a letter to NAMA at all and this prompted Mr Cunningham to ask why no letter had been sent.  In that context, Mr Seal emailed Mr Hennebry on 21 August 2011, saying "*it was indeed only after seeing the draft letter prepared by DLA that I thought it inadvisable to include reference to the NAMA debt. Agreeing to review a draft is not of itself agreement to send the letter. Being cognisant of the fact that a letter was to be sent I thought it best just to include the reference to the our [sic] disappointment in their decision not to consider an extension beyond the end of September and to reject the mezzanine proposal. If you recall it was you who told me that if that was all that was to be said that it was best not to send the letter at all. That was your decision and not mine. I would ask you to make that perfectly clear to Liam*".

522.    In his witness statement, Mr Mowatt says in relation to the draft letter circulated by Mr Hennebry that he thought demanding four weeks' notice from NAMA of any assignment of the loan was unrealistic and "*had the potential negatively to affect negotiations between Coroin and NAMA*". He further says that he believed that it was futile to ask who NAMA were negotiating with. In his witness statement Mr Seal says that he regarded the inclusion of the request for information with regard to negotiations and for a four week consultation period as inappropriate. He states that NAMA was under no obligation to comply with these requests and would simply reject them. He continues "*I was concerned that the inclusion of these matters in a letter would present Coroin in an uncommercial light and might have a detrimental impact in the context of the important and delicate negotiations between Coroin and NAMA regarding the possibility of extending Coroin's loan facility*".

523.    Looked at objectively, it would in my judgment be reasonable for Mr Seal and Mr Mowatt to form these views. The company had already put to NAMA a refinancing proposal which the directors appointed by the Barclay interests regarded as so

unattractive commercially to NAMA as to be bound to be rejected. NAMA was clearly not required to answer the questions which Mr Hennebry proposed should be asked and it could be thought unlikely that they would answer them. Making such a request was unlikely to advance negotiations between the company and NAMA. The concerns expressed by Mr Seal and Mr Mowatt in their witness statements were borne out by the very short response of NAMA when Mr McKillen himself raised these questions with them.

524.    At the same time, it must be acknowledged that MFL had made an approach to NAMA on 9 August 2011 with a view to a possible purchase of the NAMA debt and had chosen not to disclose the approach to the company. They would therefore have an interest in preventing the company from asking the question which might elicit that very information.

525.    In deciding whether Mr Seal was motivated by a desire to conceal the Barclay interests' negotiations with NAMA or, alternatively, by a view that this was an unwise letter for the company to send to NAMA at this time, there are two striking points. First, there is internal email communication between Mr Seal, Mr Mowatt and Mr Faber and in none of those emails is there any indication that the letter should be amended with a view to preventing disclosure of the Barclay interests' discussions with NAMA. On the contrary, Mr Seal emailed on receipt of the first draft of the letter on 16 August 2011: "*It seems a nonsense to write to NAMA in terms as suggested*". Secondly, Mr Mowatt was involved in the discussions about the terms of the letter and indeed talked directly to Mr Hennebry about the draft letter. Mr Mowatt's evidence that he believed it to be futile to ask NAMA who they were negotiating with was not challenged.  Thirdly, the oral offer made by Mr Peters to NAMA on 9 August 2011 was rejected by NAMA the following day.  No further offer or approach was made until the written offer on 7 September 2011.  Mr Hennebry's draft letter was not prepared at a time of continuing communication between MFL and NAMA.

526.    I accept the evidence of Mr Seal and find that in proposing amendments to the draft letter, he was not motivated by a desire to conceal the discussions taking place between the Barclay interests and NAMA.

527.    If a letter had been sent to NAMA, asking whether it was in negotiation for a sale of the debt and, if so, with whom, it is clear from its response to Mr McKillen's letter that NAMA would not have answered it.  Even if it had said that it was in discussions with MFL, the company would not, for reasons later given, have been able to change the course of events.  The company and its members suffered no loss or prejudice.

*Dismissal of Mr Hennebry*

528.    On 9 September 2011 Mr Hennebry's consultancy contract with the company was terminated. The decision was taken by Mr Faber, Mr Seal, Mr Mowatt and Mr Alden. The petition alleges that the decision was taken without good reason and without any reference to the board or attempt to convene a board meeting and during a crucial period of negotiation between the company and NAMA. It is alleged that the decision was not taken in the best interests of the company. As Mr Hennebry acted as a liaison officer between the company and its shareholders, it is

alleged that the shareholders had a legitimate expectation that they would all first be consulted before he was dismissed. The petition alleges that the decision to dismiss Mr Hennebry was intended to exclude Mr McKillen and obstruct his involvement in the company.

529. In his witness statement Mr Hennebry described his role between May 2004 and September 2011 as "*the asset manager and shareholder representative*" for the company. From 2004 until early 2010 he was employed by Mr Quinlan's asset management companies. The role of asset manager was, he describes in his witness statement, to be responsible to the shareholders for management of the hotels, dealing with many aspects of the business including ownership and real estate aspects, annual budgets and capital expenditure plans. As shareholder representative, he attended company board meetings and his role was to liaise between the company and its shareholders. In 2008, the vice-president of finance of the company left and was not replaced. Some of his responsibilities were taken up by Ms Walker and a financial controller, but, Mr Hennebry explains in his witness statement, in view of his background in finance and accounting, he took on more aspects of a chief financial officer's role.

