# EXHIBIT 25 PART 4

whether Sir David Barclay was a shadow director of the company. They do not relate to any activity on the part of Mr Faber in his capacity as a director of the company. Likewise, whether he was appointed by Misland as a director of the company on the instructions of Sir David Barclay is irrelevant because it does not concern Mr Faber's actions in his capacity as a director of a company. Statements that the company or its board were under the control of the Barclay interests do not constitute instances of instructions being given by Sir David Barclay to Mr Faber and other directors and, in a case where there has been so much evidence, they cannot form the basis for some general inference.

601. The other matters relied on in paragraph 6 of schedule B relate principally to relations between the Barclay interests on the one hand and Mr Faber and Mr Murphy on the other. General statements of support for the Barclay interests or the Barclay brothers made by Mr Murphy in text messages do not establish that instructions were given by Sir David Barclay to Mr Quinlan or Mr Murphy as to how they were to act as directors of the company, nor are any pleaded. The matters relied on other than general statements of support are as follows. First, reference is made to Mr Faber asking Mr Murphy to support the registration of Ellerman as the holder of shares held by Mr Quinlan to secure his debt to BOSI which was assigned to the Barclay interests. There is no evidence of any involvement by Sir David Barclay in this. Secondly, in May 2011 when Mr Faber asked Mr Murphy whether Mr Quinlan would be willing to convert his loan stock to non-voting shares, Mr Murphy replied *"We are happy to take your instructions on this."* This concerned Mr Quinlan's position as an investor in the company, not his actions as a director, and in any case there is no evidence of instructions coming from Sir David Barclay. Thirdly, when on 5 May 2011 Mr Murphy received an email from the solicitors for Wynton asking whether Mr Quinlan would be interested in starting discussions to sell his shares, Mr Murphy asked Mr Faber in an email what they should do and told Sir David in a further email "We will be guided by you and RM". This also concerned Mr Quinlan's position as a shareholder in the company and the response from the Barclay side was, not surprisingly, that Mr Quinlan was bound by the 17 February agreement. Fourthly and finally, it is alleged that Mr Quinlan's decision to resign as a director was in fact taken as a result of instructions from Sir David and Sir Frederick Barclay. Even if true, this would be irrelevant. The instructions needed to constitute Sir David Barclay a shadow director were instructions to Mr Quinlan on the exercise of his powers and duties as a director, not how he was to take his own personal decision whether to resign as a director.

602. My overall conclusion is that there is no evidence of any substance to support Mr McKillen's case that Sir David Barclay was a shadow director of the company. In those circumstances it is unnecessary to consider legal issues as to what duties he would have owed, if my conclusion had been different.

**Contractual obligations of good faith**

603. Clause 8.5 of the shareholders agreement provides as follows:

> *"8.5 Each of the Shareholders agree that:*
> *8.5.1 during the continuance of this Agreement all transactions entered into between any of them or any company controlled by them on the one hand and the Group on the other shall be conducted in*

> *good faith and on the basis set out or referred to in this Agreement or, if not provided for in this Agreement as may be agreed by the parties and in the absence of such agreement on an arm's length basis;*
>
> *8.5.2 each of them shall at all times act in good faith towards the others and shall use all reasonable endeavours to ensure the observance of the terms of this Agreement;*
>
> *8.5.3 no party will seek to increase its profit or reduce its loss at the expense of another; and*
>
> *8.5.4 each of them will do all things or [sic] desirable to give effect to the spirit and intention of this Agreement."*

604. Express obligations of good faith in contracts governed by English law remain relatively unusual. There has been some, but only limited, analysis in the cases as to the effect of such clauses. I was referred to a number of English and Australian authorities either directly concerned with contractual obligations of good faith or relating more generally to obligations of good faith. Rather than try to elucidate the general principles applicable to such obligations or to analyse clause 8.5 in general terms, I propose to go straight to the specific allegations of breach of clause 8.5 made by Mr McKillen. For the reasons which appear when considering those alleged breaches, this is not a case in which it is necessary to subject the clause to a general analysis.

605. It is of course elementary that the clause binds only parties to the shareholders agreement. The allegations made by Mr McKillen are therefore confined to allegations against Misland and Mr Quinlan. None of these allegations was contained in the petition as originally presented. An allegation that Misland was required to offer its shares round to the other shareholders after it had been purchased by the Barclay interests was added only after Mr McKillen failed on the preliminary issue to establish that the sale of Misland triggered the pre-emption provisions. The remaining allegations against Misland and all the allegations against Mr Quinlan were added by amendment shortly before the trial.

606. The allegations against Mr Quinlan are contained in paragraphs 42E-42G. In paragraph 42E it is alleged that *"in giving assistance and support to the Barclay brothers in furthering their Scheme to obtain control of the Company to the detriment of Mr McKillen, Mr Quinlan was in breach of the obligations owed by Mr Quinlan"* under clause 8.5, in the following respects.

607. First, Mr Quinlan or his alternate used Mr Quinlan's powers as a director *"for the collateral purpose of advancing the interests of the Barclay brothers and/or adversely to affect the interests of Mr McKillen as pleaded at paragraph 37a above."* Paragraph 37a is concerned with the closure of the data room. I have already dealt with that issue and held that it did not involve any breach of duty nor did it adversely affect the interests of Mr McKillen.

