# EXHIBIT 26



Neutral Citation Number: [2021] EWCA Civ 961

Case No: A3/2020/1072

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**PROPERTY TRUSTS AND PROBATE LIST (ChD)**
**Mr Justice Fancourt**
**[2020] EWHC 1407 (Ch) and [2020] EWHC 1521 (Ch)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 29 June 2021

Before :

**LORD JUSTICE BAKER**
**LORD JUSTICE MALES**
and
**LORD JUSTICE NUGEE**

- - - - - - - - - - - - - - - - - - - - -

Between :

| | |
|---|---|
| **MONSOLAR IQ LTD** | **Claimant and Respondent** |
| - and - | |
| **WODEN PARK LTD** | **Defendant and Appellant** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr Timothy C Dutton QC** (instructed by **Geldards LLP**) for **the Appellant**
**Mr Toby Watkin** and **Mr Luke Wilcox** (instructed by **Osborne Clarke LLP**)
for **the Respondent**

Hearing date: 10 June 2021
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

Covid-19 Protocol: This judgment was handed down remotely by circulation to the parties' representatives by e-mail, release to BAILII and publication on the Courts and Tribunals Judiciary website. The date and time for hand-down is deemed to be at 10:30am on 29 June 2021

Case 1:21-cv-11059-GHW  Document 150-32  Filed 06/28/23  Page 3 of 17

Judgment Approved by the Court for handing down.                    MonSolar IQ Ltd v Woden Park Ltd

**Lord Justice Nugee:**

*Introduction*

1. The Appellant, Woden Park Ltd (**"Woden Park"**), is the owner of a 15-acre site at Woden Park near Cardiff (**"the Land"**). By a lease dated 8 July 2013 (**"the Lease"**) Woden Park demised the Land to the Respondent, MonSolar IQ Ltd (**"MonSolar"**), for a term of 25 years and 6 months from that date for use as a solar farm. These proceedings concern the proper construction of a provision in the Lease for rent review.

2. I will set out the provision in question straightaway. It is found in sch 6 of the Lease. This provides for a starting Rent of £1,000 per acre or £15,000, and for annual Review Dates on the anniversary of the date of the Lease. Paragraph 3 of sch 6 then provides:

   "**Review of Rent**

   The Rent payable under this Lease will be reviewed in accordance with this paragraph 3 on each of the Review Dates and such Rent payable from and including each such Review Date shall be the Revised Rent which shall be calculated as follows:

   Revised Rent = Rent payable prior to the Review Date (disregarding any suspension of Rent)   x   $\frac{\text{Revised Index Figure}}{\text{Base Index Figure}}$"

   I will refer to this as **"the Formula"**.

3. It is common ground that there is no ambiguity in how the Formula, read literally, operates. It is also common ground that the effect is that although the index referred to is the General Index of Retail Prices or RPI, the rent will not increase over the term in line with RPI but (assuming RPI generally increases) at a very much higher rate. I refer below to some example calculations.

4. In these proceedings MonSolar claimed that the Formula should be construed so that the rent was indexed in line with RPI, contending that this could and should be done under the principle by which clear mistakes in the drafting of a document can be corrected as a matter of construction, as exemplified by *Chartbrook Ltd v Persimmon Homes Ltd* [2009] 1 AC 1011 (**"Chartbrook"**). I will call this **"the Chartbrook principle"** although the principle itself long pre-dates that case.

5. Fancourt J accepted MonSolar's contentions. He delivered two judgments, one (**"the Main Judgment"** or **"Jmt"**) at [2020] EWHC 1407 (Ch) on 5 June 2020, and a second one (**"the Supplementary Judgment"** or **"SJmt"**) at [2020] EWHC 1521 (Ch) on 12 June 2020. The combined effect of both judgments was encapsulated in his Order dated 12 June 2020 granting an appropriate declaration in favour of MonSolar.

6. Woden Park appeal, with permission granted by Newey LJ, on two grounds, namely that it was neither clear that the Formula contained a drafting error, nor clear, if there were an error, what the error was.

Case 1:21-cv-11059-GHW   Document 150-32   Filed 06/28/23   Page 4 of 17

Judgment Approved by the Court for handing down.    MonSolar IQ Ltd v Woden Park Ltd

7. Despite the able submissions of Mr Timothy C Dutton QC, who appeared for Woden Park, I agree with the submissions (also very able) of Mr Toby Watkin, who appeared with Mr Luke Wilcox for MonSolar. I consider that Fancourt J reached the right conclusion for the right reasons and would dismiss the appeal accordingly.

*Background*

8. Both parties adduced evidence by way of witness statement, but there was a dispute about the admissibility of the evidence on both sides. Fancourt J resolved these issues, and there is no appeal against them, so it is unnecessary to go into the detail. There was no cross-examination, nor indeed any trial at all as counsel for one of the parties fell ill the day before trial, and rather than reschedule the trial, it was agreed that Fancourt J should determine the construction of the Formula on the basis of the documents, such parts of the written evidence as he determined to be admissible, and written submissions.

