# EXHIBIT 28
# PART 1



Neutral Citation Number: [2019] EWHC 2322 (Ch)

Case No: BL-2018-000281; CR-2018-003995

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES (ChD)**
**BUSINESS LIST AND INSOLVENCY AND COMPANIES LIST**

Royal Courts of Justice
Strand, London
WC2A 2LL
Date: 16 September 2019

**Before** :

**MR JUSTICE FANCOURT**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

UTB LLC                                              Claimant

- and -

SHEFFIELD UNITED LIMITED                              Defendant
And
HRH PRINCE ABDULLAH BIN MOSAAD BIN
ABDULAZIZ AL SAUD
And
YUSUF GIANSIRACUSA

**AND IN THE MATTER OF BLADES LEISURE**
**LIMITED**
**AND IN THE MATTER OF S.994 OF THE**
**COMPANIES ACT 2006**

SHEFFFIELD UNITED LIMITED             Petitioner
And
(1) UTB LLC
(2) UTB 2018 LLC
(3) HRH PRINCE ABDULLAH BIN MOSAAD
    BIN ABDULLAH BIN ABDULAZIZ AL
    SAUD
(4) YUSUF GIANSIRACUSA
(5) HRH PRINCE MUSA'AD BIN KHALID M
    BIN ABDULRAHMAN AL SAUD
(6) BLADES LEISURE LIMITED      Respondents

- - - - - - - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - - -

**Mr Andreas Gledhill QC and Mr Tom Mountford** (instructed by **Jones Day**) for the
**Claimant, Third Party, Fourth Party and the First to Fourth Respondents**
**Mr Paul Downes QC and Miss Emily Saunderson and Mr Luka Krsljanin** (instructed by
**Shepherd and Wedderburn LLP**) for the **Defendant/Petitioner**

Hearing dates: 13-17 May, 20-24 May, 4, 5, 7, 10-13, 18, 19 June 2019
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

THE HONOURABLE MR JUSTICE FANCOURT

## Mr Justice Fancourt:

This judgment comprises the following parts:

A. Introduction (paras 1-10);

B. Undisputed factual narrative (paras 11-133)

C. The ISA: quasi-partnership and implied terms (paras 134-229)

D. The contractual obligations arising from service of the Call Option Notice and Counternotice (paras 230-270).

E. Mistake (paras 271-286)

F. The disputed events in 2017 (paras 287–372).

G. The disputed events in 2018 (paras 373-377).

H. Breaches of contract (paras 378-398).

I. Conspiracy to cause harm to SUL (paras 399-413).

J. Unfairly prejudicial conduct: the section 994 petition (paras 414-487).

K. Specific performance (paras 488-514)

L. Postscript: valuation evidence (paras 515-528)

M. Summary of conclusions (paras 529-538).

## A.   Introduction

1.   The origin of this dispute is an investment and shareholders' agreement made on 30 August 2013 ("the ISA"). The ISA was made between Blades Leisure Ltd ("Blades"), Blades' wholly-owned subsidiary, The Sheffield United Football Club Ltd ("SUFC"), which operates the football club of that name, and the two shareholders of Blades and their guarantors. The shareholders are UTB LLC ("UTB"), a company incorporated in Nevis, and a company known at the time as Sheffield United plc and now known as Sheffield United Ltd ("SUL"). The principal individual behind SUL is Kevin McCabe, a Yorkshire businessman, and the beneficial owner of UTB is HRH Prince Abdullah bin Mosaad bin Abdulaziz al Saud ("Prince Abdullah"), a grandson of the late King Abdulaziz of Saudi Arabia.

2.   Under the terms of the ISA, UTB agreed to inject £10 million of capital over a period of about two years in return for a 50% shareholding in Blades. SUL was issued with the other 50% of the shares. Blades was expected to be a loss-making company for several years, until promotion to the Premier League of English football was secured. Despite the detailed and precise terms of the new articles of association and the ISA,

3

the shareholders had different understandings about who would fund Blades after the initial two-year period of UTB's funding. SUL believed that UTB would continue to fund any deficit in future years. UTB believed that, until it achieved super-majority control of Blades, UTB and SUL would fund Blades equally.

3.  Disagreement between UTB and SUL about the funding of Blades arose in 2014, 2015, 2016, 2017 and 2018. Disagreement about funding spawned disagreement about several other matters, all of which came to a head in November 2017. At that time, Prince Abdullah believed that he was being deceived and manipulated by Kevin McCabe, who (he thought) was seeking to control SUFC at the expense of proper corporate governance. Kevin McCabe believed that those acting on behalf of Prince Abdullah were unfairly seeking to marginalise SUL's involvement in Blades and SUFC and force SUL's exit. The disagreement became very personal and acrimonious between Kevin McCabe and Prince Abdullah's attorney, Yusuf Giansiracusa, in November and December 2017.

4.  At that stage, both SUL and UTB were considering how they might be able to exercise contractual rights under the ISA to bring the joint ownership of Blades to an end. SUL acted first. In December 2017, without prior warning, it served a call option notice on UTB, offering to buy UTB's shareholding for £5 million. That offer entitled UTB instead to elect to buy SUL's shareholding at the same price. It did so on 26 January 2018, by serving a counternotice on SUL.

5.  In these proceedings, UTB seeks to enforce the contract of sale and purchase of SUL's shares at the price of £5 million that arose from service of the counternotice. SUL seeks to have that contract declared void or set aside and seeks an order that UTB sell its shares to SUL at the current value of UTB's non-majority shareholding. SUL also seeks damages for breach of contract and for a conspiracy by UTB, Prince Abdullah and Mr Giansiracusa to harm SUL by unlawful means.

6.  Following service of the counternotice, completion of the contract of sale and purchase of SUL's shares (if valid) was due at 2pm on 6 February 2018. Completion did not take place. By letter of the same day, SUL purported to terminate the ISA and the contract of sale and purchase on account of alleged repudiatory breaches of contract by UTB. UTB issued a claim form on 9 February 2018 seeking specific performance of the contract of sale and purchase and declaratory relief in relation to the status of contingent obligations of SUFC under the ISA to buy property assets used by or in association with the football club ("the Club"). By counterclaim dated 27 March 2018, SUL sought different declaratory relief in relation to those contingent obligations and served an additional claim for damages for breach of contract and unlawful conspiracy.

7.  On 15 May 2018, SUL issued and served a petition under section 994 of the Companies Act 2006 ("the Petition"), claiming relief against UTB, Prince Abdullah, Mr Giansiracusa and others in respect of conduct unfairly prejudicing the interests of SUL as a shareholder of Blades.

8.  After a substantial number of interim applications, all these claims were heard together at a trial in May and June 2019. Although the evidence and arguments at trial covered a very wide range of facts and issues, it is unnecessary to decide all the facts and issues in order to resolve the claims that have been brought. There is nevertheless

4

a substantial number of issues of fact and law that need to be determined. The principal issues that will determine the outcome of the litigation are the following:

i)     Is the contract of sale and purchase of SUL's shares for £5 million valid and enforceable?

ii)    Did UTB act in breach of contract? The main breaches of contract alleged are breach of an implied term of good faith in the ISA and preventing SUFC from exercising the property call options in the ISA.

iii)   Was any breach of contract repudiatory, and if so were the ISA or the contract of sale and purchase, or both, terminated by SUL on 6 February 2018?

iv)    Did UTB, Prince Abdullah and Mr Giansiracusa conduct the affairs of Blades between August and December 2017 in a manner unfairly prejudicial to SUL, such that relief should be granted to SUL, either by setting aside the contract of sale and purchase or by ordering the buy-out of UTB's shares at market value, or both?

9.     For the convenience of those who need only to know the outcome of the trial, reference can be made to Part M of this judgment (paras 529-538 below), where I set out a summary of my conclusions. Parts C to L below explain my conclusions and reasons on the many issues and sub-issues that the parties have raised.

10.    Before addressing all such issues individually, it is convenient to set out in Part B the main aspects of the factual history, in so far as it is now uncontentious. In doing so, I will indicate where the factual disputes arise that are relevant to the issues in dispute and will return to those disputed matters later in the judgment.

B.    Undisputed Factual Narrative

11.    Kevin McCabe was born in Sheffield and has been a Sheffield United fan all his life. After school, he qualified as a quantity surveyor and was later appointed an associate member of the Royal Institution of Chartered Surveyors. He began working in the construction industry and, by his own skill and hard work during his lifetime, established a very substantial group of companies, operating worldwide and principally in relation to real estate and property development and management. The main holding company is Scarborough Group International Limited and I will refer to the group of companies as the "Scarborough Group". SUL is a company in the Scarborough Group.

12.    By the 1990s, Kevin McCabe was an influential local businessman and became an owner and director of the Club. By about 2003, he had become the majority shareholder of SUL, which was then the holding company of SUFC. By 2013, he owned all but about 12% of the shares in SUL. These 12% are held by about 9,000 individual supporters of the Club. Effectively, therefore, Kevin McCabe owned and controlled the Club through his or his companies' shareholding in SUL. Over many years, he has injected tens of millions of pounds into the club out of love and loyalty, not for financial return.

13.   Before the early part of 2013, SUL (and certain other Scarborough Group companies) owned five properties associated with the football club: the stadium at Bramall Lane ("the Stadium"), the Sheffield United hotel at Bramall Lane, land at Shirecliffe Road, Sheffield where the Club's youth academy is established ("the Academy"), a junior development centre at Crookes Road, Sheffield and a serviced offices centre at Bramall Lane.

14.   In 2012, when Kevin McCabe was approaching 65 years of age, he began to look for someone to whom he could, as he put it, "hand on the baton". The Club, which had been in the Premiership in 2006-7, was languishing in the English League Division One (despite its name, the third tier in English professional league football, below what are now called the Premier League and the Championship). The Club was in need of a benefactor, Kevin McCabe thought, who would invest very substantial sums to make the Club competitive at higher levels.

15.   He decided to make the Club more attractive (i.e. cheaper) to would-be investors by splitting ownership of the property assets from the Club itself. Kevin McCabe's ambition was for the property assets then to be re-sold to the Club, when it was back in the Premier League and after he had handed over the baton. The mechanism was for Blades, as a new subsidiary of SUL, to purchase the shares in SUFC from SUL and for SUL (and other Scarborough Group companies) to retain the property assets. The investor would then take shares in Blades. The separation of the property assets was not in fact effected until 2013, when Prince Abdullah was negotiating to acquire an interest in the Club.

16.   At the end of 2012, Kevin McCabe and Prince Abdullah were introduced by an intermediary, Mr Puian Mollaian. Mr Mollaian led Kevin McCabe to believe that Prince Abdullah was extremely wealthy. He misrepresented the Prince's income as being £20 million to £25 million annually by way of dividends from Saudi Paper Manufacturing Company ("Saudi Paper"), a tissue paper production company in Saudi Arabia founded and part-owned by the Prince. Prince Abdullah said that the most that he received in annual dividends from Saudi Paper was about US$8 million when Saudi Paper was at its peak prior to 2013. Kevin McCabe and Prince Abdullah first met on 16 January 2013 at the Corinthia Hotel in London. Kevin McCabe was accompanied on that occasion by his son, Simon McCabe. A further meeting took place in Riyadh on 13 March 2013 at Prince Abdullah's home. At the time, Prince Abdullah was looking at more than one English football club as a possible investment.

17.   In fact, as was established in cross-examination and had become apparent in 2015, Prince Abdullah, though rich by any standards, was not as wealthy in income terms as Mr Mollaian had led Kevin McCabe to believe, nor as rich as Kevin McCabe assumed that a Saudi prince must be. Most of his assets were illiquid. Prince Abdullah's own wealth was self-made. His principal asset in 2013 was his shareholding in Saudi Paper. Prince Abdullah had himself founded and developed that business. It was worth at that time about US$160 million but declined alarmingly in value in the following years. Prince Abdullah in 2013 had other Saudi and American shares and private equity investments worth about US$30 million net, and owned houses in London and Los Angeles worth in the region of US$40-60 million. In 2013, Saudi Paper declared dividends equivalent to US$5 million, but its business declined in the following years and by 2015 it was not paying dividends at all. This deprived Prince Abdullah of his principal source of income.

6

18.   In March 2013, Kevin McCabe prepared a memorandum stating that he intended to sell:

> "a controlling stake (50.1%) in SUFC [in return for] the new partner investor committing to provide appropriate sums to efficiently run the business with an emphasis on permitting a higher than budgeted player wage bill in order to aid promotion(s) back to the Premier League within a 3-5 year term".

The memorandum referred to a sum of £300 million that could expect to be earned during two seasons in the Premier League, at the new levels of payment for broadcasting rights that were about to come into force.

19.   On 12 April 2013, leases of the property assets were granted to SUFC. The leases provided for different rents to be payable depending on the division in which the Club was playing. Schedule 2 to the lease of the Stadium specified annual rents of £150,000 in League Two, £250,000 in League One, £500,000 in the Championship and £3 million in the Premier League. From April 2013, Prince Abdullah began to undertake due diligence into SUFC, using accountants from Deloitte, lawyers from Onside Law, sports advisers and property advisers.

20.   The Club ended the season in fifth place in League One but did not secure promotion. On 13 May 2013, Kevin McCabe's other son, Scott, was appointed a director of Blades and SUFC.

21.   Following a meeting at the Scarborough Group's London offices between Kevin McCabe and Prince Abdullah's legal adviser, Jim Phipps, on 18 June 2013 Kevin McCabe emailed Mr Phipps draft heads of terms. On the same day, Mr Phipps confirmed that Prince Abdullah had decided to abandon the other football club acquisition opportunity "in preference to pursuing becoming part of the Blades family".

