# EXHIBIT 28 PART 2

the board. The business was not to be managed by Prince Abdullah and Kevin McCabe.

177. There was a joint venture in the sense that both shareholders agreed and shared the objective of achieving promotion to the Premier League and reuniting the Club with the property assets over a 3-5 year period. It is true that the principals of the shareholders must have understood and recognised that those objectives were likely more readily to be achieved if there was harmony between the principals and their appointed directors and agreement on the strategy for the Club, and were correspondingly likely to be undermined if there was no cooperation between them. But those factors do not mean that the business of Blades was to be carried on on the basis of trust, confidence and cooperation between the two shareholders rather than on the basis of the terms agreed in the ISA and the supervision of the management of the Club by the board of directors. As at 30 August 2013, Prince Abdullah and Kevin McCabe – the principals of the two shareholders – hardly knew each other and had no established business dealings. For that reason, their professional advisors drafted detailed agreements about the basis on which the affairs of Blades and its subsidiary SUFC would be run.

178. It is also pertinent to observe that the ISA was not simply an agreement about how jointly to achieve the overriding objectives. The ISA catered for a number of different eventualities: the relegation of the Club; its promotion; and the failure to achieve Premier League status within 3 seasons. It conferred rights for one or other of the parties (though it was expected to be UTB) to take over Blades at any time before promotion to the Premier League by investing more capital, and rights to offer to buy out the other shareholder, at risk of being bought out on equivalent terms. This was not simply an elaborate mechanism for terminating the joint venture: clause 10 is such a mechanism, where deadlock exists, but clause 11 confers freestanding rights for one or other of the shareholders to exclude the other and continue alone if the overriding objective has not been achieved, and in any event at specified times between years 4 and 8 regardless of the success or otherwise of the venture.

179. The ISA is therefore not merely a joint venture agreement under which the parties are to work together on the basis of trust and cooperation to achieve the specified objectives. The fact that the board and equity is set up as a 50/50 deadlock and that the parties therefore called and regarded each other as "partners" does not mean that they were partners. Smooth running of SUFC at board level (but not at management level) would require agreement of the principals or at least some of the directors, but the ISA catered for what would happen in case of dispute and deadlock. It imposed, at a late stage of the dispute resolution process, an obligation of good faith, and it provided machinery for terminating the joint venture if deadlock remained. I therefore reject the argument that the 50/50 deadlock arrangement drives a conclusion that Blades was a quasi-partnership or that the shareholders owed each other obligations of good faith.

180. In Re Coroin Ltd (No.2) [2013] 2 BCLC 583, David Richards J rejected an argument of legitimate expectation of participation in management derived from understandings outside the articles and shareholders agreement in that case and held that equitable considerations had no part to play. He said at [635]-[636]:

> "Equitable considerations, affecting the manner in which legal rights can be exercised, will arise only in those cases where there exist considerations of a personal character between the shareholders which makes it unjust or inequitable to insist on legal rights or to exercise them in a particular way. Typically that will be in the case of a company formed by a small number of individuals on the basis of participation by all or some of them in the management of the company.
>
> In my judgment, there is no room for equitable considerations of this kind in the present case. The company was formed by a group of highly sophisticated and experienced business people and investors with a view to the purchase of a well-known group of hotels for a price running into many hundreds of millions of pounds, and to retaining and managing some of those hotels. There was little prior relationship between many of the investors and some were unknown to each other until a few days before the company was formed. More importantly, Articles of Association and a shareholders' agreement were negotiated and drafted, containing lengthy and complex provisions governing their relations with each other with the company. I find it hard to imagine a case where it would be more inappropriate to overlay on those arrangements equitable considerations of the sort discussed by Lord Wilberforce and Lord Hoffmann."

181.   The same reasoning applies in the instant case. Blades and SUFC were not to be managed on the basis of a personal relationship of cooperation and trust between Prince Abdullah and Kevin McCabe. SUFC was to be managed by professional executives and management staff subject to strategic control by directors appointed by SUL and UTB in accordance with the matters agreed in the ISA. If the directors were unable to agree on a matter of importance, the dispute resolution provisions of the ISA required Kevin McCabe and Mr Phipps (not Prince Abdullah) to attempt to resolve the disagreement. Although it would have been anticipated at the date of the ISA that Prince Abdullah would be one of the UTB appointed directors and that Kevin McCabe or one or more of his sons would be SUL appointed directors, it cannot have been envisaged that Prince Abdullah would personally be present or deeply involved in managing Blades or SUFC. There was in my judgment no relationship of a personal character between Prince Abdullah and Kevin McCabe on the basis on which the affairs of Blades and SUFC were to be managed.

182.   SUL's alternative case on quasi-partnership is that Blades became a quasi-partnership on the basis of an understanding that arose between Prince Abdullah on behalf of UTB and Kevin McCabe on behalf of SUL after the date of the ISA. In light of Lord Wilberforce's reference to "an association formed *or continued* on the basis of a personal relationship" and Lord Hoffmann's dicta quoted above, it is now accepted that equitable rights and obligations can arise subsequently to the incorporation that may change the character of the company to that of a quasi-partnership. The matters relied on by SUL are the following:

i)      A shared emotional enthusiasm and bond that Kevin McCabe and Prince
        Abdullah developed for the Club;

ii)     A subsequent agreement to fund the Club equally after the initial two seasons
        of UTB's £10 million funding had ended;

iii)    A shared understanding that Kevin McCabe would be the "strong partner"
        having a regular "hands on" presence at the Club, looking after its best
        interests, while Prince Abdullah was absent on government duty in Saudi
        Arabia;

iv)     The fact that the two principals referred to and regarded each other as
        "partners" in such a way as to convey an assurance of an obligation to act in
        good faith.

v)      This was reflected in Mr Giansiracusa's acceptance at the 26 October 2017
        board meeting that, on promotion to the Premier League, the rent for the
        Stadium and Academy would be reviewed in good faith.

183.    SUL is not precise about when the change from a company to be run on the basis of
        its articles and the ISA to a company to be run on the basis of a personal relationship
        between the principals of the corporate shareholders arose. SUL faces a similar
        difficulty to the one that it faced in establishing an agreement or understanding at the
        time that the ISA was made. Clause 28.4 of the ISA provides that: "Any variation of
        this Agreement is valid only if it is in writing and signed by all the parties hereto". As
        confirmed by the decision in the Rock Advertising case, that means that any oral
        agreement or understanding to different effect from the terms of the ISA and articles
        would be ineffective to vary them. Without prejudice to that answer to SUL's case, I
        will also address its factual basis.

184.    SUL places reliance on the terms of Prince Abdullah's letter to Kevin McCabe dated
        29 June 2014, after he had been appointed minister of state in Saudi Arabia, in which
        he refers to "our beloved Sheffield United Football Club". The language used is,
        certainly, redolent of a family relationship, and Prince Abdullah emphasises his
        commitment to and affection for the Club and the values that they "hold dear as
        Blades" and his desire to achieve the goals that he and Kevin McCabe had set. There
        was a shared emotional enthusiasm for the Club and to that extent a bond between
        them, in June 2014. However, in the same letter, Prince Abdullah explains how he
        will fill the spaces on the boards of Blades and SUFC, so there is no suggestion that
        the affairs of Blades are to be conducted on the basis of a personal relationship
        between him or Mr Phipps and Kevin McCabe.

185.    Since 30 August 2013, Prince Abdullah had attended only one match at Bramall Lane,
        and there had been only one board meeting, on 18 December 2013, which Prince
        Abdullah attended by Skype. He had had few meetings with Kevin McCabe and
        otherwise the two of them communicated by email. They had agreed on the sacking
        of Mr Weir as manager and the appointment of Mr Clough and Mr Brannigan, though
        all of these were instigated by Kevin McCabe. Prince Abdullah said in evidence that,
        in the first year, he was conscious that he knew little about running an English
        football club in League One and was happy to be guided by Kevin McCabe's greater
        knowledge and rely on his presence in Sheffield. It is obvious that Prince Abdullah

had nevertheless been warmly treated by the McCabe family in the initial year, on the few occasions when they did meet, and had developed a real enthusiasm and affection for the Club. By 25 June 2014 there were no financial problems. However, Kevin McCabe was about to tell Mr Phipps that he was not intending to put a penny more into the Club. Mr Tutton told Mr Brannigan (the CEO) so on 15 August 2014 ("there is no more available from Scarborough or Kevin … enough is enough. The club must stand on its own two feet"), and Scott McCabe told Mr Phipps the same by email dated 17 August 2014.

186. Following that, there was no agreement about further funding from SUL until the July 2015 Funding Agreement. In the meantime, relations between Kevin McCabe and Prince Abdullah had deteriorated, with Prince Abdullah in effect threatening (in a letter written by Mr Phipps dated 28 May 2015) that if SUL did not honour its obligation to invest 50/50, Prince Abdullah would pull out, leading to the collapse of SUFC. Although this caused Kevin McCabe to soften his approach, Mr Phipps accused Kevin McCabe on 25 June 2015 of violating the spirit of the original deal, and Kevin McCabe finally climbed down on 1 July 2015 and agreed, formally, to inject £3 million by no later than 15 October 2015 and a further £1 million by no later than 1 May 2016. But this was an ad hoc resolution and neither established any agreement beyond the 2015/16 season nor acknowledged a 50/50 obligation as having existed in the spirit of the original agreement. I reject the argument that, by making this agreement (which Kevin McCabe then flouted) the parties reached an understanding that they would fund the deficit in equal shares going forwards.

187. It matters not for present purposes who was right about the spirit of the original deal, but what is significant is that there were substantial differences between Prince Abdullah and Kevin McCabe about fundamental matters relating to their venture. On Kevin McCabe's part the July 2015 Funding Agreement was reluctantly made: he believed that it had been understood that Prince Abdullah was going to take over responsibility for funding the Club, but he knew that it was impossible for him to stand by and allow the Club to collapse through lack of money. Both before and after the July 2015 Funding Agreement, the parties were looking for a new investor to buy out SUL's interest, or at least buy a substantial stake in Blades. When this did not materialise, the differences between Prince Abdullah and Kevin McCabe grew. These events are inconsistent with a new understanding and agreement that Kevin McCabe and Prince Abdullah were effectively partners going forwards.

188. It is clear (and I find) that the realisation that SUL was going to have to share the funding of the deficit for 2015/16 changed Kevin McCabe's attitude to the management of the Club. He persuaded Prince Abdullah to believe that the lack of success was attributable to Mr Clough, Mr Brannigan and Mr Phipps having too much involvement or influence in the management of SUFC's affairs, and that what was needed was more control by him. Although Kevin McCabe was of that opinion earlier, he was not so bothered while it was someone else's money that was being wasted, as long as the Club itself was not under threat. He was determined in any event that if he was going to be funding the Club's losses, when he had hoped no longer to need to do so, he was going to supervise the management and in particular expenditure and income from off the field activities. This is reflected in his email to Prince Abdullah dated 7 July 2015, in which he says "…as part of the new arrangements between us, as promised I am involving myself much more than in the

past two years in the various activities that ensure from Bramall Lane, Shirecliffe and Crookes". It is clear from the rest of that email that Kevin McCabe had a particular problem with the fact that the property assets leased by SUFC were not being made to "sweat", i.e. to produce income, and Kevin McCabe had it in mind to change that, but his mind was also on the amount of football expenditure.

189.    The reality was, of course, that Prince Abdullah was a continent away, engaged on heavy governmental business and with little time to consider SUFC's affairs, whereas Kevin McCabe was present in Yorkshire for much of the time. It was therefore inevitable that he would have a much greater presence at the Club and would be more able to watch over what management were doing and more influential in conveying the wishes of the owners.  Prince Abdullah recognised that, though he still used Mr Phipps to maintain some presence and involvement. In the autumn, Kevin McCabe set about persuading Prince Abdullah to remove Mr Phipps, with whom by then he felt unable to work, and whom he blamed for some of the financial misfortunes that had occurred during the initial two-year period.

190.    However, none of this amounted to a new basis on which the affairs of Blades and SUFC were to be managed, turning Blades into a quasi-partnership. On the contrary, trust and confidence were being slowly eroded by this point, and were about to suffer a further substantial blow when, on 15 October 2015, SUL did not pay the agreed £3 million because Kevin McCabe decided that it would be better discipline for the Club's management to have the funds drip fed (by him) as and when they were needed, to avoid imprudent expenditure. Prince Abdullah was greatly offended by that conduct, being a deliberate and clear breach of what had been agreed, at a time when he was personally "cutting into flesh" to make his agreed contribution. Despite the rebuke of Prince Abdullah and his insistence that the money be paid, SUL did not make payment of its agreed £3 million in full until 15 February 2016 (the first tranche was paid on 23 November 2015).

191.    By 29 October 2015, Prince Abdullah had decided that he would not renew Mr Phipps' contract when it expired in December that year. The intimation that he felt that he needed a lawyer to help him in his relations with Kevin McCabe and the Club reflected distrust and uncertainty rather than a new relationship based on trust and confidence. By early 2016, faced with Kevin McCabe exerting greater control over the affairs of SUFC, Prince Abdullah decided that he needed help and instructed Messrs Howard and Hawasli to go to Sheffield and appraise what they saw. The Howard Report was damning about the degree to which Kevin McCabe had effectively taken control and side-stepped proper corporate governance.

192.    I do not accept that there was a shared understanding that Kevin McCabe would be the strong partner and that Prince Abdullah, by implication, would be a weak one. Prince Abdullah and Kevin McCabe shared an unhappiness with the way that the £10 million invested by UTB had been spent and the lack of success on the pitch. That had happened under the watch of Mr Phipps, so Prince Abdullah's position was weakened in terms of real influence over day-to-day affairs at the Club. It is also evident that his other appointed directors were not effective in securing proper corporate governance.  Kevin McCabe seized the initiative at the time when he was again required to pay towards the deficit of the Club. He told Prince Abdullah that he would become more involved.  Up to a point Prince Abdullah was pleased that someone with an eye for financial rigour would be exerting some control.  That

limited understanding and coincidence of financial interests does not make Blades a quasi-partnership at that time, and in any event the limited understanding did not last once Prince Abdullah had received the Howard Report.

