# EXHIBIT 28 PART 3

Angeles later that month. Prince Abdullah wanted to keep Mr Bettis as CEO. He told Mr Giansiracusa and the latter made it his business to try to get Mr Bettis on UTB's side as regards changes to the governance of Blades and SUFC. It was in those circumstances that Mr Giansiracusa drafted and circulated his memorandum dated 23 May 2017, ostensibly relating to the search for a COO but also recording agreement that Mr Bettis should stay as CEO on a part time basis for the 2017/18 season. Mr Giansiracusa was criticised in cross-examination for concealing in recitals to the draft board resolution to search for a COO what should have been a board resolution to keep Mr Bettis on part-time basis. There was an element of craftiness in the way that Mr Giansiracusa proceeded; it would have been more straightforward to have included a resolution about Mr Bettis too. But as Mr Giansiracusa himself said, he was dealing with experienced professional directors, including Scott and Simon McCabe, who both supported Mr Bettis's retention in the short term, not individuals who did not know their way around board resolutions. The draft resolution was only one page long, and it was signed by all the directors of SUFC individually.

326. Kevin McCabe accepted in cross-examination that, in view of those documents, the position by June 2017 was that Mr Bettis was to stay part-time for the following season. In my judgment, that acceptance was realistic and correct. Although there was no formal resolution as such that Mr Bettis should remain, he was in fact employed as CEO at the time, and the recitals in the board resolution reflect agreement by the directors that he should remain part-time for at least the following season. Scott McCabe and Simon McCabe both stated in their evidence that that correctly reflected their views at the time. I reject the argument that Mr Giansiracusa's draft minutes had been so deviously presented that the board did not know what it was doing, even though Mr Bettis was led by Mr Downes to agree that he had not realised when signing the minutes what exactly he was agreeing to. Mr Bettis said on 21 May that he was happy to continue in the role of CEO if that is what the owners and board would like. The agreed position in mid-June was therefore that Mr Bettis was staying as CEO part-time for the following season.

327. Nevertheless, Kevin McCabe continued with his plan to remove Mr Bettis. His reason was that, although he recognised that Mr Bettis was an able and valuable executive for the Club, the job of running a football club in Sheffield could simply not be done by a man living in Los Angeles and only occasionally in the UK. That may well have been a valid viewpoint and was genuinely held, but the decision was for SUFC to take, not for Kevin McCabe. His plan at this time centred on recruiting Andy Birks, a friend of the family, as the new COO. Despite the fact that (as I find) Kevin McCabe knew Mr Birks and knew him as a close friend of his son, Simon, he told Mr Giansiracusa that "I have a meeting tomorrow with Andrew Birks (not met him before) who's been recommended to us by a business colleague." The business colleague was in fact Simon McCabe. Mr Birks was interviewed by Kevin McCabe, then by the committee established by the board resolution for that purpose, and Mr Birks was installed as COO on 26 June 2017.

328. Once appointed, Kevin McCabe saw Mr Birks as likely to take over as CEO and in the meantime able to take guidance not from Mr Bettis as CEO but from the three McCabes:

> "it's abundantly clear that CEO duties are impossible to administer for an organisation – SUFC – that operates only

> from one location namely Sheffield… Within two months
> Andy will be fully in the "pound seat" where in the interim he
> of course receives direct guidance (not interference) from Scott,
> Simon and myself…"

Mr Giansiracusa by reply criticised that approach and pointed out that UTB would be "extremely concerned" if there was any deviation from the understanding reached by the board about Mr Bettis's role. Whether Kevin McCabe's opinion was right or justified is not the issue: the question is whether it was right for him to seek to go behind the board's agreement that Mr Bettis should remain as CEO.

329. I find that Kevin McCabe at this time had determined that if Project Delta did not happen, he would de facto take control and run the Club's affairs in a different way, with a view to stopping the accrual of annual losses until a buyer could be found. On 10 May he had said to Mr Bettis in an email that "in some shape or form we have to know that Delta will definitely happen and quickly or SUFC has to change course to suit us where Scarborough will then dictate on a like it or not basis. My patience is running thin!". Asked about that in cross-examination, Kevin McCabe said that what this meant was that he would begin to look again at investors, including investors from China. I reject that explanation, which was disingenuous. Although in the autumn potential investors from the United States did come forward, looking for investors was no change of course. That would go on regardless. What Kevin McCabe meant was that, in the meantime, he would shake up the way that SUFC was run to suit SUL's agenda, which meant no further investment from SUL and close control by Kevin McCabe. Mr Birks was the means by which Kevin McCabe was going to achieve this aim, and, as Mr Birks explained, on his first day at the Club he was introduced to everyone as the CEO and the COO and the man who was going to take over the running of the Club.

330. By this time, Prince Abdullah had ceased his ministerial duties and was about to be reappointed a director of Blades and SUFC. That was one of the issues discussed at Bad Ragaz on 24 July 2017, by which time Project Delta had fizzled out entirely. Mr Bettis's position was also discussed: Prince Abdullah was willing to compromise on keeping Mr Bettis as CEO until the end of January 2018, but no agreement to that effect could be reached. Kevin McCabe had to accept that clause 5.11 of the ISA entitled UTB to appoint a finance director, but he asked Prince Abdullah to reconsider his decision to do so.

331. A further matter of dispute was the appointment of Deloitte. Kevin McCabe was implacably opposed to their involvement at the Club. Prince Abdullah wanted them to conduct a review. It is right to say that UTB had no entitlement to have such a review conducted. It was a matter on which the board would have had to decide if the two principals could not themselves reach informal agreement. When the Project Delta transaction fell through in June 2017, Prince Abdullah met Deloitte – who were intended to have been involved in the due diligence exercise for Project Delta – to request them to review, principally, payroll costs, transfer policy and the Academy's performance. At Bad Ragaz a compromise was apparently reached. The amended minutes recorded that Kevin McCabe did not agree that Deloitte should be mandated but accepted the mandate "provided it was postponed until 1 November 2017". The only natural reading of that wording is that Deloitte should be mandated to proceed but not before 1 November 2017. That is presumably how Kevin McCabe read them

too, because almost immediately on receiving the amended minutes in final draft, he sent an email asserting that all that he had agreed was that a further discussion would be held in or after November. Mr Giansiracusa refused to accept that change and suggested that if he wanted to change what had been agreed Kevin McCabe had to speak to Prince Abdullah about it.

332. After a rent review was refused at Bad Ragaz, Kevin McCabe accepts that he was "frustratedly angry". He regarded the absence of an increase in rent as unfair. Mr Tutton also agreed that he was angry about it. The matter was left until a telephone conversation between Kevin McCabe and Mr Giansiracusa on 24 August 2017. A number of issues had been raised on which Kevin McCabe said that he wanted compromise. It is not a surprise that rent review was top of the list, followed by the removal of Mr Bettis; removal of Selahattin Baki from the technical committee and Tareq Hawasli from the board; the use of loan players; and two issues that Kevin McCabe is recorded in Mr Giansiracusa's note of the conversation as objecting to as an insult to him: the proposed appointment of Deloitte and the proposed appointment of a CFO. Kevin McCabe threatened to withdraw from management completely unless Prince Abdullah compromised on these issues.

333. Mr Giansiracusa interpreted this as an invitation to concede on the issues, since no compromise position was identified, and concluded: "Basically, the guy is a bully and a blowhard. I think standing up to him continues to be the best strategy". Prince Abdullah's response to that email contained an uncharacteristic expletive and made it clear that there would be no compromise on Deloitte or the appointment of Mr Van Winckel to the technical committee. He added: "The only question is should we take more calls like this from him? I say we save our time and money and run everything through the board, do you agree?". In reply, Mr Giansiracusa said that he would just keep standing up to Kevin McCabe and see who blinked first.

334. It is clear that, by this stage, passions were already inflamed on both sides and that their positions were entrenched. Prince Abdullah was, as he confirmed in his evidence in court, particularly annoyed by the way in which Kevin McCabe would agree or concede something and then seek to go back or behind it, particularly in the case of Deloitte. He and Mr Giansiracusa had agreed that the right approach was to stand up to Kevin McCabe's attempt to do things his way and deny Prince Abdullah any say – as they saw his behaviour – and to insist on good corporate governance.

335. In the case of Deloitte, I find that Prince Abdullah's recollection of the discussion at Bad Ragaz, as minuted by Mr Giansiracusa, is likely to be correct, and that Kevin McCabe did accept that Deloitte could be instructed to start work as from 1 November 2017 but that he then sought to deny that. Although Kevin McCabe did not want Deloitte to come at all, he recognised that it was a point of central importance to Prince Abdullah at this time, but he did not want it to happen at the busiest times of the season: the two transfer windows and Christmas/New Year. Hence November. The reason why Kevin McCabe later became very anxious to keep Deloitte away from the Club in November was that, unknown to UTB, he was making substantial progress in negotiating a valuable deal for the sale of a controlling interest in SUFC to ALK, and did not want ALK to draw the wrong inference from the presence of accountants at the Club at that time. That is why he then tried to put off the Deloitte work until February and took the initiative to book them in for that month. By then he hoped that the deal with ALK would have been agreed.

336.   On 20 September 2017, Kevin McCabe sent his sons an email after a discussion of certain disputed issues with Mr Bettis the previous evening. The email suggests that Kevin McCabe had agreed with Mr Bettis that he should step down as CEO on 31 October. I do not accept that there was any such final agreement, even though Mr Bettis was led in cross-examination to accept that the email suggested that an agreement had been reached. Mr Bettis is clearly principled and a man of his word. Had such an agreement been made, Mr Bettis would have told Mr Giansiracusa and would have tendered his resignation. He did not do so.

337.   On 11 October 2017, Kevin McCabe sent a note to his side ahead of the board meeting that month, which indirectly called on Mr Bettis to resign. Again, he did not do so. Asked in re-examination by Mr Downes whether he remembered any detail of the conversation, Kevin McCabe suggested that he would have said something like "Come on Steve, why don't you step down at the end of this coming month", and that he "didn't have any reaction of Steve as saying 'No, no, no'; he had a reaction from Steve saying 'Whatever suits, Kevin'. I find that Mr Bettis was probably non-committal, and probably said something apparently accommodating to Kevin McCabe's wishes, such that no dispute arose and Kevin McCabe thought that he had what he wanted. I find that it is understandable that Kevin McCabe thought that Mr Bettis was willing to resign, but that Mr Bettis had not agreed to do so. It is clear that Mr Bettis wanted to stay on part-time and would not have agreed anything without referring to UTB's side.

338.   The note that Kevin McCabe prepared was sent on 11 October 2017 to the SUL-appointed directors and Mr Bettis. The note promoted the appointment of Mr van Winckel to the technical committee, subject to the need to work harmoniously with the Club manager. It counselled opposition to the appointment of a CFO and suggested instead that Mr Birks might recruit a lower-level employee to assist, while recognising UTB's right to appoint a CFO "but it seems totally inappropriate to do so at such a high level paying unnecessary costs that the Club simply cannot afford". It suggested that Mr Bettis write to Prince Abdullah and Kevin McCabe confirming that he wished to resign as CEO on 31 October. It asserted wholesale opposition to Deloitte and promotion of a rent review on an equitable basis. It suggested that Prince Abdullah be told that the part of the Charwell loan on Blades' books was Prince Abdullah's responsibility. It reaffirmed that SUL was not going to provide any further funds to SUFC "given current circumstances".

339.   With the exception (at that stage) of Mr van Winckel's appointment, this was a sign that Kevin McCabe was determined to continue to oppose Prince Abdullah on all fronts. He was determined to oppose the corporate governance changes that Mr Giansiracusa for UTB was trying to implement and he wanted to retain practical and effective control of the Club. Although the venture had started out with Kevin McCabe willing to hand on the baton, that was on the basis that the recipient of the baton was so rich that SUL no longer had to fund the Club and the Club would be in excellent hands for the future. When Kevin McCabe's expectations about funding were confounded, he decided that Prince Abdullah was not a suitable person to whom to hand over. He wanted to take back control of the Club until such a suitable person could be found and a buy-out (of shares and property assets) be achieved.

340.   Oddly, Kevin McCabe was not a director of Blades or SUFC at this time, and so he was not present at the 26 October 2017 board meeting. Mr Tutton, Mr Green and Mr

Bettis were the SUL-appointed directors present. Mr Bettis's own future was raised at the meeting. A transcript of the meeting shows exactly what was said. Mr Bettis said that he left it in the hands of the owners to decide: he didn't want to be the cause of a fight or problems and would go if that was what they wanted. Mr Tutton stated that he was not going to tell Mr Bettis that he had better go, but asked him whether he was devoting the right amount of time to the Club, given where he was living. Mr Bettis said that he was not, but pointed out that he was being paid less than half a full-time salary. Mr Giansiracusa stated that Mr Birks was doing a reasonable job as COO but was not ready for the CEO role and that Mr Bettis, who had a good working relationship with the Club manager, was needed to provide a steady hand for the following season. Mr Bettis then said that if Kevin McCabe wanted him to leave he would leave, it was as simple as that. Mr Giansiracusa said that if Kevin McCabe made that demand it would be over UTB's objections and that the Club was best served by Mr Bettis staying in his role. Mr Green clearly agreed at that point and later spoke strongly in favour of keeping Mr Bettis. Mr Tutton did not, as he could have done, either confirm that Kevin McCabe did insist that Mr Bettis leave, or call for a vote on the question. He said that he did not see any issue. As a result, Mr Bettis's position was left up in the air: although the majority of the board was in favour of retaining the status quo, Kevin McCabe was not present. Mr Bettis's evidence was that he believed that there would be other discussions subsequently with the owners to resolve matters.

341. After the meeting, Mr Tutton sent Kevin McCabe an email reporting on matters, telling him that he had raised all his matters and received all the answers he didn't want to hear. He told Kevin McCabe that he had put it to Mr Giansiracusa that SUL would not put in more funds and that Mr Giansiracusa had replied that Prince Abdullah would not put in funds either in that case, "Therefore heading for the impasse you want". This, in my judgment, was an indication that Kevin McCabe expected that, on a number of matters, neither side was going to back down and therefore the company would become deadlocked and one side or other would have to back out. Mr Tutton commented on Mr Bettis's performance at the meeting, but did not say that he had resigned, or that that it had been agreed that he should do so. I find that there was no agreement or expectation that Mr Bettis would resign.