530. In early 2010 Mr Hennebry established his own advisory firm, Cadence Advisory Limited, which contracted with the company for the provision of his services. Under the terms of the consultancy contract, Mr Hennebry's company was paid a fee of over £20,000 per month and a bonus of £200,000 was paid in March 2011. The services provided under the consultancy agreement were set out in the schedule to the agreement and they are stated to be "*to act as the representative for the Company's shareholders and in this respect provide, as requested, financial and asset management consultancy services to the Company and any other Group companies*". A number of specific matters are then set out including budget review, leases, banking and legal matters, general corporate matters and business development. Paragraph 2 of the schedule stated that the consultant will report to the shareholders as required.

531. The idea of terminating Mr Hennebry's contract appears first to have surfaced on 17 August 2011 in an email from Mr Faber to Mr Seal and Mr Mowatt. The email chain concerned a proposal to pay some intra-group dividends. There was some frustration at this time amongst those directors as regards this and one or two other issues. In the email sent by Mr Faber he says "*We should think about changing DLA and Mark* [Hennebry] *in the coming days. Will make our lives considerably easier*". It next surfaced in a text sent by Sir David Barclay to Mr Faber. The time and date of the text is unknown but it was during the period when consideration was being given to engage Goldman Sachs to advise the company. The text reads "*Agreed. Its better we run the Goldman process and fire Hennebry. That way u can brief them. Also we don't have to appoint Goldman. We can appoint anyone*".

532. The decision to terminate Mr Hennebry's contract was taken at a meeting on 8 September 2011 attended by Mr Faber, Mr Seal, Mr Mowatt and Mr Alden. Mr Alden was asked whether the company needed Mr Hennebry's services and whether it would cause the company any difficulties if his contract was terminated. Mr Faber, Mr Seal and Mr Mowatt are unanimous in their evidence that Mr Alden was clear that Mr Hennebry was not needed by the company. Mr Faber's evidence is that Mr Alden said "*It was beyond him what Mr Hennebry was supposed to be doing*

*and he and the office had little or no involvement with him".* According to Mr Mowatt, Mr Alden's opinion was that Mr Hennebry was surplus to requirements and had no real role in the business.

533. So far as Mr Hennebry's role as shareholder representative was concerned, the view of Mr Faber, Mr Seal and Mr Mowatt was that it had become redundant. The role may well have had some real content at a time when the shareholders were a disparate group, some of whom played little or no part in the management of the business. With the sale of Misland to the Barclay interests and the sale by Mr McLaughlin of his shares, the situation had changed. Neither Mr McKillen nor the Barclay interests, nor Mr Quinlan for that matter, needed Mr Hennebry to act as their representative in dealings with the company. They were all well capable of direct involvement with the company's affairs.

534. As regards the services provided directly to the company, Mr McKillen stresses in particular his role in representing the company in its dealings with NAMA. For reasons which were for the most part outside the control of Mr Hennebry, it was the view of Mr Faber and the others that Mr Hennebry was unable to make any impact in this role. Mr Hennebry was unable to make any headway in raising outside finance while the disagreement between the shareholders continued. In the absence of firm proposals to refinance the debt, he was not in a position to achieve anything of substance for the company in its dealings with NAMA, which by now was not interested in any long term extension to the debt.

535. Looked at objectively, it was in my judgment a view which a director could reasonably come to that the expense of continuing to engage Mr Hennebry was no longer justified. Mr Mowatt gave direct and impressive evidence as to his thinking on this topic. He made clear that he was principally swayed by the views of Mr Alden. I am satisfied that he voted in favour of the termination of Mr Hennebry's contract only because he was persuaded by what Mr Alden said that there was no point in its continuation.

536. It is not clear to me how the sectional interests of the Barclay interests were particularly advanced by the removal of Mr Hennebry. They were able to pursue their negotiation with NAMA and a variety of other third parties for a long period before 9 September 2011 without Mr Hennebry's position causing any difficulties. If one then examines the course of events following 9 September it is difficult to see that Mr Hennebry's removal made any difference.

537. While Mr Faber accepts that he perceived Mr Hennebry to be in some degree in Mr McKillen's camp, and felt no doubt that it would be convenient if Mr Hennebry was no longer involved, I am satisfied that there were grounds on which the directors could and did reasonably conclude that it was in the company's interests to terminate his contract and that therefore the decision to terminate the contract was not a breach of duty.

538. The manner in which the decision was taken, at a meeting at which no notice was given to Mr McKillen or Mr Cunningham, is unquestionably a matter which is open to criticism. However, the subject was raised at a duly convened board meeting held on 21 September 2011. The issue was discussed and Mr Cunningham proposed the reinstatement of Mr Hennebry, a resolution which was defeated. As Mr McKillen

accepted in evidence, it would have made no difference to the course of events if he had been given notice of and attended the meeting on 9 September 2011. I should add that it does not seem to me that there is anything in the allegation that the decision to dismiss Mr Hennebry was intended to exclude Mr McKillen or obstruct his involvement in the company. It made no difference to Mr McKillen's ability to participate, either himself or through Mr Cunningham in the affairs of the company.

*Security held by Ellerman over Mr Quinlan's shares*

539.   This relates to the debt due to BOSI secured on part of Mr Quinlan's shareholding which was purchased by Ellerman at the end of January 2011. The allegation pleaded in the petition is that Mr Faber, Mr Seal and Mr Mowatt failed to disclose to the company or the other directors that the security over these shares had become enforceable. In his closing submissions, Mr McKillen abandons the claim as against Mr Seal and Mr Mowatt. The claim is maintained against Mr Faber, the allegation being that he knew that the security had become enforceable by July 2011 but failed to disclose it. The result was that the directors did not have the opportunity of determining whether to deem a transfer notice to have been given in respect of Mr Quinlan's shares.