608. Secondly, it is alleged that Mr Quinlan or his alternate discharged his functions as a director *"on the instructions of a third party with whom he had entered into his own*

*commercial arrangement, rather than in accordance with the purposes for which they were conferred, as pleaded at paragraph 37 above.*" Only two instances of Mr Quinlan acting as a director on the instructions of the Barclay interests are pleaded in paragraph 37. The first is the closure of the data room to which I have just referred. The second is agreeing to the release of Deutsche Bank from any obligations owed to the company. I have earlier dealt with that matter and found that it involves no breach of duty. I do not accept on the evidence that it is correct to say that Mr Quinlan acted on the *"instructions"* of the Barclay interests but even if it were, there can be no damage to Mr McKillen if the only instances of acting on such instructions involved no breach of Mr Quinlan's duties as a director.

609. The only other matters pleaded in paragraph 37 are not instances of Mr Quinlan acting on the instructions of the Barclay interests but are of statements made by Mr Faber to the effect that the Barclay interests had an *"alliance"* with Mr Quinlan such that they could control the board votes. However, I have earlier drawn attention to another internal communication from Mr Faber where he makes clear that the Barclay interests are dependent upon the agreement of Mr Quinlan to vote in the same way as the Barclay interests. Assuming for a moment that the Barclay interests were in practice able to control Mr Quinlan's votes as a director, a breach could arise only when that control is exercised to dictate Mr Quinlan's vote on an issue or other action as a director.

610. Thirdly, paragraph 42E alleges that Mr Quinlan assisted the Barclay brothers in promoting a scheme calculated to reduce the prospects of other shareholders, and in particular Mr McKillen, receiving the best price for their shares and/or obtaining investment in the company on terms that they consider advantageous and/or were prepared to agree by reason of the matters pleaded at paragraph 33D(e),(g),(l-n) and 37a and b above. I have already dealt with the matters pleaded in paragraph 37a and b and they do not establish the point here sought to be made. Paragraph 33D(e) pleads the conference call on 15 January 2011 when Mr Murphy, on Mr Quinlan's behalf, Mr McKillen and Mr McLaughlin orally agreed that they would enter into an exclusivity agreement with Al Mirqab and later that day Mr Quinlan signed instead the exclusivity agreement with the Barclay interests. It then pleads that it is to be inferred Mr Quinlan entered into the exclusivity agreement in performance of the agreement reached with Sir David Barclay in October 2010. I have already held that the exclusivity agreement was not in performance of any arrangement reached with Sir David Barclay in 2010. Mr Quinlan was not bound to enter into the proposed exclusivity agreement with Al Mirqab and I do not understand how he can have been inhibited in agreeing to an exclusivity agreement with a different party, in this case the Barclay interests. He plainly was not prohibited from doing so by the other terms of the shareholders agreement and a prohibition to that effect cannot in my judgment be spelt out of clause 8.5. Mr Quinlan was as free to enter into an exclusivity agreement with the Barclay interests as Mr McKillen was with Al Mirqab.

611. Paragraph 33D(g) alleges that the Barclay brothers gave personal assistance to Mr Quinlan and his family *"to induce Mr Quinlan to sell his shares to the Barclay brothers for his personal advantage rather than to Al Mirqab or any other investor irrespective of whether this was part of an arrangement that would have been acceptable to and for the benefit of all shareholders in the Company and in the*

*interests of the Company itself.*" I have earlier found that there was no agreement that the Barclay brothers would provide assistance to Mr Quinlan and his family in consideration for any agreement by Mr Quinlan as regards his shares. I accept that Mr Quinlan must have realised that if he acted in relation to his shares in a way which was contrary to the wishes of the Barclay brothers, then he would be running a risk that they would cease or reduce the assistance they provided. If he had entered into an agreement for the disposal of his shares then the pre-emption provisions would have been triggered. If he has not entered into any agreement as regards his shares which triggers the pre-emption articles, he remains bound by the pre-emption provisions as and when he does so. I do not understand how he can be in breach of an obligation of good faith in these circumstances if he has an understanding with the Barclay brothers as to the use and retention of his shares which is neither prohibited by the other terms of the shareholders agreement nor triggers the pre-emption provisions.

612. Paragraph 33D(l)-(n) concern the making by Mr Quinlan of the 17 February agreement. This is contrasted with the offer made by Wynton which was accepted by Mr McLaughlin in respect of his small holding of shares. I have already dealt with these events. I have found, contrary to the allegation in paragraph 33D(n), that the 17 February agreement was not in accordance either with any agreement reached with Barclay brothers in October 2010 or in accordance with any subsequent agreement for the transfer of Mr Quinlan's shares. The 17 February agreement was expressly conditional on compliance with the shareholder's agreement, i.e. with the pre-emption provisions, and it is in my view not sustainable to argue that it involved a breach of clause 8.5.

613. It follows that there is no factual basis for the allegations made in support of the general averment contained in paragraph 42E. Paragraph 42E(b) alleges that Mr Quinlan concealed or failed to disclose the true and full arrangements between him and the Barclay brothers or Barclay interests. Those arrangements are said to include the agreement with Sir David Barclay reached in October 2010, the 17 February agreement and the power of attorney granted in May 2011. It is alleged that he was under an obligation to disclose them by reason of clause 8.5.2 because such arrangements "*would be material to Mr McKillen's decisions in relation to his own dealings with his shares in the company*". Mr McKillen has not attempted to make good how such disclosure would have affected his decisions in relation to his own dealings with his shares in the company. As regards the 17 February agreement, Mr Quinlan knew following the making of the tri-partite agreement in Doha on 12 February 2011 that the Barclay interests would be acquiring Mr Quinlan's shares. The 17 February agreement, conditional as it was on compliance with the pre-emption provisions, was clearly a step in achieving that agreed object.