9. The background facts which were either agreed, or which Fancourt J found to be admissible, were as follows. Woden Park was incorporated in September 2012. Its sole director was a Mr Feakins. It bought 38 acres of agricultural land at Woden Park (including the 15 acres that make up the Land) in January 2013. Planning permission for a solar photovoltaic park (or solar farm) on the Land was obtained in March 2013. MonSolar was incorporated, again with Mr Feakins as its sole director, in April 2013. Mr Feakins then caused Woden Park to grant the Lease to MonSolar on 8 July 2013.

10. MonSolar, which was owned by companies ultimately owned by or on behalf of Mr Feakins, was incorporated as a single purpose vehicle or SPV to hold the Lease, and as part of a structure to enable a sale of the project development rights as a package, these rights consisting of the Lease, the planning permission and an electricity grid connection offer which Woden Park had obtained. The Lease was therefore not an arms' length transaction. Although there has been no assignment of the Lease, which remains vested in MonSolar, control of MonSolar has now passed to others.

11. That is all one needs to know by way of background.

*The Lease*

12. The Lease was granted by Woden Park to MonSolar. It was executed by Mr Feakins on behalf of both parties. It demised the Land for a term of 25 years and 6 months from the date of grant of 8 July 2013, subject to a tenant's break clause as noted below. It is described on the coversheet as a lease of land "for the installation of solar photovoltaic equipment", and the tenant's user covenant required the tenant to use it only for the purpose of installing and operating a solar photovoltaic system. The tenant was also required to remove the system and reinstate the site – the relevant clause does not in fact expressly say when, but Fancourt J read it, in my view obviously correctly, as applying on the termination of the Lease. Sch 5 contained provisions whereby the tenant could break the Lease at any time on not less than 6 months' written notice, slightly oddly split into paragraph 2.1 which applied before the tenant's works had been commenced and paragraph 2.2 which applied afterwards, although there is no relevant difference between the two rights.

13. Sch 6 is headed "Rent". The first paragraph (not expressly numbered, but the next

Case 1:21-cv-11059-GHW   Document 150-32   Filed 06/28/23   Page 5 of 17

Judgment Approved by the Court for handing down.                    MonSolar IQ Ltd v Woden Park Ltd

one is paragraph 2) contains definitions for the purpose of the schedule. The relevant ones are as follows:

| | | |
|---|---|---|
| | "Base Index Figure" | the Index Figure published in respect of the month two months before the commencement of the Term |
| | "General Index" | the General Index of Retail Prices (RPI – all items) … |
| | "Index Figure" | the figure published at the relevant time as the General Index |
| | "Rent" | A x B |
| | | where 'A' equals the area of the Site measured in acres which is **15 acres** |
| | | and |
| | | 'B' equals £1,000 (**£1,000 per acre**) |
| | "Review Date" | each anniversary of the date of this Lease during the Term and 'Review Dates' shall be construed accordingly |
| | "Revised Index Figure" | the Index Figure published in respect of the month two months before the relevant Review Date |
| | "Revised Rent" | the increased Rent payable with effect from the relevant Review Date. |

14. Paragraph 3 provides for the rent to be reviewed in accordance with the Formula in the terms set out at paragraph 2 above, which I repeat here for convenience:

> "**Review of Rent**
>
> The Rent payable under this Lease will be reviewed in accordance with this paragraph 3 on each of the Review Dates and such Rent payable from and including each such Review Date shall be the Revised Rent which shall be calculated as follows:
>
> $$\text{Revised Rent} = \text{Rent payable prior to the Review Date (disregarding any suspension of Rent)} \ \times \ \frac{\text{Revised Index Figure}}{\text{Base Index Figure}}$$

15. By reading in the relevant defined terms, the Formula can be more simply expressed as follows:

> $$\text{"Revised Rent} = \text{Previous year's Rent} \ \times \ \frac{\text{May RPI for current year}}{\text{May 2013 RPI}}\text{"}$$

16. There are certain other provisions of sch 6 which it is convenient to note here:

    (1) Paragraph 2 provides for the rent to be payable half-yearly in arrears.

    (2) Paragraph 4 provides as follows:

    > "**Index**
    >
    > 4.1 In the event of any change after the date hereof in the reference base used to compile the General Index, the figure to be shown in the General Index after such change shall be the figure which would have been shown in the General Index if the reference base current at the date hereof had been retained
    >
    > 4.2 If the General Index shall cease to be published there shall be substituted as the relevant calculation in paragraph 3 a new arrangement (the "Revised Indexation") whereby the figure to be calculated under paragraph 3 shall reflect increases in the cost of living on a similar basis to that set out in paragraph 3
    >
    > …"

    (3) Paragraph 5 provides as follows:

    > "**Interim payment pending the determination of the Revised Rent**
    >
    > 5.1 If the Revised Rent shall not have been ascertained by the relevant Review Date, until such time as the Revised Rent is ascertained, the Tenant shall continue to pay the Rent previously payable
    >
    > 5.2 Within thirty days of the Revised Rent being ascertained, the Tenant shall pay to the Landlord a sum equal to the difference between the Revised Rent and the Rent actually paid during the interval between the relevant Review Date and the date upon which the Revised Rent is ascertained.