22.   The heads of terms were subsequently negotiated and signed off by the Scarborough Group and Amas Holdings Limited ("Amas") at the start of July 2013. They provided for a formal agreement to be made subsequently for the acquisition by Prince Abdullah of a 50% interest in Blades for an investment into Blades of £10 million and included the following terms:

i)    the intention of the parties to work together over a three to five-year term to achieve (a) promotion of the football club back to the Premier League and (b) re-uniting all parts of the football club by buying back the property assets;

ii)   option agreements to be put in place between SUFC and SUL and the Scarborough Group to buy back the property assets;

iii)  Amas was to provide the £10 million cash investment principally to fund first-team football in order to improve the Club's chances of achieving promotions back to the Premier League. The investment would be made in four tranches between July 2013 and January 2015;

 iv) representatives of the Scarborough Group and Amas would have an equal number of directors on the boards of Blades and SUFC and, with the approval of Amas, Kevin McCabe would initially be the chairman of both;

 v) loans made to SUFC would be reorganised so that SUFC could stand alone, to Amas's satisfaction, but on the understanding that all the property assets will be reunited with the club once Premier League football was achieved;

 vi) "once SUFC have utilised the £10 million of funds from Amas, then thereafter each party will equally provide any agreed further monies as required for the efficient running of the club".

23. On 2 August 2013, SUL and Prince Abdullah agreed a non-binding "deal sheet", which developed the agreed heads of terms. The common intention to seek to achieve promotion to the Premier League and reuniting the property assets within a 3 to 5-year term was restated. There was provision for new leases and options to be entered into. Materially, the new lease of the Stadium was to be at an annual rent of £250,000 while the club was in League One, but on promotion to the Championship or the Premier League the parties were to agree a suitable and appropriate revised annual rent. Similar provisions were to be contained in the new lease of the Academy.

24. The deal sheet stipulated that, prior to completion, the parties were to agree a business plan and operating budget for 2013/2014 which "must demonstrate how the club will be operating on a breakeven or profitable basis during Season 2013/2014 and thereafter". It also provided that either party could inject further cash for equity, with the other party having a right to match it, until one party held 75% of the fully diluted share capital of Blades or until promotion to the Premier League.

25. The deal sheet also provided for Prince Abdullah to have call options on the shares of SUL between years 3 to 7, if promotion to the Premier League was not achieved within three years, or at any time if the Club was relegated. In the event that Prince Abdullah acquired 75% or more of the share capital of Blades, he was to acquire the freehold and leasehold property assets at a price and on terms to be agreed.

26. Subsequently, Prince Abdullah's solicitors, Onside Law, negotiated with Kevin McCabe's solicitors, Shepherd & Wedderburn, the terms of the leases and property options. On 12 August 2013, Onside Law wrote to Shepherd & Wedderburn: "we need a formula to ascertain how the rent will be reviewed upon promotion to Championship and Premiership (and relegation)". Shepherd & Wedderburn replied that they had "stripped back the rent review provisions… to provide for the rent to be the higher of £250k/£60k [i.e. for the Stadium/Academy] and such other figure as the parties agreed. This is in line with… our instructions". This proposal was accepted by Onside Law on behalf of Prince Abdullah and was reflected in the final versions of the new leases.

27. On 16 August 2013, Onside Law wrote to Shepherd & Wedderburn to tell them that Prince Abdullah would be acquiring his shareholding in Blades through a newly incorporated company, UTB.

28. On 30 August 2013, the parties executed the ISA, newly-drafted articles of Association for Blades, new leases of the property assets and a call option agreement

for each of those assets. The ISA is extremely detailed. Reference to its specific terms will be made later in this judgment when I address the particular issues of interpretation of the ISA that arise for determination. At this stage, it is material to note, in the light of the heads of terms and the deal sheet just referred to, how the finally agreed terms reflected or differed from what had previously been agreed on a non-binding basis.

29.   At the start of the ISA the following section, headed "Background" states:

> "(A) The Investor wishes to subscribe for 50% of the fully diluted share capital of the Company [Blades] in return for the payment of £10 million… to the Company in a number of tranches on the terms of this Agreement.
>
> (B) The intention of the Company, SUFC, [SUL] and [UTB] is to work together to seek to achieve the following within the period covering Seasons 2015/2016 to 2017/2018:
>
> (i) promotion of Sheffield United football club to the English Premier league; and
>
> (ii) the re-unification of the freehold and leasehold interests in the property leased to SUFC.
>
> (C) This Agreement sets out the terms and conditions upon which the investment shall be made by [UTB] and regulates the basis on which the Company and SUFC shall be operated."

30.   The annual business plan was not required to be prepared on a break even or profit-making basis. That provision in the term sheet was omitted from the ISA. Clause 6.1 of the ISA contained an acknowledgement that Blades might require further finance to fund its and SUFC's projected cash requirements under the business plan. There is no requirement for each of the shareholders to fund on an equal basis, but each was given the right to subscribe for further shares in Blades for cash at any time, subject to pre-emption rights (effectively giving the other shareholder the right to match the subscription), but not after promotion to the Premier League or when either shareholder held 75% or more of the share capital. The subscription price was fixed at the rate of £5 million for new shares that would amount to a 24.9% holding on a fully diluted basis. The issue of further shares to either shareholder on that basis would require the prior written approval of the other shareholder if the subscriber's holding would as a result amount to 75% or more of the share capital. So UTB could not dilute SUL so as to achieve super-majority control without the agreement of SUL.

31.   If and when any shareholder acquired 75% or more of the share capital, SUFC was to exercise each of the property call options unless the shareholders agreed otherwise. In the event of deadlock on any important issue, each shareholder should have the right to offer to buy all the shares of the other shareholder. The offeree could either accept that offer or buy out the offeror at the same price per share. Both shareholders (not just UTB) were given the option to acquire the shares of the other shareholder during

9

the close season of years four to eight, or after the end of year three at any time if the Club had not by then been promoted to the Premier League or if it had been relegated.

32.  The new leases of the Stadium and the Academy reserved initial annual rents of £250,000/£60,000 and then subject to revision in accordance with provisions in schedules to the leases. These provided for Review Dates on 1 May 2014 and on each anniversary of that date and for the reviewed rent on each occasion to be the greater of the originally reserved annual rent and "such other sum as the Landlord and Tenant may agree". There was therefore no express obligation to increase the rents on promotion.

33.  The property call options each conferred on SUFC the right during a period of 10 years to purchase the freehold or leasehold asset at the market value at the time of exercise or, in the case of the Stadium, the average of (i) the market value at the time of exercise and (ii) a value based on the aggregate of the land value and book value of the property less capital expenditure made during the option period. The contract of sale and purchase arising from exercise of the option was to be completed 12 months after the date of service of the option notice.

34.  The completion documents therefore did not provide that the property call options must be exercised if the Club was promoted to the Premier League, nor was UTB required to have more than 75% of the share capital by that time. The ISA did not provide for further injections of capital that might be needed after the first two years to be provided equally by the shareholders; it merely conferred on each a right to subscribe for further shares for cash.

35.  As a result of completion of the investment of Prince Abdullah in these terms, it was therefore less clear that UTB would be acquiring SUL's shares by any particular time, and unclear who would be funding the annual losses (if any) incurred after the 2014/15 season had ended. The aspiration was for the Club to reach the Premier League within 3-5 years, but of course that could not be guaranteed (and in the event did not happen). The result was that the shareholders had somehow to fund four further seasons of loss-making business of SUFC before the Club did achieve promotion to the Premier League shortly before the start of the trial.

36.  Kevin McCabe believed that a super-rich Prince Abdullah would be exercising his right to subscribe for further shares and would dilute SUL to the point that he obtained super-control of Blades and the property call options would be exercised. SUL would not be troubled to inject further capital and the baton would be passed on. Prince Abdullah believed, consistently with what had been stated in the heads of terms but was not stated in the ISA, that UTB and SUL would be providing the needed capital in equal shares after the 2014/15 season until he was in a position to acquire control.

37.  It did not take very long for the disagreement about funding to arise. By the time that further capital was needed in order to pay SUFC's bills, the Club had failed to obtain promotion even to the Championship and Prince Abdullah was facing a significant decline in his income. The Scarborough Group too, as principally a real estate business, was still suffering from the after-effects of the global financial crisis and recession. Neither side was well-placed to inject further cash.

38. But that crisis was still two years away at the time when the transaction was completed in August 2013. In the meantime, Prince Abdullah became the co-chairman of SUFC with Kevin McCabe. Kevin, Scott and Simon McCabe together with Jeremy Tutton, a Scarborough Group employee, certified accountant and the secretary of Blades and SUFC, became the SUL-nominated directors of Blades and Prince Abdullah, Jim Phipps (Prince Abdullah's then legal advisor) and Selahattin Baki were nominated as directors by UTB. Even though there was (at that time) one fewer UTB-appointed director than the full complement of SUL-appointed directors, the votes on the board were nevertheless treated as equal pursuant to clause 5.10 of the ISA. Prince Abdullah and Mr Phipps also became directors of SUFC at that time.

39. Sheffield United had a disastrous start to the new football season, which resulted in the sacking of the manager, David Weir, on 11 October 2013. Nigel Clough became the full-time manager on 23 October 2013. In January 2014, the chief executive officer ("CEO") of SUFC, Julian Winter, was replaced by Malachy Brannigan, who had previously worked with Mr Clough at another club. The two of them had a close bond, and Mr Phipps (who was effectively Prince Abdullah's eyes and ears in Sheffield) became quite close to them too. Kevin McCabe was less than happy with this axis, in particular with the level of spending for which they were primarily responsible. It appears that the board of SUFC was not exercising effective control of management at that time.

40. Nevertheless, after a poor start to the season, the Club finished strongly (though it failed to achieve promotion from League One) and there was harmony between the UTB and SUL-appointed directors and, to the extent that they had contact, between Kevin McCabe and Prince Abdullah. Prince Abdullah only attended very few matches and only went to Sheffield twice during that first season. Kevin McCabe was, as he had always been, a constant presence at the Club on match days and occasionally during the week. Prince Abdullah was happy to defer to Kevin McCabe to some extent, given the latter's presence in Yorkshire (although he lived in Scarborough and the Scarborough Group had offices in Leeds and London, not Sheffield) and his substantial experience of English football and knowledge of the Club and its affairs. Mr Phipps was present to safeguard Prince Abdullah's interests.

41. Prince Abdullah's ability to be involved with the Club to any significant degree was however curtailed in June 2014 by his appointment by the King of Saudi Arabia to be President of the General Presidency of Youth Welfare in the Saudi government. This was a ministerial position with particular responsibility for sport and youth welfare in the Kingdom. Having considered his position and taken soundings from advisors, Prince Abdullah decided that it was better if he resigned as co-chairman and as a director of Blades and SUFC. Although the King had told him that it was accepted that Prince Abdullah should continue his own business interests, other advisors said that it might be better if he was not seen to be connected to the Club.

42. In a letter written to Kevin McCabe dated 29 June 2014, Prince Abdullah referred to "our beloved Sheffield United" and said that he resigned with great sadness and that:

> "It has been the highlight of my career to serve with you, Kevin, in the chairmanship of the Blades. My departure to serve my country is but for a season. When my duty has been fulfilled, it is my intention to return. Meanwhile, it is my desire

> to see the Club achieve the goals you and I have set for it. I know you share this intention. I thank you and your sons, Scott and Simon,… for introducing and welcoming me and my family to the Blades family. In the year we have spent together as partners, I have caught the Sheffield United bug and have become a Blade and, as you well know, once a Blade, always a Blade!"

43. The letter went on to charge Mr Brannigan and Mr Clough with taking the Club up to the Premier League, assured them of his commitment to the cause and reassured them that the next tranche of finance was on its way. Prince Abdullah considered that he might have to place UTB's shares into a trust, "to provide the required separation between myself and the Club to satisfy applicable Saudi law", but in the event that was not done.

44. Mr Phipps took over from Prince Abdullah as co-chairman and some consequential changes were made in the composition of the two boards.

45. By the autumn of 2014, which was the second year of UTB's initial funding, Kevin McCabe had indicated that there was no further funding for SUFC available from the SUL side, though he did suggest that part of the property assets might be sold to Prince Abdullah to raise funds. By January 2015, the question of funding had revived. On 22 January, Kevin McCabe sent an email to Mr Phipps:

> "on so many occasions over the course of the last six months or more, either Scott or myself have made it clear that Scarborough/the Family simply do not have further financial resources available to invest in SUFC. This statement has also been made to Mal to ensure that there is no confusion between the Joint Owners and Management."

46. On 13 April 2015, Kevin McCabe met Prince Abdullah in Riyadh. By that time, Mr Phipps and Kevin McCabe were disagreeing about what Kevin McCabe saw as Mr Phipps siding with Mr Clough and Mr Brannigan in unnecessary or ill-judged expenditure of UTB's £10 million. Once again, the Club failed to gain promotion to the Championship. Mr Phipps wrote to Kevin McCabe a letter headed "The Future of Sheffield United Football Club" asserting that Kevin McCabe was abandoning a commitment to fund the Club 50/50 after the first two years and criticising him for accepting two years' significant funding from Prince Abdullah then walking away from his responsibilities with three years out of the five-year project remaining. Mr Phipps threatened that if SUL did not fund the Club going forwards, UTB would not do so either and the project would come to an end. Mr Phipps proposed that each side should put in £3 million, with UTB leading the way in June/July and SUL to follow by December 2015. He suggested that thereafter the two sides should work together to identify a replacement investor for SUL before the end of the following (2015/16) season.

47. Kevin McCabe wrote a conciliatory reply to Mr Phipps, referring to the annoyance and frustration of missing out on promotion again, but not making any funding proposal. Three days later he wrote to Prince Abdullah complaining about Mr Phipps

but nevertheless making reassuring noises about his commitment to the Club. The principals then met again in Riyadh on 10 June 2015 to discuss the affairs of the Club.

48.    By that time Mr Clough had been removed as the manager of the Club. Discussions in Riyadh appeared to cover the sustainability of SUFC going forwards, as Kevin McCabe sent an email two weeks later saying that he was going to spend more time at the Club, seek to make more from the property resources that the Club enjoyed and cut costs, in an effort to move away from the "benefactor model" that had applied over the previous two years. Prince Abdullah replied to the effect that his businesses were in trouble and none were paying dividends, and that he had to "cut into flesh" in order to raise £4 million for Blades. At about the same time Mr Phipps had warned Kevin McCabe that if a funding agreement could not be reached by 15 July 2015 the Prince would cease to fund the Club.

49.    These discussions led to a funding agreement ("the July 2015 Funding Agreement") which was signed by Kevin McCabe and Mr Phipps on 2 July 2015, the day after a further meeting between them.