193. The fact that the parties regarded each other as "partners" reflects the fact that there was a corporate joint venture on which they were both engaged, working to achieve the overriding objectives, but that does not mean that a quasi-partnership existed. Both Kevin McCabe and Prince Abdullah recognised that they had a duty to act in the best interests of both of them, and in good faith in that respect, but that was inherent in the responsibilities of all the directors of Blades and SUFC, each of whom owed the companies a duty in good faith to act in the best interests of their company. It is telling that, in seeking to find an example of an acknowledged obligation of good faith, SUL relies on what was said by Mr Giansiracusa in October 2017, in relation to rent reviews, at a time when the relationship between the shareholders was in rapid decline. By that time, each of them was, to a significant degree, seeking to influence the Club's affairs in their own interests. Within 3 weeks of that occasion, the relationship had irretrievably broken down. Moreover, although an agreement to review the rent in good faith on promotion to the Premier League is relied upon, at that time the rent review would be inconsequential as the property call options would then be likely to be exercised, leading to an end to the rental liabilities. Further, from 2014 until 2017 UTB had consistently declined to agree a rent review, which was in the best interests of SUFC but was adverse to the interests of SUL and Scarborough Group as landlords.

194. In short, SUL's case on the creation of a quasi-partnership amounts to extracting from the totality of dealings between SUL and UTB after the date of the ISA those particular instances that might lend support to its case that SUL and UTB agreed to run Blades and SUFC on the basis of mutual trust and confidence rather than in accordance with the articles and the ISA. In my judgment, those particular instances do not amount to a change in the agreed basis on which Blades and SUFC were run. The total picture is different. As a result of Prince Abdullah's ministerial appointment, and through inadequate representation on the boards of the companies, UTB allowed the proper corporate governance of the companies to slide to an extent that Kevin McCabe, by himself and through his chosen appointees to executive positions, was able to take virtual control of what was happening. This was not governance on the basis of cooperation and mutual trust and confidence, nor was it by agreement with Prince Abdullah, but rather as a result of his lack of sufficient care and attention. The position was slowly remedied between 2016 and 2017. In fact, throughout the period from August 2014 to October 2017, the relationship between SUL and UTB was gradually declining and trust and confidence were evaporating, such that by 2017 a battle for control of Blades and SUFC had developed. I reject SUL's claim that, at some time after the ISA was made, the affairs of those companies were conducted on the basis of a quasi-partnership.

(iii) Implied term of good faith

195. The alternative way in which SUL seeks to establish obligations of fair dealing and good faith that bound UTB in late 2017 is to contend that the ISA was a "relational" contract, into which – as a matter of law – there are implied such obligations.

196.  The law on this subject has evolved rapidly since the (as it now appears) landmark decision of Leggatt J in Yam Seng Pte Ltd v International Trade Corp Ltd [2013] EWHC 111 (QB). However, the law has not yet reached a stage of settled clarity, nor is there binding authority, though there is a body of first instance decisions and dicta in the Court of Appeal that establish various principles.

197.  The general law of implied terms in contracts has been comprehensively restated by the Supreme Court in Marks and Spencer plc v BNP Paribas Securities Trust Company (Jersey) Ltd [2015] UKSC 72; [2016] Q.C. 742. That decision reaffirms the traditional approach that, however reasonable it may be, a term will not be implied into a contract unless, at the time the contract was made, a reasonable reader of it would consider the term to be so obvious as to go without saying or the term is necessary for business efficacy. As Lord Neuberger of Abbotsbury PSC observed at para [21], although these limbs are theoretically alternatives, in most cases both will be satisfied: a term will be obvious to the reasonable reader because it is necessary to give the contract commercial and practical coherence in accordance with its intended effect. Excluded from that general approach are contracts of a particular type where, as a matter of law, a term is treated as being implied if not expressed, such as an obligation of fidelity in an employment contract or, as in Liverpool City Council v Irwin [1977] A.C. 239, a right to safe access to and egress from a flat let under a contract of tenancy.

198.  In Yam Seng, Leggatt J implied an obligation of good faith into the distributorship contract as a matter of fact and not because the contract was a distributorship contract or, more generally, a "relational" contract:

> "Under English law a duty of good faith is implied by law as an incident of certain categories of contract, for example contracts of employment and contracts between partners or others whose relationship is characterised as a fiduciary one. I doubt that English law has reached the stage, however, where it is ready to recognise a requirement of good faith as a duty implied by law, even as a default rule, into all commercial contracts. Nevertheless, there seems to me to be no difficulty, following the established methodology of English law for the implication of terms in fact, in implying such a duty in any ordinary commercial contract based on the presumed intention of the parties [131]
>
> ….
>
> In some commercial contexts the relevant background expectations may extend further to an expectation that the parties will share information relevant to the performance of the contract such that a deliberate omission to disclose such information may amount to bad faith English law has traditionally drawn a sharp distinction between certain relationships – such as partnership, trusteeship and other fiduciary relationships – on the one hand, in which the parties owe owner's obligations of disclosure to each other, and other contractual relationships in which no duty of disclosure is

supposed to operate. Arguably at least, that dichotomy is too simplistic. While it seems unlikely that any duty to disclose information in performance of the contract would be implied where the contract involves a simple exchange, many contracts do not fit this model and involve a longer term relationship between the parties in which they make a substantial commitment. Such 'relational' contracts, as they are sometimes called, may require a high degree of communication, cooperation and predictable performance based on mutual trust and confidence and involve expectations of loyalty which are not legislated for in the express terms of the contract but are implicit in the parties' understanding and necessary to give business efficacy to the arrangements. Examples of such relational contracts might include some joint venture agreements, franchise agreements and long-term distributorship agreements. [142]"

It is clear therefore that, while certain types of joint venture agreements may require the implication of such a term, in order to give them business efficacy, other types of joint venture agreements may not do so.

199.   The dichotomy is illustrated by a later judgment of Leggatt LJ (sitting at first instance), Sheikh Tahnoon bin Saeed bin Shakhboot Al Nehayan v Kent [2018] EWHC 333 (Comm). In that case, an oral joint venture had been agreed relating to the acquisition and operation of hotels, and part of the business was later demerged under a rudimentary framework agreement. The express terms were very limited, and yet the joint venture had been intended as a long-term collaboration requiring the cooperation and commitment of both parties. It was based on a strong personal friendship between them.

200.   Leggatt LJ held that implication of an obligation to act in good faith was essential to give effect to the reasonable expectations of the parties, i.e. the term was implied in fact on the conventional approach. The contract was of course a "relational" contract, and Leggatt LJ held that the term would also have been implied as a matter of law, given the nature of the contract. Two paragraphs of the Judge's judgment are particularly apposite:

> "[167] It does not follow from the conclusion that he did not owe any fiduciary duties to Mr Kent that the Sheikh's entitlement to pursue his own self-interest was untrammelled. I have previously suggested in [Yam Seng], at para 142, that it is a mistake to draw a simple dichotomy between relationships which give rise to fiduciary duties and other contractual relationships and to treat the latter as all alike. In particular, I drew attention to a category of contract in which the parties are committed to collaborating with each other, typically on a long-term basis, in ways which respect the spirit and objectives of their venture which they have not tried to specify, and which it may be impossible to specify, exhaustively, in a written contract. Such 'relational' contracts involve trust and confidence but of a different kind from that involved in

fiduciary relationships. The trust is not in the loyal subordination by one party of its own interests to those of another. It is trust that the other party will act with integrity and in a spirit of cooperation. The legitimate expectations which the law should protect in relationships of this kind are embodied in the normative standard of good faith.

[174] In the circumstances the contract made between these parties seems to me to be a classic instance of a relational contract. In my view, the implication of a duty of good faith in the contract is essential to give effect to the parties' reasonable expectations and satisfies the business necessity test which Lord Neuberger in [*Marks and Spencer*] at paras 16 to 31 reiterated as the relevant standard for the implication of a term into a contract. I would also reach the same conclusion by applying the test adumbrated by Lord Wilberforce in *Liverpool City Council v Irwin* [1976] A.C. 239 at 254 for the implication of a term in law, on the basis that the nature of the contract as a relational contract implicitly requires (in the absence of a contrary indication) treating it as involving an obligation of good faith."

In my judgment, it is clear that Leggatt LJ is there explaining that a particular type of contract, which may be called a "relational" contract, is one that will as a matter of law include an obligation of good faith. But the type of contract in issue is not any contract that involves a long-term relationship between the parties; it is a contract that requires the parties to collaborate in future in ways that respect the spirit and objectives of their joint venture *but which they have not specified or have been unable to specify in detail*, and which involves trust and confidence that each party will act with integrity and cooperatively. The contract in that case was exactly as described above and, as explained by Leggatt LJ, in fact necessarily required such a term to be implied if it was to work in accordance with the parties' reasonable expectations.

201. The *ratio* of the decisions in Yam Seng and Sheikh Tahnoon are ones that any first instance judge must follow unless he or she were satisfied that they were wrong. I shall follow them. In other recent cases, there has been a tendency to substitute for the question whether a reasonable reader of the contract would consider a term to be necessary or obvious the question of whether the contract is a "relational" contract: see, e.g., the decision of Fraser J in Bates v Post Office [2019] EWHC 606 (QB). At para 725, Fraser J asked what the characteristics are that are expected to be present that will determine whether a commercial contract ought to be considered a "relational contract". The Judge set out nine relevant factors, of which only the first was determinative, namely that there must be no express term of the contract that prevents a duty of good faith being implied.

202. If by "relational contract" it is clear that one means a relational contract of the kind described by Leggatt LJ in Sheikh Tahnoon and not all relational contracts in a broader sense, then there is no difficulty and the characteristics identified by Fraser J may assist to identify such a contract. But there is a danger in using the term "relational contract" that one is not clear about what exactly is meant by it. There is a great range of different types of contract that involve the parties in long-term

relationships of varying types, with different terms and varying degrees of detail and use of language, and to characterise them all as "relational contracts" may be in one sense accurate and yet in other ways liable to mislead. It is self-evidently not all long-term contracts that involve an enduring but undefined, cooperative relationship between the parties that will, as a matter of law, involve an obligation of good faith. As Beatson LJ said (*obiter*) in Globe Motors, Inc v TRW Lucas Varity Electric Steering Ltd [2016] EWCA Civ 396 at para [68]:

> "… as seen from the *Carewatch Care Services* case, an implication of a duty of good faith will only be possible where the language of the contract, viewed against its context, permits it. It is thus not a reflection of a special rule of interpretation for this category of contract."

203. Rather than seek to identify and weigh likely indicia of a "relational contract" in the narrower sense used by Leggatt LJ, it is, I consider, preferable to ask oneself first – as Leggatt LJ did in the Sheikh Tahnoon case – whether a reasonable reader of the contract would consider that an obligation of good faith was obviously meant or whether the obligation is necessary to the proper working of the contract. The overall character of the contract in issue will of course be highly material in answering that question but so will its particular terms, as recognised by the principle that (as restated in the Marks and Spencer case) no term may be implied into a contract if it would be inconsistent with an express term.

204. That approach is, in my respectful opinion, preferable also because the exact content of any implied obligation of fair dealing, or to act with integrity, or to act in good faith, will be highly sensitive to the particular context of the contract, as observed by Dove J in D&G Cars Ltd v Essex Police Authority [2015] EWHC 226 (QB) at [175]. The greater part of that context is the express terms of the contract. Thus, to imply a general obligation to act at all times in good faith towards the counterparty because the contract is a relational contract may fail to have regard to rights and obligations created by the express terms, to which any implied obligation must be tailored if it is not to be excluded as being inconsistent with them. In the instant case there is a real example of just such a question, to which I return in para 214 below.

205. The question, therefore, is whether a reasonable person reading the ISA at the time that it was made, with knowledge of the circumstances in which it is entered into (though not the negotiations of the parties or their drafts and preparatory documents) and the other agreements made as part of the same transaction, would consider that it was obvious that UTB had to act in good faith in all its dealings with SUL, and vice versa, or whether such an obligation is necessary to give coherent business effect to the ISA.

206. The starting point is that the ISA and the associated contractual documents are extremely detailed and professionally (and skilfully) drafted. This case is therefore at the opposite end of the spectrum from the Sheikh Tahnoon case in that regard. Where detailed, professionally-drawn contracts exist, it is more difficult to imply terms because there is a strong inference that the parties have given careful consideration to all the terms by which they agree to be bound (though the test for implying terms remains the same). That inference is less strong if the subject-matter of the contract is such that, by its nature, it is difficult to set out and agree in advance all the terms that

will govern the relationship. The ISA is, however, not that kind of contract, as demonstrated by the quantity and detail of the express terms.

207. Further, as regards implying a term of good faith, the ISA does in two places specify that the parties owe each other obligations of good faith. The first is in clause 29.2, which provides for severance of any void, illegal or invalid term of the ISA and for the parties then in good faith to negotiate the terms of a lawful substitute term. More significantly, clause 10.3 – in the deadlock provisions – requires the principals of each shareholder to use reasonable endeavours in good faith to resolve the dispute that has not been resolved by them in the first instance and has not been resolved by mediation. There is therefore an argument that where the parties meant to impose an obligation of good faith they did so, that elsewhere they did not intend any such obligation to exist, and that implying a more general good faith obligation would be inconsistent with the structure of clause 10 in particular.