342. The email exchange later that evening between Scott McCabe and Mr Tutton shows that the McCabes knew that Mr Bettis had not resigned. Nevertheless, Kevin McCabe proceeded to instruct Mr Birks to remove Mr Bettis from the payroll. I find that that was done in a way calculated to ensure that UTB did not find out about it for some time. Kevin McCabe knew full well that UTB had not agreed to remove Mr Bettis and that he had not resigned. He would have known from Mr Tutton's oral report the day after the board meeting that the sentiment on the board was in favour of keeping Mr Bettis (he also received Mr Green's email to that effect dated 31 October 2017). Since Kevin McCabe was determined not to back down on this issue but knew that UTB would not agree with him, Kevin McCabe did not raise Mr Bettis's position at the meeting with Prince Abdullah at the Corinthia Hotel on 1 November 2017, even though he knew that UTB and the board supported Mr Bettis's retention and that the position therefore was that Mr Bettis had not been removed or resigned.

343. Kevin McCabe wrongly decided to act unilaterally to try to force matters and tried to conceal this from everyone, including Mr Bettis himself, even though Kevin McCabe

saw him at the football match at Loftus Road on the same day as the Corinthia meeting. In my judgment, Kevin McCabe, with Mr Tutton's support, had determined to present UTB with a fait accompli. Suborning Mr Birks into doing the dirty work with the payroll and keeping Mr Bettis in the dark, while he did a month's unpaid work before he discovered what had been done, were for them an acceptable way of achieving their objective, though in the cold light of the courtroom Kevin McCabe accepted that he had acted wrongly. Kevin McCabe acted immediately to reassure Mr Birks that he had settled in well and that when he needed guidance Kevin McCabe was "always to hand and available in an 'untitled CEO type role' to help". Kevin McCabe was, I find, using the removal of Mr Bettis to tighten his grip on the Club's business affairs.

344. Mr Giansiracusa and Prince Abdullah were incensed when they found out about that underhand behaviour, at the end of November, but that discovery was significantly after the breakdown in relations had occurred. The breakdown was caused by what happened about Deloitte and Mr van Winckel first, which led Mr Giansiracusa to start drafting his email of rebuke, and then the discovery about Kevin McCabe's interference in UTB's appointment of the finance director, Mr Ratcliffe, which provided further material to include in the email. The sequence of events was as follows.

345. Deloitte was discussed at the Corinthia Hotel on 1 November 2017. Both principals said afterwards that it was a "good meeting". Following the meeting, Prince Abdullah emailed to confirm that Kevin McCabe had agreed that the Club should carry on with the Deloitte review and that they had agreed that Mr van Winckel join the Club as a consultant for 3 months. Kevin McCabe replied that evening confirming that as regards Deloitte "your decision to proceed with them is accepted by me" and that in the case of Mr van Winckel a "punch point note" of how he saw his role was being awaited. When it was received Prince Abdullah should leave matters to Kevin McCabe to progress a three-month probationary consultancy arrangement with a view to a permanent position. That, one might have thought, would be the end of both those previously contentious matters, but within a week or so Kevin McCabe was seeking to go back on both matters.

346. In my judgment, what was agreed at The Corinthia was unambiguous. UTB was entitled following the meeting to assume that both matters would proceed without further delay. I reject Kevin McCabe's attempted explanation that all that was agreed at The Corinthia about Deloitte was that they should proceed at some time, but that the question of when was a good time had still to be decided. The start of Deloitte's work had been deferred from July until 1 November 2017. Provided that Prince Abdullah still wished to proceed with it at that time, after having thought about it again, as he promised at Bad Ragaz that he would, the work was to proceed in November. On 8 November 2017, Kevin McCabe first acknowledged to Mr Tutton that he had so agreed at the Corinthia; but then he wrote to Mr Giansiracusa saying that he would wish to see the mandate to Deloitte, that the mandate should not be triggered at this particularly busy time, and that February would be a better time.

347. Kevin McCabe met Mr van Winckel on 10 November. He had changed his mind about that appointment too. Mr van Winckel reported that Kevin McCabe was now seeking to postpone his appointment, on the basis that it was a sensitive time and momentum at the Club should not be disrupted. It is clear from Mr van Winckel's

email that Kevin McCabe had leaned on him, in an attempt to persuade him to sell the idea of a postponement to Prince Abdullah, in order to avoid a storm.

348.   Prince Abdullah intervened by email on 11 November:

> "I have to be frank with you, if after what we agreed on our last meeting in London regarding Jan [van Winckel] and Deloitte doesn't start this week, I see it very difficult that we can work on any thing together, I hope both of these things move forward this week."

They did not move forward. Kevin McCabe replied asking Prince Abdullah to let matters rest until the end of the season in the case of Mr van Winckel, and later that month he said only that Deloitte could start "at an appropriate time".

349.   The issue here is not whose judgment about the value of Deloitte and the timing of Mr van Winckel's introduction was right, or whether Kevin McCabe's views were reasonable ones. The issue was that after a lengthy debate Kevin McCabe had given an assurance to Prince Abdullah and then gone back on it. Prince Abdullah considered that Kevin McCabe had broken his word and that he could not trust him. Prince Abdullah accepted that he was angry about the Deloitte and van Winckel incidents, and then very angry about the way that Kevin McCabe had dealt with Mr Ratcliffe's contract and Mr Bettis's pay.

350.   In my judgment, Prince Abdullah was entirely justified in being offended by Kevin McCabe's behaviour, which was underhand and deliberately obstructive, despite the agreement that he accepted had been reached at the "good meeting" at The Corinthia. Kevin McCabe's subjective belief that the requirements of the Club at the time justified his decision misses the point. It is his case in this trial that Prince Abdullah was effectively his partner and the two of them (through their corporate vehicles) owed each other duties of fair dealing, candour and good faith. Yet here Kevin McCabe was quite deliberately operating behind Prince Abdullah's back to try to subvert agreements that they had only just confirmed. He probably did not see it that way, and certainly does not see it that way now, but that was what it amounted to.

351.   It was at this time that Mr Giansiracusa started to draft his email of rebuke (based on the Deloitte and van Winckel matters, and previous disagreements). Prince Abdullah, Mr van Winckel and Mr Hawasli all saw the draft of the email and commented on it. But, before it was sent, the incident with Mr Ratcliffe's contract occurred. Mr Giansiracusa said that, even in comparison with the anger about the Deloitte and van Winckel matters, this was on another level in terms of the offence that was caused. At that point, his and Prince Abdullah's attitude to Kevin McCabe changed dramatically. The criticism is that Kevin McCabe went behind people's backs and used Catherine Frost, an HR employee of the Club, to change the terms of Mr Ratcliffe's contract.

352.   The indisputable facts about this incident are set out in paras 102-104 above. The dispute is about what exactly Kevin McCabe did and whether he was either acting appropriately, in the best interests of SUFC, in meeting Ms Frost to answer her questions about the terms of the contract, as SUL says, or (as UTB says) was trying without alerting UTB to get Ms Frost to change the terms of the contract and ensure

that the new finance director reported to Mr Birks rather than Mr Bettis and that there was no reporting line to UTB.

353. My findings about that incident are the following:

   i) The appointment of a finance director was a sensitive issue for Kevin McCabe because UTB had the right to make the appointment and remove the appointee at will; Kevin McCabe thought that one was unnecessary and that a junior to Mr Birks would be more appropriate. In that way, Kevin McCabe would maintain his control of the Club's finances.

   ii) Mr Tutton was loyally looking out for Kevin McCabe's interests in this as in other matters and tipped him off that the contract needed his urgent attention.

   iii) Ms Frost had not drafted the letter or contract on the basis that Mr Ratcliffe had to report to UTB, but on the basis that he was to report to the CEO of SUFC and its board. The first point of concern for Mr Tutton and Kevin McCabe was the reporting to Mr Bettis, whom they had previously removed from the payroll and who was (so far as they were concerned) no longer an employee. The second point was the risk that Catherine Frost would amend the contract in accordance with Mr Giansiracusa's request to insert a reporting line to UTB instead of the board of SUFC.

   iv) What Mr Tutton and Kevin McCabe wanted to bring about was that Mr Ratcliffe should report to the COO, Mr Birks, who was Kevin McCabe's man (or so they believed), and that there was no substitution of UTB for the board of SUFC. This is the only way to make complete sense of Mr Tutton's observation that "Catherine Frost is now in an awkward position." She did not know that Mr Bettis's pay had been stopped, as there had been no formal process of resignation or dismissal.

   v) Kevin McCabe and Mr Tutton then met Catherine Frost and instructed her to change the reporting structure so that Mr Ratcliffe reported to the COO, but not otherwise to change it. They did not instruct Ms Frost to circulate the amended drafts to Mr Giansiracusa and did not intend that she should do so, but rather intended that the contract should be sent to Mr Ratcliffe in its amended form.

   vi) Ms Frost did circulate the amended drafts before posting the letter, pointing out that Kevin McCabe had made changes to the contract and letter. Mr Giansiracusa reacted swiftly and before the letter was posted identified the changes made and not made. He wrote to Kevin McCabe, copied to Catherine Frost, pointing out that he had no authority to make changes and should confirm to Ms Frost that she should take instructions only from Prince Abdullah in relation to Mr Ratcliffe.

354. In my judgment, Kevin McCabe was once more acting wrongly and in an underhand way over the Ratcliffe contract, aided and abetted by Mr Tutton. He did so in order to try to achieve control of Club employees, at the expense of UTB's interests. Again, as with Mr Birks in relation to Mr Bettis's pay, Kevin McCabe was willing to make

use of SUFC employees (Ms Frost on this occasion) to achieve his ends, thereby putting them in an invidious position.

355.    Kevin McCabe's response to Mr Giansiracusa's email that was copied to Catherine Frost is revealing: "You're a gentleman who certainly lacks grace". It is evident that Kevin McCabe felt humiliated that he had been called out by Mr Giansiracusa in a relatively public way. He challenged Mr Giansiracusa to pick up the telephone rather than look to create disputes by emails and to show his legal skills and pursue an action if he thought that SUL had breached the terms of the ISA. He said in evidence that Mr Giansiracusa's email was offensive because it was written as a lawyer, not as a colleague, and because it was "blown out of all proportion". He claimed that the changes he had made to the contract were insignificant, and that they were "common sense amendments to benefit SUFC". This was in my judgment disingenuous: Kevin McCabe knew exactly what he was doing, even though he denied it from the witness box. It was his email that provoked Mr Giansiracusa's long email of rebuke on 19 November 2017, but it is clear that the relationship between the sides had already broken down at this stage, as a result of the Deloitte and van Winckel issues.

356.    Both sides realised by this time that a separation was close. SUL was at exactly this time entering into a non-disclosure agreement with ALK, so that ALK could start due diligence on purchasing SUL's interest.    On 20 November 2017, Mr Tutton commented to Kevin McCabe "Looks like we have the dispute you want." This was a comment on an email from Mr Giansiracusa about SUFC's annual report, which required the statement "...our thanks to Stephen Bettis, who serves so ably as Chief Executive Officer" to be inserted. Kevin McCabe explained Mr Tutton's comment as his wanting a reason for him and Prince Abdullah to get together to sort things out, but I do not accept that explanation. There had been plenty of disputes since the last meeting between them at The Corinthia but they were the very reason why Prince Abdullah was no longer willing to talk. Kevin McCabe was looking for the right pretext to justify steps to force a separation of SUL and UTB, once ALK was ready to proceed.

357.    In my judgment, UTB was also starting to consider how the parties could separate, but its thinking was less well-advanced than SUL's. UTB was considering how and when it could serve a call option notice to acquire SUL's shares. Prince Abdullah and Mr Giansiracusa knew that they did not have the ready money at that time to buy out SUL and pay for the property assets within a year. So they preferred to wait and had no immediate plans to serve a call option notice. That is why Mr Giansiracusa said on 6 December 2017: "I'm really looking forward to the day we can pull the trigger on the call option" and why he started to look at the property call option machinery for the first time in mid-November.

358.    When it came, on 19 November 2017, Mr Giansiracusa's rebuke was uncompromising and, in certain respects, unnecessarily personally unpleasant. However, it reflected the state that relations between the parties had reached by then; it did not damage a good working relationship. Although Kevin McCabe may have been taken aback by the personal attack in the email, I am quite sure, having seen the man that he is, that he would not in any way have been cowed or intimidated by it and that he would not have been deflected from the course on which he was set. This was to exert his control as much as possible, sell his stake in SUFC to ALK and get out of

the continuing drain on his resources that the Club still represented, but without causing damage to the standing of the Club itself.

359.    The proof that Kevin McCabe was not in any way deflected from his course is what he wrote in the following days. First, on 20 November 2017 to Prince Abdullah, he insisted that he wished to communicate with the Prince and not with Mr Giansiracusa and explained that SUFC's business lay in Sheffield, England, not Riyadh, Saudi Arabia "where managing people is not best achieved via 'edicts and resolutions' produced as if the recipients are subservient", and that accordingly he and not the Prince's representatives had an affiliation with the Club's personnel. On the same day, he responded to Mr Giansiracusa, making the same observation about the "Sheffield-centric" nature of the business and stating that the need for change was on UTB's side, not on SUL's. On 21 November, Mr Tutton sent Kevin McCabe an email saying "If Alan Pace and chums are up for it we could take HRH out no problem at all. Remember beautiful clause 11 – Call Option…You just need to get agreement with Alan that he stands behind you irrevocably". (Alan Pace and his colleagues had been in Sheffield for meetings with Kevin McCabe at the same time as the Catherine Frost incident.) The following day, 22 November 2017, Mr Tutton wrote again, advising Kevin McCabe that he should look to structure a deal with the full intention of taking out UTB via the call option route. He warned that UTB may not be able to finance the property call options and so SUL should only propose a price that (if UTB served a counternotice) would be large enough to compensate for SUFC remaining a tenant rather than paying for the property assets. He proposed £10 million and that part of the deal with ALK should therefore be a £10 million initial loan to fund the desired buy out of UTB's interest. Mr Tutton expressed the view that Prince Abdullah might be tempted to cash in his losses, take the £10 million and avoid the need to pay that sum to SUL, fund ongoing losses of a Championship club and then pay £40 million or more for the property assets. Mr Tutton may well have been right in his analysis, but Kevin McCabe thought that he could do better than that.