540.   In the light of my decision that the security in favour of BOSI over Mr Quinlan's shares had not become enforceable, it follows that this claim must fail.

*Non-Disclosure of the Barclay interests' negotiations with NAMA*

541.   I have in the chronological section set out the sequence of events as it applies to the attempts by the Barclay interests to purchase the NAMA debt. Serious consideration of this possibility began towards the end of May 2011 when Mr Peters on behalf of the Barclay interests started negotiations with Barclays Bank with a view to an appropriate facility and MFL was identified as the company which might borrow the necessary funds and purchase the NAMA debt. Negotiations to this end with Barclays Bank and HSBC continued through June and July 2011. Discussions were started with NAMA on 9 August 2011 and after something of a lull over the holiday period resumed in earnest with MFL's offer letter sent on 7 September 2011. That offer was rejected as was an attempt to repeat it. Finally, agreement was reached between the parties on or about 26 September 2011. MFL's negotiations with NAMA were conducted by Mr Peters. Although Mr Faber texted Mr Hennigan on 5 August 2011 to suggest a meeting, this was not followed up and Mr Faber did not participate in the negotiations with NAMA which were initiated by Mr Peters on 9 August 2011.

542.   It is alleged that each of Mr Faber, Mr Seal and Mr Mowatt failed to disclose to the company that MFL was in negotiations with NAMA to acquire the NAMA debt and were accordingly in breach of their duties as directors to the company.

543.   The case is summarised in paragraph 58(g) and set out more fully in paragraphs 68A – 68F of the petition. Paragraph 58(g) alleges that Mr Faber, Mr Seal and Mr Mowatt failed to disclose to the company that MFL was in negotiation with NAMA to acquire the company's debts, and were throughout 2011 involved as directors of the company in relation to the company's own negotiations with NAMA in

circumstances where they had a conflict of interest.  Though linked, this involves two separate alleged breaches of duty, as later appears.

544.    Paragraph 68A alleges that representatives of the Barclay interests including MFL and Mr Faber had been in negotiations with NAMA in relation to the acquisition of the company's debt from January 2011 onwards.  As appears from the chronological section and the section dealing with NAMA, I do not accept that negotiations with NAMA for a purchase of the debt started before early August 2011.

545.    Paragraph 68A.1 pleads: *"The true motivation of the Barclay Brothers in seeking to acquire the NAMA debt was to further the Scheme to acquire ownership and control of the Company, by enforcing the debt or using the threat of enforcement to force a dilutive rights issue."*  In support of this allegation, reliance is placed on the negotiations with Barclays Bank in June and July 2011 for a facility to enable the debt to be acquired or repaid, Mr Faber's memorandum dated 1 August 2011 to Sir David Barclay and a further memorandum dated 8 August 2011 from Mr Faber to Sir David Barclay.

546.    Paragraphs 68B and 68C plead that Mr Faber, Mr Seal and Mr Mowatt were aware of the negotiations to acquire the company's debt and the alleged true motivation in doing so.  As regards Mr Seal and Mr Mowatt, reliance is placed on the fact that they were sent a copy of Mr Faber's memorandum of 1 August 2011.  As regards Mr Faber, reliance is placed on the memoranda written by him and on the more general proposition that:

> *"Mr Faber was one of the principal investment managers working for the Barclay Brothers and Barclay Interests in relation to the potential acquisition of ownership and control of the Company from April 2010 onwards."*

547.    Paragraph 68D alleges the following breaches of duty.  First, sub paragraph (a) alleges that Mr Faber, Mr Seal and Mr Mowatt failed to disclose to the company or to the other directors that NAMA was prepared to sell the debt to whoever was prepared to pay the asking price.  Pausing there, it will be apparent from the chronological section and the section dealing with NAMA that this is an unsustainable allegation.  It was clearly known to all concerned, including in particular Mr McKillen, that NAMA was very ready to sell the debt as a means of realising its value.  Sub paragraph (a) continues that they were in breach of duty in failing to disclose that MFL (and Mr Faber) was engaged in negotiations to acquire the NAMA debt *"for the purpose of furthering the Barclay Brothers desire to obtain ownership and control of the Company"*.  Secondly, sub paragraph (b) alleges that Mr Faber, Mr Seal and Mr Mowatt were as directors of the company involved in discussions relating to the company's own negotiations with NAMA in circumstances where they had a plain conflict of interest which was not disclosed to the board and where the only appropriate course for them would have been to disclose the conflict of interest and absent themselves from board discussions or to resign their positions as directors of the company.

548.    Further breaches are alleged against Mr Faber.  First, in paragraph 68D(a) it is alleged that he participated in MFL's negotiations with NAMA and in the scheme for the acquisition of the company of the NAMA debt and sought to further that

scheme to the detriment of the company. Secondly, paragraph 68D(c) pleads that Mr Faber's text message to Mr Hennigan on 5 August 2011 in effect encouraging Mr Hennigan to ignore the letter shortly to be sent by Mr Hennebry on behalf of the company was a breach of duty by Mr Faber as a director of the company.