614. Paragraph 42E(c) alleges that in accepting the payments and benefits from the Barclay brothers in return for support and assistance in transferring effective ownership and control of his shares in the company to the Barclay brothers in a manner designed to avoid triggering the pre-emption provisions and thereby preventing him from exercising his pre-emption rights, Mr Quinlan "*sought to profit at the expense of Mr McKillen*" in breach of clause 8.5.3. The short answer to this point is that such arrangements as were made did not avoid the pre-emption provisions. As I have just mentioned the pre-emption provisions continued to apply

such that as and when Mr Quinlan disposed or agreed to dispose of his shares, the pre-emption provisions would be triggered. The same is true of the allegation contained in paragraph 42E(d) that in entering into arrangements designed to transfer effective ownership and control of his shares without triggering the pre-emption provisions Mr Quinlan was in breach of his obligations in clauses 8.5.2 and 8.5.4.

615. Paragraph 42F asserts that rather than entering into "*arrangements designed to transfer effective ownership and control of his shares without triggering the pre-emption provisions*" Mr Quinlan was bound by clauses 8.5.2 and 8.5.4 to offer his shares in the company for sale to the other shareholders. In my judgment, an obligation to act in good faith towards the other parties and an obligation to do all things necessary or desirable to give effect to the spirit and intention of an agreement cannot be relied on to extend the scope of the express pre-emption clause, properly construed. In construing the terms of the pre-emption provisions, the court is seeking to give effect to the intention of the parties. To impose a wider set of pre-emption requirements would be to go beyond the intentions of the parties as expressed in their agreement. In my judgment, this would be a clear misuse of the obligations contained in clause 8.5.

616. Paragraph 42G asserts that in order to comply with clause 8.5.2, Mr Quinlan was obliged to inform the company and its shareholders of circumstances indicating that security over his shares had become enforceable. I have already held that the security over Mr Quinlan's shares did not become enforceable.

617. The case against Misland alleges five breaches of clause 8.5, although little is said about them in Mr McKillen's closing submissions.

618. First, Misland is said to be in breach by failing to offer its shares to the other shareholders after it was bought by the Barclay interests. For the same reasons in relation to the similar claim against Mr Quinlan, I do not think this is sustainable. It does not assist to say that Misland disposed of its other assets just prior to the sale, as it was clearly free to do so.

619. Secondly, it is alleged that Misland exercised its rights as a shareholder not for the shareholders' common purpose but in accordance with the wishes and for the benefit of the Barclay interests. No details are given of the occasions when Misland exercised its rights as a shareholder and I am not aware of any, except the appointment of Mr Faber and the acceptance of the pre-emption offer of Mr McLaughlin's shares, which Mr McKillen declined. There is nothing in this allegation.

620. Thirdly, Misland permitted Mr Faber as its appointed director to conduct the affairs of the company in the interests of the Barclay brothers, not in the interests of the company. Leaving aside whether Misland "*permitted*" Mr Faber to act in any particular way as a director, I have rejected the allegations of breach of duty against Mr Faber, save as regards his non-disclosure of a conflicting duty from which no loss to the company or Mr McKillen flowed.

621. Fourthly, Misland failed to disclose the true nature of the relationship between Mr Quinlan and the Barclay interests of which it must have been aware. Leaving aside

how it is said that Misland had such knowledge, and given that the arrangements did not trigger the pre-emption provision, I fail to see how clause 8.5 could have required their disclosure. All that is said is that it was material to Mr McKillen's decisions in relation to his dealings with his shares, but it is not explained how or what difference disclosure would have made.

622. The fifth allegation, that Misland failed to disclose that Mr Quinlan's security had become enforceable, must in any event fail in the light of my decision on that issue.

623. Sixthly, the failure to inform the company or its directors or Mr McKillen of the intention to acquire the NAMA debt or the true motivation for it. In the section on unfair prejudice, I hold that the company and Mr McKillen suffered no loss or prejudice from the non-disclosure of the intention to acquire the NAMA debt and the negotiations with NAMA, and I have earlier held that the true motivation was not as alleged by Mr McKillen. His case is not improved by alleging the non-disclosure to be a breach of clause 8.5.

**Unfair prejudice: the Law**

624. The jurisdiction of the court to grant relief in respect of unfairly prejudicial conduct in relation to a company is entirely statutory. It was first introduced by section 75 of the Companies Act 1980 and was re-enacted as sections 459-461 of the Companies Act 1985. It is now contained in sections 994-999 of the Companies Act 2006. Its essential elements have remained unchanged. The grounds on which the jurisdiction may be invoked are set out in section 994(1) which permit a member of a company to apply to the Court for relief on the ground:

> "(a) that the company's affairs are being or have been conducted in a manner that is unfairly prejudicial to the interests of members generally or of some part of its members (including at least himself), or
>
> (b) that an actual or proposed act or omission of the company (including an act or omission on its behalf) is or would be so prejudicial."

625. The petitioner must therefore establish that, first, the matters of which he complains are either actual or proposed acts or omissions of the company or consists of the conduct of the company's affairs; secondly, that those matters have caused prejudice to his interests as a member of a company; and thirdly, that the prejudice is unfair. I will take each of these elements in turn.

*The company's affairs*

626. The purpose of the jurisdiction is to provide remedies in respect of the way in which the affairs of the company are conducted. It was perceived prior to the enactment of section 75 of the Companies Act 1980 that there was insufficient protection to shareholders in that respect. The section is not directed to the activities of shareholders amongst themselves, unless those activities translate into acts or omissions of the company or the conduct of its affairs. Relations between

shareholders inter se are adequately governed by the law of contract and tort, including where appropriate the ability to enforce personal rights conferred by a company's articles of association. This important distinction has been emphasised in many of the authorities. In re *Legal Negotiators Limited* [1999] BCC 547 the Court of Appeal upheld the decision of Peter Goldsmith QC, sitting as a deputy Judge of the Chancery Division, to strike out a petition under section 459 of the Companies Act 1985 as unsustainable. Peter Gibson LJ at page 550 summarised the judgment below, with which he said he completely agreed. He said that the Judge

> "reviewed the authorities from which he drew two points of significance for the case before him. The first was that the starting point was to consider what the parties had agreed between themselves as their commercial relationships, though he recognised this not need always be contained in the articles of association. The second was that the essence of the powers under s.459 is to give a remedy where there is complaint about the way the company's affairs are being conducted through the use (or failure to use) powers in relation to the conduct of the company's affairs provided by its constitution. He regarded the section as concerned with the company's affairs rather than the affairs of individuals and to be concerned with acts done by the company or those authorised to act as its organs".