17. There is no dispute between the parties as to how the Formula, applied literally, operates. It was described by Fancourt J in the Main Judgment at [8]-[11] as follows:

    > "8. It is accepted by the Tenant that, read literally, the indexation clause operates as follows. On the first anniversary date, the rent is increased by the RPI increase over the first year of the term. On the second anniversary date, that Revised Rent is further increased by the aggregate RPI increase over the first and second years of the term. On the third anniversary date, that further Revised Rent is further increased by the aggregate RPI increase over the first, second and third years of the term. And so on during the 25 years and six months of the term, so that at the end of year 24 the Revised Rent currently payable would be further increased by the aggregate RPI increase over the first twenty-four years of the term and a year later it would be further increased by the aggregate RPI increase over the first twenty-five years of the term.

Case 1:21-cv-11059-GHW   Document 150-32   Filed 06/28/23   Page 7 of 17

Judgment Approved by the Court for handing down.    MonSolar IQ Ltd v Woden Park Ltd

9. Assuming RPI increases of 5% in each of the first three years of the term, the rent of £15,000 would thereby increase to £15,750 at the end of year one; to £17,325 (i.e. £15,750 + 10%) at the end of year two; and to £19,923.75 (i.e. £17,325 + 15%) at the end of year three. Thus, increases in rent upon the sequential annual rent reviews are not merely compounded, in the sense that it is the current, previously increased rent that is further increased on each Review Date; the current rent is also increased once more by the same factor by which the rent was previously increased, not just by a new factor reflecting the subsequent increase in the RPI index.

10. Departing from the arithmetically simple example based on successive 5% annual RPI increases, the Tenant's evidence is that if an annual rate of increase equal to the average RPI increase over the 20 years before the date of grant of the Lease (2.855% p.a.) is applied according to the formula in the Lease on each Review Date during the term of the Lease, the rent payable by year 25 of the term will be just over £76,000,000, as compared with less than £30,000 if non-cumulative RPI increases at that same average rate are applied to the reserved rent of £15,000 p.a.

11. It is of course the case that the RPI index is capable of decreasing as well as increasing – this in fact happened, for a single year only, in 2009 – and that the rate of increase (or decrease) over time cannot accurately be predicted. The Landlord's evidence is that if annual RPI increases of 1% p.a. were assumed over the length of the term of years, the annual rent would increase to only £380,660 in year 25. Neither side disputes the other's arithmetic but the appropriate assumptions to make to examine the effect of the indexation clause are very much disputed."

18. As well as looking at the potential effect of the Formula on the basis of various assumptions, it is possible to look at the actual effect of the Formula since the grant of the Lease, which has the advantage of avoiding any argument as to which assumptions might be more appropriate. This exercise does not appear to have been done below, but the relevant figures for RPI were included in written submissions for MonSolar filed between the Main and Supplementary Judgments (other than the figure for May 2020, which was not then available) and the calculations are otherwise a matter or arithmetic. The results are shown in the table in the Appendix.[1] This demonstrates the exponential effect of the Formula. Thus for example the increase in RPI for the 12 months to May 2020 was a modest 1%, but the Formula produced an increase in rent from July 2020 of 16.9% (based on the total increase in RPI between May 2013 and May 2020); and this total increase in RPI over 7 years of 16.9% can be contrasted with the total increase in rent over the same period of 83.1%.

*The Judgments*

19. In the Main Judgment, Fancourt J, having set out the facts, the evidence, his ruling on admissibility and the law, began his discussion at [52]. He summarised the question he had to decide as being whether it was clear that the indexation provisions were a

---

[1] I am indebted to Males LJ's Judicial Assistant, Mr Andrew Brown, for these figures.

Case 1:21-cv-11059-GHW   Document 150-32   Filed 06/28/23   Page 8 of 17

Judgment Approved by the Court for handing down.                           MonSolar IQ Ltd v Woden Park Ltd

mistake, and if so whether it was clear what paragraph 3 of sch 6 meant: if both conditions were satisfied, the Lease would be interpreted contrary to its literal meaning, but if one were unsatisfied, paragraph 3 could only be corrected by way of rectification, and no such claim had yet been made.

20. At [53]-[56] he accepted the submissions for MonSolar that the increases in rent produced by the Formula on a literal reading were irrational and arbitrary, or illogical and arbitrary, giving some illustrations of why that was so. At [57] he accepted the submission for MonSolar that paragraph 4.2 of sch 6 recognised that the purpose of the Formula was for the reviewed rent to reflect increases in the cost of living, but that on its literal interpretation it did not do so (except in the first year). At [58]-[62] he considered whether the Formula had an absurd effect in that (unless inflation were nominal, or there were a sustained period of deflation) the rent would grow to an unaffordable amount: he described the arguments in this respect as more subtle, pointing out that the most serious consequences would not be felt until the latter half of the term, and that the tenant could use the break clause to escape the more extreme consequences, although at the expense of dismantling the solar farm and possibly having to reinstate the Land if the landlord required it. At [62] he concluded that although the break option might have been considered adequate protection by some lessees, it did nothing to mitigate the arbitrary and irrational way in which the Formula operated. At [63]-[64] he considered the position from the point of view of the landlord, pointing out that the Lease was created as part of a package of development rights, and that it was difficult to accept that Woden Park intended the Formula to operate as drafted as it would either suppress the sale value of the package of rights, or prevent a sale to any well-advised purchaser. At [65] he held that a reasonable and informed objective observer seeking to understand the meaning of the Lease would conclude that the Formula must be a drafting mistake because it made no sense.