> "We are grateful to have reached a meeting of the minds between [SUL] and [UTB], the 50:50 owners of [Blades]… relative to owner funding of SUFC's 2015 – 2016 campaign for promotion from League One to the Championship… Our joint expectations are to ensure that the executive of SUFC do not expose SUL and UTB to further owner funding over and above the maximum combined amounts now budgeted of £8,000,000. UTB and SUL will henceforth impose sensible controls and disciplines upon the executive along with providing as deemed appropriate experience and guidance to better exploit raising revenues and saving costs for SUFC from both the 'on and off the field' activities.
>
> Additionally SUL and UTB will actively work together to secure new and suitable investors for SUFC in order to aid achievement of our joint aims using if appropriate the benefit of SUL and [Scarborough Group's] real estate investment situated at Bramall Lane, Shirecliffe and Crookes, Sheffield
>
> This letter memorializes the meeting of the minds reached as follows:
>
> 1. Further to the August 2013 [ISA] as it relates to continuing financial support of SUFC by its owners, SUL and UTB have agreed that they will each provide the following financial support to SUFC for use in connection the Campaign [sic] per the following schedule:

| Party | Amount | To be paid in full by no later |
|-------|--------|--------------------------------|
|       |        |                                |

|          |                                                    | than …                  |
|----------|----------------------------------------------------|-------------------------|
| UTB      | £3,000,000<br>(Three   Million<br>Pounds Sterling) | 15   July<br>2015       |
| SUL      | £3,000,000<br>(Three   Million<br>Pounds Sterling) | 15<br>October<br>2015   |
| SUL      | £1,000,000 (One<br>Million   Pounds<br>Sterling)   | 1<br>February<br>2016   |
| UTB      | £1,000,000 (One<br>Million   Pounds<br>Sterling)   | 1   May<br>2016         |
| Combined | £8,000,000<br>(Eight   Million<br>Pounds Sterling) | 1   May<br>2016         |

> 2.  The issuers of the parent guaranties given in respect of
> the obligations of SUL and UTB under the  [ISA] ('the
> Guaranties") have each acknowledged that the funding
> commitments set forth in the funding schedules above are:
> (a) binding each of SUL and UTB; and (B) covered by the
> Guaranties… "

50.  Pursuant to the July 2015 Funding Agreement, UTB paid its initial £3,000,000 on 14 and 16 July 2015.

51.  On 15 October, SUL did not pay its £3,000,000.  Kevin McCabe had formed the view that it was better to drip feed the money into SUFC when it was really needed, rather than pay a large sum in one go.  He did not tell Prince Abdullah that this was what he intended to do.  Mr Phipps discovered that SUL had not paid in accordance with the July 2015 Funding Agreement and informed Prince Abdullah.

52.  Prince Abdullah regarded it as a serious breach of trust.  He sent Kevin McCabe an email dated 17 October 2015 headed "Crossroads", stating "This violates both the letter and the spirit of our [July 2015 Funding Agreement] and constitutes not merely a breach of contract, but a breach of fundamental trust between us as partners".  The letter also complained that "…it has become clear to me that you want to be free of the control approach set forth in the investment agreement, under which we conceded a great deal of decision making power to management" and called on Kevin McCabe to "correct course and pay in the full 3 million pounds before we meet in early November".

53.  Kevin McCabe replied, explaining his reasons for withholding the money, and asserting his faithfulness to the aims of the ISA.  He said that at the meeting in November the key topic to discuss would be his inability to work any longer with Mr

Phipps. Prince Abdullah denied that in his response, stating that the key issue was one of trust between them. He stated that SUL had to pay in full. The email also said that Mr Phipps was not going to remain in position after December and Prince Abdullah said that he might need a lawyer to help him to deal with Mr McCabe.

54.     In a reply dated 29 October 2015, Kevin McCabe blamed the drafting of the July 2015 Funding Agreement and offered to pay the full £3million to Prince Abdullah personally, though not to Blades, but it was in the event paid neither to Prince Abdullah nor to Blades. A sum of £1.3 million was paid to Blades on 23 November 2015.

55.     On 1 December 2015, a further funding agreement was made ("the December 2015 Funding Agreement"), under which 4,000,000 new shares were to be allotted to each of UTB and SUL in order to keep debt off Blades' balance sheet. SUL's outstanding contribution for the year was re-scheduled, to be paid in instalments on 25 January, 15 February and 31 May 2016. UTB was to pay its final instalment in July 2016. The Scarborough Group guaranteed SUL's obligations to pay. Following the December 2015 Funding Agreement both parties paid on time (or early) for the remainder of the 2015-16 season.

56.     At a meeting of Prince Abdullah and Kevin McCabe in Riyadh on 2 or 3 December 2015, agreement must have been reached on the removal of Mr Brannigan as CEO. On 3 December 2015, Simon McCabe emailed his friend Stephen Bettis, offering him informally the chance to take a short-term role as CEO and restructure the football club. Mr Bettis started work in mid-January 2016.

57.     By March 2016, it is evident that Prince Abdullah – though still preoccupied by ministerial duty – was considering how the running of SUFC might change. The football season was not going as well as would have been hoped. Promotion – even to the Championship – was not imminent. The Prince met Scott McCabe on 12 March 2016 at Westfield in London to discuss how the Club might be run in future. It is accepted by all that, even when relations between the Prince and Kevin McCabe were strained, he and Scott McCabe were close and got on well.

58.     But Prince Abdullah had decided to obtain professional assistance. It is evident that for some time he had been concerned by the way in which SUFC was being run and why such substantial losses were being made. He sent two new representatives, Chris Howard, an ex-partner from a top City law firm, and Tareq Hawasli, to Sheffield to make an independent assessment of what they found there. The visit lasted for 3 days and included two meetings with Kevin McCabe. Messrs Howard and Hawasli prepared a detailed report ("the Howard Report"), which – though praising certain good qualities of Kevin McCabe – was damning in other respects: principally that he acted according to his own will and opinions and circumvented good governance. The management of the Club was described as "a fiasco and chaos … where no controls and processes were imposed". The conclusion reached was that Kevin McCabe had unfinished business at the club and was going nowhere:

> "Now that KM has to inject money into the club it is absolutely clear that he will be actively involved at every level of the club and that he will seek to direct the club in every area in order to

> protect his investment and to reduce the amount of cash contribution going forward."

59. The report was not shared with SUL at the time. It must inevitably have coloured Prince Abdullah's attitude to the way in which UTB's interests in Blades should be protected, the appropriate governance structure and the desirability of finding a replacement investor for SUL. The following month, Tareq Hawasli was appointed a director of SUFC.

60. May 2016 brought no promotion and a poor eleventh place in League One. That meant that there would be at least another year of funding a League One club. It would be the fourth season since Prince Abdullah's investment. The 3-5 year plan to regain Premier League status was not going well. The manager was sacked and Chris Wilder was appointed in his place. Mr Phipps resigned and was removed as a director of Blades and SUFC.

61. On 24 May 2016, there was a Blades and SUFC board meeting at the George V hotel, Paris. Mr Bettis's financial presentation indicated a budget for the next year that produced a cash flow shortfall of £8m, subject to possible cost savings. There is no evidence that specific dates for payments of capital contributions were agreed between principals at that time, though Mr Bettis's cash flow probably included them. It was recognised that further external investment was needed. No sooner had Kevin McCabe returned to Manchester airport the following day than he was summoned by Messrs Howard and Hawasli to London to discuss a possible investment from the Qatari Investment Authority. This was named "Project Beta" and included an outline proposal to sell the Scarborough Group property assets (other than Crookes Road) and half the football club for £47.5 million. That would leave the new investor owning most of the property assets and sharing the Club ownership with UTB. The stated aim was for completion on 31 July 2016. Kevin McCabe was enthusiastic about Project Beta.

62. On 20 June 2016, Mr Bettis asked each owner for an injection of £1m to meet SUFC's tax bill. The request had an amended cash flow forecast attached and was said to contain suggested dates for injection of capital by UTB and SUL, but the spreadsheet was not in evidence. SUL paid its £1m on 22 July 2016 but UTB did not pay. Prince Abdullah explained, when chased for his contribution at that time, that he would need a month in which to raise further cash for investment in the Club. But he paid only £200,000 on 23 August 2016, £400,000 on 21 September 2016 and a further £400,000 on 2 November 2016. At this time, Prince Abdullah had no spare cash because Saudi Paper had stopped paying dividends the previous year. SUL was reluctant to pay more money into Blades at a time when Project Beta was progressing. SUFC was in real danger of being unable to pay its employees' wages on a monthly basis. Mr Bettis called for another £1m from each owner in November 2016 but SUL paid only £450,000 on 29 November, £50,000 on 1 December and a further £500,000 on 12 December. When Prince Abdullah was called upon to equalise contributions by paying £1m in January 2017 he did not do so, and SUL had to pay a further £600,000 urgently on 27 January 2017 in order to save SUFC from insolvency.

63. Although Project Beta ultimately came to nothing, to Kevin McCabe's annoyance, by January 2017 a new potential investor had been found by Prince Abdullah in Saudi Arabia. This was presented as being Sela Sport, a Saudi sports media company

owned by Dr Rakan Al Harthy, though in fact the true investor turned out to be a different person. This new investment possibility had openly been discussed between SUL and UTB first in November 2016, though it is evident that Prince Abdullah or those acting for him had been seeking to interest Sela Sport for at least a month before that. This was named "Project Delta". A new and more complicated phase of the story was about to begin.

64. Mr Howard, who was assisting Prince Abdullah with Project Delta, sent Sela Sport and their apparent representative in London, Mr Hossam Alsaady of Nuovo Capital Wealth Management Ltd (described as an affiliate of Sela Sport), a confidentiality agreement, which was signed by Mr Alsaady on behalf of Nuovo on 5 December 2016. Whether Mr Alsaady was at any time acting for Sela Sport is a matter of dispute. The following day, Mr Howard explained to Mr Tutton that exactly the same deal as in Project Beta was to be offered to Sela Sport and that Nuovo were an affiliate and representative of Sela Sport.

65. On 9 January 2017, the three McCabes and Mr Bettis flew to Dubai to meet Prince Abdullah and Dr Rakan. At the meeting with Dr Rakan, it became clear that, although Sela Sport was a possible investor in Blades, there would likely be other investors. The name of Saleh bin Laden was mentioned. At the meeting, an early advance or loan of £3 million was discussed and apparently agreed in principle by Dr Rakan. There is an important dispute about what exactly was said by Dr Rakan and Prince Abdullah at the meeting as regards repayment of the £3 million loan, if that is what it turned out to be, and who the investor(s) might be.

66. As a result of the meetings in Dubai, the McCabes and Mr Bettis returned to England the following day confident that a deal with Sela Sport would be done. This was significant for the McCabes not just because their stake in Blades and SUFC would be acquired, ending their need to fund SUFC's losses, but because they would soon be paid very substantial sums for four of the five property assets. The next day, Mr Tutton emailed a rudimentary draft loan agreement to Dr Rakan.

67. On 28 January 2017, Mr Alsaady informed the parties to the proposed transaction that lawyers were being instructed to prepare a loan agreement between an investment company and Blades. In the event, the investment company turned out to be Charwell Investments Ltd ("Charwell"). The loan agreement dated 9 February 2017 provided for three instalments of £1 million each to be paid on 15 February, 15 March and 14 April 2017, repayable on demand, without interest, on 30 April 2018. It gave the lender but not the borrower the option to capitalise the £3 million as equity in Blades.

68. Blades did no due diligence on Charwell in connection with the money laundering regulations. In fact, the ultimate beneficial owner of Charwell was not Sela Sport but the bin Laden family. What exactly SUL knew and believed at the time and subsequently about the source of the loan is in dispute. The money from Charwell was nevertheless extremely welcome to both SUL and UTB. It saved them from having to make further capital contributions during the 2016/17 season. However, at the date of the Charwell loan agreement, SUL had contributed £1.6 million more than UTB. Although in principle, under the ISA, that entitled SUL to subscribe for more shares and dilute the interest of UTB, it did not seek to do so, no doubt because SUL wanted to sell its stake, not increase it.

69.    The next event of significance was that, in March 2017, over a dinner at The Ivy, Mr Bettis told Kevin McCabe that his other business interests required him to move to Los Angeles later that month. Mr Bettis said that he would not leave SUFC "in the lurch", but at that stage no decision was taken about whether Mr Bettis could or would continue as CEO. At about the same time, Mr Giansiracusa, a lawyer and partner in Jones Day practising from Riyadh, first became involved with Blades and SUFC, initially in connection with the heads of terms and due diligence process for Project Delta.

70.    On 1 April 2017, Prince Abdullah and Kevin McCabe met in the Peninsula Hotel, Paris, to discuss Project Delta and the future of the Club, against the happy backdrop of virtually guaranteed promotion to the Championship at the end of the season. A restructuring of the board of SUFC was discussed, assuming that Project Delta proceeded. Kevin McCabe told Prince Abdullah that Mr Bettis would resign at the end of that season and that a replacement was being sought. Prince Abdullah wanted to be involved in the process of selecting the replacement. After the meeting, Kevin McCabe contacted Mr Giansiracusa to try to arrange a meeting to discuss changes to the boards and arrangements for a successor to Mr Bettis.

71.    During April 2017, things were looking brighter for Blades in certain respects. The immediate funding crisis had passed, though that proved to be only a temporary state of affairs. The Club achieved promotion to the Championship. It was still believed that Project Delta would come to fruition, though possibly not for a full 50% stake in the Club. In Kevin McCabe's mind, payment of the Charwell loan had made Project Delta a virtual certainty. Prince Abdullah's ministerial post came to an end on 23 April 2017, releasing him to devote more time to the affairs of the Club.

72.    It was initially assumed by both Kevin McCabe and Prince Abdullah that, at some time in the near future (though no fixed date was ever agreed between them), Mr Bettis would cease to be CEO. Kevin McCabe did not believe that Mr Bettis could do that important job part-time, based in Los Angeles. Both sides concerned themselves with arrangements to recruit a successor. On 22 April 2017, ahead of their first meeting, Mr Giansiracusa emailed Kevin McCabe and suggested that they discuss the future of Mr Bettis and instruct an executive search firm to focus on proposals for three positions: a CEO, a chief financial officer ("CFO") and a player recruitment position. He also sounded warning notes about the importance of instilling good corporate governance.