208. A further substantial point is that the ISA does not only operate by pointing in a single collaborative direction. Although the overriding aim is to obtain promotion and reunite the property assets within 3-5 years, and that is expressed as a shared objective, the ISA will not necessarily operate in that way. Both parties (but in practice UTB, since SUL wanted to "hand on the baton") have the right to dilute the other and obtain super-majority control. It does not make sense for the exercise of such rights to be subject to an obligation to act in good faith, not least because super-majority control can only be obtained in that way with the consent of the other shareholder: clause 6.5 of the ISA. After a specified time or in the event of deadlock, either shareholder can (if it so chooses) offer to buy out the other, thereby becoming the owner of all the equity in Blades. But whether that shareholder succeeds in its objective depends entirely on the will of the other shareholder, who – acting in its own interests – can serve a counternotice reversing the proposed sale and purchase. The parties, when they are at the stage of preparing to serve, selecting the time at which to serve and serving a call option notice, Roulette Notice or counternotice, will very likely have adverse interests. An obligation in those circumstances to lay cards on the table, in performance of an obligation of good faith, would be inapt. Indeed, if there is a right in case of deadlock and in any event after a certain time to exit the ISA at will – in performance of the ISA and not upon a material breach of it – it is hard to see why it is necessary for each party to act on the basis of mutual trust and fair dealing; certainly not after a time (whenever it is) that the right to exit becomes available.

209. Another point is that, in entering the ISA, SUL and UTB had different interests, although they both aspired to promotion to the Premier League for financial and other reasons. SUL was expecting to be diluted and left with a minority interest, and upon UTB obtaining 75% of the share capital SUL's principal interest was in SUFC – by then under the control of UTB – buying the property assets from SUL and other Scarborough Group companies. In the meantime, SUL expected UTB to finance the club and wanted there to be rent reviews under the leases of the property assets. UTB's interests were in Blades being financed on a 50/50 basis until it was ready to exercise its right or agree with SUL to take control, and in the meantime for the rent to remain unreviewed. Once the Club had been promoted to the Premier League, UTB could not dilute SUL and could only acquire control under clause 11, by making an offer for SUL's shares. If the offer were too low, SUL could acquire its shares at

the same price. This demonstrates that clause 11 was a substantive part of the operation of the ISA, not simply an exit mechanism.

210. Against that background, can it be said that it would have been obvious on 30 August 2013 to an informed observer that each of UTB and SUL owed the other obligations of fair dealing, open cooperation and good faith for the duration of the ISA? Or that the ISA is devoid of commercial and practical coherence, to use the expression in the judgment of Lord Neuberger in para [21] of the Marks and Spencer case, unless such obligations are implied?

211. SUL contends that the ISA is in such terms that it needs the parties to cooperate in good faith for it to succeed in achieving its primary objective. That is because Blades was deliberately set up as a 50/50 deadlock company. It can be said that, in order for strategic business to be done, the shareholders would need to agree, and in order to agree they need to deal with each other fairly and openly and in good faith. Some (but not all) of the characteristics identified by Fraser J as typical of the sort of contracts where an obligation of good faith is implied are present here: in particular, the contract is (reasonably) long-term, though of variable duration; Blades will function more smoothly if the parties collaborate with each other, which will need a high degree of communication; and there is a significant financial contribution by UTB to the venture.

212. Looking at the principal way in which the ISA may operate to achieve its overriding aim, open collaboration between the representatives of UTB and SUL would be likely more effectively to achieve promotion to the Premier League and reunification of the property assets with the Club. But the directors appointed by UTB and SUL each owe a duty to Blades and SUFC to act in good faith in the best interests of those companies. Moreover, the ISA does not operate only on the basis that UTB and SUL will remain equal owners of Blades until that happens. Had UTB had unlimited funds (as perceived by Kevin McCabe when signing the deal in 2013), it would have sought to dilute SUL at an early stage and then funded the acquisition of the property assets. SUL, which wanted to hand on the baton, would have agreed. That outcome does not depend in any way on performance of obligations of good faith; nor would the exercise by either party of its rights under clause 11, possibly as soon as the end of the first season. If there had been genuine deadlock before then, the same buy-out would have been achieved under clause 10.

213. In these circumstances, I cannot accept that a mutual obligation of good faith is obviously what the parties meant to prescribe, or that such an obligation is necessary to give business efficacy to the ISA. The ISA is a sophisticated and complex mix of unequal rights and obligations for two parties who have, in some respects, conflicting interests, which can work well enough even if the parties are entitled to look after their own interests to a degree that the implied term would prevent. The shareholders are not individuals and Blades and SUFC as companies operate through boards of directors. Each director owes statutory and fiduciary duties to Blades and SUFC. A majority of directors' votes is perfectly possible (it would have been achieved in October 2017 if Mr Bettis's continuation as CEO had been put to a vote, despite Kevin McCabe's opposition), but if there is deadlock the provisions of clause 10 come into play. These include an obligation in good faith to seek to resolve the dispute. If there is genuine deadlock, both parties have the right to seek to acquire the shares of the other. It is impossible in those circumstances to say that the ISA does

58

not function effectively, in the way that the parties envisaged, unless there is an obligation on both parties to act at all times in good faith.

214.    Even if that were wrong, and each shareholder owed the other an obligation of good faith while pursuing collaboratively the primary objective of the ISA, it cannot be right that such an obligation continues when either side has the right under clause 10 of the ISA to serve a Roulette Notice, or is considering how and when to exercise the right under clause 11 of the ISA. Mr Downes QC submitted that it was particularly at that time and in those circumstances that each side had to act openly and fairly towards the other, but in my judgment that is not right, as the parties at that time have conflicting interests.

215.    The difficulty is illustrated by asking whether a party who is considering serving a Roulette Notice must tell the other that it is proposing to do so. There is only a limited period of time in which such a notice may be served after a failed attempt to resolve the dispute. Both parties agree that the machinery benefits the party that receives rather than serves the notice, so the effect may be that the offeree, who was about to serve its own Roulette Notice, desists from doing so. As a result the offeror is disadvantaged. Further, it cannot be the case that the offeree is obliged to give advance notice of its decision whether to serve a counternotice. The same considerations apply in the same way under clause 11. Moreover, the time at which a Call Option Notice is served and the price specified are likely to be calculated to benefit the offeror, and it cannot be right that the offeror has to be open about his intentions in advance. Mr Downes's contention that such protection is needed to prevent the offeree shareholder from "encumbering" its shares is in my judgment wrong, for reasons that I will come to under Part D below.

(iv) Other implied terms

216.    As stated in para 140 above, SUL also contends that other terms are to be implied into the ISA. For the reason given in para 206 above, it is more difficult to imply terms into a detailed, professionally-drawn contract, but the test is nevertheless whether such terms are obviously what the parties meant or are necessary to give business efficacy to their contract.

217.    The first term sought to be implied – if not an express term – is that a shareholder may not transfer part only of its holding in Blades. This raises in the first instance a difficult question of interpretation of the ISA, namely whether a part of SUL's or UTB's holding can be transferred, or whether their holdings can only be transferred as a whole. For the reasons given in paras 229-235 below, I consider that the terms of the ISA compel the conclusion that a part of SUL's or UTB's holding can be transferred, although it does produce rather odd results in terms of the operation of the other terms of the ISA. Since I consider that the terms of the ISA provide for and permit transfer of part only of a shareholder's holding, it is impossible to imply a term to contrary effect.

218.    The second term sought to be implied is that a shareholder must not wilfully obstruct or hinder the re-unification of the property assets pursuant to clause 9.1.12 of the ISA. Re-unification was one of the overriding objectives of the ISA. Clause 9.1.12 is a term intended to benefit SUL when UTB acquires control of Blades. It confers no equivalent benefit on UTB if SUL purchases UTB's shares because SUL or the

Scarborough Group already have control of the property assets and, if they control SUFC, can do as they please in terms of selling the assets to SUFC. Under the ISA, UTB would acquire the requisite control in one of two ways: by agreement with SUL, following dilution of SUL's interest by UTB, or following service of a Roulette Notice or call option notice under clauses 10 and 11. In the latter cases, UTB would be acquiring all of the holding of SUL; in the first case, SUL would retain up to 25% of the shares in Blades. In both cases, clause 9.1.12 is clearly intended to come into play so that the Scarborough Group's SUFC-related property assets are bought from it within a year of UTB acquiring super-majority control.

219.    It was obviously not intended that UTB should be entitled to acquire SUL's shares or take effective total control of Blades without SUFC being obliged to buy the property assets. If SUFC were not, in those circumstances, obliged to buy the property assets, SUFC would be able to continue to enjoy the benefit of very substantially reduced rents for the property assets for the remainder of the 25-year term of the new leases or until it chooses to exercise the property call options. SUL would have no control of Blades or SUFC, no ability to activate a rent review and no means of compelling SUFC to buy the property assets from it and the other Scarborough Group companies. Although UTB has in fact, upon securing promotion to the Premier League in April 2019, chosen to exercise the property call options, it was not obliged to do so if clause 9.1.12 was not triggered by its purchase of SUL's shares. UTB would then be able to buy out SUL's interest but prevent it from obtaining a fair return on the property assets. In effect, SUL and Scarborough Group companies would be subsidising companies in which they had no interest for up to 25 more years.

220.    In my judgment, it would have been obvious to the reasonable person reading the ISA that the parties intended that if UTB acquired SUL's shares under clauses 10 or 11 of the ISA, or if it acquired super-majority control by dilution, it was at that point obliged to cause SUFC to exercise the property call options. Buy-out or dilution of SUL cannot happen without UTB choosing to bring it about, so UTB cannot be forced into having to fund the purchase of the property assets at an inopportune time.

221.    UTB contended that it could not be necessary or reasonable to imply a term requiring it to ensure that the property call options were exercised at a time when SUFC could not afford to pay for the property assets, which would have the effect of making Blades and SUFC insolvent. It says that it could only have been intended that the property call options would be exercised if and when Blades could pay the price, which would be likely to be upon promotion to the Premier League. Recital (B) in the ISA contemplates that the two overriding objectives of promotion and re-unification would take place together. Accordingly, submits UTB, it is not implicit that it must not obstruct or hinder exercise of the property call options at a time when SUFC could not afford to buy the property assets.

222.    I disagree with UTB's argument. If the question is posed as being whether UTB must trigger the property call options when SUFC cannot afford to perform, the answer to the question appears obvious and in UTB's favour. But what is implicit is that *if* UTB chooses to bring about the circumstances in which clause 9.1.12 will be triggered, it must not wilfully obstruct or hinder its taking effect. UTB has the choice whether to subscribe for sufficient new shares to give it super-majority control and whether to serve a Roulette Notice or call option notice seeking to buy SUL's shares or serve a counternotice to SUL's Roulette or call option notice. If it takes those steps, and will

60

obtain control as a result, it is obliged to trigger the property call options (unless it and SUL agree otherwise) and then cause SUFC to pay for the property assets within 12 months. If it was not willing or able to do that, it should not have taken the steps that it did to bring clause 9.1.12 into play. There is no third alternative. Moreover, it is not the case that the notices will only be given under clauses 10 or 11 when the Club is a rich Premier League club, and achieving super-majority control by dilution cannot happen at such a time.

223.   What happened in this case was that UTB was unwilling to sell its shares to SUL for £5 million and so resolved to serve a counternotice; but it was unwilling to fund the purchase of the property assets within a year and so took steps calculated to prevent that obligation from arising. Whether those steps were in fact effective will be considered in Part D below. But it is in my judgment implicit in the ISA that if UTB (or SUL) chooses to take control of Blades it must comply with clause 9.1.12. It was not entitled to buy out SUL but defer acquisition of the property assets. Evasion of clause 9.1.12 produces uncommercial and unreasonable results and was obviously not what the parties intended. It is clear that SUL was never to be placed in that position. Clause 9.1.12 is of course of benefit to SUL and not UTB, but that is the bargain that the parties struck.

224.   I therefore agree with SUL that neither SUL nor UTB must wilfully obstruct or hinder the re-unification of the property assets pursuant to clause 9.1.12 where this would otherwise take effect in connection with the operation of clauses 10 or 11.

225.   Turning to the third implied term for which SUL contends, I do not consider that it is necessary to imply a term that a recipient of a call option notice must not allow its shares to be encumbered or act to prevent itself from being able to transfer its shares free from incumbrances on completion. In the first place, a recipient of a call option notice has it within its power to serve a counternotice, the result of which will be that its shares will not be sold. It is difficult to see why any restriction (other than what is expressed in the articles and the ISA, including the express prohibition in clause 16.1) should be placed on what a shareholder may do with its shares in those circumstances. The implied term contended for appears to be a counterpart of the positive obligation in clause 11.11 to transfer any shares sold free from claims, equities, liens and encumbrances, but if so there is no need for any negative prohibition. Unless the recipient of the call option notice serves a counternotice, it is obliged to sell to the offeror, subject only to receiving the price. In those circumstances, the offeree will have equitable duties to preserve and not encumber the shares, so that they can be transferred on completion, and the express terms of clause 11.11 go further than that in imposing an obligation on the seller to remove any equities, liens and encumbrances that already exist. If the seller does not comply with those obligations it will be in breach of contract. If it does something that will prevent it from complying, it is in anticipatory breach of contract. It is superfluous to create another term that the seller will breach before performance of the obligation to transfer is due.

226.   The fourth implied term contended for is a term that the recipient of a call option notice must not take any step that would materially diminish the value of the offeror's shares. Mr Downes QC described this, in an appropriate metaphor, as a prohibition on the goalposts being moved once the free kick has been taken. Once again, presented in that metaphorical way, the answer that SUL wants seems to be implied: of course the goal posts should not be moved. But I am unclear why it is that the

recipient of a call option notice is forbidden to diminish the value of the offeror's shares. One can follow the logic of an argument that the value of the shares to be purchased by the offeror must not be diminished, since the offeror has specified in the call option notice the price that it is willing to pay. Instead, the term sought to be implied is one that relates to the value of the offeror's shares. It appears, however, that the purpose of this implied term is to prohibit UTB from reorganising its shareholding to avoid triggering clause 9.1.12 and thereby reduce the value of SUFC, or alternatively of SUL itself.