360.    Further proof of Kevin McCabe's determination not to be deflected is in his emails to the SUL-appointed directors and separately to Prince Abdullah, both on 24 November 2017. He first told the directors that they must as directors confirm that Mr van Winckel did not have SUL's approval to sit on the technical committee or be employed "in any shape or form – directly or as a consultant – by the Club". As to the other issues raised in Mr Giansiracusa's "wallpaper email" he commented: "As they say 'water off a duck's back'". He awaited their confirmation "as the smooth running of SUFC is of paramount importance" – presumably to give ALK the impression that they were about to buy into a well-run football club.

361.    The email to Prince Abdullah repeated that Kevin McCabe did not approve of Deloitte's involvement and that the work "will be at a sensible date to suit SUFC's business and football operations". He repeated that proposals for Mr van Winckel's involvement could not be agreed as the time was not right and there was little or nothing for him to contribute to a well-run committee. He blamed a misunderstanding of cultures for the lack of harmony between the owners and Mr Giansiracusa for damaging the ethos and spirit of the Club. The letter ends: "It rests with yourself and not myself to sort out these issues which like it or not are disrupting a Sheffield Institution who's roots began in 1855". Characteristically, Kevin McCabe was blaming anyone but himself for what had gone wrong. He was being wholly

uncompromising on his determination to control the Club at that time. Interestingly, his email makes no reference at all to dealings with ALK and no further reference was made by SUL to those discussions before the Call Option Notice was served. The email of 24 November 2017 was forwarded to the SUL-appointed directors with the comment "Let's see if Prince Abdullah can man up and see the light!" Without waiting for a response from Prince Abdullah, Kevin McCabe emailed Mr van Winckel on the same day telling him that his involvement was not desired.

362. Kevin McCabe followed up on this with Mr Bettis (in his capacity as a director of SUFC) on 25 November, asking for confirmation that he agreed with the van Winckel proposal. He said that he sensed that "this will bring the dispute with HRH to a head", and that he intended to circulate a note to all those involved in the Club's football management and the technical committee to the effect that Mr van Winckel would not be joining. He added: "Of course HRH will be copied in". Here, as with the removal of Mr Bettis and the amendment to Mr Ratcliffe's contract, Kevin McCabe was intent on providing UTB with a fait accompli.

363. The suggestion – advanced by SUL in this case – that Mr Giansiracusa's email of rebuke (or other steps taken by him before or after that email to call out Kevin McCabe's conduct) did real damage to the relationship of trust and confidence between UTB and SUL, or cowed or intimidated Kevin McCabe and forced him to submit, is quite unrealistic and is wrong. There was at that time no trust and confidence left in the relationship, and SUL was determined to continue as it had previously, acting in its own interests and not collaboratively with UTB, with a view to selling out to ALK at a large profit. How exactly it was going to achieve that was still unclear, though SUL knew that it could rely on clause 11 and did not need to rely on deadlock. However, clause 11 (and clause 10) carried with it uncertainty. Kevin McCabe's email to Prince Abdullah dated 5 December 2017 strongly implied that the two of them needed to meet in order to decide how to separate their interests.

364. To that end, it appears to have been Kevin McCabe's thinking that a serious dispute, or perhaps deadlock on a material issue, was not inconvenient for his purpose of persuading Prince Abdullah to give up his interest in the Club. I find that by seeking to reassert control in an uncompromising manner, by obstructing Prince Abdullah's attempted reforms and being implacable in his approach, Kevin McCabe was hoping to cause Prince Abdullah to think that his continued involvement in the Club was not worth all the heartache that it was bringing him. Informing Prince Abdullah in December 2017 that he and his two sons would again become directors of Blades and SUFC was part of the same approach: to let UTB know that SUL would seek to exert maximum control, both on the board and through the appointed senior executives.

365. Negotiations with ALK were proceeding apace and a new proposal from ALK was received on 29 November 2017, ahead of a meeting with Kevin McCabe the following week. It was for an initial loan of £5 million by 31 January 2018 and options to buy up to 90% of the equity in Blades in tranches, with the first 20% to be by 30 June 2018. SUL reverted to ALK with a proposal that they provide a loan of £10 million with a view to using it to buy out UTB's interest.

366. At about the same time, Mr Giansiracusa received Mr Bettis's email informing him and Prince Abdullah that his salary had been stopped. I accept Mr Giansiracusa's evidence that he and Prince Abdullah were outraged by what had been done. This

was not just because it went contrary to UTB's aims for Mr Bettis's continued employment but because it was done in an irregular way: without informing Mr Bettis or the directors of SUFC of the fact, and again using an innocent employee to do a wrongful act.

367.   The argument advanced by SUL that Kevin McCabe had made it clear in his email of 8 November 2017 about the Deloitte mandate that Mr Bettis was no longer the CEO ("I also don't see the need for Steve's involvement other than in his position to approve as a Director of SUFC") is not persuasive. It was calculated to exclude Mr Bettis from implementing the Deloitte arrangements without making explicit to him or to the UTB side that Mr Bettis was no longer an executive of the Club. The fact that this was being concealed for as long as possible is clear from Mr Tutton's email to Mr Giansiracusa dated 21 November 2017. Mr Giansiracusa had suggested wording to insert into the statutory accounts and report about Mr Bettis "who serves so ably as Chief Executive Officer". Instead of replying to the effect that he no longer did serve in that capacity, Mr Tutton replied pointing out that Mr Bettis had accepted in the 26 October 2017 board meeting that he could not properly fulfil the CEO role from Los Angeles and stating that Mr Bettis had requested that he should not be mentioned in the document "other than where there is a statutory duty to do so". Were Kevin McCabe and Mr Tutton being open about the matter, the response would have been quite different. Mr Giansiracusa replied pointing out that he had not seen any formal resignation from Mr Bettis and that he understood he was serving until the end of the year. Mr Tutton did not take the opportunity then or at any other time during November 2017 to disabuse Mr Giansiracusa of his belief; nor did Kevin McCabe.

368.   When Mr Giansiracusa and Prince Abdullah found out what had happened to Mr Bettis, UTB realised that the relationship was beyond repair and that a suitable exit would need to be found. Both sides were then, independently, of the mind that there was no future in their carrying on together as "partners". When later in the month Mr Giansiracusa served short notice of a board meeting to be held on 18 December 2017, he realised that SUL would not attend it, but nevertheless circulated the agenda and proposed resolutions for the purpose of putting everything that he considered that Kevin McCabe had done wrong "on the record".

369.   I do not accept that UTB or Prince Abdullah or Mr Giansiracusa acted in November 2017 with a view to causing hurt, embarrassment and distress to Kevin McCabe so that the relationship was destroyed and so that he would take steps under clause 11 of the ISA (or otherwise) to get out of Blades and SUFC. SUL submitted that that was the case and that Mr Giansiracusa was the chosen instrument of oppression, but that argument seemed to me to "protest too much", given what SUL was seeking to achieve at the same time.

370.   It is undoubtedly true that Prince Abdullah and Mr Giansiracusa were determined to force Kevin McCabe to respect the constitutions of Blades and SUFC and act correctly through their boards and their appointed CEO, to the extent that matters could not be agreed by the owners. If Kevin McCabe consistently opposed that line, which he did, they regarded it as necessary to force him to act in accordance with decisions of the board and its authorised executives, and not according to Kevin McCabe's preference. That did necessitate opposing him and his wishes, directly and in strong terms, but it was not done for the purpose of embarrassing or intimidating

him. It was done to assert UTB's rights under the articles and ISA and by that means
to protect UTB's best interests, as Prince Abdullah and Mr Giansiracusa saw them.
Although pugilistic language is present in some internal emails on the UTB side
during this period (e.g. Prince Abdullah's email of 17 November 2017: "our war
against Kevin McCabe should start from here"), the aim was not to bully or intimidate
Kevin McCabe but to make him understand that his behaviour was unacceptable and
bring him to heel, so far as corporate governance was concerned.  As matters
deteriorated, which they did with the revelation about Mr Bettis on 30 November
2017, UTB realised that they needed to make plans to end the relationship too.  Later,
SUL took them by surprise, by making an oral offer on 20 December 2017 and then
serving the Call Option Notice on 29 December 2017.

371.  The discussion between Kevin McCabe and Mr Giansiracusa on 20 December 2017
followed a more conciliatory email from Mr Giansiracusa on 17 December 2017.  The
offer made on 20 December 2017 was probably a tactical offer from SUL, though the
tactics were different from those suggested by Mr Tutton in an email earlier that day.
Kevin McCabe offered to sell SUL's shares for £10 million on the basis that purchase
of the property assets would be deferred for 3-6 years.  I find that that offer was made
in an attempt to test the water and find out the ability of UTB to fund a payment of
that size, and also to flag up the problem with having to pay for the property assets.  A
range of £5 million to £10 million was clearly in consideration by SUL as an offer for
UTB's shares.  Acquiring UTB's shares was, in my judgment Kevin McCabe's clear
preference, since it enabled him to sell to ALK and retain some interest in the Club.
Everything depended on a perception of whether UTB would serve a counternotice,
and if so up to what price it would be able to do so.

372.  In the event, Kevin McCabe chose to make the offer at £5 million.  Despite his
evidence in court that he expected UTB to be able to organise funds to pay £5 million
and pay for the property assets within 12 months, I find that Kevin McCabe hoped
and expected that UTB would find itself unable to serve a counternotice, owing to
Prince Abdullah's previous financial difficulties and the problem of having to fund
the continuing losses of the Club and pay for the property assets within a year.  He
said in answer to my question that he hoped that UTB would not serve a
counternotice.  That, I find, was the truth.  He therefore must have considered that he
could get away with a price as low as £5 million.  As it turned out, £5 million was too
low a price.  Prince Abdullah's reaction was that it "was not a fair offer".  UTB
determined on 10 January 2018 to serve a counternotice, believing that it had it within
its power to defer the property asset purchase by other means.

G.  The Disputed Events in 2018.

373.  There was, in the end, no dispute about UTB's evidence that it did not decide to serve
a counternotice until 10 January 2018 and did not hit upon the device of transferring
some of its shares to UTB 2018 until 22 January 2018.  That evidence is supported by
the evident hurry in which the transfers were effected and the sub-sales of shares to be
purchased from SUL put in place.  Had UTB decided earlier to transfer its shares, it
clearly would have done so earlier, so that there was a greater chance of the transfer
being registered before service of a counternotice.

374.  After the Counternotice was received, SUL promptly sought to cause SUFC's
directors to execute the property call options and Prince Abdullah personally and then

Jones Day on his behalf intervened to seek to prevent that from happening. UTB considered that its assignment and sub-sale schemes were effective to avoid clause 9.1.12, although I have held that they were not. Prince Abdullah's email dated 30 January 2018 said that no action should be taken in response to Shepherd & Wedderburn's letter calling for execution of the property call option notices until Jones Day had written the following day.

375. Jones Day stated that they disagreed that the obligation under clause 9.1.12 of the ISA had been triggered and that there was therefore a dispute between SUL and UTB and that, in light of that, the status quo should be preserved and no action taken until UTB confirmed that the obligation had been triggered or the board of SUFC agreed by a majority to execute in any event. While emphasising that there was a dispute as to the meaning of clause 9.1.12, the letter did not in terms say that the matter would be referred to the court for determination. It was, in substance, a denial of SUL's right upon completion of the share sale to have the SUFC directors execute the property call option notices. SUL claimed that it was a repudiatory breach of contract, among others, and by letter dated 6 February 2018 purported to terminate the ISA and the contract of sale and purchase on account of repudiatory breaches by UTB.

376. Proceedings were in fact started by UTB shortly after the failure by SUL to complete the sale on 6 February 2018. UTB had contended that SUL should complete but without prejudice to any rights that had arisen prior to the date of completion, however SUL declined to do so, for fear that completion might waive such rights as SUL had to set aside or terminate the contract of sale and purchase. It offered different terms of completion but UTB would not agree these.

377. Further disputes between SUL and UTB during 2018 related to the basis on which each of them should contribute to the repayment of the Charwell loan on 30 April 2018 and the funding of the Club's deficit thereafter. It took two applications made to the Court by SUL to achieve loans of £1 million from each owner for the purpose primarily of repaying Charwell.

H.   Breaches of Contract

378. SUL argues that UTB was in breach of the ISA and the contract of sale and purchase in various respects. All but one of the alleged breaches depend on the implication of various terms. I have held, in Part D of this judgment, that there is no implied term of good faith, no implied term restricting a partial transfer of shares or encumbering of a party's own shares or diminishing the value of the other party's shares once a call option notice has been served. I have held that it is implicit that UTB and SUL must not wilfully obstruct or hinder the reunification of the property assets pursuant to clause 9.1.12 of the ISA in connection with the operation of clauses 10 or 11.

379. The allegations of breach of contract no longer matter in this case for the claim for damages. Had UTB successfully evaded the obligation under clause 9.1.12, in breach of contract, and not voluntarily agreed in April 2019 to cause SUFC to execute the property call options, there would have been a claim for damages, which prima facie would have been the difference between the price for the property assets payable under the property call options and the value of those assets subject to the leases to SUFC. However, SUL now accepts that, if SUFC does in due course pay the price under the property call options that have been triggered, there is no financial loss

caused by the breaches of contract alleged. But the alleged breaches of contract are nonetheless important because SUL claims to have terminated the ISA and the contract of sale and purchase on 6 February 2018 for repudiatory breach, with the consequence (if correct) that UTB cannot now enforce the contract of sale and purchase of SUL's shares.

380. The main breach of contract relied on in this regard was the breach of an implied term of good faith, but I have held that there is no such implied term. I have similarly rejected SUL's claim that other terms are to be implied, apart from the obligation not wilfully to obstruct or hinder the operation of clause 9.1.12 of the ISA. By transferring 40% of the shares in Blades to UTB 2018 and seeking to have the transfer registered, UTB intended to defeat the operation of clause 9.1.12 but it did not do so. It did not do so because there is a resulting trust of the shares transferred to UTB 2018 and because the nomination of third parties as transferees of the shares bought from SUL did not mean that UTB did not acquire them and was perfectly lawful. The steps taken by UTB prior to Jones Day's letter dated 31 January 2018 were therefore not a breach of the implied term because, in themselves, they did not obstruct or hinder the operation of clause 9.1.12.