549.    The loss or prejudice flowing from these alleged breaches of duty is pleaded as follows in paragraph 68F:

> "*Had the company or its board of directors been made aware of the above matters prior to 27 September 2011, it could and would have explored alternative means of re-financing the debt owed to NAMA. It would have concluded that it was not in the interests of the Company or its members as a whole (or its members including Mr McKillen) that its debt should be acquired by a vehicle of the Barclay Brothers rather than an independent and responsible lending institution.*"

550.    It is submitted that, if well founded, these allegations involve the breaches of two separate duties on the part of the directors. The first, in reliance on *Scottish Co-operative Wholesale Society v Meyer* [1959] AC 324 and *Whillock v Henderson* [2009] BCC 314, is put in Mr McKillen's closing submissions as follows: "*failure of this kind by directors to inform their co-directors or take steps to protect the company where they are aware that it has suffered or is about to suffer damage will amount to a breach of duty that comprises relevant conduct of the company's affairs*". This is an aspect of the duty of directors under section 172 of the Companies Act 2006 to act in the way they consider in good faith would be most likely to promote the success of the company. I understand the directors to accept that this duty may give rise to an obligation on directors to disclose to the company matters of which they are aware. Reference can also be made to *British Midland Tool Ltd v. Midland International Tooling Ltd* [2003] 2 BCLC 523 and *Shepherds Investments Ltd v. Walters* [2007] 2 BCLC 202. The second duty is the duty set out in section 175 to avoid conflicts of interest. Even without the alleged detrimental purpose of the intended acquisition of the NAMA debt, the fact that MFL was negotiating to acquire the debt conflicts with the company's own negotiations with NAMA. Assuming that Mr Faber, Mr Seal and Mr Mowatt had competing interests or duties in their capacities as directors or executives of companies within the Barclay interests, they were under a duty to disclose the relevant facts. The breaches alleged against Mr Faber alone engage both of these duties.

551.    It is necessary to take each of the elements in this part of the case in turn.

552.    First, it is beyond dispute that in June and July 2011 the Barclay interests were considering seriously the possibility of buying the NAMA debt, as an alternative to re-financing it, and had engaged in serious negotiations with Barclays Bank and HSBC for a facility to enable it to do so. It is further beyond dispute that from about 9 August 2011 the Barclay Interests actively pursued with NAMA a purchase of the debt.

553.    The acquisition of the NAMA debt by the Barclay Interests was not intrinsically detrimental to the company or its interests. NAMA was a creditor with a statutory objective and single-minded purpose to achieve full recovery of the indebtedness as

soon as possible.  By August 2011, it was not inhibited in how it did so by having any equity interest in the company, as had been the case earlier in 2011.  It did not mind who it sold the debt to, nor were there any commercial reasons why it should not, if necessary, enforce the debt.  As against NAMA, it could well be beneficial to the company if the debt were held instead by a substantial shareholder.  The benefit to the company would not come from the possibility that a shareholder would be a more indulgent creditor than NAMA or any other holder of the debt.  It could not be expected that a new holder of the debt including a shareholder would tolerate a lengthy extension of the debt in circumstances where all were agreed that the company was seriously over-indebted.   What might be expected is that the shareholder holding the debt would present the company with the opportunity of re-financing the debt in the obvious way, that is to say by a rights issue.

554.   As I have elsewhere observed, the position facing the company at this stage was that it had no prospect of raising the funds necessary to reduce its borrowings except by the injection of new capital.  As Mr Cunningham made clear in his correspondence with Mr Faber, Mr McKillen did not object to an injection of capital from a new investor but he did object to the capital being provided by the existing shareholders.  This is a surprising position.  Unless there are good reasons justifying a different approach, the opportunity of providing new capital should, both commercially and legally, be first offered to the existing equity holders.  Shareholders have statutory pre-emption rights over the issue of new shares for cash, which may be removed or modified only by the articles of association or a special resolution:  sections 560-577 of the Companies Act 2006.  Further, it is a requirement of the shareholders agreement that all new shares be offered first to the existing shareholders:  clause 5.

555.   Mr McKillen alleges that the Barclay interests would use the NAMA debt to force a dilutive rights issue.  The reference to *"a dilutive rights issue"* is not entirely clear.  Dilution will always occur where a shareholder does not take up his rights in a rights issue. If the word "dilutive" is to have any real meaning in this context, it must be a rights issue at an unjustifiably low price, thereby increasing the number of shares to be issued, in circumstances where it was known or anticipated that one or more of the shareholders (in this case Mr McKillen) would not take up his rights. The same would be true of a rights issue at a proper price in circumstances where it was not reasonably believed that a rights issue was necessary or desirable but was instead motivated by a desire to dilute those shareholders who it was known or anticipated would not take up their rights. In those circumstances rights issues may constitute breaches of duty and unfairly prejudicial conduct: see *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] AC 821, *In re A Company* (1986) 2 BCC 99453, [1986] BCLC 430 (CA), *In re A Company* [1986] BCLC 362 at 366-367. The evidence and in particular the memorandum produced by Mr Faber in August 2011 on which Mr McKillen relies, does not in my judgment establish that the Barclay interests had in mind a dilutive rights issue in either of these senses. They certainly had in mind a rights issue and had in mind that Mr McKillen might well not wish or be able to take up his rights but it does not follow that a rights issue would be improper. Indeed, as I say elsewhere, a rights issue was an obvious and legitimate means of providing a solution to the financial problem faced by the company at that time.