At page 551, Peter Gibson LJ said:

> "Thus, like the Judge I too would lay emphasis on the need to show that it is the affairs of the company which are being or have been conducted in an unfairly prejudicial manner or that it is an act or omission of the company that is or would be so prejudicial. The conduct of a member of his own affairs, for example by requesting a general meeting of the company or seeking answers to an excessive number of questions, is irrelevant".

I would only add that the refusal by a company to convene a general meeting would be an act of the company, although whether it was either unfair or prejudicial would of course depend on the circumstances. Other authorities in which the same distinction had been drawn include *In re Unisoft Group Limited (No. 2)* [1994] BCC 766, *In re Estate Acquisition and Development Limited* [1995] BCC 338 and *In re Leeds United Holdings Limited* [1997] BCC 131.

627. Counsel for Mr McKillen submitted that *Blackmore v Richardson* [2006] BCC 276 demonstrated that dealings by shareholders concerning their shares may be part of the affairs of the company and found a claim of unfair prejudice. In my judgment, his submission is not borne out by that authority. The case concerned a company with three shareholders which took over a business previously run by them in partnership. An outsider made an offer to purchase all the shares of the company, which was accepted by two of the shareholders. A board meeting was held at which the offeror and his associate were appointed directors and the share transfers by the two selling shareholders were approved. At a board meeting two days later, the third shareholder who was the petitioner was suspended and requested not to attend the company's premises. The Judge held that the acts complained of were unfairly prejudicial conduct, by reference to the basis upon which the parties had gone into

business and converted their business into a company. It was not the dealings between the shareholders alone which brought the case within the jurisdiction conferred by section 459. The Judge at first instance, HHJ Wyn Williams QC (as he then was), referred to the requirement that the petition must be founded upon the conduct of the affairs of the company and said at paragraph 88 of his judgment (October 2004 unreported):

> *"In my judgment, it is impossible in the factual context of this case to separate the sale of their shares which in itself and standing alone could be construed as the purely private business of the first two Respondents, from the steps associated with it which amounted to the conduct of the affairs of the Company. I refer, here, principally to the meetings which were called and conducted on the 23 and 24 June 2002".*

Moreover there had been a serious attempt to exclude the petitioner from the management of the company, contrary to the understanding on which the shareholders had formed the company. This part of the decision below is summarised in paragraph 21 of the judgment of Lloyd LJ in the Court of Appeal, but, as he records, permission to appeal against that part had been refused.

628. The Court will not adopt a technical or legalistic approach to what constitutes the affairs of the company but will look at the business realities. It was held by the Court of Appeal in *Rackind v Gross* [2005] 1 WLR 305 that the affairs of a company could include the affairs of a wholly-owned subsidiary which had common directors. If the affairs of the subsidiary are being conducted in a manner which damages the subsidiary and hence the value of the holding company's interest in the subsidiary, then the omission of the directors of the holding company to take steps to rectify the situation seems to me plainly capable of falling within section 994(1). Likewise, where the directors of a partly owned subsidiary nominated by the holding company permitted the holding company to build up a business at the expense of the subsidiary's business, which was allowed to wither, without taking any steps to protect the subsidiary's position, they were engaged in the conduct of the affairs of the subsidiary: *Scottish Co-operative Wholesale Society Limited v Mayor* [1959] AC 324. See also the decision of Court of Session (Outer House) in *Whillock v Henderson* [2009] BCC 314.

629. By way of conclusion on this aspect, guidance was given by the Court of Appeal in *In re Neath Rugby Ltd (No.2)* [2009] 2 BCLC 427 where at para. 50 of a judgment with which the other members of the Court agreed, Stanley Burnton LJ said:

> *"The judge cited the observations of Powell J in Re Dernacourt Investments Pty Ltd (1990) 2 ACSR 553:*
>
>> *The words "affairs of a company" are extremely wide and should be construed liberally: (a) in determining the ambit of the "affairs" of a parent company for the purposes of s 320, the court looks at the business realities of a situation and does not confine them to a narrow legalistic view; (b) "affairs" of a*

> *company encompass all matters which may come before its board for consideration; (c) conduct of the "affairs" of a parent company includes refraining from procuring a subsidiary to do something or condoning by inaction an act of a subsidiary, particularly when the directors of the parent and the subsidiary are the same ...*
>
> *I would accept these propositions, but with some qualification. (b) may extend to matters which are capable of coming before the board for its consideration, and may not be limited to those that actually come before the board: I do not accept that matters that are not considered by the board are not capable of being part of its affairs. Nonetheless, like the judge, I am unable to see how it can be said that the affairs of Neath and of Osprey were so intermingled that all of the affairs of the latter were the affairs of the former. It would, for example, be quite irrational to suggest that Mr Blyth, when acting as a director of Osprey, was conducting the affairs of Neath."*

It no doubt goes without saying that the affairs of the company will also encompass matters which must go to the company in general meeting, rather than the board, for consideration.