21. At [67]-[72] he proceeded to consider whether it was clear what sch 6 was objectively intended to mean. MonSolar's case was that the drafting mistake should be corrected by reading the Formula as if it read:

$$\text{Revised Rent} = \text{Original Rent (£15,000)} \times \frac{\text{May RPI for current year}}{\text{May 2013 RPI}}$$

Fancourt J however considered that the appropriate correction was as follows:

$$\text{Revised Rent} = \text{Previous year's Rent} \times \frac{\text{May RPI for current year}}{\text{May RPI for previous year}}$$

I will call these **"Correction A"** and **"Correction B"** respectively.

22. No doubt due to the fact that he was having to resolve the issues on written submissions alone, Fancourt J evidently thought that Correction A and Correction B produced different results, and he proceeded to explain why he preferred Correction B. This part of his judgment, with respect, is not entirely easy to understand, but in summary it appears he thought that Correction A would only produce simple increases whereas Correction B would produce compound increases. It is however common ground that the premise is false and that Correction A and Correction B will always produce exactly the same results. This is because RPI itself is in effect

Case 1:21-cv-11059-GHW   Document 150-32   Filed 06/28/23   Page 9 of 17

Judgment Approved by the Court for handing down.    MonSolar IQ Ltd v Woden Park Ltd

compounded, as a simple illustration demonstrates: if an item costing £100 is subject to RPI increases of 2% a year, it will cost £102 after one year and £104.04 (not £104) after two years, and the total RPI increase over the two years will be 4.04% not 4%. So it does not matter whether one calculates the price at the end of year 2 as £100 x 104.04/100 (Correction A), or £102 x 104.04/102 (Correction B). Both produce the same figure of £104.04.

23. This was pointed out to Fancourt J in written submissions on behalf of MonSolar after delivery of the Main Judgment. In his Supplementary Judgment he noted this, and proceeded to deal with a new argument raised by Mr Dutton (not previously instructed) on behalf of Woden Park, namely that if there were a mistake it was not clear how it should be corrected, because the parties might have intended an upwards only rent review clause. Fancourt J rejected this (SJmt at [11]-[12]) on the grounds that the necessary correction must reflect the nature of the mistake, and a failure to provide for upwards only rent reviews would be a different mistake of a different kind, and there was no reason to think that the parties made that mistake too. He therefore saw no reason to alter his decision in the Main Judgment.

24. By his Order dated 12 June 2020, he therefore declared:

> "On the true construction of the Lease, paragraph 3 of Schedule 6 to the Lease means that the rent passing at the end of each complete year of the term is to be increased or decreased on the Review Date in accordance with any proportionate change in the RPI during that year, as measured by the values of the RPI two months before the Review Date and two months before the previous Review Date (or, in the case of the first Review Date, two months before the Term Commencement Date)."

As I have already indicated, I consider that Fancourt J came to the right conclusion, and save for the passage where he considers the supposed choice between Correction A and Correction B, I entirely agree with his reasoning and analysis.

*The law*

25. There was very little dispute about the law. The principles applicable to the construction of written instruments in general, and contracts in particular, have been considered by the Supreme Court in a series of well-known cases, which it is not necessary to go over again. Those authorities are largely concerned with the position where a contractual provision is open to two possible interpretations. In the present case we are not concerned with such an exercise as it is common ground that the Formula, read with the relevant definitions, is clear and unambiguous and not open to two different interpretations. Rather we are concerned with the *Chartbrook* principle, under which the literal meaning of a provision can be corrected if it is clear both that a mistake has been made, and what the provision was intended to say. This is in principle a different exercise from that of choosing between rival interpretations: see for example the recent decision of this Court in *Britvic plc v Britvic Pensions Ltd* [2021] EWCA Civ 867.

26. In his written submissions, Mr Dutton contended that Fancourt J had erred in taking into account the matters he referred to at Jmt [53]-[56] and [58]-[63] (whether the Formula produced results that were illogical and arbitrary, and whether it had an

Case 1:21-cv-11059-GHW   Document 150-32   Filed 06/28/23   Page 10 of 17

Judgment Approved by the Court for handing down.    MonSolar IQ Ltd v Woden Park Ltd

absurd effect), as these matters should, he said, have been identified as relevant only in the event that the Formula was open to more than one interpretation. This submission was premised on the basis that what Lord Hoffmann said in *Chartbrook* now had to be read in the light of the judgments of Lords Neuberger and Hodge in *Arnold v Britton* [2015] UKSC 36.