73.    The meeting of the McCabes and Mr Giansiracusa (and Mr Bettis) in Sheffield took place on 29 April 2017. Mr Bettis had produced budgets for the following season, which required substantial input from the Project Delta investor. By that time, Prince Abdullah was considering instructing Deloitte to carry out an analysis of the Club's business and a benchmarking exercise. Nothing was decided about the timing of Mr Bettis's resignation.

74.    However, on 12 May 2017, Prince Abdullah had lunch with Mr Bettis in Los Angeles. He found Mr Bettis (whom he had not previously met) to be an impressive man with an independence of mind and sound judgment. He wanted him to remain as CEO. As a consequence, Mr Giansiracusa on Prince Abdullah's behalf prepared a memorandum and draft board resolution, which recorded agreement by the directors that Mr Bettis should remain in post part-time and resolved that the Club should seek

18

to appoint a full-time Chief Operating Officer ("COO"). There is disagreement between the parties as to whether that resolution, which was eventually signed by all directors, amounted to agreement that Mr Bettis should continue to be employed part-time. On 26 June 2017, Andy Birks, a friend of Simon McCabe, started work as COO of SUFC.

75.    By that time, the parties had received some bad news. On 6 June 2017, Mr Alsaady informed Mr Giansiracusa and Mr Hawasli that his principal had decided not to proceed with Project Delta. That was not unexpected: both sides had realised in about mid-May that the deal was not progressing as it should have been. Mr Giansiracusa confirmed the bad news to Kevin McCabe on 11 June and suggested that, when dealing with any future would-be investors (that Prince Abdullah was already seeking), changes needed to be made to the due diligence and legal processes. The collapse of Project Delta meant that annual debt finance was once again an overriding issue for SUL and UTB.

76.    Apart from the need for more money going forward, Blades had to deal with the implications of the £3 million Charwell debt. To comply with the Salary Costs Management Protocol of the English Football League, part of the debt had to be taken off Blades' balance sheet by the end of the season. Mr Tutton ingeniously suggested that that problem and the imbalance in the equity contributions of UTB and SUL in 2016/17 could be addressed together, by UTB taking on liability for £2.3 million of the debt and SUL for £0.7 million (i.e. UTB contributing £1.6 million more than SUL). It was later decided that, instead, £1.6 million of the Charwell loan should be novated to UTB, leaving Blades liable to repay £1.4 million. That suggestion was rather indelicately put to Mr Alsaady, on behalf of Charwell, who initially was uncooperative, with the result that no resolution was achieved in time to avoid a temporary embargo on the Club's transfer activity. Had the issue not been resolved (as it later was, on 25 July 2017) it could have had a damaging impact on the Club's ability to position itself for the new season in the Championship.

77.    After the end of Project Delta there was a period of some weeks leading up to an important meeting between Prince Abdullah, Mr Giansiracusa and Kevin McCabe at the Grand Resort, Bad Ragaz, Switzerland on 24 July 2017. Detailed communications took place in that period between Mr Giansiracusa and Kevin McCabe in relation to the restructuring of the boards of Blades and SUFC. Kevin McCabe was very keen to see Selahattin Baki and Tareq Hawasli removed as directors. Those communications gave rise to a number of misunderstandings and disagreements, in particular about Prince Abdullah's prerogative to appoint whomever he wished to be a director of Blades or SUFC. In addition, it was clear that Kevin McCabe envisaged Mr Bettis's involvement being phased out quickly, as Mr Birks settled in to the COO role, and that he should be guided by the McCabes or Prince Abdullah (not Mr Bettis) until he was ready to take over as CEO.

78.    In an email of 28 June 2017, Mr Giansiracusa criticised the suggestion that matters should carry on in that way and rebuked Kevin McCabe for seeking to interfere in the management of the Club. He stated that it had been understood that Mr Bettis would remain as a part-time CEO for the forthcoming season and that he and Prince Abdullah would be extremely concerned if there was any deviation from that understanding. The seeds of the November 2017 breakdown in relations had now been sown. They were then watered by constant conflict between Mr Giansiracusa's

19

determination on behalf of Prince Abdullah to impose orthodox corporate governance,
allowing the board of SUFC to determine strategy and hold the managers to account,
and Kevin McCabe's resistance to that, though the motives of each side in this respect
are in dispute.

79.    At Bad Ragaz, the parties discussed: board composition; the senior executive
positions at SUFC; rent increases for the Stadium and Academy; the technical
committee of the Club, and the Deloitte proposed benchmarking exercise.

80.    The composition of the boards was agreed. Each board would now comprise three
appointees of each shareholder and the two boards would be identical. Prince
Abdullah and Mr Giansiracusa would come onto the boards with Mr Hawasli, and Mr
Baki being removed; the SUL appointees were to be Scott McCabe, Simon McCabe
and Mr Tutton.

81.    No agreement was reached as to whether Mr Bettis would stay as CEO until the end
of January 2018 (a weakening of Prince Abdullah's position from the terms of the
board resolution of June 2017), the end of August 2017 or mid-September 2017 at the
latest (Kevin McCabe's position). But it was agreed that in the meantime Mr Bettis
would take steps to prepare Mr Birks to assume the CEO role at the end of the
2017/18 season. It was also agreed that, if Prince Abdullah required it, the Club must
appoint a CFO chosen by the Prince (in accordance with clause 5.11 of the ISA), and
that the Club would retain The Savannah Group (executive consultants) to conduct a
search for suitable candidates. However, Kevin McCabe is minuted as requesting
Prince Abdullah to reconsider the exercise of his right, as it could be disruptive to Mr
Birks. What exactly was said about Mr Bettis at Bad Ragaz is disputed.

82.    The question of rent increases had been raised by SUL once it was suspected that
Project Delta would fail, leaving SUL (and UTB) with the need to find cash to fund
the following season's business. The issue was raised by SUL by means of a
cashflow forecast for the season, which included a rent of £1.65 million (instead of
£310,000) for the Stadium and the Academy. UTB refused to consider a rent
increase, both before the meeting at Bad Ragaz and at it, but Prince Abdullah
expressed willingness to address the issue again the following year and stated that if
the Club achieved promotion to the Premier League he would be likely to exercise the
property call options. (Since the call options only allowed SUFC to exercise the
options, not UTB, this must have been on the assumption either that by then UTB
would have taken control of SUFC, by one means or another, or that SUL would
concur in their exercise.)

83.    There was agreement at Bad Ragaz to re-activate the technical football committee
according to the terms of the ISA, but its membership was changed to include a
shareholder representative for each side as well as the club manager, the head of
football administration (Mr Shieber) and Mr Birks (or the CEO for the time being).

84.    Prince Abdullah was keen to have Deloitte's professional opinion on how well and
efficiently Club was being run. He did not have the right under the ISA to have
accountants carry out a review of SUFC's activities, and so was dependent on the
agreement of the board (or of Kevin McCabe as the appointor of SUL's board
representatives) for such a review to take place. The minutes for Bad Ragaz record
that Kevin McCabe did not "agree" that Deloitte should be mandated to carry out the

review (since he had no faith in consultants) but "accepted" that Deloitte should be mandated, and that this acceptance was qualified: "provided that it was postponed until 1ˢᵗ November 2017". After being sent the amended minutes for signing, Kevin McCabe wrote back to Mr Giansiracusa saying "think better wording is '…Accordingly he did not agree to the mandate but was happy to accept it being discussed further in November'". He was immediately challenged on this by Mr Giansiracusa, who said that Kevin McCabe was changing his position. The parties still differ as to what exactly was said about Deloitte at that meeting.

85.    Two days after that, Kevin McCabe asked to see the brief given to Deloitte and asked Prince Abdullah to obtain a competitive quotation for the work from Grant Thornton. Prince Abdullah agreed to send the brief and asked: "if we don't agree on the end, will you stick to your promise in Bad Ragaz about accepting to this even if you Don't agree? [sic]" Kevin McCabe replied: "between now and November I will adhere to our debate in Zurich but at the same time do my utmost to convince you that there's no benefit in spending needless sums in employing so called 'Experts' to tell us how to run an English Football Club". He agreed to instruct Grant Thornton to give a quotation for the work.

86.    Shortly before this, with the agreement of Charwell, £1.6 million of the Charwell loan was novated to UTB. Under the Subscription and Novation Agreement, Blades was released from liability for that amount, UTB assumed liability for that amount and Blades (acting by Mr Tutton) confirmed and agreed that the Charwell loan remained in full force and effect to the extent of a debt of £1.4 million. It was SUL's original pleaded case that this transaction was a disguised gift and therefore a bribe to Prince Abdullah, but that case was all but abandoned at the end of the trial.

87.    On 24 August 2017, Mr Bettis emailed Mr Giansiracusa and told him that Kevin McCabe had expressed a desire not to proceed with the recruitment of a CFO. Mr Giansiracusa told Mr Bettis that SUL had no say on the CFO, since the ISA gave the right to appoint a CFO to UTB, and he instructed Mr Bettis to proceed with The Savannah Group's work in that regard.

88.    On 20 September 2017, Kevin McCabe sent his sons an email expressing the wish that SUL's board representatives would continue to address the disputed issue of the recruitment of a CFO and stating that he had "agreed also with Steve [Bettis] he should step down as CEO as at 31ˢᵗ October". By this stage, Mr Tutton was suggesting to Kevin McCabe (email of 11 September 2017) that, in view of the Project Beta/Delta debacle, SUL could not trust UTB and that Kevin McCabe should refuse to cooperate further until the ISA was amended to provide for, among other things, a rent review. The email ends: "How much time are you prepared to lose with these awful partners?"

89.    Ahead of a board meeting of SUFC due to take place on 26 October 2017, Kevin McCabe sent the SUL appointees (including Mr Bettis, who had by that time been re-appointed a director in place of Scott McCabe) a memorandum expressing his wishes about the stance that should be taken on various issues at the board meeting. As regards the technical football committee, the memorandum records that Kevin McCabe wished to see Jan van Winckel (a Belgian football coach known to Prince Abdullah) replace Mr Baki, though recognising the need to work harmoniously with the team manager in that regard. It states that Kevin McCabe did not wish to see a

21

high-ranking new executive appointment made, but rather that Mr Birks and Mr Tutton could bring a new finance person on board at a modest salary. While recognising SUL's right to appoint a CFO, he suggested that it was totally inappropriate to do so at such a high salary, which was unaffordable.

90.     As regards Mr Bettis, the memorandum reads:

> "I suggest Stephen writes to Prince Abdullah and myself confirming that he wishes to step down as CEO as from 31st October but of course retain his position as a Director on the Boards of BLL/SUFC representing SUL."

Since this memorandum was sent to Mr Bettis, it was in effect an instruction to Mr Bettis to tender his resignation.

91.     As regards Deloitte, the memorandum stated that all were as one in reaffirming to Prince Abdullah that there was no point in undertaking a benchmarking exercise of SUFC, and that any costs incurred or to be incurred should not be the responsibility of Blades/SUFC. The memorandum urged the appointees to continue to press on the property rents issue, and it reminded them that the Charwell loan was intended to be phase 1 of Project Delta and was as such a responsibility of Prince Abdullah, so that the residual £1.4 million debt "also remains as his responsibility to the Club in order to extinguish this unforeseen debt". This was an issue that had not previously been raised with Prince Abdullah or anyone else, after Kevin McCabe declined Mr Tutton's suggestion in February 2017 that SUL ought to ask Prince Abdullah to guarantee the Charwell loan, but the memorandum making this assertion (and the other points summarised above and below) was sent to all SUFC directors, including UTB appointees, prior to the board meeting.

92.     Finally, Kevin McCabe stated in the memorandum that there was a clear implication in the stated aim underlying the ISA that Prince Abdullah would secure sufficient finance to get back into the Premier League. There were to be no further funds for SUFC provided by SUL "given current circumstances".

93.     By this time, Kevin McCabe had opened negotiations with Alan Pace of ALK Capital Inc ("ALK") to sell SUL's interest in Blades. UTB had been notified of this interest and a draft non-disclosure agreement was provided to give ALK access to the data room that had been set up.

94.     Against this background, the board meeting of SUFC took place on 26 October. Contrary to Kevin McCabe's instruction, Mr Bettis had not resigned. It is evident from the transcribed recording of the meeting that: UTB did not want Mr Bettis to resign but to continue part-time until the end of the season; Mr Bettis did not want to resign but agreed to do so if that was what either of the owners required, rather than be the cause of disharmony; and that neither Mr Tutton nor Mr Green (the SUL-appointed directors) stated at the meeting that SUL did require Mr Bettis to resign, though Mr Tutton challenged Mr Bettis's ability to do the job properly even on a part-time basis. The proper interpretation of what happened at this meeting, against the background leading up to it, is a matter of dispute between the parties, though it is common ground that no matter was voted upon. Kevin McCabe's understanding (though he was not at the board meeting) was that Mr Bettis was to stop working for

SUFC on 31 October 2017. UTB's understanding (both Prince Abdullah and Mr Giansiracusa were at the meeting) was that the question was unresolved.

95.   As regards the Deloitte benchmarking, Mr Giansiracusa again explained why the work was required and Mr Tutton agreed to raise the matter again with Kevin McCabe, but no further decision was made.   There was however unanimous agreement that Mr van Winckel would be a suitable replacement for Mr Baki on the technical committee, and Mr Bettis agreed to discuss Mr van Winckel's financial terms with Kevin McCabe. Mr Tutton raised once more the question of rent review, to which Mr Giansiracusa responded that "the rent would be reviewed in good faith if and when the club attained [Premier League] status, but whilst deficits existed UTB would stand behind the legal agreement". The suggestion that the balance of the Charwell loan was the liability of Prince Abdullah was rejected by both the Prince and Mr Giansiracusa.

96.   Following the board meeting, Scott McCabe and Mr Tutton exchanged emails about Mr Bettis. Scott McCabe said that his father had asked him to establish whether Mr Bettis was "off the SU payroll", to which Mr Tutton replied: "no far from it". Scott McCabe then asked: "does Stephen want to remain in title/position?", to which the reply was: "of course he does". "And salaried?" "He thinks he is on half salary at his current rate". It would therefore have been clear to Kevin McCabe then that Mr Bettis had not resigned and wished to remain in position.