227. The value of SUL's shares in Blades depends on the assets and liabilities of Blades and its subsidiaries. If SUFC were obliged to exercise property call options when it was unlikely to be able to afford them, one would expect the value of Blades's shares to be reduced on account of the very substantial future liability to SUL that it was unable to meet. A reduction in the value of Blades shares would be avoided, not caused, by avoidance of the clause 9.1.12 obligation. What may be diminished is the value of SUL's own shares, not the shares in Blades that SUL owns, and SUL's real complaint is that it will not be receiving the price for the property assets payable under the property call options.

228. In view of the conclusion that I have reached on the second implied term, above, it is unnecessary to ponder further the appropriateness of this fourth alleged implied term. I am not persuaded that it is obvious, or adds anything to the other alleged implied terms, or that any such term is necessarily implicit in the ISA.

229. The fifth and final implied term that is asserted is that no party to the ISA must deliberately prevent or hinder any other party from fulfilling its obligations under the ISA. It is generally implicit that where performance of a contract between A and B depends on matters to be done by B, A must not seek to prevent B from performing and may be obliged to take any steps that he can take to enable B to perform: see Mackay v Dick (1881) 6 App Cas 251, 263. That is uncontroversial, but I cannot see to what issue in this case such an obligation is relevant. It may be that it was at one time considered relevant to the question whether UTB was in breach of contract in seeking on 31 January 2018 to prevent the directors of SUFC from executing property call option notices. However, if UTB was obliged on that date to cause SUFC to execute notices under clause 9.1.12 then it is in breach of contract for refusing to do so and the extra implied term adds nothing to the analysis.

D.    The Contractual Obligations Arising from Service of the Call Option Notice and the Counternotice.

(i) Introduction to the remaining issues

230. The Counternotice served on behalf of UTB on 26 January 2018 put an end to the proposed purchase by SUL of UTB's shares in Blades and gave rise to a contract for the sale of SUL's shares in Blades to UTB for £5 million. That is the stated effect of clause 11.7 of the ISA.

231. Under clause 9.1.12 of the ISA, SUFC is obliged to exercise the property call options if UTB acquires 75% of more of the issued share capital of Blades. Prior to January

2018, UTB held 50% of Blades' shares and under the contract of sale and purchase it was entitled to purchase the remaining 50% of the shares. Clause 9.1.12 would therefore apparently be triggered.

232.    UTB's case is that the contract of sale and purchase of SUL's shares in Blades for £5 million is valid but that, as a result of the transfer of most of its shares in Blades to UTB 2018 and a direction that SUL's shares should be transferred mostly to Mr Giansiracusa and Prince Musa'ad, UTB did not acquire and at no time would acquire 75% or more of the share capital of Blades. Accordingly, its case is that the Court should order SUL to transfer its shares in Blades as UTB has directed, upon payment of £5 million, and decide that UTB was right to contend by Jones Day's letter dated 31 January 2018 that SUFC should not execute property call option notices.

233.    SUL's case is that UTB's attempts to avoid acquiring 75% of the shares of Blades were unsuccessful, and that it did acquire 100% of the shares upon service of the Counternotice, such that clause 9.1.12 was enforceable from that time. If that is wrong, SUL says that it made a mistake as to the terms that it offered by the Call Option Notice, because the price of £5 million offered depended on the fact that (as Kevin McCabe assumed) SUL (or Scarborough Group companies) would also be paid the purchase price for the property assets under the property call options. It contends that that mistake was known to UTB and that accordingly the contract of sale and purchase of SUL's shares in Blades that prima facie arose from service of the Counternotice should be avoided by the Court.

234.    Since April 2019 UTB has accepted and agreed that the property call options should be exercised (and they were in fact exercised by the board of SUFC and deemed to have been exercised on 1 July 2019). In consequence, if the contract of sale and purchase is enforced SUL will indeed receive in due course the £5 million for its shares and the price payable for the property assets, as it envisaged would be the case when it served the Call Option Notice in December 2017. However, it is still necessary to resolve the question of whether clause 9.1.12 was triggered in January 2018. That is because SUL is no longer content to receive the sum of £5 million for its shares in Blades. Even if the contract of sale and purchase is not avoided for mistake, SUL claims that UTB was in repudiatory breach of the ISA and the contract of sale and purchase, such that SUL was entitled to and did terminate both contracts by notice on 6 February 2018 and is therefore not obliged to sell its shares in Blades to UTB.

235.    SUL further claims that the conduct of UTB, Mr Giansiracusa and Prince Abdullah was unfairly prejudicial to SUL's interests as shareholder and that, by way of remedy for the harm caused, UTB should be ordered to sell its shares in Blades to SUL at their current value. So, instead of receiving £5 million and (in due course) the price for the property assets, SUL seeks the right to buy out UTB at valuation. SUL argues that such an outcome is eminently fair, given that one shareholder or the other has to step aside in the interests of the wellbeing of the Club. On the other hand, it contends that for SUL to have to sell its shareholding to UTB for £5 million (which it is common ground is only a small percentage of its current market value) would be an unfair result.

236. The remainder of this judgment will address all these remaining issues and the further question of whether UTB, Mr Giansiracusa and Prince Abdullah conspired to use unlawful means to harm SUL.

(ii) Did the Scheme succeed in evading clause 9.1.12 of the ISA?

237. The first set of issues relates to UTB's attempt to avoid triggering clause 9.1.12: was it successful? For convenience, I refer to UTB's attempts to do so as "the Scheme". The Scheme comprised two parts: a transfer of 40% of the shares in Blades to UTB 2018 on 24 January 2018 and the direction (either given or to be given) by UTB to SUL to transfer 30% of its shares in Blades to Mr Giansiracusa and a further 10% to Prince Musa'ad.

238. Mr Giasiracusa gave evidence that he first became aware of the detail of clauses 11 and 9.1.12 of the ISA on about 22 November 2017 and that about that time he realised that, by directing that the shares purchased be transferred to persons other than UTB, UTB might be able to avoid clause 9.1.12. He and Prince Abdullah both gave evidence that, following legal advice and commercial consideration, the decision to serve a counternotice was taken on (and not before) 10 January 2018. They also said that they did not identify and decide to implement a second means of avoidance of clause 9.1.12, namely transferring most of UTB's shares in Blades to a new controlled company, until 22 January 2018. None of these factual matters were seriously challenged by SUL and I find that they are true. (UTB has not waived privilege in the legal advice that it obtained at those times.)

239. In the event, although it was thought of second in time, the transfer of shares to UTB 2018 became the principal means of avoiding clause 9.1.12. Had there been a genuine sale of shares by UTB to UTB 2018 and registration of UTB 2018 before the Counternotice was served (or at least before completion of the resulting contract of sale and purchase was due), UTB would have had a strong argument that it at no time "acquired" 75% of the share capital in Blades. I find that Mr Giansiracusa and UTB's lawyers hoped that such registration would take place before completion of the contract of sale and purchase, but in fact that did not happen and UTB 2018 has still not been registered.

240. The first point of challenge raised by SUL to the validity of the share transfer is that, on the true interpretation of the articles and the ISA, part only of the holding of UTB could not be transferred, only the entire holding.

241. The articles of association are drafted so as to permit the transfer of any share or number of shares. Any restriction on transfer of part of a holding must therefore derive (if it exists) from the ISA. There is no express term of the ISA that prohibits the transfer of part of a Shareholder's holding. Clause 16, which deals with dealings in shares, provides as follows:

> "16.1   No Shareholder shall do, or agree to do, any of the following during the continuance of this Agreement except with the prior written consent of the other Shareholder or otherwise in accordance with this Agreement:

16.1.1 pledge, mortgage, charge or otherwise encumber any Share or any interest in any Share;

16.1.2 grant an option over any Share or any interest in any Share; or

16.1.3 enter into any agreement in respect of the votes attached to any Share.

16.2     No Shareholder shall transfer or dispose of any Share or any interest in any Share other than in accordance with this Agreement and the Articles or with the prior written consent of the other Shareholder.

16.3     Subject always to the Articles, [UTB] and [SUL] shall be entitled to transfer their Shares with all rights attaching to those Shares (including, without limitation, any rights set out in this Agreement) and the parties to this Agreement agree to allow the transferee to enter into a Deed of Adherence. "

242.   The prohibition in clause 16.1 is on creating subordinate interests in or over any share. It is not a prohibition on transfer. Clause 16.2 is a general prohibition on transfer or disposal, but is subject to the articles of association and clause 16.3. Clause 16.3 refers to a transfer of Shares, which might be a contrast with the use of the singular form in clauses 16.1 and 16.2; but clause 1.9 of the ISA states that references to the singular include references to the plural, and vice versa.

243.   The express reference in clause 16.3 to the Deed of Adherence lends some support to the inference that what is contemplated is a transfer of all the shares of UTB or SUL. That is because the Deed of Adherence must be in the form attached at schedule 7. This includes a term that the parties to the ISA have agreed that the transferor is released and discharged from all the provisions of the ISA, save for certain specified provisions. However, recital (C) states that the proposed transferee "has made an offer to purchase [certain] shares in the capital of the Company currently held by the Transferor", rather than "… an offer to purchase the Transferor's shares".

244.   A further argument why a transfer of part of a holding of SUL or UTB might not have been envisaged is that certain clauses of the ISA work better if there are only two shareholders, as there were at the date of the ISA. The effect of clause 5 is that directors of Blades can only be directors appointed by SUL or UTB and on transfer of all the shares of a Shareholder it must procure the resignation of each director appointed by it (clause 5.6). There is no requirement to remove any director on transfer of some of a shareholder's shares, so UTB or SUL could sell all but one of their shares and retain all their directors, with the purchaser having no board representation. That looks quite odd, though it is not an impossible outcome. The deadlock provisions of clause 10 are drafted on the assumption that only SUL and UTB are involved in attempts to resolve the deadlock. The provisions are capable of having sensible effect for so long as UTB and SUL have a majority of the votes of the shareholders, but not if they become a minority. The call option provisions of clause

11 can work on the basis that any shareholder can serve a call option notice on any other shareholder.

245.     What appears to me to be conclusive of the answer to this question is clause 18 of the ISA, which restricts the ability of UTB and SUL to assign the benefit of rights under the ISA with their shares. They can only be assigned in accordance with clause 18.2, which provides:

> "If any Shares held by [UTB] or [SUL] shall at any time be transferred in accordance with the Articles their rights and benefits under this Agreement may be assigned in whole or in part to the transferee of such Shares (without prejudice to the continuing rights and benefits of the transferor under this Agreement, *for as long as it continues to hold any Shares,* provided always that the transferee shall have executed a deed of adherence *in a form agreed between the Shareholders* (acting reasonably) and provided further that no party to this Agreement shall have any greater liability to such transferee than it would have had to the transferor as a party to this Agreement. " (*emphasis added*)

This clause establishes that a part of the holding of UTB or SUL may be assigned, together with rights under the ISA, on the basis that the transferor retains its rights under the ISA for as long as it continues to hold any shares. Rights may be assigned with some shares provided that a deed of adherence is signed, and in this case it must be a deed in such form as the shareholders reasonably agree. That is because the form of the deed in schedule 7 is recognised as being appropriate only in the case where all the shares of the transferor are transferred.

246.     For these reasons, on balance I consider that the ISA does permit UTB to transfer a part of its holding. Rights under the ISA can only be assigned with the shares, however, if a deed of adherence has been executed in a form agreed between the shareholders, acting reasonably. There is therefore no objection to the execution of the stock transfer form in favour of UTB 2018 as such.

247.     The next question is: what is the effect of the executed transfer dated 24 January 2018? The transfer has not yet been registered, so UTB remains the shareholder. Given that UTB 2018 is under the sole control of Prince Abdullah, Blades has no right under the articles to object to the transfer or refuse to register it. It is not disputed by UTB that, until registered, UTB still has legal title to the shares and its principal case is that it is the legal title that matters, not the beneficial interest. On that basis, on 24 January 2018, UTB retained 50% of the Blades shares for the time being. But when UTB 2018 is registered in Blades' share register as the holder of 40% of its shares, will UTB then cease to have an interest in them?

248.     That depends on whether the shares will be held by UTB 2018 on resulting trust or other bare trust for UTB. The ISA permits UTB to take shares in the name of a nominee (clause 2.5) and, in the light of that, it is not disputed that if shares are owned by a nominee or bare trustee they are to be treated as owned by UTB for the purposes of clause 9.1.12 of the ISA. However, UTB contends that the shares are beneficially

owned by UTB 2018 and will therefore not be held on any trust once UTB 2018 is registered as the holder of them.

249.   On its face, the stock transfer form suggests that consideration of £1 was paid for the shares. That is an undervalue of £3,999,999 on the basis of the price offered in the Call Option Notice. The evidence about the transaction underlying the executed transfer of shares to UTB 2018 was extremely odd. The cross-examination of Prince Abdullah included the following:

> "Q. Did you know anything about that transaction?
>
> A. I know that Yusuf [Giansiracusa] will – or, like, my lawyers will find another company or, like, another company, something like this.
>
> …
>
> Q. Did you apply your mind at all to that transaction?
>
> A. No, I know, I trust Yusuf that he will do a good job and he will not fool me or steal money from me anything.
>
> Q. No, not the sale to Yusuf; the sale to UTB 2018.
>
> A. No, I know he would not, like, whatever number you call the company, he will not make me do something that is not in my interest.
>
> Q. No, he said he didn't know anything about that transaction. I asked him about this. He said he didn't know anything about that one.
>
> A. So how would I know then?
>
> Q. Well, who is running this show, Prince Abdullah? Who is making the decision to transfer 40% of Blades from UTB to UTB 2018? Whose decision was that?
>
> A. Did you ask Yusuf?
>
> Q. Yes.
>
> A. Okay, so I'm sure you gave a better answer –
>
> Q. No, he didn't know about that transaction.
>
> A. Okay.
>
> Q. Whose decision was that?
>
> A. If Yusuf does not know, how would I know? … So I'm sure it was, that if I have to guess, it will be Jones Day.