381. The other breach of contract on which SUL relies is a repudiatory breach of UTB's obligation under clause 9.1.12 to cause SUFC to execute and serve property call option notices. I have held that performance of that obligation would have been due immediately after completion of the contract of sale and purchase on 6 February 2018, when UTB paid SUL the price under that contract, thereby "acquiring" its shares in Blades. Completion never in fact took place, but before it was due Jones Day wrote to the directors of SUFC telling them that they must not execute property call option notices before UTB agreed or the board of SUFC resolved to do so. In the circumstances, that was an anticipatory breach of contract – since UTB and SUL would have been obliged upon completion on 6 February 2018 to cause their appointed directors to execute the property call option notices. It was also itself a breach of the implied term because it hindered the operation of clause 9.1.12.

382. Non-exercise of the property call options except at the will of UTB (or with the agreement of the majority of an evenly divided board of SUFC) would have deprived SUL of substantially the whole of the benefit then remaining to it under the terms of the ISA, since the joint venture came to an end with the purchase of SUL's shares in Blades and the principal remaining obligation of benefit to SUL was to trigger the property call options. In my judgment, UTB was plainly refusing to perform clause 9.1.12 on completion on 6 February 2018 or at any time other than a time of its choice, thereby hindering the operation of clause 9.1.12, and it was a repudiatory breach of contract entitling SUL to terminate the ISA. Jones Day's letter dated 31 January 2018 alluded to a dispute about the operation of clause 9.1.12 but it did not say that the options should not be exercised until the court had determined the issue; it said that they should not be exercised until UTB (or SUFC's board) decided that they should be exercised. SUL elected to terminate the ISA (and the contract of sale and purchase) by its solicitors' letter dated 6 February 2018, as to which there is no dispute. The effect of that was that SUL lost the benefit of clause 9.1.12 of the ISA and any other obligation of the ISA that remained to be performed and has instead a claim for damages against UTB for any losses caused by the breach.

383.  However, it is not the ISA that SUL needs to terminate if it is to avoid having to sell its shares in Blades to UTB for £5 million: it is the contract of sale and purchase that had to be terminated. This contract came into existence only on 26 January 2018, upon service of the Counternotice, which in terms accepted the alternative offer made in the Call Option Notice. Upon service of the Counternotice, subject only to payment of the price of £5 million, UTB was entitled to SUL's shares on 6 February 2018.

384.  Since the contract of sale and purchase of SUL's shares in Blades came into existence as a result of an offer made by SUL on 29 December 2017 and an acceptance of that offer by UTB on 26 January 2018, the contract in question is plainly a separate contract from the ISA itself. The same would be true even if UTB had exercised an option to buy the shares: see Sherwood v Tucker [1924] 2 Ch 440 at 444-5, per Pollock MR. Once an option is exercised, a new contract arises. The new contract is a contract of sale and purchase of shares: Francis v Vista del Mar Development Ltd [2019] UKPC 14 at [1], per Lady Arden. The new contract analysis in these option cases applies more strongly where there is a bilateral contract formed by offer and acceptance.

385.  That being so, the termination of the ISA on 6 February 2018 will leave the contract of sale and purchase in place. It will discharge the unperformed obligations of the ISA, leaving SUL with a remedy in damages: Photo Production Ltd v Securicor Transport Ltd [1980] A.C. 827, 849, per Lord Diplock. This is restated in clause 20.2 of the ISA, which provides that any termination of the ISA is without prejudice to rights, obligations or liabilities of any party accrued or arisen prior to termination. It does not therefore terminate the contract of sale and purchase.

386.  SUL seeks to avoid this outcome in two ways.

387.  First, it contends that the obligation under the contract of sale and purchase was conditional on various matters, including payment of the price and execution of documents that are reasonably required by the buyer, as well as identification of the required transferees of the shares. It argues that the right to have the shares transferred had not accrued at the time of termination and so no such obligation could arise. In my judgment that is an incorrect analysis. The contract of sale and purchase is not a conditional contract: payment of the price and execution of documents are matters of completion. UTB was entitled from 26 January 2018 to have the shares transferred to it at completion, on payment of the price. In any event, the rights of UTB were not rights under the terminated ISA: they were rights under the contract of sale and purchase itself.

388.  Second, SUL contends that the contract of sale and purchase arising under clause 11 of the ISA "does not operate in a vacuum"; the rights under clause 9.1.12 are an essential part of the clause 11 contract and "are written into the contract of sale and purchase, as a matter of construction", such that the contract cannot stand without the rights under clause 9.1.12 and therefore termination of the ISA necessarily terminates the contract of sale and purchase. This argument of SUL is not one that was fully developed by Mr Downes QC until closing submissions. SUL's pleaded case is that the ISA and/or the contract of sale and purchase were terminated on account of various repudiatory breaches of contract by UTB. Nothing specific was pleaded about the terms of the contract of sale and purchase. I remain unclear whether SUL is

arguing that the implied terms of the ISA are also implied terms of the contract of sale and purchase, or whether it is contending for an implied term of the contract of sale and purchase that SUL and UTB must cause SUFC to exercise the property call options in compliance with clause 9.1.12 of the ISA.

389.   Whichever way SUL is putting its case, I consider that the true analysis is that the contract of sale and purchase contains no such implied term. It is unnecessary to imply any such term into the contract that arises under clause 11 of the ISA for the following reasons. First, the obligations already exist under the terms of the ISA, which as I have held include an implied obligation not wilfully to do anything that defeats the operation of clause 9.1.12 when clause 11 rights are being exercised. Second, the obligation under clause 9.1.12 is triggered by completion of the contract of sale and purchase; it is not a term of that contract. The contract of sale and purchase of SUL's shares in Blades is solely concerned with transferring the shares and paying the price that has been set by the clause 11 machinery. Third, there is no lacuna in the operation of the ISA and the contract that requires to be filled. If SUL as seller of its shares wishes to enforce clause 9.1.12 its remedy is plain: it can affirm the ISA and sue to enforce clause 9.1.12 after completion of the sale of its shares, or claim damages for the loss of that right. If on the other hand UTB had succeeded in preventing clause 9.1.12 from being triggered, SUL would have a strong defence in equity to a claim for specific performance of the contract of sale and purchase of its shares. There is therefore no necessary or obvious implied term of the contract of sale and purchase relating to the operation of the ISA.

390.   In case I am later held to be wrong in holding that there are no other material terms to be implied into the ISA, I need to make brief findings about what breaches of any such terms are established – and whether they are repudiatory breaches.

391.   The principal breach of contract on which SUL relied was breach of an implied obligation of good faith, in relation to the conduct of Mr Giansiracusa, Prince Abdullah and UTB in November and December 2017 and in relation to the attempt to avoid triggering clause 9.1.12. I have held that there was no such implied term, or at least that no such obligation could exist at a time when one party was exercising or was about to exercise its rights to serve a call option notice under clause 11 or a Roulette Notice under clause 10. If there is any such implied obligation, then in my judgment UTB was in breach of that obligation by Mr Giansiracusa's emails in November 2017 and his agenda and draft resolutions of December 2017. These went further than was appropriate and necessary if the relevant context was one of a cooperative venture in which a good personal relationship between Prince Abdullah and Kevin McCabe was of paramount importance and the parties were required to deal fairly with each other. Although UTB may then have been in breach of an implied obligation to act in good faith towards SUL, there was very significant mitigation for its conduct. SUL had itself been in serious breach of the same obligation during the months September to November 2017 and, for the reasons I have already given, UTB was entitled to be offended and angry by Kevin McCabe's conduct. Nevertheless, the ISA was not terminated by UTB and in my judgment Mr Giansiracusa did in some of his language overstep the mark that would be regarded as appropriate, if there were a good faith joint venture between the parties.

392.   I do not, however, consider that UTB's actions with regard to Mr Ratcliffe's appointment and Mr Bettis's employment were breaches of the obligation of good

faith. UTB may have exceeded its rights under clause 5.11 in seeking to set the
reporting lines that it did, but there was no absence of good faith in the way that UTB
conducted itself. Mr Giansiracusa considered that UTB was properly exercising a
right conferred on it by the ISA and it is notable that, at the October 2017 board
meeting, Mr Tutton acquiesced in what UTB was doing, and subsequently acquiesced
in the terms of the appointment of Mr Ratcliffe. A vigorous disagreement about what
was best for the Club and what the ISA permitted is not an absence of good faith.
Equally, UTB did not act contrary to the requirements of good faith in seeking to
retain Mr Bettis as CEO, even though they were aware that Kevin McCabe (but not all
the SUL-appointed directors) wished that he would leave. The board did not vote to
invite Mr Bettis to resign. In those circumstances his salary was payable and Mr
Giansiracusa was right to cause it to be paid. Even if Mr Giansiracusa was strictly in
breach of fiduciary duty in advising Mr Bettis that he had a claim against SUFC, his
doing so was an attempt to mollify Mr Bettis at a time when he was angry about the
way that he had been treated. In the last year, the Club has derived the benefit of that
attempt by UTB to maintain good relations with Mr Bettis. I reject the contention that
Mr Giansiracusa acted with the intention of causing Mr Bettis to make a claim against
SUFC.

393.    Turning to January 2018, if I am wrong in concluding that there was no obligation of
good faith binding UTB after SUL had served the Option Call Notice, then UTB was
in breach of it by seeking to take advantage of SUL's misjudgment of its motives,
without first informing UTB that it considered that – by taking various steps prior to
serving a counternotice – it could avoid the obligation to trigger the property call
options until a time of its choosing. Since UTB was obliged not to obstruct clause
9.1.12 by taking any such steps, it must therefore have been a breach of the obligation
of good faith to attempt to do so without at least disclosing to SUL what it intended to
do and the basis of its entitlement. However, the obligation of good faith did not
require UTB to offer to rescind the Call Option Notice that SUL had served. UTB
was in any event obliged not to do anything that would circumvent clause 9.1.12 by
reason of the implied term that I have held to exist.

394.    The next question is whether any such breach of the implied obligation of good faith
was a repudiatory breach of contract. I consider that any breach constituted by Mr
Giansiracusa's communications in November/December 2017 was clearly not a
repudiatory breach of contract. The reason is that, by that time, any relationship of
confidence and trust between the principals of SUL and UTB had been irrevocably
damaged by Kevin McCabe's conduct in the previous weeks or months. UTB's
breaches of the obligation of good faith were minor in comparison with SUL's
breaches. The ISA-governed relationship had already reached its end stage, with both
sides starting to look for the right opportunity and circumstances in which to exercise
contractual rights to terminate the relationship. Those contractual rights were
unaffected by any breach of the obligation of good faith. There was little else of
benefit remaining for SUL in the ISA. SUFC remained a substantially loss-making
company and neither UTB nor SUL was prepared to continue to fund it without
finding a new investor. The remaining benefit of the ISA for SUL was therefore not
taken from SUL by UTB's conduct. (SUL may well have affirmed the ISA by
exercising its rights under clause 11 on 29 December 2017, with full knowledge of
UTB's conduct and its consequences; however, UTB did not plead affirmation and in

closing disclaimed its ability to argue that SUL did in fact know at that time of its legal right to elect to terminate the ISA.)

395.   As regards a breach of the obligation of good faith by seeking to avoid triggering clause 9.1.12 without first drawing its intended actions to SUL's attention, this was of no effect on the substantive rights of SUL under the ISA (other than to give rise to a legal dispute that needed to be adjudicated) if the Scheme was ineffective.

396.   If the Scheme to avoid triggering clause 9.1.12 succeeded because (contrary to my conclusion) either the transfer of UTB's shares when lodged or registered will be effective to transfer those shares beneficially to UTB 2018, or because UTB will not "acquire" the SUL shares that are transferred to Prince Musa'ad and Mr Giansiracusa, then UTB would have breached the implied term not to obstruct or hinder the operation of clause 9.1.12. That breach would be a repudiatory breach of the implied term in itself because it would deprive SUL of its very important rights under clause 9.1.12 of the ISA. On the basis that UTB was intending to serve or had served a counternotice, these rights were by far the most substantial rights remaining to SUL under the terms of the ISA.

397.   However, a repudiatory breach of any implied obligation of the ISA gets SUL no further for the reasons already explained in paras 383ff above: the contract of sale and purchase was a separate contract. There is no pleaded case that the contract of sale and purchase was a "relational" contract or otherwise subject to an implied term of good faith. Nor could any such implied term be obvious or necessary. Further, SUL does not allege that anything that UTB did after the contract of sale and purchase was formed was a breach of an implied obligation of good faith.

398.   For the reasons that I have given, no breach of contract for which SUL has contended amounts to a breach of the contract of sale and purchase that came into existence on 26 January 2018. That contract therefore is not terminated. In that regard, SUL has one remaining argument, which I shall address under Part J of this judgment dealing with alleged unfairly prejudicial conduct (see paras 415, 416 below. That is that unfairly prejudicial conduct of UTB, Prince Abdullah and Mr Giansiracusa was a substantial cause of Kevin McCabe's serving the Call Option Notice on 29 December 2017, which led to the contract of sale and purchase, and that relief granted for such conduct should include setting aside the Call Option Notice or the contract of sale and purchase.

I.   Conspiracy to Cause Harm to SUL

399.   SUL advances an additional claim that it suffered loss caused by UTB, Mr Giansiracusa and Prince Abdullah conspiring together to use unlawful means to harm its interests. At one stage, SUL also relied on a lawful means conspiracy whose predominant motive was to harm SUL's interests, but that alternative claim was abandoned by SUL during the trial.

400.   SUL contends that UTB, Mr Giansuracusa and Prince Abdullah acted in combination and unlawfully in two separate respects. First, in waging a war of attrition against Kevin McCabe in November and December 2017, calculated to cause him to give up SUL's interest in Blades by using the exit mechanisms of the ISA or otherwise offering to sell out to UTB. The alleged loss crystallised when SUL served the Call

Option Notice on 29 December 2017, which gave UTB the option to buy out SUL for £5 million. Second, in seeking to conceal until the last minute the Scheme that UTB had conceived to deprive SUL of the benefit of clause 9.1.12 upon completion of the contract of sale and purchase.