556.   The next issue is the knowledge of the individual directors.  Clearly they can only disclose what they know.

557.   As Mr McKillen's closing submissions acknowledge, the position is rather different as regards each of the directors.  Of the directors Mr Faber was the most involved. He had a strategic role in advising on, and implementing, the Barclay interests' plans to obtain control of the company. It was in that capacity that he prepared the memorandum dated 1 August 2011 for Sir David Barclay which specifically addressed the acquisition of the NAMA debt. Mr Faber acknowledges that he was aware that Mr Peters was conducting negotiations with Barclays Bank and HSBC in June and July 2011 and that from early August negotiations were under way between Mr Peters on behalf of MFL and NAMA. For the most part he was not closely concerned with those negotiations but he certainly knew of their existence and that their purpose was to acquire the NAMA debt before its maturity on 30 September 2011.

558.   Mr Seal's involvement was more remote than that of Mr Faber, but he acknowledges that he knew that Mr Peters was negotiating both with banks from June 2011 and subsequently with NAMA.  He knew that the negotiations with the banks in June-July 2011 were for the grant of a facility to MFL with the purpose of either purchasing the NAMA debt or a loan by MFL to the company to enable it to repay NAMA.  Neither of these alternatives in June-July 2011 was regarded as being the primary purpose.  They were genuine alternatives of equal weight.  Mr Seal resigned as a director of MFL on 14 June 2011, to avoid a conflict of interest as director of the company, because either alternative, if pursued, would involve a conflict.  Mr Seal knew that in late July and early August 2011, with the bank facility agreed in principle, Mr Faber, Sir David Barclay and Mr Peters were considering the next steps to be taken by the Barclays interests.  He accepted in evidence that he was kept in the loop.  Mr Faber sent his memorandum dated 1 August 2011 to Mr Seal.  I find that Mr Seal  read it carefully, as appears from his email of 2 August 2011 with its reference to "*a cold towel job*" and a detailed query arising from page 5 of the memorandum. I reject Mr Seal's evidence that he gave it just "*a cursory glance*".  The memorandum informed Mr Seal of the possibilities being considered, but not the course that would be followed.   Mr Seal's evidence, which I accept, is that he was unaware of the offer made on 7 September 2011 by MFL to purchase the debt and that when the purchase of the NAMA debt was made on 27 September 2011 it came as something of a surprise to him.  I also accept his evidence that:

> "*I knew they were talking.  I had no knowledge of how close or otherwise they were or that a deal could have been done with both the funders for MFL or the Barclay company, as well as NAMA's agreement to sell.  As I said earlier, I doubted whether NAMA would actually agree to assign the debt.*"

This does however show, as does other evidence, that Mr Seal knew that negotiations were taking place with NAMA and that a purchase of the NAMA debt was one of the main alternatives, albeit that he doubted whether NAMA would sell the debt.  This, as it seems to me, is a sufficient degree of knowledge to have put Mr Seal in a position of conflict, given his duties to the Ellerman group companies.

559.    Mr Mowatt's knowledge and involvement was a good deal less than that of Mr Seal. In this context, it is important to note that Mr Mowatt's involvement in the management of the Telegraph Media Group meant that he spent a lot of time at its offices and rather less at the St James's Street offices.

560.    Mr Mowatt knew that MFL had been formed as a possible vehicle to help refinance the company and he resigned as a director on 14 June 2011 on the advice of Mr Seal. I accept Mr Mowatt's evidence that Mr Seal told him no more than at some point there could be financing arrangements involving MFL and the company. Given that Mr Mowatt was only peripherally involved in this part of the business, there was no particular reason why he should be told or request more details.

561.    There is no evidence that Mr Mowatt was aware of the negotiations with Barclays Bank or other banks in June-July 2011, and I accept Mr Mowatt's denial in evidence of any knowledge of them.

562.    Mr Faber sent his memorandum dated 1 August 2011 to Mr Mowatt. Mr Mowatt's evidence was that he read it. He regarded it as a document prepared before the August holidays for Sir David Barclay to read, in which Mr Faber hypothesised on the various options open in relation to the company. This is consistent with Mr Faber's covering email, that he was "*trying to highlight some of the possibilities and obstacles we face*". He thought that it was sent to him so as to brief him on what was going on. He was not otherwise aware of what was happening or being considered. He did not receive any further documents and he did not discuss it with Mr Faber or Mr Peters. I accept his evidence. I also accept his evidence that he did not know of the negotiations with NAMA or the offer to it, and that he first learnt of them on 27 September 2011. There is no evidence to the contrary, and Mr Mowatt's evidence on this, as on other matters, was given in a direct and convincing manner.

563.    In my judgment, Mr Mowatt knew nothing which could give rise to a duty of disclosure to the company. He did not know that a decision to make an offer to NAMA or even to start negotiations had been taken, he did not know that there were any negotiations or offers, nor did he know of negotiations with banks for a facility.

564.    The position is different with Mr Faber and Mr Seal. Each knew that MFL was negotiating with NAMA. Mr Faber knew that the negotiations were for the purchase of the debt and Mr Seal knew that a purchase of the debt was a real possibility. If a duty of disclosure arose as regards these matters, their knowledge was sufficient for the duty to apply to them. They were each asked why they had not disclosed these matters. Mr Seal did not see why the company would need to know about discussions with NAMA. Mr Faber was clear in his view as to why he chose not to disclose the negotiations to the board. It was "*because this was patently something I felt would be in the company's best interests, but not necessarily something Mr McKillen would like*".