*Prejudice*

630. Prejudice will certainly encompass damage to the financial position of a member. The prejudice may be damage to the value of his shares but may also extend to other financial damage which in the circumstances of the case is bound up with his position as a member. So, for example, removal from participation in the management of a company and the resulting loss of income or profits from the company in the form of remuneration will constitute prejudice in those cases where the members have rights recognised in equity if not at law, to participate in that way. Similarly, damage to the financial position of a member in relation to a debt due to him from the company can in the appropriate circumstances amount to prejudice. The prejudice must be to the petitioner in his capacity as a member but this is not to be strictly confined to damage to the value of his shareholding. Moreover, prejudice need not be financial in character. A disregard of the rights of a member as such, without any financial consequences, may amount to prejudice falling within the section.

631. Where the acts complained of have no adverse financial consequence, it may be more difficult to establish relevant prejudice. This may particularly be the case where the acts or omissions are breaches of duty owed to the company rather than to shareholders individually. If it is said that the directors or some of them had been in breach of duty to the company but no loss to the company has resulted, the company would not have a claim against those directors. It may therefore be difficult for a shareholder to show that nonetheless as a member he has suffered prejudice. In *Rock (Nominees) Limited v RCO Holdings Plc* [2004] BCC 466 the respondent directors of the company procured the sale of an asset to a company of which they were also directors. It was alleged to be a sale at an undervalue and procured in

breach of the respondent directors' fiduciary duties to the company. The evidence established that the price paid was not an undervalue but was the best price reasonably obtainable, and the Court of Appeal upheld the decision at first instance that no prejudice had been caused to the petitioner. At paragraph 79 of this judgment, with which the other members of the Court agreed, Jonathan Parker LJ said;

> " As to the judge's finding of breach of fiduciary duty on the part of the respondent directors, it is plain that, as the judge found, the respondent directors were "in a position of hopeless conflict". Further, they would undoubtedly have been well advised to obtain an independent valuation. However, no harm was in fact done and no damage or prejudice was caused. Nor is there any question of the respondent directors being personally accountable in any way. That being so, it seems to me to be inappropriate to reach a conclusion that they breached their fiduciary duties, as it were, in the abstract".

*Unfairness*

632. On the difficult concept of fairness, the Court has the authoritative guidance given by the House of Lords in *O'Neill v Phillips* [1999] 1 WLR 1092 and the Court of Appeal in *In re Saul D Harrison & Sons Plc* [1995] 1 BCLC 14. The passage from the speech of Lord Hoffmann in *O'Neill v Phillips* is so central to a consideration of these issues that I consider it right to set it out in full:

> "5. "Unfairly prejudicial"
>
> In section 459 Parliament has chosen fairness as the criterion by which the court must decide whether it has jurisdiction to grant relief. It is clear from the legislative history (which I discussed in In re Saul D. Harrison & Sons Plc. [1995] 1 B.C.L.C. 14, 17-20) that it chose this concept to free the court from technical considerations of legal right and to confer a wide power to do what appeared just and equitable. But this does not mean that the court can do whatever the individual judge happens to think fair. The concept of fairness must be applied judicially and the content which it is given by the courts must be based upon rational principles. As Warner J. said in In re J. E. Cade & Son Ltd. [1992] B.C.L.C. 213, 227: "The court . . . has a very wide discretion, but it does not sit under a palm tree."
>
> Although fairness is a notion which can be applied to all kinds of activities, its content will depend upon the context in which it is being used. Conduct which is perfectly fair between competing businessmen may not be fair between members of a family. In some sports it may require, at best, observance of the rules, in others ("it's not cricket") it may be unfair in some circumstances to take advantage of them. All is said to be fair in love and war. So the context and background are very important.
>
> In the case of section 459, the background has the following two features. First, a company is an association of persons for an economic

*purpose, usually entered into with legal advice and some degree of formality. The terms of the association are contained in the articles of association and sometimes in collateral agreements between the shareholders. Thus the manner in which the affairs of the company may be conducted is closely regulated by rules to which the shareholders have agreed. Secondly, company law has developed seamlessly from the law of partnership, which was treated by equity, like the Roman societas, as a contract of good faith. One of the traditional roles of equity, as a separate jurisdiction, was to restrain the exercise of strict legal rights in certain relationships in which it considered that this would be contrary to good faith. These principles have, with appropriate modification, been carried over into company law.*

*The first of these two features leads to the conclusion that a member of a company will not ordinarily be entitled to complain of unfairness unless there has been some breach of the terms on which he agreed that the affairs of the company should be conducted. But the second leads to the conclusion that there will be cases in which equitable considerations make it unfair for those conducting the affairs of the company to rely upon their strict legal powers. Thus unfairness may consist in a breach of the rules or in using the rules in a manner which equity would regard as contrary to good faith.*

*This approach to the concept of unfairness in section 459 runs parallel to that which your Lordships' House, in In re Westbourne Galleries Ltd. [1973] A.C. 360, adopted in giving content to the concept of "just and equitable" as a ground for winding up. After referring to cases on the equitable jurisdiction to require partners to exercise their powers in good faith, Lord Wilberforce said, at p. 379:*

> *"The words ['just and equitable'] are a recognition of the fact that a limited company is more than a mere legal entity, with a personality in law of its own: that there is room in company law for recognition of the fact that behind it, or amongst it, there are individuals, with rights, expectations and obligations inter se which are not necessarily submerged in the company structure. That structure is defined by the Companies Act [1948] and by the articles of association by which shareholders agree to be bound. In most companies and in most contexts, this definition is sufficient and exhaustive, equally so whether the company is large or small. The 'just and equitable' provision does not, as the respondents [the company] suggest, entitle one party to disregard the obligation he assumes by entering a company, nor the court to dispense him from it. It does, as equity always does, enable the court to subject the exercise of legal rights to equitable considerations; considerations, that is, of a personal character arising between one individual and another, which may make it unjust, or inequitable, to insist on legal rights, or to exercise them in a particular way."*