27. I do not accept this submission. I do not read anything said by Lords Neuberger and Hodge in *Arnold v Britton* as qualifying or departing from the approach adopted by Lord Hoffmann in *Chartbrook*, and indeed in oral argument Mr Dutton said in terms that *Arnold v Britton* had in a sense not changed anything. He suggested however that it had underlined the need for judicial restraint in two ways. The first was in the observation by Lord Neuberger at [17] that commercial common sense and surrounding circumstances should not be invoked to undervalue the importance of the language of the provision to be construed. This was not I think directed at the *Chartbrook* principle at all. Lord Neuberger's point was that the parties cannot control commercial common sense or the surrounding circumstances but they can control the language of their contract, and that is primarily where the reasonable reader would expect to find what the parties intended. None of that really applies where the suggestion is that the parties have made a drafting mistake, where the very question is whether the language does really reflect what the parties intended.

28. Mr Dutton's second point was based on the judgment of Lord Hodge, who did examine the *Chartbrook* principle by reference to some of the decided cases (see at [68]-[71]). Mr Dutton said that in each case the existence of the mistake was not found in the absurdity of the result but was either based on there being factual evidence of how a mistake had come about, or on some conflict with the other terms of the contract.

29. But again I do not think Lord Hodge was intending to qualify the *Chartbrook* principle or delimit its precise boundaries. He was considering the submission of Mr Morshead QC for the tenants to the effect that no reasonable person would have thought that the parties intended the tenants to assume the risk of inflation falling below 10% (see at [67]). He rejected that submission on the basis that the question for the Court was not whether a reasonable and properly informed tenant would enter into such a bargain. That would involve illegitimately re-writing the parties' bargain in the name of commercial good sense (see at [77]). He then separately rejected the application of the *Chartbrook* principle on the basis that it was neither clear that there was a drafting mistake, nor clear, even if there were, what correction ought to be made (at [78]).

30. *Arnold v Britton* undoubtedly supports the proposition that the mere fact that a bargain is not one that a reasonable and properly informed tenant would enter into is not enough to enable the Court to re-write it. The Court cannot alter an unambiguous provision of a contract simply because it provides for one of the parties to pay a price for something which appears to be a high one. There may be any number of reasons why a party accepts such a term: it may be in return for concessions elsewhere, or because that party has made a poor bargain, or for other reasons. The reasonable objective reader, who is not privy to the parties' subjective intentions, or their negotiations, cannot know why the relevant party agreed to it, and unless it is clear that there is a drafting mistake, cannot do any other than read the contract as providing what it unambiguously says. But there is nothing new in this. Lord

Case 1:21-cv-11059-GHW   Document 150-32   Filed 06/28/23   Page 11 of 17

Judgment Approved by the Court for handing down.                    MonSolar IQ Ltd v Woden Park Ltd

Hoffmann said the same in *Chartbrook* itself: see at [20] where he said that the fact that a contract may appear to be unduly favourable to one of the parties is not a sufficient reason for supposing that it does not mean what it says. What enabled the Court in *Chartbrook* to conclude that a mistake had been made was that the result was not just imprudent but arbitrary and irrational.

31. There is therefore a distinction between a case which concerns a provision which seems merely imprudent and one which appears irrational. The position was neatly summarised by Briggs LJ in *Sugarman v CJS Investments Ltd* [2014] EWCA Civ 1239 (*"Sugarman"*) at [43]-[44] where he referred to the fine dividing line between a case where the result appears "commercially unattractive and even unreasonable" and a case which appears "nonsensical or absurd".

32. As Mr Watkin submitted in his brief but cogent oral submissions, there is a consistent line of authority illustrating the sort of case that falls on the far side of the line. The language used by judges to describe such cases naturally varies but the concept is consistent. In *City Alliance Ltd v Oxford Forecasting Services Ltd* [2000] EWCA Civ 510 Chadwick LJ at [13] referred to the Court being satisfied that the words actually used "produce a result which is so commercially nonsensical that the parties could not have intended it". In *Chartbrook* itself Lord Hoffmann referred variously to "an interpretation … sufficiently irrational to justify a conclusion that there has been a linguistic mistake" (at [15]); to a "commercially absurd" interpretation (ibid); to one that "makes no commercial sense" (at [16]); to his not being able to believe that "any rational parties" who wished to provide for a catastrophic fall in the market would have adopted the precise sum which the literal interpretation produced (at [19]); and to the interpretation adopted by the trial judge and majority of the Court of Appeal as not just producing provisions that were favourable to Chartbrook but as making the structure and language of the relevant provisions appear "arbitrary and irrational" when the concepts could be combined in a rational way (at [20]). In *Sugarman* Briggs LJ at [43] referred to a case where the apparently unambiguous meaning of the words used "produces such a nonsensical result" that it cannot be treated as expressing the meaning of the document.