97.   Prince Abdullah and Kevin McCabe met at the Corinthia Hotel on 1 November 2017 for a "clear the air" meeting. Emails exchanged after the meeting show that Kevin McCabe confirmed UTB's decision to proceed with Deloitte and accepted it, and that it was agreed that Mr van Winckel would work for three months on a probationary consultancy arrangement, with the precise role and terms to be confirmed.

98.   Oddly, the resignation or continuation in office of Mr Bettis appears not to have been discussed at the Corinthia Hotel. Neither did Kevin McCabe tell Prince Abdullah what he had instigated as regards Mr Bettis the day before their meeting. This was to remove Mr Bettis from the SUFC payroll without notifying anyone (including Mr Bettis) other than Mr Birks and Mr Tutton, who were instrumental in stopping Mr Bettis's pay. The sequence was as follows:

   i)   On 31 October 2017, Kevin McCabe emailed Mr Birks on a private and confidential basis, copied to no one, saying:

        "as I believe you're aware Steve B steps down as an assumed CEO of SUFC as from close of play today. This accords with sensible discussions that Steve and myself have held over a good few weeks/months… Now you've settled in very well to your COO duties and responsibilities then as in past months where you need guidance and direction then I'm always to hand and am available in an 'untitled CEO type role' to help. So please request Neal Barber to remove him from the payroll as from the end of October."

   ii)   The following day, Mr Birks replied:

"… In order to stop his pay, technically HR need a letter or an email confirming his resignation or otherwise we can be accused of constructive (not that he would) dismissal. Is this possible?"

iii)    Kevin McCabe responded:

"not needed. Speak tomorrow"

iv)    On 6 November 2017, Mr Tutton emailed Mr Birks, on Kevin McCabe's instruction, copying in no one else:

"further to your telephone request please accept this email, in my capacity as Director of SUFC, and remove Stephen Bettis from the SUFC payroll as from 31 October 2017."

99.    The result was that Mr Bettis's pay was stopped, but neither he nor the UTB directors were told about it. Mr Bettis continued to work (the amount of work he did is disputed) during November without realising that he was not going to be paid. SUFC's head of HR was only obliquely informed that Mr Bettis's status had been changed by SUL when she emailed him (copied to four other directors) about a proposed contract of employment for the new CFO, Simon Ratcliffe. Mr Tutton replied (copied to no one):

"I am perplexed by this, why are you dealing with Stephen Bettis since he has stepped down from his CEO role which he has clearly been unable to fulfil since he moved abroad?"

Prince Abdullah and Mr Giansiracusa first learned of what Kevin McCabe had done when Mr Bettis complained to them, in an email of 30 November 2017, that he had only just discovered that he had been working for a month and would not be paid.

100.    On 8 November 2017, Kevin McCabe emailed Mr Giansiracusa stating that the mandate to Deloitte:

"… should not be triggered at this particularly busy period of the year and critical time for first-team football. Logic says that once the mandate is understood and approved then February would seem to be more appropriate giving Andy and his key people time to prepare."

In his reply on 11 November Prince Abdullah said:

"I have to be frank with you, if after what we agreed on our last meeting in London regarding Jan and Deloitte doesn't start this week, I see it very difficult that we can work on any thing together, I hope both of these things move forward this week."

There was subsequently no movement on either from SUL.

101.    On 10 November 2017, Mr van Winckel had emailed Prince Abdullah, after meeting Kevin McCabe, to say that he considered that Kevin McCabe was seeking to postpone

24

Mr van Winckel's appointment on the grounds that it would disrupt the momentum that had been developed at the Club. Kevin McCabe wrote to Prince Abdullah two days later and said:

> "I like Jan… However at SUFC we have a very 'British cultured' + 'Sheffield centric' football management team… Let matters rest until the end of this season and then we can sensibly readdress."

The following week, Kevin McCabe emailed Mr van Winckel telling him that his attendance at the Club was contradicting Kevin McCabe's decision, and telling him not to interfere with the smooth running of the Club and to let colleagues concentrate on their jobs without distraction. Later, he told Prince Abdullah in an email that Mr van Winckel could not now be appointed to the technical committee or be employed in any shape or form by the Club.

102.   By mid-November 2017, Mr Ratcliffe had been identified as the preferred candidate for appointment as CFO. On 14 November, Mr Birks emailed Mr Giansiracusa requesting clarification:

> "in order for Catherine [Frost] to send out the offer letter to Simon Ratcliffe, we need confirmation of the reporting line please. I have attached the new starter authorisation form but need this information to complete the form…"

103.   Mr Giansiracusa replied on 15 November, copying in Mr Bettis:

> "regarding the reporting lines, Simon will have a solid line to UTB (Prince Abdullah) and a dotted line to the CEO. The Investment Agreement mandates only the solid line but I think a dotted line to the CEO is good corporate governance and UTB agrees."

A similar email, with an explanation, was sent to Ms Frost and Mr Bettis, copied to Mr Tutton. Ms Frost had prepared a draft offer letter, stating that Mr Ratcliffe would be directly responsible to the CEO and the board of SUFC, and copied in Mr Tutton, among others. Mr Tutton forwarded it to Kevin McCabe (saying "this is moving fast") and shortly afterwards received from Mr Birks Mr Giansiracusa's email about reporting lines, which was similarly forwarded by him to Kevin McCabe. As a result, Kevin McCabe attended Bramall Lane that afternoon (he had been in London but was planning to travel to Sheffield that day in any event) and a meeting took place with Ms Frost and Mr Tutton.

104.   As a result of that meeting, Ms Frost amended the offer letter and draft contract so that Mr Ratcliffe was to report to the COO, i.e. Mr Birks, not the CEO, as instructed by Mr Giansiracusa, who no longer existed at the Club so far as Kevin McCabe and Mr Tutton were concerned. No further change was made by Ms Frost to the reporting lines. However, Ms Frost copied the amended letter and contract to all the SUFC directors and indicated that Kevin McCabe had required changes to be made. As a result, Mr Giansiracusa discovered that Kevin McCabe had intervened in the preparation of the contract. He drew Kevin McCabe's attention to clause 5.11 of the

ISA, which entitled UTB to appoint a CFO, and stated that he was wrong to interfere and that any further interference on this issue would represent a breach of the ISA. The email was copied to Ms Frost.

105.   Kevin McCabe responded:

> "you're a gentleman who certainly lacks grace and has of yet learnt so little as to understanding the business of Sheffield United FC. This in part is emphasised by sending your email to Catherine an employee of the club creating confusion and at the same time besmirching myself... My direction and leadership is always to benefit SUFC and my partner and does not waver as Prince Abdullah recognises."

He added that Mr Giansiracusa should have the bravery to pick up the phone and not dictate email traffic that indicated a desire to create disputes. This email was copied to Prince Abdullah and the directors of Blades.

106.   Prince Abdullah responded to this the same day:

> "i have had the pleasure of knowing Yusuf for over 20 years, I can honestly from experience say that he has more grace than most of the people I met all my life, he is also a man of his word, classy, intelligent and educated, above all he is a good Muslim, as for our partnership, it is obviously deteriorating to the point I'm afraid it is very difficult to fix, he is only communicating with you via email because meetings as I tried many times is not working, i got your ok in Bad ragaz for Deloitte a few months ago, i met you with you again in London three weeks ago and you gave your word and agreed to Deloitte and Jan and that didn't happen yet, please be sure that things will not continue as they were before and time will prove that, i will not be writing to you anymore."

107.   Following those exchanges (and before Prince Abdullah and Mr Giansiracusa became aware that Mr Bettis's pay had been stopped), Mr Giansiracusa sent a detailed response to Kevin McCabe's email on 19 November 2017. The response had been considered by those on the UTB side. It characterised Kevin McCabe's interference in Mr Ratcliffe's appointment as "duplicitous" and a blatant attempt to deceive UTB. The email referred to Kevin McCabe's "seemingly uncontrollable insistence on meddling in matters which neither concern you nor benefit from your involvement". It accused Kevin McCabe of being a bully and refusing to compromise, yet lacking the intellectual integrity to make out an argument. The email criticised Kevin McCabe for going back on his promises in relation to Deloitte and Mr van Winckel:

> "when a person has integrity, when his word is his bond, a handshake is enough. This is how Prince Abdullah usually operates and it usually serves him quite well. Regrettably, it is no longer how we can do business with you. When a person manipulates facts to serve his purpose, promises one thing and then does another and in general, openly and notoriously flouts

the truth, then those around him would be foolish not to put things in writing. We are not foolish people and you have only your own weak grasp on honesty to blame for the fact that we want everything in writing…

In short, if you cannot act as a constructive and co-operative partner, we shall likewise stop indulging you in what has proven to be a misguided effort at achieving informal consensus and require that all directions to management be given through formal board processes. If, on reconsideration, you wish to preserve a more harmonious and co-operative working relationship, you will withdraw any objections to the Deloitte mandate and will allow Prince Abdullah to manage Jan [van Winckel]'s retention as a consultant. We do not need you to 'promote' anything or be otherwise involved …

While I am under no illusion that this will be seen as a welcome or friendly communication, let me close by emphasising that despite your disruptive and frequently malignant behaviour, we, as your partners, have no such instincts. We respect the people you have around you, including Jeremy, Stephen and Martin, while accepting their duty of loyalty to SUL. We bear no animus and seek nothing but the best interests of the Club and the benefit of our bargain for rights under the [ISA]. While we are neither petty nor vindictive, please do not underestimate our resolve. We will take counsel given in good faith from all quarters but we shall no longer tolerate your version of business as usual. "

This email was tough and uncompromising in its language: probably more personally offensive than it needed to be to convey the message that it conveyed. It does reflect UTB's anger at the way that (as it perceived it) Kevin McCabe had reneged on commitments that he had made to Prince Abdullah and was seeking to interfere in UTB's exercise of its rights under the ISA. What UTB and SUL were each seeking to achieve at this time are matters that are hotly disputed.

108. In response to Prince Abdullah, Kevin McCabe characterised Mr Giansiracusa's email as "long winded" and "disrespectful and threatening". He expressed himself to be at a loss as to why there was so much infighting when business on and off the field was performing well. He said:

> "by the way I'm not 'interfering or meddling' - my remarks are always meant to help as SUFC's business is in Sheffield, England not Riyadh, Saudi Arabia where managing people is not best achieved via 'edicts and resolutions' produced as if the recipients are subservient. It's accomplished by adapting to our culture and being present, talking and explaining. To my knowledge Yusuf has only been to Sheffield twice so he cannot possibly have an affiliation with SUFC personnel."

109.  Kevin McCabe told Mr Giansiracusa in reply that he had no desire to have further
dialogue with him and wished to know whether his "edict demanding missive" was
written as a legal adviser on behalf of Prince Abdullah, directors of UTB or directors
of Blades/SUFC, or written in his capacity as a director of Blades/SUFC. He added:

> "the partnership between Prince Abdullah and myself relates to
> a Football Club that has for 162 years been situated in
> Sheffield, England. The culture of individuals from the North
> of England is naturally far different from those based and living
> in Riyadh, Saudi Arabia. We are not subservient people who
> respond to 'edicts demands and resolutions' in a fearful way.
> The 'need for change' rests with you as should always have
> been apparent to an experienced professional businessman. "

110.  On 24 November 2017, Kevin McCabe sent Prince Abdullah a further email referring
to various points discussed at the Corinthia Hotel on 1 November 2017. He suggested
that the Deloitte exercise was underway, even though he didn't agree with it, but that
the proposals for Mr van Winckel's involvement on the technical committee could not
now be agreed by him as it would be detrimental to the club. In fact, the Deloitte
exercise was not underway. Kevin McCabe said in evidence that he had spoken to
Deloitte in Manchester about the possibility of starting work in February 2018. As for
Mr van Winckel, Kevin McCabe wrote to the SUL directors the next day, stating:

> "… There's only one issue that for the moment needs to be
> firmly addressed and thus confirmed by you as Directors of
> SUFC namely to confirm that Jan van Winckel does not have
> our approval to sit as a member of the clubs Technical
> Committee or in any shape or form be employed - directly or as
> a consultant - by the club. Can I assume you're all in
> agreement?"

111.  Later that day, Kevin McCabe emailed Mr Bettis stating that he had received
confirmation from Mr Green and Mr Tutton regarding Mr van Winckel and would be
grateful for Mr Bettis's reply that Mr van Winckel was not needed. He added: "sense
that this will bring the dispute with HRH to a head".

112.  Shortly after this, Kevin McCabe received a proposal from Mr Pace at ALK in
America relating to the acquisition of up to 90% of SUFC. This proposal was a
response to a previous proposal made by Kevin McCabe to Mr Pace. Between 1 and 3
December 2017, Kevin McCabe and Mr Tutton discussed proposed heads of terms
that included an initial advance of £10 million by ALK to allow SUL to serve a call
option notice on UTB under clause 11 of the ISA. Kevin McCabe proposed buying
out UTB's interest so that ALK and SUL could together seek to promote the Club's
interests and reunite the property assets with the Club, with a view to ALK taking in
due course an 85% stake of both. He explained the terms of clause 9.1.12 and clause
11 of the ISA to Mr Pace, pointing out that the clause 9.1.12 mechanism requiring
SUFC to exercise the property call options was drafted for SUL's benefit and that it
was potentially onerous for UTB because they would have the "headache" of
procuring the substantial monies required to pay for the property assets. He expressed
the view that, in view of UTB's past reluctance to "go for it", a "modest but sensible
and respectful offer" would suffice to obtain full control of the Club. Draft heads of

terms followed the next day for an initial sale and purchase of 60% of the shares in Blades with an option to acquire up to 85%, the price for the shares to be agreed and the price for the property assets to be market value.

113.   On the same day that the draft heads of terms were sent to Mr Pace, Kevin McCabe sent Prince Abdullah a further email, asking whether it was UTB's intention to litigate against SUL and expressing the view that the relationship with UTB was not working ("your colleagues – including new appointment Jan – are nowhere near either understanding or managing SUFC's day to day business operations on and off the field of play"), that there were decisions to be made and that he and Prince Abdullah should meet before Christmas.