Q. Jones day made the decision?

A. No, I mean, if you… I leave all things to yourself, so I don't remember at the time I have another lawyer, I'm sure I did not have any other lawyer to consult.

Q. So all that you can say is that you don't know anything about this transaction?

A. No, I left everything to Yusuf and I did not have any lawyer that I was – like, to lawyers representing me; it was only Yusuf."

250. Mr Giansiracusa had previously been asked in cross-examination about his understanding of the underlying transaction:

"Q. … Finally, the transfer from UTB to UTB 2018, the shares that were being transferred had an implied value of £4 million did they not? £3 million for 30%, £4 million for 40%?

A. Okay.

Q. On that basis. Was there any contract drawn up to govern that transfer?

A. I didn't handle that part of the transaction.

Q. The consideration on the face of the stock transfer form is £1. Do you know whether that £1 was ever paid?

A. No, I wasn't involved.

Q. So you don't have any evidence about that transaction at all?

A. I wasn't involved, I have nothing – "

251. The inference is irresistible that the transfer from UTB to UTB 2018 was just "papered" by Jones Day, probably on the instruction of Mr Giansiracusa on behalf of UTB, following the realisation on 22 January 2018 that if a transferee were registered as holder of Blades shares, UTB would or might not be the owner of them for the purposes of clause 9.1.12. I find that there was no transaction that was agreed by anyone, and no consideration was paid.

252. Mr Gledhill QC submitted, on the strength of Pennington v Waine [2002] EWCA Civ 227; [2002] 1 WLR 2075, that although UTB 2018 was a volunteer nevertheless the gift of the shares in Blades was perfected by UTB's executing the stock transfer form and delivering it to the secretary of Blades for registration. In that case, however, it was common ground that the 400 shares were a gift of the deceased; the question was whether the gift had been perfected, since the stock transfer form had only been sent to the deceased's accountant. The question in this case is whether there was intended to be a gift of the shares by UTB to UTB 2018.

253. Mr Gledhill argued that UTB, a company controlled by Prince Abdullah, had power with the consent of its shareholder, Prince Abdullah, to make a gift of property it owned to another company. That is doubtless so, subject to any questions of insolvency and the interests of creditors (which do not arise here) and assuming that the law of Nevis is the same in this respect as the law of England and Wales. But there is no evidence of any such intended gift or Prince Abdullah's consent: Prince Abdullah said that he knew nothing about it. The stock transfer form was no more than a piece of paper and did not reflect any underlying transaction.

254. In those circumstances, there was no transfer of the beneficial interest in the shares of Blades. Even if registered, UTB 2018 will (as things stand) hold the shares on resulting trust for UTB. The presumption of advancement does not apply, as between two limited companies, and so unless there is evidence that a gift was intended the law presumes that UTB 2018 was to hold the shares on behalf of UTB. In Westdeutsche Landesbank Girozentrale v Islington LBC [1996] A.C. 669 at 708, Lord Browne-Wilkinson explained the circumstances in which a resulting trust arises as follows:

> "Under existing law a resulting trust arises in two sets of circumstances: (A) where A makes a voluntary payment to B or pays (wholly or in part) for the purchase of property which is vested either in B alone or in the joint names of A and B, there is a presumption that A did not intend to make a gift to B: the money or property is held on trust for A (if he is the sole provider of the money) or in the case of a joint purchase by A and B in shares proportionate to their contributions. It is important to stress that this is only a *presumption*, which presumption is easily rebutted either by the counter-presumption of advancement or by direct evidence of A's intention to make an outright transfer… "

255. In relation to personal property, Snell's Equity (33rd ed.) states, at para 25-019:

> "For property other than land, the general law about the presumption of resulting trust applies unmodified. On a voluntary transfer of personal property the transferee is presumed to hold on a resulting trust for the transferor unless the presumption of advancement applies or the transferor is proved to have had an actual intention to make the transferee the beneficial owner of the property. Where the voluntary transfer is made by a husband, father or other person in loco parentis the presumption of advancement will apply."

256. Absent any evidence of an intention to make a gift of the shares to UTB 2018, the beneficial interest in the shares did not pass on the execution of the stock transfer form and, when UTB 2018 is registered, it will hold the shares on resulting trust for UTB. At that stage, therefore, UTB will be the beneficial but not the legal owner of the shares.

257.    The next question is whether, as UTB contends, that means that UTB will no longer
        be the shareholder, or be treated as having those shares, for the purpose of clause
        9.1.12 of the ISA. The word "acquired", in the context of SUL and UTB having 50%
        of the shares already, connotes obtaining more than the 50% already held, viz.
        additional shares that would take the holder above 75%. On obtaining another 25% of
        the shares, UTB would be "acquiring 75% or more" of the shares. If, on the other
        hand, UTB sold its shares, and then later acquired 25% at a time when it held no other
        shares, it would not have acquired 75%. But what if the original 50% are held by a
        nominee or trustee for UTB? In those circumstances, in my judgment, UTB would
        have acquired 75% even though 50% was at the time registered in the name of (and
        for the purposes of the articles held by) another person. Given that UTB was entitled
        under clause 2.5 of the ISA to take its shares in the name of a nominee, those shares
        would be treated for the purpose of the ISA as held by UTB. It would be perverse, in
        those circumstances, for UTB to be able to escape clause 9.1.12 merely by
        transferring shares to a nominee.

258.    Accordingly, I conclude that UTB did own all its original 50% holding of Blades
        shares at the time of the Counternotice and will continue to own those shares even if,
        at a future time, UTB 2018 is registered as holder of 40% of the shares.

259.    The next question is whether, upon service of the Counternotice, UTB "acquired"
        SUL's 50% of Blades shares. If it did then at that time the trigger in clause 9.1.12
        was satisfied and SUL was right in contending that UTB was obliged to procure that
        SUFC execute the property call option notices. UTB's case in this regard is that legal
        ownership is what matters, so that although upon service of the Counternotice UTB
        became the equitable owner of those shares, it did not thereby "acquire" them. SUL
        contends, on the contrary, that beneficial ownership suffices for these purposes.

260.    In the context of the ISA, I consider that UTB cannot be said to have "acquired"
        SUL's shares upon service of the Counternotice. Subject to SUL's claim for
        avoidance on the basis of mistake, which I address in Part E of this judgment, upon
        service of the Counternotice a contract of sale and purchase came into existence. As
        with a contract to sell and buy land, that contract means that, for certain purposes, the
        buyer is treated as the owner in equity, subject to payment of the price on completion.
        That is because the buyer has it within his power to compel transfer of the property on
        the completion date: a court of equity will specifically enforce the contract if the
        buyer pays the price. However, the question here is not whether UTB was an
        equitable owner of the shares on 26 January 2018 but whether it "acquired" them
        within the meaning of clause 9.1.12.

261.    In my judgment, the parties cannot have meant that the property call options should
        be irrevocably triggered at a time when the price for the shares had not yet been paid.
        Until the price was paid, the shares did not fully belong to the buyer. There might
        well be circumstances in which the buyer was unable to pay the price, for a time or at
        all. A recipient of a low bid for its shares might be unwilling to sell and therefore
        forced to buy, but not immediately have the means to do so. That is not far from the
        actual circumstances that pertained in December 2017. If the price were not paid,
        completion would be delayed and the contract of sale and purchase might be
        rescinded, in which case the parties would continue to own Blades jointly and the
        company might well be deadlocked. It was obviously not intended that in those
        circumstances the property call options should be triggered. Once the price is paid,

however, the seller becomes a bare trustee for the buyer and then the buyer has "acquired" the shares, even though it is not yet registered as the holder of them. Accordingly, UTB would only "acquire" SUL's holding on completion of the contract of sale and purchase.

262. The next question is whether a different conclusion on the acquisition of the shares must be reached if, instead of paying the £5 million and receiving a stock transfer form in relation to all SUL's shares in Blades, UTB paid the £5 million and received a transfer of only one-fifth of SUL's shares, with stock transfer forms in respect of the other four-fifths of SUL's shares being delivered to Mr Giansiracusa and Prince Musa'ad, at UTB's direction.

263. Clause 11.9 of the ISA states that at completion the transferring shareholder [SUL] must deliver or cause to be delivered to the purchasing shareholder [UTB] *or as it may direct* a duly executed transfer or transfers in favour of UTB *or as it may direct.* There is therefore no doubt that UTB is entitled to nominate other persons to take transfers of SUL's holding. But it is the purchasing shareholder (UTB) that is required by clause 11.9 to deliver to SUL a banker's draft or telegraphic transfer for value in an amount equal to the option price multiplied by the number of shares being sold. It is therefore not the nominees who stand in the shoes of UTB to complete the contract: UTB completes the contract and directs SUL to execute transfers in favour of other persons nominated by it.

264. Although UTB, as of right, could have simply directed a transfer of shares to Mr Gianisracusa and Prince Musa'ad, agreements were made between them to give some colour to the direction that UTB was intending to give SUL. The agreements are in substance sale agreements under which a deposit of 10% is paid by the buyer on completion and the remainder of the purchase price is deferred to be paid on or before 30 June 2018, subject to various options. There is a put option for the buyer to sell some or all of the shares to UTB and the price for the shares sold to UTB is the deposit paid by the buyer on completion (paid pro rata if the option is exercised in respect of fewer than all the shares). There is also a call option for UTB to buy some or all of the shares from the buyer at a price 30% above the deposit paid by the buyer.

265. Thus, in substance, the contracts made with Mr Giansiracusa and Prince Musa'ad are sub-sales of the shares to be purchased by UTB from SUL, with the same time and date for completion as the completion date for the contract of sale and purchase between SUL and UTB. But the sub-sales contain put and call options that, if exercised, will result in the ultimate transferee of the shares (or some of them) being UTB.

266. The relevant question is therefore whether UTB "acquires" the shares of SUL, within the meaning of clause 9.1.12, if it completes the contract of sale and purchase by paying the price of £5 million to SUL (and otherwise complying with the requirements of clause 11.9 as regards completion) but directs that some of the shares be transferred to others, against the background that those others have made agreements with UTB to buy shares from UTB.

267. In my judgment, UTB "acquires" all the Blades shares sold by SUL in those circumstances. It does so because it completes the contract of sale and purchase, under which it has agreed to buy those shares, by paying to SUL the full price for all

71

the shares. The fact that it directs that certain shares be transferred to others, as it is entitled to do under the ISA, cannot mean that it has not at that time acquired the shares within the meaning of clause 9.1.12. It has acquired them from SUL. A buyer who purchases shares and enters into a back-to-back contract to sub-sell them to another acquires the shares when he completes the principal contract and he does not cease to acquire them because he exercises a right to have the shares transferred to someone else. The sub-sale agreements with Mr Giansiracusa and Prince Musa'ad are *res inter alios acta*, so far as the rights of SUL are concerned. It cannot have been intended that clause 9.1.12 would not be triggered simply because UTB exercised its right (expressly given by the ISA) to have transfers executed in favour of third parties. The fact that UTB does so because it is sub-selling the shares, with an option to reacquire them, rather than because the transferee is a pure nominee, makes no difference to the analysis. The purchase of the shares pursuant to clause 11 of the ISA is one of the principal means of "acquisition" of more than 75% of the shares by UTB, and completion of a contract arising under clause 11, entitling UTB to take the shares from SUL, must have been intended by the parties to be acquisition for the purposes of clause 9.1.12.

268.    For these reasons, I consider that UTB is wrong in contending that, upon registration of the transfer in favour of UTB 2018 and completion of the contract of sale and purchase, it will not acquire more than 75% of the shares in Blades. However, SUL is wrong in contending that UTB acquired 75% or more of the shares in Blades on 26 January 2018. It would have done so only on completion of the contract of sale and purchase on 6 February 2018. Had completion taken place, UTB would have been obliged at that time to cause the directors of SUFC to exercise the property options. UTB was therefore technically right to require the directors of SUFC not to sign the property call options when called upon to do so by SUL's solicitors on 30 January 2018, but it was not entitled to seek to prevent signature after completion of the contract of sale and purchase. Although UTB tried to prevent the triggering of clause 9.1.12, it failed to achieve that. Its refusal to cause SUFC to execute property call option notices on completion was therefore wrongful.

269.    It follows that Kevin McCabe was not wholly mistaken as to the liabilities that would arise when he caused SUL to serve the Call Option Notice specifying £5 million as the purchase price. He said (and I accept) that he did so only in the belief that, if UTB elected to buy SUL's shares, UTB would also be obliged to cause the property call options to be exercised, with the result that within 12 months SUL or other Scarborough Group companies would receive the purchase prices specified in the five property call option agreements. On the basis of my conclusions, he was in fact correct in that assumption, although if UTB had genuinely sold or gifted most of its existing shares to another person and that other person had become registered as holder of those shares before completion of the contract of sale and purchase, the outcome would have been different.

270.    Kevin McCabe was mistaken in his assumption that UTB would not attempt to avoid the obligation in clause 9.1.12 and claim that it had done so, but it is clear from Mr Tutton's email to Kevin McCabe headed "Texas shoot out" dated 22 November 2017 that they did consider the risk that UTB would serve a counternotice but then be unable or unwilling to find the money to pay for the property assets 12 months later. So SUL were aware of the risk that the property assets might not be paid for on time,

but they did not foresee that this might be because UTB disputed its obligation to do so. That kind of mistake – as to the motives and likely conduct of the counterparty – is clearly not the kind of mistake that entitles a party to avoid a contract, as I shall explain. In case I am subsequently held to be wrong in my conclusion that UTB would acquire 75% of more of Blades shares, I will go on to consider whether Kevin McCabe's (assumed) mistake about clause 9.1.12 being triggered was such as to entitle SUL to have the contract of sale and purchase arising from the Call Option Notice and the Counternotice avoided.