401.    As far as the first of these is concerned, I have already found that there was no conspiracy in November and December 2017 to cause harm to SUL by making its position as an owner of Blades untenable. Prince Abdullah and Mr Giansiracusa, with the input of others such as Mr van Winckel and Mr Hawasli, worked together to seek to protect UTB's best interests, as they saw it, which necessarily involved curtailing the liberties and influence of Kevin McCabe. They considered that the events relating to the engagement of Deloitte, Mr van Winckel's appointment, Mr Ratcliffe's appointment and Mr Bettis's employment required them to confront Kevin McCabe in a strong way. They agreed how to do that to best effect. But the purpose was to cause Kevin McCabe to realise that his behaviour would not be tolerated and must cease. Their objective, as demonstrated by the Whatsapp messages exchanged before the meeting on 19 November 2017, was to restore proper balance between the two sides in the management of the Club's affairs. I find that there was no intention to cause SUL to give up its involvement in Blades.

402.    Although some strong, excessively hurtful, language was used by Mr Giansiracusa in his communications with Kevin and Scott McCabe, there was nothing unlawful in what was done. There was no motive to injure SUL and no intention to cause Kevin McCabe to walk away from the Club. Prince Abdullah and Mr Giansiracusa were angry about Kevin McCabe's conduct, and this anger only increased when they discovered the way that Mr Bettis had been treated. Nevertheless, I find that before the service of the Call Option Notice on 29 December 2017 UTB had made no decision to acquire SUL's interest in Blades or to cause SUL to serve a call option notice. UTB was starting to consider exit routes because it had become apparent that it could no longer work with SUL, unless Kevin McCabe fundamentally changed his *modus operandi*. But UTB had not reached a decision that it should operate clause 10 or 11 of the ISA, or that it should attempt to force SUL to do so. Both parties were looking at various ways of restructuring the ownership of Blades, by selling an interest to another investor, and had been for some considerable time. Unknown to Prince Abdullah and Mr Giansiracusa, SUL was at that time well advanced in discussions with ALK that would involve UTB's shares being acquired by ALK. When Kevin McCabe made an offer on the telephone to Mr Giansuracusa on 20 December 2017, UTB was interested to consider it further and possibly negotiate the offer down, but still had made no decision about what to do.

403.    In any event, I find that the various rebukes and criticisms that were directed at Kevin McCabe in November and December 2017 were not a cause of SUL's serving the Call Option Notice. That act was entirely a calculated decision by Kevin McCabe, after careful discussion with Mr Tutton and no doubt his sons over Christmas that year, to take advantage of apparent financial weakness of Prince Abdullah, so that SUL could acquire UTB's shares cheaply and sell on at a substantial profit to ALK.     The argument that Kevin McCabe was left with no alternative and that the hurtful treatment he had received caused him to trigger the exit machinery does not stand up to analysis.

404. In the first place, Kevin McCabe, though no doubt stung by the criticism he received, is not the kind of man to be intimidated by cross words. He is a seasoned businessman with the experience, toughness and "good humour" (as he often states in his emails to others) to rise above such matters. Second, his intention was not to sell SUL's shares and get out but to acquire UTB's shares as cheaply as possible. Despite the oral offer to sell SUL's shares for £10 million – which was a means only of testing UTB's means and resolve – and the discussion with Mr Tutton about offering up to that sum to buy out UTB, the offer that SUL made for UTB's shares was at the unrealistically low figure of £5 million: about one-third of Prince Abdullah's investment to that time. Despite Kevin McCabe's claim that he assumed that a wealthy Prince Abdullah would be able to fund the property call options or find another investor, I consider that he calculated that Prince Abdullah would feel unable to take the risk of such a substantial future liability, even if he could raise the £5 million. Kevin McCabe believed that SUL could if necessary afford to pay that sum from Scarborough Group's resources, in the event that no counternotice was served by UTB. Although the hoped-for loan of £10 million from ALK had not yet materialised – Mr Pace had indicated that he required some due diligence to be done before he would take that step – there was still every prospect in late December 2017 that the deal with ALK would proceed.

405. Third, Kevin McCabe does not say in his witness statement that he was so hurt by the attack on him that SUL was left with no choice but to seek to get out of Blades. What he says is that he recognised that it was in the best interests of the Club for the dispute to be resolved on the basis that one or other party should take complete control and "get on with it", and that owing to the breakdown of the relationship with Prince Abdullah it seemed appropriate to operate the machinery in the ISA to resolve matters one way or the other. However, Kevin McCabe had every intention of it being SUL that would buy out UTB, not least because he regarded those acting for UTB as inadequate and unsuitable to run the Club. Although no deal had at that time been struck with ALK, Kevin McCabe was optimistic – as he had been in January 2017 with Sela Sport – and was willing to take the chance that the deal with ALK would shortly be agreed. The relationship with Prince Abdullah had certainly deteriorated in November 2017 but it had been apparent for some time that the ISA would be terminated once a suitable and willing investor was found.

406. For all these reasons, I reject the argument that an unlawful means conspiracy caused SUL loss as a result of the service by SUL of the Call Option Notice.

407. Turning to the second aspect of the unlawful means conspiracy claim, SUL claims that Mr Giansiracusa, Prince Abdullah and UTB conspired together to try to deprive SUL of the benefit of clause 9.1.12 of the ISA, in particular by concealing their intentions until the last minute. The unlawful means invoked for this purpose are the underlying breaches of contract by UTB (breaches of an implied term and the obligation under clause 9.1.12 itself) and fraudulent misrepresentation by Mr Giansiracusa on 25 January 2018, when he implied to Shepherd & Wedderburn that he had no instructions from UTB about service of a counternotice ("I don't have instructions from my client. You'll be notified if and when I do.").

408. As for that email, I find that it was Mr Giansiracusa's intention to keep SUL and its solicitors guessing for as long as possible about UTB's decision to serve a counternotice, although in fact Mr Ratcliffe had already heard from Mr Hawasli that UTB was intending to serve one. The fact that Mr Hawasli had spoken openly about

UTB's intention demonstrates that there was no concerted attempt at secrecy. At about the same time that Mr Giansiracusa's email was sent, Jones Day sent SUL the stock transfer form in favour of UTB 2018. Mr Giansiracusa explained his email as just "brushing off" an inappropriate enquiry from Shepherd & Wedderburn; but there was nothing inappropriate about the enquiry, though Jones Day were entitled to decline to answer it. Mr Giansiracusa went further than that and accepted frankly in the witness box that his wording was unfortunate. Although he did not accept that it was a misrepresentation, I find that it was, since it was clear that UTB had decided to serve the Counternotice and was preparing to do so on the last possible day.

409.    However, Mr Giansiracusa's email was not part of a concerted plan to deceive SUL. The Scheme had only been conceived at the last moment and the incorporation of UTB 2018 and the stock transfer were hurriedly done. Mr Giansiracusa himself took the view that he would not tell SUL anything that they were not entitled to know; however, that was attributable to his own mindset as a tough business lawyer, not a shared strategy to deceive SUL. Moreover, the email had no causative effect at all. SUL lost nothing as a result of being uncertain for one further day what UTB would do and the Scheme was ineffective.

410.    Further, the loss in respect of which SUL claims damages is the difference between the freehold value of the Stadium and the Academy subject to the property call options and their value without those options. In the events that have happened, the property call options have been exercised, in July 2019, and SUL will not suffer the losses claimed because it will in due course be entitled to be paid the prices specified in those options. SUL did not seek to amend its claim for damages to allege loss caused by a delay in the exercise of the property call options.

411.    Although SUL recognises that the substantial losses that are the subject of its damages claim will not be incurred, provided that SUFC does indeed complete the purchase of the property assets, it contends that if that purchase is not completed on time it will have suffered loss. It therefore seeks to have the quantum of any damages payable (whether for breach of contract of conspiracy) adjourned to await the outcome of the exercise of the property call options.

412.    In my judgment, that is not an appropriate course to take. It wrongly assumes that SUFC would have performed if the property call options had been exercised in February 2018. The claim for damages was for the difference in value between the property assets with and without the benefit of exercised property call options. That difference will not arise. Moreover, in valuing the properties with the benefit of the property call options, the valuers would necessarily have to take into account the risk of non-completion of the purchase by SUFC, as at the date on which the tortious conduct caused loss, in about late January 2018. Unless the risk of non-completion by SUFC of the purchase of the property assets is greater today or the price lower, there is no loss resulting from delay. In January 2018, SUFC controlled by UTB would have been in substantial difficulty in paying for about £40 million of property assets within a year. Its ability to do so would have depended on UTB finding a new investor. Such an investor would have been buying into a loss-making Championship football club with no certainty of promotion to the Premier League and a liability to pay for the property assets. At the current time, SUFC has the benefit of very substantial revenue that Premier League clubs enjoy and, inevitably, a much higher prospect of attracting further capital investment. It is impossible therefore to

conclude that there is a greater risk of non-completion of the purchase of the property assets. There is no argument that the price will be lower. There is therefore no reason to adjourn assessment of loss to a later date.

413.   For the reasons given above, I dismiss the claim for conspiracy to cause loss to SUL by unlawful means. Although UTB, Prince Abdullah and Mr Giansiracusa did combine to try to avoid the exercise of the property call options, they were not conspiring to act unlawfully and their attempt to avoid the contractual obligation in clause 9.1.12 of the ISA was unsuccessful. Further, no loss was caused by any such combination; alternatively, in view of the voluntary exercise by SUFC of the property call options in July 2019, no loss that has been claimed exists.

## J.   Unfairly Prejudicial Conduct: the Section 994 Petition

414.   In its Petition, SUL seeks an order that it be entitled to buy all UTB's shares in Blades, or an order setting aside the Call Option Notice or the contract of sale and purchase, or both. It does so on the basis that UTB, Prince Abdullah and Mr Giansiracusa have conducted the affairs of Blades in a manner that is unfairly prejudicial to SUL's interests as a member of the company, such that the relief claimed is appropriate. During the course of the trial, SUL abandoned its case that the price for its purchase of UTB's shares should be £5 million. It now accepts that the price should be the market value of UTB's holding.

415.   The alleged prejudicial conduct in part mirrors the allegations that are the subject of the conspiracy claim, but there are further allegations that are relied upon. SUL accepts that the Call Option Notice or the contract of sale and purchase can only be set aside, by way of relief granted under section 996 of the Companies Act 2006, if unfairly prejudicial conduct caused SUL to serve the Call Option Notice. However, for the same reasons that I have given in Part I above, it was not the case that any unfair or wrongful treatment of Kevin McCabe by or on behalf of UTB caused him to serve the Call Option Notice. The causative link required is wholly absent, so there is no basis on which the Call Option Notice can be set aside.

416.   The allegations of unfairly prejudicial conduct and the relief that SUL seeks are therefore of significance only if I decline to grant specific performance of the contract of sale and purchase, leaving SUL as owner of 50% of the shares of Blades. Otherwise, SUL will be selling its shares at a price that it chose, not a price that reflects the market value of those shares diminished by any conduct of the Respondents. I will in any event make factual findings about the allegations of unfairly prejudicial conduct.

417.   It is unnecessary for me to consider again the allegations of quasi-partnership and breaches of an implied obligation of good faith, which I have addressed and rejected in earlier parts of this judgment. I have also rejected the argument that UTB and those acting on its behalf were seeking to cause SUL to give up its interest in Blades and SUFC. The remaining allegations on which SUL relies are the following:

i) Attempting to defeat an objective of the ISA, namely the reunification of the property assets with SUFC, so as to create a dispute that made SUL's shares in Blades unmarketable;

ii) Acting in such a tricky way in relation to the attempted avoidance of clause 9.1.12 that SUFC was likely to be brought into disrepute;

iii) Taking advantage of SUL's misunderstanding about the effect of service of the Call Option Notice;

iv) Misappropriation of SUFC funds in seeking to continue the employment of Mr Bettis;

v) Breach of fiduciary duty by Mr Giansiracusa's email to Mr Bettis dated 1 December 2017 informing him that he had a claim against SUFC;

vi) Abuse of power in relation to the appointment of Mr Ratcliffe as CFO in November 2017;

vii) Prince Abdullah's conduct in relation to the Charwell loan, viz. his accepting a bribe.

418. The starting point is to address to what extent these matters amount to management of the company's affairs. A shareholder is not entitled to complain about the way in which another shareholder exercises rights appurtenant to their shares unless it amounts to management of the company's affairs, as distinct from a shareholder's affairs. SUL submits that "management … must obviously include a shareholder exercising its powers qua shareholder" but this is far too broad a proposition. As the example then given by SUL establishes, it is only if the votes or rights of a shareholder are used to determine how the company's affairs are conducted, for example by passing a resolution in general meeting or by removing or appointing a director to the board, that it amounts to management of the company's affairs.

419. Even if a shareholder's actions do amount to managing the company's affairs, another shareholder will not be "entitled to complain of unfairness unless there has been some breach of the terms on which he agreed that the affairs of the company should be conducted" (per Lord Hoffmann in O'Neill v Phillips [1999] 1 WLR 1092 at 1098H). There must not only be material prejudice to the interests of SUL as a shareholder but the prejudice must be unfair, that is to say not justified by the terms that have been agreed or by the conduct of SUL.

(i) Creating a dispute by attempting to avoid clause 9.1.12

420. In relation to the first allegation, the steps taken by UTB in an attempt to avoid triggering clause 9.1.12 of the ISA do arguably relate to management of the affairs of Blades because SUFC had existing rights (under the property call options) and contingent obligations (under clause 9.1.12 of the ISA) in relation to the property assets, of which it was also the lessee. What UTB was seeking to do would directly affect those interests and obligations. Further, it was part of the scheme of the ISA (to which Blades and SUFC were parties) that the property assets would be reunited with SUFC when a shareholder gained super-majority control.

421.   However, it is impossible to discern prejudice caused to SUL as a shareholder of
       Blades by not exercising the property call options in February 2018. In the first place,
       the effect was that SUL remained a shareholder, when it would otherwise have had to
       sell its shares in February 2018. If any prejudice was caused to SUL by delaying the
       exercise of those options, it was caused to SUL as the owner of some of the property
       assets, which ownership predated the ISA. The interests of SUFC (and therefore of
       Blades and its shareholders) were for clause 9.1.12 not to be triggered and for it to be
       able to exercise the property call options at a time that suited it – a right that it had
       under the property call options themselves. That is so for two principal reasons.
       First, SUFC had the benefit of leases of the main property assets at concessionary
       rents (in July 2017 Kevin McCabe was seeking a market rent of £1.65 million p.a. for
       the Stadium and Academy, for which SUFC was obliged to pay £310,000 p.a.). It
       was SUFC (and therefore Blades) that benefited from that arrangement and SUL only
       in its capacity as landlord that was disadvantaged by it. While SUFC remained a loss-
       making Championship club, it was clearly in SUFC's and Blades' interests for the
       subsidised rental arrangement to continue, since the rental liabilities were a much
       lower sum than likely finance costs of paying for the property assets.