565.    Mr McKillen's case is that the purpose of the Barclay interests in seeking to acquire the NAMA debt was to enforce the debt or use the threat of enforcement to force a dilutive rights issue, to the detriment of the company. In seeking to establish this case, heavy reliance is placed on documents produced in June 2011 in the context of the negotiations with Barclays Bank for a facility and on the memoranda prepared

by Mr Faber in early August 2011. Rather less attention is paid to the offer in fact made by MFL on 28 September 2011 immediately after it acquired the debt. It seems to me that what was in fact done is a better guide to whether damage to the company was planned than wide-ranging discussion documents prepared nearly two months earlier.

566.   It cannot be doubted that the documents on which Mr McKillen relies contain ideas which, if developed and implemented, would properly be seen as damaging to the company. One of the alternative plans put forward to Barclays Bank in June 2011 was that if the Barclay interests had "*not obtained control of a satisfactory amount of the shareholding of Coroin within [3] days Business Days of utilisation of the Facility then [MFL] shall appropriate the shares of the subsidiary companies of Coroin through the share charge contained in the existing debenture granted in favour of NAMA*". Likewise, Mr Faber's memorandum set out a number of alternative ways forward, including some which envisaged the appropriation of assets through foreclosure. At the same time Mr Faber warns of the legal and other difficulties which this course would involve.

567.   The closing submissions for the directors rightly emphasise that the duty under section 172 is subjective, to the extent that a director must act in the way he considers, in good faith, would be most likely to promote the interests of the company. The closing submissions cite the following passage from the judgment of Jonathan Parker J. in *Regenterest plc (in liquidation) v. Cohen* [2001] 2 BCLC 80 at para. 120. Although referring to the corresponding equitable duty, I agree that it is equally applicable to the duty under section 172:

> "*The question is not whether, viewed objectively by the court, the particular act or omission which is challenged was in fact in the interests of the company; still less is the question whether the court, had it been in the position of the director at the relevant time, might have acted differently. Rather, the question is whether the director honestly believed that his act or omission was in the interests of the company. The issue is as to the director's state of mind. No doubt, where it is clear that the act or omission under challenge resulted in substantial detriment to the company, the director will have a harder task persuading the court that he honestly believed it to be in the company's interests; but that does not detract from the subjective nature of the test.*"

568.   I have no difficulty in accepting Mr Faber's evidence that he genuinely believed that a rights issue would be in the best interests of the company. He denied in evidence that the plan was to acquire the debt and foreclose on it and the events after 27 September 2011 corroborate this denial.

569.   If, however, the intention had been to foreclose and appropriate the company's assets in that way, as some of the ideas mooted in Mr Faber's memorandum envisaged, it could not reasonably be seen as likely to promote the success *of the company* nor would I accept that Mr Faber, an intelligent and astute man, would think so. The last sentence of the passage from Jonathan Parker J's judgment is in point.

570.  It is clear that Mr Faber's memorandum is not a blueprint for action, but, as he said in his covering email to Mr Seal and Mr Mowatt, he was "*trying to highlight some of the possibilities and obstacles we face*".

571.  MFL's proposal on 28 September 2011 was for a 3 month extension to the existing facility on terms that it was "*to be reduced by way of the proceeds of an equity issue for the minimum sum of £200,000,000 (net) by no later than 12th December 2011*". Failure so to reduce the debt would be an event of default.

572.  Objections were taken to some of the other terms, such as some very substantial fees, and it may well be that they were well-grounded objections. Alvarez & Marsal certainly thought so, when they were appointed in early October 2011, with the concurrence of Mr Faber, Mr Seal and Mr Mowatt, as the company's financial advisers.

573.  In my judgment, however, the fundamental elements of the proposal, a 3-month extension and a requirement to reduce the debt by £200 million through an equity issue, could not be described as damaging or detrimental to the company. On the contrary, a reduction in indebtedness and an increase in capital was what the company had needed for well over a year, and what Mr McKillen himself had been negotiating for with the US equity funds in 2010 and with Al Mirqab in January-February 2011.

574.  My conclusion on this aspect of the claim is that the duty of a director to disclose actual or intended damage to the company and, in conjunction with the other directors, to take steps if practicable to prevent or mitigate the damage did not arise on the facts of this case.

575.  I move on to consider the claim of a breach of the duty stated in section 175(1) of the Companies Act 2006 to avoid a situation in which a director has, or can have, a direct or indirect interest that conflicts, or possibly may conflict, with the interests of the company. A conflict of interest includes a conflict of duties.

576.  It is not suggested that Mr Faber, Mr Seal or Mr Mowatt had a relevant personal interest. What is said is that their respective positions in and duties to the companies comprised in the Barclay interests conflicted with their duties to the company.

577.  It seems clear to me that there was the potential for conflict because MFL was negotiating to purchase the NAMA debt while the company was negotiating to extend or modify it. There was a direct competition.

578.  The issue is whether any of the directors owed conflicting duties. It is not sufficient, in my view, for the directors to look solely to the position of MFL, relying on the facts that it was not part of the Ellerman group, but was separately owned by the Barclay brothers, and that they had either, in the case of Mr Faber, never been a director of MFL or, in the case of Mr Seal and Mr Mowatt, had ceased to be directors on 14 June 2011, nearly two months before any negotiations with NAMA.

579.   MFL was not acting independently of the relevant Ellerman group companies but was acting in tandem with them, with a view to those companies obtaining control of the company.  The duty of the directors and executives of the relevant Ellerman companies, acting in the best interests of those companies, was to promote and advance the policy of obtaining control.  Steps taken by the company, or which should in its best interests be taken, to deal with and improve its position with NAMA would be likely to conflict with the interests of the Ellerman companies. For the directors common to both the company and the relevant Ellerman companies, there is a conflict of their duties.