> *I would apply the same reasoning to the concept of unfairness in section 459. The Law Commission, in its report on Shareholder Remedies (Law Com. No. 246) (1997) (Cm. 3769), para. 4.11, p. 43 expresses some concern that defining the content of the unfairness concept in the way I have suggested might unduly limit its scope and that "conduct which would appear to be deserving of a remedy may be left unremedied. . ." In my view, a balance has to be struck between the breadth of the discretion given to the court and the principle of legal certainty. Petitions under section 459 are often lengthy and expensive. It is highly desirable that lawyers should be able to advise their clients whether or not a petition is likely to succeed. Lord Wilberforce, after the passage which I have quoted, said that it would be impossible "and wholly undesirable" to define the circumstances in which the application of equitable principles might make it unjust, or inequitable (or unfair) for a party to insist on legal rights or to exercise them in particular way. This of course is right. But that does not mean that there are no principles by which those circumstances may be identified. The way in which such equitable principles operate is tolerably well settled and in my view it would be wrong to abandon them in favour of some wholly indefinite notion of fairness."*

633. To similar effect is the judgment of Hoffmann LJ in *In re Saul D Harrison & Sons Plc* where he makes clear that the starting point in any case under section 994 is to ask whether the conduct complained of was in accordance with the basis upon which the petitioner agreed that the affairs of the company would be conducted and that, in most cases, this basis is adequately and exhaustively laid down in the articles of association, the material statutory provisions and sometimes in collateral agreements between the shareholders. It is equally well established that it is not every breach of the articles or shareholders agreement which will constitute unfair prejudice.

**Conclusions on Mr McKillen's case on unfair prejudice**

634. It follows that Mr McKillen must establish conduct of the affairs of the company, or acts or omissions of the company, which have caused prejudice to his interests as a member in a manner which the law recognises as unfair. To the extent that his case is founded on breaches of the articles of association, breaches of the shareholders agreement or breaches of duty by the directors, the element of unfairness may be established.

635. For part of his case, however, Mr McKillen relies also on legitimate expectations of participation in the management of the company. In my judgement, this is not sustainable. The importance of the passage from the speech of Lord Wilberforce in *In re Westbourne Galleries Ltd* cited by Lord Hoffmann in *O'Neill v Phillips* is that it indicates the circumstances in which reliance may be placed on equitable considerations (Lord Hoffmann deprecates the use of the expression 'legitimate expectations', regretting that he introduced it into this area of the law: see p.1102) as giving rise to a possible case of unfair prejudice. It is very important to note that in that passage, having identified that the structure of a company is defined by company law and the articles of association, Lord Wilberforce observed that;

> *"In most companies and in most contexts, this definition is sufficient and exhaustive, equally so whether the company is large or small."*

Equitable considerations, affecting the manner in which legal rights can be exercised, will arise only in those cases where there exist considerations of a personal character between the shareholders which makes it unjust or inequitable to insist on legal rights or to exercise them in particular way. Typically that will be in the case of a company formed by a small number of individuals on the basis of participation by all or some of them in the management of the company.

636. In my judgment, there is no room for equitable considerations of this kind in the present case. The company was formed by a group of highly sophisticated and experienced business people and investors with a view to the purchase of a well-known group of hotels for a price running into many hundreds of millions of pounds and to retaining and managing some of those hotels. There was little prior relationship between many of the investors and some were unknown to each other until a few days before the company was formed. More importantly, articles of association and a shareholders agreement were negotiated and drafted, containing lengthy and complex provisions governing their relations with each other and with the company. I find it hard to imagine a case where it would be more inappropriate to overlay on those arrangements equitable considerations of the sort discussed by Lord Wilberforce and Lord Hoffmann.

637. This part of Mr McKillen's case arises in relation to his allegation that he has been unfairly prejudiced by exclusion from participation in management. His right to participate in the management of the company is defined by his right as the holder of a particular class of shares to appoint a director to the board of the company. He exercised that right by appointing himself and by appointing Mr Cunningham as his alternate. There has been no interference with that right and no interference with the rights of either Mr McKillen, or in his absence, Mr Cunningham to attend board meetings. On the contrary, they, but mainly Mr Cunningham, have attended all or most of the board meetings held since the purchase of Misland by the Barclay interests. It is clear from the evidence that Mr McKillen and Mr Cunningham have been in no respect inhibited from exercising their rights as directors and from arguing their position. Mr McKillen submits that he has been put in a position of being a permanent minority because directors appointed by the Barclay interests and by Mr Quinlan formed a majority. But there is clearly nothing in the articles or the shareholders agreement which entitles directors to more than the votes at board meetings conferred on them by the shareholders agreement. Nor do the articles or the shareholders agreement prohibit particular groups of shareholders from co-operating with each other unless they have done so in a way which triggers the pre-emption provisions or which constitutes in some way a breach of the obligations of good faith to which I shall later return. The fact that the directors appointed by the Barclay interests and Mr Quinlan may take a position different to that of Mr McKillen does not involve any exclusion of Mr Quinlan or any unfairness unless the position which they take is taken in breach of their duties as directors.

638. Mr McKillen relies on unguarded comments made by Mr Faber in some internal emails to the effect that Mr McKillen's life would be made hell at board level and

that they should do all that they could to make him uncomfortable. That is not, however, the way in which board meetings have in fact taken place. There appears to have been every opportunity for proper discussion at those meetings and it is clear that Mr Cunningham, who for the most part has attended them, has quite properly taken advantage of those opportunities.