33. There is nothing in *Arnold v Britton* which suggests that this dividing line between on the one hand a provision which is unduly favourable to one side, imprudent or unreasonable, and on the other hand one that produces irrational, arbitrary, nonsensical or absurd results has been redrawn. In the event therefore, I do not think there is any new point of law raised by this appeal: the question is whether Fancourt J was right to hold that the present case was one which fell on the far side of the line such as to make it clear that the literal reading of the Formula cannot have been intended by the parties and that there must have been a mistake.

*Ground 1: is it clear that there was a mistake?*

34. Ground 1 of the appeal is that it is not clear that the provisions of the Lease contain a drafting error.

35. I have already said that I agree with Fancourt J's conclusion on this point. Indeed it seems to me abundantly clear that the Formula contains a drafting error, and that it is about as plain a case of such a mistake as one could find. I will briefly indicate my own reasons for coming to this view before considering the specific points relied on

Case 1:21-cv-11059-GHW   Document 150-32   Filed 06/28/23   Page 12 of 17

Judgment Approved by the Court for handing down.        MonSolar IQ Ltd v Woden Park Ltd

by Mr Dutton.

36. First, it has long been established what the general purpose of a rent review clause is. In *British Gas Corporation v Universities Superannuation Scheme Ltd* [1986] 1 WLR 398 at 401 Sir Nicolas Browne-Wilkinson V-C said (in the context of a clause requiring a review by reference to an open market rental) that the purpose was to "reflect the changes in the value of money and real increases in the value of the property during a long term". In *Equity & Law Life Assurance Society Plc v Bodfield Ltd* [1987] 1 EGLR 124 at 125 Dillon LJ (in the context of an upwards only review clause) said that the general object of a rent review clause was to provide the landlord with some measure of relief "where, by increases in property values or falls in the real value of money in an inflationary period, a fixed rent has become out of date and unduly favourable to the tenant." Where a rent review clause makes no reference to open market rentals, but is based on changes in an index such as RPI, it can be more simply be said that the general purpose of the rent review clause is ordinarily to reflect changes in the value of money, usually (since we live in inflationary times) by increasing the rent in line with increases in the relevant index.

37. Now of course the mere fact that this is the ordinary purpose of a rent review clause does not prevent the parties agreeing to review the rent in accordance with a different mechanism and for a different purpose, but it is at least a reasonable working hypothesis when one finds a rent review clause based on changes in an index such as RPI that the general purpose was to enable the rent to be increased in line with changes in the index. If that was not what the parties intended it seems slightly odd that they should have based their rent review provision on the index at all.

38. Second, that general purpose is echoed here by paragraph 4.2 of sch 6 under which where a revised index is substituted the figure to be calculated under paragraph 3 "shall reflect increases in the cost of living on a similar basis to that set out in paragraph 3": see paragraph 16(2) above. Mr Dutton said that this provision was of no help as under its literal interpretation the Formula did reflect increases in the cost of living. I do not think this is right. One could say that the Formula in its literal interpretation requires a calculation by reference to changes in RPI, or perhaps that it is based on changes in RPI, but I do not think one would normally say that it "reflected" increases in the cost of living. A provision that reflects increases in the cost of living would normally be understood to be one that adjusted a figure in line with such increases, so that one mirrored the other. The Formula, because of its exponential effect, does not do this except in a very distorted way.

39. Third, I agree with Fancourt J that the results of applying the Formula literally can aptly be described as both arbitrary and irrational; indeed I think they can equally be described as commercially nonsensical or absurd, such that it cannot be supposed that rational parties really intended them. The effect of the Formula, literally construed, is that the rent is increased each year by an amount that reflects not the change in RPI for the previous year, but the cumulative change in RPI since the start of the term, all of which, apart from that attributable to the latest 12 months, has already been taken into account, in most cases repeatedly. It is impossible to think that any rational parties could have intended that. Among the arbitrary results that it produces is that if inflation is high at the beginning of the term and low at the end, this will produce a much higher rent overall than if inflation is low at the beginning and high at the end, even if the total inflation over the term is the same (see Jmt at [56]). Another is that if

Case 1:21-cv-11059-GHW   Document 150-32   Filed 06/28/23   Page 13 of 17

Judgment Approved by the Court for handing down.                    MonSolar IQ Ltd v Woden Park Ltd

there has been a period of inflation, followed by a fall in RPI, the rent will still continue to rise each year unless and until the fall in RPI is so sustained that the RPI drops to what it had been at the start of the term. Neither of these results makes any sense, and it is impossible to think of any reason why rational parties would have intended them. They can quite properly be called nonsensical and absurd.

40. Fourth, it is not difficult to see how the mistake came about. It is not necessary before the Court can correct a mistake under the *Chartbrook* principle that the Court should be satisfied how the mistake happened, and, since, unlike in an action for rectification, evidence as to the drafting process will almost always be inadmissible (as Fancourt J correctly held it was here), it will often be impossible to know. But the fact that there is a plausible explanation as to how the error occurred can support the conclusion that there has indeed been such an error: see for example *Homburg Houtimport BV v Agrosin Private Ltd (The Starsin)* [2003] UKHL 12 at [22]-[23] where counsel suggested that the explanation for an omission was the phenomenon, technically known as homoeoteleuton, whereby the drafter's eye had skipped from one occurrence of a word to the next, an explanation accepted by Lord Bingham.