114.   On 12 December 2017, Kevin McCabe emailed Prince Abdullah seeking to convene a Blades board meeting on 11/12 January 2018 in Sheffield and informing him that the McCabes would again become directors of Blades and SUFC.   On the same day Mr Bettis sent Prince Abdullah and Mr Giansiracusa formal notice of his resignation as CEO, following his discovery that his pay had been stopped at the direction of Kevin McCabe.   Also on the same day, Mr Giansiracusa sought to give notice to the directors of SUFC, Mr Birks and Mr Ratcliffe of an emergency board meeting of SUFC to take place on 18 December 2017 to consider the recent conduct of Kevin McCabe, to reaffirm Mr Bettis's status, to discuss steps to enhance and assure compliance with the ISA, establish proper reporting lines and discuss the Club's plan for the January 2018 transfer window. The proposed resolutions included apologising to Mr Bettis, Mr Birks and Ms Frost for what had happened.

115.   Mr Tutton on behalf of SUL objected to the notice calling for an emergency meeting (and its contents). On the same day, he sent revised heads of terms to Mr Pace suggesting that a conference call should take place early the following week to finalise them "as we are keen to trigger the Call Option with UTB LLC as soon as possible".   The revised heads of terms still included a £10 million cash facility, to fund the acquisition of UTB's shares, and ALK would pay a further £7 million for its 85% holding, fund the club in future, and pay higher rents for the principal property assets with a five-year option to acquire the property assets at an aggregate price of about £66 million, or such other amount as might be agreed.

116.   On 17 December 2017, Mr Giansiracusa sent Kevin McCabe a more conciliatory email, suggesting that they ought to be able to work together constructively, but without Kevin McCabe expecting to get his way by using brute force. He expressed a wish to move forward and to discuss and address issues in a mutually respectful way. The email pointed out that the alternative, a trajectory of confrontation, was one in which SUL could expect to see its commercial interests adversely affected in various ways. By way of brief response, Kevin McCabe agreed to speak to Mr Giansiracusa the following day.

117.   In the event it appears that they spoke on 20 December 2017. Before then, Kevin McCabe and Mr Tutton had exchanged emails about the tactics for exercising the call option on UTB's shares. Mr Tutton proposed offering to subscribe under the ISA for £5 million of new capital, to see whether UTB was in a position to offer to match it, to maintain equality. He said: "if they say they can match we know we should just go for the Texas shoot out at our higher end of £10m – If they cannot match we go in at a much lower price". Kevin McCabe replied stating that it potentially was a wise move

and that he would discuss quietly with the club manager the January transfer window requirements as a proper reason for "upping the ante by investing above the agreed £1m".

118. On 20 December 2017, Mr Giansiracusa emailed Prince Abdullah in the following terms:

> "I'll fill in the colour when we talk. KM and I spoke for over an hour. It was much more productive than I had expected. Not so much on Jan or Deloitte but on longer-term issues.
>
> KM says he wants to sell but wants the real estate to be part of the deal. The concept he offered is this:
>
> 1. Purchase price for 100% of SUL's shares of BLL = £10 million
>
> 2. Fair market rent for Bramall Lane and the Academy
>
> 3. Purchase of Bramall Lane with payment over 3-5 years
>
> 4. Purchase of other real estate within 5-6 years
>
> obviously an opening offer but he seemed to be in a mood to exit and he clearly and thought about it [sic]
>
> We agreed that he would keep up the discussion with me. I told him you were upset about his behaviour and didn't want to speak with him but that I'd convey to you whatever KM and I discussed. We agreed to keep this among the three of us for now "

119. Notwithstanding that offer to sell the SUL shares, Kevin McCabe was preparing to serve a call option notice. On 22 December 2017, Mr Tutton sent a draft notice with a price of 30.12p per share, resulting in an aggregate price of £5 million.

120. On 23 December 2017, Kevin McCabe emailed Mr Pace with festive greetings stating:

> "working on the Sharp proposals over the holiday period as instinct tells me Prince Abdullah realises it's best for him to depart. Thus with the importance of the January transfer window - which brings with it decision-making re-new players etc. - dealing now seems sensible. I'll keep you posted as matters progress and reaffirm we are up for Sharp to knock the transaction in place during the coming weeks."

"Sharp" was the agreed name given by the negotiating parties to the proposed acquisition by ALK of control of SUFC.

121. On 29 December 2017, a call option notice pursuant to clause 11 of the ISA was served on UTB, under which (in accordance with its terms) SUL offered to buy

UTB's shares at 30.12p each and also offered to sell their shares to UTB at the same price ("the Call Option Notice"). A completion date of 2pm on 6 February 2018 was specified. No prior notice to UTB of SUL's intention to serve the Call Option Notice had been given.

122. So far as SUL was concerned, the die was now cast and matters were out of its control. UTB had the power either to sell for £5 million or to accept the alternative offer and buy SUL's shares for the same price. As UTB was by this time aware, an acceptance of the alternative offer would trigger the obligation in clause 9.1.12 of the ISA and require SUFC to exercise the property call options. That in turn would require SUFC (controlled by UTB) to pay for the property assets within 12 months.

123. On 10 January 2018, Prince Abdullah decided to accept the alternative offer. But UTB did not serve a counternotice at that time. It waited until the last working day before the contractual deadline for service of a counternotice, namely 26 January 2018. Before that date arrived, UTB took a number of steps with a view to defeating the operation of clause 9.1.12 of the ISA upon completion of the share sale.

   i)   On 22 January 2018, UTB and Mr Giansiracusa entered into a written agreement, under which Mr Giansiracusa agreed to buy for £3,000,000 60 percent of the shares to be acquired by UTB from SUL and UTB agreed to ensure that these shares were transferred by SUL to Mr Giansiracusa on completion. The agreement gave Mr Giansiracusa a put option to sell all or a proportion of the shares to UTB and UTB a call option to acquire the shares from Mr Giansiracusa.

   ii)  On the same day, Prince Abdullah's lawyers caused to be incorporated a company in Nevis called UTB 2018 LLC ("UTB 2018").

   iii) On 24 January 2018, a stock transfer form was executed by UTB for the transfer of 13,280,000 shares in Blades, amounting to 80% of its existing holding in Blades (40% of the Blades share capital) to UTB 2018 for the expressed consideration of £1. The stock transfer form was signed on behalf of UTB by Mr Giansiracusa. On the same day, UTB and UTB 2018 executed a deed of adherence in accordance with the form annexed to the ISA, by which UTB 2018 covenanted with the parties to the ISA to comply with its terms.

   iv)  On 25 January 2018, Jones Day on behalf of UTB sent Mr Tutton as secretary of Blades the stock transfer form and the deed of adherence. The email stated that UTB 2018 was under the control of Prince Abdullah and that the transfer was therefore permitted under the articles of association of Blades. The email asked Mr Tutton to write up the transfer in the register of members as soon as possible. Mr Tutton in response raised some questions about UTB 2018 and pointed out that the deed of adherence needed to be revised, given that UTB was going to remain a shareholder of Blades. He asked what the reason was for the transfer and whether a counternotice was to be served by UTB to the Call Option Notice.

124. Before UTB's counternotice was served on 26 January 2018 ("the Counternotice") the solicitors acting for SUL emailed Mr Giansiracusa, asking whether he could confirm that (as they had been advised) it was UTB's intention to serve a counternotice. Mr

Giansiracusa replied the following day (25 January) stating: "I don't have instructions from my client. You'll be notified if and when I do." When it was served the following day, the Counternotice confirmed a completion time of 2pm on 6 February 2018.

125.   After service of the Counternotice, Mr Tutton and Jones Day agreed that the deed of adherence should be amended to remove the reference to the release of UTB from the terms of the ISA.

126.   On 29 January 2018, an undated written agreement was prepared, under which Prince Musa'ad agreed to buy for £1,000,000 20% of the shares to be acquired by UTB from SUL (on terms similar to those of the agreement made with Mr Giansiracusa on 22 January) and it was sent to Prince Musa'ad. It was apparently signed on a different version of the document by Prince Abdullah's son, Prince Abdulrahman, on behalf of UTB.

127.   On 30 January 2018, SUL's solicitors wrote to the directors of SUFC contending that UTB had acquired all of the share capital of Blades, on the basis that it remained the legal registered owner of its own 50% of the shares and had acquired a beneficial interest in SUL's 50%. The letter stated that the directors were required to execute and serve option notices under clause 9.1.12 of the ISA in relation to all the property assets on or before 4pm on 1 February 2018, and pointed out that a failure to do so would be construed as a refusal and a breach of clause 9.1.12.

128.   On the same day, Prince Abdullah emailed his fellow directors:

> "please be advised that Jones Day will be writing to the directors tomorrow on behalf of UTB LLC responding to Shepherd and Wedderburn's letter. The position as set out in the Shepherd and Wedderburn letter is not accepted. In the meantime, I am advised that no action should be taken by the board or any individual director on behalf of the board to execute and serve the option notices to which Shepherd and Wedderburn refer in their letter nor should any other precipitous action be taken in this regard. If any such action were to be taken, particularly without the agreement of a majority of the board, I am advised that this would constitute a breach of the duties we have as directors."

The following day, 31 January 2018, Jones Day wrote to the SUFC directors to the same effect, disagreeing that the obligation under clause 9.1.12 had been triggered and stating that a dispute existed between SUL and UTB. They stated that until such time as Jones Day confirmed that the obligation had been triggered, or a majority of the board of SUFC resolved to execute option notices, the directors must not take any action in that regard. The letter then reminded the directors of their fiduciary and statutory duties, warning that UTB would treat very seriously any action taken by an individual director to execute and serve option notices.

129.   The transfer of UTB's shares to UTB 2018 was not registered by Blades. Completion of the sale and purchase of SUL's shares did not take place and no property option notices were executed. On 6 February 2018, Shepherd & Wedderburn purported to

terminate the ISA and the contract of sale and purchase. UTB issued proceedings on 9 February 2018.

130. After the proceedings had been issued and legal battle was joined, SUFC continued to suffer severe financial difficulties. £1.4 million had to be repaid to Charwell by 30 April 2018. The parties could not agree how that money would be raised. In the event, each of SUL and UTB provided a loan of £1,000,000 to Blades, but only after an application to the court had been issued by SUL to be heard urgently on 30 April 2018. Blades repaid its £1.4 million on time. UTB was unable to repay £1.6 million to Charwell, though it did prepay £100,000 on 12 April 2018. The remainder of UTB's debt was not repaid until 25 June 2018.

131. By that time, SUFC had a further funding crisis necessitating another application to the court. The parties were unable to agree whether each should give or lend a further £1 million Blades, despite their having agreed at a board meeting in May 2018 that they would contribute equally to the deficit in the 2018/19 season. SUL sought an order compelling UTB to lend £1 million. I declined to make that order in June 2018 on the basis that further funding was not as it turned out absolutely necessary, given the recent sale of a valuable player.

132. There was no evidence about how the Club's deficit was in fact funded during the 2018/19 season. It may be that player sales covered the deficit, or that the shareholders contributed equally whatever funds were needed, in accordance with the board resolution. There is no evidence or suggestion that SUL injected further capital or made loans that were not matched by UTB, or vice versa. On any view, SUFC was clearly surviving on a tight budget, with both shareholders unwilling to invest or lend more than was necessary to keep the Club afloat. In those circumstances, it is remarkable – and likely to be to the credit of the Club manager and the independent executive team headed by Mr Bettis (who returned to the position of CEO in the summer of 2018) – that the Club secured automatic promotion to the Premier League in April 2019, shortly before the start of the trial.

133. On 25 April 2019, two weeks before the start of the trial, Jones Day on behalf of UTB and UTB 2018 wrote to Shepherd & Wedderburn giving their consent to the exercise of the property call options by SUFC, subject to formal confirmation that the Club was promoted. Promotion to the Premier League meant that SUFC would have hugely increased revenue during and before the 2019/20 season and could therefore afford to buy the property assets. UTB sought SUL's confirmation that a board meeting of SUFC should take place to resolve to exercise the options. This was done during the course of the trial and the options were then exercised.

C.    The ISA: Quasi-partnership and Implied Terms

134. SUL's case (in brief outline) is that UTB (and Prince Abdullah and Mr Giansiracusa personally) acted unlawfully in the period from November 2017 to January 2018, contrary to the terms of the ISA and its duty to act in good faith and fairly and to seek to work in co-operation with SUL to achieve the objectives of the ISA, and instead acted in a manner unfairly prejudicial to the interests of SUL as a shareholder of Blades.

135.  A substantial part of SUL's case depends on there being an obligation on UTB to act in good faith, fairly and openly towards SUL. There is no such express obligation, either in the articles of association or in the terms of the ISA. There is no assertion by SUL of a collateral contract to that effect. SUL contends that nevertheless the obligation exists and that UTB breached it by seeking to drive SUL out of the joint ownership of Blades and by seeking to deprive SUL of its rights under clause 9.1.12 of the ISA.

136.  The alleged obligation of good faith is said to arise in two distinct ways.

137.  First, SUL contends that Blades is a quasi-partnership, not just a company limited by shares where the rights of its shareholders are as stated in the articles of association and the ISA. If Blades is a quasi-partnership then the shareholders (UTB and SUL) owe each other equitable obligations of trust and confidence, openness and fair dealing, and of good faith, in the same way as partners of a partnership owe each other such duties.

138.  Second, SUL contends that the ISA is a 'relational' contract between UTB and SUL, such that as a matter of law there is implied into the contract an obligation on each party to deal fairly and act in good faith towards the other.

139.  If either of those arguments succeeds, SUL argues that UTB was in dereliction of those duties: first, in its sustained attack on Kevin McCabe in November and December 2017 that was calculated to end their cooperation, and, second, in the way in which UTB devised and sought to hide until the last minute its scheme to avoid the obligations in clause 9.1.12 being triggered upon purchase of the shares of SUL.

140.  In addition to arguing for an implied obligation of good faith, SUL says that further terms are to be implied into the ISA if they are not express terms, namely:

      i)    A shareholder may not transfer part only of its shareholding in Blades;

      ii)   A shareholder must not wilfully obstruct or hinder the re-unification of the property assets pursuant to clause 9.1.12 of the ISA;

      iii)  A recipient of a call option notice under clause 11 of the ISA must not allow its shares to be encumbered or otherwise act to prevent it from being able to transfer its shares free from any incumbrances on completion;

      iv)   Following receipt of a call option notice, the recipient must not take any step that would materially diminish the value of the other party's (the offeror's) shares, and

      v)    No party to the ISA must deliberately prevent or hinder any other party from fulfilling its obligations under the ISA.