### E.   Mistake

271.   On 29 December 2017 SUL gave UTB written notice that it was exercising the call option in clause 11 of the ISA. The notice contained two offers in compliance with clause 11.4.4: an offer by SUL to purchase all UTB's shares in Blades at an aggregate price of £5m, and an alternative offer by SUL to sell all its shares in Blades to UTB at the same price. The notice specified 6 February 2018 as the date on which completion was to take place.

272.   The effect of the offer notice was (and was understood to be) that if UTB did nothing in response by 28 January 2018 it would be bound to sell its shares to SUL for £5m on 6 February 2018, and that if by 28 January 2018 UTB served a valid counternotice SUL would be bound to sell its shares to UTB for the same price on that date. Kevin McCabe on behalf of SUL believed that, if a valid counternotice was served by UTB, UTB would have to cooperate with SUL to cause SUFC to exercise the property share options. He had no specific belief or assumption about how or when that would have to happen, but he assumed that it would happen as part of the sale of SUL's shares to UTB. As I have explained, he was aware that there was a risk that SUFC, by then controlled by UTB, would not comply with its obligations under the property call options, but he did not identify as such a risk that UTB would seek to avoid (or would dispute) the obligation to exercise the property call options.

273.   If UTB served a valid counternotice then, under clauses 11.7 and 11.10 of the ISA, a contract of sale and purchase of SUL's shares would come into existence on the date of service of the counternotice, to be completed on the date specified in the counternotice. In view of the language of clauses 11.4.4(b) and 11.7, I agree with Mr Downes QC that the contract of sale and purchase of SUL's shares would be formed by express offer and acceptance of the terms of the alternative offer contained in the Call Option Notice. Although clause 11.7 says that the obligations in those circumstances are "subject only to the receipt of the Option Price", it is clear from clause 11.9 that payment of the Option Price is a matter of completion and that a binding contract of sale and purchase would come into existence upon service of the counternotice, with an obligation to pay the price on completion.

274.   The contract of sale and purchase arising from the service of the Counternotice is, of course, a separate contract from the contracts in the articles of association and the ISA. The terms of the contract of sale and purchase are principally those stated in the Call Option Notice and the Counternotice, in part by reference to clause 11 of the ISA. The fact that the ISA specifies terms of the contract of sale and purchase does

not mean that there is no separate contract. The contract of sale and purchase and the ISA exist in parallel.

275.    SUL argues that the contract of sale and purchase is void, or voidable, by reason of unilateral mistake made by SUL. The nature of the mistake that Mr Kevin McCabe asserts is explained in paras 269, 270 above. Although I have held that he was not mistaken about the obligations that bound UTB but only about the motives of UTB, for the purposes of this part of the judgment I assume that UTB had successfully avoided the obligation in clause 9.1.12 and that Kevin McCabe accordingly was mistaken as to the obligations that would flow from service of a counternotice by UTB. I will consider in the alternative the significance of SUL's actual mistake (as I have found it to be) about the motives of UTB.

276.    It was frankly accepted by Mr Giansiracusa and Prince Abdullah that they knew that Kevin McCabe must have assumed that the Counternotice would trigger the property call options under clause 9.1.12 of the ISA, otherwise he would not have risked being bought out for £5 million. They therefore knew that he was mistaken in believing that the property call options would be exercised because they had it in mind to prevent those options being triggered. The mistake as to the consequences of service of a counternotice was one made by SUL only: it was a unilateral mistake, not a common mistake.

277.    There is only a limited jurisdiction to avoid a contract on the grounds of unilateral mistake. The law in this regard is now reasonably clear, although for half a century or more it was bedevilled by confusion. The relevant distinctions are twofold: between common mistake and unilateral mistake, and between mistake as to the terms of the contract (or the identity of the contracting parties) and mistake about relevant facts or the law: see Chitty on Contracts (33rd ed), paras 6-001, 6-002. In the case of unilateral mistake, only mistakes as to the terms of the contract or identity (a "type 1 mistake") will suffice to prevent a valid contract from coming into existence, not some other mistake as to facts or motive (a "type 2 mistake"). The fact that one party knows that the other party has entered into the contract under some kind of mistake is not sufficient to avoid a contract.

278.    The law was summarised by Aikens J in Statoil ASA v Louis Dreyfus Energy Services LP [2008] 2 Lloyd's Rep 685 as follows:

> "[87]…The general rule at common law is that if one party has made a mistake *as to the terms of the contract* and that mistake is known to the other party, then the contract is not binding. The reasoning is that although the parties appear, objectively, to have agreed terms, it is clear that they are not in agreement. Therefore the normal rule of looking only at the objective agreement of the parties is displaced and the court admits evidence to show what each side subjectively intended to agree by way of terms. If it is clear from such evidence that there was not consensus, then there can be no contract, because the parties have not truly agreed on the terms. Some of the cases talk of such a contract being "void", but I think it is clearer to say that there was never a contract at all.

> [88] However, if one party has made a mistake about a fact on
> which he bases his decision to enter into the contract, but that
> fact does not form a term of the contract itself then, even if the
> other party knows that the first is mistaken as to this fact, the
> contract will be binding. That was the effect of the decision of
> the Court of Queen's Bench on appeal from the County Court
> in *Smith v Hughes* (1871) LR 6 QB 597, see particularly at
> page 603 per Cockburn CJ, and page 607 per Blackburn J. The
> correctness of that decision and the analysis in it has never been
> doubted. "

279.    In that case, the buyers and sellers of a cargo of gas negotiated a compromise of the
        sellers' demurrage claim. In calculating their claim, the sellers made a mistake about
        the date on which the vessel's lay time ended. The buyers knew that the sellers had
        made a mistake but decided not to draw it to their attention. The claim was
        compromised for a figure significantly less than the amount of the claim. When the
        buyers realised their mistake, they claimed that the contract of compromise was not
        binding, or that it should be set aside in equity. The judge held that it was not a term
        of the compromise that the discharge of the cargo was completed on a particular date.
        There was therefore no mistake about a term of the contract. The reasoning of Aikens
        J was cited with apparent approval by Hamblen J in Merrill Lynch International v
        Amorim Partners Ltd [2014] EWHC 74 (QB) at [55].

280.    Aikens J also rejected the argument that there was a wider jurisdiction in equity to
        rescind a contract formed on the basis of a unilateral mistake about a fundamental
        assumption that a party has made where the mistake was known to the other party.
        He referred to the decision of the Court of Appeal in Great Peace Shipping Ltd v
        Tsavliris Salvage International Ltd [2003] QB 679, and said:

> "[103] … The Court of Appeal reiterated the rule that a
> contract would only be held void at common law by reason of
> common mistake if the mistake of both sides concerned a
> fundamental assumption of a state of affairs (positive or
> negative) and the mistake rendered performance of the essence
> of the obligation impossible.

> [104] The Court of Appeal also considered whether there was
> any equitable principle which widened the circumstances in
> which a court could rescind a contract for common mistake
> when the common law would hold it was binding. The court
> declared that there was no jurisdiction to grant rescission of a
> contract on the ground of common mistake where that contract
> is valid and enforceable according to ordinary principles of
> contract law: para 157.

> [105] With respect to Andrew Smith J, I must disagree with his
> conclusion that there is an equitable jurisdiction to grant
> rescission of a contract where one party has made a unilateral
> mistake as to a fact or state of affairs which is the basis upon
> which the terms of the contract are agreed, but that assumption
> does not become a term of the contract. None of the cases he

cites… is authority for the existence of that jurisdiction. The *Great Peace* decision strongly suggests that there is no such jurisdiction in the case of a unilateral mistake. If there is no such jurisdiction in the case of a common mistake, I fear I am unable to see how, in logic, one can devise a rationale for an equitable jurisdiction in the case of a unilateral mistake, at least where there has been no misrepresentation by the other party."

In my judgment, that correctly states the law, though Aikens J was not addressing the different question of whether a unilateral mistake other than as to the terms of the contract or identity might lead a court of equity to decline specifically to enforce a valid contract.

281.   Mr Downes QC submits that Kevin McCabe's mistake was one as to the offer price, in that the price offered mistakenly assumed that a counternotice would trigger clause 9.1.12 of the ISA. He submits that the offer to sell was based (as a matter of obvious inference) on the operation of clause 9.1.12 and therefore could only be accepted on those terms. I reject this attempt to categorise Kevin McCabe's mistake as a mistake as to the price payable. The price payable was £5 million, as specified by SUL in the Call Option Notice, which made an alternative offer to UTB to sell SUL's shares in Blades at that price and which was accepted in terms by UTB. The offer was not £5 million plus the price payable under the property call options. The fact that Kevin McCabe believed (but UTB did not believe) that if a contract of sale and purchase of SUL's shares was made clause 9.1.12 would operate was not a mistake about the price but a mistake as to the circumstances in which a contract of sale and purchase of SUL's shares would trigger the obligations in clause 9.1.12 of the ISA. It was also a mistake of motive because it was a mistake about the risk or possibility of UTB acting so as to avoid triggering clause 9.1.12, if it could. The mistake involved an understanding about the meaning and effect of the ISA (which was a different contract) and about the conduct of UTB, but those matters were not terms of the contract of sale and purchase.

282.   There is in any event no persuasive evidence that, but for its mistake, SUL would have specified a different price in the Call Option Notice. In his witness statement, at para 416, Kevin McCabe asserts that "if I had thought that UTB were going to attempt to renege on obligations under [clause 9.1.12] then the Option Notice would have provided a considerably higher figure". However, Mr Tutton's third witness statement, at para 192 states: "We would not have called for their shares at all if we had any knowledge whatsoever that they would seek to perform a purported manoeuvre so as to seek to evade the Property Call Option". On this point, I consider that Mr Tutton must be right and I reject Kevin McCabe's evidence. The price payable for the property assets was of much greater significance to Kevin McCabe than whether he received £5 million or £10 million for SUL's shares in Blades. He would not have taken the risk of losing all control over Blades if there was a real prospect of UTB not having to procure payment for the property assets, nor would he have risked a higher offer for UTB's shares being accepted by UTB.

283.   Accordingly, the ratio of the Statoil case applies and the result must be the same: there was no unilateral mistake as to a term of the contract of sale and purchase of SUL's shares in Blades.

284. Mr Downes also argued that there was an equitable jurisdiction to set aside the contract on the basis that SUL's mistake was known to UTB and that it was unconscionable for UTB not to draw the mistake to SUL's attention. He referred to the equitable jurisdiction to rectify a contract where one party takes unconscionable advantage of another's mistake. He went as far as to say that the failure to draw attention to the mistake amounted to dishonesty on the part of Prince Abdullah and Mr Giansiracusa. I reject those arguments. There is no equitable jurisdiction to avoid a contract on the ground of a unilateral mistake of a "type 2" character, as explained by Aikens J. Rectification cases are, by definition, cases of mistake as to the terms of the contract, and so the equitable jurisdiction to rectify in cases of unilateral mistake follows the approach of the common law to cases of "type 1" unilateral mistakes, though providing the additional remedy of correction of the written document to reflect what equity regards as the true bargain, rather than concluding that no valid contract was made. The question of whether equity will decline specifically to enforce a contract where there is unconscionable conduct (or "sharp practice" as it is characterised in some of the rectification cases) is a different question. But in my judgment the contract of sale and purchase cannot be set aside on account of UTB's knowledge of Kevin McCabe's mistake of motive.

285. Whether the contract should be specifically enforced, as UTB claims, is a question to which I will return after considering all the circumstances in which the contract came into existence in January 2018. There are wide-ranging disputes of fact about the conduct of the parties during 2017, in particular who was to blame for the total breakdown in relations in November 2017; whether UTB, Prince Abdullah and Mr Giansiracusa conspired together to injure SUL by unlawful means; and whether they conducted the affairs of Blades in a manner unfairly prejudicial to SUL's interests as shareholder.

286. Another important part of SUL's case is the alleged breaches of contract by UTB. SUL argues that UTB was in breach of implied terms of fair dealing and good faith (between November 2017 and January 2018) and in breach of other implied terms (in January 2018) in pursuing the Scheme to avoid clause 9.1.12 of the ISA. SUL contends that the breaches of contract were repudiatory breaches of contract, such that it was entitled to and did terminate the ISA and the contract of sale and purchase of Blades shares by notice on 6 February 2018. Although I have held that there is no implied term of fair dealing and good faith and that the Scheme was unsuccessful, I will make findings about the facts alleged in case it is later held that I was wrong in relation to the alleged implied terms. I will then address the question of what breaches of contract are proved and whether the breaches were repudiatory breaches, so that SUL was entitled to put an end to the ISA or the contract of sale and purchase, or both.

F.    The Disputed Events in 2017

287. I heard evidence from several witnesses from each side about the events of 2017 that led to a complete breakdown in the relationship between Kevin McCabe and Prince Abdullah, and between those acting on their behalf as directors of Blades and SUFC. The evidence that I heard covered the full history of the contractual relationship and up to date. Understandably, the witness statements and the cross-examination dwelt

on matters of dispute in the years 2014, 2015 and 2016 as well as the more recent and directly relevant events in 2017 and 2018. What happened prior to January 2017 is important background and each side sought to identify aspects of the other side's conduct that was unsatisfactory in itself, or that in some way laid the ground for future disagreement or proved character traits of the principals. With some exceptions, however, it is not necessary for me to attempt to resolve all disputed matters in those earlier years, for example whether spending money on particular players was or was not approved specifically by the board to the knowledge of Kevin McCabe. These disputes are peripheral to the important issues that lead directly to the breakdown in November 2017 and the steps that both parties took thereafter.