422.   Second, if the property call options were triggered at a time when SUFC could not
       afford to pay the purchase prices, it would become insolvent. At the time of the
       attempts by UTB to avoid triggering clause 9.1.12 (including the letter of Jones Day
       dated 31 January 2018 that was a repudiatory breach of the ISA), Blades had no
       immediate prospect of paying around £40 million for the property assets, and the
       chances of Blades controlled by UTB being able to do so within 12 months were
       speculative. Even if (which is not the case) there was unfair prejudice to SUL as a
       shareholder, that prejudice has now been removed by the voluntary exercise of the
       property call options by SUFC and no further relief is needed or appropriate.

423.   SUL attempts to get round this difficulty by characterising the prejudice as the
       creation of a dispute that made its shares in Blades unmarketable. Since UTB was
       unaware of SUL's detailed negotiations with ALK until disclosure in these
       proceedings, it is not credible that UTB created a dispute to stymie those negotiations.
       UTB's conduct did create a dispute from about 31 January 2018 but by then SUL had
       offered to sell its shares to UTB for £5 million. If there had been no dispute SUL
       would have had to complete the sale of its shares to UTB on 6 February 2018 for £5
       million. It could not then have sought to market its shares anywhere else. Its ability
       to sell its shares to ALK or to any other purchaser depended on its being able to set
       aside (or resist enforcement of) the contract of sale and purchase with UTB.
       Moreover, SUL was able to agree terms with ALK even though a dispute had arisen.
       SUL has identified no prejudice that it has suffered as a result of the delay in
       completion of the contract of sale and purchase and, if that contract is valid and
       enforceable, it cannot sell its shares elsewhere. If the contract is not enforced, SUL is
       free to sell its shares to ALK or another person and there is no evidence that the value
       of the shares has been affected by the dispute with UTB or that ALK has lost interest.
       There is therefore no prejudice and no relief is justified.

       (ii) Alleged tricky conduct of UTB in relation to service of counternotice

424.   The second allegation is that SUFC has been or was likely to be brought into
       disrepute by the tricky conduct of UTB. This allegation therefore also relies on
       SUL's shares in Blades being worth less or being less marketable as a result of the

conduct in question. The tricky conduct is understood to refer to the attempts by UTB to avoid informing SUL before 26 January 2018 that it was intending to serve a counternotice and to conceal the Scheme. However, nothing that UTB did in terms of concealing its intentions from SUL or misleading SUL amounts to management of the affairs of Blades.

425.    The short answer to the remainder of this allegation is that there is no evidence that anything that UTB did that gave rise to the legal dispute has brought SUFC into disrepute so as to affect the value or marketability of SUL's shares. If SUL has to sell its shares to UTB, the price was fixed on 29 December 2017 by SUL's own act. If it is free to sell its shares (or some of them) to ALK then there is nothing to show that SUL's shares are worth less or that ALK reduced its price as a consequence of anything that UTB did. Neither of the share valuers suggested that the current market price is affected by the circumstances in which the dispute arose. Nor is there any evidence that if SUL is able and elects to keep its shares in Blades, those shares are worth less on account of the way in which UTB, Prince Abdullah or Mr Giansiracusa have conducted the affairs of Blades or SUFC. SUL submits that news about the way in which the McCabes have been treated by UTB will be liable to bring SUFC and Blades into disrepute because of adverse fan reaction, adverse media comment and the perception of strife at the Club. This however was mere supposition and assertion: there was no evidence capable of supporting it.

(iii) Attempts to avoid clause 9.1.12 ISA

426.    The third allegation is that UTB took advantage of a mistake by SUL about the effect of service of the Call Option Notice. In so far as this differs from the first allegation, it is because it focuses on the element of taking advantage by UTB of SUL's mistake and so alleges a different kind of impropriety. The mistake was a mistake by SUL, as shareholder, as to the motives of the other shareholder, or as to the scope within the ISA to avoid triggering clause 9.1.12. UTB took certain steps as shareholder: it transferred shares to UTB 2018 and agreed to sub-sell shares acquired from SUL, to try to take advantage of that mistake. But this alleged impropriety – as distinct from the alleged breach of contract – has nothing to do with UTB, Prince Abdullah or Mr Giansiracusa's managing Blades' affairs. In so far as this allegation is based on steps that UTB took to avoid clause 9.1.12, the allegation has already been dealt with in the paragraphs above dealing with the first and second allegations.

(iv) Improper use of SUFC monies to pay Mr Bettis

427.    The fourth allegation is that UTB, Prince Abdullah and Mr Giansiracusa misappropriated the funds of SUFC by their attempts to keep Mr Bettis employed. There are two components to this allegation. The first is that it was obvious from March 2017 that Mr Bettis could not properly perform the work of CEO of SUFC from Los Angeles and that the attempt by UTB to retain his services wasted money and delayed the appointment of a successor. The second is that Mr Giansiracusa and UTB caused Mr Bettis to be paid for November 2017 at a time when he was no longer working as CEO and had agreed to leave his position.

428.    In the light of my findings about these matters, it is impossible for SUL to argue that money was misappropriated on payment of Mr Bettis's wages. At no time did Mr Bettis resign, nor was he sacked or made redundant. He therefore remained employed

as CEO. The opportunity for the board of SUFC to call on Mr Bettis to resign, or terminate his employment, was the October 2017 board meeting when Mr Tutton did not move that either of those things be done and there was in any event no support on the board for his and Kevin McCabe's views. Until then, Mr Bettis was unarguably retained as CEO and the only question was on what date he should be requested to leave.

429.    UTB's decision from about May 2017 to retain Mr Bettis in part-time employment was its own judgment. That judgment was backed by all the directors of SUFC, who signed the June 2017 board resolution. Although Kevin McCabe and Mr Tutton (but not Mr Green or Mr Bettis) considered that it was in the best interests of SUFC for Mr Bettis to go, the UTB directors held a different view. The argument that this decision was taken by the UTB-appointed directors for improper reasons – to keep a friendly person in charge of SUFC – was not substantiated at trial. Prince Abdullah and Mr Giansiracusa both recognised the abilities and suitable temperament of Mr Bettis and his value to the Club, even on a part-time basis. In my judgment, they formed their views in the best interests of SUFC and not only in their own narrow interests, and their judgment has been wholly vindicated by the success that Mr Bettis has subsequently enjoyed at the Club with the support of both sides of this dispute. Whether or not Mr Bettis, supported by Mr Birks, was able to do a good enough part-time job while based in Los Angeles was a judgment call on which Kevin McCabe and Prince Abdullah genuinely differed. But the allegation that the UTB directors were acting in bad faith or in breach of their fiduciary duties is not proved.

430.    Moreover, there was no prejudice caused to SUL as a shareholder in Blades by Mr Bettis's retention until December 2017. His retention if anything saved SUFC money, compared with the cost of recruiting and remunerating a new CEO at a much higher rate of pay than Mr Bettis was being paid. It was clear at the time that Mr Birks was not ready to do the CEO job at the Club. SUL's shares are (subject to the contract of sale and purchase) now worth substantially more than they were in 2017, part of which is attributable to Mr Bettis's skill in running the Club on a shoestring budget. Removal of Mr Bettis in 2017 might well have meant that he did not return in 2018, which could have caused the Club to be less successfully run during the important 2018-19 season.

431.    The contention that Mr Giansiracusa was wrong to pay Mr Bettis his November salary is unsustainable. Mr Bettis remained employed; to do otherwise would have been unlawful. He had not agreed to leave: he had indicated that he would resign if the owners refused to support his staying. In the event, that question was not resolved at the October 2017 board meeting or afterwards, despite Kevin McCabe's unilateral decision to remove him from the payroll. Mr Bettis did then resign in December 2017 when he discovered how he had been treated. UTB's insistence in doing the right thing in terms of Mr Bettis's pay at that time contributed to his willingness to return to the position of CEO when he came back to the United Kingdom in 2018.

(v) Advice to Mr Bettis about his unlawful dismissal

432.    The fifth allegation is that Mr Giansiracusa was in breach of the fiduciary duties that he owed Blades (and SUFC) in advising Mr Bettis that he had a claim against SUFC. I consider that there was technically a breach of duty: it could have been harmful to the interests of SUFC (and Blades) for an acknowledgment of the validity of a claim

114

to have been made in writing by one of its directors. Mr Giansiracusa's email may have been well-intentioned as a whole – with a view to persuading Mr Bettis to stay and so avoid the possibility of a claim – but nevertheless his acknowledgement was incautious and wrong. I do not consider that Mr Giansiracusa could have thought that telling Mr Bettis in writing that he had a valid claim would cause him not to file a claim and so would serve the best interests of the company. If Mr Bettis did not file a claim it had nothing to do with the fact that he was told that he had one. However the short answer to this complaint is that it caused absolutely nothing and SUL was in fact not prejudiced as a shareholder at all. It would therefore be quite wrong to grant any relief on the basis of this minor breach of duty.

(vi) The appointment of Mr Ratcliffe

433.    The sixth allegation is abuse of power in relation to the appointment of Mr Ratcliffe as CFO in November 2017. This matter is rather more complex. The appointment of a finance director plainly related to the management of the affairs of Blades and SUL, even though it was UTB that was given the right by clause 5.11 of the ISA to make the appointment. SUL complains that UTB and Mr Giansiracusa acted in excess of authority conferred on UTB by (a) taking control of the appointment of recruitment consultants, The Savannah Group, and requiring their fees to be paid by SUFC; (b) seeking to impose a principal reporting line directly between Mr Ratcliffe and Prince Abdullah, and (c) agreeing a salary in excess of the limits imposed by schedule 4 to the ISA.

434.    The first question is the true interpretation of clause 5.11 of the ISA. In my judgment, that clause gives UTB the right on behalf of Blades and SUFC to appoint and agree the terms of appointment of a finance director of Blades and SUFC. It does not expressly give UTB the right to instruct consultants to search for and find suitable candidates, but in my view it is implicit that UTB must be entitled to instruct such consultants, otherwise - contrary to the best interests of the companies - UTB would be hampered in finding the right candidate. The clause does not expressly state that the director is to be remunerated by the companies, but that is obvious. I consider that it is similarly obvious that the fees of the consultants are to be paid by the companies and not by UTB. That is because UTB is acting on behalf of the companies in searching for and appointing their finance director. However, UTB is entitled to have regard to its own preference in selecting the candidate and is not exercising a fiduciary power in making its choice.

435.    I consider that remuneration is a matter for UTB to decide, provided that it is acting in the best interests of the companies in doing so (and in determining the other terms of appointment). Although clause 9.1.10 of and schedule 4 to the ISA would otherwise require majority approval of the appointment of any employee earning over £40,000 p.a., it is implicit that UTB does not need to obtain such approval before appointing the finance director, otherwise SUL could frustrate the right conferred by clause 5.11 simply by withholding its approval. It is therefore necessary for UTB to have the right – subject to its fiduciary responsibilities – to approve the remuneration.

436.    The right to appoint a finance director does not, however, mean that the director is anything other than the finance director of the companies, and there is no justification for reporting lines and employee's duties that are different from those that would be appropriate were the candidate selected and appointed by the boards of the

115

companies. It is self-evidently appropriate that the finance director report to the CEO and to the board.

437.    In my judgment, therefore, UTB were right in contending that it and not the board of Blades or SUFC had the right to agree remuneration of the finance director and appoint consultants and have them remunerated by Blades or SUFC. In any event, at the October 2017 board meeting SUL agreed to leave it to UTB to decide in good faith at the levels quoted. UTB was wrong in contending that it was entitled to impose a special reporting line to Prince Abdullah.

438.    The next question is whether Mr Giansiracusa was acting honestly and mistakenly in seeking to impose that reporting line, or whether this was something that he consciously required in the interests of UTB rather than the interests of the companies. Mr Giansiracusa had provided the reporting lines (at Mr Birks's request) from under a palm tree, while on holiday in Sri Lanka. His explanation was that he saw it in terms of the right to dismiss, and that Mr Ratcliffe would be accountable to UTB in that sense. He also understood that it was the purpose of clause 5.11 to give UTB a direct reporting line, and that that was not inconsistent with directors' fiduciary duties because it was all negotiated in advance in the ISA.

439.    Given the view that I formed of Mr Giansiracusa as a witness generally, I am unable to find that he was acting dishonestly on this point. I consider that he was acting in the genuine but mistaken belief that the ISA entitled UTB to have those reporting rights. He was not analysing the issue in a solicitor's office but from a beach holiday where, as he said, he was not inclined to get deeply involved and was using "a kind of shorthand" in the response that he sent to Mr Birks. In his email to Catherine Frost, copied to Mr Tutton, he acknowledged that the reporting lines were unusual but said that it was a contractual right and that good corporate governance was protected by the "dotted line" to the CEO. I therefore find that there was no breach of fiduciary duty in the actions that Mr Giansiracusa took in relation to Mr Ratcliffe's contract.

440.    Regardless of this, there was no substantial prejudice caused to SUL as a shareholder by the terms of Mr Ratcliffe's appointment. When asked about them in evidence, Kevin McCabe said that they did not cause him concern and that he had only been concerned to ensure that Mr Ratcliffe reported to Mr Birks, not to a CEO who was no longer in post. There was no evidence at all that any difficulty during Mr Ratcliffe's short time at the Club (before illness caused him to have to resign) was caused by the reporting lines specified by UTB. In those circumstances it would be inappropriate to grant any relief in this regard in any event.

(vii) The alleged bribing of Prince Abdullah

441.    The final and most substantial aspect of the unfairly prejudicial conduct on which SUL relies is the matter of the alleged bribe accepted by Prince Abdullah from Dr Rakan. This issue was the most significant factual dispute at the trial and was the focus of several interim applications before trial. The case that SUL has advanced based on bribery has materially changed during the course of the proceedings and even during the trial itself. It is appropriate at the outset to note what the case originally was and what it now is.