580.   In my judgment, Mr Faber was in a clear position of conflict.  He was not a director of any of the companies which had bought Misland or the secured debts of Mr Quinlan.   He was however the executive with primary responsibility for implementing on behalf of all those companies the policy of obtaining control of the company, and he was well aware of the negotiations with NAMA.  Mr Seal, like Mr Faber, is a director of Ellerman Investments Limited, which is the management company for the companies comprising the Ellerman group.  His duty as such is therefore to promote and advance the interests of the companies managed by Ellerman Investments Limited.  Moreover, he had some involvement in, or was at least kept generally aware of, plans and transactions of the Ellerman group of companies as regards the company.  He too knew that there were negotiations with NAMA which could well involve a proposal to purchase the NAMA debt.  It follows that he too had a conflict of duties.

581.   Mr Mowatt is also a director of Ellerman Investments Limited but he had no involvement in, and knew little about, developments as regards the company. Specifically, he had no knowledge of the negotiations with NAMA.  There was no actual or potential conflict of which he was aware as regards dealing with NAMA, and there was accordingly no breach by him of the duty under section 175.

582.   It was submitted for the directors that section 175(1) did not apply by virtue of section 175(3) because the proposed transfer of the NAMA debt was "*a transaction or arrangement with the company*".  I reject this.  It was a transaction between NAMA and MFL, not with the company.  A sale of a debt due from the company is no more a transaction or arrangement with the company than a sale of shares in the company.  This would equally be true if NAMA had a duty under the facility agreement to give notice to and consult with the company before the assignment, but, following the decision of the Court of Appeal on the NAMA preliminary issue, not even that point arises.

583.   For the same reason, I do not consider that section 177 is in point, as it is solely concerned with interests of a director in a proposed transaction with the company. By reason of section 175(3), sections 175 and 177 are mutually exclusive.  It is not therefore relevant that the directors had made general declarations, as permitted by sections 177(2)(b) and 185, at various meetings of the company.  They did not in any event notify the company that Mr Faber and Mr Seal had a conflict of interest arising not from a proposed transaction with the company but from a proposed transaction between MFL and NAMA.  The specific declaration relating to MFL made at the board meeting on 27 September 2011 was too late and in any event could not satisfy section 175.

584. Likewise, the exemption from the obligation to give notice under section 177 created by section 177(b), where the other directors are already aware of the relevant director's interest, does not apply. Knowledge on the part of Mr McKillen might nonetheless be relevant to his case of unfair prejudice and I refer to this below.

585. In my judgment, Mr Faber and Mr Seal were in breach of duty under section 175 as a result of the conflict created by MFL's negotiations with NAMA. I do not consider that a breach occurred at the earlier stage when Mr Peters for MFL was negotiating with banks for a facility. Plans were then too uncertain. They were at an exploratory stage. No decision had been taken, even in principle, to seek to purchase the NAMA debt and, until a facility could be agreed at least in principle, it was premature to do so. It is noticeable that the decision-making process was not undertaken until early August 2011, after agreement in principle with Barclays Bank in late July 2011. In any event, Mr McKillen's case rests on MFL's negotiations with NAMA: see paragraph 58(g) of the petition.

586. The issue then is whether this breach caused any prejudice to Mr McKillen, which I address in the section of this judgment dealing with unfair prejudice.

587. There are two allegations of breach of duty made solely against Mr Faber.

588. First, it is alleged that Mr Faber participated in MFL's negotiations with NAMA and that he sought to further the scheme for the acquisition of the NAMA debt to the detriment of the company. I reject this allegation. First, Mr Faber did not participate in the negotiations with NAMA. The nearest he got to it was his text to Mr Hennigan on 5 August 2011 suggesting a meeting which did not take place. Secondly, for the reasons already given, MFL's acquisition of the debt was not detrimental to the company.

589. Secondly, it is alleged that Mr Faber acted in breach of duty when he sent a text to Mr Hennigan on 5 August 2011, advising him to ignore the letter to be sent by Mr Hennebry on behalf of the company with the proposal for NAMA to take a junior position with part of their debt and for repayment of the balance. Mr Faber did this because he thought the proposal was "*ridiculous*" and I am inclined to agree with him. But it cannot be right for a director secretly to interfere in this way with what the company is doing. The right course was to explain to Mr Hennebry and the other directors why it was a ridiculous step for the company to take. Mr Faber's text went further and encouraged NAMA not to grant an extension to the debt beyond 30 September 2011. I am satisfied that Mr Faber genuinely believed that an extension would not help the company because it would simply lead to a further delay in dealing with the need for new capital, but this text is a clear illustration of his conflict of duties.

590. Having said that, I am satisfied that it caused no loss. It is clear that NAMA would have rejected the proposal without any prompting from Mr Faber. It was also not, as I have found, going to grant a further extension.

591. Finally, there is an allegation against all three directors that they breached the duty under section 173 to exercise independent judgment. This is based on the allegation

that they acted on the instructions of Sir David Barclay, and that he was accordingly a shadow director, an allegation to which I now turn.

**Was Sir David Barclay a shadow director?**

592.    Among the many amendments which Mr McKillen applied to make to his petition shortly before trial was an allegation that Sir David Barclay was a *de facto* or shadow director of the company. I refused permission to include the allegation that he was a *de facto* director on the grounds that the matters relied on to support it could not make out a sustainable case, but I did permit an amendment to allege that Sir David Barclay was a shadow director: see  [2012] EWHC 521 (Ch) at para 14-78.