639. The matters relied on by Mr McKillen as constituting unfairly prejudicial conduct of the affairs of the company or acts or omissions of the company are summarised in paragraphs 933-959 of his closing submissions. A substantial part of Mr McKillen's case is based on the allegation that a transfer notice should have been given or deemed to have been given in respect of Mr Quinlan's shares. As I read paragraphs 933-946 they are all based on that proposition, except paragraph 941 which concerns the alleged analogous duty arising under the express contractual duty of good faith. I have found that there were no events which triggered the pre-emption provisions, whether under clause 6.6 or 6.17 of the shareholders agreement. If I had found that a transfer notice should have been given or a directors' meeting called to determine whether a transfer notice should be deemed to be given under clause 6.6, some potentially difficult issues would arise as to the nature of the case made by Mr McKillen under section 994. The obligation of a shareholder to give a transfer notice is a personal obligation of the shareholder which is enforceable against him by the other shareholders. The failure of a shareholder to give a transfer notice is not of itself conduct of the affairs of the company or an act or omission of the company. Something more is needed to bring the case within section 994. I would accept that where the directors or a majority of the directors knew that events had occurred which triggered the power of the board to make a determination whether to deem a transfer notice to have been given under clause 6.6 of the shareholders agreement, the failure to do so could properly be described as an omission of the company. If such a meeting had been held and there was a realistic prospect that the board would have determined the transfer should be deemed to be given, then I would accept also that members who may thereby have been deprived of the opportunity of a pre-emption offer may have suffered relevant prejudice. However, in the light of my findings, it is unnecessary for me to analyse whether such a case is pleaded or made out on the evidence.

640. Paragraph 941 and 949-952 of Mr McKillen's closing submission address his case under section 994 based on breaches of the duty of good faith and other provisions of clause 8.5. I have earlier held that there were no breaches of those obligations.

641. Mr McKillen relies on the alleged breaches of duty by the directors as causing or resulting in unfair prejudice to his interests as a member. Plainly the decisions of directors as such involve the conduct of the affairs of the company and if those decisions are reached by the directors or a majority of them in breach of duty and result in prejudice to the member or to the interests of a member then the fact of the decisions being in breach of duty will supply the necessary element of unfairness. I have elsewhere examined the alleged breaches and concluded that, save in one respect, the allegations are not made out. Moreover, on the facts, none of those breaches resulted in any prejudice to Mr McKillen's interests as a member. The closure of the data room had no effect either on the making of offers to the company and its members, principally by the Qataris and Wynton, or on the way in which those offers were considered by the shareholders. The appointment of JLL to

produce a revised valuation of the hotels was approved by the board of the company which approved also the payment of JLL's fee. The company received JLL's valuation report. Mr Seal's encouragement to Mr Hennebry not to write to NAMA on or about the 16 August 2011 in terms which referred to consultation prior to a transfer of the debt and asking whether NAMA was in discussions in relation to a transfer of the debt had no impact on the course of events in August and September 2011 as between the company and NAMA. Likewise, the termination of the company's contract for the provision of Mr Hennebry's services, apart from saving the company the fees payable under that contract, had no impact on the company or its business and in particular had no impact on the course of events as regards the company and NAMA.

642. I have concluded that Mr Faber and Mr Seal were in a position in August and September 2011 where their duty to the company as directors conflicted with their duties as executives of the Ellerman Group and that disclosure should have been made of this conflict. I am satisfied that the failure to disclose this conflict of duties had no adverse impact on the company, and caused no prejudice to Mr McKillen. The same would be true of the other breaches of duty if I had found them to be established.

643. The only prejudice pleaded in the section resulting from the allegations of breach of fiduciary duty is in paragraph 68F that "*Had the Company or its board of directors been made aware of the matters prior to 27 September 2011, it could and would have explored alternative means of refinancing the debt owed to NAMA. It would have concluded that it was not in the interests of the Company or its members as a whole or its members including Mr McKillen that its debt should be acquired by a vehicle of the Barclay Brothers rather than an independent and responsible lending institution*". The company was already exploring the alternative means of refinancing the NAMA debt. The problem was not that it did not know that it had to refinance the debt in short order, but that it was unable to do so. There certainly was not "*an independent and responsible lending institution*" available to provide the necessary finance.

644. The course of events would have been the same. It was impossible for the company to re-finance the NAMA debt without the active support of the Barclay interests. While the company could raise £450-500 million by way of senior debt in a conventional manner, the problem related to the balance. The balance could be raised either by new capital or by borrowing backed by guarantees or security on which the lenders would be prepared to rely. There is no evidence to suggest that any third party would be prepared to provide new capital without very substantial changes to the existing shareholdings. The Barclay interests were not sellers of Misland or the shares which it held in the company and there was no obligation on them to consider the sale of those shares. Unless Mr McKillen was prepared to contemplate a reduction in his share holdings and in effect a return to a deal such as that reached with the Qataris on 12 February 2011 there was no prospect of further capital, except by means of a rights issue but, as earlier mentioned, Mr McKillen would not agree to a rights issue.

645. As regards a loan to bridge the gap, the only source of the requisite security were the Barclay interests. In fact, the financing raised by MFL required the personal guarantees of Sir David and Sir Frederick Barclay. It goes without saying that they

would not be willing to provide a personal guarantee to secure loans to the company if they did not have control of the company. There was the theoretical possibility of some form of mezzanine financing but the proposals which were put forward in that respect, for example by Goldman Sachs, would have been very expensive. Morgan Stanley advised Mr Cunningham that the group's net earnings could not support mezzanine financing in full on an ongoing basis and that it would be necessary to capitalise some of the interest as part of the principal, which would further increase the cost. No case is pleaded nor has any attempt been made to establish that it would have been reasonable or sensible for the company or its shareholders to agree to the type of mezzanine financing that might have been available, still less that it would have been unreasonable to decline it.