41. Here the cause of the error is simple enough. In order to review a rent each year in line with RPI, one can either draft the clause by taking the starting rent and reviewing it in line with the total cumulative increase in RPI since the start of the term (ie method A), or by taking the previous year's rent and increasing it in line with the increase in RPI for the last 12 months (ie method B). Whichever method is used therefore, one has a multiplicand consisting of a previous figure for rent and a multiplier consisting of a figure for the increase in RPI. It does not matter which method is used as they produce the same result; but what the drafter has done here is take the multiplicand from method B (the previous year's rent) and apply to it the multiplier from method A (total increases in RPI since the beginning of the term), thereby duplicating the effect and leading to the exponential rise. The error is obvious enough once it has been pointed out, but it is easy to believe that the drafter may not have noticed it at the time. There are several other indications that the drafting of the Lease was less than perfect, which suggests that it was not carefully reviewed. And we were shown extracts from two publications warning those drafting rent review provisions against falling into precisely this error: see *Lewison's Drafting Business Leases* (8th edn, 2013) at §6-14, referring to "one unfortunate error which is made from time to time", namely that the indexation relates back to the beginning of the lease so that inflation is double counted; and *Index linking rent reviews: deceptively simple* (Chandler, Estates Gazette 4.1.2018), which referred to it being easy to get the formula wrong, for example if the increase in the index is based on the index figure at the start of the lease, but applied to the passing rent. There is also a reported case from New South Wales, *Westpac Banking Corporation v Tanzone Pty Ltd* [2000] NSWCA 25, where a similar error had been made (and was duly corrected).

42. I think it is plain that that is what happened here. This is not just a case of a rent review clause that is unduly favourable to one party, or imprudent for the other party to enter into; this seems to me a paradigm example of a clause which, literally interpreted, leads to arbitrary and irrational results when it is possible for the concepts employed (the starting or passing rent, changes in the index) to be combined in a wholly orthodox and rational way. I have not the slightest doubt that Fancourt J was right to find that there was a drafting error in the way the Formula was written.

Case 1:21-cv-11059-GHW   Document 150-32   Filed 06/28/23   Page 14 of 17

Judgment Approved by the Court for handing down.                     MonSolar IQ Ltd v Woden Park Ltd

43. As to Mr Dutton's arguments, I have already in effect addressed most of them. Mr Dutton said that Fancourt J was wrong to look at the effects of the Formula: this was just part of the price paid by the tenant under the Lease and one could not say that the price, although high, was in itself not intended. One needed to find some context either in the factual background or in the Lease itself before one could conclude that there had been a mistake.

44. I do not accept that the enquiry is as limited as Mr Dutton suggested. For reasons already given, it is in my judgment legitimate to look at the results produced by the Formula, provided that one bears firmly in mind that what one is looking for are not just results that are unduly favourable to one side, but arbitrary and irrational ones that are nonsensical and lead to the conclusion that they cannot have been intended. In any event as explained above, the provisions of the Lease, and in particular paragraph 4.2 of sch 6, do lend support to the proposition that the drafting contained a mistake.

45. Mr Dutton said that the drafting of the Formula might have been intentional. It might have been counterbalanced by other factors, or have been a *quid pro quo* for some other concession. Or if the starting rent had been below market value, the Formula might have been designed to remedy this. Neither suggestion seems to me a realistic possibility. Matters such as these might explain some adaptation of the usual form of rent review provision in the landlord's favour; but they do not explain the quite arbitrary and extreme effects of the Formula as drafted.

46. Mr Dutton also sought to criticise Fancourt J for suggesting (at Jmt [63]) that it was difficult to accept that the landlord could have intended the Formula to operate as drafted. He said that since the Formula was very "landlord-friendly" it was verging on the absurd to suggest that the landlord would not want to have it. That I think does not do justice to the reality of the position. The Lease was part of a structure to exploit the potential of the land as a solar farm by selling a package including the Lease to a person wishing to operate a solar farm. The Lease was granted to MonSolar, a newly incorporated SPV. Fancourt J held those facts to be admissible (and that has not been challenged). In those circumstances, whatever MonSolar's theoretical liability for rent under the Lease, Woden Park would not actually receive any rent from MonSolar unless MonSolar installed and operated a solar farm; and that would not happen unless the package, including the Lease, could be sold. It is against that background that Fancourt J concluded that the landlord could not have really meant the Formula to operate as drafted, among other things because it would prevent a sale to any well-advised purchaser. Unless there were such a sale, Woden Park would be unlikely to receive a penny of rent from MonSolar. I agree therefore that it was not in Woden Park's interests to draft the Formula in such a way as to reduce the likelihood of the package of rights being sold.

47. I do not therefore accept Mr Dutton's criticisms of Fancourt J's conclusion that the Formula clearly contained a drafting error. I would dismiss Ground 1 of the appeal.