(i) The express terms of the ISA

141.  In order to address these arguments, it is necessary to examine in detail the contractual basis of the parties' venture. Although heads of terms and a term sheet

were agreed and exchanged during the summer of 2013, the contractual terms that the parties agreed are contained in the bespoke articles of association of Blades and the ISA. The rights of the parties as shareholders in Blades are also impacted by the subordinate documents made between companies in the Scarborough Group and SUFC: the new leases of the property assets and the property call options that SUFC was granted.

142. The articles of association govern, materially, the basis on which shares in Blades could be assigned and the rules for convening and holding board meetings of Blades. Article 49.1 provides that the company is not concerned with any beneficial interests in its shares and article 62.4 that a transferor of a share remains the holder of the share until the transferee's name is registered. The articles entitle a shareholder to sell its shares, subject to pre-emption provisions in favour of existing shareholders; but, under article 9.1, these restrictions on a transfer of shares do not apply to a transfer to certain categories of transferee, including a "privileged relation", a family trust, a nominee or bare trustee and a company controlled by the shareholder. In the last case, a company controlled by Prince Abdullah or by Kevin McCabe is deemed to be a company controlled by UTB and SUL respectively. Article 62.5 provides that the directors of the company may only refuse to register a transfer in limited circumstances (none of which is relevant in this case) and by article 62.6 any refusal to register must be notified with reasons within 30 days of the transfer being lodged.

143. By article 13, subject to the power to delegate, the management of Blades is a matter for its directors, and by article 17 decisions of the directors, unless taken unanimously, are to be by majority decision at a meeting (unless the company at any time has only one director). A quorum of two directors (at least one appointed by each of SUL and UTB) is required. The chairman is chosen by the directors at the meeting and has no casting vote.

144. The ISA is expressed to prevail in the case of any conflict or inconsistency between its terms and the articles (cl. 25), and the defined terms in the articles apply also in the ISA.

145. As previously noted (para 29 above), the parties' overriding objectives (promotion to the Premier League and reunification of Club and property assets) are set out in recital (B). Recital (C) states that the ISA sets out the terms on which UTB is investing in Blades and regulates the basis on which Blades and SUFC shall be operated. That is reinforced by clause 26, which provides:

> "This Agreement, the documents in the Agreed Form and all agreements entered, or to be entered into, pursuant to the terms of this Agreement or entered into between the parties in writing and expressly referring to this Agreement:
>
> 26.1.1 together constitute the entire agreement and understanding between the parties with respect to the subject matter of this Agreement; and
>
> 26.1.2 (in relation to such subject matter) supersede all prior discussions, understandings and agreements between the parties and their agents (or any of them) and all prior representations

> and expressions of opinion by any party (or its agent) to any
> other party (or its agent). "

146.    Clause 28.1 provides that a waiver of any term, provision or condition of the ISA
        shall be effective only if given in writing and signed by the waiving or consenting
        party. Clause 28.4 provides that any variation of the ISA is valid only if it is in writing
        and signed by all the parties.

147.    Clause 24 provides that nothing in the ISA is to be deemed to constitute a partnership
        between the parties or any of them.

148.    By clause 2.3, UTB's subscription monies were to be made available by Blades to
        SUFC solely for the Improved Performance Purpose, which was improving the on-
        pitch performance of the SUFC first team. That was therefore consonant with the
        overriding objective of achieving promotion to the Premier League.

149.    Clause 5 specifies how the board and the shareholders are to conduct the business of
        Blades and SUFC. The board was not to have responsibility for the management of
        Blades and its business to the extent of matters specified in schedule 3 as requiring
        Investor Consent. Thus, a number of important matters were to be subject to a veto by
        UTB. These include: the adoption of any operating budget that includes any line item
        more than 10% ahead of the previous year's actual results, or that reflected negative
        free cash flow; the admission of any new shareholder into Blades or any member of
        the Blades group of companies; any material activity outside the Business Plan; any
        expenditure outside the annual Player Transfer/Management Protocol; and the
        initiation of any litigation or claim.  Similarly, various matters were specified in
        schedule 4 as requiring either the approval of a majority of shareholders' or a
        supermajority of shareholders' votes.  The board could not, in the conduct of the
        ordinary business of Blades, override these matters. Each of UTB and SUL was
        therefore in practical terms given a veto in relation to these matters, which include:
        the making of any loan by or to the company, other than by its bankers in the course
        of ordinary business; any transaction other than by way of bargain at arm's length
        upon normal commercial terms; transactions involving expenditure of more than
        £50,000; any distribution; the appointment of any employee earning in excess of
        £40,000 a year; and the delegation of any matter to a committee.

150.    While there was no majority shareholder the board was deadlocked, with each
        shareholder having the right to appoint four directors, with no more than eight
        directors in total permitted. A resolution could not be passed at a board meeting
        without at least one director appointed by each shareholder being present. If either
        shareholder had appointed fewer than the permitted maximum number of directors, or
        a director so appointed was absent, the directors present at the meeting would
        nevertheless have the full number of votes that the maximum permitted number of
        directors would have had if they had been in attendance (clause 5.10).

151.    By clause 5.11, UTB alone was given the power to appoint its choice to the office of
        Finance Director of Blades and SUFC and to agree the terms of appointment of such
        person on behalf of the companies. The Finance Director was an ex officio member of
        the Technical Football Board, alongside the CEO of SUFC, the Head of Football
        Operations and the Team Manager.

152.    Unlike in the pre-contract documents exchanged, the ISA imposed no obligation on UTB or SUL to inject further capital or make loans to the companies.  Clause 6.1 provides:

> "The Shareholders acknowledge that, in addition to the subscription monies referred to in clause 2.2, the Company may require further finance to fund its and SUFC's projected cash requirements under the Business Plan. The parties agree that each of [SUL] and [UTB] has the right to subscribe for further shares in the Company for cash at any time, subject to pre-emption rights on the issue of new shares in the share capital of the Company, provided that the right to do so shall cease for so long as: (i) either Shareholder holds, or will following the issue of such shares hold, 75% or more of the fully diluted share capital; or (ii) Sheffield United football club is in the English Premier League (or any successor thereof)."

Clause 6.2 fixed the price at which any such further subscription be made. By clause 6.5, any subscription that would result in a shareholder holding 75% or more of the issued share capital required the written approval of both shareholders.

153.    By clause 8, Blades undertook to the shareholders that it would (and the shareholders were to exercise their voting rights and powers of control to that end): prepare and deliver a draft Business Plan and a draft Player Transfer/Management Protocol by a specified time each year; prepare and provide management accounts and audited accounts; deliver to the shareholders monthly Technical Football Board reports.

154.    By clause 9, Blades gave further undertakings to SUL and UTB and the shareholders were to exercise their voting rights accordingly in various respects. These included procuring that none of the matters set out in schedule 3 occurred in relation to any Blades company without the consent of UTB; that none of the matters set out in schedule 4 occurred in relation to any Blades company without either supermajority shareholder consent or majority shareholder consent, as the case may be, and most importantly:

> "**on any Shareholder acquiring 75% or more of the entire issued share capital of the Company, SUFC shall be compelled to exercise and each party hereby authorises and instructs SUFC to forthwith execute and serve Option Notices in respect of each and every Property Call Option on the date that the shareholder acquires 75% or more of the entire issued share capital of the Company, unless each of [SUL] and [UTB] agree otherwise**" (clause 9.1.12).

155.    Clause 10 of the ISA contains the deadlock provisions. Deadlock exists where the shareholders are unable to arrive at a decision on any matter that a shareholder reasonably considers to be fundamental to the business of the Blades group because of disagreement between them, having first exhausted the dispute resolution procedure in clause 33. That clause requires any dispute to be referred first to the directors of each shareholder for resolution, failing which the dispute is referred to Mr Phipps and Kevin McCabe to resolve. If Mr Phipps and Kevin McCabe cannot reach agreement,

the dispute is to be mediated. Thereafter, if the dispute remains, either party is entitled to serve a notice under clause 10. Thereupon, within 21 days, the matter is again referred to Kevin McCabe and Mr Phipps (or their successors) for each to "use all reasonable endeavours in good faith to resolve the dispute". If the deadlock has not been broken, both parties are entitled to serve a purchase notice within 10 business days offering to buy all the other party's shares in Blades at a specified price ("a Roulette Notice"). The offer is deemed to comprise an offer to buy all the offeree's shares at that price and an alternative offer to sell to the offeree all the offeror's shares at that price. The offeree has 30 days in which to serve a counternotice accepting the alternative offer, failing which it is deemed to have accepted the offer to buy its shares.

156.   Clause 11 of the ISA contains similar provisions conferring on each shareholder the right to exercise a call option to purchase all of the other shareholder's shares. There are specified option periods during which the option can be exercised. A call option notice served within the defined option periods operates in exactly the same way as a Roulette notice served under the clause 10 deadlock provisions.

157.   The following provisions are directly material in this case:

"11.1     Each Shareholder grants to the other Shareholder a right to exercise a call option to purchase all of its Shares (Option Shares) in accordance with this clause 11 (Call Option).

11.2     The Call Option may only be exercised:

11.2.1     within the period 1 June to 31 July in each year from 1 June 2017 to 31 July 2021 (inclusive) (Option Periods) or

11.2.2     at any time (i) after the end of Season 2015/2016 if Sheffield United Football Club does not achieve promotion to the English Premier League by the end of Season; or (ii) if Sheffield United Football Club is relegated from any League at any time after Completion

11.3     …..

11.4     The Call Option shall be exercised by one Shareholder (Shareholder Exercising Option) giving the other Shareholder (Other Shareholder) written notice (Option Notice) in accordance with clause 22 which shall include:

11.4.1     the date on which the Option Notice is given;

11.4.2     a statement to the effect that it is exercising the Call Option;

11.4.3    the number of Option Shares in respect of which the Call Option is being exercised, such number being all of the Shares of the other Shareholder;

11.4.4    an:

(a) offer by the Shareholder Exercising Option to purchase all (but not some only) of the Other Shareholder's shares at the price per share specified (Option Price);

(b) an alternative offer by the Shareholder Exercising Option to sell to the Other Shareholder all (but not some only) of the Shareholder Exercising Option's shares at the Option Price;

11.4.5    a date on which option completion is to take place, which shall be no less than 20 Business Days and no more than 30 Business Days following the date of the Option Notice;

11.4.6    a signature by the Shareholder exercising the Call Option.

11.5    Once given, an Option Notice may not be revoked without the prior written consent of the Other Shareholder.

11.6    Within 30 days of service of the Call Option Notice, the Other Shareholder may by counter-notice (the 'Call Option Counter Notice') to the Shareholder Exercising Option require the Shareholder Exercising Option to sell all (but not some only) of its shares to the Other Shareholder at the Option Price.

11.7    Service of the Counter Notice shall constitute an acceptance of the offer referred to in clause 11.4.4(b) and a rejection of the offer referred to in clause 11.4.4(a) and the Shareholder Exercising Option shall be bound to sell, and the Other Shareholder shall be bound to purchase, the Shareholder Exercising Option's Shares subject only to the receipt of the Option Price by the Shareholder Exercising Option.

11.8    If no counter-notice is served by the Other Shareholder under clause 11.6 then the Shareholder Exercising Option shall be bound to purchase, and the Other Shareholder shall be bound to sell, the Other Shareholder's shares subject only to receipt of the Option Price by the Other Shareholder.

11.9    Completion of the sale and purchase contemplated by this clause 11 shall be at the date, time and place specified in the Call Option Notice, or, if a Call Option Counter Notice is

served, at the date, time and place specified in the Call Option Counter Notice…

11.10    No Call Option Notice or Call Option Counter Notice may be withdrawn except with the written consent of the Shareholder to which it was given and save as aforesaid shall constitute a binding obligation on the Shareholders to sell and purchase the relevant Shares in the manner contemplated by this clause 11.

11.11    Any shares sold pursuant to this clause 11 shall be transferred free from any claims, equities, liens and encumbrances whatsoever and with all rights attached to the relevant shares as at the date of service of the Call Option Notice, but without the benefit of any other warranties or representations whatsoever. "

158.    Clause 12.2 of the ISA provides:

"each of [SUL] and [UTB] undertakes to the other that they or it will (so far as it is lawfully able) exercise the powers vested in it from time to time as shareholder (as the case may be) of the Company to ensure that the Company complies (insofar as they are able by the exercise of such powers) with the Articles, this Agreement and all other agreements referred to in this Agreement."

159.    The ISA contains numerous other detailed provisions and extends to 94 typed pages in all (excluding the execution pages). The ISA balances the rights of the two shareholders and confers particular rights on UTB alone. It establishes a 50/50 deadlock on the board with no casting vote, so that the SUL and UTB appointed directors (or some of them) will have to reach agreement in order to pass resolutions of Blades. In the event that agreement cannot be reached, there is informal and then formal mediation, and if that is unsuccessful a final requirement for a resolution to be sought in good faith. If no resolution is achieved, either party can make an offer to acquire the other's interest and the offeree has the choice whether to sell or buy at the specified price.

160.    At that stage, all attempts to resolve an important disagreement having failed, each shareholder must necessarily be entitled to have regard to its own interests in deciding whether to serve a Roulette Notice and if so what price to specify. That is particularly so since the Roulette Notice can be accepted by the offeree (in its own interest) either as an offer to buy or as an offer to sell.

161.    Clause 11 confers a similar right on both parties, but is not dependent on inability to agree how the affairs of Blades are to be conducted. Thus, unless the Club has achieved the desired promotion to the top level within 3 seasons, and even if it is progressing well and the relationship between the shareholders is good, each has the right to force separation by making an offer to buy out the other, but at risk that it may itself be bought out. In making the decision whether to serve a call option notice, a

shareholder must therefore necessarily be acting in its own interests and not in furtherance of any cooperative endeavour.

(ii) Quasi-partnership

162. A quasi-partnership is a company where the basis on which the shareholders are associating gives rise to equitable obligations as between them, which are capable of overriding or qualifying the strict terms of the company's constitution, so as to prevent one of them from taking unfair advantage of his strict rights. The paradigm (but not the only) case of quasi-partnership is where it is understood that each of the shareholders will be personally involved in managing the company's affairs with the other(s) and remunerated as such, rather than by dividends. Because of the nature of the association based on mutual cooperation and trust, the minority shareholder will not have the ability to sell his shares in the market and achieve a fair price for his interest. In those circumstances, if one of the shareholders has a majority holding and could vote to remove the other as a director and employee of the company, equity intervenes to prevent the majority shareholder from doing what the articles of the company allow him to do, where that would in all the circumstances be unconscionable.