288. From the lead up to 2017, I reach the following general conclusions:

    i)    The parties had not been clear at the outset about how SUFC would be funded after the initial two years of UTB's funding (i.e. from about the end of the 2014/15 season). Each side had different assumptions and the ISA was non-specific about it.

    ii)    Kevin McCabe was in principle keen to pass on the baton of responsibility for the Club's affairs, but in his mind that depended on UTB proving themselves to be capable and suitable as custodians of the Club's future and willing to inject much more money. He wished to be rid of the constant cash drain on Scarborough Group's resources, but he did not want to hand on the baton to someone who would be unable to lead the Club to a better place.

    iii)    Kevin McCabe was devoted to the Club and wished above all to see it succeed. I find that he felt very personally the failure of the Club since 2007, when it was relegated after only one season in the Premiership (as it then was) at the time of the Carlos Tevez controversy and then relegated again, and he was determined to see it regain top-tier status.

    iv)    Prince Abdullah, though mostly absent, also became fired with enthusiasm for (and, in due course, love of) the Club and genuinely wishes to see it succeed, though from June 2014 he was preoccupied with ministerial duty in Saudi Arabia and had less influence on the Club as a result. The directors that he appointed to look after his interests did not perform well, and the Club suffered in 2014/15 from having its affairs principally controlled by the manager, Mr Clough, the then CEO, Mr Brannigan, and Prince Abdullah's attorney, Mr Phipps, who became close to them both.

    v)    Kevin McCabe was disappointed with the way that things had developed while Prince Abdullah's £10 million was funding the Club's losses. He determined to remove all three of the above-mentioned individuals. This coincided to a large extent with the realisation that Prince Abdullah would only invest further in the Club if that investment was matched by SUL. Although Kevin McCabe did not wish to invest further, he ultimately had to agree to do so, in order to keep the Club solvent.

    vi)    As a consequence of being required to fund the Club, Kevin McCabe determined to exert greater control over the way that the Club was being run, in an attempt to reduce the losses that it was incurring (while still stuck in

League One, contrary to the overriding objectives of the ISA). He put in place (with Prince Abdullah's acquiescence) a new manager and new executives, all of whom were known to the McCabe family personally or worked for Scarborough Group companies. Messrs Clough, Brannigan and Phipps were removed.

vii)    However, Prince Abdullah encountered very serious cash flow difficulties in 2015, which only began to improve in 2017 when he made difficult decisions to sell investments at a substantial loss. Those financial difficulties and SUL's reluctance to invest further made it inevitable that another investor would have to be found. Both sides realised that and set about trying to find one, but the search proved unsuccessful. Early in the 2016/17 season, Prince Abdullah was unable to meet his share of the funding needed to keep the Club afloat and he left SUL to inject (very reluctantly) further money that was urgently needed.

viii)   Disagreements about funding, then SUL's deliberate failure to honour the July 2015 Funding Agreement and Prince Abdullah's failure to inject money during the 2016/17 season led to a deterioration of the personal relationship between Kevin McCabe and Prince Abdullah. UTB appointed Messrs Howard and Hawasli to conduct a review of the Club's operations and the Howard Report showed Prince Abdullah that steps urgently needed to be taken to impose good corporate governance on Blades and SUFC and to change the way in which Kevin McCabe was running the Club. The new manager was not a success and was replaced a year later, with the Club still in League One.

ix)     A hoped-for investment from the Qatari Investment Authority had not materialised and at the end of 2016 Prince Abdullah was working on contacts in Saudi Arabia to try to find a new purchaser for SUL's interest in Blades. By the end of 2016, he had had meetings with Dr Rakan Al Harthy of Sela Sport, who was expressing interest in the Club.

x)      The Club was, at that time, in serious financial difficulty. Mr Bettis had come on board as CEO and was bringing some financial rigour to the budgets and cash flows, but the Club was still loss-making and needed cash investment of about £8 million a year. Neither side was willing to invest further, pending the arrival of a new investor, but SUL had to pay further money to SUFC in order to protect it from insolvency.

xi)     There was, in short, an extremely difficult and rather stressful position by January 2017. There was no progress in terms of promotion from League One, the owners were unable or unwilling to invest further in the Club and, despite serious endeavours, no white knight had agreed to buy a stake in the Club's future, though Sela Sport was perceived to be the next possibility.

289.    Before embarking on resolving the disputed events of 2017, it is appropriate to say something about the witnesses that I heard and the quality and reliability of their evidence.

290.    Kevin McCabe gave a remarkable performance in the witness box. He is now in his 70s and, on his own admission, has been slowing down and is ready to hand over the affairs of the Club. He was cross-examined for the best part of three days and

appeared to relish the experience, as presenting an opportunity to set the record straight and explain why he was right. He is clearly a man of considerable physical reserves, appearing to be as fresh and alert at the end of the three days as at the beginning, and willing and able to engage in detailed debate and often lengthy answers and explanation throughout. He is a self-made man and entitled to feel proud of his achievements, but on the other hand he gave every impression of there being little in the way of truth or objective fact that differed from his own understanding or opinion. He plainly believes that his way is the only proper way of doing things.

291. The other principal characteristic that was evident was his ability to talk forcefully and persuasively on any subject. He has the gift of eloquence and was never at a loss for a reasoned and detailed explanation of a matter that he was questioned about, and indeed many points that he was not being asked about. It was easy to imagine his being a considerable personal force at the Club and a dominating presence. There is a recurring theme in the emails in 2017 of Kevin McCabe wishing to have face-to-face meetings with Prince Abdullah and Prince Abdullah and Mr Giansiracusa preferring to communicate by email. It is easy to understand Kevin McCabe's preference. He knows that he is able, by force of personality and a command of words, to dominate a conversation and thereby seek to impose his own will on those to whom he speaks.

292. He demonstrated to me an ability to turn any question that he was asked or any particular issue into an argument or exposition of his choice, often replete with self-justification. It would be an exaggeration to say that he did not answer questions that he was asked, but he rarely answered questions directly, often answered a different question rather than the one that he had been asked, or used the question as a springboard from which to assert his own perception and opinion, and he sometimes avoided answering questions that he did not wish to answer. His answers to questions too often involved assertions that were patently at odds with the documents to which he was taken, or implausible explanations for the difference. These included (on a repeated basis) that emails were "only banter between colleagues"; minutes were unreliable because they were drawn up weeks or months late; social media was inaccurate and unreliable, and he was too busy with other business to reply to emails correcting a false statement.

293. I consider that Kevin McCabe is only able to recall events or even look at documents through the prism of his own subjective beliefs and understanding of how things were, or how in his opinion they must have been, and his belief about who was in the right and who was wrong. There are numerous instances in which the account that he vigorously asserted and defended in the witness box was obviously wrong, or the opinion that he espoused was without any proper factual basis. I shall address some of these in the sections of this judgment that follow.

294. In one case he accepted that he had been in the wrong, namely the failure to tell Mr Bettis that his pay had been stopped, and he apologised for that; yet the real question is not whether he was in the wrong, which he plainly was, but why he acted in the underhand way that he did. I have come with regret to the conclusion that Kevin McCabe was being manipulative and devious in relation to the Deloitte, Van Winckel, Bettis and Ratcliffe incidents, and some of his evidence about those matters was disingenuous. Kevin McCabe was not out-and-out dishonest in the evidence that he gave, though at times disingenuous and less than fully frank. But his perception of

events that happened in the past is distorted in important respects by his own beliefs and prejudices about what was right and wrong at the Club and I feel unable to rely solely on his evidence about those events. It is also clear that to a degree he has re-cast events in order to suit the case that is being advanced on his behalf.

295. It would be wrong, however, to leave the subject of Kevin McCabe's evidence without acknowledging his devotion to the Club and the considerable generosity of his funding of it over many years. He deserves respect for that. Another admirable characteristic was his unwillingness to make unsubstantiated allegations of serious wrongdoing against others, even though he has felt himself to have been badly wronged by Prince Abdullah and Mr Giansiracusa.

296. Mr Tutton also gave an extraordinary performance in the witness box. He was extremely nervous and uncertain in much of the evidence that he gave, and eager to blame others for things that had gone wrong and absolve himself from responsibility. I regret to say that I consider that some of the evidence that he gave in his witness statements, particularly in relation to the Charwell loan, was a fabrication. He readily abandoned his account of how he was told by Charwell's solicitors that Sela Sport was behind the Charwell loan, when pressed to explain the conversations that he said that he had had. His evidence from the witness box about how the Charwell loan "stank" and SUL were the victims in the matter and Prince Abdullah personally responsible was a bravura performance but not at all convincing. He readily accepted that SUL's solicitors had written parts of his witness statements for him, as if that absolved him from responsibility for what was in them.

297. I formed the very clear view from Mr Tutton's evidence, his body language, the content of contemporaneous emails and documents and his constant presence in court, sitting next to SUL's solicitors throughout, that he has acted in this case as Kevin McCabe's trusted lieutenant and has been largely responsible for shaping the way in which its case was presented, by the account and instructions that he has given. It was only he who was willing to say in his oral evidence that Prince Abdullah had taken a bribe from Sela Sport, notwithstanding the documents produced on disclosure from third parties that showed conclusively that the ultimate beneficial owner of Charwell was the bin Laden family, not Sela Sport, and that the Charwell loan had been repaid in full. I feel unable to place reliance on Mr Tutton's evidence, save where it amounts to an admission against SUL's interests or is supported by other reliable witnesses or documentary evidence.

298. Scott McCabe was implacable in his defence of his father on certain issues, even where the line of defence was obviously wrong, for example the specification and sponsorship of the new dugouts, and he was less than completely frank on others, such as the number of non-football events able to be held on the new Desso pitch at Bramall Lane. There was, inexplicably, nothing in his witness statement about his personal involvement in signing the minutes of the June 2017 resolution about keeping Mr Bettis and appointing a COO. I treat his evidence with some caution, though there was little on which his evidence was of particular importance for the resolution of the issues in the case.

299. Simon McCabe appeared to me to be an honest and straightforward witness. He made concessions against SUL's interest where it was proper to do so. I feel that I can rely

on his evidence in general, though again there was little that he was able to add of particular importance for the resolution of the key issues in the case.

300. Mr Birks was a cautious and somewhat diffident witness, who was doing his best to assist the court. However, on one particular point on which his evidence was important I am quite satisfied that he was wrong in his claim that Mr Giansiracusa told him in October 2017 that UTB had repaid its novated part of the Charwell loan. What Mr Giansiracusa said was that part of the loan was novated to UTB so that Blades did not have to repay it. Mr Birks' only interest at the time was in knowing Blades' liability. What he and Mr Tutton say that he recalled in April 2018, upon discovering that UTB's novated debt remained outstanding, was incorrect. I see no reason to conclude that Mr Birks made anything other than an honest mistake: the language of para 74 of his witness statement, which sets out his mistaken recollection, demonstrates how easily he could have misunderstood Mr Giansiracusa's explanation that UTB had the responsibility to pay part of the Charwell loan debt. It was Mr Tutton who made the most of the mistake because it served his (and SUL's) theory at the time that the novation of part of the debt was a disguised bribe of Prince Abdullah by Dr Rakan.

301. Mr Giansiracusa was an intelligent, eloquent, careful and in my judgment truthful witness. He was accused by Mr Downes QC of having acted in a deliberately slippery way. There were undoubtedly occasions on which Mr Giansiracusa was pushing the limits of what was fair and straightforward in his dealings with SUL. In particular, he drafted the May 2017 board resolution in a way that made it more likely that SUL-appointed directors would overlook the main point, which was the agreement to retain Mr Bettis, and he misstated the extent to which that matter had been discussed with both owners. On occasions he drafted and amended minutes of meetings in a way that was calculated to provide a record favourable to UTB rather than an entirely accurate summary of what took place: the minutes of the Bad Ragaz meeting in July 2017 and the minutes of the October 2017 board meeting, in particular. In such cases, his view (and justification) was that he was not dealing with unsophisticated people and that accordingly they could be expected to read what was provided and object where appropriate to do so. Mr Giansiracusa knew that Prince Abdullah was being less than straightforward with Kevin McCabe about the Project Delta "commission" and played his part in the cover up of the use to which that commission (if paid) would have been put. These were not attractive features of Mr Giansiracusa's conduct, but they were not abusive or improper. He was not evasive or untruthful about these matters in evidence and, despite what I have said about aspects of his conduct, I found him to be a truthful witness.

302. Prince Abdullah was at a slight disadvantage in giving evidence, in that his English, though good by any standards, was not entirely fluent where sophisticated language or concepts were concerned, and there were moments where genuine misunderstandings occurred during his cross-examination and he had to ask for words to be explained. His spoken English is quite strongly accented, which led in some cases to difficulty with the transcription of his evidence. I take these matters into account in assessing the way in which he gave evidence, what he said and the reliability of his evidence. He is, however, a very intelligent man who readily understood the nature of the dispute and the criticisms made of him. Other witnesses stated that the Prince was a shy man and that is consistent with the impression that he gave in the witness box.

303.   The most striking thing about Prince Abdullah's evidence was his apparently poor memory of events, in particular (as he explained) routine meetings that took place in his home.  It was evident to me that Prince Abdullah is not a man for small detail: he relies on others to implement his wishes and deal with the fine print and does not immerse himself in the detail of transactions.  Nevertheless, there were occasions when it was quite striking that Prince Abdullah appeared to have no memory whatsoever of meetings having taken place, or of what was said or who was present at such meetings, even when those meetings took place in hotels in London or Paris rather than at his home.  A particular concern was his professed inability to remember his meetings and discussions with Dr Rakan over the period September 2016 to April 2017, other than the meeting with him in Dubai.  I consider that, for whatever reason – whether to shelter his friend or protect himself or UTB's interests – Prince Abdullah was not giving as full a picture as he could have done about his dealings with Dr Rakan.