442.    The pleaded case of SUL in its Petition, filed in May 2018, was that:

i)    Prince Abdullah procured an interest-free loan from a company that was
      owned and controlled by Dr Rakan, in anticipation that Dr Rakan would
      become an investor in SUFC and the loan would be converted to equity.

ii)   The business of Dr Rakan's company, Sela Sport, was such that Prince
      Abdullah, as a government minister for youth and sport, would be in a position
      of potential conflict of interest if Dr Rakan bestowed a benefit on him.

iii)  Charwell, UTB and SUFC entered into a novation agreement which provided
      for UTB to assume liability for £1.6 million of the loan.

iv)   Contrary to what Mr Tutton was informed by Mr Birks on 20 April 2018, UTB
      did not repay its share of the loan on the term date and Jones Day subsequently
      refused to answer questions about whether UTB's debt had been repaid, in
      order to conceal the fact that it had not been repaid.

v)    The pleaded case then proceeds as follows:

      "53. It is to be inferred that the Charwell Loan was a means by
      which Dr Rakan and Prince Abdullah disguised a payment of
      around £1.5m from Charwell to UTB (in substance from Dr
      Rakan to Prince Abdullah). That inference is to be drawn from
      the following facts:

          (a) The statement made by Prince Abdullah in January 2017
          to Mr McCabe to the effect that the Charwell Loan would
          not have to be repaid under any circumstances.

          (b) The absence of any documentary evidence showing
          payments of £100,000 or £1.5m passing from UTB to
          Charwell in repayment of its obligation arising from the
          Novation on the due date coupled with the refusal by Jones
          Day to disclose the same to the Petitioner's solicitors.

          (c) The false claim made by Mr Giansiracusa to Mr Birks to
          the effect that the full £1.6m had, as at 20th April 2018, been
          repaid.

      54. In the premises it is to be inferred that the Charwell Loan
      amounted to a benefit provided by Dr Rakan to Prince
      Abdullah in circumstances where Prince Abdullah's interests as
      a shareholder in the Company and UTB conflicted with his
      duties to the Saudi Government as Minister for Youth and
      Sports. In these circumstances the payment amounted to a
      bribe.

      55. Further or alternatively whilst the precise arrangements and
      understandings between Prince Abdullah and Dr Rakan
      regarding the Charwell Loan are unclear, they are at best
      suspicious and at worst redolent of corruption such that they are
      liable to bring SUFC and the Company into disrepute.

> 56. These actions were therefore a breach of Prince Abdullah's
> duty as a director of the Company either because they were a
> bribe and/or because they were liable to bring SUFC and the
> Company into disrepute."

443. Fairly analysed, the allegation made was not that Dr Rakan had provided financial
accommodation, in the form of an interest-free loan to Blades, that benefited Blades'
cash flow and therefore benefited Prince Abdullah as a shareholder. What is alleged
is that, either from the outset or from the time of the novation agreement, or
subsequently, Dr Rakan and Prince Abdullah agreed that the Charwell loan or part of
it would not have to be repaid; that UTB did not repay about £1.5 million and that this
was a means of disguising a gift of money to Prince Abdullah. From the outset,
therefore, a very serious allegation of bribery was made against Prince Abdullah,
which was said to be a breach of fiduciary duty by the Prince and something liable to
bring SUFC into disrepute.

444. From the outset, the inference of bribery was made from rather slender factual
foundations, namely: a comment allegedly made by Prince Abdullah to Kevin
McCabe before the terms of any loan had been agreed; the absence of proof of
repayment; a failure by Jones Day to comment; and an unspecified false claim said to
have been made by Mr Giansiracusa relating to repayment of the novated part of the
loan. Nowhere is any connection between Dr Rakan and Charwell identified. It later
became clear from Mr Tutton's witness statement that it was what he must have told
SUL's solicitors about a telephone conversation with Ms Kafena, shortly after the
Charwell loan was made, that led SUL to believe that Charwell was owned by Dr
Rakan.

445. Two months after the issue of the Petition, UTB did repay to Charwell the remaining
unpaid £1.5 million of the novated loan. Although prior to trial the suggestion was
made by SUL that this repayment was only made in order to provide UTB with a
defence to the allegation of bribery and would not otherwise have been made, no
amendment was made at that stage to the allegations of bribery.

446. SUL applied without notice for an evidence preservation order against UTB, relying
on its original allegations of bribery. It was heard by a Deputy Judge on 26 July
2018. It is clear from the transcript of that hearing that the Deputy Judge sought and
was given on behalf of SUL an assurance that it was not the original loan that was
alleged to be the bribe but the novation agreement, which it was suggested was a
sham to disguise a gift to UTB. That was consistent with the pleaded case, in that the
novation agreement and the non-repayment of £1.5 million by UTB is relied upon.

447. Following disclosure and witness statements, SUL sought and was granted permission
to amend the Petition to state that Charwell was a company SUL believed was owned
and controlled by Dr Rakan. SUL clearly had some doubt about the alleged
connection between Charwell and Dr Rakan, even though Mr Tutton's witness
statement unequivocally stated that he had spoken to Charwell's solicitors, who had
told him that Dr Rakan was the ultimate beneficial owner of Charwell. SUL then
issued and pursued specific disclosure and non-party disclosure applications,
including one against Charwell's solicitors, to try to find out who was the beneficial
owner of that company.

448.    Evidence in the form of disclosed confidential documents and a witness statement from Ms Kafena, a partner at those solicitors, clearly demonstrated that Dr Rakan was not connected with Charwell. But still SUL did not amend or abandon its allegations of bribery and it opened the trial on the basis that the documents suggested that Dr Rakan or Sela Sport was the controller or owner of Charwell. The matter was pursued relentlessly in cross-examination of Prince Abdullah, Mr Giansiracusa and Ms Kafena.

449.    SUL's case in written closing submissions was this:

   i)    Dr Rakan provided a financial or other advantage to Prince Abdullah regardless of whether he was the source of the monies that were lent to Blades.

   ii)   Dr Rakan used his influence to arrange a financial advantage provided by Charwell and had a connection to the advantage because his company, Sela Sport, was a potential investor/funder.

   iii)  There is a presumption of corruption and fraud, and Prince Abdullah has failed to prove that there was no connection between the Charwell Loan and his position as a minister in the Saudi Government.

   iv)   Alternatively, the Charwell Loan was sufficiently suspicious to give rise to the appearance of corruption.

   SUL therefore now seeks to contend that it was the facilitation of the original loan that was presumed to be a bribe to Prince Abdullah, or that reeked of corruption, and places no reliance on the novation agreement. In that regard, it is important to remember that Prince Abdullah was not a director of Blades or SUL at the time of the Charwell loan or at the date of the novation agreement, nor was he a Saudi minister at the date of the novation agreement. He was the ultimate beneficial owner of a 50% shareholding in Blades. Prince Abdullah only became a director of Blades again on 4 August 2017. At the times of the Charwell loan and the novation agreement, therefore, Prince Abdullah cannot have been acting in breach of a fiduciary duty.

450.    There is of course - despite the appearance likely to have been given to anyone watching in court - no issue as such in this trial about whether Dr Rakan bribed Prince Abdullah. What is in issue is whether the affairs of Blades were conducted by UTB, Prince Abdullah or Mr Giansiracusa in a manner unfairly prejudicial to SUL's interests as a shareholder of Blades.

451.    SUL confirmed in oral closing submissions that the main case being advanced in relation to bribery was a "procurement case", namely that Dr Rakan procured the Charwell loan by another, and that that procurement in the context of a possible conflict of interest and duty gave rise to a presumption of bribery. SUL contends that Prince Abdullah brought Blades into disrepute by accepting such a bribe. However, Prince Abdullah was no more than an indirect part owner of Blades at the time. No case was ever pleaded or advanced that, as an owner of UTB, Prince Abdullah (or UTB) owed Blades any kind of fiduciary duty. SUL did submit there is a heavy burden on a director of a company to ensure that his company is not exposed to any risk of prejudice by being connected with allegations of bribery or the appearance of corruption.

452. Faced with the difficulty arising from Prince Abdullah's distance from managing the affairs of Blades at the relevant times and the fact that he was not a director of Blades, SUL then sought to argue a new case, for the first time, on day 18 of the trial. This was that the unfairly prejudicial conduct was either that Prince Abdullah did not, on becoming a director of Blades, make disclosure to the Saudi authorities that he (through UTB) had benefited from the Charwell loan and then make repayment of the loan, or alternatively that he accepted the appointment as a director of Blades and SUFC when he could not distance himself from the smell of corruption. SUL complains that by accepting the appointment and not making disclosure in Saudi Arabia, Prince Abdullah brought that problem into SUFC.

453. No case was ever pleaded based on wrongful acceptance by Prince Abdullah of an appointment as director on 4 August 2017 or on failure by him to disclose to the Saudi government on or after that date that Dr Rakan had assisted in procuring a loan to Blades from a potential investor and to repay the loan. The primary factual case based on supposition and Mr Tutton's evidence has fallen away, though SUL did have a pleaded alternative case that the arrangements between Prince Abdullah and Dr Rakan were somewhere between suspicious and redolent of corruption and as such were liable to bring SUFC and Blades into disrepute. I shall refer to that alternative case for convenience as its "dubious dealings" case. That case is still pursued and is based on the making of the Charwell loan and the novation agreement.

454. Section 996(1) of the Companies Act 2006 states:

> "If the court is satisfied that a petition under this Part is well founded, it may make such order as it thinks fit for giving relief in respect of the matters complained of."

Accordingly, the Court cannot grant relief in respect of matters that are not the subject of complaint in the Petition. The jurisdiction to grant relief is purely statutory.

455. The Court has always taken a relatively strict approach to the scope of allegations in unfair prejudice petitions. In Re Lundie Brothers [1965] 1 WLR 1051, in a passage subsequently cited with approval by Dillon LJ in Re Tecnion Investments Ltd [1985] BCLC 434, Plowman J stated:

> "It seems to me that it would be wrong for the court to travel outside the allegations in the petition, particularly in a case of this sort where the petition is based on the proposition that the respondents to it have been guilty of some oppression or lack of probity."

In Re Coroin Ltd [2013] 2 BCLC 583, David Richards J said:

> "Many issues were explored in evidence and submissions have been made on them, but the parties' cases are defined by their pleadings. This is of particular importance to proceedings under s994 of the 2006 Act. The breadth of the jurisdiction means that the petition plays, in my judgment, a vital role in defining the basis of the petitioner's case. This is not a question of taking technical pleading points. The petition must be read sensibly.

> But it does mean that the grounds on which the petitioner says
> the affairs of the company have been conducted in an unfairly
> prejudicial manner should be fairly set out in the petition. Only
> in this way will the respondents be able properly to meet the
> case and the court to be able to keep the proceedings within
> manageable bounds…"

456.   In my judgment, the Court should not consider granting SUL relief on the basis of the
new case that it now advances, namely that Prince Abdullah was in breach of
fiduciary duty owed to Blades either by accepting appointment as a director in August
2017 or by not making disclosure of the loan in Saudi Arabia and repaying it at that
time. That case is wholly different in character from the pleaded case, which alleged
the wrongful acceptance of a disguised gift of money.

457.   The new case on bribery also raises an important question of law that has never been
identified in the pleaded case, namely whether Prince Abdullah's acceptance of
assistance from Dr Rakan to procure from a potential investor in Blades an interest-
free loan is something that is unlawful under Saudi law, or something that as a Saudi
minister Prince Abdullah should have disclosed. If there was no impropriety under
Saudi law in such circumstances then there was nothing for Prince Abdullah to
disclose to the Saudi government and no reason why he should have caused Blades
and UTB to repay the Charwell loan in August 2017. There was in fact evidence
from Prince Abdullah himself that the King of Saudi Arabia was aware of the Prince's
commercial activities when he appointed him and agreed that he should be entitled to
continue those activities. Whether anything more in terms of disclosure was required
is unclear because there has been no evidence about the position in Saudi Arabia,
despite the point about lack of such evidence being raised in UTB's Points of Defence
to the Petition and by UTB's solicitors on two occasions during the course of the
proceedings.

458.   The response of Mr Downes QC to this point was that SUL did not need to prove
Saudi law because the focus of the case was on the failure of Prince Abdullah to
promote the interests of the Company and that the proper law of the alleged bribe and
the allegation that Blades had been brought into disrepute was English law. Further,
he submitted that any question of foreign law that arises, whether pleaded or not,
gives rise to a presumption that foreign law is the same as English law.

459.   I accept that the proper law of the bribe that was alleged in the Petition (a disguised
gift of £1.5 million in the United Kingdom) and the proper law of the allegations of
breach of fiduciary duty is English law, but otherwise I reject Mr Downes's argument.
If, by way of change from its pleaded case, SUL was to pursue a case that Prince
Abdullah was in breach of his duty as a director of Blades in August 2017 by failing
to make disclosure then of the Charwell loan arrangements to the Saudi authorities
and failing to repay the loan, SUL needed to obtain permission to plead it. It needed to
allege in its pleading that taking the benefit of Dr Rakan's assistance in procuring in
Saudi Arabia a loan from a potential investor to Blades was a breach of the Prince's
duties as a minister, either regardless of disclosure or unless it was disclosed, and that
that breach of duty in Saudi Arabia was such as to bring Blades into disrepute. That
would have given rise to an issue of Saudi law, in response to which UTB was
entitled to plead that Saudi law applied and the content of Saudi law, and then to seek
to adduce evidence of the law. The pleading of the facts and allegation that relate to

121

an issue of foreign law gives both parties the opportunity to consider the applicable law and adduce evidence of it if different from English law. If no issue that involves foreign law is raised, or if though raised no evidence is adduced, the Court will generally apply English law or presume that the applicable foreign law is the same as English law in regard to the issue in question. The same presumption does not apply if, in closing submissions, a new allegation potentially involving foreign law is made without the other party having the chance to plead that foreign law applies and to put in evidence about it.

460.    In those circumstances, it would be wrong to allow SUL to pursue its new case on what amounted to a bribe and what Prince Abdullah had to do in terms of disclosure in order to comply with his duty as a director in August 2017.