593.    A shadow director is a "*person in accordance with whose directions or instructions the directors of the company are accustomed to act*": section 251(1) of the Companies Act 2006. By section 251(2) a person is not to be regarded as shadow director *"by reason only that the directors act on advice given by him in a professional capacity"*. The general duties of directors specified in section 171 to 177 of the Companies Act 2006 apply to shadow directors *"where, and to the extent, the corresponding common law rules or equitable principles so apply"*: section 170(5). The extent to which those rules and principles apply has been the subject of differing decisions at first instance: see *Yukong Line of Korea Ltd v Rendsburg Corp Investment of Liberia Inc* [1998] 1 WLR 294 and *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch).

594.    In order to make out the case that Sir David Barclay was a shadow director of the company, it is necessary for Mr McKillen to establish that the directors of the company were accustomed to act in accordance with his directions. It is not necessary that all the directors should so act.  It is sufficient if it is a majority that does. The instructions must of course be given to them so as to affect their decisions as directors.

595.    Much of the closing submissions of counsel for Mr McKillen on this topic is devoted to establishing not that Mr Faber and other directors acted in their capacity as such on the instructions of Sir David Barclay but that decisions of the Barclay interests as shareholders of the company were directed or influenced by Sir David Barclay. Save in the general sense there were circumstances in which Mr Faber and others would consult Sir David Barclay and act in accordance with his wishes and directions, this is irrelevant to a case of shadow directorship. Mr McKillen must show that Mr Faber and others acted in their capacity as directors of the company in accordance with the instructions of Sir David Barclay.

596.    The allegation that he was a shadow director is shortly stated in paragraph 60A of the petition and supported by the matters set out in schedule B to the petition. Paragraph 1 of schedule B lists seven matters from which it is to be inferred that Mr Faber, Mr Seal and or Mr Mowatt acted in accordance with the instructions of Sir David Barclay. They are:  the closure of the data room, the failure to disclose that Mr Quinlan's shareholder security had become enforceable, the appointment of JLL, the blocking of the redevelopment of two hotels, Mr Seal's position in relation to the letter to NAMA prepared by Mr Hennebry on 16 August 2011, the dismissal of Mr Hennebry and the failure of the directors in question to disclose MFL's

negotiations with NAMA in the course of August and September 2011. The allegation of blocking the redevelopment of two hotels can be disregarded because that allegation has been abandoned. Paragraphs 2 to 5 of schedule B rely on the communications between Sir David Barclay and Mr Faber and the other directors in August and September 2011  in relation to the proposal to appoint Goldman Sachs as financial advisers to the company. Paragraph 6 of schedule B refers to various matters, principally relating to Mr Quinlan and his alternate Mr Murphy.

597.   There is, in my judgment, no evidence to support the allegations that the following matters were directed by Sir David Barclay or indeed that he had any knowledge of them: the closure of the data room, the appointment of JLL, the position taken by Mr Seal in relation to the draft letter to NAMA in mid-August 2011 and the alleged failure to disclose that the shareholder security granted by Mr Quinlan had become enforceable. As to the last of those matters, I have held that the security had not become enforceable. Sir David Barclay of course knew of the negotiations with NAMA to acquire the NAMA debt but there is no evidence of any instruction or involvement on his part as to whether those negotiations should or should not be disclosed by Mr Faber or Mr Seal to the other directors of the company.

598.   This leaves only the dismissal of Mr Hennebry and the appointment of Goldman Sachs. There was communication between Mr Faber and Sir David Barclay on the appointment of Goldman Sachs. Sir David took the view, as in fact did Mr Faber, that the appointment of Goldman Sachs was pointless in that the company would in any event be unable to raise the funds required to refinance the NAMA debt. Nonetheless, Mr Faber, Mr Seal and Mr Mowatt thought there was merit in the particular circumstances in agreeing the appointment of Goldman Sachs. The emails between them undoubtedly disclose a concern that they should not proceed with the appointment of Goldman Sachs against the opposition of Sir David Barclay. They argued their corner with him and ultimately he appears reluctantly to have withdrawn his opposition. These events show some independence on the part of the directors. If they had simply been accustomed to act in accordance with the instructions of Sir David Barclay they would presumably have simply refused to consent to the appointment of Goldman Sachs. What is certainly clear is that the appointment of Goldman Sachs was not the result of instructions to those directors by Sir David Barclay. What is said is that the withdrawal of Sir David's opposition was on terms that Mr Hennebry would be dismissed. It is then said that Mr Hennebry was dismissed on Sir David's instructions. I do not accept this. I am satisfied that Mr Faber, Mr Seal and Mr Mowatt reached their own decision that the contract with Mr Hennebry's company should be terminated. They did so only after discussing the position with Mr Alden and, particular in the case of Mr Mowatt, I am satisfied that Mr Alden's views were decisive.

599.   It follows that none of the matters relied on at paragraph 1 or paragraphs 2-5 of schedule B can establish the case that Sir David Barclay was a shadow director of the company.

600.   As regards paragraphs 6 of schedule B, I shall refer first to those matters which do not principally concern Mr Quinlan and/or Mr Murphy. The allegation that Mr Faber was the principal representative of the Barclay interests in their negotiations to acquire Misland and in negotiations with Mr Quinlan, and the extent to which he acted in those respects on instructions from Sir David Barclay, are irrelevant to