646. A sale of assets would not provide the answer. First, Mr McKillen was opposed to a sale of any of the hotels, as Mr Cunningham made clear in his exchanges with Mr Faber in late August 2011. Secondly, the evidence shows that only a sale of Claridge's would release sufficient funds and that was not on the cards as far as anyone was concerned.

647. Mr McKillen's case repeatedly put in cross-examination was that Mr Faber and the other directors should have been pressing hard on behalf of the company for an extension of NAMA's debt by 2 years or at any rate by a substantial period. For the reasons which I give in the section on NAMA, it is in my judgment clear that NAMA was not prepared to grant any such extension but would almost certainly have allowed the facility to go into default on 30 September 2011 without granting any extension. Their often repeated concern was to see the debt repaid or sold at par as soon as possible. If MFL had not purchased it, NAMA is likely to have sought a sale to Wynton and Aabar or another third party. Wynton and Aabar ceased to be competitors only as a result of the deal with the Barclay interests in mid-September 2011.

648. The disclosure of the facts giving rise to the conflict therefore had in fact no impact either on what the company was able to do in relation to the NAMA debt or on what NAMA and MFL in fact did in relation to the NAMA debt. The position is the same as that which existed in *Rock Nominees Ltd v RCO (Holdings) Plc* and no prejudice to Mr McKillen's interests as a member arose as a result of this non-disclosure.

649. There is this further consideration. MFL's deal with NAMA was not a surprise to Mr McKillen. His evidence is that by 26 August 2011 rumours were rife that the Barclay brothers were negotiating with Barclays Bank to raise finance to purchase the NAMA debt. For that reason he wrote on 26 August 2011 to Bob Diamond, then the chief executive of Barclays Bank, requesting a meeting. The brief reply that there could be no meeting because Barclays Bank was conflicted can only have confirmed Mr McKillen's belief.

650. Notwithstanding this knowledge, as in effect it was, Mr McKillen did nothing to raise funds to meet the company's liability. Coming after months when no solution was found, it tends to confirm that even with formal disclosure by Mr Faber and Mr Seal, neither the company nor Mr McKillen could have found an alternative to MFL's purchase of the debt, followed by a rights issue.

651. A final but important point is that, even if Mr McKillen's case as to the true purpose of acquiring the NAMA debt were correct, the prejudice would lie not in MFL's acquisition of the debt but in what MFL and the company then sought to do. MFL was free of any contractual or other constraint on acquiring the debt and the acquisition would not involve conduct of the affairs of the company. If an ensuing foreclosure or a rights issue were in some way improper, a failure by the company to challenge the former or its agreement to the latter would constitute an omission or act respectively of the company potentially open to challenge under section 994. In that way, the real prejudice, if such it were, would be identified and addressed.

652. The section of the petition headed "*MFL Refinancing Demands*" refers in paragraphs 72 to 75 to the proposals made by MFL to the company on 27 and 28 September 2011 for refinancing the NAMA debt which it had by then acquired. Paragraph 76 sets out objections to those terms. Paragraph 78 alleges that "*Any agreement by the Company to the terms proposed by MFL or similar terms*" would in the circumstances be unfairly prejudicial to Mr McKillen's interest as a member of the company. It goes on to allege that the company should instead either challenge the assignment from NAMA or seek to establish whether improved terms were available from MFL or pursue alternative proposals for refinancing the debt.

653. In fact, matters have moved on considerably since the end of September. The board has engaged financial advisers and there have been extensive discussions between the directors and with third parties. So far as I am aware, there is no current proposal to proceed with a rights issue on the terms set out towards the end of September 2011 and these proceedings have not been concerned with and have not investigated whether the course of events since then has involved any unfairly prejudicial conduct of the affairs of the company.

**Tort claim**

654. In light of my findings and decisions on the breaches of contract and breaches of duty alleged in the petition, I can deal with the tort claim very shortly. It fails. First there have been no breaches of contract and only one breach of duty established. Secondly, Mr McKillen has suffered no loss from that one established breach of duty, nor would he if the other breaches had been established. Without loss, there is no tort. Thirdly, there is no evidence of a combination or agreement of the defendants that Mr Faber and Mr Seal should not disclose the existence of the negotiations with NAMA.

655. Many interesting issues on the limits to the tort of conspiracy to injure by unlawful means were discussed in submissions, such as whether a breach of contract can constitute unlawful means and the degree of knowledge on the defendants' part as to the unlawfulness of the means. A decision on these matters must await a case whose facts merit it. One finding I can and should make is that none of the defendants can have understood that any of their acts would breach clause 8.5 of the shareholders agreement, even assuming any of them had read it which I find highly unlikely with the possible exception of Mr Faber.

**Conclusion**

656. I wish to repeat the tribute previously paid to the solicitors and counsel engaged for all the parties. I gave directions at an early stage for a speedy trial and a very tight timetable for disclosure and the preparation of witness statements, both of which were very large tasks. The organisation of all the materials for trial was very impressive. The oral and written submissions were of the highest standard and all counsel were unfailingly helpful to me.

657. The overall conclusion is that Mr McKillen's petition and claim fail and will be dismissed. They fail because the alleged breaches of the pre-emption and other provisions in the shareholders agreement and the alleged breaches of duty by the directors are not established (save in one instance) and because Mr McKillen cannot establish any conduct of the affairs of the company which has been unfairly prejudicial to him.