*Ground 2: is it clear how the mistake should be corrected?*

48. Ground 2 of the Appeal is that if it is clear that the Formula contained a drafting error, it is not clear how it should be corrected.

Case 1:21-cv-11059-GHW   Document 150-32   Filed 06/28/23   Page 15 of 17

Judgment Approved by the Court for handing down.                MonSolar IQ Ltd v Woden Park Ltd

49. Mr Dutton accepted that it did not matter for these purposes if there were two different ways of correcting the error but they had the same mathematical effect. If therefore the only choice were between Correction A and Correction B, that would not prevent the Formula being corrected under the *Chartbrook* principle.

50. But he said that there was another possibility which could not be ruled out, which was that the parties actually intended an upwards only rent review. It is common ground that if the rent review were upwards only, it would potentially make a difference whether Correction A or Correction B was used as in periods when RPI went down, the results would diverge. But quite apart from this, Mr Dutton's submission was that if it was not clear whether the parties did intend upwards only rent reviews or not, it could not be concluded that it was clear how the mistake should be corrected.

51. Fancourt J dealt with this in his Supplementary Judgment: see paragraph 23 above. I entirely agree with him and there is little more that needs to be said. Paragraph 3 of sch 6 is not drafted as an upwards only rent review clause. Including provision for upwards only rent reviews would have nothing to do with correcting the mistake that was made (mixing the two methods of indexation); it would be including a new provision. There is no reason to suppose that the failure to specify upwards only rent reviews was a mistake at all, and no basis for supposing that the parties intended to include a provision to that effect.

52. Mr Dutton pointed to various parts of sch 6 which contemplated that the rent would increase on each review. These were (i) the definition of Revised Rent, which refers to "the increased Rent payable…"; (ii) paragraph 4.2, which refers to the revised indexation reflecting "increases in the cost of living"; and (iii) paragraph 5 which makes provision for the case where the Revised Rent has not been ascertained at the Review Date, and provides for the tenant to pay the extra rent once ascertained, but not for the case where the tenant has overpaid. All of these suggested, he said, that the parties envisaged that the rent would increase and not decrease when reviewed.

53. I accept that these provisions show that the drafter envisaged that rents would increase at each review date. I do not find that surprising. Price inflation has been a constant of the UK economy since at least the 1940s, and although there were some months in 2009 when the index showed a decrease in RPI over the previous 12 months, this was a consequence of the financial crash in 2008 which at the time of the grant of the Lease in 2013 might reasonably have been thought unlikely to recur.

54. But the fact that the drafter envisaged that rents would increase on each review does not mean that he made any provision to that effect. It is easy enough to draft a clause providing that the rent payable after a review date shall never be less than that payable before, or that it should be the higher of the passing rent and that produced by the relevant formula. The drafter did not do that, and like Fancourt J, I do not see that we, or the reasonable objective reader, have any material on which to conclude that the Lease contains, or might contain, a second and separate mistake in failing to so provide.

55. In my judgment it is clear that the drafting mistake in the Formula should be corrected by substituting either Correction A or Correction B, and not by incorporating any provision for upwards only rent reviews. Since it does not matter which correction is

adopted, I see no reason for disturbing Fancourt J's Order (which in fact adopts Correction B).

56. I would therefore dismiss Ground 2, and the appeal.

**Lord Justice Males:**

57. I agree.

**Lord Justice Baker:**

58. I also agree.

Case 1:21-cv-11059-GHW   Document 150-32   Filed 06/28/23   Page 17 of 17

Judgment Approved by the Court for handing down. MonSolar IQ Ltd v Woden Park Ltd

Appendix

| Review Date | RPI for May of that year | Formula | Rent / Revised Rent | 12 month increase in RPI | Increase in RPI since May 2013 | Increase in rent since May 2013 |
|---|---|---|---|---|---|---|
| Grant (8.7.13) | 250.0 | | £15,000.00 | - | - | - |
| 8.7.14 | 255.9 | £15,000.00 × $\frac{255.9}{250}$ | £15,354.00 | 2.4% | 2.4% | 2.4% |
| 8.7.15 | 258.5 | £15,354.00 × $\frac{258.5}{250}$ | £15,876.04 | 1.0% | 3.4% | 5.8% |
| 8.7.16 | 262.1 | £15,876.04 × $\frac{262.1}{250}$ | £16,644.44 | 1.4% | 4.8% | 11.0% |
| 8.7.17 | 271.7 | £16,644.44 × $\frac{271.7}{250}$ | £18,089.18 | 3.7% | 8.7% | 20.6% |
| 8.7.18 | 280.7 | £18,089.18 × $\frac{280.7}{250}$ | £20,310.53 | 3.3% | 12.3% | 35.4% |
| 8.7.19 | 289.2 | £20,310.53 × $\frac{289.2}{250}$ | £23,495.22 | 3.0% | 15.7% | 56.6% |
| 8.7.20 | 292.2 | £23,495.22 × $\frac{292.2}{250}$ | £27,461.21 | 1.0% | 16.9% | 83.1% |