163. The origin of the use of the expression "quasi-partnership" in relation to a particular type of limited company is Ebrahimi v Westbourne Galleries Ltd [1973] A.C. 360. The only shareholders of the company in that case were two former partners of the business and the son of one of them. After a disagreement, one partner was removed as a director, using the majority voting rights of the other two shareholders in accordance with the company's articles of association. The profits of the company had only ever been distributed by way of directors' remuneration. The judge held that the respondents had done the appellant a wrong in equity, notwithstanding the rights conferred by the articles. It was a breach of good faith to exclude the appellant from participation in a business upon which they had embarked on the basis that all the shareholders should participate in its management and be remunerated as such. It was therefore just and equitable to wind up the company.

164. The Court of Appeal allowed an appeal, holding that it had not been shown that the shareholders' voting rights had been exercised in bad faith. On appeal, Lord Wilberforce held that the statutory jurisdiction to wind up a company where it was just and equitable to do so acknowledged that there was room in company law for recognition of the fact that, behind the corporate status and personality of the company, there were "individuals with rights, obligations and expectations among themselves, which were not necessarily submerged in the corporate structure". While in most cases the corporate constitution adequately defined the rights of the members, the just and equitable criterion allowed courts to subject the exercise of legal rights to considerations of a personal character, arising between one individual and another, which might make it unjust or inequitable to insist on legal rights or to exercise them in a particular way.

165. His Lordship then identified the extra considerations, above purely commercial ones, that could indicate that equitable rights or considerations could be superimposed:

> "… typically [they] may include one, or probably more, of the
> following elements: (i) an association formed or continued on

the basis of a personal relationship, involving mutual confidence – this element will often be found where a pre-existing partnership has been converted into a limited company; (ii) an agreement, or understanding, that all, or some (for there may be 'sleeping' members), of the shareholders shall participate in the conduct of the business; (iii) restriction upon the transfer of the members' interest in the company – so that if confidence is lost, or one member is removed from management, he cannot take out his stake and go elsewhere.

It is these, and analogous, factors which may bring into play the just and equitable clause… "

166.   Lord Wilberforce then observed that, in very many cases, exercise of statutory rights or rights conferred by a company's articles would be unexceptionable and part of the risk that a director or shareholder of a company accepts, and continued:

> "the just and equitable provision nevertheless comes to his assistance if he can point to, and prove, *some special underlying obligation of his fellow member(s) in good faith, or confidence, that so long as the business continues he shall be entitled to management participation, an obligation so basic that, if broken, the conclusion must be that the association must be dissolved*" (emphasis added)

167.   In O'Neill v Phillips [1999] 1 WLR 1092, a case brought under the predecessor of section 994 of the Companies Act 2006, Lord Hoffmann said that he agreed with Jonathan Parker J. when he said, in In Re Astec (B.S.R.) plc [1998] 2 BCLC 556, 588:

> " … in order to give rise to an equitable constraint based on 'legitimate expectation' what is required is a personal relationship or personal dealings of some kind between the parties seeking to exercise the legal right and the party seeking to restrain such exercise, such as will affect the conscience of the former."

Lord Hoffmann added:

> "… I think that one useful cross-check in a case like this is to ask whether the exercise of the power in question would be contrary to what the parties, by words or conduct, have actually agreed. Would it conflict with the promises which they appear to have exchanged? In *Blisset v Daniel* the limits were found in the 'general meaning' of the partnership articles themselves. In a quasi-partnership company, they will usually be found in the understandings between the members at the time they entered into association. But there may be later promises, by words or conduct, which it would be unfair to allow a member to ignore. Nor is it necessary that such promises should be independently enforceable as a matter of contract. A promise may be binding as a matter of justice and equity although for one reason or

> another (for example, because in favour of a third party) it
> would not be enforceable in law."

168. In the instant case, SUL does not rely on the existence of a quasi-partnership to seek to restrain UTB from exercising rights given to it by the articles or by the ISA. Rather, SUL seeks to establish an additional obligation binding UTB by reason of the existence of a quasi-partnership, namely an obligation to act towards SUL in good faith. However, SUL may in substance be seeking to use equitable rights as a shield rather than as a sword, because it contends that UTB is not entitled to rely on or enforce the contract of sale and purchase arising from the Call Option Notice and Counternotice, or to rely on the intended transfer of shares to UTB 2018 (in accordance with the articles and the ISA) as a means of defeating SUL's contractual rights under the ISA. In both cases, it contends that UTB has only been able to assert contractual rights under the ISA by reason of breaches of obligations of good faith and that therefore it is unconscionable for it to do so. If the obligation, the breach and a causative link were established, equity would be acting in a conventional way in refusing to grant specific performance, either at all or unless UTB performed its obligations.

169. SUL contends that Blades was or became a quasi-partnership for the following reasons:

   i)     The parties accepted in evidence that their objectives were in the nature of a joint venture;

   ii)    They accepted that the contractual relationship could only work if they got on, cooperated and had a common vision for Blades and SUFC;

   iii)   The parties treated and referred to each other as partners;

   iv)    There was a recognition that the parties' rights and responsibilities were not exhaustively defined by the ISA (e.g. in relation to Prince Abdullah's wish to appoint Deloitte to appraise SUFC, he said "I didn't think about the [terms of the ISA] I thought that it's a matter between two partners").

170. It is not clear to me what rights and obligations equity should recognise on account of this, beyond a mutual obligation of fair dealing and good faith, but that obligation is sufficient for SUL's purposes. Indeed, the whole quasi-partnership argument advanced by SUL seems to be advanced solely for that purpose. However, to the extent that SUL contends that from 30 August 2013 the relationship of UTB and SUL was governed or affected by such equitable rights and obligations, the contention runs directly into the entire agreement clause of the ISA.

171. By that clause, Blades, SUFC, SUL and UTB and their guarantors agreed that there was no understanding between them beyond the completion documents in relation to the subject-matter of the ISA and that the ISA superseded all previous discussions and understandings in that regard. Mr Downes QC sought to characterise clause 26 as "boilerplate" in nature, but that epithet does not mean that, in a carefully drafted, detailed contract between sophisticated and professionally-advised parties, a term of this type can simply be ignored or given little weight. While such terms do not preclude the implication into the contract of unexpressed terms, or deprive any

binding collateral contracts of legal effect (or indeed prevent rectification of mistaken omissions or words), such terms do (and are intended to) prevent parties from seeking to rely on a different or additional understanding that may have been identified - or even provisionally agreed - in pre-contract negotiations but which has not been included as a term of the contract.

172. Entire agreement clauses have (subject to the above-mentioned limitations) been assumed to be effective. Their effectiveness has recently been affirmed by Lord Sumption, giving the leading judgment in the Supreme Court in the case of Rock Advertising Ltd v MWB Business Exchange Centres Ltd [2018] UKSC 24; [2019] A.C. 119, a judgment with which Lady Hale, Lord Wilson and Lord Lloyd-Jones agreed. The case was concerned with the validity and effectiveness of a "no oral modification" clause in a contract, but in reviewing that issue Lord Sumption considered the effect of comparable provisions such as "no reliance" and "entire agreement" clauses. At para [14] he said:

> "Entire agreement clauses generally provide that they 'set out the entire agreement between the parties and supersede all proposals and prior agreements, arrangements and understandings between the parties.' An abbreviated form of the clause is contained in the first two sentences of clause 7.6 of the agreement in issue in this case. Such clauses are commonly coupled (as they are here) with No Oral Modification clauses addressing the position after the contract is made. Both are intended to achieve contractual certainty about the terms agreed, in the case of entire agreement clauses by nullifying prior collateral agreements relating to the same subject-matter. As Lightman J put it in *Inntrepreneur Pub Co (GL) v East Crown Ltd* [2000] 2 Lloyd's Rep 611, para 7:
>
>> 'The purpose of an entire agreement clause is to preclude a party to a written agreement from threshing through the undergrowth and finding in the course of negotiations some (chance) remark or statement (often long forgotten or difficult to recall or explain) on which to found a claim such as the present to the existence of a collateral warranty. The entire agreement clause obviates the occasion for any such search and the peril to the contracting parties posed by the need which may arise in its absence to conduct such a search. For such a clause constitutes a binding agreement between the parties that the full contractual terms are to be found in the document containing the clause and not elsewhere, and that accordingly any promises or assurances made in the course of the negotiations (which in the absence of such a clause might have effect as a collateral warranty) shall have no contractual force, save insofar as they are reflected and given effect in that document. The operation of the clause is not to render evidence of the collateral warranty inadmissible in evidence as is suggested in *Chitty on Contract* 28th ed Vol 1 para 12-102: it is to denude what

would otherwise constitute a collateral warranty of legal effect.'

But what if the parties make a collateral agreement anyway, and it would otherwise have bound them? In *Brikom Investments Ltd v Carr* [1979] QB 467, 480, Lord Denning MR brushed aside an entire agreement clause, observing that 'the cases are legion in which such a clause is of no effect in the face of an express promise or representation on which the other side has relied.' In fact there were at that time no cases in which the courts had declined to give effect to such clauses, and the one case which Lord Denning cited (*J Evans & Son (Portsmouth) Ltd v Andrea Merzario Ltd* [1976] 1 WLR 1078) was really a case of estoppel and concerned a different sort of clause altogether. In *Ryanair Ltd v SR Technics Ireland Ltd* [2007] EWHC 3089 (QB), at paras 137-143, Gray J treated Lord Denning's dictum as a general statement of the law. But in my view it cannot be supported save possibly in relation to estoppel. The true position is that if the collateral agreement is capable of operating as an independent agreement, and is supported by its own consideration, then most standard forms of entire agreement clause will not prevent its enforcement: see *Business Environment Bow Lane Ltd v Deanwater Estates Ltd* [2007] L&TR 26 (CA), at para 43, and *North Eastern Properties Ltd v Coleman* [2010] 1 WLR 2715 at paras 57 (Briggs J), 82 to 83 (Longmore LJ). But if the clause is relied upon as modifying what would otherwise be the effect of the agreement which contains it, the courts will apply it according to its terms and decline to give effect to the collateral agreement. As Longmore LJ observed in the *North Eastern Properties Ltd* case, at para 82:

'if the parties agree that the written contract is to be the entire contract, it is no business of the courts to tell them that they do not mean what they have said.'

Thus in *McGrath v Shah* (1989) 57 P&CR 452, 459, John Chadwick QC (sitting as a Deputy Judge of the Chancery Division) applied an entire agreement clause in a contract for the sale of land, where the clause served the important function of ensuring that the contract was not avoided under section 2 of the Law of Property (Miscellaneous Provisions) Act 1989 on the ground that the terms were not all contained in one document. Outside the domain, in some ways rather special, of contracts for the sale of land, in *Deepak Fertilisers and Petrochemical Corpn v ICI Chemicals & Polymers Ltd* [1998] 2 Lloyd's Rep 139, 168 (Rix J) and (1999) 1 Lloyd's Rep 387, para 34 (CA), both Rix J and the Court of Appeal treated the question as one of construction and gave effect to the clause according to its terms. Lightman J did the same in the *Inntrepreneur* case. Since then, entire agreement clauses have been routinely applied… "

Lord Briggs, agreeing with the disposal of the appeal proposed by Lord Sumption but for different reasons, did not accept that entire agreement clauses were a useful analogy to "no oral modification" clauses because they did not attempt to bind the future conduct of the contracting parties in the same way.

173. In my judgment, it is therefore no answer to contend that clause 26 is a "boilerplate" clause. It negatives any other understanding between the parties relating to the affairs of Blades and the rights and obligations of its shareholders between themselves. There is no suggestion that a binding collateral agreement was made incorporating the obligation for which SUL contends, or that by mistake the ISA omitted it. Mr Downes QC contended that the equitable jurisdiction of the court could never be excluded and so such clauses could not have effect to prevent the assertion of equitable rights outside the terms of the contract. However, equity in such a case – though not excluded – will "follow the law" by recognising and not contradicting the legal effect of the express term that the parties have agreed. In any event, it does not seem to me that equitable rights are being asserted, but rather SUL is seeking to establish the existence of a contractual obligation of fair dealing and good faith.

174. It cannot therefore be contended that, from its inception, Blades was a quasi-partnership and that on that account SUL and UTB owed each other obligations to act fairly and in good faith.

175. Even in the absence of the entire agreement clause, I would not have held that Blades was a quasi-partnership as at 30 August 2013. Although the indicia of a quasi-partnership are not rigidly defined or exhaustively identified by Lord Wilberforce in the Ebrahimi case, the essence of a quasi-partnership is, as the name suggests, that the corporators or shareholders of a company intend to conduct their business affairs not as directors and shareholders whose rights are defined by the corporate constitution but *on the basis of* mutual confidence and mutual duties of fidelity, trust and openness and their joint management of the company's affairs. A limited company is not to be treated as a quasi-partnership merely because the shareholders and directors do in fact have or need to have confidence in each other and work together openly and in cooperation to manage the company affairs. The question is rather *on what basis* the parties understand the company's affairs to be run.

176. In this case, the affairs of Blades are governed by its articles of association and the very detailed terms of the ISA, which regulate to what extent each of the shareholders has rights and obligations and what controls exist on the way in which the business of Blades and its subsidiaries is run. This is certainly not the case of a convenient corporate wrapper being placed over a relationship that is in substance a partnership or an undefined joint venture. The particular rights and obligations of each of the shareholders are identified with care and in detail in the ISA. Each of the shareholders is a corporation, which will appoint directors of Blades and SUFC to act on its behalf. Blades itself is only a holding company, but its principal subsidiary, SUFC, was at the time carrying on a sophisticated business with the benefit of professional management and executives in place. Although loss-making, SUFC was a substantial and complex business enterprise. The business was to be managed by the managers subject to the control of the directors of the company (which might or might not include Prince Abdullah and Kevin McCabe as the principal owners of UTB and SUL respectively) and a Technical Football Committee that would report to