304.   I am also concerned that disclosure was delayed and remained incomplete.  The Prince's mobile phone, which contained business emails and Whatsapp messages, was initially not part of UTB's or the Prince's disclosure and was only disclosed under sustained pressure from SUL's solicitors.  There were other areas where there must have been more documents – such as the Prince's business diary – but nothing was produced.  There is also no doubt in my mind that Prince Abdullah knew and understood that he was concealing from SUL the fact that half of a very substantial commission payable by SUL on the intended sale of its shares in Blades (or some of them) was to be paid back to him.  Prince Abdullah thought that this was justified, in view of the part that he had played in Project Delta and the work that his employees had done to further it, but nevertheless this was not conduct that measured up to his own description of himself as being recognised to be beyond criticism in his financial dealings.

305.   Despite these matters, and subject to the qualifications that must go with them, I found Prince Abdullah to be a generally reliable witness, and where I am satisfied that he had any detailed recollection of certain meetings – for example the Bad Ragaz meeting of July 2017 and the Corinthia Hotel meeting of 1 November 2017 – I prefer his account of those meetings to Kevin McCabe's account.

306.   Mr Alsaady was an impressive, honest and helpful witness.  I accept his evidence, in particular that – despite the appearance given by some of the documents – he was only acting for Saleh bin Laden and not for Sela Sport.

307.   Mr Bettis was called as a witness by UTB but was in a difficult position.  He had the respect of both sides in the litigation (despite the unfortunate treatment of him by SUL in November 2017) but was conscious that he did not want to upset either of them by the evidence that he gave, since his future employment – in a job that he evidently loves – might depend on it.  He should have been a wholly impartial witness, on whose evidence I could entirely rely, but I am left with concern about some of the evidence that he gave.  He was watchful and careful, and started out in a frank and straightforward way.  However, by shortly before lunch on the day on which he gave evidence he had been rattled by being criticised by Mr Downes for allowing himself to become an ally of the UTB side during 2017, after the May 2017 lunch with Prince Abdullah in Los Angeles.

308.  The result – it appeared to me – was that after lunch Mr Bettis decided to say as little as possible, and broadly agreed with any leading question that was put to him. Seeing an open goal, Mr Downes took full opportunity to ask him to agree with a large number of factual propositions, or in many cases comments, that were calculated to serve SUL's interests in the trial. For the most part, Mr Bettis obliged and agreed with or acquiesced in Mr Downes' propositions with a single word or (quite often) a single noise of assent. I feel unable to give great weight to this evidence, in the circumstances. In any event, what Mr Bettis thought of Kevin McCabe as a person and employer is hardly material to the issues. The one matter on which Mr Bettis remained resolute was the suggestion that it was understood by him at any time that he was definitely to leave the position of CEO in 2017. He considered that it remained uncertain at the end of the October 2017 board meeting and was never resolved.

309.  In the light of those observations about the main witnesses, I can return to the events of 2017 that are in dispute.

310.  At the meeting on 9 January 2017 in Dubai, there was discussion between Dr Rakan, Prince Abdullah and Kevin McCabe about a proposed investment in Blades. Prince Abdullah had previously travelled to Jeddah to meet Saleh bin Laden on 30 December 2016, to discuss a possible investment by him. I accept Prince Abdullah's evidence that a loan or early advance of £3 million was not discussed there, though it is clear that a payment of £3 million towards 2016/17 losses was to be paid as part of the transaction. I find that this was raised and discussed in Jeddah: it was referred to as such in a Whatsapp message of 30 December 2016.  Mr bin Laden had obviously expressed sufficient interest in a substantial investment that his name was – as all agree – specifically mentioned by Dr Rakan at the meeting on 9 January as a possible investor.

311.  Given that Prince Abdullah had met Mr bin Laden shortly before that meeting, it is inconceivable that there was no discussion of him as a potential investor, but I find that there was also shared hope and expectation that Sela Sport itself would take a small stake. Everyone involved seemed to desire that outcome, for various reasons. Kevin McCabe was aware that Sela Sport had previously organised investment or a fund for investment in a New York football club and the expectation at that time was that Sela Sport would similarly "organise" the investment.  I find that, apart from the genuine possibility that Sela would invest, it was also regarded by all involved as convenient for Sela Sport to front the proposed deal and therefore the investor was referred to throughout as Sela Sport, rather than Charwell or bin Laden.

312.  Although a £3 million early loan had not previously been raised with Dr Rakan and had not been discussed with Mr bin Laden on 30 December 2016, it clearly was discussed in Dubai. It was very important from SUFC's perspective, as the owners were unwilling to fund the Club at that time.  It mattered not greatly whether it was to be an advance on a larger capital investment or a loan: SUFC desperately needed the money.  Although Dr Rakan evidently gave some comfort about the £3m loan, it could not have been with the authority of Mr bin Laden at that stage.  However, Dr Rakan must have appreciated that if the investment was to proceed the "loan" could be treated as a part payment of the capital investment.  That is what all the parties understood could be arranged. There is no evidence that Dr Rakan was offering himself or through Sela Sport to lend £3 million.

313.   Dr Rakan evidently gave sufficient comfort about the investment on that occasion for Kevin McCabe to believe that everything was very promising and likely to bear fruit. I find that the McCabes believed after the Dubai meetings that a loan would be made by the investor(s), that it would be capitalised if the investment proceeded, and that it could still be capitalised if the investment did not proceed. What was not spelt out in Dubai was whether the lender or the borrower should have the option to capitalise if the investment did not proceed, but it is clear that the McCabes assumed that it should be at the borrower's option. That is what Scott McCabe told Mr Tutton in an email later on the same day.

314.   Kevin McCabe said that, at the end of the meetings in Dubai, Prince Abdullah told him that whatever happened at least Blades would have a £3 million loan that did not have to be repaid. He and Mr Tutton (who was not in Dubai) later claimed to have relied on that assurance, and on its being a justification for Prince Abdullah having to repay the part of the Charwell loan that remained on Blades' books. At an even later stage, the supposed assurance of Prince Abdullah was relied upon (despite the fact that the Charwell loan had by then been repaid in full) as evidence that the financial accommodation that was being arranged was in the nature of a bribe from Sela Sport to Prince Abdullah.

315.   Prince Abdullah's account was that he said at the end of the meeting that the loan might not have to be repaid if an investment was made in the Club, and that even if there was no investment the loan was interest-free and would hopefully be paid back using income from new sponsorship deals once the Club was promoted. He says that he gave Kevin McCabe no assurance that the loan would not need to be repaid in any circumstances.

316.   I consider it most unlikely that Prince Abdullah gave Kevin McCabe any absolute assurance. Whether or not the loan would be made was still uncertain, even if Dr Rakan had agreed in principle that one could be arranged. Undoubtedly, all parties had fastened on the fact that any such loan would be made by the potential investor(s) and so could be converted to equity in the event that the investment proceeded. There was considerable optimism (rather too much optimism) that the investment would proceed. Kevin McCabe in particular assumed that it would. In a rather strange way (for an experienced businessman), Kevin McCabe was reassured that the investment would proceed by the fact that Dr Rakan agreed that in principle a loan could be made, and then – when the loan was made by Charwell – took that as proof that the investment was indeed going to happen.

317.   I consider that both Prince Abdullah and Kevin McCabe were in optimistic mood at the end of the meetings in Dubai, not just because an investment was now a serious prospect but because there was agreement in principle that a much needed loan would be made available. I do not however accept that Prince Abdullah said anything more than that the loan would be capitalised and that (since both parties believed the investment would proceed) it therefore would not have to be repaid. I reject the evidence of Kevin McCabe that an out-and-out assurance was given that in no circumstances would the loan have to be repaid, and I also reject the embellishments that appear in Prince Abdullah's witness statement. I do not accept that Prince Abdullah had such a detailed recollection of exactly what was said to Kevin McCabe, though I do accept his evidence that he would not have given and did not give any categoric assurance.

318.  Kevin McCabe was strongly of the view that the loan would not be repayable because
      he believed and assumed that the deal would proceed, whereupon it was accepted that
      it would be converted into equity. Prince Abdullah – who knew Dr Rakan well and
      had just met Mr bin Laden – was also optimistic that the deal would proceed. Mr
      Bettis was quite clear in his evidence that his understanding on the plane back to
      London that night was that if the deal did not proceed the loan would be repaid. That
      is also consistent with the note of the meeting between Prince Abdullah and Kevin
      McCabe that was made in Scott McCabe's notebook.

319.  The draft loan agreement that Mr Tutton sent Dr Rakan on 10 January 2017 was non-
      specific about whose option it would be to convert the loan to equity if the investment
      did not proceed. Mr Tutton characterised that as inept drafting on his part. In due
      course, however, a different draft loan agreement came from Mr Alsaady, ostensibly
      acting for Sela Sport but in fact acting on behalf of Mr bin Laden and Charwell. Mr
      Tutton picked up the fact that this draft gave an option to capitalise to the lender, but
      not to Blades, and he correctly pointed out the importance of this change to Kevin
      McCabe.

320.  By that stage, however, Kevin McCabe was not interested in such details. He
      (through SUL) had just had to provide another £600,000 to SUFC so that it could pay
      its wages bill on time. There was a desperate need for funds. As Mr Tutton put it in
      his third witness statement, "I was upset at the perilous state of affairs at the Club"
      (para 98). By April 2017, Kevin McCabe had quite forgotten that the option had been
      given to the lender and he had to be reminded of that fact by Mr Tutton at that time.
      The conclusion that I draw is that Kevin McCabe was only interested in getting in the
      £3 million loan, not in whether it was repayable or on what terms. For him, the loan,
      once made, would be further strong evidence that the investment was going to
      proceed, so it was important for all those reasons to ensure that the loan was provided
      as soon as possible. Although Mr Tutton suggested that there should be a guarantee
      from Prince Abdullah, Kevin McCabe was not interested in that either. He replied to
      the effect that the loan agreement should proceed.

321.  Another matter that illustrates the urgent need for the loan was the fact that, contrary
      to what Mr Tutton stated in his witness statements, he did not attempt before the loan
      agreement was made to comply with money laundering regulations and identify the
      ultimate beneficial owner of Charwell, when he became aware that it would be
      lending the £3 million. Mr Tutton's evidence that he spoke to Marianne Kafena at
      Farrer & Co LLP and that she volunteered that the owner of Charwell was Dr Rakan
      was a fabrication. On 2 February 2017, Mr Tutton emailed Kevin McCabe:

            "I think I should sign for Blades and Scott or you sign for
            SUFC. At this stage I'm not going to bother with asking any
            questions about who the lender is unless you are particular, but
            a little KYC is called for I'd hate for Sheffield Star headlines
            BLades launder money for extremists. Please no."

      Although Kevin McCabe did not reply to that particular email, another email about
      the loan was sent by Mr Tutton shortly after it, to which Kevin McCabe's response
      was:

            "J Get it done! Let's have them in our cage."

322.  Kevin McCabe was in my judgment not in the least concerned whether the money was coming from a bin Laden controlled company, as he must have known it might be. Nothing had been said to him after the Dubai meeting to suggest that the loan was coming from Sela Sport rather than from Mr bin Laden. All that was known was that Charwell was lending the money. Mr Tutton's attempt to explain away his concerns about the borrowing of extremists' money as being a general warning was not convincing. I find that it is likely that Kevin McCabe had told his loyal lieutenant after the Dubai meeting that a member of the bin Laden family might be an investor and that is why Mr Tutton wrote in the terms that he did. Nevertheless, because Kevin McCabe was not bothered, Mr Tutton did no KYC or AML diligence until a week after the loan agreement had been made. On 16 February 2017 he emailed Farrer & Co asking for the AML/KYC information they held on Charwell. Farrer & Co replied that they would usually send copies of the memorandum and articles of association and the certificate of incorporation and asked whether Mr Tutton required anything else. He replied that it was best practice to have something on file and that the documents indicated would suffice. So no attempt was made to identify the beneficial owner or owners of Charwell at that stage.

323.  The £3 million loan was duly made, in three instalments, and it appears that SUL just as much as UTB were delighted to have received the money, which they knew had been procured through Prince Abdullah's good contacts in Saudi Arabia and hoped would lead to a substantial equity investment in the Club.

324.  The next problem that Blades faced arose in early March 2017, when Mr Bettis informed Kevin McCabe that his business interests in Los Angeles required more of his time and that he was going to move there, but that he would not leave SUFC "in the lurch". By the date of the meeting between Prince Abdullah and Kevin McCabe in the Peninsula Hotel, Paris on April Fool's Day, Kevin McCabe had clearly formed the view that Mr Bettis would be leaving at the end of the season. He told Prince Abdullah so and that he had started the process to find a replacement. The Prince's comment to Mr Giansiracusa the following day was that "I think you should make it clear to him that we should be involved and active in this process, I am afraid that if we leave it to him we will end up with another person who is loyal only to him". There was no evidence that Kevin McCabe told Mr Bettis after the dinner in March that he was to leave at the end of the season. Kevin McCabe's witness statement says that on about 26 April 2017, he agreed with Mr Bettis that a search should start for Mr Bettis's successor. Mr Bettis said that there was no agreement made with him that he should leave at the end of the season. I prefer Mr Bettis's evidence on this point. Kevin McCabe had told Prince Abdullah on 1 April that he was already seeking a successor: Kevin McCabe decided to go down that route without reaching any agreement with Mr Bettis about when he would resign. He simply assumed that Mr Bettis would go when Kevin McCabe wanted him to go. Mr Bettis was hoping that he would not have to go at all and could continue part-time from Los Angeles.

325.  At the Dorchester Hotel on 3 May 2017, Prince Abdullah and Kevin McCabe were both "assuming", as Kevin McCabe put it in re-examination, that Mr Bettis would leave in due course, when a successor had been identified and appointed. Prince Abdullah had not at this stage spoken to Mr Bettis about it. Nor had Kevin McCabe. What changed matters was the lunch between Prince Abdullah and Mr Bettis in Los