461.    SUL is nevertheless entitled to pursue its dubious dealings case that, regardless of the precise arrangements between Dr Rakan and Prince Abdullah, the fact of their dealings was at best suspicious and at worst redolent of corruption and as such liable to bring SUFC or Blades into disrepute. However, it is now abundantly clear that (as SUL's changed primary case recognises) the Charwell loan and the novation agreement were not a disguised gift at all. Further, at those times, Prince Abdullah was an indirect co-owner not a director. SUL is therefore limited to the contention that Prince Abdullah's having dealings with Dr Rakan intended to benefit Blades, in circumstances of his being a Saudi minister and a beneficial co-owner of Blades, amounted to wrongful conduct of Blades's affairs that unfairly prejudiced SUL's interests as a shareholder.

462.    It is necessary now to make findings of fact about what happened, so that the dubious dealings allegation of SUL can be viewed in its correct light. I set out my findings in paras 463-477 below.

463.    Prince Abdullah was in contact with Dr Rakan, whom he knew as the husband of the daughter of the best friend of his mother and from certain historic business affairs, but more recently from his governmental dealings with Sela Sport, Dr Rakan's company. These were not business dealings in the sense of commercial, profit-orientated business where money changed hands (which Sela Sport did have with the Saudi Football Federation, an independent body), but arrangements made between Sela Sport and the Saudi government itself. Examples given by Prince Abdullah were liaising to arrange the presence of members of the Saudi Royal Family at cup finals; discussing the possibility of establishing a Gulf States international league event; regulation of the arrangements between Saudi football clubs and banks; and arranging sponsorship of the Saudi national team.

464.    Contact between Prince Abdullah and Dr Rakan in relation to Project Delta started in about October 2016, at which time both Kevin McCabe and Prince Abdullah were desperately keen to find a new investor for the Club. It is an inference that I draw that Prince Abdullah approached Dr Rakan, as a man who was heavily engaged in the sports industry and football in particular, to see whether he or Sela Sport would invest in Blades or whether he knew someone would do so. Sela Sport had previously been involved in organising investment in a prominent soccer team in North America. Disclosure by UTB about these early meetings and about Prince Abdullah's contact with Dr Rakan was undoubtedly deficient and so the full picture does not emerge. Further, Prince Abdullah claimed to have almost no recollection of meetings with Dr

Rakan about Project Delta, except the meeting on 9 January 2017 in Dubai. For whatever reason – and the reason may have nothing to do with this case – it was clear to me that the Prince was sensitive about disclosing his full dealings with Dr Rakan.

465.   Dr Rakan was interested in the proposal, as was another sports and media company called BeIN. Prince Abdullah had meetings with them in London in mid-November 2016. It is likely that by that time a group of potential investors had been contacted by Dr Rakan, including Saleh bin Laden and possibly a Mr Al-Amoudi from Jeddah. A non-disclosure agreement was sent by Mr Howard to the interested parties on 27 November 2016. These included Mr Alsaady of Nuovo Capital, who acted only on behalf of Mr bin Laden, not on behalf of Sela Sport or Dr Rakan.

466.   It is clear that Sela Sport was fronting the possible investment (and was at this stage still interested in taking a stake itself) and that it might create a fund or special purpose vehicle to that end, if there were multiple investors. It was convenient to others, including Mr bin Laden and Prince Abdullah, that these investors could remain hidden behind Sela Sport, and deal with the matter through Dr Rakan, at least initially. That is why the non-disclosure agreement was signed by Mr Alsaady on behalf of Nuovo Capital, which was (incorrectly) described by Mr Howard as an affiliate and representative of Sela Sport.

467.   Prince Abdullah accepted that Dr Rakan owed him favours, though there was no evidence that Prince Abdullah had improperly favoured Dr Rakan previously. It is clear that Dr Rakan was consciously assisting Prince Abdullah to find investors. The only investor (other than Sela Sport itself) to remain interested by the end of 2016 was Mr bin Laden. Prince Abdullah travelled with Dr Rakan to meet him in Jeddah on 30 December 2016. The fact that the Prince travelled to him, rather than the other way round, is revealing as regards both the status and wealth of Mr bin Laden and the need that the Prince had at that time to find favour. Prince Abdullah did his best to sell the investment opportunity and Mr bin Laden was positive about it, such that Prince Abdullah returned to Riyadh believing that the investment would happen. Prince Abdullah made it clear to Mr bin Laden that he was not selling but retaining UTB's shares in Blades. A loan of £3 million was probably not discussed with Mr bin Laden at that stage, but it is possible that an advance payment on account of the eventual investment was mentioned and very likely that a £3 million contribution to 2016/17 losses was required, as a term of the substantive deal.

468.   In meetings in Dubai on 9 January 2017, the proposed investment of Mr bin Laden was discussed with the McCabes. At that time, Dr Rakan was still considering taking a stake himself, through Sela Sport, but it was known that the main investor would be Mr bin Laden. I reject the attempt made by the McCabes in evidence to suggest that the bin Laden name was only mentioned in passing, as being of no particular significance, but I do accept that it was not clear at that stage that Mr bin Laden would be the only investor and that it was still contemplated that Sela Sport would set up some kind of investment vehicle or fund for investors.

469.   At those meetings with Dr Rakan in Dubai an advance (that could become a loan in the event that the investment did not proceed) was discussed and three tranches of payment in January, February and March were suggested. It was discussed and agreed in principle that there could be an option to capitalise the £3 million in any event, even if the loan did not proceed, but it was probably not made clear in

discussion with Dr Rakan whose option that should be. The loan and option arrangements had not previously been discussed with Mr bin Laden and no indication was given at that meeting about who would be making the loan, though it would have been understood that the loan would be made by the investor since the loan would be treated as part of the purchase price in the event that the investment proceeded. The true identity of the lender was not revealed to the McCabes at that stage.

470.    Prince Abdullah and the McCabes all believed from the discussion that Blades would have the option to capitalise the loan of £3 million if the investment did not proceed. Mr Tutton was told so by Scott McCabe immediately after the meeting and Prince Abdullah told Mr Giansiracusa so in a Whatsapp message at about the same time. (Prince Abdullah's attempt in oral evidence to characterise that as a mistake was not persuasive.) That explains why Kevin McCabe left Dubai with the understanding (which had been shared with Prince Abdullah in the final meeting) that whatever happened the loan would not have to be repaid (because Blades could choose to capitalise the loan if there were no further investment). The McCabes were, understandably, delighted with the way that the meetings had gone and already regarded the investment as very likely to proceed. They also realised that the £3 million loan would mean that they had no further need at all to fund SUFC (assuming that the investment proceeded). The £3 million was therefore very eagerly awaited by Kevin McCabe.

471.    When Mr Alsaady later sent a version of the loan agreement, it was clear that Mr bin Laden had not accepted that Blades should have the option to capitalise the £3 million advance payment. Mr Alsaady's draft stipulated that the lender should have the option. The only important thing for Kevin McCabe was to obtain the loan ("Let's have them in our cage"), which would (as he saw it) turn out in any event to be an advance payment and non-returnable, since the larger investment was going to proceed if the £3 million was paid. Kevin McCabe and his sons were equally unconcerned by the likely provenance of the loan or the circumstances in which it had been arranged. They knew and understood well that it was as a result of Prince Abdullah's authority and influence with Dr Rakan that likely investors had been found in Saudi Arabia and the advance of £3 million was being paid, but these matters were of no concern to them. Indeed, Kevin McCabe wanted Prince Abdullah to do exactly that. What mattered was that money was being advanced by a likely investor in the Club, that would enable SUL to end its subsidy of SUFC and enable, Kevin McCabe to hand on the baton and the Scarborough Group to sell the property assets back to the Club. Mr Tutton sounded a brief note of caution about the risk of being seen to take finance from the bin Laden family, but his concern was swept aside by Kevin McCabe. I find that the McCabes were so keen for the money to be paid by a potential investor that they would have brushed aside almost any concern about the circumstances in which the money was being raised, including whether it was proper for Prince Abdullah to assist in the way that he had.

472.    The loan turned out to be made by Charwell, but no steps were taken to identify the beneficial owner of Charwell before or after the loan was made. Mr Tutton only obtained afterwards from Charwell's solicitors documents that verified the identity and status of Charwell as an offshore limited company. Given what the McCabes had been told in Dubai, there was no proper basis on which SUL could assume that the loan was made by Sela Sport, although Sela Sport continued to be named as the lead

investor while the due diligence process was carried on. Charwell was a company indirectly owned by the bin Laden family. The loan agreement itself was negotiated between Charwell's solicitors and SUL on behalf of Blades. It was SUL that agreed that the loan would be made to Blades and agreed the terms of the loan agreement. UTB was not involved.

473.    The loan agreement was no more than that. The loan was interest-free for a little over a year and unsecured, but there was nothing in it that amounted to a gift to Blades. The reason why the loan was interest-free and unsecured was that it was also, at the option of Charwell, a first instalment of a substantial capital investment in Blades in return for a shareholding. The interest-free loan gave Charwell the status of a preferred investor and the opportunity to carry out due diligence and make an investment decision. In those circumstances, there is nothing surprising about the terms of the loan agreement.

474.    When the loan agreement was signed, Kevin McCabe and Mr Tutton were ecstatic ("turning cartwheels"). The £3 million was paid on time, thereby financing SUFC's deficit for the remainder of the season. Had the investment proceeded, that would have been the end of the drain on Scarborough Group resources and a source of future funding for the Club, but unfortunately it did not proceed. It became evident by the end of April 2017 that whoever the investors were they were getting cold feet. As a matter of convenience, the name of Sela Sport had continued to be used in connection with Project Delta, but I find that Dr Rakan had ceased to have any interest in being a co-investor by no later (and possibly earlier) than April 2017. Further, although in February 2017 Dr Rakan was still considering the possibility of investing, the £3 million loan was not funded in any way by him or by Sela Sport.

475.    By June 2017 Project Delta was dead. That left Blades having to deal with a loan that could not remain as such on the balance sheet if the Club was to comply with the Salary Cost Management Protocol. At that stage, Mr Alsaady was reluctantly persuaded by Mr Tutton to take to Mr bin Laden a proposal to novate part of the Charwell loan to UTB. The purpose of that was to capitalise the excess borrowing, to comply with the Protocol, and at the same time to equalise the capital contributions of SUL and UTB to Blades, resulting in the issue of £4 million of new shares to each of them. However, the main impetus was to avoid if possible (and then terminate urgently) the embargo on transfer activity that had been placed on the Club as a result of the Charwell loan.

476.    With Charwell's agreement, the novation agreement was belatedly made. Charwell insisted on Prince Abdullah standing as guarantor for UTB's £1.6 million part of the debt. Blades remained liable under the original loan agreement for £1.4 million (the continued existence of this debt was warranted by Mr Tutton, who signed on behalf of Blades). Both sums were to be repaid by 30 April 2018.

477.    The novation agreement was exactly what it appeared to be. It was not a disguised gift, nor was it understood that Charwell would not enforce the novated loan. The evidence is clear that this was an arm's length transaction. When UTB did not repay its part of the loan on time, this was not by agreement with Charwell but because Prince Abdullah needed time to release the necessary funds. I accept Prince Abdullah's explanation that, although he had £5 million in Jones Day's client account waiting for the delayed completion of the contract of sale and purchase of SUL's

shares in Blades, it was not sufficiently clear until about June 2018 that those funds would not be required in the short term and so could be used to repay Charwell. In the event, UTB had to pay something over the £1.5 million then outstanding (£100,000 having been prepaid in March 2018 as a sign of goodwill) in order to resolve a dispute about interest and the exchange rate used to calculate the dollar equivalent of £1.5 million. There was no question of UTB being treated favourably, or as a special case, by Charwell.

478.   In view of those findings of fact, SUL's case on dubious dealings amounts to this: that at a time when he was a government minister Prince Abdullah used his influence to persuade Dr Rakan to help him source an arm's length investor in Blades – possibly a purchaser of SUL's shares in Blades – from which investment (if it was made) UTB would benefit as a shareholder of Blades. The loan of £3 million only arose at a late stage, as part of the discussions between Dr Rakan, Prince Abdullah and the McCabes in Dubai on 9 January 2017. Prince Abdullah was in reality acting (with the express or at least tacit agreement of SUL) to seek to sell some or all of SUL's shares in Blades and some of the property assets, for the benefit of SUL, Blades and UTB. The loan that was agreed was not a free-standing loan on favourable terms: it was an advance on account of a hoped-for investment in Blades that would be treated as a short-term, interest-free loan if the investment did not proceed. The financial benefit that Charwell gave Blades, in the form of a £3 million advance, was to induce Blades and SUL to treat favourably with Charwell for the sale of a substantial interest in the Club.

479.   The benefit that Prince Abdullah (as an indirect shareholder in Blades) received from Dr Rakan or from Charwell is therefore not one that by its nature calls out for an explanation or investigation. If one is looking for conduct that is redolent of corruption there must be something that puts Prince Abdullah in a real (as opposed to fanciful) position of potential conflict between interest and duty: see Novoship (UK) Ltd v Mikhaylyuk [2012] EWHC 3586 (Comm), per Christopher Clarke J at [106]. The benefit that Dr Rakan conferred was putting Prince Abdullah in touch with potential investors in Blades. I agree with Mr Gledhill QC that that is of a wholly different order of magnitude than the pleaded allegation that Dr Rakan secretly paid Prince Abdullah £1.5 million.

480.   The dealings between Dr Rakan and Prince Abdullah were not, in my judgment, such as to give rise to a real risk of conflict of interest and duty or to any perception of impropriety: Dr Rakan was helping Prince Abdullah to find a potential arm's length investor.   Even if they were, there is no evidence of prejudice to SUL as a shareholder arising from that perception, though SUL made sustained allegations of prejudice that could arise from the Club being associated with financial impropriety. As far as the evidence is concerned, SUL offered to buy the shares of UTB on 29 December 2017 for £5 million with full knowledge of all the circumstances of the Charwell loan (and the real possibility that Charwell was associated with Mr bin Laden), and was happy to acquire full control of Blades, or sell its shares to UTB if a counternotice was served. The figure of £5 million had nothing to do with the true market value of a 50% holding in Blades. If SUL does now sell its shares to UTB that will be either at the price it chose when it served its Call Option Notice or at a price determined on the basis of valuation evidence that it and UTB called at trial. This evidence made no deduction or adjustment of any kind for a diminution in the value